# Exhibit 159

**DRAFT 1 – Copy for SafetyandCareCommitment Website**

*On Home Page of SafetyandCareCommitment.com website, at bottom right, under Key Topic, replace Microbeads with the following copy:*

## Key Topic

Talc has over 100 years of ~~safe~~ use in personal care products. Learn more …

*(Link to Ingredient Policies page, insert new item under "Other Materials" and after "Triclosan", copy to read)*

## Talc

## The Use of Cosmetic Talc in Personal Care Products

Few ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc, which has been used for over 100 (I don't think we can link cosmetic talc to 100 years of use) years by millions of people around the world. Talcum powder is made from the mineral, talc. In a powder form, talc helps reduce friction, making it useful for keeping skin dry and helping to prevent rashes. Talc is a common ingredient found in cosmetic products such as baby powder and adult body and facial powders, and in a range of other consumer products such as toothpaste, chewing gum, and aspirin.

JOHNSON'S® talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. Our talc-based consumer products are~~have always been~~(we cannot say "always") asbestos free, as confirmed by regular testing conducted since the 1970s. We also make JOHNSON'S® Baby Powder that contains cornstarch.

## Our Position on Talc

At the Johnson & Johnson Family of Consumer Companies, our confidence in the using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities. Various agencies and governmental bodies have examined whether talc is a carcinogen, and none have concluded that it is. These include the U.S Food and Drug Administration (FDA) and National Toxicology Program, part of the U.S. Department of Health and Human Services. California does not list cosmetic talc as a carcinogen under its Prop 65 list of substances identified as possible causes of cancer.

The Cosmetic Ingredient Review (CIR) is an independent scientific body that assesses the safety of ingredients and publishes results in peer-reviewed science journals.  In April 2013 it published its most recent assessment of talc used in cosmetics.  Its Expert Panel reviewed all information, data, studies spanning from 1976 through today, and concluded that talc was safe for use in personal care products.  The U.S. FDA considers the CIR review, as well as other information, in policy making.

Various independent researchers have studied talc and perineal use and found it to be safe.  A detailed meta-analysis done by Muscat/Huncharek in 2007, reviewed all available studies and showed no cause and effect relationship between perineal use and ovarian cancer.  In 2011, Neill et al also was not able to find any association between perineal talc use and ovarian cancer.  Publications based on the Nurses' Health Study, the only large-scale prospective study looking at talc and ovarian cancer, have found no causal relationship between talc and ovarian cancer (Gertig 2000; Gates 2009).

## References and Resources:

*NOTE TO CAROL/JAY:*  Besides those below, there are other links to consider, but they are not as definitive or supportive and could be interpreted as suggesting a causal effect, such as the American Cancer Society and IARC.  Even some of the studies we cite send mixed messages.  For example, Gertig et al concludes:
"Our results provide little support for any substantial association between perineal talc use and ovarian cancer risk overall; however, perineal talc use may modestly increase the risk of invasive serous ovarian cancers."

National Toxicology Program
http://ntp.niehs.nih.gov/index.cfm?objectid=03CA6E02-FBD5-5C52-9699F9DD00863ED7

Cosmetic Ingredient Review
http://www.cir-safety.org/sites/default/files/talc122012tent_faa_final%20for%20posting.pdf

Gertig, Prospective Study of Talc Use and Ovarian Cancer, *Journal of the National Cancer Institute*
http://jnci.oxfordjournals.org/content/92/3/249.full

Neill, Use of talcum powder and endometrial cancer risk, *Cancer Causes and Control*
http://rd.springer.com/article/10.1007%2Fs10552-011-9894-5

Muscat, Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology, *European Journal of Cancer Prevention*
http://www.ncbi.nlm.nih.gov/pubmed/21712717

From Homer:

http://www.fda.gov/Cosmetics/ProductandIngredientSafety/SelectedCosmeticIngredients/ucm293184.htm?source=govdelivery

FDA sponsored a workshop in 1994 ("ISRTP/FDA Talc workshop").  I don't have a copy of the report but there are many references to the conclusions, such as those below.    Experts agreed that there was no evidence to conclude that talc is capable of reaching the ovaries.  And … the experts attending the ISRTP/FDA Talc workshop concluded that the epidemiology studies did not demonstrate a real association between talc and ovarian cancer.

http://www.cosmeticsinfo.org/HBI/26

http://www.thefactsabout.co.uk/content.asp?pageid=8&menuname=Talc&menu=hidden

**File Provided Natively**

Protected Document--Subject to Protective Order

JNJTALC000067661

# JNJTALC000067661

## Metadata

| | | |
|---|---|---|
| **Applic** | Microsoft Word Document | ORIGINAL |
| **AttachCount** | 0 | ORIGINAL |
| **Author** | pballman | ORIGINAL |
| **BegAttach** | JNJTALC000067661 | ORIGINAL |
| **Confidentiality** | Y | ORIGINAL |
| **Custodian** | Goodrich, Carol | ORIGINAL |
| **DateCreated** | 10/07/2013 07:43 PM | ORIGINAL |
| **DateMod** | 10/07/2013 07:43 PM | ORIGINAL |
| **DocExt** | doc | ORIGINAL |
| **DocumentType** | E-Doc | ORIGINAL |
| **EmailDateSort** | 10/07/2013 07:43 PM | ORIGINAL |
| **EndAttach** | JNJTALC000067661 | ORIGINAL |
| **FileName** | Talc website copy 10 7 13.doc | ORIGINAL |
| **FileSize** | 39936.00 | ORIGINAL |
| **HashValue** | 967ccb81646ba286c7973fdb7d929087 | ORIGINAL |
| **LastModBy** | Carol Goodrich | ORIGINAL |
| **ProdVol** | TALC_PROD_027 | ORIGINAL |

# Exhibit 160, part 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ALAMEDA
---oOo---

TERESA ELIZABETH LEAVITT and DEAN J. MCELROY,
Plaintiffs,
vs.
JOHNSON & JOHNSON, et al.,
Defendants.
_______________________/

No. RG17882401

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
---oOo---

PUI FONG and THAI WONG,
Plaintiff,
vs.
JOHNSON & JOHNSON, et al.,
Defendants.
_______________________/

JCCP CASE NO. 4674
No. BC675449

TRIAL PRESERVATION
VIDEOTAPED DEPOSITION OF JAMES PETER MITTENTHAL
(PMQ/COR Johnson & Johnson; Johnson & Johnson Consumer, Inc.)

VOLUME II, Pages 219 - 443

Taken before EARLY K. LANGLEY, B.A., RMR, RSA, CLR
CSR No. 3537

October 18, 2018

Aiken Welch Court Reporters
One Kaiser Plaza, Suite 250
Oakland, California 94612
(510) 451-1580/(877) 451-1580
Fax: (510) 451-3797
www.aikenwelch.com

# I N D E X

| | PAGE |
|---|---|
| JAMES PETER MITTENTHAL | 225 |
| DIRECT EXAMINATION BY MR. SWANSON (Cont'd) | 225 |

# E X H I B I T S

| EXHIBIT NO. | | PAGE |
|---|---|---|
| Exhibit 20 | Spreadsheet, "Additional Investigation Regarding Scope of Searches Conducted Mid-2018 for Category 3 and 4 Methods" | 232 |
| Exhibit 21 | Spreadsheet re history of Johnson & Johnson holds, consumer talc | 242 |
| Exhibit 22 | "Mittenthal -- Leavitt/Fong Deposition Topics" | 246 |
| Exhibit 23 | WWRIM Policy, Version 4.0, 12/31/2014 | 247 |
| Exhibit 24 | WWRIM Standard RIMS-1, Version 5.0, 12/31/2016 | 247 |
| Exhibit 25 | WWRIM Policy 1.0, 7/31/2009 | 248 |
| Exhibit 26 | Mr. Mittenthal's notes for Hayes deposition | 260 |
| Exhibit 27 | WWRIM Policy Version 1.1, 9/30/2009 | 289 |
| Exhibit 28 | WWRIM Policy, Version 2.0, 1/31/2011 | 289 |
| Exhibit 29 | WWRIM Policy, Version 3.0, 12/31/2013 | 289 |

| | | |
|---|---|---|
| Exhibit 30 | Records Retention Schedule | 311 |
| Exhibit 31 | Document entitled "People Interviewed in Talc Fact Finding" | 381 |
| Exhibit 32 | Document preservation notice, 11/11/1999, Krushinski v JJCP | 416 |
| Exhibit 33 | Document preservation notice, 12/15/2009, Deane Berg v JJCP | 425 |
| Exhibit 34 | Legal hold notice, Chesteen v JJCC, 2/6/2014 | 429 |
| Exhibit 35 | Revised Legal Hold Notice, 5/14/2014, Estrada v JJ and JJCC | 430 |
| Exhibit 36 | Legal Hold Notice, 7/19/2014, State of Mississippi v J&J and JJCP | 430 |
| Exhibit 37 | Talc Ovarian Cancer PL Litigation, Updated Legal Hold Notice | 431 |

DEPOSITION OF JAMES PETER MITTENTHAL

BE IT REMEMBERED, that pursuant to Notice, and on October 18, 2018, commencing at the hour of 9:05 a.m., in the offices of Kazan, McClain, Satterley & Greenwood, 55 Harrison Street, Suite 400, Oakland, California 94607, before me, EARLY LANGLEY, a Certified Shorthand Reporter, State of California, personally appeared JAMES PETER MITTENTHAL, produced as a witness in said action, and being previously duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs:

MARK SWANSON
Kazan, McClain, Satterley & Greenwood
55 Harrison Street, Suite 400
Oakland, California 94607
(510) 302-1000
Mswanson@kazanlaw.com

For the Defendants Imerys Talc America, Inc.; Cyprus Mines Corporation; Imerys Talc Vermont, Inc.; Specially appearing for Defendant Imerys USA, Inc.:

ERIN CARPENTER
Dentons US LLP
4675 MacArthur Court, Suite 1250
Newport Beach, California 92660
(213) 623-9300
erin.carpenter@dentons.com

For the Defendants Johnson & Johnson; Johnson & Johnson Consumer, Inc.:

CHRISTOPHER COX
RICHARD T. BERNARDO (Via phone)
Skadden Arps, Slate, Meagher & Flom, LLP
4 Times Square
New York, New York 10036
(212) 735-3453
christopher.cox@skadden.com
richard.bernardo@skadden.com

Also present:

Jonathan Jaffe
ESI Consultant

Jim Partridge
Tele-Video Production Services

--oOo--

P R O C E E D I N G S

--oOo--

THE VIDEOGRAPHER: We're on the record. My name is Jim Partridge. I'm a qualified video technician video recording on behalf of Tele-Video Production Services.

The court reporter today is Early Langley of Aiken Welch Reporters.

Today's date is October 18, 2018. The time is now 9:05 a.m. The location of this deposition is the Kazan and McClain law firm in Oakland, California.

Today's witness is James Mittenthal. This is Volume Number II in the case of Leavitt and McElroy, et al. v. Johnson & Johnson and Fong, et al. v. Imerys Talc America, Inc.

This is Case Number RG17882401 filed in the Superior Court of California in and for the County of Alameda.

This deposition was noticed by the Kazan law firm for the plaintiff.

Would the counsel for the parties please identify themselves and for whom they are appearing.

MR. SWANSON: Mark Swanson appearing on behalf of the plaintiffs.

MR. CARPENTER: Good morning, sir. Erin Carpenter appearing on behalf of Imerys Talc America, Inc.; Imerys Talc Vermont; and Cyprus Mines Corporation.

MR. COX: Christopher Cox on behalf of defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc.

THE VIDEOGRAPHER: And on the telephone, please.

MR. BERNARDO: Richard Bernardo, also counsel for the Johnson & Johnson defendants.

JAMES PETER MITTENTHAL

previously sworn as a witness,

testified as follows:

THE VIDEOGRAPHER: Would the counsel please state any stipulations or statements they would like on the record.

None.

Counsel, you may proceed.

DIRECT EXAMINATION BY MR. SWANSON (Cont'd):

Q. Good morning, Mr. Mittenthal.

A. Good morning.

Q. You understand that you're still under

 oath?

A. Yes, I do.

Q. Okay. What work have you done in connection with the Fong and/or Leavitt cases since I deposed you on September 21st in the first volume?

A. So I gathered additional materials, retention schedules. I conducted follow-on interviews with Pamela Downs and Laura Giacino, and a woman named Tina French was also present for that other interview for the purpose of understanding additional information about Fong and Leavitt collection activities.

Q. Okay.

A. I obtained -- requested and obtained a list of legal holds that encompassed consumer talc and I made a list of those holds.

Q. From whom did you --

MR. SWANSON: Before I ask the question, Early could you read that entire answer back to me please.

(Record read by the court reporter.)

BY MR. SWANSON:

Q. Okay. And those retention schedules that you gathered, did you actually do the search for

those and obtain those or did you get those from counsel?

A. I got those from counsel.

Q. Okay. And those holds are for what period of time?

A. The holds cover -- the earliest hold that I received was dated 1999.

Q. And these were additional holds that had not previously been produced to the plaintiffs; is that correct?

A. These were holds that were related to, to my understanding, issues other than mesothelioma.

Q. Now, these legal holds that you're talking about -- well, let me -- let me -- because I think I got myself confused or maybe you confused me. The additional materials that you gathered were retention policies; right?

A. I -- I gathered -- that was one of the things I got, yes, were additional retention schedules.

Q. And you gathered those -- you got those from counsel; correct?

A. Yes.

Q. And why did you get those?

A. I was -- in an effort to respond to issues

raised in the last time to provide the most thorough coverage of the retention schedules during the applicable times, I sought to get what -- the retention schedules that were available.

Q. So those were retention schedules that hadn't been produced to the plaintiffs in Fong and Leavitt up to that point; is that correct?

MR. COX: Object to form.

THE WITNESS: Some of them had not been produced yet.

BY MR. SWANSON:

Q. Have they all been produced now?

MR. COX: Object to form.

THE WITNESS: That's -- that's my understanding.

BY MR. SWANSON:

Q. And what period -- can you give me the period of time that those holds cover?

A. I'm sorry?

Q. The range of years for those retention -- did I say "holds"?

A. Yes, sir.

Q. I apologize. I'm getting myself confused.

For those retention schedules that you

obtained from counsel after your first volume of your deposition that you say have been produced, what's the range of years they cover?

A. They went back to the 1997.

Q. And did you bring those with you today?

A. I believe they're all -- I'm not sure what's in this binder. I believe that everything has been brought today.

Q. Okay. For your information, the binder contains the exhibits to the first volume of your deposition. So that if I have a question for -- and that was the binder that you brought to that deposition.

Do you remember that?

A. Yes.

Q. Okay. So if I have questions about a prior exhibit, then you can refer to what's in the binder, okay?

A. Okay.

Q. All right. So what was produced subsequent to the first volume of your deposition to us were additional retention schedules for the period 2004 through 2012. Now, we did have a prior retention schedule that had previously been introduced and was marked for the record in your

original binder going back to 1997.

Does that refresh your memory about what you've seen recently or did you see additional retention schedules going back to '97 that either weren't produced in this 2004 to 2012 range that was subsequently produced and wasn't produced in the initial production?

A. The former. That refreshes my memory.

Q. So you spoke to Pamela Downs, Tina French, and Laura Giacino?

A. That's correct.

Q. All in the same place?

A. There was a conversation with Ms. Downs and then there was a second conversation with Ms. Giacino and Ms. French.

Q. Remind us again. Pam Downs, she -- Pamela Downs she worked for Triality; is that right?

A. That's right.

Q. And where did that interview take place?

A. That was -- that was at Skadden offices.

Q. And what day did that take place?

A. I'd have to double-check. It was -- it was last week.

Q. How long did it last?

A. A couple of hours.

Q. Who else was there?

A. Chris Cox.

Q. And what additional information specific to either what we spoke about in Volume I of your deposition or that's related to these two cases, Leavitt and Fong, did you discuss with Pam Downs?

A. I wanted to clarify and understand the extent of the -- her -- her involvement in specific searches related to Fong and Leavitt beyond what had been captured in my original notes from her.

Q. And what did she tell you with respect to that?

A. Well, basically I -- I created -- as we were talking, I created a Word table on my computer and that table contained six or seven columns, and as we spoke, I filled out the -- the table, and that table is with me today.

Q. Okay. Do you have a copy of that table for me?

MR. COX: I do.

MR. SWANSON: Okay. And do you have a copy I can mark or his copy -- oh, his copy I can mark.

Mr. Mittenthal, can I mark your -- put an

exhibit tag on your copy?

THE WITNESS: Sure.

MR. SWANSON: Okay.

(Whereupon, Plaintiff's Exhibit 20 was marked for identification.)

BY MR. SWANSON:

Q. And how many pages -- this is four pages.

So the Word doc -- the Word table that you created with respect to Pam Downs that's marked as Exhibit 20, that's a four-page document, and we'll just have to make sure to keep these separate from these others.

Is that okay if I separate these?

A. Sure.

Q. Okay. There you go. And I'll hand those back to you.

And it looks like you also included in this information that you've gathered from Laura Giacino; correct?

A. Yes. I took the same document and I continued it.

Q. And so does this document summarize what you learned from both of them regarding searches specific to Leavitt and Fong?

A. Yes.

Q. How long did you speak to Laura Giacino?
A. It was about an hour and a half, as I recall.
Q. And who else was there during that conversation?
A. That was a telephone call. Tina French was present with Ms. Giacino.
Q. And who is Tina French?
A. She is an assistant corporate secretary.
Q. Did you speak to them while -- let's start with Pamela Downs.
Did you speak to her about anything other than just what specific searches had been done related to Leavitt and Fong?
A. That's my recollection, yes.
Q. And is that the same with Laura Giacino?
A. Yes.
Q. Was there any information that Tina French provided?
A. I mean, there were -- there were times when they were both talking. It was -- it was really an interview with Ms. Giacino. It was announced that Ms. French was also on the phone and she occasionally piped in with information. It was not always clear which one was talking.

Generally, Ms. Giacino led the call.

Q. Can you explain to me by giving me an example how this table works that you created?

A. Well, the -- it was initially to be tied, and I worked with counsel to get the -- in terms of those, the specific case, Leavitt or Fong, and the request so that I could tie the searches back to a specific request for production.

The -- the next element is a -- is a -- simply a category, and the -- this table, for the sake of convenience, the post- -- the later searches specific to Leavitt and Fong materials, and those -- and the requests for production. But the later searches were categorized for the -- for the sake of understanding the circumstances for each.

This table speaks to what -- denoted as Category 3 and 4, which, as per the legend, are additional searches of company sources and first-time searches of company sources.

The other two categories that relate to the additional collection efforts, Category 1 target searches of the global production and refiltering of the previously collected unproduced material, did not involve additional on-the-ground

 document-gathering. So they -- only the on-the-ground collection activities were included in this table.

Q. Okay. And I see there's a column here for "people consulted."

What does that refer to?

A. So I -- in my conversations with Ms. Downs, I said, who did you go to, to identify this -- sources of this additional information, where it might be, what might be obtainable, and so the people consulted would be the people who would be -- either have a custodial relationship to the data or knowledge of where it might be.

Q. And then "areas searched," that is physically what they were actually searching?

A. Yes.

Q. Do you know, from your notes or from your memory if we went through, who did the actual searches?

A. I -- I don't. I understand that the people consulted were involved. I don't know who physically did the hands-on searches. Or, in the case of the computer systems, I guess I would call those hands-on as well. But the actual searches. It was certainly under attorney supervision.

Q. And then you've got another column, "search criteria"; correct?

A. Yes.

Q. So just looking at this second one under "industrial hygiene" for Leavitt. It's Request Number 46 and Request for Production Set Number 3, it says here the search criteria is "knowledge of file names and key words for talc and asbestos."

So what do they actually look -- first of all, let me see if I can get an idea of what happened in that search. What was -- whoever did -- do we know who did the search, the actual search here?

A. I don't know who performed the search except to say that it was based on the knowledge of Vivian Pai and Reed Holbrook.

Q. And it says, "Looked for missing information from earlier archive searches, departmental share."

So what were they actually searching? Was this a database search that they are's doing? Are they doing a search of physical archives? What's actually being searched?

A. I would understand that they looked in both the -- the ERMS archive as well as the

network share drive.

Q. Now, on some of these others, you actually did put EMRS (sic) here and you didn't put that here, so I'm curious. Are you guessing when you say they looked at ERMS?

A. Well, when Ms. Downs used the word "archive searches," that's what I interpreted her to be referring to.

Q. Okay. And that's what we discussed at length in Volume I was the ERMS searches that -- it's kind of an indexing system; correct?

A. For files in off-site --

MR. COX: Object to form.

THE WITNESS: Sorry.

MR. COX: Go ahead.

THE WITNESS: Files in off-site storage and in certain cases files that are on -- in company facilities.

BY MR. SWANSON:

Q. It says, "Knowledge of file names and key words for talc and asbestos."

That's the search criteria. What does that mean?

A. I understood that to mean that, with respect to the file shares, that between Ms. Pai

and Mr. Holbrook, they looked for certain -- they scanned the list of file names in the departmental share and looked for files that they knew would be named accordingly.

The key words I took to mean terms that were applied to the searches of the ERMS.

MR. SWANSON: Madam Court Reporter, can you read that back, please.

(Record read by the court reporter.)

BY MR. SWANSON:

Q. I don't understand. They're looking for file names where?

A. In the share drive. So, for instance, it may be denoted as the L drive or the whatever drive letter is associated with an area on the company's computer network where they -- everyone can contribute and deposit files, Microsoft office files, other files that are at the departmental or work group level.

Q. So this is -- which company are we talking about here? The share files?

A. My understanding would be corporate --

Q. Go ahead.

A. Well, Ms. -- Ms. Pay -- Pai would have been in the corporate area, so she would have

consulted a corporate share.

Q. Okay. So when you say "corporate share," you mean Johnson & Johnson proper?

A. That's my understanding.

Q. Are you guessing or that's what you --

A. Well, the notation for her title was WW. So "Worldwide" would -- I believe, and I -- that's what I took "WW" to denote.

I did not follow up and determine her corporate affiliation. I see that I wrote "corporate," so I -- by all indicia, she is part of the corporate organization as opposed to consumer. I did not independently reference her -- you know, look her up in the directory or anything like that.

Q. And how far back is the information that's -- or documents and information there on their share drives, do you know?

A. My understanding is that the -- the information in share drives is generally persistent. It is not -- it is not subject to disposition. There may be -- they may have the ability to perform retention on it, but I -- my understanding is that that material is -- just stays on the share drive.

Q. And what's the original source of those materials?

A. Oh, those would be documents that authors had placed there or people who had received them had placed there. So it is -- you know, because it's a share drive, it does not necessarily tell us how something got there. It -- we may be able to look at meta data and see who put it there originally, but there's not really a story that's told in the -- in the file share as to how something got there. Therefore, I believe Ms. Downs relied on these people's memory to understand where to look in the share drive that would be for the relevant information.

Q. So are these share drives like small companies have where a bunch of information just gets dumped in shared files -- in a shared drive?

MR. COX: Object to the form.

THE WITNESS: Well, I -- I understand that at Johnson & Johnson -- and I've heard that the term "L drive" being referred to denote areas where there is a shared directory.

Now, that might be different for, let's say, marketing versus R&D, but, generally speaking, the company makes share drives available

to users to place information on, and that's determined by the department as to how people use it.

Q. Is there -- is there some kind of standard operating procedure about what gets put there and what gets retained there and what gets removed and who removes it?

MR. COX: Object to the form.

THE WITNESS: Well, to my understanding, the company's retention policies do not speak to what I call "containers" or "vehicles."

So, in other words, the L drive, the share drive, would be simply a place to store information. The -- the policies or retention schedules relate to the purpose, the use of the document, the fact that it may be classified according to a retention schedule based on its -- its content and purpose. That's what would determine how it's treated as opposed to whether it's on a share drive or some other location.

BY MR. SWANSON:

Q. I'm sure I'll have questions about that later.

So you gathered a list of holds; correct?

A. Yes, I did.

Q. Okay. And can you -- do you have multiple copies of that?

MR. SWANSON: So let's mark that as -- let me mark yours -- as Exhibit 21 to your deposition.

(Whereupon, Plaintiff's Exhibit 21 was marked for identification.)

BY MR. SWANSON:

Q. When did you compile the list of holds?

A. Last week.

Q. Okay. And I know some of these were produced to us previously and some were produced subsequently to the plaintiffs in these cases. I have seen these.

Is this a complete list of all of the Johnson & Johnson holds with respect to talc litigation?

MR. COX: Object to the form.

THE WITNESS: I requested holds relating to consumer -- consumer talc.

BY MR. SWANSON:

Q. And is this the complete list of historical holds related to consumer talc?

MR. COX: Object to the form of the question.

THE WITNESS: This is my understanding of

what was -- what was found to satisfy my request.

BY MR. SWANSON:

Q. What specifically was your request?

A. For holds relating to consumer talc.

Q. And is the spokesperson for Johnson & Johnson, then, this -- you have no information of any prior legal holds related to consumer talc, consumer talc litigation; correct?

MR. COX: Object to the form.

THE WITNESS: That's correct.

BY MR. SWANSON:

Q. Did you interview anybody about legal holds or did you ask -- just ask counsel for whatever legal holds they had?

A. I spoke with counsel.

Q. And by the way, in between the two depositions, how much time have you spent speaking to Johnson & Johnson's counsel?

A. I was on site probably five or six times, either working by myself or working with counsel. Probably -- with counsel, perhaps 15 to 20 hours.

Q. And you say "on site," you mean at the Skadden law firm offices?

A. Yes.

Q. Is there anything that you spoke to Pamela

Downs or Laura Giacino related to Johnson & Johnson that is not summarily reflected in your notes?

MR. COX: Object to the form.

Go ahead.

THE WITNESS: Of course, my prior conversations with Ms. Downs are in my other notes. But in terms of the current time period, it's all in here.

BY MR. SWANSON:

Q. Were any searches done or inquiries done to -- were any inquiries or searches done to locate responsive documents, other than you requesting holds and retention schedules, responsive documents to the plaintiff's requests in the Leavitt and Fong cases subsequent to your first volume of your deposition?

MR. COX: Object to the form.

THE WITNESS: I -- if I understand your question correctly, I don't have complete knowledge of that. I know that additional materials have been provided to plaintiffs, additional retention schedules of company policies. I updated -- some of my materials that I worked on with counsel that were updated had

been provided.

I don't know about searches.

Q. Okay. So, other than the additional retention schedules and the worldwide records and information policy being produced and the additional holds, you're not aware of any other searches being done since September 24th; correct?

A. Well, I wouldn't -- I wouldn't be aware. I mean, I'm not privy to that -- to that in terms of the ongoing communications between plaintiff and defendants.

Q. I understand. But your role here is to talk about searches that were done, and I'm just simply asking, since September 24th, are you aware of any other searches being done other than for the items that we just mentioned with respect to holds, retention policies and...

A. I see. No. I'm only aware of that, that which has been listed in the sheet.

Q. And I believe that -- you just mentioned that you've updated some notes specific to these cases; is that correct?

A. Yes.

MR. SWANSON: Do you have a copy of that, Chris? Thank you.

So let's mark this as Exhibit 22 to your deposition. If you give me your copy, let me mark that.

THE WITNESS, oh sure.

(Whereupon, Plaintiff's Exhibit 22 was marked for identification.)

BY MR. SWANSON:

Q. What is Exhibit Number 22?

A. This was an updated version of a document that I worked on with counsel, and it's basically simply a list of the noticed deposition topics that I received, coupled with some of the produced materials that correspond to them.

Q. And this is an update of a document you previously produced; is that right?

A. Yes.

Q. And I believe we previously attached that, but I'll sort that out later.

Did you -- are there any other reports or writings or notes that you made subsequent to September 24th regarding this deposition in the Leavitt and Fong cases?

A. No.

Q. I've just been provided today worldwide's records and information management policies, so

I'm not going to get into the particulars of the -- all the prior ones, but I do want to go over some basics on those based on the ones that I've actually had an opportunity to review up until now.

MR. COX: Mark, I'll just note for the record that the revision history of the documents that you're referring to are actually referenced in the copies you've had for a while now.

MR. SWANSON: Oh, okay.

BY MR. SWANSON:

Q. And we may go over the other ones later or we may just jump to them now if we need to. But I'm going to hand you two of them, which is Version 4.

MR. SWANSON: And that's Exhibit 23.

(Whereupon, Plaintiff's Exhibit 23 was marked for identification.)

MR. SWANSON: And Version 5, which will be -- whoops, that's my copy with my notes on it -- Version 5 of Johnson & Johnson's worldwide records and information management -- records and information management program standard will be Exhibit 24 to your deposition.

(Whereupon, Plaintiff's Exhibit 24 was

marked for identification.)

BY MR. SWANSON:

Q. Do you have those in front of you?

A. I do.

Q. Okay. So, yeah, there's some language at the beginning of this. If you look at Exhibit 23, do you see what it says the policy is at the top?

A. Yes, I do.

Q. And can you read that out loud?

A. "Records and information shall be created, valued, protected, managed, and disposed in accordance with applicable laws, regulations, and the requirements of the worldwide records and information management policy and standards and other applicable Johnson & Johnson policies."

Q. This is Version 4 of this, but you've seen prior policies; correct?

A. In the past I have, yes.

Q. And the initial policy, Version 1, that goes back to 2009; correct?

A. I don't recall.

MR. SWANSON: Can I mark yours and then print another one? I apologize.

(Whereupon, Plaintiff's Exhibit 25 was marked for identification.)

BY MR. SWANSON:

Q. I'm just going to go ahead and hand you what's marked as Exhibit Number 25. You have that in front of you. And that indicates that the Version 1 of 1.0 of Johnson & Johnson's worldwide records and information management policy was created or -- the date of this policy is July 31, 2009; correct?

A. Yes.

Q. So their -- Johnson & Johnson's worldwide records and information management policy only goes back to 2009; correct?

A. This particular policy document, yes, was created in 2009.

Q. Well, this is Version 1.0; correct?

A. Yes.

Q. There's no prior version to that, is there?

A. I'm not aware of a worldwide prior version.

Q. So this was the first worldwide standard for records and information management policy at Johnson & Johnson; correct?

MR. COX: Object to the form.

THE WITNESS: Yes.

BY MR. SWANSON:

Q. And this policy, if you look back at Number 23, Exhibit 23, the policy that is described there at the top of creating, valuing, protecting, managing, disposing in accordance with applicable laws, you know, records and information, that -- does that accurately describe the policy?

MR. COX: Object to the form.

THE WITNESS: I -- I believe it describes this version of the policy. This is the language of the policy. I don't understand. This is the -- the language from the policy is, I believe, what you were referring to, and that is -- that is the preamble to the policy.

BY MR. SWANSON:

Q. Okay. So let me ask you this: Is it -- since 2009 part of Johnson & Johnson's record and information management policy to create, value, protect, manage, and dispose of information and records in accordance with applicable laws, regulations, and requirements of that policy?

MR. COX: Object to the form.

THE WITNESS: Well, yes, I've seen it in that language in the Version 1.0, and I believe

you're referring to the 4.0 version. I see it there as well.

BY MR. SWANSON:

Q. Okay. And is that still Johnson & Johnson's philosophy that a record -- their worldwide records and information management policy has to do with managing and disposing of records and information in accordance with various laws, regulations, and legal requirements?

A. Is it still the policy today?

Q. Yes.

A. My understanding is that it is -- it is still the policy today. There is a new category of -- of management of information which is archive, and that archive may be encompassed in the phrase "disposition." In the later versions of the program standard, the archive option was made more explicit.

Q. So we have Version 5 here. Is that the most recent version?

And that's Exhibit -- what did we mark that as? 24?

A. 24.

Q. Is that -- is this the most recent version, Exhibit 24?

A. I'd want to check my notes to confirm that.

Q. Now, if you look at Exhibit 24 -- 23, if you look at the second page of this, you see under "provisions"?

A. I'm sorry, did you say "24" or "23"?

Q. 23.

A. Yes. I'm there.

Q. Okay. And here -- it says here, "Records and information shall be retained in accordance with the Johnson & Johnson enterprise retention schedule in accordance with applicable legal holds. When a record or information retention requirement is reached, it shall be disposed of in accordance with this policy and associated WWRAM (sic) standards and in compliance with operating company procedure."

Do you see that?

A. Yes.

Q. So the idea of having this management policy is that it -- it's addressing how to preserve and dispose of documents and the two tools that are being used in conjunction to make those determination are retention schedules and legal holds; correct?

A. Yes.
Q. And that's still the policy; correct?
A. To my understanding, yes.
Q. And so -- and it says there, when -- when a retention requirement is reached, a record information "shall be disposed of." Right? In accordance with the policies.
So when you reach a retention schedule, the limit of how long something has to be held, if there's no legal hold in place, it gets disposed of typically; correct? That's the idea of this policy; true?
A. Yes.
MR. COX: Object to the form and mischaracterizes the document.
BY MR. SWANSON:
Q. Would you agree -- does Johnson & Johnson agree that for a records retention policy to be effective it has to be complied with?
True?
MR. COX: Object to the form.
THE WITNESS: The -- the company creates policies that are -- that express its -- its intentions and procedures under them that enable employees to comply with those policies.

BY MR. SWANSON:

Q. Sure. Of course. That's what a policy is. But if you've got a policy and you don't comply with it, then it's not an effective policy; correct?

A. Except -- yes, I would agree except to the extent that policies don't necessarily in themselves contain a mechanism to comply. You need procedures to comply.

So the policy expresses what the procedures should accomplish.

Q. Right. So there have to be procedures to accomplish it, there has to be understanding by employees; correct?

A. Yes.

Q. And that includes training of employees; correct?

A. Yes.

Q. And whatever policies and mechanisms there are need to be -- the employees who have records or information need to know about those; correct?

A. Yes.

Q. So, for example, if there's a legal hold and people don't know about a legal hold that -- that's theoretically applicable to documents or

information they have, then it's -- it has no effect; correct?

MR. COX: Object to the form.

THE WITNESS: No effect in and of itself. I mean, certainly there are other reasons why people retain information such as retention schedules.

BY MR. SWANSON:

Q. But if there wasn't a retention schedule, they wouldn't be -- I mean, if there was -- if it wasn't under a retention policy, then it wouldn't be retained. Then -- and they didn't know about a legal hold, then there would be no reason for them to preserve that document; correct?

MR. COX: Object to the form.

THE WITNESS: There would be no business reason for them to preserve them.

BY MR. SWANSON:

Q. They might preserve it sort of by accident or by the fact of just not -- not getting around to it, something like that. But otherwise they would dispose of it; true?

MR. COX: Object to the form.

THE WITNESS: From the standpoint of the policy documents, I would agree.

BY MR. SWANSON:

Q. You're aware that the plaintiffs demanded all retention schedules from Johnson & Johnson, correct, in this case?

A. I'm generally aware of that.

Q. And you're aware that it has been represented to the plaintiffs in this case that all of those policies have been produced; correct?

MR. COX: Object to the form.

THE WITNESS: I'm aware that those policies that could be located have been provided have been produced.

BY MR. SWANSON:

Q. And the oldest policy that you've seen is 1997; correct?

A. That is the oldest retention schedule I've seen at the Consumer level.

Q. And what do you mean "at the Consumer level"?

A. Well, the Johnson & Johnson Consumer, Inc. or Consumer Products are, as it's been known over the different names over the years, has, since the early '90s, created its own retention schedules.

MR. SWANSON: Can I have that answer read back, please.

(Record read by the court reporter.)

BY MR. SWANSON:

Q. Okay. So Johnson & Johnson -- you're talking about the Johnson & Johnson Consumer company that was the -- the subsidiary of Johnson & Johnson that was specifically tasked with marketing and distributing and manufacturing Johnson's Baby Powder and Shower to Shower; correct?

A. Yes.

Q. And there's a history of companies that goes back to Johnson & Johnson Consumer Companies, Inc.; Johnson & Johnson Consumer Products, Inc.; Johnson's -- different-named companies; correct?

A. Yes.

Q. And you're telling me that those companies had retention policies going back to the early '90s?

MR. COX: Object to the form.

THE WITNESS: I'm -- in my fact-finding, I interviewed Rosina Bruno-Sheerin who was one of the company's records managers. She and -- and others, too, perhaps Michelle Anderson, others that I spoke to, indicated that there were -- there was at least a schedule created in the early

'90s that was based on the McNeil Company's schedule.

BY MR. SWANSON:

Q. And where is that policy?

A. I have requested and through counsel have requested what policies and schedules could be provided by the consumer companies. What's been provided thus far is what they were able to come up with. I understand that they continue to research the availability of additional materials.

Q. Okay. And you realize that -- so I'll just cut to the chase here. You've seen the 1997 records retention schedule; correct?

A. Yes.

Q. So in 1997 in the records retention schedule, Johnson & Johnson has a retention schedule or retention period for records retention schedules; correct?

MR. COX: Object to the form.

Go ahead.

THE WITNESS: I'm sorry. When you say "Johnson & Johnson," which entity are you referring to?

BY MR. SWANSON:

Q. It says "Johnson & Johnson Consumer

 Products Companies." It was the -- you had mentioned that the earliest one that you've seen is 1997; correct?

A. Yes.

Q. And I have that here, and you have that. And, in fact, that has been marked as Exhibit 13. If you want to go ahead and pull that out.

A. Yes, I have it.

Q. If you look at page, I believe it's 251, of Exhibit 13, which is the 1997 retention schedule for Johnson & Johnson Consumer Products Company.

And what does it say there about how long records retention schedules documentations are supposed to be maintained by the company?

A. Life of corporation.

Q. Okay. So if any records retention schedules that Johnson & Johnson had were destroyed or were lost or not preserved, disposed of, whatever you want to call it, they weren't following their own records retention policy, were they?

MR. COX: Object to the form.

THE WITNESS: I mean, in response to that hypothetical, I would agree.

BY MR. SWANSON:

Q. And Johnson & Johnson's Consumer Products Companies, those are the folks who are making and marketing and distributing the baby powder; correct?

A. That's my understanding.

Q. So let's go to the notes. If you look at -- if you kind of peel under the rest of those exhibits, you find -- you can put that '97 schedule aside for now. I don't want to bog you down with too many things, but if you look at Exhibit 18, those are your notes. And those are the notes that you created, I believe, in preparation for your deposition in June in the Hayes case; is that correct?

A. Yes.

Q. And we attached those as Exhibit 18. We talked about this at some length.

MR. SWANSON: What I'd like to do is give you another copy of those that we can work off of more easily.

(Whereupon, Plaintiff's Exhibit 26 was marked for identification.)

MR. SWANSON: I'm handing you Exhibit 26 to your deposition. And let me explain what that

is.

And I think I have a copy for you, Chris.

MR. COX: Thank you.

BY MR. SWANSON:

Q. Do you have Exhibit 26 in front of you?

A. Yes.

Q. And those are your notes that you prepared in preparation for your deposition in the Hayes case; correct?

A. Appear to be, yes.

Q. And what I've -- you see what I've done here, I've had those paginated at the top right?

A. I see.

Q. And the reason is, is because I'm going to have a number of questions about these and I wanted to make it so that we could easily refer each other to where we're -- where we're looking, where your answer -- where it's related to my question.

And so that's what I've done here.

And just, again, to summarize, you prepared these notes from the conversations that you had had with various Johnson & Johnson business employees and also the people who are -- who deal with records retention, searches,

maintenance of document platforms, and that sort of stuff; right?

A. I would agree except that I would say, and I didn't really prepare them from the conversations. They are the real-time record of what people were saying as I was asking. So I was typing as I was talking.

Q. So these are -- these are the best verbatim records that you could take at the time?

A. Yes.

Q. And you mentioned a Rosina Bruno-Sheerin, I think.

A. Yes.

Q. Making a reference to earlier retention schedules prior to 1997; is that correct?

A. Yes.

Q. And can you direct that -- direct me to that in your interview?

A. Yeah. First, I'm going to look in Exhibit 19, which is just the index of the notes, and I see that she's about halfway through. So I'm going to...

So that's page 36.

Q. Okay. And where in your notes is the reference to retention schedules of the Johnson &

Johnson Consumer Companies going back to the early '90s?

A. On the first page, she noted that she came to the company, to the -- what she calls the "office side" in 1990, and she noted that she created a retention schedule and aligned boxes and used the McNeil versions as her basis.

Excuse me.

Q. Do you know what -- do you know what the retention schedule entailed in terms of what departments or companies it was for?

A. Simply what was put there, that there were a few -- that there were not a large number of boxes at that time. She references some specific material such as batch records and R&D. It's not clear from her notes what -- you know, what every records type would have been at that point, although one can conclude that the McNeil schedules were already in existence at that point and would have -- would have been -- had similar content.

MR. SWANSON: Move to strike based on speculation. It's also nonresponsive.

BY MR. SWANSON:

Q. So the retention schedule that you

created, was that only as to those boxes, those few boxes that are referenced there? And if you don't know, just tell me you don't know.

A. Yeah, like I said, my recollection is that she's -- she told me and I wrote it down that she based the schedule on the McNeil schedule. So I -- by that, I infer or deduce that it was not just covering the boxes in front of her but was a -- meant to be a representative schedule.

Q. For what?

A. For the Fort Washington operation.

Q. And what was the Fort Washington operation doing at that time? What specifically was their involvement in baby powder?

MR. COX: Object to the form.

THE WITNESS: I'm not an expert on the precise locations. I don't know that they -- that side of the business was involved. I believe there was -- there was more activity on the Skillman side related to the baby powder but that eventually the two sides came together.

BY MR. SWANSON:

Q. So you don't know whether these -- whatever retention schedule there was that she created -- first of all, we don't have it. You

 don't know the particulars of that, although she said it was based on McNeil.

Have you reviewed the Neil Fort Washington schedule?

A. No.

Q. So you don't -- as the representative for Johnson & Johnson, you don't know what was in that retention schedule, do you?

A. Correct.

Q. You don't know what the periods of retention were for; correct?

A. Correct.

Q. And you don't know whether or not that applied specifically what it applied to other than something at Fort Washington; correct?

A. Correct.

Q. So if we wanted more information about this, we would have to speak to Rosina Bruno-Sheerin; correct?

MR. COX: Object to form.

THE WITNESS: Well, I've done my best to summarize her recollection. Then there's other references to those schedules in my notes. She is a person with knowledge.

BY MR. SWANSON:

Q. What other references to early '90s schedules are there in your notes?

Well, first of all, you said she's a person of knowledge; she has more knowledge with you about these issues of course; correct?

MR. COX: Object to form.

THE WITNESS: In terms of the specific question about when -- when and how the schedules were creating, she has that knowledge.

BY MR. SWANSON:

Q. Or even what the purview of those schedules was in terms of that to which they were applicable; correct?

A. I would agree.

Q. And where else in your notes?

A. I'm just running through the various records notes.

Yeah. There's one reference in Cindy Aden's notes about talking to Rosina regarding historical schedules. I -- I'm continuing to look for other -- other references.

Q. Okay. Let's -- we've got a lot to cover, so if you see something later you can mention it and we'll go over it, if there are other references from other people, who had firsthand

knowledge of those schedules.

MR. COX: Mark, if you're going to move on to a new topic, could we take a short break? We've been going for about an hour.

MR. SWANSON: Let me ask one -- one follow-up there.

BY MR. SWANSON:

Q. If you look at page 31 of your notes. This is Exhibit 26 again.

A. "31" you said?

Q. Yeah. There was -- I'm trying to find it. Looks like this ERMS was launched in 2014; correct?

A. Yes.

Q. And you see where it says, "Now have integrated retention schedule management in ERMS."

A. Yes.

Q. Was the -- was the retention schedule of management not integrated prior to 2014 at Johnson & Johnson?

MR. COX: Object to the form.

THE WITNESS: Well, I took that to mean that the schedule had to be applied to TRIM to GIFTS to Versatile independently as opposed to being able to practice retention from a single

vantage point.

MR. SWANSON: Chris, did you say you want a break?

MR. COX: Yeah. I figured you were going to move on to a different topic.

MR. SWANSON: Well, yeah. I mean, there's a lot to cover, so if you -- if he needs a break, you need a break, that's fine.

MR. COX: Okay. Let's take a short break.

MR. SWANSON: Let's try to keep our breaks --

THE VIDEOGRAPHER: This marks the end of Video Media Number 1 in the deposition of James Mittenthal.

Off the record at 10:13.

(Recess taken.)

THE VIDEOGRAPHER: On the record at 10:34 a.m.

This marks the start of Media Number 2 in the deposition of James Mittenthal.

Counsel, you may continue.

BY MR. SWANSON:

Q. When you spoke to Rosina Bruno-Sheerin about earlier schedules that have not been produced and Johnson & Johnson hasn't located, did

she tell you that those were the first retention schedules produced -- created by Johnson & Johnson?

MR. COX: Object to form.

THE WITNESS: She indicated that there were -- and I'm going to refer to her exact words if that's okay.

BY MR. SWANSON:

Q. That's fine.

A. Or what I -- what I wrote from her words.

So this is on page 36, a few lines down. "Created retention schedule and aligned boxes."

I took that to mean that she created the retention schedule where none had existed for that department or facility.

Q. But anything more than that, you don't know as to whether or not those were the first retention schedules applicable to her department or something broader than her department; correct?

A. Correct.

Q. Are the current Johnson & Johnson record retention schedules for the consumer companies and the global retention -- well, let's start with the consumer companies.

Are they mandatory?

MR. COX: Object to the form.

THE WITNESS: They describe periods by which information in the various categories must be held -- held for. So, to the extent that they -- that a piece of information is viewed to be subject to a retention schedule, then it is required that that information be held at least as long as that retention schedule prescribes.

BY MR. SWANSON:

Q. So that's a "shall" as opposed to a "may"; correct? Something that's mandatory that employees are required to follow; is that true?

A. I would agree.

Q. And since what year have the retention schedules for Johnson & Johnson been mandatory?

A. Well, I don't know. Johnson & Johnson is -- is -- which Johnson & Johnson entity would that refer to?

Q. Let's talk about the consumer companies who are marketing and manufacturing, selling Johnson & Johnson talc -- cosmetic talc products.

A. Okay. I would refer to my notes with Darren Harris, which is going to be -- I'm sorry. I'm looking at the wrong copy. This is the paginated one. Page 27.

So in that note he indicated that ten years ago in approximately 2009, the Skillman and Fort Washington materials were -- were consolidated.

Q. Where is that note on the page?

A. About ten lines down.

Q. Okay. It says, "Ten years ago Skillman went under Fort Washington team, had different SOPs for each."

What does that mean?

A. Standard operating procedures.

Q. As to what? Document retention?

A. How to effectuate document retention, yes.

Q. How does that answer my question about whether or not the policies were mandatory? When they became mandatory.

A. Yes. I -- I didn't see the precise answer to that question in -- in his comments. I -- I have a retention schedule from 1997 that applies to Johnson & Johnson Consumer Products Companies. That's the earliest schedule I'm aware of. There may be mandatory schedules prior to that time.

Q. Now, did that 1997 schedule, which is marked as Exhibit 13 to your deposition, that doesn't say on there that it's mandatory, does it?

In fact, it calls it a "guideline." Doesn't it say "guideline" right in the title, "Johnson & Johnson Consumer Products Companies Guideline Records Retention Schedule"? True?

A. Yes, I see that.

Q. But the current ones don't say "guideline," do they?

A. I don't see that on the current ones.

Q. And when you were speaking to Rosina Bruno-Sheerin, she told you that the prior global records retention schedules were not mandatory but were only a suggestion.

Do you recall that?

A. I'd like to reference...

Q. It's page 37.

A. Can you reference me to that point on page 37?

Q. Yes. It's about -- a little more than halfway down, it says, "in 2006 tried to make records, titles more uniform in standardized retention periods. Old corporate program called 'global records retention scheduled' was only a suggestion."

Do you see that?

A. Yes, I do.

Q. So until 2006 or sometime around there -- well, let me ask you, because she's referring to a 2006 date and trying to standardize the retention schedules. When she says this global records retention schedule is only a suggestion, until what year after 2006 was it still only a suggestion?

MR. COX: Object to the form.

THE WITNESS: Well, the GRRS was not a consumer products schedule. That was a corporate schedule. That is a schedule that the Johnson & Johnson corporate had devised to be available to the franchise companies if they wished to use it.

In 2015, the GRRS was replaced with the ERS, the enterprise retention schedule. At that point adoption or harmonization with the ERS became mandatory.

BY MR. SWANSON:

Q. So until 2015, if a particular Johnson & Johnson operating company or department didn't have its own retention schedule, then it could comply with corporate's global record retention schedule, which was only a suggestion; correct?

MR. COX: Object to the form.

THE WITNESS: My understanding is that it

was available to be used by the -- the entities if they wished.

BY MR. SWANSON:

Q. And that would include -- would that include overseas entities? And if you don't know, just say you don't know.

A. Yeah. I don't know.

Q. Okay. And, again, is Rosina Bruno-Sheerin the person we should be talking to about that?

MR. COX: Object to form.

THE WITNESS: About which topic?

BY MR. SWANSON:

Q. About whether or not the global records retention schedules were applicable to overseas operating divisions or subsidiaries of Johnson & Johnson corporate.

A. Well, inasmuch as GRRS is a corporate vehicle or was a corporate vehicle, I would think a person in the corporate records program would be the best person to elicit that from.

Q. Who would that be?

A. That could be Cindy Aden. That could be Karen Skellington.

Q. Did you speak to them about that issue, the applicability of the global records retention

schedule to Johnson & Johnson International or Johnson & Johnson Hong Kong or Johnson & Johnson Philippines, for example?

A. I don't recall speaking about that.

Q. So -- but until 2015, this global records retention schedule was just a suggestion because it existed until 2015 when it was replaced by the ER -- the enterprise retention schedule; true?

A. Yes.

Q. So that just means by definition, then, if an operating division or unit or department of Johnson & Johnson did not have its own retention schedule at the time, they either wouldn't have a retention schedule or they could use this global records retention schedule; true?

MR. COX: Object to the form.

THE WITNESS: I'm not familiar if both of those alternatives were available. I know that the schedule existed prior to 2015. I don't know whether it was mandatory or not in the absence of another schedule.

BY MR. SWANSON:

Q. Well, Rosina Bruno-Sheerin said it was only a suggestion; true?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Old corporate program, that's referring to GRRS, was only a suggestion. That's what she meant; correct?

MR. COX: Object to the form.

THE WITNESS: In the -- in the 2006 time frame I believe she was referring. Yes. I -- she was referring to the 2006 period.

BY MR. SWANSON:

Q. How -- why do you say that that refers to 2006 period? The old corporate program you just told me was GRRS and it wasn't replaced until 2015 by ERS. So the old program is GRRS; true?

A. Yes.

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Okay. So are you telling me that, even though she said the old corporate program called GRRS was only a suggestion, are you telling me that GRRS went from only being a suggestion to being mandatory at some point?

A. No.

Q. Okay. So it was only a suggestion until it was replaced by ERS; true?

A. That's my -- my understanding. But I

don't know the particulars. In other words, was it a suggestion if the operating company didn't have a schedule in place or was it a suggestion if the operating company had a schedule in place they could opt to use either. I don't know the particulars between those two scenarios.

Q. Okay. But, to the extent it was being used, it was, when it existed, only a suggestion; true?

MR. COX: Object to the form.

THE WITNESS: Yes.

BY MR. SWANSON:

Q. And -- which means if a company or division or department did not at the time have an operative record retention schedule, then it could have the option of using the GRRS; true?

A. That is my understanding.

Q. But if they had their own records retention schedule, then they may or may not use the GRRS; true? Because it wasn't mandatory.

A. There are other in-between possibilities.

Q. What's the in-between possibility?

A. They take the GRS, use it as a model, and then alter it to suit their own requirements.

Q. You don't have any specific information

about any division or subsidiary doing that with the GRRS, do you?

A. Correct.

Q. So I think we discussed this, but Johnson & Johnson agrees that in order to follow its own retention schedules -- well, its own document and information policies and programs, people need to be trained; correct?

A. Yes.

Q. And you learned from your interviews that until 2008, a large number of people at Johnson & Johnson were still untrained in records retention policy; true?

MR. COX: Object to the form.

THE WITNESS: Can we reference a citation for that somewhere in my notes?

BY MR. SWANSON:

Q. Yes. It's page 29 of your notes.

Okay. Let's be specific here. This is an interview of Joan -- Joann Dodd?

A. Yes.

Q. Senior analyst, records management; true?

A. Yes.

Q. And she started in 2007-2008 according to your notes; is that right?

A. In the records program, yes.

Q. And so she's in the records program. Records program for which companies?

A. Consumer, Inc.

Q. Johnson & Johnson Consumer, Inc. And, again, that's the company that's marketing and manufacturing the cosmetic talc products including baby powder and Shower to Shower; correct?

A. Yes.

Q. And do you see here where you wrote, "Back in 2008, 56 percent participation in recurring departmental training. Now 98. But would not" -- "but would perform departmental audits."

So in 2008, only 56 percent of the employees at Johnson & Johnson Consumer, Inc., only 56 were trained in the records policies; is that right?

A. No.

Q. What does that mean?

A. Recurring training, meaning that the -- you come to the company as an employee, you receive records training. You were then required to get recurring training once or twice a year as you go forward in your -- in your job.

Q. Does it say anything in your notes

about -- well, before I get there, what's the purpose of recurring training?

A. To reinforce the objectives and the procedures for record retention, to inform employees of any changes in those procedures.

Q. Okay. And that's done currently at Johnson & Johnson Consumer, Inc. How often is that done, these reoccurring trainings?

A. A couple times a year.

Q. And so there's 44 percent of the people as of 2008 were not getting recurring training; true?

A. In 2008, I -- I would agree that that was her point.

Q. And what was the participate -- when did -- do you have any information as of 2008 whether or not any initial training was done?

A. I understand initial training was required for people to get started in their job. I understand that was mandatory. I could go back to understand if that was a hundred percent or some lesser number. I don't have that number at hand.

Q. Where did you get the understanding that there was as of 2008 a mandatory, or initial training?

A. I have -- it may be in my notes; it may

not. Over the years I have spoken to Johnson & Johnson employees and understand that there is an onboarding process that includes records training.

Q. And so that initial training was something that would be done -- well, first of all, who -- do you remember who that was who told you that? And do you know if it was as to Johnson & Johnson Consumer, Inc. or the Johnson & Johnson Consumer Companies?

A. I would have to look through my notes. I don't recall -- I know there have been references to it. I don't recall the context for whom I heard it from, and, to the extent that it's in my notes, I can check.

Q. And when -- what is -- I don't want you to guess, but do you have any information about when, what year Johnson & Johnson instituted records retention and records policy training for new employees?

A. With your permission, I'm just going to look through a couple of my notes and see if I can't get some references to that.

Q. Sure. Go ahead.

A. Well, the first one I just found off the bat was that Ms. Dodd just a few lines above from

when we were talking about indicated that training must be accomplished in 30 days for a new employee.

Q. Where does it say that?

A. Your page 29, right after that section that says the five SOPs.

Q. Oh, "need training within 30 days"?

So that's referring to records management training and records retention schedule training?

A. Further down it indicates, "Training included legal hold, departing associates, retention procedures, roles."

Q. Okay, but again, I believe the question was, do you have any information of when that started, training within 30 days of a new employee?

A. I do not.

Q. And so you don't know even if that was happening in 2005; true?

A. I don't have specific information about that.

Q. And you don't know whether or not that was being -- people were being trained at all as to that 1997 records retention schedule, do you?

A. I do not.

Q. Now, if 44 percent of the folks aren't going to reoccurring training as to 2008 and somebody started a long time ago, they may have never had the training; true?

MR. COX: Object to the form.

THE WITNESS: It's possible. I -- I think Ms. Dodd made the point afterwards that there were departmental audits that were conducted outside the training to verify participation and knowledge.

BY MR. SWANSON:

Q. Do you know the particulars of those audits?

A. No.

Q. So, again, Joann Dodd would be the person to talk -- for us to talk to about that; correct?

MR. COX: Object to the form.

THE WITNESS: With respect to that topic, yes.

BY MR. SWANSON:

Q. And would you agree with me that, even if training had started at the time of the initial record retention schedules or going back to 1997, that if somebody started right around then and didn't have retraining, whatever knowledge they

had about the records retention would be variable and it could be pretty stale, couldn't it?

MR. COX: Object to the form.

THE WITNESS: It's -- it's possible. Her point, to follow on to that statistic, was that audits would detect a nonparticipation.

BY MR. SWANSON:

Q. Where's the reference to audits again?

A. Just under the 98 percent.

Q. Well, you said something about detecting. It just says here "but would perform departmental audits."

Other than what you wrote there, those five words, "but would perform departmental audits," do you have any information about those audits?

A. Not about the audits themselves.

Q. And were there any audits prior to 2008?

A. She didn't indicate when the audits started.

Q. So there may not have been; true?

A. I can't speak one way or the other.

Q. I want to ask you about something called -- referred to in your notes as "cleanout."

Are you familiar with that?

A. Yes.
Q. Okay. And what was -- what does cleanout in your notes in the several people you discuss cleanout about, what does that refer to?
A. Cleanout was a reference to a retired WWRIM standard entitled "Records Cleanout Standard."
Q. And the cleanout was a -- it was called the "cleanout event"; correct?
A. Yes.
Q. And the cleanout event was something that happened annually; correct?
A. Generally.
Q. And it was mandatory; true?
A. It was a participatory event, the -- like an inventory day in a business.
Q. So a manager of a department would oversee the cleanout event, correct, or some manager in the department?
A. Managers and records coordinators and records officers.
Q. And they did that to ensure that everybody was complying with the policy in doing the cleanout event annually; true?
A. Yes. Compliance was also the individual

employee's responsibility, but in terms of disposal of information, they were also there to sign off on disposal of information.

Q. And generally speaking, the cleanout event was essentially if something is not currently being held because of a retention schedule or a legal hold, it should -- it has to be destroyed; correct?

MR. COX: Object to the form.

THE WITNESS: The -- the purpose of the cleanout day was to give opportunity to the employees to go through their materials, identify those that were candidates for disposition, and basically get themselves organized.

BY MR. SWANSON:

Q. But when you say "disposition," what you're really talking about is if the documents were not subject to a hold or to a retention period still, those documents, when you say "disposition," you mean they were to be destroyed; correct?

A. That's right.

MR. COX: Object to form.

BY MR. SWANSON:

Q. They can't keep them around. You

destroyed those records; true?

MR. COX: Object to the form.

THE WITNESS: That's right.

BY MR. SWANSON:

Q. Now, I just got some of these today, these WW worldwide records and information management policies. So I apologize if I fumble around on them a little bit, but I'm going to -- I want to go through them a little bit with you.

You know, we probably should just for your -- let's take that stack over there and put it on top over there, I think, will help you out. And then see what you've got underneath. Probably keep the notes around. You're going to need those.

Okay. And I think we marked, and hopefully I can locate it, the Version 1.0 is marked as Exhibit Number 25, and I believe you have that.

I can show it to you there so you can see what it looks like.

A. 25. Here it is.

Q. You got 25. Okay.

Do you have that in front of you?

A. Yes, I do.

Q. And so this is the worldwide's record information management policy Version 1.0 dated July 2009; true?

A. Yes.

Q. And the Version 1.1, which was also produced and we will mark that, too, and the rest of the versions that were provided have quite a few pages, I don't know, 30, 40 pages, something like that. This one looks to be about four or five pages.

Do you know where the rest of this document is?

MR. COX: Object to the form.

THE WITNESS: Did you say 1.1?

BY MR. SWANSON:

Q. No. 1.0 is what we're looking at.

A. Okay.

Q. I just referenced the other ones because they're --

I need to get some water. I'll be back in two seconds. Pardon me.

Okay. So you have Exhibit 25 in front of you?

A. Yes.

Q. And let's go ahead and --

Do you have -- do you have Policy 1.1?

A. I don't believe I do.

MR. SWANSON: Let's see. Let's mark this one for you.

(Whereupon, Plaintiff's Exhibit 27 was marked for identification.)

BY MR. SWANSON:

Q. So Johnson & Johnson worldwide records and information management policy Version 1.1, September 30, 2009, that is marked as Exhibit 27.

Do you have that one in front of you?

A. I do.

Q. Okay. Let me just go ahead and give you the rest of them, too, so you've got them in front of you.

MR. SWANSON: And Version 2 of the WWRIM policy dated 2011 is Exhibit 28.

(Whereupon, Plaintiff's Exhibit 28 was marked for identification.)

(Whereupon, Plaintiff's Exhibit 29 was marked for identification.)

BY MR. SWANSON:

Q. And Version 3.0 of the WWRIM policy dated April 1, 2014, is Exhibit 29.

Do you have that in front of you?

A. Yes.
Q. And we had already marked Versions 4 and 5.
Okay. So going back to Exhibit 25, Version Number 1.0, from July 31, 2009, where is the rest of the policy in terms of these various what you call "RIMS"?
MR. COX: Object to the form.
THE WITNESS: Assuming this is complete, I don't see the standards in Version 1.0.
BY MR. SWANSON:
Q. So as of July -- but you said assuming this is complete.
Do you know if this is complete?
A. I have not seen this Version 1.0 before today.
Q. Okay. Do you see on all of these WWRIM policies that were just produced today to us this morning, Versions 1.0 through Version 3, why are there no Bates numbers on those documents?
A. I -- I can't speak to that. I -- that would be a lawyer question.
Q. Now, the record retention schedule that was produced, the first one that you have, goes back to 1997.

Was there a records and information management policy or policies that went back to 1997?

MR. COX: Object to the form.

THE WITNESS: My understanding is that there were policies that accompanied the schedules.

BY MR. SWANSON:

Q. Okay. And I did not see those policies produced with the records retention schedules that were produced to us.

Do you have those?

A. No.

Q. Do you know where those are?

A. My understanding is that the records department is continuing to research those materials.

Q. Is it also fair to say that those -- those record retention policies prior to 2009 would have also been documents that should have been kept for the -- left for the corporation?

A. I'd have to go back to the schedule and see how the schedule is defined.

Do we have a reference to that?

Q. Is that page 251 of Exhibit 13, I believe?

That's the section on records management.

You see records management training information, records destruction authorization, records. Oh, sorry -- yeah, 251, records retention documentation.

And if you don't know, that's fine. Oh, if you see records -- if you look at -- let me just ask you differently: Do you know what the retention period was on records and information management policy prior to --

A. Well, I was looking.

Q. -- 2009?

A. I was looking and I found on page 248 of the '97 schedule an indication that policy documents, which are defined as written descriptives of the operating principles, are directives pertaining to the organization, are to be held S plus 8.

Q. S plus 8. So that would be 2009 to 2017; true?

A. So, in other words, the year that they were superseded plus 8.

Q. Oh, okay. I see. So presumably, then, you would expect that there should be some policies still, although we'd have to look at

subsequent record retention schedule to see if that stayed consistent; true?

A. I'd have to do the arithmetic, frankly.

Q. All right. Okay. Let me ask you about -- I've got some questions on Number -- Version 1.1, that's Exhibit 27. Okay.

If you go to RIMS Number 3 in that document, which is about, looks like about eight pages in?

A. Records cleanout events standard.

Q. You got that right?

A. Okay.

Q. And this is referring to the cleanout event, the annual cleanout event that we were talking about earlier; right?

A. Yes.

Q. And this indicates that this -- this would have been in effect September 30, 2009; true?

A. Yes.

Q. Were there cleanout events prior to September 2009?

A. I have general knowledge -- and it may not be reflected in my notes -- I have general knowledge that -- that there were.

Q. How far back were there cleanout events

prior to 2009?

A. I don't have specific answers to that. My understanding is that it was a -- had been in place for a number of years based on the fact that the company was working primarily in paper going back many years and that the cleanout standard and event was organized to organize -- was held to help employees organize paper documents primarily.

Q. And do you know -- you don't know specifically how many years that goes back, though; true?

A. Correct.

Q. And this was -- the policy -- this policy WWRIM is a worldwide policy; correct?

A. Yes.

Q. So that would affect what's going on in the Philippines, J&J Philippines, J&J Hong Kong; true?

A. It -- by implication worldwide, yes, would apply worldwide.

Q. Because it says it provides requirements for Johnson & Johnson operating companies; true?

A. Yes.

Q. It says, "Reference terms" -- under "definitions," it says, "Reference terms used in

the standard are found in the worldwide's record and information management program glossary."

Had that been provided to us?

A. I'm looking at the definitions section at the front of the policy. I don't know if that is the glossary that's being referenced or not.

Q. What page is that?

A. The first page.

Q. That doesn't look like a glossary to me.

Does that look like a glossary to you, under "definitions"?

A. I don't know.

Q. Wouldn't a glossary list the various terms that are used and define each of the terms?

A. Yes.

Q. Okay. And this definition just is a definition of disposition, standard document hold, records retention schedule, compliance, and standard; true?

A. I don't believe it's compliance.

Q. Okay. But the rest of those terms that are in -- the six italicized terms are the ones that are defined there; right?

A. Yes.

Q. Now, this says, "Management program

glossary," the reference that I was referring to under "cleanout event standard." And I don't see anything here that says -- do you see anything in this document that's been provided to us called "Worldwide records and information management program glossary"?

A. What I'm going to do is look at a later version and see if that language is still...

Q. Okay. But please just answer my question first.

A. I do not.

Q. Do you see something called a glossary in this document, Exhibit 27?

A. I do not.

Q. Okay. So you didn't -- you didn't find a glossary, did you?

A. Correct.

MR. SWANSON: Counsel, can you please provide the glossary to us that's being referred to there?

MR. COX: Take the request under advisement.

BY MR. SWANSON:

Q. Going back to Exhibit 27. You got that in front of you; right? We're at RIMS 3, page 1?

A. Yes.

Q. Okay. If you look at -- and, again, "cleanout" in this context means disposition, which means destruction; true?

MR. COX: Object to the form.

THE WITNESS: It may result in that. It may just result in materials being better organized.

BY MR. SWANSON:

Q. Where does it say that, "organized"?

A. Well, that is what I understand the purpose of the day is, is to allow employees a chance to look at their materials, determine what needs to be better aligned with the records schedule, dispositions, organized. It is an organizational day which may result in the materials being earmarked for disposition.

Q. Now, you said before and I don't want to have to redo all this, but on cleanout day, if it's not under retention pursuant to the schedule and it's not under a legal hold, it gets destroyed; right?

MR. COX: Object to the form.

THE WITNESS: Generally I would agree.

BY MR. SWANSON:

Q. Okay. Is there some specific instance you're aware of where you don't agree with that?

A. No. But I think -- I think we're talking about the same thing. The purpose of the day, the day itself, is an organizational day that then results in the ability to clean out certain materials that are candidates for destruction.

Q. And do you see under 4.2, under "minimum," these are minimum implementation standards; true?

A. I see that, yes.

Q. And under 4.2, it says, "The operating company shall conduct a cleanout event on an annual basis."

So it means it's mandatory and it has to be done annually; true?

A. Based on this, yes.

Q. And if you turn to the next page, Page Number 2 of RIMS Number 3 in the WWRIM version from September 30, 2009, under 4.3, it defines all of the -- it lists all of the types of documents that are subject to the cleanout; true?

A. Yes.

Q. And it says, "The cleanout event conducted by the operating company shall apply the requirements of the records retention schedule to

all media formats, hardcopy and electronic, originals or copies, and draft documents during the cleanout event activities."

True?

A. Yes.

Q. So it -- it pertains to all types of documents, not just paper documents; correct?

A. Correct.

Q. There is a reference to a cleanout communication kit.

Have you seen a cleanout communication kit?

A. Can you reference me to that sentence?

Q. That is under 4.5. "Instructions for accessing and reviewing hold notes will be provided in the cleanout communication kit."

A. Yes, I see that.

Q. Do you see that?

A. Yes. I do now.

Q. What is the "cleanout communication kit"?

A. I don't know.

Q. Did it set forth the methods of destroying or disposing of documents that were no longer under legal hold or retention?

A. Well, I can't speak to the contents of the

kit itself, but I have general knowledge that users were provided instructions, and I also have an understanding that users were provided lists of legal holds.

Q. And the list of instructions would include how to go about destroying documents that weren't under a legal hold or retention; correct?

MR. COX: Object to the form.

THE WITNESS: They would include instructions how to identify them and bring them to the manager or records officers for approval.

BY MR. SWANSON:

Q. But would it include instructions about how to go about destroying them? I mean, because, for example, if I've got emails on my computer and they're not under a legal hold or a retention and I've come to the cleanout event for the year and I know if those aren't on retention when I'm going through my stuff, these have to be thrown out, right, destroyed, disposed of, does this cleanout communication kit tell me how to go about doing that so that I eliminate all trace of them?

MR. COX: Object to the form.

THE WITNESS: I can -- I can't speak to the content of the instructions. I can speak to

my general knowledge of how users were using email at that point and how the cleanout days operated in general.

BY MR. SWANSON:

Q. I didn't ask that. So you don't know if this cleanup communication kit had those instructions about how to go about destroying emails that were -- should no longer be retained -- or other documents; true?

A. The reason I can speak to email is my knowledge of how emails were retained at that point in time.

Q. Okay. But you're not answering the question. I understand you have information that you want to tell me, but I'm just asking you a very simple question, which is: Do you know if this kit told them how -- employees how they should destroy the records? Let me give you an example. Forget email for a second.

Paper documents, okay? I've got documents in my office, I'm a Johnson & Johnson employee. They're not under records retention, they're not under a hold anymore, and I know I'm supposed to destroy them.

Do I have an instruction on destroying

them? For example, shredding them?

MR. COX: Object to the form.

THE WITNESS: I don't know, as I mentioned before, what's in the cleanout instructions. I do know that for those paper documents, in your example, on cleanout days they wheeled these blue containers on to the floor to be used for destruction of paper materials, if approved.

BY MR. SWANSON:

Q. So the approved materials for destruction, they're in a bin that wheels out; is that right?

A. That is how a cleanout day was described to me for the sake of paper materials.

Q. So somebody was given the task of wheeling this to each office or was it put in a central location, do you know?

A. No.

Q. And then if you are -- if the records were supposed to be destroyed under this cleanout event policy, you'd put them in that bin; is that right?

A. With approvals, yes.

Q. What do you mean "with approvals"?

A. With the managers and records coordinators approvals, they could be put in the bin.

Q. And what did that approval consist of?

A. That the employee has been verified to have confirmed the records period and the lack of an applicable legal hold or other reason why the records should be retained.

Q. And is that in the WWRIM policy? Is that written out, that there had to be approval?

A. I don't know.

Q. So where did you get that information specifically that somebody had to specifically approve an employee's destruction of records pursuant to the cleanout policy?

A. I had interviewed in the past Karen Skellington and other records officers who described the procedure. I'm not sure if it's in these notes or not.

Q. And specifically what did Karen Skellington say about what the manager or whoever's role was in signing off on that and approving it?

A. I don't have more specifics than -- than that at this point.

Q. Do you know if there was any kind of documentation created?

A. I have general knowledge that the sign-offs were in physical form, that there

were -- they were physical sign-offs. What documentation that created I don't know.

Q. Do you know -- have you seen that documentation?

MR. COX: Object to the form.

THE WITNESS: I don't recall.

BY MR. SWANSON:

Q. What's the retention policy of that documentation of sign-offs, if you know?

A. I don't.

Q. The cleanout day, would that include videos?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. It says all media formats; correct?

A. Yeah. I don't have any better interpretation than that.

Q. Would include CDs, correct, all media formats, including hardcopy, electronic?

A. That would suggest to me that CDs would be included.

Q. Did it include, for example, talc samples?

A. I would not conclude that based on my read of the policy.

Q. What -- and why is that?

A. I don't see where samples would be defined as a -- as a record.

Q. Was there an equivalent cleanout policy for talc samples and talc grids, if you know?

A. I'm not aware of such a policy.

Q. But samples, things like samples and grids that were relating to, let's say, testing, if it was -- if talc was being tested and a particular sample was tested and there were -- do you know what a TEM grid is that's generated from electronic microscopy? Generally, you know, you've heard of it; right?

A. I've heard the term "grids."

Q. Okay. And do you know -- the policies -- at some point, did the retention policies have something to say about that kind of physical evidence like a sample or a grid?

MR. COX: Object to the form.

THE WITNESS: Not that I'm aware.

BY MR. SWANSON:

Q. So at page 2 of RIMS 3, you see under 4.33, and it just puts in writing there what we had talked about, which is that essentially a document hold suspends the direction -- the destruction or deletion of records; correct?

A. Yes. Suspends operation of the policy.

Q. Right. Okay. If you look at RIMS 3, page 3. Here it is. I knew I saw that in there.

You see under 4.6 it talks about a cleanout communication kit which will contain at minimum the information listed below?

A. Yes.

Q. And that includes the proper methods of destruction and deletion; correct?

A. I see that, yes.

Q. So presumably if we had the cleanout communications kit, that would tell us specifically how to destroy, like, paper documents and that sort of thing; true?

A. For that particular event, yes.

Q. And under 4.7 it says, "The activities and participation shall be documented and reported."

Again, does Johnson & Johnson -- you don't know how long it retains those reports, do you?

A. Correct.

Q. Do you know if it still has them, back to 2009, for example?

A. I don't know one way or the other.

Q. Under -- at the very bottom it says, "new standard."

Do you see that, "Version 1.0"?

A. Yes.

Q. It says, "new document issued," has the date 30th of September 2009.

But it has that under -- it says "revision history."

So was that a revision or not?

A. Well, I believe that the -- the overarching policy is 1.1, but this is the first release of the records cleanout standards, so it's designated 1.0.

Q. So let's look at the subsequent version of this. Exhibit 28.

Do you have that in front of you?

A. Yes, I do.

Q. If you go to RIMS 3. It's seven pages in or something like that.

Do you have that in front of you?

A. Yes.

Q. And this version, Version 2.0, was dated January 31, 2011; right?

A. Yes.

Q. And do you see now that it's called the "records cleanup events standard"?

A. Yes.

Q. This is the same basic policy, though; correct?

MR. COX: Object to the form.

THE WITNESS: I mean, subject to the revision history on page 3, yes.

BY MR. SWANSON:

Q. Okay. So there was some sort of changes, fine-tuning to the policy at that point; is that right?

A. Yeah. They are listed in the -- in the table.

Q. Why was the name changed from "cleanout" to "cleanup"?

A. Well, I can only point to the revision history that says that for the law department, that change was requested.

Q. Do you know why the law department decided to call it a "cleanup" instead of a "cleanout"?

A. No.

Q. Did the -- now, when you interviewed folks -- and I think there were four or five of them -- about this, they all referred to it as "cleanout," didn't they?

A. I would have to check. There's some sort of a search. I can do some quick searches.

Q. So let me -- if you look at -- I can give you some references there to help you out. Page 5 -- page 30, 31, 34, and 55. And you're looking at your notes, and the paginated version of your notes is Exhibit 26.

A. I'm sorry, one more time, please?

Q. Oh. 5 is, I think, the first reference, to about two-thirds of the way down, the "annual cleanout days." This was...

A. Yes. Kate Gillespie.

Q. And then the next one was, I think, Dodd at page 30.

You see "cleanout" at the bottom?

A. Yes.

Q. "Cleanout days" stopped around 2011?

A. Yes.

Q. So we don't need to go through each and every one of them, but these folks were still talking about "cleanout" at the point you interviewed them in 2018; correct?

A. Yes.

Q. So -- and yet the policy was to call it "cleanup" as of 2011. So it sounds like that never really caught on, did it, "cleanup" as opposed to "cleanout"?

MR. COX: Object to the form.

THE WITNESS: I just wrote down as they told me.

BY MR. SWANSON:

Q. But when I first asked you about "cleanout," you understood what I meant immediately; right?

A. Yes.

Q. From those conversations?

A. Yes.

Q. And did they continue to -- did Johnson & Johnson continue to call those kits "cleanout communication kits," do you know?

A. I don't know.

MR. COX: Are we at a good point for a short break?

MR. SWANSON: Sure. Yeah.

THE VIDEOGRAPHER: This marks the end of Media Number 2 in the deposition of James Mittenthal. We are going off the record at 11:46.

(Recess taken.)

THE VIDEOGRAPHER: On the record at 12:03 p.m. This marks the start of Media Number 3 in the deposition of James Mittenthal.

Counsel, you may continue.

(Whereupon, Plaintiff's Exhibit 30 was marked for identification.)

BY MR. SWANSON:

Q. Mr. Mittenthal, I'm handing you Exhibit 30 and, Counsel, if you need to look at this, it's a portion of a records retention schedule, it appears to be.

Do you have that in front of you?

A. I do.

Q. So this is the Johnson & Johnson Consumer records and information management records retention schedule department records and information management; right?

A. It appears to be.

Q. And this is -- is this the current one?

A. I don't know. I'm just looking at the effective date, 14 May 2018, what it says on it.

Q. It's recent, it's not current, but you're not sure if this is current; is that true?

A. I would have to confirm that.

Q. Okay. If you look at Page Number 2, do you see there's a retention schedule for records cleanup there?

A. Yes.

Q. And that would be -- that says for the

annual cleanup for Consumer U.S.

Do you see that?

A. Yes.

Q. "May include approval memos, cleanup kits and/or housekeeping information"; right?

A. Yes.

Q. So that's -- that's the cleanout or cleanup event that we were talking about before; true? That's what that's referring to, the records retention on the kits related to that?

MR. COX: Object to the form.

THE WITNESS: It appears to be so, yes.

BY MR. SWANSON:

Q. And so -- and the records retention on that was how many years?

A. The time it's active plus ten years.

Q. So if there was a cleanout communication kit as part of, let's say, the 2009 Version 1.1 policy that was being used, would "active" -- how long would "active" be?

A. I don't know. I would want to consult the definitions.

Q. Okay. So -- well, you don't believe that in the WWRIM policy what is meant in this records retention is defined by the term "active," do you?

A. I have seen somewhere here, on -- on WWRIM, RIMS 12.

Q. Which exhibit is this?

A. This is -- the first version I grabbed was Version 2.0.

Q. Okay. That's fine. Got it.

A. RIMS 12, page 2. And I may be able to reference a later version that I was just looking for a basic definition of "active."

Q. That's fine.

A. And it says, "Retain the record or information while the document is active, in force, or in use. Once the document is no longer active, then the retention period starts and is calculated."

Q. Good. So, in other words, the 2009 RIMS got replaced by this 2011 one in January 2011. So for the 2' -- those cleanout kits from the 2009 policy, they would be retained until 2021, correct, according the that policy?

A. Yeah. I don't want to interpret what they mean by the document being active. I don't know how to interpret that against the cleanout information. It may be that's the case.

Q. Okay. But at a minimum, it would be

10 years past the date of that policy; right?

A. Yes.

Q. Okay. That's all I have about that one.

Now, we had talked about how the cleanout policy included various formats of records and documentation; correct?

A. Yes.

Q. And -- "including hardcopy, all media formats, electronic," that would include x-ray imagery; true?

A. I don't know.

Q. Well, if there were -- if there were TEM or SEM images on any of these media, that would be a document included in the policy; right?

MR. COX: Object to the form.

THE WITNESS: I would want to look and check the policy and see how they -- how they define "document," if it includes that type of media. I just don't know.

BY MR. SWANSON:

Q. Well, it says, "all media formats, hardcopy and electronic, originals or copies, and draft documents."

You're not thinking that this pertains only to written words, are you?

A. No.

Q. Okay. So it would include images; correct? It would include sound recordings on those types of media?

MR. COX: Object to the form.

THE WITNESS: I'm going to double-check the worldwide RIMS and see if there is a complete definition of what they consider a record to be.

Okay. Actually, it's on the first page. I'm once again looking at the 2.0 policy.

BY MR. SWANSON:

Q. Okay.

A. "The form of records and information includes but is not limited to paper, electronic, microfilm, microfiche, photograph, map, magnetic or optical disk or tape, software or video, or other recorded information."

Q. So that would include images?

A. I'm just checking the current -- the 5.0 version to see if that definition has changed. I don't see a -- I checked the definition version of 4.0 and it appears to be similar.

Q. Okay.

A. I recognize that an x-ray is a media that contains recorded information.

Q. This is an inclusive policy, because when it says "any form of recorded information created, maintained, or received by Johnson & Johnson," it says those records and information include but are not limited to. So this is an included -- this is a very inclusive policy, correct, in terms of the kinds of information that these cleanout days were affecting?

MR. COX: Object to the form.

THE WITNESS: Yeah. I just note that they -- that they inserted audiovisual material in the later definition. Maybe some other changes, too.

BY MR. SWANSON:

Q. But in Version 2.0, it said "microfilm, microfiche, photographs," so that information was included in there, too; correct?

A. Yes.

Q. Did you consult with Johnson & Johnson on any of the changes that went into these various WWRIM policies?

A. I have -- I believe in my notes from Karen Skellington possibly there are some references to some of the changes.

Q. Let me ask a different question. Were any

of -- were you -- did you give input on any changes that were made in these policies before they were made, or at the time they were made?

A. I did not.

Q. Now, you mentioned Karen Skellington. You talked to her about the changes in the WWRIM; is that right?

A. Some of the changes.

Q. Where is that in your notes?

A. Page 59 of your numbering.

Q. Can you point me to it?

A. Oh, sure. It's about 15 lines down. There's a line by itself. "WWRIM assigns every op code," and below that it starts, "18 standards put out in 2009, now '17. Other guidelines existed pre2009. Karen came in, in 2008 and worked to consolidate, remove cleanup standard." Moving -- moving down the document of 5.0 is "current version effective April '17." Some notes about how the standards evolved, et cetera.

Q. Now, each of these standards subsequent to 1.0 has a revision history; is that right? If you look within the first few pages, for example, you know, you go to 3 or 4, you take Version 3, for example.

Do you have that?

Which is marked as Exhibit 29.

And I think --

A. I do see "revision histories."

Q. And do you have the WWRIM policy Version 3 in front of you?

A. Yes, I do.

Q. And six pages in to that is a revision history generally of this document; correct?

A. Well, the -- the top document. The actual policy document as opposed to the standards underneath it, yes.

Q. Now, what do you mean "as opposed to the standards underneath it"? because the standards underneath it include the RIMS 1 through how many ever it goes to; correct?

A. Well, RIMS -- RIMS 1 is actually the standard and then prior to RIMS 1 -- and I'm looking at the 3.0 version that we're talking about -- there is a policy, call it a preamble, or an introductory section which is denoted as the worldwide records and information management policy. And then the things beneath that are known as -- are denoted as standards.

Q. Okay. But so this -- but this history

that's given on the policy, it includes changes -- detail -- it's a -- would you agree that that's a detailed accounting of what the changes were made in terms of the language of the policy? If you look at page 6 there again?

A. Yeah. I'm looking at it and it appears to be changes just made to these first few pages which constitute the policy. Then, within that, each standard also has its own change history.

Q. And you see there in terms of this Version 3.0 of the WWRIM policy, it notes that the -- and by this time, they were calling it the "cleanup event," it says "retired RIMS 3."

Do you see that?

A. I'm sorry. What page are we on?

Q. We're page 6 still. And this is the WWRIM policy December 31, 2013.

A. Yes, I see it.

Q. And is -- is this an accurate accounting of the changes that are made in the policy from one to the next?

MR. COX: Object to the form.

THE WITNESS: Yes. Inasmuch as now the standards jump from RIMS 2 to RIMS 4.

BY MR. SWANSON:

Q. Okay. And the way that these histories are written is that it's written with a lot of detail; right? Going back to page 6, it says "paragraph 2, removed sentence redundant tied with paragraph 3." You know, above there it says "where applicable change throughout 'employee' to 'associate.'"

These are very specific references to where the changes are being made, specifically what changes are being made in the policies as we get to subsequent versions; right?

A. Yes.

Q. So in theory, we should be able to take a subsequent version like Version 3 and if we didn't have 2 and 1, reconstitute, rewrite from it the prior version; correct?

MR. COX: Object to the form.

THE WITNESS: It would depend on the nature of the changes. To the extent that they -- they were word level, you could back -- back your way through it.

In this case, there appear to be -- I mean, there were references and sentences removed that might make it difficult to reconstitute it completely. But the -- you could create a rough

facsimile of an earlier version.

BY MR. SWANSON:

Q. But it should -- it's supposed to be an accurate accounting of what has been changed version to version; correct?

A. Yes.

Q. And that accounting includes, you know, everything that's changed from the beginning to the current version; correct?

A. Yes.

Q. And so if you go to -- this was Version 3. And we saw in Version 3 there was a reference, right, at page 6 to the cleanup event that was specified under RIMS Standard 3 in a previous version having been suspended or removed; correct?

A. Yes.

Q. And, in fact, in this Version 3, it's -- if you thumb through it, you can see that there is no RIMS Standard 3; correct?

A. Correct.

Q. And if you go to 4, Version 4, again, if you go to the revision history, page 6, it has -- again it states how -- the revision history in the same sort of way that it did under Number 3 and it includes that reference to the cleanup event;

correct?

A. Yes.

Q. And it has a full history from Version 1.0 up to this current version stating what the changes were; true?

A. Yes.

Q. And if you go to Version 5, which is Exhibit 24, and you go to page, looks like 5 through 8 -- do you see that? -- is the revision history?

A. Yes.

Q. And you see there were a lot of revisions made from 4 to 5?

A. Yes.

Q. Is there a Version 6 or is this the latest version, Number 5?

A. Well, I noted that when I spoke to Karen Skellington she said that 5.0 is the current version and that that was effective in April of 2017 which is what is reflected in this document (indicating).

Q. Good. Now if we go to -- and you see the changes are reflected for Number 4; right?

A. Yes.

Q. Now, if you go to Version Number 3 in its

version history, you see that?

A. Yes.

Q. Where is the reference to cleanout event? Or cleanup event in this history?

A. I don't see it.

Q. So if all we had in front of us was this Version 5, we wouldn't know about the cleanout event, would we?

MR. COX: Object to the form.

THE WITNESS: Well, we certainly wouldn't know about it from the revision history pertaining to 3.0.

BY MR. SWANSON:

Q. Well, is -- well, if I've got a current version in front of me and I've got this history that's supposed to be a faithful history of these changes, I don't know about this history of a cleanout event, do I?

True?

A. I don't see it in the history.

Q. Okay. So -- so this is no longer an accurate accounting -- the version history is no longer an accurate accounting of the version histories; true?

MR. COX: Object to the form.

BY MR. SWANSON:
Q. You have in front of you, it's not in the version history; correct?
A. Right. I'm just checking to -- to understand if the numbering of the standards is still as it was before, and the document does go from RIMS 2 to RIMS 4 with no RIMS 3. So there is an artifact in the sense that that RIMS 3 is still not represented.
Q. Right. It's gone, because it was gone after Version 3 of the WWRIM; true?
A. Yes.
Q. And that's when -- and then the version history, though, in Number 3 and 4 accurately reflected that that section had been removed because that event was no longer in force; correct?
A. Correct.
Q. And in Version 5 of the history, that disappears; right? It's not there; true?
A. I don't see it.
Q. Okay. So this version history has been changed and it no longer accurately reflects what happened; true?
A. It no longer reflects the -- in that area

in the revision history no longer reflects the removal of the cleanout standard.

Q. And do you know who made the decision to remove the reference to the cleanout days from the Version Number 5 WWRIM Johnson & Johnson worldwide policy?

It's not in your notes, is it?

A. I don't believe so.

Q. I didn't see it there.

A. I was just looking in my notes to understand who -- who would have been a point person at that point in time.

Q. Did the lawyers make that decision?

A. I don't know.

Q. Did you see -- going back to Version Number 4 of the WWRIM policy, it says "Exhibit 23." If you go to Page Number 6.

Do you have that in front of you?

A. Yes.

Q. It -- it states there that Johnson & Johnson -- in the reference to the cleanup event states that Johnson & Johnson has changed its philosophy on annual cleanups; right?

A. Yes.

Q. So that reference to a change in

philosophy is now gone in Version 5; correct?

A. I don't see it.

Q. And that change in philosophy, do you have an understanding of what that change in philosophy was specifically?

A. Simply as -- as is stated in the notes, "Associates shall independently manage their records and information during the normal course of business."

Q. Okay. Now, you know that -- I'm going to switch gears a little here on you.

You know that there's an issue of exposure in the Philippines in this case; correct?

A. Yes.

Q. In the Leavitt case. And of exposure in Hong Kong in the Fong case; true?

A. Yes.

Q. And that -- are you aware that the talc that was used for Johnson's Baby Powder that was manufactured or packaged at those locations came from Korea?

A. I'm -- I have a general awareness of that.

Q. Okay. Now, of the retention schedules -- I want to get back into the retention schedules briefly here.

What is the earliest retention schedule that has been produced to us that you're aware of that affects Johnson & Johnson Philippines, Johnson & Johnson Hong Kong, or the Asia Pacific? Well, let me -- let me ask a foundational question first.

Are those -- I noticed there was some references in your notes to APAC, A-P-A-C. Does that sound familiar to you? And I assumed that that referred to Asian Pacific? Asia Pacific or something like that?

A. I think -- I'd have to see it in context.

Q. Let me see if I can find a reference.

Oh, there's a reference here at page 3 of your notes.

A. Your page 3?

Q. Yes. Right. That's correct. This is again Exhibit 26.

A. So this is Tom Doyle and Judy Dowling?

Q. Yes. Do you see in the first paragraph there, there's a reference to APAC?

A. Yes.

Q. And without having you read through the rest of your notes right now, I'll just represent to you there are other references where you use

that acronym, APAC.

What does that stand for?

A. I believe it's Asia Pacific, but I don't recall --

Q. Okay. Let's --

A. -- confirming that.

Q. Sorry. Didn't mean to cut you off.

Can you turn to page 20. I see another reference to it.

Do you see where you were speaking to an individual named Nicholas Zhu?

A. Yes.

Q. And it says "responsible for APAC." Then it says "Thailand, China, Philippines," et cetera; correct?

A. Yes.

Q. So do you believe that refers something to Asia Pacific; correct?

A. Yes.

Q. So let me ask you questions broadly about any retention schedules or policies that would have impacted -- been in effect in the Philippines, in Hong Kong. Let's start with those two and we'll probably include China, but that might be more recent.

But so -- and Korea.

What was the first retention policies that would have been in effect and controlled retention of documents -- retention and disposition of documents at Johnson & Johnson Philippines?

A. I don't know the year that that would have been applicable, the first year.

Q. Do you -- was the 1997 policy, which is the first policy that has been produced to us, the oldest policy and the oldest one that you've seen, according to your testimony, did that apply to Johnson & Johnson Philippines?

A. I would have to confirm that.

Q. Okay. And before you go about -- and does the policy itself say whether or not it affects it, whether or not that policy is the policy for the Philippines or the Asia Pacific, or whether it's just domestic?

A. Yeah. The document itself does not have a scope associated with it.

Q. So you don't -- you don't know whether or not this records retention guideline schedule applied to Asia Pacific, to Hong Kong, or the Philippines; correct?

A. That's correct.

Q. Do you know if any of the records retention schedules that Johnson & Johnson has apply to Johnson & Johnson Philippines?

A. I would have to look at the scope of each one. I don't know offhand.

Q. But there's nothing in this 1997 guideline for records retention schedule that tells you what applies broadly to all of their operating companies; correct?

A. Correct.

Q. And I don't want you to guess, but would you agree with me that the natural inference looking at this is that it did not apply; correct?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Since it says Johnson & Johnson Consumer Products Companies. I don't want you to speculate. So. Okay.

And you can't tell me right now what the first year is that there is a retention policy that applies to the Philippines, to J&J China, or J&J Hong Kong; true?

A. You know, I have a general knowledge from talking to people at the company that there were retention practices. I can't speak to the

specific schedules that apply.

Q. And we'll get into that in a minute.

So you're not sure if any of the retention schedules apply, and if you have, you know, information about that even after the break as to whether these did or not, we can revisit it.

Now, when you say you have information generally about retention practices, is this something that's reflected in your notes?

A. Yes.

Q. And these are retention practices at which locations?

A. It was not location-specific. It was simply an indication of how long certain materials were held.

Q. By whom? In other words, which operating company are we talking about now? because I'm obviously interested in asking right now, but just about the Philippines, Hong Kong, China, Korea.

A. I would need to reference a couple of pieces of my notes here.

Q. I don't know what page you're at, but if you look at pages 20 and 21, there are references to overseas operations. I don't know if that -- any of that helps you.

A. Yes. And I was looking at Don Hicks who indicated that in 2009, a global specification was created. I'm jumping now to page 20.
Q. Okay. Page 20. This is Don Hicks?
A. Well, this is now Nicholas Zhu --
Q. Wait. Let's go -- since you are the one who raised the reference to Don Hicks --
A. Okay.
Q. -- what page of that, that were you looking at specifically?
A. Oh, that was -- just lost it. Page 13.
Q. Okay. This is talking about a global talc spec created in 2009; correct?
A. Yes.
Q. Okay. I'm asking about retention policies.
A. Okay.
Q. So if you can locate the place in your notes, if you have -- you haven't been specific as to the Philippines or Hong Kong or Asia Pacific or Korea, remember, my query is directed to finding out what retention schedules; policies with respect to retaining documents; destroying, disposing of documents, as to those areas. That's what I'm looking for.

A. Right. Okay.

Q. And if you find information that, that you have as a representative of Johnson & Johnson, tell me.

MR. SWANSON: While he's doing that, let's go off the transcript record briefly, and I'm going to go check on something and you keep looking.

MR. COX: Let's go off the record entirely.

MR. SWANSON: What's that?

MR. COX: Let's go off the video record, too.

MR. SWANSON: Why? I mean, I'm going to be back in two seconds. I mean, we don't need to do that whole thing of getting off it. I'll be back in two seconds. I want him to have time to look through that.

(Off the stenographic record.)

MR. SWANSON: Back on the record.

BY MR. SWANSON:

Q. Have you located some information about retention policies or retention guidelines that would have been in effect -- or practices in effect in the Philippines, Korea, China, or Hong

Kong?

A. Well, I spoke to -- this is on page 42. I have a reference to a conversation with Uday Sharan who was a sourcing manager who was based in the -- in that region, and he was specifically talking about Thailand, but he indicated that the -- from his perspective, they kept documents for -- and he was talking about the manufacturing records, that the retention on those was five years. I don't -- I have not yet found other references to any retention schedules for those particular regions.

Q. Now, you knew coming in to this deposition as -- you knew -- you knew that your assignment here, part of it, was to talk about retention schedules; right?

A. Yes.

Q. And so as a representative for Johnson & Johnson sitting here today, knowing that this was part of the assignment and knowing that these areas of the world and their retention policies were relevant to the case, you don't have any information to provide today; correct?

MR. COX: Object to the characterization. Object to the form of the question.

THE WITNESS: What I do know is that there were retention schedules in those regions, the retention practices and/or schedules; that there was information saved for periods of time. For example, Don Hicks indicated that the -- and Uday indicated that those materials were saved five years plus one, six years.

I have an understanding that information in those regions that was stored in the United States was subject to the retention schedules that we've already discussed.

I have also the understanding that those -- there are physical files in those regions of the world that were consulted and searched for materials, and that there were materials that were stored off site there were consulted.

I don't have the particular retention schedule that they were responsive to, but I understand that there was a practice for maintaining information in those regions.

BY MR. SWANSON:

Q. Specifically as to the Philippines, do you know if there's ever been a formal retention schedule for documents archived, retained, kept, generated at J&J Philippines?

A. I don't know at this moment.

Q. And do you know if there has ever been a formal policy for J&J Hong Kong for the retention, archiving of documents?

A. I would -- once again, I don't know, and it may be that the schedules I have apply to -- the current schedules apply to that time period. I just don't know.

Q. I understand.

A. I'm sorry, applied to that --

Q. You say maybe.

A. I --

Q. You say maybe --

A. Let me correct what I said. Not applied to that time period. Applied to that region. I misspoke.

Q. Now, just briefly, this reference you made to Uday Sharan, that's for Thailand; right?

A. Yes.

Q. He's not talking about the Philippines.

A. I understand that.

Q. Right. And he's not talking about Hong Kong; correct? And -- right?

A. Correct.

Q. And the source of that talc was European

talc, correct, not Korean talc?

A. He was speaking to the retention of materials in Thailand, and I drew from my understanding of my conversation with him that those materials, there were retention practices in that area and in the Asia Pacific region.

MR. SWANSON: Move to strike. Nonresponsive.

I think that's a good time to break for lunch.

Let's go off the record.

THE VIDEOGRAPHER: Off the record.

Time is now 12:52 p.m.

(Lunch break taken.)

THE VIDEOGRAPHER: On the record at 1:55 p.m. Counsel, you may continue.

MR. CARPENTER: Counsel, can I make that quick --

MR. SWANSON: Sure.

MR. CARPENTER: This is Erin Carpenter. I failed earlier when I was putting my appearance on the record to also indicate that I am here -- I'm specially appearing on behalf of Imerys U.S.A., Inc. That's it. Thank you.

BY MR. SWANSON:

Q. Good afternoon, Mr. Mittenthal. We're back on the record after the lunch break.

A. Good afternoon.

Q. I was asking you about retention policies, schedules, procedures that apply to the Asia Pacific or to the Philippines, Hong Kong, China, and I'd asked you about the policies that have been produced in this case going back to 1997 and you weren't sure which of any of those policies applied to J&J's operating companies in those regions and countries; correct?

A. Correct.

Q. Have you -- have you looked at any of those policies since we were discussing that earlier?

A. I've determined that I will -- I'm not able to ascertain based on what I have at my disposal right now.

Q. And, based on your conversations with various folks that are reflected in your notes or any subsequent conversations you have, other than what we've already discussed, you're not -- well, strike that.

We've discussed what you had in your notes with respect to any retentions over -- overseas;

correct?

A. Generally, yes.

Q. And you're not -- then just to kind of close the loop, you're not aware of what, if any, retention policies were in effect at the J&J Philippines; correct?

A. Correct.

Q. And you're not aware of any retention schedule that was in effect at J&J Hong Kong; correct?

A. Correct.

Q. Are you familiar with worldwide talc surveys? Did you hear anything about that?

A. I have an understanding of that, yes.

Q. Other than the survey documents themselves that were produced -- and there were a few of those produced -- do you have any information about retention for documents related to Korean talc that was used in Johnson's Baby Powder in Hong Kong and the Philippines?

A. I don't, no.

Q. What is the current retention schedule for -- and this may include different types of documents, but for documents related to the testing of talc for mineral contaminants like

asbestos?

A. Well, I would have to consult the -- the schedule.

Q. Why don't you go ahead and do that. In fact -- well, before you consult the schedule, because obviously I want to be -- I want us to be as efficient as we can be with our time -- have you seen something in the retention schedules that you believe applies to analytical testing reports that would be reports or, for example, the actual films or digital images from microscopy or the images or charts that would come from, I think, EDS or, you know, spectrographs, that sort of thing?

A. I don't recall with specificity. I have seen in the departmental schedules references to testing. I've seen references to testing in supplier agreements and I've seen references to testing in legal hold notices.

Q. Would you know where to look in the retention policies for something like that? Would it be under R&D?

A. Well, I -- because the schedules are departmental in scope, I would look under R&D. I would look under manufacturing. I might look

under quality. There's a couple places where I might look.

Q. Okay. I'd like to find out what the retention on these testing documents was as of 1997. And then if we need to talk about it currently, I want to know what the retention on that would be. And to be clear, what I'm looking for is testing-related documents on both finished product and on the cosmetic talc products and also on talc ore. And milled -- milled ore also, just to be clear.

I don't know if this helps you. But at page 190 of the 1997 policy, there's a reference to manufacturing and material analyst reports. I mean...

A. Yeah. I just about caught up to you, I was on 188.

Q. Okay.

A. I mean, I'm not an expert on the testing process. I see -- I'm just looking for the word "test."

I see, for instance, test cases on 188. I don't know if that applies or not. I'm going to -- I guess from there, I see material analysis reports as you mentioned.

I'm looking under -- I'm now up to "quality," page 221. And I see an entry called "analytical chemistry testing finished product devices."

Q. I'm sorry. Where is that again?

A. The top of 221. Once again, I don't know. I'm not an expert on the testing process. I don't know if that applies. I'm just looking for places where the word "testing" appears in relevant categories.

Q. And what's the minimum retention for -- well, first of all, let's go back, and I should have asked you as you were going here. We talked about material analyst analysis reports.

What's the minimum retention for those as of 1997?

A. I think that was LP, if I remember correctly. That was page 188.

Q. 190.

A. Oh, I was on 188. Yeah, 190. LP plus 6.

Q. What does that mean?

A. Life of the product. In other words, the expected life of the product in the marketplace plus six years.

Q. Does that mean like shelf life?

A. I don't know if it equates to shelf life. It may.

Q. What else would it equate or would it reference life of the product as in its baby powder, and baby powder is going to continue to be around, so essentially it would always be under retention. See what I'm saying?

A. Actually, I don't. I'm sorry.

Q. Well, life of the product. I mean, there's a life of a product, the period of time during which a company manufactures a given product; right?

A. Oh, yes.

Q. You know, under various specifications or particular specification and it's a product like Johnson's Baby Powder. I mean, that could be called "life of the product"; right?

A. Yes. You're right.

Q. But life of product here under "material analyst reports," you're not sure what that means in that context? I mean, is that shelf life? Is it something more than shelf life? Is it, you know, how long they've been -- they are going to manufacture Johnson's Baby Powder?

A. Yes. And I -- you know, I don't think I

want to interpret that without a little bit more research.

Q. So I know there's a lot of questions here today. But you were aware that these were central issues about testing in these cases, right, in talc testing, correct?

MR. COX: Object to the form of the question. Object to the characterization that this is a central issue or that a lot of the questions today regard central issues in the deposition notice or this case -- these cases.

THE WITNESS: I was aware that the -- one of the noticed topics had to do with retention.

BY MR. SWANSON:

Q. And you also, though, know that in these cases, even though you're not an expert on testing, that testing and test results and the retention of those testing is an important issue to these cases; correct? The talc testing I'm referring to.

A. Well, I wouldn't want to give an opinion, but I understand that it has been raised as an issue.

Q. So. And you understood that as a spokesperson for Johnson & Johnson, you were to be

prepared to speak on these issues, correct, because we've asked about them?

MR. COX: Object to the form.

THE WITNESS: I understand that the retention of documentation is a topic and that I am prepared to speak on that.

BY MR. SWANSON:

Q. Okay. But, as you sit here right now, you're not prepared to tell me what in 1997 life of the product meant as to these material analyst reports; correct?

A. That's right.

Q. Can you point -- and if we go to -- I think you referenced 221 of this 1997 retention schedule, "analytical chemistry testing finished product devices"?

A. Yes. And, once again, I'm not an expert. I don't know if that even applies, but I noted the word "testing" was -- was in there.

Q. Okay. But you don't even know if that applies to talc, do you?

A. Correct.

Q. Going three down, you see where it says "analytical reports and requests"?

A. Yes.

Q. On page 221. What does that refer to?

A. I can only speak to it's -- it's plain English. I don't -- I'm not here to interpret what that means.

Q. I don't want to waste time going through each of the policies like this.

Are you prepared, as you sit here today, to talk about specifically what the retention schedule is and the retention period for testing reports?

A. Well, as I mentioned, I'm not specifically able to sit here and say LP is identical to shelf life or make that assessment. What I can say is that I -- in addition to gathering the schedules, I interviewed people. I spoke to, for instance, Don Hicks, and Mr. Hicks gave a -- an appraisal that -- of testing, quality testing for talc that it was used in conjunction with the manufacturing process, that it's -- retention of those materials is tied to the expected shelf life of the product. Now, it may be the shelf life of the product plus a year; it may be double the shelf life of the product. It has changed over time, but I have a general understanding from Mr. Hicks that testing materials are generally held at least the expected

shelf life of the product plus some additional amount of time.

Q. And how long is the shelf life of Johnson's Baby Powder?

A. Well, I'm going to just refer to my discussion with Mr. Hicks. And that's at the top of -- I'm sorry. I'm on the marked copy. Let me pull that out. I can find it. Here it is. So now I'm looking at page 12. And the third, fourth, fifth lines down. "Testing" -- "test, manufacturing, inventory, shipping records tend to be kept for a shorter period per schedule times to when the product would be in the marketplace, generally about six years."

Q. Okay. So that's not quite shelf life, then. That's something longer than shelf life?

A. Once again, I -- I'm not an expert in interpreting what shelf life is or how long the product would be in the marketplace. I'm just -- I basically tried to gather that information from Mr. Hicks as best as I could.

Q. If you look at page 37 of your notes.

A. Yes.

Q. And this was from your discussion with Rosina Bruno-Sheerin.

A. Yes.

Q. Well, first of all, before I get there, and I apologize. Don Hicks, those records -- testing, manufacturing -- what kind of testing are we talking about and where?

A. I interpreted his comment to be those testing records that accompany batches or lots in the manufacturing process, such as certificates of analysis.

Q. And those certificates of analysis, were those something that were being generated by Johnson & Johnson or that came with the talc that came in?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Let me -- let me start that over again. What was included in the certificate of analysis? Did that include whether or not -- was there -- did that include a test for asbestos?

A. I'm not an expert on the testing process. I have a general understanding that there were -- there was testing done for asbestos. The best summary of the testing records I have is from Mark Zappa on page 19.

Q. But specifically what were they testing?

Now, Don Hicks was at the North Brunswick location, the manufacturing location; is that right?

A. I know he had various responsibilities. He was at one point in North Brunswick. I really don't know. I think he was at various locations. But he had -- you know, in the -- during the 2000s, he had a responsibility for quality issues related to talc manufacturing.

Q. So the records he was referring -- those testing records, you think it includes certificates of analysis?

A. Well, this is where I come to the follow-on conversation with Mr. Zappa on page 19.

Q. Okay. You said 19?

A. Yes.

Q. All right.

A. And this is under "follow-up."

Q. Got it.

A. And in this conversation, I sought to determine the flow of documentation through the -- through the life cycle so that there is testing done at the mine level. There is testing done when the -- when the material goes to Imerys, there is a -- the certificate of analysis is

transferred. There is testing that is done by Imerys itself. And then another C of A is created. I mean, I'm just basically reading from it. But then from Imerys to Pharma Tech, there are C of As sent and then additional testing done.

Q. Okay.

A. So there's -- that's kind of the flow of testing documentation.

Q. And so the mine -- and that would be prior to -- well, that would be the Vermont mines; right?

MR. COX: Object to the form.

THE WITNESS: Yeah. Once again, I mean, I'm not...

MR. CARPENTER: I'll join in that last objection. Also state lacks foundation.

BY MR. SWANSON:

Q. I'm sorry?

A. Yeah, I'm just going to say, I'm not an expert on which mines were in use at which point.

Q. So this certificate -- now, the mine did its own testing. It says that; right?

Now, Johnson & Johnson would get that certificate of analysis regarding that testing; is that right?

A. Well --

MR. COX: Object to the form. Beyond the scope of the notice.

Go ahead.

THE WITNESS: Just going through the workflow that Mr. Zappa established, the mine would create a C of A which then is forwarded.

BY MR. SWANSON:

Q. Let me try to cut to the chase on this stuff.

Is it true that you don't know specifically whether these tests that are reflected there were tests for asbestos content?

A. My general understanding is that the -- the tests did involve asbestos testing. The appearance and odor and fineness testing may not have included asbestos testing, but the -- my general understanding -- and once again, I'm not here to speak on anything but my general understanding of the testing process, but those -- those initial tests did include asbestos testing.

Q. And what was the retention on those; do you know?

A. Well, that goes back to -- to Mr. Hicks's comment to the applicable items in the retention

schedule. But it's going to be associated with the batch and lot six to seven years, and then there would also be a notation on that in the supplier agreement with PTI as to the retention period there.

Q. Now, if you go to page 37 -- this is Rosina Bruno-Sheerin.

Do you see that?

A. Yes.

Q. The second page of the notes about what she told you. It refers to R&D records being kept long-term.

Do you see that?

A. Yes.

Q. "Permanent or life of the product plus N years"?

A. Yes.

Q. What does "life of product" mean in that context?

A. It would appear she was talking about how long the product was being made.

MR. SWANSON: I'm sorry, can I have that read back, please.

(Record read by the court reporter.)

BY MR. SWANSON:

Q. So if she's referring to how long the product is being made, in other words, like Johnson's Baby Powder?

A. Yes.

Q. Not shelf life or anything like that; right?

A. Well, based on her comment about "permanent," I would say no.

Q. So but in the context of the retention schedule we looked at, we were -- we saw life of product plus 6, correct, for testing, that the manufacturing material analyst -- analysis reports?

Do you see that?

A. Yes, I did. That's on 190.

Q. So wouldn't that indicate that -- that what Don Hicks told you, doesn't that indicate they weren't at that facility following the retention policy, he said, shelf life plus 6 years, that's what that meant?

MR. COX: Object -- object to the form of the question.

THE WITNESS: Well, I believe you had guided me to the material analysis reports, that section, and I don't know -- I don't know enough

about what material analysis reports are to determine if they are associated with a batch or if there's some other type of -- I mean, I'm reading the text below it, and I see that they -- they talk about DMR and DHR; device master record, device history record. Based on that, I'm not sure that this section applies to lots of batches. I just don't know what material analysis reports are.

BY MR. SWANSON:

Q. Right. So, I mean, this kind of runs up against the problem I raised earlier, which is that you're here to speak on behalf of Johnson & Johnson. I'm trying to get this information from you and it seems to me like we're kind of guessing about what the proper retention schedule was. I mean, if Don Hicks told you it was shelf life plus 6 years in manufacturing but it was actually something different and required to be different, that's something we want to know about, and I can't get from you what the formal policies were with respect to retention of testing results and -- and not only testing results but the testing documents themselves: things like TEM images, x-ray diffraction, EDSs, that sort of

 thing.

So who is it we should be talking to, to get this information about what Johnson & Johnson's policies are and have been with respect to retention of testing records?

MR. COX: Object to the form of the question. Object to the extent that this line of questioning goes beyond the scope of the notice insofar as you're asking Mr. Mittenthal to give testimony about testing. He's not the corporate representative regarding different types of testing that was done by Johnson & Johnson or Johnson & Johnson Consumer, Inc.

MR. SWANSON: Counsel, what I'm trying to get at is -- I'm trying to get at what the retention schedules were and how long documents were supposed to be kept and whether or not there was an actual retention schedule as to any kind of testing reports to do with talc or milled talc, finished cosmetic talc products. And that's what is at issue in this case.

BY MR. SWANSON:

Q. And so, Mr. Mittenthal, let me ask you again, who is it that I should be talking to, to find this out?

A. Well, I learned it from Don Hicks and from others in my notes. I did not go out and take every interval described by Mr. Hicks and tie it back to every version of a retention schedule. I -- it would certainly be something that could be done. I did not do that step as part of my preparation. I did not view it as within my scope of preparation. There -- the -- I would expect that the retention schedules would be reflective of the comments that Mr. Hicks and others made to me.

MR. SWANSON: Move to strike that last sentence as being speculative.

BY MR. SWANSON:

Q. Does Johnson & Johnson have a formal retention policy as to retention of talc? And when I say "talc," I mean milled and talc ore testing results today?

A. Yes. My understanding is that it does, and I would look to the schedules, I would look to the supplier agreements to determine that.

Q. But you can't tell us what those retention periods are; correct?

A. Well, we were looking at the '97 schedule. I believe I can find it in the quality agreement.

Q. Okay. And where -- can you point me to the quality agreement?

A. So this is Exhibit 1. The quality agreements are provided under Tab 2D.

So I have -- on the first quality system, there's two different sets of numbers. The top says "9 of 16"; the lower one says "11 of 19."

Q. Can you direct me to where you're at specifically?

A. Yeah.

Q. This is 2D, Exhibit 2D?

A. Yes. 2D. That's right. And it's the --

MR. COX: How many pages?

THE WITNESS: Well, it appears to be nine pages in.

BY MR. SWANSON:

Q. These are --

A. I don't know why there's two sets of page numbers, but there's...

Q. Is this under "validation"?

A. I'm looking under 17.0, that section called "records."

Q. Oh, is this -- oh, yours aren't tabbed that way.

Sorry, did you say "inspection measures

and tests"?

A. 17.0. "Records." Under the first quality system procedure which is Exhibit 2D.

Q. Okay. I think I've got it. Yeah.

So what does that say about retention of testing results?

A. It says, "All documentation, including manufacturing records, packaging records, inspection records, QA records, batch tickets, cards records, et cetera, during the manufacturing process shall be maintained by PTI for six years from the date of manufacture."

Then it goes on to say, "The validation records are to be kept by PTI as long as the product is manufactured until the last batch of any discontinued product has expired."

Q. Just to be clear for the record, Pharma Tech Industries, PTI, was -- did the packaging of the manufacturing powder -- packaging of Johnson's Baby Powder for Johnson & Johnson; is that right?

A. That's my understanding.

Q. And where it says "records," and it says "six years," I notice "manufacturing records, packaging." Does it list testing?

A. It doesn't say testing per se, but it

speaks of testing in the sections that describe documentation prior to that. Sections 8, 9, 10.

Q. So PTI --

A. 13.

Q. I'm sorry. PTI started manufacturing in 2004 or '5, around there; right?

A. I need to check my notes on that.

So I show that in 2004 was the sale of the Royston plant to PTI.

Q. And do you know what the records retention was for Royston prior to that, if it had one?

A. Once again, I would be looking through these schedules to make that determination.

Q. Do you have a table of contents?

A. I'm going to see if there's a schedule closer to -- I'm sorry. Is that -- is this my pile here or that's? Not my pile.

Q. Any of those are ones you can -- those are all marked as exhibits, so.

A. Okay. So I found one in my pile that's 2002. So that would be closer to the sale to PTI.

Q. And what is that marked as? What's the exhibit number, I mean? Exhibit number?

A. Oh, I'm sorry. It's 12.

Q. Thank you.

A. And I do note that there are additional definitions at the bottom of the schedule.

Q. Okay. And you're looking at a 2002 records retention schedule of Johnson & Johnson Consumer and Personal Care companies; correct?

A. Yes.

Q. And is there something in here -- I had asked you about Royston or whoever was doing the manufacturing prior to PTI, but is there something in this record schedule from 2002 that you see with respect to a retention policy and testing of talc finished product or talc ore or milled talc?

A. I'm looking for it. It's --

Q. Did you find anything?

A. I mean, this is also -- half the pages are flipped, so I'm -- I would expect that there should be a section in here that would relate to batch record retention. I'm not finding it right now. I could continue to search on the break.

Q. Okay. Batch record retention. I'm specifically asking about any kind of testing of the finished product and of the talc that went into the finished product. So that could be a research and development document of the research department or it could be the manufacturing

department.

You understand that; right?

A. Yes.

Q. Okay. So that's what you're looking for.

A. Well, once again, I can try to match up the comments from Mr. Hicks and others to specific provisions of the schedule. I certainly would not say I'm qualified without exception to determine every place in the retention schedule that's responsive to that question. I can -- I can look for the word "testing" and make those determinations, but I can't speak to an interpretation of every category of the schedule.

MR. SWANSON: Move to strike as nonresponsive.

BY MR. SWANSON:

Q. Okay. So whatever information that you have about the retention of testing reports or things associated with testing is in your notes; is that what you're saying?

MR. COX: Object to the form.

THE WITNESS: My notes would be the primary source of my knowledge of that information.

BY MR. SWANSON:

Q. Do you know what the retention was on transmission electron microscopy grids that were created in testing Johnson's Baby Powder or in the talc ore or milled talc for asbestos content at any time?

MR. COX: Object to the form.

THE WITNESS: No, I don't know that.

BY MR. SWANSON:

Q. Do you know what the retention was on transmission electron microscopy images of testing of talc ore, milled talc, or cosmetic talc finished product at any time by Johnson & Johnson?

MR. COX: Object to the form.

THE WITNESS: Unless those have other common terms that I'm familiar with, I don't -- I'm not familiar with those terms.

BY MR. SWANSON:

Q. Do you know the retention schedule for those?

A. I'm not familiar with those -- those -- those categories, so I would not --

Q. They would be images taken from testing -- photomicrographs from testing. They might be included in a testing report.

A. Would they be associated with

manufacturing? Would they be associated with audits? Would they be associated with other steps of the process? I would -- if -- if, for instance, they were associated with the manufacturing process, Mr. Hicks has an answer for that, that I elicited. If they are associated with audits, there was an answer for that, that I elicited.

Q. What testing was done -- what do you mean by "audits" in -- with respect to testing of talc for the presence of asbestos?

A. My understanding is that a third party, RJ Lee and potentially other organizations, was contracted to perform quarterly testing of talc. That would have included a range of testing activities. That would have been -- those test results would have been captured and saved separate and apart from any ongoing manufacturing process and preserved.

Q. Okay. And where is that information either in the -- in the retention policy, if you know?

A. Yeah. As I did note, just flipping through it, there were some categories called "audits," but I have not undertaken to tie

Mr. Hicks or Mr. Zappa or other people's comments to specific sections of the schedule.

Q. Now, with respect to your notes, who did you speak to regarding the testing that was done by outside laboratories, what you called "audit testing"?

A. I did speak to Mr. Hicks about that. I spoke to members of the supplier quality team. That included -- get my table of contents.

So amongst the people I spoke to in that regard were David Allen, Don Hicks, Lisa Kaiser, Mark Zappa, Nicholas Zhu, Pankaj Verma, and Sean Park. Lorena Telofski may have mentioned it as well. I would then look through those people's notes to see who specifically referenced it. But those were the -- those were the people in the supplier quality area that I spoke to.

Q. And what was -- was there a formal -- did -- well, let me start this way: When was the -- from what you gathered, first of all, generally speaking, what was your understanding of Johnson & Johnson's retention policies on talc testing by third parties that were hired by Johnson & Johnson to do these quarterly tests or audits?

A. My understanding is that those were considered part of a system of record. They were stored in a system called "TrackWise" and also in a system called "Microsoft SharePoint" and subject to indefinite retention.

Q. And where is that in your notes?

A. Well, there is a -- there were pieces of it in different parts of my notes.

So, for instance, the RJ Lee testing was on page 14 of my Don Hicks discussion.

Q. Okay. Are you talking about this quarterly global testing in 2009?

A. Yes.

Q. Okay.

A. Then on page --

Q. Hold on a second, since we're talking about that. So it says here that "start tested quarterly global testing 2009" -- "started quarterly" testing in 2009. And then in parentheses, "also tested at an earlier time."

And it said that Don requested 500-gram samples from every manufacturing site.

And this you understand to be as of 2009?

MR. COX: Object to the form.

THE WITNESS: The -- the context was for

the quarterly global testing, yes.
BY MR. SWANSON:
Q. And then it says -- then he sent to RJ Lee. "Did not retain anything."
You mean Don Hicks didn't retain anything; is that what that means?
A. Correct.
Q. And what did you ask him that elicited that answer that he didn't retain anything? What was that in reference to? That he didn't have a record of it?
A. No, not the records. It was whether he maintained any elements of the samples themselves.
Q. And what did he do with whatever remainder of the sample that he didn't send to RJ Lee?
MR. COX: Object to the form. Mischaracterizes the testimony just given.
THE WITNESS: My understanding is that he requested 500-gram samples and he sent them along 500-gram samples to RJ Lee.
BY MR. SWANSON:
Q. What's the next reference you were referring to in terms of this quarterly testing, because this doesn't say anything about how long the testing results or the documents about the

testing should be retained; correct?

A. Correct.

Q. Where is the next one?

A. Page 18, which is the Mark Zappa discussion and that is about -- about 18 lines from the bottom.

Q. I'm sorry. Where?

A. 18 lines from the bottom of page 18.

Q. And what are you looking at?

A. "Quarterly mine results also scanned into SharePoint. Dedicated talc SharePoint site includes testing. Don kept records in physical binder until he left and then it was migrated to SharePoint until 2014. No additional steps needed to conform to legal hold. Already hold everything."

Then it notes the mine assessment may routinely come through email, and the -- also notes that the supplier tests were managed in the TrackWise system.

Q. It says that this -- well, first of all, Don kept records in a physical binder.

Do you have any idea how far back those records went, without guessing?

A. I can only note that he -- his involvement

with manufacturing quality started in 2001.

Q. Don Hicks' did?

A. Yes.

Q. And do you know whether or not that binder -- do you know if that binder contained the testing results? It just says "kept records." I know there's some discussion about testing, but I'm trying to figure out if Don kept records in physical binders, what specific records was he keeping in a physical binder?

A. I interpreted that, the conversation, to be regarding the testing results, the quarterly test results. That was my understanding.

Q. And did you ask -- I mean, I'm looking at your notes here of Hicks and Zappa, and when you were asking people who were responsible for records and information management, you were asking all about hold periods, holds and retention periods, and the policies from what we've seen in the notes. But I see here -- I don't see you asking either of these people, Mark or Don, why -- or what their understanding was of the retention schedule or any holds at the time.

In other words, did you ask them, well, what was the policy -- what was the -- what was

the company policy on holds? What policy were you following on retention schedules for any of these records that you were generating or receiving?

MR. COX: Object to the form of the question.

THE WITNESS: Well, I would disagree in part in the sense that in the page 18 discussion with Mr. Zappa, he indicated no additional steps needed to conform to legal hold. They were already holding everything going forward.

BY MR. SWANSON:

Q. Well, specifically what did you ask him about? What did he say other than -- what did you ask about legal holds?

A. I asked if the system had any provision or capability to enable a legal hold of those materials.

Q. And those materials, again, you're talking about these quarterly testing results; is that right?

A. Yes.

Q. So -- and that -- what happened to the physical binder that Don had?

A. I don't know.

Q. Was it destroyed?

MR. COX: Object as asked and answered.

THE WITNESS: I don't know.

BY MR. SWANSON:

Q. And because Mark started in 2006 and you didn't specifically ask Don that, you don't know if his binder included quarterly testing results going all the way back to 2001, do you?

A. I did not ask the date range of the binder.

Q. What other reference do you have about -- in your notes regarding retention periods -- or let's add holds to this -- for quarterly testing? And if you see anything in there on any other type of asbestos testing of the talc or the finished talc products, I want to know about it -- that we haven't discussed already.

A. Well, the next --

MR. COX: Objection to form.

Go ahead.

THE WITNESS: I'm sorry.

The next place this is referenced is in the Nicholas Zhu section on page 20.

MR. SWANSON: Before you get into that, hold that thought.

Let's go off the record so that the

digital media can be changed on the video recorder.

THE VIDEOGRAPHER: Thank you.

This marks the end of Media Disk 3 in the deposition of James Mittenthal.

We are going off the record at 2:55 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are on the record at 3:12 p.m.

This marks the start of Media Number 4 in the deposition of James Mittenthal.

Counsel, you may continue.

BY MR. SWANSON:

Q. Mr. Mittenthal, I think we were going through -- we were talking about quarterly reports and also other testing of the talc or finished product for the presence of asbestos and the retention periods or practices related to those. And I think we had sort of exhausted what you could say about the policies. But as to your notes, were there other references in your notes that you had in mind that are the basis of your understanding?

A. Yes. So in the previous conversation, I was simply walking through places in my notes

 where quarterly audit testing or RJ Lee testing had been captured, and the next place I had come to was Nicholas Zhu, which is page 20.

So there are sections that talk about batch records and mining and processing. Then it goes down to about eight, nine lines from the bottom, "quarterly testing third-party RJ Lee cites in India, China, Thailand sent talc samples to RJ Lee. Test results stored in SharePoint and shared with manufacturing sites via email. Global SharePoint site with folder dedicated to APAC source quality team may have test results back to 2012."

Q. So that would correspond to the six years, is that right, that we saw with Don Hicks? From memory he was talking about six years.

A. I would actually suggest that Mr. Hicks was talking about batch retention as opposed to quarterly testing retention.

Q. Okay. He was talking about -- but he was talking about testing, batch testing; correct?

A. Among other things, certificates of analysis and other things associated with the batch or a lot.

Q. And that would include testing of

asbestos?

A. Testing, yes.

Q. In here, what -- to be clear, Nicholas Zhu, he's a supply -- is in supplier quality management.

Does he work in China?

A. Yes.

Q. And did you speak to him on the phone?

A. Yes.

Q. And he's been there at Johnson & Johnson China for five years; is that right?

A. Yes.

Q. And his understanding is that these quarterly test results go back to 2012?

A. Yes.

Q. And do you have any other information as to how far back -- well, do you know if they've only been retained for that five or six-year period or, in other words, there were prior results and they had been retained six years, or they've only been doing that testing back to 2012?

A. Yeah. I simply note that he said, you know, don't believe they have anything prior to that.

Q. Okay. So that doesn't answer the question

in the sense that we don't know the answer to that question from what you learned from him, correct, as to whether or not they only retained it for six years or they didn't start this practice of testing -- quarterly testing until 2012; true?

A. True. I just want to go back to my Don Hicks notes for a quick second just to make sure I'm answering that fully.

Okay. I checked. And I agree.

Q. Okay. Are there any other references that you have to testing of the talc or the finished product in terms of records retention?

A. Well, as I mentioned, the walk-through that was encompassed before the break and now it was -- I was really just looking for instances of audit testing and how that was retained. I could do another sweep just for any references to retention of batches. I was -- I was really focusing on looking -- looking for the retention of quarterly audit. I may -- I may have found additional places where there's batch information, but I was -- I had been looking for the RJ Lee quarterly audit information while we were looking for it.

Q. On the break?

A. No. While we were going through this exercise, I was focusing on the quarterly audits.

Q. And what I asked the last couple of questions was go ahead and expand that. I mean, initially we started with Don Hicks and some of the testing that had been related to manufacturing; right?

And so, since we're taking the time to go through your notes on this, I'm interested in all references to retention of testing records that would involve testing for asbestos, whether that's testing at the manufacturing facility or the quarterly.

A. Uh-huh.

Q. Okay?

A. Okay.

Q. All right. So --

A. So the next one was Pankaj Verma, page 21.

Q. Okay.

A. And he indicated that "audit reports were stored in TrackWise, a validated system." And his comments about a validated system I understood that to mean, among other things, that the -- that this was a system of record and that the information would be stored indefinitely in that

system.

And that TrackWise was, in fact, a global system, meaning information that he input or that happened in his region would be visible anywhere around the world.

He --

Q. This is -- okay. So let's just back up for a second there now.

Mr. Verma is director of APAC external manufacturing quality; right?

A. Yes.

Q. And he's been working there for seven years at J&J.

Does that mean including four years at J&J India Mumbai?

A. You know, it's ambiguous because he then says he was responsible for management and mining for the last ten years. I'd have to double-check that.

Q. You said that this audit reports -- now, how do you know that those audit reports that are being referred to there are auditing actual testing -- testing results, testing talc for asbestos?

A. The -- up above where it says "raw and

packaging materials suppliers, talc part of his portfolio" then below that "audit of talc manufacturing site ensuring that talc supplier follows specs, testing, and overall global specs."

Q. So but there's a number of things in there. So following specs. What was the talc supplier for -- which talc supplier are we talking about now? Do you know? Is it China?

A. Well, it appeared from the conversation he was referring to both India and China.

Q. Okay. And you said that the audit reports are stored in TrackWise. Is there -- you said that you thought that that was -- well, strike that.

How far back do these audit reports go? Do you know?

A. I do not.

Q. And how long have they been stored in TrackWise? For how many years?

A. I'm going to look at my -- if I can find it quickly, my spreadsheet. I might need some help.

Q. Well, it says right here -- maybe this helps you -- "audit reports stored in TrackWise, a validated system. Prior to that, ETQ Symphony,

including corrective actions, 2014." That's in your notes on this same page.

A. Yes. For that region. I was looking -- okay. I wanted to see TrackWise in general. But, yes, for that region it is in my notes.

Q. Right. So for that region, the information wasn't being entered into TrackWise until 2014; right?

A. Yes.

Q. And it came -- and it transferred over from a different system? Well, let me ask you what that reference means. "...a validated system. Prior to that, ETQ Symphony, including corrective actions." What does that mean?

A. So the first line, "Audit report stored in TrackWise, a validated system," that stands on its own.

And then the system prior to that for storing audit reports was ETQ Symphony, and that system also happened to store corrective actions.

Q. And do you know if that information was transferred over that was in ETQ?

A. It doesn't say explicitly in here.

Q. Was the switch to TrackWise in 2014?

A. That's my understanding. I also wanted to

find my -- I don't see my -- is there something I can lay my hands on? The list of -- is that one of the exhibits floating around the table possibly?

Q. I'm sorry. What are you looking for?

A. Sort of a Jim Mittenthal set of lists. I think it might be in one of those maybe.

Q. I think -- it's got to be in like Exhibit 2?

A. No. It's like the three tables of the applications, the timeline, and the names.

Q. Talking about this?

A. Well, that would have been the most recent edition to it.

Q. This?

A. No. There's one more.

Q. I can't guess about what you... sorry.

A. I thought it had been marked.

Q. It probably has been. I think we marked pretty much everything.

Describe what that document is that you're looking for.

A. It's about a -- well, it's -- would be printed on both sides. It's about a four or five-page total, and it has a table that has a

timeline, it has a table that has a list of applications, and a table that has a list of people.

Q. I'm sorry. I'm not -- it's not ringing a bell right now.

A. Okay. This is the document (indicating).

Q. Oh. I guess it's a document I haven't seen yet. Or have I? Okay.

MR. COX: I think you have. It was part of his notes.

MR. SWANSON: Yeah. Okay.

BY MR. SWANSON:

Q. This is a list of people that you interviewed; right?

A. That's part of the list, yeah.

MR. SWANSON: Chris, was this in the binder? This (indicating)? I just want to figure out if we marked it or not.

MR. COX: No. He had it with him on the first day, though. I don't know if you marked it or not.

MR. SWANSON: I might not have.

MR. COX: There were a couple of things that were not marked.

MR. SWANSON: Let's go ahead and mark

that.

Mr. Mittenthal, so we that we've got a copy of it and so we just have a record of what you're looking at there.

That's going to be Exhibit 31.

(Whereupon, Plaintiff's Exhibit 31 was marked for identification.)

BY MR. SWANSON:

Q. Just for the record, can you tell me what Exhibit 31 is?

A. Yes. It's three lists, and they are lists that I compiled going through my notes. The first part of the lists are just simply the people I spoke to. The second part of the lists were the applications that were discussed. And the third part of the lists were dates mentioned by people that I spoke to.

And I have gone to the second area of the list, the applications discussed, in order to ascertain information about TrackWise. And I just have a general note that it was effective in 2014 and preceded by ETQ.

Q. Okay. All right. Let's see. We were on page, I think it was 21?

A. Yes.

Q. And I apologize if I asked a question I've already asked.

How far back did those talc testing audit reports go?

A. I don't know.

Q. Okay. What's the next -- and you don't know if this policy and practice or practice that was happening for the last several years as to, I think India and Thailand, were also practiced in the Philippines or Hong Kong, do you?

A. Just the first part of the sentence again, please?

Q. Do you know if this practice with respect to these audit reports and currently putting them in TrackWise and prior to that into ETQ Symphony, do you know if that was -- if that applied to the Philippines or Hong Kong?

A. Well, in the earlier conversation, Mr. Nicholas Zhu identified himself as responsible for the Philippines and noted that the use of -- noted the SharePoint site.

Q. Didn't we talk about that?

A. Yes.

Q. All right. As to talc -- are there any other references that you have into retention

of -- retention policies or practices that you know about that we haven't discussed already?

A. Well, in the -- further on in the section about Pankaj Verma, which is page 21, there is a notation, "expect a defined period of retention for suppliers. Typically shelf life plus one year."

So there is a general statement about document retention that once again echos the "expected shelf life plus one year" notion.

Q. So that's the six years basically; right?

A. Yes.

Q. And that would include testing?

A. Yes.

MR. COX: Object to the form.

BY MR. SWANSON:

Q. And here's another reference, and I think this is consistent with what you just said. If you go to page 61, 62. This is as to Pam Downs.

A. Yes.

Q. And Pam Downs is the person you've had the most discussions with overall about Johnson & Johnson's record searches and production and that sort of thing other than perhaps the attorneys; correct?

A. I would generally agree.

Q. And she's the principal at Triality which is a company that works for Johnson & Johnson dealing with their document searches and productions on various levels; correct?

A. Yes. Evidence management.

Q. Evidence management. Okay.

If you look at what she said here on page 62, near the top of the page it says, "Some testing records maintained by third parties," and then it says, "evaluate testing quarterly."

I don't know, do you know what that meant, "evaluate testing quarterly" meant, when you spoke to her initially then back in April of 2018?

A. Yeah. It's kind of mashed together. But I would say "evaluate the talc by testing quarterly" would be a more complete version of the sentence.

Q. And then she also says retention of testing docs was generally shelf life, a product plus one year; correct?

A. Yes.

Q. So, again, that's -- then the shelf life of the product is considered to be five years for Johnson's Baby Powder; true?

MR. COX: Object to the form.

THE WITNESS: I would conclude that. I wouldn't be able to speak on it with authority, but that sounds in the range based on what Don Hicks said as well as these other comments.

BY MR. SWANSON:

Q. So generally it seems like people are saying it's shelf life, which is about five years, plus a year for the preservation of the testing results except in these instances recently where you've said that some of the information got put into -- I forget what the name of the platform was.

MR. COX: Object to the form.

THE WITNESS: Well, going back to Mr. Hicks, he indicated that, I think it was Mr. Hicks, if not Mr. Zappa, that RJ Lee started testing in 2009 and that that quarterly testing was kept.

BY MR. SWANSON:

Q. So prior to 2009, at least in practice, even though we haven't really determined it from you looking at the policies because you haven't been able to quite straighten that out, although there was a reference in a policy.

 But in terms of what practices you've gathered from interviewing these witnesses was that it was generally about six years for testing results.

MR. COX: Object to the form.

BY MR. SWANSON:

Q. For testing; correct?

A. I would seek to make a clean separation between testing from -- that accompanies batches or the manufacturing process as opposed to testing that stands apart from -- from a particular batch or a lot, and whereas Mr. Hicks indicated that that regular quarterly audit started in 2009, he also indicated that there were other testing that was done separate and apart, from batches and audits -- sorry -- separate and apart from batches and lots that occurred prior to 2009.

So batch lot testing with its shelf life-based retention here; quarterly audits and prior to 2009 an occasional audit-like testing over here (indicating).

Q. Now, when Pam Downs is talking about this, retention of testing, she's talking about the quarterly audits or is she talking about -- do you know, or is she talking about testing done in

conjunction with manufacturing?

A. She's -- when she talks about shelf life of a product plus one year, it's in connection with manufacturing.

Q. Okay. Now, go to page -- before I leave generally this area of testing for talc or finished product for asbestos and the retention of those records, do you have any other information as the representative of Johnson & Johnson to add as far as when specific retention practices or policies came into place and how long the retention periods were that we haven't spoken about?

MR. COX: Object to the form.

THE WITNESS: When I spoke of the places in my notes, and I believe we've captured many of those places both for the quarterly audits and for the manufacturing-related testing, there are references in the retention schedules I -- I had difficulty tying them one by one. But they're -- the retention schedule would specify those applicable periods as well.

The supplier audits -- the external supplier audit agreements -- or the external supplier agreement also encompassed retention

periods in them as we went through. And I think, as I mentioned when we first started talking about this, the legal holds would also specify testing as a category to be held.

BY MR. SWANSON:

Q. Now, on retention schedules, we talked about 1997 being the first actual retention schedule. And you couldn't really tell from looking at that whether that applied to the talc testing, correct, at least from the preliminary look that you took a couple of hours ago when we looked at that; right?

MR. COX: Object to the form.

THE WITNESS: My understanding is that those schedules would cover those intervals. I would just need further study to tie the specific references made by Mr. Hicks, Ms. Downs, Mr. Zhu, Mr. Zappa, Mr. Verma, and others back to their accompanying periods in the schedules themselves.

BY MR. SWANSON:

Q. Do you have any information -- and I may ask you that tomorrow, because I don't want to continue your deposition indefinitely into the future, and I'm sure you probably agree with me there. So I may come back on that to see if we

can specifically locate those.

But setting that aside, do you have any information that there was any kind of formal retention policy as to testing -- now you've said the first hold was in 1999; correct?

A. Yes.

Q. And the first policy we have for retention is 1997; correct?

A. Yes.

Q. So do you have any information that there was -- that Johnson & Johnson had a retention schedule or retention hold prior to 1997 that would dictate the retention of any kind of testing of Johnson's Baby Powder, or cosmetic talc products, or the talc ore, or the milled talc that was used in those products for asbestos?

MR. COX: Object to the form.

THE WITNESS: Insofar as holds, I have no knowledge of anything before that. Insofar as retention schedules, I have information from the company that there were retention schedules created in the early '90s. The earliest one made available to me has been 1997. It's my understanding that the retention schedules are intended to cover topics such as retention of

testing documentation.

I have not seen anything earlier to 1997. I have just a general understanding that the -- the very purpose of the retention schedules is to -- is to address the retention of materials that would be classified in the company's business operations which would include testing.

I haven't seen anything prior to 1997.

BY MR. SWANSON:

Q. Okay. And we had -- and I wish I could remember who it was you spoke to -- and we spoke at length about a retention policy that was referred -- retention, some kind of retention policy that was referred to in your notes as of the early 1990s. Remember that? And it was supposedly based on the McNeil subsidiary's retention policy?

A. That was -- well, that was authored by Rosina Sheerin. There may have been references to it, both from her discussion and possibly Michelle Anderson.

Q. And when I asked you about that at that time, you told me you didn't know the particulars of that retention policy.

Do you remember that?

A. That's right.

Q. And you still don't know the particulars of the retention policy; true?

A. That's right.

Q. And Lorena, she didn't tell you that this retention policy was for testing results of the talc for asbestos, did she?

A. I believe you mean Rosina?

Q. Rosina, yes.

A. Correct.

Q. You mentioned earlier, before I started asking you these questions, that you -- you had that understanding that that policy would be.

Are you speculating those earlier -- the earlier policy from the earlier 1990s?

A. I'm simply saying that the purpose of a retention policy is to cover the documents that the company uses in the course of its business. I -- I haven't seen them. I don't know one way or the other whether testing is on there. I have seen the 1997 schedule, which makes reference to some types of testing. I'm not able to interpret every category of testing and what that means. I just know I've seen testing in the '97 schedule.

Q. What I want to do tomorrow so that I

don't -- I think I've closed that out for now, and I hate to give you homework, but before we start tomorrow, if you could look at those retention schedules so I can ask this question again because I do want to get to the bottom of this, because you're referring to 1997, and you weren't sure when I asked you if those were really regarding talc testing. So that if you could look at a more recent policy or two in 1997 that would help us and it wouldn't take us very long to get through it at that point as opposed to us slogging through it page by page.

Is that something you can do?

MR. COX: Hold on. First of all, we object to the continuation of this deposition beyond today, and we can talk about that more at a break, Mark. But we can also talk about whether Mr. Mittenthal can look at what you're asking him to look at, at a break today.

MR. SWANSON: Sure.

BY MR. SWANSON:

Q. All right. I want you to look at page 24 of your notes, please.

A. I'm there.

Q. Now, prior to PTI doing the manufacturing

 of the domestic Johnson's Baby Powder, it was done by Royston, is that right, or did it go from -- is that correct?

A. Well, my general understanding is that Royston was the name of a company facility.

Q. And that was in Georgia?

A. Yes.

Q. And do you know if the Royston facility had any retention policy with respect to any testing that they did for certificates of analysis on the presence of asbestos in the product or in the talc that was coming in?

A. My understanding was that Royston would be part of the company and would be subject to any consumer -- consumer retention policies in place.

Q. And Royston did the manufacturing up until 2004 or '5 when it went to PTI; is that correct?

A. Well, Johnson & Johnson did the manufacturing at its Royston facility. That's my understanding.

Q. And do you know how far back that went, that Royston did the manufacturing?

MR. COX: Objection. Beyond the scope of the notice.

BY MR. SWANSON:

Q. Strike that.

But if we went from Royston, Johnson & Johnson Royston to PTI in 2004 or '5, we talked about that; right?

A. Yes.

Q. The question is, do you have any information that at the Royston facility, the manufacturing facility, there was a retention policy as to any testing documents that were being generated by them, or received by them, in other words, generated during manufacturing or received by them in terms of, like, talc supply that they received?

A. My understanding is that those would have been subject to the franchise level retention policies that we discussed for which we have '97 and others, and also, where applicable, subject to a legal hold within the appropriate time frames.

Q. Now, going back before Royston, manufacturing was done at New Brunswick; correct? North Brunswick, sorry.

A. Well, I certainly am not able to speak --

Q. This is at page 24. I understand. But obviously -- I mean, we can both agree that you have been hired to act as a representative for

Johnson & Johnson and you've done certain research. And so, with that in mind, your notes from your interview with Lorena Telofski at page 24 of your notes indicates that the manufacturing was done at North Brunswick?

MR. COX: Object.

BY MR. SWANSON:

Q. Correct?

MR. COX: Sorry. Object to the extent you're seeking to elicit testimony from someone who's not designated about topics as to where the product was manufactured.

MR. SWANSON: These are document issues, Chris. I'm just trying to get to document issues, since that's what we're talking about.

MR. COX: That's not a document question.

THE WITNESS: She -- I asked her some questions. This was part of her answer. I wrote it down.

BY MR. SWANSON:

Q. Okay. So from that you understood that the manufacturing went from North Brunswick to the Royston plant; correct?

A. That's what she indicated.

Q. And some of the manufacturing was done by

Kolmar Laboratories in Port Jervis, New York; correct?

MR. COX: Object to the form. Object to the extent it's beyond the scope of the notice.

BY MR. SWANSON:

Q. From your notes.

A. That is in my notes.

Q. And that's all we've been talking about. I mean, your understanding from what you learned from talking to people. I understand you have more expertise about documents and retention and that sort of thing, but all this is information that you've gained from talking to people; right?

A. Well, I wrote down the -- the -- what was elicited during our conversation, so.

Q. So I want to get to the document issues, though. You see that the -- the North Brunswick plant closed down; correct? You see down there where it says, "All buildings in North Brunswick have been sold and taken down"?

A. Yes, I do.

Q. What happened to the records that were at North Brunswick?

A. I don't have that information in my notes.

Q. Were they destroyed?

MR. COX: Objection. Asked and answered.

THE WITNESS: I don't know.

BY MR. SWANSON:

Q. Now, if you look -- Don -- your notes regarding Don Hicks -- and kind of you could hold on to that Lorena Telofski page 2. But if you look at page 12.

A. Yes.

Q. You see about six lines down he says, "Responsibility of maintaining records resides with the site doing the work"?

A. Yes.

Q. Okay. So North Brunswick had the responsibility for those records; correct?

A. I can only infer that from -- from Mr. Hicks' comment. I don't know that as a fact, but it could be inferred.

Q. Do you know what year that that happened, that the North Brunswick buildings were taken down?

A. No.

Q. Do you know -- from your notes I see that they were doing testing at the manufacturing facilities; correct?

MR. COX: Object to the form.

THE WITNESS: Can you cite me to a place in my notes for that?

BY MR. SWANSON:

Q. I lost the cite, but I know that that was done. Let me see if I can find it that they had testing records.

I saw this at page 24 and I apologize. I'm not...

Oh, you see at 24, it says -- you see the reference to "PO, specs, test records, quality SOPs," about two-thirds of the way down?

A. Yes.

Q. And that's -- those are records regarding these facilities that were manufacturing; is that right?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. You see below that "testing both for what's in it, what's not in it, purity, et cetera"?

A. Absolutely. Although I'm not -- it's not clear whether Ms. Telofski is talking about Kolmar, North Brunswick, or Georgia in this -- in this portion.

Q. But they are talking about manufacturing

plants having -- and it also says "certificate of conformance and basic testing on inbound talc." So they're receiving testing records and generating their own at manufacturing facilities; right?

A. That's my interpretation of her comment.

Q. Okay. And, as you sit here today, you don't know what happened with those testing records from North Brunswick, New Jersey plant when that was -- when that manufacturing operation was transferred, or when the buildings were taken down; true?

A. Correct.

Q. And I think Mark Zappa at the bottom of page 17, he said -- this is just sort of -- at page 17, he says that the shipments of talc had to have a certificate analysis of them that came in. Let me see if I can find that.

You see the certificate of -- oh, it says, "Certificate of analysis would include test for asbestos."

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Do you see that?

A. Yes, I do.

Q. From Lorena Telofski's notes, it would appear that these manufacturing facilities receiving testing records and generating their own, that would have included the Kolmar facility, too; correct?

MR. COX: Object to the form. Beyond the scope of the notice. Other than what's in his notes.

BY MR. SWANSON:

Q. Page 24.

A. Oh, thank you. I can't confirm that -- which facilities she's talking about, as I mentioned, whether it's Kolmar, North Brunswick, or Georgia, or all of them.

Q. And again, I understand that you're not here as the PMQ on where all the manufacturing sites were, but these are all records questions. I'm just asking a foundational question here.

Do you know when Kolmar Laboratories started and during what period of time it was manufacturing Johnson's Baby Powder?

MR. COX: Objection. Beyond the scope of the notice.

BY MR. SWANSON:

Q. And if you don't know, that's fine.

A. I don't know.

Q. Okay. And do you know whatever records it had regarding certificates of analysis, testing records for asbestos, manufacturing specifications, those sorts of records, do you know how they were archived at that facility?

A. I have a general comment from Ms. Telofski that there was material put into, I believe it was Iron Mountain, but I'm not sure which -- which materials she is referring to.

Q. And where is that?

A. Looking on page 2. Let me see if I can find it. Oh. She was talking about APRs, so I know that some of records she referenced are in Iron Mountain. I don't know which other ones besides the APRs.

Q. APRs is authorization for product release?

A. Yes.

Q. That's not testing records, is it?

A. Not that I'm aware of.

Q. And it says it includes formula safety.

Do you know what plant that is applying to or what plants?

A. Well, the discussion at that time was about Skillman, but I don't know the scope of what

 was stored in Iron Mountain under her jurisdiction.

Q. Okay. So as to Kolmar, let me get back to the question, do you know at the Kolmar manufacturing packaging facility what they did with respect to the retention and archiving of records?

A. No.

Q. And do you know when that facility no longer was manufacturing Johnson's Baby Powder, what it did with whatever records it had?

A. No.

Q. Were those records destroyed?

MR. COX: Objection. Asked and answered.

THE WITNESS: I don't know.

BY MR. SWANSON:

Q. I touched on this earlier, but I want to go into this just briefly: Do you have any information regarding the Johnson & Johnson's policies, if any, with respect to what are called "grids" associated with transmission electron microscopy testing?

MR. COX: Objection. Asked and answered.

THE WITNESS: I don't --

BY MR. SWANSON:

Q. I apologize if I asked. But --

A. I don't have information on grids.

Q. Do you have information with respect to what the current retention schedule period is for talc samples? And that would be talc ore, milled talc, or baby powder samples that are tested?

A. My understanding is based on the legal hold notice, which is -- which is -- specifies that samples are to be retained.

Q. And the legal hold notice -- now, there's been a sequence of legal hold notices going back to 1999, correct, with respect to talc litigation?

A. Yes.

Q. Okay. And is it your understanding that those -- that's essentially been continuously in effect since 1999 with respect to anything that was under that original hold?

A. I read each of the notices. They have descriptions of subject matter. I've noted that those subject matter descriptions have evolved over time.

Q. Okay. But with respect to samples. And we will talk a little bit more about holds. But just -- well, let me -- let me get off of that and just stay on the retentions for a second.

 I noticed in Exhibit 2D, or Tab 2D, which is Exhibit 2D, the PTI agreement appeared to be for retention of talc samples for four years. And perhaps we should look at that and I'll ask you about that. And that's at page 9 of 2D. Oh, we get into this page issue with this, don't we?

Did you see it in there?

A. Yes. 7 of 16 and below that, 9 of 19. So it's Section 12.4.

Q. Okay. And what is the -- first of all, what samples is this referring to? This is -- these are product samples that they're referring to?

A. Yes. So this -- this Section 12.4 falls under 12.0 product controls, which relate to the identification sampling and testing of finished product.

Q. Okay. And so the retention on finished product was for what period?

A. Four years from date of manufacture or one year after expiration date.

Q. What's the -- that's the expiration date, for example, that you'd see on the actual bottle or container? Is that what that refers to?

A. I don't know.

Q. What's the date of this quality system procedure or quality responsibility agreement?

A. February 2005.

Q. Do you know -- at this point in 2005, there had already been talc litigation hold in place as early as 2' -- sorry, 1999.

Do you know if it affected this retention as to the talc that was -- the Johnson -- the baby powder that was being manufactured by Pharma Tech Industries in 2005?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. In other words, did the legal hold sort of suspend this policy?

MR. COX: You're asking as to the samples described in that document?

MR. SWANSON: Yes.

THE WITNESS: I'm -- I would want to check the legal holds. I'm not aware that the holds in that time referred to samples.

BY MR. SWANSON:

Q. Okay. Do you have any information other than -- and we'll get to the legal holds shortly.

Do you have any other information in terms of retention policies with respect to retention of

talc samples, either, you know, the talc ore or the milled talc that may have been tested on a quarterly or some other basis, or of actual product test -- finished product test samples?

A. I have a general understanding that samples -- that the universe of samples comprised those that were associated with a batch or a lot and retained in accordance with -- with the company's retention schedules.

As a second category was samples that were used specifically for testing purposes, and those samples were not retained until the last year.

And a third category would be historical samples that would be obtained from the museum and other sources.

Q. Thank you for that answer.

So I think that was pretty clear. So let me just -- as to the samples related to testing of the talc, you said until a year ago those were not retained; correct?

A. That's correct.

Q. So they were destroyed?

A. The samples used specifically for creating test results were not retained.

Q. Okay. And now they are being retained?

A. Yes.

Q. And do you know why that policy was changed in the last year?

A. My understanding is that within the past year a request was made to the testing body to retain that information.

Q. And what testing body is that?

A. Well, that would include RJ Lee, anyone else doing testing.

Q. Okay. So --

MR. SWANSON: Do you want one last break?

MR. COX: Sure.

MR. SWANSON: And then we'll go until the end of the day?

MR. COX: Yeah.

MR. SWANSON: And if we need to discuss anything, we can discuss it.

MR. COX: Sounds good.

MR. SWANSON: Let's go off the record.

THE VIDEOGRAPHER: This marks the end of Media Number 4 in the deposition of James Mittenthal.

Going off the record at 4:13 p.m.

(Recess taken.)

THE VIDEOGRAPHER: On the record at

4:49 p.m. This marks the start of Media Number 5 in the deposition of James Mittenthal.

You may continue, Counsel.

BY MR. SWANSON:

Q. Okay, Mr. Mittenthal, I'm going to try to be real efficient here for the rest of the part of the day that we have, and we're going to get into talking about holds now which we've touched on a few times, but I want to go over some information about that.

THE VIDEOGRAPHER: Is your microphone on?

Okay.

BY MR. SWANSON:

Q. So, in the most basic sense, a legal hold is an instruction to custodians or possessors of certain kinds of specified documents to preserve them and not destroy those documents as long as -- documents and information as long as the hold is in effect; is that correct?

A. I would agree.

Q. And a hold stays in effect until a hold -- a release notice is issued; is that right?

A. I would generally agree. There may be other circumstances besides a release by which a receiver of a hold could be relieved of that

obligation.

But certainly the counterpart to a hold is a release.

Q. Okay. And you've got -- you've prepared a history of holds, which is Exhibit 21; correct?

A. Is that -- just make sure I've got my version in front of me somewhere.

Q. You should have your copy there. I know you've got a lot of stuff. You know, maybe we can get some of your things there out of the way and put them in a stack.

A. Here it is.

Q. Okay. So Exhibit 21 is a list of Johnson & Johnson holds with respect to talc litigation that you've compiled; correct?

A. Yes.

Q. Okay. And the first one that you've got there is Theresa Krushinski on November 11, 19199, and that was a talcosis case; correct?

A. Yes.

Q. And then the next one you've got is 2000, which is a mesothelioma case; correct?

A. Yes.

Q. And both Johnson & Johnson's Baby Powder; true?

A. Johnson's Baby Powder.

Q. Sorry. Johnson's Baby Powder. And I think the third one listed there is 2003, the Hozeny case.

Do you see that?

A. Yes.

Q. And I know that's been produced to us. Let me find this. At Exhibit 1B.

Do you have that with you? Oh, it's in your -- those exhibits are marked per tab.

A. Okay.

Q. Exhibit 1B. So in Exhibit 1, you have several holds and then some were produced after that. And you see there, in that hold, this was hold notice issued by the legal department; correct?

A. Yes.

Q. And this puts folks on notice in the company that if you fail to preserve materials that are under a hold, it can result in the court imposing penalties or sanctions; right?

A. Yes.

Q. Now, you had previously testified that you had acted as consultant and a witness in the Ethicon litigation for Johnson & Johnson; correct?

A. Consultant and a witness meaning the same -- the same role?

Q. Yeah. In the same -- in the Ethicon litigation. Yeah. In other words, you were a witness and you were also their consultant in that litigation; true?

A. I was a witness.

Q. A witness.

A. Not a --

Q. Were you working? Were you hired by Johnson & Johnson?

A. I was hired to be a 30(b)(6) only.

Q. Okay. All right. And you testified in the case; right?

A. Yes.

Q. And you know that there was an allegation by the plaintiffs in the case that there was a failure to preserve evidence that had been subject to a hold; right?

A. I -- I recall that those issues arose, yes.

Q. And you investigated that issue; correct?

A. Yes.

Q. And you gave a deposition about it?

A. Yes.

Q. And you discovered through your investigation something you testified about that potentially responsive documents and information were destroyed that had been subject to a hold; correct?

MR. COX: Object to the form. Object that this is beyond the scope of the notice.

THE WITNESS: I investigated and I testified as to certain occasions where I had observed custodians not preserving materials that they could have.

BY MR. SWANSON:

Q. And those materials were materials that were under holds at the time; correct?

A. Yes.

Q. Have there been any -- have there been any issues of loss with respect to talc litigation by Johnson & Johnson that have not been disclosed to plaintiffs that you're aware of from your work in these talc cases?

A. I'm not.

Q. Now, we've talked about hold release notices. You said that was one way that hold would no longer be in effect. What's the other way that a hold would no longer be in effect if it

wasn't pursuant to a hold release being issued by the legal department?

A. There could be a direct communication with the custodian saying this is not something that's required anymore. There could be circumstances that -- that result in the obligation for the custodian going away.

Q. Have you -- we haven't received any -- or in this case that I've seen, no legal hold releases were produced.

Are you aware of any Johnson & Johnson talc litigation legal hold releases that have been issued?

A. I'm not.

Q. Are you aware of any of the holds having been any -- any custodians having been released from any of the talc litigation holds that have been issued since 1999?

A. No.

Q. And is it fair to say that each of the holds that you've documented starting in 1999 through 2017 has essentially been incorporating whatever was already under a hold pursuant to the prior hold and then adding some more details to it; is that -- is that correct?

MR. COX: Object to the form of the question.

THE WITNESS: Well, to my recollection, the 2017 holds serve to -- serve that function to gather earlier holds. The holds between 1999 and 2017 refer to specific cases.

BY MR. SWANSON:

Q. Okay. Now, you said that you weren't aware of any releases of those holds. So, even though those holds refer to specific cases, they weren't released or no longer in effect just because those cases ended, were they?

MR. COX: Object to the form.

THE WITNESS: As I mentioned, I hadn't seen any releases of those -- of those holds.

BY MR. SWANSON:

Q. I understand that. But it's an additional question, which is, were those holds still in effect on Johnson & Johnson that had been issued in specific cases even after the issues of the case resolved?

A. Well, the -- the instructions were -- were still out there. In terms of the legal obligation, I can't speak to that. That's a legal determination. The holds themselves had not been

subject to releases.

Q. Earlier you mentioned that the holds were related to, I think you said something like consumer talc or something like that.

Are there -- are there releases related to other kind of talc -- not releases. Are there any litigation holds that were ever put on Johnson & Johnson's businesses with respect to any other type of talc, like industrial talc, that you're aware of?

A. I'm not aware. I specifically requested consumer talc holds as being reflective of my obligations under the notice. I'm not aware of other holds.

Q. Okay. And you've asked -- you've asked witnesses about holds, is that correct, people that you've spoke to?

A. The -- the interview subjects, the topic. Not in every case but in some cases, it did come up.

Q. Did you ask them if -- did you ask -- did you do anything to audit whether or not they were complying with holds?

A. I -- I did not see a compliance audit as part of my investigation. I asked in some cases

the records personnel about the mechanism for holds. I did not personally audit any compliance.

Q. Did you audit any of the cleanout? Remember, we talked about the annual cleanout procedure. Did you audit any cleanout notices or documents documenting the cleanout procedures to see if any records had been destroyed that were under legal holds or retention schedules?

A. No. That was not part of my investigation.

Q. Now, the 1999, let's start with the first one here. Let me see if I can locate this. Here we go.

(Whereupon, Plaintiff's Exhibit 32 was marked for identification.)

BY MR. SWANSON:

Q. I'm handing you Exhibit Number 32 to your deposition. And for the record, what is Exhibit 32?

A. A document preservation notice dated November 11, 1999.

Q. And that's the one in the Krushinski case; correct?

A. Yes.

Q. And that is the first one that you're

aware of; true?

A. Yes.

Q. And this one was directed as pertaining to Johnson's Baby Powder. It says that on the second page of this. And it says on the first page that it just -- in the first paragraph there it says "JJCP" --

That would be Johnson & Johnson Consumer products; is that right?

A. That's my read.

Q. -- "is party to a lawsuit involving allegations of manufacturing or design defect or failure to warn in connection with the below product." And it mentions Johnson's Baby Powder.

To which companies, Johnson & Johnson companies, operating units, divisions was this document preservation notice directed?

A. It's not specified.

Q. Do you have any information as to this hold whether or not it applied, for example, to operating units overseas such as in Hong Kong and the Philippines?

A. I don't have information as to who it was distributed to.

Q. Do you know any of the individual

recipients of this hold notice?

A. That was not part of my investigation.

Q. Does that information still exist as to who the recipients were of the hold in 1999?

A. I don't know.

Q. In 1999, what was the policy of Johnson & Johnson with respect to distribution of holds, if it had one?

A. I can check my notes with respect to that. I'm noting on page 34 in the Renay Lawson section, simply that Renay would send holds and releases as directed by legal and upload to Web site. Had different distribution lists.

Q. And she had been there since 2009; correct? It says nine years --

A. Okay.

Q. -- at Consumer.

This is Renay Lawson, the records information management lead; right?

A. Yes.

Q. Okay.

A. I have further information on page 36 from Rosina Sheerin that both she and Renay would send hold notices at different times and that they maintained distribution lists based on a cover

page.

Q. Okay. And do you know if those distribution lists still exist?

A. I know that I have seen distributions on some of the hold notices.

Q. Okay. And we're going to go through each one in a little bit, so we'll get to that, if there's a distribution list.

With respect to 1999 Krushinski case hold, you don't have a distribution list for that, do you?

A. Correct.

Q. And again, as the Johnson & Johnson's representative on this issue, this is the first talc litigation hold that was issued in 1999; correct?

A. Consumer talc.

Q. Consumer talc.

All right. So you're not aware of any -- well, let me ask you this way: And not to get off on another sort of substantive issues too much. But do you have information that there were holds related to talc that wasn't consumer talc?

A. No.

Q. If you look at your binder there, Tab 1C.

This is the January 7, 2000 document preservation notice in the Barbara Bloch case.

Do you see that?

A. Yes.

Q. And this was, says "JJCPI, et al. is a party to a lawsuit involving allegations of manufacturing or design defect or failure to warn in connection with the below product."

And, again, this is in regards to the Johnson's Baby Powder; true? It's on the next page there? Oh, you've got it in your summary.

A. Yes. Yes.

Q. And by the way, just to make this clear on the record, "document preservation notice" means the same thing as a legal hold notice; correct?

A. Generally, yes.

Q. And Johnson & Johnson at some point just changed the language that they used to refer to it? They called it -- later they called it a "legal hold notice"; true? We can get to those later.

So, as far as this one, do you know who -- which operating units or companies of Johnson & Johnson received that, whether or not it was anybody beyond just Johnson & Johnson Consumer

Products, Inc.?

A. I do not.

Q. Okay. And do you know to whom -- what individuals received this notice?

A. I do not.

Q. Do you have any information about what training was done of individuals about how to effectuate this notice?

MR. COX: Object to the form.

THE WITNESS: I have a general understanding from the records officer that there was training in the records program and that that included legal hold instructions.

BY MR. SWANSON:

Q. And did you say "records manager"?

A. Training in records management issues.

Q. Who was it that you were speaking to about that issue?

A. Possibly Lisa Kaiser. Let me...

Q. Before I make you look that up -- and if you need to look it up to get into the heart of it, what did she tell you about what the training was?

A. Actually, I'm looking at the Joann Dodd information.

Q. Can you give me a page number on that, please?

A. Oh, yes. 29. Sure.

So Ms. Dodd spoke about the training that was -- that was provided.

Q. Can you direct me to that, please?

A. Yes. The bottom of -- near the bottom of page 1. "Training included legal hold, departing associates, retention procedures, roles."

Q. And she was the -- she is this analyst records management, J&J Consumer, Inc.; right?

A. Yes.

Q. And do you know -- she started in 2007 or '8?

A. Yes.

Q. Do you know at what point those -- the training started that she's referring to?

A. Not the exact start date, no.

Q. And do you know how -- do you have any information about how far that training goes back and whether there was any training in the year 2000 at the time of the Barbara Bloch case?

A. I don't have specifics on that.

Q. At Tab 1B there's a hold in the Hozeny -- Hozeny case versus Johnson & Johnson Consumer

Companies, Inc.

Do you see that?

A. Yes.

Q. And, again, this is called the "document preservation notice." The date is May 16, 2003.

And this is Exhibit 1B, for the record.

And what was -- this looks similar to the '99 and 2000 holds that we've seen. But does it -- it looks like it may add something additional. Can you tell me what is the subject of this hold?

A. You mean what is the -- the --

Q. Well, what product was at issue and --

A. It generally referred to talc products.

Q. And the basic language is the same, correct, of the hold? As the holds we had discussed for the 1999 and 2000 cases?

MR. COX: Object to the form.

BY MR. SWANSON:

Q. But then you get to the details of what materials are to be held, and there's a bit more detail. It's fleshed out a bit more; correct?

A. The language has evolved. There are eight categories as opposed to four categories with earlier notices. It is -- it is somewhat

different.

Q. We had earlier -- I should hit on this now so I don't forget, but we had talked about talc samples. And in this 2003 hold looking at the list of materials that were subjects -- subject matters of documents to be preserved, did that include talc samples in 2003?

A. I do not believe it did.

Q. Okay. And just looking back quickly on this, the 1999 and 2000, those didn't include -- wouldn't include talc samples either; correct?

A. There is references to information about samples, not samples themselves.

Q. Okay. Can you point me to that, under which?

A. Under Section 4 in both the '99 and the 2000 documents.

Q. But not the samples themselves; true?

A. Correct. And only those records about the samples pertaining to the event.

Q. And the 2003 legal hold in the Hozeny case, and I apologize if I asked this, do you know if this applied to any overseas operating companies of Johnson & Johnson, like Johnson & Johnson Philippines or Johnson & Johnson Hong

Kong?

A. My general understanding is that it did not.

Q. And your general understanding as to it not applying, would that be the same as to the 1999 and 2000 holds, too?

A. Yes.

Q. And what's the source of that understanding?

A. That information came from counsel.

Q. Okay. And I believe the next hold is a 2009 hold; is that correct?

A. Yes.

Q. You have a copy of that with you? I know I have it here somewhere.

MR. COX: I have extra copies if you need.

MR. SWANSON: That would be great, thanks, Chris. I'm sorry -- oh, wait. Is this it? I've got it. Yeah. Okay. Good. I have it. Thank you.

Okay. I have marked as Exhibit 33 to your deposition this hold in the Berg case.

(Whereupon, Plaintiff's Exhibit 33 was marked for identification.)

BY MR. SWANSON:

Q. Can you take a look at that and, just for the record, is that the Deane Berg v. Johnson & Johnson Consumer Companies, et al. hold dated December 15, 2009?

A. Yes.

Q. And that's Exhibit 33. And this hold again is with respect to Johnson & Johnson's Baby Powder and this time it also specifically references Shower to Shower powder; right?

A. Yes.

Q. And Shower to Shower is another cosmetic talc product that Johnson & Johnson made; true?

A. At the time, yes.

Q. And this one in 2009 we get quite a bit more detail; correct?

A. Yes.

Q. And there's even, it looks like a distribution list, is that right, in terms of what units it's distributed to?

A. Yes.

Q. And it indicates here in the units that this legal hold were issued to is -- are identified that they're checked and it looks like they're also highlighted in yellow; true?

A. I see that, yes.

Q. And that includes Johnson & Johnson Consumer Companies, Inc.; Johnson & Johnson Consumer and Personal Products Worldwide, Division of Johnson & Johnson Consumer Products, Inc. Then it says Johnson & Johnson Corporate, Corporate Communications, and then also under Corporate Consumer and Personal Care and Quality and Compliance World -- is that "Worldwide"? WW?

A. Yes.

Q. This notice was not issued to Johnson & Johnson Philippines, was it? Or Johnson & Johnson China?

A. No.

Q. Okay. Do we -- do you know who the individuals -- do you know -- there are identified Johnson & Johnson operating units and companies that were issued this legal hold notice. Do you know what individuals received it other than those listed as receiving this document on the first page, it looks like? And there's about, what, 15 -- 15 to 20 individuals there listed.

Do you see that?

A. Yes. It would be under "attachments"?

Q. Yeah.

A. "Cc."

Q. Well, there's only, I guess, about -- well, under "attachment," those are people who received this document preservation notice; is that right?

MR. COX: Object to the form.

THE WITNESS: I'm sorry. One more time, please.

BY MR. SWANSON:

Q. Under -- next to "cc," where it says the people who were copied, they received this; correct?

A. Yes.

Q. Okay. What about the other people in the right -- more to the right column? Did they receive it? What are they listed as here? Or do you have an understanding?

A. Well, I would just generally conclude that this is a long cc list and they -- there is no -- it appears to be in alphabetical order starting with Braunreuther going up to Will -- Will Wiley.

Q. Do you know of anybody -- do you know of any other individuals received this notice other than these indicated here?

A. Well, the recipients of the communication were Debbie Staneruck and Edith Mendez, and they

were directed to distribute the notice companywide to the attached companies as well as anyone else that they may understand might be knowledgeable of these issues.

Q. Okay. And when you say "distributed companywide," do you know in 2009 -- strike that.

The next one that I want to ask you about is -- there were three different holds in 2014.

Have you seen those?

A. Yes.

Q. Okay. And that would be the Chesteen case, Estrada, and the State of Mississippi; right?

A. Yes.

Q. And these were all issued as a result of lawsuits against Johnson & Johnson Consumer Companies, Inc.?

A. That's my understanding.

MR. SWANSON: Okay. I'm not going to spend much time on these, but I do want to get them marked and attached.

So 34 will be the hold in the Chesteen case.

(Whereupon, Plaintiff's Exhibit 34 was marked for identification.)

MR. SWANSON: 35 will be the hold in the Estrada case.

(Whereupon, Plaintiff's Exhibit 35 was marked for identification.)

MR. SWANSON: And 36 will be the 2014 hold in the State of Mississippi v. Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. case.

(Whereupon, Plaintiff's Exhibit 36 was marked for identification.)

BY MR. SWANSON:

Q. And, again, if you look at these, and you can go ahead and look at them, each of these notices in 2014, they relate -- related to Johnson's Baby Powder and Shower to Shower products; correct?

A. Well, Estrada is only baby powder.

Q. Okay.

A. The other two from 2014 mention both products.

Q. Okay. Thank you.

And, again, there's a recipient or a distribution list in terms of what operating units or companies received this, correct, these three holds?

A. Well, this is a sector-based distribution.

Q. Okay. And these were just domestic companies that received these holds; correct?

A. Yes.

Q. So this was not issued to Johnson & Johnson Philippines or Johnson & Johnson Hong Kong; correct?

A. Correct.

Q. Or Johnson & Johnson Korea, correct, if there was a Johnson & Johnson --

A. Correct.

Q. -- Korea at that time?

MR. SWANSON: And then finally we have here a 2017 hold, which we'll mark as Exhibit 37.

(Whereupon, Plaintiff's Exhibit 37 was marked for identification.)

BY MR. SWANSON:

Q. I'll go ahead and hand you that one. And this is what you've referred to in Exhibit 21 your summary list of holds as talc asbestos. You say "PL litigation."

What does that stand for?

MR. COX: Object to the form.

THE WITNESS: My understanding is that that is a product liability. But this is not that

one.

BY MR. SWANSON:

Q. Oh, this isn't. Okay. Well, this is the talc ovarian cancer litigation hold that I handed you; correct?

A. Yes.

MR. SWANSON: Chris, do you have a copy of this other one?

MR. COX: It should be in the binder, 1C.

MR. SWANSON: Thank you.

MR. COX: Sure.

MR. SWANSON: Appreciate that.

BY MR. SWANSON:

Q. Well, let's just -- since I've attached this 37, this legal hold, was it -- that's attached as 37 as a talc ovarian cancer litigation hold; correct?

A. Yes.

Q. Do you know what year -- is this the current -- this is the current one?

A. This is the most recent one for ovarian cancer of which I'm aware.

Q. Okay. And if you look at Exhibit 1A to your deposition, which is Tab 1A, we can go to the one that you referred to in your list as the talc

asbestos litigation hold.
Do you have that in front of you?
A. Yes, I do.
Q. Is this the current legal hold for talc asbestos litigation?
A. This is the most recent one I've received that I'm aware of.
Q. And I don't know if you use this word, but I think you indicated earlier that your understanding was this was sort of an attempt to consolidate the various holds; is that right?
A. With respect to those mesothelioma-related matters, yes.
Q. Now, in terms of what information is being held either under ovarian talc litigation hold or a case that was a talcosis case like the Krushinski case, these are all holds since 1999 that we're talking about that are related to the Johnson & Johnson's Baby Powder and Shower to Shower; correct?
A. Yes.
Q. And -- so in terms of the sort of universe of documents, types of documents and records that would be held, it's pretty much the same universe, correct --

MR. COX: Object to the form.

BY MR. SWANSON:

Q. -- from what your evaluation of these holds has been in terms of looking at what records and information are supposed to be held?

MR. COX: Object to the form.

THE WITNESS: I -- I would concur that the body of documents being held generally relates to both families of cases. I would not agree that every document from one family is connected to the other family of cases. I -- I'm not competent to decide that, but they are being held. Both -- both sets of holds concern a body of information.

BY MR. SWANSON:

Q. Right. And the body of information is about -- in terms of what's actually being held, people are being instructed to hold and preserve, it's essentially almost the exact same body of information; correct?

A. Yes.

MR. COX: Object to the form.

BY MR. SWANSON:

Q. Okay. Now, the 2017 talc asbestos litigation hold is the first one that specifically references talc, but there were prior holds that

were issued in cases where the injury being alleged was mesothelioma; correct?

A. I'm sorry. The first one that references talc?

Q. No. Did I say that? If so.

It's the first one that specifically references asbestos; is that right? From what you saw?

A. You know, I don't recall that. I did not look for the word "asbestos" in earlier holds.

Q. Okay. But in any case, regardless, the 2000 and 2002 to 2003 holds were done in cases where there was an allegation of mesothelioma by the plaintiff; right?

A. Yes.

Q. And this talc asbestos litigation hold, the current one that we have here, or the most recent one you're aware of, what Johnson & Johnson entities is that one directed to?

A. This hold notice is directed at individual custodians rather than specific entities.

Q. And is there a list of custodians anywhere that you've seen that this is directed to?

A. Not that I've seen.

Q. Have you -- do you have information about

at which Johnson & Johnson -- you know, operating units, subsidiaries, divisions, companies -- at which of those companies individuals were recipients of this current hold notice?

A. Only that the legal department has made a determination of the appropriate custodians to deliver the notice to.

Q. Do you know if any of those custodians are at Johnson & Johnson Philippines?

A. Yes.

Q. Okay. And as far as you -- and who is that individual or individuals at Johnson & Johnson Philippines?

A. I -- I'm not aware.

Q. But you got information from some source that Johnson & Johnson -- somebody at Johnson & Johnson Philippines received this notice; is that correct?

A. Yes.

Q. And what's the source of that information?

A. You mean how did I learn that?

Q. Yes.

A. From counsel.

Q. Okay. And based on our review of the prior notices, was this the first notice that

Johnson & Johnson issued legal hold notice for talc litigation issued to Johnson & Johnson Philippines?

A. It's the first I'm aware of.

Q. Now, you saw in the 2014, in the prior ones going back, there was no indication that it went to Johnson & Johnson Philippines. In fact, the distribution list from 2014 and 2009 specifically showed that it was not distributed to Johnson & Johnson Philippines; correct?

A. In 2009 it specifically showed that. In 2014 it simply denoted "US," "OUS." It didn't have a country-by-country listing.

Q. Okay. If you look at -- if you don't have those in front of you -- I think you do.

If you look at 34, for example, 35?

A. Yes.

Q. It says "U.S. only"; right?

A. Correct.

Q. So those don't -- they did not go to Johnson & Johnson Philippines; correct?

A. They didn't go outside the U.S.

Q. Right. That was all I was confirming. Okay. And that would be the same -- did this 2' -- the current Johnson & Johnson talc

litigation -- talc asbestos litigation hold, go to Johnson & Johnson Hong Kong?

A. Individuals in Hong Kong.

Q. And where did you learn that?

A. From counsel.

Q. Did it go to Johnson & Johnson China?

A. I don't know.

Q. Okay. And when did it go to Johnson & Johnson Philippines?

A. Well, as I mentioned, it didn't go to an entity; it went to individuals in those areas. And that was on May 26th of 2017.

Q. And was the -- is that the date that that hold was issued?

A. Yes.

Q. And do you specifically know that it went to those individuals on that date, at Johnson & Johnson Philippines and Hong Kong?

A. I know that the -- the -- I don't know that specifically. I know that the hold -- the custodians were notified on that date. I have no reason to believe that the Philippines or any other area were treated differently.

MR. SWANSON: Are you okay to continue some more?

I mean, you guys tell me, because I'm -- I'm moving right along, but.

THE WITNESS: I thought that was a good stopping point, but I -- I --

MR. SWANSON: Well, I mean, you know, since we do have a little bit of an issue here about when we're going to finish tomorrow, I certainly --

MR. COX: Are you about to start a new topic?

MR. SWANSON: It's related, but it's getting into an area that's going to take some time.

MR. COX: Why don't we go off the record, let's talk for a couple minutes, and we'll see.

MR. SWANSON: All right. Let's go off the record.

THE VIDEOGRAPHER: Off the record at 5:47.

(Off the record.)

THE VIDEOGRAPHER: On the record at 6:01. You may continue, Counsel.

MR. SWANSON: So we have an agreement about tomorrow's deposition and the conclusion of the deposition, and Mr. Cox will state that for the record, and if there's anything I disagree

with, we'll hammer it out.

MR. COX: Yes. First, the Johnson & Johnson defendants object to the continuation of the deposition given the two days of testimony of this witness has already sat for, given the number and nature of the subject matters for which this witness has been tendered, and the limited relevance to the claimed defenses in the case, we don't believe additional time is necessary or appropriate.

Nevertheless, in the spirit of compromise, as Mr. Swanson indicated, because the witness and counsel are here, we've agreed to continue the deposition tomorrow under the following circumstances: The deposition will begin at 9:00 a.m. There will be reasonable breaks. Plaintiffs will conclude their questioning by 1:45 p.m. at which time the J&J defendants will have an opportunity to ask direct -- pose the direct testimony from the witness and after which plaintiffs will be permitted a recross that's limited to the issues raised on the direct.

MR. SWANSON: That's our agreement, yes.

We can go off the record.

THE VIDEOGRAPHER: The marks the end of

Media Number 5 in the deposition of James Mittenthal and we are going off the record and adjourning for the day at 6:02 p.m.

(Whereupon, the deposition was adjourned at 6:02 p.m.)

SIGNATURE OF DEPONENT

I, the undersigned, JAMES PETER MITTENTHAL, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINE | CHANGE |
|---|---|---|
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |

____________________________________

JAMES PETER MITTENTHAL, Date

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

I, EARLY LANGLEY, a Certified Shorthand Reporter, State of California, do hereby certify:

That JAMES PETER MITTENTHAL, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on October 22, 2018.

EARLY LANGLEY, CSR NO. 3537
State of California

**Exhibits**

**Ex 20 Mittenthal, J** 220:10 232:4,10

**Ex 21 Mittenthal, J** 220:12 242:4,5 409:5, 13 431:19

**Ex 22 Mittenthal, J** 220:14 246:1,5,8

**Ex 23 Mittenthal, J** 220:15 247:16,17 248:6 250:3 325:17

**Ex 24 Mittenthal, J** 220:17 247:24,25 251:25 252:3 322:8

**Ex 25 Mittenthal, J** 220:18 248:24 249:3 287:18 288:22 290:4

**Ex 26 Mittenthal, J** 220:19 260:22,24 261:5 267:9 309:5 327:18

**Ex 27 Mittenthal, J** 220:21 289:5,10 293:6 296:13,24

**Ex 28 Mittenthal, J** 220:22 289:17,18 307:13

**Ex 29 Mittenthal, J** 220:24 289:20,24 318:2

**Ex 30 Mittenthal, J** 221:1 311:1,4

**Ex 31 Mittenthal, J** 221:2 381:5,6,10

**Ex 32 Mittenthal, J** 221:3 416:14,17,19

**Ex 33 Mittenthal, J** 221:5 425:21,23 426:6

**Ex 34 Mittenthal, J** 221:6 429:24

**Ex 35 Mittenthal, J** 221:8 430:3

**Ex 36 Mittenthal, J** 221:9 430:9

**Ex 37 Mittenthal, J** 221:11 431:14,15

**-**

**---ooo---** 222:12

**--ooo--** 224:1,3

**1**

**1** 234:22 248:19 249:5 268:13 289:24 296:25 318:15,17,18 320:15 357:3 410:12 422:8

**1.0** 249:5,15 250:25 287:17 288:2,16 290:5, 10,15,19 307:1,11 317:22 322:3

**1.1** 288:5,14 289:1,9 293:5 307:9 312:18

**10** 314:1 359:2

**10036** 223:4

**10:13** 268:15

**10:34** 268:18

**11** 357:7 409:18 416:21

**11:46** 310:20

**12** 313:2,7 347:9 359:24 397:7

**12.0** 404:15

**12.4** 404:9,14

**1250** 222:23

**12:03** 310:23

**12:52** 337:13

**13** 259:6,10 271:24 291:25 332:11 359:4

**14** 311:17 365:10

**15** 243:21 317:12 426:4 427:21

**16** 357:7 404:8 423:5

**17** 317:15,19 399:15,16

**17.0** 357:21 358:2

**18** 222:4 224:10 260:12, 17 317:14 367:4,5,8 369:7

**188** 341:17,22 342:18, 20

**19** 262:20 348:24 349:14,15 357:7 404:8

**190** 341:13 342:19,20 353:15

**19199** 409:18

**1990** 263:5

**1990s** 390:15 391:15

**1997** 229:4 230:1 256:15 258:12,15 259:3,10 262:15 271:19,23 282:24 283:23 290:25 291:3 329:8 330:6 338:8 341:5,13 342:16 345:9, 14 388:7 389:8,12,23 390:2,8 391:21 392:6,9

**1999** 227:7 389:5 403:12,16 405:6 413:18,21 414:5 416:11,21 418:4,6 419:9,15 423:17 424:10 425:6 433:17

**1:45** 440:18

**1:55** 337:16

**1A** 432:23,24

**1B** 410:8,12 422:24 423:6

**1C** 419:25 432:9

**2**

**2** 268:19 289:16 298:18 305:21 310:19 311:21 313:7 319:24 320:4,15 324:7 379:9 397:6 401:12

**2'** 313:18 405:6 437:25

**2.0** 307:20 313:5 315:10 316:15

**20** 232:4,10 243:21 328:8 331:23 332:3,4 370:22 372:3 427:21

**2000** 409:21 420:1 422:22 423:8,17 424:10,17 425:6 435:12

**2000s** 349:8

**2001** 368:1 370:7

**2002** 359:21 360:3,10 435:12

**2003** 410:3 423:5 424:4, 7,21 435:12

**2004** 229:23 230:5 359:6,8 393:17 394:3

**2005** 282:19 405:3,4,10

**2006** 272:19 273:1,3,6 276:6,8,11 370:4

**2007** 422:13

**2007-2008** 278:24

**2008** 278:11 279:11,14 280:11,12,15,23 283:2 284:18 317:16

**2009** 248:20 249:8,12, 14 250:18 271:2 288:3 289:10 290:5 291:19 292:12,19 293:18,21 294:1 298:19 306:22 307:4 312:18 313:16,18 317:15 332:2,13 365:12,18,19,23 385:18,21 386:13,17,20 418:14 425:12 426:4,14 429:6 437:8,11

**2011** 289:17 307:21 309:15,23 313:17

**2012** 229:23 230:5 372:13 373:14,21 374:5

**2013** 319:17

**2014** 267:12,19 289:24 367:14 378:1,8,24 381:21 429:8 430:5,14, 19 437:5,8,12

**2015** 273:14,19 275:5,7, 19 276:12

**2017** 292:19 322:20 413:22 414:4,6 431:14 434:23 438:12

**2018** 222:4 224:10 309:20 311:17 384:14

**2021** 313:19

**21** 242:4,5 331:23 375:18 381:24 383:4

409:5,13 431:19

**212 735-3453** 223:5

**213 623-9300** 222:24

**21st** 226:5

**22** 246:1,5,8

**221** 342:2,6 345:14 346:1

**23** 247:16,17 248:6 250:3 252:3,6,7 325:17

**24** 247:24,25 251:22,23, 25 252:3,6 322:8 392:22 394:23 395:4 398:7,9 400:10

**248** 292:13

**24th** 245:7,14 246:21

**25** 248:24 249:3 287:18, 22,23 288:22 290:4

**251** 259:9 291:25 292:4

**26** 260:22,24 261:5 267:9 309:5 327:18

**26th** 438:12

**27** 270:25 289:5,10 293:6 296:13,24

**28** 289:17,18 307:13

**29** 278:18 282:5 289:20, 24 318:2 422:3

**2:55** 371:6

**2D** 357:4,11,12 358:3 404:1,2,5

**3**

**3** 234:18 236:6 290:19 293:7 296:25 298:18 305:21 306:2,3 307:16 308:5 310:23 317:24 318:5 319:13 320:5,14 321:11,12,14,17,19,24 322:25 324:7,8,11,14 327:14,16 371:4

**3.0** 289:23 318:19 319:11 323:12

**30** 282:2,7,15 288:8 289:10 293:18 298:19 309:3,12 311:1,4

**30(b)(6)** 411:12

**30th** 307:4

**31** 249:7 267:8,10 290:5 307:21 309:3 319:17 381:5,6,10

**32** 416:14,17,19

**33** 425:21,23 426:6

**34** 309:3 418:10 429:22, 24 437:16

**35** 430:1,3 437:16

**36** 262:23 269:11 418:22 430:5,9

**37** 272:15,17 347:22 352:6 431:14,15 432:15,16

**3:12** 371:9

**4**

**4** 223:4 234:18 247:15 248:16 290:2 317:24 319:24 321:21 322:13, 23 324:7,14 325:16 371:10 407:21 424:16

**4.0** 251:1 315:22

**4.2** 298:8,11

**4.3** 298:19

**4.33** 305:22

**4.5** 299:14

**4.6** 306:4

**4.7** 306:16

**40** 288:8

**400** 222:6,17

**42** 334:2

**44** 280:10 283:1

**46** 236:6

**4:13** 407:23

**4:49** 408:1

**5**

**5** 247:19,21 251:19 290:3 309:3,7 322:7,8, 13,16 323:7 324:19 325:5 326:1 359:6 393:17 394:3 408:1 441:1

**5.0** 315:19 317:18 322:18

**500-gram** 365:21 366:19,20

**510 302-1000** 222:18

**55** 222:6,17 309:3

**56** 279:11,14,16

**59** 317:10

**5:47** 439:18

**6**

**6** 319:5,16 320:3 321:13,22 322:15 325:17 342:20 353:11, 20 354:18

**61** 383:19

**62** 383:19 384:9

**6:01** 439:20

**6:02** 441:3,6

**7**

**7** 404:8 420:1

**8**

**8** 292:18,19,22 322:9 359:2 422:14

**9**

**9** 357:7 359:2 404:5,8

**90s** 256:23 257:18 258:1 263:2 266:1 389:22

**92660** 222:24

**94607** 222:7,17

**97** 230:4 260:9 292:14 356:24 391:24 394:16

**98** 279:12 284:9

**99** 423:8 424:16

**9:00** 440:16

**9:05** 222:4 224:11

**A**

**A-P-A-C** 327:8

**a.m.** 222:5 224:11 268:18 440:16

**ability** 239:23 298:6

**absence** 275:20

**Absolutely** 398:21

**accessing** 299:15

**accident** 255:19

**accompanied** 291:6

**accompanies** 386:9

**accompany** 348:7

**accompanying** 388:19

**accomplish** 254:11,13

**accomplished** 282:2

**accordance** 248:12 250:5,21 251:8 252:10, 12,15 253:7 406:8

**accounting** 319:3,19 321:4,7 323:22,23

**accurate** 319:19 321:4 323:22,23

**accurately** 250:7 324:14,23

**acronym** 328:1

**act** 394:25

**acted** 410:24

**action** 222:10

**actions** 378:1,14,20

**active** 312:16,19,20,25 313:9,12,14,22

**activities** 226:13 235:2 299:3 306:16 363:16

**activity** 264:19

**actual** 235:18,24 236:12 318:10 340:10 355:18 376:22 388:7 404:23 406:3

**add** 370:12 387:9 423:9

**adding** 413:24

**addition** 346:14

**additional** 226:7,12 227:8,16,19 229:22 230:3 231:3 234:19,22, 25 235:9 244:21,23 245:3,6 258:10 347:1 350:5 360:1 367:14 369:8 374:21 414:17 423:10 440:9

**address** 390:5

**addressing** 252:21

**Aden** 274:22

**Aden's** 266:19

**adjourned** 441:6

**adjourning** 441:3

**adoption** 273:16

**advisement** 296:22

**affect** 294:16

**affected** 405:7

**affecting** 316:8

**affects** 327:3 329:15

**affiliation** 239:10

**afternoon** 338:1,3

**agree** 253:17,18 254:6 255:25 259:25 262:3 266:14 270:13 280:12 283:21 297:24 298:2 319:2 330:12 374:9 384:1 388:24 394:24 408:20,23 434:9

**agreed** 440:13

**agreement** 352:4 356:25 357:2 387:25 404:2 405:2 439:22 440:23

**agreements** 340:18 356:21 357:4 387:24

**agrees** 278:5

**ahead** 237:15 238:23 244:5 249:2 258:20 259:7 281:23 288:25 289:13 340:4 351:4 370:19 375:4 380:25 430:13 431:18

**Aiken** 224:9

**Alameda** 224:20

**aligned** 263:6 269:12 297:14

**allegation** 411:16 435:13

**allegations** 417:12 420:6

**alleged** 435:2

**Allen** 364:11

**alphabetical** 428:19

**alter** 277:24

**alternatives** 275:18

**ambiguous** 376:16

**America** 222:20 224:17 225:5

**amount** 347:2

**analysis** 341:24 342:14 348:9,10,17 349:12,25 350:24 353:12,24 354:1,8 372:23 393:10 399:17,20 401:3

**analyst** 278:22 341:14 342:14 343:20 345:10 353:12 422:10

**analytical** 340:9 342:3 345:15,24

**and/or** 226:4 312:5 335:3

**Anderson** 257:23 390:21

**announced** 233:23

**annual** 293:14 298:13 309:8 312:1 325:23 416:4

**annually** 285:12,24 298:15

**answering** 301:13 374:8

**answers** 294:2

**anymore** 301:23 413:5

**APAC** 327:8,21 328:1, 13 372:11 376:9

**apologize** 228:24 248:23 287:7 348:3 382:1 398:7 403:1 424:22

**appearance** 337:21 351:16

**APPEARANCES** 222:13

**appeared** 222:9 377:9 404:2

**appearing** 222:21 224:25 225:1,4 337:23

**appears** 311:7,14 312:12 315:22 319:6 342:9 357:14 428:19

**applicability** 274:25

**applicable** 228:3 248:12,15 250:6,21 252:12 254:25 266:13 269:18 274:14 303:3 320:6 329:7 351:25 387:22 394:17

**applications** 379:11 380:2 381:15,19

**applied** 238:6 265:14 267:23 329:23 336:10, 14,15 338:10 382:16 388:9 417:20 424:23

**applies** 271:19 330:8, 21 340:9 341:23 342:8 345:18,21 354:7

**apply** 294:20 298:24 329:11 330:3,13 331:1, 4 336:6,7 338:5

**applying** 401:22 425:5

**appraisal** 346:16

**approval** 300:11 302:25 303:6 312:4

**approvals** 302:21,22, 24

**approve** 303:10

**approved** 302:8,10

**approving** 303:19

**approximately** 271:2

**April** 289:24 317:19 322:19 384:14

**APRS** 401:13,16,17

**archive** 236:18,25 237:7 251:15,17

**archived** 335:24 401:6

**archives** 236:22

**archiving** 336:4 402:6

**are's** 236:21

**area** 238:15,25 324:25 337:6 364:17 381:18 387:6 438:23 439:12

**areas** 235:14 240:21 332:24 334:21 438:11

**arithmetic** 293:3

**arose** 411:20

**Arps** 223:3

**artifact** 324:8

**asbestos** 236:8 237:21 340:1 348:19,22 351:13,15,17,21 362:4 363:11 370:14 371:17 373:1 375:11 376:24 387:7 389:16 391:7 393:11 399:21 401:4 431:20 433:1,5 434:23 435:7,10,16 438:1

**ascertain** 338:17 381:20

**Asia** 327:4,10 328:3,18 329:17,23 332:20 337:6 338:5

**Asian** 327:10

**assessment** 346:13 367:17

**assignment** 334:14,20

**assigns** 317:13

**assistant** 233:9

**associate.'** 320:7

**associates** 282:11 326:7 422:9

**assumed** 327:9

**assuming** 290:9,12

**attached** 246:17 260:17 429:2,21 432:14,16

**attachment** 428:2

**attachments** 427:23

**attempt** 433:10

**attorney** 235:25

**attorneys** 383:24

**audiovisual** 316:11

**audit** 364:5 372:1 374:16,20,23 375:20 376:20,21 377:2,11,15, 24 378:15,19 382:3,14 386:13 387:24 415:22, 24 416:2,3,5

**audit-like** 386:20

**auditing** 376:22

**audits** 279:13 283:8,13 284:6,8,12,15,16,17,18, 19 363:2,7,10,25 364:25 375:2 386:16, 19,24 387:17,23

**authored** 390:18

**authority** 385:3

**authorization** 292:3 401:17

**authors** 240:3

**availability** 258:10

**aware** 245:6,8,14,18 249:19 256:2,5,6,10 271:21 298:2 305:5,19 326:18 327:2 339:4,8 344:4,12 401:20 405:19 412:19 413:11,15 414:9 415:10,11,13 417:1 419:19 432:22 433:7 435:18 436:14 437:4

**awareness** 326:22

**B**

**baby** 257:8 260:4 264:14,20 279:8 326:19 339:19 343:4,5,16,24 347:4 353:3 358:20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:8 409:24 410:1,2 417:4,14 420:10 426:7 430:15,17 433:19

**back** 226:20 229:4 230:1,4 232:16 234:7 238:8 239:16 248:20 249:12 250:2 256:25 257:12,17 263:1 279:10 280:19 283:23 288:20 290:4,25 291:2,22 293:25 294:6,10 296:24 306:21 320:3,20 325:15 326:24 333:15,17,20 338:2,8 342:12 351:24 352:23 356:4 367:23 370:7 372:12 373:14, 17,21 374:6 376:7 377:15 382:3 384:14 385:15 388:18,25 393:21 394:19 402:3 403:11 422:20 424:9 437:6

**Barbara** 420:2 422:22

**based** 236:15 241:17 247:3 258:1 263:22 264:6 265:2 294:4 298:16 304:23 334:4 338:17,19 353:7 354:6 385:4 390:16 403:7 418:25 436:24

**basic** 308:1 313:9 399:2 408:14 423:15

**basically** 231:14 246:10 286:14 347:20 350:3 383:11

**basics** 247:3

**basis** 263:7 298:13 371:22 406:3

**bat** 281:25

**batch** 263:15 352:2 354:2 358:9,15 360:18,

20 372:5,18,21,24 374:21 386:11,18 406:7

**batches** 348:7 354:7 374:18 386:9,15,16

**Bates** 290:20

**Beach** 222:24

**begin** 440:15

**beginning** 248:6 321:8

**behalf** 224:6 225:2,4,7 337:23 354:13

**bell** 380:5

**beneath** 318:23

**Berg** 425:22 426:2

**Bernardo** 223:3 225:12

**bin** 302:11,20,24

**binder** 229:7,9,12,18 230:1 367:13,22 368:5, 10 369:23 370:6,9 380:17 419:25 432:9

**binders** 368:9

**bit** 287:8,9 344:1 403:23 419:7 423:21,22 426:14 439:6

**Bloch** 420:2 422:22

**blue** 302:6

**body** 407:5,7 434:8,13, 15,18

**bog** 260:10

**bottle** 404:23

**bottom** 306:24 309:13 360:2 367:6,8 372:7 392:5 399:14 422:7

**boxes** 263:6,14 264:1, 2,8 269:12

**Braunreuther** 428:20

**break** 267:3 268:3,7,8,9 310:16 331:5 337:9,14 338:2 360:19 374:14,25 392:17,19 407:11

**breaks** 268:11 440:16

**briefly** 326:25 333:6 336:17 402:18

**bring** 229:5 300:10

**broader** 269:19

**broadly** 328:20 330:8

**brought** 229:8,12

**Bruno-sheerin** 257:21 262:11 265:19 268:23 272:10 274:8 275:23 347:25 352:7

**Brunswick** 349:1,5 394:20,21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

**buildings** 396:19 397:19 399:11

**bunch** 240:16

**business** 255:16 261:24 264:18 285:16 326:9 390:6 391:18

**businesses** 415:8

**C**

**calculated** 313:15

**California** 222:7,8,17, 24 224:13,19

**call** 233:6 234:1 235:23 241:11 259:20 290:7 308:18 309:22 310:12 318:20

**called** 272:21 276:18 284:24 285:8 296:4,12 307:23 342:2 343:17 357:22 363:24 364:5 365:3,4 402:20 420:19 423:4

**calling** 319:12

**calls** 263:4 272:1

**cancer** 432:4,16,22

**candidates** 286:13 298:7

**capability** 369:16

**captured** 231:10 363:17 372:2 387:16

**cards** 358:10

**Care** 360:5 427:7

**Carpenter** 222:22 225:3,4 337:17,20 350:15

**case** 224:15,18 234:6 235:23 256:4,7 260:15 261:9 313:24 320:22 326:13,15,16 334:22 338:8 344:11 355:21 409:19,22 410:4 411:14,17 413:9 414:21 415:19 416:22 419:9 420:2 422:22,25 424:22 425:22 429:12,23 430:2,8 433:16,17 435:11 440:8

**cases** 226:4 231:5 237:17 242:12 244:16 245:22 246:22 341:22 344:5,11,16,19 412:20 414:6,10,12,20 415:19, 25 423:17 434:9,11 435:1,12

**categories** 234:21 270:3 342:10 362:21 363:24 423:24

**categorized** 234:14

**category** 234:10,18,22 251:13 361:13 388:4 391:23 406:10,13

**caught** 309:24 341:16

**CDS** 304:18,20

**central** 302:15 344:4,9, 10

**certificate** 348:17 349:25 350:21,24 399:1,17,19,20

**certificates** 348:8,10 349:12 372:22 393:10 401:3

**Certified** 222:7

**cetera** 317:20 328:14 358:10 398:20

**chance** 297:13

**change** 308:16 319:9 320:6 325:25 326:3,4

**changed** 308:12 315:20 321:4,8 324:23

325:22 346:23 371:1 407:3 420:18

**characterization** 334:24 344:8

**charts** 340:12

**chase** 258:12 351:9

**check** 252:1 281:14 308:24 314:17 333:7 359:7 405:18 418:9

**checked** 315:21 374:9 426:23

**checking** 315:19 324:4

**chemistry** 342:3 345:15

**Chesteen** 429:11,22

**China** 328:14,24 330:21 331:19 333:25 338:6 372:8 373:6,11 377:8,10 427:12 438:6

**Chris** 231:2 245:25 261:2 268:2 380:16 395:14 425:18 432:7

**Christopher** 223:2 225:7

**christopher.cox@ skadden.com** 223:5

**Cindy** 266:18 274:22

**circumstances** 234:15 408:24 413:5 440:15

**citation** 278:15

**cite** 398:1,4

**cites** 372:8

**claimed** 440:8

**clarify** 231:7

**classified** 241:16 390:6

**clean** 298:6 386:8

**cleanout** 284:24 285:2, 4,5,6,8,9,11,18,24 286:4,11 293:10,13,14, 20,25 294:6 296:2 297:3,19 298:12,21,23 299:3,9,11,16,20

300:17,20 301:2 302:4, 6,12,19 303:11 304:11 305:3 306:5,11 307:10 308:12,18,23 309:9,13, 15,19,25 310:6,12 312:7,17 313:18,23 314:4 316:7 323:3,7,18 325:2,4 416:3,4,5,6

**cleanup** 301:6 307:24 308:13,18 309:23,24 311:23 312:1,4,8 317:17 319:12 321:13, 25 323:4 325:21

**cleanups** 325:23

**clear** 233:25 263:16 341:7,11 358:17 373:3 398:22 406:17 420:13

**close** 339:4

**closed** 392:1 396:18

**closer** 359:16,21

**code** 317:14

**collected** 234:24

**collection** 226:13 234:22 235:2

**column** 235:4 236:1 428:14

**columns** 231:17

**commencing** 222:4

**comment** 348:6 351:25 353:7 397:16 399:6 401:7

**comments** 271:18 356:10 361:6 364:1 375:22 385:5

**common** 362:15

**communication** 299:10,11,16,20 300:21 301:6 306:5 310:13 312:17 413:3 428:24

**communications** 245:10 306:12 427:6

**companies** 240:16 257:11,12,14,16 258:7 259:1 260:3 263:1,11 269:22,24 270:19 271:20 272:3 273:13 279:3 281:9 294:22

330:9,17 338:10 360:5 417:15,16 420:23 423:1 424:24 426:3 427:2,16 429:2,17 430:7,24 431:3 436:2,3

**company** 234:19,20 237:18 238:20 240:25 244:23 252:17 253:22 257:5 259:12,15 263:4 273:20 277:2,4,13 279:6,21 294:5 298:12, 24 330:24 331:17 343:11 369:1 384:3 389:21 391:18 393:5,14 410:19

**company's** 238:16 241:10 257:22 258:1 390:6 406:9

**companywide** 429:1,6

**competent** 434:11

**compile** 242:8

**compiled** 381:12 409:15

**complete** 242:14,21 244:20 290:9,13,14 315:7 384:17

**completely** 320:25

**compliance** 252:16 285:25 295:18,20 415:24 416:2 427:8

**complied** 253:19

**comply** 253:25 254:4, 8,9 273:22

**complying** 285:23 415:23

**comprised** 406:6

**compromise** 440:11

**computer** 231:16 235:23 238:16 300:15

**concern** 434:13

**conclude** 263:18 304:23 385:2 428:17 440:17

**conclusion** 439:23

**concur** 434:7

**conduct** 298:12

**conducted** 226:8 283:8 298:23

**confirm** 252:1 311:20 329:13 400:11

**confirmed** 303:2

**confirming** 328:6 437:23

**conform** 367:15 369:9

**conformance** 399:2

**confused** 227:15 228:24

**conjunction** 252:23 346:18 387:1

**connected** 434:10

**connection** 226:4 387:3 417:13 420:8

**considered** 365:2 384:24

**consist** 302:25

**consistent** 293:2 383:18

**consolidate** 317:17 433:11

**consolidated** 271:4

**constitute** 319:8

**consult** 312:21 316:19 340:2,5

**consultant** 223:9 410:24 411:1,5

**consulted** 235:5,11,21 239:1 335:14,16

**consumer** 223:1 225:9 226:16 239:13 242:19, 22 243:4,7,8 256:17,18, 20,21 257:4,12,13 258:7,25 259:11 260:2 263:1 269:22,24 270:19 271:20 272:3 273:10 279:4,5,15 280:7 281:8 311:10 312:1 330:16 355:13 360:5 393:15 415:4,12 417:8 418:17 419:17,18,23 420:25 422:11,25 426:3 427:2, 3,4,7 429:16 430:7

**Cont'd** 225:22

**contained** 231:16 368:5

**container** 404:24

**containers** 241:11 302:7

**contaminants** 339:25

**content** 241:18 263:21 300:25 351:13 362:4

**contents** 299:25 359:14 364:9

**context** 281:12 297:3 327:12 343:21 352:19 353:9 365:25

**continuation** 392:15 440:3

**continue** 258:9 268:21 310:11,12,25 337:16 343:5 360:19 371:12 388:23 408:3 438:24 439:21 440:13

**continued** 232:21

**continuing** 266:20 291:16

**continuously** 403:15

**contracted** 363:14

**contribute** 238:17

**controlled** 329:3

**controls** 404:15

**convenience** 234:11

**conversation** 230:13, 14 233:5 334:3 337:4 349:14,20 368:11 371:24 377:9 382:18 396:15

**conversations** 235:7 244:7 261:22 262:5 310:9 338:19,21

**coordinators** 285:20 302:23

**copied** 428:10

**copies** 242:2 247:9 299:2 314:22 425:16

**copy** 231:19,23 232:1 245:24 246:2 247:20 260:20 261:2 270:24 347:7 381:3 409:8 425:14 432:7

**corporate** 233:9 238:22,25 239:1,2,10, 11,12 272:21 273:10,12 274:16,17,18,19 276:2, 11,18 355:10 427:5,6

**corporate's** 273:22

**corporation** 222:20 225:6 259:16 291:21

**correct** 227:10,22 228:8 230:11 232:19 236:2 237:11 241:24 243:8,10 245:7,22 248:17,20 249:8,12,15, 23 252:25 253:2,11 254:5,14,17,21 255:2, 14 256:4,8,15 257:9,14 258:13,18 259:3 260:5, 15 261:9 262:15 265:9, 11,12,15,16,19 266:5, 13 267:13 269:19,20 270:11 273:23 276:4 278:3,8 279:8 283:16 285:9,12,18 286:8,21 294:12,14 296:17 299:7,8 300:7 304:15, 18 305:25 306:9,20 308:2 309:20 313:20 314:6 315:3 316:6,17 318:9,16 320:16 321:5, 9,15,19,20 322:1 324:3, 17,18 326:1,13 327:17 328:15,18 329:24,25 330:9,10,13 332:13 334:23 336:14,23,24 337:1 338:11,12 339:1, 6,7,10,11 344:6,19 345:1,11,22 353:11 356:23 360:5 366:7 367:1,2 372:21 374:2 383:25 384:5,21 386:7 388:10 389:5,8 391:10 393:3,17 394:20 395:8, 23 396:2,18 397:14,24 399:13 400:5 403:12 406:20,21 408:19 409:5,15,19,22 410:16, 25 411:22 412:5,14 413:25 415:16 416:23 418:15 419:12,16 420:15 423:16,22 424:11,19 425:12 426:15 428:11 430:16, 24 431:3,7,8,9,11 432:5,17 433:20,25 434:19 435:2 436:18 437:10,19,21

**corrective** 378:1,14,20

**correctly** 244:20 342:18

**correspond** 246:13 372:14

**cosmetic** 270:21 279:7 341:9 355:20 362:11 389:14 426:11

**counsel** 224:23 225:13,17,21 227:2,3, 22 229:1 234:5 243:13, 15,18,20,21 244:25 246:10 258:5 268:21 296:18 310:25 311:5 337:16,17 355:14 371:12 408:3 425:10 436:23 438:5 439:21 440:13

**counterpart** 409:2

**countries** 338:11

**country-by-country** 437:13

**County** 224:20

**couple** 230:25 280:9 281:21 331:20 341:1 375:3 380:23 388:11 439:15

**coupled** 246:12

**court** 222:23 224:8,19 226:22 238:7,9 257:1 352:24 410:20

**cover** 227:6 228:19 229:3 266:22 268:7 388:15 389:25 391:17 418:25

**coverage** 228:2

**covering** 264:8

**Cox** 223:2 225:7 228:9, 14 231:2,21 237:13,15 240:18 241:8 242:17,23 243:9 244:4,18 247:6

249:24 250:9,23 253:14,21 255:3,15,23 256:9 257:19 258:19 259:23 261:3 264:15 265:20 266:6 267:2,21 268:4,9 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 296:21 297:5,23 300:8, 23 302:2 304:5,13 305:18 308:3 310:1,15 312:11 314:15 315:5 316:9 319:22 320:17 323:9,25 330:14 333:9, 12 334:24 344:7 345:3 348:14 350:12 351:2 353:21 355:6 357:13 361:21 362:6,13 365:24 366:16 369:4 370:1,18 380:9,19,23 383:15 385:1,14 386:5 387:14 388:13 389:17 392:14 393:23 395:6,9,16 396:3 397:1,25 398:16 399:22 400:6,22 402:14,23 405:11,15 407:12,15,18 412:6 414:1,13 421:9 423:18 425:16 428:5 431:23 432:9,11 434:1,6,21 439:9,14,24 440:2

**create** 250:19 320:25 351:7

**created** 231:14,15 232:9 234:3 248:10 249:7,14 256:23 257:25 260:13 263:6 264:1,25 269:2,12,13 303:23 304:2 316:2 332:3,13 350:3 362:3 389:22

**creates** 253:22

**creating** 250:4 266:9 406:23

**criteria** 236:2,7 237:22

**curious** 237:4

**current** 244:8 269:21 272:6,8 311:15,18,19 315:19 317:18 321:9 322:4,18 323:14 336:7

339:22 403:4 432:20 433:4 435:17 436:4 437:25

**custodial** 235:12

**custodian** 413:4,7

**custodians** 408:15 412:10 413:16 435:21, 22 436:6,8 438:21

**cut** 258:12 328:7 351:9

**cycle** 349:22

**Cyprus** 222:20 225:5

**D**

**Darren** 270:23

**data** 235:13 240:8

**database** 236:21

**date** 224:10 249:7 273:3 307:4 311:17 314:1 358:12 370:8 404:20,21,22 405:1 422:18 423:5 438:13, 17,21

**dated** 227:7 288:2 289:17,23 307:20 416:20 426:3

**dates** 381:16

**David** 364:11

**day** 230:21 285:16 286:11 297:12,16,19 298:4,5 302:12 304:11 380:20 407:14 408:7 441:3

**days** 282:2,7,15 301:2 302:6 309:9,15 316:7 325:4 440:4

**deal** 261:25

**dealing** 384:4

**Deane** 426:2

**Debbie** 428:25

**December** 319:17 426:4

**decide** 434:12

**decided** 308:17

**decision** 325:3,13

**dedicated** 367:11 372:11

**deduce** 264:7

**defect** 417:12 420:7

**Defendant** 222:21

**defendants** 222:20 223:1 225:8,13 245:11 440:3,18

**defenses** 440:8

**define** 295:14 314:18

**defined** 291:23 292:15 295:23 305:1 312:25 383:5

**defines** 298:19

**definition** 275:10 295:16,17 313:9 315:8, 20,21 316:12

**definitions** 294:25 295:4,11 312:22 360:2

**deletion** 305:25 306:9

**deliver** 436:7

**demanded** 256:2

**denote** 239:8 240:21

**denoted** 234:17 238:14 318:21,24 437:12

**Dentons** 222:23

**departing** 282:11 422:8

**department** 241:2 269:15,18,19 273:20 275:11 277:14 285:17, 19 291:16 308:15,17 311:12 360:25 361:1 410:15 413:2 436:5

**departmental** 236:19 238:2,18 279:12,13 283:8 284:11,14 340:16,24

**departments** 263:11

**depend** 320:18

**deposed** 226:5

**deposit** 238:17

**deposition** 222:1 224:12,21 229:2,11,13, 21 231:5 242:4 244:17 246:2,11,21 247:24 260:14,25 261:8 268:13,20 271:24 310:19,24 334:13 344:11 371:5,11 388:23 392:15 407:21 408:2 411:24 416:18 425:22 432:24 439:23,24 440:4,14,15 441:1,5

**depositions** 243:17

**describe** 250:7 270:2 359:1 379:21

**describes** 250:10

**descriptions** 403:19, 20

**descriptives** 292:16

**design** 417:12 420:7

**designated** 307:11 395:11

**destroy** 301:18,24 306:13 408:17

**destroyed** 259:19 286:7,20 287:1 297:22 300:20 302:19 369:25 396:25 402:13 406:22 412:4 416:7

**destroying** 299:22 300:6,14 301:7,25 332:23

**destruction** 292:3 297:4 298:7 302:8,10 303:10 305:25 306:9

**detail** 319:2 320:3 423:22 426:15

**detailed** 319:3

**details** 413:24 423:20

**detect** 284:6

**detecting** 284:10

**determination** 252:24 359:13 414:25 436:6

**determinations** 361:12

**determine** 239:9

241:19 297:13 349:21 354:2 356:21 361:8

**determined** 241:2 338:16 385:22

**development** 360:24

**device** 354:5,6

**devices** 342:4 345:16

**devised** 273:12

**DHR** 354:5

**dictate** 389:13

**different-named** 257:14

**differently** 292:8 438:23

**difficult** 320:24

**difficulty** 387:20

**diffraction** 354:25

**digital** 340:11 371:1

**direct** 225:22 262:17 357:8 413:3 422:6 440:19,20,22

**directed** 332:21 417:3, 17 418:12 429:1 435:19,20,23

**direction** 305:24

**directives** 292:17

**director** 376:9

**directory** 239:14 240:22

**disagree** 369:6 439:25

**disappears** 324:20

**disclosed** 412:18

**discontinued** 358:16

**discovered** 412:1

**discuss** 231:6 285:3 407:16,17

**discussed** 237:9 278:4 335:11 338:22,24 370:16 381:15,19 383:2 394:16 423:17

**discussing** 338:14

**discussion** 347:6,24 365:10 367:5 368:7 369:7 390:20 401:24

**discussions** 383:22

**disk** 315:16 371:4

**disposal** 286:2,3 338:18

**dispose** 250:20 252:22 255:22

**disposed** 248:11 252:14 253:6,10 259:19 300:20

**disposing** 250:5 251:7 299:23 332:24

**disposition** 239:22 251:16 286:13,16,20 295:17 297:3,17 329:4

**dispositions** 297:15

**distribute** 429:1

**distributed** 417:24 426:19 429:5 437:9

**distributing** 257:7 260:4

**distribution** 418:7,13, 25 419:3,8,10 426:18 430:23 431:1 437:8

**distributions** 419:4

**division** 275:11 277:14 278:1 427:3

**divisions** 274:15 417:16 436:2

**DMR** 354:5

**doc** 232:8

**docs** 384:20

**document** 232:10,20, 22 241:16 246:9,14 249:13 253:15 255:14 262:1 271:12,13 278:6 288:12 293:8 295:17 296:4,13 305:24 307:3 313:12,13,22 314:14,18 317:18 318:9,10,11 322:20 324:6 329:19 360:24 379:21 380:6,7 383:9 384:4 395:13,14, 16 396:16 405:16

416:20 417:17 420:1,14 423:4 427:19 428:3 434:10

**document-gathering** 235:1

**documentation** 292:5 303:23 304:2,4,9 314:6 345:5 349:21 350:8 358:7 359:2 390:1

**documentations** 259:14

**documented** 306:17 413:21

**documenting** 416:6

**documents** 239:17 240:3 244:13,15 247:7 252:22 254:25 255:25 286:17,19 290:20 291:20 292:15 294:8 298:20 299:2,7,23 300:6 301:9,20 302:5 306:13 314:23 329:4,5 332:23,24 334:7 335:24 336:4 339:15,18,24 341:4,8 354:24 355:16 366:25 391:17 394:9 396:11 408:16,17,18 412:3 416:6 424:6,17 433:23 434:8

**Dodd** 278:20 281:25 283:7,15 309:11 421:24 422:4

**domestic** 329:18 393:1 431:2

**Don** 332:1,4,7 335:5 346:16 348:3 349:1 353:17 354:17 356:1 364:11 365:10,21 366:5 367:12,22 368:2,8,21 369:23 370:5 372:15 374:6 375:5 385:4 397:4,5

**double** 346:22

**double-check** 230:22 315:6 376:18

**Dowling** 327:19

**Downs** 226:9 230:9,13, 16,17 231:6 232:9 233:11 235:8 237:6

240:12 244:1,7 383:19, 21 386:22 388:17

**Doyle** 327:19

**draft** 299:2 314:23

**drew** 337:3

**drive** 237:1 238:13,14, 15 239:25 240:6,13,17, 21 241:12,13,20

**drives** 239:18,20 240:15,25

**duly** 222:10

**dumped** 240:17

**E**

**earlier** 236:18 262:14 268:24 293:15 321:1 337:21 338:15 354:12 365:20 382:18 390:2 391:11,14,15 402:17 414:5 415:2 423:25 424:2 433:9 435:10

**earliest** 227:6 259:2 271:21 327:1 389:22

**early** 222:7 224:8 226:20 256:23 257:17, 25 263:1 266:1 389:22 390:15 405:6

**earmarked** 297:17

**easily** 260:21 261:16

**echos** 383:9

**Edith** 428:25

**edition** 379:14

**EDS** 340:13

**EDSS** 354:25

**effect** 255:2,4 293:18 328:22 329:3 333:24,25 339:5,9 403:16 408:19, 21 412:24,25 414:11,19

**effective** 253:19 254:4 311:17 317:19 322:19 381:21

**effectuate** 271:13 421:8

**efficient** 340:7 408:6

**effort** 227:25

**efforts** 234:22

**electron** 362:2,10 402:21

**electronic** 299:1 304:19 305:11 314:9,22 315:14

**element** 234:9

**elements** 366:13

**elicit** 274:20 395:10

**elicited** 363:6,8 366:8 396:15

**eliminate** 300:22

**email** 301:1,10,19 367:18 372:10

**emails** 300:15 301:8,11

**employee** 279:21 282:3,16 301:21 303:1 320:7

**employee's** 286:1 303:10

**employees** 253:25 254:14,16,20 261:24 270:12 279:15 280:5 281:2,19 286:12 294:8 297:12 301:17

**EMRS** 237:3

**enable** 253:24 369:16

**encompassed** 226:16 251:15 374:14 387:25

**end** 268:12 310:18 371:4 407:14,20 440:25

**ended** 414:12

**English** 346:3

**ensure** 285:22

**ensuring** 377:3

**entailed** 263:10

**entered** 378:7

**enterprise** 252:11 273:15 275:8

**entire** 226:20

**entities** 274:1,5 435:19,21

**entitled** 285:6

**entity** 258:22 270:17 438:11

**entry** 342:2

**equate** 343:3

**equates** 343:1

**equivalent** 305:3

**ER** 275:8

**Erin** 222:22 225:3 337:20

**erin.carpenter@ dentons.com** 222:25

**ERMS** 236:25 237:5,10 238:6 267:12,16

**ERS** 273:15,16 276:13, 24

**ESI** 223:9

**essentially** 286:5 305:23 343:6 403:15 413:22 434:18

**established** 351:6

**Estrada** 429:12 430:2, 17

**et al** 224:16 420:5 426:3

**Ethicon** 410:25 411:3

**ETQ** 377:25 378:13,19, 22 381:22 382:15

**European** 336:25

**evaluate** 384:11,13,16

**evaluation** 434:3

**event** 285:9,11,15,18, 24 286:4 293:14 294:7 296:2 298:12,23 299:3 300:17 302:19 306:15 312:8 319:13 321:13,25 323:3,4,8,18 324:16 325:21 424:20

**events** 293:10,20,25 307:24

**eventually** 264:21

**evidence** 305:17 384:6,7 411:18

**evolved** 317:20 403:20 423:23

**exact** 269:6 422:18 434:18

**EXAMINATION** 225:22

**examined** 222:11

**exception** 361:8

**Excuse** 263:8

**exercise** 375:2

**exhausted** 371:19

**exhibit** 229:17 232:1,4, 10 242:4,5 246:1,5,8 247:16,17,24,25 248:6, 24 249:3 250:3 251:21, 25 252:3 259:6,10 260:12,17,22,24 261:5 262:20 267:9 271:24 287:18 288:22 289:5, 10,17,18,20,24 290:4 291:25 293:6 296:13,24 307:13 309:5 311:1,4 313:3 318:2 322:8 325:17 327:18 357:3,11 358:3 359:23 379:9 381:5,6,10 404:1,2 409:5,13 410:8,12 416:14,17,19 423:6 425:21,23 426:6 429:24 430:3,9 431:14,15,19 432:23

**exhibits** 229:10 260:9 359:19 379:3 410:10

**exist** 418:3 419:3

**existed** 269:14 275:7, 19 277:8 317:15

**existence** 263:19

**expand** 375:4

**expect** 292:24 356:8 360:16 383:5

**expected** 342:23 346:20,25 383:10

**expert** 264:16 341:19 342:7 344:16 345:17 347:17 348:20 350:20

**expertise** 396:11

**expiration** 404:21,22

**expired** 358:16

**explain** 234:2 260:25

**explicit** 251:18

**explicitly** 378:23

**exposure** 326:12,15

**express** 253:23

**expresses** 254:10

**extent** 231:8 254:7 270:4 277:7 281:13 320:19 355:7 395:9 396:4

**external** 376:9 387:23, 24

**extra** 425:16

F

**facilities** 237:18 397:24 398:14 399:4 400:2,12

**facility** 269:15 353:18 375:12 393:5,8,19 394:7,8 400:4 401:6 402:5,9

**facsimile** 321:1

**fact** 241:16 255:20 259:6 272:1 294:4 321:17 340:5 376:2 397:16 437:7

**fact-finding** 257:20

**fail** 410:19

**failed** 337:21

**failure** 411:18 417:13 420:7

**fair** 291:18 413:20

**faithful** 323:16

**falls** 404:14

**familiar** 275:17 284:25 327:9 339:12 362:15, 16,20

**families** 434:9

**family** 434:10,11

**February** 405:3

**figure** 368:8 380:17

**figured** 268:4

**file** 236:8 237:20,25 238:2,12 240:10

**filed** 224:18

**files** 237:12,16,17 238:3,17,18,21 240:17 335:13

**filled** 231:17

**films** 340:11

**finally** 431:13

**find** 260:9 267:11 296:15 327:13 333:2 341:3 347:8 355:25 356:25 360:14 377:20 379:1 398:5 399:18 401:13 410:8

**finding** 332:21 360:18

**fine** 268:8 269:9 292:6 313:6,10 400:25

**fine-tuning** 308:8

**fineness** 351:16

**finish** 439:7

**finished** 341:8 342:3 345:15 355:20 360:12, 22,23 362:12 370:14 371:16 374:11 387:7 404:16,18 406:4

**firm** 224:12,22 243:23

**first-time** 234:20

**firsthand** 266:25

**five-page** 379:25

**fleshed** 423:22

**flipped** 360:16

**flipping** 363:23

**floating** 379:3

**Flom** 223:3

**floor** 302:7

**flow** 349:21 350:7

**focusing** 374:19 375:2

**folder** 372:11

**folks** 260:3 283:1 308:21 309:18 338:20 410:18

**follow** 239:9 270:12 278:5 284:5

**follow-on** 226:8 349:14

**follow-up** 267:6 349:18

**Fong** 224:16 226:4,12 228:7 231:6,9 232:24 233:14 234:6,12 244:16 246:22 326:16

**force** 313:13 324:16

**forget** 301:19 385:12 424:3

**form** 228:9,14 237:13 240:18 241:8 242:17,23 243:9 244:4,18 249:24 250:9,23 253:14,21 255:3,15,23 256:9 257:19 258:19 259:23 264:15 265:20 266:6 267:21 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 297:5,23 300:8,23 302:2 303:25 304:5,13 305:18 308:3 310:1 312:11 314:15 315:5,13 316:2,9 319:22 320:17 323:9,25 330:14 334:25 344:7 345:3 348:14 350:12 351:2 353:21 355:6 361:21 362:6,13 365:24 366:16 369:4 370:18 383:15 385:1,14 386:5 387:14 388:13 389:17 396:3 397:25 398:16 399:22 400:6 405:11 412:6 414:1,13 421:9 423:18 428:5 431:23 434:1,6,21

**formal** 335:23 336:3 354:21 356:15 364:18 389:3

**formats** 299:1 304:15, 19 314:5,9,21

**formula** 401:21

**Fort** 264:11,12 265:3,15 271:3,8

**forward** 279:24 369:10

**forwarded** 351:7

**found** 243:1 281:24 292:13 295:1 334:10 359:20 374:20

**foundation** 350:16

**foundational** 327:5 400:18

**four-page** 232:10

**fourth** 347:10

**frame** 276:7

**frames** 394:18

**franchise** 273:13 394:15

**frankly** 293:3

**French** 226:10 230:9, 15 233:6,8,18,23

**front** 248:3 249:4 261:5 264:8 287:24 288:22 289:11,14,25 295:5 296:25 307:14,18 311:8 318:6 323:6,15 324:2 325:18 409:7 433:2 437:15

**full** 322:3

**fully** 374:8

**fumble** 287:7

**function** 414:4

**future** 388:24

G

**gained** 396:13

**gather** 347:20 414:5

**gathered** 226:7,25 227:16,18,21 232:18 241:24 364:20 386:2

**gathering** 346:14

**gave** 346:16 411:24

**gears** 326:11

**general** 293:22,23 300:1 301:1,3 303:24 326:22 330:23 346:24 348:21 351:14,18,19 378:4 381:21 383:8 390:3 393:4 401:7 406:5 421:10 425:2,4

**generally** 234:1 239:20 240:24 256:5 285:13 286:4 297:24 305:11 318:9 331:8 339:2 346:25 347:14 364:21 384:1,20 385:7 386:3 387:6 408:23 420:16 423:14 428:17 434:8

**generated** 305:10 335:25 348:11 394:10, 11

**generating** 369:3 399:4 400:3

**Georgia** 393:6 398:23 400:14

**Giacino** 226:9 230:10, 15 232:19 233:1,7,16, 22 234:1 244:1

**GIFTS** 267:24

**Gillespie** 309:10

**give** 228:18 246:2 260:19 286:11 289:13 301:18 309:1 317:1 344:21 355:9 392:2 422:1

**giving** 234:2

**global** 234:23 269:23 272:10,22 273:4,22 274:13,25 275:5,14 332:2,12 365:12,18 366:1 372:10 376:2 377:4

**glossary** 295:2,6,9,10, 13 296:1,6,12,16,19

**good** 225:3,23,24 310:15 313:16 322:22 337:9 338:1,3 407:18 425:19 439:3

**grabbed** 313:4

**great** 425:17

**Greenwood** 222:6,16

**grid** 305:10,17

**grids** 305:4,6,13 362:2 402:21 403:2

**group** 238:19

**GRRS** 273:9,14 274:17 276:3,12,13,19,20 277:16,20 278:2

**GRS** 277:23

**guess** 235:23 281:16 330:11 341:24 379:17 380:7 428:1

**guessing** 237:4 239:5 354:15 367:24

**guided** 353:24

**guideline** 272:1,2,3,7 329:22 330:6

**guidelines** 317:15 333:23

**guys** 439:1

**H**

**half** 233:2 360:15

**halfway** 262:21 272:19

**hammer** 440:1

**hand** 232:15 247:14 249:2 280:21 431:18

**handed** 432:4

**handing** 260:24 311:4 416:17

**hands** 379:2

**hands-on** 235:22,24

**happened** 236:11 285:12 324:24 369:22 376:4 378:20 396:22 397:18 399:8

**happening** 282:19 382:8

**hardcopy** 299:1 304:19 314:8,22

**harmonization** 273:16

**Harris** 270:23

**Harrison** 222:6,17

**hate** 392:2

**Hayes** 260:15 261:8

**hear** 339:13

**heard** 240:20 281:13 305:12,13

**heart** 421:21

**held** 253:9 270:4,7 286:6 292:18 294:7 331:15 346:25 388:4 423:21 433:15,24 434:5,8,12,16

**helps** 331:25 341:12 377:24

**Hicks** 332:1,4,7 335:5 346:16,24 347:6,21 348:3 349:1 353:17 354:17 356:1,3,10 361:6 363:5 364:1,7,11 365:10 366:5 368:15 372:15,17 374:7 375:5 385:5,16,17 386:12 388:17 397:5

**Hicks'** 368:2 397:16

**Hicks's** 351:24

**highlighted** 426:24

**hired** 364:23 394:25 411:10,12

**historical** 242:22 266:20 406:13

**histories** 318:4 320:1 323:24

**history** 247:7 257:11 307:6 308:5,15 317:22 318:9,25 319:9 321:22, 23 322:3,10 323:1,4,11, 15,16,17,20,22 324:3, 14,19,22 325:1 354:6 409:5

**hit** 424:2

**Holbrook** 236:16 238:1

**hold** 227:6 253:10 254:23,24 255:13 282:11 286:7,18 295:17 297:21 299:15,24 300:7,16 301:23 303:3 305:24 340:19 365:16 367:15 368:18 369:9,16 370:24 389:5,12 392:14 394:18 397:5 403:8,10, 11,17 405:5,13 408:14, 18,21,25 409:2 410:14, 15,20 411:19 412:4,22, 23,25 413:1,9,12,23,24 417:20 418:1,4,24 419:5,9,15 420:15,20 421:13 422:8,24 423:11,16 424:4,21 425:11,12,22 426:3,6, 22 427:17 429:22 430:1,5 431:14 432:4, 15,17 433:1,4,15 434:17,24 435:16,20 436:4 437:1 438:1,14, 20

**holding** 369:10

**holds** 226:16,17 227:4, 6,8,11,13 228:19,22 241:24 242:8,15,18,22 243:4,7,13,14 244:14 245:6,17 252:13,25 300:4 368:18,23 369:1, 14 370:12 388:3 389:18 403:23 405:19,23 408:8 409:5,14 410:13 412:14 413:15,17,21 414:4,5,9, 10,15,18,25 415:2,7,12, 14,16,23 416:2,8 418:7, 11 419:22 423:8,16 425:6 429:8 430:25 431:3,20 433:11,17 434:4,13,25 435:10,12

**homework** 392:2

**Hong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 333:25 336:3,22 338:6 339:9,20 382:10, 17 417:21 424:25 431:6 438:2,3,18

**hour** 222:4 233:2 267:4

**hours** 230:25 243:21 388:11

**housekeeping** 312:5

**Hozeny** 410:4 422:24, 25 424:21

**hundred** 280:20

**hygiene** 236:5

**hypothetical** 259:25

**I**

**idea** 236:10 252:20 253:11 367:23

**identical** 346:12

**identification** 232:5 242:6 246:6 247:18 248:1,25 260:23 289:6, 19,21 311:2 381:7 404:16 416:15 425:24 429:25 430:4,10 431:16

**identified** 382:19 426:23 427:15

**identify** 224:24 235:8 286:12 300:10

**II** 224:15

**imagery** 314:10

**images** 314:13 315:2, 18 340:11,12 354:25 362:10,22

**Imerys** 222:20,21 224:17 225:4,5 337:23 349:24 350:2,4

**immediately** 310:7

**impacted** 328:22

**implementation** 298:9

**implication** 294:19

**important** 344:18

**imposing** 410:21

**in-between** 277:21,22

**inbound** 399:2

**include** 274:4,5 300:5, 9,13 304:11,18,22 312:4 314:9 315:2,3,18 316:4 318:15 328:24 339:23 348:18,19 351:21 372:25 383:13 390:7 399:20 407:8 424:7,10,11

**included** 232:17 235:2 282:11 304:21 314:5,14

316:5,17 348:17 351:17 362:24 363:15 364:9 370:6 400:4 421:13 422:8

**includes** 254:16 281:3 306:8 314:18 315:14 319:1 321:7,25 349:11 367:12 401:21 427:1

**including** 279:7 304:19 314:8 358:7 376:14 378:1,13

**inclusive** 316:1,6

**incorporating** 413:22

**indefinite** 365:5

**indefinitely** 375:25 388:23

**independently** 239:13 267:24 326:7

**index** 262:20

**indexing** 237:11

**India** 372:8 376:15 377:10 382:9

**indicating** 322:21 380:6,17 386:21

**indication** 292:14 331:14 437:6

**indicia** 239:11

**individual** 285:25 328:11 417:25 435:20 436:12

**individuals** 421:4,7 427:15,18,21 428:22 436:3,12 438:3,11,17

**industrial** 236:5 415:9

**Industries** 358:18 405:10

**infer** 264:7 397:15

**inference** 330:12

**inferred** 397:17

**inform** 280:4

**information** 226:12 229:9 231:3 232:18 233:18,24 235:9 236:18 239:16,17,20 240:14,16

241:1,14 243:6 245:5 246:25 247:22,23 248:10,14 249:6,11,22 250:7,19,20 251:6,8,14 252:10,13 253:6 254:21 255:1,6 265:17 270:3,5, 7 277:25 278:7 280:15 281:16 282:14,20 284:15 286:2,3 287:6 288:2 289:9 291:1 292:3,9 295:2 296:5 301:14 303:8 306:6 311:11,13 312:5 313:12,24 315:13,17,25 316:2,4,7,16 318:22 326:8 331:5,7 333:2,22 334:23 335:4,8,20 339:17 347:20 354:14 355:3 361:17,24 363:20 368:17 373:16 374:21, 23 375:25 376:3 378:7, 21 381:20 385:11 387:8 388:21 389:3,10,20 394:7 396:12,24 402:19 403:2,3 405:22,24 407:6 408:9,18 412:3 417:19,23 418:3,19,22 419:22 421:6,25 422:20 424:12 425:10 433:14 434:5,13,15,19 435:25 436:15,20

**initial** 230:7 248:19 280:16,17,23 281:4 283:22 351:21

**initially** 234:4 375:5 384:14

**injury** 435:1

**input** 317:1 376:3

**inquiries** 244:11,12

**inserted** 316:11

**inspection** 357:25 358:9

**instance** 238:13 298:1 341:22 346:15 363:4 365:9

**instances** 374:15 385:10

**instituted** 281:17

**instructed** 434:17

**instruction** 301:25 408:15

**instructions** 299:14 300:2,5,10,13,25 301:7 302:4 414:22 421:13

**integrated** 267:16,19

**intended** 389:25

**intentions** 253:24

**interested** 331:18 375:9

**International** 275:1

**interpret** 313:21,23 344:1 346:3 391:22

**interpretation** 304:17 361:13 399:6

**interpreted** 237:7 348:6 368:11

**interpreting** 347:18

**interval** 356:3

**intervals** 388:15

**interview** 226:11 230:19 233:22 243:12 262:18 278:20 395:3 415:18

**interviewed** 257:21 303:12 308:20 309:20 346:15 380:14

**interviewing** 386:2

**interviews** 226:9 278:10

**introduced** 229:25

**introductory** 318:21

**inventory** 285:16 347:11

**investigated** 411:22 412:8

**investigation** 412:2 415:25 416:10 418:2

**involve** 234:25 351:15 375:11

**involved** 235:21 264:18

**involvement** 231:8

264:14 367:25

**involving** 417:11 420:6

**Iron** 401:9,15 402:1

**issue** 274:24 326:12 344:9,18,23 355:21 404:6 411:22 419:14 421:18 423:13 439:6

**issued** 307:3 408:22 410:15 413:1,13,18 414:19 419:15 426:22 427:10,17 429:15 431:5 435:1 437:1,2 438:14

**issues** 227:12,25 266:5 344:5,10 345:1 349:8 395:13,14 396:16 411:20 412:17 414:20 419:21 421:16 429:4 440:22

**italicized** 295:22

**items** 245:16 351:25

**J**

**J&j** 294:17 330:21,22 335:25 336:3 339:5,9 376:13,14 422:11 440:18

**J&j's** 338:10

**Jaffe** 223:8

**James** 222:1,9 224:14 225:14 268:13,20 310:19,24 371:5,11 407:21 408:2 441:1

**January** 307:21 313:17 420:1

**Jersey** 399:9

**Jervis** 396:1

**Jim** 223:10 224:5 379:6

**JJCP** 417:7

**JJCPI** 420:5

**Joan** 278:20

**Joann** 278:20 283:15 421:24

**job** 279:24 280:18

**Johnson** 223:1 224:16 225:8,13 239:3 240:20 242:15 243:5,6,18 244:1,2 247:21 248:15 249:5,10,23 250:18 251:4 252:11 253:17 256:3,20 257:3,4,5,6, 12,13 258:16,22,25 259:11,18 260:2 261:23 262:25 263:1 265:7 267:20 268:25 269:2,3, 21 270:15,16,17,21 271:20 272:2,3 273:11, 12,19,20 274:15,16 275:1,2,12 278:4,5,11, 12 279:5,15 280:7 281:1,2,7,8,17 289:8 294:22 301:21 306:18 310:11,12 311:10 316:3,19 325:5,20,21, 22 327:3,4 329:5,12 330:2,3,16 333:3 334:18,19 344:25 348:12 350:23 354:13, 14 355:3,12,13 356:15 358:20 360:4 362:12 364:22,24 373:10 383:22 384:3 387:9 389:11 393:18 394:2,3 395:1 402:19 405:8 409:13,14,24 410:25 411:11 412:18 413:11 414:19 415:7 417:8,15 418:6,7 419:13 420:17, 23,24,25 422:25 424:24,25 426:2,3,7,12 427:1,2,4,5,10,11,16 429:16 430:6,7 431:5,6, 9,10 433:19 435:18 436:1,9,12,13,16,17 437:1,2,7,10,21,25 438:2,6,8,9,17,18 440:2,3

**Johnson's** 243:18 247:21 249:5,10 250:18 251:5 257:8,14 260:2 326:19 339:19 343:16, 24 347:4 353:3 355:4 358:19 362:3 364:22 383:23 384:25 389:14 393:1 400:21 402:10,19 409:24 410:1,2 415:8 417:4,14 419:13 420:10 426:7 430:15 433:19

**join** 350:15

**Jonathan** 223:8

**Judy** 327:19

**July** 249:7 288:3 290:5, 12

**jump** 247:13 319:24

**jumping** 332:3

**June** 260:14

**jurisdiction** 402:2

**K**

**Kaiser** 364:11 421:19

**Karen** 274:23 303:12, 16 316:22 317:5,16 322:17

**Kate** 309:10

**Kazan** 222:5,16 224:12, 21

**keeping** 368:10

**key** 236:8 237:20 238:5

**kind** 237:11 241:4 260:8 303:22 305:16 339:3 348:4 350:7 354:11,15 355:18 360:21 384:15 389:3,13 390:13 397:5 415:6

**kinds** 316:7 408:16

**kit** 299:10,12,16,20 300:1,21 301:6,17 306:5,12 312:18

**kits** 310:12,13 312:4,10 313:18

**knew** 238:3 306:3 334:13,14

**knowing** 334:19,20

**knowledge** 235:13 236:7,15 237:20 244:21 265:24 266:4,9 267:1 283:10,25 293:22,24 300:1 301:1,11 303:24 330:23 361:23 389:19

**knowledgeable** 429:3

**Kolmar** 396:1 398:23

400:4,13,19 402:3,4

**Kong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 334:1 336:3,23 338:6 339:9,20 382:10, 17 417:21 425:1 431:7 438:2,3,18

**Korea** 326:21 329:1 331:19 332:21 333:25 431:9,12

**Korean** 337:1 339:18

**Krushinski** 409:18 416:22 419:9 433:17

**L**

**laboratories** 364:5 396:1 400:19

**lack** 303:2

**lacks** 350:16

**Langley** 222:7 224:8

**language** 248:5 250:11,13,25 296:8 319:4 420:18 423:15,23

**large** 263:13 278:11

**latest** 322:15

**launched** 267:12

**Laura** 226:9 230:10 232:18 233:1,16 244:1

**law** 224:12,22 243:23 308:15,17

**laws** 248:12 250:6,21 251:9

**Lawson** 418:10,18

**lawsuit** 417:11 420:6

**lawsuits** 429:16

**lawyer** 290:22

**lawyers** 325:13

**lay** 379:2

**lead** 418:19

**learn** 436:21 438:4

**learned** 232:23 278:10

356:1 374:2 396:9

**leave** 387:5

**Leavitt** 224:15 226:4,13 228:8 231:6,9 232:24 233:14 234:6,12 236:5 244:16 246:22 326:15

**led** 234:1

**Lee** 363:13 365:9 366:4, 15,20 372:1,7,9 374:22 385:17 407:8

**left** 291:21 367:13

**legal** 226:16 227:13 243:7,12,14 251:9 252:12,25 253:10 254:23,24 255:13 282:11 286:7 297:21 299:24 300:4,7,16 303:3 340:19 367:15 369:9,14,16 388:3 394:18 403:7,10,11 405:13,19,23 408:14 410:15 413:2,9,12 414:23,24 416:8 418:12 420:15,20 421:13 422:8 424:21 426:22 427:17 432:15 433:4 436:5 437:1

**legend** 234:18

**length** 237:10 260:18 390:12

**lesser** 280:21

**letter** 238:15

**level** 238:19 256:17,19 320:20 349:23 394:15

**levels** 384:5

**liability** 431:25

**life** 259:16 342:22,23,25 343:1,4,9,10,17,19,21, 22 345:9 346:13,20,21, 22 347:1,3,15,16,18 349:22 352:15,18 353:5,10,19 354:17 383:6,10 384:20,23 385:8 387:2

**life-based** 386:19

**limit** 253:9

**limited** 315:14 316:5

440:7,22

**lines** 269:11 271:6 281:25 317:12 347:10 367:5,8 372:6 397:9

**Lisa** 364:11 421:19

**list** 226:16,17 238:2 241:24 242:8,14,21 246:11 295:13 300:5 358:24 379:2 380:1,2, 13,15 381:19 409:13 419:8,10 424:5 426:18 428:18 430:23 431:20 432:25 435:22 437:8

**listed** 245:19 306:6 308:10 410:3 427:19,21 428:15

**listing** 437:13

**lists** 298:20 300:3 379:6 381:11,13,14,16 418:13,25 419:3

**litigation** 242:16 243:8 403:12 405:5 409:14 410:25 411:4,6 412:17 413:12,17 415:7 419:15 431:21 432:4,16 433:1, 5,15 434:24 435:16 437:2 438:1

**LLP** 222:23 223:3

**locate** 244:13 287:17 332:18 389:1 416:12

**located** 256:11 268:25 333:22

**location** 224:11 241:20 302:16 349:2

**location-specific** 331:13

**locations** 264:17 326:20 331:12 349:6

**long** 230:24 233:1 253:9 259:13 270:8 283:3 306:19 312:20 331:14 343:23 347:3,18 352:21 353:1 355:16 358:14 366:24 377:18 387:11 392:10 408:17, 18 428:18

**long-term** 352:12

**longer** 299:23 301:8 313:13 323:21,23 324:16,23,25 325:1 347:16 402:10 412:24, 25 414:11

**looked** 236:17,24 237:5 238:1,3 338:13 353:10 388:12

**loop** 339:4

**Lorena** 364:13 391:5 395:3 397:6 400:1

**loss** 412:17

**lost** 259:19 332:11 398:4

**lot** 266:22 268:7 320:2 322:12 344:3,9 352:2 372:24 386:12,18 406:7 409:9

**lots** 348:7 354:7 386:17

**loud** 248:9

**lower** 357:7

**LP** 342:17,20 346:12

**lunch** 337:10,14 338:2

**M**

**Macarthur** 222:23

**Madam** 238:7

**made** 226:17 246:20 251:18 283:7 317:2,3 319:3,7,20 320:9,10 322:13 325:3 336:17 352:21 353:2 356:10 388:17 389:22 407:5 426:12 436:5

**magnetic** 315:15

**maintained** 259:15 316:3 358:11 366:13 384:10 418:25

**maintaining** 335:20 397:10

**maintenance** 262:1

**make** 232:11 252:23 261:16 272:19 320:24 325:13 337:17 346:13 359:13 361:11 374:7 386:8 409:6 420:13 421:20

**makes** 240:25 391:21

**making** 260:3 262:14

**manage** 250:20 326:7

**managed** 248:11 367:19

**management** 246:25 247:22,23 248:14 249:6,11,22 250:19 251:6,14 252:20 267:16,19 278:22 282:8 287:6 288:2 289:9 291:2 292:1,2,10 295:2, 25 296:5 311:11,13 318:22 368:17 373:5 376:17 384:6,7 418:19 421:16 422:11

**manager** 285:17,18 300:11 303:17 334:4 421:15

**managers** 257:22 285:20 302:23

**managing** 250:5 251:7

**mandatory** 269:25 270:11,15 271:15,16, 22,25 272:11 273:17 275:20 276:21 277:20 280:19,23 285:14 298:14

**manufacture** 343:24 358:12 404:20

**manufactured** 326:20 358:15 395:12 405:9

**manufactures** 343:11

**manufacturing** 257:7 270:20 279:7 334:8 340:25 341:14 346:18 347:11 348:4,8 349:2,9 353:12 354:18 358:8, 10,19,23 359:5 360:9, 25 363:1,5,18 365:22 368:1 372:10 375:7,12 376:10 377:3 386:10 387:1,4 392:25 393:16, 19,22 394:8,11,20 395:5,22,25 397:23 398:14,25 399:4,10 400:2,16,21 401:4 402:5,10 417:12 420:7

**manufacturing-related** 387:18

**map** 315:15

**mark** 222:16 225:1 231:23,24,25 242:3,4 246:1,2 247:6 248:22 251:21 267:2 288:6 289:3 348:23 364:12 367:4 368:21 370:4 380:25 392:17 399:14 431:14

**marked** 229:25 232:5,9 242:6 246:6 247:18 248:1,25 249:3 259:6 260:23 271:24 287:16, 18 289:6,10,19,21 290:2 311:2 318:2 347:7 359:19,22 379:18,19 380:18,20,24 381:7 410:10 416:15 425:21,24 429:21,25 430:4,10 431:16

**marketing** 240:24 257:7 260:4 270:20 279:6

**marketplace** 342:23 347:13,19

**marks** 268:12,19 310:18,23 371:4,10 407:20 408:1 440:25

**mashed** 384:15

**master** 354:5

**match** 361:5

**material** 234:25 239:24 263:15 316:11 341:14, 24 342:14 343:19 345:10 349:24 353:12, 24 354:1,8 401:8

**materials** 226:7 227:16 234:12 240:2 244:22,24 246:13 258:10 271:3 286:12 291:17 297:7, 13,17 298:7 302:8,10, 13 331:14 335:6,15 337:3,5 346:19,25 369:17,18 377:1 390:5 401:10 410:19 412:10, 13 423:21 424:5

**matter** 403:19,20

**matters** 424:6 433:13 440:6

**Mcclain** 222:5,16 224:12

**Mcelroy** 224:16

**Mcneil** 258:1 263:7,18 264:6 265:2 390:16

**Meagher** 223:3

**meaning** 279:20 376:3 411:1

**means** 275:10 277:13 297:3,4 298:14 343:20 346:4 366:6 378:12 391:23 420:14

**meant** 264:9 276:4 310:6 312:24 345:10 353:20 384:12,13

**measures** 357:25

**mechanism** 254:8 416:1

**mechanisms** 254:19

**media** 268:13,19 299:1 304:15,18 310:19,23 314:8,13,19,21 315:4, 24 371:1,4,10 407:21 408:1 441:1

**members** 364:8

**memory** 230:2,8 235:18 240:12 372:16

**memos** 312:4

**Mendez** 428:25

**mention** 266:23 430:19

**mentioned** 245:16,20 259:2 262:11 302:3 317:5 341:25 346:11 364:13 374:13 381:16 388:2 391:11 400:13 414:14 415:2 438:10

**mentions** 417:14

**mesothelioma** 227:12 409:22 435:2,13

**mesothelioma-related** 433:12

**meta** 240:8

**methods** 299:22 306:8

**Michelle** 257:23 390:20

**microfiche** 315:15 316:16

**microfilm** 315:15 316:15

**microphone** 408:11

**microscopy** 305:11 340:11 362:2,10 402:22

**Microsoft** 238:17 365:4

**migrated** 367:13

**milled** 341:10 355:19 356:17 360:12 362:4,11 389:15 403:5 406:2

**mind** 371:22 395:2

**mine** 349:23 350:9,21 351:6 367:10,17

**mineral** 339:25

**mines** 222:20 225:6 350:10,20

**minimum** 298:8,9 306:6 313:25 342:11,15

**mining** 372:5 376:17

**minute** 331:2

**minutes** 439:15

**mischaracterizes** 253:15 366:17

**missing** 236:17

**Mississippi** 429:12 430:6

**misspoke** 336:16

**Mittenthal** 222:1,9 224:14 225:14,23 231:25 268:14,20 310:20,24 311:4 338:1 355:9,23 371:5,11,14 379:6 381:2 392:18 407:22 408:2,5 441:2

**model** 277:23

**moment** 336:1

**morning** 225:3,23,24 290:19

**Mountain** 401:9,15 402:1

**move** 263:22 267:2 268:5 337:7 356:12 361:14

**moving** 317:17,18 439:2

**Mswanson@ kazanlaw.com** 222:18

**multiple** 242:1

**Mumbai** 376:15

**museum** 406:14

**N**

**named** 226:10 238:4 328:11

**names** 236:8 237:20 238:2,12 256:22 379:11

**natural** 330:12

**nature** 320:19 440:6

**necessarily** 240:6 254:7

**needed** 367:14 369:9

**Neil** 265:3

**network** 237:1 238:16

**Newport** 222:24

**Nicholas** 328:11 332:5 364:12 370:22 372:3 373:3 382:19

**nonparticipation** 284:6

**nonresponsive** 263:23 337:8 361:15

**normal** 326:8

**North** 349:1,5 394:21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

**notation** 239:6 352:3 383:5

**note** 247:6 271:1,5 316:10 360:1 363:23 367:25 373:22 381:21

**noted** 263:3,5 322:17 345:18 382:20,21 403:19

**notes** 231:10 235:17 244:3,8 245:21 246:20 247:20 252:1 260:7,12, 13 261:7,22 262:20,24 263:16 265:23 266:2, 15,17,19 267:8 270:22 278:16,18,25 279:25 280:25 281:10,14,21 284:24 285:3 287:14 293:23 299:15 303:15 309:4,5 316:22 317:9, 19 319:11 325:7,10 326:6 327:8,15,24 331:9,21 332:19 338:20,24 347:22 352:10 356:2 359:7 361:19,22 364:3,15 365:6,8 367:17,19 368:15,20 370:11 371:21,25 374:7 375:9 378:2,5 380:10 381:12 387:16 390:14 392:23 395:2,4 396:6,7,24 397:4,22 398:2 400:1,8 418:9

**notice** 222:3 344:11 351:3 355:8 358:23 393:24 396:4 400:7,23 403:8,10 408:22 410:15,18 412:7 415:13 416:20 417:17 418:1 420:2,14,15,20 421:4,8 423:5 427:10,17 428:3, 22 429:1 435:20 436:4, 7,17,25 437:1

**noticed** 224:21 246:11 327:7 344:13 404:1

**notices** 340:19 403:11, 18 412:23 416:5 418:24 419:5 423:25 430:14 436:25

**notified** 438:21

**noting** 418:10

**notion** 383:10

**November** 409:18

416:21

**number** 224:15,18 236:6 246:8 249:3 250:3 261:15 263:13 268:13,19 278:11 280:21 287:18 290:5 293:5,7 294:4 298:18 310:19,23 311:21 321:24 322:16,23,25 324:14 325:5,16,17 359:23 371:10 377:5 407:21 408:1 416:17 422:1 440:5 441:1

**numbering** 317:10 324:5

**numbers** 290:20 357:6, 19

**O**

**Oakland** 222:6,17 224:13

**oath** 226:1

**object** 228:9,14 237:13 240:18 241:8 242:17,23 243:9 244:4,18 249:24 250:9,23 253:14,21 255:3,15,23 256:9 257:19 258:19 259:23 264:15 265:20 266:6 267:21 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 297:5,23 300:8,23 302:2 304:5,13 305:18 308:3 310:1 312:11 314:15 315:5 316:9 319:22 320:17 323:9,25 330:14 334:24,25 344:7,8 345:3 348:14 350:12 351:2 353:21 355:6,7 361:21 362:6, 13 365:24 366:16 369:4 370:1 383:15 385:1,14 386:5 387:14 388:13 389:17 392:15 395:6,9 396:3 397:25 398:16 399:22 400:6 405:11 412:6 414:1,13 421:9 423:18 428:5 431:23 434:1,6,21 440:3

**objection** 350:16 370:18 393:23 397:1 400:22 402:14,23

**objectives** 280:3

**obligation** 409:1 413:6 414:24

**obligations** 415:13

**observed** 412:10

**obtain** 227:1

**obtainable** 235:10

**obtained** 226:15 229:1 406:14

**occasional** 386:20

**occasionally** 233:24

**occasions** 412:9

**occurred** 386:17

**October** 222:4 224:10

**odor** 351:16

**off-site** 237:12,16

**offhand** 330:5

**office** 238:17 263:5 301:21 302:15

**officer** 421:11

**officers** 285:21 300:11 303:13

**offices** 222:5 230:20 243:23

**oldest** 256:14,16 329:10

**on-the-ground** 234:25 235:2

**onboarding** 281:3

**ongoing** 245:10 363:18

**op** 317:13

**operated** 301:2

**operating** 241:5 252:16 271:11 273:20 274:15 275:11 277:2,4 292:16 294:22 298:11, 24 330:8 331:16 338:10 417:16,21 420:23 424:23 427:16 430:23 436:1

**operation** 264:11,12 306:1 399:10

**operations** 331:24 390:7

**operative** 277:15

**opinion** 344:21

**opportunity** 247:4 286:11 440:19

**opposed** 239:12 241:19 267:24 270:10 309:25 318:11,13 372:18 386:10 392:11 423:24

**opt** 277:5

**optical** 315:16

**option** 251:17 277:16

**order** 278:5 381:19 428:19

**ore** 341:10 356:17 360:12 362:4,11 389:15 403:5 406:1

**organization** 239:12 292:17

**organizational** 297:16 298:5

**organizations** 363:13

**organize** 294:7,8

**organized** 286:14 294:7 297:8,10,15

**original** 230:1 231:10 240:1 403:17

**originally** 240:9

**originals** 299:2 314:22

**OUS** 437:12

**ovarian** 432:4,16,21 433:15

**overarching** 307:9

**overseas** 274:5,14 331:24 338:25 417:21 424:23

**oversee** 285:17

**P**

**p.m.** 310:23 337:13,16 371:6,9 407:23 408:1 440:18 441:3,6

**Pacific** 327:4,10 328:3, 18 329:17,23 332:20 337:6 338:6

**packaged** 326:20

**packaging** 358:8,18, 19,24 377:1 402:5

**pages** 232:7 288:8,10 293:9 307:16 317:23 318:8 319:7 331:23 357:13,15 360:15

**paginated** 261:12 270:25 309:4

**Pai** 236:16 237:25 238:24

**Pam** 230:16 231:6 232:9 383:19,21 386:22

**Pamela** 226:9 230:9,16 233:11 243:25

**Pankaj** 364:12 375:18 383:4

**paper** 294:5,8 299:7 301:20 302:5,8,13 306:13 315:14

**paragraph** 320:4,5 327:20 417:6

**Pardon** 288:21

**parentheses** 365:20

**Park** 364:13

**part** 239:12 250:18 312:18 334:15,20 356:6 365:2 369:7 377:1 380:9,15 381:13,14,16 382:11 393:14 395:18 408:6 415:25 416:9 418:2

**participate** 280:14

**participation** 279:11 283:9 306:17

**participatory** 285:15

**particulars** 247:1 265:1 277:1,6 283:12 390:23 391:2

**parties** 224:23 364:23 384:10

**Partridge** 223:10 224:5

**parts** 365:8

**party** 363:12 417:11 420:6

**past** 248:18 303:12 314:1 407:4

**Pay** 238:24

**peel** 260:8

**penalties** 410:21

**people** 235:5,11,21 240:4 241:2 254:24 255:6 261:24 262:6 266:25 278:7,11 280:10,18 282:23 285:3 330:24 346:15 364:10, 16 368:16,21 380:3,13 381:13,16 385:7 396:10,13 415:16 428:2,10,13 434:17

**people's** 240:12 364:1, 14

**percent** 279:11,14 280:10,20 283:1 284:9

**perform** 239:23 279:13 284:11,14 363:14

**performed** 236:14

**period** 227:4 228:18,19 229:23 244:8 258:17 276:8,11 286:19 292:9 303:2 313:14 336:7,15 343:10 346:9 347:12 352:5 373:19 383:5 400:20 403:4 404:19

**periods** 265:10 270:2 272:21 335:4 356:23 368:18,19 370:11 371:18 387:12,22 388:1,19

**permanent** 352:15 353:8

**permission** 281:20

**permitted** 440:21

**persistent** 239:21

**person** 265:24 266:4 274:9,19,20 283:15 325:12 383:21

**Personal** 360:5 427:3,7

**personally** 222:8 416:2

**personnel** 416:1

**perspective** 334:7

**pertaining** 292:17 323:11 417:3 424:20

**pertains** 299:6 314:24

**PETER** 222:1,9 225:14

**Pharma** 350:4 358:17 405:9

**Philippines** 275:3 294:17 326:13 327:3 328:14,23 329:5,12,17, 24 330:3,21 331:19 332:20 333:25 335:22, 25 336:20 338:6 339:6, 20 382:10,17,20 417:22 424:25 427:11 431:6 436:9,13,17 437:3,7,10, 21 438:9,18,22

**philosophy** 251:5 325:23 326:1,3,4

**phone** 223:3 233:23 373:8

**photograph** 315:15

**photographs** 316:16

**photomicrographs** 362:23

**phrase** 251:16

**physical** 236:22 303:25 304:1 305:16 335:13 367:12,22 368:9,10 369:23

**physically** 235:15,22

**piece** 270:5

**pieces** 331:21 365:7

**pile** 359:17,20

**piped** 233:24

**PL** 431:21

**place** 230:12,19,21 241:1,13 253:10 277:3, 4 294:4 332:18 361:9 370:21 372:2 387:11 393:15 398:1 405:6

**places** 341:1 342:8 371:25 374:21 387:15, 17

**plain** 346:2

**plaintiff** 224:22 245:10 435:14

**plaintiff's** 232:4 242:5 244:15 246:5 247:17,25 248:24 260:22 289:5, 18,20 311:1 381:6 416:14 425:23 429:24 430:3,9 431:15

**plaintiffs** 222:15 225:2 227:9 228:7 242:12 244:22 256:2,7 411:17 412:19 440:17,21

**plant** 359:9 395:23 396:18 399:9 401:22

**plants** 399:1 401:23

**platform** 385:12

**platforms** 262:1

**PMQ** 400:16

**PO** 398:10

**point** 228:8 263:17,19 268:1 272:16 273:16 276:21 280:13 283:7 284:5 301:2,12 303:21 305:15 308:8,14 309:19 310:15 317:11 325:11, 12 345:13 349:5 350:20 357:1 392:11 405:4 420:17 422:16 424:14 439:4

**policies** 227:17 241:10, 14 244:24 245:17 246:25 248:15,17 253:7,23,25 254:7,19 256:8,11 257:17 258:6 271:15 278:7 279:16 287:7 290:18 291:2,6,9, 19 292:25 305:14,15

316:21 317:2 320:10 328:21 329:2 332:16,22 333:23 334:21 338:4,7, 9,14 339:5 340:21 346:6 354:21 355:4 364:22 368:19 371:20 383:1 385:23 387:11 393:15 394:16 402:20 405:25

**policy** 245:5 248:7,14, 19 249:6,7,11,13,22 250:2,3,8,11,12,13,15, 19,22 251:7,10,13 252:15,21 253:2,12,18 254:2,3,4,10 255:11,25 256:14 258:4 259:21 278:13 281:18 285:23 288:2 289:1,9,17,23 290:6 291:2 292:10,14 294:13,14 295:5 302:20 303:5,11 304:8,24 305:3,5 306:1 307:9 308:1,8 309:22 312:19, 24 313:19,20 314:1,5, 14,17 315:10 316:1,6 318:5,11,20,23 319:1,4, 8,11,17,20 325:6,16 329:8,9,10,15,16 330:20 336:3 341:13 353:19 356:16 360:11 363:21 368:25 369:1 382:7 385:25 389:4,7 390:12,14,17,24 391:3, 6,13,15,17 392:9 393:9 394:9 405:14 407:2 418:6

**Port** 396:1

**portfolio** 377:2

**portion** 311:6 398:24

**pose** 440:19

**possessors** 408:15

**possibilities** 277:21

**possibility** 277:22

**possibly** 316:23 379:4 390:20 421:19

**post-** 234:11

**potentially** 363:13 412:3

**powder** 257:8 260:4 264:14,20 279:8 326:19

339:19 343:5,16,24 347:4 353:3 358:19,20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:9 409:24 410:1,2 417:4,14 420:10 426:8,9 430:15, 17 433:19

**practice** 267:25 335:19 374:4 382:7,13 385:21

**practiced** 382:9

**practices** 330:25 331:8,11 333:24 335:3 337:5 371:18 383:1 386:1 387:10

**pre2009** 317:16

**preamble** 250:15 318:20

**preceded** 381:22

**precise** 264:17 271:17

**preliminary** 388:10

**preparation** 260:14 261:8 356:7,8

**prepare** 262:4

**prepared** 261:7,22 345:1,6,9 346:7 409:4

**prescribes** 270:8

**presence** 363:11 371:17 393:11

**present** 223:7 226:10 233:7

**preservation** 385:9 416:20 417:17 420:1,14 423:5 428:3

**preserve** 252:22 255:14,17,19 408:16 410:19 411:18 434:17

**preserved** 259:19 363:19 424:6

**preserving** 412:10

**pretty** 284:2 379:20 406:17 433:24

**previous** 321:14 371:24

**previously** 222:10

225:15 227:9 229:24 234:24 242:11 246:15, 17 410:23

**primarily** 294:5,8

**primary** 361:23

**principal** 384:2

**principles** 292:16

**print** 248:23

**printed** 379:24

**prior** 229:17,24 243:7 244:6 247:2 248:17 249:17,19 262:15 267:19 271:22 272:10 275:19 284:18 291:19 292:10 293:20 294:1 318:18 320:16 350:9 359:2,11 360:9 373:19, 23 377:25 378:13,18 382:15 385:21 386:17, 20 389:12 390:8 392:25 413:24 434:25 436:25 437:5

**privy** 245:9

**problem** 354:12

**procedure** 241:5 252:17 303:14 358:3 405:2 416:5

**procedures** 253:24 254:9,11,12 271:11 280:4,5 282:12 338:5 416:6 422:9

**proceed** 225:21

**process** 281:3 341:20 342:7 346:19 348:8,20 351:20 358:11 363:3,5, 19 386:10

**processing** 372:5

**produced** 222:9 227:9 228:7,11,13 229:2,20 230:5,6 242:11 245:5 246:12,15 256:8,12 268:25 269:2 288:6 290:18,24 291:10,11 327:2 329:9 338:8 339:16,17 410:7,13 413:10

**product** 341:9 342:3, 22,23 343:4,9,10,12,15, 17,19 345:10,16 346:20,21,23 347:1,13, 19 352:15,18,21 353:2, 11 358:15,16 360:12, 22,23 362:12 371:17 374:12 384:20,24 387:3,7 393:11 395:12 401:17 404:12,15,17,19 406:4 417:14 420:8 423:13 426:12 431:25

**production** 223:10 224:7 230:7 234:8,13, 23 236:6 383:23

**productions** 384:5

**products** 256:21 257:13 259:1,11 260:2 270:21 271:20 272:3 273:10 279:7 330:17 341:9 355:20 370:15 389:15,16 417:9 421:1 423:14 427:3,4 430:16, 20

**program** 247:23 251:17 272:21 274:19 276:2,11,13,18 279:1,2, 3 295:2,25 296:6 421:12

**programs** 278:7

**proper** 239:3 306:8 354:16

**protect** 250:20

**protected** 248:11

**protecting** 250:5

**provide** 228:1 296:19 334:23

**provided** 233:19 244:22 245:1 246:24 256:11 258:7,8 288:7 295:3 296:4 299:16 300:2,3 357:4 422:5

**provision** 369:15

**provisions** 252:5 361:7

**PTI** 352:4 358:11,14,18 359:3,5,9,21 360:9 392:25 393:17 394:3 404:2

**pull** 259:7 347:8

**purity** 398:19

**purpose** 226:11 241:15,18 280:2 286:10 297:12 298:4 390:4 391:16

**purposes** 406:11

**pursuant** 222:3 297:20 303:11 413:1,23

**purview** 266:11

**put** 231:25 237:3 240:8 241:5 260:9 263:12 287:11 302:15,20,24 317:14 385:11 401:8 409:11 415:7

**puts** 305:22 410:18

**putting** 337:21 382:14

**Q**

**QA** 358:9

**qualified** 224:5 361:8

**quality** 341:1 342:2 346:17 349:8 356:25 357:2,3,5 358:2 364:8, 17 368:1 372:12 373:4 376:10 398:10 405:1,2 427:7

**quarterly** 363:14 364:24 365:12,18,19 366:1,23 367:10 368:12 369:19 370:6,12 371:15 372:1,7,19 373:14 374:5,20,23 375:2,13 384:11,13,17 385:18 386:13,19,24 387:17 406:3

**query** 332:21

**question** 226:19 229:11 242:24 244:20 261:19 266:8 271:14,18 282:13 290:22 296:9 301:14,16 316:25 327:5 334:25 344:8 353:22 355:7 361:10 369:5 373:25 374:2 382:1 392:4 394:6 395:16 400:18 402:4 414:2,18

**questioning** 355:8

440:17

**questions** 229:16 241:22 261:15 293:5 328:20 344:3,10 375:4 391:12 395:18 400:17

**quick** 308:25 337:18 374:7

**quickly** 377:21 424:9

**R**

**R&d** 240:24 263:15 340:22,24 352:11

**raised** 228:1 332:7 344:22 354:12 440:22

**range** 228:21 229:3 230:5 363:15 370:8 385:4

**raw** 376:25

**reach** 253:8

**reached** 252:14 253:5

**read** 226:20,22 238:8,9 248:9 256:24 257:1 304:23 327:23 352:23, 24 403:18 417:10

**reading** 350:3 354:4

**real** 408:6

**real-time** 262:5

**realize** 258:11

**reason** 255:13,17 261:14 301:10 303:3 438:22

**reasonable** 440:16

**reasons** 255:5

**recall** 233:3 248:21 272:13 275:4 281:11,12 304:6 328:4 340:15 411:20 435:9

**receive** 279:22 428:15

**received** 227:7 240:4 246:12 316:3 394:10, 11,13 413:8 420:24 421:4 427:18 428:3,10, 22 430:24 431:3 433:6 436:17

**receiver** 408:25

**receiving** 369:3 399:3 400:3 427:19

**recent** 251:20,24 311:18 328:25 379:13 392:9 432:21 433:6 435:18

**recently** 230:3 385:10

**recess** 268:16 310:21 407:24

**recipient** 430:22

**recipients** 418:1,4 428:24 436:4

**recognize** 315:24

**recollection** 233:15 264:4 265:22 414:3

**reconstitute** 320:15,24

**record** 224:4 225:19 226:22 229:25 238:9 247:7 250:18 251:5 252:13 253:5 257:1 262:5 268:15,17 269:21 273:22 277:15 280:4 283:23 288:1 290:23 291:19 293:1 295:1 305:2 310:20,22 313:11 315:8 333:6,9,12,19,20 337:11,12,15,22 338:2 352:24 354:5,6 358:17 360:10,18,20 365:2 366:11 370:25 371:6,7, 8 375:24 381:3,9 383:23 407:19,23,25 416:18 420:14 423:6 426:2 439:14,17,18,19, 20,25 440:24 441:2

**recorded** 315:17,25 316:2

**recorder** 371:2

**recording** 224:6

**recordings** 315:3

**records** 245:4 246:25 247:22 248:10,13 249:6,11,22 250:6,21 251:6,8 252:9 253:18 254:20 257:22 258:13, 15,17 259:14,17,21 261:25 262:9 263:15,17 266:17 272:4,11,20,22 273:4 274:13,19,25 275:5,15 277:18 278:12,22 279:1,2,3,16, 22 281:3,17,18 282:8,9, 24 284:1 285:6,20,21 287:1,6 289:8 291:1,10, 15 292:1,2,3,4,7,9 293:10 295:18 296:5 297:14 298:25 300:11 301:18,22 302:18,23 303:2,4,10,13 305:25 307:10,24 311:6,11,12, 22 312:10,14,24 314:5 315:13 316:4 318:22 326:8 329:22 330:1,7 334:9 347:11 348:3,7, 23 349:10,11 352:11 355:5 357:22 358:2,8,9, 10,14,22,23 359:10 360:4 366:12 367:12, 22,24 368:6,8,9,17 369:3 372:5 374:12 375:10 384:10 387:8 396:22 397:10,14 398:6,10,13 399:3,9 400:3,17 401:2,4,5,14, 19 402:7,11,13 416:1,7 418:18 421:11,12,15,16 422:11 424:19 433:23 434:4

**recross** 440:21

**recurring** 279:11,20,23 280:2,11

**redo** 297:19

**redundant** 320:4

**Reed** 236:16

**refer** 229:17 235:6 261:16 269:6 270:18,22 285:4 346:1 347:5 414:6,10 420:18

**reference** 239:13 262:14,25 266:18 272:14,16 278:15 284:8 285:5 291:24 294:24,25 296:1 299:9,13 309:7 313:8 321:12,25 323:3 325:4,21,25 327:13,14, 21 328:9 331:20 332:7 334:3 336:17 341:13 343:4 366:10,22 370:10 378:12 383:17 385:25 391:21 398:10

**referenced** 247:8 264:2 288:18 295:6 345:14 364:15 370:21 401:14

**references** 263:14 265:23 266:1,21,25 281:11,22 309:2 316:23 320:8,23 327:8,25 331:23 334:11 340:16, 17,18 371:21 374:10,17 375:10 382:25 387:19 388:17 390:19 424:12 426:9 434:25 435:3,7

**referred** 240:21 284:24 296:19 308:22 327:10 376:22 390:13,14 405:20 423:14 431:19 432:25

**referring** 237:8 247:8 250:14 251:1 258:23 273:2 276:2,7,8 282:8 293:13 296:1 312:9 344:20 349:10 353:1 366:23 377:10 392:6 401:10 404:11,12 422:17

**refers** 276:10 328:17 352:11 404:24

**refiltering** 234:24

**reflected** 244:2 293:23 322:20,23 324:15 331:9 338:20 351:13

**reflective** 356:9 415:12

**reflects** 324:23,25 325:1

**refresh** 230:2

**refreshes** 230:8

**regard** 344:10 364:11

**region** 334:5 336:15 337:6 376:4 378:3,5,6

**regions** 334:12 335:2, 9,13,20 338:11

**regular** 386:13

**regulations** 248:12 250:22 251:9

**reinforce** 280:3

**relate** 234:21 241:15 360:17 404:15 430:14

**related** 227:11 231:5,9 233:14 242:22 243:7 244:1 261:18 264:20 312:10 339:18,24 349:9 371:18 375:6 406:18 415:3,5 419:23 430:14 433:18 439:11

**relates** 434:8

**relating** 242:18 243:4 305:7

**relationship** 235:12

**release** 307:10 401:17 408:22,24 409:3 412:22 413:1

**released** 413:16 414:11

**releases** 413:10,12 414:9,15 415:1,5,6 418:11

**relevance** 440:8

**relevant** 240:14 334:22 342:9

**relied** 240:12

**relieved** 408:25

**remainder** 366:14

**remember** 229:14 281:6 332:21 342:17 390:11,15,25 416:4

**REMEMBERED** 222:3

**Remind** 230:16

**removal** 325:2

**remove** 317:17 325:4

**removed** 241:6 320:4, 23 321:15 324:15

**removes** 241:7

**Renay** 418:10,11,18,23

**reoccurring** 280:8 283:2

**replaced** 273:14 275:7 276:12,24 313:17

**report** 362:24 378:15

**reported** 306:17

**reporter** 222:8 224:8 226:22 238:7,9 257:1 352:24

**Reporters** 224:9

**reports** 246:19 306:19 340:9,10 341:14,25 342:14 343:20 345:11, 24 346:10 353:13,24 354:1,8 355:19 361:18 371:15 375:20 376:20, 21 377:11,15,24 378:19 382:4,14

**represent** 327:24

**representative** 264:9 265:6 333:3 334:18 355:11 387:9 394:25 419:14

**represented** 256:7 324:9

**request** 234:7,8 236:5, 6 243:1,3 296:21 407:5

**requested** 226:15 242:18 258:5,6 308:16 365:21 366:19 415:11

**requesting** 244:14

**requests** 234:13 244:15 345:24

**required** 270:7,12 279:22 280:17 354:19 413:5

**requirement** 252:14 253:5

**requirements** 248:13 250:22 251:9 277:24 294:21 298:25

**research** 258:10 291:16 344:2 360:24 395:2

**resides** 397:10

**resolved** 414:21

**respect** 231:12 232:9 237:25 242:15 245:16 283:18 332:23 338:25 354:22 355:4 360:11 363:10 364:3 382:13 393:9 402:6,20 403:3,

12,16,22 405:25 409:14 412:17 415:8 418:7,9 419:9 426:7 433:12

**respond** 227:25

**response** 259:24

**responsibilities** 349:4

**responsibility** 286:1 349:8 397:10,14 405:2

**responsible** 328:13 368:16 376:17 382:19

**responsive** 244:13,15 335:18 361:10 412:3

**rest** 260:8 288:6,11 289:14 290:6 295:21 327:24 408:6

**result** 297:6,7,16 410:20 413:6 429:15

**results** 298:6 344:17 354:22,23 356:18 358:6 363:17 366:25 367:10 368:6,12,13 369:19 370:6 372:9,12 373:14, 20 376:23 385:10 386:4 391:6 406:24

**retain** 255:6 313:11 366:4,5,9 407:6

**retained** 241:6 252:10 255:12 301:9,11 303:4 313:19 335:24 367:1 373:18,20 374:3,16 403:9 406:8,12,20,24, 25

**retaining** 332:23

**retains** 306:19

**retention** 226:8,24 227:17,19 228:2,4,6,21, 25 229:22,24 230:4 239:23 241:10,14,17 244:14,23 245:4,17 252:11,13,24 253:5,8, 18 255:6,9,11 256:3,16, 23 257:17 258:13,15, 16,17 259:10,14,17,21 261:25 262:14,25 263:6,10,25 264:24 265:8,11 267:16,18,25 269:1,12,14,18,22,23 270:6,8,14 271:12,13, 19 272:4,11,21,22

273:3,5,15,21,22 274:14,25 275:6,8,12, 14,15 277:15,19 278:6, 12 280:4 281:18 282:9, 12,24 283:23 284:1 286:6,18 290:23 291:10,19 292:5,9 293:1 295:18 297:20 298:25 299:24 300:7, 16,18 301:22 304:8 305:15 311:6,12,22 312:10,14,25 313:14 326:23,24 327:1 328:21 329:2,3,4,22 330:2,7, 20,25 331:3,8,11 332:15,22 333:23 334:9,11,15,21 335:2,3, 10,17,23 336:3 337:2,5 338:4 339:5,8,18,22 340:8,21 341:4,6 342:11,15 343:7 344:13,18 345:5,14 346:8,9,19 351:22,25 352:4 353:9,19 354:16, 22 355:5,16,18 356:4,9, 16,22 358:5 359:10 360:4,11,18,20 361:9, 18 362:1,9,18 363:21 364:22 365:5 368:18,22 369:2 370:11 371:18 372:18,19 374:12,18,19 375:10 382:25 383:1,5, 9 384:19 386:19,23 387:7,10,12,19,21,25 388:6,7 389:4,7,11,12, 13,20,21,24,25 390:4,5, 12,13,17,24 391:3,6,17 392:3 393:9,15 394:8, 15 396:11 402:6 403:4 404:3,18 405:7,25 406:9 416:8 422:9

**retentions** 338:25 403:25

**retired** 285:5 319:13

**retraining** 283:25

**review** 247:4 436:24

**reviewed** 265:3

**reviewing** 299:15

**revision** 247:7 307:5,7 308:5,14 317:22 318:4, 8 321:22,23 322:9 323:11 325:1

**revisions** 322:12

**revisit** 331:6

**rewrite** 320:15

**RG17882401** 224:18

**Richard** 223:3 225:12

**richard.bernardo@skadden.com** 223:6

**RIMS** 290:7 293:7 296:25 298:18 305:21 306:2 307:16 313:2,7,16 315:7 318:15,17,18 319:13,24 321:14,19 324:7,8

**ringing** 380:4

**RJ** 363:12 365:9 366:3,15,20 372:1,7,9 374:22 385:17 407:8

**role** 245:12 303:18 411:2

**roles** 282:12 422:9

**Rosina** 257:21 262:11 265:18 266:19 268:23 272:9 274:8 275:23 347:25 352:7 390:19 391:8,9 418:23

**rough** 320:25

**routinely** 367:18

**Royston** 359:9,11 360:8 393:2,5,8,13,16,19,22 394:2,3,7,19 395:23

**running** 266:16

**runs** 354:11

**S**

**safety** 401:21

**sake** 234:11,15 302:13

**sale** 359:8,21

**sample** 305:9,17 366:15

**samples** 304:22 305:1,4,6 365:22 366:13,19,20 372:8 403:5,6,9,22 404:3,11,12 405:15,20 406:1,4,6,10,12,14,18,23 424:4,7,11,13,18,20

**sampling** 404:16

**sanctions** 410:21

**sat** 440:5

**satisfy** 243:1

**Satterley** 222:5,16

**saved** 335:4,6 363:17

**scanned** 238:2 367:10

**scenarios** 277:6

**schedule** 229:24 241:17 252:12 253:8 255:9 256:16 257:25 258:2,13,16,17 259:11 260:10 263:6,10,25 264:6,9,24 265:4,8 267:16,18,23 269:12,14 270:6,8 271:19,21,23 272:4 273:5,10,11,15,21,23 275:1,6,8,13,14,15,19,21 277:3,4,15,19 282:9,24 286:6 290:23 291:22,23 292:14 293:1 295:18 297:15,20 298:25 311:6,12,22 327:1 329:22 330:7 335:18,24 339:9,22 340:3,5 345:15 346:9 347:12 352:1 353:10 354:16 355:18 356:4,24 359:15 360:2,4,10 361:7,9,13 362:18 364:2 368:23 387:21 388:8 389:12 391:21,24 403:4

**scheduled** 272:22

**schedules** 226:8,24 227:20 228:2,4,6,25 229:22 230:4 241:15 244:14,23 245:4 252:24 255:7 256:3,23 258:6,18 259:14,18 262:15,25 263:19 265:23 266:2,8,12,20 267:1 268:24 269:2,18,22 270:15 271:22 272:11 273:4 274:14 278:6 283:23 291:7,10 326:23,24 328:21 330:2 331:1,4 332:22 334:11,16 335:2,3,10 336:6,7 338:5 340:8,16,23 346:14 355:16 356:9,20 359:13 369:2 387:19 388:6,15,19 389:20,21,24 390:4 392:4 406:9 416:8

**scope** 329:20 330:4 340:24 351:3 355:8 356:7 393:23 396:4 400:7,22 401:25 412:7

**Sean** 364:12

**search** 226:25 236:2,7,11,12,13,14,21,22 237:22 308:25 360:19

**searched** 235:14 236:23 335:14

**searches** 231:9 232:23 233:13 234:7,12,14,19,20,23 235:19,22,24 236:18 237:7,10 238:6 244:11,12 245:2,7,13,15 261:25 308:25 383:23 384:4

**searching** 235:15 236:20

**seconds** 288:21 333:15,17

**secretary** 233:9

**section** 282:5 292:1 295:4 318:21 324:15 353:25 354:7 357:21 360:17 370:22 383:3 404:9,14 418:10 424:16

**sections** 359:1,2 364:2 372:4

**sector-based** 431:1

**seek** 386:8

**seeking** 395:10

**selling** 270:20

**SEM** 314:13

**send** 366:15 418:11,23

**Senior** 278:22

**sense** 324:8 369:7 374:1 408:14

**sentence** 299:13 320:4 356:13 382:11 384:18

**sentences** 320:23

**separate** 232:11,13 363:18 386:15,16

**separation** 386:8

**September** 226:5 245:7,14 246:21 289:10 293:18,21 298:19 307:4

**sequence** 403:11

**serve** 414:4

**Services** 223:10 224:7

**set** 236:6 299:22 379:6

**sets** 357:6,18 434:13

**setting** 389:2

**Sharan** 334:4 336:18

**share** 236:19 237:1 238:3,13,21 239:1,2,18,20,25 240:6,10,13,15,25 241:12,20

**shared** 240:17,22 372:10

**Sharepoint** 365:4 367:11,14 372:9,11 382:21

**shares** 237:25

**Sheerin** 390:19 418:23

**sheet** 245:19

**shelf** 342:25 343:1,21,22 346:12,20,21,22 347:1,3,15,16,18 353:5,19 354:17 383:6,10 384:20,23 385:8 386:18 387:2

**shipments** 399:16

**shipping** 347:11

**short** 267:3 268:9 310:16

**shorter** 347:12

**Shorthand** 222:8

**shortly** 405:23

**show** 287:20 359:8

**showed** 437:9,11

**Shower** 257:8 279:8 426:9,11 430:15 433:19,20

**shredding** 302:1

**sic** 237:3 252:16

**side** 263:5 264:18,20

**sides** 264:21 379:24

**sign** 286:3

**sign-offs** 303:25 304:1, 9

**signing** 303:18

**similar** 263:20 315:22 423:7

**simple** 301:16

**simply** 234:10 241:13 245:14 246:11 263:12 326:6 331:14 371:25 373:22 381:13 391:16 418:11 437:12

**single** 267:25

**sir** 225:3 228:23

**sit** 345:8 346:7,12 399:7

**site** 243:19,22 335:16 365:22 367:11 372:11 377:3 382:21 397:11 418:12

**sites** 372:10 400:17

**sitting** 334:19

**six-year** 373:18

**Skadden** 223:3 230:20 243:23

**Skellington** 274:23 303:13,17 316:23 317:5 322:18

**Skillman** 264:20 271:2, 7 401:25

**Slate** 223:3

**slogging** 392:11

**small** 240:15

**software** 315:16

**sold** 396:20

**SOPS** 271:9 282:6

398:11

**sort** 246:18 255:19 262:1 306:14 308:7,24 321:24 340:13 354:25 371:19 379:6 383:24 396:12 399:15 405:13 419:21 433:10,22

**sorts** 401:5

**sought** 228:3 349:20

**sound** 315:3 327:9

**sounds** 309:23 385:4 407:18

**source** 240:1 336:25 361:23 372:12 425:8 436:15,20

**sources** 234:19,20 235:9 406:15

**sourcing** 334:4

**speak** 233:1,10,12 241:10 265:18 274:24 284:22 290:21 299:25 300:24,25 301:10 330:25 345:1,6 346:2 351:19 354:13 361:12 364:4,7 373:8 385:3 394:22 414:24

**speaking** 240:25 243:17 272:9 275:4 286:4 328:10 337:2 364:21 421:17

**speaks** 234:17 359:1

**spec** 332:13

**specially** 222:21 337:23

**specific** 231:3,9 232:24 233:13 234:6,8,12 245:21 263:14 266:7 277:25 278:19 282:20 294:2 298:1 320:8 331:1 332:19 361:6 364:2 368:9 387:10 388:16 414:6,10,20 435:21

**specifically** 243:3 257:6 264:13 265:14 294:10 303:9,16 306:13 320:9 326:5 332:10 334:5 335:22 346:8,11

348:25 351:12 357:9 360:21 364:15 369:12 370:5 389:1 406:11,23 415:11 426:8 434:24 435:6 437:9,11 438:16, 20

**specification** 332:2 343:15

**specifications** 343:14 401:5

**specificity** 340:15

**specifics** 303:20 422:23

**specifies** 403:8

**specs** 377:4,6 398:10

**spectrographs** 340:13

**speculate** 330:18

**speculating** 391:14

**speculation** 263:23

**speculative** 356:13

**spend** 429:20

**spent** 243:17

**spirit** 440:11

**spoke** 230:9 231:4,17 243:15,25 257:24 268:23 322:17 334:2 346:15 364:8,10,17 381:14,17 384:13 387:15 390:11 415:17 422:4

**spoken** 281:1 387:12

**spokesperson** 243:5 344:25

**spreadsheet** 377:21

**Square** 223:4

**stack** 287:11 409:11

**stale** 284:2

**stand** 328:2 431:22

**standard** 241:4 247:23 249:21 251:17 271:11 285:6,7 293:10 294:6 295:1,17,19 296:2 306:25 307:24 317:17 318:18 319:9 321:14,19

325:2

**standardize** 273:3

**standardized** 272:20

**standards** 248:14 252:16 290:10 298:9 307:10 317:14,20,21 318:11,14,24 319:24 324:5

**standpoint** 255:24

**stands** 378:16 386:11

**Staneruck** 428:25

**start** 233:10 268:19 269:23 310:23 328:23 348:16 364:19 365:17 371:10 374:4 392:2 408:1 416:11 422:18 439:9

**started** 278:24 280:18 282:15 283:3,22,24 284:20 359:5 365:18 368:1 370:4 375:5 385:17 386:13 388:2 391:11 400:20 422:13, 17

**starting** 413:21 428:19

**starts** 313:14 317:14

**state** 222:8 225:18 350:16 429:12 430:6 439:24

**stated** 326:6

**statement** 383:8

**statements** 225:18

**states** 321:23 325:20, 22 335:10

**stating** 322:4

**statistic** 284:5

**stay** 403:25

**stayed** 293:2

**stays** 239:25 408:21

**stenographic** 333:19

**step** 356:6

**steps** 363:2 367:14 369:8

**stipulations** 225:18

**stopped** 309:15

**stopping** 439:4

**storage** 237:16

**store** 241:13 378:20

**stored** 335:9,16 365:3 372:9 375:21,25 377:12,18,24 378:15 402:1

**storing** 378:19

**story** 240:9

**straighten** 385:24

**Street** 222:6,17

**strike** 263:22 337:7 338:23 356:12 361:14 377:13 394:1 429:6

**study** 388:16

**stuff** 262:2 300:19 351:10 409:9

**subject** 239:21 270:6 286:18 298:21 308:4 335:10 365:4 393:14 394:15,17 403:19,20 411:18 412:4 415:1 423:10 424:5 440:6

**subjects** 415:18 424:5

**subsequent** 229:21 244:16 246:20 293:1 307:12 317:21 320:11, 14 338:21

**subsequently** 230:6 242:12

**subsidiaries** 274:15 436:2

**subsidiary** 257:5 278:1

**subsidiary's** 390:16

**substantive** 419:21

**suggest** 304:20 372:17

**suggestion** 272:12,23 273:5,7,23 275:6,24 276:3,19,20,23 277:2,3, 8

**suit** 277:24

**Suite** 222:6,17,23

**summarily** 244:2

**summarize** 232:22 261:21 265:22

**summary** 348:23 420:11 431:20

**Superior** 224:19

**superseded** 292:22

**supervision** 235:25

**supplier** 340:18 352:4 356:21 364:8,17 367:19 373:4 377:3,7 387:23, 24,25

**suppliers** 377:1 383:6

**supply** 373:4 394:12

**supposed** 259:15 301:23 302:19 321:3 323:16 355:17 434:5

**supposedly** 390:16

**survey** 339:15

**surveys** 339:13

**suspend** 405:14

**suspended** 321:15

**suspends** 305:24 306:1

**Swanson** 222:16 225:1,22 226:19,23 228:12,17 231:22 232:3,6 237:19 238:7, 10 241:21 242:3,7,20 243:2,11 244:10 245:24 246:7 247:10,11,16,19 248:2,22 249:1 250:1, 16 251:3 253:16 254:1 255:8,18 256:1,13,24 257:2 258:3,24 260:1, 19,24 261:4 263:22,24 264:22 265:25 266:10 267:5,7 268:2,6,10,22 269:8 270:9 273:18 274:3,12 275:22 276:1, 9,16 277:12 278:17 283:11,20 284:7 286:15,24 287:4 288:15 289:3,7,16,22 290:11 291:8 296:18,23 297:9, 25 300:12 301:4 302:9 304:7,14 305:20 308:6 310:4,17 311:3 312:13 314:20 315:11 316:14 319:25 321:2 323:13 324:1 330:15 333:5,11, 14,20,21 335:21 337:7, 19,25 344:14 345:7 348:15 350:17 351:8 352:22,25 354:10 355:14,22 356:12,14 357:16 361:14,16,25 362:8,17 366:2,21 369:11 370:3,23 371:13 380:11,12,16,22,25 381:8 383:16 385:6,20 386:6 388:5,20 390:9 392:20,21 393:25 395:7,13,20 396:5 397:3 398:3,17 399:23 400:9,24 402:16,25 405:12,17,21 407:11, 13,16,19 408:4,13 412:12 414:7,16 416:16 421:14 423:19 425:17, 25 428:8 429:19 430:1, 5,11 431:13,17 432:2,7, 10,12,13 434:2,14,22 438:24 439:5,11,16,22 440:12,23

**sweep** 374:17

**switch** 326:11 378:24

**sworn** 222:10 225:15

**Symphony** 377:25 378:13,19 382:15

**system** 237:11 357:5 358:3 365:2,3,4 367:20 369:15 375:21,22,24 376:1,3 377:25 378:11, 13,16,18,20 405:1

**systems** 235:23

**T**

**tab** 357:4 404:1 410:10 419:25 422:24 432:24

**tabbed** 357:23

**table** 231:15,16,18,19 232:8 234:3,10,17 235:3 308:11 359:14 364:9 379:3,25 380:1,2

**tables** 379:10

**tag** 232:1

**taking** 375:8

**talc** 222:20 224:17 225:4,5 226:16 236:8 237:21 242:15,19,22 243:4,7,8 270:21 279:7 304:22 305:4,8 326:18 332:12 336:25 337:1 339:12,19,25 341:9,10 344:6,19 345:21 346:17 348:12 349:9 355:19,20 356:16,17 360:12,22 362:4,11 363:10,14 364:22 367:11 370:14, 15 371:16 372:8 374:11 376:23 377:1,2,3,6,7 382:3,24 384:16 387:6 388:9 389:14,15 391:7 392:8 393:12 394:12 399:2,16 403:5,6,12 404:3 405:5,8 406:1,2, 19 409:14 412:17,20 413:12,17 415:4,6,9,12 419:15,17,18,23 423:14 424:3,7,11 426:12 431:20 432:4,16,25 433:4,15 434:23,25 435:4,16 437:2,25 438:1

**talcosis** 409:19 433:16

**talk** 245:13 270:19 283:16 334:15 341:5 346:8 354:5 372:4 382:22 392:16,17 403:23 439:15

**talked** 260:18 305:23 314:4 317:6 342:13 388:6 394:3 412:22 416:4 424:3

**talking** 227:13 231:15 233:21,25 238:20 257:4 262:7 266:19 274:9 282:1 286:17 293:15 298:3 309:19 312:8 318:19 330:24 331:17 332:12 334:6,8 336:20, 22 348:5 352:20 355:2, 24 365:11,16 369:18 371:15 372:16,18,20,21 377:7 379:12 386:22, 23,24,25 388:2 395:15

396:8,10,13 398:22,25 400:12 401:13 408:8 433:18

**talks** 306:4 387:2

**tape** 315:16

**target** 234:23

**task** 302:14

**tasked** 257:6

**team** 271:8 364:8 372:12

**Tech** 350:4 358:18 405:9

**technician** 224:6

**Tele-video** 223:10 224:6

**telephone** 225:10 233:6

**telling** 257:16 276:17, 19

**tells** 330:7

**Telofski** 364:13 395:3 397:6 398:22 401:7

**Telofski's** 400:1

**TEM** 305:10 314:12 354:24

**ten** 271:1,6,7 312:16 376:18

**tend** 347:11

**tendered** 440:7

**term** 240:21 305:13 312:25

**terms** 234:5 238:5 244:8 245:9 263:10 266:7,12 286:1 290:6 294:24,25 295:13,14, 21,22 316:6 319:4,10 362:15,16 366:23 374:12 386:1 394:12 405:24 414:23 426:18 430:23 433:14,22 434:4,16

**test** 341:21,22 344:17 347:10 348:19 363:16 368:13 372:9,12 373:14 398:10 399:20 406:4,24

**tested** 305:8,9 365:17, 20 403:6 406:2

**testified** 225:16 410:23 411:13 412:2,9

**testimony** 329:11 355:10 366:17 395:10 440:4,20

**testing** 305:7 339:25 340:9,17,19 341:4,19 342:3,7,9 344:5,6,17, 18,19 345:15,19 346:9, 17,24 347:10 348:4,7, 20,22,23,25 349:11,22, 23 350:1,5,8,22,24 351:15,16,17,20,21 353:11 354:22,23,24 355:5,10,12,19 356:18 358:6,24,25 359:1 360:11,21 361:11,18,19 362:3,10,22,23,24 363:9,10,14,15 364:4,6, 23 365:9,12,18,19 366:1,23,25 367:1,12 368:6,7,12 369:19 370:6,12,14 371:16 372:1,7,19,21,25 373:2, 21 374:5,11,16 375:6, 10,11,12 376:23 377:4 382:3 383:13 384:10, 11,13,16,20 385:9,18 386:3,7,9,10,14,18,20, 23,25 387:6,18 388:3, 10 389:4,13 390:1,7 391:6,20,22,23,24 392:8 393:10 394:9 397:23 398:6,18 399:2, 3,8 400:3 401:3,19 402:22 404:16 406:11, 18 407:5,7,9

**testing-related** 341:8

**tests** 351:12,13,15,21 358:1 364:24 367:19

**text** 354:4

**Thailand** 328:14 334:6 336:18 337:3 372:8 382:9

**theoretically** 254:25

**theory** 320:13

**Theresa** 409:18

**thing** 298:4 306:14

333:16 340:14 355:1 383:24 396:12 420:15

**things** 227:19 260:11 305:6 318:23 354:24 361:19 372:22,23 375:23 377:5 380:23 409:10

**thinking** 314:24

**third-party** 372:7

**thought** 370:24 377:13 379:18 439:3

**thrown** 300:19

**thumb** 321:18

**tickets** 358:9

**tie** 234:7 356:3 363:25 388:16

**tied** 234:4 320:4 346:20

**time** 224:11 227:5 228:1,19 243:17 244:8 262:9 263:14 264:13 271:22 275:13 276:6 277:14 283:3,22 301:12 309:6 312:16 317:3 319:12 325:12 333:17 335:4 336:7,15 337:9, 13 340:7 343:10 346:5, 23 347:2 362:5,12 365:20 368:23 375:8 390:23 394:18 400:20 401:24 403:21 405:20 412:14 422:22 426:8,13 428:6 429:20 431:12 439:13 440:9,18

**timeline** 379:11 380:1

**times** 223:4 228:3 233:20 243:19 280:9 347:12 408:9 418:24

**Tina** 226:10 230:9 233:6,8,18

**title** 239:6 272:2

**titles** 272:20

**today** 224:8 229:5,8 231:18 246:24 251:10, 13 287:5 290:16,18 334:19,23 344:4,10 346:7 356:18 392:16,19 399:7

**Today's** 224:10,14

**told** 240:10 264:5 272:10 276:12 281:6 301:17 310:3 352:11 353:17 354:17 390:23

**Tom** 327:19

**tomorrow** 388:22 391:25 392:3 439:7 440:14

**tomorrow's** 439:23

**tools** 252:23

**top** 248:7 250:4 261:12 287:12 318:10 342:6 347:6 357:6 384:9

**topic** 267:3 268:5 274:11 283:18 345:5 415:18 439:10

**topics** 246:11 344:13 389:25 395:11

**total** 379:25

**touched** 402:17 408:8

**trace** 300:22

**Trackwise** 365:3 367:20 375:21 376:2 377:12,19,24 378:4,7, 16,24 381:20 382:15

**trained** 278:8 279:16 282:23

**training** 254:16 279:12, 20,22,23 280:2,11,16, 17,24 281:3,4,18 282:1, 7,9,10,15 283:2,4,9,22 292:2 421:7,12,16,22 422:4,8,17,20,21

**trainings** 280:8

**transcript** 333:6

**transferred** 350:1 378:10,22 399:11

**transmission** 362:2,10 402:21

**treated** 241:19 438:23

**Triality** 230:17 384:2

**TRIM** 267:23

**true** 253:12,20 255:22

Additional Investigation Regarding Scope of Searches Conducted Mid-2018 for Category 3 and 4 Methods

CATEGORY 1: TARGETED SEARCHES OF GLOBAL PRODUCTION – RELATIVITY

CATEGORY 2: RE-FILTERING OF PREVIOUSLY COLLECTED UNPRODUCED MATERIAL - NUIX

CATEGORY 3: ADD'L SEARCHES OF COMPANY SOURCES

CATEGORY 4: FIRST TIME SEARCHES OF COMPANY SOURCES

| Case | Request | Cat | Interviewee | People Consulted | Areas Searched | Search Criteria | What was Found | Extract Format |
|---|---|---|---|---|---|---|---|---|
| Leavitt | Trade org payments: Set 3, #44 | 4 | PDowns | Corporate: Martina Scheich (dir of global compliance and procurement) - enterprise procurement, phone interview | SAP and Cognos (for pre-2010), had 20 years available to search between the two | by name of organization set up in AP system; no date restrictions | payments from Consumer, shared services, and corporate | exports to Excel |
| Leavitt | Industrial hygiene: Set 3, #46 | 3 | PDowns | Corporate: Vivian Pai – dir of WW environment health and safety; Reid Holbrook – dir of safety and industrial hygiene | Looked for missing information from earlier archive searches – departmental share | Knowledge of file names and keywords for talc and asbestos | Additional versions of policies and procedures | MS Office documents |
| Leavitt | US Navy (1965-68 time frame): Set 7, #108, 110-111, 114-115, 119-121 | 4 | PDowns | *Philippines:*<br>Tina Alvarez, Dir of Legal<br>Alvin Quilatan<br>Medel Mag-Isa<br><br>*Non-Philippines:*<br>Joahne Carter<br>James Hallenbeck | Philippines<br>US customer dev<br><br>No applicable sources identified | N/A | N/A | N/A |
| Leavitt | Philippines: Set 7, #109, 112, 113, 116-118, 122-124 | 3 | PDowns | Tina Alvarez<br>Alvin Quilatan<br>Medel Mag-Isa<br>Anne Rache Dandan<br>Dane Gilmore<br>Dina Wang<br>Eward Li<br>George Power<br>Justine Ann Gaurino-Aruta<br>Mark Zappa<br>Nicholas Zhu<br>Patricia Ann Cambel | Originally searched 1970 to present, then later circled back to check specific Leavitt ranges | Offsite storage index maintained in Excel by Philippines Records mgr, reviewed by Tina | Nothing new found beyond original Delacruz search | N/A |

| Case | Request | Cat | Interviewee | People Consulted | Areas Searched | Search Criteria | What was Found | Extract Format |
|---|---|---|---|---|---|---|---|---|
| | | | | Pearl Kuok<br>Stephen Tiu | | | | |
| Leavitt | Workers comp:<br>Set 7, #125 | 4 | PDowns | Erin Sheridan, sr mgr, risk mgt, corporate / Broadspire (third party ins. that J&J uses) | All available claim files in Broadspire system and generated Excel summaries | Claim types and key words | New material | Report output in paper and PDF as well as attachments |
| Leavitt | Trademark:<br>Set 1, #5 | 3 | PDowns | Jennifer Mahoney, trademark para, corporate | Trade applications kept in law dept share drive | Product name | New material | MS Office documents |
| Leavitt | Packaging specs:<br>Set 1, #6 | 3 | PDowns | Patrick Tsai, GSS team; "Manager 1", R&D | GSS and TRU, both Consumer systems | | New material | |
| Leavitt | Print / radio/TV ads:<br>Set 1, #10-12 | 3 | PDowns | Sarita Finnie – sr mkting dir, Baby Care; Margaret Gurowitz – J&J Chief Historian | Zonza – digital asset mgt system at consumer; TMS at the Museum; BBDO archive (outside agency) | Product name | Nothing new at museum; collected new material from museum and Zonza | MS Office docs from BBDO; Digital assets from Zonza |
| Leavitt | Other products (e.g., Micatin):<br>Set 3 , #29-31 | 3 | PDowns | RLawson | ERMS | See search term list | Factbooks, Auth for Prod Release (APR), ads, specs | Paper documents |
| Leavitt | Org charts:<br>Set 3, #22, 27, 38, 43 | 3 | PDowns | RLawson | Workday (enterprise?) | By custodians who would have been on org chart | 1 org chart | PDF |
| Leavitt | Trade orgs:<br>Set 3, #44 | 3 | PDowns | RLawson | ERMS | Name of org | Small number of docs | Paper |
| Leavitt | "Asbestos":<br>Set 3, #37-49 | 3 | PDowns | RLawson | ERMS | Search terms | Facility-related docs re: abatement | Paper |
| Fong | Hong Kong:<br>Set 1: #4-15, 25-31 | 4 | PDowns | Quality supply chain, legal, in US, Hong King, Singapore | Had already searched GSS and TRU; reviewed offsite storage indexes and any electronic listings | Info regarding the entity that sold the product during time frame; mines that supplied; mfr; | Nothing found in time frame | N/A |

| Case | Request | Cat | Interviewee | People Consulted | Areas Searched | Search Criteria | What was Found | Extract Format |
|---|---|---|---|---|---|---|---|---|
| | | | | | | distributors; all specs including labels, warning, advertisements, testing, packaging; sales data | | |
| Fong | World Talc Surveys (*): Set 3, #50-52 | 3 | PDowns | RLawson, MZappa | ERMS; no additional sources ID'd beyond previous collections | Various survey and monitoring-related search terms | No additional documents | N/A |
| Leavitt | Annual reports: Set 3, #39 | 4 | LGiacino | Corporate Secretary: Tina French (asst corp secty)<br><br>Public Relations<br><br>Controller's Office | Walk-in vault for law dept: 3 hole punch binders for each year<br><br>Public Relations and Controller's office and received a couple<br><br>www.sec.gov | All annual reports | | Paper and PDFs |
| Leavitt | 10K Filings: Set 3, #40 | 4 | LGiacino | Corporate Secretary<br><br>Controller's Office | Newer 10Ks online<br><br>Older 10Ks in vault or file cabinets | All 10K filings | Online and paper versions, including one or two obtained from Controller's office | Paper and PDFs |
| Leavitt | Histories: Set 3, #41 | 4 | LGiacino | Corporate Relations<br><br>Corporate Secretary's Office<br><br>Office of the Company Historian | Hardcopy and electronic materials from these sources | Manual search | Book by Lawrence G Foster<br>Other published material by Corp Relations | Paper and PDFs |
| Leavitt | Corp Structure documents e.g., re: asset transfer, who were | 4 | LGiacino | Corporate Secretary | CEMS (***)<br><br>Standardized materials on L drive<br><br>Online SEC filings | Individual selections from within applicable CEMS sections | Meeting minutes, filings, etc. | PDFs |

| Case | Request | Cat | Interviewee | People Consulted | Areas Searched | Search Criteria | What was Found | Extract Format |
|---|---|---|---|---|---|---|---|---|
| | officers, etc.: Set 1, #1, Set 4, #53-55, 57-61 | | | | | | | |
| Leavitt | Secty of State filings re: name changes: Set 4, #52 | 4 | LGiacino | Corporate Secretary | Electronic request to state of NJ<br><br>Scanned minute books on L drive | Manual search and requests to State of NJ for changes | Filings | Paper and PDFs |

* International program in 70s, 80s, 90s to assess talc sources and harmonize them for business purposes

** Laura Giacino: Office of the Corporate Secretary – reports to Tom Spellman

*** Corp Entity Mgt System – Web based system owned by Diligent; covers current and historical companies and keeps corporate info on each; Laura and colleague Linda King input the info – corp structure output based on this information

| Matter | Date | Product(s) | Claim |
|---|---|---|---|
| Theresa Krushinski v. JJCP | 11-Nov-99 | Johnson's Baby Powder | Talcosis |
| Barbara Bloch, individually and as Executrix of the Estate of Ronald J. Bloch v. JJCPI, et al. | 7-Jan-00 | Johnson's Baby Powder | Mesothelioma |
| Hozeny v J&J Consumer Companies, Inc. | 16-May-03 | talc products | Mesothelioma |
| Deane Berg v Johnson & Johnson Consumer Companies, et al. | 15-Dec-09 | Johnson's Baby Powder/Shower to Shower | Ovarian cancer |
| Chesteen, Molly & Randy v J&J Consumer Companies | 6-Feb-14 | J&J Baby Powder/Shower to Shower | Ovarian cancer |
| Mona Estrada v. Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. | 14-May-14 | Johnson's Baby Powder | Ovarian cancer |
| State of Mississippi v. Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. | 19-Sep-14 | Johnson's Baby Powder/Shower to Shower | Ovarian cancer |
| TALC OVARIAN CANCER PL LITIGATION | 26-May-17 | Johnson's Baby Powder/Shower to Shower | Ovarian cancer |
| TALC ASBESTOS PL LITIGATION | 26-May-17 | Johnson's Baby Powder/Shower to Shower | Mesothelioma |



# MITTENTHAL – LEAVITT/FONG DEPOSITION TOPICS

**1. DEFENDANT's RECORD RETENTION POLICIES.**

- ***Leavitt RFP #14 (Set 3) (Leavitt Tab 3J)***
- ***Fong Standard Rog #1 (Fong Tab 3A)***
- ***Fong RFP Request #36, 37 (Set 1) (Fong Tab 3C)***

- Materials
    - 2017 WWRIM Policy (Tab 2B)
    - 2015 WWRIM Policy (Tab 2A)
    - WWRIM Enterprise Retention Schedule (Tab 2C)
    - Franchise-Level Record Retention Schedules
        - 1997 (Loose)
        - 2001 (Loose)
        - 2002 (Loose)
        - 2004
        - 2007
        - 2010
        - 2011
        - 2015 (Tab 2E)
        - 2017 (Tab 2F)
    - Supplier Quality Agreements (Tab 2D)

**2. All INDEXES and/or database for DOCUMENTS contained and/or previously contained in DEFENDANT's DOCUMENT REPOSITORY (IES).**

- ***Leavitt RFP #15 (Set 3) (Leavitt Tab 3J)***

- Materials
    - Custodian List (Tab 3)
    - Non-custodial sources list (Tab 4)
    - Three lists of search terms
        - Archives Search Terms (Tab 6)
        - Filter Terms (Tab 7)
        - "NR" Spreadsheets Search Terms (Tab 8)
    - Interview notes

**3. What search terms and/or parameters, electronic and manual, can be used to identify and locate DOCUMENTS in DEFENDANT's DOCUMENT database. DOCUMENT REPOSITORIES.**

- ***Leavitt RFP #16 (Set 3) (Leavitt Tab 3J)***

- Materials
    - Custodian List (Tab 3)

- o Non-custodial sources list (Tab 4)
- o Three lists of search terms
  - ▪ Archives Search Terms (Tab 6)
  - ▪ Filter Terms (Tab 7)
  - ▪ "NR" Spreadsheets Search Terms (Tab 8)
- o Interview notes

**4. What efforts were made to locate DOCUMENTS responsive to plaintiff's requests herein above, as well as searches for DOCUMENTS responsive to Plaintiffs' Requests for Production of Documents in this matter.**

- Materials
  - o Responses to RFPs (generally)
  - o Spreadsheets that were exhibits to RFPs
  - o Leavitt and Fong production summaries
  - o Custodian List (Tab 3)
  - o Non-custodial sources list (Tab 4)
  - o Three lists of search terms
    - ▪ Archives Search Terms (Tab 6)
    - ▪ Filter Terms (Tab 7)
    - ▪ "NR" Spreadsheets Search Terms (Tab 8)
  - o Interview notes

**5. The genuineness or authenticity of DOCUMENTS produced by DEFENDANT in response to requests herein above, as well as DOCUMENTS produced by DEFENDANT in response to Plaintiffs' Requests for Production of Documents in this matter.**

**6. Whether DOCUMENTS produced by DEFENDANT in response to requests herein above, as well as DOCUMENTS produced by DEFENDANT in response to Plaintiffs' prior Requests for Production of Documents in this matter, are business records.**

- Materials
  - o Custodian list (Tab 3)
  - o Non-custodial sources list (Tab 4)

**7. Whether DOCUMENTS produced by DEFENDANT in response to requests herein above, as well as DOCUMENTS produced by DEFENDANT in response to Plaintiffs' prior Requests for Production of Documents in this matter, were produced as they were kept in the usual course of business.**

- ***Leavitt Request to Admit Generally (Set 1) (Leavitt Tab 3P)***

- Materials
  - o Custodian list (Tab 3)
  - o Non-custodial sources list (Tab 4)

- Production summaries for Leavitt and Fong

**8. The chain of custody of DOCUMENTS produced by DEFENDANT in response to requests herein above, as well as DOCUMENTS produced by DEFENDANT in response to Plaintiffs' prior Requests for Production of Documents in this matter.**

- ***Leavitt Rog #22, 29, 34 (Set 3) (Leavitt Tab 3J)***

- Materials
  - ESI protocols (Tab 9)
    - MDL (Tab 9A)
    - Hogans (Tab 9B)
  - Materials produced in Leavitt/Fong (metadata fields)
  - 9/28/17 Letter to MDL Court (Tab 10)
  - Custodian list (Tab 3)
  - Non-custodial sources list (Tab 4)

**9. Litigation holds DEFENDANT put on DOCUMENTS related to the marketing, sale, and testing (including testing of talc) of Johnson's Baby Powder.**

- Materials
  - November 1999 Krushinski hold notice (Loose)
  - January 2000 Bloch hold notice (Tab 1C)
  - May 2003 Hozeny hold notice (Tab 1B)
  - December 2009 Berg hold notice (Loose)
  - February 2014 Chesteen hold notice (Loose)
  - May 2014 Estrada hold notice (Loose)
  - September 2014 State of Mississippi hold notice (Loose)
  - May 2017 Consolidated Talc Ovarian Cancer PL hold notice (Loose)
  - May 2017 Consolidated Talc Asbestos PL hold notice (Tab 1A)

**10. DEFENDANT'S efforts to preserve DOCUMENTS related to the marketing, sale, and testing (including testing of talc) of Johnson's Baby Powder.**

- Materials
  - WWRIM policies (Tab 2A and Tab 2B)
  - WWRIM ERS (Tab 9)
  - Franchise-Level Record Retention Schedules
    - 1997 (Loose)
    - 2001 (Loose)
    - 2002 (Loose)
    - 2004
    - 2007
    - 2010
    - 2011
    - 2015 (Tab 2E)

- 2017 (Tab 2F)
    - See Topic 9

**11. DEFENDANT'S efforts to preserve evidence of testing of Johnson's Baby Powder and talc used in the manufacture of Johnson's Baby Powder.**

- ***Fong RFP Request #66 (Set 4) (Fong Tab 3F)***
- ***Leavitt RFP Request #95 (Set 5) (Leavitt Tab 3L)***

- Materials
    - Supplier Quality Agreements (Tab 2D)
    - MDL Sample Protocol (Tab 5)
    - See Topic 9

Johnson & Johnson

# Worldwide Records and Information Management Policy

**Policy** **Records and Information shall be created, valued, protected, managed, and disposed in accordance with applicable laws, regulations and the requirements of the *Worldwide Records and Information Management Policy and Standards* and other applicable Johnson & Johnson policies.**

## Scope

This Policy specifies requirements for the management, retention, and disposition of Records and Information in all formats and every medium including electronic information.

## Purpose

Johnson & Johnson recognizes that Records and Information are valuable resources and important business assets. This Policy, along with associated WWRIM Standards, defines the requirements for managing the Records and Information assets of Johnson & Johnson in accordance with legal, privacy, regulatory and business requirements. This Policy and associated WWRIM Standards assure the appropriate creation and management of authentic, reliable, and useable Records and Information capable of supporting business functions and activities for as long as they are required.

## Responsibilities

Worldwide Records and Information Management is responsible for the overall governance and strategic direction for the Records and Information Management Programs of the Johnson & Johnson Family of Companies.

The Johnson & Johnson Operating Companies are responsible for the implementation and ongoing maintenance of a Records and Information Management program in compliance with this Policy and associated WWRIM Standards to manage their Records and Information.

## Definitions

**Records and Information**: Any form of recorded information created, maintained or received by Johnson & Johnson in the conduct of its business operations and activities for use at a later time. Records and Information include, but are not limited to, documents concerning the Johnson & Johnson organization, business functions, policies, decisions, procedures, operations, and internal or external transactions that are created and retained for business or legal reasons. The form of Records and Information includes, but is not limited to, paper, electronic, audiovisual material, books, microfilm, microfiche, photograph, map, magnetic or optical disk or tape, software, video, or other recorded information.

**Disposition**: A final administrative action taken with regard to records, including disposal, transfer to another entity, or permanent preservation.

**Enterprise Retention Schedule**: A comprehensive list of Functional Business Categories, including example record types and retention requirements to be used across J&J globally.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

EXHIBIT
Mittenthal
23
10-18-18
PENGAD 800-631-6989

# Worldwide Records and Information Management Policy

**Legal Hold**: A communication issued as a result of current or reasonably anticipated litigation, audit, government investigation or other such matter that suspends the normal disposition or processing of records.

**Standard**: A governance document that specifies the mandatory requirements of a program activity.

## Compliance

All Johnson & Johnson Operating Companies and their associates shall comply with this Policy and associated WWRIM Standards.

## Provisions

1. The Records and Information Management requirements, as defined by this Policy and associated WWRIM Standards, are to be applied consistently and regularly.

2. Records and Information shall be created, stored and managed using proper protection and allowing for future access.

   2.1. Records and Information shall be protected, and access to them controlled according to their value as described in the *Information Asset Protection Policies* (IAPPs) and other applicable Johnson & Johnson policies.

   2.2. Records and Information shall be classified throughout their lifecycle in a manner that allows future authorized access and use.

3. Records and Information shall be retained in accordance with the *Johnson & Johnson Enterprise Retention Schedule* and in accordance with applicable Legal Holds. When a Record or Information retention requirement is reached, it shall be disposed of in accordance with this Policy and associated WWRIM Standards, and in compliance with Operating Company procedures.

4. Records and Information relevant to litigation or an investigation and subject to a Legal Hold as issued by the Johnson & Johnson Law Department shall be retained and preserved until further notice from the Law Department, regardless of the retention requirement set forth in the *J&J Enterprise Retention Schedule*.

5. Disposition of Records and Information may include, but is not limited to, disposal or deletion. Disposition of Records and Information shall be conducted in a systematic and routine basis during the course of normal business activity subject to the following requirements:

## Worldwide Records and Information Management Policy

5.1. Inactive Records and Information may be transferred to the Operating Company's designated inactive records storage site for long-term storage to fulfill retention requirements;

5.1.1. Records and Information transferred to the Operating Company's designated inactive records storage site shall be managed with appropriate procedures to ensure availability for future business, litigation, and investigation purposes, as necessary;

5.1.2. Records and Information subject to a Legal Hold that are no longer required for day-to-day business operations may be transferred to an appropriate inactive storage site for preservation in coordination with the Johnson & Johnson Law Department and in compliance with paragraph with this policy.

6. Operating Company Records and Information that are considered "vital" (i.e. fundamental to the functioning of an organization and necessary to continue operations without delay under abnormal conditions) shall be identified and protected in accordance with this Policy, associated WWRIM Standards and Operating Company procedures.

7. Operating Company Records and Information in the possession of a departing associate, vendor, external business partner, consultant or contractor, shall be managed as follows:

7.1. When an employee leaves Johnson & Johnson or transfers to another Operating Company or department, he or she shall ensure their Records and Information are handled appropriately, including reviewing and determining disposition for records in their custody. All records that must be retained shall either be transitioned to the associate's supervisor or another authorized individual. In the event this task is not performed prior to departure, the supervisor is responsible for ensuring the departing associate's Records and Information are managed in accordance with this Policy and associated WWRIM Standards;

7.2. Records and Information in the possession of a vendor, external business partner, consultant or contractor upon termination of contract shall be transferred to the sponsoring Operating Company and managed in accordance with this Policy and associated WWRIM Standards.

## Worldwide Records and Information Management Policy

8. The Operating Company's Records Manager, or designee, shall conduct internal department assessments within their Operating Company for compliance with this Policy and associated WWRIM Standards and Operating Company procedures.

9. The requirements of this Policy and associated WWRIM Standards shall be communicated to, and incorporated into training for, Operating Company associates.

10. Where appropriate, requirements of this Policy and associated WWRIM Standards shall be incorporated into contracts with those vendors, external business partners and consultants or contractors requiring access to Johnson & Johnson Records and Information during the course of the contract. If contract changes create a need for such access and the contract lacks the proper Records and Information Management requirements, they shall be added.

11. Disaster recovery backups shall be created solely for the purpose of accessing and recovering data in the event of a disaster and shall not be used for maintaining records for normal business purposes.

Johnson & Johnson

**WWRIM Policy**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

# Worldwide Records and Information Management Policy

## About the WWRIM Policy and Standards

The *Worldwide Records and Information Management Policy and Standards* are maintained by the Worldwide Records and Information Management Program Office. The most current version of this Policy and the WWRIM Standards are available on WWRIM site.

RIMS-1 Records and Information Management Program Standard
RIMS-2 Convenience Information Standard
RIMS-3 *Records Clean–up Event Standard (Retired)*
RIMS-4 Historic Records Preservation Standard
RIMS-5 Inactive Records and Information Storage Standard
RIMS-6 Litigation Support Standard
RIMS-7 Management of Records and information for Facility Closures and Divestitures Standard
RIMS-8 Management of Records and Information for Mergers and Acquisitions Standard
RIMS-9 Management of Records and Information of Departing Associates Standard
RIMS-10 Records and Information Management Compliance Assessment Standard
RIMS-11 Training and Education Standard
RIMS-12 Enterprise Retention Schedule Standard
RIMS-13 Vital Records Standard
RIMS-14 Management of Records for System Decommissioning Standard
RIMS-15 Management of Electronic Records and Information Standard
RIMS-16 Records and Information Archiving Standard
RIMS-17 Disaster Recovery Backup Retention Standard
RIMS-18 Electronic Messaging Standard

Approved by

Marene Allison
Vice President, Worldwide Information Security

Review and Approval

| *Title* | *Name* | *Signature* |
|---|---|---|
| Vice President, Worldwide Information Security Information Technology Services | Marene Allison | Marene N. Allison 01/30/2015 |

# Worldwide Records and Information Management Policy

**Revision History**

| | | |
|---|---|---|
| WWRIM Policy v4.0 | 31 December 2014 | • Changed RIMS-12 Title – from "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed throughout – "RRS" and/or "GRRS" to "ERS."<br>• Changed throughout – "destruction" to "disposal."<br>• Modified "About the WWRIM Policy and Standards" paragraph for clarity. |
| WWRIM Policy v3.0 | 31 December 2013 | • Changed throughout – "Document Hold" to "Legal Hold."<br>• Where applicable changed throughout "employee" to "associate."<br>• Changed the title of RIMS -10 from "audit" to "assessment" and references throughout the standard.<br>• Paragraph [2] Removed- sentence redundant, tied in with Paragraph [3].<br>• Paragraph [5.2] Removed - reference to inactive records storage.<br>• Paragraph [former 6.1] Removed- condensed with Paragraph [6].<br>• Paragraph [7.1] Added - "sponsor."<br>• Paragraph [11] Removed "tapes" and clarified wording.<br>• Retired RIMS-3 Records Clean-up Event J&J has changed its philosophy on annual clean-ups. Associates shall independently manage their records and information during the normal course of business. |
| WWRIM Policy v2.0 | 31 January 2011 | • Paragraph [5.2.2] – Changed from "no longer required for business purposes" to "no longer required for day-to-day business operations."<br>• Paragraph [7:1] - Adjusted requirement to show employee's responsibility to review and disposition their records in a departure situation<br>• Minor revision to title of RIMS-3 |
| WWRIM Policy v1.1 | 30 September 2009 | • Modified final page to include Standards |
| WWRIM Policy v1.0 | 31 July 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

Johnson & Johnson

**WWRIM Standard RIMS-1**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Records and Information Management Program Standard

## 1. Purpose

The purpose of this standard is to provide the minimum requirements for the establishment and implementation of a comprehensive Records and Information Management (RIM) program by each Johnson & Johnson Operating Company. Each program shall be implemented in a manner that conforms to the Johnson & Johnson *Worldwide Records and Information Management Policy and Standards.*

## 2. Background

An effective RIM program ensures consistent and cost-effective management of records throughout their entire lifecycle. The manner in which a RIM program is implemented is determined by the organization's business needs, as well as legal and regulatory requirements for the organization. It is essential to use a systematic approach for managing records that provides the capability for accurate and timely retrieval, protection and preservation for the overall integrity and authenticity, and timely disposition when required. These elements serve to mitigate risks related to managing records and information.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Responsibilities

5.1. Operating Company Management

The President/Managing Director/Head of each Johnson & Johnson Operating Company is responsible for the planning, implementation, and on-going compliance with the *Worldwide Records and Information Management Policy and Standards* through the establishment of a RIM program. This includes:

5.1.1. The Operating Company management will designate a Records Manager for the Operating Company;

5.1.2. Allocating adequate resources to implement and maintain their RIM program in accordance with WWRIM requirements;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

Johnson & Johnson

WWRIM Standard RIMS-1
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Records and Information Management Program Standard

5.1.3. Providing guidance on priorities;

5.1.4. Maintaining oversight.

5.2. Operating Company Records Manager

The Operating Company Records Manager is the designated central point of contact for all RIM matters in the Operating Company or Companies for which he or she is responsible. This includes:

5.2.1. Implementing and maintaining an Operating Company-wide RIM program in compliance with the *Worldwide Records and Information Management Policy and Standards*;

5.2.2. Providing clear communications, documented guidelines and a current Legal Hold Notice report to educate on normal course of business practices for handling business records;

5.2.3. Developing Operating Company-appropriate RIM lifecycle procedures;

5.2.4. Ensuring appropriate training and awareness on RIM requirements is available and provided to Operating Company employees, vendors, and contractors in order to enable compliance with those requirements;

5.2.5. Complying with WWRIM requirements including but not limited to submitting annual reports to WWRIM, completing an annual program assessment, etc.;

5.2.6. Providing program updates on RIM activities to Operating Company Senior Management and the WWRIM Program Office;

5.2.7. Working with Operating Company business units/departments to create, implement, and maintain and build awareness of the Enterprise Retention Schedule;

5.2.8. Conducting or facilitating RIM Compliance assessments with the business units/departments within the Operating Company;

5.2.9. Implementing and managing RIM services such as inactive storage solutions and/or acquire such services and other RIM products provided by external vendors, as appropriate;

5.2.10. Partnering with various Johnson & Johnson departments, such as WWRIM, IT eDiscovery, Johnson & Johnson Law Department and Worldwide Privacy to ensure alignment.

5.3. Records Coordinator

The Records Coordinator role is intended to serve as a liaison between the Department/Business Unit and the RIM program in order to assist and support compliance with RIM requirements. The Operating Company may choose to refer to the Records Coordinator role by different names such as "Department Coordinator" or "Records Liaison". Operating

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488017

Johnson & Johnson

**WWRIM Standard RIMS-1**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Records and Information Management Program Standard**

Company management shall assign appropriate resources from each department (or other agreed-upon organizational unit) to act as the Records Coordinators. The Records Manager shall develop and maintain appropriate procedures around the identification, training, and maintenance of the individuals in the Records Coordinator role.

The Operating Company shall designate a Records Coordinator responsible for all locations or departments where it is feasible and practical to do so. In cases where a Records Coordinator is not assigned to a specific site or department, approval from Senior Management is required. If the Records Coordinator is not assigned any of the responsibilities set forth in paragraph 5.3, or if a location or department does not have a Records Coordinator, the Records Manager shall assume those responsibilities.

The Records Coordinator responsibilities include but are not limited to:

5.3.1. Ensuring that RIM requirements such as identification and labeling, and other routine activities and processes, are conducted within the department in conformance with WWRIM and local Operating Company requirements;

5.3.2. Serving as a local subject matter expert on RIM matters;

5.3.3. Coordination of the transfer of records to and from the approved inactive records storage facilities;

5.3.4. Coordination/acquisition of RIM services and supplies;

5.3.5. Participation/coordination of RIM Compliance Assessments for their Department/ Business Unit.

5.4. Johnson & Johnson Law Department

The Johnson & Johnson Law Department is responsible for:

5.4.1. Determining the scope of Records and Information subject to Legal Hold Notices issued pursuant to litigation or other legal or regulatory proceedings;

5.4.2. Identifying custodians of repositories likely to contain Records and Information responsive to a Legal Hold Notice;

5.4.3. Notifying, as appropriate, individual custodians and the Operating Company Records Manager of Legal Hold Notices, their scope, and their duties respecting them;

5.4.4. Providing a current Legal Hold Notice report on a semiannual basis to each Operating Company Records Manager;

5.4.5. Coordinating document preservation and other discovery activities with Operating Company Record Managers and IT eDiscovery;

5.4.6. The Operating Company Board Attorney, or designated Law Department representative responsible for supporting that Operating Company, is responsible for:

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488018

Johnson & Johnson

WWRIM Standard RIMS-1
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Records and Information Management Program Standard

5.4.6.1. Reviewing and accepting the Johnson & Johnson Enterprise Retention Schedule;

5.4.6.2. Reviewing any written procedures for the Operating Company's RIM program for which the Johnson & Johnson Law Department is specifically listed as an owner of responsibilities, including but not limited to:

- Legal Hold Notice procedures
- Acceptance of Legal Documents procedures

5.5. Operating Company People Supervisors

Operating Company people supervisors are responsible for supporting the RIM program by ensuring that their Associates have the appropriate tools, training, and information needed to comply with the requirements and procedures of the RIM program. They are also responsible for ensuring that records and information from departing personnel are managed in accordance with Operating Company procedures.

5.6. Worldwide Records and Information Management Program Office

The Worldwide Records and Information Management (WWRIM) Program Office is responsible for the overall governance and strategic direction for Records and Information Management across the Johnson & Johnson Family of Companies. This responsibility includes maintaining and publishing the *Worldwide Records and Information Management Policy and Standards*, and the *J&J Enterprise Retention Schedule.*

## 6. Minimum Implementation Requirements

6.1. Each Operating Company shall establish a RIM program that complies with all provisions of the *Worldwide Records and Information Management Policy and Standards.*

6.2. The primary governance component of the Operating Company RIM program shall have documented procedures for managing, tracking, protecting, storing, and disposing of both active and inactive Records and Information throughout their lifecycle regardless of format or medium.

6.2.1. Procedures shall address local Operating Company business requirements;

6.2.2. Procedures shall be formally reviewed and approved by Operating Company Senior Management (e.g., Director-level or higher);

6.2.3. Procedures shall be reviewed and updated on a biennial basis, at minimum, unless business changes require it sooner;

6.2.4. The most recent review and approval date shall be documented, even if no changes are made;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJ 000488019

Johnson & Johnson

**WWRIM Standard RIMS-1**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Records and Information Management Program Standard**

6.2.5. Procedures may be supported, as appropriate, by work instructions, tools, and/or processes;

6.2.6. Procedures shall exist when regulatory or legal changes are anticipated;

6.2.7. The RIM program shall use a documented process to govern how and when changes to the program's procedures are made due to either regulatory or legal changes or to changes in the business.

6.3. The components of a compliant RIM program shall include:

6.3.1. Documented and approved procedures addressing the requirements of the WWRIM policy and standards as specified in paragraph 6.2 of this document;

6.3.2. Conducting or facilitating of compliance monitoring and assessments within the Operating Company, in accordance with the ***WWRIM RIMS-10 Records and Information Management Compliance Assessment Standard***, to gauge Operating Company compliance with *Worldwide Records and Information Management Policy and Standards*, and to develop a plan of action to address any gaps in compliance;

6.3.3. Implementation of a procedure to ensure third-party vendors who create or manage Records and Information on behalf of the Operating Company are contractually bound and made aware of how to manage those Records and Information in compliance with the following requirements at minimum:

6.3.3.1. Records and Information created and managed by a third-party on behalf of the Operating Company shall be retained only as long as required by the J&J Enterprise Retention Schedule, or as required per an active Legal Hold;

6.3.3.2. Prior to final disposition, the third-party shall notify the Operating Company to ensure that arrangements are made to identify and preserve any Records and Information that may be relevant to a Legal Hold.

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Removed paragraph [5.3.4] – no longer pertains to new ERS Standard.<br>• Paragraph [5.5] Clarified wording – condensed "employees and other personnel" to "Associates."<br>• Changed throughout – "Manager/Supervisor/Sponsor" to "Supervisor."<br>• Changed throughout Records Retention Schedule (RRS) to J&J Enterprise Retention Schedule.<br>• Paragraph [6.2.7] Clarified wording – process.<br>• Paragraph [6.2.3] former – Removed Boundary Agreements requirement. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold". |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

5

JNJ 000488020

**Worldwide Records and Information Management**

**Records and Information Management Program Standard**

| | | |
|---|---|---|
| | | • Purpose [1] Added emphasizing wording.<br>• Paragraph [5.1.1] Clarified wording – designation of a Records Manager.<br>• Paragraph [5.2] Clarified wording- eliminated redundancy.<br>• New Paragraph [5.2.2] Provide communication/guidelines for the handling of records during the normal course of business.<br>• New Paragraph [5.2.10] Lists out the various Johnson & Johnson departments.<br>• Paragraph and Note section at the end of [5.3] Combined and clarified wording.<br>• New paragraphs [5.3.1- 5.3.2] Added additional Record Coordinator responsibilities.<br>• New Paragraphs [5.4.4 – 5.4.5] Added additional Law Department and IT eDiscovery responsibilities.<br>• Paragraph [5.5] Clarified wording- broadened the scope of "staff"<br>• Paragraphs [6.2.1] Clarified wording- condensed redundancy.<br>• Paragraph [former 6.2.2] Removed- unnecessary, as supported in the rest of 6.2.<br>• Paragraph [former 6.2.7] Removed- reflected in [6.2.6].<br>• Paragraph [former 6.2.8] now [6.2.6] Clarified wording. Minor change<br>• Paragraphs [former 6.3.2- 3, 4, 6, 7, 8] Removed- reorganized in concise manner in updates.<br>• Paragraph [former 6.3.5] now [6.3.2] Clarified wording. Minor change |
| Version 2.0 | 31 January 2011 | • Paragraph 5.4.2 – Changed Law Department responsibility : "Coordinating and conducting document preservation and other discovery activities"<br>• Paragraph 5.4.3.1 – Removed review for "legal compliance"<br>• Paragraph 5.4.3.2 – Clarified Law Department responsibility for specific reviewing procedures<br>• Minor edits |
| Version 1.1 | 17 June 2010 | • Change "biannual" to "biennial" |
| New Standard Version 1.0 | 30 Sept 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-2
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Convenience Information Standard

---

## 1. Purpose

The purpose of this standard is to define Convenience Information and provide the requirements for managing, retaining, and disposing this type of information.

## 2. Introduction

Not all information created or received by Johnson & Johnson is a record, nor does all record material have an extended period of business use. Some information is instead created or maintained informally or for only local or personal purposes, and has little or no extended value beyond its immediate use. This kind of information is known as Convenience Information. Information may be considered Convenience Information if:

- it is a copy of a record maintained elsewhere and printed or otherwise captured for the use and convenience of a particular person;
- it is a record which has only transient or short-term business value and is not listed on the *J&J Enterprise Retention Schedule*; or
- it is non-record material maintained for short-term use.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1 Convenience Information subject to a Legal Hold Notice shall be retained and preserved in accordance with this standard and the requirements of the Johnson & Johnson Law Department until further notice from the Johnson & Johnson Law Department.

5.2 When disposing of Convenience Information, care shall be taken to ensure that any Convenience Information containing elements of classified Johnson & Johnson information (as defined in *IAPP S-4 Worldwide Information Classification Policy*) is disposed of in a secure manner that prevents unauthorized disclosure of such classified information during or after the disposal process.

5.3 Convenience Information shall not be sent to off-site storage or be archived unless such information is being preserved in compliance with a Legal Hold Notice.

5.4 Convenience Information includes:

5.4.1 Personal Working Files: Personal working files contain documents such as drafts (where a final version exists), rough notes, or revisions of paper or electronic records

Johnson&Johnson

WWRIM Standard RIMS-2
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Convenience Information Standard

used to create official signed documents. These documents shall be disposed of once a final document has been accepted and/or approved provided they are not subject to a Legal Hold Notice per paragraph 5.1.

5.4.2 Transitory Correspondence: Transitory correspondence is casual correspondence (including e-mails) often created for administrative purposes such as to facilitate meetings or for internal communications. These types of correspondence shall be disposed of after use provided they are not subject to a Legal Hold Notice per paragraph 5.1.

5.4.3 Duplicate Copies: Duplicate copies, where the record or information holder is not the owner of that record. These types of documents shall be disposed of after use provided they are not subject to a Legal Hold Notice per paragraph 5.1.

5.4.4 Extra Copies: Extra copies are duplicates of a document, usually a printed publication where there are many extra copies of the same document and the extra copies are preserved only for convenience of reference. Only the original master copy needs to be retained. These types of documents shall be disposed of when no longer of use provided they are not subject to a Legal Hold Notice per paragraph 5.1.

5.4.5 Catalogs and Trade Journals: Reference materials, catalogs, trade journals, bulletins, magazines, manuscripts, brochures, conference/seminar handouts, manuals, external newsletters, and supplier files that are external publications shall be disposed of when no longer of use provided they are not subject to a Legal Hold Notice per paragraph 5.1.

5.4.6 Templates: Blank document templates that have become obsolete and are no longer in use and if not admissible according to pertinent regulations shall be disposed of provided they are not subject to a Legal Hold Notice. Per paragraph 5.1.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488023

## Worldwide Records and Information Management

## Convenience Information Standard

---

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "period" to "requirement." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Introduction section- Added additional information to the paragraph and bullets to elaborate on the meaning of Convenience Information.<br>• Paragraph [former 5.1] Removed – information inherent within 5.2.<br>• Paragraph [5.3] Added additional wording- "as defined in IAPP S-4 Worldwide Information Classification Policy."<br>• Paragraph [5.3] Removed wording "disposed of in a secure manner."<br>• Paragraph [5.5.3] Removed wording- "exact copies of records and information without any notations or comments."<br>• Paragraph [former 5.5.4] Removed wording- "without any notations or comments."<br>• Paragraph [former 5.5.5] Removed as subparagraph and condensed into [5.4.5], see following note:<br>• Paragraph [5.4.5] Added -"Reference Materials."<br>• Paragraph [5.4.6] Removed wording- "Unused or blank templates that have not been filled out or completed". Replaced with "Blank document templates that have become obsolete and are no longer in use and if not admissible according to pertinent regulations." |
| Version 2.0 | 31 January 2011 | • Paragraphs [5.5.3] and [5.5.4] – Clarified language regarding what constitutes exact copies. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

**WWRIM Standard RIMS-4**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Historic Records Preservation Standard

---

## 1. Purpose

This standard establishes the criteria for preservation of those Records and Information that are determined by the Operating Company to be of historic value.

## 2. Background

The historic value of Records and Information pertains to the original and ongoing development of the organization, its mission, programs, products, major achievements, failures, significant events and personalities, and societal relationships.

## 3. Scope

This standard pertains to how the Operating Company Records and Information Management Department handles company information for historic purposes. It includes, but is not limited to, preservation of promotional and marketing materials, product displays, books, photographs, artistic renderings and audiovisual material in order to reflect progress in media and storage technology that is determined by the Operating Company to have historic value.

In Operating Companies where the formal responsibility for managing historic records does not reside within the Records and Information Management Department, the full responsibility and accountability for managing and protecting those historic records shall reside with the designated responsible department or entity. In those situations, this standard shall be considered as "guidance" for the designated responsible department or entity to follow.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

5.1. The Operating Company shall have documented criteria for determining the types of Records and Information that have historic value and implement procedures for maintaining these records in archival conditions.

5.2. Records and Information deemed as "historic" by the Operating Company Records and Information Management Department shall be presented to the Kilmer House Archivist for further determination of value. The Archivist shall determine where the Historic Record(s) should be housed.

5.3. The following data shall be recorded for each historic record that is accepted into archive for historic preservation:

- Transferring office;
- Date of transfer;

Johnson & Johnson

**WWRIM Standard RIMS-4**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Historic Records Preservation Standard**

- Records title and other unique identifiers;
- Date(s) associated with historic record;
- Special instructions for archiving;
- Description context and or background information if necessary;
- Any origin associated with the record necessary or desirable to establish its historic status or provide context for it.

5.4. The Operating Company shall develop guidelines for the use of and access to historic Records and Information for research or legal purposes.

5.5. Historic Records and Information shall be preserved under environmental conditions appropriate for long-term preservation, in accordance with archival standards.

5.6. Historic electronic Records and Information preserved in digital format shall be stored on media that conforms to ANSI/ISO standards.

5.7. Any technology solution used to preserve historic electronic Records and Information shall undergo periodic technology reviews to ensure the Records and Information remains intact and retrievable. In the event it is determined that these requirements cannot be properly ensured, the Records and Information shall be transferred to another technology solution or to a newer generation of the same technology solution to preserve the integrity of the Records and Information and to retain the ability to retrieve, display and use over time. Historic electronic Records and Information shall be formally evaluated and, if appropriate, transferred to a new technology solution at a minimum of once every six years.

5.8. Both historic electronic and hardcopy Records and Information shall be preserved from being harmed, manipulated, or destroyed by negligence, sabotage, or natural disaster of any kind. Historic electronic Records and Information shall be preserved in a format and on storage media that prevent changes or modifications.

5.9. The retention requirement for Historic Records and Information is Indefinitely.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488026

Johnson & Johnson

WWRIM Standard RIMS-4
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Historic Records Preservation Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout – "historical" to "historic."<br>• Paragraph [5.2] – added direction to take instruction from the Kilmer House Archivist as to determination of Historic Records.<br>• Paragraph [5.9] - Changed "Life of Organization" to "Indefinitely".<br>• Changed throughout - "retention period" to "retention requirement".<br>• Paragraph [5.4] Changed "criteria and procedures" to "guidelines."<br>• Changed throughout - "Operating Company Retention Schedule" to "Enterprise Retention Schedule." |
| Version 3.0 | 31 December 2013 | • Scope [3] Changed – "video tapes, audiotapes, movies etc." to "audiovisual material". Clarified wording and removed Note: referring to GxP.<br>• Paragraph [5.3] Added additional data to be recorded.<br>• Paragraph [5.5] Clarified wording- direct instructions.<br>• Paragraph [5.8] Clarified wording to ensure understanding. |
| Version 2.0 | 31 January 2011 | • No changes to this standard |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488027

Johnson & Johnson

WWRIM Standard RIMS-5
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Inactive Records and Information Storage Standard

## 1. Purpose

This standard provides the criteria for Johnson & Johnson Operating Companies to follow in managing inactive Records and Information until their final disposition and for selecting a facility to store Johnson & Johnson inactive Records and Information.

## 2. Background

Inactive Records and Information that is no longer needed to conduct current business must be preserved until their retention requirement has expired. Only records that must be retained for business, legal or regulatory purposes should be sent to inactive storage. Inactive storage should not be used as a method of storing an excessive accumulation of convenience information. Inactive records should be moved to a secure inactive records storage site/facility which provides the records (1) physical security, (2) adequate protection against damage due to natural disasters, and (3) protection from unauthorized access.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. As minimum requirements for managing inactive Records and Information, Operating Companies shall have the following:

5.1.1. Procedures for identifying, labeling, and indexing Records and Information as "inactive;"

5.1.1.1. At minimum, the following information shall be captured for any records containers or storage units being newly sent or returned to inactive storage. This information may be displayed on the container via a barcode, RFID chip, or similar machine-readable device:

- Record code;
- Record title;
- Creation date and/or date span of records in container;
- Department/Business Unit;
- Destruction date or trigger (based on *J&J Enterprise Retention Schedule*);
- J&J Legal matter number (if applicable);
- Identify if record is considered vital or historical.

Johnson & Johnson

WWRIM Standard RIMS-5
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Inactive Records and Information Storage Standard**

---

5.1.2. Procedures for ensuring the accuracy and completeness of the data entry for the elements in sec. 5.1.1.1;

5.1.3. Procedures for transferring active files to inactive storage locations;

5.1.4. Procedures for managing access/authorization to send and retrieve records to and from inactive storage. The procedure shall include requirements for the following;

5.1.4.1. Granting and approving access/authorization to Operating Company users to send and retrieve records to and from storage;

5.1.4.2. Ensuring access/authorization is terminated once the Operating Company user no longer requires it (due to job change, termination, etc.);

5.1.4.3. Ensuring Operating Company users are appropriately trained on procedures dealing with inactive record transfer prior to obtaining their access/authorization;

5.1.4.4. Ongoing maintenance of an authorized access list.

5.1.5. Areas designated for storing inactive records;

5.1.6. A mechanism for tracking inactive Records and Information at the storage location;

5.1.7. Procedures for ensuring Legal Hold Notices are applied to the records being sent to inactive storage or are already stored at inactive storage areas;

5.1.8. Procedures for Department/Business Unit to request retrieval of records from inactive storage;

5.1.9. Procedures for ensuring that records retrieved from inactive storage are promptly and systematically returned to storage upon completion of the use for which they were retrieved;

5.1.10. Procedures for conducting defensible disposal in compliance with the *J&J Enterprise Retention Schedule (ERS)* when retention requirements have been met and when there is no Legal Hold Notice in place;

5.1.10.1. Department/Business Unit management shall approve defensible disposal of their unit's inactive records;

5.1.10.2. The Operating Company RIM program shall maintain copies of approved disposal eligibility and authorization documentation for inactive records managed through RIM inactive storage;

5.1.10.3. Upon WWRIM and ERS Advisory Board approval, with proper business justification, Operating Companies may grandfather their last approved

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488029

Johnson & Johnson

**WWRIM Standard RIMS-5**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Inactive Records and Information Storage Standard**

Operating Company Records Retention Schedule for records previously stored offsite prior to July 1, 2015.

5.1.10.4. The Operating Company Records Manager shall ensure approved defensible disposal of inactive records is conducted in a secure manner consistent with industry good practices that ensures the Records and Information cannot be recovered or reconstructed by any ordinary means;

5.1.10.5. Certificates of Destruction for the defensible disposal of inactive records shall be issued only when required by the business process that owns the records being disposed.

5.1.11. The Operating Company may extend the retention requirement of records due for disposal only as follows:

5.1.11.1. The person requesting the extension must state the reason and the business value to the Operating Company of granting it;

5.1.11.2. Retention requirements may not be extended in the absence of a valid, documented reason for doing so. A general, unquantified statement of continuing need does not constitute a valid reason;

5.1.11.3. Any such reason must be authorized by a person designated by senior management of the Operating Company to grant the extension;

5.1.11.4. Approval for an extension shall be in writing and shall state the reason for the extension;

5.1.11.5. The Operating Company Records Manager and Department/Business Owner shall review, approve and document extensions to retention of inactive records for reasons other than a Legal Hold Notice.

5.2. Inactive Records and Information may be stored at either an on-site or commercial third-party storage facility:

5.2.1. Selection of and negotiation with a commercial third-party storage facility shall comply with the Operating Company procedures for engaging with third-party vendors.

5.3. Locations that serve as storage facilities shall be properly managed so as to protect the Records and Information. The following requirements shall be met for both on-site and off-site inactive records storage facilities:

5.3.1. Records and Information shall be indexed and tracked while being stored and managed by the facility;

5.3.2. The facility shall have processes and procedures that allow for the application of Legal Hold Notice to the inactive records stored at the facility;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488030

Johnson & Johnson

WWRIM Standard RIMS-5
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Inactive Records and Information Storage Standard**

5.3.3. The facility must have security measures in place to prevent unauthorized access and these measures are to be tested and documented;

5.3.4. The facility shall maintain a list of authorized personnel who may access the Records and Information;

5.3.5. The facility shall maintain documentation that employees are appropriately trained on all aspects of the operations;

5.3.6. Climate controls shall be established so as to comply with industry good practices for that geographic region for the type of media being stored;

5.3.7. Adequate notice shall be provided to the Operating Company by the storage provider for any changes in procedures and or services;

5.3.8. The facility shall have fire suppression capability that at least meets industry norms;

5.3.9. The facility shall take every precaution to ensure records protected from floods or other natural disasters.

5.4. In addition to meeting the requirements of paragraph 5.3, commercial off-site storage facilities shall meet the following requirements:

5.4.1. Commercial facilities shall have a written agreement with the Operating Company. The agreement shall include language for services that address normal business operations, appropriate compliance with the *Johnson & Johnson Worldwide Information Asset Protection Policies* (IAPPs), and any other special requirements;

5.4.2. Employees and contractors or consultants of a commercial storage facility shall be properly screened and bonded;

5.4.3. Facilities shall have the appropriate business continuity plans that address both natural and man-made disasters with documented procedures that are available for inspection. Business continuity plans and processes shall meet the local requirements and must be tested annually at minimum;

5.4.4. Facilities shall allow inspection by Johnson & Johnson during normal business hours.

5.5. Audits of the storage facility shall be conducted by one of the Johnson & Johnson Operating Companies no less than once every three years. Audits conducted by one Operating Company may be leveraged by other Operating Companies using the same storage facility.

5.6. New storage facilities must be pre-qualified by a Johnson & Johnson Operating Company prior to use. Pre-qualification includes a review of the storage facility against, at minimum, the requirements of this standard.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJ 000488031

**Worldwide Records and Information Management**

# Inactive Records and Information Storage Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Paragraphs [5.1.10.3] and [5.1.10.4] – Added paragraphs to apply ERS requirements to inactive records, and note "grandfather policy." |
| Version 3.0 | 31 December 2013 | • Changed throughout - "Business Owner" to "Department/Business unit".<br>• Changed throughout - "Document Holds" to "Legal Hold Notice".<br>• Background [2] Clarified wording to ensure understanding of inactive records; eliminated redundancy.<br>• Paragraph [5.1.1.1] Added - Identify if record is considered vital or historical. Added - wording "containers or storage units."<br>• Paragraph [5.1.1.1] Added - Option to use barcoding or RFID technology.<br>• New paragraph added [5.1.2] "Procedures for ensuring the accuracy and completeness of the data entry for the elements"<br>• Paragraph [5.1.9] Revised to include the addition of timely retrieval and return of records from storage.<br>• New section added [5.1.11 - 5.1.11.5] Included requirements when extending a retention period, once it meets the destruction date.<br>• Paragraph [former 5.1.9.1] moved to [now 5.1.11.5] Added Department/Business owner responsibilities.<br>• New paragraphs added [5.3.8 and 5.3.9]. Included facility requirements on fire suppression and natural disasters. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.1.1.1] – Clarified the requirement applies to records being either returned to storage or being newly sent to storage<br>• Paragraph [5.1.1.1.] – Removed "Record Description" as a mandatory field<br>• Paragraph [5.1.9.3] – Adjusted requirement to include maintenance of documentation for destruction authorization of inactive records.<br>• Paragraph [5.1.9.5] – Clarified the requirement applies to destruction conducted by or at the inactive storage facility |



**WWRIM Standard RIMS-5**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Inactive Records and Information Storage Standard**

| | | |
|---|---|---|
| | | • Paragraph [5.3.6] – Changed requirement to refer to industry good practices for climate controls for inactive storage.<br>• Minor grammar and typographical edits |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions
6

JNJ 000488033

Johnson & Johnson

WWRIM Standard RIMS-6
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Litigation Support Standard

## 1. Purpose

The purpose of this standard is to define requirements to ensure that Operating Companies make a reasonable, good-faith and coordinated effort to preserve Records and Information potentially relevant to Legal Hold Notices that are issued, and facilitate the identification and collection of such materials as needed.

## 2. Background

A Legal Hold Notice requires a temporary suspension of the *J&J Enterprise Retention Schedule* (ERS) and disposition of policies for Records and Information that may be relevant to actual or reasonably anticipated litigation or investigations. Such materials may include user-generated or "custodial" information such as email, planning documents, and presentations, as well as "non-custodial" information such as databases and websites. Only the Johnson & Johnson Law Department has the authority to issue or release a Legal Hold Notice.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

5.1. As needed, the Operating Company Records Manager shall coordinate with the J&J Law Department to develop and implement documented procedures, including actions, roles and responsibilities, and internal controls consistent with the following requirements:

5.1.1. Legal documents (e.g.: Summons and Complaints, Court Orders, Subpoenas, etc.) received by the Operating Company shall be transmitted to the J&J Law Department in a timely manner.

5.1.2. Communication and/or distribution of Legal Hold Notices and Hold Releases;

5.1.2.1. The Johnson & Johnson Law Department shall be solely responsible for determining the need for and content of a Legal Hold Notice, and for identifying the associates who will receive the Legal Hold Notice.

5.1.2.2. Operating Company personnel who receive a Legal Hold Notice are obligated to preserve Records and Information covered by the notice until such time as it is released. Such personnel may coordinate with the J&J Law Department or IT organization to ensure that Records and Information subject to a Legal Hold Notice are identified and protected.

Johnson & Johnson

**WWRIM Standard RIMS-6**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Litigation Support Standard**

5.1.2.3. Records and Information subject to a Legal Hold Notice may not be destroyed until the J&J Law Department issues a written release of all applicable Notices. It should be noted that Records and Information may be subject to more than one Legal Hold Notice at a time. At the time such written notice is received, the records will resume normal retention requirements, as per the ERS.

5.1.3. When required by a pending Legal Hold Notice, normal RIM practices, including the disposal of Records and Information according to the ERS, shall be suspended;

5.1.3.1. If there is uncertainty as to whether a Record or Information is relevant to a Legal Hold Notice, that Record or Information shall be preserved until guidance and clarification can be obtained from the J&J Law Department.

5.1.4. Discovery and production of records covered by a Legal Hold Notice;

5.1.4.1. Unless previously agreed between the J&J Law Department and the Operating Company Records Manager, the Operating Company Records Manager shall not be responsible for managing and tracking the production or delivery of Operating Company Records and Information to external parties for specific J&J Law Department purposes.

5.2. The duty to preserve Records and Information relevant to the subject of a Legal Hold Notice applies to all formats and media, including paper and electronic Records or Information.

5.3. Preservation of Records and Information, including any Convenience Information covered by a Legal Hold Notice, shall be undertaken reasonably and in good faith. Scheduled or in-progress disposition of any relevant Records and Information must be suspended or stopped regardless of the retention requirements.

5.4. Hard-copy Records and Information relevant to the subject of a Legal Hold Notice, but which are no longer required for day-to-day business operations, may be sent to inactive storage in accordance with Operating Company procedures based on this standard and other applicable WWRIM standards, unless otherwise notified by the J&J Law Department. Hard-copy Records and Information sent to inactive storage shall be adequately indexed or otherwise identifiable so as to allow retrieval of the Records or Information, as necessary, consistent with the applicable Legal Hold Notice.

5.5. Preservation of electronic Records and Information covered by the Legal Hold Notice shall comply with the requirements of the J&J Law Department.

5.6. Preservation of Records or Information pursuant to a Legal Hold Notice shall continue until the J&J Law Department has issued a written release(s) of all applicable Legal Hold Notices. At that point, the normal retention requirements as per the ERS shall govern the disposition of the subject Records or Information.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488035

**Worldwide Records and Information Management**

## Litigation Support Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout "RRS" to "ERS."<br>• Changed throughout "retention period" to "retention requirement."<br>• Purpose – Clarified language.<br>• Background – Added language on "non-custodial" and "custodial" information.<br>• Scope – Expanded to include Legal Hold Notice custodians.<br>• Paragraph [5.1.2.1] – Clarified language.<br>• Paragraph [5.1.2.2] – Added language to stress obligation to preserve information.<br>• Paragraph [5.1.2.3] – Added language to stress importance of the written release from Legal Hold.<br>• Paragraph [5.1.3.1] – Removed language relating to the "destruction" of records.<br>• Paragraph [5.3] – Clarified language.<br>• Paragraph [5.4] – Added language to stress importance of indexing hard-copy records.<br>• Paragraph [5.5] – Changed verbiage surrounding new Legal Hold Notice process.<br>• Paragraph [5.6] – Clarified language. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Changed throughout from Clean-out to disposition.<br>• Paragraph [5.1] Included - Law Department as a resource.<br>• Paragraph [5.1.1.] Added - transmission to Law Department requirement.<br>• Paragraph [former 5.1.1.1] now [5.1.2.2] Removed - boundary agreements.<br>• Paragraph [5.1.2.3] Added – direction on handling release notices.<br>• Paragraph [former 5.1.3.1] Remove-, condensed in a concise manner with former [5.1.3.2] to for new [5.1.3.1].<br>• Paragraph [5.2] Changed - "mediums" to "media" and removed wording "fixed or portable device." |
| Version 2.0 | 31 January 2011 | • Paragraph 5.1.2.1 – REMOVED the "Note" section<br>• Paragraph 5.1.4.1 – Change requirement whereas Records Managers will not be responsible for |

Johnson & Johnson

WWRIM Standard RIMS-6
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Litigation Support Standard

| | | |
|---|---|---|
| | | tracking documents released to external legal parties unless this is previously agreed to by the Records Manager and the Law Department. |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJ 000488037

Johnson & Johnson

**WWRIM Standard RIMS-7**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

# Management of Records and Information for Facility Closures or Divestitures Standard

## 1. Purpose

This standard provides the minimum requirements for managing Records and Information due to a facility closure or a business, plant, or product divestiture.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 4. Approach

The Operating Company planning to divest itself of a business, plant, or product, or planning to close a facility, shall include Records and Information Management requirements in their plans as defined by the situations below:

- Closure of a facility when the business remains intact elsewhere: When one or more sites of an Operating Company close, the Operating Company shall retain ownership of the Records and Information for that site. Records and information shall be under the direction of the Operating Company Records Manager and shall be governed in accordance with the *Worldwide Records and Information Management Policy and Standards*.

- Divestiture of specific products and/or functions where the balance of the Operating Company remains intact within the Johnson & Johnson Family of Companies: When the Operating Company divests itself of individual products and/or functions, Records and Information relevant to the product or function, as outlined in contracted agreement among the parties, and as required by law, shall transfer with that product or function. Only records specified in the contract shall be transferred to the new owner; all other records and information shall remain the property of the Operating Company.

- Complete divestiture of an Operating Company and all its associated products and/or functions: When the Operating Company's business is completely divested, the Records and Information defined in the contract and as required by law shall be transferred to the new owner. The remaining Records and Information shall be managed at the direction of the Johnson & Johnson Law Department, in consultation with the Records Manager of the closing Operating Company and the World Headquarters Records Manager. Custodianship of the remaining records shall transfer to the World Headquarters Records Manager unless otherwise directed by the Johnson & Johnson Law Department.

Johnson & Johnson

WWRIM Standard RIMS-7
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Management of Records and Information for Facility Closures or Divestitures Standard

- Discontinuation of an Operating Company's business without divestiture: When the Operating Company's business ceases, disposition of all records shall be at the direction of the Johnson & Johnson Law Department, in consultation with the Records Manager of the closing Operating Company and the World Headquarters Records Manager. Custody of any remaining records shall transfer to the World Headquarters Records Manager, unless otherwise directed by the Johnson & Johnson Law Department.

## 5. Minimum Implementation Requirements

5.1. Records and Information, both in paper and electronic formats, relevant to a divestiture or closure shall be indexed and a current information inventory created.

5.2. Records and Information, whose retention requirement has expired on or before the official divestiture date or the facility closing date shall be disposed of according to the *J&J Enterprise Retention Schedule* unless otherwise advised by the Johnson & Johnson Law Department.

5.3. Records and Information identified in the divestiture or closing agreement that are to be transferred to another company shall be segregated from Records and Information to be retained by the Operating Company.

5.4. Records and Information identified for transfer to a party outside the Operating Company shall be checked against active Legal Hold Notices to determine whether the Records and Information are subject to a Legal Hold.

5.4.1. If any records are subject to an active Legal Hold Notice, the Operating Company Records Manager shall seek direction from the Johnson & Johnson Law Department as to the management of those records.

5.5. Responsibility for overseeing the proper identification, management and transfer of Records and Information in all formats to a new owner shall be assigned to an appropriate team of subject matter experts, including as appropriate, personnel from Information Technology, Business Units, Legal, Human Resources, and the Operating Company Records Manager.

5.6. Records and Information that are being transferred to a new owner but are required by the Operating Company to complete a tax audit or for another business purpose shall be copied by the Operating Company and managed accordingly, unless the Operating Company is otherwise advised by the Johnson & Johnson Law Department or the Johnson & Johnson Tax Department.

5.7. Records and Information to be transferred to a new owner shall be properly indexed and clearly marked. A copy of the index of Records and Information transferred to the new owner shall be retained by the Operating Company.

5.8. Unclear or Absent Contract Language. In cases where ownership, division, or transfer of records is unclear, the Operating Company shall seek guidance from the Johnson & Johnson Law Department.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488039

Johnson & Johnson

**WWRIM Standard RIMS-7**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

## Management of Records and Information for Facility Closures or Divestitures Standard

---

5.9. Transfer of Records and Information shall follow proper chain of custody procedures.

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Reformatted Approach Paragraph for clarity. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold."<br>• Changed throughout "New Company" to "New Owner."<br>• Paragraph [5.2] Removed reference to WWRIM Clean-up Event Standard and Convenience Information.<br>• Paragraph [5.5] Added responsibility to - IT, Legal, HR, and Business Units.<br>• New paragraph [5.8] to specify procedure for "Unclear or Absent Contract Language." |
| Version 2.0 | 31 January 2011 | • Paragraph [5.2] – changed "Cleanout" to "Clean-up." |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488040

### Worldwide Records and Information Management

# Management of Records and Information for Mergers and Acquisitions Standard

## 1. Purpose

The purpose of this standard is to specify the Records and Information Management (RIM) planning requirements for integrating an acquired company's records and information into the acquiring Operating Company.

## 2. Background

When Johnson & Johnson (or one of its Operating Companies) seeks to acquire another company, the company being acquired will ultimately become part of Johnson & Johnson, and thus be required to comply with the Johnson & Johnson *Worldwide Records and Information Management Policy and Standards*.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Approach

Due to the nature of acquisition planning and integration, and to the unique situations surrounding each acquisition project, the engagement of the Operating Company Records Manager by the Mergers and Acquisitions team may occur at different intervals during the project. Engagement may not begin until the final integration is well underway. The Mergers and Acquisitions team may limit the Records Manager's level of engagement or scope of responsibility due a variety of reasons. Hence, the tasks and responsibilities required of a Records Manager will also vary. Below are listed the minimal implementation standards.

## 6. Minimum Implementation Requirements

6.1. As part of the acquisition process, the Mergers & Acquisitions team shall engage the Operating Company Records Manager as part of the integration process and/or integration team.

6.2. As part of the acquisition process, the Mergers & Acquisitions team and/or the Operating Company Records Manager shall notify WWRIM of the integration.

6.3. Within the terms and scope of this engagement (Paragraph [5]), the Records Manager shall do the following:

Johnson & Johnson

WWRIM Standard RIMS-8
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Management of Records and Information for Mergers and Acquisitions Standard

6.3.1. Facilitate or conduct an evaluation of RIM practices of the acquired company, including a gap analysis comparing that company's policies, standards and procedures with Johnson & Johnson's *Worldwide Records and Information Policy and Standards;*

6.3.2. Develop a plan of action to bring the acquired company into compliance with the Johnson & Johnson *Worldwide Records and Information Policy and Standards;* after the acquisition finalizes. The plan shall include provisions for the training/communicating the requirements of the RIM program to the acquired company personnel/contractors; the transfer-in or management of the acquired company's records, including evaluation of Legal Holds and an estimate of the resources needed to carry-out the plan.

**Revision History**

| Version | Date | Changes |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold."<br>• New Paragraph [6.2] Added – notification to WWRIM.<br>• Paragraph [former 6.2 - 6.2.2] now [6.3 – 6.32]. |
| Version 2.0 | 31 January 2011 | • Paragraph [1]: Removed reference to training as this is covered in RIMS-11.<br>• Minor edit. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488042



**WWRIM Standard RIMS-9**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

### Worldwide Records and Information Management

# Management of Records and Information of Departing Associates Standard

---

## 1. Purpose

This standard establishes the minimum requirements for Johnson & Johnson Operating Companies in managing the Records and Information of departing employees and/or contractors to assure such Records and Information are reviewed and dispositioned in compliance with laws, regulations, the *J&J Enterprise Retention Schedule* (ERS), and active Legal Hold Notices.

## 2. Scope

This Standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Approach

Hard-copy and electronic Records and Information created or received by an associate in the course of doing business are the property of that Operating Company. All records shall remain with the Operating Company upon departure of the associate. The same is applicable of Records and Information created or received by vendors.

Upon transfer or termination of an associate, appropriate steps must be taken to ensure that Records and Information used by them are appropriately managed, including transfer to other personnel, integration into records systems, or as appropriate, disposal.

## 5. Minimum Implementation Requirements

5.1. The Operating Company Records and Information Management Department shall provide a level of support for the associate's department in processing and managing records that are orphaned as a result of the departure, in the case that those records must be maintained for Records and Information Management or Legal Hold requirements.

5.2. The **departing associate** prior to leaving their position within the Operating Company, shall determine management and disposition of their Records and Information by reviewing their records against the J&J Enterprise Retention Schedule and any active Legal Hold Notices impacting that Operating Company, and/or workgroup, and/or individual. Convenience Information shall be destroyed/deleted at this time, provided it is not related to a Legal Hold Notice.

Johnson & Johnson

WWRIM Standard RIMS-9
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Management of Records and Information of Departing Associates Standard

5.2.1. The departing associate shall obtain guidance from their supervisor or the Records and Information Management Department to ensure they understand and reference the most current version of the ERS and Legal Hold Notice listing to perform their review. Management and disposition of records shall conform to the ERS and any relevant Legal Hold Notices as appropriate. The departing associate shall assist in the transfer of records to other personnel or the integration into existing records and data sources.

5.2.2. In the event the departing associate does not complete their responsibilities in section 5.2.1, the associate's supervisor will inform the Operating Company's contact at the Law Department, who will re-assign those duties to another capable custodian.

5.2.3. Records and Information determined to be eligible for disposal after this review process shall be disposed at that time in accordance with Operating Company procedures.

Johnson & Johnson Confidential

2

JNJ 000488044

## Worldwide Records and Information Management

# Management of Records and Information of Departing Associates Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout – "Records Retention Schedule" to "Enterprise Retention Schedule".<br>• Changed throughout – "RRS" to "ERS".<br>• Changed throughout – "retention period" to "retention requirement".<br>• Paragraph [5.2.2] Changed verbiage – clarified supervisor roles.<br>• Paragraph [5.2.3] Changed verbiage – "defensible destruction" to "disposal".<br>• Changed throughout – "Manager or Sponsor" to "supervisor." |
| Version 3.0 | 31 December 2013 | • Changed throughout- "Document Hold" to "Legal Hold Notice."<br>• Where applicable replaced "employee" to "associate."<br>• Approach section [4] Clarified wording, reworded former "Note" section, and eliminated wordiness and length.<br>• Paragraph [5.2.1] Clarified - departing associates responsibilities.<br>• Paragraph [5.2.2] Clarified - supervisor, sponsor, designee responsibilities.<br>• Paragraph [5.2.3 & 5.2.3.1] Combined<br>• Paragraph [5.2.3.2 - 5.4] Removed - captured in previous sections. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.2.1] – Clarified requirement to enable departing employee to perform their records review in a compliant manner.<br>• Paragraphs [5.2.2] – REMOVED reference to "within 90 days of employee's departure."<br>• Paragraph [5.2.3.1] – Added new requirement to allow for destruction of records at time of review, if Operating Company procedures support this – renumbered remaining requirements under [5.2.3]; also changed "Cleanout" to "Clean-up"<br>• Paragraph [5.3.1] – REMOVED reference to "within 90 days of the contractor or vendor's departure."<br>• Paragraph [5.5] – REMOVED –information security requirement and included in those policies. |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-10
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

# Records and Information Management Compliance Assessment Standard

## 1. Purpose

This standard defines the requirements for the Operating Company Records and Information Management (RIM) Department to follow in planning and conducting (or facilitating) RIM compliance assessments of departments within their Operating Company.

## 2. Background

RIM compliance assessments provide (1) assurance that Records and Information processes and systems are effective and compliant with business, regulatory and legal requirements, (2) a mechanism for regular scrutiny of Operating Company RIM program processes, (3) a means to identify potential problems and implement corrections, and (4) a vehicle for the improvement of the RIM program and processes.

Note: The RIM compliance assessments discussed in this standard are not to be confused with, nor used in place of, the Records and Information Management audits conducted by Johnson & Johnson Corporate Internal Audit (CIA). CIA conducts audits of the Operating Company RIM program for compliance with *Worldwide Records and Information Management Policy and Standards*; the criteria and selection process for CIA audits will be determined by CIA.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The Operating Company shall conduct assessments for compliance with Operating Company RIM procedures on an annual basis.

5.1.1. The Operating Company Records Manager shall be responsible for conducting or facilitating RIM compliance assessments of selected departments within their company or for ensuring those assessments are conducted by trained and qualified individuals as appropriate for that Operating Company.

5.2. A risk-based approach shall be used to determine the Operating Company's RIM compliance assessment schedule priorities.

5.2.1. The Operating Company Records Manager shall conduct an assessment to determine which departments within the company shall be considered "high risk" from a RIM perspective.

Johnson & Johnson

WWRIM Standard RIMS-10
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Records and Information Management Compliance Assessment Standard

5.2.2. "High risk" departments may include the following criteria:

- Non-compliant findings from previous RIM compliance assessments;
- Previously impacted by significant legal obligations;
- Exposed to regulatory audits.

5.2.3. "High risk" departments will be prioritized on an annual basis, and RIM assessments will be conducted accordingly every two years. An assessment resulting in a significant finding may warrant a full assessment in the following year.

5.2.4. "Low risk" departments will be prioritized periodically and a RIM assessment will be conducted per the schedule.

5.3. The Operating Company RIM Department shall have a documented schedule for non-"high risk" departments.

5.4. The scope of the RIM compliance assessment shall include department compliance with applicable procedures in the following areas:

- *J&J Enterprise Retention Schedule*, including disposition of records past their retention requirements;
- Training and Education;
- Legal Hold Notices;
- Inactive Records and Information Management;
- Vital Records and Protection;
- Records of Departing Associates.

5.5. A RIM compliance assessment report shall be presented to the upper management of the Operating Company department being assessed and shall include significant findings.

5.6. The department being assessed shall develop a corrective action plan, with timelines, to address significant findings.

5.6.1. Corrective action plans and timelines shall be signed by senior management of the department and submitted to the Operating Company RIM Department for acceptance and monitoring till completion. Department designee shall provide periodic updates on the progress of the action plan.

5.6.2. The Operating Company RIM Department shall be responsible for monitoring the status of the corrective action plan to assure its implementation, and for escalating repeated missed deadlines and/or lack of progress to Operating Company senior management.

Johnson & Johnson Confidential
Use Pursuant to Company Instructions

2

JNJ 000488047

## Worldwide Records and Information Management

# Records and Information Management Compliance Assessment Standard

---

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed "retention times" to "retention requirements."<br>• Added Paragraph [5.2.4] to add "Low Risk" Departments. |
| Version 3.0 | 31 December 2013 | • Background [2] First paragraph - Clarified wording. Minor change, Removed second paragraph.<br>• Paragraph [5.1] Added "for high risk areas."<br>• Paragraph [5.2.3] Added - The significance of the finding of the review may warrant a full assessment in the following year for "high risk" departments.<br>• Paragraph [former 5.2.4] Removed, condensed within new [5.2.3] for conciseness.<br>• New Paragraph [5.4] The Operating Company RIM department shall have a documented schedule for non-"high risk" departments.<br>• Paragraph [former 5.2.2.2] Removed, see below<br>• Paragraph [former 5.2.2.3 – 5.2.2.4] now [5.2.2.2 – 5.2.2.3]<br>• Paragraph [former 5.2.2.5] Removed- redundant.<br>• Paragraph [5.4] Removed – Records Cleanout, now [5.5].<br>• Paragraph [former 5.6.1] now [5.7.1] Added – Department designee shall provide periodic updates on the progress of the action plan.<br>• Paragraph [former 5.6.2] Removed, condensed within new [5.7.1].<br>• Paragraph [former 5.6.3] now [5.7.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.4] – Added "Records of Departing Associates" to list of items to be audited.<br>• Paragraph 5.4 – REMOVE requirement around conducting a random audit of vendors working with the department who store, manage or create records on the vendor's behalf.<br>• Paragraph [5.5] and [5.6.2] – clarified department "upper" management responsibilities. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-11
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Training and Education Standard

## 1. Purpose

This standard establishes the minimum requirements for Johnson & Johnson Operating Companies in providing Records and Information Management (RIM) training and education to assure that the requirements and the expectations of the RIM program are communicated and understood.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. The Operating Company RIM Department shall have a documented procedure to address RIM training and education requirements for (1) Operating Company employees; (2) vendors, external business partners, and outside consultants/contractors; and (3) individuals in special roles/circumstances.

4.2. The following training and education requirements shall be met by all Operating Companies.

4.2.1. Operating Company Employees: Shall annually receive general Records and Information Management training addressing at minimum, the following areas:

- Benefits of properly managed Records and Information;
- Consequences and risks of non-compliance;
- Overview of the *Worldwide Records and Information Management Policy*;
- Overview of the basic elements of a RIM program;
- General contact information for further RIM assistance/guidance;
- Detailed information on:

  a) The concept of RIM lifecycle methodology;
  b) The concepts of Records and Information, and Convenience Information;
  c) Understanding and using the *J&J Enterprise Retention Schedule*;
  d) Understanding and complying with a Legal Hold;
  e) Understanding the employee's role and responsibilities within the RIM program.

4.2.2. These requirements may be met by any combination of training and education mechanisms, including but not limited to class-room training, one-on-one training, J&J eUniversity training, Learning management systems (LMS), web or WebEx training, "read and understand" documentation, etc.. The requirements may be met via one

Johnson & Johnson

**WWRIM Standard RIMS-11**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Training and Education Standard**

mode(s) of training during one year and a different mode(s) of training in the subsequent year.

4.2.3. At the Operating Company Records Manager's discretion, abbreviated training topics and/or content may be provided to associates who do not handle Johnson & Johnson records during the usual course of their work activities.

4.2.4. Vendors, External Business Partners, Contractors/Consultants handling Operating Company Records and Information: Vendors, external business partners, and contractors/consultants who handle Operating Company Records and Information shall receive general Records and Information Management training/awareness addressing, at minimum, the following areas:

- Requirements of the *Worldwide Records and Information Management Policy*;
- Consequences and risks of non-compliance;
- General contact information for further assistance/guidance in complying with RIM requirements;
- Understanding their role and responsibilities in complying with RIM requirements and fulfilling RIM activities;
- Understanding and complying with a Legal Hold.

**Note:** Annual refresher training is recommended for all long-term contractors/consultants.

4.2.5. Individuals in Special Roles/Circumstances: The following requirements address individuals in special roles/circumstances:

4.2.5.1. Newly Hired/Transferred-In Employee: Shall receive RIM education and training per paragraph 4.2.2 within the first 60 days of reporting to work. The material or training shall address the topics listed in paragraph 4.2.1 of this standard.

4.2.5.2. Records Coordinators: As the focal point for RIM activities within a department, the Records Coordinator shall receive additional, specialized annual training. In addition to receiving general training as specified for Operating Company employees in paragraph 4.2.1 of this standard, the Records Coordinator training shall include the following:

- Guidance on facilitating awareness of RIM requirements within their department;
- Requirements on coordinating communication between RIM and their department;
- Requirements for facilitating RIM program events and procedures for their department;
- Detailed information on RIM requirements and Operating Company procedures for:

  a) Offsite storage;
  b) Legal Hold compliance;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488050

Johnson & Johnson

**WWRIM Standard RIMS-11**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Training and Education Standard**

c) RIM department assessments;
d) Protection of information of departing associates;
e) Vital records;
f) Compliance with the *J&J Enterprise Retention Schedule*;
g) Management of electronic Records and Information;

4.2.5.3. In the event the Records Coordinators' responsibilities differ from the standard, per the ***WWRIM RIMS-1 Records and Information Management Program Standard***, section 5.3, the training the Records Coordinators receive shall match the documented responsibilities of those Records Coordinators.

4.3. The Operating Company RIM Department shall track and document completion/attendance of all training, education sessions, and courses.

4.4. Training and education materials and training courses may be reviewed and/or updated as needed, but shall be reviewed and/or updated at a minimum of every three years to assure relevancy.

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout – "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed throughout – "program audits" to "department assessments." |
| Version 3.0 | 31 December 2013 | • Paragraph [4.1] Removed - "ongoing RIM strategy."<br>• Former note: section under section [4.2]. Moved to its own section, now [4.2.2].<br>• Former Exception paragraph in [4.2.1]. Moved to its own section, now [4.2.3].<br>• Paragraph [former 4.2.2] now [4.2.4] Added - "Understanding and complying with a legal Hold."<br>• Paragraph [4.2.1] Removed - "Cleanup events."<br>• Paragraph [4.2.4] Removed - "60 days" requirement.<br>• Note: section under [4.2.4.] Clarification for contractors.<br>• Paragraph [former 4.2.3. – 4.2.3.2] now [4.2.5 – 4.2.5.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [4.2.1] – Added Exception to allow Records Managers discretion in provided abbreviated training to J&J employees who do not handle records during the normal course of their job.<br>• Minor typographical changes |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488051

Johnson & Johnson

**WWRIM Standard RIMS-12**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Enterprise Retention Schedule Standard

---

## 1. Purpose

This standard provides the requirements for adherence to the *Johnson & Johnson Enterprise Retention Schedule* (ERS) by the Johnson & Johnson Operating Companies.

## 2. Scope

The standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

In order to ensure compliance with business and operating needs, records must be maintained in a systematic manner throughout their lifecycle. The *J&J Enterprise Retention Schedule* provides requirements on how long records must be kept to comply with legal, privacy and regulatory requirements. Operating Companies are required to use the ERS to ensure standardization and compliance with retention requirements.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

### WWRIM Program Office Responsibilities

5.1. The WWRIM Program Office shall develop and manage the ERS which documents the retention requirements that are consistently applied across the enterprise, taking into account necessary country-level exceptions for legal, privacy and regulatory requirements.

5.2. All changes to the ERS shall follow a documented Change Management Process.

5.3. Johnson & Johnson Worldwide Privacy will identify privacy requirements to be included in the ERS.

5.4. The methodology used to develop and maintain the ERS shall be reviewed and accepted by the Johnson & Johnson Law Department.

### Operating Company Responsibilities

5.5. While the ERS will be published on January 1, 2015, Operating Companies will have until July 1, 2015 to become compliant with both the Standard and the ERS.

Johnson & Johnson

**WWRIM Standard RIMS-12**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Enterprise Retention Schedule Standard**

5.6. It is the responsibility of the Operating Company to adhere to the requirements set forth by WWRIM and the ERS. Any non-compliance of this responsibility must be documented by an approved "Risk Acknowledgment Form" from the WWRIM Program Office and signed by Operating Company Senior Management.

5.7. The retention requirements of the ERS shall apply to Records and Information stored in all media formats, including electronic Records and Information. The requirements apply to Johnson & Johnson Records and Information, regardless of whether the records reside on an Operating Company computing or storage device, a third-party/partner computing or storage device, or a personally-owned computing or storage device.

5.8. Records and Information shall not be retained longer than the period of time designated for each Functional Category, unless a Legal Hold Notice has been issued by the J&J Law Department suspending the disposal of those Records and Information. If a Legal Hold Notice is issued, Records and Information relevant to the subject of the Legal Hold Notice are to be preserved until the Legal Hold Notice is released by the J&J Law Department.

5.9. Operating Company Records Managers shall develop and implement communications and training to assure Operating Company associates and vendors understand their responsibilities in complying with the requirements of the ERS, and have the necessary knowledge and tools to do so.

5.10. Records and Information, in both hard-copy and electronic formats, having met their retention time and in accordance with this standard shall be disposed of in a secure manner that prevents unauthorized disclosure consistent with good industry practices and ensures the Records and Information cannot be recovered or reconstructed by any ordinary means "provided they are not subject to a Legal Hold Notice."

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488053

## Worldwide Records and Information Management

# Enterprise Retention Schedule Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed title from "Records Retention Schedule Standard" to "Enterprise Retention Schedule Standard."<br>• Purpose Paragraph – Clarified language.<br>• Background Paragraph – Clarified language.<br>• Changed throughout – "destruction" to "disposal."<br>• Changed throughout - "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed throughout - "retention time(s)" and retention period(s) to "retention requirements."<br>• Added a new section under Section 5 for "WWRIM Program Requirements."<br>• Added paragraphs [5.4] – [5.5.1] to set requirements to the Operating Company for the Risk Acknowledgment Process and Change Control Process.<br>• Paragraph [5.6] – Clarified language.<br>• Removed original paragraphs [5.1], [5.2], [5.4], [5.5], [5.7], [5.8], [5.9], [5.10], [5.14] and [5.15] – obsolete with new ERS requirements. |
| Version 3.0 | 31 December 2013 | • Added a new Section "Background" with a descriptive paragraph.<br>• Added new paragraphs [5.1.1, 5.1.1.1, 5.1.1.2 & 5.1.1.3] Added process around Operating Company RRS modifications and the GRRS.<br>• Paragraph [5.4] deleted the reference to Vice President or above and left reference to Senior Management as the accepted level of signatory.<br>• Paragraph [5.5] Added requirement to submit RRS to WWRIM.<br>• Paragraph [5.7] Last bullet added "and/or business requirement"<br>• Paragraph [5.10] Removed trigger event table and changed to reference the GRRS. |
| Version 2.0 | 31 January 2011 | • Paragraph [4.8] – Clarified "upper" management of department in place of "Senior" management of department<br>• Paragraph [4.9] – Changed the FTA trigger description by eliminating reference to "in no case less than seven years." |
| New Standard Version 1.0 | 30 Sept 2009 | • New Document Issued |

## Worldwide Records and Information Management

# Vital Records Standard

## 1. Purpose

This standard establishes the criteria and minimum requirements for the identification, protection, and maintenance of Vital Records for all Johnson & Johnson Operating Companies to assure those Records and Information are available to promote continuity of core business functions in the event of a records-related disruption of any kind.

## 2. Background

Vital Records are defined as "Records and Information that are fundamental to the functioning of an organization and necessary to continue business operations without delay under abnormal conditions." Vital Records contain information necessary to maintain or re-establish the organization in the event of a major hazard or disaster. As such, they are a critical component of a Business Continuity Plan.

Some of the consequences of damages a company may sustain if not equipped with a functioning Vital Records program include:

- Loss or decrease in customer base;
- Interruption of revenue flow;
- Inability to comply with legal and/or regulatory requirements;
- Fines or other penalties incurred for failure to produce required Records and Information;
- Extensive cost of reconstruction of lost Records and Information;
- Damage to company reputation.

The goal is to ensure that critical business records are restored to operating conditions within a period of time that is reasonable based upon the system itself, the nature of the information within it, and the critical nature of the business process it supports.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

**Vital records** are defined in Paragraph 2 of this standard. Other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Approach

Identified Vital Records must be protected from potential loss. The protection method used is based on record media type, available resources, environmental and security requirements, and an assessment of the risks for each method. There are two basic methods of protecting Vital Records: dispersal and protective storage.

**Dispersal** is the distribution of duplicate copies of Records and Information to locations other than to those where the originals are housed; this may be part of a routine business process or specifically designed to protect identified Vital Records. Most Vital Records programs implement a combination

Johnson & Johnson

WWRIM Standard RIMS-13
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Vital Records Standard

of the two methods of protection. Regardless of the methods selected, procedures must be implemented to ensure the Vital Records are kept current for the Vital Records program to be effective.

Operating Company Senior Management must agree to protect these records or be willing to tolerate the risk of not protecting them as evidenced by a formal, approved exception to policy statement.

## 6. Minimum Implementation Requirements

6.1 Records and Information shall be identified as Vital Records only for as long as they support critical business functions and processes, and fulfill the requirements of a Vital Record. Once they have fulfilled this role, they should no longer be identified or listed as a Vital Record in the Operating Company's Master Vital Information List maintained by the Records and Information Management Department, and also included in the Business Continuity Plan.

6.2 Vital Records shall be (1) secured in a manner that preserves and protects the integrity of the record, (2) protected via dispersal or protective storage, or a combination of both, and (3) easily retrievable in the event a major hazard or disaster occurs which activates the Business Continuity Plan.

6.2.1 Means of protecting Vital Records via dispersal and protective storage include, but are not limited to, the following examples:

- Storing a Vital Record in a file cabinet in the office with the copy stored in a locking, fire-resistant cabinet in a different building on the Operating Company campus (example of a combination of dispersal and protective storage);
- Storing a Vital Record in a locked on-site facility with the copy stored at an offsite facility designed for records protection (example of combination of dispersal and protective storage);
- Storing a Vital Record in a locked, fire-resistant vault located in an off-site facility designed for records protection (example of protective storage);
- Storing a Vital Record on an encrypted hard drive in a locked off-site storage facility designated for records protection (example of dispersal);
- Storing a Vital Record on the Johnson & Johnson network with a backup of that record being stored and managed by the appropriate Johnson & Johnson IT data center (with the backup being stored or replicated off-site) (example of combination of dispersal and protective storage).

6.3 The Operating Company shall define the recovery classes for its Vital Records. Each recovery class shall fulfill the following requirements:

6.3.1 Set forth the time frame for which the Vital Records must be restored to operation in hours, days, weeks or other suitable measures of time;

6.3.2 The recovery class, and the degree and type of protection shall be determined in consultation with the Operating Company Records Manager, the Department/Business Unit, and Senior Management;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488056

Johnson & Johnson

**WWRIM Standard RIMS-13**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Vital Records Standard**

6.3.3 Due consideration must be given to the minimum necessary level of protection, the additional costs and other burdens of additional protection and available funding and other resources.

6.3.4 The correct solution for ensuring that a Vital Records is available to the continuity of business processes (i.e. via dispersal alone, via protective storage alone, or via a combination of both) is determined by the level of risk associated with the potential loss of that Vital Record. Generally, the greater the risk associated with loss and the greater the level of difficulty and cost to reconstruct, the greater the protection. In like manner, the immediacy with which a repository must be restored to operational status is determined by the risks and costs associated with its continued unavailability. Consider the following:

- Records considered highest risk should be protected by both dispersal and protective storage.
- The greater the risk, the greater the degree of geographic separation of the duplicates of those records so as to make it less likely that a disaster in the immediate area would impact the location where the duplicate records are stored.
- The more immediately a repository must be returned to operational status, the more sophisticated must be the solution for restoring it.

6.3.5 All of these considerations must be balanced against the costs of any potential solutions, and any other downside effects those solutions may present.

6.4 The determination of the status of Vital Records shall be made based on the subject content of the record or information and Business Unit Owner, and shall not be based on media format. This is an example for the use of guidance of developing a recovery class scheme:

6.4.1 Vital Information Recovery Class Levels:

- Recovery Class Level 1
  - Records and Information needed for emergency operations (for example, Business Continuity Plan for the Operating Company).
- Recovery Class Level 2
  - Records and Information needed within the first xx hours/x days after a disaster for immediate resumption and continuation of business.
- Recovery Class Level 3
  - Records and Information essential for reestablishing the legal and financial position of the Operating Company and are needed within the first x/xx days after a disaster.
- Recovery Class Level 4
  - Records and Information that are vital, but do not require recovery within the first x/xx weeks after a disaster.

6.5 The Operating Company shall develop and maintain procedures to document the following:

6.5.1 Strategy and decisions for identifying Vital Records, determining protection option, and assigning Recovery Class Levels;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488057

6.5.2 List of all Vital Records by type and repository within that Operating Company that includes the following information:

- Repository Name;
- Repository System;
- Record Types within each repository;
- Department/Business Unit;
- Media Format (e.g., paper, electronic);
- Recovery Class Level;
- Method of Protection;
- Locations (original and dispersed copies), if applicable.

6.5.3 Method for keeping the Vital Records listing current;

6.5.4 Method for controlling access to Vital Records and their copies;

6.5.5 Method for recovering Vital Records according to their Recovery Class Level;

6.5.6 Method for assessing and determining cost-effectiveness of protection and retrieval methods of Vital Records and their copies:

- Vital Information Retrieval Test;
- Verification of Document Owners on the Master Vital Information List and Business Continuity Plan.

6.5.7 Periodic assessments to assure select Vital Records are effectively and efficiently recovered for resumption of business operations in the event of a disaster.

6.6 Any decisions that are exceptions to this standard must be justified and documented with the written approval of the Operating Company Senior Management.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

## Worldwide Records and Information Management

# Vital Records Standard

**Revision History**

| Version 4.0 | 31 December 2014 | • Paragraph [6.1] - Added information about master Vital Information List.<br>• Paragraph [6.2] - Added requirement for ease of irretrievability.<br>• Paragraph [6.5.6] - Added requirement for cost-effectiveness determination. |
|---|---|---|
| Version 3.0 | 31 December 2013 | • Background section [2] Added a paragraph on the goal of protecting vital records.<br>• Paragraph [6.4] Removed - specific hours, days, months in recovery class table.<br>• Paragraph [6.5.2] Changed required fields in vital records list.<br>• Paragraph [6.5.6] Changed - testing period from "annual" to "periodic." |
| Version 2.0 | 31 January 2011 | • Paragraph [5] – Modified description of acceptable approach for protecting Vital Records per revised ANSI/ARMA standard.<br>• Paragraph [6.1] – Added protective storage and protective storage plus dispersal as acceptable means of protecting Vital Records.<br>• Paragraph [6.1.1] and [former 6.1.2] – Merged the two paragraphs to include and expand on examples of acceptable protection for Vital Records.<br>• Paragraph [6.1.2] – Added option of "protective storage" alone to the risk-based protection scenario.<br>• Paragraph [6.6.2] - REMOVED "Retention Period" as a required field. ADDED "Record Owner" as a required field.<br>• Minor grammatical and typographical changes |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

**WWRIM Standard RIMS-14**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Management of Records for System Decommissioning Standard

## 1. Purpose

This standard defines the Johnson & Johnson Records and Information Management requirements for decommissioning a system.

## 2. Background

Due to aging systems or technology or changing business requirements, the need arises to retire, or decommission, a system. The decommissioning process is complex and involves many stakeholders, including but not limited to IT, the system and data business owner(s), and the Operating Company Records Manager(s).

The Operating Company Records Manager's role is to work with the stakeholders to ensure the Records and Information contained in the system are dispositioned appropriately in accordance with the business needs and the requirements of the *Worldwide Records and Information Management Policy and Standards.*

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The Operating Company Records Manager shall work with the business owner of the system and the appropriate IT organization to determine which information shall be retained and which information shall be discarded as part of the decommissioning process.

5.2. Information that must be retained in compliance with the requirements of the *J&J Enterprise Retention Schedule* shall be either retained via migration to a new or different system or retained via migration to near-line, off-line storage to be kept until it has met its retention requirements.

5.3. Information that is either a Vital Record or a component of a Vital Record shall be retained according to paragraph 5.3. Refer to the ***WWRIM RIMS-13 Vital Records Standard*** and the ***WWRIM RIMS-16 Records and Information Archiving Standard*** for further requirements.

5.4. Information subject to an active Legal Hold shall be retained according to the requirements of the Johnson & Johnson Law Department:

Johnson & Johnson

**WWRIM Standard RIMS-14**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Management of Records for System Decommissioning Standard**

5.4.1. Prior to any action to retain information that is under an active Legal Hold, the Records Manager shall consult with the Johnson & Johnson Law Department if necessary.

5.5. Information that is retained to either a new or different system or near-line, off-line storage for retention purposes shall be managed during and after the transfer in such a way as to ensure the integrity of the information shall be preserved in accordance with IAPP Information Classification requirements.

5.6. The IT organization that is responsible for the actual decommissioning of the software and hardware shall take steps to ensure that any information or information fragments remaining on the system shall be rendered inaccessible and unreadable.

5.7. System decommissioning documentation shall include the following:

5.7.1. A listing of both the information components to be retained and the information components to be discarded based on Operating Company business needs, retention requirements, and active Legal Holds. Each information component will include the following documentation:

- Record Type;
- Record Retention Period/Requirement;
- Information Classification according to the *Worldwide Information Asset Protection Policies* (IAPPs);
- Whether the information comprises or is part of a Vital Record;
- Whether the information is under an active Legal Hold (information subject to a Legal Hold shall not be discarded until notification from the Johnson & Johnson Law Department;

5.7.2. Approval by the Operating Company Records Manager.

5.8. Any system decommission request initiated through the IT Systems Development Life Cycle (SDLC) shall follow the current SDLC Retirement Plan.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488061

### Worldwide Records and Information Management

## Management of Records for System Decommissioning Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Removed Paragraph [5.1] - not the Operating Company's responsibility.<br>• Changed throughout - "Records Retention Schedule" to "Enterprise Retention Schedule." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold"<br>• Paragraph [5.1] Clarified wording – Record Managers shall develop a communication to ensure the appropriate business owners consult them when a system is being decommissioned.<br>• Paragraph [5.6] Clarified wording – Retaining information shall be managed during and after the transfer in such a way as to ensure the integrity of the information.<br>• Paragraph [5.5.1] Clarified wording - Records Manager shall consult with the Johnson & Johnson Law Department if necessary.<br>• Paragraph [5.8.3] Removed- redundancy.<br>• Paragraph [5.8.4] Removed- inherent within new [5.9].<br>• New Paragraph [5.9] Added - reference to SDLC. |
| Version 2.0 | 31 January 2011 | • Paragraph (former)[5.3] – Moved contents of former [5.3] to [5.8.1]<br>• Paragraph [5.8] – Revised to reflect the development of system decommissioning documentation is not a Records Manager's responsibility<br>• Paragraph [5.8.2] – Revised to reflect requirement for Records Manager's sign-off<br>• Paragraph [5.10] – REMOVED – partially replaced with [5.8.2] |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

**WWRIM Standard RIMS-15**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Management of Electronic Records and Information Standard

## 1. Purpose

This standard specifies the minimum requirements related to the management and disposition of electronic Records and Information for Johnson & Johnson Operating Companies.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

**Electronic Records and Information** are defined as any combination of text, graphics, data, audio, pictorial, or other information in digital form that is created, modified, maintained, archived, retrieved, or distributed by a computer system or portable electronic device.

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. Management of electronic Records and Information shall comply with the *Worldwide Records and Information Management Policy and Standards* requirements as well as with the Johnson & Johnson *Worldwide Information Asset Protection Policies* (IAPPs).

4.2. The Operating Company shall develop and implement procedures to assure electronic Records and Information are managed to meeting the following requirements:

4.2.1. Electronic Records and Information shall be subject to the *J&J Enterprise Retention Schedule Standard*;

4.2.2. Electronic Records and Information subject to active Legal Hold Notice shall be retained per the Johnson & Johnson Law Department requirements until formal communication from the Law Department that the Legal Hold Notice has been released;

4.2.3. Electronic Records and Information eligible for disposition shall be disposed of in a secure manner consistent with industry "good practice" to ensure the Records and Information cannot be recovered or reconstructed by any ordinary means.

4.3. The Department/Business Unit shall ensure the electronic Records and Information are managed in a manner that is reasonably calculated for completeness, integrity and confidentiality, based upon their characteristics and use.

4.3.1. Systems shall be configured in such a way as to accurately capture or create electronic Records and Information;

4.3.2. Systems operators shall assign security to a system in conformance with IAPP requirements;

Johnson & Johnson

WWRIM Standard RIMS-15
Version 4.0
31 December 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Management of Electronic Records and Information Standard

4.3.3. Systems shall have sufficient Disaster Recovery Backups including the system, application and associated data to protect the production environment from loss or impairment;

4.3.4. The Operating Company shall have a procedure for extracting and preserving information subject to a Legal Hold from the system;

4.3.5. Authorization for access to electronic Records and Information, other than to perform system administration tasks, shall be controlled by the Department/Business Unit;

4.3.6. Electronic Records and Information shall be accessible and managed in active computing environments over the period of time that the information is needed for business purposes.

4.4. Electronic Records and Information that are no longer needed for current business operations may be archived as per the ***WWRIM RIMS-16 Records and Information Archiving Standard*** and in accordance with the Operating Company procedures, if they are otherwise eligible for archiving.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488064

## Worldwide Records and Information Management

# Management of Electronic Records and Information Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Paragraph [4.2.1] – Changed to "RRS" to "Enterprise Retention Schedule Standard."<br>• Paragraph [4.2.3] – Changed "destruction" and "destroyed" to "disposition" and "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold"<br>• Definitions [3] Added - "or portable electronic device."<br>• Paragraph [former 4.2.3] Removed- condensed within new [4.2.3].<br>• Paragraph [former 4.2.3.2] now [4.4] Included "if they are eligible for archiving."<br>• Paragraph [former 4.2.4] Removed- condensed within new [4.2.3].<br>• Paragraph [former 4.2.5] now [4.2.3] Clarified wording – removed references to other paragraphs.<br>• Paragraph [4.3] Clarified wording. Minor change<br>• Paragraph [ 4.3.1] Changed - "developed' to "configured"<br>• Paragraph [former 4.3.2 - 4.3.3] Removed- addressed in [4.3.4] and [4.3.5].<br>• Paragraph [former 4.3.4] now [4.3.2] Reworded – simplified wording.<br>• Paragraph [former 4.3.5] now [4.3.3] Clarified wording.<br>• Paragraph [4.3.6] Reworded- Direction for the Operating. Company to have a procedure for extracting and preserving information subject to a legal Hold. |
| Version 2.0 | 31 January 2011 | • Paragraph (former) [4.3.3] – REMOVED – partially addressed in [4.3.2].<br>• Paragraph 4.3.5 – removed the word "tape." |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-16
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Records and Information Archiving Standard

---

## 1. Purpose

This standard specifies the minimum requirements for archiving Records and Information of Johnson & Johnson Operating Companies in electronic formats. The requirements of this standard enable long-term preservation of Records and Information in accordance with laws and policy and to assure access to archived Records and Information. The length of time a record or information is to be retained is indicated on the *J&J Enterprise Retention Schedule* (ERS).

## 2. Background

Electronic Records and Information are kept in an active computing environment over the period of time that the information is needed for standard business processes (e.g., analysis, summarizing, active usage), and internal or external auditing/assessments. At the end of this active period, if further retention is required, electronic Records and Information may be archived to an appropriate archive solution using approved *J&J Enterprise Retention Schedule* requirements.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

**Archives** are storage of electronic Records and Information in near-line or off-line storage systems appropriate for long-term storage for a prescribed retention requirement, as stated in the *J&J Enterprise Retention Schedule.*

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The Operating Company Records Manager, working with the IT organization and the Department/Business Unit, shall develop and implement procedures for ensuring Records and Information retained in an archive meet the following requirements:

5.1.1. An archive shall be a separate environment from the production systems where Records and Information reside for daily business needs;

5.1.2. The procedure for moving Records and Information into an archive, including but not limited to the migration process and format of the migrated data, shall be documented;

5.1.3. Records and Information preserved in an archive shall be accessible;

5.1.4. Records and Information preserved in an archive shall be protected from unauthorized alteration to the extent reasonably possible;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

Johnson & Johnson

WWRIM Standard RIMS-16
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Records and Information Archiving Standard**

5.1.5. Records and Information preserved in an archive shall be assigned a retention requirement and monitored for compliance/disposition at the end of the retention;

5.1.6. An archive shall:

5.1.6.1. Use technology suitable for that archive;
5.1.6.2. Be stored in an appropriate and safe environment for the media being used;
5.1.6.3. Be backed-up on a regular basis when feasible;
5.1.6.4. Be maintained in a manner that ensures that Records and Information continue to be accessible and readable;

5.1.7. Backups used for disaster recovery shall not be used for archiving. Archiving processes and media must be separate.

5.2. The Operating Company Department\Business Unit of records being stored in an archive shall be responsible for:

5.2.1. Assigning retention requirements to Records and Information migrated to an archive;

5.2.2. Monitoring expiration of retention requirements for them;

5.2.3. Identifying archived records which must be held due to a Legal Hold Notice;

5.2.4. Ensuring archive records eligible for disposal are reviewed against current active Legal Holds' and if subject to a Legal Hold Notice, are retained until the release notice for the hold has been received from the Johnson & Johnson Law Department;

5.2.5. Maintaining documentation of the retention and disposal of archive records;

5.2.6. Responsible for requesting the availability and the appropriate retention requirement to ensure the records will be available and accessible if needed.

5.3. Access to archive records shall be restricted to the Department\Business Unit or those specifically delegated and authorized by the business owner.

5.4. Records and Information preserved in an archive shall be indexed for ease of access. The system and/or process to capture and index Records and Information into an archive shall include the following identifiers:

- Description of Records or Information;
- Operating Company;
- Department/Business Unit;
- Date(s) of record;
- Record Type(s);
- Retention requirement;
- Disposition date, if applicable;
- Media identification, if applicable;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488067

Johnson & Johnson

**WWRIM Standard RIMS-16**
Version 4.0
31 December 2014
*Effective – 01 April 2015*

**Worldwide Records and Information Management**

**Records and Information Archiving Standard**

- Legal Hold Notice, if applicable.

**Revision History**

| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "period" to "requirement."<br>• Changed throughout – "destruction" to "disposal." |
|---|---|---|
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Paragraph [5.1.4] Added - "protected from unauthorized alteration to the extent reasonably possible".<br>• Paragraph [5.1.5] Added – disposition.<br>• Paragraph [5.1.6] Removed – "technology used to either store or manage."<br>• Paragraph [5.1.6.1] Clarified wording. Minor change<br>• Paragraph [5.1.6.2] Clarified wording. Minor change<br>• Paragraph [5.1.6.3] Removed – "disaster and recovery purposes."<br>• Paragraph [5.1.6.4] Clarified wording. Minor change<br>• Paragraph [5.1.7] Revised to include backups used for system restoration shall not be used for archiving.<br>• Paragraph [5.2.4] Revised to Include records eligible for destruction are reviewed against current active Legal Holds' and if subject to a Legal Hold Notice, are retained until the release notice for the hold has been received from the Johnson & Johnson Law Department.<br>• Paragraph [former 5.2.5] Removed- condensed within 5.2.4].<br>• Paragraph [former 5.3] now [5.2.6] Removed the requirement "minimum of six years" and clarified wording.<br>• Moved the last sentence in paragraph [5.3] to the beginning of paragraph [5.4].<br>• Paragraph [5.4] Added – Legal Hold Notice, if applicable. |
| 3Version 2.0 | 31 January 2011 | • Paragraph [5.5] – Removed "Last modified date" as a required field |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488068

Johnson & Johnson

WWRIM Standard RIMS-17
Version 4.0
31 Decmeber 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

# Disaster Recovery Backup Retention Standard

## 1. Purpose

This standard defines the minimal requirements for Johnson & Johnson Operating Companies for retention of data backups.

## 2. Background

Data backups are generated to ensure that electronic Records and Information, and the systems in which these records reside,.can be reconstructed in the event of computer hardware or software failures, computer viruses, natural disaster or other problems in the computer operating environment.

Data backups are not to be used as archive solutions. When circumstances dictate the offline storage of electronic Records and Information for any purpose other than system restoration, the data should be considered for archive information.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

**Data backups** are snapshots of a computer system, including both business data and system data, created for restoration purposes in the event of disaster or computer environment problems. Backups are intended only for near-term system restoration purposes (backup tapes are used to recover data in the recent past, not years or decades old), and are created and disposed according to an established schedule.

**Archives** are storage of electronic Records and Information in near-line or off-line storage systems appropriate for long-term storage for a prescribed retention requirement, as stated in the *J&J Enterprise Retention Schedule.*

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. Data backups for computer systems shall be generated on a routine basis according to a rotation schedule, which may include generating different types of backups, including incremental, weekly, and monthly backups:

5.1.1. Records and Information Management does not dictate retention requirements for staging or development environments. However, there may be business or other IT requirements that require a mandatory retention for this data. In those cases, these requirements shall apply;

Johnson & Johnson

WWRIM Standard RIMS-17
Version 4.0
31 Decmeber 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Disaster Recovery Backup Retention Standard

5.2. Disaster recovery backups shall be retained according to the following timeline before they are returned to the rotation cycle (as applicable, depending on media-type):

| System Types | Backup Data Maximum Retention Requirement |
|---|---|
| Global Messaging (email) | 30 days |
| Network and Enterprise Services (including file and print servers) | 30 days incremental backups<br>90 days file level full backup |

5.3. For any system not covered by the mandatory rotation cycle found in this standard, the Operating Company managing the system shall develop and implement an appropriate rotation cycle. The maximum rotation period shall not exceed 30 days for incremental backups, 30 days for database driven backups and 90 days for file level full backups.

5.3.1. In the event that a Legal Hold Notice is issued by the Johnson & Johnson Law Department that requires identification and preservation of disaster recovery backups, those backups shall be preserved as instructed until the Johnson & Johnson Law Department communicates otherwise.

5.3.2. When Data backups have met their retention requirement and provided they are not being preserved at the request of the Johnson & Johnson Law Department, the media on which they were copied shall be reused or overwritten. The backups may also be disposed of in compliance with *Johnson & Johnson Information Asset Protection Policy (IAPP) S-26 Worldwide Information System Administration and Management Security Policy* and its associated standards.

5.3.3. Data backups may be stored on a variety of appropriate media including, but not limited to, magnetic tape and online disk storage.

5.4. Data backups shall be reasonably protected from damage or data loss during the period they are in rotation in compliance with the *Johnson & Johnson Information Asset Protection Policies*, specifically *IAPP S-26 Worldwide Information System Administration and Management Security Policy*) and in accordance with written procedures.

5.4.1. If the backups are stored in a facility that is not operated by Johnson & Johnson, that facility shall be audited by the appropriate Johnson & Johnson entity and approved for the type of storage service they are providing.

5.4.2. Backup media shall be labeled or tagged with information or metadata sufficient to ensure that the information on the media object can be correlated to a system or repository for purpose of restoration or rotation.

5.5. The appropriate organizations and IT Operations responsible for creating, managing and storing disaster recovery backups, shall have formal procedures for the following:

5.5.1. Generating data backups;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJ 000488070

Johnson & Johnson

WWRIM Standard RIMS-17
Version 4.0
31 Decmeber 2014
*Effective – 01 April 2015*

Worldwide Records and Information Management

Disaster Recovery Backup Retention Standard

5.5.2. Ensuring compliance with storage and protection requirements for those backups per IAPP S-26;

5.5.3. Deleting/overwriting backups and/or rotating backup media for reuse after the defined retention requirement has passed;

5.5.4. Maintaining data backups in a manner that ensures readability; for the period of time that they are maintained in the active rotation cycle or are subject to a Legal Hold;

5.5.5. Restoring system/application and data into production after the loss of the system/application and/or data due to a disaster or business disruption;

5.5.6. Receiving formal notification from the Johnson & Johnson Law Department to preserve data backups for Legal Hold Notice purposes, returning those backups to the rotation cycle or releasing for final disposition upon receipt from the Johnson & Johnson Law Department of a release of the Legal Hold Notice;

5.5.7. Receiving annual notification from the Johnson & Johnson Law Department identifying which Legal Holds have been released, allowing the backups related to those Legal Holds to also be released;

5.5.8. Working with the appropriate organizations in IT and/or the IT Shared Services Records Manager to document and approve exceptions to or changes in the standard data backup process.

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Changed throughout – "destroyed" to "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Purpose [1.] Changed - "minimum" to 'minimal' and "disaster recovery" to "data backup."<br>• Background [2.] Changed - "disaster recovery" to "data backup" in both paragraphs. Second paragraph changed "business reasons" to "circumstances."<br>• Definitions [4.] Changed - "disaster recovery" to "data backup". Revised to include "intended only for |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488071

Johnson & Johnson

WWRIM Standard RIMS-17
Version 4.0
31 Decmeber 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management

## Disaster Recovery Backup Retention Standard

| | | |
|---|---|---|
| | | near-term system restoration purposes". Second paragraph - included "that require further retention for business or compliance purposes other than disaster recovery" added the definition for near-term.<br>• Paragraph [5.1] Changed – "disaster recovery" to "data backup" and "take precedence" to "shall apply."<br>• New Paragraph [5.3] Direction for any system not covered by the mandatory rotation cycle. Added wording in the table "30 days incremental backups" and "90 days file level full back-up."<br>• Paragraph [5.3.2] Included reference to IAPP Policy S-26.<br>• Paragraph [5.3.3] Changed - "disaster recovery" to "data backup."<br>• Paragraph [former 5.3] now [5.4] Changed "in storage and during transport" to "protected from damage or data loss during the period they are in rotation" and "disaster recovery" to "data backup."<br>• New Paragraph [5.4.2] Direction on backup media shall be labeled or tagged for the purpose of restoration or rotation.<br>• Paragraph [former 5.4.4] now [5.5.4] Clarified wording. Minor change<br>• Paragraph [5.4.6] now [5.5.6] Clarified wording. Minor change<br>• Paragraph [former 5.4.7] now [5.5.7] Clarified wording. Minor Change<br>• Paragraph [former 5.5.1] Removed, and Paragraph [former 5.5.1] now [5.5.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.1.1] – Specified retention of backups for development environment data is not required from a records management perspective.<br>• Paragraph [5.2] – Clarified that backups are returned to the rotation cycle after their active retention period has expired.<br>• Paragraph [5.4.6] - Changed formal "instruction" to formal "authorization";<br>• Minor organizational name changes. |
| New Standard Version 1.0 | 30 October 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-18
Version 4.0
31 December 2014
*Effective – 01 April 2015*

# Worldwide Records and Information Management
# Electronic Messaging Standard

## 1. Purpose

The purpose of this standard is to define the requirements for managing electronic messages.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

**Electronic messages** are documents created and transmitted or received via an electronic messaging system, including brief notes, formal or substantive narrative documents, and any attachments, such as word processing or other electronic objects, that may be transmitted with the message along with its descriptive transmission metadata.

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. Electronic messages created or received in the course of doing business for the Johnson & Johnson Family of Companies are subject to required Johnson & Johnson policies and standards, including but not limited to the following:

- *Johnson & Johnson Worldwide Records and Information Management Policy and Standards*;
- *Johnson & Johnson Worldwide Information Asset Protection Policies* (IAPPs) and associated standards;
- AU-5 Electronic Mail and Instant Messaging Acceptable Use Policy.

4.2. Within the Johnson & Johnson Family of Companies, each individual is responsible for managing both their Records and Information and their Convenience Information (see ***WWRIM RIMS-2 Convenience Information Standard***).

4.3. Electronic messages that are Convenience Information shall be deleted after use provided they are not subject to an active Legal Hold.

4.4. Electronic messages that are not considered Convenience Information shall be retained in a manner consistent with the *J&J Enterprise Retention Schedule*.

4.4.1. Copying of electronic messaging objects from Johnson & Johnson messaging systems to personal repositories such as shared drive folders, local hard drives or portable media devices is prohibited.

4.5. Electronic messages that must be retained per section 4.4 for longer than ninety days shall not be stored on user's home drives or any other network shares.

4.6. Any electronic messages, including both Records and Information, and Convenience Information, that are subject to an active Legal Hold, shall be preserved and retained as required and instructed by the Johnson & Johnson Law Department until the Law Department issues a formal release of that Hold.

4.7. Preservation of electronic messages for compliance with the *J&J Enterprise Retention Schedule* or for Legal Hold purposes shall ensure insofar as it is feasible that structure, content, metadata, attachments and links, and delivery distribution lists are preserved along with the electronic message.

4.8. Electronic messages considered as Records and Information which have met their retention requirement and are not subject to an active Legal Hold shall be disposed.

4.9. Any data object created, transmitted received or maintained pursuant to this standard is subject to the requirements of *IAPP AU-5 Electronic Mail and Instant Messaging Acceptable Use Policy*.

4.10. Disaster recovery backups of e-mail messages shall be retained as specified in ***WWRIM RIMS-17 Disaster Recovery Backup Retention Standard***.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

Johnson & Johnson

WWRIM Standard RIMS-18
Version 4.0
31 December 2014
*Effective – 01 April 2015*

## Worldwide Records and Information Management
# Electronic Messaging Standard

**Revision History**

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Paragraph [4.8] - Changed verbiage – "destroyed" to "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Paragraph [4.1] Replaced "I/T Enterprise Instant Messaging Usage Policy" with "AU-5 Electronic Mail and Instant Messaging Acceptable Use Policy."<br>• Paragraph [4.4.1] Direction on – The copying of electronic messaging objects from Johnson & Johnson messaging systems is prohibited.<br>• Paragraph [4.5] Clarified wording. Minor change<br>• Paragraph [4.9] Added - the new IAPP Policy number. |
| Version 2.0 | 31 January 2011 | No changes to this standard |
| New Standard Version 1.0 | 30 October 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJ 000488075

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

## Worldwide Records and Information Management

# Records and Information Management Program Standard

## 1. Purpose

The purpose of this standard is to provide the minimum requirements for the implementation and maintenance of a comprehensive Records and Information Management (RIM) program by each Johnson & Johnson Operating Company. Each program shall be implemented in a manner that complies with the *Johnson & Johnson Worldwide Records and Information Management Policy and Standards*.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

An effective RIM program ensures consistent and cost-effective management of Records and Information throughout their entire lifecycle from creation through final disposition. A RIM program is implemented based on the organization's business needs, as well as legal and regulatory requirements. These elements serve to mitigate risks related to managing Records and Information.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. Each Operating Company shall establish a RIM program that complies with all provisions of the Worldwide Records and Information Management Policy and Standards.

5.2. The RIM program shall have documented procedures for managing, tracking, protecting, storing, and disposing of Records and Information throughout their lifecycle regardless of format or medium.

5.2.1. Procedures shall address local business requirements;

5.2.2. Procedures shall be formally reviewed and approved by appropriate Senior Management (e.g., Director-level or higher);

5.2.3. Procedures shall be reviewed and updated every two years, at minimum, unless business changes require it sooner;

5.2.4. Changes to procedures shall be documented;

EXHIBIT Mittenthal 24 10-18-18 PENGAD 800-631-6989

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Records and Information Management Program Standard**

5.2.5. The most recent review and approval date shall be documented, even if no changes are made to the procedure;

5.2.6. Procedures may be supported, as appropriate, by work instructions, tools, and/or processes.

## 6. Responsibilities

6.1. Operating Company Management

The President/Managing Director/Head of each Johnson & Johnson Operating Company is responsible for the planning, implementation, and on-going compliance with the *Worldwide Records and Information Management Policy and Standards* through the establishment of a RIM program, including:

6.1.1. Designating a Records Manager and Department/Business Unit Records Coordinators;

6.1.2. Allocating adequate resources to implement and maintain a compliant RIM program;

6.1.3. Providing guidance on priorities for the performance and maintenance of the RIM program;

6.1.4. Maintaining oversight of the RIM program.

6.2. Management

Managers/supervisors/sponsors are responsible for ensuring their Associates have the appropriate tools, training, and information needed to comply with RIM program requirements.

6.3. Associates

All Associates are responsible for maintaining their Records and Information in compliance with RIM program requirements.

6.4. Worldwide Records and Information Management Program Office

The WWRIM Program Office is responsible for the overall governance and strategic direction for Records and Information Management across the Johnson & Johnson Family of Companies. This responsibility includes maintaining and publishing the *Worldwide Records and Information Management Policy and Standards* and the *J&J Enterprise Retention Schedule*.

6.5. Records Manager

The Records Manager is the designated central point of contact for all RIM matters in the Operating Company or Companies for which he or she is accountable and is responsible for the following:

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687720

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Records and Information Management Program Standard

6.5.1. Implementing and maintaining a company-wide RIM program in compliance with the *Worldwide Records and Information Management Policy and Standards*;

6.5.2. Providing clear communications and guidance to educate Associates on the RIM program requirements;

6.5.3. Developing RIM lifecycle processes and procedures;

6.5.4. Ensuring appropriate training and awareness on RIM program requirements is available and provided to employees, records coordinators, contractors/consultants, vendors and external business partners;

6.5.5. Completing the required Operating Company RIM program assessments;

6.5.6. Working with Departments/Business Units to implement and maintain compliance with the *J&J Enterprise Retention Schedule;*

6.5.7. Facilitating RIM compliance assessments with Departments/Business Units;

6.5.8. Implementing and managing RIM services such as inactive storage solutions and/or acquiring such services provided by external vendors, as appropriate;

6.5.9. Providing guidance for supplier agreements to ensure alignment with the J&J Enterprise Retention Schedule and Legal Hold preservation requirements;

6.5.10. Partnering with various Johnson & Johnson departments, such as Worldwide Records and Information Management (WWRIM), Information Technology, the Law Department and Worldwide Privacy to ensure alignment.

6.6. Records Coordinator

The Records Coordinator serves as a liaison between the Department/Business Unit and the RIM program to assist and support compliance with RIM requirements, and is responsible for the following:

6.6.1. Ensuring RIM requirements and other routine activities and processes within the Department/Business Unit are conducted in compliance with WWRIM and local requirements;

6.6.2. Serving as the Business Unit/Department RIM subject matter expert;

6.6.3. Participating in RIM Compliance Assessments for their Department/ Business Unit.

6.7. Law Department

The Law Department has the following responsibilities in support of RIM activities:

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJTALC000687721

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Records and Information Management Program Standard**

6.7.1. Defining Legal Hold preservation requirements;

6.7.1.1. Determining the scope of Records and Information subject to Legal Hold Notices pursuant to actual or reasonably anticipated litigation or investigation, or other legal and regulatory proceedings.

6.7.1.2. Identifying custodians of Records and Information subject to Legal Hold Notices.

6.7.1.3. Notifying individual custodians and the appropriate Records Manager of Legal Hold Notices, their scope, and their responsibilities.

6.7.1.4. Providing training for Associates and other applicable stakeholders on Legal Hold management tools.

6.7.1.5. Collaborating with Records and Information Management and Information Technology to raise awareness of Legal Hold preservation requirements, as applicable.

6.7.1.6. Issuing releases of Legal Hold Notices.

6.7.2. Defining requirements for identification, collection, and production of Records and Information to support legal obligations;

6.7.2.1. Collaborating with Records and Information Management and Information Technology to identify potential data repositories.

6.7.3. Reviewing and accepting the J&J Enterprise Retention Schedule;

6.7.4. Providing guidance on local Legal processes at Operating Companies such as acceptance of legal documents;

6.7.5. Providing legal guidance for mergers, acquisitions, and divestitures. Collaborating with Records and Information Management and Information Technology as it pertains to Records and Information.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687722

## Worldwide Records and Information Management

# Records and Information Management Program Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Purpose [1] & Background [former 2] Clarified wording.<br>• Paragraph [5.2] Clarified wording.<br>• Paragraph [5.2.3] Updated "on a biennial basis" to "every two years" for clarification.<br>• Added paragraph [5.2.4] Changes to procedures shall be documented.<br>• Removed paragraph [former 6.2.6] Requirement addressed in paragraph [5.2].<br>• Removed paragraph [former 6.2.7] Requirement addressed in paragraph [5.2.4]<br>• Removed paragraph [former 6.3] No longer required.<br>• Removed paragraph [former 6.3.1] Requirement addressed in paragraph [5.2].<br>• Removed paragraph [former 6.3.2] Requirement addressed in RIMS-10.<br>• Removed paragraphs [former 6.3.3, 6.3.3.1, 6.3.3.2] Supplier requirements are addressed in paragraph [6.5.9].<br>• Responsibilities [6] Reordered the roles listed in this section. Added Management and Associates.<br>• Paragraph [6.1.1] Added the designation of Department/Business Unit Records Coordinators to Operating Management's responsibilities.<br>• Paragraph [6.1.2] Removed "...in accordance with the WWRIM requirements" as is it addressed in [5.1].<br>• Paragraph [6.1.3] Expanded the priorities to include performance and maintenance of a compliant RIM program.<br>• Paragraph [former 5.2.2] Removed reference to documented guidelines and a current Legal Hold Notice Report. Added responsibility for providing guidance on RIM program requirements.<br>• Paragraph [former 5.2.3] Added "processes."<br>• Paragraph [former 5.2.4] Added "records coordinators, external business partners and consultants."<br>• Paragraph [former 5.2.5] Removed requirement for submitting annual reports to WWRIM.<br>• Removed paragraph [former 5.2.6] Providing updates to OpCo Senior Management and the WWRIM Program Office.<br>• Paragraph [former 5.2.7] Clarified wording. |

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Records and Information Management Program Standard

| | | |
|---|---|---|
| | | • Paragraph [former 5.2.9] Removed reference to "other RIM products."<br>• Added paragraph [6.5.9] Providing guidance for supplier agreements.<br>• Paragraph [former 5.2.10] Removed "eDiscovery." Changed "Johnson and Johnson Law Department" to "Law Department."<br>• Paragraph [former 5.3] Clarified wording. Removed reference to different Records Coordinator names. Moved responsibility for assigning Records Coordinators to paragraph [6.1.1]. Removed reference to Records Coordinator training as it is addressed in paragraph [6.5.4]. Removed details for assigning Records Coordinators.<br>• Paragraph [former 5.3.1] Removed reference to identification and labeling.<br>• Paragraph [former 5.3.2] Replaced "local" with "Business Unit/Department RIM" subject matter expert.<br>• Removed paragraph [former 5.3.3] Coordinating the transfer for records to/from inactive storage may not be a Records Coordinator's responsibility.<br>• Removed paragraph [former 5.3.4] Acquisition of RIM services and supplies may not be a Records Coordinator's responsibility.<br>• Paragraph [former 5.3.5] Removed "coordination."<br>• Paragraph [6.7] Changed "Johnson & Johnson Law Department" to "Law Department."<br>• Added paragraph [6.7.1.] Defining Legal Hold preservation requirements.<br>• Paragraph [former 5.4.1] Added "...actual or reasonably anticipated litigation or investigation..."<br>• Paragraph [former 5.4.2] Removed reference to repositories likely to contain Records and Information.<br>• Removed paragraph [former 5.4.4] The Law Department no longer provides Legal Hold Notice Reports to OpCo Records Managers on a semiannual basis.<br>• Removed paragraph [former 5.4.5] Addressed in paragraph [6.7.1].<br>• Added paragraph [6.7.1.4] Responsibility for providing training for Associates and other applicable stakeholders on Legal Hold management tools;<br>• Added paragraph [6.7.1.5] Collaborating with |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

6

JNJTALC000687724

Johnson & Johnson

WWRIM Standard RIMS-1
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Records and Information Management Program Standard

| | | |
|---|---|---|
| | | Records and Information Management and Information Technology to raise awareness of Legal Hold preservation requirements, as applicable.<br>• Added paragraph [6.7.1.6] Responsibility for issuing releases of Legal Hold Notices.<br>• Added paragraph [6.7.2] Defining requirements for the identification, collection, and production of Records and Information to support legal obligations.<br>• Added Paragraph [6.7.2.1] Collaborating with Records and Information Management and Information Technology to identify potential data repositories.<br>• Removed paragraph [former 5.4.6] The Operating Company Board Attorney responsibilities are covered under the broader "Law Department."<br>• Paragraph [former 5.4.6.2] Changed "reviewing written procedures" to "providing guidance on legal processes at Operating Companies."<br>• Added paragraph [6.7.5] Responsibility for providing legal guidance for mergers, acquisitions, and divestitures. Collaborating with Records and Information Management and Information Technology as it pertains to Records and Information.<br>• Removed paragraph [former 5.5] People Supervisor responsibilities are addressed in paragraph [6.2] Management. |
| Version 4.0 | 31 December 2014 | • Removed paragraph [5.3.4] – no longer pertains to new ERS Standard.<br>• Paragraph [5.5] Clarified wording – condensed "employees and other personnel" to "Associates."<br>• Changed throughout – "Manager/Supervisor/Sponsor" to "Supervisor."<br>• Changed throughout Records Retention Schedule (RRS) to J&J Enterprise Retention Schedule.<br>• Paragraph [6.2.7] Clarified wording – process.<br>• Paragraph [6.2.3] former – Removed Boundary Agreements requirement. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Purpose [1] Added emphasizing wording.<br>• Paragraph [5.1.1] Clarified wording – designation of a Records Manager.<br>• Paragraph [5.2] Clarified wording- eliminated redundancy. |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

7

JNJTALC000687725

**Worldwide Records and Information Management**

## Records and Information Management Program Standard

| | | |
|---|---|---|
| | | • New Paragraph [5.2.2] Provide communication/guidelines for the handling of records during the normal course of business.<br>• New Paragraph [5.2.10] Lists out the various Johnson & Johnson departments.<br>• Paragraph and Note section at the end of [5.3] Combined and clarified wording.<br>• New paragraphs [5.3.1- 5.3.2] Added additional Record Coordinator responsibilities.<br>• New Paragraphs [5.4.4 – 5.4.5] Added additional Law Department and IT eDiscovery responsibilities.<br>• Paragraph [5.5] Clarified wording- broadened the scope of "staff"<br>• Paragraphs [6.2.1] Clarified wording- condensed redundancy.<br>• Paragraph [former 6.2.2] Removed- unnecessary, as supported in the rest of 6.2.<br>• Paragraph [former 6.2.7] Removed- reflected in [6.2.6].<br>• Paragraph [former 6.2.8] now [6.2.6] Clarified wording. Minor change<br>• Paragraphs [former 6.3.2- 3, 4, 6, 7, 8] Removed- reorganized in concise manner in updates.<br>• Paragraph [former 6.3.5] now [6.3.2] Clarified wording. Minor change |
| Version 2.0 | 31 January 2011 | • Paragraph 5.4.2 – Changed Law Department responsibility : "Coordinating and conducting document preservation and other discovery activities"<br>• Paragraph 5.4.3.1 – Removed review for "legal compliance"<br>• Paragraph 5.4.3.2 – Clarified Law Department responsibility for specific reviewing procedures<br>• Minor edits |
| Version 1.1 | 17 June 2010 | • Change "biannual" to "biennial" |
| New Standard Version 1.0 | 30 Sept 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

JNJTALC000687726

Johnson & Johnson

**Worldwide Records and Information Management**

# Convenience Information Standard

## 1. Purpose

The purpose of this standard is to define Convenience Information and provide the requirements for managing, retaining, and disposing this type of information.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Not all information created or received by Johnson & Johnson is a business record. Some information is created or maintained informally or for personal purposes. Information may be considered Convenience Information if:

- It is a copy of a record maintained elsewhere and printed or otherwise captured for the use and convenience of a particular person;
- It is a record which has transitory or short-term business value.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

Convenience Information should be kept no longer than necessary for business or legal purposes and may be discarded with the following considerations:

5.1 Convenience Information subject to a Legal Hold shall be retained and preserved in accordance with this standard and the requirements of the Law Department.

5.2 Convenience Information shall not be sent to off-site storage or be archived unless such information is being preserved in compliance with a Legal Hold.

5.3 When disposing of Convenience Information, care shall be taken to ensure that any Convenience Information containing elements of classified Johnson & Johnson information (as defined in *IAPP S-4 Worldwide Information Classification Policy*) is disposed of in a secure manner commensurate with the requirements of *IAPP S-5 Worldwide Information Protection Policy* to prevent unauthorized disclosure of such classified information during or after the disposal process.

5.4 Examples of Convenience Information:

5.4.1 Personal Working Files: Drafts (where a final version exists), rough notes, or revisions of paper or electronic records used to create official signed documents.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

Johnson & Johnson

WWRIM Standard RIMS-2
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Convenience Information Standard**

5.4.2 Transitory Correspondence: Casual correspondence (including e-mails) often created for administrative purposes such as to facilitate meetings or for internal communications.

5.4.3 Duplicate Copies: Duplicates of a document, that have not been altered with notations or comments, where the record or information holder is not the owner of that record. Only the original master must be retained.

5.4.4 Catalogs and Trade Journals: Reference materials, catalogs, trade journals, bulletins, magazines, manuscripts, brochures, conference/seminar handouts, manuals, external newsletters, and supplier files that are external publications.

5.4.5 Templates: Blank document templates that have become obsolete and are no longer in use.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687728

## Worldwide Records and Information Management

## Convenience Information Standard

**Revision History**

| Version 5.0 | 31 December 2016 | • Background [former 2] Clarified wording. [second bullet] Removed reference to the J&J ERS [former third bullet] Removed reference to non record material.<br>• Paragraph [5] Reordered requirements. Added "Convenience Information should be kept no longer than necessary for business purposes and may be discarded with the following considerations:"<br>• Paragraph [5.1] Changed "Legal Hold Notice" to "Legal Hold." Removed "..until further notice form the Johnson & Johnson Law Department."<br>• Paragraph [former 5.2] Added reference to IAPP S-5.<br>• Paragraph [former 5.3] Changed "Legal Hold Notice" to "Legal Hold."<br>• Paragraph [5.4] Clarified that the sub points are examples of Convenience Information.<br>• Paragraph [5.4.1] Removed last sentence about disposing of personal working files provided they are not subject to a Legal Hold Notice as it is addressed in paragraph [5.1].<br>• Paragraph [5.4.2] Removed last sentence about disposing of transitory correspondence provided it is not subject to a Legal Hold Notice as it is addressed in paragraph [5.1].<br>• Paragraph [5.4.3] Clarified wording. Removed last sentence about disposing of duplicate copies provided they are not subject to a Legal Hold Notice as it is addressed in paragraph [5.1].<br>• Paragraph [former 5.4.4] Removed Extra Copies example as it is addressed in paragraph [5.4.3], Duplicate Copies.<br>• Paragraph [former 5.4.5] Removed last sentence about disposing of catalogs and trade journals provided they are not subject to a Legal Hold Notice as it is addressed in paragraph [5.1].<br>• Paragraph [former 5.4.6] Removed last sentence about disposing of templates |
|---|---|---|

Johnson & Johnson

WWRIM Standard RIMS-2
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Convenience Information Standard**

| | | |
|---|---|---|
| | | provided they are not subject to a Legal Hold Notice as it is addressed in paragraph [5.1]. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "period" to "requirement." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Introduction section- Added additional information to the paragraph and bullets to elaborate on the meaning of Convenience Information.<br>• Paragraph [former 5.1] Removed – information inherent within 5.2.<br>• Paragraph [5.3] Added additional wording- "as defined in IAPP S-4 Worldwide Information Classification Policy."<br>• Paragraph [5.3] Removed wording "disposed of in a secure manner."<br>• Paragraph [5.5.3] Removed wording- "exact copies of records and information without any notations or comments."<br>• Paragraph [former 5.5.4] Removed wording- "without any notations or comments."<br>• Paragraph [former 5.5.5] Removed as subparagraph and condensed into [5.4.5], see following note:<br>• Paragraph [5.4.5] Added -"Reference Materials."<br>• Paragraph [5.4.6] Removed wording- "Unused or blank templates that have not been filled out or completed". Replaced with "Blank document templates that have become obsolete and are no longer in use and if not admissible according to pertinent regulations." |
| Version 2.0 | 31 January 2011 | • Paragraphs [5.5.3] and [5.5.4] – Clarified language regarding what constitutes exact copies. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687730

## Worldwide Records and Information Management

# Historic Records Preservation Standard

## 1. Purpose

This standard establishes the criteria for preservation of Records and Information that are determined by the Operating Company to be of historic value.

## 2. Scope

This Standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Historic Records are Records and Information that have a historic value pertaining to the original and ongoing development of the organization, its mission, programs, products, major achievements, failures, significant events and personalities, and societal relationships. Historic Records and Information may include, but are not limited to, product and product packaging, promotional and marketing materials, product displays, books, photographs, artistic renderings, audiovisual and digital material.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The Operating Company shall identify the types of Records and Information, if any, that have historic value.

5.2. Records and Information identified as "historic" shall be reviewed with the J&J World Headquarters Chief Historian/ Archivist for determination of value to the organization.

5.2.1. The Chief Historian/Archivist shall determine where the historic Records and Information should be housed.

5.2.2. The Chief Historian/Archivist shall provide guidance for the use of and access to historic Records and Information for research or legal purposes.

5.3. The following data shall be recorded for historic Records and Information that is accepted into archive for historic preservation:

- Transferring office;
- Date of transfer;
- Records title and other unique identifiers;
- Date(s) associated with historic record;
- Special instructions for archiving;
- Description and/or background information, if applicable;

Johnson & Johnson

WWRIM Standard RIMS-4
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Historic Records Preservation Standard**

- Any origin associated with the record necessary or desirable to establish its historic status or provide context for it.

5.4. The custodian of historic Records and Information shall:

5.4.1. Take reasonable measures to preserve historic Records and Information from damage, manipulation, destruction by negligence, sabotage or a natural disaster of any kind;

5.4.2. Preserve under environmental conditions appropriate for long-term preservation;

5.4.3. Implement controls to prevent changes or modifications, which take into account the format and/or storage medium of the record;

5.4.4. Conduct periodic reviews to ensure the historic Records and Information remains intact and retrievable;

5.4.5. Store electronic historic Records and Information, preserved in digital format, on media that conforms to ANSI/ISO standards;

5.4.6. Partner with Information Technology, at a minimum once every six years, to evaluate if the current technology solution is still viable for electronic historic Records and Information. If necessary, transfer to a new technology solution.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687732

**Worldwide Records and Information Management**

## Historic Records Preservation Standard

**Revision History**

| Version 5.0 | 31 December 2016 | • Background [former 2] Clarified. Added examples of Historic Records and Information from Scope [former 3]. Expanded examples to include product and product packaging.<br>• Scope [former 3] Moved language to Background [3]. Removed the standard shall be considered a "guidance" if the responsibility for managing historic records resides outside the RIM department.<br>• Paragraph [5.1] Removed requirement for documented criteria for determining records that have historic value and procedures for maintaining these. Added that the OpCo shall identify types of Records and Information, if any, that have historic value.<br>• Paragraph [5.2] Changed "Kilmer House Archivist" to "J&J World Headquarters Chief Historian/Archivist."<br>• Paragraph [5.2.2] Added Chief Historian/Archivist responsibility for providing guidance for the use of and access to historic Records and Information for research or legal purposes.<br>• Paragraph [former 5.4] Moved to paragraph [5.2.2]. Changed responsibility from OpCo to Chief Historian/Archivist.<br>• Paragraph [5.4] Added responsibilities for the custodian of the historic Records and Information.<br>• Paragraph [former 5.5] Moved to paragraph [5.4.2].<br>• Paragraph [former 5.6] Moved to paragraph [5.4.5].<br>• Paragraph [former 5.7] Move to paragraph [5.4.6] and clarified wording.<br>• Paragraph [former 5.8] Moved to paragraphs [5.4.1 and 5.4.3].<br>• Removed paragraph [former 5.9] Historic records and information retention requirement as it is documented on the J&J ERS. |
|---|---|---|

Johnson & Johnson

WWRIM Standard RIMS-4
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

## Historic Records Preservation Standard

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout – "historical" to "historic."<br>• Paragraph [5.2] – added direction to take instruction from the Kilmer House Archivist as to determination of Historic Records.<br>• Paragraph [5.9] - Changed "Life of Organization" to "Indefinitely".<br>• Changed throughout - "retention period" to "retention requirement".<br>• Paragraph [5.4] Changed "criteria and procedures" to "guidelines."<br>• Changed throughout - "Operating Company Retention Schedule" to "Enterprise Retention Schedule." |
| Version 3.0 | 31 December 2013 | • Scope [3] Changed – "video tapes, audiotapes, movies etc." to "audiovisual material". Clarified wording and removed Note: referring to GxP.<br>• Paragraph [5.3] Added additional data to be recorded.<br>• Paragraph [5.5] Clarified wording- direct instructions.<br>• Paragraph [5.8] Clarified wording to ensure understanding. |
| Version 2.0 | 31 January 2011 | • No changes to this standard |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687734

Johnson & Johnson

WWRIM Standard RIMS-5
Version 6.0
30 March 2018
*Effective – 31 December 2018*

## Worldwide Records and Information Management

# Physical Inactive Records and Information Storage Standard

## 1. Purpose

This standard provides the criteria for managing physical inactive (hereafter referred to as inactive) Records and Information until their final disposition and for selecting a facility to store Johnson & Johnson inactive Records and Information.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Inactive Records are defined as Records and Information that are no longer needed to conduct current business, but must be preserved until their retention requirement has expired. Only Records and Information that must be retained for business, legal, privacy or regulatory purposes should be sent to inactive storage. Convenience information should not be sent to inactive storage unless it is being preserved in compliance with a Legal Hold. Inactive Records and Information should be moved to a secure storage location which provides at a minimum (1) physical security including protection from unauthorized access, and (2) protection against damage due to natural disasters.

## 4. Definitions

Inactive Records are defined in section 3 of this standard. Other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. Operating Companies shall meet the following minimum requirements for managing inactive Records and Information.

5.1.1. Apply *J&J Enterprise Retention Schedule* retention requirements to all inactive Records and Information;

5.1.2. Apply and remove Legal Holds from Records and Information in inactive storage;

5.1.3. Utilize a J&J managed system to track inactive Records and Information. The J&J managed system shall track the following metadata fields:

Johnson & Johnson

WWRIM Standard RIMS-5
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Physical Inactive Records and Information Storage Standard**

| **Enterprise Metadata Fields (39 Total)** | |
|---|---|
| **Required (20)** | **Required when Applicable (19)** |
| Box Destruction Date | Comments |
| Box Site | Compound Name |
| Company Name | End Date of Product |
| Country | End Date of System |
| Country of Origin | GxP |
| Create Date | Internal Box Number |
| Date of Records From | J&J Legal Matter Number(s) |
| Date of Records To | PII |
| Department | Product Name |
| Destruction Review Date | Quality |
| ERS Code | Record Destruction Date |
| ERS Functional Category | Records Management Receipt Date |
| ERS Retention Requirement | Record Title |
| General Box Description | SOX |
| Legal Hold | System Name |
| MRC of Creator | Tax |
| Name of Creator | Vendor Account Number |
| Record Description | Vendor Box Number |
| Status of Record | Vital Classification |
| WWID of Creator | |

5.1.4. Implement procedures for tracking, transferring and receiving inactive Records and Information;

- When an external Vendor is utilized the external Vendor systems must capture the Vendor Box Number and when applicable J&J Internal Box Number.
- Methods for labeling may include a unique identifier, barcode, Radio Frequency Identification (RFID) chip, or similar machine-readable device.

5.1.5. Return Records and Information to storage upon completion of the use for which they were retrieved;

5.1.6. Manage access/authorization to send and retrieve Records and Information to and from inactive storage including the following:

- Ensure Associates are appropriately trained on inactive record transfers prior to obtaining their access/authorization;

- Ensure access/authorization is terminated once the Associate no longer requires it (due to job change, termination, etc.).

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687736

Johnson & Johnson

WWRIM Standard RIMS-5
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Physical Inactive Records and Information Storage Standard**

5.1.7. Conduct disposal in compliance with the *J&J Enterprise Retention Schedule* when retention requirements have been met and when there are no Legal Holds in place;

- Records and Information disposal shall be conducted in a secure manner commensurate with the requirements of *IAPP S-5 Worldwide Information Protection Policy* and consistent with industry good practices to ensure the Records and Information cannot be recovered or reconstructed by any ordinary means;
- Department/Business Unit management shall approve disposal of their inactive Records and Information;
- The RIM program shall maintain disposal documentation for inactive Records and Information as per the *J&J Enterprise Retention Schedule*.

5.2. Inactive Records and Information stored on-site or at an offsite J&J approved vendor shall meet the following:

5.2.1. The facility shall track and control the chain of custody of the Records and Information;

5.2.2. The facility shall have security measures in place to prevent unauthorized access and these measures are to be tested and documented;

5.2.3. The facility shall maintain a list of personnel authorized to access the Records and Information;

5.2.4. The facility shall maintain documentation that associates are appropriately trained on all aspects of the operations;

5.2.5. Climate controls shall be established so as to comply with industry good practices for that geographic region for the type of media being stored;

5.2.6. Adequate notice shall be provided to the Operating Company by the storage provider for any changes in procedures and or services;

5.2.7. The facility shall have fire suppression capability that at least meets industry norms;

5.2.8. The facility shall take reasonable precautions to ensure protection from floods or other natural disasters.

5.3. In addition to meeting the requirements of paragraph 5.2, offsite J&J approved vendors shall meet the following requirements:

5.3.1. A written agreement with the Operating Company which shall include language for services that address normal business operations, compliance with the *Johnson & Johnson Worldwide Information Asset Protection Policies* (IAPPs) and any other special requirements;

5.3.2. Employees and contractors shall be properly screened and bonded;

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJTALC000687737

Johnson & Johnson

**WWRIM Standard RIMS-5**
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Physical Inactive Records and Information Storage Standard**

5.3.3. Vendors shall have the appropriate business continuity plans that address both natural and man-made disasters with documented procedures. Business continuity plans and processes shall meet the local requirements and must be tested annually at minimum;

5.3.4. Vendors shall allow inspection by Johnson & Johnson during normal business hours.

- Audits of the storage facility shall be conducted by one of the Johnson & Johnson Operating Companies. Audits conducted by one Operating Company may be leveraged by other Operating Companies using the same storage facility.
- Vendor facility audits are used to onboard the site and quality audits/assessments should be performed using a risk based approach.
- Vendor Corporate audits/assessments of common global processes can be leveraged for other vendor facility locations.
- New storage facilities must be pre-qualified by a Johnson & Johnson Operating Company prior to use. Pre-qualification includes a review of the storage facility against, at minimum, the requirements of this standard.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687738

## Worldwide Records and Information Management

# Physical Inactive Records and Information Storage Standard

**Revision History**

| | | |
|---|---|---|
| Version 6.0 | 30 March 2018 | • Added verbiage to section 3 and 4 defining definition of Inactive Records<br>• Reworded section 5.1.3 to include metadata requirements and added a table of the metadata requirements<br>• Reworded section 5.1.4 to capture procedures for tracking.<br>• Reworded section 5.3.4 to reference a risk based approach and clarified audits/assessments. |
| Version 5.0 | 31 December 2016 | • Changed title from "Inactive Records and Information Standard" to "Physical Inactive Records and Information Standard."<br>• Changed "records" to "Records and Information" and "commercial third-party storage facility" to "offsite J&J approved vendor."<br>• Background [former 2] Clarified wording.<br>• Paragraph [5.1] Clarified wording.<br>• Added paragraph [5.1.1] Apply J&J ERS retention requirements to all inactive records and Information.<br>• Added paragraph [5.1.2] Apply and remove Legal Holds from Records and Information in inactive storage.<br>• Added paragraph [5.1.3] Implement procedures for tracking, transferring and receiving inactive Records and Information.<br>• Paragraph [former 5.1.1.1] Clarified wording. Added "Box number" and "ERS Retention Requirement." Changed "Record Code" to "ERS Code", "Record title" to "ERS Functional Category", and "Creation date and/or date span of records in container" to "Date or Date Range of Records and Information." Removed requirement for historical classification. Expanded methods for labeling to include a unique identifier.<br>• Removed paragraph [former 5.1.2].<br>• Paragraph [former 5.1.3] Reworded and expanded requirement to include tracking, transferring and receiving.<br>• Paragraph [former 5.1.4] Removed procedural requirement for managing access/authorization.<br>• Removed paragraph [former 5.1.4.1] Addressed in paragraph [5.1.5]. |

Johnson & Johnson

WWRIM Standard RIMS-5
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Physical Inactive Records and Information Storage Standard**

| | | |
|---|---|---|
| | | • Removed paragraphs [former 5.1.4.1 & 5.1.4.2] Addressed in paragraph [5.1.5].<br>• Paragraph [former 5.1.7] Moved to paragraph [5.1.2]. Removed procedural requirement for applying Legal Holds.<br>• Paragraph [5.1.9] Moved to paragraph [5.1.4]. Removed procedural requirement for promptly and systematically returning records to storage.<br>• Paragraph [former 5.1.10] Moved to paragraph [5.1.6] Removed procedural requirement for conducting defensible disposal.<br>• Paragraph [former 5.1.10.2]<br>• Removed paragraph [former 5.1.10.3].<br>• Paragraphs [former 5.1.10.2 & 5.1.10.5] Changed disposal eligibility and authorization documentation and certificates of destruction to disposal documentation.<br>• Removed paragraph [former 5.1.11] and all related sub-bullets pertaining to the process for extending the retention requirement of records due for disposal.<br>• Removed paragraph [former 5.2.1].<br>• Removed paragraph [former 5.3.2]. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Paragraphs [5.1.10.3] and [5.1.10.4] – Added paragraphs to apply ERS requirements to inactive records, and note "grandfather policy." |
| Version 3.0 | 31 December 2013 | • Changed throughout - "Business Owner" to "Department/Business unit".<br>• Changed throughout - "Document Holds" to "Legal Hold Notice".<br>• Background [2] Clarified wording to ensure understanding of inactive records; eliminated redundancy.<br>• Paragraph [5.1.1.1] Added - Identify if record is considered vital or historical. Added - wording "containers or storage units."<br>• Paragraph [5.1.1.1] Added - Option to use barcoding or RFID technology.<br>• New paragraph added [5.1.2] "Procedures for ensuring the accuracy and completeness of the data entry for the elements" |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

6

JNJTALC000687740

Johnson & Johnson

WWRIM Standard RIMS-5
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Physical Inactive Records and Information Storage Standard**

| | | |
|---|---|---|
| | | • Paragraph [5.1.9] Revised to include the addition of timely retrieval and return of records from storage.<br>• New section added [5.1.11 - 5.1.11.5] Included requirements when extending a retention period, once it meets the destruction date.<br>• Paragraph [former 5.1.9.1] moved to [now 5.1.11.5] Added Department/Business owner responsibilities.<br>• New paragraphs added [5.3.8 and 5.3.9]. Included facility requirements on fire suppression and natural disasters. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.1.1.1] – Clarified the requirement applies to records being either returned to storage or being newly sent to storage<br>• Paragraph [5.1.1.1.] – Removed "Record Description" as a mandatory field<br>• Paragraph [5.1.9.3] – Adjusted requirement to include maintenance of documentation for destruction authorization of inactive records.<br>• Paragraph [5.1.9.5] – Clarified the requirement applies to destruction conducted by or at the inactive storage facility<br>• Paragraph [5.3.6] – Changed requirement to refer to industry good practices for climate controls for inactive storage.<br>• Minor grammar and typographical edits |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

7

JNJTALC000687741

Johnson & Johnson

WWRIM Standard RIMS-6
Version 5.0
31 December 2016
*Effective – 01 April 2017*

## Worldwide Records and Information Management

# Litigation Support Standard

---

## 1. Purpose

The purpose of this standard is to define requirements to ensure that Operating Companies make a reasonable, good-faith and coordinated effort to preserve Records and Information subject to Legal Holds, and facilitate the identification and collection of such materials as needed.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Legal Holds require temporary suspension of the *J&J Enterprise Retention Schedule* (ERS) retention requirements and disposal of Records and Information that may be relevant to actual or reasonably anticipated litigation or investigations. Such materials may include user-generated or "custodial" information such as email, planning documents, and presentations, as well as "non-custodial" information such as databases and websites. The Johnson & Johnson Law Department (hereafter referred to as the Law Department) is the authoritative source for issuing and releasing Legal Holds.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The Law Department shall develop and implement procedures and internal controls for the following:

5.1.1. Receipt of Legal documents (e.g., Summons and Complaints, Court Orders, Subpoenas, etc.);

5.1.1.1. Legal documents received by the Operating Company shall be transmitted to the Law Department.

5.1.2. Communication and distribution of Legal Holds and Releases;

5.1.3. Preservation and collection of Records and Information subject to Legal Holds.

5.2. The Law Department shall provide training for Associates and other applicable stakeholders on Legal Hold Management tools.

5.3. The Law Department shall collaborate with Records and Information Management and Information Technology to raise awareness of Legal Hold preservation requirements, as applicable.

5.4. Communication/Distribution of Legal Holds and Releases

Johnson & Johnson

WWRIM Standard RIMS-6
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Litigation Support Standard**

5.4.1. The Law Department shall be solely responsible for determining the need for and content of Legal Hold Notice(s).

5.4.2. The Law Department shall have ultimate responsibility for identifying Associates and other stakeholders who receive Legal Hold Notice(s).

5.5. Preservation of Records and Information

5.5.1. Records and Information subject to Legal Hold shall be preserved and may not be disposed until the Law Department issues a written release of all applicable Legal Hold Notice(s).

5.5.1.1. The duty to preserve Records and Information subject to Legal Hold applies to all formats and media, including physical and electronic Records and Information.

5.5.2. When required by a pending Legal Hold, disposal of Records and Information according to the ERS, shall be suspended.

5.5.2.1. If there is uncertainty as to whether Records and Information are subject to a Legal Hold, the Records and Information shall be preserved until guidance and clarification can be obtained from the Law Department.

5.5.3. Preservation of Records and Information, including any Convenience Information subject to Legal Hold, shall be undertaken reasonably and in good faith. Scheduled or in-progress disposition of any such Records and Information must be suspended or stopped regardless of the ERS requirements.

5.5.4. Physical Records and Information subject to Legal Hold, but which are no longer required for day-to-day business operations, may be sent to inactive storage in accordance with company procedures based on this standard and other applicable WWRIM standards, unless otherwise notified by the Law Department.

5.5.5. After written release(s) for all applicable Legal Hold Notices have been issued, Records and Information shall resume normal retention requirements, as per the ERS.

5.6. Discovery/Production of Records and Information

5.6.1. The RIM program shall identify, collect, and deliver applicable Records and Information under their control to the parties designated by the Law Department.

5.6.2. Unless previously agreed between the Law Department and the Records Manager, the Records Manager shall not be responsible for managing and tracking the production or delivery of Records and Information to external parties for specific Law Department purposes.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687743

## Worldwide Records and Information Management

## Litigation Support Standard

**Revision History**

| Version 5.0 | 31 December 2016 | • Changed "Legal Hold Notice" to "Legal Hold" throughout if the reference is not to the actual notice.<br>• Purpose [1] Changed "potentially relevant to Legal Hold Notices that are issued" to "subject to Legal Holds."<br>• Background [former 2] Clarified wording. Added that the Johnson & Johnson Law Department is hereafter referred to as the Law Department in the standard.<br>• Minimum Implementation Requirements [5] Regrouped requirements in four areas: (1) Procedures/Internal Controls/Training/Awareness, (2) Communication/Distribution of Legal Holds and Releases, (3) Preservation of Records and Information and (4) Discovery/Production of Records and Information.<br>• Paragraph [5.1] Removed the Operating Company Records Manager as this is the Law Department's responsibility. Changed "documented procedures" to "procedures." Removed the specific requirements (actions, roles and responsibilities) for the procedures.<br>• Paragraph [5.1.1] Clarified wording. Separated requirement into paragraphs [5.1.1 and 5.1.1.1].<br>• Added paragraph [5.1.3] The Law Department shall develop and implement procedures and internal controls for the preservation and collection of Records and Information subject to Legal Holds.<br>• Paragraph [former 5.1.2.1] Moved to paragraphs [5.4.1 & 5.4.2].<br>• Removed paragraph [former 5.1.2.2] Requirements are addressed in paragraph [5.5.1].<br>• Removed paragraph [former 5.1.2.3] Requirements are addressed in paragraphs [5.5.1 & 5.5.5].<br>• Paragraph [former 5.1.3] Removed reference to "normal RIM practices."<br>• Paragraph [former 5.1.3.1] Clarified wording.<br>• Paragraph [former 5.1.4] Moved to paragraph [5.6].<br>• Paragraph [former 5.1.4.1] Moved to paragraph [5.6.2]. Changed "Operating Company Records Manager" to "Records Manager."<br>• Paragraph [former 5.2]. Moved to paragraph [5.5.1.1]. |
|---|---|---|

Johnson & Johnson

WWRIM Standard RIMS-6
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Litigation Support Standard**

| | | |
|---|---|---|
| | | • Added paragraph [5.2] The Law Department shall provide training for Associates and other applicable stakeholders on Legal Hold Management tools.<br>• Paragraph [former 5.3] Moved to paragraph [5.5.3].<br>• Added paragraph [5.3] The Law Department shall collaborate with Records and Information Management and Information Technology to raise awareness of Legal Hold preservation requirements, as applicable.<br>• Paragraph [former 5.4] Moved to paragraph [5.5.4]. Changed "Hard-copy" to "Physical." Removed specific requirements for sending Records and Information to inactive storage as that is addressed in RIMS-5, Physical Inactive Records and Information Storage Standard.<br>• Removed paragraph [former 5.5]. Addressed in paragraph [5.5.1].<br>• Removed paragraph [former 5.6] Addressed in paragraph [5.5.1].<br>• Added paragraph [5.6.1] The RIM program shall identify, collect and deliver applicable Records and Information under their control to the parties designated by the Law Department. |
| Version 4.0 | 31 December 2014 | • Changed throughout "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout "RRS" to "ERS."<br>• Changed throughout "retention period" to "retention requirement."<br>• Purpose – Clarified language.<br>• Background – Added language on "non-custodial" and "custodial" information.<br>• Scope – Expanded to include Legal Hold Notice custodians.<br>• Paragraph [5.1.2.1] – Clarified language.<br>• Paragraph [5.1.2.2] – Added language to stress obligation to preserve information.<br>• Paragraph [5.1.2.3] – Added language to stress importance of the written release from Legal Hold.<br>• Paragraph [5.1.3.1] – Removed language relating to the "destruction" of records.<br>• Paragraph [5.3] – Clarified language.<br>• Paragraph [5.4] – Added language to stress importance of indexing hard-copy records.<br>• Paragraph [5.5] – Changed verbiage surrounding new Legal Hold Notice process. |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687745

Johnson & Johnson

WWRIM Standard RIMS-6
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Litigation Support Standard**

| | | |
|---|---|---|
| | | • Paragraph [5.6] – Clarified language. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Changed throughout from Clean-out to disposition.<br>• Paragraph [5.1] Included - Law Department as a resource.<br>• Paragraph [5.1.1.] Added - transmission to Law Department requirement.<br>• Paragraph [former 5.1.1.1] now [5.1.2.2] Removed - boundary agreements.<br>• Paragraph [5.1.2.3] Added – direction on handling release notices.<br>• Paragraph [former 5.1.3.1] Remove-, condensed in a concise manner with former [5.1.3.2] to for new [5.1.3.1].<br>• Paragraph [5.2] Changed - "mediums" to "media" and removed wording "fixed or portable device." |
| Version 2.0 | 31 January 2011 | • Paragraph 5.1.2.1 – REMOVED the "Note" section<br>• Paragraph 5.1.4.1 – Change requirement whereas Records Managers will not be responsible for tracking documents released to external legal parties unless this is previously agreed to by the Records Manager and the Law Department. |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

5

JNJTALC000687746

Johnson & Johnson

WWRIM Standard RIMS-7
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

# Management of Records and Information for Facility Closures or Divestitures Standard

## 1. Purpose

This standard provides the minimum requirements for managing Records and Information subject to a facility closure or a business, plant, or product divestiture.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Approach

The Operating Company planning to divest itself of a business, plant, or product, or planning to close a facility, shall include Records and Information Management requirements in their plans as defined by the situations below:

- Closure of a facility when the business remains intact elsewhere: When one or more sites of an Operating Company close, the Operating Company shall retain ownership of the Records and Information for that site. Records and Information shall be governed under the direction of the Records Manager.

- Divestiture of specific products and/or functions where the balance of the Operating Company remains intact within the Johnson & Johnson Family of Companies: When the Operating Company divests itself of individual products and/or functions, Records and Information relevant to the product or function, as outlined in contracted agreement among the parties, and as required by law, shall transfer with that product or function. Only records specified in the contract shall be transferred to the new owner; all other records and information shall remain the property of the Operating Company.

- Complete divestiture of an Operating Company and all its associated products and/or functions: When the Operating Company's business is completely divested, the Records and Information defined in the contract and as required by law shall be transferred to the new owner. The remaining Records and Information shall be managed at the direction of the Law Department, in consultation with the Records Manager of the closing Operating Company and the World Headquarters Records Manager. The remaining records shall be transferred to the World Headquarters Records Manager, unless otherwise directed by the Law Department.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

JNJTALC000687747

Johnson & Johnson

WWRIM Standard RIMS-7
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Management of Records and Information for Facility Closures or Divestitures Standard

- Discontinuation of an Operating Company's business without divestiture: When the Operating Company's business ceases, disposition of all records shall be at the direction of the Law Department, in consultation with the Records Manager of the closing Operating Company and the World Headquarters Records Manager. The remaining records shall be transferred to the World Headquarters Records Manager, unless otherwise directed by the Law Department.

## 5. Minimum Implementation Requirements

5.1. Records and Information subject to a divestiture shall be described in the contract. In cases where ownership, division, or transfer of records is unclear, the Operating Company shall seek guidance from the Law Department.

5.2. Responsibility for overseeing the proper identification, management and transfer of Records and Information to a new owner shall be assigned to a team of subject matter experts, including Information Technology, Business Units, Legal, Human Resources, Finance, Tax, Privacy and Records Management.

5.3. Records and Information, both in paper and electronic formats, relevant to a divestiture or closure shall be identified and indexed with a copy retained by the Operating Company.

5.4. Records and Information, whose retention requirement has expired on or before the official divestiture date or the facility closing date shall be disposed of according to the *J&J Enterprise Retention Schedule* unless otherwise advised by the Law Department.

5.5. Records and Information identified for transfer to a new owner shall be checked against active Legal Holds to determine whether the Records and Information are subject to a Legal Hold.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687748

### Worldwide Records and Information Management

## Management of Records and Information for Facility Closures or Divestitures Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Changed "Johnson & Johnson Law Department" to "Law Department" throughout.<br>• Approach [4] [first bullet] Removed reference to the WWRIM Policy and Standards as all J&J Records and Information must comply with these. [third bullet] Removed "Custodianship." [fourth bullet] Removed "Custody."<br>• Paragraph [5] Reordered requirements and clarified wording.<br>• Paragraph [former 5.1] Added requirement for identifying Records and Information subject to a divestiture or closure and retaining a copy of the index with the Operating Company.<br>• Removed paragraph [former 5.3] Does not need to be stated that Records Information identified in the agreement that are to be transferred shall be separated from those retained by the OpCo.<br>• Paragraph [former 5.4] Changed "...a party outside the Operating Company" to "...a new owner." Changed "Legal Hold Notices" to "Legal Holds."<br>• Removed paragraph [former 5.4.1] Seeking guidance from the Law Department is addressed in paragraph [5.1].<br>• Removed paragraph [former 5.5] Team of subject matter experts is addressed in paragraph [5.1] Finance, Tax and Privacy were added to the team of subject matter experts.<br>• Removed paragraph [former 5.6] Involvement of the Tax department is addressed in paragraph [5.1].<br>• Removed paragraph [former 5.7] The index of Records and Information relevant to a divestiture or closure is addressed in paragraph [5.3].<br>• Removed paragraph [former 5.8] unclear or absent contract language is addressed in paragraph [5.1].<br>• Removed paragraph [former 5.9] Reference to proper chain of custody was confusing. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Reformatted Approach Paragraph for clarity. |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal |

Johnson & Johnson

WWRIM Standard RIMS-7
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Management of Records and Information for Facility Closures or Divestitures Standard**

| | | |
|---|---|---|
| | | Hold."<br>• Changed throughout "New Company" to "New Owner."<br>• Paragraph [5.2] Removed reference to WWRIM Clean-up Event Standard and Convenience Information.<br>• Paragraph [5.5] Added responsibility to - IT, Legal, HR, and Business Units.<br>• New paragraph [5.8] to specify procedure for "Unclear or Absent Contract Language." |
| Version 2.0 | 31 January 2011 | • Paragraph [5.2] – changed "Cleanout" to "Clean-up." |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687750

### Worldwide Records and Information Management

# Management of Records and Information for Mergers and Acquisitions Standard

## 1. Purpose

The purpose of this standard is to specify the Records and Information Management (RIM) planning requirements for integrating an acquired company's records and information into the acquiring Operating Company.

## 2. Background

When Johnson & Johnson (or one of its Operating Companies) seeks to acquire another company, the company being acquired will ultimately become part of Johnson & Johnson, and thus be required to comply with the Johnson & Johnson *Worldwide Records and Information Management Policy and Standards*.

## 3. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Approach

Due to the nature of acquisition planning and integration, and to the unique situations surrounding each acquisition project, the engagement of the Records Manager by the Mergers and Acquisitions team may occur at different intervals during the project. Engagement may not begin until the final integration is well underway. The Mergers and Acquisitions team may limit the Records Manager's level of engagement or scope of responsibility due to a variety of reasons. Hence, the tasks and responsibilities required of a Records Manager will also vary. Below are listed the minimal implementation standards.

## 6. Minimum Implementation Requirements

6.1. As part of the merger or acquisition process, the Mergers & Acquisitions team shall engage the Records Manager as part of the integration process and/or integration team.

6.2. As part of the merger or acquisition process, the Mergers & Acquisitions team and/or the Records Manager shall notify Worldwide Records and Information Management of the integration.

6.3. Within the terms and scope of this engagement (Section 5), the Records Manager shall do the following:

Johnson & Johnson

WWRIM Standard RIMS-8
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Management of Records and Information for Mergers and Acquisitions Standard

6.3.1. Facilitate or conduct an evaluation of RIM practices of the acquired company, including a gap analysis comparing that company's policies, standards and procedures with Johnson & Johnson's *Worldwide Records and Information Policy and Standards;*

6.3.2. Develop and implement a plan of action to bring the acquired company into compliance with the Johnson & Johnson *Worldwide Records and Information Policy and Standards;* after the merger or acquisition finalizes.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687752

### Worldwide Records and Information Management

# Management of Records and Information for Mergers and Acquisitions Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Changed "Operating Company Records Manager" to "Records Manager" throughout.<br>• Paragraph [6.1 & 6.2] Changed "...acquisition process" to "...merger or acquisition process."<br>• Paragraph [6.3.2] Changed "develop" to "develop and implement" a plan of action to bring the acquired company into compliance with the WWRIM Policy & Standards. Changed "...acquisition finalizes" to "...merger or acquisition finalizes." Removed specific provisions of that plan of action. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold."<br>• New Paragraph [6.2] Added – notification to WWRIM.<br>• Paragraph [former 6.2 - 6.2.2] now [6.3 – 6.32]. |
| Version 2.0 | 31 January 2011 | • Paragraph [1]: Removed reference to training as this is covered in RIMS-11.<br>• Minor edit. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-9
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

# Management of Records and Information of Departing Associates Standard

## 1. Purpose

This standard establishes the minimum requirements for managing the Records and Information of departing associates to assure such Records and Information are reviewed and dispositioned in compliance with the *J&J Enterprise Retention Schedule* (ERS) and Legal Holds.

## 2. Scope

This Standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Physical and electronic Records and Information created or received by an associate in the course of doing business are the property of that Operating Company. All Records and Information shall remain with the Operating Company upon departure of the associate.

Upon termination of an associate, steps must be taken to ensure the associate's Records and Information are appropriately managed, including transfer to other personnel, integration into records systems, or as appropriate, disposal.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The departing associate shall determine the appropriate disposition of their Records and Information in compliance with the *J&J Enterprise Retention Schedule* and Legal Holds.

5.1.1. Provided they are not subject to a Legal Hold, Records and Information, including Convenience Information, eligible for disposal shall be destroyed/deleted in accordance with the RIM program.

5.1.2. The departing associate shall assist in the transfer of Records and Information to other personnel or the integration into existing record systems, as applicable.

5.2. In the event the departing associate is unable to complete their responsibilities, the manager/supervisor/sponsor shall execute the duties or reassign them to another person.

## Worldwide Records and Information Management

# Management of Records and Information of Departing Associates Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Purpose [1] Clarified wording. Changed departing "employees and/or contractors" to departing "associates." The definition of "associates" was added to the WWRIM Glossary.<br>• Approach [former 4] Changed "Approach" section to "Background" for consistency with other standards.<br>• Background [former Approach 4] Changed "hard copy" to "physical." Changed "records" to "Records and Information." Removed reference to records created or received by vendors. Changed "Upon transfer or termination of an associate…" to "Upon termination of an associate…"<br>• Removed paragraph [former 5.1] Removed the RIM Department's responsibility for supporting the associate's department with processing and managing orphaned files.<br>• Paragraph [former 5.2] Clarified wording. Combined into paragraphs [5.1 and 5.1.1].<br>• Paragraph [former 5.2.1] Moved the departing associate's responsibility for assisting with the transfer of Records and Information to other personnel or the integration into existing record systems to paragraph [5.1.2]. Moved disposition requirements to paragraph [5.1.1].<br>• Paragraph [former 5.2.2] Clarified wording. In the event the departing associate is unable to complete their responsibilities, the manager/supervisor/sponsor shall execute the duties or reassign them to another person.<br>• Removed paragraph [former 5.2.3] Disposal is addressed in paragraph [5.1.1]. |
| Version 4.0 | 31 December 2014 | • Changed throughout – "Records Retention Schedule" to "Enterprise Retention Schedule".<br>• Changed throughout – "RRS" to "ERS".<br>• Changed throughout – "retention period" to "retention requirement".<br>• Paragraph [5.2.2] Changed verbiage – clarified supervisor roles.<br>• Paragraph [5.2.3] Changed verbiage – "defensible destruction" to "disposal".<br>• Changed throughout – "Manager or Sponsor" to "supervisor." |

**Worldwide Records and Information Management**

## Management of Records and Information of Departing Associates Standard

| | | |
|---|---|---|
| Version 3.0 | 31 December 2013 | • Changed throughout- "Document Hold" to "Legal Hold Notice."<br>• Where applicable replaced "employee" to "associate."<br>• Approach section [4] Clarified wording, reworded former "Note" section, and eliminated wordiness and length.<br>• Paragraph [5.2.1] Clarified - departing associates responsibilities.<br>• Paragraph [5.2.2] Clarified - supervisor, sponsor, designee responsibilities.<br>• Paragraph [5.2.3 & 5.2.3.1] Combined<br>• Paragraph [5.2.3.2 - 5.4] Removed - captured in previous sections. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.2.1] – Clarified requirement to enable departing employee to perform their records review in a compliant manner.<br>• Paragraphs [5.2.2] – REMOVED reference to "within 90 days of employee's departure."<br>• Paragraph [5.2.3.1] – Added new requirement to allow for destruction of records at time of review, if Operating Company procedures support this – renumbered remaining requirements under [5.2.3]; also changed "Cleanout" to "Clean-up"<br>• Paragraph [5.3.1] – REMOVED reference to "within 90 days of the contractor or vendor's departure."<br>• Paragraph [5.5] – REMOVED –information security requirement and included in those policies. |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

**Worldwide Records and Information Management**

# Records and Information Management Compliance Assessment Standard

## 1. Purpose

This standard defines the requirements for planning and facilitating Department/Business Unit Records and Information Management (RIM) compliance assessments.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

RIM compliance assessments provide assurance that Operating Company Records and Information processes are compliant with RIM program requirements.

RIM compliance assessments discussed in this standard are not to be confused with, nor used in place of, the Records and Information Management audits conducted by Johnson & Johnson Corporate Internal Audit (CIA). CIA conducts audits of the Operating Company RIM program for compliance with *Worldwide Records and Information Management Policy and Standards*; the criteria and selection process for CIA audits will be determined by CIA.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. The RIM program shall facilitate compliance assessments of selected Departments/Business Units within their Operating Company.

5.2. A risk-based approach shall be used to determine the RIM compliance assessment schedule priorities.

5.2.1. The Records Manager shall determine which Departments/Business Units within the company shall be considered "high risk" from a RIM perspective.

5.2.2. Considerations for classifying Departments/Business Units as "high risk" may include:

- Non-compliant findings from previous RIM compliance assessments;
- Previously impacted by significant legal obligations;
- Exposed to external (e.g. Regulatory) audits.

5.2.3. "High risk" Departments/Business Units shall be assessed at a minimum every three years.

Johnson & Johnson

WWRIM Standard RIMS-10
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Records and Information Management Compliance Assessment Standard

5.2.4. "Non-high risk" Departments/Business Units shall be assessed at a minimum every five years.

5.3. The scope of the RIM compliance assessment shall include, but is not limited to, the following areas:

- *J&J Enterprise Retention Schedule*;
- Training and Education;
- Legal Holds;
- Inactive Records and Information Management;
- Vital Records Protection;
- Records of Departing Associates.

5.4. A RIM compliance assessment report shall be presented to senior management of the Department/Business Unit being assessed and shall include significant findings. Significant findings may include non-compliance with any of the RIM program areas listed in section 5.3.

5.5. The Department/Business Unit being assessed shall develop a corrective action plan, with timelines, to address significant findings.

5.5.1. Corrective action plans shall be signed by senior management of the Department/Business Unit and submitted to the RIM program for acceptance and monitoring through completion. The Department/Business Unit shall provide periodic updates on the progress of the action plan.

5.5.2. The RIM program shall be responsible for monitoring the status of the corrective action plan to assure its implementation, and for escalating repeated missed deadlines and/or lack of progress to senior management of the Department/Business Unit.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687758

## Worldwide Records and Information Management

# Records and Information Management Compliance Assessment Standard

---

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Removed "Operating Company" throughout.<br>• Changed "departments" to "Departments/Business Units" throughout.<br>• Purpose [1] Clarified wording.<br>• Background [former 2] Clarified wording.<br>• Paragraph [5.1 and former 5.1.1] Combined into [5.1] Removed reference to "trained and qualified individuals."<br>• Paragraph [5.2.2] Added "Considerations for classifying..." [third bullet] Changed "regulatory" to "external" and included Regulatory as an example.<br>• Paragraph [5.2.3] Changed minimum assessment frequency for high risk Departments/Business Units from two years to three years. Removed "An assessment resulting in a significant finding may warrant a full assessment in the following year."<br>• Paragraph [5.2.4] Changed "Low-risk" to "Non-high risk." Added five-year minimum assessment frequency for non-high risk Departments/Business Units.<br>• Removed paragraph [former 5.3] Documenting an assessment schedule for non "high risk" departments.<br>• Paragraph [former 5.4] Added "but is not limited to." [first bullet] Removed reference to disposition of records past their retention. [third bullet] Changed "Legal Hold Notices" to "Legal Holds"<br>• Paragraph [former 5.5] Changed "upper" management to "senior" management. Added detail on what significant findings may include.<br>• Paragraph [former 5.6.1] Removed reference to timelines as they are part of the action plan.<br>• Paragraph [former 5.6.2] Changed "Operating Company senior management" to "senior management of the Department/Business Unit." |
| Version 4.0 | 31 December 2014 | • Changed throughout "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed "retention times" to "retention requirements."<br>• Added Paragraph [5.2.4] to add "Low Risk" Departments. |
| Version 3.0 | 31 December 2013 | • Background [2] First paragraph - Clarified wording. Minor change, Removed second paragraph. |

Johnson & Johnson

WWRIM Standard RIMS-10
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Records and Information Management Compliance Assessment Standard

| | | |
|---|---|---|
| | | • Paragraph [5.1] Added "for high risk areas."<br>• Paragraph [5.2.3] Added - The significance of the finding of the review may warrant a full assessment in the following year for "high risk" departments.<br>• Paragraph [former 5.2.4] Removed, condensed within new [5.2.3] for conciseness.<br>• New Paragraph [5.4] The Operating Company RIM department shall have a documented schedule for "non-high risk" departments.<br>• Paragraph [former 5.2.2.2] Removed, see below<br>• Paragraph [former 5.2.2.3 – 5.2.2.4] now [5.2.2.2 – 5.2.2.3]<br>• Paragraph [former 5.2.2.5] Removed- redundant.<br>• Paragraph [5.4] Removed – Records Cleanout, now [5.5].<br>• Paragraph [former 5.6.1] now [5.7.1] Added – Department designee shall provide periodic updates on the progress of the action plan.<br>• Paragraph [former 5.6.2] Removed, condensed within new [5.7.1].<br>• Paragraph [former 5.6.3] now [5.7.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.4] – Added "Records of Departing Associates" to list of items to be audited.<br>• Paragraph 5.4 – REMOVE requirement around conducting a random audit of vendors working with the department who store, manage or create records on the vendor's behalf.<br>• Paragraph [5.5] and [5.6.2] – clarified department "upper" management responsibilities. |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687760

**Worldwide Records and Information Management**

# Training and Education Standard

## 1. Purpose

This standard establishes the minimum requirements for Johnson & Johnson Operating Companies in providing Records and Information Management (RIM) training and education to assure that the requirements and the expectations of the RIM program are communicated and understood.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. The following training requirements shall be met by all Operating Companies for (1) employees; (2) vendors, external business partners, consultants/contractors; and (3) individuals in special roles.

4.1.1. Employees and contractors/consultants with access to the J&J network shall complete the RIM Associate Training once per year through the J&J SUMMIT Learning Management System (LMS) addressing the following areas:

- Overview of the *Worldwide Records and Information Management Policy*;
- Benefits of properly managed Records and Information;
- Consequences and risks of non-compliance;
- Basic elements of a RIM program;
- RIM lifecycle methodology;
- The concept of Records and Information and Convenience Information;
- Understanding and complying with the J&J Enterprise Retention Schedule;
- Understanding and complying with a Legal Hold;
- Understanding roles and responsibilities within the RIM program;
- General contact information for further RIM assistance/guidance.

4.1.1.1. Newly hired employees and contractors/consultants with access to the J&J network shall complete the RIM Associate Training through the J&J SUMMIT LMS within 30 days of reporting to work and once per year thereafter.

4.1.1.2. Any exceptions to section 4.1.1 and 4.1.1.1 must be reviewed and approved by Worldwide Records and Information Management (WWRIM).

**Worldwide Records and Information Management**

## Training and Education Standard

4.1.2. As documented in the *RIM Guidance for Supplier Contracts*, vendors, external business partners, and contractors/consultants without access to the J&J network who create, maintain, manage or manipulate J&J Records and Information shall receive the *RIM Supplier Requirements.*

4.1.3. The following requirements address individuals in special roles:

4.1.3.1. Records Coordinators shall receive specialized annual training that includes their responsibilities as defined in ***WWRIM RIMS-1, Records and Information Management Program Standard***. As Department/Business Unit RIM subject matter experts, Records Coordinators shall also be trained on the following RIM Program requirements:

a) Compliance with the *J&J Enterprise Retention Schedule*;
b) Legal Hold compliance;
c) Departing associate process;
d) Vital records protection.

4.2. The Operating Company shall track and document completion/attendance of all training, education sessions, and courses.

4.3. Training courses and education materials shall be reviewed and/or updated at a minimum of every two years to assure relevancy.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

## Worldwide Records and Information Management

# Training and Education Standard

**Revision History**

| | | |
|---|---|---|
| Version 6.0 | 30 March 2018 | • Paragraph [4.1.1] Changed requirement to employees and contractors/consultants <u>with</u> access to the J&J network shall complete the RIM Associate Training once per year through the J&J SUMMIT LMS.<br>• Paragraph [former 4.1.1.1, 4.1.1.2 and 4.1.1.3] Removed requirements.<br>• Paragraph [former 4.1.1.4] Changed newly hired/transferred employees to newly hired employees and contractors/consultants. Changed requirement for new hire training from within 60 days to within 30 days of reporting to work.<br>• Added paragraph [4.1.1.2] Exceptions to 4.1.1 and 4.1.1.1 must be reviewed and approved by WWRIM.<br>• Paragraph [4.1.2] Changed WWRIM Policy to RIM Supplier Requirements.<br>• Paragraph [4.2] Changed RIM Department to Operating Company. |
| Version 5.0 | 31 December 2016 | • Paragraph [4.1] Clarified wording. Removed requirement for a documented procedure. Changed "individuals in special roles/circumstances" to "individuals in special roles."<br>• Removed paragraph [former 4.2] Operating Company training requirements are addressed in paragraph [4.1].<br>• Paragraph [former 4.2.1] Changed "Operating Company Employees" to "Employees and contractors/consultants <u>with</u> access to the J&J network." Reordered bullet points. [former sub-bullet e)] Clarified that the training should include all roles and responsibilities within the RIM program, not just the employee's responsibilities.<br>• Added paragraph [4.1.1.1] The WWRIM training module meets the minimum requirements of section 4.1.1 and shall be utilized when possible.<br>• Paragraph [former 4.2.2] Clarified wording. Changed "J&J eUniversity" to "online training" and "WebEx training" to "web conferencing."<br>• Paragraph [former 4.2.3] Changed "Operating Company Records Manager" to "Records Manager."<br>• Paragraph [former 4.2.4] Updated training requirements for vendors, external business partners and contractors/consultants to the following: Vendors, external business partners, |

**Worldwide Records and Information Management**

**Training and Education Standard**

| | | |
|---|---|---|
| | | and contractors/consultants without access to the J&J network who create and/or manage business Records and Information shall receive the WWRIM Policy to understand their role and responsibilities in complying with RIM requirements.<br>• Paragraph [former 4.2.5] Changed "individuals in special roles/circumstances" to "individuals in special roles."<br>• Moved paragraph [former 4.2.5.1] to paragraph [4.1.1.4].<br>• Paragraph [former 4.2.5.2] Clarified/updated training requirements for Records Coordinators.<br>• Removed paragraph [former 4.2.5.3].<br>• Paragraph [former 4.4] Changed review period for training and education materials and training courses from three years to two years. |
| Version 4.0 | 31 December 2014 | • Changed throughout – "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed throughout – "program audits" to "department assessments." |
| Version 3.0 | 31 December 2013 | • Paragraph [4.1] Removed - "ongoing RIM strategy."<br>• Former note: section under section [4.2]. Moved to its own section, now [4.2.2].<br>• Former Exception paragraph in [4.2.1]. Moved to its own section, now [4.2.3].<br>• Paragraph [former 4.2.2] now [4.2.4] Added - "Understanding and complying with a legal Hold."<br>• Paragraph [4.2.1] Removed - "Cleanup events."<br>• Paragraph [4.2.4] Removed - "60 days" requirement.<br>• Note: section under [4.2.4.] Clarification for contractors.<br>• Paragraph [former 4.2.3. – 4.2.3.2] now [4.2.5 – 4.2.5.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [4.2.1] – Added Exception to allow Records Managers discretion in provided abbreviated training to J&J employees who do not handle records during the normal course of their job.<br>• Minor typographical changes |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

# Worldwide Records and Information Management

# Enterprise Retention Schedule Standard

## 1. Purpose

This standard provides the requirements for adherence to the Johnson & Johnson Enterprise Retention Schedule (ERS) by the Johnson & Johnson Operating Companies.

## 2. Scope

This Standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

To ensure compliance with business and operating needs, Records and Information must be maintained in a systematic manner throughout their lifecycle. The ERS defines retention requirements for business, legal, regulatory and privacy purposes. The ERS is the single authoritative source for retention requirements for all Operating Companies. The ERS is accepted by business stakeholders at the enterprise level. ERS approval signatures are not required at the Operating Company level. Country/region exceptions are documented on the ERS.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

5.1. WWRIM Program Office Responsibilities

5.1.1. Perform periodic reviews of ERS with the Law Department, Worldwide Privacy and business stakeholders.

5.1.2. Ensure controls are in place for ERS updates and related processes.

5.1.3. Ensure the methodology used to develop and maintain the ERS is accepted by the Law Department and Information Security & Risk Management Senior Leadership.

5.2. Operating Company Responsibilities

5.2.1. Use the ERS as the single authoritative source for retention requirements.

5.2.2. Apply ERS requirements to Records and Information in all media formats. The requirements apply to Johnson and Johnson Records and Information that reside on J&J

Johnson & Johnson

WWRIM Standard RIMS-12
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Enterprise Retention Schedule Standard**

computing or storage devices, third-party/partner computing or storage devices, or personally-owned computing or storage devices.

5.2.2.1. The Records Manager shall document non-compliances following the ERS Risk Acknowledgement process with Senior Management approval.

5.2.3. Retain Records and Information in accordance with ERS, but no longer than the required retention, unless a Legal Hold has been issued by the Law Department suspending the disposal. If a Legal Hold is issued, Records and Information relevant to the subject of the Legal Hold are to be preserved until the Legal Hold is formally released in writing by the Law Department.

5.2.4. Provided they are not subject to a Legal Hold, dispose of Records and Information that have met their retention period in a secure manner that prevents unauthorized disclosure consistent with good industry practices and ensures that Records and Information cannot be recovered or reconstructed by any ordinary means.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687766

**Worldwide Records and Information Management**

## Enterprise Retention Schedule Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Background [3] Clarified wording. Added ERS is the single authoritative source for retention requirements and country/regional exceptions are documented on the ERS.<br>• Minimum Implementation Requirements [5] Renumbered the requirements.<br>• Paragraph [former 5.1] Changed responsibility for developing and managing the ERS to performing periodic reviews with the Law Department, Worldwide Privacy and business stakeholders.<br>• Paragraph [former 5.2] Replaced documented Change Management Procedure with ensuring controls are in place for ERS updates and related processes.<br>• Paragraph [former 5.3] Removed Worldwide Privacy responsibility as it is addressed in paragraph [5.1.1].<br>• Paragraph [former 5.4] Added Information Security & Risk Management Senior Leadership must accept the ERS methodology from paragraph [former 5.5.1].<br>• Removed paragraph [former 5.5] "While the ERS will be effective January 1, 2015, OpCo's will have until July 1, 2015 to become compliant with both the RIMS-12 Standard and ERS." As of today, all OpCo's must be compliant with RIMS-12 and ERS.<br>• Added paragraph [5.2.1] ERS is the singe authoritative source for retention requirements.<br>• Removed paragraph [former 5.5.1] Acceptance is addressed in paragraph [5.1.3] and the comment that no signoff is required at the OpCo level is addressed in the Background [3].<br>• Paragraph [former 5.6] Clarified that the Records Manager shall document any non-compliances with ERS. Replaced reference to the "form" with "process."<br>• Paragraphs [former 5.7 & 5.8] Clarified wording.<br>• Removed paragraph [former 5.9] Communications and training are addressed in RIMS-11, Training and Education Standard.<br>• Paragraph [former 5.10] Clarified wording. Removed reference to hard-copy and electronic records. |
| Version 4.1 | 14 September 2015 | • Added paragraph [5.5.1] To remove OpCo requirement to have local level signatures.<br>• Changed "Risk Exception Form" to "ERS Risk Acknowledgement Form" |
| Version 4.0 | 31 December 2014 | • Changed title from "Records Retention Schedule Standard" to "Enterprise Retention Schedule Standard."<br>• Purpose Paragraph – Clarified language.<br>• Background Paragraph – Clarified language. |

**Worldwide Records and Information Management**

**Enterprise Retention Schedule Standard**

| | | |
|---|---|---|
| | | • Changed throughout – "destruction" to "disposal."<br>• Changed throughout - "Records Retention Schedule" to "Enterprise Retention Schedule."<br>• Changed throughout - "retention time(s)" and retention period(s) to "retention requirements."<br>• Added a new section under Section 5 for "WWRIM Program Requirements."<br>• Added paragraphs [5.4] – [5.5.1] to set requirements to the Operating Company for the Exception Process and Change Control Process.<br>• Paragraph [5.6] – Clarified language.<br>• Removed original paragraphs [5.1], [5.2], [5.4], [5.5], [5.7], [5.8], [5.9], [5.10], [5.14] and [5.15] – obsolete with new ERS requirements. |
| Version 3.0 | 31 December 2013 | • Added a new Section "Background" with a descriptive paragraph.<br>• Added new paragraphs [5.1.1, 5.1.1.1, 5.1.1.2 & 5.1.1.3] Added process around Operating Company RRS modifications and the GRRS.<br>• Paragraph [5.4] deleted the reference to Vice President or above and left reference to Senior Management as the accepted level of signatory.<br>• Paragraph [5.5] Added requirement to submit RRS to WWRIM.<br>• Paragraph [5.7] Last bullet added "and/or business requirement"<br>• Paragraph [5.10] Removed trigger event table and changed to reference the GRRS. |
| Version 2.0 | 31 January 2011 | • Paragraph [4.8] – Clarified "upper" management of department in place of "senior" management of department<br>• Paragraph [4.9] – Changed the FTA trigger description by eliminating reference to "in no case less than seven years." |
| New Standard Version 1.0 | 30 Sept 2009 | • New Document Issued |

# Worldwide Records and Information Management

# Vital Records Standard

## 1. Purpose

This standard establishes the requirements for the identification, protection, and maintenance of Vital Records for all Johnson & Johnson Operating Companies.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Vital Records are Records and Information that are fundamental to the functioning of Johnson & Johnson and its Operating Companies (referred to as the "organization") and necessary to continue business operations without excessive delay under abnormal conditions and/or disasters. Vital Records are necessary to maintain or re-establish the organization and they are a critical component of Business Continuity Plans. The Enterprise Vital Records (EVR) inventory is the authoritative source of Vital Records for all Operating Companies.

Loss of Vital Records may cause unacceptable damages to the organization's economic health, legal or regulatory status, or its ongoing viability as a business. Examples of unacceptable damages include the following:

- Damage to company brand/reputation;
- Interruption of revenue flow;
- Inability to comply with legal and/or regulatory requirements;
- Fines or other penalties incurred for failure to produce required Records and Information;
- Extensive cost of reconstruction of lost or damaged Records and Information;
- Loss or decrease in customer base.

A record is <u>not</u> vital if:

- The information it contains can be obtained or reconstructed from other sources unlikely to be affected by the same abnormal condition/disaster, within an acceptable timeframe and at a reasonable cost; or
- Its complete and permanent loss would <u>not</u> pose a significant risk to the organization's ability to continue operating.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

Johnson & Johnson

WWRIM Standard RIMS-13
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Vital Records Standard**

## 5. Minimum Implementation Requirements

5.1 The WWRIM Program Office shall maintain the EVR inventory and implement controls for periodic reviews and updates.

5.2 The Operating Company shall be responsible for the following:

5.2.1 Use the EVR inventory as the authoritative source for Vital Records identification.

5.2.2 Define Operating Company Recovery Class Levels.

5.2.2.1 The recovery class should set forth the time frame for which the Vital Records must be restored to operation in hours, days, weeks or other suitable measures of time.

5.2.2.2 Example Vital Records Recovery Class Level Scheme:

- Recovery Class Level 1
  - Records and Information needed for emergency operations (for example, Business Continuity Plan).
- Recovery Class Level 2
  - Records and Information needed within the first xx hours/x days after an abnormal condition/disaster for immediate resumption and continuation of business.
- Recovery Class Level 3
  - Records and Information essential for reestablishing the legal and financial position of the Operating Company and are needed within the first x/xx days after an abnormal condition/disaster.
- Recovery Class Level 4
  - Records and Information that are vital, but do not require recovery within the first x/xx weeks after an abnormal condition/disaster.

5.2.3 Assess and determine cost-effectiveness of protection and retrieval methods of Vital Records.

5.3 The Department/Business Unit shall be responsible for the following:

5.3.1 Identify Department/Business Unit Vital Records in alignment with the EVR inventory.

5.3.2 Secure Vital Records in a manner that preserves and protects the integrity of the records.

5.3.3 Assign Recovery Class Levels to Vital Records.

5.3.3.1 The Vital Records Recovery Class Level shall be based on the content of the Records and Information and shall not be based on media format.

5.3.4 Recover Vital Records according to their Recovery Class Level in the event of an abnormal condition/disaster.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687770

## Worldwide Records and Information Management

## Vital Records Standard

5.3.5 Protect Vital Records via dispersal, protective storage or a combination of both in compliance with the methods defined in Table 1.

5.3.5.1 Vital Records protected prior to the effective date of this Standard are not subject to the protection methods defined in Table 1.

5.3.5.2 The following shall be considered to determine the appropriate method of protection for Vital Records:

- Environmental requirements for the media type.
- Recovery Class Level and associated recovery timeframes.
- Security requirements.
- Availability of budget and resources.

**Table 1 - Vital Records Acceptable Protection Methods**

| Format | Location | Protection Methods | Dispersed Copy | Considerations |
|---|---|---|---|---|
| **PAPER** | **J&J Onsite** *(department files / central storage)*<br><br>or<br><br>**Offsite Storage Vendor Facility** | **Dispersal*** | - Scan to electronic format and store in a J&J application or in a secure area on the J&J Network with a data backup.<br><br>or<br><br>- Offsite vendor scans to electronic format and stores in their application. | - "Implementation of True Copy Processes for Physical Record Conversion to Electronic Format" must be followed. If applicable, dispose of the paper record. **<br>- Ensure data backup process/schedule meets recovery needs.<br><br>If an offsite vendor scans and stores the record, then:<br><br>- Both the electronic and paper versions must be dispersed at the offsite storage vendor.<br>- The vendor must complete a Business Partner Risk Assessment (BPRA) per the J&J Information Asset Protection Polices. |
| | | **Protective Storage** | Not Applicable | - Onsite cabinet/vault/room or offsite storage location must meet requirements for protective storage. |

Johnson & Johnson

WWRIM Standard RIMS-13
Version 6.0
30 March 2018
*Effective – 31 December 2018*

Worldwide Records and Information Management

Vital Records Standard

| Vital Records Acceptable Protection Methods | | | | |
|---|---|---|---|---|
| **Format** | **Location** | **Protection Methods** | **Dispersed Copy** | **Considerations** |
| **ELECTRONIC** | **J&J Application / J&J Network**<br>or<br>**Desktop** *(hard drive)*<br>or<br>**Mobile Device** *(USB/flash drive, external hard drive, CD, DVD, tape, etc.)* | **Dispersal*** | - Data Backup<br>or<br>- Copy the record from the desktop or mobile device and store in a J&J application or in a secure area on the J&J Network with data backup. | - Ensure data backup process/schedule meets recovery needs.<br>- If applicable, dispose of the Mobile Device. ** |

**Recommended protection method.*
***Specific circumstances, such as Legal Holds, contracts in countries that do not except eSignatures, etc. may prevent disposal.*

5.4 The RIM program shall be responsible for the following:

5.4.1 Maintain a master list of the Operating Company's Vital Records for inclusion in the Business Continuity Plan. At a minimum, the master list shall include:

- EVR Title
- ERS Code
- ERS Functional Category
- Department/Business Unit
- Vital Record Format (i.e. paper, electronic, paper/electronic, microfilm or microfiche)
- Vital Record Location (i.e. application name, network location, local device, department physical files, onsite central storage room, offsite storage vendor)
- Method of Protection (dispersal, protective storage or combination of both)
- Duplicate Record Format (only required if protection method includes dispersal)
- Duplicate Record Location (only required if protection method includes dispersal)
- Recovery Class Level

5.4.2 Provide guidance to the Department/Business Unit on access and protection methods for Vital Records.

5.4.3 Conduct periodic retrieval tests to ensure selected Vital Records can be effectively and efficiently recovered for resumption of business operations in the event of an abnormal condition/disaster.

5.5 Any exceptions to this standard must be approved by Operating Company Senior Management.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687772

## Worldwide Records and Information Management

## Vital Records Standard

**Revision History**

| | | |
|---|---|---|
| Version 6.0 | 31 December 2018 | • Clarified wording and reordered requirements throughout.<br>• Changed "abnormal condition" and "disaster" to "abnormal condition/disaster" throughout.<br>• Background [3] Added the Enterprise Vital Records Inventory (EVR) is the authoritative source of Vital Records for all Operating Companies. Added "A record is <u>not</u> vital if:..."<br>• Approach [former 5] Removed section. Removed dispersal and protective storage definitions and added them to the WWRIM Program Glossary<br>• Minimum Implementation Requirements [former 6 now 5] Added WWRIM Program Office responsibilities for maintaining and reviewing the EVR inventory.<br>• Paragraph [former 6.1 and 6.1.1] Replaced protection examples with vital records acceptable protection methods. New requirements addressed in paragraphs 5.3.5 and 5.3.5.1.<br>• Added Paragraph [5.2.1] OpCo is responsible for using the ERV inventory as the authoritative source for Vital Records identification.<br>• Added Paragraph [5.3.1] Department/Business Unit is responsible for identifying Vital Records in alignment with the EVR inventory.<br>• Added Paragraph [5.3.2] Department/Business Unit is responsible for securing vital records in a manner that preserves and protects the integrity of the records.<br>• Changed responsibility for recovering Vital Records from the Operating Company to the Department/Business Unit.<br>• Paragraph [5.3.5] Clarified the Department/Business Unit is responsible for protecting vital records in accordance with Table 1.<br>• Added Paragraph [5.3.5.1] Vital Records protected prior to the effective date of this Standard are not subject to the protection methods defined in Table 1.<br>• Added Paragraph [5.3.5.2] Acceptable protection method considerations and requirements.<br>• Paragraph [5.4.1] Modified the requirements for the Operating Company's Vital Records Master List. |
| Version 5.0 | 31 December 2016 | • Clarified wording and reordered requirements throughout.<br>• Approach [5] Clarified wording and added description for protective storage. Removed requirement for implementing a procedure to ensure the Vital Records are kept current. Removed Operating Company Sr. Mgt. must agree to protect vital records or tolerate the risk of not protecting them via a formal approved exception.<br>• Minimum Implementation Requirements [6] Divided OpCo |

Johnson & Johnson

WWRIM Standard RIMS-13
Version 6.0
30 March 2018
*Effective – 31 December 2018*

**Worldwide Records and Information Management**

**Vital Records Standard**

| | | |
|---|---|---|
| | | responsibilities into RIM Program, Department/Business Unit and Operating Company.<br>• Paragraph [former 6.1] Requirements addressed in paragraph [6.2.2].<br>• Paragraph [former 6.2.1] Added dispersal example and clarified examples.<br>• Paragraph [6.2] Added RIM Program responsibilities (some were previously OpCo responsibilities).<br>• Added paragraph [6.2.1] Providing guidance to Department/Business Unit on Vital Records processes.<br>• Paragraph [6.2.2] Modified master list of OpCo Vital Records requirements. Removed repository name, repository system and record types. Added record name/title, ERS code and ERS functional category.<br>• Paragraph [6.3] Added Department/Business Unit responsibilities (previously were OpCo responsibilities).<br>• Removed paragraph [former 6.3.2] Requirements addressed in paragraphs [6.2.1 & 6.3].<br>• Removed paragraphs [former 6.3.3, 6.3.4 & 6.3.5] Requirements for determining the level of risk associated with the potential loss of Vital Records and related costs.<br>• Removed paragraph [former 6.4] Requirements addressed in paragraph [6.3.2].<br>• Paragraph [former 6.4.1] Changed "Vital Information Recovery Class Levels" to "Example Vital Records Recovery Class Level Scheme."<br>• Removed paragraphs [former 6.5, 6.5.1, 6.5.3 & 6.5.4] Requirement for OpCo procedures for the following: strategy and decision for identifying Vital Records, determining protection methods and assigning Recovery Class Levels; method for keeping Vitals Records list current; method for controlling access to vital records and their copies.<br>• Paragraph [former 6.5.2] Requirements addressed in paragraph [6.2.2].<br>• Paragraph [former 6.5.5] Requirements addressed in paragraph [6.4.2].<br>• Paragraph [former 6.5.6] Requirements addressed in paragraph [6.4.3].<br>• Paragraph [former 6.5.7] Requirements addressed in paragraph [6.2.3].<br>• Paragraph [6.4.1] Added OpCo responsibility for defining recovery class levels.<br>• Paragraph [former 6.6] Requirements addressed in paragraph [6.5]. |
| Version 4.0 | 31 December 2014 | • Paragraph [6.1] - Added information about master Vital Information List.<br>• Paragraph [6.2] - Added requirement for ease of |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

6

JNJTALC000687774

**Worldwide Records and Information Management**

**Vital Records Standard**

| | | |
|---|---|---|
| | | irretrievability.<br>• Paragraph [6.5.6] - Added requirement for cost-effectiveness determination. |
| Version 3.0 | 31 December 2013 | • Background section [2] Added a paragraph on the goal of protecting vital records.<br>• Paragraph [6.4] Removed - specific hours, days, months in recovery class table.<br>• Paragraph [6.5.2] Changed required fields in vital records list.<br>• Paragraph [6.5.6] Changed - testing period from "annual" to "periodic." |
| Version 2.0 | 31 January 2011 | • Paragraph [5] – Modified description of acceptable approach for protecting Vital Records per revised ANSI/ARMA standard.<br>• Paragraph [6.1] – Added protective storage and protective storage plus dispersal as acceptable means of protecting Vital Records.<br>• Paragraph [6.1.1] and [former 6.1.2] – Merged the two paragraphs to include and expand on examples of acceptable protection for Vital Records.<br>• Paragraph [6.1.2] – Added option of "protective storage" alone to the risk-based protection scenario.<br>• Paragraph [6.6.2] - REMOVED "Retention Period" as a required field. ADDED "Record Owner" as a required field.<br>• Minor grammatical and typographical changes |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-14
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

# Management of Records for System Decommissioning Standard

## 1. Purpose

This standard defines the Johnson & Johnson Records and Information Management requirements for decommissioning a system.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Based on emerging technology and business requirements, systems sometimes need to be retired or decommissioned. The decommissioning process involves, at a minimum, the following stakeholders: Information Technology (IT), Information Asset Owners, Records Management and the Law Department.

## 4. Definitions

Reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. Processes and tools specified by Worldwide Records and Information Management shall be used when decommissioning a system that contains Johnson and Johnson information.

5.2. The System Development Lifecycle (SDLC) Retirement Track shall be followed when decommissioning a system.

5.3. Records Management shall work with the Information Asset Owners to determine the appropriate retention in compliance with the *J&J Enterprise Retention Schedule*.

5.4. Information Asset Owners are responsible for performing due diligence to identify applicable Legal Holds, and ensuring adherence to applicable preservation standards before decommissioning a system.

5.4.1. Systems containing information subject to Legal Hold must be preserved in compliance with the *Requirements for Preservation of Data from Systems Under Legal Hold* issued by the Law Department.

5.5. Information that must be retained shall be migrated to another system or archived to the J&J Enterprise Archiving Solution, in accordance with ***WWRIM RIMS-16, Electronic Records and Information Archiving Standard*** until it has met the retention and/or Legal requirements.

5.6. The integrity of the information shall be preserved in compliance with *Johnson & Johnson Information Asset Protection Policy (IAPP) S-4 Worldwide Information Classification Policy*.

**Worldwide Records and Information Management**

## Management of Records for System Decommissioning Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Changed "system and data business owners" to "Information Asset Owners" throughout.<br>• Changed "Operating Company Records Manager" to "Records Management" throughout.<br>• Background [former 2] Clarified wording. Added the Law Department to the stakeholders. Moved Records Management's role to paragraph [5].<br>• Paragraph [5] Reordered and clarified wording.<br>• Added paragraph [5.1] Processes and tools specified by WWRIM shall be used when decommissioning a system that contains J&J information.<br>• Paragraphs [former 5.1 and 5.2] Updated and combined into paragraph [5.3]. Removed reference to near-line and off-line storage.<br>• Removed paragraph [former 5.3] Vital record status does not pertain to system decommissioning.<br>• Added paragraph [5.4] Information Asset Owners are responsible for performing due diligence to identify applicable Legal Holds, and ensuring adherence to applicable preservation standards before decommissioning a system.<br>• Added paragraph [5.4.1] Systems containing information subject to Legal Hold must be preserved in compliance with the Requirements for Preservation of Data from Systems Under Legal Hold issued by the Law Department.<br>• Removed paragraph [former 5.4] Requirements addressed in paragraph [5.4.1].<br>• Removed paragraph [former 5.4.1] Requirement no longer applies.<br>• Paragraph [former 5.5] Removed reference to near-line and off-line storage. Added requirement for archiving to the J&J Enterprise Archiving Solution, per RIMS-16. Separated requirement for preserving the integrity of the information into paragraph [5.6]. Added reference to IAPP S-4.<br>• Removed paragraph [former 5.6] IT disposal requirements do not apply to the standard.<br>• Removed paragraphs [former 5.7, 5.7.1 and 5.7.2] Requirements for decommissioning documentation is determined through the SDLC process.<br>• Removed paragraph [former 5.8] Requirements addressed in paragraph [5.2]. |

**Worldwide Records and Information Management**

## Management of Records for System Decommissioning Standard

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Removed Paragraph [5.1] - not the Operating Company's responsibility.<br>• Changed throughout - "Records Retention Schedule" to "Enterprise Retention Schedule." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold"<br>• Paragraph [5.1] Clarified wording – Record Managers shall develop a communication to ensure the appropriate business owners consult them when a system is being decommissioned.<br>• Paragraph [5.6] Clarified wording – Retaining information shall be managed during and after the transfer in such a way as to ensure the integrity of the information.<br>• Paragraph [5.5.1] Clarified wording - Records Manager shall consult with the Johnson & Johnson Law Department if necessary.<br>• Paragraph [5.8.3] Removed- redundancy.<br>• Paragraph [5.8.4] Removed- inherent within new [5.9].<br>• New Paragraph [5.9] Added - reference to SDLC. |
| Version 2.0 | 31 January 2011 | • Paragraph (former)[5.3] – Moved contents of former [5.3] to [5.8.1]<br>• Paragraph [5.8] – Revised to reflect the development of system decommissioning documentation is not a Records Manager's responsibility<br>• Paragraph [5.8.2] – Revised to reflect requirement for Records Manager's sign-off<br>• Paragraph [5.10] – REMOVED – partially replaced with [5.8.2] |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

Johnson & Johnson

WWRIM Standard RIMS-15
Version 5.0
31 December 2016
*Effective – 01 April 2017*

## Worldwide Records and Information Management

# Management of Electronic Records and Information Standard

## 1. Purpose

This standard specifies the minimum requirements related to the management and disposition of electronic Records and Information for Johnson & Johnson Operating Companies.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

**Electronic Records and Information** are defined as any combination of text, graphics, data, audio, pictorial, or other information in digital form that is created, modified, maintained, archived, retrieved, or distributed by a computer system or portable electronic device.

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. Management of electronic Records and Information shall comply with the *Worldwide Records and Information Management Policy and Standards* requirements as well as with the Johnson & Johnson *Worldwide Information Asset Protection Policies* (IAPPs).

4.2. The Operating Company shall develop and implement procedures to assure electronic Records and Information are managed in compliance with the following requirements:

4.2.1. Electronic Records and Information shall be retained per the *J&J Enterprise Retention Schedule*;

4.2.2. Electronic Records and Information subject to a Legal Hold shall be preserved until the Law Department issues a written release;

4.2.3. Electronic Records and Information eligible for disposition shall be disposed of in a secure manner consistent with industry "good practice" to ensure the Records and Information cannot be recovered or reconstructed by any ordinary means.

4.3. The Department/Business Unit shall ensure the electronic Records and Information are managed in a manner that is reasonably calculated for completeness, integrity and confidentiality, based upon their characteristics and use.

4.3.1. Systems shall have sufficient Disaster Recovery Backups to protect the production environment, including the system, application and associated data, from loss or impairment;

4.3.2. Systems shall have the capability to extract and preserve information subject to a Legal Hold;

4.3.3. Authorization for access to electronic Records and Information, other than to perform system administration tasks, shall be controlled by the Department/Business Unit;

Johnson & Johnson

WWRIM Standard RIMS-15
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Management of Electronic Records and Information Standard

4.3.4. Electronic Records and Information shall be accessible and managed in active computing environments over the period of time that the information is needed for business purposes.

4.4. Electronic Records and Information that are no longer needed for business purposes shall be archived as per the WWRIM RIMS-16 Records and Information Archiving Standard.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687780

## Worldwide Records and Information Management

# Management of Electronic Records and Information Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Paragraphs [4.2, 4.2.1, 4.2.2] Clarified wording. Removed paragraph [former 4.3.1] Systems shall be configured in such a way as to accurately capture or create electronic Records and Information.<br>• Removed paragraph [former 4.3.2] System operators shall assign security to a system in conformance with IAPP requirements.<br>• Paragraphs [former 4.3.3, 4.3.4, & 4.4] Clarified wording. |
| Version 4.0 | 31 December 2014 | • Paragraph [4.2.1] – Changed to "RRS" to "Enterprise Retention Schedule Standard."<br>• Paragraph [4.2.3] – Changed "destruction" and "destroyed" to "disposition" and "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold"<br>• Definitions [3] Added - "or portable electronic device."<br>• Paragraph [former 4.2.3] Removed- condensed within new [4.2.3].<br>• Paragraph [former 4.2.3.2] now [4.4] Included "if they are eligible for archiving."<br>• Paragraph [former 4.2.4] Removed- condensed within new [4.2.3].<br>• Paragraph [former 4.2.5] now [4.2.3] Clarified wording – removed references to other paragraphs.<br>• Paragraph [4.3] Clarified wording. Minor change<br>• Paragraph [ 4.3.1] Changed - "developed' to "configured"<br>• Paragraph [former 4.3.2 - 4.3.3] Removed- addressed in [4.3.4] and [4.3.5].<br>• Paragraph [former 4.3.4] now [4.3.2] Reworded – simplified wording.<br>• Paragraph [former 4.3.5] now [4.3.3] Clarified wording.<br>• Paragraph [4.3.6] Reworded- Direction for the Operating. Company to have a procedure for extracting and preserving information subject to a legal Hold. |
| Version 2.0 | 31 January 2011 | • Paragraph (former) [4.3.3] – REMOVED – partially addressed in [4.3.2].<br>• Paragraph 4.3.5 – removed the word "tape." |
| New Standard Version 1.0 | 30 September 2009 | • New Document Issued |

## Worldwide Records and Information Management

# Electronic Records and Information Archiving Standard

---

## 1. Purpose

This standard specifies the minimum requirements for archiving electronic Records and Information for long-term preservation and access.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Electronic Records and Information that are no longer needed for business purposes but must be retained for compliance with the *J&J Enterprise Retention Schedule* (ERS) and/or applicable Legal Holds shall be archived.

## 4. Definitions

**J&J Enterprise Archiving Solution (EAS) -** Information Technology Shared Services approved solution for long-term storage of electronic Records and Information.

All other referenced terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary.***

## 5. Minimum Implementation Requirements

5.1. The EAS shall be used for archiving electronic Records and Information.

5.1.1. The EAS service owner may make an Exception Request using Worldwide Records and Information Management processes and tools when the EAS cannot meet the business archive requirements. The request must be approved by both IT Senior Management and the EAS service owner.

5.2. The Archive service shall have procedures in place to meet the following:

- The archive shall be maintained in a manner that ensures the Records and Information, and associated metadata, are accessible and readable;
- The archive shall be protected from unauthorized alteration;
- The archive shall be backed-up on a regular basis;
- The archive shall be indexed for ease of access and include key identifiers and associated metadata;
- The archive shall comply with the ERS;
- The archive shall have the ability to add or remove Legal Holds;
- The archive shall have the ability to tag Legal Holds so routine records retention operations are suspended;
- The archive shall comply with the *Requirements for Preservation of Data from Systems Under Legal Hold* issued by the Law Department.

Johnson & Johnson

WWRIM Standard RIMS-16
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Electronic Records and Information Archiving Standard

5.3. Access to archived electronic Records and Information shall be restricted to the Information Asset Owner and those individuals specifically delegated and authorized by the Information Asset Owner.

5.4. Prior to archiving the electronic Records and Information, the following shall be met:

5.4.1. The Information Asset Owner or delegate shall engage Record Management to ensure retention requirements have been assigned in accordance with the ERS;

5.4.2. The Information Asset Owner or delegate shall identify any electronic Records and Information subject to Legal Hold(s) in consultation with Records Management and the Law Department.

5.4.3. When decommissioning a system, ***RIMS-14, Management of Records for System Decommissioning Standard*** shall be met.

5.5. After archival of the electronic Records and Information, the following shall be met:

5.5.1. The Archive service, in collaboration with Records Management, shall monitor for changes to the ERS and adjust retention periods to ensure compliance;

5.5.2. The Information Asset Owner and the Law Department shall monitor for Legal Hold obligations and notify the Archive service owner to apply or remove Legal Hold(s);

5.5.3. Archived Electronic Records and Information subject to multiple Legal Holds shall be retained until all applicable Legal Holds are released.

5.6. The Archive service or delegate shall notify Records Management and the Information Asset Owner when archived electronic Records and Information are eligible for disposition.

5.6.1. The Information Asset Owner, in collaboration with Records Management, shall approve deletion of electronic Records and Information from the Archive service, in compliance with ERS and Legal Hold obligations.

5.6.2. The disposition shall be documented using Worldwide Records and Information Management tools and shall be retained by the Archive service.

5.7. Upon departure or change of responsibility of the Information Asset Owner, the Operating Company shall appoint a replacement and update the appropriate designators in the Archive service.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687783

**Worldwide Records and Information Management**

## Electronic Records and Information Archiving Standard

---

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Changed the title from "Records and Information Archiving Standard" to "Electronic Records and Information Archiving Standard."<br>• Changed "Data Owner or Steward" to "Information Asset Owner" throughout.<br>• Purpose [1] & Background [former 2] Clarified wording.<br>• Definitions [4] Added acronym "EAS" for J&J Enterprise Archive Solution. Changed "services and technologies" to "solution" in EAS definition.<br>• Paragraph [former 5.1] Moved to paragraph [5.2]. Clarified that the Archive service shall have procedures in place to meet the bullet points. Updated [first & fourth bullets] to include metadata. [fifth bullet] Changed "... support the ERS" to ...comply with the ERS." Added [sixth bullet] The archive shall have the ability to add or remove Legal Holds. Added [seventh bullet] The archive shall have the ability to tag Legal Holds so routine records retention operations are suspended. Added [eighth bullet] The archive shall comply with the Requirements for Preservation of Data from Systems Under Legal Hold issued by the Law Department.<br>• Paragraph [former 5.2] Move to paragraph [5.1]. Clarified wording.<br>• Added paragraph [5.1.1] The EAS service owner may make an Exception Request using Worldwide Records and Information Management processes and tools when the EAS cannot meet the business archive requirements. The request must be approved by both IT Senior Management and the EAS service owner.<br>• Paragraph [former 5.4] Changed "Prior to or as part of archiving" to "Prior to archiving." Moved responsible parties to paragraphs [5.4.1 and 5.4.2].<br>• Paragraph [5.4.2] Clarified wording. Changed responsibility to the Information Asset Owner in consultation with RIM and Law Department.<br>• Added paragraph [5.4.3] When decommissioning a system, RIMS-14, Management of Records for System Decommissioning Standard shall be met.<br>• Removed paragraph [former 5.5] Disposition process is addressed in paragraphs [5.6, 5.6.1, |

### Worldwide Records and Information Management

## Electronic Records and Information Archiving Standard

| | | |
|---|---|---|
| | | 5.6.2].<br>• Paragraph [former 5.6] Moved responsible parties to paragraphs [5.5.1 and 5.5.2]. Changed "Upon archival..." to "After archival..."<br>• Added paragraph [5.5.3] Archived electronic Records and Information subject to multiple Legal Holds shall be retained until all applicable Legal Holds are released.<br>• Paragraphs [former 5.6.2 and 5.6.3] Combined into paragraph [5.5.2]. Clarified wording. Changed collaboration with the Operating Company Records Manager to the Law Department.<br>• Added paragraph [5.6] The Archive service or delegate shall notify Records Management and the Information Asset Owner when archived electronic Records and Information are eligible for disposition.<br>• Paragraph [former 5.6.1] Clarified responsibilities. The Information Asset Owner, in collaboration with Records Management, shall approve deletion of electronic Records and Information from the Archive Service, in compliance with ERS and Legal Hold obligations.<br>• Added paragraph [5.6.2] The disposition shall be documented using Worldwide records and Information Management tools and shall be retained by the Archive service.<br>• Paragraph [5.7] Removed reference to CMDB. |
| Version 4.1 | 01 October 2015 | • Paragraph [2. Background] Removed – (e.g., analysis, summarizing, active usage), and internal or external auditing/assessments.<br>• Paragraph [2. Background] Added - When Electronic Records and Information are no longer needed for business purposes, they must be archived as necessary to comply with preservation requirements of the ERS, regulatory requirements and applicable Legal Holds.<br>• Paragraph [4. Definitions] Revised – **J&J Enterprise Archiving Solution -** the Information Technology Shared Services approved services and technologies for long-term storage of Electronic Records and Information.<br>• Paragraph [5.1] Revised - ensuring archiving shall have documented procedures in place to ensure compliance with the ERS, Legal and regulatory requirements.<br>• Paragraph [5.2] Added - the J&J Enterprise |

**Worldwide Records and Information Management**

## Electronic Records and Information Archiving Standard

| | | |
|---|---|---|
| | | Archiving Solution shall be used.<br>• Paragraph [5.3] Added – Access to the archive shall be restricted to the Data Owner or Steward.<br>• Paragraph [5.4] Clarified wording - Engage the Records Manager to ensure archiving obligations have been met.<br>• Paragraph [5.5] Added – Document and retain an agreed upon disposition plan using the WWRIM approved disposition form.<br>• Paragraph [5.7] Added – Upon departure or change of the Data owner or Steward, the Operating Company will appoint a replacement and update the CMDB with the change. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "period" to "requirement."<br>• Changed throughout – "destruction" to "disposal." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Paragraph [5.1.4] Added - "protected from unauthorized alteration to the extent reasonably possible".<br>• Paragraph [5.1.5] Added – disposition.<br>• Paragraph [5.1.6] Removed – "technology used to either store or manage."<br>• Paragraph [5.1.6.1] Clarified wording. Minor change<br>• Paragraph [5.1.6.2] Clarified wording. Minor change<br>• Paragraph [5.1.6.3] Removed – "disaster and recovery purposes."<br>• Paragraph [5.1.6.4] Clarified wording. Minor change<br>• Paragraph [5.1.7] Revised to include backups used for system restoration shall not be used for archiving.<br>• Paragraph [5.2.4] Revised to Include records eligible for destruction are reviewed against current active Legal Holds and if subject to a Legal Hold Notice, are retained until the release notice for the hold has been received from the Johnson & Johnson Law Department.<br>• Paragraph [former 5.2.5] Removed- condensed |

Johnson & Johnson

WWRIM Standard RIMS-16
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

## Electronic Records and Information Archiving Standard

| | | |
|---|---|---|
| | | within 5.2.4].<br>• Paragraph [former 5.3] now [5.2.6] Removed the requirement "minimum of six years" and clarified wording.<br>• Moved the last sentence in paragraph [5.3] to the beginning of paragraph [5.4].<br>• Paragraph [5.4] Added – Legal Hold Notice, if applicable. |
| 3Version 2.0 | 31 January 2011 | • Paragraph [5.5] – Removed "Last modified date" as a required field |
| New Standard Version 1.0 | 30 September 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

6

JNJTALC000687787



WWRIM Standard RIMS-17
Version 5.0
31 Decmeber 2016
*Effective – 01 April 2017*

## Worldwide Records and Information Management

# Backup Retention Standard

---

## 1. Purpose

This standard defines the minimum requirements for retention of data backups.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Background

Data backups are generated to ensure that electronic Records and Information can be reconstructed in the event of computer hardware or software failures, computer viruses, natural disaster or other problems in the computer operating environment.

## 4. Definitions

**Data backups** are snapshots of electronic Records and Information created for business resumption.

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 5. Minimum Implementation Requirements

5.1. Data backups shall be generated on production systems where data must be retained per the Enterprise Retention Schedule.

5.2. Data back-ups are not required for non-production environments (e.g. development, staging, etc.), unless unique production data is stored in these environments.

5.3. Data backups shall not be used for other purposes such as archive or legal obligations.

5.4. Data backups shall be generated on a routine basis to ensure the previous 30 days of data is available.

5.5. Data backups shall be reasonably protected from damage or data loss in compliance with Johnson & Johnson Information Asset Protection Policy (IAPP) *S-26 Worldwide Information System Administration and Management Security Policy*.

5.6. If data backups are stored in a facility that is not operated by Johnson & Johnson, that facility shall be:

5.6.1. Audited by the responsible Operating Company prior to storing data at the facility;

5.6.2. Periodically audited by the responsible Operating Company to ensure continued compliance.

Johnson & Johnson

WWRIM Standard RIMS-17
Version 5.0
31 Decmeber 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

**Backup Retention Standard**

5.7. Data backup media shall be labeled or tagged with information or metadata sufficient to ensure that the information on the media object can be correlated to a system or repository for purpose of restoration or rotation.

5.8. The metadata associated with the data backup shall be recorded separately for tracking and reporting purposes.

5.9. Data backups shall be maintained in a manner that ensures readability for the period of time that they are maintained in the active rotation cycle.

5.10. Data backups shall be destroyed, wiped or overwritten when they are no longer of value.

5.11. Data backups shall be disposed in compliance with *S-26 Worldwide Information System Administration and Management Security Policy*.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

2

JNJTALC000687789



## Worldwide Records and Information Management

# Backup Retention Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Changed title from "Disaster Recovery Backup Retention Standard" to "Backup Retention Standard."<br>• Background [former 2] Clarified wording. Moved language related to data backups not being used as archive solutions to paragraph [5.3].<br>• Definitions [4]. Updated "Data backups" definition and removed "Archives" definition.<br>• Added paragraph [5.1] Data backups shall be generated on production systems where data must be retained per the Enterprise Retention Schedule.<br>• Moved paragraph [former 5.1.1] requirements for non-production environments to paragraph [5.2].<br>• Removed paragraphs [former 5.2, 5.3, 5.3.1 & 5.3.3].<br>• Moved paragraph [former 5.3.2] requirements for overwriting data backups to paragraph [5.10] and the requirements for disposal of data backups in compliance with S-26 to paragraph [5.11].<br>• Added paragraph [5.4] Data backups shall be generated on a routine basis to ensure the previous 30 days of data is available.<br>• Moved paragraph [former 5.4] requirements for protecting data back-ups to paragraph [5.5]. Clarified wording.<br>• Moved paragraph [former 5.4.1] requirements for auditing storage facilities to [paragraphs 5.6, 5.6.1 & 5.6.2]. Clarified wording. Operating Company is responsible for auditing the facility.<br>• Moved paragraph [former 5.4.2] requirements for labeling or tagging data back-ups to paragraph [5.7].<br>• Removed paragraphs [former 5.5, 5.5.1, 5.5.2, 5.5.3, 5.5.5, 5.5.6, 5.5.7, 5.5.8].<br>• Moved paragraph [former 5.5.4] requirements for ensuring readability of data backups to paragraph [5.9]. Clarified wording.<br>• Added paragraph [5.8] The metadata associated with the data backup shall be recorded separately for tracking and reporting purposes. |

Johnson & Johnson

WWRIM Standard RIMS-17
Version 5.0
31 December 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Backup Retention Standard

| | | |
|---|---|---|
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Changed throughout – "destroyed" to] "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Purpose [1.] Changed - "minimum" to 'minimal' and "disaster recovery" to "data backup."<br>• Background [2.] Changed - "disaster recovery" to "data backup" in both paragraphs. Second paragraph changed "business reasons" to "circumstances."<br>• Definitions [4.] Changed - "disaster recovery" to "data backup". Revised to include "intended only for near-term system restoration purposes". Second paragraph - included "that require further retention for business or compliance purposes other than disaster recovery" added the definition for near-term.<br>• Paragraph [5.1] Changed – "disaster recovery" to "data backup" and "take precedence" to "shall apply."<br>• New Paragraph [5.3] Direction for any system not covered by the mandatory rotation cycle. Added wording in the table "30 days incremental backups" and "90 days file level full back-up."<br>• Paragraph [5.3.2] Included reference to IAPP Policy S-26.<br>• Paragraph [5.3.3] Changed - "disaster recovery" to "data backup."<br>• Paragraph [former 5.3] now [5.4] Changed "in storage and during transport" to "protected from damage or data loss during the period they are in rotation" and "disaster recovery" to "data backup."<br>• New Paragraph [5.4.2] Direction on backup media shall be labeled or tagged for the purpose of restoration or rotation.<br>• Paragraph [former 5.4.4] now [5.5.4] Clarified wording. Minor change<br>• Paragraph [5.4.6] now [5.5.6] Clarified wording. Minor change<br>• Paragraph [former 5.4.7] now [5.5.7] Clarified wording. Minor Change |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

4

JNJTALC000687791

Johnson & Johnson

WWRIM Standard RIMS-17
Version 5.0
31 Decmeber 2016
*Effective – 01 April 2017*

Worldwide Records and Information Management

Backup Retention Standard

| | | |
|---|---|---|
| | | • Paragraph [former 5.5.1] Removed, and Paragraph [former 5.5.1] now [5.5.2]. |
| Version 2.0 | 31 January 2011 | • Paragraph [5.1.1] – Specified retention of backups for development environment data is not required from a records management perspective.<br>• Paragraph [5.2] – Clarified that backups are returned to the rotation cycle after their active retention period has expired.<br>• Paragraph [5.4.6] - Changed formal "instruction" to formal "authorization";<br>• Minor organizational name changes. |
| New Standard Version 1.0 | 30 October 2009 | • New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

5

JNJTALC000687792

Johnson & Johnson

**WWRIM Standard RIMS-18**
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**

# Electronic Messaging Standard

## 1. Purpose

The purpose of this standard is to define the requirements for managing electronic messages.

## 2. Scope

This standard applies to all Johnson & Johnson Operating Companies.

## 3. Definitions

**Electronic messages** are records and information created and transmitted or received via an electronic messaging system, including brief notes, formal or substantive narratives and any attachments that may be transmitted with the message along with its descriptive transmission metadata. Electronic messages may include email and instant messages.

All other reference terms used in this standard are found in the ***Worldwide Records and Information Management Program Glossary***.

## 4. Minimum Implementation Requirements

4.1. Electronic messages created or received in the course of doing business for the Johnson & Johnson Family of Companies are subject to required Johnson & Johnson policies and standards, including but not limited to the following:

- *Johnson & Johnson Worldwide Records and Information Management Policy and Standards;*
- *Johnson & Johnson Worldwide Information Asset Protection Policies* (IAPPs) and associated standards.

4.2. Electronic messages that are Convenience Information shall be deleted after use provided they are not subject to an active Legal Hold.

4.3. Electronic messages that are not considered Convenience Information shall be retained in a manner consistent with the *J&J Enterprise Retention Schedule*.

4.4. Any electronic messages, including both Records and Information, and Convenience Information, that are subject to an active Legal Hold, shall be preserved and retained as required and instructed by the Law Department until the Law Department issues a formal release of that Hold.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

JNJTALC000687793

**Worldwide Records and Information Management**
## Electronic Messaging Standard

**Revision History**

| | | |
|---|---|---|
| Version 5.0 | 31 December 2016 | • Definitions [3] Clarified electronic messages definition. Updated to include email and instant messages.<br>• Removed paragraph [4.1 former third bullet]. AU-5 is covered by IAPPS in paragraph [4.1, second bullet].<br>• Removed paragraph [former 4.2]. Addressed in RIMS-2, Convenience Information Standard.<br>• Removed paragraph [former 4.4.1].<br>• Removed paragraph [former 4.5].<br>• Paragraph [former 4.6] Changed "Johnson & Johnson Law Department" to "Law Department."<br>• Removed paragraph [former 4.7]. Addressed in paragraphs [4.3 & 4.4].<br>• Removed paragraph [former 4.8]. Addressed in paragraphs [4.3 & 4.4].<br>• Removed paragraph [former 4.9]. Addressed in paragraph [4.1, second bullet].<br>• Removed paragraph [former 4.10]. Addressed in RIMS-17, Backup Retention Standard. |
| Version 4.0 | 31 December 2014 | • Changed throughout - "Operating Company Retention Schedule" to "J&J Enterprise Retention Schedule."<br>• Changed throughout - "retention period" to "retention requirement."<br>• Paragraph [4.8] - Changed verbiage – "destroyed" to "disposed." |
| Version 3.0 | 31 December 2013 | • Changed throughout "Document Hold" to "Legal Hold".<br>• Paragraph [4.1] Replaced "I/T Enterprise Instant Messaging Usage Policy" with "AU-5 Electronic Mail and Instant Messaging Acceptable Use Policy."<br>• Paragraph [4.4.1] Direction on – The copying of electronic messaging objects from Johnson & Johnson messaging systems is prohibited.<br>• Paragraph [4.5] Clarified wording. Minor change<br>• Paragraph [4.9] Added - the new IAPP |

Johnson & Johnson

WWRIM Standard RIMS-18
Version 5.0
31 December 2016
*Effective – 01 April 2017*

**Worldwide Records and Information Management**
**Electronic Messaging Standard**

---

| | | Policy number. |
|---|---|---|
| Version 2.0 | 31 January 2011 | No changes to this standard |
| New Standard<br>Version 1.0 | 30 October 2009 | New Document Issued |

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

JNJTALC000687795

Johnson & Johnson

**WWRIM Policy**
**Version 1.0**
**31 July 2009**

# Worldwide Records and Information Management Policy

**Policy** **Records and information shall be created, valued, protected, managed, and disposed in accordance with applicable laws, regulations and the requirements of this policy and other applicable Johnson & Johnson policies and standards.**

## Scope

This policy specifies requirements for the management, retention, and disposition of records and information in all formats and every medium including electronic information.

## Purpose

Johnson & Johnson recognizes that records and information are valuable resources and important business assets. This policy, along with associated RIM standards, defines the requirements for managing the records and information assets of Johnson & Johnson in accordance with regulatory, legal, and business requirements. This policy and associated RIM standards assure the appropriate creation and management of authentic, reliable, and useable records and information capable of supporting business functions and activities for as long as they are required.

## Responsibilities

Worldwide Records and Information Management (WWRIM) is responsible for the overall governance and strategic direction for the Records and Information Management (RIM) Programs of the Johnson & Johnson Family of Companies.

The Johnson & Johnson Operating Companies are responsible for the implementation and ongoing maintenance of a RIM program in compliance with this policy and associated RIM standards to manage their records and information.

## Definitions

***Records and information***: Any form of recorded information created, maintained or received by Johnson & Johnson in the conduct of its business operations and activities for use at a later time. Records and information include, but are not limited to, documents concerning the Johnson & Johnson organization, business functions, policies, decisions, procedures, operations, and internal or external transactions that are created and retained for business or legal reasons. The form of records and information includes, but is not limited to, paper, electronic, microfilm, microfiche, photograph, map, magnetic or optical disk or tape, software, video, or other recorded information.

***Disposition***: A final administrative action taken with regard to records, including destruction, transfer to another entity, or permanent preservation.

***Standard***: A governance document that specifies the mandatory requirements of a program activity.

EXHIBIT
Mittenthal
25
10-18-18
PENGAD 800-631-6989

## Worldwide Records and Information Management Policy

***Document Hold***: A communication issued as a result of current or reasonably anticipated litigation, audit, government investigation or other such matter that suspends the normal disposition or processing of records.

***Records Retention Schedule***: A comprehensive list of records series, indicating for each series the length of time it is to be maintained.

### Compliance

All Johnson & Johnson Operating Companies and their employees shall comply with this policy and associated RIM standards.

### Provisions

1. The records and information management requirements, as defined by this policy and associated standards, are to be applied consistently and regularly.

2. Records and information created or received in the course of conducting business shall be accurate and complete.

3. Records and information shall be created, stored and managed using proper protection and allowing for future access.

   3.1. Records and information shall be protected, and access to them controlled according to their value as described in the Information Asset Protection Policies (IAPPs) and other applicable Johnson & Johnson policies.

   3.2. Protection of and access to such records shall comply with the requirements in the IAPPs and other security standards prescribed by Worldwide Information Security.

   3.3. Records and information shall be classified throughout their lifecycle in a manner that allows future authorized access and use.

4. Records and information shall be retained in accordance with the Operating Company's Records Retention Schedule including the time that covers a Document Hold. When a record or information completes its retention period, it shall be disposed in accordance with this policy and associated standards and in compliance with Operating Company procedures.

5. Disposition of records and information may include, but is not limited to, destruction or deletion, transferring to appropriate inactive records storage, and continuing retention as an active record. Disposition of records and information shall be conducted in a systematic and routine basis during the course of normal business activity subject to the following requirements:

   5.1. Records and information relevant to litigation or an investigation and subject to a Document Hold as issued by the Johnson & Johnson Law Department shall be

Johnson & Johnson

WWRIM Policy
Version 1.0
31 July 2009

Worldwide Records and Information Management Policy

retained and preserved until further notice from the Law Department, regardless of the retention period set forth in the Records Retention Schedule;

5.2. Inactive records and information may be transferred to the Operating Company's designated inactive records storage site for long-term storage to fulfill retention requirements;

5.2.1. Records and information transferred to the Operating Company's designated inactive records storage site shall be managed with appropriate procedures to ensure availability for future business, litigation, and investigation purposes, as necessary.

5.2.2. Records and information subject to a Document Hold that are no longer required for business purposes may be transferred to an appropriate inactive storage site for preservation in coordination with the Johnson & Johnson Law Department and in compliance with paragraph 5.2.1 of this policy.

6. Operating Company records and information that are considered "vital" (i.e. fundamental to the functioning of an organization and necessary to continue operations without delay under abnormal conditions) shall be identified and protected in accordance with this policy and associated RIM standards.

6.1. The identification of "vital" records and the method designated to protect these records shall be included in the Operating Company's risk analysis for business continuity purposes, to ensure they are recoverable when needed.

7. Operating Company records and information in the possession of a departing employee, vendor, external business partner, and outside consultant or contractor, shall be managed as follows:

7.1. When an employee leaves Johnson & Johnson or transfers to another Operating Company or department, he or she shall transition their records and information to their supervisor or manager. In the event the employee does not perform this task prior to their departure, the supervisor or manager is responsible for ensuring the departing employee's records and information are managed in accordance with this policy and associated standards;

7.2. Records and information in the possession of a vendor, external business partner, outside consultant or contractor upon termination of contract shall be transferred to the owning Operating Company and managed in accordance with this policy and associated RIM standards.

8. The Operating Company's records manager, or designee, shall conduct audits within their Operating Company for compliance with this policy and associated RIM standards.

**Johnson & Johnson Confidential**
Use Pursuant to Company Instructions

3

## Worldwide Records and Information Management Policy

9. The requirements of this policy and associated RIM standards shall be communicated to, and incorporated into training for, Operating Company employees, vendors, external business partners, and outside consultants or contractors.

10. Where appropriate, requirements of this policy and associated RIM standards shall be incorporated into contracts with those vendors, external business partners, and outside consultants or contractors requiring access to Johnson & Johnson records and information during the course of the contract. If contract changes create a need for such access and the contract lacks the proper RIM requirements, they shall be added.

11. Disaster recovery backup tapes shall be created solely for the purpose of accessing and recovering data in the event of a disaster.

### About the Policy

This policy is designated maintained by WWRIM in compliance with its change management procedures. The most current version of this policy, along with associated standards, is available on the WWRIM website.

Approved by

Richard Guida
Vice President, Worldwide Information Security

Review and Approval

| *Title* | *Name* | *Signature* |
|---|---|---|
| Vice President, Worldwide Information Security Information Technology Services | Richard Guida | RICHARD GUIDA Digitally signed by RICHARD GUIDA DN: c=US, o=JNJ, ou=Employees, ou=171709, cn=RICHARD GUIDA, email=RGuida@ITS.JNJ.COM Reason: I am approving this document Date: 2009.07.31 14:10:11 -04'00' |

Revision History

| WWRIM Policy v1.0 | 31 July 2009 | • New Document Issued |
|---|---|---|

**********************
Name: Deb Warner
Title: Global Complaints Vigilance
Date: 5/21/2018
**********************

DEPOSITION EXHIBIT 2

Deb Warner - 5 years in current role
23 years - before that Ortho Clinical Diagnostics

complaint, vigilance across consumer sector
  organization, process, and PQMS system

part of Global Complaints Vigilance, part of Business Quality
reports to Bobette Williams

document the evaluation and investigation of complaint

complaint = allegation by a consumer regarding quality, safety or efficacy of product

captured by call center, feed the complaint
CRS = consumer response system
  one in each worldwide region - 4 instances
moving to new platform - SalesForce, everywhere but North America
  North America will be in July

originally CRS was used for complaints as well

complaint was formerly divided between different organizations
  now harmonized

in past--
Melinda Cetina - external mfg quality
  responsible for complaint investigation

complaint used to come into call center
  would be sent to particular business unit
now subject to triage process that Deb developed
centralized mgt of complaints so that they could be prioritized

Robin Lindevaum - globally tech lead for consumer
ask re: CRS and Safesforce

Judy Dowling is tech contact for PQMS
also have business partners who manage like Tom Doyle

don't think data migrated from CRS to PQMS

PQMS is a validated system - do integrity checks and audits

audit log

nothing deleted, even voided records are retained

how to retrieve data? can have UPC code or specific or generic product names

PQMS is used by quality organization = PQC product quality complaint
  could have code for ME medical event
for adverse events, SCEPTRE is used

call center applies codes that direct complaint to appropriate system
AE might still feed PQMS even though it many not trigger an investigation



SCEPTRE/safety contact - Nilay Gami

call manages different channels - email, social media, calls, web page, postal, etc.

global procedural document (WW, and more descriptive documents)
maintained at consumer level in TRU

her organization is responsible for updating

Deb is only global person, has regional leaders

no loss of data or corruption

************************************

Names: Tom Doyle, Judy Dowling
Title: Mgr of Quality Applications, Complaint Vigilance
Date: 5/23/2018

************************************

front end system for complaints was CRS, now salesforce everywhere but North America
  were 4 different instances of CRS, started deploying SafesForce 2 years ago
  in Latin America, EMEA, APAC, will do North America
  for each instance, migrated two years of data for product quality complaints, adverse events into PQMS
  case originates in call center regardless, even if pushed from PQMS to SCEPTRE for AEs
  everything else, archived as per StageGate program - Robin has specifics

front end holds:
- inquiries
- preferences
- product quality complaints
- adverse events

feed data to one safety system

used to feed talc safety to RSS component of PQMS

Jan 2010 transitioned from CRS for everything to just CRS as front end and PQMS for consumer complaints
  a certain number of years migrated - have complaints going back to 2006

Robin Lindenbaum - can confirm how many years were migrated

Remetrex is PQMS vendor - was used in pharma for past 20 years
consumer instance started with McNeil in 2000

started using SCEPTRE for talc in Nov 2017
prior to that it was Remetrex RSS

complaints and safety are validated systems with regulatory reqts

check on CRS front end and SalesForce with Robin

Nilay Gami - consult him regarding safety issues
  on business and process side

SOPS - many validation documents for PQMS
global documents for complaints

have diagram depicting consumer vigilance documents

stored by product
  master product and then SKUs

CRS stores "product master data" includes UPC
many captured as "J&J Baby Powder unspecified" - there is a generic code
    some came from law department - also thru call center
same for shower to shower
nothing ever manually entered into PQMS
"investigation" originates in PQMS
if an ETQ investigation had ever been opened, would have ID number referenced in PQMS

triage group in every region - could be forwarded to mfg site for investigation

two products in use would two separate PQMS entries

consumer may supply lot number and triage would validate against the product

consumer given call center number - a unique ID, flows to PQMS and SCEPTRE

salesforce - just a sequential number
CRS - Alpha + number

PQMS people have responsibility for monthly and quarterly trending
  for both pure product quality complaints and those with A/E associated

PQMS has its own group
  Everest is trending tool - vendor TIBCO SpotFire
validated monthly report is output from Everest, signed, stored on SharePoint

safety must trend all adverse

-------
use SAP for verification of lot numbers

use spec system to review specs
  GSS, now TRU

also where documentation is stored

no loss or corruption that they are aware of

Consumer-IT-KateGillespie.txt

************************
Name: Kate Gillespie
Title: Sr Director PLM Process and Platform Mgt
Date: 4/25/2018
************************

in Consumer/North America for two years (in Skillman)
2012 - 2014
Dassault is vendor, bought Matrix One
Anovia is platform
GSS platform

also Dassault/Anovia
TRU (J&J name) replaced GSS

some stuff in GSS was archived - ask Lisa Kaiser how to get to these docs

TruVault (J&J name) - SAS service "Quality Docs" from Veeva
check on documents that went - Lisa Kaiser or Garrett Sayers

then enterprise for 5 years
quality
inherited global consumer platforms and responsible for them, like GSS
  ETQ module - change quality, etc.; includes CAPAs and event documentation process
    (event = nonconformance) - ask Lisa Kaiser on use of system
  part of PLM - product life cycle mgt

Kate is now in Pharma/Horsham

back when she was in Consumer
was retention schedule
Theresa Goricki VP Consumer (no longer at J&J), Carol Montandmon replaced Theresa
  at North America level

each dept had responsibility to manage and doc coordinator

had annual cleanout days - check on when suspended

SOPs for records mgt, document mgt

former users subject to manager review of materials

litigation hold? SOPs were maintained in doc mgt as usual

no problems with record keeping that she knows

********************************
Name: Stephen Vargo
Title: IT Service Management
Date: 5/16/2018
********************************

Ft Washington

app owner for ETQ Reliance product (internally "Symphony" for consumer)
from 2009- version 5 to 7 to 11

prior to that ETQ FWE (Flexible Workflow Engine)
perhaps around 2003-2009

nothing migrated from FWE

archived a couple years ago based on CRIM group
Redgrave did an analysis
Informatica

used globally by all of consumer

about 8,000 at one time, now 5,500 users and 96 site
each have an account on ETQ

need training and supervisor approval

could be either inquiry or edit, per module

investigation (former NC module)
change control
CAPA module
audit module

fielded + document attachments
full audit trail and system of record
can't delete anything

no way to track specific products

no need to modify usage re legal hold

business person -
Madeline Vargas - no longer at J&J
Liz Vincent

IT person before Steve
mgr - Michael Weiderspiel
Jessica Frage worked for Michael and Steve

server lives in Raritan

SOPs for every module
recently migrated to TRU

could search in tool or run Cognos reports
validation reports, metrics reports

everything starts as an investigation - a "quality event" that needs to be captured

then assessing if a non-conformance - does it align with SOP?

then a decision is made -- does it become a CAPA

no corruption or loss of data
at end of 2014 or 2015, had an issue with attachments
randomly can't always get access to an attachment
  been resolved
  attachment checker verification process
  no data loss but a broken link issue
  may be a CAPA

***********************
Name: Katie Martin Decker
Title: Sr Director, Global Oral Care
Date: 5/31/2018
***********************

2011 - specifically on shower to shower
  took over portfolio
part of group in 2002

started in 2001

Shower to Shower

in 2004-2005 re-launched in different formulations, (e.g., sparkly, sport),
  and delivery methods - spray, wipes, etc., new flavors
about 6-7 versions at time of divestiture

identified file shares, "data room" for the Valiant acquisition
  still have internal data site used to sync with external deal site
have communications with consumers back to 2000

includes--
  MSDS - material safety data sheet (provided to retailers)
  communications to consumers, retailers, product launches

copy approval was a manual process, with storyboards, inkpad stamps, administrator,
  and physical file folders

copy approval and marketing was in North building

Robin Sitver - does a lot of divesture transactions, worked on shower to shower

Robin would formulate divestiture plan, Katie would "pitch"

tried to query BRAVO and SAP systems through finance - Linda Phelps
  BRAVO is official system for financial reporting
  would have roll-ups, consolidations

overall responsibility for marketing, sales, product innovation, divestiture

Sharepoint took over much of the foldering and filing about 7 years ago
  more sophisticated filing in the foldering system than the Sharepoints

what about when people leave?
  before Sharepoint, people would create a file system folder and put all their
  information there

now - consolidated Sharepoint sites and improved file systems
  things are saved centrally now to begin with

no loss of data or corruption

data room included about 15 people's materials, including each business functions
  like quality, supply chain, mfg
  team list in data room
  might include testing

********************
Name: Eliza Morais
Title: Senior Category Buyer (Brazil)
Date: 5/14/2018
********************

responsible for negotiating with talc suppliers for Latin America
Category Buyer
J&J Consumer Latin America
Paula Campos - sr mgr for strategic sourcing for chemicals

8 months at J&J

old buyer - Sara Albuquerque
  on maternity leave, with different division

deal with mfr in Brazil and Columbia

deal suppliers extract from ground
  mine in north Brazil - IMI
  also Imerys from US supplies Columbia

IMI sends to Sterevenicx
  then to J&J

lots of conference calls and face to face meetings
email to confirm

everything goes in SAP, POs come from SAP

not really any paper - knows of nothing from Sara either

had training in basic computer usage

may keep emails for 5 years or so unless a legal hold

not familiar with legal holds that affect operation of SAP

knows of no other data loss

*******************************
Name: David Allen
Title: Director of Quality
Date: 5/30/2018 and 6/8/2018
*******************************

started in 2011 to 2014 was in external mfg team

managed quality engineers across external mfg sites
  not raw materials

Skillman, last year in Quality Systems, Director of Quality

quality person signs off on all procedures
Don Hicks prior to him

Joann Dodd pulls together records retention procedures
  David is "quality signature"

ETQ Symphony = investigations (NC/NCR), CAPA, change controls
could have an investigation without a NC, however, if spec not related

would typically do word searches

while you might document changes to procedures, etc., WIs/SOPs
changes controls are specific to a product spec
  includes approvals and deliverables needed to change spec

talc spec itself would have revision history in it

specs themselves actually housed in TRU - was GSS

SOP about change process itself is consumer global WWSP-000277

did not deal with PTI, Mark Zappa did
  quality engineer who worked with PTI Susan Moy (now retired, but in Skillman)

no loss or corruption in these system
  had an upgrade issue with Chinese characters, which was fixed

Kate Gillespie actually managed the systems

******************************

Donald Hicks
Title: External Manufacturer and Business Quality
Date: 5/17/2018

******************************

42 years with J&J
1974 with medical device startup

in 1990 found a position in Consumer

head of quality re: band aid plant in North Brunswick

brought in liquid baby products, which had been mfr'd in Puerto Rico

not baby powder

had quality meetings with other plant heads, including Royston, GA plant head

at that time was sole mfg site for Shower to Shower and baby/talc products

communications and visits with other sites

2001 - moved to external mfg quality
now involved with non-J&J plants

2004 - Royston sold to PTI (Pharma Tech Inc)
responsibility began to transfer

by 2008, he was fully responsible for Royston site and talc

2010-2011 transferred to business quality (brand responsibility)
  baby business in total, reporting to quality group
  linked to marketing team, executive team
responsibility from birth of product until it was discontinued

engaged by operations/Q&A if any issues, including talc
  -reviewed alternate sources
  -FDA reports on talc testing
  -international questions
global head of baby business from quality perspective

March 2017 - retired

mfr'ing, testing records were based in paper and still are

FDA regulates certain aspects of cosmetics, therefore specific
  recordkeeping requirements

both a records retention policy that was published by J&J Consumer records center
  also had SOP that defined what should be kept and how long

schedule tied to regulatory compliance - longest time between
  that and internal schedule

boxes sent offsite with labels, etc.

Royston would conduct its own audits when part of J&J
his team would audit after the sale
including records mgt

long term retention --> R&D lab notebooks, change control records re: formulas,
technical documentation

these were all maintained by the records center

personally examined change control records after being pulled by the records center

test, mfr'ing, inventory, shipping records tend to be kept for a shorter period per schedule - timed to when product would be in marketplace

generally about 6 years

receipts of raw materials were typically shorter

responsibility of maintaining records resides with site doing the work

comes from various mines, ground at Imerys - tested there before and that

same ore lot may be repeatedly test because forms basis for multiple mill lots
loaded into railcar, shipped with Certificate of Analysis to Royston
samples taken by Royston team
create raw material receipt record and test record

Royston would pack up its records and send to Iron Mountain

after PTI acquisition, PTI tracked with its own systems
  80% of Royston people transferred over

quality agreement with external mfr's like PTI
  details records keeping reqts, reporting reqts

continue to conduct audits of that facility with J&J Consumer Quality Team
also help managed day-to-day issues

audits are placed into an audit system - need to check, maybe TrackWise
NC are placed into a system, now ETQ

audit has been electronic at least 10 years

mfr, test methods, finished product spec are all controlled documents
  in electronic systems many years

David Allen, quality group - would be "historian" of electronic systems

recently changed doc control systems

validated systems under regulatory framework-(collaboration with J&J QA, InfoMgt,external resources)
- ETq
- TrackWise
- LIMS
- document control (for specs, procedures, forms, label quality) "Matrix"
- R&D system to manage formulas, packaging, clinical, labeling, etc. (known as "approval for product release" system) - fairly new system
  - prior to that was paper

specifications system includes labeling
advertising has change control process
"Label Control System"

no sample tracking per se

Tricia Bonner - ask her about clinical trials contact
  was R&D head for baby products, now in new role

also Lorena

Shower to Shower
not part of baby group but ownership went between skincare and baby
external mfg and GA

ETQ searchable by products (word search) and mfg location

every product has a formula number , e.g., "MorningFresh formula 123"

North American baby powder would be a single formula number

quality policy - broadbased, comprehensive document that includes
responsibilities and regulatory reqts - see David Allen
"capstone" of quality-related SOPs

each world region within consumer would have associated team
would meet a couple of times per year

might socialize, for example, a new testing procedure via a proposal
mostly captured by email, though substantive changes would go into spec

global talc spec created in 2009 - uniform highest std chosen
included test methods
historical -- would need to look at specs system for each region

from time to time, test methods or other talc spec parameters would be incorporated into spec - for example, China may require testing for a new trace element

when Don left, his relevant materials were transferred to Mark Zappa, including testing records, historical information, etc.

no collaborative systems used - not SharePoint, not eRooms
except Sharepoint as publishing platform

no data loss that he is aware of
one lost document that's not been found

look at global spec for talc - controlled, approved, dated
-------------------------

FOLLOW-UP 6/4/2018:

Xerox may have been a legacy doc mgt system

Baby had a specification dept

talc samples and baby product samples

J&J only saw powdered talc at Royston (ground/milled)

raw talc is sampled coming in as milled associated with lot number
put in bottle, testing out of bottle for microbiological and appearance

testing for heavy metal, bulk density, particle, asbestos already done by supplier
J&J will inspect those testing records, typically 2-3 months of inventory
test records are sent electronically or by mail
identified by "milled lot," e.g., from IMRYS, also railcar designation
all associated with an "ore lot"

then samples are linked back to mfg lot number
begin, middle, end of shift, off each shift

microbiological, appearance, and fragrance

samples and test records retained per schedule
-samples and test records by mfrs
-test records by quality group

all of these records would be maintained at mfg site
e.g., Royston and then shipped to Iron Mountain

Vicky Barkis - might be able to speak to mfg records movement to Iron Mountain

-----------------

from Don - what are "Matrix" for doc control - also spec system
specs, label control, SOPs, supplier agreements, change control

and is that different from "Label Control System"?

1. Label control review process - Cocoon
2. Once approved, transferred to Documentum/spec system

Xerox doc mgt system in old days? or was it Documentum

North American talc - Chinese would mine and test, then release ore to Imerys
not sure if those test records went to Imerys
Imerys has "ore pile" and would sample various points from ore lot
would mill and composite, generating one milled sample
then did spec testing, including looking for asbestos, heavy metals, calcium, etc.

milled material sent out for testing, results back to Imerys/Houston
Imerys/Houston would send Cert of Analysis (e.g., test results) with railcar shipment
records lived both at Imerys/Houston and PTI/Royston

IN ADDITION
RJ Lee testing started qtrly global testing in 2009 (also tested in earlier times)
Don requested 500 Gram samples from every mfg site
then he sent to RJ Lee, did not retain anything

if Imerys got a bad result in testing, would not have shipped
never got one

lost some railcars from Houston because of train wreck or seals broken
but never got a bad spec

IF they had, would have at least been entered as investigation/NC

raw materials samples (retains) - kept 5-6 years by PTI/Royston
e.g., double shelf life
palletized and put in boxes

Vicky Barkis could speak to PTI's records tracking systems

test data would be kept per retention policy, e.g., 5 years + 1

----------------------------------
FOLLOW UP 6/11/2018

this was the document he couldn't find:
"original approval for product release documentation for original qualification of China mine"
Don indicates has been found elsewhere

**************************
Name: Lisa Kaiser
Title: Sr Director for Global Quality Systems
Date: 5/9/2018
**************************

Consumer

oversee all quality systems for consumer segment
owns doc control, change control, investigations/CAPA

not records retention - that's Joanne Dodd

3 years

prior to that Ethicon - dir of quality systems, 4 years

-----------------
quality is broken down into:
quality control - "make" quality - 33 sites under consumer
includes quality engineers, lab controls, testing
finished product release
quality assurance - "source" quality - e.g., Mark Zappa, suppliers and ext mfr's

quality systems part of ISO 1345 and bonds together both make and source quality

----------
rolled out TRU system in January
moved released documents from GSS to TRU
anything obsolete or superseded still in GSS - currently archiving
going into ILM archiving application at some point

retention schedules in GSS and TRU - confirm with Joanne

doc specifications in GSS and TRU

changes reside in CAPRI - John Gilbert is the contact
approvals for product release, clinical trials, like a design history file

CAPRI is consumer-specific managed by R&D

Sean Park was in business quality group - North America rep
now at Ethicon
could speak to history of various JJCI companies and related systems

J&J Consumer does NOT use TrueVault

TrueVault only stores **enterprise** stds and SOPs
would have older versions of enterprise stds - migrated from docspace or archived cloud-based

ETQ - investigations and CAPA
point of contact = Steve Vargo - Ft Washington

complaints - PQMS system, had precursor in North America
point of contract = Deb Warner - Skillman

manage ComplianceWire for training
Consumer has own instance
includes manufacturing processes, CAPAs and other consumer-specific processes

contact = Leslie Williams-Dunn on IT

RIM/IAPP training deployed by SUMMIT and before that, eUniversity
  at enterprise level
  cloud-based, rolled out 2 years ago
  includes asset protection
  includes what employees took and when
  contact = Deb Berrien
  programs administered by HR

also ask Emily Chu - re consumer level IT issues

no data losses

Consumer-Quality-MarkZappa.txt

*******************************************
Name: Mark Zappa
Title: Director of supplier quality, North America
Date: 5/7/2018
*******************************************

part of "source quality"
  have counterparts in EMEA, Latin America, APAC
  EMEA - Segolene Tribouillard
  APAC - Pankaj Verma
  Latin America - Barbara Liesenberg

supports raw materials and packaging for products made in North America

Source Quality is a global group
  manages sourcing from quality perspective
  materials, packaging, finished goods

standardized set of global procedures
  selection, qualification, monitoring, disengagement
from suppliers
  -direct material (raw materials and packaging components)
  -suppliers of finished goods

talc suppliers
  mine
  milling site
  pharma tech industries (external mfr "EM"), Royston GA
    adds fragrance and puts talc in bottles
  Royston originally was a J&J plant

Source Quality as a group created in ~2014

Quality Systems is a different function here that manages processes
  e.g., procedure for "how to select a supplier"

Source Quality follows Global SOPs

currently SOPs stored in TRU, went live mid-January
2010-2018 used GSS - global spec system
  at least current version was migrated

training curriculum for his area

100-150 procedures part of training, global, local, enterprise, GMP

have records coordinator as defined in SOP
 Chad Struthers? may be coordinator - heads compliance group

would need to quality supplier
  would audit supplier's quality systems

PTI, Imerys - grinding/milling (Houston)

mining, grinding, mfg - all produce records
  testing at all levels

certificate of analysis
  would include tests for asbestos

EM and mine use independent labs - managed by the facilities themselves
  EM/Imerys would received Cert of Analysis with each shipment

J&J also does quarterly testing- Quarterly Mine Health assessment
  RJ Lee in Pittsburgh is used

audits of China mine, for example, would be an EMEA person
  Hong Zhou Wang would be audit person in EMEA (China)

mine is called Guilin Guiguang Talc Development Co Ltd
  Guilin, China

Mark is responsible for Imerys

in this role since 2014

worked for Don Hicks 8 years
started with talc around 2006

technical function that measures talc specification
  this is an R&D function called "Raw Materials Center"
global function but leadership is in Skillman
  leader for North America - Dina Reese, global lead is Len Bardfeld

spec for packaging would be in TRU

if problem with testing, would open a Non-conformance (NC or NCR)
  none known for talc for North America

quality agreement with suppliers includes records retention clause

J&J would audit suppliers against applicable std (e.g., ISO 9000)
  might audit a supplier only once or more

NCs may not relate just to product
trend of NCs could lead to CAPA
deviation - justification for not meeting spec, for example
  very rare

NCs and CAPAs kept in eTQ
  various instances

electronic stuff is mostly accessible to 2008-2009

quality agreements are hand-signed and then scanned into GSS/TRU
quarterly mine results also scanned into SharePoint
  dedicated talc Sharepoint site, includes testing
Don kept records in physical binder until he left and then
  it was migrated to SharePoint until around 2014

no additional steps needed to conform to legal hold - already hold everything

qtrly mine assessment might routinely come through email

approved supplier test managed in TRACKWISE (since 2014, then ETQ before)
  basic information, audit reports
  managed by GLOBAL PERFORMANCE EXCELLENCE GROUP
also used outside of consumer - also pharma

quality agreements historically kept in TRU
switching to new system ICD - may be enterprise system
  also Global Performance Excellence team
    Christof Benzinger

Documentum retired before 2008

ETQ managed by Global Quality Systems group
  legacy ETQ audit module still accessible, records not migrated

no data loss that he knows of

-------------------------------

FOLLOW-UP 6/11/2018

mine
        mine does its own testing (external lab), creates C of A
        batch/lot records (for talc ore)

mine to Imerys
        mine's C of A, filed by Imersys, associated with lot "receiver" number
        Imerys's does own incoming testing (its own and external labs)
                creates C of A for powder
                C of A includes incoming ore and powder testing

Imerys to PTI
        Imersys sends both its own C of A and the mine's C of A
        PTI does its own incoming testing (mostly appearance testing, odor, fineness)
        finished good samples retained per supplier agreement

J&J qtrly audit (oversight testing, not associated with a lot release)
        collects samples from PTI'S ground talc in inventory and submit to RJ Lee
        Mark gets C of A from Imerys along with Qtrly Mine Health

Victoria (Vicky) Lichtiger for records received by J&J from PTI

**************************

Name: Nicholas Zhu
Title: Supplier Quality Management
Date: 5/30/2018

**************************

China

quality team
responsible for supply for OTC and talc

sr mgr for supply quality mgt

coordinator for quality and compliance

5 years at J&J and in role

worked with Mark Zappa

talc raw materials *global* spec stored in TRU system
  version 0 to version 7
  version 0 - Oct 2009

mfg batch records (paper) stored on its facility;
kept by Philippines supplier

responsible for APAC: Thailand, China, Philippines, etc.

mining: China and India (processed in India and Philippines)

qtrly testing - 3rd party RJ Lee

sites in India, China, Thailand sends talc samples to RJ Lee

test results stored in SharePoint and shared with mfg sites via email

global Sharepoint site with folder dedicated to APAC source quality team
may have test results back to 2012

don't believe have anything prior - started this practice

talc spec includes SOPs and WIs

not aware of any loss or corruption

*******************************
Name: Pankaj Verma
Title: Director, APAC External Manufacturing Quality
Date: 5/21/2018
*******************************

look at supplier quality for APAC

moved into external mfg quality

7 years at J&J, 4 years at J&J India/Mumbai

raw and packaging material suppliers - talc part of his portfolio

audit of talc mfg site; ensuring that talc supplier follows specs, testing, overall global specs

lifecycle mgt re: issues, audits, monitoring metrics

two suppliers - Golcha / Ubaipur Minerals in India

China - Guilim

responsible for mgt and mining

for last 10 years

some people in tech org might be able to talk about earlier times

audit reports stored in TrackWise, a validated system
prior to that ETQ/Symphony, including Corrective Actions
2014

global systems

information might be in email, e.g., test reports, communications

possibly paper repositories in Thailand and India for OUS products

GSS - global specifications systems
  recently migrated to TRU
everything was migrated

also SOPs/WIs

a number of regional and local procedures now in TRU

including procedures on how to manage test process

expect a defined period of retention for suppliers =
typically shelf life + 1 years

RMQ = raw materials questionnaire
  information that suppliers submit
global system

Optiva = information related to R&D team
global

SharePoint = used for qualification reports

paper files kept at site to his knowledge

two months ago, got information about suppliers regarding litigation
Nicholas Zhou managed these requests and worked with Mark Zappa
Trixie Campbell in Philippines also worked with team

no knowledge of loss or corruption

Dr Gay Pratash Vidwans
Ram Shukla

****************************************
Name: Sean Park
Title: Sr Director, Quality Assurance
Date: 5/18/2018
****************************************

based in Skillman

May 2009 - Oct 2017

worked with PTI

reported to Bobette Williams, WW VP Bus Quality for Consumer
before that Leslie Traver, same title

business quality tied to commercial partners
bring all aspects of quality

product specifications - GSS - global spec system
finished, raw, mfg instructions, packaged goods all stored

recently retired - Jan 2018

document mgt system where versions could be approved
also had change control document - documented deliverables to justify

change control system was called ETQ
also used for NC and CAPA mgt

ETQ change control number <---> document specification in GSS

change control may reference many product specs

talk to Don Hicks for things earlier than GSS

also have R&D system - development reports, raw material characterization studies, stability reports re: shelf life
called CONNECT

ask Mona Nair about CONNECT, she is NA VP of R&D

100 SOPs that applies to job also kept in GSS, now TRU

also speak to Mark Zappa

peers in other countries
all use the same global systems

no loss or corruption

Consumer-R&D-LorenaTelofski.txt
****************************
Name: Lorena Telofski
Title: R&D planning, CMPP (certified medical publication professional)
Date: 4/24/2018
****************************

started in 1979

was called Johnson & Johnson Baby Products Company

then became consumer companies

currently Johnson & Johnson Consumer Inc.

mine was at Windsor Minerals, VT - milled and ground to particular fine-ness, processed thru
"beneficiation"
ask John Hopkins
may have some test records originally stored at site; site later sold by J&J

put into designated silo and then railcar, and later mfg plant silo
work processes and SOPs that govern, including GMP
purchasing dept or central purchasing was buying raw material

job was to get the talc from the mine to the plant in Georgia

also to get talc from mine to Komar Laboratories, Port Jervis, NY

powder was being originally made at North Brunswick, NJ, before Georgia

product was made in Georgia, but Komar was in use to keep another mfr up and running perhaps 5-10%

Lorena scheduled and coordinated logistics that a PO made it from mfg to a plant
time frames, etc. - was "expediter"

tracking by number of pounds; special railcar tankers dedicated to talc

tankers cleaned by tank company with J&J specs

would lease the number of tankers needed for the time and qty needed

POs, specs, test methods, quality SOPs

testing both for what's in it, what's not in it, purity, etc.
ask Mark / Don re: how often
certificate of conformance and basic testing on inbound talc

then she became "finished goods planner" for baby powder production for Royston, GA, plant

all buildings in North Brunswick have been sold and taken down

finished goods planner - taking monthly forecasts of sales and work with production site
and determining outputs from production, raw material sourcing
developing actual production volumes for a certain size by week
including special promotions, etc.
translated into plant resourcing
would then get reports back about what plant made

think of a) plant documents b) master documents

all run by purchasing, which was part of operations
  1981 moved from Centennial Ave in Piscataway to Skillman

mainframe computer populated the forecasts

finished product goes to warehouse in mfg plant and then to distribution centers
  then to wholesalers

then went to contract mfg, which was under purchasing
  became contract mfg buyer
managed that department eventually

one of her buyers bought what was made at Komar

then quality assurance under R&D
  created an online specification system for mfg
  moved from Wang to WordPerfect

baby powder is a cosmetic product, regulated by the FDA

certified quality engineer and other training programs were stds, GMP, etc.

also looked to other industry stds and customs

then did project planning for R&D

consumer complaints were categorized and distributed by Quality as "Consumer Complaints"
  might have had to do with opening cap, etc.

CAPAs and non-conformances - talk to Quality (Don Hicks, dir of quality, is retired); Mark Zappa
  (Mark for specs)

--------------------
around 1994 - ran R&D/baby products lab in Skillman
  had responsibility for powder
  but formula hadn't changed in very long time
each scientist had physical bound noteboook

notebooks had a number stamped on the cover

who issues?  get a name in records retention in Skillman - consumer

APR - authorization for product release (formerly called FACT BOOK)
  signed off on and goes into records storage
old APRs are in Iron Mountain
includes formula, safety, etc.

R&D *might* be involved in brainstorming new ideas

labs organized by franchise and technology (e.g., liquids)

Cocoon is copy development system
  any public facing language
  team reviews for final approval

product claims center of excellence to brainstorm new ideas
a variety of stds that govern claims
need signoffs from regulatory, legal

"formulation" system

Page 26 of 67

Consumer-R&D-LorenaTelofski.txt

Cocoon has routing and signoffs, can view historical versions up to a point

check with museum

Page 3

Consumer-R&D-LorenaTelofski

Consumer-Records-DarrenHarris.txt

************************
Name: Darren Harris
Title: Records Operations Supervisor (contract)
Date: 6/1/2018
************************

10 years in September

High Density Moving File System at Skillman

lab notebooks, APR (authorization for product release), temporary staging for Iron Mountain

SOPs for consumer - US and Puerto Rico
retrieval, transfer, ERMS usage, lab notebooks, microfilming, training
30+ SOPs

training required for employee - re-training yearly
tracked in ComplianceWire

10 years ago, Skillman went under Ft Washington team
had different SOPs for each (TRIM in Skillman, Versatile in Ft Washington)

boxes always associated with a DEPT, e.g., R&D
typically search by product, not name
no field with a product name, would put in narrative
TRIM had a product field - did it migrate? Ask Michelle

Stephen Zollo - IT person who would have known about migration
Brian Mandel - in Ft Washington

archiving requests came through both R&D and sales/logistics (e.g., bills of lading)

legal hold folders for email and desktop
have been there at least 10 years
procedures and training

for retention, typically would print out an email to declare

now can mix records series in a box because ERMS distinguishes between different "transfer forms" or file level

std box = "archive box" - 15 x 10 x 12

"document" is primary accounting unit
document could be CD, VHS tape
retention for CDs - only good for 5 years
if retention is longer than that for CD, would ask associate to put on hard drive or thumb drive

Morris Plains had historical room - kept in system in Iron Mountain in Germantown NY (Listerine bottles, etc.)

categories in records schedule for "historical" and "samples"

Skillman sends to Iron Mountain, scans/microfilms, sends back
would need to know name of scientist and date
available as a PDF in ERMS

Ft Washington uploads lab notebooks into CONNECT instead, but have an entry in ERMS

had issue with some Ft Washington docs at Iron Mountain around 2009, but no indication of any talc-related documents

Page 28 of 67

Consumer-Records-DarrenHarris.txt

Joanna Siatkowski - former employee with historical perspective of Skillman (in PA) (also Hernando)

Page 2

Consumer-Records-DarrenHarris

*************************
Name: Joann Dodd
Title: Sr Analyst, Records Mgt
Date: 5/21/2018
*************************

J&J Consumer Inc.
Fort Washington

reports to Lisa Cipriani

training

sent training out for 10,000-11,000 people

now WWRIM will do and she will do tracking

she started in records 2007-2008

were just starting to get RIM SOPs/WIs designed 2008

before that used WWRIM procedures

as of consent decree - everything was put on a Work Instruction 2010

as of 2010, 5 SOPs out of consumer, 20+ WIs

now after corporate and pharma integration, have more

the 5 SOPs -
- records for associates
- records for records depts themselves
- litigation support
- records operations (transfers, retrievals, etc.)
- records coordinator (now combined)

need training within 30 days

how to declare an email as a business record? generally, put in a folder

if designate for litigation, would move to hold folders

back in 2008, 56% participation in recurring departmental training, now 98% but would perform departmental audits

would keep hard drives and copy for litigation (ask Renay)

had WWRIM procedure for departing employees
manager's responsibility to ensure records kept as needed

no distinction in training for in office or "road" employees

training included legal hold, departing associates, retention procedures, roles

eUniversity and later ComplianceWire

also shop floor employees of limited duration received modified PowerPoint and would send back training records

some shared computers for limited duration temps, possibly in Fort Washington but would always have own credentials to her knowledge

training format: could WWRIM's or develop your own, they used WWRIM

eUniversity and ComplianceWire actually provided and tracked training

Sharepoint/Web site would have detailed instructions

Nancy Heffner - responsible for Web site content

training materials are specific to US and Puerto Rico

Renay deals with lit hold stuff

not involved with movement of paper through facility to offsite

central files: batch records would stay with document control until and keep onsite or send offsite. only central dept can send offsite

Fort Washington has records center with staff that reviews
records and transfer sheet; compares to what is in box
6-7 people, plus 1 in other locations
also manage ERMS
Lancaster, Los Piedros locations (part of historical McNeil and still same products)

smaller staff in Skillman 3-4

offsite title would have main WWRIM ERS category and subcategory

boxes wouldn't mix different record types

Michelle's group - RIM ops has signoff on how boxes are described

no knowledge of loss of data

all retention schedules are kept historically - ask Rosina

David Allen - QA who signs off on SOPs
(Don Hicks before that)

Hernando - records for Skillman
had to reconcile the two sides at merger
Debbie Staneruck - on Fort Washington side, retired, Rosina reported to

--------------------------------------------
FOLLOW-UP 6/11/2018

all McNeil materials re: consent decree are being held

clean out days stopped around 2011, a year or two before being removed from WWRIM

******************************

Michelle Anderson
Title: Sr Manager, RIM
Date: 4/24/2018

******************************

at company for 4 years

responsible for RIM operations for US markets
consumer
corporate
pharma

gathered data from RIM-related repositories

indexing systems - ERMS
onsite records center
offsite storage

in 2014 - ERMS launched
first migration was from Versatile towards end of year
TRIM, GIFTS end of 2015 - beg of 2016
Neutrogena data has not migrated yet, but new data goes into ERMS

different instance of TRIM than MD&D

TRIM, GIFTS, Versatile decommissioned in 2016

now have integrated retention schedule mgt in ERMS
now have ability to managed electronic records
integrated scanning is launched but not really in use, people scan on their own and upload as PDF
can upload from thumb drive
10 - 15 formats supported by ERMS

ERMS by OpenText
TRIM is now HP
GIFTS is homegrown (Oracle)
Versatitle - Zasio

in 2015, went to corporate ERS - Feb/March rolled out, compliance date of July

had to align records series titles to ERS functional categories

schedule "alignment" rather than direct adoption
also did reductions and harmonized terms between opcos

stopped doing cleanout days for a number of years

could get Legal's approval for ad hoc disposition

GSS was doc control for J&J Consumer, except McNeil
migrated to TRU and TRU Vault
McNeil was EDM
did not migrate to TRU

Iron Mountain CONNECT is used
just box number and date
everything else is in ERMS

info put into ERMS first, then pick up box label, and then update Iron Mountain connect

only Iron Mountain disposition if legal gives special approval

doing proof of concept for disposition with some finance reports

everything is now connected between Legal Hold Manager and ERMS

departing employee - transfer of ownership
now becomes dept property rather than a specific individual
field in ERMS will still say who it came from, although could be submitter, not author

CONSUMER SOP-017118 - all interactions with associates and records program, including dept
with manager responsibility (user oriented)

last created SOP for consumer, pharma, corporate RIM TV-SOP-06290 (Tru Vault)
works across all regions and organizations in Cindy Aden's group

specs went to TRU
SOPs/WIs went to TRU Vault

Renay sent legal hold notices on Michelle's behalf
managed by legal, not discretionary

all records center work is DocuXcel, manage records center ops
based in Pennsylvania

sending to storage
owner fills out records transfer form
summary, detailed description
connected to retention schedule
directions and instructions that are part of transfer form
forms are then submitted and approved

talk to Rosina

nothing corrupt or missing

put in new processes for finding lost items and release of records custody

can get schedules at least back to 2009

had a web site showing both hold and releases, until legal hold mgr came out

during transition, if a release wasn't issued, may not have been active but didn't wanted to issue "broad"-sounding release

------------------------------
UPDATE 6/11/2018

Consumer schedules brought into harmony with ERS in 2015
ERS has section on "batch records and cleaning records"

changed sample retention from "CY+9" to "PERM" in 2015

Consumer schedules are still "departmental," moving to "product" orientation

************************************

Name: T. Renay Lawson
Title: Lead, RIM Operations Consumer
Date: 4/24/2018

************************************

Renay reports to Michelle
Michelle reports to Cindy Aden in Raritan - pharma, consumer, corporate Records for GLOBAL
  Cindy reports to Pat Turchick, he reports to Marene Allison (CISO)

at consumer 9 years, 3 years at Ethicon prior, so started at JJCI at 2009

started with offsite storage accounts - trying to consolidate where things were located

was Iron Mountain, but also Allstate
tried to move to Iron Mountain without huge impact on cost

was just McNeil in 2009
  different parts of consumer were being combined
  Skillman, Neutrogena, etc., each had separate records program

vital records was Renay's initial focus
  access and "retrievability"
  duplication

after a year, started with discovery, taking over from Terry Cooney (e.g., 2010)

for litigation, doesn't start with retention schedules

uses ERMS instead

list of search terms has expanded over the years

ERMS points both to Iron Mountain and onsite storage

historical records tracking
  MOPS (Morris Plains) - GIFTS
  JJC - TRIM
  McNeil - Versatile - launched in 2009
  Neutrogena - Excel
    in 2014 all came together into ERMS
pointed to paper both onsite and at various facilities

Versatile had retention management and file/folder level

to file something offsite, an individual contacts central filing
individual fills out a form

instructions for how to fill out a form
records dept inspects form and records themselves and verifies
including date ranges

generally find that box contents are accurate

had to consolidate multiple accounts with offsite vendor

when lab notebooks are given out, they are assigned and issued, unique ID/name/dept, etc. recorded
  including mgr's name

can check out materials in ERMS

departing employees
cleanout days

have SOPs and Work Instructions at JJ Consumer
  for everything
kept in TRU system (was recently migrated from other system, GSS)

when is stuff scanned into ERMS?
  not a standard practice, but can receive electronic docs from individuals
  and can scan some paper stuff, including lab notebooks

retention schedules in Versatile and

Cocoon is labeling system, not in ERMS

when ERS (enterprise retention schedule) came out from corporate
  had to re-map all categories

departures - individual reviews records and disseminate
  reviews and gives to manager or archives
standard for departing associates

have samples and rocks for talc - would have ERMS entry

EPL - a facility for keeping samples (check on VRI as well)
  climate controlled
  UPDATE 6/7/2018 - available on request, nothing relevant in facility

her litigation searches start with product, go to custodian or NCDS level

if an admin checked in, would not know person associated with it

ERMS hits result in a report generated, sent to atty
  record name, record title, description

ERMS will report all boxes, even those dispositioned according to schedule

some boxes were retrieved by department (withdrawn permanently) and then its status
  is changed in ERMS

if a partial contents of a box is missing, it's recorded with audit trail to ERMS

ERMS had capacity to do legal holds
  taking info from Legal Hold Mgr and putting into ERMS

in older Versatile system, had to set retention to "infinite"

no knowledge of any boxes destroyed contrary to lit hold

custodians received hold notices and act accordingly with respect to ERMS
no known accidental loss

third parties get instructions from records mgt to abide by records policies if
records is involved

no outside US locations for records storage for these products

Rosina Deveney (married name Sheerin), been here many years in records function
  records mgr

prior to Legal Hold Mgr, JJCI kept list of holds
Renay would send holds and releases as directed by legal and upload to Web site

had different distribution lists

store electronic materials in offsite storage as well
ERMS description would indicate

matter number for hold typically starts with year (at least for recent ones)

---------------

FOLLOW-UP on 6/7/2018
15 departmental records schedules (+3 retired)
14 shared services schedules

********************************
Name: Rosina (Deveney) Bruno-Sheerin
Title: RIM Manager
Date: 5/16/2018
********************************

Rosina - records manager - reports to Michelle Anderson
  work on retention schedules and policies for US and Puerto Rico
  compliance assessments
  compliance analysis for new system

Rosina started in 1988 in mfg
Ft Washington bldg

1990 came to office side

at that time, RM program was small
had a few boxes
created retention schedule and aligned boxes

got more involved in records in '92-93

schedules based on McNeil Fort Washington depts

then moved to McNeil mfg locations

Debbie Stanwick, Michelle's predecessor
  she pulled in Skillman location

McNeil was OTC products

had onsite fileroom in Ft Washington
  mostly batch records and R&D for OTC

Skillman fileroom is only for active lab notebooks

she is only responsible for inactive materials
  those to be kept for long term retention

active materials - each department's responsibility

each dept must follow retention stds, however

have records coordinator and signature of authority to assist each dept
  WWRIM requires training
  records coordinators do additional trainings
  particularly on ERS - yearly updates
  WWRIM is pushed out through ComplianceWire and is mandatory
  additional training is calendared but now mandatory

also includes legal hold awareness and understanding of the new
  Legal Hold Mgr

what's different with Legal Hold now? formerly Rosina would send out
  hold notices; now sent directly from Legal
  records mgrs also get notifications
  both Rosina and Renay would send notices at different times
    cover page identified who to send to - dist lists
  would work with legal if additional people needed inclusion
  don't recall ever sending out a release
Rosina would also assist legal in collection
helped Renay with searches for talc collection, particularly with keywords
  in ERMS

just US Consumer, not international
  see WWRIM listing of international contacts

history--
  had DOS system and then moved to Versatile, then migrated into ERMS
  Skillman's TRIM system moved to ERMS
  Morris Plains used home-made system called GIFTS
  could search for in ERMS

at year end, would collect all materials for offsite storage
this would include materials on historic records program
when Skillman came in, would have been incorporate into McNeil's materials
labeled "Records mgt program" and stored offsite, would have to do ERMS search

can't say what Skillman actually saved before 2005

Hernando Arbelaez - her counterpart at Skillman
  he was records mgr

prior to Skillman, Rosina would generate reports of materials subject to destruction, would then send to businesses for tagging based on business or litigation needs; after business signoffs, would review report based on box number and other information, match what was in box, and send for disposition

in past Skillman had Iron Mountain did some indexing, but in 2006 Iron Mountain only got box number

in 2006 tried to make records titles more uniform and standardize retention periods
  old corp program called GRRS (Global Records Retention Schedules)
    was only a suggestion
R&D records were always kept long term - permanent or life of product + nn years
  e.g., lab notebooks, trial master studies

years ago, had fire in two Iron Mountain facilities (disgruntled employee)
  no specific knowledge of any relevant records lost
possibly 1997 - possibly recorded as memo

------

file shares - retention depends on department's own instructions

had eRooms, then migrated to SharePoints

some eRooms were migrated, others kept for Legal
who is eRoom contact?

have SOPS that went from GSS to TruVault
  probably 20-25 including WI

some McNeil SOPs moving from EDM to TruVault

```
***********************************
Name:  Nilay Gami
Title:  Global Case Mgt for J&J Consumer Inc.
Date:  6/4/2018
***********************************

intake of AEs
reporting to business partners outside J&J for marketing, distrib
  e.g., other pharma
aggregate reporting group
  signal detection and surveillance
  regulatory reporting

his responsibility is individual case safety reports and reporting
  to regulatory authorities

SCEPTRE - individual case report

call center receives email, social media, phone call, etc.
  flags as inquiry, complaint, A/E
  then info flows downstream
  may be flagged as A/E and complaint

IRT - intake receipt and triage system
  feed from consumer call system

have an individual in IRT who does preliminary assessments

pushes downstream for review and submission

then goes in to SCEPTRE

LCRx system - sends individuals to regulatory authorities

SCEPTRE = global safety database, shared with Janssen

SCEPTRE - anytime new info comes info, a new version is created

"SMART" tool - used for signal detection
 flags certain issues based on logic
 has its own workflow
versions for both medicinal and nonmedicinal products

each product is ID'd with a certain name, "e.g." - "Shower to Shower"

std set of questions asked consumer on phone
  e.g., medical history, symptoms, other drugs, action, usage history
flows in SCEPTRE, used to make assessments

if email or social media, ask to call in

patient info is captured but outbound reporting must respect
  regulatory and privacy requirements

cosmetic or medical products reporting to FDA
  at any time, baby powder or shower fell into one of these two categories

SCEPTRE is a validated system, full audit trails, no deletions

Remetrex Safety System (RSS) was the prior system
  until last year

transition, not a full migration
```

for active cases, core information was transferred over
for inactive cases, "SMART" tool looks at both system

RSS has not been archived or decommissioned, still holding all data

Stan Hemsley - current employee might have pre-RSS knowledge
he performs medical review on A/Es

WHO drug dictionary - used in SCEPTRE to code drugs
MEDDRA dictionary - used to standardize A/E categories

WHO + MEDDRA = facilitates outside reporting

what is attached to a SCEPTRE record?
it is both received from call center and generated by the investigation

how to get talc aggregate info from SCEPTRE? put a search in with all products

a few SOPs = a couple that speak to overall process
main SOP: "Collection, assessment and reporting of A/Es"
also "SCEPTRE User Manual"

also have workflow for individuals to upload A/Es outside of call center

call center can assess but safety team will confirm call center's judgement

"business process clarification" - if something is classified as an A/E but is not
if not classified as AE but should have been, complaint folks can "push it" back to SCEPTRE

no data loss or corruption

Consumer-Sourcing-DaneGilmore.txt

************************
Name: Dane Gilmore
Title: Internal sourcing
Date: 5/17/2018
************************

Singapore - lead chemical sourcing category for consumer for APAC

leading that category for 3-4 months
previous stints 3-5 years ago but not talc-specific

5 years J&J Singapore, 5 years in Australia

directed Pam to quality and compliance team

reached out to raw materials center for specs
forwarded to q and c team

raw materials owns the specs-based in India
some personnel in china
documents largely exist online
transition to new system - TRU
  GSS was prior system - was migrated
  new system has greater functionality
  only PDF in old system, now can do searches
downloaded ZIP to Q&C team
suppliers must complete test results and complete on certificate of analysis
  reside with quality team at receiving site
  not part of TRU

talc comes from China and India

to be processed in Philippines and Thailand
these are receiving sites

may also process in China

Q&C team would have all the documentation
  Nicholas Zhu is Q&C contact

no loss or corruption

*************************
Jannus Shih-Min Lin
Title: Associate Director, EMEA Chemical Strategic Sourcing (Switzerland)
Date: 5/14/2018
*************************

Ana Diaz was predecessor - left the company

Jannus is EMEA chemical source team
has a sourcing manager in charge of procurement

work with Supply Quality Mgt - audit supply side to ensure quality stds are in place
RMC - raw materials center

Jannus is part of Consumer, as is RMC and SQM

can provide RMC and SQM names

Consumer-Sourcing-UdaySharan.txt

```
*******************************
Name:  Uday Sharan
Title: Senior Sourcing Manager
Date:  5/21/2018
*******************************

11 1/2 years at J&J
procurement of chemicals for J&J India

talc for Europe mfg'd in J&J Thailand

mining is done from a state in India

put into chips and sent for polishing

Thailand has batch mfr'ing records
  lot number of raw materials, packaging materials
  std doc retention - 5 years?  will confirm
  will check if paper or electronic
  certificate of analysis accompanies every shipment of raw materials
  incoming testing of talc by J&J Thailand
  test results along with certificate of analysis stored along with batch record
  specification created by R&D - fine tuned by SMTG
  every mfg site will have spec for incoming material
    issued by R&D group
  production will go through steps and prepare finished good
  distribution and logistics team then takes over

no accidental destruction
```

```
*************************
Name:  Emily Chu
Title:  VP of Consumer Supply Chain IT
Date:  5/22/2018
*************************

since Oct 2015
  formerly Joe Gimpel for supply chain
   and Tom Weck for quality
  she does both

reports to Steve Wren

responsible for all IT activities supporting consumer supply chain and quality

supply chain - ERP systems (SAP), mfg execution systems (Werum)
  5 regions - 6 instances of SAP (US and Canada each have their own)
  2007 switched from homegrown DB/2 system in US
  Canada's version of SAP went live last year, from older SAP version
  always do data migration (perhaps with selective date ranges), also would archive
before decommissioning an old system if directed by legal
  old days - did cold archive, would need to be restored
  now - do warm archive with Informatica

ERP Europe - on both SAP, Movex, BPCS

quality - LIMS, Empower, doc control (e.g., TRU, also Cocoon for R&D)

Bernhard Brouwer - her counterpart in R&D

Empower is a global system - one instance
  some sites use local lab systems
  specific to chromatography

LIMS should be a global system as well but also has local uses
  general purpose lab management system

follow up with Lorena re: where talc

what is being archived?
  GSS
  McNeil OTC's SAP for US

Arriba - accounts payable and POs - used by some regions, including US
  global

also TrackWise, PQMS

not involved in call center

no loss of data that she is aware of

she can provide vendors for LIMS and Empower
  and how used
```

Corporate-eDiscovery-MikeSeid.txt

*******************************************

Name: Mike Seid
Title: eDiscovery Manager
Date: 4/11/2018

*******************************************

Raritan

box.net and Office365 (OneDrive for Business, OneDrive)

Q4 2015
all J&J active users have moved over to Office365

some 240,000 inactive users
Sway, Yammer,
Word, Excel, Sharepoint

Azure -
network drive moving from L drive to OneDrive

still have eVault, frozen unless active user, in which case data went back to them either as document or email folder - owners Wes Fine and Ann Marie

Enterprise agreement with Microsoft
personal usage of cloud storage is not sanctioned and disabled
Kevin McCaffery enforces security on these

individuals had to request BOX and supervisor had to approve
no longer give out
BOX deployed end of 2014
Adam Sladowsky supports
Steve Kelly was SME

retention - all data is retained
departing users have account disabled but data remains

drivers for Box, now moot
1. allows field reps to sync across devices without being on J&J VPN
2. collaboration

OWA is supported by special request

specially configured BOX environment re: security
scans what services a user is using through corp firewall
only allows BOX, Office 365

tape backup has been removed for many file servers and email
some file servers are still non-GFS and use tape

until O365 went live for everyone
30 day retention for email
31st day each backup is removed and overwritten

file servers - went from 90 to 60 to 30 days
Liz Hernandez - is records mgr for ITS
now more business continuity than DR, as there is now worldwide replication

Frank Floyd is expert re: replication

Enterprise Vault - lit hold rolled out to all US 2007 or 2008
not for efficiency storage

EV mail in frozen - can restore emails but they will
  stay in EV
EV files are still accessible
  currently working to decommission
if they have a mailbox, mail content will be pushed back to mailbox

if no mailbox, content exported to PST and sent to legal

----------
IMs - Microsoft Office Communicator, moving to Skype
  not logged but; Wes Fine supports, available to everyone

Windows 7 was desktop standard, now moving to Windows 10

*********************************************
Name: Ann Marie Krok
Title: IT Manager

Name: Lou Chaney
Title: Technology Manager

Date: 4/23/2018
*********************************************

Global Messaging Ops

30 day standard Exchange rotation

Exchange 2003 2007-2013

before rollout of Exchange 2010

users were hosted in North America and Beerse data centers for EMEA
  except ASPAC - Asia South Pacific has 5 hubs (then to 3)

now migrating to Exchange Online, Azure - last 20,000 users

formerly--mailboxes were deleted for former users after 45 days
now former users mailboxes are hidden and disabled; JEDS record turns to terminated
  new approach put in place in mid 2013

in O365, former users come OUT of cloud and go back to premises

pre-Exchange 2010:
  mailbox had standard size limit of 80 MBs but many exceptions
  Mailbox Manager
    with Mailbox Manager, Inbox, Deleted, Sent items were moved to "Cleanup" folder after 30 days
    sits there for another 30 days for users to take care of, then 7 days in dumpster
  Mailbox Manager can have exceptions
  7-14 days in deleted items
  another 30 days in deleted-deleted (dumpster)
  eVault was used for lit folders only in North America
    lit hold folder - archive runs 1x per week;
    once it's archived or users click "store to vault",
    it's archived and can't be removed; although new versions can be created
  for legal hold, would have been collected prior to it being deleted - Wyatt Brown's team would create PST

post-Exchange 2010:
  user-deleted items stay for 90 days in deleted folder
  another 30 days in recovery folder
  also applies to RSS, junk, sync
  otherwise everything stays forever in primary mailbox
  after 1 year moves to secondary (archive) mailbox
  same folder structure, cheaper/slower storage
  PSTs are frozen
  eVault frozen - now gone
    ingested back in 2010 by Karen Skellington's team
  for legal hold, now "hold in place"

Exchange 2016 in Cloud (part of Office Professional Plus)
  deleted items remain 90 days, then 30 days in dumpster
  after 1 year moved to online archive
  multi-factor authentication because in cloud now
  a certain group of people work online only (27,000) contractors, etc.

OneDrive then becomes default storage
Karen Skellington can provide additional detail regarding hold procedures

BACKUP:

they backup the entire Exchange database (not "brick-level")

as of Exchange 2010 (deployed in 2013)
in Raritan, may share an Exchange server with people from another operating company
some consolidations due to capacity and retirement
sales force all shares servers
servers are not virtualized

backups in Morris Plains globally - this is DR site, holds 3rd copy of Exchange databases
each site has redundancy as well (1st and 2nd copies)

disk to disk backup - MS DPM, 30 day retention
(changed with Exchange 2010)

pre-Exchange 2010: RESTORING A DELETED EMPLOYEE (within 30 day window)
to find deleted employee, would find the tape and request from tape dept;
if older version of Exchange, would use OnTrack tool

for 2006-2007 time frame on (when using Exchange 2003), would use Exchange Recovery Group services to restore directly to server

after request, would put info an a share
team in Raritan does tape pulls

PROCESS:
request goes from legal to records manager of operating company, then to IT discovery in WW Info Security Group
Raritan hands back to requesting party
email is handled by offshore team after tape is mounted
1. for Exchange 5.5, use Raritan server with OnTrack and then migrate to PST
2. for Exchange 2003, happens at local operating company

after move to Exchange 2010 (in 2013):
"unlimited" mailbox size (really 50 GB)
backups only held for DR
deleted items has its own retention period
tapeless backup every 30 days

Peter Dietz can address existence of specific tapes

Blackberry:
for company-owned or user-owned BlackBerry devices
could send WIPE command remotely
now shut down - no BES
Apple:
manage iPhones and iPads remotely
Android:
none

have Exchange SOP
stored in EDMS document control system (was Orbit)

Webex integration, Office Communicator/Lync - now retired, Skype for Business

use Microsoft Office 365 Compliance Center
Seong Park - uses for collection

Page 48 of 67

Corporate-ITS-AnnMarieKrok_LouChaney.txt

Yammer, Sway, Planner, part of collaboration tools - Wes Fine

no data loss or corruption

Page 3

Corporate-ITS-AnnMarieKrok_LouChaney

Corporate-ITS-FrankFloyd.txt

****************************************
Name: Frank Floyd
Title: Senior Manager, Global Core Infrastructure Services, Backup and Recoverability
Date: 4/19/2018
****************************************

Raritan

Frank owns backup and recovery globally for NetBackup
  e.g., SAP, Oracle

will query CMDB to JJT-managed systems and ensure they have backups for them
  create "nobackup" report on a daily basis

BUIT does its own backups

backs up on a server level
still do backups to tape for remote sites - most have the tape drive onsite
  transitioning to data domains for them, however

90 day retention is longest retention period

fulls maintained for 90 days
incrementals for 30 days
SAPs maintained for 30 days - full nightly
Oracle / SQL maintained for 45 days
Websites just backed up as a server

email managed by exchange team, transitioning to O365
  Ann Marie Krok

do Sharepoint backups
  would need to ask Sharepoint team regarding retention for each

NAS/fileshares/home drives
  transitioned from a physical file/print server backed up to tape
now virtual on a NAS filer
  Bob McDonough

Phil Welsh for archiving program

tapes--
  Roger Rehm is retired
  transitioned to Luc Vanparijs

  Peter Dietz does global tape mgt - movement of tapes
  Frank does inventory management

legal hold - would set to "infinite" in NetBackup
legal and business would ascertain server name -
  might look in CMDB

did name of a given system change in moving to data domain from tape?
  they would have to check each time

replication:
  Morris Plains has been shut down in June 2017
  have co-locations from NTT in Ashburn VA

Frank's stuff is replicated to Sungard in Carlstadt NJ
  now transitioning to Ashburn VA
anything that is SDDC (software defined data center)/virtualized

Page 50 of 67

Corporate-ITS-FrankFloyd.txt

as opposed to legacy systems

not practical to put this under legal hold -- cannot add more disk to device

some operating companies use virtual private cloud (Amazon, Azure)
self-service model for backup

SOP 5115 for overall backup
and various Work Instructions

Page 2

Corporate-ITS-FrankFloyd

Corporate-ITS-WesleyFine.txt

*******************************************
Name: Wesley Fine
Technology Manager, Sharepoint Services
Date: 4/20/2018
*******************************************

11 years at JnJ

managing social collaboration
O365, SharePoint, Yammer

support SharePoint 2007
moved to SharePoint Online (part of O365) end of 2016
  by end of Q1 2017, all SharePoint 2007 sites were read-only
Highpoint has now archived
app services could migrate teamsites on request
portals required special programming

users could have data in both

many eRooms were migrated to SharePoint

3 types of sites worldwide for J&J
  -portal - communications (about 500)
  -team site - collaborative (about 25,000)
  -my sites (40-50,000)

security managed by Active Directory

not "storage of record"

can edit materials on a Sharepoint site

versioning can be turned on by site owner

can have a file exclusion list

120 MB was limit for a single file in 2007
online per file has grown to 10 GB

site limits--
  recommended limit 100 GB for 2007, 25 terabytes now possible for online

backup was changed from 90 days to 30 days
  data domain - tapeless backup
(retired everything but North America, now being retired too)

2 levels of recycle bins - user and admin
  total of 90 days

Microsoft itself keeps 14 days of each site online

can make a site readonly to effectuate legal hold, don't use other tools
  but now collect the site to preserve

retention is handled on a site-by-site basis

no automated disposition

no public facing internet sites driven by Sharepoint
  some access by partners

a document could be created and live only in Sharepoint

no loss or corruption, except for minor loss in connection with migration to archive
  accidental by IT

app services is performing a migration to Sharepoint online
  using "MetaLogix"; some businesses use "ShareGate"

each site owner had to make a decision to migrate or decommission
  archiving was performed in two phases
    -set to read only status
    -3rd party provider will host in readonly - HighPoint

if owner of a site is no longer an employee, will be automatically archived
  unless someone else in the sector takes over

have a big SharePoint list and BUIT leads

2007--could subdivide by content
  many team sites are sub-divided by company
  "managed paths" with a Sharepoint site
cannot do in Online

--------------------
Yammer went live in Jan 2017

unofficial pilot before that

can provide list of active Yammer users but not by opco

nothing is deleted from Yammer

---------------

TEAMS - Microsoft O365
collaboration workspace
released just last September
similar to Yammer, self-service, can create group
groups must fill out metadata and compliance info
Yammer for "crowdsourcing" info where you may not know everyone
TEAMS - defined team
have list of groups and owners
TEAMS include SharePoint, Office 365, and OneDrive for Business
  e-discovery and retention apply same way

about 7000 active users from all opcos

some policies that relate to their usage

Corporate-Museum-MargaretGurowitz.txt

****************************************

Name: Margaret Gurowitz
Title: J&J Chief Historian
Date: 6/4/2018

****************************************

museum is physical building
with archives in back

may be other sites with historical info, but only one corporate museum

no other consumer-related historical archives

had some knowledge of former "Personal Products", may have historical facility
  Milltown NJ

currently responsible for ingesting materials into the collection, but
most of existed prior

most things come to archive from public donations

both documents and physical objects

had museum since 1930s
had project a few years to create "modern" museum, so had cataloging system
  since 2014

use 3rd party with cloud based museum system - TMS (the Museum System, Gallery
Systems)
  artifacts mostly catalogued at individual level
  paper catalogued by folder and category
  provided advertising and marketing materials to be scanned
  Chenault's nomenclature naming std (museum system), not J&J product categories
  also keywords
  not much date information for ingestion
  metadata might have estimated date of objects, depending on circumstances
  talc artifacts are packaging
  some containers had product in it, some did not
  over 100 containers - less than 10 of them were not product but "100 anniversary"
tins
  no retention numbers - keep forever unless condition in very bad shape
  location tracking in system
  "catalogue number" - unique, first 4 numbers are year catalogued for products
    catalogue number for paper relates to folder

historical archive in records retention policy at corporate level

don't get historical archival documents generally from subs

in 1970s, law dept ran museum and asked for packaging/labels of note
  stopped in early 1980s; decided that operating units would not send
  and be sent back to operating units
  much of it was sent back; have transfer sheets
  now only sent if Margaret requests and if it is part of an "enterprise story"

1986 book published "A Company that Cares", included Baby Powder

earliest package is from 1890s
current is 2000s

artifacts on display in museum display cases w/humidity and temp
archives are high density, acid free storage w/humidity and temp

prior to that, in unlabeled cardboard boxes

no correlation to older handwritten catalogue number

no data loss or corruption

access control to collection starting in 2006 when Margaret took over

transfer records are still available

Margaret occasionally receives hold notices but archive materials retained indefinitely

have some old paper inventories - typewritten, perhaps to the 1950s showing what was in showcases

*************************
Name: Cindy Aden
Title: Director, RIM
Date: 5/8/2018
*************************

37 years at J&J
starting at MD sector in Ortho

records in pharma

then at end of 2014
risk assurance started reported to Pat Turchick, ISRM
 and Marene Allison

in 2015
  Deb Staneruck - hired Michelle Anderson
  Deb has now retired but was head of records/consumer

2015
Deb wanted consumer under ISRM
  headcount stayed with consumer NA, but Rosina, Renay, Michelle
    also came under Cindy

corporate records came onboard as well
  Edith Mendez, John Caruso (no longer with J&J)

Cindy - Director of RIM Operations

Karen Skellington and Cindy both report to Pat

Karen is focused on governance - owns WW RIM and ERS
  17 stds and 1 policy
  legal holds - training
  now AUTOMATICALLY assigning training using Summit around the world

Cindy = services required to support the operating companies

for example, assigns records coordinators to act as liaison
training, archiving, physical records

clean-out days / clean-up days retired several years ago
not able to destroy records == legal hold mgr, holds, etc.
not able to execute defensible disposition

Renay's interaction works closely with the business
  and the legal teams re: inactive records

GRRS - preceded global retention schedule - Karen Skellington
  a document on WW RIM portal

talk to Rosina re: historical schedules
  then....
talk to Edith Mendez re: corporate
  takes charge of historical materials from OPCos

Iron Mountain -- assessed every 3-4 years
records dispersed through various IM locations

don't share with IM what's inside boxes
only share label information - offsite box number

quality organization may accompany them on assessments

or provide requirements

vital records -- these are scanned if physical by Iron Mountain
and previous onsite vendor
so duplicate records + microfilm
images stored on J&J servers - OpenText
ask Rosina

vital records, at least for microfilm, started in 1980s
early 2000s started to scan

no loss of data for Consumer

quality org tends to have onsite filerooms
eventually it gets collate and sent to offsite storage
owned by business until moved offsite
would be covered by collection team

will send GRRS dates to Tom

RIM and legal have partnered on Stagegate Review Committee
RIM - Cindy
legal - Anthony
2-3 meetings per month
review apps slated for decommissioning

meeting with technical app owner and business owner
collect key pieces of info, where data used
what opcos
leverage CMDB, application ID, etc.
whether GxP, ServiceNow/Iris
consider ERS retention, legal hold
outcome email sent to bus and tech owners if archiving needed
must rely on tech preservation requirements
3 1/2 years ago, put Stagegate measure in - don't allow local
records mgrs to make those decisions with legal team
Application Services Factory - enterprise archiving solution
Informatica, Metalogics, etc. depending on structured/unstructured, etc.
or documented exception process
Stagegate Tracker - can get list for consumer

**************************************
Name: Edith Mendez
Title: IT Lead - WWHQ, New Brunswick
Date: 5/14/2018
**************************************

29 years at company, 2008 with records function

report to Michelle Anderson, who reports to Cindy Aden - everything reports to Marene Allison (including Karen Skellington)

all follow WWRIM
  corporate has adopted ERS - enterprise retention scheduled
  other operating companies can use ERS or map their schedules to ERS

consumer mapped its schedules to ERS

she distributes hold notices to corporate - to group operating chairman

now legal holds are custodial

before Exterro--
there was a web site that is maintained for distribution
  called CEMS - corporate entity mgt system
updated by legal

legal dept could also release using same procedure
  must be sent to same people as hold

about 5 years ago, must notify legal if other people should get notice rather than just forwarding

WWRIM - worldwide standards
WW CRIM - consumer record
  set of stds for consumer's use

Sally Kies - owner of new system

if company closes or divests, all records come to J&J corporate (if no sister company available)

would search Iron Mountain for corporate records
  IMConnect
previous records mgr was Anne Kotteras, was also using IMConnect before 2003

active materials kept in each user's own computer area
  no Sharepoint or group share specific to function

can't recall processing any talc-specific hold notices for corporate but can check Legal Hold Manager

general training to all employees on WWRIM
  retention, legal hold
  Maureen Markolina - administrator training
Karen Skellington oversees program itself

possibly talk to Frank even though he is in pharma

no corruption or loss except some Puerto Rico records - not consumer/talc

IM connect only stores box number - not other metadata
  store that for Corporate and Pharma in GREATS (not consumer) - Frank Girello's

Page 58 of 67

Corporate-Records-EdithMendez.txt

area

Page 2

Corporate-Records-EdithMendez

Corporate-Records-KarenSkellington.txt

********************************************
Name: Karen Skellington
Title: IT Director / WW Records & Information Management / eDiscovery
Date: 4/11/2018
********************************************

Raritan

structured data archiving -
  started around 2015 - CTO mandated enterprise archiving
  project Beyond - "clearing floor space" in raised floor area
  Stagegate Review - review each system before archiving/decommissioning
    IT, legal, records, etc.
  really got going in 2016
  applied to any system where data needs to be retained
  not custodial data
  business owner and legal would decide if a completely new system was migrated to

HighPoint Systems or Solutions
  providing service for enterprise archiving solution
SAP data, loose files - provides a way to take data offline or adhere to lit hold
  Informatica for structured, MetaLogix for unstructured

RM assigned to every opco

18 standards put out in 2009
 now 17
other guidelines existed pre 2009
Karen came in 2008 and worked to consolidate

Record mgr must communicate policy and perform random assessments
removed cleanup standard as of Dec 31, 2013

5.0 is current version - effective April 2017
  evolved to make more "requirements" and specific
now refers to enterprise archive solution

2015 - went to enterprise retention schedule
  all opcos must follow
"big bucket" approach not based on dept, now based on topic
43 categories now
longest retention for each picked

coordinators are "feet on the ground"
associate will be responsible

no more cleanup events, suspended several years ago

backup tapes and tapeless backups are both viewed as DR

person under hold - this concept is evolving and will
  become effectuated by the new legal hold program

Enterprise Archiving for SAP and non-SAP - live 7 months ago
  encouraging companies to use
regardless of whether data is "live" or in the approved archive, considered source of truth

WWRIM/ERS has always been in IT/Risk Mgt

had global retention schedule for last 5 years

mandated as 2016

to facilitate archiving, disposition, standardization across multiple countries
4.0 is current retention schedule version

retention is global but accommodates privacy regulations or local laws
might look at lowest common retentions across 60 countries and make exceptions as needed
country's own requirements overrule ERS
--------------------

UPDATE 6/7/2018

2010 GRRS
all WWRIM materials stored and published in SharePoint

ITS records -
now using GREATS, was IMConnect for Iron Mountain offsite storage

```
**************************
Name:  Pam Downs
Title:  Principal, Triality
Date:  4/17/2018
**************************

collection back to 60s and earlier

Leavitt case - Baby Powder '65 to present
Hayes case - Shower to Shower '75 to 2001

ERMS - electronic records mgt system
  houses index of fileroom contents
may house some electronic documents

index sometimes goes to folder level

stored in Iron Mountain facilities and some local filerooms

imaging project to do older specifications

Skillman - where "baby" line employees reside
corporate office, not mfg

HQ - Fort Washington, PA

there is a history document

Shook Hardy had handled one-off talc cases

Pam got involved in Aug 2017

started by talking to Renay Lawson - Fort Washington
  she is in records office, supports consumer litigation

Jack Coletta introduced Pam to her

boxes and files labelled
lab notebooks well documented, may have initials on each page

doc types included:
        raw materials specs
        mfg/processing specs
        formulas
        labels
        contracts with external mfrs
        lab notebooks
        testing materials
        mining info

NOT batch records

both own mine and third party supplier
specs to 3rd party and did testing of talc

Global Specification System - GSS

mfr'd until 2005, then third party in 2006

Lorena Telofski - at company 30 years, served as historian
  Skillman

talc is mixed with fragrance since 1800s
```

R&D responsible for finding supply of talc
  they would go out and test mines (e.g., Vermont, Italy, China)
pictures and slides

Quality Assurance

some testing records maintained by third parties

evaluate testing qtrly

retention of testing docs was generally shelf life of product + 1 year

from Windsor VT, rail transit

from China, comes in ship hold to Houston (Imerys, 3rd party) and then in railcar
  then milled/ground to a powder in Houston

fragrance added in Georgia - processing

was Vermont with milling too, then to Georgia for processing
now China - Houston - Georgia

shower to shower was divested in 2012, sold to Valiant

travels to Georgia in railcar

formula = milled talc + fragrance

fragrance is outsourced

Royston, Georgia - J&J through 2005, PTI (Pharma Tech Industries)
  bought the existing processing facility

Chicapee, Georgia - former J&J facility

invoices from PTI don't break out specific product lines

use third party for yearly and quarterly audits (GMP)

PTI bottles, comes back from J&J for distribution to various warehouses

*** back to 1998, have collected where every shipment has gone through SAP and prior system, e.g., to Walmart, but not a particular Walmart

UPCs by brand, number of ounces

----------------
possible clinical trials in 1970s

----------------
brand team - baby brand, not specific to baby power

separate team for shower to shower (part of cosmetics brand)

marketing plans and marketing strategies - made for entire "baby" brand

some adult marketing campaigns for baby powder
  stayed under the baby program

Cocoon- copy approval system for later years

although materials created outside of it, in paper or shared drives

went to museum in New Brunswick for older ads

Websites are being preserved - brand team designs along with print, radio, etc.

use outside agency for baby brand and Shower to Shower

P&L at baby brand or cosmetic level, not at the product level

P&L for distribution - baby brands would be an allocation of a percentage in each facility

no budgets at product level

to identify gross sales, Consumer's finance dept pulled distribution and calculated based on wholesale price

no sales force for baby - just sales brokers for JJCP
  act like account reps - e.g., Walmart or Amazon

team for Google ad-words, etc. at Consumer Products level

----------------------------

complaints/questions

Consumer Response Team and Consumer Response System - homegrown
Jan 2010, archive of prior system - no migration

call center - CRS logs call
emails
correspondence

not collected because ETQ and SCEPTRE collected with same information

Acclaro - document repository for consumer response team with scripts
collected talc scripts from Acclaro

Remetrix used for actual complaints - Feb 2010, paper prior

-----------

systems discussed: SAP, Cocoon, Consumer Response, Acclaro, ERMS
  Global Specification System (GSS), International Contracts Database (ICD, J&J global)
  Remetrix
  SharePoints - maintained by Quality re: mine health checks and audits
  TrackWise keeps external mfg audits
  SharePoints for baby and cosmetics
    consumer safety mgt team - Sharepoint (analyzed complaints) (at consumer level)
    safety surveilliance and risk - Sharepoint (at consumer level)
    ingredient topic Sharepoint
    Project Volt SharePoint - divestiture of Shower to Shower

board documents collected in hard copy

ICD - 1990

Office 2010 to O365 in progress
SharePoint 7 to Online in progress

share drive for baby marketing
share drive RoyData

other collections
  corporate contribution database
  FEC = federal election cmte
  lobbying reports from group share
  WERC = safety datasheets re: raw materials

some custodians have BOX accounts

uLex has source questions for custodians

less than 100 custodians ID'd so far

searched corporate records mgt system - worked with Edith Mendez
collected trademark info from corporate group share
collected patent info from patent Sharepoint

ask Michelle Anderson at Consumer (Renay's boss)
----------------------------------

FOREIGN COLLECTION FOLLOWUP
5/4/2018

Canada baby powder - same raw materials as US
  Canadian records found in US
  same SAP system for distribution

UK paper - specs, processing, and testing search
  date range of exposure 1969-2000
  answered interrogs
  no docs collected

Philippines paper - specs, processing, and testing search
  date range 1970-2002
  committee of mgr or higher level, included:
   legal director, records, quality, supply chain, marketing
  talc not mined there, but was manufactured there for a while
  reviewed all offsite storage indexes
  sent Skadden associate to open 100 boxes to sample based on keywords
  found NOTHING in date range
  get retention schedule from Pam pre: 2015 WWRIM ERS
  also found advertising records in both paper and electronic (e.g., TV commercials)
  Crown indexes were searched

Hong Kong
  exposure range 1971 - 1983
  put together committee as per above
  found none - in box site index
  no mine or manufacturing in Hong Kong
  no boxes needed to be opened
  J&J indexes-Excel

for all of above, collecting gross sales in e-form as far back as available

Peru
  exposure 1960 - 1992
  actions ongoing
  actively working with same committee
  haven't found anything - still looking at offsite storage indexes
  also looking at boxes in Columbia, because some boxes were mfr'd and
    shipped to Peru
  ongoing
  no mining in Peru

```
  did not own mine
  J&J index-Excel

  will eventually collect gross sales in e-form

Turkey
  exposure 1977-2012
  have found paper documents and are collecting
  have not found electronic documents
  specs, possibly testing
  collection is ongoing
  did not mine or manufacture
  J&J index - Excel

Poland
  exposure dates 1963-1989
  questioned employees in US and EMEA
  never sold J&J baby powder in Poland
  EMEA is pulling together regulatory records for other brands sold
  no Poland committee

Austria
  exposure dates 1989 - 1993
  same exercise as in Poland
  employees don't believe was ever distributed
  pulling together regulatory records

always went to offsite storage and reviewed indexes
sent people in-country as needed

only productions done to date are Philippines
  (Canada is US)
nothing to produce in Hong Kong
only special OUS production matter is the Delacruz matter/Philippines

8 countries relate to 6 separate matters

UK, Canada - Chapman matter in NJ (only answered interrogs)
Peru - Rinondi matter in NJ
Poland, Austria - Ruman matter in NJ
Turkey - Doganalp matter in NJ
Philippines - Delacruz in CA
Hong Kong - Fong matter

no destruction records found

Hong Kong - only found shipping records after date range
  worked with Mark Zappa to confirm how to search the shipping records
  along with supply chain - regional people
  Pam has their names

records reporting
  EMEA reports to Gerta
  no specific name in APAC
-------------------------------------------------------
FOLLOWUP
5/17/2018

Pam - more collection info

Vicky Barkis - ETQ collection
  quality, external mfg
```

Chad Struthers - quality, external, mfg
  collected audits from TrackWise (originally stored in ETQ)

group ran reports for PTI only and put on share drive
  Pam then documents with the group

for complaints - Nicki Nanney, Andre Mann (regional medical safety officer)
  Andre did signoffs

migrated from Remetrix to SCEPTRE for complaints/adverse events in Nov 3, 2017

3 collection passes from Remetrix
  MEDRA code
  mesothelioma
  any cancer

-----------------------------------------------
FOLLOWUP 6/4/2018

International Contract System

stores all contracts back to 1990
including domestic

safety data safety (MSDS), copy review,

WERCS = safety data sheets

Cocoon = copy review

-------------------------
FOLLOWUP 6/7/2018

APR is a system for drafts, final ones put into CONNECT (those final ones were collected)

Places searched for samples:
- Toxicoloy
- Regulatory
- R&D
- Quality
- Labeling and Packaging
- Customer Development
- Records Management
- Marketing
- External Manufacturing
- Medical Safety
- Clinical
- Museum

Vendor-UnitedLex-AndyReynolds.txt

*************************************

Name: Andy Reynolds
Title: United Lex case manager
Date: 6/7/2018

*************************************

in Virginia

about 400,000 documents

293,000 documents products at least once

production included testing reports, ads, custodial records
  formula information, testing of raw materials and finished product
  studies - clinical, preclinical, toxicology, adverse events
  govt agency communications - FDA, OSHA, IARC
  trade association information (CFTA)
  quality and specs from milling and mining
  compliance and safety audits
  medical literature
  marketing and promotion information - marketing plans, communications with marketing firms
  J&J communications re: Baby Powder and Shower to Shower
  communications with health professionals and thought leaders
  documents re: talc sourcing

270:12 272:4 275:8,15, 24 276:13,24 277:9,16, 20 278:13,22 280:11 282:19 283:4 284:21 285:14,24 287:1 288:3 292:20 293:2,18 294:11,18,22 295:19 297:4 298:9,15,21 299:4 301:9 306:14 311:19 312:9 314:10 322:5 323:19,24 324:11,20,24 326:16 330:22 351:11 374:5,6 384:25 391:3 399:12 409:25 411:6 417:1 420:10,20 424:18 426:12,24

**turn** 298:17 328:8

**two-thirds** 309:8 398:11

**tying** 387:20

**type** 263:17 314:18 354:3 370:13 415:9

**types** 298:20 299:6 315:4 339:23 355:11 391:22 433:23

**typically** 253:11 383:6

**typing** 262:7

**U**

**U.S.** 312:1 437:18,22

**U.S.A.** 337:23

**Uday** 334:3 335:5 336:18

**Uh-huh** 375:14

**underneath** 287:13 318:12,14,15

**understand** 225:25 231:7 235:20 236:24 238:11 240:13,19 244:19 245:12 250:12 258:9 280:17,19,20 281:2 297:11 301:14 324:5 325:11 335:19 336:9,21 344:22 345:4 361:2 365:23 394:23 396:10 400:15 414:17 429:3

**understanding** 226:12 227:12 228:16 234:15 238:22 239:4,19,24 241:9 242:25 251:12 253:3 254:13 260:6 273:25 276:25 277:17 280:22 291:5,15 294:3 300:3 326:4 335:8,12 337:4 339:14 346:24 348:21 351:14,18,20 356:19 358:21 363:12 364:21 365:1 366:18 368:13,22 371:23 373:13 378:25 388:14 389:24 390:3 391:13 393:4,13,20 394:14 396:9 403:7,14 406:5 407:4 421:11 425:2,4,9 428:16 429:18 431:24 433:10

**understood** 237:24 310:6 344:24 375:22 395:21

**undertaken** 363:25

**uniform** 272:20

**unit** 275:11

**United** 335:9

**units** 417:16,21 420:23 426:19,21 427:16 430:23 436:2

**universe** 406:6 433:22, 24

**unproduced** 234:24

**untrained** 278:12

**update** 246:14

**updated** 244:24,25 245:21 246:9

**upload** 418:12

**USA** 222:21

**users** 241:1 300:2,3 301:1

**V**

**validated** 375:21,22 377:25 378:12,16

**validation** 357:20

358:13

**valued** 248:11

**valuing** 250:4

**vantage** 268:1

**variable** 284:1

**vehicle** 274:18

**vehicles** 241:11

**verbatim** 262:9

**verified** 303:1

**verify** 283:9

**Verma** 364:12 375:18 376:9 383:4 388:18

**Vermont** 222:20 225:5 350:10

**Versatile** 267:24

**version** 246:9 247:15, 19,21 248:16,19 249:5, 15,17,20 250:11,25 251:1,19,20,25 287:17 288:2,5 289:9,16,23 290:5,10,15,19 293:5 296:8 298:18 307:1,12, 20 309:4 312:18 313:4, 5,8 315:20,21 316:15 317:19,24 318:5,19 319:10 320:14,16 321:1,5,9,11,12,15,17, 21 322:3,4,7,15,16,19, 25 323:1,7,15,22,23 324:3,11,13,19,22 325:5,15 326:1 356:4 384:17 409:7

**versions** 251:16 263:7 288:7 290:2,19 320:11

**versus** 240:24 422:25

**video** 224:5,6 268:13 315:16 333:12 371:1

**videos** 304:12

**view** 356:7

**viewed** 270:5

**visible** 376:4

**Vivian** 236:16

**volume** 224:15 226:6 229:1,10,21 231:4 237:10 244:17

**W**

**wait** 332:6 425:18

**walk-through** 374:13

**walking** 371:25

**wanted** 231:7 261:16 265:17 378:4,25

**warn** 417:13 420:7

**Washington** 264:11,12 265:3,15 271:3,8

**waste** 346:5

**water** 288:20

**Web** 418:12

**week** 230:23 242:9

**Welch** 224:9

**wheeled** 302:6

**wheeling** 302:14

**wheels** 302:11

**whoever's** 303:18

**whoops** 247:20

**Wiley** 428:20

**wished** 273:13 274:2

**witnesses** 386:2 415:16

**woman** 226:10

**word** 231:15 232:8 237:6 320:20 341:21 342:9 345:19 361:11 433:8 435:10

**words** 236:8 237:21 238:5 241:12 269:6,10 277:1 284:14 292:21 313:16 314:25 331:16 342:22 353:2 368:24 373:19 394:11 405:13 411:4

**work** 226:3 238:19 260:20 373:6 397:11 412:19

**worked** 230:17 234:5 244:25 246:10 317:16

**workflow** 351:6

**working** 243:20 294:5 376:12 411:10

**works** 234:3 384:3

**world** 334:21 335:14 376:5 427:8

**worldwide** 239:7 245:4 247:21 248:13 249:5, 10,19,21 251:6 287:6 289:8 294:14,19,20 296:5 315:7 318:22 325:5 339:12 427:3,8

**worldwide's** 246:24 288:1 295:1

**writing** 305:22

**writings** 246:20

**written** 292:15 303:6 314:25 320:2

**wrong** 270:24

**wrote** 239:11 264:5 269:10 279:10 284:13 310:2 395:18 396:14

**WW** 239:6,8 287:6 427:8

**WWRAM** 252:15

**WWRIM** 285:6 289:16, 23 290:17 294:14 298:18 303:5 312:24 313:2 316:21 317:6,13 318:5 319:11,16 324:11 325:5,16

**X**

**x-ray** 314:9 315:24 354:25

**Y**

**year** 270:14 273:6 279:23 280:9 281:17 292:21 300:17 329:6,7 330:20 346:22 383:7,10 384:21 385:9 387:3 397:18 404:21 406:12, 19 407:3,5 422:21 432:19

**years** 228:21 229:3 256:22 271:2,7 281:1 294:4,6,10 312:15,16 314:1 334:10 335:7 342:24 347:14 352:2,16 353:20 354:18 358:11, 23 372:14,16 373:11,20 374:4 376:13,14,18 377:19 382:8 383:11 384:24 385:8 386:3 404:3,20 418:15

**yellow** 426:24

**York** 223:4 396:1

**Z**

**Zappa** 348:24 349:14 351:6 364:1,12 367:4 368:15 369:8 385:17 388:18 399:14

**Zhu** 328:11 332:5 364:12 370:22 372:3 373:4 382:19 388:17