Exhibit 160, part 3

**In the Matter Of:**

TERESA LEAVITT/FONG and WONG vs JOHNSON & JOHNSON, et al.,

---

**JAMES MITTENTHAL (PMQ/COR)**

*October 18, 2018*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ✦ San Francisco ✦ San Jose**

**Sacramento ✦ Irvine ✦ Los Angeles**

877.451.1580

www.aikenwelch.com



1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF ALAMEDA
2                      ---O0O---

3    TERESA ELIZABETH LEAVITT
     and DEAN J. MCELROY,
4          Plaintiffs,
     vs.
5    JOHNSON & JOHNSON, et        No. RG17882401
     al.,
6          Defendants.
     _____/
7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   COUNTY OF LOS ANGELES
9                      ---O0O---
     PUI FONG and THAI WONG,
10         Plaintiff,
                                 JCCP CASE NO. 4674
11   vs.                         No. BC675449
     JOHNSON & JOHNSON, et al.,
12
           Defendants.
13   _____/

14

                     TRIAL PRESERVATION
15     VIDEOTAPED DEPOSITION OF JAMES PETER MITTENTHAL
        (PMQ/COR Johnson & Johnson; Johnson & Johnson
16                  Consumer, Inc.)

17             VOLUME II, Pages 219 - 443

18

19     Taken before EARLY K. LANGLEY, B.A., RMR, RSA, CLR
                     CSR No. 3537
20
                   October 18, 2018
21

22
                 Aiken Welch Court Reporters
23                One Kaiser Plaza, Suite 250
                  Oakland, California 94612
24             (510) 451-1580/(877) 451-1580
                   Fax:  (510) 451-3797
25                  www.aikenwelch.com

Page 220

```
 1              I N D E X
 2
                                           PAGE
 3
    JAMES PETER MITTENTHAL                   225
 4
    DIRECT EXAMINATION BY MR. SWANSON (Cont'd)  225
 5
 6
 7
 8              E X H I B I T S
 9  EXHIBIT NO.                             PAGE
10  Exhibit 20   Spreadsheet, "Additional    232
                 Investigation Regarding Scope of
11               Searches Conducted Mid-2018 for
                 Category 3 and 4 Methods"
12
    Exhibit 21   Spreadsheet re history of Johnson  242
13               & Johnson holds, consumer talc
14  Exhibit 22   "Mittenthal -- Leavitt/Fong  246
                 Deposition Topics"
15
    Exhibit 23   WWRIM Policy, Version 4.0,   247
16               12/31/2014
17  Exhibit 24   WWRIM Standard RIMS-1, Version  247
                 5.0, 12/31/2016
18
    Exhibit 25   WWRIM Policy 1.0, 7/31/2009  248
19
    Exhibit 26   Mr. Mittenthal's notes for Hayes  260
20               deposition
21  Exhibit 27   WWRIM Policy Version 1.1,    289
                 9/30/2009
22
    Exhibit 28   WWRIM Policy, Version 2.0,   289
23               1/31/2011
24  Exhibit 29   WWRIM Policy, Version 3.0,   289
                 12/31/2013
25
```

Page 221

```
 1  Exhibit 30   Records Retention Schedule   311
 2  Exhibit 31   Document entitled "People    381
                 Interviewed in Talc Fact Finding"
 3
    Exhibit 32   Document preservation notice,  416
 4               11/11/1999, Krushinski v JJCP
 5  Exhibit 33   Document preservation notice,  425
                 12/15/2009, Deane Berg v JJCP
 6
    Exhibit 34   Legal hold notice, Chesteen v  429
 7               JJCC, 2/6/2014
 8  Exhibit 35   Revised Legal Hold Notice,   430
                 5/14/2014, Estrada v JJ and JJCC
 9
    Exhibit 36   Legal Hold Notice, 7/19/2014,  430
10               State of Mississippi v J&J and
                 JJCC
11
    Exhibit 37   Talc Ovarian Cancer PL       431
12               Litigation, Updated Legal Hold
                 Notice
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 222

```
 1          DEPOSITION OF JAMES PETER MITTENTHAL
 2
 3       BE IT REMEMBERED, that pursuant to Notice, and
 4  on October 18, 2018, commencing at the hour of 9:05
 5  a.m., in the offices of Kazan, McClain, Satterley &
 6  Greenwood, 55 Harrison Street, Suite 400, Oakland,
 7  California 94607, before me, EARLY LANGLEY, a Certified
 8  Shorthand Reporter, State of California, personally
 9  appeared JAMES PETER MITTENTHAL, produced as a witness
10  in said action, and being previously duly sworn, was
11  thereupon examined as a witness in said cause.
12                   ---oOo---
13  APPEARANCES:
14
15  For the Plaintiffs:
16       MARK SWANSON
         Kazan, McClain, Satterley & Greenwood
17       55 Harrison Street, Suite 400
         Oakland, California 94607
18       (510) 302-1000
         Mswanson@kazanlaw.com
19
20  For the Defendants Imerys Talc America, Inc.; Cyprus
    Mines Corporation; Imerys Talc Vermont, Inc.;
21  Specially appearing for Defendant Imerys USA, Inc.:
22
         ERIN CARPENTER
23       Dentons US LLP
         4675 MacArthur Court, Suite 1250
24       Newport Beach, California 92660
         (213) 623-9300
25       erin.carpenter@dentons.com
```

Page 223

```
 1  For the Defendants Johnson & Johnson; Johnson & Johnson
    Consumer, Inc.:
 2
         CHRISTOPHER COX
 3       RICHARD T. BERNARDO (Via phone)
         Skadden Arps, Slate, Meagher & Flom, LLP
 4       4 Times Square
         New York, New York 10036
 5       (212) 735-3453
         christopher.cox@skadden.com
 6       richard.bernardo@skadden.com
 7
    Also present:
 8
         Jonathan Jaffe
 9       ESI Consultant
         Jim Partridge
10       Tele-Video Production Services
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    --oOo--
2              P R O C E E D I N G S
3                    --oOo--
4         THE VIDEOGRAPHER:  We're on the record.
5    My name is Jim Partridge.  I'm a qualified video
6    technician video recording on behalf of Tele-Video
7    Production Services.
8         The court reporter today is Early Langley
9    of Aiken Welch Reporters.
10        Today's date is October 18, 2018.  The
11   time is now 9:05 a.m.  The location of this
12   deposition is the Kazan and McClain law firm in
13   Oakland, California.
14        Today's witness is James Mittenthal.  This
15   is Volume Number II in the case of Leavitt and
16   McElroy, et al. v. Johnson & Johnson and Fong, et
17   al. v. Imerys Talc America, Inc.
18        This is Case Number RG17882401 filed in
19   the Superior Court of California in and for the
20   County of Alameda.
21        This deposition was noticed by the Kazan
22   law firm for the plaintiff.
23        Would the counsel for the parties please
24   identify themselves and for whom they are
25   appearing.

1         MR. SWANSON:  Mark Swanson appearing on
2    behalf of the plaintiffs.
3         MR. CARPENTER:  Good morning, sir.  Erin
4    Carpenter appearing on behalf of Imerys Talc
5    America, Inc.; Imerys Talc Vermont; and Cyprus
6    Mines Corporation.
7         MR. COX:  Christopher Cox on behalf of
8    defendants Johnson & Johnson and Johnson & Johnson
9    Consumer, Inc.
10        THE VIDEOGRAPHER:  And on the telephone,
11   please.
12        MR. BERNARDO:  Richard Bernardo, also
13   counsel for the Johnson & Johnson defendants.
14            JAMES PETER MITTENTHAL
15        previously sworn as a witness,
16            testified as follows:
17        THE VIDEOGRAPHER:  Would the counsel
18   please state any stipulations or statements they
19   would like on the record.
20        None.
21        Counsel, you may proceed.
22   DIRECT EXAMINATION BY MR. SWANSON (Cont'd):
23        Q.  Good morning, Mr. Mittenthal.
24        A.  Good morning.
25        Q.  You understand that you're still under

1    oath?
2         A.  Yes, I do.
3         Q.  Okay.  What work have you done in
4    connection with the Fong and/or Leavitt cases
5    since I deposed you on September 21st in the first
6    volume?
7         A.  So I gathered additional materials,
8    retention schedules.  I conducted follow-on
9    interviews with Pamela Downs and Laura Giacino,
10   and a woman named Tina French was also present for
11   that other interview for the purpose of
12   understanding additional information about Fong
13   and Leavitt collection activities.
14        Q.  Okay.
15        A.  I obtained -- requested and obtained a
16   list of legal holds that encompassed consumer talc
17   and I made a list of those holds.
18        Q.  From which did you --
19        MR. SWANSON:  Before I ask the question,
20   Early could you read that entire answer back to me
21   please.
22        (Record read by the court reporter.)
23   BY MR. SWANSON:
24        Q.  Okay.  And those retention schedules that
25   you gathered, did you actually do the search for

1    those and obtain those or did you get those from
2    counsel?
3         A.  I got those from counsel.
4         Q.  Okay.  And those holds are for what period
5    of time?
6         A.  The holds cover -- the earliest hold that
7    I received was dated 1999.
8         Q.  And these were additional holds that had
9    not previously been produced to the plaintiffs; is
10   that correct?
11        A.  These were holds that were related to, to
12   my understanding, issues other than mesothelioma.
13        Q.  Now, these legal holds that you're talking
14   about -- well, let me -- let me -- because I think
15   I got myself confused or maybe you confused me.
16   The additional materials that you gathered were
17   retention policies; right?
18        A.  I -- I gathered -- that was one of the
19   things I got, yes, were additional retention
20   schedules.
21        Q.  And you gathered those -- you got those
22   from counsel; correct?
23        A.  Yes.
24        Q.  And why did you get those?
25        A.  I was -- in an effort to respond to issues

Page 228

1  raised in the last time to provide the most
2  thorough coverage of the retention schedules
3  during the applicable times, I sought to get
4  what -- the retention schedules that were
5  available.
6       Q.  So those were retention schedules that
7  hadn't been produced to the plaintiffs in Fong and
8  Leavitt up to that point; is that correct?
9            MR. COX:  Object to form.
10           THE WITNESS:  Some of them had not been
11  produced yet.
12  BY MR. SWANSON:
13      Q.  Have they all been produced now?
14           MR. COX:  Object to form.
15           THE WITNESS:  That's -- that's my
16  understanding.
17  BY MR. SWANSON:
18      Q.  And what period -- can you give me the
19  period of time that those holds cover?
20      A.  I'm sorry?
21      Q.  The range of years for those retention --
22  did I say "holds"?
23      A.  Yes, sir.
24      Q.  I apologize.  I'm getting myself confused.
25          For those retention schedules that you

Page 229

1  obtained from counsel after your first volume of
2  your deposition that you say have been produced,
3  what's the range of years they cover?
4       A.  They went back to the 1997.
5       Q.  And did you bring those with you today?
6       A.  I believe they're all -- I'm not sure
7  what's in this binder.  I believe that everything
8  has been brought today.
9       Q.  Okay.  For your information, the binder
10  contains the exhibits to the first volume of your
11  deposition.  So that if I have a question for --
12  and that was the binder that you brought to that
13  deposition.
14          Do you remember that?
15      A.  Yes.
16      Q.  Okay.  So if I have questions about a
17  prior exhibit, then you can refer to what's in the
18  binder, okay?
19      A.  Okay.
20      Q.  All right.  So what was produced
21  subsequent to the first volume of your deposition
22  to us were additional retention schedules for the
23  period 2004 through 2012.  Now, we did have a
24  prior retention schedule that had previously been
25  introduced and was marked for the record in your

Page 230

1  original binder going back to 1997.
2          Does that refresh your memory about what
3  you've seen recently or did you see additional
4  retention schedules going back to '97 that either
5  weren't produced in this 2004 to 2012 range that
6  was subsequently produced and wasn't produced in
7  the initial production?
8       A.  The former.  That refreshes my memory.
9       Q.  So you spoke to Pamela Downs, Tina French,
10  and Laura Giacino?
11      A.  That's correct.
12      Q.  All in the same place?
13      A.  There was a conversation with Ms. Downs
14  and then there was a second conversation with
15  Ms. Giacino and Ms. French.
16      Q.  Remind us again.  Pam Downs, she -- Pamela
17  Downs she worked for Triality; is that right?
18      A.  That's right.
19      Q.  And where did that interview take place?
20      A.  That was -- that was at Skadden offices.
21      Q.  And what day did that take place?
22      A.  I'd have to double-check.  It was -- it
23  was last week.
24      Q.  How long did it last?
25      A.  A couple of hours.

Page 231

1       Q.  Who else was there?
2       A.  Chris Cox.
3       Q.  And what additional information specific
4  to either what we spoke about in Volume I of your
5  deposition or that's related to these two cases,
6  Leavitt and Fong, did you discuss with Pam Downs?
7       A.  I wanted to clarify and understand the
8  extent of the -- her -- her involvement in
9  specific searches related to Fong and Leavitt
10  beyond what had been captured in my original notes
11  from her.
12      Q.  And what did she tell you with respect to
13  that?
14      A.  Well, basically I -- I created -- as we
15  were talking, I created a Word table on my
16  computer and that table contained six or seven
17  columns, and as we spoke, I filled out the -- the
18  table, and that table is with me today.
19      Q.  Okay.  Do you have a copy of that table
20  for me?
21           MR. COX:  I do.
22           MR. SWANSON:  Okay.  And do you have a
23  copy I can mark or his copy -- oh, his copy I can
24  mark.
25           Mr. Mittenthal, can I mark your -- put an

1  exhibit tag on your copy?
2      THE WITNESS:  Sure.
3      MR. SWANSON:  Okay.
4      (Whereupon, Plaintiff's Exhibit 20 was
5      marked for identification.)
6  BY MR. SWANSON:
7      Q.  And how many pages -- this is four pages.
8      So the Word doc -- the Word table that you
9  created with respect to Pam Downs that's marked as
10 Exhibit 20, that's a four-page document, and we'll
11 just have to make sure to keep these separate from
12 these others.
13     Is that okay if I separate these?
14     A.  Sure.
15     Q.  Okay.  There you go.  And I'll hand those
16 back to you.
17     And it looks like you also included in
18 this information that you've gathered from Laura
19 Giacino; correct?
20     A.  Yes.  I took the same document and I
21 continued it.
22     Q.  And so does this document summarize what
23 you learned from both of them regarding searches
24 specific to Leavitt and Fong?
25     A.  Yes.

1      Q.  How long did you speak to Laura Giacino?
2      A.  It was about an hour and a half, as I
3  recall.
4      Q.  And who else was there during that
5  conversation?
6      A.  That was a telephone call.  Tina French
7  was present with Ms. Giacino.
8      Q.  And who is Tina French?
9      A.  She is an assistant corporate secretary.
10     Q.  Did you speak to them while -- let's start
11 with Pamela Downs.
12     Did you speak to her about anything other
13 than just what specific searches had been done
14 related to Leavitt and Fong?
15     A.  That's my recollection, yes.
16     Q.  And is that the same with Laura Giacino?
17     A.  Yes.
18     Q.  Was there any information that Tina French
19 provided?
20     A.  I mean, there were -- there were times
21 when they were both talking.  It was -- it was
22 really an interview with Ms. Giacino.  It was
23 announced that Ms. French was also on the phone
24 and she occasionally piped in with information.
25 It was not always clear which one was talking.

1  Generally, Ms. Giacino led the call.
2      Q.  Can you explain to me by giving me an
3  example how this table works that you created?
4      A.  Well, the -- it was initially to be tied,
5  and I worked with counsel to get the -- in terms
6  of those, the specific case, Leavitt or Fong, and
7  the request so that I could tie the searches back
8  to a specific request for production.
9      The -- the next element is a -- is a --
10 simply a category, and the -- this table, for the
11 sake of convenience, the post- -- the later
12 searches specific to Leavitt and Fong materials,
13 and those -- and the requests for production.  But
14 the later searches were categorized for the -- for
15 the sake of understanding the circumstances for
16 each.
17     This table speaks to what -- denoted as
18 Category 3 and 4, which, as per the legend, are
19 additional searches of company sources and
20 first-time searches of company sources.
21     The other two categories that relate to
22 the additional collection efforts, Category 1
23 target searches of the global production and
24 refiltering of the previously collected unproduced
25 material, did not involve additional on-the-ground

1  document-gathering.  So they -- only the
2  on-the-ground collection activities were included
3  in this table.
4      Q.  Okay.  And I see there's a column here for
5  "people consulted."
6      What does that refer to?
7      A.  So I -- in my conversations with
8  Ms. Downs, I said, who did you go to, to identify
9  this -- sources of this additional information,
10 where it might be, what might be obtainable, and
11 so the people consulted would be the people who
12 would be -- either have a custodial relationship
13 to the data or knowledge of where it might be.
14     Q.  And then "areas searched," that is
15 physically what they were actually searching?
16     A.  Yes.
17     Q.  Do you know, from your notes or from your
18 memory if we went through, who did the actual
19 searches?
20     A.  I -- I don't.  I understand that the
21 people consulted were involved.  I don't know who
22 physically did the hands-on searches.  Or, in the
23 case of the computer systems, I guess I would call
24 those hands-on as well.  But the actual searches.
25 It was certainly under attorney supervision.

Page 236

1      Q.  And then you've got another column,
2  "search criteria"; correct?
3      A.  Yes.
4      Q.  So just looking at this second one under
5  "industrial hygiene" for Leavitt.  It's Request
6  Number 46 and Request for Production Set Number 3,
7  it says here the search criteria is "knowledge of
8  file names and key words for talc and asbestos."
9          So what do they actually look -- first of
10  all, let me see if I can get an idea of what
11  happened in that search.  What was -- whoever
12  did -- do we know who did the search, the actual
13  search here?
14      A.  I don't know who performed the search
15  except to say that it was based on the knowledge
16  of Vivian Pai and Reed Holbrook.
17      Q.  And it says, "Looked for missing
18  information from earlier archive searches,
19  departmental share."
20          So what were they actually searching?  Was
21  this a database search that they are's doing?  Are
22  they doing a search of physical archives?  What's
23  actually being searched?
24      A.  I would understand that they looked in
25  both the -- the ERMS archive as well as the

Page 237

1  network share drive.
2      Q.  Now, on some of these others, you actually
3  did put EMRS (sic) here and you didn't put that
4  here, so I'm curious.  Are you guessing when you
5  say they looked at ERMS?
6      A.  Well, when Ms. Downs used the word
7  "archive searches," that's what I interpreted her
8  to be referring to.
9      Q.  Okay.  And that's what we discussed at
10  length in Volume I was the ERMS searches that --
11  it's kind of an indexing system; correct?
12      A.  For files in off-site --
13          MR. COX:  Object to form.
14          THE WITNESS:  Sorry.
15          MR. COX:  Go ahead.
16          THE WITNESS:  Files in off-site storage
17  and in certain cases files that are on -- in
18  company facilities.
19  BY MR. SWANSON:
20      Q.  It says, "Knowledge of file names and key
21  words for talc and asbestos."
22          That's the search criteria.  What does
23  that mean?
24      A.  I understood that to mean that, with
25  respect to the file shares, that between Ms. Pai

Page 238

1  and Mr. Holbrook, they looked for certain -- they
2  scanned the list of file names in the departmental
3  share and looked for files that they knew would be
4  named accordingly.
5          The key words I took to mean terms that
6  were applied to the searches of the ERMS.
7          MR. SWANSON:  Madam Court Reporter, can
8  you read that back, please.
9          (Record read by the court reporter.)
10  BY MR. SWANSON:
11      Q.  I don't understand.  They're looking for
12  file names where?
13      A.  In the share drive.  So, for instance, it
14  may be denoted as the L drive or the whatever
15  drive letter is associated with an area on the
16  company's computer network where they -- everyone
17  can contribute and deposit files, Microsoft office
18  files, other files that are at the departmental or
19  work group level.
20      Q.  So this is -- which company are we talking
21  about here?  The share files?
22      A.  My understanding would be corporate --
23      Q.  Go ahead.
24      A.  Well, Ms. -- Ms. Pay -- Pai would have
25  been in the corporate area, so she would have

Page 239

1  consulted a corporate share.
2      Q.  Okay.  So when you say "corporate share,"
3  you mean Johnson & Johnson proper?
4      A.  That's my understanding.
5      Q.  Are you guessing or that's what you --
6      A.  Well, the notation for her title was WW.
7  So "Worldwide" would -- I believe, and I -- that's
8  what I took "WW" to denote.
9          I did not follow up and determine her
10  corporate affiliation.  I see that I
11  wrote "corporate," so I -- by all indicia, she is
12  part of the corporate organization as opposed to
13  consumer.  I did not independently reference
14  her -- you know, look her up in the directory or
15  anything like that.
16      Q.  And how far back is the information
17  that's -- or documents and information there on
18  their share drives, do you know?
19      A.  My understanding is that the -- the
20  information in share drives is generally
21  persistent.  It is not -- it is not subject to
22  disposition.  There may be -- they may have the
23  ability to perform retention on it, but I -- my
24  understanding is that that material is -- just
25  stays on the share drive.

Page 240

1    Q.  And what's the original source of those
2  materials?
3    A.  Oh, those would be documents that authors
4  had placed there or people who had received them
5  had placed there.  So it is -- you know, because
6  it's a share drive, it does not necessarily tell
7  us how something got there.  It -- we may be able
8  to look at meta data and see who put it there
9  originally, but there's not really a story that's
10 told in the -- in the file share as to how
11 something got there.  Therefore, I believe
12 Ms. Downs relied on these people's memory to
13 understand where to look in the share drive that
14 would be for the relevant information.
15   Q.  So are these share drives like small
16 companies have where a bunch of information just
17 gets dumped in shared files -- in a shared drive?
18       MR. COX:  Object to the form.
19       THE WITNESS:  Well, I -- I understand that
20 at Johnson & Johnson -- and I've heard that the
21 term "L drive" being referred to denote areas
22 where there is a shared directory.
23       Now, that might be different for, let's
24 say, marketing versus R&D, but, generally
25 speaking, the company makes share drives available

Page 241

1  to users to place information on, and that's
2  determined by the department as to how people use
3  it.
4    Q.  Is there -- is there some kind of standard
5  operating procedure about what gets put there and
6  what gets retained there and what gets removed and
7  who removes it?
8        MR. COX:  Object to the form.
9        THE WITNESS:  Well, to my understanding,
10 the company's retention policies do not speak to
11 what I call "containers" or "vehicles."
12       So, in other words, the L drive, the share
13 drive, would be simply a place to store
14 information.  The -- the policies or retention
15 schedules relate to the purpose, the use of the
16 document, the fact that it may be classified
17 according to a retention schedule based on its --
18 its content and purpose.  That's what would
19 determine how it's treated as opposed to whether
20 it's on a share drive or some other location.
21 BY MR. SWANSON:
22   Q.  I'm sure I'll have questions about that
23 later.
24       So you gathered a list of holds; correct?
25   A.  Yes, I did.

Page 242

1    Q.  Okay.  And can you -- do you have multiple
2  copies of that?
3        MR. SWANSON:  So let's mark that as -- let
4  me mark yours -- as Exhibit 21 to your deposition.
5        (Whereupon, Plaintiff's Exhibit 21 was
6        marked for identification.)
7  BY MR. SWANSON:
8    Q.  When did you compile the list of holds?
9    A.  Last week.
10   Q.  Okay.  And I know some of these were
11 produced to us previously and some were produced
12 subsequently to the plaintiffs in these cases.  I
13 have seen these.
14       Is this a complete list of all of the
15 Johnson & Johnson holds with respect to talc
16 litigation?
17       MR. COX:  Object to the form.
18       THE WITNESS:  I requested holds relating
19 to consumer -- consumer talc.
20 BY MR. SWANSON:
21   Q.  And is this the complete list of
22 historical holds related to consumer talc?
23       MR. COX:  Object to the form of the
24 question.
25       THE WITNESS:  This is my understanding of

Page 243

1  what was -- what was found to satisfy my request.
2  BY MR. SWANSON:
3    Q.  What specifically was your request?
4    A.  For holds relating to consumer talc.
5    Q.  And is the spokesperson for Johnson &
6  Johnson, then, this -- you have no information of
7  any prior legal holds related to consumer talc,
8  consumer talc litigation; correct?
9        MR. COX:  Object to the form.
10       THE WITNESS:  That's correct.
11 BY MR. SWANSON:
12   Q.  Did you interview anybody about legal
13 holds or did you ask -- just ask counsel for
14 whatever legal holds they had?
15   A.  I spoke with counsel.
16   Q.  And by the way, in between the two
17 depositions, how much time have you spent speaking
18 to Johnson & Johnson's counsel?
19   A.  I was on site probably five or six times,
20 either working by myself or working with counsel.
21 Probably -- with counsel, perhaps 15 to 20 hours.
22   Q.  And you say "on site," you mean at the
23 Skadden law firm offices?
24   A.  Yes.
25   Q.  Is there anything that you spoke to Pamela

Page 244

1  Downs or Laura Giacino related to Johnson &
2  Johnson that is not summarily reflected in your
3  notes?
4          MR. COX:  Object to the form.
5          Go ahead.
6          THE WITNESS:  Of course, my prior
7  conversations with Ms. Downs are in my other
8  notes.  But in terms of the current time period,
9  it's all in here.
10 BY MR. SWANSON:
11     Q.  Were any searches done or inquiries done
12 to -- were any inquiries or searches done to
13 locate responsive documents, other than you
14 requesting holds and retention schedules,
15 responsive documents to the plaintiff's requests
16 in the Leavitt and Fong cases subsequent to your
17 first volume of your deposition?
18         MR. COX:  Object to the form.
19         THE WITNESS:  I -- if I understand your
20 question correctly, I don't have complete
21 knowledge of that.  I know that additional
22 materials have been provided to plaintiffs,
23 additional retention schedules of company
24 policies.  I updated -- some of my materials that
25 I worked on with counsel that were updated had

Page 245

1  been provided.
2          I don't know about searches.
3      Q.  Okay.  So, other than the additional
4  retention schedules and the worldwide records and
5  information policy being produced and the
6  additional holds, you're not aware of any other
7  searches being done since September 24th; correct?
8      A.  Well, I wouldn't -- I wouldn't be aware.
9  I mean, I'm not privy to that -- to that in terms
10 of the ongoing communications between plaintiff
11 and defendants.
12     Q.  I understand.  But your role here is to
13 talk about searches that were done, and I'm just
14 simply asking, since September 24th, are you aware
15 of any other searches being done other than for
16 the items that we just mentioned with respect to
17 holds, retention policies and...
18     A.  I see.  No.  I'm only aware of that, that
19 which has been listed in the sheet.
20     Q.  And I believe that -- you just mentioned
21 that you've updated some notes specific to these
22 cases; is that correct?
23     A.  Yes.
24         MR. SWANSON:  Do you have a copy of that,
25 Chris?  Thank you.

Page 246

1          So let's mark this as Exhibit 22 to your
2  deposition.  If you give me your copy, let me mark
3  that.
4          THE WITNESS, oh sure.
5          (Whereupon, Plaintiff's Exhibit 22 was
6          marked for identification.)
7  BY MR. SWANSON:
8      Q.  What is Exhibit Number 22?
9      A.  This was an updated version of a document
10 that I worked on with counsel, and it's basically
11 simply a list of the noticed deposition topics
12 that I received, coupled with some of the produced
13 materials that correspond to them.
14     Q.  And this is an update of a document you
15 previously produced; is that right?
16     A.  Yes.
17     Q.  And I believe we previously attached that,
18 but I'll sort that out later.
19         Did you -- are there any other reports or
20 writings or notes that you made subsequent to
21 September 24th regarding this deposition in the
22 Leavitt and Fong cases?
23     A.  No.
24     Q.  I've just been provided today worldwide's
25 records and information management policies, so

Page 247

1  I'm not going to get into the particulars of
2  the -- all the prior ones, but I do want to go
3  over some basics on those based on the ones that
4  I've actually had an opportunity to review up
5  until now.
6          MR. COX:  Mark, I'll just note for the
7  record that the revision history of the documents
8  that you're referring to are actually referenced
9  in the copies you've had for a while now.
10         MR. SWANSON:  Oh, okay.
11 BY MR. SWANSON:
12     Q.  And we may go over the other ones later or
13 we may just jump to them now if we need to.  But
14 I'm going to hand you two of them, which is
15 Version 4.
16         MR. SWANSON:  And that's Exhibit 23.
17         (Whereupon, Plaintiff's Exhibit 23 was
18         marked for identification.)
19         MR. SWANSON:  And Version 5, which will
20 be -- whoops, that's my copy with my notes on
21 it -- Version 5 of Johnson & Johnson's worldwide
22 records and information management -- records and
23 information management program standard will be
24 Exhibit 24 to your deposition.
25         (Whereupon, Plaintiff's Exhibit 24 was

Page 248

1          marked for identification.)
2     BY MR. SWANSON:
3          Q.  Do you have those in front of you?
4          A.  I do.
5          Q.  Okay.  So, yeah, there's some language at
6     the beginning of this.  If you look at Exhibit 23,
7     do you see what it says the policy is at the top?
8          A.  Yes, I do.
9          Q.  And can you read that out loud?
10         A.  "Records and information shall be created,
11    valued, protected, managed, and disposed in
12    accordance with applicable laws, regulations, and
13    the requirements of the worldwide records and
14    information management policy and standards and
15    other applicable Johnson & Johnson policies."
16         Q.  This is Version 4 of this, but you've seen
17    prior policies; correct?
18         A.  In the past I have, yes.
19         Q.  And the initial policy, Version 1, that
20    goes back to 2009; correct?
21         A.  I don't recall.
22         MR. SWANSON:  Can I mark yours and then
23    print another one?  I apologize.
24         (Whereupon, Plaintiff's Exhibit 25 was
25         marked for identification.)

Page 249

1     BY MR. SWANSON:
2          Q.  I'm just going to go ahead and hand you
3     what's marked as Exhibit Number 25.  You have that
4     in front of you.  And that indicates that the
5     Version 1 of 1.0 of Johnson & Johnson's worldwide
6     records and information management policy was
7     created or -- the date of this policy is July 31,
8     2009; correct?
9          A.  Yes.
10         Q.  So their -- Johnson & Johnson's worldwide
11    records and information management policy only
12    goes back to 2009; correct?
13         A.  This particular policy document, yes, was
14    created in 2009.
15         Q.  Well, this is Version 1.0; correct?
16         A.  Yes.
17         Q.  There's no prior version to that, is
18    there?
19         A.  I'm not aware of a worldwide prior
20    version.
21         Q.  So this was the first worldwide standard
22    for records and information management policy at
23    Johnson & Johnson; correct?
24         MR. COX:  Object to the form.
25         THE WITNESS:  Yes.

Page 250

1     BY MR. SWANSON:
2          Q.  And this policy, if you look back at
3     Number 23, Exhibit 23, the policy that is
4     described there at the top of creating, valuing,
5     protecting, managing, disposing in accordance with
6     applicable laws, you know, records and
7     information, that -- does that accurately describe
8     the policy?
9          MR. COX:  Object to the form.
10         THE WITNESS:  I -- I believe it describes
11    this version of the policy.  This is the language
12    of the policy.  I don't understand.  This is
13    the -- the language from the policy is, I believe,
14    what you were referring to, and that is -- that is
15    the preamble to the policy.
16    BY MR. SWANSON:
17         Q.  Okay.  So let me ask you this:  Is it --
18    since 2009 part of Johnson & Johnson's record and
19    information management policy to create, value,
20    protect, manage, and dispose of information and
21    records in accordance with applicable laws,
22    regulations, and requirements of that policy?
23         MR. COX:  Object to the form.
24         THE WITNESS:  Well, yes, I've seen it in
25    that language in the Version 1.0, and I believe

Page 251

1     you're referring to the 4.0 version.  I see it
2     there as well.
3     BY MR. SWANSON:
4          Q.  Okay.  And is that still Johnson &
5     Johnson's philosophy that a record -- their
6     worldwide records and information management
7     policy has to do with managing and disposing of
8     records and information in accordance with various
9     laws, regulations, and legal requirements?
10         A.  Is it still the policy today?
11         Q.  Yes.
12         A.  My understanding is that it is -- it is
13    still the policy today.  There is a new category
14    of -- of management of information which is
15    archive, and that archive may be encompassed in
16    the phrase "disposition."  In the later versions
17    of the program standard, the archive option was
18    made more explicit.
19         Q.  So we have Version 5 here.  Is that the
20    most recent version?
21         And that's Exhibit -- what did we mark
22    that as?  24?
23         A.  24.
24         Q.  Is that -- is this the most recent
25    version, Exhibit 24?

Page 252

1    A.  I'd want to check my notes to confirm
2  that.
3    Q.  Now, if you look at Exhibit 24 -- 23, if
4  you look at the second page of this, you see
5  under "provisions"?
6    A.  I'm sorry, did you say "24" or "23"?
7    Q.  23.
8    A.  Yes.  I'm there.
9    Q.  Okay.  And here -- it says here, "Records
10  and information shall be retained in accordance
11  with the Johnson & Johnson enterprise retention
12  schedule in accordance with applicable legal
13  holds.  When a record or information retention
14  requirement is reached, it shall be disposed of in
15  accordance with this policy and associated WWRAM
16  (sic) standards and in compliance with operating
17  company procedure."
18       Do you see that?
19    A.  Yes.
20    Q.  So the idea of having this management
21  policy is that it -- it's addressing how to
22  preserve and dispose of documents and the two
23  tools that are being used in conjunction to make
24  those determination are retention schedules and
25  legal holds; correct?

Page 253

1    A.  Yes.
2    Q.  And that's still the policy; correct?
3    A.  To my understanding, yes.
4    Q.  And so -- and it says there, when -- when
5  a retention requirement is reached, a record
6  information "shall be disposed of."  Right?  In
7  accordance with the policies.
8       So when you reach a retention schedule,
9  the limit of how long something has to be held, if
10  there's no legal hold in place, it gets disposed
11  of typically; correct?  That's the idea of this
12  policy; true?
13    A.  Yes.
14       MR. COX:  Object to the form and
15  mischaracterizes the document.
16  BY MR. SWANSON:
17    Q.  Would you agree -- does Johnson & Johnson
18  agree that for a records retention policy to be
19  effective it has to be complied with?
20       True?
21       MR. COX:  Object to the form.
22       THE WITNESS:  The -- the company creates
23  policies that are -- that express its -- its
24  intentions and procedures under them that enable
25  employees to comply with those policies.

Page 254

1  BY MR. SWANSON:
2    Q.  Sure.  Of course.  That's what a policy
3  is.  But if you've got a policy and you don't
4  comply with it, then it's not an effective policy;
5  correct?
6    A.  Except -- yes, I would agree except to the
7  extent that policies don't necessarily in
8  themselves contain a mechanism to comply.  You
9  need procedures to comply.
10       So the policy expresses what the
11  procedures should accomplish.
12    Q.  Right.  So there have to be procedures to
13  accomplish it, there has to be understanding by
14  employees; correct?
15    A.  Yes.
16    Q.  And that includes training of employees;
17  correct?
18    A.  Yes.
19    Q.  And whatever policies and mechanisms there
20  are need to be -- the employees who have records
21  or information need to know about those; correct?
22    A.  Yes.
23    Q.  So, for example, if there's a legal hold
24  and people don't know about a legal hold that --
25  that's theoretically applicable to documents or

Page 255

1  information they have, then it's -- it has no
2  effect; correct?
3       MR. COX:  Object to the form.
4       THE WITNESS:  No effect in and of itself.
5  I mean, certainly there are other reasons why
6  people retain information such as retention
7  schedules.
8  BY MR. SWANSON:
9    Q.  But if there wasn't a retention schedule,
10  they wouldn't be -- I mean, if there was -- if it
11  wasn't under a retention policy, then it wouldn't
12  be retained.  Then -- and they didn't know about a
13  legal hold, there would be no reason for them
14  to preserve that document; correct?
15       MR. COX:  Object to the form.
16       THE WITNESS:  There would be no business
17  reason for them to preserve them.
18  BY MR. SWANSON:
19    Q.  They might preserve it sort of by accident
20  or by the fact of just not -- not getting around
21  to it, something like that.  But otherwise they
22  would dispose of it; true?
23       MR. COX:  Object to the form.
24       THE WITNESS:  From the standpoint of the
25  policy documents, I would agree.

Page 256

1   BY MR. SWANSON:
2       Q.  You're aware that the plaintiffs demanded
3   all retention schedules from Johnson & Johnson,
4   correct, in this case?
5       A.  I'm generally aware of that.
6       Q.  And you're aware that it has been
7   represented to the plaintiffs in this case that
8   all of those policies have been produced; correct?
9           MR. COX:  Object to the form.
10          THE WITNESS:  I'm aware that those
11  policies that could be located have been provided
12  have been produced.
13  BY MR. SWANSON:
14      Q.  And the oldest policy that you've seen is
15  1997; correct?
16      A.  That is the oldest retention schedule I've
17  seen at the Consumer level.
18      Q.  And what do you mean "at the Consumer
19  level"?
20      A.  Well, the Johnson & Johnson Consumer, Inc.
21  or Consumer Products are, as it's been known over
22  the different names over the years, has, since the
23  early '90s, created its own retention schedules.
24          MR. SWANSON:  Can I have that answer read
25  back, please.

Page 257

1           (Record read by the court reporter.)
2   BY MR. SWANSON:
3       Q.  Okay.  So Johnson & Johnson -- you're
4   talking about the Johnson & Johnson Consumer
5   company that was the -- subsidiary of Johnson
6   & Johnson that was specifically tasked with
7   marketing and distributing and manufacturing
8   Johnson's Baby Powder and Shower to Shower;
9   correct?
10      A.  Yes.
11      Q.  And there's a history of companies that
12  goes back to Johnson & Johnson Consumer Companies,
13  Inc.; Johnson & Johnson Consumer Products, Inc.;
14  Johnson's -- different-named companies; correct?
15      A.  Yes.
16      Q.  And you're telling me that those companies
17  had retention policies going back to the early
18  '90s?
19          MR. COX:  Object to the form.
20          THE WITNESS:  I'm -- in my fact-finding, I
21  interviewed Rosina Bruno-Sheerin who was one of
22  the company's records managers.  She and -- and
23  others, too, perhaps Michelle Anderson, others
24  that I spoke to, indicated that there were --
25  there was at least a schedule created in the early

Page 258

1   '90s that was based on the McNeil Company's
2   schedule.
3   BY MR. SWANSON:
4       Q.  And where is that policy?
5       A.  I have requested and through counsel have
6   requested what policies and schedules could be
7   provided by the consumer companies.  What's been
8   provided thus far is what they were able to come
9   up with.  I understand that they continue to
10  research the availability of additional materials.
11      Q.  Okay.  And you realize that -- so I'll
12  just cut to the chase here.  You've seen the 1997
13  records retention schedule; correct?
14      A.  Yes.
15      Q.  So in 1997 in the records retention
16  schedule, Johnson & Johnson has a retention
17  schedule or retention period for records retention
18  schedules; correct?
19          MR. COX:  Object to the form.
20          Go ahead.
21          THE WITNESS:  I'm sorry.  When you say
22  "Johnson & Johnson," which entity are you
23  referring to?
24  BY MR. SWANSON:
25      Q.  It says "Johnson & Johnson Consumer

Page 259

1   Products Companies."  It was the -- you had
2   mentioned that the earliest one that you've seen
3   is 1997; correct?
4       A.  Yes.
5       Q.  And I have that here, and you have that.
6   And, in fact, that has been marked as Exhibit 13.
7   If you want to go ahead and pull that out.
8       A.  Yes, I have it.
9       Q.  If you look at page, I believe it's 251,
10  of Exhibit 13, which is the 1997 retention
11  schedule for Johnson & Johnson Consumer Products
12  Company.
13          And what does it say there about how long
14  records retention schedules documentations are
15  supposed to be maintained by the company?
16      A.  Life of corporation.
17      Q.  Okay.  So if any records retention
18  schedules that Johnson & Johnson had were
19  destroyed or were lost or not preserved, disposed
20  of, whatever you want to call it, they weren't
21  following their own records retention policy, were
22  they?
23          MR. COX:  Object to the form.
24          THE WITNESS:  I mean, in response to that
25  hypothetical, I would agree.

Page 260

BY MR. SWANSON:

Q. And Johnson & Johnson's Consumer Products Companies, those are the folks who are making and marketing and distributing the baby powder; correct?

**A. That's my understanding.**

Q. So let's go to the notes. If you look at -- if you kind of peel under the rest of those exhibits, you find -- you can put that '97 schedule aside for now. I don't want to bog you down with too many things, but if you look at Exhibit 18, those are your notes. And those are the notes that you created, I believe, in preparation for your deposition in June in the Hayes case; is that correct?

**A. Yes.**

Q. And we attached those as Exhibit 18. We talked about this at some length.

MR. SWANSON: What I'd like to do is give you another copy of those that we can work off of more easily.

(Whereupon, Plaintiff's Exhibit 26 was marked for identification.)

MR. SWANSON: I'm handing you Exhibit 26 to your deposition. And let me explain what that

Page 261

is.

And I think I have a copy for you, Chris.

MR. COX: Thank you.

BY MR. SWANSON:

Q. Do you have Exhibit 26 in front of you?

**A. Yes.**

Q. And those are your notes that you prepared in preparation for your deposition in the Hayes case; correct?

**A. Appear to be, yes.**

Q. And what I've -- you see what I've done here, I've had those paginated at the top right?

**A. I see.**

Q. And the reason is, is because I'm going to have a number of questions about these and I wanted to make it so that we could easily refer each other to where we're -- where we're looking, where your answer -- where it's related to my question.

And so that's what I've done here.

And just, again, to summarize, you prepared these notes from the conversations that you had had with various Johnson & Johnson business employees and also the people who are -- who deal with records retention, searches,

Page 262

maintenance of document platforms, and that sort of stuff; right?

**A. I would agree except that I would say, and I didn't really prepare them from the conversations. They are the real-time record of what people were saying as I was asking. So I was typing as I was talking.**

Q. So these are -- these are the best verbatim records that you could take at the time?

**A. Yes.**

Q. And you mentioned a Rosina Bruno-Sheerin, I think.

**A. Yes.**

Q. Making a reference to earlier retention schedules prior to 1997; is that correct?

**A. Yes.**

Q. And can you direct that -- direct me to that in your interview?

**A. Yeah. First, I'm going to look in Exhibit 19, which is just the index of the notes, and I see that she's about halfway through. So I'm going to...**

**So that's page 36.**

Q. Okay. And where in your notes is the reference to retention schedules of the Johnson &

Page 263

Johnson Consumer Companies going back to the early '90s?

**A. On the first page, she noted that she came to the company, to the -- what she calls the "office side" in 1990, and she noted that she created a retention schedule and aligned boxes and used the McNeil versions as her basis.**

**Excuse me.**

Q. Do you know what -- do you know what the retention schedule entailed in terms of what departments or companies it was for?

**A. Simply what was put there, that there were a few -- that there were not a large number of boxes at that time. She references some specific material such as batch records and R&D. It's not clear from her notes what -- you know, what every records type would have been at that point, although one can conclude that the McNeil schedules were already in existence at that point and would have -- would have been -- had similar content.**

MR. SWANSON: Move to strike based on speculation. It's also nonresponsive.

BY MR. SWANSON:

Q. So the retention schedule that you

Page 264

1  created, was that only as to those boxes, those
2  few boxes that are referenced there?  And if you
3  don't know, just tell me you don't know.
4      A.  Yeah, like I said, my recollection is that
5  she's -- she told me and I wrote it down that she
6  based the schedule on the McNeil schedule.  So
7  I -- by that, I infer or deduce that it was not
8  just covering the boxes in front of her but was
9  a -- meant to be a representative schedule.
10     Q.  For what?
11     A.  For the Fort Washington operation.
12     Q.  And what was the Fort Washington operation
13  doing at that time?  What specifically was their
14  involvement in baby powder?
15         MR. COX:  Object to the form.
16         THE WITNESS:  I'm not an expert on the
17  precise locations.  I don't know that they -- that
18  side of the business was involved.  I believe
19  there was -- there was more activity on the
20  Skillman side related to the baby powder but
21  that eventually the two sides came together.
22  BY MR. SWANSON:
23     Q.  So you don't know whether these --
24  whatever retention schedule there was that she
25  created -- first of all, we don't have it.  You

Page 265

1  don't know the particulars of that, although she
2  said it was based on McNeil.
3         Have you reviewed the Neil Fort Washington
4  schedule?
5      A.  No.
6      Q.  So you don't -- as the representative for
7  Johnson & Johnson, you don't know what was in that
8  retention schedule, do you?
9      A.  Correct.
10     Q.  You don't know what the periods of
11  retention were for; correct?
12     A.  Correct.
13     Q.  And you don't know whether or not that
14  applied specifically what it applied to other than
15  something at Fort Washington; correct?
16     A.  Correct.
17     Q.  So if we wanted more information about
18  this, we would have to speak to Rosina
19  Bruno-Sheerin; correct?
20         MR. COX:  Object to form.
21         THE WITNESS:  Well, I've done my best to
22  summarize her recollection.  Then there's other
23  references to those schedules in my notes.  She is
24  a person with knowledge.
25  BY MR. SWANSON:

Page 266

1      Q.  What other references to early '90s
2  schedules are there in your notes?
3         Well, first of all, you said she's a
4  person of knowledge; she has more knowledge with
5  you about these issues of course; correct?
6         MR. COX:  Object to form.
7         THE WITNESS:  In terms of the specific
8  question about when -- when and how the schedules
9  were creating, she has that knowledge.
10  BY MR. SWANSON:
11     Q.  Or even what the purview of those
12  schedules was in terms of that to which they were
13  applicable; correct?
14     A.  I would agree.
15     Q.  And where else in your notes?
16     A.  I'm just running through the various
17  records notes.
18         Yeah.  There's one reference in Cindy
19  Aden's notes about talking to Rosina regarding
20  historical schedules.  I -- I'm continuing to look
21  for other -- other references.
22     Q.  Okay.  Let's -- we've got a lot to cover,
23  so if you see something later you can mention it
24  and we'll go over it, if there are other
25  references from other people, who had firsthand

Page 267

1  knowledge of those schedules.
2         MR. COX:  Mark, if you're going to move on
3  to a new topic, could we take a short break?
4  We've been going for about an hour.
5         MR. SWANSON:  Let me ask one -- one
6  follow-up there.
7  BY MR. SWANSON:
8      Q.  If you look at page 31 of your notes.
9  This is Exhibit 26 again.
10     A.  "31" you said?
11     Q.  Yeah.  There was -- I'm trying to find it.
12  Looks like this ERMS was launched in 2014;
13  correct?
14     A.  Yes.
15     Q.  And you see where it says, "Now have
16  integrated retention schedule management in ERMS."
17     A.  Yes.
18     Q.  Was the -- was the retention schedule of
19  management not integrated prior to 2014 at
20  Johnson & Johnson?
21         MR. COX:  Object to the form.
22         THE WITNESS:  Well, I took that to mean
23  that the schedule had to be applied to TRIM to
24  GIFTS to Versatile independently as opposed to
25  being able to practice retention from a single

1  vantage point.
2        MR. SWANSON:  Chris, did you say you want
3  a break?
4        MR. COX:  Yeah.  I figured you were going
5  to move on to a different topic.
6        MR. SWANSON:  Well, yeah.  I mean, there's
7  a lot to cover, so if you -- if he needs a break,
8  you need a break, that's fine.
9        MR. COX:  Okay.  Let's take a short break.
10       MR. SWANSON:  Let's try to keep our
11 breaks --
12       THE VIDEOGRAPHER:  This marks the end of
13 Video Media Number 1 in the deposition of James
14 Mittenthal.
15       Off the record at 10:13.
16           (Recess taken.)
17       THE VIDEOGRAPHER:  On the record at
18 10:34 a.m.
19       This marks the start of Media Number 2 in
20 the deposition of James Mittenthal.
21       Counsel, you may continue.
22 BY MR. SWANSON:
23    Q.  When you spoke to Rosina Bruno-Sheerin
24 about earlier schedules that have not been
25 produced and Johnson & Johnson hasn't located, did

1  she tell you that those were the first retention
2  schedules produced -- created by Johnson &
3  Johnson?
4        MR. COX:  Object to form.
5        THE WITNESS:  She indicated that there
6  were -- and I'm going to refer to her exact words
7  if that's okay.
8  BY MR. SWANSON:
9     Q.  That's fine.
10    A.  Or what I -- what I wrote from her words.
11       So this is on page 36, a few lines down.
12 "Created retention schedule and aligned boxes."
13       I took that to mean that she created the
14 retention schedule where none had existed for that
15 department or facility.
16    Q.  But anything more than that, you don't
17 know as to whether or not those were the first
18 retention schedules applicable to her department
19 or something broader than her department; correct?
20    A.  Correct.
21    Q.  Are the current Johnson & Johnson record
22 retention schedules for the consumer companies and
23 the global retention -- well, let's start with the
24 consumer companies.
25       Are they mandatory?

1        MR. COX:  Object to the form.
2        THE WITNESS:  They describe periods by
3  which information in the various categories must
4  be held -- held for.  So, to the extent that
5  they -- that a piece of information is viewed to
6  be subject to a retention schedule, then it is
7  required that that information be held at least as
8  long as that retention schedule prescribes.
9  BY MR. SWANSON:
10    Q.  So that's a "shall" as opposed to a "may";
11 correct?  Something that's mandatory that
12 employees are required to follow; is that true?
13    A.  I would agree.
14    Q.  And since what year have the retention
15 schedules for Johnson & Johnson been mandatory?
16    A.  Well, I don't know.  Johnson & Johnson
17 is -- is -- which Johnson & Johnson entity would
18 that refer to?
19    Q.  Let's talk about the consumer companies
20 who are marketing and manufacturing, selling
21 Johnson & Johnson talc -- cosmetic talc products.
22    A.  Okay.  I would refer to my notes with
23 Darren Harris, which is going to be -- I'm sorry.
24 I'm looking at the wrong copy.  This is the
25 paginated one.  Page 27.

1        So in that note he indicated that ten
2  years ago in approximately 2009, the Skillman and
3  Fort Washington materials were -- were
4  consolidated.
5     Q.  Where is that note on the page?
6     A.  About ten lines down.
7     Q.  Okay.  It says, "Ten years ago Skillman
8  went under Fort Washington team, had different
9  SOPs for each."
10       What does that mean?
11    A.  Standard operating procedures.
12    Q.  As to what?  Document retention?
13    A.  How to effectuate document retention, yes.
14    Q.  How does that answer my question about
15 whether or not the policies were mandatory?  When
16 they became mandatory.
17    A.  Yes.  I -- I didn't see the precise answer
18 to that question in -- in his comments.  I -- I
19 have a retention schedule from 1997 that applies
20 to Johnson & Johnson Consumer Products Companies.
21 That's the earliest schedule I'm aware of.  There
22 may be mandatory schedules prior to that time.
23    Q.  Now, did that 1997 schedule, which is
24 marked as Exhibit 13 to your deposition, that
25 doesn't say on there that it's mandatory, does it?

1   In fact, it calls it a "guideline."  Doesn't it
2   say "guideline" right in the title, "Johnson &
3   Johnson Consumer Products Companies Guideline
4   Records Retention Schedule"?  True?
5        **A.  Yes, I see that.**
6        Q.  But the current ones don't say
7   "guideline," do they?
8        **A.  I don't see that on the current ones.**
9        Q.  And when you were speaking to Rosina
10  Bruno-Sheerin, she told you that the prior global
11  records retention schedules were not mandatory but
12  were only a suggestion.
13       Do you recall that?
14       **A.  I'd like to reference...**
15       Q.  It's page 37.
16       **A.  Can you reference me to that point on**
17  **page 37?**
18       Q.  Yes.  It's about -- a little more than
19  halfway down, it says, "in 2006 tried to make
20  records, titles more uniform in standardized
21  retention periods.  Old corporate program called
22  'global records retention scheduled' was only a
23  suggestion."
24       Do you see that?
25       **A.  Yes, I do.**

1        Q.  So until 2006 or sometime around there --
2   well, let me ask you, because she's referring to a
3   2006 date and trying to standardize the retention
4   schedules.  When she says this global records
5   retention schedule is only a suggestion, until
6   what year after 2006 was it still only a
7   suggestion?
8        MR. COX:  Object to the form.
9        **THE WITNESS:  Well, the GRRS was not a**
10  **consumer products schedule.  That was a corporate**
11  **schedule.  That is a schedule that the Johnson &**
12  **Johnson corporate had devised to be available to**
13  **the franchise companies if they wished to use it.**
14       **In 2015, the GRRS was replaced with the**
15  **ERS, the enterprise retention schedule.  At that**
16  **point adoption or harmonization with the ERS**
17  **became mandatory.**
18  BY MR. SWANSON:
19       Q.  So until 2015, if a particular Johnson &
20  Johnson operating company or department didn't
21  have its own retention schedule, then it could
22  comply with corporate's global record retention
23  schedule, which was only a suggestion; correct?
24       MR. COX:  Object to the form.
25       **THE WITNESS:  My understanding is that it**

1   was available to be used by the -- the entities if
2   they wished.
3   BY MR. SWANSON:
4        Q.  And that would include -- would that
5   include overseas entities?  And if you don't know,
6   just say you don't know.
7        **A.  Yeah.  I don't know.**
8        Q.  Okay.  And, again, is Rosina Bruno-Sheerin
9   the person we should be talking to about that?
10       MR. COX:  Object to form.
11       **THE WITNESS:  About which topic?**
12  BY MR. SWANSON:
13       Q.  About whether or not the global records
14  retention schedules were applicable to overseas
15  operating divisions or subsidiaries of Johnson &
16  Johnson corporate.
17       **A.  Well, inasmuch as GRRS is a corporate**
18  **vehicle or was a corporate vehicle, I would think**
19  **a person in the corporate records program would be**
20  **the best person to elicit that from.**
21       Q.  Who would that be?
22       **A.  That could be Cindy Aden.  That could be**
23  **Karen Skellington.**
24       Q.  Did you speak to them about that issue,
25  the applicability of the global records retention

1   schedule to Johnson & Johnson International or
2   Johnson & Johnson Hong Kong or Johnson & Johnson
3   Philippines, for example?
4        **A.  I don't recall speaking about that.**
5        Q.  So -- but until 2015, this global records
6   retention schedule was just a suggestion because
7   it existed until 2015 when it was replaced by the
8   ER -- the enterprise retention schedule; true?
9        **A.  Yes.**
10       Q.  So that just means by definition, then, if
11  an operating division or unit or department of
12  Johnson & Johnson did not have its own retention
13  schedule at the time, they either wouldn't have a
14  retention schedule or they could use this global
15  records retention schedule; true?
16       MR. COX:  Object to the form.
17       **THE WITNESS:  I'm not familiar if both of**
18  **those alternatives were available.  I know that**
19  **the schedule existed prior to 2015.  I don't know**
20  **whether it was mandatory or not in the absence of**
21  **another schedule.**
22  BY MR. SWANSON:
23       Q.  Well, Rosina Bruno-Sheerin said it was
24  only a suggestion; true?
25       MR. COX:  Object to the form.

Page 276

1  BY MR. SWANSON:
2      Q.  Old corporate program, that's referring to
3  GRRS, was only a suggestion.  That's what she
4  meant; correct?
5          MR. COX:  Object to the form.
6          THE WITNESS:  In the -- in the 2006 time
7  frame I believe she was referring.  Yes.  I -- she
8  was referring to the 2006 period.
9  BY MR. SWANSON:
10     Q.  How -- why do you say that that refers to
11 2006 period?  The old corporate program you just
12 told me was GRRS and it wasn't replaced until 2015
13 by ERS.  So the old program is GRRS; true?
14     A.  Yes.
15         MR. COX:  Object to the form.
16 BY MR. SWANSON:
17     Q.  Okay.  So are you telling me that, even
18 though she said the old corporate program called
19 GRRS was only a suggestion, are you telling me
20 that GRRS went from only being a suggestion to
21 being mandatory at some point?
22     A.  No.
23     Q.  Okay.  So it was only a suggestion until
24 it was replaced by ERS; true?
25     A.  That's my -- my understanding.  But I

Page 277

1  don't know the particulars.  In other words, was
2  it a suggestion if the operating company didn't
3  have a schedule in place or was it a suggestion if
4  the operating company had a schedule in place they
5  could opt to use either.  I don't know the
6  particulars between those two scenarios.
7      Q.  Okay.  But, to the extent it was being
8  used, it was, when it existed, only a suggestion;
9  true?
10         MR. COX:  Object to the form.
11         THE WITNESS:  Yes.
12 BY MR. SWANSON:
13     Q.  And -- which means if a company or
14 division or department did not at the time have an
15 operative record retention schedule, then it could
16 have the option of using the GRRS; true?
17     A.  That is my understanding.
18     Q.  But if they had their own records
19 retention schedule, then they may or may not use
20 the GRRS; true?  Because it wasn't mandatory.
21     A.  There are other in-between possibilities.
22     Q.  What's the in-between possibility?
23     A.  They take the GRS, use it as a model, and
24 then alter it to suit their own requirements.
25     Q.  You don't have any specific information

Page 278

1  about any division or subsidiary doing that with
2  the GRRS, do you?
3      A.  Correct.
4      Q.  So I think we discussed this, but Johnson
5  & Johnson agrees that in order to follow its own
6  retention schedules -- well, its own document and
7  information policies and programs, people need to
8  be trained; correct?
9      A.  Yes.
10     Q.  And you learned from your interviews that
11 until 2018, a large number of people at Johnson &
12 Johnson were still untrained in records retention
13 policy; true?
14         MR. COX:  Object to the form.
15         THE WITNESS:  Can we reference a citation
16 for that somewhere in my notes?
17 BY MR. SWANSON:
18     Q.  Yes.  It's page 29 of your notes.
19         Okay.  Let's be specific here.  This is an
20 interview of Joan -- Joann Dodd?
21     A.  Yes.
22     Q.  Senior analyst, records management; true?
23     A.  Yes.
24     Q.  And she started in 2007-2008 according to
25 your notes; is that right?

Page 279

1      A.  In the records program, yes.
2      Q.  And so she's in the records program.
3  Records program for which companies?
4      A.  Consumer, Inc.
5      Q.  Johnson & Johnson Consumer, Inc.  And,
6  again, that's the company that's marketing and
7  manufacturing the cosmetic talc products including
8  baby powder and Shower to Shower; correct?
9      A.  Yes.
10     Q.  And do you see here where you wrote, "Back
11 in 2008, 56 percent participation in recurring
12 departmental training.  Now 98.  But would not" --
13 "but would perform departmental audits."
14         So in 2008, only 56 percent of the
15 employees at Johnson & Johnson Consumer, Inc.,
16 only 56 were trained in the records policies; is
17 that right?
18     A.  No.
19     Q.  What does that mean?
20     A.  Recurring training, meaning that the --
21 you come to the company as an employee, you
22 receive records training.  You were then required
23 to get recurring training once or twice a year as
24 you go forward in your -- in your job.
25     Q.  Does it say anything in your notes

Page 280

1  about -- well, before I get there, what's the
2  purpose of recurring training?
3      A.  To reinforce the objectives and the
4  procedures for record retention, to inform
5  employees of any changes in those procedures.
6      Q.  Okay.  And that's done currently at
7  Johnson & Johnson Consumer, Inc.  How often is
8  that done, these reoccurring trainings?
9      A.  A couple times a year.
10     Q.  And so there's 44 percent of the people as
11  of 2008 were not getting recurring training; true?
12     A.  In 2008, I -- I would agree that that was
13  her point.
14     Q.  And what was the participate -- when
15  did -- do you have any information as of 2008
16  whether or not any initial training was done?
17     A.  I understand initial training was required
18  for people to get started in their job.  I
19  understand that was mandatory.  I could go back to
20  understand if that was a hundred percent or some
21  lesser number.  I don't have that number at hand.
22     Q.  Where did you get the understanding that
23  there was as of 2008 a mandatory, or initial
24  training?
25     A.  I have -- it may be in my notes; it may

Page 281

1  not.  Over the years I have spoken to Johnson &
2  Johnson employees and understand that there is an
3  onboarding process that includes records training.
4      Q.  And so that initial training was something
5  that would be done -- well, first of all, who --
6  do you remember who that was who told you that?
7  And do you know if it was as to Johnson & Johnson
8  Consumer, Inc. or the Johnson & Johnson Consumer
9  Companies?
10     A.  I would have to look through my notes.  I
11  don't recall -- I know there have been references
12  to it.  I don't recall the context for whom I
13  heard it from, and, to the extent that it's in my
14  notes, I can check.
15     Q.  And when -- what is -- I don't want you to
16  guess, but do you have any information about when,
17  what year Johnson & Johnson instituted records
18  retention and records policy training for new
19  employees?
20     A.  With your permission, I'm just going to
21  look through a couple of my notes and see if I
22  can't get some references to that.
23     Q.  Sure.  Go ahead.
24     A.  Well, the first one I just found off the
25  bat was that Ms. Dodd just a few lines above from

Page 282

1  when we were talking about indicated that training
2  must be accomplished in 30 days for a new
3  employee.
4      Q.  Where does it say that?
5      A.  Your page 29, right after that section
6  that says the five SOPs.
7      Q.  Oh, "need training within 30 days"?
8          So that's referring to records management
9  training and records retention schedule training?
10     A.  Further down it indicates, "Training
11  included legal hold, departing associates,
12  retention procedures, roles."
13     Q.  Okay, but again, I believe the question
14  was, do you have any information of when that
15  started, training within 30 days of a new
16  employee?
17     A.  I do not.
18     Q.  And so you don't know even if that was
19  happening in 2005; true?
20     A.  I don't have specific information about
21  that.
22     Q.  And you don't know whether or not that
23  was being -- people were being trained at all as
24  to that 1997 records retention schedule, do you?
25     A.  I do not.

Page 283

1      Q.  Now, if 44 percent of the folks aren't
2  going to reoccurring training as to 2008 and
3  somebody started a long time ago, they may have
4  never had the training; true?
5          MR. COX:  Object to the form.
6          THE WITNESS:  It's possible.  I -- I think
7  Ms. Dodd made the point afterwards that there were
8  departmental audits that were conducted outside
9  the training to verify participation and
10  knowledge.
11  BY MR. SWANSON:
12     Q.  Do you know the particulars of those
13  audits?
14     A.  No.
15     Q.  So, again, Joann Dodd would be the person
16  to talk -- for us to talk to about that; correct?
17         MR. COX:  Object to the form.
18         THE WITNESS:  With respect to that topic,
19  yes.
20  BY MR. SWANSON:
21     Q.  And would you agree with me that, even if
22  training had started at the time of the initial
23  record retention schedules or going back to 1997,
24  that if somebody started right around then and
25  didn't have retraining, whatever knowledge they

Page 284

1  had about the records retention would be variable
2  and it could be pretty stale, couldn't it?
3        MR. COX:  Object to the form.
4        THE WITNESS:  It's -- it's possible.  Her
5  point, to follow on to that statistic, was that
6  audits would detect a nonparticipation.
7  BY MR. SWANSON:
8     Q.  Where's the reference to audits again?
9     A.  Just under the 98 percent.
10    Q.  Well, you said something about detecting.
11 It just says here "but would perform departmental
12 audits."
13       Other than what you wrote there, those
14 five words, "but would perform departmental
15 audits," do you have any information about those
16 audits?
17    A.  Not about the audits themselves.
18    Q.  And were there any audits prior to 2008?
19    A.  She didn't indicate when the audits
20 started.
21    Q.  So there may not have been; true?
22    A.  I can't speak one way or the other.
23    Q.  I want to ask you about something
24 called -- referred to in your notes as "cleanout."
25       Are you familiar with that?

Page 285

1     A.  Yes.
2     Q.  Okay.  And what was -- what does cleanout
3  in your notes in the several people you discuss
4  cleanout about, what does that refer to?
5     A.  Cleanout was a reference to a retired
6  WWRIM standard entitled "Records Cleanout
7  Standard."
8     Q.  And the cleanout was a -- it was called
9  the "cleanout event"; correct?
10    A.  Yes.
11    Q.  And the cleanout event was something that
12 happened annually; correct?
13    A.  Generally.
14    Q.  And it was mandatory; true?
15    A.  It was a participatory event, the -- like
16 an inventory day in a business.
17    Q.  So a manager of a department would oversee
18 the cleanout event, correct, or some manager in
19 the department?
20    A.  Managers and records coordinators and
21 records officers.
22    Q.  And they did that to ensure that everybody
23 was complying with the policy in doing the
24 cleanout event annually; true?
25    A.  Yes.  Compliance was also the individual

Page 286

1  employee's responsibility, but in terms of
2  disposal of information, they were also there to
3  sign off on disposal of information.
4     Q.  And generally speaking, the cleanout event
5  was essentially if something is not currently
6  being held because of a retention schedule or a
7  legal hold, it should -- it has to be destroyed;
8  correct?
9        MR. COX:  Object to the form.
10       THE WITNESS:  The -- the purpose of the
11 cleanout day was to give opportunity to the
12 employees to go through their materials, identify
13 those that were candidates for disposition, and
14 basically get themselves organized.
15 BY MR. SWANSON:
16    Q.  But when you say "disposition," what
17 you're really talking about is if the documents
18 were not subject to a hold or to a retention
19 period still, those documents, when you say
20 "disposition," you mean they were to be destroyed;
21 correct?
22    A.  That's right.
23       MR. COX:  Object to form.
24 BY MR. SWANSON:
25    Q.  They can't keep them around.  You

Page 287

1  destroyed those records; true?
2        MR. COX:  Object to the form.
3        THE WITNESS:  That's right.
4  BY MR. SWANSON:
5     Q.  Now, I just got some of these today, these
6  WW worldwide records and information management
7  policies.  So I apologize if I fumble around on
8  them a little bit, but I'm going to -- I want to
9  go through them a little bit with you.
10       You know, we probably should just for
11 your -- let's take that stack over there and put
12 it on top over there, I think, will help you out.
13 And then see what you've got underneath.  Probably
14 keep the notes around.  You're going to need
15 those.
16       Okay.  And I think we marked, and
17 hopefully I can locate it, the Version 1.0 is
18 marked as Exhibit Number 25, and I believe you
19 have that.
20       I can show it to you there so you can see
21 what it looks like.
22    A.  25.  Here it is.
23    Q.  You got 25.  Okay.
24       Do you have that in front of you?
25    A.  Yes, I do.

Page 288

1      Q.  And so this is the worldwide's record
2  information management policy Version 1.0 dated
3  July 2009; true?
4      A.  Yes.
5      Q.  And the Version 1.1, which was also
6  produced and we will mark that, too, and the rest
7  of the versions that were provided have quite a
8  few pages, I don't know, 30, 40 pages, something
9  like that.  This one looks to be about four or
10 five pages.
11         Do you know where the rest of this
12 document is?
13         MR. COX:  Object to the form.
14         THE WITNESS:  Did you say 1.1?
15 BY MR. SWANSON:
16     Q.  No.  1.0 is what we're looking at.
17     A.  Okay.
18     Q.  I just referenced the other ones because
19 they're --
20         I need to get some water.  I'll be back in
21 two seconds.  Pardon me.
22         Okay.  So you have Exhibit 25 in front of
23 you?
24     A.  Yes.
25     Q.  And let's go ahead and --

Page 289

1          Do you have -- do you have Policy 1.1?
2      A.  I don't believe I do.
3          MR. SWANSON:  Let's see.  Let's mark this
4  one for you.
5          (Whereupon, Plaintiff's Exhibit 27 was
6          marked for identification.)
7  BY MR. SWANSON:
8      Q.  So Johnson & Johnson worldwide records and
9  information management policy Version 1.1,
10 September 30, 2009, that is marked as Exhibit 27.
11         Do you have that one in front of you?
12     A.  I do.
13     Q.  Okay.  Let me just go ahead and give you
14 the rest of them, too, so you've got them in front
15 of you.
16         MR. SWANSON:  And Version 2 of the WWRIM
17 policy dated 2011 is Exhibit 28.
18         (Whereupon, Plaintiff's Exhibit 28 was
19         marked for identification.)
20         (Whereupon, Plaintiff's Exhibit 29 was
21         marked for identification.)
22 BY MR. SWANSON:
23     Q.  And Version 3.0 of the WWRIM policy dated
24 April 1, 2014, is Exhibit 29.
25         Do you have that in front of you?

Page 290

1      A.  Yes.
2      Q.  And we had already marked Versions 4 and
3  5.
4          Okay.  So going back to Exhibit 25,
5  Version Number 1.0, from July 31, 2009, where is
6  the rest of the policy in terms of these various
7  what you call "RIMS"?
8          MR. COX:  Object to the form.
9          THE WITNESS:  Assuming this is complete, I
10 don't see the standards in Version 1.0.
11 BY MR. SWANSON:
12     Q.  So as of July -- but you said assuming
13 this is complete.
14         Do you know if this is complete?
15     A.  I have not seen this Version 1.0 before
16 today.
17     Q.  Okay.  Do you see on all of these WWRIM
18 policies that were just produced today to us this
19 morning, Versions 1.0 through Version 3, why are
20 there no Bates numbers on those documents?
21     A.  I -- I can't speak to that.  I -- that
22 would be a lawyer question.
23     Q.  Now, the record retention schedule that
24 was produced, the first one that you have, goes
25 back to 1997.

Page 291

1          Was there a records and information
2  management policy or policies that went back to
3  1997?
4          MR. COX:  Object to the form.
5          THE WITNESS:  My understanding is that
6  there were policies that accompanied the
7  schedules.
8  BY MR. SWANSON:
9      Q.  Okay.  And I did not see those policies
10 produced with the records retention schedules that
11 were produced to us.
12         Do you have those?
13     A.  No.
14     Q.  Do you know where those are?
15     A.  My understanding is that the records
16 department is continuing to research those
17 materials.
18     Q.  Is it also fair to say that those -- those
19 record retention policies prior to 2009 would have
20 also been documents that should have been kept for
21 the -- left for the corporation?
22     A.  I'd have to go back to the schedule and
23 see how the schedule is defined.
24         Do we have a reference to that?
25     Q.  Is that page 251 of Exhibit 13, I believe?

Page 292

1    That's the section on records management.
2           You see records management training
3    information, records destruction authorization,
4    records.  Oh, sorry -- yeah, 251, records
5    retention documentation.
6           And if you don't know, that's fine.  Oh,
7    if you see records -- if you look at -- let me
8    just ask you differently:  Do you know what the
9    retention period was on records and information
10   management policy prior to --
11        A.  Well, I was looking.
12        Q.  -- 2009?
13        A.  I was looking and I found on page 248 of
14   the '97 schedule an indication that policy
15   documents, which are defined as written
16   descriptives of the operating principles, are
17   directives pertaining to the organization, are to
18   be held S plus 8.
19        Q.  S plus 8.  So that would be 2009 to 2017;
20   true?
21        A.  So, in other words, the year that they
22   were superseded plus 8.
23        Q.  Oh, okay.  I see.  So presumably, then,
24   you would expect that there should be some
25   policies still, although we'd have to look at

Page 293

1    subsequent record retention schedule to see if
2    that stayed consistent; true?
3         A.  I'd have to do the arithmetic, frankly.
4         Q.  All right.  Okay.  Let me ask you about --
5    I've got some questions on Number -- Version 1.1,
6    that's Exhibit 27.  Okay.
7           If you go to RIMS Number 3 in that
8    document, which is about, looks like about eight
9    pages in?
10        A.  Records cleanout events standard.
11        Q.  You got that right?
12        A.  Okay.
13        Q.  And this is referring to the cleanout
14   event, the annual cleanout event that we were
15   talking about earlier; right?
16        A.  Yes.
17        Q.  And this indicates that this -- this would
18   have been in effect September 30, 2009; true?
19        A.  Yes.
20        Q.  Were there cleanout events prior to
21   September 2009?
22        A.  I have general knowledge -- and it may not
23   be reflected in my notes -- I have general
24   knowledge that -- that there were.
25        Q.  How far back were there cleanout events

Page 294

1    prior to 2009?
2         A.  I don't have specific answers to that.  My
3    understanding is that it was a -- had been in
4    place for a number of years based on the fact that
5    the company was working primarily in paper going
6    back many years and that the cleanout standard and
7    event was organized to organize -- was held to
8    help employees organize paper documents primarily.
9         Q.  And do you know -- you don't know
10   specifically how many years that goes back,
11   though; true?
12        A.  Correct.
13        Q.  And this was -- the policy -- this policy
14   WWRIM is a worldwide policy; correct?
15        A.  Yes.
16        Q.  So that would affect what's going on in
17   the Philippines, J&J Philippines, J&J Hong Kong;
18   true?
19        A.  It -- by implication worldwide, yes, would
20   apply worldwide.
21        Q.  Because it says it provides requirements
22   for Johnson & Johnson operating companies; true?
23        A.  Yes.
24        Q.  It says, "Reference terms" -- under
25   "definitions," it says, "Reference terms used in

Page 295

1    the standard are found in the worldwide's record
2    and information management program glossary."
3           Had that been provided to us?
4         A.  I'm looking at the definitions section at
5    the front of the policy.  I don't know if that is
6    the glossary that's being referenced or not.
7         Q.  What page is that?
8         A.  The first page.
9         Q.  That doesn't look like a glossary to me.
10          Does that look like a glossary to you,
11   under "definitions"?
12        A.  I don't know.
13        Q.  Wouldn't a glossary list the various terms
14   that are used and define each of the terms?
15        A.  Yes.
16        Q.  Okay.  And this definition just is a
17   definition of disposition, standard document hold,
18   records retention schedule, compliance, and
19   standard; true?
20        A.  I don't believe it's compliance.
21        Q.  Okay.  But the rest of those terms that
22   are in -- the six italicized terms are the ones
23   that are defined there; right?
24        A.  Yes.
25        Q.  Now, this says, "Management program

Page 296

1 glossary," the reference that I was referring to
2 under "cleanout event standard." And I don't see
3 anything here that says -- do you see anything in
4 this document that's been provided to us called
5 "Worldwide records and information management
6 program glossary"?
7      A. What I'm going to do is look at a later
8 version and see if that language is still...
9      Q. Okay. But please just answer my question
10 first.
11     A. I do not.
12     Q. Do you see something called a glossary in
13 this document, Exhibit 27?
14     A. I do not.
15     Q. Okay. So you didn't -- you didn't find a
16 glossary, did you?
17     A. Correct.
18         MR. SWANSON: Counsel, can you please
19 provide the glossary to us that's being referred
20 to there?
21         MR. COX: Take the request under
22 advisement.
23 BY MR. SWANSON:
24     Q. Going back to Exhibit 27. You got that in
25 front of you; right? We're at RIMS 3, page 1?

Page 297

1      A. Yes.
2      Q. Okay. If you look at -- and, again,
3 "cleanout" in this context means disposition,
4 which means destruction; true?
5         MR. COX: Object to the form.
6         THE WITNESS: It may result in that. It
7 may just result in materials being better
8 organized.
9 BY MR. SWANSON:
10     Q. Where does it say that, "organized"?
11     A. Well, that is what I understand the
12 purpose of the day is, is to allow employees a
13 chance to look at their materials, determine what
14 needs to be better aligned with the records
15 schedule, dispositions, organized. It is an
16 organizational day which may result in the
17 materials being earmarked for disposition.
18     Q. Now, you said before and I don't want to
19 have to redo all this, but on cleanout day, if
20 it's not under retention pursuant to the schedule
21 and it's not under a legal hold, it gets
22 destroyed; right?
23         MR. COX: Object to the form.
24         THE WITNESS: Generally I would agree.
25 BY MR. SWANSON:

Page 298

1      Q. Okay. Is there some specific instance
2 you're aware of where you don't agree with that?
3      A. No. But I think -- I think we're talking
4 about the same thing. The purpose of the day, the
5 day itself, is an organizational day that then
6 results in the ability to clean out certain
7 materials that are candidates for destruction.
8      Q. And do you see under 4.2, under "minimum,"
9 these are minimum implementation standards; true?
10     A. I see that, yes.
11     Q. And under 4.2, it says, "The operating
12 company shall conduct a cleanout event on an
13 annual basis."
14         So it means it's mandatory and it has to
15 be done annually; true?
16     A. Based on this, yes.
17     Q. And if you turn to the next page, Page
18 Number 2 of RIMS Number 3 in the WWRIM version
19 from September 30, 2009, under 4.3, it defines all
20 of the -- it lists all of the types of documents
21 that are subject to the cleanout; true?
22     A. Yes.
23     Q. And it says, "The cleanout event conducted
24 by the operating company shall apply the
25 requirements of the records retention schedule to

Page 299

1 all media formats, hardcopy and electronic,
2 originals or copies, and draft documents during
3 the cleanout event activities."
4         True?
5      A. Yes.
6      Q. So it -- it pertains to all types of
7 documents, not just paper documents; correct?
8      A. Correct.
9      Q. There is a reference to a cleanout
10 communication kit.
11         Have you seen a cleanout communication
12 kit?
13     A. Can you reference me to that sentence?
14     Q. That is under 4.5. "Instructions for
15 accessing and reviewing hold notes will be
16 provided in the cleanout communication kit."
17     A. Yes, I see that.
18     Q. Do you see that?
19     A. Yes. I do now.
20     Q. What is the "cleanout communication kit"?
21     A. I don't know.
22     Q. Did it set forth the methods of destroying
23 or disposing of documents that were no longer
24 under legal hold or retention?
25     A. Well, I can't speak to the contents of the

Page 300

1  kit itself, but I have general knowledge that
2  users were provided instructions, and I also have
3  an understanding that users were provided lists of
4  legal holds.
5       Q.  And the list of instructions would include
6  how to go about destroying documents that weren't
7  under a legal hold or retention; correct?
8       MR. COX:  Object to the form.
9       THE WITNESS:  They would include
10 instructions how to identify them and bring them
11 to the manager or records officers for approval.
12 BY MR. SWANSON:
13      Q.  But would it include instructions about
14 how to go about destroying them?  I mean, because,
15 for example, if I've got emails on my computer and
16 they're not under a legal hold or a retention and
17 I've come to the cleanout event for the year and I
18 know if those aren't on retention when I'm going
19 through my stuff, these have to be thrown out,
20 right, destroyed, disposed of, does this cleanout
21 communication kit tell me how to go about doing
22 that so that I eliminate all trace of them?
23      MR. COX:  Object to the form.
24      THE WITNESS:  I can -- I can't speak to
25 the content of the instructions.  I can speak to

Page 301

1  my general knowledge of how users were using email
2  at that point and how the cleanout days operated
3  in general.
4  BY MR. SWANSON:
5       Q.  I didn't ask that.  So you don't know if
6  this cleanup communication kit had those
7  instructions about how to go about destroying
8  emails that were -- should no longer be
9  retained -- or other documents; true?
10      A.  The reason I can speak to email is my
11 knowledge of how emails were retained at that
12 point in time.
13      Q.  Okay.  But you're not answering the
14 question.  I understand you have information that
15 you want to tell me, but I'm just asking you a
16 very simple question, which is:  Do you know if
17 this kit told them how -- employees how they
18 should destroy the records?  Let me give you an
19 example.  Forget email for a second.
20      Paper documents, okay?  I've got documents
21 in my office, I'm a Johnson & Johnson employee.
22 They're not under records retention, they're not
23 under a hold anymore, and I know I'm supposed to
24 destroy them.
25      Do I have an instruction on destroying

Page 302

1  them?  For example, shredding them?
2       MR. COX:  Object to the form.
3       THE WITNESS:  I don't know, as I mentioned
4  before, what's in the cleanout instructions.  I do
5  know that for those paper documents, in your
6  example, on cleanout days they wheeled these blue
7  containers on to the floor to be used for
8  destruction of paper materials, if approved.
9  BY MR. SWANSON:
10      Q.  So the approved materials for destruction,
11 they're in a bin that wheels out; is that right?
12      A.  That is how a cleanout day was described
13 to me for the sake of paper materials.
14      Q.  So somebody was given the task of wheeling
15 this to each office or was it put in a central
16 location, do you know?
17      A.  No.
18      Q.  And then if you are -- if the records were
19 supposed to be destroyed under this cleanout event
20 policy, you'd put them in that bin; is that right?
21      A.  With approvals, yes.
22      Q.  What do you mean "with approvals"?
23      A.  With the managers and records coordinators
24 approvals, they could be put in the bin.
25      Q.  And what did that approval consist of?

Page 303

1       A.  That the employee has been verified to
2  have confirmed the records period and the lack of
3  an applicable legal hold or other reason why the
4  records should be retained.
5       Q.  And is that in the WWRIM policy?  Is that
6  written out, that there had to be approval?
7       A.  I don't know.
8       Q.  So where did you get that information
9  specifically that somebody had to specifically
10 approve an employee's destruction of records
11 pursuant to the cleanout policy?
12      A.  I had interviewed in the past Karen
13 Skellington and other records officers who
14 described the procedure.  I'm not sure if it's in
15 these notes or not.
16      Q.  And specifically what did Karen
17 Skellington say about what the manager or
18 whoever's role was in signing off on that and
19 approving it?
20      A.  I don't have more specifics than -- than
21 that at this point.
22      Q.  Do you know if there was any kind of
23 documentation created?
24      A.  I have general knowledge that the
25 sign-offs were in physical form, that there

Page 304

1  were -- they were physical sign-offs.  What
2  documentation that created I don't know.
3      Q.  Do you know -- have you seen that
4  documentation?
5          MR. COX:  Object to the form.
6          THE WITNESS:  I don't recall.
7  BY MR. SWANSON:
8      Q.  What's the retention policy of that
9  documentation of sign-offs, if you know?
10     A.  I don't.
11     Q.  The cleanout day, would that include
12 videos?
13         MR. COX:  Object to the form.
14 BY MR. SWANSON:
15     Q.  It says all media formats; correct?
16     A.  Yeah.  I don't have any better
17 interpretation than that.
18     Q.  Would include CDs, correct, all media
19 formats, including hardcopy, electronic?
20     A.  That would suggest to me that CDs would be
21 included.
22     Q.  Did it include, for example, talc samples?
23     A.  I would not conclude that based on my read
24 of the policy.
25     Q.  What -- and why is that?

Page 305

1      A.  I don't see where samples would be defined
2  as a -- as a record.
3      Q.  Was there an equivalent cleanout policy
4  for talc samples and talc grids, if you know?
5      A.  I'm not aware of such a policy.
6      Q.  But samples, things like samples and grids
7  that were relating to, let's say, testing, if it
8  was -- if talc was being tested and a particular
9  sample was tested and there were -- do you know
10 what a TEM grid is that's generated from
11 electronic microscopy?  Generally, you know,
12 you've heard of it; right?
13     A.  I've heard the term "grids."
14     Q.  Okay.  And do you know -- the policies --
15 at some point, did the retention policies have
16 something to say about that kind of physical
17 evidence like a sample or a grid?
18         MR. COX:  Object to the form.
19         THE WITNESS:  Not that I'm aware.
20 BY MR. SWANSON:
21     Q.  So at page 2 of RIMS 3, you see under
22 4.33, and it just puts in writing there what we
23 had talked about, which is that essentially a
24 document hold suspends the direction -- the
25 destruction or deletion of records; correct?

Page 306

1      A.  Yes.  Suspends operation of the policy.
2      Q.  Right.  Okay.  If you look at RIMS 3,
3  page 3.  Here it is.  I knew I saw that in there.
4          You see under 4.6 it talks about a
5  cleanout communication kit which will contain at
6  minimum the information listed below?
7      A.  Yes.
8      Q.  And that includes the proper methods of
9  destruction and deletion; correct?
10     A.  I see that, yes.
11     Q.  So presumably if we had the cleanout
12 communications kit, that would tell us
13 specifically how to destroy, like, paper documents
14 and that sort of thing; true?
15     A.  For that particular event, yes.
16     Q.  And under 4.7 it says, "The activities and
17 participation shall be documented and reported."
18         Again, does Johnson & Johnson -- you don't
19 know how long it retains those reports, do you?
20     A.  Correct.
21     Q.  Do you know if it still has them, back to
22 2009, for example?
23     A.  I don't know one way or the other.
24     Q.  Under -- at the very bottom it says, "new
25 standard."

Page 307

1          Do you see that, "Version 1.0"?
2      A.  Yes.
3      Q.  It says, "new document issued," has the
4  date 30th of September 2009.
5          But it has that under -- it says "revision
6  history."
7          So was that a revision or not?
8      A.  Well, I believe that the -- the
9  overarching policy is 1.1, but this is the first
10 release of the records cleanout standards, so it's
11 designated 1.0.
12     Q.  So let's look at the subsequent version of
13 this.  Exhibit 28.
14         Do you have that in front of you?
15     A.  Yes, I do.
16     Q.  If you go to RIMS 3.  It's seven pages in
17 or something like that.
18         Do you have that in front of you?
19     A.  Yes.
20     Q.  And this version, Version 2.0, was dated
21 January 31, 2011; right?
22     A.  Yes.
23     Q.  And do you see now that it's called the
24 "records cleanup events standard"?
25     A.  Yes.

Page 308

1    Q.  This is the same basic policy, though;
2    correct?
3         MR. COX:  Object to the form.
4         THE WITNESS:  I mean, subject to the
5    revision history on page 3, yes.
6    BY MR. SWANSON:
7    Q.  Okay.  So there was some sort of changes,
8    fine-tuning to the policy at that point; is that
9    right?
10   A.  Yeah.  They are listed in the -- in the
11   table.
12   Q.  Why was the name changed from "cleanout"
13   to "cleanup"?
14   A.  Well, I can only point to the revision
15   history that says that for the law department,
16   that change was requested.
17   Q.  Do you know why the law department decided
18   to call it a "cleanup" instead of a "cleanout"?
19   A.  No.
20   Q.  Did the -- now, when you interviewed
21   folks -- and I think there were four or five of
22   them -- about this, they all referred to it as
23   "cleanout," didn't they?
24   A.  I would have to check.  There's some sort
25   of a search.  I can do some quick searches.

Page 309

1    Q.  So let me -- if you look at -- I can give
2    you some references there to help you out.
3    Page 5 -- page 30, 31, 34, and 55.  And you're
4    looking at your notes, and the paginated version
5    of your notes is Exhibit 26.
6    A.  I'm sorry, one more time, please?
7    Q.  Oh.  5 is, I think, the first reference,
8    to about two-thirds of the way down, the "annual
9    cleanout days."  This was...
10   A.  Yes.  Kate Gillespie.
11   Q.  And then the next one was, I think, Dodd
12   at page 30.
13        You see "cleanout" at the bottom?
14   A.  Yes.
15   Q.  "Cleanout days" stopped around 2011?
16   A.  Yes.
17   Q.  So we don't need to go through each and
18   every one of them, but these folks were still
19   talking about "cleanout" at the point you
20   interviewed them in 2018; correct?
21   A.  Yes.
22   Q.  So -- and yet the policy was to call it
23   "cleanup" as of 2011.  So it sounds like that
24   never really caught on, did it, "cleanup" as
25   opposed to "cleanout"?

Page 310

1         MR. COX:  Object to the form.
2         THE WITNESS:  I just wrote down as they
3    told me.
4    BY MR. SWANSON:
5    Q.  But when I first asked you about
6    "cleanout," you understood what I meant
7    immediately; right?
8    A.  Yes.
9    Q.  From those conversations?
10   A.  Yes.
11   Q.  And did they continue to -- did Johnson &
12   Johnson continue to call those kits "cleanout
13   communication kits," do you know?
14   A.  I don't know.
15        MR. COX:  Are we at a good point for a
16   short break?
17        MR. SWANSON:  Sure.  Yeah.
18        THE VIDEOGRAPHER:  This marks the end of
19   Media Number 2 in the deposition of James
20   Mittenthal.  We are going off the record at 11:46.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  On the record at
23   12:03 p.m.  This marks the start of Media Number 3
24   in the deposition of James Mittenthal.
25        Counsel, you may continue.

Page 311

1         (Whereupon, Plaintiff's Exhibit 30 was
2             marked for identification.)
3    BY MR. SWANSON:
4    Q.  Mr. Mittenthal, I'm handing you Exhibit 30
5    and, Counsel, if you need to look at this, it's a
6    portion of a records retention schedule, it
7    appears to be.
8         Do you have that in front of you?
9    A.  I do.
10   Q.  So this is the Johnson & Johnson Consumer
11   records and information management records
12   retention schedule department records and
13   information management; right?
14   A.  It appears to be.
15   Q.  And this is -- is this the current one?
16   A.  I don't know.  I'm just looking at the
17   effective date, 14 May 2018, what it says on it.
18   Q.  It's recent, it's not current, but you're
19   not sure if this is current; is that true?
20   A.  I would have to confirm that.
21   Q.  Okay.  If you look at Page Number 2, do
22   you see there's a retention schedule for records
23   cleanup there?
24   A.  Yes.
25   Q.  And that would be -- that says for the

Page 312

1  annual cleanup for Consumer U.S.
2        Do you see that?
3     A.  Yes.
4     Q.  "May include approval memos, cleanup kits
5  and/or housekeeping information"; right?
6     A.  Yes.
7     Q.  So that's -- that's the cleanout or
8  cleanup event that we were talking about before;
9  true?  That's what that's referring to, the
10 records retention on the kits related to that?
11       MR. COX:  Object to the form.
12       THE WITNESS:  It appears to be so, yes.
13 BY MR. SWANSON:
14    Q.  And so -- and the records retention on
15 that was how many years?
16    A.  The time it's active plus ten years.
17    Q.  So if there was a cleanout communication
18 kit as part of, let's say, the 2009 Version 1.1
19 policy that was being used, would "active" -- how
20 long would "active" be?
21    A.  I don't know.  I would want to consult the
22 definitions.
23    Q.  Okay.  So -- well, you don't believe that
24 in the WWRIM policy what is meant in this records
25 retention is defined by the term "active," do you?

Page 313

1     A.  I have seen somewhere here, on -- on
2  WWRIM, RIMS 12.
3     Q.  Which exhibit is this?
4     A.  This is -- the first version I grabbed was
5  Version 2.0.
6     Q.  Okay.  That's fine.  Got it.
7     A.  RIMS 12, page 2.  And I may be able to
8  reference a later version that I was just looking
9  for a basic definition of "active."
10    Q.  That's fine.
11    A.  And it says, "Retain the record or
12 information while the document is active, in
13 force, or in use.  Once the document is no longer
14 active, then the retention period starts and is
15 calculated."
16    Q.  Good.  So, in other words, the 2009 RIMS
17 got replaced by this 2011 one in January 2011.  So
18 for the 2' -- those cleanout kits from the 2009
19 policy, they would be retained until 2021,
20 correct, according the that policy?
21    A.  Yeah.  I don't want to interpret what they
22 mean by the document being active.  I don't know
23 how to interpret that against the cleanout
24 information.  It may be that's the case.
25    Q.  Okay.  But at a minimum, it would be

Page 314

1  10 years past the date of that policy; right?
2     A.  Yes.
3     Q.  Okay.  That's all I have about that one.
4        Now, we had talked about how the cleanout
5  policy included various formats of records and
6  documentation; correct?
7     A.  Yes.
8     Q.  And -- "including hardcopy, all media
9  formats, electronic," that would include x-ray
10 imagery; true?
11    A.  I don't know.
12    Q.  Well, if there were -- if there were TEM
13 or SEM images on any of these media, that would be
14 a document included in the policy; right?
15       MR. COX:  Object to the form.
16       THE WITNESS:  I would want to look and
17 check the policy and see how they -- how they
18 define "document," if it includes that type of
19 media.  I just don't know.
20 BY MR. SWANSON:
21    Q.  Well, it says, "all media formats,
22 hardcopy and electronic, originals or copies, and
23 draft documents."
24       You're not thinking that this pertains
25 only to written words, are you?

Page 315

1     A.  No.
2     Q.  Okay.  So it would include images;
3  correct?  It would include sound recordings on
4  those types of media?
5        MR. COX:  Object to the form.
6        THE WITNESS:  I'm going to double-check
7  the worldwide RIMS and see if there is a complete
8  definition of what they consider a record to be.
9        Okay.  Actually, it's on the first page.
10 I'm once again looking at the 2.0 policy.
11 BY MR. SWANSON:
12    Q.  Okay.
13    A.  "The form of records and information
14 includes but is not limited to paper, electronic,
15 microfilm, microfiche, photograph, map, magnetic
16 or optical disk or tape, software or video, or
17 other recorded information."
18    Q.  So that would include images?
19    A.  I'm just checking the current -- the 5.0
20 version to see if that definition has changed.  I
21 don't see a -- I checked the definition version of
22 4.0 and it appears to be similar.
23    Q.  Okay.
24    A.  I recognize that an x-ray is a media that
25 contains recorded information.

Page 316

1      Q.   This is an inclusive policy, because when
2    it says "any form of recorded information created,
3    maintained, or received by Johnson & Johnson," it
4    says those records and information include but are
5    not limited to.  So this is an included -- this is
6    a very inclusive policy, correct, in terms of the
7    kinds of information that these cleanout days were
8    affecting?
9           MR. COX:  Object to the form.
10          THE WITNESS:  Yeah.  I just note that
11   they -- that they inserted audiovisual material in
12   the later definition.  Maybe some other changes,
13   too.
14   BY MR. SWANSON:
15     Q.   But in Version 2.0, it said "microfilm,
16   microfiche, photographs," so that information was
17   included in there, too; correct?
18     A.   Yes.
19     Q.   Did you consult with Johnson & Johnson on
20   any of the changes that went into these various
21   WWRIM policies?
22     A.   I have -- I believe in my notes from Karen
23   Skellington possibly there are some references to
24   some of the changes.
25     Q.   Let me ask a different question.  Were any

Page 317

1    of -- were you -- did you give input on any
2    changes that were made in these policies before
3    they were made, or at the time they were made?
4      A.   I did not.
5      Q.   Now, you mentioned Karen Skellington.  You
6    talked to her about the changes in the WWRIM; is
7    that right?
8      A.   Some of the changes.
9      Q.   Where is that in your notes?
10     A.   Page 59 of your numbering.
11     Q.   Can you point me to it?
12     A.   Oh, sure.  It's about 15 lines down.
13   There's a line by itself.  "WWRIM assigns every op
14   code," and below that it starts, "18 standards put
15   out in 2009, now '17.  Other guidelines existed
16   pre2009.  Karen came in, in 2008 and worked to
17   consolidate, remove cleanup standard."  Moving --
18   moving down the document of 5.0 is "current
19   version effective April '17."  Some notes about
20   how the standards evolved, et cetera.
21     Q.   Now, each of these standards subsequent to
22   1.0 has a revision history; is that right?  If you
23   look within the first few pages, for example, you
24   know, you go to 3 or 4, you take Version 3, for
25   example.

Page 318

1           Do you have that?
2           Which is marked as Exhibit 29.
3           And I think --
4      A.   I do see "revision histories."
5      Q.   And do you have the WWRIM policy Version 3
6    in front of you?
7      A.   Yes, I do.
8      Q.   And six pages in to that is a revision
9    history generally of this document; correct?
10     A.   Well, the -- the top document.  The actual
11   policy document as opposed to the standards
12   underneath it, yes.
13     Q.   Now, what do you mean "as opposed to the
14   standards underneath it"?  because the standards
15   underneath it include the RIMS 1 through how many
16   ever it goes to; correct?
17     A.   Well, RIMS -- RIMS 1 is actually the
18   standard and then prior to RIMS 1 -- and I'm
19   looking at the 3.0 version that we're talking
20   about -- there is a policy, call it a preamble, or
21   an introductory section which is denoted as the
22   worldwide records and information management
23   policy.  And then the things beneath that are
24   known as -- are denoted as standards.
25     Q.   Okay.  But so this -- but this history

Page 319

1    that's given on the policy, it includes changes --
2    detail -- it's a -- would you agree that that's a
3    detailed accounting of what the changes were made
4    in terms of the language of the policy?  If you
5    look at page 6 there again?
6      A.   Yeah.  I'm looking at it and it appears to
7    be changes just made to these first few pages
8    which constitute the policy.  Then, within that,
9    each standard also has its own change history.
10     Q.   And you see there in terms of this Version
11   3.0 of the WWRIM policy, it notes that the -- and
12   by this time, they were calling it the "cleanup
13   event," it says "retired RIMS 3."
14          Do you see that?
15     A.   I'm sorry.  What page are we on?
16     Q.   We're page 6 still.  And this is the WWRIM
17   policy December 31, 2013.
18     A.   Yes, I see it.
19     Q.   And is -- is this an accurate accounting
20   of the changes that are made in the policy from
21   one to the next?
22          MR. COX:  Object to the form.
23          THE WITNESS:  Yes.  Inasmuch as now the
24   standards jump from RIMS 2 to RIMS 4.
25   BY MR. SWANSON:

Page 320

1    Q.  Okay.  And the way that these histories
2  are written is that it's written with a lot of
3  detail; right?  Going back to page 6, it says
4  "paragraph 2, removed sentence redundant tied with
5  paragraph 3."  You know, above there it
6  says "where applicable change throughout
7  'employee' to 'associate.'"
8          These are very specific references to
9  where the changes are being made, specifically
10  what changes are being made in the policies as we
11  get to subsequent versions; right?
12    A.  Yes.
13    Q.  So in theory, we should be able to take a
14  subsequent version like Version 3 and if we didn't
15  have 2 and 1, reconstitute, rewrite from it the
16  prior version; correct?
17        MR. COX:  Object to the form.
18        **THE WITNESS:  It would depend on the**
19  **nature of the changes.  To the extent that they --**
20  **they were word level, you could back -- back your**
21  **way through it.**
22          **In this case, there appear to be -- I**
23  **mean, there were references and sentences removed**
24  **that might make it difficult to reconstitute it**
25  **completely.  But the -- you could create a rough**

Page 321

1  **facsimile of an earlier version.**
2  BY MR. SWANSON:
3    Q.  But it should -- it's supposed to be an
4  accurate accounting of what has been changed
5  version to version; correct?
6    A.  Yes.
7    Q.  And that accounting includes, you know,
8  everything that's changed from the beginning to
9  the current version; correct?
10    A.  Yes.
11    Q.  And so if you go to -- this was Version 3.
12  And we saw in Version 3 there was a reference,
13  right, at page 6 to the cleanup event that was
14  specified under RIMS Standard 3 in a previous
15  version having been suspended or removed; correct?
16    A.  Yes.
17    Q.  And, in fact, in this Version 3, it's --
18  if you thumb through it, you can see that there is
19  no RIMS Standard 3; correct?
20    A.  Correct.
21    Q.  And if you go to 4, Version 4, again, if
22  you go to the revision history, page 6, it has --
23  again it states how -- the revision history in the
24  same sort of way that it did under Number 3 and it
25  includes that reference to the cleanup event;

Page 322

1  correct?
2    A.  Yes.
3    Q.  And it has a full history from Version 1.0
4  up to this current version stating what the
5  changes were; true?
6    A.  Yes.
7    Q.  And if you go to Version 5, which is
8  Exhibit 24, and you go to page, looks like 5
9  through 8 -- do you see that? -- is the revision
10  history?
11    A.  Yes.
12    Q.  And you see there were a lot of revisions
13  made from 4 to 5?
14    A.  Yes.
15    Q.  Is there a Version 6 or is this the latest
16  version, Number 5?
17    A.  Well, I noted that when I spoke to Karen
18  **Skellington she said that 5.0 is the current**
19  **version and that that was effective in April of**
20  **2017 which is what is reflected in this document**
21  **(indicating).**
22    Q.  Good.  Now if we go to -- and you see the
23  changes are reflected for Number 4; right?
24    A.  Yes.
25    Q.  Now, if you go to Version Number 3 in its

Page 323

1  version history, you see that?
2    A.  Yes.
3    Q.  Where is the reference to cleanout event?
4  Or cleanup event in this history?
5    A.  I don't see it.
6    Q.  So if all we had in front of us was this
7  Version 5, we wouldn't know about the cleanout
8  event, would we?
9        MR. COX:  Object to the form.
10        **THE WITNESS:  Well, we certainly wouldn't**
11  **know about it from the revision history pertaining**
12  **to 3.0.**
13  BY MR. SWANSON:
14    Q.  Well, is -- well, if I've got a current
15  version in front of me and I've got this history
16  that's supposed to be a faithful history of these
17  changes, I don't know about this history of a
18  cleanout event, do I?
19        True?
20    A.  I don't see it in the history.
21    Q.  Okay.  So -- so this is no longer an
22  accurate accounting -- the version history is no
23  longer an accurate accounting of the version
24  histories; true?
25        MR. COX:  Object to the form.

BY MR. SWANSON:

Q.   You have in front of you, it's not in the version history; correct?

A.   Right.  I'm just checking to -- to understand if the numbering of the standards is still as it was before, and the document does go from RIMS 2 to RIMS 4 with no RIMS 3.  So there is an artifact in the sense that that RIMS 3 is still not represented.

Q.   Right.  It's gone, because it was gone after Version 3 of the WWRIM; true?

A.   Yes.

Q.   And that's when -- and then the version history, though, in Number 3 and 4 accurately reflected that that section had been removed because that event was no longer in force; correct?

A.   Correct.

Q.   And in Version 5 of the history, that disappears; right?  It's not there; true?

A.   I don't see it.

Q.   Okay.  So this version history has been changed and it no longer accurately reflects what happened; true?

A.   It no longer reflects the -- in that area

in the revision history no longer reflects the removal of the cleanout standard.

Q.   And do you know who made the decision to remove the reference to the cleanout days from the Version Number 5 WWRIM Johnson & Johnson worldwide policy?

It's not in your notes, is it?

A.   I don't believe so.

Q.   I didn't see it there.

A.   I was just looking in my notes to understand who -- who would have been a point person at that point in time.

Q.   Did the lawyers make that decision?

A.   I don't know.

Q.   Did you see -- going back to Version Number 4 of the WWRIM policy, it says "Exhibit 23."  If you go to Page Number 6.

Do you have that in front of you?

A.   Yes.

Q.   It -- it states there that Johnson & Johnson -- in the reference to the cleanup event states that Johnson & Johnson has changed its philosophy on annual cleanups; right?

A.   Yes.

Q.   So that reference to a change in

philosophy is now gone in Version 5; correct?

A.   I don't see it.

Q.   And that change in philosophy, do you have an understanding of what that change in philosophy was specifically?

A.   Simply as -- as is stated in the notes, "Associates shall independently manage their records and information during the normal course of business."

Q.   Okay.  Now, you know that -- I'm going to switch gears a little here on you.

You know that there's an issue of exposure in the Philippines in this case; correct?

A.   Yes.

Q.   In the Leavitt case.  And of exposure in Hong Kong in the Fong case; true?

A.   Yes.

Q.   And that -- are you aware that the talc that was used for Johnson's Baby Powder that was manufactured or packaged at those locations came from Korea?

A.   I'm -- I have a general awareness of that.

Q.   Okay.  Now, of the retention schedules -- I want to get back into the retention schedules briefly here.

What is the earliest retention schedule that has been produced to us that you're aware of that affects Johnson & Johnson Philippines, Johnson & Johnson Hong Kong, or the Asia Pacific?  Well, let me -- let me ask a foundational question first.

Are those -- I noticed there was some references in your notes to APAC, A-P-A-C.  Does that sound familiar to you?  And I assumed that that referred to Asian Pacific?  Asia Pacific or something like that?

A.   I think -- I'd have to see it in context.

Q.   Let me see if I can find a reference.

Oh, there's a reference here at page 3 of your notes.

A.   Your page 3?

Q.   Yes.  Right.  That's correct.  This is again Exhibit 26.

A.   So this is Tom Doyle and Judy Dowling?

Q.   Yes.  Do you see in the first paragraph there, there's a reference to APAC?

A.   Yes.

Q.   And without having you read through the rest of your notes right now, I'll just represent to you there are other references where you use

Page 328

1 that acronym, APAC.
2      What does that stand for?
3     **A. I believe it's Asia Pacific, but I don't**
4 **recall --**
5     Q. Okay. Let's --
6     **A. -- confirming that.**
7     Q. Sorry. Didn't mean to cut you off.
8     Can you turn to page 20. I see another
9 reference to it.
10     Do you see where you were speaking to an
11 individual named Nicholas Zhu?
12     **A. Yes.**
13     Q. And it says "responsible for APAC." Then
14 it says "Thailand, China, Philippines," et cetera;
15 correct?
16     **A. Yes.**
17     Q. So do you believe that refers something to
18 Asia Pacific; correct?
19     **A. Yes.**
20     Q. So let me ask you questions broadly about
21 any retention schedules or policies that would
22 have impacted -- been in effect in the
23 Philippines, in Hong Kong. Let's start with those
24 two and we'll probably include China, but that
25 might be more recent.

Page 329

1     But so -- and Korea.
2     What was the first retention policies that
3 would have been in effect and controlled retention
4 of documents -- retention and disposition of
5 documents at Johnson & Johnson Philippines?
6     **A. I don't know the year that that would have**
7 **been applicable, the first year.**
8     Q. Do you -- was the 1997 policy, which is
9 the first policy that has been produced to us, the
10 oldest policy and the oldest one that you've seen,
11 according to your testimony, did that apply to
12 Johnson & Johnson Philippines?
13     **A. I would have to confirm that.**
14     Q. Okay. And before you go about -- and does
15 the policy itself say whether or not it affects
16 it, whether or not that policy is the policy for
17 the Philippines or the Asia Pacific, or whether
18 it's just domestic?
19     **A. Yeah. The document itself does not have a**
20 **scope associated with it.**
21     Q. So you don't -- you don't know whether or
22 not this records retention guideline schedule
23 applied to Asia Pacific, to Hong Kong, or the
24 Philippines; correct?
25     **A. That's correct.**

Page 330

1     Q. Do you know if any of the records
2 retention schedules that Johnson & Johnson has
3 apply to Johnson & Johnson Philippines?
4     **A. I would have to look at the scope of each**
5 **one. I don't know offhand.**
6     Q. But there's nothing in this 1997 guideline
7 for records retention schedule that tells you what
8 applies broadly to all of their operating
9 companies; correct?
10     **A. Correct.**
11     Q. And I don't want you to guess, but would
12 you agree with me that the natural inference
13 looking at this is that it did not apply; correct?
14     MR. COX: Object to the form.
15 BY MR. SWANSON:
16     Q. Since it says Johnson & Johnson Consumer
17 Products Companies. I don't want you to
18 speculate. So. Okay.
19     And you can't tell me right now what the
20 first year is that there is a retention policy
21 that applies to the Philippines, to J&J China, or
22 J&J Hong Kong; true?
23     **A. You know, I have a general knowledge from**
24 **talking to people at the company that there were**
25 **retention practices. I can't speak to the**

Page 331

1 specific schedules that apply.
2     Q. And we'll get into that in a minute.
3     So you're not sure if any of the retention
4 schedules apply, and if you have, you know,
5 information about that even after the break as to
6 whether these did or not, we can revisit it.
7     Now, when you say you have information
8 generally about retention practices, is this
9 something that's reflected in your notes?
10     **A. Yes.**
11     Q. And these are retention practices at which
12 locations?
13     **A. It was not location-specific. It was**
14 **simply an indication of how long certain materials**
15 **were held.**
16     Q. By whom? In other words, which operating
17 company are we talking about now? because I'm
18 obviously interested in asking right now, but just
19 about the Philippines, Hong Kong, China, Korea.
20     **A. I would need to reference a couple of**
21 **pieces of my notes here.**
22     Q. I don't know what page you're at, but if
23 you look at pages 20 and 21, there are references
24 to overseas operations. I don't know if that --
25 any of that helps you.

Page 332

1     A. Yes. And I was looking at Don Hicks who
2  indicated that in 2009, a global specification was
3  created. I'm jumping now to page 20.
4     Q. Okay. Page 20. This is Don Hicks?
5     A. Well, this is now Nicholas Zhu --
6     Q. Wait. Let's go -- since you are the one
7  who raised the reference to Don Hicks --
8     A. Okay.
9     Q. -- what page of that, that were you
10 looking at specifically?
11    A. Oh, that was -- just lost it. Page 13.
12    Q. Okay. This is talking about a global talc
13 spec created in 2009; correct?
14    A. Yes.
15    Q. Okay. I'm asking about retention
16 policies.
17    A. Okay.
18    Q. So if you can locate the place in your
19 notes, if you have -- you haven't been specific as
20 to the Philippines or Hong Kong or Asia Pacific or
21 Korea, remember, my query is directed to finding
22 out what retention schedules; policies with
23 respect to retaining documents; destroying,
24 disposing of documents, as to those areas. That's
25 what I'm looking for.

Page 333

1     A. Right. Okay.
2     Q. And if you find information that, that you
3  have as a representative of Johnson & Johnson,
4  tell me.
5     MR. SWANSON: While he's doing that, let's
6  go off the transcript record briefly, and I'm
7  going to go check on something and you keep
8  looking.
9     MR. COX: Let's go off the record
10 entirely.
11    MR. SWANSON: What's that?
12    MR. COX: Let's go off the video record,
13 too.
14    MR. SWANSON: Why? I mean, I'm going to
15 be back in two seconds. I mean, we don't need to
16 do that whole thing of getting off it. I'll be
17 back in two seconds. I want him to have time to
18 look through that.
19    (Off the stenographic record.)
20    MR. SWANSON: Back on the record.
21 BY MR. SWANSON:
22    Q. Have you located some information about
23 retention policies or retention guidelines that
24 would have been in effect -- or practices in
25 effect in the Philippines, Korea, China, or Hong

Page 334

1  Kong?
2     A. Well, I spoke to -- this is on page 42. I
3  have a reference to a conversation with Uday
4  Sharan who was a sourcing manager who was based in
5  the -- in that region, and he was specifically
6  talking about Thailand, but he indicated that
7  the -- from his perspective, they kept documents
8  for -- and he was talking about the manufacturing
9  records, that the retention on those was five
10 years. I don't -- I have not yet found other
11 references to any retention schedules for those
12 particular regions.
13    Q. Now, you knew coming in to this deposition
14 as -- you knew -- you knew that your assignment
15 here, part of it, was to talk about retention
16 schedules; right?
17    A. Yes.
18    Q. And so as a representative for Johnson &
19 Johnson sitting here today, knowing that this was
20 part of the assignment and knowing that these
21 areas of the world and their retention policies
22 were relevant to the case, you don't have any
23 information to provide today; correct?
24    MR. COX: Object to the characterization.
25 Object to the form of the question.

Page 335

1     THE WITNESS: What I do know is that there
2  were retention schedules in those regions, the
3  retention practices and/or schedules; that there
4  was information saved for periods of time. For
5  example, Don Hicks indicated that the -- and Uday
6  indicated that those materials were saved five
7  years plus one, six years.
8     I have an understanding that information
9  in those regions that was stored in the United
10 States was subject to the retention schedules that
11 we've already discussed.
12    I have also the understanding that
13 those -- there are physical files in those regions
14 of the world that were consulted and searched for
15 materials, and that there were materials that were
16 stored off site there were consulted.
17    I don't have the particular retention
18 schedule that they were responsive to, but I
19 understand that there was a practice for
20 maintaining information in those regions.
21 BY MR. SWANSON:
22    Q. Specifically as to the Philippines, do you
23 know if there's ever been a formal retention
24 schedule for documents archived, retained, kept,
25 generated at J&J Philippines?

Page 336

1    A.   I don't know at this moment.
2    Q.   And do you know if there has ever been a
3  formal policy for J&J Hong Kong for the retention,
4  archiving of documents?
5    A.   I would -- once again, I don't know, and
6  it may be that the schedules I have apply to --
7  the current schedules apply to that time period.
8  I just don't know.
9    Q.   I understand.
10   A.   I'm sorry, applied to that --
11   Q.   You say maybe.
12   A.   I --
13   Q.   You --
14   A.   Let me correct what I said.  Not applied
15 to that time period.  Applied to that region.  I
16 misspoke.
17   Q.   Now, just briefly, this reference you made
18 to Uday Sharan, that's for Thailand; right?
19   A.   Yes.
20   Q.   He's not talking about the Philippines.
21   A.   I understand that.
22   Q.   Right.  And he's not talking about Hong
23 Kong; correct?  And -- right?
24   A.   Correct.
25   Q.   And the source of that talc was European

Page 337

1  talc, correct, not Korean talc?
2    A.   He was speaking to the retention of
3  materials in Thailand, and I drew from my
4  understanding of my conversation with him that
5  those materials, there were retention practices in
6  that area and in the Asia Pacific region.
7         MR. SWANSON:  Move to strike.
8  Nonresponsive.
9         I think that's a good time to break for
10 lunch.
11        Let's go off the record.
12        THE VIDEOGRAPHER:  Off the record.
13        Time is now 12:52 p.m.
14        (Lunch break taken.)
15        THE VIDEOGRAPHER:  On the record at
16 1:55 p.m.  Counsel, you may continue.
17        MR. CARPENTER:  Counsel, can I make that
18 quick --
19        MR. SWANSON:  Sure.
20        MR. CARPENTER:  This is Erin Carpenter.  I
21 failed earlier when I was putting my appearance on
22 the record to also indicate that I am here -- I'm
23 specially appearing on behalf of Imerys U.S.A.,
24 Inc.  That's it.  Thank you.
25 BY MR. SWANSON:

Page 338

1    Q.   Good afternoon, Mr. Mittenthal.  We're
2  back on the record after the lunch break.
3    A.   Good afternoon.
4    Q.   I was asking you about retention policies,
5  schedules, procedures that apply to the Asia
6  Pacific or to the Philippines, Hong Kong, China,
7  and I'd asked you about the policies that have
8  been produced in this case going back to 1997 and
9  you weren't sure which of any of those policies
10 applied to J&J's operating companies in those
11 regions and countries; correct?
12   A.   Correct.
13   Q.   Have you -- have you looked at any of
14 those policies since we were discussing that
15 earlier?
16   A.   I've determined that I will -- I'm not
17 able to ascertain based on what I have at my
18 disposal right now.
19   Q.   And, based on your conversations with
20 various folks that are reflected in your notes or
21 any subsequent conversations you have, other than
22 what we've already discussed, you're not -- well,
23 strike that.
24        We've discussed what you had in your notes
25 with respect to any retentions over -- overseas;

Page 339

1  correct?
2    A.   Generally, yes.
3    Q.   And you're not -- then just to kind of
4  close the loop, you're not aware of what, if any,
5  retention policies were in effect at the J&J
6  Philippines; correct?
7    A.   Correct.
8    Q.   And you're not aware of any retention
9  schedule that was in effect at J&J Hong Kong;
10 correct?
11   A.   Correct.
12   Q.   Are you familiar with worldwide talc
13 surveys?  Did you hear anything about that?
14   A.   I have an understanding of that, yes.
15   Q.   Other than the survey documents themselves
16 that were produced -- and there were a few of
17 those produced -- do you have any information
18 about retention for documents related to Korean
19 talc that was used in Johnson's Baby Powder in
20 Hong Kong and the Philippines?
21   A.   I don't, no.
22   Q.   What is the current retention schedule
23 for -- and this may include different types of
24 documents, but for documents related to the
25 testing of talc for mineral contaminants like

Page 340

1  asbestos?
2      A.  Well, I would have to consult the -- the
3  schedule.
4      Q.  Why don't you go ahead and do that.  In
5  fact -- well, before you consult the schedule,
6  because obviously I want to be -- I want us to be
7  as efficient as we can be with our time -- have
8  you seen something in the retention schedules that
9  you believe applies to analytical testing reports
10 that would be reports or, for example, the actual
11 films or digital images from microscopy or the
12 images or charts that would come from, I think,
13 EDS or, you know, spectrographs, that sort of
14 thing?
15     A.  I don't recall with specificity.  I have
16 seen in the departmental schedules references to
17 testing.  I've seen references to testing in
18 supplier agreement and I've seen references to
19 testing in legal hold notices.
20     Q.  Would you know where to look in the
21 retention policies for something like that?  Would
22 it be under R&D?
23     A.  Well, I -- because the schedules are
24 departmental in scope, I would look under R&D.  I
25 would look under manufacturing.  I might look

Page 341

1  under quality.  There's a couple places where I
2  might look.
3      Q.  Okay.  I'd like to find out what the
4  retention on these testing documents was as of
5  1997.  And then if we need to talk about it
6  currently, I want to know what the retention on
7  that would be.  And to be clear, what I'm looking
8  for is testing-related documents on both finished
9  product and on the cosmetic talc products and also
10 on talc ore.  And milled -- milled ore also, just
11 to be clear.
12         I don't know if this helps you.  But at
13 page 190 of the 1997 policy, there's a reference
14 to manufacturing and material analyst reports.  I
15 mean...
16     A.  Yeah.  I just about caught up to you, I
17 was on 188.
18     Q.  Okay.
19     A.  I mean, I'm not an expert on the testing
20 process.  I see -- I'm just looking for the
21 word "test."
22         I see, for instance, test cases on 188.  I
23 don't know if that applies or not.  I'm going
24 to -- I guess from there, I see material analysis
25 reports as you mentioned.

Page 342

1      I'm looking under -- I'm now up to
2  "quality," page 221.  And I see an entry called
3  "analytical chemistry testing finished product
4  devices."
5      Q.  I'm sorry.  Where is that again?
6      A.  The top of 221.  Once again, I don't know.
7  I'm not an expert on the testing process.  I don't
8  know if that applies.  I'm just looking for places
9  where the word "testing" appears in relevant
10 categories.
11     Q.  And what's the minimum retention for --
12 well, first of all, let's go back, and I should
13 have asked you as you were going here.  We talked
14 about material analyst analysis reports.
15         What's the minimum retention for those as
16 of 1997?
17     A.  I think that was LP, if I remember
18 correctly.  That was page 188.
19     Q.  190.
20     A.  Oh, I was on 188.  Yeah, 190.  LP plus 6.
21     Q.  What does that mean?
22     A.  Life of the product.  In other words, the
23 expected life of the product in the marketplace
24 plus six years.
25     Q.  Does that mean like shelf life?

Page 343

1      A.  I don't know if it equates to shelf life.
2  It may.
3      Q.  What else would it equate or would it
4  reference life of the product as in its baby
5  powder, and baby powder is going to continue to be
6  around, so essentially it would always be under
7  retention.  See what I'm saying?
8      A.  Actually, I don't.  I'm sorry.
9      Q.  Well, life of the product.  I mean,
10 there's a life of a product, the period of time
11 during which a company manufactures a given
12 product; right?
13     A.  Oh, yes.
14     Q.  You know, under various specifications or
15 particular specification and it's a product like
16 Johnson's Baby Powder.  I mean, that could be
17 called "life of the product"; right?
18     A.  Yes.  You're right.
19     Q.  But life of product here under "material
20 analyst reports," you're not sure what that means
21 in that context?  I mean, is that shelf life?  Is
22 it something more than shelf life?  Is it, you
23 know, how long they've been -- they are going to
24 manufacture Johnson's Baby Powder?
25     A.  Yes.  And I -- you know, I don't think I

Page 344

1  want to interpret that without a little bit more
2  research.
3       Q.  So I know there's a lot of questions here
4  today.  But you were aware that these were central
5  issues about testing in these cases, right, in
6  talc testing, correct?
7       MR. COX:  Object to the form of the
8  question.  Object to the characterization that
9  this is a central issue or that a lot of the
10  questions today regard central issues in the
11  deposition notice or this case -- these cases.
12       THE WITNESS:  I was aware that the -- one
13  of the noticed topics had to do with retention.
14  BY MR. SWANSON:
15       Q.  And you also, though, know that in these
16  cases, even though you're not an expert on
17  testing, that testing and test results and the
18  retention of those testing is an important issue
19  to these cases; correct?  The talc testing I'm
20  referring to.
21       A.  Well, I wouldn't want to give an opinion,
22  but I understand that it has been raised as an
23  issue.
24       Q.  So.  And you understood that as a
25  spokesperson for Johnson & Johnson, you were to be

Page 345

1  prepared to speak on these issues, correct,
2  because we've asked about them?
3       MR. COX:  Object to the form.
4       THE WITNESS:  I understand that the
5  retention of documentation is a topic and that I
6  am prepared to speak on that.
7  BY MR. SWANSON:
8       Q.  Okay.  But, as you sit here right now,
9  you're not prepared to tell me what in 1997 life
10  of the product meant as to these material analyst
11  reports; correct?
12       A.  That's right.
13       Q.  Can you point -- and if we go to -- I
14  think you referenced 221 of this 1997 retention
15  schedule, "analytical chemistry testing finished
16  product devices"?
17       A.  Yes.  And, once again, I'm not an expert.
18  I don't know if that even applies, but I noted the
19  word "testing" was -- was in there.
20       Q.  Okay.  But you don't even know if that
21  applies to talc, do you?
22       A.  Correct.
23       Q.  Going three down, you see where it says
24  "analytical reports and requests"?
25       A.  Yes.

Page 346

1       Q.  On page 221.  What does that refer to?
2       A.  I can only speak to it's -- it's plain
3  English.  I don't -- I'm not here to interpret
4  what that means.
5       Q.  I don't want to waste time going through
6  each of the policies like this.
7       Are you prepared, as you sit here today,
8  to talk about specifically what the retention
9  schedule is and the retention period for testing
10  reports?
11       A.  Well, as I mentioned, I'm not specifically
12  able to sit here and say LP is identical to shelf
13  life or make that assessment.  What I can say is
14  that I -- in addition to gathering the schedules,
15  I interviewed people.  I spoke to, for instance,
16  Don Hicks, and Mr. Hicks gave a -- an appraisal
17  that -- of testing, quality testing for talc that
18  it was used in conjunction with the manufacturing
19  process, that it's -- retention of those materials
20  is tied to the expected shelf life of the product.
21  Now, it may be the shelf life of the product plus
22  a year; it may be double the shelf life of the
23  product.  It has changed over time, but I have a
24  general understanding from Mr. Hicks that testing
25  materials are generally held at least the expected

Page 347

1  shelf life of the product plus some additional
2  amount of time.
3       Q.  And how long is the shelf life of
4  Johnson's Baby Powder?
5       A.  Well, I'm going to just refer to my
6  discussion with Mr. Hicks.  And that's at the top
7  of -- I'm sorry.  I'm on the marked copy.  Let me
8  pull that out.  I can find it.  Here it is.  So
9  now I'm looking at page 12.  And the third,
10  fourth, fifth lines down.  "Testing" -- "test,
11  manufacturing, inventory, shipping records tend to
12  be kept for a shorter period per schedule times to
13  when the product would be in the marketplace,
14  generally about six years."
15       Q.  Okay.  So that's not quite shelf life,
16  then.  That's something longer than shelf life?
17       A.  Once again, I -- I'm not an expert in
18  interpreting what shelf life is or how long the
19  product would be in the marketplace.  I'm just --
20  I basically tried to gather that information from
21  Mr. Hicks as best as I could.
22       Q.  If you look at page 37 of your notes.
23       A.  Yes.
24       Q.  And this was from your discussion with
25  Rosina Bruno-Sheerin.

Page 348

1    A.  Yes.
2    Q.  Well, first of all, before I get there,
3  and I apologize.  Don Hicks, those records --
4  testing, manufacturing -- what kind of testing are
5  we talking about and where?
6    **A.  I interpreted his comment to be those**
7  **testing records that accompany batches or lots in**
8  **the manufacturing process, such as certificates of**
9  **analysis.**
10    Q.  And those certificates of analysis, were
11  those something that were being generated by
12  Johnson & Johnson or that came with the talc that
13  came in?
14    MR. COX:  Object to the form.
15  BY MR. SWANSON:
16    Q.  Let me -- let me start that over again.
17  What was included in the certificate of analysis?
18  Did that include whether or not -- was there --
19  did that include a test for asbestos?
20    **A.  I'm not an expert on the testing process.**
21  **I have a general understanding that there were --**
22  **there was testing done for asbestos.  The best**
23  **summary of the testing records I have is from Mark**
24  **Zappa on page 19.**
25    Q.  But specifically what were they testing?

Page 349

1  Now, Don Hicks was at the North Brunswick
2  location, the manufacturing location; is that
3  right?
4    **A.  I know he had various responsibilities.**
5  **He was at one point in North Brunswick.  I really**
6  **don't know.  I think he was at various locations.**
7  **But he had -- you know, in the -- during the**
8  **2000s, he had a responsibility for quality issues**
9  **related to talc manufacturing.**
10    Q.  So the records he was referring -- those
11  testing records, you think it includes
12  certificates of analysis?
13    **A.  Well, this is where I come to the**
14  **follow-on conversation with Mr. Zappa on page 19.**
15    Q.  Okay.  You said 19?
16    **A.  Yes.**
17    Q.  All right.
18    **A.  And this is under "follow-up."**
19    Q.  Got it.
20    **A.  And in this conversation, I sought to**
21  **determine the flow of documentation through the --**
22  **through the life cycle so that there is testing**
23  **done at the mine level.  There is testing done**
24  **when the -- when the material goes to Imerys,**
25  **there is a -- the certificate of analysis is**

Page 350

1  **transferred.  There is testing that is done by**
2  **Imerys itself.  And then another C of A is**
3  **created.  I mean, I'm just basically reading from**
4  **it.  But then from Imerys to Pharma Tech, there**
5  **are C of As sent and then additional testing done.**
6    Q.  Okay.
7    **A.  So there's -- that's kind of the flow of**
8  **testing documentation.**
9    Q.  And so the mine -- and that would be prior
10  to -- well, that would be the Vermont mines;
11  right?
12    MR. COX:  Object to the form.
13    **THE WITNESS:  Yeah.  Once again, I mean,**
14  **I'm not...**
15    MR. CARPENTER:  I'll join in that last
16  objection.  Also state lacks foundation.
17  BY MR. SWANSON:
18    Q.  I'm sorry?
19    **A.  Yeah, I'm just going to say, I'm not an**
20  **expert on which mines were in use at which point.**
21    Q.  So this certificate -- now, the mine did
22  its own testing.  It says that; right?
23    Now, Johnson & Johnson would get that
24  certificate of analysis regarding that testing; is
25  that right?

Page 351

1    A.  Well --
2    MR. COX:  Object to the form.  Beyond the
3  scope of the notice.
4    Go ahead.
5    **THE WITNESS:  Just going through the**
6  **workflow that Mr. Zappa established, the mine**
7  **would create a C of A which then is forwarded.**
8  BY MR. SWANSON:
9    Q.  Let me try to cut to the chase on this
10  stuff.
11    Is it true that you don't know
12  specifically whether these tests that are
13  reflected there were tests for asbestos content?
14    **A.  My general understanding is that the --**
15  **the tests did involve asbestos testing.  The**
16  **appearance and odor and fineness testing may not**
17  **have included asbestos testing, but the -- my**
18  **general understanding -- and once again, I'm not**
19  **here to speak on anything but my general**
20  **understanding of the testing process, but those --**
21  **those initial tests did include asbestos testing.**
22    Q.  And what was the retention on those; do
23  you know?
24    **A.  Well, that goes back to -- to Mr. Hicks's**
25  **comment to the applicable items in the retention**

Page 352

1  schedule.  But it's going to be associated with
2  the batch and lot six to seven years, and then
3  there would also be a notation on that in the
4  supplier agreement with PTI as to the retention
5  period there.
6      Q.  Now, if you go to page 37 -- this is
7  Rosina Bruno-Sheerin.
8      Do you see that?
9      A.  Yes.
10     Q.  The second page of the notes about what
11 she told you.  It refers to R&D records being kept
12 long-term.
13     Do you see that?
14     A.  Yes.
15     Q.  "Permanent or life of the product plus N
16 years"?
17     A.  Yes.
18     Q.  What does "life of product" mean in that
19 context?
20     A.  It would appear she was talking about how
21 long the product was being made.
22     MR. SWANSON:  I'm sorry, can I have that
23 read back, please.
24     (Record read by the court reporter.)
25 BY MR. SWANSON:

Page 353

1      Q.  So if she's referring to how long the
2  product is being made, in other words, like
3  Johnson's Baby Powder?
4      A.  Yes.
5      Q.  Not shelf life or anything like that;
6  right?
7      A.  Well, based on her comment about
8  "permanent," I would say no.
9      Q.  So but in the context of the retention
10 schedule we looked at, we were -- we saw life of
11 product plus 6, correct, for testing, that the
12 manufacturing material analyst -- analysis
13 reports?
14     Do you see that?
15     A.  Yes, I did.  That's on 190.
16     Q.  So wouldn't that indicate that -- that
17 what Don Hicks told you, doesn't that indicate
18 they weren't at that facility following the
19 retention policy, he said, shelf life plus
20 6 years, that's what that meant?
21     MR. COX:  Object -- object to the form of
22 the question.
23     THE WITNESS:  Well, I believe you had
24 guided me to the material analysis reports, that
25 section, and I don't know -- I don't know enough

Page 354

1  about what material analysis reports are to
2  determine if they are associated with a batch or
3  if there's some other type of -- I mean, I'm
4  reading the text below it, and I see that that --
5  they talk about DMR and DHR; device master record,
6  device history record.  Based on that, I'm not
7  sure that this section applies to lots of batches.
8  I just don't know what material analysis reports
9  are.
10 BY MR. SWANSON:
11     Q.  Right.  So, I mean, this kind of runs up
12 against the problem I raised earlier, which is
13 that you're here to speak on behalf of Johnson &
14 Johnson.  I'm trying to get this information from
15 you and it seems to me like we're kind of guessing
16 about what the proper retention schedule was.  I
17 mean, if Don Hicks told you it was shelf life plus
18 6 years in manufacturing but it was actually
19 something different and required to be different,
20 that's something we want to know about, and I
21 can't get from you what the formal policies were
22 with respect to retention of testing results
23 and -- and not only testing results but the
24 testing documents themselves:  things like TEM
25 images, x-ray diffraction, EDSs, that sort of

Page 355

1  thing.
2      So who is it we should be talking to, to
3  get this information about what Johnson &
4  Johnson's policies are and have been with respect
5  to retention of testing records?
6      MR. COX:  Object to the form of the
7  question.  Object to the extent that this line of
8  questioning goes beyond the scope of the notice
9  insofar as you're asking Mr. Mittenthal to give
10 testimony about testing.  He's not the corporate
11 representative regarding different types of
12 testing that was done by Johnson & Johnson or
13 Johnson & Johnson Consumer, Inc.
14     MR. SWANSON:  Counsel, what I'm trying to
15 get at is -- I'm trying to get at what the
16 retention schedules were and how long documents
17 were supposed to be kept and whether or not there
18 was an actual retention schedule as to any kind of
19 testing reports to do with talc or milled talc,
20 finished cosmetic talc products.  And that's what
21 is at issue in this case.
22 BY MR. SWANSON:
23     Q.  And so, Mr. Mittenthal, let me ask you
24 again, who is it that I should be talking to, to
25 find this out?

Page 356

1    A.  Well, I learned it from Don Hicks and from
2  others in my notes.  I did not go out and take
3  every interval described by Mr. Hicks and tie it
4  back to every version of a retention schedule.
5  I -- it would certainly be something that could be
6  done.  I did not do that step as part of my
7  preparation.  I did not view it as within my scope
8  of preparation.  There -- the -- I would expect
9  that the retention schedules would be reflective
10  of the comments that Mr. Hicks and others made to
11  me.
12          MR. SWANSON:  Move to strike that last
13  sentence as being speculative.
14  BY MR. SWANSON:
15    Q.  Does Johnson & Johnson have a formal
16  retention policy as to retention of talc?  And
17  when I say "talc," I mean milled and talc ore
18  testing results today?
19    A.  Yes.  My understanding is that it does,
20  and I would look to the schedules, I would look to
21  the supplier agreements to determine that.
22    Q.  But you can't tell us what those retention
23  periods are; correct?
24    A.  Well, we were looking at the '97 schedule.
25  I believe I can find it in the quality agreement.

Page 357

1    Q.  Okay.  And where -- can you point me to
2  the quality agreement?
3    A.  So this is Exhibit 1.  The quality
4  agreements are provided under Tab 2D.
5          So I have -- on the first quality system,
6  there's two different sets of numbers.  The top
7  says "9 of 16"; the lower one says "11 of 19."
8    Q.  Can you direct me to where you're at
9  specifically?
10    A.  Yeah.
11    Q.  This is 2D, Exhibit 2D?
12    A.  Yes.  2D.  That's right.  And it's the --
13          MR. COX:  How many pages?
14          THE WITNESS:  Well, it appears to be nine
15  pages in.
16  BY MR. SWANSON:
17    Q.  These are --
18    A.  I don't know why there's two sets of page
19  numbers, but there's...
20    Q.  Is this under "validation"?
21    A.  I'm looking under 17.0, that section
22  called "records."
23    Q.  Oh, is this -- oh, yours aren't tabbed
24  that way.
25          Sorry, did you say "inspection measures

Page 358

1  and tests"?
2    A.  17.0.  "Records."  Under the first quality
3  system procedure which is Exhibit 2D.
4    Q.  Okay.  I think I've got it.  Yeah.
5          So what does that say about retention of
6  testing results?
7    A.  It says, "All documentation, including
8  manufacturing records, packaging records,
9  inspection records, QA records, batch tickets,
10  cards records, et cetera, during the manufacturing
11  process shall be maintained by PTI for six years
12  from the date of manufacture."
13          Then it goes on to say, "The validation
14  records are to be kept by PTI as long as the
15  product is manufactured until the last batch of
16  any discontinued product has expired."
17    Q.  Just to be clear for the record, Pharma
18  Tech Industries, PTI, was -- did the packaging of
19  the manufacturing powder -- packaging of Johnson's
20  Baby Powder for Johnson & Johnson; is that right?
21    A.  That's my understanding.
22    Q.  And where it says "records," and it says
23  "six years," I notice "manufacturing records,
24  packaging."  Does it list testing?
25    A.  It doesn't say testing per se, but it

Page 359

1  speaks of testing in the sections that describe
2  documentation prior to that.  Sections 8, 9, 10.
3    Q.  So PTI --
4    A.  13.
5    Q.  I'm sorry.  PTI started manufacturing in
6  2004 or '5, around there; right?
7    A.  I need to check my notes on that.
8          So I show that in 2004 was the sale of the
9  Royston plant to PTI.
10    Q.  And do you know what the records retention
11  was for Royston prior to that, if it had one?
12    A.  Once again, I would be looking through
13  these schedules to make that determination.
14    Q.  Do you have a table of contents?
15    A.  I'm going to see if there's a schedule
16  closer to -- I'm sorry.  Is that -- is this my
17  pile here or that's?  Not my pile.
18    Q.  Any of those are ones you can -- those are
19  all marked as exhibits, so.
20    A.  Okay.  So I found one in my pile that's
21  2002.  So that would be closer to the sale to PTI.
22    Q.  And what is that marked as?  What's the
23  exhibit number, I mean?  Exhibit number?
24    A.  Oh, I'm sorry.  It's 12.
25    Q.  Thank you.

Page 360

1      A. And I do note that there are additional
2  definitions at the bottom of the schedule.
3      Q. Okay. And you're looking at a 2002
4  records retention schedule of Johnson & Johnson
5  Consumer and Personal Care companies; correct?
6      A. Yes.
7      Q. And is there something in here -- I had
8  asked you about Royston or whoever was doing the
9  manufacturing prior to PTI, but is there something
10 in this record schedule from 2002 that you see
11 with respect to a retention policy and testing of
12 talc finished product or talc ore or milled talc?
13     A. I'm looking for it. It's --
14     Q. Did you find anything?
15     A. I mean, this is also -- half the pages are
16 flipped, so I'm -- I would expect that there
17 should be a section in here that would relate to
18 batch record retention. I'm not finding it right
19 now. I could continue to search on the break.
20     Q. Okay. Batch record retention. I'm
21 specifically asking about any kind of testing of
22 the finished product and of the talc that went
23 into the finished product. So that could be a
24 research and development document of the research
25 department or it could be the manufacturing

Page 361

1  department.
2         You understand that; right?
3      A. Yes.
4      Q. Okay. So that's what you're looking for.
5      A. Well, once again, I can try to match up
6  the comments from Mr. Hicks and others to specific
7  provisions of the schedule. I certainly would not
8  say I'm qualified without exception to determine
9  every place in the retention schedule that's
10 responsive to that question. I can -- I can look
11 for the word "testing" and make those
12 determinations, but I can't speak to an
13 interpretation of every category of the schedule.
14        MR. SWANSON: Move to strike as
15 nonresponsive.
16 BY MR. SWANSON:
17     Q. Okay. So whatever information that you
18 have about the retention of testing reports or
19 things associated with testing is in your notes;
20 is that what you're saying?
21        MR. COX: Object to the form.
22        THE WITNESS: My notes would be the
23 primary source of my knowledge of that
24 information.
25 BY MR. SWANSON:

Page 362

1      Q. Do you know what the retention was on
2  transmission electron microscopy grids that were
3  created in testing Johnson's Baby Powder or in the
4  talc ore or milled talc for asbestos content at
5  any time?
6         MR. COX: Object to the form.
7         THE WITNESS: No, I don't know that.
8  BY MR. SWANSON:
9      Q. Do you know what the retention was on
10 transmission electron microscopy images of testing
11 of talc ore, milled talc, or cosmetic talc
12 finished product at any time by Johnson & Johnson?
13        MR. COX: Object to the form.
14        THE WITNESS: Unless those have other
15 common terms that I'm familiar with, I don't --
16 I'm not familiar with those terms.
17 BY MR. SWANSON:
18     Q. Do you know the retention schedule for
19 those?
20     A. I'm not familiar with those -- those --
21 those categories, so I would not --
22     Q. They would be images taken from testing --
23 photomicrographs from testing. They might be
24 included in a testing report.
25     A. Would they be associated with

Page 363

1  manufacturing? Would they be associated with
2  audits? Would they be associated with other steps
3  of the process? I would -- if -- if, for
4  instance, they were associated with the
5  manufacturing process, Mr. Hicks has an answer for
6  that, that I elicited. If they are associated
7  with audits, there was an answer for that, that I
8  elicited.
9      Q. What testing was done -- what do you mean
10 by "audits" in -- with respect to testing of talc
11 for the presence of asbestos?
12     A. My understanding is that a third party, RJ
13 Lee and potentially other organizations, was
14 contracted to perform quarterly testing of talc.
15 That would have included a range of testing
16 activities. That would have been -- those test
17 results would have been captured and saved
18 separate and apart from any ongoing manufacturing
19 process and preserved.
20     Q. Okay. And where is that information
21 either in the -- in the retention policy, if you
22 know?
23     A. Yeah. As I did note, just flipping
24 through it, there were some categories called
25 "audits," but I have not undertaken to tie

Page 364

1  Mr. Hicks or Mr. Zappa or other people's comments
2  to specific sections of the schedule.
3      Q.  Now, with respect to your notes, who did
4  you speak to regarding the testing that was done
5  by outside laboratories, what you called "audit
6  testing"?
7      A.  I did speak to Mr. Hicks about that.  I
8  spoke to members of the supplier quality team.
9  That included -- get my table of contents.
10         So amongst the people I spoke to in that
11 regard were David Allen, Don Hicks, Lisa Kaiser,
12 Mark Zappa, Nicholas Zhu, Pankaj Verma, and Sean
13 Park.  Lorena Telofski may have mentioned it as
14 well.  I would then look through those people's
15 notes to see who specifically referenced it.  But
16 those were the -- those were the people in the
17 supplier quality area that I spoke to.
18     Q.  And what was -- was there a formal --
19 did -- well, let me start this way:  When was
20 the -- from what you gathered, first of all,
21 generally speaking, what was your understanding of
22 Johnson & Johnson's retention policies on talc
23 testing by third parties that were hired by
24 Johnson & Johnson to do these quarterly tests or
25 audits?

Page 365

1      A.  My understanding is that those were
2  considered part of a system of record.  They were
3  stored in a system called "TrackWise" and also in
4  a system called "Microsoft SharePoint" and subject
5  to indefinite retention.
6      Q.  And where is that in your notes?
7      A.  Well, there is a -- there were pieces of
8  it in different parts of my notes.
9         So, for instance, the RJ Lee testing was
10 on page 14 of my Don Hicks discussion.
11     Q.  Okay.  Are you talking about this
12 quarterly global testing in 2009?
13     A.  Yes.
14     Q.  Okay.
15     A.  Then on page --
16     Q.  Hold on a second, since we're talking
17 about that.  So it says here that "start tested
18 quarterly global testing 2009" -- "started
19 quarterly" testing in 2009.  And then in
20 parentheses, "also tested at an earlier time."
21        And it said that Don requested 500-gram
22 samples from every manufacturing site.
23        And this you understand to be as of 2009?
24     MR. COX:  Object to the form.
25     THE WITNESS:  The -- the context was for

Page 366

1  the quarterly global testing, yes.
2  BY MR. SWANSON:
3      Q.  And then it says -- then he sent to RJ
4  Lee.  "Did not retain anything."
5         You mean Don Hicks didn't retain anything;
6  is that what that means?
7      A.  Correct.
8      Q.  And what did you ask him that elicited
9  that answer that he didn't retain anything?  What
10 was that in reference to?  That he didn't have a
11 record of it?
12     A.  No, not the records.  It was whether he
13 maintained any elements of the samples themselves.
14     Q.  And what did he do with whatever remainder
15 of the sample that he didn't send to RJ Lee?
16     MR. COX:  Object to the form.
17 Mischaracterizes the testimony just given.
18     THE WITNESS:  My understanding is that he
19 requested 500-gram samples and he sent them along
20 500-gram samples to RJ Lee.
21 BY MR. SWANSON:
22     Q.  What's the next reference you were
23 referring to in terms of this quarterly testing,
24 because this doesn't say anything about how long
25 the testing results or the documents about the

Page 367

1  testing should be retained; correct?
2      A.  Correct.
3      Q.  Where is the next one?
4      A.  Page 18, which is the Mark Zappa
5  discussion and that is about -- about 18 lines
6  from the bottom.
7      Q.  I'm sorry.  Where?
8      A.  18 lines from the bottom of page 18.
9      Q.  And what are you looking at?
10     A.  "Quarterly mine results also scanned into
11 SharePoint.  Dedicated talc SharePoint site
12 includes testing.  Don kept records in physical
13 binder until he left and then it was migrated to
14 SharePoint until 2014.  No additional steps needed
15 to conform to legal hold.  Already hold
16 everything."
17        Then it notes the mine assessment may
18 routinely come through email, and the -- also
19 notes that the supplier tests were managed in the
20 TrackWise system.
21     Q.  It says that this -- well, first of all,
22 Don kept records in a physical binder.
23        Do you have any idea how far back those
24 records went, without guessing?
25     A.  I can only note that he -- his involvement

Page 368

1  with manufacturing quality started in 2001.
2      Q.  Don Hicks' did?
3      A.  Yes.
4      Q.  And do you know whether or not that
5  binder -- do you know if that binder contained the
6  testing results?  It just says "kept records."  I
7  know there's some discussion about testing, but
8  I'm trying to figure out if Don kept records in
9  physical binders, what specific records was he
10  keeping in a physical binder?
11      A.  I interpreted that, the conversation, to
12  be regarding the testing results, the quarterly
13  test results.  That was my understanding.
14      Q.  And did you ask -- I mean, I'm looking at
15  your notes here of Hicks and Zappa, and when you
16  were asking people who were responsible for
17  records and information management, you were
18  asking all about hold periods, holds and retention
19  periods, and the policies from what we've seen in
20  the notes.  But I see here -- I don't see you
21  asking either of these people, Mark or Don, why --
22  or what their understanding was of the retention
23  schedule or any holds at the time.
24          In other words, did you ask them, well,
25  what was the policy -- what was the -- what was

Page 369

1  the company policy on holds?  What policy were you
2  following on retention schedules for any of these
3  records that you were generating or receiving?
4          MR. COX:  Object to the form of the
5  question.
6          THE WITNESS:  Well, I would disagree in
7  part in the sense that in the page 18 discussion
8  with Mr. Zappa, he indicated no additional steps
9  needed to conform to legal hold.  They were
10  already holding everything going forward.
11  BY MR. SWANSON:
12      Q.  Well, specifically what did you ask him
13  about?  What did he say other than -- what did you
14  ask about legal holds?
15      A.  I asked if the system had any provision or
16  capability to enable a legal hold of those
17  materials.
18      Q.  And those materials, again, you're talking
19  about these quarterly testing results; is that
20  right?
21      A.  Yes.
22      Q.  So -- and that -- what happened to the
23  physical binder that Don had?
24      A.  I don't know.
25      Q.  Was it destroyed?

Page 370

1          MR. COX:  Object as asked and answered.
2          THE WITNESS:  I don't know.
3  BY MR. SWANSON:
4      Q.  And because Mark started in 2006 and you
5  didn't specifically ask Don that, you don't know
6  if his binder included quarterly testing results
7  going all the way back to 2001, do you?
8      A.  I did not ask the date range of the
9  binder.
10      Q.  What other reference do you have about --
11  in your notes regarding retention periods -- or
12  let's add holds to this -- for quarterly testing?
13  And if you see anything in there on any other type
14  of asbestos testing of the talc or the finished
15  talc products, I want to know about it -- that we
16  haven't discussed already.
17      A.  Well, the next --
18          MR. COX:  Objection to form.
19          Go ahead.
20          THE WITNESS:  I'm sorry.
21          The next place this is referenced is in
22  the Nicholas Zhu section on page 20.
23          MR. SWANSON:  Before you get into that,
24  hold that thought.
25          Let's go off the record so that the

Page 371

1  digital media can be changed on the video
2  recorder.
3          THE VIDEOGRAPHER:  Thank you.
4          This marks the end of Media Disk 3 in the
5  deposition of James Mittenthal.
6          We are going off the record at 2:55 p.m.
7              (Off the record.)
8          THE VIDEOGRAPHER:  We are on the record at
9  3:12 p.m.
10          This marks the start of Media Number 4 in
11  the deposition of James Mittenthal.
12          Counsel, you may continue.
13  BY MR. SWANSON:
14      Q.  Mr. Mittenthal, I think we were going
15  through -- we were talking about quarterly reports
16  and also other testing of the talc or finished
17  product for the presence of asbestos and the
18  retention periods or practices related to those.
19  And I think we had sort of exhausted what you
20  could say about the policies.  But as to your
21  notes, were there other references in your notes
22  that you had in mind that are the basis of your
23  understanding?
24      A.  Yes.  So in the previous conversation, I
25  was simply walking through places in my notes

Page 372

1  where quarterly audit testing or RJ Lee testing
2  had been captured, and the next place I had come
3  to was Nicholas Zhu, which is page 20.
4      So there are sections that talk about
5  batch records and mining and processing.  Then it
6  goes down to about eight, nine lines from the
7  bottom, "quarterly testing third-party RJ Lee
8  cites in India, China, Thailand sent talc samples
9  to RJ Lee.  Test results stored in SharePoint and
10 shared with manufacturing sites via email.  Global
11 SharePoint site with folder dedicated to APAC
12 source quality team may have test results back to
13 2012."
14     Q.  So that would correspond to the six years,
15 is that right, that we saw with Don Hicks?  From
16 memory he was talking about six years.
17     A.  I would actually suggest that Mr. Hicks
18 was talking about batch retention as opposed to
19 quarterly testing retention.
20     Q.  Okay.  He was talking about -- but he was
21 talking about testing, batch testing; correct?
22     A.  Among other things, certificates of
23 analysis and other things associated with the
24 batch or a lot.
25     Q.  And that would include testing of

Page 373

1  asbestos?
2      A.  Testing, yes.
3      Q.  In here, what -- to be clear, Nicholas
4  Zhu, he's a supply -- is in supplier quality
5  management.
6      Does he work in China?
7      A.  Yes.
8      Q.  And did you speak to him on the phone?
9      A.  Yes.
10     Q.  And he's been there at Johnson & Johnson
11 China for five years; is that right?
12     A.  Yes.
13     Q.  And his understanding is that these
14 quarterly test results go back to 2012?
15     A.  Yes.
16     Q.  And do you have any other information as
17 to how far back -- well, do you know if they've
18 only been retained for that five or six-year
19 period or, in other words, there were prior
20 results and they had been retained six years, or
21 they've only been doing that testing back to 2012?
22     A.  Yeah.  I simply note that he said, you
23 know, don't believe they have anything prior to
24 that.
25     Q.  Okay.  So that doesn't answer the question

Page 374

1  in the sense that we don't know the answer to that
2  question from what you learned from him, correct,
3  as to whether or not they only retained it for six
4  years or they didn't start this practice of
5  testing -- quarterly testing until 2012; true?
6      A.  True.  I just want to go back to my Don
7  Hicks notes for a quick second just to make sure
8  I'm answering that fully.
9      Okay.  I checked.  And I agree.
10     Q.  Okay.  Are there any other references that
11 you have to testing of the talc or the finished
12 product in terms of records retention?
13     A.  Well, as I mentioned, the walk-through
14 that was encompassed before the break and now it
15 was -- I was really just looking for instances of
16 audit testing and how that was retained.  I could
17 do another sweep just for any references to
18 retention of batches.  I was -- I was really
19 focusing on looking -- looking for the retention
20 of quarterly audit.  I may -- I may have found
21 additional places where there's batch information,
22 but I was -- I had been looking for the RJ Lee
23 quarterly audit information while we were looking
24 for it.
25     Q.  On the break?

Page 375

1      A.  No.  While we were going through this
2  exercise, I was focusing on the quarterly audits.
3      Q.  And what I asked the last couple of
4  questions was go ahead and expand that.  I mean,
5  initially we started with Don Hicks and some of
6  the testing that had been related to
7  manufacturing; right?
8      And so, since we're taking the time to go
9  through your notes on this, I'm interested in all
10 references to retention of testing records that
11 would involve testing for asbestos, whether that's
12 testing at the manufacturing facility or the
13 quarterly.
14     A.  Uh-huh.
15     Q.  Okay?
16     A.  Okay.
17     Q.  All right.  So --
18     A.  So the next one was Pankaj Verma, page 21.
19     Q.  Okay.
20     A.  And he indicated that "audit reports were
21 stored in TrackWise, a validated system."  And his
22 comments about a validated system I understood
23 that to mean, among other things, that the -- that
24 this was a system of record and that the
25 information would be stored indefinitely in that

1  system.
2          And that TrackWise was, in fact, a global
3  system, meaning information that he input or that
4  happened in his region would be visible anywhere
5  around the world.
6          He --
7      Q.  This is -- okay.  So let's just back up
8  for a second there now.
9          Mr. Verma is director of APAC external
10  manufacturing quality; right?
11     A.  Yes.
12     Q.  And he's been working there for seven
13  years at J&J.
14         Does that mean including four years at J&J
15  India Mumbai?
16     A.  You know, it's ambiguous because he then
17  says he was responsible for management and mining
18  for the last ten years.  I'd have to double-check
19  that.
20     Q.  You said that this audit reports -- now,
21  how do you know that those audit reports that are
22  being referred to there are auditing actual
23  testing -- testing results, testing talc for
24  asbestos?
25     A.  The -- up above where it says "raw and

1  packaging materials suppliers, talc part of his
2  portfolio" then below that "audit of talc
3  manufacturing site ensuring that talc supplier
4  follows specs, testing, and overall global specs."
5      Q.  So but there's a number of things in
6  there.  So following specs.  What was the talc
7  supplier for -- which talc supplier are we talking
8  about now?  Do you know?  Is it China?
9      A.  Well, it appeared from the conversation he
10  was referring to both India and China.
11     Q.  Okay.  And you said that the audit reports
12  are stored in TrackWise.  Is there -- you said
13  that you thought that that was -- well, strike
14  that.
15         How far back do these audit reports go?
16  Do you know?
17     A.  I do not.
18     Q.  And how long have they been stored in
19  TrackWise?  For how many years?
20     A.  I'm going to look at my -- if I can find
21  it quickly, my spreadsheet.  I might need some
22  help.
23     Q.  Well, it says right here -- maybe this
24  helps you -- "audit reports stored in TrackWise, a
25  validated system.  Prior to that, ETQ Symphony,

1  including corrective actions, 2014."  That's in
2  your notes on this same page.
3      A.  Yes.  For that region.  I was looking --
4  okay.  I wanted to see TrackWise in general.  But,
5  yes, for that region it is in my notes.
6      Q.  Right.  So for that region, the
7  information wasn't being entered into TrackWise
8  until 2014; right?
9      A.  Yes.
10     Q.  And it came -- and it transferred over
11  from a different system?  Well, let me ask you
12  what that reference means.  "...a validated
13  system.  Prior to that, ETQ Symphony, including
14  corrective actions."  What does that mean?
15     A.  So the first line, "Audit report stored in
16  TrackWise, a validated system," that stands on its
17  own.
18         And then the system prior to that for
19  storing audit reports was ETQ Symphony, and that
20  system also happened to store corrective actions.
21     Q.  And do you know if that information was
22  transferred over that was in ETQ?
23     A.  It doesn't say explicitly in here.
24     Q.  Was the switch to TrackWise in 2014?
25     A.  That's my understanding.  I also wanted to

1  find my -- I don't see my -- is there something I
2  can lay my hands on?  The list of -- is that one
3  of the exhibits floating around the table
4  possibly?
5      Q.  I'm sorry.  What are you looking for?
6      A.  Sort of a Jim Mittenthal set of lists.  I
7  think it might be in one of those maybe.
8      Q.  I think -- it's got to be in like
9  Exhibit 2?
10     A.  No.  It's like the three tables of the
11  applications, the timeline, and the names.
12     Q.  Talking about this?
13     A.  Well, that would have been the most recent
14  edition to it.
15     Q.  This?
16     A.  No.  There's one more.
17     Q.  I can't guess about what you... sorry.
18     A.  I thought it had been marked.
19     Q.  It probably has been.  I think we marked
20  pretty much everything.
21         Describe what that document is that you're
22  looking for.
23     A.  It's about a -- well, it's -- would be
24  printed on both sides.  It's about a four or
25  five-page total, and it has a table that has a

Page 380

1  timeline, it has a table that has a list of
2  applications, and a table that has a list of
3  people.
4      Q.  I'm sorry.  I'm not -- it's not ringing a
5  bell right now.
6      A.  Okay.  This is the document (indicating).
7      Q.  Oh.  I guess it's a document I haven't
8  seen yet.  Or have I?  Okay.
9          MR. COX:  I think you have.  It was part
10 of his notes.
11         MR. SWANSON:  Yeah.  Okay.
12 BY MR. SWANSON:
13     Q.  This is a list of people that you
14 interviewed; right?
15     A.  That's part of the list, yeah.
16         MR. SWANSON:  Chris, was this in the
17 binder?  This (indicating)?  I just want to figure
18 out if we marked it or not.
19         MR. COX:  No.  He had it with him on the
20 first day, though.  I don't know if you marked it
21 or not.
22         MR. SWANSON:  I might not have.
23         MR. COX:  There were a couple of things
24 that were not marked.
25         MR. SWANSON:  Let's go ahead and mark

Page 381

1  that.
2          Mr. Mittenthal, so we that we've got a
3  copy of it and so we just have a record of what
4  you're looking at there.
5          That's going to be Exhibit 31.
6          (Whereupon, Plaintiff's Exhibit 31 was
7          marked for identification.)
8  BY MR. SWANSON:
9      Q.  Just for the record, can you tell me what
10 Exhibit 31 is?
11     A.  Yes.  It's three lists, and they are lists
12 that I compiled going through my notes.  The first
13 part of the lists are just simply the people I
14 spoke to.  The second part of the lists were the
15 applications that were discussed.  And the third
16 part of the lists were dates mentioned by people
17 that I spoke to.
18         And I have gone to the second area of the
19 list, the applications discussed, in order to
20 ascertain information about TrackWise.  And I just
21 have a general note that it was effective in 2014
22 and preceded by ETQ.
23     Q.  Okay.  All right.  Let's see.  We were on
24 page, I think it was 21?
25     A.  Yes.

Page 382

1      Q.  And I apologize if I asked a question I've
2  already asked.
3          How far back did those talc testing audit
4  reports go?
5      A.  I don't know.
6      Q.  Okay.  What's the next -- and you don't
7  know if this policy and practice or practice that
8  was happening for the last several years as to, I
9  think India and Thailand, were also practiced in
10 the Philippines or Hong Kong, do you?
11     A.  Just the first part of the sentence again,
12 please?
13     Q.  Do you know if this practice with respect
14 to these audit reports and currently putting them
15 in TrackWise and prior to that into ETQ Symphony,
16 do you know if that was -- if that applied to
17 Philippines or Hong Kong?
18     A.  Well, in the earlier conversation,
19 Mr. Nicholas Zhu identified himself as responsible
20 for the Philippines and noted that the use of --
21 noted the SharePoint site.
22     Q.  Didn't we talk about that?
23     A.  Yes.
24     Q.  All right.  As to talc -- are there any
25 other references that you have into retention

Page 383

1  of -- retention policies or practices that you
2  know about that we haven't discussed already?
3      A.  Well, in the -- further on in the section
4  about Pankaj Verma, which is page 21, there is a
5  notation, "expect a defined period of retention
6  for suppliers.  Typically shelf life plus one
7  year."
8          So there is a general statement about
9  document retention that once again echos the
10 "expected shelf life plus one year" notion.
11     Q.  So that's the six years basically; right?
12     A.  Yes.
13     Q.  And that would include testing?
14     A.  Yes.
15         MR. COX:  Object to the form.
16 BY MR. SWANSON:
17     Q.  And here's another reference, and I think
18 this is consistent with what you just said.  If
19 you go to page 61, 62.  This is as to Pam Downs.
20     A.  Yes.
21     Q.  And Pam Downs is the person you've had the
22 most discussions with overall about Johnson &
23 Johnson's record searches and production and that
24 sort of thing other than perhaps the attorneys;
25 correct?

**Page 384**

1    A. I would generally agree.
2    Q. And she's the principal at Triality which
3 is a company that works for Johnson & Johnson
4 dealing with their document searches and
5 productions on various levels; correct?
6    A. Yes. Evidence management.
7    Q. Evidence management. Okay.
8    If you look at what she said here on
9 page 62, near the top of the page it says, "Some
10 testing records maintained by third parties," and
11 then it says, "evaluate testing quarterly."
12    I don't know, do you know what that meant,
13 "evaluate testing quarterly" meant, when you spoke
14 to her initially then back in April of 2018?
15    A. Yeah. It's kind of mashed together. But
16 I would say "evaluate the talc by testing
17 quarterly" would be a more complete version of the
18 sentence.
19    Q. And then she also says retention of
20 testing docs was generally shelf life, a product
21 plus one year; correct?
22    A. Yes.
23    Q. So, again, that's -- then the shelf life
24 of the product is considered to be five years for
25 Johnson's Baby Powder; true?

**Page 385**

1    MR. COX: Object to the form.
2    THE WITNESS: I would conclude that. I
3 wouldn't be able to speak on it with authority,
4 but that sounds in the range based on what Don
5 Hicks said as well as these other comments.
6 BY MR. SWANSON:
7    Q. So generally it seems like people are
8 saying it's shelf life, which is about five years,
9 plus a year for the preservation of the testing
10 results except in these instances recently where
11 you've said that some of the information got put
12 into -- I forget what the name of the platform
13 was.
14    MR. COX: Object to the form.
15    THE WITNESS: Well, going back to
16 Mr. Hicks, he indicated that, I think it was
17 Mr. Hicks, if not Mr. Zappa, that RJ Lee started
18 testing in 2009 and that that quarterly testing
19 was kept.
20 BY MR. SWANSON:
21    Q. So prior to 2009, at least in practice,
22 even though we haven't really determined it from
23 you looking at the policies because you haven't
24 been able to quite straighten that out, although
25 there was a reference in a policy.

**Page 386**

1    But in terms of what practices you've
2 gathered from interviewing these witnesses was
3 that it was generally about six years for testing
4 results.
5    MR. COX: Object to the form.
6 BY MR. SWANSON:
7    Q. For testing; correct?
8    A. I would seek to make a clean separation
9 between testing from -- that accompanies batches
10 or the manufacturing process as opposed to testing
11 that stands apart from -- from a particular batch
12 or a lot, and whereas Mr. Hicks indicated that
13 that regular quarterly audit started in 2009, he
14 also indicated that there were other testing that
15 was done separate and apart, from batches and
16 audits -- sorry -- separate and apart from batches
17 and lots that occurred prior to 2009.
18    So batch lot testing with its shelf
19 life-based retention here; quarterly audits and
20 prior to 2009 an occasional audit-like testing
21 over here (indicating).
22    Q. Now, when Pam Downs is talking about this,
23 retention of testing, she's talking about the
24 quarterly audits or is she talking about -- do you
25 know, or is she talking about testing done in

**Page 387**

1 conjunction with manufacturing?
2    A. She's -- when she talks about shelf life
3 of a product plus one year, it's in connection
4 with manufacturing.
5    Q. Okay. Now, go to page -- before I leave
6 generally this area of testing for talc or
7 finished product for asbestos and the retention of
8 those records, do you have any other information
9 as the representative of Johnson & Johnson to add
10 as far as when specific retention practices or
11 policies came into place and how long the
12 retention periods were that we haven't spoken
13 about?
14    MR. COX: Object to the form.
15    THE WITNESS: When I spoke of the places
16 in my notes, and I believe we've captured many of
17 those places both for the quarterly audits and for
18 the manufacturing-related testing, there are
19 references in the retention schedules I -- I had
20 difficulty tying them one by one. But they're --
21 the retention schedule would specify those
22 applicable periods as well.
23    The supplier audits -- the external
24 supplier audit agreements -- or the external
25 supplier agreement also encompassed retention

Page 388

1   periods in them as we went through.  And I think,
2   as I mentioned when we first started talking about
3   this, the legal holds would also specify testing
4   as a category to be held.
5   BY MR. SWANSON:
6       Q.   Now, on retention schedules, we talked
7   about 1997 being the first actual retention
8   schedule.  And you couldn't really tell from
9   looking at that whether that applied to the talc
10  testing, correct, at least from the preliminary
11  look that you took a couple of hours ago when we
12  looked at that; right?
13      MR. COX:  Object to the form.
14      THE WITNESS:  My understanding is that
15  those schedules would cover those intervals.  I
16  would just need further study to tie the specific
17  references made by Mr. Hicks, Ms. Downs, Mr. Zhu,
18  Mr. Zappa, Mr. Verma, and others back to their
19  accompanying periods in the schedules themselves.
20  BY MR. SWANSON:
21      Q.   Do you have any information -- and I may
22  ask you that tomorrow, because I don't want to
23  continue your deposition indefinitely into the
24  future, and I'm sure you probably agree with me
25  there.  So I may come back on that to see if we

Page 389

1   can specifically locate those.
2       But setting that aside, do you have any
3   information that there was any kind of formal
4   retention policy as to testing -- now you've said
5   the first hold was in 1999; correct?
6       A.   Yes.
7       Q.   And the first policy we have for retention
8   is 1997; correct?
9       A.   Yes.
10      Q.   So do you have any information that there
11  was -- that Johnson & Johnson had a retention
12  schedule or retention hold prior to 1997 that
13  would dictate the retention of any kind of testing
14  of Johnson's Baby Powder, or cosmetic talc
15  products, or the talc ore, or the milled talc that
16  was used in those products for asbestos?
17      MR. COX:  Object to the form.
18      THE WITNESS:  Insofar as holds, I have no
19  knowledge of anything before that.  Insofar as
20  retention schedules, I have information from the
21  company that there were retention schedules
22  created in the early '90s.  The earliest one made
23  available to me has been 1997.  It's my
24  understanding that the retention schedules are
25  intended to cover topics such as retention of

Page 390

1   testing documentation.
2       I have not seen anything earlier to 1997.
3   I have just a general understanding that the --
4   the very purpose of the retention schedules is
5   to -- is to address the retention of materials
6   that would be classified in the company's business
7   operations which would include testing.
8       I haven't seen anything prior to 1997.
9   BY MR. SWANSON:
10      Q.   Okay.  And we had -- and I wish I could
11  remember who it was you spoke to -- and we spoke
12  at length about a retention policy that was
13  referred -- retention, some kind of retention
14  policy that was referred to in your notes as of
15  the early 1990s.  Remember that?  And it was
16  supposedly based on the McNeil subsidiary's
17  retention policy?
18      A.   That was -- well, that was authored by
19  Rosina Sheerin.  There may have been references to
20  it, both from her discussion and possibly Michelle
21  Anderson.
22      Q.   And when I asked you about that at that
23  time, you told me you didn't know the particulars
24  of that retention policy.
25      Do you remember that?

Page 391

1       A.   That's right.
2       Q.   And you still don't know the particulars
3   of the retention policy; true?
4       A.   That's right.
5       Q.   And Lorena, she didn't tell you that this
6   retention policy was for testing results of the
7   talc for asbestos, did she?
8       A.   I believe you mean Rosina?
9       Q.   Rosina, yes.
10      A.   Correct.
11      Q.   You mentioned earlier, before I started
12  asking you these questions, that you -- you had
13  that understanding that that policy would be.
14      Are you speculating those earlier -- the
15  earlier policy from the earlier 1990s?
16      A.   I'm simply saying that the purpose of a
17  retention policy is to cover the documents that
18  the company uses in the course of its business.
19  I -- I haven't seen them.  I don't know one way or
20  the other whether testing is on there.  I have
21  seen the 1997 schedule, which makes reference to
22  some types of testing.  I'm not able to interpret
23  every category of testing and what that means.  I
24  just know I've seen testing in the '97 schedule.
25      Q.   What I want to do tomorrow so that I

Page 392

1    don't -- I think I've closed that out for now, and
2    I hate to give you homework, but before we start
3    tomorrow, if you could look at those retention
4    schedules so I can ask this question again because
5    I do want to get to the bottom of this, because
6    you're referring to 1997, and you weren't sure
7    when I asked you if those were really regarding
8    talc testing.  So that if you could look at a more
9    recent policy or two in 1997 that would help us
10   and it wouldn't take us very long to get through
11   it at that point as opposed to us slogging through
12   it page by page.
13          Is that something you can do?
14          MR. COX:  Hold on.  First of all, we
15   object to the continuation of this deposition
16   beyond today, and we can talk about that more at a
17   break, Mark.  But we can also talk about whether
18   Mr. Mittenthal can look at what you're asking him
19   to look at, at a break today.
20          MR. SWANSON:  Sure.
21   BY MR. SWANSON:
22   **Q.**  All right.  I want you to look at page 24
23   of your notes, please.
24   **A.  I'm there.**
25   **Q.**  Now, prior to PTI doing the manufacturing

Page 393

1    of the domestic Johnson's Baby Powder, it was done
2    by Royston, is that right, or did it go from -- is
3    that correct?
4    **A.  Well, my general understanding is that**
5    **Royston was the name of a company facility.**
6    **Q.**  And that was in Georgia?
7    **A.  Yes.**
8    **Q.**  And do you know if the Royston facility
9    had any retention policy with respect to any
10   testing that they did for certificates of analysis
11   on the presence of asbestos in the product or in
12   the talc that was coming in?
13   **A.  My understanding was that Royston would be**
14   **part of the company and would be subject to any**
15   **consumer -- consumer retention policies in place.**
16   **Q.**  And Royston did the manufacturing up until
17   2004 or '5 when it went to PTI; is that correct?
18   **A.  Well, Johnson & Johnson did the**
19   **manufacturing at its Royston facility.  That's my**
20   **understanding.**
21   **Q.**  And do you know how far back that went,
22   that Royston did the manufacturing?
23          MR. COX:  Objection.  Beyond the scope of
24   the notice.
25   BY MR. SWANSON:

Page 394

1    **Q.**  Strike that.
2          But if we went from Royston, Johnson &
3    Johnson Royston to PTI in 2004 or '5, we talked
4    about that; right?
5    **A.  Yes.**
6    **Q.**  The question is, do you have any
7    information that at the Royston facility, the
8    manufacturing facility, there was a retention
9    policy as to any testing documents that were being
10   generated by them, or received by them, in other
11   words, generated during manufacturing or received
12   by them in terms of, like, talc supply that they
13   received?
14   **A.  My understanding is that those would have**
15   **been subject to the franchise level retention**
16   **policies that we discussed for which we have '97**
17   **and others, and also, where applicable, subject to**
18   **a legal hold within the appropriate time frames.**
19   **Q.**  Now, going back before Royston,
20   manufacturing was done at New Brunswick; correct?
21   North Brunswick, sorry.
22   **A.  Well, I certainly am not able to speak --**
23   **Q.**  This is at page 24.  I understand.  But
24   obviously -- I mean, we can both agree that you
25   have been hired to act as a representative for

Page 395

1    Johnson & Johnson and you've done certain
2    research.  And so, with that in mind, your notes
3    from your interview with Lorena Telofski at
4    page 24 of your notes indicates that the
5    manufacturing was done at North Brunswick?
6          MR. COX:  Object.
7    BY MR. SWANSON:
8    **Q.**  Correct?
9          MR. COX:  Sorry.  Object to the extent
10   you're seeking to elicit testimony from someone
11   who's not designated about topics as to where the
12   product was manufactured.
13          MR. SWANSON:  These are document issues,
14   Chris.  I'm just trying to get to document issues,
15   since that's what we're talking about.
16          MR. COX:  That's not a document question.
17          THE WITNESS:  She -- I asked her some
18   questions.  This was part of her answer.  I wrote
19   it down.
20   BY MR. SWANSON:
21   **Q.**  Okay.  So from that you understood that
22   the manufacturing went from North Brunswick to the
23   Royston plant; correct?
24   **A.  That's what she indicated.**
25   **Q.**  And some of the manufacturing was done by

Page 396

1  Kolmar Laboratories in Port Jervis, New York;
2  correct?
3          MR. COX:  Object to the form.  Object to
4  the extent it's beyond the scope of the notice.
5  BY MR. SWANSON:
6      Q.  From your notes.
7      A.  That is in my notes.
8      Q.  And that's all we've been talking about.
9  I mean, your understanding from what you learned
10 from talking to people.  I understand you have
11 more expertise about documents and retention and
12 that sort of thing, but all this is information
13 that you've gained from talking to people; right?
14     A.  Well, I wrote down the -- the -- what was
15 elicited during our conversation, so.
16     Q.  So I want to get to the document issues,
17 though.  You see that the -- the North Brunswick
18 plant closed down; correct?  You see down there
19 where it says, "All buildings in North Brunswick
20 have been sold and taken down"?
21     A.  Yes, I do.
22     Q.  What happened to the records that were at
23 North Brunswick?
24     A.  I don't have that information in my notes.
25     Q.  Were they destroyed?

Page 397

1          MR. COX:  Objection.  Asked and answered.
2          THE WITNESS:  I don't know.
3  BY MR. SWANSON:
4      Q.  Now, if you look -- Don -- your notes
5  regarding Don Hicks -- and kind of you could hold
6  on to that Lorena Telofski page 2.  But if you
7  look at page 12.
8      A.  Yes.
9      Q.  You see about six lines down he says,
10 "Responsibility of maintaining records resides
11 with the site doing the work"?
12     A.  Yes.
13     Q.  Okay.  So North Brunswick had the
14 responsibility for those records; correct?
15     A.  I can only infer that from -- from
16 Mr. Hicks' comment.  I don't know that as a fact,
17 but it could be inferred.
18     Q.  Do you know what year that that happened,
19 that the North Brunswick buildings were taken
20 down?
21     A.  No.
22     Q.  Do you know -- from your notes I see that
23 they were doing testing at the manufacturing
24 facilities; correct?
25          MR. COX:  Object to the form.

Page 398

1          THE WITNESS:  Can you cite me to a place
2  in my notes for that?
3  BY MR. SWANSON:
4      Q.  I lost the cite, but I know that that was
5  done.  Let me see if I can find it that they had
6  testing records.
7          I saw this at page 24 and I apologize.
8  I'm not...
9          Oh, you see at 24, it says -- you see the
10 reference to "PO, specs, test records, quality
11 SOPs," about two-thirds of the way down?
12     A.  Yes.
13     Q.  And that's -- those are records regarding
14 these facilities that were manufacturing; is that
15 right?
16          MR. COX:  Object to the form.
17 BY MR. SWANSON:
18     Q.  You see below that "testing both for
19 what's in it, what's not in it, purity, et
20 cetera"?
21     A.  Absolutely.  Although I'm not -- it's not
22 clear whether Ms. Telofski is talking about
23 Kolmar, North Brunswick, or Georgia in this -- in
24 this portion.
25     Q.  But they are talking about manufacturing

Page 399

1  plants having -- and it also says "certificate of
2  conformance and basic testing on inbound talc."
3  So they're receiving testing records and
4  generating their own at manufacturing facilities;
5  right?
6      A.  That's my interpretation of her comment.
7      Q.  Okay.  And, as you sit here today, you
8  don't know what happened with those testing
9  records from North Brunswick, New Jersey plant
10 when that was -- when that manufacturing operation
11 was transferred, or when the buildings were taken
12 down; true?
13     A.  Correct.
14     Q.  And I think Mark Zappa at the bottom of
15 page 17, he said -- this is just sort of -- at
16 page 17, he says that the shipments of talc had to
17 have a certificate analysis of them that came in.
18 Let me see if I can find that.
19          You see the certificate of -- oh, it says,
20 "Certificate of analysis would include test for
21 asbestos."
22          MR. COX:  Object to the form.
23 BY MR. SWANSON:
24     Q.  Do you see that?
25     A.  Yes, I do.

1    Q.  From Lorena Telofski's notes, it would
2  appear that these manufacturing facilities
3  receiving testing records and generating their
4  own, that would have included the Kolmar facility,
5  too; correct?
6        MR. COX:  Object to the form.  Beyond the
7  scope of the notice.  Other than what's in his
8  notes.
9  BY MR. SWANSON:
10   Q.  Page 24.
11   A.  Oh, thank you.  I can't confirm that --
12 which facilities she's talking about, as I
13 mentioned, whether it's Kolmar, North Brunswick,
14 or Georgia, or all of them.
15   Q.  And again, I understand that you're not
16 here as the PMQ on where all the manufacturing
17 sites were, but these are all records questions.
18 I'm just asking a foundational question here.
19      Do you know when Kolmar Laboratories
20 started and during what period of time it was
21 manufacturing Johnson's Baby Powder?
22      MR. COX:  Objection.  Beyond the scope of
23 the notice.
24 BY MR. SWANSON:
25   Q.  And if you don't know, that's fine.

1    A.  I don't know.
2    Q.  Okay.  And do you know whatever records it
3  had regarding certificates of analysis, testing
4  records for asbestos, manufacturing
5  specifications, those sorts of records, do you
6  know how they were archived at that facility?
7    A.  I have a general comment from Ms. Telofski
8  that there was material put into, I believe it was
9  Iron Mountain, but I'm not sure which -- which
10 materials she is referring to.
11   Q.  And where is that?
12   A.  Looking on page 2.  Let me see if I can
13 find it.  Oh.  She was talking about APRs, so I
14 know that some of records she referenced are in
15 Iron Mountain.  I don't know which other ones
16 besides the APRs.
17   Q.  APRs is authorization for product release?
18   A.  Yes.
19   Q.  That's not testing records, is it?
20   A.  Not that I'm aware of.
21   Q.  And it says it includes formula safety.
22      Do you know what plant that is applying to
23 or what plants?
24   A.  Well, the discussion at that time was
25 about Skillman, but I don't know the scope of what

1  was stored in Iron Mountain under her
2  jurisdiction.
3    Q.  Okay.  So as to Kolmar, let me get back to
4  the question, do you know at the Kolmar
5  manufacturing packaging facility what they did
6  with respect to the retention and archiving of
7  records?
8    A.  No.
9    Q.  And do you know when that facility no
10 longer was manufacturing Johnson's Baby Powder,
11 what it did with whatever records it had?
12   A.  No.
13   Q.  Were those records destroyed?
14      MR. COX:  Objection.  Asked and answered.
15   THE WITNESS:  I don't know.
16 BY MR. SWANSON:
17   Q.  I touched on this earlier, but I want to
18 go into this just briefly:  Do you have any
19 information regarding the Johnson & Johnson's
20 policies, if any, with respect to what are called
21 "grids" associated with transmission electron
22 microscopy testing?
23      MR. COX:  Objection.  Asked and answered.
24   THE WITNESS:  I don't --
25 BY MR. SWANSON:

1    Q.  I apologize if I asked.  But --
2    A.  I don't have information on grids.
3    Q.  Do you have information with respect to
4  what the current retention schedule period is for
5  talc samples?  And that would be talc ore, milled
6  talc, or baby powder samples that are tested?
7    A.  My understanding is based on the legal
8  hold notice, which is -- which is -- specifies
9  that samples are to be retained.
10   Q.  And the legal hold notice -- now, there's
11 been a sequence of legal hold notices going back
12 to 1999, correct, with respect to talc litigation?
13   A.  Yes.
14   Q.  Okay.  And is it your understanding that
15 those -- that's essentially been continuously in
16 effect since 1999 with respect to anything that
17 was under that original hold?
18   A.  I read each of the notices.  They have
19 descriptions of subject matter.  I've noted that
20 those subject matter descriptions have evolved
21 over time.
22   Q.  Okay.  But with respect to samples.  And
23 we will talk a little bit more about holds.  But
24 just -- well, let me -- let me get off of that and
25 just stay on the retentions for a second.

Page 404

1        I noticed in Exhibit 2D, or Tab 2D, which
2    is Exhibit 2D, the PTI agreement appeared to be
3    for retention of talc samples for four years.  And
4    perhaps we should look at that and I'll ask you
5    about that.  And that's at page 9 of 2D.  Oh, we
6    get into this page issue with this, don't we?
7        Did you see it in there?
8        A.  Yes.  7 of 16 and below that, 9 of 19.  So
9    it's Section 12.4.
10        Q.  Okay.  And what is the -- first of all,
11    what samples is this referring?  This is --
12    these are product samples that they're referring
13    to?
14        A.  Yes.  So this -- this Section 12.4 falls
15    under 12.0 product controls, which relate to the
16    identification sampling and testing of finished
17    product.
18        Q.  Okay.  And so the retention on finished
19    product was for what period?
20        A.  Four years from date of manufacture or one
21    year after expiration date.
22        Q.  What's the -- that's the expiration date,
23    for example, that you'd see on the actual bottle
24    or container?  Is that what that refers to?
25        A.  I don't know.

Page 405

1        Q.  What's the date of this quality system
2    procedure or quality responsibility agreement?
3        A.  February 2005.
4        Q.  Do you know -- at this point in 2005,
5    there had already been talc litigation hold in
6    place as early as 2' -- sorry, 1999.
7        Do you know if it affected this retention
8    as to the talc that was -- the Johnson -- the baby
9    powder that was being manufactured by Pharma Tech
10    Industries in 2005?
11        MR. COX:  Object to the form.
12    BY MR. SWANSON:
13        Q.  In other words, did the legal hold sort of
14    suspend this policy?
15        MR. COX:  You're asking as to the samples
16    described in that document?
17        MR. SWANSON:  Yes.
18        THE WITNESS:  I'm -- I would want to check
19    the legal holds.  I'm not aware that the holds in
20    that time referred to samples.
21    BY MR. SWANSON:
22        Q.  Okay.  Do you have any information other
23    than -- and we'll get to the legal holds shortly.
24        Do you have any other information in terms
25    of retention policies with respect to retention of

Page 406

1    talc samples, either, you know, the talc ore or
2    the milled talc that may have been tested on a
3    quarterly or some other basis, or of actual
4    product test -- finished product test samples?
5        A.  I have a general understanding that
6    samples -- that the universe of samples comprised
7    those that were associated with a batch or a lot
8    and retained in accordance with -- with the
9    company's retention schedules.
10        As a second category was samples that were
11    used specifically for testing purposes, and those
12    samples were not retained until the last year.
13        And a third category would be historical
14    samples that would be obtained from the museum and
15    other sources.
16        Q.  Thank you for that answer.
17        So I think that was pretty clear.  So let
18    me just -- as to the samples related to testing of
19    the talc, you said until a year ago those were not
20    retained; correct?
21        A.  That's correct.
22        Q.  So they were destroyed?
23        A.  The samples used specifically for creating
24    test results were not retained.
25        Q.  Okay.  And now they are being retained?

Page 407

1        A.  Yes.
2        Q.  And do you know why that policy was
3    changed in the last year?
4        A.  My understanding is that within the past
5    year a request was made to the testing body to
6    retain that information.
7        Q.  And what testing body is that?
8        A.  Well, that would include RJ Lee, anyone
9    else doing testing.
10        Q.  Okay.  So --
11        MR. SWANSON:  Do you want one last break?
12        MR. COX:  Sure.
13        MR. SWANSON:  And then we'll go until the
14    end of the day?
15        MR. COX:  Yeah.
16        MR. SWANSON:  And if we need to discuss
17    anything, we can discuss it.
18        MR. COX:  Sounds good.
19        MR. SWANSON:  Let's go off the record.
20        THE VIDEOGRAPHER:  This marks the end of
21    Media Number 4 in the deposition of James
22    Mittenthal.
23        Going off the record at 4:13 p.m.
24        (Recess taken.)
25        THE VIDEOGRAPHER:  On the record at

Page 408

1  4:49 p.m.  This marks the start of Media Number 5
2  in the deposition of James Mittenthal.
3          You may continue, Counsel.
4  BY MR. SWANSON:
5      Q.  Okay, Mr. Mittenthal, I'm going to try to
6  be real efficient here for the rest of the part of
7  the day that we have, and we're going to get into
8  talking about holds now which we've touched on a
9  few times, but I want to go over some information
10  about that.
11          THE VIDEOGRAPHER:  Is your microphone on?
12      Okay.
13  BY MR. SWANSON:
14      Q.  So, in the most basic sense, a legal hold
15  is an instruction to custodians or possessors of
16  certain kinds of specified documents to preserve
17  them and not destroy those documents as long as --
18  documents and information as long as the hold is
19  in effect; is that correct?
20      A.  I would agree.
21      Q.  And a hold stays in effect until a hold --
22  a release notice is issued; is that right?
23      A.  I would generally agree.  There may be
24  other circumstances besides a release by which a
25  receiver of a hold could be relieved of that

Page 409

1  obligation.
2          But certainly the counterpart to a hold is
3  a release.
4      Q.  Okay.  And you've got -- you've prepared a
5  history of holds, which is Exhibit 21; correct?
6      A.  Is that -- just make sure I've got my
7  version in front of me somewhere.
8      Q.  You should have your copy there.  I know
9  you've got a lot of stuff.  You know, maybe we can
10  get some of your things there out of the way and
11  put them in a stack.
12      A.  Here it is.
13      Q.  Okay.  So Exhibit 21 is a list of Johnson
14  & Johnson holds with respect to talc litigation
15  that you've compiled; correct?
16      A.  Yes.
17      Q.  Okay.  And the first one that you've got
18  there is Theresa Krushinski on November 11, 19199,
19  and that was a talcosis case; correct?
20      A.  Yes.
21      Q.  And then the next one you've got is 2000,
22  which is a mesothelioma case; correct?
23      A.  Yes.
24      Q.  And both Johnson & Johnson's Baby Powder;
25  true?

Page 410

1      A.  Johnson's Baby Powder.
2      Q.  Sorry.  Johnson's Baby Powder.  And I
3  think the third one listed there is 2003, the
4  Hozeny case.
5          Do you see that?
6      A.  Yes.
7      Q.  And I know that's been produced to us.
8  Let me find this.  At Exhibit 1B.
9          Do you have that with you?  Oh, it's in
10  your -- those exhibits are marked per tab.
11      A.  Okay.
12      Q.  Exhibit 1B.  So in Exhibit 1, you have
13  several holds and then some were produced after
14  that.  And you see there, in that hold, this was
15  hold notice issued by the legal department;
16  correct?
17      A.  Yes.
18      Q.  And this puts folks on notice in the
19  company that if you fail to preserve materials
20  that are under a hold, it can result in the court
21  imposing penalties or sanctions; right?
22      A.  Yes.
23      Q.  Now, you had previously testified that you
24  had acted as consultant and a witness in the
25  Ethicon litigation for Johnson & Johnson; correct?

Page 411

1      A.  Consultant and a witness meaning the
2  same -- the same role?
3      Q.  Yeah.  In the same -- in the Ethicon
4  litigation.  Yeah.  In other words, you were a
5  witness and you were also their consultant in that
6  litigation; true?
7      A.  I was a witness.
8      Q.  A witness.
9      A.  Not a --
10      Q.  Were you working?  Were you hired by
11  Johnson & Johnson?
12      A.  I was hired to be a 30(b)(6) only.
13      Q.  Okay.  All right.  And you testified in
14  the case; right?
15      A.  Yes.
16      Q.  And you know that there was an allegation
17  by the plaintiffs in the case that there was a
18  failure to preserve evidence that had been subject
19  to a hold; right?
20      A.  I -- I recall that those issues arose,
21  yes.
22      Q.  And you investigated that issue; correct?
23      A.  Yes.
24      Q.  And you gave a deposition about it?
25      A.  Yes.

Page 412

1      Q.  And you discovered through your
2  investigation something you testified about that
3  potentially responsive documents and information
4  were destroyed that had been subject to a hold;
5  correct?
6          MR. COX:  Object to the form.  Object that
7  this is beyond the scope of the notice.
8          THE WITNESS:  I investigated and I
9  testified as to certain occasions where I had
10 observed custodians not preserving materials that
11 they could have.
12 BY MR. SWANSON:
13     Q.  And those materials were materials that
14 were under holds at the time; correct?
15     A.  Yes.
16     Q.  Have there been any -- have there been any
17 issues of loss with respect to talc litigation by
18 Johnson & Johnson that have not been disclosed to
19 plaintiffs that you're aware of from your work in
20 these talc cases?
21     A.  I'm not.
22     Q.  Now, we've talked about hold release
23 notices.  You said that was one way that hold
24 would no longer be in effect.  What's the other
25 way that a hold would no longer be in effect if it

Page 413

1  wasn't pursuant to a hold release being issued by
2  the legal department?
3      A.  There could be a direct communication with
4  the custodian saying this is not something that's
5  required anymore.  There could be circumstances
6  that -- that result in the obligation for the
7  custodian going away.
8      Q.  Have you -- we haven't received any -- or
9  in this case that I've seen, no legal hold
10 releases were produced.
11         Are you aware of any Johnson & Johnson
12 talc litigation legal hold releases that have been
13 issued?
14     A.  I'm not.
15     Q.  Are you aware of any of the holds having
16 been any -- any custodians having been released
17 from any of the talc litigation holds that have
18 been issued since 1999?
19     A.  No.
20     Q.  And is it fair to say that each of the
21 holds that you've documented starting in 1999
22 through 2017 has essentially been incorporating
23 whatever was already under a hold pursuant to the
24 prior hold and then adding some more details to
25 it; is that -- is that correct?

Page 414

1          MR. COX:  Object to the form of the
2  question.
3          THE WITNESS:  Well, to my recollection,
4  the 2017 holds serve to -- serve that function to
5  gather earlier holds.  The holds between 1999 and
6  2017 refer to specific cases.
7  BY MR. SWANSON:
8      Q.  Okay.  Now, you said that you weren't
9  aware of any releases of those holds.  So, even
10 though those holds refer to specific cases, they
11 weren't released or no longer in effect just
12 because those cases ended, were they?
13         MR. COX:  Object to the form.
14     THE WITNESS:  As I mentioned, I hadn't
15 seen any releases of those -- of those holds.
16 BY MR. SWANSON:
17     Q.  I understand that.  But it's an additional
18 question, which is, were those holds still in
19 effect on Johnson & Johnson that had been issued
20 in specific cases even after the issues of the
21 case resolved?
22     A.  Well, the -- the instructions were -- were
23 still out there.  In terms of the legal
24 obligation, I can't speak to that.  That's a legal
25 determination.  The holds themselves had not been

Page 415

1  subject to releases.
2      Q.  Earlier you mentioned that the holds were
3  related to, I think you said something like
4  consumer talc or something like that.
5          Are there -- are there releases related to
6  other kind of talc -- not releases.  Are there any
7  litigation holds that were ever put on Johnson &
8  Johnson's businesses with respect to any other
9  type of talc, like industrial talc, that you're
10 aware of?
11     A.  I'm not aware.  I specifically requested
12 consumer talc holds as being reflective of my
13 obligations under the notice.  I'm not aware of
14 other holds.
15     Q.  Okay.  And you've asked -- you've asked
16 witnesses about holds, is that correct, people
17 that you've spoke to?
18     A.  The -- the interview subjects, the topic.
19 Not in every case but in some cases, it did come
20 up.
21     Q.  Did you ask them if -- did you ask -- did
22 you do anything to audit whether or not they were
23 complying with holds?
24     A.  I -- I did not see a compliance audit as
25 part of my investigation.  I asked in some cases

Page 416

1  the records personnel about the mechanism for
2  holds.  I did not personally audit any compliance.
3     Q.  Did you audit any of the cleanout?
4  Remember, we talked about the annual cleanout
5  procedure.  Did you audit any cleanout notices or
6  documents documenting the cleanout procedures to
7  see if any records had been destroyed that were
8  under legal holds or retention schedules?
9     A.  No.  That was not part of my
10 investigation.
11    Q.  Now, the 1999, let's start with the first
12 one here.  Let me see if I can locate this.  Here
13 we go.
14        (Whereupon, Plaintiff's Exhibit 32 was
15     marked for identification.)
16 BY MR. SWANSON:
17    Q.  I'm handing you Exhibit Number 32 to your
18 deposition.  And for the record, what is
19 Exhibit 32?
20    A.  A document preservation notice dated
21 November 11, 1999.
22    Q.  And that's the one in the Krushinski case;
23 correct?
24    A.  Yes.
25    Q.  And that is the first one that you're

Page 417

1  aware of; true?
2     A.  Yes.
3     Q.  And this one was directed as pertaining to
4  Johnson's Baby Powder.  It says that on the second
5  page of this.  And it says on the first page that
6  it just -- in the first paragraph there it says
7  "JJCP" --
8         That would be Johnson & Johnson Consumer
9  products; is that right?
10    A.  That's my read.
11    Q.  -- "is party to a lawsuit involving
12 allegations of manufacturing or design defect or
13 failure to warn in connection with the below
14 product."  And it mentions Johnson's Baby Powder.
15        To which companies, Johnson & Johnson
16 companies, operating units, divisions was this
17 document preservation notice directed?
18    A.  It's not specified.
19    Q.  Do you have any information as to this
20 hold whether or not it applied, for example, to
21 operating units overseas such as in Hong Kong and
22 the Philippines?
23    A.  I don't have information as to who it was
24 distributed to.
25    Q.  Do you know any of the individual

Page 418

1  recipients of this hold notice?
2     A.  That was not part of my investigation.
3     Q.  Does that information still exist as to
4  who the recipients were of the hold in 1999?
5     A.  I don't know.
6     Q.  In 1999, what was the policy of Johnson &
7  Johnson with respect to distribution of holds, if
8  it had one?
9     A.  I can check my notes with respect to that.
10 I'm noting on page 34 in the Renay Lawson section,
11 simply that Renay would send holds and releases as
12 directed by legal and upload to Web site.  Had
13 different distribution lists.
14    Q.  And she had been there since 2009;
15 correct?  It says nine years --
16    A.  Okay.
17    Q.  -- at Consumer.
18        This is Renay Lawson, the records
19 information management lead; right?
20    A.  Yes.
21    Q.  Okay.
22    A.  I have further information on page 36 from
23 Rosina Sheerin that both she and Renay would send
24 hold notices at different times and that they
25 maintained distribution lists based on a cover

Page 419

1  page.
2     Q.  Okay.  And do you know if those
3  distribution lists still exist?
4     A.  I know that I have seen distributions on
5  some of the hold notices.
6     Q.  Okay.  And we're going to go through each
7  one in a little bit, so we'll get to that, if
8  there's a distribution list.
9         With respect to 1999 Krushinski case hold,
10 you don't have a distribution list for that, do
11 you?
12    A.  Correct.
13    Q.  And again, as the Johnson & Johnson's
14 representative on this issue, this is the first
15 talc litigation hold that was issued in 1999;
16 correct?
17    A.  Consumer talc.
18    Q.  Consumer talc.
19        All right.  So you're not aware of any --
20 well, let me ask you this way:  And not to get off
21 on another sort of substantive issues too much.
22 But do you have information that there were holds
23 related to talc that wasn't consumer talc?
24    A.  No.
25    Q.  If you look at your binder there, Tab 1C.

Page 420

1  This is the January 7, 2000 document preservation
2  notice in the Barbara Bloch case.
3        Do you see that?
4      A.  Yes.
5      Q.  And this was, says "JJCPI, et al. is a
6  party to a lawsuit involving allegations of
7  manufacturing or design defect or failure to warn
8  in connection with the below product."
9        And, again, this is in regards to the
10  Johnson's Baby Powder; true?  It's on the next
11  page there?  Oh, you've got it in your summary.
12      A.  Yes.  Yes.
13      Q.  And by the way, just to make this clear on
14  the record, "document preservation notice" means
15  the same thing as a legal hold notice; correct?
16      A.  Generally, yes.
17      Q.  And Johnson & Johnson at some point just
18  changed the language that they used to refer to
19  it?  They called it -- later they called it a
20  "legal hold notice"; true?  We can get to those
21  later.
22        So, as far as this one, do you know who --
23  which operating units or companies of Johnson &
24  Johnson received that, whether or not it was
25  anybody beyond just Johnson & Johnson Consumer

Page 421

1  Products, Inc.?
2      A.  I do not.
3      Q.  Okay.  And do you know to whom -- what
4  individuals received this notice?
5      A.  I do not.
6      Q.  Do you have any information about what
7  training was done of individuals about how to
8  effectuate this notice?
9        MR. COX:  Object to the form.
10        THE WITNESS:  I have a general
11  understanding from the records officer that there
12  was training in the records program and that that
13  included legal hold instructions.
14  BY MR. SWANSON:
15      Q.  And did you say "records manager"?
16      A.  Training in records management issues.
17      Q.  Who was it that you were speaking to about
18  that issue?
19      A.  Possibly Lisa Kaiser.  Let me...
20      Q.  Before I make you look that up -- and if
21  you need to look it up to get into the heart of
22  it, what did she tell you about what the training
23  was?
24      A.  Actually, I'm looking at the Joann Dodd
25  information.

Page 422

1      Q.  Can you give me a page number on that,
2  please?
3      A.  Oh, yes.  29.  Sure.
4        So Ms. Dodd spoke about the training that
5  was -- that was provided.
6      Q.  Can you direct me to that, please?
7      A.  Yes.  The bottom of -- near the bottom of
8  page 1.  "Training included legal hold, departing
9  associates, retention procedures, roles."
10      Q.  And she was the -- she is this analyst
11  records management, J&J Consumer, Inc.; right?
12      A.  Yes.
13      Q.  And do you know -- she started in 2007 or
14  '8?
15      A.  Yes.
16      Q.  Do you know at what point those -- the
17  training started that she's referring to?
18      A.  Not the exact start date, no.
19      Q.  And do you know how -- do you have any
20  information about how far that training goes back
21  and whether there was any training in the year
22  2000 at the time of the Barbara Bloch case?
23      A.  I don't have specifics on that.
24      Q.  At Tab 1B there's a hold in the Hozeny --
25  Hozeny case versus Johnson & Johnson Consumer

Page 423

1  Companies, Inc.
2        Do you see that?
3      A.  Yes.
4      Q.  And, again, this is called the "document
5  preservation notice."  The date is May 16, 2003.
6        And this is Exhibit 1B, for the record.
7        And what was -- this looks similar to
8  the '99 and 2000 holds that we've seen.  But does
9  it -- it looks like it may add something
10  additional.  Can you tell me what is the subject
11  of this hold?
12      A.  You mean what is the -- the --
13      Q.  Well, what product was at issue and --
14      A.  It generally referred to talc products.
15      Q.  And the basic language is the same,
16  correct, of the hold?  As the holds we had
17  discussed for the 1999 and 2000 cases?
18        MR. COX:  Object to the form.
19  BY MR. SWANSON:
20      Q.  But then you get to the details of what
21  materials are to be held, and there's a bit more
22  detail.  It's fleshed out a bit more; correct?
23      A.  The language has evolved.  There are eight
24  categories as opposed to four categories with
25  earlier notices.  It is -- it is somewhat

Page 424

1  different.
2      Q.  We had earlier -- I should hit on this now
3  so I don't forget, but we had talked about talc
4  samples.  And in this 2003 hold looking at the
5  list of materials that were subjects -- subject
6  matters of documents to be preserved, did that
7  include talc samples in 2003?
8      A.  I do not believe it did.
9      Q.  Okay.  And just looking back quickly on
10  this, the 1999 and 2000, those didn't include --
11  wouldn't include talc samples either; correct?
12      A.  There is references to information about
13  samples, not samples themselves.
14      Q.  Okay.  Can you point me to that, under
15  which?
16      A.  Under Section 4 in both the '99 and the
17  2000 documents.
18      Q.  But not the samples themselves; true?
19      A.  Correct.  And only those records about the
20  samples pertaining to the event.
21      Q.  And the 2003 legal hold in the Hozeny
22  case, and I apologize if I asked this, do you know
23  if this applied to any overseas operating
24  companies of Johnson & Johnson, like Johnson &
25  Johnson Philippines or Johnson & Johnson Hong

Page 425

1  Kong?
2      A.  My general understanding is that it did
3  not.
4      Q.  And your general understanding as to it
5  not applying, would that be the same as to the
6  1999 and 2000 holds, too?
7      A.  Yes.
8      Q.  And what's the source of that
9  understanding?
10      A.  That information came from counsel.
11      Q.  Okay.  And I believe the next hold is a
12  2009 hold; is that correct?
13      A.  Yes.
14      Q.  You have a copy of that with you?  I know
15  I have it here somewhere.
16      MR. COX:  I have extra copies if you need.
17      MR. SWANSON:  That would be great, thanks,
18  Chris.  I'm sorry -- oh, wait.  Is this it?  I've
19  got it.  Yeah.  Okay.  Good.  I have it.  Thank
20  you.
21      Okay.  I have marked as Exhibit 33 to your
22  deposition this hold in the Berg case.
23      (Whereupon, Plaintiff's Exhibit 33 was
24  marked for identification.)
25  BY MR. SWANSON:

Page 426

1      Q.  Can you take a look at that and, just for
2  the record, is that the Deane Berg v. Johnson &
3  Johnson Consumer Companies, et al. hold dated
4  December 15, 2009?
5      A.  Yes.
6      Q.  And that's Exhibit 33.  And this hold
7  again is with respect to Johnson & Johnson's Baby
8  Powder and this time it also specifically
9  references Shower to Shower powder; right?
10      A.  Yes.
11      Q.  And Shower to Shower is another cosmetic
12  talc product that Johnson & Johnson made; true?
13      A.  At the time, yes.
14      Q.  And this one in 2009 we get quite a bit
15  more detail; correct?
16      A.  Yes.
17      Q.  And there's even, it looks like a
18  distribution list, is that right, in terms of what
19  units it's distributed to?
20      A.  Yes.
21      Q.  And it indicates here in the units that
22  this legal hold were issued to is -- are
23  identified that they're checked and it looks like
24  they're also highlighted in yellow; true?
25      A.  I see that, yes.

Page 427

1      Q.  And that includes Johnson & Johnson
2  Consumer Companies, Inc.; Johnson & Johnson
3  Consumer and Personal Products Worldwide, Division
4  of Johnson & Johnson Consumer Products, Inc.  Then
5  it says Johnson & Johnson Corporate, Corporate
6  Communications, and then also under Corporate
7  Consumer and Personal Care and Quality and
8  Compliance World -- is that "Worldwide"?  WW?
9      A.  Yes.
10      Q.  This notice was not issued to Johnson &
11  Johnson Philippines, was it?  Or Johnson & Johnson
12  China?
13      A.  No.
14      Q.  Okay.  Do we -- do you know who the
15  individuals -- do you know -- there are identified
16  Johnson & Johnson operating units and companies
17  that were issued this legal hold notice.  Do you
18  know what individuals received it other than those
19  listed as receiving this document on the first
20  page, it looks like?  And there's about, what,
21  15 -- 15 to 20 individuals there listed.
22      Do you see that?
23      A.  Yes.  It would be under "attachments"?
24      Q.  Yeah.
25      A.  "Cc."

Page 428

1      Q.  Well, there's only, I guess, about --
2  well, under "attachment," those are people who
3  received this document preservation notice; is
4  that right?
5          MR. COX:  Object to the form.
6          THE WITNESS:  I'm sorry.  One more time,
7  please.
8  BY MR. SWANSON:
9      Q.  Under -- next to "cc," where it says the
10 people who were copied, they received this;
11 correct?
12     A.  Yes.
13     Q.  Okay.  What about the other people in the
14 right -- more to the right column?  Did they
15 receive it?  What are they listed as here?  Or do
16 you have an understanding.
17     A.  Well, I would just generally conclude that
18 this is a long cc list and they -- there is no --
19 it appears to be in alphabetical order starting
20 with Braunreuther going up to Will -- Will Wiley.
21     Q.  Do you know of anybody -- do you know of
22 any other individuals received this notice other
23 than these indicated here?
24     A.  Well, the recipients of the communication
25 were Debbie Staneruck and Edith Mendez, and they

Page 429

1  were directed to distribute the notice companywide
2  to the attached companies as well as anyone else
3  that they may understand might be knowledgeable of
4  these issues.
5      Q.  Okay.  And when you say "distributed
6  companywide," do you know in 2009 -- strike that.
7          The next one that I want to ask you about
8  is -- there were three different holds in 2014.
9          Have you seen those?
10     A.  Yes.
11     Q.  Okay.  And that would be the Chesteen
12 case, Estrada, and the State of Mississippi;
13 right?
14     A.  Yes.
15     Q.  And these were all issued as a result of
16 lawsuits against Johnson & Johnson Consumer
17 Companies, Inc.?
18     A.  That's my understanding.
19         MR. SWANSON:  Okay.  I'm not going to
20 spend much time on these, but I do want to get
21 them marked and attached.
22         So 34 will be the hold in the Chesteen
23 case.
24         (Whereupon, Plaintiff's Exhibit 34 was
25         marked for identification.)

Page 430

1          MR. SWANSON:  35 will be the hold in the
2  Estrada case.
3          (Whereupon, Plaintiff's Exhibit 35 was
4          marked for identification.)
5          MR. SWANSON:  And 36 will be the 2014 hold
6  in the State of Mississippi v. Johnson & Johnson
7  and Johnson & Johnson Consumer Companies, Inc.
8  case.
9          (Whereupon, Plaintiff's Exhibit 36 was
10         marked for identification.)
11 BY MR. SWANSON:
12     Q.  And, again, if you look at these, and you
13 can go ahead and look at them, each of these
14 notices in 2014, they relate -- related to
15 Johnson's Baby Powder and Shower to Shower
16 products; correct?
17     A.  Well, Estrada is only baby powder.
18     Q.  Okay.
19     A.  The other two from 2014 mention both
20 products.
21     Q.  Okay.  Thank you.
22         And, again, there's a recipient or a
23 distribution list in terms of what operating units
24 or companies received this, correct, these three
25 holds?

Page 431

1      A.  Well, this is a sector-based distribution.
2      Q.  Okay.  And these were just domestic
3  companies that received these holds; correct?
4      A.  Yes.
5      Q.  So this was not issued to Johnson &
6  Johnson Philippines or Johnson & Johnson Hong
7  Kong; correct?
8      A.  Correct.
9      Q.  Or Johnson & Johnson Korea, correct, if
10 there was a Johnson & Johnson --
11     A.  Correct.
12     Q.  -- Korea at that time?
13         MR. SWANSON:  And then finally we have
14 here a 2017 hold, which we'll mark as Exhibit 37.
15         (Whereupon, Plaintiff's Exhibit 37 was
16         marked for identification.)
17 BY MR. SWANSON:
18     Q.  I'll go ahead and hand you that one.  And
19 this is what you've referred to in Exhibit 21 your
20 summary list of holds as talc asbestos.  You say
21 "PL litigation."
22         What does that stand for?
23         MR. COX:  Object to the form.
24         THE WITNESS:  My understanding is that
25 that is a product liability.  But this is not that

Page 432

1    one.
2    BY MR. SWANSON:
3        Q.  Oh, this isn't.  Okay.  Well, this is the
4    talc ovarian cancer litigation hold that I handed
5    you; correct?
6        A.  Yes.
7            MR. SWANSON:  Chris, do you have a copy of
8    this other one?
9            MR. COX:  It should be in the binder, 1C.
10           MR. SWANSON:  Thank you.
11           MR. COX:  Sure.
12           MR. SWANSON:  Appreciate that.
13   BY MR. SWANSON:
14       Q.  Well, let's just -- since I've attached
15   this 37, this legal hold, was it -- that's
16   attached as 37 as a talc ovarian cancer litigation
17   hold; correct?
18       A.  Yes.
19       Q.  Do you know what year -- is this the
20   current -- this is the current one?
21       A.  This is the most recent one for ovarian
22   cancer of which I'm aware.
23       Q.  Okay.  And if you look at Exhibit 1A to
24   your deposition, which is Tab 1A, we can go to the
25   one that you referred to in your list as the talc

Page 433

1    asbestos litigation hold.
2            Do you have that in front of you?
3        A.  Yes, I do.
4        Q.  Is this the current legal hold for talc
5    asbestos litigation?
6        A.  This is the most recent one I've received
7    that I'm aware of.
8        Q.  And I don't know if you use this word, but
9    I think you indicated earlier that your
10   understanding was this was sort of an attempt to
11   consolidate the various holds; is that right?
12       A.  With respect to those mesothelioma-related
13   matters, yes.
14       Q.  Now, in terms of what information is being
15   held either under ovarian talc litigation hold or
16   a case that was a talcosis case like the
17   Krushinski case, these are all holds since 1999
18   that we're talking about that are related to the
19   Johnson & Johnson's Baby Powder and Shower to
20   Shower; correct?
21       A.  Yes.
22       Q.  And -- so in terms of the sort of universe
23   of documents, types of documents and records that
24   would be held, it's pretty much the same universe,
25   correct --

Page 434

1            MR. COX:  Object to the form.
2    BY MR. SWANSON:
3        Q.  -- from what your evaluation of these
4    holds has been in terms of looking at what records
5    and information are supposed to be held?
6            MR. COX:  Object to the form.
7            THE WITNESS:  I -- I would concur that the
8    body of documents being held generally relates to
9    both families of cases.  I would not agree that
10   every document from one family is connected to the
11   other family of cases.  I -- I'm not competent to
12   decide that, but they are being held.  Both --
13   both sets of holds concern a body of information.
14   BY MR. SWANSON:
15       Q.  Right.  And the body of information is
16   about -- in terms of what's actually being held,
17   people are being instructed to hold and preserve,
18   it's essentially almost the exact same body of
19   information; correct?
20       A.  Yes.
21           MR. COX:  Object to the form.
22   BY MR. SWANSON:
23       Q.  Okay.  Now, the 2017 talc asbestos
24   litigation hold is the first one that specifically
25   references talc, but there were prior holds that

Page 435

1    were issued in cases where the injury being
2    alleged was mesothelioma; correct?
3        A.  I'm sorry.  The first one that references
4    talc?
5        Q.  No.  Did I say that?  If so.
6            It's the first one that specifically
7    references asbestos; is that right?  From what you
8    saw?
9        A.  You know, I don't recall that.  I did not
10   look for the word "asbestos" in earlier holds.
11       Q.  Okay.  But in any case, regardless, the
12   2000 and 2002 to 2003 holds were done in cases
13   where there was an allegation of mesothelioma by
14   the plaintiff; right?
15       A.  Yes.
16       Q.  And this talc asbestos litigation hold,
17   the current one that we have here, or the most
18   recent one you're aware of, what Johnson & Johnson
19   entities is that one directed to?
20       A.  This hold notice is directed at individual
21   custodians rather than specific entities.
22       Q.  And is there a list of custodians anywhere
23   that you've seen that this is directed to?
24       A.  Not that I've seen.
25       Q.  Have you -- do you have information about

Page 436

1  at which Johnson & Johnson -- you know, operating
2  units, subsidiaries, divisions, companies -- at
3  which of those companies individuals were
4  recipients of this current hold notice?
5      **A.  Only that the legal department has made a**
6  **determination of the appropriate custodians to**
7  **deliver the notice to.**
8      Q.  Do you know if any of those custodians are
9  at Johnson & Johnson Philippines?
10     **A.  Yes.**
11     Q.  Okay.  And as far as you -- and who is
12 that individual or individuals at Johnson &
13 Johnson Philippines?
14     **A.  I -- I'm not aware.**
15     Q.  But you got information from some source
16 that Johnson & Johnson -- somebody at Johnson &
17 Johnson Philippines received this notice; is that
18 correct?
19     **A.  Yes.**
20     Q.  And what's the source of that information?
21     **A.  You mean how did I learn that?**
22     Q.  Yes.
23     **A.  From counsel.**
24     Q.  Okay.  And based on our review of the
25 prior notices, was this the first notice that

Page 437

1  Johnson & Johnson issued legal hold notice for
2  talc litigation issued to Johnson & Johnson
3  Philippines?
4      **A.  It's the first I'm aware of.**
5      Q.  Now, you saw in the 2014, in the prior
6  ones going back, there was no indication that it
7  went to Johnson & Johnson Philippines.  In fact,
8  the distribution list from 2014 and 2009
9  specifically showed that it was not distributed to
10 Johnson & Johnson Philippines; correct?
11     **A.  In 2009 it specifically showed that.  In**
12 **2014 it simply denoted "US," "OUS."  It didn't**
13 **have a country-by-country listing.**
14     Q.  Okay.  If you look at -- if you don't have
15 those in front of you -- I think you do.
16         If you look at 34, for example, 35?
17     **A.  Yes.**
18     Q.  It says "U.S. only"; right?
19     **A.  Correct.**
20     Q.  So those don't -- they did not go to
21 Johnson & Johnson Philippines; correct?
22     **A.  They didn't go outside the U.S.**
23     Q.  Right.  That was all I was confirming.
24 Okay.  And that would be the same -- did this
25 2' -- the current Johnson & Johnson talc

Page 438

1  litigation -- talc asbestos litigation hold, go to
2  Johnson & Johnson Hong Kong?
3      **A.  Individuals in Hong Kong.**
4      Q.  And where did you learn that?
5      **A.  From counsel.**
6      Q.  Did it go to Johnson & Johnson China?
7      **A.  I don't know.**
8      Q.  Okay.  And when did it go to Johnson &
9  Johnson Philippines?
10     **A.  Well, as I mentioned, it didn't go to an**
11 **entity; it went to individuals in those areas.**
12 **And that was on May 26th of 2017.**
13     Q.  And was the -- is that the date that that
14 hold was issued?
15     **A.  Yes.**
16     Q.  And do you specifically know that it went
17 to those individuals on that date, at Johnson &
18 Johnson Philippines and Hong Kong?
19     **A.  I know that the -- the -- I don't know**
20 **that specifically.  I know that the hold -- the**
21 **custodians were notified on that date.  I have no**
22 **reason to believe that the Philippines or any**
23 **other area were treated differently.**
24         MR. SWANSON:  Are you okay to continue
25 some more?

Page 439

1         I mean, you guys tell me, because I'm --
2  I'm moving right along, but.
3         **THE WITNESS:  I thought that was a good**
4  **stopping point, but I -- I --**
5         MR. SWANSON:  Well, I mean, you know,
6  since we do have a little bit of an issue here
7  about when we're going to finish tomorrow, I
8  certainly --
9         MR. COX:  Are you about to start a new
10 topic?
11        MR. SWANSON:  It's related, but it's
12 getting into an area that's going to take some
13 time.
14        MR. COX:  Why don't we go off the record,
15 let's talk for a couple minutes, and we'll see.
16        MR. SWANSON:  All right.  Let's go off the
17 record.
18        THE VIDEOGRAPHER:  Off the record at 5:47.
19            (Off the record.)
20        THE VIDEOGRAPHER:  On the record at 6:01.
21 You may continue, Counsel.
22        MR. SWANSON:  So we have an agreement
23 about tomorrow's deposition and the conclusion of
24 the deposition, and Mr. Cox will state that for
25 the record, and if there's anything I disagree

**Page 440**

1 with, we'll hammer it out.
2       MR. COX:  Yes.  First, the Johnson &
3 Johnson defendants object to the continuation of
4 the deposition given the two days of testimony of
5 this witness has already sat for, given the number
6 and nature of the subject matters for which this
7 witness has been tendered, and the limited
8 relevance to the claimed defenses in the case, we
9 don't believe additional time is necessary or
10 appropriate.
11       Nevertheless, in the spirit of compromise,
12 as Mr. Swanson indicated, because the witness and
13 counsel are here, we've agreed to continue the
14 deposition tomorrow under the following
15 circumstances:  The deposition will begin at
16 9:00 a.m.  There will be reasonable breaks.
17 Plaintiffs will conclude their questioning by
18 1:45 p.m. at which time the J&J defendants will
19 have an opportunity to ask direct -- pose the
20 direct testimony from the witness and after which
21 plaintiffs will be permitted a recross that's
22 limited to the issues raised on the direct.
23       MR. SWANSON:  That's our agreement, yes.
24       We can go off the record.
25       THE VIDEOGRAPHER:  The marks the end of

**Page 441**

1 Media Number 5 in the deposition of James
2 Mittenthal and we are going off the record and
3 adjourning for the day at 6:02 p.m.
4
5             (Whereupon, the deposition was
6              adjourned at 6:02 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 442**

1                 SIGNATURE OF DEPONENT
2
3       I, the undersigned, JAMES PETER MITTENTHAL, do
4 hereby certify that I have read the foregoing
5 deposition and find it to be a true and accurate
6 transcription of my testimony, with the following
7 corrections, if any:
8
9 PAGE    LINE                    CHANGE
10 ____    ____    _____
11 ____    ____    _____
12 ____    ____    _____
13 ____    ____    _____
14 ____    ____    _____
15 ____    ____    _____
16 ____    ____    _____
17 ____    ____    _____
18 ____    ____    _____
19 ____    ____    _____
20 ____    ____    _____
21 ____    ____    _____
22 ____    ____    _____
23
24       _____
25            JAMES PETER MITTENTHAL, Date

**Page 443**

1 STATE OF CALIFORNIA     )
2                         )   ss.
3 COUNTY OF ALAMEDA       )
4
5       I, EARLY LANGLEY, a Certified Shorthand
6 Reporter, State of California, do hereby certify:
7       That JAMES PETER MITTENTHAL, in the foregoing
8 deposition named, was present and by me sworn as a
9 witness in the above-entitled action at the time and
10 place therein specified;
11       That said deposition was taken before me at
12 said time and place, and was taken down in shorthand by
13 me, a Certified Shorthand Reporter of the State of
14 California, and was thereafter transcribed into
15 typewriting, and that the foregoing transcript
16 constitutes a full, true and correct report of said
17 deposition and of the proceedings that took place;
18 IN WITNESS WHEREOF, I have hereunder subscribed my hand
19 on October 22, 2018.
20
21
22
       EARLY LANGLEY, CSR NO. 3537
22       State of California
23
24
25

## Exhibits

**Ex 20 Mittenthal, J**
220:10 232:4,10

**Ex 21 Mittenthal, J**
220:12 242:4,5 409:5,13
431:19

**Ex 22 Mittenthal, J**
220:14 246:1,5,8

**Ex 23 Mittenthal, J**
220:15 247:16,17 248:6
250:3 325:17

**Ex 24 Mittenthal, J**
220:17 247:24,25 251:25
252:3 322:8

**Ex 25 Mittenthal, J**
220:18 248:24 249:3
287:18 288:22 290:4

**Ex 26 Mittenthal, J**
220:19 260:22,24 261:5
267:9 309:5 327:18

**Ex 27 Mittenthal, J**
220:21 289:5,10 293:6
296:13,24

**Ex 28 Mittenthal, J**
220:22 289:17,18 307:13

**Ex 29 Mittenthal, J**
220:24 289:20,24 318:2

**Ex 30 Mittenthal, J** 221:1
311:1,4

**Ex 31 Mittenthal, J** 221:2
381:5,6,10

**Ex 32 Mittenthal, J** 221:3
416:14,17,19

**Ex 33 Mittenthal, J** 221:5
425:21,23 426:6

**Ex 34 Mittenthal, J** 221:6
429:24

**Ex 35 Mittenthal, J** 221:8
430:3

**Ex 36 Mittenthal, J** 221:9
430:9

**Ex 37 Mittenthal, J**
221:11 431:14,15

## -

**---ooo---** 222:12

**--ooo--** 224:1,3

## 1

**1** 234:22 248:19 249:5
268:13 289:24 296:25
318:15,17,18 320:15 357:3
410:12 422:8

**1.0** 249:5,15 250:25 287:17
288:2,16 290:5,10,15,19
307:1,11 317:22 322:3

**1.1** 288:5,14 289:1,9 293:5
307:9 312:18

**10** 314:1 359:2

**10036** 223:4

**10:13** 268:15

**10:34** 268:18

**11** 357:7 409:18 416:21

**11:46** 310:20

**12** 313:2,7 347:9 359:24
397:7

**12.0** 404:15

**12.4** 404:9,14

**1250** 222:23

**12:03** 310:23

**12:52** 337:13

**13** 259:6,10 271:24 291:25
332:11 359:4

**14** 311:17 365:10

**15** 243:21 317:12 426:4
427:21

**16** 357:7 404:8 423:5

**17** 317:15,19 399:15,16

**17.0** 357:21 358:2

**18** 222:4 224:10 260:12,17
317:14 367:4,5,8 369:7

**188** 341:17,22 342:18,20

**19** 262:20 348:24 349:14,

15 357:7 404:8

**190** 341:13 342:19,20
353:15

**19199** 409:18

**1990** 263:5

**1990s** 390:15 391:15

**1997** 229:4 230:1 256:15
258:12,15 259:3,10 262:15
271:19,23 282:24 283:23
290:25 291:3 329:8 330:6
338:8 341:5,13 342:16
345:9,14 388:7 389:8,12,
23 390:2,8 391:21 392:6,9

**1999** 227:7 389:5 403:12,
16 405:6 413:18,21 414:5
416:11,21 418:4,6 419:9,
15 423:17 424:10 425:6
433:17

**1:45** 440:18

**1:55** 337:16

**1A** 432:23,24

**1B** 410:8,12 422:24 423:6

**1C** 419:25 432:9

## 2

**2** 268:19 289:16 298:18
305:21 310:19 311:21
313:7 319:24 320:4,15
324:7 379:9 397:6 401:12

**2'** 313:18 405:6 437:25

**2.0** 307:20 313:5 315:10
316:15

**20** 232:4,10 243:21 328:8
331:23 332:3,4 370:22
372:3 427:21

**2000** 409:21 420:1 422:22
423:8,17 424:10,17 425:6
435:12

**2000s** 349:8

**2001** 368:1 370:7

**2002** 359:21 360:3,10
435:12

**2003** 410:3 423:5 424:4,7,
21 435:12

**2004** 229:23 230:5 359:6,8
393:17 394:3

**2005** 282:19 405:3,4,10

**2006** 272:19 273:1,3,6
276:6,8,11 370:4

**2007** 422:13

**2007-2008** 278:24

**2008** 278:11 279:11,14
280:11,12,15,23 283:2
284:18 317:16

**2009** 248:20 249:8,12,14
250:18 271:2 288:3 289:10
290:5 291:19 292:12,19
293:18,21 294:1 298:19
306:22 307:4 312:18
313:16,18 317:15 332:2,13
365:12,18,19,23 385:18,21
386:13,17,20 418:14
425:12 426:4,14 429:6
437:8,11

**2011** 289:17 307:21
309:15,23 313:17

**2012** 229:23 230:5 372:13
373:14,21 374:5

**2013** 319:17

**2014** 267:12,19 289:24
367:14 378:1,8,24 381:21
429:8 430:5,14,19 437:5,8,
12

**2015** 273:14,19 275:5,7,19
276:12

**2017** 292:19 322:20 413:22
414:4,6 431:14 434:23
438:12

**2018** 222:4 224:10 309:20
311:17 384:14

**2021** 313:19

**21** 242:4,5 331:23 375:18
381:24 383:4 409:5,13
431:19

**212 735-3453** 223:5

**213 623-9300** 222:24

**21st** 226:5

**22** 246:1,5,8

**221** 342:2,6 345:14 346:1

**23** 247:16,17 248:6 250:3 252:3,6,7 325:17

**24** 247:24,25 251:22,23,25 252:3,6 322:8 392:22 394:23 395:4 398:7,9 400:10

**248** 292:13

**24th** 245:7,14 246:21

**25** 248:24 249:3 287:18,22, 23 288:22 290:4

**251** 259:9 291:25 292:4

**26** 260:22,24 261:5 267:9 309:5 327:18

**26th** 438:12

**27** 270:25 289:5,10 293:6 296:13,24

**28** 289:17,18 307:13

**29** 278:18 282:5 289:20,24 318:2 422:3

**2:55** 371:6

**2D** 357:4,11,12 358:3 404:1,2,5

---

**3**

**3** 234:18 236:6 290:19 293:7 296:25 298:18 305:21 306:2,3 307:16 308:5 310:23 317:24 318:5 319:13 320:5,14 321:11, 12,14,17,19,24 322:25 324:7,8,11,14 327:14,16 371:4

**3.0** 289:23 318:19 319:11 323:12

**30** 282:2,7,15 288:8 289:10 293:18 298:19 309:3,12 311:1,4

**30(b)(6)** 411:12

**30th** 307:4

**31** 249:7 267:8,10 290:5 307:21 309:3 319:17 381:5,6,10

**32** 416:14,17,19

**33** 425:21,23 426:6

**34** 309:3 418:10 429:22,24 437:16

**35** 430:1,3 437:16

**36** 262:23 269:11 418:22 430:5,9

**37** 272:15,17 347:22 352:6 431:14,15 432:15,16

**3:12** 371:9

---

**4**

**4** 223:4 234:18 247:15 248:16 290:2 317:24 319:24 321:21 322:13,23 324:7,14 325:16 371:10 407:21 424:16

**4.0** 251:1 315:22

**4.2** 298:8,11

**4.3** 298:19

**4.33** 305:22

**4.5** 299:14

**4.6** 306:4

**4.7** 306:16

**40** 288:8

**400** 222:6,17

**42** 334:2

**44** 280:10 283:1

**46** 236:6

**4:13** 407:23

**4:49** 408:1

---

**5**

**5** 247:19,21 251:19 290:3 309:3,7 322:7,8,13,16 323:7 324:19 325:5 326:1 359:6 393:17 394:3 408:1 441:1

**5.0** 315:19 317:18 322:18

**500-gram** 365:21 366:19, 20

**510 302-1000** 222:18

**55** 222:6,17 309:3

**56** 279:11,14,16

**59** 317:10

**5:47** 439:18

---

**6**

**6** 319:5,16 320:3 321:13,22 322:15 325:17 342:20 353:11,20 354:18

**61** 383:19

**62** 383:19 384:9

**6:01** 439:20

**6:02** 441:3,6

---

**7**

**7** 404:8 420:1

---

**8**

**8** 292:18,19,22 322:9 359:2 422:14

---

**9**

**9** 357:7 359:2 404:5,8

**90s** 256:23 257:18 258:1 263:2 266:1 389:22

**92660** 222:24

**94607** 222:7,17

**97** 230:4 260:9 292:14 356:24 391:24 394:16

**98** 279:12 284:9

**99** 423:8 424:16

**9:00** 440:16

**9:05** 222:4 224:11

---

**A**

**A-P-A-C** 327:8

**a.m.** 222:5 224:11 268:18 440:16

---

**ability** 239:23 298:6

**absence** 275:20

**Absolutely** 398:21

**accessing** 299:15

**accident** 255:19

**accompanied** 291:6

**accompanies** 386:9

**accompany** 348:7

**accompanying** 388:19

**accomplish** 254:11,13

**accomplished** 282:2

**accordance** 248:12 250:5, 21 251:8 252:10,12,15 253:7 406:8

**accounting** 319:3,19 321:4,7 323:22,23

**accurate** 319:19 321:4 323:22,23

**accurately** 250:7 324:14, 23

**acronym** 328:1

**act** 394:25

**acted** 410:24

**action** 222:10

**actions** 378:1,14,20

**active** 312:16,19,20,25 313:9,12,14,22

**activities** 226:13 235:2 299:3 306:16 363:16

**activity** 264:19

**actual** 235:18,24 236:12 318:10 340:10 355:18 376:22 388:7 404:23 406:3

**add** 370:12 387:9 423:9

**adding** 413:24

**addition** 346:14

**additional** 226:7,12 227:8, 16,19 229:22 230:3 231:3 234:19,22,25 235:9 244:21,23 245:3,6 258:10 347:1 350:5 360:1 367:14 369:8 374:21 414:17

address 390:5

addressing 252:21

Aden 274:22

Aden's 266:19

adjourned 441:6

adjourning 441:3

adoption 273:16

advisement 296:22

affect 294:16

affected 405:7

affecting 316:8

affects 327:3 329:15

affiliation 239:10

afternoon 338:1,3

agree 253:17,18 254:6 255:25 259:25 262:3 266:14 270:13 280:12 283:21 297:24 298:2 319:2 330:12 374:9 384:1 388:24 394:24 408:20,23 434:9

agreed 440:13

agreement 352:4 356:25 357:2 387:25 404:2 405:2 439:22 440:23

agreements 340:18 356:21 357:4 387:24

agrees 278:5

ahead 237:15 238:23 244:5 249:2 258:20 259:7 281:23 288:25 289:13 340:4 351:4 370:19 375:4 380:25 430:13 431:18

Aiken 224:9

Alameda 224:20

aligned 263:6 269:12 297:14

allegation 411:16 435:13

allegations 417:12 420:6

alleged 435:2

Allen 364:11

alphabetical 428:19

alter 277:24

alternatives 275:18

ambiguous 376:16

America 222:20 224:17 225:5

amount 347:2

analysis 341:24 342:14 348:9,10,17 349:12,25 350:24 353:12,24 354:1,8 372:23 393:10 399:17,20 401:3

analyst 278:22 341:14 342:14 343:20 345:10 353:12 422:10

analytical 340:9 342:3 345:15,24

and/or 226:4 312:5 335:3

Anderson 257:23 390:21

announced 233:23

annual 293:14 298:13 309:8 312:1 325:23 416:4

annually 285:12,24 298:15

answering 301:13 374:8

answers 294:2

anymore 301:23 413:5

APAC 327:8,21 328:1,13 372:11 376:9

apologize 228:24 248:23 287:7 348:3 382:1 398:7 403:1 424:22

appearance 337:21 351:16

APPEARANCES 222:13

appeared 222:9 377:9 404:2

appearing 222:21 224:25 225:1,4 337:23

appears 311:7,14 312:12 315:22 319:6 342:9 357:14 428:19

applicability 274:25

applicable 228:3 248:12, 15 250:6,21 252:12 254:25 266:13 269:18 274:14 303:3 320:6 329:7 351:25 387:22 394:17

applications 379:11 380:2 381:15,19

applied 238:6 265:14 267:23 329:23 336:10,14, 15 338:10 382:16 388:9 417:20 424:23

applies 271:19 330:8,21 340:9 341:23 342:8 345:18,21 354:7

apply 294:20 298:24 329:11 330:3,13 331:1,4 336:6,7 338:5

applying 401:22 425:5

appraisal 346:16

approval 300:11 302:25 303:6 312:4

approvals 302:21,22,24

approve 303:10

approved 302:8,10

approving 303:19

approximately 271:2

April 289:24 317:19 322:19 384:14

APRS 401:13,16,17

archive 236:18,25 237:7 251:15,17

archived 335:24 401:6

archives 236:22

archiving 336:4 402:6

are's 236:21

area 238:15,25 324:25 337:6 364:17 381:18 387:6 438:23 439:12

areas 235:14 240:21 332:24 334:21 438:11

arithmetic 293:3

arose 411:20

Arps 223:3

artifact 324:8

asbestos 236:8 237:21 340:1 348:19,22 351:13, 15,17,21 362:4 363:11 370:14 371:17 373:1 375:11 376:24 387:7 389:16 391:7 393:11 399:21 401:4 431:20 433:1,5 434:23 435:7,10, 16 438:1

ascertain 338:17 381:20

Asia 327:4,10 328:3,18 329:17,23 332:20 337:6 338:5

Asian 327:10

assessment 346:13 367:17

assignment 334:14,20

assigns 317:13

assistant 233:9

associate.' 320:7

associates 282:11 326:7 422:9

assumed 327:9

assuming 290:9,12

attached 246:17 260:17 429:2,21 432:14,16

attachment 428:2

attachments 427:23

attempt 433:10

attorney 235:25

attorneys 383:24

audiovisual 316:11

audit 364:5 372:1 374:16, 20,23 375:20 376:20,21 377:2,11,15,24 378:15,19 382:3,14 386:13 387:24 415:22,24 416:2,3,5

audit-like 386:20

auditing 376:22

audits 279:13 283:8,13 284:6,8,12,15,16,17,18,19 363:2,7,10,25 364:25 375:2 386:16,19,24

387:17,23

**authored** 390:18

**authority** 385:3

**authorization** 292:3 401:17

**authors** 240:3

**availability** 258:10

**aware** 245:6,8,14,18 249:19 256:2,5,6,10 271:21 298:2 305:5,19 326:18 327:2 339:4,8 344:4,12 401:20 405:19 412:19 413:11,15 414:9 415:10,11,13 417:1 419:19 432:22 433:7 435:18 436:14 437:4

**awareness** 326:22

**B**

**baby** 257:8 260:4 264:14, 20 279:8 326:19 339:19 343:4,5,16,24 347:4 353:3 358:20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:8 409:24 410:1,2 417:4,14 420:10 426:7 430:15,17 433:19

**back** 226:20 229:4 230:1,4 232:16 234:7 238:8 239:16 248:20 249:12 250:2 256:25 257:12,17 263:1 279:10 280:19 283:23 288:20 290:4,25 291:2,22 293:25 294:6,10 296:24 306:21 320:3,20 325:15 326:24 333:15,17,20 338:2,8 342:12 351:24 352:23 356:4 367:23 370:7 372:12 373:14,17,21 374:6 376:7 377:15 382:3 384:14 385:15 388:18,25 393:21 394:19 402:3 403:11 422:20 424:9 437:6

**Barbara** 420:2 422:22

**based** 236:15 241:17 247:3 258:1 263:22 264:6 265:2 294:4 298:16 304:23 334:4 338:17,19 353:7 354:6 385:4 390:16 403:7

**basic** 308:1 313:9 399:2 408:14 423:15

**basically** 231:14 246:10 286:14 347:20 350:3 383:11

**basics** 247:3

**basis** 263:7 298:13 371:22 406:3

**bat** 281:25

**batch** 263:15 352:2 354:2 358:9,15 360:18,20 372:5, 18,21,24 374:21 386:11,18 406:7

**batches** 348:7 354:7 374:18 386:9,15,16

**Bates** 290:20

**Beach** 222:24

**begin** 440:15

**beginning** 248:6 321:8

**behalf** 224:6 225:2,4,7 337:23 354:13

**bell** 380:5

**beneath** 318:23

**Berg** 425:22 426:2

**Bernardo** 223:3 225:12

**bin** 302:11,20,24

**binder** 229:7,9,12,18 230:1 367:13,22 368:5,10 369:23 370:6,9 380:17 419:25 432:9

**binders** 368:9

**bit** 287:8,9 344:1 403:23 419:7 423:21,22 426:14 439:6

**Bloch** 420:2 422:22

**blue** 302:6

**body** 407:5,7 434:8,13,15, 18

**bog** 260:10

**bottle** 404:23

**bottom** 306:24 309:13

**basic** 360:2 367:6,8 372:7 392:5 399:14 422:7

**boxes** 263:6,14 264:1,2,8 269:12

**Braunreuther** 428:20

**break** 267:3 268:3,7,8,9 310:16 331:5 337:9,14 338:2 360:19 374:14,25 392:17,19 407:11

**breaks** 268:11 440:16

**briefly** 326:25 333:6 336:17 402:18

**bring** 229:5 300:10

**broader** 269:19

**broadly** 328:20 330:8

**brought** 229:8,12

**Bruno-sheerin** 257:21 262:11 265:19 268:23 272:10 274:8 275:23 347:25 352:7

**Brunswick** 349:1,5 394:20,21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

**buildings** 396:19 397:19 399:11

**bunch** 240:16

**business** 255:16 261:24 264:18 285:16 326:9 390:6 391:18

**businesses** 415:8

**C**

**calculated** 313:15

**California** 222:7,8,17,24 224:13,19

**call** 233:6 234:1 235:23 241:11 259:20 290:7 308:18 309:22 310:12 318:20

**called** 272:21 276:18 284:24 285:8 296:4,12 307:23 342:2 343:17 357:22 363:24 364:5 365:3,4 402:20 420:19

**423**:4

**calling** 319:12

**calls** 263:4 272:1

**cancer** 432:4,16,22

**candidates** 286:13 298:7

**capability** 369:16

**captured** 231:10 363:17 372:2 387:16

**cards** 358:10

**Care** 360:5 427:7

**Carpenter** 222:22 225:3,4 337:17,20 350:15

**case** 224:15,18 234:6 235:23 256:4,7 260:15 261:9 313:24 320:22 326:13,15,16 334:22 338:8 344:11 355:21 409:19,22 410:4 411:14,17 413:9 414:21 415:19 416:22 419:9 420:2 422:22,25 424:22 425:22 429:12,23 430:2,8 433:16,17 435:11 440:8

**cases** 226:4 231:5 237:17 242:12 244:16 245:22 246:22 341:22 344:5,11, 16,19 412:20 414:6,10,12, 20 415:19,25 423:17 434:9,11 435:1,12

**categories** 234:21 270:3 342:10 362:21 363:24 423:24

**categorized** 234:14

**category** 234:10,18,22 251:13 361:13 388:4 391:23 406:10,13

**caught** 309:24 341:16

**CDS** 304:18,20

**central** 302:15 344:4,9,10

**certificate** 348:17 349:25 350:21,24 399:1,17,19,20

**certificates** 348:8,10 349:12 372:22 393:10 401:3

**Certified** 222:7

cetera 317:20 328:14 358:10 398:20

chance 297:13

change 308:16 319:9 320:6 325:25 326:3,4

changed 308:12 315:20 321:4,8 324:23 325:22 346:23 371:1 407:3 420:18

characterization 334:24 344:8

charts 340:12

chase 258:12 351:9

check 252:1 281:14 308:24 314:17 333:7 359:7 405:18 418:9

checked 315:21 374:9 426:23

checking 315:19 324:4

chemistry 342:3 345:15

Chesteen 429:11,22

China 328:14,24 330:21 331:19 333:25 338:6 372:8 373:6,11 377:8,10 427:12 438:6

Chris 231:2 245:25 261:2 268:2 380:16 395:14 425:18 432:7

Christopher 223:2 225:7

christopher.cox@ skadden.com 223:5

Cindy 266:18 274:22

circumstances 234:15 408:24 413:5 440:15

citation 278:15

cite 398:1,4

cites 372:8

claimed 440:8

clarify 231:7

classified 241:16 390:6

clean 298:6 386:8

cleanout 284:24 285:2,4, 5,6,8,9,11,18,24 286:4,11 293:10,13,14,20,25 294:6

296:2 297:3,19 298:12,21, 23 299:3,9,11,16,20 300:17,20 301:2 302:4,6, 12,19 303:11 304:11 305:3 306:5,11 307:10 308:12, 18,23 309:9,13,15,19,25 310:6,12 312:7,17 313:18, 23 314:4 316:7 323:3,7,18 325:2,4 416:3,4,5,6

cleanup 301:6 307:24 308:13,18 309:23,24 311:23 312:1,4,8 317:17 319:12 321:13,25 323:4 325:21

cleanups 325:23

clear 233:25 263:16 341:7, 11 358:17 373:3 398:22 406:17 420:13

close 339:4

closed 392:1 396:18

closer 359:16,21

code 317:14

collected 234:24

collection 226:13 234:22 235:2

column 235:4 236:1 428:14

columns 231:17

commencing 222:4

comment 348:6 351:25 353:7 397:16 399:6 401:7

comments 271:18 356:10 361:6 364:1 375:22 385:5

common 362:15

communication 299:10, 11,16,20 300:21 301:6 306:5 310:13 312:17 413:3 428:24

communications 245:10 306:12 427:6

companies 240:16 257:11,12,14,16 258:7 259:1 260:3 263:1,11 269:22,24 270:19 271:20 272:3 273:13 279:3 281:9 294:22 330:9,17 338:10 360:5 417:15,16 420:23

423:1 424:24 426:3 427:2, 16 429:2,17 430:7,24 431:3 436:2,3

company 234:19,20 237:18 238:20 240:25 244:23 252:17 253:22 257:5 259:12,15 263:4 273:20 277:2,4,13 279:6, 21 294:5 298:12,24 330:24 331:17 343:11 369:1 384:3 389:21 391:18 393:5,14 410:19

company's 238:16 241:10 257:22 258:1 390:6 406:9

companywide 429:1,6

competent 434:11

compile 242:8

compiled 381:12 409:15

complete 242:14,21 244:20 290:9,13,14 315:7 384:17

completely 320:25

compliance 252:16 285:25 295:18,20 415:24 416:2 427:8

complied 253:19

comply 253:25 254:4,8,9 273:22

complying 285:23 415:23

comprised 406:6

compromise 440:11

computer 231:16 235:23 238:16 300:15

concern 434:13

conclude 263:18 304:23 385:2 428:17 440:17

conclusion 439:23

concur 434:7

conduct 298:12

conducted 226:8 283:8 298:23

confirm 252:1 311:20 329:13 400:11

confirmed 303:2

confirming 328:6 437:23

conform 367:15 369:9

conformance 399:2

confused 227:15 228:24

conjunction 252:23 346:18 387:1

connected 434:10

connection 226:4 387:3 417:13 420:8

considered 365:2 384:24

consist 302:25

consistent 293:2 383:18

consolidate 317:17 433:11

consolidated 271:4

constitute 319:8

consult 312:21 316:19 340:2,5

consultant 223:9 410:24 411:1,5

consulted 235:5,11,21 239:1 335:14,16

consumer 223:1 225:9 226:16 239:13 242:19,22 243:4,7,8 256:17,18,20,21 257:4,12,13 258:7,25 259:11 260:2 263:1 269:22,24 270:19 271:20 272:3 273:10 279:4,5,15 280:7 281:8 311:10 312:1 330:16 355:13 360:5 393:15 415:4,12 417:8 418:17 419:17,18,23 420:25 422:11,25 426:3 427:2,3,4,7 429:16 430:7

Cont'd 225:22

contained 231:16 368:5

container 404:24

containers 241:11 302:7

contaminants 339:25

content 241:18 263:21 300:25 351:13 362:4

**contents** 299:25 359:14 364:9

**context** 281:12 297:3 327:12 343:21 352:19 353:9 365:25

**continuation** 392:15 440:3

**continue** 258:9 268:21 310:11,12,25 337:16 343:5 360:19 371:12 388:23 408:3 438:24 439:21 440:13

**continued** 232:21

**continuing** 266:20 291:16

**continuously** 403:15

**contracted** 363:14

**contribute** 238:17

**controlled** 329:3

**controls** 404:15

**convenience** 234:11

**conversation** 230:13,14 233:5 334:3 337:4 349:14,20 368:11 371:24 377:9 382:18 396:15

**conversations** 235:7 244:7 261:22 262:5 310:9 338:19,21

**coordinators** 285:20 302:23

**copied** 428:10

**copies** 242:2 247:9 299:2 314:22 425:16

**copy** 231:19,23 232:1 245:24 246:2 247:20 260:20 261:2 270:24 347:7 381:3 409:8 425:14 432:7

**corporate** 233:9 238:22, 25 239:1,2,10,11,12 272:21 273:10,12 274:16, 17,18,19 276:2,11,18 355:10 427:5,6

**corporate's** 273:22

**corporation** 222:20 225:6 259:16 291:21

**correct** 227:10,22 228:8

230:11 232:19 236:2 237:11 241:24 243:8,10 245:7,22 248:17,20 249:8, 12,15,23 252:25 253:2,11 254:5,14,17,21 255:2,14 256:4,8,15 257:9,14 258:13,18 259:3 260:5,15 261:9 262:15 265:9,11,12, 15,16,19 266:5,13 267:13 269:19,20 270:11 273:23 276:4 278:3,8 279:8 283:16 285:9,12,18 286:8, 21 294:12,14 296:17 299:7,8 300:7 304:15,18 305:25 306:9,20 308:2 309:20 313:20 314:6 315:3 316:6,17 318:9,16 320:16 321:5,9,15,19,20 322:1 324:3,17,18 326:1,13 327:17 328:15,18 329:24, 25 330:9,10,13 332:13 334:23 336:14,23,24 337:1 338:11,12 339:1,6,7,10,11 344:6,19 345:1,11,22 353:11 356:23 360:5 366:7 367:1,2 372:21 374:2 383:25 384:5,21 386:7 388:10 389:5,8 391:10 393:3,17 394:20 395:8,23 396:2,18 397:14,24 399:13 400:5 403:12 406:20,21 408:19 409:5,15,19,22 410:16,25 411:22 412:5,14 413:25 415:16 416:23 418:15 419:12,16 420:15 423:16,22 424:11,19 425:12 426:15 428:11 430:16,24 431:3,7,8,9,11 432:5,17 433:20,25 434:19 435:2 436:18 437:10,19,21

**corrective** 378:1,14,20

**correctly** 244:20 342:18

**correspond** 246:13 372:14

**cosmetic** 270:21 279:7 341:9 355:20 362:11 389:14 426:11

**counsel** 224:23 225:13,17, 21 227:2,3,22 229:1 234:5 243:13,15,18,20,21 244:25 246:10 258:5 268:21 296:18 310:25 311:5 337:16,17 355:14 371:12

408:3 425:10 436:23 438:5 439:21 440:13

**counterpart** 409:2

**countries** 338:11

**country-by-country** 437:13

**County** 224:20

**couple** 230:25 280:9 281:21 331:20 341:1 375:3 380:23 388:11 439:15

**coupled** 246:12

**court** 222:23 224:8,19 226:22 238:7,9 257:1 352:24 410:20

**cover** 227:6 228:19 229:3 266:22 268:7 388:15 389:25 391:17 418:25

**coverage** 228:2

**covering** 264:8

**Cox** 223:2 225:7 228:9,14 231:2,21 237:13,15 240:18 241:8 242:17,23 243:9 244:4,18 247:6 249:24 250:9,23 253:14,21 255:3, 15,23 256:9 257:19 258:19 259:23 261:3 264:15 265:20 266:6 267:2,21 268:4,9 269:4 270:1 273:8, 24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 296:21 297:5,23 300:8,23 302:2 304:5,13 305:18 308:3 310:1,15 312:11 314:15 315:5 316:9 319:22 320:17 323:9,25 330:14 333:9,12 334:24 344:7 345:3 348:14 350:12 351:2 353:21 355:6 357:13 361:21 362:6,13 365:24 366:16 369:4 370:1,18 380:9,19,23 383:15 385:1, 14 386:5 387:14 388:13 389:17 392:14 393:23 395:6,9,16 396:3 397:1,25 398:16 399:22 400:6,22 402:14,23 405:11,15 407:12,15,18 412:6 414:1, 13 421:9 423:18 425:16

428:5 431:23 432:9,11 434:1,6,21 439:9,14,24 440:2

**create** 250:19 320:25 351:7

**created** 231:14,15 232:9 234:3 248:10 249:7,14 256:23 257:25 260:13 263:6 264:1,25 269:2,12, 13 303:23 304:2 316:2 332:3,13 350:3 362:3 389:22

**creates** 253:22

**creating** 250:4 266:9 406:23

**criteria** 236:2,7 237:22

**curious** 237:4

**current** 244:8 269:21 272:6,8 311:15,18,19 315:19 317:18 321:9 322:4,18 323:14 336:7 339:22 403:4 432:20 433:4 435:17 436:4 437:25

**custodial** 235:12

**custodian** 413:4,7

**custodians** 408:15 412:10 413:16 435:21,22 436:6,8 438:21

**cut** 258:12 328:7 351:9

**cycle** 349:22

**Cyprus** 222:20 225:5

---

**D**

**Darren** 270:23

**data** 235:13 240:8

**database** 236:21

**date** 224:10 249:7 273:3 307:4 311:17 314:1 358:12 370:8 404:20,21,22 405:1 422:18 423:5 438:13,17,21

**dated** 227:7 288:2 289:17, 23 307:20 416:20 426:3

**dates** 381:16

**David** 364:11

**day** 230:21 285:16 286:11 297:12,16,19 298:4,5 302:12 304:11 380:20 407:14 408:7 441:3

**days** 282:2,7,15 301:2 302:6 309:9,15 316:7 325:4 440:4

**deal** 261:25

**dealing** 384:4

**Deane** 426:2

**Debbie** 428:25

**December** 319:17 426:4

**decide** 434:12

**decided** 308:17

**decision** 325:3,13

**dedicated** 367:11 372:11

**deduce** 264:7

**defect** 417:12 420:7

**Defendant** 222:21

**defendants** 222:20 223:1 225:8,13 245:11 440:3,18

**defenses** 440:8

**define** 295:14 314:18

**defined** 291:23 292:15 295:23 305:1 312:25 383:5

**defines** 298:19

**definition** 275:10 295:16, 17 313:9 315:8,20,21 316:12

**definitions** 294:25 295:4, 11 312:22 360:2

**deletion** 305:25 306:9

**deliver** 436:7

**demanded** 256:2

**denote** 239:8 240:21

**denoted** 234:17 238:14 318:21,24 437:12

**Dentons** 222:23

**departing** 282:11 422:8

**department** 241:2 269:15, 18,19 273:20 275:11

**departmental** 236:19 238:2,18 279:12,13 283:8 284:11,14 340:16,24

**departments** 263:11

**depend** 320:18

**deposed** 226:5

**deposit** 238:17

**deposition** 222:1 224:12, 21 229:2,11,13,21 231:5 242:4 244:17 246:2,11,21 247:24 260:14,25 261:8 268:13,20 271:24 310:19, 24 334:13 344:11 371:5,11 388:23 392:15 407:21 408:2 411:24 416:18 425:22 432:24 439:23,24 440:4,14,15 441:1,5

**depositions** 243:17

**describe** 250:7 270:2 359:1 379:21

**describes** 250:10

**descriptions** 403:19,20

**descriptives** 292:16

**design** 417:12 420:7

**designated** 307:11 395:11

**destroy** 301:18,24 306:13 408:17

**destroyed** 259:19 286:7, 20 287:1 297:22 300:20 302:19 369:25 396:25 402:13 406:22 412:4 416:7

**destroying** 299:22 300:6, 14 301:7,25 332:23

**destruction** 292:3 297:4 298:7 302:8,10 303:10 305:25 306:9

**detail** 319:2 320:3 423:22 426:15

**detailed** 319:3

**details** 413:24 423:20

**detect** 284:6

**detecting** 284:10

**determination** 252:24 359:13 414:25 436:6

**determinations** 361:12

**determine** 239:9 241:19 297:13 349:21 354:2 356:21 361:8

**determined** 241:2 338:16 385:22

**development** 360:24

**device** 354:5,6

**devices** 342:4 345:16

**devised** 273:12

**DHR** 354:5

**dictate** 389:13

**different-named** 257:14

**differently** 292:8 438:23

**difficult** 320:24

**difficulty** 387:20

**diffraction** 354:25

**digital** 340:11 371:1

**direct** 225:22 262:17 357:8 413:3 422:6 440:19,20,22

**directed** 332:21 417:3,17 418:12 429:1 435:19,20,23

**direction** 305:24

**directives** 292:17

**director** 376:9

**directory** 239:14 240:22

**disagree** 369:6 439:25

**disappears** 324:20

**disclosed** 412:18

**discontinued** 358:16

**discovered** 412:1

**discuss** 231:6 285:3 407:16,17

**discussed** 237:9 278:4 335:11 338:22,24 370:16 381:15,19 383:2 394:16 423:17

**discussing** 338:14

**discussion** 347:6,24 365:10 367:5 368:7 369:7 390:20 401:24

**discussions** 383:22

**disk** 315:16 371:4

**disposal** 286:2,3 338:18

**dispose** 250:20 252:22 255:22

**disposed** 248:11 252:14 253:6,10 259:19 300:20

**disposing** 250:5 251:7 299:23 332:24

**disposition** 239:22 251:16 286:13,16,20 295:17 297:3,17 329:4

**dispositions** 297:15

**distribute** 429:1

**distributed** 417:24 426:19 429:5 437:9

**distributing** 257:7 260:4

**distribution** 418:7,13,25 419:3,8,10 426:18 430:23 431:1 437:8

**distributions** 419:4

**division** 275:11 277:14 278:1 427:3

**divisions** 274:15 417:16 436:2

**DMR** 354:5

**doc** 232:8

**docs** 384:20

**document** 232:10,20,22 241:16 246:9,14 249:13 253:15 255:14 262:1 271:12,13 278:6 288:12 293:8 295:17 296:4,13 305:24 307:3 313:12,13,22 314:14,18 317:18 318:9, 10,11 322:20 324:6 329:19 360:24 379:21 380:6,7 383:9 384:4 395:13,14,16 396:16 405:16 416:20 417:17 420:1,14 423:4 427:19 428:3 434:10

**document-gathering** 235:1

**documentation** 292:5 303:23 304:2,4,9 314:6 345:5 349:21 350:8 358:7 359:2 390:1

**documentations** 259:14

**documented** 306:17 413:21

**documenting** 416:6

**documents** 239:17 240:3 244:13,15 247:7 252:22 254:25 255:25 286:17,19 290:20 291:20 292:15 294:8 298:20 299:2,7,23 300:6 301:9,20 302:5 306:13 314:23 329:4,5 332:23,24 334:7 335:24 336:4 339:15,18,24 341:4, 8 354:24 355:16 366:25 391:17 394:9 396:11 408:16,17,18 412:3 416:6 424:6,17 433:23 434:8

**Dodd** 278:20 281:25 283:7, 15 309:11 421:24 422:4

**domestic** 329:18 393:1 431:2

**Don** 332:1,4,7 335:5 346:16 348:3 349:1 353:17 354:17 356:1 364:11 365:10,21 366:5 367:12,22 368:2,8,21 369:23 370:5 372:15 374:6 375:5 385:4 397:4,5

**double** 346:22

**double-check** 230:22 315:6 376:18

**Dowling** 327:19

**Downs** 226:9 230:9,13,16, 17 231:6 232:9 233:11 235:8 237:6 240:12 244:1, 7 383:19,21 386:22 388:17

**Doyle** 327:19

**draft** 299:2 314:23

**drew** 337:3

**drive** 237:1 238:13,14,15 239:25 240:6,13,17,21 241:12,13,20

**drives** 239:18,20 240:15, 25

**duly** 222:10

**dumped** 240:17

---

**E**

**earlier** 236:18 262:14 268:24 293:15 321:1 337:21 338:15 354:12 365:20 382:18 390:2 391:11,14,15 402:17 414:5 415:2 423:25 424:2 433:9 435:10

**earliest** 227:6 259:2 271:21 327:1 389:22

**early** 222:7 224:8 226:20 256:23 257:17,25 263:1 266:1 389:22 390:15 405:6

**earmarked** 297:17

**easily** 260:21 261:16

**echos** 383:9

**Edith** 428:25

**edition** 379:14

**EDS** 340:13

**EDSS** 354:25

**effect** 255:2,4 293:18 328:22 329:3 333:24,25 339:5,9 403:16 408:19,21 412:24,25 414:11,19

**effective** 253:19 254:4 311:17 317:19 322:19 381:21

**effectuate** 271:13 421:8

**efficient** 340:7 408:6

**effort** 227:25

**efforts** 234:22

**electron** 362:2,10 402:21

**electronic** 299:1 304:19 305:11 314:9,22 315:14

**element** 234:9

**elements** 366:13

**elicit** 274:20 395:10

**elicited** 363:6,8 366:8 396:15

**eliminate** 300:22

**email** 301:1,10,19 367:18 372:10

**emails** 300:15 301:8,11

**employee** 279:21 282:3, 16 301:21 303:1 320:7

**employee's** 286:1 303:10

**employees** 253:25 254:14,16,20 261:24 270:12 279:15 280:5 281:2,19 286:12 294:8 297:12 301:17

**EMRS** 237:3

**enable** 253:24 369:16

**encompassed** 226:16 251:15 374:14 387:25

**end** 268:12 310:18 371:4 407:14,20 440:25

**ended** 414:12

**English** 346:3

**ensure** 285:22

**ensuring** 377:3

**entailed** 263:10

**entered** 378:7

**enterprise** 252:11 273:15 275:8

**entire** 226:20

**entities** 274:1,5 435:19,21

**entitled** 285:6

**entity** 258:22 270:17 438:11

**entry** 342:2

**equate** 343:3

**equates** 343:1

**equivalent** 305:3

**ER** 275:8

**Erin** 222:22 225:3 337:20

**erin.carpenter@ dentons.com** 222:25

**ERMS** 236:25 237:5,10 238:6 267:12,16

**ERS** 273:15,16 276:13,24

**ESI** 223:9

**essentially** 286:5 305:23 343:6 403:15 413:22 434:18

**established** 351:6

**Estrada** 429:12 430:2,17

**et al** 224:16 420:5 426:3

**Ethicon** 410:25 411:3

**ETQ** 377:25 378:13,19,22 381:22 382:15

**European** 336:25

**evaluate** 384:11,13,16

**evaluation** 434:3

**event** 285:9,11,15,18,24 286:4 293:14 294:7 296:2 298:12,23 299:3 300:17 302:19 306:15 312:8 319:13 321:13,25 323:3,4, 8,18 324:16 325:21 424:20

**events** 293:10,20,25 307:24

**eventually** 264:21

**evidence** 305:17 384:6,7 411:18

**evolved** 317:20 403:20 423:23

**exact** 269:6 422:18 434:18

**EXAMINATION** 225:22

**examined** 222:11

**exception** 361:8

**Excuse** 263:8

**exercise** 375:2

**exhausted** 371:19

**exhibit** 229:17 232:1,4,10 242:4,5 246:1,5,8 247:16, 17,24,25 248:6,24 249:3 250:3 251:21,25 252:3 259:6,10 260:12,17,22,24 261:5 262:20 267:9 271:24 287:18 288:22 289:5,10,

17,18,20,24 290:4 291:25 293:6 296:13,24 307:13 309:5 311:1,4 313:3 318:2 322:8 325:17 327:18 357:3,11 358:3 359:23 379:9 381:5,6,10 404:1,2 409:5,13 410:8,12 416:14, 17,19 423:6 425:21,23 426:6 429:24 430:3,9 431:14,15,19 432:23

**exhibits** 229:10 260:9 359:19 379:3 410:10

**exist** 418:3 419:3

**existed** 269:14 275:7,19 277:8 317:15

**existence** 263:19

**expand** 375:4

**expect** 292:24 356:8 360:16 383:5

**expected** 342:23 346:20, 25 383:10

**expert** 264:16 341:19 342:7 344:16 345:17 347:17 348:20 350:20

**expertise** 396:11

**expiration** 404:21,22

**expired** 358:16

**explain** 234:2 260:25

**explicit** 251:18

**explicitly** 378:23

**exposure** 326:12,15

**express** 253:23

**expresses** 254:10

**extent** 231:8 254:7 270:4 277:7 281:13 320:19 355:7 395:9 396:4

**external** 376:9 387:23,24

**extra** 425:16

F

**facilities** 237:18 397:24 398:14 399:4 400:2,12

**facility** 269:15 353:18

375:12 393:5,8,19 394:7,8 400:4 401:6 402:5,9

**facsimile** 321:1

**fact** 241:16 255:20 259:6 272:1 294:4 321:17 340:5 376:2 397:16 437:7

**fact-finding** 257:20

**fail** 410:19

**failed** 337:21

**failure** 411:18 417:13 420:7

**fair** 291:18 413:20

**faithful** 323:16

**falls** 404:14

**familiar** 275:17 284:25 327:9 339:12 362:15,16,20

**families** 434:9

**family** 434:10,11

**February** 405:3

**figure** 368:8 380:17

**figured** 268:4

**file** 236:8 237:20,25 238:2, 12 240:10

**filed** 224:18

**files** 237:12,16,17 238:3, 17,18,21 240:17 335:13

**filled** 231:17

**films** 340:11

**finally** 431:13

**find** 260:9 267:11 296:15 327:13 333:2 341:3 347:8 355:25 356:25 360:14 377:20 379:1 398:5 399:18 401:13 410:8

**finding** 332:21 360:18

**fine** 268:8 269:9 292:6 313:6,10 400:25

**fine-tuning** 308:8

**fineness** 351:16

**finish** 439:7

**finished** 341:8 342:3

345:15 355:20 360:12,22, 23 362:12 370:14 371:16 374:11 387:7 404:16,18 406:4

**firm** 224:12,22 243:23

**first-time** 234:20

**firsthand** 266:25

**five-page** 379:25

**fleshed** 423:22

**flipped** 360:16

**flipping** 363:23

**floating** 379:3

**Flom** 223:3

**floor** 302:7

**flow** 349:21 350:7

**focusing** 374:19 375:2

**folder** 372:11

**folks** 260:3 283:1 308:21 309:18 338:20 410:18

**follow** 239:9 270:12 278:5 284:5

**follow-on** 226:8 349:14

**follow-up** 267:6 349:18

**Fong** 224:16 226:4,12 228:7 231:6,9 232:24 233:14 234:6,12 244:16 246:22 326:16

**force** 313:13 324:16

**forget** 301:19 385:12 424:3

**form** 228:9,14 237:13 240:18 241:8 242:17,23 243:9 244:4,18 249:24 250:9,23 253:14,21 255:3, 15,23 256:9 257:19 258:19 259:23 264:15 265:20 266:6 267:21 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 297:5,23 300:8,23 302:2 303:25 304:5,13 305:18 308:3 310:1 312:11 314:15 315:5,13 316:2,9 319:22

320:17 323:9,25 330:14 334:25 344:7 345:3 348:14 350:12 351:2 353:21 355:6 361:21 362:6,13 365:24 366:16 369:4 370:18 383:15 385:1,14 386:5 387:14 388:13 389:17 396:3 397:25 398:16 399:22 400:6 405:11 412:6 414:1,13 421:9 423:18 428:5 431:23 434:1,6,21

**formal** 335:23 336:3 354:21 356:15 364:18 389:3

**formats** 299:1 304:15,19 314:5,9,21

**formula** 401:21

**Fort** 264:11,12 265:3,15 271:3,8

**forward** 279:24 369:10

**forwarded** 351:7

**found** 243:1 281:24 292:13 295:1 334:10 359:20 374:20

**foundation** 350:16

**foundational** 327:5 400:18

**four-page** 232:10

**fourth** 347:10

**frame** 276:7

**frames** 394:18

**franchise** 273:13 394:15

**frankly** 293:3

**French** 226:10 230:9,15 233:6,8,18,23

**front** 248:3 249:4 261:5 264:8 287:24 288:22 289:11,14,25 295:5 296:25 307:14,18 311:8 318:6 323:6,15 324:2 325:18 409:7 433:2 437:15

**full** 322:3

**fully** 374:8

**fumble** 287:7

**function** 414:4

**future** 388:24

**G**

**gained** 396:13

**gather** 347:20 414:5

**gathered** 226:7,25 227:16, 18,21 232:18 241:24 364:20 386:2

**gathering** 346:14

**gave** 346:16 411:24

**gears** 326:11

**general** 293:22,23 300:1 301:1,3 303:24 326:22 330:23 346:24 348:21 351:14,18,19 378:4 381:21 383:8 390:3 393:4 401:7 406:5 421:10 425:2,4

**generally** 234:1 239:20 240:24 256:5 285:13 286:4 297:24 305:11 318:9 331:8 339:2 346:25 347:14 364:21 384:1,20 385:7 386:3 387:6 408:23 420:16 423:14 428:17 434:8

**generated** 305:10 335:25 348:11 394:10,11

**generating** 369:3 399:4 400:3

**Georgia** 393:6 398:23 400:14

**Giacino** 226:9 230:10,15 232:19 233:1,7,16,22 234:1 244:1

**GIFTS** 267:24

**Gillespie** 309:10

**give** 228:18 246:2 260:19 286:11 289:13 301:18 309:1 317:1 344:21 355:9 392:2 422:1

**giving** 234:2

**global** 234:23 269:23 272:10,22 273:4,22 274:13,25 275:5,14 332:2, 12 365:12,18 366:1 372:10 376:2 377:4

**glossary** 295:2,6,9,10,13 296:1,6,12,16,19

**good** 225:3,23,24 310:15 313:16 322:22 337:9 338:1,3 407:18 425:19 439:3

**grabbed** 313:4

**great** 425:17

**Greenwood** 222:6,16

**grid** 305:10,17

**grids** 305:4,6,13 362:2 402:21 403:2

**group** 238:19

**GRRS** 273:9,14 274:17 276:3,12,13,19,20 277:16, 20 278:2

**GRS** 277:23

**guess** 235:23 281:16 330:11 341:24 379:17 380:7 428:1

**guessing** 237:4 239:5 354:15 367:24

**guided** 353:24

**guideline** 272:1,2,3,7 329:22 330:6

**guidelines** 317:15 333:23

**guys** 439:1

**H**

**half** 233:2 360:15

**halfway** 262:21 272:19

**hammer** 440:1

**hand** 232:15 247:14 249:2 280:21 431:18

**handed** 432:4

**handing** 260:24 311:4 416:17

**hands** 379:2

**hands-on** 235:22,24

**happened** 236:11 285:12 324:24 369:22 376:4 378:20 396:22 397:18

399:8

**happening** 282:19 382:8

**hardcopy** 299:1 304:19 314:8,22

**harmonization** 273:16

**Harris** 270:23

**Harrison** 222:6,17

**hate** 392:2

**Hayes** 260:15 261:8

**hear** 339:13

**heard** 240:20 281:13 305:12,13

**heart** 421:21

**held** 253:9 270:4,7 286:6 292:18 294:7 331:15 346:25 388:4 423:21 433:15,24 434:5,8,12,16

**helps** 331:25 341:12 377:24

**Hicks** 332:1,4,7 335:5 346:16,24 347:6,21 348:3 349:1 353:17 354:17 356:1,3,10 361:6 363:5 364:1,7,11 365:10 366:5 368:15 372:15,17 374:7 375:5 385:5,16,17 386:12 388:17 397:5

**Hicks'** 368:2 397:16

**Hicks's** 351:24

**highlighted** 426:24

**hired** 364:23 394:25 411:10,12

**historical** 242:22 266:20 406:13

**histories** 318:4 320:1 323:24

**history** 247:7 257:11 307:6 308:5,15 317:22 318:9,25 319:9 321:22,23 322:3,10 323:1,4,11,15,16, 17,20,22 324:3,14,19,22 325:1 354:6 409:5

**hit** 424:2

**Holbrook** 236:16 238:1

**hold** 227:6 253:10 254:23, 24 255:13 282:11 286:7,18 295:17 297:21 299:15,24 300:7,16 301:23 303:3 305:24 340:19 365:16 367:15 368:18 369:9,16 370:24 389:5,12 392:14 394:18 397:5 403:8,10,11, 17 405:5,13 408:14,18,21, 25 409:2 410:14,15,20 411:19 412:4,22,23,25 413:1,9,12,23,24 417:20 418:1,4,24 419:5,9,15 420:15,20 421:13 422:8,24 423:11,16 424:4,21 425:11,12,22 426:3,6,22 427:17 429:22 430:1,5 431:14 432:4,15,17 433:1, 4,15 434:17,24 435:16,20 436:4 437:1 438:1,14,20

**holding** 369:10

**holds** 226:16,17 227:4,6,8, 11,13 228:19,22 241:24 242:8,15,18,22 243:4,7,13, 14 244:14 245:6,17 252:13,25 300:4 368:18,23 369:1,14 370:12 388:3 389:18 403:23 405:19,23 408:8 409:5,14 410:13 412:14 413:15,17,21 414:4,5,9,10,15,18,25 415:2,7,12,14,16,23 416:2, 8 418:7,11 419:22 423:8, 16 425:6 429:8 430:25 431:3,20 433:11,17 434:4, 13,25 435:10,12

**homework** 392:2

**Hong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 333:25 336:3,22 338:6 339:9,20 382:10,17 417:21 424:25 431:6 438:2,3,18

**hour** 222:4 233:2 267:4

**hours** 230:25 243:21 388:11

**housekeeping** 312:5

**Hozeny** 410:4 422:24,25 424:21

**hundred** 280:20

**hygiene** 236:5

**hypothetical** 259:25

**I**

**idea** 236:10 252:20 253:11 367:23

**identical** 346:12

**identification** 232:5 242:6 246:6 247:18 248:1,25 260:23 289:6,19,21 311:2 381:7 404:16 416:15 425:24 429:25 430:4,10 431:16

**identified** 382:19 426:23 427:15

**identify** 224:24 235:8 286:12 300:10

**II** 224:15

**imagery** 314:10

**images** 314:13 315:2,18 340:11,12 354:25 362:10, 22

**Imerys** 222:20,21 224:17 225:4,5 337:23 349:24 350:2,4

**immediately** 310:7

**impacted** 328:22

**implementation** 298:9

**implication** 294:19

**important** 344:18

**imposing** 410:21

**in-between** 277:21,22

**inbound** 399:2

**include** 274:4,5 300:5,9,13 304:11,18,22 312:4 314:9 315:2,3,18 316:4 318:15 328:24 339:23 348:18,19 351:21 372:25 383:13 390:7 399:20 407:8 424:7, 10,11

**included** 232:17 235:2 282:11 304:21 314:5,14 316:5,17 348:17 351:17 362:24 363:15 364:9 370:6

400:4 421:13 422:8

**includes** 254:16 281:3 306:8 314:18 315:14 319:1 321:7,25 349:11 367:12 401:21 427:1

**including** 279:7 304:19 314:8 358:7 376:14 378:1, 13

**inclusive** 316:1,6

**incorporating** 413:22

**indefinite** 365:5

**indefinitely** 375:25 388:23

**independently** 239:13 267:24 326:7

**index** 262:20

**indexing** 237:11

**India** 372:8 376:15 377:10 382:9

**indicating** 322:21 380:6, 17 386:21

**indication** 292:14 331:14 437:6

**indicia** 239:11

**individual** 285:25 328:11 417:25 435:20 436:12

**individuals** 421:4,7 427:15,18,21 428:22 436:3,12 438:3,11,17

**industrial** 236:5 415:9

**Industries** 358:18 405:10

**infer** 264:7 397:15

**inference** 330:12

**inferred** 397:17

**inform** 280:4

**information** 226:12 229:9 231:3 232:18 233:18,24 235:9 236:18 239:16,17,20 240:14,16 241:1,14 243:6 245:5 246:25 247:22,23 248:10,14 249:6,11,22 250:7,19,20 251:6,8,14 252:10,13 253:6 254:21 255:1,6 265:17 270:3,5,7 277:25 278:7 280:15

281:16 282:14,20 284:15 286:2,3 287:6 288:2 289:9 291:1 292:3,9 295:2 296:5 301:14 303:8 306:6 311:11,13 312:5 313:12,24 315:13,17,25 316:2,4,7,16 318:22 326:8 331:5,7 333:2,22 334:23 335:4,8, 20 339:17 347:20 354:14 355:3 361:17,24 363:20 368:17 373:16 374:21,23 375:25 376:3 378:7,21 381:20 385:11 387:8 388:21 389:3,10,20 394:7 396:12,24 402:19 403:2,3 405:22,24 407:6 408:9,18 412:3 417:19,23 418:3,19, 22 419:22 421:6,25 422:20 424:12 425:10 433:14 434:5,13,15,19 435:25 436:15,20

**initial** 230:7 248:19 280:16,17,23 281:4 283:22 351:21

**initially** 234:4 375:5 384:14

**injury** 435:1

**input** 317:1 376:3

**inquiries** 244:11,12

**inserted** 316:11

**inspection** 357:25 358:9

**instance** 238:13 298:1 341:22 346:15 363:4 365:9

**instances** 374:15 385:10

**instituted** 281:17

**instructed** 434:17

**instruction** 301:25 408:15

**instructions** 299:14 300:2,5,10,13,25 301:7 302:4 414:22 421:13

**integrated** 267:16,19

**intended** 389:25

**intentions** 253:24

**interested** 331:18 375:9

**International** 275:1

**interpret** 313:21,23 344:1

346:3 391:22

**interpretation** 304:17 361:13 399:6

**interpreted** 237:7 348:6 368:11

**interpreting** 347:18

**interval** 356:3

**intervals** 388:15

**interview** 226:11 230:19 233:22 243:12 262:18 278:20 395:3 415:18

**interviewed** 257:21 303:12 308:20 309:20 346:15 380:14

**interviewing** 386:2

**interviews** 226:9 278:10

**introduced** 229:25

**introductory** 318:21

**inventory** 285:16 347:11

**investigated** 411:22 412:8

**investigation** 412:2 415:25 416:10 418:2

**involve** 234:25 351:15 375:11

**involved** 235:21 264:18

**involvement** 231:8 264:14 367:25

**involving** 417:11 420:6

**Iron** 401:9,15 402:1

**issue** 274:24 326:12 344:9, 18,23 355:21 404:6 411:22 419:14 421:18 423:13 439:6

**issued** 307:3 408:22 410:15 413:1,13,18 414:19 419:15 426:22 427:10,17 429:15 431:5 435:1 437:1, 2 438:14

**issues** 227:12,25 266:5 344:5,10 345:1 349:8 395:13,14 396:16 411:20 412:17 414:20 419:21 421:16 429:4 440:22

**italicized** 295:22

**items** 245:16 351:25

---

**J**

**J&j** 294:17 330:21,22 335:25 336:3 339:5,9 376:13,14 422:11 440:18

**J&j's** 338:10

**Jaffe** 223:8

**James** 222:1,9 224:14 225:14 268:13,20 310:19, 24 371:5,11 407:21 408:2 441:1

**January** 307:21 313:17 420:1

**Jersey** 399:9

**Jervis** 396:1

**Jim** 223:10 224:5 379:6

**JJCP** 417:7

**JJCPI** 420:5

**Joan** 278:20

**Joann** 278:20 283:15 421:24

**job** 279:24 280:18

**Johnson** 223:1 224:16 225:8,13 239:3 240:20 242:15 243:5,6,18 244:1,2 247:21 248:15 249:5,10,23 250:18 251:4 252:11 253:17 256:3,20 257:3,4,5, 6,12,13 258:16,22,25 259:11,18 260:2 261:23 262:25 263:1 265:7 267:20 268:25 269:2,3,21 270:15, 16,17,21 271:20 272:2,3 273:11,12,19,20 274:15,16 275:1,2,12 278:4,5,11,12 279:5,15 280:7 281:1,2,7, 8,17 289:8 294:22 301:21 306:18 310:11,12 311:10 316:3,19 325:5,20,21,22 327:3,4 329:5,12 330:2,3, 16 333:3 334:18,19 344:25 348:12 350:23 354:13,14 355:3,12,13 356:15 358:20 360:4 362:12 364:22,24 373:10 383:22 384:3 387:9

**Johnson's** 243:18 247:21 249:5,10 250:18 251:5 257:8,14 260:2 326:19 339:19 343:16,24 347:4 353:3 355:4 358:19 362:3 364:22 383:23 384:25 389:14 393:1 400:21 402:10,19 409:24 410:1,2 415:8 417:4,14 419:13 420:10 426:7 430:15 433:19

**join** 350:15

**Jonathan** 223:8

**Judy** 327:19

**July** 249:7 288:3 290:5,12

**jump** 247:13 319:24

**jumping** 332:3

**June** 260:14

**jurisdiction** 402:2

---

**K**

**Kaiser** 364:11 421:19

**Karen** 274:23 303:12,16 316:22 317:5,16 322:17

**Kate** 309:10

**Kazan** 222:5,16 224:12,21

**keeping** 368:10

**key** 236:8 237:20 238:5

**kind** 237:11 241:4 260:8 303:22 305:16 339:3 348:4 350:7 354:11,15 355:18 360:21 384:15 389:3,13 390:13 397:5 415:6

**kinds** 316:7 408:16

**kit** 299:10,12,16,20 300:1, 21 301:6,17 306:5,12 312:18

**kits** 310:12,13 312:4,10 313:18

**knew** 238:3 306:3 334:13, 14

**knowing** 334:19,20

**knowledge** 235:13 236:7, 15 237:20 244:21 265:24 266:4,9 267:1 283:10,25 293:22,24 300:1 301:1,11 303:24 330:23 361:23 389:19

**knowledgeable** 429:3

**Kolmar** 396:1 398:23 400:4,13,19 402:3,4

**Kong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 334:1 336:3,23 338:6 339:9,20 382:10,17 417:21 425:1 431:7 438:2,3,18

**Korea** 326:21 329:1 331:19 332:21 333:25 431:9,12

**Korean** 337:1 339:18

**Krushinski** 409:18 416:22 419:9 433:17

---

**L**

**laboratories** 364:5 396:1 400:19

**lack** 303:2

**lacks** 350:16

**Langley** 222:7 224:8

**language** 248:5 250:11, 13,25 296:8 319:4 420:18 423:15,23

**large** 263:13 278:11

**latest** 322:15

**launched** 267:12

**Laura** 226:9 230:10 232:18

233:1,16 244:1

**law** 224:12,22 243:23 308:15,17

**laws** 248:12 250:6,21 251:9

**Lawson** 418:10,18

**lawsuit** 417:11 420:6

**lawsuits** 429:16

**lawyer** 290:22

**lawyers** 325:13

**lay** 379:2

**lead** 418:19

**learn** 436:21 438:4

**learned** 232:23 278:10 356:1 374:2 396:9

**leave** 387:5

**Leavitt** 224:15 226:4,13 228:8 231:6,9 232:24 233:14 234:6,12 236:5 244:16 246:22 326:15

**led** 234:1

**Lee** 363:13 365:9 366:4,15, 20 372:1,7,9 374:22 385:17 407:8

**left** 291:21 367:13

**legal** 226:16 227:13 243:7, 12,14 251:9 252:12,25 253:10 254:23,24 255:13 282:11 286:7 297:21 299:24 300:4,7,16 303:3 340:19 367:15 369:9,14,16 388:3 394:18 403:7,10,11 405:13,19,23 408:14 410:15 413:2,9,12 414:23, 24 416:8 418:12 420:15,20 421:13 422:8 424:21 426:22 427:17 432:15 433:4 436:5 437:1

**legend** 234:18

**length** 237:10 260:18 390:12

**lesser** 280:21

**letter** 238:15

**level** 238:19 256:17,19

320:20 349:23 394:15

**levels** 384:5

**liability** 431:25

**life** 259:16 342:22,23,25
343:1,4,9,10,17,19,21,22
345:9 346:13,20,21,22
347:1,3,15,16,18 349:22
352:15,18 353:5,10,19
354:17 383:6,10 384:20,23
385:8 387:2

**life-based** 386:19

**limit** 253:9

**limited** 315:14 316:5
440:7,22

**lines** 269:11 271:6 281:25
317:12 347:10 367:5,8
372:6 397:9

**Lisa** 364:11 421:19

**list** 226:16,17 238:2 241:24
242:8,14,21 246:11 295:13
300:5 358:24 379:2 380:1,
2,13,15 381:19 409:13
419:8,10 424:5 426:18
428:18 430:23 431:20
432:25 435:22 437:8

**listed** 245:19 306:6 308:10
410:3 427:19,21 428:15

**listing** 437:13

**lists** 298:20 300:3 379:6
381:11,13,14,16 418:13,25
419:3

**litigation** 242:16 243:8
403:12 405:5 409:14
410:25 411:4,6 412:17
413:12,17 415:7 419:15
431:21 432:4,16 433:1,5,
15 434:24 435:16 437:2
438:1

**LLP** 222:23 223:3

**locate** 244:13 287:17
332:18 389:1 416:12

**located** 256:11 268:25
333:22

**location** 224:11 241:20
302:16 349:2

**location-specific** 331:13

**locations** 264:17 326:20
331:12 349:6

**long** 230:24 233:1 253:9
259:13 270:8 283:3 306:19
312:20 331:14 343:23
347:3,18 352:21 353:1
355:16 358:14 366:24
377:18 387:11 392:10
408:17,18 428:18

**long-term** 352:12

**longer** 299:23 301:8
313:13 323:21,23 324:16,
23,25 325:1 347:16 402:10
412:24,25 414:11

**looked** 236:17,24 237:5
238:1,3 338:13 353:10
388:12

**loop** 339:4

**Lorena** 364:13 391:5
395:3 397:6 400:1

**loss** 412:17

**lost** 259:19 332:11 398:4

**lot** 266:22 268:7 320:2
322:12 344:3,9 352:2
372:24 386:12,18 406:7
409:9

**lots** 348:7 354:7 386:17

**loud** 248:9

**lower** 357:7

**LP** 342:17,20 346:12

**lunch** 337:10,14 338:2

---

**M**

**Macarthur** 222:23

**Madam** 238:7

**made** 226:17 246:20
251:18 283:7 317:2,3
319:3,7,20 320:9,10
322:13 325:3 336:17
352:21 353:2 356:10
388:17 389:22 407:5
426:12 436:5

**magnetic** 315:15

**maintained** 259:15 316:3
358:11 366:13 384:10

418:25

**maintaining** 335:20
397:10

**maintenance** 262:1

**make** 232:11 252:23
261:16 272:19 320:24
325:13 337:17 346:13
359:13 361:11 374:7 386:8
409:6 420:13 421:20

**makes** 240:25 391:21

**making** 260:3 262:14

**manage** 250:20 326:7

**managed** 248:11 367:19

**management** 246:25
247:22,23 248:14 249:6,
11,22 250:19 251:6,14
252:20 267:16,19 278:22
282:8 287:6 288:2 289:9
291:2 292:1,2,10 295:2,25
296:5 311:11,13 318:22
368:17 373:5 376:17
384:6,7 418:19 421:16
422:11

**manager** 285:17,18
300:11 303:17 334:4
421:15

**managers** 257:22 285:20
302:23

**managing** 250:5 251:7

**mandatory** 269:25
270:11,15 271:15,16,22,25
272:11 273:17 275:20
276:21 277:20 280:19,23
285:14 298:14

**manufacture** 343:24
358:12 404:20

**manufactured** 326:20
358:15 395:12 405:9

**manufactures** 343:11

**manufacturing** 257:7
270:20 279:7 334:8 340:25
341:14 346:18 347:11
348:4,8 349:2,9 353:12
354:18 358:8,10,19,23
359:5 360:9,25 363:1,5,18
365:22 368:1 372:10
375:7,12 376:10 377:3
386:10 387:1,4 392:25

393:16,19,22 394:8,11,20
395:5,22,25 397:23
398:14,25 399:4,10 400:2,
16,21 401:4 402:5,10
417:12 420:7

**manufacturing-related**
387:18

**map** 315:15

**mark** 222:16 225:1 231:23,
24,25 242:3,4 246:1,2
247:6 248:22 251:21 267:2
288:6 289:3 348:23 364:12
367:4 368:21 370:4 380:25
392:17 399:14 431:14

**marked** 229:25 232:5,9
242:6 246:6 247:18 248:1,
25 249:3 259:6 260:23
271:24 287:16,18 289:6,
10,19,21 290:2 311:2
318:2 347:7 359:19,22
379:18,19 380:18,20,24
381:7 410:10 416:15
425:21,24 429:21,25
430:4,10 431:16

**marketing** 240:24 257:7
260:4 270:20 279:6

**marketplace** 342:23
347:13,19

**marks** 268:12,19 310:18,
23 371:4,10 407:20 408:1
440:25

**mashed** 384:15

**master** 354:5

**match** 361:5

**material** 234:25 239:24
263:15 316:11 341:14,24
342:14 343:19 345:10
349:24 353:12,24 354:1,8
401:8

**materials** 226:7 227:16
234:12 240:2 244:22,24
246:13 258:10 271:3
286:12 291:17 297:7,13,17
298:7 302:8,10,13 331:14
335:6,15 337:3,5 346:19,
25 369:17,18 377:1 390:5
401:10 410:19 412:10,13
423:21 424:5

**matter** 403:19,20

**matters** 424:6 433:13 440:6

**Mcclain** 222:5,16 224:12

**Mcelroy** 224:16

**Mcneil** 258:1 263:7,18 264:6 265:2 390:16

**Meagher** 223:3

**meaning** 279:20 376:3 411:1

**means** 275:10 277:13 297:3,4 298:14 343:20 346:4 366:6 378:12 391:23 420:14

**meant** 264:9 276:4 310:6 312:24 345:10 353:20 384:12,13

**measures** 357:25

**mechanism** 254:8 416:1

**mechanisms** 254:19

**media** 268:13,19 299:1 304:15,18 310:19,23 314:8,13,19,21 315:4,24 371:1,4,10 407:21 408:1 441:1

**members** 364:8

**memory** 230:2,8 235:18 240:12 372:16

**memos** 312:4

**Mendez** 428:25

**mention** 266:23 430:19

**mentioned** 245:16,20 259:2 262:11 302:3 317:5 341:25 346:11 364:13 374:13 381:16 388:2 391:11 400:13 414:14 415:2 438:10

**mentions** 417:14

**mesothelioma** 227:12 409:22 435:2,13

**mesothelioma-related** 433:12

**meta** 240:8

**methods** 299:22 306:8

**Michelle** 257:23 390:20

**microfiche** 315:15 316:16

**microfilm** 315:15 316:15

**microphone** 408:11

**microscopy** 305:11 340:11 362:2,10 402:22

**Microsoft** 238:17 365:4

**migrated** 367:13

**milled** 341:10 355:19 356:17 360:12 362:4,11 389:15 403:5 406:2

**mind** 371:22 395:2

**mine** 349:23 350:9,21 351:6 367:10,17

**mineral** 339:25

**mines** 222:20 225:6 350:10,20

**minimum** 298:8,9 306:6 313:25 342:11,15

**mining** 372:5 376:17

**minute** 331:2

**minutes** 439:15

**mischaracterizes** 253:15 366:17

**missing** 236:17

**Mississippi** 429:12 430:6

**misspoke** 336:16

**Mittenthal** 222:1,9 224:14 225:14,23 231:25 268:14, 20 310:20,24 311:4 338:1 355:9,23 371:5,11,14 379:6 381:2 392:18 407:22 408:2,5 441:2

**model** 277:23

**moment** 336:1

**morning** 225:3,23,24 290:19

**Mountain** 401:9,15 402:1

**move** 263:22 267:2 268:5 337:7 356:12 361:14

**moving** 317:17,18 439:2

**Mswanson@kazanlaw. com** 222:18

**multiple** 242:1

**Mumbai** 376:15

**museum** 406:14

___

**N**

**named** 226:10 238:4 328:11

**names** 236:8 237:20 238:2,12 256:22 379:11

**natural** 330:12

**nature** 320:19 440:6

**necessarily** 240:6 254:7

**needed** 367:14 369:9

**Neil** 265:3

**network** 237:1 238:16

**Newport** 222:24

**Nicholas** 328:11 332:5 364:12 370:22 372:3 373:3 382:19

**nonparticipation** 284:6

**nonresponsive** 263:23 337:8 361:15

**normal** 326:8

**North** 349:1,5 394:21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

**notation** 239:6 352:3 383:5

**note** 247:6 271:1,5 316:10 360:1 363:23 367:25 373:22 381:21

**noted** 263:3,5 322:17 345:18 382:20,21 403:19

**notes** 231:10 235:17 244:3,8 245:21 246:20 247:20 252:1 260:7,12,13 261:7,22 262:20,24 263:16 265:23 266:2,15,17,19 267:8 270:22 278:16,18,25 279:25 280:25 281:10,14, 21 284:24 285:3 287:14

**Michelle** 293:23 299:15 303:15 309:4,5 316:22 317:9,19 319:11 325:7,10 326:6 327:8,15,24 331:9,21 332:19 338:20,24 347:22 352:10 356:2 359:7 361:19,22 364:3,15 365:6, 8 367:17,19 368:15,20 370:11 371:21,25 374:7 375:9 378:2,5 380:10 381:12 387:16 390:14 392:23 395:2,4 396:6,7,24 397:4,22 398:2 400:1,8 418:9

**notice** 222:3 344:11 351:3 355:8 358:23 393:24 396:4 400:7,23 403:8,10 408:22 410:15,18 412:7 415:13 416:20 417:17 418:1 420:2,14,15,20 421:4,8 423:5 427:10,17 428:3,22 429:1 435:20 436:4,7,17, 25 437:1

**noticed** 224:21 246:11 327:7 344:13 404:1

**notices** 340:19 403:11,18 412:23 416:5 418:24 419:5 423:25 430:14 436:25

**notified** 438:21

**noting** 418:10

**notion** 383:10

**November** 409:18 416:21

**number** 224:15,18 236:6 246:8 249:3 250:3 261:15 263:13 268:13,19 278:11 280:21 287:18 290:5 293:5,7 294:4 298:18 310:19,23 311:21 321:24 322:16,23,25 324:14 325:5,16,17 359:23 371:10 377:5 407:21 408:1 416:17 422:1 440:5 441:1

**numbering** 317:10 324:5

**numbers** 290:20 357:6,19

___

**O**

**Oakland** 222:6,17 224:13

**oath** 226:1

**object** 228:9,14 237:13 240:18 241:8 242:17,23 243:9 244:4,18 249:24 250:9,23 253:14,21 255:3, 15,23 256:9 257:19 258:19 259:23 264:15 265:20 266:6 267:21 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 297:5,23 300:8,23 302:2 304:5,13 305:18 308:3 310:1 312:11 314:15 315:5 316:9 319:22 320:17 323:9,25 330:14 334:24,25 344:7,8 345:3 348:14 350:12 351:2 353:21 355:6,7 361:21 362:6,13 365:24 366:16 369:4 370:1 383:15 385:1,14 386:5 387:14 388:13 389:17 392:15 395:6,9 396:3 397:25 398:16 399:22 400:6 405:11 412:6 414:1, 13 421:9 423:18 428:5 431:23 434:1,6,21 440:3

**objection** 350:16 370:18 393:23 397:1 400:22 402:14,23

**objectives** 280:3

**obligation** 409:1 413:6 414:24

**obligations** 415:13

**observed** 412:10

**obtain** 227:1

**obtainable** 235:10

**obtained** 226:15 229:1 406:14

**occasional** 386:20

**occasionally** 233:24

**occasions** 412:9

**occurred** 386:17

**October** 222:4 224:10

**odor** 351:16

**off-site** 237:12,16

**offhand** 330:5

**office** 238:17 263:5 301:21 302:15

**officer** 421:11

**officers** 285:21 300:11 303:13

**offices** 222:5 230:20 243:23

**oldest** 256:14,16 329:10

**on-the-ground** 234:25 235:2

**onboarding** 281:3

**ongoing** 245:10 363:18

**op** 317:13

**operated** 301:2

**operating** 241:5 252:16 271:11 273:20 274:15 275:11 277:2,4 292:16 294:22 298:11,24 330:8 331:16 338:10 417:16,21 420:23 424:23 427:16 430:23 436:1

**operation** 264:11,12 306:1 399:10

**operations** 331:24 390:7

**operative** 277:15

**opinion** 344:21

**opportunity** 247:4 286:11 440:19

**opposed** 239:12 241:19 267:24 270:10 309:25 318:11,13 372:18 386:10 392:11 423:24

**opt** 277:5

**optical** 315:16

**option** 251:17 277:16

**order** 278:5 381:19 428:19

**ore** 341:10 356:17 360:12 362:4,11 389:15 403:5 406:1

**organization** 239:12 292:17

**organizational** 297:16 298:5

**organizations** 363:13

**organize** 294:7,8

**organized** 286:14 294:7 297:8,10,15

**original** 230:1 231:10 240:1 403:17

**originally** 240:9

**originals** 299:2 314:22

**OUS** 437:12

**ovarian** 432:4,16,21 433:15

**overarching** 307:9

**overseas** 274:5,14 331:24 338:25 417:21 424:23

**oversee** 285:17

**P**

**p.m.** 310:23 337:13,16 371:6,9 407:23 408:1 440:18 441:3,6

**Pacific** 327:4,10 328:3,18 329:17,23 332:20 337:6 338:6

**packaged** 326:20

**packaging** 358:8,18,19,24 377:1 402:5

**pages** 232:7 288:8,10 293:9 307:16 317:23 318:8 319:7 331:23 357:13,15 360:15

**paginated** 261:12 270:25 309:4

**Pai** 236:16 237:25 238:24

**Pam** 230:16 231:6 232:9 383:19,21 386:22

**Pamela** 226:9 230:9,16 233:11 243:25

**Pankaj** 364:12 375:18 383:4

**paper** 294:5,8 299:7 301:20 302:5,8,13 306:13 315:14

**paragraph** 320:4,5 327:20

417:6

**Pardon** 288:21

**parentheses** 365:20

**Park** 364:13

**part** 239:12 250:18 312:18 334:15,20 356:6 365:2 369:7 377:1 380:9,15 381:13,14,16 382:11 393:14 395:18 408:6 415:25 416:9 418:2

**participate** 280:14

**participation** 279:11 283:9 306:17

**participatory** 285:15

**particulars** 247:1 265:1 277:1,6 283:12 390:23 391:2

**parties** 224:23 364:23 384:10

**Partridge** 223:10 224:5

**parts** 365:8

**party** 363:12 417:11 420:6

**past** 248:18 303:12 314:1 407:4

**Pay** 238:24

**peel** 260:8

**penalties** 410:21

**people** 235:5,11,21 240:4 241:2 254:24 255:6 261:24 262:6 266:25 278:7,11 280:10,18 282:23 285:3 330:24 346:15 364:10,16 368:16,21 380:3,13 381:13,16 385:7 396:10,13 415:16 428:2,10,13 434:17

**people's** 240:12 364:1,14

**percent** 279:11,14 280:10, 20 283:1 284:9

**perform** 239:23 279:13 284:11,14 363:14

**performed** 236:14

**period** 227:4 228:18,19 229:23 244:8 258:17 276:8,11 286:19 292:9

303:2 313:14 336:7,15 343:10 346:9 347:12 352:5 373:19 383:5 400:20 403:4 404:19

**periods** 265:10 270:2 272:21 335:4 356:23 368:18,19 370:11 371:18 387:12,22 388:1,19

**permanent** 352:15 353:8

**permission** 281:20

**permitted** 440:21

**persistent** 239:21

**person** 265:24 266:4 274:9,19,20 283:15 325:12 383:21

**Personal** 360:5 427:3,7

**personally** 222:8 416:2

**personnel** 416:1

**perspective** 334:7

**pertaining** 292:17 323:11 417:3 424:20

**pertains** 299:6 314:24

**PETER** 222:1,9 225:14

**Pharma** 350:4 358:17 405:9

**Philippines** 275:3 294:17 326:13 327:3 328:14,23 329:5,12,17,24 330:3,21 331:19 332:20 333:25 335:22,25 336:20 338:6 339:6,20 382:10,17,20 417:22 424:25 427:11 431:6 436:9,13,17 437:3,7, 10,21 438:9,18,22

**philosophy** 251:5 325:23 326:1,3,4

**phone** 223:3 233:23 373:8

**photograph** 315:15

**photographs** 316:16

**photomicrographs** 362:23

**phrase** 251:16

**physical** 236:22 303:25 304:1 305:16 335:13

367:12,22 368:9,10 369:23

**physically** 235:15,22

**piece** 270:5

**pieces** 331:21 365:7

**pile** 359:17,20

**piped** 233:24

**PL** 431:21

**place** 230:12,19,21 241:1, 13 253:10 277:3,4 294:4 332:18 361:9 370:21 372:2 387:11 393:15 398:1 405:6

**places** 341:1 342:8 371:25 374:21 387:15,17

**plain** 346:2

**plaintiff** 224:22 245:10 435:14

**plaintiff's** 232:4 242:5 244:15 246:5 247:17,25 248:24 260:22 289:5,18,20 311:1 381:6 416:14 425:23 429:24 430:3,9 431:15

**plaintiffs** 222:15 225:2 227:9 228:7 242:12 244:22 256:2,7 411:17 412:19 440:17,21

**plant** 359:9 395:23 396:18 399:9 401:22

**plants** 399:1 401:23

**platform** 385:12

**platforms** 262:1

**PMQ** 400:16

**PO** 398:10

**point** 228:8 263:17,19 268:1 272:16 273:16 276:21 280:13 283:7 284:5 301:2,12 303:21 305:15 308:8,14 309:19 310:15 317:11 325:11,12 345:13 349:5 350:20 357:1 392:11 405:4 420:17 422:16 424:14 439:4

**policies** 227:17 241:10,14 244:24 245:17 246:25 248:15,17 253:7,23,25 254:7,19 256:8,11 257:17 258:6 271:15 278:7 279:16

287:7 290:18 291:2,6,9,19 292:25 305:14,15 316:21 317:2 320:10 328:21 329:2 332:16,22 333:23 334:21 338:4,7,9,14 339:5 340:21 346:6 354:21 355:4 364:22 368:19 371:20 383:1 385:23 387:11 393:15 394:16 402:20 405:25

**policy** 245:5 248:7,14,19 249:6,7,11,13,22 250:2,3, 8,11,12,13,15,19,22 251:7, 10,13 252:15,21 253:2,12, 18 254:2,3,4,10 255:11,25 256:14 258:4 259:21 278:13 281:18 285:23 288:2 289:1,9,17,23 290:6 291:2 292:10,14 294:13,14 295:5 302:20 303:5,11 304:8,24 305:3,5 306:1 307:9 308:1,8 309:22 312:19,24 313:19,20 314:1,5,14,17 315:10 316:1,6 318:5,11,20,23 319:1,4,8,11,17,20 325:6, 16 329:8,9,10,15,16 330:20 336:3 341:13 353:19 356:16 360:11 363:21 368:25 369:1 382:7 385:25 389:4,7 390:12,14, 17,24 391:3,6,13,15,17 392:9 393:9 394:9 405:14 407:2 418:6

**Port** 396:1

**portfolio** 377:2

**portion** 311:6 398:24

**pose** 440:19

**possessors** 408:15

**possibilities** 277:21

**possibility** 277:22

**possibly** 316:23 379:4 390:20 421:19

**post-** 234:11

**potentially** 363:13 412:3

**powder** 257:8 260:4 264:14,20 279:8 326:19 339:19 343:5,16,24 347:4 353:3 358:19,20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:9

409:24 410:1,2 417:4,14 420:10 426:8,9 430:15,17 433:19

**practice** 267:25 335:19 374:4 382:7,13 385:21

**practiced** 382:9

**practices** 330:25 331:8,11 333:24 335:3 337:5 371:18 383:1 386:1 387:10

**pre2009** 317:16

**preamble** 250:15 318:20

**preceded** 381:22

**precise** 264:17 271:17

**preliminary** 388:10

**preparation** 260:14 261:8 356:7,8

**prepare** 262:4

**prepared** 261:7,22 345:1, 6,9 346:7 409:4

**prescribes** 270:8

**presence** 363:11 371:17 393:11

**present** 223:7 226:10 233:7

**preservation** 385:9 416:20 417:17 420:1,14 423:5 428:3

**preserve** 252:22 255:14, 17,19 408:16 410:19 411:18 434:17

**preserved** 259:19 363:19 424:6

**preserving** 412:10

**pretty** 284:2 379:20 406:17 433:24

**previous** 321:14 371:24

**previously** 222:10 225:15 227:9 229:24 234:24 242:11 246:15,17 410:23

**primarily** 294:5,8

**primary** 361:23

**principal** 384:2

**principles** 292:16

**print** 248:23

**printed** 379:24

**prior** 229:17,24 243:7 244:6 247:2 248:17 249:17,19 262:15 267:19 271:22 272:10 275:19 284:18 291:19 292:10 293:20 294:1 318:18 320:16 350:9 359:2,11 360:9 373:19,23 377:25 378:13,18 382:15 385:21 386:17,20 389:12 390:8 392:25 413:24 434:25 436:25 437:5

**privy** 245:9

**problem** 354:12

**procedure** 241:5 252:17 303:14 358:3 405:2 416:5

**procedures** 253:24 254:9, 11,12 271:11 280:4,5 282:12 338:5 416:6 422:9

**proceed** 225:21

**process** 281:3 341:20 342:7 346:19 348:8,20 351:20 358:11 363:3,5,19 386:10

**processing** 372:5

**produced** 222:9 227:9 228:7,11,13 229:2,20 230:5,6 242:11 245:5 246:12,15 256:8,12 268:25 269:2 288:6 290:18,24 291:10,11 327:2 329:9 338:8 339:16,17 410:7,13 413:10

**product** 341:9 342:3,22,23 343:4,9,10,12,15,17,19 345:10,16 346:20,21,23 347:1,13,19 352:15,18,21 353:2,11 358:15,16 360:12,22,23 362:12 371:17 374:12 384:20,24 387:3,7 393:11 395:12 401:17 404:12,15,17,19 406:4 417:14 420:8 423:13 426:12 431:25

**production** 223:10 224:7 230:7 234:8,13,23 236:6

383:23

**productions** 384:5

**products** 256:21 257:13 259:1,11 260:2 270:21 271:20 272:3 273:10 279:7 330:17 341:9 355:20 370:15 389:15,16 417:9 421:1 423:14 427:3,4 430:16,20

**program** 247:23 251:17 272:21 274:19 276:2,11, 13,18 291:3 295:2,25 296:6 421:12

**programs** 278:7

**proper** 239:3 306:8 354:16

**protect** 250:20

**protected** 248:11

**protecting** 250:5

**provide** 228:1 296:19 334:23

**provided** 233:19 244:22 245:1 246:24 256:11 258:7,8 288:7 295:3 296:4 299:16 300:2,3 357:4 422:5

**provision** 369:15

**provisions** 252:5 361:7

**PTI** 352:4 358:11,14,18 359:3,5,9,21 360:9 392:25 393:17 394:3 404:2

**pull** 259:7 347:8

**purity** 398:19

**purpose** 226:11 241:15,18 280:2 286:10 297:12 298:4 390:4 391:16

**purposes** 406:11

**pursuant** 222:3 297:20 303:11 413:1,23

**purview** 266:11

**put** 231:25 237:3 240:8 241:5 260:9 263:12 287:11 302:15,20,24 317:14 385:11 401:8 409:11 415:7

**puts** 305:22 410:18

**putting** 337:21 382:14

**Q**

**QA** 358:9

**qualified** 224:5 361:8

**quality** 341:1 342:2 346:17 349:8 356:25 357:2,3,5 358:2 364:8,17 368:1 372:12 373:4 376:10 398:10 405:1,2 427:7

**quarterly** 363:14 364:24 365:12,18,19 366:1,23 367:10 368:12 369:19 370:6,12 371:15 372:1,7, 19 373:14 374:5,20,23 375:2,13 384:11,13,17 385:18 386:13,19,24 387:17 406:3

**query** 332:21

**question** 226:19 229:11 242:24 244:20 261:19 266:8 271:14,18 282:13 290:22 296:9 301:14,16 316:25 327:5 334:25 344:8 353:22 355:7 361:10 369:5 373:25 374:2 382:1 392:4 394:6 395:16 400:18 402:4 414:2,18

**questioning** 355:8 440:17

**questions** 229:16 241:22 261:15 293:5 328:20 344:3,10 375:4 391:12 395:18 400:17

**quick** 308:25 337:18 374:7

**quickly** 377:21 424:9

**R**

**R&d** 240:24 263:15 340:22, 24 352:11

**raised** 228:1 332:7 344:22 354:12 440:22

**range** 228:21 229:3 230:5 363:15 370:8 385:4

**raw** 376:25

**reach** 253:8

**reached** 252:14 253:5

**read** 226:20,22 238:8,9 248:9 256:24 257:1 304:23 327:23 352:23,24 403:18 417:10

**reading** 350:3 354:4

**real** 408:6

**real-time** 262:5

**realize** 258:11

**reason** 255:13,17 261:14 301:10 303:3 438:22

**reasonable** 440:16

**reasons** 255:5

**recall** 233:3 248:21 272:13 275:4 281:11,12 304:6 328:4 340:15 411:20 435:9

**receive** 279:22 428:15

**received** 227:7 240:4 246:12 316:3 394:10,11,13 413:8 420:24 421:4 427:18 428:3,10,22 430:24 431:3 433:6 436:17

**receiver** 408:25

**receiving** 369:3 399:3 400:3 427:19

**recent** 251:20,24 311:18 328:25 379:13 392:9 432:21 433:6 435:18

**recently** 230:3 385:10

**recess** 268:16 310:21 407:24

**recipient** 430:22

**recipients** 418:1,4 428:24 436:4

**recognize** 315:24

**recollection** 233:15 264:4 265:22 414:3

**reconstitute** 320:15,24

**record** 224:4 225:19 226:22 229:25 238:9 247:7 250:18 251:5 252:13 253:5 257:1 262:5 268:15,17 269:21 273:22 277:15 280:4 283:23 288:1 290:23

291:19 293:1 295:1 305:2
310:20,22 313:11 315:8
333:6,9,12,19,20 337:11,
12,15,22 338:2 352:24
354:5,6 358:17 360:10,18,
20 365:2 366:11 370:25
371:6,7,8 375:24 381:3,9
383:23 407:19,23,25
416:18 420:14 423:6 426:2
439:14,17,18,19,20,25
440:24 441:2

**recorded** 315:17,25 316:2

**recorder** 371:2

**recording** 224:6

**recordings** 315:3

**records** 245:4 246:25
247:22 248:10,13 249:6,
11,22 250:6,21 251:6,8
252:9 253:18 254:20
257:22 258:13,15,17
259:14,17,21 261:25 262:9
263:15,17 266:17 272:4,
11,20,22 273:4 274:13,19,
25 275:5,15 277:18
278:12,22 279:1,2,3,16,22
281:3,17,18 282:8,9,24
284:1 285:6,20,21 287:1,6
289:8 291:1,10,15 292:1,2,
3,4,7,9 293:10 295:18
296:5 297:14 298:25
300:11 301:18,22 302:18,
23 303:2,4,10,13 305:25
307:10,24 311:6,11,12,22
312:10,14,24 314:5 315:13
316:4 318:22 326:8 329:22
330:1,7 334:9 347:11
348:3,7,23 349:10,11
352:11 355:5 357:22
358:2,8,9,10,14,22,23
359:10 360:4 366:12
367:12,22,24 368:6,8,9,17
369:3 372:5 374:12 375:10
384:10 387:8 396:22
397:10,14 398:6,10,13
399:3,9 400:3,17 401:2,4,
5,14,19 402:7,11,13 416:1,
7 418:18 421:11,12,15,16
422:11 424:19 433:23
434:4

**recross** 440:21

**recurring** 279:11,20,23
280:2,11

**redo** 297:19

**redundant** 320:4

**Reed** 236:16

**refer** 229:17 235:6 261:16
269:6 270:18,22 285:4
346:1 347:5 414:6,10
420:18

**reference** 239:13 262:14,
25 266:18 272:14,16
278:15 284:8 285:5 291:24
294:24,25 296:1 299:9,13
309:7 313:8 321:12,25
323:3 325:4,21,25 327:13,
14,21 328:9 331:20 332:7
334:3 336:17 341:13 343:4
366:10,22 370:10 378:12
383:17 385:25 391:21
398:10

**referenced** 247:8 264:2
288:18 295:6 345:14
364:15 370:21 401:14

**references** 263:14 265:23
266:1,21,25 281:11,22
309:2 316:23 320:8,23
327:8,25 331:23 334:11
340:16,17,18 371:21
374:10,17 375:10 382:25
387:19 388:17 390:19
424:12 426:9 434:25
435:3,7

**referred** 240:21 284:24
296:19 308:22 327:10
376:22 390:13,14 405:20
423:14 431:19 432:25

**referring** 237:8 247:8
250:14 251:1 258:23 273:2
276:2,7,8 282:8 293:13
296:1 312:9 344:20 349:10
353:1 366:23 377:10 392:6
401:10 404:11,12 422:17

**refers** 276:10 328:17
352:11 404:24

**refiltering** 234:24

**reflected** 244:2 293:23
322:20,23 324:15 331:9
338:20 351:13

**reflective** 356:9 415:12

**reflects** 324:23,25 325:1

**refresh** 230:2

**refreshes** 230:8

**regard** 344:10 364:11

**region** 334:5 336:15 337:6
376:4 378:3,5,6

**regions** 334:12 335:2,9,
13,20 338:11

**regular** 386:13

**regulations** 248:12
250:22 251:9

**reinforce** 280:3

**relate** 234:21 241:15
360:17 404:15 430:14

**related** 227:11 231:5,9
233:14 242:22 243:7 244:1
261:18 264:20 312:10
339:18,24 349:9 371:18
375:6 406:18 415:3,5
419:23 430:14 433:18
439:11

**relates** 434:8

**relating** 242:18 243:4
305:7

**relationship** 235:12

**release** 307:10 401:17
408:22,24 409:3 412:22
413:1

**released** 413:16 414:11

**releases** 413:10,12 414:9,
15 415:1,5,6 418:11

**relevance** 440:8

**relevant** 240:14 334:22
342:9

**relied** 240:12

**relieved** 408:25

**remainder** 366:14

**remember** 229:14 281:6
332:21 342:17 390:11,15,
25 416:4

**REMEMBERED** 222:3

**Remind** 230:16

**removal** 325:2

**remove** 317:17 325:4

**removed** 241:6 320:4,23
321:15 324:15

**removes** 241:7

**Renay** 418:10,11,18,23

**reoccurring** 280:8 283:2

**replaced** 273:14 275:7
276:12,24 313:17

**report** 362:24 378:15

**reported** 306:17

**reporter** 222:8 224:8
226:22 238:7,9 257:1
352:24

**Reporters** 224:9

**reports** 246:19 306:19
340:9,10 341:14,25 342:14
343:20 345:11,24 346:10
353:13,24 354:1,8 355:19
361:18 371:15 375:20
376:20,21 377:11,15,24
378:19 382:4,14

**represent** 327:24

**representative** 264:9
265:6 333:3 334:18 355:11
387:9 394:25 419:14

**represented** 256:7 324:9

**request** 234:7,8 236:5,6
243:1,3 296:21 407:5

**requested** 226:15 242:18
258:5,6 308:16 365:21
366:19 415:11

**requesting** 244:14

**requests** 234:13 244:15
345:24

**required** 270:7,12 279:22
280:17 354:19 413:5

**requirement** 252:14 253:5

**requirements** 248:13
250:22 251:9 277:24
294:21 298:25

**research** 258:10 291:16
344:2 360:24 395:2

**resides** 397:10

**resolved** 414:21

**respect** 231:12 232:9 237:25 242:15 245:16 283:18 332:23 338:25 354:22 355:4 360:11 363:10 364:3 382:13 393:9 402:6,20 403:3,12,16,22 405:25 409:14 412:17 415:8 418:7,9 419:9 426:7 433:12

**respond** 227:25

**response** 259:24

**responsibilities** 349:4

**responsibility** 286:1 349:8 397:10,14 405:2

**responsible** 328:13 368:16 376:17 382:19

**responsive** 244:13,15 335:18 361:10 412:3

**rest** 260:8 288:6,11 289:14 290:6 295:21 327:24 408:6

**result** 297:6,7,16 410:20 413:6 429:15

**results** 298:6 344:17 354:22,23 356:18 358:6 363:17 366:25 367:10 368:6,12,13 369:19 370:6 372:9,12 373:14,20 376:23 385:10 386:4 391:6 406:24

**retain** 255:6 313:11 366:4, 5,9 407:6

**retained** 241:6 252:10 255:12 301:9,11 303:4 313:19 335:24 367:1 373:18,20 374:3,16 403:9 406:8,12,20,24,25

**retaining** 332:23

**retains** 306:19

**retention** 226:8,24 227:17, 19 228:2,4,6,21,25 229:22, 24 230:4 239:23 241:10, 14,17 244:14,23 245:4,17 252:11,13,24 253:5,8,18 255:6,9,11 256:3,16,23 257:17 258:13,15,16,17 259:10,14,17,21 261:25 262:14,25 263:6,10,25 264:24 265:8,11 267:16,

18,25 269:1,12,14,18,22, 23 270:6,8,14 271:12,13, 19 272:4,11,21,22 273:3,5, 15,21,22 274:14,25 275:6, 8,12,14,15 277:15,19 278:6,12 280:4 281:18 282:9,12,24 283:23 284:1 286:6,18 290:23 291:10,19 292:5,9 293:1 295:18 297:20 298:25 299:24 300:7,16,18 301:22 304:8 305:15 311:6,12,22 312:10,14,25 313:14 326:23,24 327:1 328:21 329:2,3,4,22 330:2,7,20,25 331:3,8,11 332:15,22 333:23 334:9,11,15,21 335:2,3,10,17,23 336:3 337:2,5 338:4 339:5,8,18, 22 340:8,21 341:4,6 342:11,15 343:7 344:13,18 345:5,14 346:8,9,19 351:22,25 352:4 353:9,19 354:16,22 355:5,16,18 356:4,9,16,22 358:5 359:10 360:4,11,18,20 361:9,18 362:1,9,18 363:21 364:22 365:5 368:18,22 369:2 370:11 371:18 372:18,19 374:12, 18,19 375:10 382:25 383:1,5,9 384:19 386:19, 23 387:7,10,12,19,21,25 388:6,7 389:4,7,11,12,13, 20,21,24,25 390:4,5,12,13, 17,24 391:3,6,17 392:3 393:9,15 394:8,15 396:11 402:6 403:4 404:3,18 405:7,25 406:9 416:8 422:9

**retentions** 338:25 403:25

**retired** 285:5 319:13

**retraining** 283:25

**review** 247:4 436:24

**reviewed** 265:3

**reviewing** 299:15

**revision** 247:7 307:5,7 308:5,14 317:22 318:4,8 321:22,23 322:9 323:11 325:1

**revisions** 322:12

**revisit** 331:6

**rewrite** 320:15

**RG17882401** 224:18

**Richard** 223:3 225:12

**richard.bernardo@ skadden.com** 223:6

**RIMS** 290:7 293:7 296:25 298:18 305:21 306:2 307:16 313:2,7,16 315:7 318:15,17,18 319:13,24 321:14,19 324:7,8

**ringing** 380:4

**RJ** 363:12 365:9 366:3,15, 20 372:1,7,9 374:22 385:17 407:8

**role** 245:12 303:18 411:2

**roles** 282:12 422:9

**Rosina** 257:21 262:11 265:18 266:19 268:23 272:9 274:8 275:23 347:25 352:7 390:19 391:8,9 418:23

**rough** 320:25

**routinely** 367:18

**Royston** 359:9,11 360:8 393:2,5,8,13,16,19,22 394:2,3,7,19 395:23

**running** 266:16

**runs** 354:11

___

**S**

**safety** 401:21

**sake** 234:11,15 302:13

**sale** 359:8,21

**sample** 305:9,17 366:15

**samples** 304:22 305:1,4,6 365:22 366:13,19,20 372:8 403:5,6,9,22 404:3,11,12 405:15,20 406:1,4,6,10,12, 14,18,23 424:4,7,11,13,18, 20

**sampling** 404:16

**sanctions** 410:21

**sat** 440:5

**satisfy** 243:1

**Satterley** 222:5,16

**saved** 335:4,6 363:17

**scanned** 238:2 367:10

**scenarios** 277:6

**schedule** 229:24 241:17 252:12 253:8 255:9 256:16 257:25 258:2,13,16,17 259:11 260:10 263:6,10,25 264:6,9,24 265:4,8 267:16, 18,23 269:12,14 270:6,8 271:19,21,23 272:4 273:5, 10,11,15,21,23 275:1,6,8, 13,14,15,19,21 277:3,4,15, 19 282:9,24 286:6 290:23 291:22,23 292:14 293:1 295:18 297:15,20 298:25 311:6,12,22 327:1 329:22 330:7 335:18,24 339:9,22 340:3,5 345:15 346:9 347:12 352:1 353:10 354:16 355:18 356:4,24 359:15 360:2,4,10 361:7,9, 13 362:18 364:2 368:23 387:21 388:8 389:12 391:21,24 403:4

**scheduled** 272:22

**schedules** 226:8,24 227:20 228:2,4,6,25 229:22 230:4 241:15 244:14,23 245:4 252:24 255:7 256:3,23 258:6,18 259:14,18 262:15,25 263:19 265:23 266:2,8,12, 20 267:1 268:24 269:2,18, 22 270:15 271:22 272:11 273:4 274:14 278:6 283:23 291:7,10 326:23,24 328:21 330:2 331:1,4 332:22 334:11,16 335:2,3,10 336:6,7 338:5 340:8,16,23 346:14 355:16 356:9,20 359:13 369:2 387:19 388:6,15,19 389:20,21,24 390:4 392:4 406:9 416:8

**scope** 329:20 330:4 340:24 351:3 355:8 356:7 393:23 396:4 400:7,22 401:25 412:7

**Sean** 364:12

**search** 226:25 236:2,7,11, 12,13,14,21,22 237:22 308:25 360:19

**searched** 235:14 236:23 335:14

**searches** 231:9 232:23 233:13 234:7,12,14,19,20, 23 235:19,22,24 236:18 237:7,10 238:6 244:11,12 245:2,7,13,15 261:25 308:25 383:23 384:4

**searching** 235:15 236:20

**seconds** 288:21 333:15,17

**secretary** 233:9

**section** 282:5 292:1 295:4 318:21 324:15 353:25 354:7 357:21 360:17 370:22 383:3 404:9,14 418:10 424:16

**sections** 359:1,2 364:2 372:4

**sector-based** 431:1

**seek** 386:8

**seeking** 395:10

**selling** 270:20

**SEM** 314:13

**send** 366:15 418:11,23

**Senior** 278:22

**sense** 324:8 369:7 374:1 408:14

**sentence** 299:13 320:4 356:13 382:11 384:18

**sentences** 320:23

**separate** 232:11,13 363:18 386:15,16

**separation** 386:8

**September** 226:5 245:7, 14 246:21 289:10 293:18, 21 298:19 307:4

**sequence** 403:11

**serve** 414:4

**Services** 223:10 224:7

**set** 236:6 299:22 379:6

**sets** 357:6,18 434:13

**setting** 389:2

**Sharan** 334:4 336:18

**share** 236:19 237:1 238:3, 13,21 239:1,2,18,20,25 240:6,10,13,15,25 241:12, 20

**shared** 240:17,22 372:10

**Sharepoint** 365:4 367:11, 14 372:9,11 382:21

**shares** 237:25

**Sheerin** 390:19 418:23

**sheet** 245:19

**shelf** 342:25 343:1,21,22 346:12,20,21,22 347:1,3, 15,16,18 353:5,19 354:17 383:6,10 384:20,23 385:8 386:18 387:2

**shipments** 399:16

**shipping** 347:11

**short** 267:3 268:9 310:16

**shorter** 347:12

**Shorthand** 222:8

**shortly** 405:23

**show** 287:20 359:8

**showed** 437:9,11

**Shower** 257:8 279:8 426:9,11 430:15 433:19,20

**shredding** 302:1

**sic** 237:3 252:16

**side** 263:5 264:18,20

**sides** 264:21 379:24

**sign** 286:3

**sign-offs** 303:25 304:1,9

**signing** 303:18

**similar** 263:20 315:22 423:7

**simple** 301:16

**simply** 234:10 241:13 245:14 246:11 263:12

326:6 331:14 371:25 373:22 381:13 391:16 418:11 437:12

**single** 267:25

**sir** 225:3 228:23

**sit** 345:8 346:7,12 399:7

**site** 243:19,22 335:16 365:22 367:11 372:11 377:3 382:21 397:11 418:12

**sites** 372:10 400:17

**sitting** 334:19

**six-year** 373:18

**Skadden** 223:3 230:20 243:23

**Skellington** 274:23 303:13,17 316:23 317:5 322:18

**Skillman** 264:20 271:2,7 401:25

**Slate** 223:3

**slogging** 392:11

**small** 240:15

**software** 315:16

**sold** 396:20

**SOPS** 271:9 282:6 398:11

**sort** 246:18 255:19 262:1 306:14 308:7,24 321:24 340:13 354:25 371:19 379:6 383:24 396:12 399:15 405:13 419:21 433:10,22

**sorts** 401:5

**sought** 228:3 349:20

**sound** 315:3 327:9

**sounds** 309:23 385:4 407:18

**source** 240:1 336:25 361:23 372:12 425:8 436:15,20

**sources** 234:19,20 235:9 406:15

**sourcing** 334:4

**speak** 233:1,10,12 241:10 265:18 274:24 284:22 290:21 299:25 300:24,25 301:10 330:25 345:1,6 346:2 351:19 354:13 361:12 364:4,7 373:8 385:3 394:22 414:24

**speaking** 240:25 243:17 272:9 275:4 286:4 328:10 337:2 364:21 421:17

**speaks** 234:17 359:1

**spec** 332:13

**specially** 222:21 337:23

**specific** 231:3,9 232:24 233:13 234:6,8,12 245:21 263:14 266:7 277:25 278:19 282:20 294:2 298:1 320:8 331:1 332:19 361:6 364:2 368:9 387:10 388:16 414:6,10,20 435:21

**specifically** 243:3 257:6 264:13 265:14 294:10 303:9,16 306:13 320:9 326:5 332:10 334:5 335:22 346:8,11 348:25 351:12 357:9 360:21 364:15 369:12 370:5 389:1 406:11,23 415:11 426:8 434:24 435:6 437:9,11 438:16,20

**specification** 332:2 343:15

**specifications** 343:14 401:5

**specificity** 340:15

**specifics** 303:20 422:23

**specifies** 403:8

**specs** 377:4,6 398:10

**spectrographs** 340:13

**speculate** 330:18

**speculating** 391:14

**speculation** 263:23

**speculative** 356:13

**spend** 429:20

**spent** 243:17

**spirit** 440:11

**spoke** 230:9 231:4,17 243:15,25 257:24 268:23 322:17 334:2 346:15 364:8,10,17 381:14,17 384:13 387:15 390:11 415:17 422:4

**spoken** 281:1 387:12

**spokesperson** 243:5 344:25

**spreadsheet** 377:21

**Square** 223:4

**stack** 287:11 409:11

**stale** 284:2

**stand** 328:2 431:22

**standard** 241:4 247:23 249:21 251:17 271:11 285:6,7 293:10 294:6 295:1,17,19 296:2 306:25 307:24 317:17 318:18 319:9 321:14,19 325:2

**standardize** 273:3

**standardized** 272:20

**standards** 248:14 252:16 290:10 298:9 307:10 317:14,20,21 318:11,14,24 319:24 324:5

**standpoint** 255:24

**stands** 378:16 386:11

**Staneruck** 428:25

**start** 233:10 268:19 269:23 310:23 328:23 348:16 364:19 365:17 371:10 374:4 392:2 408:1 416:11 422:18 439:9

**started** 278:24 280:18 282:15 283:3,22,24 284:20 359:5 365:18 368:1 370:4 375:5 385:17 386:13 388:2 391:11 400:20 422:13,17

**starting** 413:21 428:19

**starts** 313:14 317:14

**state** 222:8 225:18 350:16 429:12 430:6 439:24

**stated** 326:6

**statement** 383:8

**statements** 225:18

**states** 321:23 325:20,22 335:10

**stating** 322:4

**statistic** 284:5

**stay** 403:25

**stayed** 293:2

**stays** 239:25 408:21

**stenographic** 333:19

**step** 356:6

**steps** 363:2 367:14 369:8

**stipulations** 225:18

**stopped** 309:15

**stopping** 439:4

**storage** 237:16

**store** 241:13 378:20

**stored** 335:9,16 365:3 372:9 375:21,25 377:12, 18,24 378:15 402:1

**storing** 378:19

**story** 240:9

**straighten** 385:24

**Street** 222:6,17

**strike** 263:22 337:7 338:23 356:12 361:14 377:13 394:1 429:6

**study** 388:16

**stuff** 262:2 300:19 351:10 409:9

**subject** 239:21 270:6 286:18 298:21 308:4 335:10 365:4 393:14 394:15,17 403:19,20 411:18 412:4 415:1 423:10 424:5 440:6

**subjects** 415:18 424:5

**subsequent** 229:21 244:16 246:20 293:1 307:12 317:21 320:11,14 338:21

**subsequently** 230:6 242:12

**subsidiaries** 274:15 436:2

**subsidiary** 257:5 278:1

**subsidiary's** 390:16

**substantive** 419:21

**suggest** 304:20 372:17

**suggestion** 272:12,23 273:5,7,23 275:6,24 276:3, 19,20,23 277:2,3,8

**suit** 277:24

**Suite** 222:6,17,23

**summarily** 244:2

**summarize** 232:22 261:21 265:22

**summary** 348:23 420:11 431:20

**Superior** 224:19

**superseded** 292:22

**supervision** 235:25

**supplier** 340:18 352:4 356:21 364:8,17 367:19 373:4 377:3,7 387:23,24, 25

**suppliers** 377:1 383:6

**supply** 373:4 394:12

**supposed** 259:15 301:23 302:19 321:3 323:16 355:17 434:5

**supposedly** 390:16

**survey** 339:15

**surveys** 339:13

**suspend** 405:14

**suspended** 321:15

**suspends** 305:24 306:1

**Swanson** 222:16 225:1,22 226:19,23 228:12,17 231:22 232:3,6 237:19 238:7,10 241:21 242:3,7, 20 243:2,11 244:10 245:24 246:7 247:10,11,16,19 248:2,22 249:1 250:1,16

251:3 253:16 254:1 255:8, 18 256:1,13,24 257:2 258:3,24 260:1,19,24 261:4 263:22,24 264:22 265:25 266:10 267:5,7 268:2,6,10,22 269:8 270:9 273:18 274:3,12 275:22 276:1,9,16 277:12 278:17 283:11,20 284:7 286:15,24 287:4 288:15 289:3,7,16, 22 290:11 291:8 296:18,23 297:9,25 300:12 301:4 302:9 304:7,14 305:20 308:6 310:4,17 311:3 312:13 314:20 315:11 316:14 319:25 321:2 323:13 324:1 330:15 333:5,11,14,20,21 335:21 337:7,19,25 344:14 345:7 348:15 350:17 351:8 352:22,25 354:10 355:14, 22 356:12,14 357:16 361:14,16,25 362:8,17 366:2,21 369:11 370:3,23 371:13 380:11,12,16,22,25 381:8 383:16 385:6,20 386:6 388:5,20 390:9 392:20,21 393:25 395:7, 13,20 396:5 397:3 398:3, 17 399:23 400:9,24 402:16,25 405:12,17,21 407:11,13,16,19 408:4,13 412:12 414:7,16 416:16 421:14 423:19 425:17,25 428:8 429:19 430:1,5,11 431:13,17 432:3,7,10,12, 13 434:2,14,22 438:24 439:5,11,16,22 440:12,23

**sweep** 374:17

**switch** 326:11 378:24

**sworn** 222:10 225:15

**Symphony** 377:25 378:13,19 382:15

**system** 237:11 357:5 358:3 365:2,3,4 367:20 369:15 375:21,22,24 376:1,3 377:25 378:11,13, 16,18,20 405:1

**systems** 235:23

## T

**tab** 357:4 404:1 410:10 419:25 422:24 432:24

**tabbed** 357:23

**table** 231:15,16,18,19 232:8 234:3,10,17 235:3 308:11 359:14 364:9 379:3,25 380:1,2

**tables** 379:10

**tag** 232:1

**taking** 375:8

**talc** 222:20 224:17 225:4,5 226:16 236:8 237:21 242:15,19,22 243:4,7,8 270:21 279:7 304:22 305:4,8 326:18 332:12 336:25 337:1 339:12,19,25 341:9,10 344:6,19 345:21 346:17 348:12 349:9 355:19,20 356:16,17 360:12,22 362:4,11 363:10,14 364:22 367:11 370:14,15 371:16 372:8 374:11 376:23 377:1,2,3,6, 7 382:3,24 384:16 387:6 388:9 389:14,15 391:7 392:8 393:12 394:12 399:2,16 403:5,6,12 404:3 405:5,8 406:1,2,19 409:14 412:17,20 413:12,17 415:4,6,9,12 419:15,17,18, 23 423:14 424:3,7,11 426:12 431:20 432:4,16,25 433:4,15 434:23,25 435:4, 16 437:2,25 438:1

**talcosis** 409:19 433:16

**talk** 245:13 270:19 283:16 334:15 341:5 346:8 354:5 372:4 382:22 392:16,17 403:23 439:15

**talked** 260:18 305:23 314:4 317:6 342:13 388:6 394:3 412:22 416:4 424:3

**talking** 227:13 231:15 233:21,25 238:20 257:4 262:7 266:19 274:9 282:1 286:17 293:15 298:3 309:19 312:8 318:19 330:24 331:17 332:12

**talks** 306:4 387:2

**tape** 315:16

**target** 234:23

**task** 302:14

**tasked** 257:6

**team** 271:8 364:8 372:12

**Tech** 350:4 358:18 405:9

**technician** 224:6

**Tele-video** 223:10 224:6

**telephone** 225:10 233:6

**telling** 257:16 276:17,19

**tells** 330:7

**Telofski** 364:13 395:3 397:6 398:22 401:7

**Telofski's** 400:1

**TEM** 305:10 314:12 354:24

**ten** 271:1,6,7 312:16 376:18

**tend** 347:11

**tendered** 440:7

**term** 240:21 305:13 312:25

**terms** 234:5 238:5 244:8 245:9 263:10 266:7,12 286:1 290:6 294:24,25 295:13,14,21,22 316:6 319:4,10 362:15,16 366:23 374:12 386:1 394:12 405:24 414:23 426:18 430:23 433:14,22 434:4,16

**test** 341:21,22 344:17 347:10 348:19 363:16 368:13 372:9,12 373:14 398:10 399:20 406:4,24

**tested** 305:8,9 365:17,20 403:6 406:2

**testified** 225:16 410:23 411:13 412:2,9

**testimony** 329:11 355:10 366:17 395:10 440:4,20

**testing** 305:7 339:25 340:9,17,19 341:4,19 342:3,7,9 344:5,6,17,18,19 345:15,19 346:9,17,24 347:10 348:4,7,20,22,23, 25 349:11,22,23 350:1,5,8, 22,24 351:15,16,17,20,21 353:11 354:22,23,24 355:5,10,12,19 356:18 358:6,24,25 359:1 360:11, 21 361:11,18,19 362:3,10, 22,23,24 363:9,10,14,15 364:4,6,23 365:9,12,18,19 366:1,23,25 367:1,12 368:6,7,12 369:19 370:6, 12,14 371:16 372:1,7,19, 21,25 373:2,21 374:5,11, 16 375:6,10,11,12 376:23 377:4 382:3 383:13 384:10,11,13,16,20 385:9, 18 386:3,7,9,10,14,18,20, 23,25 387:6,18 388:3,10 389:4,13 390:1,7 391:6,20, 22,23,24 392:8 393:10 394:9 397:23 398:6,18 399:2,3,8 400:3 401:3,19 402:22 404:16 406:11,18 407:5,7,9

**testing-related** 341:8

**tests** 351:12,13,15,21 358:1 364:24 367:19

**text** 354:4

**Thailand** 328:14 334:6 336:18 337:3 372:8 382:9

**theoretically** 254:25

**theory** 320:13

**Theresa** 409:18

**thing** 298:4 306:14 333:16 340:14 355:1 383:24 396:12 420:15

**things** 227:19 260:11 305:6 318:23 354:24 361:19 372:22,23 375:23 377:5 380:23 409:10

**thinking** 314:24

**third-party** 372:7

**thought** 370:24 377:13 379:18 439:3

**thrown** 300:19

**thumb** 321:18

**tickets** 358:9

**tie** 234:7 356:3 363:25 388:16

**tied** 234:4 320:4 346:20

**time** 224:11 227:5 228:1,19 243:17 244:8 262:9 263:14 264:13 271:22 275:13 276:6 277:14 283:3,22 301:12 309:6 312:16 317:3 319:12 325:12 333:17 335:4 336:7,15 337:9,13 340:7 343:10 346:5,23 347:2 362:5,12 365:20 368:23 375:8 390:23 394:18 400:20 401:24 403:21 405:20 412:14 422:22 426:8,13 428:6 429:20 431:12 439:13 440:9,18

**timeline** 379:11 380:1

**times** 223:4 228:3 233:20 243:19 280:9 347:12 408:9 418:24

**Tina** 226:10 230:9 233:6,8, 18

**title** 239:6 272:2

**titles** 272:20

**today** 224:8 229:5,8 231:18 246:24 251:10,13 287:5 290:16,18 334:19,23 344:4,10 346:7 356:18 392:16,19 399:7

**Today's** 224:10,14

**told** 240:10 264:5 272:10 276:12 281:6 301:17 310:3 352:11 353:17 354:17 390:23

**Tom** 327:19

**tomorrow** 388:22 391:25 392:3 439:7 440:14

**tomorrow's** 439:23

**tools** 252:23

**top** 248:7 250:4 261:12 287:12 318:10 342:6 347:6 357:6 384:9

**topic** 267:3 268:5 274:11 283:18 345:5 415:18 439:10

**topics** 246:11 344:13 389:25 395:11

**total** 379:25

**touched** 402:17 408:8

**trace** 300:22

**Trackwise** 365:3 367:20 375:21 376:2 377:12,19,24 378:4,7,16,24 381:20 382:15

**trained** 278:8 279:16 282:23

**training** 254:16 279:12,20, 22,23 280:2,11,16,17,24 281:3,4,18 282:1,7,9,10,15 283:2,4,9,22 292:2 421:7, 12,16,22 422:4,8,17,20,21

**trainings** 280:8

**transcript** 333:6

**transferred** 350:1 378:10, 22 399:11

**transmission** 362:2,10 402:21

**treated** 241:19 438:23

**Triality** 230:17 384:2

**TRIM** 267:23

**true** 253:12,20 255:22 270:12 272:4 275:8,15,24 276:13,24 277:9,16,20 278:13,22 280:11 282:19 283:4 284:21 285:14,24 287:1 288:3 292:20 293:2, 18 294:11,18,22 295:19 297:4 298:9,15,21 299:4 301:9 306:14 311:19 312:9 314:10 322:5 323:19,24 324:11,20,24 326:16 330:22 351:11 374:5,6 384:25 391:3 399:12 409:25 411:6 417:1 420:10,20 424:18 426:12,

24

**turn** 298:17 328:8

**two-thirds** 309:8 398:11

**tying** 387:20

**type** 263:17 314:18 354:3 370:13 415:9

**types** 298:20 299:6 315:4 339:23 355:11 391:22 433:23

**typically** 253:11 383:6

**typing** 262:7

---

**U**

**U.S.** 312:1 437:18,22

**U.S.A.** 337:23

**Uday** 334:3 335:5 336:18

**Uh-huh** 375:14

**underneath** 287:13 318:12,14,15

**understand** 225:25 231:7 235:20 236:24 238:11 240:13,19 244:19 245:12 250:12 258:9 280:17,19,20 281:2 297:11 301:14 324:5 325:11 335:19 336:9,21 344:22 345:4 361:2 365:23 394:23 396:10 400:15 414:17 429:3

**understanding** 226:12 227:12 228:16 234:15 238:22 239:4,19,24 241:9 242:25 251:12 253:3 254:13 260:6 273:25 276:25 277:17 280:22 291:5,15 294:3 300:3 326:4 335:8,12 337:4 339:14 346:24 348:21 351:14,18,20 356:19 358:21 363:12 364:21 365:1 366:18 368:13,22 371:23 373:13 378:25 388:14 389:24 390:3 391:13 393:4,13,20 394:14 396:9 403:7,14 406:5 407:4 421:11 425:2,4,9 428:16 429:18 431:24 433:10

**understood** 237:24 310:6 344:24 375:22 395:21

**undertaken** 363:25

**uniform** 272:20

**unit** 275:11

**United** 335:9

**units** 417:16,21 420:23 426:19,21 427:16 430:23 436:2

**universe** 406:6 433:22,24

**unproduced** 234:24

**untrained** 278:12

**update** 246:14

**updated** 244:24,25 245:21 246:9

**upload** 418:12

**USA** 222:21

**users** 241:1 300:2,3 301:1

---

**V**

**validated** 375:21,22 377:25 378:12,16

**validation** 357:20 358:13

**valued** 248:11

**valuing** 250:4

**vantage** 268:1

**variable** 284:1

**vehicle** 274:18

**vehicles** 241:11

**verbatim** 262:9

**verified** 303:1

**verify** 283:9

**Verma** 364:12 375:18 376:9 383:4 388:18

**Vermont** 222:20 225:5 350:10

**Versatile** 267:24

**version** 246:9 247:15,19, 21 248:16,19 249:5,15,17, 20 250:11,25 251:1,19,20,

25 287:17 288:2,5 289:9, 16,23 290:5,10,15,19 293:5 296:8 298:18 307:1, 12,20 309:4 312:18 313:4, 5,8 315:20,21 316:15 317:19,24 318:5,19 319:10 320:14,16 321:1,5,9,11,12, 15,17,21 322:3,4,7,15,16, 19,25 323:1,7,15,22,23 324:3,11,13,19,22 325:5, 15 326:1 356:4 384:17 409:7

**versions** 251:16 263:7 288:7 290:2,19 320:11

**versus** 240:24 422:25

**video** 224:5,6 268:13 315:16 333:12 371:1

**videos** 304:12

**view** 356:7

**viewed** 270:5

**visible** 376:4

**Vivian** 236:16

**volume** 224:15 226:6 229:1,10,21 231:4 237:10 244:17

---

**W**

**wait** 332:6 425:18

**walk-through** 374:13

**walking** 371:25

**wanted** 231:7 261:16 265:17 378:4,25

**warn** 417:13 420:7

**Washington** 264:11,12 265:3,15 271:3,8

**waste** 346:5

**water** 288:20

**Web** 418:12

**week** 230:23 242:9

**Welch** 224:9

**wheeled** 302:6

**wheeling** 302:14

**wheels** 302:11

**whoever's** 303:18

**whoops** 247:20

**Wiley** 428:20

**wished** 273:13 274:2

**witnesses** 386:2 415:16

**woman** 226:10

**word** 231:15 232:8 237:6
320:20 341:21 342:9
345:19 361:11 433:8
435:10

**words** 236:8 237:21 238:5
241:12 269:6,10 277:1
284:14 292:21 313:16
314:25 331:16 342:22
353:2 368:24 373:19
394:11 405:13 411:4

**work** 226:3 238:19 260:20
373:6 397:11 412:19

**worked** 230:17 234:5
244:25 246:10 317:16

**workflow** 351:6

**working** 243:20 294:5
376:12 411:10

**works** 234:3 384:3

**world** 334:21 335:14 376:5
427:8

**worldwide** 239:7 245:4
247:21 248:13 249:5,10,
19,21 251:6 287:6 289:8
294:14,19,20 296:5 315:7
318:22 325:5 339:12
427:3,8

**worldwide's** 246:24 288:1
295:1

**writing** 305:22

**writings** 246:20

**written** 292:15 303:6
314:25 320:2

**wrong** 270:24

**wrote** 239:11 264:5 269:10
279:10 284:13 310:2
395:18 396:14

**WW** 239:6,8 287:6 427:8

**WWRAM** 252:15

**WWRIM** 285:6 289:16,23
290:17 294:14 298:18
303:5 312:24 313:2 316:21
317:6,13 318:5 319:11,16
324:11 325:5,16

**X**

**x-ray** 314:9 315:24 354:25

**Y**

**year** 270:14 273:6 279:23
280:9 281:17 292:21
300:17 329:6,7 330:20
346:22 383:7,10 384:21
385:9 387:3 397:18 404:21
406:12,19 407:3,5 422:21
432:19

**years** 228:21 229:3 256:22
271:2,7 281:1 294:4,6,10
312:15,16 314:1 334:10
335:7 342:24 347:14
352:2,16 353:20 354:18
358:11,23 372:14,16
373:11,20 374:4 376:13,
14,18 377:19 382:8 383:11
384:24 385:8 386:3 404:3,
20 418:15

**yellow** 426:24

**York** 223:4 396:1

**Z**

**Zappa** 348:24 349:14
351:6 364:1,12 367:4
368:15 369:8 385:17
388:18 399:14

**Zhu** 328:11 332:5 364:12
370:22 372:3 373:4 382:19
388:17

Exhibit 161

Margaret M. Gurowitz

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF NEW JERSEY
 3                      -  -  -
 4

          IN RE:  JOHNSON &        :
 5        JOHNSON TALCUM POWDER     :
          PRODUCTS MARKETING,       :
 6        SALES PRACTICES, AND      :  NO. 16-2738
          PRODUCTS LIABILITY        :   (FLW) (LHG)
 7        LITIGATION                :
                                    :
 8        THIS DOCUMENT RELATES     :
          TO ALL CASES              :
 9
10                      -  -  -
11                  July 12, 2018
12                      -  -  -
13
14               Videotaped deposition of
     MARGARET M. GUROWITZ, taken pursuant to
15   notice, was held at the law offices of
     Drinker Biddle & Reath, 105 College Road
16   East, Princeton, New Jersey, beginning at
     9:29 a.m., on the above date, before
17   Michelle L. Gray, a Registered
     Professional Reporter, Certified
18   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
19
20                      -  -  -
21
             GOLKOW LITIGATION SERVICES
22        877.370.3377 ph| 917.591.5672
                 deps@golkow.com
23
24
```

Margaret M. Gurowitz

```
 1    APPEARANCES:
 2

      WILENTZ GOLDMAN & SPITZER, P.A.
 3    BY:  DANIEL R. LAPINSKI, ESQ.
      90 Woodbridge Center Drive
 4    Suite 900 Box 10
      Woodbridge, New Jersey 07095
 5    (732) 855-6066
      dlapinski@wilentz.com
 6
         - and -
 7

      BEASLEY ALLEN, P.C.
 8    BY:  P. LEIGH O'DELL, ESQ.
      218 Commerce Street
 9    Montgomery,  AL  36104
      (334) 269-2343
10    leigh.odell@beasleyallen.com
11       - and -
12    ASHCRAFT & GEREL, LLP
      BY:  MICHELLE A. PARFITT, ESQ.
13    4900 Seminary Road, Suite 650
      Alexandria, VA 22311
14    (703) 931-5500
      mparf@aol.com
15    Representing the Plaintiffs'
      Steering Committee
16
17
18
19
20
21
22
23
24
```

Margaret M. Gurowitz

```
 1        APPEARANCES:   (Cont'd.)
 2

          ORRICK, HERRINGTON & SUTCLIFFE, LLP
 3        BY:  KRISTEN RENEE FOURNIER, ESQ.
          51 West 52nd street
 4        New York, New York 10019
          (212) 506-3767
 5        kfournier@orrick.com
 6           - and -
 7        DRINKER, BIDDLE & REATH, LLP
          BY:  JULIE L. TERSIGNI, ESQ.
 8        500 Campus Drive
          Florham Park, New Jersey 07932
 9        (973) 549-7000
          Julie.tersigni@dbr.com
10

             - and -
11

          SKADDEN ARPS, LLP
12        BY:  ANDREW M. KARP, ESQ.
          Four Times Square
13        New York, New York 10036
          (212) 735-3000
14        Andrew.karp@skadden.com
          Representing the Defendants,
15        Johnson & Johnson entities
16
17
18
19
20
21
22
23
24
```

Margaret M. Gurowitz

```
 1        APPEARANCES:  (Cont'd.)
 2
          GORDON & REES, LLP
 3        BY: JAMES E. ROBINSON, ESQ.
          Three Logan Square
 4        1717 Arch Street, Suite 610
          Philadelphia, Pennsylvania 19103
 5        (215) 717-4007
          Jrobinson@grsm.com
 6
             - and -
 7
          COUGHLIN DUFFY L.L.P.
 8        BY: MARK K. SILVER, ESQ.
          350 Mount Kemble Avenue
 9        Morristown, NJ 07962
          973-267-0058
10        Msilver@coughlinduffy.com
          Representing the Defendant, Imerys
11        Talc America, Inc.
12
          SEYFARTH SHAW, LLP
13        BY:  JAMES R. BILLINGS-KANG, ESQ.
          975 F Street, NW
14        Washington, D.C. 20004
          (202) 463-2400
15        jbillingskang@seyfarth.com
          Representing the Defendant, PCPC
16
17        TUCKER ELLIS, LLP
          BY:  JENNIFER L. STEINMETZ, ESQ.
18        950 Main Avenue Suite 1100
          Cleveland, Ohio 44113
19        (216) 696-3499
          Jennifer.steinmetz@tuckerellis.com
20        Representing the Defendant, PTI
          Royston LLC and PTI Union LLC
21
22
          VIDEOTAPE TECHNICIAN:
23           Devyn Mulholland
24
```

Margaret M. Gurowitz

```
1                    -  -  -
2                 I N D E X
3                    -  -  -
4
    Testimony of:      MARGARET M. GUROWITZ
5
         By Mr. Lapinski          18, 371
6
         By Ms. Fournier             353
7
8
9                    -  -  -
10               E X H I B I T S
11                   -  -  -
12
13  NO.            DESCRIPTION           PAGE
14  Gurowitz-1    PSC Second Amended     23
                  Notice of Deposition
15
    Gurowitz-2    PSC Second Amended     24
16                Notice of Deposition
17  Gurowitz-3    Agreed Order and       29
                  Stipulation Regarding
18                J&J Production of
                  Talcum Powder Products
19                And Talc Samples
20  Gurowitz-4    Curriculum Vitae       50
                  Of Margaret Gurowitz
21
    Gurowitz-5    E-mail Thread          65
22                6/27/18
                  Subject, Follow Up
23                To Phone Meeting
                  Last Friday
24                (No Bates)
```

Margaret M. Gurowitz

```
 1                    -   -   -
 2          E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Gurowitz-6       Letter, 3/19/82         136
                      RE:  Kilmer Museum
 7                    JNJTALC000536396
 8   Gurowitz-7       Letter, 3/9/51          154
                      Subject, Draft
 9                    JNJTALC000536395
10   Gurowitz-8       Paperwork Retention     168
                      JNJTALC000536392-94
11
     Gurowitz-9       Handwritten Note        170
12                    JNJTALC000536391
13   Gurowitz-10      Evidence List           190
                      JNJTALC000536623-34
14
     Gurowitz-11      Evidence List           195
15                    JNJTALC000536610-22
16   Gurowitz-12      Copy of Photograph      197
                      JNJTALC000536604
17
     Gurowitz-13      Copy of Photograph      198
18                    JNJTALC000536605
19   Gurowitz-14      Copy of Photograph      200
                      JNJTALC000536602
20
     Gurowitz-15      Copy of Photograph      201
21                    JNJTALC000536601
22   Gurowitz-16      Copy of Photograph      202
                      JNJTALC000536600
23
24
```

Margaret M. Gurowitz

```
1                    -  -  -
2            E X H I B I T S  (Cont'd.)
3                    -  -  -
4
5    NO.              DESCRIPTION              PAGE
6    Gurowitz-17   Copy of Photograph        202
                   JNJTALC000536603
7
     Gurowitz-18   Iron Mountain             203
8                  Box Details, Box
                   History
9                  JNJTALC000536856-76
10   Gurowitz-19   Evidence List             229
                   JNJTALC000536657-80
11
     Gurowitz-20   FedEx Receipt             240
12                 Alliance Technologies
                   JNJTALC000536777
13
     Gurowitz-21   Laboratory Chain          242
14                 Of Custody Form
                   JNJTALC000536706-30
15
     Gurowitz-22   Laboratory Chain          243
16                 Of Custody Form
                   JNJTALC000536768-76
17
     Gurowitz-23   Laboratory Chain          249
18                 Of Custody Form
                   JNJTALC000536734-58
19
     Gurowitz-24   Laboratory Chain          249
20                 Of Custody Form
                   JNJTALC000536759-67
21
     Gurowitz-25   Johnson's Baby Powder 253
22                 Copy of Photograph
                   JNJTALC000536841-46
23
24
```

Margaret M. Gurowitz

```
 1              -  -  -
 2         E X H I B I T S  (Cont'd.)
 3              -  -  -
 4
 5   NO.            DESCRIPTION           PAGE
 6   Gurowitz-26   Johnson's Baby Powder 255
                   Copy of Photograph
 7                 JNJTALC000536836-40
 8   Gurowitz-27   Johnson's Baby Powder 279
                   Copy of Photograph
 9                 JNJTALC000536819-29
10   Gurowitz-28   Johnson's Baby and    258
                   Toilet Powder
11                 Copy of Photograph
                   JNJTALC000536830-35
12
     Gurowitz-29   Shower to Shower      258
13                 Body Powder
                   Copy of Photograph
14                 STS033
15   Gurowitz-30   Shower to Shower      267
                   Body Powder
16                 Copy of Photograph
                   STS036
17
     Gurowitz-31   Shower to Shower      269
18                 Body Powder
                   Copy of Photograph
19                 STS042
20   Gurowitz-32   Shower to Shower      269
                   Body Powder
21                 Copy of Photograph
                   STS043
22
23
24
```

Margaret M. Gurowitz

```
 1                          -   -   -
 2                E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5     NO.              DESCRIPTION                PAGE
 6     Gurowitz-33   Shower to Shower              272
                     Body Powder
 7                   Copy of Photograph
                     STS046
 8
       Gurowitz-34   Shower to Shower             273
 9                   Body Powder
                     Copy of Photograph
10                   STS051
11     Gurowitz-35   Shower to Shower             275
                     Body Powder
12                   Copy of Photograph
                     STS053
13
       Gurowitz-36   Shower to Shower             276
14                   Body Powder
                     Copy of Photograph
15                   STS055
16     Gurowitz-37   Shower to Shower             279
                     Body Powder
17                   Copy of Photograph
                     STS067
18
       Gurowitz-38   Shower to Shower             280
19                   Body Powder
                     Copy of Photograph
20                   STS065
21     Gurowitz-39   Johnson's                    281
                     Body Powder
22                   Copy of Photograph
                     JBP-001
23
24
```

Margaret M. Gurowitz

```
 1                      -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5      NO.              DESCRIPTION              PAGE
 6      Gurowitz-40   Johnson's                  282
                      Body Powder
 7                    Copy of Photograph
                      JBP-006
 8
        Gurowitz-41   Johnson's                  284
 9                    Body Powder
                      Copy of Photograph
10                    JBP-085
11      Gurowitz-42   Johnson's                  285
                      Body Powder
12                    Copy of Photograph
                      JBP-087
13
        Gurowitz-43   Johnson's                  286
14                    Body Powder
                      Copy of Photograph
15                    JBP-096
16      Gurowitz-44   Johnson's                  287
                      Body Powder
17                    Copy of Photograph
                      JBP-097
18
        Gurowitz-45   Johnson's                  289
19                    Body Powder
                      Copy of Photograph
20                    JBP-099
21      Gurowitz-46   Johnson's                  290
                      Body Powder
22                    Copy of Photograph
                      JBP-107
23
24
```

Margaret M. Gurowitz

```
 1                       -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Gurowitz-47   Johnson's                  292
                    Body Powder
 7                  Copy of Photograph
                    JBP-119
 8
      Gurowitz-48   Johnson's                  294
 9                  Body Powder
                    Copy of Photograph
10                  JBP-133
11    Gurowitz-49   Johnson's                  295
                    Body Powder
12                  Copy of Photograph
                    JBP-135
13
      Gurowitz-50   Johnson's                  296
14                  Body Powder
                    Copy of Photograph
15                  JBP-165
16    Gurowitz-51   Johnson's                  298
                    Body Powder
17                  Copy of Photograph
                    JBP-166
18
      Gurowitz-52   Johnson's                  299
19                  Body Powder
                    Copy of Photograph
20                  JBP-167
21    Gurowitz-53   Johnson's                  300
                    Body Powder
22                  Copy of Photograph
                    JBP-169
23
24
```

Margaret M. Gurowitz

```
 1                     -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Gurowitz-54  Johnson's                   302
                   Body Powder
 7                 Copy of Photograph
                   JBP-175
 8
      Gurowitz-55  Johnson's                   305
 9                 Body Powder
                   Copy of Photograph
10                 JBP-177
11    Gurowitz-56  Johnson's                   306
                   Body Powder
12                 Copy of Photograph
                   JBP-183
13
      Gurowitz-57  Johnson's                   307
14                 Body Powder
                   Copy of Photograph
15                 JBP-190
16    Gurowitz-58  Johnson's                   309
                   Body Powder
17                 Copy of Photograph
                   JBP-215
18
      Gurowitz-59  Johnson's                   310
19                 Body Powder
                   Copy of Photograph
20                 JBP-232
21    Gurowitz-60  Johnson's                   312
                   Body Powder
22                 Copy of Photograph
                   JBP-237
23
24
```

Margaret M. Gurowitz

```
 1                       -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5     NO.              DESCRIPTION            PAGE
 6     Gurowitz-61  Johnson's               313
                    Body Powder
 7                  Copy of Photograph
                    JBP-294
 8
       Gurowitz-62  Johnson's               318
 9                  Body Powder
                    Copy of Photograph
10                  JBP-295
11     Gurowitz-63  Shower to Shower        320
                    Copy of Photograph
12                  STS001
13     Gurowitz-64  Shower to Shower        323
                    Copy of Photograph
14                  STS002
15     Gurowitz-65  Shower to Shower        325
                    Copy of Photograph
16                  STS003
17     Gurowitz-66  Shower to Shower        328
                    Copy of Photograph
18                  STS004
19     Gurowitz-67  Shower to Shower        331
                    Copy of Photograph
20                  STS005
21     Gurowitz-68  Shower to Shower        332
                    Copy of Photograph
22                  STS011
23
24
```

Margaret M. Gurowitz

```
1                     -   -   -
2            E X H I B I T S  (Cont'd.)
3                     -   -   -
4
5    NO.             DESCRIPTION              PAGE
6    Gurowitz-69  Shower to Shower        334
                  Copy of Photograph
7                 STS012
8    Gurowitz-70  Shower to Shower        335
                  Copy of Photograph
9                 STS013
10   Gurowitz-71  Shower to Shower        338
                  Copy of Photograph
11                STS016
12   Gurowitz-72  Shower to Shower        340
                  Copy of Photograph
13                STS017
14   Gurowitz-73  Shower to Shower        341
                  Copy of Photograph
15                STS018
16   Gurowitz-74  Shower to Shower        342
                  Copy of Photograph
17                STS021
18   Gurowitz-75  Shower to Shower        342
                  Copy of Photograph
19                STS031
20   Gurowitz-76  Leahy Product          345
                  And Museum Number
21                JNJ 000660416-80
22
23
24
```

Margaret M. Gurowitz

```
1                      -   -   -
2              E X H I B I T S  (Cont'd.)
3                      -   -   -
4
5    NO.              DESCRIPTION              PAGE
6    Gurowitz-77  Itemization               346
                  Record Title Range
7                 Date
                  3/14/83
8                 JNJ000087993-97
9    Gurowitz-78  Johnson's Baby            364
                  Powder
10                JBP-071
                  JNJTALC000449246
11

     Gurowitz-79  Sample from               365
12                Mr. Burchfield
                  JBP-015
13                JNJTALC000448941
14
15
16
17
18
19
20
21
22
23
24
```

Margaret M. Gurowitz

```
 1                  -   -   -

 2             DEPOSITION SUPPORT INDEX

 3                  -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      None.

16

17

18

19

20

21

22

23

24
```

Margaret M. Gurowitz

1              THE VIDEOGRAPHER:  We are

2         now on the record.

3              My name is Devyn Mulholland.

4         I'm a videographer for Golkow

5         Litigation Services.

6              Today's date is July 12,

7         2018.  The time is 9:29 a.m.

8              This video deposition is

9         being held in Princeton, New

10        Jersey, in the matter of Talcum

11        Powder Litigation MDL.

12             The deponent is Margaret

13        Gurowitz.

14             Counsel will be noted on the

15        stenographic record.

16             The court reporter is

17        Michelle Gray and will now swear

18        in the witness.

19                   -  -  -

20             ... MARGARET M. GUROWITZ,

21        having been first duly sworn, was

22        examined and testified as follows:

23                   -  -  -

24             MS. FOURNIER:  For purposes

Margaret M. Gurowitz

1              of the record, Ms. Gurowitz is

2              being produced today pursuant to a

3              March set of deposition notices

4              served by the Plaintiffs' Steering

5              Committee as amended, adjusted,

6              whatever is the right word, by

7              both the Court and the agreement

8              of the parties.

9                    She will be representing

10             both J&J and JJCI today, and she

11             is being presented on Topic 3.4.

12                   MR. LAPINSKI:  You just took

13             three quarters of my outline.

14                        -   -   -

15                   EXAMINATION

16                        -   -   -

17      BY MR. LAPINSKI:

18             Q.    Good morning, Ms. Gurowitz.

19      How are you this morning?

20             A.    Good.

21             Q.    I introduced myself to you

22      earlier today.  My name is Dan Lapinski,

23      and I'm here on behalf of the Plaintiffs'

24      Steering Committee.

Margaret M. Gurowitz

1    MR. LAPINSKI:  This

2    deposition is being taken pursuant

3    to the February 6, 2018 order of

4    Special Master Pisano and

5    subsequent modifications to that

6    order and on topics permitted to

7    be discovered, which include

8    composition, testing, sampling and

9    bias.

10   The deposition is also being

11   taken pursuant to the Plaintiffs'

12   Steering Committee's second

13   amended notice of 30(b)(6)

14   depositions served on defendants

15   Johnson & Johnson and Johnson &

16   Johnson Consumer Incorporated.

17   The Plaintiffs' Steering

18   Committee reserves the right to

19   notice and conduct follow-up

20   depositions, including depositions

21   of individual witnesses identified

22   during this 30(b)(6) deposition

23   and on topics discussed by

24   Ms. Gurowitz.

Margaret M. Gurowitz

1       Ms. Gurowitz has been

2   designated to testify today in

3   response to deposition notices

4   served upon both by Johnson &

5   Johnson and Johnson & Johnson

6   Consumer, and it's our expectation

7   that her testimony will be binding

8   upon both defendants.

9       To the extent Ms. Gurowitz

10  is unable to offer testimony as to

11  the conduct of one or both of the

12  J&J defendants, Plaintiffs'

13  Steering Committee reserves the

14  right to request a supplemental

15  deposition, so --

16      MS. FOURNIER:  Can I add one

17  thing?

18      MR. LAPINSKI:  You can.

19      MS. FOURNIER:  In response

20  to the mention of the amended

21  notices, I just want to note for

22  the record our ongoing objection

23  to the definition and specifically

24  the definition of asbestos that

Margaret M. Gurowitz

1          was added into the second notice.

2          I don't believe that will have any

3          impact on this particular topic

4          today, but good to note for the

5          record.

6                    MR. LAPINSKI:  Very good.

7     BY MR. LAPINSKI:

8          Q.   So now we're -- now we're

9     set, Ms. Gurowitz.  Good morning.  Have

10    you ever been deposed before?

11         A.   No.

12         Q.   Okay.  I'm going to give you

13    a little bit of background and

14    instruction.  This is just a question and

15    answer session that we're -- we're going

16    to be involved in today.

17                   We're on video, but more

18    importantly, as we discussed a little

19    while ago, everything that's said is

20    being taken down stenographically.  So

21    there's a couple different things that we

22    need to keep in consideration because of

23    that.

24                   One, make sure that all of

Margaret M. Gurowitz

1   your answers are verbal answers so that

2   the court reporter is able to take them

3   down.

4            Try and speak slowly and

5   clearly, and as you'll see as the day

6   goes by, I can't do that.  I'm from New

7   Jersey, so I speak very quickly.

8            I'm going to assume that if

9   I ask a question and you answer it, that

10  you understood my question, so that if

11  for any reason you're not sure of a

12  question that I asked, please ask me to

13  repeat or rephrase the question.  Is that

14  understood?

15       A.   Yes.

16       Q.   Very good.  We're going to

17  try not to speak over each other as well.

18  If I'm asking a question, even if you can

19  anticipate the answer, please try to give

20  me an opportunity to finish it, and I

21  will try to do the same as far as your

22  answers are concerned, okay.

23       A.   Yes.

24       Q.   This is not an endurance

Margaret M. Gurowitz

1  contest, it's not a marathon.  If for any

2  reason you need a break, please let me

3  know, and then at an appropriate time

4  we'll make arrangements to be able to

5  take a break.  Okay?

6            Ms. Gurowitz, I'm going to

7  hand to you what's been marked as

8  Exhibit 1.

9            (Document marked for

10       identification as Exhibit

11       Gurowitz-1.)

12  BY MR. LAPINSKI:

13       Q.    And, Ms. Gurowitz, if you

14  would take that deposition -- the

15  Exhibit 1, and just look at it for a

16  minute.

17            This document is the

18  Plaintiffs' Steering Committee's second

19  amended notice of 30(b)(6) deposition of

20  defendant Johnson & Johnson.  I'm going

21  to ask you if you've seen that deposition

22  notice before.

23       A.    I have seen something

24  similar.  I don't know that I've seen

Margaret M. Gurowitz

1    this exact one.

2         Q.    Okay.  And do you recall

3    when the first time was that you saw that

4    notice?

5         A.    It was a little bit ago,

6    maybe a week or two.

7         Q.    Okay.  And where did you

8    receive that document from?

9         A.    I received it from Kristen.

10              (Document marked for

11         identification as Exhibit

12         Gurowitz-2.)

13   BY MR. LAPINSKI:

14        Q.    I'm also going to now hand

15   you what has been marked as Exhibit 2.

16              Actually, if I could take

17   that back for a second.

18        A.    Sure.

19        Q.    I think what I did was --

20   I'm going to hand to you what I've marked

21   as Exhibit 2 and ask you to take a look

22   at that for a minute.

23              And Exhibit 2 is the

24   Plaintiffs' Steering Committee's second

Margaret M. Gurowitz

1    amended notice of 30(b)(6) deposition

2    from defendant Johnson & Johnson Consumer

3    Incorporated.

4              Ms. Gurowitz, have you seen

5    that document before?

6        A.    I have seen the back part of

7    this document.  In terms of the front

8    part, I'm not sure how it differs from

9    the first one.

10       Q.    When you say the back part

11   of the document, what are you referring

12   to?

13       A.    The listing of all the

14   samples.

15       Q.    Okay.  And the front part,

16   you're not sure whether you've seen the

17   front part before?

18       A.    Correct.

19       Q.    Okay.  Ms. Gurowitz, you

20   understand that you're testifying here

21   today on both -- on behalf of both

22   defendant Johnson & Johnson and defendant

23   Johnson & Johnson Consumer Incorporated?

24       A.    Yes, I understand.

Margaret M. Gurowitz

1        Q.     And your testimony is being

2    offered today in your capacity as a

3    corporate representative of both of those

4    defendants, correct?

5        A.     Correct.

6        Q.     You understand that you're

7    not testifying here today as an

8    individual?

9        A.     I understand that.

10       Q.     Okay.  And you understand

11   that your testimony today will be binding

12   upon both of those defendants?

13       A.     I understand.

14       Q.     As we move forward generally

15   I'll be referring to J&J or the Johnson &

16   Johnson defendants.  And unless I

17   distinguish otherwise, can we just agree

18   that when I refer to J&J or I refer

19   Johnson & Johnson defendants, I'm

20   referring to both of the defendants

21   collectively?

22       A.     Yes.

23       Q.     Okay.  And what I would ask

24   is that unless -- unless you distinguish

Margaret M. Gurowitz

1    otherwise, I'm going to assume that your

2    references are references that relate to

3    both of the defendants.  Is that a fair

4    assumption?

5            A.    Yes.

6            Q.    Okay.  And then I would just

7    ask you if for any reason your answer is

8    going to be specific to Johnson & Johnson

9    or specific to Johnson & Johnson Consumer

10   Incorporated, that you let me know that

11   the response is specific to one of those

12   defendants.

13           A.    I understand.

14           Q.    Thank you.  We're also going

15   to be talking today about talcum powder

16   and talcum powder products.  And in

17   regard to this deposition, I'd like to

18   have an understanding, as long as you'll

19   agree, that when we reference talcum

20   powder products we're talking about

21   Johnson's Baby Powder and Johnson's

22   Shower to Shower product.

23           A.    I understand.

24           Q.    Okay.  To the extent that

Margaret M. Gurowitz

1  there is going to be discussion about a

2  single product, I will try to make clear

3  that I'm talking about a particular

4  product and I would ask that you do the

5  same, if that's okay.

6          A.    I understand.

7          Q.    If you would look at Page 1

8  of Exhibit 1.  At the bottom of Page 1 it

9  has your name listed as a witness,

10 Ms. Gurowitz.

11               Do you see that?

12         A.    Yes.

13         Q.    And are you here today to

14 testify only as to Topic 3.4 of that

15 deposition notice?

16         A.    Yes.

17         Q.    Okay.  And if you would

18 please turn to Page 17 of that deposition

19 notice.  At the bottom of Page 17 if you

20 would look at Number 4, chain of custody

21 for identified samples.  Are you here

22 today to testify as to the storage and

23 chain of custody for any and all samples

24 that have been identified as being in

Margaret M. Gurowitz

1    defendant's possession?

2         A.    Yes.

3              (Document marked for

4         identification as Exhibit

5         Gurowitz-3.)

6    BY MR. LAPINSKI:

7         Q.    Ms. Gurowitz, I'm handing

8    you a document that has been marked as

9    Exhibit 3.  And if you would please take

10   a minute to just review that document.

11   Exhibit 3 is the January 31st, 2018

12   agreed order and stipulation regarding

13   the Johnson & Johnson defendants'

14   production of talcum powder products and

15   talc samples.

16              If you'd let me know when

17   you're done reviewing that document.

18        A.    Sure.  Okay, I've reviewed

19   it.

20        Q.    Very good.  Is this the

21   first time that you've seen that

22   document?

23        A.    Yes.

24        Q.    Okay.  Do you have an

Margaret M. Gurowitz

1  understanding as to what that document

2  is?

3       A.    Yes.

4       Q.    Okay.  What's your

5  understanding as to what that document

6  is?

7       A.    My understanding is that

8  this document sets forth the process by

9  which identified samples of historic talc

10 products that have been discovered would

11 be sent to a lab and then divided.  And

12 it talks about the presentation -- the

13 preservation of those samples, the

14 original containers, et cetera, et

15 cetera.

16      Q.    Okay.  Now at the back of

17 the order, Exhibit 3, there is a

18 list of -- there's a list of samples.

19 And what I'm going to represent to you is

20 that the list of samples that is

21 contained within the order is the same

22 list of samples that is in Exhibit 1, the

23 deposition notice for Johnson & Johnson

24 and 2, the deposition notice for

Margaret M. Gurowitz

1    Johnson & Johnson Consumer Incorporated,

2    okay?

3           A.    Yes.

4           Q.    And those three lists are

5    the same.  We're going to be dealing with

6    the list today, which I'd like to just

7    refer to it as the sample list if that's

8    okay, unless you have a different phrase

9    or different term that you use for it?

10          A.    No, that's fine.

11          Q.    Okay.  In regard to the

12   sample list, did you play any role in

13   preparing that sample list?

14          A.    I prepared a role in

15   preparing part of that sample list.

16          Q.    And what part of that sample

17   list did you play a role in preparing?

18          A.    That is the part of the

19   sample list that has as the leftmost

20   column museum number.

21          Q.    And am I correct that the

22   section that has -- the section that

23   deals with museum number would actually

24   be Exhibit 2 of the sample list?

Margaret M. Gurowitz

1    A.    I'm not sure where it says

2    that.

3    Q.    Well, it -- the prior page

4    that you were just looking at --

5    A.    Exhibit 2.

6    Q.    -- says Exhibit 2.  And just

7    between you and I for purposes of today,

8    there's confusing marks all over these

9    things.  Sometimes it's Exhibit 1,

10   sometimes it's Exhibit 2, A, B.  But

11   we're going to try to stay on the same

12   page.

13            The important thing as far

14   as the current question is concerned, you

15   were responsible for -- strike that.

16            You played a role in

17   preparing the list that at the top says,

18   "Supplemental inventory of agreed upon

19   museum samples"?

20   A.    Correct.

21   Q.    Now, staying with that list

22   for now, could you please tell me the

23   purpose of the museum number that's on

24   the left-hand side.  And specifically, as

Margaret M. Gurowitz

1   an example, if you go down to the fifth

2   entry, which is 2014.001.0086.

3          Do you see that?

4       A.    I see that.

5          So in -- in 2014 and 2015,

6   we had the collection of artifacts,

7   items, in the corporate archives museum

8   collection professionally catalogued for

9   the first time ever by a team of

10  professional archivists.  It was part of

11  our project to restore the Johnson &

12  Johnson museum.

13         So those numbers represent

14  catalogue numbers, individual catalogue

15  numbers, so we can identify each artifact

16  in a new database that was created.  The

17  2014 at the beginning represents the year

18  in which that artifact was catalogued.

19  Some of them will have a 2014 in the

20  front.  Some of them will have a 2015

21  that represents the years 2014 and 2015.

22      Q.    Okay.  In regard to the

23  .001, what is the significance of that

24  number?

Margaret M. Gurowitz

1     A.    That is -- I looked back at

2  the documents that the archivists -- when

3  they created the numbers.  I couldn't

4  find anything that documented the

5  significance of that number.  It's just a

6  cataloguing system they used.

7     Q.    And then how about the last

8  four digits set of numbers, and in the

9  example we're looking at it's .0086?

10    A.    The last four digits

11 represent the individual -- the

12 individual unique catalogue number for

13 each particular item in the collection.

14 So that's -- that would be how we can

15 find it.  So if you're looking for item

16 .0086, I could look that up in the

17 database and see where it was stored and

18 be able to access it.

19    Q.    You just referred to a

20 database.  Could you give me some more

21 detail as to the database you're

22 referring to?

23    A.    It's actually an online

24 system that is used by small and midsize

Margaret M. Gurowitz

1   museums to manage their collections.  So

2   Johnson & Johnson has a contract with

3   them.  And we utilize that software to

4   manage our collection.

5          Q.    And for how long have you

6   been using that software?

7          A.    Since about 2016 maybe.

8          Q.    And was there any type of

9   software system used prior to 2016 in

10  order for Johnson & Johnson to manage

11  their archives?

12         A.    There was not.

13         Q.    What's the name of that

14  software system?

15         A.    It's called TMS, which

16  stands for The Museum System.

17         Q.    Ms. Gurowitz, what was the

18  role that you played in compiling this

19  list, this section of the sample list

20  that you said you played a role in?

21         A.    This section.  I was asked

22  to locate any Johnson's Baby Powder or

23  Shower to Shower products that were in

24  the corporate archives collection.  So I

Margaret M. Gurowitz

1    used key word searches to find them.  And

2    these are the items that were identified.

3         Q.    Can you explain to me what

4    the corporate archives collection is?

5         A.    The corporate archives

6    collection is a collection of physical

7    artifacts which would be historical

8    products and objects, and also paper

9    artifacts that have been in our museum

10   building for many, many decades.

11        Q.    When you did your -- when

12   you did your search, what keywords did

13   you use --

14        A.    Johnson --

15        Q.    -- to conduct your search?

16        A.    Johnson's Baby Powder, Baby

17   Powder, JBP, Shower to Shower, and STS.

18        Q.    You had also referenced

19   earlier that you had archive consultants

20   who helped you to develop your inventory

21   and archive list; is that correct?

22        A.    That is correct.

23        Q.    What was the name of those

24   archive consultants?

Margaret M. Gurowitz

1      A.    It's a company called

2  History Associates.

3      Q.    And do you know where

4  they're based?

5      A.    They're based somewhere down

6  around the Washington D.C. area.

7      Q.    When you conducted your

8  search for samples that are included in

9  the list that you prepared, did your

10  search for samples go beyond the

11  Johnson & Johnson archive collection?

12      A.    My particular search did

13  not.  But the general search did.

14      Q.    And what is your

15  understanding of what the general search

16  was?

17      A.    The general search was -- a

18  request had gone out to locate any other

19  samples that might be in existence.  And

20  so a search was conducted, I believe by

21  our law department initially, and

22  additional samples were discovered that

23  had been in offsite storage.  There are

24  also samples from PTI, which is the

1    contract manufacturer for Johnson's Baby

2    Powder.

3        Q.    Are you aware of any samples

4    other than the offsite samples that you

5    just referred to?

6        A.    I am not.

7        Q.    Were there any -- are you

8    aware of any samples that may have been

9    produced by other departments within

10   Johnson & Johnson that were not in any

11   type of offsite storage?

12       A.    If I might ask, are you

13   asking about samples that are not part of

14   this list?

15       Q.    Well, let's break that out.

16   First of all, in regard to samples that

17   are included on this list, are you aware

18   of any samples that were included on this

19   list that came from Johnson & Johnson

20   organizations other than the archives and

21   other than offsite storage?

22       A.    There are a few.  There are

23   four samples that came from a retired

24   employee in the United Kingdom.

Margaret M. Gurowitz

1      Q.     Would they be the Hopkins

2   samples?

3      A.     Yes.

4      Q.     Other than the Hopkins

5   samples, are you aware of samples coming

6   from anywhere else?

7      A.     There are samples identified

8   that did come from offsite storage.

9   They're not finished products.  They're

10  rocks.  I -- in doing research to try to

11  track their origins, I understand that

12  before they went into offsite storage,

13  some of them were brought -- were brought

14  back to Johnson & Johnson Consumer by the

15  daughter of an employee who passed away

16  who had a collection of rocks in his

17  home.

18     Q.     Are you able to identify

19  those samples that were brought back to

20  Johnson & Johnson by the daughter of a

21  former employee?

22     A.     Not specifically.  But they

23  would be among the items listed on the

24  offsite storage list as rocks.

Margaret M. Gurowitz

1    Q.    And are you aware of this

2  individual bringing any samples back to

3  Johnson & Johnson other than rocks?

4    A.    From my conversation, it was

5  relayed to me that his daughter brought

6  rocks back.  But he -- there may have

7  been some product samples stored in his

8  area that never left the company, but

9  they would have been part of the offsite

10  storage list.

11    Q.    But you have no knowledge of

12  any specific sample that would have been

13  stored in his work area?

14    A.    Let me -- actually, if I can

15  look through the list, I can see what --

16    Q.    Sure.  And as you look

17  through that list, are you looking

18  through the museum list or are you

19  looking through the offsite list?

20    A.    I'm looking through the

21  offsite list.

22        Most of them I marked by

23  department, research and development, are

24  the rocks.  But there are one, two,

1   three, four, five samples that are

2   labeled Johnson's Baby Powder that came

3   from research and development.

4           I was not able to -- we

5   were -- in my research into the origins

6   of these, I was not -- not able to track

7   down exactly who owned those samples

8   because it's beyond the memory of anyone

9   who is still at Johnson & Johnson.  But

10  it was in the area, the research and

11  development area, the area that this

12  employee who passed away had been in.

13          And then they moved offices,

14  everything was boxed up, and then later

15  there was construction and everything was

16  sent to offsite storage.  So there are --

17  there are a very few sample bottles from

18  that.

19      Q.    So let me try and clarify

20  what was just said here.  First of all,

21  in regard to the specific samples that

22  you're referring to, on the list there

23  are sample numbers.  Can you identify for

24  me the sample numbers that you're

Margaret M. Gurowitz

1    referring to?

2         A.    Yes.   The sample numbers are

3    JBP-001, 002, 003, 004, and 006.

4         Q.    And it's your understanding

5    that those five samples are samples that

6    were provided by the daughter of a former

7    employee, correct?

8              MS. FOURNIER:   Objection.

9              THE WITNESS:   No.   That is

10        not correct.   It is my

11        understanding that these are

12        samples that were found in the

13        research and development area, the

14        area of the building that research

15        and development had occupied and

16        had been sent to offsite storage.

17   BY MR. LAPINSKI:

18        Q.    The former employee who you

19   referenced earlier, what was that

20   employee's name?

21        A.    His name was Bill Ashton.

22        Q.    And what was Bill Ashton's

23   role while he was an employee at

24   Johnson & Johnson?

Margaret M. Gurowitz

1          A.    He was in research and

2    development.  He was a scientist.

3          Q.    And is it your understanding

4    that the five samples that we've been

5    talking about were found in Mr. Ashton's

6    office?

7          A.    It is my understanding that

8    they were found in a common area that had

9    shelving and other means of storage that

10   had been at one point -- that he had been

11   located in or around this area.

12         Q.    And approximately when were

13   those items moved from the common area to

14   offsite storage?

15         A.    So they were, initially they

16   were moved, it is my understanding that

17   this whole group moved floors, and so

18   everything was boxed up, and the person

19   who boxed that up put them in -- kept

20   them in boxes in her office on another

21   floor.

22               And then around 2016, they

23   went to open plan work space with no

24   storage.  And so everything had to be

Margaret M. Gurowitz

1    moved to offsite storage.

2         Q.    Okay.  You said that samples

3    were boxed up because there was a move?

4         A.    Correct.

5         Q.    Did I understand you

6    correctly?

7         A.    Yes.

8         Q.    Okay.  When was that move?

9         A.    The move would have been

10   around -- it was related to me that it

11   was ten years prior to that.  So it would

12   have been somewhere in the 2006 time

13   frame.

14        Q.    And prior to -- prior to the

15   move, where were the offices located that

16   you're referring to?

17        A.    Prior to the move to offsite

18   storage or the move between floors?

19        Q.    No, now -- research and

20   development department -- strike that.

21             The research and development

22   department you indicated was in the

23   process of a move when they packed up

24   these samples, correct?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    Okay.  Where was the

3    research and development department

4    located prior to that move?

5    A.    It was located at the

6    consumer company in Skillman, New Jersey.

7    Q.    At J&J Consumer

8    Incorporated?

9    A.    Yes.

10    Q.    And was Mr. Ashton an

11    employee of Johnson & Johnson Consumer

12    Incorporated?

13    A.    He was.

14    Q.    You indicated that there was

15    a woman who had packed these samples into

16    boxes and kept them in her office,

17    correct?

18    A.    Correct.

19    Q.    Okay.  Do you know the name

20    of that woman?

21    A.    Yes.

22    Q.    And what's that woman's

23    name?

24    A.    Her name is Lorena Telofski.

Margaret M. Gurowitz

1    Q.    And is Ms. Telofski an
2  employee of Johnson & Johnson Consumer?
3    A.    Yes.
4    Q.    Okay.  Do you know what role
5  she plays within Johnson & Johnson
6  Consumer?
7    A.    I don't know her official
8  title, but she would be in the R&D group.
9    Q.    And is she still a member of
10 JJCI's research and development group?
11   A.    I believe she is, yes.
12   Q.    Okay.  If we continue to
13 look at the part of the sample list that
14 relates to offsite storage.  If you go
15 down below the research and development
16 listings, the next listings are marketing
17 listings, correct?
18   A.    Correct.
19   Q.    Okay.  Can you describe for
20 me where samples from the marketing
21 department came from?
22   A.    As best as I've been able to
23 determine, the sample -- the samples that
24 are denoted as being from marketing, many

Margaret M. Gurowitz

1  of them came from the original museum

2  collection that had been in New

3  Brunswick.

4          Q.     How was a sample

5  distinguished from a marketing sample,

6  which would be listed in the offsite

7  storage listing, and a museum sample that

8  you would help to compile?

9          A.     The ones that are labeled as

10  museum samples are currently in the

11  corporate archives in museum.  The ones

12  that are labeled as marketing samples had

13  been sent to offsite storage in 1982.

14          Q.     When they were sent to

15  offsite storage in '82, were they sent to

16  offsite storage by the J&J museum?

17          A.     No, they were not.

18          Q.     Were they sent to offsite

19  storage by members of the marketing

20  department?

21          A.     They were sent to offsite

22  storage by the Johnson & Johnson Consumer

23  company.

24          Q.     Staying with the list of

Margaret M. Gurowitz

 1   offsite storage -- the sample list for

 2   offsite storage, there is also a

 3   department name referenced there as QA,

 4   which I think is towards the back.

 5            If you look at the top of

 6   the page, there is page references that

 7   go up to Number 91.  And if you look for

 8   Page 37 of 91, there are references to

 9   quality assurance.

10            Do you see that?

11       A.    I see that.

12       Q.    Okay.  And that's for Sample

13   Numbers JBP-294 and 295.  What does the

14   quality assurance reference refer to?

15       A.    Those refer to two samples

16   that were discovered in offsite storage

17   that had been marked with the department

18   name of quality assurance.

19       Q.    Were those two samples

20   stored offsite along with the marketing

21   samples that we just referred to?

22       A.    I don't know whether they

23   were in the same box, but they were all

24   pulled from the offsite storage.

Margaret M. Gurowitz

1    Q.    Is it your -- is it your

2 understanding, Ms. Gurowitz, that all

3 samples of talcum powder products in the

4 possession of Johnson & Johnson and

5 Johnson & Johnson Consumer are contained

6 here in these two lists?

7    A.    All the ones that were

8 located, yes.

9    Q.    When was it that you were

10 first asked to work on the exhibit -- the

11 sample list that you worked on for the

12 museum?

13    A.    Oh, it was a while ago.  I'm

14 try -- it was months and months ago.  So

15 I'm trying to -- trying to remember if it

16 was entirely in 2018 or it was a little

17 before.  I feel like I've been working on

18 it for a long time.  I'm trying to

19 remember.  It was a while ago though.

20    Q.    Okay.  And since the time

21 that you first started working on --

22 strike that.

23         Since the time that you

24 finished this list, have you discovered

Margaret M. Gurowitz

1    any additional samples?

2         A.    There were some that were

3    donated.  So we get a lot of donations.

4    And there were some that were donated.

5    They are marked at the beginning of the

6    museum list.

7         Q.    So they are included on this

8    list?

9         A.    Yes.

10        Q.    Are you aware of any samples

11   that are not on this list?

12        A.    I am not.

13             (Document marked for

14             identification as Exhibit

15             Gurowitz-4.)

16   BY MR. LAPINSKI:

17        Q.    Ms. Gurowitz, I'm going to

18   hand to you a document that we are

19   marking as Exhibit 4.

20             Ms. Gurowitz, this document

21   was provided to us by counsel for

22   Johnson & Johnson.  Is this your current

23   CV?

24        A.    Yes.

Margaret M. Gurowitz

1  Q.   And when was this CV first

2  created?

3  A.   This CV was first created

4  last year.  I was asked to do it because

5  somebody had requested it and I kept it

6  as, and updated it as needed.

7  Q.   And who had requested it?

8  A.   Initially when we

9  re-launched the museum, there were a

10  number of news stories, and our media

11  team had asked, somebody had asked them

12  for a CV, so they asked me to create it.

13  Q.   And when was the last time

14  this CV was updated?

15  A.   Perhaps at the beginning of

16  2018.

17  Q.   And you are a graduate of

18  Douglas College in New Brunswick?

19  A.   That's correct.

20  Q.   Okay.  And your degree was

21  in medieval history?

22  A.   That's correct.

23  Q.   Fair to say that you don't

24  have any educational background in

Margaret M. Gurowitz

1  science?

2       A.    That's correct.

3       Q.    You began working at

4  Johnson & Johnson in 1983?

5       A.    Yes.

6       Q.    And you've worked for

7  Johnson & Johnson for your entire career?

8       A.    That's correct.

9       Q.    And for purposes of

10  clarification, Johnson & Johnson -- is it

11  Johnson & Johnson company or is it just

12  Johnson & Johnson if we are trying to

13  distinguish between Johnson & Johnson and

14  Johnson & Johnson Consumer?  That's a lot

15  of Johnsons in a row right there.

16       A.    It's just Johnson & Johnson.

17       Q.    Just Johnson & Johnson.  You

18  were an employee of Johnson & Johnson

19  since 1983?

20       A.    Yes.  I was -- I was hired

21  full-time in 1988.  Before then I was a

22  research assistant.

23       Q.    And you're still employed by

24  Johnson & Johnson, correct?

Margaret M. Gurowitz

1    A.    That's correct.

2    Q.    And your paychecks come from

3    Johnson & Johnson?

4    A.    They do.  Johnson & Johnson

5    Services, which is the legal entity.

6    Q.    And you've been with that

7    same legal -- you've been with the same

8    legal entity, Johnson & Johnson,

9    throughout your entire career?

10    A.    I have.

11    Q.    And where is your office

12    located?

13    A.    My office is located in our

14    museum building in New Brunswick.

15    Q.    And is it fair to say or to

16    categorize your job as a historian for

17    Johnson & Johnson?

18    A.    Yes.

19    Q.    In the positions that you've

20    held at Johnson & Johnson during your

21    career, have you had any responsibilities

22    that are specific to talcum powder

23    products?

24    A.    No, I have not.

Margaret M. Gurowitz

1      Q.    Are you personally

2  responsible for the -- any talc samples

3  that are maintained in the Johnson &

4  Johnson museum?

5      A.    Yes.

6      Q.    Okay.  And for how long have

7  you had that responsibility?

8      A.    Officially since about 2011.

9  Unofficially since 2006.

10     Q.    Prior to 2011, was there

11  someone else who had responsibility for

12  maintaining the samples in the museum?

13     A.    No.  It was me.  It was

14  not -- my title was different.  So it was

15  part of my job, but not the entirety, if

16  that makes sense.

17     Q.    I think it makes sense, but

18  let me just ask a question to clarify.

19          From 2006 forward, other

20  than yourself has there been anybody else

21  who has had responsibility for

22  maintaining the samples in the museum?

23     A.    No.

24     Q.    How about prior to 2006?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    And who was responsible for

3 maintaining the samples prior to 2006?

4    A.    It was the corporate

5 librarian in the corporate communication

6 group.

7    Q.    And I'm sorry.  Did you say

8 the corporate librarian in the corporate

9 communications group?

10    A.    Yes.

11    Q.    Okay.  And who was that

12 corporate librarian?

13    A.    It was a woman named

14 Elizabeth King.

15    Q.    Do you know how long

16 Ms. King had that responsibility?

17    A.    I do not.

18    Q.    Is Ms. King still an

19 employee of Johnson & Johnson?

20    A.    No, she's not.

21    Q.    Okay.  Is she retired?

22    A.    Yes.

23    Q.    And do you know

24 approximately when she retired?

Margaret M. Gurowitz

1      A.     I do not know, but it was --
2  it had to be more than ten years ago,
3  so...
4      Q.     And do you know how long she
5  had worked for Johnson & Johnson before
6  she retired?
7      A.     I do not know that.
8      Q.     Are you able to give me an
9  estimate as to for how long prior to 2006
10  she was responsible for maintaining the
11  samples in the museum?
12      A.     I do not know when she
13  started, but it would have been -- you
14  know, certainly through the 1990s, that
15  decade.  And I'm not sure when she
16  started with that responsibility.  But
17  certainly during the '90s.
18      Q.     Do you have a recollection
19  when you started working there in 1983 as
20  to whether or not Ms. King was the
21  corporate librarian?
22      A.     Yes, she was.  So it would
23  have been certainly before that.
24      Q.     What are your

Margaret M. Gurowitz

1    responsibilities as it relates to the

2    maintenance of talc samples that are in

3    the museum?

4         A.    Well, the talc -- the talc

5    samples are some of the many, many

6    artifacts in our museum.  So since we had

7    them professionally catalogued in 2014

8    and 2015, they were put for the first

9    time in acid-free storage that's designed

10   to preserve them, so they're in high

11   density acid-free climate-controlled

12   storage.

13            And so my responsibility is

14   to maintain them in that storage.  So

15   they're pretty much -- it's a

16   climate-controlled facility, our

17   archives.  It's high density storage.

18   They are in acid-free boxes on shelves in

19   that storage area.

20        Q.    And for how long have they

21   been in that type of storage condition?

22        A.    Since 2016.

23        Q.    And has that storage

24   condition a -- you've been using the word

Margaret M. Gurowitz

1   museum.  Is that storage condition a

2   physical museum where people are able to

3   see the different samples on display?

4          A.    It is -- they are stored in

5   the building, but the samples in storage

6   are not on display.

7          Q.    Are there any talc samples

8   that are on display?

9          A.    There are two.

10          Q.    And which two are they?

11          A.    It is a container from 1896

12   and one from, I believe, maybe the early

13   1950s.

14          Q.    And are those two contained

15   on the exhibit list?

16          A.    I would have to look up

17   their number to confirm that.

18          Q.    And are you able to do that

19   with the documents that you have in front

20   of you?

21          A.    I am not.

22          Q.    Okay.  If you were going to

23   do that, how would you go about doing

24   that?

Margaret M. Gurowitz

1    A.    I would use the database
2  that sort of -- that runs our -- that
3  manages our archives.  It's a cloud-based
4  system.  So I would need my computer to
5  do that.
6    Q.    So when you went into that
7  cloud based system, what would you do in
8  order to be able to identify and locate
9  the two samples that you're referring to?
10   A.    I would do a keyword search
11 and I would look to see which ones in
12 location were noted on display.
13   Q.    So your keyword search would
14 be "on display"?
15   A.    My keyword search would be
16 Johnson's Baby Powder.
17   Q.    And then once you did that
18 search, you would have an indication as
19 to which ones were on display as compared
20 to being in storage?
21   A.    Yes.  I would need to look
22 through each entry.
23   Q.    Okay.  I'm sorry.  You said
24 one of them was a container from the

Margaret M. Gurowitz

1  1950s?

2       A.    But not -- it was from the

3  United Kingdom in the 1950s, I believe.

4  Both of the ones on display are just in

5  very fragile containers.

6       Q.    The second one that you

7  referred to was a container as well,

8  correct?

9       A.    Yes.

10      Q.    And approximately when was

11 that from?

12      A.    1896.

13      Q.    Are you aware of whether

14 there was any product in either of those

15 two containers?

16      A.    Not offhand.

17      Q.    Then the remaining samples

18 are not on display, they're in storage,

19 correct?

20      A.    Yes.  Some -- yeah, they are

21 in storage, some in our museum and some

22 were moved offsite to the lab.  So you

23 have -- I mean, they're generally -- they

24 would be in storage, but they were moved

Margaret M. Gurowitz

1  offsite to the laboratory.

2          Q.     Okay.  So just talking about

3  the museum samples, you have the two that

4  are on display.  And the remainder at

5  some point in time were all in storage as

6  you had described it earlier in your

7  testimony, correct?

8          A.     Correct.

9          Q.     Some of them samples have

10  since been moved from that storage

11  facility to a lab?

12          A.     Correct.

13          Q.     Okay.  What lab were they

14  moved to?

15          A.     It's a lab in Monmouth

16  Junction.

17          Q.     And were those, the samples

18  that you're referring to, were they moved

19  as part of the order that we looked at

20  earlier that is Exhibit 3?

21          A.     Yes.

22          Q.     Other than the samples that

23  were moved to the facility in Monmouth

24  Junction pursuant to the court order, are

Margaret M. Gurowitz

1    you aware of any of this store -- these

2    samples in museum storage being moved

3    anywhere else?

4         A.    No.

5         Q.    Okay.  Ms. Gurowitz, you are

6    here today in order to testify about the

7    chain of custody of these various

8    samples, correct?

9         A.    Correct.

10        Q.    Okay.  Do you have any

11   personal knowledge of the chain of

12   custody of any of these samples?

13        A.    I have personal knowledge of

14   the partial chain of custody of the ones

15   that are specifically marked museum

16   samples.

17        Q.    And in what way did you

18   acquire that personal knowledge?

19        A.    I worked with the team to

20   identify these samples and then to pull

21   them from the corporate archives.  They

22   were packed up and sent to the lab.

23        Q.    And what team did you work

24   with, when you refer to team?

Margaret M. Gurowitz

1    A.    I worked with the legal

2  team.

3          Q.    Is that the Johnson &

4  Johnson legal team or is that Johnson --

5  strike that.

6                The legal team that you're

7  referring to, are they J&J employees?

8          A.    They are outside counsel.

9          Q.    Everybody who was on that

10  legal team is outside counsel?

11         A.    Everyone who I worked

12  directly with.

13         Q.    Is there anyone that you

14  worked indirectly with that was not

15  outside counsel?

16         A.    Can I ask you to clarify?

17  You mean indirectly in packing up the

18  samples or indirectly in somebody said,

19  "Hey, these guys are going to come and

20  they want to pack up samples"?

21         Q.    Well, we'll get -- we'll get

22  to the packing -- we'll get to the

23  packing of the samples.  But I guess --

24  let me ask it this way.

Margaret M. Gurowitz

1         How were you first put in
2  touch with the legal team?
3         A.    Somebody from the Johnson &
4  Johnson law department contacted me.
5         Q.    And what was the purpose
6  that they contacted you?
7         A.    They said that they -- we
8  were asked to produce samples and
9  somebody would -- they would be putting
10 somebody in touch with me who would then
11 work with me to identify samples and then
12 pull them.
13        Q.    And is that the only outside
14 counsel that you worked with in regard to
15 the talc samples?  Strike that.
16            Is that the only non-outside
17 counsel person that you worked with in
18 regard to the collection of these
19 samples?
20        A.    Yes.
21        Q.    And what was that person's
22 name?
23        A.    Kim Giganti.
24        Q.    Ms. Gurowitz, is it fair to

Margaret M. Gurowitz

1  say that you're not going to be offering

2  testimony today regarding the chemical

3  composition of the talcum powder

4  products?

5          A.    Yes, correct, I will not.

6          Q.    That would not be part of

7  your education?

8          A.    No.

9          Q.    And that would not be part

10 of your job function at J&J?

11         A.    No.

12         Q.    That would not be within

13 your area of expertise, correct?

14         A.    That is correct.

15         Q.    And it's also outside the

16 topic area for which you have been

17 designated today, correct?

18         A.    Correct.

19              (Document marked for

20         identification as Exhibit

21         Gurowitz-5.)

22 BY MR. LAPINSKI:

23         Q.    Ms. Gurowitz, I'm going to

24 hand to you what I've marked as

Margaret M. Gurowitz

1   Exhibit 5.  And if you would take a

2   minute to look at that.

3          A.    Okay.

4          Q.    And let me know when you're

5   ready to answer some questions in regard

6   to that exhibit.

7          A.    I'm ready.

8          Q.    Before we move on to this,

9   let me go back to the museum list if we

10  could just for a minute.

11         A.    Sure.

12         Q.    Am I correct that you had

13  testified that certain of the samples

14  that are maintained in the museum were

15  donated?

16         A.    Some of them, yes.

17         Q.    Okay.  Other than the

18  samples that we had talked about that

19  came from Mr. Ashton, are you able to

20  identify which samples were donated?

21         A.    Yes, the ones that were

22  donated when I was keeping track.  There

23  may have been others that were donated

24  decades ago but records -- records were

Margaret M. Gurowitz

1   not kept.

2          Q.    But you have no knowledge,

3   other than while you were keeping track,

4   of any of the samples being donated?

5          A.    Correct.  Although it's

6   been, historically and today, lots of

7   people donate, you know, vintage

8   packaging to us.

9          Q.    But you have no knowledge as

10  far as the samples that are listed on

11  here of any of them being donated, other

12  than the ones that you're going to point

13  to now?

14         A.    Correct.

15         Q.    And which ones are those?

16         A.    Let me just turn to that

17  section.

18                Those are the first -- one

19  two -- those are the first four under --

20  on Page 2 of 8 for the museum samples.

21  The ones marked "New artifact donated on

22  9/19/17" and "New museum" 1, 3 and 4.

23         Q.    Okay.  And do you have

24  information as to who these specific

Margaret M. Gurowitz

1  samples were donated by?

2       A.    Most of them, yes.  The New

3  Museum 3, the regular scent Shower to

4  Shower, somebody left that in an unmarked

5  envelope at the security desk in the

6  front of the museum.  There was no name

7  on it, no note with it.  And it was an

8  empty bottle.  So I have no information

9  on who donated that.

10      Q.    When was that?

11      A.    That was sometime within the

12 last year.  I don't have the date with

13 me.  It was sometime within the last

14 year.

15      Q.    Does the museum have a

16 policy in place for the receipt of

17 donated samples?

18      A.    Yes.

19      Q.    And is it a written policy?

20      A.    It is not a written policy,

21 but generally when something is donated,

22 we make sure it's a Johnson -- a product

23 from the Johnson & Johnson family of

24 companies.  We would want it to be in

Margaret M. Gurowitz

1    good condition.  And we would take the

2    donor name and information.

3              That being said, a lot of

4    things, like that Shower to Shower

5    bottle, do get left.  They're just

6    dropped off with no -- you know, with no

7    information, no name, no note, no return

8    address on the envelope.  So there's no

9    way to track it in those cases.

10         Q.    And it was you who received

11   New Museum 3 which is the Shower to

12   Shower bottle we're talking about?

13         A.    Yes.

14         Q.    Okay.  And what was it about

15   that particular bottle that made you

16   decide to keep it in the museum?

17         A.    I had already been asked to

18   pull Johnson's Baby Powder and Shower to

19   Shower artifacts.  So when that arrived,

20   I let the legal team know somebody just

21   donated this.  And so I kept it.

22         Q.    You said it was left in an

23   unmarked envelope at the --

24         A.    Security desk.

Margaret M. Gurowitz

1    Q.    At the security desk.  Is
2  that the museum security desk?
3    A.    Yes.
4    Q.    Okay.  So Johnson & Johnson
5  museum has a -- has a separate security
6  desk from the rest of Johnson & Johnson
7  corporate?
8    A.    Yes.  Because it's a -- it's
9  in its own building, so...
10    Q.    In order to be able to get
11  to the museum, would you first have to be
12  able to go through Johnson & Johnson
13  corporate security to get on the grounds?
14    A.    No.
15    Q.    So is the Johnson & Johnson
16  museum open to the public?
17    A.    No, it is not.
18    Q.    However, the public has the
19  ability to get to the museum and interact
20  with security personnel specifically
21  assigned to the museum?
22    A.    That's correct.
23    Q.    Okay.  How about the other
24  three samples that we talked about that

Margaret M. Gurowitz

1  were donated?  What information can you

2  give me about the first one that was

3  donated on September 19, 2017?

4       A.    That is -- it's listed as

5  cardboard metal.  So if it's a cardboard

6  container, it's likely one of the rare

7  containers from the 1940s era, World War

8  II era, in which the packaging was

9  switched to cardboard because metal was

10  not available due to the war effort.

11       Q.    Okay.  And this was donated

12  in September of 2017, correct?

13       A.    Correct.

14       Q.    This would have gone through

15  your process, and you would have been the

16  one who accepted it into the museum,

17  correct?

18       A.    Correct.

19       Q.    Do you have the name of the

20  individual who donated that product?

21       A.    I would have back at the

22  museum.  I didn't know that I needed to

23  bring it, so I do not.

24       Q.    And then same in regard to

Margaret M. Gurowitz

1  New Museum 3, would you have available to

2  you the name of the person who donated

3  the item designated as New Museum 3?

4      A.    No, I would not.  That's the

5  one that came in anonymously in the

6  envelope.

7      Q.    I'm sorry.  That's the one

8  that we -- that we've been talking about.

9  How about New Museum 1.

10     A.    New Museum 1.  I would have

11 to look.  Again, a lot of them just sort

12 of show up.  Sometimes people leave a

13 note.  Sometimes they don't.  So I would

14 have to go back and look.

15     Q.    Now, when you say a lot of

16 them just show up, we're only talking

17 about four.  Right now we're limited to

18 these four that were donated.

19     A.    Correct.  We get other

20 donations, vintage Band-Aid brand

21 adhesive bandage tins for safety, things

22 like that.

23     Q.    And then how about New

24 Museum 4?  Do you have any knowledge as

Margaret M. Gurowitz

1   to whether you know the person who

2   donated that particular product?

3          A.    Again, I would need to go

4   look through the record.  But -- but I --

5   as long as it's not donated anonymously

6   with no information, I do take the donor

7   name.

8          Q.    Earlier you had testified

9   about the Johnson & Johnson librarian who

10   had responsibility for overseeing the

11   museum samples before you took on that

12   responsibility.

13              Do you recall that?

14          A.    Yes.

15          Q.    What's the difference

16   between Johnson & Johnson librarian and

17   you as the Johnson & Johnson historian?

18          A.    I am a trained historian by

19   my educational background.  I also -- I

20   also work to research and tell stories

21   from the company's -- the history of the

22   company.

23              I maintain our current

24   museum.  The corporate librarian was a

Margaret M. Gurowitz

1    librarian.  She kept -- at the time they

2    had a library with books and periodicals.

3    She kept that.  She would look up

4    articles in those periodicals for people

5    who needed to see them.  And she also had

6    charge of what was in the old museum.

7            Q.    And is corporate librarian

8    still a position within Johnson &

9    Johnson?

10           A.    Not in corporate.  It may be

11   somewhere in Johnson & Johnson around the

12   world, but not that I'm aware of.

13           Q.    Okay.  Looking at your CV

14   for a second, which is Exhibit 4.  Your

15   first bullet point under your current

16   position, it references, "The Johnson &

17   Johnson Our Story At the Power House."

18               That's the current Johnson &

19   Johnson museum?

20           A.    Correct.

21           Q.    And where is that museum

22   located?

23           A.    It is located on our campus

24   in New Brunswick, New Jersey.

Margaret M. Gurowitz

1          Q.     And how long has that museum
2     been open?

3          A.     In its current state?

4          Q.     Yes.

5          A.     Since May of 2016 -- wait,
6     so this is 2018, which I can't -- I can't
7     believe.  We opened in 2016.

8          Q.     Okay.  Going back to
9     Exhibit 5.  Could you please tell me what
10    this document is?

11         A.     Yes.  This document
12    represents the research I conducted to
13    try to put together partial chains of
14    custody for the entirety of this list of
15    samples.

16              So these represent the
17    people I spoke to.  My handwriting
18    represents the people I spoke to in the
19    different groups that represent the
20    groups -- if you look at the leftmost
21    column that says department name -- that
22    are represented by those groups.

23              So some of the samples were
24    marked marketing.  So I asked to speak

Margaret M. Gurowitz

1    with folks in the marketing group who

2    might be able to shed some light on the

3    chain of custody for those.  The same

4    with R&D and quality, and also PTI.

5                 I also spoke to Pam Downs

6    who does records management for our law

7    department because she had also sent out

8    a call for -- around Johnson -- around

9    Johnson & Johnson to try to identify any

10   samples that might be somewhere.  And the

11   typed list represents the people that Pam

12   spoke with.

13        Q.    Okay.  So as far as this

14   e-mail is concerned, the people on this

15   e-mail who you spoke with are Pam Downs,

16   correct?

17        A.    Yes.

18        Q.    Lorena Telofski?

19        A.    Correct.

20        Q.    Sarita Finnie from

21   marketing?

22        A.    Yes.

23        Q.    Barbara Brewer from

24   marketing?

Margaret M. Gurowitz

1      A.      Yes.

2      Q.      Mark Zappa from quality?

3      A.      Yes.

4      Q.      And Janet Stanish from PTI?

5      A.      Yes.

6      Q.      Okay.  And you spoke with

7   them in order to be able to get chain of

8   custody information in regard to offsite

9   samples; is that correct?

10      A.      That is correct.

11      Q.      Okay.  Did you have any

12   conversations with them in regard to any

13   of the museum samples that are contained

14   in the museum list?

15      A.      No, I did not.

16      Q.      Now, you referred to Janet

17   Stanish from PTI.  What were the

18   conversations that you had with Janet

19   Stanish from PTI?

20      A.      Well, so PTI is the one that

21   we actually can put a chain of custody

22   together for.  So what I asked Janet --

23   and the PTI samples are the ones in the

24   back that just say lot number, sample

Margaret M. Gurowitz

1    number.

2              And so what I asked -- so

3    PTI as the contract manufacturer, they

4    are required by their contract to keep

5    samples for either four years from date

6    of manufacture or one year after

7    expiration date, whichever comes first.

8              And so they send -- they

9    received a request to send their samples

10   to the lab.  They did so.

11             So I asked Janet how the

12   samples were stored, whether they were

13   stored onsite at PTI or offsite, how they

14   sent -- packaged the samples up to send

15   to the lab, and also what it meant, on

16   the one that has the four columns across,

17   what the quantity column referred to.

18        Q.    So I'm going to interrupt

19   you for a second because now you're

20   starting to refer to a document.  And I

21   just want to make sure we are all looking

22   at the document?

23        A.    Sorry.

24        Q.    So when you said -- you were

Margaret M. Gurowitz

1    referring to -- you asked her a question

2    about a column?

3            A.    Yes.

4            Q.    What document are you

5    looking at right now?

6            A.    So that is in the documents

7    I have here.  It's marked --

8            Q.    The sample list?

9            A.    The sample document.  The

10   sample list.  So this would be the

11   Exhibit C part of the sample list.

12           Q.    And then for clarity, why

13   don't we work off of the numbers that are

14   at the top of the page where it says --

15   the one that I'm looking at right now is

16   Page 71 of 91.  If you could refer to the

17   specific page that you were looking at.

18           A.    Sure.  I am looking at Page

19   64 of 91.  It is part of that same

20   subset.

21           Q.    And you said you had

22   questions in regard to the fourth column,

23   which was sample number?

24           A.    So it was part of my

1  conversation with Janet, just to put

2  together -- because this area is the area

3  that we can do the most complete chain of

4  custody for.  The others are just little

5  pieces.  But I was not able to put

6  together full chains of custody.

7                    So Janet said the samples

8  were stored at a storage room at the PTI

9  facility.  They were stored in containers

10  on shelves.

11                    The quantity column, the one

12  represents a sealed container of

13  Johnson's Baby Powder.  So where they had

14  more than one sample, they were able to

15  send a sealed container.  Where they only

16  had one, what they did was they took out

17  a portion of that and put it in a sealed

18  cup, which they labeled, that would be

19  represented by the columns that say --

20  the entries that say 0.5.

21                    She said they then put them

22  on pallets and took them by truck to a

23  lab in Georgia where they initially

24  thought that the separation, the

Margaret M. Gurowitz

1    splitting was going to happen.  And then

2    when it was determined that it was going

3    to happen in New Jersey, they Federal

4    Expressed them from that lab to

5    Georgia -- from the lab in Georgia to New

6    Jersey, to the lab in New Jersey.

7         Q.    Other than discussions that

8    you had with Ms. Stanish in regard to the

9    PTI samples, did you have any other

10   discussions with her at all?

11        A.    No.

12        Q.    When was it that you first

13   spoke with Ms. Stanish?

14        A.    It was earlier this week.

15   So it was the very beginning of the week.

16        Q.    For how long did you speak

17   with her?

18        A.    It was 15 minutes, maybe.

19   It was a very short conversation.

20        Q.    And is that the only time

21   that you spoke with her?

22        A.    Correct, yes.

23        Q.    And did you take any notes

24   during that particular conversation?

Margaret M. Gurowitz

1        A.    No, I did not.

2              MR. LAPINSKI:  Why don't we

3        go off the record.

4              THE VIDEOGRAPHER:  The time

5        is 10:36 a.m.  We are off the

6        record.

7              (Short break.)

8              THE VIDEOGRAPHER:  We are

9        back on the record at 10:52 a.m.

10   BY MR. LAPINSKI:

11        Q.    Ms. Gurowitz, before the

12   break we were talking about several

13   samples that had been donated to the J&J

14   museum.  Do you recall that?

15        A.    Yes.

16        Q.    And I believe you had

17   testified that to the extent you had

18   recorded the names of individuals who had

19   donated particular items, they would be

20   available to you in a database that you

21   maintain; is that correct?

22        A.    Yes.

23        Q.    And that's a cloud-based

24   database?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    If on a break we were to

3 make -- give you access to a computer,

4 would you be able to access that database

5 and get the names of any individuals who

6 donated product?

7         Excuse me.

8    A.    I have the -- I have the

9 connection from my laptop.  So I wouldn't

10 be able to.  So it's -- it's like a path,

11 a specific pathway.  So I wouldn't be

12 able to without the login screens and

13 things like that.

14   Q.    Okay.  Before the break I

15 had given you Exhibit 5, which was an

16 e-mail that you were -- that was sent to

17 you in regard to potential individuals to

18 speak to about chain of custody, correct?

19   A.    This e-mail was sent to me

20 as -- the typed part of the e-mail from

21 Pam Downs is a list of people that she

22 spoke to trying to find out if there were

23 any more samples around.

24   Q.    Okay.  And then the

Margaret M. Gurowitz

1  handwritten names are the names of the

2  people that you spoke to, correct?

3        A.    Correct.

4        Q.    We were talking about your

5  conversation with Janet Stanish from PTI

6  before the break.  You said you did speak

7  with miss Stanish once, correct?

8        A.    Correct.

9        Q.    And you spoke with her for

10  about 15 minutes?

11        A.    About that, yes.

12        Q.    Okay.  Did you do any other

13  research in regard to the 400-plus PTI

14  samples that are identified as it relates

15  to chain of custody?

16        A.    I just -- I just looked at

17  the list and then I spoke with Janet.

18        Q.    If -- as we sit here today,

19  if I were to pick out a specific sample

20  from the list of PTI, would you be able

21  to discuss the chain of custody -- chain

22  of custody for a specific sample?

23              MS. FOURNIER:  Objection.

24              THE WITNESS:  As part of the

Margaret M. Gurowitz

1    overall set, I would, because I

2    did talk to Janet about the chain

3    of custody for the collection of

4    samples.

5    BY MR. LAPINSKI:

6        Q.    Okay.  You had testified

7    that -- and why don't we -- why don't we

8    go to, so that we're looking at the list

9    of samples that had been provided by PTI.

10        A.    Okay.

11        Q.    And just for point of

12    reference, why don't we work off of the

13    same page that we were working off of

14    before, which I believe was Page 64.

15        A.    I think we may be looking at

16    different iterations of this, because

17    mine says Exhibit 2.

18        Q.    Mine is just stacked

19    differently.  I think we're getting to

20    the same page.

21        A.    Okay.

22        Q.    Because this isn't my --

23    that's not my PTI stuff.

24        A.    Oh, okay.

Margaret M. Gurowitz

1       Q.    So if you're looking at Page

2   64 of 91, the first lot number should be

3   2362 RB, correct?

4       A.    Correct.

5       Q.    Okay.  So you had -- you had

6   testified that in the quantity column, if

7   there is a one listed in the quantity

8   column, then that means that PTI had at

9   least one sealed sample; is that correct?

10      A.    That means that PTI had more

11  than one sealed sample.

12      Q.    PTI had more than one sealed

13  sample, but they only produced one

14  sample, correct?

15      A.    That is correct.

16      Q.    Okay.  Do you know how many

17  additional samples are in the possession

18  of PTI that have not been produced?

19      A.    I do not know.  I do know,

20  through my conversation with Janet, that

21  they are required by their contract with

22  Johnson & Johnson that they need to keep

23  samples of the finished product.  So they

24  were -- so if they had more than one

Margaret M. Gurowitz

1   sealed bottle of the finished product,

2   they could then send an entire sealed

3   bottle.  So, for example, if they had two

4   bottles, hypothetically, of a product,

5   they could send one bottle to the lab and

6   they would keep one bottle as part of

7   their contractual obligations.

8              If they only had one bottle

9   total of that particular product, then

10   they had to divide it.  And that's what

11   the 0.5's represent.

12        Q.    And is it your understanding

13   that all of the samples that were

14   produced by PTI were finished products

15   that were in a sealed bottle?

16        A.    No.  That was not my

17   understanding.  The ones on the pages

18   that have four columns across were the

19   finished product samples.

20              The ones on the pages that

21   only have three columns across --

22        Q.    Okay.  So I'll interrupt you

23   for a second, and let's turn.  I'm

24   looking at Page 72 of 91 right now.

Margaret M. Gurowitz

1      A.     Okay.  I can't used to
2   double-sided.
3      Q.     I was just about to say,
4   I've made it a little more difficult on
5   you in order to save the trees.  I have
6   them double-sided, so it's becoming a
7   little more difficult for you.
8             We're looking at Page 72 of
9   91?
10     A.     Yes.
11     Q.     And you started to provide
12  some testimony in regard to the samples
13  that are listed on the page with three
14  columns.  Is this what you're referring
15  to?
16     A.     That is what I'm referring
17  to.
18     Q.     And what is your
19  understanding of these samples?
20     A.     It is my understanding that
21  these samples are raw talc and not
22  finished product.
23     Q.     Okay.  If we can go back
24  to -- first of all, staying with PTI for

Margaret M. Gurowitz

1   a minute.  Is there anyone other than

2   Janet Stanish that you spoke with in

3   regard to PTI samples?

4          A.    No.  It was just Janet.

5          Q.    Going back to Exhibit 5 and

6   the other people that you spoke with.

7   You wrote down Mark Zappa from quality,

8   correct?

9          A.    Correct.

10          Q.    Okay.  And you had a

11   conversation with Mark Zappa in regard to

12   chain of custody?

13          A.    I did.

14          Q.    Okay.  When was the first

15   time that you spoke with Mr. Zappa?

16          A.    Oh, it was -- I don't have

17   the date.  It was a few weeks ago.

18          Q.    And for how long did you

19   speak with Mr. Zappa?

20          A.    Again, it was not a

21   tremendously long conversation.  It would

22   have been under 30 minutes.

23          Q.    Okay.  And what was the

24   substance of the conversation that you

Margaret M. Gurowitz

1    had with Mr. Zappa?

2           A.    So I was trying to piece

3    together chain of custody for the samples

4    that are marked quality assurance.  And I

5    will turn to those and let you know what

6    page those are on as soon as I find them.

7    I'm sorry.  I always forget to look on

8    the other side of the double-sided.

9           Q.    If I can find it, I'll let

10   you know.

11          A.    On Page 37 of 91.

12          Q.    So on Page 37 of 91, there

13   are two samples that are listed as coming

14   from the quality assurance department; is

15   that correct?

16          A.    That is correct.

17          Q.    And that's Samples JBP-294

18   and JBP-295, correct?

19          A.    That is correct.

20          Q.    Are they the only two

21   samples that you spoke with Mr. Zappa

22   about?

23          A.    Yes, I believe they are.  I

24   think those are the only two marked

Margaret M. Gurowitz

1  quality assurance on the list.

2       Q.    And did you take notes while

3  you were speaking with Mr. Zappa?

4       A.    No, I did not.

5       Q.    So you spoke with Mr. Zappa

6  for about a half hour in regard to these

7  two samples, correct?

8       A.    Yes.

9       Q.    And what did Mr. Zappa tell

10  you in regard to these two samples?

11       A.    Mr. Zappa said that these

12  particular samples are from 1984 so they

13  are beyond the memory of any employee

14  still in quality assurance, in that area.

15            They were found in -- they

16  were pulled from offsite storage in a box

17  of general products, not just Johnson's

18  Baby Powder, but other products and other

19  items.  And the box was labeled quality

20  assurance.

21            I asked Mark if it were the

22  practice of quality assurance to send

23  samples to offsite storage.  He said no,

24  it was not their practice.  They did not

Margaret M. Gurowitz

1  send samples to offsite storage.  So he

2  was not sure how or why they initially

3  got in those boxes.

4            In the conversation, we

5  determined that it's possible that these

6  were just things that were boxed up from

7  the quality assurance area, whatever area

8  they occupied, and they found their way

9  into that box, and it was labeled quality

10  assurance because that's the area of the

11  building they had occupied.

12        Q.    Okay.  So did Mr. Zappa have

13  any other information in regard to these

14  two samples other than what you just

15  shared?

16        A.    He did not.

17        Q.    Did he give -- did he say

18  that he was aware that the bottles were

19  damaged in any way?

20        A.    He did not mention that.

21        Q.    Did he indicate at all that

22  he had knowledge of the bottles having

23  been tampered with at any particular

24  time?

Margaret M. Gurowitz

1      A.     He did not.

2      Q.     Did he indicate that the

3   bottles had been previously donated by

4   someone outside of Johnson & Johnson?

5      A.     He did not.  Again, they

6   were so old that they were beyond the

7   memory of anyone -- of certainly him and

8   anyone in that area.  Nobody was --

9   nobody was -- is currently there who was

10  there when these were sent to offsite

11  storage.

12     Q.     Did Mr. Zappa refer you to

13  any documents during your conversation?

14     A.     No, he did not.

15     Q.     Did he send you any

16  documents prior to or subsequent to your

17  conversation?

18     A.     He did not.

19     Q.     And you said you didn't take

20  any notes when you spoke with Mr. Zappa?

21     A.     I wrote down his name.

22     Q.     Did the two of you discuss

23  anything else?

24     A.     No.

Margaret M. Gurowitz

1    Q.    You also noted here that you

2   spoke with Barbara Brewer from marketing,

3   correct?

4    A.    That is correct.

5    Q.    And before we get to

6   Ms. Brewer, did Mr. Zappa indicate to you

7   that there was anyone else from within

8   marketing who may have -- I'm sorry.

9    Did Mr. Zappa indicate to

10   you that there was anyone else within the

11   quality department who may have

12   information in regard to these two

13   samples?

14    A.    No, he did not.

15    Q.    Now, you wrote down that you

16   had also spoken with Barbara Brewer from

17   the marketing department, correct?

18    A.    That is correct.

19    Q.    And how many times did you

20   speak with Ms. Brewer?

21    A.    Just once.

22    Q.    Okay.  And when was it that

23   you spoke with Ms. Brewer?

24    A.    It was a few weeks ago.

Margaret M. Gurowitz

1    Q.    Okay.  For how long did that

2  conversation last?

3    A.    Anywhere between half hour,

4  45 minutes.

5    Q.    And what was the subject of

6  your conversation with Ms. Brewer?

7    A.    An attempt to piece together

8  chain of custody for the offsite samples

9  that are labeled marketing as department

10  name.

11    Q.    And looking at the list,

12  would you agree that the majority of

13  offsite samples are samples that fall

14  under the marketing department?

15    A.    Yes.

16    Q.    Okay.  And what was the

17  substance of the conversation that you

18  had with Ms. Brewer?

19    A.    The substance of the

20  conversation was that these were sent to

21  offsite storage so long ago that they

22  were again beyond the memory of any

23  employee still there.  And Barbara Brewer

24  is an employee who has been with the

Margaret M. Gurowitz

1    company a long time.  And it was still

2    outside of her memory as an employee.

3            So -- but, so we -- we

4    discussed that.  She did say that it is

5    not the practice of marketing to send

6    samples to offsite storage and that these

7    boxes were labeled marketing, but since

8    it is not part of marketing's policy and

9    practice to send samples to offsite

10   storage, she doubted whether the

11   marketing group that long ago had sent

12   them.

13           And so that was part of my

14   attempt to piece together the chain of

15   custody.  And we had determined that

16   probably the bulk of the samples that are

17   labeled marketing had been separated from

18   the old Johnson & Johnson museum in 1982,

19   sent back to the consumer company, and

20   then somebody there sent them to offsite

21   storage, and they had gotten -- they were

22   labeled marketing likely because they

23   were product samples.

24           Q.    You say that Ms. Brewer

Margaret M. Gurowitz

1  indicated that it was not the practice of

2  the marketing department to send samples

3  to offsite storage; is that correct?

4        A.     That is correct.

5        Q.     Do you know whether or not

6  it is the practice of the marketing

7  department to maintain product samples?

8        A.     I do not.  I think she said

9  if they maintained something, it would be

10  for really -- I was trying to -- since we

11  were trying to track chain of custody, it

12  was not part of the discussion because I

13  was concerned with these particular

14  samples.  She said -- she did say that it

15  was not their practice to send them to

16  offsite storage.

17        Q.     And what else did you

18  discuss with Ms. Brewer?

19        A.     It was -- that was it.  Just

20  around these samples and how they had

21  gotten into offsite storage originally.

22        Q.     Okay.  It indicates here

23  that you also spoke with Ms. Finnie from

24  the marketing department?

Margaret M. Gurowitz

1      A.     That is correct.

2      Q.     Okay.  And did you speak

3  with Ms. Finnie before or after you had

4  spoken with Ms. Brewer?

5      A.     At the same time on the same

6  call.

7      Q.     The two of them were on the

8  same call?

9      A.     Correct.

10      Q.     Okay.  And what information

11  did Ms. Finnie share with you in regard

12  to marketing samples?

13      A.     Sarita Finnie has a much

14  shorter tenure with the company.  So she

15  asked Barbara Brewer, who is a long-term

16  employee, to be on the call, because

17  Sarita did not have any information about

18  the samples.

19      Q.     And it was -- if I

20  understand correctly, Ms. Downs had

21  recommended that you contact either

22  Sarita Finnie or Katie Decker from

23  marketing in regard to chain of custody;

24  is that correct?

Margaret M. Gurowitz

1      A.     That is not --

2             MS. FOURNIER:  Objection.

3             THE WITNESS:  That is not

4      correct.  The typed list

5      represents people that Pam Downs

6      reached out to because she thought

7      they might know of samples.

8  BY MR. LAPINSKI:

9      Q.     Okay.  When you reached out

10 to the marketing department, who was the

11 person in the marketing department that

12 you first reached out to?

13     A.     I asked the legal team if I

14 could find, if I could speak with

15 somebody in the marketing group.  Sarita

16 who leads that team was identified.  And

17 then she asked Barbara to participate

18 because she has a much shorter tenure

19 with the company and she did not have any

20 information.  And she was hoping that

21 Barbara would.

22     Q.     And do you know what

23 Ms. Finnie's title is?

24     A.     I don't know exactly.  We

Margaret M. Gurowitz

1  could -- we could find out for you.

2       Q.    And do you know what

3  Ms. Brewer's title is?

4       A.    I don't know her exact

5  title, but she's an administrative

6  assistant.

7       Q.    Was there anyone else on the

8  call other than Ms. Finnie and Ms. Brewer

9  when you spoke with them?

10       A.    Just one of the legal folks

11  who facilitated the call.

12       Q.    Okay.  Was it an outside

13  attorney or was it an inside attorney?

14       A.    Outside.

15       Q.    Do you know who that

16  attorney was?

17       A.    It was Andrew Karp.

18       Q.    Okay.  Did Ms. Finnie or

19  Ms. Brewer share any other information

20  with you other than what we discussed?

21       A.    No.

22       Q.    You also indicate here that

23  you spoke with Lorena Telofski from

24  research and development; is that

Margaret M. Gurowitz

1    correct?

2          A.    That is correct.

3          Q.    Okay.  And when did you

4    first speak with Ms. Telofski?

5          A.    It was a few weeks ago.

6          Q.    And for how long did that

7    telephone conversation last?

8          A.    Again, probably somewhere

9    between half hour, 45 minutes.

10          Q.    Taking a step back to the

11    marketing people that we spoke about.

12    Did the marketing people send you any

13    documents in regard to -- in follow-up to

14    the conversations that you had?

15          A.    They did not.

16          Q.    Did they send you any

17    documents prior to the conversation that

18    you had?

19          A.    They did not.

20          Q.    Okay.  Going back to Ms.

21    Telofski.  You said you spoke with her a

22    couple weeks ago?

23          A.    Yes.

24          Q.    And the conversation lasted

Margaret M. Gurowitz

1   about a half hour?

2       A.     Somewhere between half hour,

3   45 minutes.

4       Q.     Okay.  And what did you

5   speak to Ms. Telofski about?

6       A.     I was attempting to try to

7   piece together a chain of custody for the

8   samples on the list that are marked

9   research and development.  That would

10  start on Page 18 of 91.

11      Q.     What information did

12  Ms. Telofski give you in regard to these

13  samples?

14      A.     Ms. Telofski, the first set

15  of samples are actual Johnson's Baby

16  Powder.  Again, they were -- they were

17  much older, and she didn't have

18  information specifically.  She did say

19  that research and development again did

20  not have a practice of sending things to

21  offsite storage.  She did say that the

22  ones that were not United States products

23  would likely have been kept by someone as

24  souvenirs because it was interesting

Margaret M. Gurowitz

1 because they were from outside of the

2 U.S.

3          Q.    And just for purposes of

4 clarification, the first five research

5 and development samples that we're

6 talking about which are JBP-1, 2, 3, 4

7 and 6 are samples which originated from

8 Mr. Ashton's office; is that correct?

9          A.    Or the area around

10 Mr. Ashton's office.  There was, as I

11 understand it, an open common area.  And

12 these things were in that space.

13          Q.    Did Ms. Telofski -- did

14 Ms. Telofski indicate that she had any

15 knowledge that the samples -- the

16 research and development samples were

17 part of any type of research project?

18          A.    She did not.

19          Q.    If you turn to Page 46 of

20 91.

21          A.    I'm not seeing it.  I'm

22 sorry.

23          Q.    Take your time.

24          A.    They've gotten maybe a

Margaret M. Gurowitz

1    little out of order.  48 of 91?

2         Q.    46.

3         A.    46.  Okay.

4         Q.    And at the bottom of Page

5    46, there's an entry for a sample from

6    the research and development department

7    and it starts RR-001; is that correct?

8         A.    That is correct.

9         Q.    And do you know what the RR

10   designation refers to?

11        A.    I do not.

12        Q.    Do you know where the RR

13   designation came from?

14        A.    I do not.  But I believe the

15   sample number, those were -- the legal

16   team that collected these, those are

17   their sample numbers.  So the one

18   directly above RR-001, STS would be

19   Shower to Shower, but I don't know what

20   the RR stands for.

21        Q.    And did you inquire at all

22   from Ms. Telofski what that represented?

23        A.    I did not, because it was

24   pretty clear from the label column that

Margaret M. Gurowitz

1   we were talking about rocks.

2       Q.   Okay.  And is it your

3   assumption that all of these samples that

4   are labeled with a sample number

5   beginning with RR refers to a raw rock?

6       A.   Yes, they would appear to do

7   that.

8       Q.   And is that your testimony,

9   that they all refer to raw rock?

10      A.   If that's -- they all refer

11  to -- they all refer to rocks, yes.

12      Q.   Okay.  And what was the

13  specific testimony -- what was the

14  specific information that Ms. Telofski

15  had given to you?

16      A.   Ms. Telofski said that these

17  rocks were in that common area that

18  Mr. Ashton, who retired -- she said he

19  was active I believe during the '60s,

20  '70s and part of the '80s, retired, and

21  then subsequently passed away.

22              He collected things when he

23  traveled around the world.  And the rocks

24  were part of his collection.

Margaret M. Gurowitz

1    Q.    And did Ms. Telofski tell

2  you anything else in regard to the

3  samples that are from the research and

4  development department?

5    A.    She said that after

6  Mr. Ashton passed away, that his daughter

7  said -- came with a box of rocks that he

8  had at his house and gave them to

9  Ms. Telofski.

10    Q.    And from this list, are you

11  able to identify which samples would have

12  been samples that came from Mr. Ashton's

13  daughter's home?

14    A.    I am not.

15    Q.    Okay.  Did you make any

16  further inquiry in regard to that?

17    A.    About which samples came

18  from his daughter?

19    Q.    Yes.

20    A.    It was relayed to me that

21  they were just put in boxes with the

22  other rocks.

23    Q.    Do you know what

24  Mr. Ashton's daughter's name is?

Margaret M. Gurowitz

1    A.    I do not.

2    Q.    Did you speak with

3  Ms. Telofski in regard to any samples

4  other than those from the research and

5  development department?

6    A.    No, I did not.

7    Q.    Is there anything else that

8  you discussed with Ms. Telofski that you

9  have not yet mentioned?

10   A.    Just sort of the movement of

11  these items, the rocks that were not

12  brought back by Mr. Ashton's daughter

13  were in -- on shelves, you know, some

14  sort of storage unit in sort of the

15  common area that had been outside of the

16  area -- around the area that his office

17  had been in.

18        And then Ms. Telofski had to

19  box these up at some point somewhere

20  around 2006 when her group moved floors.

21  She boxed them up and they sat in boxes

22  in her office for quite a number of

23  years.  Around the 2016 time frame, they

24  were informed that there was going to be

Margaret M. Gurowitz

1    construction on that space in the

2    building and it was moving to open plan

3    work space which would have no storage.

4    And at that time these items were sent to

5    offsite storage.

6              Q.   And you said that was around

7    2016?

8              A.   Yes.  In that time frame.

9              Q.   Okay.  And then lastly, you

10   indicated that in preparation you spoke

11   with Pam Downs, correct?

12             A.   I spoke with -- Pam Downs

13   was the next-to-last conversation I had,

14   yes.

15             Q.   Okay.  And when did you

16   speak with Ms. Downs?

17             A.   Maybe a week or two ago.

18             Q.   And for how long did you

19   speak with Ms. Downs?

20             A.   Probably less than

21   30 minutes.

22             Q.   Okay.  And what was your

23   conversation with Ms. Downs in regard to?

24             A.   My conversation with Pam

Margaret M. Gurowitz

1  Downs was whether she had identified

2  any -- any other samples or she, in this

3  list of people that she spoke to, that

4  they had -- they were able to provide any

5  information regarding the chain of

6  custody for the samples on this list.

7       Q.   And did she give you any

8  additional information?

9       A.   She said they -- the folks

10  that she spoke to were not able to

11  identify any other samples, and they had

12  no information about chain of custody.  I

13  mean other than -- you know, because she

14  spoke with some of the folks I spoke

15  with, although I spoke with the folks

16  before I spoke with Pam.  So other than

17  what was relayed to me by them.

18       Q.   So it's your understanding

19  that other -- other than the people who

20  you spoke with, there's no one who has

21  any knowledge as it relates to chain of

22  custody of the offsite samples?

23       A.   That is my understanding.

24       Q.   Now, you said that Pam Downs

Margaret M. Gurowitz

1  was the next-to-last person that you had

2  spoken with?

3       A.    Correct.

4       Q.    Is there someone else that

5  you spoke with who we've not discussed?

6       A.    No.

7       Q.    Okay.  What did you mean

8  when you said she was the next to last

9  person you spoke with?

10      A.    I spoke with Janet Stanish

11 from PTI after I spoke with Pam.

12      Q.    Okay.  So you're talking

13 just in the chronology of things,

14 Ms. Downs was the second-to-last person

15 that you had spoken with?

16      A.    Correct.

17      Q.    Okay.  Ms. Gurowitz, when

18 were you first contacted about this

19 deposition?

20      A.    Oh, I'm trying to think.

21 I'm trying to think back of the entire

22 chronology of pulling the samples and the

23 deposition.

24            It was a few weeks ago.  I'm

Margaret M. Gurowitz

1   sorry.  I don't remember the exact date.

2          Q.    By whom were you contacted?

3          A.    I was contacted by the

4   outside legal folks who were working with

5   us.

6          Q.    Okay.  Is providing

7   testimony regarding chain of custody a

8   normal part of your job function?

9          A.    I've never done it before.

10          Q.    Okay.  Have you in the past

11   ever had to provide any type of an

12   affidavit in regard to the chain of

13   custody for any type of Johnson & Johnson

14   product in your capacity as the

15   historian?

16          A.    I have not had to provide an

17   affidavit.

18          Q.    And as we've discussed,

19   you've had to educate yourself in order

20   to prepare for the testimony today,

21   correct?

22          A.    That is correct.

23          Q.    Okay.  Other than talking to

24   the people who we just spoke with, what

Margaret M. Gurowitz

1    have you done in order to prepare to

2    testify today?

3           A.    I looked at documents that

4    were in the corporate archives.

5           Q.    And did you -- did you

6    search out those specific documents in

7    order to educate yourself?

8           A.    Yes, I did.

9           Q.    Okay.  And what documents

10   did you look at?

11          A.    I believe you have them.

12   There is an internal memo from about the

13   1981, 1982 time frame that said that the

14   law department, which was in charge of

15   the old Johnson & Johnson museum, was

16   going to disband and close the museum and

17   eliminate the collection because they no

18   longer had space.  They were keeping it

19   for the purposes of keeping a trademark

20   history.  So, you know, the changes over

21   time in the labels and the packaging and

22   the colors used, things like that.

23                And so this memo said that

24   they would then be sending the relevant

Margaret M. Gurowitz

1    artifacts back to the operating

2    companies.

3         Q.    And what other documents did

4    you look at?

5         A.    There was another document

6    that, from the same time frame from the

7    then head of public relations who said

8    whatever does not get sent back we're

9    going to keep a part of this collection,

10   because it helps us tell the story of the

11   history of Johnson & Johnson.

12        Q.    Now, when you went to look

13   at documents in the corporate archives,

14   what was the process -- what was the

15   process that you used when you were in

16   the corporate archives?  What was it

17   first that you were looking at where you

18   then came upon these documents?

19        A.    So what I was trying to do

20   is I was trying to track -- piece

21   together as much of a chain of custody as

22   was possible for the -- for the sample

23   items labeled marketing that had been in

24   offsite storage, because most of them,

Margaret M. Gurowitz

1  many or most of them had at one point

2  been in the old museum collection.

3          So I went and looked at

4  documents in the archives that related to

5  the historical management of that old

6  museum and found that document from about

7  the 1982 time frame saying that the

8  museum, the collection would be disbanded

9  and the artifacts, the items would be

10  sent back to the operating companies.

11          Q.   Okay.  Now, when you talk

12  about looking at documents in the

13  corporate archives, is this something

14  that you're able to do by going online on

15  an internal J&J database to access the

16  documents --

17          A.   It is --

18          Q.   -- or are you going to a --

19          A.   It's that --

20          Q.   -- file and pulling a file?

21          A.   It's that cloud-based

22  database, which tells me the location of

23  what I'm looking for.  And then I would

24  go back into the archives, look for the

Margaret M. Gurowitz

1  relevant shelf and acid-free file box and

2  then pull those.

3      Q.    So you said that the cloud

4  is able to tell you where to go for what

5  you're looking for.  When you started the

6  process, what was the -- what was the

7  search term or terms that you used in

8  order to start this document search

9  process?

10     A.    So those -- there are a few

11 boxes, and when I say boxes, they are

12 slim boxes of museum records, files, and

13 so I looked for those.

14     Q.    So this is before you

15 went -- before you went online, you

16 looked at a physical box of documents?

17     A.    So I went into the database

18 that helps us manage the collection,

19 tells us where everything is.

20     Q.    Okay.

21     A.    I looked up the location,

22 and then pulled those boxes and found

23 that document that I had mentioned

24 before.

Margaret M. Gurowitz

1    Q.    So just so that I can

2   clarify.  When you went into the database

3   in order to look for the boxes, what were

4   the search term or terms that you used in

5   order to be pointed to those boxes?

6    A.    So I used museum management

7   records as the search term, because it

8   would have been part of the museum

9   management records.

10    Q.    And that search term led you

11   to -- I'm sorry -- you said one or two

12   boxes?

13    A.    Yes.  It's just a very few

14   boxes.  And when I say boxes I'm not

15   talking about, you know, those big sort

16   of banker boxes, file boxes.  These are

17   sort of slim, acid free storage boxes in

18   which there are acid free file folders

19   and the documents were in those folders.

20    Q.    And how many documents in

21   total do you think you reviewed in

22   preparation for the deposition?

23    A.    I -- there were two that

24   applied specifically to putting together

Margaret M. Gurowitz

1   chain of custody, so those were the ones

2   that I reviewed.

3          Q.     And they're the two

4   documents that you referenced, the 1982

5   document and the memo in and around that

6   time?

7          A.     Yes.

8          Q.     Okay.  Were there any other

9   documents that you reviewed that you did

10  not consider to be relevant?

11         A.     There were other things that

12  had complete non-relevance.  They were,

13  you know, research inquiries from

14  students that date back, you know, things

15  like that, completely irrelevant.

16         Q.     Okay.  So approximately how

17  many pages in total did you review as you

18  were looking for materials of relevance

19  to you?

20         A.     So I looked through the file

21  folders in those boxes.  I don't have a

22  count on pages.  But those were the two

23  documents that were of relevance.

24         Q.     Okay.  They're the only two

Margaret M. Gurowitz

1    documents that you feel provided you with

2    any type of information that you're able

3    to share here today?

4         A.    Regarding the dispersal of

5    the collection.  Again, I was trying to

6    piece together as much of a chain of

7    custody as I could for the ones that were

8    labeled marketing on the list.

9         Q.    Okay.  And as far as the

10   other samples that are on the list,

11   whether for the offsite samples or for

12   the museum samples, was there any

13   other -- any other work that you did in

14   order to prepare yourself?

15        A.    I spoke to people who I had

16   hoped would have information about those

17   particular items.

18        Q.    Okay.  Now, how about within

19   the museum itself.  Did you speak with

20   anybody in the museum in regard to chain

21   of custody and samples?

22        A.    It's just me, so...

23        Q.    Okay.  So other than doing a

24   search for and pulling some documents,

Margaret M. Gurowitz

1  the remainder -- and speaking to the --

2  speaking to the people who you spoke

3  with, there is no other work that you did

4  in preparation for the deposition?

5        A.    That was it.  There's one

6  other set of documents that was provided

7  to me.  It was a set marked Drawer 5E

8  that seems to represent at least some of

9  the items that are in the -- listed as

10 marketing in the samples.  And so I could

11 not make a direct correlation with

12 everything on that list with everything

13 here.  But there's some that you can say,

14 okay, yes, so these do look like they

15 came from the collection of the old

16 museum, were sent back to the operating

17 unit, and the operating unit sent them to

18 offsite storage.

19        Q.    And by whom was this Drawer

20 5E file provided?

21        A.    It was -- it was obtained as

22 part of this process.  And so it was

23 provided so that I could try to -- you

24 know, I was -- in doing research, it was

Margaret M. Gurowitz

1  provided so that I could try to piece

2  together, again, chain of custody for the

3  items marked marketing.

4       Q.   Okay.  You said it was

5  obtained as part of this process.  Who --

6  let's go back to my original question.

7  Who gave it to you?  Who gave the Drawer

8  5E file to you?

9       A.   So I believe originally the

10  outside legal folks.

11       Q.   Okay.  And did you have any

12  role in compiling the information that

13  was in drawer -- the drawer 5E file?

14       A.   No.  It very much predates

15  my tenure at Johnson & Johnson.

16       Q.   Okay.  But the file is a

17  Johnson & Johnson file?

18       A.   What they were -- it's -- it

19  was -- it was -- there were copies of old

20  typed transfer sheets to transfer the

21  items to offsite storage from about 1982.

22       Q.   And other -- other than the

23  old typed transfer sheets, was there

24  anything else in that -- in that

Margaret M. Gurowitz

1  particular file?

2        A.    I believe that was it.

3        Q.    And did you meet with

4  counsel in preparing for today's

5  deposition, with your -- the attorneys

6  for Johnson & Johnson?

7        A.    Yes.

8        Q.    Okay.  When was the first

9  time that you met with them?

10       A.    To prepare for the

11 deposition --

12       Q.    Correct?

13       A.    -- or to pull the samples?

14             I'm trying to remember

15 exactly.  Maybe in the past few weeks to

16 month or so.  It was after I was notified

17 that I would be deposed.

18       Q.    Okay.  And how many times

19 did you end up meeting with counsel?

20       A.    I don't have a -- it would

21 be single digits, but I don't have -- I

22 don't know if I could give you an exact

23 number.

24       Q.    Okay.  But less than ten?

Margaret M. Gurowitz

1    A.    Yeah.

2    Q.    Okay.  And approximately how

3  long did you meet with them each time you

4  met?

5    A.    Two were most of the day

6  meetings.  The other ones were short.

7  Maybe just an hour, few hours, hour or

8  so.

9    Q.    And telephone or in person?

10   A.    Both.

11   Q.    Okay.  And if you could just

12  make sure to speak up a little bit.

13   A.    Sure.  I'm sorry.

14   Q.    That's quite all right.  I

15  want to make sure we're able to hear

16  everything.

17        Now, you mentioned that that

18  you met with counsel in order to prepare

19  for the deposition.  But you also had

20  meetings with counsel for purposes of

21  gathering samples, correct?

22   A.    That is correct.

23   Q.    Okay.  What role did you

24  play in gathering samples?

Margaret M. Gurowitz

1         A.    I gathered the samples that

2    were specifically from the current

3    museum, the ones on -- that are marked

4    museum collection.  I can give you a page

5    number on which to start.

6               So the ones -- it should --

7    it starts with Page 2 of 8, page ID is

8    13369.

9               So that was the ones that --

10   where the leftmost column is museum

11   number.

12        Q.    Okay.  And you were

13   responsible for gathering all of these

14   samples and providing them to counsel?

15        A.    Yes.

16        Q.    Okay.  Did you also -- were

17   you also responsible for packing these

18   samples?

19        A.    I worked with the legal

20   folks on that, just because it's a

21   massive job, and it helps if there's more

22   than one person doing it.

23        Q.    And what was -- what was the

24   process that was followed in preparing

Margaret M. Gurowitz

1   all of these samples for shipment?

2        A.    So I pulled them from the

3   archival storage, and I wear gloves,

4   obviously, when I handle fragile and old

5   artifacts.

6              They were then taken out of

7   the acid free tissue paper that they were

8   wrapped in out of the archival boxes.

9   They were noted by the legal folks.  They

10  were put into boxes for transport to the

11  lab.  And then they were -- each item was

12  checked off on a transfer sheet and

13  signed and initialed.

14       Q.    So when you say they did --

15  when you say they were noted by counsel,

16  what do you mean noted by counsel?

17       A.    So there are -- and I

18  apologize if I'm not using the right

19  name -- transfer sheets --

20       Q.    Okay.

21       A.    -- that you have to -- like

22  a chain of custody sheet.  And so it was

23  that with -- you know, it had a listing

24  of, this is X, Y, Z, this is the number

Margaret M. Gurowitz

1   A, B, C.  And so I would need to initial

2   next to each one, yes, we put this in

3   this box, took it from this box, put it

4   in this box.

5          Q.    And was it you who prepared

6   each sample for shipping?

7          A.    When you say prepared for

8   shipping, what do you mean?

9          Q.    You said, as you had

10  testified to, you take the -- you wear

11  gloves when handling the samples in order

12  to be able to, I would, assume have a

13  level of care when you're handling the

14  samples, correct?

15         A.    Correct.  Well, skin oils

16  can damage a fragile old artifact, so you

17  don't want to touch it directly.

18         Q.    Okay.  So now I want to

19  transfer that over to the packaging

20  process when we're getting ready to ship.

21             Did you oversee or do the

22  packaging of the products when they were

23  being prepared for shipment?

24         A.    So I put them, with the

Margaret M. Gurowitz

1  assistance of counsel, again it was a

2  massive job.  We put them in -- took them

3  out of the archival storage, put them in

4  boxes, signed the transfer sheet.

5  Counsel then took the boxes.

6          Q.    And is there packing around

7  each of the samples when they were in the

8  boxes?

9          A.    There was some -- not around

10  each individual sample.  But to prevent

11  them from jostling around.

12          Q.    Okay.  How was each sample

13  stored at the museum when it's in --

14  strike that.

15          You had said that for each

16  sample you would take it out of an

17  acetate wrapping, correct?

18          A.    Acid-free tissue paper.

19          Q.    Acid-free tissue paper.  So

20  when it's stored, it's in acid-free

21  tissue paper, correct?

22          A.    Most of them, yes.  The ones

23  that would have acid-free tissue paper

24  are some of the older ones where the

Margaret M. Gurowitz

1  printing was done on the metal container

2  because it might -- you know, you don't

3  want the paint to flake off at a certain

4  point in time.  So the ones that

5  didn't -- were not completely wrapped in

6  acid-free tissue paper had a spacer of

7  acid-free tissue paper in between, in the

8  boxes.

9         Q.    In the boxes that are

10  packed?

11         A.    In the -- in the archival

12  boxes in the archives.

13         Q.    In the boxes where they're

14  stored?

15         A.    Yes.

16         Q.    Okay.  When they're taken

17  out of those storage boxes and put into

18  the packing boxes, was each bottle

19  also -- each sample separated from the

20  other samples?

21         A.    Some were, some were not.  I

22  believe they were just packed upright so

23  that they wouldn't jostle.

24         Q.    Okay.  Let's talk about the

Margaret M. Gurowitz

1    J&J museum.  I think you had testified

2    that there is a new J&J museum that

3    opened in May of 2016; is that correct?

4           A.    Correct.

5           Q.    Okay.  Is that the only

6    Johnson & Johnson museum?

7           A.    That is the only one at

8    corporate.  There might be other groups

9    that consider they have a museum.  But it

10   might be just a glass case with things in

11   it.

12          Q.    Okay.  So are you aware of

13   any other subsidiaries of Johnson &

14   Johnson that might have what they

15   consider to be a museum?

16          A.    No.

17          Q.    Is the museum owned by

18   Johnson & Johnson?

19          A.    Yes.

20          Q.    Is the museum operated by

21   Johnson & Johnson?

22          A.    Yes.

23          Q.    You testified earlier that

24   there is a -- there's security at the

Margaret M. Gurowitz

1  museum, correct?

2      A.    There is security three days

3  a week when we are open for visits.

4      Q.    And can you describe for me

5  what you mean by open for visits?

6      A.    So the museum is open

7  Mondays, Wednesdays, and Fridays between

8  10:00 a.m. and 5:00 p.m. for employees,

9  contractors who work on the campus,

10  retirees, and their escorted guests to

11  visit.

12      Q.    When you say escorted

13  guests, can you explain to me what you

14  mean by escorted guests?

15      A.    Sure.  Partners they are

16  working with.  A lot of employees want to

17  bring their families to visit the museum,

18  so families, spouses, families.

19      Q.    And I guess what I'm trying

20  to understand is when you say escorted

21  guest, if I'm a J&J employ -- if I'm a

22  Johnson & Johnson employee and I go to

23  the museum, I can bring my family and I'm

24  considered to be the escort?

Margaret M. Gurowitz

1      A.    That is correct.  They would

2  have to register in advance and sign in

3  like any visitor to our campus.  But yes,

4  that is correct.

5      Q.    And is -- as it relates

6  specifically to talcum powder products,

7  the current museum that opened May of

8  2016, there are only the two items that

9  we previously discussed that are on

10  display in the museum; is that correct?

11      A.    That is correct.

12      Q.    Okay.  Is the storage area

13  of the museum physically connected to the

14  actual museum itself?

15      A.    It is in the same building.

16  But it is card key access, restricted

17  access.

18      Q.    And who has access to that

19  storage facility?

20      A.    I do.  Some facilities folks

21  do, because they need to do cleaning and

22  maintenance, and the general manager of

23  the museum has access.

24      Q.    And who's the general

Margaret M. Gurowitz

1   manager of the museum?

2         A.     Lauren Haber.

3         Q.     H-A-B-E-R?

4         A.     Yes, that is correct.

5         Q.     And do you report to Lauren

6   Haber?

7         A.     No, I do not.  She manages

8   the space, events and things like that,

9   if people want to register to visit,

10  things like that.  But she does not work

11  with the archives.

12        Q.     And other than yourself and

13  Lauren, who is it that you said has

14  access to the room?

15        A.     There are facilities

16  cleaning staff have access so they can

17  clean.  When I say the space, it's

18  through the office space, the restricted

19  access space, so they clean the office

20  space.

21        Q.     Facilities people

22  wouldn't -- wouldn't have a need to go

23  into the storage space for any reason

24  that you're aware of, would they?

Margaret M. Gurowitz

1          MS. FOURNIER:  Objection.

2          THE WITNESS:  They

3     shouldn't.

4  BY MR. LAPINSKI:

5          Q.    Okay.  You said that there

6  is a -- it's a card key access.  Is

7  entrance to the storage area tracked?

8          A.    I believe if it's card key

9  access, they would have the ability to

10  track it.

11         Q.    Okay.  And do you know -- do

12  you know by whom that's tracked?

13         A.    Security.

14         Q.    Are you aware of any

15  unauthorized people entering the storage

16  area during the time that it's been in

17  existence?

18         A.    I'm not aware of that.

19         Q.    And like the museum, is this

20  current storage -- has this current

21  storage facility been in existence since

22  May of 2016?

23         A.    Correct.

24         Q.    I think I asked you this

Margaret M. Gurowitz

1 earlier.  Are there employees who work in

2 the museum?

3          A.    Just me and occasionally the

4 general manager.  And three days a week

5 there's security at the front desk.

6          Q.    And when you're working --

7 working in the museum, what is the role

8 that you're playing inside of the museum

9 while you're working there?

10          A.    So my office space is there,

11 and so I do what I generally do over the

12 course of my -- with the course of my

13 workday.

14              Did you want me to go

15 into --

16          Q.    Unless you were going to

17 add -- unless you were going to add

18 something else that you do.

19          A.    No.

20          Q.    Okay.  What are -- what are

21 your job responsibilities within the

22 museum?

23          A.    So as noted on my CV, I do

24 sort of all of the things there.  So I

Margaret M. Gurowitz

1  manage and maintain the archives.  I

2  research stories from Johnson & Johnson

3  history, so I'd go into the archives to

4  do research for that.

5            I respond to requests.  A

6  lot of people have questions about some

7  aspect of the company history.  So I

8  would respond to those things.  I curate

9  exhibits in our museum.

10       Q.    Prior to May of 2016, was

11  there a Johnson & Johnson museum located

12  at a different location?

13       A.    It was located at the same

14  location.

15       Q.    And like the current museum,

16  was it a museum that was accessible to

17  employees and personnel?

18       A.    Only by appointment.

19       Q.    And for how long had that

20  museum been in place before the new

21  museum opened in 2016?

22       A.    Since the 1960s in that

23  building.

24       Q.    And was it in the same

Margaret M. Gurowitz

1   location since the 1960s?

2        A.    It was.

3        Q.    And what is that location?

4        A.    That is our power house

5   building.  It is a 1907-built building on

6   our campus.

7             MS. FOURNIER:  Counsel, when

8        you find a natural breaking point,

9        do you mind?  We are at not quite

10       an hour.  But I would like to take

11       a break.

12            MR. LAPINSKI:  That's fine.

13       We can go off the record.

14            THE VIDEOGRAPHER:  The time

15       is 11:42 a.m.  We are off the

16       record.

17            (Lunch break.)

18            THE VIDEOGRAPHER:  We are

19       back on the record at 12:46 p.m.

20   BY MR. LAPINSKI:

21       Q.    Good afternoon,

22   Ms. Gurowitz.  Before the break we were

23   talking about physical locations of J&J

24   museums.  I believe you testified prior

Margaret M. Gurowitz

1    to May of 2016 there was a J&J museum

2    that had been in existence since the

3    1960s; is that correct?

4         A.    That is correct.

5         Q.    Okay.  I'm going to hand you

6    a document that I've marked as Exhibit 6.

7              (Document marked for

8              identification as Exhibit

9              Gurowitz-6.)

10   BY MR. LAPINSKI:

11        Q.    And this is a document dated

12   March 19, 1982.  And it's on Johnson &

13   Johnson letterhead.  If you would just

14   take a minute and review that document

15   and then let me know after you've had an

16   opportunity to review it.

17        A.    I'm familiar with this

18   document.

19        Q.    Okay.  Earlier you had

20   testified that you had done a search for

21   documents that may be relevant to your

22   testimony, correct?

23        A.    Correct.

24        Q.    Is this one of the documents

Margaret M. Gurowitz

1    that you found in that search that you

2    considered to be relevant to your

3    testimony?

4         A.    Yes.

5         Q.    Okay.  And if you wouldn't

6    mind, could you please describe for me

7    what this document is?

8         A.    This is a document.  It's

9    titled "The Kilmer Museum," which was the

10   name of the old Johnson & Johnson museum

11   that had been in this building since the

12   '60s.

13             And it is from L.G. Foster,

14   who at the time was the vice president of

15   public relations at Johnson & Johnson.

16             And the addressees, J.E.

17   Burke was the chairman and CEO of the

18   company.  D.R. Clare was the president.

19             And in this memo Mr. Foster

20   states that he and George Frazza who was

21   the head counsel of Johnson --

22   senior-most person at Johnson & Johnson

23   in charge of our law group, decided that

24   when we moved to the new building -- and

Margaret M. Gurowitz

1    what they are referencing is Johnson &

2    Johnson's new world headquarters, which

3    was completed and opened in 1982, that

4    the Kilmer Museum, the old museum would

5    be divided into two areas of

6    responsibility and that public relations

7    would assume the responsibility for

8    maintaining the history of the company.

9         Q.    So couple questions based

10   upon what you just said.

11        A.    Sure.

12        Q.    And you can tell that she is

13   a J&J historian, because she does her

14   research or knows.

15             It references the Kilmer

16   Museum.

17             Was the Kilmer Museum -- is

18   it fair to say that the Kilmer Museum is

19   the name of the Johnson & Johnson museum

20   from the 1960s up until the new museum --

21   new museum opened in May of 2016?

22        A.    Yes.  I did say that the

23   museum had been in that building since

24   the 1960s.  It had existed in some form

Margaret M. Gurowitz

1  before that in a building that is no

2  longer existing.

3      Q.    Okay.  So let's -- let's

4  take a step back.  From the 1960s until

5  1982, the Kilmer Museum was in the power

6  house building, correct?

7      A.    Correct.

8      Q.    Now, in 1982, this memo

9  talks about a move to a new building,

10 correct?

11     A.    Yes.  What they're

12 referencing is the newly constructed

13 Johnson & Johnson world headquarters in

14 New Brunswick.

15          And so what they are talking

16 about was they would take -- they would

17 turn what had been the museum, which had

18 been a collection of showcases with just

19 stuff, items in them, and then products

20 in storage, develop an audio-visual

21 presentation, and then have a very

22 limited number of, as they put it, old

23 product samples in this memo on display

24 in the outer lobby of the tower, which is

Margaret M. Gurowitz

1    part of the new world headquarters

2    building.

3         Q.    And when was the new world

4    headquarters building completed?

5         A.    It opened in 1982.

6         Q.    And at the time that the new

7    world headquarters opened, did they have

8    a museum in that building as anticipated

9    by this memo?

10        A.    In the new world

11   headquarters building?

12        Q.    Yes.

13        A.    Not as we consider the

14   museum.  What they had was, they

15   referenced the outer lobby by the tower.

16   There was sort of a very shallow showcase

17   there.  And inside that showcase was sort

18   of a graphic timeline with very few

19   artifacts in it.

20        Q.    Are you aware of whether or

21   not within that showcase there were any

22   samples that are contained on the sample

23   list that we have here?

24        A.    I do not know.  We don't

Margaret M. Gurowitz

1   have information on exactly what was in

2   the showcase.

3        Q.    And how long was that

4   showcase in existence?

5        A.    It was in existence from

6   sometime circa 1982 to sometime in the

7   1990s or late 1990s, maybe.

8        Q.    Do you have any -- do you

9   have any records in your museum files

10  that would lead you to believe that there

11  were sample products -- talcum powder

12  sample products that were put on display

13  in that outer lobby?

14       A.    There may have been.  It was

15  sort of a historical timeline of the

16  corporation.  So it's possible that in

17  that showcase there might have been

18  Johnson's Baby Powder artifact among the

19  other artifacts that was ultimately

20  decommissioned, and a flat screen monitor

21  was put in its place.

22       Q.    But you have -- you have no

23  documentation or knowledge that there

24  actually was a Baby Powder product that

Margaret M. Gurowitz

1    was in that display?

2         A.    I don't.  At the time

3    documentation was not kept, so presumably

4    when they took whatever was in there out

5    of it they just would have put it in a

6    box along with all the other boxed up

7    artifacts without documenting what was

8    put and where it was put.

9         Q.    Is there a -- are there

10   boxes of artifacts that came from the

11   world headquarter display that we are

12   talking about that were ultimately

13   removed and put somewhere?

14        A.    We do not have records of

15   exactly where those products went from

16   the world headquarters display, if they

17   were returned to the collection that was

18   in what was left of the old museum.

19   They -- it would not have been noted.

20        Q.    Okay.  Going back to the

21   Kilmer Museum, was the Kilmer Museum a

22   public access museum?

23        A.    No, it was not.

24        Q.    Could you describe for me

Margaret M. Gurowitz

1  what the Kilmer Museum was?

2      A.    The Kilmer Museum was a

3  collection of artifacts in sort of, you

4  know, wood and glass showcases, sort of

5  very old school.  There was no

6  interactivity.  They were just sort of in

7  these showcases with no explanation.

8           There was no climate

9  control, so there was no air

10  conditioning.  In the summer, it got very

11  hot in there.  There was no light

12  control, so if the light was hitting

13  those cases it would fade whatever was in

14  it or, you know, interact with it.

15      Q.    In addition to the

16  collection of glass cases that you just

17  referenced, did that museum also have a

18  storage area?

19      A.    It did.  It had a room with

20  boxes, unlabeled boxes, like, you know,

21  the cardboard banker boxes with the lids,

22  with product artifacts in it.

23      Q.    Prior to the 1960s, did J&J

24  have any type of museum?

Margaret M. Gurowitz

1    A.    From the research I

2  conducted in our archives, the company

3  did.  It was the same sort of showcase

4  museum with glass and wood showcases.

5    Q.    And do you know where that

6  museum was located?

7    A.    It was in a building that no

8  longer exists.

9    Q.    And do you know the period

10  of time for which that museum was in

11  existence?

12    A.    We have a photograph or two

13  from company newsletters from the 1950s

14  that photographs were taken in that.  So

15  certainly it was in existence in the

16  1950s.

17    Q.    Okay.  And do you have -- do

18  you have any documentation in regard to

19  the samples that are contained on this

20  sample list, that any of those samples

21  were displayed in the Kilmer Museum?

22    A.    We don't have documentation.

23  But some -- when we restored the museum,

24  obviously everything had to be taken out

Margaret M. Gurowitz

1  of the building so that construction

2  would happen.   There were some that were

3  in showcases.   They were taken out and

4  packed up along with what was in storage.

5          Q.    When you say restored the

6  museum, what are you referring to?

7          A.    So the old museum, again I

8  mentioned it's a building that was built

9  in 1907.   The museum had been put in

10 there sometime in the early 1960s.   And

11 so when the determination was made to

12 restore the museum and make it sort of a

13 modern state-of-the-art museum as we

14 understand museums to be, everything was

15 removed to offsite storage so that the

16 building could be restored, and then the

17 current museum constructed, and along

18 with the proper climate-controlled

19 archival storage inside it.

20         Q.    So when -- when you are

21 talking about restoring the museum, are

22 you referring to building the new museum

23 on the main campus?

24         A.    Well, so the new museum is

Margaret M. Gurowitz

1    in that same building.  We restored the

2    1907 building and then created a modern

3    state-of-the-art, interactive,

4    climate-controlled museum with

5    climate-controlled archival storage in

6    the back.

7        Q.    So your reference to the

8    restoration of the museum is, after the

9    restoration was complete, you opened the

10   current museum in May 2016, correct?

11       A.    Correct, in that same

12   building.

13       Q.    Okay.  So you were a J&J

14   employee employed as a historian at the

15   time that the old museum samples were

16   boxed up and moved to an offsite

17   facility, correct?

18       A.    Correct.  And if you

19   remember before, we talked about hiring a

20   team of professional archivists who

21   catalogued the collection for the first

22   time.  They are the ones who boxed it up.

23   We moved it to offsite storage during

24   construction.  And then once the archives

Margaret M. Gurowitz

1   in the building was completed, we moved

2   it back into its new climate-controlled

3   archival storage.

4        Q.    Now, do you know whether the

5   archivists at the time that they were

6   boxing up the various samples were

7   recording where those samples had been

8   taken from?

9        A.    They were not, because it

10  was not relevant moving forward.  So

11  there were some samples that were in a

12  showcase that, again, there was no air

13  conditioning in there.  No light control.

14  And others were stored in boxes in a

15  room.

16            So but it wasn't relevant to

17  moving forward.  I mean, they all got new

18  catalogue numbers so we could find them

19  in the new storage.  But it wasn't

20  relevant to note for the museum purposes

21  where we had -- where they had taken them

22  out of, whether it was from one of those

23  old showcase cabinets or a box.

24        Q.    Was there any policy that

Margaret M. Gurowitz

1  was in place when these -- when samples

2  were being boxed by the archivists,

3  whether they were supposed to document

4  anything beyond a product number for the

5  particular product?

6         A.    Well, they documented what

7  was written on the label, which is also

8  reflected on this sheet.  So they

9  documented that.  Occasionally they might

10 document condition, is it in good

11 condition?  Is the artifact in such

12 fragile condition that you need to get it

13 restored right away?  That kind of a

14 thing.

15        Q.    Was there a policy in place

16 that they were to document whether or not

17 there was damage -- strike that.

18              Was there a policy in place

19 where they would document recognizable

20 damage to packaging?

21        A.    Yes.  They generally would

22 document recognizable damage to

23 packaging.

24        Q.    And was that documentation

Margaret M. Gurowitz

1    provided to you as the historian for the

2    museum?

3           A.    Yes.

4           Q.    And do you maintain that

5    documentation now?

6           A.    I do.

7           Q.    Is that on the cloud system

8    that you had previously mentioned?

9           A.    Some of it is.  If there

10   were significant damage to an artifact,

11   it was listed.  But they would provide me

12   a list.  Most of those, the things with

13   significant damage, were things that were

14   in paper or cardboard packaging.  So it

15   really didn't apply to the powder

16   artifacts, because they were either in

17   tins or plastic.

18          Q.    Ms. Gurowitz, going back to

19   your search for documents when you found

20   Exhibit 6, which was the 1982 memo, what

21   were you using as a basis in order to

22   determine whether or not a document was

23   relevant?

24          A.    Whether either it related to

Margaret M. Gurowitz

1  Johnson's Baby Powder samples, for

2  example, but mostly related to the museum

3  collection, because I was trying to piece

4  together chain of custody for the samples

5  labeled marketing that were sent to

6  offsite storage in this 1982 time frame.

7            I had mentioned before that

8  they sent the products back to the

9  relevant operating company, and then the

10  consumer company put those in offsite

11  storage.  So I was trying to piece

12  together chain of custody.

13        Q.    Okay.  Are you -- and going

14  back to the documentation that we

15  discussed that the archivists would

16  document if they saw damage to a

17  particular product while they were

18  packing it up at the old Kilmer Museum,

19  are you aware of any documentation of

20  talc samples that were damaged in any

21  way?

22        A.    There was one plastic

23  container, I remember it was damaged.  So

24  if there's a -- plastic gets very brittle

Margaret M. Gurowitz

1   with age sometimes.  So there was one

2   that -- an older plastic container that

3   the top was off, and so that would have

4   been noted.  And I think that actually

5   was -- I think that was one of the

6   samples that went to the lab.  So it was

7   noted.

8        Q.    Okay.

9        A.    And it was just that the

10  plastic had broken over time.

11       Q.    If the top is removed from

12  one of the plastic talc bottles, are you

13  able to put that top back on and secure

14  that top again?

15       A.    It depends on the condition

16  of the bottle and the age of the bottle.

17  The older plastic bottles get very

18  brittle.  So the act of removal could

19  just cause the plastic to fracture into

20  little pieces.  So it would depend.

21       Q.    Other than the one bottle

22  you're referring to, you're not aware of

23  any other bottles that were listed as

24  damaged when they were packed and stored

Margaret M. Gurowitz

1    from the Kilmer house?

2         A.    Not off the top of my head.

3    There were some where there were cracks

4    in the caps, I remember, when we were

5    packing them up.  But there was one where

6    the top had completely come off.

7         Q.    And to the extent that there

8    were cracks within the cap, would that

9    have been documented as well?

10        A.    By the archivists or?

11        Q.    Well, you had said that it

12   was the archivists who were documenting

13   it.  If -- would it have the been

14   documented by the archivists?  That would

15   be my first question.

16        A.    They were documenting

17   significant damage, so it may have.  But

18   they were looking at thousands of

19   artifacts beyond just powder artifacts.

20        Q.    Right.

21        A.    So it's -- so I would have

22   to check and see.  It's possible that

23   they were documenting significant damage

24   like, you know, half of this package has

Margaret M. Gurowitz

1   come apart from the other half or

2   something like that, versus there's a

3   crack in a cap.

4        Q.    Now, would they document --

5   was anyone else documenting any type of

6   damage?

7        A.    When I worked with the legal

8   folks to pack up the samples from the

9   corporate archives to go to the lab, I

10  believe we noticed -- we documented if

11  things were significantly damaged.

12       Q.    And that was you that was

13  documenting it, or someone from the legal

14  team that was documenting it?

15       A.    It was both of us in tandem.

16       Q.    Okay.  And is that -- is

17  that documentation something that you

18  maintain now as the historian?

19       A.    I believe it was in -- it

20  might be -- I would have to look.

21  It's -- it might be on the transfer

22  sheets or the materials that went with

23  the objects to the lab.

24       Q.    Okay.  I'm going to give you

Margaret M. Gurowitz

1   another exhibit.

2            (Document marked for

3        identification as Exhibit

4        Gurowitz-7.)

5   BY MR. LAPINSKI:

6        Q.    We'll mark this as

7   Exhibit 7.  This is a little bit

8   difficult to read.  This is how it was

9   produced to us.

10            This is a March 9, 1951,

11  draft memo on Johnson & Johnson

12  letterhead.

13            If you would take a minute

14  to review that and just let me know after

15  you've had an opportunity to review it.

16        A.    Sure.

17            I have reviewed it.

18        Q.    Okay.  Before we -- I ask

19  you questions about this document, going

20  back to the talcum powder bottle that we

21  discussed where the top was off.

22            Do you recall what the

23  sample number was of that particular

24  bottle?

Margaret M. Gurowitz

1    A.    I don't offhand.  But it was

2    one that had a very square profile.  So

3    it would not have been a super recent

4    one.

5              It would have been --

6    anytime between 1963 and the late 1980s.

7         Q.    And are you aware of whether

8    there was any powder inside of the

9    container?

10        A.    There was, which is why we

11   were concerned to store it upright,

12   because if it tipped over it would spill.

13   I believe it was put in a bag so that --

14   and baggy so it wouldn't -- in case it

15   did get jostled the contents wouldn't

16   come out.

17        Q.    And that was put in a bag at

18   the time that you prepared it for

19   shipment to the lab?

20        A.    We did -- I believe -- we

21   did something to it so that it would --

22   that the top was secure in case it got

23   jostled because we realized that the top

24   was open.

Margaret M. Gurowitz

1    Q.    Okay.  And just so that I

2    can confirm on my end, the timing that we

3    are talking about with that particular

4    sample deals with you preparing the

5    samples to go to the lab as compared to

6    that sample being taken from the old

7    museum and put in storage until the new

8    museum was complete, correct?

9    A.    That's correct.  Although it

10   had been stored upright for obvious

11   reasons so that it didn't spill.

12   Q.    Okay.  Going back to the

13   document that I handed you, which is

14   Exhibit 7.  Have you seen that document

15   before?

16   A.    It's -- it's hard -- from

17   the copy, it's hard to tell.  I may have.

18   But I couldn't say for sure.

19   Q.    Is this one of the documents

20   that you found when you were doing a

21   document search in preparation for today?

22   A.    I honestly don't remember.

23   Q.    This document was produced

24   to us, and I understand that it's a draft

Margaret M. Gurowitz

1   document.  But I have a couple questions

2   about some information that's in here.

3              And again, this is a

4   March 1951 document.  And if you look on

5   the first line, it says, "Henceforth the

6   law department museum will be located on

7   the ground floor directly beneath the law

8   department."

9              My question is, are you

10  familiar with the law department museum?

11        A.    The law department museum, I

12  think what they are referring to here is

13  that collection that's later referred to

14  as the Kilmer Museum.  And the law

15  department kept it because they wanted to

16  keep a trademark history so they can tell

17  when labeling or package shape changed.

18        Q.    And are you aware of whether

19  or not there were any talcum powder

20  products that were part of the law

21  department museum?

22        A.    I don't have any

23  documentation that says they definitely

24  would -- were, but I think it's safe for

Margaret M. Gurowitz

1    us to assume that the collection that was

2    in the old Johnson & Johnson Kilmer

3    Museum was what they're more or less

4    referring to here.

5         Q.    Okay.  Now, the Kilmer

6    Museum, starting in the 1960s and this

7    memo being from 1951, there's a nine-year

8    period of time between that where there

9    may have been products that came and

10   went, were discarded, et cetera?

11        A.    It's possible.

12        Q.    And there's no documentation

13   to confirm that products that were law

14   department museum actually did make their

15   way into the Kilmer Museum, correct?

16        A.    We do not have that

17   documentation.

18        Q.    Now, if you go to the second

19   paragraph.  The second sentence in the

20   second paragraph says, "It has not always

21   been the practice to forward samples of

22   each of our products to the museum, and

23   unfortunately some appear to be missing."

24             Is there now a policy in

Margaret M. Gurowitz

1   place for samples of Johnson & Johnson

2   products to be forwarded to the museum?

3        A.    There is not.

4        Q.    Do you know of any period of

5   time that there was actually a written

6   policy put in place where product samples

7   would be forwarded to the museum?

8        A.    Yes, I do.

9        Q.    Okay.  When -- when was that

10  policy first put in place?

11       A.    As best as we can -- as best

12  as can be pieced together from the

13  documentation we do have, sometime from

14  the 1950s through the 1970s.  That was

15  discontinued when it was decided to

16  disband the museum as per the 1982 memo.

17       Q.    And what specifically was

18  that policy?

19       A.    As best as I was able to

20  piece together from the existing records,

21  it was a policy that when the packaging

22  or labeling of something changed, they

23  were to send a sample to the museum.

24  Again, the law department was keeping

Margaret M. Gurowitz

1    this as a trademark history so if they

2    needed to look back on all of the

3    historical iterations of a trademark,

4    they would be able to do that.

5         Q.    Other than with the change

6    of packaging, were there any other

7    requirements or policies that samples be

8    sent to the museum?

9         A.    I'm sorry.  I'm not sure I

10   understand the question.

11        Q.    I believe what you just

12   testified was that the policy that was in

13   place from the 1950s to the 1970s was

14   that product samples would be sent to the

15   museum when there was some type of a

16   label change, correct?

17        A.    Yes.

18        Q.    Other than the requirement

19   that samples be sent to the museum upon a

20   label change, were there any other

21   requirements for samples to be forwarded

22   to the museum?

23        A.    If the packaging changed in

24   some -- in some way.  If they changed the

Margaret M. Gurowitz

1   shape of the packaging or they decided on

2   a new size or a new style, then that

3   would have met those requirements.

4        Q.    And those samples that were

5   sent to the museum, is it your

6   understanding that to the extent any such

7   samples were sent to the museum, they are

8   now part of the sample list that we're

9   discussing here today?

10       A.    I was able to trace some and

11  to determine that yes, you can make

12  correlation with some of them.  That is

13  on the list that is labeled as marketing,

14  that department name list, the things

15  that were sent to offsite storage in

16  1982.

17       Q.    So pursuant to the policy

18  that we were just discussing, any

19  products that were produced to the museum

20  pursuant to that policy were ultimately

21  sent to offsite storage and are contained

22  in the offsite storage list that we have

23  here?

24       A.    Yes.  They would have -- so

Margaret M. Gurowitz

1    the collection was culled, as we know

2    from that memo.  Things were sent back to

3    the operating companies.  The operating

4    company then sent that to offsite

5    storage.  A much smaller part of that

6    collection was kept in the corporate

7    museum, and those are reflected in the

8    museum -- the part -- the section with

9    the museum number that were catalogued by

10   the archivists.

11             That being said, obviously

12   there are samples and artifacts that

13   predate this 1950s policy.  We have no

14   idea how they got into the collection.

15   There is no documentation about that.

16        Q.   Okay.  In your answer you

17   had referenced a memo, and you said

18   pursuant to the memo samples were sent

19   back to the operating companies.

20             Did I hear you correctly?

21        A.   Yeah.  So there's this memo

22   from March 19th, 1982.  And then there

23   were the transfer sheets from 1982.

24        Q.   Okay.  So that's what I'm --

Margaret M. Gurowitz

1    I wanted to be able to clarify.  When you

2    referred to the memo, you were referring

3    to the 1982 memo which is Exhibit 6 that

4    discusses, for lack of a better term, the

5    breakdown of the museum, correct?

6         A.    Correct.

7         Q.    Okay.  So samples that had

8    been collected and maintained from the

9    1950s to the 1970s pursuant to the policy

10   were stored at the museum, correct?

11        A.    At one time, yes.

12        Q.    And then in and around 1982,

13   the samples that were at the museum were

14   sent back to the various operating

15   companies from which they had been

16   produced, correct?

17        A.    Many of them were, yes.  A

18   smaller amount was kept in the corporate

19   collection.

20        Q.    Okay.  So using the sample

21   list, the documents that are listed on

22   the offsite storage list will also

23   include some samples that had been

24   maintained at the museum for years prior

Margaret M. Gurowitz

1    to 1982?

2         A.    That's correct.

3         Q.    For the -- strike that.

4              Other than the law

5    department museum that is referenced in

6    the 1951 draft memo, the Kilmer Museum

7    that we've spoken about.  And the latest

8    Johnson & Johnson museum that you oversee

9    have there been any other Johnson &

10   Johnson museums?

11        A.    There have been things that

12   were referred to as museum.  But they may

13   not be a museum in the way that we

14   understand it.

15             There is a Shower to Shower

16   sample that says, "Property of the PPC

17   Museum," Personal Products Company.  It

18   was an operating unit that no longer

19   exists at one time that marketed Shower

20   to Shower.

21             I don't have -- it's in a

22   building that's no longer there.  There's

23   nobody left who would remember that.

24             And so we don't know what

Margaret M. Gurowitz

1  they mean by museum.  Probably it was not

2  a museum the way we understand -- the way

3  we understand a museum to be.  It likely

4  was probably a showcase somewhere.

5          And also the -- four

6  samples, the samples that were sent from

7  the UK, they were referenced as having

8  been on a museum on site.  But the person

9  who made that reference said that the

10  museum was actually a glass case with

11  stuff in it.

12       Q.    Okay.  To your knowledge,

13  there -- other than the three museums

14  that we talked about from a Johnson &

15  Johnson perspective, there were no other

16  official museums?

17       A.    To my knowledge, that's

18  correct.

19       Q.    In your current role

20  overseeing the museum, is there a written

21  policy in place for the procurement of

22  product samples for the museum?

23       A.    There is not.

24       Q.    And has there ever been any

Margaret M. Gurowitz

1   type of written policy in regard to the

2   procurement of product samples for the

3   museum?

4        A.    There is this 1951 policy

5   that's Exhibit 7 that said that samples

6   should be sent.  And again, when they had

7   a change in trademark somehow, they would

8   send a sample.

9        Q.    And other than this draft

10  document, are you aware of any other

11  written documentation that would outline

12  those policies and procedures?

13       A.    Are you referring to --

14  you're referring to the old policy?

15       Q.    Well, the 1951 policy is

16  just a draft memo.  And I'm just asking

17  whether or not there were any type of

18  actual written policies that were

19  incorporated that you're aware of.

20       A.    I think there was something

21  else that was provided as part of me

22  looking through the records and finding

23  it.  But other than that specific policy

24  that's encompassed by those documents,

Margaret M. Gurowitz

1  I'm not aware of other specific policies.

2       Q.     And are they documents that

3  you reviewed in preparation for today's

4  deposition?

5       A.     Yes.

6       Q.     And do you -- can you

7  describe for me what those documents were

8  as far as the date of those documents,

9  and any other information you may have in

10  regard to those documents?

11       A.     I think -- I think one of

12  them was undated.  So I don't know when

13  the date was.  Although it looks like it

14  was typewritten, so we can infer that

15  they used a typewriter that it's

16  certainly not recent.

17            It did say something about

18  when there was a change to the labeling

19  or packaging, send a sample to the

20  Johnson & Johnson museum.

21            And they were referenced by,

22  you know, merchandising notices that said

23  you are supposed to list which

24  merchandising notice this would be.  So

Margaret M. Gurowitz

1  in other words, if they made the type

2  bigger, they would -- might be -- they

3  might -- they would list that and say

4  this is the packaging change that

5  happened as a result of -- we made the

6  logo bigger, or something like that.

7           (Document marked for

8       identification as Exhibit

9       Gurowitz-8.)

10  BY MR. LAPINSKI:

11      Q.    I'm going to mark this as

12  Exhibit 8.  I'm going to hand that to

13  you, and I'll ask you to take a look at

14  that and describe it.

15           MS. FOURNIER:  She is so

16       good at describing.

17           THE WITNESS:  Yes, that is

18       the document.

19  BY MR. LAPINSKI:

20      Q.    All right.  Before we

21  start -- before we start talking about

22  this document that I've marked as

23  Exhibit 8, the documents that, similar to

24  Exhibit 8 that you had looked at when --

Margaret M. Gurowitz

1  let me take a step back.

2              Did you bring any documents

3  with you here today other than the

4  document that we previously marked as

5  Exhibit 5, which was the e-mail with the

6  various peoples names?

7        A.    No, I did not.

8        Q.    Okay.  Other than the

9  document that you have in front of you

10  now which has been marked as Exhibit 8,

11  approximately how many other documents

12  were there that you reviewed and relied

13  upon in order to refresh your

14  recollection in preparation for today?

15             MS. FOURNIER:  Objection to

16        form.

17             THE WITNESS:  I think other

18        than what's in front of me --

19        front of us, that's it.  That's

20        what I reviewed.

21  BY MR. LAPINSKI:

22        Q.    If we can go back to

23  Exhibit 8.  And you had started to

24  describe the document in great detail

Margaret M. Gurowitz

1    before I had it in front of me.  So I'm

2    going to ask you to kind of go through

3    this again.

4              Is it your understanding

5    that Exhibit 8 is the written policy that

6    you had been referring to about the

7    provision of product samples to the

8    museum?

9         A.    It appears to be that, yes.

10        Q.    And it's your understanding

11   that this policy was in place from

12   approximately the 1950s to the 1970s?

13        A.    Well this references a date

14   in 1979 and '82.  So it certainly was in

15   place -- certainly some iterations of

16   this policy were in place over that time.

17        Q.    Okay.  And then it's your

18   understanding that after 1982, that was

19   no longer a policy?

20        A.    Correct.

21             (Document marked for

22        identification as Exhibit

23        Gurowitz-9.)

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1    Q.    I'm going to hand you a

2  document that's going to be marked as

3  Exhibit 9.  I'll ask you to just take a

4  minute and take a look at that.  Just let

5  me know when you're done reviewing and

6  ready to answer questions on that.

7    A.    I'm done reviewing.

8    Q.    Okay.  Have you seen this

9  document before?

10   A.    I don't believe I have, no.

11   Q.    Okay.  This is a document

12 that was produced, and it's a handwritten

13 document with some notes on it.

14        First of all, do you know

15 who Marilyn Rondelli is?

16   A.    No, I do not.

17   Q.    There is -- the next line

18 says, "Baby products, test materials

19 sent."  And I believe that's 1/1983.

20        Do you have any idea what

21 that would be a reference to?

22   A.    I do not.

23   Q.    Do you know whether in and

24 around the January 1983 time frame,

Margaret M. Gurowitz

1  talcum powder products would be included

2  in baby products?

3       A.    I don't have any information

4  they would or not.  So I'm unable to

5  determine that.

6       Q.    If you go to the second

7  line, it refers to ortho products.  Do

8  you know who Harry Grigg is?

9       A.    I do not.

10      Q.    On the third line it refers

11  to McNeil Consumers.  Do you know who

12  Jack McCann is?

13      A.    No, I do not.

14      Q.    Next line that refers to

15  McNeil Pharmaceutical.  Do you know who

16  Ron Dahlen is?

17      A.    I do not.

18      Q.    And then the last line it

19  refers to personal -- well, there's no

20  name there with Personal Products.

21           Do you know whether or not

22  Baby Powder products would have been

23  considered a group of personal care

24  products or Personal Products in 1983?

Margaret M. Gurowitz

1          A.    Personal Products was the

2    name of an operating unit.  So they would

3    not have marketed baby products from that

4    operating unit.

5          Q.    Do you currently have a

6    written policy in place for the

7    maintenance of historical samples at the

8    J&J museum?

9          A.    When you say historical

10   samples, are you referring to them in the

11   sense of the 1951 memo where they said

12   send samples, or are you referring to the

13   collection that's part of the corporate

14   archives in the museum?

15         Q.    I'm referring to the

16   collection that's part of the corporate

17   archives now.

18              So we previously -- we've

19   previously discussed that there are

20   samples of all sorts of products that are

21   on display in the current museum, and

22   then there are also samples of all sorts

23   of products that are currently maintained

24   in archives, correct?

Margaret M. Gurowitz

1          A.     Correct.

2          Q.     Okay.  And my question is

3    whether or not there is a written policy

4    in regard to the maintenance of those

5    archive samples.

6          A.     I would have to look back

7    and see if the policy is written.  But

8    the policy as it is followed would be the

9    policy of any archives, that they must be

10   maintained in a climate and

11   light-controlled storage area in

12   acid-free storage.

13         Q.     And if the policy was a

14   written policy, where would that written

15   policy be maintained?

16         A.     I would have an electronic

17   copy of that.

18         Q.     Do you know when that policy

19   would have gone into effect?

20         A.     It would have been created

21   by the archivists who professionally

22   catalogued the collection.  So sometime

23   in the 2014, 2015 time frame.

24         Q.     And prior to that 2014 or

Margaret M. Gurowitz

1    2015 time frame, are you aware of any

2    type of written policy that was in place

3    in regard to the storage of samples?

4         A.    No, I'm not.  There was no

5    policy as far as I'm aware of.

6         Q.    Prior to 2014, one of your

7    responsibilities as the historian was to

8    be able to maintain samples, correct?

9         A.    When you're referring -- you

10   mean -- I just want to ensure that I

11   understand the question correctly.  Do

12   you mean the artifacts in the museum

13   building in the corporate archives

14   collection?

15        Q.    Correct, yes.  So -- and let

16   me -- let me rephrase the question so

17   that I actually understand along with

18   you.

19             Prior to -- prior to the

20   archivist policy that was put in place in

21   and around 2014, you were responsible for

22   the care and maintenance of product

23   samples that were at the museum, correct?

24        A.    Correct, to the best of my

Margaret M. Gurowitz

1    ability, under the conditions they were

2    in before the museum restoration project.

3                As I mentioned, they were

4    not stored in a climate-controlled area.

5    I was not -- there was nothing to be done

6    to influence that.  So I maintained them

7    as best I could under those conditions.

8            Q.    Okay.  Was there -- is there

9    currently a policy in place regarding the

10   intake of samples into the museum?

11           A.    Yes.  We have an

12   accessioning policy.

13           Q.    And is that a written

14   policy?

15           A.    It's -- I believe I may have

16   a draft of it.  But it's -- right now it

17   may be largely unwritten.

18           Q.    Okay.  When you're in a

19   situation where the only employee that's

20   there, it's not necessarily necessary to

21   have the written policies since you are

22   the only one that's enforcing it?

23           A.    That's true.  And -- you

24   know, so it probably exists in a draft

Margaret M. Gurowitz

```
 1   form.  It may not exist in a final form
 2   right now.  But...
 3          Q.   So what is that -- what is
 4   that policy?
 5          A.   So the policy is that the
 6   artifact have to be relevant to major
 7   stories in Johnson & Johnson history.
 8   They have to be in good to excellent
 9   condition.
10          They -- so in other words,
11   if something were in very bad shape,
12   rusty, dirty, falling apart, it would not
13   meet the accessioning criteria.  If it
14   was an artifact that was a product from
15   another company, that wouldn't meet the
16   accessioning criteria.  If it were -- if
17   it were something that -- so if it was,
18   you know, something that did not help us
19   illustrate a major story about Johnson &
20   Johnson history, it also might not meet
21   the accessioning criteria.
22          Q.   And about how long ago did
23   you start to implement that particular
24   policy?
```

Margaret M. Gurowitz

1     A.     With the restoration and

2  opening of the new museum.

3     Q.     Okay.  Prior to -- prior to

4  the opening of the museum, was there any

5  policy that you had in place as far as

6  the intake of samples?

7     A.     Just that -- basically that

8  possibly informally.  But as I mentioned

9  before we get a lot of donations.

10           Sometimes I would come back

11 from lunch to find an anonymous donation

12 on my desk.  No note, no identifying

13 information.  I would ask people, "Did

14 you see who dropped this off?"  They

15 hadn't.  So things would show up on my

16 doorstep as it were.

17     Q.     Now, as it relates to talc

18 samples, there's only one instance that

19 you're aware of where that happened with

20 talc samples, correct?

21     A.     Correct.  Most of them were

22 other products.

23     Q.     Okay.  Is there any type of

24 policy in place for the current museum as

Margaret M. Gurowitz

1  far as the removal of samples from the

2  museum?

3        A.    Yeah.   Something could be

4  deaccessioned if its condition was so

5  deteriorated that it posed a danger to

6  the artifacts stored around it.

7              For example, if it was a

8  product that was liquid in it and that

9  was leaking or something like that, or if

10  it was in such bad condition that we

11  could never exhibit it and it wasn't the

12  only one of its kind, so those would be

13  examples of why something might be

14  deaccessioned.  Or if it had completely

15  no relation to Johnson & Johnson or its

16  history.  Those could be reasons why

17  something would be deaccessioned.

18        Q.    Now, would that apply to

19  both items that are on display as well as

20  items that are maintained in storage?

21        A.    It would be, although, you

22  know, we try to ensure all of the items

23  that are on display are in -- the ones

24  that are in better condition.

Margaret M. Gurowitz

1      Q.     How about -- well --

2      A.     With some exceptions

3  obviously.

4      Q.     In a -- in a situation that

5  you just described, if there was a

6  product that was in such a condition that

7  you were going to remove it, what would

8  you do with that product?

9      A.     It depends on what it --

10  what it was.  We would dispose of it.  We

11  would work with our facilities folks to

12  dispose of it in the best -- whatever

13  manner they advised.

14      Q.     So it would be disposed of,

15  but it would be disposed of in a way

16  that, for example, environmentally may

17  have been the environmentally appropriate

18  way to dispose of it?

19      A.     Correct.

20      Q.     How about removal of samples

21  from the museum not for purposes of

22  disposal, but because someone wants to

23  take something out of the museum?  Is

24  there a policy in place for that?

Margaret M. Gurowitz

1        MS. FOURNIER:  Objection.

2    Outside the scope.  You can go

3    ahead and answer.

4        THE WITNESS:  Okay.  We

5    don't allow people to borrow

6    things from the museum or

7    archives.  It's not a lending

8    library.

9        Occasionally we might get a

10   request from another museum who

11   asks for a loan for something to

12   go on exhibit.

13       The protocol among museums

14   is they fill out paperwork that

15   details the climate and humidity

16   control they have, how they're

17   going to safely transport it and

18   exhibit it and things like that.

19   And you can either agree to the

20   loan or not agree to the loan.

21   BY MR. LAPINSKI:

22       Q.   Are you aware of any

23   situations since you've been in your

24   position at Johnson & Johnson where

Margaret M. Gurowitz

1  you've loaned a talc sample to another

2  museum?

3       A.    No.

4       Q.    Are you aware of any time

5  during your tenure at Johnson & Johnson

6  that you have loaned any sample that's on

7  these lists to anyone other than a

8  museum?

9       A.    I am not aware.  But I did

10  not have charge of the archives until

11  2006.  So I -- there is no information

12  about what was done before then.

13       Q.    Okay.  If there -- similar

14  to what you talked about with the museum

15  protocol, was there a policy in place

16  when you started in 2006 that if a sample

17  were to be removed from the museum, the

18  removal of that sample would be

19  documented?

20       A.    I would have documented it.

21  When I started in 2006, nobody --

22  nobody -- before that, nobody really had

23  charge of the archives.  They were in the

24  museum building, and lots of people had

Margaret M. Gurowitz

1  access to that building.  The corporate

2  art, like the stuff that people, when

3  they moved into the office, they wanted

4  artwork to hang on their walls, was

5  stored in the back of the building.  So

6  there were people in and out of the

7  building looking at corporate art.

8              The room that the

9  archives -- the artifacts were stored in

10  was not locked.  Anyone could go in and

11  out of there.  I put a lock on the door.

12  So before that it was open to whoever

13  accessed the building.  So -- and we had

14  -- there was no way of knowing if, you

15  know, who came in and out of that room.

16      Q.    And are you aware at any

17  time of anyone accessing the storage in

18  the archives at any time prior to you

19  putting a lock on the door?

20      A.    Well, people would have gone

21  in.  Certainly the corporate librarian

22  would have gone in.  She had charge of

23  that before I did.  So -- and there might

24  have been -- I don't remember, I'm sorry,

Margaret M. Gurowitz

1    when she retired.  But there might have

2    been an interim time where sort of nobody

3    really had really charge of that.

4              So it's possible that people

5    did go in and out.

6              There are things I remember

7    looking at when I was first hired as a

8    research assistant that were not part of

9    the archives when I took over charge of

10   it.

11             So clearly -- they were

12   paper documents.  So clearly, you know,

13   some things had been removed.

14        Q.   So you said when you were an

15   intern -- when you were an intern, you

16   recall looking at things that were

17   maintained in the archives that were no

18   longer there when you started --

19        A.   So, yeah, when I was first

20   hired as a research assistant.  And let

21   me preface, they were paper artifacts.

22   They weren't related to talc.  They were

23   letters from U.S. presidents.  And so

24   when I got the management of the archives

Margaret M. Gurowitz

1  they were no longer in the paper

2  archives.  That's what I was referring

3  to.

4        Q.    Okay.  Understood.  Do you

5  have any knowledge of any talc-related

6  archives being removed from storage prior

7  to you putting a lock on the door?

8        A.    I do not knowledge of that.

9        Q.    Okay.  Do you have any

10  knowledge of anyone accessing any of the

11  talc samples prior to 2006 before you put

12  the lock on the door?

13        A.    I do not have knowledge of

14  that.

15        Q.    Since 2006 when you assumed

16  responsibility, are you aware of any talc

17  samples being removed from the archives?

18        A.    I am not aware of that.

19        Q.    Are you aware of any talc

20  samples having been destroyed that had

21  previously been maintained in the

22  archives?

23        A.    I'm not aware of that.

24        Q.    Since 2006, are you aware of

Margaret M. Gurowitz

1   any talc samples being temporarily

2   removed from the archives for purposes of

3   testing?

4           A.    I'm not aware of that.

5           Q.    To the extent that any

6   archive had been removed for such a

7   purpose, is that something that you would

8   have documented?

9           A.    If -- if I knew about it,

10  yes.  I mean, I had a key and obviously

11  our facilities people had a key to the

12  door.  But, I mean, these are historic

13  artifacts.  So, you know, so there was

14  very little interest in them.

15          MR. LAPINSKI:  Let's go off

16      the record.  Let's take a

17      five-minute break.

18          THE VIDEOGRAPHER:  The time

19      is 1:35 p.m.  We are off the

20      record.

21          (Short break.)

22          THE VIDEOGRAPHER:  We are

23      back on the record at 1:54 p.m.

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

1      Q.    Ms. Gurowitz, we've talked

2   previously about the -- briefly about the

3   four samples that were sent from the

4   United Kingdom by Dr. Hopkins correct?

5      A.    Yes.

6      Q.    And we also talked about

7   certain samples that are on our list that

8   were provided to Johnson & Johnson by

9   Bill Ashton's daughter at some point in

10  time, correct?

11     A.    That's correct.

12     Q.    And we also talked about the

13  item New Museum 3, which was an item that

14  was left at the security area at the

15  museum and you don't know where that came

16  from, correct?

17     A.    Yes, correct.

18     Q.    Other than those three --

19  those three examples there, are you aware

20  of -- strike that.

21          Other than those three

22  examples there, is it fair to say that

23  the other samples have been in the

24  control of Johnson & Johnson since the

Margaret M. Gurowitz

1    time they were manufactured?

2                    MS. FOURNIER:  Objection.

3                    THE WITNESS:  We cannot say

4            that.  While I was able to piece

5            together pieces of their history

6            and continuity and where they've

7            been, there's not enough

8            information to place -- to create

9            an entire chain of custody.

10                   The only thing that I was

11           able to create or to research or

12           really more or less complete chain

13           of custody for were the PTI

14           samples, because there was good

15           information.

16                   For the others, we just do

17           not know how they got into the

18           collection originally for many of

19           them.

20                   There are, as I mentioned

21           before, many samples that are

22           older than those marketing

23           notices, that said, "Hey, if you

24           change your packaging, send us a

Margaret M. Gurowitz

1      sample."  We don't know how those

2      got into the collection.  So --

3      and as well as, you know, other

4      ones that you cannot piece

5      together a complete chain of

6      custody.  You can piece together

7      pieces of chains of custody, but

8      not a complete chain of custody.

9   BY MR. LAPINSKI:

10      Q.    And other than the three

11  examples that we spoke about, when you

12  did your research, you didn't come across

13  any information to show that the

14  remaining samples were not in J&J's

15  control at any time since the time of

16  manufacture, correct?

17          MS. FOURNIER:  Objection.

18          THE WITNESS:  There is no

19      information.  So I don't have any

20      data or information to base that

21      on.  I cannot come to a conclusion

22      about it.

23  BY MR. LAPINSKI:

24      Q.    Okay.  Going back to the

Margaret M. Gurowitz

1  policy we had talked about that was in

2  place from the '50s up until the early

3  1980s about the provision of samples to

4  the museum.

5              Was there a policy in place

6  as to how those samples were supposed to

7  be provided to the museum?

8       A.    I haven't seen anything

9  other than those documents.  So they were

10 interested in the packaging, how the

11 packaging had changed and the labeling.

12             So I haven't seen any

13 information about how they were provided,

14 whether they had to be full, whether they

15 could be empty.  Certainly the packages

16 weren't sealed.  Safety seals are a very

17 modern phenomena that happened after the

18 1980s.  So historically, you know,

19 products were not sealed.

20             So they could have been

21 provided a variety of ways.  It just said

22 whenever you change the label or the

23 packaging, provide a sample.

24             (Document marked for

Margaret M. Gurowitz

1    identification as Exhibit

2    Gurowitz-10.)

3    BY MR. LAPINSKI:

4         Q.    I'm going to hand to you a

5    document that we are marking as

6    Exhibit 10.  And if you could review that

7    document and let me know when you've had

8    an opportunity to review it.

9         A.    Yes, I've reviewed it.

10        Q.    And have you seen this

11   document before?

12        A.    Yes, I have.

13        Q.    And what is your

14   understanding of what this document is?

15        A.    These are the chain of

16   custody sheets that were filled out when

17   the product artifact or samples, as we

18   call them, were transferred from the J&J

19   museum to the legal folks for

20   transportation to the lab.

21        Q.    And on the first page of the

22   document, and actually running throughout

23   the entire document, there's a section

24   that is labeled release by.  And there

Margaret M. Gurowitz

1    are initials there.  Are they your

2    initials?

3           A.    They are.

4           Q.    Okay.  So this chain of

5    custody you released on February 22nd,

6    2018.  You released custody of all of the

7    museum samples to a representative of

8    DBR, correct?

9           A.    All the museum samples

10   listed in this document, yes.

11          Q.    Okay.  And going back to

12   testimony that you provided earlier,

13   could you just run through the process

14   that you went through in preparing these

15   samples for shipping?

16          A.    So I pulled them from the

17   storage boxes they were in in the

18   corporate archives.

19                As I mentioned before, I

20   wear gloves when I handle artifacts so as

21   not to potentially damage the artifact

22   from, you know, oils on your skin and

23   things like that.

24                So they were taken out of

Margaret M. Gurowitz

1  those boxes and they were -- you know,

2  sometimes they were -- I don't remember

3  whether we un- -- some of them had

4  acid-free tissue paper around them.  I

5  don't remember whether we unwrapped some

6  of them.  Some of them may have,

7  depending on there fragility, been

8  transported with that in place, some not.

9           And then they were then

10 placed in the boxes that were going to be

11 used to transport them to the lab, and

12 then these sheets were filled out.

13      Q.    Okay.  And when they were

14 placed into the boxes, after you placed

15 them into the boxes, did you seal those

16 boxes?

17      A.    The top was put on.  I don't

18 know if it was -- I don't remember

19 whether it was sealed with tape or

20 anything like that.  They were, you know,

21 like bankers boxes kind of things.

22      Q.    And if you would turn to --

23 if you look in the lower right-hand

24 corner, there are Bates numbers on there.

Margaret M. Gurowitz

1  All the way -- yes.

2         A.    Is this what you're --

3         Q.    Yes.  If you would turn to

4  the page that ends in 628.

5              And the second entry on that

6  page is for Package Number 2014.001.2455.

7              Do you see that?

8         A.    I do.

9         Q.    And there's a notation on

10  there in parentheses "Top off."

11         A.    I see that.

12         Q.    Is that referring to the

13  particular museum sample that you

14  testified to earlier that was produced

15  with the top off?

16         A.    I believe that would, yes.

17         Q.    And are you aware of any

18  other samples that were produced from the

19  museum that had the top removed at the

20  time it was produced?

21         A.    At the time it was produced,

22  no.  That's one that came to mind,

23  because at some point in the artifact's

24  history, the top, the plastic top had

Margaret M. Gurowitz

1    broken completely off.

2          Q.    Is it fair to say if there

3    were other samples that you had taken

4    from the museum in order to produce that

5    were missing the top, you would have

6    documented it for those samples as well?

7          A.    If the top was completely

8    off at the time of transfer, yes.  It

9    would have -- I'm sure it would have been

10   documented.

11         Q.    That was Exhibit 10 that I

12   gave you, right?  That's what I marked it

13   as?

14         A.    Mm-hmm, yes.

15              (Document marked for

16              identification as Exhibit

17              Gurowitz-11.)

18   BY MR. LAPINSKI:

19         Q.    I'm going to hand you a

20   document that we're marking as

21   Exhibit 11.  Take a moment to look at

22   that and let me know when you've had an

23   opportunity to review it.

24         A.    Okay.  Okay.

Margaret M. Gurowitz

1           Q.   Okay.  Have you seen this

2   document before?

3           A.   I don't believe I have.

4           Q.   Okay.  This is a -- this is

5   a chain of custody document.  The first

6   Bates number on it is JNJTALC000536610.

7           Ms. Gurowitz, what's your

8   understanding of what this document is?

9           A.   It's a chain of custody

10  sheet.  It says samples from J&J museum,

11  collected 2/22/18.  This is not the set

12  of sheets I signed.

13          Q.   Okay.  This does indicate

14  that for the -- as you indicated samples

15  from the J&J museum collected on

16  February 22, 2018.  Those samples in

17  boxes were transferred from a

18  representative of DBR to Alliance

19  Technologies; is that correct, if you

20  look at the chain of custody line?

21          A.   That is what it says on the

22  document.

23          Q.   Okay.  Are you aware of

24  whether or not in between the time you

Margaret M. Gurowitz

1    transferred the documents to DBR and they

2    were subsequently transferred to Alliance

3    Technologies there was anything that was

4    done to the samples?

5         A.    I am not aware of any.  I

6    have no information on that.

7         Q.    Are you aware of whether or

8    not the boxes that are listed here were

9    opened?

10         A.    I do not know.

11         Q.    Are you aware of whether

12    there was any testing that was done on

13    the product?

14         A.    Ultimately?  Or --

15         Q.    No, in between --

16         A.    I do not know.

17         Q.    In between --

18         A.    I do not know.

19         Q.    In between the period of

20    time of February 22nd and March 2nd.

21         A.    I do not know.

22              (Document marked for

23         identification as Exhibit

24         Gurowitz-12.)

Margaret M. Gurowitz

1    BY MR. LAPINSKI:

2         Q.    I'm going to hand you a

3    document that's been marked as

4    Exhibit 12.  The first Bates number on

5    this group of documents is JNJTALC005 --

6    actually you know what?  You've got to

7    bring them all back in for a second.  I

8    apologize.  I have them the wrong way.

9              I'm going to give you just

10   that document that's marked as

11   Exhibit 12.

12             Ms. Gurowitz, have you seen

13   this photograph before?

14        A.    I have not.

15        Q.    Do you know what it's a

16   photograph of?

17        A.    It is a photograph of

18   storage boxes.

19        Q.    And do you know where this

20   photograph was taken?

21        A.    I do not.

22        Q.    Do you know whether it was

23   taken at a J&J facility?

24        A.    I have no information.  I do

Margaret M. Gurowitz

1    not know that.

2              (Document marked for

3         identification as Exhibit

4         Gurowitz-13.)

5    BY MR. LAPINSKI:

6         Q.    I'm going to hand you a

7    document that's being marked as

8    Exhibit 13.

9              Ms. Gurowitz, have you seen

10   this photograph before?

11        A.    I have not.

12        Q.    Are you aware of what it is

13   a photograph of?

14        A.    It is a photograph of

15   storage boxes.

16        Q.    Do you know where this

17   photograph was taken?

18        A.    I do not.

19        Q.    Is there anything on --

20   anything marked on the boxes in this

21   photograph that would enable you to

22   identify what these boxes are?

23        A.    Well, there are Post-It

24   notes that say partial JBP-02 done,

Margaret M. Gurowitz

1  partial JBP-06 done, 03 done, and 04

2  done.  So presumably the contents of

3  these relate to Johnson's Baby Powder.

4       Q.    But you don't know where

5  these pictures generated from?

6       A.    I do not.

7            (Document marked for

8            identification as Exhibit

9            Gurowitz-14.)

10 BY MR. LAPINSKI:

11      Q.    Okay.  I'll give that to

12 you.  And that's Exhibit 14.

13            Ms. Gurowitz, have you seen

14 this photo before?

15      A.    I have not.

16      Q.    Do you have an understanding

17 as to what that photograph is?

18      A.    Again, it's a photograph of

19 storage boxes.

20      Q.    And are you aware of where

21 that photograph was taken?

22      A.    I am not.

23      Q.    Are you aware of when that

24 photograph was taken?

Margaret M. Gurowitz

1          A.    I do not know when it was

2     taken.

3          Q.    And as to the other

4     photographs that we've looked at which

5     would collectively be Exhibits 12, 13,

6     and 14, are you aware of when those

7     photographs may have been taken?

8          A.    I am not aware of when they

9     would have been taken.

10               (Document marked for

11               identification as Exhibit

12               Gurowitz-15.)

13    BY MR. LAPINSKI:

14         Q.    I'm going to hand you

15    Exhibit 15.

16               Ms. Gurowitz, have you seen

17    this photograph before?

18         A.    I have not.

19         Q.    Are you aware of where this

20    photograph was taken?

21         A.    I am not aware of that.

22         Q.    Are you aware of when it was

23    taken?

24         A.    I do not know when it was

Margaret M. Gurowitz

1    taken.

2         Q.    And do you have any

3    information -- strike that.

4              Do you have any information

5    as to who may have taken this photograph?

6         A.    I do not know that.

7              (Document marked for

8         identification as Exhibit

9         Gurowitz-16.)

10   BY MR. LAPINSKI:

11        Q.    I've marked this photograph

12   as Exhibit 16.

13             Have you seen this

14   photograph before?

15        A.    I have not.

16        Q.    Are you aware of when this

17   photograph was taken?

18        A.    I don't have any information

19   about when it was taken.

20        Q.    And are you aware of where

21   this photograph was taken?

22        A.    I do not know where it was

23   taken.

24             (Document marked for

Margaret M. Gurowitz

1    identification as Exhibit

2    Gurowitz-17.)

3  BY MR. LAPINSKI:

4       Q.    I've handed you what's been

5  marked as Exhibit 17.

6            Have you seen this

7  photograph before?

8       A.    I have not.

9       Q.    Okay.  Are you aware of when

10 this photograph was taken?

11      A.    I am not.

12      Q.    Are you aware when the

13 photograph was taken?

14      A.    I am not.

15           (Document marked for

16           identification as Exhibit

17           Gurowitz-18.)

18 BY MR. LAPINSKI:

19      Q.    I'm handing you a document

20 that's being marked as Exhibit 18.  I'll

21 ask you to take a minute or two to review

22 that document.

23      A.    Sure.

24      Q.    All set?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    Okay.  I've handed you a --

3  before I get to the document.

4  Ms. Gurowitz, how many offsite storage

5  facilities does J&J have for where talc

6  samples are stored?

7    A.    Are you talking about -- if

8  I can ask you to clarify.  Physical

9  facilities or vendors?

10    Q.    Let's start with vendors.

11    A.    I believe that Iron Mountain

12  is Johnson & Johnson's offsite storage

13  vendor for anything the company stores

14  offsite.

15    Q.    And do you know how long

16  Iron Mountain has been Johnson &

17  Johnson's storage company?

18    A.    I do not know that.

19    Q.    And just for purposes of

20  clarification, when we say Iron Mountain

21  is Johnson & Johnson's storage company,

22  are we referring to both Johnson &

23  Johnson defendants?

24    A.    I believe so.

Margaret M. Gurowitz

1  Q.    The talc samples that are

2  maintained in the museum, to whom do

3  those talc samples belong?

4  A.    The ones that are in the

5  corporate archives?

6  Q.    Yes.

7  A.    Those are property of

8  Johnson & Johnson.

9  Q.    Okay.  And how about the

10 offsite samples that are maintained --

11 A.    In the offsite storage?

12 Q.    Yes.

13 A.    Those are property of

14 Johnson & Johnson Consumer.

15 Q.    And I don't know if I asked

16 you this.  Do you know for how long Iron

17 Mountain has been the offsite storage

18 facility for Johnson & Johnson?

19 A.    I do not know that.

20 Q.    Do you know which

21 location -- strike that.

22 Do you know which Iron

23 Mountain location the Johnson & Johnson

24 offsite samples were stored at?

Margaret M. Gurowitz

1       A.    I believe there are two in

2   New Jersey that they were stored at.  One

3   is in Monroe, and the other is in

4   Freehold.

5       Q.    And have you ever been to

6   either of those locations?

7       A.    I have not.

8       Q.    Do you know how long the

9   offsite samples have been stored at the

10  Iron Mountain facility?

11      A.    I do not know.  The transfer

12  sheets, I have seen from 1982.  So they

13  were sent to Leahy Business Archives.  So

14  at some point they must have been

15  transferred to Iron Mountain when

16  Johnson & Johnson must have at some point

17  switched providers.

18      Q.    You said those transfer

19  sheets were from 1982?

20      A.    Yes.

21      Q.    When was it that you saw

22  those transfer sheets?

23      A.    During the process of trying

24  to put together a chain of custody for

Margaret M. Gurowitz

1   the offsite samples that were labeled

2   marketing.

3          Q.    Is it fair to say that the

4   transfer sheets from 1982 were used by

5   you in order to prepare yourself for the

6   deposition today?

7          A.    Yes.

8          Q.    Did they provide you with

9   background in regard to the chain of

10  custody of the museum samples?

11         A.    They helped shed some light

12  on a very tiny piece of the chain of

13  custody for just the samples marked

14  marketing and offsite storage.

15         Q.    So the 1982 transfer sheets

16  did not relate to any of the research and

17  development samples that were maintained

18  in offsite storage?

19         A.    No, they do not appear to.

20  Just the marketing ones.

21         Q.    And it's your understanding

22  that those transfer sheets document the

23  transfer of marketing samples from

24  Johnson & Johnson to the Leahy Business

Margaret M. Gurowitz

1  Storage facility?

2          A.    That is what they appeared

3  to do, yes.  They are transfer sheets

4  listing items that were moved to offsite

5  storage for Leahy.

6          Q.    And included in those items,

7  was it all of the marketing samples that

8  we've been discussing here on the offsite

9  storage list?

10         A.    It was -- if not all, it was

11  certainly a good portion of them.

12         Q.    Are you able to determine

13  with the information that you have in

14  front of you which marketing samples

15  would have not been included on that

16  transfer sheet?

17         A.    In some cases, I can make a

18  correlation with marketing samples that

19  were included.  In other cases, you can

20  get close enough to say this either could

21  or could not be included.  But not in all

22  cases, there's not enough information

23  there.

24         Q.    And upon what would you rely

Margaret M. Gurowitz

1    in order to be able to get yourself as

2    close as possible as you indicated?

3            A.   So I would compare the

4    information on the transfer sheet --

5    excuse me.  I'm just going to find the

6    relevant sheet.

7                 So I'm looking at Page 11883

8    under offsite storage.  And so what I

9    would do is I look at --

10           Q.   I'm going to interrupt you

11   for a second just so we can keep the

12   record straight.  You are right now

13   referring to what is marked as Page 36 of

14   91, and it is Page ID 11883, correct?

15           A.   That is correct.

16           Q.   Okay.  So go ahead.

17           A.   So what I would do is look

18   at the information contained in the

19   columns that say label, date on

20   container, or wrapping medium, and

21   container volume which references how

22   much volume the container held.  It would

23   have been material printed on the

24   container, and then tried to match it up

Margaret M. Gurowitz

1   with items that were on the transfer

2   sheet to see if they correlated.

3           Q.    Again, you're referring to

4   the 1982 transfer sheet, correct?

5           A.    Correct.

6           Q.    And you did not bring those

7   transfer sheets here with you today,

8   correct?

9           A.    I did not.

10          MR. LAPINSKI:  Counsel, I'm

11      going to make a request that those

12      transfer sheets be produced

13      because I don't think that --

14          MS. FOURNIER:  They've been

15      produced.

16          MR. LAPINSKI:  They've been

17      produced?  Were they just recently

18      produced?

19          MS. FOURNIER:  I don't they

20      were, no.  They were previously

21      produced.

22  BY MR. LAPINSKI:

23          Q.    Are you aware of how long

24  the offsite sample -- are you aware of

Margaret M. Gurowitz

1  how long the offsite samples were in

2  storage at Leahy business?

3          A.    Certainly since 1982.  But I

4  do not have an ending date when they

5  ceased to be stored at Leahy.

6          Q.    And do you know -- do you

7  know at what point of time -- do you know

8  what facility the offsite samples were

9  stored at just prior to being produced by

10  Johnson & Johnson?

11          A.    I do not know what specific

12  facility, but I know there were two

13  facilities in New Jersey that they were

14  stored at.  But I don't know which were

15  stored at either one.

16          Q.    Is it -- is it fair to say

17  that prior to production by Johnson &

18  Johnson, they were at an Iron Mountain

19  facility?

20          A.    It is -- the marketing

21  samples?

22          Q.    Yes, the marketing samples.

23          A.    It is fair to say that.

24          Q.    And do you know at what

Margaret M. Gurowitz

```
1    point in time the marketing samples were
2    moved from storage in Leahy business to
3    storage at Iron Mountain?
4         A.    I do not know.  We don't
5    have the records that indicate that.
6         Q.    Are you familiar at all with
7    the Leahy storage facility?
8         A.    I am not.
9         Q.    Do you know where it's
10   located?
11        A.    I do not.
12        Q.    Are you aware of the
13   contractual relationship that Johnson &
14   Johnson had with the Leahy storage
15   facility?
16        A.    I am not aware of the
17   specific contractual relationship.  But
18   at the time, since the items were moved
19   there, they would have been the storage
20   vendor for the company.
21        Q.    And is it -- would it be
22   your position that as a storage vendor of
23   Johnson & Johnson, Leahy Business would
24   not open any of the boxes that it was
```

Margaret M. Gurowitz

1   storing on behalf of Johnson & Johnson?

2            MS. FOURNIER:  Objection.

3            THE WITNESS:  That -- that

4       would be a question for our

5       records management folks.  I don't

6       know what the terms of the

7       contract with them was.

8   BY MR. LAPINSKI:

9       Q.   Are you aware of any reason

10  why representatives of Leahy business

11  would go into boxes that were being

12  stored at this facility?

13      A.   Again, I -- that would be a

14  question for records management folks.

15  They manage all of the offsite storage.

16      Q.   As it relates to chain of

17  custody, is there any reason why you

18  would believe that while the -- while the

19  samples were being stored at Leahy

20  business, they were tampered with at all?

21      A.   I have no information about

22  that.

23      Q.   And do you know how to spell

24  Leahy in Leahy business?

Margaret M. Gurowitz

1      A.     I believe it's L-E-A-H-Y or

2    something very close to that.

3      Q.     I don't know whether or not

4    I asked this question, but are they a New

5    Jersey organization?

6      A.     That, I do not know.

7      Q.     Okay.   Do you know if the

8    facilities are located in New Jersey?

9      A.     That, I don't know.   I don't

10   think they're -- I'm not even sure they

11   are still in business actually.

12     Q.     When the marketing samples

13   were sent to Leahy business, where were

14   they sent from?

15     A.     The marketing samples had

16   been sent, as we've established by

17   looking at the other documents, in 1982.

18   They were closing the Kilmer Museum.

19   They were sent back to the operating

20   unit, so it would have been someone at

21   the consumer company who would have sent

22   them to offsite storage.

23     Q.     Is it fair to say that if

24   Leahy had to open any of the boxes that

Margaret M. Gurowitz

1  were in storage for Johnson & Johnson

2  they would have notified Johnson &

3  Johnson beforehand?

4          MS. FOURNIER:  Objection.

5          THE WITNESS:  That, again,

6      would have been part of whatever

7      agreement they had with our

8      records management folks.

9  BY MR. LAPINSKI:

10     Q.    As the corporate

11  representative for Johnson & Johnson

12  testifying on chain of custody, is

13  there -- do you have any knowledge of

14  Leahy business tampering with any of the

15  boxes that it held in storage?

16     A.    Again, that's sort of --

17  although I am -- I've researched chain of

18  custody, the relationship with our

19  records management organization is

20  outside sort of the area that I look at.

21          So if -- so I don't know

22  what the relationship was, if they had to

23  open a box, did they have to notify

24  records management.  I do not know.

Margaret M. Gurowitz

1          Q.     In your preparation for this

2     deposition and research that you did in

3     order to prepare yourself to testify on

4     chain of custody, do you have any

5     information that would indicate that

6     Leahy Business had at all opened and

7     tampered with the marketing samples that

8     were stored offsite?

9          A.     We don't have any

10    information about Leahy Business, what

11    Leahy Business did with the boxes they

12    were storing.

13         Q.     And, again, you previously

14    indicated that you don't know when the

15    boxes were transferred to Iron Mountain,

16    correct?

17         A.     No.   And when I asked the

18    folks I talked to in the marketing group,

19    they -- before it was discovered that

20    these boxes were in offsite storage, they

21    didn't even know they had existed, they'd

22    been there so long.

23         Q.     They had been there so long

24    meaning they'd been --

Margaret M. Gurowitz

1    A.    Since 1982.

2    Q.    I'm sorry.  Let me -- let me

3 finish my --

4    A.    I'm sorry.

5    Q.    That's okay.

6          When you say they had been

7 there so long, they had been at Iron

8 Mountain so long?

9    A.    They had been in offsite

10 storage so long.

11    Q.    Just in offsite storage so

12 long?

13    A.    Yes.

14    Q.    If you look at the document

15 that I have given you which we marked as

16 Exhibit -- is that 18?

17    A.    Yes.

18    Q.    The Iron Mountain documents?

19    A.    Mm-hmm.

20    Q.    Have you ever seen these

21 documents before?

22    A.    I believe I have.  If not,

23 it was something very similar.

24    Q.    Okay.  What's your

Margaret M. Gurowitz

1  understanding of what these documents

2  are?

3          A.    My understanding is these

4  are internal Iron Mountain records.

5          Q.    Did you review these records

6  in preparation for your testimony today?

7          A.    If this is the same set of

8  records, then yes, I've seen them before.

9          Q.    Okay.  And when was the

10  first time that you saw them?

11          A.    Maybe just a -- two weeks

12  ago maybe, something in that time frame.

13  So very recently.

14          Q.    If you would take a look at

15  the description information that's about

16  a third of the way down the page.  And if

17  you see, there is an SKP box/barcode

18  number?

19          A.    Mm-hmm.

20          Q.    Okay.  Do you know what that

21  number represents?

22          A.    I do not.  But I can make an

23  educated inference that it represents a

24  unique number for a particular box.

Margaret M. Gurowitz

1    Q.    Okay.  If you would now go

2  back to Exhibit 16, which is one of the

3  photographs.  If you would look in the

4  upper left-hand corner of that

5  photograph, there is a box that has a

6  barcode number of 15140487.

7           Do you see that?

8    A.    I do.

9    Q.    And does that number

10 correspond to this Iron Mountain shipment

11 statement?

12    A.    It corresponds to the

13 barcode number on the statement.

14    Q.    Okay.  That particular box

15 that ends with 0487 in the picture, is

16 there any way that we're able to identify

17 the contents of that box?

18    A.    It says partial JBP.  So one

19 can infer that there might be Johnson's

20 Baby Powder in it.

21    Q.    But you don't -- as you sit

22 here, you're not able to make that

23 determination other than making the

24 assumption based upon that?

Margaret M. Gurowitz

1        A.    Not having seen the contents

2    of the box or an exact listing of the

3    contents, I cannot say.

4        Q.    Okay.  If you would look at

5    the bottom of the first page of

6    Exhibit 18 where it has a box history.

7        A.    Mm-hmm.

8        Q.    And if you start at the

9    bottom, you'll see it says, "12/12/94

10   received at Iron Mountain"?

11       A.    Mm-hmm.

12       Q.    Above that it says, "7/26/96

13   checked out."

14            Do you know who Hernando

15   Arbelaez is?

16       A.    I do not.

17       Q.    Do you know why if at all

18   that particular box may have been checked

19   out by Johnson & Johnson in July of 1996?

20            MS. FOURNIER:  Objection.

21            THE WITNESS:  We don't know

22       that that represents a checkout by

23       Johnson & Johnson because we don't

24       know if Hernando Arbelaez was a

Margaret M. Gurowitz

1    Johnson & Johnson employee or an

2    Iron Mountain employee.

3  BY MR. LAPINSKI:

4    Q.    Do you know of any reason

5  why anyone other than a representative of

6  Johnson & Johnson would be able to check

7  a box out from Iron Mountain that was a

8  Johnson & Johnson box?

9         MS. FOURNIER:  Objection.

10        THE WITNESS:  Well,

11    presumably some of -- some of

12    these could represent internal

13    movement, you know, moving things

14    from one place to another in their

15    storage facility.

16  BY MR. LAPINSKI:

17    Q.    Well, that's a presumption

18  that you're making though?  You don't

19  know that?

20    A.    Well, you'd have to

21  determine who these contact folks were,

22  whether they were Johnson & Johnson

23  people or Iron Mountain people.

24    Q.    Okay.  Let's go to -- let's

Margaret M. Gurowitz

1    jump up on this to September 21st, 2017,

2    which is on the box history the last time

3    the box was checked out.

4           A.    Mm-hmm.

5           Q.    Do you know who AnneMarie

6    Braman is?

7           A.    I do not.

8           Q.    Okay.  In September of 2017,

9    would offsite samples have been part of

10   your responsibility as the J&J historian?

11          A.    No, they would not.

12          Q.    Okay.  Do you as the J&J

13   historian use Iron Mountain for the

14   storage of any offsite samples?

15          A.    No.

16          Q.    Okay.  Did you speak with

17   anybody in regard to offsite samples and

18   the storage policies for those samples at

19   Iron Mountain?

20          A.    I spoke with Sarita Finnie

21   and Barbara Brewer about the marketing

22   samples.  Also Mark Zappa and Lorena

23   Telofski.  And they had told me that it

24   was not the practice of marketing or

Margaret M. Gurowitz

1  quality or R&D to send samples to offsite

2  storage, that it would not be part of

3  their regular practice to do so.

4      Q.    But these were samples that

5  were maintained by Iron Mountain on

6  behalf of J&J, correct?

7      A.    That's correct.

8      Q.    And if I understand your

9  testimony correctly, none of the people

10  that you spoke to had an awareness of how

11  these boxes were maintained at Iron

12  Mountain?

13      A.    No.  I think it actually

14  came as a surprise to them that there

15  were boxes of samples there.

16      Q.    And if you could remind me

17  again.  You had stated that as far as the

18  relationship between Johnson & Johnson

19  and Iron Mountain, there was an

20  individual within Johnson & Johnson who

21  would have a better understanding as to

22  the contractual relationship between the

23  two organizations, correct?

24      A.    Johnson & Johnson has a

Margaret M. Gurowitz

1   worldwide records management group.  And

2   that's a large organization, as you might

3   imagine.  And so the people in that group

4   would partner with people in different

5   areas of the company.  So somebody --

6   folks in that group would have an

7   understanding of the contract -- the

8   contract we have with the service

9   provider.

10          Q.    So as you sit here, you have

11   no knowledge of how the boxes were

12   maintained at Iron Mountain?

13          A.    I do not.

14          Q.    Okay.  Do you know whether

15   or not when the boxes were sent to the

16   Iron Mountain facility they were sealed?

17          A.    I do not have that

18   information.  I can say though these just

19   look like they are banker boxes.  It

20   doesn't look like there are seals on

21   them.  You can see from the photos.

22          Q.    Okay.  You don't know where

23   those photographs were taken though?

24          A.    I do not.

Margaret M. Gurowitz

1       Q.      Okay.   So you don't know if

2    they were photographs of the boxes at

3    Iron Mountain?

4       A.      I don't know.

5       Q.      Okay.   And do you know who

6    within worldwide records management group

7    might be the best person to speak to in

8    regard to the maintenance of the offsite

9    samples at Iron Mountain?

10       A.      I do not.   It would be

11    whoever works with the consumer company.

12       Q.      Meaning Johnson & Johnson

13    Consumer Incorporated?

14       A.      Yeah, there would be

15    somebody that -- who they would partner

16    with in records management if they needed

17    to store things offsite.

18       Q.      In the preparation that you

19    did in order to testify as to chain of

20    custody for these offsite samples, do you

21    have any knowledge of these boxes being

22    tampered with while they were at --

23    strike that.

24            Do you have any knowledge of

Margaret M. Gurowitz

1   the offsite samples being tampered with

2   while they were in the control of Iron

3   Mountain?

4           A.    We -- I do not have any

5   information about how these offsite

6   samples were treated or stored when they

7   were at Iron Mountain.

8           Q.    Do you know who Kelly Starr

9   is?

10          A.    I do not.

11          Q.    Do you know who Samantha

12  Floyd is?

13          A.    I do not.

14          Q.    Do you have any reason to

15  believe that the offsite samples stored

16  at Iron Mountain would have been tampered

17  with?

18          A.    When you say tampered, can

19  you clarify?

20          Q.    In any way damaged, opened,

21  accessed at all by Iron Mountain?

22          A.    Well, without knowing

23  exactly what these checkouts refer to,

24  are they just internal moves because they

Margaret M. Gurowitz

1    need to move things around in their

2    storage facility or do they -- it's hard

3    to say.  So I do not have enough

4    information to have an opinion about

5    that.

6         Q.    Are you aware of the names

7    of the individuals who would have sent

8    samples to offsite storage?

9         A.    Would you -- can I ask what

10   time frame?

11        Q.    At any time frame.  Are you

12   aware of any individuals who would have

13   said offsite marketing samples to Iron

14   Mountain?

15        A.    No.  When I talked to Sarita

16   Finnie and certainly Barbara Brewer who

17   has been with the company a long time,

18   they didn't know these samples existed in

19   offsite storage.  None of us knew they

20   had been there because they had been

21   there so long.  So I do not know of

22   anyone who would have done it, and both

23   of them said that it was not the policy

24   or practice of marketing to send samples

Margaret M. Gurowitz

1    to offsite storage.

2        Q.    And would the same hold true

3    for quality assurance?

4        A.    Yes.

5        Q.    And would the same hold true

6    for research and development?

7        A.    Yes.

8        Q.    Going back to the Iron

9    Mountain records, which is Exhibit 18.

10   It indicates that the customer is

11   Johnson & Johnson Consumer Products,

12   correct?

13       A.    That is what it says, yes.

14       Q.    Do you have any reason to

15   believe that a non-Johnson & Johnson --

16   any non-Johnson & Johnson personnel would

17   have been able to send sample boxes to

18   Iron Mountain for storage?

19            MS. FOURNIER:  Objection.

20            THE WITNESS:  Do you mean

21        somebody who's not an employee of

22        either Johnson & Johnson or the

23        consumer company --

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1      Q.    Correct.

2      A.    -- or just the consumer

3  company?

4      Q.    Both.

5      A.    No, I don't think so.  Not

6  under these parameters, no.  I mean, that

7  being said I'm sure there are a lot of

8  companies who use Iron Mountain.

9           (Document marked for

10          identification as Exhibit

11          Gurowitz-19.)

12  BY MR. LAPINSKI:

13     Q.    I'm going to hand you a

14  document that's been marked as

15  Exhibit 19.  If you would review that

16  document and just let me know when you're

17  finished I'm sorry are you ready.

18          I apologize.  I thought I

19  asked you to let me know when you're

20  ready.

21     A.    Oh, I'm sorry.

22     Q.    No, that's okay.

23          Ms. Gurowitz, I've handed

24  you Exhibit 19.  Is this a document that

Margaret M. Gurowitz

```
 1    you've ever seen before?
 2         A.    No.
 3         Q.    The first page of this
 4    document is Bates-stamped
 5    JNJTALC00536657.  And it is a chain of
 6    custody document.
 7              Ms. Gurowitz, if you would
 8    look in the upper left-hand corner under
 9    description, it says JBP Sample 01.  I
10    believe that says partial next to it.  Do
11    you know what that refers to?
12         A.    Not -- I do not know exactly
13    what that refers to.
14         Q.    Do you know whether or not
15    it corresponds to sample JP -- JBP-001 on
16    the sample list that we've been
17    discussing?
18         A.    Let me take a look.  I'm
19    sorry I'm having a hard time to get it
20    with the double-sided it.  It continues
21    to throw me off.  I think these are
22    slightly out of order somehow.
23              Just to be clear, you're
24    referring to the -- oh, that's 91.  I'm
```

Margaret M. Gurowitz

1    sorry.

2          Q.    I'm looking at page ID 11865

3    if that helps.

4          A.    11865.  Okay.  I've got it.

5    The one that's JBP-001?

6          Q.    Yes.

7          A.    Well, this says JBP Sample

8    01 partial, and this says JBP-001 full.

9                So if this refers to a

10   container that's partially full, it does

11   not match up with this one, because this

12   states that the container is full.

13         Q.    Okay.  If you look -- and

14   it's a difficult copy looking at

15   Exhibit 19.  But going across the

16   different columns, there is a column for

17   packing contents that on this first page

18   is blank.  And then if you see the second

19   column it says time and date.  Can you

20   make that out?  Actually, date and time.

21   Are you able to make that out?

22         A.    This one, yes.

23         Q.    And then the next one after

24   that says "released by."

Margaret M. Gurowitz

1          Do you see that?

2          A.    I do.

3          Q.    Okay.  Do you know what IT

4    lead is?

5          A.    I do not.  IT usually refers

6    to information technology.  But I don't

7    know what it means in this case.

8          Q.    How about in the received by

9    section, "entrusted advisors."  Do you

10   know who entrusted advisors are?

11         A.    I do not.

12         Q.    If you go to the third line

13   down, the entry dated February 21st,

14   2018.  There is an entry there, it looks

15   like initials.  And under that is QA.  Do

16   you know who those initials would be?

17         A.    Can I ask you to clarify?

18   You are looking for the signature column?

19         Q.    Yeah.

20         A.    The signature directly

21   above --

22         Q.    In the "received by" column

23   there are initials and a signature, and

24   below that it says QA.  Okay.

Margaret M. Gurowitz

1    A.    I do not know.  I can't make
2  out the handwriting.  It could be an S or
3  an A.  I can't really tell from the
4  writing.
5    Q.    Okay.  If you go to the next
6  page, under description it says JBP
7  Sample Number 01.  Do you have any idea
8  what that refers to?
9    A.    I do not.
10    Q.    If you turn to the next
11  page, which has Bates numbers ending in
12  659.  The description is, "JBP sample
13  partial Number 2 done."  Do you know what
14  that refers to?
15    A.    Not offhand.  It's possible
16  that it refers to JBP-002.  But I could
17  not say without more information.
18    Q.    Okay.  What additional
19  information would you need in order to be
20  able to say?
21    A.    Well, so, on this -- the
22  chain of custody sheet, it's listed as
23  JBP Sample 02.  But the sample numbers on
24  the sheet of all of the samples of two

Margaret M. Gurowitz

1  zeros before the other numbers.  So they

2  don't exactly correspond.

3       Q.    On the following page, JBP

4  Sample 02, do you know what that refers

5  to?

6       A.    Without more information I

7  could not say.

8       Q.    On the following page, JBP

9  Sample 03 partial, do you know what that

10  refers to?

11       A.    Again, without more

12  information, I could not say.

13       Q.    Do you know whether any of

14  these are referring to offsite samples

15  that have been produced and included on

16  the sample list?

17       A.    Without more information I

18  could not say, again.

19       Q.    If you could -- if you could

20  take a minute and just look at the

21  various pages that are included in this

22  document, and in particular the

23  description page of each of these, and

24  tell me whether or not there are any

Margaret M. Gurowitz

1    descriptions on there that can correspond

2    to the sample lists that we have been

3    talking about today?

4          A.    Again, without more

5    information, I couldn't say because the

6    numbering system is different on the

7    chain of custody list.  And the sample

8    list.  And the chain of custody list does

9    not provide information, like, for

10   instance, what it says on the label or a

11   date if given.  So I don't have enough

12   information to make that determination.

13         Q.    You had testified earlier in

14   regard to the PTI Royston samples that

15   you had had a conversation with an

16   individual in regard to those samples,

17   correct?

18         A.    That is correct.

19         Q.    And who was it that you

20   spoke to in regard to the PTI samples?

21         A.    A woman named Janet Stanish

22   at PTI.  I took an approximate guess on

23   the spelling on the last name.  I can't

24   confirm that it's spelled exactly how I

Margaret M. Gurowitz

1    wrote it.

2         Q.    And do you know what
3    Ms. Stanish's position is at PTI?

4         A.    I do not know what her title
5    is.

6         Q.    And what was it that she
7    told you in regard to the samples that
8    were maintained for Johnson & Johnson at
9    PTI?

10        A.    She told me that as per
11   their contract, and it's listed in the
12   contracts, that they need to maintain
13   samples as per the contract for either
14   four years from date of manufacture or
15   one year after date of expiration,
16   whichever comes first.

17             She said that the room, the
18   retaining room they kept them in was in
19   fact located at PTI.  They were kept in,
20   you know, on shelves in boxes in
21   containers and there was climate control.

22             And then she told me that
23   when the samples were requested, if there
24   was more than one bottle of a product,

Margaret M. Gurowitz

1   they were able to send an entire bottle,

2   because as part of their contractual

3   obligation with Johnson & Johnson they

4   need to retain samples.

5           So for instance, if, say,

6   there were two bottles of a particular

7   sample, they were able to keep one bottle

8   as per the contract and send the other.

9           If, however, there was only

10  one bottle, they had to open and divide

11  that sample and send part of that sample.

12      Q.    And when you say when the

13  samples were requested, are you referring

14  to the point in time where the samples

15  were requested pursuant to the order that

16  was entered by the court?

17      A.    Yes.

18      Q.    Are you aware of any time

19  prior to the -- the request being made

20  pursuant to this order that PTI had

21  released samples to anybody?

22          MS. FOURNIER:  Objection.

23      Outside the scope.

24          THE WITNESS:  I am not,

Margaret M. Gurowitz

1    because I was only trying to track

2    chain of custody for the items

3    listed in this list.

4  BY MR. LAPINSKI:

5        Q.    To the extent that PTI

6  maintained multiple samples from the same

7  Johnson Baby Powder lot, are you aware of

8  what other samples were sent out for

9  testing?

10           MS. FOURNIER:  Objection.

11    Outside the scope.

12           THE WITNESS:  I am only

13    aware of the samples that are

14    included as part of this list,

15    because that's what I was

16    researching the chain of custody

17    for.

18  BY MR. LAPINSKI:

19        Q.    You had indicated that to

20  the extent that there was only one sample

21  available, and if you look at Page ID

22  11911 as a point of reference.

23        A.    I am there.

24        Q.    Actually, strike that.

Margaret M. Gurowitz

1          Do you have any independent

2  knowledge of the samples that were

3  maintained at PTI Royston on behalf of

4  J&J?

5          A.    Other than tracking them for

6  the purposes of establishing chain of

7  custody for what is on this list, no.

8          Q.    And you did that only for

9  purposes of this deposition today,

10  correct?

11          A.    Correct.

12          Q.    Maintaining records on PTI's

13  samples is not part of your job

14  responsibility as a J&J historian,

15  correct?

16          A.    No, it is not.

17          Q.    Who other than yourself

18  within Johnson & Johnson would have

19  knowledge of the samples that are

20  maintained at PTI?

21          MS. FOURNIER:  Objection.

22          Outside the scope.

23          THE WITNESS:  I don't know

24          people's names.  But it would be

Margaret M. Gurowitz

1    whoever that they work with on the

2    Johnson & Johnson side.

3  BY MR. LAPINSKI:

4        Q.    And the samples that were

5  maintained by PTI on behalf of Johnson &

6  Johnson were in sealed Johnson & Johnson

7  containers, correct?

8            MS. FOURNIER:  Objection.

9            THE WITNESS:  The samples

10   were -- they were in packages, in

11   Johnson's Baby Powder packages.

12   So I have not seen photographs of

13   those packages.  So I couldn't

14   tell you if they were sealed or

15   not.

16  BY MR. LAPINSKI:

17       Q.    Is it your understanding

18  that the samples maintained by PTI on

19  behalf of Johnson & Johnson were in

20  sealed packages?

21       A.    That, I do not know.  I

22  have -- again, I have not seen

23  photographs of the actual samples, so I

24  do not know.

Margaret M. Gurowitz

1              (Document marked for

2         identification as Exhibit

3         Gurowitz-20.)

4    BY MR. LAPINSKI:

5         Q.    I'm going to mark this

6    document as Exhibit 20.  Ms. Gurowitz,

7    I've handed you a Federal Express

8    shipping -- shipping receipt.

9              The question I have for you

10   is that, in the upper left-hand corner,

11   the shipment is from Kelly Smith at

12   Bureau Veritas.  Do you know what Bureau

13   Veritas is?

14        A.    I do not know what Bureau

15   Veritas is.  It's in Kennesaw, Georgia.

16   When I spoke with Janet Stanish at PTI,

17   she told me initially their samples were

18   sent to a lab in Georgia before it was

19   determined that they would be examined by

20   a lab in New Jersey.

21             So I could -- although I

22   could make a personal educated inference

23   that that might represent the facility in

24   Georgia.  But I do not have factual

Margaret M. Gurowitz

1    information that I could point to

2    regarding that.

3              (Document marked for

4         identification as Exhibit

5         Gurowitz-21.)

6    BY MR. LAPINSKI:

7         Q.    I'm going to hand you a

8    document that's marked as Exhibit 21.  If

9    you could review that document and just

10   let me know after you've had an

11   opportunity to review it.

12        A.    I have reviewed it.

13        Q.    Okay.  Do you know what this

14   document is?

15        A.    It is laboratory chain of

16   custody form.  It says so right at the

17   top.

18        Q.    Have you seen this document

19   before?

20        A.    I have not.

21        Q.    Okay.  As indicated, this

22   document is entitled "Laboratory Chain of

23   Custody Form."

24              And it says it's from PTI

1  Royston, LLC, to Maxxam Analytics,

2  M-A-X-X-A-M, Analytics in Kennesaw,

3  Georgia.  And it's a relinquish date of

4  9/12/17 of samples.

5           Would you agree with that?

6       A.    That is what it says on the

7  paper, yes.

8       Q.    And if you would take a

9  minute just to review these samples that

10 are included as part of this list to

11 confirm that the samples on this list

12 include all samples that are part of the

13 PTI inventory that has been produced in

14 this litigation?

15      A.    Did you want me to look at

16 each one or just --

17      Q.    Actually why don't we do it

18 this way.  I'm going to give you another

19 document that's Exhibit 22.

20           (Document marked for

21           identification as Exhibit

22           Gurowitz-22.)

23 BY MR. LAPINSKI:

24      Q.    And this is a second

Margaret M. Gurowitz

1    laboratory chain of custody form, Bates

2    Number JNJTALC00553768.  And it's, like

3    Exhibit 21, it's dated September 12th,

4    2017, from PTI Royston to Maxxam

5    Analytics.

6              Would you agree?

7         A.    Yes.

8         Q.    As the representative for

9    Johnson & Johnson here to testify on

10   chain of custody, are you aware of PTI

11   sample, included on this sample list

12   being sent from PTI Royston to Maxxam

13   Analytics in September of 2017?

14        A.    I am aware that samples were

15   sent from PTI.  I did not know the name

16   of the lab in Georgia till now.

17        Q.    Is it your understanding

18   that Maxxam Analytics is a lab?

19        A.    This is the first time I'm

20   seeing the name.  So I -- without looking

21   them up or confirming that, I could not

22   confirm just by looking at the paper.

23        Q.    And do you know who Alan

24   Seagrave is?

Margaret M. Gurowitz

1    A.    I do not.

2    Q.    Do you know why the PTI

3 samples would have been sent from PTI

4 Royston in Georgia to Maxxam Analytics in

5 September of 2017?

6    A.    Well, presumably it was per

7 a request for this matter.  Janet Stanish

8 at PTI did tell me that they were

9 requested to send their samples to a lab

10 in Georgia, and then it was decided that

11 they would in fact be reviewed at a lab

12 in New Jersey.

13    Q.    There was -- there was a

14 request to PTI to send the samples to a

15 laboratory in September of 2017?

16    A.    She did not tell me exactly

17 what the date of the request was.  But

18 she said they were requested to send

19 samples.

20    Q.    And do you know who made

21 that request?

22    A.    I do not know the specific

23 person who made that request to them.

24    Q.    We had talked briefly

Margaret M. Gurowitz

1    earlier today in regard to the process

2    that PTI followed when preparing the

3    samples for shipping.

4              Do you recall that?

5        A.    Yes.

6        Q.    Okay.  What is your

7    understanding of how PTI Royston prepared

8    the PTI samples on our sample list for

9    shipping in September of 2017 when they

10   sent them to Maxxam Analytics?

11       A.    My understanding from

12   speaking to Janet at PTI was that if more

13   than one sample existed of any given

14   bottle, that they were able to send a

15   full sample because they were still able

16   to send a sample and meet their

17   contractual obligation to Johnson &

18   Johnson to retain a sample.

19              In the case that there was

20   only container of a sample, in order to

21   meet both obligations, they had to divide

22   that sample, and so they did do that.

23   And they put the section they sent to the

24   lab in a sealed cup.

Margaret M. Gurowitz

1      Q.    And as far as the shipping

2  of the products, all of the samples from

3  PTI to Maxxam Analytics, are you aware of

4  how those samples were packed for

5  shipping?

6      A.    She told me they were packed

7  in boxes.  In her words, they were

8  palletized, which means they were put on

9  pallets.  And they actually drove them

10 from PTI to the lab in Georgia.  She said

11 they were FedExed from the Georgia

12 facility to New Jersey.

13     Q.    And do you have any

14 information that would lead you to

15 believe that during that process any of

16 the PTI samples were tampered with?

17     A.    I do not have information to

18 indicate that.  I was trying to trace

19 their chain of custody from PTI through

20 every step till they got to the lab.

21          So I was looking at, you

22 know, who had them, had they packed them,

23 how they got from one place to another.

24     Q.    Are you aware of whether or

Margaret M. Gurowitz

1  not the samples that were delivered to

2  Maxxam Analytics were unpacked?

3          A.    I do not know.

4          Q.    Do you know whether or not

5  those samples were opened when they were

6  at Maxxam Analytics?

7          A.    I do not know.

8          Q.    Do you know whether any of

9  those samples were tested while they were

10  at Maxxam Analytics?

11          A.    I do not know.

12          Q.    Do you know whether any

13  samples were destroyed while they were at

14  Maxxam Analytics?

15          A.    I do not know.  I can't

16  imagine they would have destroyed them

17  though.

18          Q.    But you have no knowledge?

19          A.    I do not.

20          Q.    You have no knowledge

21  whether they were tested either?

22          A.    No.

23          Q.    Do you have any idea what if

24  anything at all was done with the samples

Margaret M. Gurowitz

1    when they were at Maxxam Analytics?

2         A.    It's my understanding they

3    sent them to Maxxam Analytics.  They were

4    there for a period of time.  It was then

5    decided that they would be looked at at a

6    lab in New Jersey, and so Maxxam

7    Analytics Federal Expressed them to the

8    facility in New Jersey.

9         Q.    Do you know whether there's

10   any relationship between Maxxam Analytics

11   and Bureau Veritas?

12        A.    I do not.

13             (Document marked for

14        identification as Exhibit

15        Gurowitz-23.)

16   BY MR. LAPINSKI:

17        Q.    We'll mark this as

18   Exhibit 23.  If you could just take a

19   look at that document and let me know

20   whether you've seen that document before.

21        A.    Unless you showed it to me

22   earlier today, I do not believe I've seen

23   this.

24             (Document marked for

Margaret M. Gurowitz

1          identification as Exhibit

2          Gurowitz-24.)

3    BY MR. LAPINSKI:

4          Q.    Okay.  I'm also going to

5    mark Exhibit 24.  Have you ever seen

6    Exhibit 24 before?

7          A.    I don't believe I have.

8          Q.    Exhibits 23 and 24 are

9    laboratory chain of custody forms,

10   correct?

11         A.    That is what it says on the

12   documents.

13         Q.    And both of the documents

14   show that there is laboratory -- that

15   there is a shipment going from Maxxam

16   Analytics in Kennesaw, Georgia to

17   Jonathan Chun at Alliance Technologies,

18   correct?

19         A.    That is what it says on the

20   document, yes.

21         Q.    Do you have an understanding

22   of the purpose of this document?

23         A.    It's a chain of custody form

24   designed to document, just from looking

Margaret M. Gurowitz

1  at the information on it, it would be

2  designed to document this transfer of

3  whatever is listed inside it from one

4  organization to the other.

5          Q.    Do you have an understanding

6  that the PTI samples that are contained

7  on our sample list were transferred from

8  Maxxam Analytics to Alliance Technologies

9  in February of 2018?

10         A.    That is what it says on the

11 document.

12         Q.    And as the representative of

13 the Johnson & Johnson defendants

14 testifying in regard to chain of custody,

15 is that the date that the transfer

16 occurred?

17         A.    According to the information

18 written here, yes.

19         Q.    Are you aware of what if

20 anything was done with the PTI samples

21 for the five-month period of time that

22 they were at Maxxam Analytics?

23         A.    I am not.

24         Q.    Did you make any attempt

Margaret M. Gurowitz

1  to -- in preparation for today's

2  deposition to determine what if anything

3  was done with those samples during that

4  five-month period of time?

5        A.    I did not.  When I spoke

6  with Janet, she said they -- they put

7  them on pallets, they drove them by truck

8  over to the lab in Georgia, and then it

9  was decided that they needed to be looked

10  at at a lab in New Jersey.  And so they

11  were then FedExed.

12              But from the way she told it

13  to me, it didn't seem -- it sounded like

14  it was a much shorter time frame.  So I

15  did not pursue that further, because it

16  seemed like it was a very sort of short

17  time frame where one thing followed from

18  the next.

19              MR. LAPINSKI:  Why don't we

20         go off the record take a

21         five-minute break.

22              THE VIDEOGRAPHER:  The time

23         is 3:08 p.m.  We are off the

24         record.

Margaret M. Gurowitz

1           (Short break.)

2           THE VIDEOGRAPHER:  We are

3       back on the record at 3:27 p.m.

4    BY MR. LAPINSKI:

5       Q.    Ms. Gurowitz, I'm going to

6    hand you a document that's been marked as

7    Exhibit 25.

8           (Document marked for

9       identification as Exhibit

10      Gurowitz-25.)

11   BY MR. LAPINSKI:

12      Q.    There are several

13   photographs that were produced of a Baby

14   Powder container.  If you could just take

15   a minute and review those and let me know

16   whether or not you've seen those

17   photographs before?

18      A.    I have seen the photograph

19   of the front, but not the back and sides.

20      Q.    Okay.  What is your

21   understanding of what that is a

22   photograph of?

23      A.    This is a photograph of a

24   Johnson's Baby Powder tin that was

Margaret M. Gurowitz

1  manufactured and marketed in England.  It

2  was one of a small handful of samples

3  provided by a Johnson & Johnson retiree

4  named John Hopkins.

5       Q.    So would this be one of the

6  Hopkins samples that we've referred to

7  previously?

8       A.    Yes.

9       Q.    And are you able to identify

10 which of the samples on the sample list

11 these photos relate to?

12      A.    Yes.  If you give me a

13 moment to find that on the list.

14      Q.    Sure.

15      A.    Absolutely.  I still can't

16 get used to the double-sided.

17      Q.    Are these going to be on the

18 museum list or on the offsite sample

19 list?  These are going to be on the

20 offsite sample list, correct?

21      A.    Correct.

22      Q.    Okay.  It's going to be the

23 last two pages of the offsite sample

24 list.  Page ID 1189 and 1190, if that

Margaret M. Gurowitz

1   helps.

2            MS. FOURNIER:  You can go

3        ahead.

4            THE WITNESS:  Okay.  This

5        looks like it would be the sample

6        that is referred to as UK Facility

7        2, because it is a metal container

8        from the early 1950s.  The

9        photograph of the bottom has a

10       label that says early 1950s.

11           (Document marked for

12       identification as Exhibit

13       Gurowitz-26.)

14   BY MR. LAPINSKI:

15       Q.    I'm going to hand you

16   Exhibit 26.  I'll ask you to take a look

17   at those photos.  And similarly we're

18   going to look to identify if that is one

19   of the Hopkins samples which one it is.

20       A.    Judging by the photograph at

21   the bottom with the label it says late

22   1950s.  This looks like it would be the

23   sample labeled UK Facility 3.

24           (Document marked for

Margaret M. Gurowitz

1     identification as Exhibit

2     Gurowitz-27.)

3   BY MR. LAPINSKI:

4         Q.    This is Exhibit 27.  Take a

5   look at that and let me know if you've

6   ever seen those photographs before.

7         A.    I have seen a photograph of

8   just the front of this container, not the

9   sides or top or bottom.

10        Q.    And is it your understanding

11  that this is photographs of the -- one of

12  the Hopkins products as well?

13        A.    It is labeled October '66

14  and UK Facility 4, sample number is

15  identified as saying October 1966 on the

16  container, so that would -- that would

17  correspond.

18        Q.    If you would do me a favor.

19  If you could please turn to -- if you

20  look on the bottom right-hand corner with

21  the Bates number.  The Bates number that

22  ends in 6825.  And if you can describe

23  that picture for me, I would appreciate

24  it.

Margaret M. Gurowitz

1          A.    It is the picture of a top

2    of a container with the labeling separate

3    by the side.  I have not seen this

4    artifact in person.  So that's what I can

5    make out from the photograph.

6          Q.    Are you familiar at any time

7    of Johnson & Johnson having a promotion

8    for a free trip to Disneyland that would

9    be able to be slid off of a Baby Powder

10   bottle?

11         A.    I am not.  But Johnson &

12   Johnson throughout a good portion of its

13   history was highly decentralized.  That

14   would be something that was conducted in

15   the United Kingdom where this sample was

16   from.  We don't have a representative --

17   a good representation of a wide variety

18   of artifacts, product artifacts from the

19   UK in the corporate archives collection.

20              So before these matters,

21   this is the first time I had seen this

22   particular packaging.  So being

23   decentralized in this time, October of

24   1966, the UK would have done -- it

Margaret M. Gurowitz

1  wouldn't have been a central thing that

2  was done necessarily in the States or all

3  over the world.  The UK would have sort

4  of run its own promotions.

5              (Document marked for

6         identification as Exhibit

7         Gurowitz-28.)

8  BY MR. LAPINSKI:

9         Q.    This is Exhibit 28.  And if

10  you could just look at those pictures.

11  Let me know if you've ever seen those

12  pictures before.

13         A.    I have seen the picture of

14  the front, so the first one on this.

15         Q.    And what is your

16  understanding that that's a picture of?

17         A.    This is a picture that it's

18  labeled on the bottom late 1940.  It

19  would correspond to Sample Number UK

20  Facility 1.

21              (Document marked for

22         identification as Exhibit

23         Gurowitz-29.)

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

1          Q.    I'm going to hand you a

2     document that's been marked as

3     Exhibit 29.  Ms. Gurowitz, have you ever

4     seen that photograph before?

5          A.    I believe so.  There were

6     two that I looked at that had the

7     "Property of PPC Museum" on them.  If you

8     look at the second in the set.

9          Q.    And what is your

10    understanding of what the "Property of

11    PPC Museum" refers to?

12         A.    So we don't have any records

13    relating to a museum, as we understand a

14    museum to be at Personal Products.

15    Personal Products is a historical

16    operating unit of Johnson & Johnson that

17    no longer exists.

18              At one point in time it

19    marketed Shower to Shower among other

20    products.  It was located in Milltown,

21    New Jersey in a building that likely no

22    longer exists now either.

23              At some point in time, this

24    artifact belonged to or was labeled

Margaret M. Gurowitz

1   property of whatever that was.  And so we

2   don't know.  It probably was not a museum

3   in the way that we think of museums or

4   the way the current Johnson & Johnson

5   museum power house is.  It may have been

6   as simple as a case, the museum,

7   quote-unquote, in the UK that those four

8   UK samples were taken from, was a

9   glass-fronted case.  So it may have been

10  something like that.

11         Q.    And I'm sorry.  You said --

12  what does PPC stand for?

13         A.    PPC is an acronym for

14  Personal Products Corporation.  It is a

15  no longer existing historical operating

16  unit of Johnson & Johnson.

17         Q.    So it is a -- it was a

18  Johnson & Johnson entity?

19         A.    At one point, yes.

20         Q.    Okay.  And if you look at

21  the label on the bottom.  It says,

22  "Property of PPC museum, Milltown, New

23  Jersey."  And it says, "Must be returned

24  to consumer affairs."

1    Do you know what that refers

2    to?

3         A.    Presumably consumer affairs

4    was in charge of whatever the PPC museum

5    was.

6         Q.    And would that be Johnson &

7    Johnson consumer affairs?  Is that your

8    understanding?

9         A.    Or PPC consumer affairs.

10        Q.    But consumer -- consumer

11   affairs of a J&J entity?

12        A.    Yes.

13        Q.    At the top of that photo

14   there's a reference to Doyle/B&PD.  Do

15   you know what that refers to?

16        A.    I do not know what

17   Doyle/B&PD refers to.

18        Q.    Okay.  And you had said

19   earlier that you assumed this was housed

20   at PPC?

21        A.    At one time.  It has --

22   elsewhere on that upper label, it says

23   MDSE notice which stands for

24   merchandising notice.  This may have been

Margaret M. Gurowitz

1    something related to that policy that was

2    in place for a few decades that whenever

3    you change the packaging shape or the

4    label style, send a sample.  That would

5    correspond to merchandising notices.

6              So this may reflect that

7    this was one of those.  And it is from

8    1968.  So it would fall inside those

9    parameters.  So it is possible that this

10   was one of those items that resulted

11   in -- they did something, they changed

12   the label, changed the colors on the

13   label or something like that.

14             And then one point in time,

15   we don't know when, it belonged to

16   whatever the PPC museum in Milltown was.

17        Q.   If you look at the first

18   page of the document, and it's indicated

19   that this is STS033.

20             Do you see that?

21        A.   I do.

22        Q.   And is it your understanding

23   that this is a photograph of the offsite

24   storage sample STS033?

Margaret M. Gurowitz

1       A.    Yes.   The year corresponds.

2   I'm looking at that right now.   It's on

3   Page 41 of 91 of the big list.   And that

4   says it's -- STS033 is 1968.   That

5   corresponds with the date on the label on

6   the back.   So there we can make a

7   correlation.

8       Q.    And is that an authentic

9   Shower to Shower container?

10      A.    It looks to be from the

11  photograph.

12      Q.    And is there any reason to

13  believe that that cap was removed from

14  the container at any time?

15              MS. FOURNIER:   Objection.

16              THE WITNESS:   I have no

17          information on that products back

18          then they didn't have seals.

19          Safety seems did not become a

20          thing until 1980s.   No consumer

21          products really had them.   So I

22          don't -- it certainly wasn't

23          sealed.

24              I don't have any information

Margaret M. Gurowitz

1    about whether the cap was removed

2    or opened.

3  BY MR. LAPINSKI:

4        Q.    Based upon your review of

5  the photograph, is there any evidence in

6  the photograph that the cap was removed

7  at any time?

8             MS. FOURNIER:  Objection.

9             THE WITNESS:  I cannot tell

10       from the photograph.  I couldn't

11       tell -- I don't even know if you

12       could tell by looking at the

13       artifact.  I can't see what the

14       top of it looks like.  So I cannot

15       tell from just the photographs

16       here.

17  BY MR. LAPINSKI:

18       Q.    Were you responsible -- were

19  you responsible for preparing this sample

20  for production?

21       A.    No.  This was from offsite

22  storage.  So this was pulled in from

23  offsite storage.

24       Q.    The samples that were pulled

Margaret M. Gurowitz

1    in from offsite storage who was

2    responsible for preparing them for

3    production?

4         A.    So when you say preparing

5    for production, do you mean doing all

6    this, labeling?

7         Q.    Yes.

8         A.    So they were -- they were

9    identified.  I mean, they had -- as I

10   mentioned earlier, they had been there so

11   long that until the search commenced for

12   samples that might be located in offsite

13   storage or other places that nobody even

14   realized that these were there.  And so

15   they were pulled in.

16             So this would have been --

17   they would have been requested by

18   somebody at the consumer company records

19   management.  And this particular -- these

20   numbers, the STS033, the sample numbers

21   were signed by the legal folks.  So this

22   would have been photographed by somebody

23   on the legal team.

24        Q.    Do you know who at Johnson &

Margaret M. Gurowitz

1  Johnson Consumer was responsible for

2  bringing the samples back from offsite

3  storage?

4        A.    I do not know.

5        Q.    Do you know who at Johnson &

6  Johnson Consumer was responsible for

7  taking the samples from the offsite

8  storage boxes and preparing them for

9  shipment to innovative technologies?

10        A.    No, I do not know that.

11        Q.    Do you know the process that

12  was used in order to transfer any of the

13  offsite samples from the offsite storage

14  facility to the lab in Eatontown?

15        A.    I do not know that process.

16  When I was looking at tracing the chain

17  of custody, I was looking at tracing the

18  chain of custody from the other end,

19  not -- you know, not once they were

20  identified and pulled and sent to the

21  lab.  I was looking at tracing the

22  historical chain of custody as to how

23  they got to offsite storage, where they

24  might have been before they got to

Margaret M. Gurowitz

1   offsite storage.  That's the side I was

2   looking at.

3           Q.    Okay.  And would that --

4   would that statement pertain to all of

5   the offsite storage samples that we've

6   talked about, other than the Ashton

7   samples, the Hopkins samples and the

8   sample that was left at your museum

9   security?

10          A.    Yes.

11              MS. FOURNIER:  Objection.

12              THE WITNESS:  Sorry.

13              Yes, because that's the part

14          of the chain of custody that we

15          didn't have.

16              (Document marked for

17          identification as Exhibit

18          Gurowitz-30.)

19   BY MR. LAPINSKI:

20          Q.    I'm going to hand you a

21   document that's been marked as

22   Exhibit 30.  I apologize.  That was not

23   stapled.

24              MS. FOURNIER:  Can we go off

Margaret M. Gurowitz

1       the record for a second?

2               THE VIDEOGRAPHER:  The time

3       is 3:44 p.m.  We are off the

4       record.

5               (Brief pause.)

6               THE VIDEOGRAPHER:  We are

7       back on the record at 3:45 p.m.

8   BY MR. LAPINSKI:

9           Q.      Excuse me, Ms. Gurowitz.

10  I've handed you what's been marked as

11  Exhibit 30.  Have you seen that

12  photograph before?

13          A.      I may have.  I have looked

14  at a lot of them.

15          Q.      And the first page of that

16  photograph has a Post-It note

17  representing that is sample STS036.

18  Based upon your review of the photograph,

19  does that comport with the sample list?

20          A.      Based upon my review of the

21  photograph, it does comport with the

22  sample list.  They're both noted from

23  being from 1975.  And the product name,

24  the label name is the same, is

Margaret M. Gurowitz

1   consistent.

2        Q.    In your role as historian,

3   have you personally seen any of these

4   offsite samples?

5        A.    No, I have not.

6             (Document marked for

7             identification as Exhibit

8             Gurowitz-31.)

9   BY MR. LAPINSKI:

10       Q.    I'm going to hand you a

11  document that has been marked as

12  Exhibit 31.  Ms. Gurowitz, can you tell

13  me what that's a photograph of?

14       A.    It's a photograph of a

15  Shower to Shower product artifact labeled

16  STS042.  It's labeled as being from 1969.

17  That corresponds to the listing on the --

18  of the same number on the offsite, the

19  things from offsite storage.

20       Q.    And based upon your review

21  of this picture, does this -- does this

22  look like it's an authentic Shower to

23  Shower container?

24       A.    As far as I can tell from

Margaret M. Gurowitz

1   the picture, it does.

2                 (Document marked for

3            identification as Exhibit

4            Gurowitz-32.)

5   BY MR. LAPINSKI:

6            Q.   I'll hand you a document

7   that's been marked as Exhibit 32.

8                 MR. LAPINSKI:  I'm going to

9            go off the record for a second.

10                THE VIDEOGRAPHER:  The time

11           is 3:48 p.m.  We're off the

12           record.

13                (Brief pause.)

14                THE VIDEOGRAPHER:  Back on

15           the record at 3:49 p.m.

16  BY MR. LAPINSKI:

17           Q.   Ms. Gurowitz, I just handed

18  you what exhibit number?

19           A.   32.

20           Q.   That's STS043?

21           A.   Yes.

22           Q.   Very good.  Ms. Gurowitz

23  I've handed you a document that's been

24  marked Exhibit 32.  Have you seen this

Margaret M. Gurowitz

1   photograph before?

2          A.    It's possible.  I've seen a

3   lot of the -- the Shower to Shower

4   packaging was more consistent over the

5   years historically, so they all look much

6   more similar than the Johnson's Baby

7   Powder.

8          Q.    And this photo -- this

9   photograph is labeled STS043, correct?

10         A.    That is correct.

11         Q.    And does that photograph

12  correspond with the sample entry that's

13  listed in the sample list?

14         A.    It does.

15         Q.    And based upon your review

16  of the photograph, is that an authentic

17  Shower to Shower bottle?

18         A.    As far as I can tell from

19  the photograph.

20         Q.    And do you think that the

21  photograph is an accurate depiction of

22  that particular bottle?

23              MS. FOURNIER:  Objection.

24              THE WITNESS:  I'm not sure

Margaret M. Gurowitz

1    exactly what you mean by that, but

2    as far as I can tell.

3  BY MR. LAPINSKI:

4       Q.    The photograph itself, it

5  doesn't look like the photograph has been

6  doctored in any way?

7       A.    Not that I can tell.

8            (Document marked for

9            identification as Exhibit

10           Gurowitz-33.)

11  BY MR. LAPINSKI:

12       Q.    I'm going to hand you a

13  document that's been marked as

14  Exhibit 33.  Ms. Gurowitz, this document

15  has a Post-It note on it indicating

16  sample STS046.

17            Do you see that?

18       A.    I do.

19       Q.    And your review of the

20  picture, does this photograph correspond

21  to the STS046 listed on the sample list?

22       A.    Based on the information on

23  both, it appears to correspond.

24       Q.    And does the photograph look

Margaret M. Gurowitz

1   like it is an authentic Shower to Shower

2   bottle?

3        A.   As far as I can tell from

4   the photograph, yes.

5        Q.   And is there anything from

6   that photograph that would lead you to

7   believe that is not an accurate picture?

8        A.   Not that I could see from

9   the photograph.

10            (Document marked for

11        identification as Exhibit

12        Gurowitz-34.)

13   BY MR. LAPINSKI:

14        Q.   I'm going to hand you a

15   document that has been marked as

16   Exhibit 34.  Ms. Gurowitz, this document

17   has a Post-It on it indicating sample

18   STS051.

19            Do you see that?

20        A.   I do.

21        Q.   And your review of the

22   picture, does this photograph correspond

23   to STS051 that is listed on the sample

24   list?

Margaret M. Gurowitz

1      A.    Based on the information on

2  the photograph, on the sample list it

3  appears to correspond.

4      Q.    And based upon your review

5  of the photograph, does this appear to be

6  an authentic Shower to Shower bottle?

7          MS. FOURNIER:  I'm just

8          going to -- so I don't have to

9          keep doing it.  Object to that

10         question and the one you do after

11         about, does the picture look

12         tampered with.  And I do that for

13         all the pictures.

14         MR. LAPINSKI:  I changed the

15         tampered with one, so you'll have

16         to.

17  BY MR. LAPINSKI:

18     Q.    Is -- okay, based upon your

19  review of the photograph, does this

20  appear to be an authentic Shower to

21  Shower bottle?

22     A.    As far as I can tell it

23  appears to be.

24     Q.    Is there anything about the

Margaret M. Gurowitz

1   photograph that would make you question

2   whether it's an authentic Shower to

3   Shower bottle?

4          A.    Not that I can tell from the

5   photograph.

6          Q.    And is there anything about

7   the photograph that would lead you to

8   believe that the photograph is not

9   accurate?

10         A.    Not that I can tell from

11  this.  It's a black-and-white.  So as far

12  as I can tell from the photograph.

13             (Document marked for

14             identification as Exhibit

15             Gurowitz-35.)

16  BY MR. LAPINSKI:

17         Q.    I'm going to hand you a

18  document that's been marked as

19  Exhibit 35.  Ms. Gurowitz, this is a

20  photograph with a Post-It note indicating

21  Sample Number STS053.

22             In your review of the

23  photograph, does this photograph

24  correspond with the sample on the sample

Margaret M. Gurowitz

1   list STS053?

2        A.    Based on the information in

3   the photograph and on the sample list, it

4   appears to correspond.

5        Q.    Is there anything about the

6   photograph that would lead you to believe

7   that this is not an authentic Shower to

8   Shower bottle?

9        A.    Not that I can tell from a

10  black-and-white photograph of a color

11  bottle, no.

12       Q.    And is there anything in the

13  photograph that would lead you to believe

14  that it is not an accurate picture of the

15  bottle?

16       A.    Not that I could tell from

17  the photograph.

18            (Document marked for

19            identification as Exhibit

20            Gurowitz-36.)

21  BY MR. LAPINSKI:

22       Q.    I'll hand you Exhibit 36.

23  This is a photograph with a Post-It note

24  indicating STS055.  Based upon your

Margaret M. Gurowitz

1    review of the photograph does this

2    photograph correspond with STS055 that is

3    listed in the offsite storage list?

4           A.     Based on what I can see from

5    the photograph, it appears to correspond.

6           Q.     Okay.  And this particular

7    photograph indicates that it is -- it

8    says "museum" on it.

9                  Do you see that?

10          A.     No, I don't.

11          Q.     On the -- on the front?

12          A.     Oh.

13          Q.     There's some type of sticker

14   that's on the product itself.

15          A.     Yes, I see that.

16          Q.     Do you have any

17   understanding as to why that would say

18   museum on it?

19          A.     I do not know.  It was in

20   offsite storage.  So it is possible it is

21   one of those artifacts from the old

22   museum that was sent back to the

23   operating company.

24          Q.     And then below that it says

Margaret M. Gurowitz

1    19 --

2         A.    Although it's after.  I'm

3    sorry.  It's after the time period.

4         Q.    So then you don't have an

5    understanding as to why museum would be

6    written on there as you sit here?

7         A.    I don't.  So it's -- as the

8    memo we discussed from 1982 referenced

9    the closing of the museum.  This is from

10   the year after.  So they would have

11   stopped sending samples to that museum

12   entity.  So I don't have any information

13   as to why that would say museum.

14        Q.    And it also says underneath

15   that, "1983 sealed container," "tamper,"

16   and something is scribbled out.

17              Do you see that?

18        A.    I do see that.

19        Q.    Do you have an understanding

20   of what that stands for?

21        A.    1938 was about the time

22   consumer products decided to have

23   tamper-evident seals on them.  So that

24   was a new thing in society at that time.

Margaret M. Gurowitz

1 And that's -- that may be why that was

2 noted.

3         Q.    Based upon your review of

4 the picture, do you believe that that's

5 an authentic Shower to Shower bottle?

6         A.    As far as I can tell from a

7 black-and-white photograph of a color

8 artifact, yeah.

9         Q.    And is there anything that

10 would lead you to believe that it is not

11 an accurate photo?

12         A.    Not that I can tell from the

13 photograph.

14             (Document marked for

15             identification as Exhibit

16             Gurowitz-37.)

17 BY MR. LAPINSKI:

18         Q.    I'm going to hand you a

19 document that has been marked as Exhibit

20 37.  This photograph is labeled STS062.

21 Based upon your review of the photograph,

22 does it correspond with STS062 in the

23 sample list?

24         A.    It appears to correspond.

Margaret M. Gurowitz

1    Q.    Based upon your review of

2  the photograph, do you believe that

3  that's an authentic Shower to Shower

4  bottle?

5    A.    As far as I can tell, again,

6  from a black-and-white photograph of a

7  color artifact, yes.

8    Q.    And is there anything about

9  that picture that would lead you to

10  believe that it is not an accurate

11  picture?

12    A.    Not that I could tell from

13  the picture.

14         (Document marked for

15         identification as Exhibit

16         Gurowitz-38.)

17  BY MR. LAPINSKI:

18    Q.    I'm going to hand you

19  Exhibit 38, which is a photograph that

20  looks like it was taken going about

21  60 miles an hour past the Shower to

22  Shower bottle.

23         If you could look at the

24  second page of that, which is, has a

Margaret M. Gurowitz

1   Post-It note STS065.  And based upon the

2   three photographs that are here, do you

3   believe that this photograph would

4   correspond to the sample that's listed in

5   the sample list as STX -- STS065?

6           A.    There is less evidence

7   because the first one is so blurry.  So I

8   can't read the number of ounces in the

9   package.  That's one of the things that

10  I've been basing it on.  And I can't read

11  the number in the first one.  But based

12  on the Post-Its on the other two pages,

13  it would appear to correspond as best I

14  can tell without really being able to see

15  the bottles clearly.

16              (Document marked for

17          identification as Exhibit

18          Gurowitz-39.)

19  BY MR. LAPINSKI:

20          Q.    I'm going to hand you a

21  document that's been marked as

22  Exhibit 39.  And this is a photograph

23  with a Post-It note that indicates

24  JBP-001 and based upon your review of

Margaret M. Gurowitz

1   these photographs, does this photograph

2   correspond with the sample list

3   production JP-001?

4         A.    As far as I can tell it

5   appears to correspond.

6         Q.    Is there anything in that

7   photograph that would lead you to believe

8   that the photograph of JP-001 is not an

9   authentic bottle?

10        A.    Not -- again, not that I

11  could tell from a black-and-white

12  photograph of a color artifact.

13        Q.    Anything to lead you to

14  believe that that picture is not

15  accurate?

16        A.    Not that I could tell from

17  the photograph, the black-and-white

18  photograph.

19              MS. FOURNIER:  I'll have the

20          same series of objections about

21          authentic bottle and inaccurate

22          photograph, et cetera, for the

23          Johnson's Baby Powder series.

24              (Document marked for

Margaret M. Gurowitz

1        identification as Exhibit

2        Gurowitz-40.)

3    BY MR. LAPINSKI:

4        Q.    What did I mark that one as?

5        A.    40.

6        Q.    40?

7        A.    40.

8        Q.    Okay.  I've handed you a

9    document that has been marked as

10   Exhibit 40.  And that indicates with a

11   Post-It note it's a picture of JBP-006.

12   Based upon your review of the photograph

13   does that correspond with JP-006 in the

14   sample list?

15       A.    Based upon the information

16   given, it appears to correspond.

17       Q.    Based upon your review of

18   the photograph, is there anything that

19   would lead you to believe that is not an

20   authentic J&J bottle?

21       A.    Not that I can tell, again,

22   from a black-and-white photograph of a

23   color artifact, it really helps you to

24   see it in color because you know if the

Margaret M. Gurowitz

1    branding is a certain color and if for

2    some reason that's not captured in a

3    photograph and the branding was some

4    color that never appeared on a bottle,

5    you could question it.  But based on -- I

6    can't tell from the black and white.

7              (Document marked for

8         identification as Exhibit

9         Gurowitz-41.)

10   BY MR. LAPINSKI:

11        Q.   I'm going to hand you a

12   document that has been marked as

13   Exhibit 41.  And these are photographs

14   that are marked as JBP-085.  Based upon

15   your review, do the photographs

16   correspond with the sample list JBP-085?

17        A.   I -- based on my review it

18   appears to correspond.

19        Q.   Does that appear to be a

20   picture of an authentic Johnson's Baby

21   Powder bottle?

22        A.   Again, you can't really tell

23   from the black-and-white photograph of a

24   color artifact.  It appears to be, but I

Margaret M. Gurowitz

1    would really have to see it in color to

2    make an absolute determination.

3         Q.    Is there anything that would

4    lead you to believe that is not an

5    accurate picture?

6         A.    Not from this, no.  But

7    again it helps to see it in color.

8              (Document marked for

9              identification as Exhibit

10             Gurowitz-42.)

11   BY MR. LAPINSKI:

12        Q.    I'm going to hand you

13   Exhibit 42.  Exhibit 42 is photographs of

14   JBP 087.  Based upon your review of

15   Exhibit 42, does it appear to be -- does

16   it appear to correspond with the sample

17   list JBP-087 entry?

18        A.    It appears to correspond.

19        Q.    Anything that would lead you

20   to believe that it's not an authentic

21   Johnson's Baby Powder bottle?

22        A.    Not that I could tell from a

23   black-and-white photograph of a color

24   artifact.

Margaret M. Gurowitz

1       Q.     And would it -- is there

2   anything that would lead you to believe

3   that it's not an accurate picture?

4       A.     Not that I could tell from

5   this photograph.

6                (Document marked for

7                identification as Exhibit

8                Gurowitz-43.)

9   BY MR. LAPINSKI:

10      Q.     Let me hand you a document

11  that has been marked as Exhibit 43.  And

12  the Post-It note here indicates that this

13  is photographs of sample JBP-096.  Based

14  upon your review of the photograph do the

15  photographs correspond with the sample

16  listing JBP-096?

17      A.     They -- it appears to

18  correspond.

19      Q.     And does that appear to be

20  an accurate depiction -- I'm sorry.

21  Strike that.

22               Does that appear to be an

23  authentic J&J bottle?

24      A.     As best I can tell from a

Margaret M. Gurowitz

1  black and white photograph of a color

2  artifact, it does.  But I'd really have

3  to see it in color.

4       Q.    Is there anything that would

5  lead you to believe that it is not an

6  accurate picture?

7       A.    Well, if you showed me

8  something in color and for some reasons

9  the Johnson's was in orange, I would say

10  I know for a fact that that has never

11  been part of the branding, so I would

12  question it.  That's why I've been saying

13  it's hard to say from a black and white.

14       Q.    But there's nothing there

15  that leads you to believe that it is

16  inaccurate?

17       A.    Not that I could tell from a

18  black-and-white photograph of a color

19  artifact.

20            Document marked for

21            identification as Exhibit

22            Gurowitz-44.)

23  BY MR. LAPINSKI:

24       Q.    Exhibit 44.  This is --

Margaret M. Gurowitz

1  Post-It note indicating this is a

2  photograph of JBP 097.  Based upon your

3  review of the photographs, does this

4  correspond with the sample list and the

5  entry for JBP-097?

6       A.   Yes, it appears to

7  correspond.

8       Q.   Is there anything about the

9  photograph that would lead you to believe

10  that it's not an authentic J&J bottle?

11       A.   Again, I cannot tell

12  100 percent from a black and white

13  photograph of a color artifact.  But

14  there is nothing that appears in the

15  black and white, but I'd really have to

16  see a color photograph.

17       Q.   If you would turn to the

18  fourth page of the photographs of

19  JBP-097.  And there is a sticker on there

20  that indicates that it's a Merchandise

21  Notice 6963.

22            Do you see that?

23       A.   I do.

24       Q.   And what does that refer to?

Margaret M. Gurowitz

1          A.    So that would refer back to

2   that policy that was in effect from about

3   the '50s to the '70s, that whenever there

4   was a change made to the packaging, or

5   the labeling, that they were to send a

6   sample.

7               And in fact it says on that

8   label, "Delete 'family size' from front

9   label."  So that would have been a change

10  to the label that would have caused them

11  to send a sample.

12         Q.    So, these pictures depict a

13  sample that was sent to offsite storage

14  by a Johnson & Johnson entity?

15         A.    They do.  This is among the

16  marketing samples that were found in

17  offsite storage.  So at some point they

18  were sent to offsite storage.

19              (Document marked for

20         identification as Exhibit

21         Gurowitz-45.)

22  BY MR. LAPINSKI:

23         Q.    I'll hand you a document

24  that's been marked as Exhibit 45.

Margaret M. Gurowitz

1    Post-It note indicates this is sample

2    JBP-099.  Based upon your review, do

3    these photographs comport with the sample

4    list entry for JBP-099?

5         A.    Based on my review it

6    appears to correspond.

7         Q.    On the fourth page, there is

8    a photograph and it has a label on the

9    bottle itself.  Do you have -- can you

10   give me an indication of what that label

11   refers to?

12        A.    Sure.  Again the top says --

13   I'm assuming MD -- the part is cut-off.

14   It goes around the bottle.  That would

15   correspond to a merchandising notice.  So

16   something about the package was changed,

17   whether it was the label or the size or

18   the shape.  And therefore, they -- as per

19   that policy that was in effect for a few

20   decades, they would have sent a sample.

21        Q.    So this is a sample that

22   would have been -- would have been sent

23   by J&J Consumer to the museum?

24        A.    To the old J&J museum.

Margaret M. Gurowitz

1    Q.    And then eventually moved to

2    offsite storage?

3    A.    Yes.  At some point.

4         (Document marked for

5         identification as Exhibit

6         Gurowitz-46.)

7    BY MR. LAPINSKI:

8    Q.    I'm going to hand you

9    Exhibit 46.  Post-It note indicates that

10   Exhibit 46, pictures of sample JBP 107.

11   Based upon your review of the

12   photographs, does this comport with the

13   listing on the sample list for JBP 107?

14   A.    It sort of appears to.  But

15   the sample -- the JBP 107 on the sample

16   list has a date of 1973.  But the actual

17   photograph of the artifact has three

18   dates.  1973, 1974, and one where I can't

19   see because the date is cut off.  1975.

20         So on this one I couldn't

21   say exactly, because the dates are so

22   different.  The one on the sample list

23   does not list three dates.  It only lists

24   one date.

Margaret M. Gurowitz

1    Q.    And the dates that you're

2  referring to are on the third page of the

3  photographs?

4    A.    Correct.

5    Q.    Okay.  And --

6    A.    The second and third.

7    Q.    Or the third and fourth?

8    A.    Or the -- that too.

9    Q.    The -- and those dates that

10 you're referring to, what do those labels

11 for those particular dates refer to?

12   A.    So, again, it has that

13 merchandise notice number up top.  So

14 there would have been some sort of change

15 to either the label or the package shape

16 or size.  And if you look at Page three,

17 the bottom label says something -- I

18 can't make on you the first word.

19 Something spaced lettering.  So that

20 looks like that would have been a label

21 change.

22   Q.    And this is a bottle that

23 would have been produced to the J&J

24 museum pursuant to the policies that were

Margaret M. Gurowitz

1   in place at that time?

2         A.    At the old museum, yes.  It

3   would have been -- it falls in that time

4   frame.

5              (Document marked for

6         identification as Exhibit

7         Gurowitz-47.)

8   BY MR. LAPINSKI:

9         Q.    Exhibit 47.  Do the

10  photographs in Image 47 correspond to

11  sample JBP-119 on the sample list?

12        A.    Yes, it appears to

13  correspond.

14        Q.    And on the fourth page,

15  there's a label on the packaging on the

16  fourth page.  What's your understanding

17  of that labeling?

18        A.    It says -- are you referring

19  to the one that says, "New good sheet,

20  Number 5928?

21        Q.    Yes.

22        A.    That again, would have been

23  in relation to a packaging change and as

24  noted, if you look -- it says new

Margaret M. Gurowitz

1    plastic, it's from 1963.  That is the

2    first year that the product was in a

3    plastic container as opposed a metal

4    container.  So that would have been most

5    likely a packaging change.

6            Q.    And this would have been a

7    sample that would have been sent to the

8    museum pursuant to the written policy

9    that was in place at that time?

10           A.    As best I can tell from

11   this, yes.

12               (Document marked for

13               identification as Exhibit

14               Gurowitz-48.)

15   BY MR. LAPINSKI:

16           Q.    I'm going to hand you what's

17   been marked as Exhibit 48.  And these

18   photographs correspond to the entries on

19   the sample list for JBP-133?

20           A.    Perhaps.  The reason I say

21   perhaps is there is a label.  And I can't

22   tell.  On Page 3 and 4, the label goes

23   over two sides of the container, so it's

24   hard to say.

Margaret M. Gurowitz

1           On Page 3 it says Leahy "box

2  number."  And then on Page 4, there's a

3  61.  So I don't know if it refers to Box

4  Number 61 or the year 1961.

5           If it refers to a year, then

6  they don't correspond because on the list

7  JBP-133 is listed as being from 1960.

8           (Document marked for

9      identification as Exhibit

10      Gurowitz-49.)

11  BY MR. LAPINSKI:

12      Q.   I'll hand you Exhibit 49.

13  These are photographs of JBP-135.  Based

14  upon your review of the photographs do

15  these images correspond with the product

16  that's listed as JBP-135 on the sample

17  list?

18      A.   I can't tell.  There is a

19  handwritten label taped onto it that has

20  a date of 1963.  But if you look at Page

21  2, the photo on Page 2, it looks like it

22  says -- there's a label toward the

23  bottom.  It says, "Filed 11/8/54."

24      Q.   And below that writing it

Margaret M. Gurowitz

1    says, "Reg number 74,097."  Do you have

2    any idea what that indicates?

3         A.    I can take an educated guess

4    that it relates to the big label,

5    handwritten label that's taped that says

6    "Trademark application."  Potentially

7    that could be a registration number from

8    that.  But without more information I

9    couldn't say 100 percent sure.

10        Q.    Is it possible that that

11   represents a trademark application that

12   was filed in November of 1954?

13        A.    It's possible.  But it's got

14   two dates.  1963 and 1964.  So that to me

15   would raise an issue right there.

16        Q.    And I'm sorry.  Where are

17   the two dates that you're referring to?

18        A.    So there's a bigger

19   handwritten label that says -- on Page 3

20   it says, "U.S. trade sample."  And then

21   on Page 4 it says, "Trademark

22   application."  That's got the one -- it's

23   got a date, the month is obscured.  It

24   might be a one.  It may not.  Something,

Margaret M. Gurowitz

1  17/63.

2            And then on Page 2, it says,

3  "Filed 11/8/54."

4            (Document marked for

5       identification as Exhibit

6       Gurowitz-50.)

7  BY MR. LAPINSKI:

8       Q.    I'm handing you a document

9  that has been marked Exhibit 50.  And

10  these are photographs relating to sample

11  JBP 165.

12            Based upon your review of

13  the photographs, do the photographs

14  correspond with the sample list entry JBP

15  165?

16       A.    As far as I can determine

17  from the information on the photograph

18  and on the list, it appears to

19  correspond.

20       Q.    And on Page 3 of the

21  photographs, there are change labels that

22  are depicted here, correct?

23       A.    That is correct.

24       Q.    And there are three

Margaret M. Gurowitz

1   different change labels.  One is Number

2   6715, the other is 7231, and the last one

3   is 7344, correct?

4         A.    That is correct.

5         Q.    And are they change labels

6   that would represent changes to the

7   labeling of the bottle?

8         A.    Changes to something on the

9   bottle.  Either the labeling -- something

10  to do with the labeling or the shape or

11  size of the package.

12        Q.    And would these samples have

13  been produced to the J&J museum based

14  upon the written protocol that was in

15  place at the time?

16        A.    They fall in that time

17  frame.  So presumably they would have.

18              (Document marked for

19        identification as Exhibit

20        Gurowitz-51.)

21  BY MR. LAPINSKI:

22        Q.    I'm going to hand to you a

23  document that has been marked Exhibit 51.

24              And these relate to JBP-166.

Margaret M. Gurowitz

1  Based upon your review of the

2  photographs, do these photographs comport

3  with the sample list entry JBP-166?

4        A.    Based upon the information

5  it appears to comport.  Although the big

6  listing of stuff does not reference that.

7  It has a sample of baby lotion attached

8  to it.

9        Q.    I'm sorry.  Could you just

10 repeat what you said?

11       A.    Sure.  They appear to

12 comport.  Although the listing for Number

13 166 on the list of offsite storage

14 samples does not mention that it has a

15 sample of baby lotion attached to it.

16       Q.    So other -- other than the

17 absence of the reference to baby lotion,

18 do you believe that they comport?

19       A.    It appears to.

20             (Document marked for

21             identification as Exhibit

22             Gurowitz-52.)

23 BY MR. LAPINSKI:

24       Q.    I'm going to hand you

Margaret M. Gurowitz

1  Exhibit 52.  These are photos of sample

2  JBP-167.  Based upon your review of the

3  photos, do these comport with the entry

4  for JBP-167 on the sample list?

5       A.    It appears to, yes.

6       Q.    Anything that would lead you

7  to believe that these are not accurate

8  photos of JBP 167?

9       A.    Not that I can tell from the

10 photograph.

11      Q.    And in 1960 J&J was still

12 using metal cans; is that correct?

13      A.    That's -- in the U.S.,

14 that's correct, yes.

15      Q.    Anything about the

16 photograph that would lead you to believe

17 that it's not an authentic J&J container?

18      A.    I cannot tell from a black

19 and white photograph of a color artifact.

20 I'd really need to see it in color to

21 make that 100 percent determination.

22           (Document marked for

23           identification as Exhibit

24           Gurowitz-53.)

Margaret M. Gurowitz

1    BY MR. LAPINSKI:

2         Q.    I'm going to hand you

3    Exhibit 53.  And these are photographs of

4    sample JBP 169.  Based upon your review

5    of the photographs, do you believe these

6    photographs relate to the sample list JBP

7    169?

8         A.    Based on the photographs and

9    the information on the sample list, it

10   appears to.

11        Q.    And on the fourth page of

12   the document, there is a label reflecting

13   J -- the picture has -- strike that.

14             On the fourth page, the

15   bottle has a label on it indicating that

16   there was a change to the product,

17   correct?

18        A.    The bottle has a product

19   change label indicating that there was

20   some sort of change to something.

21        Q.    And do you know who the --

22   may have signed -- may have signed this

23   D-E-T-T-R-E?

24        A.    I do not.  1966 is beyond

Margaret M. Gurowitz

1   the institutional memory of any employee

2   currently at Johnson & Johnson.

3        Q.    How about B&PD that says

4   next -- that's next to the name.  Do you

5   know what that refers to?

6        A.    I do not.

7        Q.    Is this a sample that would

8   have been produced to the Johnson &

9   Johnson museum pursuant to the written

10  protocol that was in place at the time?

11       A.    It is in that time frame,

12  and it has a product change number.  So

13  likely it would -- it falls within that

14  time frame.

15            (Document marked for

16            identification as Exhibit

17            Gurowitz-54.)

18  BY MR. LAPINSKI:

19       Q.    This is Exhibit 54.  These

20  are photographs of JBP-175.  Based upon

21  your review of the photos, do these

22  photos align with JBP-175 that is listed

23  on the sample list?

24       A.    Based upon the photos and

Margaret M. Gurowitz

1    the information, it does appear to align.

2          Q.    And on the fourth page there

3    is a label referencing the change that

4    was made to the bottle; is that correct?

5          A.    That is correct.

6          Q.    And that was in 1972?

7          A.    That is correct.

8          Q.    And this sample would have

9    been produced to the J&J museum pursuant

10   to the policies that were in place at the

11   time?

12         A.    It is during the time frame

13   that those policies were in place, so

14   likely it would have been.

15         Q.    And the -- next to the label

16   reflecting the change there's a second

17   label that says SE-116.  Do you see that?

18         A.    I do.

19         Q.    Do you know what that refers

20   to?

21         A.    I believe that's a five,

22   actually, 5E-116.  That refers to

23   something that was labeled -- I've seen

24   papers and on those transfer sheets

Margaret M. Gurowitz

1  Drawer 5E.

2          Apparently that all of the

3  baby -- Johnson's Baby Powder artifacts

4  that were sent from the old Kilmer Museum

5  back to the operating company, they are

6  listed as being from Drawer 5E.  Based on

7  the volume of those samples, I don't

8  think that there could physically exist a

9  drawer that big.  So it had to refer to

10  some sort of unknown filing system.

11          Q.    The 5E refers to a museum

12  filing system?

13          A.    Some sort of filing system

14  that was used in the old law department

15  Kilmer Museum.  Maybe more like a Dewey

16  decimal system like in a library, because

17  based on the amount of -- if you look at

18  how many things are labeled marketed, I

19  don't think you can physically construct

20  a drawer that big.

21          Q.    Okay.  Is it your

22  understanding that -- excuse me.  Is it

23  your understanding that all of the

24  marketing samples that are listed in the

Margaret M. Gurowitz

1    offsite storage list had a 5E designation

2    to them?

3          A.    I don't know that every

4    single one of them did.  But there were

5    things on the transfer sheets where it

6    said Drawer 5E and it had Johnson's Baby

7    Powder.

8          Q.    And the transfer sheets that

9    you're referring to are the transfer

10   sheets of the -- well, strike that.

11              Which transfer sheets are

12   you referring to?

13         A.    I'm referring to the 1982

14   transfer sheets to Leahy Business

15   Archives.

16              MR. LAPINSKI:  I'm going to

17         go off the record for a minute.  I

18         need two minutes.

19              THE VIDEOGRAPHER:  The time

20         is 4:28 p.m.  We are off the

21         record.

22              (Short break.)

23              THE VIDEOGRAPHER:  We are

24         back on the record at 4:42 p.m.

Margaret M. Gurowitz

1          (Document marked for

2          identification as Exhibit

3          Gurowitz-55.)

4    BY MR. LAPINSKI:

5          Q.    Ms. Gurowitz, I'm going to

6    hand you a document that's been marked as

7    Exhibit 55.

8               I'm going to try to get you

9    one that doesn't have highlighting on it.

10              These photos indicate that

11   these are pictures of sample JBP 177.

12   Your review of the photographs, do these

13   photos correspond with the sample list

14   entry of JBP 177?

15         A.    Yes, they appear to

16   correspond.

17         Q.    And on the last page, if you

18   would look, there is a -- excuse me.  A

19   change label on the bottle in the last

20   image, correct?

21         A.    Correct.

22         Q.    And that change label would

23   relate to the policy that was in place at

24   the time they produced this to the J&J

Margaret M. Gurowitz

1  museum?

2      A.    Yes, the date of 1966 is

3  within that time frame.

4          (Document marked for

5          identification as Exhibit

6          Gurowitz-56.)

7  BY MR. LAPINSKI:

8      Q.    I'm going to hand you a

9  document that has been labeled as

10 Exhibit 56.  And this indicates that it

11 is a sample associated -- it is photos

12 associated with sample JBP-183.  If you

13 would review the photographs.  Do these

14 photographs correspond with the sample

15 list entry of JBP-183?

16     A.    Yes, it appears to

17 correspond.

18     Q.    And on the fourth page, the

19 last photograph, there is a product

20 change label attached to the bottle,

21 correct?

22     A.    That is correct.

23     Q.    And would this bottle have

24 been produced pursuant to the written

Margaret M. Gurowitz

1    policy that was in place at the time?

2         A.    It was in that time frame.

3    So I think we could assume that it was.

4              (Document marked for

5              identification as Exhibit

6              Gurowitz-57.)

7    BY MR. LAPINSKI:

8         Q.    Next exhibit is Exhibit 57.

9    And these are photographs of JBP-190.

10   And if you would review the photographs.

11   Based upon your review of the

12   photographs, do these samples -- these

13   photos correspond with the entry on the

14   sample list of JBP 190?

15        A.    As best I could tell, they

16   can.  Some of the photographs are blurry

17   so I cannot make out some of the

18   information.

19        Q.    On the last photograph,

20   there is a sticker with the indication of

21   5E-154.  Is that an indication that this

22   bottle would have been transferred from

23   the J&J museum at one point in time?

24        A.    That is an indication.  It

Margaret M. Gurowitz

1    refers to whatever was meant by Drawer

2    5E.  So since that was on that transfer

3    information, it would be a fairly strong

4    indicator that this likely is one of

5    those.

6              Q.    And while the image is

7    blurry on the second page, there's an

8    image of a product change label, correct?

9              A.    That is correct.

10             Q.    And that's dated 1967?

11             A.    I can't make out the date on

12   that.  It's too blurry to see.

13             Q.    Is that the label the type

14   of label that you would normally see on a

15   product that was sent to the J&J museum

16   after a label change?

17             A.    That -- it looks like one of

18   those kind of change labels.

19             Q.    And that would have been

20   sent pursuant to the policy that was in

21   place at J&J at the time?

22             A.    If this is from 1967 that

23   falls within that time frame.

24                   (Document marked for

Margaret M. Gurowitz

1    identification as Exhibit

2    Gurowitz-58.)

3  BY MR. LAPINSKI:

4        Q.    Next exhibit is Exhibit 58.

5  This is photographs of JBP-215.  Based

6  upon your review of these photographs do

7  these photographs correlate with the

8  sample list entry JBP-215?

9        A.    Yes, it appears to

10 correlate.

11       Q.    And on the last page there

12 is a sticker with the designation 5E-146.

13 As we've discussed, would that relate to

14 transfer of this product from the J&J

15 museum?

16       A.    It related to whatever

17 filing system the old museum used at that

18 time.

19       Q.    And at the same page, the

20 top portion of the bottle has a label on

21 it, a sticker on it.  It says 44-133.

22             Do you see that?

23       A.    I do see that.

24       Q.    Do you know what that would

Margaret M. Gurowitz

1    refer to?

2          A.    I do not.

3                Document marked for

4          identification as Exhibit

5          Gurowitz-59.)

6    BY MR. LAPINSKI:

7          Q.    I'll hand you Exhibit 59.

8    This is for sample JBP-232.  And if you

9    would review those pictures.  Do the

10   photographs relate to the entry on the

11   sample list for JBP 232?

12         A.    As best I can tell, I don't

13   see anything on the photograph of the

14   actual artifact that references container

15   volume or a year.  So I cannot say for

16   100 percent certain.

17         Q.    Has it been a common

18   practice for J&J to have container volume

19   and product year on their bottles?

20         A.    No, not necessarily.

21   Container volume certainly, but year, not

22   necessarily.

23         Q.    So it's not -- it's not

24   uncommon for a J&J -- a Johnson's Baby

1   Powder product to not have a year

2   designated on it?

3           A.    That's correct.  Some of --

4   some of the historical artifacts had been

5   labeled at some point in their past with

6   a stick-on label with a year, which is

7   helpful in helping identify when they

8   might be from.

9           Q.    And the last page of this

10  photograph has a sticker on it with the

11  designation 5E-102, correct?

12          A.    That is correct.

13          Q.    And that is a designation

14  for the Johnson & Johnson museum filing

15  system?

16          A.    That is a designation for

17  the old filing system in the old

18  Johnson & Johnson museum.

19              (Document marked for

20          identification as Exhibit

21          Gurowitz-60.)

22  BY MR. LAPINSKI:

23          Q.    This is Exhibit 60.  And

24  Exhibit 60 relates to sample JBP-237?

Margaret M. Gurowitz

1      A.    Yes.  It appears to

2  correspond.

3      Q.    And the second page has

4  designation 5E-149 relating to the old

5  museum filing system, correct?

6      A.    Yes.  It does refer to that

7  old filing system.

8      Q.    And above that there's a

9  sticker with a designation, excuse me,

10  45-133.  Do you know what that refers to?

11      A.    I do not.  We don't have any

12  information about what that would refer

13  to.

14          (Document marked for

15          identification as Exhibit

16          Gurowitz-61.)

17  BY MR. LAPINSKI:

18      Q.    I'm going to hand you

19  Exhibit 61.  Exhibit 61 relates to sample

20  JBP-294.  Based upon your review of the

21  photographs, are these do these

22  photographs correspond with entry JBP-294

23  in the sample list?

24      A.    JBP-294, no, they do not.

Margaret M. Gurowitz

1    There are more than one, so actually I'm

2    just paging through it.  On the sample

3    list, JBP-294 is listed as Johnson's Baby

4    Powder from 1984 for two 9-ounce bottles

5    in a cardboard box.  That corresponds

6    with the photographs on Page 4 and

7    subsequent, but there is also on the

8    first three pages, there is a photograph

9    of a round container that's also listed

10   as JBP 294.  This round container does

11   not correspond with that.  It is not from

12   1984.

13        Q.    So if we can, let's break

14   this down a little bit.  The second half

15   of the exhibit that's been marked as

16   Exhibit 61 where there is -- beginning

17   with the photograph that has two 9-ounce

18   bottles of the Johnson's Baby Powder,

19   based upon your review of the -- of those

20   five total photos of the dual pack, we'll

21   call it, do those photos relate to the

22   sample entry JBP-294 on the sample list?

23        A.    The photos of the two-pack

24   of Johnson's Baby Powder in the plastic

Margaret M. Gurowitz

1   containers do appear to relate to JBP-294

2   on the sample list.

3        Q.    And just to -- just to

4   confirm, if you could go through the

5   photos that are after the front image of

6   JBP 294 and just confirm that those

7   photos, to your knowledge, relate to the

8   double pack?

9        A.    To my knowledge those photos

10  appear to relate to the double pack.

11       Q.    And the second-to-last photo

12  has a change sticker on it, correct?

13       A.    It does.  But this one is

14  from 1984.  This is after the date of

15  1982 that references when the old Kilmer

16  Museum, the Johnson & Johnson museum was

17  closed.  And samples were no longer being

18  sent there.

19            So clearly this was

20  preserved somewhere and sent to offsite

21  storage.  This was actually a -- it's

22  294.  This was in quality assurance.

23  This is not part of things that were sent

24  from the old Johnson & Johnson museum.

Margaret M. Gurowitz

1      Q.    So this is -- this is a

2  sample that was maintained by the quality

3  assurance department?

4      A.    This -- when I spoke to --

5  I'm sorry, just going to -- Mark Zappa in

6  quality, he checked around and he said

7  that it was not the policy or practice of

8  quality assurance to send samples to

9  offsite storage.  So these had been

10  packed up in boxes with other stuff that

11  were labeled quality assurance and sent

12  to offsite storage.

13          So we don't know necessarily

14  how or who put them in those boxes or why

15  they were sent to offsite storage, but

16  they were among the things labeled

17  quality assurance.  Clearly this is a

18  merchandising notice.  But this postdates

19  anytime where it would have been sent to

20  the museum in New Brunswick.

21      Q.    But the merchandising note

22  that's on it is a merchandising notice

23  that would typically be affixed to a

24  product by a J&J department?

Margaret M. Gurowitz

1          A.    It would have been, as I

2    mentioned, in the 1980s Johnson & Johnson

3    was a decentralized organization.  So the

4    individual operating units had their --

5    had their own ways of doing things.

6               So clearly this indicates

7    that somebody in the consumer operating

8    unit was still sending out merchandising

9    notices.  But they were not -- the

10   samples were not being preserved in New

11   Brunswick, because that museum had been

12   disbanded for those purposes by that

13   time.

14        Q.    And as a separate operating

15   unit, you're referring to Johnson &

16   Johnson Consumer, Inc.?

17        A.    Correct.

18        Q.    If we can go to the first

19   three pages of that exhibit?

20        A.    Sure.

21        Q.    Based upon your review of

22   the first three pages of the exhibit, do

23   you have an understanding as to the year

24   of the Johnson's Baby Powder product

Margaret M. Gurowitz

1   that's represented there?

2       A.   Yes, I do.  If you'll note

3   that it is a cylindrical container.  And

4   if you look at Page 2, the picture on

5   Page 2.  At the very bottom of the back,

6   it says, "Wartime container," so that

7   would have been circa 1942 during World

8   War II.

9            Metal was needed by the

10  United States for the war effort, so

11  Johnson & Johnson switched the containers

12  of Johnson's Baby Powder to a round

13  cardboard container at that time.

14      Q.   So based upon your review of

15  the picture this is a round cardboard

16  container that's depicted?

17      A.   It appears to be.  It's hard

18  to tell on the picture on the first page,

19  but if you look at the back it says,

20  "Wartime container," which clearly

21  references World War II.

22           MS. FOURNIER:  Can you give

23      us a copy?

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

1        Q.     That was Exhibit 61?

2        A.     Correct.

3               (Document marked for

4        identification as Exhibit

5        Gurowitz-62.)

6    BY MR. LAPINSKI:

7        Q.     This is Exhibit 62.   And

8    these are photos of JBP 295.   And based

9    upon your review of these photographs, do

10   the photos correspond with the sample

11   list entry JBP 295?

12       A.     Based upon the photograph,

13   they appear to correspond with that

14   sample entry.

15              MR. LAPINSKI:  Do you want

16       to go off the record for a minute?

17              MS. FOURNIER:  Yes.

18              THE VIDEOGRAPHER:  The time

19       is 4:58 p.m.  We are off the

20       record.

21              (Brief pause.)

22              THE VIDEOGRAPHER:  Back on

23       record at 5:00 p.m.

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1      Q.    Ms. Gurowitz, you have in

2    front of you Exhibit 62.  And I believe

3    you had already testified that this does

4    appear to correspond with the sample list

5    entry JBP 295, correct?

6      A.    As best as I can tell.  It

7    appears to.  In the -- in the column that

8    says, "Approximate contents of container,

9    one bottle only."  These are clearly two

10   packs.  So I'm not sure what that

11   reference is.

12     Q.    The container -- going to

13   the sample list, just to confirm.  The

14   container volume does say two 9-ounce

15   bottles in cardboard box, correct?

16     A.    Yes, it does.

17     Q.    Okay.  And on the fourth

18   page there is again one of the

19   merchandising label change stickers,

20   correct?

21     A.    That is correct.

22            (Document marked for

23            identification as Exhibit

24            Gurowitz-63.)

Margaret M. Gurowitz

1  BY MR. LAPINSKI:

2       Q.    We're switching back now no

3  Shower to Shower.

4       A.    That means I have to re-find

5  that.

6       Q.    We're going to be starting

7  with the beginning of the Shower to

8  Shower.  So it's actually going to be --

9       A.    I can't get used to the

10  double-sided.

11       Q.    Page ID 11884.

12       A.    1884.  Okay.

13       Q.    Now, the page that you're

14  looking at, you're looking at the top of

15  the page.  Are you starting there with

16  STS003?

17       A.    The top of Page 11884 --

18       Q.    You have the --

19       A.    -- on mine has JBP-288.

20       Q.    Okay.  We're on the same

21  page.

22            This is Exhibit 63.  And

23  this is indicated to be photographs of

24  STS001.  Based upon your review of the

Margaret M. Gurowitz

1  photographs, do these photographs

2  correspond to the sample list entry

3  STS001?

4        A.    It appears to correspond,

5  yes.

6        Q.    Okay.  On the second page,

7  there is a sticker that says, "1982,

8  55M-645."

9              Do you know what that refers

10 to?

11       A.    1982, obviously would refer

12 to the year.  55M-645 was some sort of

13 identifying number.

14       Q.    And do you know the purpose

15 of that identifying number?

16       A.    I do not.

17       Q.    Would that have been a

18 practice within J&J to affix that

19 identifying number to some type of a

20 sample product?

21       A.    The samples, the ones with

22 the marketing notices had a much longer

23 number.  And it would say merchandise

24 notice with a multi-digit number.  So

Margaret M. Gurowitz

1   this looks like it was not relating maybe

2   to a marketing notice but some other type

3   of filing system.

4             Again, this is from 1982,

5   which was the year that the old museum

6   was closed.  So I don't know whether this

7   would have been sent to that museum

8   before the closing was done or if it was

9   after.  It's possible it never was sent

10  to New Brunswick.

11       Q.    If it wasn't sent to New

12  Brunswick, then it would have been

13  maintained at J&J consumer Inc.?

14       A.    Potentially.  This is -- it

15  is labeled -- it was in the box with the

16  marketing materials according to the

17  list.

18       Q.    And are you able to -- are

19  you able to ascertain the year on the

20  bottle, other than the date that written

21  on the sticker based upon the

22  photographs?

23       A.    Based upon the photographs I

24  am not able to do that.

Margaret M. Gurowitz

1          (Document marked for

2          identification as Exhibit

3          Gurowitz-64.)

4    BY MR. LAPINSKI:

5          Q.    This is Exhibit 64,

6    photographs of STS002.

7                Based upon your review, do

8    these photographs -- are these

9    photographs correspond to STS002 in the

10   sample list?

11         A.    It appears to correspond.

12         Q.    And on the second page of

13   the photographs, there is a marketing

14   label change sticker, correct?

15         A.    That is correct.

16         Q.    And this is a sample that

17   normally would have been produced to the

18   museum pursuant to the policy that was in

19   place at that time?

20         A.    It's dated 1980.  So it is

21   two years before the memo saying it was

22   going to close.  So it's possible that it

23   was.

24         Q.    Is there anything that would

Margaret M. Gurowitz

1   lead you to believe that it was not

2   produced pursuant to the policies that

3   were in place at that time?

4         A.    I don't have enough

5   information to make that determination.

6         Q.    There's nothing that would

7   indicate that it was not produced

8   pursuant to that policy, correct?

9         A.    Again, there's not enough

10  information either way.  One can assume

11  based on that sticker and the date on it.

12              (Document marked for

13              identification as Exhibit

14              Gurowitz-65.)

15  BY MR. LAPINSKI:

16        Q.    I'm going to hand to you a

17  document that's been marked as Exhibit

18  65.  This is photographs of STS003.

19  Based upon your review of the

20  photographs, do these photos correspond

21  with the listing in the sample list of

22  STS003?

23        A.    It appears to correspond,

24  yes.

Margaret M. Gurowitz

1       Q.    And this particular product

2   has a couple different stickers on it.

3   On the front page there is a sticker with

4   the number 707A.  Do you know what that

5   refers to?

6       A.    I do not.

7       Q.    And there is also a sticker

8   indicated property of PPC museum,

9   correct?

10      A.    Correct.

11      Q.    And as we discussed before,

12  what does PPC stand for?

13      A.    PPC stands for Personal

14  Products Corporation.  It is a

15  no-longer-existing historical subsidiary

16  of Johnson & Johnson.

17      Q.    And then on the second page

18  there is a merchandising notice change

19  label, correct?

20      A.    That is correct.

21      Q.    And I can't make out the

22  date on that label change.  But do you

23  know what the approximate date of this

24  product is?

Margaret M. Gurowitz

1       A.    On the -- on the list it

2    says -- it says 1969.

3              The date is blurry.  It

4    looks like 11/6, and the year is too

5    blurry to make out.

6       Q.    If this were a product from

7    1969, this would have been produced to

8    the museum pursuant to the policies that

9    were in place at that time?

10      A.     It falls in those time

11   parameters, yes.  I do note that in the

12   column, approximate contents of

13   container, this one is not full.  So

14   somehow in whatever journey it took to

15   get wherever it went, it ended up as

16   three-quarters full instead of full.

17             So again, since we cannot

18   put together an end-to-end chain of

19   custody for one of these historic

20   artifacts, appears from about 1969, we

21   don't know how, when, or why it ended up

22   with some contents missing.

23      Q.    And as far as chain of

24   custody is concerned, there is nothing in

Margaret M. Gurowitz

1    the photograph or on the bottle itself

2    that would lead you to believe that at

3    any time the bottle was out of the

4    custody of Johnson & Johnson?

5         A.    We don't know.  At some

6    point it was clearly opened because there

7    are contents missing.  So we have no way

8    to determine whether it was -- no way to

9    determine what the full chain of custody

10   is.  There's just not enough historical

11   information.

12        Q.    Well, even if the bottle was

13   sealed and full, there's no indication

14   that it was ever outside of the custody

15   of Johnson & Johnson, correct?

16        A.    Well, the bottle wasn't

17   sealed.  Safety seals on consumer

18   packaging was not a thing until the

19   1980s.  So a bottle from 1969 would never

20   have been sealed.

21             And we don't know.  We do

22   know that this is noted as being

23   three-quarters full.  So clearly at some

24   point contents were removed.  We don't

Margaret M. Gurowitz

1  know how or by who or for what purpose.

2  And so that is just part of not being

3  able to trace an end-to-end chain of

4  custody for this artifact.

5           (Document marked for

6       identification as Exhibit

7       Gurowitz-66.)

8  BY MR. LAPINSKI:

9       Q.    I'll hand you Exhibit 66.

10          These are photographs of

11  STS004.  Based upon your review of the

12  photographs, does this bottle correspond

13  to the entry in the sample list for

14  STS004?

15      A.    As best as I can tell, it

16  does.  One of the things that I've been

17  looking at is not just the number on the

18  Post-It.  But the volume listed on the

19  package.  And this has stickers on it, so

20  I cannot see if there is a volume listed.

21  So I'm basing that on the number, because

22  I also don't see a date -- oh, yeah.

23  There's a '68 date on here, so that also

24  corresponds.

Margaret M. Gurowitz

1    Q.    And where is the '68 date

2    that you're looking at?

3    A.    On the second page, the

4    photograph of the back, there's a

5    merchandising notice label.  And you can

6    just make that out at the top of that

7    label.

8    Q.    So it's the 3/20/68 date

9    that you're referring to on the

10   merchandising label?

11   A.    Yes.

12   Q.    Okay.  And that

13   merchandising notice label is the label

14   that would be affixed to the product when

15   it was sent to the museum pursuant to the

16   policy in place, correct?

17   A.    Sent to -- well, it was --

18   it would have been, but it also says

19   property of PPC, Milltown, New Jersey.

20   It was sent to either the old law

21   department Kilmer museum or the PPC

22   museum.  I don't have enough information

23   to determine which one.

24   Q.    Both of those facilities are

Margaret M. Gurowitz

1  Johnson & Johnson facilities, correct?

2      A.    The Kilmer Museum is

3  definitely a Johnson & Johnson facility.

4  I don't have enough information about the

5  PPC museum or what it was to make that

6  determination.  It does say it was in

7  Milltown, New Jersey, and the

8  headquarters of Personal Products was in

9  Milltown.  So that's as far as a

10 determination I could make.

11     Q.    Personal products was a J&J

12 company, correct?

13     A.    It's a historical,

14 no-longer-existing company.

15     Q.    It was a J&J company in

16 March of 1968 correct?

17     A.    I would have to research

18 that to confirm that.  I couldn't tell

19 you.  I mean, I don't know when that

20 sticker from -- it's a historical

21 company.  I would have to look through

22 records to determine whether that was

23 around in '68.

24              (Document marked for

Margaret M. Gurowitz

1  identification as Exhibit

2  Gurowitz-67.)

3  BY MR. LAPINSKI:

4  Q. Exhibit 67. This is for

5  STS005. Based upon your review of these

6  photographs, do the photographs

7  correspond with the sample list entry for

8  STS005?

9  A. Yes, they appear to

10  correspond.

11  Q. And on the back there is a

12  sticker. It says 1982, and below that it

13  says 55M-644. Do you have any

14  understanding as to what that refers to?

15  A. I do not. I would assume

16  1982 would be the date though.

17  (Document marked for

18  identification as Exhibit

19  Gurowitz-68.)

20  BY MR. LAPINSKI:

21  Q. This is Exhibit 68. This is

22  STS011. And in your review of the

23  photographs, do these photos correspond

24  to the sample list entry STS011?

Margaret M. Gurowitz

1    A.    They appear to correspond,

2  yes.

3    Q.    And there is a sticker on

4  the first page that says, "New STS Spice

5  with baking soda" -- "baking

6  soda/cornstarch," correct?

7    A.    Correct.

8    Q.    And do you know what that's

9  a reference to?

10    A.    Obviously -- so potentially

11  a label change because it's noted on the

12  label.  However, this one is from 1985,

13  this is after the old museum closed.  So

14  this would not have been sent to that

15  museum in New Brunswick.

16    Q.    And are you aware whether it

17  continued to be a practice after 1982

18  when the museum closed for Johnson &

19  Johnson Consumer to retain product

20  samples after there was a change to the

21  label?

22        MS. FOURNIER:  Objection.

23    Outside the scope.

24        THE WITNESS:  There is no

Margaret M. Gurowitz

1    information that we have regarding

2    the policy of a no-longer-existing

3    operating unit.

4  BY MR. LAPINSKI:

5        Q.    In 1980 -- in 1985, who was

6  the manufacturer of Shower to Shower?

7        A.    If you look at the second --

8  the photograph of the back, it says

9  Personal Products Company, Milltown, New

10 Jersey.

11       Q.    And do you know when

12 Personal Products Company went out of

13 existence?

14       A.    I would have to look that

15 up.

16           (Document marked for

17       identification as Exhibit

18       Gurowitz-69.)

19 BY MR. LAPINSKI:

20       Q.    This is Exhibit 69.  And

21 these photos pertain to STS012.  Based

22 upon your review of the photos, do the

23 photos correspond to sample list entry

24 STS012?

Margaret M. Gurowitz

1    A.    They appear to correspond.

2    Q.    And on the second page there

3    is a promotional bulletin from November

4    of 1980, correct?

5    A.    That is correct.

6    Q.    And that would be during the

7    period of time that there was a policy in

8    place for samples to be sent from the

9    Johnson & Johnson unit to the Johnson &

10   Johnson museum?

11   A.    That would fall before 1982,

12   so presumably, yes.

13            (Document marked for

14            identification as Exhibit

15            Gurowitz-70.)

16   BY MR. LAPINSKI:

17   Q.    Exhibit 70.  These

18   correspond to STS013.  And if you would

19   review the photographs, do the

20   photographs depict what is in the sample

21   list entry STS013?

22   A.    They appear to do so, yes.

23   Q.    And on the second page there

24   is a merchandise notice from September of

Margaret M. Gurowitz

1    1976, correct?

2         A.    That is correct.

3         Q.    And that notice and this

4    product would fall within the time period

5    where there was a policy for sample

6    products with label changes to be sent to

7    the J&J museum, correct?

8         A.    They would.  But on the

9    photograph of the front of this, it says

10   property of PPC museum Milltown, New

11   Jersey.  So we don't have any information

12   on whether this was sent to New Brunswick

13   or sent to whatever the PPC museum in

14   Milltown was.

15        Q.    The PPC museum was a

16   Johnson & Johnson-owned company, correct?

17        A.    Personal Products was a

18   Johnson & Johnson affiliate --

19   subsidiary, affiliate.

20        Q.    Personal Products Company

21   was an affiliate of Johnson & Johnson,

22   correct?

23        A.    Yes.

24        Q.    And is it your understanding

Margaret M. Gurowitz

1    that the PPC museum was part of Personal

2    Products?

3         A.    There is no one at Johnson &

4    Johnson currently who dates back that far

5    regarding employment, so nobody knows.

6              It was obviously in Milltown

7    where personal products was

8    headquartered.  That's about as far as we

9    can go without having any more

10   information.

11        Q.    Is there anything that would

12   lead you to believe that the product

13   depicted in Exhibit 70 for STS013 was not

14   at the personal products organization in

15   Milltown?

16        A.    There's just not enough

17   historical information existing.  This

18   one interestingly is also noted as being

19   half full.  So sometime during its

20   existence it was opened and half the

21   contents are no longer there.

22              So we don't know, again,

23   when that happened.  That's just part of

24   not being able to recreate an entire sort

Margaret M. Gurowitz

1  of chain of where this was at every

2  moment in its history.

3        Q.    Well, do you have any

4  evidence that would indicate that there

5  was any point in time where this sample

6  bottle was not in the custody of

7  Johnson & Johnson or a Johnson & Johnson

8  subsidiary?

9        A.    We do not have enough

10 information to make that determination.

11             (Document marked for

12             identification as Exhibit

13             Gurowitz-71.)

14 BY MR. LAPINSKI:

15       Q.    I'll hand you Exhibit 71.

16 These are photographs related to STS016.

17 And if you look at these photographs, do

18 these photographs correspond to the

19 sample list entry STS016?

20       A.    Yes, they do appear to

21 correspond.

22       Q.    And on the second -- second

23 page, there is a promotional bulletin

24 notice reflecting a change, correct?

Margaret M. Gurowitz

1    A.    That is correct.

2    Q.    And that's from 11/7/1980,

3  which is during the period of time that

4  Johnson & Johnson had a policy in place

5  for label changes to be produced to the

6  museum?

7    A.    That is correct.  This one

8  also is half full.  So we don't know --

9  so we don't know why this is half full.

10  Again, we can't trace an entire chain of

11  custody.  Just sort of very small pieces

12  of that.  So we don't know why this is

13  half full.  Was it something that was --

14  stayed within Johnson & Johnson.  Did

15  somebody at one point in time say, "We

16  need an example of this kind of

17  packaging," and this was donated by

18  somebody because it was the type of

19  packaging they needed.  We just don't

20  know.

21    Q.    That's just speculation on

22  your part?

23    A.    It is speculation.

24    Q.    You have no evidence that

Margaret M. Gurowitz

1   would indicate that this was any period

2   of time that this particular sample was

3   out of the custody of either Johnson &

4   Johnson or a Johnson & Johnson company?

5        A.    That's because we don't have

6   evidence regarding its entire chain of

7   custody.  There's just not enough

8   information to piece together a full

9   enough chain of custody for this.

10       Q.    So you -- so you don't have

11  evidence that would indicate that it was

12  ever out of the control of Johnson &

13  Johnson or Johnson & Johnson company?

14       A.    We don't.  But we also don't

15  have evidence to show that it -- there's

16  not enough evidence to prove that it --

17  or to show that it was in control.  It

18  could have been either way.  There's just

19  not enough evidence.

20            (Document marked for

21            identification as Exhibit

22            Gurowitz-72.)

23  BY MR. LAPINSKI:

24       Q.    I'll hand you Exhibit 72.

Margaret M. Gurowitz

1               And these are photographs

2    related to STS017.  Based upon your

3    review of the photographs do these

4    photographs relate to sample list entry

5    STS017?

6         A.    They appear to correspond,

7    yes.

8         Q.    And on the second page of

9    the photographs, there are merchandise

10   notice labels attached to it, correct?

11        A.    That is correct.

12        Q.    And they're from 1974?

13        A.    Yes.

14        Q.    And that's during a period

15   of time when Johnson & Johnson had a

16   policy in place that changes to the

17   label, samples would be sent to the

18   Johnson & Johnson museum?

19        A.    That is correct.  It does

20   fall during that time.

21             (Document marked for

22        identification as Exhibit

23        Gurowitz-73.)

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1          Q.     Exhibit 73.  This is related

2    to STS018.  Based upon your review of the

3    photographs, do these photos relate to

4    the sample list entry STS018?

5          A.     They appear to relate to it,

6    yes.  Here again, this is from -- marked

7    as being from 1985, which is after the

8    old Johnson & Johnson museum was closed.

9    So this was not something that would have

10   been sent to that entity in New

11   Brunswick.

12         Q.     But this is something that

13   was maintained in Johnson & Johnson's

14   offsite storage, correct?

15         A.     It was found in offsite

16   storage among boxes that were labeled

17   marketing.  But we do not know how it

18   originally got into those.

19              (Document marked for

20         identification as Exhibit

21         Gurowitz-74.)

22   BY MR. LAPINSKI:

23         Q.     Exhibit 74.  And these

24   photographs relate to STS021.  Based upon

Margaret M. Gurowitz

1  review of the photographs, do these

2  photographs relate to the entry on the

3  sample list for STS021?

4        A.    It appears to correspond.

5  And, again, this is half full.

6             (Document marked for

7             identification as Exhibit

8             Gurowitz-75.)

9  BY MR. LAPINSKI:

10        Q.    This is Exhibit 75.  These

11  are related to STS031.  Based upon your

12  review of these photographs, do these

13  photos correspond with the sample list

14  entry STS031?

15        A.    It appears to.  This notes

16  that this was part of a twin pack but

17  there is only one bottle from that twin

18  pack.  If that's the case, it appears to

19  correspond based on this information.

20        Q.    Based upon the two

21  photographs that are there, are you able

22  to make a definitive determination that

23  there's only one bottle, or is it

24  possible that there's a second bottle and

Margaret M. Gurowitz

1  these are stacked one on top of another?

2      A.    I cannot tell from the

3  photograph.

4      Q.    Okay.  There is a sticker on

5  the second page of the photograph,

6  correct?

7      A.    Yes.  There are several

8  stickers.

9      Q.    Okay.  And the sticker at

10  the top does refer to a merchandise

11  notice change from 1969?

12      A.    That's correct.

13      Q.    And it also refers to

14  12-and-a-half-ounce twin pack, correct?

15      A.    That is correct.

16      Q.    And would that -- the

17  references on that sticker conform to the

18  entry and the information in the sample

19  list for STS031?

20      A.    It would.  The sample list

21  notes that there's -- it says plastic

22  curved bottle.  So I assume that means

23  there's only one bottle.

24      Q.    And the merchandise notice

Margaret M. Gurowitz

1    on the second page, that notice from 1969

2    was during the period of time where the

3    Johnson & Johnson company would send a

4    sample of the product to the Johnson &

5    Johnson museum at the time there was a

6    change, correct?

7         A.    It was during that time.

8    However, the label at the bottom of the

9    back says "Property of PPC Museum,

10   Milltown, New Jersey."  We do not know if

11   this was sent to the old Johnson &

12   Johnson museum in New Brunswick or the

13   PPC museum, whatever that might have

14   been.

15        Q.    Okay.  PPC was a Johnson &

16   Johnson company at the time that it was

17   in existence, correct?

18        A.    I believe it was in

19   existence in 1959.  But I would have

20   to -- would have to look it up to confirm

21   that.

22        Q.    My question was when it was

23   in existence it was a Johnson & Johnson

24   company?

Margaret M. Gurowitz

1      A.     Yes.

2             (Document marked for

3      identification as Exhibit

4      Gurowitz-76.)

5  BY MR. LAPINSKI:

6      Q.     Ms. Gurowitz, I'm going to

7  hand you a document that has been marked

8  as Exhibit 76.  If you can take a minute

9  to review that, I would appreciate it.

10  If you would let me know when you are

11  ready for me to ask a couple questions

12  regarding this exhibit.

13      A.     I'm ready.

14      Q.     Ms. Gurowitz, earlier today

15  you had mentioned a couple times that

16  there were transfer records that you had

17  reviewed in preparation for your

18  deposition, correct?

19      A.     Correct.

20      Q.     And they related to the

21  transfer of offsite storage materials

22  from Johnson & Johnson to Leahy business,

23  correct?

24      A.     Correct.

Margaret M. Gurowitz

1          Q.    Is Exhibit 76 the document

2    that you were referring to?

3          A.    Yes, it appears to be so.

4                (Document marked for

5          identification as Exhibit

6          Gurowitz-77.)

7    BY MR. LAPINSKI:

8          Q.    I'm going to hand you a

9    document that has been marked as

10   Exhibit 77.

11         A.    And I just want to say, it

12   was -- these were the -- transferred from

13   the operating unit, the consumer.  This

14   is -- here it's called -- it says

15   Johnson & Johnson Baby Products.

16         Q.    Okay.  So -- so I understand

17   correctly, the purpose for your

18   clarification is that it was not

19   transferred by Johnson & Johnson.  It was

20   transferred by their operating unit, was

21   Johnson & -- at the time was Johnson &

22   Johnson Baby Products?

23         A.    Correct.

24         Q.    I think I was going to hand

Margaret M. Gurowitz

1    you, did I hand you Exhibit 77?

2         A.    Yes.

3         Q.    Ms. Gurowitz, have you seen

4    this document before?

5         A.    I believe I have, yeah.

6         Q.    And is this a document that

7    you reviewed in preparation for your

8    deposition?

9         A.    I believe so, yes.

10        Q.    And on the first page

11   there's a listing of advertisements and

12   promotional materials.

13             Do you see that?

14        A.    I do.

15        Q.    And were ads also sent to

16   storage?

17        A.    It appears from these

18   documents that they were, yes.

19        Q.    Are you aware, other than

20   Exhibits 76 and 77, are you aware of any

21   other transfer documents related to

22   talcum powder products or the samples

23   that are contained on the sample list?

24        A.    I am not.  I don't see

Margaret M. Gurowitz

1  Shower to Shower on here.  But I'm not

2  aware, that I can think of, of any

3  others.

4       Q.    If you would go back to

5  Exhibit 49, please.

6             Got it?

7       A.    Yes.

8       Q.    Okay.  And we had talked

9  briefly in regard to Exhibit 49 and the

10 sample JBP-135.

11            If you would turn to the

12 second page, which again has the Reg

13 Number 74,097.

14            Do you see that?

15      A.    Yes, I do.

16      Q.    Did you testify earlier that

17 that was a trademark registration number?

18      A.    I don't know that for a

19 fact, but I said based on the fact that

20 the larger label that you can see on Page

21 3 and 4 says "U.S. trademark

22 application," it's possible that could

23 refer to that.

24      Q.    And if that were a trademark

Margaret M. Gurowitz

1    registration, would this sample have been

2    kept as part of a retention policy?

3            A.    It likely -- it falls into

4    those time parameters, so it's possible

5    that it was.  We don't have any

6    information regarding keeping samples for

7    trademark registration, just for labeling

8    changes.

9            Q.    If I recall, did you testify

10   earlier that it was a practice of the

11   Johnson & Johnson legal department to

12   retain samples related to trademark?

13           A.    Related to trademark

14   history, yes.

15           Q.    Okay.  If you would go to --

16   lastly, go back to Exhibit 61.  The first

17   three pages of -- I'll wait till you get

18   to it.

19                 This is the exhibit that had

20   two different products for JBP-294.  And

21   what I'd like you to do is just look at

22   the first three pictures that relate to

23   the old canister we discussed that I

24   believe was a wartime canister.

Margaret M. Gurowitz

1            If you would look at STS016

2    in the sample list -- I'm sorry, JBP-016

3    in the sample list.

4            A.    I'm going to get there.

5            Q.    It's on Page ID 11866.

6            A.    I have Page 11866.  I'm

7    sorry.  Could you repeat the number?

8            Q.    Sure.  JBP-016?

9            A.    Okay.

10           Q.    And as based upon your

11   review of those three documents, do those

12   photographs correspond with the sample

13   list entry JBP-016?

14           A.    They appear to.

15           Q.    Okay.

16                MR. LAPINSKI:  Off the

17         record.

18                THE VIDEOGRAPHER:  The time

19         is 5:34 p.m.  We are off the

20         record.

21               (Brief pause.)

22                THE VIDEOGRAPHER:  We are

23         back on the record at 5:35 p.m.

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1        Q.    Ms. Gurowitz, you have been

2    responsible for the maintenance of

3    samples at the J&J museum since 2006,

4    correct?

5        A.    Correct.

6        Q.    Okay.  Were you ever

7    provided with a litigation hold notice by

8    Johnson & Johnson?

9             MS. FOURNIER:  Objection.

10        Outside the scope.

11             THE WITNESS:  For this I

12        was, yes.

13    BY MR. LAPINSKI:

14        Q.    And when -- when were you

15    provided with that?

16             MS. FOURNIER:  Objection.

17             THE WITNESS:  I don't

18        remember when it came out.  So I'd

19        have to go back and look.

20    BY MR. LAPINSKI:

21        Q.    Within the last year?

22    Within the last two years?

23        A.    It's safe to say within the

24    last two years.

Margaret M. Gurowitz

1          MR. LAPINSKI:  Okay.  I have

2     no further questions.

3          THE VIDEOGRAPHER:  The time

4     is 5:35 p.m.  We are off the

5     record.

6          (Brief pause.)

7          THE VIDEOGRAPHER:  We are

8     back on the record at 5:37 p.m.

9          MS. FOURNIER:  As I begin,

10    because I've now been reprimanded

11    by my colleagues multiple times,

12    I'm going to put on the record

13    what we discussed, which is an

14    objection by one is an objection

15    for all.

16          Do you have any issue with

17    that?

18          MR. LAPINSKI:  No problem

19    with that.

20          MS. FOURNIER:  Thank you.

21               -  -  -

22          EXAMINATION

23               -  -  -

24  BY MS. FOURNIER:

Margaret M. Gurowitz

1          Q.    Good afternoon,

2    Ms. Gurowitz.  I have a couple questions

3    to ask you on behalf of Johnson &

4    Johnson.

5                I want to start by having

6    you look at the list, the sample list.

7    We've spent a lot of time talking about

8    the section that is -- we're just sort of

9    referring to as the offsite storage,

10   right?

11         A.    Correct.

12         Q.    Can you just walk us

13   through, so that everyone is on the same

14   page, the sequence of where the bottles

15   on that section sort of start to finish,

16   where they were?

17         A.    Sure.  So I have been

18   researching and attempting to put

19   together a chain of custody.  And

20   unfortunately, we do not have enough good

21   information to do that.

22                So when the call went out to

23   locate any potential samples that might

24   be around, these samples were discovered

Margaret M. Gurowitz

1    in offsite storage.  They had been there

2    so long that nobody literally knew that

3    they were there, it came as a surprise to

4    everyone.  I had -- I had long heard that

5    in many cases, when the objects were sent

6    back to the operating units from the old

7    Johnson & Johnson museum, that, you know,

8    nobody knows what happened to them

9    because nobody is still around from that

10   time.

11              So I think that nobody knew

12   that these had been in offsite storage.

13   And so it was discovered that they were

14   in offsite storage.  And then I attempted

15   to put together, based -- you know, if I

16   could, based on the information that

17   still existed, a chain of custody.

18              And unlike the PTI samples,

19   where they're modern, people keep

20   records, now there are electronic

21   records, these are so old that they're

22   just -- the records were not there.

23              We can assume from those

24   marketing notices that in the time

Margaret M. Gurowitz

1    between the '50s and the '70s, maybe

2    perhaps up to 1982 or close to that, that

3    whenever there are -- as per the law

4    department, whenever there was a

5    packaging change or a change to the

6    label, that they sent a sample to the old

7    Johnson & Johnson museum, which was run

8    by the law department, so they could

9    preserve trademark history of the

10   products.

11              There are a lot of products

12   that are labeled as marketing that fall

13   outside those parameters.  The people I

14   talked to in marketing, including Barbara

15   Brewer, who is one of the longest -- she,

16   I think, was the longest-tenured person

17   that Sarita Finnie could find, and she

18   even did not know how those got there.

19              So there are things that

20   were in those -- in those boxes labeled

21   marketing that may not have come from the

22   old law department museum.  They just --

23   whoever made that determination might

24   have seen, okay, these are product

Margaret M. Gurowitz

1   samples.  We'll just call them marketing

2   in the same way that if you had a box

3   full of staplers, you might call it

4   office supplies.

5        Q.    Okay.  And so part of the

6   bottles or some of the bottles, you do

7   believe came from the old museum; is that

8   right?

9        A.    That is correct.

10        Q.    And then at some point those

11   were sent back to what you keep referring

12   to as the, quote, operating companies,

13   correct?

14        A.    Correct.

15        Q.    And do we have any

16   information about, when those were sent

17   to the operating companies, what did

18   people do with them?

19        A.    Based on the transfer sheets

20   and based on the memo about closing the

21   old law department, the Kilmer Museum, it

22   looks like that was done in the 1982 time

23   frame.

24                  And so when we were engaged

Margaret M. Gurowitz

1  in the project to restore the museum in

2  the 2014 to 2016 time frame, I had

3  reached out to folks at the operating

4  companies because we were looking for

5  artifacts to display from a variety of --

6  a variety of places in the company.

7          And I said, "Do you have any

8  of these old products?"  And nobody knew

9  anything about them.  They said, "No,

10  this is way before our time.  We would

11  presume we don't have these.  Nobody

12  knows.  Nobody has even heard of this."

13       Q.    So all we know is that

14  sometime after 1982, but when exactly we

15  don't know; is that fair?

16       A.    Correct.

17       Q.    Okay.  So shifting gears

18  slightly, we then talked about the

19  merchandise notice change -- change

20  orders, right?  And one of the questions

21  that I wanted to ask you about is we

22  looked at that policy.  And does that

23  policy have -- does that policy state

24  that the samples sent have to be new

Margaret M. Gurowitz

1    samples?

2              MR. LAPINSKI:  Object to the

3         form of the question.

4              THE WITNESS:  They do not.

5    BY MS. FOURNIER:

6         Q.    Does it state whether they

7    have -- they can be open or closed?

8         A.    The policy did not mention

9    anything about open or closed.  It just

10   said we need to capture examples of

11   changes to the labeling or package shape.

12             MR. LAPINSKI:  Objection.

13   BY MS. FOURNIER:

14        Q.    Does the policy refer to

15   whether the package needs to be sourced

16   from J&J or an outside source?

17        A.    It did not.

18        Q.    So do you know with respect

19   to the bottles that have those

20   merchandise notice change on them, what

21   the original source of the bottle is?

22        A.    No, we do not.

23        Q.    In addition, during that

24   period of time of the 1960s to 1980s, is

Margaret M. Gurowitz

1    it fair to say that there was some

2    collection of bottles that did not come

3    into the possession of the museum because

4    of merchandise notice changes?

5            MR. LAPINSKI:  Object to the

6        form of the question.

7            THE WITNESS:  That is

8        correct.

9    BY MS. FOURNIER:

10        Q.    So if you can go and dig out

11   of your pile, I want you to take out

12   Exhibit 43 and 45.

13        A.    I have to dig.

14        Q.    It's relatively early in the

15   Johnson's Baby Powder set?

16        A.    Okay.  I'm looking.  They

17   start in the '70s for some unknown

18   reason.

19            MR. LAPINSKI:  What are the

20        JBP numbers that they relate to?

21            MS. FOURNIER:  Exhibit 45 is

22        JBP-099, and Exhibit 43 is

23        JBP-096.

24            THE WITNESS:  It was -- I'm

Margaret M. Gurowitz

1    sorry.  Could you just tell me

2    exhibit --

3 BY MS. FOURNIER:

4    Q.    45 and 43.  43 and 45 is

5 probably the order you'll come across

6 them.

7    A.    Here is 45.

8    Q.    Let's start with 45 then.

9    A.    Sure.

10    Q.    Turn to the fourth page of

11 45.  It's a picture of one of the sides.

12    A.    Yes.

13    Q.    And it has taped to it a

14 sticker.  What is your understanding of

15 what that -- that label or whatever you

16 want to call it taped to it is?

17    A.    My understanding is that

18 corresponds to a merchandising notice

19 from 1/15/1970, Johnson's Baby Powder

20 hospital, four ounces.  I do not know

21 what Hadley PPD refers to.

22    Q.    And so earlier in your

23 testimony you said that you could surmise

24 that this came into the possession of the

Margaret M. Gurowitz

1    museum because of the merchandise notice

2    changes; is that right?

3         A.    That's possible.  Yes.

4         Q.    So let's look at Exhibit 43

5    if you will.  Okay.  If you look at

6    Exhibit 43, do any of the pictures

7    contain a label like the one we were

8    looking at on Exhibit 45?

9         A.    No, they do not.

10         Q.    Do we have any knowledge of

11   how this particular bottle came into

12   possession of the old museum?

13         A.    We do not.  We do not.

14         Q.    Okay.  I'd also like you to

15   take a quick look at Exhibit 49, which we

16   have looked at a couple times now.  What

17   can you tell us, if anything, about these

18   sorts of containers and how the lid

19   works?

20         A.    Okay.  So these are slightly

21   older containers.  This one has two

22   dates, 1963 and 1964.  So as I mentioned,

23   products were not sealed until the 1980s.

24   So this would have been open.  You could

Margaret M. Gurowitz

1  open it and access the contents at any

2  time.

3              The top, there's not a

4  photograph of the top, I believe.  But

5  the top was sort of a twist container

6  where you would just twist it, and it

7  would line up holes, which would open,

8  and then you could access the contents.

9         Q.    And can you screw this top

10 all the way off?

11        A.    You can take that top off.

12 If you notice, there's kind of a -- lip

13 isn't the right word, but the top -- the

14 top part that has the very top of the

15 container, it's a separate piece from the

16 rest of the container.  So you would be

17 able to pull that off.

18        Q.    And so do you know if the

19 contents of the powder in this particular

20 container, do we have any way of knowing

21 whether it was the original powder from

22 this container?

23              MR. LAPINSKI:  Object to

24        form of the question.

Margaret M. Gurowitz

1           THE WITNESS:  We don't.  And

2       if you look -- if you look at the

3       first photograph, the front page,

4       if you look at the right side of

5       that container, it looks like

6       there is a gap there.  And it's a

7       little higher than on the left.

8           So it looks like that may

9       have been pulled off at some

10       point.

11   BY MS. FOURNIER:

12       Q.    During this period of time,

13   do you know if the museum also received

14   donations?

15       A.    The museum has received

16   donations for many decades.  So yes, it

17   would be likely we received donations.

18           MS. FOURNIER:  Can I get

19       some stickers?  Thank you.

20           (Document marked for

21       identification as Exhibit

22       Gurowitz-78.)

23   BY MS. FOURNIER:

24       Q.    I'm going to pass you

Margaret M. Gurowitz

1   something.  I think we're on 78.

2           Actually, I've handed you

3   something that we marked as Exhibit 78,

4   which is two pages.  First can you just

5   look at those and tell me if they appear

6   to be the same picture just one in black

7   and white and one in color?

8        A.    They appear to be the same

9   picture.

10       Q.    Okay.  And have you seen

11  these pictures before?

12       A.    Yes.

13       Q.    What can you tell us about

14  this particular bottle based on these

15  pictures?

16       A.    This is a very rusted tin, a

17  Johnson's Baby Powder tin in very poor

18  condition.  By the trademark, it's got

19  the red chain, the circular logo.  So

20  that looks like it was marketed outside

21  of the United States.  And this was one

22  that was found in a shipwreck.  So

23  presumably it was somewhere at the bottom

24  of the ocean.

Margaret M. Gurowitz

1    BY MS. FOURNIER:

2         Q.    So do you think this is

3    potentially an example of a donation

4    during the period?

5         A.    I think this is absolutely

6    an example of something that was donated.

7              (Document marked for

8              identification as Exhibit

9              Gurowitz-79.)

10   BY MS. FOURNIER:

11        Q.    Let me mark the next one as

12   79.  Let's start with 79.  The same

13   question.  If you can just look at the

14   two pages and confirm that this is a

15   black-and-white but then a color photo of

16   the same bottle?

17        A.    Yes, I can confirm that.

18        Q.    And can you read for us what

19   this particular bottle says on it?

20        A.    Sure.  It says, "Sample from

21   Mr. Burchfield's cabinet, return 1928."

22        Q.    Any idea who Mr. Burchfield

23   is?

24        A.    No idea.

Margaret M. Gurowitz

1       Q.     Do you know if he worked at

2   J&J or was outside the company?

3       A.     We have no way of knowing

4   that or tracking that down.

5       Q.     Any idea if Mr. Burchfield

6   is responsible for any of the other

7   containers on the list?

8       A.     Not unless it was noted.

9   The only thing we know is clearly

10  somebody did not return this to

11  Mr. Burchfield.

12      Q.     Fair enough.  Let me switch

13  gears a little bit.  You talked about, if

14  we think about the second section of that

15  list, that's the section that was sourced

16  from today's museum.

17             And you, I believe,

18  testified that you were part of the group

19  or you were responsible for finding those

20  and then actually putting them down in

21  packages to ship off to the lab; is that

22  correct?

23      A.     That is correct.

24      Q.     Now, as to the first

Margaret M. Gurowitz

1  section, the section that we spent more

2  time, the stuff that came from marketing

3  and offsite storage, I believe you

4  testified that you didn't know who

5  exactly put that into boxes and sent that

6  off; is that correct?

7      A.    That's correct.

8      Q.    But do you have an

9  understanding of what group of people

10  were responsible to do that once they

11  were found?

12      A.    Yes, it would have been some

13  combination of the legal folks, the

14  records management folks, and the folks

15  that worked at the consumer company.

16      Q.    So was it the same group of

17  people who worked with you on your

18  section of the bottles?

19      A.    Presumably some of them

20  would probably have been the same.

21      Q.    Okay.  And then the last

22  question I have for you is, can we go

23  back to the very last picture that we

24  looked at.  It was the one that was

Margaret M. Gurowitz

1  attached to the double pack.  And we were

2  trying to figure out maybe if we could

3  understand which sample that was.

4          MS. FOURNIER:  What was the

5      exhibit number?  Does anybody have

6      that?  75?  Okay.  Thank you.

7          MR. LAPINSKI:  I think it

8      was 61.

9          MS. FOURNIER:  Oh, Exhibit

10     61.  Thank you.

11         THE WITNESS:  This is

12     Exhibit 61, the one that had that

13     anomalous --

14  BY MS. FOURNIER:

15     Q.    That's right.

16     A.    Yeah.

17     Q.    And we just went through on

18  this exhibit listing and found that it

19  potentially matches to JBP-016, right?

20  Is that correct?

21     A.    Potentially it could match

22  to that, yes.

23     Q.    Okay.  I'd like you to take

24  a look at the entry for JBP-223.  And let

Margaret M. Gurowitz

1    me know whether you think that it could

2    potentially match that entry as well?

3                    MR. LAPINSKI:  Did you say

4            JBP-223?

5                    MS. FOURNIER:  223.  I'm

6            looking at Page 11880, Page ID.

7            Page 33 of 91.

8                    THE WITNESS:  JBP-223?

9    BY MS. FOURNIER:

10           Q.    That's correct.

11           A.    That does say it is -- it is

12   a cardboard cylinder from the right time.

13   I think the volume is different though.

14           Q.    Okay.  Are there other

15   cardboard cylinder samples on this list?

16           A.    Yes.  I believe there are.

17           Q.    And do you know with

18   certainty if that one is 016?

19           A.    We cannot determine with

20   certainty which one that is.  I would

21   have to look and see what the sizes were,

22   if there's another cardboard cylinder

23   that was one and three-quarters ounces.

24   We would not be able to tell which one is

Margaret M. Gurowitz

1   which.

2              MS. FOURNIER:  Got it.

3        Those are all my questions.

4              THE VIDEOGRAPHER:  The time

5        is --

6              MR. LAPINSKI:  Two

7        questions, so let's go off for

8        now.

9              THE VIDEOGRAPHER:  The time

10       is 5:54 p.m.  We're off the

11       record.

12             (Brief pause.)

13             THE VIDEOGRAPHER:  Back on

14       the record at 5:55 p.m.

15                   -   -   -

16                 EXAMINATION

17                   -   -   -

18   BY MR. LAPINSKI:

19        Q.    Ms. Gurowitz if you can

20   refer to Exhibit 78?

21        A.    I'll just need a moment to

22   find it.

23        Q.    We're going to look at 78

24   and 79, which were the last two given to

Margaret M. Gurowitz

1     you by counsel.

2         A.     Yes.   Okay.

3         Q.     Exhibit 78 you said was

4     photographs of a sample that was donated

5     to Johnson & Johnson, correct?

6         A.     Correct.

7         Q.     And if you look at the color

8     photo on Page 2, I believe it says --

9     what we can see is, "Photo taken from,"

10    and then it has a July date, correct?

11        A.     Correct.

12        Q.     And would you agree that

13    someone within Johnson & Johnson took

14    steps to label this product that had been

15    donated to Johnson & Johnson?

16        A.     No, I would not agree.

17    Somebody labeled it.   But we don't know

18    if it was a Johnson & Johnson person or

19    the person who donated it.

20        Q.     But it's a donated -- as a

21    donated product, it's labeled as such,

22    correct?

23        A.     It is labeled, but we don't

24    know who labeled it.

Margaret M. Gurowitz

1    Q.    As far as -- if you would go

2  to Exhibit 79.  And Exhibit 79 is a

3  sample that came from Mr. Burchfield's

4  cabinet, correct?

5    A.    Correct.

6    Q.    And someone did label this

7  as a sample that came from an outside

8  source, correct?

9    A.    Correct.

10    Q.    In regard to Exhibit 49,

11  which was one that you should have it

12  on -- pretty close to the top because we

13  just talked about it.

14    Okay.  You testified that

15  you had not examined or handled any of

16  the offsite -- any of the offsite

17  samples, correct?

18    A.    Correct.

19    Q.    So you haven't examined

20  Exhibit Number 49, correct?

21    A.    Not in person, no.

22    Q.    So your testimony about the

23  top possibly being off is based only on

24  the photograph and is speculation

Margaret M. Gurowitz

1  otherwise?

2       A.    It is based on the

3  photograph and the fact that there's a

4  gap here and it looks like it -- it looks

5  like it was -- there's more space here

6  than there is on the other side.  So it's

7  based on that.

8       Q.    And the top of that is a

9  removable top, correct?

10       A.    If you are referring to this

11  entire top, yes.  You can pull that off.

12       Q.    Okay.  And there became a

13  point in time where Johnson & Johnson

14  changed the design of their Baby Powder

15  bottles so that the top was no longer

16  removable, correct?

17       A.    Well, initially the oldest

18  samples did not have this type of top.

19  Then for a number of decades they had

20  this type of top, and then they moved

21  away from it.

22       Q.    And when did they move away

23  from that?

24       A.    I believe this was moved

Margaret M. Gurowitz

1   away from when they changed to plastic

2   packaging in 1963 time frame.

3            MR. LAPINSKI:  Okay.  No

4        more questions.

5            THE VIDEOGRAPHER:  This

6        concludes today's deposition.  The

7        time is 5:58 p.m.  We are off the

8        record.

9            (Excused.)

10            (Deposition concluded at

11        approximately 5:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Margaret M. Gurowitz

1

2                         CERTIFICATE

3

4

5             I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

             It was requested before
8  completion of the deposition that the
   witness, MARGARET M. GUROWITZ, have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12        _____

          MICHELLE L. GRAY,
13        A Registered Professional
          Reporter, Certified Shorthand
14        Reporter, Certified Realtime
          Reporter and Notary Public
15        Dated:  July 20, 2018

16

17

18             (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Margaret M. Gurowitz

1        INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Margaret M. Gurowitz

```
1                        –    –    –    –    –    –

                        E   R   R   A   T   A

2                        –    –    –    –    –    –

3

4      PAGE   LINE    CHANGE

5      _____  _____   _____

6         REASON: _____

7      _____  _____   _____

8         REASON: _____

9      _____  _____   _____

10        REASON: _____

11     _____  _____   _____

12        REASON: _____

13     _____  _____   _____

14        REASON: _____

15     _____  _____   _____

16        REASON: _____

17     _____  _____   _____

18        REASON: _____

19     _____  _____   _____

20        REASON: _____

21     _____  _____   _____

22        REASON: _____

23     _____  _____   _____

24        REASON: _____
```

Margaret M. Gurowitz

1

2        ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5   hereby certify that I have read the

6   foregoing pages, 1 - 380, and that the

7   same is a correct transcription of the

8   answers given by me to the questions

9   therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16   MARGARET M. GUROWITZ              DATE

17

18

19  Subscribed and sworn

    to before me this

20  _____ day of _____, 20_____.

21  My commission expires:_____

22

    _____

23  Notary Public

24

Margaret M. Gurowitz

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```

Exhibit 162



mccrone environmental services, inc.
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

RECEIVED

FEB 2 1987

W. M. I.

28 January 19876

Windsor Minerals, Inc.
P. O. Box 680
Windsor, Vermont  05089

Attention:  Mr. Roger N. Miller, President

        Re:  McCrone Project No. ME-3241

Dear Mr. Miller:

        Under your Purchase Order QC-0548, we received nineteen talc
samples for asbestos analysis by transmission electron microscopy.
The samples were labelled as follows:

```
WMI 86-10    WMI 86-14    WMI 86-18    WMI 86-22    WMI 86-26
WMI 86-11    WMI 86-15    WMI 86-19    WMI 86-23    WMI 86-27
WMI 86-12    WMI 86-16    WMI 86-20    WMI 86-24    WMI 86-32
WMI 86-13    WMI 86-17    WMI 86-21    WMI 86-25
```

        Examination found no quantifiable amounts of asbestiform
minerals. The limit of detection for each sample is below
0.001 weight percent.

        Thank you for consulting McCrone Environmental Services, Inc.

                                Sincerely,

                                Thomas Kremer
                                Electron Microscopist

                                James R. Millette, Ph.D.
                                Manager, Laboratory Services

TK/JRM/mtw

cc:  1)  Windsor Minerals, Inc.
         Windsor VT
     1)  Mr. Roger N. Miller, President

a subsidiary of walter c. mccrone associates, inc.
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

**EXHIBIT J&J-355**

Protected Document--Subject to Protective Order

JNJTALC000387714



**mccrone environmental services, inc.**
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

RECEIVED

FEB 2 1987

W. M. I.

### PLEASE NOTE

It is our present policy to hold samples for 30 days after issuance of the analysis report at no additional charge to the client. At the end of the 30 day period, samples will be disposed of unless a written request to return has been received in our office. A sample return fee in the amount of U.S. certified postage plus 15% will be charged for each group of samples mailed. McCrone Environmental Services, Inc. will archive samples upon receipt of written notification from the client at a charge of $ 0.50 per sample per month. Special arrangements will be made for samples received under specific "chain of custody" orders. Please contact our office if special handling is needed for your samples.

Sincerely,

James R. Millette, Ph.D.
Manager, Laboratory Operations

a subsidiary of **walter c. mccrone associates, inc.**
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

Protected Document--Subject to Protective Order

JNJTALC000387715

WINDSOR MINERALS, INC.

Samples to McCrone Environmental Services

October 13, 1986

### West Windsor

| | | |
|---|---|---|
| Float Feed | April, 1986 | WMI 86-10 |
| Float Feed | May, 1986 | WMI 86-11 |
| Float Feed | June, 1986 | WMI 86-12 |
| Float Feed | July, 1986 | WMI 86-13 |
| Float Feed | August, 1986 | WMI 86-14 |
| Float Feed | September, 1986 | WMI 86-15 |

### Columbia

| | | |
|---|---|---|
| Grade 36 | April, 1986 | WMI 86-16 |
| Grade 36 | May, 1986 | WMI 86-17 |
| Grade 36 | June, 1986 | WMI 86-18 |
| Grade 36 | July, 1986 | WMI 86-19 |
| Grade 36 | August, 1986 | WMI 86-20 |
| Grade 36 | September, 1986 | WMI 86-21 |

### Columbia

| | | |
|---|---|---|
| Alpha Beta Product | April, 1986 | WMI 86-22 |
| Alpha Beta Product | May, 1986 | WMI 86-23 |
| Alpha Beta Product | June, 1986 | WMI 86-24 |
| Alpha Beta Product | July, 1986 | WMI 86-25 |
| Alpha Beta Product | August, 1986 | WMI 86-26 |
| Alpha Beta Product | September, 1986 | WMI 86-27 |

### Other

| | | |
|---|---|---|
| 66 product from Rainbow test run, September 26, 1986 | | WMI 86-31 |

Cheryl Hill-Bennett
CC:  Roger Miller
     Robert Goff

Protected Document--Subject to Protective Order

JNJTALC000387716

Exhibit 163

# Memo

**To:**     William Ashton

**cc:**     Regina Gallagher, Lorena Telofski, Mike Chudkowski

**From:**   Joyce Payeur

**Date:**   10/20/00

**Re:**     TALC CLOSET CLEANOUT & STORAGE

---

I was requested by Research Support Sciences to remove all powder items from the storage closet in Research North, second floor.  The majority of items were from previous world talc surveys and Chinese competitor brands.  These items were discarded today as standard chemical waste through Skillman Environmental Affairs.

I have relabeled and repackaged the following items for long-term storage in the Research North Sub-Basement Room, first corridor:

        Historical Talc from Kilmer Museum  - 1 Box
        Asbestiform Mineral samples and purchased standards - 1 Box
        Tremolite & Carbonate 95%- 1 Kilo Poly Jar
        NY State Tremolite labeled XRD Std - 1 gallon paint can
        Card File with Mine Locations and Photomicrographs of Talc

Please be aware of their presence and location.

Joyce Payeur - Technical Assurance

**Technical Assurance**

EXHIBIT
J&J-800

Protective Order

11

JNJNL61_000015761

# Exhibit 164

**From:**         McCarthy, Timothy [CPCUS]
**Sent:**         Friday, November 21, 2008 1:55 PM
**To:**           Bernhofer, Lauren [CPCUS]
**Subject:**      RE: Baby Powder

Monica Popescu has been running these surveys since I've been here.
unless you have run anything recently, I am guessing your surveys are out of date.  ergo,
PITCH them.

thanks

    -----Original Message-----
From:  Bernhofer, Lauren [CPCUS]
Sent:  Friday, November 21, 2008 8:52 AM
To:    McCarthy, Timothy [CPCUS]
Subject:      RE: Baby Powder

Tim,

   Do you have an idea of what the retention time would be on information related to the
CTFA ingredient surveys we have responded to over the past few years?  I can show you if you
come over to see the Talc files.

Thanks,
Lauren

    -----Original Message-----
From:  McCarthy, Timothy [CPCUS]
Sent:  Friday, November 21, 2008 8:46 AM
To:    Bernhofer, Lauren [CPCUS]
Subject:      RE: Baby Powder

great reading!
I may take a walk up north to familiarize myself with the talc goodies you have.

thanks

    -----Original Message-----
From:  Bernhofer, Lauren [CPCUS]
Sent:  Friday, November 21, 2008 8:41 AM
To:    McCarthy, Timothy [CPCUS]; Casalvieri, Joan [CPCUS]
Subject:      RE: Baby Powder

Hi Tim,

   I don't think you would want to share this document, but FYI, I thought
you would find it interesting.  Not exactly hundreds of years old, but close to it.  Dr. Lord
was the Director of the Research Foundation when I first came to J&J, but retired shortly
after.  He just passed away this last year at a very respectable old age!

   More seriously, we have about 4 file drawers of info on Talc over here.

Lauren

1

JNJ 000368489

```
                  << File: Talc_1978.pdf >>


              -----Original Message-----
          From:  McCarthy, Timothy [CPCUS]
          Sent:  Friday, November 21, 2008 8:15 AM
          To:    Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
          Subject:       FW: Baby Powder

          I can surmise that any tox studies conducted on J Baby Powder
precede even Lauren's tenure by several thousands of years.

              best I could probably cough up would be a literature review on talc
plus an IFRA compliance statement.

              any better ideas?

              -----Original Message-----
          From:  Clayton, Tom [MEDGB]
          Sent:  Friday, November 21, 2008 7:47 AM
          To:    McCarthy, Timothy [CPCUS]; Auld, Karen [CPCUS Non J&J]
          Cc:    Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
          Subject:       RE: Baby Powder

          Hi Tim,
          Thanks for the info.  I am after the toxicological /
biocompatibility data for the J&J Baby powder in order for our product safety officer to say
that it is ok for us to use this as a processing aid.  The only reason why we need this
information, is that the processes that it will be used on, it will be in direct contact with
our devices that, in turn, come into contact with skin / open lesions etc..

          Do you have this information available?  I presume that the powder
has had this data compiled during development?
          Thanks,
          Tom.

              -----Original Message-----
          From:  McCarthy, Timothy [CPCUS]
          Sent:  19 November 2008 17:11
          To:    Auld, Karen [CPCUS Non J&J]; Clayton, Tom [MEDGB]
          Cc:    Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
          Subject:       FW: Baby Powder


              Tom/Karen: Johnson's Baby Powder is a cosmetic product, not a device
or OTC drug.

              Although we use talc, USP in our North America manufacture of J Baby
Powder, it contains a small amount (< 0.5%) fragrance, itself a complex blend of chemicals.
I am uncertain how fragrance components may impact your process.

              J&J Consumer has a very good relationship with our vendor of talc
(Rio Tinto, formerly known as Luzenac).  Would it be better to go right to our source of
talc, USP?
```

2

JNJ 000368490

It just so happens that I have a meeting this afternoon on-site with the Regulatory Affairs Manager from Rio-Tinto to discuss some talc issues.

if you want to go right to R-T on this:
Mark Zamek, Sr Key Account Manager, Rio-Tinto Minerals, 610 530-7850 (cell: 908 334-0850); mark.zamek@riotinto.com
Kent Cutler, VP Sales, 303 713-5500; kent.cutler@riotinto.com

please get back to us, if this is not helpful

Tim

908 874-1232

-----Original Message-----
From:    Bernhofer, Lauren [CPCUS]
Sent:    Tuesday, November 18, 2008 10:05 AM
To:      Clayton, Tom [MEDGB]
Cc:      McCarthy, Timothy [CPCUS]
Subject:       FW: Baby Powder

Hi Tom,

I am forwarding you question to Tim McCarthy, who is our Toxicologist responsible for baby powder support.  He is probably the best person to help you.

Tim - Please see Toms question at the bottom of this email string, regarding the proposed use of J&J Baby Powder in manufacturing of wound care products.

Best Regards,
Lauren

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Tuesday, November 18, 2008 9:34 AM
To:      Bernhofer, Lauren [CPCUS]
Subject:       FW: Baby Powder

Hi Lauren,
I have been given your name as a possible contact for the information I requested below.  Please would you be able to help?

Kind regards,
Tom.

Tom Clayton
Quality Engineer
Johnson & Johnson Wound Management
Airebank Mill, Gargrave, North Yorkshire, BD23 3RX
Tel:  +44 (0) 1756 747249
Fax:  +44 (0) 1756 748403

<mailto:tclayto1@its.jnj.com>

3

JNJ 000368491

Confidentiality notice:  The information contained in this e-mail is intended only for the individual or entity to whom it is addressed. It may contain privileged and confidential information and if you are not an intended recipient you must not copy, distribute or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately. Please also destroy and delete the message from your computer.

Johnson & Johnson Medical Limited, Po Box 1988, Kirkton Campus, Livingston, West Lothian, EH54 0AB.  Registered in Scotland, No SC 132162

P  Before printing this message, make sure that it's necessary.


-----Original Message-----
From:    Auld, Karen [CPCUS Non J&J]
Sent:    18 November 2008 14:32
To:      Clayton, Tom [MEDGB]
Subject:       RE: Baby Powder

Tom,

I don't have access to that type of information.

I would recommend you try Lauren Bernhofer.  See works in toxicology and may be able to provide you with the information you need.

Hope this helps.

Karen

    -----Original Message-----
    From:    Clayton, Tom [MEDGB]
    Sent:    Tuesday, November 18, 2008 9:25 AM
    To:      Auld, Karen [CPCUS Non J&J]
    Subject:       RE: Baby Powder

    Hi Karen,
    Our Product Safety Officer has asked if you can provide biocompatibility data including cytotoxic data, and clinical studies for the talc baby powder?

        This information, if available, would be of great use when completing the product safety approval request.
        Thanks in advance,
        Tom.

    -----Original Message-----
    From:    Auld, Karen [CPCUS Non J&J]
    Sent:    14 November 2008 18:14
    To:      Clayton, Tom [MEDGB]
    Cc:      Carbonetta, Lou [CPCUS]
    Subject:       RE: Baby Powder

    Tom,

    Attached are North American MSDSs.  Not sure if you needed talc or corn starch so I attached both.

4

JNJ 000368492

Hope this helps.

Karen Auld
EHS Consultant

<< File: MSDS Baby Powder Cornstarch.pdf >>  << File: MSDS Baby Powder Talc.pdf >>

-----Original Message-----
From:    Carbonetta, Lou [CPCUS]
Sent:    Friday, November 14, 2008 1:07 PM
To:      Clayton, Tom [MEDGB]
Cc:      Auld, Karen [CPCUS Non J&J]
Subject:       RE: Baby Powder

Tom,

I was given the name Karen Auld. Try her. She is on the e-mail system.  Let me know the results of your search.

Lou

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Friday, November 14, 2008 3:17 AM
To:      Carbonetta, Lou [CPCUS]
Subject:       RE: Baby Powder

Thanks Lou,
I appreciate your help.
Tom.

-----Original Message-----
From:    Carbonetta, Lou [CPCUS]
Sent:    13 November 2008 22:48
To:      Clayton, Tom [MEDGB]
Subject:       RE: Baby Powder

I will look into it.

Lou

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Thursday, November 13, 2008 11:05 AM
To:      Carbonetta, Lou [CPCUS]
Cc:      Whaites, Adam [MEDGB]; Lewis, Joanne [MEDGB]
Subject:       Baby Powder

Hi Lou,
I'm hoping you can help me with something totally unrelated to UltraHeal!

We are currently using BIOSORB* powder on one of our machines as a processing aid, and the supply of this is becoming very sparse.  The operators are wanting to use Johnson's Baby Powder as a replacement, but I would like to get a health hazard assessment on the powder before saying yes.

5

JNJ 000368493

As you are the only person I know in the Consumer group, I am wondering if you know anybody who would be able to provide an MSDS or data sheet relating to J&J baby powder?  I'll then be able to use this as a starting block to formulating a risk assessment.

Thanks in advance,
Tom.


Tom Clayton
Quality Engineer
Johnson & Johnson Wound Management
Airebank Mill, Gargrave, North Yorkshire, BD23 3RX
Tel:  +44 (0) 1756 747249
Fax:  +44 (0) 1756 748403

<mailto:tclayto1@its.jnj.com>


Confidentiality notice:  The information contained in this e-mail is intended only for the individual or entity to whom it is addressed. It may contain privileged and confidential information and if you are not an intended recipient you must not copy, distribute or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately. Please also destroy and delete the message from your computer.

Johnson & Johnson Medical Limited, Po Box 1988, Kirkton Campus, Livingston, West Lothian, EH54 0AB.  Registered in Scotland, No SC 132162

P  Before printing this message, make sure that it's necessary.

JNJ 000368494

## JNJ000368489

## Metadata

| AttachCount | 0 | ORIGINAL |
|---|---|---|
| BegAttach | JNJ 000368489 | ORIGINAL |
| Confidentiality | N | ORIGINAL |
| Custodian | McCarthy, Timothy | ORIGINAL |
| DateCreated | 01/09/2010 12:00 AM | ORIGINAL |
| DateMod | 11/21/2008 12:00 AM | ORIGINAL |
| EndAttach | JNJ 000368494 | ORIGINAL |
| FileName | RE: Baby Powder | ORIGINAL |
| FileSize | 68096.00 | ORIGINAL |
| PgCount | 6 | ORIGINAL |

Exhibit 165



**FILE COPY**

1412 OAKBROOK DRIVE  •  SUITE 100
NORCROSS, GA 30093  •  404-368-9600

26 November 1990

Mr. Michael J. Keener
Quality Control Manager
Cyprus Windsor Minerals Corporation
P.O. Box 680
Windsor, Vermont  05089

Dear Mr. Keener:

Under your letter of authorization dated 02 November 1990, we
received three (3) talc samples for asbestos analysis by
transmission electron microscopy.  The samples were labelled as
follows:

                    CWM 90-28
                    CWM 90-29
                    CWM 90-30

Examination found no quantifiable amounts of asbestiform
minerals.  Thank you for consulting McCrone Environmental
Services, Inc.

                         Sincerely,


                         E. Kent Sprague
                         Electron Microscopist

EKS:ljf
ME-7882


a member of **the mccrone group**

850 PASQUINELLI DRIVE  •  WESTMONT, ILLINOIS 60559  •  708-887-7100

Protected Document--Subject to Protective Order

PLAINTIFF'S
TRIAL EXHIBIT
**2035**

JNJMX68_000012851

Cust#
911453

ME-7883
MA90009

CYPRUS WINDSOR MINERALS CORP.
P.O.BOX 680
WINDSOR. VERMONT 05089
TELEPHONE (802) 484-7763

Mr. James R. Millette. Ph.D.                    November 2. 1990
Electron Optics Group
McCrone Environmental Services. Inc.
1412 Oakbrook Dr. #100
Norcross. GA  30093 - 2243

Dear Mr. Millette:

     We are sending the next series of three samples for

asbestiform analysis via transmission electron microscopy.

The samples are designated per attached list.

     You may charge this work to our Purchase Order QC26388W.

     Please send the results to Michael J. Keener,Quality

Control Manager. Eastern Operations,Cyprus Windsor Minerals.

     Thank You

                              Sincerely,
                              Joan R. Johnson
                              Joan R. Johnson
                              Quality Assurance Lab Supervisor

jrj
Enclosure

J&J-0007795

Protected Document--Subject to Protective Order                                    JNJMX68_000012852

CYPRUS WINDSOR MINERALS CORPORATION

SAMPLES TO MCCRONE ENVIRONMENTAL SERVICES

NOVEMBER 1990

CWM 90 - 28

CWM 90 - 29

CWM 90 - 30

J&J-0007796

Protected Document--Subject to Protective Order

JNJMX68_000012853

# EPA LEVEL II TEM ANALYSIS

ME # 90009-1    McCRONE ID# _____

PROJECT    Cyprus Windsor

CLIENT ID    1 CWM 90-38

CLIENT COMMENTS _____

VOLUME/AREA SAMPLED _____

FILTER AREA (mm2) _____

AVG GRID SQ AREA (SQum) _____

ANALYST    RR

CAL MAG    20,520 x  *5,100x

# SQUARES COUNTED    20

TOTAL STRUCTURES COUNTED    1

DATA ENTRY BY _____

DISC # _____

DATE ANALYZED    11/19/90

PRIORITY
- RUSH ☐
- REGULAR ☑

LOADING
- LIGHT ☐
- MEDIUM ☑
- HEAVY ☐

PLATE #
- ED1 _____
- ED2 _____
- IMAGE _____

SAMPLE TYPE
- EPA II AIR ☐
- DUST (BY AREA) ☐ cm²
- DUST (BY WT) ☐ mg.
- WATER ☐
- TALC ☑
- LUNG TISSUE ☐
- OTHER ☐

NOTES  Fibers present @ 20,520

Scope 400   Acc.Volt 20 kV

GRID 1

GRID 2

GRID MAPS

| OBS | G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES | |
|-----|-----|--------|------|--------|-------|----------|------------|-----------|------|-----|-------|---|
| 6, | S1 | | | | | | | | | | | 20,540 |
| | S2 | | | | | | | | | | | |
| | S3 | | | | | | | | | | | |
| | S4 | | | | | | | | | | | 5,400 |
| | S5 | | | | | | | | | | | |
| | S6 | (20.0) | TALC (1.5) | 20.0 | 1.5 | | | | ✓ | ✓ | ANThYthyl/R | |
| | S7 | | | | | | | | | | | |
| | S8 | | | | | | | | | | | |
| | S9 | | | | | | | | | | | |
| | S10 | | | | | | | | | | | |
| 6, | S11 | | | | | | | | | | | 20,540 |
| | S12 | | | | | | | | | | | |
| | S13 | | | | | | | | | | | |
| | S14 | | | | | | | | | | | 5,400 |
| | S15 | | | | | | | | | | | |
| | S16 | | | | | | | | | | | |
| | S17 | | | | | | | | | | | |
| | S18 | | | | | | | | | | | |
| | S19 | | | | | | | | | | | |
| | S20 | | | | | | | | | | | |

## McCrone Environmental Services, Inc.

J&J-0007797

Protected Document--Subject to Protective Order

JNJMX68_000012854

QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:MA90009-1 ANTHOPHYLLITE

POSSIBLE IDENTIFICATION
    SI  KA OR  RB LA?
    CU  KA KB
    MG  KA OR  AS LA?
    FE  KA KB
    CL  KA

                PEAK LISTING
        ENERGY    AREA   EL. AND LINE
    1    1.254     3413  MG KA OR AS LA?
    2    1.737    10078  SI KA OR RB LA?
    3    2.627      320  CL KA
    4    6.400     1153  FE KA
    5    7.057      188  FE KB
    6    8.037     5079  CU KA
    7    8.894      774  CU KB



McCrone Environmental Services Inc.    MON 19-NOV-90   12:13
Cursor: 0.300keV = 0        ROI (SIKα) 1.670: 1.810=7518

MA90009-9 ANTHOPHYLLITE        VFS = 1024   10.240

J&J-0007798

Protected Document--Subject to Protective Order        JNJMX68_000012855



J&J-0007799

Protected Document--Subject to Protective Order

JNJMX68_000012856

QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:MAS0009-1

POSSIBLE IDENTIFICATION
    CU KA KB LA
    SI KA OR  RB LA?
    FE KA KB
    MG KA OR  AS LA?
    CA KA
    CL KA
    MN KA
    K  KA OR  IN LA?

           PEAK LISTING
       ENERGY    AREA   EL. AND LINE
   1   0.941      261  CU LA
   2   1.255     2260  MG KA OR AS LA?
   3   1.739     8078  SI KA OR RB LA?
   4   2.615      474  CL KA
   5   3.317      217  K  KA OR IN LA?
   6   3.696     1009  CA KA
   7   5.907      236  MN KA
   8   6.396     2560  FE KA
   9   7.042      329  FE KB
  10   8.038    64354  CU KA
  11   8.898     9058  CU KB



McCrone Environmental Services Inc.        MON 19-NOV-90  11:56
Cursor: 0.300KeV = 0          ROI (SIKα) 1.670: 1.810=6259

MAS0009-1                                VFS = 1024    10.240

J&J-0007800

Protected Document--Subject to Protective Order                    JNJMX68_000012857



McCrone Environmental Services, Inc.

J&J-0007801

Protected Document--Subject to Protective Order

JNJMX68_000012858

## EPA LEVEL II TEM ANALYSIS

ME # 90009-3  McCRONE ID# _____

PROJECT _____
CLIENT ID ___ CUM 90-30 ___

CLIENT _____
COMMENTS _____
VOLUME/AREA SAMPLED _____

FILTER AREA (mm2) _____
AVG GRID SQ AREA (50um) _____

ANALYST  JH

CAL MAG  19,440x  5,962X

# SQUARES COUNTED _____

TOTAL STRUCTURES COUNTED  1

DATA ENTRY BY _____
DISC # _____

DATE ANALYZED  11/19/90
PRIORITY
RUSH ☐
REGULAR ☐
LOADING
LIGHT ☐
MEDIUM ☑
HEAVY ☐
PLATE # _____
ED1 _____
ED2 _____
IMAGE _____

SAMPLE TYPE
☐ EPA II AIR
☐ DUST (BY AREA) km²
☐ DUST (BY WT) mg
☐ WATER
☑ TALC
☐ LUNG TISSUE
☐ OTHER

GRID 1

GRID 2

GRID MAPS

NOTES
Scope /200X  Acc.Volt /20 kV

| OBS | G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | S1S1 | | | | | | | | | | |
| | S2 | | | | | | | | | | 20,000X |
| | S3 | F | C | 1.0 | 0.15 | | | | ✓ | ✓ | |
| | S4 | | | | | | | | | | |
| | S5 | | | | | | | | | | |
| | S6 | | | | | | | | | | |
| | S7 | | | | | | | | | | 6,000X |
| | S8 | | | | | | | | | | |
| | S9 | | | | | | | | | | |
| | S10 | | | | | | | | | | |
| | G2S1 | | | | | | | | | | |
| | S11 | | | | | | | | | | 20,000X |
| | S12 | | | | | | | | | | |
| | S13 | | | | | | | | | | |
| | S14 | | | | | | | | | | |
| | S15 | | | | | | | | | | 6,000X |
| | S16 | | | | | | | | | | |
| | S17 | | | | | | | | | | |
| | S18 | | | | | | | | | | |
| | S19 | | | | | | | | | | |
| | S20 | | | | | | | | | | |

**McCrone Environmental Services, Inc.**

J&J-0007802

Protected Document--Subject to Protective Order

JNJMX68_000012859

QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:90009-3   CHRYSOTILE FIBER

POSSIBLE IDENTIFICATION
    CU KA KB
    SI KA OR  SR LA?

              PEAK LISTING
        ENERGY     AREA   EL. AND LINE
    1   1.750       130 SI KA OR SR LA?
    2   8.053     12306 CU KA
    3   8.921      1756 CU KB



McCRONE ENVIRONMENTAL - JEOL 1200EX      MON 19-NOV-90  12:14
Cursor: 1.270KeV = 10      ROI   (SI) 1.670: 1.810=154
                            ROI   (MG) 1.190: 1.330=130

0.000                            VFS = 128    10.240
    58     90009-3   CHRYSOTILE FIBER

J&J-0007803

Protected Document--Subject to Protective Order

JNJMX68_000012860

Exhibit 166

**Johnson&Johnson**
CONSUMER PRODUCTS, INC.
SKILLMAN, NJ 08558-9418

**DATE:**        November 23, 1993

**TO:**          W. Ashton, D. Jones

**FROM:**        R. Denton

**SUBJECT:**     **TRIP REPORT**
                 **TALC VALIDATION TEAM MEETING - NOVEMBER 16, 1993**
                 **WINDSOR, VERMONT**

**TUESDAY MORNING MEETING  HIGHLIGHTS:**

- Flocculant was removed from the process as of 9/28/93 (i.e., just subsequent to farmhouse meeting).

- Luzenac will return to the exclusive use of "conventional" (i.e., horizontal) flotation cells.

- Luzenac has begun investigating possible alternative methods of particle size analysis (e.g., a "dry" coulter counter, etc.), but will continue to utilize the Micromeritics Corporation's "sedigraph" instrument. They have accumulated a large body of data on their talc with this device, and it is one of the most generally accepted methods for mineral particle size analysis in the 0.5 to 50 micron size range. It is also an accepted technique within the talc and mica industries.  We expressed concern that the sedigraph, which analyzes samples as an aqueous dispersion, may not give data reflecting the respirable particle distribution. We also brought up the possibility of using an aerodynamic technique (e.g., Aerosizer).

- Luzenac has produced "high, loose bulk density" talc powder by minimal passage of material through the air classifier, thereby increasing the loose bulk density from 25.5 to approx. 27.0 lbs/cu ft..

- Luzenac is placing considerable emphasis on our acceptance of the V-96 special material ( < 3.0% acid solubles).  We have promised to continue reviewing the data, but expressed great caution in any hasty judgement as to the acceptability of the V-96 grade.

- Randy Corder gave a brief review of the effort to reduce microbial contamination of the talc. Prior to 1986, he mentioned that a large number of talc shipments were rejected due to contamination (spec. is ≤ 100 c.f.u.'s/gram and no harmfuls in 0.1 gram).  After chlorination of the dewatering tank was begun (1986),  there have been no rejections based on microbial content.   However, due to technical problems with the chlorination (i.e.,  pH control, destruction of equipment due to corrosive HCl vapor, etc.) there continues to be emphasis on the acceptance of a brominating agent for microbial control.  However Luzenac will keep the process as it currently is being run.

29-491

Protected Document--Subject to Protective Order                                         JNJ 000240739

Pltf_JNJ_000240739

-2·

- In order to create a "benchmark" talc for our characterization and specification work, we agreed that there will be a "moratorium" on any further process changes, to avoid chasing a "moving target" on particle size, odor changes, density, etc..

  Here is a summary of major ore reduction/purification ('front-end") processing changes over the past 16 years.

  Pre-1976
  Crusher-----Roller Mill----Delaminator----Flotation*-----Dewatering----Finishing

  1976-1991
  Crusher-----Roller Mill----Shear Disc-----Flotation*-----Dewatering----Finishing

  1991-1993
  Crusher-----Roller Mill----Shear Disc-----Flotation----Dewatering-----Vertical Mill------Fin.

  1993 to present
  Crusher-----Roller Mill----Shear Disc----Flotation*---Dewatering-----Air Classifier Mill---Fin.

  Planned Changes (1994 Onward)
  Crusher-----Roller Mill--------------------Flotation*---Dewatering-----Air Classifier Mill---Fin.
  (*-indicates use of "conventional" flotation cells.)

- We will be provided with samples of the processing stream from immediately before and after the shear disc.  Johnson & Johnson (Bob Denton) will analyze these samples for any changes in morphology, surface area, surface energy, and especially delamination or edge rounding.  Until this analysis is carried out and the results evaluated, the shear disc will not be removed from the process stream.

## PLANT AND MINE TOUR:

Ore Typology:

- High Grade, "A" Type - Platy, opaque, schist-like fracturing, wavelly banded ore with large talc crystal plates. Often with smoky quartz inclusions occurring as lens shaped pods. Very soft, and easily delaminated (sheets can be separated with a pocket knife or fingernail). Low carbonate level (< 35 percent solubles).  Usually occurs at the margins of the ore body (shear zone).

- "B" Type - Fine platy to granular, grainy fracture, semi-translucent ore.  Ham material is typically light green with dark magnetite and chlorite inclusions. Contains from 45 percent to 35 percent solubles (moderate carbonate level).  Makes up the majority of the commercially useful cosmetic talc ore body at the Ham mine. Harder than high grade ore.

Protected Document--Subject to Protective Order

JNJ 000240740

Pltf_JNJ_00003002240740

-3-

- "C" Type · Dark colored, translucent, granular ore with a grainy fracture. Ham material is greenish gray with numerous dark inclusions of magnetite and chlorite. High carbonate level (>45 percent soluble material).  Highest hardness of all commercially useful cosmetic ores due to high magnesite levels.

**PLANT TOUR HIGHLIGHTS:**  (Conducted by M. Keener)

- Use of too much high grade ore has had a history of producing "slimes"  which tended to block up the filters. This was attributed to the fact that the high grade ore delaminated easily into very thin, soft talc plates  which tended to yield a large amount of fines during the grinding process.  Both the fines and the thin plates contributed to the clogging of the filters and production of excessive foam during flotation.

- Higher carbonate rocks ("B" and "C" type ores) were easier to crush, float, filter, and processed more efficiently in general. Thus, quantities of the "B" and "C" type ore were blended into the high grade material even when Hammondsville was in operation, especially after the advent of continuous mining techniques. However, the exact percentages used in this blending at Hammondsville are currently unknown.

- The Ham production has consisted of primarily "B" grade ore, although as much as 10 to 15 percent of the "A" type ore continues to be mined there.  The quantities of "A" ore incorporated into the grind could be even higher, but this facies often contains an unacceptable level of arsenides at this locality.

- All column flotation tanks were removed from process in late 1992.  Column flotation was never used exclusively as the material produced by this technique tended to be inconsistent in quality.

**MINE TOUR HIGHLIGHTS:**   (Conducted by Lance Meade)

- Polished thin sections are prepared as part of the prospecting routine to assess crystallinity and mineral types in the bench extensions.

- Hammondsville Mine (open pit/underground · Reading, Vermont) is at the north end of the Chester Dome structural zone.  R. Denton collected a sample of a high grade (type A) ore.  Lance explained that the underground mining operation was probably* more selective than the current surface mining techniques, and utilized a mixture of primarily high grade and "B" type ore.

   *(Note· The specifics of the mining operation at Hammondsville are uncertain, as most of the pre-Luzenac records were destroyed by the mine management staff just prior to the J&J divestiture and the Cyprus purchase. However, several former Hammondsville miners are still employed at the Ham mine, and they provided us with useful information as to the nature of the underground works.)

Protected Document--Subject to Protective Order

JNJ 000240741

Pltf_JNJ_0003082240741

-4-

- Ham mine (Open pit- Windham, Vermont) is on the western flank of the Chester Dome. Although the ore body exhibits a steeper dip, the basic geological setting is similar to Hammondsville. The ore bodies at both localities are theorized to have originated as serpentinites which were altered by acidic aqueous intrusions to magnesite (magnesium carbonate). Then, the magnesite was partially altered to talc by the intrusion of water-containing dissolved silica into a process known as "steatization". This incomplete steatization gave rise to a biphasic rock containing both talc and magnesite, the so-called "Talc Carbonate".

- The country rock in both locations varies from a phyllosilicate schist (hanging wall) to a garnetiferrous gneiss (footwall), with the ore body lying in between. There is an adjacent deposit of serpentine, grading into the magnesite facies, which has been steatized outwards forming the commercially usable talc. At both locations the flaky high grade ore (A type) is a border deposit lying in the shear zones, especially near the contact with the schist (although there are intraformational shear zones as well).

c:  **Skillman:**
    R. Gallagher
    A. Kulkarni
    E. Lukenbach
    V. McCluskey
    J. Molnar
    K. Scisorek

    **Royston:**
    R. Corder
    D.Dye
    J. Flaska
    M. Roser

Protected Document--Subject to Protective Order

JNJ 000240742

Pltf_JNJ_000240742

## JNJ000240739

## Metadata

| BegAttach | JNJ 000240739 | ORIGINAL |
|---|---|---|
| Confidentiality | Y | ORIGINAL |
| Custodian | Legacy 1 | ORIGINAL |
| DocumentType | Physical | ORIGINAL |
| EndAttach | JNJ 000240742 | ORIGINAL |
| PgCount | 4 | ORIGINAL |
| Text Path | TEXT\0236\JNJ 000240739.txt | ORIGINAL |
| Trial_Ex_Number | Pltf_JNJ_00031594 | ORIGINAL |

# Exhibit 167

*Johnson & Johnson*

**BABY PRODUCTS COMPANY**

TO:  File                                    DATE:  May 10, 1985        SKILLMAN, N. J. 08558

RE:  INGESTIONS AND INHALATIONS - JOHNSON'S BABY POWDER
     JANUARY, 1982 - JANUARY, 1985

| COMPLAINT # | NAME | DATE RECEIVED | NATURE OF COMPLAINT | MEDICAL ATTENTION RECEIVED | CHILD OR ADULT |
|---|---|---|---|---|---|
| 02043 | Joly | 5/4/82 | Inhalation | Yes | Adult |

Patricia J. Mills

PJM:mmn
cc:  M. McTernan
     N. Musco
     B. Semple

PLAINTIFF'S
TRIAL EXHIBIT
**JJ 448**

Protected Document--Subject to Protective Order

JNJ 000058414

Exhibit 168

*George: F.Y.I.*

# Johnson & Johnson

**DOMESTIC OPERATING COMPANY**                                    NEW BRUNSWICK, N. J.

**June 10, 1977**

Dear Task Force Member:

> We are sending to you, under separate cover, Set of coded talc samples for the CTFA round robin retest. It is hoped that through this partial retesting we can achieve our objectives as discussed at our recent meeting.

> **A.** To verify that CTFA Method J4-1 is accurate and reliable.

> **B.** To determine whether or not any 1976 production major commercial talc products contain asbestiform amphibole contaminants.

Each set of 4 samples has been selected at RANDOM from:

> 1 standard sample prepared by spiking talc with an amphibole mineral, and
> 3 products which were indicated by several labs in our initial round robin to have failed the Method.

This means that your set might include <u>any combination</u> of the above four talc samples. Each vial should contain sufficient sample to prepare at least three (3) pellets, if necessary. The smudges on the sides and bottom of each vial are again caused by the masking perfume.

> It is imperative that we adhere strictly to the CTFA Method as written if we are to obtain a valid inter-laboratory comparison of results. For this purpose, please:

> **1.** In reporting round robin results, consider <u>only</u> those samples showing x-ray diffraction <u>peaks</u> of intensity equal to or greater than that obtained for your own standard talc spiked with <u>0.5% of the CTFA tremolite</u>.

JNJ 000250596

CTFA Round Robin          -2-                    June 10, 1977

2.  Substitute Method J4-1, Part II - Tentative
    Revision (attached) for the Optical Microscopy
    and Dispersion-Staining Method.

3.  Consider an amphibole particle to be a fiber
    only if it meets the shape, size and aspect
    ratio criteria of the OSHA Field Memorandum,
    given in Method J4-1, p. 9.  Note:  Item 3
    of the OSHA fiber definition has been corrected
    to read:

        "3. The maximum length of a fiber to be
        counted is 200 microns."

    It may be necessary to accurately measure certain
    particles to determine if they conform to this
    fiber definition.

    In addition to round robin results, please report to me
your results from Method J4-1 (Parts I and II) for those samples
showing statistically significant x-ray diffraction amphibole
peaks of intensity less than the 0.5% standard.

    We have set August 1, 1977 as deadline for receipt of
your round robin results.  We would also appreciate your comments
and suggestions concerning the Part II Tentative Revision.  Please
contact me (201/524-5518) should you have problems or questions.
Thank you for your participation.

                            Sincerely,

                            John P. Schelz, Chairman
                            CTFA Task Force on
                            Round Robin Testing of
                            Consumer Talcum Products
                            Central Analytical Laboratories
                            Johnson & Johnson Research Center
                            New Brunswick, N.J.  08903

JPS/gm

cc:  Dr. N. F. Estrin
       Vice President-Science, CTFA
     Mr. G. Sandland
       Bristol-Myers Products

JNJ 000250597

RECEIVED

JUN 14 1977

GEORGE LEE

JNJ 000250598

Exhibit 169

*George Lee*

# Johnson&Johnson

*file*   *Talc Committee*
*— CTFA*

C O N F I D E N T I A L

DOMESTIC OPERATING COMPANY                     NEW BRUNSWICK, N. J.

March 1, 1978

Mr. Charles Haynes
The Cosmetic, Toiletry and Fragrance Association, Inc.
1133 15th Street, N.W.
Washington, D.C.  20005

Dear Mr. Haynes:

I am enclosing a table which breaks the code for the recently completed CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals.  The names, addresses, and phone numbers are also included for those industrial partici- cipants whose products were involved.

In accordance with your discussions with Norm Estrin and George Sandland, Chairman CTFA Talc Subcommittee, we would request your assistance in the dissemination of these round robin results as follows:

1.  Please contact me (201/524/5518) upon receipt of this letter so that I may destroy the only other copy of this table, which is in my possession.

2.  Contact each of the industrial participants to inform them of the round robin results for their product only, as well as the actual lot tested.  Please emphasize that no talcum product failed CTFA Method J4-1, Parts I and II; i.e., no product was found to contain asbestiform amphibole at a level equal to or greater than 0.5% by weight. "Nonasbestiform Amphibole Detected" means that the product was found by CTFA Method J4-1 to contain only nonasbestiform amphibole at a level equal to approximately 0.5% or greater.

RECEIVED

MAR D 1978

GEORGE LEE

JNJ 000265120

-2-                                March 1, 1978


    3.  Destroy your copy of the table.

    Your participation in this final important phase of the round robin is appreciated.  Thank you very much.

              Sincerely,

              John P. Schelz, Chairman
              CTFA Task Force on
              Round Robin Testing of
              Consumer Talcum Products

JS/gm
Enclosure

cc    (without table):  Dr. N. F. Estrin
                  Vice President-Science, CTFA
              Mr. G. Sandland
                  Bristol-Myers Products

JNJ 000265121

Exhibit 170



1   SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF ALAMEDA
2                      ---O0O---

3   TERESA ELIZABETH LEAVITT
    and DEAN J. MCELROY,
4        Plaintiffs,
    vs.
5   JOHNSON & JOHNSON, et        No. RG17882401
    al.,
6        Defendants.
    _____/
7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF LOS ANGELES
9                      ---O0O---
    PUI FONG and THAI WONG,
10       Plaintiff,
                         JCCP CASE NO. 4674
11   vs.                     No. BC675449
    JOHNSON & JOHNSON, et al.,
12
         Defendants.
13   _____/

14           TRIAL PRESERVATION
    VIDEOTAPED DEPOSITION OF JAMES PETER MITTENTHAL
15    (PMQ/COR Johnson & Johnson; Johnson & Johnson
                 Consumer, Inc.)
16
             VOLUME III, Pages 444 - 602
17

18
    Taken before EARLY K. LANGLEY, B.A., RMR, RSA, CLR
19               CSR No. 3537

20             October 19, 2018

21

22
             Aiken Welch Court Reporters
23            One Kaiser Plaza, Suite 250
             Oakland, California 94612
24           (510) 451-1580/(877) 451-1580
              Fax:  (510) 451-3797
25             www.aikenwelch.com

Page 445

I N D E X

PAGE

JAMES PETER MITTENTHAL                    449

DIRECT EXAMINATION BY MR. SWANSON (Cont'd)     449

CROSS-EXAMINATION BY MR. COX              586

REDIRECT EXAMINATION BY MR. SWANSON       592

RECROSS-EXAMINATION BY MR. COX            599

E X H I B I T S

EXHIBIT NO.                              PAGE
Exhibit 38    4/15/69 memo re Alternate    457
              Domestic Talc Sources

Exhibit 39    Defendant Johnson & Johnson  469
              Consumer Inc.'s September 2018
              Amended Responses to Plaintiffs'
              LAOSD Standard Interrogatories -
              Fong case

Exhibit 40    USDC District of Rhode Island,  471
              deposition of Roger N. Miller,
              10/29/82, in the Westfall v
              Whittaker, Clark & Daniels case
Exhibit 41    Superior Court New Jersey,   477
              Middlesex County, Gambino v
              Johnson & Johnson Baby Products
              Company, Complaint and Demand for
              Trial by Jury
Exhibit 42    8/6/18 letter, K. Frazier, Shook,  483
              Hardy & Bacon, to J. Satterley,
              with attached privilege log

Page 446

Exhibit 43    11/23/93 memo, R. Denton to W.   494
              Ashton, Trip Report, Talc
              Validation Team Meeting, 11/16/93
              Windsor, Vermont

Exhibit 44    10/17/94 letter, Luzenac America   501
              letterhead, to J. O'Shaughnessy
Exhibit 45    Superior Court, San Diego, Selby   504
              v Johnson & Johnson, Defendant
              Johnson & Johnson Consumer
              Products, Inc.'s Response to
              Plaintiffs' Requests for
              Admission

Exhibit 46    Superior Court, Alameda County,    531
              Leavitt v Johnson & Johnson,
              Defendant Johnson & Johnson's
              June 11, 2018 Amended Responses
              to Plaintiffs' Requests for
              Production of Documents Set 3

Page 447

DEPOSITION OF JAMES PETER MITTENTHAL

BE IT REMEMBERED, that pursuant to Notice, and
on October 19, 2018, commencing at the hour of 9:01
a.m., in the offices of Kazan, McClain, Satterley &
Greenwood, 55 Harrison Street, Suite 400, Oakland,
California 94607, before me, EARLY LANGLEY, a Certified
Shorthand Reporter, State of California, personally
appeared JAMES PETER MITTENTHAL, produced as a witness
in said action, and being previously duly sworn, was
thereupon examined as a witness in said cause.
               ---oOo---
APPEARANCES:

For the Plaintiffs:
    MARK SWANSON
    Kazan, McClain, Satterley & Greenwood
    55 Harrison Street, Suite 400
    Oakland, California 94607
    (510) 302-1000
    Mswanson@kazanlaw.com

For the Defendants Imerys Talc America, Inc.; Cyprus
Mines Corporation; Imerys Talc Vermont, Inc.;
Specially appearing for Defendant Imerys USA, Inc.:
    KARLEEN MURPHY
    (Via phone)
    Dentons US LLP
    601 S. Figueroa Street, Suite 2500
    Los Angeles, CA 90017-5704
    213 623 9300
    karleen.murphy@dentons.com

Page 448

For the Defendants Johnson & Johnson; Johnson & Johnson
Consumer, Inc.:

    CHRISTOPHER COX
    RICHARD T. BERNARDO (Via phone)
    Skadden Arps, Slate, Meagher & Flom, LLP
    4 Times Square
    New York, New York 10036
    (212) 735-3453
    christopher.cox@skadden.com
    richard.bernardo@skadden.com

Also present:

    Jonathan Jaffe
    ESI Consultant
    Jim Partridge
    Tele-Video Production Services

Page 449

1          --oOo--
2        P R O C E E D I N G S
3          --oOo--
4        THE VIDEOGRAPHER:  We are on the record at
5  11 -- excuse me.  We are on the record at
6  9:01 a.m.
7        This marks -- today's date is October 19,
8  2018.
9        This is the continuation of the deposition
10  of James Mittenthal.  This is Volume III, Disk
11  Number 1.
12        Counsel, you may proceed.
13        MR. SWANSON:  Thank you.
14          JAMES PETER MITTENTHAL
15        previously sworn as a witness,
16          testified as follows:
17  DIRECT EXAMINATION BY MR. SWANSON (Cont'd):
18     Q.  Good morning, Mr. Mittenthal.
19     A.  Good morning.
20     Q.  Your deposition is continuing now, and are
21  you ready to go forward today?
22     A.  Yes.
23     Q.  Any reason you can't give your best
24  testimony?
25     A.  No.

Page 450

1     Q.  Okay.  So I want to ask you a couple
2  follow-ups on one of the legal holds.  So if you'd
3  go to Exhibit 1A, and that's Tab 1A in your
4  binder.
5        Do you have that in front of you?
6     A.  Yes, I do.
7     Q.  Now, this is the 2' -- I think it's the
8  current or most recent Johnson & Johnson legal
9  hold notice in asbestos-related talc litigation;
10  correct?
11     A.  Yes.
12     Q.  And I wanted -- I want to go through a
13  little bit on this notice.  It looks like there is
14  some kind of software that notes -- a notice is
15  sent via an email, I guess; is that right?  This
16  notice that -- is that how it gets sent to
17  recipients?
18     A.  Yes.
19     Q.  Okay.  And there is some kind of software
20  that's related to this in terms of them
21  acknowledging receipt in various things; is that
22  right?
23     A.  Yes.
24     Q.  And does that software track certain kinds
25  of information in terms of when they receive it

Page 451

1  and acknowledge receipt and that sort of thing?
2     A.  Yes.
3     Q.  And does the software -- and what's the
4  name of the software?
5     A.  Exterro.
6     Q.  And it says, "Visit the legal hold manager
7  compliance portal, legal hold manager."
8        And does the software track who the
9  intended recipient -- recipients are?
10     A.  Of what?
11     Q.  Of the hold.  In other words, to whom it's
12  sent?
13     A.  Yes.
14     Q.  And I notice there's a section in here
15  that tells recipients that they can suggest other
16  recipients of the hold.
17        Did you see that?
18     A.  Can you reference me to that section?
19  Yes.  I see it.
20     Q.  Yes.  "Suggest other custodians."
21        Do you see that?
22     A.  Yes.
23     Q.  And does the software track who gets
24  suggested?
25     A.  It's my understanding that the company can

Page 452

1  add those people to the list and that they would
2  be tracked.
3     Q.  Does the software track when each
4  recipient acknowledges receipt of the hold?
5     A.  I believe it does.
6     Q.  Okay.  And does the software track who was
7  trained on legal holds, or what the -- anything --
8  information about the recipients of the hold's
9  training?
10     A.  From my fact finding, I have other
11  vehicles, eUniversity, other modules unrelated to
12  Exterro that track training.  And I can pull out
13  my notes for those.
14     Q.  We may do that later.
15        But so that the -- you're not aware that
16  this software actually would have that
17  information; correct?
18     A.  Correct.
19     Q.  Okay.  I noticed that it -- it states here
20  in the first page that "the instruction is within
21  seven days, please visit the legal hold manager
22  compliance portal," and "review and acknowledge
23  this notice."
24        Now, what is triggered with -- what
25  triggers the seven days?  At the point they open

Page 453

1  that email, the recipient of the soft -- of the
2  email regarding this legal hold?  In other words,
3  I work for Johnson & Johnson, I get an email with
4  this legal hold notice.  If I didn't open my email
5  for several days, does that seven days start
6  running when I open my email?
7      A.  I would -- I would be guessing.  My -- I
8  would -- I have a sense of how it works, but I --
9  I'm not -- I would need to do further research to
10  determine that.
11     Q.  I'm interested in what your -- I don't
12  want you to guess, but, based on your experience,
13  what is your expectation?
14     A.  My expectation would be from the -- from
15  the date sent.
16     Q.  From the date the email gets sent?
17     A.  Yes.
18     Q.  Okay.  Do you know why they give seven
19  days for that?  Couldn't somebody -- for example,
20  if I'm an employee and I open the email
21  immediately and I see that there's this legal hold
22  notice, why so long before I have to acknowledge
23  that I've gotten the legal hold notice?
24         MR. COX:  Object to the form of the
25  question.

Page 454

1         THE WITNESS:  I mean, it calls for
2  speculation on my part, but perhaps someone is out
3  of the office on a plane traveling over a long
4  weekend.  It would give them an opportunity to get
5  in front of a place where they can operate the
6  Chrome browser and access the portal.
7  BY MR. SWANSON:
8      Q.  Okay.  That's -- you're assuming that,
9  correct, based on your experience?
10     A.  Those would be -- as I mentioned, I don't
11  know the precise reasons seven days was chosen.  I
12  can only speak to why there may be some days given
13  in terms of the time period.
14     Q.  Okay.  Now, isn't it true that obviously
15  the longer that you wait to require
16  acknowledgment, the greater the chances that some
17  document could get destroyed that should have been
18  preserved under the notice; correct?
19         MR. COX:  Object to the form.
20  BY MR. SWANSON:
21     Q.  Well, let's say if you gave 30 days,
22  right, so any period that you wait beyond what's
23  minimally necessary to acknowledge receipt of that
24  increases the likelihood that documents that are
25  subject to the hold get destroyed; true?

Page 455

1         MR. COX:  Object to the form.
2         THE WITNESS:  Well, I'm not sure if it's a
3  philosophical or legal distinction.  But if I see
4  the email, I can -- I'm able to comply even before
5  I acknowledge compliance.  So the email tells me
6  that there's something going on and that I have
7  something I should or should not be doing.
8         The acknowledgment obviously is a formal
9  indication that I read and understood.  It doesn't
10 mean I can't be doing those things before I even
11 can formally comply with the -- with the notice.
12 BY MR. SWANSON:
13     Q.  Right.  But the idea of having the receipt
14 acknowledgment is so that the company can track
15 who knew when; right?
16     A.  Well, I don't know if I can speculate to
17 all the motives.  It certainly gives the company a
18 sense of -- from an overall perspective who has --
19 who has acknowledged and, therefore, a way to
20 understand who needs to be followed up on, who
21 needs to have their manager contacted, who needs
22 additional action taken.
23     Q.  Right.  Now, if somebody gets it and they
24 don't acknowledge it and they wait the maximum
25 period -- let's say this person doesn't have good

Page 456

1  intentions, and you said, you know, you're
2  assuming somebody is going to -- they see the
3  email, they can comply anyway.  But until they
4  acknowledge it, the company has no way of knowing
5  if somebody actually read it and looked at it,
6  and, furthermore, if somebody had an intention to
7  get rid of something within that window of seven
8  days, that would give them the opportunity to do
9  it before they even acknowledge receipt; correct?
10     A.  Well --
11         MR. COX:  Object to the form.
12         Go ahead.
13         THE WITNESS:  I'm sorry.
14         The company does not know that the person
15 has formally acknowledged until they do so.  But
16 this -- the system operates against the backdrop
17 of all the training and records management
18 awareness and legal hold awareness so that the
19 automated portion of it that I get a legal hold
20 and I'm responding to it formally is just a part
21 of the overall duties and expectations and
22 training for every custodian.  And so it's
23 understood that if I get a notice, it's not the
24 first time I've ever heard of a -- what a legal
25 hold is and what my responsibilities are.

Page 457

1     MR. SWANSON:  I'm going to move to strike
2  that last answer as being nonresponsive.
3     (Whereupon, Plaintiff's Exhibit 38 was
4     marked for identification.)
5  BY MR. SWANSON:
6     Q.  Mr. Mittenthal, I'm handing you Exhibit 38
7  to your deposition.
8     Do you have Exhibit 38 in front of you?
9     A.  I do.
10    Q.  And this is a Johnson & Johnson document
11 dated April 15, 1969, and the subject matter is
12 "alternative domestic source" -- "talc sources."
13    Do you see that?
14    A.  "Alternate domestic talc sources."
15    Q.  "Alternate" -- thank you -- "domestic talc
16 sources."
17    You have been asked about this document
18 before; correct?
19    Do you remember this document?
20    A.  I frankly don't recall.
21    Q.  Okay.  You see here in paragraph --
22 paragraph 3 here that -- well, the author of this
23 is a T.M. Thompson, M.D., and he's writing to
24 William Ashton, W.H. Ashton, at Johnson & Johnson;
25 correct?

Page 459

1  General Johnson and several pediatricians
2  expressing concern over the possibility of adverse
3  effects on the lungs of babies or mothers who
4  might inhale any substantial amounts of our talc
5  formulations.  In the past we have replied to the
6  effect that, since our talc is essentially all of
7  the platelet-type of crystalline structure and is
8  of a size which would not be likely to enter the
9  pulmonary alveoli, we would not regard the usage
10 of our powders as presenting any hazard."
11    Do you see that?
12    A.  Yes, I do.
13    Q.  And then next sentence says, "Obviously,
14 if we do not" -- "if we do include tremolite in
15 more than unavoidable trace amounts, this sort of
16 negation of such inquiries could no longer
17 pertain."
18    Do you see that?
19    A.  Yes.
20    Q.  And then if you look at the next page, the
21 second paragraph, you see where it says -- author
22 says, "Since pulmonary diseases including
23 inflammatory fibroplastic and neoplastic types
24 appear to be on the increase, it would seem to be
25 prudent to limit any possible content of tremolite

Page 458

1     A.  Well, I see that's what's written on the
2  document, yes.
3     Q.  That's what the document says.
4     And Mr. Thompson tells Mr. Ashton, "We
5  have been concerned to a much greater extent with
6  regard to possible dangers relative to inhalation
7  of the talc with a spicule or needle-like
8  crystalline structure as compared to the flat
9  platelet-type of crystalline structure."
10    Do you see that?
11    A.  Yes.
12    Q.  Then he goes on to talk about how there
13 are reports in the literature of talcosis.
14    Do you see that?  Right after that
15 sentence.
16    A.  I'm looking for...
17    Q.  There are reports in the literature?
18    A.  Oh, yes.  Yes.  Yes.
19    Q.  Okay.
20    If you go towards the bottom, the
21 second-to-last sentence.  It says, "In the past we
22 have applied" -- oh, wait.  "Furthermore."  Do you
23 see that halfway through that paragraph?
24 "Furthermore we have occasionally received
25 inquiries from various individuals including

Page 460

1  in our powder formulations to an absolute minimum.
2  To the best of my knowledge, we have never been
3  faced with any litigation involving either skin or
4  lung penetration in our formulas."
5     Then it talks about they were "faced with
6  more or less serious problem resulting from what
7  we have considered to have been unjust accusation
8  of danger due to the presence of small amount of
9  boric acid in our talc."
10    Do you see that?
11    MR. COX:  Object to the form of the
12 question.
13    THE WITNESS:  Yes.
14 BY MR. SWANSON:
15    Q.  It says, you see the sentence here, "It is
16 conceivable that a similar situation might
17 eventually arise if it became known that our talc
18 formulations contained any significant amount of
19 tremolite.  Since the usage of these products is
20 so widespread and the existence of pulmonary
21 disease is increasing, it is not inconceivable
22 that we could become involved in litigation in
23 which pulmonary fibrosis or other changes might be
24 rightfully or wrongfully attributed to inhalation
25 of our powder formulations.  It might be that

Page 461

1  someone in the law department should be consulted
2  with regard to the defensibility of our position
3  in the event that such a situation should ever
4  arise."
5      Do you see that?
6  A. "Could ever arise," yes.
7  Q. "Could ever arise." Thank you.
8      So in -- as of April 15, 1969, people in
9  the research and development department,
10  Mr. Ashton in -- at Johnson & Johnson was aware --
11  anticipating at least the possibility of
12  litigation from tremolite-contaminated talc and
13  allegations of lung disease resulting from that;
14  true?
15      MR. COX: Object to the form of the
16  question. Mischaracterizes the document.
17      THE WITNESS: I'm not in a position to
18  say. I'm not familiar with this document. I'm
19  not -- it's beyond my scope to make any assessment
20  of its content.
21  BY MR. SWANSON:
22  Q. Well, you're the person who's here to talk
23  about legal holds and you're also here to talk
24  about the documents that have been produced in
25  this case and whether or not these are authentic

Page 462

1  documents.
2      This is an authentic Johnson & Johnson
3  document; correct?
4  A. I can't say one way or the other.
5  Q. Well, what is it about -- this was -- you
6  can see that this is Johnson & Johnson's Bates
7  numbers; correct?
8  A. I frankly -- oh, yes. I do see a Bates
9  number on it.
10  Q. So you know that that was produced by
11  Johnson & Johnson in this case; true?
12  A. I would want to study it further and
13  verify that, but I do see a Bates number on it.
14  Q. All right. Well, you understand you were
15  noticed, you were -- have been produced as the
16  corporate representative to talk about the
17  authenticity -- authenticity of these documents
18  and whether or not they're business records.
19      You understand that; right?
20  A. I understand that was part of my notice,
21  yes.
22  Q. Okay. So what is it about this document
23  that makes you unable to say whether or not that
24  is an authentic Johnson & Johnson business record?
25      MR. COX: Object to the form of the

Page 463

1  question.
2      THE WITNESS: I -- I'm not familiar with
3  the content. I'm not able to speak to what the
4  content means in any sense of the scientific,
5  factual, or business or medical sense. To the
6  extent that this is an actual Bates number, and I
7  can certainly confirm that, I have no reason to
8  believe that -- nor does the company believe that
9  there are documents that have been produced that
10  are not authentic documents.
11      But in terms of the content, I can't speak
12  to it.
13  Q. I'm not asking -- I'm asking you first
14  whether or not this is an authentic business
15  record of Johnson & Johnson. And you'll agree
16  that it is; true?
17      MR. COX: Object to the form of the
18  question.
19      THE WITNESS: No. The -- the -- the
20  term "business record" is one that I -- I believe
21  entails a legal judgment. And I think the first
22  time you asked me you didn't say the -- I don't
23  believe you said "business."
24  BY MR. SWANSON:
25  Q. Let me ask it differently. It's an

Page 464

1  authentic record of Johnson & Johnson; correct?
2  A. It -- it appears to be a document from the
3  production, and if it is -- if that is the case,
4  then the company has no reason to believe that it
5  is not an authentic document.
6  Q. An authentic document that was created in
7  Johnson & Johnson's regular course of business;
8  true?
9  A. I don't know.
10      MR. SWANSON: Counsel, I want to meet and
11  confer on this because he is designated to speak
12  on these issues and we're talking about, you know,
13  business record in the simplest terms: Is this
14  authentic and is it something created in the
15  regular course of their business. He needs to be
16  able to talk about that. That's one of the
17  noticed topics.
18      MR. COX: I think he is talking about
19  that. I don't think --
20      MR. SWANSON: Well, he needs to be able
21  to -- he isn't because he's saying, I don't know,
22  I can't say.
23      MR. COX: Well, you're asking compound
24  questions and I think he's trying to answer them
25  the best he can.

Page 465

1  BY MR. SWANSON:
2      Q.  Was this document, Exhibit 38, created in
3  the regular course of Johnson & Johnson's
4  business?
5      A.  I simply don't have the information to
6  answer that.  It -- the -- based on the fact that
7  it appears to be a document produced in this
8  litigation, the company does not doubt -- have any
9  special reason to question its authenticity, but I
10 cannot speak to whether it's -- how it was
11 created, whether it was in the ordinary course of
12 business, whether it was in any sense of how the
13 company chose to create its documents.  It is --
14 the document population certainly contains many
15 records created in the course of business.  I'm
16 not able to make a judgment as to this particular
17 document as to the circumstances by which it was
18 created.
19     Q.  Do you have any reason to believe that any
20 documents that are created that were produced in
21 this case, in Leavitt or Fong, that are on
22 Johnson & Johnson letterhead are not records that
23 were created in the regular course of Johnson &
24 Johnson's business?
25     MR. COX:  Object to the form.

Page 466

1      THE WITNESS:  I -- if -- to the extent
2  that the regular course of business assumes a
3  legal judgment, I'm not able to say one way or the
4  other.  I can say that amongst the information
5  produced where there are records created in the
6  course of the company's business operations, I
7  cannot speak to the providence, the context, or
8  the classification of this particular document.
9  BY MR. SWANSON:
10     Q.  But it was created in Johnson & Johnson's
11 business; correct?  You just said that.
12     A.  It was created in such a manner that the
13 company has no reason to doubt its authenticity,
14 to the extent that it was produced in this -- in
15 this litigation.
16     Q.  As a Johnson & Johnson record; correct?
17     A.  I don't know what -- what does that mean,
18 Johnson & Johnson?
19     Q.  It means this is a Johnson & Johnson
20 letter, correct, sent in their -- in the course of
21 their business.  This isn't somebody else's
22 business; right?  This is Johnson & Johnson's
23 business we're talking about; right?
24     A.  I -- I can agree with you that the words
25 at the top say "Johnson & Johnson," but I'm not

Page 467

1  here, nor would I be able to make a judgment as to
2  whether it's a business record created in the
3  course of business and any other categorization of
4  it.
5      Q.  Okay.
6      MR. SWANSON:  We're going to have to meet
7  and confer on that.  He's not an adequate witness
8  on this issue.  These are really simple questions
9  and he is tasked with doing that and he's not able
10 to do it.
11     MR. COX:  I disagree.  I mean, I think he
12 answered your question about authenticity and he
13 answered your question about whether it was
14 created in -- in connection with Johnson &
15 Johnson's business.  I think he's appropriately
16 making a distinction in terms of the legal import
17 of the term "business record," but I think he
18 answered the question -- the other two questions
19 you asked.
20     MR. SWANSON:  Well, I left out the
21 term "business record" and I started asking if it
22 was created in the regular course of their
23 business.  That's not a highly legal term.
24     MR. COX:  No.  And I think he answered
25 that question and said it was.

Page 468

1      MR. SWANSON:  You're agreeing that it was,
2  correct, as counsel for Johnson & Johnson, on this
3  document?
4      MR. COX:  That that was -- that that's a
5  Johnson & Johnson -- created in Johnson &
6  Johnson's business, yes.  Yes.
7      MR. SWANSON:  Okay.
8  BY MR. SWANSON:
9      Q.  All right.  So, with regard to this
10 document, is there -- was -- let me ask you this:
11 Legal holds can be issued either because a lawsuit
12 has been filed, correct, or because a company
13 anticipates litigation; correct?
14     MR. COX:  Object to the form of the
15 question to the extent it calls for a legal
16 conclusion.
17 BY MR. SWANSON:
18     Q.  Those are two situations in which a legal
19 hold could be...
20     A.  And -- and I would concur, but there's
21 many situations where a legal hold could be
22 issued, and the law department makes that
23 determination as to what to issue and when.
24     Q.  But the legal holds themselves talk about
25 anticipated, and, Johnson & Johnson's

Page 469

1  documentation that I've seen, and I can't point
2  you to the exact document, mention both litigation
3  and anticipated litigation in terms of when holds
4  are appropriate; correct?
5      A. Well, I've seen language like Johnson &
6  Johnson -- or so and so is party to litigation.
7  That I recall seeing in the notice.
8      Q. But you agree that anticipated litigation
9  is sometimes a trigger for issuing a hold,
10  correct, for a company?
11      A. In the hypotheticals, yes.  Absolutely.
12      Q. Do you have any information that Johnson &
13  Johnson issued a legal hold in 1969 in instructing
14  Johnson & Johnson employees not to destroy
15  documents relating to the testing of Johnson's
16  Baby Powder or talc that was used in Johnson's
17  Baby Powder for the presence of asbestos?
18      A. I have no information as to that.
19      Q. Is there anything that you're aware of
20  that prevented anybody at Johnson & Johnson from
21  issuing a hold on testing documents at this time
22  in 1969?
23      A. I have -- I have no information one way or
24  the other.  That was not part of my research.
25         (Whereupon, Plaintiff's Exhibit 39 was

Page 470

1         marked for identification.)
2  BY MR. SWANSON:
3      Q. Mr. Mittenthal, I'm handing you Exhibit
4  Number 39.
5         Let your counsel see that for a moment.
6         Do you have Exhibit Number 39 in front of
7  you?
8      A. Yes, I do.
9      Q. And these are Defendant Johnson & Johnson
10  Consumer, Inc.'s September 2018 Amended Responses
11  to Plaintiff's LAOSD Standard Interrogatories in
12  the Fong case; correct?
13      A. I see that, yes.
14      Q. Okay.  And if you go to page 21 of this
15  document, Interrogatory Number 36, do you see the
16  question is, "When did you first receive notice
17  that any person including any agent" -- "employee
18  or agent claimed injury as a result of exposure to
19  asbestos or asbestos-containing product supplied
20  by you?"
21         Do you see that?
22      A. Yes, I do.
23      Q. And then starting at the second sentence
24  of the answer, "After reasonable investigation,
25  defendant states that it has reasonable and good

Page 471

1  faith belief that it first became aware of a claim
2  of alleged exposure to asbestos with respect to
3  defendant's talc in connection with Westfall v.
4  Whittaker, Clark & Daniels, et al., Case Number
5  79-0269, in the United States District Court for
6  the District of Rhode Island in which plaintiffs
7  alleged injury was mesothelioma, and plaintiff was
8  represented by Decoff & Grimm of Providence,
9  Rhode Island.  Defendant states that the J&J
10  entity Windsor Minerals was voluntarily dismissed
11  from the case."
12         Have you seen this before?
13      A. I've seen the interrogatory responses,
14  yes.
15      Q. So you were aware that Johnson & Johnson,
16  or its operating entity company, Windsor Minerals,
17  was sued in the Westfall case; correct?
18      A. I'm aware of the question and the answer.
19      Q. Okay.  Were you aware that -- were you
20  aware that Johnson & Johnson's Windsor Minerals
21  had been sued in the Westfall case?
22      A. I have a general understanding of that.
23      Q. And to your knowledge, when was that?
24      A. I'm not familiar with the precise date.
25         (Whereupon, Plaintiff's Exhibit 40 was

Page 472

1         marked for identification.)
2  BY MR. SWANSON:
3      Q. Let me hand you Exhibit Number 40 to your
4  deposition.
5         MR. COX:  Do you have an extra copy of
6  that, Mark?
7         Thank you.
8  BY MR. SWANSON:
9      Q. Do you have Exhibit 40 in front of you?
10      A. Yes.
11      Q. Okay.  And I've just given you the -- here
12  the first few pages of a transcript of a Roger
13  Miller in the Westfall case.
14         Do you see that?
15      A. Yes.
16      Q. And you see that's the same case number,
17  790269?
18      A. Yes, I do.
19      Q. And what was the date of that deposition?
20      A. October 29, 1982.
21      Q. And if you go to the second page of this
22  on appearances, do you see that Windsor Minerals
23  was represented at the deposition?
24      A. I do.
25      Q. And you know that Windsor Minerals, Inc.

Page 473

1   was a subsidiary of Johnson & Johnson that
2   supplied talc to Johnson & Johnson for Johnson's
3   Baby Powder and cosmetic talc products; correct?
4       A. That's my general understanding.
5       Q. And from this information it's clear that
6   Johnson & Johnson was aware of the lawsuit; true?
7           MR. COX: Object to the form of the
8   question.
9   BY MR. SWANSON:
10      Q. From the interrogatory response that I
11  provided you?
12      A. Well, it -- by inference it would appear
13  that the company was aware by virtue of counsel.
14      Q. Okay. Right.
15          And -- okay. Did Johnson & Johnson
16  instruct anyone at Windsor Minerals at that time
17  to preserve or not destroy documents, information,
18  or physical evidence or talc from Windsor
19  Minerals, Inc. Vermont mines --
20          MR. COX: Object to form.
21  BY MR. SWANSON:
22      Q. -- or related to products manufactured
23  from talc that came from Windsor Minerals mines?
24          MR. COX: Object to the form of the
25  question.

Page 474

1           THE WITNESS: That was outside the scope
2   of my investigation.
3   BY MR. SWANSON:
4       Q. Well, the scope of your investigation was
5   to investigate talc hold issues; correct?
6           MR. COX: Object to the form of the
7   question misstates the scope of the notice for
8   which this witness has been tendered.
9   BY MR. SWANSON:
10      Q. You know from looking at the notice that
11  we asked what efforts were made by Johnson &
12  Johnson to preserve documents, correct --
13          MR. COX: Object to the form.
14  BY MR. SWANSON:
15      Q. -- as well as samples?
16          MR. COX: Object to the form of the
17  question. Misstates what the notice says.
18          THE WITNESS: My understanding was that
19  the -- my investigation was concerning consumer
20  talc products.
21  BY MR. SWANSON:
22      Q. And what distinction are you making here
23  about Westfall?
24      A. I have a general and limited understanding
25  that Westfall did not involve a consumer talc

Page 475

1   product.
2       Q. And you got this from the lawyers, right,
3   this understanding?
4       A. Yes.
5       Q. Did you also get an understanding that
6   this came from the same mines where cosmetic talc
7   was being mined?
8           MR. COX: Object to the form.
9           THE WITNESS: That was outside the scope
10  of my investigation.
11  BY MR. SWANSON:
12      Q. I see. So you didn't ask that question or
13  find the answer to that?
14      A. I asked -- I asked -- which question?
15      Q. Whether or not the mines that were
16  involved in -- in the Westfall case issues were
17  the same mines that were producing cosmetic talc
18  for cosmetic talc products for Johnson & Johnson.
19      A. I -- I would not have viewed that as
20  within the scope of my investigation.
21      Q. Speaking on behalf of Johnson & Johnson on
22  the issue of legal holds and preservation of
23  documents, are you aware of any legal hold being
24  issued with respect to the Westfall case?
25      A. I'm -- I'm not aware of holds. I

Page 476

1   requested holds that related to consumer talc. I
2   received those holds. I'm not aware of other
3   holds.
4       Q. Okay. You are aware of the Westfall case?
5   You were made aware of that and you were
6   specifically made aware of the fact that the case
7   allegations itself weren't about a cosmetic talc
8   product; true?
9       A. I have general knowledge of that, yes.
10      Q. But you didn't bother to find out whether
11  or not the talc issues were related to these
12  cases; true?
13          MR. COX: Object to the form.
14          THE WITNESS: I -- looking at the
15  deposition notice and my responsibilities, I did
16  not see that my investigation included
17  understanding where talc came from. I was focused
18  on responding to the deposition topics.
19  BY MR. SWANSON:
20      Q. You would agree with me, though, that if
21  the area where the talc was being mined that's at
22  issue in the Johnson case was an area where
23  cosmetic talc was being mined and in addition it's
24  a mesothelioma case, that there would be many,
25  many overlapping issues with the cosmetic talc

Page 477

1 case; correct?
2      MR. COX:  Object to the form.
3      THE WITNESS:  I know that -- that's a
4 legal conclusion.  I -- I think I'm being asked to
5 provide, and I -- I just can't speak to that.
6 BY MR. SWANSON:
7      Q.  You understand that mesothelioma results
8 from inhalation typically; correct?
9      MR. COX:  Object to the form.  Beyond the
10 scope of the notice.
11      THE WITNESS:  I'm not an expert on the
12 causes of mesothelioma.
13 BY MR. SWANSON:
14      Q.  In any case, you're not aware of any legal
15 hold notice, you've never heard of any legal hold
16 notice being issued with respect to any type of
17 talc prior to 1999; true?
18      A.  I am not aware of any notices prior to
19 1999.
20      (Whereupon, Plaintiff's Exhibit 41 was
21      marked for identification.)
22 BY MR. SWANSON:
23      Q.  Handing you Exhibit 41 to your deposition.
24      Do you have that in front of you?
25      A.  I do.

Page 478

1      Q.  Have you seen -- now, Exhibit 41, you can
2 see that this is a Johnson & Johnson Bates number
3 at the bottom; correct?
4      A.  Yes.  I see what appear to be two
5 different Bates numbers.
6      Q.  And you recognize those are Bates numbers
7 that Johnson & Johnson uses; you've seen those on
8 other documents that they've produced from their
9 records; correct?
10      A.  Correct.
11      Q.  And this is -- appears to be a complaint
12 in a case called Anthony Gambino and Rose Marie
13 Gambino, his wife v. Johnson & Johnson Baby
14 Products Company; correct?
15      A.  I see that.
16      Q.  Were you aware of the Gambino case?
17      A.  I don't recall it specifically.
18      Q.  And if you go to the last -- if you go
19 to -- well, on the first page, first claim of
20 relief, and you can see that the product at issue
21 is Johnson's Baby Powder Purest Protection.
22      Do you see that?
23      A.  Yes.
24      Q.  And, then, if you go to the second page,
25 there is a mention in paragraph 2 that the

Page 479

1 plaintiff alleges that they purchased the product.
2      Do you see that?
3      A.  Yes.
4      Q.  And do you see that Number 4, the
5 plaintiff alleges talcosis from long-term use of
6 Johnson's Baby Powder?
7      A.  I see it.
8      Q.  And in Number 5, they are alleging severe
9 and permanent injuries from that exposure.
10      Do you see that?
11      A.  Yes.
12      Q.  Okay.  If you go to the last page, you see
13 the date of the complaint?
14      A.  Yes.
15      Q.  And what was the date of the complaint?
16      A.  October 11, 1983.
17      Q.  And Johnson & Johnson obviously was aware
18 of this lawsuit; correct?
19      MR. COX:  Object to the form.
20      THE WITNESS:  Well, I have not seen this
21 document before and can't speak to it.  By -- by
22 common sense, it would appear that Johnson &
23 Johnson was aware of this.
24 BY MR. SWANSON:
25      Q.  Right.  Because this document -- I didn't

Page 480

1 make this up or even get it off the Court's Web
2 site or anything; I got it from Johnson & Johnson
3 because that's their Bates number; right?
4      A.  I see the Bates number, yes.
5      Q.  And speaking on behalf of Johnson &
6 Johnson on the issue of legal holds and
7 preservation of documents and evidence, you are
8 not aware of any legal hold being issued at the
9 time of this Gambino case with respect to talc
10 litigation issues and Johnson's Baby Powder; true?
11      MR. COX:  Object to the form.
12      THE WITNESS:  I have no information as to
13 whether a hold was issued or not issued or what
14 the circumstances were.
15 BY MR. SWANSON:
16      Q.  Now, the reality is you're not aware of
17 any legal hold being issued in any kind of talc
18 litigation case prior to 1999.  So, as the
19 spokesperson for Johnson & Johnson, Johnson &
20 Johnson did not issue a legal hold in response to
21 this complaint; correct?
22      MR. COX:  Object to the form of the
23 question.
24      THE WITNESS:  I'm sorry, are you asking me
25 to -- to verify that statement or are you asking

Page 481

1  me if I know it?
2  BY MR. SWANSON:
3      Q.  I'm asking you to verify that.
4      A.  I don't --
5          MR. COX:  Object to the form.
6          THE WITNESS:  I'm sorry.
7          I am not aware of holds prior to 1999, but
8  I'm not speaking as to whether there were or were
9  not holds issued.
10 BY MR. SWANSON:
11     Q.  Well, sure you are.  You are the
12 representative.  You are Johnson & Johnson sitting
13 here speaking as Johnson & Johnson today, and I'm
14 asking you about legal holds, and it's a noticed
15 topic.
16         So did Johnson & Johnson issue a legal
17 hold as a result of the Gambino case --
18         MR. COX:  Object to the form of the
19 question.
20 BY MR. SWANSON:
21     Q.  -- in 1983?
22         MR. COX:  Same objection.
23         THE WITNESS:  That was -- that was not
24 part of my investigation.  I don't have that
25 information.

Page 482

1  BY MR. SWANSON:
2      Q.  So the answer is you don't know, it was
3  your assignment, so there's two options:  Either
4  you don't know -- you did your investigation and
5  there wasn't one, or it hasn't been produced or
6  it's been destroyed or they never issued one.
7          Are there any other options I'm not
8  thinking of?
9          MR. COX:  Object to the form.
10         THE WITNESS:  My objective was to identify
11 the holds that were available.  As far as the
12 holds that weren't available, if there were any,
13 I -- I can't speak to the absence of something as
14 to why it was or wasn't there.  I don't know one
15 way or the other if there was a hold issued or
16 not.  I simply asked for the holds that were
17 available.
18 BY MR. SWANSON:
19     Q.  As Johnson & Johnson speaking today here,
20 do you have any evidence of a hold as a result of
21 the Gambino case in 1983?
22     A.  I do -- I have not received a hold
23 associated with that case.
24     Q.  Okay.  That's all I have about that.  Put
25 that in the stack.

Page 483

1          MR. SWANSON:  Whoever's on the phone, one
2  of you, please mute your phone.
3          MR. BERNARDO:  This is Rich.  Mine has
4  been on mute.
5          MR. SWANSON:  Okay.
6          This is a Fong privilege log.
7          (Whereupon, Plaintiff's Exhibit 42 was
8          marked for identification.)
9  BY MR. SWANSON:
10     Q.  Do you have Exhibit 42 in front of you?
11     A.  Yes, I do.
12     Q.  And you can see that this is a privilege
13 log that was produced by Johnson & Johnson in the
14 Fong case; correct?
15     A.  Appears to be, yes.
16     Q.  Have you seen this privilege log before?
17     A.  I have not.
18     Q.  So you didn't have anything to do with
19 making it a privilege log; correct?
20     A.  That's correct.
21     Q.  Now I want to go through some -- you
22 understand what the general purpose of a privilege
23 log is; correct?
24     A.  Yes.
25     Q.  Okay.  If you go to page 2 of this -- and

Page 484

1  I know the writing is small, but I -- you're
2  pretty young and I assume you can read it.
3      A.  Okay.
4      Q.  Page 2.  Tell me when you're there.
5      A.  I'm on page 2.
6      Q.  You see on page 2 it lists the document.
7  There's various columns for this, and you can see
8  there's -- including privilege log number, the
9  Bates number, the date of the document, the
10 author, the recipient, people who were copied,
11 very -- sometimes a little bit of information
12 about subject matter but not so much, and a
13 privilege description and a privilege claim;
14 correct?
15         MR. COX:  Object to the form.
16         THE WITNESS:  Yeah.  I see those are the
17 column headings on page 1.
18 BY MR. SWANSON:
19     Q.  Okay.  And if you go to page 2, you see
20 the third one down, there's a document that --
21 about which Johnson & Johnson's claiming privilege
22 dated 7/22/1981 from William Ashton to Frank
23 Bolden.
24         Do you see that entry?
25     A.  Yes, I do.

Page 485

1    Q. If you just go to the right there, you see
2   it says, "Memorandum prepared at the request of
3   counsel pursuant to pending and anticipated talc
4   litigation."
5        Do you see that?
6    A. Yes, I do.
7    Q. I don't know what pending talc litigation
8   they're referring to.
9        Do you know if any legal holds were issued
10  with respect to the pending talc litigation that's
11  being referred to in that item from 1981?
12       MR. COX:  Object to the form.
13       THE WITNESS:  I don't know and I simply
14  didn't investigate those types of notations from
15  the privilege log.
16  BY MR. SWANSON:
17   Q. Okay.  You're not aware of any being
18  privilege log from 1981 related to talc
19  litigation, are you?
20   A. I'm sorry.  One more time, please.
21   Q. You're not aware of any talc litigation
22  related legal hold being issued in 1981; correct?
23   A. I'm not aware of one.  I did not receive
24  one when I requested.
25   Q. Okay.  The next item down, do you see

Page 486

1   there's an entry for May 5, 1989?
2    A. Yes.
3    Q. And there's some kind of communication
4   between Ira Dembro and William Ashton.
5        Do you see that?
6    A. I do.
7    Q. And, again, this indicates there's a
8   memorandum prepared by counsel pursuant to pending
9   and anticipated litigation prepared by counsel
10  pursuant to pending and anticipated talc
11  litigation; correct?
12   A. I see that, yes.
13   Q. Are you aware of any legal holds with
14  respect to pending talc litigations being issued
15  by Johnson & Johnson or one of its -- Johnson &
16  Johnson broadly speaking, in 1989 as a result of
17  whatever pending litigation is being referred to
18  there?
19       MR. COX:  Object to the form.
20       THE WITNESS:  I'm not aware.
21  BY MR. SWANSON:
22   Q. Okay.  Going to Page Number 4.  Tell me
23  when you're there.
24   A. Yes.
25   Q. Do you see at the top there are multiple

Page 487

1   references to communications dated November 30,
2   1982, between a George Lee and an Edward
3   Leibensperger?
4    A. I see that, yes.
5    Q. And date of communication is 11/30/1982;
6   correct?
7    A. Well, the first four --
8    Q. That's what I am --
9    A. Yeah.
10   Q. Okay.  And it refers to -- the first one
11  says, "Letter from client to counsel providing
12  materials in anticipation of litigation for
13  counsel to provide legal advice regarding talc
14  sample evidence."
15       Do you see that?
16   A. Yes.
17   Q. And then the next one says, "Attachment
18  between counsel and client sent at counsel's
19  request seeking legal advice regarding ongoing
20  talc litigation."
21       Do you see that?
22   A. I do.
23   Q. So, as of November 30, 1982, whatever case
24  they're referring to these issues in, or
25  anticipated cases, was any legal hold issued by

Page 488

1   Johnson & Johnson?
2        MR. COX:  Object to the form.
3   BY MR. SWANSON:
4    Q. For talc litigation-related information
5   and documents?
6        MR. COX:  Same objection.
7        THE WITNESS:  I -- I simply don't have
8   that information.  I didn't view it as my scope to
9   investigate these -- these privilege log
10  notations.
11  BY MR. SWANSON:
12   Q. Well, you understood that we were asking
13  you about Johnson & Johnson's attempt to preserve
14  evidence related to talc issues; correct?
15       MR. COX:  Object to the form.
16       THE WITNESS:  Yes.  With respect to the
17  Fong and Leavitt cases.
18  BY MR. SWANSON:
19   Q. Okay.  But you just didn't look at this
20  thing.
21       But you asked for holds; right?
22   A. Yes, I did.
23   Q. Okay.  And from what you saw, you're not
24  aware of any holds before 1999; true?
25   A. That's true.

Page 489

1    Q.  And if you go down further at the bottom
2  of the page, you see the reference to June 22,
3  1983?
4    A.  Yes.
5    Q.  You see again there's another
6  communication and this one between
7  Mr. Leibensperger and a John Beidler?
8    A.  Yes.
9    Q.  And copied is Roger Miller.  You see that?
10    A.  Yes.
11    Q.  And this also refers to pending and
12  anticipated talc litigation; correct?
13    A.  Yes.  Correct.
14    Q.  Okay.  So as of 1983 you're not aware of
15  any talc litigation legal holds being issued by
16  Johnson & Johnson; true?
17        MR. COX:  Object to the form.
18        THE WITNESS:  That's correct.
19  BY MR. SWANSON:
20    Q.  Was there anything that prevented
21  Johnson & Johnson issuing holds as to any of
22  these cases that we've talked about so far?  The
23  Gambino case, the Westfall case, or any of these
24  cases that are referred to in this privilege log?
25        MR. COX:  Object to the form.

Page 490

1        THE WITNESS:  So I would disagree that the
2  absence of a hold means that a hold wasn't issued.
3  I requested the holds that were available in
4  consumer talc.  As to whether holds were issued in
5  these cases or the other circumstances surrounding
6  the discovery process, I can't say one way or the
7  other.  I can't say that there wasn't a hold
8  issued.  I simply don't know.
9  BY MR. SWANSON:
10    Q.  So as Johnson & Johnson, you don't know if
11  there were holds on these issues; correct?
12    A.  That's correct.
13    Q.  Okay.  And are you -- and that does
14  suggest an issue I need to follow up on.
15        Are you saying that legal holds don't get
16  retained by Johnson & Johnson?
17        MR. COX:  Object to the form.
18        THE WITNESS:  I -- I'm not saying that one
19  way or the other.
20  BY MR. SWANSON:
21    Q.  Are you aware of the destruction of legal
22  holds by Johnson & Johnson?
23    A.  I am not.
24    Q.  Okay.  If you could go to page 25 of this
25  privilege log, please.

Page 491

1        Are you there?
2    A.  Yes.
3    Q.  So if you see the second reference down,
4  you see there was a communication from Roger N.
5  Miller to a Frank Bolden and other individuals?
6    A.  I do.
7    Q.  And the date of this communication was
8  November 7, 1977.
9        Do you see that?
10    A.  Yes.
11    Q.  And the privilege description says,
12  "Attachment prepared at the request of counsel
13  pursuant to pending and anticipated litigation
14  regarding talc litigation."
15        Did I read that right?
16    A.  Sounds right.
17    Q.  Okay.  And was any legal hold issued with
18  respect to that case that you're aware of?
19    A.  I'm not aware.
20    Q.  Was there anything that prevented
21  Johnson & Johnson from issuing a legal hold as to
22  that talc litigation that you can think of?
23        MR. COX:  Object to the form.
24        THE WITNESS:  I don't know the
25  circumstances of the case.  I don't know

Page 492

1  whether -- what holds were issued.  I don't know
2  the circumstances of the case.
3  BY MR. SWANSON:
4    Q.  Now, you said that you were -- only
5  prepared hold issues related to the Fong and
6  Leavitt case or something along those lines;
7  correct?
8    A.  Well, I understood that my general charge
9  was in reference to these two cases.
10    Q.  Right.  But you understand we're looking
11  here at a privilege log from the Fong case;
12  correct?
13    A.  I understand that.
14    Q.  So Johnson & Johnson already made the
15  determination that it was required to give us a
16  privilege log on documents that were related to
17  these cases; correct?
18    A.  When you say "these cases," you mean --
19    Q.  Fong and Leavitt.  This was issued in
20  Fong.  You see that; right?
21    A.  Yes.  I just didn't know what "these" was
22  referring to.
23    Q.  Okay.  But that's a true statement; right?
24    A.  Yes.
25    Q.  Okay.  The third item down you see there

Page 493

1 was a communication from a Frank Bolden to Roger
2 Miller December 6, 1978?
3    A.  Yes.
4    Q.  And, again, it says, "Attachment between
5 counsel and client providing legal advice prepared
6 by counsel pursuant to pending and anticipated
7 litigation regarding talc litigation."
8       Did I read that right?
9    A.  Yes.
10    Q.  Okay.  And with respect to that talc
11 litigation that's referring to, do you have any
12 information that a legal hold was issued?
13    A.  I – I don't know one way or the other.
14    Q.  And, again, because you're saying "one way
15 or the other," you understand that you were to
16 talk about legal holds on behalf of Johnson &
17 Johnson; correct?
18    A.  Yes.
19    Q.  And you made an inquiry about that to
20 Johnson & Johnson; correct?
21    A.  Yes.
22    Q.  And they provided legal holds to you that
23 go back to 1999; true?
24    A.  Yes.
25    Q.  And those are the same legal holds they

Page 494

1 provided to us in this case; correct?
2    A.  Yes.
3    Q.  Okay.  And those go back to 1999?
4    A.  I believe I've answered that, yes.
5    Q.  That's right.  Okay.
6       I'm done with that one.  Thank you.
7       (Whereupon, Plaintiff's Exhibit 43 was
8       marked for identification.)
9 BY MR. SWANSON:
10    Q.  Mr. Mittenthal, I'm handing you Exhibit 47
11 to your deposition.
12       Do you have that in front of you?
13    A.  Yes, I do.
14    Q.  Okay.  And at the top, you see this is on
15 Johnson & Johnson letterhead?
16       THE REPORTER:  You got the wrong number.
17       MR. SWANSON:  Oh, I did?
18       THE REPORTER:  You're out of order.
19       MR. SWANSON:  Okay.  Let's start over on
20 what, then.
21       Thank you, Early.
22       Let me redo that.  I'm getting ahead of
23 myself.
24 BY MR. SWANSON:
25    Q.  I'm handing you Exhibit 43.  That's a

Page 495

1 correction.  This was not Exhibit 47.  Exhibit 43
2 to your deposition.
3    A.  Thank you.
4    Q.  You have Exhibit 43 in front of you?
5    A.  I do.
6    Q.  And that is correspondence on Johnson &
7 Johnson letterhead; correct?
8    A.  Appears to be, yes.
9    Q.  And from an R. Denton to a W. Ashton and
10 to a D. Jones; correct?
11    A.  I haven't seen this document before, but I
12 agree with you those are the words in the "to" and
13 "from."
14    Q.  And the date it's dated is November 23,
15 1993; correct?
16    A.  Yes.
17    Q.  And it says, "Subject:  Trip report, talc
18 validation team meeting November 16, 1993,
19 Windsor, Vermont."  Correct?
20    A.  Yes.  I see that.
21    Q.  Okay.  And I'm not going to read through
22 this whole document.  But I want to skip -- first
23 of all, again, you're aware that Windsor Minerals
24 was a subsidiary of Johnson & Johnson that mined
25 talc that was used in Johnson & Johnson's baby

Page 496

1 powder; correct?
2       MR. COX:  Object to the form.
3       THE WITNESS:  I have a general awareness
4 of that.
5 BY MR. SWANSON:
6    Q.  And if you go to Page Number 3 of this
7 letter, you see that there's -- above that they're
8 talking about mine tour highlights.
9       Is the heading there?
10    A.  You mean down on the page.
11    Q.  Yeah.  That's right.  Two-thirds of the
12 way down the page.
13    A.  Yes.
14    Q.  And then in the last paragraph, there's a
15 note.
16       Do you see that?
17    A.  Yes.
18    Q.  And the note says -- well, you go ahead
19 and read that note, please.
20    Q.  What does the note say?
21    A.  "Note:  The specifics of the mining
22 operation at Hammondsville are uncertain as most
23 of the pre-Luzenac records were destroyed by the
24 mine management staff just prior to the J&J
25 divestiture and the Cyprus purchase.  However,

Page 497

1  several former Hammondsville miners are still
2  employed at the Ham mine, and they provided us
3  with useful information as to the nature of the
4  underground works."
5      Q.  Now, you're aware from your research that
6  Windsor Minerals did testing of talc; true?
7      A.  I recall that I have some notes to that
8  effect.
9      Q.  And you're also aware that Hammondsville
10  was one of the main mines where the talc for
11  Johnson & Johnson's baby powder was mined;
12  correct?
13      MR. COX:  Object to the form of the
14  question.
15      THE WITNESS:  I don't know the specific
16  names of the mines.
17  BY MR. SWANSON:
18      Q.  Okay.  And do you know -- did you do any
19  research -- had you been aware of this destruction
20  of records from your research?
21      MR. COX:  Object to the form.
22      THE WITNESS:  I'm generally aware that
23  records are destroyed from time to time in
24  accordance with retention practices.
25  BY MR. SWANSON:

Page 498

1      Q.  Okay.  That wasn't the question.  I
2  specifically -- I understand that you say you
3  hadn't seen this document before, but were you
4  aware from your research that at the time of the
5  J&J divestiture in the Cyprus purchase or prior to
6  that, which was 1989, for the record, there
7  were -- that the most of the records were
8  destroyed by the mine management staff?
9      MR. COX:  Object to the form.
10      THE WITNESS:  Well, I can read this
11  document on first impression that it refers to
12  pre-Luzenac records being destroyed by mine
13  management.  I did not investigate that issue.  I
14  don't know the circumstances of the destruction
15  and under what business circumstances it was -- it
16  was conducted.
17  BY MR. SWANSON:
18      Q.  Okay.  Do you know of all the testing
19  records that have been there up until that point
20  had been destroyed as of 1989 that were in the
21  possession of the mine?
22      MR. COX:  Object to the form.
23      THE WITNESS:  Yeah.  I have general notes
24  as we've gone through on testing records.  I
25  cannot speak to any specific instances that would

Page 499

1  be in this document which I'm just seeing.
2  BY MR. SWANSON:
3      Q.  And from your research on legal holds,
4  you're not aware of any legal holds being in place
5  at that time in 1989; correct?
6      MR. COX:  Object to the form.
7      THE WITNESS:  I'm not aware any.
8  BY MR. SWANSON:
9      Q.  And the reason why there was no legal hold
10  in place at that time is because Johnson & Johnson
11  chose not to issue legal holds with respect to its
12  talc litigation up to that point; true?
13      MR. COX:  Object to the form.
14  Mischaracterizes the earlier testimony.
15      THE WITNESS:  I would disagree on two
16  points.  Number one, I'm not -- I believe I made
17  it clear, I don't know if holds were issued or
18  not, and I'm also aware that historic cases may be
19  dispositions settled, litigated, come to their
20  conclusion.  I -- I'm not aware of relevant holds
21  that would be in effect prior to 1999.
22  BY MR. SWANSON:
23      Q.  And if there had been a hold in place for
24  testing records and mining records prior to 1989
25  when these records were destroyed, they would have

Page 500

1  been preserved and retained at that point;
2  correct?
3      MR. COX:  Object to the form.
4      THE WITNESS:  I mean, that -- that -- that
5  calls for some degree of speculation.  I -- the
6  records you're speaking about I can't speak to
7  there what happened to them.  I know that what it
8  says on the page here as you've had me read it,
9  but I have not investigated the circumstances of
10  this particular matter.
11  BY MR. SWANSON:
12      Q.  You're not aware -- I mean, you keep
13  raising the specter that you just aren't aware of
14  any holds as if there could have been some holds
15  from before.  But you've told us that you're
16  not -- you're not aware of any holds being
17  destroyed by Johnson & Johnson; correct?
18      A.  I'm not aware of any, no.
19      Q.  That's right.  And you're not aware of any
20  hold releases being issued on talc litigation
21  holds; correct?
22      A.  Correct.
23      MR. SWANSON:  That's all I have about
24  that.  Thank you.
25      MR. COX:  Want to take a five-minute break

Page 501

1  now, Mark?
2      MR. SWANSON:  Sure.  Yeah.
3      MR. COX:  Okay.
4      THE VIDEOGRAPHER:  This marks the end of
5  Media Number 1 in Volume III of the deposition of
6  James Mittenthal.
7      Off the record at 10:07 a.m.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  On the record at
10  10:20 a.m.  This marks the start of Media Number
11  2, Volume III in the deposition of James
12  Mittenthal.
13      You may proceed, Counsel.
14      (Whereupon, Plaintiff's Exhibit 44 was
15      marked for identification.)
16  BY MR. SWANSON:
17      Q.  Mr. Mittenthal, I'm going to hand you --
18  I'm handing your counsel first.  Oh, actually, I
19  have a separate copy there -- Exhibit 44 to your
20  deposition.
21      Do you have that in front of you?
22      A.  I do.
23      Q.  And you've seen this letter before,
24  correct, been shown it in a deposition?
25      A.  I may have.  I don't recall.

Page 502

1      Q.  You see that this appears to be
2  correspondence from Luzenac America to Johnson &
3  Johnson dated October 17, 1994?
4      A.  Yes.
5      Q.  And do you recognize the name of the
6  recipient, Mr. O'Shaughnessy; is that correct?
7      A.  I don't know how it's pronounced.  I see
8  that that's the recipient.
9      Q.  Right.  But you've seen his name on legal
10  holds, correct, John O'Shaughnessy for Johnson &
11  Johnson?
12      A.  I've seen his name before.
13      Q.  And it says, "Dear Mr. O'Shaughnessy, the
14  following is in reply to your letter dated
15  October 4, 1994, in reference to Ritter v. Cyprus,
16  et al."
17      Do you see that?
18      A.  Yes.
19      Q.  And the Ritter case was a case in which
20  Johnson & Johnson, or Cyprus, or Windsor Minerals
21  was a defendant; correct?  Have you heard of that
22  case?
23      MR. COX:  Object to the form.
24      THE WITNESS:  I don't recall.
25  BY MR. SWANSON:

Page 503

1      Q.  Okay.  You see that in the second sentence
2  here.  Second paragraph, second sentence says, "We
3  did not begin to produce roofing-grade products
4  from our local mines until 1970s.  These mines are
5  Clifton, Frostbite, Argonaut, Rainbow, and the
6  Hammondsville mine."
7      Do you see that?
8      A.  I do.
9      Q.  And then you go to the second page.  You
10  see the first actual paragraph there starting
11  with, "Testing was done on a monthly basis on the
12  ore bodies we were mining"?
13      A.  Yes.
14      Q.  "Composites for the talc used for
15  industrial as well as cosmetics were sent to
16  McCrone Associates, an independent lab, for
17  asbestiform analysis."
18      Do you see that?
19      A.  I do.
20      Q.  Now, I don't have the complaint in front
21  of me, but are you aware of any legal holds being
22  issued by Johnson & Johnson with respect to the
23  Ritter case?
24      A.  I'm not aware one way or the other.
25      MR. SWANSON:  That's all I have about that

Page 504

1  one.
2      Thank you.
3      (Whereupon, Plaintiff's Exhibit 45 was
4      marked for identification.)
5      MR. COX:  Thanks.  I'm handing you.
6  BY MR. SWANSON:
7      Q.  I'm handing you Exhibit Number 45 to your
8  deposition.
9      Do you have that in front of you?
10      A.  Yes, I do.
11      Q.  And do you see that this appears to be a
12  discovery response of Johnson & Johnson Consumer
13  Products, Inc. to a plaintiff's request for
14  admission in a Marlene Selby and Lowell Selby --
15  Lowell Wayne Selby v. Johnson & Johnson case?
16      A.  Yes.
17      Q.  Okay.
18      And if you go to the last page, you see
19  that these responses were verified on July 19,
20  1994, in San Francisco, California, according to
21  the signature?
22      A.  July 19, 1994.
23      Q.  And if you go to the second page of these
24  responses, do you see where the plaintiffs are
25  requesting Johnson & Johnson to admit various

Page 505

1  things, including that you engage in the
2  production, manufacture, and/or packaging of
3  Johnson's Baby Powder?
4      Do you see that Request Number 1?
5      A. Yes.
6      Q. Okay. And if you look at Request Number
7  2, it says, "You are aware that the plaintiffs
8  requesting that Johnson & Johnson admit that
9  they're aware that the aspiration of Johnson's
10  Baby Powder may lead to bronchoconstriction."
11      Do you see that?
12      A. Yes.
13      Q. And then if you go to the fourth page, you
14  see where the plaintiff is asking Johnson &
15  Johnson to admit that you were aware that the
16  aspiration of Johnson's Baby Powder may lead to
17  fibrosis.
18      Do you see that?
19      A. Yes.
20      Q. Did Johnson & Johnson issue a legal hold
21  notice in the Selby case in 1994, or at any time
22  for the Selby case?
23      A. I'm not aware of whether or not a hold was
24  issued for the Selby case.
25      Q. You have no information that a hold was

Page 506

1  issued; correct?
2      A. One way or the other.
3      Q. When you say "one way or the other,"
4  again, you're not aware of any holds being
5  destroyed, correct, by Johnson & Johnson?
6      A. Correct.
7      Q. And you're not ahold -- aware of a hold
8  release ever being issued by Johnson & Johnson
9  related in any way to talc litigation; correct?
10      A. I'm not aware that the -- of releases to
11  the holds that I requested. In other words, the
12  1999 through 2017 holds that I requested I am not
13  aware of releases applicable to those holds.
14      Q. Are you aware of releases applicable to
15  other holds related to talc litigation for
16  Johnson & Johnson?
17      A. I requested all holds applicable to
18  cosmetic talc. I -- I don't recall if I requested
19  every release ever issued.
20      Q. Okay. Well, this is clearly cosmetic talc
21  issue, right, the Selby case; true? Johnson's
22  Baby Powder is what they're talking about.
23      A. Yes.
24      Q. And so was the Gambino case. Remember
25  that was a talcosis case --

Page 507

1      A. Yes.
2      Q. -- back in 1983?
3      A. Yes.
4      Q. So those are consumer talc holds if there
5  was a hold related to those talc -- let me start
6  over.
7      If there was a hold related to those
8  cases, it would be a cosmetic talc litigation
9  hold; true?
10      A. True.
11      Q. Okay. And you asked for all those; right?
12      A. Yes, I did.
13      Q. And the oldest one you got is 1999?
14      A. Correct.
15      Q. And you're not aware of any hold releases
16  ever being issued by Johnson & Johnson related to
17  cosmetic talc litigation; correct?
18      A. Correct.
19      Q. Or any other talc litigation; true?
20      A. I have not seen any releases.
21      Q. Okay. That's all I have about that.
22  Thank you.
23      I want to ask you a few questions about
24  Johnson & Johnson International, and I probably
25  should have asked some of these in the context of

Page 508

1  what we were doing yesterday, but I've looked at
2  the holds again in preparation for today, and we
3  went over them in some detail yesterday, and I'd
4  asked you questions about recipients of those
5  legal holds for talc -- in talc litigation going
6  back to 1999.
7      And do you have any information that
8  Johnson & Johnson International ever received any
9  of those holds?
10      A. As an entity?
11      Q. Yes.
12      A. I -- I don't have information with respect
13  to that. I do understand that the 2017 hold was
14  directed at people in international entities.
15      Q. And that was at the first hold that you're
16  aware of that was directed to individuals at
17  Johnson & Johnson International?
18      MR. COX: Object to the form.
19      THE WITNESS: Well, I'm not -- in terms of
20  the precise name of the entity, I would have to
21  double-check those entities. But I -- it's
22  certainly in international locations for over --
23  overseas or OUS locations. That is the first ones
24  I am aware of.
25  BY MR. SWANSON:

Page 509

1    Q. I see.  And I should have been clear in my
2  question.  My understanding is, Mr. Mittenthal,
3  that there is -- there is an operating company of
4  Johnson & Johnson called "Johnson & Johnson
5  International."
6      Are you aware of that?
7    A.  Well, I'm aware that the -- that the names
8  of the entities change over time, and so I just
9  want to make sure I'm using the right terminology
10  that befits the time and place.
11    Q.  Let me -- let me ask it a little more
12  precisely.  Try to.  Are you aware of an entity
13  called "Johnson & Johnson International" that was
14  the recipient as an entity of legal holds?
15    A.  I'm not aware.
16    Q.  Are you aware of individuals who worked
17  for an entity called -- an entity or division
18  called "Johnson & Johnson International" who
19  received any of the talc litigation legal holds?
20    A.  I am aware that in 2017 people in -- that
21  worked for international elements of the
22  organization received litigation holds.
23    Q.  When you say "worked for international
24  elements of the organization," are you talking
25  about people who worked domestically or, for

Page 510

1  example, people in the Philippines like we talked
2  about yesterday?
3    A.  The latter.  People who were physically
4  located in the Philippines or Hong Kong.
5    Q.  Do you have any awareness that the most --
6  and you're talking about the most recent hold --
7  the current hold in asbestos cases; correct?
8    A.  Yes.
9    Q.  Okay.  Are you aware of any individuals at
10  a domestic unit of Johnson & Johnson that's called
11  "Johnson & Johnson International" receiving legal
12  holds?
13    A.  A domestic unit that's called
14  "International"?
15    Q.  Yes.
16    A.  I -- I wouldn't know that one way or the
17  other.
18    Q.  The way Chris is smiling it might be that
19  I needed to do more research before I asked that
20  question, but.
21      So are you -- did you -- and I don't want
22  to redo what we've done with respect to your notes
23  already, but with -- so keeping in mind that I'm
24  just asking about an operating unit or division
25  called "Johnson & Johnson International," and I'm

Page 511

1  not asking generally about operating units outside
2  the United States like, you know, J&J Hong Kong,
3  J&J Philippines, okay, so just keep -- let's keep
4  that separate.
5      From the research that you've done, can
6  you provide any information about what search --
7  inquiry search was done for documents that were
8  documents that were kept, produced, retained by
9  Johnson & Johnson International?
10      MR. COX:  Object to the form.
11      THE WITNESS:  I -- I can't speak to the --
12  to the entities per se.  I know that my notes
13  reflect the fact that there were documents from
14  international operations that were housed in the
15  United States and were searched as part of this
16  effort.
17  BY MR. SWANSON:
18    Q.  Okay.  And would that be, for example,
19  when we were talking about in the first volume of
20  your deposition about the search that was done
21  through the Philippines documents you had -- there
22  was something in your notes about a hundred boxes
23  being selected and then a Skadden associate going
24  through those boxes and not really finding
25  anything.

Page 512

1      Do you remember that generally?
2    A.  I do.
3    Q.  And is that what you're referring to as a
4  search about an "outside of the U.S." entity but
5  the search is actually physically being done in
6  the United States in an archive in the
7  United States?
8    A.  Well, that hundred-box search -- that
9  hundred-box search was actually performed
10  overseas.  So I am actually talking about other
11  documents that were related to international
12  operations but the documents themselves were
13  stored in U.S. locations and searched there.
14    Q.  I don't know if this will help, but the
15  Johnson & Johnson International entity or
16  operating unit is located in Brunswick, New
17  Jersey.
18      Does that help you at all in terms of
19  whether or not what information that you have
20  about that from your research?
21    A.  You know, in my research, I understand
22  that -- and I have a list of company sources that
23  were searched that was -- that was -- you know,
24  we've talked about the archive, the various
25  noncustodial and custodial sources that were

Page 513

1　listed with my materials. To the extent that they
2　were available to be searched, regardless of
3　whether they were part of an international entity
4　or a U.S. entity, I -- they were all searched, to
5　my understanding.
6　　Q. Well --
7　　　MR. SWANSON: I'm going to move to strike
8　that.
9　　　I just -- it's a very particular question.
10　I'm trying to get at.
11　BY MR. SWANSON:
12　　Q. Which is what information specifically do
13　you have about the operating unit, Johnson &
14　Johnson International, which is in New Brunswick,
15　New Jersey, searches being done of their
16　documents, documents that they retained or
17　archived or had on their computers? And if you
18　have a list of sources that you're referring to
19　that we can refer to -- if it helps you at all,
20　you know, let's look at it.
21　　A. Well, I'm certainly going to look at the
22　list of noncustodial sources and see if there's
23　anything specifically mentioned about company
24　entities.
25　　Q. For the record, that's a -- Exhibit Number

Page 514

1　4 to your deposition; is that right?
2　　A. That's right. I just have a general
3　understanding that all documents that would have
4　been available in the U.S. and potentially
5　relevant were subject to search.
6　　　MR. SWANSON: Again, I'm going to move to
7　strike as nonresponsive.
8　　　THE WITNESS: You know, I'm looking, for
9　instance, on page 2 of Exhibit 4, contracts from
10　the international contracts database. I'm just
11　seeing an international reference there. I --
12　I...
13　BY MR. SWANSON:
14　　Q. Can you provide any additional information
15　about any search done -- other than your general
16　impression that searches were done of all U.S.
17　sources, do you have any information specifically
18　as it relates to searches done with respect to
19　Johnson & Johnson International, that you
20　associate with Johnson & Johnson International?
21　　A. Well, I have in my notes, for instance,
22　that various people who I interviewed in
23　international locations who I presume to be part
24　of an international organization utilized
25　enterprise global systems that would have stored

Page 515

1　information in the U.S. relating to international
2　facts or data.
3　　　So, for instance, the TrackWise system,
4　the SCEPTRE system, other business systems were
5　global in nature so that if I put something into
6　that system in the Philippines or Hong Kong or
7　China, it would have been stored essentially in
8　the -- in the U.S. system.
9　　Q. Do you know as of what year that was being
10　stored in those databases, the first year?
11　　A. You know, I have a chart that I've
12　assembled that we marked yesterday. From what I
13　know about those various business systems, the
14　objective was not to necessarily understand when a
15　system went global, but there are systems listed
16　there that have international usage.
17　　Q. Let me -- let me just try to cut it short
18　because I don't want to...
19　　　Do any of those systems go back to the
20　1970s? In other words, were any of those systems
21　utilized in the 1970s?
22　　A. I have information in my notes that
23　information may have been scanned and brought
24　forward. There were not a lot of electronic
25　systems in the '70s -- there were some -- but that

Page 516

1　certain information was carried forward, brought
2　into systems that have been migrated forward in
3　our -- so I would not be surprised if there were
4　systems today that had some information from those
5　earlier times.
6　　　For instance, I know that there has been
7　some scanning of -- occasional scanning of lab
8　notebooks. So those were in paper form. Those
9　went back many years. Those have now been brought
10　forward, some of them, at least, into electronic
11　systems.
12　　Q. I appreciate what you're saying, which is
13　some of the information got transferred forward
14　from a long time ago paper -- paper-type documents
15　from like the 1970s; correct?
16　　A. But would those database systems that
17　you're talking about being in use for Johnson &
18　Johnson -- for domestic Johnson & Johnson's
19　companies keeping track of and having
20　documentation from Johnson & Johnson operating
21　units outside the United States, those are recent
22　platforms, correct, and the -- in terms of
23　preserving those locations; correct?
24　　　MR. COX: Object to the form.
25　BY MR. SWANSON:

Page 517

1  Q. They don't go back to the 1970s.
2  A. Well, certainly many of the systems I
3  investigated were in paper form in the '70s, and
4  I -- it would be a one-by-one investigation to
5  look at complaints, adverse events, the call
6  center, the document control systems, the
7  archiving system. I mean, each of those has a
8  different story as to when it was -- what system
9  went live when and what was migrated from a
10  previous system where paper filings would. So it
11  would be -- it's not a monolithic answer. Each
12  system would have an answer as to...
13  Q. I understand. But what was -- you
14  referred to some current systems. Since I don't
15  have a handle on these names when you first
16  answered the question, what were those systems you
17  referred to?
18  A. The first ones I mentioned TrackWise.
19  Q. TrackWise. Were any of those in use --
20  was TrackWise in use by Johnson & Johnson in the
21  1970s or 1980s, 1990s, or even the early 2000s?
22  A. I believe TrackWise -- TrackWise went live
23  relatively recently in about 2009. Well, ten
24  years, nine years ago.
25  Q. Okay.

Page 518

1  A. Approximately when -- around the time that
2  certain operations were consolidated and a global
3  talc specification was created. So there was a
4  lot of that activity in that 2009 time frame,
5  including, as I recall, the conversion to the
6  TrackWise system.
7  Q. And what was the system before TrackWise?
8  A. I've got to check my notes.
9  Q. Okay. I'm going to have you hold that
10  thought.
11  Let me ask. I think I do want to look at
12  your notes for a moment here and ask you about --
13  a little bit more about the Philippines.
14  Do you have your paginated notes? It's
15  Exhibit 26 and I think for the most part, those
16  are -- actually, it would be over there, I
17  believe, wouldn't it?
18  If you go to page 64 in the paginated
19  notes, your paginated notes, which is Exhibit 26.
20  You see here where it's -- there's a summary of
21  your discussions with, was it Pamela Downs? Let's
22  see, yes.
23  A. Yes.
24  Q. Pam Downs regarding searches in overseas
25  location including the Philippines, Hong Kong.

Page 519

1  Did you investigate what systems were in
2  use at either of those locations, the Philippines
3  or Hong Kong in the 1960s or '70s or '80s in terms
4  of database systems or the systems for organizing
5  and preserving documents?
6  A. I did not catalogue the systems in use at
7  that time. I understood that what was available
8  from the time frame that had been preserved from
9  that time was in paper form or in a storage form
10  that it could be put in a box and had been stored
11  in a facility, and that that's the material that
12  was -- that was -- that was searched and that
13  there were indexes to that material.
14  I don't know that there were any
15  electronic systems in use then. I did not
16  catalogue that.
17  Q. We talked about this a little bit so I
18  don't want to spend a lot of time on this, but
19  this hundred boxes that got pulled, that was
20  pulled based on key words, right, according to
21  your notes, for the Philippines?
22  A. Yes. And what that indicated was that
23  when they did the search and came up with
24  nothing -- nothing based on the key word search of
25  the index, they retrieved -- it may have been

Page 520

1  101 boxes -- it was approximately a hundred
2  boxes -- to go through to confirm from a sampling
3  standpoint.
4  Q. I'm going to cut you off. I just asked
5  you a real simple question and you gave me the
6  full explanation again. And we talked about it
7  last time, so I've just got a couple little pieces
8  here to cover.
9  A. Okay.
10  Q. I don't mean to be rude or anything, but I
11  want to move things along and I'm sure you do,
12  too.
13  Okay. So the key words that were
14  searched, were those only in English?
15  A. I don't know if the key words were only in
16  English. I have an understanding that the -- that
17  there was a general use of English for business
18  documents and that there were English speakers
19  there in the records staff who would have known if
20  there were other foreign language issues. I don't
21  know if there were other key words added in any
22  other languages.
23  Q. Well, were the key words the same word --
24  these are different key words from the ERMS key
25  words or the E-R-M-S key words that we spoke about

Page 521

1  last time that are in Exhibit 6 to your
2  deposition?
3      A.  You know, I think the terms may have been
4  the same, but because it was a different system --
5  it was an index, it may have been an Excel index
6  or some other different format than ERMS -- and
7  therefore, the precise way it was searched may
8  have varied.  I understand that the intent was to
9  search the same type of information.
10     Q.  Okay.  But you don't know if there were --
11 whether or not there were any non-English words
12 that were used; correct?
13     A.  That's correct.
14     Q.  Did you -- has this been produced to us,
15 this index of key words?
16        MR. COX:  Object to the form.
17        THE WITNESS:  I'm not aware one way or the
18 other.
19 BY MR. SWANSON:
20     Q.  You didn't produce it for your deposition;
21 true?
22     A.  Correct.
23     Q.  Now, these boxes that were selected, a
24 hundred boxes, out of how many boxes were those
25 selected?

Page 522

1      A.  I -- I don't know the total box count in
2  all these facilities.
3      Q.  That was not a random sampling; correct?
4      A.  It was -- it was chosen by the attorneys.
5  The methodology I'm not -- I'm not aware of.
6      Q.  And is it true that any documents based on
7  the search -- well, whatever documents there were
8  there still -- strike that.
9         With respect to the Hong Kong search,
10 again, it says there was "inbox site index."
11        Has that been produced?
12     A.  I'm not aware of one way or the other.
13     Q.  Okay.  "Put together committee as per
14 above."
15        What does that mean?
16     A.  So, there were a list of people associated
17 with the search, and those are actually listed in
18 the later document, because these searches were
19 prior -- prior to the specific Fong and Leavitt
20 searches.
21        So my recent exhibit list additional
22 efforts and list out those people.
23     Q.  Okay.  And we can pull that up if we need
24 to, but let me -- let me ask you:  It says that no
25 responsive documents were found; correct?

Page 523

1      A.  Can you reference me to where we are?
2      Q.  "Found none.  No" -- "no boxes needed" --
3  it says, "No boxes needed to be opened."  What was
4  that -- that was based on what?
5      A.  The searching of the index.
6      Q.  Okay.  And what -- and I apologize if I
7  asked this.  Was -- were the searches in the Hong
8  Kong documents only done in English, as far as you
9  know?
10     A.  I -- I don't know.  I do know that there
11 was a committee of people involved with the
12 search, and that committee would list people who
13 would be aware of what documents would be in
14 English and in other languages, and the search
15 would have been calibrated accordingly.
16        MR. SWANSON:  Move to strike as
17 nonresponsive.
18 BY MR. SWANSON:
19     Q.  Would you agree that if the search terms
20 were English only, then English documents --
21 documents in English would be more likely to come
22 up; right?
23     A.  I -- I'm not sure I would say that because
24 you have the index and you have the body of the
25 documents, and the index terms could be in

Page 524

1  English, the document could be in another
2  language.  I don't have the particulars on how the
3  index was -- was developed.  I have an
4  understanding that the business language in use
5  would have been English, but I don't know the
6  nature of how the boxes were described and which
7  languages were used.
8      Q.  And when you say you have an understanding
9  the business language being used, you mean
10 English?
11     A.  Yes.
12     Q.  For business?
13     A.  Yes.
14     Q.  Is that what you're saying?
15     A.  English was commonly used in the business,
16 yes.
17     Q.  So Johnson & Johnson -- and I think you
18 referred to that in the Philippines, too; correct?
19     A.  Yes.
20     Q.  So Johnson & Johnson's operating
21 companies -- in Philippines, in Hong Kong,
22 Johnson & Johnson was using English in those for
23 the most part; is that what you're saying?
24     A.  I would say that English was widely used.
25 I don't -- I can't speak to the ratios or the

Page 525

1  official adoption.
2      Q.  Okay.  Right.  So but would you agree that
3  manufacturers and suppliers to Johnson & Johnson
4  in those foreign countries might not be using
5  English?
6      A.  I wouldn't want to speculate on how they
7  communicated.
8      Q.  Now, with respect to your subsequent
9  discussion with Pam Downs and Laura -- I --
10 Giacino, or whatever her name was, did you learn
11 anything more in terms of whether or not any
12 documents were actually located at the Hong Kong
13 location?
14     A.  Well, I can make a blanket statement that
15 what I did learn was in my notes and I --
16     Q.  Well, let's go to your notes, then, and
17 let's pull that -- I don't remember what exhibit
18 that is offhand, but I believe --
19     A.  It's right on top here, actually.
20     Q.  Oh, it is.
21     A.  20.
22     Q.  Okay.  Great.  And let's -- since we've
23 got this in front of us, it looks like that's on
24 the bottom of page 2 there's a reference to Hong
25 Kong; correct?

Page 526

1      A.  Yeah.  That is the first Fong reference.
2      Q.  Okay.  And is it correct that no documents
3  were located with respect to Hong Kong?
4      A.  Yes.  So this -- this is in Category 4,
5  and if I reference what that means, it says that
6  this type of search was a company source that had
7  not been searched before.  So there were
8  certain -- certain searches conducted in new
9  areas, new searches, entirely new searches, and
10 that was -- that further yielded nothing in that
11 time frame.
12     Q.  Do you know what the terms -- have you
13 seen the offsite storage index and any electronic
14 listings with respect to Hong Kong?
15     A.  Have I -- have I seen it?
16     Q.  Yeah.
17     A.  No.
18     Q.  Do you know what -- how detailed it is?
19     A.  I have not -- I have not seen it.
20     Q.  Do you know what search -- what search
21 terms -- what specific -- do you know the specific
22 individuals who did -- who looked at the storage
23 indexes, who they were?
24     A.  No.  I know Ms. Downs and attorneys were
25 part of the process.  I don't know who -- who

Page 527

1  actually --
2      Q.  Do you know what their instructions or
3  training was in terms of what they were looking
4  for, the people who actually looked at the offsite
5  storage indexes or any electronic listings?
6      A.  Well, I don't know about their training.
7  I know that they -- they were looking for the
8  items detailed in the search criteria.
9      Q.  And what was the year limit put on the
10 search?
11     A.  I don't know that they had a year limit.
12 I know that they were aware of the time frame, as
13 I recall, from 1970 to '84 -- or '71 -- '70 to
14 '84.
15     Q.  That's all I've got about that one.
16 Although you probably hold on to that one because
17 you may look at it again in a moment.
18      Do you know, with respect to the Korean
19 talc that was being supplied to Johnson & Johnson
20 Hong Kong and Johnson & Johnson Philippines,
21 whether or not any searches for documents related
22 to that talc supply in either Leavitt or Fong
23 cases, or any other cases, for that matter, were
24 done in English, and what languages they were done
25 in?  Let me ask you that way.

Page 528

1      MR. COX:  Object to the form.
2      THE WITNESS:  I don't know the range of
3  languages that were used in the search.
4  BY MR. SWANSON:
5      Q.  Do you know whether or not the talc
6  supplier from Korea's talc supply documents are in
7  Korean or some other language?
8      A.  I don't have that information.  I did not
9  research that.
10     Q.  And you're aware from your review of the
11 discovery and the responses to discovery in the
12 Fong and Leavitt cases that the plaintiffs broadly
13 asked for results of testing and testing documents
14 related to talc that went into Johnson's Baby
15 Powder, including from that manufactured overseas;
16 correct?
17     MR. COX:  Object to the form.
18     THE WITNESS:  I'm generally aware that
19 test results were requested.
20 BY MR. SWANSON:
21     Q.  Okay.  And we have been provided, and I
22 don't know if you're aware of it, some Johnson &
23 Johnson worldwide talc surveys from the late 1970s
24 and early 1980s.
25      Have you seen those documents?  And I

Page 529

1  believe those may have been initially obtained or
2  provided in the De La Cruz case?
3      A.  I'm aware of those documents.
4      Q.  Other than those documents, are you aware
5  of the existence of any other talc testing-related
6  documents for the testing of Korean talc for
7  asbestos?
8      A.  I'm not specifically aware one way or the
9  other.
10     Q.  And I believe I asked this yesterday, but
11 you're not aware of a legal hold ever being issued
12 with respect to Korean underlying testing
13 documents, testing of Korean talc; true?
14     MR. COX:  Object to the form.
15     THE WITNESS:  I'm not aware of a -- of
16 a...
17     Actually, I should rephrase.  What I
18 believe I said yesterday was that I'm not aware if
19 there were holds sent to any international
20 locations prior to 2017.
21 BY MR. SWANSON:
22     Q.  Fair enough.
23     Are there any MSDS sheets that Johnson &
24 Johnson has for Korean talc?  I haven't seen any,
25 but do you know from your research are there MSDS

Page 530

1  sheets for Korean talc?
2      A.  I mean, I'm just going to quickly tab
3  through the noncustodial sources and see if I see
4  any references to it.  I don't recall any
5  references to it.
6      Q.  Just for the record, you're looking at
7  Exhibit 4?
8      A.  That's right.
9      Yeah.  I can't tell from here.  I'm not
10 aware of any.
11     Q.  Okay.  You saw from your review of the
12 discovery that the plaintiffs again asked for --
13 and we can go through the discovery, but I think
14 you've looked at it, so if we need to, we will --
15 but that the plaintiffs have asked Johnson &
16 Johnson, in the Leavitt case specifically, for all
17 talc testing results going back to 1965 to the
18 present.
19     Did you see that?
20     A.  I'm aware of historical requests for
21 testing.
22     Q.  Do you -- are you aware in the Leavitt
23 case those went out pretty far; correct?
24     Let me see if I can pull this out real
25 quickly and show it to you.

Page 531

1      MR. SWANSON:  Might as well go ahead and
2  mark it, Exhibit 46 to your deposition.
3      (Whereupon, Plaintiff's Exhibit 46 was
4      marked for identification.)
5  BY MR. SWANSON:
6      Q.  Do you have that in front of you?
7      A.  Yes, I do.
8      Q.  And you see this is defendant Johnson &
9  Johnson's June 26, 2018, Amended Responses to
10 Plaintiff's Request for Production of Documents,
11 Set 3; correct?
12     A.  Yes.
13     Q.  And if you go to the Request Number 29 --
14 Request Number 29 and 30, you see that 29 asks for
15 all the results of testing of talc or talc ore
16 that was used for Johnson & Johnson cosmetic talc
17 products from '65 -- 1965 to the present.
18     Do you see that?
19     A.  Yes.
20     Q.  And Number 30 asked essentially the same
21 question for Johnson & Johnson's talc products,
22 right, testing or testing results of Johnson &
23 Johnson cosmetic talc products 1965 to the
24 present; correct?
25     A.  Yes.

Page 532

1      Q.  And you see that Johnson & Johnson has
2  said that it has produced all documents; correct?
3      MR. COX:  Object to the form.
4      THE WITNESS:  I see that.
5  BY MR. SWANSON:
6      Q.  Okay.  It says it's identified and
7  produced all documents in its possession, custody,
8  or control.
9      So -- and these are verified; right?  If
10 you go to the last page or the second-to-last
11 page, you see the verification; correct?
12     A.  Yes.
13     Q.  Who verified those?
14     A.  Tina French.
15     Q.  And you know who Tina French is; correct?
16     A.  Yes.
17     Q.  And she's empowered by Johnson & Johnson
18 to verify those; correct?
19     A.  Yes.
20     Q.  And so if -- do you have information with
21 respect to the level of completeness of -- let me
22 see if I can ask this differently:  Do you know of
23 all the testing that would -- that was done from
24 1965 to the present that meets that description,
25 how much of those testing results were produced in

Page 533

1  the Leavitt case?
2      MR. COX:  Object to the form.
3  BY MR. SWANSON:
4      Q.  And I'm not talking about the documents
5  that just exist now but of all the testing that
6  was done from '65 to the present, those testing
7  results, how many of those have actually been
8  produced?
9      MR. COX:  Objection.
10 BY MR. SWANSON:
11     Q.  What percentage, anything like that.
12     MR. COX:  Object to the form.  Beyond the
13 scope of the notice.
14     THE WITNESS:  I'm not sure how I would
15 have -- be able to understand what percentage were
16 produced.  Certainly the ones were produced that
17 were -- the company could find.
18 BY MR. SWANSON:
19     Q.  Right.  So you -- right.  And that's fine.
20 And you can say you don't know.  I mean, that's a
21 perfectly fine answer in a deposition, as you
22 know.
23     Okay.  But they produced everything they
24 had, according to their diligent search, according
25 to that answer; right?

Page 534

1      A.  Yes.
2      Q.  Okay.  So if any document -- if any
3  testing documents are missing that there is reason
4  to believe existed, those documents would have
5  been destroyed; correct?
6      MR. COX:  Object to the form.
7      THE WITNESS:  I -- I didn't understand the
8  last question, I'm sorry.
9  BY MR. SWANSON:
10     Q.  Well, hypothetically -- you said they
11 produced all the documents in their possession,
12 custody, or control.  And they said that under
13 oath; Johnson & Johnson said that and you've
14 verified that.
15     My question is, if -- first of all, can
16 you say what percentage of the documents
17 reflecting all testing results from those periods
18 were produced, whether it was more or less than 5
19 percent?
20     MR. COX:  Object to the form.
21     THE WITNESS:  I'm in no position to --
22 based on research or even research that I could
23 do, I don't know you could say what a percentage
24 would be.  I think the company's methodology, as
25 in much discovery, is to look for the information

Page 535

1  that it can find to identify it, or review it and
2  produce it.  I don't know how one would go about
3  knowing what percentage of a hypothetical,
4  historical population would have -- would have
5  been calculated.
6  BY MR. SWANSON:
7      Q.  Okay.  So, to the extent that testing
8  results have not been produced by Johnson &
9  Johnson, that -- where the testing was done and at
10 some point there was a testing result, that would
11 be the result of destruction of the testing
12 results; correct?
13     MR. COX:  Object to the form.
14     THE WITNESS:  I don't think that
15 inevitably follows a "to be."  That could be a --
16 that's a potential reason for why something wasn't
17 produced if it was a disposition in the course of
18 business.
19 BY MR. SWANSON:
20     Q.  Right.  Which means it would be -- and if
21 those documents -- and we -- I'm not going to go
22 back into all the holds and the retention
23 schedules, but we talked about this yesterday.  If
24 something is not under a hold and it's no longer
25 under retention by the retention schedule, it's

Page 536

1  actually supposed to be disposed of; correct?
2      MR. COX:  Object to the form.
3      THE WITNESS:  It becomes a candidate for
4  destruction.
5  BY MR. SWANSON:
6      Q.  Right.  And if, for example, a company
7  like Johnson & Johnson has a cleanout policy
8  annually that's a mandatory possible -- procedure,
9  then, in fact, it would get destroyed; true?
10     MR. COX:  Object to the form.
11     THE WITNESS:  To the extent that it was
12 agreed upon and signed off on, yes.
13 BY MR. SWANSON:
14     Q.  I'd like to ask you some questions about
15 the Legacy collections of documents.  And we
16 touched on this a little bit in the first volume
17 of your deposition.  And let me ask you about --
18 first of all, are those listed in noncustodial
19 sources, I believe?  Is that right?
20     A.  Yes, they are, which is Exhibit 4.
21     Q.  Okay.  And you've got some information in
22 your notes about this.
23     Did you prepare this document,
24 "Noncustodial sources"?
25     A.  I did not.

Page 537

1    Q. It was prepared by counsel?
2    A. Yes.
3    Q. So looking at page 2 of Exhibit 4, it
4  lists Legacy 1 and some information about that;
5  correct?
6    A. Yes.
7    Q. And Legacy 1 was a document collection of
8  talc-related documents that was put together in --
9  as a result or in connection with a 2009 South
10  Dakota action, Berg v. Johnson & Johnson; correct?
11    A. That's my read of the description, yes.
12    Q. And that was a lawsuit alleging ovarian
13  cancer as a result of the use of Johnson's Baby
14  Powder; correct?
15    A. By its description.
16    Q. Do you -- do you know -- was a legal hold
17  issued in that case?  I think actually we may have
18  seen -- is this Berg?  Yeah, okay.  I think we did
19  see Berg from 2009.  Yeah.  Okay.
20      So I think I know the answer to that.
21      So that was a 2009 hold that we looked; is
22  that right?
23    A. Yeah.  You know, I'm going to actually
24  just reach over and grab my list of holds so I've
25  got that in front of me.

Page 538

1    Q. Oh, yeah.  So what exhibit is that for the
2  record?
3    A. That is 21.
4    Q. Thank you.
5      And the Berg case was under a legal hold;
6  is that right?
7    A. I have a legal hold from December 15th,
8  '09.
9    Q. And a collection of documents was put
10  together at that time?
11    A. At some point it was put together.
12    Q. Do you know -- do you remember the last
13  time we talked about in some detail how the
14  various inquiry and search steps related to
15  documents that had become part of the sort of -- I
16  forget what we're calling it, but the large sort
17  of omnibus talc collection of documents, and we
18  talked about those procedures with respect to the
19  1600 boxes being pulled and the ERMS and the
20  filtering terms.
21      You remember that?
22    A. Yes.
23    Q. And what I'd like to ask you is about
24  what -- how the searches were done, the inquiry
25  and searches related to Legacy -- the Legacy 1

Page 539

1  collection were done back in 2009 or '10 or
2  whenever that was actually effectuated.
3      Do you have information about that?
4    A. I -- I don't.  I have it represented to
5  that was a monolithic collection that was
6  preserved and carried forward.  I don't have the
7  search criteria for -- for that particular matter.
8    Q. Do you know how sources of documents were
9  identified?
10    A. In Legacy 1?
11    Q. Yes.
12    A. No.  As I mentioned, that was presented to
13  me as a -- as a monolithic set.  I mentioned in
14  the first day that I had gone through and reviewed
15  certain -- sampled and reviewed certain documents
16  in a litigation review tool.  I -- I pulled up a
17  few Legacy 1 documents just to -- just to see them
18  and get familiar with them.  I certainly couldn't
19  speak to where all -- they all came from.
20    Q. And it looks like -- interesting.  I'm
21  looking at these other Legacy collections and I
22  think I'll just jump over to some of these others.
23      You see -- do you know why Legacy 4, for
24  example, was -- how the numbering for the Legacy
25  collections came about?  For example, there were

Page 540

1  some documents, it appears from the description
2  here that are part of Legacy 4, that were gathered
3  in the Ritter case.
4      Do you see that?
5    A. Yes.
6    Q. Do you know when those were gathered?
7    A. No, I do not.
8    Q. It says "primarily collected in connection
9  with the Ritter case."
10      And then you were aware of the Coker case
11  and the collection that came out of that; is that
12  right?  That's Legacy Number 2?
13    A. That's right.
14    Q. Does the -- and I know you don't have any
15  holds prior to 1999, but does the existence of
16  these Legacy collections to you suggest that there
17  were legal holds in place?
18      MR. COX:  Object to the form.
19      THE WITNESS:  It does not necessarily
20  follow that.  And I -- as a hypothetical and maybe
21  they collected for the purposes of accomplishing a
22  hold.  I know from -- in some cases that happens.
23  I don't know if that's an indication or not of
24  whether holds were issued.
25  BY MR. SWANSON:

Page 541

1    Q.  Looking at the Coker, the one that was
2    collect -- the Legacy 2, it says it was a
3    historical collection of materials primarily
4    located in connection with the 1998 Texas action,
5    Coker v. Bill Thames Pharmacy, Inc. et al.
6       Do you see that?
7    A.  Yes.
8    Q.  And that was a case where a woman had
9    alleged that she developed malignant mesothelioma
10   from airborne exposure to talcum powder, and that
11   would be referring to either Johnson & Johnson
12   Baby Powder or Shower to Shower; right?
13   A.  I'd have to double-check, but apparently,
14   yes.
15   Q.  Okay.  Speaking as to that collection that
16   was gathered as a result of this Coker case that
17   was filed in 1998, do you know what sources of --
18   do you know -- generally, can you talk about how
19   the collection was created?
20   A.  You know, I received a brief overview from
21   counsel and then I was also referred to the letter
22   that is marked as Exhibit 10 to familiarize myself
23   with those materials.
24   Q.  Okay.  Without me reading this letter in
25   detail right now, based on your understanding

Page 542

1    after having read it, do you know what sources
2    were consulted to locate relevant documents that
3    were collected and became Legacy 2?
4    A.  Well, I did not personally verify this,
5    but based on your read of the document, on page 2
6    there's a question about the document collection
7    that occurred, and the text in the case that "the
8    collection efforts involved identifying,
9    collecting, and copying the reasonably available
10   documents related to talc from employees
11   identified in the memo," that collection which was
12   referred to as "the '98 collection" contains a
13   list of identified individuals below that.
14   Q.  Okay.  And you're looking at this list:
15   John Hopkins, Bill Ashton, Regina Gallagher,
16   Connie Seamen, James Molnar, Bob Russell, George
17   Lee, and Bruce Semple?
18   A.  Yes.
19   Q.  Are you aware of anybody else who was
20   consulted or -- for documents from whom documents
21   were sought with respect to this -- the Coker case
22   and the documents that became Legacy 2 collection?
23   A.  Well, as I mentioned, I know basically my
24   understanding comes from a read of the documents,
25   and it does note that some documents came from

Page 543

1    other people.  But beyond that, I don't have
2    specific information, nor did I do a discrete
3    investigation of this historical collection that
4    was brought forward.
5    Q.  And do you know specifically -- or what
6    information do you have about the -- what was
7    being sought and what indexes -- indices,
8    electronic or paper, were consulted for that?
9    A.  I don't have specific information beyond
10   what -- what's in the letter.
11   Q.  And do you know who actually did the
12   search?
13   A.  My understanding is that it was done under
14   attorney supervision.  Beyond that, I can't speak
15   to who physically performed the search.
16   Q.  Do you know if the search was done only
17   through paper files or were there electronic
18   searches done?
19   A.  I'm reviewing the letter to see if there's
20   any indications.
21      Yeah.  It -- it's not clear from the
22   letter what sources were consulted.  There are --
23   there are certainly references to paper documents.
24   I -- I can't ascertain the scope of the search
25   from the letter.

Page 544

1    Q.  And is your information about that
2    collection limited to that letter?
3    A.  There was a brief summary of it from --
4    from counsel, and then there's the materials that
5    are in the Exhibit 4 table.
6    Q.  Where it mentions the collection?
7    A.  The noncustodial list, yes.
8    Q.  When you say a summary from counsel, and
9    I'm not specifically -- are you talking about some
10   written summary as in, for example, what's written
11   here in Exhibit 4, or something additional?
12   A.  No.  I was generally told that there was a
13   case and I was being provided a letter about the
14   case to educate me.
15   Q.  Do you know whoever did the search, and I
16   know -- whether, how narrowly or broadly their
17   instruction was as to -- well, do you know how
18   broadly or narrowly they interpreted what was
19   relevant to the inquiry?  For example, if there
20   was a document with attachments and the
21   attachments, for example, maybe one of the
22   attachments doesn't match up some particular
23   search terms or group of search terms, whether or
24   not all of the attachments would be included?
25   A.  I -- I don't have that information.  I

Page 545

1 mean, I understand from the memo certain searches
2 were conducted with certain custodians and other
3 sources where the documents were reasonably
4 calculated to be, that they were put in boxes at
5 some point. They were rearranged and reorganized.
6 But that that collection has been preserved
7 historically in a monolithic way and only -- only
8 what's in this letter is what I know about how the
9 collection was performed.
10    Q.  And in looking at your noncustodial
11 sources here, Legacy, the Legacy 4 collection.
12       MR. SWANSON:  Oh, let me stop for a
13 second.
14    Is it about time for a little break?
15    MR. COX:  That sounds good.
16       MR. SWANSON:  I think that's about the
17 right time.  Okay.  And we'll have lunch coming,
18 so.  But we'll do some more testimony first.  I
19 think it's -- isn't it 11:30?
20    MR. COX:  It is.
21    MR. SWANSON:  Yeah.  That's fine.  Okay.
22 Good.
23       THE VIDEOGRAPHER:  This marks the end of
24 Media Number 2, Volume III in the deposition of
25 James Mittenthal.

Page 546

1    Off the record at 11:29.
2       (Recess taken.)
3    THE VIDEOGRAPHER:  We are on the record at
4 11:52 a.m.
5    This marks the start of Media Number 3,
6 Volume III in the deposition of James Mittenthal.
7    Counsel, you may continue.
8 BY MR. SWANSON:
9    Q.  Okay.  Let's see.  Gather myself up here.
10    You have that letter in front of you.
11 That was Exhibit 10 we were talking about, the
12 Legacy 2 collection in the Coker case.
13    Do you remember that?
14    A.  Yes.
15    Q.  And that indicates on the first page that
16 the case was actually filed in 1997; correct?
17    A.  Yes.
18    Q.  Okay.  And was a legal hold issued in that
19 case?
20    A.  I don't have information about that.
21    Q.  Now, you knew about this document and you
22 asked for legal holds in this case.
23    Did you ask if there was a legal hold for
24 this case?
25    A.  I recall asking for all relevant legal

Page 547

1 holds from the context of consumer talc.  I didn't
2 specify this case individually.
3    Q.  We had spoken about the Gambino case and
4 the Westfall case.  Were any Legacy document
5 collections created in connection with those
6 cases?
7    A.  Well, I'm not aware of a precise
8 definition of a Legacy document collection.  I
9 know that in the noncustodial sources there are
10 four designated groups of documents called Legacy
11 1 through 4 that have been denoted that for
12 various reasons.
13    I don't -- I also understand that -- that
14 the global put out -- the global talc production
15 and, in addition to that, the specific productions
16 for Leavitt and Fong were based on documents that
17 were available, both through the ongoing
18 collection process as well as the incorporation of
19 Legacy 1 through 4.
20    I'm not aware of any distinct sets that
21 have been created that are called "Legacy,"
22 anything else.  But I know that the company used
23 its best efforts to collect the information from
24 whatever relevant sources were available and
25 incorporated those Legacy cases as well.

Page 548

1    MR. SWANSON:  Move to strike as
2 nonresponsive.
3 BY MR. SWANSON:
4    Q.  Was there -- do you have any information
5 that documents were gathered in connection with
6 the Westfall litigation that are part of the
7 global talc production of documents?
8    A.  You know, I have no specific tie-back from
9 a document to a case.  I have an understanding
10 that the documents that have been produced in this
11 case go back and in some cases many, many years to
12 the '60s before that.  I -- I can't tie a
13 particular document to a particular prior case.
14    Q.  Well, I mean, that's not really the case,
15 is it, because you've got these descriptions of
16 the Legacy collections and they tell you what
17 cases those were in connection with; correct?
18    A.  Well, I was -- I believe I was speaking of
19 Legacy 1 through 4 as a carve-out to the general
20 approach that the company took to comply with its
21 production obligations.
22    Q.  But you can tell from those Legacy
23 collections in connection with what case they were
24 done; correct?
25    A.  I believe -- well, I --

Page 549

1    Q. It says right there, it says, "Coker" --
2 for Legacy 2, "Coker v. Bill Thames Pharmacy." It
3 was primarily collected in connection with that.
4    A. Yes. I see that now. I just read through
5 them, yes.
6    Q. And the Legacy collections, these were
7 stored at attorneys' offices; correct? And we saw
8 that -- you saw that with Legacy 2; correct?
9    A. I'm not able to respond in every case
10 where they were stored. I know they were in
11 attorney custody.
12    Q. Okay. But -- and if you would just answer
13 the question, because you're talking about this
14 huge gathering of documents over many, many years.
15       The question is simply now, are -- do you
16 have any information that documents were gathered
17 in connection with the Gambino case by Johnson &
18 Johnson and became -- and are now part of the
19 global talc collection of documents?
20    A. Other than Legacy 1 through 4, I cannot
21 tie specific documents to historical -- historical
22 cases, but I can speak to the fact that the
23 document production goes back many, many years.
24    Q. Okay. I didn't ask about how far it goes
25 back. I'm -- I've looked at the document

Page 550

1 collection, I understand that. That's not
2 responsive to my question.
3       So please answer the questions -- and
4 you're putting a bunch of nonresponsive stuff in
5 here and I want to get through this. So.
6       And, again, as to the Westfall case, same
7 answer, you're not aware of any documents that are
8 now part of the global talc production that were
9 gathered initially during the period of the
10 Westfall case; true?
11    A. I just want to make sure I understand the
12 answer. I'm not aware of any documents that I can
13 associate specifically with that -- with that
14 case.
15    Q. And you don't know whether or not any of
16 the documents that are part of the global talc
17 production were gathered during that -- during
18 that pending litigation, are you?
19    A. I have not done that particular
20 investigation.
21    Q. So you're not aware of it; correct?
22    A. One way or the other.
23    Q. Well, do you have any reason to believe
24 that there are documents related that were
25 gathered during the period of the Westfall

Page 551

1 litigation that are part of the global talc
2 production?
3    A. My reasoning is just based on the
4 understanding that the documents go back many,
5 many years. That's the basis I have to understand
6 that there may be documents from other cases that
7 are a part of the global talc production.
8    Q. And when you say "maybe," that means
9 you're speculating, true, as to those particular
10 cases?
11    A. Well, I think by definition it is
12 speculation.
13    Q. Okay. Thank you.
14       I want to go back to the testing results a
15 little bit.
16       You're aware that testing for asbestos was
17 done on a quarterly and annual basis; correct?
18    MR. COX: Object to the form.
19    THE WITNESS: I am aware that there are
20 many types of testing and that included, for
21 instance, quarterly testing.
22 BY MR. SWANSON:
23    Q. Did you make any attempt to -- did you
24 make any attempt to determine the number of tests
25 that were generated during the course of the

Page 552

1 period from 1965 when we first asked for testing
2 results to the present, testing for asbestos, that
3 is, in the talc?
4    A. I did not investigate the number of tests
5 performed and the -- and the particular date
6 range.
7    Q. And can you say that even 1 percent of the
8 testing results were produced in the Leavitt case?
9    MR. COX: Object to the form of the
10 question.
11    THE WITNESS: I'm not in a position, nor
12 did I conduct an investigation to ascertain
13 percentages of -- of test results produced.
14 BY MR. SWANSON:
15    Q. And you didn't -- so you didn't do an
16 audit; correct?
17    A. Well, as I mentioned, there's many types
18 of test results. Even if I had attempted to do an
19 audit, I might not have viewed testing categories
20 in the -- as anyone else would have viewed them.
21 It's -- there's -- a number of different types of
22 testing analysis, certificates. I -- I don't have
23 a specific parameter to even make that assessment.
24    Q. Well, for example, you know how many
25 quarters there are in a year; right?

Page 553

1    A. I -- I think so.
2    Q. Right. And you can multiply, so that if
3  you -- if you could -- you could find out by
4  asking Johnson & Johnson when it first started
5  doing quarterly testing for certain types of
6  quarterly tests; correct?
7    A. Well --
8    Q. For example, from the talc that came out
9  of the mine, you could find that out; right?
10    A. That presupposes that I would be able to
11  ascertain how many tests were done each quarter,
12  which -- and even that information I don't -- I
13  would have to understand how -- what I do know is
14  that there are tests that were performed
15  quarterly.
16      But how many tests, where the tests were
17  performed, I have some information about that in
18  my notes, but I can't specifically say where every
19  quarterly test was done so that I could multiply
20  it.
21    Q. Right. But you didn't try to figure that
22  out. You didn't see whether or not in theory that
23  could be done because you didn't do an audit;
24  correct?
25    A. I didn't do an audit of the number of

Page 554

1  tests done.
2    Q. Right. But hypothetically, you could go
3  about trying to do that, correct, if you wanted
4  to? You are telling us that that would be
5  difficult and you're not sure if it could be done,
6  but you can certainly think about how you would go
7  about doing that and attempt to do that; correct?
8    MR. COX: Object to the form.
9    THE WITNESS: I mean, if we're talking
10  hypothetically, I could -- I could -- you know,
11  one -- not I, but one could attempt to conduct
12  such an activity. I don't know if that
13  information could be easily -- readily or even
14  possibly ascertained, but one could go -- could go
15  about an exercise to do that.
16  BY MR. SWANSON:
17    Q. I'm looking at Exhibit 6, and if you could
18  pull that out, that's Tab 6 for you there. The
19  next one in a row.
20      And looking through this -- and Exhibit 6,
21  for the record, what is that again?
22    A. Those are to date -- or as of September 7,
23  2018, a list of search terms by which the ERMS
24  system was -- was searched.
25    Q. Does that list include -- other than

Page 555

1  perhaps as proper names, does it include any terms
2  that are not in English?
3    MR. COX: Object to the form.
4    THE WITNESS: You know, I -- I can't
5  interpret all of the terms. I can say that
6  these -- that the terms are as you and I see them
7  here are -- I don't -- many of them look like
8  English words or names, but I can't necessarily
9  interpret all the terms or verify if there's any
10  that aren't in English.
11  BY MR. SWANSON:
12    Q. I want to go to your notes, the paginated
13  notes that's Exhibit 26.
14    A. I got to pull that out again.
15    THE REPORTER: Here. That's it; right?
16    THE WITNESS: Looks good.
17  BY MR. SWANSON:
18    Q. We had touched on this yesterday. But if
19  you go to page 42, these are your contemporaneous
20  notes from interviewing an Uday Sharan; is that
21  right?
22    A. Yes.
23    Q. And you were discussing with him documents
24  related to Johnson & Johnson India and Johnson &
25  Johnson Thailand; is that right?

Page 556

1    A. Yes.
2    Q. And he told you that the Thailand has
3  batch manufacturing records, raw materials,
4  packaging materials, and that the standard
5  document retention was -- it says five years.
6  There's a question mark next to it.
7      Does that mean it was five years or around
8  five years, do you remember?
9    A. He -- he estimated it was five years.
10    Q. Okay. Now, the Johnson & Johnson Thailand
11  was making baby powder for distribution in Europe,
12  correct, according to your notes?
13    A. According to my notes.
14    Q. And would you agree that the legal
15  standards with respect to lawsuits and document
16  retention and those sort of things are tougher in
17  Europe, for example, or the United States, than
18  they are in -- overseas in many countries like the
19  Philippines?
20    MR. COX: Object to the form of the
21  question. And beyond the scope of the notice.
22    THE WITNESS: I mean, it would call for
23  some speculation. I mean, I know in Europe and
24  other parts of the world there's -- there's
25  certain privacy standards that are beyond those in

Page 557

1  the U.S. I don't think it's an easily answerable
2  question even as a hypothetical.
3  BY MR. SWANSON:
4      Q. Do you know if the standard, for example,
5  the retention on these types of documents at J --
6  Johnson & Johnson Philippines, which as I
7  understand makes Johnson's Baby Powder for the
8  Philippines, Philippines consumption, are -- the
9  retention period is as long?
10     MR. COX: Object to the form.
11     THE WITNESS: Yeah, I don't have specific
12  information on that.
13  BY MR. SWANSON:
14     Q. Were -- just so that the record is clear,
15  in Fong and Leavitt on these overseas searches, in
16  Leavitt, are there contemporaneous records --
17  well, I should say, are there -- were there any
18  records produced -- located with respect to
19  Johnson & Johnson Philippines and the baby powder
20  manufactured there contemporaneous with her
21  exposure -- or alleged exposure in the 1966 to
22  1968 period in the Philippines with respect to the
23  mining, milling, or manufacturing of the talc and
24  the baby powder?
25     MR. COX: Object to the form.

Page 558

1      THE WITNESS: I need to understand just a
2  couple parts of your question better.
3      Were those -- were there contemporaneous
4  documents located that were stored in those
5  countries or that were relating to those countries
6  but stored, let's say, in the United States?
7  BY MR. SWANSON:
8      Q. Yeah. Let me break it down a little bit
9  more, and it would be -- it would be either. Are
10  there any documents regarding the mining of the
11  talc for use in Johnson's Baby Powder that was
12  manufactured in the Philippines contemporaneous
13  with her exposure, in other words, for that period
14  1966-1968?
15     A. You know, I'm going to look at the
16  specific searches in that area. In terms of
17  information stored in the U.S., there -- I can't
18  speak to that. I have not looked at the global
19  talc production or the specific Leavitt
20  production.
21     There may -- I'm going to also consult the
22  production summaries to see if there's anything
23  written down about that. So I'm just going to
24  look at those sources.
25     Q. And since I asked the question specific to

Page 559

1  mines, let's throw in there milling and
2  manufacturing since you're doing the search and
3  then we can touch on anything you do find.
4      A. And I'm just applying my general
5  understanding of your questions to these
6  categories, that is not dispositive, but, for
7  instance by your question, I would assume you
8  don't care about, for the sake of this question,
9  trade organization payments.
10     Q. Correct.
11     A. Or Workers' Comp.
12     Q. I'm asking about the mining, milling --
13  the mining of the talc, the milling of the talc,
14  and the manufacturing of the baby powder with
15  respect to the Johnson's Baby Powder that was
16  manufactured in the Philippines from 1966 to 1968.
17     A. I'm sorry, I was reading Pam Downs'
18  section as you were restating the question.
19     I just want to hear it one more time
20  specific to the country.
21     MR. SWANSON: Can you read that, my
22  clarification, back to him?
23     (Record read by the court reporter.)
24     THE WITNESS: You know -- and I'm not an
25  expert on all the places where talc was mined and

Page 560

1  manufactured and I'm not here to respond to that
2  specifically. I'm just noting that in my Pamela
3  Downs notes, it indicates for the Philippines that
4  talc was not mined there but was manufactured
5  there for a while.
6  BY MR. SWANSON:
7      Q. Right. And we had touched on this before,
8  and I had informed you based on the discovery
9  responses of Johnson & Johnson that the talc came
10  from Korea.
11     A. Yes.
12     Q. So if you have the information about the
13  mining and milling of Korean talc contemporaneous
14  with Teresa Leavitt's exposure in the Philippines
15  from 1966 to '68 that would be also responsive.
16     MR. COX: So why don't you take a look at
17  what you need to look at and then answer his
18  question.
19     THE WITNESS: I'm sorry. Take a look at
20  what?
21     MR. COX: Why don't you take a look at
22  whatever you need to look at and then answer
23  Mr. Swanson's question.
24     MR. SWANSON: That's fine. Let me -- and
25  I can re-ask the question later.

Page 561

1 BY MR. SWANSON:
2      Q. Let's just -- let me be clear about the
3 totality of what I am asking and I'm going to ask
4 as to the Philippines and Teresa Leavitt's
5 exposure and I'm going to ask as to Hong Kong.
6      So for the Philippines, it's going to be
7 the bottling of the talc related to Johnson &
8 Johnson Philippines, the manufacturing, and it
9 will be the mining and the milling of the talc
10 that was used for that.  And these are
11 contemporaneous with their exposure.  So '66 to '68
12 period, okay?  So that talc would have come from
13 Korea based on what Johnson & Johnson has told us.
14 And then in the Fong case, it would be the
15 Johnson & Johnson baby powder distributed in Hong
16 Kong from 1971 to '83, contemporaneous with that
17 period, and it would be the mining of the talc
18 during that period, mining and milling of the talc
19 during that same period.  And that talc, from what
20 we have been told, also came from Korea.
21      So it's whether or not there are any
22 contemporaneous documents that have been located
23 and produced for that.
24      A. So I want to -- I want to find the
25 production requests.

Page 562

1      Q. Now, the production requests --
2      Do you have the -- well, yeah.  Go ahead
3 and look at that.
4      A. Actually...
5      MR. SWANSON:  Yeah.  Why don't we do this,
6 let's take our break and grab our lunch.
7      Obviously, since I've committed to a stop
8 time, I don't want to, you know, run out my clock
9 by taking the time to do this.
10      If you can sort of gather your thoughts
11 during the break, that would be great.
12      Okay.  Let's go ahead and go off the
13 record.
14      THE VIDEOGRAPHER:  Off the record at
15 12:17.
16      (Lunch break taken.)
17      THE VIDEOGRAPHER:  On the record at 1:02.
18      You may continue, Counsel.
19 BY MR. SWANSON:
20      Q. Okay.  Mr. Mittenthal, we've had our lunch
21 break.  Are you okay to continue?
22      A. Yes.
23      Q. Good.  Before the break, I was asking you
24 very specific questions -- or I was attempting
25 to -- about the Fong and Leavitt cases and whether

Page 563

1 or not documents related to the mining and milling
2 of talc or the manufacturing of the baby powder
3 contemporaneous with their exposure in Hong Kong
4 and the Philippines, and I'll separate them --
5 were located and produced.
6      Do you remember that?
7      A. Yes.
8      Q. Okay.  And have you had an opportunity to
9 look at anything else?
10      A. So I -- I did this for both Hong Kong and
11 the Philippines:  consulted my notes, specifically
12 noncustodial sources, interview notes, including
13 the interview notes with Pam Downs.
14      I looked at the chart that I had assembled
15 that represented the follow-up collection efforts
16 for Leavitt and Fong.
17      I then turned to the document production
18 summaries and --
19      Are we on Fong or Leavitt at this point?
20      Q. Let's talk about Leavitt first and Johnson
21 & Johnson Philippines, the manufacturing of that
22 baby powder from '66 to '68 and the mining and
23 milling from Korea that was used in that baby
24 powder.
25      A. Well, I can't answer the questions with

Page 564

1 respect to the specific entities of Johnson &
2 Johnson.  What I attempted to do was to understand
3 the extent to which those questions have been
4 asked for document production and that document
5 responses have been provided.
6      To do so, with respect to Leavitt, I
7 looked at this production summary which has been
8 marked as Exhibit 14 and I looked first of all at
9 the Set 3 which is -- has tabs that, in the
10 document production responses that relate to just
11 general questions about entities that supplied
12 talc and mines that were sources of talc and the
13 J&J Company's role in mining and processing of
14 talc and the specified date range to see if there
15 was anything specific to the contemporaneous time
16 frames for Fong or Leavitt -- well, in this case,
17 Leavitt -- or any indications of those overseas
18 locations.
19      I looked -- as I mentioned, I looked in
20 the RFP Set 3 for those and I looked specifically
21 at responses on, I believe, starting on page 8
22 which is Request -- I'm sorry -- page 7, Request
23 22.  And I did not see anything specific to the
24 particulars of your question in terms of
25 locations.

Page 565

1    I went to then RFP Set 7 which was
2   specific to the Philippines and the aforementioned
3   date ranges and I consulted to the responses to
4   RFP Set 7 which begin in the binder that I have as
5   tab N as in Nancy, and in the -- starting with
6   page 1, Request 99, I reviewed those productions
7   and production summaries, and, as noted, there
8   were certain documents identified in response to
9   that -- to those searches, including some that
10  were designated confidential. In reviewing those,
11  started with 99, continuing through page 2, I note
12  that in response to RFP 103, "All documents
13  regarding or reflecting the locations where
14  Johnson's Baby Powder was manufactured which was
15  supplied to the Philippines from 1965 through
16  April 1968," there is an indication that there
17  were documents produced and that the Exhibit 1,
18  which is, I believe, a spreadsheet of --
19  containing the relevant Bates ranges under Tab 2,
20  denotes the documents that were responsive to
21  that.
22       I also continued going through Request 104
23  and noted the request for locations where
24  Johnson's Baby Powder was manufactured which was
25  available for purchase in the Philippines from

Page 566

1   1966 through April 1968, and also noted documents
2   that were provided in response in Exhibit 1,
3   Tab 2. And then continued on through 104, 105,
4   106, 107. And then 107, which was documents
5   regarding or reflecting what entities supplied
6   talc that was used in Johnson's Baby Powder
7   supplied to the Philippines from 1965 through
8   April 1968. I noted that in Exhibit 1, Tab 3
9   there were other documents produced in response to
10  that request, as well as Request For
11  Production 108, which was similar, although
12  instead of supplied to the Philippines, it was
13  available for purchase in the Philippines from
14  1966 through 19' -- April 1968.
15       The documents were produced in that same
16  exhibit, Exhibit 1, Tab 3. So that was -- those
17  were the request for production categories that I
18  consulted that yielded documents that had been
19  produced that I believe are in the context of your
20  question.
21       Q. All right. So you provided a lot of
22  information there. We're going to have to break
23  that down substantially.
24       You threw me off there. You were actually
25  talking about -- you said Johnson & Johnson, and

Page 567

1   maybe I just heard that, but you were actually
2   looking at the Set 2 of request for production to
3   Johnson & Johnson Consumer, Inc.; correct? That's
4   the numbers you were referencing. They're fairly
5   equivalent, but the numbering is different, so I
6   just wanted to be clear. That's what you were
7   just referencing when you were going through Set
8   Number 7?
9       MR. COX: Look at the footer.
10      THE WITNESS: Oh. Yeah. I'm sorry,
11  Johnson & Johnson Consumer, yes.
12  BY MR. SWANSON:
13      Q. And I didn't have that in front of me. So
14  let me -- and you haven't reviewed the specific
15  documents that were stated as being responsive to
16  those requests; correct?
17      A. Correct. I noted on the first day that I
18  had run various documents from the production to
19  get an understanding of several hundred documents.
20  I didn't review any of these production sets
21  specifically for that goal.
22      Q. So, yeah, you kind of -- because I didn't
23  have this in front of me, I wasn't looking at the
24  same thing you were talking about.
25       So we're going to have to go through it

Page 568

1   again even though you gave me that long answer.
2       Let's start with Request 103 on Set Number
3   7. That's reflecting the locations, okay? There
4   were a list there of documents. Let's see.
5       And, I'm sorry, what was the other set
6   that you were referring to, Set Number 5?
7       A. I believe it was Set 3, and that was just
8   from the standpoint of making sure that in the --
9   sort of the general request for production that
10  didn't specify a country, I wanted to confirm that
11  there were no mentions of those countries in any
12  of the responses. So I consulted RFP Set 3, the
13  tabs that included 6, 7, 8.
14      Q. Okay.
15      A. Just to make sure there were no mentions.
16      Q. Okay. So let me -- and I'm not going to
17  make too firm of a representation about exactly
18  what has been produced. But let me start with
19  just asking you, or confirming. You didn't review
20  the specific documents that were -- that were
21  identified as being produced to those requests we
22  talked about. So, going back to my original
23  question, if you can answer this because -- well,
24  let me -- let me back up another step.
25       When I looked at your notes on the

Page 569

1  Philippines in the Hong Kong -- and Hong Kong and
2  looking at what I had looked at from the
3  production in your notes, it looked to me like
4  what had been -- what -- that, for example, Hong
5  Kong they weren't related -- they weren't able to
6  locate any responsive documents.
7       And, as to the Philippines -- and this is
8  looking at page, I think, 64 of your notes --
9  saying that nothing had been found in the date
10 range.
11      So that's where I started with this, is
12 that you had nothing being found in that date
13 range, so -- and you haven't reviewed specifically
14 the documents that were produced in response to
15 the request that you pointed out.
16      So are you aware of any manufacturing
17 documents with respect to the Philippines
18 Johnson's Baby Powder that were produced for that
19 period from 1966 to 1968?
20      A. Well, I don't -- I'm interpreting these
21 broadly. So I don't know what "supply" means.
22 For instance...
23      Q. And "supply" does include manufacturing.
24      A. Okay. So, for instance, in 101, the
25 documents regarding or reflecting location where

Page 570

1  Johnson's Baby Powder was manufactured which was
2  supplied to the U.S. Navy in the Philippines in
3  the date range.
4       So I conclude that that is a part of your
5  question insofar as it relates to manufacturing.
6       Q. Yes. "Supply" includes manufacturing.
7       A. Okay. So, for instance, in page 2 of
8  Tab -- I guess this is Set -- Set -- Set 7 --
9       Q. Uh-huh.
10      A. -- of -- in the -- in the notebook under
11 Tab N, Number 103 on page 2, "documents regarding
12 or reflecting location where Johnson's Baby Powder
13 was manufactured which was supplied to the
14 Philippines."
15      So that is "manufactured." There were
16 documents provided that are reflected in
17 Exhibit 1, Tab 2.
18      Q. Right. And that's regarding the location.
19 Okay. I guess -- and partly I may need to get to
20 the bottom of this by specifically looking through
21 each and every document that was produced. What I
22 am telling you is that I am not aware of documents
23 specific to the manufacturing being produced for
24 the Philippines for that '66 to '68 time frame.
25 And I don't think the answer resolves that issue

Page 571

1  because the question is not phrased precisely that
2  way and it's phrased broadly enough that it can
3  include other documents. So.
4       But you haven't reviewed the specific
5  documents that were produced; right?
6       A. I've sampled them. I have not reviewed
7  them.
8       Q. Sampled them. Right.
9       A. Yes.
10      Q. And your initial -- your initial notes
11 speaking to Pam Downs it indicated that there
12 weren't any documents related to the
13 manufacturing, correct?
14      MR. COX: Object to the form.
15 BY MR. SWANSON:
16      Q. During the -- during the relevant time
17 period.
18      A. My notes from Ms. Downs covered the onsite
19 searches of archive materials in the Philippines,
20 so that -- that only covered that category of
21 document searches.
22      Q. As to -- and what about as to the mining
23 and milling by the Korean talc supplier. Do you
24 have any -- has Johnson & Johnson produced
25 documents regarding the mining and milling of the

Page 572

1  talc contemporaneous with Ms. Leavitt's exposure
2  from '66 to '68?
3       A. Well, you know, I'm not the best person to
4  interpret what's covered in some of these
5  requests. It is possible that 103 would cover
6  that.
7       Q. Okay. Let's -- I get that, and -- but
8  that's a specific question. And, you know,
9  whether or not there was a request that covered
10 it, because simply you looking at what tabs were
11 referenced in an Excel spreadsheet and the Bates
12 numbers isn't going to tell you if something was
13 produced specifically responsive to my question.
14      So -- and if you don't know the answer,
15 that's fine, but I don't want a record that is
16 unclear, so -- and if you don't know and we just
17 need to look at it again, that's okay. But I
18 don't have -- yeah. I think if you can just focus
19 on the question -- and if you don't have the
20 answer based on the information that you have,
21 that's fine.
22      A. I've gathered a lot of information in
23 anticipation of these topics, including all the
24 productions, my notes. In response to the
25 question at hand, I have tracked down what I think

Page 573

1  is the best place to look to definitively answer
2  the question. I have certainly not reviewed the
3  documents to determine which ones are specifically
4  responsive, but this is -- this is my best answer
5  to where one would determine those documents that
6  are in the context of your requests.
7      Q.  And as to -- we're not going to get --
8  obviously get to the bottom of this right now in
9  terms of the -- whether or not those documents
10  are, but if those documents listed aren't
11  regarding the manufacture during that time period
12  of from '66 to '68 of Johnson's Baby Powder at the
13  Philippines facility, then they weren't produced;
14  correct?
15      MR. COX:  Object to the form.
16      THE WITNESS:  Well, once again, what you
17  are asking for sounded a lot like this category.
18  Now, as you said, the category may not be
19  precisely those documents. There may be overlap.
20  But it's the closest approximation of what you're
21  looking for.
22  BY MR. SWANSON:
23      Q.  I understand that. And that's the best
24  you can do based on that. This is just the
25  question, though, if those documents -- and I've

Page 574

1  reviewed them and I haven't seen what I'm looking
2  for here and that's why I'm asking. And, you
3  know, there are a lot of documents, so it's
4  possible I missed it.
5      But if those -- if those documents
6  regarding the manufacture of the baby powder from
7  '66 to '68 aren't listed among those documents in
8  those tabs that are cited, then they were not
9  produced; correct?
10      A.  That would -- that would make sense.
11      Q.  Okay. And if they hadn't been produced,
12  assuming they hadn't been produced -- and I
13  understand this is a hypothetical -- then they
14  were destroyed at some point; correct?
15      MR. COX:  Object to the form.
16      THE WITNESS:  I mean, that -- that is one
17  explanation. That is also a hypothetical as to
18  what happened, why they weren't produced. They --
19  they -- there's other explanations.
20  BY MR. SWANSON:
21      Q.  The other explanation would be what, that
22  a -- not an adequate search was done?
23      MR. COX:  Object to the form.
24      THE WITNESS:  They could have been
25  mislabeled. I'm, you know, in hypothetical land

Page 575

1  here, but there are reasons why they -- they could
2  have been misfiled in a different part of the
3  warehouse. I mean, I'm just saying there are --
4  you know, there are errors in the process that
5  occur from time to time in filing information.
6  BY MR. SWANSON:
7      Q.  Same question as to Hong Kong. Did you
8  look at Hong Kong to see if you had -- if Johnson
9  & Johnson produced manufacturing documents
10  contemporaneous with Ms. Fong's exposure?
11      A.  So as I mentioned, I consulted my notes,
12  including my typewritten notes, my follow-on with
13  Pamela Downs, the noncustodial document listing.
14  Then I further went to the production summaries
15  for Fong, RFP Set 1. It speaks to mining
16  entities, mines that produced talc for JPP in Hong
17  Kong '70 through '84. Other -- the next four or
18  five entries -- and I went to the corresponding
19  sections, which I believe are in the Fong binder
20  under discovery responses, Tab 3, Subtab C, and
21  looked through -- well, I looked through -- just
22  starting from the beginning, looked through 1, 2,
23  3, 4. I'm up through -- you know, it was -- it's
24  more difficult to connect your question to the
25  specific categories in Fong. I -- for instance, I

Page 576

1  looked at Response 11, "testing of talc marketed
2  in Hong Kong from '70 through '84." There were
3  documents produced for that. I understand that to
4  be part of the manufacturing process.
5      I looked at response -- Request For
6  Production 12.
7      I haven't found other document categories
8  that were produced that are directly reflective of
9  your question in Fong, looking at -- looking
10  through the production set.
11      Q.  The same thing in Fong, you haven't looked
12  at the actual documents that were produced under
13  those categories related to Hong Kong
14  manufacturing; correct? I mean, you see where
15  some Bates numbers have been identified; correct?
16      A.  Yes. And I sampled some documents. But I
17  haven't looked at them for the eye to verifying
18  what was there.
19      Q.  Were -- just in terms of audio that was
20  produced in the Leavitt and Fong matters, were the
21  only audio records that were produced related to
22  advertising?
23      A.  You know, I was just checking the
24  noncustodial sources to see if there's any
25  additional information about that. I -- I don't

Page 577

1  know for sure.  An audio file could just be a
2  computer file type that's present in a custodial
3  production in a share directory.  I can't speak to
4  the extent to which there may be files that have
5  audio in them.
6      Q.  If you go to Exhibit Number 6 which are
7  the archive search terms.  You have -- it's Tab 6
8  in your binder.
9      A.  Okay.  Thank you.
10     Q.  And these are the archive search terms
11 that are used in the ERMS system to locate
12 documents that may have relevant documents to the
13 talc litigation, correct, that are Iron Mountain's
14 archive documents and I believe some onsite
15 collections, too; is that correct?
16     A.  There are -- onsite there is a movable
17 file system in the records-keeping facilities, and
18 the ERMS would have covered that area as well as
19 offsite storage.
20     Q.  And this was the most recent list of
21 archive search terms; true?
22     A.  Yes.
23     Q.  If you go to -- I don't these are
24 numbered, but if you go to the third page of this,
25 they're alphabetical, though, right, the search

Page 578

1  terms, the way they're set out here?
2      A.  Well, I don't know if the search
3  descriptions or the terms are alphabetical.  I
4  believe it's the search titles, not the terms.
5      Q.  Do you see the search term "fiber"
6  anywhere in these archive search terms?
7      A.  I don't see the term "fiber," but it may
8  be there.  As a quick go-through, I don't see it.
9      Q.  That is a term which I don't see it in
10 there and I've looked at it.  That's a term that
11 should be in there, shouldn't it, for talc
12 litigation?
13     MR. COX:  Object.  Object to the form of
14 the question.  Beyond the scope of the notice.
15 BY MR. SWANSON:
16     Q.  I mean, you told us that people would
17 enter information about the boxes and the amount
18 of information and descriptive information they
19 would vary.
20         Isn't "fiber" a term that you'd want to
21 look for if you were looking for documents
22 relevant to asbestos talc litigation where there's
23 an allegation that the tremolite that's being
24 found in Johnson's Baby Powder is fibrous
25 tremolite?

Page 579

1      MR. COX:  Object to the form.  Beyond the
2  scope of the notice.
3      THE WITNESS:  You know, I didn't see that
4  as my area to investigate under the scope of the
5  notice.  I will say that the composition of the
6  searches is -- some of the attorneys have made
7  their work product, and I have a general
8  understanding that it's designed -- the totality
9  of the search terms are designed to cast a very
10 wide possible net.  The search terms have been
11 refined over time.  They have been provided to the
12 plaintiffs, as I understand.  I -- I can't opine
13 on whether a particular term would have been
14 appropriate in the context of all the terms
15 presented.
16     MR. SWANSON:  Move to strike nonresponsive
17 portions.
18 BY MR. SWANSON:
19     Q.  If you -- if you see under Exhibit 6,
20 there's a search term "mesothelioma"?
21     A.  Yes.
22     Q.  Okay.  Do you know if this system is set
23 up to do stem searches?
24     A.  You know, I did not conduct a -- and I
25 think we got into this on a previous day as well.

Page 580

1  I don't -- I didn't understand -- seek to
2  understand the search engine behind ERMS and how
3  it does stem searches or fuzzy searches or if it's
4  Google-like in the way it returns information.
5  BY MR. SWANSON:
6      Q.  And it makes sense that "mesothelioma"
7  could be misspelled by people; right?
8      MR. COX:  Object to the form.
9  BY MR. SWANSON:
10     Q.  It's a complicated enough word that one
11 would expect that that could be misspelled; true?
12     MR. COX:  Object to the form.
13     THE WITNESS:  Yes.  In general I would
14 agree as a -- as a lay opinion.
15 BY MR. SWANSON:
16     Q.  And you would want, then, search terms
17 that would pick up possible misspellings, and one
18 way to do that is to have what's sometimes called
19 a "stem search"; correct?
20     A.  For the sake of certain search engines, I
21 would agree with you.
22     Q.  And if you continue on here, if you look
23 at -- if you look in the Ts, do you see the term
24 "talc" in there?
25     A.  Yes.

Page 581

1    Q. There is no term "talcosis" in there, is
2  there?
3    A. I wouldn't guarantee it, but I don't see
4  it.
5    Q. I mean, most of these things from your
6  view of this are alphabetical, right, even the
7  search terms and the search description that
8  generally are falling in the same alphabetical
9  range; correct?
10    A. They appear to be alphabetized.
11    Q. Okay. If you go to the Cs, you've heard
12  the term "cleavage fragment" when it comes to talc
13  and testing talc for the presence of asbestos?
14    A. I -- I'm not sure if I know that
15  expression or not.
16    Q. You haven't heard it?
17    A. I may have. I don't recall.
18    Q. It's something that -- it's an element
19  found in testing results -- or claimed in testing
20  results that, for example, the tremolite that's
21  being found or the anthophyllite is a cleavage
22  fragment and not an asbestos fiber.
23       Have you heard about that controversy at
24  all?
25    A. I'm not current on the technical details

Page 582

1  of that.
2    Q. Assuming that I didn't misrepresent that
3  to you, wouldn't it make sense that you would want
4  the term "cleavage" in these archive search terms?
5    A. You know, once again, my understanding is
6  that these search terms were designed to retrieve
7  boxes that had been denoted a certain way to be
8  sent to storage.
9       I don't -- I -- I'm not opining on whether
10  a term like that would be appropriate to locate a
11  box in this particular context.
12    Q. If you go to the Is -- turn to the Is
13  here.
14       Are you there?
15    A. Yeah.
16    Q. "I-N"?
17    A. Yes.
18    Q. You see the term "inhalation" anywhere?
19    A. I -- I don't see the term "inhalation" on
20  this page.
21    Q. Certainly you can agree with me that
22  "inhalation" is a relevant term when -- a relevant
23  term to the talc litigation; correct?
24       MR. COX: Object to the form.
25       THE WITNESS: As I mentioned before, it

Page 583

1  may be relevant, but it may not be a criteria to
2  retrieve a box.
3  BY MR. SWANSON:
4    Q. And -- now, you say it may not be a
5  criteria to return a box.
6       The -- the information that you gave me
7  about what were required terms on those boxes, if
8  I remember right, was a date range, the retention
9  cutoff period, and the department; correct? Those
10  were required terms.
11    A. Well, the retention series.
12    Q. Okay. Retention series.
13    A. Which would then be driven off the date
14  range, but yes.
15    Q. Okay. That's -- and then they were
16  supposed to put in a textual or a narrative
17  description of the contents of the box; correct?
18    A. Yes.
19    Q. And there were no hard-and-fast rules that
20  you knew about that were consistent throughout the
21  company in terms of exactly what information was
22  in there; right?
23    A. As I recall, the department, each
24  individual department, was responsible for how
25  that information was entered based on the

Page 584

1  requirements laid out by the SOP of the records
2  department.
3    Q. So how did Johnson -- based on that and
4  based on the issues that are -- would be relevant
5  here, how did Johnson & Johnson go about
6  determining the terms such as "fiber" and
7  "inhalation" and "talcosis" and "cleavage" are not
8  relevant? Because you don't know specifically
9  what that individual is going to put in their
10  textual description, do you?
11       MR. COX: Object to the form.
12  BY MR. SWANSON:
13    Q. And it's variable.
14    A. As I mentioned before, the search terms
15  were designed to return a large overly inclusive
16  set of boxes. The search terms have been refined
17  over time and they've been -- the decision as to
18  what goes into a search term is -- is a legal --
19  ultimately a legal decision.
20    Q. And they've been refined over time to make
21  changes; correct?
22    A. Well, that -- I think that's the
23  definition of "refined."
24    Q. And giving Johnson & Johnson's lawyers the
25  benefit of the doubt in terms of creating that,

Page 585

1  you would hope that the changes that were made
2  over time were to improve this and make it catch
3  more relevant documents; true?
4      MR. COX: Object to the form.
5      THE WITNESS: Well, "improve" is a -- is
6  one rationale that there may have been other
7  specific searches related to Leavitt and Fong that
8  would have been added so it was -- the -- the
9  search terms themselves reflect all of the cases
10  and matters and needs that have been, up until
11  that present time, encapsulated in the -- in the
12  list.
13  BY MR. SWANSON:
14      Q. You're not saying this is a perfect list,
15  are you?
16      A. I don't believe I said that.
17      Q. Okay. And you're not testifying either
18  that -- you don't know one way or the other
19  whether or not using the terms "talcosis,"
20  "fiber," "cleavage," "inhalation" would produce --
21  would catch more boxes of documents that had
22  relevant information and documents in them; true?
23      A. That's a hypothetical. I'm not able to
24  speak to that hypothetical, no -- or yes. I
25  mean --

Page 586

1      Q. Right. Because you -- you haven't audited
2  that, have you?
3      A. "Audited" by meaning that I haven't --
4      Q. By adding -- nobody did an experiment, as
5  far as you know. Johnson & Johnson hasn't audited
6  this to add a search term like "fiber" and see if
7  it would pick up anything else, has it?
8      A. I -- I don't know. That was beyond the
9  scope of my inquiry for this matter.
10      MR. SWANSON: Okay. I'll keep to my
11  promise.
12      MR. COX: Can we go off the record for a
13  moment?
14      MR. SWANSON: Yes.
15      THE VIDEOGRAPHER: Off the record at 1:45.
16      (Off the record.)
17      THE VIDEOGRAPHER: On the record at 1:48.
18      You may proceed, Counsel.
19  CROSS-EXAMINATION BY MR. COX:
20      Q. Mr. Mittenthal, I'm just going to ask you
21  a few questions on behalf of the J&J defendants,
22  okay?
23      A. Yes.
24      Q. Do you have an understanding of why you
25  were asked to provide testimony in response to the

Page 587

1  topics that were identified in plaintiff's
2  deposition notice?
3      A. There were a number of different topics in
4  the notice. They covered a number of different
5  functional areas and departments, and my prior
6  experience with the company and as a consultant,
7  my knowledge of the information enabled me to go
8  and speak to people in the various aspects of the
9  company to gather the documentation to cohesively
10  bring all the information together to be able to
11  provide the best answers to those questions.
12      Q. Did you investigate all of the areas in
13  which you were asked to provide testimony over the
14  three days?
15      A. Yes, I did.
16      Q. Can you please describe how you did that
17  investigation?
18      A. Well, I conducted at least -- I conducted
19  four site visits. During that period, I spoke to
20  various records managers and people with
21  responsibility for document issues. Over time, I
22  expanded the list of people that I interviewed to
23  encompass nearly 40 people and nearly 70
24  single-spaced typewritten pages of notes.
25      I requested a number of documents,

Page 588

1  including retention schedules, policies and
2  procedures, other supporting materials. I asked
3  for production summaries and built with that
4  information timelines, applications listings,
5  people listings of -- lists of legal holds which I
6  requested, and better in order to understand the
7  document population itself.
8      I loaded a litigation review tool on my
9  computer and went through various aspects of the
10  production, looked at the exhibit spreadsheets and
11  the various tabs, and put Bates ranges in to look
12  at the documents specifically.
13      I sampled several hundred documents.
14      I conducted follow-up interviews.
15      I -- probably in total I put together
16  about ten different reference aids in order to be
17  able to respond to the questions.
18      Q. You mentioned interviewing a number of
19  people, nearly 40 people.
20      What disciplines or functional areas did
21  those individuals cover?
22      A. They included people in the records
23  function, in the quality function. And that's
24  both supplier quality as well as internal quality
25  control; records officers; IT people; procurement

Page 589

1  people; people involved with the supply chain;
2  people in the corporate organization, including
3  records officers; third parties, including several
4  vendors who were responsible for assisting in
5  retrieving and staging documents. That brought
6  the total to about close to 40.
7      Q. And you mentioned that the list of
8  interviewees expanded over time.
9         Who determined which individuals you
10 interviewed in connection with your fact-finding?
11     A. I did.
12     Q. How did you go about doing that?
13     A. Well, I asked to identify the records
14 officer first. And then that led me to a records
15 person who had more experience actually running
16 the searches in the system, and then that brought
17 me to the corporate records people.
18        I had previously experience with the
19 corporate reports people, so I knew some of the
20 people to ask and also some of the corporate IT
21 people to ask.
22        And then, through the records officers at
23 the consumer level, I was able to get names of
24 other people involved with R&D and supply chain
25 and supplier quality and, you know, sort of built

Page 590

1  upon those lists additional names.
2         And then, with respect to the actual
3  collection activities, I knew -- I knew from
4  counsel who the vendors were and sought to
5  interview the vendors.
6         And then, in terms of some of the
7  follow-up, I found it necessary to speak to people
8  in the corporate secretary's office to learn
9  information about the additional searches
10 conducted for the cases.
11     Q. Did you identify any individuals at any
12 time during your investigation that you believed
13 were important to your fact-finding but who you
14 did not speak with?
15     A. I did not.
16     Q. Were there any questions during your
17 interviews that you wanted to ask people that you
18 were not permitted to ask?
19     A. There were not.
20     Q. How did you go about identifying the
21 documents that you said you reviewed?
22     A. Well, with respect to the records
23 officers, I knew that there were procedures -- and
24 this goes back to my past experience with the
25 company that there were procedures and schedules

Page 591

1  at the corporate level as well as at the consumer
2  level or the operating company level. And I knew
3  which procedures were operational at the corporate
4  level, the worldwide policies and supporting
5  schedules. Through the results of my interviews
6  at the consumer level, I learned of the existence
7  of the consumer level schedules and their
8  histories and requested those.
9         I was also -- also went to the legal team
10 and requested the document productions, their
11 request for interrogatories, the holds, the
12 pleadings of other -- other materials in the case
13 file to best educate myself, both about the nature
14 of the Fong and Leavitt cases as well as the
15 efforts to produce information to date.
16     Q. In terms of all of the efforts you've
17 described involved in your preparation, over how
18 long a period of time did that occur?
19     A. I started in the -- in the spring of 2018
20 approximately March -- in the March time frame.
21 Some of the people I knew had come from earlier
22 efforts in other matters. But my fact-finding in
23 this case -- and I went to all those people,
24 starting in March and interviewed them all going
25 forward.

Page 592

1      Q. And in total, how many hours were involved
2  in your preparation to give testimony regarding
3  the topics for which you were designated in the
4  Leavitt and Fong cases?
5      A. At least 200.
6      MR. COX: I don't have any further
7  questions.
8         Thank you, Mr. Mittenthal.
9         THE VIDEOGRAPHER: This concludes the
10 deposition --
11     MR. SWANSON: Uh, uh, uh, uh --
12     THE VIDEOGRAPHER: Oh, I'm sorry. I
13 was -- I was waiting -- I'm so sorry. I was
14 waiting for a response. I saw nothing. I strike
15 that.
16     MR. SWANSON: I need to take my seat
17 again.
18     THE VIDEOGRAPHER: Yeah. So sorry.
19     MR. SWANSON: We're still on the record,
20 aren't we?
21        Oh, funny.
22 REDIRECT EXAMINATION BY MR. SWANSON:
23     Q. I bet you're happy this is about done,
24 huh?
25     A. Well --

Page 593

1    Q. I think we all are.
2    A. I will be happy when it is done.
3    Q. I just want to clarify some things from
4  the testimony you just gave, and I will be brief.
5        When you -- you testified in June in the
6  Hayes case; correct?
7    A. Yes.
8    Q. And in June, you said you were aware of
9  the Leavitt case but you hadn't been asked to do
10  any specific work with respect to that case.
11        Do you remember that testimony?
12    A. Yes.
13    Q. And you also said you didn't even know
14  about the Fong case.
15        You remember that testimony in the Hayes
16  case?
17    A. I didn't recall it, yes.
18    Q. So you hadn't done any work in these cases
19  up until June; correct?
20    A. I would disagree that --
21    Q. Specific to these cases.
22    A. My work encompassed talc cases and they --
23  much of my preparation was in connection with
24  Hayes which I supplemented with specific Fong and
25  Leavitt investigation.

Page 594

1    Q. Okay. If anyone were to get the
2  impression that all of that work that you were
3  doing was specific to the Leavitt and Fong cases,
4  that would be the wrong impression from the
5  testimony that you just gave in response to
6  Mr. Cox's questions; correct?
7    A. Well, I -- that -- if that were the
8  impression, that would be wrong.
9    Q. Right. And you talked about talking to
10  40 people, but, actually, once you were working on
11  the Leavitt and Fong cases, you spent a few
12  minutes speaking to Pam Downs -- and that was
13  between Hayes and your Leavitt deposition -- and
14  then this last time you spent an hour and a half
15  speaking to Pam Downs, and I think, an hour or so
16  speaking to Ms. -- Ms. French and Giacino;
17  correct?
18    A. Yes. I spent -- well, I mean, in total
19  the number of hours speaking to Ms. Downs and
20  Ms. Giacino.
21    Q. Right. So that's about three hours total,
22  and that's just two individuals, or three
23  individuals you were speaking to, and those were
24  the follow-up interviews that you just spoke
25  about; right?

Page 595

1    A. Those were interviews that were
2  follow-ups.
3        Well, I hadn't spoken to Ms. Giacino
4  before that.
5    Q. And none of those original interviews were
6  done specifically -- of those 40 people were done
7  specifically with the Leavitt and Fong cases in
8  mind; true?
9    A. They were done with -- with the talc
10  litigation in mind.
11    Q. Okay. That wasn't my question. They were
12  not done specifically with Leavitt and Fong in
13  mind, were they?
14    A. Correct.
15    Q. Everything that you've learned from these
16  individuals you've spoken to, other than the
17  attorneys for Johnson & Johnson, you've reflected
18  in your contemporaneous notes; correct?
19        MR. COX: Object to the form.
20  BY MR. SWANSON:
21    Q. Except for the follow-up interviews where
22  you didn't produce contemporaneous notes; is that
23  correct?
24        MR. COX: Object to the form.
25        THE WITNESS: Well, what I've learned

Page 596

1  encompasses not just my notes but the materials
2  I've assembled. The policies and procedures, the
3  supporting documents, that is part of what I
4  learned.
5  BY MR. SWANSON:
6    Q. And I may have asked the question poorly.
7        But everything that you learned from
8  speaking to people at Johnson & Johnson other than
9  the lawyers who have information about document
10  retention, document searches, document
11  productions, the various platforms in which
12  documents are kept, those are reflected in your
13  contemporaneous notes that have been attached to
14  this transcript; correct?
15    A. Yes.
16    Q. Except for the follow-up interviews, the
17  very brief follow-up interview with Pam Downs
18  before the Leavitt, the first volume of the
19  Leavitt -- Leavitt and Fong deposition, and then
20  you've got some notes that I wouldn't call
21  "contemporaneous notes" that are summarized in a
22  chart that you produced that you brought with you
23  to this -- to the second volume of your deposition
24  yesterday; true?
25    A. I'm sorry. I heard the words, but I

Page 597

1  wasn't sure what the question was on the table at
2  that point.
3      Q.  Okay.  The bottom line is, your -- if you
4  spoke to somebody about these talc-related issues
5  in the work that you just described to Mr. Cox,
6  that's reflected in your contemporaneous notes
7  except for a little bit of your follow-up
8  conversations; correct?
9      A.  I would generally agree.
10         MR. COX:  Object to the form.
11 BY MR. SWANSON:
12     Q.  Okay.  And how much have you billed
13 Johnson & Johnson for your work in this case?
14     A.  It will be -- you mean the bills that have
15 actually gone out the door?  I don't know.  It
16 will be about close to probably a hundred
17 thousand.
18     Q.  Okay.  That's $500 an hour for 200 hours?
19     A.  Yes.
20     Q.  I'm terrible at math.
21         And that's a hundred -- that's a hundred
22 thousand dollars just in these two cases; correct?
23         MR. COX:  Object to the form.
24 BY MR. SWANSON:
25     Q.  Or does that include the prior work that

Page 598

1  you were talking about?
2      A.  That includes the prior work.
3      Q.  Okay.  Now, you mentioned that you -- and
4  we talked about this last time a little bit --
5  that you actually looked through several hundred
6  pages of documents that were responsive documents
7  produced by Johnson & Johnson in Fong and Leavitt;
8  correct?
9      A.  Yes.
10     Q.  And you're aware, though, that something
11 like at least 250,000 different documents were
12 produced; correct?
13     A.  Yes.
14     Q.  And, even though you've seen the responses
15 to the requests for production and you've seen
16 what was described abstractly in terms of the
17 Excel spreadsheets and the various tabs and the
18 Bates numbers, you didn't systematically go
19 through the production and sort of audit the
20 production and see if this was exactly what was
21 produced in response to different requests, have
22 you?
23     A.  That's right.  That was not something I
24 viewed as my responsibility.
25     Q.  And you have not audited -- even though

Page 599

1  you asked for the holds, you haven't audited holds
2  for Johnson & Johnson to find out whether or not
3  there's been good compliance with those holds,
4  have you?
5          MR. COX:  Object to the form.
6          THE WITNESS:  I've spoken to people in the
7  records functions to understand how hold programs
8  are delivered, how compliance is measured.  I
9  haven't audited individual holds.
10         MR. SWANSON:  Move to strike nonresponsive
11 portions.
12         That's all I have.  Thank you.
13         MR. COX:  One question.
14         MR. SWANSON:  Okay.  Do you want to come
15 over here for it?
16         MR. COX:  No, that's fine.
17         MR. SWANSON:  You can bounce it off me.
18 And he can look at me when he's answering.
19 RECROSS-EXAMINATION BY MR. COX:
20     Q.  Mr. Mittenthal, did all the work you did
21 for the Hayes case inform the testimony you've
22 given in response to the topics in the deposition
23 notices in the Leavitt and Fong cases?
24     A.  Yes, it did.
25         MR. COX:  That's all I have.

Page 600

1          MR. SWANSON:  Okay.
2          THE VIDEOGRAPHER:  I'm afraid to say
3  anything.
4          MR. SWANSON:  You should be.
5          Let's go off the record.
6          THE VIDEOGRAPHER:  This concludes the
7  deposition of James Mittenthal.
8          Volumes II and III contain eight media
9  disks.  These originals are to be retained by
10 Tele-Video Production Services.  Telephone is
11 (510) 893-0555.
12         Copies are available to interested parties
13 unless otherwise stipulated.
14         Off the record at 2:05.
15
16         (Whereupon, the deposition was
17          concluded at 2:05 p.m.)
18
19
20
21
22
23
24
25

Page 601

1    SIGNATURE OF DEPONENT

2

3     I, the undersigned, JAMES PETER MITTENTHAL, do

4   hereby certify that I have read the foregoing

5   deposition and find it to be a true and accurate

6   transcription of my testimony, with the following

7   corrections, if any:

8

9  PAGE   LINE          CHANGE

10   ____   ____   _____

11   ____   ____   _____

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21   ____   ____   _____

22   ____   ____   _____

23

24       _____

       JAMES PETER MITTENTHAL, Date

25

Page 602

1  STATE OF CALIFORNIA    )

2                )  ss.

3  COUNTY OF ALAMEDA    )

4

5     I, EARLY LANGLEY, a Certified Shorthand

6  Reporter, State of California, do hereby certify:

7     That JAMES PETER MITTENTHAL, in the foregoing

8  deposition named, was present and by me sworn as a

9  witness in the above-entitled action at the time and

10  place therein specified;

11     That said deposition was taken before me at

12  said time and place, and was taken down in shorthand by

13  me, a Certified Shorthand Reporter of the State of

14  California, and was thereafter transcribed into

15  typewriting, and that the foregoing transcript

16  constitutes a full, true and correct report of said

17  deposition and of the proceedings that took place;

18  IN WITNESS WHEREOF, I have hereunder subscribed my hand

19  on October 22, 2018.

20

21       _____

       EARLY LANGLEY, CSR NO. 3537

22        State of California

23

24

25

**Exhibits**

**Ex 38 Mittenthal, J**
445:13 457:3,6,8 465:2

**Ex 39 Mittenthal, J**
445:14 469:25 470:3,4,6

**Ex 40 Mittenthal, J**
445:17 471:25 472:3,9

**Ex 41 Mittenthal, J**
445:20 477:20,23 478:1

**Ex 42 Mittenthal, J**
445:23 483:7,10

**Ex 43 Mittenthal, J** 446:1
494:7,25 495:1,4

**Ex 44 Mittenthal, J** 446:3
501:14,19

**Ex 45 Mittenthal, J** 446:5
504:3,7

**Ex 46 Mittenthal, J** 446:8
531:2,3

---

**$**

**$500** 597:18

---

**-**

**---ooo---** 447:12

**--ooo--** 449:1,3

---

**0**

**09** 538:8

---

**1**

**1** 449:11 484:17 501:5
505:4 537:4,7 538:25
539:10,17 547:11,19
548:19 549:20 552:7
565:6,17 566:2,8,16
570:17 575:15,22

**10** 539:1 541:22 546:11

**10036** 448:4

**101** 520:1 569:24

**103** 565:12 568:2 570:11
572:5

**104** 565:22 566:3

**105** 566:3

**106** 566:4

**107** 566:4

**108** 566:11

**10:07** 501:7

**10:20** 501:10

**11** 449:5 479:16 576:1

**11/30/1982** 487:5

**11:29** 546:1

**11:30** 545:19

**11:52** 546:4

**12** 576:6

**12:17** 562:15

**14** 564:8

**15** 457:11 461:8

**15th** 538:7

**16** 495:18

**1600** 538:19

**17** 502:3

**19** 447:4 449:7 504:19,22

**19'** 566:14

**1960s** 519:3

**1965** 530:17 531:17,23
532:24 552:1 565:15 566:7

**1966** 557:21 559:16 560:15
566:1,14 569:19

**1966-1968** 558:14

**1968** 557:22 559:16 565:16
566:1,8,14 569:19

**1969** 457:11 461:8 469:13,
22

**1970** 527:13

**1970s** 503:4 515:20,21
516:15 517:1,21 528:23

**1971** 561:16

**1977** 491:8

**1978** 493:2

**1980s** 517:21 528:24

**1981** 485:11,18,22

**1982** 472:20 487:2,23

**1983** 479:16 481:21 482:21
489:3,14 507:2

**1989** 486:1,16 498:6,20
499:5,24

**1990s** 517:21

**1993** 495:15,18

**1994** 502:3,15 504:20,22
505:21

**1997** 546:16

**1998** 541:4,17

**1999** 477:17,19 480:18
481:7 488:24 493:23 494:3
499:21 506:12 507:13
508:6 540:15

**1:02** 562:17

**1:45** 586:15

**1:48** 586:17

**1A** 450:3

---

**2**

**2** 478:25 483:25 484:4,5,6,
19 501:11 505:7 514:9
525:24 537:3 540:12 541:2
542:3,5,22 545:24 546:12
549:2,8 565:11,19 566:3
567:2 570:7,11,17 575:22

**2'** 450:7

**20** 525:21

**200** 592:5 597:18

**2000s** 517:21

**2009** 517:23 518:4 537:9,
19,21 539:1

**2017** 506:12 508:13 509:20
529:20

**2018** 447:4 449:8 470:10
531:9 554:23 591:19

**21** 470:14 538:3

**212 735-3453** 448:5

**22** 489:2 564:23

**23** 495:14

**25** 490:24

**250,000** 598:11

**2500** 447:23

**26** 518:15,19 531:9 555:13

**29** 472:20 531:13,14

**2:05** 600:14,17

---

**3**

**3** 457:22 496:6 531:11
546:5 564:9,20 566:8,16
568:7,12 575:20,23

**30** 454:21 487:1,23 531:14,
20

**36** 470:15

**38** 457:3,6,8 465:2

**39** 469:25 470:4,6

---

**4**

**4** 448:4 479:4 486:22
502:15 514:1,9 526:4
530:7 536:20 537:3 539:23
540:2 544:5,11 545:11
547:11,19 548:19 549:20
575:23

**40** 471:25 472:3,9 587:23
588:19 589:6 594:10 595:6

**400** 447:6,17

**41** 477:20,23 478:1

**42** 483:7,10 555:19

**43** 494:7,25 495:1,4

**44** 501:14,19

**45** 504:3,7

**46** 531:2,3

**47** 494:10 495:1

---

**5**

**5** 479:8 486:1 534:18 568:6

**510 302-1000** 447:18

**510 893-0555** 600:11

**55** 447:6,17

---

**6**

**6** 493:2 521:1 554:17,18,20 568:13 577:6,7 579:19

**60s** 548:12

**623** 447:24

**64** 518:18 569:8

**65** 531:17 533:6

**66** 561:11 563:22 570:24 572:2 573:12 574:7

**68** 560:15 561:11 563:22 570:24 572:2 573:12 574:7

---

**7**

**7** 491:8 554:22 564:22 565:1,4 567:8 568:3,13 570:8

**7/22/1981** 484:22

**70** 527:13 575:17 576:2 587:23

**70s** 515:25 517:3 519:3

**71** 527:13

**79-0269** 471:5

**790269** 472:17

---

**8**

**8** 564:21 568:13

**80s** 519:3

**83** 561:16

**84** 527:13,14 575:17 576:2

---

**9**

**90017-5704** 447:24

**9300** 447:24

**94607** 447:7,17

**98** 542:12

**99** 565:6,11

**9:01** 447:4 449:6

---

**A**

**a.m.** 447:5 449:6 501:7,10 546:4

**absence** 482:13 490:2

**absolute** 460:1

**Absolutely** 469:11

**abstractly** 598:16

**access** 454:6

**accomplishing** 540:21

**accordance** 497:24

**accusation** 460:7

**acid** 460:9

**acknowledge** 451:1 452:22 453:22 454:23 455:5,24 456:4,9

**acknowledged** 455:19 456:15

**acknowledges** 452:4

**acknowledging** 450:21

**acknowledgment** 454:16 455:8,14

**action** 447:10 455:22 537:10 541:4

**activities** 590:3

**activity** 518:4 554:12

**actual** 463:6 503:10 576:12 590:2

**add** 452:1 586:6

**added** 520:21 585:8

**adding** 586:4

**addition** 476:23 547:15

**additional** 455:22 514:14 522:21 544:11 576:25 590:1,9

**adequate** 467:7 574:22

**admission** 504:14

**admit** 504:25 505:8,15

**adoption** 525:1

**adverse** 459:2 517:5

**advertising** 576:22

**advice** 487:13,19 493:5

**aforementioned** 565:2

**afraid** 600:2

**agent** 470:17,18

**agree** 463:15 466:24 469:8 476:20 495:12 523:19 525:2 556:14 580:14,21 582:21 597:9

**agreed** 536:12

**agreeing** 468:1

**ahead** 456:12 494:22 496:18 531:1 562:2,12

**ahold** 506:7

**aids** 588:16

**airborne** 541:10

**allegation** 578:23

**allegations** 461:13 476:7

**alleged** 471:2,7 541:9 557:21

**alleges** 479:1,5

**alleging** 479:8 537:12

**alphabetical** 577:25 578:3 581:6,8

**alphabetized** 581:10

**Alternate** 457:14,15

**alternative** 457:12

**alveoli** 459:9

**Amended** 470:10 531:9

**America** 447:20 502:2

**amount** 460:8,18 578:17

**amounts** 459:4,15

**analysis** 503:17 552:22

**and/or** 505:2

**Angeles** 447:24

**annual** 551:17

**annually** 536:8

**answerable** 557:1

**answering** 599:18

**answers** 587:11

**Anthony** 478:12

**anthophyllite** 581:21

**anticipated** 468:25 469:3, 8 485:3 486:9,10 487:25 489:12 491:13 493:6

**anticipates** 468:13

**anticipating** 461:11

**anticipation** 487:12 572:23

**apologize** 523:6

**apparently** 541:13

**appearances** 447:13 472:22

**appeared** 447:9

**appearing** 447:21

**appears** 464:2 465:7 478:11 483:15 495:8 502:1 504:11 540:1

**applicable** 506:13,14,17

**applications** 588:4

**applied** 458:22

**applying** 559:4

**approach** 548:20

**appropriately** 467:15

**approximately** 518:1 520:1 591:20

**approximation** 573:20

**April** 457:11 461:8 565:16 566:1,8,14

**archive** 512:6,24 571:19 577:7,10,14,21 578:6 582:4

**archived** 513:17

**archiving** 517:7

**area** 476:21,22 558:16 577:18 579:4

**areas** 526:9 587:5,12 588:20

**Argonaut** 503:5

**arise** 460:17 461:4,6,7

**Arps** 448:3

**asbestiform** 503:17

**asbestos** 469:17 470:19 471:2 510:7 529:7 551:16 552:2 578:22 581:13,22

**asbestos-containing** 470:19

**asbestos-related** 450:9

**ascertain** 543:24 552:12 553:11

**ascertained** 554:14

**Ashton** 457:24 458:4 461:10 484:22 486:4 495:9 542:15

**asks** 531:14

**aspects** 587:8 588:9

**aspiration** 505:9,16

**assembled** 515:12 563:14 596:2

**assessment** 461:19 552:23

**assignment** 482:3

**assisting** 589:4

**associate** 511:23 514:20 550:13

**Associates** 503:16

**assume** 484:2 559:7

**assumes** 466:2

**assuming** 454:8 456:2 574:12 582:2

**attached** 596:13

**Attachment** 487:17 491:12 493:4

**attachments** 544:20,21, 22,24

**attempt** 488:13 551:23,24 554:7,11

**attempted** 552:18 564:2

**attempting** 562:24

**attorney** 543:14 549:11

**attorneys** 522:4 526:24 579:6 595:17

**attorneys'** 549:7

**attributed** 460:24

**audio** 576:19,21 577:1,5

**audit** 552:16,19 553:23,25 598:19

**audited** 586:1,3,5 598:25 599:1,9

**authentic** 461:25 462:2,24 463:10,14 464:1,5,6,14

**authenticity** 462:17 465:9 466:13 467:12

**author** 457:22 459:21 484:10

**automated** 456:19

**aware** 452:15 461:10 469:19 471:1,15,18,19,20 473:6,13 475:23,25 476:2, 4,5,6 477:14,18 478:16 479:17,23 480:8,16 481:7 485:17,21,23 486:13,20 488:24 489:14 490:21 491:18,19 495:23 497:5,9, 19,22 498:4 499:4,7,18,20 500:12,13,16,18,19 503:21,24 505:7,9,15,23 506:4,7,10,13,14 507:15 508:16,24 509:6,7,12,15, 16,20 510:9 521:17 522:5, 12 523:13 527:12 528:10, 18,22 529:3,4,8,11,15,18 530:10,20,22 540:10 542:19 547:7,20 550:7,12, 21 551:16,19 569:16 570:22 593:8 598:10

**awareness** 456:18 496:3 510:5

---

**B**

**babies** 459:3

**baby** 469:16,17 473:3 478:13,21 479:6 480:10

495:25 497:11 505:3,10,16 506:22 528:14 537:13 541:12 556:11 557:7,19,24 558:11 559:14,15 561:15 563:2,22,23 565:14,24 566:6 569:18 570:1,12 573:12 574:6 578:24

**back** 493:23 494:3 507:2 508:6 515:19 516:9 517:1 530:17 535:22 539:1 548:11 549:23,25 551:4,14 559:22 568:22,24 590:24

**backdrop** 456:16

**based** 453:12 454:9 465:6 519:20,24 522:6 523:4 534:22 541:25 542:5 547:16 551:3 560:8 561:13 572:20 573:24 583:25 584:3,4

**basically** 542:23

**basis** 503:11 551:5,17

**batch** 556:3

**Bates** 462:6,8,13 463:6 478:2,5,6 480:3,4 484:9 565:19 572:11 576:15 588:11 598:18

**befits** 509:10

**begin** 503:3 565:4

**beginning** 575:22

**behalf** 475:21 480:5 493:16 586:21

**Beidler** 489:7

**belief** 471:1

**believed** 590:12

**benefit** 584:25

**Berg** 537:10,18,19 538:5

**BERNARDO** 448:3 483:3

**bet** 592:23

**Bill** 541:5 542:15 549:2

**billed** 597:12

**bills** 597:14

**binder** 450:4 565:4 575:19 577:8

**bit** 450:13 484:11 518:13 519:17 536:16 551:15 558:8 597:7 598:4

**blanket** 525:14

**Bob** 542:16

**bodies** 503:12

**body** 523:24

**Bolden** 484:23 491:5 493:1

**boric** 460:9

**bother** 476:10

**bottling** 561:7

**bottom** 458:20 478:3 489:1 525:24 570:20 573:8 597:3

**bounce** 599:17

**box** 519:10 522:1 582:11 583:2,5,17

**boxes** 511:22,24 519:19 520:1,2 521:23,24 523:2,3 524:6 538:19 545:4 578:17 582:7 583:7 584:16 585:21

**break** 500:25 545:14 558:8 562:6,11,16,21,23 566:22

**bring** 587:10

**broadly** 486:16 528:12 544:16,18 569:21 571:2

**bronchoconstriction** 505:10

**brought** 515:23 516:1,9 543:4 589:5,16 596:22

**browser** 454:6

**Bruce** 542:17

**Brunswick** 512:16 513:14

**built** 588:3 589:25

**bunch** 550:4

**business** 462:18,24 463:5,14,20,23 464:7,13, 15 465:4,12,15,24 466:2,6, 11,21,22,23 467:2,3,15,17, 21,23 468:6 498:15 515:4, 13 520:17 524:4,9,12,15 535:18

**C**

**CA** 447:24

**calculated** 535:5 545:4

**calibrated** 523:15

**California** 447:7,8,17 504:20

**call** 517:5 556:22 596:20

**called** 478:12 509:4,13,17, 18 510:10,13,25 547:10,21 580:18

**calling** 538:16

**calls** 454:1 468:15 500:5

**cancer** 537:13

**candidate** 536:3

**care** 559:8

**carried** 516:1 539:6

**carve-out** 548:19

**case** 461:25 462:11 464:3 465:21 470:12 471:4,11, 17,21 472:13,16 475:16,24 476:4,6,22,24 477:1,14 478:12,16 480:9,18 481:17 482:21,23 483:14 487:23 489:23 491:18,25 492:2,6, 11 494:1 502:19,22 503:23 504:15 505:21,22,24 506:21,24,25 529:7 530:16,23 533:1 537:17 538:5 540:3,9,10 541:8,16 542:7,21 544:13,14 546:12,16,19,22,24 547:2, 3,4 548:9,11,13,14,23 549:9,17 550:6,10,14 552:8 561:14 564:16 591:12,23 593:6,9,10,14, 16 597:13 599:21

**cases** 476:12 487:25 488:17 489:22,24 490:5 492:9,17,18 499:18 507:8 510:7 527:23 528:12 540:22 547:6,25 548:11,17 549:22 551:6,10 562:25 585:9 590:10 591:14 592:4 593:18,21,22 594:3,11 595:7 597:22 599:23

**cast** 579:9

**catalogue** 519:6,16

**catch** 585:2,21

**categories** 552:19 559:6 566:17 575:25 576:7,13

**categorization** 467:3

**category** 526:4 571:20 573:17,18

**center** 517:6

**certificates** 552:22

**Certified** 447:7

**chain** 589:1,24

**chances** 454:16

**change** 509:8

**charge** 492:8

**chart** 515:11 563:14 596:22

**check** 518:8

**checking** 576:23

**China** 515:7

**chose** 465:13 499:11

**chosen** 454:11 522:4

**Chris** 510:18

**CHRISTOPHER** 448:2

**christopher.cox@ skadden.com** 448:5

**Chrome** 454:6

**circumstances** 465:17 480:14 490:5 491:25 492:2 498:14,15 500:9

**cited** 574:8

**claim** 471:1 478:19 484:13

**claimed** 470:18 581:19

**claiming** 484:21

**clarification** 559:22

**clarify** 593:3

**Clark** 471:4

**classification** 466:8

**cleanout** 536:7

**clear** 473:5 499:17 509:1 543:21 557:14 561:2 567:6

**cleavage** 581:12,21 582:4 584:7 585:20

**client** 487:11,18 493:5

**Clifton** 503:5

**clock** 562:8

**close** 589:6 597:16

**closest** 573:20

**cohesively** 587:9

**Coker** 540:10 541:1,5,16 542:21 546:12 549:1,2

**collect** 541:2 547:23

**collected** 540:8,21 542:3 549:3

**collecting** 542:9

**collection** 537:7 538:9,17 539:1,5 540:11 541:3,15, 19 542:6,8,11,12,22 543:3 544:2,6 545:6,9,11 546:12 547:8,18 549:19 550:1 563:15 590:3

**collections** 536:15 539:21,25 540:16 547:5 548:16,23 549:6 577:15

**column** 484:17

**columns** 484:7

**commencing** 447:4

**committed** 562:7

**committee** 522:13 523:11, 12

**common** 479:22

**commonly** 524:15

**communicated** 525:7

**communication** 486:3 487:5 489:6 491:4,7 493:1

**communications** 487:1

**Comp** 559:11

**companies** 516:19 524:21

**company** 451:25 455:14, 17 456:4,14 463:8 464:4 465:8,13 466:13 468:12

**clear** 469:10 471:16 473:13 478:14 509:3 512:22 513:23 526:6 533:17 536:6 547:22 548:20 583:21 587:6,9 590:25 591:2

**company's** 466:6 534:24 564:13

**compared** 458:8

**complaint** 478:11 479:13, 15 480:21 503:20

**complaints** 517:5

**completeness** 532:21

**compliance** 451:7 452:22 455:5 599:3,8

**complicated** 580:10

**comply** 455:4,11 456:3 548:20

**Composites** 503:14

**composition** 579:5

**compound** 464:23

**computer** 577:2 588:9

**computers** 513:17

**conceivable** 460:16

**concern** 459:2

**concerned** 458:5

**conclude** 570:4

**concluded** 600:17

**concludes** 592:9 600:6

**conclusion** 468:16 477:4 499:20

**concur** 468:20

**conduct** 552:12 554:11 579:24

**conducted** 498:16 526:8 545:2 587:18 588:14 590:10

**confer** 464:11 467:7

**confidential** 565:10

**confirm** 463:7 520:2 568:10

**confirming** 568:19

**connect** 575:24

**connection** 467:14 471:3 537:9 540:8 541:4 547:5 548:5,17,23 549:3,17 589:10 593:23

**Connie** 542:16

**considered** 460:7

**consistent** 583:20

**consolidated** 518:2

**consult** 558:21

**consultant** 448:9 587:6

**consulted** 461:1 542:2,20 543:8,22 563:11 565:3 566:18 568:12 575:11

**consumer** 448:1 470:10 474:19,25 476:1 490:4 504:12 507:4 547:1 567:3, 11 589:23 591:1,6,7

**consumption** 557:8

**Cont'd** 449:17

**contacted** 455:21

**contained** 460:18

**contemporaneous** 555:19 557:16,20 558:3,12 560:13 561:11,16,22 563:3 564:15 572:1 575:10 595:18,22 596:13,21 597:6

**content** 459:25 461:20 463:3,4,11

**contents** 583:17

**context** 466:7 507:25 547:1 566:19 573:6 579:14 582:11

**continuation** 449:9

**continue** 546:7 562:18,21 580:22

**continued** 565:22 566:3

**continuing** 449:20 565:11

**contracts** 514:9,10

**control** 517:6 532:8 534:12 588:25

**controversy** 581:23

**conversations** 597:8

**conversion** 518:5

**copied** 484:10 489:9

**Copies** 600:12

**copy** 472:5 501:19

**copying** 542:9

**corporate** 462:16 589:2, 17,19,20 590:8 591:1,3

**Corporation** 447:20

**correct** 450:10 452:17,18 454:9,18 456:9 457:18,25 462:3,7 464:1 466:11,16, 20 468:2,12,13 469:4,10 470:12 471:17 473:3 474:5,12 477:1,8 478:3,9, 10,14 479:18 480:21 483:14,19,20,23 484:14 485:22 486:11 487:6 488:14 489:12,13,18 490:11,12 492:7,12,17 493:17,20 494:1 495:7,10, 15,19 496:1 497:12 499:5 500:2,17,21,22 501:24 502:6,10,21 506:1,5,6,9 507:14,17,18 510:7 516:15,22,23 521:12,13,22 522:3,25 524:18 525:25 526:2 528:16 530:23 531:11,24 532:2,11,15,18 534:5 535:12 536:1 537:5, 10,14 546:16 548:17,24 549:7,8 550:21 551:17 552:16 553:6,24 554:3,7 556:12 559:10 567:3,16,17 571:13 573:14 574:9,14 576:14,15 577:13,15 580:19 581:9 582:23 583:9,17 584:21 593:6,19 594:6,17 595:14,18,23 596:14 597:8,22 598:8,12

**correction** 495:1

**correspondence** 495:6 502:2

**cosmetic** 473:3 475:6,17, 18 476:7,23,25 506:18,20 507:8,17 531:16,23

**cosmetics** 503:15

**counsel** 449:12 464:10 468:2 470:5 473:13 485:3

486:8,9 487:11,13,18 491:12 493:5,6 501:13,18 537:1 541:21 544:4,8 546:7 562:18 586:18 590:4

**counsel's** 487:18

**count** 522:1

**countries** 525:4 556:18 558:5 568:11

**country** 559:20 568:10

**couple** 450:1 520:7 558:2

**court** 471:5 559:23

**Court's** 480:1

**cover** 520:8 572:5 588:21

**covered** 571:18,20 572:4, 9 577:18 587:4

**Cox** 448:2 453:24 454:19 455:1 456:11 460:11 461:15 462:25 463:17 464:18,23 465:25 467:11, 24 468:4,14 472:5 473:7, 20,24 474:6,13,16 475:8 476:13 477:2,9 479:19 480:11,22 481:5,18,22 482:9 484:15 485:12 486:19 488:2,6,15 489:17, 25 490:17 491:23 496:2 497:13,21 498:9,22 499:6, 13 500:3,25 501:3 502:23 504:5 508:18 511:10 516:24 521:16 528:1,17 529:14 532:3 533:2,9,12 534:6,20 535:13 536:2,10 540:18 545:15,20 551:18 552:9 554:8 555:3 556:20 557:10,25 560:16,21 567:9 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 586:12,19 592:6 595:19,24 597:5,10,23 599:5,13,16, 19,25

**Cox's** 594:6

**create** 465:13

**created** 464:6,14 465:2,11, 15,18,20,23 466:5,10,12 467:2,14,22 468:5 518:3 541:19 547:5,21

**creating** 584:25

**criteria** 527:8 539:7 583:1, 5

**CROSS-EXAMINATION** 586:19

**Cruz** 529:2

**crystalline** 458:8,9 459:7

**Cs** 581:11

**current** 450:8 510:7 517:14 581:25

**custodial** 512:25 577:2

**custodian** 456:22

**custodians** 451:20 545:2

**custody** 532:7 534:12 549:11

**cut** 515:17 520:4

**cutoff** 583:9

**Cyprus** 447:20 496:25 498:5 502:15,20

---

**D**

**Dakota** 537:10

**danger** 460:8

**dangers** 458:6

**Daniels** 471:4

**data** 515:2

**database** 514:10 516:16 519:4

**databases** 515:10

**date** 449:7 453:15,16 471:24 472:19 479:13,15 484:9 487:5 491:7 495:14 552:5 554:22 564:14 565:3 569:9,12 570:3 583:8,13 591:15

**dated** 457:11 484:22 487:1 495:14 502:3,14

**day** 539:14 567:17 579:25

**days** 452:21,25 453:5,19 454:11,12,21 456:8 587:14

**De** 529:2

**Dear** 502:13

**December** 493:2 538:7

**decision** 584:17,19

**Decoff** 471:8

**defendant** 447:21 470:9, 25 471:9 502:21 531:8

**defendant's** 471:3

**defendants** 447:20 448:1 586:21

**defensibility** 461:2

**definition** 547:8 551:11 584:23

**definitively** 573:1

**degree** 500:5

**delivered** 599:8

**Dembro** 486:4

**denoted** 547:11 582:7

**denotes** 565:20

**Denton** 495:9

**Dentons** 447:23

**department** 461:1,9 468:22 583:9,23,24 584:2

**departments** 587:5

**deposition** 447:1 449:9,20 457:7 472:4,19,23 476:15, 18 477:23 494:11 495:2 501:5,11,20,24 504:8 511:20 514:1 521:2,20 531:2 533:21 536:17 545:24 546:6 587:2 592:10 594:13 596:19,23 599:22 600:7,16

**describe** 587:16

**description** 484:13 491:11 532:24 537:11,15 540:1 581:7 583:17 584:10

**descriptions** 548:15 578:3

**descriptive** 578:18

**designated** 464:11 547:10 565:10 592:3

**designed** 579:8,9 582:6 584:15

**destroy** 469:14 473:17

**destroyed** 454:17,25 482:6 496:23 497:23 498:8,12,20 499:25 500:17 506:5 534:5 536:9 574:14

**destruction** 490:21 497:19 498:14 535:11 536:4

**detail** 508:3 538:13 541:25

**detailed** 526:18 527:8

**details** 581:25

**determination** 468:23 492:15

**determine** 453:10 551:24 573:3,5

**determined** 589:9

**determining** 584:6

**developed** 524:3 541:9

**development** 461:9

**differently** 463:25 532:22

**difficult** 554:5 575:24

**diligent** 533:24

**DIRECT** 449:17

**directed** 508:14,16

**directly** 576:8

**directory** 577:3

**disagree** 467:11 490:1 499:15 593:20

**disciplines** 588:20

**discovery** 490:6 504:12 528:11 530:12,13 534:25 560:8 575:20

**discrete** 543:2

**discussing** 555:23

**discussion** 525:9

**discussions** 518:21

**disease** 460:21 461:13

**diseases** 459:22

**Disk** 449:10

**disks** 600:9

**dismissed** 471:10

**disposed** 536:1

**disposition** 535:17

**dispositions** 499:19

**dispositive** 559:6

**distinct** 547:20

**distinction** 455:3 467:16 474:22

**distributed** 561:15

**distribution** 556:11

**District** 471:5,6

**divestiture** 496:25 498:5

**division** 509:17 510:24

**document** 454:17 457:10, 17,19 458:2,3 461:16,18 462:3,22 464:2,5,6 465:2, 7,14,17 466:8 468:3,10 469:2 470:15 479:21,25 484:6,9,20 495:11,22 498:3,11 499:1 517:6 522:18 524:1 534:2 536:23 537:7 542:5,6 544:20 546:21 547:4,8 548:9,13 549:23,25 556:5,15 563:17 564:4,10 570:21 571:21 575:13 576:7 587:21 588:7 591:10 596:9,10

**documentation** 469:1 516:20 587:9

**documents** 454:24 461:24 462:1,17 463:9,10 465:13,20 469:15,21 473:17 474:12 475:23 478:8 480:7 488:5 492:16 511:7,8,13,21 512:11,12 513:16 514:3 516:14,23 519:5 520:18 522:6,7,25 523:8,13,20,21,25 525:12 526:2 527:21 528:6,13,25 529:3,4,6,13 531:10 532:2, 7 533:4 534:3,4,11,16 535:21 536:15 537:8 538:9,15,17 539:8,15,17 540:1 542:2,10,20,22,24, 25 543:23 545:3 547:10,16 548:5,7,10 549:14,16,19, 21 550:7,12,16,24 551:4,6 555:23 557:5 558:4,10 561:22 563:1 565:8,12,17,

20 566:1,4,9,15,18 567:15, 18,19 568:4,20 569:6,14, 17,25 570:11,16,22 571:3, 5,12,25 573:3,5,9,10,19,25 574:3,5,7 575:9 576:3,12, 16 577:12,14 578:21 585:3,21,22 587:25 588:12,13 589:5 590:21 596:3,12 598:6,11

**dollars** 597:22

**domestic** 457:12,14,15 510:10,13 516:18

**domestically** 509:25

**door** 597:15

**double-check** 508:21 541:13

**doubt** 465:8 466:13 584:25

**Downs** 518:21,24 525:9 526:24 560:3 563:13 571:11,18 575:13 594:12, 15,19 596:17

**Downs'** 559:17

**driven** 583:13

**due** 460:8

**duly** 447:10

**duties** 456:21

**E**

**E-R-M-S** 520:25

**earlier** 499:14 516:5 591:21

**early** 447:7 494:21 517:21 528:24

**easily** 554:13 557:1

**educate** 544:14 591:13

**Edward** 487:2

**effect** 459:6 497:8 499:21

**effects** 459:3

**effectuated** 539:2

**effort** 511:16

**efforts** 474:11 522:22 542:8 547:23 563:15 591:15,16,22

**electronic** 515:24 516:10 519:15 526:13 527:5 543:8,17

**element** 581:18

**elements** 509:21,24

**else's** 466:21

**email** 450:15 453:1,2,3,4,6, 16,20 455:4,5 456:3

**employed** 497:2

**employee** 453:20 470:17

**employees** 469:14 542:10

**empowered** 532:17

**enabled** 587:7

**encapsulated** 585:11

**encompass** 587:23

**encompassed** 593:22

**encompasses** 596:1

**end** 501:4 545:23

**engage** 505:1

**engine** 580:2

**engines** 580:20

**English** 520:14,16,17,18 523:8,14,20,21 524:1,5,10, 15,22,24 525:5 527:24 555:2,8,10

**entails** 463:21

**enter** 459:8 578:17

**entered** 583:25

**enterprise** 514:25

**entities** 508:14,21 509:8 511:12 513:24 564:1,11 566:5 575:16

**entity** 471:10,16 508:10,20 509:12,14,17 512:4,15 513:3,4

**entries** 575:18

**entry** 484:24 486:1

**equivalent** 567:5

**ERMS** 520:24 521:6 538:19 554:23 577:11,18 580:2

**errors** 575:4

**ESI** 448:9

**essentially** 459:6 515:7 531:20

**estimated** 556:9

**et al** 471:4 502:16 541:5

**euniversity** 452:11

**Europe** 556:11,17,23

**event** 461:3

**events** 517:5

**eventually** 460:17

**evidence** 473:18 480:7 482:20 487:14 488:14

**exact** 469:2

**EXAMINATION** 449:17 592:22

**examined** 447:11

**Excel** 521:5 572:11 598:17

**excuse** 449:5

**exercise** 554:15

**exhibit** 450:3 457:3,6,8 465:2 469:25 470:3,6 471:25 472:3,9 477:20,23 478:1 483:7,10 494:7,10, 25 495:1,4 501:14,19 504:3,7 513:25 514:9 518:15,19 521:1 522:21 525:17 530:7 531:2,3 536:20 537:3 538:1 541:22 544:5,11 546:11 554:17,20 555:13 564:8 565:17 566:2,8,16 570:17 577:6 579:19 588:10

**exist** 533:5

**existed** 534:4

**existence** 460:20 529:5 540:15 591:6

**expanded** 587:22 589:8

**expect** 580:11

**expectation** 453:13,14

**expectations** 456:21

**experience** 453:12 454:9 587:6 589:15,18 590:24

**experiment** 586:4

**expert** 477:11 559:25

**explanation** 520:6 574:17, 21

**explanations** 574:19

**exposure** 470:18 471:2 479:9 541:10 557:21 558:13 560:14 561:5,11 563:3 572:1 575:10

**expressing** 459:2

**expression** 581:15

**extent** 458:5 463:6 466:1, 14 468:15 513:1 535:7 536:11 564:3 577:4

**Exterro** 451:5 452:12

**extra** 472:5

**eye** 576:17

**F**

**faced** 460:3,5

**facilities** 522:2 577:17

**facility** 519:11 573:13

**fact** 452:10 465:6 476:6 511:13 536:9 549:22

**fact-finding** 589:10 590:13 591:22

**facts** 515:2

**factual** 463:5

**Fair** 529:22

**fairly** 567:4

**faith** 471:1

**falling** 581:8

**familiar** 461:18 463:2 471:24 539:18

**familiarize** 541:22

**fiber** 578:5,7,20 581:22 584:6 585:20 586:6

**fibroplastic** 459:23

**fibrosis** 460:23 505:17

**fibrous** 578:24

**Figueroa** 447:23

**figure** 553:21

**file** 577:1,2,17 591:13

**filed** 468:12 541:17 546:16

**files** 543:17 577:4

**filing** 575:5

**filings** 517:10

**filtering** 538:20

**find** 475:13 476:10 533:17 535:1 553:3,9 559:3 561:24 599:2

**finding** 452:10 511:24

**fine** 533:19,21 545:21 560:24 572:15,21 599:16

**firm** 568:17

**five-minute** 500:25

**flat** 458:8

**Flom** 448:3

**focus** 572:18

**focused** 476:17

**follow** 490:14 540:20

**follow-on** 575:12

**follow-up** 563:15 588:14 590:7 594:24 595:21 596:16,17 597:7

**follow-ups** 450:2 595:2

**Fong** 465:21 470:12 483:6, 14 488:17 492:5,11,19,20 522:19 526:1 527:22 528:12 547:16 557:15 561:14 562:25 563:16,19 564:16 575:15,19,25 576:9,11,20 585:7 591:14 592:4 593:14,24 594:3,11 595:7,12 596:19 598:7 599:23

**Fong's** 575:10

**footer** 567:9

**foreign** 520:20 525:4

**forget** 538:16

**form** 453:24 454:19 455:1 456:11 460:11 461:15

462:25 463:17 465:25 468:14 473:7,20,24 474:6, 13,16 475:8 476:13 477:2, 9 479:19 480:11,22 481:5, 18 482:9 484:15 485:12 486:19 488:2,15 489:17,25 490:17 491:23 496:2 497:13,21 498:9,22 499:6, 13 500:3 502:23 508:18 511:10 516:8,24 517:3 519:9 521:16 528:1,17 529:14 532:3 533:2,12 534:6,20 535:13 536:2,10 540:18 551:18 552:9 554:8 555:3 556:20 557:10,25 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 595:19,24 597:10,23 599:5

**formal**  455:8

**formally**  455:11 456:15,20

**format**  521:6

**formulas**  460:4

**formulations**  459:5 460:1, 18,25

**forward**  449:21 515:24 516:1,2,10,13 539:6 543:4 591:25

**found**  522:25 523:2 569:9, 12 576:7 578:24 581:19,21 590:7

**fourth**  505:13

**fragment**  581:12,22

**frame**  518:4 519:8 526:11 527:12 570:24 591:20

**frames**  564:16

**Francisco**  504:20

**Frank**  484:22 491:5 493:1

**frankly**  457:20 462:8

**French**  532:14,15 594:16

**front**  450:5 454:5 457:8 470:6 472:9 477:24 483:10 494:12 495:4 501:21 503:20 504:9 525:23 531:6 537:25 546:10 567:13,23

**Frostbite**  503:5

**full**  520:6

**function**  588:23

**functional**  587:5 588:20

**functions**  599:7

**funny**  592:21

**fuzzy**  580:3

**G**

**Gallagher**  542:15

**Gambino**  478:12,13,16 480:9 481:17 482:21 489:23 506:24 547:3 549:17

**gather**  546:9 562:10 587:9

**gathered**  540:2,6 541:16 548:5 549:16 550:9,17,25 572:22

**gathering**  549:14

**gave**  454:21 520:5 568:1 583:6 593:4 594:5

**general**  459:1 471:22 473:4 474:24 476:9 483:22 492:8 496:3 498:23 514:2, 15 520:17 548:19 559:4 564:11 568:9 579:7 580:13

**generally**  497:22 511:1 512:1 528:18 541:18 544:12 581:8 597:9

**generated**  551:25

**George**  487:2 542:16

**Giacino**  525:10 594:16,20 595:3

**give**  449:23 453:18 454:4 456:8 492:15 592:2

**giving**  584:24

**global**  514:25 515:5,15 518:2 547:14 548:7 549:19 550:8,16 551:1,7 558:18

**go-through**  578:8

**goal**  567:21

**good**  449:18,19 455:25 470:25 545:15,22 555:16 562:23 599:3

**Google-like**  580:4

**grab**  537:24 562:6

**great**  525:22 562:11

**greater**  454:16 458:5

**Greenwood**  447:6,16

**Grimm**  471:8

**group**  544:23

**groups**  547:10

**guarantee**  581:3

**guess**  450:15 453:12 570:8,19

**guessing**  453:7

**H**

**half**  594:14

**halfway**  458:23

**Ham**  497:2

**Hammondsville**  496:22 497:1,9 503:6

**hand**  472:3 501:17 572:25

**handing**  457:6 470:3 477:23 494:10,25 501:18 504:5,7

**handle**  517:15

**happened**  500:7 574:18

**happy**  592:23 593:2

**hard-and-fast**  583:19

**Harrison**  447:6,17

**Hayes**  593:6,15,24 594:13 599:21

**hazard**  459:10

**heading**  496:9

**headings**  484:17

**hear**  559:19

**heard**  456:24 477:15 502:21 567:1 581:11,16,23 596:25

**helps**  513:19

**highlights**  496:8

**highly**  467:23

**historic**  499:18

**historical**  530:20 535:4 541:3 543:3 549:21

**historically**  545:7

**histories**  591:8

**hold**  450:9 451:6,7,11,16 452:4,21 453:2,4,21,23 454:25 456:18,19,25 468:19,21 469:9,13,21 474:5 475:23 477:15 480:8,13,17,20 481:17 482:15,20,22 485:22 487:25 490:2,7 491:17,21 492:5 493:12 499:9,23 500:20 505:20,23,25 506:7 507:5,7,9,15 508:13,15 510:6,7 518:9 527:16 529:11 535:24 537:16,21 538:5,7 540:22 546:18,23 599:7

**hold's**  452:8

**holds**  450:2 452:7 461:23 468:11,24 469:3 475:22,25 476:1,2,3 480:6 481:7,9,14 482:11,12,16 485:9 486:13 488:21,24 489:15,21 490:3,4,11,15,22 492:1 493:16,22,25 499:3,4,11, 17,20 500:14,16,21 502:10 503:21 506:4,11,12,13,15, 17 507:4 508:2,5,9 509:14, 19,22 510:12 529:19 535:22 537:24 540:15,17, 24 546:22 547:1 588:5 591:11 599:1,3,9

**Hong**  510:4 511:2 515:6 518:25 519:3 522:9 523:7 524:21 525:12,24 526:3,14 527:20 561:5,15 563:3,10 569:1,4 575:7,8,16 576:2, 13

**hope**  585:1

**Hopkins**  542:15

**hour**  447:4 594:14,15 597:18

**hours**  592:1 594:19,21 597:18

**housed**  511:14

**huge** 549:14

**hundred** 511:22 519:19 520:1 521:24 567:19 588:13 597:16,21 598:5

**hundred-box** 512:8,9

**hypothetical** 535:3 540:20 557:2 574:13,17,25 585:23,24

**hypothetically** 534:10 554:2,10

**hypotheticals** 469:11

---

**I**

**I-N** 582:16

**idea** 455:13

**identification** 457:4 470:1 472:1 477:21 483:8 494:8 501:15 504:4 531:4

**identified** 532:6 539:9 542:11,13 565:8 568:21 576:15 587:1

**identify** 482:10 535:1 589:13 590:11

**identifying** 542:8 590:20

**II** 600:8

**III** 449:10 501:5,11 545:24 546:6 600:8

**Imerys** 447:20,21

**immediately** 453:21

**import** 467:16

**important** 590:13

**impression** 498:11 514:16 594:2,4,8

**improve** 585:2,5

**inbox** 522:10

**Inc.'s** 470:10

**include** 459:14 554:25 555:1 569:23 571:3 597:25

**included** 476:16 544:24 551:20 568:13 588:22

**includes** 570:6 598:2

**including** 458:25 459:22 470:17 484:8 505:1 518:5, 25 528:15 563:12 565:9 572:23 575:12 588:1 589:2,3

**inclusive** 584:15

**inconceivable** 460:21

**incorporated** 547:25

**incorporation** 547:18

**increase** 459:24

**increases** 454:24

**increasing** 460:21

**independent** 503:16

**index** 519:25 521:5,15 522:10 523:5,24,25 524:3 526:13

**indexes** 519:13 526:23 527:5 543:7

**India** 555:24

**indication** 455:9 540:23 565:16

**indications** 543:20 564:17

**indices** 543:7

**individual** 583:24 584:9 599:9

**individually** 547:2

**individuals** 458:25 491:5 508:16 509:16 510:9 526:22 542:13 588:21 589:9 590:11 594:22,23 595:16

**industrial** 503:15

**inevitably** 535:15

**inference** 473:12

**inflammatory** 459:23

**inform** 599:21

**information** 450:25 452:8, 17 465:5 466:4 469:12,18, 23 473:5,17 480:12 481:25 484:11 488:4,8 493:12 497:3 505:25 508:7,12 511:6 512:19 513:12 514:14,17 515:1,22,23 516:1,4,13 521:9 528:8

**informed** 560:8

**inhalation** 458:6 460:24 477:8 582:18,19,22 584:7 585:20

**inhale** 459:4

**initial** 571:10

**initially** 529:1 550:9

**injuries** 479:9

**injury** 470:18 471:7

**inquiries** 458:25 459:16

**inquiry** 493:19 511:7 538:14,24 544:19 586:9

**instance** 514:9,21 515:3 516:6 551:21 559:7 569:22,24 570:7 575:25

**instances** 498:25

**instruct** 473:16

**instructing** 469:13

**instruction** 452:20 544:17

**instructions** 527:2

**intended** 451:9

**intent** 521:8

**intention** 456:9

**intentions** 456:1

**interested** 453:11 600:12

**interesting** 539:20

**internal** 588:24

**international** 507:24 508:8,14,17,22 509:5,13, 18,21,23 510:11,14,25 511:9,14 512:11,15 513:3, 14 514:10,11,19,20,23,24 515:1,16 529:19

**interpret** 572:4

**interpret all** 555:5,9

**interpreted** 544:18

**interpreting** 569:20

**interrogatories** 470:11 591:11

**interrogatory** 470:15 471:13 473:10

**interview** 563:12,13 590:5 596:17

**interviewed** 514:22 587:22 589:10 591:24

**interviewees** 589:8

**interviewing** 555:20 588:18

**interviews** 588:14 590:17 591:5 594:24 595:1,5,21 596:16

**investigate** 474:5 485:14 488:9 498:13 519:1 552:4 579:4 587:12

**investigated** 500:9 517:3

**investigation** 470:24 474:2,4,19 475:10,20 476:16 481:24 482:4 517:4 543:3 550:20 552:12 587:17 590:12 593:25

**involve** 474:25

**involved** 460:22 475:16 523:11 542:8 589:1,24 591:17 592:1

**involving** 460:3

**Ira** 486:4

**Iron** 577:13

**Island** 471:6,9

**issue** 467:8 468:23 475:22 476:22 478:20 480:6,20 481:16 490:14 498:13 499:11 505:20 506:21 570:25

**issued** 468:11,22 469:13 475:24 477:16 480:8,13,17 481:9 482:6,15 485:9,22 486:14 487:25 489:15 490:2,4,8 491:17 492:1,19

493:12 499:17 500:20 503:22 505:24 506:1,8,19 507:16 529:11 537:17 540:24 546:18

**issues** 464:12 474:5 475:16 476:11,25 480:10 487:24 488:14 490:11 492:5 520:20 584:4 587:21 597:4

**issuing** 469:9,21 489:21 491:21

**item** 485:11,25 492:25

**items** 527:8

___

**J**

**J&j** 471:9 496:24 498:5 511:2,3 564:13 586:21

**Jaffe** 448:8

**James** 447:1,9 449:10,14 501:6,11 542:16 545:25 546:6 600:7

**Jersey** 512:17 513:15

**Jim** 448:10

**John** 489:7 502:10 542:15

**Johnson** 448:1 450:8 453:3 457:10,24 459:1 461:10 462:2,6,11,24 463:15 464:1,7 465:3,22, 23 466:10,16,18,19,22,25 467:14 468:2,5,25 469:5,6, 12,13,14,20 470:9 471:15, 20 473:1,2,6,15 474:11,12 475:18,21 476:22 478:2,7, 13 479:17,22,23 480:2,5,6, 19,20 481:12,13,16 482:19 483:13 484:21 486:15,16 488:1,13 489:16,21 490:10,16,22 491:21 492:14 493:16,17,20 494:15 495:6,7,24,25 497:11 499:10 500:17 502:2,3,10,11,20 503:22 504:12,15,25 505:8,14,15, 20 506:5,8,16 507:16,24 508:8,17 509:4,13,18 510:10,11,25 511:9 512:15 513:13,14 514:19,20 516:17,18,20 517:20 524:17,20,22 525:3

527:19,20 528:22,23 529:23,24 530:15,16 531:8,16,21,22,23 532:1, 17 534:13 535:8,9 536:7 537:10 541:11 549:17,18 553:4 555:24,25 556:10 557:6,19 560:9 561:7,8,13, 15 563:20,21 564:1,2 566:25 567:3,11 571:24 575:8,9 584:3,5,24 586:5 595:17 596:8 597:13 598:7 599:2

**Johnson's** 462:6 464:7 465:3,24 466:10,22 467:15 468:6,25 469:15,16 471:20 473:2 478:21 479:6 480:10 484:21 488:13 495:25 497:11 505:3,9,16 506:21 516:18 524:20 528:14 531:9,21 537:13 557:7 558:11 559:15 565:14,24 566:6 569:18 570:1,12 573:12 578:24 584:24

**Jonathan** 448:8

**Jones** 495:10

**JPP** 575:16

**judgment** 463:21 465:16 466:3 467:1

**July** 504:19,22

**jump** 539:22

**June** 489:2 531:9 593:5,8, 19

___

**K**

**KARLEEN** 447:22

**karleen.murphy@ dentons.com** 447:25

**Kazan** 447:5,16

**keeping** 510:23 516:19

**key** 519:20,24 520:13,15, 21,23,24,25 521:15

**kind** 450:14,19 480:17 486:3 567:22

**kinds** 450:24

**knew** 455:15 546:21 583:20 589:19 590:3,23

591:2,21

**knowing** 456:4 535:3

**knowledge** 460:2 471:23 476:9 587:7

**Kong** 510:4 511:2 515:6 518:25 519:3 522:9 523:8 524:21 525:12,25 526:3,14 527:20 561:5,16 563:3,10 569:1,5 575:7,8,17 576:2, 13

**Korea** 560:10 561:13,20 563:23

**Korea's** 528:6

**Korean** 527:18 528:7 529:6,12,13,24 530:1 560:13 571:23

___

**L**

**La** 529:2

**lab** 503:16 516:7

**laid** 584:1

**land** 574:25

**LANGLEY** 447:7

**language** 469:5 520:20 524:2,4,9 528:7

**languages** 520:22 523:14 524:7 527:24 528:3

**LAOSD** 470:11

**large** 538:16 584:15

**late** 528:23

**Laura** 525:9

**law** 461:1 468:22

**lawsuit** 468:11 473:6 479:18 537:12

**lawsuits** 556:15

**lawyers** 475:2 584:24 596:9

**lay** 580:14

**lead** 505:10,16

**learn** 525:10,15 590:8

**learned** 591:6 595:15,25 596:4,7

**Leavitt** 465:21 488:17 492:6,19 522:19 527:22 528:12 530:16,22 533:1 547:16 552:8 557:15,16 558:19 562:25 563:16,19, 20 564:6,16,17 576:20 585:7 591:14 592:4 593:9, 25 594:3,11,13 595:7,12 596:18,19 598:7 599:23

**Leavitt's** 560:14 561:4 572:1

**led** 589:14

**Lee** 487:2 542:17

**left** 467:20

**Legacy** 536:15 537:4,7 538:25 539:10,17,21,23,24 540:2,12,16 541:2 542:3, 22 545:11 546:12 547:4,8, 10,19,21,25 548:16,19,22 549:2,6,8,20

**legal** 450:2,8 451:6,7 452:7,21 453:2,4,21,23 455:3 456:18,19,24 461:23 463:21 466:3 467:16,23 468:11,15,18,21,24 469:13 475:22,23 477:4,14,15 480:6,8,17,20 481:14,16 485:9,22 486:13 487:13, 19,25 489:15 490:15,21 491:17,21 493:5,12,16,22, 25 499:3,4,9,11 502:9 503:21 505:20 508:5 509:14,19 510:11 529:11 537:16 538:5,7 540:17 546:18,22,23,25 556:14 584:18,19 588:5 591:9

**Leibensperger** 487:3 489:7

**letter** 466:20 487:11 496:7 501:23 502:14 541:21,24 543:10,19,22,25 544:2,13 545:8 546:10

**letterhead** 465:22 494:15 495:7

**level** 532:21 589:23 591:1, 2,4,6,7

**likelihood** 454:24

**limit** 459:25 527:9,11

**limited** 474:24 544:2

**lines** 492:6

**list** 452:1 512:22 513:18,22 522:16,21,22 523:12 537:24 542:13,14 544:7 554:23,25 568:4 577:20 585:12,14 587:22 589:7

**listed** 513:1 515:15 522:17 536:18 573:10 574:7

**listing** 575:13

**listings** 526:14 527:5 588:4,5

**lists** 484:6 537:4 588:5 590:1

**literature** 458:13,17

**litigated** 499:19

**litigation** 450:9 460:3,22 461:12 465:8 466:15 468:13 469:2,3,6,8 480:10, 18 485:4,7,10,19,21 486:9, 11,17 487:12,20 489:12,15 491:13,14,22 493:7,11 499:12 500:20 506:9,15 507:8,17,19 508:5 509:19, 22 539:16 548:6 550:18 551:1 577:13 578:12,22 582:23 588:8 595:10

**litigation-related** 488:4

**litigations** 486:14

**live** 517:9,22

**LLP** 447:23 448:3

**loaded** 588:8

**local** 503:4

**locate** 542:2 569:6 577:11 582:10

**located** 510:4 512:16 525:12 526:3 541:4 557:18 558:4 561:22 563:5

**location** 518:25 525:13 569:25 570:12,18

**locations** 508:22,23 512:13 514:23 519:2 529:20 564:18,25 565:13, 23 568:3

**log** 483:6,13,16,19,23 484:8 485:15,18 488:9 489:24 490:25 492:11,16

**long** 453:22 454:3 516:14 557:9 568:1 591:18

**long-term** 479:5

**longer** 454:15 459:16 535:24

**looked** 456:5 508:1 526:22 527:4 530:14 537:21 549:25 558:18 563:14 564:7,8,19,20 568:25 569:2,3 575:21,22 576:1,5, 11,17 578:10 588:10 598:5

**Los** 447:24

**lot** 515:24 518:4 519:18 566:21 572:22 573:17 574:3

**Lowell** 504:14,15

**lunch** 545:17 562:6,16,20

**lung** 460:4 461:13

**lungs** 459:3

**Luzenac** 502:2

**M**

**M.D.** 457:23

**made** 474:11 476:5,6 492:14 493:19 499:16 579:6 585:1

**main** 497:10

**make** 461:19 465:16 467:1 480:1 509:9 525:14 550:11 551:23,24 552:23 568:15, 17 574:10 582:3 584:20 585:2

**makes** 462:23 468:22 557:7 580:6

**making** 467:16 474:22 483:19 556:11 568:8

**malignant** 541:9

**management** 456:17 496:24 498:8,13

**manager** 451:6,7 452:21 455:21

**managers** 587:20

**mandatory** 536:8

**manner** 466:12

**manufacture** 505:2 573:11 574:6

**manufactured** 473:22 528:15 557:20 558:12 559:16 560:1,4 565:14,24 570:1,13,15

**manufacturers** 525:3

**manufacturing** 556:3 557:23 559:2,14 561:8 563:2,21 569:16,23 570:5, 6,23 571:13 575:9 576:4, 14

**March** 591:20,24

**Marie** 478:12

**mark** 447:16 472:6 501:1 531:2 556:6

**marked** 457:4 470:1 472:1 477:21 483:8 494:8 501:15 504:4 515:12 531:4 541:22 564:8

**marketed** 576:1

**marks** 449:7 501:4,10 545:23 546:5

**Marlene** 504:14

**match** 544:22

**material** 519:11,13

**materials** 487:12 513:1 541:3,23 544:4 556:3,4 571:19 588:2 591:12 596:1

**math** 597:20

**matter** 457:11 484:12 500:10 527:23 539:7 586:9

**matters** 576:20 585:10 591:22

**maximum** 455:24

**Mcclain** 447:5,16

**Mccrone** 503:16

**Meagher** 448:3

**meaning** 586:3

**means** 463:4 466:19 490:2 526:5 535:20 551:8 569:21

**measured** 599:8

**media** 501:5,10 545:24 546:5 600:8

**medical** 463:5

**meet** 464:10 467:6

**meeting** 495:18

**meets** 532:24

**memo** 542:11 545:1

**memorandum** 485:2 486:8

**mention** 469:2 478:25

**mentioned** 454:10 513:23 517:18 539:12,13 542:23 552:17 564:19 575:11 582:25 584:14 588:18 589:7 598:3

**mentions** 544:6 568:11,15

**mesothelioma** 471:7 476:24 477:7,12 541:9 579:20 580:6

**methodology** 522:5 534:24

**migrated** 516:2 517:9

**Miller** 472:13 489:9 491:5 493:2

**milling** 557:23 559:1,12,13 560:13 561:9,18 563:1,23 571:23,25

**mind** 510:23 595:8,10,13

**mine** 483:3 496:8,24 497:2 498:8,12,21 503:6 553:9

**mined** 475:7 476:21,23 495:24 497:11 559:25 560:4

**Minerals** 471:10,16,20 472:22,25 473:16,19,23 495:23 497:6 502:20

**miners** 497:1

**mines** 447:20 473:19,23 475:6,15,17 497:10,16 503:4 559:1 564:12 575:16

**minimally** 454:23

**minimum** 460:1

**mining** 496:21 499:24 503:12 557:23 558:10

559:12,13 560:13 561:9, 17,18 563:1,22 564:13 571:22,25 575:15

**minutes** 594:12

**Mischaracterizes** 461:16 499:14

**misfiled** 575:2

**mislabeled** 574:25

**misrepresent** 582:2

**missed** 574:4

**missing** 534:3

**misspelled** 580:7,11

**misspellings** 580:17

**misstates** 474:7,17

**Mittenthal** 447:1,9 449:10, 14,18 457:6 470:3 494:10 501:6,12,17 509:2 545:25 546:6 562:20 586:20 592:8 599:20 600:7

**modules** 452:11

**Molnar** 542:16

**moment** 470:5 518:12 527:17 586:13

**monolithic** 517:11 539:5, 13 545:7

**monthly** 503:11

**morning** 449:18,19

**mothers** 459:3

**motives** 455:17

**Mountain's** 577:13

**movable** 577:16

**move** 457:1 513:7 514:6 520:11 523:16 548:1 579:16 599:10

**MSDS** 529:23,25

**Mswanson@kazanlaw. com** 447:18

**multiple** 486:25

**multiply** 553:2,19

**MURPHY** 447:22

**mute** 483:2,4

**N**

**names** 497:16 509:7 517:15 555:1,8 589:23 590:1

**Nancy** 565:5

**narrative** 583:16

**narrowly** 544:16,18

**nature** 497:3 515:5 524:6 591:13

**Navy** 570:2

**necessarily** 515:14 540:19 555:8

**needed** 510:19 523:2,3

**needle-like** 458:7

**negation** 459:16

**neoplastic** 459:23

**net** 579:10

**non-english** 521:11

**noncustodial** 512:25 513:22 530:3 536:18,24 544:7 545:10 547:9 563:12 575:13 576:24

**nonresponsive** 457:2 514:7 523:17 548:2 550:4 579:16 599:10

**notations** 485:14 488:10

**note** 496:15,18,19,20,21 542:25 565:11

**notebook** 570:10

**notebooks** 516:8

**noted** 565:7,23 566:1,8 567:17

**notes** 450:14 452:13 497:7 498:23 510:22 511:12,22 514:21 515:22 518:8,12, 14,19 519:21 525:15,16 536:22 553:18 555:12,13, 20 556:12,13 560:3 563:11,12,13 568:25 569:3,8 571:10,18 572:24 575:11,12 587:24 595:18, 22 596:1,13,20,21 597:6

**notice** 447:3 450:9,13,14, 16 451:14 452:23 453:4, 22,23 454:18 455:11 456:23 462:20 469:7 470:16 474:7,10,17 476:15 477:10,15,16 505:21 533:13 556:21 578:14 579:2,5 587:2,4

**noticed** 452:19 462:15 464:17 481:14

**notices** 477:18 599:23

**noting** 560:2

**November** 487:1,23 491:8 495:14,18

**number** 449:11 462:9,13 463:6 470:4,6,15 471:4 472:3,16 478:2 479:4,8 480:3,4 484:8,9 486:22 494:16 496:6 499:16 501:5,10 504:7 505:4,6 513:25 531:13,14,20 540:12 545:24 546:5 551:24 552:4,21 553:25 567:8 568:2,6 570:11 577:6 587:3,4,25 588:18 594:19

**numbered** 577:24

**numbering** 539:24 567:5

**numbers** 462:7 478:5,6 567:4 572:12 576:15 598:18

**O**

**O'SHAUGHNESSY** 502:6,10,13

**Oakland** 447:6,17

**oath** 534:13

**Object** 453:24 454:19 455:1 456:11 460:11 461:15 462:25 463:17 465:25 468:14 473:7,20,24 474:6,13,16 475:8 476:13 477:2,9 479:19 480:11,22 481:5,18 482:9 484:15 485:12 486:19 488:2,15 489:17,25 490:17 491:23 496:2 497:13,21 498:9,22 499:6,13 500:3 502:23

**notice** 447:3 450:9,13,14,

508:18 511:10 516:24 521:16 528:1,17 529:14 532:3 533:2,12 534:6,20 535:13 536:2,10 540:18 551:18 552:9 554:8 555:3 556:20 557:10,25 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 595:19,24 597:10,23 599:5

**objection** 481:22 488:6 533:9

**objective** 482:10 515:14

**obligations** 548:21

**obtained** 529:1

**occasional** 516:7

**occasionally** 458:24

**occur** 575:5 591:18

**occurred** 542:7

**October** 447:4 449:7 472:20 479:16 502:3,15

**offhand** 525:18

**office** 454:3 590:8

**officer** 589:14

**officers** 588:25 589:3,22 590:23

**offices** 447:5 549:7

**official** 525:1

**offsite** 526:13 527:4 577:19

**oldest** 507:13

**omnibus** 538:17

**one-by-one** 517:4

**ongoing** 487:19 547:17

**onsite** 571:18 577:14,16

**open** 452:25 453:4,6,20

**opened** 523:3

**operate** 454:5

**operates** 456:16

**operating** 471:16 509:3 510:24 511:1 512:16 513:13 516:20 524:20

operation 496:22

operational 591:3

operations 466:6 511:14 512:12 518:2

opine 579:12

opining 582:9

opinion 580:14

opportunity 454:4 456:8 563:8

options 482:3,7

order 494:18 588:6,16

ordinary 465:11

ore 503:12 531:15

organization 509:22,24 514:24 559:9 589:2

organizing 519:4

original 568:22 595:5

originals 600:9

OUS 508:23

ovarian 537:12

overlap 573:19

overlapping 476:25

overly 584:15

overseas 508:23 512:10 518:24 528:15 556:18 557:15 564:17

overview 541:20

**P**

p.m. 600:17

packaging 505:2 556:4

pages 472:12 587:24 598:6

paginated 518:14,18,19 555:12

Pam 518:24 525:9 559:17 563:13 571:11 594:12,15 596:17

Pamela 518:21 560:2

paper 516:8,14 517:3,10 519:9 543:8,17,23

paper-type 516:14

paragraph 457:21,22 458:23 459:21 478:25 496:14 503:2,10

parameter 552:23

part 454:2 456:20 462:20 469:24 481:24 511:15 513:3 514:23 518:15 524:23 526:25 538:15 540:2 548:6 549:18 550:8, 16 551:1,7 570:4 575:2 576:4 596:3

particulars 524:2 564:24

parties 589:3 600:12

partly 570:19

Partridge 448:10

parts 556:24 558:2

party 469:6

past 458:21 459:5 590:24

payments 559:9

pediatricians 459:1

pending 485:3,7,10 486:8, 10,14,17 489:11 491:13 493:6 550:18

penetration 460:4

people 452:1 461:8 484:10 508:14 509:20,25 510:1,3 514:22 522:16,22 523:11, 12 527:4 543:1 578:16 580:7 587:8,20,22,23 588:5,19,22,25 589:1,2,17, 19,20,21,24 590:7,17 591:21,23 594:10 595:6 596:8 599:6

percent 534:19 552:7

percentage 533:11,15 534:16,23 535:3

percentages 552:13

perfect 585:14

perfectly 533:21

performed 512:9 543:15 545:9 552:5 553:14,17

period 454:13,22 455:25 550:9,25 552:1 557:9,22 558:13 561:12,17,18,19 569:19 571:17 573:11 583:9 587:19 591:18

periods 534:17

permanent 479:9

permitted 590:18

person 455:25 456:14 461:22 470:17 572:3 589:15

personally 447:8 542:4

perspective 455:18

pertain 459:17

PETER 447:1,9 449:14

Pharmacy 541:5 549:2

Philippines 510:1,4 511:3,21 515:6 518:13,25 519:2,21 524:18,21 527:20 556:19 557:6,8,19,22 558:12 559:16 560:3,14 561:4,6,8 563:4,11,21 565:2,15,25 566:7,12,13 569:1,7,17 570:2,14,24 571:19 573:13

philosophical 455:3

phone 447:22 448:3 483:1, 2

phrased 571:1,2

physical 473:18

physically 510:3 512:5 543:15

pick 580:17 586:7

pieces 520:7

place 454:5 499:4,10,23 509:10 540:17 573:1

places 559:25

plaintiff 471:7 479:1,5 505:14

plaintiff's 457:3 469:25 470:11 471:25 477:20 483:7 494:7 501:14 504:3,

13 531:3,10 587:1

plaintiffs 447:15 471:6 504:24 505:7 528:12 530:12,15 579:12

plane 454:3

platelet-type 458:9 459:7

platforms 516:22 596:11

pleadings 591:12

point 452:25 469:1 498:19 499:12 500:1 535:10 538:11 545:5 563:19 574:14 597:2

pointed 569:15

points 499:16

policies 588:1 591:4 596:2

policy 536:7

poorly 596:6

population 465:14 535:4 588:7

portal 451:7 452:22 454:6

portion 456:19

portions 579:17 599:11

position 461:2,17 534:21 552:11

possession 498:21 532:7 534:11

possibility 459:2 461:11

possibly 554:14

potential 535:16

potentially 514:4

powder 460:1,25 469:16, 17 473:3 478:21 479:6 480:10 496:1 497:11 505:3,10,16 506:22 528:15 537:14 541:10,12 556:11 557:7,19,24 558:11 559:14,15 561:15 563:2, 22,24 565:14,24 566:6 569:18 570:1,12 573:12 574:6 578:24

powders 459:10

practices 497:24

**pre-luzenac** 496:23 498:12

**precise** 454:11 471:24 508:20 521:7 547:7

**precisely** 509:12 571:1 573:19

**preparation** 508:2 591:17 592:2 593:23

**prepare** 536:23

**prepared** 485:2 486:8,9 491:12 492:5 493:5 537:1

**presence** 460:8 469:17 581:13

**present** 448:7 530:18 531:17,24 532:24 533:6 552:2 577:2 585:11

**presented** 539:12 579:15

**presenting** 459:10

**preservation** 475:22 480:7

**preserve** 473:17 474:12 488:13

**preserved** 454:18 500:1 519:8 539:6 545:6

**preserving** 516:23 519:5

**presume** 514:23

**presupposes** 553:10

**pretty** 484:2 530:23

**prevented** 469:20 489:20 491:20

**previous** 517:10 579:25

**previously** 447:10 449:15 589:18

**primarily** 540:8 541:3 549:3

**prior** 477:17,18 480:18 481:7 496:24 498:5 499:21,24 522:19 529:20 540:15 548:13 587:5 597:25 598:2

**privacy** 556:25

**privilege** 483:6,12,16,19, 22 484:8,13,21 485:15,18 488:9 489:24 490:25

**problem** 460:6

**procedure** 536:8

**procedures** 538:18 588:2 590:23,25 591:3 596:2

**proceed** 449:12 501:13 586:18

**process** 490:6 526:25 547:18 575:4 576:4

**processing** 564:13

**procurement** 588:25

**produce** 503:3 521:20 535:2 585:20 591:15 595:22

**produced** 447:9 461:24 462:10,15 463:9 465:7,20 466:5,14 478:8 482:5 483:13 511:8 521:14 522:11 532:2,7,25 533:8, 16,23 534:11,18 535:8,17 548:10 552:8,13 557:18 561:23 563:5 565:17 566:9,15,19 568:18,21 569:14,18 570:21,23 571:5,24 572:13 573:13 574:9,11,12,18 575:9,16 576:3,8,12,20,21 596:22 598:7,12,21

**producing** 475:17

**product** 470:19 475:1 476:8 478:20 479:1 579:7

**production** 448:10 464:3 505:2 531:10 547:14 548:7,21 549:23 550:8,17 551:2,7 558:19,20,22 561:25 562:1 563:17 564:4,7,10 565:7 566:11, 17 567:2,18,20 568:9 569:3 575:14 576:6,10 577:3 588:3,10 598:15,19, 20 600:10

**productions** 547:15 565:6 572:24 591:10 596:11

**products** 460:19 473:3,22 474:20 475:18 478:14 503:3 504:13 531:17,21,23

**programs** 599:7

**promise** 586:11

**pronounced** 502:7

**proper** 555:1

**Protection** 478:21

**provide** 477:5 487:13 511:6 514:14 586:25 587:11,13

**provided** 473:11 493:22 494:1 497:2 528:21 529:2 544:13 564:5 566:2,21 570:16 579:11

**providence** 466:7 471:8

**providing** 487:11 493:5

**prudent** 459:25

**pull** 452:12 522:23 525:17 530:24 554:18 555:14

**pulled** 519:19,20 538:19 539:16

**pulmonary** 459:9,22 460:20,23

**purchase** 496:25 498:5 565:25 566:13

**purchased** 479:1

**Purest** 478:21

**purpose** 483:22

**purposes** 540:21

**pursuant** 447:3 485:3 486:8,10 491:13 493:6

**put** 482:24 515:5 519:10 522:13 527:9 537:8 538:9, 11 545:4 547:14 583:16 584:9 588:11,15

**putting** 550:4

**Q**

**quality** 588:23,24 589:25

**quarter** 553:11

**quarterly** 551:17,21 553:5, 6,15,19

**quarters** 552:25

**question** 453:25 460:12 461:16 463:1,18 465:9

**promise** see above

467:12,13,18,25 468:15 470:16 471:18 473:8,25 474:7,17 475:12,14 480:23 481:19 497:14 498:1 509:2 510:20 513:9 517:16 520:5 531:21 534:8,15 542:6 549:13,15 550:2 552:10 556:6,21 557:2 558:2,25 559:7,8,18 560:18,23,25 564:24 566:20 568:23 570:5 571:1 572:8,13,19, 25 573:2,25 575:7,24 576:9 578:14 595:11 596:6 597:1 599:13

**questions** 464:24 467:8, 18 507:23 508:4 536:14 550:3 559:5 562:24 563:25 564:3,11 586:21 587:11 588:17 590:16 592:7 594:6

**quick** 578:8

**quickly** 530:2,25

**R**

**R&d** 589:24

**Rainbow** 503:5

**raising** 500:13

**random** 522:3

**range** 528:2 552:6 564:14 569:10,13 570:3 581:9 583:8,14

**ranges** 565:3,19 588:11

**rationale** 585:6

**ratios** 524:25

**raw** 556:3

**re-ask** 560:25

**reach** 537:24

**read** 455:9 456:5 484:2 491:15 493:8 495:21 496:19 498:10 500:8 537:11 542:1,5,24 549:4 559:21,23

**readily** 554:13

**reading** 541:24 559:17

**ready** 449:21

**real** 520:5 530:24

**reality** 480:16

**rearranged** 545:5

**reason** 449:23 463:7 464:4 465:9,19 466:13 499:9 534:3 535:16 550:23

**reasonable** 470:24,25

**reasoning** 551:3

**reasons** 454:11 547:12 575:1

**recall** 457:20 469:7 478:17 497:7 501:25 502:24 506:18 518:5 527:13 530:4 546:25 581:17 583:23 593:17

**receipt** 450:21 451:1 452:4 454:23 455:13 456:9

**receive** 450:25 470:16 485:23

**received** 458:24 476:2 482:22 508:8 509:19,22 541:20

**receiving** 510:11

**recent** 450:8 510:6 516:21 522:21 577:20

**recently** 517:23

**recess** 501:8 546:2

**recipient** 451:9 452:4 453:1 484:10 502:6,8 509:14

**recipients** 450:17 451:9, 15,16 452:8 508:4

**recognize** 478:6 502:5

**record** 449:4,5 462:24 463:15,20 464:1,13 466:16 467:2,17,21 498:6 501:7,9 513:25 530:6 538:2 546:1, 3 554:21 557:14 559:23 562:13,14,17 572:15 586:12,15,16,17 592:19 600:5,14

**records** 456:17 462:18 465:15,22 466:5 478:9 496:23 497:20,23 498:7, 12,19,24 499:24,25 500:6 520:19 556:3 557:16,18

576:21 584:1 587:20 588:22,25 589:3,13,14,17, 22 590:22 599:7

**records-keeping** 577:17

**RECROSS-EXAMINATION** 599:19

**REDIRECT** 592:22

**redo** 494:22 510:22

**refer** 513:19

**reference** 451:18 489:2 491:3 492:9 502:15 514:11 523:1 525:24 526:1,5 588:16

**referenced** 572:11

**references** 487:1 530:4,5 543:23

**referencing** 567:4,7

**referred** 485:11 486:17 489:24 517:14,17 524:18 541:21 542:12

**referring** 485:8 487:24 492:22 493:11 512:3 513:18 541:11 568:6

**refers** 487:10 489:11 498:11

**refined** 579:11 584:16,20, 23

**reflect** 511:13 585:9

**reflected** 570:16 595:17 596:12 597:6

**reflecting** 534:17 565:13 566:5 568:3 569:25 570:12

**reflective** 576:8

**regard** 458:6 459:9 461:2 468:9

**Regina** 542:15

**regular** 464:7,15 465:3,23 466:2 467:22

**relate** 564:10

**related** 450:20 473:18,22 476:1,11 485:18,22 488:14 492:5,16 506:9,15 507:5,7, 16 512:11 527:21 528:14 538:14,25 542:10 550:24

555:24 561:7 563:1 569:5 571:12 576:13,21 585:7

**relates** 514:18 570:5

**relating** 469:15 515:1 558:5

**relative** 458:6

**release** 506:8,19

**releases** 500:20 506:10, 13,14 507:15,20

**relevant** 499:20 514:5 542:2 544:19 546:25 547:24 565:19 571:16 577:12 578:22 582:22 583:1 584:4,8 585:3,22

**relief** 478:20

**remember** 457:19 506:24 512:1 525:17 538:12,21 546:13 556:8 563:6 583:8 593:11,15

**REMEMBERED** 447:3

**reorganized** 545:5

**rephrase** 529:17

**replied** 459:5

**reply** 502:14

**report** 495:17

**reporter** 447:8 494:16,18 555:15 559:23

**reports** 458:13,17 589:19

**representation** 568:17

**representative** 462:16 481:12

**represented** 471:8 472:23 539:4 563:15

**request** 485:2 487:19 491:12 504:13 505:4,6 531:10,13,14 564:22 565:6,22,23 566:10,17 567:2 568:2,9 569:15 572:9 576:5 591:11

**requested** 476:1 485:24 490:3 506:11,12,17,18 528:19 587:25 588:6 591:8,10

**requesting** 504:25 505:8

**requests** 530:20 561:25 562:1 567:16 568:21 572:5 573:6 598:15,21

**require** 454:15

**required** 492:15 583:7,10

**requirements** 584:1

**research** 453:9 461:9 469:24 497:5,19,20 498:4 499:3 510:19 511:5 512:20,21 528:9 529:25 534:22

**resolves** 570:25

**respect** 471:2 475:24 477:16 480:9 485:10 486:14 488:16 491:18 493:10 499:11 503:22 508:12 510:22 514:18 522:9 525:8 526:3,14 527:18 529:12 532:21 538:18 542:21 556:15 557:18,22 559:15 564:1,6 569:17 590:2,22 593:10

**respond** 549:9 560:1 588:17

**responding** 456:20 476:18

**response** 473:10 480:20 504:12 565:8,12 566:2,9 569:14 572:24 576:1,5 586:25 592:14 594:5 598:21 599:22

**responses** 470:10 471:13 504:19,24 528:11 531:9 560:9 564:5,10,21 565:3 568:12 575:20 598:14

**responsibilities** 456:25 476:15

**responsibility** 587:21 598:24

**responsible** 583:24 589:4

**responsive** 522:25 550:2 560:15 565:20 567:15 569:6 572:13 573:4 598:6

**restating** 559:18

**result** 470:18 481:17 482:20 486:16 535:10,11 537:9,13 541:16

**resulting** 460:6 461:13

**results** 477:7 528:13,19 530:17 531:15,22 532:25 533:7 534:17 535:8,12 551:14 552:2,8,13,18 581:19,20 591:5

**retained** 490:16 500:1 511:8 513:16 600:9

**retention** 497:24 535:22, 25 556:5,16 557:5,9 583:8, 11,12 588:1 596:10

**retrieve** 582:6 583:2

**retrieved** 519:25

**retrieving** 589:5

**return** 583:5 584:15

**returns** 580:4

**review** 452:22 528:10 530:11 535:1 539:16 567:20 568:19 588:8

**reviewed** 539:14,15 565:6 567:14 569:13 571:4,6 573:2 574:1 590:21

**reviewing** 543:19 565:10

**RFP** 564:20 565:1,4,12 568:12 575:15

**Rhode** 471:6,9

**Rich** 483:3

**RICHARD** 448:3

**richard.bernardo@ skadden.com** 448:6

**rid** 456:7

**rightfully** 460:24

**Ritter** 502:15,19 503:23 540:3,9

**Roger** 472:12 489:9 491:4 493:1

**role** 564:13

**roofing-grade** 503:3

**Rose** 478:12

**row** 554:19

**rude** 520:10

**rules** 583:19

**run** 562:8 567:18

**running** 453:6 589:15

**Russell** 542:16

**S**

**sake** 559:8 580:20

**sample** 487:14

**sampled** 539:15 571:6,8 576:16 588:13

**samples** 474:15

**sampling** 520:2 522:3

**San** 504:20

**Satterley** 447:5,16

**scanned** 515:23

**scanning** 516:7

**SCEPTRE** 515:4

**schedule** 535:25

**schedules** 535:23 588:1 590:25 591:5,7

**scientific** 463:4

**scope** 461:19 474:1,4,7 475:9,20 477:10 488:8 533:13 543:24 556:21 578:14 579:2,4 586:9

**Seamen** 542:16

**search** 511:6,7,20 512:4,5, 8,9 514:5,15 519:23,24 521:9 522:7,9,17 523:12, 14,19 526:6,20 527:8,10 528:3 533:24 538:14 539:7 543:12,15,16,24 544:15,23 554:23 559:2 574:22 577:7,10,21,25 578:2,4,5,6 579:9,10,20 580:2,16,19, 20 581:7 582:4,6 584:14, 16,18 585:9 586:6

**searched** 511:15 512:13, 23 513:2,4 519:12 520:14 521:7 526:7 554:24

**searches** 513:15 514:16, 18 518:24 522:18,20 523:7 526:8,9 527:21 538:24,25 543:18 545:1 557:15 558:16 565:9 571:19,21

579:6,23 580:3 585:7 589:16 590:9 596:10

**searching** 523:5

**seat** 592:16

**second-to-last** 458:21 532:10

**secretary's** 590:8

**section** 451:14,18 559:18

**sections** 575:19

**seek** 580:1

**seeking** 487:19

**Selby** 504:14,15 505:21, 22,24 506:21

**selected** 511:23 521:23,25

**Semple** 542:17

**sense** 453:8 455:18 463:4, 5 464:13 465:12 479:22 574:10 580:6 582:3

**sentence** 458:15,21 459:13 460:15 470:23 503:1,2

**separate** 501:19 511:4 563:4

**September** 470:10 554:22

**series** 583:11,12

**Services** 448:10 600:10

**set** 531:11 539:13 564:9,20 565:1,4 567:2,7 568:2,5,6, 7,12 570:8 575:15 576:10 578:1 579:22 584:16

**sets** 547:20 567:20

**settled** 499:19

**severe** 479:8

**Sharan** 555:20

**share** 577:3

**sheets** 529:23 530:1

**short** 515:17

**Shorthand** 447:8

**show** 530:25

**Shower** 541:12

**shown** 501:24

**signature** 504:21

**signed** 536:12

**significant** 460:18

**similar** 460:16 566:11

**simple** 467:8 520:5

**simplest** 464:13

**simply** 465:5 482:16 485:13 488:7 490:8 549:15 572:10

**single-spaced** 587:24

**site** 480:2 522:10 587:19

**sitting** 481:12

**situation** 460:16 461:3

**situations** 468:18,21

**size** 459:8

**Skadden** 448:3 511:23

**skin** 460:3

**skip** 495:22

**Slate** 448:3

**small** 460:8 484:1

**smiling** 510:18

**soft** 453:1

**software** 450:14,19,24 451:3,4,8,23 452:3,6,16

**SOP** 584:1

**sort** 451:1 459:15 538:15, 16 556:16 562:10 568:9 589:25 598:19

**sought** 542:21 543:7 590:4

**sounded** 573:17

**sounds** 491:16 545:15

**source** 457:12 526:6

**sources** 457:12,14,16 512:22,25 513:18,22 514:17 530:3 536:19,24 539:8 541:17 542:1 543:22 545:3,11 547:9,24 558:24 563:12 564:12 576:24

**South** 537:9

**speak** 454:12 463:3,11 464:11 465:10 466:7 477:5 479:21 482:13 498:25 500:6 511:11 524:25 539:19 543:14 549:22 558:18 577:3 585:24 587:8 590:7,14

**speakers** 520:18

**speaking** 475:21 480:5 481:8,13 482:19 486:16 500:6 541:15 548:18 571:11 594:12,15,16,19,23 596:8

**speaks** 575:15

**special** 465:9

**Specially** 447:21

**specific** 497:15 498:25 522:19 526:21 543:2,9 547:15 548:8 549:21 552:23 557:11 558:16,19, 25 559:20 562:24 564:1, 15,23 565:2 567:14 568:20 570:23 571:4 572:8 575:25 585:7 593:10,21,24 594:3

**specifically** 476:6 478:17 498:2 513:12,23 514:17 529:8 530:16 543:5 544:9 550:13 553:18 560:2 563:11 564:20 567:21 569:13 570:20 572:13 573:3 584:8 588:12 595:6, 7,12

**specification** 518:3

**specifics** 496:21

**specter** 500:13

**speculate** 455:16 525:6

**speculating** 551:9

**speculation** 454:2 500:5 551:12 556:23

**spend** 519:18

**spent** 594:11,14,18

**spicule** 458:7

**spoke** 520:25 587:19 594:24 597:4

**spoken** 547:3 595:3,16

599:6

**spokesperson** 480:19

**spreadsheet** 565:18 572:11

**spreadsheets** 588:10 598:17

**spring** 591:19

**Square** 448:4

**stack** 482:25

**staff** 496:24 498:8 520:19

**staging** 589:5

**standard** 470:11 556:4 557:4

**standards** 556:15,25

**standpoint** 520:3 568:8

**start** 453:5 494:19 501:10 507:5 546:5 568:2,18

**started** 467:21 553:4 565:11 569:11 591:19

**starting** 470:23 503:10 564:21 565:5 575:22 591:24

**State** 447:8

**stated** 567:15

**statement** 480:25 492:23 525:14

**states** 452:19 470:25 471:5,9 511:2,15 512:6,7 516:21 556:17 558:6

**stem** 579:23 580:3,19

**step** 568:24

**steps** 538:14

**stipulated** 600:13

**stop** 545:12 562:7

**storage** 519:9 526:13,22 527:5 577:19 582:8

**stored** 512:13 514:25 515:7,10 519:10 549:7,10 558:4,6,17

**story** 517:8

**Street** 447:6,17,23

**strike** 457:1 513:7 514:7 522:8 523:16 548:1 579:16 592:14 599:10

**structure** 458:8,9 459:7

**study** 462:12

**stuff** 550:4

**subject** 454:25 457:11 484:12 495:17 514:5

**subsequent** 525:8

**subsidiary** 473:1 495:24

**substantial** 459:4

**substantially** 566:23

**Subtab** 575:20

**sued** 471:17,21

**suggest** 451:15,20 490:14 540:16

**suggested** 451:24

**Suite** 447:6,17,23

**summaries** 558:22 563:18 565:7 575:14 588:3

**summarized** 596:21

**summary** 518:20 544:3,8, 10 564:7

**supervision** 543:14

**supplemented** 593:24

**supplied** 470:19 473:2 527:19 564:11 565:15 566:5,7,12 570:2,13

**supplier** 528:6 571:23 588:24 589:25

**suppliers** 525:3

**supply** 527:22 528:6 569:21,23 570:6 589:1,24

**supporting** 588:2 591:4 596:3

**supposed** 536:1 583:16

**surprised** 516:3

**surrounding** 490:5

**surveys** 528:23

**SWANSON** 447:16 449:13,17 454:7,20 455:12

457:1,5 460:14 461:21 463:24 464:10,20 465:1 466:9 467:6,20 468:1,7,8, 17 470:2 472:2,8 473:9,21 474:3,9,14,21 475:11 476:19 477:6,13,22 479:24 480:15 481:2,10,20 482:1, 18 483:1,5,9 484:18 485:16 486:21 488:3,11,18 489:19 490:9,20 492:3 494:9,17,19,24 496:5 497:17,25 498:17 499:2,8, 22 500:11,23 501:2,16 502:25 503:25 504:6 508:25 511:17 513:7,11 514:6,13 516:25 521:19 523:16,18 528:4,20 529:21 531:1,5 532:5 533:3,10,18 534:9 535:6,19 536:5,13 540:25 545:12,16,21 546:8 548:1,3 551:22 552:14 554:16 555:11,17 557:3,13 558:7 559:21 560:6,24 561:1 562:5,19 567:12 571:15 573:22 574:20 575:6 578:15 579:16,18 580:5,9,15 583:3 584:12 585:13 586:10,14 592:11, 16,19,22 595:20 596:5 597:11,24 599:10,14,17 600:1,4

**Swanson's** 560:23

**sworn** 447:10 449:15

**system** 456:16 515:3,4,6, 8,15 517:7,8,10,12 518:6,7 521:4 554:24 577:11,17 579:22 589:16

**systematically** 598:18

**systems** 514:25 515:4,13, 15,19,20,25 516:2,4,11,16 517:2,6,14,16 519:1,4,6,15

**T**

**T.M.** 457:23

**tab** 450:3 530:2 554:18 565:5,19 566:3,8,16 570:8, 11,17 575:20 577:7

**table** 544:5 597:1

**tabs** 564:9 568:13 572:10 574:8 588:11 598:17

**taking** 562:9

**talc** 447:20 450:9 457:12, 14,15 458:7 459:4,6 460:9, 17 461:12 469:16 471:3 473:2,3,18,23 474:5,20,25 475:6,17,18 476:1,7,11,17, 21,23,25 477:17 480:9,17 485:3,7,10,18,21 486:10, 14 487:13,20 488:4,14 489:12,15 490:4 491:14,22 493:7,10 495:17,25 497:6, 10 499:12 500:20 503:14 506:9,15,18,20 507:4,5,8, 17,19 508:5 509:19 518:3 527:19,22 528:5,6,14,23 529:5,6,13,24 530:1,17 531:15,16,21,23 538:17 542:10 547:1,14 548:7 549:19 550:8,16 551:1,7 552:3 553:8 557:23 558:11,19 559:13,25 560:4,9,13 561:7,9,12,17, 18,19 563:2 564:12,14 566:6 571:23 572:1 575:16 576:1 577:13 578:11,22 580:24 581:12,13 582:23 593:22 595:9

**talc-related** 537:8 597:4

**talcosis** 458:13 479:5 506:25 581:1 584:7 585:19

**talcum** 541:10

**talk** 458:12 461:22,23 462:16 464:16 468:24 493:16 541:18 563:20

**talked** 489:22 510:1 512:24 519:17 520:6 535:23 538:13,18 568:22 594:9 598:4

**talking** 464:12,18 466:23 496:8 506:22 509:24 510:6 511:19 512:10 516:17 533:4 544:9 546:11 549:13 554:9 566:25 567:24 594:9 598:1

**talks** 460:5

**tasked** 467:9

**team** 495:18 591:9

**technical** 581:25

**Tele-video** 448:10 600:10

**Telephone** 600:10

**telling** 554:4 570:22

**tells** 451:15 455:5 458:4

**ten** 517:23 588:16

**tendered** 474:8

**Teresa** 560:14 561:4

**term** 463:20 467:17,21,23 578:5,7,9,10,20 579:13,20 580:23 581:1,12 582:4,10, 18,19,22,23 584:18 586:6

**terminology** 509:9

**terms** 450:20,25 454:13 463:11 467:16 469:3 508:19 512:18 516:22 519:3 521:3 523:19,25 525:11 526:12,21 527:3 538:20 544:23 554:23 555:1,5,6,9 558:16 564:24 573:9 576:19 577:7,10,21 578:1,3,4,6 579:9,10,14 580:16 581:7 582:4,6 583:7,10,21 584:6,14,16, 25 585:9,19 590:6 591:16 598:16

**terrible** 597:20

**test** 528:19 552:13,18 553:19

**testified** 449:16 593:5

**testifying** 585:17

**testimony** 449:24 499:14 545:18 586:25 587:13 592:2 593:4,11,15 594:5 599:21

**testing** 469:15,21 497:6 498:18,24 499:24 503:11 528:13 529:6,12,13 530:17,21 531:15,22 532:23,25 533:5,6 534:3, 17 535:7,9,10,11 551:14, 16,20,21 552:1,2,8,19,22 553:5 576:1 581:13,19

**testing-related** 529:5

**tests** 551:24 552:4 553:6, 11,14,16 554:1

**Texas** 541:4

**text** 542:7

**textual** 583:16 584:10

**Thailand** 555:25 556:2,10

**Thames** 541:5 549:2

**theory** 553:22

**thing** 451:1 488:20 567:24 576:11

**things** 450:21 455:10 505:1 520:11 556:16 581:5 593:3

**thinking** 482:8

**Thompson** 457:23 458:4

**thought** 518:10

**thoughts** 562:10

**thousand** 597:17,22

**threw** 566:24

**throw** 559:1

**tie** 548:12 549:21

**tie-back** 548:8

**time** 454:13 456:24 463:22 469:21 473:16 480:9 485:20 497:23 498:4 499:5,10 505:21 509:8,10 516:14 518:1,4 519:7,8,9, 18 520:7 521:1 526:11 527:12 538:10,13 545:14, 17 559:19 562:8,9 564:15 570:24 571:16 573:11 575:5 579:11 584:17,20 585:2,11 587:21 589:8 590:12 591:18,20 594:14 598:4

**timelines** 588:4

**times** 448:4 516:5

**Tina** 532:14,15

**titles** 578:4

**today** 449:21 481:13 482:19 508:2 516:4

**today's** 449:7

**told** 500:15 544:12 556:2 561:13,20 578:16

**tool** 539:16 588:8

**top** 466:25 486:25 494:14 525:19

**topic** 481:15

**topics** 464:17 476:18 572:23 587:1,3 592:3 599:22

**total** 522:1 588:15 589:6 592:1 594:18,21

**totality** 561:3 579:8

**touch** 559:3

**touched** 536:16 555:18 560:7

**tougher** 556:16

**tour** 496:8

**trace** 459:15

**track** 450:24 451:8,23 452:3,6,12 455:14 516:19

**tracked** 452:2 572:25

**Trackwise** 515:3 517:18, 19,20,22 518:6,7

**trade** 559:9

**trained** 452:7

**training** 452:9,12 456:17, 22 527:3,6

**transcript** 472:12 596:14

**transferred** 516:13

**traveling** 454:3

**tremolite** 459:14,25 460:19 578:23,25 581:20

**tremolite-contaminated** 461:12

**trigger** 469:9

**triggered** 452:24

**triggers** 452:25

**Trip** 495:17

**true** 454:14,25 461:14 462:11 463:16 464:8 473:6 476:8,12 477:17 480:10 488:24,25 489:16 492:23 493:23 497:6 499:12 506:21 507:9,10,19 521:21 522:6 529:13 536:9 550:10 551:9 577:21 580:11 585:3,22 595:8 596:24

**Ts** 580:23

**turn** 582:12

**turned** 563:17

**Two-thirds** 496:11

**type** 477:16 521:9 526:6 577:2

**types** 459:23 485:14 551:20 552:17,21 553:5 557:5

**typewritten** 575:12 587:24

**typically** 477:8

**U**

**U.S.** 512:4,13 513:4 514:4, 16 515:1,8 557:1 558:17 570:2

**Uday** 555:20

**Uh-huh** 570:9

**ultimately** 584:19

**unable** 462:23

**unavoidable** 459:15

**uncertain** 496:22

**unclear** 572:16

**underground** 497:4

**underlying** 529:12

**understand** 455:20 462:14,19,20 477:7 483:22 492:10,13 493:15 498:2 508:13 512:21 515:14 517:13 521:8 533:15 534:7 545:1 547:13 550:1,11 551:5 553:13 557:7 558:1 564:2 573:23 574:13 576:3 579:12 580:1,2 588:6 599:7

**understanding** 451:25 471:22 473:4 474:18,24 475:3,5 476:17 509:2 513:5 514:3 520:16 524:4, 8 541:25 542:24 543:13 548:9 551:4 559:5 567:19 579:8 582:5 586:24

**understood** 455:9 456:23

488:12 492:8 519:7

**unit** 510:10,13,24 512:16 513:13

**United** 471:5 511:2,15 512:6,7 516:21 556:17 558:6

**units** 511:1 516:21

**unjust** 460:7

**unrelated** 452:11

**USA** 447:21

**usage** 459:9 460:19 515:16

**utilized** 514:24 515:21

**V**

**validation** 495:18

**variable** 584:13

**varied** 521:8

**vary** 578:19

**vehicles** 452:11

**vendors** 589:4 590:4,5

**verification** 532:11

**verified** 504:19 532:9,13 534:14

**verify** 462:13 480:25 481:3 532:18 542:4 555:9

**verifying** 576:17

**Vermont** 447:20 473:19 495:19

**view** 488:8 581:6

**viewed** 475:19 552:19,20 598:24

**virtue** 473:13

**visit** 451:6 452:21

**visits** 587:19

**volume** 449:10 501:5,11 511:19 536:16 545:24 546:6 596:18,23

**Volumes** 600:8

**voluntarily** 471:10

**W**

**W.H.** 457:24

**wait** 454:15,22 455:24 458:22

**waiting** 592:13,14

**wanted** 450:12 554:3 567:6 568:10 590:17

**warehouse** 575:3

**Wayne** 504:15

**Web** 480:1

**weekend** 454:4

**Westfall** 471:3,17,21 472:13 474:23,25 475:16, 24 476:4 489:23 547:4 548:6 550:6,10,25

**Whittaker** 471:4

**Whoever's** 483:1

**wide** 579:10

**widely** 524:24

**widespread** 460:20

**wife** 478:13

**William** 457:24 484:22 486:4

**window** 456:7

**Windsor** 471:10,16,20 472:22,25 473:16,18,23 495:19,23 497:6 502:20

**woman** 541:8

**word** 519:24 520:23 580:10

**words** 451:11 453:2 466:24 495:12 506:11 515:20 519:20 520:13,15, 21,23,24,25 521:11,15 555:8 558:13 596:25

**work** 453:3 579:7 593:10, 18,22 594:2 597:5,13,25 598:2 599:20

**worked** 509:16,21,23,25

**Workers'** 559:11

**working** 594:10

**works** 453:8 497:4

**world** 556:24

**worldwide** 528:23 591:4

**writing** 457:23 484:1

**written** 458:1 544:10 558:23

**wrong** 494:16 594:4,8

**wrongfully** 460:24

**Y**

**year** 515:9,10 527:9,11 552:25

**years** 516:9 517:24 548:11 549:14,23 551:5 556:5,7,8, 9

**yesterday** 508:1,3 510:2 515:12 529:10,18 535:23 555:18 596:24

**yielded** 526:10 566:18

**York** 448:4

**young** 484:2

# Exhibit 171

*Attorney(s):*        LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL

*Office Address & Tel. No.:* 2 Lincoln Highway, Edison, New Jersey  08818-2905
                (201)494-2727
*Attorney(s) for*      Plaintiff

---

LOUIS EDLEY

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
MIDDLESEX COUNTY

*Plaintiff(s)*

*vs.*
E & B MILL SUPPLY, et als

*DOCKET NO.* L-075913-86

*CIVIL ACTION*

*Defendant(s)*

Stipulation of Dismissal
with prejudice
(as to defendant, Windsor Minerals, Inc.)

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party,* with prejudice as to defendant, Windsor Minerals, Inc.

EXHIBIT
43

*Dated:*  July 23,        19 87   .

*By* _____
   RONALD S. LEVITT
*Attorney(s) for Defendant(s)*
WINDSOR MINERALS, INC.

*By* _____
   RONALD B. GRAYZEL
*Attorney(s) for Plaintiff(s)*
LOUIS EDLEY

# NEWMAN, HERMAN, SALTMAN, LEVITT AND FEINSON

### A PROFESSIONAL ASSOCIATION

### ATTORNEYS AT LAW

EDWARD H. HERMAN
JAY J. NEWMAN
  (N.J. & D.C. Bar)
DAVID A. SALTMAN
  (N.J. & Fla. Bar)
RONALD S. LEVITT
  (N.J. & N.Y. Bar)
JULIUS J. FEINSON
JULIE VACCHER GOLDSTEIN
  (N.J. & Pa. Bar)

————

ISRAEL H. SALTMAN (1914-1982)

————

Of Counsel
ALLEN J. SIMONSON
DONALD J. PERRELLA
  (N.J. & N.Y. Bar)
ROBERT J. PINTO

Please Reply To:
    P.O. Box 769
    East Windsor, New Jersey 08520

New Brunswick Office:
    47 Paterson Street
    (201) 745-9005

East Windsor Office:
    339 Princeton-Hightstown Road
    (609) 443-4900

Somerville Area:
    By Appointment Only
    (201) 725-4257

————

OUR FILE NO.
11092-L

July 23, 1987

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza, 2 Lincoln Highway
PO Box 2905
Edison, New Jersey  08818-2905

RE:  Edley -v- Madsen & Howell, Windsor Minerals, Inc., et als

Dear Mr. Grayzel:

Enclosed please find an Affidavit on behalf of Windsor Minerals, Inc., signed by Roger N. Miller, President of Windsor Minerals, Inc. since 1968.  Also enclosed you will find an assay from McCrone Environmental Services, Inc.  I trust that these documents will now enable you to sign a Dismissal as was done in the Yuhas file.  I have taken the liberty of drafting the Dismissal and enclosing the same for your signature along with a self-addressed stamped envelope.

If you are still unable or unwilling to sign the Dismissal, please forward immediately your client's answers to supplemental interrogatories which were served upon you almost one year ago.

Very truly yours,

Ronald S. Levitt

RSL/gbf
Encl.

cc:  Michael M. Tanenbaum, Esq., McCarter & English
    Thomas M. Kelly, Esq., Morley, Cramer, Tansey, Haggarty & Fanning
    Anthony Luongo, Esq., Donington, Leroe, Toland & Luongo

Certified Mail, Return Receipt Requested

```
--------------------------------
LOUIS EDLEY,                    :    SUPERIOR COURT
                                :    OF NEW JERSEY
              Plaintiff,        :    LAW DIVISION
                                :    MIDDLESEX COUNTY
     vs.                        :
                                :    DOCKET NO. L-075913-86
WINDSOR MINERALS, INC.;         :
NICOLET, INC., as Successor-    :        CIVIL ACTION
in-Interest to Keasby &         :
Mattison; GAF CORP., RUBEROID,  :        AFFIDAVIT
GAF CORP., as Successor-in-     :
Interest to Ruberoid; MADSEN    :
& HOWELL, INC.; JOHN DOE #1     :
to #50 (Fifty Unidentified      :
Manufacturers and Distributors  :
of asbestos-containing          :
products),                      :
                                :
              Defendants.       :
--------------------------------
```

STATE OF VERMONT  :
                 SS.
COUNTY OF WINDSOR :

     ROGER N. MILLER, of full age, being duly sworn, according to law, upon his oath, deposes and says:

     1. I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

     2. The exclusive business of Windsor Minerals, Inc. is, and has been for the last eighteen years, the mining and milling of talc from a single mining district in Windsor, Vermont. That mining district is the exclusive source of talc for all of the Johnson's Baby Powder sold in the United States. In addition to supplying the talc for Johnson's Baby Powder, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users.

3.   All of the talc mined by Windsor Minerals, Inc.,
whether it is ultimately sold to industrial users or used in
Johnson's Baby Powder, is sampled and tested for the presence
of asbestos.   No evidence of the presence of asbestos in
Windsor Minerals' product has ever been revealed by this
testing.   Attached hereto as Exhibit "A" is a true copy of a
recent report of such testing.

ROGER N. MILLER

Sworn to and subscribed
before me this 13 day
of July, 1987.

Alice G. Bean
Notary Public
My Commission Expires:
Feb. 10, 1991



**mccrone environmental services, inc.**
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

28 January 19876

RECEIVED

FEB 2 1987

W. M. I.

Windsor Minerals, Inc.
P. O. Box 680
Windsor, Vermont  05089

Attention:  Mr. Roger N. Miller, President

  Re:  McCrone Project No. ME-3241

Dear Mr. Miller:

  Under your Purchase Order QC-0548, we received nineteen talc samples for asbestos analysis by transmission electron microscopy. The samples were labelled as follows:

| | | | | |
|---|---|---|---|---|
| WMI 86-10 | WMI 86-14 | WMI 86-18 | WMI 86-22 | WMI 86-26 |
| WMI 86-11 | WMI 86-15 | WMI 86-19 | WMI 86-23 | WMI 86-27 |
| WMI 86-12 | WMI 86-16 | WMI 86-20 | WMI 86-24 | WMI 86-32 |
| WMI 86-13 | WMI 86-17 | WMI 86-21 | WMI 86-25 | |

  Examination found no quantifiable amounts of asbestiform minerals. The limit of detection for each sample is below 0.001 weight percent.

  Thank you for consulting McCrone Environmental Services, Inc.

    Sincerely,

    *Thomas Kremer*
    Thomas Kremer
    Electron Microscopist

    *James R. Millette*
    James R. Millette, Ph.D.
    Manager, Laboratory Services

TK/JRM/mtw

cc:  1)  Windsor Minerals, Inc.
    Windsor VT
  1)  Mr. Roger N. Miller, President *EXHIBIT A*

**a subsidiary of walter c. mccrone associates, inc.**
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

Exhibit 172

$40

REC'D. & FILED
SUPERIOR COURT
OF NEW JERSEY

OCT 3 1986

M.V. 9
JOHN M. MAYSON
CLERK

LAW          UNIT

OCT 10 1986

SUPERIOR COURT OF N.J.
PAID

## NEWMAN, HERMAN, SALTMAN, LEVITT & FEINSON, P.A.

☒ PRINCETON RD          ☐ 281 E. MAIN ST.
BOX 769                    SOMERVILLE, N.J.
EAST WINDSOR, N.J          (201) 725-1338
(609) 443-4900
ATTORNEYS FOR   Defendant, Windsor Minerals, Inc.

# JURY

*Plaintiff*

ALEX YUHAS and JEAN YUHAS, his wife,

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
MIDDLESEX COUNTY

*vs.*

*Defendant*

E&B MILL SUPPLY; MADSEN & HOWELL; GAF; RUBEROID;
GAF as Successor-in-Interest to Ruberoid;
CENTRAL JERSEY SUPPLY CO.; ELIZABETH INDUSTRIAL,
Division of Charles F. Guyon, Inc., as Successor-
in-Interest to Elizabeth Hardware; ZESTON; WINDSOR
MINERALS, INC.; NICOLET, INC., as Successor-in-
Interest to Keasbey & Mattison;  JOHN DOE #8 to #100;
(Forty three unidentified manufacturers and suppliers
of Asbestos and Asbestos Products to Plaintiff's
Places of Employment).

*Docket No.* L-029706-84

*CIVIL ACTION*

ASBESTOS LITIGATION
ANSWER, CROSSCLAIM AND
DEMAND FOR TRIAL BY JURY

Windsor Minerals, Inc., having offices in the Town of Windsor and State

of Vermont, by way of Answer to plaintiffs' Complaint says:

FIRST COUNT

1.   This defendant does not have sufficient information to admit or

deny the allegations contained herein and, accordingly, plaintiffs are

left to their proofs.

2.   This defendant does not have sufficient information to admit or

deny the allegations contained herein and, accordingly, plaintiffs are

left to their proofs.

3. This defendant does not have sufficient information to admit or deny the allegations contained herein and, accordingly, plaintiffs are left to their proofs.

4. Denied, and plaintiffs are left to their proofs.

5. Denied, and plaintiffs are left to their proofs.

6. Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the First Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### SECOND COUNT

1. This defendant repeats the Answer as set forth above and makes the same a part hereof as though set forth at length herein.

2. Denied, and plaintiffs are left to their proofs.

3. Denied, and plaintiffs are left to their proofs.

4. Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the Second Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### THIRD COUNT

1. This defendant repeats the Answer as set forth in the First and Second Counts above and makes the same a part hereof as though set forth at length herein.

2. Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the Third Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### SEPARATE DEFENSES

1. Plaintiffs are barred from recovery by reason of the limits set forth in the statute of limitations.

IMAN. HERMAN.
LTMAN. LEVITT
FEINSON. P.A.

2.   Plaintiffs are barred from recovery by reason of the limits set forth in the statute of limitations.

3.   Any and all injuries and damages allegedly sustained by the plaintiffs were the result of the carelessness and negligence of third persons over whom this defendant had no control.

4.   This defendant never warranted, either expressly or impliedly, any products which were allegedly used by the plaintiffs' claim based on warranties, either expressed or implied, cannot be sustained as against this defendant.

5.   The plaintiffs were guilty of contributory negligence with respect to any injuries allegedly caused by this defendant, and should this defendant be found guilty of any negligence with respect to the plaintiffs' damages, which liability is denied, the comparative contributory negligence of the plaintiffs were greater than that of this defendant, barring any recovery of the plaintiffs as against this defendant, pursuant to N.J.S.A. 2A:15-5.1.

6.   The plaintiffs were cognizant of and had full knowledge of all the facts, circumstances and conditions existing with respect to the use of any products allegedly manufactured by this defendant as referred to in the Complaint and voluntarily assumed the risks therefrom or attendant thereto.

7.   This defendant denies any conduct on their part which would justify an award of punitive damages in favor of the plaintiffs.

8.   At the time and place mentioned in the Complaint, this defendant was not guilty of any negligence, whether by act of commission or omission, which was a proximate cause of the alleged accident, injuries and damages of which plaintiffs complain.

9.   This defendant reserves the right to move at or before the time of trial to dismiss the Complaint on the grounds that the Court lacks personal jurisdiction over this defendant.

NEWMAN, HERMAN,
SALTMAN, LEVITT
& FEINSON, P.A.

10.   This defendant reserves the right to move at or before the time of trial to dismiss the Complaint on the grounds that the Court lacks jurisdiction over the subject matter of the Complaint.

11.   This defendant reserves the right to move to dismiss the Complaint on the grounds that the plaintiffs failed to give notice to the defendant of the alleged breach of express or implied warranty contrary to the provisions of the applicable statutes of the State of New Jersey.

12.   This defendant reserves the right to move to dismiss the plaintiffs' Complaint on the grounds that the plaintiffs' Complaint and each Count thereof fails to state a claim upon which relief can be granted.

13.   This defendant denies that willfully, wantonly or intentionally withheld or prevented the dissemination of information concerning the alleged hazardous effects of asbestos products and further denies that they were guilty of fraudulent misrepresentation to the plaintiffs and members of the general public and further denies that they conspired to withhold the aforesaid information from the plaintiffs and other members of the general public.

14.   The incident, injuries and damages complained of were caused by unauthorized, unintended or improper use of the product complained of and was the result of the failure to exercise reasonable and ordinary care, caution or vigilance.

15.   This defendant denies the applicability of the concept of strict liability in tort to this litigation.

<u>CROSSCLAIM</u>

Defendant, Windsor Minerals, Inc., by way of Crossclaim against co-defendants, E&B Mill Supply, Madsen & Howell, GAF, Ruberoid, GAF as Successor-in-INterest to Ruberoid, Central Jersey Supply Co., Elizabeth Industrial, Division of Charles F. Guyon, Inc., as Successor-in-INterest to Elizabeth Hard-ware, Zeston,  Nicolet, Inc., as Successor-in-Interest to Keasbey & Mattison, John Doe #8 to #100, (Forty-three unidentified manu-facturers and suppliers of Asbestos and Asbestos Products to Plaintiffs'

WMAN, HERMAN
LTMAN, LEVITT
FEINSON, P.A.

Places of Employment, says:

## FIRST COUNT

Defendant, Windsor Minerals, Inc., denies that they were negligent and state that the accident was the direct and proximate result of the actions of Defendants, E&B Mill Supply, Madsen & Howell, GAF, Ruberoid, GAF as Successor-in-Interest to Ruberoid, Central Jersey Supply Co., Elizabeth Industrial, Division of Charles F. Guyon, Inc., as Successor-in-Interest to Elizabeth Hardware, Zeston, Nicolet, Inc., as Successor-in-Interest to Keasbey & Mattison, John Doe #8 to #100, (Forty three unidentified manufacturers and suppliers of Asbestos and Asbestos Products to Plaintiffs' Places of Employment), and that they were solely responsible for the injuries sustained by the plaintiffs but in the event this defendant is found guilty of contributory negligence, defendant, Windsor Minerals, Inc., demands contribution under and by reason of the Joint Tortfeasors Contribution Act, N.J.S. 2A:53a-1, et seq., and as provided by the provisions of the Comparative Negligence Act, N.J.S. 2A;15-5.3, for a proportionate share of all of which the plaintiffs may recover.

## SECOND COUNT

The defendant, Windsor Minerals, Inc., further demands and makes a claim for indemnity against the defendant, in the event it be deemed that the damages claimed in the Complaint were occasioned by the primary negligence of the said co-defendants, should the defendant, Windsor Minerals, Inc., be found secondarily liable to the plaintiffs herein.

## THIRD COUNT

Defendant, Windsor Minerals, Inc., hereby demands common law and contractual indemnification both expressed and implied from the co-defendants.

## FOURTH COUNT

The defendant, Windsor Minerals, Inc., further demands and makes a claim for indemnification against the co-defendants in the event it is deemed that they were manufacturers and distributors to this defendant of products alleged

IMAN, HERMAN
LITMAN, LEVITT
FEINSON P.A.

by the plaintiffs to give rise to liability under theories of strict liability, warranty and products liability.

## ANSWER TO ALL CROSSCLAIMS

The defendant, Windsor Minerals, Inc., denies any and all Crossclaims for Contribution and Indemnification filed or to be filed against this defendant in the within action.

## DEMAND FOR ANSWERS TO INTERROGATORIES

This defendant hereby makes demand upon the plaintiffs for answers to interrogatories (Standard Form A) as directed by Order of the Honorable John E. Keefe, J.S.C., dated January 25, 1982. These interrogatories may be obtained from the Court upon request.

## JURY DEMAND

Defendant, Windsor Minerals, Inc., hereby demands a trial by a six man jury on all issues in the above captioned matter.

## DEMAND FOR STATEMENT OF DAMAGES

PLEASE TAKE NOTICE that pursuant to Rule 4:5-2, the Defendant filing this Answer requires that within five days you furnish its attorney with a Statement of the amount of damages claimed.

## CERTIFICATION

I hereby certify that a copy of the within Answer was served within the time prescribed by Rule 4:6, and that a true copy of same has been served upon my adversary by first class mail on even date hereof.

NEWMAN, HERMAN, SALTMAN, LEVITT & FEINSON
Attorneys for Defendant, Windsor Minerals

BY: _____
EDWARD H. HERMAN, ESQ.

Date: September 30, 1986

HERMAN
/ LEVITT
ON P.A.

CERTIFICATION

PURSUANT TO RULE 4:5-1

Defendant hereby certifies the matter in controversy is not the subject of any other action pending in any Court, or of a pending arbitration proceeding and no other action or arbitration proceeding is contemplated. To the best of the defendant, Windsor Minerals, Inc., knowledge, there are no other parties who should be joined in this action.

EDWARD H. HERMAN, ESQ.

EWMAN, HERMAN,
ALTMAN, LEVITT
& FEINSON, P.A.

RECD. & FILED
SUPERIOR COURT
OF NEW JERSEY

JAN 13 1987

M.V. 24
JOHN M. MAYSON
CLERK

*Attorney(s):*   LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL

*Office Address & Tel. No.:*   2 Lincoln Hwy., Edison, NJ 08818

*Attorney(s) for*  Plaintiffs      (201) 494-2727

---

ALEX YUHAS and JEAN YUHAS,
his wife

                    *Plaintiff(s)*

            *vs.*

E & B MILL SUPPLY, et als.


                    *Defendant(s)*

*SUPERIOR COURT OF NEW JERSEY*

MIDDLESEX          COUNTY

LAW          DIVISION


*DOCKET NO.* L-029706-84

*CIVIL ACTION*

Stipulation of Dismissal

with prejudice
(as to defendant, Windsor Minerals, Inc.)

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party.*

*Dated:*   January 6        19 87  .

NEWMAN, HERMAN, SALTMAN, LEVITT
& FEINSON

*By* _____

Edward H. Herman
*Attorney(s) for Defendant(s)*  Windsor
Minerals, Inc.

LEVINSON, CONOVER, AXELROD, WHEATON
& GRAYZEL

*By* _____

Ronald B. Grayzel
*Attorney(s) for Plaintiff(s)*

Copyright© 1969 by ALL-STATE LEGAL SUPPLY CO.
One Commerce Drive, Cranford, N. J. 07016

Exhibit 173

```
                                              Page 1

 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION - MIDDLESEX COUNTY
 2              DOCKET NO. MID-1809-17AS
                APPELLATE DOCKET NO._____
 3
 4    DOUGLAS AND ROSALYN BARDEN,      )
                                       )  TRIAL
 5              Plaintiff,             )
                                       )
 6              v.                     )
                                       )  (VOLUME 1 OF 2)
 7    BRENNTAG NORTH AMERICA, et al., )
                Defendants.            )
 8    ----------------------------- )
      DAVID CHARLES ETHERIDGE AND      )
 9    DARLENE PASTORE ETHERIDGE,       )  MID-L-0932-17AS
                                       )
10              Plaintiffs,            )
                                       )
11              v.                     )
                                       )
12    BRENNTAG NORTH AMERICA, et al., )
                                       )
13              Defendants.            )
      ----------------------------- )
14    D'ANGELA McNEILL-GEORGE,         )
                                       )  MID-L-7049-16AS
15              Plaintiff,             )
                                       )
16              v.                     )
                                       )
17    BRENNTAG NORTH AMERICA, et al., )
                                       )
18              Defendants.            )
      ----------------------------- )
19    WILLIAM AND ELIZABETH RONNING,   )
                                       )  MID-L-6040-17AS
20              Plaintiffs,            )
                                       )
21              v.                     )
                                       )
22    BRENNTAG NORTH AMERICA, et al., )
                                       )
23              Defendants.            )
24
25    Job No. NJ3446618
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 2

```
 1
 2          Place:  Middlesex County Courthouse
                    56 Paterson Street
 3                  New Brunswick, New Jersey  08903
 4
            Date:   Tuesday, July 23, 2019
 5                  9:00 a.m.
                    (Volume 1 of 2)
 6                  (Pages 1 - 200)
 7
 8
 9
10
11  Before:
12          Hon. Ana C. Viscomi, J.S.C.
13
14
15
16
17  TRANSCRIPT ORDERED BY:
18          MOSHE MAIMON ESQ.
            LEVY KONIGSBERG
19
20
21
            SILVIA P. WAGE, CCR CRR
22          PRIORITY ONE
            290 West Mount Pleasant Avenue
23          Livingston, New Jersey  07039
            (718) 983-1234
24          E-mail:  P1steno@veritext.com
25
```

Page 3

```
 1  A P P E A R A N C E S:
 2
    CHRISTOPHER PLACITELLA, ESQ.
 3  COHEN PLACITELLA & ROTH
    127 Maple Avenue
 4  Red Bank, New Jersey  07701
    -and-
 5  MOSHE MAIMON, ESQ.
    LEVY KONIGSBERG
 6  800 Third Avenue
    11th Floor
 7  New York, New York  10022
    -and-
 8  CHRIS J. PANATIER, ESQ.
    SIMON GREENSTONE PANATIER
 9  1201 Elm Street
    Suite 3400
10  Dallas, Texas  75270
    Attorneys for Plaintiffs, Douglas and
11  Rosalyn Barden, Charles Etheridge and
    Darlene Pastore Etheridge, D'Angela
12  McNeill-George, William and Elizabeth
    Ronning
13
14  DIANE P. SULLIVAN, ESQ.
    JACK NOLAN, ESQ.
15  WEIL GOTSCHAL & MANGES LLP
    17 Hulfish Street
16  Suite 201
    Princeton, New Jersey  08542
17  -and-
    JOHN C. GARDE, ESQ.
18  McCARTER & ENGLISH
    Four Gateway Center
19  100 Mulberry Street
    Newark, New Jersey  07102
20  Attorneys for Defendants Johnson & Johnson,
    and Johnson & Johnson Consumer, Inc.
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2  WITNESS:  JOHN HOPKINS            PAGE
 3  CONTINUED DIRECT EXAMINATION BY MR. PANATIER    6
 4            E X H I B I T S
 5  NO.        DESCRIPTION        PAGE
 6  Plaintiff's Exhibit 1297        14
    Plaintiff's Exhibit 2049        115
 7  Plaintiff's Exhibit 2321        129
    Plaintiff's Exhibit 2416        43
 8  Plaintiff's Exhibit 2417        43
    Plaintiff's Exhibit 2423        28
 9  Plaintiff's Exhibit 2434        21
    Plaintiff's Exhibit 2450        91
10  Plaintiff's Exhibit 2451        99
    Plaintiff's Exhibit 2452        93
11  Plaintiff's Exhibit 2454        102
    Plaintiff's Exhibit 2455        96
12  Plaintiff's Exhibit 2506        107
    Plaintiff's Exhibit 2525        137
13  Plaintiff's Exhibit 2536        140
    Plaintiff's Exhibit 2581        162
14  Plaintiff's Exhibit 2601        131
    Plaintiff's Exhibit 2669        165
15  Plaintiff's Exhibit 2723        176
    Plaintiff's Exhibit 2848        62
16  Plaintiff's Exhibit 2849        65
    Plaintiff's Exhibit 3051        161
17  Plaintiff's Exhibit 3083        151
    Plaintiff's Exhibit 3121        155
18  Plaintiff's Exhibit 3224        157
    Plaintiff's Exhibit 3441        82
19  Plaintiff's Exhibit 3446        188
    Plaintiff's Exhibit 3695-26     41
20  Plaintiff's Exhibit 3695-30     178
21
22
23
24
25
```

Page 5

```
 1            (Jury enters.)
 2            THE COURT:  Good morning, everyone.
 3  Please be seated.  Make sure cell phones are turned
 4  off.
 5            Today is July 23, 2019.  This is a
 6  continued trial in the matter of Douglas and Rosalyn
 7  Barden versus Johnson & Johnson, David and Darlene
 8  Etheridge versus Johnson & Johnson, D'Angela McNeill
 9  versus Johnson & Johnson and William and Elizabeth
10  Ronning versus Johnson & Johnson.
11            May I have appearances please for the
12  Plaintiffs.
13            MR. MAIMON:  Thank you.  Good
14  morning, your Honor.  Moshe Maimon, Chris Panatier
15  and Christopher Placitella for the Bardens, the
16  Etheridges, the Ronnings and Ms. McNeill.
17            THE COURT:  Thank you.  On behalf of
18  the Defendants, Johnson & Johnson and Johnson &
19  Johnson Consumer Incorporated.
20            MS. SULLIVAN:  Good morning, your
21  Honor.  Hi, everyone, Diane Sullivan and Jack Nolan
22  for J&J.
23            MR. NOLAN:  Good morning.
24            THE COURT:  So Members of the Jury
25  yesterday, we began with the direct examination of
```

1 Dr. John Hopkins, who is the corporate
2 representative for the Johnson & Johnson Companies.
3 We're going to continue with that today.
4      Whenever you're ready, Mr. Panatier.
5      MR. PANATIER:  Thank you, your Honor.
6      Good morning, everyone.
7 CONTINUED DIRECT EXAMINATION BY MR. PANATIER:
8   Q.   Good morning, Dr. Hopkins.
9   A.   Good morning.
10      THE WITNESS:  Good morning, Jury.
11      THE COURT:  Oh, I'm sorry, yes,
12 please distribute the notebooks.  The Jurors just
13 hand the envelopes back to the officer when you're
14 done, thank you.
15      And now whenever you're ready.  Thank
16 envelopes and put them to the side.  Thank you.
17      And now whenever you're ready.  Thank
18 you.
19 BY MR. PANATIER:
20   Q.   Alright.  Sir, yesterday I asked you
21 a question about whether or not Johnson & Johnson
22 understood that people would put powder in their
23 sheets to smell good or feel fresh, right?
24   A.   You did.
25   Q.   And did you say at that point you had

1 -- you were unaware of that ever happening?
2   A.   On a personal basis, I was not aware
3 that people did that.  But, you know, if you have
4 different information...
5   Q.   This will be Exhibit 3695.
6      MS. SULLIVAN:  Your Honor, can we
7 have a sidebar on this?
8      THE COURT:  Sure.
9      MS. SULLIVAN:  Thank you.
10      (Sidebar.)
11      MR. PANATIER:  3695-25.
12      THE COURT:  That's right.  I have
13 yesterday's copy.  So I will give one back to you,
14 just in case.  We'll spread it around.
15      MR. PANATIER:  So we located a copy
16 with a Bates Stamp.
17      THE COURT:  Hold on, hold on.
18      Okay.  So, for the record, this was
19 the issue that we explained yesterday with regard to
20 quote, unquote, "native" documents, which is the
21 first time I've ever heard of anything like that.
22      MR. PANATIER:  So we got one -- so
23 there's -- they produced -- there's got to be 30
24 copies of this in the production.  So we finally got
25 one with a Bates Stamp.

1      MS. SULLIVAN:  And, your Honor, we've
2 done investigation.  It is actually a J&J document.
3 My objection relates to the time frame.  2014
4 post-dates anybody's use in this case and so it's
5 not relevant.
6      THE COURT:  Okay.  So that's --
7      MS. SULLIVAN:  This is the e-mail
8 that's attached.
9      THE COURT:  Got it.  Okay.
10      MR. PANATIER:  Our argument is that
11 it's a foreseeable use.
12      MS. SULLIVAN:  2014? Stretch.
13      MR. PANATIER:  It's a realistic
14 foreseeable use.
15      THE COURT:  Look, there have --
16 certainly, in the course of this litigation, I've
17 read testimony from various individual, Plaintiffs
18 that have indicated that.  But in 2014 to say that
19 it's a foreseeable -- documents say that it's a
20 foreseeable use, I mean, unless you have something
21 else.
22      MR. PANATIER:  Well...
23      THE COURT:  This witness has never,
24 you know, heard of it.  It's 2014.  We're talking
25 about the various Plaintiffs' use going back

1 decades.  To say that this is foreseeable without
2 anything more --
3      MR. PANATIER:  Okay.
4      MS. SULLIVAN:  Thank you.
5      THE COURT:  Okay.
6      MS. SULLIVAN:  Thank you, your Honor.
7      (Sidebar ends.)
8 BY MR. PANATIER:
9   Q.   Alright.  Yesterday, I brought up
10 that we finished talking about Dr. Langer.  Now,
11 we're going to talk about the other Dr. L, Dr.
12 Lewin, okay?
13   A.   Yes.
14   Q.   And you're familiar with this -- with
15 the Dr. Lewin situation in the early '70s, right?
16   A.   Yes.
17   Q.   Now, Dr. Lewin was retained by the
18 FDA to test cosmetic talc samples, right?
19   A.   Yes.  They gave him that as a
20 project.
21   Q.   Right.  So, if you will turn to --
22 there is a tab marked August 3rd, 1972.  If you can
23 turn to that please.
24      (There is a discussion off the
25      record.)

Page 10

1    THE COURT:  I'm sorry, Counsel,
2 what's the year?  What's the date?
3    MR. PANATIER:  This is August 3rd,
4 1972, your Honor.
5    THE COURT:  Thank you.
6    MR. PANATIER:  And this is already in
7 evidence from last week.  It's Plaintiffs'
8 Exhibit 2852.  And then to help us, this is part of
9 our Exhibit 2852.
10 BY MR. PANATIER:
11    Q.    Here.
12    THE COURT:  Thank you.
13    A.    Thank you.
14    Q.    That's the back part of the exhibit.
15    So here we know that on August 3rd of
16 1972, Dr. Lewin issued his report and the FDA --
17 there you go.
18    Seymour Lewin communicated it to the
19 FDA, correct?
20    A.    Yes.
21    Q.    Okay.  And in this set, he had looked
22 at a 102 samples, right?
23    A.    Yes.
24    Q.    Now, he was a professor at NYU,
25 right?

Page 11

1    A.    He was, yes, at that time, yes.
2    Q.    He was a world-renowned mineralogist,
3 wasn't he?
4    A.    I don't know "world-renowned."  He
5 was well-respected.
6    Q.    Okay.  And you know that before he
7 was even retained by the FDA to do this work, he was
8 already working for the talc industry, correct?
9    A.    I didn't know that, no.  But, you
10 know --
11    Q.    We'll look at a document.
12    A.    If you can document it, I'll believe
13 you.
14    Q.    So he's got the product numbers on
15 the side.  And then if you turn to the back, he
16 lists out some of those different products.  There's
17 a product called Cashmere Bouquet.  We just heard
18 about that popular case.
19    And there's Sample 84, Shower to
20 Shower, right?
21    A.    Yes.
22    Q.    Okay.  By the time he was finished,
23 he had looked at close to a 195 different samples,
24 right?
25    A.    Yes.

Page 12

1    Q.    Okay.  Now, if you'll go to page...
2    A.    I've got 102 up to Page 6 but...
3    Q.    Right.  In this one he had looked at
4 102.
5    A.    Uh-huh.
6    Q.    And by the time he was done, by 1973,
7 he had looked at about 195 --
8    A.    Yeah.
9    Q.    -- correct?
10    A.    Yes, on the later, yes.
11    Q.    Right.  Now these are from the FDA,
12 so they don't number their pages.  But it is the
13 fifth page in.  It's this one here.
14    It says, "Products having small
15 amounts of chrysotile more than 1 percent but not
16 more than 5 percent by weight," right?
17    A.    Yes.
18    Q.    Do you see the sample 84, which is
19 Shower to Shower, is listed as having 5 percent
20 chrysotile, correct?
21    A.    You read what is written.
22    Q.    And sample 84 is Shower to Shower,
23 correct?
24    A.    I don't have the key.
25    Q.    We literally just looked at it.

Page 13

1    A.    I don't have the key here so...
2    Q.    Here it is.  Oh, that's 29, baby
3 powder.
4    A.    The key is on Page 10.
5    Q.    Right.  Shower to Shower, right, 84?
6    A.    Yes.  It's on Page 10.
7    Q.    And Shower to Shower is sample 84,
8 correct, Dr. Hopkins?
9    A.    That is what it states on Page 10.
10    Q.    So that's 72.
11    Now, that's August 3rd.
12    Let's skip all the way to July 31st
13 of '73.
14    MR. PANATIER:  This is Plaintiffs'
15 Exhibit 1297, your Honor.  I believe the Defense
16 offered their version, but we'll offer ours.
17 It's...
18    MS. SULLIVAN:  It's the same
19 document, right?
20    MR. PANATIER:  I believe it's the
21 same document, but just in case there's anything
22 missing.  We'll offer Plaintiff's Exhibit 1297.
23    THE WITNESS:  What was the date
24 again?
25    MR. PANATIER:  July 31st, 1973.

4 (Pages 10 - 13)

1      THE COURT:  Counsel, is there any
2  objection?
3      MS. SULLIVAN:  I'm not sure why we
4  need two of the same document, your Honor, but I
5  don't care.  No objection.
6      THE COURT:  So admitted as previously
7  admitted and readmitted again.
8      MR. PANATIER:  Thank you.
9      (Plaintiff's Exhibit 1297 was moved
10     into evidence.)
11  BY MR. PANATIER:
12      Q.    Before we look at that one -- you
13  found it?
14      A.    Yes, I found it.
15      Q.    The one with the seal?
16      A.    Yes.
17      Q.    The second part of the previous
18  document?
19      A.    Yes.
20      Q.    Let's take a look at that.
21      That's an FDA document provided through
22  FOIA, right, you see that?
23      A.    Yes.
24      Q.    If you turn to the second to last
25  page, just so we can get a full picture of Lewin's

1  analysis.  You can see that this is on New York
2  University letterhead.  Do you see that?
3      A.    Yes.
4      Q.    And it's got some other products.
5      Now, it looks like it's Products 13
6  through 38 on the side.  Do you see that, but it's
7  kind of cut off?
8      A.    On this version, it's 113 to 138.
9      Q.    Well, look on the next page.  You can
10  see that it's 113 through 138, but on the results it
11  looks like it's cut off, correct?
12      A.    Yes.
13      Q.    Okay.  So, just to get our bearings,
14  we know that 131 through 138 were also Johnson &
15  Johnson products, correct?
16      A.    Yes.
17      Q.    There's two medicated powders,
18  there's three Shower to Showers and it looks like
19  there's three baby powders, right?
20      A.    Yes.
21      Q.    Okay.  He tested a total of 11
22  Johnson & Johnson products, correct?
23      A.    On this project, yes.
24      Q.    Yes.  Okay.  We know that he was
25  doing XRD, correct?

1      A.    Yes.
2      Q.    XRD is the non-microscope analytical
3  tool that has a detection limit of about half a
4  percent, right?
5      A.    Yeah, .3 to .5 depending on the speed
6  at which you run the machine.
7      Q.    Alright, sir.
8      So now looking at July 31st, 1973,
9  now this was Lewin's final report, correct?
10      A.    I believe so.
11      Q.    Okay.  But let's look at what -- this
12  is from the FDA, correct, sir?
13      A.    Yes.
14      Q.    Okay.  Now let's look at what Dr.
15  Weissler says here.  He's at the FDA, true?
16      A.    Yes.
17      Q.    Okay.  It says, "I asked Dr. Lewin in
18  December of '71 to undertake asbestos analyses in
19  100 samples of cosmetic powders.  The scope was
20  expanded on two subsequent occasions to include a
21  total of 195.  I chose Dr. Lewin for this work
22  because he is an internationally-recognized expert
23  on mineralogical chemistry," right?
24      So, according to the FDA, he was an
25  internationally-recognized expert on mineralogical

1  chemistry, correct?
2      A.    Yes, you read what was written.
3      Q.    Yeah.  "And because he is a member of
4  the academic community and, therefore, likely to be
5  impartial in a confrontation between industry and
6  government.  Furthermore, his competence had
7  previously been recognized by industry by virtue of
8  their own use of him as a consultant which appeared
9  to confer a desirable immunity against possible
10  industry attacks on the validity of the results."
11      Now, we know that Dr. Lewin was not
12  immune to attacks from industry, correct?
13      A.    Yes.
14      Q.    Okay.  So let's look at how these
15  results evolved, okay.
16      So here's sample 84.  If you go to
17  the page at the bottom, there's a Bates Stamp
18  HHS220, right?  And 73 he goes from 5 percent to
19  questionable, right?
20      A.    Yes.
21      Q.    Alright.  In 29 and 30 on Page 226 --
22  oh, sorry, 29 and 30 are J&J Baby Powder, correct?
23      A.    I believe they were, yes.
24      Q.    J&J Baby Powder and medicated powder.
25      And then here's the list again.  We

Page 18

1 can see 131 to 138 are the J&J products, correct?
2     A.    Yes.
3     Q.    They all went to ND, non-detect,
4 right, from 1972?
5     A.    On the final version that he's got
6 here, the later 1973 report it states non-detect.
7     Q.    Right.  In fact, for most of them --
8 here, we can look at them, right.
9           So let me go to 181 ND, 82, 83
10 question mark, 84, 85 ND, 186 question mark, right?
11     A.    Yes.
12     Q.    Okay.  Oh, let's look at 131 through
13 138.  Here we go.  Here we are.  Look, 131, 138
14 those are all ND now, correct?
15     A.    Yes.  On this final version, he's
16 written what he's written, ND.
17     Q.    Now, it says, X-ray diffraction,
18 right?
19     A.    Yes.
20     Q.    Now, you know that he only did the
21 X-ray diffraction the one time, correct?
22     A.    I don't know that, no.
23     Q.    Okay.
24     A.    I don't -- I mean, scientists --
25 yeah, I've done these sort of things and you often

Page 19

1 do duplicate or replicates --
2     Q.    You've done X-ray diffraction?
3     A.    No, no, with analyses you can do --
4 scientists may well do more than one just to check
5 the results.
6     Q.    My question isn't about what you do.
7           My question is about what Dr. Lewin did.  So
8 my question is, did Dr. Lewin do X-ray diffraction
9 more than once on these?
10     A.    I don't know.  That's not stated.
11     Q.    And between 1972 and 1973, what did
12 he do that brought him from finding asbestos in some
13 of these to non-detect in virtually all of them but
14 for 84 where there is a question mark?  What did he
15 do?
16     A.    I don't know what he did.  I can
17 speculate.  He checked again with his results.  But
18 that's no more than speculation.
19     Q.    Well, you said you've seen all the
20 relevant documents in the case, right?
21     A.    Well, his project was sponsored by
22 the Food and Drug Administration.
23           MR. PANATIER:  I'm going to object to
24 nonresponsive.
25     Q.    The question was --

Page 20

1           MR. PANATIER:  Well, I'll object to
2 nonresponsive, your Honor.
3           THE WITNESS:  Okay.
4           THE COURT:  The jury will not
5 consider that testimony.  It's stricken.
6           Please answer the question he asked.
7           THE WITNESS:  I beg your pardon.  Ask
8 the question again.
9 BY MR. PANATIER:
10     Q.    Yes.  You've reviewed all the
11 relevant documents in the case, right, you told us
12 that yesterday?
13     A.    I believe I have, yes.
14     Q.    Okay.  So, if you reviewed all the
15 relevant documents in the case, I expect that you
16 would have reviewed a document dated August 14th,
17 1972.  And there's two of them.  They should be
18 right next to each other in your binder, yeah, on
19 both of them.
20           That one and the next one, yes.
21           MR. PANATIER:  These will be
22 Exhibits 2423 and 2424.
23     Q.    Have you found those two dated
24 August 14, 1972?
25     A.    Yes.

Page 21

1     Q.    Okay.  Let's go to the one -- since
2 they have the same date, let's go to the one that
3 says, "talc asbestos summary of FDA meeting
4 8/11/72," to Dr. R.A. Fuller."  Do you see that?
5     A.    Yes.
6     Q.    Okay, good.  Now, that is a Johnson &
7 Johnson document, do you see it's from W. Nashed to
8 R.A. Fuller?
9     A.    It is, yes.
10           MR. PANATIER:  Okay.  We offer this
11 into evidence, Exhibit 2424.
12           MS. SULLIVAN:  No objection.
13           THE COURT:  So admitted.
14           (Plaintiff's Exhibit 2434 was moved
15       into evidence.)
16 BY MR. PANATIER:
17     Q.    This is the document we're looking at
18 here, sir.  And we know that this is, approximately,
19 11 days after Lewin's initial report comes out.  So
20 they have a meeting with the FDA on 8/11/72, which
21 is eight days after the Lewin report is sent to FDA,
22 right?
23     A.    Yes, it's eight days, yes.
24     Q.    J&J has notice of it pretty quick,
25 don't they?

6 (Pages 18 - 21)

Page 22

1     A.     Well, obviously, yes.
2     Q.     Okay.  So his summary says, "The
3 CTFA, FDA and Johnson & Johnson meeting can be
4 summarized as follows."  And they have a lot of
5 stuff.  They provided their own data on Shower to
6 Shower that they say it is free of chrysotile,
7 right?
8     A.     Yes.
9     Q.     They say that Dr. Lewin didn't agree
10 with McCrone's interpretation of the X-ray data;
11 however, he could not satisfactorily explain the
12 absence of chrysotile asbestos in the electro
13 microscopy grids.  He said it may be asbestos
14 growing inside the plates on top.
15           They summarize a lot of stuff here,
16 right?
17     A.     Yes.
18     Q.     What they say here is, "On the basis
19 of our data, CTFA was able to say that the Lewin
20 report is incomplete since it relied only on X-ray
21 assay, which must be confirmed by microscopy."
22           So what they're saying is, if you're
23 going to do X-ray you have to confirm it by optical
24 microscopy, correct?
25     A.     Yes.

Page 23

1     Q.     Now, let's skip ahead.  In 1976
2 Johnson & Johnson and the CTFA adopt J4-1, correct,
3 which is the industry analytical standard for talc
4 and asbestos, right?
5     A.     It is, yes.
6     Q.     Okay.  That method is XRD and then
7 only if there's a positive do you go to optimal
8 microscopy, correct?
9     A.     Yes.
10     Q.     Okay.  Yet here in 1972, Johnson &
11 Johnson is saying that X-ray assay must be confirmed
12 by microscopy, correct?
13     A.     Yes.
14     Q.     Okay.  "Dr. Schaffner asked Dr. Lewin
15 to tell the group what work he proposes to confirm
16 his X-ray findings.  After some discussion Dr. Lewin
17 said that to be able to say that a sample contains
18 asbestos, the X-ray results have to be confirmed by
19 a light microscopy.  If no asbestos tremolite or
20 chrysotile is seen, the sample is declared free of
21 asbestos.  In subsequent discussion, Mr. Ian Stewart
22 pointed out that light microscopy may not detect
23 chrysotile fibers."
24           Now what was the chief type of fiber
25 that Dr. Lewin had said was in the Johnson & Johnson

Page 24

1 products?
2     A.     He claimed he saw -- he observed
3 chrysotile.  He claimed that, yes.
4     Q.     Right.  And Ian Stewart from McCrone
5 said that light microscopy may not detect
6 chrysotile, correct?
7     A.     He stated what he stated.
8     Q.     Right.
9     A.     He didn't specify whether it's
10 optical light or polarized light.  He just uses the
11 word light microscopy.
12     Q.     I didn't ask you what type of light
13 microscopy.
14           He said light microscopy may not
15 detect chrysotile fibers, correct?
16     A.     Correct.
17     Q.     And look at what Dr. Weissler for the
18 FDA, what he says.  "Dr. Weissler said that they
19 recognized that some samples will be passed on that
20 basis but they are willing to live with that,"
21 right?
22     A.     Well, what is written is what Dr.
23 Weissler stated back in 1972.
24     Q.     Meaning, that they accept that some
25 chrysotile will not be seen, correct?

Page 25

1     A.     What Dr. Weissler and FDA stated is
2 what he stated.
3     Q.     Okay.  And so he then says, "Dr.
4 Schaffner" -- who is at the FDA, is he not?
5     A.     Yes, he was.
6     Q.     (Continuing.) "Said that this
7 procedure will be adopted in the proposed policy
8 statement.  He asked if anyone present had any
9 toxicological objections to the allowance of
10 1 percent weight for weight asbestos and talc.  No
11 objections were raised"; is that correct?
12     A.     At that particular meeting, that is
13 what is written.
14     Q.     Johnson & Johnson was at this
15 meeting, right?
16     A.     Yes.  I believe they were.
17     Q.     Right.  This is Johnson & Johnson's
18 memo of the meeting, correct?
19     A.     There was a lot of people there.  But
20 I believe they were there, yes.
21     Q.     Okay.  Well, let's just -- just so we
22 are clear, right, CTFA, FDA and Johnson & Johnson
23 meeting, right?
24     A.     Yes.
25     Q.     They wouldn't call it a Johnson &

7 (Pages 22 - 25)

1 Johnson meeting if they weren't there?

2    A.    No, it was a CTFA and a Food and Drug

3 Administration meeting.

4    Q.    You told us yesterday that Johnson &

5 Johnson's stated policy is zero tolerance for

6 asbestos, correct?

7    A.    That is the policy, yes.

8    Q.    Here, Schaffner for the FDA says

9 that -- "he asked if anyone present had any

10 toxicological objections to the allowance of

11 1 percent asbestos in talc.  No objections were

12 raised," correct?

13    A.    Well, that's what Dr. Schaffer --

14 Schaffner wrote.

15    Q.    Are you saying that Johnson & Johnson

16 did object, but it wasn't recorded?

17    A.    I don't know.  I wasn't there in

18 1972.

19    Q.    If Johnson & Johnson has a zero

20 tolerance policy for asbestos, why would they not

21 object when the FDA said, we're going to allow

22 1 percent asbestos in talc?

23    A.    I can't answer that.  All I can say

24 is they had and still have a zero tolerance policy.

25    Q.    But the reality is outside of what

1 they say, they really didn't because we have the

2 evidence right here.  The FDA has said 1 percent

3 will be allowed and no objections were raised; isn't

4 that true?

5        MS. SULLIVAN:  Objection, lawyer

6 argument, your Honor.

7        THE COURT:  Overruled.

8        You can answer.

9        THE WITNESS:  The document states

10 what Dr. Schaffner FDA stated, period.

11 BY MR. PANATIER:

12    Q.    And what Johnson & Johnson didn't

13 state, an objection, right?

14    A.    Well, it said no objections were

15 raised.

16    Q.    Let's go down here.  "We obtained an

17 agreement with Dr. Schaffner and Lewin to allow Ian

18 Stewart to interact with Dr. Lewin to resolve the

19 differences on Shower to Shower findings."

20        Now, Ian Stewart was a consultant to

21 Johnson & Johnson, right?

22    A.    Yes.

23    Q.    Okay.  So that's the first memo from

24 that day by Dr. Nashed.  If you'll look at the next

25 one also dated the same date.  Have you found it?

1    A.    Yes.

2    Q.    Okay.  Alright.  This one is also by

3 Dr. Nashed, right?

4    A.    Yes.

5    Q.    August 14th, 1972, correct?

6    A.    Correct.

7        MR. PANATIER:  This is Exhibit 2423,

8 your Honor.  We offer it into evidence.

9        MS. SULLIVAN:  No objection.

10        THE COURT:  Admitted.

11        (Plaintiff's Exhibit 2423 was moved

12    into evidence.)

13 BY MR. PANATIER:

14    Q.    This is Dr. Nashed writing a memo to

15 file.  We've seen one of these before, right?

16    A.    We have, yes.

17    Q.    Okay.  This is more of a sort of

18 summary of what individual people said, correct?

19    A.    It appears to be, yes.  It's their

20 comments at a particular meeting, Food and Drug

21 Administration, yes.

22    Q.    Now, Mr. Merritt was head of the

23 CTFA, correct?

24    A.    I don't know.  I don't know at that

25 time.  He was certainly part of CTFA.

1    Q.    Okay.  Let's see what Merritt says.

2 "It is unfair to select samples at random and

3 release information by brand name.  This is not an

4 industry survey but an industry sampling.  If the

5 results are in error, the FDA will have to apologize

6 later.  Also the release of information will cause

7 economic hardships."

8        Now, it would only cause an economic

9 hardship if the information showed that there was

10 asbestos in the product, right; if it said it was

11 asbestos free, there would be no economic hardship,

12 right?

13    A.    Well, if the information was

14 factually correct, right.

15    Q.    Okay.  He suggested that if the FDA

16 releases anything it should be by code number.  So

17 not by brand name, right?

18    A.    Well, he's written what he's written.

19    Q.    Okay.  Schaffner says, "Our lawyers

20 say we have to release the actual names," right?

21    A.    Again, you're reading what he wrote.

22    Q.    Okay.  Merritt says, "This is not

23 legally the case.  We reserve the right to legal

24 action by the CTFA."

25        So they're threatening legal action

Page 30

1 against the FDA, correct?
2     A.    Well, they have an opinion and Dr.
3 Schaffner had an opinion.
4     Q.    Okay.  Alright.  So let's see what
5 they say about Dr. Lewin.  Dr. Lewin in responding
6 to Johnson & Johnson says, "Knowing Johnson &
7 Johnson, I repeated my work on Shower to Shower last
8 night using stefs scanning.  I find that my initial
9 result is confirmed," right?
10     A.    That's what he stated.
11     Q.    Now, on the Shower to Shower, he
12 reported finding asbestos, correct?
13     A.    He claimed to have found -- he
14 claimed to have found chrysotile.
15     Q.    And he said, "I know these guys, so I
16 repeated my work last night.  I verified it," right?
17     A.    Well, that's what he wrote.
18     Q.    Dr. Nashed from J&J says, "We didn't
19 find any asbestos in Shower to Shower," right?
20     A.    Yes.
21     Q.    Okay.  Interestingly, Dr. Schaffner
22 says at one point, "I understand that talc can be
23 purified to remove asbestos, looking at Nashed."
24 And then someone said -- from Whitaker Clark &
25 Daniel says, "This cannot be done.  The mine must be

Page 31

1 substantially free of asbestos."  And Johnson &
2 Johnson agrees with that, correct?
3     A.    Absolutely, yes.
4     Q.    Right.  If there is asbestos present,
5 there's not a process that can remove it all from
6 the talc, correct?
7     A.    Correct.
8     Q.    Okay.  And then Avon says, "We don't
9 know if our supply has less than 1 percent of
10 asbestos.  But this isn't an Avon case."
11         Schaffner, "No, I think all samples
12 must be confirmed.  Lewin finally suggested that the
13 samples be examined by light microscopy and if the
14 asbestos is not seen, the sample will be declared no
15 detectable asbestos."
16     Right, that's that "ND" we've seen, correct?
17     A.    Yes, looking at it by light, yes.
18     Q.    Not withstanding the X-ray finding.
19 Dr. Stewart -- now, in the previous memo, Dr. Nashed
20 says that Dr. Stewart says something about light
21 microscopy, correct?
22     A.    He used the word "light microscopy."
23     Q.    Right.  Dr. Stewart said or Ian
24 Stewart said, "Light microscopy may not detect
25 chrysotile fibers," correct?

Page 32

1     A.    That's what he states -- stated.
2     Q.    And here he -- that's verified, "The
3 light microscopy is not capable of detecting fine
4 chrysotile fibers," correct?
5     A.    That's what he stated.
6     Q.    Right.  Dr. Weissler, "I understand
7 that some samples will be passed even though they
8 contain such fibers but we are willing to live with
9 it," right?
10     A.    Again, you're reading what he stated.
11     Q.    Dr. Schaffner from the FDA, "The
12 policy will depend on X-ray, which is sensitive to
13 more than 1 percent asbestos."
14         So X-ray, right, that's XRD, correct?
15     A.    It is, yes.
16     Q.    Here they're saying it's sensitive
17 only to 1 percent, right?
18     A.    At the time it was.
19     Q.    Meaning, if there's asbestos present
20 less than 1 percent, it's not going to be seen,
21 right?
22     A.    At that time, that was the case by
23 X-ray diffraction.
24     Q.    Again, does anybody object from a
25 toxicological point of view, no objections, right?

Page 33

1     A.    Well, I wasn't at that meeting.
2     Q.    The people who were say nobody
3 objected to that?
4     A.    Well, that's what's stated in that
5 report.
6     Q.    Okay.  And so industry said, Lewin
7 you've got to verify your results, right?
8     A.    Are you reading from...
9     Q.    We just went over it on the previous
10 document right here.  "On the basis of our data,
11 CTFA" -- of which Johnson & Johnson was a member,
12 correct, sir?
13     A.    Yes.
14     Q.    (Continuing.) "Was able to say that
15 the Lewin report is incomplete since it relied on
16 X-ray only.  It has to be confirmed by microscopy,"
17 correct?
18     A.    Correct.
19     Q.    They insisted upon that, correct?
20     A.    That's what was written.
21     Q.    Right.  At the same time they know
22 that the light microscopy is not capable of
23 detecting the chrysotile, right?  Correct, sir?
24     A.    On the previous -- yeah, that's what
25 is stated.  But on the previous one it uses the word

9 (Pages 30 - 33)

Page 34

1 "microscopy." Certainly, by 1972 Johnson & Johnson
2 were using transmission electron microscopy.
3        MR. PANATIER: I'm going to object as
4 nonresponsive.
5        THE COURT: Doctor, could you please
6 just answer the question being asked.
7        THE WITNESS: Yes.
8        THE COURT: Thank you.
9 BY MR. PANATIER:
10    Q.    What they used here was not
11 transmission electron microscopy at all, correct?
12    A.    Let's go back again.
13    Q.    Sir, let me just ask you a question.
14    You said yesterday that you had reviewed all
15 of the relevant documents in the case, correct?
16    A.    Yes.
17    Q.    I've shown you these documents
18 before, haven't I?
19    A.    You have, yes.
20    Q.    In person, at your deposition?
21    A.    Yes.
22    Q.    You know that they're not talking
23 about transmission electron microscopy here,
24 correct?
25    A.    Ian Stewart was not talking about

Page 35

1 transmission electron microscopy, no.
2    Q.    What the industry said was, Lewin you
3 have to follow up with light microscopy, correct?
4    A.    Would you put that back on the screen
5 so --
6    Q.    I will put it up again, sure.
7    A.    I don't want to give a false
8 statement.
9    Q.    "Confirmed by microscopy," correct?
10    A.    Yeah, that was the point I was trying
11 to make. It said it must be confirmed by
12 microscopy.
13    Q.    Yes. And in the discussion they're
14 clearly talking about Lewin doing light microscopy.
15 "In subsequent discussion Ian Stewart pointed out
16 light microscopy may not detect chrysotile fibers.
17 Weissler said they recognize some samples will be
18 passed on that basis but willing to live with it,"
19 correct?
20    A.    Yes.
21    Q.    Okay. We know that Lewin concludes
22 by saying, "I'll do light microscopy. If I don't
23 see it, I'll say non-detect," correct?
24    A.    I believe that was what he stated,
25 yes.

Page 36

1    Q.    Okay.
2    A.    He didn't have...
3    Q.    Again, you have two documents here
4 where Johnson & Johnson is given an opportunity to
5 object to something that is only sensitive to 1
6 percent, right, XRD?
7    A.    Yes.
8    Q.    Right?
9    A.    Yes.
10    Q.    And they are given an opportunity to
11 object to using light microscopy but they all accept
12 it, don't they?
13    A.    On that part of the phraseology, I,
14 you know, I don't know whether you are going to go
15 on to Page 3 of the...
16    Q.    Which one? What do you want to look
17 at?
18    A.    Well, it's part of this whole
19 documentation of what was said and what they did, on
20 Page 3, which is top of Page 358. He does talk --
21 and that's what I was trying to say -- "I suggested
22 he look at a sample by EM."
23    Q.    Where are you?
24    A.    It's Bates No. ending 3555.
25    Q.    I have that. Where are you?

Page 37

1    A.    Okay. The penultimate paragraph on
2 the bottom said, "During lunch I discussed with Dr.
3 Lewin" -- and then he goes on to say -- "I suggested
4 he look at our sample by EM."
5    Q.    Right.
6    A.    And I believe -- that's what I was
7 just trying to say, that they weren't just talking
8 about optical in the discussion.
9    Q.    Dr. Nashed invited Dr. Lewin to look
10 at a sample, a sample by EM, not all of his testing.
11    You understand that this entire thing
12 was about all -- confirming, as they say, all of the
13 testing he had done, correct?
14    A.    Yes.
15    Q.    And it was set to be confirmed, as
16 they put it, by optical microscopy, you understand
17 that, right?
18    A.    At that part of the meeting, yes.
19    Q.    Dr. Lewin never confirmed his results
20 by EM, correct?
21    A.    No --
22    Q.    Okay.
23    A.    -- but I was just trying to explain
24 that they did talk about it at that meeting.
25    Q.    They talked about all sorts of things

10 (Pages 34 - 37)

Page 38

1 at the meeting. But that's what Dr. Lewin was asked
2 to do, was it?
3          MS. SULLIVAN: Objection, your Honor,
4 lawyer argument.
5          THE COURT: Overruled.
6          You can answer it.
7 BY MR. PANATIER:
8    Q.    Correct, sir?
9    A.    Lewin was asked to look at it by
10 light microscopy.
11    Q.    Right. And so, when he comes back in
12 1973 and a bunch of his chrysotile results become
13 question marks or non-detects, right, we have a
14 reasonable explanation as to why, because Ian
15 Stewart from McCrone told us the light microscopy
16 will not resolve the fine chrysotile fibers,
17 correct?
18    A.    Again, I'm not -- I mean, you are
19 stating what was stated, correct.
20    Q.    Right.
21    A.    But I'm not a microscopist, so I
22 don't want to speculate.
23    Q.    Ian Stewart was, though?
24    A.    Ian Stewart was, yes.
25    Q.    Alright. You can set that aside.

Page 39

1          And then Dr. Lewin was -- he wrote a
2 letter to the editor where he said -- he said --
3 you're familiar with this, right?
4    A.    Yes.
5    Q.    Right. It's marked 1973. I think
6 this is already in evidence from last week. It's a
7 Defense exhibit. I'll just put it up.
8          Right, we saw this last week where he
9 says, "In the article referred to, I was erroneously
10 quoted as having reported that Johnson & Johnson
11 talcum powder contained 2 to 3 percent asbestos. In
12 actual fact, I reported that 11 of the samples of
13 the products of this company I found no asbestos in
14 nine of the samples and the other two samples fell
15 into the inconclusive category described above.
16 These results are not seriously at variance with
17 those reported by investigators retained by the
18 company."
19          So we're talking about McCrone, Colorado
20 School of Mines, Brown, all those guys, right?
21    A.    Yeah, Berger.
22    Q.    Berger?
23    A.    Professor Pooley.
24    Q.    Yes, okay.
25    A.    Yeah.

Page 40

1    Q.    Okay, yeah.
2          So, to summarize, Lewin does XRD, XRD
3 is only sensitive, according to this report, down to
4 1 percent, correct?
5    A.    According to that report.
6    Q.    He does get a good number of
7 positives for asbestos, correct?
8    A.    He gets positives for amphibole by
9 XRD.
10    Q.    Right, right. Then he reports in
11 '72?
12    A.    He reports in this -- yes,
13 amphiboles.
14    Q.    Eight days later they're meeting with
15 the FDA and they get the FDA to say, you've got to
16 confirm these but you have to do it by a different
17 method optical microscopy, correct?
18    A.    Yes.
19    Q.    And Johnson & Johnson's own
20 consultant at the meeting says, it's not going to
21 see fine chrysotile, correct?
22    A.    Well, that's what he stated at that
23 time.
24    Q.    And then the results go to non-detect
25 in the last report, correct?

Page 41

1    A.    Well, that's what Dr. Lewin --
2 Professor Lewin reported.
3    Q.    Now, he also said in that meeting,
4 eight days after the initial report that he had
5 confirmed the Shower to Shower report the night
6 before, right?
7    A.    That's what he stated.
8    Q.    Shower to Shower was sample 84,
9 right?
10    A.    Yes.
11          MR. PANATIER: Okay. Okay. Let's
12 look at -- this will be 3695-26. This is a FDA FOIA
13 document, your Honor.
14          THE COURT: Thank you.
15
16    Q.    Dr. Hopkins, this here --
17          MR. PANATIER: Your Honor, we'll
18 offer this into evidence. It's a memo of a meeting
19 August 11, 1972. It's the FDA FOIA response.
20          MS. SULLIVAN: No objection.
21          THE COURT: Admitted.
22          (Plaintiff's Exhibit 3695-26 was
23     moved into evidence.)
24 BY MR. PANATIER:
25    Q.    This is the FDA's own memo of their

11 (Pages 38 - 41)

Page 42

1 meeting, right?
2    A.    Yes.
3    Q.    Okay.  And you can see that Nashed,
4 Rolle, Hammer, Goudie and Stewart are all listed as
5 being there for Johnson & Johnson, right?
6    A.    Yes.
7    Q.    They have more people there than any
8 other company, right?
9    A.    There are representatives from many
10 other companies, yes.
11    Q.    But they have more people for their
12 company than any others did for theirs, right?
13    A.    Yes, they have a few more, yes.
14    Q.    I just wanted to see if you agreed
15 with this statement.  "There was no disagreement
16 between FDA industry scientists present at this
17 meeting about the potential safety hazard that the
18 presence of asbestos in talc containing cosmetic
19 product posses to the consumer."
20         Johnson & Johnson still agrees today
21 that that would pose a danger to the consumer,
22 correct, if there was asbestos in consumer talc?
23    A.    Yes.
24    Q.    Alright.  So let's go to October 27,
25 1972.  And you probably have four tabs with that

Page 43

1 date.  And they're all related.
2         (There is a discussion off the
3     record.)
4         MR. PANATIER:  Alright.  So these
5 will be Exhibits 2415, 2416, which are both in --
6 I'm sorry -- yeah, 2416, 2415 is already in
7 evidence.  2419 is already in evidence and then
8 2417.  So 2416 and 2417 we'll offer into evidence.
9         MS. SULLIVAN:  No objection.
10         THE COURT:  So admitted.
11         (Plaintiff's Exhibit 2416 was moved
12     into evidence.)
13         (Plaintiff's Exhibit 2417 was moved
14     into evidence.)
15 BY MR. PANATIER:
16    Q.    Now, Dr. Hopkins, if you'll turn to
17 -- yeah.  Yeah, that's a good place to start.
18         That is dated October 27, 1972,
19 right?
20    A.    Yes.
21    Q.    And this is McCrone's analysis of
22 Lewin's Johnson's Baby Powder, correct?
23    A.    It is, yes.
24    Q.    Okay.
25         THE COURT:  For the record, you're

Page 44

1 starting with 2416?
2         MR. PANATIER:  2415, your Honor.
3         THE COURT:  15, thank you.
4         MR. PANATIER:  Yes.
5 BY MR. PANATIER:
6    Q.    And inside he makes very clear what
7 they're looking at.  He says that, both samples, at
8 least, by their characterization contained an
9 insignificant amount of tremolite, less than
10 5 percent, right?
11    A.    Yes.
12    Q.    Okay.  And we know that these were
13 samples 108 and 109T, correct?
14    A.    Yes.
15    Q.    And McCrone -- now, we've heard a lot
16 about McCrone.  I think you have said they're
17 world-renowned.  They were head of the game.  They
18 knew what they were doing with microscopy, correct?
19    A.    Yes.
20    Q.    And they say here, the total
21 tremolite content of the two samples would be,
22 approximately, .5 percent for 108T and about .2 to
23 .3 percent for 109T, correct?
24    A.    Yes.
25    Q.    And they say in their conclusion, "A

Page 45

1 detailed examination of two samples of Johnson &
2 Johnson's Baby Powder 108T and 109T has shown this
3 material to be substantially free of asbestiform
4 minerals."
5         Now, "substantially free" doesn't mean all
6 free, does it?
7    A.    No.  You're reading what is written.
8 I'm not going to speculate on what they meant by
9 "substantially free."
10    Q.    Well, if it was free, they would say
11 "free," wouldn't they?
12    A.    They may do.
13    Q.    Right.
14    A.    They may do.
15    Q.    And, in fact, the very next line they
16 say, a few tremolite rods were observed in both
17 samples at a level less than .5 percent, right?
18    A.    Tremolite rods.
19    Q.    Right?
20    A.    Yes.
21    Q.    They say, "substantially free of
22 asbestiform minerals" and then they describe what
23 they found in the very next sentence.
24    A.    As tremolite rods.
25    Q.    Are you saying that's different

12 (Pages 42 - 45)

Page 46

1 than asbestiform minerals that they say in the
2 sentence right before that, sir?
3      A.    No, tremolite rods are not
4 asbestiform.
5      Q.    Where do you get -- are you a trained
6 geologist?
7      A.    I've read so much of those, thousands
8 of documents, that's where I've gained that
9 information.
10     Q.    Let's just see here.
11           So I want you to tell me --
12           MR. PANATIER:  You know what, your
13 Honor, permission for the witness to step down to
14 the chart.
15           THE COURT:  Sure.
16 BY MR. PANATIER:
17     Q.    And choosing any color you like, sir,
18 can you draw what you believe a rod looks like.
19 Show us a rod.
20     A.    It looks like my pen.
21     Q.    Okay.  So go ahead and draw it since
22 you're down here.
23     A.    (The witness complies.)
24     Q.    Okay.  Thank you.
25     A.    That's it.

Page 47

1      Q.    That's very good.  That's very good.
2 Did you go to art school?
3           And we're going to put -- I'll put
4 "rod" here; is that okay?
5      A.    Yes.
6      Q.    Okay.  Okay.  I'm sorry I got you
7 down here to just draw one line.  But now we know
8 what we're talking about.
9      A.    That's okay.  Now we know what we are
10 talking about.  Like I said, it looks like my pen.
11     Q.    Now, we know it was tremolite, right?
12     A.    Yes.
13     Q.    And we know that Johnson & Johnson's
14 definition of a fiber is something that is 3-to-1 or
15 longer, correct?
16     A.    A fiber?
17     Q.    That's correct.
18     A.    Yes, yes.
19     Q.    What you drew is certainly 3-to-1 or
20 longer.  It's about probably a hundred-to-1, isn't
21 it?
22     A.    That particular drawing is a rod,
23 which is not microscopically described as fibrous or
24 fibrous.
25     Q.    I'm going to draw a fiber; there.

Page 48

1 There's my drawing of a fiber.
2           Now what's the difference between my
3 fiber and your rod?
4      A.    This is where we get into the
5 expertise that are required from a microscopist to
6 explain the difference between a fibrous form of --
7 for asbestos or the non-fibrous form of tremolite or
8 those materials.
9      Q.    What we have here from McCrone is
10 McCrone says it's "substantially free," which means
11 it's not free of asbestiform minerals, correct?
12     A.    What is written is what is written.
13 It says, "substantially free of asbestiform
14 minerals."
15     Q.    If I draw a circle and I -- say it's
16 substantially colored in, it means it's not all the
17 way colored in, correct?
18     A.    You know, I'm not going to speculate
19 on what McCrone wrote long ago.
20     Q.    Hold on.  I'm just talking about my
21 circle right now.
22     A.    Okay.  You can talk about your
23 circle.
24     Q.    Okay.  So, if -- because we're just
25 trying to get your understanding straight, sir.

Page 49

1           So, if I substantially color in the
2 circle, I haven't colored in the entire circle, have
3 I?
4      A.    No.  But you're talking about
5 circles.
6      Q.    Can we agree that it's substantially
7 colored in?
8      A.    Again, it's -- you're playing word
9 games.  It is substantially colored in, not entirely
10 colored in.
11     Q.    I don't think I'm the one playing
12 "word games," sir.
13     A.    It's not entirely colored in.
14           MS. SULLIVAN:  Lawyer argument.
15     Q.    Can you just answer my question?
16           THE COURT:  Excuse me.  Not more than
17 one person at one time please, for the record.
18           The question, please.
19 BY MR. PANATIER:
20     Q.    The question is, sir, with regard to
21 the circle, so we can try to get our bearings and be
22 on the same ground, would you agree that it's
23 substantially colored in?
24     A.    If you are describing the circle,
25 yes.

13 (Pages 46 - 49)

Page 50

1    Q.    Okay.  Which means that part of it,
2  this little part down here, is not colored in,
3  right?
4    A.    The circle is not fully colored in.
5    Q.    What "substantially" means, is that
6  most of, but not all.  Can we agree with that
7  working definition of "substantial"?
8    A.    In relation to the circle, yes.
9    Q.    Okay.  Now, let's take that same
10  definition and let's apply it to what McCrone said.
11  They said "substantially free," which means most but
12  not all.  Can we agree that that's what that means?
13    A.    Again, I'm not going to speculate
14  what Ian Stewart wrote in 1970, whatever it was, as
15  to what he meant.
16    Q.    I --
17    A.    He wrote what he's spoken, "not
18  substantially free."
19    Q.    I'm sorry, sir.
20          I'm asking you whether or not we can
21  just apply plain English to the word
22  "substantially."  Can we do that together?
23          MS. SULLIVAN:  Objection, your Honor.
24  It's lawyer argument.
25          THE COURT:  Overruled.

Page 51

1          You can answer.
2    A.    We can apply "substantially free" and
3  that is what McCrone wrote.
4    Q.    It doesn't say all free or asbestos
5  free, does it?
6    A.    What it says is what it says,
7  "substantially free."
8    Q.    And if we -- we know that according
9  to Johnson & Johnson's own definition of fiber, it
10  is a particle of one of the six regulated minerals,
11  right?
12    A.    Yes.
13    Q.    That is greater than or equal to
14  3-to-1, right?  And that's from JM -- I'm sorry, TM.
15  And that has a J.  TM7024, right?
16    A.    On that particular definition, right.
17    Q.    That's their TEM definition for
18  asbestiform fibers, right?
19    A.    On their particular four-line
20  definition, yes.
21    Q.    Now, we know that this report was
22  changed, correct?
23    A.    It was revised when it was
24  re-evaluated, yes.
25    Q.    Because it says, do not use this

Page 52

1  report, right?
2    A.    Yes.
3    Q.    And this is now in evidence.  You can
4  see this is 2416.
5          This says "McCrone study being
6  redone," right?
7    A.    Yes.
8    Q.    If you turn to the other side of it,
9  it says, October 27, 1972.  "Here is our report on
10  the baby samples.  I hope to have the Shower to
11  Shower report out to you soon.  But something always
12  seems to break lose when I sit down to write it."
13  Okay.
14          Someone there at J&J says, it's being
15  redone, right?
16    A.    Yes.
17    Q.    And then there's addition, I guess,
18  once it comes in.  It says, new one is in the Master
19  talc file, right?
20    A.    Yes.
21    Q.    Where was the old one put?
22    A.    Well, the old one we just looked at.
23    Q.    Yeah, right.  It's present in the
24  courtroom right now.  But did they not put it in the
25  Master talc file?

Page 53

1    A.    I don't see why they wouldn't.
2    Q.    This was not sent to the FDA,
3  correct?
4          THE COURT:  For the record, when you
5  say, "this was not sent to the FDA"?
6          MR. PANATIER:  Thank you, your Honor.
7  BY MR. PANATIER:
8    Q.    Exhibit 2415.  The one that says, "do
9  not use this report," correct?
10    A.    I don't know.
11    Q.    Exhibit 2419 was sent to the FDA,
12  correct?
13    A.    I believe so, yes.
14    Q.    Okay.  Now, let's look at -- this is
15  the revised report, correct?
16    A.    Yes.
17    Q.    Now --
18    A.    They repeat -- they did the study
19  again.
20    Q.    Here now it says, "both samples
21  contain an insignificant amount of tremolite,"
22  right?
23    A.    Yes.
24    Q.    In the first version it says,
25  "insignificant amount," and they give the

14 (Pages 50 - 53)

1 percentage, correct?

2    A.    On the first version they claimed a

3 percentage, on the --

4    Q.    Now, they say --

5    A.    -- on the second version. They

6 dropped the word "percentages" and simply stated --

7 well...

8    Q.    A few isolated crystals?

9    A.    Oh, in the conclusion, they say

10 almost exactly the same thing. Are we...

11    Q.    That's fine. I was looking at the

12 front, but we can go to the conclusion. Here's the

13 conclusion from the first version, right?

14    A.    Yes.

15    Q.    Observed in both samples of less than

16 5 percent -- .5 percent, correct?

17    A.    Less than 0.5, yes.

18    Q.    And then they take that out in the

19 second one and say, "a few tremolite rods were

20 observed in both samples," correct?

21    A.    Yes. They say almost the same thing,

22 substantially free of asbestiform minerals --

23        MR. PANATIER: I'm going to object to

24 nonresponsive.

25        THE WITNESS: Yes, correct.

1        THE COURT: Overruled.

2        THE WITNESS: Correct.

3 BY MR. PANATIER:

4    Q.    Sir, look under "light microscopy."

5 Do you see there under "light microscopy"? You can

6 either look on the board, if you want, it might be

7 easier.

8    A.    No, I can see it.

9    Q.    In the revised version they say --

10 let's see -- "presence of tremolite and a few

11 individual crystals were found, some rod shaped,"

12 right?

13    A.    Yes.

14    Q.    In the original, they actually give

15 the percentages in each product, correct?

16    A.    Yes. On the second version they did

17 it again and weren't able to confirm the

18 percentages. They still stated that they found

19 tremolite rods.

20    Q.    And they even sent in a letter to J&J

21 saying, "here's our revised thinking, we couldn't

22 confirm our percentages," right?

23    A.    Yes, they checked again and they

24 could still see tremolite rods but could not confirm

25 percentages.

1    Q.    Okay. So this is McCrone. The best

2 lab in the world, we've heard?

3    A.    They did the study twice.

4    Q.    Well, that's what they say they did,

5 right?

6    A.    Yeah.

7    Q.    Okay.

8    A.    They did it again.

9    Q.    If you do a study again, you have a

10 new study, don't you?

11    A.    Yes.

12    Q.    But we don't have a new study here,

13 do we?

14    A.    Well, they're two separate studies

15 that came in on separate times.

16    Q.    Are they?

17    A.    Well, they're both separate.

18    Q.    Because it seems to me like there's

19 two versions and the second one is backdated to the

20 first, is it not?

21    A.    The second one they didn't change the

22 front page date. But they're two separate reports.

23    Q.    They replaced the report. If it was

24 two separate reports, right, you wouldn't say, don't

25 use this report, you would have two separate

1 reports, correct, sir?

2    A.    Who is "they"? Who wrote, "do not

3 use this report"?

4    Q.    Sir, Johnson & Johnson wrote "do not

5 use this report." You know that.

6    A.    Well, I don't know that. But someone

7 wrote it.

8        What I'm saying is that, you asked

9 the question, were there are two separate reports,

10 yes.

11    Q.    But this isn't two separate reports.

12 It's represented to be the same report.

13        Are they both titled "Examination of Johnson

14 & Johnson's Baby Powder"?

15    A.    They are.

16    Q.    Are they both dated 27 October '72?

17    A.    They are.

18    Q.    Okay. And they both are reporting on

19 the exact same two samples, 108 and 109T, correct?

20    A.    Yes.

21    Q.    And then one they're told, do not

22 use, right?

23    A.    Yes. They did a second version, a

24 second review, a second study, and issued a second

25 report.

Page 58

1    Q.    It's the same report, just backdated
2  to replace the first.  In fact, that's what these
3  words say, is it not?
4         MS. SULLIVAN:  Objection, your Honor,
5  lawyer argument.
6         THE COURT:  Objection overruled.
7         You can answer.
8    A.    Sorry.  I missed the question there.
9    Q.    It's the same report to be replaced
10  by the first.  In fact, it even says replaced by
11  another version.  It's not a -- this is not a second
12  report, is it?
13    A.    It depends on how you define "second
14  report."  There are two reports here, this one and
15  this one.
16    Q.    You know the do not the use --
17    A.    Yes.
18    Q.    -- stayed at Johnson & Johnson and
19  you know the second one to the FDA, right?
20    A.    The second one went to the FDA based
21  on a second study.
22    Q.    If you'll go to the next document
23  dated 10/27.  That's it.  That's it.  You've got it.
24    A.    Okay.
25    Q.    That's Exhibit 2417.  It's two-sided,

Page 59

1  okay.  On the one side it says, "revise report just
2  received," right?
3    A.    Yes, uh-huh.
4    Q.    And on the other side there's a note
5  from Nashed to Dr. Goudie, right?
6    A.    Yes.
7    Q.    And Nashed says, "I thought tremolite
8  was mistakenly identified in view of similarity to
9  sodium sesquihydrate," another chemical, correct?
10    A.    Yes.
11    Q.    And Al Goudie writes back, "There are
12  trace quantities present confirmed both by McCrone
13  and Bill Ashton."
14         Now, Bill Ashton was Johnson & Johnson,
15  right?
16    A.    Yeah.
17    Q.    "Levels are extremely low but
18  occasionally can be detected optically."  This is
19  not new, right?
20    A.    Yes.
21    Q.    And you and I know the issue of
22  tremolite in the baby powder was not new; it was
23  quite old by this point, correct?
24    A.    Yes.  This could be trace tremolite,
25  yes.

Page 60

1    Q.    And just because you said "trace,"
2  going back to Battelle, we know that it appeared
3  anywhere from trace up to 3 percent, right?
4    A.    On some of those early Battelle
5  studies.
6    Q.    Right.  We'll put that in the inbox.
7         Now, because we had that revised
8  report that was backdated -- and it was backdated,
9  was it not?
10    A.    I don't know.  They both carry the
11  same date.
12    Q.    Right.  Even though -- even though
13  the second version came later than October 27th,
14  correct?
15    A.    I don't know when the second
16  version -- they both carry the same dates, but there
17  was -- they were -- the second report was a repeat
18  of the experiments.
19    Q.    Johnson & Johnson actually took
20  liberty to revise reports of its consultants for
21  them, did it not?
22    A.    Revise, I'm not aware of revising.
23  You'd need to show me what you're talking about.
24    Q.    I will.  This is Exhibit 2848.  And,
25  sir, it is under the Tab 1976, June 2nd.  It's

Page 61

1  probably in the third binder is going to be my
2  guess.  Let me help you.  Yeah, it will be right
3  there.  There it is right there.  Got it?
4    A.    (No response.)
5    Q.    Okay.
6         THE COURT:  What was the date on
7  that?
8         MR. PANATIER:  June 2nd, 1976.
9  BY MR. PANATIER:
10    Q.    Okay.  Sir, if you could turn --
11  there's some handwriting on the cover of that
12  document, right --
13    A.    Yes.
14    Q.    -- on the first page?
15         And then there's a report on the second page
16  dated June 2nd, 1976.  Do you see that?
17    A.    Yes.
18    Q.    Okay.  And that is a letter from Gene
19  Greiger to Walter McCrone, correct -- or to, I'm
20  sorry, to Johnson & Johnson, correct?
21    A.    Yes.  Yeah.
22         MR. PANATIER:  We offer this into
23  evidence, your Honor.
24         MS. SULLIVAN:  No objection.
25         THE COURT:  So admitted.

16 (Pages 58 - 61)

Page 62

1          (Plaintiff's Exhibit 2848 was moved
2       into evidence.)
3 BY MR. PANATIER:
4      Q.     So let's turn to the second page that
5 has --
6          THE COURT:  I'm sorry.  And what's
7 the marking on this?
8          MR. PANATIER:  Yes, your Honor, this
9 is 2848.
10         THE COURT:  Thank you.
11 BY MR. PANATIER:
12     Q.     So let's turn to the second page
13 which is the sample.  And this is just a sample that
14 was run by McCrone.  They sent their results to J&J,
15 right?
16     A.     Yes.
17     Q.     Okay.  And they're looking at a talc
18 sample.  I don't think they identify what the
19 samples are.
20     A.     No.
21     Q.     But you can see there's some detail
22 in the middle paragraph about those samples.  They
23 found some talc ribbons.  They said found one fiber
24 which was not asbestiform, probably talc and they
25 summarized their results, right?

Page 63

1      A.     Yes.
2      Q.     Okay.  And then they -- on the next
3 pages they take photomicrographs, they take
4 pictures?
5      A.     They do.
6      Q.     Was McCrone an independent company?
7      A.     Yes.
8      Q.     Right.  Could they be influenced by
9 Johnson & Johnson?
10     A.     I don't believe so.
11     Q.     There's some of the -- there's some
12 of the pictures they sent along.
13         Now, let's go to the cover, right?
14 You see the front page, "note from Bill Ashton"?
15 Now he's Johnson & Johnson, right?
16     A.     Yes.
17     Q.     Okay.  I'll put our list of folks up
18 here.  "About 6-2-76 reports, delete second
19 paragraph, first and third only," right?  Right?
20 Signed "Gene," that's Gene Grieger, right?
21     A.     Yes.
22     Q.     And then there's a note that says,
23 "done," right?
24     A.     That's what it says, here, yes,
25 handwritten.

Page 64

1      Q.     They generated a report for Johnson &
2 Johnson.  Somehow Bill Ashton finds out about it,
3 tells them to delete the second paragraph, correct?
4      A.     Well, I'm not going to speculate
5 what -- any chain of events.
6      Q.     Well, it says it right there, right?
7      A.     This document says nothing more than
8 what it says.
9      Q.     Don't you agree it's pretty clear,
10 note from Bill Ashton, "About 6-2-76 reports, delete
11 second paragraph, first and third okay"?  That seems
12 pretty clear to me.
13     A.     Yeah, whether that actually happened,
14 I don't know.
15     Q.     I do.  So let's go to the next
16 document.  It's dated -- go to August 18, 1976.  Let
17 me see.  Actually, it may have the same date.  It
18 may have the same date.  Yes, it's this one right
19 here.  Sorry.
20         This is dated August 18, 1976,
21 correct?
22     A.     Yes.
23     Q.     It's from Gene Grieger to Johnson &
24 Johnson to Bill Ashton?
25         MS. SULLIVAN:  May I have a copy,

Page 65

1 Counsel?
2          MR. PANATIER:  Oh, I'm so sorry.
3 Here it is.  Yeah, here you go.  That's yours.
4 Sorry.
5 BY MR. PANATIER:
6      Q.     It's Exhibit 2849.  Have you had a
7 chance to look at that?
8      A.     Yes.
9      Q.     Okay.  And it has the Johnson &
10 Johnson Bates Stamp on it, correct?
11     A.     Yes.
12         MR. PANATIER:  We offer this into
13 evidence, your Honor.
14         MS. SULLIVAN:  No objection, your
15 Honor.
16         THE COURT:  Admitted.
17         (Plaintiff's Exhibit 2849 was moved
18      into evidence.)
19 BY MR. PANATIER:
20     Q.     So here's the report.  You see where
21 it says, "using TEM we examine 13 samples of talc
22 for asbestiform minerals submitted with your letter
23 dated 5, April '76"?
24     A.     Yes.
25     Q.     And this they were designated 1976 1

17 (Pages 62 - 65)

1 through 13 --
2    A.    Yes.
3    Q.    -- right?
4        Now, let's go to the original report.  Do
5 you see the paragraph here?  It's the identical
6 first paragraph.
7    A.    Yes.
8    Q.    And then the middle paragraph is
9 gone, correct?
10   A.    Yes.
11   Q.    And the conclusions, the conclusions
12 are...
13   A.    The same.
14   Q.    The same?
15   A.    Didn't find any asbestiform minerals.
16   Q.    Right.  But per Johnson & Johnson's
17 instruction, they deleted the entire middle part of
18 their report, right?
19   A.    Well, both --
20   Q.    Sir, can you answer the question,
21 please?
22   A.    Yes.  I mean, the second version
23 which came two months later is a condensed version,
24 yes.
25   Q.    Sir, here's my question --

1    A.    So the answer is, yes.
2    Q.    Yes.  Johnson & Johnson told them to
3 delete a paragraph and they did it and they reissued
4 their report, right?
5    A.    Well, there are two reports.
6    Q.    And this is Bill Ashton, right, to
7 Bill Ashton and it was Bill Ashton who called and
8 said, "delete the second paragraph," right?
9    A.    Yes.  He's, obviously, wanted a
10 condensed version, a shortened version.
11   Q.    Maybe he was into speeding things up.
12 But it resulted in a lot of information being taken
13 out, correct?
14   A.    But both versions are here.  There's
15 nothing -- no one is hiding it.
16   Q.    No one is hiding it?
17   A.    No, both versions are here.
18   Q.    Did Johnson & Johnson give me this
19 document, do you know?
20   A.    Where else?  Yes.
21   Q.    Do you know if I had to go to McCrone
22 to get it?
23   A.    I believe you got this from Johnson &
24 Johnson.
25   Q.    You think I got this one from Johnson

1 & Johnson to delete the second paragraph?
2    A.    Yeah, I don't know.
3    Q.    Because this one has the Johnson &
4 Johnson Bates Stamp, right?
5    A.    Yes.
6    Q.    Either way, wherever I got it --
7        MS. SULLIVAN:  Your Honor, just for
8 completeness, if Counsel can show the second page of
9 the document with the Johnson & Johnson Bates Stamp
10 on it.
11       THE COURT:  Counsel.
12       MR. PANATIER:  Sure.
13       Second page of this one?
14       MS. SULLIVAN:  Right here.
15       MR. PANATIER:  That's not a Johnson &
16 Johnson's Bates Stamp.
17 BY MR. PANATIER:
18   Q.    That -- JOJOMA2546 is the McCrone
19 Bates Stamp.  But, anyway, you see the Bates Stamp
20 and there's the J&J Bates Stamp?
21       Bottom line is, wherever I got it --
22       THE COURT:  Excuse me.
23       MR. PANATIER:  I'm sorry.
24       MS. SULLIVAN:  Your Honor, I just --
25       THE COURT:  Counsel, let's have a

1 discussion at sidebar.
2        (Sidebar.)
3        THE COURT:  I have no issue with
4 discussions at Counsel table, but they're little bit
5 too loud and they're getting picked up.  Okay.
6        MS. SULLIVAN:  I object to the
7 misrepresentation.  It says "JOJ" on it.
8        THE COURT:  Hold on, hold on.  And
9 what's your response?
10       MR. PANATIER:  My response is she's
11 wrong.  These are from McCrone.  I can prove it.
12 I've got affidavits.  For her to say these are
13 J&J's, well, she just doesn't know her documents.
14 It's patently clear.
15       THE COURT:  Okay.  Well, are you
16 going to do that?
17       MR. PANATIER:  I can -- if there is
18 an allegation or a reason to present to the Jury
19 that this is from McCrone instead of J&J, I'm happy
20 to do it.  I'll do it right now.
21       THE COURT:  I think you should.
22       MR. PANATIER:  Okay.  I will do it.
23       THE COURT:  Okay.
24       (Sidebar ends.)
25 BY MR. PANATIER:

Page 70

1    Q.    Just so we can be clear on where
2  these documents come from.  You see that Bates Stamp
3  JOJOMA2546, right?
4    A.    Yes.  Yes.
5    Q.    I'm just going to show the Court an
6  affidavit from McCrone.  Do you see that, "My name
7  is David Wiley.  I am of sound mind" --
8         MR. SULLIVAN:  Your, Honor, I'm going
9  to object because I haven't been shown the
10 affidavit.  I don't know what he's putting on the
11 screen.
12        MR. PANATIER:  She just asked me to
13 do it.
14        MS. SULLIVAN:  The practice is
15 usually to show it to --
16        THE COURT:  Show it to Counsel.
17        MS. SULLIVAN:  No objection, your
18 Honor.
19        THE COURT:  Continue.
20 BY MR. PANATIER:
21   Q.    You see how this says, "I'm David
22 Wiley.  I am one of the custodians of records from
23 McCrone & Associates."  Do you see that?
24   A.    Yes.
25   Q.    It says that they were served with a

Page 71

1  subpoena to produce documents.  Do you see that?
2    A.    Yes.
3    Q.    These are kept, it says, in response
4  to the subpoena and we produced records to
5  Plaintiffs identified in the attached Exhibit 1.
6  These are kept by McCrone in the regular course of
7  business and so on and so on.  Do you see that?
8    A.    Yes.
9    Q.    Signed April 23, 2018, right?
10   A.    Yes.
11   Q.    Okay.  And attached to this affidavit
12 are a list of documents, right, from McCrone?  You
13 see those Bates Stamps?
14   A.    Yes.
15   Q.    They have ones related to Cyprus,
16 Engelhard, Imerys, Johns Manville and Johnson &
17 Johnson, right?
18   A.    Yes.
19   Q.    And do you see here, the Johnson &
20 Johnson ones that McCrone produced are all with that
21 "JOJOMA" and then a number as you get down to the
22 possession of documents?
23   A.    Yes.
24   Q.    Okay.
25        (There is a discussion off the

Page 72

1    record.)
2    Q.    In fact, 2546 on the document I
3  showed you, do you see that?
4    A.    Yes.
5    Q.    It's right here 2546?
6    A.    Yes.
7    Q.    And it say there's 1,561 pages in the
8  sequence, right?
9    A.    Yes.
10   Q.    And this is number 1,410, right?
11   A.    Yes.
12   Q.    This came from McCrone --
13   A.    Okay.
14   Q.    -- right, not Johnson & Johnson?
15   A.    Okay.
16   Q.    But going back to my point which
17 wasn't about where it came from.
18        My point is even if this stayed in
19 Johnson & Johnson's files, right, the report that
20 was ultimately generated was missing the middle
21 paragraph per Johnson & Johnson's instructions; is
22 that right?  Can we agree on that?
23   A.    The report was ultimately generated,
24 did not include the middle paragraph.
25   Q.    Alright.  Do you know how many other

Page 73

1  reports generated by its consultants, these
2  apparently independent people that's been said, how
3  many more were altered by Johnson & Johnson?
4    A.    None that I know of.
5    Q.    Okay.  Let's talk about FDA testing
6  of the Lewin samples, okay.  This is already in
7  evidence.  It's Exhibit 2617.
8         Thank you.
9         We discussed some of this last week
10 with Dr. Weber, okay.  So the Jury has already seen
11 this.  It's in evidence.
12        Sir, you and I have been over -- if
13 you'll take a look at the board -- you and I have
14 been over this document before.
15        This is the FDA testing of the Lewin
16 samples, correct?
17   A.    Yes.
18   Q.    Okay.  And we're going to talk about
19 sample 84.  The FDA found tremolite asbestos in
20 sample 84, correct?
21   A.    Well, do we have the document in here
22 I can look at?
23   Q.    Yeah, of course.  So it will be dated
24 -- it should be dated 1973.  Because it covers a
25 range of dates, so we just put the year.  And if I

19 (Pages 70 - 73)

Page 74

1 can -- do you mind if I help you find it, because I
2 know what it looks like.
3     A.    Yeah.  It's in the binder.
4     Q.    Okay.  It probably is, yeah.  Here it
5 is.  There you go.
6           So, sir, if you will turn please to
7 the page at the top marked 670 -- you know what, I
8 think of a lot them are marked 679.  It's not the
9 page number.  It's the -- again, we have this issue
10 of the FDA not numbering pages.  It's about the
11 fifth page in, sir.  Have you found that?
12    A.    Yes.
13    Q.    Okay.  Okay.  So we know sample 84,
14 because we just talked about it with Lewin, was
15 Shower to Shower, right?
16    A.    Yes.
17    Q.    And we know that the FDA confirmed
18 that there was tremolite actinolite in sample 84,
19 true?
20    A.    Tremolite actinolite, yes.
21    Q.    Right?  It says it right there.  It
22 says that, sample 84 contained a 107 fibers of
23 tremolite actinolite per gram, right, or per
24 milligram?
25    A.    Yes, tremolite actinolite, yes.

Page 75

1     Q.    Okay.  And you and I can do the
2 simple math on this, right?  There are -- if it's
3 107 fibers -- by the way, 107 fibers would be
4 fibrous, can we agree?
5     A.    No, we can't agree unless you own a
6 microscope.
7     Q.    We can't agree that 107 fibers is not
8 fibrous, sir?  Are we still having this argument?
9     A.    Yes.
10    Q.    Okay, alright.
11          107 fibers in a milligram, right?
12    A.    Yes.
13    Q.    A milligram -- how many milligrams
14 are there in a gram?
15    A.    A thousand.
16    Q.    There's a thousand.
17          So, if we wanted to know what it is per
18 gram, we have to multiply this times a thousand,
19 correct?  Do we want to know what it is per gram?
20    A.    Yeah, 107,000.
21    Q.    And it's tremolite, right, tremolite
22 actinolite, right?
23    A.    Yes.  It doesn't say asbestos.  It's
24 just described as tremolite actinolite.
25    Q.    Okay.  Well, according to Johnson &

Page 76

1 Johnson's definitions, if it's fibrous, right,
2 fibrous versions of the amphiboles including
3 tremolite it's asbestos, right?
4     A.    If it's in the fibrous form, it could
5 be asbestos.
6     Q.    Okay.  And he found --
7     A.    They tested in the fibrous form as
8 opposed to a fiber.
9     Q.    Okay.  And by light microscopy he
10 found 107 of them, right?
11    A.    He found 107 fibers, yes.
12    Q.    Fibers, right?
13    A.    But he doesn't say they're asbestos
14 fibers.  He doesn't describe them as fibrous, which
15 would make them asbestos, according to the J4-1
16 definition.
17    Q.    According to the industry definition
18 that came out three years after this, right?
19    A.    It's a microscopic -- microscopist
20 definition to -- if you're going to describe
21 asbestos --
22          MR. PANATIER:  I'm going to object to
23 nonresponsive.  Move to strike.
24          MS. SULLIVAN:  Your Honor, I'm going
25 to object to interrupting his answer.  That was

Page 77

1 responsive.
2          THE COURT:  I'm going to strike that
3 response and instruct the witness to please listen
4 to the question being asked and only answer that
5 question.
6          One more time.
7 BY MR. PANATIER:
8     Q.    J4-1, which came out three years
9 after this, right?
10    A.    Yeah, the final version, three
11 years -- I think it's three years.  Yeah, three
12 years later.
13    Q.    Why would an analyst for the FDA be
14 using a version that wasn't even invented yet, sir?
15    A.    A version of J4-1?
16    Q.    A method that hadn't been invented
17 yet.
18    A.    I don't know.  But it was -- it was
19 certainly in process development at that time.
20    Q.    He would -- and I'm not being
21 hyperbolic here.  It might sound like it.  But he
22 would literally need a time machine to go and use a
23 method that hadn't been invented yet, right?
24          MS. SULLIVAN:  Objection, lawyer
25 argument.

20 (Pages 74 - 77)

1          THE COURT: Counsel, let's --
2          MR. PANATIER: Okay.
3          THE COURT: -- get this back on
4  track.
5          MR. PANATIER: Yes, your Honor.
6  BY MR. PANATIER:
7     Q.    So we've got what he finds.
8          Now, last week -- this is Defense
9  Exhibit 7873. It's in evidence. We saw this.
10         Counsel for Johnson & Johnson showed this
11  document to Dr. Weber.
12         Have you seen this document before? It's
13  not in there. This is a Defense exhibit.
14    A.    I think I have, yes.
15    Q.    Okay. Do you see that up at the top,
16  there's a sample numbered 084-802H, right?
17    A.    Yes.
18    Q.    Do you know what sample 084-802H is?
19    A.    No.
20    Q.    Do you have any idea?
21    A.    No.
22    Q.    In fact, under "product" it says,
23  "Johnson's Baby Powder," right?
24    A.    That's what someone's written.
25    Q.    Right. And then here it's crossed

1  out. It says "J&J baby PROD," maybe, product. Seal
2  date 6 -- or 8/8/74, right?
3     A.    Yes.
4     Q.    So the seal on it had a date,
5  August 8th, '74, right?
6     A.    I don't know whether the seal is on
7  the product or that was the bag it came in. I don't
8  know.
9     Q.    Yeah, right. We don't know what the
10  seal was on, right?
11    A.    What seal was, no.
12    Q.    Okay. But it says, "Johnson's Baby
13  Powder" and then the sample is "084-802H."
14         You told us you don't know what sample that
15  is or if it's just the designation for this sample,
16  correct?
17    A.    Correct.
18    Q.    You have no basis to say that this
19  was Shower to Shower, not Johnson's Baby Powder as
20  is written here, correct?
21    A.    Not without information, no.
22    Q.    Right. And let's look at the bottom.
23  This sample was reported September 18th, 1974. Do
24  you see that?
25    A.    I do, yes.

1     Q.    Signed by John Stewart, right?
2     A.    Yes.
3     Q.    Now, last week Counsel for Johnson &
4  Johnson suggested this was the actual analysis
5  for Shower to Shower.
6          Did you know that Counsel for Johnson &
7  Johnson did that?
8     A.    No.
9     Q.    Okay. This couldn't have been the
10  analysis for Shower to Shower sample 84, could it
11  have?
12    A.    Well, that's dated -- sorry, remind
13  me, September '74.
14    Q.    And this says as of, right here, as
15  of December 21st, 1973 samples, Lewin's
16  identification 84 were analyzed for mineral content,
17  correct?
18    A.    Yes.
19    Q.    So sample 84 Shower to Shower had
20  been analyzed ten months before whatever this is was
21  sampled, correct?
22    A.    Well, before that report was done.
23    Q.    Right.
24    A.    That may have been a second version
25  of the first one. I don't know. I'm not going to

1  speculate. There's a ten-month difference.
2     Q.    Is there ten months between
3  December 1973 when they say they did the analysis on
4  sample 84 and this sample which is identified as
5  "baby powder" in September of '74?
6     A.    Well, there's ten months' -- ten
7  months' difference.
8     Q.    And I think I might have said
9  December '74 -- December '73, right?
10    A.    Yes, ten months' difference.
11    Q.    You have no basis to say that this
12  count sheet shown to the jury last week is Shower to
13  Shower, do you?
14    A.    I don't have that basis unless there
15  is other documentation to validate it.
16         MR. PANATIER: This will be
17  Exhibit 3441, your Honor.
18         THE COURT: Thank you.
19         MR. PANATIER: Yes, your Honor.
20  BY MR. PANATIER:
21    Q.    Here you go, Doctor. Do you see that
22  this is -- it says, "Italian medicated Grantham talc
23  from R. Rolle's files"?
24    A.    Yes.
25    Q.    That's a Robert Rolle?

Page 82

1    A.    Yes.
2    Q.    At J&J, right?
3    A.    (No response.)
4    Q.    And do you see on the next page the
5 Bates Stamps?  These are J&J Bates Stamps, right?
6    A.    Yes.
7    Q.    These are handwritten notes, correct?
8    A.    Yes.
9    Q.    And just so we get our bearings,
10 they're entitled, "Lewin samples of Shower to Shower
11 August 10, 1972," right?
12    A.    Yes.
13    MR. PANATIER:  We offer these into
14 evidence.
15    MS. SULLIVAN:  No objection.
16    THE COURT:  Admitted.
17    (Plaintiff's Exhibit 3441 was moved
18    into evidence.)
19 BY MR. PANATIER:
20    Q.    Alright.  You see it's, "Italian
21 medicated Grantham talc," right, on the cover?
22    A.    Yes, there are three products there,
23 Italian talc, medicated talc and Grantham talc.
24    Q.    And then there are some handwritten
25 notes about Lewin's samples of Shower to Shower,

Page 83

1 August 10, 1972.
2    This is an internal document, correct?
3    A.    Yes.
4    Q.    About one fiber or of -- I don't know
5 whether that says "or"...
6    But "about one fiber or rod/needle every 500
7 particles," correct?
8    A.    Yes, there's a rod every 500
9 particles, yes.
10    Q.    Well, one fiber or rod/needle, right?
11    A.    Yes.
12    Q.    And about one-third of these are
13 tremolite, two-thirds are roll talc or talc shards,
14 right?
15    A.    Yeah, you read what is written.
16    Q.    So Dr. Rolle -- so this is Shower to
17 Shower, sample 84 Lewin.  This here was the FDA.
18 And then Rolle, I think, we have him on our list
19 here.
20    Yeah, Robert Rolle, Assistant
21 Director Analytical Research, right?
22    A.    Yes.
23    Q.    Okay.  In the same sample, Lewin
24 Shower to Shower, he identifies "fiber rod/needle
25 one per 500 particles," right?

Page 84

1    A.    Yeah, fiber or rod, yes.
2    Q.    Right.  And you can see that it
3 says --
4    MS. SULLIVAN:  Your Honor, just in
5 the interest -- for the sake of completeness, if I
6 can have the third line down on that document read
7 to the Jury.
8    Q.    "No crinkled fibers or small bundles
9 of chrysotile asbestos were observed."
10    MS. SULLIVAN:  Thank you.
11    Q.    He found tremolite, he didn't see
12 chrysotile?
13    A.    He found, yeah, tremolite described
14 as rods, fiber rod, yeah.
15    Q.    And he's using plain polarized light,
16 right?
17    A.    (No response.)
18    Q.    If you look down paragraph starting
19 "observations"?
20    A.    Yes.  Yes, he was using polarized
21 light microscopy, yes.
22    Q.    Okay.  And so that's the same method
23 that was discussed in the Lewin meeting that the FDA
24 had with Dr. Lewin that he would confirm with
25 polarized light, right, or optical microscopy,

Page 85

1 correct?
2    A.    Well, this states polarized light
3 microscopy.
4    Q.    And that is optical microscopy?
5    A.    There are two kinds of optical
6 microscopy.
7    Q.    PLM?
8    A.    PLM and just the regular one that you
9 have at school, yeah.
10    Q.    Right.
11    A.    Yeah.
12    Q.    Is Rolle using optical microscopy?
13    A.    He's using optical microscopy,
14 polarized light --
15    Q.    Right.
16    A.    -- microscopy.
17    Q.    And just like Dr. Lewin, he doesn't
18 see any chrysotile with it, does he?
19    A.    No.
20    Q.    Okay.  But he does see tremolite as
21 he describes it, "fiber" or "rod/needle," right?
22    A.    Yes.
23    Q.    "One every 500 particles," true?
24    A.    On that particular sample is what he
25 sees, yes.

Page 86

1    Q.    Okay.  And I think this is -- this is
2  perhaps illustrative for us.  It says, "particle
3  density."
4      So he's looking at a very small area, right?
5    A.    Yes.
6    Q.    And that's an 18 square millimeter
7  area, right?
8    A.    Yes.
9    Q.    So what would you say, is that a
10  little bit more than four millimeters by four
11  millimeters, something like that, that would get us
12  to 16?
13    A.    No 18 millimeters square, means 18
14  millimeters by 18 millimeters.
15    Q.    I don't think it does.
16    A.    No.  18 square millimeters would be 6
17  by 3.
18    Q.    Right.  That's what he's looking at.
19    A.    No, it isn't.  He's looking 18
20  millimeters square, which is a grid square.
21    Q.    Okay.  So you're saying he's looking
22  at 18 by 18, right?
23    A.    Well, that's what I'm reading, yes.
24    Q.    Okay.  I'm not going to argue about
25  whether it was 18 square or 18 square millimeters.

Page 87

1      We know it was a small area, right?
2    A.    Yes.
3    Q.    And he said that there were 125,000
4  particles in that area, right?
5    A.    Yes.
6    Q.    And that one of every 500 was
7  tremolite, right?
8    A.    That's what he reported on that
9  particular sample.
10    Q.    One out of every 500 --
11    A.    Yes.
12    Q.    -- right?
13      So how many times does 500 go into 125,000?
14  Here, I have a calculator on my phone.  Okay.  So
15  I'll just divide, right, I would just divide 125,000
16  divided by 500, correct?  I get 250.
17    A.    Sounds right.
18    Q.    Okay.  So that would be in the area
19  he looked at.  That would equate to about 250
20  tremolite.  And we'll do fiber/rod/needle, right?
21    A.    Yes.
22    Q.    Did his analysis go to the FDA?
23    A.    I don't know.  This is a -- it looks
24  like a hundred page from an exercise book.
25    Q.    They also looked at -- if you go to

Page 88

1  the last page, they also looked at their own
2  retained samples of Shower to Shower.  Do you see
3  that?
4    A.    I do, yes.
5    Q.    Right.  So they have -- so they had
6  it looks like from February of '70 through August of
7  1971, right?
8    A.    Yes.  They report trace tremolite.
9    Q.    And, again, he says, "no chrysotile
10  observed," true?
11    A.    Yes.
12    Q.    But he has 1, 2, 3, 4 results where
13  he identifies tremolite, correct?
14    A.    Trace tremolite, yes.
15    Q.    Yeah.  Did this go to the FDA?
16    A.    I don't know.  This is someone's
17  handwritten notes.  It may well have gone into a
18  typed-up report.  But this is just handwritten
19  notes.
20      MR. PANATIER:  Your Honor, I'm moving
21  on to another topic, if you we like to do a break
22  now.
23      THE COURT:  This would be a good
24  time.  Thank you.
25      Members of the Jury, we're going to

Page 89

1  take a 15-minute break.  Please remember all the
2  instructions I've provided to you.  No discussions
3  with regard to this case including testimony you've
4  heard this morning.  Please be ready to be back up
5  here -- be ready to come back up at five of.  No
6  research of any kind whatsoever.  Thank you.
7      And then at five of just be
8  downstairs, bring them up and I will meet you in the
9  hallway.
10      THE COURT OFFICER:  Jury exiting.
11      (Jury exits.)
12      (There is a discussion off the
13    record.)
14      THE COURT:  So we're off the record.
15      (Recess taken 10:39 to 11:01 a.m.)
16      (Jury enters.)
17      THE COURT:  Please be seated.  Make
18  sure cell phones are turned off.
19      You may continue, Mr. Panatier.
20      MR. PANATIER:  Thank you, your Honor.
21  BY MR. PANATIER:
22    Q.    Mr. Hopkins, Johnson & Johnson was
23  aware that in the early 1970s a company called RT
24  Vanderbilt was selling talc that had tremolite in
25  it, correct?

23 (Pages 86 - 89)

Page 90

1      A.      There was a company called RT
2  Vanderbilt, but sold -- I think they owned a talc
3  mine in New York State, yes.
4      Q.      Okay.  So they were a company that
5  was selling talc, right?
6      A.      Yes.
7      Q.      Okay.  And you're aware that they
8  were claiming that the tremolite in their talc was
9  not asbestos or nonasbestiform, right?
10     A.      I'm not familiar with RT Vanderbilt.
11 I know that they had talc mine in New York State.
12 Johnson & Johnson never used it.  But I'm aware that
13 they did have a talc mine.
14             MR. PANATIER:  Okay.  This is
15 Exhibit 2450.
16     Q.      And if you would turn to April 13th,
17 1973 in your binder.  This is a document I've shown
18 you before.
19             THE COURT:  I'm sorry, Counsel,
20 what's the date?
21             MR. PANATIER:  April 13, 1973, your
22 Honor.
23             THE COURT:  Thank you.
24 BY MR. PANATIER:
25     Q.      You found that, sir?

Page 91

1      A.      Yes.
2      Q.      Okay.  This is a Johnson & Johnson
3  memo with the date I've just stated, correct?
4      A.      Yes.
5      Q.      From Bill Ashton, right?
6      A.      Yes.
7             MR. PANATIER:  I'm going to offer
8  this into evidence your Honor 2450.
9             MS. SULLIVAN:  No objection.
10            THE COURT:  So admitted.
11            (Plaintiff's Exhibit 2450 was moved
12       into evidence.)
13 BY MR. PANATIER:
14     Q.      "I attended a meeting with talc
15 manufacturers which R. Bacon of Vanderbilt called
16 had his New York offices yesterday."
17            So Johnson & Johnson met with RT Vanderbilt,
18 right?
19     A.      Yes.
20     Q.      Vanderbilt's idea was to try to
21 elicit and unify presentations, which talc firms
22 might present to the US Bureau of Mines at the Talc
23 Safety Symposium scheduled for May 8th in Washington
24 D.C.
25            And the part I'm interested in is

Page 92

1  this part down below.  "Only a couple broader
2  aspects were made reasonably clear.  One, Johns
3  Manville.  Now Johns Manville was a pretty
4  well-known asbestos miner manufacturer of products
5  right?
6      A.      I've heard of them, yes, yes.
7      Q.      "Johns Manville is going to take the
8  position that tremolite is an asbestos mineral and
9  they will not go along with the type of science
10 which Vanderbilt has been indicating aimed at
11 confusing the mineralogy of talc."  Right, isn't
12 that what Mr. Ashton wrote there?
13     A.      You've read what was written.
14     Q.      That Vanderbilt tried to confuse the
15 mineralogy of talc, true?
16     A.      Well, that was Vanderbilt's --
17 whatever Vanderbilt were doing, yeah.
18     Q.      Okay.
19     A.      I can't speak for Vanderbilt.
20     Q.      We're going to go from that document
21 to the next one.
22            The next one is dated April 24th, which is
23 11 days later.  And this is Exhibit 2452.  So
24 April 24th is what you're looking for, sir, 1973.
25 You found that?

Page 93

1      A.      Yes.
2      Q.      Okay.  And that is Plaintiff's
3  Exhibit 2452.  This is another J&J memo, right?
4      A.      Yes.
5             MR. PANATIER:  Okay.  We offer this
6  into evidence, your Honor.
7             MS. SULLIVAN:  No objection.
8             THE COURT:  So admitted.
9             (Plaintiff's Exhibit 2452 was moved
10       into evidence.)
11     Q.      11 days later this is a memo from
12 Mr. Nashed, right?
13     A.      Yes.
14     Q.      "Mr. Norwood said he followed my
15 advice to adopt the attitude that Pfizer is there to
16 see what they can do to help FDA in methodology.  He
17 also followed my advice and did not mention that he
18 had been talking to Johnson & Johnson."
19            And by the way, sorry, I didn't read this at
20 first.  "I talked with Mr. Norwood of Pfizer."  So
21 that's who that is, right?
22     A.      It appears to be, yes.
23     Q.      Yeah.  On the phone today to touch
24 base on their current activities in their views of
25 Vanderbilt and the Bureau of Mines Meeting."

24 (Pages 90 - 93)

Page 94

1 Alright. So sorry I didn't give us that framework,
2 but now we have it.
3       A.    Yes.
4       Q.    He said that, "subsequent to the
5 meeting they have been informed by Sherwin Williams
6 that they will discontinue use of New York talc
7 because of their feeling that tremolite may be a
8 problem, i.e., Vanderbilt's story was not accepted."
9 Do you see that?
10      A.    Yes. Yes, you read what is written.
11      Q.    "Bureau of Mines Meeting. Mr.
12 Norwood expressed the view that Vanderbilt is acting
13 very rationally in raising the question on talc
14 safety and he agreed that they are desperate if they
15 lose their tremolite is safe argument. They will be
16 out of the talc business and, therefore, would not
17 be interested in defending safety of talc, per se.
18 He felt that questions on safety of talc fibers
19 other than tremolite could reflect on the whole talc
20 industry. He thought Vanderbilt's defense of
21 tremolite is very weak and that the meeting at the
22 Bureau of Mines is bound to raise problems for the
23 talc industry. Therefore, they've decided to avoid
24 all involvement with Vanderbilt."
25          You're aware that Vanderbilt was

Page 95

1 trying to argue that the tremolite in their talc was
2 not an issue, correct?
3       A.    Well, I can't speak for Vanderbilt.
4 They're a separate company. But you read what was
5 written.
6       Q.    They were trying to say that their
7 tremolite was not asbestos, correct?
8       A.    Well, you read what is written. And
9 again, I'm not speaking for Vanderbilt. They're a
10 separate company and this quotes what they were
11 saying.
12      Q.    Okay. Dr. Nashed reports, "I called
13 Pfizer today to determine FDA's attitude toward
14 microscopy. Mr. Stanley, Mr. Norwood's associate,
15 said that the FDA microscopist was of the opinion
16 that optical microscopy was not suitable as a
17 control method."
18          Now, sir, this is April 24, 1973.
19 This is right around the time that Lewin's second
20 report is coming out, a confirmation of his results
21 using optical microscopy, correct?
22      A.    It describes the word "optical
23 microscopy." It doesn't break it down as to
24 polarized or regular.
25      Q.    Well, and neither does this, does it?

Page 96

1       A.    No. You have read what is written.
2       Q.    Let's go to the next one. This
3 should be May 2nd, 1973. So this is a couple weeks
4 later. This is Exhibit 2455, May 2nd, 1973, sir.
5 Let me know when you've found that.
6       A.    Yeah, we've got it. Yeah, we're
7 there.
8       Q.    Got it? Okay.
9       A.    Yeah.
10      Q.    Another J&J memo, right?
11      A.    Yes.
12      Q.    This one is from Nashed again, right?
13      A.    Yes.
14          MR. PANATIER: We offer Exhibit 2455
15 into evidence.
16          MS. SULLIVAN: No objection.
17          THE COURT: Admitted.
18          (Plaintiff's Exhibit 2455 was moved
19      into evidence.)
20 BY MR. PANATIER:
21      Q.    This is a meeting between Johns
22 Manville and J&J, right?
23      A.    Yes.
24      Q.    Okay. "The Johns Manville group
25 agreed with us that the efforts by Vanderbilt were

Page 97

1 somewhat unsophisticated and, in general, they
2 expect that the Bureau of Mines will adopt the
3 asbestos standards for trembolic talc and fibrous
4 talc. Fibrous talc, according to the ACGIH it's
5 talc containing asbestos."
6          Okay. And you can see that there's
7 several presentations that are given, right?
8       A.    Yes.
9       Q.    Okay. "We," that's Johnson &
10 Johnson, right?
11      A.    Yes.
12      Q.    "We told the Johns Manville group
13 that our efforts have been mainly directed to the
14 FDA on cosmetic uses of talc. We outlined in the
15 status of the safety of cosmetic talc."
16          And they go through what they have done and
17 some of which you and I have discussed, correct?
18      A.    Yes.
19      Q.    Okay. Let's go to the last page.
20 "They saw no chance of success for Vanderbilt
21 claiming tremolite not to be asbestos," right?
22      A.    You read what is written.
23      Q.    That's 1973, 46 years ago, right?
24      A.    Yes, that's what -- that's what Johns
25 Manville stated.

25 (Pages 94 - 97)

Page 98

1    Q.    Right.  Vanderbilt was trying to
2 claim that tremolite was not asbestos and they saw
3 no chance of success for them doing that, right?
4    A.    Johns Mansville stated they saw no
5 chance of success for Vanderbilt claiming tremolite
6 not being asbestos.
7    Q.    For the past two days whenever I have
8 shown you a reference to fibers of tremolite,
9 needles of tremolite, rods of tremolite, you said
10 that's not asbestos, haven't you?
11    A.    Unless -- unless it's proven to be in
12 the asbestiform version, you cannot say that the
13 tremolite when it's described as rods is asbestos.
14    Q.    MR. PANATIER:  Your Honor, I object
15 to nonresponsive.
16    THE COURT:  Objection sustained.
17    MR. PANATIER:  Move to strike.
18    THE COURT:  Stricken.
19 BY MR. PANATIER:
20    Q.    Sir, for the past two days anytime
21 I've shown you a needle, fiber, fibers or rods of
22 tremolite you said it's not asbestos; is that
23 correct?
24    A.    Yes, that is correct.
25    Q.    Thank you, sir, okay.

Page 99

1    Next document is going to be
2 April 27th -- I'm sorry, April 19th -- yeah,
3 April 19, 1973.  This is Exhibit 2451.
4    Have you found that one, sir?
5    A.    Yes.
6    Q.    Alright.  And do you see that that is
7 a memo from David H. Hammer to Rolle and then it's
8 marked out and they marked in someone else's
9 initials, right?
10    A.    Yes.
11    Q.    Okay.  That's a Johnson & Johnson
12 memo, true?
13    A.    Yes.
14    Q.    It's CC'd to about nine people?
15    A.    Yeah.
16    Q.    Right?
17    MR. PANATIER:  Your Honor, we offer
18 Exhibit 2451 into evidence.
19    MS. SULLIVAN:  No objection.
20    THE COURT:  Admitted.
21    (Plaintiff's Exhibit 2451 was moved
22    into evidence.)
23 BY MR. PANATIER:
24    Q.    Sir, do you see that this is
25 "dispersion staining examination of retained samples

Page 100

1 of Johnson's Baby Powder"?
2    A.    Yes.
3    Q.    It says "25 samples of Johnson's Baby
4 Powder representing retained samples."
5    Those are samples, by the way, that are held
6 back by the company in case they want to look at
7 what was in a certain lot at a certain time,
8 correct?
9    A.    "A retained sample" is one you hold
10 back in case there is a question on it, if someone
11 said it irritated my skin or whatever.  You keep it
12 in the -- in a cupboard until you don't need it.
13    Q.    You can go back and look at it?
14    A.    Yeah.
15    Q.    "Retained samples from both ESDP" --
16 and what does "ESDP" stand for?
17    A.    It stands -- it's the place where
18 they manufactured -- Eastern Surgical Dressings
19 Plant, just down the road here.
20    Q.    "Both ESDP and Chicago facilities
21 were examined microscopically by the dispersion
22 staining technique for the presence of tremolite.
23 Four of these samples are suspected of containing
24 tremolite based on the finding of 1 or 2 fibers per
25 sample, which satisfy the color/morphology

Page 101

1 criteria."
2    Now, they're just looking for
3 tremolite, right?
4    A.    Yeah, that would appear to be what
5 the memo is about.
6    Q.    It doesn't say they're looking for
7 tremolite asbestos, right?
8    A.    No, it's just -- the memo states what
9 it states.
10    Q.    But according to you, the presence of
11 tremolite is not a problem, it's tremolite asbestos
12 that's the problem?
13    A.    Tremolite asbestos would be a
14 problem.
15    Q.    Is tremolite a problem?
16    A.    It's asbestos, no.
17    Q.    But yet here in 1973 they're
18 investigating the retained samples for tremolite,
19 right?
20    A.    Right, appears to be, yes.
21    Q.    Not a problem, right?
22    A.    The microscopist is looking at those
23 samples.
24    Q.    Okay.  So those are the samples and
25 let's look at the results.  This will be April 27,

26 (Pages 98 - 101)

Page 102

1 '73. It's likely the next document in your folder.
2 It's Exhibit 2454.
3     A.    Yes.
4     Q.    Do you see that?
5     A.    I have that, yeah.
6     Q.    Okay.  And are those the results of
7 those retained samples, sir?
8     A.    They appear to be.
9     Q.    Okay.  You can look at the bottom of
10 this document and you can see that the samples match
11 --
12          MR. PANATIER:  Your Honor, we offer
13 this into evidence, 2454.
14          MS. SULLIVAN:  No objection.
15          THE COURT:  Admitted.
16          (Plaintiff's Exhibit 2454 was moved
17     into evidence.)
18     Q.    And, sir, you can see the samples are
19 here and they match.  Do you see that?
20     A.    Yes.
21     Q.    Okay.  So if we look here at the
22 results, "petrographic optical microscopy revealed
23 trace amounts of amphibole in each of the above
24 samples.  Based on the numbers and particles
25 scanned, we estimate trace amounts to be .001 to .01

Page 103

1 by weight," right?
2     A.    Yeah.
3     Q.    Okay.  And they tell us what the
4 shape of these particles were and they say
5 "prismatic columnar."  That's mean like a column,
6 right?
7     A.    Yeah, like my pen.
8     Q.    Like your pen.
9     A.    Yeah.
10     Q.    Okay.  "Parallel sided," right?
11     A.    Yes.
12     Q.    Rods?
13     A.    Yeah.
14     Q.    And see how it says, "size from 20 by
15 4 microns," that would be 5-to-1, would it not?
16     A.    Yes.
17     Q.    And 20 by 30.  What would that be
18 about 6 or 7-to-1?
19     A.    200 by 30, isn't it?  Yeah, 200 by
20 30.
21     Q.    I'm sorry, 200 by 30.  That's my --
22 my error.  That would be about 6 or 7-to-1?
23     A.    Yes, yes.
24     Q.    Right.  The optical properties of the
25 particles are closer to actinolite than tremolite.

Page 104

1 So they are amphibole particles that they found,
2 right?
3     A.    They're amphiboles, yes.
4     Q.    They are from between 5-to-1 to 6 or
5 7-to-1 in shape, right?
6     A.    Yeah, they're amphibole rods, yeah.
7     Q.    And they are parallel sided, right?
8     A.    Yes.
9     Q.    Alright.  Let's talk about the
10 definition of fiber in Johnson & Johnson.  3-to-1
11 parallel sides, right?
12     A.    That's that -- that's that definition
13 you have on that chart.
14     Q.    That's the analytical definition that
15 Johnson & Johnson uses to define asbestiform
16 minerals to find asbestiform minerals in their talc,
17 right?
18     A.    It is not.  It is the definition
19 that's written on the specification.  It is not the
20 system for the --
21          MR. PANATIER:  Your Honor, I object
22 as nonresponsive, your Honor.
23          MS. SULLIVAN:  I think he's answering
24 the question.
25          THE COURT:  Objection sustained.

Page 105

1 BY MR. PANATIER:
2     Q.    Here's the question I'm asking.
3     "3-to-1 parallel sides" is the
4 definition of "fiber" used by Johnson & Johnson in
5 testing method 7024 to define asbestiform minerals
6 in the talc, correct?
7     A.    I don't see where asbestiform.  I...
8     Q.    Sir, you and I have already been over
9 this.  This is in evidence testing method 7024.
10 Look at the board.  Elongated particle, right?
11     A.    Yes.  On that definition TM7024 that
12 is what is stated.
13     Q.    Okay.  And look, we have elongated
14 particles, do we not?
15     A.    We do.
16     Q.    We have longer than 3-to-1 aspect
17 ratios, correct?
18     A.    Yes.
19     Q.    We have parallel sides, correct?
20     A.    Yes.
21     Q.    By this definition, these are
22 asbestiform minerals by Johnson & Johnson's own
23 definition?
24     A.    By that definition but not by the
25 microscopist's.

27 (Pages 102 - 105)

Page 106

1    Q.    Just by Johnson & Johnson's
2 definition, right?
3    A.    By that -- what you've copied down
4 there, yes.
5    Q.    You know I didn't write that
6 document, right?
7    A.    No, you -- as you say, you just
8 copied it down. That's okay.
9    Q.    So those were four samples where they
10 found actinolite tremolite, right?
11    A.    They found actinolite tremolite rods.
12    Q.    Do you know if that went to the FDA?
13    A.    I don't know.
14    Q.    Okay. The next document will be
15 dated January 18, 1974. So it should be a few
16 documents before what we just went through, I think.
17 This is Exhibit 2506.
18    A.    '74 or '73?
19    Q.    1974, January 18, '74. Let me know
20 if you have any trouble finding it.
21        THE COURT: It's in Binder 2.
22        MR. PANATIER: Binder 2.
23    Q.    I think you put it on the ground.
24    A.    Oh, that's where it is.
25    Q.    These documents will not hide from

Page 107

1 you.
2    A.    You need to give me a bigger table.
3 Right, '74, give me the...
4    Q.    Yes, January 18, '74.
5    A.    Okay, we have that.
6    Q.    Have you found that?
7    A.    Yes.
8    Q.    Okay. That's a Johnson & Johnson
9 memo, correct, sir?
10    A.    Yes.
11    Q.    It is from Hildick-Smith and Nashed,
12 right?
13    A.    Yes.
14    Q.    Okay. Now, this is --
15        MR. PANATIER: We offer 2506 into
16 evidence.
17        MS. SULLIVAN: No objection.
18        THE COURT: Admitted.
19        (Plaintiff's Exhibit 2506 was moved
20        into evidence.)
21 BY MR. PANATIER:
22    Q.    This is another meeting with the FDA.
23 The meeting was January 16th and the memo is
24 January 18th, right?
25    A.    Yes.

Page 108

1    Q.    The FDA asks Johnson & Johnson to do
2 a calculation about the amount of asbestos that they
3 believe to be safe in baby powder, correct?
4    A.    They asked Johnson & Johnson to do a
5 calculation, a mathematical calculation, yes.
6    Q.    And when they said, can you do a
7 mathematical calculation that tells us how much
8 asbestos is safe in baby powder, I assume Johnson &
9 Johnson said zero, right?
10    A.    Well, that wasn't the exact question
11 that was asked. They were asked to give a question
12 -- sorry. They were asked to give a mathematical
13 calculation as to what may be present if there was a
14 certain amount of asbestos there.
15    Q.    When they were asked by the FDA what
16 amount is safe in baby powder, did they say zero
17 because our policy is zero tolerance?
18    A.    I don't know whether they said that.
19 But if FDA -- if the FDA asks you to do something.
20    Q.    Sir, if you don't know, you don't
21 know, okay?
22    A.    I don't know.
23    Q.    Okay.
24    A.    I don't know.
25    Q.    That's fine.

Page 109

1        Okay. Now, Eiermann, Eiermann, he is
2 at this meeting, correct?
3    A.    He was one of several FDA people,
4 yes.
5    Q.    Because I've been wanting to ask you
6 about him, but I keep forgetting.
7        Eiermann, he's at the FDA, right?
8    A.    Yes.
9    Q.    But there's an asterisk by his name,
10 right?
11    A.    Yes.
12    Q.    And if we go to the bottom, it says
13 he's a former Johnson & Johnson employee in Brazil,
14 right?
15    A.    That was one of his previous
16 employers, Johnson & Johnson Brazil, yes.
17    Q.    And now he's with the FDA, right?
18    A.    Yes, yes, no secret.
19    Q.    So let's get to that calculation. So
20 see where Johnson & Johnson says here, "Our very
21 preliminary calculation indicates that substantial
22 asbestos can be allowed safely in a baby powder"?
23 Did they say that to the FDA?
24    A.    That was in response to a question.
25    Q.    I know.

28 (Pages 106 - 109)

Page 110

1    A.    To say if there are 1 percent, how
2 much would that --
3          MR. PANATIER:  Your Honor, I object
4 as nonresponsive.
5    A.    Okay.  That's what is written.
6          THE COURT:  Objection is sustained.
7    A.    That is what is written.
8    Q.    Okay.  Because that's all I asked
9 you.
10    A.    That is what is written, yes.
11    Q.    Is that what was said to the FDA?
12    A.    That is what is written, yes.
13    Q.    And Eiermann -- Wodicka, Mr. Wodicka
14 appeared skeptical of Dr. Eiermann's approach to the
15 problem because it was Eiermann, the former J&J
16 employee, who had asked them to do the calculation,
17 right?
18    A.    He had asked him to do a calculation
19 based on certain hypothesis, yes.
20    Q.    And what Wodicka says is, he implied
21 that what is safe for a miner may not be safe for a
22 baby, right?
23    A.    Yes, I wouldn't disagree.
24    Q.    Okay.  Has Johnson & Johnson ever
25 told the public what they told the FDA in 1974 that

Page 111

1 they believed that substantial asbestos can be
2 safely allowed in a baby powder?
3    A.    What they actually told FDA --
4          MR. PANATIER:  Your Honor -- your
5 Honor, I'm objecting, nonresponsive.
6    A.    In that case, no.
7          MR. PANATIER:  I would ask the
8 witness to answer the question.
9    Q.    No, they have not, correct?
10    A.    They have not stated that sentence
11 that was written in this report.
12    Q.    Okay.  What Johnson & Johnson has
13 always told the public is zero tolerance, right?
14    A.    And that's still the case.
15    Q.    Do you believe it was the case right
16 here when they told this to the FDA?
17    A.    Yes.
18    Q.    Okay.  And then Dr. Fuller of Johnson
19 & Johnson stressed that Johnson & Johnson has a
20 policy of full cooperation with the FDA and that if
21 the results of any scientific studies show any
22 question of safety of talc, Johnson & Johnson will
23 not hesitate to take it off the market, right?
24    A.    Yes.
25    Q.    Sir, don't you agree that just based

Page 112

1 on what we've gone through so far, what's in our
2 inbox, was enough to present the question about the
3 safety of their talc?
4    A.    No.
5    Q.    Okay.  But if there ever was a
6 question, they should take it off the market, right?
7    A.    If there was a genuine question
8 relating to safety, yes.
9    Q.    So, if there was "a genuine
10 question."
11          And what do you mean by "a genuine
12 question"?
13    A.    The question where the answer is that
14 there's a significant problem or a problem.  In
15 other words, you can have a question, I can have a
16 question, but it has to be one where there is
17 evidence to say this question is valid.
18    Q.    So, sir, does Johnson & Johnson agree
19 that the consumers of its products should be able to
20 make their own health and safety decisions about
21 whether or not to use that product?
22    A.    Yes.
23    Q.    And does Johnson & Johnson agree that
24 they should provide full information to those
25 people, those consumers about the products that they

Page 113

1 are manufacturing and selling?
2    A.    Yes.
3    Q.    And that Johnson & Johnson shouldn't
4 make risk decisions for consumers, consumers should
5 be able to make their own risk decisions, right?
6    A.    Yes.
7    Q.    Okay.  So far in everything that we
8 have gone through where we found fibers of
9 tremolite, needles of tremolite, rods of tremolite,
10 none of that was provided to the public, was it?
11    A.    No.
12    Q.    Okay.
13    A.    For good reason.
14    Q.    Do you know whether or not the
15 consumers who were purchasing it thought it was a
16 good reason?
17    A.    I cannot speak or hypothesize what
18 consumers think.
19    Q.    Let's go to the next document.  This
20 one will be 1974, April 24, 1974.  There were two
21 primary ore bodies in the '70s which Johnson &
22 Johnson was using.
23          The biggest, the one that produced the most
24 talc was Hammondsville Cosmetic, correct?
25    A.    The Hammondsville mine produced

Page 114

1 cosmetic talc, yes.
2     Q.    Okay.  And the other one was
3 Argonaut, that was qualified in '74 or '75 and went
4 open in about '76; is that true?
5     A.    It was never used commercially until
6 around about 1995 for cosmetic talc.
7     Q.    It was qualified in the '70s?
8     A.    It was qualified in the '70s, yes,
9 but it wasn't used in cosmetic talc until the --
10 '95, '96.
11     Q.    Okay, alright.  And we'll address
12 that a little bit later.
13     They qualified it 15 to 20 years earlier,
14 right?
15     A.    Yes, but they had sufficient in the
16 Hammondsville mine not to need it.
17     Q.    And when they qualified the Argonaut
18 ore body, Johnson & Johnson knew it contained
19 chrysotile asbestos, correct?
20     A.    No.
21     Q.    No, alright.
22     Let's look at this document dated April 24,
23 1974, okay?  Can you find that one, sir, please?
24     A.    Yes.
25     Q.    Have you found that?

Page 115

1     A.    Yes.
2     Q.    Okay.  You've got it.  This is a
3 McCrone report entitled, "Examination of Talc
4 Samples Argonaut Ore Body," right?
5     A.    Yes.  This is -- they looked at 38
6 core samples from a new ore body.
7     Q.    One second, step by step.
8     A.    Yes.
9     Q.    Hold on.  It is what I represented it
10 was, right?
11     A.    It's -- it's examination of samples.
12     Q.    Right.
13     A.    Yes.
14     Q.    I'm just getting the title, okay.
15 April 24, 1974, true?
16     A.    Yes.
17     Q.    Okay.
18         MR. PANATIER:  Your Honor, we offer
19 this into evidence.
20         MS. SULLIVAN:  No objection.
21         THE COURT:  Admitted.
22         (Plaintiff's Exhibit 2049 was moved
23     into evidence.)
24 BY MR. PANATIER:
25     Q.    Now, I asked you if Johnson & Johnson

Page 116

1 knew there was chrysotile asbestos in the Argonaut
2 ore body, right?  Right?
3     A.    Which Argonaut ore body?  There are
4 two Argonaut mines.
5     Q.    What does this say?
6     A.    Well, this describes -- this is a
7 generic one talking about the Argonaut ore body.
8     Q.    Are you saying that there is another
9 Argonaut mine or are you saying that through time
10 they pulled from different areas in Argonaut?
11     A.    There are two Argonauts.  There's the
12 main ore body, south Argonaut and the east Argonaut.
13     Q.    Okay.  Anyway --
14     A.    That's the ore body which covers many
15 acres.
16     Q.    The question I asked you not one
17 minute ago, was Johnson & Johnson knew there was
18 chrysotile asbestos in the Argonaut ore body and you
19 said no, correct?
20     A.    Not in the -- not in the main ore
21 body.
22     Q.    Can you answer the question.  Did you
23 say yes to my question or did you say no to my
24 question?
25     A.    I said no to your question.

Page 117

1     Q.    Alright.  Let's look at this
2 document, which is an examination of talc samples
3 from the Argonaut ore body, shall we, okay?
4     A.    From the Argonaut ore body, yes.
5     Q.    Right.  This is the one they were
6 qualifying for baby powder, correct?
7     A.    They were looking at 15 years
8 previously for baby powder as a possibility, yes.
9     Q.    Okay.  "An intensive examination has
10 been made by XRD and electron microscopy of 38 core
11 samples," right?
12     A.    Yes.
13     Q.    "From a new ore body which Windsor
14 Minerals, Inc., are contemplating exploiting.  The
15 examination was undertaken to determine the
16 mineralogical content of core samples and, in
17 particular, whether or not there was any significant
18 content of asbestiform minerals in the ore body.
19 For comparison three core samples from the current
20 ore body were also examined."
21     Now, here's what it says, "The
22 majority of the samples showed no evidence of
23 asbestiform minerals and 15" -- now they did 38,
24 right?
25     A.    Yes.

30 (Pages 114 - 117)

Page 118

1    Q.    "Of the 15 that did show an
2 asbestiform mineral, only one exceeded an estimated
3 level of 0005 percent," right?
4    A.    Yes.
5    Q.    Now, you and I discussed first thing
6 yesterday that with tens to hundreds of trillions of
7 particles per bottle, even if it was just 1 trillion
8 and you had .00001 percent, that's still 10 million
9 particles of asbestos, correct?
10    A.    Yes.
11    Q.    Okay.  So by the way, they found
12 asbestos in the Argonaut ore body, right?
13    A.    In one part of the ore body, yes.
14        MS. SULLIVAN:  And, your Honor, just
15 in the interest of completeness, I ask that Counsel
16 read the conclusion of this paragraph right below
17 that.
18        MR. PANATIER:  Right below that?  I
19 haven't gotten there, your Honor.
20        THE COURT:  Whenever you get there.
21        MR. PANATIER:  I will.
22        THE COURT:  Thank you.
23 BY MR. PANATIER:
24    Q.    Now look at what it says.  "It is
25 anticipated that the beneficiation" -- that's the

Page 119

1 flotation, right?
2    A.    Yes, yes.
3    Q.    (Continuing.)  "Of the ore would
4 significantly reduce these low levels and that,
5 therefore, the benefitiated ore would prove free of
6 any asbestiform minerals."
7        So they're saying, if you float it, we think
8 it will take it out, right?
9    A.    Well, that was his opinion in 1974.
10    Q.    That was not true, was it?
11    A.    No.
12    Q.    Okay.  "It is concluded that the ore
13 body is of suitable quality for manufacture of
14 high-grade cosmetic and toiletry products," and that
15 is where the baby powder falls, correct?
16    A.    It would be if it were ever accepted,
17 yes.
18    Q.    Let's look at -- we talked about XRD,
19 right?  "In no instance was any asbestos or
20 potentially asbestiform mineral identified by XRD,"
21 right?
22    A.    That's what is written.
23    Q.    We know XRD does not have very low
24 sensitivity, right?
25    A.    Yes, down about half percent

Page 120

1 amphibole, yes.
2    Q.    And by the way, when we say "low
3 sensitivity," the lower the better, correct?  If you
4 say high --
5    A.    The stricter --
6    Q.    Right.
7    A.    The stricter the better, yes.
8    Q.    Right.  So, if you say, "high
9 sensitivity," that's actually poorer sensitivity
10 than something that is low sensitivity, right?
11    A.    Yes.
12    Q.    Okay.  But they also did electron
13 microscopy.
14    A.    They did, yes.
15    Q.    It starts there.
16    A.    Yeah.
17    Q.    And they say, "As will be seen from
18 Table 2, only two samples showed a level above 0005
19 the actual figures being 007 and 001 respectively.
20 For chrysotile asbestos plus, approximately,
21 .0001 percent of fibrous tremolite."
22        Now, right there he's describing the
23 asbestos they found as fibrous tremolite, right?
24    A.    Yes.
25    Q.    Okay.  "Excluding" -- excluding I

Page 121

1 think is what that word is trying to say -- "these
2 samples, the remaining samples which showed
3 asbestiform in fibers are exhibiting levels which
4 are no higher than has been seen in a raw composite
5 used to manufacture a finished product."
6        Remember that he said, we looked at the
7 Argonaut and we also looked at the ore currently
8 being used, right?
9    A.    Yes.
10    Q.    And that's Hammondsville, correct?
11    A.    Yes.
12    Q.    Okay.  And they say that "The levels
13 of chrysotile observed in the two high samples is
14 only in order of magnitude above this."
15        So what he's saying is, we saw it in
16 the stuff we're using right now and the stuff we saw
17 in the Argonaut stuff that we're testing is too --
18 is an order of magnitude higher than what they're
19 currently using, correct?
20    A.    You're reading what he wrote.
21    Q.    And what I have summarized is
22 accurate, is it not?
23    A.    Well, you're reading or you've
24 summarized what he wrote.
25    Q.    Okay.  He's saying there's chrysotile

31 (Pages 118 - 121)

Page 122

1 in the Hammondsville ore body, correct?
2      A.    Well, he doesn't actually say that.
3 He doesn't mention the Hammondsville ore body.
4      Q.    That's why you're here, sir, is you
5 and I have established that as the Hammondsville ore
6 body was the then used ore body, correct?
7      A.    The Hammondsville ore body was the
8 then -- was used at that time, yes.
9      Q.    Right.  And he was given a raw
10 composite used to make finished product then,
11 Hammondsville, correct?
12      A.    He was given a raw composite.  It
13 doesn't say it was Hammondsville, but it could have
14 been.
15      Q.    Sir, I don't want to go around in
16 circles with you.
17      A.    Yeah, like I say.
18      Q.    Go back to the beginning and I'll
19 show you if you want to see it.
20           For comparison three core samples
21 from the current ore body were also examined, right?
22      A.    Yes.
23      Q.    Okay.  We know that's Hammondsville,
24 right?
25      A.    It should have been, yes, yes.

Page 123

1      Q.    Okay.  And what he says is that the
2 chrysotile that they found in the ore body that they
3 were looking to qualify had more chrysotile than the
4 current ore, correct?
5      A.    Well, that's what he's written.
6      Q.    Okay.  Right, that's all I'm asking
7 you, is did he write that?
8      A.    Yeah, he's written that as part of
9 this review to whether or not to use the --
10      Q.    Right.
11      A.    -- Argonaut mines.
12           MS. SULLIVAN:  Counsel, can you read
13 the conclusion.
14           MR. PANATIER:  Sure.
15      Q.    It's already been stated but he says,
16 The level of chrysotile -- "The levels of
17 chrysotile" --
18           MS. SULLIVAN:  The paragraph,
19 Counsel.
20           MR. PANATIER:  You want me to read
21 the bottom paragraph, okay.
22      Q.    "The examine of 41 core samples, 38
23 of them from a new talc ore body using the
24 techniques of X-ray diffraction, electron microscopy
25 and selected area electron refraction have shown

Page 124

1 that even prior to beneficiation this material is of
2 extremely high grade substantially asbestos free."
3           By the way, we're back to
4 "substantially."
5           MS. SULLIVAN:  Can we read it first,
6 Counsel?
7           MR. PANATIER:  Your Honor, I can --
8           THE COURT:  Stop interrupting,
9 Counsel, he is reading it.
10           Continue.
11           MR. PANATIER:  I'm going to stop here
12 and I will read the rest but I'm going ask a
13 question.
14 BY MR. PANATIER:
15      Q.    "Substantially asbestos free,"
16 doesn't mean "asbestos free," does it?
17      A.    Again, we're going to that argument
18 as to what "substantially" means.  And, you know, I
19 can speculate.  But it reads what it reads
20 "substantially asbestos free."
21      Q.    I don't want to you speculate.
22      A.    Thank you.
23      Q.    I just want you to -- I just want you
24 to -- let's talk commonsense, okay?  Does
25 "substantially asbestos free" mean "asbestos free,"

Page 125

1 sir?
2      A.    I don't know the context on how this
3 person thought.  What he stated is what he stated.
4      Q.    He already said he found asbestos.
5      A.    What he reads --
6      Q.    Did he say he found asbestos?
7           MS. SULLIVAN:  Your Honor, I'm just
8 going to object.  The Court instructed him to read
9 the conclusion for completeness and he's not doing
10 that.
11           THE COURT:  Overruled.  He is.
12      Q.    Does it say he found asbestos, Dr.
13 Hopkins?
14      A.    In the -- in the summary or the
15 conclusions?
16      Q.    In the summary.
17      A.    What he reads -- what he writes --
18           MR. PANATIER:  I'm going to object to
19 nonresponsive.
20      A.    He doesn't say he found asbestos.
21      Q.    He doesn't say he found asbestos?  It
22 literally says he found chrysotile asbestos in 15
23 samples, doesn't it?
24      A.    That's what -- I thought you were
25 going to read that in the next sentence.  In only

32 (Pages 122 - 125)

Page 126

1 two samples --
2     Q.    Wait, wait.
3          MR. PANATIER:  Okay.  Your Honor, I
4 have to object to nonresponsive and move to strike.
5          MS. SULLIVAN:  Objection, your Honor.
6 He's arguing with -- Counsel is arguing with the
7 witness.
8          THE COURT:  Objection overruled.
9          Please listen to the question before
10 you begin to answer and answer only the question
11 being asked.
12          One more time.
13 BY MR. PANATIER:
14     Q.    Did they find asbestos in 15 samples?
15     A.    The claimed to.  He reported.  In
16 those core samples, drill samples, that's what he
17 reported.
18     Q.    And then down here when he describes
19 it as, "substantially asbestos free," that does not
20 mean "asbestos free," can we agree on that?
21     A.    Yes.
22     Q.    Okay.  And he says that, "And of a
23 quality which we associate with cosmetic-grade talc.
24 In only two samples was a level of chrysotile
25 observed which was higher than .0005.  Chrysotile

Page 127

1 levels of this order of magnitude might well arise
2 during taking and handling of samples," right?
3     A.    That's exactly what is written, yes.
4     Q.    Now, if we actually look at the
5 results, there's XRD in Table 1.  And no positives.
6 There is one questionable for chrysotile, right?
7     A.    Yes.
8     Q.    But when we go to transmission
9 electron microscopy, we have both chrysotile and
10 amphibole in 15 samples, right?
11     A.    Yes, on the core drill samples, yes.
12     Q.    Okay.  Before this time Johnson &
13 Johnson had represented to the FDA that they had
14 never found chrysotile in any of their ores,
15 correct?
16     A.    Not in the -- not in the ores used to
17 make the powder, this ore body evaluation.
18          MR. PANATIER:  Objection
19 nonresponsive, your Honor.
20     A.    Okay.  Not in the ores used to make
21 the powder, period.
22     Q.    Okay.  And when they got this report,
23 when they started using the ore body, okay, in the
24 '90s, did this go to the FDA, that's the question?
25     A.    I don't know.

Page 128

1     Q.    By the way, since he also said that
2 he found chrysotile in the then current ore body,
3 did that information go to the FDA?
4     A.    I don't know.
5     Q.    Okay.  Let's go to November 10th.
6 This is -- actually, it's dated November 6th, but
7 your tab says November 10, 1974, because that's when
8 the document is signed.  This is Exhibit 2321.  So
9 November 10, 1974.  Do you have that, sir?
10     A.    Yes.
11     Q.    Alright.  And this is one of our FDA
12 FOIA documents.  This is not a great copy, as we've
13 seen from some of the FDA documents.  But this a --
14 can you see it's a memorandum of a meeting
15 November 6th, 1974?
16     A.    Yeah.
17     Q.    Okay.
18     A.    Yes.
19     Q.    And it says, "Between FDA
20 representatives" -- and it has a list -- "and
21 representatives of J&J," right?
22     A.    Yes.
23     Q.    Subject is "General discussion of the
24 talc/asbestos problem," right?
25     A.    Yes.

Page 129

1          MR PANATIER:  Okay.  Your Honor, we
2 offer Exhibit 2321 into evidence.
3          MS. SULLIVAN:  No objection.
4          THE COURT:  Admitted.
5          (Plaintiff's Exhibit 2321 was moved
6     into evidence.)
7 BY MR. PANATIER:
8     Q.    We're going to try to make this out
9 as best we can.  This is what I'm -- what I want to
10 discuss right here.  Following introductions, "Dr.
11 Nashed had stated that their statistical group had
12 made an estimation of a theoretical safe level of
13 asbestos fiber in a baby talc utilizing the official
14 TLV for asbestos and the data obtained from their
15 experiment on dusting of baby powder."  So I'll stop
16 there.
17          Again, Johnson & Johnson has said publically
18 and said here in this courtroom yesterday there is
19 no known safe level of asbestos exposure, correct?
20     A.    Yes.
21     Q.    Okay.  He further stated that
22 "Johnson & Johnson had examined many cosmetic talc
23 samples and had not detected chrysotile at any
24 level," right?
25     A.    You read what is written.

33 (Pages 126 - 129)

Page 130

1    Q.    Okay.  That comes about seven months
2 after April where they analyzed the core samples,
3 right?
4    A.    In the mine that they were beginning
5 to look at, yes.
6    Q.    That's right.
7    A.    Yes.
8    Q.    Correct?  On the back -- we'll it's
9 here.  "He wondered, therefore" -- this is Dr.
10 Nashed -- "if a health hazard does exist involving
11 the presence of chrysotile in cosmetic talcs since
12 their calculation showed that a substantial safety
13 factor can be expected with talc containing
14 1 percent by weight asbestos particles," right?
15    A.    You read what is written.
16    Q.    Okay.  So, again, this is not zero
17 tolerance, correct?
18    A.    No, this is a response to a request
19 from FDA.
20    Q.    Okay.
21    A.    And you read what they wrote when
22 they responded to FDA.
23    Q.    Dr. Eiermann indicated that, "The
24 division of cosmetics technology had carried out a
25 simulated baby dusting experiment and the results

Page 131

1 seem to differ from the results of Johnson & Johnson
2 by one order of magnitude."
3        Now, an order of magnitude is tenfold,
4 correct?
5    A.    Yes.
6    Q.    Okay.  That's it.  Let's look at
7 July 16, 1976.  Have you found that?
8    A.    Yes, you.
9    Q.    Johnson & Johnson memo, July 16,
10 1976, Plaintiff's Exhibit 2601.  That's from Alan
11 Marks, right?
12    A.    Yes.
13        MR. PANATIER:  We'll offer this into
14 evidence, your Honor.
15        MS. SULLIVAN:  No objection, your
16 Honor.
17        THE COURT:  Admitted.
18        (Plaintiff's Exhibit 2601 was moved
19        into evidence.)
20 BY MR. PANATIER:
21    Q.    Now, this is a discussion of the
22 Argonaut mine evaluation, correct?
23    A.    Yes.
24    Q.    "Processed talc produced from the
25 Argonaut mineral of Windsor Minerals, Inc., has been

Page 132

1 shown to be suitable for the production of Johnson's
2 Baby Powder."  So this is July.
3        That's two years and three months after the
4 74 core sample report, right?
5    A.    Yes.
6    Q.    And they are proving it, right?
7    A.    They are proving the areas that were
8 clean, yes.
9    Q.    Oh, I'm sorry, does it say that?
10    A.    Put it the other way around, you
11 would not approve areas.
12        MR. PANATIER:  I'm going to object as
13 nonresponsive, your Honor.
14    A.    No, it does not say that.  It does
15 not say that, no.
16    Q.    It doesn't say we're only approving
17 the clean areas, right?
18    A.    It doesn't that on here, no.
19    Q.    And by the way, when McCrone went out
20 and did the core samples, the core sample
21 representation represented areas of the entire ore
22 body, right?
23    A.    They went over several acres, yes.
24    Q.    If you go to the next page, they talk
25 about McCrone's report from '74, right?

Page 133

1    A.    Yes.
2    Q.    And it says, "Walter C. McCrone &
3 Associates evaluated 38 ore samples from the
4 Argonaut ore body and found no difference in the
5 qualitative and quantitative presence of asbestiform
6 minerals compared to three samples from
7 Hammondsville ore body," right?
8    A.    That's what is written.
9    Q.    So remember how I asked you?  I said,
10 well, then current ore being used was
11 Hammondsville, right?
12    A.    Yes.
13    Q.    Well, now we know for sure that's
14 correct, isn't it?
15    A.    That is correct, yes.
16    Q.    And they say that it didn't differ in
17 quantity or quality of the asbestiform minerals
18 present, right?
19    A.    You read what was written.
20    Q.    Right.  So we had the levels that
21 were found and we had the quantity, 15 of 38 that
22 were found, right?
23    A.    Yes.
24    Q.    Okay.  And they're saying it's
25 virtually the same as Hammondsville, right?

34 (Pages 130 - 133)

Page 134

1    A.    Well, obviously, they were taking it
2 from the areas that were asbestos free to meet that.
3    Q.    I'm so sorry, where does it say that?
4    A.    You know, it doesn't say that.
5    Q.    It doesn't, alright.
6    A.    I'm happy to give that information
7 and explanation later.
8    Q.    Okay.  Alright.  You can set that
9 aside, sir, or are you ready to turn to the next
10 page.
11        This will be 9 May 1974.  So it's
12 Exhibit 2525.  So May 9th, 1974.  If you would turn
13 to that, sir.
14        You found that?
15    A.    Yes.
16    Q.    Okay.  And by the way, what McCrone
17 said in their 1974 survey was that the talc they'd
18 sampled, all of it, was suitable for use in the
19 cosmetic products, correct?
20    A.    Did they state that, specifically,
21 or -- for every one of those core samples?
22    Q.    The sample was of the Argonaut ore
23 body, right?
24    A.    The ore body, yes.
25    Q.    It says, "It has concluded the ore

Page 135

1 body is of suitable quality for the manufacture of
2 high-grade cosmetic and toiletry products," correct?
3    A.    That's what they wrote.
4    Q.    They didn't say "the clean part,"
5 right?
6    A.    They didn't say that.
7    Q.    They didn't say the "south part" or
8 the "east part, did they?
9    A.    They didn't say that, no.
10        MS. SULLIVAN:  Your Honor, in the
11 interest of completeness, I ask that Counsel read
12 the back page that he hasn't shown the witness.
13        MR. PANATIER:  What page?
14        MS. SULLIVAN:  The back page.
15        MR. PANATIER:  Okay.
16 BY MR. PANATIER:
17    Q.    "It is our conclusion based on the
18 platyness of the material and its freedom from
19 asbestiform minerals that the ore body would be
20 suitable for use in high-quality cosmetic toiletry
21 products."  Isn't that what we just said?
22    A.    Yes, it's free from asbestiform
23 minerals.  You're reading what they wrote.
24    Q.    Wait, hold it, hold it.
25        That's what we just said, right?

Page 136

1    A.    Yes.  You're reading what they wrote.
2    Q.    Of course, it's not free of
3 asbestiform minerals, is it?
4    A.    Certain areas would be avoided.
5    Q.    Right.  But look, it's interesting
6 what they say in their conclusion.  This is McCrone
7 again, is it not?
8    A.    It's McCrone -- it's a McCrone
9 memorandum, yes.
10    Q.    Yes.  They say, "Based on it's
11 freedom from asbestiform minerals," and they're
12 talking about the whole ore body?
13    A.    They talk about the whole ore body,
14 yes.
15    Q.    But it's not free of asbestiform
16 minerals?
17    A.    No, there are areas that you would
18 not use.
19    Q.    Does it say that?
20    A.    That's just the way that the miners
21 and the geologists work.
22        MR. PANATIER:  Objection.
23 Nonresponsive, your Honor.
24    A.    It does not say that, no, it does
25 not.

Page 137

1        MR. PANATIER:  Move to strike.
2        THE COURT:  That part of the response
3 that was not in direct response to the question is
4 stricken.  The last sentence is responsive.
5 BY MR. PANATIER:
6    Q.    Okay.  So you have -- have you found
7 the May 9, 1974 document?
8    A.    Yes.
9    Q.    Okay.  This is another report of talc
10 ores and products from the Argonaut ore body from
11 McCrone, right?
12    A.    It is, yes.
13        MR. PANATIER:  Okay.  We offer this
14 into evidence, 2525.
15        MS. SULLIVAN:  No objection.
16        THE COURT:  Admitted.
17        (Plaintiff's Exhibit 2525 was moved
18    into evidence.)
19 BY MR. PANATIER:
20    Q.    They looked at six samples, right?
21    A.    Yes.
22    Q.    And they marked them "ore" and
23 "product," meaning one is ore coming into the
24 benefitiation process, one is the product coming out
25 of it; is that right?

35 (Pages 134 - 137)

Page 138

1    A.    Yes.
2    Q.    Let's just look at some of the
3 results.  In 6/6/14 ore they say that they found
4 nine small chrysotile fibers, right?
5    A.    Yes.
6    Q.    They didn't find any asbestiform
7 amphiboles, just chrysotile, true?
8    A.    You read what is reported.
9    Q.    Now, well, here, let's look at the
10 next one, "product."  You see where it says,
11 "electron microscopical examination showed three
12 fibers which bore an exact resemblance to chrysotile
13 but no conclusive electron diffraction pattern could
14 be obtained.  In addition, three other small
15 chrysotile fibers were found which did give
16 diffraction patterns, no amphiboles," right?
17    A.    Yes.
18    Q.    They found chrysotile asbestos in the
19 product of the beneficiation process, right?
20    A.    From -- yes, yeah.
21    Q.    Alright.  So, after it's floated,
22 after it's benefitiated, they still found asbestos,
23 right?
24    A.    Yes.  And we've said that
25 benefitiation will not remove --

Page 139

1    Q.    Right.
2    A.    -- asbestiforms.
3    Q.    And J&J's always known that, right?
4    A.    Yes.
5    Q.    Okay.  Here it says, "The results of
6 extensive light and electron microscopical
7 examination of three Argonaut talc core samples and
8 three product samples produced from these ores so
9 that the Argonaut ore body, in general, produces a
10 good quality platy talc with low content of rolltop
11 fibers.  Only ARX66-14 ore and product showed any
12 evidence of asbestos contamination."
13    They're put unequivocal there, right, that's
14 asbestos, right?
15    A.    That's what is written.
16    Q.    "Which is estimated at less than 1 to
17 2 parts per million for the ore and less than one
18 half to one part per million for the resulting
19 product," right?
20    A.    Yes.
21    Q.    Okay.  Did this go to the FDA?
22    A.    I don't know.  I mean, this was never
23 used at that time as a cosmetic product.  It was an
24 industrial product.
25    MR. PANATIER:  Objection, your Honor,

Page 140

1 nonresponsive.  I move to strike.
2    A.    I said I don't know.
3    THE COURT:  Everything short of "I
4 don't know" has been stricken from the record.
5    Q.    The next document will be
6 September 6th, 1974.
7    THE COURT:  What was the date,
8 Counsel?
9    MR. PANATIER:  September 6th, 1974
10 and the Exhibit No. is 2536.
11 BY MR. PANATIER:
12    Q.    Let me know once you've located that,
13 Dr. Hopkins.
14    A.    Yeah, we have it.
15    Q.    You got it?
16    A.    Yes.
17    Q.    This is a letter to the FDA from
18 Johnson & Johnson, right?
19    A.    Yes.
20    MR. PANATIER:  We offer this into
21 evidence.
22    MS. SULLIVAN:  No objection.
23    THE COURT:  Admitted.
24    (Plaintiff's Exhibit 2536 was moved
25    into evidence.)

Page 141

1 BY MR. PANATIER:
2    Q.    September 6th, 1974.  They say to Dr.
3 Schaffner, they've done another calculation.  It
4 says, "The calculation shows that a substantial
5 safety factor can be expected with talc containing
6 1 percent by weight asbestos fibers," right?
7    A.    That was their response.
8    Q.    "WW" by the way, that just means
9 "weight for weight," right?
10    A.    Yes.
11    Q.    "Therefore, methods capable of
12 determining less than 1 percent in talc are not
13 necessary to assure the safety in cosmetic talc,"
14 right?
15    A.    That was their opinion in 1974.
16    Q.    So what they're saying is, if methods
17 are going to be developed, we don't need anything
18 that goes below 1 percent, right?
19    A.    Well, that was the opinion in 1974.
20    Q.    But Johnson & Johnson knew if certain
21 methods were used such as TEM, that asbestiforms,
22 chrysotile or amphiboles could be found but at less
23 than 1 percent, right?
24    A.    Yes.  And J&J were using TEM.
25    Q.    So Johnson & Johnson knew that if you

36 (Pages 138 - 141)

Page 142

1 looked down to a smaller percentage, you could see
2 it, right, by TEM?
3      A.     Yeah, they've been using TEM since
4 '72.
5           MR. PANATIER:  Objection,
6 nonresponsive, your Honor.
7      A.   Yes.
8           THE COURT:  The objection is
9 sustained.
10     A.     Your answer is, yes.
11          THE COURT:  Dr. Hopkins, could I
12 please ask that you answer only the question being
13 asked.  Counsel for Johnson & Johnson will have an
14 opportunity to ask questions later.
15          THE WITNESS:  My apologies, your
16 Honor.
17          THE COURT:  Thank you.
18 BY MR. PANATIER:
19     Q.   Yet the same year, 1974, they're
20 telling the FDA, we only need a method that goes --
21 I'm sorry.
22          (There is a discussion off the
23           record.)
24     Q.   They're telling the FDA, we only need
25 a method that goes down to 1 percent; is that true?

Page 143

1      A.     That was what was written in 1974.
2      Q.     So that's to the FDA.  So that goes
3 in the outbox.
4           Let's look at July 1st, 1975.  You
5 know that McCrone was finding asbestos in the
6 Hammondsville ore body in 1975, do you not?
7      A.     I don't know.  I'd need to refresh my
8 mind on that one.
9      Q.     Okay.  Well, look at July 1st, 1975,
10 please.  That's already in evidence and it's
11 Exhibit 2053.
12          Have you found July 5th, 1975?
13     A.     Yes, yes, yes.
14     Q.     I've shown you that document, at
15 least, two or three times before, have I not?
16     A.     July 1st, 1975?
17     Q.     July 1st.
18     A.     Yes, I have that.
19     Q.     1975.
20     A.     Yeah.
21          MR. PANATIER:  We offer this in
22 evidence.
23          MS. SULLIVAN:  No objection.
24          MR. PANATIER:  It's 2053.  It might
25 already been.

Page 144

1           MS. SULLIVAN:  It's already in
2 evidence.
3           THE COURT:  It's already in.
4 BY MR. PANATIER:
5      Q.     Okay.  So here's the -- here's the
6 document.  We've already established that at this
7 time only Hammondsville is the only cosmetic ore
8 body, correct?
9      A.     The only cosmetic ore body.
10     Q.     Right.
11     A.     Yes.
12     Q.     Right.
13     A.     Yes.
14     Q.     And they're looking at 29 talc
15 samples, right?
16     A.     Yes.
17     Q.     And they found asbestos in them,
18 right?
19     A.     Yes.
20     Q.     Oh, by the way, we haven't seen this
21 fella's name yet, Vern Zeitz.
22          He was R&D director at Windsor Minerals,
23 right?
24     A.     Yes.
25     Q.     And I didn't put him on my list here

Page 145

1 because he didn't fit and he was "Z."  So let's add
2 him.  Let's add him by Miller because he was at
3 Windsor Minerals.  So we're going to put "Zeitz,
4 head of R&D."
5           Okay.  They found confirmed asbestos
6 in a number of these samples, right?
7      A.     In the samples that were reported,
8 yes.
9      Q.     Right.  And let's just focus on HC.
10          Okay.  So they found 1, 2, 3, 4, 5 results
11 for confirmed asbestos in the HC, correct?
12     A.     Yes.
13     Q.     And that's in the fines, right?
14     A.     Yes.
15     Q.     Because what they did here is they
16 actually did a separation technique, right, where
17 they put the powder into a test tube and they
18 sonicated it, right, which we talked about
19 yesterday, which separated out the fines from the
20 sediment, right?
21     A.     Yes.
22     Q.     That's a bit -- that's sort of like a
23 concentration technique, you can concentrate one
24 fraction away from another, right?
25     A.     Yeah, a bit like centrifuging, yes.

37 (Pages 142 - 145)

1    Q.    Yeah.  If then you go to the next
2  page, they have the sediment.  And for HC one, two
3  -- two of those are the HC, right, in the sediment?
4    A.    Two of those are at HC.
5    Q.    So they were able to -- I think it
6  says right here on the front page, they say, "In
7  examining the samples, we kept a running tabulation
8  of the asbestos which we could positively identify
9  the total fiber content in the organic material
10  present in each sample.  These are listed
11  qualitatively as zero for none found, low for one to
12  three fibers found, medium for four to eight fibers,
13  high and very high.  In no case did the asbestos
14  content exceed medium."
15        My first question here is, did this
16  go to the FDA?
17    A.    I don't know.
18    Q.    Have you seen any evidence that it
19  actually did?
20    A.    I've not seen evidence that it did or
21  that it did not.  So my answer is the same.  I don't
22  know.
23    Q.    Now, there was a followup report on
24  this one in November.  So if you'll turn to November
25  5th, 1975.  This is also in evidence, November 5th,

1  1975.
2        "This letter will supplement our
3  report of July 1st on a series of talc or samples
4  which we've analyzed for you.  Table 1 shows the
5  actual fiber counts and the approximate equivalent
6  concentration in parts per million of the amphibole
7  particles which we found in these samples."
8        So these were amphibole asbestos they found,
9  correct?
10    A.    They're described as amphiboles, yes.
11    Q.    Right.  It was amphibole asbestos
12  they found?
13    A.    Well, that was the heading that --
14  yeah, they've described it under the heading of
15  "fibers of asbestos."
16    Q.    Right.
17    A.    And described them as amphiboles.
18    Q.    By the way, it doesn't say "fibrous
19  asbestos," it says "fibers of asbestos," right?
20    A.    That is what is written.
21    Q.    They said some of them seemed rather
22  high, one at 10 and one had 9 amphiboles.  Most of
23  these come in bundles of 1, 2 or 3 fibers with
24  anywhere from 2 to 5 amphiboles in a bundle.
25        And here they're describing their suspension

1  where they say that when they suspend the fines it's
2  more sensitive to the presence of amphibole than
3  looking in the sediment, right?
4    A.    Yeah, you're reading what is written.
5    Q.    So they had a way to sort of separate
6  out the different particles, fines versus sediment,
7  and they had a more sensitive way to look for the
8  asbestos, right?
9    A.    That is the impression we get, yes.
10    Q.    Do you know that they ever did this
11  again?
12    A.    McCrone?
13    Q.    Yeah, that they ever did this type of
14  technique to look for the asbestos after November of
15  1975?
16    A.    I don't know.
17    Q.    Okay.
18    A.    Don't know.
19    Q.    And on the back, fibers of asbestos
20  we've got HC.  Let's look at HC 1, 2, 3, 4, right?
21    A.    Yes.
22    Q.    And that's in the fines.  And then
23  five, looks like five, right, a total if you include
24  the sediment, right?
25    A.    Yes.

1    Q.    And the highest result was this one
2  that had ten and that was marked HC?
3    A.    Yes.
4    Q.    Okay.  "HC" you know is Hammondsville
5  Cosmetic, correct?
6    A.    No.
7    Q.    It's not, okay.  So help me out then
8  so we can figure out what it means.  I'll put it in
9  green.  "HC," so I say it means "Hammondsville
10  Cosmetic" but you're the company, you tell me what
11  it is means.  What does that stand for?
12    A.    The designation HC --
13    Q.    Uh-huh, right, I'm ready.
14    A.    -- is applied to both industrial
15  talcs and to cosmetic talcs.
16    Q.    Well, I'm asking what it stands for.
17  What does "HC" stand for?
18    A.    I've never ever seen a key or a
19  breakdown as to what "HC" stands for.
20    Q.    Okay.  This is already in evidence as
21  Exhibit 2840 and I've shown you this before.
22  January 14, 1975.  Do you see that?
23    A.    Yes.
24    Q.    The samples represented both the
25  industrial materials produced at Gassetts, GI, the

38 (Pages 146 - 149)

Page 150

1 West Windsor, WI, mill sites and the ores used in
2 the cosmetic production "HC," right?
3       A.    That's what I said a minute ago.  HC
4 can mean cosmetic ores, but it's, also, a
5 designation for industrial talcs.
6       Q.    Well, for this they're saying it's
7 the cosmetic talc, right, they're not saying it's
8 industrial, are they?
9       A.    On that particular memo.
10      Q.    Yes.
11      A.    That's what they said.  On that day
12 they shipped that product and that was the
13 designation they used on that day.
14      Q.    Oh, okay.  So they would have only
15 used it on that day.  Let's just be clear.  Look,
16 this was for six months of work.
17      A.    Okay.  Okay.
18      Q.    They said HC was the cosmetic
19 production, right?
20      A.    On that -- on that particular memo,
21 yes, on that -- written on that day.
22      Q.    Fine.  This next document is dated
23 May 24, 1976, if you'll turn to that.  It just says
24 '76.  So I'll help you find it.  Because it will be
25 near the front.  Here it is.

Page 151

1       A.    Thank you.
2       Q.    No problem.  Sir, this is a letter
3 from Roger Miller, the president of Windsor
4 Minerals, to McCrone, right?
5       A.    Yes.
6       Q.    Dated May 24th, '76, true?
7       A.    Yes.
8       Q.    And you've seen this before?
9       A.    Yes.
10            MR. PANATIER:  Okay.  We offer this
11 into evidence, Plaintiff's Exhibit 3083.
12            MS. SULLIVAN:  No objection, your
13 Honor.
14            THE COURT:  Admitted.
15            (Plaintiff's Exhibit 3083 was moved
16      into evidence.)
17 BY MR. PANATIER:
18      Q.    This is a letter where he writes,
19 Roger Miller now, Windsor Minerals, so he knows what
20 the designation is for the products they use, right?
21      A.    Well, yeah, I would hope so.
22      Q.    You'd "hope so."  He's the president
23 of the mining company, right?
24      A.    Yes.
25      Q.    He says, "never ask a lawyer for a

Page 152

1 quick answer."  We know that's true.  "I've just now
2 received the answer to your request of March 26,
3 1976.  You are hereby granted permission to disclose
4 data resulting from your tests on our samples.  The
5 samples which are relevant to the production and
6 sale of cosmetic talcs in the US and Canadian
7 markets are those bearing the letters HC as part of
8 their prefix," correct?
9       A.    Yes, you read what is written.
10      Q.    Right.  He's not saying one time for
11 one sample, is he?
12      A.    On that memo date on May 24, 1976 he
13 is instructing --
14            MR. PANATIER:  I'm going to object to
15 nonresponsive, your Honor.
16            THE COURT:  Let him finish the
17 answer.
18            Go ahead, Doctor.
19            THE WITNESS:  I'm sorry, I forgot the
20 question.
21 BY MR. PANATIER:
22      Q.    Yeah.  At that time he is saying that
23 the cosmetic production, the cosmetic talcs, are
24 designated HC, correct?
25      A.    Yes, and that's what I was saying.

Page 153

1 On that time, that date, that's what he was saying.
2       Q.    Well, he doesn't restrict to it to
3 any date, sir, does he?
4       A.    Well, I was quoting from the memo
5 which is May 24th.  So he's saying on -- he wrote a
6 memo on May 24th saying those results you've got
7 designated HC, those are the ones that you're going
8 to look at.
9       Q.    Right.  You're testings, right?
10      A.    Yes.
11      Q.    Your tests?
12      A.    Yes.
13      Q.    He doesn't say one test at one time.
14 He said if you want the cosmetic tests, it's the
15 ones bearing the letters "HC," right?
16      A.    That's what he wrote on May 24th,
17 yes.
18      Q.    Do you agree -- can we agree on this
19 -- and I bet we can -- that Hammondsville Cosmetic,
20 if you just take the first letters of each one,
21 that's "HC," can we agree on that?
22      A.    Yeah, that's -- that's -- yeah, H and
23 C, yeah.
24      Q.    Right, okay.
25      A.    But --

39 (Pages 150 - 153)

Page 154

1    Q.    Well, hold on.
2    A.    I'll shut up.
3          Okay.  So now we have the memo from
4  1975 that says, "The cosmetic production is HC."
5          We have one the next year that is
6  unrestricted in time that says, "the cosmetics was
7  HC," correct?
8    A.    We do.
9    Q.    Okay.  This next one is just dated
10  1977.  And I can help you find that if you need it.
11  It should be at the front of the 77s.  Yeah, right,
12  here.  It's probably where it starts.  I'm just
13  going to let you look at it.
14        Okay.  So take a look a that.  Is
15  that dated November 4th, 1977?
16    A.    It is, yes.
17    Q.    And that's from Vernon Zeitz to Ian
18  Stewart at McCrone?
19    A.    Yes.
20    Q.    Okay.  Thank you.
21        MR. PANATIER:  We offer this into
22  evidence, your Honor, as Exhibit 3121.
23        MS. SULLIVAN:  No objection.
24        THE COURT:  I'm sorry, which one is
25  it?

Page 155

1        MR. PANATIER:  3121; 1977,
2  November 4, 1977.  It's this one.  It may have been
3  left out of the binders.
4        THE COURT:  Okay, thank you.
5        (Plaintiff's Exhibit 3121 was moved
6         into evidence.)
7  BY MR. PANATIER:
8    Q.    So we have '74 was our first one.
9  '76 was our second one.  Now we have '77.  "Enclosed
10  you will find our next series of samples for
11  asbestiform analysis via TEM in conjunction with
12  your discussions with Roger Miller."
13        And if you look at the back side of it,
14  you've got "Columbia Mill" composite, right?
15    A.    Yes.
16    Q.    Columbia Mill was industrial, right?
17    A.    It was one of several, yes.
18    Q.    Right.  So you have "CI," right?
19    A.    Yes.
20    Q.    Columbia Industrial, right?
21    A.    I don't know what it stands for but
22  Columbia was one of the industrial mines.
23    Q.    Gassetts was industrial, right?
24    A.    It was a milling operation for
25  industrial.

Page 156

1    Q.    Right.  So you have Gassetts
2  Industrial, right?
3    A.    Yes.
4    Q.    And then you have Hammondsville
5  Cosmetic grade ore "HC," right?
6    A.    Yes, on that particular memorandum,
7  yes.
8    Q.    Okay.  Alright.  This next one is --
9  it is missing the tag on that one.  This one is --
10  says 1978.  You should only have 1 or 2 tabs that
11  just say 1978.
12        It might be in Binder 3.  Let me help
13  you get it.  Yeah, here it is.  Here you go.
14        MR. PANATIER:  It's the first
15  document, your Honor, in Binder 3.
16        THE COURT:  Sure.
17  BY MR. PANATIER:
18    Q.    So that's a Windsor Minerals memo,
19  correct?
20    A.    Yes.  The answer is yes.
21    Q.    Sorry?
22    A.    The answer is yes.
23    Q.    Starting, "asbestiform mineral
24  analysis sampling procedure for Hammondsville
25  Cosmetic ore," right?

Page 157

1    A.    Yes.
2    Q.    Okay.  And you can see they're
3  summarizing the sampling?
4    A.    Yes.  Sorry, I said yes.
5        MR. PANATIER:  By the way, this is
6  Exhibit 3224.  We offer it, your Honor.  Sorry.
7        MS. SULLIVAN:  No objection.
8        THE COURT:  Admitted.
9        (Plaintiff's Exhibit 3224 was moved
10         into evidence.)
11  BY MR. PANATIER:
12    Q.    So they go through the sampling
13  procedure and they see under the Hammondsville
14  Cosmetic ore they reference 16 HC composite samples,
15  right?
16    A.    They do, yes.
17    Q.    Right?  And then they have a separate
18  section for industrial grade talcs, correct?
19    A.    They do in that memo, yes.
20    Q.    Okay.  So now we've seen '78, '77,
21  '76, '75 where Hammondsville Cosmetic is "HC,"
22  right, every single time, right?
23    A.    On those memos, yes.
24    Q.    Now, that is not to say that they
25  didn't also mine the Hammondsville -- I'm going to

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 158

1 draw a mine real fast, okay.
2      So here's the Hammondsville mine, okay,
3 Hammondsville.  They mine the cosmetic talc out of
4 Hammondsville, correct?
5    A.    Yes.
6    Q.    That's not to say that they didn't
7 also pull some out and sell it as roofing talc,
8 correct?
9    A.    Yes.
10    Q.    They did that, right?
11    A.    Yes.  And they occasionally, if I
12 may, mix it with material from the other mines, the
13 Columbia mine and the Clifton mine.
14    Q.    Well, we'll, get into that.  The
15 Clifton mine wasn't in operation in 1975, was it?
16    A.    I believe it was.  It was a short
17 period when it was shut down.  But there were other
18 mines, the Chester mine and the Blackbear.
19    Q.    I was asking you about Clifton.
20    A.    Clifton.  There was a short period it
21 was shut down.
22    Q.    Okay.  So roofing talc, right?
23    A.    Yes.
24    Q.    You call that industrial?
25    A.    It is, yes.

Page 159

1    Q.    Right?
2      But if it was roofing talc from
3 Hammondsville, it was coming from the same place the
4 cosmetic was coming from, from Hammondsville,
5 correct?  True?
6    A.    From the same mine, yes.
7    Q.    Yes.
8    A.    Yes, yes, yes.
9      (There is a discussion off the
10      record.)
11      MR. PANATIER:  We're going to put the
12 November 5, '75 confirmed asbestos and the July 1st,
13 '75 fibers of asbestos in the inbox.
14      MS. SULLIVAN:  Objection, lacks
15 foundation.
16      MR. PANATIER:  I was asked yesterday
17 to state where they were going.  That's all I'm
18 doing.
19      THE COURT:  Objection overruled.
20      MR. PANATIER:  Okay.
21      (There is a discussion off the
22      record.)
23      MR. PANATIER:  Alright, this will be
24 Exhibit 3051.  Your Honor, I don't think I have
25 another copy of it.

Page 160

1      THE COURT:  That's okay.  Don't worry
2 about it.
3 BY MR. PANATIER:
4    Q.    Okay.  So I'll just show -- you see
5 that this is a FDA response to a FOIA request?
6 Right there?
7      MS. SULLIVAN:  It looks like it's --
8 (INAUDIBLE.)
9      THE COURT:  I'm sorry, is that an
10 objection?
11      MS. SULLIVAN:  No, your Honor, it's
12 just it looks like it's not FDA but another
13 government.
14      MR. PANATIER:  Oh, I'm sorry, that's
15 absolutely correct, it's --
16      THE WITNESS:  US Department of Labor.
17 BY MR. PANATIER:
18    Q.    US Department of Labor, right?
19    A.    Yeah.
20    Q.    I'm sorry.  We're so used to the FDA
21 here.
22      MR. PANATIER:  Your Honor, I'm just
23 going to offer this into evidence.
24      MS. SULLIVAN:  No objection.
25      THE COURT:  Admitted.

Page 161

1      (Plaintiff's Exhibit 3051 was moved
2      into evidence.)
3    Q.    So we've got the cover sheet where we
4 get the documents from the Department of Labor.  And
5 there's only one part I'm interested on in this.
6      Do you see that it says it looks at some
7 mining companies and one of those is -- it says,
8 "Johnson & Johnson Division Windsor Minerals, Inc.,"
9 right?
10    A.    Yes.
11    Q.    And it says, "number of employees."
12 It says, "Argonaut, Frost Bite, Gassetts Mill,
13 Hammondsville Mine, West Windsor Mill," right?
14    A.    Yes.
15    Q.    And it doesn't list any employees for
16 Clifton, does it?
17    A.    On what date was that?
18    Q.    Right down here if you look.  "We
19 already gave this info to Dr. Peters 6/11/74,"
20 correct?
21    A.    It doesn't list them, no, no.
22    Q.    So the mine is not running if it
23 doesn't have employees, right?
24    A.    I did say it was closed for a short
25 period.

41 (Pages 158 - 161)

Page 162

1     Q.     Correct, okay.
2            (There is a discussion off the
3       record.)
4     Q.     This will be Exhibit 2581.  And this
5  is dated November 15th [sic], 1975, sir.  This is
6  probably going to be in your second binder.
7     A.     November the?
8     Q.     The 19th.
9     A.     The 19th.  That's it.  Got it.
10    Q.     Okay, great.
11           This is another memo from McCrone to
12  Windsor Minerals, right?
13    A.     It is, yes.
14           MR. PANATIER:  Okay.  We offer this
15  into evidence, 2581, your Honor.
16           MS. SULLIVAN:  No objection.
17           THE COURT:  Admitted.
18           (Plaintiff's Exhibit 2581 was moved
19       into evidence.)
20  BY MR. PANATIER:
21    Q.     This is just another testing result,
22  correct, where they looked at 24 talc ore samples,
23  right?
24    A.     Yes.
25    Q.     Dated 9/2/75, for asbestiform

Page 163

1  minerals, right?
2     A.     Yes.
3     Q.     They say, "In the entire series, we
4  found only two asbestiform fibers, both amphiboles.
5  One in sample N1 HC of a size equivalent to a
6  concentration of, approximately, .1 parts per
7  million and one at sample 01 HC equivalent to,
8  approximately, .3 parts per million," correct?
9     A.     Yes.
10    Q.     Okay.  So, again, these are two more
11  results for asbestiform, as they call it, which is
12  asbestos, by the way, right?
13    A.     I wouldn't disagree with what we have
14  there.  It doesn't say "asbestos."
15    Q.     If it says -- sorry.
16    A.     We can only read what it says.
17    Q.     Just to be clear, Johnson & Johnson
18  agrees, if it says asbestiform, it's asbestos,
19  right?
20    A.     That would be the -- that would be
21  the approach today, yes.  I don't know what they
22  meant in 1975.  But that would be the approach
23  today.  I would agree today if I read that.
24    Q.     So are you saying you don't know what
25  that was in --

Page 164

1     A.     I don't know what this individual
2  wrote in 1975.  He wrote what he wrote, you know.
3  I'm not going to argue over it, so...
4     Q.     Well, because you told me like when I
5  put up Johnson & Johnson's definitions, you say, oh,
6  no, it has to say it's asbestiform.  Well, they're
7  saying it here.  Is it asbestos?
8     A.     He says "asbestiform."
9     Q.     Is it asbestos?
10    A.     That would be my interpretation.
11    Q.     Did this go to the FDA?
12    A.     I don't know.  I don't know what
13  these talcs were.
14    Q.     Well it says "HC," right?
15    A.     It says "HC," yes.
16    Q.     And we know that there are some memos
17  you've shown me and that we've gone through, where
18  they reference "HC" as roofing talc, right, that we
19  know is taken out of Hammondsville Cosmetic,
20  correct?
21    A.     "HC" can mean industrial talcs.
22    Q.     Right, the roofing talcs were
23  industrial, correct?
24    A.     They were, yes.
25    Q.     Okay, alright.  Let's do -- let's go

Page 165

1  to December and skip that one.  Go to December 15.
2  December 15, 1977, please sir.
3            (There is a discussion off the
4       record.)
5     Q.     Alright.  Sir, have you found
6  December 15, 1977?
7     A.     Yes.
8     Q.     Is that a document from the -- well,
9  does it look like this?  Yeah.
10    A.     Yeah.
11    Q.     That's it.
12           This is a document from Mountain
13  States Research and Development in Tucson, Arizona
14  dated December 15, 1977 with the Johnson & Johnson
15  Bates Stamp on it, correct?
16    A.     Yes.
17           MR. PANATIER:  Okay.  We offer this
18  into evidence, your Honor.
19           MS. SULLIVAN:  No objection.
20           THE COURT:  Admitted.
21           (Plaintiff's Exhibit 2669 was moved
22       into evidence.)
23    Q.     It says --
24           THE COURT:  What is the marking on
25  the document?

42 (Pages 162 - 165)

Page 166

1       MR. PANATIER: Sorry. 2669, your
2 Honor, Exhibit 2669.
3       THE COURT: Thank you.
4 BY MR. PANATIER:
5    Q.    And you see it's prepared for Windsor
6 Minerals?
7    A.    Yes.
8    Q.    And, in fact, the title is,
9 "Mineralogical Investigation of Three Main
10 Contaminating Rock Types in a Talc Deposit of
11 Windsor, Vermont."
12      So we know this is Windsor's talc. This is
13 the talc that is being mined by Windsor which is
14 owned by Johnson & Johnson, correct?
15   A.    Well, I don't know which mine this
16 relates to. It only says "of the talc deposit of
17 Windsor, Vermont."
18   Q.    Johnson & Johnson owns Windsor
19 Minerals?
20   A.    Yes, they --
21   Q.    Right?
22   A.    Yes.
23   Q.    So, if it's any talc being mined by
24 Windsor, then it's something Johnson & Johnson owns?
25   A.    Oh, I see, okay. I was thinking

Page 167

1 Windsor is actually a place, that's where the mines
2 are, in that location.
3    Q.    You see here where it says,
4 "Mineralogical investigation three main
5 contaminating rock types the talc deposit of
6 Windsor, Vermont," right?
7    A.    Yes, I'm thinking that's Windsor,
8 Vermont's place.
9    Q.    Okay. Is it your testimony that that
10 would not include Hammondsville, it would not
11 include Argonaut?
12   A.    It might do, yeah. It might do.
13   Q.    Okay. Okay. Well, let's see what it
14 says.
15   A.    Yeah.
16   Q.    Right. They said, "Purpose, to
17 determine the mineral composition of the samples in
18 particular respect to the transparent and opaque
19 contaminates intergrown with talc."
20      Under "mineralogy" it says, "Talc is the
21 second most abundant mineral in the samples." Oh,
22 I'm sorry, just before that.
23      "Both chlorites are intergrown with other
24 minerals such as talc, muscovite, hydromica,
25 biotite, tremolite, apatite, rutile and other

Page 168

1 opaques," right?
2    A.    Yes, that's what's written.
3    Q.    "The talc is associated mostly with
4 chloride, muscovite, hydromica, biotite, calcite and
5 tremolite," right?
6    A.    That's what's written.
7    Q.    Alright. Let's just look at what
8 they say for those. "Actinolite, tremolite, zoisite
9 and apatite are only trace minerals in the samples.
10 Tremolite is the only mineral of the above-mentioned
11 ores which occur in minor amounts, four volume
12 percent Sample B. It also present in Sample A in
13 trace amount accompanied by actinolite. Tremolite
14 actinolite occurs in long prismatic needles."
15      I know we've seen references to needles a
16 number of times by now, correct?
17   A.    We have.
18   Q.    Okay. And then it talks about the
19 grain size of tremolite and actinolite.
20      Then on the very back page, it just
21 gives us the percentages, tremolite actinolite in
22 two of the samples, trace and 4 percent, right?
23   A.    On that particular examination of the
24 rocks, yes.
25   Q.    Okay. Now, in fairness -- in

Page 169

1 fairness, there are other talc deposits around the
2 ones that Johnson & Johnson was mining in Vermont,
3 correct?
4    A.    Yes, as I recollect, there were
5 something like 50 mines in the State of Vermont.
6    Q.    Sure. It was talc heavy, right?
7    A.    Yes.
8    Q.    The reason I'm asking you about it is
9 Johnson & Johnson, of course, had this, correct, do
10 you see that Bates Stamped?
11   A.    Yes.
12   Q.    Okay. And there's an RVZ, Vern
13 Zeitz, right?
14   A.    Yes.
15   Q.    Okay. So this is something that
16 Johnson & Johnson certainly had, correct?
17   A.    Yes.
18   Q.    Okay. In fairness, it doesn't
19 specify the exact mines that were being sampled,
20 true?
21   A.    No, it doesn't, no.
22      MR. PANATIER: Your Honor, one more
23 document and then lunch break?
24      THE COURT: Sure.
25      (There is a discussion off the

43 (Pages 166 - 169)

Page 170

1    record.)
2  BY MR. PANATIER:
3      Q.    The next one should be dated March 2,
4  March 2, '87.  So that's probably going to be three
5  or four.  Let me help you.
6      A.    Uh-huh.
7      Q.    This is three.  Yeah, it will be at
8  the tail end of three.  And this is Exhibit 2723.
9      A.    March 4th, '87?
10     Q.    This is March 2, '87.
11     A.    March 2, '87, got it.
12     Q.    You see that it's entitled
13 "Mineralogical Report"?
14     A.    Yes.
15     Q.    Have you seen this document before?
16     A.    I don't think I have, no.
17     Q.    You and I can then decide if it's
18 relevant, okay?
19           So you can see it says, "subject,
20 microscopic examination of various flotation, high
21 intensity magnetic static and Archimedes spiral
22 separator products of Windsor talc," right?
23     A.    Yes.
24     Q.    Now, the "flotation," we know that's
25 the cosmetic talc, right, they didn't float the

Page 171

1  industrial, right?
2      A.    Correct.
3      Q.    And you can see that the purpose was
4  "to determine any contaminating minerals in talc,
5  concentrates and ore in particular respect to their
6  tremolite content."
7           Now, it doesn't say "tremolite asbestos,"
8  does it?
9      A.    No.  You read what is written.
10     Q.    But they did a specific test to find
11 out if there was tremolite to determine the content,
12 right?
13     A.    Someone did.  I don't know who this
14 -- I'm trying to find out who the author is, but
15 there's no author.
16     Q.    Not all the documents that we got
17 from Johnson & Johnson list the author.
18     A.    Okay.
19     Q.    On the second page under "Discussion"
20 they're describing the preparation.  They say, "In
21 this thin sections the talc plates show preferred
22 orientation according to one of the pseudohexagonal
23 edges of the plate.  This may cause some difficulty
24 in the immediate recognition of needle-type minerals
25 such as tremolite actinolite contaminating the talc

Page 172

1  product," right?
2      A.    That's what's written.
3      Q.    Another reference to needles, right?
4      A.    Yes.
5      Q.    Now, they're talking about the
6  Raymond Mill and that is the specific mill that was
7  being used by Johnson & Johnson for the cosmetic
8  talc, right?
9      A.    There was more than one Raymond Mill.
10 Raymond Mill it's a brand name, made by the Raymond
11 Company.  And that mill is -- the ore went into
12 powder.  But they also milled industrial as well as
13 cosmetic.
14     Q.    Okay.  Were they using -- but to be
15 clear, okay, so that's a machine?
16     A.    Yeah, it's a, you know, like a Ford
17 car.  It's a Raymond Mill.
18     Q.    Okay.  Do you know whether or not
19 they used the same mill for the cosmetic and the
20 industrial?
21     A.    I do know and they did not,
22 otherwise, that would be contamination.  You'd avoid
23 that.
24     Q.    Okay.  Let's go to the next page
25 tremolite.  So, to be clear, Johnson & Johnson would

Page 173

1  not want to mill the industrial with the cosmetic,
2  fair?
3      A.    No, you keep them separate.
4      Q.    Okay.  Tremolite as an iron-poor
5  needle-type amphibole was detected only as to two or
6  three small needles in the sand of the Raymond Mill
7  feed and one needle in the fourth cleaner
8  concentrate and tailings treated with sodium
9  silicate and citric acid.  Tremolite is present in
10 the fines minus 100 plus 200 mesh in 6 volume
11 percent as free needles in the loose grain mounds.
12 It was detected only as two or three small needles
13 in the other products such as the high intensely
14 magnetic static belt and Archimedes spiral
15 products."  They found a lot of tremolite needles,
16 fair?
17     A.    Well, they certainly -- they report
18 finding needles, yes --
19     Q.    Okay.
20     A.    -- tremolite.
21     Q.    Throughout the process, right?
22     A.    Yeah.  I don't know what product they
23 were milling, though.  It doesn't say, does it?
24     Q.    Well, this is flotation.  We know
25 it's cosmetic.

44 (Pages 170 - 173)

Page 174

1    A.    This looks like an experiment to me,
2 but they floated.  Yes, they were doing a flotation.
3    Q.    They didn't float the industrial, did
4 they?
5    A.    Not in production, no, no.
6    Q.    "Tremolite and serpentine are present
7 only in subtrace amounts in the flotation and other
8 separation products, right?
9    A.    That's what's written.
10    Q.    So the product still had the
11 tremolite, right?
12    A.    Well, again, this looks to me like an
13 experimental study rather than production.
14    Q.    And they -- they, certainly, did a
15 lot of experiments.  We'll see in 1974 where they do
16 an experiment to try to suppress the chrysotile
17 that's present in the ore, correct?
18    MS. SULLIVAN:  Objection, foundation
19 it's argument.  That's not what the document said.
20    THE WITNESS:  They did many --
21    THE COURT:  Objection, overruled.
22    You can answer.
23    THE WITNESS:  I'll say, correct, they
24 did many experiments over the years, many
25 experiments.

Page 175

1 BY MR. PANATIER:
2    Q.    Okay, alright.  And in fairness, when
3 we were talking about this volume of documents, some
4 are going to be experiments, right, and some will be
5 analysis of actual product, fair?
6    A.    Yes.
7    Q.    Okay.  What this does and we'll look
8 into it a little bit more after the break.  But what
9 this does is it's yet more proof that to the extent
10 there's tremolite or actinolite needles present, it
11 is not removed by flotation, correct?
12    A.    Yes, I would never disagree with
13 that.
14    Q.    Alright.
15    MR. PANATIER:  Your Honor, I think
16 it's good time.
17    THE COURT:  Members of the jury,
18 we're going to take a lunch break now.  Leave your
19 notebooks here.  Remember to wear juror badges where
20 are they visible.  No discussions with regard to
21 this case, including testimony you've just heard, no
22 research of any kind whatsoever.
23    Enjoy your lunch.  Be ready to come
24 back upstairs at 1:30.  Thank you.
25    THE COURT OFFICER:  Jury exiting.

Page 176

1    (Jury exits.)
2    THE COURT:  Thank you.
3    We're off the record.  I'll see
4 everyone at 1:30.
5    (There is a discussion off the
6    record.)
7    MR. PANATIER:  Your Honor, can I just
8 offer 2723?
9    MS. SULLIVAN:  No objection.
10    THE COURT:  Ercilyn, back on the
11 record.
12    We're back on the record.
13    What are you offering into evidence?
14    2723.
15    THE COURT:  And there is no
16 objection, so thank you.
17    (Plaintiff's Exhibit 2723 was moved
18    into evidence.)
19    (Lunch recess taken 12:27 to 1:37
20    p.m.)
21    (Jury enters.)
22    THE COURT:  Please be seated.  Make
23 sure cell phones are turned off.
24    Whenever you're ready, Mr. Panatier,
25 you can continue.

Page 177

1    MR. PANATIER:  Thank you, your Honor.
2 Good afternoon, everybody.
3 BY MR. PANATIER:
4    Q.    Okay.  So, before we left for lunch,
5 sir, we were talking about that research that was
6 done by Mountain States Research in Arizona.  Do you
7 recall that?
8    A.    I do.
9    Q.    And you had brought up that there
10 might be some other mines in or around Windsor,
11 Vermont, right?
12    A.    I think at one time I remember there
13 was up to 50 in the State of Vermont.
14    (There is a discussion off the
15    record.)
16    MR. PANATIER:  Okay.  So this will be
17 Exhibit 3695-30 and I'll just mark it right now.
18    There you are, your Honor.
19    THE COURT:  Thank you.
20 BY MR. PANATIER:
21    Q.    There you go, sir.
22    So what I did over the break is I looked
23 through some of these documents to see if I could
24 find any other information, alright.
25    And do you see here you have a July 23, 1987

45 (Pages 174 - 177)

Page 178

1  document from Roger Miller to William C. Egan
2  subject of which is process modifications?
3      A.    Yes.
4      Q.    Alright.  And there's another note at
5  the top.  It says, "BS_" and that's, in all
6  likelihood, probably Bruce Semple, would that be?
7      A.    He was there in '87.  I don't whether
8  that was him or not.
9      Q.    Okay.  It's not really important.
10 The handwritten note is not super important.
11         MR. PANATIER:  Your Honor, we offer
12 this in evidence.
13         MS. SULLIVAN:  No objection.
14         THE COURT:  Admitted.
15         (Plaintiff's Exhibit 3695-30 was
16     moved into evidence.)
17 BY MR. PANATIER:
18     Q.    Okay.  And just to give us a
19 framework of what we were talking about.  There were
20 two documents.  One was this document from
21 December 15th, 1977 where Mountain States Research
22 had done some work for Windsor Minerals, right?
23     A.    Yes, they had done some geological
24 reports, yes.
25         MS. SULLIVAN:  I'm sorry, Counsel.

Page 179

1         THE COURT:  Sidebar.  Take your
2  document down, please.
3         MR. PANATIER:  Okay.
4         THE COURT:  Yeah, thank you.
5         (Sidebar.)
6         MR. PANATIER:  I'm so sorry, Judge.
7  I didn't -- I'll make sure it doesn't get shown.
8         MS. SULLIVAN:  Well, before you go,
9  what part of it of it do you wish to show?
10        MR. PANATIER:  So just the top part
11 and the part at the bottom and I don't think it says
12 anything.  Yeah.
13        MS. SULLIVAN:  The what?
14        MR. PANATIER:  Just the bottom, yeah,
15 paragraph second to last and last.
16        THE COURT:  And objection to that as
17 long as the rest --
18        MS. SULLIVAN:  No.
19        THE COURT:  Just make sure that you
20 cover that up.  Okay.
21        MR. PANATIER:  Yes, of course.
22        THE COURT:  Thank you.
23        (Sidebar ends.)
24 BY MR. PANATIER:
25     Q.    So we had looked at that one that one

Page 180

1  from '77 and then the second one from March of '87
2  where we had looked at what you said could be an
3  experiment where they were experimenting with
4  flotation with particle respect to the tremolite
5  content, correct?
6      A.    That was '77?
7      Q.    That was '87 -- '82, I'm sorry.  So
8  we have '77 and then we have '80 -- sorry '87 -- '77
9  and '87 --
10     A.    Yes.
11     Q.    -- right?
12         Now, this document is July 23rd of '87 the
13 one that I've just given to you, right?
14     A.    Yes.
15     Q.    Okay.  And what they say there in the
16 first paragraph is, "Working with Mountain States
17 Research or Vail, Arizona, we have tested in their
18 laboratories and confirmed by plant trials here at
19 West Windsor the efficacy of sodium silicate as a
20 modifier, disbursing agent, to enhance the rejection
21 of deleterious mineral species in our process."  Do
22 you see that?
23     A.    Yes.
24     Q.    "Deleterious" means could be bad,
25 damaging, something you don't want, right?

Page 181

1      A.    Something you don't want.
2      Q.    Okay.  And just to be clear that
3  we're talking about the right talc here, you can see
4  that at the bottom of Page 2 they say, "We will
5  shortly forward for approval via organoleptic
6  evaluation a sample of grade 66 talc processed by
7  the improved methods.  This material will
8  incorporate both the dispersion technique utilizing
9  the sodium silicate and the organic acid technique.
10 We do not believe that either of the special
11 techniques will leave a residual in the grade 66
12 talc."
13        That's what I'm trying to get to.  Grade 66
14 is the baby powder talc, right?
15     A.    Yes.
16     Q.    "We would like to move forward in
17 this matter, so I will appreciate early feedback of
18 the results of the testing at baby products
19 company."
20        So this testing, at least, what he's
21 referencing here, did have to do with the baby
22 powder that they were concerned about, right?
23     A.    In this 1987 report, yes.
24     Q.    Oh, alright.
25     A.    Yes.

46 (Pages 178 - 181)

Page 182

1    Q.    And are you aware of any other -- any
2  other testing that was done by this institution in
3  Arizona for Johnson & Johnson other than what I've
4  just shown you?
5    A.    I'm not aware of, no.
6         THE COURT:  For the record, where did
7  you put those documents?
8         MR. PANATIER:  In the inbox.
9         THE COURT:  Thank you.
10 BY MR. PANATIER:
11   Q.    Okay.  I'm going to take us back to
12 powder in the sheets.  I'm going to try again.
13        And perhaps we can -- well, here,
14 I'll hand you a copy of this.
15        MR. PANATIER:  And, for the record,
16 this document is 1996.  It will be 3695-29.
17   Q.    Here you go, sir.
18   A.    This one?
19   Q.    This one right here, yeah.
20        MR. PANATIER:  Here you go, your
21 Honor.
22        THE COURT:  Thank you.
23        MR. PANATIER:  Sure.
24   Q.    And, sir, you see that this has the
25 J&J Bates Stamp on it?

Page 183

1    A.    Yes.
2    Q.    It's dated 1996?
3    A.    Yes.
4    Q.    It says, "Shower to Shower
5  confidential."  It says, "Qualitative Research
6  conducted on behalf of Johnson & Johnson consumer
7  products, Inc.," correct?
8    A.    Yeah.
9         MR. PANATIER:  Okay.  And, your
10 Honor, we offer this into evidence as Exhibit
11 3695-29.
12        MS. SULLIVAN:  And, your Honor, I'm
13 going to object, hearsay.  It's an outside company's
14 document.
15        MR. PANATIER:  It goes to notice,
16 your Honor.
17        THE COURT:  I'll allow it as to
18 notice only.
19        MS. SULLIVAN:  Thank you.
20 BY MR. PANATIER:
21   Q.    So sometimes the company will do
22 market research, they'll have prospective customers
23 come in and they'll survey them, right?
24   A.    Well, usually, the company doesn't.
25 It's an agent that would do it in this case.

Page 184

1    Q.    Sure.  Whether it's the company or
2  somebody they hire to do the research, they're
3  interested in information about how their products
4  are used, correct?
5    A.    Yes.
6    Q.    Okay.  So, look, on this one I asked
7  you about sheets, people using it on their sheets.
8  So look at Page 8, please.
9         Do you see here it says, "It is not
10 surprising that during the warm and humid summer
11 months, powder usage is said to be remembered and
12 used with greater frequently.  During the warm
13 months a few woman said that they used powder in
14 between showers and also sprinkle powder between
15 sheets."
16        So Johnson & Johnson was, certainly,
17 aware that some customers did this as a use of their
18 product, correct?
19   A.    Well, that's of 1996, that's -- yeah.
20   Q.    Right?
21   A.    Yes.
22   Q.    And then if you'll turn to Page 10.
23 "Apart from the desire to want their own brand of
24 powder, many of the Shower to Shower users inherited
25 the product ritual from their mothers.  Even a

Page 185

1  relatively young user said that she had first tried
2  Shower to Shower because her mother was using it.
3  And quickly began to use it more regularly and then
4  went to purchase her own.  So was the case for a
5  majority of these woman who had first become aware
6  of Shower to Shower right at home and then continued
7  quite loyally, it appears, to maintain their usage
8  over a period of years."
9         And my question is, Johnson & Johnson
10 certainly doesn't disagree that a lot of users of
11 the products got it -- started using it because a
12 parent was using it on them or was using it in their
13 company, fair?
14   A.    That's not an unreasonable
15 conclusion.
16   Q.    Alright.  Sir, that's all I have.
17        So Johnson & Johnson, certainly, understood
18 that people would sprinkle it in their sheets, at
19 least, by '96, right?
20   A.    Yes.  By '96, yes.
21   Q.    And at no point did Johnson & Johnson
22 ever put out information whether it be on a package,
23 in a commercial or anything like that, that said,
24 here's a use we're aware of, don't sprinkle this in
25 your sheets, right?

47 (Pages 182 - 185)

Page 186

1     A.    I'm not aware of that.
2     Q.    Is there any reason that a person
3 shouldn't sprinkle it into their sheets?
4     A.    Again, I'm not aware that they
5 wouldn't. They're still getting it on their body.
6     Q.    Let's jump ahead.
7           This is dated July 23, 1987. So, if
8 you can find your binder with '87.
9     A.    Yeah.
10    Q.    Do you have it?
11    A.    I do.
12    Q.    Okay. Great. This is Exhibit 3446.
13 And do you see that this is -- if you turn the page
14 to -- it looks like this.
15    A.    Yes.
16    Q.    The third page in?
17    A.    Uh-huh.
18    Q.    It's an affidavit of Roger Miller,
19 right?
20    A.    It is.
21    Q.    Roger Miller was the President of
22 Windsor Minerals, which was the company owned by
23 Johnson & Johnson?
24    A.    It was.
25    Q.    And do you see that he filled out a

Page 187

1 sworn affidavit?
2     A.    Yeah, he appears to, yes.
3     Q.    Okay. He signed it on the 13th day
4 of July, 1987, true?
5     A.    Yes.
6     Q.    And back on the front where his
7 affidavit is, he signed this in Middlesex County,
8 right?
9     A.    Yes.
10          MR. PANATIER: Your Honor, we offer
11 this into evidence.
12          MS. SULLIVAN: It's hearsay, your
13 Honor and unrelated. It looks like unrelated
14 lawsuits.
15          THE COURT: How about we do this at
16 sidebar.
17          (Sidebar.)
18          THE COURT: What is the purpose for
19 which you are offering this into evidence?
20          MR. PANATIER: Yes, your Honor, this
21 is -- first of all, this would be an admission in
22 Plaintiff's interest. It's also an admission from
23 (INAUDIBLE) Stork by Johnson & Johnson. And the
24 purpose is to demonstrate that Mr. Miller, after all
25 of the records that we've gone through did not tell

Page 188

1 the truth about whether or not asbestos had been
2 detected in powders when he was defending the
3 company publically.
4           THE COURT: So this was -- this was
5 No. 3 -- (The Judge reads to herself out loud.)
6           MR. PANATIER: Yes, your Honor.
7           THE COURT: And your objection is?
8           MS. SULLIVAN: Yes.
9           THE COURT: I can't hear you.
10          MS. SULLIVAN: It's the record, I'm
11 objecting to hearsay (INAUDIBLE) to test.
12          MR. PANATIER: Yeah, he references
13 the text. That's fine.
14          THE COURT: Okay. So I'll allow the
15 statement as to the interest and whether you don't
16 use the test (INAUDIBLE) and I'm going to admit it
17 for purposes of completeness --
18          MS. SULLIVAN: (INAUDIBLE.)
19          MR. PANATIER: Fine. I'll show it.
20          (Sidebar ends.)
21          THE COURT: Okay. This document is
22 now admitted.
23          MS. SULLIVAN: Thank you, your Honor.
24          (Plaintiff's Exhibit 3446 was moved
25     into evidence.)

Page 189

1 BY MR. PANATIER:
2     Q.    Alright. Sir, so if you go to
3 Paragraph 1, Mr. Miller says, "I'm the president of
4 Windsor Minerals, Inc., and I've held that position
5 since 1968 when Windsor Minerals, Inc., was first
6 formed. The exclusive business of Windsor Minerals
7 is and has been over the last 18 years the mining
8 and milling of talc from a single milling district
9 in Windsor, Vermont."
10          Now, the last 18 years, so he's referencing
11 the full-time, isn't he?
12    A.    Yes.
13    Q.    Right? He's not referencing a
14 specific date, true?
15    A.    Yes.
16    Q.    Okay. "That mining district is the
17 exclusive source of talc for all of the Johnson's
18 Baby Powder sold in the United States. In addition
19 to supplying the talc for Johnson's Baby Powder,
20 Windsor Minerals, Inc., also sells a portion of its
21 products to independent industrial users."
22          So he's including in this paragraph
23 everything they sell, their baby powder talc and
24 their industrial talc, correct?
25    A.    Yeah, it says what it says. It sells

48 (Pages 186 - 189)

Page 190

1 a portion of it's product to industrial uses.
2     Q.    As well as the baby powder, correct?
3     A.    As well as the baby powder.
4     Q.    They didn't sell any other products.
5 He's listed everything they sold, right?
6     A.    They sold industrial and they sold
7 cosmetic talc, yes.
8     Q.    My question is, has he listed
9 everything that Windsor Minerals sold between the
10 cosmetic and the industrial?
11    A.    Yes.
12    Q.    Okay.  Let's go to the next page.
13        And, again, you understand this was -- this
14 was in a case called Edly versus Windsor Minerals?
15 Do you see that on the front?
16    A.    Yes.
17    Q.    And you see here it says it's sworn?
18 This is a sworn statement?
19    A.    Yes.
20    Q.    Okay.  Let's go to what he says last.
21 "All of the talc mind by Windsor Minerals, Inc.,
22 whether it is ultimately sold to industrial users or
23 used in Johnson's Baby Powder is sampled and tested
24 for the presence of asbestos.  No evidence of the
25 presence of asbestos in Windsor Minerals' product

Page 191

1 has ever been revealed by this testing."  Did he say
2 that?
3     A.    You read what he wrote.
4     Q.    And he attached a recent test, right?
5 Right?
6     A.    Yes.
7     Q.    He attached one test from -- that
8 looks like -- I don't know that this is a year yet.
9 We probably have a few thousand years to go, but I
10 think that's 1987, right?
11    A.    Yes.
12    Q.    He attaches one test, does he not?
13    A.    Exhibit A is one page.
14    Q.    Okay.  Alright.  This statement was
15 false, correct?
16    A.    Well, the statement -- I'm not going
17 to comment on whether it was false or true.  It's
18 for Roger Miller to comment.
19    Q.    No.  It's for you to comment.  You're
20 here for Johnson & Johnson and Johnson & Johnson was
21 using this talc.  So my question is, was Mr. Miller
22 being truthful or was he being untruthful?
23    A.    Well, okay, let's go through that
24 sentence, if I may.  Industrial users or use in baby
25 powder.  The baby powder testing that is available

Page 192

1 indicates asbestos free in the product that is sold.
2 We've seen some results on industrial talcs that
3 don't demonstrate that.
4     Q.    We've seen the HC samples that show
5 asbestos, correct?
6     A.    We've seen it.
7     Q.    Hold on.  It's one question.
8     A.    Sorry.  I thought you had finished.
9     Q.    We've seen the HC samples that show
10 asbestos, right, 1975, right?
11    A.    Yes.
12    Q.    We've seen GI and WI, those are
13 industrial, correct, at least, as of this year those
14 were industrial, right?
15    A.    I believe so, yes.
16    Q.    Right?  We saw them again in
17 November.  Over and over and over again.  And those
18 were written, sir, to who?
19    A.    To whom?
20    Q.    Yeah.  They were written to Windsor
21 Mineral, right?
22    A.    Yes.
23    Q.    This is the President of Windsor
24 Mineral in a lawsuit saying, no evidence of the
25 presence of asbestos in Windsor Minerals' product.

Page 193

1        And he included -- I asked you, he included
2 everything they'd ever sold, cosmetic and
3 industrial, has ever revealed or been revealed by
4 this testing.
5        Here's the question.  Was that true or was
6 that false?
7     A.    On the face of it, it does not appear
8 to be true.
9     Q.    So that makes it what?
10    A.    Unless we've got other evidence.  On
11 the face of it, it would not be true.  Unless --
12    Q.    Which would make it?
13    A.    It would make it false, unless there
14 is other evidence that we don't have here.
15    Q.    But this -- well, presumably, sir,
16 Mr. Miller had all the evidence at his disposal, did
17 he not?
18    A.    In 1987?
19    Q.    Yeah.
20    A.    He must have been a very old man in
21 1987.  I'm sure he long retired.
22    Q.    I didn't ask you his age.
23    A.    I don't know if he had the evidence
24 at his disposable -- at his disposal.
25    Q.    Sir, this is the President of Windsor

49 (Pages 190 - 193)

Page 194

1 Minerals in 1987.  No one -- you wouldn't expect
2 anybody at the company to have more access to the
3 information of that company than him, correct?
4     A.    You would expect him to be able to
5 access, if he requested it.
6     Q.    That was stated publically, correct,
7 in a lawsuit, right?
8     A.    It is.  The document states what it
9 states.
10     Q.    The documents we had going directly
11 to them in the '70s were internal, correct?
12     A.    Yes.
13     Q.    Do you know what happened to that
14 person's lawsuit as a result of Mr. Miller's
15 affidavit?
16     A.    No.
17     Q.    Is there any excuse to not be
18 truthful ever?
19         MS. SULLIVAN:  Objection.
20     A.    Everyone should also aim to speak the
21 truth.
22     Q.    Whether they're under oath or not?
23     A.    Yes.
24     Q.    And he was under oath, wasn't he?
25     A.    I believe so, yes.

Page 195

1     Q.    And that is -- you understand that is
2 perjury, do you not?
3     A.    I do.
4     Q.    Okay.  Alright.
5         (There is a discussion off the
6      record.)
7         MR. PANATIER:  This is 1991.  This is
8 already in evidence.  It's Exhibit 3390.  This is
9 the Blount paper, your Honor.
10     Q.    Sir, you know who Alice Blount is,
11 correct?
12     A.    Yes.
13     Q.    I'll just put it up here.  It's
14 already in evidence.
15     A.    Okay, yes.
16     Q.    She published this paper in 1991,
17 right?
18     A.    She did publish that paper in 1991,
19 yes.
20     Q.    We know that per her key and her
21 letters, we know that she tested Johnson's Baby
22 Powder, correct?
23     A.    In the report she states that she
24 tested baby powder, yes.
25     Q.    Now, when Johnson & Johnson found out

Page 196

1 about this, did they run it over to the FDA?
2     A.    I don't know.
3     Q.    Because the only thing that was
4 published when she published it was the article, not
5 the key, correct?
6     A.    The article was published.  The key
7 appears many years later, as I understand it.  But
8 the article stands by itself.
9     Q.    So, in the article where it says that
10 there were needles and fibers in Sample I, if you're
11 just looking at the article, you have no idea what
12 Sample I is, correct?
13     A.    Correct.
14     Q.    But looking at the key, you do know,
15 because it says what Sample I is, right?
16     A.    The key states samples A, B, C, D, E,
17 down to I.  It does state what Sample I is on that
18 key.
19     Q.    And you know that -- and, by the way,
20 is this Dr. Blount?
21     A.    Yes, she had a Ph.D. in mineralogy.
22     Q.    This is also in evidence.  This is
23 Exhibit 3191.  This is another copy of her letter.
24 And, of course, this was produced by J&J.  Can you
25 see that?

Page 197

1     A.    Yes.
2     Q.    By the way, the first one was
3 produced by Johnson & Johnson, too.  Do you see
4 that?
5     A.    Yes.
6     Q.    Meaning that Johnson & Johnson had
7 the key, correct?
8     A.    There is a key.
9     Q.    Right.  You see the Bates Stamp at
10 the bottom of the key?
11     A.    There is a key.
12     Q.    So the key -- key is in the inbox,
13 right, because that is something that Johnson &
14 Johnson had, true?
15     A.    Well, the key is in the Johnson &
16 Johnson files.  A key is in the Johnson & Johnson
17 files.
18     Q.    Okay.  And you know that in 1992, one
19 year after the paper came out -- so not many years
20 later, but one year after the paper came out, she
21 wrote to Luzenac, correct?
22     A.    I can't remember that, but refresh
23 me.
24     Q.    It's right up there.
25         MS. SULLIVAN:  Objection.  Can I get

50 (Pages 194 - 197)

Page 198

1 a copy, Counsel?

2        MR. PANATIER:  Sure.  This is

3 Exhibit 3191.  That's correct.  This is from 1992,

4 right.

5 BY MR. PANATIER:

6    Q.    And Luzenac -- yes?

7    A.    So is this in here?

8    Q.    Yes, sir.  It is in there.  It will

9 be under the tab that is 1992, if you want to look

10 at it.  It's, also, up on the board if you would

11 like to reference it there.

12        Do you have it, sir?

13    A.    Yes, I do.

14    Q.    Okay, good.

15        So she writes -- and by the way, she

16 was at the Newark Museum at that time.  Do you see

17 that?

18    A.    Yes.

19    Q.    Okay.  And there's her signature down

20 there.  She was a consultant to Johnson & Johnson,

21 correct?

22    A.    Johnson & Johnson had used her on

23 isolated occasions as a consultant, correct.

24    Q.    They had paid for a lot of her

25 research, correct?

Page 199

1    A.    I don't know how much they ever paid,

2 but they had used her on occasions as a consultant

3 for her mineralogical ability.

4    Q.    Sure.  And I don't know how much they

5 paid her either.

6    A.    No.

7    Q.    But my question wasn't how much they

8 paid her.

9        My question was, she was paid by them

10 for her research, correct?

11    A.    Again, I don't know how often or on

12 what occasion.  She was a consultant.  I know no

13 more than that, whether it was one off, two off,

14 three off.  But she did some consultancy.

15    Q.    I'm not asking how much she did or

16 how much she got paid.

17        By being a consultant, that meant she was

18 paid, right?

19    A.    Yes.

20    Q.    That's all I'm asking.

21    A.    Okay.

22        (Continuation of the day's

23 proceedings in Volume 2.)

24

25

Page 200

1        CERTIFICATION

2

3        I, SILVIA P. WAGE, C.S.R., License Number

4 30X100182700, a Certified Court Reporter in and for

5 the State of New Jersey, do hereby certify the

6 foregoing to be prepared in full compliance with the

7 current Transcript Format for Judicial Proceedings

8 and is a true and accurate non-compressed transcript

9 to the best of my knowledge and ability.

10

11

12 SILVIA P. WAGE                JULY 22, 2019

13 CERTIFIED COURT REPORTER        DATE

14 MIDDLESEX COUNTY COURTHOUSE

15

16

17

18

19

20

21

22

23

24

25

51 (Pages 198 - 200)

**[& - 195]**

**&**

**&**   3:3,15,18,20,20
5:7,8,9,10,18,18
6:2,21 15:14,22
21:6 22:3 23:2,10
23:25 25:14,17,22
25:25 26:4,15,19
27:12,21 30:6,6,24
31:1 33:11 34:1
36:4 39:10 40:19
42:5,20 45:1
47:13 51:9 57:4
57:14 58:18 59:14
60:19 61:20 63:9
63:15 64:1,23
65:9 66:16 67:2
67:18,23 68:1,3,9
68:15 70:23 71:16
71:19 72:14,19,21
73:3 75:25 78:10
80:3,6 89:22
90:12 91:2,17
93:18 97:9 99:11
104:10,15 105:4
105:22 106:1
107:8 108:1,4,8
109:13,16,20
110:24 111:12,19
111:19,22 112:18
112:23 113:3,21
114:18 115:25
116:17 127:12
129:17,22 131:1,9
133:2 140:18
141:20,25 142:13
161:8 163:17
164:5 165:14
166:14,18,24
169:2,9,16 171:17
172:7,25 182:3
183:6 184:16

185:9,17,21
186:23 187:23
191:20,20 195:25
197:3,6,13,15,16
198:20,22

**0**

**0.5**   54:17
**00001**   118:8
**0001**   120:21
**0005**   118:3 120:18
126:25
**001**   102:25 120:19
**007**   120:19
**01**   102:25 163:7
**07039**   2:23
**07102**   3:19
**07701**   3:4
**084-802h**   78:16,18
79:13
**08542**   3:16
**08903**   2:3
**0932-17as**   1:9

**1**

**1**   1:6 2:5,6 12:15
25:10 26:11,22
27:2 31:9 32:13
32:17,20 36:5
40:4 47:14,19,20
51:14 65:25 71:5
88:12 100:24
103:15,18,22
104:4,5,10 105:3
105:16 110:1
118:7 127:5
130:14 139:16
141:6,12,18,23
142:25 145:10
147:4,23 148:20
156:10 163:6
189:3

**1,410**   72:10
**1,561**   72:7
**10**   13:4,6,9 82:11
83:1 118:8 128:7
128:9 147:22
184:22
**10/27**   58:23
**100**   3:19 16:19
173:10
**10022**   3:7
**102**   4:11 10:22
12:2,4
**107**   4:12 74:22
75:3,3,7,11 76:10
76:11
**107,000**   75:20
**108**   44:13 57:19
**108t**   44:22 45:2
**109t**   44:13,23 45:2
57:19
**10:39**   89:15
**10th**   128:5
**11**   15:21 21:19
39:12 41:19 92:23
93:11
**113**   15:8,10
**115**   4:6
**11:01**   89:15
**11th**   3:6
**1201**   3:9
**125,000**   87:3,13,15
**127**   3:3
**129**   4:7
**1297**   4:6 13:15,22
14:9
**12:27**   176:19
**13**   15:5 65:21 66:1
90:21
**131**   4:14 15:14
18:1,12,13

**137**   4:12
**138**   15:8,10,14
18:1,13,13
**13th**   90:16 187:3
**14**   4:6 20:24
149:22
**140**   4:13
**14th**   20:16 28:5
**15**   44:3 89:1
114:13 117:7,23
118:1 125:22
126:14 127:10
133:21 165:1,2,6
165:14
**151**   4:17
**155**   4:17
**157**   4:18
**15th**   162:5 178:21
**16**   86:12 131:7,9
157:14
**161**   4:16
**162**   4:13
**165**   4:14
**16th**   107:23
**17**   3:15
**176**   4:15
**178**   4:20
**18**   64:16,20 86:6
86:13,13,14,16,19
86:22,22,25,25
106:15,19 107:4
189:7,10
**1809-17as**   1:2
**181**   18:9
**186**   18:10
**188**   4:19
**18th**   79:23 107:24
**19**   99:3
**195**   11:23 12:7
16:21

**1968** 189:5
**1970** 50:14
**1970s** 89:23
**1971** 88:7
**1972** 9:22 10:4,16
18:4 19:11 20:17
20:24 23:10 24:23
26:18 28:5 34:1
41:19 42:25 43:18
52:9 82:11 83:1
**1973** 12:6 13:25
16:8 18:6 19:11
38:12 39:5 73:24
80:15 81:3 90:17
90:21 92:24 95:18
96:3,4 97:23 99:3
101:17
**1974** 79:23 106:15
106:19 110:25
113:20,20 114:23
115:15 119:9
128:7,9,15 134:11
134:12,17 137:7
140:6,9 141:2,15
141:19 142:19
143:1 174:15
**1975** 143:4,6,9,12
143:16,19 146:25
147:1 148:15
149:22 154:4
158:15 162:5
163:22 164:2
192:10
**1976** 23:1 60:25
61:8,16 64:16,20
65:25 131:7,10
150:23 152:3,12
**1977** 154:10,15
155:1,2 165:2,6,14
178:21

**1978** 156:10,11
**1987** 177:25
181:23 186:7
187:4 191:10
193:18,21 194:1
**1991** 195:7,16,18
**1992** 197:18 198:3
198:9
**1995** 114:6
**1996** 182:16 183:2
184:19
**19th** 99:2 162:8,9
**1:30** 175:24 176:4
**1st** 143:4,9,16,17
147:3 159:12

**2**

**2** 1:6 2:5 39:11
44:22 88:12
100:24 106:21,22
120:18 139:17
145:10 147:23,24
148:20 156:10
170:3,4,10,11
181:4 199:23
**20** 103:14,17
114:13
**200** 2:6 103:19,19
103:21 173:10
**201** 3:16
**2014** 8:3,12,18,24
**2018** 71:9
**2019** 2:4 5:5
200:12
**2049** 4:6 115:22
**2053** 143:11,24
**21** 4:9
**21st** 80:15
**22** 200:12
**226** 17:21
**23** 2:4 5:5 71:9
177:25 186:7

**2321** 4:7 128:8
129:2,5
**23rd** 180:12
**24** 95:18 113:20
114:22 115:15
150:23 152:12
162:22
**2415** 43:5,6 44:2
53:8
**2416** 4:7 43:5,6,8
43:11 44:1 52:4
**2417** 4:8 43:8,8,13
58:25
**2419** 43:7 53:11
**2423** 4:8 20:22
28:7,11
**2424** 20:22 21:11
**2434** 4:9 21:14
**2450** 4:9 90:15
91:8,11
**2451** 4:10 99:3,18
99:21
**2452** 4:10 92:23
93:3,9
**2454** 4:11 102:2,13
102:16
**2455** 4:11 96:4,14
96:18
**24th** 92:22,24
151:6 153:5,6,16
**25** 100:3
**250** 87:16,19
**2506** 4:12 106:17
107:15,19
**2525** 4:12 134:12
137:14,17
**2536** 4:13 140:10
140:24
**2546** 72:2,5
**2581** 4:13 162:4,15
162:18

**26** 152:2
**2601** 4:14 131:10
131:18
**2617** 73:7
**2669** 4:14 165:21
166:1,2
**27** 42:24 43:18
52:9 57:16 101:25
**2723** 4:15 170:8
176:8,14,17
**27th** 60:13 99:2
**28** 4:8
**2840** 149:21
**2848** 4:15 60:24
62:1,9
**2849** 4:16 65:6,17
**2852** 10:8,9
**29** 13:2 17:21,22
144:14
**290** 2:22
**2nd** 60:25 61:8,16
96:3,4

**3**

**3** 16:5 36:15,20
39:11 44:23 47:14
47:19 51:14 60:3
86:17 88:12
104:10 105:3,16
145:10 147:23
148:20 156:12,15
163:8 188:5
**30** 7:23 17:21,22
103:17,19,20,21
**3051** 4:16 159:24
161:1
**3083** 4:17 151:11
151:15
**30x100182700**
200:4
**3121** 4:17 154:22
155:1,5

**[3191 - actual]**

**3191** 196:23 198:3
**31st** 13:12,25 16:8
**3224** 4:18 157:6,9
**3390** 195:8
**3400** 3:9
**3441** 4:18 81:17 82:17
**3446** 4:19 186:12 188:24
**3555** 36:24
**358** 36:20
**3695** 7:5
**3695-25** 7:11
**3695-26** 4:19 41:12,22
**3695-29** 182:16 183:11
**3695-30** 4:20 177:17 178:15
**38** 15:6 115:5 117:10,23 123:22 133:3,21
**3rd** 9:22 10:3,15 13:11

**4**

**4** 88:12 103:15 145:10 148:20 155:2 168:22
**41** 4:19 123:22
**43** 4:7,8
**46** 97:23
**4th** 154:15 170:9

**5**

**5** 12:16,19 16:5 17:18 44:10,22 45:17 54:16,16 65:23 103:15 104:4 145:10 147:24 159:12

**50** 169:5 177:13
**500** 83:6,8,25 85:23 87:6,10,13 87:16
**56** 2:2
**5th** 143:12 146:25 146:25

**6**

**6** 4:3 12:2 79:2 86:16 103:18,22 104:4 173:10
**6-2-76** 63:18 64:10
**6/11/74** 161:19
**6/6/14** 138:3
**6040-17as** 1:19
**62** 4:15
**65** 4:16
**66** 181:6,11,13
**670** 74:7
**679** 74:8
**6th** 128:6,15 140:6 140:9 141:2

**7**

**7** 103:18,22 104:5
**70** 88:6
**7024** 105:5,9
**7049-16as** 1:14
**70s** 9:15 113:21 114:7,8 194:11
**71** 16:18
**718** 2:23
**72** 13:10 40:11 57:16 142:4
**73** 13:13 17:18 81:9 102:1 106:18
**74** 79:5 80:13 81:5 81:9 106:18,19 107:3,4 114:3 132:4,25 155:8

**75** 114:3 157:21 159:12,13
**75270** 3:10
**76** 65:23 114:4 150:24 151:6 155:9 157:21
**77** 155:9 157:20 180:1,6,8,8
**77s** 154:11
**78** 157:20
**7873** 78:9

**8**

**8** 184:8
**8/11/72** 21:4,20
**8/8/74** 79:2
**80** 180:8
**800** 3:6
**82** 4:18 18:9 180:7
**83** 18:9
**84** 11:19 12:18,22 13:5,7 17:16 18:10 19:14 41:8 73:19,20 74:13,18 74:22 80:10,16,19 81:4 83:17
**85** 18:10
**87** 170:4,9,10,11 178:7 180:1,7,8,9 180:12 186:8
**8th** 79:5 91:23

**9**

**9** 134:11 137:7 147:22
**9/2/75** 162:25
**90s** 127:24
**91** 4:9
**93** 4:10
**95** 114:10
**96** 4:11 114:10 185:19,20

**983-1234** 2:23
**99** 4:10
**9932** 200:11
**9:00** 2:5
**9th** 134:12

**a**

**a.m.** 2:5 89:15
**ability** 199:3 200:9
**able** 22:19 23:17 33:14 55:17 112:19 113:5 146:5 194:4
**absence** 22:12
**absolutely** 31:3 160:15
**abundant** 167:21
**academic** 17:4
**accept** 24:24 36:11
**accepted** 94:8 119:16
**access** 194:2,5
**accompanied** 168:13
**accurate** 121:22 200:8
**acgih** 97:4
**acid** 173:9 181:9
**acres** 116:15 132:23
**acting** 94:12
**actinolite** 74:18,20 74:23,25 75:22,24 103:25 106:10,11 168:8,13,14,19,21 171:25 175:10
**action** 29:24,25
**activities** 93:24
**actual** 29:20 39:12 80:4 120:19 147:5 175:5

**add**  145:1,2
**addition**  52:17
 138:14 189:18
**address**  114:11
**administration**
 19:22 26:3 28:21
**admission**  187:21
 187:22
**admit**  188:16
**admitted**  14:6,7
 21:13 28:10 41:21
 43:10 61:25 65:16
 82:16 91:10 93:8
 96:17 99:20
 102:15 107:18
 115:21 129:4
 131:17 137:16
 140:23 151:14
 157:8 160:25
 162:17 165:20
 178:14 188:22
**adopt**  23:2 93:15
 97:2
**adopted**  25:7
**advice**  93:15,17
**affidavit**  70:6,10
 71:11 186:18
 187:1,7 194:15
**affidavits**  69:12
**afternoon**  177:2
**age**  193:22
**agent**  180:20
 183:25
**ago**  48:19 97:23
 116:17 150:3
**agree**  22:9 49:6,22
 50:6,12 64:9
 72:22 75:4,5,7
 111:25 112:18,23
 126:20 153:18,18
 153:21 163:23

**agreed**  42:14
 94:14 96:25
**agreement**  27:17
**agrees**  31:2 42:20
 163:18
**ahead**  23:1 46:21
 152:18 186:6
**aim**  194:20
**aimed**  92:10
**al**  1:7,12,17,22
 59:11
**alan**  131:10
**alice**  195:10
**allegation**  69:18
**allow**  26:21 27:17
 183:17 188:14
**allowance**  25:9
 26:10
**allowed**  27:3
 109:22 111:2
**alright**  6:20 9:9
 16:7 17:21 28:2
 30:4 38:25 42:24
 43:4 72:25 75:10
 82:20 94:1 99:6
 104:9 114:11,21
 117:1 128:11
 134:5,8 138:21
 156:8 159:23
 164:25 165:5
 168:7 175:2,14
 177:24 178:4
 181:24 185:16
 189:2 191:14
 195:4
**altered**  73:3
**america**  1:7,12,17
 1:22
**amount**  44:9
 53:21,25 108:2,14
 108:16 168:13

**amounts**  12:15
 102:23,25 168:11
 174:7
**amphibole**  40:8
 102:23 104:1,6
 120:1 127:10
 147:6,8,11 148:2
 173:5
**amphiboles**  40:13
 76:2 104:3 138:7
 138:16 141:22
 147:10,17,22,24
 163:4
**ana**  2:12
**analyses**  16:18
 19:3
**analysis**  15:1
 43:21 80:4,10
 81:3 87:22 155:11
 156:24 175:5
**analyst**  77:13
**analytical**  16:2
 23:3 83:21 104:14
**analyzed**  80:16,20
 130:2 147:4
**answer**  20:6 26:23
 27:8 34:6 38:6
 49:15 51:1 58:7
 66:20 67:1 76:25
 77:4 111:8 112:13
 116:22 126:10,10
 142:10,12 146:21
 152:1,2,17 156:20
 156:22 174:22
**answering**  104:23
**anticipated**  118:25
**anybody**  32:24
 194:2
**anybody's**  8:4
**anytime**  98:20

**anyway**  68:19
 116:13
**apart**  184:23
**apatite**  167:25
 168:9
**apologies**  142:15
**apologize**  29:5
**apparently**  73:2
**appear**  101:4
 102:8 193:7
**appearances**  5:11
**appeared**  17:8
 60:2 110:14
**appears**  28:19
 93:22 101:20
 185:7 187:2 196:7
**appellate**  1:2
**applied**  149:14
**apply**  50:10,21
 51:2
**appreciate**  181:17
**approach**  110:14
 163:21,22
**approval**  181:5
**approve**  132:11
**approving**  132:16
**approximate**
 147:5
**approximately**
 21:18 44:22
 120:20 163:6,8
**april**  65:23 71:9
 90:16,21 92:22,24
 95:18 99:2,2,3
 101:25 113:20
 114:22 115:15
 130:2
**archimedes**
 170:21 173:14
**area**  86:4,7 87:1,4
 87:18 123:25

**areas** 116:10
132:7,11,17,21
134:2 136:4,17
**argonaut** 114:3,17
115:4 116:1,3,4,7
116:9,10,12,12,18
117:3,4 118:12
121:7,17 123:11
131:22,25 133:4
134:22 137:10
139:7,9 161:12
167:11
**argonauts** 116:11
**argue** 86:24 95:1
164:3
**arguing** 126:6,6
**argument** 8:10
27:6 38:4 49:14
50:24 58:5 75:8
77:25 94:15
124:17 174:19
**arizona** 165:13
177:6 180:17
182:3
**art** 47:2
**article** 39:9 196:4
196:6,8,9,11
**arx66-14** 139:11
**asbestiform** 45:3
45:22 46:1,4
48:11,13 51:18
54:22 62:24 65:22
66:15 98:12
104:15,16 105:5,7
105:22 117:18,23
118:2 119:6,20
121:3 133:5,17
135:19,22 136:3
136:11,15 138:6
155:11 156:23
162:25 163:4,11

163:18 164:6,8
**asbestiforms**
139:2 141:21
**asbestos** 16:18
19:12 21:3 22:12
22:13 23:4,18,19
23:21 25:10 26:6
26:11,20,22 29:10
29:11 30:12,19,23
31:1,4,10,14,15
32:13,19 39:11,13
40:7 42:18,22
48:7 51:4 73:19
75:23 76:3,5,13,15
76:21 84:9 90:9
92:4,8 95:7 97:3,5
97:21 98:2,6,10,13
98:22 101:7,11,13
101:16 108:2,8,14
109:22 111:1
114:19 116:1,18
118:9,12 119:19
120:20,23 124:2
124:15,16,20,25
124:25 125:4,6,12
125:20,21,22
126:14,19,20
128:24 129:13,14
129:19 130:14
134:2 138:18,22
139:12,14 141:6
143:5 144:17
145:5,11 146:8,13
147:8,11,15,19,19
148:8,14,19
159:12,13 163:12
163:14,18 164:7,9
171:7 188:1
190:24,25 192:1,5
192:10,25

**ashton** 59:13,14
63:14 64:2,10,24
67:6,7,7 91:5
92:12
**aside** 38:25 134:9
**asked** 6:20 16:17
20:6 23:14 25:8
26:9 34:6 38:1,9
57:8 70:12 77:4
108:4,11,11,12,15
110:8,16,18
115:25 116:16
126:11 133:9
142:13 159:16
184:6 193:1
**asking** 50:20
105:2 123:6
149:16 158:19
169:8 199:15,20
**asks** 108:1,19
**aspect** 105:16
**aspects** 92:2
**assay** 22:21 23:11
**assistant** 83:20
**associate** 95:14
126:23
**associated** 168:3
**associates** 70:23
133:3
**assume** 108:8
**assure** 141:13
**asterisk** 109:9
**attached** 8:8 71:5
71:11 191:4,7
**attaches** 191:12
**attacks** 17:10,12
**attended** 91:14
**attitude** 93:15
95:13
**attorneys** 3:10,20

**august** 9:22 10:3
10:15 13:11 20:16
20:24 28:5 41:19
64:16,20 79:5
82:11 83:1 88:6
**author** 171:14,15
171:17
**available** 191:25
**avenue** 2:22 3:3,6
**avoid** 94:23
172:22
**avoided** 136:4
**avon** 31:8,10
**aware** 7:2 60:22
89:23 90:7,12
94:25 182:1,5
184:17 185:5,24
186:1,4

**b**

**b** 4:4 168:12
196:16
**baby** 13:2 15:19
17:22,24 43:22
45:2 52:10 57:14
59:22 78:23 79:1
79:12,19 81:5
100:1,3 108:3,8,16
109:22 110:22
111:2 117:6,8
119:15 129:13,15
130:25 132:2
181:14,18,21
189:18,19,23
190:2,3,23 191:24
191:25 195:21,24
**back** 6:13 7:13
8:25 10:14 11:15
24:23 34:12 35:4
38:11 59:11 60:2
72:16 78:3 89:4,5
100:6,10,13

122:18 124:3
130:8 135:12,14
148:19 155:13
168:20 175:24
176:10,12 182:11
187:6
**backdated**  56:19
58:1 60:8,8
**bacon**  91:15
**bad**  180:24
**badges**  175:19
**bag**  79:7
**bank**  3:4
**barden**  1:4 3:11
5:7
**bardens**  5:15
**base**  93:24
**based**  58:20
100:24 102:24
110:19 111:25
135:17 136:10
**basis**  7:2 22:18
24:20 33:10 35:18
79:18 81:11,14
**bates**  7:16,25
17:17 36:24 65:10
68:4,9,16,19,19,20
70:2 71:13 82:5,5
165:15 169:10
182:25 197:9
**battelle**  60:2,4
**bearing**  152:7
153:15
**bearings**  15:13
49:21 82:9
**beg**  20:7
**began**  5:25 185:3
**beginning**  122:18
130:4
**behalf**  5:17 183:6

**believe**  11:12
13:15,20 16:10
17:23 20:13 25:16
25:20 35:24 37:6
46:18 53:13 63:10
67:23 108:3
111:15 158:16
181:10 192:15
194:25
**believed**  111:1
**belt**  173:14
**beneficiation**
118:25 124:1
138:19
**benefitiated**  119:5
138:22
**benefitiation**
137:24 138:25
**berger**  39:21,22
**best**  56:1 129:9
200:9
**bet**  153:19
**better**  120:3,7
**bigger**  107:2
**biggest**  113:23
**bill**  59:13,14 63:14
64:2,10,24 67:6,7
67:7 91:5
**binder**  20:18 61:1
74:3 90:17 106:21
106:22 156:12,15
162:6 186:8
**binders**  155:3
**biotite**  167:25
168:4
**bit**  69:4 86:10
114:12 145:22,25
175:8
**bite**  161:12
**blackbear**  158:18

**blount**  195:9,10
196:20
**board**  55:6 73:13
105:10 198:10
**bodies**  113:21
**body**  114:18 115:4
115:6 116:2,3,7,12
116:14,18,21
117:3,4,13,18,20
118:12,13 119:13
122:1,3,6,6,7,21
123:2,23 127:17
127:23 128:2
132:22 133:4,7
134:23,24 135:1
135:19 136:12,13
137:10 139:9
143:6 144:8,9
186:5
**book**  87:24
**bore**  138:12
**bottle**  118:7
**bottom**  17:17 37:2
68:21 79:22 102:9
109:12 123:21
179:11,14 181:4
197:10
**bound**  94:22
**bouquet**  11:17
**brand**  29:3,17
172:10 184:23
**brazil**  109:13,16
**break**  52:12 88:21
89:1 95:23 169:23
175:8,18 177:22
**breakdown**
149:19
**brenntag**  1:7,12
1:17,22
**bring**  89:8

**broader**  92:1
**brought**  9:9 19:12
177:9
**brown**  39:20
**bruce**  178:6
**brunswick**  2:3
**bs**  178:5
**bunch**  38:12
**bundle**  147:24
**bundles**  84:8
147:23
**bureau**  91:22
93:25 94:11,22
97:2
**business**  71:7
94:16 189:6

**c**

**c**  2:12 3:1,17 133:2
153:23 178:1
196:16
**c.s.r.**  200:3
**calcite**  168:4
**calculation**  108:2
108:5,5,7,13
109:19,21 110:16
110:18 130:12
141:3,4
**calculator**  87:14
**call**  25:25 158:24
163:11
**called**  11:17 67:7
89:23 90:1 91:15
95:12 190:14
**canadian**  152:6
**capable**  32:3
33:22 141:11
**car**  172:17
**care**  14:5
**carried**  130:24
**carry**  60:10,16

[case - concentrates]

**case** 7:14 8:4
  11:18 13:21 19:20
  20:11,15 29:23
  31:10 32:22 34:15
  89:3 100:6,10
  111:6,14,15
  146:13 175:21
  183:25 185:4
  190:14
**cashmere** 11:17
**category** 39:15
**cause** 29:6,8
  171:23
**cc'd** 99:14
**ccr** 2:21
**cell** 5:3 89:18
  176:23
**center** 3:18
**centrifuging**
  145:25
**certain** 100:7,7
  108:14 110:19
  136:4 141:20
**certainly** 8:16
  28:25 34:1 47:19
  77:19 169:16
  173:17 174:14
  184:16 185:10,17
**certification** 200:1
**certified** 200:4,13
**certify** 200:5
**chain** 64:5
**chance** 65:7 97:20
  98:3,5
**change** 56:21
**changed** 51:22
**characterization**
  44:8
**charles** 1:8 3:11
**chart** 46:14
  104:13

**check** 19:4
**checked** 19:17
  55:23
**chemical** 59:9
**chemistry** 16:23
  17:1
**chester** 158:18
**chicago** 100:20
**chief** 23:24
**chloride** 168:4
**chlorites** 167:23
**choosing** 46:17
**chose** 16:21
**chris** 3:8 5:14
**christopher** 3:2
  5:15
**chrysotile** 12:15
  12:20 22:6,12
  23:20,23 24:3,6,15
  24:25 30:14 31:25
  32:4 33:23 35:16
  38:12,16 40:21
  84:9,12 85:18
  88:9 114:19 116:1
  116:18 120:20
  121:13,25 123:2,3
  123:16,17 125:22
  126:24,25 127:6,9
  127:14 128:2
  129:23 130:11
  138:4,7,12,15,18
  141:22 174:16
**ci** 155:18
**circle** 48:15,21,23
  49:2,2,21,24 50:4
  50:8
**circles** 49:5 122:16
**citric** 173:9
**claim** 98:2
**claimed** 24:2,3
  30:13,14 54:2

126:15
**claiming** 90:8
  97:21 98:5
**clark** 30:24
**clean** 132:8,17
  135:4
**cleaner** 173:7
**clear** 25:22 44:6
  64:9,12 69:14
  70:1 92:2 150:15
  163:17 172:15,25
  181:2
**clearly** 35:14
**clifton** 158:13,15
  158:19,20 161:16
**close** 11:23
**closed** 161:24
**closer** 103:25
**code** 29:16
**cohen** 3:3
**color** 46:17 49:1
  100:25
**colorado** 39:19
**colored** 48:16,17
  49:2,7,9,10,13,23
  50:2,4
**columbia** 155:14
  155:16,20,22
  158:13
**column** 103:5
**columnar** 103:5
**come** 70:2 89:5
  147:23 175:23
  183:23
**comes** 21:19 38:11
  52:18 130:1
**coming** 95:20
  137:23,24 159:3,4
**comment** 191:17
  191:18,19

**comments** 28:20
**commercial**
  185:23
**commercially**
  114:5
**commonsense**
  124:24
**communicated**
  10:18
**community** 17:4
**companies** 6:2
  42:10 161:7
**company** 39:13,18
  42:8,12 63:6
  89:23 90:1,4 95:4
  95:10 100:6
  149:10 151:23
  172:11 181:19
  183:21,24 184:1
  185:13 186:22
  188:3 194:2,3
**company's** 183:13
**compared** 133:6
**comparison**
  117:19 122:20
**competence** 17:6
**completeness** 68:8
  84:5 118:15 125:9
  135:11 188:17
**compliance** 200:6
**complies** 46:23
**composite** 121:4
  122:10,12 155:14
  157:14
**composition**
  167:17
**compressed** 200:8
**concentrate**
  145:23 173:8
**concentrates**
  171:5

[concentration - correct]                                                                 Page 8

concentration
  145:23 147:6
  163:6
concerned  181:22
concluded  119:12
  134:25
concludes  35:21
conclusion  44:25
  54:9,12,13 118:16
  123:13 125:9
  135:17 136:6
  185:15
conclusions  66:11
  66:11 125:15
conclusive  138:13
condensed  66:23
  67:10
conducted  183:6
confer  17:9
confidential  183:5
confirm  22:23
  23:15 40:16 55:17
  55:22,24 84:24
confirmation
  95:20
confirmed  22:21
  23:11,18 30:9
  31:12 33:16 35:9
  35:11 37:15,19
  41:5 59:12 74:17
  145:5,11 159:12
  180:18
confirming  37:12
confrontation
  17:5
confuse  92:14
confusing  92:11
conjunction
  155:11
consider  20:5

consultancy
  199:14
consultant  17:8
  27:20 40:20
  198:20,23 199:2
  199:12,17
consultants  60:20
  73:1
consumer  3:20
  5:19 42:19,21,22
  183:6
consumers  112:19
  112:25 113:4,4,15
  113:18
contain  32:8 53:21
contained  39:11
  44:8 74:22 114:18
containing  42:18
  97:5 100:23
  130:13 141:5
contains  23:17
contaminates
  167:19
contaminating
  166:10 167:5
  171:4,25
contamination
  139:12 172:22
contemplating
  117:14
content  44:21
  80:16 117:16,18
  139:10 146:9,14
  171:6,11 180:5
context  125:2
continuation
  199:22
continue  6:3 70:19
  89:19 124:10
  176:25

continued  4:3 5:6
  6:7 185:6
continuing  25:6
  33:14 119:3
control  95:17
cooperation
  111:20
copied  106:3,8
copies  7:24
copy  7:13,15
  64:25 128:12
  159:25 182:14
  196:23 198:1
core  115:6 117:10
  117:16,19 122:20
  123:22 126:16
  127:11 130:2
  132:4,20,20
  134:21 139:7
corporate  6:1
correct  10:19 11:8
  12:9,20,23 13:8
  15:11,15,22,25
  16:9,12 17:1,12,22
  18:1,14,21 22:24
  23:2,8,12 24:6,15
  24:16,25 25:11,18
  26:6,12 28:5,6,18
  28:23 29:14 30:1
  30:12 31:2,6,7,16
  31:21,25 32:4,14
  33:12,17,18,19,23
  34:11,15,24 35:3,9
  35:19,23 37:13,20
  38:8,17,19 40:4,7
  40:17,21,25 42:22
  43:22 44:13,18,23
  47:15,17 48:11,17
  51:22 53:3,9,12,15
  54:1,16,20,25 55:2
  55:15 57:1,19

59:9,23 60:14
  61:19,20 64:3,21
  65:10 66:9 67:13
  73:16,20 75:19
  79:16,17,20 80:17
  80:21 82:7 83:2,7
  85:1 87:16 88:13
  89:25 91:3 95:2,7
  95:21 97:17 98:23
  98:24 100:8 105:6
  105:17,19 107:9
  108:3 109:2 111:9
  113:24 114:19
  116:19 117:6
  118:9 119:15
  120:3 121:10,19
  122:1,6,11 123:4
  127:15 129:19
  130:8,17 131:4,22
  133:14,15 134:19
  135:2 144:8
  145:11 147:9
  149:5 152:8,24
  154:7 156:19
  157:18 158:4,8
  159:5 160:15
  161:20 162:1,22
  163:8 164:20,23
  165:15 166:14
  168:16 169:3,9,16
  171:2 174:17,23
  175:11 180:5
  183:7 184:4,18
  189:24 190:2
  191:15 192:5,13
  194:3,6,11 195:11
  195:22 196:5,12
  196:13 197:7,21
  198:3,21,23,25
  199:10

[cosmetic - declared]                                          Page 9

**cosmetic** 9:18
16:19 42:18 97:14
97:15 113:24
114:1,6,9 119:14
126:23 129:22
130:11 134:19
135:2,20 139:23
141:13 144:7,9
149:5,10,15 150:2
150:4,7,18 152:6
152:23,23 153:14
153:19 154:4
156:5,25 157:14
157:21 158:3
159:4 164:19
170:25 172:7,13
172:19 173:1,25
190:7,10 193:2
**cosmetics** 130:24
154:6
**counsel** 10:1 14:1
65:1 68:8,11,25
69:4 70:16 78:1
78:10 80:3,6
90:19 118:15
123:12,19 124:6,9
126:6 135:11
140:8 142:13
178:25 198:1
**count** 81:12
**counts** 147:5
**county** 1:1 2:2
187:7 200:14
**couple** 92:1 96:3
**course** 8:16 71:6
73:23 136:2 169:9
179:21 196:24
**court** 1:1 5:2,17
5:24 6:11 7:8,12
7:17 8:6,9,15,23
9:5 10:1,5,12 14:1

14:6 20:4 21:13
27:7 28:10 34:5,8
38:5 41:14,21
43:10,25 44:3
46:15 49:16 50:25
53:4 55:1 58:6
61:6,25 62:6,10
65:16 68:11,22,25
69:3,8,15,21,23
70:5,16,19 77:2
78:1,3 81:18
82:16 88:23 89:10
89:14,17 90:19,23
91:10 93:8 96:17
98:16,18 99:20
102:15 104:25
106:21 107:18
110:6 115:21
118:20,22 124:8
125:8,11 126:8
129:4 131:17
137:2,16 140:3,7
140:23 142:8,11
142:17 144:3
151:14 152:16
154:24 155:4
156:16 157:8
159:19 160:1,9,25
162:17 165:20,24
166:3 169:24
174:21 175:17,25
176:2,10,15,22
177:19 178:14
179:1,4,16,19,22
182:6,9,22 183:17
187:15,18 188:4,7
188:9,14,21 200:4
200:13
**courthouse** 2:2
200:14

**courtroom** 52:24
129:18
**cover** 61:11 63:13
82:21 161:3
179:20
**covers** 73:24
116:14
**crinkled** 84:8
**criteria** 101:1
**crossed** 78:25
**crr** 2:21
**crystals** 54:8
55:11
**ctfa** 22:3,19 23:2
25:22 26:2 28:23
28:25 29:24 33:11
**cupboard** 100:12
**current** 93:24
117:19 122:21
123:4 128:2
133:10 200:7
**currently** 121:7,19
**custodians** 70:22
**customers** 183:22
184:17
**cut** 15:7,11
**cyprus** 71:15

**d**

**d** 4:1 196:16
**d'angela** 1:14 3:11
5:8
**d.c.** 91:24
**dallas** 3:10
**damaging** 180:25
**danger** 42:21
**daniel** 30:25
**darlene** 1:9 3:11
5:7
**data** 22:5,10,19
33:10 129:14
152:4

**date** 2:4 10:2
13:23 21:2 27:25
43:1 56:22 60:11
61:6 64:17,18
79:2,4 90:20 91:3
140:7 152:12
153:1,3 161:17
189:14 200:13
**dated** 20:16,23
27:25 43:18 57:16
58:23 61:16 64:16
64:20 65:23 73:23
73:24 80:12 92:22
106:15 114:22
128:6 150:22
151:6 154:9,15
162:5,25 165:14
170:3 183:2 186:7
**dates** 8:4 60:16
73:25
**david** 1:8 5:7 70:7
70:21 99:7
**day** 27:24 150:11
150:13,15,21
187:3
**day's** 199:22
**days** 21:19,21,23
40:14 41:4 92:23
93:11 98:7,20
**decades** 9:1
**december** 16:18
80:15 81:3,9,9
165:1,1,2,6,14
178:21
**decide** 170:17
**decided** 94:23
**decisions** 112:20
113:4,5
**declared** 23:20
31:14

[defendants - documents]                                         Page 10

**defendants** 1:7,13
1:18,23 3:20 5:18
**defending** 94:17
188:2
**defense** 13:15 39:7
78:8,13 94:20
**define** 58:13
104:15 105:5
**definition** 47:14
50:7,10 51:9,16,17
51:20 76:16,17,20
104:10,12,14,18
105:4,11,21,23,24
106:2
**definitions** 76:1
164:5
**delete** 63:18 64:3
64:10 67:3,8 68:1
**deleted** 66:17
**deleterious** 180:21
180:24
**demonstrate**
187:24 192:3
**density** 86:3
**department**
160:16,18 161:4
**depend** 32:12
**depending** 16:5
**depends** 58:13
**deposit** 166:10,16
167:5
**deposition** 34:20
**deposits** 169:1
**describe** 45:22
76:14,20
**described** 39:15
47:23 75:24 84:13
98:13 147:10,14
147:17
**describes** 85:21
95:22 116:6

126:18
**describing** 49:24
120:22 147:25
171:20
**description** 4:5
**designated** 65:25
152:24 153:7
**designation** 79:15
149:12 150:5,13
151:20
**desirable** 17:9
**desire** 184:23
**desperate** 94:14
**detail** 62:21
**detailed** 45:1
**detect** 18:3,6
19:13 23:22 24:5
24:15 31:24 35:16
35:23 40:24
**detectable** 31:15
**detected** 59:18
129:23 173:5,12
188:2
**detecting** 32:3
33:23
**detection** 16:3
**detects** 38:13
**determine** 95:13
117:15 167:17
171:4,11
**determining**
141:12
**developed** 141:17
**development**
77:19 165:13
**diane** 3:14 5:21
**differ** 131:1
133:16
**difference** 48:2,6
81:1,7,10 133:4

**differences** 27:19
**different** 7:4 11:16
11:23 40:16 45:25
116:10 148:6
**difficulty** 171:23
**diffraction** 18:17
18:21 19:2,8
32:23 123:24
138:13,16
**direct** 4:3 5:25 6:7
137:3
**directed** 97:13
**directly** 194:10
**director** 83:21
144:22
**disagree** 110:23
163:13 175:12
185:10
**disagreement**
42:15
**disbursing** 180:20
**disclose** 152:3
**discontinue** 94:6
**discuss** 129:10
**discussed** 37:2
73:9 84:23 97:17
118:5
**discussion** 9:24
23:16,21 35:13,15
37:8 43:2 69:1
71:25 89:12
128:23 131:21
142:22 159:9,21
162:2 165:3
169:25 171:19
176:5 177:14
195:5
**discussions** 69:4
89:2 155:12
175:20

**dispersion** 99:25
100:21 181:8
**disposable** 193:24
**disposal** 193:16,24
**distribute** 6:12
**district** 189:8,16
**divide** 87:15,15
**divided** 87:16
**division** 1:1
130:24 161:8
**docket** 1:2,2
**doctor** 34:5 81:21
152:18
**document** 8:2
11:11,12 13:19,21
14:4,18,21 20:16
21:7,17 27:9
33:10 41:13 58:22
61:12 64:7,16
67:19 68:9 72:2
73:14,21 78:11,12
83:2 84:6 90:17
92:20 99:1 102:1
102:10 106:6,14
113:19 114:22
117:2 128:8 137:7
140:5 143:14
144:6 150:22
156:15 165:8,12
165:25 169:23
170:15 174:19
178:1,20 179:2
180:12 182:16
183:14 188:21
194:8
**documentation**
36:19 81:15
**documents** 7:20
8:19 19:20 20:11
20:15 34:15,17
36:3 46:8 69:13

[documents - evidence]                                                        Page 11

70:2 71:1,12,22
106:16,25 128:12
128:13 161:4
171:16 175:3
177:23 178:20
182:7 194:10
**doing**  15:25 35:14
44:18 92:17 98:3
125:9 159:18
174:2
**douglas**  1:4 3:10
5:6
**downstairs**  89:8
**dr**  6:1,8 9:10,11,11
9:15,17 10:16
13:8 16:14,17,21
17:11 19:7,8 21:4
22:9 23:14,14,16
23:25 24:17,18,22
25:1,3 26:13
27:10,17,18,24
28:3,14 30:2,5,5
30:18,21 31:19,19
31:20,23 32:6,11
37:2,9,9,19 38:1
39:1 41:1,16
43:16 59:5 73:10
78:11 83:16 84:24
85:17 95:12
110:14 111:18
125:12 129:10
130:9,23 140:13
141:2 142:11
161:19 196:20
**draw**  46:18,21
47:7,25 48:15
158:1
**drawing**  47:22
48:1
**dressings**  100:18

**drew**  47:19
**drill**  126:16
127:11
**dropped**  54:6
**drug**  19:22 26:2
28:20
**duplicate**  19:1
**dusting**  129:15
130:25

**e**

**e**  2:24 3:1,1 4:1,4
8:7 196:16
**earlier**  114:13
**early**  9:15 60:4
89:23 181:17
**easier**  55:7
**east**  116:12 135:8
**eastern**  100:18
**economic**  29:7,8
29:11
**edges**  171:23
**editor**  39:2
**edly**  190:14
**efficacy**  180:19
**efforts**  96:25
97:13
**egan**  178:1
**eiermann**  109:1,1
109:7 110:13,15
130:23
**eiermann's**  110:14
**eight**  21:21,23
40:14 41:4 146:12
**either**  55:6 68:6
181:10 199:5
**electro**  22:12
**electron**  34:2,11
34:23 35:1 117:10
120:12 123:24,25
127:9 138:11,13
139:6

**elicit**  91:21
**elizabeth**  1:19
3:12 5:9
**elm**  3:9
**elongated**  105:10
105:13
**else's**  99:8
**em**  36:22 37:4,10
37:20
**employee**  109:13
110:16
**employees**  161:11
161:15,23
**employers**  109:16
**enclosed**  155:9
**ends**  9:7 69:24
179:23 188:20
**engelhard**  71:16
**english**  3:18 50:21
**enhance**  180:20
**enjoy**  175:23
**enters**  5:1 89:16
176:21
**entire**  37:11 49:2
66:17 132:21
163:3
**entirely**  49:9,13
**entitled**  82:10
115:3 170:12
**envelopes**  6:13,16
**equal**  51:13
**equate**  87:19
**equivalent**  147:5
163:5,7
**ercilyn**  176:10
**erroneously**  39:9
**error**  29:5 103:22
**esdp**  100:15,16,20
**esq**  2:18 3:2,5,8,14
3:14,17

**established**  122:5
144:6
**estimate**  102:25
**estimated**  118:2
139:16
**estimation**  129:12
**et**  1:7,12,17,22
**etheridge**  1:8,9
3:11,11 5:8
**etheridges**  5:16
**evaluated**  51:24
133:3
**evaluation**  127:17
131:22 181:6
**events**  64:5
**everybody**  177:2
**evidence**  10:7
14:10 21:11,15
27:2 28:8,12 39:6
41:18,23 43:7,7,8
43:12,14 52:3
61:23 62:2 65:13
65:18 73:7,11
78:9 82:14,18
91:8,12 93:6,10
96:15,19 99:18,22
102:13,17 105:9
107:16,20 112:17
115:19,23 117:22
129:2,6 131:14,19
137:14,18 139:12
140:21,25 143:10
143:22 144:2
146:18,20,25
149:20 151:11,16
154:22 155:6
157:10 160:23
161:2 162:15,19
165:18,22 176:13
176:18 178:12,16
183:10 187:11,19

188:25 190:24 192:24 193:10,14 193:16,23 195:8 195:14 196:22
**evolved** 17:15
**exact** 57:19 108:10 138:12 169:19
**exactly** 54:10 127:3
**examination** 4:3 5:25 6:7 45:1 57:13 99:25 115:3 115:11 117:2,9,15 138:11 139:7 168:23 170:20
**examine** 65:21 123:22
**examined** 31:13 100:21 117:20 122:21 129:22
**examining** 146:7
**exceed** 146:14
**exceeded** 118:2
**excluding** 120:25 120:25
**exclusive** 189:6,17
**excuse** 49:16 68:22 194:17
**exercise** 87:24
**exhibit** 4:6,6,7,7,8 4:8,9,9,10,10,11 4:11,12,12,13,13 4:14,14,15,15,16 4:16,17,17,18,18 4:19,19,20 7:5 10:8,9,14 13:15,22 14:9 21:11,14 28:7,11 39:7 41:22 43:11,13 53:8,11 58:25 60:24 62:1 65:6

65:17 71:5 73:7 78:9,13 81:17 82:17 90:15 91:11 92:23 93:3,9 96:4 96:14,18 99:3,18 99:21 102:2,16 106:17 107:19 115:22 128:8 129:2,5 131:10,18 134:12 137:17 140:10,24 143:11 149:21 151:11,15 154:22 155:5 157:6,9 159:24 161:1 162:4,18 165:21 166:2 170:8 176:17 177:17 178:15 183:10 186:12 188:24 191:13 195:8 196:23 198:3
**exhibiting** 121:3
**exhibits** 20:22 43:5
**exist** 130:10
**exiting** 89:10 175:25
**exits** 89:11 176:1
**expanded** 16:20
**expect** 20:15 97:2 194:1,4
**expected** 130:13 141:5
**experiment** 129:15 130:25 174:1,16 180:3
**experimental** 174:13
**experimenting** 180:3

**experiments** 60:18 174:15,24,25 175:4
**expert** 16:22,25
**expertise** 48:5
**explain** 22:11 37:23 48:6
**explained** 7:19
**explanation** 38:14 134:7
**exploiting** 117:14
**exposure** 129:19
**expressed** 94:12
**extensive** 139:6
**extent** 175:9
**extremely** 59:17 124:2

**f**

**face** 193:7,11
**facilities** 100:20
**fact** 18:7 39:12 45:15 58:2,10 72:2 78:22 166:8
**factor** 130:13 141:5
**factually** 29:14
**fair** 173:2,16 175:5 185:13
**fairness** 168:25 169:1,18 175:2
**falls** 119:15
**false** 35:7 191:15 191:17 193:6,13
**familiar** 9:14 39:3 90:10
**far** 112:1 113:7
**fast** 158:1
**fda** 9:18 10:16,19 11:7 12:11 14:21 16:12,15,24 21:3 21:20,21 22:3

24:18 25:1,4,22 26:8,21 27:2,10 29:5,15 30:1 32:11 40:15,15 41:12,19 42:16 53:2,5,11 58:19,20 73:5,15,19 74:10 74:17 77:13 83:17 84:23 87:22 88:15 93:16 95:15 97:14 106:12 107:22 108:1,15,19,19 109:3,7,17,23 110:11,25 111:3 111:16,20 127:13 127:24 128:3,11 128:13,19 130:19 130:22 139:21 140:17 142:20,24 143:2 146:16 160:5,12,20 164:11 196:1
**fda's** 41:25 95:13
**february** 88:6
**feed** 173:7
**feedback** 181:17
**feel** 6:23
**feeling** 94:7
**fell** 39:14
**fella's** 144:21
**felt** 94:18
**fiber** 23:24 47:14 47:16,25 48:1,3 51:9 62:23 76:8 83:4,6,10,24 84:1 84:14 85:21 87:20 98:21 104:10 105:4 129:13 146:9 147:5
**fibers** 23:23 24:15 31:25 32:4,8

35:16 38:16 51:18
74:22 75:3,3,7,11
76:11,12,14 84:8
94:18 98:8,21
100:24 113:8
121:3 138:4,12,15
139:11 141:6
146:12,12 147:15
147:19,23 148:19
159:13 163:4
196:10
**fibrous** 47:23,24
48:6,7 75:4,8 76:1
76:2,4,7,14 97:3,4
120:21,23 147:18
**fifth** 12:13 74:11
**figure** 149:8
**figures** 120:19
**file** 28:15 52:19,25
**files** 72:19 81:23
197:16,17
**filled** 186:25
**final** 16:9 18:5,15
77:10
**finally** 7:24 31:12
**find** 30:8,19 66:15
74:1 104:16
114:23 126:14
138:6 150:24
154:10 155:10
171:10,14 177:24
186:8
**finding** 19:12
30:12 31:18
100:24 106:20
143:5 173:18
**findings** 23:16
27:19
**finds** 64:2 78:7
**fine** 32:3 38:16
40:21 54:11

108:25 150:22
188:13,19
**fines** 145:13,19
148:1,6,22 173:10
**finish** 152:16
**finished** 9:10
11:22 121:5
122:10 192:8
**firms** 91:21
**first** 7:21 27:23
53:24 54:2,13
56:20 58:2,10
61:14 63:19 64:11
66:6 80:25 93:20
118:5 124:5
146:15 153:20
155:8 156:14
180:16 185:1,5
187:21 189:5
197:2
**fit** 145:1
**five** 89:5,7 148:23
148:23
**float** 119:7 170:25
174:3
**floated** 138:21
174:2
**floor** 3:6
**flotation** 119:1
170:20,24 173:24
174:2,7 175:11
180:4
**focus** 145:9
**foia** 14:22 41:12
41:19 128:12
160:5
**folder** 102:1
**folks** 63:17
**follow** 35:3
**followed** 93:14,17

**following** 129:10
**follows** 22:4
**followup** 146:23
**food** 19:22 26:2
28:20
**ford** 172:16
**foregoing** 200:6
**foreseeable** 8:11
8:14,19,20 9:1
**forgetting** 109:6
**forgot** 152:19
**form** 48:6,7 76:4,7
**format** 200:7
**formed** 189:6
**former** 109:13
110:15
**forward** 181:5,16
**found** 14:13,14
20:23 27:25 30:13
30:14 39:13 45:23
55:11,18 62:23,23
73:19 74:11 76:6
76:10,11 84:11,13
90:25 92:25 96:5
99:4 104:1 106:10
106:11 107:6
113:8 114:25
118:11 120:23
123:2 125:4,6,12
125:20,21,22
127:14 128:2
131:7 133:4,21,22
134:14 137:6
138:3,15,18,22
141:22 143:12
144:17 145:5,10
146:11,12 147:7,8
147:12 163:4
165:5 173:15
195:25

**foundation** 159:15
174:18
**four** 3:18 42:25
51:19 86:10,10
100:23 106:9
146:12 168:11
170:5
**fourth** 173:7
**fraction** 145:24
**frame** 8:3
**framework** 94:1
178:19
**free** 22:6 23:20
29:11 31:1 45:3,5
45:6,9,10,11,21
48:10,11,13 50:11
50:18 51:2,4,5,7
54:22 119:5 124:2
124:15,16,20,25
124:25 126:19,20
134:2 135:22
136:2,15 173:11
192:1
**freedom** 135:18
136:11
**frequently** 184:12
**fresh** 6:23
**front** 54:12 56:22
63:14 146:6
150:25 154:11
187:6 190:15
**frost** 161:12
**full** 14:25 111:20
112:24 189:11
200:6
**fuller** 21:4,8
111:18
**fully** 50:4
**further** 129:21
**furthermore** 17:6

**g**

gained  46:8
game  44:17
games  49:9,12
garde  3:17
gassetts  149:25
  155:23 156:1
  161:12
gateway  3:18
gene  61:18 63:20
  63:20 64:23
general  97:1
  128:23 139:9
generated  64:1
  72:20,23 73:1
generic  116:7
genuine  112:7,9
  112:11
geological  178:23
geologist  46:6
geologists  136:21
george  1:14 3:12
getting  69:5
  115:14 186:5
gi  149:25 192:12
give  7:13 35:7
  53:25 55:14 67:18
  94:1 107:2,3
  108:11,12 134:6
  138:15 178:18
given  36:4,10 97:7
  122:9,12 180:13
gives  168:21
go  10:17 12:1
  17:16 18:9,13
  21:1,2 23:7 27:16
  34:12 36:14 40:24
  42:24 46:21 47:2
  54:12 58:22 63:13
  64:15,16 65:3
  66:4 67:21 74:5

77:22 81:21 87:13
  87:22,25 88:15
  92:9,20 96:2
  97:16,19 100:13
  109:12 113:19
  122:15,18 127:8
  127:24 128:3,5
  132:24 139:21
  146:1,16 152:18
  156:13 157:12
  164:11,25 165:1
  172:24 177:21
  179:8 182:17,20
  189:2 190:12,20
  191:9,23
goes  17:18 37:3
  141:18 142:20,25
  143:2 183:15
going  6:3 8:25
  9:11 19:23 22:23
  26:21 32:20 34:3
  36:14 40:20 45:8
  47:3,25 48:18
  50:13 54:23 60:2
  61:1 64:4 69:16
  70:5,8 72:16
  73:18 76:20,22,24
  77:2 80:25 86:24
  88:25 91:7 92:7
  92:20 99:1 124:11
  124:12,17 125:8
  125:18,25 129:8
  132:12 141:17
  145:3 152:14
  153:7 154:13
  157:25 159:11,17
  160:23 162:6
  164:3 170:4 175:4
  175:18 182:11,12
  183:13 188:16
  191:16 194:10

good  5:2,13,20,23
  6:6,8,9,10,23 21:6
  40:6 43:17 47:1,1
  88:23 113:13,16
  139:10 175:16
  177:2 198:14
gotschal  3:15
gotten  118:19
goudie  42:4 59:5
  59:11
government  17:6
  160:13
grade  119:14
  124:2 126:23
  135:2 156:5
  157:18 181:6,11
  181:13
grain  168:19
  173:11
gram  74:23 75:14
  75:18,19
granted  152:3
grantham  81:22
  82:21,23
great  128:12
  162:10 186:12
greater  51:13
  184:12
green  149:9
greenstone  3:8
greiger  61:19
grid  86:20
grids  22:13
grieger  63:20
  64:23
ground  49:22
  106:23
group  23:15 96:24
  97:12 129:11
growing  22:14

guess  52:17 61:2
guys  30:15 39:20

**h**

h  4:4 99:7 153:22
half  16:3 119:25
  139:18
hallway  89:9
hammer  42:4 99:7
hammondsville
  113:24,25 114:16
  121:10 122:1,3,5,7
  122:11,13,23
  133:7,11,25 143:6
  144:7 149:4,9
  153:19 156:4,24
  157:13,21,25
  158:2,3,4 159:3,4
  161:13 164:19
  167:10
hand  6:13 182:14
handling  127:2
handwriting
  61:11
handwritten
  63:25 82:7,24
  88:17,18 178:10
happened  64:13
  194:13
happening  7:1
happy  69:19 134:6
hardship  29:9,11
hardships  29:7
hazard  42:17
  130:10
hc  145:9,11 146:2
  146:3,4 148:20,20
  149:2,4,9,12,17,19
  150:2,3,18 152:7
  152:24 153:7,15
  153:21 154:4,7
  156:5 157:14,21

163:5,7 164:14,15
164:18,21 192:4,9
**head** 28:22 44:17
145:4
**heading** 147:13,14
**health** 112:20
130:10
**hear** 188:9
**heard** 7:21 8:24
11:17 44:15 56:2
89:4 92:6 175:21
**hearsay** 183:13
187:12 188:11
**heavy** 169:6
**held** 100:5 189:4
**help** 10:8 61:2
74:1 93:16 149:7
150:24 154:10
156:12 170:5
**hesitate** 111:23
**hhs220** 17:18
**hi** 5:21
**hide** 106:25
**hiding** 67:15,16
**high** 119:14 120:4
120:8 121:13
124:2 135:2,20
146:13,13 147:22
170:20 173:13
**higher** 121:4,18
126:25
**highest** 149:1
**hildick** 107:11
**hire** 184:2
**hold** 7:17,17 48:20
69:8,8 100:9
115:9 135:24,24
154:1 192:7
**home** 185:6
**hon** 2:12

**honor** 5:14,21 6:5
7:6 8:1 9:6 10:4
13:15 14:4 20:2
27:6 28:8 38:3
41:13,17 44:2
46:13 50:23 53:6
58:4 61:23 62:8
65:13,15 68:7,24
70:8,18 76:24
78:5 81:17,19
84:4 88:20 89:20
90:22 91:8 93:6
98:14 99:17
102:12 104:21,22
110:3 111:4,5
115:18 118:14,19
124:7 125:7 126:3
126:5 127:19
129:1 131:14,16
132:13 135:10
136:23 139:25
142:6,16 151:13
152:15 154:22
156:15 157:6
159:24 160:11,22
162:15 165:18
166:2 169:22
175:15 176:7
177:1,18 178:11
182:21 183:10,12
183:16 187:10,13
187:20 188:6,23
195:9
**hope** 52:10 151:21
151:22
**hopkins** 4:2 6:1,8
13:8 41:16 43:16
89:22 125:13
140:13 142:11
**huh** 12:5 59:3
149:13 170:6

186:17
**hulfish** 3:15
**humid** 184:10
**hundred** 47:20
87:24
**hundreds** 118:6
**hydromica** 167:24
168:4
**hyperbolic** 77:21
**hypothesis** 110:19
**hypothesize**
113:17

**i**

**i.e.** 94:8
**ian** 23:21 24:4
27:17,20 31:23
34:25 35:15 38:14
38:23,24 50:14
154:17
**idea** 78:20 91:20
196:11
**identical** 66:5
**identification**
80:16
**identified** 59:8
71:5 81:4 119:20
**identifies** 83:24
88:13
**identify** 62:18
146:8
**illustrative** 86:2
**imerys** 71:16
**immediate** 171:24
**immune** 17:12
**immunity** 17:9
**impartial** 17:5
**implied** 110:20
**important** 178:9
178:10
**impression** 148:9

**improved** 181:7
**inaudible** 160:8
187:23 188:11,16
188:18
**inbox** 60:6 112:2
159:13 182:8
197:12
**include** 16:20
72:24 148:23
167:10,11
**included** 193:1,1
**including** 76:2
89:3 175:21
189:22
**incomplete** 22:20
33:15
**inconclusive** 39:15
**incorporate** 181:8
**incorporated** 5:19
**independent** 63:6
73:2 189:21
**indicated** 8:18
130:23
**indicates** 109:21
192:1
**indicating** 92:10
**individual** 8:17
28:18 55:11 164:1
**industrial** 139:24
149:14,25 150:5,8
155:16,20,22,23
155:25 156:2
157:18 158:24
164:21,23 171:1
172:12,20 173:1
174:3 189:21,24
190:1,6,10,22
191:24 192:2,13
192:14 193:3
**industry** 11:8 17:5
17:7,10,12 23:3

29:4,4 33:6 35:2
42:16 76:17 94:20
94:23
**influenced** 63:8
**info** 161:19
**information** 7:4
29:3,6,9,13 46:9
67:12 79:21
112:24 128:3
134:6 177:24
184:3 185:22
194:3
**informed** 94:5
**inherited** 184:24
**initial** 21:19 30:8
41:4
**initials** 99:9
**inside** 22:14 44:6
**insignificant** 44:9
53:21,25
**insisted** 33:19
**instance** 119:19
**institution** 182:2
**instruct** 77:3
**instructed** 125:8
**instructing** 152:13
**instruction** 66:17
**instructions** 72:21
89:2
**intensely** 173:13
**intensity** 170:21
**intensive** 117:9
**interact** 27:18
**interest** 84:5
118:15 135:11
187:22 188:15
**interested** 91:25
94:17 161:5 184:3
**interesting** 136:5
**interestingly**
30:21

**intergrown**
167:19,23
**internal** 83:2
194:11
**internationally**
16:22,25
**interpretation**
22:10 164:10
**interrupting** 76:25
124:8
**introductions**
129:10
**invented** 77:14,16
77:23
**investigating**
101:18
**investigation** 8:2
166:9 167:4
**investigators**
39:17
**invited** 37:9
**involvement** 94:24
**involving** 130:10
**iron** 173:4
**irritated** 100:11
**isolated** 54:8
198:23
**issue** 7:19 59:21
69:3 74:9 95:2
**issued** 10:16 57:24
**italian** 81:22 82:20
82:23

**j**

**j** 3:8 51:15
**j&j** 5:22 8:2 17:22
17:24 18:1 21:24
30:18 52:14 55:20
62:14 68:20 69:19
79:1 82:2,5 93:3
96:10,22 110:15
128:21 141:24

182:25 196:24
**j&j's** 69:13 139:3
**j.s.c.** 2:12
**j4-1** 23:2 76:15
77:8,15
**jack** 3:14 5:21
**january** 106:15,19
107:4,23,24
149:22
**jersey** 1:1 2:3,23
3:4,16,19 200:5
**jm** 51:14
**job** 1:25
**john** 3:17 4:2 6:1
80:1
**johns** 71:16 92:2,3
92:7 96:21,24
97:12,24 98:4
**johnson** 3:20,20
3:20,20 5:7,7,8,8,9
5:9,10,10,18,18,18
5:19 6:2,2,21,21
15:14,15,22,22
21:6,7 22:3,3 23:2
23:2,10,11,25,25
25:14,14,17,22,22
25:25 26:1,4,15,15
26:19,19 27:12,12
27:21,21 30:6,6,6
30:7 31:1,2 33:11
33:11 34:1,1 36:4
36:4 39:10,10
40:19 42:5,5,20,20
45:1 47:13 51:9
57:4,4,13 58:18,18
59:14,14 60:19,19
61:20,20 63:9,9,15
63:15 64:1,2,23,24
65:9,10 66:16
67:2,2,18,18,23,24
67:25 68:1,3,4,9,9

68:15 71:16,17,19
71:20 72:14,14,19
72:21 73:3,3
75:25 78:10,10
80:3,4,6,7 89:22
89:22 90:12,12
91:2,2,17,17 93:18
93:18 97:9,10
99:11,11 104:10
104:10,15,15
105:4,4,22 106:1
107:8,8 108:1,1,4
108:4,8,9 109:13
109:13,16,16,20
109:20 110:24,24
111:12,12,18,19
111:19,19,22,22
112:18,18,23,23
113:3,3,21,22
114:18,18 115:25
115:25 116:17,17
127:12,13 129:17
129:17,22,22
131:1,1,9,9 140:18
140:18 141:20,20
141:25,25 142:13
142:13 161:8,8
163:17,17 164:5
165:14,14 166:14
166:14,18,18,24
166:24 169:2,2,9,9
169:16,16 171:17
171:17 172:7,7,25
172:25 182:3,3
183:6,6 184:16,16
185:9,9,17,17,21
185:21 186:23,23
187:23,23 191:20
191:20,20,20
195:25,25 197:3,3
197:6,6,13,14,15

197:16,16,16
198:20,20,22,22
**johnson's**  25:17
26:5 40:19 43:22
45:2 47:13 51:9
57:14 66:16 68:16
72:19,21 76:1
78:23 79:12,19
100:1,3 105:22
106:1 132:1 164:5
189:17,19 190:23
195:21
**joj**  69:7
**jojoma**  71:21
**jojoma2546**  68:18
70:3
**judge**  179:6 188:5
**judicial**  200:7
**july**  2:4 5:5 13:12
13:25 16:8 131:7
131:9 132:2 143:4
143:9,12,16,17
147:3 159:12
177:25 180:12
186:7 187:4
200:12
**jump**  186:6
**june**  60:25 61:8,16
**juror**  175:19
**jurors**  6:12
**jury**  5:1,24 6:10
20:4 69:18 73:10
81:12 84:7 88:25
89:10,11,16
175:17,25 176:1
176:21

### k

**keep**  100:11 109:6
173:3
**kept**  71:3,6 146:7

**key**  12:24 13:1,4
149:18 195:20
196:5,6,14,16,18
197:7,8,10,11,12
197:12,15,16
**kind**  15:7 89:6
175:22
**kinds**  85:5
**knew**  44:18
114:18 116:1,17
141:20,25
**know**  7:3 8:24
10:15 11:4,6,9,10
15:14,24 17:11
18:20,22 19:10,16
21:18 26:17 28:24
28:24 30:15 31:9
33:21 34:22 35:21
36:14,14 44:12
46:12 47:7,9,11,13
48:18 51:8,21
53:10 57:5,6
58:16,19 59:21
60:2,10,15 64:14
67:19,21 68:2
69:13 70:10 72:25
73:4 74:2,7,13,17
75:17,19 77:18
78:18 79:6,8,9,14
80:6,25 83:4 87:1
87:23 88:16 90:11
96:5 106:5,12,13
106:19 108:18,20
108:21,22,24
109:25 113:14
119:23 122:23
124:18 125:2
127:25 128:4
133:13 134:4
139:22 140:2,4,12
143:5,7 146:17,22

148:10,16,18
149:4 152:1
155:21 163:21,24
164:1,2,12,12,16
164:19 166:12,15
168:15 170:24
171:13 172:16,18
172:21 173:22,24
191:8 193:23
194:13 195:10,20
195:21 196:2,14
196:19 197:18
199:1,4,11,12
**knowing**  30:6
**knowledge**  200:9
**known**  92:4
129:19 139:3
**knows**  151:19
**konigsberg**  2:18
3:5

### l

**l**  1:9,14,19 9:11
**lab**  56:2
**labor**  160:16,18
161:4
**laboratories**
180:18
**lacks**  159:14
**langer**  9:10
**law**  1:1
**lawsuit**  192:24
194:7,14
**lawsuits**  187:14
**lawyer**  27:5 38:4
49:14 50:24 58:5
77:24 151:25
**lawyers**  29:19
**leave**  175:18
181:11
**left**  155:3 177:4

**legal**  29:23,25
**legally**  29:23
**letter**  39:2 55:20
61:18 65:22
140:17 147:2
151:2,18 196:23
**letterhead**  15:2
**letters**  152:7
153:15,20 195:21
**level**  45:17 118:3
120:18 123:16
126:24 129:12,19
129:24
**levels**  59:17 119:4
121:3,12 123:16
127:1 133:20
**levy**  2:18 3:5
**lewin**  9:12,15,17
10:16,18 16:17,21
17:11 19:7,8
21:21 22:9,19
23:14,16,25 27:17
27:18 30:5,5
31:12 33:6,15
35:2,14,21 37:3,9
37:19 38:1,9 39:1
40:2 41:1,2 73:6
73:15 74:14 82:10
83:17,23 84:23,24
85:17
**lewin's**  14:25 16:9
21:19 43:22 80:15
82:25 95:19
**liberty**  60:20
**license**  200:3
**light**  23:19,22 24:5
24:10,10,11,12,14
31:13,17,20,22,24
32:3 33:22 35:3
35:14,16,22 36:11
38:10,15 55:4,5

76:9 84:15,21,25
85:2,14 139:6
**likelihood** 178:6
**limit** 16:3
**line** 45:15 47:7
51:19 68:21 84:6
**list** 17:25 63:17
71:12 83:18
128:20 144:25
161:15,21 171:17
**listed** 12:19 42:4
146:10 190:5,8
**listen** 77:3 126:9
**lists** 11:16
**literally** 12:25
77:22 125:22
**litigation** 8:16
**little** 50:2 69:4
86:10 114:12
175:8
**live** 24:20 32:8
35:18
**livingston** 2:23
**llp** 3:15
**located** 7:15
140:12
**location** 167:2
**long** 48:19 168:14
179:17 193:21
**longer** 47:15,20
105:16
**look** 8:15 11:11
14:12,20 15:9
16:11,14 17:14
18:8,12,13 24:17
27:24 36:16,22
37:4,9 38:9 41:12
53:14 55:4,6 65:7
73:13,22 79:22
84:18 100:6,13
101:25 102:9,21

105:10,13 114:22
117:1 118:24
119:18 127:4
130:5 131:6 136:5
138:2,9 143:4,9
148:7,14,20
150:15 153:8
154:13,14 155:13
161:18 165:9
168:7 175:7 184:6
184:8 198:9
**looked** 10:21
11:23 12:3,7,25
52:22 87:19,25
88:1 115:5 121:6
121:7 137:20
142:1 162:22
177:22 179:25
180:2
**looking** 16:8 21:17
30:23 31:17 44:7
54:11 62:17 86:4
86:18,19,21 92:24
101:2,6,22 117:7
123:3 144:14
148:3 196:11,14
**looks** 15:5,11,18
46:18,20 47:10
74:2 87:23 88:6
148:23 160:7,12
161:6 174:1,12
186:14 187:13
191:8
**loose** 173:11
**lose** 52:12 94:15
**lot** 22:4,15 25:19
44:15 67:12 74:8
100:7 173:15
174:15 185:10
198:24

**loud** 69:5 188:5
**low** 59:17 119:4
119:23 120:2,10
139:10 146:11
**lower** 120:3
**loyally** 185:7
**lunch** 37:2 169:23
175:18,23 176:19
177:4
**luzenac** 197:21
198:6

**m**

**machine** 16:6
77:22 172:15
**magnetic** 170:21
173:14
**magnitude** 121:14
121:18 127:1
131:2,3
**mail** 2:24 8:7
**maimon** 2:18 3:5
5:13,14
**main** 116:12,20
166:9 167:4
**maintain** 185:7
**majority** 117:22
185:5
**man** 193:20
**manges** 3:15
**mansville** 98:4
**manufacture**
119:13 121:5
135:1
**manufactured**
100:18
**manufacturer**
92:4
**manufacturers**
91:15
**manufacturing**
113:1

**manville** 71:16
92:3,3,7 96:22,24
97:12,25
**maple** 3:3
**march** 152:2
170:3,4,9,10,11
180:1
**mark** 18:10,10
19:14 177:17
**marked** 9:22 39:5
74:7,8 99:8,8
137:22 149:2
**market** 111:23
112:6 183:22
**markets** 152:7
**marking** 62:7
165:24
**marks** 38:13
131:11
**master** 52:18,25
**match** 102:10,19
**material** 45:3
124:1 135:18
146:9 158:12
181:7
**materials** 48:8
149:25
**math** 75:2
**mathematical**
108:5,7,12
**matter** 5:6 181:17
**mccarter** 3:18
**mccrone** 24:4
38:15 39:19 44:15
44:16 48:9,10,19
50:10 51:3 52:5
56:1 59:12 61:19
62:14 63:6 67:21
68:18 69:11,19
70:6,23 71:6,12,20
72:12 115:3

132:19 133:2
134:16 136:6,8,8
137:11 143:5
148:12 151:4
154:18 162:11
**mccrone's** 22:10
43:21 132:25
**mcneill** 1:14 3:12
5:8,16
**mean** 8:20 18:24
38:18 45:5 66:22
103:5 112:11
124:16,25 126:20
139:22 150:4
164:21
**meaning** 24:24
32:19 137:23
197:6
**means** 48:10,16
50:1,5,11,12 86:13
124:18 141:8
149:8,9,11 180:24
**meant** 45:8 50:15
163:22 199:17
**medicated** 15:17
17:24 81:22 82:21
82:23
**medium** 146:12,14
**meet** 89:8 134:2
**meeting** 21:3,20
22:3 25:12,15,18
25:23 26:1,3
28:20 33:1 37:18
37:24 38:1 40:14
40:20 41:3,18
42:1,17 84:23
91:14 93:25 94:5
94:11,21 96:21
107:22,23 109:2
128:14

**member** 17:3
33:11
**members** 5:24
88:25 175:17
**memo** 25:18 27:23
28:14 31:19 41:18
41:25 91:3 93:3
93:11 96:10 99:7
99:12 101:5,8
107:9,23 131:9
150:9,20 152:12
153:4,6 154:3
156:18 157:19
162:11
**memorandum**
128:14 136:9
156:6
**memos** 157:23
164:16
**mention** 93:17
122:3
**mentioned** 168:10
**merritt** 28:22 29:1
29:22
**mesh** 173:10
**met** 91:17
**method** 23:6 40:17
77:16,23 84:22
95:17 105:5,9
142:20,25
**methodology**
93:16
**methods** 141:11
141:16,21 181:7
**microns** 103:15
**microscope** 16:2
75:6
**microscopic** 76:19
170:20
**microscopical**
138:11 139:6

**microscopically**
47:23 100:21
**microscopist**
38:21 48:5 76:19
95:15 101:22
**microscopist's**
105:25
**microscopy** 22:13
22:21,24 23:8,12
23:19,22 24:5,11
24:13,14 31:13,21
31:22,24 32:3
33:16,22 34:1,2,11
34:23 35:1,3,9,12
35:14,16,22 36:11
37:16 38:10,15
40:17 44:18 55:4
55:5 76:9 84:21
84:25 85:3,4,6,12
85:13,16 95:14,16
95:21,23 102:22
117:10 120:13
123:24 127:9
**mid** 1:2,9,14,19
**middle** 62:22 66:8
66:17 72:20,24
**middlesex** 1:1 2:2
187:7 200:14
**mill** 150:1 155:14
155:16 161:12,13
172:6,6,9,10,11,17
172:19 173:1,6
**milled** 172:12
**miller** 145:2 151:3
151:19 155:12
178:1 186:18,21
187:24 189:3
191:18,21 193:16
**miller's** 194:14
**milligram** 74:24
75:11,13

**milligrams** 75:13
**millimeter** 86:6
**millimeters** 86:10
86:11,13,14,14,16
86:20,25
**milling** 155:24
173:23 189:8,8
**million** 118:8
139:17,18 147:6
163:7,8
**mind** 70:7 74:1
143:8 190:21
**mine** 30:25 90:3
90:11,13 113:25
114:16 116:9
130:4 131:22
157:25 158:1,2,3
158:13,13,15,18
159:6 161:13,22
166:15
**mined** 166:13,23
**miner** 92:4 110:21
**mineral** 80:16
92:8 118:2 119:20
131:25 156:23
167:17,21 168:10
180:21 192:21,24
**mineralogical**
16:23,25 117:16
166:9 167:4
170:13 199:3
**mineralogist** 11:2
**mineralogy** 92:11
92:15 167:20
196:21
**minerals** 45:4,22
46:1 48:11,14
51:10 54:22 65:22
66:15 104:16,16
105:5,22 117:14
117:18,23 119:6

131:25 133:6,17
135:19,23 136:3
136:11,16 144:22
145:3 151:4,19
156:18 161:8
162:12 163:1
166:6,19 167:24
168:9 171:4,24
178:22 186:22
189:4,5,6,20 190:9
190:14,21,25
192:25 194:1
**miners**   136:20
**mines**   39:20 91:22
93:25 94:11,22
97:2 116:4 123:11
155:22 158:12,18
167:1 169:5,19
177:10
**mining**   151:23
161:7 169:2 189:7
189:16
**minor**   168:11
**minus**   173:10
**minute**   89:1
116:17 150:3
**misrepresentation**
69:7
**missed**   58:8
**missing**   13:22
72:20 156:9
**mistakenly**   59:8
**mix**   158:12
**modifications**
178:2
**modifier**   180:20
**month**   81:1
**months**   66:23
80:20 81:2,6,7,10
130:1 132:3
150:16 184:11,13

**morning**   5:2,14,20
5:23 6:6,8,9,10
89:4
**morphology**
100:25
**moshe**   2:18 3:5
5:14
**mother**   185:2
**mothers**   184:25
**mounds**   173:11
**mount**   2:22
**mountain**   165:12
177:6 178:21
180:16
**move**   76:23 98:17
126:4 137:1 140:1
181:16
**moved**   14:9 21:14
28:11 41:23 43:11
43:13 62:1 65:17
82:17 91:11 93:9
96:18 99:21
102:16 107:19
115:22 129:5
131:18 137:17
140:24 151:15
155:5 157:9 161:1
162:18 165:21
176:17 178:16
188:24
**moving**   88:20
**mulberry**   3:19
**multiply**   75:18
**muscovite**   167:24
168:4
**museum**   198:16

**n**

**n**   3:1 4:1
**n1**   163:5
**name**   29:3,17 70:6
109:9 144:21

172:10
**names**   29:20
**nashed**   21:7 27:24
28:3,14 30:18,23
31:19 37:9 42:3
59:5,7 93:12
95:12 96:12
107:11 129:11
130:10
**native**   7:20
**nd**   18:3,9,10,14,16
31:16
**near**   150:25
**necessary**   141:13
**need**   14:4 60:23
77:22 100:12
107:2 114:16
141:17 142:20,24
143:7 154:10
**needle**   83:6,10,24
85:21 87:20 98:21
171:24 173:5,7
**needles**   98:9 113:9
168:14,15 172:3
173:6,11,12,15,18
175:10 196:10
**neither**   95:25
**never**   8:23 37:19
90:12 114:5
127:14 139:22
149:18 151:25
175:12
**new**   1:1 2:3,3,23
3:4,7,7,16,19 15:1
52:18 56:10,12
59:19,22 90:3,11
91:16 94:6 115:6
117:13 123:23
200:5
**newark**   3:19
198:16

**night**   30:8,16 41:5
**nine**   39:14 99:14
138:4
**nj3446618**   1:25
**nolan**   3:14 5:21,23
**non**   16:2 18:3,6
19:13 35:23 38:13
40:24 48:7 200:8
**nonasbestiform**
90:9
**nonresponsive**
19:24 20:2 34:4
54:24 76:23 98:15
104:22 110:4
111:5 125:19
126:4 127:19
132:13 136:23
140:1 142:6
152:15
**north**   1:7,12,17,22
**norwood**   93:14,20
94:12
**norwood's**   95:14
**note**   59:4 63:14,22
64:10 178:4,10
**notebooks**   6:12
175:19
**notes**   82:7,25
88:17,19
**notice**   21:24
183:15,18
**november**   128:5,6
128:7,9,15 146:24
146:24,25 148:14
154:15 155:2
159:12 162:5,7
192:17
**number**   12:12
29:16 40:6 71:21
72:10 74:9 145:6
161:11 168:16

200:3
**numbered** 78:16
**numbering** 74:10
**numbers** 11:14
102:24
**nyu** 10:24

**o**

**oath** 194:22,24
**object** 19:23 20:1
26:16,21 32:24
34:3 36:5,11
54:23 69:6 70:9
76:22,25 98:14
104:21 110:3
125:8,18 126:4
132:12 152:14
183:13
**objected** 33:3
**objecting** 111:5
188:11
**objection** 8:3 14:2
14:5 21:12 27:5
27:13 28:9 38:3
41:20 43:9 50:23
58:4,6 61:24
65:14 70:17 77:24
82:15 91:9 93:7
96:16 98:16 99:19
102:14 104:25
107:17 110:6
115:20 126:5,8
127:18 129:3
131:15 136:22
137:15 139:25
140:22 142:5,8
143:23 151:12
154:23 157:7
159:14,19 160:10
160:24 162:16
165:19 174:18,21
176:9,16 178:13

179:16 188:7
194:19 197:25
**objections** 25:9,11
26:10,11 27:3,14
32:25
**observations**
84:19
**observed** 24:2
45:16 54:15,20
84:9 88:10 121:13
126:25
**obtained** 27:16
129:14 138:14
**obviously** 22:1
67:9 134:1
**occasion** 199:12
**occasionally** 59:18
158:11
**occasions** 16:20
198:23 199:2
**occur** 168:11
**occurs** 168:14
**october** 42:24
43:18 52:9 57:16
60:13
**offer** 13:16,22
21:10 28:8 41:18
43:8 61:22 65:12
82:13 91:7 93:5
96:14 99:17
102:12 107:15
115:18 129:2
131:13 137:13
140:20 143:21
151:10 154:21
157:6 160:23
162:14 165:17
176:8 178:11
183:10 187:10
**offered** 13:16

**offering** 176:13
187:19
**officer** 6:13,15
89:10 175:25
**offices** 91:16
**official** 129:13
**oh** 6:11 13:2 17:22
18:12 54:9 65:2
106:24 132:9
144:20 150:14
160:14 164:5
166:25 167:21
181:24
**okay** 7:18 8:6,9
9:3,5,12 10:21
11:6,22 12:1
15:13,21,24 16:11
16:14,17 17:14,15
18:12,23 20:3,14
21:1,6,10 22:2
23:6,10,14 25:3,21
27:23 28:2,17
29:1,15,19,22 30:4
30:21 31:8 33:6
35:21 36:1 37:1
37:22 39:24 40:1
41:11,11 42:3
43:24 44:12 46:21
46:24 47:4,6,6,9
48:22,24 50:1,9
52:13 53:14 56:1
56:7 57:18 58:24
59:1 61:5,10,18
62:17 63:2,17
64:11 65:9 69:5
69:15,22,23 71:11
71:24 72:13,15
73:5,6,10,18 74:4
74:13,13 75:1,10
75:25 76:6,9 78:2
78:15 79:12 80:9

83:23 84:22 85:20
86:1,21,24 87:14
87:18 90:4,7,14
91:2 92:18 93:2,5
95:12 96:8,24
97:6,9,19 98:25
99:11 101:24
102:6,9,21 103:3
103:10 105:13
106:8,14 107:5,8
107:14 108:21,23
109:1 110:5,8,24
111:12,18 112:5
113:7,12 114:2,11
114:23 115:2,14
115:17 116:13
117:3,9 118:11
119:12 120:12,25
121:12,25 122:23
123:1,6,21 124:24
126:3,22 127:12
127:20,22,23
128:5,17 129:1,21
130:1,16,20 131:6
133:24 134:8,16
135:15 137:6,9,13
139:5,21 143:9
144:5 145:5,10
148:17 149:4,7,20
150:14,17,17
151:10 153:24
154:3,9,14,20
155:4 156:8 157:2
157:20 158:1,2,22
159:20 160:1,4
162:1,10,14
163:10 164:25
165:17 166:25
167:9,13,13
168:18,25 169:12
169:15,18 170:18

171:18 172:14,15
172:18,24 173:4
173:19 175:2,7
177:4,16 178:9,18
179:3,20 180:15
181:2 182:11
183:9 184:6
186:12 187:3
188:14,21 189:16
190:12,20 191:14
191:23 195:4,15
197:18 198:14,19
199:21
**old** 52:21,22 59:23
193:20
**once** 19:9 52:18
140:12
**ones** 71:15,20
153:7,15 169:2
**opaque** 167:18
**opaques** 168:1
**open** 114:4
**operation** 155:24
158:15
**opinion** 30:2,3
95:15 119:9
141:15,19
**opportunity** 36:4
36:10 142:14
**opposed** 76:8
**optical** 22:23
24:10 37:8,16
40:17 84:25 85:4
85:5,12,13 95:16
95:21,22 102:22
103:24
**optically** 59:18
**optimal** 23:7
**order** 121:14,18
127:1 131:2,3

**ordered** 2:17
**ore** 113:21 114:18
115:4,6 116:2,3,7
116:12,14,18,20
117:3,4,13,18,20
118:12,13 119:3,5
119:12 121:7
122:1,3,5,6,7,21
123:2,4,23 127:17
127:23 128:2
132:21 133:3,4,7
133:10 134:22,24
134:25 135:19
136:12,13 137:10
137:22,23 138:3
139:9,11,17 143:6
144:7,9 156:5,25
157:14 162:22
171:5 172:11
174:17
**ores** 127:14,16,20
137:10 139:8
150:1,4 168:11
**organic** 146:9
181:9
**organoleptic**
181:5
**orientation** 171:22
**original** 55:14
66:4
**outbox** 143:3
**outlined** 97:14
**outside** 26:25
183:13
**overruled** 27:7
38:5 50:25 55:1
58:6 125:11 126:8
159:19 174:21
**owned** 90:2
166:14 186:22

**owns** 166:18,24

**p**

**p** 2:21 3:1,1,14
200:3,12
**p.m.** 176:20
**p1steno** 2:24
**package** 185:22
**page** 4:2,5 12:1,2
12:13 13:4,6,9
14:25 15:9 17:17
17:21 36:15,20,20
56:22 61:14,15
62:4,12 63:14
68:8,13 74:7,9,11
82:4 87:24 88:1
97:19 132:24
134:10 135:12,13
135:14 146:2,6
168:20 171:19
172:24 181:4
184:8,22 186:13
186:16 190:12
191:13
**pages** 2:6 12:12
63:3 72:7 74:10
**paid** 198:24 199:1
199:5,8,9,16,18
**panatier** 3:8,8 4:3
5:14 6:4,5,7,19
7:11,15,22 8:10,13
8:22 9:3,8 10:3,6
10:10 13:14,20,25
14:8,11 19:23
20:1,9,21 21:10,16
27:11 28:7,13
34:3,9 38:7 41:11
41:17,24 43:4,15
44:2,4,5 46:12,16
49:19 53:6,7
54:23 55:3 61:8,9
61:22 62:3,8,11

65:2,5,12,19 68:12
68:15,17,23 69:10
69:17,22,25 70:12
70:20 76:22 77:7
78:2,5,6 81:16,19
81:20 82:13,19
88:20 89:19,20,21
90:14,21,24 91:7
91:13 93:5 96:14
96:20 98:14,17,19
99:17,23 102:12
104:21 105:1
106:22 107:15,21
110:3 111:4,7
115:18,24 118:18
118:21,23 123:14
123:20 124:7,11
124:14 125:18
126:3,13 127:18
129:1,7 131:13,20
132:12 135:13,15
135:16 136:22
137:1,5,13,19
139:25 140:9,11
140:20 141:1
142:5,18 143:21
143:24 144:4
151:10,17 152:14
152:21 154:21
155:1,7 156:14,17
157:5,11 159:11
159:16,20,23
160:3,14,17,22
162:14,20 165:17
166:1,4 169:22
170:2 175:1,15
176:7,24 177:1,3
177:16,20 178:11
178:17 179:3,6,10
179:14,21,24
182:8,10,15,20,23

183:9,15,20
187:10,20 188:6
188:12,19 189:1
195:7 198:2,5
**paper** 195:9,16,18
197:19,20
**paragraph** 37:1
62:22 63:19 64:3
64:11 66:5,6,8
67:3,8 68:1 72:21
72:24 84:18
118:16 123:18,21
179:15 180:16
189:3,22
**parallel** 103:10
104:7,11 105:3,19
**pardon** 20:7
**parent** 185:12
**part** 10:8,14 14:17
28:25 36:13,18
37:18 50:1,2
66:17 91:25 92:1
118:13 123:8
135:4,7,8 137:2
139:18 152:7
161:5 179:9,10,11
**particle** 51:10
86:2 105:10 180:4
**particles** 83:7,9,25
85:23 87:4 102:24
103:4,25 104:1
105:14 118:7,9
130:14 147:7
148:6
**particular** 25:12
28:20 47:22 51:16
51:19 85:24 87:9
117:17 150:9,20
156:6 167:18
168:23 171:5

**parts** 139:17 147:6
163:6,8
**passed** 24:19 32:7
35:18
**pastore** 1:9 3:11
**patently** 69:14
**paterson** 2:2
**pattern** 138:13
**patterns** 138:16
**pen** 46:20 47:10
103:7,8
**penultimate** 37:1
**people** 6:22 7:3
25:19 28:18 33:2
42:7,11 73:2
99:14 109:3
112:25 184:7
185:18
**percent** 12:15,16
12:19 16:4 17:18
25:10 26:11,22
27:2 31:9 32:13
32:17,20 36:6
39:11 40:4 44:10
44:22,23 45:17
54:16,16 60:3
110:1 118:3,8
119:25 120:21
130:14 141:6,12
141:18,23 142:25
168:12,22 173:11
**percentage** 54:1,3
142:1
**percentages** 54:6
55:15,18,22,25
168:21
**period** 27:10
127:21 158:17,20
161:25 185:8
**perjury** 195:2

**permission** 46:13
152:3
**person** 34:20
49:17 125:3 186:2
**person's** 194:14
**personal** 7:2
**peters** 161:19
**petrographic**
102:22
**pfizer** 93:15,20
95:13
**ph.d.** 196:21
**phone** 87:14 93:23
**phones** 5:3 89:18
176:23
**photomicrographs**
63:3
**phraseology** 36:13
**pick** 6:15
**picked** 69:5
**picture** 14:25
**pictures** 63:4,12
**place** 2:2 43:17
100:17 159:3
167:1,8
**placitella** 3:2,3
5:15
**plain** 50:21 84:15
**plaintiff** 1:5,15
**plaintiff's** 4:6,6,7
4:7,8,8,9,9,10,10
4:11,11,12,12,13
4:13,14,14,15,15
4:16,16,17,17,18
4:18,19,19,20
13:22 14:9 21:14
28:11 41:22 43:11
43:13 62:1 65:17
82:17 91:11 93:2
93:9 96:18 99:21
102:16 107:19

115:22 129:5
131:10,18 137:17
140:24 151:11,15
155:5 157:9 161:1
162:18 165:21
176:17 178:15
187:22 188:24
**plaintiffs** 1:10,20
3:10 5:12 8:17,25
10:7 13:14 71:5
**plant** 100:19
180:18
**plate** 171:23
**plates** 22:14
171:21
**platy** 139:10
**platyness** 135:18
**playing** 49:8,11
**pleasant** 2:22
**please** 5:3,11 6:12
9:23 20:6 34:5
49:17,18 66:21
74:6 77:3 89:1,4
89:17 114:23
126:9 142:12
143:10 165:2
176:22 179:2
184:8
**plm** 85:7,8
**plus** 120:20
173:10
**point** 6:25 30:22
32:25 35:10 59:23
72:16,18 185:21
**pointed** 23:22
35:15
**polarized** 24:10
84:15,20,25 85:2
85:14 95:24
**policy** 25:7 26:5,7
26:20,24 32:12

108:17 111:20
**pooley** 39:23
**poor** 173:4
**poorer** 120:9
**popular** 11:18
**portion** 189:20
190:1
**pose** 42:21
**position** 92:8
189:4
**positive** 23:7
**positively** 146:8
**positives** 40:7,8
127:5
**posses** 42:19
**possession** 71:22
**possibility** 117:8
**possible** 17:9
**post** 8:4
**potential** 42:17
**potentially** 119:20
**powder** 6:22 13:3
17:22,24,24 39:11
43:22 45:2 57:14
59:22 78:23 79:13
79:19 81:5 100:1
100:4 108:3,8,16
109:22 111:2
117:6,8 119:15
127:17,21 129:15
132:2 145:17
172:12 181:14,22
182:12 184:11,13
184:14,24 189:18
189:19,23 190:2,3
190:23 191:25,25
195:22,24
**powders** 15:17,19
16:19 188:2
**practice** 70:14

**preferred** 171:21
**prefix** 152:8
**preliminary** 109:21
**preparation** 171:20
**prepared** 166:5
200:6
**presence** 42:18
55:10 100:22
101:10 130:11
133:5 148:2
190:24,25 192:25
**present** 25:8 26:9
31:4 32:19 42:16
52:23 59:12 69:18
91:22 108:13
112:2 133:18
146:10 168:12
173:9 174:6,17
175:10
**presentations** 91:21 97:7
**president** 151:3,22
186:21 189:3
192:23 193:25
**presumably** 193:15
**pretty** 21:24 64:9
64:12 92:3
**previous** 14:17
31:19 33:9,24,25
109:15
**previously** 14:6
17:7 117:8
**primary** 113:21
**princeton** 3:16
**prior** 124:1
**priority** 2:22
**prismatic** 103:5
168:14

**probably** 42:25
47:20 61:1 62:24
74:4 154:12 162:6
170:4 178:6 191:9
**problem** 94:8
101:11,12,14,15
101:21 110:15
112:14,14 128:24
151:2
**problems** 94:22
**procedure** 25:7
156:24 157:13
**proceedings** 199:23 200:7
**process** 31:5 77:19
137:24 138:19
173:21 178:2
180:21
**processed** 131:24
181:6
**prod** 79:1
**produce** 71:1
**produced** 7:23
71:4,20 113:23,25
131:24 139:8
149:25 196:24
197:3
**produces** 139:9
**product** 11:14,17
29:10 42:19 55:15
78:22 79:1,7
112:21 121:5
122:10 137:23,24
138:10,19 139:8
139:11,19,23,24
150:12 172:1
173:22 174:10
175:5 184:18,25
190:1,25 192:1,25
**production** 7:24
132:1 150:2,19

152:5,23 154:4
174:5,13
**products** 11:16
12:14 15:4,5,15,22
18:1 24:1 39:13
82:22 92:4 112:19
112:25 119:14
134:19 135:2,21
137:10 151:20
170:22 173:13,15
174:8 181:18
183:7 184:3
185:11 189:21
190:4
**professor** 10:24
39:23 41:2
**project** 9:20 15:23
19:21
**proof** 175:9
**properties** 103:24
**proposed** 25:7
**proposes** 23:15
**prospective** 183:22
**prove** 69:11 119:5
**proven** 98:11
**provide** 112:24
**provided** 14:21
22:5 89:2 113:10
**proving** 132:6,7
**pseudohexagonal** 171:22
**public** 110:25
111:13 113:10
**publically** 129:17
188:3 194:6
**publish** 195:18
**published** 195:16
196:4,4,6
**pull** 158:7

**pulled**  116:10
**purchase**  185:4
**purchasing**  113:15
**purified**  30:23
**purpose**  167:16
  171:3 187:18,24
**purposes**  188:17
**put**  6:16,22 35:4,6
  37:16 39:7 47:3,3
  52:21,24 60:6
  63:17 73:25
  106:23 132:10
  139:13 144:25
  145:3,17 149:8
  159:11 164:5
  182:7 185:22
  195:13
**putting**  70:10

**q**

**qualified**  114:3,7,8
  114:13,17
**qualify**  123:3
**qualifying**  117:6
**qualitative**  133:5
  183:5
**qualitatively**
  146:11
**quality**  119:13
  126:23 133:17
  135:1,20 139:10
**quantitative**  133:5
**quantities**  59:12
**quantity**  133:17
  133:21
**question**  6:21
  18:10,10 19:6,7,8
  19:14,25 20:6,8
  34:6,13 38:13
  49:15,18,20 57:9
  58:8 66:20,25
  77:4,5 94:13

100:10 104:24
  105:2 108:10,11
  109:24 111:8,22
  112:2,6,7,10,12,13
  112:15,16,17
  116:16,22,23,24
  116:25 124:13
  126:9,10 127:24
  137:3 142:12
  146:15 152:20
  185:9 190:8
  191:21 192:7
  193:5 199:7,9
**questionable**
  17:19 127:6
**questions**  94:18
  142:14
**quick**  21:24 152:1
**quickly**  185:3
**quite**  59:23 185:7
**quote**  7:20
**quoted**  39:10
**quotes**  95:10
**quoting**  153:4

**r**

**r**  3:1 81:23 91:15
**r&d**  144:22 145:4
**r.a.**  21:4,8
**raise**  94:22
**raised**  25:11 26:12
  27:3,15
**raising**  94:13
**random**  29:2
**range**  73:25
**rationally**  94:13
**ratios**  105:17
**raw**  121:4 122:9
  122:12
**ray**  18:17,21 19:2
  19:8 22:10,20,23
  23:11,16,18 31:18

32:12,14,23 33:16
  123:24
**raymond**  172:6,9
  172:10,10,17
  173:6
**read**  8:17 12:21
  17:2 46:7 83:15
  84:6 92:13 93:19
  94:10 95:4,8 96:1
  97:22 118:16
  123:12,20 124:5
  124:12 125:8,25
  129:25 130:15,21
  133:19 135:11
  138:8 152:9
  163:16,23 171:9
  191:3
**reading**  29:21
  32:10 33:8 45:7
  86:23 121:20,23
  124:9 135:23
  136:1 148:4
**readmitted**  14:7
**reads**  124:19,19
  125:5,17 188:5
**ready**  6:4,17 89:4
  89:5 134:9 149:13
  175:23 176:24
**real**  158:1
**realistic**  8:13
**reality**  26:25
**really**  27:1 178:9
**reason**  69:18
  113:13,16 169:8
  186:2
**reasonable**  38:14
**reasonably**  92:2
**recall**  177:7
**received**  59:2
  152:2

**recess**  89:15
  176:19
**recognition**
  171:24
**recognize**  35:17
**recognized**  16:22
  16:25 17:7 24:19
**recollect**  169:4
**record**  7:18 9:25
  43:3,25 49:17
  53:4 72:1 89:13
  89:14 140:4
  142:23 159:10,22
  162:3 165:4 170:1
  176:3,6,11,12
  177:15 182:6,15
  188:10 195:6
**recorded**  26:16
**records**  70:22 71:4
  187:25
**red**  3:4
**redone**  52:6,15
**reduce**  119:4
**reference**  98:8
  157:14 164:18
  172:3 198:11
**references**  168:15
  188:12
**referencing**
  181:21 189:10,13
**referred**  39:9
**reflect**  94:19
**refraction**  123:25
**refresh**  143:7
  197:22
**regard**  7:19 49:20
  89:3 175:20
**regular**  71:6 85:8
  95:24
**regularly**  185:3

**regulated** 51:10
**reissued** 67:3
**rejection** 180:20
**related** 43:1 71:15
**relates** 8:3 166:16
**relating** 112:8
**relation** 50:8
**relatively** 185:1
**release** 29:3,6,20
**releases** 29:16
**relevant** 8:5 19:20
20:11,15 34:15
152:5 170:18
**relied** 22:20 33:15
**remaining** 121:2
**remember** 89:1
121:6 133:9
175:19 177:12
197:22
**remembered**
184:11
**remind** 80:12
**remove** 30:23 31:5
138:25
**removed** 175:11
**renowned** 11:2,4
44:17
**repeat** 53:18 60:17
**repeated** 30:7,16
**replace** 58:2
**replaced** 56:23
58:9,10
**replicates** 19:1
**report** 10:16 16:9
18:6 21:19,21
22:20 33:5,15
40:3,5,25 41:4,5
51:21 52:1,9,11
53:9,15 56:23,25
57:3,5,12,25 58:1
58:9,12,14 59:1

60:8,17 61:15
64:1 65:20 66:4
66:18 67:4 72:19
72:23 80:22 88:8
88:18 95:20
111:11 115:3
127:22 132:4,25
137:9 146:23
147:3 170:13
173:17 181:23
195:23
**reported** 30:12
39:10,12,17 41:2
79:23 87:8 126:15
126:17 138:8
145:7
**reporter** 200:4,13
**reporting** 57:18
**reports** 40:10,12
56:22,24 57:1,9,11
58:14 60:20 63:18
64:10 67:5 73:1
95:12 178:24
**representation**
132:21
**representative** 6:2
**representatives**
42:9 128:20,21
**represented** 57:12
115:9 127:13
132:21 149:24
**representing**
100:4
**request** 130:18
152:2 160:5
**requested** 194:5
**required** 48:5
**research** 83:21
89:6 165:13
175:22 177:5,6
178:21 180:17

183:5,22 184:2
198:25 199:10
**resemblance**
138:12
**reserve** 29:23
**residual** 181:11
**resolve** 27:18
38:16
**respect** 167:18
171:5 180:4
**respected** 11:5
**respectively**
120:19
**responded** 130:22
**responding** 30:5
**response** 41:19
61:4 69:9,10 71:3
77:3 82:3 84:17
109:24 130:18
137:2,3 141:7
160:5
**responsive** 77:1
137:4
**rest** 124:12 179:17
**restrict** 153:2
**result** 30:9 149:1
162:21 194:14
**resulted** 67:12
**resulting** 139:18
152:4
**results** 15:10
17:10,15 19:5,17
23:18 29:5 33:7
37:19 38:12 39:16
40:24 62:14,25
88:12 95:20
101:25 102:6,22
111:21 127:5
130:25 131:1
138:3 139:5
145:10 153:6

163:11 181:18
192:2
**retained** 9:17 11:7
39:17 88:2 99:25
100:4,9,15 101:18
102:7
**retired** 193:21
**revealed** 102:22
191:1 193:3,3
**review** 57:24
123:9
**reviewed** 20:10,14
20:16 34:14
**revise** 59:1 60:20
60:22
**revised** 51:23
53:15 55:9,21
60:7
**revising** 60:22
**ribbons** 62:23
**right** 6:23 7:12
9:15,18,21 10:22
10:25 11:20,24
12:3,11,16 13:5,5
13:19 14:22 15:19
16:4,23 17:18,19
18:4,7,8,10,18
19:20 20:11,18
21:22 22:7,16
23:4 24:4,8,21
25:15,17,22,23
27:2,13,21 28:3,15
29:10,12,14,17,20
29:23 30:9,16,19
31:4,16,23 32:6,9
32:14,17,21,25
33:7,10,21,23 36:6
36:8 37:5,17
38:11,13,20 39:3,5
39:8,20 40:10,10
41:6,9 42:1,5,8,12

43:19 44:10 45:13
45:17,19 46:2
47:11 48:21 50:3
51:11,14,15,16,18
52:1,6,15,19,23,24
53:22 54:13 55:12
55:22 56:5,24
57:22 58:19 59:2
59:5,15,19 60:3,6
60:12 61:2,3,12
62:15,25 63:8,13
63:15,19,19,20,23
64:6,6,18 66:3,16
66:18 67:4,6,8
68:4,14 69:20
70:3 71:9,12,17
72:5,8,10,14,19,22
74:15,21,21,23
75:2,11,21,22 76:1
76:3,10,12,18 77:9
77:23 78:16,23,25
79:2,5,9,10,22
80:1,14,23 81:9
82:2,5,11,21 83:10
83:14,21,25 84:2
84:16,25 85:10,15
85:21 86:4,7,18,22
87:1,4,7,12,15,17
87:20 88:5,7 90:5
90:9 91:5,18 92:5
92:11 93:3,12,21
95:19 96:10,12,22
97:7,10,21,23 98:1
98:3 99:9,16
101:3,7,19,20,21
103:1,6,10,24
104:2,5,7,11,17
105:10 106:2,6,10
107:3,12,24 108:9
109:7,10,14,17
110:17,22 111:13

111:15,23 112:6
113:5 114:14
115:4,10,12 116:2
116:2 117:5,11,24
118:3,12,16,18
119:1,8,19,21,24
120:6,8,10,22,23
121:8,16 122:9,21
122:24 123:6,10
127:2,6,10 128:21
128:24 129:10,24
130:3,6,14 131:11
132:4,6,17,22,25
133:7,11,18,20,22
133:25 134:23
135:5,25 136:5
137:11,20,25
138:4,16,19,23
139:1,3,13,14,19
140:18 141:6,9,14
141:18,23 142:2
144:10,12,15,18
144:23 145:6,9,13
145:16,18,20,24
146:3,6 147:11,16
147:19 148:3,8,20
148:23,24 149:13
150:2,7,19 151:4
151:20,23 152:10
153:9,9,15,24
154:11 155:14,16
155:18,18,20,23
156:1,2,5,25
157:15,17,22,22
158:10,22 159:1
160:6,18 161:9,13
161:18,23 162:12
162:23 163:1,12
163:19 164:14,18
164:22 166:21
167:6,16 168:1,5

168:22 169:6,13
170:22,25 171:1
171:12 172:1,3,8
173:21 174:8,11
175:4 177:11,17
178:22 180:11,13
180:25 181:3,14
181:22 182:19
183:23 184:20
185:6,19,25
186:19 187:8
189:13 190:5
191:4,5,10 192:10
192:10,14,16,21
194:7 195:17
196:15 197:9,13
197:24 198:4
199:18
**risk**  113:4,5
**ritual**  184:25
**road**  100:19
**robert**  81:25 83:20
**rock**  166:10 167:5
**rocks**  168:24
**rod**  46:18,19 47:4
  47:22 48:3 55:11
  83:6,8,10,24 84:1
  84:14 85:21 87:20
**rods**  45:16,18,24
  46:3 54:19 55:19
  55:24 84:14 98:9
  98:13,21 103:12
  104:6 106:11
  113:9
**roger**  151:3,19
  155:12 178:1
  186:18,21 191:18
**roll**  83:13
**rolle**  42:4 81:25
  83:16,18,20 85:12
  99:7

**rolle's**  81:23
**rolltop**  139:10
**ronning**  1:19 3:12
  5:10
**ronnings**  5:16
**roofing**  158:7,22
  159:2 164:18,22
**rosalyn**  1:4 3:11
  5:6
**roth**  3:3
**rt**  89:23 90:1,10
  91:17
**run**  16:6 62:14
  196:1
**running**  146:7
  161:22
**rutile**  167:25
**rvz**  169:12

**s**

**s**  3:1 4:4
**safe**  94:15 108:3,8
  108:16 110:21,21
  129:12,19
**safely**  109:22
  111:2
**safety**  42:17 91:23
  94:14,17,18 97:15
  111:22 112:3,8,20
  130:12 141:5,13
**sake**  84:5
**sale**  152:6
**sample**  11:19
  12:18,22 13:7
  17:16 23:17,20
  31:14 36:22 37:4
  37:10,10 41:8
  62:13,13,18 73:19
  73:20 74:13,18,22
  78:16,18 79:13,14
  79:15,23 80:10,19
  81:4,4 83:17,23

85:24 87:9 100:9
100:25 132:4,20
134:22 146:10
152:11 163:5,7
168:12,12 181:6
196:10,12,15,17
**sampled**  80:21
134:18 169:19
190:23
**samples**  9:18
10:22 11:23 16:19
24:19 29:2 31:11
31:13 32:7 35:17
39:12,14,14 44:7
44:13,21 45:1,17
52:10 53:20 54:15
54:20 57:19 62:19
62:22 65:21 73:6
73:16 80:15 82:10
82:25 88:2 99:25
100:3,4,5,15,23
101:18,23,24
102:7,10,18,24
106:9 115:4,6,11
117:2,11,16,19,22
120:18 121:2,2,13
122:20 123:22
125:23 126:1,14
126:16,16,24
127:2,10,11
129:23 130:2
132:20 133:3,6
134:21 137:20
139:7,8 144:15
145:6,7 146:7
147:3,7 149:24
152:4,5 155:10
157:14 162:22
167:17,21 168:9
168:22 192:4,9
196:16

**sampling**  29:4
156:24 157:3,12
**sand**  173:6
**satisfactorily**
22:11
**satisfy**  100:25
**saw**  24:2 39:8 78:9
97:20 98:2,4
121:15,16 192:16
**saying**  22:22 23:11
26:15 32:16 35:22
45:25 55:21 57:8
86:21 95:11 116:8
116:9 119:7
121:15,25 133:24
141:16 150:6,7
152:10,22,25
153:1,5,6 163:24
164:7 192:24
**says**  12:14 16:15
16:17 18:17 21:3
22:2 24:18 25:3
26:8 29:1,19,22
30:6,18,22,25 31:8
31:20,20 39:9
40:20 44:7 48:10
48:13 51:6,6,25
52:5,9,14,18 53:8
53:20,24 58:10
59:1,7 63:22,24
64:6,7,8 65:21
69:7 70:21,25
71:3 74:21,22
78:22 79:1,12
80:14 81:22 83:5
84:3 86:2 88:9
100:3 103:14
109:12,20 110:20
117:21 118:24
123:1,15 125:22
126:22 128:7,19

133:2 134:25
138:10 139:5
141:4 146:6
147:19 150:23
151:25 154:4,6
156:10 161:6,7,11
161:12 163:15,16
163:18 164:8,14
164:15 165:23
166:16 167:3,14
167:20 170:19
178:5 179:11
183:4,5 184:9
189:3,25,25
190:17,20 196:9
196:15
**scanned**  102:25
**scanning**  30:8
**schaffer**  26:13
**schaffner**  23:14
25:4 26:8,14
27:10,17 29:19
30:3,21 31:11
32:11 141:3
**scheduled**  91:23
**school**  39:20 47:2
85:9
**science**  92:9
**scientific**  111:21
**scientists**  18:24
19:4 42:16
**scope**  16:19
**screen**  35:4 70:11
**se**  94:17
**seal**  14:15 79:1,4,6
79:10,11
**seated**  5:3 89:17
176:22
**second**  14:17,24
54:5,19 55:16
56:19,21 57:23,24

57:24,24 58:11,13
58:19,20,21 60:13
60:15,17 61:15
62:4,12 63:18
64:3,11 66:22
67:8 68:1,8,13
80:24 95:19 115:7
155:9 162:6
167:21 171:19
179:15 180:1
**secret**  109:18
**section**  157:18
**sections**  171:21
**sediment**  145:20
146:2,3 148:3,6,24
**see**  12:18 14:22
15:1,2,6,10 18:1
21:4,7 29:1 30:4
35:23 40:21 42:3
42:14 46:10 52:4
53:1 55:5,8,10,24
61:16 62:21 63:14
64:17 65:20 66:5
68:19 70:2,6,21,23
71:1,7,13,19 72:3
78:15 79:24 81:21
82:4,20 84:2,11
85:18,20 88:2
93:16 94:9 97:6
99:6,24 102:4,10
102:18,19 103:14
105:7 109:20
122:19 128:14
138:10 142:1
149:22 157:2,13
160:4 161:6 166:5
166:25 167:3,13
169:10 170:12,19
171:3 174:15
176:3 177:23,25
180:22 181:3

182:24 184:9
186:13,25 190:15
190:17 196:25
197:3,9 198:16
**seen**  19:19 23:20
24:25 28:15 31:14
31:16 32:20 73:10
78:12 120:17
121:4 128:13
144:20 146:18,20
149:18 151:8
157:20 168:15
170:15 192:2,4,6,9
192:12
**sees**  85:25
**select**  29:2
**selected**  123:25
**sell**  158:7 189:23
190:4
**selling**  89:24 90:5
113:1
**sells**  189:20,25
**semple**  178:6
**sensitive**  32:12,16
36:5 40:3 148:2,7
**sensitivity**  119:24
120:3,9,9,10
**sent**  21:21 53:2,5
53:11 55:20 62:14
63:12
**sentence**  45:23
46:2 111:10
125:25 137:4
191:24
**separate**  56:14,15
56:17,22,24,25
57:9,11 95:4,10
148:5 157:17
173:3
**separated**  145:19

**separation**  145:16
174:8
**separator**  170:22
**september**  79:23
80:13 81:5 140:6
140:9 141:2
**sequence**  72:8
**series**  147:3
155:10 163:3
**seriously**  39:16
**serpentine**  174:6
**served**  70:25
**sesquihydrate**
59:9
**set**  10:21 37:15
38:25 134:8
**seven**  130:1
**seymour**  10:18
**shape**  103:4 104:5
**shaped**  55:11
**shards**  83:13
**sheet**  81:12 161:3
**sheets**  6:23 182:12
184:7,7,15 185:18
185:25 186:3
**sherwin**  94:5
**shipped**  150:12
**short**  140:3 158:16
158:20 161:24
**shortened**  67:10
**shortly**  181:5
**show**  46:19 60:23
68:8 70:5,15,16
111:21 118:1
122:19 160:4
171:21 179:9
188:19 192:4,9
**showed**  29:9 72:3
78:10 117:22
120:18 121:2
130:12 138:11

139:11
**shower**  11:19,20
12:19,19,22,22
13:5,5,7,7 15:18
22:5,6 27:19,19
30:7,7,11,11,19,19
41:5,5,8,8 52:10
52:11 74:15,15
79:19,19 80:5,5,10
80:10,19,19 81:12
81:13 82:10,10,25
82:25 83:16,17,24
83:24 88:2,2
183:4,4 184:24,24
185:2,2,6,6
**showers**  15:18
184:14
**shown**  34:17 45:2
70:9 81:12 90:17
98:8,21 123:25
132:1 135:12
143:14 149:21
164:17 179:7
182:4
**shows**  141:4 147:4
**shut**  154:2 158:17
158:21
**sic**  162:5
**side**  6:16 11:15
15:6 52:8 59:1,4
155:13
**sidebar**  7:7,10 9:7
69:1,2,24 179:1,5
179:23 187:16,17
188:20
**sided**  58:25 103:10
104:7
**sides**  104:11 105:3
105:19
**signature**  198:19
200:11

**signed**  63:20 71:9
80:1 128:8 187:3
187:7
**significant**  112:14
117:17
**significantly**  119:4
**silicate**  173:9
180:19 181:9
**silvia**  2:21 200:3
200:12
**similarity**  59:8
**simon**  3:8
**simple**  75:2
**simply**  54:6
**simulated**  130:25
**single**  157:22
189:8
**sir**  6:20 16:7,12
21:18 33:12,23
34:13 38:8 46:2
46:17 48:25 49:12
49:20 50:19 55:4
57:1,4 60:25
61:10 66:20,25
73:12 74:6,11
75:8 77:14 90:25
92:24 95:18 96:4
98:20,25 99:4,24
102:7,18 105:8
107:9 108:20
111:25 112:18
114:23 122:4,15
125:1 128:9 134:9
134:13 151:2
153:3 162:5 165:2
165:5 177:5,21
182:17,24 185:16
189:2 192:18
193:15,25 195:10
198:8,12

**sit** 52:12
**sites** 150:1
**situation** 9:15
**six** 51:10 137:20
150:16
**size** 103:14 163:5
168:19
**skeptical** 110:14
**skin** 100:11
**skip** 13:12 23:1
165:1
**small** 12:14 84:8
86:4 87:1 138:4
138:14 173:6,12
**smaller** 142:1
**smell** 6:23
**smith** 107:11
**sodium** 59:9 173:8
180:19 181:9
**sold** 90:2 189:18
190:5,6,6,9,22
192:1 193:2
**somebody** 184:2
**someone's** 78:24
88:16
**somewhat** 97:1
**sonicated** 145:18
**soon** 52:11
**sorry** 6:11 10:1
17:22 43:6 47:6
50:19 51:14 58:8
61:20 62:6 64:19
65:2,4 68:23
80:12 90:19 93:19
94:1 99:2 103:21
108:12 132:9
134:3 142:21
152:19 154:24
156:21 157:4,6
160:9,14,20
163:15 166:1

167:22 178:25
179:6 180:7,8
192:8
**sort** 18:25 28:17
145:22 148:5
**sorts** 37:25
**sound** 70:7 77:21
**sounds** 87:17
**source** 189:17
**south** 116:12
135:7
**speak** 92:19 95:3
113:17 194:20
**speaking** 95:9
**special** 181:10
**species** 180:21
**specific** 171:10
172:6 189:14
**specifically** 134:20
**specification**
104:19
**specify** 24:9
169:19
**speculate** 19:17
38:22 45:8 48:18
50:13 64:4 81:1
124:19,21
**speculation** 19:18
**speed** 16:5
**speeding** 67:11
**spiral** 170:21
173:14
**spoken** 50:17
**sponsored** 19:21
**spread** 7:14
**sprinkle** 184:14
185:18,24 186:3
**square** 86:6,13,16
86:20,20,25,25
**staining** 99:25
100:22

**stamp** 7:16,25
17:17 65:10 68:4
68:9,16,19,19,20
70:2 165:15
182:25 197:9
**stamped** 169:10
**stamps** 71:13 82:5
82:5
**stand** 100:16
149:11,17
**standard** 23:3
**standards** 97:3
**stands** 100:17
149:16,19 155:21
196:8
**stanley** 95:14
**start** 43:17
**started** 127:23
185:11
**starting** 44:1
84:18 156:23
**starts** 120:15
154:12
**state** 27:13 90:3,11
134:20 159:17
169:5 177:13
196:17 200:5
**stated** 19:10 24:7
24:7,23 25:1,2
26:5 27:10 30:10
32:1,5,10 33:4,25
35:24 38:19 40:22
41:7 54:6 55:18
91:3 97:25 98:4
105:12 111:10
123:15 125:3,3
129:11,21 194:6
**statement** 25:8
35:8 42:15 188:15
190:18 191:14,16

**states** 13:9 18:6
27:9 32:1 85:2
101:8,9 165:13
177:6 178:21
180:16 189:18
194:8,9 195:23
196:16
**static** 170:21
173:14
**stating** 38:19
**statistical** 129:11
**status** 97:15
**stayed** 58:18 72:18
**stefs** 30:8
**step** 46:13 115:7,7
**stewart** 23:21 24:4
27:18,20 31:19,20
31:23,24 34:25
35:15 38:15,23,24
42:4 50:14 80:1
154:18
**stop** 124:8,11
129:15
**stork** 187:23
**story** 94:8
**straight** 48:25
**street** 2:2 3:9,15
3:19
**stressed** 111:19
**stretch** 8:12
**stricken** 20:5
98:18 137:4 140:4
**stricter** 120:5,7
**strike** 76:23 77:2
98:17 126:4 137:1
140:1
**studies** 56:14 60:5
111:21
**study** 52:5 53:18
56:3,9,10,12 57:24
58:21 174:13

**stuff** 22:5,15
121:16,16,17
**subject** 128:23
170:19 178:2
**submitted** 65:22
**subpoena** 71:1,4
**subsequent** 16:20
23:21 35:15 94:4
**substantial** 50:7
109:21 111:1
130:12 141:4
**substantially** 31:1
45:3,5,9,21 48:10
48:13,16 49:1,6,9
49:23 50:5,11,18
50:22 51:2,7
54:22 124:2,4,15
124:18,20,25
126:19
**subtrace** 174:7
**success** 97:20 98:3
98:5
**sufficient** 114:15
**suggested** 29:15
31:12 36:21 37:3
80:4
**suitable** 95:16
119:13 132:1
134:18 135:1,20
**suite** 3:9,16
**sullivan** 3:14 5:20
5:21 7:6,9 8:1,7
8:12 9:4,6 13:18
14:3 21:12 27:5
28:9 38:3 41:20
43:9 49:14 50:23
58:4 61:24 64:25
65:14 68:7,14,24
69:6 70:8,14,17
76:24 77:24 82:15
84:4,10 91:9 93:7

96:16 99:19
102:14 104:23
107:17 115:20
118:14 123:12,18
124:5 125:7 126:5
129:3 131:15
135:10,14 137:15
140:22 143:23
144:1 151:12
154:23 157:7
159:14 160:7,11
160:24 162:16
165:19 174:18
176:9 178:13,25
179:8,13,18
183:12,19 187:12
188:8,10,18,23
194:19 197:25
**summarize** 22:15
40:2
**summarized** 22:4
62:25 121:21,24
**summarizing**
157:3
**summary** 21:3
22:2 28:18 125:14
125:16
**summer** 184:10
**super** 178:10
**superior** 1:1
**supplement** 147:2
**supply** 31:9
**supplying** 189:19
**suppress** 174:16
**sure** 5:3 7:8 14:3
35:6 46:15 68:12
89:18 123:14
133:13 156:16
169:6,24 176:23
179:7,19 182:23
184:1 193:21

198:2 199:4
**surgical** 100:18
**surprising** 184:10
**survey** 29:4
134:17 183:23
**suspected** 100:23
**suspend** 148:1
**suspension** 147:25
**sustained** 98:16
104:25 110:6
142:9
**sworn** 187:1
190:17,18
**symposium** 91:23
**system** 104:20

**t**

**t** 4:4
**tab** 9:22 60:25
128:7 198:9
**table** 69:4 107:2
120:18 127:5
147:4
**tabs** 42:25 156:10
**tabulation** 146:7
**tag** 156:9
**tail** 170:8
**tailings** 173:8
**take** 14:20 50:9
54:18 63:3,3
73:13 89:1 92:7
111:23 112:6
119:8 153:20
154:14 175:18
179:1 182:11
**taken** 67:12 89:15
164:19 176:19
**talc** 9:18 11:8 21:3
23:3 25:10 26:11
26:22 30:22 31:6
42:18,22 52:19,25
62:17,23,24 65:21

81:22 82:21,23,23
82:23 83:13,13
89:24 90:2,5,8,11
90:13 91:14,21,22
92:11,15 94:6,13
94:16,17,18,19,23
95:1 97:3,4,4,5,14
97:15 104:16
105:6 111:22
112:3 113:24
114:1,6,9 115:3
117:2 123:23
126:23 128:24
129:13,22 130:13
131:24 134:17
137:9 139:7,10
141:5,12,13
144:14 147:3
150:7 158:3,7,22
159:2 162:22
164:18 166:10,12
166:13,16,23
167:5,19,20,24
168:3 169:1,6
170:22,25 171:4
171:21,25 172:8
181:3,6,12,14
189:8,17,19,23,24
190:7,21 191:21
**talcs** 130:11
149:15,15 150:5
152:6,23 157:18
164:13,21,22
192:2
**talcum** 39:11
**talk** 9:11 36:20
37:24 48:22 73:5
73:18 104:9
124:24 132:24
136:13

[talked - transmission]

talked 37:25 74:14
93:20 119:18
145:18
talking 8:24 9:10
34:22,25 35:14
37:7 39:19 47:8
47:10 48:20 49:4
60:23 93:18 116:7
136:12 172:5
175:3 177:5
178:19 181:3
talks 168:18
technique 100:22
145:16,23 148:14
181:8,9
techniques 123:24
181:11
technology 130:24
tell 23:15 46:11
103:3 149:10
187:25
telling 142:20,24
tells 64:3 108:7
tem 51:17 65:21
141:21,24 142:2,3
155:11
ten 80:20 81:1,2,6
81:6,10 149:2
tenfold 131:3
tens 118:6
test 9:18 145:17
153:13 171:10
188:11,16 191:4,7
191:12
tested 15:21 76:7
180:17 190:23
195:21,24
testimony 8:17
20:5 89:3 167:9
175:21

testing 37:10,13
73:5,15 105:5,9
121:17 162:21
181:18,20 182:2
191:1,25 193:4
testings 153:9
tests 152:4 153:11
153:14
texas 3:10
text 188:13
thank 5:13,17 6:5
6:14,16,17 7:9 9:4
9:6 10:5,12,13
14:8 34:8 41:14
44:3 46:24 53:6
62:10 73:8 81:18
84:10 88:24 89:6
89:20 90:23 98:25
118:22 124:22
142:17 151:1
154:20 155:4
166:3 175:24
176:2,16 177:1,19
179:4,22 182:9,22
183:19 188:23
theirs 42:12
theoretical 129:12
thin 171:21
thing 37:11 54:10
54:21 118:5 196:3
things 18:25 37:25
67:11
think 31:11 39:5
44:16 49:11 62:18
67:25 69:21 74:8
77:11 78:14 81:8
83:18 86:1,15
90:2 104:23
106:16,23 113:18
119:7 121:1 146:5
159:24 170:16

175:15 177:12
179:11 191:10
thinking 55:21
166:25 167:7
third 3:6 61:1
63:19 64:11 83:12
84:6 186:16
thirds 83:13
thought 59:7
94:20 113:15
125:3,24 192:8
thousand 75:15,16
75:18 191:9
thousands 46:7
threatening 29:25
three 15:18,19
76:18 77:8,10,11
77:11 82:22
117:19 122:20
132:3 133:6
138:11,14 139:7,8
143:15 146:12
166:9 167:4 170:4
170:7,8 173:6,12
199:14
time 7:21 8:3 11:1
11:22 12:6 18:21
28:25 32:18,22
33:21 40:23 49:17
77:6,19,22 88:24
95:19 100:7 116:9
122:8 126:12
127:12 139:23
144:7 152:10,22
153:1,13 154:6
157:22 175:16
177:12 189:11
198:16
times 56:15 75:18
87:13 143:15
168:16

title 115:14 166:8
titled 57:13
tlv 129:14
tm 51:14
tm7024 51:15
105:11
today 5:5 6:3
42:20 93:23 95:13
163:21,23,23
toiletry 119:14
135:2,20
told 20:11 26:4
38:15 57:21 67:2
79:14 97:12
110:25,25 111:3
111:13,16 164:4
tolerance 26:5,20
26:24 108:17
111:13 130:17
tool 16:3
top 22:14 36:20
74:7 78:15 178:5
179:10
topic 88:21
total 15:21 16:21
44:20 146:9
148:23
touch 93:23
toxicological 25:9
26:10 32:25
trace 59:12,24
60:1,3 88:8,14
102:23,25 168:9
168:13,22
track 78:4
trained 46:5
transcript 2:17
200:7,8
transmission 34:2
34:11,23 35:1
127:8

**transparent**
167:18
**treated** 173:8
**tremboletic** 97:3
**tremolite** 23:19
44:9,21 45:16,18
45:24 46:3 47:11
48:7 53:21 54:19
55:10,19,24 59:7
59:22,24 73:19
74:18,20,23,25
75:21,21,24 76:3
83:13 84:11,13
85:20 87:7,20
88:8,13,14 89:24
90:8 92:8 94:7,15
94:19,21 95:1,7
97:21 98:2,5,8,9,9
98:13,22 100:22
100:24 101:3,7,11
101:11,13,15,18
103:25 106:10,11
113:9,9,9 120:21
120:23 167:25
168:5,8,10,13,19
168:21 171:6,7,11
171:25 172:25
173:4,9,15,20
174:6,11 175:10
180:4
**trial** 1:4 5:6
**trials** 180:18
**tried** 92:14 185:1
**trillion** 118:7
**trillions** 118:6
**trouble** 106:20
**true** 16:15 27:4
74:19 85:23 88:10
92:15 99:12 114:4
115:15 119:10
138:7 142:25

151:6 152:1 159:5
169:20 187:4
189:14 191:17
193:5,8,11 197:14
200:8
**truth** 188:1 194:21
**truthful** 191:22
194:18
**try** 49:21 91:20
129:8 174:16
182:12
**trying** 35:10 36:21
37:7,23 48:25
95:1,6 98:1 121:1
171:14 181:13
**tube** 145:17
**tucson** 165:13
**tuesday** 2:4
**turn** 9:21,23 11:15
14:24 43:16 52:8
61:10 62:4,12
74:6 90:16 134:9
134:12 146:24
150:23 184:22
186:13
**turned** 5:3 89:18
176:23
**twice** 56:3
**two** 14:4 15:17
16:20 20:17,23
36:3 39:14 44:21
45:1 56:14,19,22
56:24,25 57:9,11
57:19 58:14,25
66:23 67:5 83:13
85:5 98:7,20
113:20 116:4,11
120:18 121:13
126:1,24 132:3
143:15 146:2,3,4
163:4,10 168:22

173:5,12 178:20
199:13
**type** 23:24 24:12
92:9 148:13
171:24 173:5
**typed** 88:18
**types** 166:10 167:5

**u**

**uh** 12:5 59:3
149:13 170:6
186:17
**ultimately** 72:20
72:23 190:22
**unaware** 7:1
**understand** 30:22
32:6 37:11,16
190:13 195:1
196:7
**understanding**
48:25
**understood** 6:22
185:17
**undertake** 16:18
**undertaken**
117:15
**unequivocal**
139:13
**unfair** 29:2
**unify** 91:21
**united** 189:18
**university** 15:2
**unquote** 7:20
**unreasonable**
185:14
**unrelated** 187:13
187:13
**unrestricted** 154:6
**unsophisticated**
97:1
**untruthful** 191:22

**upstairs** 175:24
**usage** 184:11
185:7
**use** 8:4,11,14,20
8:25 17:8 51:25
53:9 56:25 57:3,5
57:22 58:16 77:22
94:6 112:21 123:9
134:18 135:20
136:18 151:20
184:17 185:3,24
188:16 191:24
**user** 185:1
**users** 184:24
185:10 189:21
190:22 191:24
**uses** 24:10 33:25
97:14 104:15
190:1
**usually** 70:15
183:24
**utilizing** 129:13
181:8

**v**

**v** 1:6,11,16,21
**vail** 180:17
**valid** 112:17
**validate** 81:15
**validity** 17:10
**vanderbilt** 89:24
90:2,10 91:15,17
92:10,14,17,19
93:25 94:12,24,25
95:3,9 96:25
97:20 98:1,5
**vanderbilt's** 91:20
92:16 94:8,20
**variance** 39:16
**various** 8:17,25
170:20

[verified - written]                                                              Page 34

| | | | |
|---|---|---|---|
| **verified** 30:16 | **walter** 61:19 133:2 | **weeks** 96:3 | **witness** 4:2 6:10 |
| 32:2 | **want** 35:7 36:16 | **weight** 12:16 | 8:23 13:23 20:3,7 |
| **verify** 33:7 | 38:22 46:11 55:6 | 25:10,10 103:1 | 27:9 34:7 46:13 |
| **veritext.com** 2:24 | 75:19 100:6 | 130:14 141:6,9,9 | 46:23 54:25 55:2 |
| **vermont** 166:11 | 122:15,19 123:20 | **weil** 3:15 | 77:3 111:8 126:7 |
| 166:17 167:6 | 124:21,23,23 | **weissler** 16:15 | 135:12 142:15 |
| 169:2,5 177:11,13 | 129:9 153:14 | 24:17,18,23 25:1 | 152:19 160:16 |
| 189:9 | 173:1 180:25 | 32:6 35:17 | 174:20,23 |
| **vermont's** 167:8 | 181:1 184:23 | **went** 18:3 33:9 | **wodicka** 110:13 |
| **vern** 144:21 | 198:9 | 58:20 106:12,16 | 110:13,20 |
| 169:12 | **wanted** 42:14 67:9 | 114:3 132:19,23 | **woman** 184:13 |
| **vernon** 154:17 | 75:17 | 172:11 185:4 | 185:5 |
| **version** 13:16 15:8 | **wanting** 109:5 | **west** 2:22 150:1 | **wondered** 130:9 |
| 18:5,15 53:24 | **warm** 184:10,12 | 161:13 180:19 | **word** 24:11 31:22 |
| 54:2,5,13 55:9,16 | **washington** 91:23 | **whatsoever** 89:6 | 33:25 49:8,12 |
| 57:23 58:11 60:13 | **way** 13:12 48:17 | 175:22 | 50:21 54:6 95:22 |
| 60:16 66:22,23 | 68:6 75:3 93:19 | **whitaker** 30:24 | 121:1 |
| 67:10,10 77:10,14 | 100:5 118:11 | **wi** 150:1 192:12 | **words** 58:3 112:15 |
| 77:15 80:24 98:12 | 120:2 124:3 128:1 | **wiley** 70:7,22 | **work** 11:7 16:21 |
| **versions** 56:19 | 132:10,19 134:16 | **william** 1:19 3:12 | 23:15 30:7,16 |
| 67:14,17 76:2 | 136:20 141:8 | 5:9 178:1 | 136:21 150:16 |
| **versus** 5:7,8,9,10 | 144:20 147:18 | **williams** 94:5 | 178:22 |
| 148:6 190:14 | 148:5,7 157:5 | **willing** 24:20 32:8 | **working** 11:8 50:7 |
| **view** 32:25 59:8 | 163:12 196:19 | 35:18 | 180:16 |
| 94:12 | 197:2 198:15 | **windsor** 117:13 | **world** 11:2,4 |
| **views** 93:24 | **we've** 8:1 28:15 | 131:25 144:22 | 44:17 56:2 |
| **virtually** 19:13 | 31:16 44:15 56:2 | 145:3 150:1 151:3 | **worry** 160:1 |
| 133:25 | 78:7 96:6 112:1 | 151:19 156:18 | **write** 52:12 106:5 |
| **virtue** 17:7 | 128:12 138:24 | 161:8,13 162:12 | 123:7 |
| **viscomi** 2:12 | 144:6 147:4 | 166:5,11,13,17,18 | **writes** 59:11 |
| **visible** 175:20 | 148:20 157:20 | 166:24 167:1,6,7 | 125:17 151:18 |
| **volume** 1:6 2:5 | 161:3 164:17 | 170:22 177:10 | 198:15 |
| 168:11 173:10 | 168:15 187:25 | 178:22 180:19 | **writing** 28:14 |
| 175:3 199:23 | 192:2,4,6,9,12 | 186:22 189:4,5,6,9 | **written** 12:21 17:2 |
| | 193:10 | 189:20 190:9,14 | 18:16,16 24:22 |
| **w** | **weak** 94:21 | 190:21,25 192:20 | 25:13 29:18,18 |
| **w** 21:7 | **wear** 175:19 | 192:23,25 193:25 | 33:20 45:7 48:12 |
| **wage** 2:21 200:3 | **weber** 73:10 78:11 | **windsor's** 166:12 | 48:12 78:24 79:20 |
| 200:12 | **week** 10:7 39:6,8 | **wish** 179:9 | 83:15 92:13 94:10 |
| **wait** 126:2,2 | 73:9 78:8 80:3 | **withstanding** | 95:5,8 96:1 97:22 |
| 135:24 | 81:12 | 31:18 | 104:19 110:5,7,10 |

[written - zoisite]                                                                Page 35

110:12 111:11
119:22 123:5,8
127:3 129:25
130:15 133:8,19
139:15 143:1
147:20 148:4
150:21 152:9
168:2,6 171:9
172:2 174:9
192:18,20
**wrong** 69:11
**wrote** 26:14 29:21
30:17 39:1 48:19
50:14,17 51:3
57:2,4,7 92:12
121:20,24 130:21
135:3,23 136:1
153:5,16 164:2,2,2
191:3 197:21
**ww** 141:8

**x**

**x** 4:1,4 18:17,21
19:2,8 22:10,20,23
23:11,16,18 31:18
32:12,14,23 33:16
123:24
**xrd** 15:25 16:2
23:6 32:14 36:6
40:2,2,9 117:10
119:18,20,23
127:5

**y**

**yeah** 12:8 16:5
17:3 18:25 20:18
33:24 35:10 39:21
39:25 40:1 43:6
43:17,17 52:23
56:6 59:16 61:2
61:21 64:13 65:3
68:2 73:23 74:3,4

75:20 77:10,11
79:9 83:15,20
84:1,13,14 85:9,11
88:15 92:17 93:23
96:6,6,9 99:2,15
100:14 101:4
102:5 103:2,7,9,13
103:19 104:6,6
120:16 122:17
123:8 128:16
138:20 140:14
142:3 143:20
145:25 146:1
147:14 148:4,13
151:21 152:22
153:22,22,23
154:11 156:13
160:19 165:9,10
167:12,15 170:7
172:16 173:22
179:4,12,14
182:19 183:8
184:19 186:9
187:2 188:12
189:25 192:20
193:19
**year** 10:2 73:25
142:19 154:5
191:8 192:13
197:19,20
**years** 76:18 77:8
77:11,11,12 97:23
114:13 117:7
132:3 174:24
185:8 189:7,10
191:9 196:7
197:19
**yesterday** 5:25
6:20 7:19 9:9
20:12 26:4 34:14
91:16 118:6

129:18 145:19
159:16
**yesterday's** 7:13
**york** 3:7,7 15:1
90:3,11 91:16
94:6
**young** 185:1

**z**

**z** 145:1
**zeitz** 144:21 145:3
154:17 169:13
**zero** 26:5,19,24
108:9,16,17
111:13 130:16
146:11
**zoisite** 168:8

Exhibit 174

*Attorney(s):*          LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL

*Office Address & Tel. No.:*   2 Lincoln Highway, Edison, New Jersey   08818-2905
                              (201)494-2727

*Attorney(s) for*       Plaintiff

---

LOUIS EDLEY

                                          SUPERIOR COURT OF NEW JERSEY
                                          LAW DIVISION
                                          MIDDLESEX COUNTY

                         *Plaintiff(s)*

                 *vs.*
E & B MILL SUPPLY, et als

                                          *DOCKET NO.* L-075913-86

                                              *CIVIL ACTION*

                         *Defendant(s)*        Stipulation of Dismissal
                                                  with prejudice
                                          (as to defendant, Windsor Minerals, Inc.)

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party,* with prejudice as to defendant, Windsor Minerals, Inc.

**EXHIBIT**
**43**

*Dated:*   July 23,          *19* 87   .

*By* _____          *By* _____
  RONALD S. LEVITT                          RONALD B. GRAYZEL
*Attorney(s) for Defendant(s)*            *Attorney(s) for Plaintiff(s)*
WINDSOR MINERALS, INC.                    LOUIS EDLEY

**EXHIBIT**
**J&J 188**

# NEWMAN, HERMAN, SALTMAN, LEVITT AND FEINSON

### A PROFESSIONAL ASSOCIATION

### ATTORNEYS AT LAW

EDWARD H. HERMAN
JAY J. NEWMAN
  (N.J. & D.C. Bar)
DAVID A. SALTMAN
  (N.J. & Fla. Bar)
RONALD S. LEVITT
  (N.J. & N.Y. Bar)
JULIUS J. FEINSON
JULIE VACCHER GOLDSTEIN
  (N.J. & Pa. Bar)

---

ISRAEL H. SALTMAN (1914-1982)

---

Of Counsel
ALLEN J. SIMONSON
DONALD J. PERRELLA
  (N.J. & N.Y. Bar)
ROBERT J. PINTO

Please Reply To:
  P.O. Box 769
  East Windsor, New Jersey 08520

---

New Brunswick Office:
  47 Paterson Street
  (201) 745-9005

East Windsor Office:
  339 Princeton-Hightstown Road
  (609) 443-4900

Somerville Area:
  By Appointment Only
  (201) 725-4257

---

OUR FILE NO.
11092-L

July 23, 1987

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza, 2 Lincoln Highway
PO Box 2905
Edison, New Jersey 08818-2905

RE: Edley -v- Madsen & Howell, Windsor Minerals, Inc., et als

Dear Mr. Grayzel:

Enclosed please find an Affidavit on behalf of Windsor Minerals, Inc., signed by Roger N. Miller, President of Windsor Minerals, Inc. since 1968. Also enclosed you will find an assay from McCrone Environmental Services, Inc. I trust that these documents will now enable you to sign a Dismissal as was done in the Yuhas file. I have taken the liberty of drafting the Dismissal and enclosing the same for your signature along with a self-addressed stamped envelope.

If you are still unable or unwilling to sign the Dismissal, please forward immediately your client's answers to supplemental interrogatories which were served upon you almost one year ago.

Very truly yours,

Ronald S. Levitt

RSL/gbf
Encl.

cc: Michael M. Tanenbaum, Esq., McCarter & English
    Thomas M. Kelly, Esq., Morley, Cramer, Tansey, Haggarty & Fanning
    Anthony Luongo, Esq., Donington, Leroe, Toland & Luongo

Certified Mail, Return Receipt Requested

```
----------------------------------
LOUIS EDLEY,                      :    SUPERIOR COURT
                                  :    OF NEW JERSEY
             Plaintiff,           :    LAW DIVISION
                                  :    MIDDLESEX COUNTY
      vs.                         :
                                  :    DOCKET NO. L-075913-86
WINDSOR MINERALS, INC.;           :
NICOLET, INC., as Successor-      :       CIVIL ACTION
in-Interest to Keasby &           :
Mattison; GAF CORP., RUBEROID,    :       AFFIDAVIT
GAF CORP., as Successor-in-       :
Interest to Ruberoid; MADSEN      :
& HOWELL, INC.; JOHN DOE #1       :
to #50 (Fifty Unidentified        :
Manufacturers and Distributors    :
of asbestos-containing            :
products),                        :
                                  :
             Defendants.          :
----------------------------------
```

STATE OF VERMONT  :
                 SS.
COUNTY OF WINDSOR :

     ROGER N. MILLER, of full age, being duly sworn, according to law, upon his oath, deposes and says:

     1.  I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

     2.  The exclusive business of Windsor Minerals, Inc. is, and has been for the last eighteen years, the mining and milling of talc from a single mining district in Windsor, Vermont.  That mining district is the exclusive source of talc for all of the Johnson's Baby Powder sold in the United States.  In addition to supplying the talc for Johnson's Baby Powder, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users.

3.   All of the talc mined by Windsor Minerals, Inc., whether it is ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos.   No evidence of the presence of asbestos in Windsor Minerals' product has ever been revealed by this testing.   Attached hereto as Exhibit "A" is a true copy of a recent report of such testing.

ROGER N. MILLER

Sworn to and subscribed
before me this 13   day
of July, 1987.

Notary Public
My Commission Expires:
Feb. 10, 1991

# Exhibit 175

REDACTED DOCUMENT

**Phelps Dodge Corporation**

Ext Ref                0000000

Sale of CIM - Stock Purchase Agreement among Cyprus Mines
Corporation, Cyprus Minerals Company and RTZ America Inc. - 5
01/58704

2001/58704

Row-12, Section 1, Shelf 5

REDACTED DOCUMENT

**TABLE OF CONTENTS**

ITA-Herford-002675

REDACTED DOCUMENT

**TABLE OF CONTENTS**

Document
Number

I.        **Closing Agenda**                                                                    1

II.       **Agreements and Schedules - U.S.A. Closing**

          Stock Purchase Agreement among Cyprus Mines              2
          Corporation, Cyprus Minerals Company, and RTZ
          America Inc. dated as of June 5, 1992. (the "Agreement").

          Amendment dated June 24, 1992 to the Agreement.          3

          Conformed copy of the Agreement.                          4

                    Annex A - Cyprus Industrial Minerals - Talc Only      5
                    Balance Sheets dated December 31, 1991 and March 31, 1992

                    Annex B - Accounting Principles                    6

                    Annex C - Hamm Underground Mine Property           7

                    Schedule 5.2 - Ability to Carry Out the Agreement   8

                    Schedule 5.3 - Capitalization of the Companies      9

                    Schedule 5.5 - Financial Statements               10

                    Schedule 5.6 - Absence of Certain Changes or Events  11

                    Schedule 5.7 - Liens                              12

                    Schedule 5.8 - Real Property - Permitted Exceptions  13

                    Schedule 5.8-1a - Fee Property                    14

                    Schedule 5.8-1b - Fee Property  (Unpatented Millsite Claims)  15

                    Schedule 5.8-1c - Fee Property  (Patented Millsite Claims)   16

                    Schedule 5.8-2a - Mineral Property                17

                    Schedule 5.8-2b - Mineral Property  (Unpatented Mining Claims)  18

                    Schedule 5.8-3a - Leased Property                 19

                    Schedule 5.8-3b - Leased Property  (Unpatented Mining Claims)  20

                    Schedule 5.8-4a - Water Rights                    21

                    Schedule 5.9 - Litigation                         22

                    Schedule 5.10 - Compliance with Law               23

ITA-Herford-002676

REDACTED DOCUMENT

Schedule 5.11 - Contracts 24

Schedule 5.13 - Tax Matters 25

Schedule 5.14 - Employee Benefits 26

Schedule 5.15 - Patents and Trademarks 27

Schedule 5.16 - Environmental Matters 28

Schedule 5.23 - Inventory 29

Schedule 7.3 - Intercompany Accounts 30

Schedule 11.3 - Environmental Indemnification 31

Schedule 11.3a - Operating Sites 32

III.     **Agreement and Schedules - European Closing**

European Stock Purchase Agreement between Cyprus Mines Corporation and Talc De Luzenac S.A. dated as of June 5, 1992 (the "European Agreement"). 33

Amendment dated June 30, 1992 to the European Agreement. 34

Schedule 5.3 - Capitalization of the Companies 35

Schedule 5.5 - Financial Statements 36

Schedule 5.6 - Absence of Certain Changes of Events 37

Schedule 5.11 - Employment Agreements 38

Schedule 5.14 - Employee Benefits 39

IV.     **Closing Documents**

Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated June 5, 1992. 40

Amendment dated June 24, 1992 to the Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated as of June 5, 1992. 41

Second Amendment dated June 30, 1992 to the Agreement of Transfer and Assumption by and between Cyprus Talc Corporation and Cyprus Mines Corporation dated as of June 5, 1992. 42

Bill of Sale and Assignment dated June 30, 1992. 43

Assignment of Trademarks and Tradenames dated June 30, 1992. 44

Assignment of Patents dated June 30, 1992. 45

REDACTED DOCUMENT

Assumption Agreement dated June 30, 1992.                                                46

Assumption and Retention Agreement dated June 30, 1992.                    47

Certificate of the Secretary of the State of Delaware, dated              48
June 25, 1992, as to the good sanding of RTZ America Inc.
in the state of Delaware

Consent Action by the Board of Directors of Cyprus Mine                   49
Corporation, dated June 30, 1992.

Officer's Certificate of RTZ America Inc., dated June 30, 1992.            50

Secretary's Certificate and Incumbency Certificate of RTZ                 51
America Inc., dated June 30, 1992.

Officer's Certificate of Cyprus Mines Corporation, dated June 30, 1992.   · 52

Officer's Certificate of Talc de Luzenac S.A., dated June 30, 1992.       53

Secretary's Certificate and Incumbency Certificate of Cyprus              54
Mines Corporation, dated June 30, 1992.

Secretary's Certificate and Incumbency Certificate of Cyprus              55
Minerals Company, dated June 30, 1992.

Stock Transfer dated June 30, 1992, between Cyprus Mines                   56
Corporation and Talc de Luzenac, S.A.

Resignations of Directors and Officers                                    57

Officer's Certificate of Cyprus Mines Corporation, dated                  58
June 30, 1992.

Officer's Certificate of Cyprus Minerals Company,                         59
dated June 30, 1992.

Certificate of the Secretary of the State of Delaware, dated              60
June 23, 1992, as to the good standing of Cyprus Talc Corporation
in the state of Delaware.

Certificate of the Secretary of the State of Delaware, dated              61
June 23, 1992, as to the good standing of Cyprus Mines Corporation
in the state of Delaware.

Certificate of the Secretary of the State of Delaware, dated              62
June 23, 1992, as to the good standing of Cyprus Minerals Company
in the state of Delaware.

ITA-Herford-002678

REDACTED DOCUMENT

Certificate of Assistant Secretary of Cyprus Minerals Company, dated June 30, 1992.    63

Certificate of Assistant Secretary of Cyprus Mines Corporation, dated June 30, 1992.    64

Cross Receipt    65

Stock Assignment and Stock Certificates    66

ITA-Herford-002679

REDACTED DOCUMENT

**40**

ITA-Herford-003354

REDACTED DOCUMENT

## AGREEMENT OF TRANSFER AND ASSUMPTION

AGREEMENT OF TRANSFER AND ASSUMPTION made this 5th day of June, 1992 by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS Cyprus wishes to sell and transfer to Newco, and Newco desires to acquire from Cyprus, all of the "Transferred Assets" (as defined below); and

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation, have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement").

NOW THEREFORE, in consideration of the mutual covenants herein set forth:

1.   _Definitions_.  All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement.

2.   _Purchase and Sale_.  Cyprus, in accordance with and subject to the terms and conditions of this Agreement of Transfer and Assumption, agrees to sell, assign, transfer, convey and deliver to Newco, and Newco agrees to purchase, accept, acquire and take delivery of the Transferred Assets, all for the consideration specified in Section 8.(b)(ii), as they exist at the Newco Closing (as defined below), in each case free and clear of any Encumbrances except Permitted Exceptions.   For purposes of this Agreement of Transfer and Assumption, the "Transferred Assets" shall mean all of Cyprus' right, title and interest in and to the assets, properties, rights and businesses of every type and description used primarily in or relating primarily to Cyprus' talc business (the "Talc Business"), whether real, personal or mixed, tangible or intangible, whether currently in use or idle, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and including, without limitation, all of the right, title and interest of Cyprus in the assets listed in paragraphs (a) through (l) below (but excluding the assets described in Section 3).

(a)   Cyprus' record  and beneficial ownership of all of the issued and outstanding  shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation; Cyprus Windsor Minerals Corporation, a Vermont corporation and its subsidiary Cyprus Western Source Corporation, a California

ITA-Herford-003355

REDACTED DOCUMENT

corporation; and Green Mountain Talc Corporation, a Delaware corporation; and Cyprus' record and beneficial ownership of ███ of the issued and outstanding shares of capital stock of DIMTA SA, a company organized under the laws of Spain, and Cyprus' record and beneficial ownership of ███ of the issued and outstanding shares of capital stock of Nihon Mistron Company, Ltd., a Tokyo, Japan corporation (collectively, the "Shares");

    (b)  the real property and mineral rights of the Talc Business and the records thereof;

    (c)  All current assets, including without limitation, all cash and, to the extent that the same may exist, all certificates of deposit, accounts receivable, claims, prepaid expenses, deferred charges, advances and deposits;

    (d)  All talc inventories of finished products, work-in-progress and raw materials of the Talc Business;

    (e)  All talc facilities and equipment of the Talc Business;

    (f)  All business machines, furniture and fixtures, supplies, office equipment, vehicles and other tangible personal property used primarily in or relating primarily to the Talc Business;

    (g)  All trademarks and other marks and, to the extent that the same may exist, all inventions, patents and any copyrights, and registrations thereof, all applications for any of the foregoing and all trade names;

    (h)  All right, title and interest in, to and under all contracts, agreements, leases, licenses, permits, orders, commitments of understandings to which Cyprus is a party or entitled to any right or interest;

    (i)  All trade secrets, processes, specifications, designs, drawings and technology which relate primarily to the Talc Business;

    (j)  All contracts, books, records and other data relating primarily to the Talc Business;

    (k)  All causes of action and claims of any kind of Cyprus against any other party related primarily to the Talc Business; and

-2-

REDACTED DOCUMENT

    (1)  All other assets and rights of the Talc Business as a going concern.

    3.  <u>Excluded Assets</u>.  Notwithstanding any provision of this Agreement of Transfer and Assumption to the contrary, the properties and assets (the "Excluded Assets") described in the attached Exhibit A, which by this reference is incorporated herein, shall be excepted herefrom and reserved to and retained by Cyprus.

    4.  <u>Assumed Liabilities</u>.  Subject to the terms and conditions of this Agreement, in connection with its purchase of the Transferred Assets at the Newco Closing, Newco shall assume and shall perform, pay and discharge all of the liabilities or obligations, whether known, unknown, contingent or otherwise primarily relating to the Transferred Assets, including, without limitations, liabilities and obligations, whether known, unknown, contingent or otherwise arising out of transactions or events occurring on or prior to the Closing and relating primarily to the Transferred Assets (the "Assumed Liabilities").

    5.  <u>Excluded Liabilities</u>.  Notwithstanding any provision of this Agreement of Transfer and Assumption to the contrary, Newco shall not be responsible for and shall not assume any of the following liabilities or obligations, whether known, unknown, contingent or otherwise (the "Excluded Liabilities") which are hereby expressly excluded from the definition of Assumed Liabilities: (i) any liabilities or obligations arising out of or relating to the Excluded Assets, (ii) any liabilities or obligations arising out of the Montana net proceeds tax liability, (iii) any liabilities arising out of or relating to properties disposed of by the Talc Business prior to the Newco Closing, and (iv) any liabilities or obligations (including costs and expenses associated therewith) arising from any litigation arising out of or relating to the operation of the businesses of the Companies prior to the Closing as to which Buyer has given written notice to Seller within one year of the Closing Date.

    6.  <u>Non-Assignable Contracts</u>.  Nothing herein shall be deemed to constitute an assignment or an attempt to assign any contract, agreement, lease, license, permit, order, or commitment or understanding to which Cyprus is a party if the attempted assignment thereof without the consent of the other party thereto would constitute a breach thereof or affect in any way the rights of Cyprus thereunder and such consent has not been given; but Cyprus will cooperate with Newco in any reasonable arrangement designed

-3-

REDACTED DOCUMENT

to provide for Newco the benefits under any such contract or agreement including, without limitation, the enforcement, for the benefit of Newco, of any and all rights of Cyprus against such other party or parties thereto arising out of any breach or cancellation thereof by such other party or parties or otherwise.

       7.   <u>Closing</u>.  The closing of the transactions provided for herein (the "Newco Closing") will take place at the offices of Sullivan & Cromwell at 125 Broad Street, New York, New York, immediately prior to the Closing provided for in the Stock Purchase Agreement.

       8.   <u>Transactions at the Newco Closing</u>. (a)  At the Newco Closing, Cyprus will deliver to Newco the following:

       (i)  stock certificates evidencing the Shares, in each case endorsed in blank or with an executed blank stock power attached, and in form suitable for transfer of valid title thereto to Newco or its assigns, free and clear of any Encumbrances;

       (ii)  such deeds, bills of sale, endorsements, certificates, instruments of assignment and such other instruments of conveyance and transfer reasonably satisfactory in form and substance to vest in Newco good and marketable title to the Transferred Assets, in each case, free and clear of any Encumbrances other than Permitted Exceptions;

       (iii) such instrument of retention reasonably satisfactory in form and substance as shall be necessary for Cyprus to retain the Excluded Liabilities.

    (b)  At the Newco Closing, Newco will deliver to Cyprus the following:

       (i)  such instruments of assumption reasonably satisfactory in form and substance to Cyprus as shall be necessary for Newco to assume all of the Assumed Liabilities;

       (ii) Stock certificates evidencing all shares of Common Stock of Newco.

       9.   <u>Representations and Warranties of Cyprus</u>. Cyprus hereby represents and warrants to Newco that it has good and marketable title or possessory rights to all of the Transferred Assets and that at the Newco Closing, good and

-4-

ITA-Herford-003358

REDACTED DOCUMENT

marketable title or possessory rights to all of the Transferred Assets, free and clear of any Encumbrances other than Permitted Exceptions, will be transferred to Newco.

10. <u>Attorney-in-Fact</u>. Cyprus hereby makes, constitutes and appoints Newco the true and lawful attorney-in-fact of Cyprus, with full power of substitution, in the name and stead of Cyprus, but on behalf and for the benefit of Newco, to demand and receive any and all of the Transferred Assets, and to give receipts and releases for and in respect of the same, and any part thereof, and from time to time institute, prosecute, appear in, defend and appeal in the name of Cyprus, or otherwise, at the expense and for the benefit of Newco, any and all actions, suits and proceedings at law, in equity or otherwise, which Newco may deem proper in order to collect or reduce to possession any of the Transferred Assets, or enforce any claim or right of any kind hereby conveyed or assigned and transferred, or to resist or defend against any claim, or assertion relating to an Assumed Liability and to do all acts and things in relation to the Transferred Assets or the Assumed Liabilities which Newco shall deem desirable.

11. <u>Mail</u>. Cyprus further authorizes Newco, its successors and assigns, to receive and open all mail, telegrams and other communications, and all express and other packages addressed to Cyprus under the name of "Cyprus Industrial Minerals Company" and to retain such of the same as relate to the Transferred Assets and Newco hereby agrees to forward to Cyprus with reasonable dispatch all other mail, telegrams, communications, express and other packages addressed to Cyprus. The foregoing shall constitute a full authorization to the postal authorities, all telegraph and express companies, and all other persons to make delivery of such items to Newco, its successors and assigns.

12. <u>Further Assurance</u>. Upon written request of Newco, Cyprus shall from time to time execute and deliver to Newco, without further consideration, such other and further instruments of conveyance, assignment and transfer as Newco may reasonably request for the more effective conveyance, assignment and transfer to Newco of any of the Transferred Assets.

13. <u>Indemnification</u>. (a) Cyprus shall indemnify and hold Newco harmless from and against all Damages caused by, resulting or arising from (i) any Breach of the representations or warranties of Cyprus set forth in Section 9 hereof, or (ii) the Excluded Liabilities.

-5-

REDACTED DOCUMENT

      (b)   Newco shall indemnify and hold Cyprus harmless from and against all expenses, including reasonable legal expenses, incurred by Cyprus in any litigation against Newco in which Newco is found to have breached any of its obligations under this Agreement.


      14.   <u>Miscellaneous</u>.   This Agreement of Transfer and Assumption shall be governed by, and construed in accordance with, the law of the State of New York without reference to choice of law principles, including all matters of construction, validity and performance.   This Agreement of Transfer and Assumption contains the entire understanding of the parties hereto with respect to the subject matter contained herein, supersedes and cancels all prior agreements, negotiations, correspondences, undertakings and communications of the parties, oral or written, respecting such subject matter.   This Agreement may be amended only by a written instrument executed by the parties.   This Agreement may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

ITA-Herford-003360

REDACTED DOCUMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement of Transfer and Assumption on the day and year first above written.

CYPRUS TALC CORPORATION

By: _____

CYPRUS MINES CORPORATION

By: _____

−7−

ITA-Herford-003361

REDACTED DOCUMENT

**EXHIBIT A**

**Excluded Assets**

1.    The Hamm Underground Mine Property

ITA-Herford-003362

REDACTED DOCUMENT

41

ITA-Herford-003363

REDACTED DOCUMENT

### AMENDMENT TO AGREEMENT OF TRANSFER AND ASSUMPTION

AMENDMENT DATED AS OF JUNE 24, 1992, TO AGREEMENT OF TRANSFER AND ASSUMPTION DATED JUNE 5, 1992, by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS, on June 5, 1992, the parties entered into an Agreement of Transfer and Assumption (the "Transfer Agreement");

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation ("RTZ"), have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement");

WHEREAS, with the recognition and acknowledgement of RTZ, the parties desire to make certain conforming changes to the Transfer Agreement to confirm the intent of the parties;

NOW THEREFORE, in consideration of the mutual covenants set forth herein and in the Transfer Agreement:

1. The Transfer Agreement is hereby amended on page 3, Section 5, line 14, by deleting "litigation" after "any" and by inserting "third party claims (other than employee claims for which RTZ, referred to as "Buyer" in the Stock Purchase Agreement, is responsible under Section 7.4 of the Stock Purchase Agreement)" after "any".

2. The Transfer Agreement is hereby amended on page 4, Section 7, line 5, by inserting "and shall be effective immediately prior to the close of business on the Closing Date" after "Agreement".

3. The Transfer Agreement is hereby amended on page 4, Section 8(a)(ii), by deleting the last three lines of the section and inserting in lieu thereof "all right, title and interest of Cyprus in the Transferred Assets;" after "Newco".

4. Section 9 of the Transfer Agreement is hereby amended by deleting the existing Section 9 and inserting in lieu thereof the following:

" 9. <u>Representations and Warranties of Cyprus</u>.

(a) Cyprus hereby represents and warrants to Newco that it has good and marketable title to the Shares and that at the Newco Closing, good and marketable title to the

ITA-Herford-003364

REDACTED DOCUMENT       - 2 -

Shares, free and clear of any Encumbrances will be transferred to Newco.

(b)   Cyprus hereby represents and warrants to Newco that, to the "Knowledge of Cyprus" (as such term is defined with respect to Seller in the Stock Purchase Agreement), it has good and marketable title or possessory rights to all of the Transferred Assets (other than the Shares covered in (a) above) and that at the Newco Closing, good and marketable title or possessory rights to all such Transferred Assets, free and clear of any Encumbrances other than those described in Section 5.8 or in Schedule 5.8 of the Stock Purchase Agreement, will be transferred to Newco.

(c)   The representations and warranties contained in Section 9(a) hereof shall survive the Newco Closing until the expiration of the limitation period under the applicable statutes of limitations (or any extension thereof) and thereafter shall expire except with respect to breaches or violations theretofore specified in writing to Cyprus by Newco, RTZ or their successors.  The representations and warranties contained in Section 9(b) hereof shall survive for a period of one year after the Newco Closing and shall thereafter expire except with respect to breaches and violations theretofore specified in writing to Cyprus by Newco, RTZ or their successors."

5.   The Transfer Agreement is hereby amended on page 5, Section 13(a), line 5, by inserting ", provided, however, that with respect to claims made pursuant to (i) of this Section 13(a), the limitations set forth in Section 11.4 of the Stock Purchase Agreement shall apply to all such claims and, in applying such limitations, such claims shall be added to all other claims made against Cyprus (referred to as "Seller" in the Stock Purchase Agreement) or Cyprus Minerals Company pursuant to Section 11.4 of the Stock Purchase Agreement" after "Liabilities".

6.   The Transfer Agreement is hereby amended on page 6 by renumbering Section 14 to become Section 15 and inserting a new Section 14 as follows:

"   14.   <u>Taxes</u>.  Cyprus shall be liable for all transfer, sales, use or other similar taxes arising under any state, local or foreign law from the sale and transfer of the Transferred Assets to Newco."

ITA-Herford-003365

REDACTED DOCUMENT    - 3 -

     7.   This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

     IN WITNESS WHEREOF, the parties have duly executed this Amendment to the Agreement of Transfer and Assumption on the day and year first above written.

          CYPRUS TALC CORPORATION

          By: _____
              G. J. Inalis, Senior Vice President

          CYPRUS MINES CORPORATION

          By: _____
              P. C. Wolf, President

REDACTED DOCUMENT

**42**

ITA-Herford-003367

REDACTED DOCUMENT

## SECOND AMENDMENT TO AGREEMENT OF
## TRANSFER AND ASSUMPTION

SECOND AMENDMENT DATED AS OF JUNE 30, 1992, TO AGREEMENT OF TRANSFER AND ASSUMPTION DATED JUNE 5, 1992, by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS, on June 5, 1992, the parties entered into an Agreement of Transfer and Assumption (the "Transfer Agreement") and thereafter entered into an Amendment to the Transfer Agreement;

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation ("RTZ"), have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement") and thereafter entered into an Amendment to the Stock Purchase Agreement;

WHEREAS, with the recognition and acknowledgement of RTZ, the parties desire to make certain conforming changes to the Transfer Agreement to confirm the intent of the parties;

NOW THEREFORE, in consideration of the mutual covenants set forth herein and in the Transfer Agreement:

1.  The Transfer Agreement as amended is hereby amended on page 3, Section 5, line 14, by deleting "third party claims (other than employee claims for which RTZ, referred to as "Buyer" in the Stock Purchase Agreement, is responsible under Section 7.4 of the Stock Purchase Agreement)" after "any" and by inserting "third party claims (other than third party claims for which and to the extent that Cyprus and Cyprus Minerals Company are not liable to any Buyer Indemnitee under the Stock Purchase Agreement)" after "any".

2.  This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

REDACTED DOCUMENT

       IN WITNESS WHEREOF, the parties have duly executed this Second Amendment to the Agreement of Transfer and Assumption on the day and year first above written.

Approved by:

RTZ AMERICA INC.

By: _Arthur S. Glass_
      President

CYPRUS TALC CORPORATION

By: _____
    Senior Vice President

CYPRUS MINES CORPORATION

By: _____
    President

-2-

REDACTED DOCUMENT

**43**

ITA-Herford-003370

REDACTED DOCUMENT

## BILL OF SALE AND ASSIGNMENT

THIS IS A BILL OF SALE AND ASSIGNMENT executed this 30th day of June, 1992, by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer"). Capitalized terms used herein and not otherwise defined herein have the same meaning ascribed to them in the Agreement.

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, its successors and assigns, all of Seller's right, title, and interest in and to all of the Transferred Assets.

To the extent that any provision of this Bill of Sale and Assignment is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the Seller has caused this Bill of Sale and Assignment to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name:  P. C. Wolf
Title:  President

ITA-Herford-003371

REDACTED DOCUMENT

**44**

ITA-Herford-003372

REDACTED DOCUMENT

## ASSIGNMENT OF TRADEMARKS AND TRADENAMES

THIS IS AN ASSIGNMENT OF TRADEMARKS AND TRADENAMES executed this 30th day of June, 1992 by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer").

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer all of its legal or beneficial right, title and interest in and to all trademarks, trademark applications, service marks and tradenames, including all goodwill associated therewith, that are specified on Exhibit A hereto, for Buyer's own use and enjoyment and for the use and enjoyment of its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Seller if this sale, assignment and transfer had not been made.

To the extent any provision of this Assignment of Trademarks and Tradenames is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, Seller has caused this Assignment of Trademarks and Tradenames to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____

Name: P. C. Wolf
Title: President

REDACTED DOCUMENT

Exhibit A
Page 1

## TRADEMARKS

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | AC CLAY | U.S.A. - No. 787,316 | 03/31/64 |
| Cyprus Mines Corporation | ADSORBOL | U.S.A. - No. 437,025 | 05/09/47 |
| Cyprus Mines Corporation | ALTALC | U.S.A. - No. 1,271,407 | 03/27/84 |
| Cyprus Mines Corporation | ASPEN | U.S.A. - No. 1,276,609 | 05/08/84 |
| Cyprus Mines Corporation | ATOMITE | U.S.A. - No. 415,469 | 09/18/85 |
| Cyprus Mines Corporation | BARIMITE | U.S.A. - No. 1,244,925 | 07/12/83 |
| Cyprus Mines Corporation | CYPRUFIL | U.S.A. - No. 1,276,607 | 05/08/84 |
| Cyprus Mines Corporation | CYPRUCAST | U.S.A. - No. 1,205,102 | 08/17/83 |
| Cyprus Minerals Company | CIMFLX | U.S.A. - No. 74/144,440 | |
| Cyprus Mines Corporation | DRIKALITE | U.S.A. - No. 1,244,041 | 07/05/83 |
| Cyprus Mines Corporation | DURAMITE | U.S.A. - No. 1,246,713 | 08/03/83 |
| Cyprus Mines Corporation | FURNACE CREEK | U.S.A. - No. 1,276,606 | 05/08/84 |
| Cyprus Mines Corporation | KOTAMITE | U.S.A. - No. 1,063,629 | 04/23/86 |
| Cyprus Mines Corporation | MISTROBRITE | U.S.A. - No. 886,957 | 03/03/70 |
| Cyprus Mines Corporation | MISTRON | United Kingdom - No. 868,418 | 08/24/64 |
| Cyprus Mines Corporation | MISTRON | Greece - No. 32,090 | 08/13/64 |
| Cyprus Mines Corporation | MISTRON | France - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Finland - No. 46,340 | 03/05/66 |
| Cyprus Mines Corporation | MISTRON | Canada - No. 138,280 | 02/19/65 |
| Cyprus Mines Corporation | MISTRON | Benelux - No. 71,923 | 10/26/71 |
| Cyprus Mines Corporation | MISTRON | Belgium - No. 102,577 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Denmark - No. 3873/64 | 11/18/64 |
| Cyprus Mines Corporation | MISTRON | Japan - No. 552,002 | 06/07/60 |
| Cyprus Mines Corporation | MISTRON | Mexico - No. 170,002 (abandoned) | 11/11/64 |
| Cyprus Mines Corporation | MISTRON | Netherlands - No. 153,884 | 08/03/64 |
| Cyprus Mines Corporation | MISTRON | U.S.A. - No. 534,073 | 11/28/50 |
| Cyprus Mines Corporation | MISTRON | Australia - No. A-189,166 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Australia - No. 53,206 | 07/27/64 |
| Cyprus Mines Corporation | MISTRON | West Germany - No. 819,565 | 05/16/66 |
| Cyprus Mines Corporation | MISTRON | South Korea - No. 20980 | 01/13/71 |
| Cyprus Mines Corporation | MISTRON | Spain - No. 452,784 | 07/28/64 |
| Cyprus Mines Corporation | MISTRON | Sweden - No. 199,404 | |
| Cyprus Mines Corporation | MISTRON | Switzerland - No. 205,871 | 11/03/64 |
| Cyprus Mines Corporation | MISTRON | Italy - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Norway - No. 66,025 | 05/15/65 |
| Cyprus Mines Corporation | MISTRON CASCADE | U.S.A. - No. 74,080,117 | * |
| Cyprus Mines Corporation | MISTRON CYPRUSBOND | U.S.A. - No. 1,271,408 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON CYPRUSPERSE | U.S.A. - No. 1,271,405 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON FROST | U.S.A. - No. 1,272,268 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,332 | * |
| Cyprus Mines Corporation | MISTRON SUPER FROST | U.S.A. - No. 1,271,403 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON SUPER VAPOR | U.S.A. - No. 1,331,497 | |

P80527

*unknown

REDACTED DOCUMENT

Exhibit A
Page 2

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | MISTRON ULTRAMIX | U.S.A. - No. 1,272,287 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON VAPOR | Japan - No. 1,248,300 | |
| Cyprus Mines Corporation | MISTRON ZETA PLUS | Registration pending | * |
| Cyprus Mines Corporation | MONOBLEND | U.S.A. - No. 1,271,406 | 03/27/84 |
| Cyprus Mines Corporation | SIERRALITE | U.S.A. - No. 1,271,401 | 03/27/84 |
| Cyprus Mines Corporation | SIERRA WHITE | U.S.A. - No. 1,278,371 | 05/29/84 |
| Cyprus Mines Corporation | SILVERBOW | U.S.A. - No. 1,271,399 | 03/27/84 |
| Cyprus Mines Corporation | SNOWFLAKE WHITE | U.S.A. - No. 1,246,714 | 08/02/83 |
| Cyprus Mines Corporation | STEAWHITE | U.S.A. - No. 1,271,400 | 03/27/84 |
| Cyprus Mines Corporation | SUPERCOAT | U.S.A. - No. 1,244,040 | 07/05/83 |
| Cyprus Mines Corporation | SUPERMITE | U.S.A. - No. 1,063,678 | * |
| Cyprus Mines Corporation | SUPRA | U.S.A. - No. 1,270,450 | 03/20/84 |
| Cyprus Mines Corporation | SUPRAFINO | U.S.A. - No. 1,275,683 | 05/01/84 |
| Cyprus Mines Corporation | UNITED SIERRA | U.S.A. - No. 12,488 | 08/22/66 |
| Cyprus Mines Corporation | PYROPAQUE | U.S.A. - No. 807,428 | 04/26/66 |
| Cyprus Mines Corporation | SIERRA | U.S.A. - No. 197,912 | 03/29/83 |
| Cyprus Mines Corporation | SUPREME | * | |
| Cyprus Mines Corporation | YELLOWSTONE TALC | U.S.A. - No. 589,928 | 05/18/54 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,322 | 04/16/85 |
| Cyprus Mines Corporation | ULTRAMITE | * | |
| Cyprus Mines Corporation | MISTROCARB | S/N 380,779 (expired) | 08/19/82 |
| Cyprus Mines Corporation | STELLAR | U.S.A. - No. 1,630,531 | 01/08/91 |

P80827

*unknown

REDACTED DOCUMENT

## SCHEDULE 5.15

### DIMTA, S.A.

Trademark 1.185.098/1 "TALCOLIVA", applied for on 13th March 1987 and granted on 20th September 1989 for Class 3rd: Talc Products.

U:DOCUMENT\615

# REDACTED DOCUMENT

SUPPLEMENT

**TRADEMARKS**

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | AC CLAY | U.S.A. - No. 767,316 | 03/31/64 |
| Cyprus Mines Corporation | ADSORBOL | U.S.A. - No. 437,025 | 05/09/47 |
| Cyprus Mines Corporation | ALTALC | U.S.A. - No. 1,271,407 | 03/27/84 |
| Cyprus Mines Corporation | ASPEN | U.S.A. - No. 1,276,609 | 05/08/84 |
| Cyprus Mines Corporation | ATOMITE | U.S.A. - No. 416,469 | 09/18/65 |
| Cyprus Mines Corporation | BARIMITE | U.S.A. - No. 1,244,925 | 07/12/83 |
| Cyprus Mines Corporation | CYPRUFIL | U.S.A. - No. 1,276,607 | 05/08/84 |
| Cyprus Mines Corporation | CYPRUCAST | U.S.A. - No. 1,205,102 | 08/17/83 |
| Cyprus Minerals Company | CIMFLX | U.S.A. - No. 74/144,440 | 03/04/91 |
| Cyprus Mines Corporation | DRIKALITE | U.S.A. - No. 1,244,041 | 07/05/83 |
| Cyprus Mines Corporation | DURAMITE | U.S.A. - No. 1,246,713 | 08/03/83 |
| Cyprus Mines Corporation | FURNACE CREEK | U.S.A. - No. 1,276,605 | 05/08/84 |
| Cyprus Mines Corporation | KOTAMITE | U.S.A. - No. 1,063,629 | 04/23/86 |
| Cyprus Mines Corporation | MISTROBRITE | U.S.A. - No. 886,957 | 03/03/70 |
| Cyprus Mines Corporation | MISTROCARB | S/N 380,779 (expired) | 08/19/82 |
| Cyprus Mines Corporation | MISTRON | United Kingdom - No. 868,418 | 08/24/64 |
| Cyprus Mines Corporation | MISTRON | Greece - No. 32,090 | 08/13/64 |
| Cyprus Mines Corporation | MISTRON | France - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Finland - No. 46,340 | 03/05/66 |
| Cyprus Mines Corporation | MISTRON | Canada - No. 139,280 | 02/19/65 |
| Cyprus Mines Corporation | MISTRON | Benelux - No. 71,923 | 10/28/71 |
| Cyprus Mines Corporation | MISTRON | Belgium - No. 102,577 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Denmark - No. 3673/64 | 11/18/64 |
| Cyprus Mines Corporation | MISTRON | Japan - No. 552,002 | 06/07/60 |
| Cyprus Mines Corporation | MISTRON | Mexico - No. 170,002 (abandoned) | 11/11/64 |
| Cyprus Mines Corporation | MISTRON | Netherlands - No. 153,884 | 08/03/64 |
| Cyprus Mines Corporation | MISTRON | U.S.A. - No. 534,073 | 11/28/50 |
| Cyprus Mines Corporation | MISTRON | Australia - No. A-189,166 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Australia - No. 53,206 | 07/27/64 |
| Cyprus Mines Corporation | MISTRON | West Germany - No. 819,565 | 05/16/66 |
| Cyprus Mines Corporation | MISTRON | South Korea - No. 20980 | 01/13/71 |
| Cyprus Mines Corporation | MISTRON | Spain - No. 452,784 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Sweden - No. 199,404 | 01/17/86 |
| Cyprus Mines Corporation | MISTRON | Switzerland - No. 205,871 | 11/03/64 |
| Cyprus Mines Corporation | MISTRON | Italy - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Norway - No. 66,025 | 05/15/65 |
| Cyprus Mines Corporation | MISTRON CASCADE | U.S.A. - No. 74/080,117 | 07/20/90 |
| Cyprus Mines Corporation | MISTRON CYPRUSBOND | U.S.A. - No. 1,271,408 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON CYPRUSPERSE | U.S.A. - No. 1,271,405 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON FROST | U.S.A. - No. 1,272,268 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,322 | 04/16/85 |
| Cyprus Mines Corporation | MISTRON SUPER FROST | U.S.A. - No. 1,271,403 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON SUPER VAPOR | U.S.A. - No. 1,331,497 | 04/23/85 |

PS0527

REDACTED DOCUMENT

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | MISTRON ULTRAMIX | U.S.A. - No. 1,272,267 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON VAPOR | Japan  - No. 1,248,300 | 02/10/77 |
| Cyprus Mines Corporation | MISTRON ZETA PLUS | Registration pending | |
| Cyprus Mines Corporation | MONOBLEND | U.S.A. - No. 1,271,406 | 03/27/84 |
| Cyprus Mines Corporation | PYROPAQUE | U.S.A. - No. 807,429 | 04/26/66 |
| Cyprus Mines Corporation | SIERRALITE | U.S.A. - No. 1,271,401 | 03/27/84 |
| Cyprus Mines Corporation | SIERRA | U.S.A. - No. 197,912 | 03/29/83 |
| Cyprus Mines Corporation | SIERRA WHITE | U.S.A. - No. 1,279,371 | 05/29/84 |
| Cyprus Mines Corporation | SILVERBOW | U.S.A. - No. 1,271,399 | 03/27/84 |
| Cyprus Mines Corporation | SNOWFLAKE WHITE | U.S.A. - No. 1,246,714 | 08/02/83 |
| Cyprus Mines Corporation | STEAWHITE | U.S.A. - No. 1,271,400 | 03/27/84 |
| Cyprus Mines Corporation | STELLAR | U.S.A. - No. 1,630,531 | 01/08/91 |
| Cyprus Mines Corporation | SUPERCOAT | U.S.A. - No. 1,244,040 | 07/05/83 |
| Cyprus Mines Corporation | SUPERMITE | U.S.A. - No. 1,063,678 | 04/19/77 |
| Cyprus Mines Corporation | SUPRA | U.S.A. - No. 1,270,450 | 03/20/84 |
| Cyprus Mines Corporation | SUPRAFINO | U.S.A. - No. 1,275,663 | 05/01/84 |
| Cyprus Mines Corporation | SUPREME | U.S.A. - No. 1,273,240 | 04/10/84 |
| Cyprus Mines Corporation | ULTRAMITE | • | • |
| Cyprus Mines Corporation | UNITED SIERRA | U.S.A. - No. 12,498 | 08/22/66 |
| Cyprus Mines Corporation | YELLOWSTONE TALC | U.S.A. - No. 589,928 | 05/18/54 |
| LMTA, S.A. | TALCOLIVA | Spain - No. 1.185.098/1 | 09/20/89 |

PS0527

ITA-Herford-003378

REDACTED DOCUMENT

**45**

ITA-Herford-003379

REDACTED DOCUMENT

## ASSIGNMENT OF PATENTS

THIS IS AN ASSIGNMENT OF PATENTS executed this 30th day of June, 1992 by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer").

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer all of its legal or beneficial right, title and interest in and to all patents, exclusive or non-exclusive rights or interests in patents, and patent applications, including all goodwill associated therewith, that are specified on Exhibit A hereto, for Buyer's own use and enjoyment and for the use and enjoyment of its successors and assigns, to the full term of all the letters patent relating thereto, as fully and entirely as the same would have been held and enjoyed by Seller if this sale, assignment and transfer had not been made.

To the extent any provision of this Assignment of Patents is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, Seller has caused this Assignment of Patents to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____

Name: P. C. Wolf
Title: President

ITA-Herford-003380

REDACTED DOCUMENT

## PATENTS

| Cyprus Party | Patent | Country/Number | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | An Amino Acid Coated Mineral Powder Composition and a Method for Making the same | U.S.A. - 07/824,580 | |
| Cyprus Industrial Minerals Company | Centrifugal Particle Classifer Having Uniform Influx Distributor | U.S.A. - * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Australia - No. 23168/88 | 05/23/91 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Brazil - No. PI 88807707 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Canada - No. 539,916 and 577,321 | 09/14/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | China - No. 89104404.3 and 88107159 | 05/16/89 |
| Cyprus Industrial Minerals | Method and Apparatus for Friction Sorting of Particular Materials | Egypt - No. 243/89 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Europe - No. 88907635.4 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Finland - * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | France - No. 8911027 | |

PSSpat

*Patent number unknown

ITA-Herford-003381

# REDACTED DOCUMENT

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | India - Nos. 821/Cal/88 382/Cal/89 383/Cal/89 | 10/04/88 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Italy - No. * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Japan - No. 50712/88 | 08/18/88 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Norway - No. 185/182 | 01/06/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | South Korea - No. 89-700872 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Spain - No. 2009039 | 08/27/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Turkey - No. 45527/88 | 10/19/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | U.S.A. - No. 5,089,346 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | WO - No. 8,902,328 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | EP - No. 335,922 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Brazil - No. PI 8904545 | |

*Patent number unknown

ITA-Herford-003382

REDACTED DOCUMENT

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Denmark - No. 4412/89 | 01/06/89 |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Greece - No. 890100006 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Argentina - No. 312935 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Australia - No. 29373/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Chile - No. 009/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Europe - No. 89901770.1-2304 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Finland - No. 894147 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Italy - No. 88/02814 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Japan - No. 501645/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Mexico - No. 14459 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | New Zealand - No. 277,526 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Norway - No. 893578 | |

ITA-Herford-003383

REDACTED DOCUMENT

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Portugal - No. 89397 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | South Africa - No. 880038 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Spain - No. 2010072 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | U.S.A. - No. 4,864,955 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | WO - No. 8,906,294 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | EP - No. 374,196 | |
| Cyprus Industrial Minerals Company | Rubber Composition Comprising Phyllosilicate Salses | U.S.A. - No. 4,431,755 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | U.S.A. - * | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | ES - No. 2,011740 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | BR - No. 8,904,173 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | FR - No. 2,635,475 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | AU - No. 8,934,837 | |

ITA-Herford-003384

REDACTED DOCUMENT

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | CN - No. 1,040,335 | |
| Cyprus Industrial Minerals Company | Small Particle Separator | U.S.A. - No. 07/588,202 | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Egypt - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Brazil - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Brazil - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Europe - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | India - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | South Korea - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Norway - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Finland - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Australia - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | China - No. * | |
| Cyprus Mines Corporation | Beneficiation of New York State Talc | U.S.A. - No. 3,837,582 | |
| Cyprus Mines Corporation | Beneficiated Talc as Filler | U.S.A. - No. 4,814,019 | |
| Cyprus Mines Corporation | Removing Tremolite | U.S.A. - No. 3,965,241 | |
| Cyprus Mines Corporation | Rendering Montana Talc Suitable for use as fillers | U.S.A. - No. 4,931,493 | |

ITA-Herford-003385

REDACTED DOCUMENT

SUPPLEMENT

## PATENTS

| CYPRUS PARTY | PATENT | COUNTRY/NUMBER | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Belgium - No. 883,648 | 06/30/80 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Canada - No. 1188513 | 06/30/80 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Europe - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | France - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Great Britain - No. 00417567 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Italy - No. 004176 | 01/18/85 |
| Cyprus Industrial Minerals | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Japan - No. 824049 | 10/24/81 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Korea - No. 18339 | 02/01/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Luxembourg - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Netherlands - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | New Zealand - No. 197297 | 05/15/84 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Sweden - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Switzerland - No. 0041756 | 01/18/85 |

ITA-Herford-003386

REDACTED DOCUMENT

## PATENTS

| CYPRUS PARTY | PATENT | COUNTRY/NUMBER | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | West Germany - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | Rubber Composition Comprising Phyllisilicate Minerals, Salines, and Quaternary Ammonium Salts | Canada - No. 490,980 | ◆ |
| Cyprus Industrial Minerals Company | Rubber Composition and Method of Incorporating Carbon Black and a Quaternary Ammonium Coupling Agent Salt into Natural Rubber Containing Compositions | U.S.A. - No. 4,598,105 | 07/01/86 |
| Cyprus Industrial Minerals Company | Rubber Composition and Method of Incorporating Carbon Black and a Quaternary Ammonium Coupling Agent Salt into Natural Rubber Containing Compositions | U.S.A. - No. 4,602,052 | 07/22/86 |
| Cyprus Industrial Minerals Company | Pharmaceutical Tablet Matrix Containing Talc as a Major Component | U.S.A. - No. S/N264,377 | 10/31/88 |

ITA-Herford-003387

REDACTED DOCUMENT

46

ITA-Herford-003388

REDACTED DOCUMENT

## ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT dated June 30, 1992 by and between Cyprus Mines Corporation, a Delaware corporation ("Seller") and Cyprus Talc Corporation, a Delaware corporation ("Buyer"). All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended, by and among Seller and Buyer (the "Agreement").

WHEREAS, pursuant to Sections 4 and 8(b)(i) of the Agreement, Buyer has agreed to assume the Assumed Liabilities;

NOW, THEREFORE, in consideration of the foregoing, Buyer hereby agrees, subject to the terms and conditions set forth in the Agreement, to assume, perform, pay and discharge the Assumed Liabilities.

To the extent any provision of this Assumption Agreement is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Assumption Agreement to be duly executed on the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name: P. C. Wolf
Title: President

CYPRUS TALC CORPORATION,
a Delaware corporation

BY: _____
Name: G. J. Malys
Title: Senior Vice President

REDACTED DOCUMENT

47

ITA-Herford-003390

REDACTED DOCUMENT

## ASSUMPTION AND RETENTION AGREEMENT

ASSUMPTION AND RETENTION AGREEMENT dated June 30, 1992 by and between Cyprus Mines Corporation, a Delaware corporation ("Seller") and Cyprus Talc Corporation, a Delaware corporation ("Buyer"). All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended, by and among Seller and Buyer (the "Agreement").

WHEREAS, pursuant to Sections 5 and 8(a)(iii) of the Agreement, Seller has agreed to retain or assume the Excluded Liabilities;

NOW, THEREFORE, in consideration of the foregoing, Seller hereby agrees, subject to the terms and conditions set forth in the Agreement, to retain or assume the Excluded Liabilities.

To the extent any provision of this Assumption and Retention Agreement is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Assumption and Retention Agreement to be duly executed on the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name:  P. G. Wolf
Title:  President

CYPRUS TALC CORPORATION,
a Delaware corporation

BY: _____
Name:  G. J. Malys
Title:  Senior Vice President

REDACTED DOCUMENT

**48**

ITA-Herford-003392

REDACTED DOCUMENT



## State of Delaware

PAGE    1

# Office of Secretary of State

I, MICHAEL RATCHFORD, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY RTZ AMERICA INC. IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE DATE SHOWN BELOW.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

✿ ✿ ✿ ✿ ✿ ✿ ✿ ✿ ✿ ✿

Michael Ratchford, **Secretary of State**

AUTHENTICATION:    ᴬ 3498001

DATE:

06/25/1992

722177006

REDACTED DOCUMENT

**49**

ITA-Herford-003394

REDACTED DOCUMENT

## CYPRUS MINES CORPORATION

### Consent Action by the Board

### June 30, 1992

We, the undersigned, being all of the Directors of Cyprus Mines Corporation (the "Corporation"), do hereby waive call, notice, meeting, and vote and do hereby consent to, confirm, and verify the following corporate actions pursuant to authority vested by the Delaware Corporation Law, Section 141(f):

**RESOLVED,** that this Corporation hereby transfer, effective immediately prior to the close of business on the Closing Date as defined in the Stock Purchase Agreement dated June 5, 1992 among Cyprus Mines Corporation ("Cyprus"), Cyprus Minerals Company, and RTZ America, Inc., as amended, (the "Agreement"), a copy of which is attached hereto as Exhibit A, to Cyprus Talc Corporation, a wholly owned subsidiary of this Corporation, as a contribution to the capital of Cyprus Talc Corporation, in accordance with the Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated June 5, 1992, as amended (the "Transfer Agreement"), a copy of which is attached hereto as Exhibit B, all of Cyprus' right, title and interest in and to the assets, properties, rights and businesses of every type and description used primarily in or relating primarily to Cyprus' talc business (the "Talc Business"), whether real, personal and mixed, tangible or intangible, whether currently in use or idle, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and including, without limitation, all of the right, title and interest of Cyprus in the assets listed in paragraphs [a] through [l] below (but excluding the Excluded Assets as defined in the Transfer Agreement):

[a]    Cyprus' record and beneficial ownership of all of the issued and outstanding shares of the capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation, and its subsidiaries, Mistron Mineralien GmbH, a German corporation ▮▮▮▮▮ and DIMTA, S.A., a Spanish corporation ▮▮▮▮▮ Cyprus Windsor Minerals Corporation, a Vermont corporation and its subsidiary Cyprus Western Source Corporation, a California corporation; and Green Mountain Talc Corporation, a Delaware corporation; and Cyprus' record and beneficial ownership of ▮▮ of the issued and outstanding shares of capital stock of Nihon Mistron Company, Ltd., a Tokyo, Japan corporation (collectively, the "Shares");

[b]    The real property and mineral rights of the Talc Business and the records thereof;

REDACTED DOCUMENT

[c]     All current assets, including without limitation, all cash and, to the extent that the same may exist, all certificates of deposit, accounts receivable, claims, prepaid expenses, deferred charges, advances and deposits;

[d]     All talc inventories of finished products, work-in-progress and raw materials of the Talc Business;

[e]     All talc facilities and equipment of the Talc Business;

[f]     All business machines, furniture and fixtures, supplies, office equipment, vehicles and other tangible personal property used primarily in or relating primarily to the Talc Business;

[g]     All trademarks and other marks and, to the extent that the same may exist, all inventions, patents and any copyrights, and registrations thereof, all applications for any of the foregoing and all trade names;

[h]     All right, title and interest in, to and under all contracts, agreements, leases, licenses, permits, orders, commitments of understandings to which Cyprus is a party or entitled to any right or interest;

[i]     All trade secrets, processes, specifications, designs, drawings and technology which relate primarily to the Talc Business;

[j]     All contracts, books, records and other data relating primarily to the Talc Business;

[k]     All causes of action and claims of any kind of Cyprus against any other party related primarily to the Talc Business;

[l]     All other assets and rights of the Talc Business as a going concern;

together with any and all liabilities whether known, unknown, contingent or otherwise related to the above-referenced items, with the exception of Excluded Liabilities as described in the Agreement; provided, however, that no such right, title, or interest described above shall be deemed to be conveyed hereof if any consent necessary to such conveyance, which consent shall be effective as of the effective date of such conveyance, shall not have been, or shall not be, obtained, or if such conveyance would result in forfeiture of the interest conveyed or in other significant monetary (non-tax) penalty; and further

**RESOLVED,** that any prior transfer of the assets, properties, rights, and businesses to Cyprus Talc Corporation by this Corporation are hereby ratified, confirmed, and approved; and further

REDACTED DOCUMENT

**RESOLVED,** that the Transfer Agreement, as amended, is hereby ratified, confirmed and approved; and further

**RESOLVED,** that the President, any Senior Vice President, Vice President, the Secretary or any Assistant Secretary of this Corporation are hereby authorized, empowered and directed to convey the Shares to Cyprus Talc Corporation, and to execute and deliver such stock certificates, stock powers and other documents and to take all other steps which may be necessary or desirable in connection with such conveyance.

P. C. Wolf

G. J. Malys

Deborah J. Friedman

I hereby certify that the above signatories to this Consent Action by the Board of Cyprus Mines Corporation dated June 30, 1992, are all of the members of the Board of Directors of this Corporation on the date hereof.

Assistant Secretary

ITA-Herford-003397

REDACTED DOCUMENT

50

ITA-Herford-003398

REDACTED DOCUMENT

RTZ AMERICA INC.

## Officer's Certificate

I, Arthur Glass, President of RTZ America Inc., a Delaware corporation ("RTZ"), pursuant to Section 8.3 of the Stock Purchase Agreement dated as of June 5, 1992, as amended (the "Purchase Agreement"), by and among RTZ, Cyprus Mines Corporation, a Delaware corporation, and Cyprus Minerals Company, a Delaware corporation, hereby certify that (i) each of the representations and warranties of RTZ contained in the Purchase Agreement are true in all material respects at and as of the date hereof with the same force and effect as though made at and as of the date hereof, except for changes permitted or contemplated by the Purchase Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and (ii) RTZ have performed and complied in all material respects with all its undertakings and agreements required by the Purchase Agreement to be performed or complied with by RTZ prior to or on the date hereof.

IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

_____
President

REDACTED DOCUMENT

**51**

ITA-Herford-003400

REDACTED DOCUMENT

RTZ AMERICA INC.

Secretary's Certificate

and

Incumbency Certificate

The undersigned hereby certifies that he is the Secretary of RTZ America Inc., a Delaware corporation ("RTZ"), and that, as such, he is authorized to execute this Certificate on behalf of RTZ, and further certifies, as of immediately prior to the consummation of the transactions contemplated by the Stock Purchase Agreement dated as of June 5, 1992, as amended, (the "Purchase Agreement"), by and among RTZ, Cyprus Mines Corporation, a Delaware corporation, and Cyprus Minerals Company, a Delaware corporation, as follows:

(i)  attached hereto as Exhibit A is a complete and correct copy of the resolutions of the Board of Directors of RTZ authorizing the execution and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereunder;

(ii) the following person is a duly elected, qualified and acting officer of RTZ and the signature appearing opposite the name of such officer is his true signature:

| Name | Office | Signature |
|------|--------|-----------|
| Arthur Glass | President | _Arthur Glass_ |

ITA-Herford-003401

REDACTED DOCUMENT

       IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

RTZ AMERICA INC.

By: *Barry Grossman*
Barry Grossman
Secretary

-2-

ITA-Herford-003402

REDACTED DOCUMENT

Exhibit A

RESOLUTIONS
ADOPTED BY THE BOARD OF
RTZ AMERICA INC.
AT A SPECIAL MEETING
HELD ON JUNE 5, 1992

WHEREAS, Cyprus Mines Corporation, a Delaware Corporation ("Seller"), is the sole record and beneficial owner of all issued and outstanding shares of capital stock (the "Shares") of Cyprus Talc Corporation, a Delaware corporation ("Newco");

WHEREAS, Newco is the sole record and beneficial owner of all issued and outstanding shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation, Cyprus Windsor Minerals Corporation, a Vermont corporation, and its subsidiary Cyprus Western Source Corporation, a California corporation, and Green Mountain Talc Corporation, a Delaware Corporation, and is the record and beneficial owner of ███ of the issued and outstanding shares of DIMTA S.A., a company organized under the laws of Spain and is the record and beneficial owner of ███ of the issued and outstanding shares of Nihon Mistron Company, a Tokyo, Japan corporation (collectively the "Other Companies"); and

WHEREAS, Seller desires to sell or cause the sale of, and the Corporation desires to purchase, the Shares; NOW, THEREFORE, BE IT,

RESOLVED, that the Stock Purchase Agreement, together with the Schedules and Exhibits attached thereto (the "Agreement"), among Seller, Cyprus Minerals Company, a Delaware corporation ("Cyprus"), and the Corporation, in substantially the form distributed to directors at this meeting and to be included with the minutes of this meeting, providing for the purchase by the Corporation from Seller of the Shares, together with all transactions contemplated thereby, be and hereby are approved, with such changes as the President, the Secretary, the Treasurer or any Director (each an "Authorized Officer") of the Corporation may approve, such approval to be conclusively evidenced by the execution and delivery thereof; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized to take, or cause the Corporation or any of its subsidiaries to take, any actions they deem necessary or appropriate in order to obtain any and all necessary permits, authorizations, orders and approvals under applicable statutes or regulations, including federal,

ITA-Herford-003403

REDACTED DOCUMENT

state, local and foreign statutes or regulations, as may be required to carry out the transactions contemplated by the Agreement; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized and directed to do and perform all such acts, deeds and things and to make, execute and deliver, or cause to be made, executed and delivered, all such applications, filings, agreements including the Agreement, documents, instruments or certificates in the name and on behalf of the Corporation as each such Authorized Officer may deem necessary or appropriate to effectuate or carry out fully the purpose and intent of these resolutions; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized to execute and file any applications, certif- icates or other documents as may be necessary to carry out any one or more of the Agreements and the intent of the foregoing resolutions; and

FURTHER RESOLVED, that all actions heretofore taken by any officer or director of the Corporation in connection with, or with respect to, the matters referred to in the foregoing resolutions be and hereby are confirmed, ratified and approved in all respects.

-2-

ITA-Herford-003404

REDACTED DOCUMENT

**52**

ITA-Herford-003405

REDACTED DOCUMENT

## OFFICER'S CERTIFICATE
## CYPRUS MINES CORPORATION

I, P. C. Wolf, President of Cyprus Mines Corporation, a Delaware corporation (herein called "Mines"), do hereby certify, pursuant to Section 12(c) of the European Stock Purchase Agreement (the "Agreement"), dated June 5, 1992 among Cyprus Mines Corporation and Talc de Luzenac S.A., as amended, as follows:

1. The representations and warranties of Mines referred to in Section 12(a) and 12(b) of the Agreement are true in all material respects except for changes permitted or contemplated by the Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty is true in all material respects as of such date, and except to the extent the untruthfulness of the representations and warranties in the aggregate would not constitute a material adverse change or unanticipated and undisclosed material liability previously unknown to RTZ America, Inc. which would have a material adverse effect on the talc business of the Companies (as defined in the Agreement) as a whole.

2. Mines has performed and complied in all material respects with all of its undertakings and agreements required by the Agreement to have been complied with by it except to the extent non-compliance in the aggregate would not have a material adverse effect on the talc business of the Companies (as defined in the Agreement) as a whole.

IN WITNESS WHEREOF, the undersigned has hereunto subscribed his name and affixed the seal of Cyprus Mines Corporation this 30th day of June, 1992.

ATTEST:

(CORPORATE SEAL)

_____                    _____
                                           P. C. Wolf, President
                                           Cyprus Mines Corporation

REDACTED DOCUMENT

**53**

ITA-Herford-003407

REDACTED DOCUMENT

TALC DE LUZENAC S.A.

<u>Officer's Certificate</u>

I, Dr. Graham B. Lawson, Director of Talc Luzenac S.A., a company organized under the laws of France ("Luzenac"), pursuant to Section 11(c) of the European Stock Purchase Agreement dated as of June 5, 1992 (the "Purchase Agreement"), by and between Luzenac and Cyprus Mines Corporation, a Delaware corporation, hereby certify that (i) each of the representations and warranties of Luzenac contained in the Purchase Agreement are true in all material respects at and as of the date hereof with the same force and effect as though made at and as of the date hereof, except for changes permitted or contemplated by the Purchase Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and (ii) Luzenac has performed and complied in all material respects with all its undertakings and agreements required by the Purchase Agreement to be performed or complied with by Luzenac prior to or on the date hereof.

IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

_____
Director

ITA-Herford-003408

REDACTED DOCUMENT

**54**

REDACTED DOCUMENT

**CYPRUS MINES CORPORATION**

**SECRETARY'S CERTIFICATE**

**AND**

**INCUMBENCY CERTIFICATE**

The undersigned hereby certifies that he is the Secretary of Cyprus Mines Corporation, a Delaware corporation ("Cyprus Mines"), and that, as such, he is authorized to execute this certificate on behalf of Cyprus Mines, and further certifies, as of immediately prior to the consummation of the transactions contemplated by the Stock Purchase Agreement dated as of June 5, 1992, as amended, (the "Purchase Agreement"), by and among Cyprus Mines Corporation, Cypurs Minerals Company, and RTZ America, Inc. as follows:

(i)     attached hereto as Exhibit A is a complete and correct copy of the resolutions of the Board of Directors of Cyprus Mines authorizing the execution and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereunder;

(ii)     the following persons are duly elected, qualified and acting officers of Cyprus Mines and the signature appearing opposite the name of such officer is his true signature:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Philip C. Wolf | President | |
| Gerald J. Malys | Senior Vice President | |
| Dale E. Huffman | Assistant Secretary | |

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of Cyprus Mines Corporation this 30th day of June, 1992.

CYPRUS MINES CORPORATION

BY: _____
Kevin Loughrey, Secretary

ITA-Herford-003410

REDACTED DOCUMENT

EXHIBIT A

**RESOLVED**, that the execution of that certain Stock Purchase Agreement dated June 5, 1992, as amended on June 24, 1992, among Cyprus Mines Corporation, Cyprus Minerals Company, and RTZ America Inc., a copy of which is attached hereto as Exhibit A, and the performance by this Corporation of its obligations thereunder hereby are authorized; and further

**RESOLVED**, that the President, any Senior Vice President, Vice President, the Controller, Treasurer, Secretary or Assistant Secretary of this Corporation, or any person designated by any of the foregoing hereby are authorized to take such action as is necessary or appropriate to give effect to the foregoing resolution, including but not limited to the authority to make amendments to the terms and conditions of the Agreement and to execute and deliver all such documents as may to such officer appear necessary or appropriate to carry out the intent of the resolutions.

REDACTED DOCUMENT

LONDON/2746.05

EXHBIT A

---

STOCK PURCHASE AGREEMENT

AMONG

CYPRUS MINES CORPORATION

CYPRUS MINERALS COMPANY

and

RTZ AMERICA INC.

Dated as of June 5, 1992

---

ITA-Herford-003412

REDACTED DOCUMENT

STOCK PURCHASE AGREEMENT dated as of June 5, 1992 (herein, together with the Schedules and Annexes attached hereto, referred to as the "Agreement") by and among Cyprus Mines Corporation, a Delaware Corporation ("Seller"), Cyprus Minerals Company, a Delaware corporation ("Cyprus") and RTZ America Inc., a Delaware corporation ("Buyer").

W I T N E S S E T H:

WHEREAS, Seller is the sole record and beneficial owner of all issued and outstanding shares of capital stock (the "Shares") of Cyprus Talc Corporation, a Delaware corporation ("Newco");

WHEREAS, Newco is the sole record and beneficial owner of all issued and outstanding shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation; Cyprus Windsor Minerals Corporation, a Vermont corporation, and its subsidiary Cyprus Western Source Corporation, a California corporation; and Green Mountain Talc Corporation, a Delaware Corporation; and is the record and beneficial owner of ███ of the issued and outstanding shares of DIMTA S.A., a company organized under the laws of Spain and is the record and beneficial owner of ███ of the issued and outstanding shares of Nihon Mistron Company, a Tokyo, Japan corporation (collectively the "Other Companies"); and

WHEREAS, upon the terms and conditions hereinafter set forth, Seller desires to sell or cause the sale of, and Buyer desires to purchase, the Shares;

NOW, THEREFORE, in reliance upon the representations and warranties made herein and in consideration of the mutual agreements herein contained, Buyer and Seller hereby agree as follows:

ARTICLE 1

DEFINITIONS

1.1  Definitions.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Accounting Principles" means the accounting principles, policies and procedures of the Companies set forth on Annex B hereto.

"Acquisition Proposal" shall have the meaning set forth in Section 7.10.

-1-

ITA-Herford-003413

REDACTED DOCUMENT

"Active Employee" shall have the meaning set forth in Section 7.4(a).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"Assets of the Companies" means all assets, properties and rights of the Companies recorded on the Reference Balance Sheet.

"Breach" shall have the meaning set forth in Section 11.1(a).

"Business Liabilities" shall have the meaning set forth in Section 7.6.

"Buyer Indemnitee" shall have the meaning set forth in Section 11.1.

"Claims" shall have the meaning set forth in Section 7.6.

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" shall mean collectively Newco and the Other Companies and each and every one of them shall be a "Company".

"Confidentiality Agreement" shall have the meaning set forth in Section 7.1.

"Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Current Assets" shall have the meaning set forth in Section 4.2.

"Current Liabilities" shall have the meaning set forth in Section 4.2.

-2-

ITA-Herford-003414

REDACTED DOCUMENT

"Damages" shall have the meaning set forth in Section 11.1(a).

"Disputes Auditor" means Ernst & Young or any other independent accounting firm mutually agreed upon by Seller and Buyer.

"Encumbrances" shall have the meaning set forth in Section 5.3.

"Employee" shall have the meaning set forth in Section 5.14(i).

"Environmental Laws" mean any federal, state, foreign and local law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, order, judgment, decree, injunction, requirement or agreement with any governmental entity and any judicial interpretation thereof, in effect on the Closing Date relating to (x) the protection, preservation or restoration of the environment, (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, Release or disposal of Hazardous Substances. The term Environmental Law includes, without limitation, the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act (SARA), the Federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal and the federal Toxic Substances Control Act, the federal Insecticide, Fungicide and Rodenticide Act, each as in effect on the Closing Date. However, notwithstanding anything in this Agreement to the contrary, "Environmental Laws" shall not include (i) laws relating to product liability; and (ii) laws and regulations regarding human health or safety including without limitation, federal and state Occupational Safety and Health and Mine Safety and Health Acts (collectively, "Non-Environmental Laws").

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"European Companies" shall mean Cyprus Industrial Minerals de France SARL and Mistron Mineralien GmbH.

-3-

ITA-Herford-003415

REDACTED DOCUMENT

"<u>Fee Property</u>" shall have the meaning set forth in Section 5.8.

"<u>Final Closing Statement</u>" shall have the meaning set forth in Section 4.4.

"<u>Financial Statements</u>" shall have the meaning set forth in Section 5.5.

"<u>Hamm Underground Mine Property</u>" shall mean the property set forth on Annex C.

"<u>Hazardous Substances</u>" and "<u>Hazardous Materials</u>" mean any substance presently listed, defined, designated or classified as hazardous, toxic or radioactive under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component. Hazardous Substance includes, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial substance or petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos containing material, urea formaldehyde foam insulation, lead and polychlorinated biphenyl.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>Indemnifying Party</u>" shall mean any party indemnifying an Indemnitee pursuant to the terms of this Agreement.

"<u>Indemnitee</u>" means any party indemnified pursuant to the terms of this Agreement.

"<u>Intellectual Property Rights</u>" shall have the meaning set forth in Section 5.15.

"<u>Knowledge of Seller</u>" means the actual or "<u>Other Knowledge</u>" of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright.

"<u>Leased Property</u>" shall have the meaning set forth in Section 5.8.

"<u>Leases</u>" shall have the meaning set forth in Section 5.8.

"<u>Liabilities of the Companies</u>" means all liabilities and obligations of the Companies recorded on the Reference Balance Sheet.

-4-

REDACTED DOCUMENT

"Losses" shall have the meaning set forth in Section 11.3.

"Mineral Property" shall have the meaning set forth in Section 5.8.

"Non-Represented Employee" means any Employee who is not a Represented Employee.

"Other Companies" shall have the meaning set forth in the Preamble.

"Other Knowledge" means information which should have been acquired by a reasonable person in the position of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright and having his respective knowledge of facts (which shall be deemed to include the representations and warranties to be given by Seller to Buyer in this Agreement) which should have caused such reasonable person to make due enquiries, which enquiries would have provided such information.

"Permitted Exceptions" shall have the meaning set forth in Section 5.8.

"Person" means an individual, corporation, partnership, trust or unincorporated organization or a government or any agency or political subdivision thereof.

"Plan" shall have the meaning set forth in Section 5.14.

"Possessory Property" shall have the meaning set forth in Section 5.8.

"Pre-Closing Period" means any Tax period ending on or prior to the Closing Date; and a "Post-Closing Period" means any Tax period that is not a Pre-Closing Period.

"Preliminary Closing Statement" shall have the meaning set forth in Section 4.2.

"Purchase Price" shall have the meaning set forth in Section 2.2.

"Real Property" shall have the meaning set forth in Section 5.8.

"Reference Balance Sheet" means the combined balance sheet of the Companies and the European Companies as of March 31, 1992 included in the Financial Statements.

-5-

ITA-Herford-003417

REDACTED DOCUMENT

"Release" has the same definition as in 42 U.S.C. § 9601(22).

"Represented Employee" means any Employee who is a member of a unit of Employees covered by a collective bargaining agreement.

"Returns" means all returns, reports, estimates, declarations, information returns and statements of any nature with respect to Taxes, including, without limitation, consolidated federal income tax returns of the Seller's Group, declarations of estimated tax and tax reports required to be filed with respect to the Companies or their respective income, properties or operations.

"Seller Indemnitee" shall have the meaning set forth in Section 11.2.

"Seller's Group" shall mean any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that includes the Seller or any predecessor of or successor to Seller (or another such predecessor or successor).

"Seller's Insurance Policies" shall have the meaning set forth in Section 7.6.

"Shares" shall have the meaning set forth in the Preamble.

"Subsidiaries" shall mean any Person (other than an individual) in which another person owns, beneficially or of record, securities or any other interest representing fifty percent (50%) or more of the aggregate voting power or equity interest in such Person.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, profits, severance, franchise, license, transfer, sales, use, payroll, employment, withholding, property (real or personal), excise and similar taxes (including interest, penalties or additions to such taxes and any interest in respect of such penalties or additions), but excluding all sales, use, value added, transfer and similar taxes imposed in connection with the consummation of the transactions contemplated by this Agreement.

"Working Capital of the Companies" shall have the meaning set forth in Section 4.2.

-6-

ITA-Herford-003418

REDACTED DOCUMENT

## ARTICLE 2

### SALE AND PURCHASE OF SHARES

2.1. <u>Sale and Purchase</u>. Upon the terms and subject to the conditions contained herein, Seller will sell and transfer to Buyer, or cause the sale and transfer to Buyer of, and Buyer will purchase and accept, at the Closing, the Shares.

2.2. (a) <u>Purchase Price and Payment</u>. In consideration of the sale and transfer pursuant to Section 2.1, Buyer hereby agrees to pay to Seller a purchase price of (the "<u>Purchase Price</u>") ███████████, by wire transfer as provided in Section 3.2(b).

## ARTICLE 3

### CLOSING AND TERMINATION

3.1. <u>Closing</u>. The closing of the transactions provided for herein (the "<u>Closing</u>") will take place at the offices of Sullivan & Cromwell at 125 Broad Street, New York, New York at 10:00 a.m. (local time) on June 30, 1992 provided all conditions set forth in Articles 7 and 8 are satisfied or, if on such date such conditions are not satisfied, on the fifth business day following the satisfaction of all conditions set forth in Articles 7 and 8 (other than the conditions specified in Section 7.6 and 8.6, which shall be satisfied at the Closing), or at such other time and place as Buyer and Seller shall agree (the "<u>Closing Date</u>").

3.2. <u>Transactions on the Closing Date</u>. (a) At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(i) stock certificates evidencing the Shares, in each case endorsed in blank or with an executed blank stock power attached, and in form suitable for transfer of valid title thereto to Buyer or its assigns, free and clear of any Encumbrances.

(ii) resignations of each of the directors and officers of each Company (except as Buyer may specify to Seller prior to Closing);

(iii) resignations of such auditors for each Company as Buyer may specify to Seller prior to Closing; and

-7-

ITA-Herford-003419

REDACTED DOCUMENT

(iv)   each of the certificates and other documents required by Article 9 hereof.

(b)   At the Closing, Buyer will deliver to Seller the following:

(i)   the Purchase Price by wire transfer in immediately available funds in U.S. dollars to the following account:

Pittsburgh National Bank (PNB)
Pittsburgh, PA ███████████

Cyprus Minerals Company ████████

Further Credit:   Cyprus Mines Corporation

the Closing shall not be deemed consummated until Seller shall have received confirmation from PNB of its receipt of the Purchase Price and;

(ii)   each of the certificates and other documents required by Article 8 hereof.

3.3. <u>Termination</u>.   Anything contained in this Agreement other than in this Section 3.3 to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)   by mutual consent of Buyer and Seller;

(b)   by either Buyer or Seller, if the transactions contemplated hereby are not consummated on or before August 31, 1992 (or such later date as may be agreed upon in writing by the parties hereto);

(c)   by Buyer, if Seller shall breach in any material respect any of its representations, warranties or obligations hereunder and all breaches in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business taken as a whole and such breach shall not have been cured in all material respects or waived by Buyer and Seller shall not have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

(d)   by Seller, if Buyer shall breach in any material respect any of its representations, warranties or obligations hereunder and such breach shall not have been cured in all material respects or waived and Buyer shall not

-8-

REDACTED DOCUMENT

have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

3.4 <u>Effect of Termination</u>. Termination of this Agreement pursuant to this Article 3 shall terminate all provisions of this Agreement, except that Section 3.4, the last sentence of Section 7.1(a) and Sections 12.2, 12.3 and 12.11 shall survive any such termination; <u>provided</u>, <u>however</u>, that termination pursuant to Sections 3.3(c) or (e) shall not relieve the defaulting or breaching party hereunder from any liability to the other party hereto resulting from the default or breach hereunder of such defaulting or breaching party occurring prior to the date of termination.


ARTICLE 4

PRELIMINARY AND FINAL CLOSING
STATEMENTS; ADJUSTMENTS

4.1 <u>Working Capital</u>. The parties intend that "Working Capital of the Companies", as defined in Section 4.2 below, shall be ████████████ as of the Closing. Using the procedure set forth below, the parties shall determine the amount and manner by which Seller shall pay Buyer for any deficiency in Working Capital of the Companies below ████████████ or by which Buyer shall pay Seller for any excess in Working Capital of the Companies over ████████ as of the Closing.

4.2 <u>Preliminary Closing Statement</u>. (a) As soon as reasonably possible after the Closing Date but in any event within sixty (60) days thereafter, Buyer shall prepare and deliver to Seller a statement of combined Working Capital of the Companies derived from a combined balance sheet for the Companies and the European Companies as of the Closing (the "<u>Preliminary Closing Statement</u>"). "<u>Working Capital of the Companies</u>" shall for all purposes of this Agreement mean, as the context requires, the difference between total Current Assets and total Current Liabilities of the Companies and the European Companies reflected on the Reference Balance Sheet, the Preliminary Closing Statement or the Final Closing Statement. "Current Assets" shall for all purposes of this Agreement mean, as the context requires, cash, money on deposit with banks and other financial institutions, securities (excluding the stock of its subsidiaries), accounts receivable from customers or employees of the Companies, other receivables, all crude, work-in-process, finished goods and other product inventories, materials and supplies, and prepaid expenses. "Current Liabilities" shall

-9-

ITA-Herford-003421

REDACTED DOCUMENT

for all purposes of this Agreement mean, as the context requires, the amount of accounts payable, short-term debt, the current portion of long-term debt, and accrued liabilities due within one year other than liability for federal income taxes.  Any current assets retained by Seller at Closing shall be excluded from Working Capital of the Companies.  Any current liabilities assumed or retained by Seller at Closing shall be excluded from Working Capital of the Companies.  Current Assets and Current Liabilities shall be recorded consistent with the Accounting Principles. Seller shall assist Buyer, as reasonably requested by Buyer, in the preparation of such statement.

(b)  The Preliminary Closing Statement and the Final Closing Statement shall be prepared in accordance with the Accounting Principles applied on a basis consistent with that applied in preparing the Reference Balance Sheet.  In the determination of Working Capital of the Companies, finished product and crude talc inventories shall be valued in accordance with Seller's normal inventory valuation procedures and such valuation shall not be subject to adjustment.

(c)  Seller will make available to Buyer and its representatives, as reasonably requested by Buyer, all books, records and other documents pertaining to the businesses of the Companies deemed necessary or desirable by Buyer in preparing the Preliminary Closing Statement.

4.3.  Review of Statements.  Seller and its independent certified public accountants may review the Preliminary Closing Statement and the books of account of Buyer relating to the Companies and the European Companies and may make inquiry of the representatives of Buyer's accountants and Buyer.  The Preliminary Closing Statement shall be binding and conclusive upon, and deemed accepted by, Seller unless Seller shall have notified Buyer in writing within thirty (30) days after receipt of the Preliminary Closing Statement of any objections thereto. A notice under this Section 4.3 shall specify in reasonable detail the items in the Preliminary Closing Statement which are being disputed, and a summary of the reasons for such dispute.

4.4.  Disputes; Final Closing Statement. (a) At the request of either party, any dispute between the parties relating to the Preliminary Closing Statement which cannot be resolved by them within thirty (30) days after receipt of notice of any objections to such Preliminary Closing Statement pursuant to Section 4.3 shall be referred to the Disputes Auditor for decision, which decision shall be final and binding on both parties. The parties agree that they

-10-

ITA-Herford-003422

REDACTED DOCUMENT

will require the Disputes Auditor to render its decision within thirty (30) days after referral of the dispute to the Disputes Auditor for decision pursuant hereto.

(b)   Before referring a matter to the Disputes Auditor, the parties shall agree on procedures to be followed by the Disputes Auditor (including procedures for presentation of evidence). If the parties are unable to agree upon procedures before the end of thirty (30) days after receipt of notice of any objections pursuant to Section 4.3, the Disputes Auditor shall establish procedures giving due regard to the intention of the parties to resolve disputes as quickly, efficiently and inexpensively as possible; the Disputes Auditor's procedures may be, but need not be, those proposed by either party, provided, that such procedure shall require the Disputes Auditor to render its decision within thirty (30) days after referral of the dispute to the Disputes Auditor for decision pursuant hereto. The parties shall, as promptly as practicable, submit evidence in accordance with the procedures agreed upon or established by the Disputes Auditor, and the Disputes Auditor shall decide the dispute in accordance therewith as promptly as practicable. The fee of the Disputes Auditor for, and relating to, the making of any such decision shall be borne by the parties equally.

(c)   The Preliminary Closing Statement shall become final and binding on both parties upon the earliest of (i) if no such notice has been given, the expiration of the period within which Seller may notify Buyer of any objections thereto pursuant to Section 4.3, (ii) agreement in writing by Seller and Buyer that such Preliminary Closing Statement, together with any modifications thereto agreed by Seller and Buyer, shall be final and binding and (iii) the date on which the Disputes Auditor shall issue its decision with respect to any dispute relating to such Preliminary Closing Statement. The Preliminary Closing Statement, as adjusted pursuant to any agreement between the parties or pursuant to the decision of the Disputes Auditor, when final and binding on both parties, is herein referred to as the "Final Closing Statement".

4.5   Adjustment. Promptly after the Preliminary Closing Statement having become final and binding on Seller and Buyer pursuant to Section 4.4, but in no event later than the fifth business day thereafter, the following shall occur:

(a)   If the Working Capital of the Companies as reflected on the Final Closing Statement exceeds ██████████, Buyer shall pay to Seller, by wire transfer in immediately available funds to the account designated by

-11-

REDACTED DOCUMENT

Seller not less than three business days prior to the date of such payment, an amount equal to such excess.

(b)  If the Working Capital of the Companies as reflected on the Final Closing Statement is less than ████████████, Seller shall pay to Buyer, by wire transfer in immediately available funds to the account designated by Buyer not less than three business days prior to the date of such payment, an amount equal to such deficit.

4.6  <u>Effect of Payment</u>.  Notwithstanding any other provision of this Agreement to the contrary, any payment made by Seller to Buyer or Buyer to Seller under this Article 4 shall have no effect upon either party's obligations to the other party under any other provision of this Agreement, including without limitation, Article 11.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLER AND CYPRUS

Seller and Cyprus represent and warrant, jointly and severally, to Buyer that:

5.1  <u>Organization of Seller, Cyprus and the Companies; Authority</u>.  Seller, Cyprus and each of the Companies is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with, in the case of Seller and Cyprus, the corporate power and authority to enter into this Agreement and to perform their respective obligations hereunder.  Each of the Companies is qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified except where failure to be so qualified would not have a material adverse effect on the assets, businesses, financial condition, results of operations or prospects of such Company.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller and of Cyprus.  This Agreement has been duly executed and delivered by Seller and Cyprus and constitutes the valid, binding and enforceable obligation of Seller and Cyprus.

5.2.  <u>Ability to Carry Out the Agreement</u>.  Except as provided in Schedule 5.2, none of Seller, Cyprus or any of the Companies is subject to or bound by any provision of

-12-

ITA-Herford-003424

REDACTED DOCUMENT

       (i)  any law, statute, rule, regulation or judicial or administrative decision,

       (ii)  any articles or certificates of incorporation or by-laws,

       (iii)  any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship or other restriction, or

       (iv)  any judgment, order, writ, injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement to which any of the Companies or any of its predecessors is a party, which consent has not been obtained, required for the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby.

     5.3.  <u>Capitalization of the Companies; Ownership</u>. (a) The authorized, issued and outstanding capital stock of each of the Companies are set forth in Schedule 5.3.  All of the issued and outstanding shares of capital stock of each of the Companies are duly authorized, validly issued, fully paid and nonassessable.  Except as set forth in Schedule 5.3, there are no outstanding options, warrants or other rights of any kind to acquire any additional shares of capital stock of any of the Companies or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to acquire, any such additional shares, nor is any of the Companies committed to issue any such option, warrant, right or security.

     (b)  The Shares are owned of record and beneficially by Seller.  Seller has good and valid title to the Shares, free and clear of any and all liens, claims, restrictions, encumbrances, security interests or options ("<u>Encumbrances</u>") and good and valid title to the Shares, free and clear of any and all Encumbrances will pass to Buyer on the Closing Date.  Except as set forth on Schedule 5.3, Newco owns all shares of capital stock of the Other Companies, free and clear of any Encumbrances.

     5.4.  <u>Equity Interests</u>.  Except as set forth in Schedule 5.3, none of the Companies or the European Companies has, directly or indirectly, any equity interest

-13-

ITA-Herford-003425

REDACTED DOCUMENT

in any other corporation, joint venture, partnership or other entity.

5.5. <u>Financial Statements</u>.  Seller has heretofore furnished Buyer with copies of the following financial statements:  (i) combined balance sheets for the Companies and the European Companies as of December 31, 1991 and as of March 31, 1992, and (ii) combined income statements and statements of cash flow (or, if applicable, changes in financial position) for the year ended December 31, 1991, and the period ended March 31, 1992 (such balance sheets and income statements and statements of cash flow (or, if applicable, changes in financial position), together with the comments thereto, being collectively referred to as the "<u>Financial Statements</u>").  The Financial Statements are attached hereto as Annex A.  To the Knowledge of Seller, the Financial Statements have been prepared in conformity with the Accounting Principles as applied by the Companies on a consistent basis throughout the period covered by such statements and the accounting principles used in the preparation of the Financial Statements are consistent with the accounting principles used by Seller and amended from time to time in the preparation of its financial statements for the years 1989, 1990 and 1991.  To the Knowledge of Seller, except as disclosed in the Reference Balance Sheet or in Schedule 5.5, as of March 31, 1992 there were no actual or contingent debts, liabilities or obligations of any of the Companies which were required to be disclosed on the Reference Balance Sheet or any note thereto by the Accounting Principles as applied by the Companies nor as of the Closing, any contingent debts, liabilities or obligations of any of the Companies which were required to be disclosed on the Final Closing Balance Sheet or any note thereto by the Accounting Principles as applied by the Companies.

5.6. <u>Absence of Certain Changes or Events</u>.  To the Knowledge of Seller, except as set forth on Schedule 5.6, or specifically required by the Agreement to consummate the transactions contemplated by the Agreement, since December 31, 1991, the Companies have conducted their businesses in the ordinary and usual course, and there has not been (i) any change or amendment to the charter, by-laws or other organizational agreements of any of the Companies, (ii) any issuance or sale of any shares of capital stock of any of the Companies, or options, warrants or other rights of any kind to acquire any such shares or securities convertible into or securities exchangeable for, or which otherwise confer on the holder thereof any rights to acquire, any such shares, or enter into any agreement obligating it to do any of the foregoing, (iii) any non-cash dividends declared, set aside, paid or made with respect to the capital stock of any

-14-

REDACTED DOCUMENT

of the Companies, except as provided in Section 7.3(b), (iv) any damage, destruction or other casualty loss of any asset or assets of the Companies (whether or not covered by insurance) which, singly or in the aggregate, has a Material Adverse Effect, (v) any increase in the compensation payable or to become payable by any of the Companies to any of its officers, directors or employees, or any increase in any bonus, insurance, pension or other employee benefit plan, payment or arrangement made by any of the Companies for or with any such officers, directors or employees, except in the ordinary course of business consistent with past practice (vi) any labor dispute, other than routine labor matters, (vii) any transaction between any of the Companies on the one hand and any of Seller, Cyprus or any of their Affiliates (other than the Companies) on the other hand, other than transactions in the ordinary and usual course of business, (viii) any acquisition or disposition of businesses or assets, other than in the ordinary course of business, (ix) any increased production or purchase of inventory in anticipation of the transactions contemplated by this Agreement, (x) any increase or decrease in the accounts receivable or accounts payable of the Companies in anticipation of the transactions contemplated by this Agreement or (xi) any other event or change of condition of any character which, singly or in the aggregate, has had or is reasonably likely to have a material adverse effect on the assets, businesses, financial condition, results of operations or, to the extent the event or change is caused by Seller, prospects, of the Companies taken as a whole.

5.7.   <u>Title to Personal Properties; Absence of Liens</u>.  To the Knowledge of Seller, except as set forth on Schedule 5.7, each of the Companies has good and valid title to, or valid and subsisting leasehold or other possessory interests in, all of its personal properties and assets reflected on the Reference Balance Sheet (except for property and assets disposed of since the date of the Reference Balance Sheet) or acquired since the date of the Reference Balance Sheet and required by the Accounting Principles to be recorded on the balance sheets of such Company, free and clear of any Encumbrances, except for Encumbrances which, individually or in the aggregate, do not exceed ███████.

5.8   <u>Real Property Matters</u>:

(a)   <u>Title to Real Properties; Absence of Liens</u>.
To the Knowledge of Seller, the Companies (i) own good and valid fee simple title in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "<u>Fee Property</u>"), free and clear from any and all Encumbrances other than those identified as

-15-

REDACTED DOCUMENT

Permitted Exceptions on Schedule 5.8 (the "Permitted Exceptions"), (ii) own good and valid fee simple title to certain mineral rights pursuant to certain Deeds more particularly identified by parcel on Schedule 5.8 (the "Mineral Property") (iii) hold valid and subsisting leasehold estates in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "Leased Property"), pursuant, in each case, to a valid and subsisting lease (individually, "Lease" and collectively, the "Leases") identified, as to each Leased Property, on Schedule 5.8. and (iv) hold a possessory interest in certain unpatented mining claims subject to the paramount title of the United States Government as set forth on Schedule 5.8 (the "Possessory Property"). The Fee Property, the Mineral Property, the Leased Property and the Possessory Property are hereinafter referred to as the "Real Property". To the Knowledge of Seller, Schedule 5.8 also includes a complete and accurate list of all patented and unpatented mining claims of the Companies.

(b)  Wetlands. To the Knowledge of Seller, except as set forth on Schedule 5.8, there does not exist any written survey, study or report which claims specifically that any portion of the Real Property is a wetland as that term is used and defined in The Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, which would render previously disclosed talc reserves unrecoverable.

(c)  Real Property Records. Seller has made available to Buyer, to the extent in Seller's possession or control, or in the possession or control of one of the Companies, copies of any documents directly relating to the Real Property, including, without limitation, copies of any and all title insurance policies, title commitments, title abstracts; deeds and options; leases and pipeline documents; plans and surveys; and environmental studies, surveys and reports. In addition, in the event any additional items become available to Seller during the term of this Agreement, Seller shall promptly make such items or copies of such items available to Buyer.

(d)  Preservation of Mineral Rights. To the Knowledge of Seller, except as set forth in Schedule 5.8, the Companies have good and valid title or possessory interest (where indicated) to the mineral rights located on the Real Property and each of them and its respective immediate predecessors have complied in all material respects with the requirements of any

-16-

REDACTED DOCUMENT

and all federal, state or local laws or ordinances related to the preservation of such mineral rights.

(e) <u>Operations Within Boundary Lines</u>.  To the Knowledge of Seller, except as set forth in Schedule 5.8, the activities conducted by any of the Companies and the improvements located on the Real Property are in all material respects within the boundary lines of the Real Property as described in Schedule 5.8 and there are no material encroachments by others onto the Real Property.

(f) <u>Condemnation</u>.  To the Knowledge of Seller, there is not now pending any condemnation or similar proceeding which affects the Real Property or any portion thereof.  Seller has received no notice that any such proceeding or taking by condemnation is contemplated.

5.9 <u>Litigation</u>.  To the Knowledge of Seller, except as set forth on Schedule 5.9, there is no action, suit, proceeding or investigation pending or threatened against any Company or relating to any Company's properties, at law, in equity or otherwise, in, before, or by any court or governmental agency or authority.  To the Knowledge of Seller, there are no unsatisfied judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court, an administrative agency or by an arbitrator) against any of the Companies or against any Real Property or any other of their properties, assets or businesses.

5.10 <u>Compliance with Law</u>.  To the Knowledge of Seller, except as with respect to matters set forth in Section 5.16 which are covered therein, and except as set forth on Schedule 5.10, the business of each Company is being conducted, and has at all times during the last three years been conducted by a Company or its predecessor, in material compliance with all laws, ordinances and regulations of any governmental entity, common law and equitable doctrines applicable to such Company (including, without limitation, Non-Environmental Laws).  To the Knowledge of Seller, all material governmental approvals, permits and licenses required by any Company in connection with the conduct of its business have been obtained and are in full force and effect and are being complied with in all material respects.

5.11 <u>Contracts</u>.  (a)  To the Knowledge of Seller, Schedule 5.11 sets forth each written contract or agreement outstanding as of the date hereof to which any Company is a party or to which any of its properties are bound and which,

-17-

REDACTED DOCUMENT

(i)   involves future payment or receipt of in excess of ████████ or future performance or receipt of services or delivery or receipt of goods and materials, in each case with an aggregate value in excess of ████████, including, but not limited to, sale and purchase agreements, distributorship agreements and loan agreements, notes and other financing documents;

(ii)   is a guarantee in respect of indebtedness of any Person (other than a Company) which may involve future payment by a Company in excess of ████████, or is a mortgage, security agreement or other collateral arrangement securing indebtedness of any Person (other than a Company) and creating Encumbrances on properties and assets of a Company;

(iii)   is a lease providing for monthly rental payments by a Company in excess of ████████ (exclusive of charges for taxes, insurance, utilities, maintenance and repair);

(iv)   is an employment or consulting contract or is a collective bargaining agreement;

(v)   is a technology license agreement;

(vi)   contains a change of control provision or provisions of similar effect;

(vii) is between any Company and Seller or any of Seller's Affiliates (other than any Company);

(viii) is not an arm's-length agreement; or

(ix) contains any restriction on the Companies ability to compete with any other business.

(b)   To the Knowledge of Seller, there is no material default by any Company or any other party, under any contract or agreement set forth or described in Schedule 5.11.

5.12.   Brokers and Intermediaries.   Except for Dillon Read & Co., neither Seller nor any Company has employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's or similar fee or commission in connection therewith or upon the consummation thereof.   Seller shall be responsible for making any payments to which Dillon Read & Co. shall be entitled.

-18-

REDACTED DOCUMENT

5.13.  <u>Tax Matters</u>.  (a)  Except as set forth in Schedule 5.13, (i) all Returns with respect to Taxes that are required to have been filed by or with respect to the Seller's Group prior to the date of this Agreement, including any of the Companies, have been duly filed, (ii) all Taxes shown to be due on the Returns referred to in clause (i) or in assessments received have in either case been paid in full, (iii) the Returns referred to in clause (i) have been examined by the Internal Revenue Service or the appropriate state, local or foreign taxing authority or the period for assessment of the Taxes in respect of which such Returns were required to be filed has expired, (iv) all deficiencies asserted or assessments made as a result of such examinations have been paid in full, (v) no issues that have been raised by the relevant taxing authority in connection with the examination of any of the Returns referred to in clause (i) are currently pending, (vi) no waivers of statutes of limitation have been given or requested by or with respect to any Taxes of the Seller's Group or any of the Companies, (vii) there are no adjustments required by Section 481 of the Code or similar carryover items that would affect the income tax liability of any of the Companies for a tax year that ends after the Closing Date, and (viii) no adjustments have been made or proposed by the Internal Revenue Service or the appropriate state, local or foreign taxing authority with respect to any of the Returns referred to in clause (i) which would in any way affect the liability for Taxes of any of the Companies for any taxable year or periods ending after the Closing Date.

(b)  No tax is required to be withheld pursuant to Section 1445 of the Code as a result of the transfer contemplated by this Agreement.

(c)  As a result of Buyer's purchase of the Shares, neither Buyer nor any Company will be obligated to make a payment to an individual that would be a "parachute payment" to a "disqualified individual" as those terms are defined in Section 280G of the Code, without regard to whether such payment is reasonable compensation for personal services performed or to be performed in the future.

5.14.  <u>Employee Benefits</u>.

(i) All benefit plans, contracts or arrangements having a benefit value exceeding, in present value terms (determined using a discount rate of 8-1/2% per annum), ██████████ (regardless of whether they are funded or unfunded, foreign or domestic, contractual or not) covering current employees or former employees of the Companies (the "Employees"), including, but not limited to, "employee

-19-

ITA-Herford-003431

REDACTED DOCUMENT

benefit plans" within the meaning of Section 3(3) of ERISA, and plans of deferred compensation (the "Benefit Plans"), are listed in Schedule 5.14.  True and complete copies of all Benefit Plans including, but not limited to, any trust instruments and insurance contracts forming a part of any Benefit Plans, summary plan descriptions and all amendments thereto have been made available to Buyer.

(ii)   To the Knowledge of Seller, all employee benefit plans, other than "multiemployer plans" within the meaning of Section 3(37) or 4001(a)(3) of ERISA, covering Employees (the "Plans"), to the extent subject to ERISA, are in substantial compliance with ERISA.  To the Knowledge of Seller, except as set forth on Schedule 5.14, each Plan which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("Pension Plan") and which is intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter, or is currently the subject of a request for a determination letter, from the Internal Revenue Service, and Seller is not aware of any circumstances likely to result in refusal or revocation of any such favorable determination letter.  To the Knowledge of Seller, there is no material pending or threatened litigation relating to the Plans.  To the Knowledge of Seller, the Companies have not engaged in a transaction with respect to any Plan that, assuming the taxable period of such transaction expired as of the date hereof, could subject the Companies to a tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA in an amount which, individually or in the aggregate, would be material.

(iii)   To the Knowledge of Seller, no liability under Subtitle C or D of Title IV of ERISA has been or is expected to be incurred by the Companies with respect to any ongoing, frozen or terminated "single-employer plan", within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with any Company under Section 4001 of ERISA or Section 414 of the Code (an "ERISA Affiliate").  To the Knowledge of Seller, the Companies have not incurred and do not expect to incur any withdrawal liability with respect to a multiemployer plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of an ERISA Affiliate).  To the Knowledge of Seller, no notice of a "reportable event", within the meaning of Section 4043 of ERISA for which the 30-day reporting requirement has not been waived, has been required to be filed for any Pension Plan or by any ERISA Affiliate within the 12-month period ending on the date hereof.

ITA-Herford-003432

REDACTED DOCUMENT

(iv)  To the Knowledge of Seller, all contributions required to be made under the terms of any Benefit Plan have been timely made.  Neither any Pension Plan nor any single-employer plan of an ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and no ERISA Affiliate has an outstanding funding waiver.  To the Knowledge of Seller, the Companies have not provided, or are required to provide, security to any Pension Plan or to any single-employer plan of an ERISA Affiliate pursuant to Section 401(a)(29) of the Code.

(v)  To the Knowledge of Seller, except as previously disclosed in writing to the Buyer, under each Pension Plan which is a single-employer plan, as of the last day of the most recent plan year ended prior to the date hereof, the actuarially determined present value of all "benefit liabilities", within the meaning of Section 4001(a)(16) of ERISA (as determined on the basis of the actuarial assumptions contained in the Plan's most recent actuarial valuation), did not exceed the then current value of the assets of such Plan, and there has been no material change in the financial condition of such Plan since the last day of the most recent plan year.  To the Knowledge of Seller, the withdrawal liability of the Companies under each Benefit Plan which is a multiemployer plan to which the Companies or an ERISA Affiliate has contributed during the preceding 12 months, determined as if a "complete withdrawal", within the meaning of Section 4203 of ERISA, had occurred as of the date hereof, does not exceed ▮▮▮.

(vi)  To the Knowledge of Seller, the Companies have no obligations for post retiree health and life benefits under any Benefit Plan, except as set forth on Schedule 5.14.  To the Knowledge of Seller, there are no restrictions on the rights of the Companies to amend or terminate any such Benefit Plan or any post retirement medical plan covering Active Employees without incurring any liability thereunder, except for any restrictions set forth in the Plan or arising under a collective bargaining agreement.

5.15.  <u>Patents and Trademarks</u>.  To the Knowledge of Seller, the Companies own or have the rights to use, without payment of any  consideration, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and rights which are necessary for use in connection with the businesses of the Companies (collectively, the "<u>Intellectual Property Rights</u>").  The Intellectual Property Rights owned by the Companies are described on Schedule 5.15 hereto.  To the Knowledge of  Seller, the use and registration of the

-21-

ITA-Herford-003433

REDACTED DOCUMENT

Intellectual Property Rights do not conflict with the intellectual property rights of any other person, firm or corporation and no other person's, firm's or corporation's operations conflict with the use and registration of the Intellectual Property Rights. To the Knowledge of Seller, there are no suits pending or threatened by any of the Companies claiming a conflict by such Company with any intellectual property rights of third parties or a conflict by any third party claiming a conflict by such third party with any of the Intellectual Property Rights.

5.16. **Environmental Matters**. For the purpose of this Section 5.16 only, and expressly not for the purpose of Section 11.3 hereof, "Predecessors" shall mean the companies that operated Seller's talc business immediately prior to the creation of Newco. Except as set forth on Schedule 5.16:

(a) Each of the Companies has obtained all material permits, licenses and other such authorizations required to be obtained by it for the operation of its business under all applicable Environmental Laws.

(b) Each of the Companies is, and each of the Companies and its Predecessors has been, in material compliance with all applicable Environmental Laws.

(c) None of Seller, any Company or any of their respective Predecessors have received any written notice during the last six years of any material violation of any Environmental Law by the Companies or their respective Predecessors, and there are no civil, criminal or administrative actions, suits, hearings, proceedings, written notices of violations, claims or demands pending or, to the Knowledge of Seller, threatened against any Company or with respect to any property owned or previously owned by any Company or its Predecessor under any Environmental Law. None of the Companies has received any written notice of any actual or threatened Release of any Hazardous Substance in violation of any Environmental Law.

(d) None of the Companies or any of its Predecessors have generated, transported, or disposed, and none of the Companies is generating, transporting or disposing, of any Hazardous Substances to, in, upon, about, or under any property wherever situated, which have resulted in a Release giving rise to any material claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines, or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

-22-

ITA-Herford-003434

REDACTED DOCUMENT

(e)  None of the Companies and no other party has been involved in any activity in, upon, about, or under the Real Property or any parcel or portion thereof, and none of the Companies or any of its Predecessors have been involved in any activity in, upon, about, or under any property previously owned by any Company or its Predecessors, in connection with the generation, use, handling, treatment, removal, storage, clean up, transport, or disposal of any Hazardous Substances which have resulted in a Release giving rise to any claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

(f)  To the Knowledge of Seller, there are not now any underground storage tanks (as such term is defined in 40 CFR § 280.12) in, upon, about or under any of the Real Property or any parcel or portion thereof.

(g)  Seller has made available in writing to Buyer which equipment of the Companies contain PCB and Seller has made available to Buyer all reports relating thereto.

(h)  There are not now, nor has there ever to the Knowledge of Seller been, any areas in, upon, about, or under the Real Property or any parcel or portion thereof which should have been permitted as treatment, storage, or disposal facilities under the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.

5.17  Improper Payments.  To the Knowledge of Seller, no improper payment has been made by or on behalf of any of the Companies which is in violation of any applicable federal, state, local or foreign law.

5.18  Insurance.  Full and complete copies of all property and casualty insurance policies which currently insure each of the Companies have been made available to Buyer.

5.19  Talc Reserves.  Seller has made available its talc reserve written data to Buyer.  To the Knowledge of Seller, Seller's reporting of talc reserves is consistent with the reserve reporting requirements of the U.S. Securities and Exchange Commission.

5.20  Entire Business.  The Companies and the European Companies conduct all of the talc business of Seller and its Affiliates and own (without any right, title or encumbrance in favor of Seller or any of its Affiliates other than the Companies) all of the assets, rights or interests relating to such business, other than Cyprus logos

-23-

ITA-Herford-003435

REDACTED DOCUMENT

and the Hamm Underground Mine Property, that are owned by Seller or any of its Affiliates.  The assets of the Companies as of the Closing Date will be sufficient to enable the Companies to carry out the talc business of Seller and its Affiliates as presently conducted by Seller and its Affiliates.

    5.21  <u>Mining and Technical Matters</u>.  (a)  For the purposes of this representation and warranty, "<u>Mineral Rights</u>" means all rights, leases, concessions, licenses and other entitlements to explore for, mine and extract all and any minerals.

    (b)  To the Knowledge of Seller, except as set forth on Schedule 5.8, each Company is duly authorized to carry on production of minerals in each jurisdiction where it presently carries on such activities, has good and valid title to all Mineral Rights required in connection with its current operations and possesses all rights of access, easements, rights to water, power and other services necessary for the said operations.

    (c)  To the Knowledge of Seller, each Company is duly authorized to carry on exploration for minerals (where such exploration is currently in progress) in each jurisdiction where it carries on such activities.

    (d)  To the Knowledge of Seller, all Mineral Rights held by a Company are in full force and effect and, free from cancellation, forfeiture or any accrued right of termination and there has been no material adverse change in the condition of or rights under the same except depletion of ore reserves due to operations in the ordinary course of business; provided, however, that with respect to cancellation of possessory interests, Seller only represents and warrants that it has not received any written notice of cancellation.

    (e)  To the Knowledge of Seller, no Company has received any notice of default or claim of default or of any current or threatened expropriation, withdrawal or cancellation of any Mineral Rights nor are there any suits or proceedings in progress or pending or threatened against or affecting any Mineral Rights or the minerals produced therefrom which, if decided adversely, would materially prejudice the Mineral Rights or the rights enjoyed thereunder.

    (f)  To the Knowledge of Seller, except as set forth on Schedule 5.8, none of the Mineral Rights nor the production of minerals thereunder is subject to any royalty, production payment, lien, charge, security interest or other

-24-

REDACTED DOCUMENT

encumbrance, and no Company is obliged by virtue of any prepayment under any contract providing for the sale of any such minerals or under any similar arrangement to deliver any of such minerals at any future date without then or in due course thereafter receiving full payment therefor.

(g)   To the Knowledge of Seller, the records supplied to Buyer relating to:

(i)   geological, geophysical, geochemical, drilling and other engineering data;

(ii)   maps and drawings showing mining operations carried out;

(iii)   ore reserve estimates and production data; and

(iv)   metallurgical test work,

are true and accurate, within the standards of the industry, in all material respects.

5.22   <u>Disclosure</u>.   To the Knowledge of Seller, all written information which has been given by Seller or any representative of Seller to Buyer or any representative of Buyer, is true, complete and accurate in all material respects and there are no facts, matters or circumstances which render any such information inaccurate or misleading in any material respect.

5.23   <u>Inventory</u>.   All inventories of the Companies are of a quality and specification conforming to the usual standards used by the Companies, and except as set forth on Schedule 5.23, all inventories are reflected on the Reference Balance Sheet in accordance with the Accounting Principles to realizable value on a going-concern basis. There are no talc ores included in the inventories of the Companies that can not produce products in conformity with the Companies existing product specifications and existing production methods.

5.24   <u>Condition of the Assets of the Companies</u>. To the Knowledge of Seller, all of the physical assets of the Companies, including machinery and equipment, are in reasonable operating condition required for the current conduct of the business of the Companies, normal wear and tear excepted.

5.25   <u>Accounts Receivable</u>.   To the Knowledge of Seller, all accounts receivable of the Companies and the European Companies shown on the Reference Balance Sheet, and

-25-

ITA-Herford-003437

REDACTED DOCUMENT

all accounts receivable arising thereafter and prior to the Closing shown in the books of the Companies, arose and will arise in the ordinary course of business and are fully collectible, except to the extent a bad debt reserve has been established for such accounts receivable in accordance with the Accounting Principles.

5.26  Formation of Newco.  Newco was incorporated on April 1, 1992 in the State of Delaware.  Since its date of incorporation, Newco has not engaged in any activity other than activities contemplated and disclosed to Buyer in connection with the restructuring of the talc business of Seller and its Affiliates.

5.27  Working Capital of the Companies.  To the Knowledge of Seller, no individual working capital item set forth on the Reference Balance Sheet has changed by more than ████████ since the date of the Reference Balance Sheet, except for changes in the ordinary course of business of the Companies.

5.28  Disclaimer.  No representations or warranties have been made to Buyer by Seller other than those expressly set forth in this Agreement.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

6.1  Organization and Authority of Buyer.  Buyer is a Delaware corporation, with the corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer and, constitutes the valid, binding and enforceable obligation of Buyer.

6.2  Ability to Carry Out the Agreement.  Buyer is not subject to or bound by any provision of

(i)  any law, statute, rule, regulation or judicial or administrative decision,

(ii)  any articles or certificates of incorporation or by-laws,

-26-

REDACTED DOCUMENT

(iii) any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship, other restriction, or

(iv) any judgment, order, writ injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement which has not been obtained required for, the execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby.

6.3. **Brokers and Intermediaries.** Buyer has not employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's, or similar fee or commission in connection therewith or upon the consummation thereof.

6.4. **Investment.** Buyer is acquiring the Shares for its own account for investment, without a view to, or for resale in connection with, the distribution thereof in violation of federal or state securities laws and with no present intention of distributing or reselling any part thereof. Buyer will not so distribute or resell any Shares in violation of any such law.

## ARTICLE 7

### CERTAIN COVENANTS AND AGREEMENTS OF SELLER, CYPRUS AND BUYER

7.1. **Access and Information; Testing of Reserves; Notice of Breaches.** (a) Seller shall permit Buyer and its representatives (including, without limitation, its public accountants, counsel and other advisors) after the date of this Agreement to have access during normal business hours, upon reasonable advance notice to Seller to the officers and directors of the Companies and/or the Seller (as appropriate), the auditors of the Companies and any and all of the premises, properties, contracts, books, records and data of or relating to each of the Companies. Without limiting the foregoing, Buyer, its public accountants, counsel and other advisors shall have the right at any time and from time to time prior to Closing to enter the Real

-27-

ITA-Herford-003439

REDACTED DOCUMENT

Property, or any portion or parcel thereof, for the purpose of obtaining a survey, either boundary or as-built, of such Real Property, conducting Phase I environmental audits and property audits of Real Property, surveying and otherwise examining the physical, hydrological and topographical nature of the Real Property. "Phase I environmental audits" shall be understood to consist of walk-throughs of any of the Real Property or facilities thereon, review of documents relating to environmental issues, interviews of personnel with knowledge relating to environmental issues, and review of public records. Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company. All information provided to Buyer pursuant hereto shall be subject to that certain confidentiality agreement executed by an affiliate of Buyer and dated April 24, 1991 (the "Confidentiality Agreement").

(b)   From the date hereof through and including the Closing Date, Seller shall cause the Companies to give full access to Buyer and its representatives for the purpose of testing Seller's talc reserves, using standard industry testing techniques. Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company.

7.2   Regulatory Filings.   Each party hereto will furnish to the other party hereto such necessary information and reasonable assistance as such other party may reasonably request in connection with its preparation of necessary filings or submissions to any government agency related to this transaction.

7.3   Conduct of Business; Intercompany Accounts.
(a) Prior to the Closing, and except as set forth in Schedule 7.3 or otherwise contemplated by this Agreement or consented to or approved by Buyer in writing, Seller covenants and agrees that:

(i)   it will cause the businesses conducted by the Companies to be operated only in the ordinary and usual course and use all reasonable efforts to preserve the properties and relationships with suppliers and customers of such businesses;

(ii)   it will cause each Company not to issue or sell any shares of capital stock of such Company, or issue or sell any options, warrants or other rights of any kind to acquire any such shares or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to

-28-

REDACTED DOCUMENT

acquire, any such shares, or enter into any agreement obligating it to do any of the foregoing;

(iii) except for the contemplated transfer of assets from Seller to Newco, it will not, other than in the ordinary course of business, cause the transfer of any material assets or contracts, or hire, fire or transfer any key employees to or from any subsidiary, division or other business unit within or among the Companies;

(iv) it will cause each of the Companies not to change or amend its charter, by-laws or other organization agreements;

(v) it will cause the Companies not to acquire or to dispose of any property, right or other asset employed in the business of the Companies, other than in the ordinary course of business (it being understood that the purchase or sale of talc reserves shall not be considered in the ordinary course of business for purposes of this paragraph (v));

(vi) it will cause the Companies to or will itself keep in full force and effect insurance on assets and Real Property and other property of the Companies or for the benefit of employees of the Companies, liability and other casualty insurance related to the Companies, and bonds on personnel of the Companies in accordance with the past practices of the Companies, and it will ensure that all proceeds received under such insurances will remain assets of the Companies at the Closing or will be transferred to the Companies prior to the Closing;

(vii) it will cause the Companies not to enter into or to amend any employment, bonus, severance or retirement contract or arrangement or any employee benefit plan with regard to the Companies;

(viii) it will cause the Companies not to increase any salary or other form of compensation payable or to become payable to any of the executives or employees of the Companies, or to pay any bonuses to any of such executives or employees, except for payments made in the ordinary course and for such payments to be made pursuant to the bonus or profit sharing provisions of the employment agreements listed on Schedule 5.14 hereto;

(ix) it will cause the Companies not to enter into, make, agree upon or to agree to enter into

-29-

ITA-Herford-003441

REDACTED DOCUMENT

(A) other than in the ordinary course, any contract, purchase or sale order, or other commitment, or (B) any real property lease requiring an expenditure or payment in excess of [REDACTED] per annum or which cannot be terminated by the relevant Company within a period not exceeding 12 months;

(x)   it will cause the Companies not to incur any debt or obligation for borrowed funds and not to extend credit in the sale of products, collection of receivables or otherwise, other than in the ordinary and regular course of business;

(xi)   it will cause the Companies not to take any action and not to cause any action to be taken by any party, which action would materially and adversely affect the businesses of any of the Companies, including, without limitation, the state of title of any of the Companies in and to any material portion of the Real Property.  It will not permit any Company to fail to exercise any option to extend or exercise any option to terminate any Lease between the date hereof and the Closing without Buyer's prior written consent as to each such non-extension or termination of any Lease, or amend or modify any such Lease except in the ordinary course;

(xii) it will not permit any of the Companies to wind up, liquidate or dissolve or to enter into any transaction of merger or consolidation; and

(xiii) it will not, and it will not permit any of the Companies to, agree to take any of the foregoing actions.

(b)   Seller and Buyer agree that all intercompany accounts between Seller or any Affiliate of Seller (other than a Company) and any Company shall be settled with payment effective prior to the Closing and to the extent such settlement is not feasible at or prior to the Closing, shall be settled as soon as practicable after Closing, and such settlement shall be effective as of prior to Closing.

7.4. **Employee Matters**.  (a) **Ongoing Employment.** Buyer shall ensure that all persons who were employed by any Company immediately preceding the Closing Date, including those on vacation, leave of absence or disability (whether short-term or long-term disability or workers's compensation) and those subject to or on lay-off (but only, in the case of employees subject to or on lay-off, to the extent a collective bargaining agreement providing for

-30-

REDACTED DOCUMENT

recall rights is applicable to such employees) ("Active Employees", which term shall be defined as those individuals identified above), will be employed by Buyer or any Affiliate of Buyer (including but not limited to the Companies) on the Closing Date, on substantially the same terms (regarding salary, job responsibility and location but excluding retirement and welfare benefits) as those provided to such Active Employees immediately prior to the Closing Date.  The employment of any Active Employee by Buyer on the Closing Date does not create a right to ongoing employment with Buyer other than may exist under a collective bargaining agreement or an individual agreement.

(b)   <u>Welfare Benefit Plans</u>.

(i)   Seller shall retain the responsibility for providing for payment of all (A) claims of Employees under any medical, dental, hospital or health plans for previously documented physical or mental conditions in existence on the Closing Date, and provided that a claim for such condition is made within one year of the Closing Date, and (B) claims incurred under any life insurance plans for death occurring prior to the Closing Date.

(ii)   Seller shall retain the responsibility for providing for payments of all long-term disability claims (including long-term disability claims that result from continuous short-term disability claims in existence on the Closing Date) arising from disabilities of Employees that occurred prior to the Closing Date and up until such time as the Employee returns to work with the relevant Company on a full-time, unrestricted basis for at least 30 days.  Buyer shall assume the responsibility for providing for payments of all short-term disability claims arising from such disabilities.

(iii)   Seller shall retain the responsibility for providing for payments of all worker's compensation claims made on or before the Closing Date, <u>provided</u>, <u>however</u>, that Seller shall only be liable under this paragraph (iii) for payments in excess of the amount accrued with respect thereto on the Final Closing Statement.  Buyer shall assume the responsibility for providing for payments of all worker's compensation claims made after the Closing Date.

(iv)   Seller shall retain the responsibility for providing Non-Represented Employees who retired (or if applicable who terminated with vested benefits) prior to the Closing Date with retiree health and life

-31-

ITA-Herford-003443

REDACTED DOCUMENT

benefit under the Benefit Plan(s) which covered such Employees prior to the Closing Date.  As of the Closing Date, Buyer assumes all liabilities for vested and non-vested post-retirement medical and life insurance benefits with respect to Non-Represented Employees who are Active Employees.

(v)  Seller shall retain the responsibility for providing Employees who terminated employment with the relevant Company prior to the Closing Date (and their "qualified beneficiaries" within the meaning of Section 4980B of the Code) with the continuation of group health coverage required by Section 4980B of the Code.

(vi)  Buyer shall assume Seller's obligations and responsibilities under all collective bargaining agreements covering Employees.

(c)  <u>Pension Plans</u>.

(i)  Effective as of the Closing Date, Buyer shall amend an appropriate pension plan to be designated by Buyer (the "Buyer Pension Plan") to provide that (A) upon the transfer of assets referred to below, the service of Active Employees who participated in the Retirement Plan for Salaried Employees of Cyprus Minerals Company or the Cyprus Industrial Minerals Company Division Pension Plan for Yellowstone Mine Hourly Employees (the "Seller Pension Plans") shall be recognized for all purposes thereunder (including benefit accrual) to the extent such service was recognized under the relevant Seller Pension Plan and (B) upon such transfer, the accrued benefits under the Buyer Pension Plan of Active Employees who participated in either of the Seller Pension Plans shall in no event be less than their accrued benefits under such Seller Pension Plan as of the Closing Date.

As soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, Seller shall cause to be transferred from the trusts under the Seller Pension Plans to the trust under the Buyer Pension Plan an amount in cash equal to the actuarial present value of the "benefit liabilities" (within the meaning of Section 4001(a)(16) of ERISA) as of the Closing Date of Active Employees who participated in either of the Seller Pension Plans, together with interest at the rate of 8½% per annum from the Closing Date to the date of transfer.  Determination of such actuarial present value shall be the Base Present

-32-

ITA-Herford-003444

REDACTED DOCUMENT

Value, provided, however, that if the Alternate Present Value exceeds the Base Present Value by more than ████████, the actuarial present value shall be the Base Present Value plus ███ of the difference between the Alternate Present Value and the Base Present Value. As used herein, the "Base Present Value" shall mean the actuarial present value determined on the basis of the actuarial assumptions used in preparing the Cyprus Minerals Company Annual Report and ███ as of December 31, 1991 plus ███ of the actuarial present value so determined, and the "Alternate Present Value" shall mean the actuarial present value based on the actuarial assumptions used in preparing the Cyprus Minerals Company Annual Report and ███ as of December 31, 1991, modified to (x) assume that a proportion of Employees will receive benefits upon termination or retirement under the lump sum option based upon the calculation practices currently used by Seller (including any non-qualified supplements that may be applicable) and upon deferred (or immediate, if applicable) Pension Benefit Guaranty Corporation interest rates, and (y) base the proportion of Employees assumed to take the lump sum option on the actual experience under the Seller Pension Plans over the last two years, taking into account the age and service of the Employees at termination or retirement. Such actuarial present values shall be calculated as at the Closing Date by an actuary appointed by Seller and agreed to by an actuary appointed by Buyer, and shall be reduced by the amount of any benefit payments made with respect to Active Employees after the Closing Date but prior to the date of transfer.

Pending completion of the transfers described in this paragraph (i), Seller and Buyer shall make arrangements for any required benefit payments to Employees from the relevant Seller Pension Plan. Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this Section.

(ii)   Effective as of the Closing Date, Seller shall amend the Retirement Plan for Employees of Windsor Minerals Corporation Represented by Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, A.F.L.-C.I.O., local lodge D449 (the "Windsor Plan") and Cyprus Industrial Minerals Company Division Pension Plan for Three Forks Plant Hourly Employees (the "Three Forks Plan")to make the Buyer the "plan sponsor" (as such term is defined in Section 3(16)(B) of ERISA thereunder. Seller shall cause to be transferred, as

-33-

ITA-Herford-003445

REDACTED DOCUMENT

soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, to a trust established by Buyer under the Windsor Plan and the Three Forks Plan, all assets attributable to such Plans held under the Cyprus Minerals Company Master Trust.

(iii)  Seller shall continue to make contributions to these plans when due as required until the Closing Date.  Buyer shall be responsible for making required contributions when due to these plans after the Closing Date.  With respect to the Three Forks Plan and the Windsor Plan, the required contributions for 1991 and 1992 for purposes of this Agreement shall be the minimum required contribution under Section 412 of the Code as determined by an actuary appointed by Seller.  Seller's share of the required contribution for 1991 will be the entire required contribution for 1991.  Seller's share of the required contribution for 1992 shall be determined by multiplying the total required contribution for 1992 by the fractional portion of 1992 preceding the Closing Date.  Buyer's share of the required contribution for 1992 shall be the total required contribution for 1992 minus Seller's share of the required contribution for 1992.  If actual contributions to these plans by Seller exceeds Seller's share of the required contributions then Buyer shall reimburse Seller for the amount of such excess.  If Seller's share of the required contributions exceeds Seller's actual contributions then Seller shall reimburse Buyer for the amount of such excess.

(iv)  Buyer shall assume Seller's liability under the Grand Island, Nebraska Multiemployer Pension Plan for Members of General Drivers and Helpers Local Union #544 Affiliated with the International Brotherhood of Teamsters Afl-CIO.

(d)  <u>European Pension Liabilities</u>.  Buyer shall assume all liabilities and assets for all Benefit Plans listed on Schedule 5.14 that cover foreign employees of the Companies or the European Companies.

(e)  Buyer shall assume responsibility for all liabilities, including but not limited to severance benefit liabilities and any withdrawal liabilities, arising because of Buyer's actions or omissions regarding Seller's then former Employees after the Closing Date.

-34-

ITA-Herford-003446

REDACTED DOCUMENT

(f) <u>Savings Plan</u>.

(i)  Effective as of the Closing Date, Buyer shall amend an appropriate savings plan to be designated by Buyer (the "Buyer Savings Plan") to provide that (A) the service of Active Employees who participated in the Cyprus Minerals Company Savings Plan and Trust (the "Seller Savings Plan") shall be recognized for all purposes thereunder to the extent such service was recognized under the Seller Savings Plan and (B) the account balances of such Employees which are transferred from the Seller Savings Plan to the Buyer Savings Plan in accordance with this paragraph shall be fully vested at all times.

As soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, Sellers shall cause to be transferred from the Seller Savings Plan to the Buyer Savings Plan the liability for the account balances of Active Employees who participated in the Seller Savings Plan, together with assets the fair market value of which is equal to such liability.

(ii)  Pending the completion of the transfer described in paragraph (i), Seller and Buyer shall make arrangements for any required benefit payments to Employees from the Seller Savings Plan.  Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this Section.

(g)  <u>ESOP</u>.  Seller shall take all necessary actions to provide that all Active Employees are fully vested in the amounts credited to their accounts under the Cyprus Minerals Company Amended and Restated Employee Stock Ownership Plan as of the Closing Date.

(h)  <u>Indemnity</u>.  Seller agrees to defend, indemnify and hold harmless the Buyer Indemnitees against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Seller's responsibilities or obligations under this Section 6.4, and Buyer agrees to defend, indemnify and hold harmless the Seller Indemnities against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Buyer's responsibilities or obligations under this Section 6.4.  The obligations of this Section 6.4 shall survive the Closing Date without limitation as to time.  For purposes of this paragraph (h), the terms Buyer Indemnitees, Damages, Breach and Seller

ITA-Herford-003447

REDACTED DOCUMENT

Indemnities have the respective meanings ascribed thereto in Section 11.1.

7.5. <u>Tax Matters</u>. (A) <u>Section 338(h)(10)</u>. Neither Buyer nor Seller nor any of their respective Affiliates shall make any election pursuant to Section 338(h)(10) of the Code. Seller understands that, Buyer may make and may cause each member of its affiliated group (as defined in Section 338(h)(5) of the Code) to join in a protective carryover basis election as provided for by regulations under Section 338(e) of the Code. With regard to this election, Seller will fully cooperate and join in the election, if necessary.

(B) <u>Liability for Taxes and Related Matters</u>.

(i) <u>Liability for Taxes</u>. Seller shall be liable for and indemnify Buyer for all Taxes (including, without limitation, any obligation to contribute to the payment of a tax determined on a consolidated, combined or unitary basis with respect to a group of corporations that includes or included any of the Companies and Taxes resulting from any of the Companies ceasing to be a member of the Seller's Group) (a) imposed on Seller's Group (other than any Taxes described in the following clause (b) of the Companies for any taxable year), (b) imposed on any of the Companies or for which any of the Companies may otherwise be liable (i) for any taxable year or period that ends on or before the Closing Date and, (ii) with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year ending on and including the Closing Date. Except as set forth in (v), Seller shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(ii) Buyer shall be liable for and indemnify Seller for the Taxes of any of the Companies for any taxable year or period that begins after the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year beginning after the Closing Date. The Buyer shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(iii) <u>Taxes for Short Taxable Year</u>. For purposes of paragraphs (B)(i) and (B)(ii), whenever it is necessary to determine the liability for Taxes of any of the Companies for a portion of a taxable year or period that begins before and ends after the Closing

-36-

ITA-Herford-003448

REDACTED DOCUMENT

Date, the determination of the Taxes of any Company for the portion of the year or period ending on, and the portion of the year or period beginning after, the Closing Date shall be determined by assuming that such Company had a taxable year or period which ended at the close of the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a time basis.

(iv)   If, as a result of a challenge by any taxing authority to any transaction that had been treated or a tax-free transaction under Section 351 of the Code or any similar provision under state tax law, such taxing authority determines the adjusted tax basis in an asset of Newco, including the stock in any of the Other Companies, as of the Closing Date to be less than the Carryover Basis (as defined below), then Seller shall indemnify Buyer to the extent that the Carryover Basis of such asset would have produced greater tax benefits to Buyer.  Payment under this paragraph shall be made at the time the adjusted tax basis in an asset of Newco is determined to be other than the Carryover Basis and shall equal the highest marginal corporate tax rate in effect on the Closing Date multiplied by the difference between the Carryover Basis and the redetermined adjusted tax basis; provided, however, that for the purposes of computing such payment, a reduction in the basis of one or more assets shall not be taken into account to the extent that the determination that resulted in a reduction in the basis of such assets also resulted in the increase in the basis in inventory, receivables or other current assets, or any asset that is amortizable, depreciable or depletable under the applicable tax law in effect on the date that such determination is made.  As used herein, the term "Carryover Basis" means the adjusted tax basis in the asset as of December 31, 1991 reduced by any depreciation, depletion or other such allowance (or, in the case of stock in any of the Other Companies, by the adjustments provided for in section 1.1502-32 of the income tax regulations) properly attributable to the period between December 31, 1991 and the Closing Date.

(v)   Adjustment to Purchase Price.  Any payment by Buyer or Seller under this Section will be an adjustment to the Purchase Price.

(vi)   Refunds from Carrybacks.  If Seller becomes entitled to a refund or credit of Taxes for any period for which it is liable under paragraph (B)(i) to

-37-

ITA-Herford-003449

REDACTED DOCUMENT

indemnify Buyer and such refund or credit is attributable solely (or in part) to the carryback of losses, credits or similar items from either a taxable year or period that begins after the Closing Date or in the case of a taxable year or period that begins before and ends after the Closing Date, that portion of the taxable year or period that begins after the Closing Date (determined under the principles of paragraph (B)(iii)), and is attributable to any of the Companies, Seller shall promptly pay to the Buyer the amount of such refund or credit (or a pro-rata share of such refund or credit if due only in part to the carryback of such losses, credits or similar items) together with any interest thereon.  In the event that any refund or credit of Taxes for which a payment has been made is subsequently reduced or disallowed, the Buyer shall repay any amounts paid to it by the Seller pursuant to this paragraph and indemnify and hold harmless the Seller for any interest and penalties assessed against Seller by reason of the reduction or disallowance. Provided, however, that the preceding sentence shall not apply if the reduction or disallowance is caused by Seller's computational error.

(vii)  Returns.  Seller shall file or cause to be filed when due all Returns with respect to Taxes that are required to be filed by or with respect to any of the Companies for taxable years or periods ending on or before the Closing Date and shall pay any Taxes due in respect of such Returns, and Buyer shall file or cause to be filed when due all Returns with respect to Taxes that are required to be filed by or with respect to any of the Companies for taxable years or periods ending after the Closing Date and shall remit any Taxes due in respect of such Returns.  Each of the Companies shall retain an officer of Seller for the sole purpose of signing the Returns that Seller is required to file pursuant to this paragraph.  Seller shall pay Buyer the Taxes for which Seller is liable pursuant to paragraph (B)(i) but which are payable with Returns to be filed by Buyer pursuant to the previous sentence not less than two business days prior to the due date for the payment of such Taxes.  Buyer shall provide Seller with its then best estimate of these taxes 10 business days prior to the due date for payments of such Taxes. Notwithstanding the foregoing, with regard to taxes for periods that begin before but end after the Closing Date, Seller shall be entitled to reduce its payment under this paragraph to Buyer to the extent of the amount accrued by the Company making the payment on the Company's balance sheet as of the Closing Date.  With regard to taxes for periods that begin before but end

-38-

ITA-Herford-003450

REDACTED DOCUMENT

after the Closing Date, Buyer shall pay Seller, within five (5) business days of making a payment for the applicable taxes to a tax authority, any amounts accrued on the Final Closing Statement of the Company making the payment, for the particular liability for tax, in excess of the applicable tax.

(viii) <u>Contest Provisions</u>. Buyer shall promptly notify Seller in writing upon receipt by Buyer, any of its Affiliates or any of the Companies of notice of any pending or threatened audit or assessment by any federal, state, local or foreign taxing authorities which may affect the tax liabilities of any of the Companies for any periods for which Seller would be required to indemnify Buyer pursuant to paragraph (B)(i), provided that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder. Seller shall have the sole right to represent any Company's interests in any tax audit or administrative or court proceedings relating to taxable periods ending on or before the Closing Date, and to employ counsel of its choice at its expense. Notwithstanding the foregoing, Seller shall not be entitled to settle, either administratively or after the commencement of litigation, any claim for Taxes which would adversely affect the liability for Taxes of the Buyer or any of the Companies for any period ending after the Closing Date to any extent (including, but not limited to, the imposition of income tax deficiencies, the reduction of asset basis or cost adjustments, the lengthening of any amortization or depreciation periods, the denial of amortization or depreciation deductions, or the reduction of loss or credit carryforwards) without the prior written consent of Buyer. Such consent shall not be unreasonably withheld, and shall not be necessary to the extent that Seller has indemnified the Buyer against the effects of any such settlement. Buyer shall have the sole right to represent any Company's interest in any tax audit or administrative or court proceeding for any taxable year or period that begins before but ends after the Closing Date. Neither Buyer nor any of the Companies may agree to settle any tax claim for the portion of the year or period ending on the Closing Date which may be the subject of indemnification by Seller under paragraph (B)(i) without the prior written consent of Seller, which consent shall not be unreasonably withheld.

(ix) <u>Termination of Tax Allocation Agreements</u>. Any tax allocation or sharing agreement or arrangement, whether or not written, that may have been

-39-

REDACTED DOCUMENT

entered into by Seller or any member of Seller's Group and any of the Companies shall be terminated as to each of the Companies as of the Closing Date, and no payments which are owed by or to any of the Companies pursuant thereto shall be made thereunder.

(C) <u>Transfer Taxes</u>. Seller and Buyer shall each be liable for one half the transfer, sales, use or other similar taxes arising under any state, local or foreign law from the sale of the Shares, including any real property transfer taxes. Buyer and Seller shall cooperate fully in making any payment, withholding any amount or filing any return or information which is required with respect to a transfer, sales, use or other similar tax described in the preceding sentence. The party responsible under state, local or foreign law for making such payment, withholding such amount or filing such return or information with respect to such transfer, sales, use or other similar taxes shall undertake to fulfill that responsibility; provided, however, that Seller must inform Buyer of any payment that must be made by Buyer, amount that must be withheld by Buyer or return or information that must be filed by Buyer with respect to such transfer, sales, use or other similar taxes.

(D) <u>Information to be Provided by Buyer</u>. With respect to the periods in 1992 prior to the Closing Date, Buyer shall promptly cause each of the Companies to prepare and provide to Seller a package of tax information materials (the "Tax Package"), which shall be completed in accordance with past practice including past practice as to providing the information, schedules and work papers and as to the method of computation of separate taxable income or other relevant measure of income of each of the Companies. Buyer shall cause the Tax Package described in this paragraph to be delivered to Seller by December 31, 1992.

(E) <u>Assistance and Cooperation</u>. After Closing Date, each of Seller and Buyer shall:

(i) assist (and cause their respective Affiliates to assist) the other party in preparing any Returns or reports with such other party is responsible for preparing and filing in accordance with this Section;

(ii) cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding any Returns of any of the Companies;

(iii) make available to the other and to any taxing authority as reasonably requested all

-40-

ITA-Herford-003452

REDACTED DOCUMENT

information, records, and documents relating to Taxes of any of the Companies;

(iv)  provide timely notice to the other in writing of any pending or threatened tax audits or assessments of any of the Companies for taxable periods for which the other may have a liability under this Section; and

(v)  furnish the other with copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any such taxable period.

(F)  <u>Record Retention</u>.  Seller will continue to store and maintain the original copies of any federal, state, local or foreign tax return or report for any year still open for audit by any taxing authority for any period up to and including the taxable years or periods ending on or before the Closing Date and any work papers prepared exclusively for purposes of filing such returns.  Seller will provide Buyer with copies of all such returns and work papers that have been prepared within 10 days after the Closing Date and with copies of subsequent returns and work papers as soon as possible after such returns and work papers are prepared.  Seller will notify Buyer prior to the destruction of any records mentioned in this subsection (F) and provide Buyer with the option of continuing to store and maintain such records on its own behalf.

(G)  <u>Survival of Obligations</u>.  The obligations of the parties set forth in this Section shall be unconditional and absolute and shall remain in effect without limitation as to time.

7.6.  <u>Insurance</u>.  To the extent that (i) there are third-party insurance policies maintained by Seller and its Affiliates (other than the Companies) ("<u>Seller's Insurance Policies</u>") insuring against any loss, liability, damage or expense relating to the assets, businesses, operations, conduct, products and employees (including former employees) of the business of any Company (all such losses, liabilities, claims, damages or expenses, regardless of the availability of insurance coverage, are herein referred to collectively as the "<u>Business Liabilities</u>") and relating to or arising out of occurrences prior to the Closing, and (ii) Seller's Insurance Policies continue after the Closing to permit claims ("<u>Claims</u>") to be made with respect to such Business Liabilities relating to or arising out of occurrences prior to the Closing, Seller agrees to cooperate and cause such Affiliates to cooperate with Buyer and the Companies in submitting Claims on behalf of Buyer or such

-41-

ITA-Herford-003453

REDACTED DOCUMENT

Companies under Seller's Insurance Policies with respect to such Business Liabilities relating to occurrences prior to the Closing.

　　　　7.7.　**Books and Records**.　Except for tax records covered by Section 7.6(F), Buyer will, and will cause each Company to, for a period of six years after the Closing, retain all books, records and other documents pertaining to the businesses of the Companies in existence on the Closing Date and to make the same available after the Closing Date for inspection and copying by Seller or any Affiliate of Seller at Seller's expense during the normal business hours of Buyer or such Company, as applicable, upon reasonable request and upon reasonable notice.　Without limiting the generality of the foregoing, Buyer will, and will cause each Company to, make available to Seller, the Affiliates of Seller and their respective representatives all information deemed necessary or desirable by Seller or such Affiliates in preparing their respective financial statements and Tax returns and conducting any audits in connection therewith.

　　　　7.8.　**Announcements**.　Prior to the Closing, neither Seller nor Buyer will issue any press release or otherwise make any public statement with respect to this Agreement and the transactions contemplated hereby without the prior written consent of the other (which consent shall not be unreasonably withheld), except as may be required by applicable law, stock exchange regulation or in connection with Buyer obtaining the approval of its shareholders.

　　　　7.9.　**Interim Use of Names**.　Except as provided in this Section 7.9, no interest in or right to use the name "Cyprus" or any derivation or logo thereof is being transferred hereunder.　The parties agree that Buyer shall, as promptly as practicable but in any event within forty-five (45) days following the Closing Date, file an amendment with the appropriate authorities to eliminate the name Cyprus from the name of each Company, and within one year following the Closing Date, remove or obliterate all such trade names, trademarks and logos from all signs, purchase orders, invoices, sales orders, packaging stock, labels, letterheads, shipping documents and other materials used by it or any of its Affiliates (including but not limited to the Companies).　For a period of sixty (60) days after the Closing Date, Buyer and its Affiliates (including the Companies) may continue to use any purchase orders, invoices, sales orders, letterheads or shipping documents which bear the name Cyprus, provided that after such sixty (60) days' period, Buyer and its Affiliates (including the Companies) shall cease to use (i) any purchase orders, invoices, sales orders, letterheads or shipping documents existing on the date hereof, which bear the name "Cyprus" or

-42-

REDACTED DOCUMENT

any name confusingly similar thereto, without first
obliterating or covering such name, mark or logo, or (ii)
any such materials not in existence on the Closing Date
which bear such name, mark or logo. Except to the extent
contemplated above, Buyer will not, and will cause each of
its Affiliates (including but not limited to the Companies)
not to, misappropriate, misrepresent or otherwise infringe,
abuse or diminish the value of said names.

      7.10.  <u>No Shopping</u>.  Between the date hereof and
the earlier of the Closing Date and the termination of this
Agreement, neither Seller nor any of its Affiliates shall,
directly or indirectly, through any officer, director or
agent or otherwise, in any manner solicit, initiate,
encourage, or participate in any negotiation in respect of
or cooperate with any person making an Acquisition Proposal
(as hereinafter defined).  The term "<u>Acquisition Proposal</u>"
means any proposal for a merger with the Companies or for
the acquisition of all or substantially all the assets of
the Companies or the Shares.

      7.11.  <u>Computer Technology and Other Interim
Services</u>.  For a period not to exceed six months following
the Closing, Seller will provide to the Companies such
computer services of the types and of substantially the same
standard of service that Seller has provided prior to the
date hereof, as and to the extent Buyer shall require, at
Seller's cost.  Buyer shall only be billed for such services
to the extent Seller's cost for such services exceeds
█████████████.  Buyer shall be responsible for obtaining all
required software licenses that are necessary for Seller to
provide such computer services to the Companies after
Closing.  Buyer shall be responsible for all costs
associated with obtaining the software licenses required by
the Companies and for all costs associated with establishing
such computer services separate from Seller's processing
systems to provide for adequate security, efficient
processing, and transfer of historical data as may be
required by Buyer.  Nothing herein shall prevent Buyer from
contracting directly with Seller's computer services vendor.
Buyer, Seller and the Companies, shall use reasonable
efforts to minimize data processing costs including costs
associated with the utilization of transitional operational
systems and software packages.  Other transitional support
services provided to Buyer and the Companies by Seller after
the Closing will be performed at Buyer's expense but at an
amount equal to Seller's cost.

      7.12.  <u>Barite Tolling Agreement</u>.  For as long as
the Companies operate the Houston Mill lease, or for a
maximum of one year from the Closing, if the operation
continues after such one year period, Buyer shall provide to

ITA-Herford-003455

REDACTED DOCUMENT

Seller reasonable barite toll grinding services at the Houston Mill on negotiated fair market value terms.  Buyer shall provide Seller, and a purchaser and subsequent purchaser of Seller's facilities to the extent of using it only with respect to such facility, with a non-assignable perpetual, royalty free license to utilize the Nichols classifier technology.

7.13.  <u>Best Efforts</u>.  Subject to the terms and conditions herein provided, each of Buyer and Seller agree to cooperate and to use their respective best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, obtaining consents under all contracts and agreements, requiring consent to be assigned to Buyer.

7.14.  <u>Covenant Not to Compete</u>.  (a)  Subject to Seller's right to engage in the barite business, for a period of five years after the Closing, Seller will not, and will cause each of its Affiliates not to engage in any talc business that directly, or indirectly, competes with the businesses of the Companies, as conducted on the Closing Date; <u>provided</u>, <u>however</u>, that nothing contained in this Section 7.14(a) shall prohibit Seller or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a talc business.

(b)  For a period of five years after the Closing, Buyer will not, and will cause each of its Affiliates not to engage in any barite business that directly, or indirectly, competes with the barite business of Seller, as conducted on the Closing Date; <u>provided</u>, <u>however</u>, that nothing contained in this Section 7.14(b) shall prohibit Buyer or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a barite business.

(c)  After the Closing, Seller will not, and will cause each of its Affiliates not to, utilize the trade secrets to be transferred to Buyer pursuant to this Agreement to engage in any business that directly, or indirectly, competes with the businesses of the Companies, or disclose to any Affiliate or any other person any such trade secrets or, within five years after the Closing, any other confidential information relating to the Companies or its properties, except that Seller may make disclosures, after consultation with Buyer, as required by law or applicable rules of a stock exchange.  It is understood that confidential information does not include information which is or becomes publicly available without Seller's fault.

-44-

REDACTED DOCUMENT

(d)   For a period of three years after the Closing Date, Seller will not and will cause each of its Affiliates not to, except with Buyer's prior written consent (which consent shall not be unreasonably withheld), hire or employ, or solicit the hiring or employment of, any employee of the Companies.

(e)   Seller and Buyer agree that, if any provision of this Section 7.14 should be adjudicated to be invalid or unenforceable, such provision shall, to the extent permitted by law, be deemed deleted herefrom with respect, and only with respect, to the operation of such provision in the particular jurisdiction in which such adjudication was made; provided, however, that to the extent any such provision may be made valid and enforceable in such jurisdiction by limitation of the scope of the activities, geographical area or time period covered, Seller and Buyer agree that such provision instead shall be deemed limited to the extent, and only to the extent, necessary to make such provision enforceable to the fullest extent permissible under the laws and public policy applied in such jurisdiction.

7.15   <u>Nihon Mistron.</u>   Pursuant to the Agreement of Transfer and Assumption dated June 5, 1992 between Seller and Newco, Seller has agreed to transfer to Newco, its record and beneficial ownership of ▮▮▮ of the issued and outstanding shares of Nihon Mistron Company.  If Seller is unable to transfer such shares to Newco because the other parties in the joint venture exercise their preemptive right to purchase such shares, the proceeds from such sale shall immediately be delivered to Buyer.

7.16   <u>Hamm Underground Mine Property.</u>   The parties have agreed that Seller shall retain title to the Hamm Underground Mine Property and shall be responsible for all costs associated with any required clean up of such property.  Any required clean up shall be performed as soon as reasonably practicable.  At such time as such property is in material compliance with all applicable Environmental Laws, Buyer shall have the option to purchase such property for one dollar in cash.

7.17   <u>Buyer's Insurance.</u>   For as long as Seller may be liable to indemnify Buyer pursuant to this Agreement, Buyer agrees to maintain business interruption insurance for the Companies in a manner and amount reasonable for a Company engaged in the same business as the Companies in the same area.

-45-

ITA-Herford-003457

REDACTED DOCUMENT

ARTICLE 8

CONDITIONS PRECEDENT OF SELLER

The obligation of Seller to consummate the transactions described in Article 2 hereof is subject to the fulfillment of each of the following conditions prior to or at the Closing:

8.1.  **Representations and Warranties**.  The representations and warranties of Buyer made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date.

8.2.  **Agreements**.  Buyer shall have performed and complied in all material respects with all its undertakings and agreements required by this Agreement to be performed or complied with by Buyer prior to or at the Closing.

8.3.  **Buyer Certificate**.  Seller shall have been furnished with certificates of an authorized officer of Buyer, dated the Closing Date, certifying to the effect that the conditions contained in Sections 8.1 and 8.2 have been fulfilled.

8.4.  **No Injunction**.  No injunction, restraining order or decree of any nature of any court or governmental or regulatory authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

8.5.  **Consents**.  All material consents, approvals and authorizations of governmental and regulatory authorities, and all material filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable).

-46-

ITA-Herford-003458

REDACTED DOCUMENT

8.6. <u>Miscellaneous Closing Deliveries</u>. Seller shall have received such evidence as Seller may reasonably request in order to establish (i) the power and authority of Buyer to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.

ARTICLE 9

<u>CONDITIONS PRECEDENT OF BUYER</u>

The obligation of Buyer to consummate the transactions described in Article 2 hereof is subject to the fulfillment of each of the following conditions prior to or at the Closing:

9.1. <u>Representations and Warranties</u>. The representations and warranties of Seller and Cyprus made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date; provided that Buyer may not invoke this Section 9.1, unless the untruthfulness of the representations and warranties in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business of the Companies as a whole.

9.2. <u>Agreements</u>. Seller shall have performed and complied in all material respects with all of its undertakings and agreements required by this Agreement to be performed or complied with by it prior to or at the Closing; provided that Buyer may not invoke this Section 9.2, unless the non-compliance, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.3. <u>Seller Certificate</u>. Buyer shall have been furnished with a certificate of an authorized officer of Seller, dated the Closing Date, certifying to the effect that the conditions contained in Sections 9.1 and 9.2 have been fulfilled.

9.4. <u>No Injunction</u>. No injunction, restraining order or decree of any court or governmental or regulatory

-47-

ITA-Herford-003459

REDACTED DOCUMENT

authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

9.5.  <u>Consents</u>.  All material consents, approvals and authorizations of governmental and regulatory authorities, and all filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable); provided that Buyer may not invoke this Section 9.5 unless the failure to obtain or effect such consents, approvals and authorizations, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.6.  <u>Miscellaneous Closing Deliveries</u>.  Buyer shall have received such evidence as Buyer may reasonably request in order to establish (i) the power and authority of Seller and Cyprus to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.

9.7  <u>Newco Closing</u>.  The Closing of the transactions contemplated in the Agreement of Transfer and Assumption dates June 5, 1992 between Seller and Newco shall have occurred to Buyer's reasonable satisfaction.

9.8  <u>J&J Non-Termination</u>.  Johnson & Johnson Consumer Products, Inc. ("J&J") shall not have given notice of termination to Cyprus or its Affiliates or to Buyer pursuant to the Talc Supply Agreement by and between Windsor Minerals Inc. and J&J, dated January 6, 1989.

ARTICLE 10

SURVIVAL OF REPRESENTATIONS
AND WARRANTIES

10.1.  <u>Survival of Representations and Warranties</u>.
(a)  Except as specified in Section 10.1(b) hereof, all representations and warranties of Seller

-48-

ITA-Herford-003460

REDACTED DOCUMENT

included or provided for herein or in any schedule or in any certificate or other document delivered pursuant to this Agreement shall survive for a period of one year after the Closing Date and shall thereafter expire except with respect to breaches and violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

(b)  The representations and warranties contained in Sections 5.1, 5.3. 5.4 and 5.13 of this Agreement shall survive the Closing Date until the expiration of the limitation period under the applicable statutes of limitations (or any extensions thereof) and thereafter shall expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.  The representations and warranties contained in Section 5.16 of this Agreement shall survive for a period of thirty (30) months after the Closing and shall thereafter expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

## ARTICLE 11

### INDEMNIFICATION

11.1.  <u>Indemnification of Buyer and its Affiliates</u>.  Subject to Section 11.4, Seller and Cyprus, jointly and severally, agree to defend, indemnify and hold harmless Buyer, its Affiliates and its successors and assigns (individually, a "<u>Buyer Indemnitee</u>", and collectively, the "<u>Buyer Indemnities</u>") against and in respect of:

(a)  any and all losses, claims, damages, liabilities, costs and expenses ("<u>Damages</u>") caused by, resulting or arising from or otherwise relating to (i) any failure by Cyprus or Seller to perform or otherwise fulfill or comply with any provision of this Agreement; (ii) any breach or violation ("<u>Breach</u>") of any representation or warranty of Cyprus or Seller hereunder, or (iii) any claim arising out of or relating to the operation of the businesses of any of the Companies or either of the European Companies prior to the Closing as to which Buyer has given written notice to Seller within one year of the Closing Date;

-49-

ITA-Herford-003461

REDACTED DOCUMENT

(b)  any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.2.   Indemnification of Seller and Its Affiliates.  Subject to Section 11.4, Buyer agrees to defend, indemnify and hold harmless Seller and Seller's Affiliates, and their respective successors and assigns (individually, a "Seller Indemnitee", and collectively, the "Seller Indemnities") against and in respect of:

(a)  any and all Damages caused by, resulting or arising from or otherwise relating to (i) any failure by Buyer to perform or otherwise fulfill or comply with any provision of this Agreement, or (ii) any Breach of any representation or warranty of Buyer hereunder;

(b)  any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.3.   (a)  Environmental Indemnification. Subject to Section 11.3(c), and except to the extent disclosed in Schedule 11.3 or to the extent Dr. Graham B. Lawson, J. Stevenson, Richard Gaunt or John Paulson has actual knowledge on the date hereof of a matter that would give rise to a valid claim under (ii), (iii) or (iv) below, with respect to any written claim, specifying in reasonable detail to the extent known, made by Buyer within thirty (30) months of the Closing Date, Seller and Cyprus shall jointly and severally indemnify and hold Buyer Indemnitee harmless from and against any and all damages, losses, liabilities, actions, claims, costs and expenses (including, without limitation, removal costs, remediation costs, fines, penalties, expenses of investigation and ongoing monitoring, and reasonable attorney's fees) ("Losses") directly or indirectly based upon, arising out of, resulting from or relating to (i) any action taken by Seller with respect to the Hamm Underground Mine Property or any liability under Environmental Law relating to a present condition at the Hamm Underground Mine Property, (ii) any violation of any Environmental Law by the Companies or their predecessors or any of its employees, representatives, agents or any other person or entity acting on behalf of the Companies prior to the Closing (including, without limitation, any failure to obtain or comply with any permit, license or other approval or authorization under the provisions of any Environmental Law), (iii) any and all liabilities under any Environmental Law arising on or prior to the Closing out of or otherwise in respect of any act, omission, event, condition or

-50-

ITA-Herford-003462

REDACTED DOCUMENT

circumstance occurring or existing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing (including, without limitation, liabilities relating to investigation, removal, remediation, containment, cleanup or abatement of the presence, Release or threatened Release of any Hazardous Substance, whether on-site or off-site) and (iv) any and all expenditures required to be incurred by the Companies (x) to enable them to operate in compliance with all applicable Environmental Laws and (y) to repair and restore all damage to any building, land or property of the Companies arising out of or relating to the removal, remediation, cleanup or abatement of the presence of any Hazardous Substance in violation of any Environmental Law existing on or prior to the Closing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing; provided, however, that Seller shall not have any liability pursuant to this Section 11.3(a) for claims brought by private individuals where there is no violation or liability under any Environmental Law.  The indemnity provided in this Section 11.3 shall be without regard to any purported availability of insurance.

(b)  If any governmental authority (whether federal, foreign, state or local) or if any Environmental Law shall require Buyer or any Company to effect or take any removal, remedial, corrective or similar actions ("Remedial Action"), or if any third party makes any other claim which is to be the basis for a claim for indemnification under Section 11.3 ("Other Environmental Claim"), then Buyer shall prior to taking any Remedial Action or having discussions with or reporting to the governmental authority (except in situations requiring immediate action under the applicable Environmental Law or emergency situations to preserve life or property) give prompt written notice to Seller of the required Remedial Action or the Other Environmental Claim. Seller, at its option, by notice to Buyer given within thirty (30) days of Buyer's notice to Seller of the Remedial Action or Other Environmental Claim (or such shorter periods specified in Buyer's notice if the ordering governmental agency requires that action be taken more promptly than such thirty (30) day notice period would allow, or if Buyer reasonably determines that the existing condition which is the subject of the Remedial Action or Other Environmental Claim requires that action be taken more promptly than such thirty (30) day period would allow) shall (i) assume control of and effect such Remedial Action or defend such Other Environmental Claim at its cost and expense, or (ii) permit Buyer to control and effect such Remedial Action or defend such Other Environmental Claim at Seller's cost and expense. Any and all costs and expenses incurred or paid by Seller or

-51-

ITA-Herford-003463

REDACTED DOCUMENT

by Buyer on Seller's account hereunder shall be considered within the term Losses and be subject to the limitations set forth in Section 11.3(c).  Buyer and Seller shall cooperate with each other and shall have a right to participate in discussions with applicable government authorities in effecting any Remedial Action with a view toward promptly completing any Remedial Action, minimizing the disruptive effect of any Remedial Action on the conduct of the businesses of the Companies, avoiding the incurrence of additional environmental liabilities with respect to the existing condition as to which the Remedial Action is taken and performing any Remedial Action at the lowest reasonable cost.  All Remedial Action performed by Buyer shall be performed at the lowest reasonable cost, taking into consideration the matters set forth in the preceding sentence, and subject to audit by Seller.  Costs in excess of such lowest reasonable cost shall be for Buyer's account. Seller may not settle or compromise any claim by any governmental authorities relating to a Remedial Action or Other Environmental Claim, without Buyer's prior written consent (which consent may not be unreasonably withheld). Buyer may not settle or compromise any claim by any governmental authorities relating to a Remedial Action or Other Environmental Claim, without Seller's prior written consent (which consent may not be unreasonably withheld). If Seller elects to assume control of a Remedial Action, Buyer shall provide Seller reasonable access to the relevant properties to allow Seller to complete such Remedial Action. Buyer shall, at Seller's expense, provide reasonable access to the properties of the Companies, to the extent reasonably required by Seller in order for Seller to take Remedial Action with respect to the Hamm Underground Mine Property, provided that such access shall not have any disruptive effect on the businesses of the Companies or expose the Companies to any potential material liability.

        (c)  With respect to the operating sites of the Companies set forth on Schedule 11.3A, Seller's liability for Losses pursuant to Section 11.3(a) shall not include any liability for closure costs or reclamation costs, and shall not in the aggregate exceed an amount equal to the Purchase Price; provided, however, that no claim for any single item may be made under this Section 11.3, unless and until the amount of such claim exceeds ██████ in which case Seller and Cyprus shall be liable for the whole amount of such claim.  With respect to the sites of the Companies not set forth on Schedule 11.3A, Seller's liability for Losses pursuant to Section 11.3(a) shall include all liabilities for closure and reclamation costs, and shall not be limited to any amount; provided, however, that no claim for any single item may be made under this Section 11.3 unless and until the amount of such claim exceeds ███████, in which

-52-

ITA-Herford-003464

REDACTED DOCUMENT

case Seller and Cyprus shall be liable for the whole amount of such claim; _provided_, _further_, _however_, that if the cost of any Remedial Action on such property is clearly shown, by Seller to the reasonable satisfaction of Buyer, to be in excess of its fair market value, Seller shall instead of taking such Remedial Action have the option to reacquire such property from Buyer for one dollar and shall be solely liable for any costs associated with such property.

11.4.   <u>Limitations on Indemnifications.</u>  The provisions for indemnity under Sections 11.1(a)(i),(ii) and (b) and 11.2 shall be effective only when the aggregate amount of all claims for which Seller or Buyer is liable under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, exceeds ▇▇▇▇▇, in which case such party shall be liable for all such amounts; _provided_, _however_, that in no event shall either Buyer or Seller be liable for more than an amount in the aggregate equal to ▇▇▇▇▇ for all claims made against it under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively; _provided_, _further_, _however_, that no claim for any single item may be made, nor shall Seller or Buyer be liable, under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, if the amount of such claim is less than ▇▇▇▇▇ provided, further, however, that no claim may be made for indemnity to the extent the Indemnitee can reasonably, and does actually recover pursuant to an existing business interruption insurance.

11.5.   <u>Claims</u>.  Any claim for indemnity under Section 11.1 or 11.2 hereof shall be made by written notice from the Indemnitee to the Indemnifying Party specifying in reasonable detail the basis of the claim.  Except as otherwise provided herein, when an Indemnitee seeking indemnification under Section 11.1 or 11.2 receives notice of any claims made by third parties ("Third Party Claims") which is to be the basis for a claim for indemnification hereunder, the Indemnitee shall give prompt written notice thereof to the Indemnifying Party reasonably indicating (to the extent known) the nature of such claims and the basis thereof.  Upon notice from the Indemnitee, the Indemnifying Party may, but shall not be required to, assume the defense of any such Third Party Claims, including its compromise or settlement, and the Indemnifying Party shall pay all reasonable costs and expenses thereof and shall be fully responsible for the outcome thereof; _provided_, _however_, that in such case, the Indemnifying Party shall have no obligation to pay any further costs or expense of legal counsel of the Indemnitee in connection with such defense and, _provided_, _further_, that the Indemnifying Person may not settle or compromise any Third Party Claims without the Indemnitee's prior written consent (which consent shall not be unreasonably withheld).  The Indemnifying Party shall

-53-

ITA-Herford-003465

REDACTED DOCUMENT

give notice to the Indemnitee as to its intention to assume the defense of any such Third Party Claims within twenty (20) business days after the date of receipt of the Indemnitee's notice in respect of such Third Party Claims. If an Indemnifying Party does not, within twenty (20) business days after the Indemnitee's notice is given, give notice to the Indemnitee of its assumption of the defense of the Third Party Claims, the Indemnifying Party shall be deemed to have waived its rights to control the defense thereof. If the Indemnitee assumes the defense of any Third Party Claims because of the failure of the Indemnifying Party to do so in accordance with this Section 11.4, the Indemnifying Party shall pay all reasonable costs and expenses of such defense and shall be fully responsible for the outcome thereof. The Indemnifying Party shall have no liability with respect to any compromise or settlement thereof effected without its prior written consent (which consent shall not be unreasonably withheld).

11.6.   Survival.  Notwithstanding anything in this Agreement to the contrary, this Article 11 shall survive termination of this Agreement without limitation.


ARTICLE 12

MISCELLANEOUS

12.1.   Further Assurances.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Buyer as Buyer shall reasonably request in order to vest more effectively in Buyer good title to the Shares or otherwise consummate more effectively the transactions contemplated by this Agreement, and from time to time after the Closing, Buyer will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement.

12.2.   Expenses.  Each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby. Seller shall pay all expenses, including, without limitation, all taxes, duties and registration fees, incurred by it or the Companies in connection with the restructuring of the talc business of Seller and its

-54-

REDACTED DOCUMENT

Affiliates, including, without limitation, those relating to the creation of Newco.

12.3.  <u>Applicable Law</u>.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York without reference to choice of law principles, including all matters of construction, validity and performance.

12.4.  <u>Notices</u>.  All notices, requests, permissions, waivers, and other communications hereunder shall be in writing and shall be deemed to have been duly given if signed by the respective persons giving them (in the case of any corporation the signature shall be by an officer thereof) and delivered by hand, or by United States mail (registered, return receipt requested), properly addressed and postage prepaid:

If to Seller, to:

Cyprus Mines Corporation
9100 Mineral Circle
P.O. Box 3299
Englewood, Colorado 80155

Attention:  President

with a copy to:

Cyprus Mines Corporation
9100 Mineral Circle
P.O. Box 3299
Englewood, Colorado 80155

Attention:  General Counsel

If to Buyer, to:

RTZ America, Inc.,
150 East 58th Street
New York, New York  10155

Attention: President

with copies to:

Borax Consolidated Limited
Borax House
Carlisle Place
London
SW1P 1HT

-55-

ITA-Herford-003467

REDACTED DOCUMENT

Attention:  Mr. F. Alan S. Lesser

RTZ Corporation PLC
6 St. James's Square
London SW1Y 4LD

Attention:  Charles H.H. Lawton Esq.

Sullivan & Cromwell
St Olave's House
9a Ironmonger Lane
London EC2V 8EY

Attention:  David M. Kies, Esq.

Such names and addresses may be changed by such notice.

12.5.  <u>Entire Agreement</u>.  This Agreement
(including the Schedules attached thereto, all of which are
a part hereof) and the Confidentiality Agreement contains
the entire understanding of the parties hereto with respect
to the subject matter contained herein, supersedes and
cancels all prior agreements, negotiations, correspondence,
undertakings and communications of the parties, oral or
written, respecting such subject matter.

12.6.  <u>Amendments</u>.  This Agreement may be amended
only by a written instrument executed by the parties or
their respective successors or assigns.

12.7.  <u>Headings; References</u>.  The article, section
and paragraph headings and table of contents contained in
this Agreement are for reference purposes only and shall not
affect in any way the meaning or interpretation of this
Agreement.  All references herein to "Articles", "Sections",
or "Schedules" shall be deemed to be references to Articles
or Sections hereof and Schedules hereto unless otherwise
indicated.

12.8.  <u>Counterparts</u>.  This Agreement may be
executed in one or more counterparts and each counterpart
shall be deemed to be an original.

12.9.  <u>Parties in Interest; Assignment</u>.  This
Agreement shall inure to the benefit of and be binding upon
Seller and Buyer and their respective successors.  Nothing
in this Agreement, express or implied, is intended to confer
upon any Person not a party to this Agreement any rights or
remedies under or by reason of this Agreement.  No party to
this Agreement may assign or delegate all or any portion of
its rights, obligations or liabilities under this Agreement
without the prior written consent of the other party to this

-56-

ITA-Herford-003468

REDACTED DOCUMENT

Agreement; _provided_, _however_, that Seller shall have the right to assign or delegate any portion of its rights, obligations or liabilities hereunder to any Affiliate of Seller, so long as Seller and Cyprus shall remain fully liable for the fulfillment of all of its obligations and liabilities hereunder; and _provided_, _further_, that Buyer shall have the right to assign or delegate any or all of its rights, obligations or liabilities hereunder to any Affiliate of Buyer, so long as Buyer shall remain fully liable for the fulfillment of all of its obligations hereunder.

    12.10.  _Severability; Enforcement_.  The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder it too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

    12.11.  _Jurisdiction_.  Buyer, Seller and Cyprus hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, The City of New York, for any actions, suits, or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and Buyer, Seller and Cyprus agree not to commence any action, suit or proceeding relating thereto except in such courts), and further agree that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process of any action, suit or proceeding brought against it in any such court.  Buyer, Seller and Cyprus hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such state or federal courts as aforesaid and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

    12.12.  _Waiver_.  Any of the conditions to Closing set forth in this Agreement may be waived at any time prior to or at the Closing hereunder by the party entitled to the benefit thereof.  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be waiver of any such provision, nor in any way to affect the validity of this Agreement or any

-57-

ITA-Herford-003469

REDACTED DOCUMENT

part hereof or the right of such party thereafter to enforce each and every such provisions.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach of non-compliance.

12.13.  <u>Interest</u>.  If any party to this Agreement defaults in the payment when due of any sum payable under this Agreement (whether determined by agreement or pursuant to an order of a court or otherwise), the liability of such party shall be increased to include interest on such sum from the date when such payment shall be due until the date of actual payment at a rate per annum (but not in excess of the maximum lawful rate) of three percent above the rate for three-month deposits in the London interbank market in the currency of payment, as announced by Citibank N.A. as of 11:00 A.M., London time, on the date when such payment shall be due.

ITA-Herford-003470

REDACTED DOCUMENT

IN WITNESS WHEREOF, the parties hereto have duly
executed this Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By _____

Name:
Title: SENIOR VICE PRESIDENT

CYPRUS MINERALS COMPANY

By _____

Name:
Title: SENIOR VICE PRESIDENT
AND CHIEF FINANCIAL OFFICER

RTZ AMERICA INC.

By _____

Name: Arthur L Glass
Title: President

-59-

ITA-Herford-003471

REDACTED DOCUMENT

AMENDMENT TO

STOCK PURCHASE AGREEMENT

AMONG

CYPRUS MINES CORPORATION

CYPRUS MINERALS COMPANY

and

RTZ AMERICA INC.

Dated as of June 24, 1992

ITA-Herford-003472

REDACTED DOCUMENT

AMENDMENT DATED AS OF JUNE 24, 1992, TO STOCK PURCHASE AGREEMENT DATED JUNE 5, 1992, by and among Cyprus Mines Corporation, a Delaware corporation ("<u>Seller</u>"), Cyprus Minerals Company, a Delaware corporation ("<u>Cyprus</u>") and RTZ America Inc., a Delaware corporation ("<u>Buyer</u>").

W I T N E S S E T H:

WHEREAS, on June 5, 1992 the parties entered into a Stock Purchase Agreement ("Agreement");

WHEREAS, the parties desire to make certain conforming changes to the Agreement to confirm the intent of the parties;

NOW, THEREFORE, in consideration of the mutual agreements contained herein and in the Agreement, Buyer, Seller and Cyprus hereby agree as follows:

1. The Agreement is hereby amended to insert and delete specified words and phrases as follows:

a. On page 7, Section 3.1, at the end of the section insert "The Closing shall be effective as of the close of business on the Closing Date.";

b. On page 8, Section 3.3(c), line 1, insert "or Cyprus" after "Seller";

c. On page 8, Section 3.3(c), line 9, insert "or Cyprus" after "Seller";

d. On page 26, Section 5.28, line 2, insert "or Cyprus" after "Seller";

e. On page 48, Section 10.1(a), line 2, insert "and Cyprus" after "Seller";

f. On page 49, Section 11.1(a), line 8, insert "third party" after "any";

g. On page 49, Section 11.1(a), line 12, insert "excluding, however, any such third party claim (x) for which a Buyer Indemnitee would be entitled to indemnification pursuant to Sections 11.1(a)(i), (ii) or (b), in each case disregarding the limitations set forth in Section 11.4, (y) regarding any environmental matter covered in Section 11.3, disregarding the limitations set forth in Section 11.3, or (z) for which Buyer is responsible under Section 7.4" after "Date";

- 1 -

ITA-Herford-003473

REDACTED DOCUMENT

h.   On page 51, Section 11.3(a), line 6 from end of paragraph, insert "neither Cyprus nor" prior to "Seller" and delete "not" prior to "have";

i.   On page 54, Section 11.6, line 3, insert "as to time" after "limitation";

j.   On page 55, Section 12.4, line 9, insert "or Cyprus" after "Seller"; and

k.   On page 56, Section 12.9, line 3, insert ", Cyprus" after "Seller".

   2.   Section 11.3(c) of the Agreement is hereby amended to delete the existing Section 11.3(c) and insert in lieu thereof the following:

   "   11.3.   (c)  With respect to the operating sites of the Companies set forth on Schedule 11.3A, Seller and Cyprus' liability for Losses pursuant to Section 11.3(a) shall not include any liability for closure costs or reclamation costs, and collectively shall not in the aggregate exceed an amount equal to the Purchase Price; provided, however, that no claim for any single item may be made under this Section 11.3, unless and until the amount of such claim exceeds ▇▇▇▇ in which case Seller and Cyprus shall be liable for the whole amount of such claim subject to the aggregate limit stated above.  With respect to the sites of the Companies not set forth on Schedule 11.3A, Seller and Cyprus' liability for Losses pursuant to Section 11.3(a) shall include all liabilities for closure and reclamation costs, and shall not be limited to any amount; provided, however, that no claim for any single item may be made under this Section 11.3 unless and until the amount of such claim exceeds ▇▇▇▇, in which case Seller and Cyprus shall be liable for the whole amount of such claim; provided, further, however, that if the cost of any Remedial Action on such property is clearly shown, by Seller or Cyprus to the reasonable satisfaction of Buyer, to be in excess of its fair market value, Seller or Cyprus shall instead of taking such Remedial Action have the option to reacquire such property from Buyer for one dollar and shall be solely liable for any costs associated with such property."

   3.   Section 11.4 of the Agreement is hereby amended to delete the existing Section 11.4 and insert in lieu thereof the following:

   "   11.4.   Limitations on Indemnifications.  The provisions for indemnity under Sections 11.1(a)(i),

- 2 -

ITA-Herford-003474

REDACTED DOCUMENT

(ii) and (b) and 11.2 shall be effective only when the aggregate amount of all claims for which Seller and Cyprus, on the one hand, or Buyer, on the other hand, is liable under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, exceeds ▇▇▇▇▇▇, in which case such Indemnifying Party or Parties shall be liable for all such amounts; provided, however, that in no event shall either Buyer, on the one hand, or Seller and Cyprus collectively, on the other hand, be liable for more than an amount in the aggregate equal to ▇▇▇▇▇▇ for all claims made against it or them under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively; provided, further, however, that no claim for any single item may be made, nor shall Seller and Cyprus, on the one hand, nor Buyer, on the other hand, be liable, under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, if the amount of such claim is less than ▇▇▇▇▇ provided, further, however, that no claim may be made for indemnity to the extent the Indemnitee can reasonably, and does actually recover pursuant to an existing business interruption insurance. Notwithstanding other provisions of this Section 11.4, the limitations set forth in this Section 11.4 do not apply to any claims by Buyer Indemnitees against Seller or Cyprus for any liabilities or obligations (including costs and expenses associated therewith) arising out of any litigation or claims listed on Schedule 5.9."

4.    Typographical errors in the Agreement are hereby corrected by amendment as follows:

a.    On page 7, Section 3.1, line 5, "7 and 8" is corrected to read "8 and 9";

b.    On page 7, Section 3.1, line 8, "7 and 8" is corrected to read "8 and 9";

c.    On page 7, Section 3.1, line 9, "Section 7.6 and 8.6" is corrected to read "Sections 8.6 and 9.6";

d.    On page 9, Section 3.4, line 6, "(e)" is corrected to read "(d)";

e.    On page 15, lines 4-5, "Material Adverse Effect" is corrected to read "material adverse effect";

f.    On page 34, Subsection (iv), line 5, "Afl-CIO" is corrected to read "AFL-CIO";

g.    On page 35, Subsection (f), line 16, "Sellers" is corrected to read "Seller";

- 3 -

ITA-Herford-003475

REDACTED DOCUMENT

h.   On page 35, Subsection (h), line 6, "6.4" is corrected to read "7.4";

i.   On page 35, Subsection (h), line 7, "Indemnities" is corrected to read "Indemnitees";

j.   On page 35, Subsection (h), line 10, "6.4" is corrected to read "7.4";

k.   On page 35, Subsection (h), line 11, "6.4" is corrected to read "7.4";

l.   On page 36, line 1, "Indemnities" is corrected to read "Indemnitees";

m.   On page 37, Section 7.5(B)(iv), line 3, "treated or" is corrected to read "treated as";

n.   On page 48, Section 9.7, line 3, "dates" is corrected to read "dated";

o.   On page 49, Section 11.1, line 6, "Indemnities" is corrected to read "Indemnitees";

p.   On page 50, Section 11.2, line 6, "Indemnities" is corrected to read "Indemnitees";

q.   On page 54, line 12, "11.4" is corrected to read "11.5"; and

r.   On page 58, line 4, "breach of" is corrected to read "breach or".

     5.   The parties hereby recognize, acknowledge and agree to the execution of a conforming amendment of even date to the Agreement of Transfer and Assumption dated June 5, 1992 between Seller and Newco.

- 4 -

ITA-Herford-003476

REDACTED DOCUMENT

     6.   This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

     IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment to the Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By: _____

     Name: P. C. Wolf
     Title: President

CYPRUS MINERALS CORPORATION

By: _____

     Name: G. J. Malys
     Title: Senior Vice President

RTZ AMERICA INC.

By: _____

     Name:
     Title:

- 5 -

ITA-Herford-003477

REDACTED DOCUMENT

JUN 24 '92  11:16AM CYPRUS MINERALS 303 643 5943          CYPRUS MINERALS      P.10/10

     6.  This Amendment MAY be executed in one or more counterparts and each counterpart shall be deemed to be an original.

     IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment to the Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By:_____
    Name:
    Title:

CYPRUS MINERALS CORPORATION

By:_____
    Name:
    Title:

RTZ AMERICA INC.

By:_____
    Name: Arthur L Glass
    Title: President

- 5 -

ITA-Herford-003478