Exhibit 176

IN THE COURT OF COMMON PLEAS

SUMMIT COUNTY, OHIO

PAUL ANDONIAN, et al.,               :      CASE NO. ACV 88-6-1731

            Plaintiff,               :      JUDGE VICTOR

vs.                                  :

A.C. & S., INC., et al.              :           **AFFIDAVIT**

            Defendants.              :


        ROGER N. MILLER, being duly sworn, according to law, upon his oath, deposes and says:

        1.   I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

        2.   The exclusive business of Windsor Minerals, Inc. is and has been the mining and milling of talc from a single mining district in Windsor, Vermont. In addition, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users for manufacturing purposes. Windsor Minerals, Inc. never sold any of its product to distributors or agents for resale.

EXHIBIT
J&J-282

3.     Windsor Minerals, Inc. has never sold any of its product to the General Tire and Rubber Company in Akron, Ohio, or any other tire manufacturing facility or rubber company.

4.     All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. No evidence of the presence of asbestos in Windsor Mineral, Inc.'s product has ever been revealed by this testing.

ROGER N. MILLER

Sworn to and subscribed
before me this _8th_
day of July, 1988.

Notary Public

JNJ-WIL_00000095

Exhibit 177

# CAHILL GORDON & REINDEL

## EIGHTY PINE STREET

### NEW YORK, N.Y. 10005

FLOYD ABRAMS
ROBERT A. ALESSI
ROGER ANDRUS
MICHAEL A. BECKER
SUSAN BUCKLEY
KEVIN J. BURKE
P. KEVIN CASTEL
JAMES J. CLARK
WALTER C. CLIFF, P.C.
BENJAMIN J. COHEN
JOSEPH P. CONWAY
MARSHALL COX
THOMAS F. CURNIN
W. LESLIE DUFFY
PATRICIA FARREN
BART FRIEDMAN
CIRO A. GAMBONI
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
THOMAS R. JONES
ALLEN S. JOSLYN
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
'MANUEL KOHN
WARD P. KRUGMAN
ILLIAM T. LIFLAND
MICHAEL MACRIS
JONATHAN I. MARK

RAND McQUINN*
GERARD M. MEISTRELL
ROGER MELTZER
CLIFFORD L. MICHEL
JOHN P. MITCHELL
MATHIAS E. MONE
DONALO J. MULVIHILL
KENNETH W. ORCE
ROY L. REGOZIN
RICHARD L. REINHOLD
DEAN RINGEL
THORN ROSENTHAL
RICHARD J. SABELLA
H. RICHARD SCHUMACHER
JOHN SCHUSTER
LAURENCE A. SILVERMAN
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
GERALD S. TANENBAUM
JONATHAN D. THIER
MICHAEL P. TIERNEY
ROBERT USADI
JOHN R. VAUGHAN
GEORGE WAILAND
GLENN J. WALDRIP, JR.
GARY W. WOLF
JOHN R. YOUNG
DANIEL J. ZUBKOFF

August 4, 1992

DAVID R. HYDE
DENIS McINERNEY, P.C.
IRWIN SCHNEIDERMAN
RALPH O. WINGER
SENIOR COUNSEL

CORYDON B. DUNHAM
SAMUEL ESTREICHER
PHILIP A. HEIMOWITZ
MICHAEL S. SACKHEIM
JEFFREY E. SHAPIRO
JOHN J. STANTON, JR.
COUNSEL

FREDDY DRESSEN**
EUROPEAN COUNSEL

WASHINGTON, D.C. OFFICE
1990 K STREET, N.W.
WASHINGTON, D.C. 20006

EUROPEAN OFFICE
19 RUE FRANÇOIS 1er
75008 PARIS, FRANCE

TELEX / CABLE
RCA 232184   WUT 127068
CAGO UR   COTTOFRANK NYK
FACSIMILE 212-269-5420

*ADMITTED D.C. ONLY
**ADMITTED FRANCE ONLY

TELEPHONE 212-701-3000
WRITER'S DIRECT NUMBER
(212) 701-3321

Re:   Akron Tireworker Litigation

Dear Russ and Brian:

        We recently learned that your firm voluntarily dis-
missed Windsor Minerals, Inc. from the Akron cases some time ago
after reviewing an affidavit supplied by Windsor.  Our client,
Eastern Magnesia Talc, bought precisely the same mining opera-
tions from Windsor in 1967 and operated them until 1983.  The
Windsor affidavit attests to the fact that "all of the talc
mined by Windsor Minerals, Inc. has been regularly sampled and
tested for the presence of asbestos.  No evidence of the pres-
ence of asbestos in Windsor Minerals, Inc.'s product has ever
been revealed by this testing".  (Copies of the affidavit and
dismissal stipulations are enclosed).

        In light of your dismissal of the predecessor owner
and operator of these mining operations, Windsor, we urge you to
voluntarily dismiss EMTal from the remaining Akron cases on the
same basis.  As I have indicated to you in the past, similar

BASF_WILLIAMS000105111

CAHILL GORDON & REINDEL

-2-

orders have been signed by plaintiffs' counsel in numerous
jurisdictions around the country after concluding that there was
no asbestos in the EMTal product.

Very truly yours,

Howard G. Sloane

A. Russell Smith, Esq.
Brian R. Nace, Esq.
Laybourne, Smith, Gore
  & Goldsmith
503 Society Building
159 South Main Street
Akron, Ohio 44308-1317

BASF_WILLIAMS000105112

IN THE COURT OF COMMON PLEAS

SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| FAYE MILLER, Individually | : | CASE NO. ACV884-1087 |
| and as Administratrix of the | | |
| Estate of ROBERT R. MILLER, | : | JUDGE CARROLL |
| Deceased, 3026 Lake James | | |
| Terrace, Akron, Ohio 44312 | : | |
| | | |
| Plaintiff, | : | |
| | | |
| vs. | : | AFFIDAVIT |
| A.C. & S., INC., et al. | : | |
| | | |
| Defendants. | : | |

ROGER N. MILLER, being duly sworn, according to law, upon his oath, deposes and says:

1.  I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

2.  The exclusive business of Windsor Minerals, Inc. is and has been the mining and milling of talc from a single mining district in Windsor, Vermont. In addition, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users for manufacturing purposes. Windsor Minerals, Inc. never sold any of its product to distributors or agents for resale.

BASF_WILLIAMS000105113

3.  : Windsor Minerals, Inc. has never sold any of its product to the General Tire and Rubber Company in Akron, Ohio, or any other tire manufacturing facility or rubber company.

4.    All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos.  No evidence of the presence of asbestos in Windsor Mineral, Inc.'s product has ever been revealed by this testing.

ROGER N. MILLER

Sworn to and subscribed
before me this 𝟙𝟙𝓉𝒽
day of July, 1988.

Notary Public

BASF_WILLIAMS000105114

Exhibit 178

## AFFIDAVIT

STATE OF NEW JERSEY)
　　　　　　　　　　: SS.:
COUNTY OF SOMERSET )

　　　　　WILLIAM H. ASHTON, being duly sworn, deposes and says:

　　　　　1.　For thirty-five years, I was actively involved in investigating and studying the domestic and international talc industry and talc technology while employed by Johnson & Johnson.  In the course of this work, I examined talc deposits in the United States and throughout the world.  I graduated from the University of Pennsylvania in 1940 with a Bachelor of Science degree.  My major field of study was chemistry; my minor fields of study were geology and mineralogy.  I did graduate work at Louisiana State University and also received training in talc minerals at the Battelle Memorial Institute in Columbus, Ohio, which included consultations with the Geology Department of Ohio State University.  I have been retired since 1984, but have remained an active member of various talc and mineral committees of the American Society for Testing and Materials and the International Standards Organization.

-2-

2.    From the 1940s through the 1980s, talc mined in Vermont and specifically, the talc mined by Engelhard Corporation (and its predecessors) from the talc mine located in Johnson, Vermont (the "Johnson mine") has been considered to be talc free from contamination by asbestos.  This conclusion is the result of numerous investigations, examinations and studies of the Johnson mine.  The following paragraphs discuss, in chronological order, these studies and investigations.

3.    In 1949, Warren L. Hogue, Jr. and Frederick S. Mallette published a scientific paper entitled "A Study of Workers Exposed to Talc and Other Dusting Compounds in the Rubber Industry" (a copy of which is annexed hereto as Exhibit A). The authors studied workers in two rubber plants who had been exposed to talc and other dusting compounds for periods as long as 36 years.  The authors noted that "[t]he dusting compound used in the tube operations and in rerolling liners is a pure talc from a deposit near Johnson, Vermont, and contains no free silica, tremolite, chrysolite, chrysotile, or actinolite." (Exhibit A at 360)  The authors identified the talc discussed in their study as being produced by Eastern Magnesia Talc Company (Exhibit A at 363-64), a predecessor of the Engelhard

-3-

subsidiary of the same name which produced talc from the
Johnson mine.[1]

4.    In March 1951, the U.S. Geological Survey pub-
lished a report written by Dr. Alfred H. Chidester (and two co-
authors), entitled "Talc Investigation in Vermont, Preliminary
Report" (relevant portions of which are annexed hereto as
Exhibit B).  Dr. Chidester was employed for 39 years by the
U.S. Geological Survey, a unit of the U.S. Department of the
Interior.  For a period of about 18 years, from 1944 through
1962, he was primarily concerned with the talc deposits of Ver-
mont and northern Massachusetts.  (From 1963 to 1971, while
still employed by the Geological Survey, he was primarily
involved with the United States lunar exploration program and
training astronauts in field geology.)  Dr. Chidester has an
extremely prestigious reputation for his studies of the geology
of talc deposits in the United States.  In this 1951 report,
Dr. Chidester stated:

-----------------------------

[1]    The Hogue and Mallette study concluded that "[p]hysical
      examinations and chest roentgenograms of a group of 20 men
      exposed to talc dust (hydrous magnesium silicate) for
      periods ranging from 10 to 36 years in rubber inner tube
      production were normal for men of their age group and
      urban industrial environment" and "[t]he findings of the
      present study indicate that long exposure to talc does not
      appear to produce pathologic changes in the lungs."
      (Exhibit A at 364)

-4-

> "All the commercial talc deposits in Vermont are
> associated with the verde antique type of ultra-
> mafic body, whereas none is known to occur in
> ultramafic bodies that are only partly serpentin-
> ized.  On the other hand, cross-fiber asbestos
> appears to occur in appreciable quantities only in
> ultramafic bodies that contain unaltered dunite or
> peridolite, and is extremely rare or absent in the
> verde antique type." (Exhibit B at 4)

Stating this another way, Dr. Chidester wrote:  "no commercial
talc deposits are known to be associated" with a certain type
of rock formation in Vermont which "commonly contains more or
less chrysotile asbestos. . . ." (Exhibit B at 1)

          5.    In a 1962 Geological Survey Professional Paper,
entitled "Petrology and Geochemistry of Selected Talc-Bearing
Ultramafic Rocks and Adjacent Country Rocks in North-Central
Vermont" (relevant portions of which are annexed hereto as
Exhibit C), Dr. Chidester analyzed talc samples from a number
of different mines in Vermont.  He used the Johnson mine as a
standard for the chemical analysis of pure talc.  He noted that
a sample "from the Johnson talc mine, Johnson, Vt., is included
because specimens for chemical analysis of the pure mineral
were not obtainable from the Mad River and Barnes Hill locali-
ties, and the specimen from the Johnson mine represents talc
from the steatite zone of a purity not obtainable at the other
deposits." (Exhibit C at 79)

-5-

6.    A scientific paper by Maryanne G. Boundy, Karen
Gold, Kenneth P. Martin, Jr., William A. Burgess and John M.
Dement, entitled "Occupational Exposures to Non-Asbestiform
Talc in Vermont" (a copy of which is annexed hereto as
Exhibit D) reported on an environmental study of three Vermont
talc companies, including Eastern Magnesia Talc and its Johnson
mine, during the summer of 1975 and the winter of 1976.  This
study, under the auspices of the Department of Environmental
Health Sciences, Harvard School of Public Health, Boston, Mas-
sachusetts, tested bulk samples of ore dust for their mineral
constituents.  The purpose of this study, as stated in the
introduction to the paper, was to verify "geological studies
dating from the early 1900's [that] have shown that the Vermont
talc deposits contain no asbestos and little quartz. . . ."
(Exhibit D at 1)  In reporting the results of the study, the
paper stated that "petrographic microscopy analysis, analytical
transmission electron microscopy, and x-ray diffraction with
step-scanning revealed no asbestos in the bulk samples" from
the three Vermont talc companies.  (Exhibit D at 377)

7.    In September and October 1982, an independent
testing laboratory, EMV Associates, then located in Rockville,
Maryland, analyzed two talc samples taken from the Johnson mine
by two different investigators in the 1961 time frame.  (One

-6-

sample had been taken by Dr. Chidester during the research
incorporated in his 1962 Geological Survey Paper; I took the
other sample during a May, 1961 visit to the Johnson mine.)
These samples had not been modified or adulterated in any way
prior to their 1982 analysis. (Dr. Chidester's talc sample had
been maintained by the National Museum of Natural History,
Smithsonian Institute in Washington, D.C.) The reports of the
analysis of these two samples, dated September 24, 1982 and
October 18, 1982 (copies of which are annexed hereto as
Exhibits E and F), stated that no asbestos was detected and
"prismatic and blocky forms of tremolite were not detected."
The reports indicated that the talc samples were examined for
freedom from asbestos by "scanning electron microscopy and
energy dispersive spectroscopy (SEM/EDS)" and were examined at
various magnifications from 1000x to 10,000x.  Each of the
reports includes a "Certificate of Microanalysis for Asbestos"
which contains a Sample Description, Method of Analysis and
"Results:  No asbestos detected."  The results of this analysis
were confirmed by a subsequent analysis performed on these sam-
ples by Professor F.W. Pooley of the University of Cardiff in
Wales, England.  Prof. Pooley is one of the foremost author-
ities in the world in the identification of asbestos and other
hazardous minerals in the respiratory tracts of individuals.

-7-

In a December 22, 1982 report, Prof. Pooley noted that the samples were examined by x-ray diffraction analysis and by an analytical transmission electron microscope.  The conclusion of these examinations was that no fibrous mineral particles were detected in the samples.

       8.   In sworn testimony in 1983 (relevant portions of which are annexed as Exhibit G), Dr. Chidester stated that he had never found veins of chrysotile asbestos in talc located in Vermont.  He noted that chrysotile was a serpentine mineral found in serpentinite rock, but that, in the formation of talc in Vermont, all of the serpentine minerals are changed to talc. "So any asbestos that may have been there in the first place is altered to talc." (Exhibit G at 24)  Thus, in Vermont, talc and serpentinite are mutually exclusive.  Dr. Chidester testified that he had personally been at the talc mine in Johnson, Vermont and, based on his personal observations and testing, all of the serpentinite at the Johnson mine had been changed to talc and magnesite.  He never observed any asbestos at the

-8-

Johnson mine and never saw any asbestos in any of the samples that he took from the Johnson mine and subjected to microscopic analysis.

WILLIAM H. ASHTON

Sworn to before me this
8th day of May, 1989

Notary Public

MARGARET M. NAGY
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES AUG. 18, 1991

**EXHIBIT A**

PLT-04771-0010

# A STUDY OF WORKERS EXPOSED TO TALC AND OTHER DUSTING COMPOUNDS IN THE RUBBER INDUSTRY*

WARREN L. HOGUE, JR. AND FREDERICK S. MALLETTE

*Firestone Tire and Rubber Company, Akron, Ohio*

TALC and similar minerals are widely used in industry. In the Mineral Yearbook Johnston and Barsigian (1) report that in 1946 over 450,000 short tons of domestically produced talc, pyrophyllite, and ground soapstone were consumed, of which 77 per cent was utilized in five industries—paint, rubber, roofing, ceramics, and insecticides. The paint industry alone used 23 per cent of the total.

## CHEMICAL COMPOSITION

One should note that the above-mentioned report groups talc with materials of like commercial applications rather than with those of mineralogical or chemical similarity. Actually talc is a hydrous magnesium silicate with the formula $Mg_3Si_4O_{10}(OH)_2$. Other minerals which have similar uses are: pyrophyllite, a hydrous calcium magnesium silicate, $Ca_2Mg_5Si_8O(OH)_2$; serpentine, a hydrous magnesium silicate, $Mg_3Si_2O_7(OH)_2$; and dolomite, a calcium magnesium carbonate, $CaMg(CO_3)_2$. Tremolite, frequently found in nature with talc, has a fibrous variety which is used to some extent as asbestos (2). Soapstone is the granular to cryptocrystalline form of talc.

Apparently the physical characteristics of all these materials are so much alike that they may be used in almost identical applications and therefore are designated commercially as *talc*. Schulz and Williams (3) pointed out that "talc as used industrially generally refers to a substance which meets certain physical requirements rather than one which has a definite chemical composition." In an examination of 71 analyzed samples they found extreme variation in composition.

## PHYSIOLOGICAL EFFECTS

In general, most silicates of this kind were considered harmless until 1933 when Dreesen (4) studied conditions in tremolite mines and mills. He found dust exposures averaging as high as

1,440 million particles per cubic foot in pneumatic drilling operations and as low as 4 million outside the mill proper. He reported that "in only three cases (5%) were the X-ray findings within the limits of normal; 38 (67%) showed evidence of an early or first-stage pneumoconiosis." Only one case—that of an individual who had been in the tremolite mills for over 40 years—had fibrosis advanced beyond the first stage. Dreesen concluded that the resulting pneumoconiosis was not disabling.

In 1935 Dreesen and Dalla Valle (5) reported dust concentrations varying from 32 to 1,672 million particles per cubic foot in two Georgia mills. Among 66 workers examined, they found 8 having advanced pneumoconiosis with disability and 14 having roentgenographically demonstrated slight pneumoconiosis without disability. The dust was found, by analysis, to consist chiefly of soapstone, but it also contained 10 per cent tremolite. The authors stated that the dust of the Georgia mills appeared to be more injurious than that reported by Dreesen (4). However, the study made in Georgia showed much higher concentrations of the dust. Furthermore, quite a few of the miners had worked in hard rock, although only 6 out of 13 showed pneumoconiosis stage I.

Eason, Trice, and Carpenter (6) reported pulmonary fibrosis among miners and millers of pyrophyllite, characterized roentgenographically by massive tumor-like shadows bilaterally situated in the subapical region or by granular densities distributed throughout the lungs. Of 101 workers, 35 per cent of those with two or more years of exposure showed evidence of pathologic changes in the lungs. The pyrophyllite dust contained from 25 to 35 per cent quartz.

Porro, Patton, and Hobbs (7) found 15 cases of pneumoconiosis in two tremolite mines and mills in New York State. According to them, the composition and concentrations of the dust were the same as those reported by Dreesen (4), who had previously surveyed one of the plants. Nondisabling pulmonary fibrosis was found in almost

* Presented at the Annual Meeting of the American Industrial Hygiene Association, Detroit, Michigan, April 5–8, 1949.

PLT-04771-0011

Case 3:16-md-02738-MAS-RLS   Document 16137-10   Filed 12/22/20   Page 20 of 164 PageID: 129432

all of the workers examined. Of the 15 patients, 7 were known to have worked in other types of mining operations. Dyspnea was an almost universal complaint, and several patients had cyanosis and club fingers. In all of those tested with a spirometer, vital capacity was very low (35–52 per cent). In the 5 postmortem examinations asbestosis bodies were a fairly frequent finding in lesions of the lungs. This may not be puzzling when it is recalled that tremolite is characteristically fibrous.

Further studies in tremolite mines and mills of northern New York by Siegal, Smith, and Greenburg (8) disclosed 32 cases of advanced fibrosis in a group of 221. Dust counts in the mines varied from 6 to 5,000 million particles per cubic foot in milling. The talc was of the asbestine variety and was mingled with tremolite and anthophyllite. The fibrosis tended to be disabling and was frequently accompanied by dyspnea, cough, and fatigue.

Prompted by these reports and by proposals for the inclusion of a limit for talc among dust hazards in certain state codes (9, 10, 11) we made a study in two rubber plants where workers had been exposed to talc and other dusting compounds for periods as long as 36 years. Talc dusting experiments were made on laboratory animals, the results of which will be reported in a separate communication.

## DUSTING RUBBER

As rubber is naturally tacky, it must be coated with a lubricant to keep it from sticking together. Many materials are used, both in the wet and the dry state, for this purpose. Among them are talc, pyrophyllite, mica, clay, walnut shell dust, corn starch, whiting, et cetera. Operations employing these materials in the dry state tend to be very dusty. In recent years control ventilation has reduced the concentrations of the dusts, but there are still operations, especially of an intermittent or temporary nature, which it is difficult or impractical to control. In these operations dust respirators must be relied upon for protection.

For the past six years periodic dust surveys have been made of several processes in the manufacture of inner tubes and in the reclaiming of rubber. The occupations in which talc was the only dust to which workers were exposed were those of tuber operators, tube bookers, tube cure men, and liner rerolling. Those jobs in which the major exposure was to whiting and the minor to

talc (in the past, to pyrophyllite) were those of refiner operators, strainer operators, mill men, truckers, slab checkers, and shipping laborers. The results of the surveys have been averaged for the period 1943 to 1948 and are presented together with the number of years of total exposure of the various occupations, in tables 1 and 2. It must be emphasized that before the installation of control ventilation the dust concentrations were probably much higher.

### TABLE 1

AVERAGE DUST CONCENTRATION AND PERIOD OF EXPOSURE FOR WORKERS IN TALC

| WORKERS EXPOSED | YEARS OF EXPOSURE | MILLIONS OF PARTICLES/CU. FT. |
|---|---|---|
| 6 tube machine operators | 20–34 | 20 |
| 3 tube bookers | 32–36 | 35 |
| 10 tube cure men | 10–34 | 15 |
| 1 liner reroller | 14 | 50 |

### TABLE 2

AVERAGE DUST CONCENTRATION AND PERIOD OF EXPOSURE FOR WORKERS IN WHITING, PYROPHYLLITE, AND TALC

| WORKERS EXPOSED | YEARS OF EXPOSURE | MILLIONS OF PARTICLES/CU. FT. |
|---|---|---|
| 13 refiner operators | 13–25 | 50 |
| 3 strainer operators | 15–25 | 75 |
| 1 mill man | 24 | 50 |
| 1 trucker | 20 | 30 |
| 1 slab checker | 23 | 50 |
| 1 shipping laborer | 24 | 150 |

## DUST COMPOSITION

The dusting compound used in the tube operations and in rerolling liners is a pure talc from a deposit near Johnson, Vermont, and contains no free silica, tremolite, chrysolite, chrysotile, or actinolite. It has the following composition:

### Talc Analysis

| | |
|---|---|
| Silicon dioxide | 34.86% |
| Ferrous oxide | 6.30 |
| Aluminum oxide | 1.22 |
| Manganese oxide | 0.09 |
| Sodium oxide | 0.53 |
| Potassium oxide | Trace |
| Combined water | 6.17 |
| Carbon dioxide | 13.10 |

PLT-04771-0012

Whiting (calcium carbonate) is the principal compound for dusting reclaimed rubber. Until about six years ago pyrophyllite containing 65 per cent free silica was used for certain stocks, but since that time talc has been used for these special applications, but the use of both compounds amounted to only about 10 per cent of production.

### CLINICAL INVESTIGATION

The two groups of workers included in this study were specially selected for type and length of exposure. Only those with the longest and heaviest exposures were included. Complete physical

posed of 20 men who had been exposed to talc alone for periods ranging from 10 to 30 years. All of the men were working at the time of the study and were in apparent good health. None of them presented any symptoms referable to the lungs, such as dyspnea, cough, or shortness of breath. None had clubbing of the fingers or cyanosis. Only one member of this group had subnormal (71 per cent) vital capacity. This finding can perhaps be explained by the presence of an enlarged heart, as determined by the Hodges-Eyster formula.

