# EXHIBIT 2

Page 1

```
 1                  SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION: MIDDLESEX COUNTY
 2                  DOCKET NO. MID-2912-17AS
                    APPELLATE DOCKET NO._____
 3
 4         RICARDO RIMONDI AND PILAR RIMONDI,    )
                                                 )
 5                                               )
                               Plaintiffs,       )
 6                                               )
              v.                                 )
 7                                               ) MOTIONS
           BASF CATALYSTS LLC, et al.,           )
 8                                               )
                               Defendants.       )
 9         _____       )
                                                 )
10
                    Place:  Middlesex County Courthouse
11                          56 Paterson Street
                            New Brunswick, New Jersey  08903
12
                    Date:  Friday, February 22, 2019
13
14   BEFORE:
15       HON. ANA C. VISCOMI, J.S.C.
16
17   TRANSCRIPT ORDERED BY:
18       ALLISON BROWN, ESQ.
         WEIL, GOTSHAL & MANGES LLP
19
20
21                       ANDREA F. NOCKS, CCR, CRR
                         PRIORITY ONE
22                       290 West Mount Pleasant Avenue
                         Livingston, New Jersey  07039
23                       (718) 983-1234
                         E-mail:  p1steno@veritext.com
24
25       Job No. NJ3236379
```

```
 1    APPEARANCES:
 2         JOSEPH N. COTILLETTA, ESQ.
           MONICA COOPER, ESQ.
 3         THE LANIER FIRM
           Attorneys for Plaintiffs
 4
 5         ALLISON BROWN, ESQ.
           JED WINER, ESQ.
 6         WEIL, GOTSHAL & MANGES LLP
           -and-
 7         JOHN C. GARDE, ESQ.
           McCARTER & ENGLISH
 8         (Present for Morning Session)
           Attorneys for Defendants,
 9         Johnson & Johnson, and
           Johnson & Johnson Consumer, Inc.
10
11         JOHN C. McMEEKIN, II, ESQ.
           SEBASTIAN A. GOLDSTEIN, ESQ.
12         SAM GARSON, ESQ.
           RAWLE & HENDERSON, LLP
13         (Present for Morning Session)
           Attorneys for Defendants,
14         Cyprus Amax Minerals Company
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  Good morning.  We are here with
2    regard to Ricardo and Pilar Rimondi versus BASF
3    Catalyst et al., Docket Number 2912-17, continuing in
4    limine matters prior to the commencement of this trial
5    which is Monday, February 25.
6          May I have appearances, please, on behalf of
7    the plaintiff.
8          MS. COOPER:  Yes, your Honor.  This is Monica
9    Cooper with the Lanier Law Firm for plaintiffs.
10          MR. COTILLETTA:  Good morning, your Honor.
11    Joseph Cotilletta.
12          THE COURT:  Thank you.
13          On behalf of the defendants, beginning with
14    Cyprus Amax Minerals Company.
15          MR. McMEEKIN:  Good morning, your Honor.
16    John McMeekin on behalf of Cyprus Amax Mineral Company.
17          MR. GOLDSTEIN:  And good morning, your Honor.
18    Sebastian Goldstein on behalf of Cyprus Amax Minerals.
19          MR. GARSON:  Good morning, your Honor.  Sam
20    Garson on behalf of -- on behalf of Cyprus Amax Mineral
21    Company.
22          THE COURT:  See, I jinxed you.
23          And now on behalf of the defendants Johnson &
24    Johnson and Johnson & Johnson Consumer Incorporated.
25          MR. GARDE:  Good morning, your Honor.  John

 1   Garde of McCarter & English.

 2              MS. BROWN:  Good morning, your Honor.  Alli

 3   Brown for the J&J defendants, with my colleague Jed

 4   Winer from my office as well.

 5              MR. WINER:  Good morning, your Honor.

 6              THE COURT:  Good morning and welcome back.

 7              So as I indicated, the court has, off the

 8   record, the court has several rulings to put on the

 9   record as a result of a series of motions that were

10   argued in the past few days.  The first is the motion

11   by the defendant Cyprus Amax Minerals Company for

12   reconsideration of this court's December 21, 2018,

13   order which denied its motion for summary judgment.

14   And I won't go over the arguments in depth placed by

15   counsel on the record.  It's a matter of the record

16   already.  They need not be recited again.  Just some

17   discussions with regard to that.

18              So back on December 21, 2018, the court did

19   hear the motion for summary judgment.  There had been a

20   series of cases in which this court granted Cyprus Amax

21   Minerals Company's summary judgment.  And this was

22   after the court's granting directed verdict in the

23   Lanzo trial of Cyprus Amax Minerals Company.

24              However, in this motion, in opposition to the

25   motion for summary judgment back in December of 2018,

 1    opposition filed by the Lanier firm, this is the first

 2    time that the court had seen evidence submitted to

 3    oppose that motion, which were affirmative pleadings by

 4    Cyprus Amax Minerals Company in the context of

 5    declaratory judgment action wherein it is indicated

 6    that it is indeed a successor company and it is seeking

 7    the benefit of insurance policies.  It was on that

 8    basis that the court denied the motion for summary

 9    judgment, and that is a matter of the record.

10           Now, in this motion for reconsideration of

11    this court's order, the moving party, CAMC, raises

12    three points as a basis for reconsideration; one is the

13    jurisdictional action, jurisdictional matter which is

14    the subject of appeal in a separate matter; the Huff

15    versus, I think Arkema is the first name plaintiff,

16    which is presently on appeal; the issue of successor

17    liability, and then that there is something new for the

18    court to consider and that is the deposition testimony

19    of CAMC corporate representative Patrick Downey, that

20    deposition being noticed and taken after the motion for

21    summary judgment.

22           So on a motion for reconsideration, what is

23    proper before the court is, to consider it is basically

24    that based upon the record in the prior motion, motion

25    for summary judgment, that the court either heard in

1   its analysis that it is not applying the law correctly

2   or that there is something new that was not available

3   in advance.  So the court does not consider the issues

4   of jurisdiction or successor liability which are being

5   raised for the first time now, although one could say,

6   could argue that the reason why successor liability is

7   being raised now is as a result of the opposition, but

8   certainly there was the opportunity to raise that in

9   the reply that had been submitted.

10          So having reviewed the motions, the

11  oppositions and other -- and the reply and arguments of

12  counsel herein, and I did spend quite a bit of time

13  reviewing this and analyzing it, looking at

14  Mr. Downey's deposition, but essentially certainly

15  Mr. Downey's deposition on this issue could have been

16  taken before one could argue, although alternatively

17  one could also state that until the opposition was

18  filed which brought this whole issue into question

19  about the affirmative pleadings, that it was not

20  something that CAMC was in a position to have to

21  address.

22          The court essentially relies on its ruling of

23  December 21, 2018, which denied the motion for summary

24  judgment, denies reconsideration; in essence, all that

25  Mr. Downey presents is a corporate representative's

1  version of what those pleadings mean and his knowledge

2  as a corporate representative thereof.  And so in

3  context of the pre -- alleged pre 1992 exposures, CAMC

4  remains in this case, and so the motion for

5  reconsideration is denied and I will provide you a copy

6  of the order.

7          MR. McMEEKIN:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          MR. McMEEKIN:  Your Honor, may I address the

10 court?

11         THE COURT:  Of course.

12         MR. McMEEKIN:  We will be filing a motion for

13 stay and motion to sever CAMC.

14         THE COURT:  Okay.

15         MR. McMEEKIN:  We have a copy of it here.  We

16 have not yet filed it with the court.  We will file it

17 and you can hear it whatever time you'd like to.

18         THE COURT:  Well, I'd like to do it today.

19 Have you provided a copy of this to plaintiffs?

20         MR. McMEEKIN:  We have not, your Honor.  We

21 were waiting for your Honor's ruling.

22         THE COURT:  I know, but I don't want to take

23 up the jury's time on Monday and if you need to go to

24 the appellate division by way of emergent relief, I'd

25 like to take care of it today.  So if you could provide

Page 8

1    a copy -- excuse me -- to plaintiffs' counsel and I

2    have conference calls at 3 o'clock on a separate

3    asbestos matter that I need to take care of; how about

4    we have oral argument at -- later on this morning if we

5    could, if plaintiffs are ready; otherwise, we could do

6    it at 1 o'clock or 1:30.

7              MR. COTILLETTA:  I'm sorry, your Honor.  I

8    just need to make a call to somebody, so we could argue

9    before the afternoon and that's fine with us.  I just

10   need to make a call.

11             THE COURT:  Why don't you do that now.

12             MR. COTILLETTA:  Thank you, judge.

13             THE COURT:  Do you want to take the papers

14   with you?

15             MR. COTILLETTA:  Yes, judge.  Thank you.

16             THE COURT:  How about we take -- how much

17   time do you need, 15 minutes?

18             MR. COTILLETTA:  15 minutes would be great,

19   judge.  Thank you.

20             THE COURT:  15-minute break.  Provide counsel

21   those papers, if you could provide my copy, and then

22   file it with the clerk in due course.

23             That is extra orders?

24             MR. McMEEKIN:  I'll swap you.

25             COURT CLERK:  Off the record, judge?

1          THE COURT:  Off the record.

2          (Brief recess.)

3          THE COURT:  So we're back on the record with

4   the next motion.

5          MS. COOPER:  I'm sorry, your Honor.  May I

6   grab Mr. Cotilletta?

7          THE COURT:  If he's still on the phone leave

8   him on the phone, right?

9          MS. COOPER:  That's fine, your Honor.

