**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

—————————————————

                                    CIVIL DOCKET NUMBER:

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS              3:16-md-2738-FLW-LHG
MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY              STATUS CONFERENCE VIA
LITIGATION                         REMOTE ZOOM VIDEOCONFERENCE

—————————————————

        Clarkson S. Fisher Building & U.S. Courthouse
        402 East State Street
        Trenton, New Jersey  08608
        February 17, 2021
        Commencing at 2:30 p.m.

**B E F O R E:**            THE HONORABLE FREDA L. WOLFSON,
                            CHIEF UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

        MOTLEY RICE LLC
        BY:  DANIEL R. LAPINSKI, ESQUIRE
        210 LAKE DRIVE EAST, SUITE 101
        CHERRY HILL, NJ  08002
        For the Plaintiffs

        ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT, ESQUIRE
        1825 K STREET, NW
        WASHINGTON, DC  20006
        For the Plaintiffs

        BEASLEY ALLEN LAW FIRM
        BY:  PATRICIA LEIGH O'DELL, ESQUIRE
        218 COMMERCE STREET
        P.O. BOX 4160
        MONTGOMERY, AL  36104
        For the Plaintiffs

            Carol Farrell, Official Court Reporter
                  cfarrell.crr@gmail.com
                     856-318-6100

   Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

```
 1   A P P E A R A N C E S (Continued):

 2        COHEN, PLACITELLA & ROTH, PC
          BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
 3        127 MAPLE AVENUE
          RED BANK, NJ  07701
 4        For the Plaintiffs

 5        LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY PROCTOR, P.A.
          BY:  CHRISTOPHER V. TISI, ESQUIRE
 6        316 SOUTH BAYLEN STREET
          PENSACOLA, FL  32502
 7        For the Plaintiffs

 8        FAEGRE DRINKER BIDDLE & REATH LLP
          BY:  SUSAN M. SHARKO, ESQUIRE
 9        600 CAMPUS
          FLORHAM PARK, NJ  07932
10        For the Defendant, Johnson & Johnson and
          Johnson & Johnson Consumer Companies, Inc.,
11        now known as Johnson & Johnson Consumer Inc.

12        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          BY:  JOHN H. BEISNER, ESQUIRE
13             RICHARD T. BERNARDO, ESQUIRE
               ALLISON M. BROWN, ESQUIRE
14        1440 NEW YORK AVENUE, N.W.
          WASHINGTON, DC  20005
15        For the Defendants, Johnson & Johnson and
          Johnson & Johnson Consumer Companies, Inc.,
16        now known as Johnson & Johnson Consumer Inc.

17        SEYFARTH SHAW LLP
          BY:  THOMAS T. LOCKE, ESQUIRE
18        975 F STREET, N.W.
          WASHINGTON, DC  20004
19        For the Defendant, Personal Care Products Council

20

21

22

23

24

25
```

1              (PROCEEDINGS held via remote Zoom videoconference

2    before The Honorable Freda L. Wolfson, Chief United States

3    District Judge, at 2:30 p.m.)

4              THE COURT:  Okay.  So, let me get on the appearances

5    for counsel who will be participating today.  For the

6    plaintiffs, please.

7              MS. PARFITT:  Good afternoon, Your Honor.  Michelle

8    Parfitt.  How are you?

9              THE COURT:  Good, thank you.

10             MS. O'DELL:  Good afternoon.  Leigh O'Dell.

11             MR. PLACITELLA:  Good afternoon, Your Honor.  Chris

12   Placitella, only if needed.

13             THE COURT:  Okay.  But you might want to adjust so we

14   can actually see your head instead of your chest, Chris.

15             Okay, that's better.  Thank you.

16             MR. PLACITELLA:  I am open to improvement.

17             MR. LAPINSKI:  Good afternoon, Your Honor.  Dan

18   Lapinski.  How are you this afternoon?

19             THE COURT:  Good, thank you.

20             MR. TISI:  Good afternoon, Your Honor.  This is Chris

21   Tisi, only if needed.

22             THE COURT:  Okay.

23             THE COURTROOM DEPUTY:  Can you put your full name on

24   your box, please.

25             MR. TISI:  I don't know how to do that but I will

1   try.

2           THE COURT:  Okay.  And let's see.  All right.  Is

3   that it for the plaintiffs?

4           MS. O'DELL:  Yes, Your Honor.

5           THE COURT:  I'm getting an echo.  I don't know why.

6           UNIDENTIFIED VOICE:  Please make sure, Jessie, this

7   e-mail is important.

8           THE COURT:  Hello?  Clearly, we're not getting people

9   muted.  So let me have defense counsel.

10          MS. SHARKO:  Susan Sharko for the J&J defendants.

11          MS. BROWN:  Good afternoon, Your Honor.  Alli Brown

12  for the J&J defendants as well.

13          MR. BEISNER:  Good afternoon, Your Honor.  John

14  Beisner for the J&J defendants.

15          MR. BERNARDO:  Good afternoon, Your Honor.  Richard

16  Bernardo for the J&J defendants.

17          THE COURT:  All right.  And then --

18          MR. LOCKE:  Good afternoon, Your Honor.  This is Tom

19  Locke for Personal Care Products Council.

20          THE COURT:  Okay, fair enough.

21          All right.  And I have someone on an iPad that I

22  don't think is participating.  I don't know.  It's

23  "Ernestine's 5th iPad," whoever that is, so why don't you turn

24  off your video, please.  Okay.  I don't know who that is, but

25  fair enough.

```
1              All right.  We have actually a number of things to
2    address today that I have been getting over time -- hold on.
3    I just need to get my third iPad.  One moment.
4              Okay.  So, for my agenda, in addition to the status
5    letter that you sent yesterday that had a joint agenda status
6    report, there was also the proposed trial plan submission, and
7    then we have the letters that I got earlier in the month about
8    the privilege issues, and I intend to address all of those
9    things this afternoon with you so we can move along.
10             Let's start as well with -- I think really the
11   biggest issue is talking about the bellwethers, where we go
12   from that.
13             Really, on your status letter, I did not see any real
14   issues, other than mentioning what the motions are, right?  I
15   don't think there were any issues to resolve on the status
16   letter.  And I'm going to give you an update on motion
17   practice.
18             There was an order filed today, consistent with a
19   request that we made that counsel get us an order out with
20   regard to those cases where there was not opposition to
21   dismissal, and we just entered that, so that has been done.
22   Thank you for getting that out to me.
23             And then I also have -- one moment -- okay.
24             So, taking a look at the pending motions, just to
25   give you an idea, the Plaintiffs' Steering Committee motion
```

1    for leave to amend the master complaint is pending before

2    Judge Goodman.  I understand it is being reviewed.

3            The summary judgment motion by PCPC, hope to have

4    that done in April.

5            And the issue with regard to dismissing PCPC as a

6    defendant in those 3,000 cases where the indication was that

7    the Clerk's Office is working on them, the Clerk's Office has

8    estimated that it will fully dismiss PCPC and all the

9    appropriate cases by this Friday, so that's imminent.

10           MS. O'DELL:  Thank you.

11           THE COURT:  Okay.  That's in the works.

12           And we did get the order, as I said, on all the

13   motion -- J&J's motion to dismiss stage one discovery pool

14   cases that were unopposed.  And the remaining motions to

15   dismiss that need to be adjudicated will be done during the

16   month of March.

17           And the motions to remand and dismiss involving PTI

18   Union and PTI Royston will be decided by May.

19           That's my estimate on dates, just to give you a

20   better idea of when you can expect these things coming your

21   way.  Okay?

22           So I think that was largely what was really anything

23   to discuss in the status report.

24           Is there anything else you want to bring up to me

25   before we get to then the other issues that come up with the

1  real questions today, which are the bellwether trial cases and

2  the privilege issues?  Is there anything else you think in the

3  status letter?

4          MS. O'DELL:  Nothing from the plaintiff.

5          MS. PARFITT:  Your Honor, from the plaintiff,

6  nothing.

7          THE COURT:  Okay.  Fair enough.

8          All right.  Why don't I go to the privilege questions

9  first because they have been hanging out there for awhile, and

10 I want to talk about this a little bit with you, and some of

11 the questions I have, and my concerns, and they are as

12 follows:

13         What we have currently is, at one point in time, that

14 there were issues or there were documents brought, I guess, to

15 Judge Pisano's attention early on in the case when there were

16 objections to designations in the privilege log.  Those were

17 largely resolved.  And there has been nothing else.  In fact,

18 the plaintiff points out we don't have anything pending at the

19 moment.  But what I want to be clear is "at the moment"

20 doesn't work for me.

21         When it comes to privilege, there is no reason to

22 wait to see would you perhaps want to use that document, and

23 if you have an objection, raise it at that time.  No.

24 Privilege questions should be raised right at the outset so

25 everyone understands what's fair game and what's not.  So,

1   this is not going to be a wait and see on the privilege

2   questions on defendants' documents.  So if you think somewhere

3   down the line any of these documents may come into this case

4   or you may be interested in them, you have to bring your

5   objections now.  Judge Pisano stands ready to resolve them.

6   Any appeals will be brought to me.  So you can't wait.  And if

7   you don't do it, they're not coming into this case; can't do

8   it later.

9           Now, in that regard, the only other then matter that

10  I have that concerns me is that, let's say your view is, on

11  the plaintiffs' side, um, no, I don't think we're going to

12  actually use those, but the question is is the bell basically

13  unrung when I have lawyers in this case who may be involved in

14  those state cases that will get to see those documents that

15  are not being challenged here, and have the benefit of that

16  knowledge, and what does that mean for my case, even if you're

17  not going to be able to use the document directly but you've

18  been informed by what's in those documents?  And that

19  involves, I think, you, Ms. O'Dell, your firm is involved.

20  Mr. Placitella I know has the New Jersey cases with Judge

21  Viscomi.  You're not in Missouri.  And I don't know if that

22  involves anybody else.  That's my concern as well, and how to

23  deal with that, which is why, from my perspective, at that

24  point we would have to have some sort of wall created in this

25  case, if you get to see those documents and they are not being

 1   produced here, and you're going to have to figure that one

 2   out.

 3          MS. O'DELL:  Your Honor, we would be glad to respond

 4   to that.  I know Mr. Lapinski is prepared to do that today, if

 5   you would like us to do that.

 6          THE COURT:  Yes.  I'd like to hear what your view on

 7   that is.  That's my concern.  I've made clear where I am,

 8   though, that it's now or never on challenging the privilege.

 9          MS. O'DELL:  And we can do that, Your Honor, and I

10   know that Mr. Lapinski is going to address this, but we've

11   been working through this in relation to other privilege

12   documents, but I will defer to Mr. Lapinski.

13          THE COURT:  Okay.

14          MR. LAPINSKI:  Good afternoon, Your Honor.  I

15   appreciate the points that you just brought up.

16          I think the biggest concern that we would have on our

17   side is that the cases that Ms. Sharko is pointing to as far

18   as privilege challenges are concerned are cases that are on

19   the eve of trial.

20          The *Forrest* case, for example, in Missouri is

21   scheduled to go to trial in April, and they're in the middle

22   of pretrial motions, and that's not where we are here in the

23   MDL.

24          THE COURT:  Well, let me ask you a question,

25   Mr. Lapinski.

```
 1          MR. LAPINSKI:  Sure.

 2          THE COURT:  Is Missouri really trying cases?  I want

 3   everyone to be practical.  Are they really trying cases --

 4          (Simultaneous indiscernible crosstalk.)

 5          THE COURT:  There are too many people speaking, so

 6   one at a time.  I don't know who wants to respond to that

 7   question.

 8          MS. O'DELL:  Go ahead, Dan.

 9          MR. LAPINSKI:  No, go ahead, Leigh.  I think that was

10   someone who wasn't on mute that was interrupting us.

11          MS. O'DELL:  I was trying to say, Your Honor, yes, we

12   expect to begin trial the week of -- I think it's April the

13   9th in Missouri, and that's expected to go.

14          THE COURT:  So they are trying cases in Missouri

15   State Court?

16          MS. O'DELL:  Yes, Your Honor, they are.

17          THE COURT:  Okay.

18          MS. BROWN:  And, Your Honor, I had a slightly

19   different intel on that particular case, which is that it was

20   not yet clear that they were going to be able to bring in a

21   jury as soon as April, and that's still under discussion in

22   Missouri, as I understand it.

23          MS. O'DELL:  The trial is set, Your Honor.  We have

24   been told to be ready to go, and that they will be calling a

25   jury in, and we expect to try the case, and that would be
```

1  true -- that's true in Missouri, it's true in some other

2  jurisdictions too, that we're trying cases.

3          THE COURT:  And I can't speak to that.  I can only

4  rely on what you all tell me is going on there.

5          But, Mr. Lapinski, whatever you're saying to me, that

6  doesn't really matter.  So you're on the eve of trial there.

7  You're bringing your motion there; bring it here too.  You've

8  got so many people to work on everything.  There is no reason

9  those challenges can't be brought here immediately.

10         MR. LAPINSKI:  I understand your position, Your

11 Honor, and the point that you're bringing up, and we can file

12 the necessary motions in order to be able to challenge before

13 Your Honor.

14         Our concern in doing that is when it goes in front of

15 Judge Pisano, whether or not there is going to be a decision

16 from Judge Pisano, one, in time to have any type of relation

17 to the Missouri case, and two, whether or not those decisions

18 are going to be made in coordination with the judge in

19 Missouri.  They would be the two questions that I would bring

20 up that I would have concerns with.

21         THE COURT:  Well, I spoke with Judge Pisano this

22 morning.  He's ready to go.  I think your experience with

23 Judge Pisano has been in the past that he acts very quickly.

24 He doesn't have thousands of cases on his docket as I do or

25 our Magistrate Judges do, and he's ready to go, and he told me

 1   he would be ready to go on it.  So, there is not going to be a

 2   delay from him.  I think, frankly, you'll get a faster

 3   decision from him than you will from your judge perhaps in

 4   Missouri, so don't worry about that.  Not an issue.

 5           And, by the way, I think his associates are on this

 6   Zoom call.  They're listening to what I'm saying.  He's not on

 7   but they are.  So that's not a problem, timing.  I don't

 8   anticipate he's going to be coordinating with Missouri.

 9           MR. LAPINSKI:  Okay.  And we do have a similar

10   situation in New Jersey, in Middlesex County, with Judge

11   Viscomi, where I know that there has been motions that have

12   been pending before her for quite some time that have been

13   fully briefed, and just a similar situation.

