**\*FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| | : | |
| IN RE: JOHNSON & JOHNSON | : | MDL No. 16-2738 (FLW) (LHG) |
| TALCUM POWDER PRODUCTS | : | |
| MARKETING, SALES PRACTICES, | : | **OPINION** |
| AND PRODUCTS LIABILITY | : | |
| LITIGATION | : | |
| | : | |

**WOLFSON, Chief Judge:**

Individual consumer-plaintiffs ("Plaintiffs") brought tort actions related to talcum powder use in their respective states against defendants Johnson & Johnson, Johnson & Johnson Consumer, Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. (the "Johnson & Johnson Defendants"), Imerys Talc American, Inc. f/k/a Luzenac America, Inc. f/k/a Ro Tino Minerals, Inc. ("Imerys"), and Personal Care Products Counsel ("PCPC") (collectively, "Defendants"). Those cases have been transferred to this Multidistrict Litigation ("MDL") by the MDL Panel for pretrial coordination purposes. Before the Court is PCPC's Motion for Summary Judgment on all claims against it. For the reasons set forth below, PCPC's Motion is **GRANTED**.

## I. BACKGROUND[1]

### A. Factual Background

PCPC is a non-profit, trade association for its members, who are cosmetics and personal care products manufacturers and ingredient suppliers. (PCPC Statement of Undisputed Facts ("PCPC SUMF"), ¶¶ 1–2.) PCPC is organized under the laws of the District of Columbia and maintains a principal place of business in the District of Columbia. (*Id.* ¶ 2.)

---

[1] The following facts are not disputed unless otherwise noted.

Plaintiffs' claims against Defendants center on the alleged link between ovarian cancer and the use of talc products, specifically those sold by the Johnson & Johnson Defendants. Plaintiffs allege that the products contained known carcinogens, such as asbestos, arsenic, and heavy metals and that they, or the person whose estate they represent, developed cancer as a result of using the products. Plaintiffs further allege that Defendants, including PCPC, knew of the potential health effects of exposure to the products and misrepresented to consumers, regulators, and the scientific and medical communities the contents of, and health hazard posed by, the products. Relevant here, Plaintiffs assert common law claims of negligence, fraud, fraudulent concealment, and civil conspiracy against PCPC.

Different from traditional products liability claims, Plaintiffs' claims against PCPC arise from PCPC's activities as a trade association for the cosmetics industry. The Johnson & Johnson Defendants are members of PCPC and participated with PCPC "and other [industry] members on petitioning various government entities regarding the regulation of talc." (PCPC Resp. to Pls.' SUMF ¶ 1.) Specifically, in the 1970s, PCPC organized a talc task force (the "Talc Task Force") "to coordinate voluntary, self-regulating testing standards for asbestos." (Pls.' SUMF ¶ 1.) The Talc Task Force worked with the Food & Drug Administration ("FDA") and provided documentation from talc manufacturers regarding the presence of certain types of asbestos in talc. (*See id.*; PCPC Resp. to Pls.' SUMF ¶ 1.) Thereafter, in 1976, PCPC formed the Cosmetic Ingredient Review ("CIR") "to thoroughly review and assess the safety of cosmetic ingredients in an unbiased and expert manner."[2] (Pls.' SUMF, Ex. 47, at 5.) The CIR is wholly funded by, and

---

[2] Although not the basis for their claims, Plaintiffs contend that the CIR was formed to "avoid any further actions from regulators." (Pls. SUMF ¶ 2.) The record, however, does not support that assertion, as there is no indication in the CIR documents that the CIR sought to avoid regulator involvement. Indeed, the record indicates that the CIR includes three non-voting members who represent the Consumer Federation of America, the cosmetics industry, and the

shares the same office space as, PCPC in Washington, D.C. and CIR staff are considered employees of PCPC. (Pls.' SUMF ¶¶ 11–12.) The CIR and its review processes, however, "are distinctively separate from [PCPC] and the cosmetics industry, except as the latter contributes directly and substantially by providing data needed for assessing safety." (Pls. SUMF, Ex. 47, at 5.)

In the 1990s, the PCPC Talc Task Force began meeting frequently and, from 1992 to 2009, the Johnson & Johnson Defendants contributed significant funds to the Task Force "in order to pool resources and hire scientists and consultants to help [engage] regulatory agencies" about the safety of talc. (Pls.' SUMF ¶ 4; PCPC Resp. to Pls.' SUMF ¶ 4.) PCPC also formed, and operated, various committees over the years focused on safety issues facing the cosmetic industry, including the Scientific Advisory Executive Committee ("SAEC") and the Safety and Regulatory Toxicology Committee ("SRTC"). (Pls. SUMF ¶ 7.)

### B. Procedural History

In their Complaint, Plaintiffs assert claims of negligence, fraud and fraudulent concealment, and civil conspiracy against PCPC. Specifically, in Count X of the Amended Complaint, Plaintiffs bring a common law negligence claim against PCPC. (Am. Compl. ¶¶ 132–41.) In support of their negligence claim, Plaintiffs allege that PCPC is a national trade association, the "purpose and intent of [which] was to interact with and influence local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc-based body powders," including the products at issue in this MDL. (*Id.* ¶¶ 133–34.) Plaintiffs allege that PCPC had knowledge of the alleged risk of ovarian cancer caused by the application of talc products to the female perineal area. (*Id.* at 135.) According to Plaintiffs, PCPC "voluntarily

---

Food and Drug Administration. (Pls. SUMF, Ex. 47, at 5.)

undertook a duty of care to Plaintiffs by self-regulating the cosmetics industry by promulgating federal, state and local standards, norms and/or bylaws that govern, control and/or inform the manufacturing, design, labeling, marketing and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc." (*Id.* ¶ 137.) Plaintiffs claim that PCPC breached that duty by "negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied with and adhered to the PCPC standards, norms and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution and/or branding of [their talc-based products] . . . despite their significant health and safety risks of which PCPC had full knowledge." (*Id.* ¶ 138.) Plaintiffs contend that, as a proximate result of this breach, Plaintiffs suffered damages. (*Id.* ¶¶ 140–41.)

