## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

**IN RE:  JOHNSON & JOHNSON**
**TALCUM POWDER PRODUCTS**
**MARKETING, SALES**
**PRACTICES, AND PRODUCTS**
**LIABILITY LITIGATION**

MDL No. 2738 (FLW) (LHG)

## SPECIAL MASTER OPINION AND ORDER NO. 5
## (ADDRESSING PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PRIVILEGE
## ASSERTIONS)

This matter is before the Special Master ("SM") on plaintiffs' challenge to Johnson &

Johnson's ("J&J") privilege claims as to approximately 140 documents.[1]  In addition to extensively

reviewing the subject documents in camera, the SM received J&J's supporting papers which

included the Declarations of Richard T. Bernardo, Esquire, outside counsel for J&J, and Kimberly

Montagnino, former Director of Global Issues Management for JJCI and, since April of 2020,

Director of Global Corporate Media Relations for J&J.  J&J supplemented its submission with

Declarations and Affidavits from three in-house counsel who worked on the defense of talc

litigation:  John Kim, Andrew C. White, and John O'Shaughnessy.  In addition, the SM received

plaintiffs' opposition and recently held oral argument.[2]  For the reasons to be discussed, J&J's

privilege assertions are sustained in part and overruled in part.[3]

---

[1] Although only 140 documents are presently at issue, plaintiffs contend these documents are representative of a larger group of alleged privileged documents they are challenging. The SM's present rulings will be used as a "guide" for the larger group of challenged documents. The defendants are Johnson & Johnson and Johnson & Johnson Consumer Inc. ("JJCI"), collectively referred to as "J&J."

[2] The citation to the transcript of the oral argument will be abbreviated "Tr.".

[3] Although the SM overrules a number of J&J's privilege objections, it does not question that the objections were made in good faith.

BACKGROUND

By way of brief background, this MDL concerns plaintiffs' claim that the prolonged perineal use of J&J's talcum powder causes ovarian cancer.  J&J has litigated cases for decades involving whether the talc in J&J's Baby Powder ("JBP") contained asbestos and if the product causes cancer.   J&J steadfastly denies these allegations. J&J's early talc cases involved mesothelioma. This MDL involves claims arising from ovarian cancer. Approximately 35,000 complaints have been filed to date in this MDL with more filed every day.  Until fairly recently the parties' discovery focused on expert causation and Daubert issues.  Now that the primary Daubert issues have been decided, the parties turned their attention to discovery in the bellwether cases scheduled for trial in 2022.

Plaintiffs are challenging J&J's privilege assertions as to approximately 1,300 documents plus redactions. The challenged documents were selected by plaintiffs as a representative sample, although J&J contests whether the selected documents are truly representative. J&J supplied a copy of each document to the SM for its in camera review along with a narrative summary as to why each document should be protected. The narratives were supplied to plaintiffs, who also served a document-by-document explanation of why J&J's documents are not protected.[4]

J&J claims its documents are protected by the attorney-client privilege and work-product doctrine.[5]  Plaintiffs divided the challenged documents at issue into the following five categories:

---

[4] Since the documents at issue were selected from a larger universe of challenged documents, they are not homogenous in the sense that they cover a discrete time period or subject matter.  J&J's documents date from as early as 1966 to as late as 2020. The documents cover a wide variety of topics with few common themes. The variation in J&J's documents necessitated a time-consuming review of their contents. If future reviews are necessary the SM expects they will be reviewed more expeditiously.

[5] The SM was only tasked with addressing whether J&J's documents are privileged.  Thus, the SM is not addressing whether J&J's documents are "relevant" to a claim or defense in the case for discovery purposes or whether the documents meet the proportionality standard set forth in Federal Rule of Civil Procedure 26(b)(1).

-2-

(1) documents where no attorneys are identified in the logged document; (2) documents where an attorney was only carbon copied on a document; (3) documents gathering information requested by lawyers to allegedly facilitate the provision of legal advice; (4) documents involving communications with third parties, and; (5) business and technical communications.[6]

This Opinion and Order will be organized in the following manner:  First, the SM will summarize the general attorney-client and work-product principles to be applied.  Second, the SM will separately discuss specific issues that permeate the parties' dispute.  Third, the SM will rule on J&J's privilege assertions.  Last, in an effort to hopefully assist the parties with resolving any remaining privilege disputes, the SM will summarize its holdings to give guidance to the parties as to the principles the SM will apply if asked to rule on additional challenges.  The SM will only specifically discuss its rulings as to the documents where J&J's privilege assertions are overruled.  To the extent a document is not specifically mentioned the SM sustains J&J's privilege assertion.

**LEGAL DISCUSSION**

**I.     GENERAL ATTORNEY-CLIENT AND WORK-PRODUCT PRINCIPLES**

J&J claims its documents are protected by the attorney-client privilege and work-product doctrine.  The generally applicable principles that guide the SM's analysis are straightforward and are largely noncontroversial.  See generally In re Riddell Concussion Reduction Litigation, C.A. No. 13-7585 (JBS/JS), 2016 WL 7108455 (D.N.J. Dec. 5, 2016).  Nevertheless, some important points will be emphasized.

**A.     Attorney-Client Privilege**

As to the attorney-client privilege, a statement is not protected simply because it was made by or to an attorney.  Id. at *3.  Thus, merely copying an attorney on a document does not

---

[6] Some of the challenged documents undoubtedly fit into more than one category.

automatically immunize a document from discovery.  Id. (citing cases).  Similarly, a document may be privileged even if an attorney is not included.  Id. at *5 ("[S]imply sharing documents amongst corporate employees does not necessarily vitiate a privilege.  These communications remain privileged if they assist the attorney to formulate and render legal advice.").

An attorney who is not performing legal services or relaying legal advice does not qualify for the privilege.  Payton v. N.J. Tpk. Auth., 691 A.2d 321, 334 (N.J. 1997) ("An attorney who is not performing legal services or providing legal advice in some form does not qualify as a 'lawyer' for purposes of the privilege."); see also Rowe v. E.I. Dupont de Nemours & Co., C.A. Nos. 06-1810 and 06-3080 (RMB/AMD), 2008 WL 4514092, at *8 (D.N.J. Sept. 30, 2008). Further, it is well-settled that business advice is not protected by the attorney-client privilege.  Id. (noting that modern in-house counsel are involved in all aspects of the company they work for and that "in-house legal counsel participates in and renders decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues") (quoting In re Vioxx Prod. Liab. Litig., 501 F. Supp. 2d 789, 797 (E.D. La. 2007)).  Moreover, the Supreme Court has written that the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  Fisher v. U.S., 425 U.S. 391, 403 (1976).

It is axiomatic that the attorney-client privilege applies to in-house counsel.  However, since in-house counsel often participates in and renders decisions about business issues, it is often times difficult to apply the privilege.  Riddell, at *4; see also Payton, 691 A.2d at 334 ("[A] fine line exists between an attorney who provides legal services or advice to an organization and one who performs essentially nonlegal duties.").  In instances of mixed communication the SM must determine "whether the primary purpose and content of the [communication] is predominately

legal." Rowe, 2008 WL 4514092, at *11 (overruling privilege objection to a document because it did not reflect the exercise of predominately legal as opposed to business advice).[7]  Thus, in order to resolve the privilege disputes implicated here, it is essential to assess the purpose for which J&J's documents were prepared and the reasons and purpose behind any responsive comments.  In the present context this was primarily done by reviewing the language of the challenged documents and responses and the context in which they were prepared.

