**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
─────────────────────────────
                                    CIVIL DOCKET NUMBER:

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS              3:16-md-2738-FLW-LHG
MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY              STATUS CONFERENCE
LITIGATION                          VIA REMOTE ZOOM
                                    VIDEOCONFERENCE

─────────────────────────────
```

        Clarkson S. Fisher Building & U.S. Courthouse
        402 East State Street
        Trenton, New Jersey  08608
        July 21, 2021
        Commencing at 11:30 a.m.

**B E F O R E:**              THE HONORABLE FREDA L. WOLFSON,
                          CHIEF UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

        MOTLEY RICE LLC
        BY:  DANIEL R. LAPINSKI, ESQUIRE
        210 LAKE DRIVE EAST, SUITE 101
        CHERRY HILL, NJ  08002
        For the Plaintiffs

        ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT, ESQUIRE
        1825 K STREET, NW
        WASHINGTON, DC  20006
        For the Plaintiffs

        BEASLEY ALLEN LAW FIRM
        BY:  PATRICIA LEIGH O'DELL, ESQUIRE
        218 COMMERCE STREET
        P.O. BOX 4160
        MONTGOMERY, AL  36104
        For the Plaintiffs

Carol Farrell, Official Court Reporter
cfarrell.crr@gmail.com
856-318-6100

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1   **A P P E A R A N C E S (Continued):**

2

3       COHEN, PLACITELLA & ROTH, PC
        BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
4       127 MAPLE AVENUE
        RED BANK, NJ  07701
5       For the Plaintiffs

6

7       FAEGRE DRINKER BIDDLE & REATH LLP
        BY:  SUSAN M. SHARKO, ESQUIRE
8            JESSICA LEIGH BRENNAN, ESQUIRE
        600 CAMPUS
9       FLORHAM PARK, NJ  07932
        For the Defendant, Johnson & Johnson and
10      Johnson & Johnson Consumer Companies, Inc.,
        now known as Johnson & Johnson Consumer Inc.
11

12

13      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  JOHN H. BEISNER, ESQUIRE
14      1440 NEW YORK AVENUE, N.W.
        WASHINGTON, DC  20005
15      For Defendants, Johnson & Johnson and
        Johnson & Johnson Consumer Companies, Inc.,
16      now known as Johnson & Johnson Consumer Inc.

17

18  **A L S O   P R E S E N T:**

19

20      The Honorable Joel Schneider (Retired), Special Master

21

22

23

24

25

 1              (PROCEEDINGS held via remote Zoom videoconference

 2    before The Honorable Freda L. Wolfson, Chief United States

 3    District Judge, at 11:30 a.m.)

 4              THE COURT:  Good morning, everyone.

 5              RESPONSE:  Good morning.

 6    (Discussion held off the record.)

 7              THE COURT:  Everyone else is here.  I see

 8    Mr. Placitella, Ms. Sharko, Mr. Beisner, Ms. Parfitt,

 9    Ms. Brennan, and Ms. O'Dell.  Okay.  And Judge Schneider is on

10    with us as well this morning, who I invited.

11              So, first thing, everyone looks well so I guess

12    everyone is doing fine, right?  Good.

13              My preliminary question is when I saw some of the things

14    you want to discuss with me, is there a reason that you think

15    you want me to resolve these issues as opposed to Judge

16    Schneider?

17              MS. PARFITT:  Your Honor, if I can speak, Michelle

18    Parfitt.  Good morning.

19              No, I don't see any reason why we can't take these up

20    with Judge Schneider.  What they have to deal with, frankly,

21    scheduling issues, who should be deposed, the content, the

22    depth.  As you know, we had extensive depositions back right

23    before the *Daubert* hearing on many of the individuals that J&J

24    wishes to redepose so -- and, obviously, we have differences of

25    opinions as to whether or not that should happen, since Your

1   Honor allowed very extensive depositions and then a *Daubert*

2   hearing and then a cross-examination.  So we need to talk about

3   that.

4           There are some experts with -- that are case-specific

5   and, of course, J&J's entitled to explore those case-specific

6   opinions.

7           But I see no reason why we couldn't schedule a time

8   with Judge Schneider and we could probably walk through these.

9           But Ms. Sharko had asked that Your Honor, and because

10  you had been presiding, obviously, over the *Daubert*

11  proceedings, we didn't not want to say hello and ask you, but I

12  think, you know, if Judge Schneider is available, we can do

13  that too.  So ...

14          MS. SHARKO:  Well, we thought it was the proper

15  procedure to reach out to Your Honor.

16          THE COURT:  Okay.

17          MS. SHARKO:  The most important thing is to have quick

18  rulings on these issues.  They're not hard issues.  We were

19  pretty surprised when Ms. Parfitt said no, you can't depose our

20  experts, and we're now burning time in the schedule I think

21  both sides really want to adhere to.

22          We were supposed to be deposing the plaintiffs'

23  experts between July 3 and August 27, and it's now July 21; we

24  don't have a date for a single one.  So whether you resolve it

25  or Judge Schneider resolves that first issue, it's up to Your

1   Honors.

2          MS. PARFITT:  If I can correct one thing.  We have not

3   taken the position that J&J cannot take our experts'

4   depositions.

5          Two, we did not, we did not -- the time period, the

6   reason the time period is an issue right now is that Ms. O'Dell

7   and I approached Ms. Sharko back in April and said there were

8   trials scheduled in July, and would J&J consider taking the

9   depositions of certainly the obstetrician/gynecologists

10  earlier, so that we would avoid the problem that we are in

11  right now, where we have some experts that are actually in

12  trial.  So I just want to be clear.  We are not objecting to

13  expert depositions.  Clearly, J&J is entitled to take, you

14  know, the case-specific.

15         I think where the parties' divide is, frankly, the

16  when, the scope, and that sort of thing, all things that we

17  should be able to work out, that I had hoped, frankly, that we

18  wouldn't have to ask either your help or, frankly, Judge

19  Schneider's help.

20         MS. SHARKO:  So --

21         MS. PARFITT:  We've arrived at a position that we're

22  in, I guess we can't agree, and maybe -- so I just don't want

23  to be misquoted as to the position of the plaintiffs.

24         What we did say is that if you intend to take the

25  deposition of perhaps Dr. McTiernan again or Dr. Siemiatycki,

