# Exhibit C

*(Emergency Stay Motion)*

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. |  |

### DEBTOR'S EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST TALC CLAIMANTS WHO SEEK TO PURSUE THEIR CLAIMS AGAINST THE DEBTOR AND ITS NON-DEBTOR AFFILIATES

The above-captioned debtor ("LTL" or the "Debtor") moves the Court for the entry of an interim and final order enforcing the automatic stay against tort claimants (collectively, the "Plaintiffs")[2] who, despite the imposition of the automatic stay, seek to recover on their claims against the Debtor by asserting those same claims against the Debtor's ultimate parent, Johnson & Johnson ("J&J"), the Debtor's other non-debtor affiliates, and the former Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI"). In support of this Emergency Motion, the Debtor respectfully represents as follows:

### Preliminary Statement

Shortly after the commencement of this chapter 11 case on October 14, 2021 (the "Petition Date"), the Debtor filed a notice of suggestion of bankruptcy in thousands of pending talc lawsuits to inform the courts and the parties about the commencement of this case and the applicability of the automatic stay to their pending lawsuits. The very next day numerous Plaintiffs responded. Using virtually identical language, they informed the applicable

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]     A list of Plaintiffs' counsel who have, as the filing of this Motion, released statements or taken actions indicating an intent to take actions that violate the automatic stay, is attached hereto as Exhibit A.

courts and the Debtor that they have no intention of respecting the Debtor's notice of the automatic stay and instead will continue to pursue their talc claims against the Debtor by pursuing those same claims against (i) Old JJCI – an entity that no longer exists and whose talc-related liability now resides in the Debtor, (ii) J&J and (iii) the Debtor's other non-debtor affiliates. As stated in a written communication from the plaintiffs' ovarian cancer steering committee (the "Plaintiffs' Steering Committee"):[3]

> [t]he Plaintiffs' Steering Committee opposes any stay of proceedings against [J&J] or [Old JJCI]. Neither company has filed bankruptcy. The law does not provide for an automatic stay of cases against non-debtors ….

The Plaintiffs are incorrect. As this Court recently affirmed based on well-established precedent in the Fourth Circuit, actions against Non-Debtor parties to recover claims against the Debtor are automatically stayed under section 362 of the Bankruptcy Code. This is because either the non-Debtor parties share such an identity of interest with the Debtor that the Debtor is, in effect, the real-party defendant, or the claims are property of the Debtor's estate. See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), 2021 WL 3729335, at *30-32 (Bankr. W.D.N.C. Aug. 23, 2021); DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC), 2021 WL 3552350, at *27-28 (Bankr. W.D.N.C. Aug. 11, 2021). In addition, the commencement or continuation of the talc claims against Old JJCI or J&J is for the purpose of liquidating and recovering claims against the Debtor. Thus, such an action is expressly enjoined by section 362(a)(1) because it constitutes an "action or proceeding against the debtor" to recover a prepetition claim. Permitting the continued piecemeal litigation of such claims in the tort system

---

[3]     The Plaintiffs Steering Committee represents 35,000 plaintiffs in talc-related lawsuits against Old JJCI and J&J in the federal multi-district litigation in the United States District Court for the District of New Jersey, No. 16-02738.

notwithstanding the automatic stay would undoubtedly interfere with, and potentially end, the

Debtor's reorganization case. For these reasons, the Plaintiffs' pursuit of claims against the

Debtor's non-debtor affiliates, including J&J, to recover their claims against the Debtor is a

violation of the automatic stay that this Court should halt.

## Factual Background

1.      On the Petition Date, the Debtor commenced this reorganization case by

filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is

authorized to continue to manage its property and operate its business as a debtor in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      In support of this Emergency Motion, the Debtor incorporates by

reference the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 5] (the "First

Day Declaration").

### *Corporate History*

3.      On October 12, 2021, Old JJCI implemented an internal corporate

restructuring (the "2021 Corporate Restructuring"), as described below. First Day Decl. ¶ 16.

As a result of that restructuring, Old JJCI ceased to exist and two new entities were created:

(a) the Debtor, which was initially formed as a Texas limited liability company and then

converted into a North Carolina limited liability company; and (b) a second entity, which was

initially formed as a Texas limited liability company and then merged into a New Jersey

corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this

entity changed its name to "Johnson & Johnson Consumer Inc." ("New JJCI"). Id.

4.      New JJCI manufactures and sells a broad range of products used in the

baby care, beauty, oral care, wound care and women's health-care fields, as well as

over-the-counter pharmaceutical products. Id. ¶ 19. The Debtor's ultimate parent company,

J&J, is a holding company that through its operating subsidiaries conducts business in virtually

all countries in the world, focused primarily on products related to human health and well-being.

Id.

### The 2021 Corporate Restructuring

5.      Old JJCI and its affiliates have engaged in multiple restructurings through

the years to achieve business and operational objectives.  First Day Decl. ¶ 20.

The 2021 Corporate Restructuring was implemented to enable the Debtor to fully resolve

talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI

enterprise to a bankruptcy proceeding.  Id. ¶ 21.

6.      As a result of the 2021 Corporate Restructuring, which is described in

greater detail in the First Day Declaration:

   a.   Old JJCI ceased to exist;

   b.   The Debtor, as well as New JJCI, were formed;

   c.   The Debtor received certain of Old JJCI's assets, as set forth below, and
        became solely responsible for certain of its liabilities, including Old JJCI's
        liabilities arising from talc-related claims against it (other than claims for
        which the exclusive remedy is provided under a workers' compensation
        statute or similar laws) (the "Debtor Talc Claims");

   d.   New JJCI was allocated all other assets of Old JJCI and became solely
        responsible for all other liabilities of Old JJCI;

   e.   A funding agreement (the "Funding Agreement") was established between
        New JJCI, J&J and the Debtor for the purpose of ensuring that the Debtor

has at least the same, if not greater, ability to pay the Debtor Talc Claims

against it as Old JJCI had before the 2021 Corporate Restructuring;[4] and

    f.    The Debtor agreed to indemnify New JJCI and its affiliates for any losses
it might suffer related to the Debtor Talc Claims.

Id. ¶¶ 22-23.

    7.    At the time of the 2021 Corporate Restructuring, the Debtor received the

following assets:

    a.    Old JJCI's rights and interests as payee under the Funding Agreement (as
discussed below, J&J and New JJCI have agreed to advance $2 billion
under the Funding Agreement into a qualified settlement trust);

    b.    A bank account and approximately $6 million in cash;

    c.    All contracts of Old JJCI related to its talc-related litigation, including
settlement agreements, interests in qualified settlement trusts, indemnity
rights, insurance coverage rights, service contracts and engagement and
retention contracts, if any;

    d.    All equity interests in Royalty A&M LLC ("Royalty A&M"), which owns
a portfolio of royalty revenue streams, including royalty revenue
streams based on third-party sales of certain products, a business that is projected
to generate approximately $50 million in revenue per year over the next
five years and has the ability to borrow up to $50 million from J&J on
terms consistent to those provided to other J&J affiliates;

    e.    Causes of action that relate to the assets and liabilities allocated to the
Debtor;

---

[4]    Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on
a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses
of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case
and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11
case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M
are insufficient to pay such costs and expenses. First Day Decl. ¶ 27. In addition, the Funding Agreement
requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the
Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a
chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash
distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses
and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that
funding. Id.

      f.   Privileges that relate to the assets and liabilities allocated to the Debtor; and

      g.   Records that relate to the assets and liabilities allocated to the Debtor.

Id. ¶¶ 24, 26, 30.

      8.    In total, the Debtor's value is approximately $373.1 million, without taking into account the Funding Agreement with New JJCI and J&J.  Id. ¶ 26.  In addition, J&J and New JJCI have committed to fund as early as January 31, 2022 a North Carolina trust that will constitute a "qualified settlement fund" with an aggregate amount of $2 billion for the payment of current and future talc-related claims asserted against or related to the Debtor.  Id. ¶ 28.

### The Debtor Talc Claims

      9.    Cosmetic talc litigation against the Debtor has focused primarily on JOHNSON'S® Baby Powder (hereinafter, "Johnson's Baby Powder") as a purported cause of ovarian cancer and mesothelioma.  Id. ¶ 32.  For over 125 years Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  Id.

      10.   J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1894, launching its baby-care line of products.  Id. ¶ 10.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  Id.  In 1979, J&J transferred all its assets and liabilities associated with the baby products division to Old JJCI.  Id.  Following this transaction, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder and, instead, Old JJCI manufactured and sold Johnson's Baby Powder.  Id. ¶¶ 10, 33.  Old JJCI is responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other disease.  Id. ¶¶ 9-15.

11.     On May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada.  <u>Id.</u>  The decision was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.  <u>Id.</u> ¶ 33.  As set forth in the Debtor's *Information Brief* filed on the Petition Date [Dkt. 3], the Debtor stands behind the safety of Johnson's Baby Powder and asserts, based on decades of internal and third party studies and testing, that it is not a cause of either ovarian cancer or mesothelioma.

12.     As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey (the "<u>MDL</u>"), and approximately 3,300 cases in multiple state court jurisdictions across the country.  <u>Id.</u> ¶ 42.  In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio.

13.     Even though J&J has not manufactured or sold talc-containing products for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both the Debtor and J&J.  In many jurisdictions, the plaintiffs seek to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims.

***The Debtor's Insurance Coverage***

14.     The Debtor believes that it has rights to insurance coverage for its Debtor Talc Claims.  <u>Id.</u> ¶ 46.  In particular, the Debtor has access to primary and excess liability

insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[5]  Id.

