UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON<br>TALCUM POWDER PRODUCTS<br>MARKETING, SALES<br>PRACTICES, AND PRODUCTS<br>LIABILITY LITIGATION | MDL No. 2738 (FLW) (LHG) |

## SPECIAL MASTER OPINION AND ORDER NO. 15

This matter is before the Special Master ("SM") on the Ferraro Law Firm's ("Ferraro") "Motion for Relief from Common Benefit Fee Assessments." [Dkt.. No. 26550]. The motion is opposed by the Plaintiffs' Steering Committee ("PSC"). The SM has received extensive briefs and supporting Declarations and recently held oral argument via Zoom. For the reasons to be discussed Ferraro's motion is DENIED.[1] To the extent not already done, Ferraro shall pay an 8% common benefit assessment on the 24 cases that are the subject of this motion. The money shall be withheld from Ferraro in accordance with the Court's Orders.

In order to avoid any misunderstanding or potential confusion, the SM makes it clear that it is only deciding the narrow issue(s) presented in movant's motion. The movant did not raise nor is the SM addressing or deciding the appropriateness of a common benefit fee or assessment in the bankruptcy context. All of the Orders and settlements at issue were entered and finalized before LTL's bankruptcy filing. The right to object to any future common benefit assessment or the propriety of assessments in the bankruptcy context is reserved.

BACKGROUND

---

[1] This motion was referred to the SM via an Order entered on March 22, 2022. [Dkt. No. 26567].

By way of brief background this MDL concerns plaintiffs' claim that the prolonged perineal use of talcum powder causes ovarian cancer. The targets of plaintiffs' claims are Johnson and Johnson and Johnson and Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. (Hereinafter collectively referred to as "J&J.") J&J steadfastly denies plaintiffs' allegations. After LTL Management, an indirect subsidiary of J&J, filed a voluntary petition for Chapter 11 bankruptcy relief on October 14, 2021, this MDL, as well as related state court litigation, was stayed. Before the stay was entered approximately 38,000 talcum powder cases were filed in this MDL.

In order to fully understand the background of this dispute it is necessary to summarize the Court's "common benefit" Orders. The two key Orders are CMO No. 7 entered on August 9, 2017 [Dkt. No. 426] and CMO No. 7(A) entered on September 17, 2020. [Dkt. No. 14741]. Importantly, attached to CMO No. 7(A) as Exhibit A is the Common Benefit Participation Agreement ("Agreement"). As set forth in CMO No. 7(A), "it is standard to order that a percentage of all [settlement] recoveries be contributed to a fund to compensate attorneys who provide work for the common benefit of all plaintiffs." Id. at ¶3. This procedure is "necessary for MDLs to be an effective means for the timely and economic resolution of cases." Id. Consistent with this practice CMO No. 7 provided standards and procedures "for the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs [in the MDL]." CMO No. 7 at I. The Order applied to all pending and future cases in the MDL. Id. at I.B.

The scope of CMO No. 7 was expanded in CMO No. 7(A) to not only include cases in the MDL, but also talcum powder cases filed in state court. The Orders applied to federal and state "cases and claims of ovarian cancer injuries, including talcum powder products." CMO

No. 7(A) at II.4. The fact that state cases are subject to a common benefit assessment is evidenced by the language in the Agreement which documents that the common benefit assessment "shall apply to all of the claimed cases of Plaintiffs' attorneys who are subject to CMO 7(A), …, that are pending in the MDL or state court …." Similarly, ¶9 of the Agreement provides that counsel who sign the Agreement consent that the common benefit assessment shall apply to all of the attorneys' ovarian cancer injury/death claims and cases that arise from the Talcum Powder Products including all unfiled claims, cases, …, and/or claims/cases filed in state court in which they have a fee interest[.]"

The Court's Orders established a procedure to enable plaintiffs' attorneys to request access to the work-product of the PSC and the work-product of others who performed common benefit work. Id. The Court's Orders also set forth "standards and procedures for the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs." CMO No. 7 at ¶1. CMO No. 7(A) also listed the cases and claims involving ovarian cancer injuries to which a common benefit assessment applied: (1) "all cases and/or claims settled pursuant to an MDL-supervised settlement agreement between the parties," including state court and unfiled claims; (2) "all cases and/or claims of any of the ovarian cancer clients of any counsel who signed…the "Participation Agreement" (hereinafter "Agreement"), and; (3) "all cases and/or claims of any ovarian cancer clients of any counsel who received, used or benefited from the Common Benefit Work Product." Id. at ¶ II.4.

