# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2738 (MAS) (RLS)** |

*THIS DOCUMENT RELATES TO ALL CASES*

<u>**PLAINTIFFS' SECOND AMENDED MASTER LONG FORM COMPLAINT AND JURY DEMAND**</u>

Plaintiffs, by and through their counsel and pursuant to Case Management Order No. 1 ("CMO-1"), bring this Second Amended Master Long Form Complaint against Defendants Johnson & Johnson ("J&J"), Johnson & Johnson Holdco (NA) Inc. f/k/a Johnson & Johnson Consumer Inc. f/k/a Curahee Holding Company Inc. and f/k/a Johnson & Johnson Consumer Companies, Inc., individually and as successor in interest to Old Johnson & Johnson Consumer Inc. ("Old JJCI," specifically defined, *infra.*) ("New JJCI"), Janssen Pharmaceuticals, Inc., individually and as successor in interest to Old JJCI and New JJCI ("Janssen"), Kenvue, Inc., individually and as successor in interest to Old JJCI and New JJCI ("Kenvue"), LTL Management LLC, individually and as successor in interest to Old JJCI ("LTL"), Imerys Talc America, Inc. f/k/a Luzenac America, Inc., f/k/a Rio Tinto Minerals, Inc. ("Imerys Talc")[1] and Personal Care

---

[1] Imerys Talc filed for Chapter 11 bankruptcy protection on February 13, 2019. *See In re: Imerys Talc America, Inc.*, 19-10289-LSS, USBC, District of Delaware. Imerys Talc is named as a Defendant in this Second Amended Master Long Form Complaint solely because it relates back to cases filed against Imerys before the bankruptcy petition. This Second Amended Long Form Complaint does not assert new claims against Imerys Talc.

Products Council f/k/a Cosmetic, Toiletry, and Fragrance Association ("PCPC")[2] (collectively referred to as "Defendants").

This Second Amended Master Long Form Complaint sets forth allegations and questions of fact and law common to those claims subsumed within the context of this multidistrict proceeding. Plaintiffs seek compensatory and punitive damages, monetary restitution, equitable relief, and all other available remedies as a result of injuries caused by Defendants' defective products. Plaintiffs make the following allegations based upon their personal knowledge and upon information and belief, as well as upon their attorneys' investigative efforts, regarding Defendants' talcum powder-containing products known as Johnson's Baby Powder and Shower to Shower (hereinafter together or individually, "the PRODUCTS").

This Second Amended Master Long Form Complaint does not necessarily include all claims asserted in all of the transferred actions to this Court, nor is it intended to consolidate for any purpose the separate claims of the Plaintiffs herein. It is anticipated that individual plaintiffs may adopt this Second Amended Master Long Form Complaint and the necessary causes of action herein through use of a separate Short Form Complaint. Any separate facts and additional claims of individual plaintiffs are set forth in those actions filed by the respective plaintiffs. This Second Amended Master Long Form Complaint does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions, nor does any plaintiff relinquish the right to move to amend their individual claims to seek any additional claims as discovery proceeds. As more particularly set forth herein, each plaintiff maintains that the PRODUCTS are defective, dangerous

---

[2] On June 16, 2021, the Court granted summary judgment in favor of PCPC. The Court has not entered final judgment pursuant to Fed. R. Civ. P. 54(b). PCPC is included in this Second Amended Master Long Form Complaint to preserve all rights, including rights on appeal of the case if a final judgment is entered. This Second Amended Long Form Complaint does not assert new claims against PCPC.

to human health, unfit and unsuitable to be advertised, marketed, and sold in the United States, and lack proper warnings associated with their use.

## PARTIES

1.      Pursuant to CMO-1, this Second Amended Master Long Form Complaint is filed for all Plaintiffs and, if applicable, Plaintiffs' spouses, children, decedents, estates, or wards represented by Plaintiffs' counsel who file a Short Form Complaint. By operation of CMO-1, all allegations pleaded herein are deemed pleaded in any Short Form Complaint.

2.      Plaintiffs were diagnosed with various forms of cancer of the female reproductive system, including epithelial ovarian cancer, fallopian tube cancer, and primary peritoneal cancer, which were directly and proximately caused by their regular and prolonged exposure to talcum powder contained in the PRODUCTS.

3.      Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Johnson & Johnson may be served with process by serving its registered agent at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

4.      At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.  At all relevant times, Johnson & Johnson regularly transacted, solicited, and conducted business in all fifty states of the United States.

5.      Defendant New JJCI, individually and as successor in interest to Old JJCI, is a New Jersey corporation with its principal place of business in the State of New Jersey.  New JJCI may be served with process by serving its registered agent located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

6.     At all relevant times, upon information and belief, New JJCI was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.  At all relevant times, New JJCI regularly transacted, solicited, and conducted business in all fifty states of the United States.

7.     Defendant Janssen, individually and as successor in interest to Old JJCI and New JJCI, is a New Jersey Corporation with its principal place of business in the State of New Jersey. Janssen may be served with process by serving its General Counsel at 1125 Trenton-Harbourton Rd., Titusville, NJ 08560.

8.     At all relevant times, upon information and belief, Janssen was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.  At all relevant times, Janssen regularly transacted, solicited, and conducted business in all fifty states of the United States.

9.     In the April 4, 2023 Declaration of John K. Kim in Support of First Day Pleadings, filed in LTL's second bankruptcy filing in *In re: LTL Management LLC*, Case no.: 23-12825, United States Bankruptcy Court District of New Jersey ("Kim LTL Decl."), Mr. Kim, as Chief Legal Officer for LTL Management, stated "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim Decl. at ¶26.  Pursuant to Defendants' Organization Structure, Janssen is the parent entity of Defendant New JJCI.  *See* Kim Decl. at Annex B.

10.     Defendant Kenvue, individually and as successor in interest to Old JJCI and New JJCI, is a Delaware corporation with its principal place of business in the State of New Jersey. Kenvue may be served with process by serving its General Counsel at 199 Grandview Road, Skillman, NJ 08558.

11.     At all relevant times, upon information and belief, Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS.  At all relevant times, Kenvue, or its predecessors, regularly transacted, solicited, and conducted business in all fifty States of the United States.

12.     In its initial SEC filing, Kenvue stated that "It is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." Kenvue further stated that it "may be subject to additional claims . . . related to the sale of talc-based Johnson's Baby Powder in markets where we have discontinued this product (such as in the United States and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." **Exhibit 1** (Kenvue Inc. Form S1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)).[3]

13.     Defendant LTL is a North Carolina limited liability company.  LTL's sole member is New JJCI. For purposes of diversity, LTL is a citizen of the State of New Jersey.   LTL can be served with process by serving John Kim,[4] Chief Legal Officer, at 501 George Street, New Brunswick, NJ 08933.

14.     At all relevant times, upon information and belief, LTL, or its predecessor, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling,

---

[3] All exhibits referenced in this Second Amended Master Long Form Complaint are appended hereto and incorporated by reference.

[4] John Kim is an employee of Johnson & Johnson Services, Inc., a wholly owned subsidiary of Johnson & Johnson, and seconded to LTL Management LLC. Mr. Kim served as the Assistant General Counsel and Head of Product Liability Litigation for Johnson & Johnson immediately prior to accepting the position of Chief Legal Officer at LTL.

and/or distributing the PRODUCTS.  At all relevant times, LTL, or its predecessor, regularly transacted, solicited, and conducted business in all fifty States of the United States.

15.     At all relevant times, Defendants J&J, New JJCI, LTL, Janssen, Kenvue have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the PRODUCTS.

16.     Defendants New JJCI, LTL, and Janssen are and have been at all relevant times wholly owned subsidiaries of Defendant Johnson & Johnson, under the complete dominion and control of Defendant Johnson & Johnson.  Hereinafter, unless otherwise delineated, these entities together shall be referred to as the "Johnson & Johnson Defendants."

17.     Johnson & Johnson is one of the world's largest and most financially stable corporations, with a market capitalization in excess of $450 billion, a credit rating better than that of the United States, and approximately $30 billion in liquid assets.

18.     Prior to October 2021, J&J's subsidiary Johnson & Johnson Consumer Inc. ("Old JJCI"), was a New Jersey corporation with its principal place of business in the State of New Jersey.  Old JJCI engaged in the business of researching, developing, formulating, manufacturing, designing, testing, licensing, selling, distributing, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the PRODUCTS. As of October 2021, Old JJCI was worth more than $61.5 billion.

19.     In October 2021, facing adverse court judgments for ovarian cancer and mesothelioma caused by the PRODUCTS, and rather than declare bankruptcy themselves, J&J and Old JJCI engaged in a maneuver referred to as the "Texas Two-Step." First, at J&J's instruction, Old JJCI merged into Chenango Zero, LLC, a Texas limited liability company. Then, Chenango Zero, LLC effected a divisional merger under the Texas Business Organizations Code,

resulting in the dissolution of Chenango Zero, LLC and the formation of two new companies: Chenango One, LLC and Chenango Two, LLC. Following the divisional merger, Old JJCI ceased existence. All Old JJCI legacy talc-related liabilities were transferred to the newly created Chenango One, LLC, and all remaining Old JJCI operating assets were transferred to Chenango Two, LLC. Chenango One, LLC, then reincorporated in North Carolina and changed its name to LTL Management LLC. Chenango Two, LLC merged into Curahee Holding Company Inc., which name was then changed to Johnson & Johnson Consumer Inc. (Defendant "New JJCI").

20.    Second, within 48 hours of the creation of LTL and transfer of Old JJCI operating assets to Defendant New JJCI, LTL declared bankruptcy, strategically leaving Old JJCI's productive operations and trade creditors outside of the bankruptcy. With no employees or pre-existing business, LTL had nothing to "reorganize." As acknowledged by the newly formed organization, LTL was created solely to resolve talc claims in bankruptcy, away from juries. The resulting bankruptcy operated for the benefit of nondebtors who sat outside the bankruptcy in control of the business—while litigation involving rapidly dying victims was halted, including this MDL.

21.    LTL is a North Carolina limited liability company and a citizen of the State of New Jersey. At all relevant times, upon information and belief, LTL, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all relevant times, LTL, or its predecessor, regularly transacted, solicited, and conducted business in all fifty States of the United States.

22.    On February 25, 2022, Chief Judge Michael B. Kaplan of the Unites States Bankruptcy Court, District of New Jersey, entered a Memorandum Opinion denying motions seeking dismissal of the first LTL bankruptcy proceeding pursuant to 11 U.S.C. § 1112(b) as not having been filed in good faith.

23.     On January 30, 2023, the United States Court of Appeals for the Third Circuit issued an Opinion in which it reversed the Bankruptcy Court's denial of motions to dismiss and remanded the case with the instruction to dismiss the Chapter 11 petition. Examining circuit precedent, decisions of other courts, and the Bankruptcy Code's structure, purpose, and legislative history, the panel reaffirmed the long-standing rule that debtors "who do[] not suffer from financial distress cannot demonstrate" a good-faith basis for filing for bankruptcy.  On March 31, 2023, the Third Circuit issued a mandate to implement its decision, and Chief Judge Kaplan dismissed the LTL bankruptcy on April 4, 2023.

24.     Also in January 2023, in and around the same time the Third Circuit ordered the dismissal of the LTL bankruptcy proceeding, and in an effort to shield assets from liability, New JJCI transferred all of its consumer business assets to its parent entity, Defendant Janssen.

25.     On April 4, 2023, immediately following the dismissal of its first bankruptcy, LTL Management LLC filed a second bankruptcy, which Plaintiffs again believed was not filed in good faith, but as tactic to delay this MDL as well as cases pending in state courts.

26.     On July 28, 2023, Chief Judge Michael Kaplan issued a Memorandum Opinion in which he ruled that LTL's second bankruptcy was not filed in good faith "due to LTL's lack of imminent and immediate financial distress." LTL Opinion at 39. Chief Judge Kaplan dismissed the bankruptcy by Order on August 11, 2023.

27.     Defendant Imerys Talc America, Inc., f/k/a Luzenac America, Inc., f/k/a Rio Tinto Minerals, Inc. (hereinafter, "Imerys Talc"), is a Delaware corporation with its principal place of business in the State of California, located at 1732 North First Street, Suite 450, San Jose, CA 95112.  At all relevant times, Imerys Talc has maintained a registered agent in the State of Delaware.  Imerys Talc may be served with process of this Court via service on its registered agent, Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

28.     At all relevant times, upon information and belief, Imerys Talc has been in the business of mining and distributing talc for use in talcum powder-based products, including the PRODUCTS.  Imerys Talc is the successor or continuation of Luzenac America, Inc. and Rio Tinto Minerals, Inc.  Imerys Talc is legally responsible for the conduct of Luzenac America, Inc. and Rio Tinto Minerals, Inc.

29.     Defendant Personal Care Products Council ("PCPC") f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA"), is a corporation organized under the laws of the District of Columbia, with its principal place of business in the District of Columbia. At all relevant times, upon information and belief, Imerys Talc and Johnson & Johnson have been active members of PCPC.  PCPC may be served with process of this Court via service on its registered agent, Thomas Myers, at 1620 L Street, N.W., Suite 1200, Washington, District of Columbia 20036.   PCPC is the successor or continuation of CTFA, and PCPC is legally responsible for CTFA's conduct.

30.     At all relevant times, upon information and belief, PCPC was a national trade association representing the personal care and cosmetics industry for the purposes of and, in fact, interacting with and influencing local, state and federal governmental agencies on issues related to, among other things, the regulation, testing and marketing of talc-based body powders and the PRODUCTS.  The actions of Defendant PCPC have had repercussions throughout the talc industry, and in all states of the United States.

31.     Beyond acting as a trade association, as alleged herein, PCPC actively engaged in actions that directly impacted the marketing and sale of the PRODUCTS.

32.     Defendants John Does/Jane Does 1-30 are those persons, agents, employees, and/or representatives of Defendants whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

33.     Defendants Unknown Businesses and/or Corporations A-Z are unknown entities whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

## JURISDICTION AND VENUE

34.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiffs and Defendants.

35.     The amount in controversy alleged by each of the respective individual Plaintiffs will exceed the sum or value of $75,000.

36.     Defendants have significant contacts with the federal judicial districts identified in the Short Form Complaints such that they are subject to the personal jurisdiction of the court in said districts.

37.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the federal judicial districts identified in the Short Form Complaints.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in said districts.

## FACTUAL ALLEGATIONS

I.     **Facts Relating to Defendants' Successor Liability**

a.     **The Assets, Operating Business, and Liabilities of Old JJCI Were Transferred to Defendants New JJCI, LTL, Janssen, and Kenvue**

38.     The Kim LTL Decl. summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against the Defendants as follows:

a.      "J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products."

b.     "In 1972, J&J established a formal operating division for its baby products

10

business, which included JOHNSON'S® Baby Powder…. J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

c.    "In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("**Omni**"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

d.    "In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc."

e.    "In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc. ("**J&J Consumer Companies**")."

f.    "In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "**Old JJCI**")."

g.    "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases…. Old JJCI also became responsible for all claims alleging that Shower to Shower

11

products, which contained talc, cause cancer or other diseases."[5]

39.     J&J and its subsidiary, "Johnson & Johnson Consumer Inc.," both in the form of "Old JJCI" and "New JJCI" (which is identified and described below), were at all times material responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder product lines, including the iconic Johnson & Johnson Baby Powder product line.

40.     Each and every one of the J&J's corporate entities, including itself and its affiliated companies involved or associated with talc business and PRODUCTS, were at all times material to this case aware that raw talc ingredient and/or resulting talc-based PRODUCTS contained asbestos, and each and all collectively actively concealed such fact from the public for decades.

41.     Prior to the 2021 implementation of J&J's multifaceted restructuring of its consumer product subsidiaries, Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed.

42.     In an effort to avoid or eliminate J&J and Old JJCI's respective responsibility and liability for injuries and harm caused by Johnson & Johnson Baby Powder, as well as other talc PRODUCTS, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

43.     The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J. LTL is an acronym

---

[5] Plaintiffs do not agree with this statement that Old JJCI became responsible for all claims, especially not claims related to J&J's independent, non-derivative liability.

for "Legacy Talc Litigation."

44.     LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its PRODUCTS and their families, given that J&J and its subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

45.     As part of J&J's liability avoidance/limiting corporate restructuring, all of the productive assets of Old JJCI, including those used to manufacture and market J&J Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("**New JJCI**"). New JJCI, upon receipt of the Old JJCI's operating assets continued to sell J&J Baby Powder, as Old JJCI had previously done, and as J&J itself had done when it directly marketed the product line through an internal division.

46.     Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor but all cosmetic talc injury related litigation involving J&J and New JJCI.

47.     During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court. After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL

2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

48.     LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an *en banc* hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower court's duty to enter an order dismissing the case.

49.     Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court, seeking the same relief as in the dismissed case, claiming its funding sources and arrangements had been replaced and reconfigured in such way that purportedly overcame the Third Circuit's reasons for ordering the earlier bankruptcy case be dismissed.

50.     Unbeknownst to Plaintiffs, during the time the Third Circuit Court of Appeals was considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its assets and business to yet another J&J subsidiary, Defendant Kenvue, Inc., by transfers through JJCI's direct parent, Janssen Pharmaceuticals, Inc.

51.     According to the Kim Declaration, as part of J&J's further corporate restructuring, New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("**Holdco**"), a New Jersey corporation. His declaration before the Bankruptcy Court additionally revealed that "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim LTL Decl. at ¶ 26.

52.     While Mr. Kim's declaration does not expressly state who the parent entity is, a careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc, is the parent entity of Defendant New JJCI. *Id.* Figure 1 below is from an Exhibit to Mr. Kim's Declaration and shows that Janssen is the parent that received all of the JJCI assets used to manufacture, market, and sell J&J Baby Powder.

**Figure 1**



53.     Accordingly, under New Jersey law, both Holdco and Janssen are successors to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI.

54.     The information gleaned from Mr. Kim's Declaration and one of J&J subsidiary's SEC filings shows that J&J is in the process of once again manipulating assets and responsibilities related to the sale of J&J's Baby Powder.

55.     On January 4, 2023, Defendant Kenvue, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("**SEC**"), an S-1 registration of securities form. Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023). Figure 2 below reproduces a portion of the filing's cover page.

**Figure 2**



56.     In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of **our products marketed in the United States,** including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act. **Our cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." *Id.* (emphasis added).

57.     Kenvue acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based PRODUCTS it is responsible for: "It is also possible that various parties will seek to bring **and will be successful** in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id.*

58.     Kenvue further acknowledges itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of **talc-based Johnson's Baby Powder in markets where we have discontinued** this product (**such as in the United States** and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id.* (emphasis added).

59.     Kenvue also acknowledges that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

60.     As such, Kenvue is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which the Plaintiff was exposed.

**b.     Defendants Continue the Business of Old JJCI, Including the Johnson's Baby Powder Product Line**

61.     In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of **our products marketed in the United States,** including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act. **Our cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." (Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)). (emphasis added).

62.     The bottle for the cornstarch-based formulation Johnson's® Baby Powder, which is sold today in the United States, states: "For over 125 years JOHNSON's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"

**Figure 3**



63.     Kenvue admits in its SEC filing that while J&J transitioned to a cornstarch-based formula for Johnson's® Baby Powder in the United States and Canada in 2020, it is still distributing talc-based Johnson's® Baby Powder in other markets and will continue to do so until sometime in 2023. *Id*. at 63, 330.

64.     It remains possible today, through Amazon's online shopping website, to purchase talc-based Johnson's Baby Powder and have it delivered to the customer. (Transcript of Motions May 24, 2023, *Naranjo, et. al., v. Johnson & Johnson, et al.*, Vol. 1 of 2, at 44:18-45:10).

65.     Kenvue's website lists Johnson's as one of its "iconic brands" under the categories of "Skin health & Beauty – Face & body" and "Essential health – Baby care". https://www.kenvue.com/brands.

66.     Following the link to the Johnson's brand page, one finds Johnson's Baby Powder, amongst a variety of baby care products. https://www.johnsonsbaby.com/baby-products.

67.     On Kenvue's Johnson's brand website's FAQ page, under the questions "Why did Johnson's® reformulate?" and "How have the Johnson's® products changed?" Kenvue indicates it has generally reformulated its line of Johnson's baby products recently based on its continued scientific research and input from parents. https://www.johnsonsbaby.com/faq#why-did-johnson-

s-reformulate and https://www.johnsonsbaby.com/faq#how-have-the-johnson-s-products-. As with its corn-starch-based Johnson's Baby Powder, Kenvue continues to market these reformulated products under the trusted Johnson's brand name.

## II.  Overview of Talc & the PRODUCTS

68.     Talc is an inorganic magnesium silicate mineral that may occur in a variety of forms (massive or platy, foliated, and fibrous).

69.     Talc is used in a wide array of industrial, commercial, and cosmetic substances. It is the main substance in talcum powders, talc-based body powders, and the PRODUCTS.

70.     Talc is mined from deposits in the earth that contain asbestos, heavy metals (nickel, cadmium, cobalt, chromium, arsenic, etc.), and other toxic minerals.

71.     The Johnson & Johnson Defendants manufactured the PRODUCTS.

72.     Johnson & Johnson began the manufacture of Johnson's Baby Powder in approximately 1894.

73.     In the early 1970s, Johnson & Johnson incorporated its Baby Products Division (a/k/a Johnson & Johnson Baby Products Company), which took over the marketing of Johnson's Baby Powder.

74.     In the 1990s, the Baby Products Division became Johnson & Johnson Consumer Products, Inc.; Johnson & Johnson Consumer Products, Inc. remained a division of Johnson & Johnson.

75.     In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies Inc. and operated under this name until approximately 2015, when its name was changed to Johnson & Johnson Consumer Inc., remaining a division of Johnson & Johnson.

76.     During all relevant times, Johnson's Baby Powder® was composed primarily of talc along with other constituent elements found in talc such as asbestos, fibrous talc, and heavy metals (e.g., nickel, cadmium, cobalt, chromium, arsenic), and fragrance chemicals.

77.     Johnson & Johnson began the manufacture of Shower to Shower in 1967.

78.     Shower to Shower was manufactured through the same Johnson & Johnson divisions as Johnson's Baby Powder until Shower to Shower was sold in 2012.

79.     During all relevant times, Shower to Shower was composed of talc and cornstarch, along with other constituent elements found in talc such as asbestos, fibrous talc, and heavy metals (e.g., nickel, cadmium, cobalt, chromium, arsenic), and fragrance chemicals.

80.     Johnson & Johnson obtained the talc for the PRODUCTS from various sources including Guangxi, China, and the Fontane mine in the Germanasca Valley and Val Chisone region in Italy. J&J also obtained the talc for the PRODUCTS from the Johnson, Hammondsville, Rainbow, Hamm, and Argonaut mines in Vermont (collectively referred to as "Vermont mines"). *See* **Exhibit 2** (Feb. 15, 2019 Musco Dep. 63:7–64:5) (Hammondsville and Johnson mines were sources of cosmetic talc for Johnson's Baby Powder); *see also* **Exhibit 3** (Mar. 8, 2019 Musco Dep. 451:2–453:22) (Emtal 500 from Johnson Mine used in Cosmetics); **Exhibit 4** (Oct. 29, 1982 Miller Dep.); *see also* **Exhibit 5** (Trial Testimony of John Hopkins, July 22, 2019, *Barden et al. v. Johnson & Johnson* at 18:15-19:21).

81.     From approximately 1967 until 2003, the primary source of talc for the PRODUCTS was Vermont mines including the Hammondsville, Rainbow, Hamm, and Argonaut mines.  The mines were owned and operated by Johnson & Johnson's subsidiary, Windsor Minerals, with Johnson & Johnson exercising control over all key decisions concerning the mines.

82.     In 1989, Johnson & Johnson sold the Vermont mines and mills used to supply talc for its talc products to Cyprus Mines Corporation ("Cyprus"). Cyprus Mines Corporation sold the

mines to Rio Tinto Minerals, Inc. in 1992. In a series of later transactions, the mines were later transferred to Luzenac America, Inc., now known as Imerys Talc America, Inc. These Vermont mines were the primary source of Johnson & Johnson's talc products until 2003.

83.     Over time, the trade names for the talc ore used by Johnson & Johnson in Johnson's Baby Powder and Shower to Shower included "Emtal," "Grade 66," "Grade 96," "1615," "Italian 00000," and "Supra" all of which contain asbestos.

84.     At all relevant times, a feasible and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness as talcum powders. **Exhibit 6** (JNJ 000011777). See **Exhibit 7** (JNJ 000331979), cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc." See **Exhibit 8** (JNJ 000332195), Johnson's baby powder, pure cornstarch, being marketed as "a change for the better."

85.     As set forth herein, it was recommended that talc-based powders be replaced by cornstarch since at least the 1970s because of the potential risk of ovarian cancer with use in feminine hygiene.  Once epidemiology studies were conducted beginning in 1982, the number of calls to abandon talc in favor of cornstarch grew, in both the medical community and in the medical and scientific community.

86.     At various points in time, the Johnson & Johnson Defendants considered replacing talc with cornstarch-based powders which they began marketing in the early 1980s.  For example, in 2000, representatives prepared a plan to abandon the production of talc-containing Johnson's Baby Powder in the U.S. by December 1, 2000—weeks before the National Toxicology Program ("NTP") was set to consider the question of whether talc was a likely human carcinogen. Specifically, on November 20, 2000, there was a meeting of executives of the Johnson & Johnson

Defendants to consider a plan to abandon the use of talc.  That plan to abandon talc was developed weeks before by a "crisis management group" retained by Old JJCI, including a public relations company that assisted in preparing a "position brief to share with senior [J&J] management," a "summary" document and a "draft holding statement" to be presented to J&J management by executive, John McKeegan.  *See* **Exhibit 9** (Deposition of John McKeegan, Sept. 27, 2021, at 195:3-15).  This plan was developed after a confidential memorandum was prepared for all talc manufacturers and PCPC, which concluded that "the bottom line—except for a very few number of recruited experts—the cosmetic industry will be the lone voice" in arguing for the safety of talc and that "it would not be unwise for companies marketing talc-based products for use in babies and infants to consider ways to reformulate if necessary."  *Id.* at 233:11-14; 237:23-238:2.