In this group the roentgenographic findings were either completely normal or showed only

### TABLE 3

PHYSICAL EXAMINATION, VITAL CAPACITY DETERMINATIONS AND CHEST ROENTGENOGRAMS ON WORKERS EXPOSED TO TALC

| WORKER | AGE | YEARS OF EXPOSURE | MILLIONS OF PARTICLES/CU. FT. | BLOOD PRESSURE | VITAL CAPACITY | HEART | CHEST ROENTGENOGRAMS | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 117R | 62 | 25 | 20 | 144/92 | 86% | | Negative | |
| 118R | 62 | 30 | 35 | 152/80 | 105% | | " | |
| 119R | 53 | 24 | 20 | 112/68 | 119% | +10 | " | Coal miner—10 years |
| 126R | 49 | 31 | 35 | 132/78 | 122% | | " | |
| 90R | 53 | 25 | 20 | 142/82 | 71% | +17 | " | |
| 251R | 50 | 30 | 15 | 142/80 | 112% | | " | |
| 190R | 53 | 20 | 20 | 160/90 | 94% | Normal | " | |
| 167R | 62 | 36 | 35 | 120/80 | 95% | " | " | Coal miner—11 years |
| 187R | 49 | 30 | 15 | 140/70 | 94% | | " | |
| 205R | 49 | 32 | 15 | 180/80 | 118% | | " | |
| 196R | 49 | 25 | 15 | 124/80 | 107% | | " | |
| 246R | 51 | 10 | 15 | 110/70 | 121% | | " | |
| 209R | 47 | 32 | 15 | 95/65 | 86% | | " | |
| 207R | 52 | 31 | 15 | 112/80 | 102% | Normal | " | |
| 17R | 58 | 27 | 15 | 140/95 | 118% | | " | |
| 287R | 50 | 24 | 20 | 138/78 | 116% | Normal | " | Coal miner—15 years |
| 206R | 57 | 34 | 20 | 194/94 | 85% | | " | |
| 290R | 43 | 14 | 50 | 103/71 | 105% | | " | |
| 292R | 51 | 19 | 15 | 110/65 | 93% | | " | |
| 286R | 39 | 18 | 15 | 120/55 | 114% | | " | |

examinations, including blood counts, urinalysis, blood pressure readings, and vital capacity determinations, were made. For the latter tests the Scott-McKesson apparatus was employed, and readings below 85 per cent were considered indicative of disease of the heart or the lungs. Roentgenograms of the lungs were made on 14" × 17" films and interpreted by a qualified radiologist with considerable experience in the diagnosis of pneumoconiosis.

### TALC WORKERS

*Physical and Roentgenographic Examinations*

The first group, presented in table 3, was com-

the chronic changes found in industrial urban dwellers. (See figure 1.)

### RECLAIMING RUBBER WORKERS

*Physical and Roentgenographic Examinations*

The second group, presented in table 4, was composed of 20 men with a major exposure to whiting and minor exposures to pyrophyllite and talc. The exposure periods of this group ranged from 10 to 25 years. All of these men were also working at the time of the study, and none complained of or presented symptoms referable to the lungs, such as dyspnea, cough, or shortness of breath. No clubbing of the fingers nor cyanosis was noted.

PLT-04771-0013



Fig. 1. This man is 62 years old and has worked in the rubber industry for 36 years with an average dust exposure of 35 million particles per cubic foot. His vital capacity was 95 per cent. These lungs show only truncal accentuation of the lower lobes.

TABLE 4

PHYSICAL EXAMINATION, VITAL CAPACITY DETERMINATIONS AND CHEST ROENTGENOGRAMS ON WORKERS EXPOSED TO WHITING, PYROPHYLLITE, AND TALC

| WORKER | AGE | YEARS OF EX-POSURE | MILLIONS OF PARTICLES CU. FT. | BLOOD PRESSURE | VITAL CAPACITY | HEART | CHEST ROENT-GENOGRAMS | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 229R | 55 | 23 | 50 | 160/100 | 71% | +17 | Negative | Previously coal miner |
| 244R | 62 | 15 | 0 | 158/86 | 68%, * | +25 | ·· | |
| 228R | 47 | 24 | 50 | 104/56 | 85% | Normal | ·· | |
| 953R | 49 | 24 | 150 | 132/90 | 68% | ·· | Pneumoconn-iosis III | Coal miner—5 years |
| 195R | 51 | 23 | 50 | 124/90 | 116% | — | Negative | |
| 226R | 59 | 24 | 50 | 140/70 | 99% | ·· | ·· | Coal miner—13 years |
| 248R | 54 | 10 | 75 | 130/90 | 98% | Normal | ·· | |
| 170R | 42 | 13 | 50 | 120/70 | 123% | ·· | ·· | |
| 165R | 49 | 20 | 50 | 130/80 | 73% | ·· | ·· | |
| 18L | 48 | 20 | 50 | 112/62 | 110% | — | ·· | |
| 185R | 64 | 18 | 50 | 180/98 | 101% | +10 | ·· | Foundry—7 years |
| 247R | 54 | 20 | 50 | 160/85 | 119% | Normal | ·· | Coal miner—4½ years |
| 234R | 54 | 23 | 75 | 120/70 | 110% | ·· | ·· | |
| 231R | 53 | 23 | 50 | 132/80 | 97% | ·· | ·· | |
| 232R | 55 | 25 | 50 | 130/70 | 74% | +21 | ·· | |
| 164R | 61 | 14 | 50 | 142/95 | 97% | Normal | ·· | |
| 184R | 53 | 25 | 75 | 110/65 | 106% | — | ·· | |
| 235R | 55 | 24 | 50 | 175/100 | 94% | ·· | ·· | |
| 217R | 57 | 20 | 30 | 165/95 | 94% | Normal | ·· | Coal miner—19 years |
| 972R | 55 | 23 | 50 | 182/120 | 56%, † | ·· | ·· | |

* The subject was unsatisfactory—uncooperative.

† The subject was 5 feet 2½ inches in height and weighed 203 pounds.

362

PLT-04771-0014

*No. 19-99]*

Six had vital capacities considered subnormal; of these, 3 had enlarged hearts, as determined by the formula mentioned above.

In this second group only one chest roentgenogram showed abnormality, which was considered third-stage pneumoconiosis. The man also had lowered vital capacity, but he appeared to be suffering no disability. He had previously worked in the mining industry for five years. (See figure 2.)

exposures restricted to that mineral. In the New York mines and mills the dust was composed of equal proportions of tremolite and talc. Porro *et al* (7) published illustrations contrasting the fibrous structure of tremolite with the granular nature of talc. In the Georgia studies the dust was principally soapstone, a form of talc, but also contained 10 per cent tremolite. The dust in the North Carolina studies was *not* talc but pyrophyllite and,



Fig. 2. This man is 49 years old and has been employed in the rubber industry for 24 years with an average exposure to pyrophyllite and whiting of 150 million particles per cubic foot. He worked in coal mines for a period of five years. His lungs show well-advanced pneumoconiosis diagnosed as grade III. His vital capacity was 68 per cent. In spite of the well-advanced pneumoconiosis and lowered vital capacity, he showed no disability. His work record shows that he has lost only three weeks from illness over the past 24 years.

Another group of 16 men engaged in the same rubber processes but with shorter exposure periods were examined in the same manner. All chest roentgenograms were normal.

The producer of the talc discussed in this study stated that periodic roentgenographic examinations among his employees have failed to reveal any changes due to talc (12).

## DISCUSSION

Previous publications reporting *talc* as a cause of disabling pneumoconiosis do not present

furthermore, contained from 25 to 35 per cent quartz!

In an excellent discussion of the entire matter Pendergrass and Robert (13) stated "... the occurrence of an asbestosis-like reaction following prolonged exposure to talc would seem unlikely. Further controlled investigation, designed to eliminate the possible complicating factors of quartz-contaminated dust and infection, is, however, imperative before concluding with finality that the roentgen changes are the reflection of a specific and progressive fibrosis, and that talc is the sole

PLT-04771-0015

etiologic agent in their production. In this regard, it seems quite probable that the described coexistent nodulation may be silicotic in origin. In the reported autopsy cases there had been other opportunities for the inhalation of dusts presumably contaminated with silica, and in the mining of talc itself similar exposures have not been excluded."

## SUMMARY AND CONCLUSIONS

1. A review of the literature indicates that dust exposures producing pneumoconiosis allegedly due to talc were not restricted to that mineral alone, as tremolite, pyrophyllite, and even quartz were also involved.

2. Physical examinations and chest roentgenograms of a group of 20 men exposed to talc dust (hydrous magnesium silicate) for periods ranging from 10 to 36 years in rubber inner tube produc-

tion were normal for men of their age group and urban industrial environment.

3. Similar examinations of another group of 20 men exposed for periods ranging from 10 to 25 years to whiting (calcium carbonate), with minor exposures to pyrophyllite (65 per cent quartz) and to talc, in rubber-reclaiming operations disclosed all to be normal except one whose condition was diagnosed as pneumoconiosis stage III. This man had the highest dust exposure in the two groups (150 million particles per cubic foot) and had a previous occupational history of five years in mining.

4. The findings of the present study indicate that long exposure to talc does not appear to produce pathologic changes in the lungs.

5. Proposals that limits for silicate minerals be added to lists of maximum allowable concentrations should include careful definition of chemical and mineralogical composition.

## REFERENCES

(1) JOHNSON, BERTRAND L. AND BARSIGIAN, F. M.: Talc and Pyrophyllite. Minerals Year Book 1946, Bureau of Mines, United States Department of the Interior.

(2) DANA, J. D.: Manual of Mineralogy, revised by C. S. Hurlbutt, 15th Edition, John Wiley and Sons, Inc., New York, 1941.

(3) SCHULZ, R. V. AND WILLIAMS, C. R.: Commercial talc: Animal and mineralogical studies. This J., 24: 75-79, 1942.

(4) DREESEN, W. C.: Effects of certain silicate dusts on the lungs. This J., 15: 66-78, 1933.

(5) DREESEN, W. C. AND DALLA VALLE, J. M.: Effects of exposure to talc in two Georgia talc mills. Public Health Reports, 50: 131-143, 1935.

(6) EASON, H. F., TRICE, M. F. AND CARPENTER, C. C.: A Study of Effects of Mining and Milling of Pyrophyllite. North Carolina State Board of Health, Division of Industrial Hygiene, and North Carolina Industrial Commission, Raleigh, North Carolina, 1939.

(7) POSSO, F. W., PATTON, J. R. AND HOBBS, JR., A. A.: Pneumoconiosis in the talc industry.

American Journal of Roentgenology and Radium Therapy, 17: 507-524, 1942.

(8) SIEGAL, WILLIAM, SMITH, A. R. AND GREENBURG, LEONARD: Study of Talc Miners and Millers in St. Lawrence County. New York State Industrial Bulletin, vol. 22, November, December, 1943.

(9) Preliminary draft, Proposed Ohio Industrial Public Health Hazards Code, Ohio Department of Health, 1946.

(10) Proposed California Safety Orders, as amended, Division of Industrial Safety, California Department of Industrial Relations, August 23, 1948.

(11) Tentative Hygiene and Sanitation Standards, Hygiene and Sanitation Section, Division of Engineering and Safety, Trenton, New Jersey, November 15, 1945.

(12) Personal communication, W. W. Magnus, Eastern Magnesia Talc Company, Burlington, Vermont.

(13) PENDERGRASS, E. P. AND ROBERT, A. G.: Some considerations of the roentgen diagnosis of silicosis and conditions that may simulate it. Radiology, 50: 736-745, 1948.

EXHIBIT B

PLT-04771-0017



GEOLOGICAL SURVEY CIRCULAR 95

DEPARTMENT OF THE INTERIOR

March 3, 1849

March 1951

# TALC INVESTIGATIONS IN VERMONT
## PRELIMINARY REPORT

By

A. H. Chidester, M. P. Billings
and W. M. Cady

*W.A. Hejami*

*Hammondville Mine*

PLT-04771-0018



UNITED STATES DEPARTMENT OF THE INTERIOR
Oscar L. Chapman, Secretary

GEOLOGICAL SURVEY
W. E. Wrather, Director

Washington, D. C.

Free on application to the Geological Survey, Washington 25, D. C.

PLT-04771-0019

CONTENTS

Abstract...................................... 1
Introduction.................................. 1
    Uses of talc.............................. 1
    Preliminary maps available................ 2
    Scope of the report....................... 2
    Acknowledgments........................... 2
    Definitions of technical terms............ 3
    Geographic distribution of the
        talc deposits......................... 3
Geology....................................... 4
    The country rock ......................... 4
        Rock types............................ 4
        Structure............................. 4
    The ultramafic rocks...................... 4
        Composition and alteration............ 4
        Size and shape........................ 5
        Distribution of steatite and grit..... 5
        Structural details.................... 6
            Banding........................... 6
            Schistosity....................... 7
            Shear polyhedrons................. 7
        Faults................................ 7
        Origin................................ 7
    Talc reserves............................. 8
Talc deposits................................. 8
    Geographic location of known deposits..... 8
        Enosburg Falls quadrangle............. 8
        Jay Peak quadrangle................... 8
        Irasburg quadrangle................... 9
        Mount Mansfield quadrangle............ 9
        Hyde Park quadrangle.................. 9
        Hardwick quadrangle................... 10
        Camels Hump quadrangle................ 10
        Montpelier quadrangle................. 10
        Lincoln Mountain quadrangle........... 10
        Barre quadrangle...................... 11
        Rochester quadrangle.................. 11
        Randolph quadrangle................... 11
        Mt. Cube quadrangle................... 12
        Woodstock quadrangle.................. 12
        Hanover quadrangle.................... 12
        Ludlow quadrangle..................... 12
        Saxtons River quadrangle.............. 13
        Wilmington quadrangle................. 13
        Brattleboro quadrangle................ 14

Descriptions of deposits...................... 14
    The Montgomery Center talc prospect,
        locality 5............................ 14
    The Belvidere Mountain asbestos
        quarry, locality 6.................... 14
    Locality 16............................... 16
    Locality 17............................... 16
    The Waterville talc quarry,
        locality 22........................... 16
    The Rousseau talc prospect,
        locality 23........................... 16
    The Sterling Pond talc deposits,
        locality 25........................... 17
    The Johnson talc mine, locality 29........ 20
    Locality 30............................... 22
    The Barnes Hill talc prospect,
        locality 40........................... 22
    The Waterbury talc mine, locality 41...... 22
    The Mad River talc mine, locality 46...... 22
    Locality 50............................... 24
    Locality 51............................... 24
    Locality 54............................... 24
    The Roxbury verde antique quarries,
        localities 66 and 67.................. 24
    The East Granville talc mine,
        locality 72........................... 25
    The Rochester verde antique quarry,
        locality 73........................... 26
    Localities 74 and 75...................... 26
    Locality 110.............................. 27
    Localities 112 and 113.................... 27
    Locality 114.............................. 28
    The Hammondsville talc quarry,
        locality 117.......................... 28
    Locality 124.............................. 28
    The Vermont Talc Co., quarry,
        locality 126.......................... 29
    Localities 127 and 128.................... 30
    The Barton talc quarry, locality 129...... 30
    The Davis (or Holden) talc quarry,
        locality 130.......................... 30
    Locality 136.............................. 31
Suggestions for exploration and further
    geologic study............................ 31
References.................................... 32-33

ILLUSTRATIONS

Plate   1.--Map of Vermont showing locations of ultramafic rocks .............................. Inside back cover
Figure 1.-- Idealized sketch map of a typical steatite-grit-serpentinite body.................................. 6

PLT-04771-0020

# TALC INVESTIGATIONS IN VERMONT
## PRELIMINARY REPORT

### ABSTRACT

Commercial talc deposits in Vermont are derived from ultramafic igneous rocks confined chiefly to a narrow belt that extends northward through the central part of the state from Massachusetts to Canada. This belt forms part of a more extensive belt that may be traced from Alabama to Newfoundland.

Bodies of ultramafic rock occur in phyllites, schists, gneisses, greenstones and amphibolites. Most of the ultramafic rocks are emplaced in or near greenstones or amphibolites. Knowledge of the regional structural and stratigraphic relations of the belt is incomplete, but in general the country rock forms a homoclinal sequence and exhibits little repetition of formations by folding.

The ultramafic bodies range in width from a few feet to about a mile, and in length from less than 100 feet to at least 3½ miles. They are of two types: Most of them, referred to here as the verde antique type, are completely serpentinized and more or less extensively steatitized. The second type, with which no commercial talc deposits are known to be associated, consists of partly serpentinized dunite or peridotite and minor pyroxenite, and commonly contains more or less chrysotile asbestos; this type occurs in one or two localities in southern Vermont and in several localities in northern Vermont. The mineral assemblage associated with the verde antique type of body reflects the effects of regional metamorphism alone, whereas the country rock bordering some bodies containing peridotite and dunite also reflects contact metamorphic effects attributable to the ultramafic intrusive.

The typical ultramafic body of the verde antique type contains steatite and grit, (a mixture of talc and carbonate at the margins), and a core of serpentinite. The steatite zone, at the outer border of the body, commonly ranges from a few inches to a few feet in thickness. The grit zone, between the steatite and serpentinite zones, is commonly several feet to a few tens of feet thick. There are, however, all gradations from ultramafic bodies formed almost entirely of serpentinite to bodies made up exclusively of grit and steatite. Inclusions, septa, and tongue-like projections of wall rock, which range widely in size, are common in the talc deposits; they are called "cinders" by the miners.

The structural features of the ultramafic rocks contrast rather markedly with those of the country rock. Serpentinite and grit show local schistosity that varies from poor to good, and steatite commonly exhibits a good schistosity. Some ultramafic masses appear to be folded. A layering or banding of undetermined origin is conspicuous at a few localities. Most serpentinite bodies are made up of rather distinct blocks of massive serpentinite as much as several feet across, termed shear polyhedrons, surrounded by thin, irregular layers of slickensided serpentinite. This feature contrasts markedly with the structural features

of the country rock; it may be interpreted in several ways, but suggests that the serpentinite was intruded in solid state. Minor faults are found in a few ultramafic bodies. Current general conceptions of the intrusion, serpentinization, and steatitization of the ultramafic bodies are stated briefly; a definitive statement of the genesis of the ultramafic rocks is not attempted.

It is inferred from the wide distribution of localities in which ultramafic rocks are found and the general prevalence of steatitization at those localities, that the talc reserves in Vermont are large. The geographic positions of 145 localities are indicated. Suggestions for exploration and further geologic study are made.

## INTRODUCTION

Commercial talc deposits, with a few exceptions, fall into two classes: those derived from or very closely associated with ultramafic igneous rocks and those formed from carbonate rocks of sedimentary origin. In commercial usage of the term pyrophyllite, whose properties are similar to those of talc, is commonly included with talc. Nearly all of the talc deposits in Vermont, and all of those of economic value in the state are of ultramafic origin.

Talc deposits related to ultramafic bodies were formed by the metamorphism and alteration of the ultramafic rocks, accompanied by minor steatitization of the country rock. Although such talc deposits are commonly in or closely associated with highly serpentinized ultramafic bodies, it is generally recognized that the processes of serpentinization and steatitization are unrelated and that serpentinization is an earlier process. Talc deposits derived from carbonate rocks are generally considered to have been produced by contact metamorphism of the carbonates where intruded by granitic rocks.

Talc derived from carbonate rocks is generally superior in "color" (whiteness) to talc associated with ultramafic rocks. But, many carbonate-derived deposits contain a large amount of tremolite which is undesirable in some talc products. Talc associated with ultramafic rocks commonly contains a relatively large amount of carbonate, and minor amounts of chlorite and serpentine, to which the generally inferior color of this type of talc is attributed.

## Uses of Talc

Massive talc, called soapstone or steatite, [2] has peculiar properties, particularly softness,

[1] A. E. J. Engel (written communication, March 19, 1950's.)
[2] For a definition of these terms, as used in this paper, see p. 3

1

PLT-04771-0021

denseness, impermeability, and high heat-resistivity, which have made it useful to man from very early times for making pipes, ornaments, and cooking utensils. Talc has a wide variety of uses in modern industry. 3/ Soapstone is sawed into crayons and pencils which are used in foundries to mark white-hot steel and in the garment industry to mark fabrics. Because of its resistance to acids, soapstone is used extensively for laboratory tables and sinks. Its refractory properties make it suitable for molds for such materials as iron and glass. Its dielectric properties make it suitable for insulators and base plates for switchboards. The pure, dense, cryptocrystalline variety of steatite known as "lava grade" is valuable because it can be machined into intricate forms and then heat-treated to great hardness with negligible shrinkage. 4/

The soft varieties of talc which are not suitable for sawing or machining are ground to various degrees of fineness for a great variety of industrial uses. Some of the products in which ground talc is used are: paper, toilet and pharmaceutical preparations, pottery and porcelain, rope and twine, wall plaster, paints, electrical insulation, textiles, linoleum and oil cloths, soaps, roofing papers, rubber, lubricants, foundry facings, glass, agricultural insecticides, pipe-coverings, leather, cement, asbestos shingles, candy, shoe polish, and crayons. Ground talc is used also to polish some articles of food, such as coffee and rice.

The talc deposits of Vermont furnish varieties suitable chiefly for grinding, but small quantities of material suitable for pencils to mark structural steel are produced as a by-product. The largest producer of talc in Vermont reports the following consumption data, in terms of percentages of total sales, for 1949. 5/

| | Percent |
|---|---|
| Paper | 30 |
| Rubber | 18 |
| Textiles | 2 |
| Roofing | 5 |
| Paint | 5 |
| Ceramics | 1 |
| Cosmetics | 0.5 |
| Insecticides | 23 |
| Asphalt filler | .13 |
| Miscellaneous | 2.5 |
| Total | 100.0 |

## Preliminary maps available

. As a result of the studies made by the U. S. Geological Survey in the period August 1944-November 1945, the following maps have been prepared and placed in open file:

The Johnson talc mine:
Geologic surface map, scale: 1 inch to 30 feet.
Geologic map of the 200-foot level, scale: 1 inch to 30 feet.
Structure sections, scale: 1 inch to 30 feet.

[1] For a more complete discussion of the uses of talc see Engel (1949, pp. 1035-1038) or Jullsen (1937, pp. 982-688).

[2] For further discussion of the properties and uses of "lava grade" steatite see Engel (1949, pp. 1036-1037; also references cited in his bibliography, pp. 1039-1041).

[3] Quoted with permission of Eastern Magnesia Talc Co., Burlington, Vt.

The Waterbury talc mine, preliminary map 3-100
Geologic surface map, scale: 1 inch to 60 feet.
Underground maps, including geologic maps, outline map of the underground workings.
1 inch to 30 feet.
Structure sections, scale: 1 inch to 30 feet. (3 sheets).

The Barnes Hill talc prospect, preliminary map 3-221.
Geologic surface map, scale: 1 inch to 50 feet.

The Vermont Talc Co. quarry, Windham, preliminary map 3-221:
Geologic surface map and structure sections, scale: 1 inch to 30 feet.

The Hammondsville talc quarry, preliminary map 3-221:
Geologic surface map and structure sections, scale: 1 inch to 30 feet.

The Rousseau talc prospect, preliminary map 3-221:
Geologic surface map and structure sections, scale: 1 inch to 50 feet; geologic map of the underground workings, scale: 1 inch to 30 feet.

The Mad River talc mine, preliminary map 3-227:
Geologic surface map, scale: 1 inch to 50 feet; geologic map of the underground workings and structure sections, scale: 1 inch to 20 feet.

The Carleton talc quarry, preliminary map 3-227:
Geologic surface map and structure sections, scale: 1 inch to 20 feet.

Copies of these maps, released as Strategic Minerals Investigations, Preliminary Maps, may be obtained by persons directly interested in the talc deposits upon application to the U. S. Geological Survey, Washington 25, D. C.

## Scope of the report

The primary purpose of the report is to make available to interested persons the results of this work to date. The report is based almost entirely on field studies and is chiefly a description of the structural relationships of the talc deposits. Interpretations based on laboratory data are not included as laboratory work is still in progress.

## Acknowledgments

The authors appreciate the courtesy and cooperation of the officials of the following companies for their assistance in this investigation: Eastern Magnesia Talc Co., Burlington, Vt.; Vermont Talc Co., Chester Vt.; Vermont Mineral Products Co., Chester, Vt.; Mad River Talc Corp., New York, N. Y.; and Vermont Marble Co., Rutland, Vt.

The Geological Survey is also indebted to a number of individual geologists, including F. H. T. P. E. Osberg, J. L. Rosenfeld, James Skehan, and J. B. Thompson, for their contributions to various aspects of the investigations. The authors are grateful to these persons for unpublished information concerning the regional geology, and for invitations to join in several interesting and informative field excursions.

2

PLT-04771-0022

The authors benefited from several days spent in the field with R. H. Jahns and T. P. Thayer of the Geological Survey. Jahns furnished unpublished information on the regional geology. H. R. Kopper and A. E. J. Engel of the Geological Survey read the manuscript critically and suggested numerous improvements.

## Definitions of technical terms

The following technical terms have been variously used in the past by different geologists, and many are in common use among talc miners. Because some of the miners' terms are apparently peculiar to the Vermont talc industry and may not be known in other areas, the terms in this report are defined.

Ultramafic. -- The term is used throughout the report in a broad sense with reference to the igneous rocks peridotite, dunite, and pyroxenite and their derivatives. Thus the term ultramafic body refers to the unaltered igneous rock, the serpentinite, the grit, and that part of the steatite which is an alteration of the original igneous body.