10          THE COURT:  I mean, go ahead.  If he needs to

11   be on the phone that's fine, but if he's not on the

12   phone you can bring him back in.

13          How about some water there?

14          MR. McMEEKIN:  It was the coffee that did it.

15          MS. COOPER:  I don't know where he went, your

16   Honor, so --

17          THE COURT:  Okay.  We'll continue.  Do you

18   want to excuse yourself to get water?

19          MR. McMEEKIN:  No, I'm fine, your Honor.

20          THE COURT:  Next is a motion to preclude the

21   testimony of Alice Blount.  This was filed by the

22   defendants.  Essentially the defendants contend that

23   although the plaintiffs identified Alice Blount as a

24   fact witness, that due to the nature of her testimony

25   and her area of expertise that she is, in fact, an

1    expert.

2            The plaintiffs designated Dr. Blount as a

3    fact witness back, I believe, in April of last year,

4    2018.  And they did not receive any objections from the

5    defendants prior to the filing of the motion for -- to

6    bar.

7            The defendants assert that her testimony, in

8    addition to being expert testimony in nature,

9    constitute inadmissible hearsay for which there's no

10   exception; also indicate that her 1990, 1991 article

11   with regard to the testing that she did that when she

12   was deposed she talked about acquiring the Sample I

13   which was the Sample I designated as a Johnson &

14   Johnson product, baby powder product in 1996, so there

15   were some issues there; also argued that the

16   methodology that she utilized was not adopted by EPA,

17   OSHA, or NIOSH, and so therefore, it creates a concern

18   under the recent Accutane decision and argued

19   relevancy.

20           In opposition to this motion, the plaintiffs

21   assert that she is a fact witness; that the court has

22   heard her testimony before and allowed it in the

23   context of a fact witness; and that she is elderly and

24   unavailable living at Rutland, Vermont, and so that her

25   deposition is appropriate to be played as a fact

1   witness under Rule 416:1(c) also, that her methodology

2   is incorporated as an ISO methodology.

3            So I've considered the arguments by counsel

4   and also including the various attempts by the

5   plaintiffs at the court's direction to contact

6   Dr. Blount to ascertain her availability and I've

7   been -- we were advised yesterday by counsel that she

8   responded to, I think an e-mail request, she says I'm

9   82 years old and I live in Rutland, Vermont.

10           So the issue at play here is that when her

11  deposition was taken, which was sometime after the

12  Lanzo trial, was taken by Mr. Lanier and there were

13  counsel present for Johnson & Johnson, counsel present

14  for Imerys Talc America, but CAMC asserts herein that

15  there was no counsel present on behalf of CAMC and

16  therefore, that that testimony certainly cannot be used

17  as to CAMC.

18           In reviewing the case law and the court rules

19  and the evidence rules, so this court first looks to

20  414 -- excuse me 416:1C which provides, "Except as

21  otherwise provided by 414:9E, the deposition of a

22  witness, whether or not a party, may be used by any

23  party for any purpose, against any party who was

24  present or represented at the taking of the deposition

25  or who had reasonable notice thereof.  If the court

1    finds that the appearance of the witness cannot be

2    obtained because of death or other inability to attend

3    or testify such as age, illness, infirmity or

4    imprisonment or is out of the state or because the

5    party offering the deposition has been unable, on the

6    exercise of reasonable diligence, to procure the

7    witness's attendance by Subpoena, provided, however,

8    that the absence of the witness was not procured or

9    caused by the offering party, deposition of an absent

10   but not unavailable witness may also be so used.

11           "If, upon application and notice, the court

12   finds that such exceptional circumstances exist, it's

13   to make such use desirable in the interest of justice

14   and with due regard to the importance of presenting the

15   testimony of witnesses orally in open court."

16           So while one could argue of the similarity

17   and motive in defending against any deposition against

18   Imerys and CAMC, the court does not do that.  The court

19   permitted this testimony in the Henry trial and finding

20   that she was part of the story.  She was a consultant

21   at one point in time for Johnson & Johnson.  There was

22   communication between her and Johnson & Johnson

23   relative to her testing.  And so the court will permit

24   her testimony under 416:1C.

25           She is of that age, 82, where she's not an

1    active 82-year-old and she does live out of state.  I

2    don't think that the Subpoena requirement there to

3    compel an 82-year-old to travel would be appropriate.

4    The plaintiffs certainly sought to try to procure her

5    testimony voluntarily.  But the court will permit her

6    testimony to be used as to the defendant Johnson &

7    Johnson only.

8              I understand that there have been

9    designations by both sides and that the court had, when

10   it played the video in the Henry case, had read to the

11   jury a stipulation with regard to that testimony and

12   that would be something the court would consider herein

13   as appropriate.  But the motion to otherwise preclude

14   her testimony is denied, and we'll get you copies of

15   the orders.

16             If you give me a moment, I have two more

17   motions.

18             Two more motions were filed by the plaintiff

19   seeking sanctions.  First is the motion for sanctions

20   due to discovery abuse and spoliation of evidence by

21   the defendant Johnson & Johnson and Johnson & Johnson

22   Consumer Incorporated.

23             In moving for sanctions, this motion is

24   essentially divided into three parts where the

25   plaintiffs contend that there were discovery abuses

1    that are sanctionable.

2            So first was with regard to the scheduling of

3    the deposition of Johnson & Johnson's corporate

4    designee, Dr. John Hopkins.  The court has discussed

5    that extensively herein and noted that we're dealing

6    with national litigation, not with regard -- only with

7    regard to the allegation that talc was contaminated

8    with asbestos and caused mesothelioma, but that talc

9    caused ovarian cancer.

10           So if you look at the responsibilities of

11   Johnson & Johnson's corporate designee in that regard

12   in connection with both discovery depositions and trial

13   testimony, they are tremendous responsibilities, and

14   the parties have to coordinate the scheduling of this

15   deposition.

16           So certainly this deposition didn't happen

17   earlier.  The court had ordered it happen by February 4

18   and that date did not occur.  But what happened was

19   that Dr. Hopkins was called to testify in connection

20   with a trial out in California.  So while this court

21   had entered an order, the court does not see the fact

22   that that deposition did not occur on that date as a

23   violation, willful violation of an order by the

24   defendant Johnson & Johnson, but merely recognizing

25   what all of us judges recognize is that we have to take

 1    into consideration that certainly a deposition,

 2    discovery deposition does not trump the requirement of

 3    producing a witness for purposes of live testimony at

 4    trial.

 5              Second area that the defendants -- plaintiffs

 6    assert that sanctions should be awarded by the court as

 7    against Johnson & Johnson is the contention that J&J

 8    defendant's deficient Interrogatory responses and/or

 9    request for production of document responses.  And

10    there was significant -- a lot of that deals with the

11    issue of the time period that Mr. Rimondi spent in Peru

12    and deriving as much information as possible, discovery

13    as possible.

14              And so Mr. Bernardo was here from Skadden,

15    Arps yesterday and he detailed painstakingly the

16    attempts to comply with discovery for an entity that no

17    longer essentially exists, as of 30 years ago, that

18    documents were then moved off-site and in accordance

19    with document retention policies, were ultimately

20    destroyed well before any litigation contemplated

21    someone outside of this country pursuing a cause of

22    action for alleged exposure that occurred 30, 40 years

23    prior in another country, not the United States.

24              Documents were provided to counsel.  I

25    understand from Mr. Bernardo, if I understood

1   correctly, that there were initial document production

2   all across that involved redactions, but that

3   ultimately they determined that it was better to

4   provide documents unredacted and then deal with the

5   issues and so that's what they did.  So they took it

6   upon themselves to do a second production of all these

7   documents.

8           The court is satisfied that there was a

9   diligent response to discovery, and sometimes documents

10  don't exist and you just have to live with that.  Not

11  only was there diligent efforts to provide discovery,

12  but then to create documents and provide them,

13  documents that they did not have to create which showed

14  in categories of types of documents, where they're --

15  essentially creating a comprehensive index of the

16  production of documents which they are not required to

17  do.  So certainly the efforts to produce were

18  reasonable and diligent, and there is no basis for

19  which the court to sanction the defendant in that

20  regard.

21          Next, the final area in this section, this

22  motion, is that the J&J defendants, February 1, 2019,

23  filing of Dr. Gibbs' and Weill's supplemental expert

24  reports and reliance materials are out of time, and

25  they are.  The court's already ruled upon that.  But

1   certainly what would be the court's decision in that

2   regard, not to sanction but to bar, and so that's what

3   the court has done, and essentially ruled those out of

4   time.