14           MR. PLACITELLA:  Your Honor, I could speak.  I was on

15   the call or the Zoom call, as was Rich, as I -- my specific

16   issue was not privilege.  It had to do with the litigation

17   control group.

18           THE COURT:  Okay.

19           MR. PLACITELLA:  But, one, when I was on the call,

20   they did argue privilege issues.  I listened intently.  And,

21   as I understand it, Judge Viscomi is in the process of writing

22   a decision on that.  But that's not a motion that we brought

23   at that point.  That was brought by the Levy firm before Judge

24   Viscomi.

25           THE COURT:  Okay.

 1          MR. BERNARDO:  Your Honor, as the other person who

 2  argued that motion, I had a different takeaway.  My

 3  understanding was that Judge Viscomi asked to see the

 4  documents, that she would be getting back to us -- I believe

 5  the date was on March 9th, but somewhere around that -- if

 6  there are questions, and that it wasn't that there was a

 7  ruling imminent, number one, and number two, my understanding

 8  also is that that's the first of what will be many challenges

 9  that are also overlapping the same set of documents, that are

10  being challenged in Missouri.

11          And as to the comments about timing, as Your Honor is

12  aware, the Missouri case that they're referring to was filed

13  in 2015.  The documents that are at issue were produced many

14  years ago, and it's only now that plaintiffs are seeking to

15  challenge them.  So I think the timing issue, if there even is

16  one, is one of plaintiffs' own creation.

17          THE COURT:  Yes.  Well, I guess the good thing is I

18  only have to worry about the cases in Federal Court, and I

19  don't control what happens in Missouri.

20          So, though I was speaking to a Missouri District

21  Judge the other day who is writing some article, Judge Bough,

22  B-O-U-G-H, I don't know, and he was asking me about MDLs.  So,

23  but I don't know much else about what's going on there.

24          So I'm going to worry about my case for now, and I

25  have made clear my direction that I want those challenges to

1  be brought very quickly here.  Judge Pisano stands ready and

2  poised to rule on them, I have no doubt.  Once they are before

3  him, he will be right on it, and that's his plan.  So I'm not

4  concerned about that.

5       The question will become, however, if -- the one that

6  I raise, which is that's -- of course, that's what's going to

7  control my case, but what we do in a situation if I have some

8  competing rulings from State Court judges on those documents,

9  and attorneys in this case get to see those documents in those

10  other cases, and what do they do with that.

11       MS. O'DELL:  Your Honor?

12       THE COURT:  Yes, Ms. O'Dell.

13       MS. O'DELL:  Excuse me.  I apologize if I interrupted

14  you.

15       THE COURT:  No, no, no, not at all.  I'm ready to

16  hear from you.

17       MS. O'DELL:  You know, we have had some situations

18  like this already, and the parties have been able to work

19  through it, where there has been a decision in State Court to

20  allow a document to be deprivileged, for example, some of the

21  documents related to Dr. Alice Blount and her work for Johnson

22  & Johnson.  You ruled on that.  And so we understand that

23  that's not something that can be used in your court because

24  you ruled on it prior to the *Daubert* hearing.  But there were

25  some different rulings in State Court, and those documents

1    have been used, and so we believe that we can maneuver around

2    that, certainly, on or in the Court's ruling, but knowing that

3    a State Court may be applying a different, you know, different

4    case law to a particular ruling.

5            THE COURT:  Okay.

6            MR. BERNARDO:  Your Honor, I'm sorry.  I just want to

7    correct something that's important here, given the point Your

8    Honor is making, because I argued in multiple states the

9    Blount documents, and we prevailed with each of the courts,

10   and that's the very thing we're trying to prevent here is

11   inconsistent ruling.  And I think the difficulty that Your

12   Honor is raising is it's not just the use of the documents,

13   but these documents are being used at depositions, and

14   plaintiffs are going to try and designate testimony from other

15   depositions, as they have.  I think it's impractical to expect

16   that this can be walled off, which I agree makes sense,

17   therefore, to try and have these documents, to the extent they

18   need to get raised, get raised in this court, and not in some

19   wholesale challenge of 8,000 documents on an entire privilege

20   log, but a more intelligent, thoughtful, and targeted

21   challenge that we can all readily and quickly respond to and

22   apply the rulings.

23           THE COURT:  Okay.

24           MR. PLACITELLA:  The only thing I would respond, Your

25   Honor, to address your concern, is that I don't want to see

1   any document that's not made public.

2          I'm assuming that if the Court gets a document in

3   camera, that no one showed me that document.  If a judge in

4   California rules on a document and says it's deprivileged and

5   it's made public, then the issue just becomes whether it's

6   admissible in your trial.  It's not at that point a document

7   that only I have seen.  I'm presuming the whole world has seen

8   it at that point.

9          THE COURT:  Well, look, I see where you're going,

10  Mr. Placitella, but what I want to make clear here is that at

11  that point I know you would be saying, well, there is nothing

12  to protect because it's already been disclosed to lots of

13  people.  Yes, but admissibility will be a question for me.  I

14  will probably -- I will not admit it if we've ruled on it.

15         MS. O'DELL:  We understand, Your Honor, and this

16  would be another example that came up was a Julie Pier

17  document, which is the Imerys document, early on, and we

18  appreciate the Court's ruling and Judge Rich's point that

19  designated testimony would include a document that you have

20  ruled is privileged.  We would not do that.

21         THE COURT:  Okay.

22         MS. O'DELL:  We understand your rulings are the

23  control in the MDL.

24         THE COURT:  Okay.  Well, come up with a schedule of,

25  first, which documents you want to present and when that's

1   going to be done to Judge Pisano for his in-camera review and

2   any arguments you want to make in that regard, and I'll leave

3   that then in his court for you to contact him, but I'll let

4   him know that it's coming his way, something is coming his

5   way, I don't know to what extent, and you should deal with

6   him.  Okay?  Great.

7          All right.  Next.  Now --

8          MR. LAPINSKI:  Your Honor, before you move forward,

9   if I may, I have another hearing that I have scheduled, so

10  I'm -- if you're okay with me signing off so that I can join

11  that other hearing, I would appreciate it.  I don't think that

12  I have anything of substance to provide to the trial plan or

13  whatever else you're going to discuss.

14         THE COURT:  That's fine.  You're excused.  Thanks.

15         MR. LAPINSKI:  Thank you very much, Your Honor.

16         MR. BERNARDO:  And, Your Honor, I have to ask for the

17  same.  I'm in the middle of a deposition and took a break for

18  this, and I have nothing further.  I don't want to be

19  discourteous and just leave.

20         THE COURT:  Not a problem.  Thank you.

21         (Mr. Bernardo and Mr. Lapinski left the Zoom

22  hearing.)

23         THE COURT:  All right.  I must tell you, looking at

24  your proposed trial plan submissions, I don't think that I

25  tend to be dense, but I must say, I must have read this

1    several times already and I'm having difficulty really

2    figuring out what each one of you is saying and what's

3    different about what you're saying.  And I'm really being

4    quite honest about this.  I have read it several times and

5    tried to break this down into what are my differences, what

6    are the benefits of each, what are you really all saying, and

7    I want to come up with something that makes sense today

8    that's not so complicated.  This shouldn't be so complicated

9    at this point, and it really shouldn't.  But, okay, so let's

10   talk about this.

11         Obviously, everyone believes that we should have a

12   small group of cases.  It goes somewhere between four, six,

13   eight, whatever that might be.  You each talk about possible

14   striking and you can react to each other's cases, right?  I

15   mean, okay, that seems to be out there too.  And what you

16   consider to whether it should be representative and what

17   really is representative here, and differences of views

18   perhaps of what that is.

19         So help me, talk to me, and let's see if we can come

20   up with something that makes sense to work these cases up

21   because what we really need is we need our identification at

22   this point because I know it's not going to be just the

23   discovery, but there will be substantial motion practice with

24   the cases that we select, so I want to get to that point.

25   Because while I indicated to you the last time, obviously,

1   with the COVID issues, no, we're not Missouri State Court.

2   You're not going to trial quickly.  And also because in

3   Federal Court we do civil and criminal.  The Missouri State

4   Court judge is only doing his civil cases or her civil cases.

5   So, knowing that, I've got to at least do the things I can do,

6   which is rule on motions as they come along to get these cases

7   ready.  So I want to get to the point where we have these

8   cases identified.

9           All these charts and percentages, what the heck?  I'm

10  being --

11          MS. PARFITT:  Your Honor, if we could start, maybe we

12  could lay it out, Your Honor, with your permission.

13          THE COURT:  Okay.  All right.

14          MS. PARFITT:  And please feel free to interrupt us at

15  any point in time, and Leigh and I -- Ms. O'Dell and I will

16  tag team a little bit.

17          But what we've tried to do with regard to the

18  plaintiffs' proposal -- and you're right, the defendants have

19  some similarities to ours, but there are some differences.

20  But what we tried to do is we looked at the 30 cases, and the

21  purpose for the charts was an effort by the plaintiffs to

22  provide the Court with a good sense of what is representative

23  of the cases that are before her.  And after we ascertained

24  various categories and criteria and characteristics of the

25  cases, we then presented the Court with the option, and, well,

1    try and lay it out simply.

2          Let's take six out of the 30.  What we can do,

3    initially, is plaintiffs select three, defendants select

4    three.  Each one, as you said, is provided an opportunity to

5    strike.  You end up with four cases, we work them up, and then

6    we alternate with regard to the selection.  Plaintiff goes

7    first, defendant selects the next one, plaintiff goes next,

8    defendant selects the next one, because the plaintiff has the

9    burden of proof.

10          The purpose for the chart, and Ms. O'Dell will

11    elaborate as well, is to set out the key characteristics of

12    what the cases are that are before you.  And, not

13    surprisingly, the cases from the 30 resemble the data from the

14    original thousand or 930.  They are closely -- they're

15    similar.  And so the percentages, we set that out to give you

16    an idea -- the defendants had indicated that we were, I guess,

17    cherry-picking or we were trying to create a process that was

18    plaintiff friendly, and that's not it at all.

19          The same characteristics were examined for the almost

20    1,000 cases that are before the Court which ostensibly

21    represent what the 22,000 or more cases are in front of the

22    Court, and then the 30, we wanted to make sure they look

23    similar to the thousand.  And, ironically, when you look at

24    phase one and phase two and you look at the percentages, as to

25    subtype, age at diagnosis, living or deceased, product usage,

1    and genetic risk, they are very similar.

2           So our effort, the plaintiffs, to submit to the Court

3    something that truly was representative of the body of cases

4    because, ultimately, the purpose of having bellwether cases is

5    to provide information to the Court, hopefully, for resolution

6    at some point in time.  I'm --

7           THE COURT:  So, by the way, Michelle, I think Susan

8    says that -- Ms. Sharko says that, no, the thousand versus the

9    pool of 30 aren't the same.  And she goes through her

10   percentages and says -- this is why I'm like that, and

11   also all of these things are coming at me.

12          MS. PARFITT:  Sure.

13          THE COURT:  She says, if you look at the pool of

14   1,000, the known high-grade serous cases were at 34 percent.

15   If you take your 30 cases, there is 63 percent, and then kind

16   of the reverse on the other statistics.  She's saying it's not

17   quite the same and representative.  So I don't know what --

18          MS. PARFITT:  Let us address that.  Leigh, why don't

19   you go ahead, because this argument about high grade and low

20   grade being different, different disease process, is a

21   distinction without a difference, and we're prepared to

22   address that, Your Honor.  Because if you put serous high

23   grade and serous low grade together, our percentages are

24   indeed very similar.

25          Leigh, if you want, I know you wanted to address that

1    issue, so why don't you go ahead, Leigh.

2              MS. O'DELL:  I'm happy to.

3              I mean, when you look at the literature, Judge, and

4    how the researchers have addressed these questions, and you'll

5    remember one of the -- two of the articles that were prominent

6    at the *Daubert* hearing were the Penninkilampi meta-analysis,

7    if you recall, and Taher, and I'm happy to put them up and

8    share my screen, if that would remind you, but what they

9    report the subtypes of epithelial ovarian cancer, which is

10   what we're talking about -- and we're talking about serous,

11   clear cell, endometrioid, and the subtypes we've listed there.

12   Serous cancer is one histologic subtype.

13             Now, Ms. Sharko has tried to draw a distinction and

14   say there is high grade and low grade, and really, when you

15   look at the literature, it's all one disease.  I mean, they

16   are both treated the same way.  They have surgery and

17   chemotherapy.

18             And so, from the perspective of the researchers and

19   from our perspective, we believe the appropriate way to look

20   at it is what is the histologic subtype?  And for serous, in

21   the overall pool of fact sheet cases or phase one cases, it's

22   62 percent are serous cases.  When you look at the subset of

23   30 cases, 70 percent are serous.  So we believe that's the --

24   that is consistent, one, with the literature, that 70 percent

25   of all ovarian cancers are serous, and so that's a

1    representative case, and so that's our point.

2         To draw out -- you know, Ms. Sharko is drawing out 34

3    percent, and so those are the cases in which the plaintiff has

4    identified high-grade serous.  There is another 25 percent

5    where there is no -- either the diagnosis doesn't say high

6    grade or low grade, they just say serous, because that's what

7    physicians are looking for, and in some, don't know, and then

8    there was a very small percentage that is low grade.

9         Our view is that's not meaningful.  You look at

10   serous, and that's why we focussed on the 70 percent for the

11   pool of 30.

12        In terms of the other representative characteristics,

13   we focused on age of diagnosis, and that's why we put that

14   there for Your Honor to see, sort of what does it look like in

15   terms of the percentage cases that are within each decade.

16        And so, Judge, I tried to sort of jazz it up a little

17   bit with some color on my chart, so sorry it was not helpful,

18   the blue.  But if you look at the blue, you know, that's 53

19   percent of the cases were diagnosed between 41 and age 60 in

20   the group of the phase one cases, the larger group.  And then

21   the subset, you've got basically 67 percent were diagnosed

22   during that age bracket, and that's a representative sort of

23   characteristic, if you're diagnosed between the ages of 41 and

24   60.

25        In the MDL fact sheet pool, about 66 percent of the

1  cases are living; the remainder, unfortunately, are deceased.

2  And that's very consistent with the discovery pool cases;

3  about 70 percent are living and 30 percent deceased.

4         Product usage?  Product usage, that evidence is going

5  to be from the plaintiff.  This is not a pharmaceutical case

6  where you have a pharmacy profile.  A woman is going to

7  testify to her personal practice of how she used talcum powder

8  for hygiene, and we give you some statistics there.