In Count XIII of the Amended Complaint, Plaintiffs assert a claim of fraud against PCPC. (*Id.* ¶¶ 159–70.) Plaintiffs allege that PCPC misrepresented and concealed material facts to consumers and users of talc-based body powders and local, state and federal regulators in order to unduly influence the regulation and marketing of talc. (*Id.* ¶ 160–61.) Plaintiffs allege that the conduct giving rise to their fraud claim includes the formation of the Talc Task Force and the activities of the Talc Task Force. (*See id.* ¶ 164.) For example, Plaintiffs claim that the Talc Task Force funded scientific research studies on the safety of talc and then "edited the scientific reports in an effort to skew the data so that it demonstrated the safety of talc and talc-based body powder and suppressed data demonstrating these dangers." (*Id.* ¶ 164(b).) According to Plaintiffs, the consuming public, including Plaintiffs, relied on PCPC's misrepresentations concerning the safety of talc products, and further that Plaintiffs would not have purchased or used talc-based products if not for those misrepresentations. (*See id.* ¶¶ 165–68.) Relatedly, in Count XVII of the Amended complaint, Plaintiffs assert a fraudulent concealment claim against PCPC. (*Id.* ¶¶ 197–208.) In

support of this count, Plaintiffs allege that PCPC fraudulently suppressed material information regarding the safety and efficacy of talc-based body powders from the public.  Indeed, Plaintiffs contend that "[a]t the time PCPC concealed the fact that talc based body powders . . . were not safe as designed and marketed by the Johnson & Johnson Defendants, PCPC was under a duty to communicate this information to local, state and federal agencies, as well as the general public, in such a manner that the general public could appreciate the risks associated with using [talc products], generally."  (*Id.* ¶ 201.)  Plaintiffs allege that they relied on PCPC's concealment of information  regarding the safety of talc products.  (*Id.* ¶ 202.)

Finally, in Count XVIII, Plaintiffs assert a claim of civil conspiracy against all Defendants, including PCPC.  (*Id.* ¶¶ 209–16.)  In support of Count XVIII, Plaintiffs allege that Defendants, including PCPC, conspired to defraud Plaintiffs and consumers of talc-based products in order to maintain the popularity and reputation of such products and, therefore, continue high sales of the products, at the expense of consumer safety.  (*Id.* ¶ 212.)  Notably, nowhere in the Complaint do Plaintiffs assert any products liability claims against PCPC.  Indeed, Plaintiffs only assert such claims against the manufacturer defendants, *i.e.*, the Johnson & Johnson Defendants and Imerys.  (*See id.* ¶¶ 57–116.)  For example, in Counts I and II of the Amended Complaint, Plaintiffs assert strict liability—failure to warn claims against Imerys and the Johnson & Johnson Defendants, which specifically state that only those defendants "are liable under a theory of strict products liability."  (*Id.* ¶¶ 58, 68.)

Pursuant to Case Management Order No. 10 in the MDL, all claims against PCPC that were not designated for trial in either New Jersey or the District of Columbia were dismissed. PCPC moves for summary judgment on all claims remaining against it.[3]

---

[3]       Plaintiffs additionally filed a motion for leave to file a surreply in opposition to PCPC's

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331.  On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary

---

motion for summary judgment, apparently to respond to new arguments raised in PCPC's reply brief and to clarify alleged misstatements made by PCPC regarding Plaintiffs' evidence and arguments against summary judgment.  Having reviewed the proposed surreply, which was attached to Plaintiffs' motion as an exhibit, I denied Plaintiffs' motion for leave to file as I determined that it would not be helpful to me in resolving this motion.  (ECF No. 13796.)

judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   DISCUSSION

### A.  Choice of Law

Before reaching the merits of PCPC's motion for summary judgment, I must first determine which state's law applies to Plaintiffs' common law claims against PCPC. In an MDL proceeding, the transferee court applies "the choice of law rules of the transferor courts." *Ford Motor Co. Ignition Switch Prods. Liab. Litigation*, 174 F.R.D. 332, 348 (D.N.J. 1997); *see also In re Delta*

*Dental Antitrust Litig.*, ___ F. Supp. 3d ___, 2020 WL 7382602, at *3 (J.P.M.L. Dec. 16, 2020) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court.").  On issues of federal law or federal procedure, however, the transferee court applies the law of the circuit in which it sits (here, the Third Circuit).  *See Various Plaintiffs v. Various Defendants ("Oil Field Cases")*, 673 F. Supp. 2d 358, 362–63 (E.D. Pa. 2009).  Here, the only claims remaining against PCPC are those designated for trial in New Jersey (the "Multistate Plaintiffs") and those designated for remand to the District of Columbia (the "D.C. Plaintiffs").  Thus, the Court must apply New Jersey and District of Columbia choice of law principles, respectively, to determine what law applies to each group of Plaintiffs' claims.

Both New Jersey and the District of Columbia's choice of law analyses begin with a determination of whether there is an actual conflict among the laws of the states in question.  *See Felder v. WMATA*, 174 F. Supp. 3d 524, 528–29 (D.D.C. 2016) ("Initially, we must determine whether a true conflict exists between the laws of the two jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." (quoting *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51– 52 (D.C. Cir. 2014)); *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists.  That is done by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006)).

Here, PCPC contends that there is a conflict between the laws of New Jersey and the District of Columbia because, if New Jersey law applies, the Multistate Plaintiffs' claims are subject to the New Jersey Products Liability Act ("NJPLA"); and, if District of Columbia law

applies, PCPC contends it is permitted to raise a defense pursuant to the District of Columbia's

Anti-Strategic Lawsuits Against Public Participation Act ("the D.C. Anti-SLAPP Act").[4]  (*See*