Many of the challenged documents involve a determination of whether documents sent to or from in-house counsel address legal issues, business issues, or both.  This is not an easy task since "in the corporate community, legal advice is often intimately intertwined with and difficult to distinguish from business advice." Leonen v. Johns-Manville, 135 F.R.D. 94, 98-99 (D.N.J. 1990) (internal citation and quotation marks omitted). Only if an attorney is acting as a lawyer giving advice with respect to the legal implications of a proposed course of conduct does the privilege apply.  Riddell, at *4.  However, if a communication is made primarily for the purpose of obtaining legal advice, an incidental request for business advice does not void the attorney-client privilege.  Id. Quoting an instructive opinion, Harrington v. Freedom of Information Commission, 144 A.3d 405, 416 (Conn. 2016), the SM has written:

> There is broad consensus in other jurisdictions that, if the non-legal aspects of the consultation are integral to the legal assistance given and the legal assistance is the primary purpose of the consultation, both the client's communications and the lawyer's advice and assistance that reveals the substance of those communications will be afforded the protection of the privilege.

---

[7] In lieu of the "primary purpose" test for mixed communications some courts use a "but for" test.  See, e.g., Graco, Inc. v. PMC Global, Inc., C.A. No. 08-1304 (FLW), 2011 WL 666048, at *16 (D.N.J. Feb. 14, 2011) ("[T]he party claiming privilege should demonstrate that the communication would not have been made but for the client's need for legal advice or services.") (citations and quotations omitted); see also U.S. v. ISS Marine Services, Inc., 905 F. Supp. 2d 121, 128 (D.D.C. 2012).  As a practical matter the same result occurs under both formulations.

Riddell, at \*5. Factors to be considered to determine the primary purpose of a mixed communication include:  (1) the context of the communication and the content of the document;  (2) whether the legal purpose permeates the document and can be separated from the rest of the document, and;  (3) whether legal advice is specifically requested and the extent of the recipient list. Id. (citation omitted).  "Judicial scrutiny should focus on the nature of the relationship between in-house counsel and others and the type of information or communication involved."  Id.

Many of the documents at issue involve communications between J&J and its outside public relations consultants.  The SM addressed confidentiality in this context in Riddell.  Even in the absence of an attorney, these communications may be privileged if they are necessary for the client to obtained informed legal advice.  Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991) ("[C]ourts have held that the client may allow disclosure to an 'agent' assisting the attorney in giving legal advice to the client without waiving the privilege."); see also O'Boyle v. Borough of Longport, 94 A.3d 299, 309 (N.J. 2014) ("The privilege . . . . extends to consultations with third parties whose presence and advice are necessary to the legal representation."); In re Grand Jury, 705 F.3d 133, 160 (3d Cir. 2012) ("'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation.") (quoting In re Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007), as amended (Oct. 12, 2007)).

The last general point to emphasize is that facts are discoverable but the legal conclusions flowing from those facts are protected. See, e.g., Rhone-Poulenc Rorer Inc. v. Home Indem. Co. 32 F.3d 851, 864 (3rd Cir. 1994).  "A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer."  Id.

**B.**     **Work-Product Doctrine**

In order for documents to be protected from discovery pursuant to the work-product doctrine, "it must be reasonably clear based on the surrounding facts and the nature of the materials that they were in fact prepared or obtained because of pending or anticipated litigation." Reich v. Hercules, Inc., 857 F. Supp. 367, 373 (D.N.J. 1994).  Documents prepared in the regular course of business are not protected. U.S. v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990).  Documents created for other purposes that are useful in subsequent litigation are also not work-product. In re: Gabapentin Pat. Litig., 214 F.R.D. 178, 184 (D.N.J. 2003).  Thus, a party seeking to invoke the work-product doctrine must prove at least the following two elements: first, that a document was prepared because of reasonably anticipated litigation; and second, that the material was prepared because of the prospect of litigation and for no other purpose. Id. at 183-84.

Whether a document was prepared in anticipation of litigation is a difficult determination. Id.  In general, however, a party must show more than a "remote prospect, an inchoate possibility, or a likely chance of litigation." Id. at 183 (citations and quotation marks omitted).  "[A] party must show that there existed an identifiable specific claim of impending litigation when the materials were prepared." Id. (citation and quotation marks omitted). The "dominant purpose" in preparing the document must be the concern about potential litigation and the concern must be "objectively reasonable." Littlejohn v. Vivant Solar, C.A. 16-9446 (NLH/JS), 2018 WL 6705673, at *2 (D.N.J. Dec. 10, 2018). The mere involvement of an attorney does not, in and of itself, evidence that a document was prepared in anticipation of litigation. Id.  Documents created for other purposes that prove useful in subsequent litigation are not attorney work-product. Gabapentin, at 184. To be sure, however, a document may be protected by the work-product doctrine even though it was not prepared by an attorney. For example, the work-product doctrine

may apply even if a document was prepared by a party's agent. United Coal Cos. v. Powell Const. Co., 839 F.2d 958, 966-67 (3d Cir. 1988).

## II.   DISCUSSION OF SPECIFIC ISSUES

A number of specific issues permeate the SM's analysis. These issues will be separately discussed.

### A.   Burden of Proof

It is unquestionably the case that J&J has the burden of proving that the attorney-client privilege and/or work-product doctrine applies. See, e.g., Johnson v. Ford Motor Co., C.A. No. 13-06529, 2015 WL 5193568, at *3 (S.D. W.Va. Sept. 3, 2015). J&J must make this showing with a "specific demonstration of facts supporting the requested protection[.]" Id. (citation omitted). J&J has attempted to satisfy its burden by serving supporting Declarations. However, the SM does not give much weight to the portions of the Declarations that include overbroad and general conclusory statements.[8] As the SM previously noted, it is not the case that the SM must accept at face value all averments in an affidavit. In re Valsartan, C.A. No. 19-2875 (RBK/JS), 2021 WL 75258, at *5 (D.N.J. Jan. 8, 2021). To be sure, however, the SM is not limited to just the four corners of J&J's documents to decide if they are protected. Importantly, J&J's documents will be examined as a whole in the context in which they were prepared. See Baines v. Atlanta, C.A. No. 19-2079-TWT-JSA, 2020 WL 10058115, at *1 (N.D. Ga. Oct. 2, 2020); Chemtech Royalty Assocs., L.P. v. U.S., C.A. No. 06-258-RET-DLD, 2009 WL 854358, at *5 (M.D. La. March 30, 2009); see also Lugosch v. Congel, C.A. No. 1:00-CV-0784, 2006 WL 931687, at *14

---

[8] For example, O'Shaughnessy's October 18, 2020 (¶7) Affidavit avers, "[a]ll of my legal work, including but not limited to my legal work involving talcum powder products, reflected or related to my mental impressions, thoughts, conclusions, opinions, advice, and legal theories." Kim's June 11, 2021 Declaration (¶4) states that to the extent any of the attorneys in J&J's product liability group were interested in talcum powder, "it was in connection with providing legal review and advice . . . . or to obtain information . . . . attorneys needed to render legal advice . . . . and to defend the company against talcum powder litigation."