```
 1   they were general causation experts that have been deposed

 2   extensively, they went through a Daubert proceeding, and,

 3   frankly, Your Honor ruled with regard to the scope of their

 4   testimony in this case.  They are not giving case-specific

 5   opinions.  So that seemed to not make much sense.  Some of the

 6   experts, we have already talked this morning that there are

 7   some we can provide in August.

 8           So, again, I don't know, Your Honor, how in depth you

 9   want us to go, but I just don't like being misquoted that I

10   said we have taken the position that we are not permitting any

11   expert depositions.  That's just not it.  And I think --

12           THE COURT:  So let me just set the stage for this a

13   moment.

14           MS. PARFITT:  Sure.

15           THE COURT:  If it's an issue of when, how, where, then

16   no doubt case-specific experts are going to be taken.  I will

17   leave to Judge Schneider to work scheduling if you have issues

18   with regard to it.

19           If there is an issue with regard to general causation,

20   Ms. Sharko, let me hear what the deal there is, please.

21           MS. SHARKO:  Sure.  First of all, Ms. Parfitt refers

22   to a request that the plaintiffs made in April.  They said

23   their two gynecologic oncology experts would be on trial in the

24   summer; would we consider taking their depositions earlier, if

25   we got the reports earlier?  And I told her no, because we need
```

```
 1   all the reports.  We don't just want those reports in a vacuum.

 2   That request was limited to two experts, and you know what?

 3   One of them isn't even involved in trials this summer,

 4   Dr. Clarke-Pearson.  It's only Dr. Wolf, and she's testifying

 5   in one trial.

 6          Now, to go to the substance of the issue, the

 7   depositions that were taken two years ago of the

 8   non-case-specific experts were laser focused on issues that

 9   would be addressed in the Daubert hearing.  These experts had

10   reports in many instances of over a hundred pages.  The idea

11   that you could depose any of these experts completely on all of

12   their opinions in seven hours was beyond ambitious, but we

13   agreed to one day per expert, and we took the depositions.

14          We need to go back now and take the depositions with

15   the focus on case-specific experts and case-specific issues,

16   and how the general issues interact with those issues.