15.      Aetna Casualty and Surety Company ("Travelers")[6] issued primary general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980 (the "Travelers Policies").  Id. ¶ 47.  The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $263 million in the aggregate.  Id.  The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.  Id.  The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits.  Id.  From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor.  The combined aggregate limits of those policies total approximately $563 million.  Id. ¶ 48.

16.      From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor.  Id. ¶ 49.  Those insurers include subsidiaries or affiliates of the following companies:  American International Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity Company and North River Insurance Company.  Id.  The combined limits of those excess policies total more than $1.09 billion in the aggregate.  Id.  Certain of the insurers that issued the above-described excess policies are insolvent (including, in particular, Home Insurance Company).  Id.

---

[5]      The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

[6]      Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

17.    From 1981 to 1985, American Motorists Insurance Company ("<u>AMICO</u>") issued primary and excess coverage that covers the Debtor (the "<u>AMICO Policies</u>").  <u>Id.</u> ¶ 50. AMICO is insolvent, having been placed into liquidation in 2013.  <u>Id.</u>  The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.  <u>Id.</u>

18.    From 1973 through 1985, Middlesex Insurance Company ("<u>Middlesex</u>"), a captive that is a wholly-owned subsidiary of J&J, issued policies that cover J&J and the Debtor. <u>Id.</u> ¶ 51.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  <u>Id.</u>  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  <u>Id.</u>  As described in the First Day Declaration, there is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (<u>i.e.</u>, insurers other than the Middlesex captive), on the other hand, regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies.  <u>Id.</u>

19.    In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion. <u>Id.</u> ¶ 52.

20.    J&J and Old JJCI have tendered talc-related claims to the third-party insurers.  To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments.  Instead, the third-party insurers have asserted various coverage defenses. <u>Id.</u> ¶ 53.

21.    In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against Old JJCI, J&J and Middlesex in the Superior Court of Middlesex County (Docket No.

MID-L-003563-19) (the "New Jersey Coverage Action"), seeking a declaratory judgment
regarding the parties' respective obligations under the plaintiff insurers' policies including, in
particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among others, Old
JJCI. The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020. On July 31,
2020, J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint, and
asserted counterclaims and cross-claims against certain defendants. Travelers and certain other
insurers filed cross-claims against J&J, Old JJCI, and Middlesex to which J&J, Old JJCI, and
Middlesex responded later in 2020. The New Jersey Coverage Action remains pending. Id. at
54.

***The Debtor's Decision to File for Chapter 11 Reorganization***

   22. As of the Petition Date, tens of thousands of talc-related lawsuits are
pending in jurisdictions throughout the United States. See id. ¶ 42. Absent its bankruptcy filing,
the Debtor expects that thousands of additional ovarian cancer and mesothelioma cases would
have been filed against it for decades to come. Id. ¶ 45.

   23. As noted, prior to the Petition Date, Old JJCI and J&J asserted that there
was no scientific or other proof that Johnson's Baby Powder either contained asbestos or was a
cause of ovarian cancer or mesothelioma. As a result, Old JJCI and J&J had various successes in
cosmetic talc litigation, including, among others things, dismissing roughly 1,300 ovarian cancer
and over 250 mesothelioma cases without payment, and achieving 16 key defense verdicts. Id. ¶
38. Old JJCI also succeeded in obtaining reversal of many plaintiff verdicts on appeal. Id.
Despite these results, and the lack of proof that its product was unsafe, Old JJCI was also subject
to a number of plaintiff verdicts involving unpredictable and wildly divergent compensatory and
punitive damages awards. Id. In addition, prior to the commencement of this case, Old JJCI had
incurred nearly $1 billion in defending a tidal wave of personal-injury lawsuits relating to alleged

talc exposure, nearly all of which was spent in only the last five years.  Id. ¶ 40.  In the months

prior to the Petition Date, Old JJCI was paying anywhere from $10 million to $20 million

monthly in defense costs.  Id.  And, cosmetic talc litigation against the Debtor was anticipated to

grow for decades more, as were the extraordinary costs of resolving tens of thousands of

expected claims.  Id. ¶ 41.

        24.     The status quo was untenable given the cost, burden, uncertainty and

anticipated duration of the cosmetic talc litigation.  The only available option to appropriately

assess, resolve, and administer the current and future talc-related claims in an efficient and

equitable manner is this chapter 11 case.  Id. ¶ 58.

***The Plaintiffs' Statements Threatening Violations of the Automatic Stay***

        25.     Following the Petition Date, the Debtor filed notices of suggestion of

bankruptcy (the "Bankruptcy Notices") on the dockets of pending talc-related cases against the

Debtor and/or J&J (Old JJCI ceased to exist as result of the 2021 Corporate Restructuring).  A

copy of the Bankruptcy Notice filed in the MDL (without Exhibit A thereto) is attached hereto as

Exhibit B.  The Bankruptcy Notices informed the applicable courts and the parties about the

commencement of this chapter 11 case and the application of the automatic stay to the assertion

of the Debtor Talc Claims against the Debtor, J&J and other parties.

        26.     In an apparent coordinated effort to resist the automatic stay, counsel

representing thousands of talc-related plaintiffs then informed the relevant courts and the Debtor

in writing that they challenge the application of the automatic stay and intend to pursue the

Debtor Talc Claims against J&J, Old JJCI and/or related parties.  A representative sample of

these communications offered by the Plaintiffs' leadership in a coordinated proceeding in

California:

> The Plaintiffs' Leadership opposes any effort to stay these proceedings sought by [J&J, Old JJCI] or any other related entities. The law does not provide for an automatic stay of cases against non-debtors. The Plaintiffs' Leadership will be filing an opposition to any stay filed and will request an opportunity to be heard on this issue if it should arise.

Virtually identical statements have been filed in the MDL, as referenced above, and the multicounty litigation pending in New Jersey as well as in lawsuits in New York, Georgia and Florida. The judge presiding over the MDL has asked for submissions by the parties this week regarding whether the stay applies to non-debtor parties. The counsel in these proceedings represent more than 35,000 claims against the Debtor and J&J.

## Jurisdiction

27.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. In particular, this Court has "arising under" jurisdiction to determine that section 362(a) of the Bankruptcy Code prohibits the commencement or continuation of the Debtor Talc Claims against the Debtor and its non-debtor affiliates. A bankruptcy court has jurisdiction for matters "arising under" provisions of the Bankruptcy Code such as section 362. See e.g., A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999-1000 (4th Cir. 1986); DBMP, 2021 WL 3552350, at *18; In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013).

28.     This is a core proceeding pursuant to 28 U.S.C. § 157(b). For example, and without limitation, this matter is a core proceeding under (a) 28 U.S.C. § 157(b)(2)(A) (relating to "matters concerning the administration of the estate") because the outcome will directly affect the Debtor's ability to achieve a successful reorganization to resolve all current and future talc claims and (b) 28 U.S.C. § 157(b)(2)(G) (relating to "motions to terminate, annul,

or modify the automatic stay") because it seeks to ensure the integrity and application of the automatic stay. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409

<u>**Relief Requested**</u>

29.     The Debtor seeks an order enforcing the automatic stay against Plaintiffs who have threatened or otherwise taken actions to recover their talc claims against the Debtor by asserting those same claims against Old JJCI, J&J or the Debtor's other non-debtor affiliates.

<u>**Argument**</u>

**I.      The Automatic Stay Prohibits Prosecution of Debtor Talc Claims against J&J and the Debtor's Other Non-Debtor Affiliates**

30.     The automatic stay imposed by section 362(a) of the Bankruptcy Code allows "the bankruptcy court to centralize all disputes concerning property of the debtor's estate in bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." <u>Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)</u>, 922 F.2d 984, 989 (2d Cir. 1990); <u>Aldrich Pump</u>, 2021 WL 3729335, at [¶ 181] (ruling that claims against third parties which "necessarily result in the liquidation and recovery of claims against the Debtors outside of the bankruptcy case" are barred by the automatic stay); <u>see also</u> 11 U.S.C. § 362(a). Fourth Circuit precedent recognizes that the automatic stay of section 362(a) may apply of its own force to prohibit the prosecution of Debtor Talc Claims against J&J and its non-debtor affiliates. Indeed, this Court has recently ruled that the automatic stay applies to actions against non-debtor parties under very similar circumstances. <u>See Aldrich Pump</u>, 2021 WL 3729335, at *31-32; <u>DBMP</u>, 2021 WL 3552350, at *28 (same).

**A.      Actions Seeking to Hold J&J and Old JJCI Liable for Debtor Talc Claims Are Stayed Pursuant to Section 362(a)(1).**

31.     Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could

have been commenced before the commencement of the case under this title, or to recover a

claim against the debtor that arose before the commencement of the case under this title." 11

U.S.C. § 362(a)(1).

        32.     As explained above, Old JJCI no longer exists, and the Debtor is

responsible for the Debtor Talc Claims.  Thus, the commencement or continuation of the Debtor

Talc Claims against Old JJCI can have only one purpose:  the ultimate liquidation and recovery

of claims against the Debtor.  And, because the Debtor Talc Claims allege liabilities arising out

of Old JJCI's actions years before the Petition Date, any action against Old JJCI to recover such

claims is expressly enjoined by section 362(a)(1) because it constitutes an "action or proceeding

against the debtor" to recover a prepetition claim.  See In re Heating Oil Partners, No. 3:08-CV-

1976 CSH, 2009 WL 5110838, at *6–7 (D. Conn. Dec. 17, 2009) (holding that a default

judgment entered as to a predecessor entity of the debtor was automatically stayed upon the

successor entity's chapter 11 filing and void ab initio), aff'd sub nom. In re Heating Oil Partners,

LP, 422 F. App'x 15 (2d Cir. 2011).