In exchange for obtaining access to common benefit work-product participating counsel agreed to pay an assessment on their settlement or judgments.[2]  As set forth in ¶17 of CMO No. 7(A):

> Participating Counsel are entitled to access the Common Benefit Work Product for the use and benefit of clients with cases filed in this MDL or any other court of competent jurisdiction, and in all unfiled ovarian cancer cases and claims, including those for which a tolling agreement exists.  All ovarian cases and claims of a Participating Counsel shall be assessed whether the claim/case is filed or unfiled.  All claims/cases in which a Participating Counsel has a fee interest shall be assessed.

"Common Benefit Work Product" includes (¶2):

> [A]ll work performed for the benefit of all plaintiffs, including pre-trial matters, the *Daubert* proceedings, discovery, Bellwether work-up, trial preparation, potential settlement process(es), and all other work that advances this litigation to conclusion.

Importantly, counsel made a voluntary decision whether to gain access to common benefit work-product in exchange for paying an assessment.[3]  In order to opt-in an attorney was required to execute the Participation Agreement attached as Exhibit A to CMO No. 7(A).  In exchange for voluntarily executing the Agreement attorneys were entitled to receive the PSC's Common Benefit Work Product subject to the provisions of the Agreement.  Agreement at I.1.  Counsel who signed the Agreement consented that the required assessment applied "to all the attorneys' ovarian cancer injury/death claims and cases that arise from the Talcum Powder Products including all un-filed cases, tolled (if applicable) claims/cases, and/or claims/cases filed in state

---

[2] An election to participate early required the payment of an 8% assessment.  Later participation required a 12% assessment.  CMO No. 7(A) at V.  Assessments applied to cases and claims subject to CMO No. 7(A) and or the cases and claims of attorneys who signed the Participation Agreement [.]" Id. at ¶6.

[3] "The [Participation] Agreement may be entered into by Plaintiffs' attorneys on a voluntary basis."  CMO No. 7(A) at ¶15.

court in which they have a fee interest[.]" Id. at C.9. Paragraph D.10 of the Agreement addressed the right of participating counsel to access common benefit work-product:

> **D. RIGHTS AND OBLIGATIONS OF PARTICIPATING COUNSEL**
>
> 10. Upon execution of this *Agreement*, the PSC will provide Participating Counsel, with access to the Common Benefit Work Product defined in the Court's CMO 7 and 7(A), and any amendments to which this Exhibit "A" is attached, including access to the document depository as well as all the coding and summarizing of the documents in the depository, access to all deposition transcripts and summaries, deposition cuts for the purpose of trial, medical literature library, legal briefing and research, and, as deemed appropriate by the PSC, expert witness work product. Participating Counsel agree that all cases in which Participating Counsel has a fee interest, including unfiled cases, tolled cases, and/or cases filed in state and/or federal court, are subject to the terms of this *Agreement*.

Movant signed the Agreement and agreed to be legally bound by its provisions on September 21, 2020. According to the PSC 127 law firms executed the Agreement. PSC's Response in Opposition ("Response") at 9. [Dkt. No. 26558].[4]

As to the specific background relevant to the present motion, prior to the LTL bankruptcy Ferraro settled 24 cases in its inventory against J&J. The 24 cases were comprised of 22 lawsuits filed in the MDL, one lawsuit filed in Florida state court, and one claim belonging to an individual with an unfiled case.