87.     At a November 20, 2000 meeting, members of Old JJCI proposed to J&J that J&J announce the following: "J&J in the U.S. has made a decision to switch manufacturing entirely to cornstarch to ensure the commercial viability of its powder produced and ensure consumer peace of mind. . . . This switch will take place by December 1st, 2000."  *Id.* at 204:3-9. Until recently, the plan to switch to cornstarch was abandoned.

88.     On April 27, 2020, this Court denied the then-existing Johnson & Johnson Defendants' motion to exclude Plaintiffs' general causation experts, finding that the opinions of Plaintiffs' experts that talcum powder can cause ovarian cancer and that historical samples of Johnson's Baby Powder and Shower to Shower contain asbestos and fibrous talc are admissible evidence in all cases filed in the MDL.

89.     On May 19, 2020, Johnson & Johnson announced the discontinuation of sale of all talc-based Johnson's Baby Powder in the United States and Canada. (*Johnson & Johnson Consumer Health Announces Discontinuation of Talc-based Johnson's Baby Powder in U.S. and Canada*, May 19, 2020, available at: https://www.jnj.com/our-company/johnson-johnson-

consumer-health-announces-discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada).

90.     On August 11, 2022, Johnson & Johnson announced the worldwide discontinuation of sale of all talc-based Johnson's Baby Powder in 2023. (*Johnson & Johnson Consumer Health to Transition Global Baby Powder Portfolio to Cornstarch*, Aug. 11, 2022, available at: https://www.factsabouttalc.com/_document/johnson-johnson-consumer-health-to-transition-global-baby-powder-portfolio-to-cornstarch?id=00000182-8df9-d979-a797-edfb15d40000).

91.     At all relevant times, Defendant Imerys Talc[6] mined, refined, screened, tested, and delivered the raw talc contained in the PRODUCTS.

92.     At all relevant times, Imerys Talc continually advertised and marketed talc as safe for human use and knew that its processed talc was intended for human use.

93.     Beginning in 2006 and until the present, Imerys Talc supplied its customers, including the Johnson & Johnson Defendants, with Material Safety Data Sheets ("MSDS") for talc, which conveyed health and warning information about talc.  *See* **Exhibit 10** (IMERYS 081218).

94.     At relevant times, the Johnson & Johnson Defendants advertised and marketed their "Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild."  The Johnson & Johnson Defendants induced women through advertisements to dust themselves with this product to mask odors.  The Johnson's Baby Powder

---

[6]     All allegations regarding actions taken by Imerys Talc also include actions taken while that entity was known as Luzenac America, Inc.

bottle specifically targets women, stating: "For you, use every day to help feel soft, fresh, and comfortable." *See* **Exhibit 11** (P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com)); **Exhibit 12** (P-125 (JNJ 000058760)); and **Exhibit 13** (P-49 (picture of Johnson & Johnson's Baby Powder bottle)).

95.      At relevant times, the Johnson & Johnson Defendants advertised and marketed their "Shower to Shower" product as safe for use by women as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisements such as: "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body." The website included the suggested use of the product "Shower to Shower" in the genital area with the following: "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort." *See* **Exhibit 14** (P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com)); **Ex. 13** (P-49 (picture of Johnson & Johnson's Baby Powder bottle)); and **Exhibit 15** (P-50 (picture of Johnson & Johnson's Shower to Shower bottle)).

96.      Although the labels on the bottles for the Johnson's Baby Powder and Shower to Shower products have changed over time, the core message has been the same:  that women can safely use the products on their bodies including their genital areas.

**III.    Strong Scientific Evidence Links Talc Use to Ovarian Cancer**

97.      Internally, over decades, Johnson & Johnson discussed its corporate obligation that "if the results of any scientific studies show any question of safety of talc" use it would "not hesitate to take it off the market."  *See* **Exhibit 16** (P-660 (JNJ000488208)); **Exhibit 17** (P-55 (JNJ000026241); and **Exhibit 18** (P-115 (JNJ000024495)).  However, when faced with questions about the safety of talc, Johnson & Johnson refused to act.

98.     In a 1948 paper, Johnson & Johnson scientists recognized talc as a hazard to human health. Eberl et al., *Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves*, 25 Am. J. Surgery 493 (1948).

99.     As early as 1961, research established that some particles, including particles like talc, can translocate from the exterior genital area to the ovaries in women. Egli & Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract*, 12 Fertility Sterility 2 (1961).

100.     In 1964, Johnson & Johnson admitted in an internal company document that talc could not be safely absorbed in the vagina while cornstarch could be. *See* **Exhibit 19** (P-343 (JNJ 000265536 at 3 (cornstarch "replaced talc because [cornstarch]. . . was found to be absorbed safely in the vagina whereas, of course, talc was not")). *See also*, **Ex. 7** (JNJ 000331979 (cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc.")).

101.     Beginning in the 1970s, Johnson & Johnson had in its possession published scientific literature detailing specific cases involving consumers who developed extensive talcosis as a result of the liberal use of cosmetic powder.  **Exhibit 20** (Nov. 28, 2018 Musco Dep. 107:12–109:10).

102.     There is no dispute that for over half a century, there have been serious questions about whether talcum powder can cause cancer.  For example, in 2021, Old JJCI's Chief Medical Officer, Edwin Kuffner testified that:

> Q And you would agree for at least a half century before you became CMO for Old JJCI in 2017 there were questions raised in the medical and scientific community about the safety of talcum powder, true?
>
> A Yes

**Exhibit 21** (Testimony of Ed Kuffner, *In re: LTL Management LLC*, Nov. 5, 2021 at 417).

103.     In fact, as early as 1973, proposals were made to Congress to both study the link of talc and ovarian cancer and whether to replace talc with cornstarch in cosmetics.  *See* **Exhibit 22** (Toxic Substances Control Act of 1973 hearings before the U.S. Senate (February 23, 1973)). For example, because of studies finding talc in the ovaries of women with ovarian cancer, it was noted that and "area which requires immediate investigation should be talcum powder and vaginal deodorants." *Id.* at 170 (emphasis added). Indeed, at those 1973 Senate Hearings, it was noted that cornstarch could act as a safe alternative to talcum powder:

> Before 1895, when Johnson and Johnson began talc manufacture, babies were commonly dusted with com starch; this safe substitute is still available, and at one-fourth the cost of talc. We recommend it. Don't use feminine hygiene sprays which contain talc.

*Id.* at 173.

104.     In or about 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales.  *See* **Exhibit 23** (P-1 (Henderson, WJ, et al., *Talc and carcinoma of the ovary and cervix*, 78 J. Obstetrics & Gynaecology of the British Commonwealth 266 (1971)). *See also* **Exhibit 24** (P-344 (JNJ 000327788)), JNJ forwarded tissue samples from Dr. Henderson to Dr. Langer at Mt. Sinai who confirmed Dr. Henderson's observations.

105.     In or about 1979, migration of particulates from the vagina to the peritoneal cavity and ovaries was found, correlating previous findings in surgically removed specimens. *See* **Exhibit 25** (JNJ 000005093).

106.     In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others.  *See* **Exhibit 26** (P-3 (JNJ000020733)).  This study found a 92% increased risk of ovarian cancer with women who reported genital talc use. Upon information and belief, shortly after this study was published, Dr.

Bruce Semple of Johnson & Johnson visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a warning on its talcum powder products about the ovarian cancer risks so that women could make an informed decision about their health.

107.   A 1986 Johnson & Johnson Technology Forecast acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health benefit.  The document also acknowledged that "Retrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer." *See* **Exhibit 27** (P-9 (JNJ00000523)).

108.   Since publication of the Cramer study in 1982, there have been dozens of additional epidemiologic and other scientific studies providing data regarding the association of talc and ovarian cancer. Nearly all of the epidemiology studies have reported an elevated risk for ovarian cancer associated with genital talc use in women. Significantly, scientific studies have also provided biologically plausible explanations as to how genital talc use can cause ovarian cancer:

   a.   In 1983, a case-control study found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P., et al., *Talc and Ovarian Cancer*, 250 *JAMA* 1844 (1983).

   b.   In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their genital area and the relative risk for talc use between 1 and 9 years, relative to a shorter duration, was 1.6 (p = 0.05).  Whittemore AS, *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II.

Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* 1988 Dec; 128(6):1228-40.

c.  A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once each week. Booth, M., *et al*. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d.  In 1992, a case-control study found an 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al.* Perineal exposure to talc and ovarian cancer risk. *Obstet. Gynecol.* 1992 Jul; 80(1):19-26.

e.  Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% significantly increased risk of ovarian cancer in women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol. Oncol.* 1992 Apr; 45(1):20-5.

f.  Yet another 1992 case-control study by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen, *et al.*, Risk Factors for Epithelial Ovarian Cancer in Beijing, China, 21 *Int. J. Epidemiol.* 23-29 (1992).

g.  In 1995, the largest study of its kind to date found a 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie,

D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int. J. Cancer.* 1995 Sep 15; 62(6):678-84.

h.  In 1996, a case-control study found a statistically significant 97% increased risk of ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

i.  In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women who performed any perineal dusting or used genital deodorant spray respectively had a statistically significant 60% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

j.  In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc directly or via sanitary napkins to their perineal area. Chang, S, *et al.* Perineal talc exposure and risk of ovarian carcinoma. *Cancer.* 1997 Jun 15; 79(12):2396-401.

k.  In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am. J. Obstet. Gynecol.* 1998 Aug; 179(2):403-10.

l.  Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80% increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int. J. Cancer.* 1999 May 5; 81(3):351-56.

m.  In 2000, a case-control study including over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000 Mar; 11(2):111-7.

n.  In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study also examined women's use of cornstarch powders as an alternative to talc and found no increased risk of ovarian cancer in women in the cornstarch group, supporting a safe alternative to talc for genital use. Mills, PK, *et al.* Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int. J. Cancer.* 2004 Nov 10; 112(3):458-64.

o.  In a 2007 study by Buz'Zard, *et al.*, talc was found to increase proliferation, induce neoplastic transformation and increase reactive oxygen species (ROS) generation time-dependently in the ovarian cells. The study concluded that talc may contribute to ovarian carcinogenesis in humans.  The data suggested that talc may contribute

to ovarian neoplastic transformation and Pycnogenol reduced the talc-induced transformation. *Phytotherapy Research: PTR* 21, no. 6 (June 2007): 579–86.

p.  In 2008, a combined study of over 3,000 women from a New England-based case-control study found a 36% statistically significant increased risk for all types of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a highly significant dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer (and all serous invasive ovarian cancer), adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev.* 2008 Sep; 17(9):2436-44.

q.  A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. That increased risk rose dramatically to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

r.  In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42.

s.  In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian

cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev. Res. (Phila).* 2013 Aug; 6(8):811.

t.   In May 2015, Roberta Ness performed a meta-analysis of all accumulated epidemiologic evidence (23 case-control studies, 5 meta-analyses, and 3 analyses of a single cohort).  Talc use was found to increase ovarian cancer by 30-60% in almost all well-designed studies.  The results were published in the International Journal of Gynecological Cancer. Roberta Ness, Does talc exposure cause ovarian cancer?, 25 *Intl. J. Gyn. Cancer* 51 (May 2015).

u.   Also in 2015, Cramer, *et al.* performed a retrospective case-control study.  Overall, genital talc use was associated with an OR (95% CI) of 1.33 (1.16, 1.52), with a trend for increasing risk by talc-years. In addition, subtypes of ovarian cancer more likely to be associated with talc included invasive serous and endometrioid tumors and borderline serous and mucinous tumors. Premenopausal women and postmenopausal HT users with these subtypes who had accumulated greater than 24 talc-years had ORs (95% CI) of 2.33 (1.32, 4.12) and 2.57 (1.51, 4.36), respectively. *Epidemiology* (Cambridge, Mass.), December 17, 2015.

v.   A 2016 study of African American women found that body powder was significantly associated with epithelial ovarian cancer (EOC).  Genital powder was associated with an increased risk of EOC (OR = 1.44; 95% CI, 1.11–1.86) and a dose–response relationship was found for duration of use and number of lifetime applications ($P < 0.05$).   The study concluded that body powder is a modifiable

risk factor for epithelial ovarian cancer among African American women. Schildkraut JM, *et al.*, Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES), *Cancer Epidemiol Biomarkers Prev.; 25(10); 1411–7.*[7]

w. A 2016 study examined 2,041 cases with epithelial ovarian cancer and 2,100 age-and-residence-matched controls.  Genital use of talc was associated with a 1.33 OR with a trend for increasing risk by years of talc use.  Most women in the study reported using Johnson & Johnson's Baby Powder and Shower to Shower.  Among epidemiologic variables, no confounders for the association were identified.  Cramer DW, et al. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology*. 2016; 27, 334-46.

x. In 2018, two meta-analyses were published. These meta-analyses, which combined prior epidemiological studies, concluded that the use of talcum products increased the risk of ovarian cancer.  *See* Ross Penninkilampi and Guy D. Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis.* 29 Epidemiology 41 (2018); *see also* Wera Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis.* European Journal of Cancer Prevention, January 2017, 1.

---

[7]      Johnson & Johnson was aware of the high rate of usage among African Americans (52%) and among Hispanics (37.6%).  **Exhibit 28** (P-10 (JNJ000021093)).  Despite its knowledge of the increased risk of ovarian cancer, Johnson & Johnson targeted these populations in its marketing efforts. *Id.*

y.  In 2018, Saed, et al. found that talc effects the redox state in human ovarian cells, a known biological pathway to cause cancer. The scientists concluded that this study demonstrated a cellular biological mechanism of how talc causes ovarian cancer. *See* Fletcher, NM, et al. *Molecular Basis Supporting the Association of Talcum Powder Use with Increased Risk of Ovarian Cancer.* Reproductive Sciences 1-10 (2019).

z.  In 2019, Taher, et al. published a systematic review of the evidence linking talcum powder to ovarian cancer. This study concluded that "talc is a possible cause of cancer in humans based on the totality of evidence from multiple observational studies and a plausible biological pathway including chronic inflammation and oxidative stress." Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88, 99 (2019).

aa.  In 2020, O'Brien, et al. published a pooled study in the Journal of American Medical Association (JAMA). The O'Brien investigators pooled data from the three (3) cohort studies: Nurse's Health Study I and II (NHS), Women's Health Initiative (WHI), and the Sisters' Study. This study included 252,745 subjects with a total of 1,884 medically confirmed ovarian cancers. The authors acknowledged the direct physical pathway between exposure of talcum powder to the genital area and the fallopian tubes and ovaries. There was a significantly elevated risk found in women with patent (open) reproductive tracts (RR 1.13; CI 1.01-1.26). In addition, a statistically significant increased risk of 19% was noted in frequent users (at least weekly) (RR 1.19 (1.03-1.37). O'Brien et al., Association of Powder

Use in the Genital Area with Risk of Ovarian Cancer. 323 *JAMA* 49 (2020); O'Brien et al., Supplementary Online Content (2020).

bb. In 2022, Woolen, et al. published a meta-analysis of 10 case-controlled studies and a single cohort study which focused on the frequent use of genital use of talcum powder, defined as at least two times per week. The study included 66,876 patients and 6,542 ovarian cancer cases. Frequent talcum powder use was associated with an elevated risk of ovarian cancer of 47% (adjusted pooled summary odds ratio 1.47 (95% CI 1.31, 1.65, P<0.0001). Woolen, SA, et al., *Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: a Systematic Review and Meta-analysis*. 37 J. Gen. Intern. Med. 2526-2532. (2022).

cc. In addition, over the past four decades, there have been animal and human ovarian cell studies that show talc is harmful and can increase the risk of developing ovarian cancer.

109.    Although questions about the PRODUCTS' safety have persisted since the 1970's, the Johnson & Johnson Defendants did not adequately study whether these products, which were advertised for feminine hygiene, could cause ovarian cancer.

110.    In fact, upon information and belief, the only study ever supported by Johnson & Johnson was a 1995 study, Gross & Berg, *A Meta-Analytical Approach Examining the Potential Relationship Between Talc Exposure and Ovarian Cancer*, 5 J. Exposure Analysis Environ. Epi. 181 (1995). In that study, the authors concluded that "…the results of this metanalysis do suggest the possibility of an increased risk of ovarian cancer and perineal talc use. **Further research is warranted by these results."** *Gross & Berg* at 193. Upon information and belief, despite these findings, Johnson & Johnson did no further research.

111.     Even though the onus of ensuring the safety of the PRODUCTS rested with the Johnson & Johnson Defendants and the potential risk of cancer was raised in the medical and scientific literature, and the Gross & Berg study said "additional studies are warranted," the Johnson & Johnson Defendants did not commission additional studies to prove safety or study the potential risk of ovarian cancer.

112.     In 1995, the same year that the Berg and Gross Study was published, Donald Jones of Old JJCI recommended that "J&J sponsor a new, highly structured epidemiology study focused to examine the possibility that cosmetic talc use can lead to increased risk of ovarian cancer." The proposed study would have cost less than $400,000. *See* **Exhibit 29** (JNJ 000000082).

113.     J&J scientists described the proposed Muscat study as one which should "replace all others as the definitive treatise on this issue" *Id.*  Inexplicably, Johnson & Johnson never funded this "definitive" study. The committee that considered the proposal included Johnson & Johnson's product liability attorney, John O'Shaughnessy.

114.     When asked whether J&J ever gave a reason for not funding his definitive ovarian cancer study, Dr. Muscat stated that he was never given an explanation: "There was obviously a point where we knew it was not going to be funded so…" *See* **Exhibit 30** (Deposition of Joshua Muscat, Sept 25, 2018, at 100).

## IV.     Johnson & Johnson Had an Independent Duty to Ensure the Safety of All Johnson & Johnson Products

115.     Johnson & Johnson, through its Chief Medical Officer, had the independent and ultimate responsibility for the safety of talc and all products developed and sold by all J&J subsidiaries, including all of the Johnson & Johnson Defendants.

116.     As described by Ed Kuffner, MD., former Chief Medical Officer of Old JJCI, Old JJCI had a Consumer Medical Safety Committee (CMSC), which was initially responsible for the

review of safety of consumer products produced by Old JJCI at that sector level. However, J&J had a separate and distinct J&J Medical Safety Council (JJMSC), which was responsible for all products sold by any J&J Subsidiary. *See* **Exhibit 31** (Testimony of Ed Kuffner, MD, *In re: LTL Management LLC*, Nov. 5, 2021, at 396-398). One of the products within the JJMSC was Johnson's Baby Powder.

117.    While the JJMSC was comprised of representatives from different J&J subsidiaries within the Consumer Products, Pharmaceuticals, and Medical Devices divisions, the Committee Chair was a Johnson & Johnson employee, the J&J Chief Medical Officer, who had ultimate responsibility to make decisions regarding safety of any product sold by any subsidiaries.

118.    J&J's internal Policies and Procedures described the JJMSC as the highest body of the Johnson & Johnson Enterprise engaged in "setting the standards for medical safety" across the J&J enterprise. According to J&J's Policies and Procedures, the role of the JJMSC was to: (a) "Set [] medical safety standards to protect safety of patients, consumers, and users of products marketed by Johnson & Johnson companies"; and (b) To "provid[e] review and consultation on matters of medical safety at the Enterprise level." *Id.* at 401. The purpose of the JJMSC was to review and, where necessary, correct the safety decisions made by subsidiaries "to make sure that they are in accord with the overall safety standards of" J&J. *Id.* at 404.

119.    The decision-making authority of the J&J Chief Medical Officer over any product sold by any subsidiary—including the PRODUCTS—is clear. According to J&J's Policies and Procedures, the J&J Chief Medical Officer makes the final decision on any issue relating to safety and can summarily overrule every member of the JJMSC.

120.    In a 2017 video released by Johnson & Johnson, J&J made clear that all issues concerning the safety of all J&J products rest with the J&J Chief Medical Officer. According to J&J Chief Medical Officer Joanne Waldstreicher, M.D., her authority "includes changes to

development programs, labeling updates, warnings, and, when necessary, product withdrawals."
*See* https://www.youtube.com/watch?v=yhhaD03Vjeo.  Dr. Waldstreicher further explained that
"When questions are raised regarding the safety of our products, members of the OCMO team are
dedicated to understanding the concerns."

121.    According to Mr. Kim, LTL Chief Legal Officer and former J&J Associate
General Counsel, the role of J&J as described in the J&J Policies and Procedures has long been
the practice at J&J.

## V.    Asbestos and Other Constituents in Talc

122.    The PRODUCTS contain platy talc, fibrous talc (talc fibers or asbestiform talc),
asbestos, heavy metals, and fragrance chemicals, and Defendants failed to warn the public,
including Plaintiffs, about the fact that the PRODUCTS contained such carcinogenic substances.

123.    Beginning in the 1930s, medical and scientific literature emerged indicating talc
was commonly, if not invariably, contaminated with substances known or suspected of being
carcinogenic, such as asbestos, silica, quartz, nickel, and arsenic. Over the next several decades, a
growing body of medical and scientific literature demonstrated that direct and secondary exposure
to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it
could cause lung disease, cancer, and death.

124.    The United States Geological Survey on Commercial Talc Production conducted
in 1965, as well as those dating back to the 1800s, noted the presence of tremolite, anthophyllite
and chrysotile commonly among those minerals found within talc deposits.

125.    In 1968, a scientific study of store-bought, commercially available talcum powders
conducted by the Occupational Health Program, National Center for Urban Industrial Health, was
published and presented by the American Industrial Hygiene Association. The study revealed that,
contrary to popular belief, talcum powders were not entirely pure, but rather contained various

fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits like those mined by Defendants for use in the Products. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public. The study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." **Exhibit 32**, L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 Am. Industrial Hygiene Assoc. J. 350, 354 (1968).

126.     In 1971, the New York City Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers.

127.     A 1976 follow-up study of commercially available talcum products concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." **Exhibit 33** (Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J. Tox. Environ. Health 255-284 (1976)).

128.    In 1981, Lockey in *Nonasbestos fibrous materials* (1981), reported that talc frequently exists in complex deposits containing quartz and asbestos, and that talc free from asbestos also contains talc in fibrous form.

129.    Paoletti, et al., *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs* (1983), analyzed talc powders from national and international markets in order to assess their fiber contents and the proportion of asbestos in the fibrous material. Analysis of talcum powder samples revealed that the powders contained fiber content up to 30% of total particles. About half of the talc powders revealed the presence of asbestos.

130.    In 1991, Alice Blount tested talcum powder mined from Vermont, including Johnson's Baby Powder, and found that the powder contained asbestos fibers and needles. Blount, A M., *Amphibole Content of Cosmetic and Pharmaceutical Talcs*, 94 Environmental Health Perspectives 225 (August 1991); *see also* **Exhibit 34**, Deposition of Alice Blount (April 13, 2018) at 30:16-33:8; 47:15-25.

131.    On November 14, 2018, Drs. William Longo and Mark Rigler published a report detailing results from tests they performed on samples of the PRODUCTS provided by Johnson & Johnson dating from the 1960s to the early 2000s. 68% of the samples tested contained amphibole asbestos. The authors further found that 98% of the samples contained fibrous talc.

132.    In 2019, the U.S. Food and Drug Administration (FDA) contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder. As a result, Johnson & Johnson issued a recall of all bottles (approximately 33,000) from the sampled lot.

## VI.     Johnson & Johnson Concealed Evidence of Asbestos in the PRODUCTS Despite Knowing the Risks to Consumers

133.     Beginning as early as the 1950s, Johnson & Johnson tested its talc for contaminant or co-minerals, including "asbestos" and "tremolite," because the company knew there were deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based cosmetic products.

134.     At all times relevant hereto Johnson & Johnson understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

135.      Internally, Johnson and Johnson historically defined "asbestos" as "the fibrous serpentine chrysotile and the fibrous forms of … anthophyllite, … tremolite, and actinolite." **Exhibit 35** (Aug. 16, 2018 Hopkins Dep. 174:24–175:23).

136.     In addition to conducting its own internal tests described above, Johnson & Johnson hired testing laboratories, such as the Battelle Memorial Institute, McCrone Associates, the Colorado School of Mines Research Institute, and others to test for asbestos contamination (or co-mineralization) in the source talc ore used to manufacture Johnson's Baby Powder and Johnson & Johnson cosmetic products.[8]

---

[8] *See, e.g.*, **Exhibit 36** (4/12/1960 Battelle Memorial Institute report); **Exhibit 37** (10/15/1957 Battelle Memorial Institute report); **Exhibit 38** (5/23/1958 Battelle Memorial Institute report); **Exhibit 39** (7/31/1959 Battelle Memorial Institute report); **Exhibit 40** (8/31/1959 Battelle Memorial Institute report); **Exhibit 41** (9/15/1959 Battelle Memorial Institute report); **Exhibit 42** (12/31/1959 Battelle Memorial Institute report); **Exhibit 43** (1/24/1968 Battelle Memorial Institute report); **Exhibit 44** (5/9/1958 Battelle Memorial Institute report); **Exhibit 45** (3/8/1960 Battelle Memorial Institute report); **Exhibit 46** (6/6/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton summarizing observations of Smith Gouverneur, NY and Hammondsville, VT ore deposits, beneficiation products); **Exhibit 47** (8/25/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton evaluating exploration work on Hammondsville talc deposit).