Serpentinite. -- The term is applied to rocks composed essentially of serpentine, after the usage of Lodochnikov (1933, p. 145), Phillips and Hess (1936, p. 333), and Selfridge (1936, p. 501). However, no genetic significance is attached to the term, as is apparently done by Phillips and Hess. The term serpentine is used here only in the mineral sense; it is used by miners in the sense of serpentinite as defined above. Verde antique is a trade term for serpentinite intricately veined with carbonate, and capable of taking a high polish so that it is suitable for use as an ornamental stone. Ultramafic bodies composed entirely of serpentinite, grit, and steatite are referred to as the verde antique type, and the serpentinite of such bodies is similarly distinguished. [6]

Serpentinization is the process by which ultramafic igneous rocks were partly or completely altered to serpentinite. The term has no genetic significance as used here. The serpentinite zone includes the part of the ultramafic body that consists principally of serpentinite; it commonly forms the core of the verde antique type of ultramafic body.

Talc. -- The word talc is used here only in the mineral sense. Grit is a miners' term for a rock composed essentially of talc and carbonate. The grit zone is that portion of an ultramafic body composed almost entirely of grit; it lies between the serpentinite zone and the steatite zone. The term steatite

is used in a broad sense to designate a mixture consisting almost entirely of talc. The minor and distinction is that there is practically no carbonate; chlorite may be more or less abundant. [?]

The steatite zone is the portion of the ultramafic body and immediately adjacent altered country rock between the grit zone and the blackwall zone (see next paragraph) at the outermost edge of the ultramafic body. The term steatite is restricted to steatite that is suitable for making sawn and shaped slabs. Pencil stock is a variety of steatite with physical properties that make it suitable for "pencils" used in marking structural steel. Steatization is the term applied to the process by which an ultramafic rock is partly or completely altered to talc or talc and carbonate. No genetic significance is attached to the term.

Blackwall. -- The altered country rock at the outer border of the steatite zone is called blackwall by the miners. In the majority of deposits the blackwall is chlorite schist, but in a few it is biotite schist. The blackwall zone is the altered part of the country rock between the steatite zone and the unaltered country rock; it lies outside of the ultramafic body.

Cinder. -- The term "cinder" is applied by miners to masses of schist within a steatite-grit body. Cinders may range in size from small fragments less than an inch across to very large tabular masses. In practice, any body of schist which is not demonstrably a part of the accepted hanging wall or footwall of a deposit is referred to as cinder.

## Geographic distribution of the talc deposits

The talc deposits of Vermont are associated with ultramafic rocks that form part of a belt more than 2000 miles long, which extends from Alabama to Newfoundland. The belt lies in the terrane of crystalline rocks of the Appalachian Mountains.

In Vermont the ultramafic rocks are nearly all confined to a rather narrow belt that trends northward through the central part of the state from Massachusetts to Canada. The belt is almost 25 miles wide at its northern end, but it narrows rather markedly southward so that south of the Winooski River it is not more than 5 miles wide except at the latitude of Plymouth, where it broadens to a maximum width of 10 miles. Plate 1 shows the location of all known ultramafic bodies in Vermont; their distribution indicates the pattern of the ultramafic belt.

---

[6] This application of the term verde antique type of serpentinite is somewhat more restricted than that of Bain (1936, pp. 1967-1974) who distinguished two practical types of serpentinite: the "verde antique (white weathering) type" and the "red-weathering type." The verde antique type of serpentinite as defined by Bain on the basis of weathering characteristics is found to some extent in ultramafic bodies that contain relatively large masses of unserpentinized dunite and peridotite, but is found structurally in bodies that consist only serpentinite or the verde antique type. The commercial verde antique occurs only in the white, and the term verde antique may be logically restricted to such inclusions as the purpose of designating a type of ultramafic body. We believe that this usage does not violate that of Bain in any essential way, inasmuch as the verde antique type of serpentinite as defined by Bain is overwhelmingly more abundant in the verde antique type of ultramafic body as defined herein. We believe that the classification of the ultramafic bodies on the basis proposed (see pp. 4-5) has greater genetic and practical merit.

[?] Various meanings have been attached to the word "steatite" in geologic literature. Probably the general accepted usage is the definition given here, but in some geologic literature and especially in writings on high-quality ceramic talcs a different usage has evolved. The term "steatite" is used in the ceramic industry to denote a massive, compact, and comparatively pure variety of talc which must meet certain chemical and physical requirements for the manufacture of ceramics. U. S. Bureau of Mines, from study of commercial stoneware, gives specifications of not more than 1.5 percent CaO, 1.5 percent Fe₂O₃ + other Al₂O₃, and 5 to 10 percent non-talc minerals. Individual manufacturers' standards vary considerably, and some will accept as much as 4.5 percent CaO for certain uses (see Engel, 1949, p. 107). In its common usage it is best to qualify "steatite" in a broad sense and to distinguish as "ceramic-grade steatite" or "specification-grade steatite" when it is desired to indicate a specific grade or type of steatite.

3

GEOLOGY

Most of the ultramafic rocks of Vermont occur in schists, phyllites, and greenstones on the east flank of the Green Mountain anticlinorium; but in the northern part of the state, north of the approximate latitude of the village of Johnson, several occurrences are known in similar formations west of the anticlinorial axis; for example, in Cambridge, Waterville, and Berkshire townships. C. H. Hitchcock and A. D. Hager (Hitchcock et al., 1861, pp. 539, 543, 788-789) report occurrences of both serpentinite and steatite in schists and gneisses in extreme eastern Vermont; these are apparently separated from those in the central part of the state by a broad synclinal belt of interbedded crystalline limestone and slate. Scattered occurrences of serpentinite, steatite, and grit are found in comparable rocks throughout both New Hampshire and Maine (Hitchcock, C. H., 1878; Smith, Bastin, and Brown, 1907, pp. 8-9). Further knowledge of the regional relationships of the ultramafic rocks must await completion of areal mapping now in progress.

### The country rock

#### Rock types

The country rocks of the ultramafic belt include phyllites, schists, and gneisses, with intercalated schistose greenstones and amphibolites that represent altered volcanic rocks, both tuffs and flows, and intrusive rocks, chiefly sill-like dikes. Most of the ultramafic bodies are emplaced in greenstone or amphibolite or in schist and phyllite in the immediate vicinity of greenstones or amphibolites. Mafic dikes formed after regional folding and metamorphism intrude the ultramafic rock and country rock at several localities. There are no known granitic intrusive rocks, other than small felsic dikes at a few localities, associated with the ultramafic bodies.

The ages of the various formation into which the ultramafic rocks are intruded are uncertain, but it is probable that they range from Cambrian to Lower or Middle Ordovician.

#### Structure

Knowledge of the structural relations in the ultramafic belt is yet far from complete. Throughout most of the belt the rocks are vertical or dip steeply east or west on the east limb of the Green Mountain anticlinorium. The strike ranges from slightly west of north to northeast and averages about north. Schistosity and bedding are nearly parallel or parallel in most places where bedding is recognizable. There is remarkably little repetition of beds in folds, but very small folds with amplitudes of a few inches are present almost everywhere throughout the belt. At some localities there are folds with amplitudes of tens or hundreds of feet, and in a few areas, as much as a mile. These reflect the regional structural pattern, particularly that of the Green Mountain anticlinorium. However, such large folds appear to be the exception rather than the rule.

This rather simple homoclinal structure passes in the vicinity of Chester township into broad anticlinal arches and large overturned recumbent folds. [8]/ These structures, featured and responsible for the relatively greater width of the ultramafic in the latitude of Chester.

### The ultramafic rocks

#### Composition and alteration

The original minerals of the ultramafic rocks have been nearly or completely altered at most localities, and only rare relics and ghosts of olivine and pyroxene remain. It is difficult or impossible to determine accurately the composition of the rocks as first emplaced. At several places a clinopyroxene; however, and in at least one place in southern Vermont the ultramafic rocks are, at least in part, nearly unaltered (Bain, 1936, pp. 1963-1970). They apparently range from dunite, composed almost entirely of the mineral olivine, to pyroxenic peridotite in which the mineral pyroxene as well as olivine is abundant. Most of the ultramafic rocks were probably of peridotitic composition originally.

The ultramafic bodies may be divided into two types on the basis of absence or presence within each body of unserpentinized peridotite or dunite. Those that do not contain peridotite or dunite are called the verde antique type (see footnote on p. 3 for a fuller discussion). Those that contain unaltered peridotite and dunite correspond in a broad way to the red-weathering type described by Bain (1936, pp. 1979- ).

All the commercial talc deposits in Vermont are associated with the verde antique type of ultramafic body, whereas none is known to occur in ultramafic bodies that are only partly serpentinized. On the other hand, cross-fiber asbestos appears to occur in appreciable quantities only in ultramafic bodies that contain unaltered dunite or peridotite, and is either rare or absent in the verde antique type. Small seams of slip-fiber asbestos, commonly brittle and altered, have been found in association with a few talc deposits, and so have a few examples of what appear to be talc pseudomorphs after cross-fiber asbestos.

Several investigations of ultramafic rocks (Selfridge, 1936, pp. 497-498; T. P. Thayer, oral communication, August 1949) from widely separated regions, supplemented by incomplete petrographic studies made in connection with the current investigation in Vermont, indicate that the serpentine mineral in the verde antique type of ultramafic body is antigorite, whereas the serpentine mineral in serpentinite associated with unaltered dunite and peridotite is a non-asbestiform variety of chrysotile. [9]/

---

[8] Thompson, J. B., Oral communication, September 1948.

[9] C. Selfridge (1936, pp. 456-469) defines the serpentine group of minerals as consisting of two distinct species, serpentine and antigorite. He considers chrysotile to be an asbestiform variety of the species serpentine.

Bain's conclusion that the "white-weathering" and the "red-weathering" serpentinite are two genetic types (1936, pp. 1975- ) may be used to support the foregoing definition. He identifies the serpentine mineral in both types as chrysotile, but presents no supporting data. It is commonly difficult to distinguish the serpentine minerals by optical characteristics (see Selfridge, 1936, pp. 484-496) and in thin-section serpentine may easily be mistaken for antigorite.

4

EXHIBIT C

PLT-04771-0025

# Petrology and Geochemistry of Selected Talc-bearing Ultramafic Rocks and Adjacent Country Rocks in North-Central Vermont

*By* ALFRED H. CHIDESTER

GEOLOGICAL SURVEY PROFESSIONAL PAPER 345



UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON : 1962

PLT-04771-0026

UNITED STATES DEPARTMENT OF THE INTERIOR

STEWART L. UDALL, *Secretary*

GEOLOGICAL SURVEY

Thomas B. Nolan, *Director*

The U.S. Geological Survey Library has cataloged this publication as follows:

Chidester, Alfred Herman, 1914–
   Petrology and geochemistry of selected talc bearing ultra-
mafic rocks and adjacent country rocks in north-central
Vermont.  Washington, U.S. Govt. Print. Off., 1961.

   vii. 207 p. illus., maps (7 fold. col. in pocket) diagrs., tables.  29 cm.
( U.S. Geological Survey.  Professional paper 345)
   Bibliography : p. 205–207.
   1. Petrology—Vermont.  2. Talc—Vermont.  3. Mines and mineral
resources—Vermont.  4. Geochemistry—Vermont.  5. Rocks, Igne-
ous—Vermont.  I. Title.    (Series)

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington 25, D.C.

PLT-04771-0027

# CONTENTS

| | Page |
|---|---|
| Abstract | 1 |
| Introduction | 3 |
| Location and history | 3 |
| Barnes Hill locality | 3 |
| Waterbury mine locality | 4 |
| Mad River locality | 4 |
| Previous investigations | 5 |
| Fieldwork and acknowledgments | 5 |
| Geologic setting | 6 |
| Regional setting | 6 |
| Waterbury-Waitsfield area | 7 |
| Metamorphosed sedimentary and volcanic rocks | 8 |
| Intrusive igneous rocks | 9 |
| Ultramafic rocks | 9 |
| Mafic hypabyssal and granitic rocks | 9 |
| Metamorphism | 10 |
| Structure | 10 |
| Geology of the Barnes Hill, Waterbury mine, and Mad River localities | 10 |
| General geology | 10 |
| Barnes Hill locality | 11 |
| Waterbury mine locality | 12 |
| Mad River locality | 14 |
| Structure | 16 |
| Major features | 16 |
| Structural details | 16 |
| Bedding | 17 |
| Layering in ultramafic rocks | 17 |
| Folds | 17 |
| Schistosity | 22 |
| Slip cleavage | 23 |
| Fracture cleavage | 23 |
| Other cleavage | 24 |
| Lineation | 24 |
| Shear polyhedrons | 24 |
| Joints | 24 |
| Faults | 24 |
| Structural features of the Sterling Pond area | 24 |
| Origin and relations of structural features | 25 |
| Petrography | 27 |
| Methods and procedures | 27 |
| Determination of mineral compositions | 41 |
| Chlorite | 44 |
| Serpentine | 46 |
| Talc | 48 |
| General features | 48 |
| Schist | 49 |
| Mineralogy, textural features, and paragenesis | 49 |
| Quartz | 49 |
| Albite | 50 |
| Sericite | 50 |
| Chlorite | 51 |
| Biotite | 51 |
| Graphite | 52 |

| | Page |
|---|---|
| Geology of the Barnes Hill, Waterbury mine, and Mad River localities—Continued | |
| Petrography—Continued | |
| Schist—Continued | |
| Mineralogy, etc.—Continued | |
| Ilmenite, rutile, and sphene | 52 |
| Garnet | 52 |
| Apatite | 53 |
| Epidote and allanite | 53 |
| Other minerals | 53 |
| Petrogenesis | 53 |
| Quartzite | 55 |
| Mineralogy, textural features, and paragenesis | 55 |
| Petrogenesis | 55 |
| Greenstone | 55 |
| General features | 55 |
| Mineralogy, textural features, and paragenesis | 57 |
| Albite | 57 |
| Chlorite | 57 |
| Amphibole | 57 |
| Epidote and allanite | 58 |
| Biotite | 58 |
| Carbonate | 58 |
| Ilmenite, rutile, and sphene | 59 |
| Other minerals | 59 |
| Petrogenesis | 59 |
| Carbonate rock | 60 |
| General features | 60 |
| Barnes Hill | 60 |
| Waterbury mine | 61 |
| Mad River | 61 |
| Mineralogy, textural features, and paragenesis | 61 |
| Carbonate | 61 |
| Amphibole | 62 |
| Chlorite | 62 |
| Other minerals | 62 |
| Petrogenesis | 63 |
| Albite porphyroblast rock | 64 |
| Mineralogy, textural features, and paragenesis | 64 |
| Albite | 64 |
| Chlorite | 64 |
| Accessory minerals | 64 |
| Petrogenesis | 64 |
| Rocks of the blackwall zone | 65 |
| General features | 65 |
| Blackwall chlorite rock | 65 |
| Tremolite rock | 65 |
| Talcose carbonate rock | 66 |
| Mineralogy, textural features, and paragenesis | 66 |
| Chlorite | 66 |
| Ilmenite, rutile, and sphene | 69 |
| Magnetite | 69 |

III

PLT-04771-0028

IV

CONTENTS

Geology of the Barnes Hill, Waterbury mine, and Mad River localities—Continued

Petrography—Continued

Rocks of the blackwall zone—Continued

Mineralogy, textural features, and para-
genesis—Continued

| | Page |
|---|---|
| Tremolite | 70 |
| Carbonate | 70 |
| Other minerals | 70 |
| Petrogenesis | 70 |
| Serpentinite | 71 |
| General features | 71 |
| Mineralogy, textural features, and para-genesis | 73 |
| Serpentine | 73 |
| Magnetite and chromite | 75 |
| Carbonate | 76 |
| Pyrite and pyrrhotite | 76 |
| Talc | 76 |
| Petrogenesis | 77 |
| Talc-carbonate rock, steatite, and talc-carbonate veins | 77 |
| General features | 77 |
| Talc-carbonate rock | 77 |
| Steatite | 78 |
| Talc-carbonate veins | 79 |
| Mineralogy, textural features, and para-genesis | 79 |
| Talc | 79 |
| Carbonate | 80 |
| Chlorite | 81 |
| Magnetite and chromite | 81 |
| Gersdorffite(?) and unidentified opaque mineral | 81 |
| Petrogenesis | 81 |
| Mafic dikes | 82 |
| Mineralogy, textural features, and para-genesis | 83 |
| Augite | 83 |
| Plagioclase (An₃₀) | 83 |
| Hornblende | 83 |
| Biotite, sericite or talc, and chlorite | 83 |
| Glass and rutile | 83 |
| Magnetite | 83 |
| Carbonate and quartz | 83 |
| Petrogenesis | 84 |
| Petrology and geochemistry | 84 |
| Metamorphism | 84 |
| Origin of the peridotite and serpentinite | 87 |
| Source and derivation of the primary igneous rocks | 87 |
| Serpentinization | 88 |
| Steatitization | 88 |
| Previous work on steatitization | 90 |
| Age of steatitization | 91 |
| Relations of steatite and talc-carbonate rock | 91 |
| Relations between the steatite and the rocks of the blackwall zone | 91 |

Petrology and geochemistry—Continued

Steatitization—Continued

| | Page |
|---|---|
| Relation of steatitization to structure and regional metamorphism | 92 |
| Volume relations in steatitization | 93 |
| Temperature relations during steatitization | 94 |
| Mechanism of steatitization | 94 |
| Talc-carbonate rock reaction | 121 |
| Boundary between talc-carbonate rock and serpentinite | 122 |
| Serpentinite-dunite boundary | 122 |
| Blackwall-steatite reaction | 122 |
| Steatite-serpentinite boundary | 123 |
| Boundary between steatite and talc-carbonate rock | 123 |
| Blackwall-schist boundary | 124 |
| Steatite-blackwall boundary | 124 |
| Geochemistry of the rocks affected by steatiti-zation | 124 |
| Potassium | 124 |
| Sodium | 125 |
| Calcium | 125 |
| Magnesium | 125 |
| Iron and manganese | 126 |
| Nickel | 126 |
| Cobalt | 126 |
| Aluminum | 126 |
| Chromium | 127 |
| Titanium | 127 |
| Silicon | 127 |
| Phosphorus | 127 |
| Carbon | 127 |
| Hydrogen | 128 |
| Oxygen | 128 |
| Sulfur and arsenic | 128 |
| Nature of the steatitizing "solutions" | 128 |
| Origin of the talc-carbonate veins | 128 |
| Appendixes | 129 |
| Appendix A—Some basic procedures, definitions, and terminology | 129 |
| Appendix B—The modified standard cell, calculated modes, and mineral formulas | 132 |
| Definition of the modified standard cell | 132 |
| Calculation of the cell contents | 133 |
| Calculation of mineral modes | 137 |
| Calculation of mineral formulas | 137 |
| Appendix C—Carbonate in ultramafic rocks | 138 |
| Appendix D—Talc | 146 |
| Appendix E—Magnetite and chromite | 148 |
| Appendix F—Chrysotile asbestos | 150 |
| Appendix G—Serpentinite | 151 |
| Appendix H—Steatite and talc-carbonate rock | 161 |
| Appendix I—Blackwall chlorite rock | 172 |
| Appendix J—Sedimentary carbonate rock | 182 |
| Appendix K—Schist and albite porphyroblast rock | 194 |
| Appendix L—Calculated rock analyses | 192 |
| References cited | 205 |

## TALC-CARBONATE VEINS

Talc-carbonate veins are exposed and accessible to observation only at the Waterbury mine locality, but were also encountered in drill holes at Barnes Hill. Veins identical in mineralogic composition, form. and structural relations have been noted in many other ultramafic bodies in Vermont. and those at the Barnes Hill locality are inferred to be similar.

The talc-carbonate veins are composed of dolomite and talc in roughly equal proportions, finely disseminated traces of magnetite. and small blebs of pyrite. The dolomite occurs in coarse, anhedral, white crystals from ¼ to 1½ inches across; the talc forms fan-shaped aggregates of pale-green translucent folia as large as 1 inch across. Carbonate is predominantly near the centers of the veins and talc at the borders. but the relationship is irregular and many exceptions to the general pattern occur. Masses of carbonate from the veins are irregularly embayed and pitted, and in thin section wedge-shaped masses of talc are seen to extend into the carbonate.

The talc-carbonate veins commonly are joint controlled, though some are very irregular. Where joint control is apparent, the joints dip rather gently, though the direction of dip is variable. In a few places, where two or three sets of joints form a conjugate system, only the gently dipping set has a talc-carbonate vein along it, and the other joints are unmineralized. Not all gently dipping joints, however, have talc-carbonate veins along them.

## MINERALOGY, TEXTURAL FEATURES, AND PARAGENESIS

### TALC

Optical data on talc are summarized in table 26. The talc at a given locality is uniform in index except for that in talc-carbonate veins and in pseudomorphs after chrysotile asbestos, which has an index from 0.001 to 0.004 lower than the average. On the other hand, talc from Barnes Hill has a consistently lower index than that from the Waterbury mine and Mad River localities; talc from Barnes Hill averages about $\beta \approx \gamma = 1.585$, whereas that from both the Waterbury mine and Mad River localities averages about $\beta = \gamma = 1.591$. Only a few measurements of the $\alpha$ index were made; they indicate a birefringence of about 0.044 to 0.048, but the measurement of $\alpha$ is not as reliable as that of $\beta \approx \gamma$. The optic angle ($2V$) is consistently small, but varies from 0° to 25°. However, determinations of $2V$ are not reliable because of the probable superposition of layers of talc with c axes parallel but with the other axes randomly oriented with respect to each other. Extinction is parallel, the optic sign negative, and the sign of elongation is positive. The talc is colorless in thin section.

Two chemical analyses of nearly pure specimens of talc are given in table 3 (mineral analyses 7 and 8). One of these (J–103), from the Johnson talc mine. Johnson. Vt.. is included because specimens for chemical analysis of the pure mineral were not obtainable from the Mad River and Barnes Hill localities. and the specimen from the Johnson mine represents talc from the steatite zone of a purity not obtainable at the other deposits. It is of fine-grained pale-green talc that is distributed irregularly in the steatite in a branching veinlike pattern; no contaminating minerals are visible either megascopically or in thin section. but the analysis indicates the presence of small amounts of carbonate. Specimen W–83 is from a vein of coarse talc and carbonate. The only contaminating minerals are very small amounts of dolomite and traces of pyrite.

In addition to the chemical analyses of the mineral talc. there are two analyses of steatite (analyses 18 and 31) and three analyses of talc-carbonate rocks (analyses 21, 22, and 23). The steatite commonly contains only traces of dustlike particles of magnetite as visible contaminants. but locally small amounts of colorless chlorite occur also. The talc-carbonate rock specimens contain variable amounts of carbonate and small amounts of magnetite. By subtracting the appropriate amounts of oxides for the minerals other than talc in each rock, it is possible to approximate rather closely the chemical analysis of talc in each specimen.

The calculated formula compositions of the talc in each of the two analyses of the mineral and five analyses of steatite and talc-carbonate rock are given in table 3. Tables 33 to 34, and 43 to 47 show the calculated modes and the derivation of the formula compositions. The formula compositions calculated from analyses of steatite and talc-carbonate rock are not as accurate as those based on analyses of talc, but they probably represent closely the actual composition of the talc. In each case appropriate corrections were made for recognized contaminant minerals in the sample. No corrections were made for chlorite in W–23 because there was no basis for estimating how much. if any. is present. The slightly high content of (OH) and of $\bar{R}^{+3}$ plus $\bar{R}^{+3}$ suggests the presence of a small amount of chlorite; the amount, however, must be so small that it does not significantly affect the formula composition other than to make the $(Al,Fe^{+3})$ content appear very slightly higher than is actually the case. The very small amounts of $K_2O$ and $Na_2O$ in each analyses were ignored in making the calculations.

It is not known whether the Al and $Fe^{+3}$ indicated in the analyses substitutes directly for Mg by partial replacement of $3Mg$ for $2(Al,Fe^{+3})$, or by coupled substitution for Si and Mg. Samples that contain very little alumina approach the ideal formula almost

EXHIBIT D

PLT-04771-0031

## OCCUPATIONAL EXPOSURES
## TO NON-ASBESTIFORM TALC IN VERMONT

Maryanne G. Boundy, Karen Gold, Kenneth P. Martin, Jr., William A. Burgess, John M. Dement

Department of Environmental Health Sciences, Harvard School of Public Health, Boston, Massachusetts 02115

### INTRODUCTION

An environmental study of the Vermont talc mines and mills was undertaken in support of a concurrent epidemiological study of talc workers. Since geological studies dating from the early 1900's have shown that the Vermont talc deposits contain no asbestos and little quartz this population represents a group of talc workers employed in mining and milling operations who have no association with these two fibrosis producing minerals (Jacobs, 1914, 1918; Weiss and Boettner, 1967). Therefore, the intent of this study was to verify these geological reports by quantitating the personal dust exposures of these talc workers, and by identifying the mineral content of this "clean" talc ore.