5           The sanctions that were requested were

6   comprehensive.  I won't read all of them.  They take up

7   an entire page.  But they include the ultimate sanction

8   of dismissal of pleadings with prejudice, not being

9   able to produce corporate representative, Dr. Hopkins',

10  prior or live testimony.

11          So plaintiffs have failed to meet their

12  burden as to why this court should impose any sanctions

13  as to any of these issues.  It is their burden to meet.

14  And the motion for sanctions due to alleged discovery

15  abuses and spoliation of evidence by Johnson & Johnson

16  is denied.  We'll provide you a copy of that order.

17          Which leaves us one more motion.  In this

18  motion, plaintiffs seek an adverse inference

19  instruction due to the alleged spoliation of evidence

20  by defendants Johnson & Johnson, Johnson & Johnson

21  Consumer Incorporated, Imerys Talc America Incorporated

22  and Cyprus Amax Minerals Company.  Imerys Talc America

23  has filed for bankruptcy, so the court will not address

24  that aspect of this motion.

25          So in essence what this motion says is that

1  back in 1969, as to the J&J entities, that they should

2  have been aware of pending litigation and essentially

3  preserved talc samples, grids and other testing

4  evidence.  I asked counsel for the plaintiff during

5  oral argument, are you saying that there was the

6  obligation of Johnson & Johnson and Cyprus Amax

7  Minerals, as the case might be, that every testing

8  sample had to be preserved going back to 1969.  I don't

9  know that I ever received an answer to that.  And I

10 certainly haven't been able to find any law that would

11 require that.

12          So if you go back to 1969, according to the

13 plaintiffs, Johnson & Johnson was aware of danger

14 relative to inhalation of the, quote, spicule, closed

15 quote, or, quote, needle-like crystals of tremolite in

16 its talc, and on the basis of that one document, they

17 assert that there should have been a litigation hold at

18 that time.

19          I haven't been able to find any case law that

20 goes back to 1969 that would require something of that

21 nature.

22          We move forward in time as to other examples.

23 I think we next come to the Westfall case which we've

24 heard a lot about.  That matter, which was filed in

25 Rhode Island, involved industrial talc, and Johnson &

1    Johnson was not brought into that case until, I

2    believe, 1982, and then they were dismissed in 1983.

3    So by virtue of them being brought in, although they

4    were involved prior to 1982 as a consultant, I

5    understand, it is the assertion of the plaintiffs that

6    a litigation hold should have been in place at that

7    time.

8              The plaintiffs assert that as an active

9    participant in Westfall, J&J knew that talc samples,

10   talc ore samples, identification of purchasers and

11   suppliers of talc and identification of source ore

12   mines were paramount.  And it should be noted that that

13   case involved alleged exposures to industrial talc

14   which is not at issue herein, but rather cosmetic talc

15   is.

16             After the Westfall case there are a series of

17   other cases, I think the next cases don't come up until

18   1996.  So with regard to Johnson & Johnson, the

19   plaintiffs assert that there was a legal duty to

20   maintain those samples, assert the same as it relates

21   to CAMC, and find that sanctions are warranted because

22   of defendants' intentionally spoliated relevant

23   evidence and documentary evidence for decades.

24             I'm sorry, I discussed Westfall.  There was

25   also the Gambino case of 1983.  That case involved

 1    talcosis, did not involve mesothelioma or an

 2    asbestos-related illness for that matter.

 3             As to CAMC, CAMC asserts it was not formed

 4    until 1993 and it was not in the talc business.  Also

 5    assert that the plaintiffs have presented no evidence

 6    that CAMC destroyed any materials relevant to this

 7    lawsuit, much less bad faith or even negligently.  The

 8    court would agree in that regard.

 9             As to defendant Johnson & Johnson asserts

10    that the plaintiffs can't demonstrate J&J had a duty to

11    retain materials at issue, and can't establish that J&J

12    defendants acted intentionally in bad faith or even

13    negligently, nor is there any evidence of extreme

14    prejudice to the plaintiffs.

15             So the court finds that essentially the

16    plaintiffs have failed to meet their burden of proof as

17    to intentional bad faith or even negligently spoiling

18    evidence; in fact, I saw the summary of samples that

19    were produced in this case.  I was provided by

20    plaintiffs' counsel, as part of this motion, another

21    copy brought to the court yesterday where these are

22    samples that go back, I think there might be one in the

23    late 1800s, but certainly in the early 1900s through

24    present of Johnson & Johnson's Baby Powder that had

25    been produced or had been made available.

Page 21

1              Unlike the first Johnson & Johnson case that

2    this court tried where no samples were requested by

3    plaintiffs, in the Lanzo matter, I know that in Johnson

4    & Johnson's Answers to Interrogatories they did

5    indicate samples were available, but plaintiffs never

6    requested them.  Plaintiffs at that point had given

7    Dr. Longo samples that three plaintiffs' firms had

8    acquired through the eBay system.

9              We move forward -- in that case,

10   understanding it's on appeal so I won't say that much,

11   but as to Imerys Talc America, not CAMC but just to

12   show the distinction, Imerys Talc America erroneously

13   indicated in Answers to Interrogatories that it did not

14   have any samples, and yet through their corporate

15   designee it was learned that they did have samples.  So

16   there was a distinction there as to what happened.

17             So in Henry, samples were provided by Johnson

18   & Johnson, additional samples, not through eBay.  These

19   were provided by J&J and counsel had the ability, or

20   rather, plaintiffs had the ability to present their

21   defense based upon samples that were not obtained

22   through eBay.  And there are even more samples that

23   were provided herein.  I think, because there's ongoing

24   testing, ultimately the court had to cut it off at some

25   point to move forward.  I think there's about 50 or so

 1    that ultimately were tested here.

 2              And in determining this issue of prejudice

 3    because the plaintiffs have indicated they're

 4    prejudiced because those samples were not retained,

 5    they nonetheless have an availability of samples that

 6    span decades of usage of the product as alleged by

 7    Mr. Rimondi.  And also the court finds persuasive the

 8    testimony of Dr. Longo wherein, I'm trying to look for

 9    that quote, but he basically says, hey, the mines

10    really don't change over a long period of time.

11              And so while one may not have the samples

12    that correspond with the documents that were produced

13    in these cases, although there is cross-examination

14    there for plaintiffs with regard to those documents and

15    the meaning of what a non-detect is and what is the

16    level of sensitivity in the testing, those are all

17    cross-examination that the jury can then consider; but

18    with this testimony of Dr. Longo indicated that the

19    mines don't change, the mines don't change over the

20    course of decades, then the plaintiffs have the ability

21    to have testing done on a whole series of available

22    samples that span the decades.

23              So the court denies the motions seeking

24    sanction -- adverse inference due to spoliation of

25    evidence.  Certainly if the plaintiffs are inclined to

Page 23

1    renew it at the close of the case they may do so, if

2    they feel that circumstances are appropriate, but at

3    this point the court finds that the plaintiff has not

4    met their burden in that regard as to the J&J

5    defendants and Cyprus Amax Minerals.  Thank you.  I'll

6    provide a copy of that order.

7             All right.  So I think what we come to is, I

8    do want to discuss, when do you think we'll be able to

9    hear that motion, Mr. Cotilletta?

10             MR. COTILLETTA:  We're ready.

11             THE COURT:  Okay.  I left it in the back.

12   Give me a moment and I'll bring it right back.  Just go

13   off the record.

14             (Off the record.)

15             THE COURT:  Next before the court is a motion

16   that was filed this morning, and this is by the

17   defendant CAMC to stay this action or in the

18   alternative, to sever the claims against the defendants

19   CAMC, Cyprus Amax Minerals Company.

20             Who will argue this motion on behalf of the

21   moving party?

22             MR. McMEEKIN:  Your Honor, John McMeekin, on

23   behalf of defendant Cyprus Amax Minerals Company.

24             THE COURT:  Thank you.  On behalf of the

25   plaintiffs?

Page 24

1           MR. COTILLETTA:  Your Honor, Joseph

2    Cotilletta from the Lanier Law Firm.

3           THE COURT:  Thank you.

4           Will the J&J entities be taking a position on

5    this?

6           MR. GARDE:  We will, your Honor.  John Garde

7    of McCarter and English.

8           THE COURT:  Thank you.  Whenever you're

9    ready.

10          MR. McMEEKIN:  May I proceed, your Honor?

11          THE COURT:  Yes.

12          MR. McMEEKIN:  Your Honor, by way of

13   background, and your Honor is aware of this but for the

14   record purposes, Imerys Talc America Inc. was a

15   defendant in this and other pending talc litigation in

16   New Jersey and around the country.  Imerys Talc America

17   and other Imerys entities filed for Chapter 11

18   bankruptcy on February 13.

19          I have raised with your Honor at conference

20   call we had preliminary to setting motions for argument

21   that it was our position that this court lacked

22   jurisdiction at all by virtue of the filing of the

23   bankruptcy.  The plaintiffs had not moved to lift the

24   stay and that the court could not proceed forward at

25   all in this case.

Page 25