9         And then lastly, for the genetic testing, a majority

10 of the -- I would say -- not a majority, that's not fair -- 53

11 percent of the cases in the group of fact sheet population, if

12 you will, 53 percent did not have genetic testing.  If you

13 look at those that did, a very small percentage of those cases

14 were BRCA positive.  If you look at the group of 30 cases, of

15 the 22 that had genetic testing, only one tested positive for

16 a BRCA mutation.  So we feel like that a BRCA case would not

17 be representative because it's such a small portion of the

18 overall group of discovery pool cases and the larger group of

19 a thousand.

20        So trying to provide -- happy to answer questions

21 about what we've presented, Your Honor, if it wasn't clear

22 after that, but that's what we were trying to put forward.

23 This is what's representative.

24        So we think it would be helpful for the overall

25 bellwether process if the Court directed the parties to

```
 1   nominate, if you will, either three or four cases each that
 2   are representative.  We then have the option to strike one,
 3   each side.  And then the group that's remaining, we work up,
 4   and our position is that the plaintiffs would pick the first
 5   trial case, and then the defendants would pick the second.
 6        MS. PARFITT:  And if I can just reiterate one thing,
 7   I think what we found very interesting from a statistical
 8   standpoint is we didn't know, we didn't know whether the 30
 9   would look like the thousand.  We did assume from the
10   outset -- and that was random.  Remember, when the Court -- we
11   got the thousand, that was a random selection.  That wasn't
12   cherry-picked by either side.  Purely random.
13        And what's interesting about the initial random
14   selection is the criteria and the characteristics of those
15   cases are very similar.  The only distinction I think that's
16   being drawn here is really unfair because it's making a
17   distinction that it's a different disease, that is, low grade
18   versus high grade, when, when you put them together, which is
19   what the literature does, which is what our experts -- and,
20   frankly, the defendants' experts were before Your Honor.  You
21   did not hear the experts for the defendant nor the experts
22   from the plaintiff arguing high grade and low grade.  What
23   they argued before Your Honor, and the questions that they
24   answered when questioned by Your Honor, dealt with serous,
25   endometrioid, clear cell, because that's the way it's
```

1    presented in the literature.  That's how the epidemiology has

2    looked over the course of decades.  So we weren't playing

3    quick math, fast math, funny math.  We were calling it as

4    scientists call it.  We were calling it as Your Honor called

5    it.

6              So I just want to make that distinction because I

7    hear you.  When you look at them, you think, well, why are

8    they looking at the same group of cases?  Why do the

9    plaintiffs' numbers look different than the defendants'?  At

10   the end of the day, they don't.  The numbers are uniquely

11   similar.  They really are.  They are interestingly -- not

12   uniquely similar, but interestingly very similar, and we

13   didn't know that at the beginning.  So it was a good exercise

14   then, and I think it's a good exercise now, and it's something

15   that I think imperative to bring before the Court because we

16   do hear you.  You don't want to try a case or cases that don't

17   look anything like that which is before you.  You've got

18   22,000 and growing.  It only makes sense that Your Honor have

19   before her that which is representative of the largest body of

20   cases that you ultimately will have to consider.

21             MS. SHARKO:  So, addressing the two basic points that

22   have been raised, before we get to the method of selection,

23   what the scientists say and what the scientists said at the

24   *Daubert* hearing, Dr. Neel, the only cancer biologist who

25   testified, Dr. Saenz, and others, is that ovarian cancer is

1    not one disease; it's many diseases.  And these different

2    subtypes are very important.  Low grade is a different disease

3    from high grade.  Endometrioid cancer is a different disease

4    from high-grade serous.  They have different mutations, they

5    have different cells of origin, and to some extent they're

6    treated differently.  They have different risk factors.  And

7    so we think it's really important to look at the subtypes and

8    see what the pool of cases is made up of.

9            And when we did that, when we pulled the subtypes

10   identified by the plaintiffs in their fact sheets, what they

11   show is that high-grade serous does not make up the majority

12   of the then 931 and now I guess there's 907 cases out of the

13   pool of 1,000.  And so to that extent, the group of 30 does

14   not represent the subtypes that we see in the group of 1,000.

15           So we think it is really important to give

16   consideration, in selecting cases, to the subtypes, and that's

17   why we divided them up into two groups, and one of -- there is

18   someone talking while I'm talking.  I don't -- thank you.

19           And, in fact, one of plaintiffs' experts testified

20   that there are -- you can start at the top and have these two

21   basic groups, high grade and then others.  So when cases are

22   being selected for the trial pool group, we thought they

23   should come from these two buckets, one the high-grade cases,

24   and the other being the other subtypes.

25           And we propose that either Your Honor select four

1   randomly from the high-grade group and four randomly from the

2   other group, or, to go to the plaintiffs' model, we would each

3   pick a certain number, making sure that there were cases from

4   both subgroups, and then we'd strike.

5           And in terms of motions, because there are

6   specific -- case-specific *Daubert* motions for all the

7   subtypes, if the subtype wasn't represented in the group that

8   was being worked up for trial, we would work out a separate

9   schedule and make the motion in one of the nontrial cases.

10          As to what the plaintiffs are calling the

11  representative case that they have on Page 4 of their

12  submission, with subtype age at diagnosis, plaintiff's status,

13  it's important to recognize that they get to those points by

14  doing a review of the fact sheets for each item.

15          If you do a review of the fact sheets and analyze the

16  data in a multi-variable way, looking for how many plaintiffs

17  in the pool of 1,000 have high-grade serous, were diagnosed at

18  age 41 to 60, living, the product usage specification, and

19  genetic testing, there is actually only 50 plaintiffs or 5

20  percent of the pool of 1,000 that hit on each of those things.

21  And so that composite plaintiff -- high-grade serous, age 41

22  to 60, living, et cetera -- she's not the predominant

23  plaintiff in the group that's here for the litigation, for

24  whatever reason.

25          THE COURT:  Well, do you disagree with that,

1    Ms. O'Dell?  I mean, that's a pretty stark representation by

2    Ms. Sharko.

3          MS. O'DELL:  No, I don't think that that -- I mean, I

4    would need to look at how Ms. Sharko did that.  I don't

5    believe that to be a fair representation of the group of a

6    thousand, and I don't -- for sure, I don't think that that's

7    true of the group of 30.  I mean, our view --

8          THE COURT:  But that's an important inquiry for me,

9    because I think that I certainly appreciate some of the things

10   that you're saying, why you think this is a representative

11   case, but you look at each one of these individually and fair

12   numbers fall within each, but if you take all of them together

13   to find a plaintiff, and if that's a small number that fits

14   everyone of the category, to me that is not a representative

15   plaintiff, I would agree.

16         MS. O'DELL:  If I could be more clear, Your Honor,

17   and I'm sorry.  I'm looking at a chart of actually the case of

18   30, and really, there are 21 serous cases in the subset of 30,

19   and 20 of those are high grade, and a majority of those serous

20   cases -- nearly, I think about 18, but I need to count again

21   to make sure -- are between 40 and 60, and their usage is

22   greater than ten years.  That's not as big of an issue for us,

23   but it's greater than ten years.  I do know that.  And only

24   one of them is a BRCA positive case.

25         So, from our perspective, I don't know exactly what

1    Ms. Sharko is looking at and how she came to that number, but

2    when you look at the group of cases within the 30, the

3    majority of those would fit these parameters.

4         THE COURT:  But isn't the concern when we're picking

5    bellwether trials -- it's one thing if you're trying one case,

6    but if you're trying several cases, the idea is do you give

7    also -- either we're going to reach a point where people have

8    some idea where this is going, maybe they're talking

9    settlement or they're going back to transferee courts for

10   trial.  You want to have an idea of where these cases fall.

11   And to try the same case over and over again to me is not

12   representative.  It's not telling those transferee courts

13   anything other than that one case.

14        So I don't agree that the selection is to fit all of

15   these criteria.  To me, that's not -- that doesn't help us in

16   the process.  I'm just trying the same case several times over

17   with a different plaintiff.

18        MS. O'DELL:  Your Honor, one -- yes, ma'am.

19        One of the things that might help us is to know more

20   about how many you anticipate trying.  I think there's some

21   sort of nod to maybe you trying two, but is there more than

22   that?  If you said to us, for example, I plan to try four or

23   three or whatever it is, then that might inform the parties to

24   look at the groups of cases differently, and if you said I

25   want to try one serous case and then I want to try an

1    endometrioid case or -- that would be helpful.

2           THE COURT:  Okay.  Well, I'll start with I do want to

3    try cases that fall under different categories, not the same

4    case, so I'll start with that.

5           Honestly, it's hard for me to tell you how many will

6    I try because I don't know when we're going to start these and

7    how long it's going to take us and how long these cases will

8    go.  At least I'm getting older, and I don't know about the

9    rest of you, but somewhere down the line, this has to end.

10          MR. PLACITELLA:  (Raises hand.)

11          THE COURT:  Yeah, Chris, you, too.  All right.

12          But I've been joking basically lately about the

13   benefit of being a senior citizen is I can get vaccinated, but

14   all right.

15          But what I'm saying is even with the best of

16   intentions, if I said what I'd like to do is four trials,

17   let's say, I can't guarantee that's going to happen.  And we

18   also don't know, because as that first one happens or second

19   one happens, where we go from there.  I have a feeling it's

20   going to educate a lot of people, and I'm not sure we're ever

21   getting to a third or fourth trial.  Things will happen.

22          So, and if these trials are going to take months, no,

23   I can't see doing four trials because I can't have my docket

24   taken up that way.  If we're talking, you know, a couple of

25   weeks at a time or whatever it is, yes, I could do four

1    trials.  So those are variables that I can't answer today

2    until I have a little more information about what a trial

3    would look like and when we're going to get there.

4          I am very, very hopeful that as the year 2021 goes on

5    that we're going to be back in the courtroom, starting up

6    those criminal cases, and starting to get back to civil

7    trials.  But, as you know, what's that line?  "Man plans, and

8    God laughs."

9          So who would have thought in February of 2021, we're

10   still where we are?  I never thought it last March, never in a

11   million years.  So I am beyond even trying to figure out

12   exactly where we'll be, but I'm hopeful.

13         So let's go with the idea that we could be talking

14   about maybe four trials.  And my view is, just to give some

15   guidance, and you can go into further discussions, I have

16   already said to you, no, I don't want to try the same case

17   over and over again that fits every one of these subtypes --

18   age, status, product usage, and genetic testing.  It's got to

19   be different.  They've got to be cases that educate us going

20   forward.

21         You've got 22,000 cases in this MDL that will go

22   back.  The idea is the transferee courts have a better idea

23   where we're going than we do.

24         So my thinking is that instead, you go back and,

25   frankly, I think the defendants' alternative suggestion is not

1    so different than the plaintiffs' suggestion, which is that

2    you each pick a few cases.  The first one was that I just

3    randomly pick cases, and randomly picking doesn't necessarily

4    make sense to me either because it may not be what I'm asking

5    to have happen, which is having cases that satisfy different

6    criteria.  Okay?

7          So I think we're better with having each of you pick

8    a certain number of cases.  I think you both agree that you

9    have a right to strike, however many that may be, and then you

10   can present your position, and then whittle it down from

11   there.  And if there is a reason that there's a particular

12   case shouldn't go, okay, we'll talk about it, but I really

13   think that that's where we should be, each of you picking a

14   certain number of cases.

15         Now, I appreciate Ms. Sharko's comment was we've got

16   to have -- I think in the alternative suggestion, you only

17   said one non.  Let me go back because I'm looking at your

18   alternative as opposed to me doing this kind of just randomly

19   picking things out of the hat, that I know nothing about these

20   cases.

21         I think you said each side pick four cases, that at

22   least one of which must be from the non-high-grade serous

23   list.  So she's only asking for one.  Okay?  She's not saying

24   evenly divided.  And whatever, I don't know, you're going to

25   end up striking it anyway, I guess, so -- on the plaintiffs'

1  side.  But I don't think that's out of line.

2       Look, what's clearly going to happen and happens in

3  these cases all the time is the defendant is going to look for

4  cases that they think are the best for them, and you're going

5  to look from the plaintiffs' side the ones that you think that

6  are best for you, and, yeah, we'll get a conglomerate of them.

7  That's the way it's going to work.  That's the realty.  You're

8  not going to get all four that are good for one side or the

9  other, so that's fine.  We'll live with that.

10       And as far as -- I think one of the suggestions being

11  made too is I saw, Ms. Sharko, you suggested that if they

12  remove one of the cases that you're entitled or the defense is

13  entitled to, let's see, to pick the replacement.  Look, I

14  understand why you're saying that, because you said there has

15  been wholesale removal of cases from the randomly selected

16  pool, but, on the other hand, if the -- you're saying, so if

17  you pick a case that you like, they say, oop, we've decided we

18  don't want that case anymore, we don't like our case.  I think

19  that the reason you picked your case, Ms. Sharko, yeah, you

20  should be entitled to pick the one that replaces that on your

21  side, because you had reason for that kind of case.  So I'm

22  okay with that.

23       I guess the reverse holds true as well, but you're

24  not dismissing them, so I don't think it's you getting rid of

25  a case, so it's only going the other way -- and so it's really

1   not one side.  It's the idea that you are each permitted to

2   pick the four you want or however many it is.

3           And so with -- when defense uses its strategy to why

4   they pick that as a representative case, they should pick one

5   just like it, yeah, I'll give you that right.  Okay?

6           As far as who goes first, I'm going to let the

7   plaintiff try a case first.  I don't see any reason not to.

8   What would be the reason I wouldn't?  You wanted me to pick

9   them out of a hat and say which one goes first?  No.  I'll let

10  the plaintiff try their case first, the first one.  Okay?

11  That's where we are.  All right?

12          So does that kind of give you the guidance of what

13  you have to do next?

14          MS. O'DELL:  I think it does, Your Honor.

15          MS. PARFITT:  I think so.  I think it's also much of

16  what you've just said.  I think the process that you proposed

17  pretty much gets you there.  Because you've indicated the

18  defendants are going to pick their three they want, the

19  plaintiffs will pick the three they want, and we're going to

20  end up with the mixture that you're talking about, the mixture

21  of the different cases.  Because I guarantee you, Ms. Sharko

22  is not going to pick the same case that Ms. O'Dell and I will,

23  but we're going to get a mixture.