_____

[4]     "A 'SLAPP' (strategic lawsuit against public participation) is an action filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Competitive Enterprise Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. Ct. App. 2016) (quotation omitted). "[T]he goal of a SLAPP 'is not to win the lawsuit but to punish the opponent and intimidate them into silence.'" *Id.* (quoting George W. Pring, *SLAPPS: Strategic Lawsuits Against Public Participation*, 7 Pace Envtl. L. Rev. 3, 3, 9–11 (1989)).  In that connection, the D.C. Anti-SLAPP Act is intended "to protect targets of such meritless lawsuits by creating 'substantive rights with regard to a defendant's ability to fend off a SLAPP.'" *Id.*  Thus, the D.C. Anti-SLAPP Act permits a defendant to "file a special motion to dismiss 'any claim arising from an act in furtherance of the right of advocacy on issues of public interest.'" *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1332 (D.C. Cir. 2015) (quoting D.C. Code § 16-5502(a)).  In short, on a special motion to dismiss under the D.C. Anti-SLAPP Act, the defendant must make a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."  D.C. Code § 16-5502(b).  If the defendant makes that showing, the plaintiff must demonstrate that "the claim is likely to succeed on the merits." *Id.*  The D.C. Anti-SLAPP Act further permits the court to stay discovery pending resolution of the special motion to dismiss.  *Id.* § 16-5502(c).  There is disagreement amongst the federal courts as to whether a federal court exercising diversity jurisdiction can apply a state's anti-SLAPP law.  *Compare Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010) (holding that Maine's anti-SLAPP law does not conflict with Rules 12 and 56 and, therefore, applies in federal court); *with Abbas*, 783 F.3d at 1335.  In *Abbas*, the D.C. Circuit held that "[a] federal court exercising diversity jurisdiction . . . must apply Federal Rules 12 and 56 instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision."  783 F.3d at 1337.  In other words, the D.C. Circuit determined that the D.C. Anti-SLAPP Act "conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial." *Id.* at 1334.  Since *Abbas*, the D.C. Court of Appeals has clarified that the D.C. Anti-SLAPP Act's special motion to dismiss provision mirrors the standard imposed by Rule 56.  *See Competitive Enterprise Inst. v. Mann*, 150 A.3d 1213, 1238 n.32 (D.C. 2016).  PCPC contends that because it moves for summary judgment, the federal rules and the D.C. Anti-SLAPP Act are in accord and, therefore the Anti-SLAPP Act may apply in federal court. I disagree.  Since the *Mann* decision, the D.C. Circuit has declined to revisit its decision in *Abbas* and continues to hold that the D.C. Anti-SLAPP Act does not apply in a federal court sitting in diversity jurisdiction.  *See, e.g.*, *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 239 (D.C. Cir. 2021) ("Although *Mann* may undermine some of *Abbas'*s reasoning, the bottom line remains: the federal rules and the anti-SLAPP law 'answer the same question about the circumstances under which a court must dismiss a case before trial . . . differently,' and the anti-SLAPP law still 'conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial.'" (quoting *Abbas*, 783 F.3d at 1333–34).  Indeed, the D.C. Circuit in *Tah* highlighted two key distinctions between Rule 56 and the D.C. Anti-SLAPP Act: (1) "the special motion to dismiss 'imposes the burden on plaintiffs,'" whereas under Rule 56, the movant "retains some initial 'burden of showing that there is no genuine issue of fact,'" and (2) a special motion to dismiss is typically decided before the completion of discovery.  *Id.*  As such, I find that the D.C.

Reply Br., at 2.)  Inexplicably, however, the parties' arguments do not focus on the types of claims the Complaint asserts against PCPC.  Specifically, as detailed above, the Complaint does not assert traditional products liability claims against PCPC, which generally sound in strict liability.  Rather, it only asserts, unlike against the manufacturing defendants, common law negligence and fraud claims against PCPC.  In other words, the Complaint does not refer to any statutory products liability claims or otherwise plead traditional products liability causes of action against PCPC.  Nevertheless, the parties confusingly brief these common law claims under the NJPLA.  PCPC's argument, in this regard, is puzzling.  In the same breath, PCPC argues that not only are Plaintiffs' common law claims subsumed by the NJPLA, but also that PCPC cannot be held liable under the NJPLA since it is not a seller or manufacturer as defined by the statute.  Plaintiffs' briefing on this issue fares no better.  Glaringly, Plaintiffs do not argue that their claims against PCPC are not asserted under the NJPLA, which is contrary to their Complaint.  Rather, Plaintiffs fall into the same trap by contending that PCPC is a seller under the Act, and that their claims against PCPC are not subsumed because they "are consistent with the legislative scheme of the NJPLA."

Plainly, these arguments miss the mark.  The Complaint is the operative document on which the Court determines what claims are raised against PCPC.  In that regard, a fair reading of the Complaint reveals that it does not assert products liability claims against PCPC.  Rather, Plaintiffs' claims against PCPC arise only under the common law.  Indeed, the gravamen of Plaintiffs' claims against PCPC is that PCPC misrepresented and concealed the dangers of talc, not that PCPC sold Plaintiffs a dangerous or defective product.  Consequently, there is no conflict between the common of law of New Jersey and the District of Columbia as "the application of

---

Anti-SLAPP Act does not apply in this case.

either state's law would yield the same result." *Warriner v. Stanton*, 475 F.3d 497, 501 (3d Cir.

2007) (quoting *High v. Balun*, 943 F.2d 323, 325 (3d Cir. 1991)).  Indeed, as I will set forth below,

the elements of common law negligence, fraud, and civil conspiracy are the same under both New

Jersey and District of Columbia law.  *See infra; compare, e.g.*, *Hedgepeth v. Whitman Walker*

*Clinic*, 22 A.3d 789, 793 (D.C. 2011) (stating that to prove negligence under District of Columbia

law, a plaintiff "must show: (1) that defendant owed a duty to the plaintiff, (2) breach of that duty,

and (3) injury to the plaintiff that was proximately caused by the breach."); *with Kubert v. Best*,

432 N.J. Super. 495, 508 (App. Div. 2013) ("In a lawsuit alleging that a defendant is liable to a

plaintiff because of the defendant's negligent conduct, the plaintiff must prove four things: (1) that

the defendant owed a duty of care to the plaintiff, (2) that the defendant breached that duty, (3)

that the breach was a proximate cause of the plaintiff's injuries, and (4) that the plaintiff suffered

actual compensable injuries as a result."); *compare also Busby v. Capital One, N.A.*, 772 F. Supp.

2d 268, 275 (D.D.C. 2011) ("[T]he essential elements of common law fraud are: (1) a false

representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with

the intent to deceive, and (5) action is taken in reliance upon the misrepresentation."); *with Perry*

*v. Gold & Laine, P.C.*, 371 F. Supp. 2d 622, 627 (D.N.J. 2005) ("In order to establish a claim for

common law fraud under New Jersey law, one must show: (1) a material misrepresentation of a

presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and

(5) resulting damages."); *compare also Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (setting

forth elements of civil conspiracy claim under District of Columbia law as "(1) an agreement

between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful

manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the

agreement (4) pursuant to, and in furtherance of, the common scheme"); *with Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) ("In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'").  Because there is no conflict of law, the Court must apply New Jersey law to the Multistate Plaintiffs' claim and District of Columbia law to the D.C. Plaintiffs' claims.  *See In re Delta Dental Antitrust Litig.*, 2020 WL 7382602, at *3 ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court.").

Putting aside the common law claims, as a matter of law, Plaintiffs cannot assert a claim under the NJPLA against PCPC in any event.  The NJPLA provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2.  Critically, only manufacturers and sellers of products can be held liable under the NJPLA for injuries caused by a product.  *See id.*; *see also Garten v. Intamin Amusement Rides Int. Corp. Est.*, No. 19-20040, 2020 WL 4745780, at *4 (D.N.J. Aug. 7, 2020). Under the NJPLA, a manufacturer is defined as:

> (1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates,

> makes, packages, labels or constructs the product before its sale; (3) any product seller not described in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer has a controlling interest in the domestic sales subsidiary.