(N.D.N.Y. March 7, 2006) ("Because of the duality of the [in-house counsel's} advice, a court must assume the very complicated task of inquiring into the subject matter of the communications in order to determine its true character….To this extent, a court may have to parse not only the words but their intent in order to glean the authentic purpose of the communication.").

### B.   Alleged Inadequacies in J&J's Privilege Log

Much of plaintiffs' argument is focused on the contention that J&J's privilege log is deficient and, therefore, its privilege assertions should be waived.  The SM will not deem J&J's privilege assertions to be waived on this ground.  Plaintiffs did not previously raise with the SM the argument that J&J's log was deficient.  It would be inequitable to apply a wavier where J&J did not have an opportunity to contest plaintiffs' assertions and where J&J did not have an opportunity to cure the alleged defects.  Further, only a flagrant violation of the rules regarding the details of a privilege log should result in a waiver.  Universal Standard Inc. v. Target Corp., 331 F.R.D. 80, 85 (S.D.N.Y. 2019).  This is certainly not the case here.  In an effort to prevent further delay in this MDL, the SM will address the merits of J&J's privilege assertions without further briefing and supplementation of its privilege log.

### C.   Role of J&J's In-House Litigation Counsel

The parties' most significant dispute involves the role of J&J's in-house counsel, especially John O'Shaughnessy, Esquire.  O'Shaughnessy was employed as in-house litigation counsel for J&J from 1987 to 2018 and played a key role in J&J's defense over the years. At various times during his long employment with J&J O'Shaughnessy had the responsibility of overseeing J&J's talc litigation. Plaintiffs contend that at times O'Shaughnessy played a dual legal and business role and, therefore, not all of his documents are protected.  J&J contends that O'Shaughnessy only played a legal role and that everything he did was with an eye towards defending J&J's talc litigation.  Having the benefit of an extensive record on this dispute, the SM disagrees with

-9-

plaintiffs that O'Shaughnessy and other attorneys in J&J's litigation group played a business or scientific role with regard to talc.[9]

The SM has been presented with an extensive record regarding O'Shaughnessy. The SM reviewed the at-issue O'Shaughnessy documents in camera, O'Shaughnessy's Affidavits, and the Motion to Quash O'Shaughnessy's deposition, along with the accompanying exhibits that was filed in the New Jersey state talc/mesothelioma JBP litigation. In addition, the SM has the benefit of having been present during all four days of O'Shaughnessy's recent depositions. With the benefit of this extensive record the SM concludes that O'Shaughnessy played a "legal role" with regard to talc. Stated another way, the SM finds that O'Shaughnessy did not render business advice, comments or analysis. On the contrary, the SM finds that O'Shaughnessy's position as litigation counsel necessitated that he defend existing and anticipated talc litigation, not to render business or scientific advice. The SM is satisfied that the talc-related communications at-issue would not have been made by or to O'Shaughnessy absent J&J's need for legal advice or services. Leonen, 135 F.R.D. at 99.

Although there are instances when O'Shaughnessy's legal advice was not explicitly requested, an explicit request for legal advice is not necessary to establish a privilege. Rather, requests for legal advice may be implicit. Hoffman-La Roche, Inc. v. Roxane Lab'ys, Inc., C.A. No. 09-6335 (WJM), 2011 WL 2446600, at *3 n.7 (D.N.J. June 16, 2011); see also In re Aenergy, S.A., 451 F.Supp. 3d 319, 324 (S.D.N.Y.) ("Although a request for legal advice need not be explicit, because information is frequently sent to in-house corporate counsel in order to keep them apprised of ongoing business developments, the implied request for advice must still be the primary reason for the communication in order for the privilege to attach."). Client

---

[9] The SM is not addressing the role played by J&J's litigation attorneys beyond the talc/asbestos/JBP litigation.

5575797v1

communications intended to keep an attorney apprised of continuing business developments, with an implied request for legal advice, are privileged. <u>Jack Winter, Inc. v. Koratron Co.</u>, 54 F.R.D. 44, 46 (N.D. Cal. 1971).

The SM's conclusion regarding O'Shaughnessy's legal and non-business role makes sense given the unique stakes at issue with regard to talc litigation and the context in which O'Shaughnessy performed his job. It is hard to overstate the monetary and public relations exposure J&J faced and continues to face regarding talc/asbestos/JBP litigation. It is evident from reviewing J&J's documents that J&J recognized this potential exposure long ago and this recognition continues to this day. It is not surprising, therefore, that J&J devoted substantial time and resources defending its position that its talc did not contain asbestos and that its baby powder does not cause cancer. Unquestionably, J&J's documents reveal it devoted substantial resources directed to the business implications of its talc litigation. Nonetheless, it is not surprising that J&J recognized that everything it did with regard to talc had potential legal implications. Given the exposure J&J faced O'Shaughnessy's legal input was critical. J&J had and has the necessary resources to address business issues regarding talc. O'Shaughnessy's input was not needed on these issues. His input was needed, however, to address the myriad of legal issues that reasonably could and did arise from talc-related communications, actions, developments and decisions.[10] The SM credits O'Shaughnessy's testimony that in order to properly defend J&J in existing and anticipated litigation he had to be aware of relevant talc developments in all spheres, not just in litigated cases.

---

[10] The SM sees no reason to distinguish O'Shaughnessy's role from the other attorneys in J&J's in-house litigation group who worked on talc/asbestos/JBP issues. These attorneys include, but are not limited to, John Kim, Andrew White, Lisbeth Warren, and Denise Houghton, as well as Deputy General Counsel Joseph Braureuther.

There is no doubt that O'Shaughnessy received business and public relations related emails, memoranda and reports.  There also is no question that O'Shaughnessy responded and commented upon many of these non-legal communications.  However, the SM concludes that O'Shaughnessy's responses and communications were made in his role as legal counsel for J&J. So-called non-legal documents were provided to O'Shaughnessy so he could examine them with an eye toward legal and/or litigation ramifications. The SM finds that the primary or predominant reason talc communications were sent to O'Shaughnessy was to seek or provide information to obtain legal advice. Thus, O'Shaughnessy's comments, notes and analyses are privileged.

To the extent plaintiffs argue otherwise, the SM makes clear that O'Shaughnessy's legal analysis of business documents are privileged. Plaintiffs appear to focus on the subject matter of the challenged documents to decide whether a document with O'Shaughnessy's comments is privileged. Instead, the proper focus should be on the purpose for which documents were sent to O'Shaughnessy and what he was explicitly or implicitly asked to do upon their receipt. The extensive record regarding O'Shaughnessy convinces the SM that he only played a legal role with regard to talc. Because of the unique circumstances facing J&J this is true even if the underlying document related to a business issue.

The SM emphasizes it is not ruling that all of O'Shaughnessy's communications are automatically privileged.  The burden of proof remains with J&J. If O'Shaughnessy's communication did not convey or concern a request for or the provision of legal advice, the communication is not privileged. Further, if fact or background documents were provided to O'Shaughnessy and J&J did not satisfy its burden of showing this was primarily related to the provision of legal assistance, the documents are not privileged.