17          THE COURT:  Well, let me ask you -- go ahead,

18   Ms. Sharko.  I'll ask my question after you're done.  Go ahead.

19          MS. SHARKO:  Sure.  Thanks.

20          A lot has happened in the last two years.  There's

21   been more epidemiology and more powerful epidemiology,

22   specifically, the O'Brien study, Health Canada came down with

23   its position on the regulation of talc, for better or for

24   worse.  The company made the decision to take the product off

25   the market, for commercial and legal advertising reasons.  I
```

1  know the plaintiffs disagree with that.  And there was the

2  issue of the FDA's position that they found asbestos in one

3  bottle or one lot, and the company took that particular lot off

4  the market.

5          So it's not like we took these depositions last week

6  or last month or yesterday.  They were a couple years ago.  All

7  those things have happened.  We're not going to repeat stuff.

8  We're grown-ups.  We're going to use our time wisely.  But we

9  do think we should be allowed to have one seven-hour deposition

10 of each expert on the non-case-specific experts.

11         MS. PARFITT:  Your Honor, may I respond to one part of

12 that?

13         THE COURT:  Yes.

14         MS. PARFITT:  And I think Ms. O'Dell would as well.

15         With regard to the new material that Ms. Sharko was

16 referencing, that is all true; all that has happened in the

17 last two years.  Importantly, though, it has not changed the

18 experts' opinion which was exhaustively examined.  Does talcum

19 powder cause -- can it cause ovarian cancer?  That was their

20 general causation opinion.  Of course, there has been

21 additional evidence.  But what we did is we went ahead and

22 amended, as Your Honor I think -- we amended those reports to

23 reflect their review of that material, with the same

24 conclusion, with the same opinion.

25         So, in an inquiry to Ms. Sharko, I did ask, if you

1   intend to take a deposition, are you making an inquiry of that

2   which has been talked about prior to O'Brien, asbestos in the

3   product, Health Canada -- and you correct me if I'm wrong -- my

4   understanding was that you were not necessarily going to limit

5   your examination to those areas that were supplemented in the

6   report.

7           And, again, so it is very clear, Your Honor, the

8   opinions of those experts have not changed.  Have they moved

9   forward, as all experts do, and looked at new material?  The

10  world is changing.  Our world changed dramatically in the last

11  two years.  So did they look at other material?  Yes.  Did

12  their opinions change?  No.  Are their opinions the same?  Yes.

13  Are they further buttressed by much of this material?  Oh, yes.

14  But their opinions are the same.  So I just wanted to comment

15  with regard to that.

16          I know Ms. O'Dell had written the letter with regard

17  to the case specifics, and she might want to address that.

18          THE COURT:  Well, let me deal with the general

19  causation first, case-specific.

20          My view is, particularly if they have supplemented

21  reports, even though their opinions may not have changed, but

22  if they have now said we've looked at these but are relying on

23  these as well, I would give the defendant an opportunity to

24  explore that.  But it's not opening up, Ms. Sharko, to what

25  they relied on before or opening up their deposition generally,

1    but it says to what they're now going to indicate and testify

2    that they reviewed since those reports issued, since,

3    obviously, as well, by the time they would ever testify at a

4    trial, they would want to talk about these, and I don't want to

5    come up at trial and say, well, I never got a chance to depose

6    you on those.  So yes, I will permit it.

7           I don't see that it needs to be seven hours.  If it

8    took seven hours the first time, and we're talking about

9    supplemental material and testing their opinions and why they

10   remain the same, I'm going to give you four hours, please, to

11   each of those.  I don't know who they are, how many they are.

12   So yes, you can.

13          MS. SHARKO:  Thank you.

14          THE COURT:  Turning to case-specific, obviously, those

15   should be occurring, and Ms. O'Dell, what's the issue there?

16          MS. O'DELL:  Judge, obviously, with the pandemic,

17   there have been a number of trials that have been reset.  It's

18   been very --

19          (The court reporter requested clarification.)

20          THE COURT:  We are having a hard time hearing you,

21   Leigh.  I don't know why.  It's almost a little freezing,

22   coming in and out, there is a hesitation.

23          MS. O'DELL:  I'm sorry.  I'm sorry, Judge.  I hope

24   that's better.

25          THE COURT:  No.  You know what we have found sometimes

 1   that's worked very well?  Maybe if you do the dial-in on your

 2   phone and we can get your audio on the phone.  Oops, she left

 3   us.

 4          MS. PARFITT:  Your Honor, if I may, I will go ahead

 5   and text her to see if she can dial in.

 6          MS. O'DELL:  Yes, ma'am.  Can you hear me better now?

 7          THE COURT:  Yes, that's fine.  I don't have to see the

 8   video.

 9          MS. O'DELL:  Just give me one moment.

10          THE COURT:  Actually, I'm hearing you okay right now

11   so let's try again.  You know what it is?  It's when you put

12   your video on that we have a problem.  So take your video off

13   and try and talk to us again.

14          MS. O'DELL:  How is that?

15          THE COURT:  Very good.  So let's just do it that way.

16   We won't get to see your expressions, you want to make faces,

17   just go right ahead, we don't see you, but you can just talk to

18   us.

19          MS. O'DELL:  I'm just smiling, Judge.

20          Actually, I'm in trial actually in St. Clair County,

21   Illinois, right now, I just stepped out of the courtroom, so we

22   have a number of trials that have been -- that one after the

23   other, even going to Philadelphia, and we knew this was coming

24   post-pandemic when things were set at once.  And so that's why

25   in April, anticipating this, I wrote to Ms. Sharko and said we

1    know this is coming, there is going to be experts in these

2    trials, it will be very difficult, and, frankly, it's experts

3    involved in the trials and it's the people that work with these

4    experts, and that's really important that they put them up.

5            And so I offered on April 27th to give dates earlier

6    to try to get these done in advance, and this doesn't happen in

7    a vacuum, Judge.  These case-specific-type expert reports have

8    been disclosed in probably -- [no audio] as well as State Court

9    as well as Federal Court now, and so the bottom line is what

10   I've offered through Ms. Parfitt [no audio].

11           THE COURT:  We lost you.  You know, let's go to you

12   dialing in on the phone.  Do you have all the info you could

13   use to dial in?

14           MS. O'DELL:  Yes, ma'am.  I will dial in.

15           THE COURT:  Okay, thanks.

16           MR. PLACITELLA:  The technology is not as good in

17   Illinois.

18           THE COURT:  That must be it.  By the way, you are

19   talking to a group here, between Jackie and Carol, we just

20   finished a seven-day patent trial yesterday afternoon that was

21   chock-full of chemistry like you can't believe, so there is

22   nothing you could throw out to me today that I can't handle.

23   All right?  An all-remote patent trial, my third one since

24   October, and it went so amazingly well, seamlessly, and the

25   attorneys even said at the end they would like to continue