        33.     Likewise, as explained above, all of J&J's liabilities associated with

Johnson's Baby Powder and other talc-containing products were transferred to Old JJCI when it

assumed those liabilities in 1979.  Thus, the pursuit of the Debtor Talc Claims against J&J is an

effort to liquidate and recover claims for liabilities that were transferred to the Debtor's

predecessor in 1979 and are now liabilities of the Debtor.  Queenie, Ltd. v. Nygard Int'l, 321

F.3d 282, 287 (2d Cir. 2003) (automatic stay may apply to non-debtors, specifically where there

is a claim to establish an obligation of which the debtor is a guarantor) (citing McCartney v.

Integra National Bank North, 106 F.3d 506, 510-11 (3d Cir. 1997)).

34.     In addition, Fourth Circuit precedent recognizes that the automatic stay
imposed by section 362(a)(1) extends of its own force to enjoin actions against parties who share
such an identity of interests with the debtor in respect to those actions that the debtor is, in effect,
the real-party defendant.  Actions against New JJCI and J&J are stayed by this provision
because, given the Debtor's assumption of the responsibility for claims asserted against New
JJCI or J&J, "there is such identity" with the Debtor that it "may be said to be the real party
defendant."  See Robins, 788 F.2d at 999; see also McCartney v. Integra Nat'l Bank N., 106 F.3d
506, 510–11 (3d Cir. 1997) (concluding that the automatic stay enjoined an action against non-
debtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a
deficiency judgment against the third party); In re Brier Creek Corp. Ctr. Assoc. Ltd. P'ship, 486
B.R. 681, 689-92 (Bankr. E.D.N.C. 2013).

35.     The Fourth Circuit in Robins described a type of situation that would
cause such an identity of interests:

> An illustration of such a situation would be a suit against a
> third-party who is entitled to absolute indemnity by the debtor on
> account of any judgment that might result against them in the case.

Robins, 788 F.2d at 999.  Indeed, the court continued, "[t]o refuse application of the statutory
stay in that case would defeat the very purpose and intent of the statute."  Id.; see id. (quoting In
re Metal Ctr., 31 B.R. 458, 462 (D. Conn. 1983) ("Clearly the debtor's protection must be
extended to enjoin litigation against others if the result would be binding upon the debtor's
estate.")); Edwards v. McElliotts Trucking, LLC, No. 3:16-1879, 2017 WL 5559921 at *3 (S.D.
W. Va. Nov. 17, 2017) (finding that indemnification arrangement between the debtor and non-
debtor defendants made action against non-debtor defendants subject to the automatic stay
imposed by section 362(a)(1)); In re W.R. Grace & Co., Case No. 01-01139 (JKF), 2004 WL
954772, *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two

non-debtor parties where one of the parties was entitled to contractual indemnity from the debtor

on account of such claims and amending preliminary injunction order to include such action).

"Identity of interests" also occurs where adjudication of the claims against non-debtors "raises

collateral estoppel and res judicata issues for the debtor."  <u>Aldrich Pump</u>, 2021 WL 3729335,

at *31.

      36.    This Court recently held on similar facts that the automatic stay applied to

stay actions where the debtor was the real-party defendant and litigating the mass tort claims

against third parties, which included non-debtor affiliates, would effectively liquidate claims

against the debtor.  <u>Aldrich Pump</u>, 2021 WL 3729335, at *31; <u>DBMP</u>, 2021 WL 3552350, at

*27.

      37.    Here, as in <u>Robins</u>, and more recently in <u>DBMP</u> and <u>Aldrich Pump</u>, New

JJCI and J&J share an identity of interest with the Debtor in respect of the Debtor Talc Claims

such that the Debtor is the real-party defendant in the Debtor Talc Claims brought against the

non-debtor affiliate.  As discussed above, litigating, settling or attempting to establish the value

the Debtor Talc Claims against the non-debtor affiliate would liquidate claims against the

Debtor, including by triggering existing indemnification and similar obligations of the Debtor to

such entities.  Such litigation also creates risks of binding the Debtor through *res judicata* and

collateral estoppel, and creating an evidentiary record that prejudices the Debtor.  Because the

Debtor is the real-party defendant in any suit seeking to liquidate and recover on account of a

Debtor Talc Claim, section 362(a)(1) stays such actions.

     **B.**    **Insurance Policies Are Estate Assets and Therefore Suits That Would
Deplete Those Policies Are Automatically Stayed.**

      38.    Section 362(a)(3) bars plaintiffs from bringing suits that would deplete the

Debtor's insurance on account of Debtor Talc Claims because the insurance coverage is property

of the estate.  See Aldrich Pump, 2021 WL 3729335, at *33 ("[S]ection 362(a)(3) bars plaintiffs

from bringing actions against the Debtors' Insurers on account of Aldrich/Murray Asbestos

Claims because the insurance coverage is also property of the estate."); see also Robins, 788 F.2d

at 1001 (agreeing with "the weight of authority" that insurance contracts are property of the

estate and that "[a]ccordingly actions 'related to' the bankruptcy proceedings against the insurer

. . . are to be stayed under section 362(a)(3)"); In re Johns-Manville Corp., 40 B.R. 219, 231

(S.D.N.Y. 1984) ("determin[ing] that Manville's insurance is property of the estate under the

Code and that actions by third parties against the bankrupt's insurers are automatically stayed

upon the filing of the petition").

      39.    J&J and the Debtor are both covered for talc-related claims under various

shared insurance policies.  The right to coverage under these insurance policies is property of the

Debtor's estate, and prosecution of a claim against J&J, a co-insured party, would deplete

proceeds available to the Debtor, thereby reducing assets available to the bankruptcy estate.  See,

e.g., In re Quigley Co., Inc., 676 F.3d 45, 53-54, 58 (2d Cir. 2012) ("[W]here litigation of the

[lawsuits against non-debtor] would almost certainly result in the drawing down of insurance

policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction

to enjoin these suits was appropriate."); Robins, 788 F.2d at 1008 (sustaining injunction and

transfer of claims against non-debtors in part because such claims, if successful, would reduce

insurance funds available to debtor's estate); In re Montreal Me. & Atl. Ry., Ltd., No. 1:13-MC-

00184-NT, 2014 WL 1155419, at *10 (D. Me. Mar. 21, 2014) (finding jurisdiction and

transferring non-debtors' cases based on shared insurance); Raudonis, as trustee for the Raudonis

2016 Revocable Trust v. RealtyShares, Inc., 507 F.Supp 378, 384 (D. Mass. 2020) ("Because

courts generally recognize insurance policy as 'property' under 11 U.S.C. § 541(a)(1) – and thus

find such policies subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3) – the

defendants' shared insurance contract arguably sweeps [co-insureds] into the reach of the

automatic stay."); In re Metro Mortg. & Secs. Co., 325 B.R. 851 (Bankr. E.D. Wash. 2005)

(holding that shared insurance policies and their proceeds were property of the debtors' estates

and were protected by automatic stay).

40.     Here, insurance is potentially available to both the Debtor and J&J under

various insurance policies for talc-related claims.  If a Debtor Talc Claim is prosecuted against

J&J, J&J may seek coverage under these shared insurance policies to satisfy any judgment,

thereby reducing the coverage available to the Debtor's estate.  Such a depletion of an estate

asset violates the automatic stay and, therefore, Debtor Talc Claims against J&J are stayed

pursuant to section 362(a)(3).

**C.     Actions Seeking to Hold Non-Debtor Affiliates Liable
for the Debtor Talc Claims Based on "Derivative Liability" Are
Property of the Debtor's Estate and Automatically Stayed.**

41.     Section 541 of the Bankruptcy Code establishes that the filing of a

bankruptcy case creates an "estate."  11 U.S.C. § 541(a).  That estate includes "all legal or

equitable interests of the debtor in property as of the commencement of the case," wherever

located and by whomever held.  Id. § 541(a)(1).  Thus, the estate "includes legal causes of action

the debtor had against others at the commencement of the bankruptcy case."  Baillie Lumber Co.

v. Thompson (In re Icarus Holding, LLC), 391 F.3d 1315, 1319 (11th Cir. 2004).  See

Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988) (creditor's alter

ego claim against debtor's principal and affiliate was cause of action that debtor could assert

under state law and thus was "'property of the estate' within the meaning of § 541(a)(1)").

42.     Section 362(a) of the Bankruptcy Code states that the filing of a

bankruptcy petition "operates as a stay, applicable to all entities, of . . . (3) any act . . . to exercise

control over property of the estate; . . ." 11 U.S.C. § 362(a)(3).  Accordingly, when claims

against a non-debtor "are property of the estate under section 541(a), any similar extraneous

lawsuits brought by individual creditors will be subject to the automatic stay provision of 11

U.S.C. § 362(a)(3)."  Baillie Lumber, 391 F.3d at 1319.  As the Fourth Circuit explained in Steyr:

> Since the alter ego claim against Pappas and Hawk U.S.A. is
> "property of the estate" within the meaning of § 541(a)(1), certain
> conclusions follow. First, the automatic stay applies. Moreover,
> because the claim is property of the estate, the trustee is given full
> authority over it.  Thus, before . . . a creditor may pursue a claim,
> there must be a judicial determination that the trustee in
> bankruptcy has abandoned the claim.   Without such a
> determination, a creditor seeking to pursue a claim cannot maintain
> it.