A summary of Ferraro's beef follows. According to Ferraro, in December 2020, as trial approached in one Florida state court case, he approached co-lead counsel for this MDL, P. Leigh O'Dell, Esquire ("O'Dell"), seeking "introductions to two expert witnesses - Dr. Ghassan Saed and Laura Plunkett." Memo. of Law at 2 [Dkt. No. 26550-1]. In Ferraro's

---

[4] The PSC points out that Ferraro did not object to the entry of any of the referenced common benefit Orders. Nor did Ferraro ask to be exempted from any provision in the Orders.

words he sought "at a minimum, consultations with both experts" to aid its trial preparation. Id. Ferraro's request to directly consult with the experts was denied. Ferraro claims that not only was "no justification" given for the denial, but there was also no "reasonable justification" for the response. Id. at 3. Ferraro claims this not only thwarted his ability to "aggressively advance its clients' cases against [J&J]," but it also "actively undermined one of the central tenets of [O'Dell] and her firm's role as Co-Lead Counsel - to manage this MDL for the common benefit of **all** Plaintiffs." (Emphasis in original). Ferraro also contends O'Dell's response was contrary to the Agreement it executed. Id. Ferraro claims the Agreement "entitled it to access Common Benefit Work Product as defined therein, including discovery materials and experts." Id.

The gist of Ferraro's motion relates to whether it is required to contribute a specific percentage of its settlements to plaintiffs' common benefit fund. Ferraro says no for several reasons: (1) the settled cases are not covered because the settlements were not reached as part of an MDL - supervised settlement agreement; (2) Ferraro was unreasonably denied the benefit of any 'Common Benefit Work Product' that would justify common benefit contributions, and; (3) "Co-Lead Counsel's Conduct… was… antithetical to the 'common benefit' MDL leadership is bound to pursue and should not be incentivized for permitting Ferraro['s]… clients' recoveries to be automatically reduced without Court intervention." Id. at 5. Ferraro also argues it should not have to pay a common benefit assessment because lead counsel played no role with regard to its settlements and payment of a common benefit fee was not discussed with J&J during its settlement negotiations.

Not surprisingly the PSC opposes Ferraro's motion. The PSC argues: (1) the Participation Agreement Ferraro signed requires it to pay an assessment on all of its settlements; (2) Ferraro was not denied Common Benefit Work Product; (3) Co-lead Counsel (O'Dell)

-6-

faithfully complied with her responsibilities, and; (4) Ferraro's assessment must be paid even if lead counsel did not participate in settlement negotiations and Ferraro did not discuss payment of a common benefit fee with &J.[5]

LEGAL DISCUSSION

The SM's ruling is dictated by the term of the Court's Orders and the Participation Agreement Ferraro voluntarily signed. By executing the Agreement Ferraro agreed to be bound by the provisions in CMO No. 7(A). CMO No. 7(A) applied to all cases that satisfied the criteria in ¶4 which are as follows:

> 4.  This Order applies to cases and claims of ovarian cancer injuries, including death cases and claims from Talcum Powder Products. This Order applies to any claims for a request for a fee or claims for reimbursement of expenses emanating from those cases and claims. Accordingly, this Order applies to:
>
> > a.  All cases now or hereafter subject to the jurisdiction of this Court in this MDL litigation regardless of whether the case is resolved after a remand from this Court to the transferor federal court;
> >
> > b.  All cases and/or claims settled pursuant to an [MDL-supervised settlement agreement] between the parties, which may include cases in any state court and claims that are not filed but participate in any MDL-supervised settlement agreement;
> >
> > c.  All cases and/or claims of any of the ovarian cancer clients of any counsel who signed or are deemed to have signed the "*Participation Agreement*" that is attached to this Order as Exhibit A hereto, whether

---

[5] The SM acknowledges, appreciates and agrees with O'Dell's statement that it is unnecessary to respond to the personal attacks lodged against her. Sur-Reply at 2 n.2. The SM hopes that on reflection movant's counsel recognizes that its attacks and flowery language were inappropriate and unnecessary and have no place in this litigation.

> case was filed, unfiled or tolled, including cases filed in state court; and,
>
> d.   All cases and/or claims of any ovarian cancer clients of any counsel who received, used, or benefited from the Common Benefit Work Product.