137.    All of these testing laboratories found asbestos minerals both in the source talc ore and Johnson & Johnson's cosmetic talc products.[9]

138.    Tests performed by Johnson & Johnson and its consultants in the 1960s, 1970s, 1980s, and 1990s demonstrated that there was asbestos in the talc mined from Johnson &

---

[9] *See, e.g.* **Exhibit 48** (4/14/1971, Colorado School of Mines Institute letter to Johnson & Johnson); **Exhibit 49** (10/27/1972, McCrone report); **Exhibit 50** (2/26/1973, Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re:  Mineralogical Exam of Five Talc Samples); **Exhibit 51** (6/6/1973, Johnson & Johnson memorandum); **Exhibit 52** (2/11/1974, McCrone to JJ Rolle); **Exhibit 53** (4/10/1974, McCrone to JJ Russell); **Exhibit 54** (4/24/1974, McCrone report); **Exhibit 55** (4/27/1973, Microscopic Exam of Johnson's Baby Powder); **Exhibit 56** (5/8/1974, McCrone report); **Exhibit 57** (7/8/1974, McCrone to J.J. Rolle); **Exhibit 58** (10/10/1974, McCrone to Windsor Minerals Inc.); **Exhibit 59** (12/9/1974, McCrone to Johnson & Johnson); **Exhibit 60** (7/1/1975, McCrone to Windsor Minerals Inc.); **Exhibit 61** (8/31/1976, Johnson & Johnson Memo Re: Vermont 66 Talc); **Exhibit 62** (9/11/1975, Stewart to V. Zeitz); **Exhibit 63** (11/5/1975, McCrone to Windsor Minerals Inc.); **Exhibit 64** (11/19/1975 McCrone to Windsor Minerals Inc.); **Exhibit 65** (7/5/1976, Colorado School of Mines Research Institute report); **Exhibit 66** (1/25/1977, F. Pooley to J.J. Rolle); **Exhibit 67** (4/1/1977, EMV Report to Johnson & Johnson); **Exhibit 68** (10/5/1978, McCrone to Windsor Minerals Inc.); **Exhibit 69** (2/9/1979, handwritten notes regarding conversation with Harold Cohen); **Exhibit 70** (11/6/1980, McCrone to Windsor Minerals Inc.); **Exhibit 71** (8/22/1985, McCrone to Windsor Minerals Inc.); **Exhibit 72** (4/29/1986, McCrone to Windsor Minerals Inc.); **Exhibit 73** (3/25/1992, Johnson & Johnson Interoffice Memo by Munro); **Exhibit 74** (12/4/1997, Bain Environmental Report); **Exhibit 75** (5/23/2002, Luzenac America Inc. (hereinafter "Luzenac") Technical Report); **Exhibit 76** (2/26/2004, Luzenac Product Certification Report); **Exhibit 77** (2/27/2004 Luzenac - Product Certification); **Exhibit 78** (3/4/2011, Summary of TEM Asbestos Results: Grade 66/96 USP Product Composites).

Johnson's Vermont mines.[10]

139.    Contaminants satisfying Johnson & Johnson's own definition of asbestos have been found in Johnson & Johnson talc, include "chrysotile," "tremolite," "anthophyllite," and/or "actinolite".  *See, e.g.*, **Exhibit 79** (12/4/1970 Colorado School of Mines Institute testing results); **Exhibit 80** (6/30/1971 Colorado School of Mines Institute testing results); **Exhibit 81** (*Barden* Trial Ex. P3695-082-86: Summary chart of testing of Johnson's Baby Powder detecting asbestos and asbestos minerals).

140.    The existence of laboratory tests finding asbestos in Johnson & Johnson cosmetic talc products and source talc used in those products was verified by Johnson & Johnson under cross examination in recent litigation.  **Exhibit 82** (*Barden v. J&J*, 8/14/19 at 148:17-21.)

141.    As detailed in the following paragraphs, Johnson & Johnson executives acknowledged and communicated internally about the results of testing demonstrating the presence of asbestos in Johnson & Johnson's consumer talc products and the source ore used to make these products.

142.    In 1972, for example, Johnson & Johnson's Al Goudie confirmed that McCrone found trace tremolite and that these findings are "not new."  **Exhibit 83** (handwritten note from W. Nashed to Dr. Goudie).

---

[10] *See* **Exhibit 84** (11/10/1971, Letter from A.M. Langer to G. Hildick-Smith); **Exhibit 85** (8/24/1972, Memo from W. Nashed to R.A. Fuller); **Exhibit 86** (9/25/1972, Memo from W. Nashed to Fuller, Hildick-Smith, on Shower-to-Shower/Asbestos FDA Meeting 9/21/1972); **Exhibit 87** (6/12/1972, ES Laboratories Talc Analysis (Asbestos); **Exhibit 88** (12/13/1973, Memo from M.J.M. Oerlemans to J.H. Smids, H.L. Farlow, Re: Asbestos in Baby Powder); **Exhibit 89** (9/9/1975, Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting); **Exhibit 90** (4/23/1998, Letter from A.M. Blount to R. Hatcher); **Exhibit 91** (Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc); **Exhibit 92** (University of Minnesota Investigation of Possible Asbestos Contaminations in Talc Samples).

143.    In May 1973, Roger Miller, the President of Johnson & Johnson's mining company, Windsor Minerals, informed Dr. Dewitt Petterson of Johnson & Johnson that "the ore body contains actinolite." **Exhibit 93** (5/1/1973, Memo from R.N. Miller to Dr. Petterson).  This talc ore body was actively used to produce Johnson & Johnson's cosmetic talc products.

144.    One week later, Johnson & Johnson's William Ashton informed Dr. Petterson that "[t]he first showing of actinolite we know about is October 1972." **Exhibit 94** (5/8/1973, Memo from W. Ashton to D. Petterson).

145.    In April 1969, Johnson & Johnson discussed the need to firm up the company's position on tremolite in talc because of potential dangers to human health and safety noted in the medical literature and by environmental health agencies.  **Exhibit 95** (4/9/1969 Ashton to Hildick Smith - Alternate Domestic Talc Sources File No. 101).

146.    Johnson & Johnson was concerned that the presence of tremolite in its cosmetic talc products, and thus, the resultant inhalation of talc with these needle-like crystalline structures, was related to the rising incidence of pulmonary diseases and cancer and increased the risk that the company would be drawn into litigation relating to these diseases and cancer.  **Exhibit 96** (4/15/1969 Thompson to Ashton - Alternate Domestic Talc Sources File No. 101).

147.    In July 1971, Johnson & Johnson reported a conversation with Dr. Clark Cooper, a professor at the School of Public Health at the University of California, Berkley, who expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be removed from the market.  **Exhibit 97** (7/30/1971 Hildick Smith to R.A. Fuller).  According to Dr. Cooper, no level of asbestos in talc is acceptable for cosmetic use. *Id.*

148.    Johnson & Johnson was aware of studies demonstrating that both talc and asbestos have been found in the tissue of women who never worked with asbestos or talc.  **Exhibit 98** (2/19/2019 Nicholson Dep. 83:6-11).

149.    Johnson & Johnson has known for many years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung. **Ex. 20** (11/28/2018 Musco Dep. 91:7-19; *see also id.* at 130:1-21).

150.    For decades, Johnson & Johnson has known about the dangers of talc powder inhalation during the normal and expected use of its talc-based cosmetic products, especially to babies.  *Id.* at 111:2–112:15; *see also id.* at 116:11–119:18; **Exhibit 99** (5/27/2009 email from Nancy Musco).

**VII.    Actions by Regulatory Bodies and Health Organizations**

151.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. The Johnson & Johnson Defendants and PCPC conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as the PRODUCTS.

152.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing, and drugs to be asbestos-free. These were some of the same grades of talc used and supplied by Defendants.

153.    In 1987, the International Agency for Research on Cancer (IARC), the specialized cancer agency of the World Health Organization, published a paper in which it classified talc containing asbestiform fibers as a "Group 1" human carcinogen, finding sufficient evidence linking talc containing asbestiform fibers to the development of cancer in humans.  *See* **Exhibit 100** (JNJ 000018820).

154.    Upon information and belief, in or about 1990, the FDA asked manufacturers to voluntarily stop putting talc on surgical gloves because mounting scientific evidence showed that

it caused adhesions in surgical patients, an indication of a foreign body reaction.  On December 19, 2016, the FDA issued a ban on powdered surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial."  *See* **Exhibit 101** (FDA, 21 CFR Parts 878, 880, and 895 [Docket No. FDA–2015–N–5017] RIN 0910–AH02 Banned Devices; Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove).

155.    In or about 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.  **Exhibit 102** (P-11 (JNJ000008945)).

156.    On or about November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.O., Ralph Larson, informing his company that studies as far back as 1960's ". . . show[ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.  *See* **Exhibit 103** (P-18 (JNJ 000016645)).

157.    Upon information and belief, in or about 1996 and at the request of the FDA, the condom industry stopped dusting condoms with talc due to growing health concerns.  *See* **Exhibit 104** (P-19 (JNJTALC000365903)).

158.     In or about 2006, the Canadian government, under The Hazardous Products Act and associated Controlled Products Regulations, classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A."  *See* **Exhibit 105** (P-215 (IMERYS 255900)).

159.     In 2008, the Cancer Prevention Coalition submitted a second "Petition Seeking a Cancer Warning on Cosmetic Talc Products" to the FDA.  The first Citizen Petition had been filed on November 17, 1994.  The second Petition requested that the FDA immediately require cosmetic talcum powder products to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer.  The FDA response to the two Citizen Petitions was filed on April 1, 2014, twenty years after the first Petition was filed. *See* **Exhibit 106** (P-47 (JNJ 000542606)).

160.     In February 2010, IARC published a paper whereby it classified perineal use of talc-based body powder (talc not containing asbestiform fibers) as a "Group 2B" human carcinogen.  *See* **Exhibit 107** (P-29 (JNJ000381975)).  IARC, which is universally accepted as an international authority on determining the carcinogenicity of chemical substances and cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women who used talc in the perineal area.  IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%.

161.     In 2012, IARC published monograph in which it concluded that exposure to asbestos and talc containing asbestiform fibers (fibrous talc or talc fiber) can cause ovarian cancer and listed asbestos and talc containing asbestiform fibers as "Group 1" human carcinogens. See **Exhibit 108** (P-817 (JNJ 000451296)).

162.     Despite the IARC listing of talc and its constituents as possible human

carcinogens, documents show that industry, spearheaded by PCPC, continued their national, state, and local promotional campaigns touting talc safety and recruiting scientists to publish articles that raised doubt about the link between perineal talc use and ovarian cancer. *See* **Exhibit 109** (P-78 (IMERYS-A_0005090)); **Exhibit 110** (P-92 (IMERYS-A_0001252)); **Exhibit 111** (P-348 (IMERYS 287251)); **Exhibit 112** (P-650 (IMERYS 288001)); and **Exhibit 113** (P-32 (IMERYS-A_0000127)).

163.    In 2006, The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont published a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area." **Exhibit 114** (P-212).

164.    In December 2018, Health Canada published a draft screening assessment on the safety of talc. The comprehensive scientific assessment included a Bradford Hill analysis of relevant epidemiological and animal studies.  Health Canada concluded that there is a "statistically significant positive association between perineal exposure to talc and ovarian cancer" and "available data are indicative of a causal effect." **Exhibit 115** (JNJTALC001094046).

165.    In April 2021, Health Canada confirmed its draft finding and issued its final screening assessment. In its final assessment, Health Canada concluded: "With regards to perineal exposure, analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect." **Exhibit 116** (Health Canada, *Screening Assessment*, at iii (April 2021).

## VIII.   Defendants' Actions in Response to the Evidence of Cancer Risk

166.    Upon information and belief, since these early 1970s studies and the publications related to them, Defendants have been on notice of an association between talc exposure and ovarian cancer. Even before these studies specifically linking talcum powder to ovarian cancer, Defendants were aware of the human health hazards posed by talc as far back as the 1930s.

167.    Johnson & Johnson was aware of the Henderson 1971 study and Tenovus data suggesting an association between talc and ovarian cancer. In an internal document, Defendants admit that this knowledge "puts them on notice" of the association. At or around this same time, Johnson & Johnson sent a donation to the Cardiff Scientific Society to obtain information concerning research being conducted by the Tenovus Institute, further proving they were on notice of the "talc and ovarian cancer problem." **Ex. 17** (P-55 (JNJ 000026241)).

168.    For decades, Johnson & Johnson has been repeatedly asked by consumers whether its cosmetic talc product ever contained any amount of asbestos.  **Ex. 20** (11/28/2018 Musco Dep. 40:17–41:12).

169.    In response to these inquires, Johnson & Johnson has always assured consumers "Asbestos has never been found in Johnson's Baby Powder and it never will." *Id.* at 49:17–50:25, 51:17–52:10.  Historically, when pressed, Johnson & Johnson always responded that there "is no evidence that Johnson's Baby Powder contained any amount of asbestos and there never was." *Id.* at 59:1-10.

170.    Johnson & Johnson repeatedly told consumers and the public that "Baby Powder does not contain asbestos and never will.  We test every single lot to ensure it."  **Exhibit 117** (12/19/2018 Johnson & Johnson Ad).

171.    Johnson's Baby Powder product label says it was the "Purest Protection" and it was advertised as "the best you can buy" and "the purest."  **Exhibit 118** (P3695-265).

49

172.    The intent of these representations to consumers has always been "to reassure them they could feel safe and comfortable using Johnson's Baby Powder because it does not contain asbestos" and to convey that in using Johnson's Baby Powder, there was "zero chance" of exposing their families to asbestos.  **Ex. 20** (11/28/2018 Musco Dep. 61:21–62:7); *see also* **Ex. 2** (2/15/2019 Musco Dep. 39:7–42:8).

173.    The statements made to consumers by Johnson & Johnson, including that Johnson's Baby Powder does not contain asbestos and that there was "zero chance" consumers were exposing their families to asbestos, were false when they were made, and Johnson & Johnson knew they were false when they made those statements.

174.    As a direct result of Johnson & Johnson's false representations that Johnson's Baby Powder never contained asbestos, millions of people, including babies, were unwittingly and needlessly exposed to asbestos.  *See* **Ex. 20** (11/28/2018 Musco Dep. 68:3–69:10).

175.    Johnson & Johnson has never communicated to the public or federal government that it knew that its asbestos containing talc-based cosmetic products would be aerosolized and inhaled during normal use.  *Id.* at 114:6-25.

176.    Johnson & Johnson has never placed warnings on its talc-based powder products about the potential hazards presented by the product being aerosolized in normal application.  *Id.* at 188:2-9.

177.    Johnson & Johnson never placed warnings on its talc-based powder products about the risk of asbestos exposure.  *Id.* at 188:13-17.

178.    Johnson & Johnson purposely withheld from their spokespeople, whose job it was to communicate the "no evidence of asbestos" message, any reports indicating there was in fact evidence of asbestos in Johnson's Baby Powder.  *Id.* at 59:15–60:5, 61:16-20, 140:3-10, 215:13-18.

179.    In 1973, PCPC created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, PCPC designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

180.    Going forward, the difference between what Defendants knew diverged from what they were representing to the FDA. Defendants and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the adopted and most economical analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

181.    Defendants and third parties collectively met with and corresponded with PCPC and also met with the FDA to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection

51

limit of XRD. Defendants knew that the XRD detection limits were inadequate. Defendants also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiffs were exposed.

182.    In support of their voluntary XRD methodology, which was finally published in 1977, PCPC produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. PCPC, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens. Defendants made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiffs, that talc-containing products contained asbestos.

183.    The Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free" when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" means something much different than "no asbestos," but due to Defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe.

184.    Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos as well as other constituents such as fibrous talc, cadmium, cobalt, chromium, copper, iron,

manganese, and nickel. None of these positive tests were ever produced or made known to any regulatory agency until late 2019, and only after knowledge of their existence became known in civil litigation.

185.   Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, their tests are conducted pursuant to FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been granted the regulatory authority by Congress to regulate cosmetics, including talcum powders.

186.   Defendants, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution, and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiffs, regarding the hazards of exposure to carcinogens, including talc, asbestos, and fibrous talc. Defendants knowingly and intentionally released, published, and disseminated invalid, inaccurate, outdated and misleading scientific data, literature containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiffs were exposed.

187.   Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in the data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiffs, of alarming medical and scientific findings surrounding the safety of asbestos -containing talc and talcum powder products, many of which remained in their exclusive possession and under their exclusive control.

188.   Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Defendants knew and should have known would be exposed

thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers.

189.    McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

190.    The PCPC "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications."  The published J4-1 method did not rely on TEM, but on XRD with "the level of detection of amphibole by this method [being] 0.5% and above."  PCPC met with and corresponded with Defendants and third parties to advocate to the FDA individually and collectively for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by tests by TEM when XRD was positive or suspicious.

191.    This voluntary testing method was developed by PCPC and Defendants and was advocated to the FDA by PCPC and Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though PCPC and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the

first "round robin" tests, which analyzed a "PCPC Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

192.     In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using PCPC's own J4-1 method. There is no evidence that the Defendants ever shared this remarkable failure with the FDA or the public.

193.     The FDA, and ultimately Plaintiffs, directly and/or indirectly relied upon PCPC's false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding PCPC's and Defendants' misrepresentations and concealment was obvious seven years later. In a response to a July 11, 1986 Citizen Petition requesting an asbestos warning label on cosmetic talc, the FDA stated that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" PCPC's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc.

194.     In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, three decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

195.     On or about September 17, 1997, Johnson & Johnson's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by the Defendants regarding talc safety. **Exhibit 119** (P-20 (JNJ000040596)).

196.     In response to safety issues related to talc and talc-based body powders, the Cosmetic Toiletry and Fragrance Association (CTFA), now known as Defendant PCPC, formed the Talc Interested Party Task Force (TIPTF).  The TIPTF, which was originally formed in

anticipation of litigation related safety issues, periodically convened, including in the 1970s and 1980s, to defend talc in response to safety concerns about talc. The TIPTF once again convened in and around 1992 to combat the United States National Toxicology Program's study.  J&J, Old JJCI, and Luzenac – now known as Defendant Imerys Talc – were the primary actors and contributors to the TIPTF.  *See* **Exhibit 120** (P-14 (JNJ000011704), **Exhibit 121** (P-83 (LUZ011963)); and **Exhibit 122** (02/18/2016 Mark Pollak Dep. Exhibit No. 2 Spreadsheet: Talc IP – Revenue Received; Date Initiated: 08/17/92).

197.    The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend the use of talc and, specifically, talc-based body powders at all costs, in anticipation of future litigation, ensure self-regulation, and to prevent local, state, or federal regulation of any type over this industry. Imerys and the Johnson & Johnson Defendants wielded considerable influence on TIPTF.  TIPTF hired scientists to perform biased research regarding the safety of talc.  Members of TIPTF, including Johnson & Johnson and Luzenac, edited reports of the scientists hired by this group before they were submitted to governmental agencies and/or released to the consuming public.  Members of TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on local, state and federal regulatory bodies regarding talc. These activities were conducted by these companies and organizations, including the Johnson & Johnson Defendants, PCPC, and Luzenac, over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer. *See* **Ex. 118** (P-14 (JNJ000011704); **Exhibit 123** (P-13 (JNJTALC000249618)); **Exhibit 124** (P-122 (JNJ000021035)); **Exhibit 125** (P-66 (IMERYS-A_0006056)); **Exhibit 126** (P-90 (IMERYS 179104)); **Ex. 113** (P-32 (IMERYS-A_0000127); **Ex. 119** (P-20 (JNJ000040596));

**Exhibit 127** (P-12 (IMERYS-A_0021921); **Exhibit 128** (P-27 (JNJ000000636)); **Exhibit 129** (P-24 (JNJTALC000716846)); **Exhibit 130** (JNJTALC000224218).

198.    At all times relevant, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc-based body powder and acted as a mouthpiece for the members of the TIPTF, including the Johnson & Johnson Defendants and Imerys.   PCPC, completely reliant on funding from cosmetic-industry companies, was motivated to defend talc and talc-based body powders to retain its members involved with these products and retain their revenues. Upon information and belief, and at all times relevant, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales.  In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating a direct pecuniary interest in defending the safety of talc, talc-based body powders and the PRODUCTS. *See* **Exhibit 131** (08/29/2018 Mark Pollak Dep. 104:11 – 105:18).

199.    In and around the mid-1970s, the Cosmetic Ingredient Review ("CIR") was formed to give PCPC and the cosmetic industry more credibility for self-regulation.  Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although Defendants have, at all relevant times, promoted CIR as an independent regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC, and its employees are paid by PCPC. *See* **Exhibit 132** (10/02/2018 Linda Loretz Dep. 828:23 – 829:7; 831:10 - 833:18; 834:20 - 835:2).

200.    Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry but has only found 13 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1,800 ingredients to be "safe as used."  Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances.  Over the course of these annual meetings, the panel is able to review about 500 ingredients per year.  On average, only

about 20 minutes is spent discussing the safety of each ingredient. See **Exhibit 133** (08/10/2017 Alan Andersen trial testimony, Echeverria v. JNJ, 3126:25 – 27), and **Exhibit 134** (08/11/2017 Alan Andersen trial testimony, Echeverria v. JNJ, 3291:10 – 3292:1).

201.    Even though PCPC knew of the safety concerns surrounding talc and talc-based body powders for almost three decades, CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants, including PCPC, influenced the CIR scientists writing and performing the review and, ultimately, edited the reviews in a biased manner. Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

202.    In or about 2006, Imerys Talc began placing a warning on the Material Safety Data Sheet (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs provided warning information that IARC designated that the perineal use of talc-based body powder is possibly carcinogenic to humans or a Group B carcinogen.  *See* **Ex. 10** (IMERYS 081218 (2006) (referencing IARC's review of "talc not containing asbestiform fibers")).

203.    Defendants knew of the adverse risks of using talc and talc-based body powders in the perineal area and ovarian cancer and had a duty to warn about the potential hazards associated with the use of the PRODUCTS.  *See* **Ex. 137** (P-341 (IMERYS 284935)).

204.    Defendants, though having knowledge of the increased risk of ovarian cancer associated with genital use of talc-based body powder, nevertheless actively marketed the safety of the product to users and failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of the PRODUCTS, particularly when used by women in the perineal area.  *See* **Ex. 18** (P-115 (JNJ000024495)); **Exhibit 135** (P-374

(JNJ000093556));   **Exhibit   136**   (P-81   (IMERYS-A_0001298));   and   **Ex.   28**   (P-10 (JNJ000021093)).

205.   In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders and the PRODUCTS to the public, and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder.   *See* **Ex. 119** (P-20 (JNJ000040596)); **Ex. 28** (P-10 (JNJ000021093)); and **Exhibit 138** (P-26 (IMERYS-A_0013094)).

206.   In 2012, Johnson & Johnson sold Shower to Shower to Valeant Pharmaceuticals n/k/a Bausch Health Co. Inc. In 2019, Bausch Health announced that it had reformulated Shower to Shower to replace the talc in the product with cornstarch.

207.   In 2016, Johnson & Johnson registered Baby Powder under the California Safe Cosmetics Act. This law was established to compel cosmetic manufacturers to register ingredients that are "known" or "suspected" carcinogens.

208.   Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiffs, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling talcum powder products which contained asbestos and fibrous talc, which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiffs.

209.   Defendants have long employed and/or consulted with doctors, scientists, geologists, mineralogists, and toxicologists, and they have maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos and asbestiform talc fibers in talc and talc deposits.  Despite the wealth of knowledge, Defendants continued to mine, mill, process, supply, distribute, design, manufacture,

and sell talcum powder products which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiffs.

**IX.   Defendants Misrepresented or Concealed Information about Asbestos in the PRODUCTS from the Government and the Public**

210.    Since the early 1970's the FDA has repeatedly asked Johnson & Johnson whether it's talc-based products contained asbestos (**Ex. 98** (2/19/2019 Nicholson Dep. at 87:10-23) including, whether there was any evidence of any amount of asbestos in any Johnson & Johnson cosmetic talc product.  *Id.* at 88:20-24.

211.    Johnson & Johnson's answer to the FDA's inquiries was always the same: there is no evidence of any amount of asbestos in any Johnson & Johnson cosmetic talc product.  *Id.* at 89:3-8.

212.    While Johnson & Johnson's CEO has recently proclaimed that "we have always cooperated fully and openly with the FDA and other regulators and have given them full access to our talc testing results" the record is to the contrary.  *See* **Ex. 115** (12/19/2018 Johnson & Johnson Ad); *see also* **Exhibit 139** (Alex Gorsky Video)[11] (Johnson & Johnson claims that it "has cooperated fully with the U.S. FDA and other global regulators providing them with all the information they requested over decades.").

213.    In the early 1970s, independent scientists publicly reported finding asbestos in Johnson & Johnson talc products. *See* **Ex. 84** (11/10/1971, Letter from A.M. Langer to G. Hildick-Smith), **Ex. 89** (9/9/1975, Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting), and **Ex. 91** (Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc).

---

[11] A copy of the video of Alex Gorsky is available at: https://lanierlawfirm.sharefile.com/d-s8ae050614a248fb8.

214.    In response, Johnson & Johnson sought to discredit the independent scientists' results and hired consultants to refute the asbestos in talc findings.  Some of Johnson & Johnson's experts found asbestos when evaluating consumer talc products. These results were reported to Johnson & Johnson though the company never provided those results to the FDA. Johnson & Johnson's claim that it provided the FDA with its "entire background file on asbestos talc testing" related to the company's cosmetic talc products was untrue because it never provided the FDA with the test results it received that identified asbestos in its talc and cosmetic talc products.  *See* **Ex. 98** at 184:20–185:9 (2/19/19 Nicholson Deposition).

215.    Johnson & Johnson did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc product, nor did it give those results to the FDA.  *Id.* at 105:2-5.