### MINERALOGY

Pure talc mineral is a hydrous magnesium silicate (Table 1) and consists of a brucite sheet containing magnesium ions sandwiched between two weakly held silica sheets (Hildick-Smith, 1976). This mineral is extremely soft and slippery, and has a hardness of 1 on the Mohs scale. However, as used industrially, the term "talc" refers to a mixture of minerals that meet certain physical requirements rather than one which has a fixed chemical composition (Brown, 1973). Industrial grades of talc (Table 2) usually contain chlorites which are sheet silicate minerals containing magnesium, iron, and aluminum, and carbonates which include magnesite, dolomite, and calcite. Quartz, iron oxides, serpentine (one of the minerals from which talc evolved) and tremolite may also be present. Since the constituents of industrial talc

**TABLE 1. Some Chemical and Physical Properties of Talc**

Talc: $3MgO \cdot 4SiO_2 \cdot H_2O$

Refractive indices: 1.54 - 1.6

Specific gravity: 2.6 - 2.8

Hardness (Mohs Scale): 1

Color: White or grey to apple green

Morphological varieties: Laminated and Fibrous

PLT-04771-0032

vary in their mineral and fiber content, the ensuing product has a considerable range in hardness and particle shape which contributes to its versatility.

TABLE 2. Some Minerals Found in Industrial Talc

| Chlorite | $(MgFe)_5Al(AlSi_3)O_{10}(OH)_8$ |
|----------|----------|
| Magnesite | $MgCO_3$ |
| Dolomite | $CaMg(CO_3)_2$ |
| Calcite | $CaCO_3$ |
| Serpentine | $Mg_6(Si_4O_{10})(OH)_8$ |
| Quartz | $SiO_2$ |
| Tremolite | $Ca_2Mg_5Si_8O_{22}(OH)_2$ |

## FIELD STUDY

The three major Vermont talc companies were surveyed in the summer of 1975 and the winter of 1976. Bulk samples from representative milling and mining operations were collected and were analyzed qualitatively for their mineral constituents. A total of 312 personal respirable mass samples (118 in mines and 194 in mills) were taken using nylon, 10 mm cyclones at a flow rate of 1.7 lpm. Seventy percent of these samples were analyzed for free silica content by infrared spectrophotometry or x-ray diffraction (Cares et al., 1973). Fifty-seven parallel filter samples were taken for fiber determinations on 0.8 $\mu$m Millipore filters using phase contrast microscopy at X437 magnification and on 0.4 $\mu$m Nuclepore filters using scanning electron microscopy at X5000 magnification.

## BULK SAMPLES

Bulk samples from the mines and mineral mixtures or products from the mills were obtained from each company. Each sample was ground, dried, and scanned qualitatively by x-ray diffraction (Table 3). For all the samples, talc and magnesite are found in major amounts, chlorite and/or dolomite are minor constituents, and dolomite, calcite, quartz, biotite, ankerite, chromite, oligoclase, or phlogopite may be found in trace quantities.

Quartz was present in trace amounts in 15% of these samples. Further analysis by NIOSH, which included petrographic microscope analysis, transmission electron microscopy, and x-ray diffraction with step-scanning, revealed no asbestos in these samples.

PLT-04771-0033

Case 3:16-md-02738-MAS-RLS   Document 16137-18   Filed 12/22/20   Page 42 of 164 PageID: 129454

TABLE 3. Qualitative Analysis of Bulk Samples by X-Ray Diffraction

| Source | Major (20-100%) | Minor (5-20%) | Trace (<5%) |
|---|---|---|---|
| Mine (37) | Talc Magnesite | Chlorite (Dolomite) | Dolomite Calcite Quartz Biotite Ankerite Chromite Phlogopite Oligoclase |
| Mill (20) | Talc Magnesite | Chlorite (Dolomite) | Calcite Quartz Phlogopite Biotite Dolomite |

## RESPIRABLE MASS SAMPLES

The personal respirable mass concentrations of the miners for the two sampling surveys are presented in Table 4. Companies A and B were working one mine, while Company C had three mines in operation in the summer and two mines during the

TABLE 4. Respirable Mass Concentrations of Vermont Miners

| Company | | Summer 1975 | | | Winter 1976 | | |
|---|---|---|---|---|---|---|---|
| | | (N) | GM | GSD (mg/m³) | (N) | GM | GSD (mg/m³) |
| A | Underground Mine | (18) | 0.6 | 2.1 | (16) | 0.5 | 2.1 |
| B | Underground Mine | (18) | 1.5 | 1.6 | (23) | 0.9 | 1.9 |
| C | Underground Mine | (12) | 0.6 | 1.9 | (19) | 0.7 | 1.8 |
| | Walk-in Mine | ( 7) | 1.2 | 2.2 | | | |
| | Walk-in Mine | | | | ( 6) | 1.7 | 3.3 |
| | Open Pit Mine | ( 2) | 0.1 | 1.4 | | | |

GM - Geometric mean
GSD - Geometric standard deviation
N - Number of samples

PLT-04771-0034

Case 3:16-md-02738-MAS-RLS Document 10137-10 Filed 12/22/20 Page 43 of 164 PageID: 129455

winter survey. Table 4 shows that the highest dust concentrations in the underground mines occur at Company B. The ore in this mine is relatively hard, and the extensive drilling operations required to break apart the large boulders may account for the higher dust levels. There is no statistical difference between the dust exposures of the summer and winter surveys for the mines.

The respirable mass data of the millers for the summer and winter surveys are presented in Table 5. With the exception of Mill #1 at Company C, all the Vermont talc mills are large, barn-like, drafty structures heated by space-heaters. Despite the

TABLE 5. Respirable Mass Concentrations of Vermont Millers

| Company | Shift | Summer 1975 | | | Winter 1976 | | |
|---|---|---|---|---|---|---|---|
| | | (N) | GM | GSD (mg/m³) | (N) | GM | GSD |
| Company A | 1st | ( 4) | 1.7 | 1.6 | (13) | 1.7 | 1.9 |
| | 2nd | ( 6) | 0.5 | 2.0 | ( 3) | 1.5 | 2.2 |
| Company B | 1st | (22) | 1.6 | 1.8 | (42) | 1.8 | 1.6 |
| | 2nd | (12) | 2.9 | 1.7 | (16) | 1.9 | 1.6¹ |
| Company C | | | | | | | |
| Mill #1 | 1st | (12) | 0.9 | 2.4 | (20) | 1.1 | 2.8 |
| | 3rd | ( 3) | 0.8 | 2.0 | ( 4) | 1.4 | 1.9 |
| Mill #2 | 1st | (11) | 1.0 | 1.4 | ( 8) | 0.5² | 1.7² |
| | 2nd | (13) | 0.8 | 1.5 | ( 3) | 1.1 | 1.5 |

¹ $p < 0.5$
² $p < 0.2$
GM - Geometric mean
GSD - Geometric standard deviation
N - Number of samples.

winter closed-door policy, Table 5 shows that the dust concentrations were statistically different for only two shifts during the winter study. At Company B, the lower winter respirable dust exposures for the second shift may be caused by the severe weather conditions which forced the milling area employees to stay inside their acoustical booths whenever possible.

Case 3:16-md-02738-MAS-RLS Document 16137-10 Filed 12/22/20 Page 44 of 164 PageID: 129456

Of the three companies, the millers at Company C have the lowest respirable dust exposures. The bagging area at Mill #1 was not operational in the summer, since most of the product is shipped in bulk. However, this area was sampled during the winter survey and may partially account for the slight increase in the mean dust exposures. Since only the bagging area at Mill #2 was operational during the winter survey, the mean exposures are lower than the summer data.

## FIBER COUNTS

The carcinogenic potential and the hazards of asbestos exposures have been well documented. Also, several types of asbestos are known to be geological contaminants in talc ore. Since the accepted best index of exposure to asbestos requires counting the respirable fibers in the worker's breathing zone, a problem arises in the methodology of distinguishing asbestos fibers from talc. Characteristically, talc has a tendency to curl and stand on its edge which may result in many erroneous counts by optical microscopy.

The latest USPHS/NIOSH method for counting asbestos fibers requires phase contrast microscopy at X400-500 magnification, and arbitrarily defines a fiber as a particulate with a length to width ratio of 3:1 or greater, and a maximum width and minimum length of 5 micrometers (Leidel *et al.*, in press). This method is a crude determination of total fiber exposure because of the resolution limitations of optical microscopy. Most airborne asbestos fibers are less than $5\,\mu m$ in length, and those that are longer may have diameters too small to be resolved by phase contrast microscopy.

To compensate for the many controversies, our sampling protocol involved taking parallel fiber samples on Millipore (0.8 $\mu$m) and Nuclepore (0.4 $\mu$m) filters and quantitating the fibers by phase contrast microscopy and scanning electron microscopy. The fiber samplers were placed in the immediate vicinity of the worker, and a breathing zone sample was obtained without having the man wear the pumps. The Millipore filters were counted using the latest USPHS/NIOSH method at X437 magnification.

The evaluation of the corresponding Nuclepore filter by scanning electron microscopy at X5000 magnification allows one to morphologically distinguish rolled talc particles and talc shards from actual fibers. Fibers less than five micrometers in length may be counted by the higher magnification of this instrument, and the sample stage may be rotated to view a specific particle at various angles. Figures 1 through 7 represent scanning electron micrographs (SEM) of some Nuclepore filter samples showing rolled talc and elongated talc particles. Phase contrast magnifications cannot resolve the detailed morphology of these particles, and hence they would be erroneously counted as fibers.

Table 6 represents a partial list of fiber samples, and shows that by phase contrast microscopy the counts range from 0 to 60 fibers/cc. The parallel filters counted by SEM are greatly reduced and range from 0 to 0.8 fibers/cc. These concentrations are below the present time-weighted average (TWA) of asbestos which is 2 fibers/cc greater than five micrometers in length based on the phase contrast method. If the minimum length restriction is released, then the total fiber concentration for some of these samples changes slightly and ranges from 0 to 2.0 fibers/cc. Thus this SEM method provides a more realistic approach to fiber counting in the talc industry.

PLT-04771-0036

370                                    BOUNDY ET AL.                         EXPC:



FIGURE 1. Scanning electron micrograph of a Nuclepore filter showing a counting field at X400 which is
the magnification recommended for fiber counting by phase contrast microscopy. Notice the number of
elongated particles that fit the definition of a fiber.

FIGURE 2
located in

Case 3:16-md-02738-MAS-RLS Document 10137-16 Filed 12/02/20 Page 46 of 164 PageID: 129458



FIGURE 2. Scanning electron micrograph at X7000 magnification showing that the elongated particle located in the center of Figure 1 is morphologically not a fiber.

PLT-04771-0038

BOUNDY ET AL

EXPOSURES



FIGURE 3. Scanning electron micrograph of one rolled talc particle at X12,000 which has curled on both sides to form a tube. At a lower magnification this particle would be counted as a fiber.

FIGURE 4.   S
magnification w
laminated featur

Case 3:16-md-02738-MAS-RLS Document 16137-10 Filed 12/22/20 Page 48 of 164 PageID: 129460



FIGURE 4. Scanning electron micrograph of an elongated particle standing on edge at X3500 magnification which might be considered as a fiber. By rotating the sample stage 60° (Figure 5), the laminated features of this talc particle can be seen.

PLT-04771-0040

374

BOUNDY ET AL.



FIGURE 5. (see Fig. 4 for legend).

EXPOSURES TO NON-ASBESTIFORM TALC                                    375



**FIGURE 6.** Scanning electron micrographs showing that even some "fibers" are not immune from closer scrutiny. When the sample stage of the "fiber" in Figure 6 is rotated 50°, this "fiber" has the appearance as shown in Figure 7. These magnifications are X5000 and X15,000 respectively.

PLT-04771-0042

BOUNDY ET AL.



FIGURE 7. (see Fig. 6 for legend).

Case 3:16-md-02738-MAS-RLS   Document 16137-10   Filed 12/22/20   Page 52 of 164 PageID: 129404

TABLE 6. Fiber Counts

| Company | | Location | Phase Contrast (fibers/cm³ > 5 µm length) | SEM | SEM fibers/cm³ |
|---|---|---|---|---|---|
| A | Mine | Bobcat area | 3.8 | 0 | 0.3 |
| | | Drilling area | 4.1 | 0 | |
| | Mill | Crushing area | 4.7 | 0 | — |
| | | Bagger | 63.5 | 0 | |
| | | Palletizer | 7.9 | 0.7 | |
| B | Mine | Driller | 0.8 | 0 | |
| | | Scraper | 16.1 | 0.7 | 2.0 |
| | Mill | Crusher | 1.6 | 0 | |
| | | Bagger | 6.0 | 0.8 | |
| | | Palletizer | 4.6 | 0.3 | |
| C | Underground mine | Driller | 0.6 | 0.3 | |
| | | Mucker | 0 | 0.3 | 0.6 |
| | Walk-in Mine | Automatic Miner | 7.5 | 0 | |
| | Mill #2 | Bagging Area | 0.6 | 0.1 | |
| | | Palletizing area | 1.7 | 0 | |

## CONCLUSIONS

The Vermont talc industry was selected by NIOSH for both epidemiological and environmental surveys to establish a TWA dust exposure because this talc was believed to contain minimum amounts of quartz and asbestos. This environmental study characterized bulk samples from the three companies, and quantitated the talc workers' dust exposures. X-ray diffraction studies showed that the bulk samples contained major amounts of talc, and only trace amounts of quartz were found in 15% of these samples. Petrographic microscopy analyses, analytical transmission electron microscopy, and x-ray diffraction with step-scanning revealed no asbestos in the bulk samples.

The study further showed that SEM should be considered as an adjunct to the USPHS/NIOSH method when counting fibers in a dust environment. Phase contrast microscopy may suffice in an asbestos environment, but the resolution limitations of optical microscopy and the inability to distinguish rolled talc particles and talc "shards" from actual asbestos fibers will allow only a crude determination of the total fiber exposure.

FIGURE 7. (see Fig 6 for legend).

PLT-04771-0044

378                                         **BOUNDY ET AL.**

## REFERENCES

Brown, C.E.: Talc. In Brobst, D.A. and Pratt, W.P. (editors), U.S. Mineral Resources. Washington, D.C., 1973, pp. 619-625.

Caroe, J.W., Golden, A.S., Lynch, J.J., and Burgess, W.A.: The Determination of Quartz in Airborne Respirable Granite Dust by Infrared Spectrophotometry. Am. Ind. Hyg. Ass. J. 34: 298, 1973.

Hildick-Smith, G.Y.: The Biology of Talc. Brit. J. Ind. Med. 33: 217, 1976.

Jacobs, E.C.: Talc and the Talc Deposits of Vermont. Ninth Report Vermont State Geologist, 1914, pp. 382-429.

Jacobs, E.C.: The Talc and Verde Antique Deposits of Vermont. Report Vermont State Geologist, 1918, 232-281.

Leidel, N.A., Bayer, S.G., and Zumwalde, R.D.: USPHS/NIOSH Membrane Filter Method for Evaluating Airborne Asbestos Fibers. (in press).

Weiss, B. and Boettner, E.A.: Commercial Talc and Talcosis. Archives of Env. Health 14: 304, 1967.

PLT-04771-0045

**EXHIBIT E**

PLT-04771-0046

✚ EMV
ASSOCIATES

Consultant Report to
Johnson & Johnson

ANALYSIS OF TWO TALC
SAMPLES BY SEM/EDS

24 September 1982

Submitted by:

EMV ASSOCIATES, INC.

*Ethan J. Goldberg*

Ethan J. Goldberg
Laboratory Director

*John M. Wehrung*

John M. Wehrung
Executive Vice President

PLT-04771-0047

+EMV
ASSOCIATES

## ANALYSIS AND RESULTS

Two talc samples were examined for freedom from asbestos by scanning electron microscopy and energy dispersive spectroscopy (SEM/EDS).

The samples were designated as 100 mesh ore acid steeped (EMV #1) and ground ore at 100 mesh (EMV #2).

The samples were prepared by two methods. The first method involved placing a representative quantity of the powder onto double sided tape until a uniform dispersion of particles was obtained. The second method involved placing a representative quantity of powder into a beaker containing 20 ml of ethanol. This mixture was ultrasonically treated for 10 seconds to allow the powder to become suspended in the ethanol. The ultrasonic treatment was then stopped allowing for a density separation of the particles in the ethanol. The top layer of ethanol (which would contain the lighter asbestos particles, if present) was then filtered directly across a Nuclepore membrane (47 mm diameter, 0.2 um pore size). A 1 $cm^2$ region of the filter was trimmed and mounted on an SEM stub.

All samples were then coated with an evaporated layer of carbon for electrical conductivity.

The samples were examined at various magnifications (1000X to 10,000X) during the investigation with the SEM. Any fibrous particles encountered were identified by EDS analyses and an EDS spectrum was also obtained for typical talc particles. Total area viewed during the examination was approximately 0.5 $mm^2$.

PLT-04771-0048



Results of the analysis on these samples are that no asbestos was detected. In addition, prismatic and blocky forms of tremolite were not detected.

Representative SEM micrographs and EDS spectra for typical areas observed are shown in Figures 1 and 2.

PLT-04771-0049

EMV
ASSOCIATES



2000X



Figure 1.   SEM micrograph of talc particles observed during the analysis
of sample 100 mesh ore acid steeped (EMV #1).   EDS spectrum is
representative of particles encountered throughout the sample.

PLT-04771-0050





2000X



Figure 2.   SEM micrograph of talc particles observed during the analysis of sample ground ore at 100 mesh (EMV #2).  EDS spectrum is representative of particles encountered throughout the sample.

PLT-04771-0051

# CERTIFICATE OF MICROANALYSIS
# FOR ASBESTOS

**SAMPLE DESCRIPTION:**   100 mesh ore acid steeped (EMV #1)
and ground ore at 100 mesh (EMV #2)

**METHOD OF ANALYSIS:** Qualitative physical and chemical characterization of fibrous
material with the scanning electron microscope and energy
dispersive x-ray analyzer.

**RESULTS:**   No asbestos detected.

*John M. Wehrung*
**Analyst**

*9-23-82*
**Date**

*Ethan J. Goldberg*
Ethan J. Goldberg
Laboratory Director

**EMV ASSOCIATES** INC

MICROANALYSIS LABORATORY
15825 Shady Grove Road
Rockville, Maryland 20850

PLT-04771-0052

EXHIBIT F

PLT-04771-0053

**EMV**
ASSOCIATES

Consultant Report to
Johnson & Johnson

ANALYSIS OF ONE TALC
SAMPLE BY SEM/EDS

18 October 1982

Submitted by:

EMV ASSOCIATES, INC.

Leonard G. Burrelli
Research Analyst

Ethan J. Goldberg
Laboratory Director

PLT-04771-0054



## ANALYSIS AND RESULTS

One talc sample was examined for freedom from asbestos by scanning electron microscopy and energy dispersive spectroscopy (SEM/EDS).

The sample was designated as talc ore coded 529-162.

The sample was prepared by two methods.  The first method involved placing a representative quantity of the powder onto double sided tape until a uniform dispersion of particles was obtained.  The second method involved placing a representative quantity of powder into a beaker containing 20 ml of ethanol.  This mixture was ultrasonically treated for 10 seconds to allow the powder to become suspended in the ethanol.  The ultrasonic treatment was then stopped allowing for a density separation of the particles in the ethanol.  The top layer of ethanol (which would contain the lighter asbestos particles, if present) was then filtered directly across a Nuclepore membrane (47 mm diameter, 0.2 um pore size).  A 1 $cm^2$ region of the filter was trimmed and mounted on an SEM stub.

The sample  was then coated with an evaporated layer of carbon for electrical conductivity.

The sample was examined at various magnifications (1000X to 10,000X) during the investigation with the SEM.  Any fibrous particles encountered were identified by EDS analyses and an EDS spectrum was also obtained for typical talc particles.  Total area viewed during the examination was approximately 0.5 $mm^2$.

EMV
ASSOCIATES

No asbestos was detected in this sample during the analysis.  In addition, prismatic and blocky forms of tremolite were not detected.

A representative SEM micrograph and EDS spectrum for a typical area observed is shown in Figure 1.

PLT-04771-0056





2000X



Figure 1.  SEM micrograph of talc particles observed during the analysis of Johnson & Johnson sample 529-162.  EDS spectrum is representative of particles encountered throughout the sample.

# CERTIFICATE OF MICROANALYSIS

# FOR ASBESTOS

**SAMPLE DESCRIPTION:**

Talc ore 529-162

**METHOD OF ANALYSIS:** Qualitative physical and chemical characterization of fibrous material with the scanning electron microscope and energy dispersive x-ray analyzer.

**RESULTS:** No asbestos detected.

_Leonard S. Burrell_
**Analyst**

18 October 1982
**Date**

_E. J. Goldberg_
**Ethan J. Goldberg**
**Laboratory Director**

## EMV ASSOCIATES INC

MICROANALYSIS LABORATORY
15825 Shady Grove Road
Rockville, Maryland 20850

PLT-04771-0058

**EXHIBIT G**

PLT-04771-0059

Volume _____
Pages _____
Exhibits ___A and B___

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - x
DAVID HOWARD WESTFALL IN HIS          :
CAPACITY AS ADMINISTRATOR OF THE      :
ESTATE OF THOMAS HOWARD WESTFALL      :
AND HIS CAPACITY AS ADMINISTRATOR     :
OF THE ESTATE OF BETTY E. WESTFALL,   :
                    Plaintiff,        :
                                      :
        v.                            :
                                      :      Civil Action
WHITTAKER, CLARK & DANIELS,           :      No. 79-0269
METROPOLITAN TALC COMPANY, INC.,      :
PFIZER, INC., WINDSOR MINERALS, INC., :
ITSELF AND AS SUCCESSOR TO EASTERN    :
MAGNESIA TALC COMPANY, INC., AND      :
OMYA, INC., ITSELF AND AS SUCCESSOR   :
TO VERMONT TALC COMPANY, INC.,        :
                    Defendants.       :
- - - - - - - - - - - - - - - - - - - x

        VIDEOTAPE DEPOSITION of ALFRED H. CHIDESTER, a witness

called on behalf of the Defendants, taken pursuant to the

Federal Rules of Civil Procedure, before Doris M. Jones,

Registered Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the Offices of

Nutter, McClennen & Fish, 600 Atlantic Avenue, Boston,

Massachusetts, on Sunday, October 23, 1983, commencing at

10:15 a.m.

PRESENT:

        Decof & Grimm (by R. Daniel Prentiss, Esq.),
            One Smith Hill, Providence, Rhode Island 02903,
            for the Plaintiff.
                                    (continued)

PLT-04771-0060

1     am from Providence, Rhode Island and I represent

2     Omya, Inc.

3                    MR. PRENTISS:   I am Dan Prentiss.   I am

4     from the firm of Decof & Grimm in Providence and I

5     represent the plaintiff.

6                    MR. LEIBENSPERGER:   I would now like to

7     ask the court stenographer and court officer to

8     swear in the witness please.

9

10                      ALFRED H. CHIDESTER

11    a witness called for examination by counsel for

12    the Defendants, being first duly sworn, was

13    examined and testified as follows:

14

15                      DIRECT EXAMINATION

16       BY   MR. LEIBENSPERGER:

17       Q.    Sir, would you state your full name

18    please.

19       A.    Alfred H. Chidester.

20       Q.    And what's your home address?

21       A.    2427 Alsop, A L S O P, Court, Reston,

22    Virginia.

23       Q.    Where are you employed?

24       A.    U.S. Geological Survey.

PLT-04771-0061

1       Q.    Are you married, sir?

2       A.    Yes.

3       Q.    Any children?

4       A.    Three.

5       Q.    Their ages?

6       A.    Thirty-nine, 32 and 25.

7       Q.    How long have you been employed by the

8 United States Geological Survey?

9       A.    Thirty-nine years. I think. Just

10 about. Nearly 39 years.

11       Q.    And what's your present position?

12       A.    I am the associate chief of the Office

13 of International Geology.

14       Q.    Would you tell us what the United

15 States Geological Survey is.

16       A.    It's an organization that has the

17 responsibility to prepare topographic maps of the

18 United States, to assess the mineral resources of

19 the United States and the water resources.

20       Q.    Is it a governmental agency?

21       A.    Yes.

22       Q.    Under what --

23       A.    Department of the Interior.

24       Q.    A federal government agency then?

DORIS M. JONES & ASSOCIATES

1          A.     Yes.

2          Q.     Sir, where did you attend under-

3    graduate college?