```
1              THE COURT:  Okay.  Are you now making that
2    argument on behalf of ITA or CAMC or both?
3              MR. McMEEKIN:  I'm going to make it on behalf
4    of CAMC, your Honor.
5              THE COURT:  Okay.
6              MR. McMEEKIN:  So for that purpose I had
7    raised the issue and your Honor advised you disagree
8    with that position.
9              Proceeded forward to today and your Honor has
10   denied the motion for reconsideration.
11             THE COURT:  Summary judgment.
12             MR. McMEEKIN:  As to summary judgment,
13   correct, your Honor.
14             At this point, your Honor, the liabilities
15   which CAMC has sought to be held liable for are related
16   claims to the Imerys Talc America bankruptcy.  The
17   motion we have pending before your Honor is a motion to
18   sever and -- I'm sorry, a motion to stay and if not, a
19   motion to sever CAMC out of the case by virtue of both
20   the pendency of the bankruptcy and the relatedness of
21   the claims, but also the prejudice which CAMC has by
22   virtue of Imerys Talc America filing for bankruptcy.
23             Your Honor, I will dispense with the factual
24   background of the case.  Your Honor is very well aware
25   of it and all the other records substantiate what the
```

Page 26

1  factual record is as to the claims; but very briefly,

2  they involve exposure to talc from 1960 until after

3  1993 when CAMC came into business.

4        One of the issues that's going to have to be

5  dealt with with this court and with this jury is how to

6  address the bankruptcy of Imerys Talc America.  The

7  claims as to CAMC are related, but we are going to have

8  to talk with the jury about the bankruptcy because the

9  claims against CAMC go past 1993 and it is CAMC's

10  position that those claims would have been the

11  responsibility of Imerys Talc America, that Imerys Talc

12  America should be published to the jury as to that

13  liability, and the jury will be told or should be told

14  about the bankruptcy of Imerys Talc America and how it

15  applies to this case.

16        Further, your Honor, to the extent that there

17  is argument or assertions as to Cyprus Mines

18  Corporation and what liabilities went where, we'll have

19  to talk with the jury about those liabilities.  Our

20  position is those liabilities would have flowed to

21  Imerys Talc America, Imerys Talc America's

22  predecessors, and that the jury will be involved in a

23  determination of the bankruptcy.  That is why the

24  bankruptcy court has very wide discretion and

25  jurisdiction over relatedness claims.

1          So, your Honor, I think we are in a position

2   where there will be undue prejudice to both the

3   plaintiffs and the defendants in this case if CAMC was

4   compelled to continue on in this litigation.  For that

5   reason, we are asking CAMC be severed out, it could be

6   severed out without prejudice for a determination of

7   what, if any, liabilities would befall to it or a

8   determination by the bankruptcy court as to the scope

9   of relatedness.

10          I say the scope of relatedness because we are

11   only about a week after the bankruptcy has been filed.

12   It is unreasonable to expect for CAMC, the nonmoving

13   party in bankruptcy, to be able to get its arms around

14   the ramification of Imerys Talc America having filed

15   for bankruptcy in such a short time.

16          And we cite to the Borough of Glassboro case

17   where the court can balance the equities including the

18   probability of success on appeal and the interest in

19   avoiding irreparable harm and hardship to the parties.

20   Your Honor has remarked in this case and other cases

21   about the value of the jury's time, the value to the

22   litigants and the values to the court about prolonged

23   proceedings.  There is clearly a hardship that would

24   fall if, at some point during this trial, the court

25   determined that there was a relatedness and this case

Page 28

1   was removed.  It would be the defendant's position at

2   that point that if a stay was entered it applies to the

3   entire case, not just to the case against CAMC.  And so

4   it would require, at that point, a mistrial.

5          So we raise these issues to the court for

6   purposes of a stay of the proceedings, but certainly

7   that CAMC could be severed out without prejudice.

8          There is also additional prejudice to CAMC,

9   your Honor; for example, Mr. Downey, Cyprus Amax

10  Mineral's corporate designee, is himself tied up in the

11  bankruptcy.  We don't have the ability to -- he's not a

12  New Jersey resident.  We don't have the ability to

13  compel him to appear.  He was properly designated as

14  CAMC's corporate designee at a time when CAMC and

15  Imerys Talc America, neither of them were in

16  bankruptcy.  Imerys Talc America's filing for

17  bankruptcy is a severe prejudice to CAMC in terms of

18  how it is able to defend the case.

19         Your Honor, for the reasons we have

20  articulated, we think the prejudice is grave.  We think

21  the impact to the trial, to the court and the jury's

22  schedule is significant, having to publish to the jury

23  issues of bankruptcy which are not within the jury's

24  purview.  But also I'd raise, your Honor, there's even

25  been issues today with your Honor's rulings that impact

1   the difference between CAMC and Johnson & Johnson.  For

2   example, Dr. Blount's video, it would be very difficult

3   to say that this can only be considered as to Johnson &

4   Johnson but it has to do with the potential finding of

5   asbestos in talc and that period that would have been

6   the Imerys talc.  So again, the jury is going to be

7   wrestling with these issues that are beyond the scope

8   of the jurisdiction of this court and are very clearly

9   within the related scope of the bankruptcy that is

10  currently pending in the State of Delaware.

11              THE COURT:  Thank you.

12              MR. McMEEKIN:  Thank you, your Honor.

13              THE COURT:  Mr. Cotilletta.

14              MR. COTILLETTA:  Thank you, your Honor.

15              I'm in a unique position because we are

16  likewise seeking a stay but on different grounds, and

17  we object to their and oppose their stay because our

18  stay is different.  Our stay conceivably, and we have

19  to get the application to the court, I don't think we

20  have them up here yet, but one for the stay and one for

21  the consolidation.  And so it's possible that if the

22  appellate division was going to take this into

23  consideration for our case, that they would decide in a

24  matter of days as opposed to this which is seeking

25  essentially another court, out of state court, to

Page 30

1    assume jurisdiction on not just this case on a national

2    basis that would affect all cases where plaintiffs'

3    firms have sued CAMC in this -- I'm talking about in

4    this jurisdiction, not just the Lanier Law Firm but

5    other firms.  And so I have to oppose the stay on that

6    ground because it's indefinite.

7            Mr. Rimondi and any other case Lanier has

8    with CAMC will never see the light of day because

9    apparently they'll be moving for a similar motion and

10   to have bankruptcy subsumed into CAMC on all their

11   cases.

12           And the other issue, judge, is that they

13   cited three exhibits; one of them's a bankruptcy

14   filing, it's Exhibit A.  It doesn't mention CAMC.

15   They're a separate entity.  They've always argued that.

16   And they've argued there was a liability split.

17   There's a lot of information that's not put in this

18   motion that makes it really hard to -- for me to be

19   able to argue what they're saying.  They're saying a

20   lot of different things that I don't know what's going

21   on in the bankruptcy docket.  I don't know if they made

22   any motions in the bankruptcy docket to seek

23   the court's jurisdiction and to say that the debtor's

24   estate is included with CAMC's liabilities in cosmetic

25   talc litigation.

Page 31

1          Likewise, with the issue of Pat Downey,
2    there's no exhibit to that.  Right now it's all
3    speculation.  What evidence do they have that Pat
4    Downey is now subsumed as a part of that and they don't
5    have control?  They've always produced him both as a
6    corporate representative of ITA and CAMC.  I don't see
7    any evidence why they don't have control of Mr. Downey
8    because he's been produced in both of those capacities.
9    He did it in this case as well.
10          The issue of severance, it's the same
11   reasons.  There's speculation right now, and they would
12   need to produce more evidence to be able to make a full
13   determination as to whether or not a severance is
14   appropriate.
15          Those are my objections and my opposition.
16   Thank you.
17          THE COURT:  Thank you.  Mr. Garde.
18          MR. GARDE:  Your Honor, on behalf of Johnson
19   & Johnson, I'm only here to argue about Rimondi and the
20   issue as this application relates to the Rimondi matter
21   which is scheduled for trial on Monday.
22          Johnson & Johnson has no objection to a
23   severance of CAMC provided it's only CAMC and the
24   moving forward to trial on Monday.  That's our
25   position.

1          THE COURT:  Thank you.

2          When the Imerys Talc America, Imerys Talc

3    Vermont, and Imerys Talc Canada bankruptcy was filed

4    and we had our conference call very early on after that

5    occurred and I had indicated at that time the concern

6    that CAMC was not listed as a separate entity that

7    would be provided that protection; similar to two other

8    Imerys Talc's iterations that are not covered for which

9    we have cases here; namely, Imerys Talc U.S.A. and

10   Imerys Talc Italy.

11         So now CAMC is before this court and with

12   this filing the court has reviewed the submission and

13   feels that a stay of the entire proceeding is not

14   appropriate.  The way that this court has dealt with

15   bankruptcies in the past, based upon its understanding

16   of bankruptcy laws, is that essentially the court is

17   deprived of jurisdiction from that entity that has

18   filed for bankruptcy but that the case moves forward.

19         So a stay of this entire proceeding would not

20   be appropriate.  However, the court agrees with CAMC

21   that it is up to the bankruptcy court to determine the

22   relatedness of CAMC to ITA, Imerys Talc America, Imerys

23   Talc Vermont.

24         The court has had the benefit of having

25   Imerys Talc America and CAMC before it for about three

Page 33

1    years.  Both entities have shared local counsel,

2    national counsel, corporate designee and in the

3    organizational hierarchy structure of the Cyprus

4    entities and Luzenac and Imerys Talc America, they all

5    seem to flow.  At least that has been the contention.

6              So I am of the opinion that this court at

7    this point does not have jurisdiction, that in terms of

8    relatedness it's up to a bankruptcy judge to determine,

9    and so that severance of the CAMC claim in this case is

10   appropriate and I will sign the order in that regard.

11             MR. McMEEKIN:  Thank you, your Honor.

12             THE COURT:  So, counsel, I'm going to make

13   sure you get a copy of this now so that you can do

14   whatever is necessary.

15             Off the record.

16             (Off the record.)

17             (Luncheon recess taken from 12:30 p.m. to

18   1:50 p.m.)

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2          THE COURT:  We're back on the record and I

3     just want to do a quick overview of what we have left