24          THE COURT:  Right.

25          MS. PARFITT:  We'll get exactly what you're talking.

1      MS. SHARKO:  And then I just want to make sure that

2  we can still make *Daubert* motions or dispositive motions in

3  the cases that aren't part of the smaller pool, because we can

4  use that -- the next few months productively while we work up

5  the cases in the trial pool.

6      THE COURT:  Well, let me ask you.  Why would I --

7  unless that *Daubert* motion would apply to the pool cases that

8  you're working on, I mean, I don't know, why would I be doing

9  a *Daubert* motion on a case that's not being selected for

10  trial?  I've got to worry about my schedule too.  I don't want

11  to decide something on a case that I don't need to.

12      So I would suggest you work faster on getting your

13  pool cases and then file your *Daubert* motions in those

14  cases -- not your pool cases, I'm sorry -- your trial cases.

15      Why would I do that?  You tell me, Ms. Sharko.  Give

16  me the case.  Why would I ever do that?

17      MS. SHARKO:  Sure.  Because, for example, there's

18  over a thousand, when you extrapolated out endometrioid cases,

19  for example, and if we had put an endometrioid case in the

20  trial pool and the plaintiffs struck it, there would be no

21  endometrioid case there, and you wouldn't have the opportunity

22  to rule on the *Daubert* motions which could define a specific

23  category of cases before Your Honor.  And that --

24      THE COURT:  Well, why don't I wait to see that I

25  don't have one of those in my trial pool?  If I don't, I would

```
 1   consider what you're saying because it does help the case,
 2   you're right, and transferee courts.  I agree with you.  But
 3   if it ends up as one of these bellwether trials and it doesn't
 4   get eliminated, I'll decide it in that case, right?
 5             MS. SHARKO:  Right.  And so that --
 6             THE COURT:  So let's wait.
 7             MS. SHARKO:  Yeah.  So that's why we propose that
 8   after the trial pool of six or eight or however many cases is
 9   set, we then meet and confer on what other motions we might
10   want to file that weren't covered by those cases, for example,
11   statute of limitations motion, or if there was no endometrioid
12   case, and then what discovery we would need, which would be
13   more limited because it's just a case-specific *Daubert* motion,
14   and then present a schedule to Your Honor.  And we can do
15   both --
16             THE COURT:  Look, I'm amenable to motions that deal
17   with cases that are in this MDL, as we've been all along,
18   whether it's been the general *Daubert*, whether it's been our
19   remands, whatever they may be that we've dealt with along the
20   way.  If there are statute of limitations questions, yeah,
21   let's get rid of them, okay, and things.  I'm not going to bar
22   you from that.
23             I'm just saying I don't see a reason to do that.
24   Yes, let's work first on these, and then you'll see where you
25   are and what's left and where you want to go with that.
```

```
 1          We're going to try and get as many motions done in
 2   this MDL to educate everyone as we can.  I don't see it
 3   helpful to not do that and start to send them back to
 4   different courts and let them decide these issues willy-nilly.
 5   There was a reason it was here.  So, yes, I'm in agreement
 6   with that.  I just don't see it being filed this minute.
 7          MS. O'DELL:  Thank you.  Understood, right.
 8          THE COURT:  Okay, that's fine.  We'll keep talking
 9   about it.  We'll come up with a schedule.  But I do agree that
10   it's appropriate to do.
11          MS. SHARKO:  Okay.
12          THE COURT:  Okay?  What else can I help you with
13   today?
14          MS. PARFITT:  I think those are our issues, Your
15   Honor.
16          THE COURT:  Okay.  All right.  And if there is
17   nothing else, then I think we're good to go.  You know what
18   you have to go about doing.  We'll get the privilege matters
19   going.  You'll start to work on your cases for the jury trial
20   selection.  And we'll start dealing with motions once those
21   are done, and we'll move along, and we'll see where the world
22   takes us and how soon we can start to get to these.
23          Yes, it's concerning, you know, it definitely is, to
24   try and get to these, as it is with all the cases we have.
25   So, hopefully, things will get better.
```

```
 1         MS. O'DELL:  We hope that as well.

 2         THE COURT:  Yes, and it's a priority, so we're good.

 3         Okay.  All right, thanks, everybody.  Let's schedule

 4   another date.  One second, don't go.  Let's schedule another

 5   date, which would, hopefully, by that time -- okay.  You see,

 6   this is our world.

 7         (Discussion held off the record.)

 8         THE COURT:  Our date, our date, our date.  What do

 9   you think?  I'd like to schedule this at a time when you think

10   you've gotten -- you can get us to the point where you're

11   telling me what this is going to look like, right?  On the

12   bellwethers?  So what do you think?

13         MS. SHARKO:  I'd like to think that we could agree on

14   a form of order for Your Honor, on the bellwethers, within the

15   next week.  We actually talked a lot over the weekend, trying

16   to get closer, and I think what Your Honor has told us will

17   enable us to get there.  So I would think we should either

18   have an order next week or we should have competing orders.

19         THE COURT:  Okay.  So what would you like?  You want

20   a date in April?

21         MS. SHARKO:  I think March would be better, and if

22   there is no issues, we can cancel it.

23         THE COURT:  Okay.  Hold on a moment.

24         MS. SHARKO:  Because once we have an order on how to

25   pick the cases, then we need to pick them, which we should be
```

```
 1   able to do in a short period of time, but then we'll need to
 2   work out a schedule with expert report deadlines and things
 3   like that.
 4          MS. O'DELL:  And just to weigh in there, I mean, I
 5   know, Susan, you'd like to pick today, I'm sure, but discovery
 6   is ongoing in these cases, Judge, as you know.  I mean, they
 7   are working very hard to get physician depositions completed
 8   by the end of the month, and that's well in progress.  But
 9   we're going to need -- it's going to go right up to the wire
10   because of various scheduling issues with physicians, and
11   we're going to need a little time to digest those depositions
12   in order to understand the cases that are -- we're going to
13   need a little bit of time, not much, but it cannot be done,
14   you know, the next day, just from our perspective.
15          MS. PARFITT:  You had given us, Your Honor, February
16   28th to complete everything, and we're certainly working to
17   that end, but I can't agree more with Leigh that it will take
18   time to put that together.  We'll move quickly.  We'll move as
19   quickly as we possibly can.  We're not trying to delay.  We
20   just want to --
21          THE COURT:  Yes, well, on my schedule, I could
22   either -- Jackie, when is Good Friday?  When is Easter, do you
23   know?
24          THE COURTROOM DEPUTY:  Good Friday is April 2nd.
25          THE COURT:  Okay.  So I'm looking at maybe the week
```

```
 1  before, the week of the 29th of March.  I'm on a patent trial
 2  all the week of the 22nd, so I'm unavailable that week, and I
 3  think doing it around the 15th is still a little too early, so
 4  how about that last week in March?  And I'll suggest -- how
 5  about the 31st at 2:00?
 6            MS. SHARKO:  That's fine for me, Judge.
 7            MS. PARFITT:  Fine for me, Your Honor.
 8            MS. O'DELL:  Thank you, that works well.
 9            THE COURT:  Okay.  That will give us a little bit of
10  time.  And you know, you know how to write me letters or
11  e-mail me.  If you have a problem, we'll get on sooner, and
12  we'll do it that way.  So, okay.  I think we're good.
13            All right.  I think we accomplished a lot.  I
14  appreciate everyone's cooperation, and great.  Take care of
15  yourselves.  Be well.  I'll see you in a few weeks.
16            (The proceedings concluded at 3:39 p.m.)
17            - - - - - - - - - - - - - - - - -
18
19            I certify that the foregoing is a correct transcript
20  from the record of proceedings in the above-entitled matter.
21
22  /S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI
    Court Reporter/Transcriber
23
24  February 20, 2021
        Date
25
```

| / |
|---|

/S [1] - 41:22

| 0 |
|---|

07701 [1] - 2:3
07932 [1] - 2:9
08002 [1] - 1:15
08608 [1] - 1:9

| 1 |
|---|

1,000 [6] - 20:20, 21:14, 27:13, 27:14, 28:17, 28:20
101 [1] - 1:14
127 [1] - 2:3
1440 [1] - 2:14
15th [1] - 41:3
17 [1] - 1:9
18 [1] - 29:20
1825 [1] - 1:17

| 2 |
|---|

20 [2] - 29:19, 41:24
20004 [1] - 2:18
20005 [1] - 2:14
20006 [1] - 1:18
2015 [1] - 13:13
2021 [4] - 1:9, 32:4, 32:9, 41:24
21 [1] - 29:18
210 [1] - 1:14
218 [1] - 1:20
22 [1] - 24:15
22,000 [3] - 20:21, 26:18, 32:21
22nd [1] - 41:2
25 [1] - 23:4
28th [1] - 40:16
29th [1] - 41:1
2:00 [1] - 41:5
2:30 [2] - 1:10, 3:3
2nd [1] - 40:24

| 3 |
|---|

3,000 [1] - 6:6
30 [16] - 19:20, 20:2, 20:13, 20:22, 21:9, 21:15, 22:23, 23:11, 24:3, 24:14, 25:8, 27:13, 29:7, 29:18, 30:2
316 [1] - 2:6
31st [1] - 41:5
32502 [1] - 2:6
34 [2] - 21:14, 23:2

36104 [1] - 1:21
3:16-md-2738-FLW-LHG [1] - 1:4
3:39 [1] - 41:16

| 4 |
|---|

4 [1] - 28:11
40 [1] - 29:21
402 [1] - 1:8
41 [4] - 23:19, 23:23, 28:18, 28:21
4160 [1] - 1:21

| 5 |
|---|

5 [1] - 28:19
50 [1] - 28:19
53 [3] - 23:18, 24:10, 24:12
5th [1] - 4:23

| 6 |
|---|

60 [5] - 23:19, 23:24, 28:18, 28:22, 29:21
600 [1] - 2:9
62 [1] - 22:22
63 [1] - 21:15
66 [1] - 23:25
67 [1] - 23:21

| 7 |
|---|

70 [4] - 22:23, 22:24, 23:10, 24:3

| 8 |
|---|

8,000 [1] - 15:19
856-318-6100 [1] - 1:24

| 9 |
|---|

907 [1] - 27:12
930 [1] - 20:14
931 [1] - 27:12
975 [1] - 2:18
9th [2] - 10:13, 13:5

| A |
|---|

able [5] - 8:17, 10:20, 11:12, 14:18, 40:1
above-entitled [1] - 41:20
accomplished [1] - 41:13
acts [1] - 11:23
addition [1] - 5:4

address [7] - 5:2, 5:8, 9:10, 15:25, 21:18, 21:22, 21:25
addressed [1] - 22:4
addressing [1] - 26:21
adjudicated [1] - 6:15
adjust [1] - 3:13
admissibility [1] - 16:13
admissible [1] - 16:6
admit [1] - 16:14
afternoon [12] - 3:7, 3:10, 3:11, 3:17, 3:18, 3:20, 4:11, 4:13, 4:15, 4:18, 5:9, 9:14
age [8] - 20:25, 23:13, 23:19, 23:22, 28:12, 28:18, 28:21, 32:18
agenda [2] - 5:4, 5:5
ages [1] - 23:23
ago [1] - 13:14
agree [8] - 15:16, 29:15, 30:14, 33:8, 37:2, 38:9, 39:13, 40:17
agreement [1] - 38:5
ahead [4] - 10:8, 10:9, 21:19, 22:1
aided [1] - 1:25
AL [1] - 1:21
Alice [1] - 14:21
ALLEN [1] - 1:19
Alli [1] - 4:11
ALLISON [1] - 2:13
allow [1] - 14:20
almost [1] - 20:19
alternate [1] - 20:6
alternative [3] - 32:25, 33:16, 33:18
amenable [1] - 37:16
amend [1] - 6:1
analysis [1] - 22:6
analyze [1] - 28:15
AND [1] - 1:5
answer [2] - 24:20, 32:1
answered [1] - 25:24
anticipate [2] - 12:8, 30:20
anyway [1] - 33:25
apologize [1] - 14:13
appeals [1] - 8:6
appearances [1] - 3:4
apply [2] - 15:22, 36:7
applying [1] - 15:3
appreciate [6] - 9:15, 16:18, 17:11, 29:9, 33:15, 41:14
appropriate [3] - 6:9,

22:19, 38:10
April [6] - 6:4, 9:21, 10:12, 10:21, 39:20, 40:24
argue [1] - 12:20
argued [3] - 13:2, 15:8, 25:23
arguing [1] - 25:22
argument [1] - 21:19
arguments [1] - 17:2
ARPS [1] - 2:12
article [1] - 13:21
articles [1] - 22:5
ascertained [1] - 19:23
ASHCRAFT [1] - 1:16
associates [1] - 12:5
assume [1] - 25:9
assuming [1] - 16:2
attention [1] - 7:15
attorneys [1] - 14:9
AVENUE [2] - 2:3, 2:14
aware [1] - 13:12
awhile [1] - 7:9

| B |
|---|

BANK [1] - 2:3
bar [1] - 37:21
basic [2] - 26:21, 27:21
BAYLEN [1] - 2:6
BEASLEY [1] - 1:19
become [1] - 14:5
becomes [1] - 16:5
begin [1] - 10:12
beginning [1] - 26:13
Beisner [1] - 4:14
BEISNER [2] - 2:12, 4:13
believes [1] - 18:11
bell [1] - 8:12
bellwether [5] - 7:1, 21:4, 24:25, 30:5, 37:3
bellwethers [3] - 5:11, 39:12, 39:14
benefit [2] - 8:15, 31:13
benefits [1] - 18:6
Bernardo [2] - 4:16, 17:21
BERNARDO [5] - 2:13, 4:15, 13:1, 15:6, 17:16
best [3] - 31:15, 34:4, 34:6
better [6] - 3:15, 6:20, 32:22, 33:7, 38:25,