N.J. Stat. Ann. § 2A:58C-8.  A "product seller" is defined as "any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce," subject to certain exceptions.  *Id.*

Here, PCPC is neither a "manufacturer" nor a "product seller" under the definition of the NJPLA.  There is no evidence—or any allegation—that PCPC was ever involved in the manufacturing or design of the talc powder products at issue in this MDL, or that PCPC sold or otherwise placed such products in the line of commerce.  In fact, Plaintiffs do not dispute those facts.  What they nevertheless argue is that PCPC should be held liable under the NJPLA because its "actions constitute marketing within the meaning of the NJPLA." (Pls.' Opp., at 57.)  I disagree. First and foremost, the NJPLA only contemplates marketing with respect to the *specific* products at issue in the litigation.  In that regard, an important consideration in determining whether a defendant is a seller or manufacturer of a product under the NJPLA is the control that the defendant had over the manufacture, packaging, and marketing of the particular products.  *See Lyons v. Premo Pharm. Labs, Inc.*, 170 N.J. Super. 183, 196 (App. Div. 1979); *see also Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, No. 17-2738, 2018 WL 3546197, at *7 (D.N.J. July 24, 2018) ("Under state law, control over the product is the touchstone that New Jersey courts have considered to determine whether a party has the requisite involvement to be a product seller.").  Discovery has concluded, and Plaintiffs present no evidence that PCPC was in any way involved or exercised

control over the marketing of Johnson & Johnson Baby Powder and Shower to Shower products. Rather, Plaintiffs' argument is premised on the notion that PCPC, in its role as a trade association that represented various cosmetic companies, including Johnson & Johnson, led the public to believe that talc-based products, in general, were safe. This is far too broad of a reading of the NJPLA. As a trade organization, PCPC did not have any control over the talc products at issue, and if I were to adopt Plaintiffs' position that PCPC can be held liable as a "product seller" under the NJPLA, that would extend liability to PCPC for harm caused by *any* cosmetic products made by its represented manufacturers. Clearly, that is not what was intended by the statute. Tellingly, Plaintiffs cite to no case, nor is the Court aware of any, in which courts have found a trade association, like PCPC, to be a "seller" under the NJPLA. Looking outside of New Jersey, other state courts have determined that their respective state products liability statutes do not apply to trade associations, such as PCPC. *See, e.g.*, *Swartzbauer v. Lead Industries Ass'n*, 794 F. Supp. 142 (E.D. Pa. 1992) (holding that trade association was not a "seller or supplier," as defined under Pennsylvania law where the trade association did not produce, market, or supply the defective product in question); *Howard v. Poseidon Pools*, 133 Misc. 2d 50, 53–54 (N.Y. Sup. Ct. 1986) (finding that trade association that certified swimming pool equipment was "not embraced within the recited group against whom an action for strict products liability may be brought"); *see also In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775, 799 (N.D. Ohio 2007) ("[C]ourts have repeatedly held that trade associations, themselves, have no duty to users of products in that trade").

While it does not involve a trade association, my decision in *Lopienski v. Centocor, Inc.*, provides a useful example. No. 07-4519, 2008 WL 2565065, at *4 (D.N.J. June 25, 2008). There, plaintiffs asserted claims under the NJPLA against, *inter alia*, the manufacturer of the prescription

14

drug Remicade and against a research and development company that performed drug safety and surveillance functions for the manufacturer.  *Id.*  I found that the research and development company was not a seller or manufacturer under the NJPLA because the company, at most, "merely conducted certain studies in order for [the manufacturer] to carry out its decision with respect to labeling and post-marketing strategies" and was not involved "in any manufacturing functions or selling the product."  *Id.*  Similarly, here, there is no allegation, let alone evidence, that PCPC was involved in the manufacturing or sale of the talc products at issue in the MDL.  As PCPC is not a seller or manufacturer as defined by the NJPLA, Plaintiffs cannot, as a matter of law, proceed with a claim under the NJPLA against PCPC.[5]

## B. Common Law Claims

Having found that Plaintiffs bring only common law claims against PCPC, I now turn to the merits of those claims.  For the sake of clarity and convenience, and as there is no conflict between the law of New Jersey and the District of Columbia, I analyze these claims in tandem.

At the outset, PCPC moves for summary judgment on Plaintiffs' claims on the basis that its actions related to talcum powder products are protected by the First Amendment under the *Noerr-Pennington* doctrine.  On the merits, PCPC argues that each of Plaintiffs' common law claims—negligence, fraud and fraudulent concealment, and civil conspiracy—fail as a matter of

---

[5]      PCPC argues that Plaintiffs' claims are subsumed under the NJPLA and that it cannot be liable under the NJPLA as it is not a seller or manufacturer.  PCPC cannot have it both ways. Either the NJPLA applies to Plaintiffs' claims, or it does not.  *See, e.g.*, *Guillen v. Six Flags Great Adventure, LLC*, No. 14-2091, 2015 WL 9582141, at *5 (D.N.J. Dec. 29, 2015) ("Six Flags' heads-I-win, tails-you-lose position is that this must be an NJPLA case, and that the NJPLA does not apply as a matter of law. That is very close to a claim that there is no such thing as an action against an amusement park based on injuries sustained on a ride. That simply is not so . . . .").  Plainly, for the reasons set forth above, this is not pled as an NJPLA case against PCPC and, moreover, even if it were, the NJPLA does not apply as a matter of law.

law.  As set forth herein, I find that summary judgment is appropriate on the merits of each of

Plaintiffs' claims against PCPC.  Because I find that there is no dispute of material fact that

Plaintiffs cannot proceed with their common law claims against PCPC, I decline to decide this

motion pursuant to the *Noerr-Pennington* doctrine as it is not jurisdictional in nature.[6]  *See*

*Akhmetshin v. Browder*, 993 F.3d 922, 967 (D.C. Cir. 2021) (explaining that *Noerr-Pennington*

doctrine "is a defense to *liability*" that requires a "fact-intensive inquiry that can only be resolved

at trial"); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 328–30 (3d Cir. 1999) (concluding "that