The SM's conclusion regarding O'Shaughnessy's role and input has determinative implications for its rulings. As to the numerous draft documents containing O'Shaughnessy's comments on press releases, memoranda, etc., the SM sustains J&J's attorney-client privilege assertions for the reason that Shaughnessy's comments reflect his legal input and analysis. J&J looked to O'Shaughnessy for his legal opinions and analysis and therefore needed him to be appraised of talc developments that could impact litigation. The SM agrees with J&J that the disclosures to O'Shaughnessy were necessary for him to provide proper legal advice and representation. O'Shaughnessy was not consulted for business advice. Again, to be clear, the SM is not ruling that every comment from an in-house litigation counsel's review of a draft document is privileged. It may be the case that a particular litigation counsel also played a business role. Also, it is not beyond contemplation that an in-house attorney's comments are solicited as a pretext to protect a document from discovery. However, this is not the case here. The record reflects J&J's position that O'Shaughnessy only played a litigation and not a business or scientific role. And, there is not a shred of evidence O'Shaughnessy's comments were a subterfuge to protect otherwise discoverable documents.

### D.  <u>Patent Communications</u>

Several documents at issues concern technical information provided to J&J's in-house patent attorneys. Since J&J claims these documents are privileged, the SM must decide whether legal analysis was the primary purpose of the communication. In addition, the SM must decide if the communication would have been made absent an alleged privilege. It has long been recognized in patent cases that classifying internal technical documents related to patent issues is "particularly troublesome," as is the issue of whether an attorney is "acting as a lawyer." <u>Hercules, Inc. v. Exxon Corp.</u>, 434 F.Supp. 136, 147 (D. Del. 1977); <u>Smithkline Beecham Corp. v. Apotex Corp.</u>, 193 F.R.D. 530, 537 (N.D. Ill. 2000) (the line between technical and legal information is not easily

drawn).  As already noted, the attorney-client privilege only protects disclosures "necessary to obtain informed legal advice which might not have been made absent the privilege." Westinghouse Elec. Corp., 951 F.2d at 1423-24 (citation and quotation omitted).

With respect to most of the at-issue patent documents, the SM finds that J&J has not satisfied its burden of showing the communications were done for a legal purpose, "as opposed to providing the document for other corporate or intellectual property management purposes." Veolia Water Solutions & Techs. Support v. Siemens Indus., Inc., 63 F.Supp. 3d 558, 569 (E.D.N.C. 2014).  The SM does not accept the notion that all communications of technical information provided to an in-house patent counsel are provided for the purpose of obtaining legal advice and are therefore privileged.  For example, "[t]echnical information communicated to the attorney but not calling for a legal opinion or interpretation and meant primarily for aid in completing patent applications" is not privileged.  Id. at 567-68; see also Exxon, 434 F.Supp. at 147; Jack Winter, 54 F.R.D. at 46 ("Generally, when factual information [is] communicated so that the attorney could disclose it in a patent or trademark application, the communication [is] viewed as non-privileged."); Veolia Water Solutions and Technologies Support v. Siemens Industry, Inc., 63 F. Supp.3d 558, 567-68 (E.D.N.C. 2014) (technical information communicated to the attorney but not calling for a legal opinion or interpretation and meant primarily for aid in completing patent applications is not privileged).[11] J&J's reliance on Transweb, LLC v. 3M Innovative Properties Co., C.A. No.-cv-4413 (FSH) (PS), 2012 WL 2878076, at *10 (D.N.J. April 12, 2012), is

---

[11] The SM's rulings regarding J&J's patent documents are of little consequence since J&J has represented that the factual information in the documents has already been produced. Tr. at 124. Thus, plaintiffs already possess the information in the challenged patent documents. The SM is not unsympathetic to J&J's argument that it is difficult for it to sustain its burden of proof because many authors and recipients of its patent communications are deceased. Nevertheless, the fact that a document is old does not relieve J&J of its burden of proof. J&J could have satisfied its burden even though certain individuals are no longer available.

-14-

misplaced. In <u>Transweb</u> a "cursory review of the [at issue] memorandum clearly show[ed] that its purpose was to seek legal advice[.]" This is not the case here.

E.     **Public Relations Documents**

Plaintiffs challenged numerous J&J "public relations" documents, including draft press releases with in-house counsel's comments.  The final press releases and drafts with no attorney comments do not appear to present an issue since J&J has represented these documents have been produced. Tr. at 52, 168.  Given this situation, plaintiffs' argument appears to lose sight of the fact that what is at issue is the production of in-house counsel's comments on the drafts, not the underlying documents. The SM's previous discussion dictates the outcome of the parties' dispute. Since J&J's litigation counsel were explicitly or implicitly asked for and subsequently provided their legal analysis of the drafts prepared by in-house personnel and outside P.R. consultants, the attorney-client privilege applies to the challenged documents with counsel's comments.  This is true whether the underlying document was prepared to address a specific case or threatened litigation, or if the underlying document was designed to generally foster J&J's reputation and protect its brand.[12]  Regardless of the contents of the underlying documents, J&J's litigation attorneys reviewed the documents with a view towards legal issues and provided their legal analysis. Thus, the attorneys' comments are protected by the attorney-client privilege. The SM has already ruled that an attorney's legal analysis of a "business document" is protected. "Confidential advice from an attorney does not lose its privileged character merely because it affects business plans or is conveyed within a document that also has non-privileged information." <u>In re Intuniv</u>

---

[12] It is unquestionably true that not all of the P.R. consultants' work was directed to "litigation" issues. There should be no reasonable dispute that the consultants were engaged, in part, to protect J&J's reputation and brand.

5575797v1

Antitrust Litig., C.A. Nos. 16-cv-12653 and 12396-ADB, 2018 WL 6492747, at *3 (D. Mass. Dec. 10, 2018).

Although counsel's comments on draft press releases are privileged, it is not the case that all of counsel's comments on the draft press releases are protected by the work-product doctrine. The dominant or predominate purpose of some of J&J's press releases and publications was to foster and protect J&J's reputation rather than aiding in the defense of existing or threatened litigation. Counsel's comments on these documents do not satisfy the criteria for work-product protection. General public relations advice, even if it bears on litigation, does not qualify for work-product protection. A media campaign is not a litigation strategy. Egiazaryan v. Zalmavey, 290 F.R.D. 421, 431 (S.D.N.Y. 2013).[13] Rather, the work-product doctrine protects communications concerning the litigation itself, not the effects of the litigation on a company's customers, the media, or on the public generally. Calvin Klein Trademark Tr. v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

Plaintiffs argue J&J waived any privilege or work-product protection that applied to its public relations documents by sharing them with its outside public relations firms. The SM disagrees and turns to its Riddell decision for guidance. In Riddell the SM decided whether communications with a third-party communications firm waived the attorney-client privilege. The SM ruled, "[t]o be protected communications with a third-party agent must be made in confidence for the purpose of obtaining legal advice from the lawyer." Riddell, 2016 WL 7108455, at *6. That is what happened here. J&J's attorneys needed to consult and communicate with J&J's outside public relations firms so that they could provide informed legal advice about talc matters

---

[13] The SM did not segregate out for discussion purposes the documents intended to foster J&J's reputation from those that were directed to litigation issues. Since counsel's comments are privileged, the "reputation" documents are protected from discovery even if they do not qualify for work-product protection.

that could impact J&J's defense. Given the stakes at issue and the ongoing publicity regarding talc/asbestos/JBP litigation, the SM credits Montagnino's statement that it was essential that J&J's P.R. consultants "communicate with J&J's lawyers-and provide [the] lawyers with drafts to review-in order to ensure that [their] documents were consistent with J&J's litigation position in pending lawsuits and did not raise any other legal concerns." Aff. at 14; see also 23 and 33.