```
 1   these patent trials in this fashion, these bench trials.  I
 2   think they're highly preferable to being in court.  We have
 3   50-some people on our Zoom, and particularly when you get
 4   confidential information, the idea that you would have to empty
 5   your courtroom, instead, we had consultants that were running
 6   this for us, and within a couple of seconds, they had removed
 7   everybody from the proceeding that couldn't hear the
 8   information; bring them back in, bring them out.  Half an hour
 9   for lunch, that's it.  Everybody is in their seat when they
10   need to be.  Witnesses didn't have to travel from India, Japan,
11   California, Florida, England.  It was three of these done, down
12   the tube now for me, and they're terrific that way.  Not a jury
13   trial, but a bench trial.  Anyway --
14           MS. O'DELL:  Judge, I'm back, so I hope you can hear
15   me.
16           THE COURT:  Good, I hear you well now, so go ahead.
17           MS. O'DELL:  Thank you.
18           So my point, Judge, is we certainly agree that these
19   case-specific experts need to be examined on their
20   case-specific opinions, and so what we had proposed is -- the
21   deadline currently is August the 27th, and what we proposed is
22   instead of having that as a deadline, because I will be in
23   trial up until I think August 26th, we proposed an extension to
24   the first two weeks of September, and we -- so I guess that the
25   bottom line is we know they need to be deposed, we're working
```

1   with J&J.  We just need some additional time because of trial

2   settings to do that.  Your Honor?

3          MS. PARFITT:  I think we lost the judge.  Oh, she's

4   back.

5          MR. PLACITELLA:  That's when you know your argument

6   has been rejected, Leigh.

7          (Laughter.)

8          THE COURT:  I'm back in now.  I signed out and in

9   again.  I don't know what happened.

10          Okay.  So, Leigh, start again.

11          MS. O'DELL:  Okay, Judge, I'm not sure where we

12   dropped off because I can't see you anymore.

13          But the bottom line is what we have asked for is an

14   additional time in early September, the first two weeks of

15   September, to try to get these depositions done.  That will

16   allow us to get out of trial on I believe August the 26th or

17   '7th, in that time frame, and for us to be able to do this.  We

18   know that depositions need to occur.  We just need some

19   flexibility because of the trials.

20          THE COURT:  Okay.  Well, at this point we're at the

21   end of July.  Is the world going to end, I don't know,

22   Ms. Sharko, if you have to wait until the beginning of

23   September?  Somehow, I don't think so.

24          MS. SHARKO:  So the problem is that we still don't

25   have dates for anyone.

1      Ms. Parfitt raised the possibility of an extension to

2  me for the first time about two hours ago, and I mean, it

3  depends.  The experts who are involved in the trials this

4  summer are all professional witnesses.  That's all they do now

5  is testify.  Dr. Plunkett; Dr. Godleski is retired and he's a

6  professional witness.  Dr. Longo of course is a professional

7  witness.  And then I understand Dr. Wolf is testifying in the

8  Philadelphia trial but not in the Illinois trial.

9      So, yes, I mean, if a deposition or two had to schlep

10  over into the week of August -- I guess it's 30 -- 30? -- I'm

11  sure the parties can work together on that.  Much beyond that,

12  it really impacts the schedule that we have.  And, again,

13  it's -- how many experts are we talking about?

14      MS. PARFITT:  Your Honor, if I may respond.  The

15  defendants have until 10-15 as the current schedule exists to

16  take their case-specific experts, for them to be deposed, and

17  as I indicated to Susan this morning, obviously, if this grace

18  was given to us, we would obviously give them an extension and

19  try not to delay anything.  We have no desire to delay the

20  dates.

21      I also explained to Ms. Sharko that Dr. Plunkett, who

22  is one of the individuals they would like to depose, we would

23  like to cross-notice her deposition.  She's already being

24  scheduled or in the process.  The dates were submitted for the

25  10th and 11th of August, to be taken in a State Court case, and

1    we felt, well, that would make sense to go ahead and

2    cross-notice, so that in the MDL we would have one deposition

3    with regard to any supplemental material that she looked at.

4    So that's one in the works.

5            And then I also believe that Dr. Allen Smith might

6    also -- there may be some dates that we can give to the Court

7    and to J&J.  So we're not trying, again, to drag it out.  If we

8    get availability for these experts, that is exactly what we're

9    trying to do.