852 F.2d at 136 (citations omitted).  "Thus," as Judge Mullen has observed, "in the Fourth

Circuit the rule is settled that Code § 362(a)(3) stays automatically—without a restraining

order—a creditor's claim against a third-party that the debtor can assert for the benefit of the

estate." Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd.

P'ship), 135 B.R. 797, 803 n.4 (W.D.N.C. 1992).

        43.     To determine whether a creditor's claim against a non-debtor constitutes

an act to exercise control over property of the estate, a court must answer two inquiries: (a)

whether "the debtor could have asserted the claim on his own behalf under state law" and (b)

whether the individual creditor's claim against the non-debtor is a "general claim" available to

the debtor's other creditors.  Harrison v. Soroof Int'l, Inc., 320 F. Supp. 3d 602, 613 (D. Del.

2018); see Baillie Lumber, 391 F.3d at 1321.  Those answers here establish that any fraudulent

transfer, alter ego and, successor liability or similar "derivative" claims that might be alleged by

the Plaintiffs against the Debtor's non-debtor affiliates seek to exercise control over property of

the Debtor's estate and are thus stayed by section 362(a)(3).  Aldrich Pump, 2021 WL 3729335,

at *36 ("The law in the Fourth Circuit is that certain theories of recovery . . . are property of the

debtor's estate. These include alter ego and successor liability theories of recovery."). While it
is not entirely clear whether the Plaintiffs are asserting or will assert such "derivative claims"
against the Debtor's non-debtor affiliates, given the Plaintiffs broad statements to date that they
intend to continue to pursue these entities for talc-related claims notwithstanding the Debtor's
chapter 11 filing, it is appropriate for this Court to confirm for the benefit of the Debtor, and as a
clear direction to the Plaintiffs, that any such actions would be barred by the automatic stay.

      1.    **The Debtor Had Standing Under State Law To Assert Alter Ego and
Successor Liability Claims at the Time It Commenced This
Chapter 11 Case**

          (a)    **The Debtor's Standing To Bring Alter Ego and Successor
Liability Claims Under State Law**

44.    Whether a debtor has standing to assert a cause of action against another at
the time it files its bankruptcy case is a question of state law. Mitchell v. Greenberg (In re
Creative Entm't, Inc.), No. 00-3114, 2003 Bankr. LEXIS 2468, at *6 n.5 (Bankr. W.D.N.C. May
28, 2003); see also Alvarez v. Ward, 2011 WL 7025906 at *3; In re Midstate Mills, Inc., No. 13
50033, 2015 WL 5475295, at *6 (Bankr. W.D.N.C. Sept. 15, 2015). As the court observed in
Holcomb v. Pilot Freight Carriers, Inc., 120 B.R. 35 (M.D.N.C. 1990), the Fourth Circuit, along
with many other circuits, "has determined that whether a bankruptcy trustee alone has a right to
bring alter ego claims, on behalf of unsecured creditors and the debtor corporation, is a matter
which ultimately depends on whether the relevant state law provides that such actions belong to
the corporation and creditors in general." Id. at 38.

45.    To determine which state law is the "relevant state law" for this inquiry,
courts use the choice-of-law rules of the forum state. See Butler v. Enhanced Equity Fund II, LP
(In re Am. Ambulette & Ambulance Serv. Inc.), 560 B.R. 256, 262 & 269 (Bankr. E.D.N.C.
2016). Accord M-Tek Kiosk, Inc. v. Clayton, No. 1:15CV886, 2016 WL 2997505 at *5

(M.D.N.C. May 23, 2016) (noting that it is settled in the Fourth Circuit "that a bankruptcy court faced with the issue of which substantive law to apply to a claim . . . applies the choice of law rules of the forum state") (citation omitted).  Because it is the forum state here, North Carolina's choice-of-law rules determine which state law governs whether the Debtor had standing to assert alter ego and successor liability claims at the time the bankruptcy case was filed.  The choice-of-law rules "vary depending on the character of the claim at hand, i.e., whether the claim relates to torts, contracts, property, etc., or whether it is procedural as opposed to substantive in nature." Butler, 560 B.R. at 262.

46.     With respect to alter ego claims, North Carolina (like most jurisdictions) applies the "internal affairs doctrine," which applies the law of the state in which the debtor is incorporated.  See Butler, 560 B.R. at 269-70 (citing Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 348-49 (M.D.N.C. 1995)).  See generally M-Tek, 2016 WL 2997505 at *5 (Delaware law governed debtor's right to bring claim against alter ego because forum state's choice-of-law rules apply "internal affairs doctrine" to such claims and debtor was a Delaware corporation).  Here, the Debtor was a North Carolina limited liability company when it commenced its chapter 11 case.  Thus, North Carolina law governs whether it had standing on the Petition Date to assert alter ego claims.[7]

---

[7]     At the time of the 2021 Corporate Restructuring when it was formed, the Debtor was a Texas limited liability company.  In addition, during the 2021 Corporate Restructuring, Old JJCI (which was formerly a New Jersey corporation) became an entity formed under Texas law.  See First Day Decl. ¶ 16.  Thus, it is conceivable that a claimant might contend that, under the "internal affairs doctrine," Texas (or even New Jersey) law instead governs whether a Debtor had the right to assert the alleged alter ego claim when these bankruptcy cases were commenced, depending on what facts are alleged to support the claim and when the claim allegedly arose.  See Keene, 164 B.R. at 847 n.3.

As detailed below, the law of Texas and New Jersey is identical to North Carolina law as to whether a corporation has a right to pierce its own veil to sue an alleged alter ego in order to hold it responsible for the corporation's debts.  Accordingly, this Court does not need to resolve that particular choice-of-law question to determine whether a Defendant's assertion of such an alter ego claim is barred by the automatic stay.  See Tronox, 855 F.3d at 104 & n.25 ("we need not resolve the parties' dispute concerning which

          **(b)**     **The Debtor Had Standing Under North Carolina Law To Pierce its Corporate Veil and Seek Recovery from an Alter Ego**

47.      Courts that have examined the issue have held that North Carolina law empowers a corporation to seek to pierce its corporate veil to sue an alleged alter ego for the purpose of holding it responsible for the corporation's debts.  See <u>Alvarez v. Ward</u>, No. 1:11CV03, 2012 WL 113567, *4 n.5 (W.D.N.C. Jan. 13, 2012); <u>Alvarez v. Ward</u>, 2011 WL 7025906 at *3; <u>Holcomb</u>, 120 B.R. at 41-42; <u>Midstate Mills</u>, 2015 WL 5475295 at *7; <u>Mitchell</u>, 2003 Bankr. LEXIS 2468 at *26-28.  Those decisions all followed the Fourth Circuit's decision in <u>Steyr</u>.

48.      In <u>Steyr</u>, the Fourth Circuit held that a debtor corporation had the right under Virginia law to bring an alter ego claim against its principal and an affiliate, and that the claim became property of the estate when the corporation filed its chapter 7 case.  852 F.2d at 136.  The court reasoned that "[u]nder Virginia law, a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same.'"  <u>Id.</u> (quoting <u>Pepper v. Dixie Splint Coal Co.</u>, 165 Va. 179, 181 S.E. 406 (1935)).  The Fourth Circuit in <u>Steyr</u> held that section 541(a) "brings the right of [the debtor corporation] to proceed against its alter ego and claim its equitable interest in assets of the alter ego into the bankruptcy estate," id., endorsing the Fifth Circuit's analysis of the same question under Texas law in <u>S.I.</u>

---

(cont.)

       state's law governs" because, under either Pennsylvania or Delaware law, alter ego claims were estate property "to the extent the claims qualify as 'general'").  <u>In re Emoral Inc.</u>, 740 F.3d 875, 879 n.2 (3d Cir. 2014) (whether debtor had right to bring successor liability claim was governed by either New Jersey or New York law, and "the two states' relevant applicable legal standards are identical, rendering a choice-of-law analysis unnecessary"); <u>Sterne Agee Grp., Inc. v. Robinson (In re Anderson & Strudwick, Inc.)</u>, No. 14-03175, 2015 WL 1651146, *6 n.4 (Bankr. E.D. Va. April 8, 2015) (same for New York and Virginia successor liability law, which are "'essentially the same'").

Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1152-53 (5th Cir. 1987).

49.     In analyzing Texas law on this issue, the Fifth Circuit in S.I. Acquisition concluded:

> Not surprisingly, we have found no Texas law suggesting that a corporation could or could not itself bring an alter ego claim. Even so, we note that the predominate policy of Texas alter ego law is that the control entity that has misused the corporate form will be held accountable for the corporation's obligations. [Citation omitted]; see also Valdes [v. Leisure Resource Group, Inc., 810 F.2d 1345, 1353 (5th Cir. 1987)] (alter ego doctrine applies to hold dominant entity responsible for subservient company's debt since dominant entity was responsible for creating the debts). Since the corporation has an independent existence at law, we do not believe it is inconsistent in light of the above policy to say that a corporation may pierce its own corporate veil and hold accountable those who have misused the corporation in order to meet its corporate obligations.