It is evident that the 24 cases Ferraro settled meet the criteria in ¶4. The 22 cases pending in the MDL qualify under ¶4.a since the cases were "subject to the jurisdiction of this Court in this MDL litigation." Further, Ferraro's settlement of its state case and unfiled case, as well as the 22 MDL cases, meet the criteria in ¶4.c since they are cases and/or claims of "counsel who signed …the Participation Agreement[.]" This conclusion is reinforced in paragraph 9 of the Agreement which states:

> Counsel who sign…this <u>Agreement</u> consent that the assessment shall apply to all the attorneys' ovarian cancer injury/death claims and cases that arise from the Talculm Powder Products including all unfiled claims cases,…,and/or claims/cases filed in state court in which they have a fee interest, regardless of the size of that fee interest.[6]

Since all of Ferraro's settlements are subject to the Court's common benefit orders, and Ferraro voluntarily signed the Participation Agreement, the cases are subject to an assessment on the "Gross Monetary Recovery" as provided in the Agreement.[7] Further, since the parties do not question that Ferraro qualifies for "Early Participation," the parties' dispute as to the required assessment amount at issue is moot  The common benefit assessment applicable to Ferraro's 24 settlements is 8% (6% for fees and 2% for expenses). <u>Id</u>. at ¶6.[8]

---

[6] It having been established that Ferraro's cases meet the criteria in 4.a and c, there is no need to decide if 4.d is also satisfied. The SM is therefore not deciding if Ferraro "benefitted" from the Common Benefit Work-Product by merely being able to access the work-product.

[7] "Gross Monetary Recovery" includes any and all amounts paid to plaintiffs by defendants through a settlement [.]" <u>Id</u>. at ¶3.

[8] J&J was justified and in fact mandated to withhold from Ferraro's settlements the required common benefit assessments. <u>See</u> CMO No. 7 at ¶30. ("For cases subject to an assessment, Defendants are directed to withhold an

Ferraro's arguments as to why he is not required to pay an assessment are unavailing. Ferraro argues that since he did not participate in an "MDL-supervised settlement agreement" but instead settled separately with J&J, his settlements do not qualify for inclusion under ¶4. To reach this conclusion, however, Ferraro misreads ¶4. The clear import and intent of ¶4 is that meeting any of the listed a-d criteria qualifies a case for a common benefit assessment. The paragraph does not require, as Ferraro posits, that all the criteria in sub-paragraphs a-d must be met for a settlement to be assessed. Instead, as the PSC argues, the sub-paragraphs comprise a complete list of the qualifying categories of settlements.

Ferraro's interpretation of ¶4 would lead to results not contemplated by participating counsel or the Court. For example, if Ferraro's interpretation is accepted an attorney who signed the Agreement and settled a state talculm powder case with J&J after receiving, using and benefitting from common benefit work product, would not have to pay an assessment because there was no MDL supervised settlement. This plainly was not envisioned by the Court or by the parties as evidenced by the language requiring an assessment for the settlement of state cases.[9] ("The assessment shall apply to all of the claims/cases of the Plaintiffs' attorneys who are subject to CMO 7(A),…, that are pending in the MDL or state court[.]")  Similarly, Ferraro's interpretation contravenes ¶9 of the Agreement which states that parties that sign the Agreement consent to an assessment on the settlements of their state talc ovarian cases. The parties plainly did not envision that an assessment for a state settlement would only be required if it was accomplished in connection with a MDL supervised settlement. The SM will not accept

---

assessment from any and all amounts paid to Plaintiff and their counsel and to pay the assessments directly into the accounts[.]"

[9] The SM agrees with Plaintiffs' argument: "The intent Ferraro attributes to the provisions [of ¶4] make no sense so effectively it would mean no case could be subject to a holdback unless the case was part of a [MDL] Court-supervised global settlement." Plaintiffs' Sur-Reply at 5.  [Doc. No. 26563].

Ferraro's interpretation of ¶4 of CMO No. 7(A) since it will lead to unreasonable contrarian results that are inconsistent with the language in the Court's Orders and the purpose and intent of the Orders. See Educational Impact, Inc. v. Danielson, C.A. No. 14-937 (FLW)(LHG), 2015 WL 381332, at *7 (D.N.J. Jan. 28, 2015) (if the interpretation of a term would lead to an unreasonable or absurd result, the court may consider an alternative interpretation); see also State v. Morrison, 227 N.J. 295, 308 (2016) (statutes must be construed sensibly and consistent with the objectives to be achieved).