216.    Under cross-examination, Johnson & Johnson's representative was forced to admit that despite claiming it provided all testing to the FDA, Johnson & Johnson never provided any results of asbestos testing of its talc products or ore to the FDA for the Vermont mine after 1973. **Exhibit 140** (3/6/2019 Nicholson Dep. 293:12–294:19).   These include tests in which fibers matching the Johnson & Johnson definition of asbestos were found.  *Id.* at 349:6–353:23.

217.    Since the early 1970s, Johnson & Johnson represented to the FDA that there was no tremolite or fibrous talc in its talc-based cosmetic products. **Ex. 98** (2/19/2019 Nicholson Dep. 89:17–90:8); *see also* **Exhibit 141** (7/21/1971 J&J Memo to File: Special Talc Project No. 503 FDA Meeting).

218.    Over the course of more than 4 decades, Johnson & Johnson represented to the FDA "over and over again" that there is not a single instance or report of asbestos – including chrysotile asbestos – in its products. **Ex. 98** (2/19/2019 Nicholson Dep. 98:10-19).

219.    Beginning in early 1970s, Johnson & Johnson represented to the FDA that its data

"conclusively proves that Johnson's Baby Powder is free of asbestos." *Id.* (2/19/19 Nicholson Dep. 90:9-23); *see also* **Exhibit 142** (9/21/1971 Letter from W. Nashed to FDA Director R. Schaffner) ("It is seen that the data conclusively proves that Johnson's Baby Powder is free of asbestos.").

220.    Johnson & Johnson has represented to the FDA that "no amphibole materials have been detected" in the company's talc-based products. **Ex. 98** (2/19/2019 Nicholson Dep. 99:2-21); *see also* **Exhibit 143** (3/15/1976 Letter from G. Lee re: Examination of Asbestos in Talc at 6).

221.    When pressed, Johnson & Johnson went so far as to represent to the FDA that "there wasn't a shred of evidence to support the idea that either our Johnson's Baby Powder or Shower to Shower contained any chrysotile asbestos." **Exhibit 144** (12/13/1972 J&J Memo re: Meeting Nov. 1, 1972 with Dr. Schaffner – FDA); *see also* **Ex. 98** (2/19/2019 Nicholson Dep. 90:24–91:18).

222.    Johnson & Johnson knew that its consultant, McCrone, purposely omitted findings of asbestos in its talc-based products because it "would only tend to confuse the issue perhaps with the FDA" and offered that if Johnson & Johnson "decide[d] to use these reports with the FDA" to "please call us." **Exhibit 145** (10/12/1971 Letter from G. Grieger to A. Goudie); *see also* **Ex. 140** (3/6/2019 Nicholson Dep. 327:14–328:21).

223.    As a part of its testing and reporting protocol for Johnson & Johnson's talc-based products, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or cosmetic talc products from those that allegedly found "no quantifiable" asbestos. For instance, on April 29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals.  The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces

of chrysotile were found.  *Compare* **Exhibit 146** (Musco Dep. Ex. 8B, Tab 73) with **Ex. 72** (4/29/1986 *Edley* Samples).

224.    As further explained in the paragraphs below, McCrone and Johnson & Johnson worked together to manipulate the asbestos testing results of Johnson & Johnson products done by outside laboratories and reported those manipulated findings to the FDA as negative results.

225.    Although aware of McCrone reports to the contrary, Johnson & Johnson represented to the FDA that its consultant McCrone Associates never found asbestos in the talc ore that was used to make the PRODUCTS. **Ex. 140** (3/6/2019 Nicholson Dep. 316:8-23; 326:20–327:2 (Johnson & Johnson cites McCrone tests to the FDA to support its position that there was "no evidence" of asbestos in the Shower to Shower product)). This statement to the FDA was false.

226.    In 1972, after Johnson & Johnson was notified that an FDA consultant found asbestos in the Johnson & Johnson talc products, Johnson & Johnson hired Professor Hutchinson from the Minnesota Space Center to privately test the products with the intention of refuting the FDA consultant's findings.

227.    On September 20, 1972, in anticipation of a meeting with the FDA to discuss the asbestos test results, Johnson & Johnson executives arranged for its consultant, Ian Stewart of McCrone, to meet with Professor Hutchinson in the Chicago O'Hare airport. At that meeting, Professor Hutchinson informed Ian Stewart that he found "incontrovertible asbestos" in Johnson & Johnson's talc-based products **Exhibit 147** (handwritten notes by Professor Hutchinson).  From there Mr. Stewart, on behalf of Johnson & Johnson, flew directly to Washington DC to meet with the FDA to discuss test results. Mr. Stewart never disclosed Dr. Hutchinson's findings of asbestos to the FDA. **Exhibit 148** (Ian Stewart Traveling Expense report).

228.    Thereafter, Professor Hutchinson provided Johnson & Johnson with a formal report documenting his asbestos findings with photographs of the asbestos he found in the Johnson &

Johnson products. Johnson & Johnson produced excerpts of the report to the FDA, removing all references to Professor Hutchinson's "incontrovertible" findings of chrysotile asbestos**. Ex. 140** (3/6/2019 Nicholson Dep. 339:20–341:9, 345:11-21).

229.     Johnson & Johnson similarly never informed the FDA that it was aware of additional evidence demonstrating the presence of actinolite in Johnson's Baby Powder.  *Id.* at 325:4-15.  For example, Johnson & Johnson did not submit a March 1974 test result from Professor Reynolds at Dartmouth College that "Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals."  *Id.* at 346:24–347:2; *see also* **Exhibit 149** (JNJ 000266903, Mar. 1974 Memo re: Analysis of Talc Products and Ores for Asbestiform Amphiboles).

230.     Instead, Johnson & Johnson submitted test results to the FDA from Dartmouth claiming that no amphiboles were found in the company's talc products.  **Ex. 98** (2/19/2019 Nicholson Dep. 158:10–159:1).

231.     As part of its plan to mislead the FDA and falsely claim its talc ore and cosmetic talc products were free of any asbestos, Johnson & Johnson hired outside consultants to conduct tests of Johnson & Johnson talc products using test methods Johnson & Johnson knew would not detect asbestos at low levels.  *Id.* at 196:19-24, 197:24–198:8.

232.     Thereafter, Johnson & Johnson submitted test reports to the FDA as proof that its talc was asbestos free knowing that the methods used would not detect asbestos at low levels and, thus, were not reliable to rule out the presence of asbestos.  **Ex. 138** (3/6/19 Nicholson Dep. 255:23-256:4).

233.     Instead of utilizing a method it knew was sensitive enough to find asbestos at low levels, Johnson & Johnson routinely used a testing method that was not sufficient to detect asbestos at those level and continued to submit the same false negative testing results to the FDA.  This

method was known as J4-1.

234.    The J4-1 testing method utilized "XRD" as the initial screen to determine if any further testing was necessary (with a level of detection of about 1%).  **Exhibit 150** (CTFA Method J4-1 Part I & Part II).  If the XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected."  This process virtually guaranteed that low levels of asbestos would never be found.

235.    Johnson & Johnson similarly knew that XRD could not detect chrysotile at levels below two or three percent of the talc product and was also incapable of detecting low levels of tremolite.  **Ex. 98** (2/19/2019 Nicholson Dep. 196:19-198:8).

236.    In the unlikely event an XRD test result was positive, Johnson & Johnson implemented a second step, polarized light microscopy ("PLM"), but instructed the PLM analyst not to count *all* of the fibers he or she would actually see under the microscope.  **Ex. 150** (CTFA Method J4-1 Part I & Part II). Short fibers, below a defined size, recognized as carcinogenic, were excluded from any reporting.  According to the J4-1 method, a fiber must have an aspect ratio (length to width) of 5:1 or greater, and both dispersion testing and fibrous morphology criteria must be satisfied before a particle can be identified as asbestiform.  *Id*. and **Exhibit 151** (JNJNL61_000005032 (8/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals)).

237.    Johnson & Johnson knew and was advised of other methods of testing talc that were sensitive enough to detect the presence of small fibers of asbestos in its talc ore and/or cosmetic talc products and, thus, provide more accurate results than the testing it purposely utilized to increase the likelihood of negative results. One of those methods was the "pre-concentration" method.  **Exhibit 152** (JNJ 000268037, 12/27/1973 Colorado School of Mines Research Institute report); **Ex. 51** (6/6/1973, Memo JNJAZ55_000005081 to Pooley from Rolle); **Ex. 149**

(JNJ000266903, 3/1974 Memo from R.C. Reynolds, Jr. to Windsor Minerals, Inc.)( "a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis."）); **Exhibit 153** (JNJNL61_000007330, Special Talc Studies Monthly Report, March, 1974 – Assay Methods for Asbestos Minerals in Talc); **Exhibit 154** (JNJ 000250919, 3/11/1974, Memo from J.P. Schelz to F.R. Rolle); **Exhibit 155** (JNJNL61_000062964, 11/26/1974, Memo from J.P. Schelz to F.R. Rolle)) (collectively referred to as "concentration method").

238.    Internal Johnson & Johnson memoranda prove the company considered "the limitation" of the concentration method "is that it may be too sensitive" and when used found traces of tremolite which the J&J testing methods would fail to expose**. Exhibit 156** (JNJAZ55_00001892, 5/16/1973 Memo from F.R. Rolle to T.H. Shelley).

239.    When Dr. Fred Pooley, a Johnson & Johnson consultant, told Johnson & Johnson that the concentration method was being used in Great Britain, Johnson & Johnson rejected the method as not "in the worldwide company interest." **Exhibit 157** (JNJNL61_000062953, 2/18/1975 Johnson & Johnson Limited letter to Johnson & Johnson).

240.    Although many of Johnson & Johnson's consultants — including the Colorado Research School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University — found asbestos in Johnson & Johnson's talc-based cosmetic products using the pre-concentration method, the company did not provide any of those test results to the FDA. **Ex. 98** (2/19/19 Nicholson Dep. 172:8-15).

241.    Johnson & Johnson was also urged by its consultants to use TEM to test for asbestos as it was far more sensitive than the J4-1 method used by Johnson & Johnson. *See, e.g.,* **Exhibit 158** (JNJNL61_000006726, 5/18/1973 Message on from G.E. Heinze to W. Ashton *et al.*

– Talc Symposium); **Exhibit 159** (JNJ 000035507, 9/30/1992 Notes on Meeting with Professor F. Pooley, Cardiff) ("TEM is the only suitable method for looking for fibers of biologically relevant dimensions in lungs, therefore it is logical to use the same technique for examining mineral products for biologically relevant fibers.")); **Exhibit 160** (Johnson & Johnson correspondence at FDA_FOIA_013573) ("I think we all recognize XRD, PCM, and PLM are simply not sensitive enough to provide complete assurance that the talc is free of detectable asbestos.").

242.     Eventually, Johnson & Johnson began to use TEM as a testing method on a limited basis but implemented a TEM reporting methodology designed to yield negative, rather than accurate results. In this regard, Johnson & Johnson intentionally limited the amount of each sample that was analyzed and required a high fiber count of the same mineral type before a positive result could be reported. Johnson & Johnson called its method TM7024.

243.     According to Johnson & Johnson's TM7024 method, Johnson & Johnson would report the test results as negative and "not quantifiable" unless the scientist, who was directed to look only at approximately 10 percent of the material available to examine under the microscope, counted 5 or more asbestos fibers of the same variety.  **Ex. 151** (JNJNL_000005032 (8/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals)).  Thus, even if the examiner counted as many as 16 asbestos fibers (i.e., four fibers each of tremolite, actinolite, anthophyllite, and chrysotile) looking only at 10% of the sample seen under the microscope, it would be reported as not finding asbestos or "not quantifiable."

244.     Johnson & Johnson's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with that of environmental and health agencies. The United States Environmental Protection Agency ("EPA") has refused to limit its concern to only the type of identifiable asbestos fibers Johnson & Johnson instructs its microscopists to count.  **Exhibit 161** (4/20/2006 US EPA Region IX Response to the November 2005 R.J. Lee Group, Inc.).

245.     To further reduce the likelihood of detecting asbestos in its cosmetic talc ore, Johnson & Johnson required J4-1 method testing on only a composite sample from every two silos of talc (each silo containing hundreds of tons of talc), TM7024 testing only quarterly from a composite of all siloed talc, and a monthly composite of float feed. **Exhibit 162** (JNJMX68_000002913 (10/4/1984, Memo from J.A. Molnar to B. Semple, on Evaluation Program for Talc)).  As a result, the total amount of talcum powder Johnson & Johnson ever put under a microscope to test for asbestos was approximately 1/100 of a breath mint by weight. **Exhibit 163** (Testimony of Matthew Sanchez 1/29/20 134:19-135:20).

246.     Even though Johnson & Johnson tested miniscule amounts of product, and utilized methods specifically designed to yield negative results, asbestos was still found in Johnson & Johnson's cosmetic talc. **Exhibit 164** (chart of various testing results).  Johnson & Johnson did not produce these asbestos-positive test results until 2017, when documents were produced in this litigation.

247.     In 1976, Johnson & Johnson rejected the FDA's request to provide the results of its respective periodic monitoring for asbestos.  *See* **Ex. 140** (3/6/19 Nicholson Dep. at 255:17-256:6.)

248.     Johnson & Johnson also submitted false and misleading statements through its trade association (CTFA).

249.     In March of 1976, the CTFA told the FDA that all industry testing had shown all talcum powder products to be completely free of asbestos.  **Exhibit 165** (JNJ000330157).

250.     On March 15, 1976, George Lee, Director of Applied Research for Johnson & Johnson, wrote to the CTFA, with the "understanding that you would wish to submit this information to the FDA," that it was "erroneously reported in 1971 that our powder contained asbestos," that the Vermont talc is "highly purified," and that Johnson & Johnson confirms the "absence of asbestos materials in this talc." **Exhibit 166** (WCD000009).  This false information

was then transmitted by the CTFA to the FDA to "give assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." *See* **Ex. 165** (JNJ000330157).

251.    Two weeks later, on March 31, 1976, Johnson & Johnson met privately in Hillside, New Jersey. During this meeting, Defendants congratulated themselves on the "success" of the "presentations" to the FDA and agreed that they should not bind themselves to having to further update the FDA.  See **Exhibit 167** (JNJ000299024).

252.    On March 1, 1978, John Schelz, the Chairman of the CTFA Task Force On Round Robin Testing and then current employee of Johnson & Johnson, instructed the CTFA to "destroy your copy of the table" containing the results of the CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals.    **Exhibit 168** (JNJNL_000062534 (3/1/1978 correspondence from Johnson & Johnson to the CTFA)).

253.    Although possessing test results indicating that the talc used in its talc-based products contained tremolite and chrysotile asbestos — reportable as asbestos under federal regulations — Johnson & Johnson represented to the National Toxicology Project (NTP) that there was never any evidence of asbestos in the talc used in Johnson's Baby  Powder. **Ex. 20** (11/28/18 Musco Dep. 200:12-25.)

254.    Decades after asbestos was first reported, Johnson & Johnson continued to represent to the FDA that it had confirmed "the absence of asbestiform minerals" in its finished talc-based products. **Exhibit 169** (JNJ 000021285 (6/27/1995 Comments of CTFA in Response to a Citizens Petition at 7-8)).

255.    As recent as 2016, Johnson & Johnson represented to the FDA that no asbestos structures have ever been found in its talc-based products in any testing anywhere in the world. **Ex. 98** (2/19/2019 Nicholson Dep. 99:18–100:9); *see also* **Exhibit 170** (JNJ 000489313

(3/17/2016 J&J Response to FDA Request for Information on Talc at 12)). This statement made to the FDA was false.

256.    In about 2013, while editing information for its website, Johnson & Johnson even acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free"[12] but made the representations anyway. **Exhibit 171** (Draft 1 – Copy for SafetyandCareCommitment Website).

## X.    Johnson & Johnson Destroyed or Secreted Away Relevant Evidence

257.    Johnson & Johnson has had the duty to preserve evidence and documents relevant to foreseeable litigation, including the responsibility to suspend any document destruction policies on or about 1971.

258.    Since at least 1969, Johnson & Johnson was aware that it was foreseeable and likely that it would be sued in personal injury litigation alleging pulmonary injuries – including asbestos-related disease – attributable to Johnson & Johnson's talc-based products.

259.    On April 15, 1969, Dr. T.M. Thompson, Medical Director for Johnson & Johnson, wrote to Mr. William H. Ashton, a Johnson & Johnson executive supervising the company's talc-based products, to advise him of danger relative to "inhalation" of the "spicule" or "needle-like" crystals of tremolite in Johnson & Johnson's talc.  *See* **Ex. 96** (JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources) ("[S]ince pulmonary diseases, including inflammatory, fibroplastic and neoplastic types, appear to be on the increase, it would seem prudent to limit any possible content of tremolite in our powder formulations to an absolute minimum.")).

260.    Although Dr. Thompson states that he was not aware of "any litigation involving

---

[12] *See* n. 2, *supra*.

either skin or lung penetration by our talc formulations," he cautioned Mr. Ashton that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [Johnson & Johnson] could become **involved in litigation** in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." *Id.* To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." *Id.*; *see also* **Ex. 2** (2/15/2019 Musco Dep. 64:18–68:1).

261.    Dr. Thompson further forewarned Mr. Ashton that the company could confront a situation where the company would be more or less compelled to remove its talc products from the market "if it became known that our talc formulations contained any significant amount of Tremolite." *See* **Ex. 96** (JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources)).

262.    Dr. Thompson's prediction of litigation came to fruition shortly thereafter.  By the early 1970's, Johnson and Johnson was involved in litigating and planning its defense to personal injury cases related to its talc products.

263.    Through the litigation process, Johnson & Johnson has been forced to identify documents from as early as 1971 (and from every year thereafter) relating to "ongoing," "pending," and "anticipated" litigation regarding Johnson's Baby Powder.   **Ex. 2** (2/15/2019 Musco Dep. 74:23–76:7, 93:3-16.).

264.    Since at least 1971, Johnson & Johnson has known and recognized that information and documentation in the company's possession relevant to or produced in any particular talc-based lawsuit would be relevant to discovery in future talc-based cases.  *Id.* (2/15/19 Musco Dep. 25:13-20.)

265.    Johnson & Johnson has reported that during the 1970s alone, the company was sued

in talc-based cases in nearly each year of the decade.  *Id.* (2/15/2019 Musco Dep. 81:25–82:18). Although Johnson & Johnson was legally obligated to retain the evidence, it does not know where the documents and evidence related to these cases are located or whether they even exist.  *Id.* at 78:25-79:23; 80:6-81:24.

266.    While the evidence from the cases is missing, documents listed on Johnson & Johnson's privilege log related to these cases date back to 1971.  *Id.* at 93:3-16.  The entries on the privilege log indicate that samples of talcum powder used in litigation existed at the time the litigation in the 1970s was pending, but those samples have not been produced.  *Id.* at 93:17-94:16.

267.    Although Johnson & Johnson, by its own admission, had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable, it failed to do so.  *Id.* (2/15/19 Musco) 278:24-280:23.

268.    Johnson & Johnson knew and understood that evidence produced in litigation concerning the health effects of its talc products would be material and relevant to other anticipated cases.  *Id.*  Yet Johnson & Johnson failed to preserve records from any of the lawsuits that alleged injuries as a result of Johnson's Baby Powder, talc, or asbestos, even though Johnson & Johnson knew that relevant and material documents existed and were in its possession.

269.    While Johnson and Johnson internally recognized there could be dire consequences for failing to preserve evidence, there is no record of a litigation hold ever being imposed prior to 1997. Even then, Johnson & Johnson's General Counsel, John O'Shaughnessy, only preserved evidence when there was a case actually pending and not when anticipated. *See* **Exhibit 172** (June 29, 2021 Deposition of John O'Shaughnessy at 310:20-311:5).

270.    Johnson & Johnson did not retain any samples of its talc ore or milled talc used in its talc-based cosmetic products, which it tested regularly, albeit insufficiently, for the presence of asbestos and asbestiform minerals at any time until 2017.  *See* **Exhibit 173** (10/18/2018 Mittenthal

Dep. 405:22-407:9; 424:2-425:7).

271.    Although litigation was pending and anticipated, the samples chosen by Johnson & Johnson specifically to create test results were not retained under the company's evidence retention schedules and were not subject to any litigation hold.  *Id.* at 371:14-374:9; 384:8:387:4; 405:22-407:9.

272.    Johnson & Johnson's failure to institute a litigation hold also made certain that the testing results were destroyed in accordance with its document retention policy.  *Id*. at 405:22-407:1.

273.    At all times relevant to this current lawsuit, Johnson & Johnson has been in complete control of all aspects of the domestic and foreign subsidiaries implicated in its talc, including, but not limited to, the testing of talc source ore mines and testing of finished Johnson's Baby Powder and Shower to Shower products.  Johnson & Johnson knew, or should have known, that this material would be material in pending and anticipated cases alleging injury resulting from exposure to its talc products and, therefore, had a duty to preserve that testing evidence. Johnson & Johnson destroyed those testing results and discarded its samples of talc.

274.    Johnson & Johnson failed to preserve talc samples maintained in its museum after 1982 when the museum was suspended, even though litigation was pending and anticipated at that time.  **Exhibit 174** (7/12/2018 Gurowitz Dep. 157:3–160:17).

275.    Johnson & Johnson did not instruct its consultants that repeatedly tested its talc ore and products to retain the samples tested, even though litigation was pending and anticipated.  *See, e.g., id.* (7/12/2018 Gurowitz Dep. 158:12–159:16). Although Johnson & Johnson was acutely aware that it was McCrone's policy to dispose of samples 30 days after testing results were generated, it never instructed McCrone to retain any samples.  *See, e.g.,* **Exhibit 175** (1/28/87 McCrone Letter at JNJTALC000387715).

276.     Johnson & Johnson failed to retain all test results for the presence of asbestos and asbestiform minerals of the talc ore and milled talc used in its talc-based cosmetic products. **Ex. 173** (10/18/18 Mittenthal Dep. 405:22-406:24).

277.     Even after a litigation hold was finally issued in 2000, Johnson & Johnson failed to retain samples from its Worldwide Talc Survey. *See* **Exhibit 176** (JNJNL_000015761 (10/20/2000 Letter)).

278.     In 2008, nearly ten years after the first litigation hold, Johnson & Johnson, when asked about retention time for "information related to the CTFA ingredient surveys" directed its employees to "PITCH them." *See* **Exhibit 177** (JNJ 000368489).

279.     Any test results that Johnson & Johnson has not yet produced are presumed to be destroyed, as the disposal of these results were mandated by the company's evidence retention scheduled absent a litigation hold, which Johnson & Johnson never issued. *Id.*

280.     In addition to final testing results, Johnson & Johnson failed to preserve any of the original scientific data underlying these results. Besides failing to retain the actual talc ore and milled talc samples, Johnson & Johnson did not retain photomicrographs, count sheets, or TEM grids and knowingly allowed for this evidence to be destroyed.

281.     This missing scientific data is of utmost importance to the fair and proper vetting of Johnson & Johnson's defense. The limited underlying scientific data that still exists confirms that the reports of "no detectable" asbestos are belied by the underlying scientific data, which shows evidence of asbestos. *Compare* page 1 with pages 4 and 10 in **Exhibit 178**. There are countless similar non-detect letters with no underlying data.

282.     Johnson & Johnson has not located the photomicrographs underlying the reported findings of asbestos minerals conducted by the University of Minnesota. **Ex. 140** (3/6/2019 Nicholson Dep. 333:8-23).

283.     In 1989, after facing litigation related to its talc-based products for nearly two decades and anticipating further litigation, Johnson & Johnson intentionally destroyed records relating to its Hammondsville, Vermont mining operations.   **Exhibit 179** (JNJ 000240739 (11/23/1993 Denton to Ashton and Jones at p. 3)).

284.     Johnson & Johnson has represented that "[i]f we had any reason to believe our talc was unsafe, it would be off our shelves immediately." **Ex. 117** (12/19/2018 Johnson & Johnson Ad).

285.     Yet in the *Joly* case, Johnson & Johnson's Medical Services Department – including the company's Medical Director – recognized that the plaintiff, who had used Johnson's Baby Powder for years, had "scarring of lung tissue [that] was noted on x-ray." Furthermore, "Pulmonary function studies revealed very severe obstruction of the small airways. Consumer did not respond to bronchodilators. Talc crystals were identified in the consumer's sputum." *See* **Ex. 2** (2/15/2019 Musco Dep. 155:18–158:25); *see also* **Exhibit 180** (JNJ 000058414 (5/10/1985 J&J Ingestions and Inhalations Memorandum)).

286.     Besides this report, Johnson & Johnson has not located its records related to the *Joly* litigation even though Mr. George Lee, a Johnson & Johnson scientist, had a file on the case in his possession as late as July 1988.  *See* **Ex. 2** (2/15/2019 Musco Dep. 170:16–172:20).  Yet, J&J's designated corporate representative concerning the history and substance of prior litigation was not supplied with a single piece of paper regarding the *Joly* case.  *Id.* at 159:21-161:11.

287.     Evidence indicates that Johnson & Johnson historically preserved no records whatsoever from the majority of cases in which it has been sued for causing talc-related injuries.

288.     For those cases where there is at least some documentation, Johnson & Johnson either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc-based products. *See e.g.,* **Ex.   3** (3/8/2019 Musco Dep.

361:24-362:17) (missing *Westfall* photographs); **Ex. 2** (2/15/2019 Musco Dep. 232:9-17) (missing *Edley* interrogatories); *id*. at 111:23–112:3 (no records from the *Cunningham* case); *id*. at 112:10–25) (no records from the *Kreppel* case); *id*. at 113:12–114:3) (no records from the *Lopez* case); *id*. at 114:19-22) (no records from the *Sheldon* case).

289.    Despite being involved in countless cases dating back to 1971, Johnson & Johnson could only locate two sets of discovery responses for its corporate representative to review.  *See id*. at 202:2-13).