4          A.     Augustana College in Rock Island,

5    Illinois.

6          Q.     And what year did you graduate?

7          A.     1942.

8          Q.     And what degree did you receive from

9    Augustana College?

10         A.     B.A. I think it was.  A.B., whichever

11   it is.

12         Q.     In what major please?

13         A.     In mathematics.

14         Q.     Now did you go on to any higher

15   education?

16         A.     Yes, I went to graduate school at the

17   University of Chicago.

18         Q.     And what degree did you receive from

19   the University of Chicago?

20         A.     Ph.D.

21         Q.     What year did you receive your Ph.D.

22   from Chicago?

23         A.     It was granted in 1959.

24         Q.     Did you spend some time in residence at

PLT-04771-0063

1    the University of Chicago?

2         A.    Yes.  A little over three years.

3         Q.    And what were those years?

4         A.    1942 to 1944 and '45 to '48.

5         Q.    Doctor Chidester, what was your first

6    full time employment in the field of geology?  I'm

7    sorry, let me take a step back.  I didn't ask you

8    what your Ph.D. was in at the University of

9    Chicago.

10        A.    Geology.

11        Q.    What was your first full time

12   employment in the field of geology?

13        A.    My first full time employment was a

14   short -- about two months working on pegmatites in

15   New Hampshire.  Then I transferred immediately

16   after that over to Vermont, working on the talc

17   deposits of Vermont.

18        Q.    By whom were you employed?

19        A.    Geological Survey.

20        Q.    So your first full time employment was

21   the U.S. Geological and Survey and you have been

22   employed by them ever since; is that correct?

23        A.    Yes.

24        Q.    What year was it that you went to

PLT-04771-0064

1    Vermont and began working in the area of talc

2    deposits?

3         A.    1944.

4         Q.    Did you develop a specialty or a

5    special area of interest within the United States

6    Geological Survey with respect to any particular

7    type of rock?

8         A.    Yes, I specialized in the geology of

9    the ultramafic rocks with which talc is associated.

10        Q.    You used the word ultramafic rock.

11   Would you tell us what that is please.

12        A.    It's an igneous rock that consists of

13   minerals that are high in magnesium and iron.

14        Q.    You use the word igneous rock.  Would

15   you tell us what igneous is please.

16        A.    It's a rock that at one time in its

17   history was molten.

18        Q.    Such as -- well, molten meaning --

19        A.    Melted.

20        Q.    Melted.  All right.  Let's take a step

21   back then.

22             With respect to your starting

23   employment in the area of talc and that area of

24   interest, how many years did you spend with the

DORIS M. JONES & ASSOCIATES

1    U.S. Geological Survey concerning yourself with

2    talc?

3          A.    Actually in field mapping probably

4    about a total of 19 years.

5          Q.    And where did this take place?

6          A.    In Vermont and northern Massachusetts,

7    with considerable trips to other areas of

8    ultramafic rock though throughout the United

9    States.

10         Q.    The primary area of your concentration

11   geographically was --

12         A.    Vermont.

13         Q.    Vermont?

14         A.    And northern Mass.

15         Q.    Okay.  At some point in time in your

16   career at the United States Geological Survey did

17   you change into another area of interest other

18   than talc?

19         A.    Yeah, I went into the lunar exploration

20   program.

21         Q.    Lunar exploration?

22         A.    Yes.

23         Q.    And what year was that?

24         A.    1963.

DORIS M. JONES & ASSOCIATES

PLT-04771-0066

1       Q.      And would you tell us just very briefly

2    what you did with respect to that?

3            A.      Well, I became involved in the manned

4    lunar exploration part of the lunar program and it

5    was training the astronauts in field geology.

6            Q.      Where did you train the astronauts?

7            A.      Oh, everywhere from Hawaii to Alaska to

8    Iceland.

9            Q.      Would you give us the years inclusive

10   that you were involved with training the

11   astronauts?

12           A.      1963 to 1971.

13           Q.      What was your title with respect to

14   this job position?

15           A.      Well, it changed several times.  It

16   started out as chief of the field training for

17   astronauts.  Then I became the chief of the manned

18   lunar exploration branch of the Geological Survey

19   and then was chief of the Astrogeology Center in

20   Flagstaff, Arizona.

21           Q.      Since 1970, Doctor Chidester, would you

22   tell us in a brief sketch what your area of

23   interest has been with respect to the United

24   States Geological Survey?

DORIS M. JONES & ASSOCIATES

PLT-04771-0067

1          A.     I have been primarily involved in the

2    international programs of the Geological Survey,

3    the coordination of those.

4          Q.     And your present title is what?

5          A.     Associate chief of the Office of

6    International Geology.

7          Q.     And what does that entail, being

8    involved with the international programs?

9          A.     Coordinating the activities of the

10   Geological Survey in cooperative research with

11   other countries throughout the world.

12         Q.     At the present time are you getting

13   ready to travel outside the United States?

14         A.     Yes.

15         Q.     Where are you going?

16         A.     South Africa.

17         Q.     On whose behalf are you going to South

18   Africa?

19         A.     The Geological Survey.

20         Q.     Will you tell us what this trip is just

21   very briefly?

22         A.     We have a cooperative program with

23   Australia, South Africa, Great Britain, West

24   Germany and -- the United States -- I knew there

PLT-04771-0068

1   was another one -- involving an assessment --

2   developing an inventory of the principal mineral

3   deposits throughout the world, exchanging

4   information amongst these participants on these

5   mineral deposits.

6          Q.    With respect to this particular

7   conference, if I can use that word, in South

8   Africa, what is your title or role?

9          A.    I am the chief of the U.S. delegation.

10         Q.    And when do you leave?  What date do

11  you leave for that trip to South Africa?

12         A.    26th of October.

13         Q.    And what date do you come back from the

14  trip to South Africa?

15         A.    November 17.

16         Q.    Doctor Chidester, do you belong to any

17  professional societies?

18         A.    Yes.

19         Q.    Would you tell us what those are please?

20         A.    The Geological Society of America,

21  American Mineralogical Society, the American

22  Geophysical Union, Sigma Psi.  Let's see, there

23  must be a few others but those are the principal

24  ones.

PLT-04771-0069

1     Q.    Now is the same true with the igneous

2  and sedimentary rocks?  Does that occur over

3  millions of years also?

4         A.    Ordinarily, yes.

5         Q.    Now how is the rock talc formed?

6         A.    Well, there are two principal kinds of

7  talc.  That is, in terms of what it was formed

8  from.  One is formed by the alteration of the

9  ultramafic rocks and talc is also formed by the

10  alteration of carbonate rocks like limestone.

11        Q.    So of the two ways that talc is formed --

12  and you used the word alteration.  Does that mean

13  change?

14        A.    Change, yes.

15        Q.    Over millions of years?

16        A.    Over a considerable period anyway, yes.

17        Q.    Hundreds of thousands of years?

18        A.    Hundreds of thousands.

19        Q.    All right.  Of the two ways that talc

20  is formed, which way is talc formed in Vermont?

21        A.    All the talc in Vermont that I am aware

22  of is formed by the alteration of ultramafic rocks.

23        Q.    So the only thing we are concerned

24  about here today is the formation of talc from

DORIS M. JONES & ASSOCIATES

PLT-04771-0070

1    what you call ultramafic rocks?

2         A.    Yes.

3         Q.    Would you tell us then what an

4    ultramafic rock is?

5         A.    Ultramafic rock in the sense that we

6    are using it is -- those in Vermont anyway -- are

7    rocks that -- they were originally igneous rocks

8    and they consisted of two rock types in various

9    mixtures, dunite and peridotite.

10        Q.    And then did something happen to those

11   rocks to cause them to change?

12        A.    In Vermont they were -- most of the

13   ultramafic rock bodies are almost entirely or

14   entirely altered to serpentine.  The rock name is

15   serpentinite but it's a rock consisting of the

16   mineral serpentine and talc.  Talc rock, let's say.

17        Q.    If I understand you, the periodotite

18   and the dunite over hundreds of thousands of years

19   in Vermont was altered to sepentinite; is that

20   correct?

21        A.    Yes.

22        Q.    What is sepentinite then?

23        A.    It's a rock consisting primarily of one

24   or more of the serpentine minerals, commonly

DORIS M. JONES & ASSOCIATES

PLT-04771-0071

1     antigorite, lizardite and chrysotile.

2          Q.     Now what happens --

3          A.     -- with minor accessory minerals.

4          Q.     What happens to serpentinite that

5     causes a change to talc?

6                 MR. PRENTISS:  Objection.

7          Q.     Let me rephrase the question.

8                 My original question was how was talc

9     formed and you have talked about the formation of

10    serpentinite.  What next happens in that process?

11         A.     Under appropriate conditions of

12    temperature and pressure the serpentinite can

13    alter to talc or -- actually I use the term talc

14    rock in a loose sense.  It's a rock consisting

15    either entirely of talc or a rock of talc and

16    magnesite.

17         Q.     Would you describe for us the changes

18    or the affects to serpentinite that causes that

19    alteration or change?

20                MR. PRENTISS:  Objection.

21         A.     With the -- when carbon dioxide carried

22    in solution deep within the earth, deep within the

23    rock mass, rock pile, reaches the body of

24    serpentinite, it's altered under appropriate

DORIS M. JONES & ASSOCIATES

PLT-04771-0072

2

1   conditions of temperature and pressure to talc and

2   magnesite.

3       Q.    How long does that take?

4       A.    Oh, I suppose that is a long continued

5   process.

6       Q.    Well, in numbers of years?

7       A.    Well, you know, it's really hard to say,

8   but hundreds of thousands to maybe a few million.

9       Q.    Years?

10      A.    Yes.

11      Q.    Does talc have a specific structure to

12  it that can be identified?

13      A.    Yes.

14      Q.    Is that also true of serpentinite or

15  serpentine?

16      A.    Yeah, there are three serpentine

17  minerals.

18      Q.    Can you tell the difference between

19  those two things by looking at the structure?

20      A.    Yeah.  Talc and serpentine minerals are

21  quite easily distinguished.

22      Q.    Doctor, we have talked up to now about

23  the rock talc and how talc was formed.  I am going

24  to change the subject now.  Would you tell us what

DORIS M. JONES & ASSOCIATES

PLT-04771-0073

81

1     asbestos is?

2              MR. PRENTISS:   Objection.   You can

3     answer.

4         A.     Asbestos in Vermont, the kind that we

5     are concerned with in Vermont that I have worked

6     with, is a form of serpentine called chrysotile

7     and it's formed in a body of serpentine rock,

8     serpentinite, by when it is fractured and material

9     moves -- these fractures are filled with a

10    solution, a fluid, mostly water, and the asbestos,

11    chrysotile asbestos grows into these fractures.

12        Q.     Let me take a step back about the word

13    asbestos.  What does the word asbestos mean?  Is

14    that a rock, a mineral?

15        A.     It's a particular -- it's a mineral

16    that has a particular shape really.

17        Q.     Are there types of asbestos?

18        A.     Yes.

19        Q.     What types are there?

20        A.     Well, the two basic principal divisions

21    are amphibole asbestos and chrysotile asbestos.

22        Q.     Now of the two types of asbestos,

23    amphibole on the one hand and chrysotile on the

24    other hand, which of those kinds of asbestos is

PLT-04771-0074

22

1    found in Vermont?

2         A.    Chrysotile.

3         Q.    Only chrysotile?

4               MR. PRENTISS:  Objection.

5         A.    It's the only kind mined and it's the

6    only kind that I have seen.

7         Q.    And I think you said in answer to a

8    previous question that the chrysotile asbestos

9    derives from serpentine or serpentinite; is that

10   correct?

11        A.    Yes.

12        Q.    Would you describe for us what that

13   process is.

14        A.    Under appropriate conditions of

15   temperature and pressure, when a fracture is

16   opened in the rock --

17        Q.    Opened in what rock?

18        A.    In the serpentinite or in the dunite.

19        Q.    All right.

20        A.    It can also form in a rock that is not

21   completely altered to serpentinite.  In fact it's

22   generally in these large bodies that there is some

23   residual igneous ultramafic rock left that you get

24   the chrysotile asbestos.  And under these

DORIS M. JONES & ASSOCIATES

PLT-04771-0075

1    conditions material moves up from the wall rock

2    into -- because of the -- I want to avoid getting

3    too technical but it moves out into the wall rock

4    and forms fibers, hairlike filaments of chrysotile

5    that commonly are oriented normal or at a large

6    angle to the adjacent -- to the adjacent rock

7    bounding the fracture.

8         Q.    Is chrysotile asbestos found only --

9    well, let me withdraw that question.

10             You mentioned a crevice or a vein

11   before?

12             MR. PRENTISS:  Objection.

13        Q.    What did you mean by that?  A crevice

14   or vein in what?

15             MR. PRENTISS:  Objection.

16        A.    A fracture in the host rock.

17        Q.    What is the host rock?

18        A.    Sepentinite or dunite.

19        Q.    What do you mean by fracture?

20        A.    It's a -- well, it's a space in which a

21   rock opens up to form a void of appreciable length

22   and width and generally much smaller thickness.

23        Q.    What occurs in that fracture with

24   respect to this forming of asbestos you have

PLT-04771-0076

1    talked about?

2         A.    Because of chemical relations the

3    material from the rock bounding the fracture moves

4    out into the void and develops chrysotile asbestos.

5         Q.    I think you said before that you find

6    veins of chrysotile asbestos in a host rock of

7    serpentinite or dunite; is that correct?

8         A.    Yes.

9         Q.    Do you ever find veins of chrysotile

10   asbestos in talc?

11        A.    In a talc rock?  No, I have never.

12        Q.    Why not?

13        .     MR. PRENTISS:   Objection.

14        A.    Because the process by which the talc

15   was formed has changed the serpentine, all the

16   serpentine minerals to talc.  So any asbestos that

17   may have been there in the first place is altered

18   to talc.

19        Q.    How long does that take?

20        A.    Oh, you know, hundreds of thousands to

21   millions of years again.

22        Q.    Between serpentine or serpentinite and

23   chrysotile asbestos, which would alter first into

24   talc?

PLT-04771-0077

1   personally been at the Johnson mine in Johnson,

2   Vermont?

3        A.     Yes.

4        Q.     Would you compare the Johnson mine with

5   this average ultramafic body with respect to the

6   existence of serpentinite?

7        A.     Yeah.   The Johnson mine has virtually --

8   well, not -- not no serpentinite, but very little

9   serpentinite.

10       Q.     Well, would you tell us with the

11  drawing you are looking at right now, with this

12  drawing, what happens to the serpentinite -- or

13  what happened to the serpentinite at the Johnson

14  mine?

15       A.     Well, it all changed to talc and

16  magnesite.

17       Q.     So that the area in the middle which is

18  serpentinite --

19       A.     Like so.

20       Q.     I understand.   All right.   Why don't

21  you have a seat again, Doctor Chidester, and let

22  me ask you a few more questions.

23            I think your earlier testimony was that

24  you spent from approximately 1943 or 4 to 1952

DORIS M. JONES & ASSOCIATES

1    studying talc; is that correct?

2         A.    Yes.

3         Q.    Would you tell us, for example, in

4    Vermont just a description of what -- how many

5    mines, for example, you visited?

6              MR. PRENTISS:   Objection.

7         Q.    In those years of '44 to '52, how many

8    mines did you go to in Vermont?

9              MR. PRENTISS:   Objection.

10        Q.    Talc mines, I mean.

11        A.    To virtually every talc mine.

12        Q.    Which is how many approximately?

13        A.    Well, at that time there were probably

14   four or five active and several that were shut

15   down.

16        Q.    All right.  And what did you do as part

17   of your job for the United States Geological

18   Survey with respect to looking at the talc mines?

19             MR. PRENTISS:   Objection.

20        A.    I would map the talc mine, collect

21   samples, analyze the samples and write a report.

22        Q.    Would you tell us what it means to map

23   the talc mine?

24        A.    Well, mapping a mine consists of two

PLT-04771-0079

1    phases.   One, mapping the surface outcrop of the

2    rocks in which you plot the distribution of the

3    different rock types on a map and draw in the

4    boundaries between the different rock types and

5    make observations on the attitudes of the

6    boundaries between these rock types, the contacts,

7    and then the underground workings you do the same

8    only on a plot of the mine workings themselves.

9         Q.    Now do you have to go into the mine

10   itself to do the mapping?

11        A.    Yes.

12        Q.    Would you tell us then what do you do

13   in terms of actually looking at things and getting

14   it down on paper?  What's the process?

15        A.    You take a plot of the mine workings,

16   which also includes in the mining activity they

17   actually drill -- make diamond drill holes ahead

18   of them to plan their mining so that they know the

19   distribution ahead of the talc rock.

20            So using this basic information you map

21   in the walls, the distribution of rock types in

22   the walls of the mine workings and make sketches

23   of the roof or anything else that is relevant to

24   collect samples for analysis.

PLT-04771-0080

1          Q.     Now what do you do with the samples

2    that you collect?

3          A.     Examine them with a hand lens and then

4    make a selection of samples that are

5    representative of different rock types and of the

6    different areas so that you adequately cover the

7    area of the mine and make thin sections for

8    microscopic study and select some for chemical

9    analysis.

10         Q.     Now with respect to the Johnson mine in

11   Johnson, Vermont, did you have a direct experience

12   or were you personally there at the Johnson mine

13   at sometime?

14         A.     Yes.

15         Q.     Did you map Johnson mine?

16         A.     Yes.

17         Q.     Tell us when that was.

18         A.     194 -- the intensive period of mapping

19   was 1944 to 1945.

20         Q.     When you say intensive period, would

21   you describe your day to day working.

22         A.     Virtually we made a map of the surface

23   and then map of the underground virtually every

24   day, spent much of that period actually in

PLT-04771-0081

1    underground mapping and surface mapping.

2         Q.    Since that time, 1945, have you been

3    back to the Johnson mine?

4         A.    Yeah, I'd go back periodically after

5    1948 when I returned to Vermont to update the

6    mapping as they progressed in their mining.

7         Q.    Approximately how many times after 19 --

8    I guess commencing in 1943 did you go back to

9    update the mapping?

10        A.    Oh, probably two, three, four times a

11   year.

12        Q.    Through what year?  What was the last

13   time you updated the mapping at the Johnson mine?

14        A.    Probably in the mid-fifties.

15        Q.    Was that your best memory?  Can you

16   give us a year?

17        A.    No, not really.  I'd say probably

18   around '54, '55, something like that.

19        Q.    Since 1954, 1955, have you gone back to

20   the Johnson mine for any purpose?

21        A.    I would go back occasionally to take

22   foreign visitors who were interested in talc,

23   probably two or three, four times.

24        Q.    Can you give us the years that you took

DORIS M. JONES & ASSOCIATES

5

1    visitors back to the Johnson mine after 1954 to '557

2        A.    I'd say probably the last time would

3    have been in '51 or '52.

4        Q.    Now with respect to the Johnson mine

5    mapping, did you take any samples from the Johnson

6    mine?

7        A.    Yes.

8        Q.    Would you describe for us how you took

9    samples, where you took them, and what you did

10   with the samples?

11       A.    I took them out of the mine workings

12   themselves, the walls of the levels, out of the

13   stopes and particularly out of the stopes where

14   the principal -- where the ore is fully mined.

15       Q.    You are going to have to tell us what a

16   stope is.

17       A.    It's a large opening above a level

18   hallway, haulage way that is raised up along the

19   talc body, in the talc body, and they open this

20   out by various kinds of mining methods, and I'm no

21   mining engineer so I won't attempt to describe

22   them, so that it ends up as a very large opening,

23   maybe a hundred or more feet high, several hundred

24   feet long and 50, 60, 30, a hundred feet wide.

PLT-04771-0083

```
 1          Q.     Is this all underground?

 2          A.     Yes.

 3          Q.     So go ahead, tell us further where

 4    you take samples in the underground --

 5          A.     Throughout the mine really, wherever

 6    there was a -- so that I had a good geographic

 7    representation of the rocks as well as a good

 8    selection of slight variations in rock type, both

 9    of the country rock and of the talc body itself.

10          Q.     Would you tell us how many samples you

11    took from the Johnson mine?

12          A.     Oh, I would guess three, four, five

13    hundred.

14          Q.     And what did you do with those samples?

15          A.     After examining them by hand lens, I

16    selected probably a hundred or so for thin

17    sections.

18          Q.     When you say thin sections, would you

19    tell us what that means?

20          A.     You cut a thin slice of rock, just very

21    thin so that light -- so the light can be

22    transmitted through it, and it's mounted on a

23    glass slide covered with a glass plate.  You put

24    it under a microscope, petrographic microscope,
```

DORIS M. JONES & ASSOCIATES

PLT-04771-0084

1       MR. PRENTISS:  Well, objection.  I

2   think that calls for a yes or no answer.

3       A.    Yes.

4       Q.    Let me withdraw the question and I will

5   get back to it.

6             Did you go into this mine that you have

7   now drawn for us?

8       A.    Yes.

9       Q.    Did you observe anywhere in the mine

10  any serpentinite?

11      A.    During the time that I was mapping

12  there, there was no serpentinite exposed in any of

13  the active mine workings.  There was an old mine

14  working that had been shut down for a number of

15  years, and I'm not sure how many, several years

16  though, before I started mapping, in which they

17  had encountered serpentinite.

18            MR. PRENTISS:  Objection.  Motion to

19  strike.

20      Q.    Let me go back for a moment.

21            What year did you start your mapping at

22  Johnson mine?

23      A.    '44.

24      Q.    And would you show us, for example, on

DORIS M. JONES & ASSOCIATES

PLT-04771-0085

1   this drawing where the mine shaft would be that

2   the miners would go down in to get to the talc?

3        A.    Well, in the early days of mining they

4   went down on talc outcropping at the surface.

5   They went down for maybe a hundred feet.  Then --

6        Q.    By the early days of mining you mean

7   when?

8        A.    The early 1900s.

9        Q.    Before you were there?

10       A.    Before I was there.

11       Q.    And they went down about a hundred feet?

12       A.    Something like that.

13       Q.    Show us a hundred feet on this.

14       A.    There.

15       Q.    Just down to there?

16       A.    Yes.

17       Q.    When you got down there in 1944 was

18   that shaft going down a hundred feet still being

19   operated?

20       A.    No.

21       Q.    What shaft was being operated in 1944?

22       A.    They had put another shaft principally

23   in the country rock at 45 degrees.

24       Q.    So it angled down in the country rock?

PLT-04771-0086

1    A.    Yes.

2         Q.    And then how would they get from that

3    shaft to where the talc was?

4         A.    They would drift over from the shaft at

5    appropriate intervals, something on the order of a

6    hundred feet, I recall, and then drift along the

7    length of the ore body.

8         Q.    The ore body meaning the talc?

9         A.    Yes.

10        Q.    Now I asked you before whether you had

11   ever in your time at Johnson mine observed any

12   serpentinite and would you answer that question

13   again please.

14        A.    Yes.

15        Q.    Where was that?

16        A.    At the north end of this old working.

17        Q.    All right.  Did you ever observe any

18   serpentinite in the active mine?

19        A.    No.

20        Q.    At any of your time at Johnson mine did

21   you ever observe any asbestos at the mine?

22        A.    No.

23        Q.    Were you looking for asbestos?

24        A.    Yes.

PLT-04771-0087

1     Q.    Why?

2     A.    Well, I was interested in establishing

3   how these deposits -- and one of the critical

4   things to establish is the relation of the talc to

5   the serpentinite and the relation in terms of age

6   and the relation of the talc to the asbestos in

7   the serpentinite.

8     Q.    All right.  Have you been in other

9   ultramafic bodies other than the Johnson mine

10  where you did see serpentinite, for example?

11        MR. PRENTISS:  Objection.

12    A.    Yes.

13    Q.    So you had seen serpentinite before; is

14  that correct?

15    A.    Oh, yes.

16        MR. PRENTISS:  Objection.

17    Q.    And have you -- had you been in that

18  time, in the 1940s and 1950s, in an ore body where

19  there was asbestos?

20        MR. PRENTISS:  Objection.

21        MR. DOLAN:  Objection.

22    A.    Yes.

23    Q.    Had you seen asbestos before?

24    A.    Yes.

PLT-04771-0088

1      Q.    In a mine?

2      A.    Yes.

3      Q.    Now with respect to the samples that

4   you took from the Johnson mine, I think you said

5   several hundred; is that correct?

6      A.    Yes.

7      Q.    Did you ever see any asbestos in any of

8   those samples?

9      A.    No.

10      Q.    You also looked at under a microscope --

11   I forget the number now, was it over a hundred?

12      A.    Over a hundred.

13      Q.    -- samples from the Johnson mine.  Did

14   you see any asbestos in any of those microscopic

15   thin sections?

16      A.    No.

17      Q.    Have you seen in your experience or had

18   you seen at that time in your experience asbestos

19   under a microscope?