4     to do this afternoon, not in any particular order.

5     Blount designations; review of the preliminary charges

6     to the jury real quickly, including the proposed charge

7     relative to Imerys Talc America and CAMC.  I think

8     there was supposed to be some kind of a stipulation, or

9     that might be related to the Blount designation which

10    would be read to the jury in advance of the video being

11    played, and then the voir dire of the jurors as to what

12    they've been doing for the past few weeks in relation

13    to keeping up with media and whatever may have happened

14    on the Today show today.

15          Is there anything else we need to cover

16    before Monday?

17          MS. BROWN:  Not for us, your Honor.

18          MS. COOPER:  Your Honor, we just want to make

19    the court aware, we spoke with Brian Rimondi, one of

20    Mr. Rimondi's sons.  He was hospitalized this morning,

21    so we will keep the court updated.  We don't really

22    know how long that might be or exactly the situation,

23    but just wanted to let the court know he is

24    hospitalized currently.

25          THE COURT:  Okay.  If you can give us an

Page 35

1   update on Monday.

2           MR. COTILLETTA:  I'll let the court know.

3           THE COURT:  Thank you.  And I know that at

4   three o'clock today your IT people are going to be able

5   to go into the high tech courtroom to set up.

6           MS. BROWN:  Thank you, judge.

7           THE COURT:  We needed to take care of

8   something first, Mr. Cotilletta, so that you could

9   leave to take care of other matters.  What are we

10  taking care of?

11          MR. COTILLETTA:  Okay.  Well, first thing,

12  judge, may I approach with the applications that we

13  have to give to the court regarding the emergency

14  appeal?

15          THE COURT:  It's just a copy.  Sure.  You

16  have a copy for counsel?

17          MS. BROWN:  Yes.

18          THE COURT:  How many copies do you have

19  there?

20          MR. COTILLETTA:  I was told I have to give

21  the court one for stay and one for the consolidation,

22  so I'm not sure why there's four here.

23          THE COURT:  I only want one of each.

24          COURT OFFICER:  (Handing.)

25          THE COURT:  Thank you.

1          So what was it that we needed to entertain

2     before so that you could go?

3          MR. COTILLETTA:  So there is two stipulations

4     that would be a part of preliminary charges.  One of

5     them dealt with the fact that now CAMC and Imerys Talc

6     are out of the case, and the second one is a

7     stipulation regarding essentially who the proper

8     entities for the foreign exposures based on the

9     stipulation that my firm and Skadden, Arps had entered

10    into this court had so ordered earlier in October of

11    2018.

12          THE COURT:  Okay.  Now, for the first one

13    that deals with what we're going to tell the jury about

14    Imerys Talc America and Cyprus Amax Minerals Company,

15    which one am I looking at?

16          MR. COTILLETTA:  So you have one that doesn't

17    have a red marking on it.  That is J&J's proposal.  One

18    that I have, the one that I gave the court is the one

19    with the red marking.  And we generally agree that

20    there needs to be a charge.

21          Plaintiffs' position, we want to keep it very

22    simple.  Not explain why they're out.  I think that's

23    the fairest way to do it.  Just say they're out of the

24    case and you're not to consider why they're out of the

25    case and leave it at that.  If we start talking about

Page 37

1   bankruptcies or legal technicalities, it can be

2   prejudicial.

3           THE COURT:  All right.  So, for the record,

4   what the plaintiffs have proposed is the following:

5   "Imerys Talc America and CAMC are no longer defendants

6   in this case.  You are not to speculate as to why

7   Imerys Talc America and CAMC are no longer defendants

8   in this case."

9           Proposal by the defendant J&J, JJCI:  "Imerys

10  Talc America and Cyprus Amax Minerals Company are no

11  longer defendants in this case due to technical legal

12  issues.  Imerys Talc America and Cyprus Amax Mineral

13  Company did not settle with or pay money to the

14  plaintiffs.  You are not to speculate as to why Imerys

15  Talc America and Cyprus Amax Mineral Companies are no

16  longer defendants in this case."

17          So why do you object to the proposal which is

18  just telling them they're no longer in this case,

19  you're not to speculate why, they are going to think

20  that there was a settlement and that could be

21  prejudicial, if you think about it, it really cuts both

22  ways.  So they could think oh, well, then there's

23  something to this case, and be prejudicial to the

24  plaintiff; in second regard, they might think if they

25  were to find, for example, that the plaintiff had

Page 38

1    proven its case, that oh, well, they have settled

2    already with regard to one, so, you know, that might

3    affect your damages.

4              MR. COTILLETTA:  And I understand that, it

5    cuts either way.  The reason why I don't like the

6    language from Johnson & Johnson's proposal is because

7    it may -- right now what you and I just said seems to

8    be, it could be bounced and go one way or the other.

9              If you look at the Johnson & Johnson

10   proposal, they might think of it as, well, if they're

11   not in the case anymore and there's no settlement, then

12   the plaintiff doesn't have a legitimate case, plaintiff

13   is not bringing legitimate cases to some of the

14   co-defendants.  And that's the fear I have is that

15   there might be speculation in the jury's mind that

16   we're just suing whoever.

17             MS. BROWN:  And I appreciate that, judge.

18   And due to a technical legal issue was meant to address

19   just that point to just kind of say it's a

20   technicality.

21             THE COURT:  We could say due to technical

22   legal issues related to those two entities.

23             MS. BROWN:  That's fine, too.

24             THE COURT:  So that just hones in on them

25   that it was a technical legal issue as it related to

1    those two.

2              MS. BROWN:  That's fine as well.

3              MR. COTILLETTA:  That's fine, judge.

4              THE COURT:  Okay.  So you're going to add

5    that to the language?

6              MS. BROWN:  Judge, if it's helpful, we can

7    send Shirley and, of course, a copy to plaintiffs, an

8    updated copy, whatever's easier.

9              THE COURT:  Yeah.  If you wouldn't mind, in

10   addition to Shirley, could you copy my law clerk?

11             MS. BROWN:  Of course.

12             THE COURT:  Because Shirley has the flu.  I

13   don't know if she's going to be in on Monday.

14             MS. BROWN:  Of course.

15             THE COURT:  Thank you.

16             MS. BROWN:  We'll say due to technical legal

17   issues related to those two entities.

18             THE COURT:  Right.

19             MS. BROWN:  Okay.

20             THE COURT:  Let's look at the second, which

21   was:  "In this case plaintiffs allege exposure to

22   Johnson's Baby Powder in Peru from 1960 to 1992.

23   Johnson & Johnson Consumer Incorporated states that

24   Johnson's Baby Powder sold in Peru from 1960 to 1992

25   was safe, did not contain asbestos and did not cause

 1   plaintiff's mesothelioma.

 2            "However, plaintiffs and defendants agree

 3   that for purposes of this case, Johnson & Johnson

 4   Consumer Incorporated, a United States company, is the

 5   proper defendant and the company that would satisfy any

 6   judgment arising from exposure to Johnson's Baby

 7   Powder.

 8            "This stipulation should be considered only

 9   for the purpose of determining who is the proper party

10   to be sued and who would satisfy a judgment and for no

11   other purpose."

12            Why are we telling them this, or whatever

13   variation you may agree upon, now rather than at the

14   end of the trial right before the charge?

15            MR. COTILLETTA:  My only concern is if we

16   start talking about the facts of the case in opening,

17   the fear that I have is that the jurors might think in

18   their head, wait a minute, there's Peruvian exposure

19   here, there's U.S. companies.  They failed to sue the

20   Peruvian company.  Why isn't there a Peruvian entity in

21   this case?

22            And so I know that takes a little bit of

23   thought to get there for the jurors.  We do have some

24   jurors with advanced degrees and things like that, so

25   I'm thinking they're going to reach that point and say

Page 41

1   why isn't there a Peruvian entity?

2          I get it, judge.  I know that for sure it

3   should be in the closing.  I have proposed to

4   Miss Brown we should do it in the beginning, too, just

5   because we don't know how, what they're going to think

6   of that and that's a risk.

7          THE COURT:  Do you agree to this language?

8          MS. BROWN:  I agree to the language on mine.

9          THE COURT:  The one that I just read?

10         MS. BROWN:  Yes.  I, too, share the views

11  that this is better at the end.  Frankly, I don't think

12  we need a charge on this at all, but I was willing to

13  work with Mr. Cotilletta and the court's decision on

14  when it should be read.

15         THE COURT:  Okay.  So the plaintiff, you

16  wanted to add J&J to this?

17         MR. COTILLETTA:  Right.

18         THE COURT:  How did you want yours to read?

19         MR. COTILLETTA:  It would read the same way

20  except where it says Johnson & Johnson Consumer Inc.,

21  it would say Johnson & Johnson and Johnson & Johnson

22  Consumer Inc., and then everything where there's issues

23  in the singular would be pleural.

24         THE COURT:  Okay.  Has there been any kind of

25  stipulation -- so in Lanzo, ultimately I granted the

Page 42

1    motion for directed verdict on a motion at the end to

2    let out J&J because JJCI was a wholly owned subsidiary

3    that indicated that to the extent that there would be

4    any liability, they would be responsible for it.  Do we

5    have a similar situation here; rather than starting

6    this trial with both, can we narrow it down, or is that

7    not possible?

8              MS. BROWN:  So, your Honor, from our point of

9    view I think it is possible and it's even cleaner here,

10   frankly, in most cases.  And the reason for that is

11   that for the 1960 to 1992 Peruvian exposure period we

12   entered a stip that Mr. Bernardo spoke about yesterday

13   and we said JJCI will assume liability, if any, for

14   that period of time.

15             So that covers what sometimes, as your Honor

16   has grappled with, can be a difficult situation for

17   those earlier years, and certainly by the time he gets

18   to the United States in '92, JJCI is already the entity

19   that would be responsible.

20             So from our point of view, it is very

21   clearly, given this foreign stip, just JJCI, and I

22   offered a stipulation to that effect and it has not

23   gotten anywhere.

24             MR. COTILLETTA:  So the issue is there's been

25   some movement on the national level with information we

Page 43

1    received since Lanzo.  I had that meet and confer with

2    Skadden.  They didn't know the answer at that time and

3    that was what is the liability split.  J&J, my

4    understanding from documents I reviewed, there seems to

5    be that they were actually independently liable in the

6    very beginning before they had these divisions.  And

7    they were like, we don't know the answer, we'll get