39:21
between [4] - 18:12, 23:19, 23:23, 29:21
beyond [1] - 32:11
BIDDLE [1] - 2:8
big [1] - 39:22
biggest [2] - 5:11, 9:16
biologist [1] - 26:24
bit [5] - 7:10, 19:16, 23:17, 40:13, 41:9
Blount [2] - 14:21, 15:9
blue [1] - 23:18
body [2] - 21:3, 26:19
Bough [1] - 13:21
BOUGH [1] - 13:22
BOX [1] - 1:21
box [1] - 3:24
bracket [1] - 23:22
BRCA [4] - 24:14, 24:16, 29:24
break [2] - 17:17, 18:5
briefed [1] - 12:13
bring [6] - 6:24, 8:4, 10:20, 11:7, 11:19, 26:15
bringing [2] - 11:7, 11:11
brought [7] - 7:14, 8:6, 9:15, 11:9, 12:22, 12:23, 14:1
BROWN [3] - 2:13, 4:11, 10:18
Brown [1] - 4:11
buckets [1] - 27:23
Building [1] - 1:8
burden [1] - 20:9
BY [8] - 1:14, 1:17, 1:20, 2:2, 2:5, 2:8, 2:12, 2:17

| C |
|---|

California [1] - 16:4
camera [2] - 16:3, 17:1
CAMPUS [1] - 2:9
cancel [1] - 39:22
cancer [5] - 22:9, 22:12, 26:24, 26:25, 27:3
cancers [1] - 22:25
cannot [1] - 40:13
Care [2] - 2:19, 4:19
care [1] - 41:14
Carol [2] - 1:23, 41:22
case [53] - 7:15, 8:3, 8:7, 8:13, 8:16, 8:25, 9:20, 10:19, 10:25, 11:17, 13:12, 13:24,

14:7, 14:9, 15:4, 23:1, 24:5, 24:16, 25:5, 26:16, 28:6, 28:11, 29:11, 29:17, 29:24, 30:5, 30:11, 30:13, 30:16, 30:25, 31:1, 31:4, 32:16, 33:12, 34:17, 34:18, 34:19, 34:21, 34:25, 35:4, 35:7, 35:10, 35:22, 36:9, 36:11, 36:16, 36:19, 36:21, 37:1, 37:4, 37:12, 37:13

*case-specific* [2] - 28:6, 37:13

*cases* [102] - 5:20, 6:6, 6:9, 6:14, 7:1, 8:14, 8:20, 9:17, 9:18, 10:2, 10:3, 10:14, 11:2, 11:24, 13:18, 14:10, 18:12, 18:14, 18:20, 18:24, 19:4, 19:6, 19:8, 19:20, 19:23, 19:25, 20:5, 20:12, 20:13, 20:20, 20:21, 21:3, 21:4, 21:14, 21:15, 22:21, 22:22, 22:23, 23:3, 23:15, 23:19, 23:20, 24:1, 24:2, 24:11, 24:13, 24:14, 24:18, 25:1, 25:15, 26:8, 26:16, 26:20, 27:8, 27:12, 27:16, 27:21, 27:23, 28:3, 28:9, 29:18, 29:20, 30:2, 30:6, 30:10, 30:24, 31:3, 31:7, 32:6, 32:19, 32:21, 33:2, 33:3, 33:5, 33:8, 33:14, 33:20, 33:21, 34:3, 34:4, 34:12, 34:15, 35:21, 36:3, 36:5, 36:7, 36:13, 36:14, 36:18, 36:23, 37:8, 37:10, 37:17, 38:19, 38:24, 39:25, 40:6, 40:12

*categories* [2] - 19:24, 31:3

*category* [2] - 29:14, 36:23

*cell* [2] - 22:11, 25:25

*cells* [1] - 27:5

*certain* [3] - 28:3, 33:8, 33:14

*certainly* [3] - 15:2, 29:9, 40:16

*certify* [1] - 41:19

*cetera* [1] - 28:22

cfarrell.crr@gmail. com [1] - 1:23

*challenge* [4] - 11:12, 13:15, 15:19, 15:21

*challenged* [2] - 8:15, 13:10

*challenges* [4] - 9:18, 11:9, 13:8, 13:25

*challenging* [1] - 9:8

*characteristic* [1] - 23:23

*characteristics* [5] - 19:24, 20:11, 20:19, 23:12, 25:14

*chart* [3] - 20:10, 23:17, 29:17

*charts* [2] - 19:9, 19:21

*chemotherapy* [1] - 22:17

*CHERRY* [1] - 1:15

*cherry* [2] - 20:17, 25:12

*cherry-picked* [1] - 25:12

*cherry-picking* [1] - 20:17

*chest* [1] - 3:14

*CHIEF* [1] - 1:11

*Chief* [1] - 3:2

*Chris* [4] - 3:11, 3:14, 3:20, 31:11

*CHRISTOPHER* [2] - 2:2, 2:5

*citizen* [1] - 31:13

*CIVIL* [1] - 1:3

*civil* [4] - 19:3, 19:4, 32:6

*Clarkson* [1] - 1:8

*clear* [9] - 7:19, 9:7, 10:20, 13:25, 16:10, 22:11, 24:21, 25:25, 29:16

*clearly* [2] - 4:8, 34:2

*Clerk's* [2] - 6:7

*closely* [1] - 20:14

*closer* [1] - 39:16

*COHEN* [1] - 2:2

*color* [1] - 23:17

*coming* [5] - 6:20, 8:7, 17:4, 21:11

*Commencing* [1] - 1:10

*comment* [1] - 33:15

*comments* [1] - 13:11

*COMMERCE* [1] - 1:20

*Committee* [1] - 5:25

*Companies* [2] - 2:10, 2:15

*competing* [2] - 14:8, 39:18

*complaint* [1] - 6:1

*complete* [1] - 40:16

*completed* [1] - 40:7

*complicated* [2] - 18:8

*composite* [1] - 28:21

*computer* [1] - 1:25

*computer-aided* [1] - 1:25

*concern* [6] - 8:22, 9:7, 9:16, 11:14, 15:25, 30:4

*concerned* [2] - 9:18, 14:4

*concerning* [1] - 38:23

*concerns* [3] - 7:11, 8:10, 11:20

*concluded* [1] - 41:16

*confer* [1] - 37:9

*CONFERENCE* [1] - 1:5

*conglomerate* [1] - 34:6

*consider* [3] - 18:16, 26:20, 37:1

*consideration* [1] - 27:16

*consistent* [3] - 5:18, 22:24, 24:2

*Consumer* [4] - 2:10, 2:11, 2:15, 2:16

*contact* [1] - 17:3

*Continued* [1] - 2:1

*control* [4] - 12:17, 13:19, 14:7, 16:23

*cooperation* [1] - 41:14

*coordinating* [1] - 12:8

*coordination* [1] - 11:18

*correct* [2] - 15:7, 41:19

*Council* [2] - 2:19, 4:19

*counsel* [3] - 3:5, 4:9, 5:19

*count* [1] - 29:20

*County* [1] - 12:10

*couple* [1] - 31:24

*course* [2] - 14:6, 26:2

*COURT* [58] - 1:1, 3:4, 3:9, 3:13, 3:19, 3:22, 4:2, 4:5, 4:8, 4:17, 4:20, 6:11, 7:7, 9:6, 9:13, 9:24, 10:2, 10:5, 10:14, 10:17, 11:3, 11:21, 12:18, 12:25, 13:17, 14:12,

14:15, 15:5, 15:23, 16:9, 16:21, 16:24, 17:14, 17:20, 17:23, 19:13, 21:7, 21:13, 28:25, 29:8, 30:4, 31:2, 31:11, 35:24, 36:6, 36:24, 37:6, 37:16, 38:8, 38:12, 38:16, 39:2, 39:8, 39:19, 39:23, 40:21, 40:25, 41:9

*court* [3] - 14:23, 15:18, 17:3

*Court* [21] - 1:23, 10:15, 13:18, 14:8, 14:19, 14:25, 15:3, 16:2, 19:1, 19:3, 19:4, 19:22, 19:25, 20:20, 20:22, 21:2, 21:5, 24:25, 25:10, 26:15, 41:22

*Court's* [2] - 15:2, 16:18

*Courthouse* [1] - 1:8

*COURTROOM* [2] - 3:23, 40:24

*courtroom* [1] - 32:5

*courts* [6] - 15:9, 30:9, 30:12, 32:22, 37:2, 38:4

*covered* [1] - 37:10

*COVID* [1] - 19:1

*CRC* [1] - 41:22

*CRCR* [1] - 41:22

*create* [1] - 20:17

*created* [1] - 8:24

*creation* [1] - 13:16

*CRI* [1] - 41:22

*criminal* [2] - 19:3, 32:6

*criteria* [4] - 19:24, 25:14, 30:15, 33:6

*crosstalk* [1] - 10:4

*CRR* [1] - 41:22

## D

*Dan* [2] - 3:17, 10:8

*DANIEL* [1] - 1:14

*data* [2] - 20:13, 28:16

*Date* [1] - 41:24

*date* [7] - 13:5, 39:4, 39:5, 39:8, 39:20

*dates* [1] - 6:19

*Daubert* [11] - 14:24, 22:6, 26:24, 28:6, 36:2, 36:7, 36:9, 36:13, 36:22, 37:13, 37:18

*DC* [3] - 1:18, 2:14,

2:18

*deadlines* [1] - 40:2

*deal* [3] - 8:23, 17:5, 37:16

*dealing* [1] - 38:20

*dealt* [2] - 25:24, 37:19

*decade* [1] - 23:15

*decades* [1] - 26:2

*deceased* [3] - 20:25, 24:1, 24:3

*decide* [3] - 36:11, 37:4, 38:4

*decided* [2] - 6:18, 34:17

*decision* [4] - 11:15, 12:3, 12:22, 14:19

*decisions* [1] - 11:17

*defendant* [5] - 6:6, 20:7, 20:8, 25:21, 34:3

*Defendant* [2] - 2:10, 2:19

*defendants* [9] - 4:10, 4:12, 4:14, 4:16, 19:18, 20:3, 20:16, 25:5, 35:18

*Defendants* [1] - 2:15

*defendants'* [4] - 8:2, 25:20, 26:9, 32:25

*defense* [3] - 4:9, 34:12, 35:3

*defer* [1] - 9:12

*define* [1] - 36:22

*definitely* [1] - 38:23

*delay* [2] - 12:2, 40:19

*dense* [1] - 17:25

*deposition* [1] - 17:17

*depositions* [4] - 15:13, 15:15, 40:7, 40:11

*deprivileged* [2] - 14:20, 16:4

*DEPUTY* [2] - 3:23, 40:24

*designate* [1] - 15:14

*designated* [1] - 16:19

*designations* [1] - 7:16

*diagnosed* [4] - 23:19, 23:21, 23:23, 28:17

*diagnosis* [4] - 20:25, 23:5, 23:13, 28:12

*difference* [1] - 21:21

*differences* [3] - 18:5, 18:17, 19:19

*different* [23] - 10:19, 13:2, 14:25, 15:3, 18:3, 21:20, 25:17, 26:9, 27:1, 27:2, 27:3, 27:4, 27:5,

27:6, 30:17, 31:3, 32:19, 33:1, 33:5, 35:21, 38:4
**differently** [2] - 27:6, 30:24
**difficulty** [2] - 15:11, 18:1
**digest** [1] - 40:11
**directed** [1] - 24:25
**direction** [1] - 13:25
**directly** [1] - 8:17
**disagree** [1] - 28:25
**disclosed** [1] - 16:12
**discourteous** [1] - 17:19
**discovery** [6] - 6:13, 18:23, 24:2, 24:18, 37:12, 40:5
**discuss** [2] - 6:23, 17:13
**Discussion** [1] - 39:7
**discussion** [1] - 10:21
**discussions** [1] - 32:15
**disease** [6] - 21:20, 22:15, 25:17, 27:1, 27:2, 27:3
**diseases** [1] - 27:1
**dismiss** [4] - 6:8, 6:13, 6:15, 6:17
**dismissal** [1] - 5:21
**dismissing** [2] - 6:5, 34:24
**dispositive** [1] - 36:2
**distinction** [5] - 21:21, 22:13, 25:15, 25:17, 26:6
**District** [2] - 3:3, 13:20
**DISTRICT** [3] - 1:1, 1:1, 1:11
**divided** [1] - 27:17, 33:24
**docket** [2] - 11:24, 31:23
**DOCKET** [1] - 1:3
**document** [11] - 7:22, 8:17, 14:20, 16:1, 16:2, 16:3, 16:4, 16:6, 16:17, 16:19
**documents** [20] - 7:14, 8:2, 8:3, 8:14, 8:18, 8:25, 9:12, 13:4, 13:9, 13:13, 14:8, 14:9, 14:21, 14:25, 15:9, 15:12, 15:13, 15:17, 15:19, 16:25
**done** [7] - 5:21, 6:4, 6:15, 17:1, 38:1, 38:21, 40:13

**doubt** [1] - 14:2
**down** [4] - 8:3, 18:5, 31:9, 33:10
**Dr** [3] - 14:21, 26:24, 26:25
**draw** [2] - 22:13, 23:2
**drawing** [1] - 23:2
**drawn** [1] - 25:16
**DRINKER** [1] - 2:8
**DRIVE** [1] - 1:14
**during** [2] - 6:15, 23:22

### E

**e-mail** [2] - 4:7, 41:11
**early** [3] - 7:15, 16:17, 41:3
**EAST** [1] - 1:14
**East** [1] - 1:8
**Easter** [1] - 40:22
**echo** [1] - 4:5
**educate** [3] - 31:20, 32:19, 38:2
**effort** [2] - 19:21, 21:2
**eight** [2] - 18:13, 37:8
**either** [8] - 23:5, 25:1, 25:12, 27:25, 30:7, 33:4, 39:17, 40:22
**elaborate** [1] - 20:11
**eliminated** [1] - 37:4
**enable** [1] - 39:17
**end** [7] - 20:5, 26:10, 31:9, 33:25, 35:20, 40:8, 40:17
**endometrioid** [8] - 22:11, 25:25, 27:3, 31:1, 36:18, 36:19, 36:21, 37:11
**ends** [1] - 37:3
**entered** [1] - 5:21
**entire** [1] - 15:19
**entitled** [4] - 34:12, 34:13, 34:20, 41:20
**epidemiology** [1] - 26:1
**epithelial** [1] - 22:9
**Ernestine's** [1] - 4:23
**ESQUIRE** [10] - 1:14, 1:17, 1:20, 2:2, 2:5, 2:8, 2:12, 2:13, 2:13, 2:17
**estimate** [1] - 6:19
**estimated** [1] - 6:8
**et** [1] - 28:22
**eve** [2] - 9:19, 11:6
**evenly** [1] - 33:24
**evidence** [1] - 24:4
**exactly** [3] - 29:25, 32:12, 35:25

**examined** [1] - 20:19
**example** [7] - 9:20, 14:20, 16:16, 30:22, 36:17, 36:19, 37:10
**excuse** [1] - 14:13
**excused** [1] - 17:14
**exercise** [2] - 26:13, 26:14
**expect** [4] - 6:20, 10:12, 10:25, 15:15
**expected** [1] - 10:13
**experience** [1] - 11:22
**expert** [1] - 40:2
**experts** [5] - 25:19, 25:20, 25:21, 27:19
**extent** [4] - 15:17, 17:5, 27:5, 27:13
**extrapolated** [1] - 36:18