---

[6]      "The *Noerr-Pennington* doctrine takes its name from a pair of Supreme Court cases that placed a First Amendment limitation on the reach of the Sherman Act."  *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961).  The Supreme Court has since extended the protections of the *Noerr-Pennington* doctrine to the labor law context.  *See, e.g.*, *BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002); *see also Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 90 (D.C. Cir. 2015) (collecting cases).  The Supreme Court has not, however, extended the doctrine to common law tort claims.  Nevertheless, lower federal courts, including the Third Circuit and the District of Columbia, and state courts have extended *Noerr-Pennington* immunity to certain common law tort claims.  *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) ("Although New Jersey has not yet decided whether the *Noerr-Pennington* doctrine 'extends beyond antitrust liability to tort liability,' we have been presented with no persuasive reason why these state tort claims, based on the same petition activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine." (citation omitted)); *Nader v. Democratic Nat'l Committee*, 555 F. Supp. 2d 137, 156–57 (D.D.C. 2008) (observing that "[t]he doctrine's provenance lies in the field of antitrust law, but its reach has since then been extended to include common-law torts such as malicious prosecution and abuse of process"); *Main St. at Woolwich, LLC v. Ammons Supermarket, Inc.*, 451 N.J. Super. 135, 144–45 (App. Div. 2017).  As I find that summary judgment is appropriate on the merits of Plaintiffs' claims against PCPC, I need not resolve the question of whether the *Noerr-Pennington* doctrine immunizes PCPC from liability here.  However, I question the applicability of the *Noerr-Pennington* doctrine to Plaintiffs' claims.  In the context of the *Noerr-Pennington* doctrine, "parties exercise their right to petition when they advocate their causes and points of view respecting resolution of their business and economic interests, or attempt to influence the passage or enforcement of laws."  *Venetian Casino Resort*, 793 F.3d at 90 (citations and quotations omitted).  Here, Plaintiffs' claims against PCPC are not premised on petitioning and related activities but, rather, Plaintiffs seek to hold PCPC liable for its alleged misrepresentations, intentional concealment of relevant information from the public, and other tortious conduct aimed at the general public.

the *Noerr-Pennington* doctrine does not confer a right not to stand trial, but rather provides only a defense against liability for certain conduct"); *see also Reaves v. Pa. Bd. of Probation & Parole*, 580 F. App'x 49, 54 n.3 (3d Cir. 2014) (declining to consider non-jurisdictional defense because claims were barred by issue preclusion); *United States ex rel. Long v. SCS Bus. & Tech. Inst. Inc.*, 173 F.3d 890, 894 (D.C. Cir. 1999) ("[A] less than pure jurisdictional question need not be decided before a merits question."); *K&D, LLC v. Trump Old Post Office, LLC*, No. 17-731, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) (declining to reach constitutional defenses where plaintiff's claims failed on the merits).  I, accordingly, turn to the merits of each of Plaintiffs' common law claims against PCPC.

### 1. Common Law Negligence

To succeed on a negligence claim under both New Jersey and District of Columbia law, a plaintiff "must show: (1) that defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth*, 22 A.3d at 793; *see also Kubert*, 432 N.J. Super .at 508 ("In a lawsuit alleging that a defendant is liable to a plaintiff because of the defendant's negligent conduct, the plaintiff must prove four things: (1) that the defendant owed a duty of care to the plaintiff, (2) that the defendant breached that duty, (3) that the breach was a proximate cause of the plaintiff's injuries, and (4) that the plaintiff suffered actual compensable injuries as a result.").  The existence of a duty is a threshold question and "is essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Hedgepeth*, 22 A.3d at 793. (quoting *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984)).  The question of whether a duty exists is a question of law. *Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 55 (D.D.C. 2012); *see also Kubert*, 432 N.J. Super. at 508 ("Whether a duty of care exists 'is generally for a

court to decide,' not a jury." (quoting *Acuna v. Turkish*, 192 N.J. 399, 413 (2007)).

Generally, "courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the [plaintiff] in a negligence action and examine whether the risk to the [plaintiff] was 'reasonably foreseeable' to the defendant." *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 175 (D.D.C. 2017) (alterations in original) (quoting *Hedgepeth*, 22 A.3d at 793); *see also Velluci v. Allstate Ins. Co.*, 431 N.J. Super. 30, 55–56 (App. Div. 2013). Thus, "[t]he relationship between the plaintiff and defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty." *Hedgepeth*, 22 A.3d at 794.; *see also Acuna*, 132 N.J. at 414 (noting that, under New Jersey law, the relationship of the parties is an important consideration in determining the existence of a defendant's duty). However, a court's determination of whether defendant owes a duty to plaintiff must take into account a variety of other considerations, including "considerations of fairness," and "results ultimately from policy decisions made by the courts and legislatures." *Bradley*, 249 F. Supp. 2d at 175 (quoting *Jefferson v. Collins*, 905 F. Supp. 2d 269, 291 (D.D.C. 2012)); *see also Acuna*, 192 N.J. at 414 ("The fairness and public policy considerations involve weighing several factors: 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" (quoting *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 573 (1996))).

Here, Plaintiffs contend that PCPC has a duty to consumers by virtue of working with the cosmetics industry to create and publish industry standards to test talc products for asbestos and other harmful heavy metals. (*See* Pls. Opp. Br., at 41–43.) Plaintiffs maintain that these standards, which are prefixed with "CTFA" (PCPC's former name), "have been used by the cosmetics industry to assure . . . consumers and the government that talc was free of asbestos and did not

18

contain harmful levels" of other heavy metals.  (*Id.*)  Plaintiffs further argue that PCPC undertook a duty to consumers by publishing the *International Cosmetic Ingredient Dictionary and Handbook*, which provides uniform names and definitions for cosmetic ingredients using a system developed by PCPC, and by establishing the CIR.  (*Id.* at 42.)  Finally, in support of their duty argument, Plaintiffs point to the PCPC website, which states that PCPC's goal "remains to help consumers make informed decisions and have confidence in the products they use each day."  (Pls.' SUMF, Ex. 82.)  In sum, Plaintiffs argue that "PCPC accepted a duty to consumers to regulate the cosmetic industry, create testing standards, publish definitions and standards, and substantiate the safety of cosmetics ingredients—including talc."  (Pls. Opp. Br., at 43.)

PCPC, however, maintains that it had no duty to consumers as it lacked governmental authority to regulate cosmetics and that the FDA, instead, "regulates the manufacture and sale of talc products."  (Moving Br., at 14; *see also* Pls.' Resp. to PCPC SUMF ¶ 7 (conceding that the FDA "has general regulatory authority over cosmetics").)  Moreover, PCPC asserts that Plaintiffs' contention that PCPC self-regulates the cosmetics industry is unsupported by the evidence. (Moving Br., at 14–15.)  In that regard, PCPC highlights that Plaintiffs have presented "no evidence that PCPC ever agreed to test the J&J products or that FDA expected PCPC to test J&J products."  (Reply Br., at 25.)