Montagnino's Declaration establishes that J&J hired outside public relations consultants to assist with work J&J could not handle in-house. As Montagnino explained in her Declaration, "[r]etaining outside firms to augment the internal communications team is a common practice at J&J and JJCI, which have relatively small corporate communications departments and therefore rely on outside consultants to assist with time-intensive and long-term projects." Montagnino further explained that, "[t]he huge media interest in the talc controversy necessitated expanding the team" such that J&J hired three outside public relations firms: APCO Worldwide, Purple Strategies, LLC, and Joele Frank. According to Montagnino, these consultants "were retained to provide communications advice in the highly-sensitive atmosphere that ... developed around the cosmetic talc litigation." Montagnino also attested that there was an increased need for communications assistance due to "plaintiffs' aggressive effort to promote their litigations claims in the media, on television and on the internet."

There is little question the communications with these third parties were made in confidence. Further, Montagnino's Declaration establishes that J&J hired outside P.R. consultants to assist with work it could not handle in-house. As noted in O'Boyle, "[i]f . . . . the third party is a person to whom disclosure of confidential attorney-client communications is necessary to advance the representation, disclosure will not waive the privilege." 94 A.3d at 309; see also In re Grand Jury, 705 F.3d at 160 ("Privileged persons include the client, the attorney(s), and any of

-17-

their agents that help facilitate attorney-client communications or the legal representation") (citation and quotation marks omitted); Tractenberg v. Township of West Orange, 416 N.J. Super. 354, 376 (App. Div. 2010)  (privilege extends to "the necessary intermediaries and agents through whom the communications are made") (citation and quotation marks omitted).

As noted, the SM finds that it was necessary for J&J's attorneys to communicate with J&J's outside public relations consultants to render legal assistance.  The SM agrees with the decision and rationale expressed in In re Flonase Antitrust Litigation, 879 F.Supp. 2d 454, 460 (E.D. Pa. 2012), holding that a "broad practical approach" applies to determine whether an independent consultant is the functional equivalent of an employee. As expressed in the Flonase decision, this approach reflects the privilege analysis in Upjohn Co. v. United States, 449 U.S. 383 (1981), by focusing on whether the communications at issue were kept confidential and made for the purpose of obtaining or providing legal advice. 879 F.Supp. at 459-60. The SM's ruling "offers all parties to the exchange [of information] the real possibility for better representation by making more information available to craft a position and inform decision-making in anticipation of or in the course of litigation." O'Boyle, 94 A. 3d at 316.

Another instructive case is In re Copper Market Antitrust Litig., 200 F.R.D. 213 (S.D.N.Y. 2001). In that case the plaintiffs sought the production of RLM's communications with a defendant (Sumitono) in the litigation. RLM, a "crisis management" public relations firm, was retained after the disclosure of critical deposition testimony. In ruling that RLM's documents were protected the court wrote, "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice." Id. at 219. Accordingly, the court ruled that the communications between Sumitomo, RLM and in-house counsel made for the purpose of

-18-

"facilitating the rendition of legal services to Sumitono" were protected by the attorney-client privilege. Id. A similar situation exists here.

The SM's ruling is not, as plaintiffs may posit, an unwarranted expansion of the scope of the attorney-client privilege. Instead, the SM's ruling recognizes the realities and practicalities of corporate life wherein consultations with third-party consultants is sometimes essential for in-house counsel to render informed and competent legal advice. Given this necessity, in-house counsel should be able to communicate freely with consultants about legal issues without being chilled by the prospect that their communications will be produced to an adversary in discovery.

To the extent plaintiffs argue J&J waived work-product protection by sharing its documents with third-party consultants, the argument is rejected. The waiver of the work-product doctrine is different than the waiver of the attorney-client privilege. "The predicate of the waiver inquiry in the work-product context is not, as it is in the attorney-client context, whether the material was disclosed, but whether the material was disclosed to an adversary." Cooper Health Sys. v. Virtua Health, Inc., 259 F.R.D. 208, 215 (D.N.J. 2009) (citation and quotation marks omitted). The essential question with respect to waiver of work-product is whether the material has been kept away from adversaries. Id. Since J&J's public relations consultants were not adversaries, there was no waiver of the work-product doctrine by disclosing communications to them. Similarly, there was no waiver of the attorney-client privilege. In O'Boyle, the court noted the protections offered by the attorney-client privilege and work-product doctrine are not waived by disclosure to a third party if the "person to whom disclosure of confidential attorney-client communications is necessary to advance the representation." 94 A.3d at 309. J&J's public relations consultants fit into this description.

-19-

F.     **Email Attachments**

A number of J&J's emails include attachments. It is well-settled that where a privileged document has attachments, each attachment must individually satisfy the appliable privilege criteria. "Merely attaching something to a privileged document will not, by itself, make the attachment privileged." Leonen, 135 F.R.D. at 99; see also Gabapentin, 214 F.R.D. at 187. In instances where J&J did not satisfy the criteria for protecting an attachment to an otherwise protected email, the SM directs that the attachment be produced. Further, non-final draft documents are not off limits to discovery if they contain relevant and non-privileged information. Dejewski v. Nat'l Beverage Corp., C.A. No. 19-CV-14532 (ES) (ESK), 2021 WL 118929, at *1 (D.N.J. Jan. 12, 2021) (citation and quotation omitted).

III.     **RULINGS ON J&J'S PRIVILEGE ASSERTIONS**

The SM will now rule on J&J's privilege assertions. These rulings are organized according to plaintiffs' five challenge categories, which include: (A) communications in which there is no attorney on the logged document; (B) communications in which an attorney is carbon copied on the logged document; (C) communications gathering information requested by lawyers to facilitate the provision of legal advice; (D) communications with third parties, and; (E) business and technical communications.

A.     **Communications in Which There is no Attorney on the Logged Document[14]**

The first category of at-issue documents is "Communications in Which there is no Attorney on the Logged Document." This category primarily consists of emails although there are also letters, spreadsheets, a press release, reports and a PowerPoint presentation. The documents date from as early as 1982 to as late as 2019.

---

[14] Many of the documents plaintiffs selected in fact included attorneys.

The majority of documents in this category are protected because the communications are designed to assist in-house or outside counsel to render legal advice and/or defend J&J in existing or anticipated litigation.  As already discussed, the mere absence of an attorney on a document is not necessarily determinative as to the document's protected status. "[C]ommunications remain privileged if they assist [an] attorney to formulate and render legal advice."  Riddell, 2016 WL 7108455, at *5. Nevertheless, the SM concludes the following documents or attachments should be produced. [15]

### 1.      Tab 4 – P2_JNJTALC_000000311

This is an internal February 25, 1994 memorandum regarding a request made by O'Shaughnessy for JBP formulation information.  This memo is privileged and work-product since the request was made to assist J&J in pending litigation.  However, attached to the privileged memo is a July 13, 1966 memo titled "JOHNSON'S Baby Powder Historical Survey." (JNJTALC-793384; P2_JNJTALC 312).  The 1966 memo contains relevant factual information with no accompanying justification as to why the memo is privileged.  To the extent not already done, the non-privileged July 13, 1966 memo should be produced.. See Intuniv, 2018 WL 6492747, at *6. ("Historical documents do not become privileged because they were requested by an attorney.").