10           The Court might also be aware that -- I mean, Labor

11   Day is the 3rd of September and it goes through the 6th, that

12   long weekend.  So we have to factor that in for some of our

13   experts.  They are doing their best to accommodate.

14           Ms. Sharko asked us to get three dates for each one of

15   the experts.  We have been out there trying to do that, trying

16   to accommodate.  This is not a stalling mechanism.  It is just

17   a reasonable request that we be given a little bit of time so

18   that we can accommodate all of the needs of J&J, and, frankly,

19   some trial schedules that we anticipated might present a

20   problem, and tried to do something about it earlier in the

21   year.  So, again --

22           THE COURT:  So let me tell you where we are.  And I

23   don't really want to get into the nitty-gritty of this, so I'm

24   going to refer to Judge Schneider who is on the line.  And he's

25   also happy, I'm sure, to stay on with you today and talk about

1    this a little further and try and bear down on this.

2          But the other question is narrowing the list of 24

3    experts, and that's going to be important, and that has to be

4    done in quick fashion.  So I'll let him work out a schedule

5    with all of you.

6          But I think what I want to put on your horizon, even

7    though we have a conference scheduled towards the end of the

8    summer to talk about trial, I can tell you what I'm looking at

9    right now, which is scheduling a bellwether trial in April

10   2022.  I'm not going to put it on in the winter months.  One,

11   I'm still cleaning up criminal cases; and, two, I don't want to

12   deal with the weather out here in the north either and have

13   problems with experts coming in and other things.  So I really

14   would prefer the spring.  And there are a number of things I

15   have in March already that are taking me to Washington and

16   other places so I don't want to break this up.  So April looks

17   good.  That's what I'm looking at.  And you're going to work

18   backwards.  I told Judge Schneider that this morning, in fact.

19   So everything we do has to work backwards from getting this

20   ready for that date, some date in April.

21          MS. PARFITT:  Excellent.  Thank you.  Helps a lot.

22          MS. O'DELL:  Thank you, Judge.

23          MS. SHARKO:  We have one more issue.

24          THE COURT:  Sure.

25          MS. SHARKO:  I just want to make sure you are aware of

1   it, and then we can deal with Judge Schneider on it if you

2   want, and that is the fact that the evening before the expert

3   reports were due, plaintiffs told us they were going to dismiss

4   one of our picks, one of the six picks.  We immediately

5   substituted -- we didn't complain, although I think we could

6   have.  We immediately substituted a new case and asked

7   plaintiffs for expert reports.  A week or so later, plaintiffs

8   dismissed that case, with prejudice, as to the J&J defendants.

9   We then immediately picked a third replacement, the Bondurant

10  case, and we need deadlines for expert reports.  So perhaps

11  Judge Schneider can help us with that.  Ms. Parfitt and I tried

12  to work that out this morning and we were unable to,

13  sympathetic, I guess, to the fact that she says they don't have

14  the pathology yet, et cetera.  But I think we need dates.

15           THE COURT:  Sounds like you do.  You need a plan here.

16           Joel, are you going to have some time to talk to these

17  lawyers today?

18           JUDGE SCHNEIDER:  I was going to suggest that, that

19  after you're done with your issues, you don't have to stay on

20  the line, and I'll be happy to deal with the parties with the

21  other issues we talked about.

22           THE COURT:  So we are hosting this, so, Jackie, can

23  you come on a moment?

24           JUDGE SCHNEIDER:  Is it possible, Judge --

25           THE COURT:  I want to make somebody a cohost so you

1 can take it over.  So, Jackie, can you make someone a cohost so

2 they can continue without us?

3          THE COURTROOM DEPUTY:  Sure.  Who wants to be the

4 cohost?

5          THE COURT REPORTER:  Your Honor, do I stay on or do I

6 leave?

7          THE COURT:  No, you can leave, Carol.

8          MS. PARFITT:  We can, Your Honor, or Judge Schneider.

9 I don't know who you wish to be the cohost?

10          MS. SHARKO:  We'll be the host.

11          JUDGE SCHNEIDER:  I'm probably not the right person to

12 do that.  I had some technical difficulties.  I'm on my little

13 iPhone, so probably someone who knows what they're doing ought

14 to do it.

15          MS. SHARKO:  Sounds like Ms. Brennan is the logical

16 candidate.

17          MS. BRENNAN:  I can, so go ahead.

18          THE COURT:  Okay.  Jackie, let's let Jessica Brennan