817 F.2d at 1152.  In reaching that conclusion, the Fifth Circuit found persuasive Judge Jones' explanation in In re Western World Funding, Inc., 52 B.R. 743 (Bankr. D. Nev. 1985), that "[t]he corporation may be thought of as a separate legal entity which 'has an interest of its own in assuring that it can meet its responsibility to its creditors,' [citation omitted] while at the same time allowing it to argue that it should be deemed to be identical to its alleged alter ego for purposes of paying those creditors." Id. at 784.

50.     In Holcomb, Judge Bullock adopted Magistrate Judge Eliason's extensive review of North Carolina law governing alter ego claims.  120 B.R. at 38-42.  Based on that review, Magistrate Judge Eliason rejected the argument that North Carolina law was "radically different" from the Nevada law applied by Judge Jones in Western World Funding and the Virginia law applied by the Fourth Circuit in Steyr.  120 B.R. at 39-40.  Instead, he found:

> Having completed this examination of North Carolina law, the Court finds it to be entirely consistent with the Fourth Circuit's

> requirement in <u>Steyr</u> that a corporation may be said to have an
> equitable interest in the assets of an alter ego when they are one
> and the same. <u>Steyr</u>, 852 F.2d at 136. Thus, in North Carolina,
> alter ego claims, which are based on factors which establish that
> the controlled corporation and the alter ego have the same identity,
> belong to the bankruptcy estate and must be prosecuted by the
> trustee.

<u>Id</u>. at 41-42. Magistrate Judge Howell reached the very same conclusion in <u>Alvarez</u>:

> North Carolina law, like Virginia law, treats a corporation and its
> alter-ego as "one and the same . . . ." <u>Fischer Inv. Capital, Inc. v.
> Catawba Dev., Corp.</u>, 689 S.E.2d 143, 147 (N.C. Ct. App. 2009)
> (quoting <u>Strategic Outsourcing, Inc. v. Stacks</u>, 625 S.E.2d 800, 804
> (N.C. Ct. App. 2006)). Consistent with the Fourth Circuit's
> holding in [<u>Steyr</u>], a corporation has an interest in the assets of its
> alter ego, and, thus, an alter ego claim is the property of the estate
> for purposes of Section 541(a)(1).

2011 WL 7025906 at *3 (citing <u>Steyr</u>, 852 F.2d at 136, and <u>Holcomb</u>, 120 B.R. at 41-42).

Relying on <u>Holcomb</u> and <u>Alvarez</u>, the bankruptcy court in this District has repeatedly held that a corporation has the right to sue an alleged alter ego under North Carolina law and that such claim becomes property of the estate when the corporation files a bankruptcy case. <u>Midstate Mills</u>, 2015 WL 5475295 at *7; <u>Mitchell</u>, 2003 Bankr. LEXIS 2468 at *26-28.

       51. To the extent that a party might assert instead that Texas or New Jersey law governs whether the Debtor has standing to bring an alter ego claim against a Non-Debtor Affiliate, courts applying the law from both states have reached the same conclusion. <u>See</u> <u>S.I. Acquisition</u>, 817 F.2d at 1153 (corporation had right under Texas law to bring alter ego claim, which became property of estate when corporation filed bankruptcy case); <u>Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs. by Jamie, Inc.)</u>, 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (corporation can sue alter ego under New Jersey law, noting "majority of courts in other jurisdictions that have addressed the issue of authority to pursue an alter ego action on behalf of a corporate debtor have also held that the trustee has standing" to assert such claim).

### (c) The Debtor Also Had Standing To Bring Successor Liability Claims

52.     As is the case in most states, the general rule is, "'where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.' <u>City of Richmond v. Madison Mgmt. Grp., Inc.</u>, 918 F.2d 438, 450 (4th Cir. 1990) (quoting 15 W. Fletcher, <u>Cyclopedia of the Law of Private Corporations</u>, § 7122, at 188 (rev. perm. ed. 1983))." <u>Leonard v. Bed, Bath & Beyond, Inc.</u>, No.5:15-CV-00284, 2016 WL 158587, *2 (E.D.N.C. Jan. 8, 2016).  Most states recognizes four exceptions to the general rule:

> (1) where there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) where the transfer amounts to a de facto merger of the two corporations; (3) where the transfer of assets was done for the purpose of defrauding the corporation's creditors; or (4) where the purchasing corporation is a "mere continuation" of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers.

<u>Leonard</u>, 2016 WL 158587 at *3 (citing <u>G.P. Publ'ns, Inc. v. Quebecor Printing-St. Paul, Inc.</u>, 481 S.E.2d 674, 679 (N.C. Ct. App. 1997) (citing <u>Budd Tire Corp. v. Pierce Tire Co.</u>, 370 S.E.2d 267, 269 (N.C. Ct. App. 1988))).

53.     In <u>Mitchell</u>, this Court noted that whether state law allows a corporation (or its receiver) to recover on a claim against an alleged successor under one of these exceptions "is apparently a question of first impression under North Carolina law."  2003 Bankr. LEXIS 2468 at *28-*29.  Finding that "[s]uch a claim is substantially similar to an alter ego claim because it seeks to recover assets of a corporation and to make these available to satisfy creditor claims," the Court held that the debtor could assert a successor liability claim under North Carolina law and that the claim became property of the estate under section 541(a) when the corporation's chapter 7 case was commenced.  <u>Id.</u> (citing <u>Keene</u>, 164 B.R. at 853).

54.     As was this Court's reasoning in <u>Mitchell</u>, Judge Bernstein's reasoning in
<u>Keene</u> was based on the finding that "[t]he principles relating to successor tort liability, and the
results which they are designed to achieve, are similar to piercing the corporate veil."  164 B.R.
at 852.  Applying New York law on successor liability that was the same as the North Carolina
law detailed in <u>Leonard</u>, <u>id.</u>, Judge Bernstein declared that the automatic stay barred the asbestos
claimants from pursuing their actions against the debtor's affiliates on successor liability claims,
explaining that "the remedy against a successor corporation for the tort liability of the
predecessor is, like the piercing remedy, an equitable means of expanding the assets available to
satisfy creditor claims" and that, for "the same reasons stated with respect to the piercing claims,
claims based upon successor liability should be asserted by the trustee on behalf of all creditors."
<u>Id</u>. at 853.

55.     The Third Circuit reached the same conclusion in <u>In re Emoral Inc.</u>, 740
F.3d 875 (3d Cir. 2014).  In that case, the debtor manufactured a chemical used in food flavoring
that gave rise to personal injury claims.  After it sold operating assets to a transferee, the debtor
filed its bankruptcy case, and the trustee for the debtor's estate entered into a settlement with the
transferee in which the trustee released it from claims that "are property of the" debtor's estate.
The personal injury claimants then sued the transferee in state court, alleging that the transferee
was a "mere continuation" of the debtor and thus subject to their successor liability claims.

56.     When the bankruptcy court denied the transferee's motion to enforce the
order approving its settlement with the trustee, the district court reversed and the Third Circuit
affirmed the district court's reversal.  The Third Circuit, relying on <u>Keene</u> and cases finding that
a corporation had standing under state law to assert alter ego claims, held that the personal injury
claimants' successor liability claims against the transferee were property of the estate under the

state law of both New York and New Jersey and were thus settled and released by the trustee.

740 F.3d at 880-82 and n.3. The court noted that, while that result might seem odd at first, it

nonetheless makes perfect sense:

> As we observed in *Phar–Mor*, so, too, here it "may seem strange" to hold that a cause of action for successor liability against Aaroma is property of Emoral's bankruptcy estate. As a practical matter, it is difficult to imagine a factual scenario in which a solvent Emoral, outside of the bankruptcy context, would or could bring a claim for successor liability against Aaroma. [Citation omitted.] Just as the purpose behind piercing the corporate veil, however, the purpose of successor liability is to promote equity and avoid unfairness, and it is not incompatible with that purpose for a trustee, on behalf of a debtor corporation, to pursue that claim.

Id. at 881.

57.　　The Second Circuit, in <u>Tronox</u>, reached the same conclusion as this Court

in <u>Mitchell</u> and the courts in <u>Keene</u> and <u>Emoral,</u> holding that the alter ego and the successor

liability claims of 4,300 toxic tort claimants against a non-debtor transferee were property of the

debtor's estate under both Pennsylvania and Delaware law. 855 F.3d at 104 (citing <u>Rosener v.</u>

<u>Majestic Mgmt., Inc. (In re OODC, LLC)</u>, 321 B.R. 128, 136-37 (Bankr. D. Del. 2005) (allowing

trustee to bring successor liability and alter ego claims under Delaware law)); <u>see also</u> <u>Sterne</u>

<u>Agee Grp., Inc. v. Robinson (In re Anderson & Strudwick, Inc.)</u>, No. 14-32679-KLP, 2015 WL

1651146, *5 (Bankr. E.D. Va. Apr. 8, 2015) (holding Virginia law allows corporation to recover

against its alleged successor based on both <u>Steyr</u> and the "weight of authority outside this Circuit"

that "supports the conclusion that a successor liability claim constitutes property of the

bankruptcy estate under Bankruptcy Code § 541(a)(1)").

58.　　As noted in <u>Emoral</u> above, personal injury claimants' successor liability

claims against a transferee are property of a debtor's estate under New Jersey law. As also

described above, the law is generally uniform on this issue in that an entity has the right to bring

successor liability claims holding third parties liable for its debts under most states' laws, including under the laws of New Jersey, North Carolina, New York, Pennsylvania, Delaware, and Virginia. As such, the Debtor had standing to bring successor liability claims against third parties as of the Petition Date.