Ferraro's argument that he is not required to pay an assessment because he was wrongly denied access to common benefit work-product is also unavailing. The gist of Ferraro's argument is that lead counsel would not permit him to "consult" directly with plaintiffs' experts. The problem with Ferraro's argument, however, is that the Agreement did not give participating counsel carte blanche or unfettered access to plaintiffs' experts. Instead, as to expert witness work-product participating counsel was only given access "as deemed appropriate by the PSC." See Agreement at D.10.[10] O'Dell had reasonable and logical reasons why Ferraro was denied the opportunity to directly consult with plaintiffs' experts. Since over one hundred counsel signed the Agreement, plaintiffs' experts would be overwhelmed if they had to personally consult with everyone who wanted a separate audience. Instead, O'Dell offered a reasonable alternative to Ferraro which gave Ferraro access to the expert work-product it requested. O'Dell explained in her January 4, 2022 Declaration [Doc. No. 26558-1] that in December 2020, she was asked by David Jagolinzer, Esquire, an attorney with Ferraro, to facilitate the live testimony of Drs. Saad and Plunkett in Ferraro's upcoming state court trials. Id. at ¶3. O'Dell explained it

---

[10] The SM disagrees with Ferraro's argument that a "consultation" with the PSC's experts to ask about their expert opinions is not an inquiry involving the work-product of the PSC.

was the PSC's intent to present the experts' testimony by videotape deposition that would be available for use. Id. at ¶4. O'Dell further explained that Ferraro was treated the same as other counsel who requested access to the PSC's experts. Id. at ¶5. O'Dell's explanation is reasonable and was authorized by the discretion afforded to her in the Court's Orders.

Having ruled that O'Dell's actions were reasonable and authorized, the SM disagrees with Ferraro's assertion that O'Dell's actions were antithetical to the common benefit MDL leadership is bound to pursue. To the contrary, the evidence of record shows that O'Dell reasonably and faithfully fulfilled her role. Also, for the reasons stated the SM disagrees with Ferraro's argument that the conduct of O'Dell weighs "in favor of exempting Ferraro Law's settlements to date, and future recoveries, from any common benefit fee assessments." Ferraro's Reply at 7. [Dkt. No. 26559].[11]

Ferraro argues that O'Dell could have asked to join Ferraro's conferences with experts, that she could have been involved in deposition preparation or she otherwise could have collaborated with Ferraro. This arrangement was unworkable given the likely demands on the time and resources of plaintiffs' experts and Lead Counsel. The Agreement afforded Lead Counsel discretion to share plaintiffs' expert common benefit work-product. O'Dell appropriately exercised her discretion.

The fact that lead counsel played no active role in Ferraro's settlements is of no moment. Nor is the fact that Ferraro worked independently of Lead Counsel. The Court's Orders and Agreements did not mandate that this was a prerequisite to the obligation to pay an assessment. The SM agrees with the PSC's argument that the court does not have the time or capacity to

---

[11] As noted, this Opinion and Order only addresses the issue(s) before the SM. The SM is not addressing or deciding if Ferraro must pay an assessment on future recoveries.

make individual factual determinations. Nor is it relevant that Ferraro did not discuss with J&J the payment of a common benefit fee.  Payment of the fee was required upon the consummation of a settlement. As already noted, J&J was mandated to withhold an assessment from Ferraro's settlement. It is of no moment that Ferraro may not have used any of the PSC's work-product. Ferraro had the right to access the work-product. Whether it chose to avail itself of the access is not determinative as to whether it is required to pay an assessment.

CONCLUSION AND ORDER

For all the foregoing reasons Ferraro's motion is denied. Accordingly,

IT IS HEREBY ORDERED this 7th day of September, 2022, that Ferraro's Motion for Relief from Common Benefit Fee Assessments is DENIED; and it is further

ORDERED as follows:

1. To the extent not already done, Ferraro shall pay an 8% common benefit assessment on the 24 cases that are the subject of this motion. The money shall be withheld from Ferraro in accordance with the Court's Orders, and

2. To the extent more than an 8% common benefit assessment was withheld from Ferraro's settlements, Ferraro is entitled to a refund.  However, this Order does not address the mechanics of the refund in view of LTL's bankruptcy and the stay entered as to J&J. Ferraro's request that the PSC pay the refund is DENIED; and it is further

ORDERED that this Order is entered without prejudice to Ferraro's right to object in the future whether lead Counsel should receive any portion of the common benefit fund as compensation for their work in this MDL.

By: /s/ Joel Schneider
SPECIAL MASTER
HON. JOEL SCHNEIDER (RET.)

Dated; September 7, 2022