290.    Johnson & Johnson once maintained a paper file documenting all of its telephone conversations with the FDA related to its talc-based cosmetic products dating to the early 1970s. **Ex. 98** (2/19/2019 Nicholson Dep. 48:9–15).  The "FDA Call File" no longer exists.  *Id.* at 113:25–114:19).

291.    William Ashton, otherwise known within J&J as "Mr. Talc", was intimately involved in issues affecting the safety of talc for the entire length of his Johnson & Johnson career, spanning many decades.  As part of his responsibility, Ashton maintained his own set of files concerning J&J talc. Those files concerning talc and asbestos maintained by William Ashton, while litigation was pending remain unaccounted for. *See* **Exhibit 181** (Note from Rebecca Farlow to William Ashton with a "list of TALC files from the last case.").

292.    According to Johnson and Johnson, McCrone was the primary outside consultant charged with testing J&J talc for asbestos. The original McCrone testing files were sent to in-house counsel while litigation was pending.  Instead of producing those files to litigants alleging talc related injuries, the files were secreted away in the offices of outside counsel. *See* **Exhibit 182** (Letter Dated 1/3/1995) and **Exhibit 183** (June 30, 2021 Deposition of John O'Shaughnessy at 442:10-444:17, 712:6-16.). While some McCrone testing results were finally produced after 2016, the complete McCrone files were secreted away in the offices of outside counsel and were not

produced. Virtually all of the underlying scientific data was either lost or destroyed.

293.   Johnson & Johnson once maintained toxicology information in boxes and binders. This toxicology information was never disclosed.   *See* **Ex. 20** (11/28/18 Musco Dep. 149:7–152:24).

294.   In 1977, the Talc Task Force conducted "round robin" testing of talcum powder products manufactured by member companies.

295.    John P. Schelz, a Johnson & Johnson employee and chair of the Talc Task Force, coordinated the testing and review of the testing data.   *See* **Exhibit 184** (JNJ 000250596).

296.   Once the testing data was received, Schelz compiled the data in a table and assigned each sample a coded value. He then created a separate "code key" to interpret the coded value assigned to each sample.

297.   He did not send the code key to any of the other companies. *See* **Exhibit 185** (JNJ 000265120).

298.   Schelz sent the only other copy of the code key to Charles Haynes at PCPC with instructions to destroy the code key after Haynes called the companies to inform them of the results. *Id.*

299.   Upon information and belief, both Schelz and Haynes destroyed the code keys to the "round robin" testing results. As a result, it's impossible to determine which products were tested. *Id.*

300.   All companies involved in the "round robin" testing agreed to the process of destroying the code key.

301.    From the 1950s to the 2000s, Defendant Johnson & Johnson (or outside laboratories, including RJ Lee and McCrone) tested samples of talc for asbestos content.

302.    Upon information and belief, Defendant Johnson & Johnson failed to ensure the preservation of these samples, TEM grids, count sheets, photomicrographs, and other documents generated during the testing and, as a result, the samples, TEM grids, count sheets, photomicrographs, and other documents generated during the testing were destroyed.

303.    Defendant Johnson & Johnson intentionally failed to preserve relevant documents generated in litigation in a number of cases filed against it between the 1960s to the 1990s.

## XI.    Johnson & Johnson Intentionally Made Material Misrepresentations to Courts and Litigants for More Than 40 Years

304.    Johnson & Johnson knowingly and intentionally concealed relevant and discoverable evidence and made repeated false and misleading statements to plaintiffs, their counsel and the courts, ultimately leading to the dismissal of numerous cases.  Upon dismissal of the cases, Johnson & Johnson destroyed all relevant records, including any discovery.

305.    Despite being involved in litigation for decades, Johnson & Johnson never produced a single asbestos test in any case prior to 2017, even when specifically requested**.  Ex. 3** (3/8/2019 Musco Dep. 420:19–424:13); *see also* **Ex. 2** (2/15/2019 Musco Dep. 262:2-13).

306.    Many of the same Johnson & Johnson executives who were involved in discussions with the FDA about the company's talc-based cosmetic products were involved in defending Johnson & Johnson in litigation alleging asbestos-related injuries from Johnson's Baby Powder and other talc-based cosmetic products.  **Ex. 3** (3/8/2019 Musco Dep. 381:25–383:23).

307.    Johnson & Johnson clearly understood there was a difference between representing that it disagreed with evidence that existed and the representation that no evidence exists at all. *See* **Ex. 2** (February 15, 2019 Deposition of Nancy Musco at 173:10-21) and **Exhibit 186** (June 30, 2021 Deposition of John O'Shaughnessy at 466:12-20).

308.    J&J's in-house counsel, John O'Shaughnessy, admitted under oath that he

supervised litigation where J&J asserted under oath Johnson's Baby Powder never contained asbestos in any form or tremolite. *See* **Exhibit 187** (June 23, 2021 Deposition of John O'Shaughnessy at 289:4-22).

309.    In litigation involving its talc products, Johnson & Johnson was repeatedly asked whether the talc used in any of its talc-based cosmetic products contained any amount of asbestos. **Ex. 2** (2/15/19 Musco Dep. 37:1-20).

310.    In defending against litigation, Johnson & Johnson represented to plaintiffs' counsel that "there was no evidence" of asbestos in the cosmetic talc used in Johnson's Baby Powder or Shower to Shower. **Ex. 3** (3/8/19 Musco Dep. 400:12–401:15).

311.    These representations exemplified Johnson & Johnson's pattern and practice in defending talc-injury litigation, which was to conceal all evidence of asbestos in its cosmetic talc products and represent that no such evidence ever existed. *Id.* (3/8/19 Musco Dep. 400:12–401:15).

312.    In furtherance of this practice, Johnson & Johnson routinely provided sworn affidavits from company executives asserting that there was no evidence of asbestos in the talc used for Johnson & Johnson cosmetic products. *Id.* (3/8/19 Musco Dep. 415:8–417:7)

313.    Johnson & Johnson similarly repeatedly certified answers to interrogatories in asbestos-injury cases stating that there was never any evidence of asbestos in any Johnson & Johnson cosmetic talc product. **Ex. 2** (2/15/2019 Musco Dep. 139:8-22).

### A.    *Westfall v. Whittaker Clark & Daniels*, **et al., No. 79-0269 (D.R.I.)**

314.    In 1979, David Howard Westfall filed an asbestos death lawsuit in the United States District Court for the District of Rhode Island captioned *Westfall v. Whittaker Clark & Daniels, et al.*, C.A. No. 79-0269 (hereinafter referred to as "*Westfall*"), arising out of exposure to asbestos-containing talc products sourced from the Vermont mines.

315.     As a result of its active involvement with the *Westfall* case, Johnson & Johnson knew that  scientists involved in testing the talc clearly testified that the talc originating from the Johnson mine contained asbestos. The Johnson mine was once owned by Johnson & Johnson.

316.     The Westfall case focused on talc mined from the Johnson Mine in Vermont which was owned by Johnson & Johnson until 1967 when it sold the mine to Engelhard Corporation.

317.     While the Johnson mine sold primarily industrial grade talc it also sold talc for use in Johnson's Baby Powder until sales of talc coming out of the Johnson mine were suspended in 1967 because of the high arsenic content. *See* **Exhibit 188** (Eastern Magnesia Talc Co., Inc.'s The Cosmetics Industry outline) and **Exhibit 189** (June 12, 1991 Deposition of Roger Miller at 42:9-16).

318.     After the sale of the Johnson Mine, talc from the Johnson Mine was no longer used in Johnson's Baby Powder.

319.     The Westfall lawsuit initially named J&J's subsidiary Windsor Mineral Inc.  as a defendant. Windsor Mineral in turn sued Engelhard Corporation.

320.     Numerous high-level J&J executives participated in the case including George Lee (Director of Applied Research), Windsor Mineral President, Roger Miller, J&J General Counsel John Beidler, J&J Medical Director, Bruce Semple, and "Mr. Talc", William Ashton.

321.     During the case numerous scientists testified that the Johnson Mine contained asbestos including Engelhard's head scientist, Glenn Hemstock, and company mineralogist, Peter Gale.  Peter Gale testified that he identified chrysotile asbestos in talc taken from the Johnson Mine "using selected area electron diffraction in conjunction with transmission electron microscopy". *See* **Exhibit 190** (April 26, 1983 Deposition of Peter Gale in *Westfall* at 20:13-20:14). Similarly, Engelhard's chief scientist, Glenn Hemstock, testified that his department found chrysotile in both the raw ore and finished talc.  *See* **Exhibit 191** (March 16, 1983 Deposition of Glenn Hemstock in

*Westfall* at 14:6-15:10).

322.    After the evidence of asbestos contamination came out, the *Westfall* case was quietly settled and all evidence of asbestos contamination, including sworn testimony of all of the scientists, was placed under seal. *See* **Exhibit 192**, Stipulation and Order of Confidentiality relating to document disclosure from Westfall case.

> **B.**    ***Gambino v. Johnson & Johnson Baby Products Co.,*** **No. L-064200-83 (N.J. Super.)**

323.    In 1983, Johnson & Johnson was named as a defendant in *Gambino v. Johnson & Johnson Baby Products Company,* Docket No. L-064200-83, Superior Court of New Jersey, Law Division, Middlesex County (hereinafter "*Gambino*").

324.    In *Gambino*, the plaintiff alleged that his talcosis diagnosis was a direct result of exposure to and use of Johnson's Baby Powder.  Although documents were once in the control of Johnson & Johnson's Legal department, no evidence from the case exists with the exception of the complaint and answers to one set of interrogatories.  *See* **Ex. 20** (11/28/18 Musco Dep. 89:2–90:1); **Ex. 2** (2/15/19 Musco Dep. 105:16–107:5).

325.    Johnson & Johnson never issued a litigation hold during the *Gambino* proceedings and, presumably, any other case involving talc used in its cosmetic talc products in the 20th century.  *See* **Ex. 225** (10/19/18 Mittenhal Dep. 478:1-481:9).

> **C.**    ***Yuhas v. Windsor Minerals, Inc., et al.,*** **No. MID-L-029706-84 (N.J. Super.);** ***Edley v. Windsor Minerals Inc., et al.,*** **No. MID-L-075913-86 (N.J. Super.).**

326.    In 1986, the *Edley* case was filed in Middlesex County, New Jersey.  Mr. Edley alleged he developed asbestosis as a result of working with talc from Johnson & Johnson's Vermont talc mine.

327.    On August 27, 1986, John Beidler, the same J&J in house counsel who worked on the Westfall case, wrote to the plaintiff's attorney Ronald Grayzel demanding a dismissal and citing the New Jersey frivolous lawsuit statute as a veiled threat. In his letter, J&J's counsel represented  "All of the talc mined by Windsor Minerals, Inc., whether it is ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos and no evidence of the presence of asbestos in any Windsor Minerals product has ever been revealed."  (Beidler cited as precedent another case dismissed two months earlier based upon the same representations. *See* **Exhibit 193** (August 27, 1986 Johnson & Johnson letter from John Beidler to Ronald Grayzel Re: Edley v. Windsor Minerals, Inc.) No other testing reports including those finding asbestos in the Vermont talc were referenced or turned over.

328.    After Mr. Edley refused to dismiss his case, J&J sent yet another letter demanding dismissal. Attached to the letter was an affidavit of the President of Windsor Minerals, Roger Miller, parroting the previous representation of J&J's counsel All of the talc mined by Windsor Minerals, Inc., whether it is ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos. No evidence of the presence of asbestos in Windsor Minerals' product has ever been revealed by this testing. Attached hereto as Exhibit 'A' is a true copy of a recent report of such testing."  *See* **Exhibit 194** (Affidavit of Roger Miller, Edley v. Windsor Minerals, Inc., No. MID-L-075913-86 (N.J. Super. Ct. Middlesex Cnty.) (emphasis added)).

329.    Roger Miller's affidavit makes no distinction between industrial and cosmetic talc stating unequivocally the same talc was used in both products.

330.    Attached as Exhibit A to Roger Miller's affidavit was the report of a 1987 assay by McCrone that found "no quantifiable amounts of asbestiform minerals" in Windsor talc samples. *Id*.

331.    Not disclosed was the scheme to use as code language "non quantifiable" in the reports from McCrone to cover up asbestos findings.  That scheme is disclosed in the correspondence between Roger Miller, the author of the Edley Affidavit, and McCrone Laboratories.

332.    On August 22, 1985, the year prior to the filing of the Edley case, McCrone sent a letter to J&J subsidiary Windsor Minerals advising that chrysotile asbestos was found in J&J talc. *See* **Exhibit 195** (August 22, 1985 McCrone letter to Arthur LaPierre Re: McCrone Project No. ME-1862).

333.    Upon finding out about the report, Windsor Minerals President Miller wrote to McCrone admonishing "We received on August 22, the enclosed report on these samples mailed to another Company employee. The August 22, report is couched in substantially different language than earlier reports. As I explained to you on my visit to Chicago it is very important that specific language be used." *See* **Exhibit 196** (September 10, 1985 Windsor Minerals letter to Ian Stewart Re: methodology and reports).

334.    After receiving the letter from Miller, McCrone issued a new report omitting the asbestos findings and substituting the code words "non quantifiable" indicating the test of the J&J talc was negative for asbestos. *See* **Exhibit 197** (October 8, 1985 McCrone Letter to Roger Miller Re: McCrone Project No: ME-1862).

335.    Not only did Johnson & Johnson use code words to cover up the McCrone asbestos findings, but it also failed to disclose numerous other tests in possession of J&J reporting asbestos in J&J talc. See for example 10/27/1972, McCrone report, 2/11/1974, McCrone to JJ Rolle; 4/24/1974, McCrone report, 5/8/1974, McCrone report; 7/8/1974, McCrone to J.J. Rolle, 10/10/1974, McCrone to Windsor Minerals Inc., 7/1/1975, McCrone to Windsor Minerals Inc., 9/11/1975, Stewart to V. Zeitz, 10/5/1978, McCrone to Windsor Minerals Inc.; 8/22/1985,

McCrone to Windsor Minerals Inc., McCrone Images of Plate 46770 4678, June 4, 1962 Battelle letter to Ashton Re: field work in Chester, Vermont, September 3, 1971 McCrone preliminary report to Dr. Goudie, May 9, 1974 Windsor MA Number 3295, Examination of Talc Ores and Products from the Argonaut Ore Body, March 4, 2014 Mount Sinai letter to Steven Smith Re: Cashmere Bouquet powder, September 1, 1983 McCrone letter to Roger Miller Re: fiber count analysis purchase order R-503, November 2, 1984 McCrone letter to Roger Miller Re: analyses for four air filter samples, and August 8, 1986 Roger Miller handwritten notes Re: sample origins.

336.    Not only did Johnson & Johnson fail to disclose all of the prior asbestos findings, but it also failed to disclose a similar assay from McCrone done a few months earlier that "resulted in the detection of trace amounts of chrysotile asbestos" in Windsor talc samples from the same source.

337.    In urging the *Edley* plaintiff to agree to dismiss his case, Johnson & Johnson cited to a similar case named *Yuhas* where the plaintiff had previously agreed to dismiss his case based upon a similar false affidavit.  *See* **Exhibit 198** (Windsor Ans. to *Yuhas* Compl. and Stip. of Dismissal).

338.    In a recent trial in the same courthouse, Johnson & Johnson's corporate representative was forced to admit under oath that the representations made in Miller's affidavit were false and perjurious.  *See* **Exhibit 199** (7/23/2019 *Barden* Hopkins Trial Tr. 189:1–195:4).

339.    In reliance upon the fraudulent affidavits and affirmations, Mr. Edley voluntarily dismissed his case as Yuhas did before him. *See*, *e.g.*, **Exhibit 200** (Stipulation of Dismissal, R.B. Grayzel); **Exhibit 201** (*Yuhas* dismissal).

340.    By the end of 1987 at least three documented cases were dismissed based upon the representation that no evidence existed reporting asbestos in J&J talc. *See* **Exhibit 202** (June

30, 2021 Deposition of John O'Shaughnessy Depo. 478:11-480:14). As numerous pre-1987 files are missing, the question remains how many other plaintiffs met the same fate.

### D.    Countless fraudulent dismissals followed in the 1980s and 1990s.

341.    When Johnson & Johnson entered into negotiations with Cyprus to sell its wholly-owned subsidiary, Windsor Minerals Inc., the parties included an indemnification provision for then-current asbestos-in-talc litigation, including claims for asbestosis arising from talc exposure. *See* **Exhibit 203** (1989 Cyprus Agreement of Transfer).

342.    The agreement provided the details of numerous claims and lawsuits regarding injuries allegedly due to asbestos and talc. *Id.*

343.    "Exhibit I" to the Indemnification agreement establishes that Johnson & Johnson was aware of susbtantial pending and probable asbestos-in-talc litigation involving Windsor Minerals Inc., including the cases of 982 plaintiffs, all of whom suffered from asbestos-related diseases and attributed their injuries to exposure to asbestos and asbestos-containing talc. *Id.*

344.    While scant evidence exists from the approximate 1,000 dismissed cases involving Windsor Minerals, discovery has disclosed false sworn discovery responses as well as affidavits similar to that used to secure dismissals in the *Edley* and *Yuhas* cases, executed by Roger Miller and other Johnson & Johnson executives.

345.    On July 8, 1988, a year after executing his affidavit in the *Edley* case, Roger Miller executed another sworn affidavit attesting: "All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in Windsor Mineral, Inc.'s product ***has ever been revealed*** by this testing." **Exhibit 204** (Affidavit of Roger Miller, *Andonian v. A.C. & S, Inc.*, No. ACV-88-6-1731 (Summit Cnty. Ct. Comm. Pls.) (emphasis added)).

346.    **On the same date in a different case,** Roger Miller again swore — "All of the talc

mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in Windsor Mineral, Inc.'s [product] ***has ever been revealed*** by this testing." **Exhibit 205** (Affidavit of Roger Miller, *Miller v. A.C. & S, Inc.*, No. ACV884-1087 (Summit Cnty. Ct. Comm. Pls.) (emphasis added)).

347.    At the same time, 1,827 additional cases alleging injury from talc exposure from the Johnson mine were pending against J&J. Engelhard was also named in the cases as a result of it purchasing the Johnson mine from J&J.

348.    After Engelhard threatened to sue J&J over the sale of the Johnson mine, J&J decided to cooperate with Engelhard to obtain dismissals of pending cases. According to J&J's in-house counsel "[w]hat we did was we participated in this affidavit and Mr. Ashton wrote the affidavit to protect Johnson &Johnson's interests." **Ex. 186** (June 30, 2021 Deposition of John O'Shaughnessy at 525:5-15).

349.    In order to extricate itself from responsibility, Johnson & Johnson had J&J executive William Ashton execute a false affidavit stating that "[f]rom the 1940s through the 1980s, talc mined in Vermont and specifically, the talc mined by Engelhard Corporation (and its predecessors) from the talc mine located in Johnson, Vermont (the "Johnson mine") has been considered to be talc free from contamination by asbestos." *See* **Exhibit 206** (Affidavit of William Ashton (Somerset Cnty., N.J.)).

350.    Johnson & Johnson's has withheld the Ashton Affidavit, stating in its privilege log that it is directly relevant to "ongoing and anticipated Johnson Baby Powder litigation." *See* **Exhibit 207** (privilege log entry specifying May 5, 1989 memo from Dembrow to Ashton).

351.    Attached to the Ashton affidavit in support of the no asbestos assertion was the deposition of Alfred Chidester, J&J's expert from the *Westfall* case. Having worked on the *Westfall* case, Ashton was intimately familiar with the proof from that case.

352.     Conspicuously missing from the Ashton affidavit was any reference to the depositions of the scientists in the Westfall case unequivocally stating there was, in fact, asbestos in the mine.

353.     Thereafter, the Ashton affidavit was sent to numerous plaintiffs' attorneys around the country demanding dismissal of cases asserting that the talc from the mine "did not contain asbestos." *See* **Exhibit 208** (May 17, 1989 Cahill letter to Schwartz re: Tireworkers' Asbestos Litigation).

354.     The affidavit was even submitted to federal judges overseeing all of the federal asbestos cases in the country with the representation that "Mr. Ashton concludes that our client's talc did not contain asbestos." *See* **Exhibit 209** (August 14, 1985, Victoria N. Komarnicki letter to Judge Weiner Re: Tireworkers' Litigation).

355.     Upon information and belief in excess of 10,000 cases were ultimately dismissed as a result of the Ashton affidavit.

### E.     *Ritter v. Cyprus, et al.*, No. 93-5121-CV-8 (W.D. Mo.)

356.     In 1993, Johnson & Johnson was named as a defendant in the matter of *Ritter v. Cyprus et al.* (hereinafter "*Ritter*"), related to injuries caused by Johnson & Johnson's talc products.  *See* **Exhibit 210** (Oct. 17, 1994 Luzenac America Inc. letter to Johnson & Johnson).

357.     In *Ritter*, McCrone sent its entire original testing file to J&J in house counsel John O'Shaugnesssy. *See* **Exhibit 211** (January 3, 1995 McCrone letter to John O'Shaughnessy Re: McCrone Project No. IL-2689).

358.     Apparently O'Shaugnessy then shared all or part of the original  file including the underlying scientific data with its expert Barry Doolan who confirmed the tests in the file reported that the J&J talc contained chrysotile asbestos. *See* **Exhibit 212** (April 4, 1995 Johnson & Johnson Memo Re: Site visit to Vermont Mines and Interview with Barry Doolan).

359. The McCrone file was secreted away by sending the file offsite to J&J outside counsel. See **Exhibit 213** (June 30, 2021 Deposition of John O'Shaughnessy at 442:22-443:1; 443:19-444:7); *see also* **Exhibit 214** (January 3, 1995 McCrone letter to John O'Shaughnessy Re: McCrone Project No. IL-2689).

360. Discussions between Johnson & Johnson and its talc supplier, Cyprus, regarding the *Ritter* litigation confirmed that Johnson & Johnson and its talc supplier destroyed all samples of talc tested for the presence of asbestos, including the samples tested by Johnson & Johnson's retained laboratory, McCrone Associates. **Ex. 225** (10/19/2018 Mittenhal Depo. 496:21:14–504:1).

361. Despite being properly requested, the related documents, information, and samples, were never identified, disclosed, or produced in litigation.

      **F.**    *Selby v. Johnson & Johnson, et al.*, **No. 670577 (Cal. Sup. Ct.).**

362. In 1994, Marlene Selby and Lowell Wayne Selby filed a lawsuit in the Superior Court of California, County of San Diego, captioned *Selby v. Johnson & Johnson, et al.* (hereinafter "*Selby*"), alleging that Mrs. Selby's talcosis was caused as a direct result of exposure to Johnson's Baby Powder.

363. In *Selby*, Johnson & Johnson made the false represention in answers to interrogatries that its talc products never contained asbestos. *See* **Exhibit 215** (Apr. 20, 1994, Johnson & Johnson's Supplemental Responses to Plaintiffs' Special Interrogatories in *Selby*).

      **G.**    *Coker v. Johnson & Johnson, et al.*, **No. D-157,746 (Tex. 136th Judicial Dist. Ct.).**

364. In September 1997, Darlene Coker and her husband, Roy Coker, filed suit against Johnson & Johnson and others in the 136th Judicial District Court of Jefferson County, Texas ("*Coker*").

365.     On May 6, 1998, Johnson & Johnson served its responses to plaintiffs' interrogatories and requests for production.  **Exhibit 216** ("*Coker* discovery responses").

366.     In Johnson & Johnson's "Preliminary Statement" in the *Coker* discovery responses, Johnson & Johnson, stated in pertinent part:

> Johnson & Johnson Consumer Companies, Inc. (hereinafter Johnson & Johnson) states that in the preparation of its responses to plaintiff's requests and interrogatories, it has made, and continues to make, a concerted good faith effort to collect all of the requested information or documents from Johnson & Johnson as well as any relevant predecessors and vendors.
>
> ***
>
> As for its responses to interrogatories, Johnson & Johnson state that when the requested information is readily available from documents, the documents will be produced as noted in individual interrogatory responses.
>
> ***
>
> In response to requests for documents and interrogatories, Johnson & Johnson will produce information relevant to talc or baby powder.

*Id.*

367.     In the *Coker* discovery responses, Johnson & Johnson concealed and refused to produce documents from any analyses of Johnson's Baby Powder for fibrous material or for asbestiform material, objecting that such requests for documents constituted a "fishing expedition," even though Johnson & Johnson knew that relevant and material documents showing the asbestos content of Johnson & Johnson's cosmetic talc products existed.  *Id.*

368.     Johnson & Johnson concealed and refused to produce in response to plaintiffs' discovery requests, any geological surveys or documents regarding the source mines for Johnson & Johnson's talc products despite knowingly possessing documents relating to the Vermont mines, which were owned and operated by Johnson & Johnson's wholly owned subsidiary prior to 1989.

369.    Johnson & Johnson concealed and refused to produce in response to plaintiffs' discovery requests in *Coker* any documents evidencing or relating to tests, studies, investigations, and analyses of Johnson's Baby Powder for the presence of asbestos at the request of, or by, Johnson & Johnson, members of the CTFA, Johnson & Johnson's talc suppliers, the federal government, McCrone, E.S. Laboratories, Colorado School of Mines Research Institute, Bain Environmental, or other outside laboratories in the 1950, 1960s, or 1970s, despite Johnson &\Johnson's knowledge that relevant and material documents existed and were in its possession. *See* **Ex. 216** (*Coker* J&J interrogatory responses).

370.    Johnson & Johnson concealed and refused to turn over these documents despite knowing that it had an obligation to turn over what was requested.  *See* **Ex. 2** (2/15/19 Musco Dep. 279:11-17).