20      A.    Yes.

21      Q.    Would you tell us please what

22   microscope -- you may sit down, Doctor Chidester,

23   if you want.

24            Would you tell us please what type of

PLT-04771-0089

1    microscope you used in the 1940s and '50s to

2    examine the samples from the Johnson mine?

3         A.    It was a Leitz spectrographic

4    microscope, polarizing microscope.

5         Q.    The first word you said was?

6         A.    Leitz.

7         Q.    Can you spell it?

8         A.    L E I T Z.

9         Q.    And do you still today on occasion look

10   at rocks or rock samples under a microscope?

11        A.    Rarely but occasionally.

12        Q.    What sort of microscope would you use

13   today to look at a sample?

14        A.    Essentially the same kind, that

15   probably costs about ten times as much but

16   essentially the same kind.

17        Q.    Would you tell us please the procedure

18   you use when you look in the microscope to be able

19   to identify the material you are looking at on the

20   thin section?

21        A.    Well, there are various optical

22   properties that are characteristic of different

23   minerals and they relate to the rate at which

24   light goes through the mineral and light gets

PLT-04771-0090

1   through minerals -- each mineral it may go through
2   in different rates in different directions.
3          So depending upon the individual
4   mineral, you get these variations in three or four
5   optical properties that enable you to distinguish
6   one mineral from another.  That's the mineral
7   identification.
8          Then you are concerned with the
9   relations between minerals, the fabric of the rock
10  itself and that the polarizing microscope brings
11  these out too.
12         So essentially you are identifying
13  textural relations of minerals and mineral species,
14  identifying mineral species.
15      Q.   Would the microscopic technique you
16  used in the 1940s and  '50s reveal the existence
17  of asbestos in the samples?
18      A.   Yes.
19      Q.   And with respect to the Johnson mine
20  did you see any asbestos?
21      A.   No.
22      Q.   Did any of the samples that you took
23  from the Johnson mine, were they taken to the
24  Smithsonian Institute?

PLT-04771-0091

1                    MR. PRENTISS:  Objection.

2         A.     There are some there now so I presume

3    they were taken there.

4         Q.     Do you know about that, as to how and

5    if any samples went to the Smithsonian?

6         A.     Actually what the -- the Smithsonian is

7    the official I think repository of samples from

8    the Geological Survey, but they are so buried in

9    samples that all they want are those that have

10   been chemically analyzed.  So some of those that

11   were chemically analyzed are now in the

12   Smithsonian.

13        Q.     Some of those from the Johnson mine?

14        A.     Yes.

15        Q.     Do you know that?

16        A.     I haven't seen them myself but -- well,

17   wait a minute now.  I have -- I guess it's

18   actually hearsay that it's there.

19                    MR. PRENTISS:  Objection.  Motion to

20   strike.

21        Q.     Doctor Chidester, do you have an

22   opinion as to whether the talc mined from the

23   Johnson mine in the 1940s and 1950s and the early

24   1960s had any asbestos in it?

PLT-04771-0092

```
 1                    MR. PRENTISS:  Objection.

 2        A.    Yes.

 3        Q.    What is your opinion?

 4                    MR. PRENTISS:  Objection.

 5        A.    It did not contain asbestos.

 6        Q.    Would you tell us the reasons for that

 7   opinion.

 8        A.    Because the areas that were actively

 9   mined while I was there contained no serpentinite

10   and asbestos would persist only in zones -- only

11   in the serpentinite, in say a body of serpentinite

12   that had not been altered to talc, in my opinion.

13                    MR. PRENTISS:  Motion to strike.

14        Q.    And is your opinion based on your own

15   observations and testing?

16        A.    Yes.

17                    MR. PRENTISS:  Objection.

18                    MR. LEIBENSPERGER:  We might want to

19   take a break here if everyone else agrees.

20                    MR. PRENTISS:  Yes.

21                    (Recess taken)

22        Q.    Doctor, I just have a few more

23   questions I wanted to ask you.

24                    With respect to the samples that you
```

DORIS M. JONES & ASSOCIATES

PLT-04771-0093

53

1    yes.  It goes the other way.  The serpentinite is

2    altered to steatite or to talc.

3         Q.    Do you know of a categorization of talc

4    as being either steatitized or serpentinized?

5         A.    Talc being serpentinized?

6         Q.    Yes.  Just as a classification of talc

7    as being serpentinized as opposed to being

8    steatitized.

9         A.    If it's serpentinized it's no longer

10   talc.  I can conceive of situations in -- no, I do

11   not.  I guess the answer to that is no.  As far as

12   I -- I have never run into serpentinized talc.

13        Q.    You are not familiar with that

14   terminology as a classification of a type of talc;

15   is that your testimony?

16        A.    I guess so.

17        Q.    Okay.

18        A.    Serpentinized talc?  I mean, the

19   alteration -- I'm not quite sure what is meant by

20   that.

21        Q.    Okay.

22        A.    It's a contradiction in terms as far as

23   I am concerned.

24        Q.    Okay.  To go back to my earlier

DORIS M. JONES & ASSOCIATES

PLT-04771-0094

1        Q.      Now in the process that you have

2    described, and you used a chart, I will go to the

3    chart in a bit, you have described a method by

4    which certain kind of talc is created from

5    serpentinite rock; is that right?

6        A.      Yes.

7        Q.      Now serpentinite is a mixture of three

8    different serpentine minerals; is that true?

9        A.      Can be, yes.

10        Q.      Can be.  What does it consist of?

11        A.      Can be antigorite, a couple varieties

12    of chrysotile and lizardite.

13        Q.      Okay.  Is there such a thing as

14    serpentine itself?  Is that a distinct mineral?

15        A.      It's a group name for this.  The

16    serpentine minerals are chrysotile, lizardite and

17    antigorite.

18        Q.      And you have said that during the

19    geological process you have a mass of serpentinite

20    that would be converted over time to talc rock?

21        A.      Yes.

22        Q.      Is that the way you described the

23    process by which the talc that is mined at the

24    Johnson, Vermont mine is created?

DORIS M. JONES & ASSOCIATES

PLT-04771-0095

1      A.      Yes.

2      Q.      And you said that the method by which

3   that transformation takes place is that carbon

4   dioxide reacts with the serpentinite; is that

5   correct?

6      A.      Yes.

7      Q.      How does the carbon dioxide reach and

8   penetrate into this serpentinite?

9      A.      It's part of the fluid system that is

10  moving through the rocks during a process called

11  regional metamorphism.

12     Q.      Now the serpentinite, is that a uniform

13  substance or is that made up of a variety of other

14  substances?

15     A.      Serpentinite?

16     Q.      Yes.

17     A.      Well, it consists of serpentine

18  minerals and minor amounts of magnetite,

19  occasional relics, remnants of chromite, and

20  chloride.  Those are the predominant.

21     Q.      If you were to take a cross-section of

22  a piece of serpentinite that's typical in the

23  Johnson, Vermont area, would that look like one

24  clean uniform structure or would you be able to

PLT-04771-0096

# Exhibit 179



Luzenac America, Inc.  ·  P.O. Box 680  ·  Windsor, VT 05089  ·  (802) 484-7763  ·  Fax: (802) 484-3621

Ocotber 17, 1994

Johnson & Johnson
One Johnson & Jonson Plaza
New Brunswick, NJ  08933-7002

Attn:  Mr. John C. O'Shaughnessy

Dear Mr. O'Shaughnessy:

    The following is in reply to your letter dated October 4,
1994, in reference to RITTER V. CYPRUS, ET AL.

    To the best of my recollection and that of Bert White and
Frank Hasty, the mines used to supply talc for the roofing industry
prior to 1984 came from several ore bodies.  We did not begin to
produce roofing grade products from our local mines until 1970.
These mines are Clifton, Frostbite, Argonaut, Rainbow, and the
Hammondsville Mine.  Prior to 1970, it is unclear where ore was
shipped from.  The following are the mines and dates in which talc
was used for the roofing grades.

        1970........Clifton Mine
        1971........Clifton Mine
        1972........Clifton Mine, Frostbite Mine
        1973........Clifton Mine, Frostbite Mine,
                    Argonaut Mine, Hammondsville Mine
        1974........Clifton Mine, Frostbite Mine,
                    Argonaut Mine, Hammondsville Mine
        1975........Clifton Mine, Frostbite Mine,
                    Argonaut Mine, Hammondsville Mine, Rainbow Mine
        1976........Clifton Mine, Frostbite Mine
                    Argonaut Mine, Hammondsville Mine, Rainbow Mine
        1977........Clifton Mine, Frostbite Mine,
                    Argonaut Mine, Hammondsville Mine, Rainbow Mine
        1978........Argonaut Mine, Rainbow Mine
                    Hammondsville Mine
        1979........Clifton Mine, Argonaut Mine
                    Rainbow Mine, Hammondsville Mine
        1980........Clifton Mine, Argonaut Mine
                    Rainbow Mine, Hammondsville Mine
        1981........Clifton Mine, Argonaut Mine
                    Rainbow Mine, Hammondsville Mine

RECEIVED

OCT 19 1994

J.C. O'SHAUGHNESSY

J&J-0109238

Protected Document--Subject to Protective Order                JNJ 000063581

-2-

```
1982.......Clifton Mine, Argonaut Mine
            Rainbow Mine, Hammondsville Mine
1983.......Clifton Mine, Argonaut Mine
            Rainbow Mine, Hammondsville Mine
1984.......Clifton Mine, Frostbite Mine,
            Argonaut Mine, Hammondsville Mine, Rainbow Mine
```

Testing was done on a monthly basis on the ore bodies we were mining. Composites for the talc used for industrial as well as cosmetics were sent to McCrone Associates, an independent lab for asbestiform analysis. Attached is a copy of the current procedure used which has been the procedure followed since 1970.

Samples are not available for this time frame since retention is only two years. All McCrone records for this time frame were turned over to Cyrus Minerals Company in 1989 with the sale of Windsor Minerals. It is my understanding that these records have since been turned over to Luzenac America Corporate Headquarters with the sale of Cyprus Windsor Minerals in 1992. Richard Zazenski, our Director Product Safety & Quality Assurance, may be able to help you in this area. He can be reached at (303)643-0404.

I hope the information I have provided will be of some assistance to you. If you have any other questions, please feel free to contact me.

Best regards,

LUZENAC AMERICA, INC.

James R. Gray
Manager of Purchasing

cc:  F. Hasty
     B. White
     R. Zazenski

J&J-0109239

Protected Document--Subject to Protective Order                    JNJ 000063582

# Exhibit 180

```
 1  CHARLES F. PREUSS  (State Bar No. 45783)
    THOMAS W. PULLIAM, JR.  (State Bar No. 46322)
 2  PREUSS, WALKER & SHANAGHER
    595 Market Street, 16th Floor
 3  San Francisco, California  94105-2802
    Telephone: (415) 978-2600
 4
    Attorneys for Defendant
 5  JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

 6

 7

 8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 9                   FOR THE COUNTY OF SAN DIEGO

10

11  MARLENE SELBY and LOWELL          )  No. 670577
    WAYNE SELBY,                      )
12                                    )
              ;   Plaintiff,          )  DEFENDANT JOHNSON &
13                                    )  JOHNSON CONSUMER
       .v.                            )  PRODUCTS, INC.'S
14                                    )  SUPPLEMENTAL RESPONSES TO
    JOHNSON & JOHNSON, a New Jersey   )  PLAINTIFFS' SPECIAL
15  corporation; AVON PRODUCTS, INC., a)  INTERROGATORIES
    New York corporation; LONGS DRUG  )
16  STORES CALIFORNIA, INC., a        )
    California corporation; and DOES 1 )
17  through 100, inclusive,           )
                                      )
18            Defendants.             )
                                      )
19  ─────────────────────────────────
```

PROPOUNDING PARTY:     Plaintiffs, MARLENE SELBY, et al.

RESPONDING PARTY:      Defendant, JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., erroneously sued as JOHNSON & JOHNSON

SET NUMBER:            ONE

### DEFINITIONS

1.     The word "YOU", "YOUR", or "YOURSELF" refers to the party to which these interrogatories are addressed and any and all of its agents, representatives and/or employees.

///



EXHIBIT
J&J 337

INTERIM-DISCO-000000062

2.     The term "THE PRODUCT" refers to the chemical composition, or compositions, marketed as Johnson's Baby Powder.

3.     The term" PRODUCT CONTAINER" refers to the complete vessel holding THE PRODUCT, as marketed and/or distributed to the general public, including all packaging, attachments or inserts.

4.     The term "DOCUMENT" means a writing, as defined in Evidence Code Section 250, and includes the original or a copy of handwriting, typewriting, printing, photostating, photographing, computer data and records, and every other means of recording upon any tangible thing and form of communicating or representing, including letters, words, pictures, sounds, or symbols or combinations of them, including any/all computer records.

5.     The term "IDENTIFY" as used herein means to describe with particularity the person, place, document and/or event referred to in the interrogatory, including, where requested, the name, address, telephone number, character of the document and/or event, and the relationship of the person, place and/or event to the defendant so as to allow the documents to be requested with particularity in Requests for Production and to allow persons to be properly noticed for deposition.

6.     The Term "JJCPI" refers to Johnson and Johnson Consumer Products, Inc.

7.     The Term "QUALITY CONTROL", as used herein shall mean any tests, samplings, and/or studies conducted at any time during the manufacture, production, marketing and/or distribution of THE PRODUCT, its ingredients and or THE PRODUCT CONTAINER, whether conducted at random or in accordance with a regularly maintained schedule.

///

///

///

INTERIM-DISCO-000000063

## SPECIAL INTERROGATORIES

INTERROGATORY NO. 1:

State the trade name, product identification number and/or other means of identification of the product whose label reads "Johnson's Baby Powder". (See Exhibit "A" attached hereto).

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

The name of THE PRODUCT appearing on the container label is and has been "Johnson's Baby Powder". The trade name is "Johnson's".

INTERROGATORY NO. 3:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of the design and formulation of the chemical formula and/or composition of THE PRODUCT, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 4:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of manufacturing of THE PRODUCT, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 5:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of manufacturing of THE PRODUCT CONTAINER, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 24:

For each complaint and/or report identified in YOUR response to Interrogatory No. 23, IDENTIFY the person most knowledgeable concerning how YOU investigated, responded to and/or resolved each complaint and/or report.

SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 3, 4, 5 and 24:

With the exception of Dr. Bruce Semple, the persons identified are JJCPI employees and we will cooperate with you in making them available for

PRINER, WALKER & HARRAKSES
535 Market Street, 18ᵗʰ Flr
San Francisco, California 94105
Telephone: (415) 878-2000

3.

INTERIM-DISCO-000000064

1   deposition, should that become necessary and appropriate.  Dr. Bruce Semple is

2   the former Medical Director of JJCPI and is now with Procter & Gamble in

3   Cincinnati, Ohio.  Dr. Semple should not be contacted except through the formal

4   deposition process, and, if you wish to depose him, JJCPI requests that its counsel

5   be contacted first, so that JJCPI may assist in scheduling a deposition mutually

6   convenient to all parties.

7   INTERROGATORY NO. 15:

8       IDENTIFY all warnings which appeared at any time on/with the PRODUCT

9   CONTAINER or which were included with THE PRODUCT and its packaging at

10   the time THE PRODUCT was first marketed in the United States.

11   INTERROGATORY NO. 16:

12      If at any time since you first began marketing THE PRODUCT the warnings

13   to consumers included on the PRODUCT CONTAINER were changed and/or

14   modified, describe each such modification and/or change, including the substance

15   of the modification and/or change, the date each modification and/or change was

16   instituted, the purpose of the modification and/or change and the identity of the

17   person upon whose authority each modification and/or change was implemented.

18   SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 15 and 16:

19      JJCPI believes its previous responses are adequate.

20   INTERROGATORY NO. 27:

21      State the name and full address of each location and/or plant where THE

22   PRODUCT is manufactured.

23   INTERROGATORY NO. 28:

24      State the name and full address of each location and/or plant where the

25   PRODUCT CONTAINER is manufactured.

26   ///

27   ///

28   ///

INTERIM-DISCO-000000065

INTERROGATORY NO. 29:

State the name and full address of each location where JOHNSON'S BABY POWDER is manufactured in final form before being distributed for sale to the general public.

SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 27, 28 and 29:

Royston, Georgia is the only location of any manufacturing facility for THE PRODUCT. JJCPI will cooperate in arranging an inspection of that plant, should that become necessary and appropriate.

INTERROGATORY NO. 36:

Do YOU have knowledge of any tests and/or studies conducted concerning the health effects of asbestos on humans?

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 36:

There has been no asbestos in THE PRODUCT during the time plaintiff claims to have used it. Accordingly, the information sought by this interrogatory is neither relevant to the subject matter of this action as to JJCPI nor is it reasonably calculated to lead to the discovery of admissible evidence against JJCPI. If plaintiffs have evidence that THE PRODUCT has contained asbestos at any relevant time, JJCPI will reconsider this response.

Dated:  April 20 , 1994

PREUSS, WALKER & SHANAGHER

*Thomas W. Pulliam*

THOMAS W. PULLIAM, JR.

Attorneys for Defendant
JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

## CERTIFICATE OF SERVICE BY MAIL

I, BEVERLY A. LEE, declare under penalty of perjury under the laws of the State of California that the following is true and correct:

I am a citizen of the United States, over the age of 18 years and not a party to or interested in the within entitled action.  I am an employee of PREUSS, WALKER & SHANAGHER, and my business address is 595 Market Street, 16th Floor, San Francisco, California 94105.

I caused to be served by mail the following document(s):

**DEFENDANT JOHNSON & CONSUMER PRODUCTS, INC.'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES**

I enclosed a true copy of said document(s) in an envelope, addressed as follows:

**ATTORNEYS FOR PLAINTIFFS:**
Kevin F. Quinn, Esq.
John J. Rice, Esq.
THORSNES, BARTOLOTTA, McGUIRE & PADILLA
2550 Fifth Avenue, Suite 1100
San Diego, CA  92103
(619) 236-9363
(619) 236-9653 FAX

**ATTORNEYS FOR DEFENDANT AVON PRODUCTS, INC.**
Regina A. Petty, Esq.
MAZZARELLA, DUNWOODY, WILSON & PETTY
550 West C Street, Suite 1050
San Diego, CA  92101-3532
(619) 236-9600
(619) 236-9669 FAX

**ATTORNEYS FOR DEFENDANT AMERICAN DRUG STORES**
(erroneously sued as SAV-ON DRUG STORES)
Joseph T. Kutyla, Esq.
CALLAHAN, McCUNE & WILLIS
402 West Broadway, Suite 800
San Diego, CA  92101
(619) 232-5700
(619) 232-2206 FAX

PREUSS, WALKER &
SHANAGHER
595 Market Street, 16th Floor
San Francisco, California
94105

INTERIM-DISCO-000000067

1 | ATTORNEYS FOR DEFENDANT LONGS DRUG STORES CALIFORNIA, INC.
Scott R. Diamond, Esq.
2 | Scott D. Buchholz, Esq.
DUMMIT, FABER & BRIEGLEB
3 | 750 B Street, Suite 1900
San Diego, CA  92101
4 | (619) 231-7738
(619) 231-0886 FAX
5 |
6 |  I am readily familiar with my firm's practice for collection and processing
of correspondence for mailing with the United States Postal Service, to-wit, that
7 |
correspondence will be deposited with the United States Postal Service this same
8 |
day in the ordinary course of business.  I sealed said envelope and placed it for
9 |
collection and mailing on April 20, 1994, following the ordinary business practice.
10 |
    I declare under penalty of perjury under the laws of the State of California
11 |
that the above is true and correct.  I further declare that I am employed in the
12 |
office of a member of the bar of this court at whose direction the service was
13 |
made.
14 |
    Executed on April 20, 1994, at San Francisco, California.
15 |
16 |
17 |                             _Beverly A. Lee_
                                  Beverly A. Lee
18 |
19 |
20 |
21 |
22 | H:\DOCS\25560\1373\PLEA\SELBY.POS
23 |
24 |
25 |
26 |
27 |
28 |

PREUSS, WALKER &
SHANNONER
595 Market Street, 19th Floor
San Francisco California
94105

2

INTERIM-DISCO-000000068

Exhibit 181

## CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANTS' OBJECTIONS AND ANSWERS TO INTERROGATORIES AND OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., Defendant in the above-styled and numbered cause, and files this its Objections and Answers to Interrogatories and Objections and Responses to Request for Production propounded to Defendant Johnson & Johnson Consumers Company, Inc.

MW/80804

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas  77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has  been forwarded  to all counsel of record on this the 6th day of May, 1998.

_____
SANDRA F. CLARK

MW/80804                                          -2-

## **Preliminary Statement**

Johnson & Johnson Consumer Companies, Inc. (hereinafter Johnson & Johnson) states that in the preparation of its responses to plaintiff's requests and interrogatories, it has made, and continues to make, a concerted good faith effort to collect all of the requested information or documents from Johnson & Johnson as well as any relevant predecessors and vendors. Defendant provides these preliminary responses with the understanding that information may change as discovery proceeds. Pursuant to agreement with plaintiff's counsel, defendant Johnson & Johnson provide these responses on behalf of Johnson & Johnson and reserves the right to make objections and to file responses for all other entities served by plaintiff's counsel in this lawsuit.

Johnson & Johnson will not produce any documents generated by its counsel directed to other counsel or to its officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees of Johnson & Johnson to its counsel regarding legal matters. Johnson & Johnson will not produce any documents which are work-product drafted by attorneys employed by Johnson & Johnson. As for its responses to interrogatories, Johnson & Johnson state that when the requested information is readily available from documents, the documents will be produced as noted in individual interrogatory responses. When information or documents concerning incomplete research are requested, Johnson & Johnson state that they will produce published interim reports of such research. In response to requests for documents and interrogatories, Johnson & Johnson will produce information relevant to talc or baby powder.

Johnson & Johnson reserves the right to change its responses if it appears from additional research that omissions or errors have been made herein or that further or more accurate information should be provided. Furthermore, Johnson & Johnson has not completed preparation for trial. Because the responses contained herein are based only upon such information and documents which are presently available to or specifically known to Johnson & Johnson at the time the responses were prepared, the responses herein may be supplemented or changed upon continuing investigation.

This Preliminary Statement shall apply to each and every response given herein, and shall be incorporated by reference as though fully set forth in each of the responses appearing in the following pages.

MW/80804

-3-

OBJECTIONS AND ANSWERS TO INTERROGATORIES AND
OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

Interrogatory No. 1

      Please list the company name and location of each entity that packaged your baby powder from 1945 through 1975,

ANSWER:    **Baby powder was packaged at a variety of locations by Johnson & Johnson entities from 1945 through 1975. To the best of the company's knowledge, baby powder was not packaged by any non-Johnson & Johnson entity.**

Request for Production No. 1

      Please produce any and all documents responsive to Interrogatory No. 1.

RESPONSE:    **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 1 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 2

      Did Johnson & Johnson ever sell baby powder under any name other than Johnson & Johnson between 1945 through 1975, and if so, what name and when?

ANSWER:    **No**

Request for production No. 2

      Please produce any and all documents responsive to Interrogatory No. 2.

RESPONSE:    **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 2 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the**

extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 3

Please list each location where your raw materials for Johnson & Johnson baby powder was mined from 1945 through 1975.

ANSWER:   Based on defendants' current investigation and document review to date, from 1945 through 1975, talc was mined from the Val Chisone Mine in Italy, and the Hammondsville Mine in Vermont, U.S.A.

Request for Production No. 3

Please produce any and all documents responsive to Interrogatory No. 3.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 3 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).   Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 4

Please list all suppliers to Johnson & Johnson of raw or processed material used in Johnson & Johnson baby powder between 1945 and 1975.

ANSWER:   Defendants object to this Interrogatory to the extent it calls for privileged or trade secret information.   Subject to the foregoing objection, talc was supplied by Windsor Minerals (Hammondsville Mine, Vermont) and the Val Chisone Mine, Italy.

Request for Production No. 4

Please produce any and all documents responsive to Interrogatory No. 4.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 4 does not request documents.   As such,

plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 5

Please list each claim made against you giving the style, court and date of filing, which involved an asbestos-related claim of injury and any talc product made or sold by you.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable. Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges. Subject to the foregoing objection, none.

Request for Production No. 5

Please produce any and all documents responsive to Interrogatory No. 5.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 5 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 6

Please list each epidemiological study any of your employees potentially occupationally exposed to talc made up all or part of the study cohort.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable. Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges. Subject to the foregoing objections, defendants investigation is

MW/80804

-6-

ongoing .  Defendant will supplement this interrogatory with non-objectionable information as it is discovered.

Request for Production No. 6

Please produce all documents responsive to Interrogatory No. 6.