8    back to you.  So they amended their Interrogatory

9    responses.

10           In the Rimondi case there's two sets of

11   supplemental Interrogatories.  There's one I call

12   supplemental Interrogatories regarding Peru and there's

13   supplemental Interrogatories regarding U.S. exposures.

14   So for that Interrogatory Number 16, and that was where

15   I told them they need to make an amendment, the

16   question asks, "Identify where your cosmetic or

17   personal hygiene products including but not limited to

18   those identified by plaintiffs or any fact witness in

19   this case were manufactured, assembled and distributed

20   and by whom, name and address."

21           And then it says, answer to Interrogatory

22   Number 16, "By agreement of the parties at the April

23   26, 2018, meet and confer, between plaintiffs' counsel

24   and J&J's counsel, plaintiffs are providing" -- excuse

25   me -- "defendants are providing an amended response to

Page 44

1    the Interrogatory with respect to Johnson's Baby Powder

2    only."

3              Then it states that they have a reasonable

4    and good faith belief that the following entities were

5    responsible for manufacture and distribution of

6    Johnson's Baby Powder during the following periods.

7    The first bullet point, 1894 to 1972, Johnson &

8    Johnson.  Second bullet point, 1972 to 1979, Johnson &

9    Johnson Baby Products Company, a division of Johnson &

10   Johnson.

11             And then the third bullet point is where it

12   carries on to what eventually would be JJCI and that

13   one is '79 to '81, Johnson & Johnson Baby Products

14   Company, which is actually then an actual separate

15   entity.

16             And so if you take that with the fact that in

17   one of our clauses talks about that the stipulation we

18   entered into with Skadden was in exchange for a

19   stipulation that the defendants, that's defined as J&J

20   and JJCI, accept liability for Johnson's brand talcum

21   powder sold in Peru.

22             So the issue going back from yesterday, the

23   issue we had with Skadden was we wanted to avoid the

24   apparent manufacturer doctrine and piercing the

25   corporate veil.  So what they said was okay, we really

1   would like JJCI to be responsible in these kind of

2   cases and the only way we're going to agree to this is

3   if you agree they accept liability.  Darron and I had a

4   back and forth with Mr. Bernardo about it, and

5   eventually we concluded that we would contain a

6   provision that would allow us to still go after Johnson

7   & Johnson because I said hey, wait, you guys have it in

8   here that the Johnson's Baby Powder the plaintiffs

9   identified in this case through the entirety of their

10  exposure that from '60 to '72 was J&J, and potentially

11  also between '72 and '79.  They said okay, and that's

12  how we got to the agreement.

13          So I don't disagree that JJCI would be

14  responsible from '79 on.  I think it's unclear and I

15  don't feel necessarily comfortable agreeing to letting

16  them out at this point; however, I can agree to circle

17  back towards the end of the case to try to see if

18  that's something we could do instead of having there be

19  motion practice.  I would like some facts to come out

20  more than what the Interrogatories are showing if you

21  think that Mr. Hopkins -- Dr. Hopkins is going to say

22  at trial something that's contradictory.

23          THE COURT:  What about a signed stipulation

24  from someone that's authorized to bind the company and

25  as I read these proposed stipulations, whether it's the

Page 46

1    defendants' or whether it's the plaintiffs' request to

2    add J&J, correct me if I'm wrong, Mr. Rimondi also

3    alleges exposure to talc post 1992.

4              MR. COTILLETTA:  Correct.

5              THE COURT:  So if we read this to the jury at

6    the beginning you really have to address post '92;

7    otherwise they are thinking oh, well, then what about

8    post '92, right?  I mean, even though you have opening

9    statements and I'm telling them opening statements is

10   not evidence, then the court presents a stipulation

11   which they must, you know, consider, and it doesn't

12   address post '92 exposure.

13             MR. COTILLETTA:  So I don't know if I, maybe

14   I never said this to you.  I did have initial thoughts

15   to have a stipulation that had a sentence in there

16   somewhere in that that broke down the liability.  It

17   says from -- from 1960 to 1992 would be Johnson &

18   Johnson, I don't know if that carries '79, from '79 or

19   so on it would be JJCI.  I don't know if I ever

20   actually officially proposed that to you, but I did

21   have a sentence in a draft, judge, that I would be okay

22   with adding a sentence in with that.

23             MS. BROWN:  I think these discussions sort of

24   highlight that a charge like this is not appropriate in

25   the beginning of the case.  And to the extent that

Page 47

1    they're going to rely on Interrogatories which,

2    frankly, I would contend don't apply where we allowed

3    them not to go have to sue the Peruvian entities, in

4    exchange JJCI would accept liability, but it seems that

5    at a bare minimum on the eve of openings this is not a

6    charge that should happen Monday.  And to the extent

7    that Mr. Cotilletta feels, during the course of his

8    case, he has established liability as to J&J, then this

9    is perhaps better visited at the charge conference.

10              MR. COTILLETTA:  Just one second, judge.

11              MS. BROWN:  I mean, if I could --

12              MR. COTILLETTA:  You know, I obviously don't

13   want to burden everybody with back and forth.  Maybe we

14   can just have a simple stipulation that says something

15   like, I don't know, there are no improper parties at

16   this point based on the exposure, something like that.

17   I mean, I don't know, judge.

18              MS. BROWN:  Anything like that now is going

19   to suggest there's something improper.  I understand

20   the concern of plaintiffs, right.  They are trying to

21   cure the fact that we had an agreement that they didn't

22   have to sue J&J Peru.  I understand that.  And it may

23   be appropriate in the charges that they get at the end

24   to explain, JJCI or J&J Peru is not here and there's

25   nothing wrong with that.  But once we start going

Page 48

1  beyond the Peru period about which entity, I think

2  we're paying more attention to the liability piece --

3             THE COURT:  Right.  Whereas, as opposed to at

4  the end of the case before your charge, you know, they

5  now will have heard all of the evidence and so that

6  they know that this alleged exposure for which

7  plaintiff is seeking judgment on their behalf, it runs

8  from 1960 through sometime here in the United States

9  and then we're just highlighting for them this one

10  portion of, by the way, here's what we've stipulated to

11  relative to that time period.

12             MS. BROWN:  Agreed, your Honor.

13             THE COURT:  Look, think about it over the

14  weekend.  If you feel that -- to read this to the jury

15  in either form in the court's mind begs the question

16  well, what about post 1992.  So they're going to sit

17  there and wonder throughout the trial well, why are

18  they giving us, why are we hearing evidence, wasting

19  our time regarding about after they came to the United

20  States when they just told us about that 32-year time

21  period outside of this country.

22             MS. BROWN:  Yes.  We're happy to work with

23  you as it gets closer to the charge conference on

24  something more appropriate.  Thanks, judge.

25             THE COURT:  That's how we're going to resolve

Page 49

1   that.

2          Is there anything else we need to take care

3   of before you need to go?

4          MR. COTILLETTA:  No, judge.  I know you

5   mentioned preliminary charges.  Are you going through

6   like kind of the --

7          THE COURT:  Preliminary charges, I'm going to

8   go through them right now.  First is 1.11 which is,

9   discusses the role of the jury, judge and attorneys,

10  right.  Number 1.25, that's the optional charge

11  regarding or concerning video recorded testimony which

12  we have in this case.  Then the prohibition,

13  preliminary charge 1.11 B, prohibition regarding

14  discussion of the case; 1.11 C, jurors not to do

15  independent research; 1.15, preliminary instruction

16  before trial regarding jurors taking notes;

17  preliminary -- 1.23, preliminary instructions regarding

18  jurors taking -- submitting questions.

19          And what I've added to the preliminary

20  charge, the model one, is the sentence as it reads in

21  the model charge is "in this trial, after the lawyers

22  have asked their own questions of each witness."  What

23  we have tailored that to is "their own questions of

24  witnesses testifying on technical or complex issues."

25  So that, for example, if the plaintiff takes the

Page 50

1   witness stand or any other fact witness, they're not

2   going to be submitting questions with regard to any of

3   that testimony.

4          And this charge highlights that they're not

5   here as the third party in the room.  They are here to

6   understand the testimony.  So if there's anything that

7   they don't understand, only then, and it also

8   highlights for them not to take it personally if you

9   don't ask the question, you know, all of that.

10          1.11 E is outline of the order of the events,

11   so I just go through opening statements, evidence, and

12   then closing statements.  I'm not giving a charge with

13   regard to settled defendants 'cause there aren't any,

14   although that would be the time period to talk about

15   Imerys Talc America, CAMC.  And then we're letting them

16   know there's a jury of eight, and then after the

17   court's charge at the end of the case we will select

18   alternates, but they all have to pay attention.

19          Then I'm supposed to discuss scheduling, and

20   we'll go over that briefly again with them; and then

21   the final preliminary charge is cell phone, pagers,

22   other wireless communication devices.  All right.

23          MS. BROWN:  Judge, before that would it be

24   appropriate to ask about recent news or after?

25          THE COURT:  I think the issue with regard to

1    recent news is why don't we -- want to do it one by one

2    at sidebar.

3               MS. BROWN:  Okay.

4               THE COURT:  Part of that inquiry is if they

5    say that they have --

6               MS. BROWN:  Exactly.

7               THE COURT:  -- is have you spoken with any of

8    the other jurors in relation to that, so keep that in

9    mind that that's something we want to ask.  And then

10   hopefully there are no issues.

11              MS. BROWN:  Hopefully.

12              MS. COOPER:  After all this.

13              MR. COTILLETTA:  I didn't know it was the

14   Today show.

15              THE COURT:  Did you hear what happened in a

16   criminal trial down in Monmouth County?  Monmouth

17   County is the next county down.  There was a murder

18   trial that was going on, 21 days in, this young woman

19   whose body has not been found, and someone who was a

20   childhood friend that supposedly they were going to run

21   off together, supposedly, he is the one that's been on

22   trial for her murder.  Someone testified, someone that

23   makes movies, a friend of his, about meeting with him

24   and wherein he told him, hey, this is supposedly an

25   idea for a movie, and supposedly tells him everything

Page 52