### F

**fact** [8] - 7:17, 22:21, 23:25, 24:11, 27:10, 27:19, 28:14, 28:15
**factors** [1] - 27:6
**FAEGRE** [1] - 2:8
**fair** [7] - 4:20, 4:25, 7:7, 7:25, 24:10, 29:5, 29:11
**fall** [3] - 29:12, 30:10, 31:3
**far** [3] - 9:17, 34:10, 35:6
**Farrell** [1] - 1:23, 41:22
**fast** [1] - 26:3
**faster** [2] - 12:2, 36:12
**FCRR** [1] - 41:22
**February** [4] - 1:9, 32:9, 40:15, 41:24
**Federal** [2] - 13:18, 19:3
**few** [3] - 33:2, 36:4, 41:15
**figure** [2] - 9:1, 32:11
**figuring** [1] - 18:2
**file** [3] - 11:11, 36:13, 37:10
**filed** [3] - 5:18, 13:12, 38:6
**fine** [5] - 17:14, 34:9, 38:8, 41:6, 41:7
**firm** [2] - 8:19, 12:23
**FIRM** [1] - 1:19
**first** [13] - 7:9, 13:8, 16:25, 20:7, 25:4, 31:18, 33:2, 35:6, 35:7, 35:9, 35:10, 37:24

**Fisher** [1] - 1:8
**fit** [2] - 30:3, 30:14
**fits** [2] - 29:13, 32:17
**FL** [1] - 2:6
**FLOM** [1] - 2:12
**FLORHAM** [1] - 2:9
**focused** [1] - 23:13
**focussed** [1] - 23:10
**follows** [1] - 7:12
**FOR** [1] - 1:1
**foregoing** [1] - 41:19
**form** [1] - 39:14
**Forrest** [1] - 9:20
**forward** [7] - 17:8, 24:22, 32:20
**four** [13] - 18:12, 20:5, 25:1, 27:25, 28:1, 30:22, 31:16, 31:23, 31:25, 32:14, 33:21, 34:8, 35:2
**fourth** [1] - 31:21
**frankly** [3] - 12:2, 25:20, 32:25
**Freda** [1] - 3:2
**FREDA** [1] - 1:11
**free** [1] - 19:14
**Friday** [3] - 6:9, 40:22, 40:24
**friendly** [1] - 20:18
**front** [2] - 11:14, 20:21
**full** [1] - 3:23
**fully** [2] - 6:8, 12:13
**funny** [1] - 26:3

### G

**game** [1] - 7:25
**general** [2] - 37:18
**genetic** [6] - 21:1, 24:9, 24:12, 24:15, 28:19, 32:18
**GEREL** [1] - 1:16
**given** [2] - 15:7, 40:15
**glad** [1] - 9:3
**God** [1] - 32:8
**Goodman** [1] - 6:2
**grade** [26] - 21:14, 21:19, 21:20, 21:23, 22:14, 23:4, 23:6, 23:8, 25:17, 25:18, 25:22, 27:2, 27:3, 27:4, 27:11, 27:21, 27:23, 27:23, 28:1, 28:17, 28:21, 29:19, 33:22
**great** [2] - 11:4, 14:11
**greater** [2] - 29:22, 29:23
**group** [20] - 12:17, 18:12, 23:20, 24:11, 24:14, 24:18, 25:3,

26:8, 27:13, 27:14, 27:22, 28:1, 28:2, 28:7, 28:23, 29:5, 29:7, 30:2
**groups** [3] - 27:17, 27:21, 30:24
**growing** [1] - 26:18
**guarantee** [2] - 31:17, 35:21
**guess** [6] - 7:14, 13:17, 20:16, 27:12, 33:25, 34:23
**guidance** [2] - 32:15, 35:12

### H

**hand** [2] - 31:10, 34:16
**hanging** [1] - 7:9
**happy** [3] - 22:2, 22:7, 24:20
**hard** [2] - 31:5, 40:7
**hat** [2] - 33:19, 35:9
**head** [1] - 3:14
**hear** [5] - 9:6, 14:16, 25:21, 26:7, 26:16
**hearing** [6] - 14:24, 17:9, 17:11, 17:22, 22:6, 26:24
**heck** [1] - 19:9
**held** [2] - 3:1, 39:7
**hello** [1] - 4:8
**help** [5] - 18:19, 30:15, 30:19, 37:1, 38:12
**helpful** [4] - 23:17, 24:24, 31:1, 38:3
**high** [18] - 21:14, 21:19, 21:22, 22:14, 23:4, 23:5, 25:18, 25:22, 27:3, 27:4, 27:11, 27:21, 27:23, 28:1, 28:17, 28:21, 29:19, 33:22
**high-grade** [8] - 21:14, 23:4, 27:4, 27:11, 27:23, 28:1, 28:17, 28:21
**HILL** [1] - 1:15
**histologic** [2] - 22:12, 22:20
**hit** [1] - 28:20
**hold** [2] - 5:2, 39:23
**holds** [1] - 34:23
**honest** [1] - 18:4
**honestly** [1] - 31:5
**Honor** [52] - 3:7, 3:11, 3:17, 3:20, 4:4, 4:11, 4:13, 4:15, 4:18, 7:5, 9:3, 9:9, 9:14, 10:11,

10:16, 10:18, 10:23, 11:11, 11:13, 12:14, 13:1, 13:11, 14:11, 15:6, 15:8, 15:12, 15:25, 16:15, 17:8, 17:15, 17:16, 19:11, 19:12, 21:22, 23:14, 24:21, 25:20, 25:23, 25:24, 26:4, 26:18, 27:25, 29:16, 30:18, 35:14, 36:23, 37:14, 38:15, 39:14, 39:16, 40:15, 41:7
**HONORABLE** [1] - 1:11
**Honorable** [1] - 3:2
**hope** [2] - 6:3, 39:1
**hopeful** [2] - 32:4, 32:12
**hopefully** [3] - 21:5, 38:25, 39:5
**hygiene** [1] - 24:8

## I

**idea** [10] - 5:25, 6:20, 20:16, 30:6, 30:8, 30:10, 32:13, 32:22, 35:1
**identification** [1] - 18:21
**identified** [3] - 19:8, 23:4, 27:10
**Imerys** [1] - 16:17
**immediately** [1] - 11:9
**imminent** [2] - 6:9, 13:7
**imperative** [1] - 26:15
**important** [7] - 4:7, 15:7, 27:2, 27:7, 27:15, 28:13, 29:8
**impractical** [1] - 15:15
**improvement** [1] - 3:16
**IN** [1] - 1:4
**in-camera** [1] - 17:1
**Inc** [4] - 2:10, 2:11, 2:15, 2:16
**include** [1] - 16:19
**inconsistent** [1] - 15:11
**indeed** [1] - 21:24
**indicated** [3] - 18:25, 20:16, 35:17
**indication** [1] - 6:6
**indiscernible** [1] - 10:4
**individually** [1] - 29:11
**inform** [1] - 30:23

**information** [2] - 21:5, 32:2
**informed** [1] - 8:18
**initial** [1] - 25:13
**inquiry** [1] - 29:8
**instead** [2] - 3:14, 32:24
**intel** [1] - 10:19
**intelligent** [1] - 15:20
**intend** [1] - 5:8
**intentions** [1] - 31:16
**intently** [1] - 12:20
**interested** [1] - 8:4
**interesting** [2] - 25:7, 25:13
**interestingly** [2] - 26:11, 26:12
**interrupt** [1] - 19:14
**interrupted** [1] - 14:13
**interrupting** [1] - 10:10
**involved** [2] - 8:13, 8:19
**involves** [2] - 8:19, 8:22
**involving** [1] - 6:17
**iPad** [3] - 4:21, 4:23, 5:3
**ironically** [1] - 20:23
**issue** [9] - 5:11, 6:5, 12:4, 12:16, 13:13, 13:15, 16:5, 22:1, 29:22
**issues** [12] - 5:8, 5:14, 5:15, 6:25, 7:2, 7:14, 12:20, 19:1, 38:4, 38:14, 39:22, 40:10
**item** [1] - 28:14

## J

**J&J** [4] - 4:10, 4:12, 4:14, 4:16
**J&J's** [1] - 6:13
**Jackie** [1] - 40:22
**jazz** [1] - 23:16
**JERSEY** [1] - 1:1
**Jersey** [3] - 1:9, 8:20, 12:10
**Jessie** [1] - 4:6
**JOHN** [1] - 2:12
**John** [1] - 4:13
**JOHNSON** [2] - 1:4
**Johnson** [14] - 2:10, 2:10, 2:11, 2:15, 2:15, 2:16, 14:21, 14:22
**join** [1] - 17:10
**joint** [1] - 5:5
**joking** [1] - 31:12

**judge** [4] - 11:18, 12:3, 16:3, 19:4
**JUDGE** [1] - 1:11
**Judge** [22] - 3:3, 6:2, 7:15, 8:5, 8:20, 11:15, 11:16, 11:21, 11:23, 12:10, 12:21, 12:23, 13:3, 13:21, 14:1, 16:18, 17:1, 22:3, 23:16, 40:6, 41:6
**Judges** [1] - 11:25
**judges** [1] - 14:8
**judgment** [1] - 6:3
**Julie** [1] - 16:16
**jurisdictions** [1] - 11:2
**jury** [3] - 10:21, 10:25, 38:19

## K

**keep** [1] - 38:8
**key** [1] - 20:11
**kind** [4] - 21:15, 33:18, 34:21, 35:12
**knowing** [2] - 15:2, 19:5
**knowledge** [1] - 8:16
**known** [3] - 2:11, 2:16, 21:14

## L

**LAKE** [1] - 1:14
**Lapinski** [7] - 3:18, 9:4, 9:10, 9:12, 9:25, 11:5, 17:21
**LAPINSKI** [9] - 1:14, 3:17, 9:14, 10:1, 10:9, 11:10, 12:9, 17:8, 17:15
**largely** [2] - 6:22, 7:17
**larger** [2] - 23:20, 24:18
**largest** [1] - 26:19
**last** [3] - 18:25, 32:10, 41:4
**lastly** [1] - 24:9
**lately** [1] - 31:12
**laughs** [1] - 32:8
**law** [1] - 15:4
**LAW** [1] - 1:19
**lawyers** [1] - 8:13
**lay** [2] - 19:12, 20:1
**least** [3] - 19:5, 31:8, 33:22
**leave** [3] - 6:1, 17:2, 17:19
**left** [2] - 17:21, 37:25
**Leigh** [7] - 3:10, 10:9,

19:15, 21:18, 21:25, 22:1, 40:17
**LEIGH** [1] - 1:20
**letter** [4] - 5:5, 5:13, 5:16, 7:3
**letters** [2] - 5:7, 41:10
**LEVIN** [1] - 2:5
**Levy** [1] - 12:23
**LIABILITY** [1] - 1:5
**limitations** [2] - 37:11, 37:20
**limited** [1] - 37:13
**line** [4] - 8:3, 31:9, 32:7, 34:1
**list** [1] - 33:23
**listed** [1] - 22:11
**listened** [1] - 12:20
**listening** [1] - 12:6
**literature** [5] - 22:3, 22:15, 22:24, 25:19, 26:1
**LITIGATION** [1] - 1:6
**litigation** [2] - 12:16, 28:23
**live** [1] - 34:9
**living** [5] - 20:25, 24:1, 24:3, 28:18, 28:22
**LLC** [1] - 1:13
**LLP** [4] - 1:16, 2:8, 2:12, 2:17
**Locke** [1] - 4:19
**LOCKE** [2] - 2:17, 4:18
**log** [2] - 7:16, 15:20
**look** [31] - 5:24, 16:9, 20:22, 20:23, 20:24, 21:13, 22:3, 22:15, 22:19, 22:22, 23:9, 23:14, 23:18, 24:13, 24:14, 25:9, 26:7, 26:9, 26:17, 27:7, 29:4, 29:11, 30:2, 30:24, 32:3, 34:2, 34:3, 34:5, 34:13, 37:16, 39:11
**looked** [2] - 19:20, 26:2
**looking** [8] - 17:23, 23:7, 26:8, 28:16, 29:17, 30:1, 33:17, 40:25
**low** [8] - 21:19, 21:23, 22:14, 23:6, 23:8, 25:17, 25:22, 27:2

## M

**ma'am** [1] - 30:18
**Magistrate** [1] - 11:25
**mail** [2] - 4:7, 41:11

**majority** [5] - 24:9, 24:10, 27:11, 29:19, 30:3
**man** [1] - 32:7
**maneuver** [1] - 15:1
**MAPLE** [1] - 2:3
**March** [6] - 6:16, 13:5, 32:10, 39:21, 41:1, 41:4
**MARKETING** [1] - 1:5
**master** [1] - 6:1
**math** [3] - 26:3
**matter** [3] - 8:9, 11:6, 41:20
**matters** [1] - 38:18
**MDL** [6] - 9:23, 16:23, 23:25, 32:21, 37:17, 38:2
**MDLs** [1] - 13:22
**MEAGHER** [1] - 2:12
**mean** [10] - 8:16, 18:15, 22:3, 22:15, 29:1, 29:3, 29:7, 36:8, 40:4, 40:6
**meaningful** [1] - 23:9
**mechanical** [1] - 1:25
**meet** [1] - 37:9
**mentioning** [1] - 5:14
**meta** [1] - 22:6
**meta-analysis** [1] - 22:6
**method** [1] - 26:22
**Michelle** [2] - 3:7, 21:7
**MICHELLE** [1] - 1:17
**middle** [2] - 9:21, 17:17
**Middlesex** [1] - 12:10
**might** [5] - 3:13, 18:13, 30:19, 30:23, 37:9
**million** [1] - 32:11
**minute** [1] - 38:6
**Missouri** [17] - 8:21, 9:20, 10:2, 10:13, 10:14, 10:22, 11:1, 11:17, 11:19, 12:4, 12:8, 13:10, 13:12, 13:19, 13:20, 19:1, 19:3
**MITCHELL** [1] - 2:5
**mixture** [3] - 35:20, 35:23
**model** [1] - 28:2
**moment** [5] - 5:3, 5:23, 7:19, 39:23
**MONTGOMERY** [1] - 1:21
**month** [3] - 5:7, 6:16, 40:8
**months** [2] - 31:22,