There is limited case law in the District of Columbia on the question of whether a voluntary trade association that establishes voluntary product standards owes a duty of care to the product's users.  However, in one example, *Murray v. Motorola, Inc.*, No. 01-8479B, 2011 WL 2885872 (D.C. Super. Ct. July 14, 2011), the District of Columbia Superior Court considered whether a telecommunications trade association that established and enforced safety standards for cell phones had a duty of care to consumers.  The trade association in *Murray*, among other things,

funded research into the safety of cell phones, created safety standards for testing cell phones, and permitted cell phone manufacturers to place its "seal of approval" on cell phones it approved. *Id.* at *25. Accordingly, the court found that it could "reasonably be inferred from the complaint that the cell phone manufacturers did not sell cell phones unless they had been tested and approved by [the trade association], and the public was made aware that [the trade association] had approved them." *Id.* Based on those factual allegations, the court determined that the trade association exercised control over the manufacture of cell phones because, without its "certification that a manufacturer's cell phone met [the trade association's] safety standard, [which was] enforced by its testing, the manufacturer could not reasonably expect that consumers would buy it." *Id.* at 26. Further, the *Murray* Court found that it was reasonably foreseeable that "harm could result to a consumer from cell phones that it certified as safe but were not safe." *Id.* In other words, because the trade association's members "allow[ed] [the association] to control the safety of their cell phones by letting it test and certify them under its own standards, [the trade association] has 'undertaken to perform a duty owed [by the manufacturers to the plaintiffs],' and should bear the responsibility should a consumer be injured by an unsafe cell phone." *Id.* (last alteration in original) (quoting *Restatement (Second) of Torts* § 324A(b)).

The case law in New Jersey on this issue is more developed. The New Jersey Supreme Court considered the duty owed to consumers by a voluntary trade association in *Snyder v. American Association of Blood Banks*, 144 N.J. 269 (1996). There, a blood transfusion recipient who contracted Acquired Immune Deficiency Syndrome ("AIDS") after receiving blood contaminated with Human Immunodeficiency Virus ("HIV"), asserted a negligence claim against the American Association of Blood Banks ("AABB"), a voluntary trade association of blood banks. *Id.* at 273. The AABB developed and recommended standards for the practice of blood

banking, engaged in lobbying activities and, notably, inspected and accredited its member institutions. *Id.* at 277. The New Jersey Supreme Court held that the AABB owed the public a duty of care based on the "considerable influence" it exerted "over the practices and procedures over its member banks" and the foreseeable risk that blood transfusions could spread the AIDS virus. *Id.* at 293–94. Further, the *Snyder* Court found that the AABB was "not a mere advisory body," as it instructed "its member banks how to screen, obtain, and distribute blood," and the United States Department of Health required blood banks to meet the AABB standards for the bank to be licensed. *Id.* at 297. Based on the AABB's governance over blood banks, the *Snyder* Court found that "the imposition of liability on [it] is both fair and reasonable." *Id.* at 307. Conversely, in *Myers v. Donatucci*, a New Jersey trial court determined that a pool safety trade association "owe[d] no duty to the general public who may use products manufactured and/or installed by its members" where the trade association promulgated only voluntary minimum standards for installation and maintenance of swimming pools. 220 N.J. Super. 73, 81–82 (Law Div. 1987). Notably, in *Myers*, the court determined that the trade association had little control over its members and had no way of enforcing its safety standards. *See id.* at 82–83. *Myers*, decided before *Snyder*, has not been disturbed since the issuance of the *Snyder* decision.

Other jurisdictions have determined that a trade association has no duty to the general public where the trade association established voluntary safety standards for an industry and had no control over its members' products. *See, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d at 798–800; *Sizemore v. Georgia-Pacific Corp.*, Civ. Nos. 94-2894, 94-2895, 94-2896, 1996 WL 498410, at *8 (D.S.C. Mar. 8, 1996) (finding that hardwood plywood trade association "owed no duty of care to the plaintiffs with respect to hardwood plywood paneling manufactured by one of its members"); *Beasock v. Dioguardi Enters., Inc.*, 130 Misc.2d 25, 31 (N.Y. Sup. Ct.

1985) (granting summary judgment in favor of tire trade association where "it [was] clear that it had neither the duty nor the authority to control what the manufacturers produced").

Distilling the relevant precedent from both New Jersey and the District of Columbia, it is clear that under both New Jersey and District of Columbia law, a trade association may be found to owe a legal duty to the general public where the trade association is able to exert control over its members and enforce its safety standards and regulations. Indeed, in *Murray*, the D.C. Superior Court observed that "courts have seen the association's degree of control over the implementation of the standard as a significant factor" in determining whether the trade association owes a legal duty to the general public. 2011 WL 2885872, at *25. The degree of control similarly played a substantial role in the *Snyder* and *Myers* decisions. *See Snyder*, 144 N.J. at 307; *Myers*, 220 N.J. Super. at 82–83.

Here, Plaintiffs contend that PCPC undertook a duty to the general public by (1) publishing standards for testing talc for the presence of asbestos that have been widely used by the cosmetics industry; (2) publishing the *International Cosmetic Ingredient Dictionary and Handbook*, which provides uniform names and definitions for cosmetic ingredients that are used by both the industry and the government; (3) establishing the CIR in an effort to self-regulate the cosmetics industry; and (4) recognizing to duty to help consumers make informed decisions regarding cosmetic products. First, PCPC's publication of testing standards and ingredient definitions did not create any legal duty to the general public. There does not appear to be any requirement that cosmetics companies utilize PCPC's testing standards for talc in order to manufacture and sell their products. In fact, during the *Daubert* proceedings in this MDL, there is significant dispute over the methods that should be used to test talc for asbestos. *See In re Johnson & Johnson Prods. Liab. Litig.*, ___ F. Supp. 3d ___, 2020 WL 8968851, at *17–25 (D.N.J. Apr. 27, 2020). Further, Plaintiffs fail to

explain how publishing definitions of cosmetic ingredients somehow warrants the safety of those ingredients sufficient to create a duty to the general public.

Plaintiffs' arguments regarding PCPC's creation of the CIR similarly fail to demonstrate that PCPC undertook a legal duty to consumers. The CIR was established by PCPC in 1976 and is describes itself as "a unique endeavor by the industry to thoroughly review and assess the safety of cosmetic ingredients in an unbiased and expert manner." (Pls.' Opp., Ex. 47, at 5.) In that regard, the CIR selects an Expert Panel that reviews and assesses ingredient safety data and, following scientific review and a public comment period, issues a Final Report with its conclusion as to the safety of each ingredient examined. (*See id.*) These conclusions are later published in a compendium that presents summary information on the ingredients reviewed by the expert panel and provides the rationale for each conclusion. (*Id.* at 6; *see also* Pls.' Opp., Ex. 52, at 14.)