### 2.      Tab 8 – P2_JNJTALC_000002574

This is a draft of a 1999 letter in-house counsel prepared addressing alleged inaccuracies regarding JBP made by a competitor.  The SM agrees this draft is privileged as it reflects the legal advice of J&J's attorney as to how J&J should proceed.  However, to the extent a final version of

---

[15] The Tab numbers refer to the index in the binders provided to the SM.

the letter was served, it should be produced.  To the extent not already done, J&J should also produce the referenced "Paterson" August 6, 1999 letter referred to in the draft.

### 3.   Tab 15 – P2_JNJTALC_000010462, P2_JNJTALC_000010314, and P2_JNJTALC_000011109

The SM agrees these draft press releases prepared by and for counsel with attorney comments are protected, as they reflect an attorney's legal advice and impressions.  However, to the extent not already done, the final versions of these press releases that were published should be produced.

### 4.   Tab 18 – P2_JNJTALC_000012141

The SM agrees that the referenced March 1994 memo is privileged because it reflects an attorney's legal advice.  However, the attached photographs are not protected and should be produced.

### 5.   Tab 21 – P2_JNJTALC_000006360

The SM agrees this draft report titled "Issues Management Plan" with comments from in-house counsel is privileged.  However, the substance of the document is plainly directed to predominantly business issues.  Thus, to the extent not already done, the final version of this document should be produced.

### B.   Communications in Which an Attorney is Carbon Copied on the Logged Document

The second category of documents at issue is "Communications in Which an Attorney is CC'd on the Logged Document."   This category primarily consists of emails, letters and memoranda dating from 1975–2019.  Just as the mere absence of an attorney on a document is not determinative as to whether a document is protected, the mere inclusion of an attorney's name is not determinative.  Riddell, 2016 WL 7108455, at *3 ("[T]he mere fact that Riddell's counsel is

copied on emails does not prove a document is privileged."). The majority of documents in this category are protected because they reflect in-house counsel's legal analysis. Other documents are protected because they were prepared by or for counsel to assist with pending or threatened litigation.  Nevertheless, the SM concludes the following documents are not protected and should be produced:

### 1.        Tab 30 – P2_JNJTALC_000005178

This is an August 2018 email chain regarding whether J&J will reveal the contents of JBP's fragrance.  Despite J&J's description that this email chain involves "a legal issue involving trade secrets," the SM disagrees.  The only issue discussed is whether a decision was made to include baby powder in J&J's "movement toward 100% transparency of ingredients[.]" This was primarily a business not legal decision. This document was the subject of extensive discussions during the ex parte portion of oral argument. Despite J&J's argument, the SM finds this document discusses a business not legal issue.  The document does not reveal any legal advice or impressions of an attorney and is therefore not privileged. J&J has not satisfied its burden of proof with regard to this document.

### 2.        Tab 31 – P2_JNJTALC_000009906 and P2_JNJTALC_000010766

The SM agrees Attorney White's comments on the draft reflect legal analysis and are therefore privileged.  However, to the extent the statement was published a copy of the final version should be produced.

### 3.        Tab 39 – P2_JNJTALC_000005462

The SM agrees the referenced August 2017 email is protected since it asks for in-house counsel's legal input on a "potential public document" regarding talc.  However, the referenced attachment (P2_JNJTALC_5468) does not reflect any comments or input from counsel and is not privileged.  Since the document is primarily directed at business and reputation issues, it is not

work-product.  The SM does not agree with J&J's argument that the attachment is protected because "draft pubic statements regarding talc [are] highly sensitive and [have] the potential to affect talc litigation[.]"   This is not the appropriate standard by which to decide whether a document is work-product. Mere concern that a report or writing may have legal consequences is not the equivalent  of preparing a report or writing for anticipated or pending litigation. <u>Johnson</u>, 2015 WL 5193568, at *4.

### 4.      Tab 44 – P2_JNJTALC_000011549

This document consists of a May 2020 email with an attached internal page titled "Deliverables."  Also attached is a "Global Message Map – North American Documentation of Johnson's Baby Powder (Talc)."  (P2_JNJTALC_11551).  These papers are directed to business and not legal issues and therefore are not protected.  The SM disagrees with J&J that the documents are privileged because they reflect "Attorney White's request that certain materials be reviewed for discussion."

### C.      <u>Documents Gathering Information Requested by Lawyers to Allegedly Facilitate the Provision of Legal Advice</u>

The third category of challenged documents are  "Documents Gathering Information Requested by Lawyers to Allegedly Facilitate the Provision of Legal Advice."  The SM concludes the following documents are not protected and should be produced or the SM requires more information to render a decision:

### 1.      Tab 46 – P2_JNJTALC_000000001

This document concerns Books 1 to 5. At this time the SM does not have enough information to make an informed decision as to whether this document is privileged. During oral argument counsel indicated the underlying books were the subject of a

"fair amount of back and forth about them." Tr. at 176.  The SM needs more background information to make its decision.

### 2.    Tab 51 – P2_JNJTALC_000000104

This is a January 20, 1977 memo from a manager at J&J Consumer Products to an in-house patent attorney. The memo refers to experiments performed by Windsor Minerals to reduce talc's "dusting potential." This document should be produced because J&J has not satisfied its burden of showing the experimentation was done in order for J&J's patent attorney to "provide patent advice." Nothing in the memo or surrounding context supports the conclusion that the memo was prepared so an attorney could render legal advice.  It is just as likely the memo was prepared in the normal course of business to update J&J's patent attorney to ongoing developments with JBP.

### 3.    Tab 52 – P2_JNJTALC_000000137

This is an August 12, 1982 memo from J&J's scientists to J&J's in-house patent attorney regarding an "improved body dusting powder based on starch[.]" This memo should be produced for the same reasons as Tab 51. J&J has not satisfied its burden of showing the memo is privileged "because it provides information to counsel for the purpose of seeking legal advice."  To the contrary, it appears the memo was prepared in the normal course of J&J's ongoing scientific pursuits.  These pursuits were not done in anticipation of litigation.  Further, it appears the dominant purpose of the memo was to document ongoing scientific pursuits and not to provide information for legal advice.

### 4.    Tab 53 – P2_JNJTALC_000000160

This is a July 11, 1980 internal J&J memo regarding "improved body dusting powders having novel properties and utility."  This memo should be produced for the same reasons as Tabs 51 and 52.

**5.      Tab 56 – P2_JNJTALC_0000172**

This memo (undated) to O'Shaughnessy refers to the binders about which a decision is being deferred. See Tab 46.

**6.      Tab 60 – P2_JNJTALC_000000752**

This is a one-page November 17, 1993 memo from D.F. Jones to O'Shaughnessy enclosing two copies of papers on ovarian cancer**.**  This document should be produced because J&J has not satisfied its burden to show the information was provided to render legal advice or was prepared in anticipation of litigation**.**  The SM rejects J&J's argument that the memo is privileged "because it reveals the nature of communications between Attorney O'Shaughnessy and Mr. Jones." The SM also does not accept J&J's explicit or implicit argument that all communications to O'Shaughnessy are privileged or work-product. See Intuniv, 2018 WL 6492747, at *6. ("Historical documents do not become privileged because they were requested by an attorney.").