19 become your cohost, and then we will make sure that you can

20 take it over and then we'll exit and allow you to -- you make

21 good use of your time with Judge Schneider today, since you are

22 all on, and take care of this.

23          We are on, as I said, whatever it is, in about a month

24 or so, to talk more specifically about the trial date, but I

25 have given you now the ballpark month and year, and we just

1    hope things keep going along the way they are so that all of

2    this remains realistic.

3          I will tell you I did do a full in-person criminal

4    jury trial in the beginning of June, and that required 14

5    jurors, and I'll just give you the benefit of this.  I know you

6    are all going in different places around the country but I'm

7    talking about New Jersey right now.

8          The state courts, I know, are still doing a hybrid

9    jury selection, remotely, and then you come in.

10         We did total jury selection in the courthouse.  It

11   went amazingly well.  We had no resistance to serving based on

12   COVID.  We follow all protocols in our courthouses still of

13   mask wearing and not six-foot social distancing but about three

14   feet at this point.  And we had an eight-day criminal trial and

15   with almost double the jury of what you would get in a civil

16   trial, more than double, and it went very, very well, without a

17   hiccup.  And I'm hoping things will be different by April and

18   we will be able to not do even some of these other things, but

19   we had our jurors in the jury box, every other seat, created a

20   row in the front, couple on the end, so I know some

21   jurisdictions put jurors in a gallery.  We didn't do that.  We

22   got them all in the jury box.  For purposes of witnesses,

23   witnesses wore a clear facial shield so we could see their

24   faces.  When we individually questioned jurors, they wore a

25   clear mask so we could see them.  All kind of little things,

1 though, that allowed us to follow safety protocols but allowed

2 you to see faces.

3          And then I permitted my attorneys to take off their

4 masks to do questioning, openings, et cetera, even though my

5 attorneys were vaccinated, but they did remove masks for that

6 purpose.

7          You had a question, Chris?

8          MR. PLACITELLA:  I was going to say sounds like I need

9 to have a conversation with the state bar about another

10 seminar.

11          THE COURT:  Right, there you go.  Yes.

12          And we have now -- I have successfully completed one,

13 Judge Shipp did, Kugler did, and Hillman.  I think Vazquez is

14 doing one as we speak.  So we have been doing one in a

15 courthouse at a time, but that we intend to change in

16 September.  And we are permitting if someone wants to begin to

17 schedule civil trials now.

18          MR. PLACITELLA:  Great.

19          THE COURT:  But criminal will remain the priority.  If

20 there is a conflict in some way, we are still doing criminal

21 first, but I am committing to you it will not be a conflict if

22 I schedule this in April, it will work, unless the world turns

23 again and we are in a terrible place, and then none of us are

24 doing any of this, but I'm hoping that's not the case, and we

25 will see if we have to follow protocols as this, but it worked

1    very well.

2          I debriefed the jurors about whether they had

3    suggestions for us or what they thought about the experience.

4    Everyone felt very comfortable and they had no recommendations

5    that they would make for changing things, which is pretty

6    unbelievable because, you know, a lot of people don't want to

7    wear a mask all day long, particularly if they have been

8    vaccinated, but we came to the conclusion we really couldn't

9    ask or demand that they be, and we didn't want anyone to think

10   by inquiring, that meant maybe you would not be favored to

11   serve if you were not, so we never got into it, and that's why

12   it was just across-the-board mask-wearing policy, and they

13   didn't mind it in the slightest.  And when it came down to

14   deliberate, we asked if they wanted to use -- because we were

15   using Judge Shipp's courtroom next-door when we had large

16   gatherings for overflow.  We asked if they wanted to deliberate

17   in his courtroom so they could distance, because during the

18   trial, what we do is we put seven jurors in my jury room, seven

19   in his, when they would take breaks or lunch, and they said no,

20   they were comfortable with all 12 coming in to deliberate in

21   one room, and when I came in to see them, they all had their

22   masks off as they deliberated.

23         But there was maybe a slightly longer jury selection

24   because we used a questionnaire, and the manner in which we did

25   it, and, of course, it's a little different because I had