> **2.** **Any Alleged Alter Ego and Successor Liability Claims Are Based on Facts and Legal Theories That Are Generally Available to Other Creditors of the Debtor**

59. State law affords an individual creditor the right in some circumstances to recover a claim against an entity from a third party based on alter ego and successor liability theories. But once that entity files for bankruptcy, the creditor's pursuit of the claim against the third party is automatically stayed by section 362(a)(3) if it constitutes an act "to exercise control over" the same or similar claim that state law affords to the debtor to assert generally on behalf of its creditors. When the individual creditor's claim against the third party is based on facts and legal theories "generally available" to the debtor's other creditors, the stay applies because the individual creditor's pursuit of the claim interferes with, and thus constitutes an act "to exercise control over," the same or similar claim that is property of the estate. Accordingly, to avoid the automatic stay, the individual creditor's claim against the third party must be based on facts and legal theories of liability that are "personal" and "unique" to that creditor. Emoral, 740 F.3d at 880; Baillie Lumber, 391 F.3d at 1321.

60. In undertaking this inquiry, the Court "should be focused on [the creditor]'s alter ego claim itself—not [the creditor]'s underlying claim" against the debtor. Harrison, 320 F. Supp. 3d at 619. "The case law demonstrates that an alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports the claim is the same conduct that directly harmed the creditor in the underlying cause

of action." <u>Labarbera v. United Crane & Rigging Servs, Inc.</u>, No 08-CV-3274, 2011 WL 1303146 at *7 (E.D.N.Y. March 2, 2011).

61.     Any alter ego or successor liability claims that the Plaintiffs attempt to assert against the non-debtor affiliates, including J&J, are "general," not "personal," because the facts and legal theories on which the alleged liability of the affiliate is based have nothing to do with the conduct that gave rise to the claimants' talc-related claim against the Debtor.  Here, as in <u>Emoral</u>, if claimants were in fact harmed by the restructuring (they were not), all creditors would benefit if the successor liability claims were successful:

> To determine whether the Diacetyl Plaintiffs' cause of action against Aaroma constitutes property of Emoral's bankruptcy estate, we must examine the nature of the cause of action itself.  While the Diacetyl Plaintiffs focus on the individualized nature of their personal injury claims against *Emoral*, we cannot ignore the fact, and fact it be, the their only theory of liability as against *Aaroma*, a third party that is not alleged to have caused any direct injury to the Diacetyl Plaintiffs, is that, as a matter of state law, Aaroma constitutes a "mere continuation" of Emoral such that it has also succeeded to all of Emoral's liabilities. . . .
>
> The Diacetyl Plaintiffs fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral.  Likewise, they fail to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities. . . .
>
> . . . Therefore, the District Court appropriately classified the cause of action as a generalized claim constituting property of the estate.

740 F.3d at 879-81 (emphasis by the court).  <u>Accord</u> <u>Tronox</u>, 855 F.3d at 103 (agreeing with <u>Emoral</u> holding that personal injury claimants' successor liability claim was "general" rather than "individualized," observing: "That the plaintiffs in <u>Emoral</u> had an underlying harm specific to them did not put the claims automatically outside the estate.  Indeed, every creditor in

bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise.").

62.     The Second Circuit's analysis of the issue in <u>Tronox</u> is instructive here.  In that case, the court emphasized the "critical distinction between the underlying tort claim against" the debtors and the alter ego and successor liability claims against the newly created transferee that received assets from the debtors' predecessors.  855 F.3d at 107.  In holding that the court below had "correctly classified the [tort claimants'] claims as generalized, derivative claims comprising estate property," the Second Circuit explained that:

> establishing the former [the underlying tort claim] would benefit only [the tort claimants] as individual creditors, whereas the latter—that New Kerr-McGee is the alter ego of the relevant Tronox debtors and should therefore be charged with all its liabilities—would benefit all creditors of the Tronox debtors generally.  See <u>Emoral</u>, 740 F.3d at 880.  The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the [tort claimants], but the facts necessary to impute that liability to New Kerr-McGee "would be . . . generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors."

<u>Tronox</u>, 855 F.3d at 107 (quoting <u>Emoral</u>, 740 F.3d at 881).

63.     The court in <u>Tronox</u> emphasized that, "[i]n distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy."  855 F.3d at 100.  "In other words," the court explained, "we are wary of putting form over substance.  Thus, we 'inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted.'"  <u>Id</u>. (citations omitted).

64.     Judge Mullen made the same point almost thirty years ago, in <u>Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship)</u>, 135 B.R. 797 (W.D.N.C. 1992).  In that case, a creditor bank filed a state court action against the general

partners of a debtor limited partnership, based on state law that permitted creditors to hold

general partners liable for the partnership's debts.  In the bankruptcy court, Judge Wooten,

applying the Fourth Circuit's decision in <u>Steyr</u>, held that the bank's continued prosecution of its

state court action violated the automatic stay imposed by section 362(a)(3) because, "under

South Carolina law, the debtor was empowered to compel its general partners to pay the debts of

the debtor partnership and that, under Code § 541(a), this power became property of the estate

upon the filing of the debtor's bankruptcy case." <u>Id</u>. at 802.  In affirming Judge Wooten's

holding on appeal, Judge Mullen rejected the bank's argument "that its right[] to proceed against"

the general partners "is separate and legally distinct from the right of the debtor to compel its

general partners to pay the debts of the debtor partnership." <u>Id</u>. at 804.  Judge Mullen explained:

> While it is true that the appellant's right to proceed against the
> general partners is not identical to the debtor's rights under South
> Carolina law, *nevertheless, proceeding against the general
> partners would necessarily impair the debtor's exercise of its right
> to compel its general partners to pay its debts, thus interfering with
> property of the estate*. . . .  The bankruptcy court's application of
> the rule set forth by the Fourth Circuit in [<u>Steyr</u>] to the defendant's
> action against the Partners is not only consistent with, but
> necessary to promote, the fundamental bankruptcy principle of
> preserving property of the estate to ensure a ratable distribution to
> creditors.

<u>Id</u>. (emphasis added).

65.     Seven years later, the Fourth Circuit, in <u>Nat'l Am. Ins. Co. v. Ruppert</u>

<u>Landscaping Co., Inc.</u>, 187 F.3d 439 (4th Cir. 1999), relied on Judge Mullen's decision in

<u>Litchfield</u> in making this same fundamental point.  In that case, sureties filed an involuntary

petition against the debtor.  After the case became a chapter 7 proceeding and a trustee was

appointed, the sureties sued a transferee of some of the debtor's assets in district court, alleging

successor liability and conspiracy counts.  The court affirmed judgment against the sureties for

lack of standing, finding their claims to be "similar in object and purpose" to claims the trustee

should bring on behalf of all creditors:

> The bankruptcy court noted that the trustee has a potential
> fraudulent conveyance action to challenge the legality of the
> transaction between [the debtor and the transferee]. See 11 U.S.C.
> § 548. All of the Sureties' claims have this same focus. To make
> out their successor liability claim the Sureties rely heavily on
> exposing the [debtor/transferee] transaction to be fraudulent in
> fact. . . . Although the Sureties' claims and the trustee's fraudulent
> conveyance claim do not contain identical elements, they all share
> this same underlying focus. [Citing Litchfield.] *The Sureties'*
> *causes of action are thus so similar in object and purpose to claims*
> *the trustee could bring in bankruptcy court that the Sureties lack*
> *standing to pursue these claims in district court. . . .*
>
> It is clear that the trustee should have the first crack at challenging
> the [debtor/transferee] transaction—the trustee's role is to bring
> suits such as these on behalf of all creditors. [Citing Steyr.]

187 F.3d at 441 (emphasis added). Accord Alvarez, 2012 WL 113567 at *5 (applying National

American. Insurance in holding that creditors' alter ego and breach of fiduciary duty claims were

automatically stayed by section 362(a)(3)); Sterne Agee Group, 2015 WL 1651146 at *7

(applying National American Insurance in holding that creditors' successor liability claims were

property of debtor's estate to be pursued by trustee).

      66.    As the Fourth Circuit emphasized in National American Insurance, "[t]o

allow selected creditors to artfully plead their way out of bankruptcy court would unravel the

bankruptcy process and undermine an ordered distribution of the bankruptcy estate." 187 F.3d at

142 (citing Litchfield). Enforcing the automatic stay to prevent individual creditors from

pursuing liability claims against non-debtors based on alter ego or successor liability theories is

essential to provide the estate with control over the res available for distribution to all claimants.

As the Second Circuit pointed out in Tronox, preserving the estate's control over such claims not

only ensures a fair distribution of the res, but also promotes the efficient resolution of those

causes of action, which are part of the res:

> The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets. [Citation omitted.] That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property. Instead, the trustee is conferred the right to recover for derivative, generalized claims; only the estate is charged with ensuring equitable distribution of estate assets and preventing individual creditors from pursuing their own interests and thus diminishing the res available to the rest of the creditors. Even more, it encourages, as it did here, orderly settlement—an interest not taken lightly.

855 F.3d at 106.

67.     In this regard, it is noteworthy that, in several prior mass tort bankruptcy

cases—including two in this Court—an official committee of creditors requested a bankruptcy

court order affording it standing to bring—*as the representative of the estate and on behalf and

for the benefit of that estate*—similar claims to impose liability, based on alter ego and successor

liability theories, on non-debtor entities that were involved in pre-petition corporate transactions

with the debtor.[8] As this Court is aware, the official committee of asbestos creditors in the

DBMP case also recently sought (and was granted) such standing.