371.    In response to plaintiffs' questioning regarding whether Colorado School of Mines Research Institute or McCrone "found the presence of asbestos or asbestiform minerals" in its testing of Johnson & Johnson talcum products, Johnson & Johnson objected, asserting that such a request violated the Texas Rules of Civil Procedure as it requested proprietary and trade secret information and required each witness "to speculate and provide an expert opinion that [the] witness is not qualified to express." **Ex. 3** (3/8/2019 Musco Dep. 402:4–405:21).

372.    Notably, the Colorado School of Mines Research Institute, who had been retained by Johnson & Johnson since the 1950s, repeatedly and consistently detected the presence of asbestos in Johnson & Johnson's talc sources, yet Johnson & Johnson failed to disclose this information or produce said testing results during the *Coker* litigation.

373.    Similarly, McCrone Associates, also retained by Johnson & Johnson since the 1970s, repeatedly and consistently detected the presence of asbestos in Johnson & Johnson's talc sources, yet Johnson & Johnson failed to disclose this information or produce said testing results

during the *Coker* litigation.

374.    When McCrone files were subpoenaed by the plaintiff, J&J asserted that the testing information represented trade secrets. *See* **Exhibit 217** (October 27, 1997 letter from Hobson's office to Appleman Re: Coker enclosing Affidavit of Return Services).  As explained by J&J's general counsel, John O'Shaughnessy, the reason the testing documents were not turned over was because they "were so sensitive that disclosure of them were so sensitive without certain protections would harm the business of the company." *See* **Ex. 186** (June 30, 2021 Deposition of John O'Shaughnessy at 657:15-658:12).

375.    During the course of the case, J&J's talc supplier, Luzenac, sent J&J's counsel all of its testing documents concerning Italian talc going back to 1982. *See* **Exhibit 218** (April 17, 1998 facsimile from Jean-Pierre Grange to John O'Shaughnessy). Instead of turning the documents over in litigation, they were also secreted away to the offices of outside counsel. *See* **Ex. 186** (June 30, 2021 Deposition of John O'Shaughnessy at 442:10-20).

376.    Finally, Johnson & Johnson was aware that E.S. Laboratories, which had also been retained by Johnson & Johnson, reported a finding of 1% chrysotile asbestos in Italian talc A.G.T. 1615, the same talc source used in Johnson's Baby Powder and Shower to Shower, but Johnson & Johnson never disclosed this information during the *Coker* litigation.

377.    Instead, while defending against the plaintiffs' claim, Johnson & Johnson represented to the plaintiffs' counsel that "there was no evidence" of asbestos in the cosmetic talc used in Johnson's Baby Powder and Shower to Shower.  **Ex. 3** (3/8/2019 Musco Dep. 400:12–401:15).

378.    In defending the *Coker* case, Johnson & Johnson contacted Dr. Alice M. Blount, Ph.D., a Rutgers University professor and researcher who had studied the asbestos content of various cosmetic talc products about serving as the company's consultant.  Subsequently, on April

23, 1998, Dr. Blount advised Johnson & Johnson's counsel that the "Sample I" referred to in her 1991 paper, "Amphibole Content of Cosmetic and Pharmaceutical Talcs," was a sample from Johnson & Johnson's Vermont mines that was found to have contained asbestos.  **Ex. 90** (JNJ 000064241 (Apr. 23, 1998 correspondence from Dr. Blount)). In this letter, Dr. Blount states "[a]s I told you, I believe that Johnson & Johnson's Vermont talc contains trace amounts of asbestos…" *Id.*

379.    Sample I in Dr. Blount's study was found to contain asbestos at levels that would not have been identified using the industry-created procedure, the J4-1 method, for which Johnson & Johnson had advocated, used in-house, and required its outside laboratories to use.  Sample I was a sample of Johnson's Baby Powder, though the identity of its manufacturer was not disclosed in Blount's article. Johnson & Johnson concealed this information and never disclosed it to the plaintiffs during litigation. *Id.*

380.    It was no secret that Alice Blount found asbestos in cosmetic talc as it was published in the open literature and so important that it was ultimately cited by IARC. *See Id.*

381.    What was kept and remained a secret, however, was that it was Johnson & Johnson's talc that contained the asbestos. The secret was relayed to people inside J&J but went no further until it was mistakenly turned in a lawsuit. *See* **Ex. 186** (Deposition of John O'Shaughnessy, June 30, 2021, at 639:4-19)

382.    Johnson & Johnson knew that Dr. Blount had found asbestos in Johnson's Baby Powder but concealed this fact and never informed the plaintiffs or their counsel of this fact.

      **H.**    ***Krushinski v. Johnson & Johnson Baby Products Co***., **Docket No. MID-L-9389-99 (N.J. Super.)**

383.    In *Krushinski v. Johnson & Johnson Baby Products Co.*, Docket No. MID-L-9389-99, Superior Court of New Jersey, Law Division, Middlesex County (hereinafter "*Krushinski*")

Johnson & Johnson again objected to producing scientific testing to determine whether there are any health risks in Johnson's Baby Powder, claiming it was confidential, proprietary trade secrets. **Exhibit 219** (*Krushinski* Interrogatories at 3).

384.     In *Krushinski*, Johnson & Johnson again certified interrogatories swearing that "talc used in the manufacture of Johnson's Baby Powder **never contained asbestos in any form, or tremolite**." *Id.* at 7 (emphasis added); *see also* **Ex. 2** (Feb. 15, 2019 Musco Dep. at 123:18–124:1); **Ex. 20** (Nov. 28, 2018 Musco Dep. at 90:2-14).

385.     Johnson & Johnson has since been forced to admit that these interrogatories, which were answered in conjunction with the company's lawyers, are false. *See* **Ex. 5** (July 22, 2019 *Barden* Trial Tr. 139:14–140:15).

386.     Johnson & Johnson also admitted that it cannot be sure that the information that was available to it during the pendency of the *Gambino* case was available to it years later in the *Krushinski* case. **Ex. 20** (Nov. 28, 2018 Musco Dep. 88:5-23).

387.     Yet, Johnson & Johnson knew there was tremolite in Johnson's Baby Powder when responding to the *Krushinski* discovery requests. **Ex. 140** (Mar. 6, 2019 Nicholson Dep. 319:21–320:2).

388.     In making representations in asbestos-injury litigation, Johnson & Johnson knew there was a difference between representing that there is "no evidence" of asbestos contamination and acknowledging that evidence exists, but claiming it is unreliable. Despite this knowledge, Johnson & Johnson chose to represent that there was "no evidence" of asbestos contamination. **Ex. 2** (Feb. 15, 2019 Musco Dep. 173:10-21).

389.     In certifying answers to interrogatories, it was Johnson & Johnson's pattern and practice that its representative signing the responses never review a single document. **Ex. 20** (Nov. 28, 2018 Musco Dep. 77:6-11; *see also id.* at 21:1-15).

390.     In certifying answers to interrogatories, it was Johnson & Johnson's pattern and practice that its representative signing the responses never independently verify whether the information supplied was truthful and complete.  *Id.* (Nov. 28, 2018 Musco Dep. 135:22–136:9).

    **I.**    ***Durham v. Metropolitan Life Ins. Co.*, No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.)**

391.     On September 19, 2006, Johnson & Johnson Executive John Hopkins executed another fraudulent affidavit swearing:

    a.     "The conclusion of the Audits was that for both of the Italian and Vermont mines, there was ***zero evidence*** of asbestos in the geology and mineralogy of the mines."

    b.     "For the talc sources in use in the United States over the period 1955-2002, there has ***never*** been an instance of asbestos contamination."

    c.     "***No evidence*** of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States."

    d.     "***No evidence*** of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 – date."

    e.     "It may be concluded that there has ***never*** been asbestos contamination of the talc used by Johnson & Johnson in the United States from the period in question, 1955-2002." **Exhibit 220**.

392.     According to Hopkins, Dr. Fred Pooley who was a consultant to J&J, reported zero evidence of asbestos in the Italian and Vermont mines.

393.     Unfortunately, evidence discovered years later proves unequivocally that Hopkins's representations concerning Pooley were false.

394.     As early as 1972, Pooley conducted analysis of samples of Italian talc from the mine used to produce Johnson's Baby Powder and concluded that "the only asbestos type mineral

to be found in the hand samples was tremolite." *See* **Exhibit 221** (University College Cardiff, An Examination of Italian Mine Samples and Relevant Powders, Conclusions).

395.    Hopkins's representations concerning Pooley's analysis of Vermont talc was equally false. As reported on May 16,1973, internally at J&J, Pooley found asbestos "tremolite-type in Vermont." *See* **Ex. 156** (JNJAZ55_00001892 (5/16/1973, Memo from F.R. Rolle to T.H. Shelley)).

396.    Apparently forgetting the substance of his own sworn testimony, years later John Hopkins testified that similar affidavits executed by Windsor Minerals were in fact false. *See* **Ex. 199** (July 23, 2019 Trial Testimony of John Hopkins in *Barden* at 189:1–195:4).

###    J.    *Payan v. CBS Corp., et al.***, Caso No. BC 608412 (Cal. Sup. Ct., Los Angeles Cnty.)**

397.    On July 7, 2016, Dr. John Hopkins executed another fraudulent affidavit swearing:

a.    "***Confirmation of the absence of asbestos*** on a historical basis has been reported in a Johnson & Johnson internal report from 1966 that summarized the results of 13 samples of talc from the Company Museum and dating from the period 1910-1964."

b.    "The conclusion of the Audit was ***that there was zero evidence of asbestos*** in the geology and mineralogy of the Italian mine."

c.    "Based on the absence of asbestos contamination in historical talc samples; an in-house raw material specification requirement dating from at least 1949, for absence of asbestos in talc; no evidence of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States; and no evidence of asbestos contamination in each production batch sampling as certified by the suppliers, from the period of 1975 to the present, it is my expert opinion that Johnson & Johnson baby powder … was not contaminated with asbestos."

*See* **Exhibit 222** (July 7, 2016 Affidavit of John Hopkins).

398.     In 2007, Roger Miller testified McCrone never found asbestos in any mine. *See* **Exhibit 223** (January 16, 2007 Deposition of Roger Miller, 84:12-15).

399.     Miller went on to testify specifically that the testing of the Argonaut mine, which was the primary mine at the time used to manufacture Johnson' Baby Powder, "never revealed" any asbestos. Id. at. 103:10-104:13.

400.     That testimony is proven false by numerous reports including the report issued by McCrone before the mine was officially opened finding Chrysotile asbestos throughout the mine. *See* **Ex. 54** (April 24, 1974 McCrone Examination of Talc Samples, Argonaut Ore Body).

## XII.   Federal Standards and Requirements

401.     Certain federal standards and requirements apply to both talc as a cosmetic ingredient and talc-based body powder products.  *See* **Exhibit 224** (P-324 (21 C.F.R. 740.1)).

402.     At all relevant times, Defendants had the obligation to comply with federal standards and regulations in the manufacture, design, marketing, branding, labeling, distribution, and sale of the PRODUCTS.

403.      At all times that Johnsons Baby Powder and Shower to Shower Powder was marketed in the United States, J&J did not have to submit its PRODUCTS to FDA for approval for sale.   According to FDA: "FDA's legal authority over cosmetics is different from our authority over other products we regulate, such as drugs, biologics, and medical devices. Under the law, cosmetic products and ingredients do not need FDA premarket approval, with the exception of color additives."[13]

---

[13] https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated.

404.    At all times, the responsibility to study the safety of Johnsons Baby Powder rested solely with J&J and Old JJCI.  According to the FDA: "*Companies and individuals who manufacture or market cosmetics have a legal responsibility to ensure the safety of their products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients. The law also does not require cosmetic companies to share their safety information with FDA.*"[14]

405.    Defendants, each individually, *in solido*, and/or jointly, violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq*., and regulations promulgated thereunder.

406.    Defendants have or may have failed to comply with federal standards and requirements governing the manufacture, design, marketing, branding, and sale of the PRODUCTS including, but not limited to, the following violations of sections and subsections of the United States Code and the Code of Federal Regulations:

   a.   The PRODUCTS are adulterated pursuant in violation of 21 U.S.C. § 361 because, among other things, they contain a poisonous or deleterious substance which may render them injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual.

   b.   The PRODUCTS are misbranded in violation of 21 U.S.C. § 362 because, among other things, their labeling is false or misleading.

   c.   The PRODUCTS are misbranded in violation 21 U.S.C. § 362 because words, statements or other information required by or under authority of 21 U.S.C. § 362 are not prominently placed thereon with such conspicuousness and in such terms

---

[14] *Id.*

as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

d.   The PRODUCTS are misbranded in violation of 21 C.F.R. § 701.1 because they contain false or misleading representations that they are safe for daily application to all parts of the female body.

e.   The PRODUCTS do not bear a warning statement, in violation of 21 C.F.R. § 740.1, to prevent a health hazard that may be associated with the PRODUCTS, namely that the PRODUCTS may cause ovarian cancer or a heightened risk of ovarian cancer when applied to the perineal area.

f.   The PRODUCTS do not prominently and conspicuously bear a warning statement, in violation of 21 C.F.R. § 740.2, as to the risk of ovarian cancer caused by use of the PRODUCTS when applied to the perineal area, in such terms and design that it is likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

g.   The PRODUCTS, in violation of 21 C.F.R. § 740.10, do not conspicuously state on their principal display panel that the safety of the PRODUCTS have not been determined and/or that the safety of the PRODUCTS' principal ingredients have not been determined.

## COUNT I - STRICT LIABILITY-FAILURE TO WARN
### (Against Imerys Talc)

407.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

408.    Imerys Talc is liable under a theory of strict products liability as set forth in §402A of the Restatement of Torts (Second).

409.    At all relevant times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants with full knowledge that the Johnson & Johnson Defendants were then packaging the talc and selling the talc to consumers as the PRODUCTS and that consumers of the PRODUCTS were using it to powder their perineal regions.

410.    At all relevant times, by mining, refining, screening, and testing talc, and supplying that talc to the Johnson & Johnson Defendants for use in the PRODUCTS, Imerys Talc was knowingly an integral part of the overall manufacture, design and production of the PRODUCTS, and the PRODUCTS' introduction into the stream of interstate commerce.

411.    At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when applied to a woman's perineal regions, and it knew or should have known that the Johnson & Johnson Defendants were not warning consumers of this danger.

412.    At all relevant times, Imerys Talc knew or should have known that the use of the PRODUCTS significantly increases the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

413.    At all relevant times, the PRODUCTS were defective and unreasonably dangerous when used in a reasonably foreseeable manner because, despite Imerys Talc's knowledge that the PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer, Imerys Talc failed to provide adequate warning and/or instruction to consumers, including Plaintiffs, regarding

the increased risk of ovarian cancer associated with the use of the PRODUCTS when applied to the perineal area.

414.    Had Plaintiffs received warning or instruction regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

415.    Due to the absence of any warning or instruction by the Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

416.    As a direct and proximate result of Imerys Talc's failure to warn Plaintiffs of the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, despite its actual knowledge of this material fact, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT II - STRICT LIABILITY-FAILURE TO WARN
### (Against Johnson & Johnson)

417.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

418.    Johnson & Johnson is liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

419.    At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

420.    At all relevant times, Johnson & Johnson knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

421.    At all relevant times, the PRODUCTS, manufactured and supplied by Johnson & Johnson were defective and unreasonably dangerous because, despite Johnson & Johnson's knowledge that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, Johnson & Johnson failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

422.    At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

423.    Had Plaintiffs received warning and/or instruction from Johnson & Johnson regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

424.    Due to the absence of any warning or instruction by Johnson & Johnson as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

425.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and

introduced into the stream of commerce by Johnson & Johnson, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT III - STRICT LIABILITY-FAILURE TO WARN
### (Against Johnson & Johnson Consumer Inc. (New JJCI))

426.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

427.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

428.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

429.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

430.    New JJCI is liable individually and as successor in interest to Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

431.    At all relevant times, New JJCI was engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

432.    At all relevant times, New JJCI knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

433.    At all relevant times, the PRODUCTS, manufactured and supplied by New JJCI, were defective and unreasonably dangerous because, despite the knowledge of New JJCI that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, New JJCI failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

434.    At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

435.    Had Plaintiffs received warning and/or instruction from New JJCI regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

436.    Due to the absence of any warning or instruction by New JJCI as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

437.     As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by the New JJCI, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT IV - STRICT LIABILITY-FAILURE TO WARN
### (Against LTL Management LLC)

438.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

439.     Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

440.     LTL Management LLC is liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

441.     At all relevant times, LTL Management LLC was engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

442.     At all relevant times, LTL Management LLC knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

443.     At all relevant times, the PRODUCTS, manufactured and supplied by LTL Management LLC, were defective and unreasonably dangerous because, despite LTL Management LLC's knowledge that the PRODUCTS were carcinogenic and lead to an increased

risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, LTL Management LLC failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

444.    At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

445.    Had Plaintiffs received warning and/or instruction from LTL Management LLC regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

446.    Due to the absence of any warning or instruction by LTL Management LLC as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

447.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by LTL Management LLC, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT V - STRICT LIABILITY-FAILURE TO WARN
### (Against Kenvue Inc.)

448.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

449.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

450.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

451.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

452.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

453.     At all relevant times, Kenvue was engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

454.    At all relevant times, Kenvue knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

455.    At all relevant times, the PRODUCTS, manufactured and supplied by Kenvue, were defective and unreasonably dangerous because, despite Kenvue Inc.'s knowledge that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, the Kenvue Inc. failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

456.    At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

457.    Had Plaintiffs received warning and/or instruction from the Kenvue regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

458.    Due to the absence of any warning or instruction by Kenvue as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

459.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by Kenvue, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VI - STRICT LIABILITY-FAILURE TO WARN
### (Against Janssen Pharmaceuticals, Inc.)

460.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

461.  Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

462.  Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

463.  Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

464.  Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

465.     At all relevant times, Janssen was engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

466.     At all relevant times, Janssen knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

467.     At all relevant times, the PRODUCTS, manufactured and supplied by Janssen, were defective and unreasonably dangerous because, despite Janssen Inc.'s knowledge that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, the Janssen Inc. failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

468.     At all relevant times, Plaintiffs used the PRODUCTS to powder their perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

469.     Had Plaintiffs received warning and/or instruction from the Janssen regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiffs would not have used the PRODUCTS in this manner.

470.     Due to the absence of any warning or instruction by Janssen as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiffs were unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

471.     As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by Janssen, Plaintiffs suffered and will continue to suffer

damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VII – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against Imerys Talc)

472.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

473.    Imerys Talc is liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

474.    At all relevant times, Defendant Imerys Talc was engaged in the business of mining and distributing talcum to the Johnson & Johnson Defendants for use in the PRODUCTS, and Imerys Talc was knowingly an integral part of the overall manufacture, design and production of the PRODUCTS, and their introduction into the stream of interstate commerce.

475.    At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in their condition.

476.    At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Imerys Talc in that, when Imerys Talc supplied its talc product to the Johnson & Johnson Defendants with full knowledge that the Johnson & Johnson Defendants would use the talc in formulating the PRODUCTS, and that the talc would be the primary ingredient in the PRODUCTS, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

477.    At all relevant times, the PRODUCTS were defectively manufactured and designed by Imerys Talc in that their design and formulation were more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

478.    At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

479.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT VIII – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against Johnson & Johnson)

480.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

481.    Johnson & Johnson is liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

482.    At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

483.    At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

484.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Johnson & Johnson in that, when the PRODUCTS left the hands of Johnson & Johnson, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

485.     At all relevant times, the PRODUCTS were defectively manufactured and designed by Johnson & Johnson in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

486.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

487.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by Johnson & Johnson to manufacture a product with the same therapeutic purpose as the PRODUCTS.   Despite knowledge of this reasonable and safer alternative design, Johnson & Johnson failed to alter the PRODUCTS' design and formulation. The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

488.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT IX – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

489.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

490.   New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

491.   New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

492.   New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

493.   New JJCI is liable individually and as a successor in interest to Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

494.   At all relevant times, New JJCI was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

495.   At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

496.    At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by the Johnson & Johnson Defendants in that, when the PRODUCTS left the hands of New JJCI, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

497.    At all relevant times, the PRODUCTS were defectively manufactured and designed by New JJCI in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

498.    At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

499.    At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by New JJCI to manufacture a product with the same therapeutic purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, New JJCI failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

500.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT X – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against LTL Management LLC)

501.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

502. LTL are liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

503. Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

504. At all relevant times, LTL was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

505. At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

506. At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by LTL in that, when the PRODUCTS left the hands of LTL, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

507. At all relevant times, the PRODUCTS were defectively manufactured and designed by LTL in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

508. At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

509. At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by LTL to manufacture a product with the same therapeutic purpose

as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, LTL failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

510.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XI – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against Kenvue Inc.)

511.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

512.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

513.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

514.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same

products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

515.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

516.     At all relevant times, Kenvue were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

517.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

518.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Kenvue in that, when the PRODUCTS left the hands of Kenvue, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

519.     At all relevant times, the PRODUCTS were defectively manufactured and designed by Kenvue in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

520.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

521.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by Kenvue to manufacture a product with the same therapeutic

purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, Kenvue failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

522.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XII – STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN
### (Against Janssen Pharmaceuticals, Inc.)

523.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

524.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

525.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

526.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

527.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

528.     At all relevant times, Janssen were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

529.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiffs without a substantial change in condition.

530.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Janssen in that, when the PRODUCTS left the hands of Janssen, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

531.     At all relevant times, the PRODUCTS were defectively manufactured and designed by Janssen in that their design and formulation was more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

532.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

533.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by Janssen to manufacture a product with the same therapeutic purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, Janssen failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

534.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiffs have suffered and will continue to suffer damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XIII – BREACH OF EXPRESS WARRANTIES
#### (Against Johnson & Johnson)

535.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

536.     Johnson & Johnson, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. Johnson & Johnson' express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

    a.  Johnson & Johnson advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body

perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

    b.   Johnson & Johnson advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, Johnson & Johnson advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

537.    Johnson & Johnson, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

538.    At all relevant times, Johnson & Johnson breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which Johnson & Johnson advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

539.    At all relevant times, Johnson & Johnson had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

540.    At all relevant times, Johnson & Johnson willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

541.    At all relevant times, in reliance upon the express warranties made by Johnson & Johnson as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

542.     As a direct and proximate result of Johnson & Johnson' express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XIV – BREACH OF EXPRESS WARRANTIES
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

543.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

544.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

545.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

546.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

547.    New JJCI, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. New JJCI's express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

    a.   New JJCI advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

    b.   New JJCI advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, New JJCI advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

548.    New JJCI, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

549.    At all relevant times, New JJCI breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which New JJCI advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

550.     At all relevant times, New JJCI had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

551.     At all relevant times, New JJCI willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

552.     At all relevant times, in reliance upon the express warranties made by New JJCI as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

553.     As a direct and proximate result of New JJCI's express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XV – BREACH OF EXPRESS WARRANTIES
### (Against LTL Management LLC)

554.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

555.     Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

556.     LTL, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. LTL's express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a. LTL advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

b. LTL advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, LTL advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

557.    LTL, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

558.    At all relevant times, LTL breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which LTL advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

559.    At all relevant times, LTL had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

560.    At all relevant times, LTL willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

561.     At all relevant times, in reliance upon the express warranties made by LTL as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

562.     As a direct and proximate result of LTL's express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XVI – BREACH OF EXPRESS WARRANTIES
### (Against Kenvue Inc.)

563.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

564.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

565.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

566.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same

products to the same customers as did Old JJCI. Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

567. Kenvue, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. Kenvue's express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a. Kenvue advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

b. Kenvue advertised SHOWER to SHOWER to be applied around or on the perineal area. For example, Kenvue advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

568. Kenvue, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

569. At all relevant times, Kenvue breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used

in the female perineal area, because the PRODUCTS, when used in this manner for which Kenvue advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

570.     At all relevant times, Kenvue had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

571.     At all relevant times, Kenvue willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

572.     At all relevant times, in reliance upon the express warranties made by Kenvue as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

573.     As a direct and proximate result of Kenvue's express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XVII – BREACH OF EXPRESS WARRANTIES
### (Against Janssen Pharmaceuticals, Inc.)

574.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

575.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities

of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

576.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

577.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

578.    Janssen, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. Janssen's express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

      a.    Janssen advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

      b.    Janssen advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, Janssen advertised that women should use SHOWER to

SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

579.    Janssen, through the advertisements as listed above, made express warranties to Plaintiffs and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

580.    At all relevant times, Janssen breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which Janssen advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

581.    At all relevant times, Janssen had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

582.    At all relevant times, Janssen willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiffs and the consuming public.

583.    At all relevant times, in reliance upon the express warranties made by Janssen as set forth above, Plaintiffs purchased and used the PRODUCTS in their perineal area, believing that the PRODUCTS were safe when used in this manner.

584.    As a direct and proximate result of Janssen's express warranties concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XVIII – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Johnson & Johnson)

585.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual plaintiffs' resident State.

586.     At the time Johnson & Johnson manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

587.     Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

588.     The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

589.     Plaintiffs reasonably relied on Johnson & Johnson's representations that the PRODUCTS were safe and free of defects.

590.     Johnson & Johnson's breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

591.     Johnson & Johnson's conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.  Johnson & Johnson made conscious decisions not to redesign, relabel, warn, or inform Plaintiffs or the unsuspecting consuming public.  Johnson & Johnson's outrageous conduct warrants an award of punitive damages.

592.     As a direct and proximate result of Johnson & Johnson's implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XIX – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

593.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual plaintiffs' resident State.