RESPONSE:  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 6.  Interrogatory No. 6 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 7

Please list each location where your baby powder was packaged from 1945 through 1975.

ANSWER:  **Object - Question is repetitious and duplicative of Interrogatory No. 1.  Subject to the foregoing objection, see Answer to Interrogatory No. 1.**

Request for Production No. 7

Please produce all documents responsive to Interrogatory No. 7.

RESPONSE:  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 7.  Interrogatory No. 7 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 8

MW/80804                                      -7-

What year did your baby powder change from talc to corn starch?

ANSWER:     **Johnson's Baby Powder made with talc has been available from 1945 through 1975 and is currently sold; Johnson's Baby Powder with corn starch was first marketed in 1978.**

Request for Production No. 8

Please produce any and all documents responsive to Interrogatory No. 8.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 8.  Interrogatory No. 8 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 9

Please list all persons known by you who:

a)      ever recommended changing from talc to corn starch for baby powder product;
b)      ever made any analysis of your baby powder for fibrous material content;
c)      ever made any analysis of your baby powder for asbestiform material;
d)      ever surveyed your mine(s) for the geological structure prior to or during mining;
e)      ever made any analysis of raw and/or processed material used or considered for use in your baby powder for fibrous material content;
f)      ever made any analysis of raw and/or processed material used or considered for use in your baby powder for asbestiform mineral.

ANSWER:     **Defendant objects to the overbroad nature of plaintiffs' requests.  Identifying all persons without limitation to time, scope, and employment, is unduly burdensome.  To identify all persons over the company's 100+ year history is not possible.**

            **a) Defendants object to sub-part (a) as vague and that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence.  Furthermore,**

MW/80804                                    -8-

defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.   Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant will supplement its response to this interrogatory as non-objectionable information is discovered.

b) Defendants object to sub-part (b) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

c) Defendants object to sub-part (c) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

d) Defendants object to sub-part (d) in that it is vague, overbroad, and unlimited in time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Subject to the foregoing objections, analysis may have been conducted by McCrone Associates, and Colorado School of Mines Research Institute.

e) Defendants object to sub-part (e) as  vague, overbroad,  and that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of  Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

f) Defendants object to sub-part (f) as vague, overbroad and that it is unlimited

to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

Request for Production No. 9

Please produce any and all documents responsive to Interrogatory No. 9.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 9.  Interrogatory No. 9 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 10

Please identify any person having knowledge of relevant facts.  A fact witness is a person who "has or may have knowledge of any discoverable matter."  As to each witness, please provide the following:

a.   Name;
b.   Address;
c.   Telephone number;
d.   Knowledge and opinions of the witness.

ANSWER:   Defendant objects to this Interrogatory as vague and overbroad.  The identity of fact witnesses over the 100+ history in which plaintiff requests is virtually impossible to determine all persons who may have facts relevant to this case. Subject to the above objections defendant's investigation is continuing and Defendant's will supplement.

MW/80804

-10-

<u>Request for Production No. 10</u>

Please produce any and all documents responsive to Interrogatory No. 10.

<u>RESPONSE:</u>   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 10.   Interrogatory No. 10 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

<u>Interrogatory No. 11</u>

Please provide the following information as to each testifying expert:

a.       Name;
b.       Address;
c.       Telephone Number;
d.       Facts known by the testifying expert;
e.       Expected substance of testimony of each testifying expert, the mental impressions and opinions of each testifying expert, and any report or other documents prepared by each expert in anticipation of trial.

<u>ANSWER:</u>   **Defendant objects to this interrogatory as unduly burdensome, vague, and beyond the scope of permissible discovery.   Specifically, it is not possible for defendant to list all facts, mental impressions, and opinions known to the testifying expert.   Defendant will supplement this interrogatory in accordance with Rule 166(b).**

<u>Request for Production No. 11</u>

Please produce any and all documents responsive to Interrogatory No. 11.

<u>RESPONSE:</u>   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 11.   Interrogatory No. 11 does not request documents.   As such, plaintiffs' request is overbroad, vague,**

unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

(THERE IS NO INTERROGATORY NO. 12)

Request for Production No. 12

As to each testifying expert, please produce any documents, tangible things, physical models, or compilations of data or other material prepared by testifying expert.

RESPONSE:   Defendant objects to this request as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence. Defendant is willing to exchange trial exhibits with plaintiff by court order or by agreement of the counsel.

Interrogatory No. 13

Please describe any and all studies of asbestos or asbestiform talc disease in which you , the defendant, participated.

ANSWER:   Defendant objects to this interrogatory as vague, overbroad, and unduly burdensome, and not likely to lead to the discovery of relevant evidence. Plaintiff's interrogatory is unlimited in time and scope and is not confined to the issues in this case. Defendant further objects to the extent that plaintiff's interrogatory seeks to evade the attorney/client, work product, party communications/investigatory, and witness statement privileges. Subject to the foregoing objections, defendant's investigation is continuing and defendant will supplement with non-objectionable information as it is discovered.

Request for Production No. 13

Please produce any and all documents responsive to Interrogatory No. 13.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 13. Interrogatory No. 13 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).

**Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.   Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant will make non-objectionable documents available for inspection and copying at a mutually agreeable time and place as they are discovered.**

Interrogatory No. 14

Please describe any and all studies of asbestos or asbestiform talc disease in which you,. the defendant, were aware of as of :

| | |
|---|---|
| a. | 1940; |
| b. | 1950; |
| c. | 1970; |
| d. | 1972 |

ANSWER:   **Defendant objects to this interrogatory as vague, and overbroad, and not calculated to lead to discovery of relevant evidence.  It is impossible to determine what study any individual employee of Defendant was aware of by a certain date.**

Request for Production No. 14

Please produce any documents responsive to Interrogatory No. 14.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 14.  Interrogatory No. 14 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 15

Each workers' compensation claim for an alleged asbestos or asbestiform talc injuries, disease or death of an employee which could be used to evaluate the risk of developing an asbestos or asbestiform talc disease and/or providing knowledge to you of asbestos or asbestiform talc.

MW/80804

ANSWER:   **Defendants object to this Interrogatory in that it is vague, ambiguous, overly broad and compound.  Furthermore, this interrogatory will call for a legal conclusion.  Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant is not aware of any workers compensation claim alleging either asbestos or an asbestiform talc disease by any employee of Johnson & Johnson.**

Interrogatory No. 16

Please state if any air sampling was done to determine the exposure to your baby powder during its normal and intended use.

ANSWER:   **Defendants object to this interrogatory as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence.  Furthermore, this interrogatory is not limited to time or scope.**

Request for Production No. 15

Please produce any and all documents responsive to Interrogatory No. 16.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 16.  Interrogatory No. 16 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 17

Please identify each mineralogist employed by you and/or consulted by you at any time before 1975.  Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:   **Defendants object to plaintiffs' request in that it is duly burdensome and overbroad for defendants to list every mineralologist that may have been consulted with prior to 1975.  Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be mineralogist.  Defendant's investigation is ongoing.  Defendant will supplement this interrogatory as persons are identified.**

Request for Production No. 16

Please produce any and all documents responsive to Interrogatory No. 17.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 17.  Interrogatory No. 17 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in _Loftin v. Martin_, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 18

Please identify each physician employed by you at any time before 1975.  Please provide the last known address, telephone number, vital status and dates of employment.

ANSWER:   **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every physician employed prior to 1975.  Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 19

Please identify each geologist employed by you an/or consulted by you at any time before 1975.  Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:   **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendant to list every geologist that may have been consulted with prior to 1975.  Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be geologist.  Defendant's investigation is ongoing.  Defendant will supplement this interrogatory as persons are identified.**

Interrogatory No. 20

Each document evidencing health warnings provided by you or to you before 1975 concerning the asbestos material or asbestos-containing products:

MW/80804                                                    -15-

a.   used by you as an ingredient of a product;

b.   made by another and marketed by you.

ANSWER:   **a) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and ambiguous.  Subject to the foregoing objections, no warning related to asbestos would be applicable or required.**

**b) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and that it does not identify warning related to what product.  Subject to the foregoing objection, defendant has not marketed an asbestos containing product manufactured by another.**

Interrogatory No. 21

Please identify each industrial hygienist employed by you and/or consulted by you at any time before 1975.  Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:   **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every industrial hygienist that may have been consulted with prior to 1975. Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 22

Documents which describe the asbestos content or absence of asbestos in your baby powder sold or manufactured by you or related companies of yours from 1945 through 1975.

ANSWER:   **Defendants object to this interrogatory as vague, ambiguous, and unintelligible. Specifically, the interrogatory does not ask a question but merely makes a statement, and therefore, as such can not be answered and should be rephrased. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will supplement its response to this interrogatory as information is discovered.**

Interrogatory No. 23

Please list each and every mine that was utilized by your company for talc.  Please include complete address and dates of use.

ANSWER:   **Defendants object to this Interrogatory as over broad in that it is not limited to time or to cosmetic talc.  Subject to the foregoing objections, Defendant answers, from 1945 until approximately 1964 from Val Chisone, Italy and from**

MW/80804                                      -16-

**1964 until approximately 1975 from Hammondsville Mine, Vermont, U.S.A.**

Request for Production No. 17

Each workers' compensation claim or notice of injury filed before 1980 for any allegation of asbestos or asbestiform talc illnesses, including without limitation, asbestosis, pneumoconiosis, or mesothelioma.

RESPONSE:   **Defendant objects to plaintiffs' request as vague, overbroad, unduly burdensome, and not likely lead to the discovery of relevant evidence. Plaintiff's request is not limited in time and scope or to any specific entity. Plaintiff's request does not identify from whom it is requesting documents.   Subject to the foregoing objections, defendant has no documents responsive to this request.**

Request for Production No. 18

Please produce each version of your "corporate biography" or published company history, whether an in-house effort, and "authorized" version or otherwise.

RESPONSE:   **Defendants object to this request as overbroad, vague, unduly burdensome, and not likely to lead to the discovery of any relevant evidence.  Further, plaintiff's request is not limited in time or scope.**

Request for Production No. 19

Documents evidencing:
  a.    the identity of each of your insurer(s), including property loss, workers' compensation and general liability;
  b.    the extent of your yearly liability coverage relative to the claims raised to this suit.

RESPONSE:   **Defendants object to this request as vague, overbroad and likely to lead to the discovery of relevant evidence.  Furthermore, plaintiff's request is not limited in either time or scope.   Subject to the foregoing objections, for the years of exposure Johnson & Johnson Consumer Companies, Inc., had coverage for claims provided through self insurance and The Aetna Property & Casualty Company in varying amounts ranging from 1.5 million through 50 million.**

Request for Production No. 20

Research or studies which you, the defendant, possess conducted by NIOSH, Vermont Health Department, Mining Enforcement and Safety Administration (MESA), OSHA, and/or Walter C.

MW/80804

-17-

McCrone and Associates concerning asbestos or asbestiform talc illnesses.

RESPONSE:   **Defendant objects to this request as vague, overbroad, unduly burdensome, and not calculated to lead to the discovery of relevant evidence. Defendant's document review is ongoing. Defendants will make non-objectionable documents available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 21

Please provide a complete copy of "Talc: A Possible Occupational and Environmental Carcinogen", authored by H.P. Blejer and R. Arlon, 1973, showing who received each copy.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, documents responsive to this request will be made available at a mutually agreeable place and time.**

Request for Production No. 22

Please provide a copy of "The Biology of Talc", Brit. J. Ind. Med. 33: 217, 1976, authored by G.Y. Hildick-Smith, showing who received each copy.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, documents responsive to this request will be made available for inspection and copying at a mutually agreeable time and place.**

Request for Production No. 23

Research or studies conducted by or with any trade associations that in any way discuss asbestos or asbestiform minerals in consumer products prior to 1975.

RESPONSE:   **Defendant objects to this request as overbroad, vague, not likely to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited in time and scope or to projects in which Defendant participated. Furthermore, Defendant objects to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will make documents responsive to this**

request available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 24

Produce each air sampling results for dust, including asbestos or asbestiform minerals at your mining, milling and packaging plants.

RESPONSE: **Defendant objects to this request as overbroad, vague, and not likely to lead to the discovery of relevant evidence. Further, plaintiff's request is limited in time or scope. Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Defendants document review is ongoing. Non-objectionable documents responsive to this request will be made available for inspection at a mutually convenient time and place as they are discovered.**

Request for Production No. 25

Documents not dated greater than 1975 which mention compliance with or changes to, or proposed changes to, any regulations, statutes, rules or standards for the use or handling of materials which yield pneumoconiosis producing dust, including asbestosis or mesothelioma.

RESPONSE: **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 26

Documents not dated greater than 1975 which mention proposed or prescribed warnings, cautions or instructions regarding the potential health hazards or pneumoconiosis-producing dust, including asbestos or asbestiform minerals for use upon or in your baby powder, your manuals or catalogs ("catalogs" means those documents regarding products made or sold by you, the defendant and your product literature).

RESPONSE: **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and**

MW/80804

-19-

**witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 26

Please produce all documents provided to your sale and/or marketing organization which concern asbestos being found or not being found in baby powder.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.**

# V E R I F I C A T I O N

STATE OF NEW JERSEY      §

COUNTY OF MIDDLESEX     §

        BEFORE ME,   the undersigned authority, on this day personally appeared Michael Ullmann, who being by me here and now duly sworn upon oath says that he is Secretary of Johnson & Johnson Consumer Companies, Inc., duly authorized to verify the statements contained in the foregoing instrument for and on behalf of Johnson & Johnson Consumer Companies, Inc., that certain of these matters stated herein are not within the personal knowledge of affiant, and that the facts stated herein have been assembled by authorized agents, employees and counsel of Johnson & Johnson Consumer Companies, Inc., and affiant is informed that the facts stated therein are true.

_____
Michael Ullmann

        SUBSCRIBED AND SWORN TO BEFORE ME by the said affiant on this the 7th day of May, 1998.

_____
Cira Georgiou
Notary Public in and for
The State of New Jersey

My commission expires:  January 5, 1999

Exhibit 182

DRINKER BIDDLE & SHANLEY LLP
A Pennsylvania Limited Liability Partnership
500 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 360-1100
Attorneys for Defendants
JOHNSON & JOHNSON CONSUMER COMPANIES, INC.
AND JOHNSON & JOHNSON

| | |
|---|---|
| THERESA KRUSHINSKI and FRANK KRUSHINSKI, <br><br> Plaintiffs, <br><br> v. <br><br> JOHNSON & JOHNSON BABY PRODUCTS COMPANY, A DIVISION OF JOHNSON & JOHNSON CONSUMER PRODUCTS COMPANY, INC., a subsidiary of JOHNSON & JOHNSON, INC.; JOHNSON & JOHNSON, INC.; ABC CORPORATIONS (fictitious corporations, subsidiaries and or divisions of JOHNSON & JOHNSON, INC.); THE ESTEE LAUDER COMPANIES, INC.; DEF CORPORATIONS (fictitious corporations); THE PUIG GROUP, trading as NINA RICCI; XYZ CORPORATIONS (fictitious corporations or business entities, trading as JEAN PATOU), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: MIDDLESEX COUNTY <br> DOCKET NUMBER MID-L-9389-99 <br><br> CIVIL ACTION <br><br> **DEFENDANTS JOHNSON & JOHNSON CONSUMER COMPANIES, INC. AND JOHNSON & JOHNSON'S ANSWERS TO PLAINTIFFS' SUPPLEMENTAL INTERROGATORIES** |

## OBJECTIONS AND ANSWERS TO SUPPLEMENTAL INTERROGATORIES

1.     If you contend that Johnson's Baby Powder was the subject of pre-market approval or licensure by the Federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. § 301 et seq. or the "Public Health Service Act, " 58 Stat. 682, 42 U.S.C. § 201 and was approved or licensed; or is generally recognized as safe and effective pursuant to conditions established by the Food and Drug Administration and applicable regulations,

J&J-0162339

Protected Document--Subject to Protective Order

including packaging and labeling regulations, set forth all facts and identify all documents upon which you intend to rely to support your contentions.

**RESPONSE**: It is defendants' position that the provision of the statute quoted in this interrogatory precludes any award of punitive damages against the Johnson & Johnson defendants.   Johnson & Johnson's Baby Powder is not subject to specific pre-market approval or licensure under the Federal Food Drug and Cosmetic Act. However, The FDA regulates cosmetics such as baby powders. The FDA has certain labeling and ingredient guidelines which are applicable to Johnson & Johnson's Baby Powder. Further defendant has at all required times submitted voluntary information regarding complaints or reactions pursuant to CFR 710 et seq.   Defendant objects to providing supporting documentation as overly broad and unduly burdensome and equally available to the plaintiff.

    2.    Define the term "cosmetic talc" in complete detail as used by Defendant in Defendant's response to Demands # 1, #2, #3, #4, #5, #6, #7, #8, #9, #1 O, #11, #12, #13, #14, #15, #16, #17, #18, #19, #20, #21, and #29, of Plaintiff's Demand for Admissions by Plaintiff by stating the range of size and the chemical formula of the talc particles contained in Johnson's Baby Powder.

**RESPONSE**: Cosmetic talc is one of three grades of commercial talc, the other two grades are industrial and pharmaceutical. Industrial grades of talc vary widely in talc mineral content from below 50% up to ranges approaching pure talc mineral assay, and also vary widely in particle size distribution. Cosmetic talcs normally have a talc mineral assay of 90% or more.   Pharmaceutical talc assay is generally from 95% to 100% pure talc mineral.

    3.    Define the term "industrial talc" in complete detail as used by Defendant in Defendant's response to Demands # 1, #2, #3, #4, #5, #6, #7, #8, #9, #10, #11, #12, #13, #14, #15, #16, #17, #18, #19, #20, #21, and #29, of Plaintiffs Demand for Admissions by Johnson & Johnson by stating the range of size and the chemical formula of the talc particles contained in industrial talc.

**RESPONSE**: Industrial talc is one of three grades of commercial talc, the other two grades are cosmetic and pharmaceutical. Industrial grades of talc vary widely in talc mineral content from below 50% up to ranges approaching pure talc mineral assay, and also vary widely in particle size distribution. Cosmetic talcs normally have a talc mineral assay of 90% or more.   Pharmaceutical talc assay is generally from 95% to 100% pure talc mineral.

- 2 -

J&J-0162340

Protected Document--Subject to Protective Order

4.      Define the term "normal and expected use" of Johnson's Baby Powder as used by Defendant in Defendant's response to Demands #23, #24, #25, #26, #27, #28, and #29 of Plaintiffs Demand for Admissions by Johnson & Johnson, Inc. dated February 23, 2000.

**RESPONSE**: Johnson's Baby Powder is expected to be used by shaking the powder into the hand of the consumer and applied to the skin.

5.      Identify all written warnings contained on labels affixed to containers of Johnson's Baby Powder containing talc by setting forth all language contained on the label(s); the date each label was first placed upon containers of Johnson's Baby Powder containing talc, the dimensions of the label and the size of the type used for each portion of the label and the reason the language was incorporated.

**RESPONSE**: See labeling documents found among the documents produced in response to plaintiffs' document demand.

6.      Identify all studies performed by Johnson & Johnson, Johnson & Johnson Consumer Product or any of their subsidiaries, divisions, affiliates or any agent, or outside consultant designed to determine manner in which consumers apply and or use Johnson's Baby Powder.

**RESPONSE**: Defendant objects to this interrogatory as over broad, vague and ambiguous. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, see documents provided in responses to request for production.

7.      Identify all scientific testing performed by Johnson & Johnson, any of its subsidiaries, divisions, affiliates or any agent, or outside consultant designed to determine whether there are any health risks posed to users of Johnson's Baby Powder or any other cosmetic powders containing talc.

**RESPONSE**: Defendant objects to this interrogatory as overly broad, vague, and ambiguous. Specifically, plaintiffs use of "health risks" include a myriad of conditions unrelated to any issue in this lawsuit. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, defendant refers plaintiff to the studies provided in response to plaintiffs requests for production.

8.      Identify and describe all clinical testing performed by Johnson & Johnson, any of its subsidiaries, divisions, affiliates or any agent, or outside consultant upon Johnson's Baby Powder.

- 3 -

J&J-0162341

Protected Document--Subject to Protective Order                                                JNJ 000065003

RESPONSE: Defendant objects to this interrogatory as overly broad, vague, and ambiguous. Specifically, plaintiffs use of "all clinical testing" include a myriad of testing unrelated to any issue in this lawsuit. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, defendant refers plaintiff to the studies provided in response to plaintiffs requests for production.

9.    Describe all refining processes undergone by the "highly refined cosmetic talc" contained in Johnson's Baby Powder prior to shipment for distribution for sale to consumers and identify the person or entity responsible for performing such process and the location where such processes are performed.

RESPONSE: Defendant objects to further response to this interrogatory on the grounds that it requests confidential and proprietary information subject to trade secret privileges. Further, this interrogatory is not relevant as plaintiffs have not made any manufacturing defect claim. Subject to the forgoing objections, the talc used in Johnson & Johnson's Baby Powder is selected from specific sources based on material specifications. Talc ore containing approximately 50% talc is taken from specific mining sites and is introduced into the refining process. Ore is crushed, dried and rolled to form a powder. Wetting is introduced to obtain a slurry which is introduced into a multiple horizontal float cell process which removes non talc particles. Talc is sampled at routine intervals and is prepared for shipping with methodology to retain aseptic qualities. Talc is maintained in dedicated silos and transported by air veying system for fragrance blending then filling and capping with routine sampling. The bottles are then packaged for shipping. These processes occur at the West Windsor Vermont purification plant and at the packaging facility in Royston GA. The individual with significant knowledge of these items is Randy Corder, an employee of defendant.

10.    Describe all refining processes which the talc contained in Johnson's Baby Powder has undergone prior to receipt by Johnson & Johnson in complete detail and identify all individuals or entities involved in or responsible for performing such processes, by name and address.

RESPONSE: Defendant objects to further response to this interrogatory on the grounds that it requests confidential and proprietary information subject to trade secret privileges. Further, this interrogatory is not relevant as plaintiffs have not made any manufacturing defect claim. Subject to the forgoing objections, the talc used in Johnson & Johnson's Baby Powder is selected from specific sources based on material specifications. Talc ore containing approximately 50% talc is taken from specific mining sites and is introduced into the refining process.

- 4 -

J&J-0162342

Ore is crushed, dried and rolled to form a powder. Wetting is introduced to obtain a slurry which is introduced into a multiple horizontal float cell process which removes non talc particles. Talc is sampled at routine intervals and is prepared for shipping with methodology to retain aseptic qualities. Talc is maintained in dedicated silos and transported by air veying system for fragrance blending then filling and capping with routine sampling. The bottles are then packaged for shipping. These processes occur at the West Windsor Vermont purification plant and at the packaging facility in Royston GA. The individual with significant knowledge of these items is Randy Corder, an employee of defendant.

11.     Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether any adverse health effects have been associated with the long term use of cosmetic powders which contain talc? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE:  Defendant objects to this interrogatory in that it is overly broad, vague, ambiguous, and unduly burdensome. Specifically, "adverse health effects" is overly broad in that it calls for the identification of documents unrelated to any condition at issue in this lawsuit. In addition, such documents may be confidential or subject to a protective order. Subject to the foregoing objections, medical literature concerning talc and talcosis are available in the public domain. In addition, Defendant refers you to studies provided in response to plaintiffs' request for production.

12.     Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether any adverse health effects have been associated with the long term use of cosmetic powders which contain corn starch? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE:  Defendant objects to this interrogatory as overly broad and vague in that it does not define "adverse health effects," and that it seeks discovery related to a product not at issue in this case. "Adverse health effects" could include the identification of documents unrelated to any condition or product at issue in this lawsuit. Subject to the foregoing objection, medical literature related to cornstarch is available in the public domain.

- 5 -

J&J-0162343

Protected Document--Subject to Protective Order                              JNJ 000065005

13.    Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether Johnson's Baby Powder containing talc is effective in reducing the likelihood of infants developing diaper rash or reducing its effects? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: **Defendant objects to this interrogatory as irrelevant. Specifically, this interrogatory calls for information that is not relevant to any condition at issue in this lawsuit.**

14.    Is Defendant Johnson & Johnson aware of the existence of any study conducted to determine whether Johnson's Baby Powder containing corn starch is effective in reducing or likelihood of developing diaper rash or its effects? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: **Defendant objects to this interrogatory as irrelevant. Specifically, this interrogatory calls for information that is not relevant to any condition or product at issue in this lawsuit.**

15.    State the name, address and title of the individual(s) employed by Defendant who are most knowledgeable concerning the refining processes and procedures employed by Defendant or defendant's suppliers of the talc contained in Johnson's Baby Powder.