```
 1    that had happened.
 2              So 21 days in, the State, I think, had just a
 3    few more witnesses left and they were going to rest and
 4    as has happened to me in one of my cases, one of the
 5    jurors goes on Facebook that night and says, sitting in
 6    this murder trial LMAO.  So the judge went -- it was
 7    brought to the attention of the judge.  The judge
 8    called the juror to the sidebar, ultimately released
 9    that juror.  That juror claims, based upon the time
10    that it was posted, that it was her sister using her
11    account.  But then I think there may have been
12    discussions with another juror because a second juror
13    was released as well.
14              MS. COOPER:  Had to be, to release both of
15    them, it would have to be they conferred with each
16    other.
17              MS. BROWN:  They have enough people to keep
18    losing that many, though?
19              MS. COOPER:  Did that bust the panel?
20              THE COURT:  No.
21              Yeah, and the first juror afterward gave an
22    interview --
23              MS. BROWN:  Oh my God.
24              THE COURT:  -- what it was like sitting on
25    that trial.
```

Page 53

1              MS. BROWN:  I'm sure no one saw that.

2              MS. COOPER:  Did he do that immediately after

3    while the jury is still on or when the trial was over?

4              THE COURT:  No.  The minute he got bounced he

5    gave an interview.

6              MS. COOPER:  So inappropriate.

7              THE COURT:  So, we'll talk to them on Monday.

8              MS. BROWN:  Thank you.  Thanks, judge.

9              THE COURT:  If any one of them has seen it

10   and has discussed it, we have to deal with that.

11             MS. BROWN:  Okay.

12             MS. COOPER:  Yes, your Honor.

13             THE COURT:  Hopefully after all the

14   excitement we've had now, we won't have anymore on

15   Monday.

16             Okay.  So those are the preliminary charges.

17             MS. BROWN:  Thank you, your Honor.

18             MR. COTILLETTA:  Awesome.  Thank you, your

19   Honor.  See you on Monday.

20             THE COURT:  Get some sleep.

21             MR. COTILLETTA:  I don't know.

22             THE COURT:  Okay.  We next turn to

23   Dr. Blount.  So you're going to submit the revised --

24             MS. BROWN:  I am.

25             THE COURT:  -- instruction about telling the

Page 54