36:4

**morning** [1] - 11:22
**motion** [14] - 5:16, 5:25, 6:3, 6:13, 11:7, 12:22, 13:2, 18:23, 28:9, 36:7, 36:9, 37:11, 37:13
**motions** [18] - 5:14, 5:24, 6:14, 6:17, 9:22, 11:12, 12:11, 19:6, 28:5, 28:6, 36:2, 36:13, 36:22, 37:9, 37:16, 38:1, 38:20
**MOTLEY** [1] - 1:13
**move** [5] - 5:9, 17:8, 38:21, 40:18
**MR** [22] - 3:11, 3:16, 3:17, 3:20, 3:25, 4:13, 4:15, 4:18, 9:14, 10:1, 10:9, 11:10, 12:9, 12:14, 12:19, 13:1, 15:6, 15:24, 17:8, 17:15, 17:16, 31:10
**MS** [49] - 3:7, 3:10, 4:4, 4:10, 4:11, 6:10, 7:4, 7:5, 9:3, 9:9, 10:8, 10:11, 10:16, 10:18, 10:23, 14:11, 14:13, 14:17, 16:15, 16:22, 19:11, 19:14, 21:12, 21:18, 22:5, 25:6, 26:21, 29:3, 29:16, 30:18, 35:14, 35:15, 35:25, 36:1, 36:17, 37:5, 37:7, 38:7, 38:11, 38:14, 39:1, 39:13, 39:21, 39:24, 40:4, 40:15, 41:6, 41:7, 41:8
**multi** [1] - 28:16
**multi-variable** [1] - 28:16
**multiple** [1] - 15:8
**must** [4] - 17:23, 17:25, 33:22
**mutation** [1] - 24:16
**mutations** [1] - 27:4
**mute** [1] - 10:10
**muted** [1] - 4:9

### N

**N.W** [2] - 2:14, 2:18
**name** [1] - 3:23
**nearly** [1] - 29:20
**necessarily** [1] - 33:3
**necessary** [1] - 11:12
**need** [14] - 5:3, 6:15,

15:18, 18:21, 29:4, 29:20, 36:11, 37:12, 39:25, 40:1, 40:9, 40:11, 40:13
**needed** [2] - 3:12, 3:21
**Neel** [1] - 26:24
**never** [3] - 9:8, 32:10
**NEW** [2] - 1:1, 2:14
**New** [3] - 1:9, 8:20, 12:10
**next** [9] - 17:7, 20:7, 20:8, 35:13, 36:4, 39:15, 39:18, 40:14
**nilly** [1] - 38:4
**NJ** [4] - 1:15, 2:3, 2:9, 41:22
**NJ-CRCR** [1] - 41:22
**nominate** [1] - 25:1
**non** [2] - 33:17, 33:22
**non-high-grade** [1] - 33:22
**nontrial** [1] - 28:9
**nothing** [7] - 7:4, 7:6, 7:17, 16:11, 17:18, 18:17
**number** [8] - 5:1, 13:7, 28:3, 29:13, 30:1, 33:8, 33:14
**NUMBER** [1] - 1:3
**numbers** [3] - 26:9, 26:10, 29:12
**NW** [1] - 1:17

### O

**O'Dell** [7] - 3:10, 8:19, 14:12, 19:15, 20:10, 29:1, 35:22
**O'DELL** [25] - 1:20, 3:10, 4:4, 6:10, 7:4, 9:3, 9:9, 10:8, 10:11, 10:16, 10:23, 14:11, 14:13, 14:17, 16:15, 16:22, 22:2, 29:3, 29:16, 30:18, 35:14, 38:7, 39:1, 40:4, 41:8
**objection** [1] - 7:23
**objections** [2] - 7:16, 8:5
**obviously** [2] - 18:11, 18:25
**OF** [1] - 1:1
**Office** [2] - 6:7
**Official** [1] - 1:23
**older** [1] - 31:8
**once** [3] - 14:2, 38:20, 39:24
**one** [58] - 5:3, 5:23,

6:13, 7:13, 9:1, 10:6, 11:16, 12:19, 13:7, 13:16, 14:5, 16:3, 18:2, 20:4, 20:7, 20:8, 20:24, 22:5, 22:12, 22:15, 22:21, 22:24, 23:20, 24:15, 25:2, 25:6, 27:1, 27:17, 27:19, 27:23, 28:9, 29:11, 29:24, 30:5, 30:13, 30:18, 30:19, 30:25, 31:18, 31:19, 32:17, 33:2, 33:17, 33:22, 33:23, 34:8, 34:10, 34:12, 34:20, 35:1, 35:4, 35:9, 35:10, 36:25, 37:3, 39:4
**ones** [1] - 34:5
**ongoing** [1] - 40:6
**oop** [1] - 34:17
**open** [1] - 3:16
**opportunity** [2] - 20:4, 36:21
**opposed** [1] - 33:18
**opposition** [1] - 5:20
**option** [2] - 19:25, 25:2
**order** [8] - 5:18, 5:19, 6:12, 11:12, 39:14, 39:18, 39:24, 40:12
**orders** [1] - 39:18
**origin** [1] - 27:5
**original** [1] - 20:14
**ostensibly** [1] - 20:20
**outset** [2] - 7:24, 25:10
**ovarian** [2] - 22:9, 22:25, 26:25
**overall** [3] - 22:21, 24:18, 24:24
**overlapping** [1] - 13:9
**own** [1] - 13:16

### P

**P.A** [1] - 2:5
**p.m** [3] - 1:10, 3:3, 41:16
**P.O** [1] - 1:21
**Page** [1] - 28:11
**PAPANTONIO** [1] - 2:5
**parameters** [1] - 30:3
**Parfitt** [1] - 3:8
**PARFITT** [13] - 1:17, 3:7, 7:5, 19:11, 19:14, 21:12, 21:18, 25:6, 35:15, 35:25, 38:14, 40:15, 41:7

**PARK** [1] - 2:9
**part** [1] - 36:3
**participating** [2] - 3:5, 4:22
**particular** [3] - 10:19, 15:4, 33:11
**parties** [3] - 14:18, 24:25, 30:23
**past** [1] - 11:23
**patent** [1] - 41:1
**PATRICIA** [1] - 1:20
**PC** [1] - 2:2
**PCPC** [3] - 6:3, 6:5, 6:8
**pending** [4] - 5:24, 6:1, 7:18, 12:12
**Penninkilampi** [1] - 22:6
**PENSACOLA** [1] - 2:6
**people** [6] - 4:8, 10:5, 11:8, 16:13, 30:7, 31:20
**percent** [16] - 21:14, 21:15, 22:22, 22:23, 22:24, 23:3, 23:4, 23:10, 23:19, 23:21, 23:25, 24:3, 24:11, 24:12, 28:20
**percentage** [3] - 23:8, 23:15, 24:13
**percentages** [5] - 19:9, 20:15, 20:24, 21:10, 21:23
**perhaps** [3] - 7:22, 12:3, 18:18
**period** [1] - 40:1
**permission** [1] - 19:12
**permitted** [1] - 35:1
**person** [1] - 13:1
**personal** [1] - 24:7
**Personal** [2] - 2:19, 4:19
**perspective** [5] - 8:23, 22:18, 22:19, 29:25, 40:14
**pharmaceutical** [1] - 24:5
**pharmacy** [1] - 24:6
**phase** [4] - 20:24, 22:21, 23:20
**physician** [1] - 40:7
**physicians** [2] - 23:7, 40:10
**pick** [20] - 25:4, 25:5, 28:3, 33:2, 33:3, 33:7, 33:21, 34:13, 34:17, 34:20, 35:2, 35:4, 35:8, 35:18, 35:19, 35:22, 39:25, 40:5

**picked** [2] - 25:12, 34:19
**picking** [2] - 20:17, 30:4, 33:3, 33:13, 33:19
**Pier** [1] - 16:16
**Pisano** [7] - 8:5, 11:15, 11:16, 11:21, 11:23, 14:1, 17:1
**Pisano's** [1] - 7:15
**PLACITELLA** [1] - 2:2, 2:2, 3:11, 3:16, 12:14, 12:19, 15:24, 31:10
**Placitella** [3] - 3:12, 8:20, 16:10
**plaintiff** [17] - 7:4, 7:5, 7:18, 20:6, 20:7, 20:8, 20:18, 23:3, 24:5, 25:22, 28:21, 28:23, 29:13, 29:15, 30:17, 35:7, 35:10
**plaintiff's** [1] - 28:12
**Plaintiffs** [5] - 1:15, 1:18, 1:22, 2:4, 2:7
**plaintiffs** [14] - 3:6, 4:3, 13:14, 15:14, 19:21, 20:3, 21:2, 25:4, 27:10, 28:10, 28:16, 28:19, 35:19, 36:20
**plaintiffs'** [9] - 8:11, 13:16, 19:18, 26:9, 27:19, 28:2, 33:1, 33:25, 34:5
**Plaintiffs'** [1] - 5:25
**plan** [5] - 5:6, 14:3, 17:12, 17:24, 30:22
**plans** [1] - 32:7
**playing** [1] - 26:2
**point** [18] - 7:13, 8:24, 11:11, 12:23, 15:7, 16:6, 16:8, 16:11, 16:18, 18:9, 18:22, 18:24, 19:7, 19:15, 21:6, 23:1, 30:7, 39:10
**pointing** [1] - 9:17
**points** [4] - 7:18, 9:15, 26:21, 28:13
**poised** [1] - 14:2
**pool** [22] - 6:13, 21:9, 21:13, 22:21, 23:11, 23:25, 24:2, 24:18, 27:8, 27:13, 27:22, 28:17, 28:20, 34:16, 36:3, 36:5, 36:7, 36:13, 36:14, 36:20, 36:25, 37:8
**population** [1] - 24:11

*portion* [1] - 24:17
*position* [3] - 11:10, 25:4, 33:10
*positive* [3] - 24:14, 24:15, 29:24
*possible* [1] - 18:13
*possibly* [1] - 40:19
*POWDER* [1] - 1:4
*powder* [1] - 24:7
*practical* [1] - 10:3
*practice* [3] - 5:17, 18:23, 24:7
*PRACTICES* [1] - 1:5
*predominant* [1] - 28:22
*prepared* [2] - 9:4, 21:21
*present* [3] - 16:25, 33:10, 37:14
*presented* [3] - 19:25, 24:21, 26:1
*presuming* [1] - 16:7
*pretrial* [1] - 9:22
*pretty* [2] - 29:1, 35:17
*prevailed* [1] - 15:9
*prevent* [1] - 15:10
*priority* [1] - 39:2
*privilege* [14] - 5:8, 7:2, 7:8, 7:16, 7:21, 7:24, 8:1, 9:8, 9:11, 9:18, 12:16, 12:20, 15:19, 38:18
*privileged* [1] - 16:20
*problem* [3] - 12:7, 17:20, 41:11
*Proceedings* [1] - 1:25
*PROCEEDINGS* [1] - 3:1
*proceedings* [2] - 41:16, 41:20
*process* [6] - 12:21, 20:17, 21:20, 24:25, 30:16, 35:16
*PROCTOR* [1] - 2:5
*produced* [3] - 1:25, 9:1, 13:13
*product* [5] - 20:25, 24:4, 28:18, 32:18
*productively* [1] - 36:4
*Products* [2] - 2:19, 4:19
*PRODUCTS* [2] - 1:4, 1:5
*profile* [1] - 24:6
*progress* [1] - 40:8
*prominent* [1] - 22:5
*proof* [1] - 20:9
*proposal* [1] - 19:18
*propose* [2] - 27:25,

37:7
*proposed* [3] - 5:6, 17:24, 35:16
*protect* [1] - 16:12
*provide* [4] - 17:12, 19:22, 21:5, 24:20
*provided* [1] - 20:4
*PTI* [2] - 6:17, 6:18
*public* [2] - 16:1, 16:5
*pulled* [1] - 27:9
*purely* [1] - 25:12
*purpose* [3] - 19:21, 20:10, 21:4
*put* [8] - 3:23, 21:22, 22:7, 23:13, 24:22, 25:18, 36:19, 40:18

## Q

*questioned* [1] - 25:24
*questions* [11] - 7:1, 7:8, 7:11, 7:24, 8:2, 11:19, 13:6, 22:4, 24:20, 25:23, 37:20
*quick* [1] - 26:3
*quickly* [6] - 11:23, 14:1, 15:21, 19:2, 24:18, 40:19
*quite* [3] - 12:12, 18:4, 21:17

## R

*RAFFERTY* [1] - 2:5
*raise* [2] - 7:23, 14:6
*raised* [4] - 7:24, 15:18, 26:22
*Raises* [1] - 31:10
*raising* [1] - 15:12
*random* [4] - 25:10, 25:11, 25:12, 25:13
*randomly* [6] - 28:1, 33:3, 33:18, 34:15
*RDR* [1] - 41:22
*RE* [1] - 1:4
*reach* [1] - 30:7
*react* [1] - 18:14
*read* [2] - 17:25, 18:4
*readily* [1] - 15:21
*ready* [8] - 8:5, 10:24, 11:22, 11:25, 12:1, 14:1, 14:15, 19:7
*real* [2] - 5:13, 7:1
*really* [20] - 5:10, 5:13, 6:22, 10:2, 10:3, 11:6, 18:1, 18:3, 18:6, 18:9, 18:17, 18:21, 22:14, 25:16, 26:11, 27:7, 27:15, 29:18, 33:12, 34:25

*realty* [1] - 34:7
*reason* [10] - 7:21, 11:8, 28:24, 33:11, 34:19, 34:21, 35:7, 35:8, 37:23, 38:5
*REATH* [1] - 2:8
*recognize* [1] - 28:13
*record* [2] - 39:7, 41:20
*recorded* [1] - 1:25
*RED* [1] - 2:3
*referring* [1] - 13:12
*regard* [6] - 5:20, 6:5, 8:9, 17:2, 19:17, 20:6
*reiterate* [1] - 25:6
*related* [1] - 14:21
*relation* [2] - 9:11, 11:16
*rely* [1] - 11:4
*remainder* [1] - 24:1
*remaining* [2] - 6:14, 25:3
*remand* [1] - 6:17
*remands* [1] - 37:19
*remember* [2] - 22:5, 25:10
*remind* [1] - 22:8
*REMOTE* [1] - 1:6
*remote* [1] - 3:1
*removal* [1] - 34:15
*remove* [1] - 34:12
*replacement* [1] - 34:13
*replaces* [1] - 34:20
*report* [4] - 5:6, 6:23, 22:9, 40:2
*Reporter* [1] - 1:23
*Reporter/ Transcriber* [1] - 41:22
*represent* [2] - 20:21, 27:14
*representation* [2] - 29:1, 29:5
*representative* [17] - 18:16, 18:17, 19:22, 21:3, 21:17, 23:1, 23:12, 23:22, 24:17, 24:23, 25:2, 26:19, 28:11, 29:10, 29:14, 30:12, 35:4
*represented* [1] - 28:7
*request* [1] - 5:19
*researchers* [2] - 22:4, 22:18
*resemble* [1] - 20:13
*resolution* [1] - 21:5
*resolve* [2] - 5:15, 8:5
*resolved* [1] - 7:17