Plaintiffs contend that "the CIR is a fundamentally flawed, regulatory review panel that merely rubber stamps the safety of ingredients used by the cosmetic industry." (Pls.' Reply Br., at 42.) In that regard, Plaintiffs maintain that PCPC, through the CIR, "reviewed and determined" talc to be safe for use by consumers.[7] (Pls.' SUMF ¶ 15.) However, absent from Plaintiffs' allegations and evidence with respect to the CIR is any indication that the CIR has any enforcement power over the ingredients added to cosmetic products. For example, Plaintiffs present no

---

[7]    Plaintiffs' briefing contains a lengthy discussion of the alleged deficiencies of the CIR. However, Plaintiffs' Statement of Undisputed Material Facts includes limited information on how the CIR determines the safety of cosmetic ingredients or, more specifically, how the CIR determined talc to be safe for use. (*See* Pls. SUMF ¶¶ 2, 11–13, 15, 25.) This Court is not obligated to "search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact." *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140, 145–46 (3d Cir. 2014). My analysis of whether the creation of CIR created a legal duty to consumers, therefore, rests solely on the facts properly included in Plaintiffs' Statement of Undisputed Material Facts pursuant to Federal Rule of Civil Procedure 56(c)(1)(A).   *See* Fed. R. Civ. P. 56(c)(1)(A).

evidence that would suggest that if the CIR determines that an ingredient is unsafe for use, manufacturers must cease using that ingredient. Such power rests solely with the FDA, which may take the CIR's conclusion on a cosmetic ingredient under advisement, but the agency does not always adopt those conclusions. (*See* Dep. Of Linda Loretz, Ph.D. (PCPC Executive), PCPC Resp. to Pls.' SUMF, Ex. I (testifying that the "FDA has consistently said that they take into account CIR conclusions" but that it does not always adopt CIR's findings)); s*ee* 21 C.F.R. § 740.1. Rather, the safety conclusions provided by the CIR constitute voluntary guidance that manufacturers and the FDA may take into consideration, but are in not required to adopt. The issuance of such voluntary guidance cannot create a legal duty of care to the general public. *See, e.g.*, *Myers*, 220 N.J. Super. at 82–83; *see also In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d at 798–800; *Sizemore*, 1996 WL 498410, at *8; *Beasock*, 130 Misc.2d at 31. Indeed, unlike in *Murray* and *Snyder*, Plaintiffs do not proffer any evidence that the CIR inspected any of, for example, the Johnson & Johnson Defendants' talc powder products and approved them for use by consumers. Nor did the CIR have any enforcement power to ensure that talc-based products complied with CIR's safety recommendations. Rather, the CIR provides only voluntary guidance that cosmetic manufacturers and the FDA may take in account.

Nor does the statement on PCPC's website that its goal is to "help consumers make informed decisions and have confidence in the products they use each day," establish any legal duty to consumers. As a number of courts have explained, "public statements espousing aspirational goals, statements of generic intent, or statements vowing or acknowledging that it has a duty" do not "constitute promises that would create a legal duty based on a voluntary undertaking." *McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 741–42 (M.D.N.C. 2016); *see also Doe 30's Mother v. Bradley*, 58 A.3d 429, 455 (Del. Super. Ct. 2012) ("[A]

statement of aspirational goals that an organization's members will strive to uphold does not meet the prerequisites for even the most minimal of recognized undertakings—a mere promise. . . . No legal duty arises from these statements that would be owing to anyone."); *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998) (finding that "vaguely promissory statements to the general public" did not create any legal duty because "[p]recatory statements and generic expressions of intent such as these do not create legal duties"); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997) (observing that Texas law does not recognize any legal "duty based upon corporate statements or advertising"). In other words, a vague statement of PCPC's aspirational duty to consumers on its website does not create a legal duty.

In sum, I find that PCPC does not have a legal duty to consumers to ensure that its members' products are safe for consumer use. PCPC is a voluntary trade association that has no control over the ingredients used by cosmetic manufacturers. PCPC is in no way involved in the manufacture of cosmetic products, like talcum powder, and it does not purport to test its members' products for safety and warrant that safety to the general public. In that regard, it is not foreseeable to PCPC that harm could result to a consumer from use of specific talc products sold by its member manufacturers. Indeed, PCPC did not test each member's specific products, nor did it certify those products as safe. *Compare Murray*, 2011 WL 2885872. Rather, PCPC provided general guidance to the cosmetics industry and the FDA alike regarding the safety of talc and PCPC exercised no control over whether that guidance was adopted, followed, or enforced. As such, PCPC does not have a legal duty of liability should a consumer be injured by talc powder products.

Because PCPC owes no legal duty to Plaintiffs, they cannot proceed with a negligence claim against it. Summary judgment is, therefore, granted in PCPC's favor on Plaintiffs'

negligence claims.

## 2. Common Law Fraud and Fraudulent Concealment

Under both District of Columbia and New Jersey law, "[t]he essential elements of common law fraud are: (1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the misrepresentation." *Busby*, 772 F. Supp. 2d at 275 (D.D.C. 2011) (alteration in original) (quoting *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n.22 (D.C. 2008)); *Perry v. Gold & Laine, P.C.*, 371 F. Supp. 2d 622, 627 (D.N.J. 2005) ("In order to establish a claim for common law fraud under New Jersey law, one must show: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). Relatedly, the elements of a fraudulent concealment claim are: "(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) the failure to disclose that fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's concealment." *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 75 (D.D.C. 2012); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 305 (D.N.J. 2009). Further, to prevail on either a common law fraud or fraudulent concealment claim, "the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation." *Howard Univ.*, 857 F. Supp. 2d at 75. (quoting *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998)).

In this case, Plaintiffs have presented voluminous documentary evidence that they argue contains numerous allegedly fraudulent misrepresentations made by PCPC since its formation in the 1970s. For example, Plaintiffs contend that PCPC and the Talc Task force made numerous

false statements that cosmetic talc is "carefully produced" and "examined to ensure its freedom from asbestos fibers," (Pls. Opp. Br., at 45), and that no scientific study has demonstrated a connection between use of talc and ovarian cancer, (*id.* at 46–48). While Plaintiffs focus on these allegedly fraudulent misrepresentations, they include no evidence that any plaintiff *relied* on PCPC's misrepresentations. Instead, Plaintiffs contend that it is "evident that Plaintiffs detrimentally relied on assertions by PCPC (including the CIR) that talc was safe because they remained unaware of the safety concerns with talc due to PCPC['s] fraudulent statements and omissions and continued to use products containing talc." (Pls.' Opp. Br., at 50.) Indeed, PCPC argues that Plaintiffs have failed to show either that it made fraudulent misrepresentations in its lobbying efforts, that it knew of the falsity of any statement, or that any plaintiff detrimentally relied on PCPC's allegedly false statements.