**7.      Tab 61 – P2_JNJTALC_000000768**

This is a March 14, 1994 memo from Catherine Christensen to O'Shaughnessy regarding a "Talc Literature Search."  This memo should be produced for the same reason as Tab 60.  J&J has not satisfied its burden of showing the information was supplied to provide legal advice. The SM does not accept J&J's argument that the document is protected because "it offers insight into counsel's legal mindset."

**8.      Tab 67 – P2_JNJTALC_0000068527**

This is a February 25, 2016 email that attaches a draft media statement. Since the email and attachment do not reflect Attorney Houghton's comments, and it does not appear that this is an explicit or implicit request for legal advice, these documents should be produced.

**9.** **Tab 72 – P2_JNJTALC_000006866**

These four 2018 emails concern a draft email to the New York Times prepared by J&J's outside counsel. It appears the email is a follow-up to an in-person meeting. Since the emails do not reflect any legal analysis not already part of the public record, and the substantive content of the emails was intended for publication, the emails are not privileged. Further, the emails are not work-product because they are directed to general issues and not anticipated or existing litigation.

**10.** **Tab 74 – P2_JNJTALC_000007862**

This is an internal January 5, 1996 email sent to an in-house J&J regulatory attorney that addresses the CTFA's procedure for approval of INCI submissions.[16] The email is not protected and should be produced. J&J has not satisfied its burden of showing the listed information was "necessary for counsel to render informed legal advice."

**11.** **Tab 75 – P2_JNJTALC_000011059**

These are January 7, 2020 emails that attach a copy of a JAMA article and editorial. The email and attachment are not protected and should be produced. J&J has not satisfied its burden of showing the information was provided to in-house counsel (amongst others) to "render legal advice."

**D.** **Communications Sent to Third Parties**

The fourth category of documents at-issue is "Communications Sent to Third Parties." This category of documents includes emails, press releases, memos, and letters dated as early as 1973 to 2017. The following documents are not protected and should be produced.

---

[16] CTFA stands for the Cosmetic, Toiletry and Fragrance Association. INCI stands for the International Nomenclature of Cosmetic Ingredients.

### 1.     Tab No. 76 – P2_JNJTALC_000004780

This is a draft statement regarding the <u>Herford</u> talc rial that was prepared by an outside press consultant and in-house counsel**.**  Although counsel's email states that the draft statement was "part of our legal advice," the SM finds the statement and emails are not protected**.**  The draft statement does not reflect legal advice and merely addresses general comments regarding media strategy. <u>See</u> <u>Johnson</u>, 2015 WL 5193568, at *4 (stating that a document is not necessarily privileged because a copy was sent to a lawyer in an email chain with a note that it was "a request for legal direction").

### 2. Tab 78 – P2_JNJTALC_000009760

This is a draft 2019 press release prepared by a J&J employee sent to various in-house employees.  The draft is titled, "Company Investigation Confirms No Asbestos in Johnson's Baby Powder."  Since the draft was prepared in the regular course of business and does not reflect input or comments from an attorney, the document is not protected and should be produced.  The SM disagrees the document is protected because it seeks legal advice.  Even if there was an implicit request for legal advice, this was not the primary or predominant purpose of the mixed communication. The SM also disagrees the draft is work-product because it was prepared as a result of ongoing litigation.  The draft only references general issues regarding J&J's investigation concerning the FDA's finding of asbestos in JBP.

### 3. Tab 79 – P2_JNJTALC_000009967

This document includes a draft statement prepared by an outside consultant regarding responses to media reports regarding talc testing, safety and regulatory compliance.   This document is not protected and should be produced for the same reason as Tab 78.  Although the draft was sent to counsel, no attorney comments or analysis is included and legal advice is not the primary or predominant purpose of the communication.

-28-

### 4. Tab 85 – P2_JNJTALC_000002103

The SM agrees this draft public statement ("The Facts on Talcum Powder Safety") is protected. To the extent not already done, the final published version of this statement should be produced.

### 5. Tab 90 – P2_JNJTALC_000006852

This is a February 25, 2016 email with attached memo titled "Joanne's Messaging." Although not clear, the memo apparently was prepared in response to a jury verdict. This document is not protected for the same reasons as Tabs 78 and 79. The SM rejects J&J's argument that the document is protected "because the communications were sent in the context of ongoing litigation." The document does not assist in the defense of the referenced litigation and was primarily designed to minimize the public's potential reaction to an adverse verdict.

### 6. Tab 95 – P2_JNJTALC_000011141

This is an email with an attached draft notice to be sent to J&J employees (not the general public) if J&J wins the Daubert decision. The draft does not reflect or include any attorney comments or input and is therefore not protected. This document should be produced.

### 7. Tab 98 – P2_JNJTALC_000005777

This is an email chain regarding a request from J&J's supplier quality team to understand what information Imerys supplies for each receipt of talc. The document does not reflect any legal analysis or input and is not designed to assist with the defense of litigation. The document appears to be a routine business communication. Thus, the document is not protected and should be produced. It makes no difference that a June 11, 2018 email states that "anything related to talc etc. would need to be handled through lawyers[.]" This is not determinative when deciding whether the document is protected. The SM disagrees that the document was "made for the

5575797v1

purpose of assisting counsel in the defense of ongoing litigation." J&J has not satisfied its burden to show this is why the emails were prepared.

### E.       Business and Technical Communications

The last category of documents at-issue is "Business and Technical Communications." These include memos and emails dating from 1972–2018. For the reasons discussed, the SM concludes the following documents are not protected and should be produced.

####       1.       Tab 99 – P2_JNJTALC_000000003

Since this document addresses the binders previously mentioned, a decision is reserved for the same reason as Tabs 46 and 56.

####       2.       Tab 103 – JNJTALC_000000342, JNJTALC_000000343, and JNJTALC_000001344

These are September 5 and October 3, 1972 memos prepared by J&J's scientists to J&J in-house counsel regarding a Federal Register proposal regarding the use of talc containing asbestos-form particles in food. The memos do not explicitly or implicitly request legal advice and appear to be routine business communications designed to update in-house counsel on a regulatory development. Thus, these memos should be produced. The SM rejects J&J's argument that these memos implicitly request legal advice.

####       3.       Tab 106 – P2_JNJTALC_000000721

This is a January 20, 1977 J&J memo sent to an in-house attorney regarding experiments to talc "to reduce its dusting potential." For the same reason the SM previously ruled that certain J&J memos sent to in-house patent counsel are not protected, the SM rules that this memo should be produced.

### 4.      Tab 108 – P2_JNJTALC_000000774

This is a March 3, 1994 memo to O'Shaughnessy regarding "contacts as we discussed." The memo does not explicitly or implicitly indicate that the requested information was provided in order for O'Shaughnessy to provide legal advice.  Thus, the memo should be produced.  The SM does not accept J&J's implicit argument that all historical or fact information provided to O'Shaughnessy at his request was necessary for him to render legal advice.[17]

### 5.      Tab 114 – P2_JNJTALC_0000006391

This is a December 2018 email chain regarding a "piece" that appeared on a website.  The emails do not explicitly or implicitly involve a legal issue or legal developments and therefore should be produced.  The SM rejects J&J's argument that the email chain is protected because it apprises the client "with respect to the legal developments of an issue."  No legal developments are referenced in the emails.