```
 1   someone who was in custody and shackled, and so how we could do
 2   things and bring people in and out was different.  We won't
 3   have that in a civil case.
 4         I'm hoping a lot of this won't be an issue, but I'm
 5   pointing out to you, even with those logistical issues, it went
 6   very well, and no hybrid, no remote on jury selection, and I'm
 7   pleasantly surprised at the willingness of jurors to serve.
 8   Maybe they feel like they wanted to get out of their house at
 9   this point, and they liked it, but they were good.  Or, as
10   one of the judges put to me, maybe it was also the case we were
11   trying which wasn't the run-of-the-mill drug or whatever.  It
12   was an attempted murder for hire of an ex-wife, so I think
13   maybe they liked the subject so ...
14         But, okay, in other words, I think we're good.  I'm
15   comfortable with trying to schedule this and work with that.
16         So, Joel, I'm going to turn them over to you.
17   Jessica, you're ready to take over or you have as cohost?
18         MS. BRENNAN:  (Indicating.)
19         THE COURT:  You know what you're doing.  I couldn't do
20   this so I'm glad you are.
21         All right.  Everybody have a good month.  We will see
22   you the next conference.
23   (The proceedings concluded at 12:03 p.m.)
24         - - - - - - - - - - - - - - - - -
25
```

1          I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3

4    /S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI
     Court Reporter/Transcriber

5

6    July 29, 2021
          Date

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court
District of New Jersey