---

[8]     In In re Garlock Sealing Technologies, LLC, No. 10-31607 (Bankr. W.D.N.C. 2010), the asbestos claimants' committee sought "Leave to Control and Prosecute Certain Claims as Estate Representatives" in order to challenge certain pre-bankruptcy restructuring transactions between one of the debtors and its affiliates. (Dkt. 2150) The committee's proposed complaint on behalf of the estate included (in addition to counts for breach of fiduciary duty, conspiracy and fraudulent conveyances) a count XVII ("Successor Liability") and a count XVIII ("Piercing the Corporate Veil"). Id. The debtors moved for authorization to enter into tolling agreements preserving such claims but delaying their prosecution. (Dkt. 2194). After a hearing on both motions, the court approved the debor's entry into the proposed tolling agreements (Dkt. 2281) and denied the committee's motion. (Dkt. 2292).

In In re Kaiser Gypsum Company, Inc., No. 16-31602, (Bankr. W.D.N.C. 2016), the unsecured creditors' committee moved for standing to prosecute, on behalf of the estates, certain claims against non-debtor affiliates, including those for fraudulent conveyance, alter ego and successor liability. (Dkt. 1009) At a

68.     The bottom line is that the Plaintiffs here are in the same position as were the individual creditors in S.I. Acquisition, and Steyr, the bank in Litchfield, the former employees in Holcomb, the sureties in National American Insurance, the purchasers of empty lots in Alvarez, the retired partners in Coudert, the asbestos claimants in Keene, the diacetyl claimants in Emoral, and the toxic tort claimants in Tronox. Their successor liability and alter ego claims against the non-debtor affiliates are based on facts and theories generally available to the Debtor's other creditors and are therefore automatically stayed by section 362(a)(3) because they are acts to exercise control over property of the Debtor's estate.

### D.     The Plaintiffs' Fraudulent Transfer Claims Are Estate Property

69.     Any fraudulent conveyance claims asserted by the Plaintiffs in their lawsuits are property of the Debtor's estate. Section 541(a)(7) of the Bankruptcy Code states that the debtor's estate is also comprised of "[a]ny interest in property that the estate acquires after the commencement of case." 11 U.S.C. § 541(a)(7) (emphasis added). Section 544(b) of the Bankruptcy Code authorizes the trustee, after the bankruptcy case is filed, to bring on behalf of the estate the same fraudulent conveyance actions that individual creditors could bring under state law prior to the filing of the bankruptcy case. Because the trustee's claims under section 544(b) must be brought on behalf of the estate, those claims constitute property in which the estate acquires an interest "after the commencement of the case" and are therefore property of the debtor's estate under section 541(a)(7). As Judge Mullen has observed, "in the Fourth

---

(cont.)

      hearing, the court denied the standing motion and instead granted the debtors authority to enter into tolling agreements to preserve the alleged claims. (Dkt. 1154).

      In In re Specialty Prods. Holding Corp., No. 10-11780 (Bankr. D. Del. 2010), the asbestos claimants' committee sought standing to prosecute, on behalf of the estates, claims against non-debtor affiliates— including alter ego and fraudulent conveyance claims—related to the debtors' pre-petition reorganization. (Dkt. 1799). While the court granted the committee standing to sue on behalf of the estates (Dkt. 4318), the committee never actually filed a complaint against the debtors' affiliates.

Circuit the rule is settled that Code § 362(a)(3) stays automatically—without a restraining

order—a creditor's claim against a third-party that the debtor can assert for the benefit of the

estate" and this rule "has been embraced by other courts" to include "actions to recover

fraudulent transfers." <u>Litchfield</u>, 135 B.R. at 803 n.4[9].

<u>**Notice**</u>

70. Notice of this Motion has been given to: (a) the Bankruptcy

Administrator; (b) the top law firms representing talc claimants against the Debtor, as identified

in the Debtor's chapter 11 petition; (c) counsel to the Plaintiffs; and (d) counsel to the Debtor's

non-debtor affiliates, New JJCI and J&J. The Debtor submits that, in light of the nature of the

relief requested, no other or further notice need be provided.

<u>**No Prior Request**</u>

71. No prior request for the relief sought in this Motion has been made to this

or any other Court in connection with the Chapter 11 Case.

WHEREFORE, the Debtor respectfully requests that the Court: (a) enter an

interim and final order, substantially in the form attached hereto as <u>Exhibit C</u>, granting the relief

requested herein; and (b) grant such other and further relief to the Debtor as the Court may deem

proper.

---

[9] Moreover, courts uniformly hold that, once the bankruptcy case is filed, [s]ection 544 transfers the right to recover fraudulent transfers from individual creditors to the bankruptcy trustee (or the debtor in possession) acting as a fiduciary on behalf of all creditors," and as a result, "[t]he trustee has the exclusive right to bring a fraudulent conveyance action during the pendency of the bankruptcy proceedings." <u>Guttman</u>, 458 B.R. at 258-59. <u>See</u> <u>Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.</u>, 187 F.3d 439, 441 (4th Cir. 1999) ("In fact, this circuit has explicitly held that until there is an 'abandonment' by the trustee of his [potential fraudulent conveyance action] the individual creditor has no standing to pursue it."); <u>M-Tek</u>, 2016 WL 2997505 at *8.

Dated: October 18, 2021
      Charlotte, North Carolina

Respectfully submitted,

  */s/ John R. Miller, Jr.*
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
Matthew L. Tomsic (NC 52431)
RAYBURN COOPER & DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
Email: rrayburn@rcdlaw.net
       jmiller@rcdlaw.net
       mtomsic@rcdlaw.net

Gregory M. Gordon (TX Bar No. 08435300)
Dan B. Prieto (TX Bar No. 24048744)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
      dbprieto@jonesday.com
      asrush@jonesday.com
(Admitted *pro hac vice*)

Brad B. Erens (IL Bar No. 06206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
(Admitted *pro hac vice*)

PROPOSED ATTORNEYS FOR DEBTOR

## **EXHIBIT A**

Plaintiffs' Counsel

| Plaintiff Counsel |
|---|
| Ashcraft & Gerel, LLP |
| Barnes Law Group, LLC |
| Beasley Allen Law Firm |
| Cohen, Placitella & Roth, P.C. |
| Golomb Spirit Grunfeld, P.C. |
| Kazan, McClain, Satterley & Greenwood PLC |
| Kiesel Law, LLP |
| Levy Konigsberg LLP |
| Motley Rice LLC |
| Osborne & Francis Law Firm PLLC |
| Robinson, Calcagnie, Robinson, Shapiro, Davis, Inc. |

# **EXHIBIT B**

Bankruptcy Notice Filed in the MDL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

<table>
<tr>
<td>IN RE JOHNSON & JOHNSON<br>TALCUM POWDER PRODUCTS<br>MARKETING, SALES PRACTICES,<br>AND PRODUCTS LIABILITY<br>LITIGATION</td>
<td>Case No. 3:16-md-02738 (FLW) (LHG)<br><br>CIVIL ACTION</td>
</tr>
</table>

### NOTICE OF BANKRUPTCY FILING AND STAY OF PROCEEDINGS

**PLEASE TAKE NOTICE THAT**, on October 14, 2021 (the "Petition Date"), LTL Management LLC, a North Carolina limited liability company ("LTL"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). A copy of the voluntary petition (excluding the attachments thereto) is attached hereto as Exhibit A. LTL's case is captioned In re LTL Management LLC, Case No. 21-30589 (JCW).

**PLEASE TAKE FURTHER NOTICE THAT**, upon the filing of LTL's chapter 11 case, the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay") became immediately effective and, as a result, all claims asserted against LTL in the above-captioned action (this "Proceeding") are stayed absent an order of the Bankruptcy Court lifting or modifying the Automatic Stay.

**PLEASE TAKE FURTHER NOTICE THAT**: (i) Defendant Johnson & Johnson Consumer Inc. ("Old JJCI"), following a corporate restructuring that was completed on October 14, 2021, ceased to exist; (ii) as a result of the restructuring, LTL is now responsible for the talc-related claims asserted against Old JJCI in this Proceeding; and (iii) a new entity named Johnson & Johnson Consumer Inc. ("New JJCI") was created as part of the same restructuring.

**PLEASE TAKE FURTHER NOTICE THAT**:  (i) one or more of the entities set forth on the list attached hereto as <u>Exhibit B</u> and/or Johnson & Johnson are Defendants in this Proceeding (collectively with Old JJCI and New JJCI, the "<u>LTL Defendants</u>"); and (ii) as a result of the Automatic Stay, no further action may be taken to prosecute the talc-related claims against any LTL Defendant absent an order of the Bankruptcy Court lifting or modifying the Automatic Stay because (a) all LTL Defendants share such an identity of interest with LTL that LTL is, in effect, the real-party defendant in any claims asserted against them in this Proceeding and/or (b) prosecution of the talc-related claims against any LTL Defendant would allow plaintiffs to fix claims against LTL— particularly through indemnity or alleged indemnity obligations, but also through collateral estoppel, res judicata and evidentiary prejudice.