594.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

595.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

596.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

597.     At the time New JJCI manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

598.     Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

599.     The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

600.     Plaintiffs reasonably relied on New JJCI's representations that the PRODUCTS were safe and free of defects.

601.     New JJCI's breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

602.     New JJCI's conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.  New JJCI made conscious decisions not to redesign, relabel, warn, or inform Plaintiffs or the unsuspecting consuming public.  New JJCI's outrageous conduct warrants an award of punitive damages.

603.     As a direct and proximate result of New JJCI's implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XX – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against LTL Management LLC)

604.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual plaintiffs' resident State.

605.    Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

606.    At the time LTL manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

607.    Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

608.    The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

609.    Plaintiffs reasonably relied on LTL's representations that the PRODUCTS were safe and free of defects.

610.    LTL's breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

611.    LTL's conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.  LTL made conscious decisions not to redesign, relabel, warn, or inform Plaintiffs or the

unsuspecting consuming public.  LTL's outrageous conduct warrants an award of punitive damages.

612.     As a direct and proximate result of LTL's implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXI – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Kenvue Inc.)

613.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual plaintiffs' resident State.

614.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

615.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

616.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while

135

preserving a continuity of management, personnel, physical locations, assets, and general business operations.

617.    At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

618.    Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

619.    The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

620.    Plaintiffs reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and free of defects.

621.    The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

622.    The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn, or inform Plaintiffs or the unsuspecting consuming public. The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

623.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery,

including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXII – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Janssen Pharmaceuticals, Inc.)

624.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual plaintiffs' resident State.

625.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

626.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

627.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

628.     At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the

PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

629.    Members of the consuming public, including consumers such as Plaintiffs, were intended third-party beneficiaries of the warranty.

630.    The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

631.    Plaintiffs reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and free of defects.

632.    The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

633.    The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiffs and the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn, or inform Plaintiffs or the unsuspecting consuming public. The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

634.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXIII – BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE
### (Against Johnson & Johnson)

635.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

636.    Johnson & Johnson manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

637.    Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

638.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

639.    Plaintiffs reasonably relied on Johnson & Johnson's representations that the PRODUCTS were safe and effective for use by women in the perineal area.

640.    Johnson & Johnson's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

641.    Johnson & Johnson's conduct, as described above, was extreme and outrageous. Johnson & Johnson risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public. Johnson & Johnson made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public. Johnson & Johnson's outrageous conduct warrants an award of punitive damages.

642.     As a direct and proximate result of Johnson & Johnson's implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XXIV – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

643.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

644.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

645.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

646.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

647.    New JJCI manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

648.    Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

649.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

650.    Plaintiffs reasonably relied on New JJCI's representations that the PRODUCTS were safe and effective for use by women in the perineal area.

651.    New JJCI's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

652.    New JJCI's conduct, as described above, was extreme and outrageous. New JJCI risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  New JJCI made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public.  New JJCI's outrageous conduct warrants an award of punitive damages.

653.    As a direct and proximate result of New JJCI's implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXV – BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE
## (Against LTL Management LLC)

654.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

655.    Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

656.    LTL manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

657.    Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

658.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

659.    Plaintiffs reasonably relied on LTL's representations that the PRODUCTS were safe and effective for use by women in the perineal area.

660.    LTL's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

661.    LTL's conduct, as described above, was extreme and outrageous. LTL risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  LTL made conscious decisions not to redesign, relabel, warn, or inform

the unsuspecting consuming public.  LTL's outrageous conduct warrants an award of punitive damages.

662.     As a direct and proximate result of LTL's implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXVI – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (Against Kenvue Inc.)

663.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

664.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

665.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

666.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while

preserving a continuity of management, personnel, physical locations, assets, and general business operations.

667.    Kenvue manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

668.    Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

669.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

670.    Plaintiffs reasonably relied on Kenvue's representations that the PRODUCTS were safe and effective for use by women in the perineal area.

671.    Kenvue's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

672.    Kenvue's conduct, as described above, was extreme and outrageous. Kenvue risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public. Kenvue made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public. Kenvue's outrageous conduct warrants an award of punitive damages.

673.    As a direct and proximate result of Kenvue's implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXVII – BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE
## (Against Janssen Pharmaceuticals, Inc.)

674.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

675.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

676.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

677.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

678.     Janssen manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

679.     Members of the consuming public, including Plaintiffs, were the intended third-party beneficiaries of the warranty.

680.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

681.    Plaintiffs reasonably relied on Janssen's representations that the PRODUCTS were safe and effective for use by women in the perineal area.

682.    Janssen's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiffs' injuries.

683.    Janssen's conduct, as described above, was extreme and outrageous. Janssen risked the lives of the consumers and users of their products, including Plaintiffs, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  Janssen made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public.  Janssen's outrageous conduct warrants an award of punitive damages.

684.    As a direct and proximate result of Janssen's implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## <u>COUNT XXVIII – NEGLIGENCE</u><br><u>(Against Imerys Talc)</u>

685.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

686.    At all relevant times, Imerys Talc mined, refined, screened, tested, and sold talc to the Johnson & Johnson Defendants, which it knew that the Johnson & Johnson Defendants were then packaging and selling to consumers as the PRODUCTS, and that consumers of the PRODUCTS were using it to powder their perineal regions.

687.    At all relevant times, Imerys Talc had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, and sale of the PRODUCTS.

688.    At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when used in a woman's perineal regions, and it knew or should have known that the Johnson & Johnson Defendants did not warn its consumers of that danger.

689.    At all relevant times, Imerys Talc was negligent in supplying talc to the Johnson & Johnson Defendants, when it knew or should have known that the talc would be used in the PRODUCTS, without adequately taking steps to ensure that consumers of the PRODUCTS, including Plaintiffs, received material information that Imerys Talc possessed on carcinogenic properties of talc, including its risk of causing ovarian cancer.

690.    At all relevant times, Imerys Talc breached its duty of reasonable care to Plaintiffs in that it negligently designed, developed, marketed, labeled, manufactured, formulated, tested, monitored and/or sold talc to the Johnson & Johnson Defendants.

691.    As a direct and proximate result of Imerys Talc's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to

recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXIX – NEGLIGENCE
### (Against Johnson & Johnson)

692.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

693.     At all relevant times, Johnson & Johnson manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

694.     At all relevant times, Johnson & Johnson had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

695.     At all relevant times, Johnson & Johnson had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers, and adverse side effects of the PRODUCTS.

696.     At all relevant times, Johnson & Johnson knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

697.     Johnson & Johnson breached its duty to Plaintiffs and was otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

698.     Johnson & Johnson was further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

699.     As a direct and proximate result of Johnson & Johnson's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XXX – NEGLIGENCE
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

700.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

701.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

702.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

703.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same

customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

704.    At all relevant times, New JJCI manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

705.    At all relevant times, New JJCI had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

706.    At all relevant times, New JJCI had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers, and adverse side effects of the PRODUCTS.

707.    At all relevant times, New JJCI knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

708.    New JJCI breached its duty to Plaintiffs and was otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

709.    New JJCI was further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

710.     As a direct and proximate result of New JJCI's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXI – NEGLIGENCE
### (Against LTL Management LLC)

711.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

712.     Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

713.     At all relevant times, LTL manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

714.     At all relevant times, LTL had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

715.     At all relevant times, LTL had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers, and adverse side effects of the PRODUCTS.

716.     At all relevant times, LTL knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

717.     LTL breached its duty to Plaintiffs and was otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution

and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

718.    LTL was further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

719.    As a direct and proximate result of LTL's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXII – NEGLIGENCE
### (Against Kenvue Inc.)

720.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

721.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

722.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all

operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

723.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

724.    At all relevant times, Kenvue manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

725.    At all relevant times, Kenvue had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

726.    At all relevant times, Kenvue had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers, and adverse side effects of the PRODUCTS.

727.    At all relevant times, Kenvue knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

728.    Kenvue breached its duty to Plaintiffs and was otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

729.    Kenvue was further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks

153

associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

730.    As a direct and proximate result of Kenvue's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XXXIII – NEGLIGENCE
### (Against Janssen Pharmaceuticals, Inc.)

731.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

732.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

733.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

734.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while

preserving a continuity of management, personnel, physical locations, assets, and general business operations.

735.    At all relevant times, Janssen manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

736.    At all relevant times, Janssen had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

737.    At all relevant times, Janssen had a duty to act with reasonable care and to warn Plaintiffs and the consuming public of the risk, dangers, and adverse side effects of the PRODUCTS.

738.    At all relevant times, Janssen knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

739.    Janssen breached its duty to Plaintiffs and was otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of the PRODUCTS utilized by Plaintiffs, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

740.    Janssen was further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

741.    As a direct and proximate result of Janssen's negligence, Plaintiffs have suffered and will continue to suffer from injuries and damages for which they are entitled to recovery,

including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXIV – NEGLIGENCE
### (Against PCPC)

742.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

743.    At all relevant times, PCPC was a national trade association representing the personal care and cosmetics industry of which the Johnson & Johnson Defendants and Imerys Talc were active members.

744.    At all relevant times, upon information and belief, the purpose and intent of PCPC was to interact with and influence local, state, and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc-based body powders and the PRODUCTS.

745.    At all relevant times, PCPC had actual knowledge of the significant risk of ovarian cancer caused by application of talc, talc-based body powders and the PRODUCTS to the female perineal area.

746.    At all relevant times, PCPC voluntarily undertook a duty of care to Plaintiffs by self-regulating the cosmetics industry by promulgating federal, state, and local standards, norms and/or bylaws that govern, control and/or inform the manufacturing, design, labeling, marketing, distribution and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc.

747.     At all relevant times, PCPC undertook efforts to disseminate information about talc, talc-based body powder and the PRODUCTS to the consuming public, including Plaintiffs, that it knew or should have known was false and/or misleading and that would result in injury or damages to Plaintiffs.

748.     At all relevant times, PCPC had a duty to act with reasonable care in marketing and disseminating information about talc, talc-based body powder and the PRODUCTS to consumers, including Plaintiffs.

749.     At all relevant times, PCPC had the means and authority to control the federal, state, and local safety standards of the Johnson & Johnson Defendants and Imerys Talc in the manufacturing, design, labeling, marketing, distribution and/or branding of talc, talc-based body powder and the PRODUCTS.

750.     At all relevant times, PCPC had the means and authority to control the information about talc and the PRODUCTS it was disseminating to the consuming public regarding the manufacturing, design, labeling, marketing, distribution and/or branding of talc, talc-based body powders and the PRODUCTS.

751.     PCPC breached its duty of care to Plaintiffs and the consuming public by negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied with and adhered to the PCPC standards, norms and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution and/or branding of talc, talc-based body powders and the PRODUCTS, and subsequently allowing the talc, talc-based body powders and PRODUCTS to be introduced into the federal, state and local streams of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

752.     PCPC breached its duty of care to Plaintiffs and the consuming public by negligently disseminating information to the consuming public that it knew or should have known

was false and/or misleading, and subsequently allowing the talc, talc-based body powders and PRODUCTS to be introduced into the federal, state, and local streams of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

753.    PCPC engaged in activities for the unlawful purpose of promoting its private and commercial interests, the interests of its member companies and talc, specifically, talc-based body powder and the PRODUCTS.  PCPC's coordinated efforts, specifically designed to influence the regulation and marketing of talc, talc-based body powder and the PRODUCTS on a local, state, and national level, facilitated conduct which had no legitimate purpose.  PCPC's conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

754.    As a direct and proximate result of PCPC's negligence, the Johnson & Johnson Defendants and Imerys Talc manufactured, designed, labeled, marketed, distributed and branded talc, talc-based body powders and the PRODUCTS on a federal, state, and local level in a way that foreseeably caused a significant risk of ovarian cancer when the talc, talc-based body powders and/or the PRODUCTS were applied to the female perineal area.

755.    As a direct and proximate result of PCPC's negligence, the marketplace into which the Johnson & Johnson Defendants and Imerys Talc introduced their talc, talc-based body powders and the PRODUCTS, was void of fair and balanced information regarding the significant risk of ovarian cancer when the talc, talc-based body powders and/or the PRODUCTS were applied to the female perineal area.

756.    As a further direct and proximate result of PCPC's negligence, Plaintiffs suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXV – NEGLIGENT MISREPRESENTATION
### (Against Johnson & Johnson)

757.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

758.    At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

759.    At all relevant times, Johnson & Johnson had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

760.    Through their actions and omissions in advertising, promoting, labeling and otherwise, Johnson & Johnson made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety, and effectiveness of the PRODUCTS.

761.    At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

    a.    Johnson & Johnson labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

    b.   Johnson & Johnson advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

    c.   Johnson & Johnson, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

    d.   Johnson & Johnson misrepresented to consumers, including Plaintiffs, that the PRODUCTS did not contain asbestos, heavy metals, or fibrous talc.

    e.   Despite actual knowledge of the health risks of the PRODUCTS, Johnson & Johnson failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

    f.   Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, Johnson & Johnson failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

762.   At all relevant times, Johnson & Johnson failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

763.    At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.   In reasonable reliance upon Johnson & Johnson' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas.  If Johnson & Johnson had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

764.    Plaintiffs' reliance upon Johnson & Johnson's misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because Johnson & Johnson failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, Johnson & Johnson's corporate officers, directors and/or managing agents knew of and ratified the acts of Johnson & Johnson, as alleged herein.

765.    As a direct and proximate result of Johnson & Johnson's negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXVI – NEGLIGENT MISREPRESENTATION
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

766.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

767.    New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

768.    New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

769.    New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

770.    At all relevant times, New JJCI was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

771.    At all relevant times, New JJCI had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

772.    Through their actions and omissions in advertising, promoting, labeling and otherwise, New JJCI made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety, and effectiveness of the PRODUCTS.

773.    At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

a.  New JJCI labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

b.  New JJCI advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

c.  New JJCI, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

d.  New JJCI misrepresented to consumers, including Plaintiffs, that the PRODUCTS did not contain asbestos, heavy metals, or fibrous talc.

e.  Despite actual knowledge of the health risks of the PRODUCTS, New JJCI failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

f.  Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, New JJCI failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

774.    At all relevant times, New JJCI failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

775.     At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon New JJCI' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas.  If New JJCI had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

776.    Plaintiffs' reliance upon New JJCI's misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions

were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because New JJCI failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, New JJCI's corporate officers, directors and/or managing agents knew of and ratified the acts of New JJCI, as alleged herein.

777.    As a direct and proximate result of New JJCI's negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XXXVII – NEGLIGENT MISREPRESENTATION
#### (Against LTL Management LLC)

778.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

779.    Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

780.    At all relevant times, LTL was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

781.    At all relevant times, LTL had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

782.    Through their actions and omissions in advertising, promoting, labeling and otherwise, LTL made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety, and effectiveness of the PRODUCTS.

783.    At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

    a.  LTL labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

    b.  LTL advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

    c.  LTL, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

    d.  LTL misrepresented to consumers, including Plaintiffs, that the PRODUCTS did not contain asbestos, heavy metals, or fibrous talc.

     e.   Despite actual knowledge of the health risks of the PRODUCTS, LTL failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

     f.   Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, LTL failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

784.    At all relevant times, LTL failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

785.    At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon LTL' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas.  If LTL had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

786.    Plaintiffs' reliance upon LTL's misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made

by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because LTL failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, LTL's corporate officers, directors and/or managing agents knew of and ratified the acts of LTL, as alleged herein.

787.    As a direct and proximate result of LTL's negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXVIII – NEGLIGENT MISREPRESENTATION
### (Against Kenvue Inc.)

788.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

789.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

790.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all

operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

791.   Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.   Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

792.   At all relevant times, Kenvue was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

793.   At all relevant times, Kenvue had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

794.   Through their actions and omissions in advertising, promoting, labeling and otherwise, Kenvue made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety, and effectiveness of the PRODUCTS.

795.   At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

a.   Kenvue labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

b. Kenvue advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

c. Kenvue, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

d. Kenvue misrepresented to consumers, including Plaintiffs, that the PRODUCTS did not contain asbestos, heavy metals, or fibrous talc.

e. Despite actual knowledge of the health risks of the PRODUCTS, Kenvue failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

f. Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, Kenvue failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

796.    At all relevant times, Kenvue failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

797.     At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon Kenvue' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas.  If Kenvue had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

798.     Plaintiffs' reliance upon Kenvue's misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because Kenvue failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, Kenvue's corporate officers, directors and/or managing agents knew of and ratified the acts of Kenvue, as alleged herein.

799.     As a direct and proximate result of Kenvue's negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XXXIX – NEGLIGENT MISREPRESENTATION
### (Against Janssen Pharmaceuticals, Inc.)

800.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

801.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

802.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

803.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

804.     At all relevant times, Janssen was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

805.     At all relevant times, Janssen had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

806.     Through their actions and omissions in advertising, promoting, labeling and otherwise, Janssen made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiffs concerning the character, safety, and effectiveness of the PRODUCTS.

807.     At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

a.    Janssen labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

b.    Janssen advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

c.    Janssen, through the advertisements described above, among others, misrepresented to consumers, including Plaintiffs, that the PRODUCTS were safe for use all over the body, including the female perineal area.

d.    Janssen misrepresented to consumers, including Plaintiffs, that the PRODUCTS did not contain asbestos, heavy metals, or fibrous talc.

e.   Despite actual knowledge of the health risks of the PRODUCTS, Janssen failed to disclose to the consumers and Plaintiffs, through adequate warnings, representations, labeling or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

f.   Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, Janssen failed to disclose to consumers, including Plaintiffs, through adequate warnings, representations, labeling or otherwise, that material fact.

808.   At all relevant times, Janssen failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiffs and/or concealed relevant facts that were known to them.

809.   At all relevant times, Plaintiffs were not aware of the falsity of the foregoing misrepresentations, nor were they aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon Janssen' misrepresentations and/or omissions, Plaintiffs were induced to and did purchase the PRODUCTS and did use the PRODUCTS on their perineal areas.  If Janssen had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiffs would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

810.   Plaintiffs' reliance upon Janssen's misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made

by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiffs were not in a position to know these material facts, and because Janssen failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiffs to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, Janssen's corporate officers, directors and/or managing agents knew of and ratified the acts of Janssen, as alleged herein.

811.     As a direct and proximate result of Janssen's negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XL – FRAUD
### (Against Johnson & Johnson)

812.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

813.     At all relevant times, Johnson & Johnson intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

814.     At all relevant times, Johnson & Johnson misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

815.   At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by Johnson & Johnson include, but are not limited to the following:

    a.  Johnson & Johnson falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

    b.  Johnson & Johnson falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

    c.  Johnson & Johnson, through the advertisements described above, knowingly misrepresented to Plaintiffs and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

    d.  Johnson & Johnson intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

    e.  Johnson & Johnson intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

    f.  Johnson & Johnson intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in

the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g. Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, Johnson & Johnson falsely marketed, advertised, labeled, and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

816. At all relevant times, Johnson & Johnson actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

817. At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

818. At all relevant times, Plaintiffs relied on Johnson & Johnson's misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

819. As a direct and proximate result of Johnson & Johnson's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLI – FRAUD
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

820.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

821.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

822.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

823.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

824.     At all relevant times, New JJCI intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

825.    At all relevant times, New JJCI misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

826.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by New JJCI include, but are not limited to the following:

a.  New JJCI falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

b.  New JJCI falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.  New JJCI, through the advertisements described above, knowingly misrepresented to Plaintiffs and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

d.  New JJCI intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.  New JJCI intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

f. New JJCI intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g. Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, New JJCI falsely marketed, advertised, labeled, and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

827. At all relevant times, New JJCI actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

828. At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

829. At all relevant times, Plaintiffs relied on New JJCI's misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

830. As a direct and proximate result of New JJCI's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## **COUNT XLII – FRAUD**
### **(Against LTL Management LLC)**

831.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

832.     Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

833.     At all relevant times, LTL intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

834.     At all relevant times, LTL misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

835.     At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by LTL include, but are not limited to the following:

    a.  LTL falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

b. LTL falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c. LTL, through the advertisements described above, knowingly misrepresented to Plaintiffs and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

d. LTL intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e. LTL intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

f. LTL intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g. Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, LTL falsely marketed, advertised, labeled, and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

836. At all relevant times, LTL actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

837.    At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

838.    At all relevant times, Plaintiffs relied on LTL's misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

839.    As a direct and proximate result of LTL's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLIII – FRAUD
### (Against Kenvue Inc.)

840.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

841.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

842.    Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all

operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

843.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

844.     At all relevant times, Kenvue intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

845.     At all relevant times, Kenvue misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

846.     At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by Kenvue include, but are not limited to the following:

a.   Kenvue falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

b.   Kenvue falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas

to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.   Kenvue, through the advertisements described above, knowingly misrepresented to Plaintiffs and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

d.   Kenvue intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.   Kenvue intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

f.   Kenvue intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g.   Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, Kenvue falsely marketed, advertised, labeled, and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

847.   At all relevant times, Kenvue actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

848.   At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if

they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

849.    At all relevant times, Plaintiffs relied on Kenvue's misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

850.    As a direct and proximate result of Kenvue's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLIV – FRAUD
### (Against Janssen Pharmaceuticals, Inc.)

851.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

852.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

853.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

854.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

855.     At all relevant times, Janssen intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiffs.

856.     At all relevant times, Janssen misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiffs, with knowledge of the falsity of their misrepresentations.

857.     At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by Janssen include, but are not limited to the following:

   a.  Janssen falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

   b.  Janssen falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.  Janssen, through the advertisements described above, knowingly misrepresented to Plaintiffs and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

d.  Janssen intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.  Janssen intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

f.  Janssen intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g.  Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, Janssen falsely marketed, advertised, labeled, and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

858.  At all relevant times, Janssen actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use the PRODUCTS in the female perineal area.

859.  At all relevant times, the consuming public, including Plaintiffs, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

860.     At all relevant times, Plaintiffs relied on Janssen's misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using the PRODUCTS on their perineal areas, and their reliance was reasonable and justified.

861.     As a direct and proximate result of Janssen's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XLV – FRAUD
### (Against PCPC)

862.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

863.     At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users of talc-based body powders and the PRODUCTS, including Plaintiffs.

864.     At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed materials facts to local, state, and federal regulators in order to unduly influence the regulation and marketing of talc, talc-based body powders and the PRODUCTS.  The actions of PCPC on a local, state, and federal level impacted what material facts were or could be disclosed to consumers and users of talc-based body powders and the PRODUCTS, including Plaintiffs.

865. At all relevant times, PCPC, on a local, state, and federal level, fraudulently misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiffs, with knowledge of the falsity of their misrepresentations.

866. At all relevant times, PCPC fraudulently misrepresented and/or concealed materials facts to local, state, and federal regulators in order to unduly influence the regulation and marketing of talc, talc-based body powders and the PRODUCTS.  The fraudulent actions of PCPC on a local, state, and federal level impacted what material facts were or could be disclosed to consumers and users of talc-based body powders and the PRODUCTS, including Plaintiffs.

867. At all relevant times, upon information and belief, PCPC's conduct giving rise to fraud includes, but is not limited, to the following:

a. PCPC formed the TIPTF, with the purpose of self-regulating the talc industry and to pool financial resources in an effort to prevent regulation of talc, including talc-based body powders and the PRODUCTS.

b. PCPC, through the TIPTF, hired and funded scientists to perform research regarding the safety of talc.  The TIPTF then edited the scientific reports in an effort to skew the data so that it demonstrated safety of talc and talc-based body powder and suppressed data demonstrating these dangers.  The TIPTF then released and disseminated this biased and intentionally misleading data to local, state, and federal governmental agencies, with the intent that the biased and intentionally misleading data would influence material facts that were or could be disclosed to consumers of talc, talc-based body powders and the PRODUCTS, including Plaintiffs.

c.  PCPC, through the TIPTF, knowingly released false information about the safety of talc-based body powder to the consuming public with the intent to induce consumers, including the Plaintiffs, to purchase talc-based body powders.

d.  PCPC extensively lobbied and used political and economic influence on local, state, and federal governmental bodies in order to prevent regulation of talc-based body powder, including the PRODUCTS.  These efforts were based knowingly on false and misleading information about the safety of talc and talc-based body powder.

e.  PCPC caused to be released, published, and disseminated, medical and scientific data, literature and reports containing information and statements regarding the risks of ovarian cancer which PCPC knew were incorrect, incomplete, and misleading.

f.  PCPC's action impacted the perceptions about the safety of talc and talc-based body powder in the public domain in a manner that falsely made it appear as though the PRODUCTS were safe and that their use did not pose a risk for women of contracting cancer of the reproductive system. PCPC's actions contaminated and falsely influenced the risk /benefit information available in the public domain to the detriment of consumers, including the Plaintiffs.

868.  At all relevant times, PCPC actively, knowingly, and intentionally concealed and misrepresented these material facts to consumers, including Plaintiffs, with the intent to deceive the public and Plaintiffs, and with the intent that consumers would purchase and use talc-based body powder and the PRODUCTS in the female perineal area.

869.  At all relevant times, PCPC actively, knowingly, and intentionally misrepresented these material facts to local, state, and federal governmental agencies with the intent to deceive

these agencies and influence material facts conveyed to consumers, including Plaintiffs, with the intent that consumers would purchase and use talc-based body powder and the PRODUCTS in the female genital area.

870.     The consuming public, including Plaintiffs, would not have purchased talc-based body powders and/or the PRODUCTS and/or applied talc-based body powders and/or the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in that manner.

871.     At all relevant times, Plaintiffs relied on PCPC's self-regulation of and misrepresentations concerning the safety of talc-based body powders and the PRODUCTS and PCPC's fraudulent conduct when purchasing talc-based body powders and/or the PRODUCTS and using them in their perineal areas, and their reliance was reasonable and justified.