RESPONSE: **Defendant objects to this interrogatory as overly broad and vague. Defendant has had hundreds of employees involved in the production of Johnson & Johnson's Baby Powder of its 50 + year history. It is not possible to identify one person or even a small group of persons with complete knowledge of all aspects of production over the years. Furthermore, this interrogatory calls for information that is not likely to lead to the discovery of any evidence that is relevant to any issue in this lawsuit.**

**Subject to the above stated objections, individuals knowledgeable to this area would be Roger Miller, former President of Windsor Minerals, Inc. and Randy Corder, Quality Assurance, Johnson & Johnson.**

**These individuals may be contacted only through counsel for Johnson & Johnson.**

- 6 -

J&J-0162344

Protected Document--Subject to Protective Order                    JNJ 000065006



16.    State the name, address and title of the individual(s) employed by Defendant who are most knowledgeable concerning the incidence of talcosis and/or pulmonary fibrosis among employees of Johnson & Johnson engaged in the refining talc of used in the manufacture of Johnson's Baby Powder.

RESPONSE:  **Defendant objects to this interrogatory as overly broad and vague. Defendant has had hundreds of employees involved in the production of Johnson & Johnson's Baby Powder of its 50 + year history. It is not possible to identify one person or small group of persons with complete knowledge worker related injuries over the years. Furthermore, this interrogatory calls for information that is not likely to lead to the discovery of any evidence that is relevant to any issue in this lawsuit. Subject to this objection, see those individuals listed in response to # 15, above.**

17.    Describe in detail all processes, procedures and testing performed upon the talc used in the manufacture of Johnson's Baby Powder to reduce or eliminate the existence of asbestos, tremolite or other contaminants in Johnson's Baby Powder.

RESPONSE:  **To the best of defendant's knowledge talc used in the manufacture of Johnson & Johnson's Baby Powder never contained asbestos in any form, or tremolite. Defendant's sources of talc were selected for their lack of contaminants and further, testing was performed over a significant number of years by outside laboratories which verified that defendant's talc sources did not contain asbestos or tremolite. Defendant objects to providing further information as overbroad and irrelevant. Plaintiff has made no claim of an asbestos-related illness.**

18.    Is Defendant Johnson & Johnson aware of the existence of any studies or tests conducted for the purpose of determining whether Johnson's Baby Powder containing talc contains any asbestos, tremolite or other contaminants? If so please identify each such study or test by setting forth the identity of the individual(s) or entity responsible for conducting such study or performing such testing, whether the results of such study or tests have been published, where such study or the results of such test(s) has been published and whether or not the results of the study or testing have been subject to peer review.

RESPONSE:  **Over a number of years, defendant had an ongoing process of testing its source talc for Johnson & Johnson's Baby Powder for asbestos, tremolite or other contaminants. This testing was performed by outside laboratories both McCrone and R.J. Lee. For a significant period of time this testing was directed by Ian Stewart, a former employer of McCrone. Mr. Stewart is a consultant for defendant and may be contacted only through its counsel.**

- 7 -

J&J-0162345

Protected Document--Subject to Protective Order

JNJ 000065007

Defendant objects to providing further information as it is overly broad and
irrelevant. Plaintiff has made no claim for an asbestos-related illness.

19.    Has Johnson & Johnson ever received notice of any claim(s) made by any individual
other than Plaintiff, Theresa Krushinski who claimed or alleged that they developed talcosis and/or
pulmonary fibrosis through exposure to Johnson's Baby Powder? If so, for each such claim set forth
the date upon which Defendant received notice of such claim, the name and address of the claimant,
and whether or not such claim resulted in litigation. If the claimant was represented by counsel, set
forth the name and address of the attorney who represented the claimant, the name of the court in
which such claim was venued, the caption of the action, the docket number or case number
identifying such action and the identity of the attorney or attorneys who represented Johnson &
Johnson in that action. If any employee gave deposition or trial testimony in connection with such
action, set forth the name and address of the employee who testified, the date and place where such
testimony was given and the name and address of the court reporter who recorded such testimony.
Please attach a copy of the transcript of such testimony to your responses to these Interrogatories.

RESPONSE: Defendant objects to this interrogatory to the extent it calls for information
          irrelevant to any matter at issue in this lawsuit.  Subject to the foregoing
          objections, defendant has been sued in the following cases.

          No. L 064208-83; Selby v. Johnson & Johnson Consumer Products, Inc.
          California Superior Court, San Diego County - Filed 12-22-93

          No. 670577; Gambino v. Johnson & Johnson Baby Products, Co,
          Superior Court, New Jersey, Middlesex County - Filed 10-12-83

20.    If Defendant has had any lung tissue sample alleged by any individual to evidence the
existence of talcosis or pulmonary fibrosis caused by Plaintiff's exposure to Johnson's Baby Powder
subject to scientific analysis, set forth the name and address of the individual whose tissue sample was
tested, the name and address of the individual who performed such testing, the date such testing was
performed and the result of such testing. Please attach a copy of the results of such testing or analysis
to your responses to these Interrogatories.

RESPONSE: Objection. Improper. The Judge in this case has ruled that the plaintiff is not
          entitled to this information unless or until an individual reviews tissues samples
          from the plaintiff and is identified as an expert.

21.    If you contend that the risk of developing talcosis and/or pulmonary fibrosis through
the use of Johnson's Baby Powder was known to the average or ordinary consumer set forth, in
complete detail, all facts upon which you intend to rely to establish that the characteristics of talc are
known to the average or ordinary consumer.

- 8 -

J&J-0162346

JNJ 000065008

**RESPONSE**: Defendant objects to this interrogatory on the grounds that it is over broad, vague, and irrelevant. Plaintiff attempts to improperly shift the burden to defendant to prove that its product was safe. Subject to the foregoing objections, the normal and expected use of Johnson's Baby Powder poses no health risks.

22.    If you contend that exposure to "highly refined cosmetic talc" poses a reduced risk of developing pulmonary fibrosis or talcosis set forth all facts and identify all studies upon which you intend to rely to establish this fact at the time of trial.

**RESPONSE**: Defendant objects to this interrogatory on the grounds that it is over broad, vague, and irrelevant. Plaintiff attempts to improperly shift the burden to defendant to prove that its product was safe. Subject to the foregoing objections, the normal and expected use of Johnson's Baby Powder poses no health risks.

23.    If you contend that Plaintiff developed talcosis by exposure to talc other than through the use of Johnson's Baby Powder set forth in complete detail all facts upon which you rely to establish this contention.

**RESPONSE**: Defendant disputes the contention that plaintiff developed talcosis by exposure to talc produced by Johnson & Johnson. Further information will be provided in response to this interrogatory when discovery is completed.

24.    Identify all individuals employed by Defendant, by name, address and job title who provided information necessary to respond to these Interrogatories and identify the individual, by name address and job title with Defendant, who Certified these Answers to Interrogatories on behalf of Defendants.

**RESPONSE**: Defendant objects to this interrogatory as over broad, harassing, and requests information subject to the attorney client, work product, and investigative privileges. Subject to the foregoing objection, these answers to interrogatories were compiled from numerous sources and the investigation by counsel.

25.    If any individual employed by Defendant consulted in connection with providing Defendant's answers to these Interrogatories or provided information necessary to respond to these Interrogatories is licensed to practice medicine in this or any other state, or is a scientist with experience or training in the field of inhalation toxicology, set forth the name and address of such

- 9 -

J&J-0162347

Protected Document--Subject to Protective Order

JNJ 000065009

physician, whether such physician has been Board Certified in any area of medicine and attach a copy of the current curriculum vitae for such individuals.

**RESPONSE**:  Defendant objects to this interrogatory as over broad, harassing, and requests information subject to the attorney client, work product, and investigative privileges.  These answers to interrogatories were compiled from numerous sources and the investigation of counsel.

- 10 -

SFNJ1 667751v1

J&J-0162348

Protected Document--Subject to Protective Order                                    JNJ 000065010

01/10/01  13:11 FAX 973 360 9831        DRINKER BIDDLE SHANLEY                    Ø027/027

# CERTIFICATION

I am employed by Johnson & Johnson Consumer Companies, Inc. (JJCCI), a defendant in the above-entitled action. The foregoing answers to interrogatories were prepared with the assistance and advice of counsel for JJCCI, upon whose advice and information JJCCI and I relied. The foregoing answers are true and correct to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

*Nancy C. Musso*

Dated: 5/23/00

SFNJ1 665775v1

J&J-0162349

Protected Document--Subject to Protective Order                    JNJ 000065011

Exhibit 183

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION | ) |
| | ) |
| HORACE A DURHAM, SR., and | ) |
| DOLORES JANE DURHAM | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 05C-07-136 ASB |
| | ) |
| METROPOLITAN LIFE INSURANCE., | ) NON-ARBITRATION |
| COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

**AFFIDAVIT**

My name is John Hopkins. I hold a BSc (Batchelor of Science) degree with Honors in Chemistry & Biochemistry from the University of St Andrews, Scotland, UK. I also hold a PhD degree in Toxicology from the University of Dundee, Scotland, UK.

I am a Chartered Biologist, holding the Diploma, C Biol.

My academic background is in the field of Toxicology.

I make this affidavit based on my personal knowledge gained during my employment with Johnson & Johnson Consumer Products, Inc. (hereinafter referred to as "Johnson & Johnson" as described below and from a personal review of documents in the files of Johnson & Johnson during certain of the times I worked for the Company as well as information conveyed to me in the ordinary course of business by other employees of Johnson & Johnson.

Prior to joining Johnson & Johnson in 1976 I undertook some teaching to medical students followed by employment as a Toxicologist in the Pharmaceutical industry. I was a founder Member of the British Toxicology Society in 1979.

During the period 1976 -2000 I was in the employment of Johnson & Johnson.

222733v1

EXHIBIT
J&J-230

I was employed in the United Kingdom (1976-1948) in the United States for the four years 1995-1998 inclusive and in France (1999-2000).

Since 2000 I am the President my own Company, Innovant Research. This is an independent Consultancy in the field of Toxicology, Product Safety and Risk Assessment.

For the whole of the period from 1976 onwards I have been familiar with the literature and debate as to talc safety. I am a Member of the UK Trade Association, CTPA Scientific Advisory Committee and the CTPA Talc Committee.

I am also familiar with the history and background of the sourcing, standards and specification of talc as used by Johnson & Johnson on a worldwide basis. During my employment for Johnson & Johnson in the UK, I was in regular contact with medical and scientific colleagues in the United States on all matter relating to talc safety.

Through my Company, I am a Consultant to Johnson & Johnson both in Europe and in the United States on safety matters, including talc safety, and still retain authorized copies of talc literature and information on talc usage within Johnson & Johnson.

This documentation includes summary of documented historical data and talc specifications.

**Johnson & Johnson Talc History**

### 1. Talc Sourcing:

The purity of talc is based on its source. There are only a limited number on talc mines in the World that provide a grade of talc that meets the requirements of talc for pharmaceutical applications (Talc USP) and talc for cosmetic applications (compliance with the CTFA monograph).

Mines that include geological structures, other than pure talc are not suited as a source of Cosmetic and Pharmaceutical grades of talc.

From 1946 talc for Johnson & Johnson in the United States was sourced from the Italian mine at Val Chisone.

Italian talc was the sole source for Johnson & Johnson products until 1964.

From 1964 until 2002, talc was sourced by Johnson & Johnson in the United States from the Windsor mine in Vermont, USA.

222733v1

## 2. Specification of Cosmetic Talc

The records indicate that as far back as 1949, there is documented evidence that the specification for Johnson & Johnson Cosmetic talc should be free from asbestos and asbestiform minerals.

Although asbestos was not known as a hazard in 1949, the presence of asbestos was even at that time, considered highly undesirable as the "feel" of its presence on the skin is regarded as unpleasant and cosmetically unacceptable.

Confirmation of the absence of asbestos on a historical basis has been reported in a Johnson & Johnson internal Report from 1966 that summarized the results of 13 samples of talc from the Company Museum, and dating from the period 1910 – 1964.

### 3. Audits of Talc Mines.

As a part of a program to ensure that the talc used in Johnson & Johnson products was free from asbestos, an independent geological audit of the talc mines both in Italy and in Vermont was conducted in 1972 by Professor Fred Pooley from the Department of Mineral Exploitation, University of Wales, UK.

Professor Pooley is considered a world class expert in talc mineralogy and geology. The audits included a systematic geological sampling of all areas of the mines, including the non-talc bearing areas.

The conclusion of the Audits was that for both of the Italian and Vermont mines, there was zero evidence of asbestos in the geology and mineralogy of the mines.

Additionally Professor Pooley examined a sample of talc dating from 1949, as used by Johnson & Johnson in the UK. It was reported that the quality had not changed.

### 4. Sampling of Talc

Since 1975, Johnson & Johnson has conducted a regular monitoring program of samples of talc from all mines supplying to affiliate Johnson & Johnson companies throughout the world. Although Italian talc was not used in the United States after 1964, it was used in Europe until 1999. The monitoring program included assay for asbestos, silica and quartz. Assay has been conducted by an independent external laboratory in the United States.

In addition, it has been a requirement of the Raw Material specification since 1975, for each batch of talc to be supplied to Johnson & Johnson to be free from asbestos and in compliance to the CTFA Talc Monograph. This has required the supplier to confirm purity of every batch supplied using state of the art techniques.

222733v1

3

For the talc sources in use in the United States over the period 1955-2002, there has never been an instance of asbestos contamination.

## 5. Conclusions

It is my considered expert opinion that based on:

1. An absence of asbestos contamination in historical talc samples,
2. An in-house raw material specification requirement, dating from at least prior to 1949, for absence of asbestos in talc,
3. No evidence of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States and
4. No evidence of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 –to date,

It may be concluded that there has never been asbestos contamination of the talc used by Johnson & Johnson in the United States from the period in question, 1955-2002.

John Hopkins. BSc, PhD, C Biol.

Duly sworn before me
by John Hopkins on
19ᵃ September 2006

RICHARD W S. DRAKE

NOTARY PUBLIC

PENNINGTONS
Newbury House
20 Kings Road West
Newbury
Berkshire RG14 5XR UK
Telephone 01635 571000

222733v1

4

Exhibit 184

E-SERVICE
59262175
Jul 11 2016
04:07PM
File & ServeXpress

1  ALEXANDER G. CALFO (State Bar No. 152891)
   acalfo@kslaw.com
2  JULIA E. ROMANO (State Bar No. 260857)
   jromano@kslaw.com
3  BRIAN PRIESTLEY (State Bar No. 301586)
   bpriestley@kslaw.com
4  **KING & SPALDING LLP**
   633 West 5th Street, Suite 1700
5  Los Angeles, CA 90071
   Telephone:     +1 213 443 4355
6  Facsimile:     +1 213 443 4310
7
8  Attorneys for Defendant
   JOHNSON & JOHNSON CONSUMER INC.
9  (formerly known as JOHNSON & JOHNSON
   CONSUMER COMPANIES, INC.)
10
11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
12                  **FOR THE COUNTY OF LOS ANGELES**
13
   JESUS PAYAN and FRANCISCA PAYAN,        JCCP 4674
14                                         Case No. BC608412
              Plaintiff,
15                                         **DECLARATION OF JOHN HOPKINS IN**
         v.                                **SUPPORT OF DEFENDANT JOHNSON**
16                                         **& JOHNSON CONSUMER INC.'S**
   CBS CORPORATION, et al.,                **MOTION FOR SUMMARY JUDGMENT,**
17                                         **OR IN THE ALTERNATIVE, SUMMARY**
              Defendants.                  **ADJUDICATION OF ISSUES**
18
19                                         *[Filed Concurrently with JJCI's Notice of*
20                                         *Motion and Motion; Separate Statement Of*
                                           *Undisputed Material Facts; Declaration Of*
21                                         *Julia E. Romano; Compendium of Evidence;*
                                           *[Proposed] Order]*
22
23                                         Date:    August 12, 2016
                                           Time:    9:00 a.m.
24                                         Dept.:   1
                                           Judge:   Hon. Joseph R. Kalin
25
26                                         Action Filed:     January 27, 2016
                                           Trial Date:       August 22, 2016
27 ///
28
                                    1
   DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S
       MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

**EXHIBIT**

tabbies

15

I, John Hopkins, declare:

1. My name is John Hopkins. I hold a BSc (Bachelor of Science) degree with Honors in Chemistry & Biochemistry from the University of St Andrews, Scotland, UK. I also hold a PhD degree in Toxicology from the University of Dundee, Scotland, UK.

2. I am a Chartered Biologist, holding the Diploma, C Biol.

3. My academic background is in the field of Toxicology.

4. I make this declaration based on my personal knowledge gained during my employment with the Johnson & Johnson Consumer Companies (hereinafter referred to as "Johnson & Johnson") as described below, from my personal review of documents in the files of Johnson & Johnson during certain of the times I worked for the Company, as well as information conveyed to me in the ordinary course of business by other employees of Johnson & Johnson.

5. Prior to joining Johnson & Johnson in 1976, I undertook some teaching to medical students followed by employment as a toxicologist in the pharmaceutical industry. I was a founding member of the British Toxicology Society in 1979.

6. During the period 1976-2000, I was in the employment of Johnson & Johnson. I was employed in the United Kingdom (1976-94), in the United States for the four years 1995-1998 inclusive and in France (1999-2000).

7. Since 2000 I am the President my own Company, Innovant Research. This is an independent Consultancy in the field of Toxicology, Product Safety and Risk Assessment.

8. For the whole of the period from 1976 onwards I have been familiar with the literature and debate as to talc safety. Through my Company I am a Member of the UK Trade Association, CTPA Scientific Advisory Committee and the CTPA Talc Committee.

9. I am also familiar with the history and background of the sourcing, standards and specification of talc as used by Johnson & Johnson on a worldwide basis. During my employment for Johnson & Johnson in the UK, I was in regular contact with medical and scientific colleagues in the United States on all matter relating to talc safety.

///

2

10.     Through my Company, I have consulted to Johnson & Johnson both in Europe and in the United States on safety matters, including talc safety, and still retain authorized copies of talc literature and information on talc usage within Johnson & Johnson.  This documentation includes summary of documented historical data and talc specifications.

11.     It is my understanding that Plaintiffs JESUS PAYAN and FRANCISCA PAYAN ("Plaintiffs") allege Mr. Payan was exposed to asbestos-contaminated Johnson & Johnson baby powder while serving in the U.S. Navy from 1960 to 1966.

**Johnson & Johnson Talc History:**

A.  **Talc Sourcing:**

12.     The purity of talc is based on its source. There are only a limited number on talc mines in the World that provide a grade of talc that meets the requirements of talc for pharmaceutical applications (Talc USP) and talc for cosmetic applications (compliance with the PCPC (formerly known as CTFA) monograph and the Monograph for USP).

13.     Mines that include geological structures, other than pure talc are not suited as a source of Cosmetic and Pharmaceutical grades of talc.

14.     From 1946 talc for Johnson & Johnson products in the United States was sourced from the Italian mine at Val Chisone.

15.     Italian talc was the sole source for Johnson & Johnson products until 1967.

16.     From 1967 until 2003, talc was sourced by Johnson & Johnson in the United States from the Windsor mine in Vermont, USA.

B.  **Specification of Cosmetic Talc**

17.     The records indicate that as far back as 1949, there is documented evidence that the specification for Johnson & Johnson cosmetic talc should be free from asbestos and asbestiform minerals.

18.     Although asbestos was not known as a hazard in 1949, the presence of asbestos was even at that time, considered highly undesirable as the "feel" of its presence on the skin is regarded as unpleasant and cosmetically unacceptable.

DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

19.     Confirmation of the absence of asbestos on a historical basis has been reported in a Johnson & Johnson internal report from 1966 that summarized the results of 13 samples of talc from the Company Museum, and dating from the period 1910-1964.

C. Audits of Talc Mines

20.     As a part of a program to ensure that the talc used in Johnson & Johnson products was free from asbestos, an independent geological audit of the talc mine in Italy was conducted in 1972 by Professor Fred Pooley from the Department of Mineral Exploitation, University of Wales, UK.

21.     Professor Pooley is considered a world class expert in talc mineralogy and geology.

22.     The audits included a systematic geological sampling of all areas of the mines, including the non-talc bearing areas.

23.     The conclusion of the Audit was that there was zero evidence of asbestos in the geology and mineralogy of the Italian mine.

24.     Additionally Professor Pooley examined a sample of talc dating from 1949, as used by Johnson & Johnson in the UK. It was reported that the quality had not changed.

D. Sampling of Talc

25.     Since 1975, Johnson & Johnson has conducted a regular monitoring program of samples of talc from all mines supplying to affiliate Johnson & Johnson companies throughout the world. Although Italian talc was not used in the United States after 1967, it was used in Europe until 1999. The monitoring program included assay for asbestos, silica and quartz. Assay has been conducted by an independent external laboratory in the United States.

26.     In addition, it has been a requirement of the Raw Material specification since 1975, for each batch of talc to be supplied to Johnson & Johnson to be free from asbestos and in compliance to the PCPC (CTFA) Talc Monograph. This has required the supplier to confirm purity of every batch supplied using state of the art techniques.

///

4

27.     Based on the absence of asbestos contamination in historical talc samples; an in-house raw material specification requirement dating from at least 1949, for absence of asbestos in talc; no evidence of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States; and no evidence of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 to present, it is my expert opinion that the Johnson & Johnson baby powder Mr. Payan was allegedly exposed to while serving in the U.S. Navy from 1960 to 1966 was not contaminated with asbestos.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed July 7th, 2016, at Newbury, United Kingdom.

_____
John Hopkins, Declarant

DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S
MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

## PROOF OF SERVICE

*Jesus and Francisca Payan v. CBS Corporation, et al.*
LASC Case No. JCCP 4674; BC608412

I, the undersigned, declare: I am a citizen of the United States, over 18 years of age and not a party to the within action. I am employed in the County of Los Angeles, State of California; my business address is 633 West 5th Street, Suite 1700, Los Angeles, CA 90071.

On the date specified below, I served a copy of the foregoing document described as:

**DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**

on the interested parties in this action

[X]     by placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Laurel L. Simes, Esq.<br>Heather B. Osuna, Esq.<br>LEVIN SIMES LLP<br>44 Montgomery Street, 32nd Floor<br>San Francisco, CA 94104 | Attorneys for Plaintiffs<br>JESUS PAYAN and FRANCISCA PAYAN<br><br>T:     (415) 426-3000<br>F:     (415) 426-3001 |

[ ]     BY MAIL: I am readily familiar with the business practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business; on this date, the above-referenced correspondence was placed for deposit at Los Angeles, California, and placed for collection and mailing following ordinary business practices.

[X]     BY ELECTRONIC SERVICE VIA FILE & SERVEXPRESS: File & ServeXpress for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service and pursuant to California Code of Civil Procedure § 1010.6 and California Rules of Court 2060(c). The transmission was reported as complete without error.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 11, 2016, at Los Angeles, California.

Brigette S. Price

1

Exhibit 185

CFR - Code of Federal Regulations Title 21

FDA Home[3] Medical Devices[4] Databases[5]

# CFR - Code of Federal Regulations Title 21

## The information on this page is current as of April 1 2015.

For the most up-to-date version of CFR Title 21, go to the Electronic Code of Federal Regulations (eCFR).[6]

New Search                                          Help[7] | More About 21CFR [8]

```
[Code of Federal Regulations]
[Title 21, Volume 7]
[Revised as of April 1, 2015]
[CITE: 21CFR740.1]
```

```
TITLE 21--FOOD AND DRUGS
CHAPTER I--FOOD AND DRUG ADMINISTRATION
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER G--COSMETICS
```

PART 740 -- COSMETIC PRODUCT WARNING STATEMENTS

Subpart A--General

Sec. 740.1 Establishment of warning statements.

(a) The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product.

(b) The Commissioner of Food and Drugs, either on his own initiative or on behalf of any interested person who has submitted a petition, may publish a proposal to establish or amend, under subpart B of this part, a regulation prescribing a warning for a cosmetic. Any such petition shall include an adequate factual basis to support the petition, shall be in the form set forth in part 10 of this chapter, and will be published for comment if it contains reasonable grounds for the proposed regulation.

[40 FR 8917, Mar. 3, 1975, as amended at 42 FR 15676, Mar. 22, 1977]

Plaintiff's Exhibit No.

**P-324**

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. http://www.ecfr.gov/cgi-bin/text-idx?SID=3ee286332416f26a91d9e6d786a604ab&mc=true&tpl=/ecfrbrowse/Title21/21tab_02.tpl

7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true

8. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/ucm135680.htm

Page Last Updated: 08/21/2015

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

    

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

 U.S. Department of **Health & Human Services**

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. http://www.ecfr.gov/cgi-bin/text-idx?SID=3ee286332416f26a91d9e6d786a604ab&mc=true&tpl=/ecfrbrowse/Title21/21tab_02.tpl

7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true

8. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/ucm135680.htm