```
 1    jury about CAMC and Imerys Talc America.

 2               MS. BROWN:  Yes.  And actually, with your

 3    Honor's permission, I'll just head back now and we'll

 4    get that to you.

 5               THE COURT:  Okay.

 6               MS. BROWN:  Mr. Winer will handle the Blount

 7    depositions.

 8               Thank you, judge.  We'll see you Monday.

 9               THE COURT:  Thank you.

10               You don't need to stand unless you want to.

11               MS. COOPER:  We've been working so hard over

12    the weekend.  Or not the weekend, the...

13               THE COURT:  Since during the lunch break.

14    May feel like the weekend.

15               MR. WINER:  Your Honor --

16               THE COURT:  Again, for the record, could you

17    spell your last name?

18               MR. WINER:  Jed Winer, from Weil, Gotschal

19    and Manges, for the Johnson & Johnson defendants.

20               Miss Cooper and I have met and conferred over

21    the lunch break and I am pleased to report that we have

22    -- lunch break consisting of an Atkins bar and a

23    PowerBar, I believe.  But we have made significant

24    progress, so we have substantially narrowed down the

25    issues.
```

Page 55

```
 1              The first thing I can report is we have
 2   agreed on an instruction that should be read to the
 3   jury --
 4              THE COURT:  Prior to.
 5              MR. WINER:  -- prior to the video being
 6   played.  And I'll just put it on the record if that's
 7   okay.
 8              THE COURT:  Sure.
 9              MR. WINER:  That number one, after
10   Dr. Blount's deposition was taken, Johnson & Johnson
11   requested Dr. Blount provide any documents or data
12   concerning testing she has done of Johnson & Johnson
13   products since the 1991 paper.  Dr. Blount responded
14   that she did not maintain any such documents or data.
15              And then number two, Dr. Blount did not
16   permit any of the parties to test the Johnson's Baby
17   Powder bottle that she brought to her deposition.
18              So we have agreed on that.
19              THE COURT:  Okay.  You can send that to
20   Shirley and Greyson.  That would be great.
21              MR. WINER:  Certainly.  I think with that
22   I'll get into the few objections that we have, and then
23   I know Miss Cooper has some as well.
24              So with respect to the plaintiffs'
25   designations, our first objection is on page 23 of the
```

Page 56

1    transcript.

2              THE COURT:  Before you go there, I'm going to

3    raise this.  You can be seated.  I don't know if

4    previously on page 16, the plaintiffs have an objection

5    to line 6 through 25.  Have you removed that?

6              MR. WINER:  That was actually our objection.

7              THE COURT:  Yes.  That's what I meant, the

8    defendants.

9              MR. WINER:  I didn't think it was relevant

10   but...

11             THE COURT:  I have issues beyond that having

12   nothing to do with relevance, and if you don't mind

13   that I express them.

14             So the first time I heard this I actually was

15   offended by it insofar as, you know, that old joke in

16   the '50s and '60s that women went to college to get an

17   M-R-S degree.  And I know that that was not the intent

18   of Mr. Lanier.  But if you read this, I mean, and it

19   makes no difference that there are no women on this

20   jury, but if you read this, with all due respect, I

21   mean, it's a cute story of how they met, but that's not

22   what's coming out here in this.

23             I don't know if you agree or disagree, but,

24   you know, to say now you've also got, if I remember the

25   story correct, you've also got a husband at the

1   University of Wisconsin.  Yes, that's right.  It's not

2   on your resume.  How did you find your husband when you

3   were looking at rocks?  You know, I mean, no offense,

4   but I don't think it belongs.  I don't think it

5   belonged back in the '50s or '60s whenever she went and

6   graduated -- 1970s.  I don't think it belonged then and

7   it doesn't belong now.

8           So I really suggest you consider removing

9   this.  If you want to say it's with regard to relevancy

10  that's fine, but I find it offensive.  And that's not

11  just from a woman's perspective, from a professional's

12  perspective, you know.  But regardless of whether you

13  agree or disagree with her testing and all of that, I

14  mean, this is someone who got a master's of science in

15  geology and a Ph.D. in geology in the 1970s and, you

16  know, that was trailblazing at the time.  I'm sure she

17  encountered a lot of issues because of her gender, not

18  studying in what was a recognized woman's field, you

19  know.

20          MS. COOPER:  Absolutely.

21          THE COURT:  So I think you should reconsider

22  that.

23          MS. COOPER:  I will have it removed.

24  Absolutely, your Honor.

25          THE COURT:  Thank you.  So I think you were

Page 58

1    talking about page 23.

2                   MR. WINER:  Yes, your Honor.

3                   THE COURT:  Okay.

4                   MR. WINER:  On page 23, and sort of to your

5    Honor's comment you just made, I have tried to narrow

6    the instances where we feel strongly about some of the

7    lawyer commentary that went on during this deposition.

8                   THE COURT:  Like we sat on the porch and had

9    pie.

10                  MR. WINER:  Some of this stuff, yeah, I would

11   submit is a little over the top.  But the first one

12   relates to that on the bottom of page 23 where counsel

13   refers to having Dr. Blount autograph the 1991 paper.

14   I don't see how that's relevant and certainly I think

15   it's prejudicial.

16                  MS. COOPER:  I'm sorry.  Were you done,

17   Mr. Winer?

18                  MR. WINER:  Just for the record, that same

19   issue comes up again on page 36 where counsel says that

20   this, you signed your name the same way for me at the

21   bakery, in the coffee shop in Rutland, Vermont when I

22   had you autograph your article.  I think it's

23   unnecessary and it's prejudicial.

24                  MS. COOPER:  Your Honor, what I would

25   suggest, starting with page 23, is taking out I got

Page 59

1    your autograph copy, didn't I, starting at, I got an

2    autograph copy, didn't I, and taking that line out.

3         So just pointing out she signed it.  Not that

4    it's an autographed copy or anything like that, as far

5    as that's concerned.  But I do think it's important to

6    point out that it is the same person that signed this

7    document that signed it back in the past and that is

8    the relevance that I see there.

9         As far as cutting down on page 36 --

10        THE COURT:  So what you're saying is, judge,

11   we need to leave in that part that I got the amphibole

12   content cosmetic and pharmaceutical talc to publish in

13   1991.  Is that correct?  Yeah, it looks like it.  And I

14   made you sign it.  That's right, you did.

15        Because you're trying to say then that

16   relates to, on 36, all right, then there's one other

17   letter that I found interesting what's marked as

18   exhibit number, I can't read that part in red, I'm

19   looking specifically at a letter that someone wrote,

20   Alice Blount, Ph.D., minerals.  Is that you?  Yes.  Is

21   that your signature?  Yes.  In fact, you signed your

22   name in 1998 just about -- okay.

23        So what you're trying to do just is verify

24   that the '91 paper that she signed and this 2000 -- and

25   this other letter that she signed, that it's the same

Page 60

1    person that's authored them.

2              MS. COOPER:  Yes, your Honor, that would be

3    the purpose.

4              MR. WINER:  I don't think there's any dispute

5    about the authenticity of the '91 article or the other

6    letter.  So I don't really see how it's relevant that

7    he's having her sign things.  To me, it suggests undue

8    importance to the jury that she's signing these things

9    as though he's going to keep them in some collector's

10   box.

11             THE COURT:  1998 -- wait.  The 1998 letter or

12   whatever that is, she signed it back in '98.  Is that

13   right?

14             MS. COOPER:  Yes, your Honor.

15             THE COURT:  So rather than showing it to her

16   and asking her is this your signature, which he could

17   have done, he's just comparing what she signed, a copy

18   of the 1991 article with her signature now in 1998.  Is

19   that right?

20             MS. COOPER:  Yes.  I believe in that part of

21   the deposition he is just comparing that it's the same

22   signature.  And, your Honor, I'm more than willing to

23   cut out line 11 on 36 to 16, talking about the bakery.

24             THE COURT:  Please.  Okay.  All right.  I get

25   that.  I mean, it could have been done differently, but

Page 61

1    it wasn't.  The other way around it is that, you know,

2    no one is objecting to or questions the authenticity of

3    the 1991 article being hers and this 1998 letter being

4    hers.

5             There's two ways of doing it.  I don't mind

6    your way as long as we get rid of the objectionable

7    issues which really implies like some sort of, not that

8    he was trying to exercise undue influence on her, but

9    it shows an undue familiarity with one party over

10   another that we want to avoid.

11            MS. COOPER:  Absolutely, your Honor.

12            THE COURT:  Okay.  Where do we go to now?

13            MR. WINER:  Okay.  The next issue is on page

14   40 of the transcript, relates to an exhibit, Exhibit

15   Number 9, which is what appears to be a printout from

16   the website that purports to be related to Johnson &

17   Johnson, but it's clearly not something that the

18   witness had ever seen.  And counsel basically just

19   walked through and apparently asked questions about

20   setting up the context, you know, this stuff is used on

21   babies and, you know, trying to build up this whole

22   thing where there's really no foundation with the fact

23   witness.

24            He can ask her about her testing, but to

25   start going through lines from a blog post and trying

1    to make an argument about whether they are accurate or

2    not, I don't think is appropriate with a fact witness

3    like that, particularly when she hadn't seen it before.

4           MS. COOPER:  And, your Honor, first of all,

5    as to the exhibit, I believe it is an admission by a

6    party opponent because it is from the J&J's blog and it

7    is their post.  We've spoken about taking off this is

8    the stuff used on babies and we've taken out any

9    reference to her expertise.  But I do think that it is

10   setting up context for this last sentence which is

11   since the 1970s it's been asbestos-free and then her

12   saying it does have asbestos, so it's --

13          THE COURT:  I understand what you're saying,

14   but doesn't she say that anywhere else or is it all

15   predicated on this article that she's never seen and

16   basically it's Mr. Lanier reading in the document is

17   what's happening.

18          MR. WINER:  I'm sorry, your Honor.  On page

19   42 he asks the appropriate question which is, based

20   upon what you did, was Johnson & Johnson's Baby Powder

21   in the 1970s, you know, did it have asbestos.  That's

22   the appropriate question.

23          THE COURT:  And that question really stands

24   alone, because throughout this deposition talk about

25   her 1991 test and her paper, and I think that there's

Page 63

 1    also reference throughout this deposition about her

 2    reaching out to the J&J attorneys.  This is almost like

 3    a non-sequitur here to this article that she has never

 4    seen and it's essentially Mr. Lanier reading in the

 5    document.  And you're saying it's J&J and it's a party

 6    admission.  Well, bringing it, try bringing it in

 7    throughout the trial, not through this witness who's

 8    never seen it.

 9            MS. COOPER:  Absolutely, your Honor.  Can we

10    agree to have it just from 42, line 3 to line 10, which

11    is starting with Dr. Blount, based on what you know or

12    you know from what you did.

13            THE COURT:  Right.

14            MS. COOPER:  Asking just the relevant

15    question.

16            THE COURT:  You want to end it at 9 or 10?

17            MS. COOPER:  At 10, please.

18            THE COURT:  Okay.  Any objection to that?

19            MR. WINER:  No, your Honor.

20            THE COURT:  Okay.  Is that it for the defense

21    objections?

22            MR. WINER:  Just a couple more.

23            THE COURT:  I saw blue and got excited.  I

24    didn't see we pick up on yellow again.

25            MR. WINER:  I guess maybe then it does make

Page 64

1    sense, if we're going to go in the order.

2              THE COURT:  Why don't we do it that way for

3    continuity on reference.

4              MR. WINER:  Sure.

5              MS. COOPER:  I believe we had gotten actually

6    through all of the ones and we were able to agree.

7              MR. WINER:  Even better.

8              MS. COOPER:  We had been working, let me

9    double check with Mr. Winer.  We had gotten through 79,

10   page 79.

11             THE COURT:  That's remarkable progress.

12   Thank you.

13             MR. WINER:  You're welcome.

14             MS. COOPER:   It's the PowerBars.

15             MR. WINER:  Actually, I think that is it.

16             The one, only issue I would raise, and I

17   don't mean to put Miss Cooper on the spot since we've

18   reached agreement on pretty much everything now, the

19   additional counters that you had proposed this morning

20   I don't think are necessary 'cause I think they were

21   really in response to some things that we have agreed

22   to cut.

23             MS. COOPER:  And I would have to disagree

24   just because I believe that they were initially

25   designated as well.  So starting on 86, which is the --

Page 65

1                THE COURT:  You know what, we don't need this

2      on the record.  Why don't we go off the record.

3                (Proceedings adjourn at 2:49 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 66

1                    CERTIFICATION

2

3          I, ANDREA F. NOCKS, C.S.R., License Number

4    30XI00157300, an Certified Court Reporter in and for

5    the State of New Jersey, do hereby certify the

6    foregoing to be prepared in full compliance with the

7    current Transcript Format for Judicial Proceedings and

8    is a true and accurate non-compressed transcript to the

9    Best of my knowledge and ability.

10

11

     <%10613,Signature%>

12   ANDREA F. NOCKS                    February 22, 2019

13   CERTIFIED COURT REPORTER           DATE

14   MIDDLESEX COUNTY COURTHOUSE

15

16

17

18

19

20

21

22

23

24

25