*respond* [4] - 9:3, 10:6, 15:21, 15:24
*rest* [1] - 31:9
*reverse* [2] - 21:16, 34:23
*review* [3] - 17:1, 28:14, 28:15
*reviewed* [1] - 6:2
*RICE* [1] - 1:13
*Rich* [1] - 12:15
*Rich's* [1] - 16:18
*RICHARD* [1] - 2:13
*Richard* [1] - 4:12
*rid* [2] - 34:24, 37:21
*risk* [2] - 21:1, 27:6
*RMR* [1] - 41:22
*ROTH* [1] - 2:2
*Royston* [1] - 6:18
*rule* [3] - 14:2, 19:6, 36:22
*ruled* [4] - 14:22, 14:24, 16:14, 16:20
*rules* [1] - 16:4
*ruling* [5] - 13:7, 15:2, 15:4, 15:11, 16:18
*rulings* [4] - 14:8, 14:25, 15:22, 16:22

## S

*Saenz* [1] - 26:25
*SALES* [1] - 1:5
*satisfy* [1] - 33:5
*saw* [1] - 34:11
*schedule* [10] - 16:24, 28:9, 36:10, 37:14, 38:9, 39:3, 39:4, 39:9, 40:2, 40:21
*scheduled* [2] - 9:21, 17:9
*scheduling* [1] - 40:10
*scientists* [3] - 26:4, 26:23
*screen* [1] - 22:8
*second* [3] - 25:5, 31:18, 39:4
*see* [26] - 3:14, 4:2, 5:13, 7:22, 8:1, 8:14, 8:25, 13:3, 14:9, 15:25, 16:9, 18:19, 23:14, 27:8, 27:14, 31:23, 34:13, 35:7, 36:24, 37:23, 37:24, 38:2, 38:6, 38:21, 39:5, 41:15
*seeking* [1] - 13:14
*select* [4] - 18:24, 20:3, 27:25
*selected* [3] - 27:22, 34:15, 36:9

*selecting* [1] - 27:16
*selection* [6] - 20:6, 25:11, 25:14, 26:22, 30:14, 38:20
*selects* [2] - 20:7, 20:8
*send* [1] - 38:3
*senior* [1] - 31:13
*sense* [6] - 15:16, 18:7, 18:20, 19:22, 26:18, 33:4
*sent* [1] - 5:5
*separate* [1] - 28:8
*serous* [21] - 21:14, 21:22, 21:23, 22:10, 22:12, 22:20, 22:22, 22:23, 22:25, 23:4, 23:6, 23:10, 25:24, 27:4, 27:11, 28:17, 28:21, 29:18, 29:19, 30:25, 33:22
*set* [5] - 10:23, 13:9, 20:11, 20:15, 37:9
*settlement* [1] - 30:9
*several* [4] - 18:1, 18:4, 30:6, 30:16
*SEYFARTH* [1] - 2:17
*share* [1] - 22:8
*Sharko* [12] - 4:10, 9:17, 21:8, 22:13, 23:2, 29:2, 29:4, 30:1, 34:11, 34:19, 35:21, 36:15
*SHARKO* [12] - 2:8, 4:10, 26:21, 36:1, 36:17, 37:5, 37:7, 38:11, 39:13, 39:21, 39:24, 41:6
*Sharko's* [1] - 33:15
*SHAW* [1] - 2:17
*sheet* [3] - 22:21, 23:25, 24:11
*sheets* [3] - 27:10, 28:14, 28:15
*short* [1] - 40:1
*show* [1] - 27:11
*showed* [1] - 16:3
*side* [10] - 8:11, 9:17, 25:3, 25:12, 33:21, 34:1, 34:5, 34:8, 34:21, 35:1
*signing* [1] - 17:10
*similar* [10] - 12:9, 12:13, 20:15, 20:23, 21:1, 21:24, 25:15, 26:11, 26:12
*similarities* [1] - 19:19
*simply* [1] - 20:1
*Simultaneous* [1] - 10:4
*situation* [3] - 12:10,

12:13, 14:7
**situations** [1] - 14:17
**six** [3] - 18:12, 20:2, 37:8
**SKADDEN** [1] - 2:12
**SLATE** [1] - 2:12
**slightly** [1] - 10:18
**small** [5] - 18:12, 23:8, 24:13, 24:17, 29:13
**smaller** [1] - 36:3
**someone** [3] - 4:21, 10:10, 27:18
**somewhere** [4] - 8:2, 13:5, 18:12, 31:9
**soon** [2] - 10:21, 38:22
**sooner** [1] - 41:11
**sorry** [4] - 15:6, 23:17, 29:17, 36:14
**sort** [5] - 8:24, 23:14, 23:16, 23:22, 30:21
**SOUTH** [1] - 2:6
**speaking** [2] - 10:5, 13:20
**specific** [5] - 12:15, 28:6, 36:22, 37:13
**specification** [1] - 28:18
**stage** [1] - 6:13
**standpoint** [1] - 25:8
**stands** [2] - 8:5, 14:1
**stark** [1] - 29:1
**start** [10] - 5:10, 19:11, 27:20, 31:2, 31:4, 31:6, 38:3, 38:19, 38:20, 38:22
**starting** [2] - 32:5, 32:6
**state** [1] - 8:14
**State** [8] - 1:8, 10:15, 14:8, 14:19, 14:25, 15:3, 19:1, 19:3
**states** [1] - 15:8
**STATES** [2] - 1:1, 1:11
**States** [1] - 3:2
**statistical** [1] - 25:7
**statistics** [2] - 21:16, 24:8
**status** [8] - 5:4, 5:5, 5:13, 5:15, 6:23, 7:3, 28:12, 32:18
**STATUS** [1] - 1:5
**statute** [2] - 37:11, 37:20
**Steering** [1] - 5:25
**stenography** [1] - 1:25
**still** [4] - 10:21, 32:10, 36:2, 41:3
**strategy** [1] - 35:3

**Street** [1] - 1:8
**STREET** [4] - 1:17, 1:20, 2:6, 2:18
**strike** [4] - 20:5, 25:2, 28:4, 33:9
**striking** [2] - 18:14, 33:25
**struck** [1] - 36:20
**subgroups** [1] - 28:4
**submission** [2] - 5:6, 28:12
**submissions** [1] - 17:24
**submit** [1] - 21:2
**subset** [3] - 22:22, 23:21, 29:18
**substance** [1] - 17:12
**substantial** [1] - 18:23
**subtype** [5] - 20:25, 22:12, 22:20, 28:7, 28:12
**subtypes** [10] - 22:9, 22:11, 27:2, 27:7, 27:9, 27:14, 27:16, 27:24, 28:7, 32:17
**suggest** [2] - 36:12, 41:4
**suggested** [1] - 34:11
**suggestion** [3] - 32:25, 33:1, 33:16
**suggestions** [1] - 34:10
**SUITE** [1] - 1:14
**summary** [1] - 6:3
**surgery** [1] - 22:16
**surprisingly** [1] - 20:13
**Susan** [3] - 4:10, 21:7, 40:5
**SUSAN** [1] - 2:8

**T**

**tag** [1] - 19:16
**Taher** [1] - 22:7
**takeaway** [1] - 13:2
**talcum** [1] - 24:7
**TALCUM** [1] - 1:4
**targeted** [1] - 15:20
**team** [1] - 19:16
**ten** [2] - 29:22, 29:23
**tend** [1] - 17:25
**terms** [3] - 23:12, 23:15, 28:5
**tested** [1] - 24:15
**testified** [2] - 26:25, 27:19
**testify** [1] - 24:7
**testimony** [2] - 15:14, 16:19

**testing** [5] - 24:9, 24:12, 24:15, 28:19, 32:18
**THE** [61] - 1:1, 1:11, 3:4, 3:9, 3:13, 3:19, 3:22, 3:23, 4:2, 4:5, 4:8, 4:17, 4:20, 6:11, 7:7, 9:6, 9:13, 9:24, 10:2, 10:5, 10:14, 10:17, 11:3, 11:21, 12:18, 12:25, 13:17, 14:12, 14:15, 15:5, 15:23, 16:9, 16:21, 16:24, 17:14, 17:20, 17:23, 19:13, 21:7, 21:13, 28:25, 29:8, 30:4, 31:2, 31:11, 35:24, 36:6, 36:24, 37:6, 37:16, 38:8, 38:12, 38:16, 39:2, 39:8, 39:19, 39:23, 40:21, 40:24, 40:25, 41:9
**therefore** [1] - 15:17
**they've** [1] - 32:19
**thinking** [1] - 32:24
**third** [2] - 5:3, 31:21
**THOMAS** [2] - 2:5, 2:17
**thoughtful** [1] - 15:20
**thousand** [8] - 20:14, 20:23, 21:8, 24:19, 25:9, 25:11, 29:6, 36:18
**thousands** [1] - 11:24
**three** [6] - 20:3, 20:4, 25:1, 30:23, 35:18, 35:19
**timing** [3] - 12:7, 13:11, 13:15
**Tisi** [1] - 3:21
**TISI** [3] - 2:5, 3:20, 3:25
**today** [9] - 3:5, 5:2, 5:18, 7:1, 9:4, 18:7, 32:1, 38:13, 40:5
**together** [4] - 21:23, 25:18, 29:12, 40:18
**Tom** [1] - 4:18
**took** [1] - 17:17
**top** [1] - 27:20
**transcript** [2] - 1:25, 41:19
**transcription** [1] - 1:25
**transferee** [4] - 30:9, 30:12, 32:22, 37:2
**treated** [2] - 22:16, 27:6
**Trenton** [1] - 1:9

**trial** [25] - 5:6, 7:1, 9:19, 9:21, 10:12, 10:23, 11:6, 16:6, 17:12, 17:24, 19:2, 25:5, 27:22, 28:8, 30:10, 31:21, 32:2, 36:5, 36:10, 36:14, 36:20, 36:25, 37:8, 38:19, 41:1
**trials** [8] - 30:5, 31:16, 31:22, 31:23, 32:1, 32:7, 32:14, 37:3
**tried** [5] - 18:5, 19:17, 19:20, 22:13, 23:16
**true** [5] - 11:1, 29:7, 34:23
**truly** [1] - 21:3
**try** [17] - 4:1, 10:25, 15:14, 15:17, 20:1, 26:16, 30:11, 30:22, 30:25, 31:3, 31:6, 32:16, 35:7, 35:10, 38:1, 38:24
**trying** [17] - 10:2, 10:3, 10:11, 10:14, 11:2, 15:10, 20:17, 24:20, 24:22, 30:5, 30:6, 30:16, 30:20, 30:21, 32:11, 39:15, 40:19
**turn** [1] - 4:23
**two** [10] - 11:17, 11:19, 13:7, 20:24, 22:5, 26:21, 27:17, 27:20, 27:23, 30:21
**type** [1] - 11:16

**U**

**U.S** [1] - 1:8
**ultimately** [2] - 21:4, 26:20
**unavailable** [1] - 41:2
**under** [2] - 10:21, 31:3
**understood** [1] - 38:7
**unfair** [1] - 25:16
**unfortunately** [1] - 24:1
**UNIDENTIFIED** [1] - 4:6
**Union** [1] - 6:18
**uniquely** [2] - 26:10, 26:12
**UNITED** [2] - 1:1, 1:11
**United** [1] - 3:2
**unless** [1] - 36:7
**unopposed** [1] - 6:14
**unrung** [1] - 8:13
**up** [27] - 6:24, 6:25, 9:15, 11:11, 11:20, 16:16, 16:24, 18:7,

18:20, 20:5, 22:7, 23:16, 25:3, 27:8, 27:11, 27:17, 28:8, 31:24, 32:5, 33:25, 35:20, 36:4, 37:3, 38:9, 40:9
**update** [1] - 5:16
**usage** [6] - 20:25, 24:4, 28:18, 29:21, 32:18
**uses** [1] - 35:3

**V**

**vaccinated** [1] - 31:13
**variable** [1] - 28:16
**variables** [1] - 32:1
**various** [2] - 19:24, 40:10
**versus** [2] - 21:8, 25:18
**via** [1] - 3:1
**VIA** [1] - 1:5
**video** [1] - 4:24
**VIDEOCONFERENC E** [1] - 1:6
**videoconference** [1] - 3:1
**view** [5] - 8:10, 9:6, 23:9, 29:7, 32:14
**views** [1] - 18:17
**Viscomi** [5] - 8:21, 12:11, 12:21, 12:24, 13:3
**VOICE** [1] - 4:6

**W**

**wait** [5] - 7:22, 8:1, 8:6, 36:24, 37:6
**wall** [1] - 8:24
**walled** [1] - 15:16
**wants** [1] - 10:6
**WASHINGTON** [3] - 1:18, 2:14, 2:18
**week** [8] - 10:12, 39:15, 39:18, 40:25, 41:1, 41:2, 41:4
**weekend** [1] - 39:15
**weeks** [2] - 31:25, 41:15
**weigh** [1] - 40:4
**whittle** [1] - 33:10
**whole** [1] - 16:7
**wholesale** [2] - 15:19, 34:15
**willy** [1] - 38:4
**willy-nilly** [1] - 38:4
**wire** [1] - 40:9
**Wolfson** [1] - 3:2

**WOLFSON** [1] - 1:11
**woman** [1] - 24:6
**works** [2] - 6:11, 41:8
**world** [3] - 16:7, 38:21, 39:6
**worry** [4] - 12:4, 13:18, 13:24, 36:10
**write** [1] - 41:10
**writing** [2] - 12:21, 13:21

### Y

**year** [1] - 32:4
**years** [4] - 13:14, 29:22, 29:23, 32:11
**yesterday** [1] - 5:5
**YORK** [1] - 2:14
**yourselves** [1] - 41:15

### Z

**Zoom** [4] - 3:1, 12:6, 12:15, 17:21
**ZOOM** [1] - 1:6