The question of whether PCPC made a false representation regarding the safety of talc cannot be resolved on summary judgment because the science on that question is unsettled.[8] Putting that question aside, however, both Plaintiffs' fraud and fraudulent concealment claims fail because Plaintiffs have failed to demonstrate detrimental reliance. Under both New Jersey and District of Columbia law, "[a] plaintiff may recover for a defendant's fraudulent statement only if *the plaintiff* took some action in reliance on that statement." *Busby*, 772 F. Supp. 2d at 276 (alteration in original) (quoting *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 22–23 (D.C. Cir. 2008)); *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000) ("The actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove

---

[8]     Of course, the question of whether use of talc powder products can cause ovarian cancer is greatly disputed in this MDL proceeding. In that regard, to succeed on their fraud claims, Plaintiffs would need to show not only that (1) PCPC misrepresented the research regarding the connection between talc use and ovarian cancer, but also (2) that PCPC knew that use of talc could cause ovarian cancer.

that he or she was deceived by the misstatement or omission.") *see also Howard Univ.*, 857 F. Supp. 2d at 75 (noting that reliance is an essential element of a fraudulent concealment claim). Simply put, both Plaintiffs' Complaint and Opposition to this Motion are devoid of any allegations, let alone evidence, that any plaintiff was aware of the existence of PCPC, that any plaintiff relied on any statement made by PCPC in choosing to use the Johnson & Johnson Defendants' talcum powder products, or that she purchased talc because PCPC represented that those products were safe to use.  Indeed, the Court has not been presented with any deposition testimony to suggest that any individual plaintiff knew that PCPC existed or otherwise relied on any statement made by PCPC regarding the safety of talc powder products.  Nor have Plaintiffs submitted any affidavit from any plaintiff to suggest that she understood the Johnson & Johnson Defendants' talcum powder products to be safe based on statements made by PCPC or CIR.  This complete lack of evidence to show detrimental reliance is a death knell to Plaintiffs' fraud claims against PCPC. *See, e.g.*, *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 109 (D.D.C. 2013) (granting summary judgment where plaintiff did "not provide[] evidence that she acted in reliance on [the] alleged misrepresentation"); *Smith v. Brown & Williamson Tobacco Corp.*, 108 F. Supp. 2d 12, 17–18 (D.D.C. 2000) (granting summary judgment on fraud claim against cigarette advertiser where plaintiff failed to present any evidence that she "rel[ied] on defendants' nondisclosure of information in making decisions with respect to cigarette smoking"); *U.S. for Use & Benefit of DMI, Inc. v. Darwin Const. Co.*, 750 F. Supp. 536, 542 (D.D.C. 1990) (granting summary judgment on fraud claim where there was "no evidence to suggest that DMI acted in reliance on Darwin's alleged misrepresentations"); *Kuhnel v. CNA Ins. Cos.*, 322 N.J. Super. 568, 571 (App. Div. 1999) (affirming trial court's dismissal of fraud claims where "plaintiffs made no showing of detrimental reliance").  Accordingly, PCPC's motion for summary judgment is granted on

Plaintiffs' fraud claims.

### 3. Civil Conspiracy

The elements of a civil conspiracy claim under District of Columbia and New Jersey law are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva*, 637 A.2d at 848 (D.C. 1994); *Banco Popular N. Am.*, 184 N.J. at 177 ("In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'"). Civil conspiracy is not an independent action but rather "a means for establishing vicarious liability for the underlying tort." *Weishapl v. Sowers*, 771 A.2d 1014, 1023–24 (D.C. 2001) . In other words, "[p]erformance of the underlying tort, pursuant to an agreement, give[s] rise to a civil conspiracy claim." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 73 (D.D.C. 2005); *Banco Popular N. Am.*, 184 N.J. at 178.

Plaintiffs' civil conspiracy claim against PCPC is premised on its alleged underlying tortious acts of fraud.[9]  However, as I determined above, Plaintiffs have not met their burden of showing that there is a genuine dispute of material fact on their fraud claims, because Plaintiffs have failed to prove an essential element of their claim: reliance. Because Plaintiffs have failed to show that PCPC committed an underlying tortious act, Plaintiffs cannot proceed with a civil

---

[9]     Even if Plaintiffs had established a genuine dispute of material fact with respect to their negligence claim, negligence cannot serve as a predicate for a conspiracy claim because conspiracy requires the commission of an unlawful act or a lawful act committed for an unlawful purpose. *See Chen v. Dist. of Columbia*, 256 F.R.D. 267, 273 n.5 (D.D.C. 2009) (observing that plaintiff could not rely on negligence claim to support conspiracy claim).

conspiracy claim against PCPC.  *See Banneker Ventures. LLC v. Graham*, No. 13-391, 2016 WL 1304834, at *1 n.2 (D.D.C. Mar. 31, 2016) ("Without an underlying tort claim against WMATA, the civil conspiracy claim against WMATA fails."); *District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 533 (D.N.J. 2011) ("Under New Jersey law, a claim for civil conspiracy cannot survive without a viable underlying tort . . . ."); *see also Herron v. Fannie Mae*, No. 10-943, 2016 WL 1177918, at *30 (D.D.C. Mar. 8, 2016) (granting summary judgment on civil conspiracy claim where plaintiff "failed to establish a cognizable underlying tort—namely, an intentional interference claim or wrongful termination claim"); *Bank of N.Y. Mellon Trust Co. N.A. v. Henderson*, 107 F. Supp. 3d 41, 48 (D.D.C. 2015) (dismissing civil conspiracy counterclaim where defendant failed to state a claim for underlying fraud counterclaim); *Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42–43 (D.D.C. 2013) (dismissing civil conspiracy claim where plaintiffs failed to allege underlying fraudulent act); *Daisley*, 372 F. Supp. 2d at 73 ("Because the court dismisses [plaintiff's] intentional interference with employment claim, there is no longer an 'underlying tortious act' to support his claim of civil conspiracy against Roane.").  Summary judgment is therefore granted on this claim.

## IV.   CONCLUSION

For the foregoing reasons, PCPC's Motion for Summary Judgment is **GRANTED**.  An appropriate Order accompanies this Opinion.

DATED:  June 16, 2021                    /s/ Freda L. Wolfson
                                         Freda L. Wolfson
                                         U.S. Chief District Judge