### 6.      Tab 116 – P2_JNJTALC_0000009167

There are two shorts emails wherein J&J's in-house counsel appear to send "two prior AMA reports done for Colgate talc" to in-house J&J employees.  The emails do not explicitly or implicitly reflect any legal advice or issues.  Thus, the emails are not protected and should be produced.  There is no evidence to support J&J's statement that the emails relate to ongoing talc litigation and "contains [counsel's] legal impressions."

### 7.      Tab 118 – P2_JNJTALC_000009013

This is an October 23, 2019 email from a J&J regulatory compliance employee to in-house counsel enclosing a link to an article.  For the same reason Tab 116 should be produced, this document should also be produced.  There is no evidence to support J&J's argument that the email

---

[17] For example, as a member of J&J's Worldwide Talc Committee O'Shaughnessy received non-legal communications for his background information.

was created "for the express purpose of transmitting information that J&J's in-house counsel required to render legal advice[.]"

### 8.    Tab 126 – JNJ_TALC_000000708

This is a March 10, 1983 memo from J&J scientists to an in-house patent attorney regarding data to support J&J's claim "of a baby powder having increased absorbency." This memo should be produced for the same reasons the SM ruled that other patent memos should be produced.

## IV.    SUMMARY OF RULINGS

The SM understands that the documents it ruled upon are only a representative sample of a larger group of alleged privileged documents. To hopefully avoid future disputes, the SM will summarize the most important general principles it applied to the documents at issue. Absent unexpected developments, the SM assumes it would apply the same general principles to the remaining documents.

(1)    J&J clearly has the burden of proof to demonstrate that its designated documents are protected. To the extent J&J did not satisfy its burden, the SM directed J&J's documents to be produced. Unless otherwise noted by the SM, the parties have had more than a sufficient opportunity to support their arguments. The record is therefore closed on the challenged documents. The SM understands the practical difficulties J&J faced because many of its documents are old and relevant individuals are deceased. However, as noted, in almost all instances the SM is confident that it was able to discern the purpose and intent of J&J's documents from the language used and the context of the communications.

(2)    No privilege assertions were deemed waived on account of alleged inadequacies in J&J's privilege logs.

(3)    The attorneys in J&J's in-house litigation group, mainly O'Shaughnessy, played a legal role with regard to their talc work. J&J's litigation attorneys were not engaged to provide business or scientific advice or input. Nevertheless, not all of litigation counsel's documents are immunized from discovery. Litigation counsel's documents are not protected if they were not sent or prepared for the purpose of giving or receiving legal advice. As is evident by its rulings, the SM did not find that J&J satisfied its burden of showing in 100% of the disputed instances that litigation counsel's communications are protected.

(4)     For the most part J&J did not satisfy its burden to show that factual or technical information was provided to its in-house patent counsel for legal analysis or input.

(5)     The comments J&J's attorneys made on draft press releases or other public relations documents are privileged as they reflect counsel's legal analysis and opinions.

(6)     Attachments to privileged documents are not automatically protected. Unless J&J satisfied its burden of showing an attachment to a protected document was privileged, the attachment was directed to be produced.

## ORDER

For all the reasons explained in the foregoing Opinion, it is hereby **ORDERED** this 26th

day of July, 2021, that J&J shall produce the following documents within seven (7) calendar

days of the date this Order is entered:

(1)     Tab 4 – P2_JNJTALC_000000311– To the extent not already done, only the referenced July 13, 1966 memo should be produced.

(2)     Tab 8 – P2_JNJTALC_000002574 – To the extent a final version of the draft letter was served, a copy shall be produced. Also produce the referenced "Paterson" August 6, 1999 letter

(3)     Tab 15 – P2_JNJTALC_000010462, P2_JNJTALC_000010314, and P2_JNJTALC_000011109 – To the extent not already done, produce final version of these draft press releases

(4)     Tab 18 – P2_JNJTALC_000012141 – Produce the attached photographs

(5)     Tab 21 – P2_JNJTALC_000006360 – To the extent not already done, produce final version of the "Issues Management Plan."

(6)     Tab 30 – P2_JNJTALC_000005178 – Produce

(7)     Tab 31 – P2_JNJTALC_000009906 and P2_JNJTALC_000010766 – To the extent not already done, produce a copy of the final version of this document.

(8)     Tab 39 – P2_JNJTALC_000005462 – Produce a copy of the referenced attachment (Bates 5468).

(9)     Tab 44 – P2_JNJTALC_000011549 – Produce

(10)    Tab 46 – P2_JNJTALC_000000001 – Decision deferred

-33-

5575797v1

(11)     <u>Tab 51 – P2_JNJTALC_000000104</u> – Produce

(12)     <u>Tab 52 – P2_JNJTALC_000000137</u> – Produce

(13)     <u>Tab 53 – P2_JNJTALC_000000160</u> – Produce

(14)     <u>Tab 56 – P2_JNJTALC_000000172</u> – Decision reserved

(15)     <u>Tab 60 – P2_JNJTALC_000000752</u> – Produce

(16)     <u>Tab 61 – P2_JNJTALC_000000768</u> – Produce

(17)     <u>Tab 67 – P2_JNJTALC_000068527</u> – Produce

(18)     <u>Tab 72 – P2_JNJTALC_000006866</u> – Produce

(19)     <u>Tab 74 – P2_JNJTALC_000007862</u> – Produce

(20)     <u>Tab 75 – P2_JNJTALC_000011059</u> – Produce

(21)     <u>Tab 76 – P2_JNJTALC_000004780</u> – Produce

(22)     <u>Tab 78 – P2_JNJTALC_000009760</u> – Produce

(23)     <u>Tab 79 – P2_JNJTALC_000009967</u> – Produce

(24)     <u>Tab 85 – P2_JNJTALC_000002103</u> – To the extent not already done, the final version of the draft should be produced.

(25)     <u>Tab 90 – P2_JNJTALC_000006852</u> – Produce

(26)     <u>Tab 95 – P2_JNJTALC_000011141</u> – Produce

(27)     <u>Tab 98 – P2_JNJTALC_000005777</u> – Produce

(28)     <u>Tab 99 – P2_JNJTALC_000000003</u> – Decision reserved

(29)     <u>Tab 103 – JNJTALC_000000342, JNJTALC_000000343, and JNJTALC_000001344</u> – Produce

(30)     <u>Tab 106 – P2_JNJTALC_000000721</u> – Produce

(31)     <u>Tab 108 – P2_JNJTALC_000000774</u> – Produce

(32)     <u>Tab 114 – P2_JNJTALC_0000006391</u> – Produce

(33)     <u>Tab 116 – P2_JNJTALC_0000009167</u> – Produce

(34)     <u>Tab 118 – P2_JNJTALC_000009013</u> – Produce

(35)     <u>Tab 126 – P2 JNJTALC_000000708 -</u> Produce


It is further ORDERED the SM will schedule a prompt conference call to address Tabs 46, 56, 58 and 99, and any other relevant issues regarding plaintiffs' challenge to J&J's privilege assertions.


DATED: July 26, 2021                              By: <u>/s/ Joel Schneider</u>
                                                   SPECIAL MASTER
                                                   HON. JOEL SCHNEIDER (RET.)

-35-