**PLEASE TAKE FURTHER NOTICE THAT** information regarding the status of LTL's chapter 11 case may be obtained by (a) reviewing the docket of the LTL chapter 11 case at http://www.ncwb.uscourts.gov/ (PACER login and password required) or free of charge at https://dm.epiq11.com/LTL; or (b) contacting any of the following counsel for LTL:

Gregory M. Gordon
Dan B. Prieto
Amanda Rush
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
         dbprieto@jonesday.com
         asrush@ jonesday.com

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

-2-

E-mail: bberens@jonesday.com

Dated:  October 15, 2021

Respectfully submitted:

Susan M. Sharko, Esq.
FAEGRE DRINKER, BIDDLE & REATH, LLP
600 Campus Dr.
Florham Park, NJ  07932-1047
Telephone: (973) 549-7350
Facsimile:  (973) 360-9831
Email: susan.sharko@faegredrinker.com

-3-

## EXHIBIT B

7-Eleven
Acme Markets, Inc.
Ahold Delhaize USA, Inc.
Albertsons Companies, Inc.
Alpha Beta Company
Associated Wholesale Grocers, Inc.
Associated Wholesaler Grocers, Inc.
Bartell Drug Company
Bashas', Inc.
Bausch Health Americas, Inc.
Bausch Health Companies Inc.
Bausch Health US, LLC
BCW LLC
Beautyland
Best Market of Astoria, Inc.
BI-LO, LLC
Bi-Mart Corporation
C&S Wholesale Grocers
C&S Wholesale Grocers, Inc.
Classic Pharmacy, Inc.
Cosentino Enterprises, Inc.
Cosentino Group, Inc.
Cosentino Price Chopper
Cosentino's Food Stores
Costco Wholesale Corporation
CVS Health Corporation
CVS Pharmacy, Inc.
Demoulas Super Markets, Inc.
Dierbergs Markets, Inc.
Discount Drug Mart, Inc.
Dollar Tree Stores, Inc.
DRI I, Inc.
Duane Reade, Inc.
Eckerd Corporation of Florida, Inc.
Family Dollar Stores
Fleming Companies, Inc.
Food 4 Less of California
Food 4 Less of Southern California, Inc.
Foodland (Sullivan Family of Companies
Foodland Super Market, LTD
Foot Locker, Inc.
Foot Locker Specialties, Inc.,
    individually and as successor-in-interest to F.W. Woolworth Co.
Foot Locker Specialty, Inc.
Four B Corporation d/b/a Balls Food Stores
Fred Meyer Stores, Inc.
Fruth Pharmacy, Inc.
Gerlands Food Fair, LLC
Gerlands, LLC
Giant Eagle, Inc.
Giant Food of Maryland, LLC
Giant Food Stores, LLC

Grocery Outlet Holding Corporation
Grocery Outlet, Inc.
HAC, Inc.
H-E-B, LP
Hughes Markets, Inc.
Hy-Vee, Inc.
Johnson & Johnson
Johnson & Johnson Consumer Inc.
K&B Corporation
K&B Louisiana Corporation
Kings Park Slope, Inc.
Kings Pharmacy
Kings Pharmacy Holdings, LLC
Kings Third Ave. Pharmacy, Inc.
Knorr Street ShopRite, Inc.
La Luz Market, LTD. Co.
Lewis Food Town, Inc.
Longs Drug Stores California, L.L.C.
Longs Drug Stores of Southern California, L.L.C.
Longs Drug Stores, L.L.C.
Lucky Stores, Inc.
Marc Glassman Inc.
Marc Glassman, Inc. d/b/a Marc's Store & Pharmacy
MBF Healthcare Holdings, Inc.
MBF Healthcare Management, LLC
Meijer, Inc.
MMG Equity Partners
Navarro Discount Pharmacies No. 5, LLC
Navarro Discount Pharmacies, LLC
OMJ Pharma, Inc.
Owens & Minor Distribution, Inc.
Owens & Minor, Inc.
Piggly Wiggly Carolina Co.
Piggly Wiggly Carolina Co., Inc.
Piggly Wiggly Companies, Inc.
Piggly Wiggly, LLC
Piggly Wiggly, LLC (subsidiary of C&S Wholesale Grocers)
PTI
PTI Royston LLC, A Georgia Limited Liability Co., d/b/a Pharma Tech Industries
PTI Union, LLC d/b/a Pharma Tech Industries
Publix Super Markets, Inc.
Raley's
Ralphs Grocery Company
Rite Aid
Rite Aid Corporation
Rite Aid Hdqtrs. Corp.
Rite Aid of New York City, Inc.
Rite Aid of New York, Inc.
Rite Aid of Pennsylvania, Inc.
Rite Aid of South Carolina, Inc.
Rouse's Enterprises, L.L.C.
Rouse's Enterprises, L.L.C. d/b/a Rouses Market
Safeway Inc.
Save Mart Supermarkets, Inc.

ACTIVE.134392425.01

Schnuck Markets
Schnuck Markets, Inc.
Sedano's Market, Inc.
Shanti Pharmacy Corp.
Shop-Rite Supermarkets, Inc. a/k/a Shop Rite of Knorr Street
Smith Food and Drug Center, Inc.
Southeastern Grocers, Inc.
Stater Bros. Markets
Super Center Concepts, Inc. d/b/a Superior Grocers
Superior Grocers
SuperValu, Inc.
T. Levy Associates, d/b/a Beauty Land Enterprises
T. Levy Associates, Inc. t/d/b/a Beauty Land Enterprises
Target Corporation
The Bartell Drug Company
The Former Johnson & Johnson Consumer Inc.
The Kroger Company
The Stop & Shop Supermarket Company LLC
Thrifty Payless, Inc.
Thrifty White Drug
Tops Holding, LLC
Valeant Pharmaceuticals International
Valeant Pharmaceuticals International, Inc.
Valeant Pharmaceuticals North America LLC
Wakefern Food Corp.
Walgreen Co.
Walgreen Eastern Co., Inc.
Walgreen Pharmacy Strategies, LLC
Walgreens Boots Alliance, Inc.
Walmart Inc.
Wegmans Food Markets, Inc.
Winn-Dixie Stores, Inc.
Woolworth Corporation

ACTIVE.134392425.01

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on October 15, 2021, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record.  Parties may access the filing through the Court's system.

By:  _____

Jessica L. Brennan
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ  07932-1047
Phone: (973) 549-7164
Fax:     (973) 360-9831
E-mail: Jessica.Brennan@faegredrinker.com

Dated: October 15, 2021

## EXHIBIT C

Proposed Order

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. | |

### INTERIM ORDER ENFORCING THE AUTOMATIC STAY
### AGAINST TALC CLAIMANTS WHO SEEK TO PURSUE THEIR
### CLAIMS AGAINST THE DEBTOR AND ITS NON-DEBTOR AFFILIATES

This matter coming before the Court on the *Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and Its Non-Debtor Affiliates* (the "Motion"),[2] filed by the debtor in the above-captioned case (the "Debtor"); the Court having reviewed the Motion; the Court having considered the statements of counsel with respect to the Motion at an interim hearing before the Court (the "Interim Hearing"); the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

28 U.S.C. §§ 1408 and 1409, (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b) and
(d) notice of the Motion and the Interim Hearing was sufficient under the circumstances and no
other or further notice is required; and this Court having determined that the legal and factual
bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted
herein; and the Court having determined that the relief sought in the Motion is in in the best
interests of the Debtor, its estate and parties in interest; and sufficient cause appearing therefor,
the Court finds and concludes as follows;

      A.    The Court finds and concludes that the Plaintiffs' efforts to continue talc-
related litigation against J&J, Old JJCI, and other non-debtor affiliates of the Debtor are actions
that are "against the debtor" or that seek to "recover a claim against the debtor" within the
meaning of section 362(a)(1) of the Bankruptcy Code.

      B.    The Court further finds and concludes that the Debtor Talc Claims against
J&J and New JJCI are inherently intertwined with talc-related claims against the Debtor, such
that the Debtor is the real-party defendant to any such claims. Therefore, application or
extension of the automatic stay of section 362 of the Bankruptcy Code to the Debtor Talc Claims
against J&J and New JJCI is warranted because those actions or claims are "against the debtor"
or seek "to recover a claim against the debtor" within the meaning of section 362(a)(l) of the
Bankruptcy Code.

      C.    The Court further finds and concludes that any talc-related claims of the
Plaintiffs against J&J, New JJCI or other non-debtor affiliates asserting fraudulent transfer or
voidable transfer or conveyance claims, or alter ego, successor liability, vicarious liability or
other theories of recovery through which the Plaintiffs would seek to assert the Debtor Talc

Claims against a non-debtor affiliate constitute property of the Debtor's estate. Section 362(a)(3) of the Bankruptcy Code applies to stay such actions.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on an interim basis as set forth below.

2.      All talc-related claims against J&J, New JJCI, or any other affiliate of the Debtor, including any claims that seek to hold such entities "derivatively" liable for talc-related claims against the Debtor (under any theory), are automatically stayed pursuant to section 362(a) of the Bankruptcy Code.

3.      The Debtor shall serve this Interim Order on (a) the Bankruptcy Administrator; (b) the top law firms representing talc claimants against the Debtor, as identified in the Debtor's chapter 11 petition; (c) counsel to the Plaintiffs; and (d) counsel to New JJCI and J&J.

4.      A final hearing on the Motion shall be held by the Court on _____, 2021 at _____ (prevailing Eastern time).

5.      Any objection to the relief sought at the final hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven days prior to the final hearing at 5:00 p.m. (prevailing Eastern time) by proposed counsel to the Debtor. The Debtor shall have the right to file a reply in support of the Motion with the Court on or before the last business day that is at least three calendar days before the final hearing.

6.     The Court shall retain exclusive jurisdiction over any and all matters

arising from or related to the implementation, interpretation or enforcement of this Order.


This Order has been signed electronically.          United States Bankruptcy Court
The Judge's signature and Court's seal appear
at the top of the Order.