872.     PCPC engaged in, coordinated, or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

873.     As a direct and proximate result of PCPC's fraudulent conduct concerning talc-based body powder and the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLVI – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against Johnson & Johnson)

874.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

875.    Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of Johnson & Johnson's actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

876.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

     a.  Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

     b.  Advertising goods or services with the intent not to sell them as advertised;

     c.  Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

     d.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

877.    Johnson & Johnson violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

878.    Johnson & Johnson uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety, efficacy, and usefulness.  Johnson & Johnson made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein.  Johnson & Johnson's conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Johnson & Johnson

misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy, and advantages of the PRODUCTS.

879.     As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which Johnson & Johnson are liable.

880.     As a direct and proximate result of Johnson & Johnson's violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLVII – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

881.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

882.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

883.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

194

884.     New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

885.     Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of New JJCI's actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

886.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

e.     Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

f.     Advertising goods or services with the intent not to sell them as advertised;

g.     Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

h.     Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

887.     New JJCI violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

888.     New JJCI uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety,

efficacy, and usefulness. New JJCI made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein. New JJCI's conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because New JJCI misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy, and advantages of the PRODUCTS.

889.    As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which New JJCI are liable.

890.    As a direct and proximate result of New JJCI's violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT XLVIII – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against LTL Management LLC)

891.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

892.    Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

893.    Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of LTL's actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

894.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

i.     Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

j.     Advertising goods or services with the intent not to sell them as advertised;

k.     Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

l.     Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

895.     LTL violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

896.     LTL uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety, efficacy, and usefulness.  LTL made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein. LTL's conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because LTL misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy, and advantages of the PRODUCTS.

897.     As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which LTL are liable.

898.     As a direct and proximate result of LTL's violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from

the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT XLIX – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against Kenvue Inc.)

899.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

900.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

901.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

902.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

903.     Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of Kenvue's actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

904.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

m.  Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

n.  Advertising goods or services with the intent not to sell them as advertised;

o.  Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

p.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

905.     Kenvue violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

906.     Kenvue uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety, efficacy, and usefulness.  Kenvue made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein.  Kenvue's conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Kenvue misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy, and advantages of the PRODUCTS.

907.    As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which Kenvue are liable.

908.    As a direct and proximate result of Kenvue's violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT L – VIOLATION OF CONSUMER PROTECTION LAWS
### (Against Janssen Pharmaceuticals, Inc.)

909.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

910.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

911.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

912.    Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while

preserving a continuity of management, personnel, physical locations, assets, and general business operations.

913. Plaintiffs purchased and used the PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of Janssen's actions in violation of the consumer protection laws applicable to the individual Plaintiffs' resident State.

914. Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

    q. Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

    r. Advertising goods or services with the intent not to sell them as advertised;

    s. Over-promotion of the PRODUCTS, including but not limited to over-promotion of their safety and efficacy; and

    t. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

915. Janssen violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the PRODUCTS.

916. Janssen uniformly communicated the purported benefits of the PRODUCTS while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of the PRODUCTS, especially use in the perineal area, and of the true state of the PRODUCTS' safety, efficacy, and usefulness. Janssen made these representations to consumers, including Plaintiffs, in the marketing and advertising described herein. Janssen's conduct in connection with the PRODUCTS was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Janssen misleadingly, falsely and/or deceptively misrepresented and

omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy, and advantages of the PRODUCTS.

917.     As a result of these violations of consumer protection laws, Plaintiffs have incurred damage and other expenses, for which Janssen are liable.

As a direct and proximate result of Janssen's violation of consumer protection laws concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT LI – FRAUDULENT CONCEALMENT
### (Against Imerys Talc)

918.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

919.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which plaintiffs actually used the PRODUCTS, Imerys Talc fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch-based products for the same purposes.  Furthermore, Imerys Talc fraudulently concealed the safety information about the use of talc, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of its talc.

920.     Imerys Talc intentionally concealed safety issues with talc generally in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

921.     At the time Imerys Talc concealed the fact that the PRODUCTS were not safe as designed and marketed by the Johnson & Johnson Defendants, Imerys Talc was under a duty to communicate this information to the general public in such a manner that the general public would appreciate the risks associated with using the PRODUCTS, generally.

922.     Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

923.     As a direct and proximate result of Imerys Talc's malicious and intentional concealment of material and information, Defendants caused or significantly contributed to Plaintiffs' injuries.

924.     Imerys Talc furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

925.     Imerys Talc's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Imerys Talc must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

926.     As a direct and proximate result of Imerys Talc's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT LII – FRAUDULENT CONCEALMENT
### (Against Johnson & Johnson)

927.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form

Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

928.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, Johnson & Johnson fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes.  Furthermore, Johnson & Johnson fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

929.     Johnson & Johnson intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

930.     At the time Johnson & Johnson concealed the fact that the PRODUCTS were not safe as designed and marketed, Johnson & Johnson were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

931.     Plaintiffs relied upon the Johnson & Johnson's false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

932.     As a direct and proximate result of Johnson & Johnson's malicious and intentional concealment of material and information, Johnson & Johnson caused or significantly contributed to Plaintiffs' injuries.

933.     Johnson & Johnson furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

934.     Johnson & Johnson's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

935.     Johnson & Johnson's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Johnson & Johnson must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

936.     As a direct and proximate result of Johnson & Johnson's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT LIII – FRAUDULENT CONCEALMENT
### (Against Johnson & Johnson Holdco (NA) Inc. (New JJCI))

937.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

938.     New JJCI is liable individually and as a successor in interest to Old JJCI because the transfer of assets from Old JJCI to New JJCI was designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

939.     New JJCI is liable individually and as a successor in interest to Old JJCI because the intent of the transaction was for New JJCI to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

205

940.    New JJCI is liable individually and as a successor in interest to Old JJCI because New JJCI continues to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transaction was done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.  New JJCI is a wholly owned subsidiary of J&J just as was Old JJCI prior to the transaction and the new corporate entity maintains the same or similar name of the old corporate entity.

941.    Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, New JJCI fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes.  Furthermore, New JJCI fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

942.    New JJCI intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

943.    At the time New JJCI concealed the fact that the PRODUCTS were not safe as designed and marketed, New JJCI were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

944.    Plaintiffs relied upon the New JJCI's false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

945.     As a direct and proximate result of New JJCI's malicious and intentional concealment of material and information, New JJCI caused or significantly contributed to Plaintiffs' injuries.

946.     New JJCI furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

947.     New JJCI's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

948.     New JJCI's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which New JJCI must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

949.     As a direct and proximate result of New JJCI's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT LIV – FRAUDULENT CONCEALMENT
### (Against LTL Management LLC)

950.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

951.     Old JJCI's legacy talc-related liabilities were transferred to LTL Management LLC.

952.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, LTL fraudulently suppressed material information regarding the

safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch based cornstarch-based products for the same purposes. Furthermore, LTL fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

953.    LTL intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

954.    At the time LTL concealed the fact that the PRODUCTS were not safe as designed and marketed, LTL were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

955.    Plaintiffs relied upon LTL's false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

956.    As a direct and proximate result of LTL's malicious and intentional concealment of material and information, LTL caused or significantly contributed to Plaintiffs' injuries.

957.    LTL furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

958.    LTL's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

959.    LTL's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which LTL must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

960.     As a direct and proximate result of LTL's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT LV – FRAUDULENT CONCEALMENT
### (Against Kenvue Inc.)

961.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

962.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Kenvue were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Kenvue, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

963.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Kenvue to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

964.     Kenvue is liable individually and as a successor in interest to New JJCI and Old JJCI because Kenvue will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

965.     Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, Kenvue fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes.   Furthermore, Kenvue fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

966.     Kenvue intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

967.     At the time Kenvue concealed the fact that the PRODUCTS were not safe as designed and marketed, Kenvue were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

968.     Plaintiffs relied upon Kenvue's false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

969.     As a direct and proximate result of Kenvue's malicious and intentional concealment of material and information, Kenvue caused or significantly contributed to Plaintiffs' injuries.

970.     Kenvue furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

971.     Kenvue's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

972.     Kenvue's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Kenvue must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

973.     As a direct and proximate result of Kenvue's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT LVI – FRAUDULENT CONCEALMENT
### (Against Janssen Pharmaceuticals, Inc.)

974.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

975.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to Janssen were designed with the improper purpose of escaping responsibility for such debts and liabilities of Old JJCI.  In transferring assets from Old JJCI to New JJCI and then from New JJCI to Janssen, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

976.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for Janssen to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

977.     Janssen is liable individually and as a successor in interest to New JJCI and Old JJCI because Janssen will continue to manufacture the same product lines and sell the same

products to the same customers as did Old JJCI.  Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations.

978.    Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, Janssen fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes.  Furthermore, Janssen fraudulently concealed the safety information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this Second Amended Master Long Form Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

979.    Janssen intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

980.    At the time Janssen concealed the fact that the PRODUCTS were not safe as designed and marketed, Janssen were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

981.    Plaintiffs relied upon the Janssen's false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

982.    As a direct and proximate result of Janssen's malicious and intentional concealment of material and information, Janssen caused or significantly contributed to Plaintiffs' injuries.

983.    Janssen furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

984.    Janssen's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

985.    Janssen's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Janssen must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

986.    As a direct and proximate result of Janssen's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

### COUNT LVII – FRAUDULENT CONCEALMENT
### (Against PCPC)

987.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

988.    Prior to Plaintiffs' use of the PRODUCTS and during the period in which Plaintiffs actually used the PRODUCTS, PCPC fraudulently suppressed material information regarding the safety and efficacy of talc-based body powders and the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch-based products for the same purposes.  Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and talc-based body powder on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment

described throughout this Second Amended Master Long Form Complaint was intentional so as to maintain the sales volume of talc, talc-based body powders and the PRODUCTS.

989.    PCPC fraudulently suppressed material information from the consuming public, local, state and federal government agencies regarding the safety and efficacy of talc-based body powders and the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch-based products for the same purposes. Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and the application of talc-based body powder to the female genital area, specifically.

990.    PCPC intentionally concealed safety issues with talc-based body powders, generally, in order to induce consumers, including plaintiffs, to purchase the PRODUCTS.

991.    At the time PCPC concealed the fact that talc-based body powders and the PRODUCTS were not safe as designed and marketed by the Johnson & Johnson Defendants, PCPC was under a duty to communicate this information to local, state, and federal agencies, as well as the general public, in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

992.    Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of talc-based body powders and the PRODUCTS when used in the female genital area.

993.    PCPC engaged in, coordinated, or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

994.    As a direct and proximate result of PCPC's malicious and intentional concealment of material and information, PCPC caused or significantly contributed to Plaintiffs' injuries.

995.     PCPC furthered this fraudulent concealment through a continued and systematic failure to disclose information to local, state, and federal government agencies, Plaintiffs and the public.

996.     PCPC's acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

997.     PCPC's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which PCPC must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

998.     As a direct and proximate result of PCPC's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

## COUNT LVIII – CIVIL CONSPIRACY
### (Against All Defendants)

999.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as if set forth fully herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the laws of the individual Plaintiffs' resident State.

1000.   At all relevant times, the Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, acted in concert, aided and abetted, and/or conspired to cause Plaintiffs' injuries by exposing Plaintiffs to the PRODUCTS, which are harmful and dangerous.

1001.   Further, at all relevant times, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, and/or conspired to defraud Plaintiffs and

consumers of the PRODUCTS regarding the true nature of the PRODUCTS and their potential to cause ovarian cancer when used in a reasonably foreseeable manner.

1002.   At all relevant times, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, and/or conspired to defraud Plaintiffs and consumers of the PRODUCTS with the purpose of maintaining the popularity and reputation of the PRODUCTS and, therefore, maintaining high sales of the PRODUCTS, at the expense of consumer safety.

1003.   At all relevant times, pursuant to and in furtherance of said conspiracies, the Defendants performed the following overt and unlawful acts:

    a.  For many decades, upon information and belief, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, talc-based body powder and the PRODUCTS are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly;

    b.  Upon information and belief, despite the medical and scientific data, literature and test reports possessed by and available to the Defendants, Defendants individually, jointly and in conspiracy with each other, fraudulently, willfully and maliciously:

      i.  Withheld, concealed, and suppressed said medical information regarding the increased risk of ovarian cancer from consumers, including Plaintiffs;

      ii.  Withheld, concealed and suppressed information regarding the presence of fibrous talc, asbestos, heavy metals, and fragrance chemicals in the PRODUCTS;

      iii.  Through the TIPTF, Defendants instituted a "defense strategy" to defend talc-based body powder at all costs. Admittedly, the Defendants, through

the TIPTF, used their influence over the NTP Subcommittee, and the threat

of litigation against the NTP, to prevent the NTP from classifying talc as a

carcinogen on its 10th RoC;

iv.   Defendants, through the TIPTF, used their influence over local, state and

federal agencies to control material facts disclosed to consumers, including

Plaintiffs; and

v.   Caused to be released, published, and disseminated medical and scientific

data, literature, and test reports containing information and statements

regarding the risks of ovarian cancer, which Defendants knew were

incorrect, incomplete and misleading.

c.   Upon information and belief, by these false and fraudulent representations,

omissions and concealments, Defendants intended to induce consumers, including

Plaintiffs, to rely upon said false and fraudulent representations, omissions, and

concealments, and to continue to expose themselves to the dangers inherent in the

use of talc-based body powders and the PRODUCTS.

1004.   Plaintiffs reasonably relied upon the aforementioned fraudulent representations,

omissions and concealments made by the Defendants regarding the nature of talc-based body

powder and the PRODUCTS.

1005.   PCPC engaged in, coordinated, or facilitated conduct with no legitimate purpose,

and used various improper means to achieve unlawful ends, such that its conduct constituted a

sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar

immunities.

1006.   As a direct and proximate result of Defendants' overt unlawful acts regarding the

nature of talc-based baby powder and the PRODUCTS which were made pursuant to and in

furtherance of a common scheme, and Plaintiffs' reliance thereon, Plaintiffs suffered and continue to suffer from the injuries and damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorney fees.

### COUNT LIX – LOSS OF CONSORTIUM
### (Against All Defendants)

1007.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles, including the law of the Plaintiffs' resident State.

1008.   At all relevant times hereto, Plaintiffs had spouses (hereafter referred to as "Spouse Plaintiffs") and/or family members (hereafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of the PRODUCTS and Plaintiffs' injuries.

1009.   For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment, monitoring, medications and other expenditures, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

1010.   For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

1011.   For all Spouse Plaintiffs, Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

1012.   Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

1013.   As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs, Family Member Plaintiffs and/or intimate partners of the aforesaid Plaintiffs, have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Spouse Plaintiffs, Family Member Plaintiffs and intimate partners jointly and severally for all general, special and equitable relief to which Spouse Plaintiffs, Family Member Plaintiffs and intimate partners are entitled by law.

<u>**COUNT LX – PUNITIVE DAMAGES**</u>
<u>**(Against All Defendants)**</u>

1014.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1015.   Defendants sold the PRODUCTS to Plaintiffs and other consumers throughout the United States without doing adequate testing to ensure that the PRODUCTS were reasonably safe for their intended use.

1016.   Defendants sold the PRODUCTS to Plaintiffs and other consumers throughout the United States in spite of their knowledge that the PRODUCTS cause the problems heretofore set forth in this Second Amended Master Long Form Complaint, thereby causing the severe and debilitating injuries suffered by the Plaintiffs.

1017.   At all times relevant hereto, Defendants knew or should have known that the PRODUCTS were inherently dangerous with respect to the risk of ovarian cancer, loss of life's

enjoyment, an effort to cure the conditions proximately related to the use of the PRODUCTS, as well as other severe and personal injuries which are permanent and lasting in nature.

1018.   At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the PRODUCTS, including but not limited to information regarding the increased risk of developing ovarian cancer when the PRODUCTS are used in the perineal area.

1019.   Defendants' misrepresentations included knowingly withholding material information from the consumers, including Plaintiffs, concerning the safety and efficacy of the PRODUCTS.

1020.   At all times material hereto, Defendants knew and intentionally and/or recklessly disregarded the fact that the PRODUCTS cause debilitating and potentially lethal side effects with greater frequency than safer alternative products.

1021.   At all times material hereto, Defendants knew and intentionally and/or recklessly disregarded the fact that the PRODUCTS cause debilitating and potentially lethal side effects with greater frequency than safer alternative products and recklessly failed to advise the public of the same.

1022.   At all times material hereto, Defendants intentionally misstated and misrepresented data, and continue to misrepresent data, so as to minimize the true and accurate risk of injuries and complications caused by the PRODUCTS.

1023.   Notwithstanding the foregoing, Defendants continue to aggressively market the PRODUCTS to consumers, without disclosing the true risk of side effects.

1024.   Defendants knew that the PRODUCTS were defective and of an unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute and sell the PRODUCTS so as to maximize sales and profits at the expense of the health and safety of the

Public, including Plaintiffs, in conscious and/or reckless disregard of the foreseeable harm caused by the PRODUCTS.

1025.   Defendants continue to intentionally conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiffs, the serious side effects of the PRODUCTS in order to ensure continued and increased sales.

1026.   Defendants' intentional, reckless and/or grossly negligent failure to disclose information deprived Plaintiffs of necessary information to enable them to weigh the true risks of using the PRODUCTS against their benefits.

1027.   As a direct and proximate result of the foregoing acts and omissions, Plaintiffs have required and will require health care and services, and have incurred medical, health care, incidental and related expenses. Plaintiffs are informed and believe and further allege that Plaintiffs will in the future be required to obtain further medical care and/or hospital care and medical services.

1028.   Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant to Common Law principles and the statutory provisions of the Plaintiffs' respective states.

1029.   Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

### COUNT LXI – WRONGFUL DEATH
### (Against All Defendants)

1030.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master

Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1031.   Plaintiffs Decedents' spouses, beneficiaries and/or lawful representatives of Decedents' Estates bring this claim on behalf of themselves and as the Decedents' lawful beneficiaries.

1032.   As a direct and proximate result of the conduct of the Defendants and the defective nature of the PRODUCTS as outlined above, Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

1033.   As a direct and proximate cause of the conduct of Defendants, Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedents' deaths.  Plaintiffs, Administrators of Decedents' estates, bring this claim on behalf of Decedents' lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries pursuant to any and all relevant statutes.

1034.   As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, damages for wrongful death, together with interest, costs of suit, attorneys' fees, punitive damages, and such further relief as the Court deems equitable and just.

## COUNT LXII – SURVIVAL ACTION
### (Against All Defendants)

1035.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master

Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1036.    As a direct and proximate result of the conduct of Defendants, Decedents, prior to their deaths, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by their estates. As a direct and proximate cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earnings and earning capacity. Plaintiffs' spouses, as Administrators of the Estates of Decedents, bring this claim on behalf of the estates for damages under any and all applicable statute or common law.

1037.    As a direct and proximate result of the conduct of Defendants, Decedents and their spouses, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder. This claim is brought on behalf of the Estates of the Decedents pursuant to any and all applicable statutes or common law.

1038.    As a direct and proximate result of the conduct of Defendants, and including the observances of the suffering of the Decedents, until the date of their deaths, Plaintiffs suffered permanent and ongoing psychological damage.

1039.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiffs' spouses, as Administrators of the Estates of the Decedents, bring the claims on behalf of the Estates for damages any and all applicable statutes or common law and in their own right.

1040. Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiffs and the public.

1041. As a result of the Defendants' conduct, the Plaintiffs suffered the injuries and damages specified herein.

1042. Accordingly, the Plaintiffs seek and are entitled to compensatory and punitive damages in an amount to be determined at trial.

1043. As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, damages for wrongful death, together with interest, costs of suit, attorneys' fees, punitive damages, and such further relief as the Court deems equitable and just.

**COUNT LXIII – SPOLIATION**
**(Against Johnson & Johnson, Johnson & Johnson Holdco (NA), Inc. (New JJCI), LTL Management LLC, Kenvue, Inc., Janssen Pharmaceuticals, Inc. and PCPC)**
**(Alaska, Connecticut, New Mexico, Ohio, & West Virginia Plaintiffs)**

1044. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to the laws of Alaska, Connecticut, New Mexico, Ohio, and West Virginia.

1045. At least since 1971, Defendants (independently or as successors in interest) had a duty to preserve relevant evidence even though litigation had not commenced because Defendants knew litigation related to the PRODUCTS was probable at some point in the future.

1046. As described above, Defendants intentionally destroyed relevant evidence despite knowledge of the potential for future litigation and the need to preserve the evidence.

1047.    Defendants intentionally destroyed the code keys corresponding to the tables with asbestos test results from "round robin" testing conducted in 1977.

1048.    Defendants J&J, New JJCI, LTL, Janssen, and Kenvue destroyed documents created or produced in prior litigation related to talc.

1049.    Defendants J&J, New JJCI, LTL, Janssen, and Kenvue (or outside laboratories contracted by J&J) failed to preserve any talc samples, including TEM grids, it tested for asbestos content from the 1950s to the 2000s.

1050.    Defendants J&J, New JJCI, LTL, Janssen, and Kenvue (or its outside laboratories at their direction) failed to preserve count sheets, photomicrographs, and other documentation generated during the testing of talc samples for asbestos and other fibers from the 1950s to the 2000s.

1051.    Plaintiffs have been damaged as a result of Defendants' intentional spoliation because the absence of the spoliated evidence limits Plaintiffs' ability to present and prove their cases.

### <u>COUNT LXIV – ASSUMPTION OF DUTY</u><br><u>(Against Johnson & Johnson)</u>

1052.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1053.    At all times relevant hereto, Johnson & Johnson as the parent company of Windsor Minerals, Inc., New JJCI, Old JJCI, and other affiliated subsidiaries negligently failed to exercise the standard of care and skill it was obliged to exercise by reason of its aforesaid undertaking and assumption of duty regarding the testing and safety profile of the talcum powder that it sold,

distributed, manufactured and/or marketed, including but not limited to the failure to properly test for asbestos contamination; failure to properly communicate test results of positive asbestos tests. and issue and implement appropriate recommendations regarding the removal of talcum powder from Johnson's Baby Powder; the failure to warn customers it knew or should have known would come into contact with its asbestos contaminated products; and the failure to expeditiously discontinue use and remove asbestos-contaminated products from the market, thereby causing and creating or permitting dangerous conditions where Plaintiff sustained exposure to asbestos.

1054.   Johnson & Johnson's failure to exercise the standard of care and skill it was obliged to exercise by reason of its aforesaid undertaking and assumption of duty increased the risk of harm to plaintiff.

1055.   As a direct and proximate result of Johnson & Johnson's failure to exercise the standard of care and skill it was obliged to exercise by reason of its aforesaid undertaking and assumption of duty, Plaintiff was exposed to asbestos and ultimately diagnosed with asbestos-related ovarian cancer.

## COUNT LXV – AIDING AND ABETTING
### (Against Defendant Johnson & Johnson)

1056.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1057.  Upon information and belief, Defendant Johnson & Johnson knowingly and willfully aided and abetted the fraudulent marketing and sales described herein.

1058.   Defendant Johnson & Johnson aided and abetted this fraudulent scheme by providing substantial assistance to Old JJCI. This substantial assistance is described, among other places, in the "Facts" section of this pleading.

1059.   Without Defendant Johnson & Johnson's substantial assistance, involvement, and participation; the fraudulent scheme would not have been possible.

1060.   Plaintiff suffered serious injury and pecuniary losses as a proximate result of the aiding and abetting of Defendant Johnson & Johnson.

## COUNT LXVI – ACTING IN CONCERT
### (All Defendants)

1061.   Plaintiff incorporates by reference each of the preceding and succeeding paragraph as if set forth fully herein.  Plaintiff pleads all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including laws of the individual Plaintiff's resident state.

1062.   At all pertinent times, the Johnson & Johnson Defendants, and the Personal Care Products Council f/k/a Cosmetic, Toiletry, and Fragrance Association (PCPC) knew that the PRODUCTS should contain warnings on the risk of ovarian cancer posed by women using the product to powder the perineal region, but purposefully sought to suppress such information and omit such information from talc based products so as not to negatively affect sales and maintain the profits of the Johnson & Johnson Defendants, and the members of the PCPC.

1063.   Additionally and/or alternatively, the Defendants aided and abetted each other in the negligence, gross negligence, and reckless misconduct.  Pursuant to the Restatement (Second) of Torts Section 876, each of the Defendants is liable for the conduct of the other Defendants for whom they aided and abetted.

## DISCOVERY RULE AND TOLLING

1064.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Second Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice-of-law principles including the law of the Plaintiffs' resident State.

1065.   Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

1066.   Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

1067.   Despite diligent investigation by Plaintiffs into the cause of their injuries, the nature of Plaintiffs' injuries and damages and their relationship to the PRODUCTS was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

1068.   The running of the statute of limitations in this cause is tolled due to equitable tolling. Defendant(s) are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiffs and/or the consuming public, of the true risks associated with the PRODUCTS.  As a result of the Defendants' fraudulent concealment, Plaintiffs and/or Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiffs

had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant(s).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants on each of the above-referenced claims and causes of action, jointly and severally, as follows:

a.  Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, physical impairment, physical disfigurement, fear of cancer recurrence or death, emotional distress, loss of enjoyment of life, loss of consortium, wrongful death and other noneconomic damages in an amount to be determined at trial of this action;

b.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

c.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Decedent in an amount sufficient to punish Defendants and deter future similar conduct;

d.  Prejudgment interest;

e.  Post-judgment interest;

f.  Awarding reasonable attorneys' fees;

g.  Awarding the costs of these proceedings; and

h.  Such other and further relief as this Court deems just and proper.

Dated:  August 14, 2023                    RESPECTFULLY SUBMITTED,

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street NW, Suite 700
Washington, DC 20006
Tel: 202-783-6400
Fax: 703-820-1656
mparfitt@ashcraftlaw.com

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com

**Plaintiffs' Co-Lead Counsel**

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701
Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com

**Plaintiffs' Liaison Counsel**