# Exhibit 1

S-1 1 kenvues-1.htm S-1

**As filed with the Securities and Exchange Commission on January 4, 2023.**

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1**
**REGISTRATION STATEMENT UNDER**
**THE SECURITIES ACT OF 1933**

# Kenvue Inc.

<small>(Exact name of registrant as specified in its charter)</small>

| **Delaware** | **2844** | **88-1032011** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**199 Grandview Road**
**Skillman, NJ 08558**
**(732) 524-0400**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Thibaut Mongon**
**Kenvue Inc.**
**199 Grandview Road**
**Skillman, NJ 08558**
**(732) 524-0400**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Michael E. Mariani** | **John B. Meade** |
| **Cravath, Swaine & Moore LLP** | **Roshni Banker Cariello** |
| **Worldwide Plaza** | **Davis Polk & Wardwell LLP** |
| **825 Eighth Avenue** | **450 Lexington Avenue** |
| **New York, NY 10019** | **New York, NY 10017** |
| **(212) 474-1000** | **(212) 450-4000** |

Approximate date of commencement of proposed sale to the public: As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion, Dated January 4, 2023

**Preliminary Prospectus**

# Shares



## Kenvue Inc.

### Common Stock

This is an initial public offering of shares of the common stock of Kenvue Inc. We are offering          shares of our common stock to be sold in this offering.

Prior to this offering, there has been no public market for shares of our common stock. We estimate that the initial public offering price per share of our common stock will be between $          and $          . We intend to apply to list our shares of common stock on the New York Stock Exchange (the "NYSE") under the symbol "KVUE."

Upon completion of this offering, Johnson & Johnson will continue to own          % of the voting power of our shares of common stock eligible to vote in the election of our directors (or          % if the underwriters exercise in full their option to purchase additional shares of our common stock from us to cover over-allotments). As a result, we will be a "controlled company" as defined under the corporate governance rules of the NYSE. See "Management—Controlled Company Exemption."

**Investing in shares of our common stock involves risks. See "Risk Factors" beginning on page 20 to read about factors you should consider before purchasing shares of our common stock.**

**Neither the Securities and Exchange Commission nor any state securities commission or other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Proceeds to us, before expenses | $ | $ |

(1) See "Underwriting" for a description of compensation to be paid to the underwriters

We have granted the underwriters an option for a period of 30 days from the date of this prospectus to purchase up to an additional          shares of our common stock from us at the initial public offering price less the underwriting discounts and commissions to cover over-allotments.

The underwriters expect to deliver the shares of common stock against payment in New York, New York on or about          .

**Goldman Sachs & Co. LLC**                                        **J.P. Morgan**

**Prospectus dated          .**

However, the ability of LTL to successfully reorganize and resolve all Talc-Related Liabilities will depend on various factors and is subject to risks and uncertainties, including the ability to reach agreements with representatives of the claimants on the terms of a plan of reorganization that satisfies applicable legal requirements and to obtain the requisite court approvals of such plan. In addition, certain claimants alleging exposure to talc or talc-containing products have opposed LTL's efforts to resolve Talc-Related Liabilities in the bankruptcy proceedings, and there is a risk that the claimants may succeed in preventing LTL from doing so. As a result, LTL may not be able to successfully reorganize, and we cannot predict with certainty the amount of Talc-Related Liabilities that LTL or Johnson & Johnson will be required to pay, whether in connection with the bankruptcy proceedings or otherwise.

It is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities. Although, under the Separation Agreement, Johnson & Johnson will agree to indemnify us for the Talc-Related Liabilities and any costs associated with resolving such claims, we cannot assure you that the indemnity from Johnson & Johnson will be sufficient to protect us against the full amount of these liabilities or that Johnson & Johnson will be able to fully satisfy its indemnification obligations. See "—Risks Related to Our Relationship with Johnson & Johnson—In connection with the Separation, Johnson & Johnson will indemnify us for certain liabilities. However, we cannot assure you that the indemnity will be sufficient to protect us against the full amount of such liabilities or that Johnson & Johnson's ability to satisfy its indemnification obligation will not be impaired in the future."

Furthermore, we have been, and may continue to be, subject to claims arising out of the sale of talc-based Johnson's Baby Powder that do not constitute Talc-Related Liabilities, including claims relating to the sale of talc-based Johnson's Baby Powder outside the United States or Canada. We are currently subject to a few such claims which are in early stages, and as such, we cannot reasonably estimate any probable loss relating to such claims. While we believe we have substantial defenses to these claims, it is not feasible to predict the ultimate outcome of these litigations. Although we have discontinued the sale of talc-based Johnson's Baby Powder in certain markets, including the United States and Canada, and the sale of talc-based Johnson's Baby Powder will be discontinued globally in 2023, we presently sell talc-based Johnson's Baby Powder in certain other markets around the world. Given this, we may be subject to additional claims related to the sale of talc-based Johnson's Baby Powder in markets where we presently sell this product, as well as additional claims related to the sale of talc-based Johnson's Baby Powder in markets where we have discontinued this product (such as in the United States and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general. We expect that these other claims, whether currently pending or made in the future, would not be resolved by LTL's bankruptcy filing and that any related liabilities would not be covered by Johnson & Johnson's indemnification obligations under the Separation Agreement. As a result, it is possible that these additional claims could adversely affect our business, results of operations or financial condition.

In addition, Johnson & Johnson has received inquiries, subpoenas and requests to produce documents regarding talc matters from various U.S. governmental authorities and is also subject to consumer protection cases and investigations from state attorneys general.

***We may not be able to successfully establish, maintain, protect and enforce intellectual property rights that are, in the aggregate, material to our business.***

We rely on a combination of intellectual property rights, including our trademarks, trade secrets, patents and copyrights, as well as rights to third-party intellectual property pursuant to licenses and other contracts, to establish, maintain, protect and enforce the intellectual property and proprietary information used in our business.

We may not be able to establish, maintain, protect or enforce our own intellectual property rights or, where appropriate, license in intellectual property rights necessary to support new product introductions. In addition, intellectual property is territorial, and, even if such rights are protected in the United States, the laws of other countries in which our products are or may be sold do not universally protect intellectual property rights to the same extent or in the same way as U.S. intellectual property laws. Public policy, both within and outside the United States, has often become increasingly unfavorable toward certain classes of intellectual property rights. We cannot be

41

Exhibit 2

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. MID-L-3095-18 AS
CIVIL ACTION

MARIA FOLEY AND JOSEPH          :
FOLEY, HUSBAND AND WIFE,        :
                                :
                Plaintiffs,     :
                                :
        vs.                     :
                                :
AVON PRODUCTS, INC., et         :
al.,                            :
                                :
                Defendants.     :

(CAPTION CONTINUED ON FOLLOWING PAGE)

------------------------------

                - - -
        Friday, February 15, 2019
                - - -

        Oral sworn videotaped deposition
of NANCY MUSCO, held at the law offices of
Drinker, Biddle & Reath LLP, 105 College Road
East, Princeton, New Jersey commencing at
10:11 a.m. before Sharon L. Martin,
Registered Professional Reporter, Certified
Court Reporter-NJ, Notary Public.


                - - -

        MAGNA LEGAL SERVICES

            (866) 624-6221

            www.MagnaLS.com



## Page  2

```
 1              SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
 2             DOCKET NO  MID-L-600-18 AS
               CIVIL ACTION
 3
     LISA FRACE, INDIVIDUALLY    :
 4   AND AS REPRESENTATIVE OF    :
     THE ESTATE OF CAROLE        :
 5   DICERBO, DECEASED,          :
                                 :
 6            Plaintiffs,        :
                                 :
 7         vs                    :
                                 :
 8   BRENNTAG NORTH AMERICA, et  :
     al,                         :
 9                               :
              Defendants  :
10
11   ----------------------------------------------
12             SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
13             DOCKET NO  MID-L-4252-18 AS
               CIVIL ACTION
14
15   VICMAR GATMAITAN,           :
     INDIVIDUALLY AND AS         :
16   REPRESENTATIVE OF THE       :
     ESTATE OF MELISSA E         :
17   ROONEY, DECEASED,           :
                                 :
18            Plaintiffs,        :
                                 :
19         vs                    :
                                 :
20   IMERYS TALC AMERICA, INC ,  :
     et al ,                     :
21            Defendants  :
22
23
24
25   (CAPTION CONTINUED ON FOLLOWING PAGE)
```

## Page  3

```
 1              SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
 2             DOCKET NO  MID-L-6805-16 AS
               CIVIL ACTION
 3
     ANITA GRABOWSKI AND ALFRED  :
 4   GRABOWSKI, HUSBAND and      :
     WIFE,                       :
 5                               :
              Plaintiffs, :
 6                               :
         vs                     :
 7                               :
     BRENNTAG NORTH AMERICA, et  :
 8   al ,                        :
                                 :
 9            Defendants  :
10
11   ----------------------------------------------
12
13             SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
14             DOCKET NO  MID-L-2456-18 AS
               CIVIL ACTION
15
     ROBERT GREENE, III ,        :
16   INDIVIDUALLY AND AS         :
     ADMINISTRATOR OF THE ESTATE :
17   OF DEBORAH GREENE BRAKE,    :
     DECEASED; STEPEHEN A        :
18   BRAKE; AND THE INDIVIDUAL   :
     HEIRS OF THE ESTATE OF      :
19   DEBORAH GREENE BRAKE,       :
                                 :
20            Plaintiffs,        :
                                 :
21         vs                    :
                                 :
22   BRENNTAG NORTH AMERICA, et  :
     al ,                        :
23                               :
              Defendants  :
24
25   (CAPTION CONTINUED ON FOLLOWING PAGE)
```

## Page  4

```
 1              SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
 2             DOCKET NO  MID-L-4826-18 AS
               CIVIL ACTION
 3
     EMMA GRIFFIN AND WALTER     :
 4   GRIFFIN, HUSBAND AND WIFE,  :
                                 :
 5            Plaintiffs, :
                                 :
 6         vs                    :
                                 :
 7   CYPRUS AMAX MINERALS        :
     COMPANY, et al ,            :
 8                               :
              Defendants  :
 9
10   ----------------------------------------------
11             SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
12             DOCKET NO  MID-L-5368-17 AS
               CIVIL ACTION
13
     MATTHEW HODJERA and SYLVIA  :
14   DUFF-PETO,                  :
                                 :
15            Plaintiffs, :
                                 :
16         vs                    :
                                 :
17   BORGWARNER MORSE TEC, LLC,  :
     et al ,                     :
18                               :
              Defendants  :
19
20
21
22
23
24
25   (CAPTION CONTINUED ON FOLLOWING PAGE)
```

## Page  5

```
 1              SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
 2             DOCKET NO  MID-L-7049-16 AS
               CIVIL ACTION
 3
     D'ANGELA M  MCNEILL-GEORGE, :
 4
              Plaintiff, :
 5                               :
         vs                     :
 6                               :
     BRENNTAG NORTH AMERICA, et  :
 7   al ,                        :
              Defendants  :
 8
 9   ----------------------------------------------
10             SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
11             DOCKET NO  MID-L-598-18 AS
               CIVIL ACTION
12
     LORETTA SELVAGGIO,          :
13
              Plaintiff, :
14                               :
         vs                     :
15                               :
     BRENNTAG NORTH AMERICA, et  :
16   al ,                        :
                                 :
17            Defendants  :
18
19             SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
20             DOCKET NO  MID-L-6635-17 AS
               CIVIL ACTION
21
     LEONARD E  WENDOWSKI, SR ,  :
22   AND KATHLEEN WENDOWSKI,     :
     HUSBAND AND WIFE,           :
23            Plaintiff, :
         vs                     :
24   IMERYS TALC AMERICA, INC ,  :
     et al ,                     :
25            Defendants  :
```



Page 6

```
 1
 2   A P P E A R A N C E S :
 3   COHEN, PLACITELLA, ROTH, P C
       BY:  CHRISTOPHER PLACITELLA, ESQUIRE
 4          JARED M  PLACITELLA, ESQUIRE
            LEA CALLAHAN, PARALEGAL
 5   Two Commerce Square
     2001 Market Street, Suite 2900
 6   Philadelphia, PA 19103
     (215) 567-3500
 7   cplacitella@cprlaw com
     jmplacitella@cprlaw com
 8   Counsel for the Plaintiffs
 9
10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
       BY:  RICHARD T  BERNARDO, ESQUIRE
11          ANDREW KARP, ESQUIRE
     4 Times Square
12   New York, NY 10036
     (212) 735-3453
13   richard bernardo@skadden com
     andrew karp@skadden com
14   Counsel for the Defendant, Johnson &
     Johnson
15
16
17   McGIVNEY, KLUGER & COOK, P C
       BY:  JONATHAN C  LEE, ESQUIRE
18   18 Columbia Turnpike
     Florham Park, NJ 07932
19   (973) 822-1110
     jlee@mkclaw us com
20   Counsel for the Defendant, Whittaker,
     Clark & Daniels
21
22
23
24
25
```

Page 7

```
 1
 2   A P P E A R A N C E S (CONTINUED):
 3   O'TOOLE, SCRIVO, FERNANDEZ, WEINER,
       VAN LIEU, LLC
 4   BY:  LESLIE ELLIS LOMBARDY, ESQUIRE
     (via telephone)
 5   14 Village Park Road
     Cedar Grove, NJ 07009
 6   (973) 239-5700
     llombardy@oslaw com
 7   Counsel for the Defendant,
     Colgate-Palmolive Co
 8
 9
10   RAWLE & HENDERSON, LLP
       BY:  LINDA DOBBINS, ESQUIRE
11   (via telephone)
     The Widener Building
12   One South Penn Square
     Philadelphia, PA 19107
13   (215) 575-4303
     ldobbins@rawle com
14   Counsel for the Defendant, Cyprus Amax
     Minerals Company
15
16   HAWKINS, PARNELL & YOUNG, LLP
       BY:  ELIZABETH KELLY, ESQUIRE
17   (via telephone)
     600 Lexington Avenue, 8th Floor
18   New York, NY 10022
     (646) 589-8722
19   ekelly@hpylaw com
     Counsel for the Defendant, Revlon, Inc
20
21
               - - -
22
23   A L S O  P R E S E N T :
24
     Thomas Karwacki, The Videotape Operator
25
```

Page 8

```
 1
 2   W I T N E S S  I N D E X
 3   TESTIMONY OF:  NANCY MUSCO
 4   EXAMINATION                       PAGE
 5
     By Mr  C  Placitella          12
 6
 7             - - -
 8
     E X H I B I T S
 9
10
     EXHIBIT NAME   DESCRIPTION         PAGE
11
12   Exhibit P-1    Letter dated      11
                    September 13, 2018,
13                  Corporate Deposition
                    Notice and Request for
14                  Production of Documents
15   Exhibit P-2    Chart             71
16   Exhibit P-3    Trial transcript of John  183
                    Hopkins, Ph D
17
     Exhibit P-4    Handwritten document  173
18
     Exhibit P-5    Ad                181
19
     Exhibit P-6    Depositions and testimony 288
20                  of Dr  Hopkins
21   Exhibit P-7    Testimonies and      288
                    interrogatories for Selby
22                  and Krushinski
23   Exhibit P-8A   Documents sent to    289
                    Dr  Hopkins
24
     Exhibit P-8B   Documents sent to    289
25                  Dr  Hopkins
```

Page 9

```
 1
 2   E X H I B I T S (CONTINUED)
 3
 4   EXHIBIT NAME   DESCRIPTION       PAGE
 5   Exhibit P-9    Unidentified documents  290
 6   Exhibit P-10   Deposition transcript   290
                    of Nancy Musco
 7
 8   Exhibit P-11   Complaint          291
 9   Exhibit P-12   Complaint          291
10   Exhibit P-13   Complaint          291
11   Exhibit P-14   Notes              291
12
     (**Exhibits P-6 through P-14 were retained
13   by Mr  C  Placitella)
14
15   Exhibit J&J-8   April 15, 1969 Memo    65
16   Exhibit J&J-172  Deposition transcript  207
                     of Glenn A  Hemstock
17
18   Exhibit J&J-173  Continuation deposition  208
                     transcript of Glenn
19                   Hemstock
20   Exhibit J&J-188  Stipulation of Dismissal 224
21   Exhibit J&J-195  Affidavit          266
22   Exhibit J&J-277  Answers to Plaintiffs'  173
                     Supplemental
23                   Interrogatories
24   Exhibit J&J-282  (Not attached)       262
25
```

3  (Pages  6  to  9)





## Page 10

```
 1           E X H I B I T S (CONTINUED)
 2
 3     EXHIBIT NAME  DESCRIPTION        PAGE
 4
       Exhibit J&J-294  Deposition transcript  202
 5                      of Roger N. Miller
 6     Exhibit J&J-412  Handwritten document    34
 7     Exhibit J&J-436  Deposition transcript  210
                        Of Peter N. Gale
 8
       Exhibit J&J-446  Agreement           274
 9
       Exhibit J&J-448  Memo                154
10
       Exhibit J&J-450  Letter              152
11
       Exhibit J&J-452  Memo                155
12
       Exhibit J&J-453  Document entitled   170
13                      George Lee's Talc Files
14     Exhibit J&J-456  Memo                282
15     Exhibit J&J-483  Memo                203
16     Exhibit J&J-486  Privilege log        74
17     Exhibit J&J-488  Chart               146
18
                          ---
19
20
21
22
23
24
25
```

## Page 11

```
 1                        ---
 2               (Exhibit P-1, Letter dated
 3     September 13, 2018, Corporate Deposition
 4     Notice and Request for Production of
 5     Documents, is marked for identification.)
 6                        ---
 7               THE VIDEOTAPE OPERATOR:  We are
 8     now on the record.
 9               This begins videotape number
10     one in the deposition of Nancy Musco in the
11     Matter of the Estate of Maria Foley versus
12     Avon Products, Inc., et al., in the Superior
13     Court of New Jersey, Law Division, Middlesex
14     County, Docket number MID-L-3095-18 AS.
15               Today is Friday, February 15,
16     2019 and the time is 10:11 a.m.
17               This deposition is being taken
18     at 105 College Road East, Princeton, New
19     Jersey at the request of Cohen, Placitella &
20     Roth.
21               The videographer is Thomas
22     Karwacki of Magna Legal Services.
23               And the court reporter is
24     Sharon Martin of Magna Legal Services.
25               Appearance of counsel will be
```

## Page 12

```
 1     noted on the stenographic record.
 2               Will the court reporter please
 3     swear in the witness?
 4                        ---
 5               NANCY MUSCO, having been duly
 6     sworn, was examined and testified as follows:
 7               THE VIDEOTAPE OPERATOR:  You
 8     may proceed.
 9                        ---
10               EXAMINATION
11                        ---
12     BY MR. C. PLACITELLA:
13          Q.  Good morning, Miss Musco.  How are
14     you?
15          A.  Good morning.
16          Q.  We're here together again.
17               You're here -- last time I took
18     your deposition you were taken as a fact
19     witness in this case; do you recall that?
20          A.  Yes, I do.
21          Q.  And today you understand that you
22     are here testifying not as a fact witness,
23     but on behalf of Johnson & Johnson as their
24     corporate representative, correct?
25          A.  Yes.
```

## Page 13

```
 1          Q.  Okay.
 2               MR. C. PLACITELLA:  Can you
 3     please give the witness P-1?
 4     BY MR. C. PLACITELLA:
 5          Q.  P-1 is the deposition notice for
 6     this case.  And if you can go to the notice
 7     itself, it asks that Johnson & Johnson
 8     produce the representative with the most
 9     knowledge concerning discovery responses
10     historically provided by Johnson & Johnson
11     and Windsor Minerals concerning the asbestos
12     content of talc, Johnson's Baby Powder or
13     Shower to Shower sold by Johnson & Johnson,
14     Windsor Minerals or Eastern Magnesia Talc
15     Company.
16               Do you see that?
17          A.  Yes.
18          Q.  Okay.
19          A.  That's what it says.
20          Q.  Are you that person?
21          A.  Yes, I am.
22          Q.  Okay.  And how is it -- why are you
23     the person most qualified to respond to
24     this -- to this -- notice?
25               MR. BERNARDO:  Object to the
```

4  (Pages 10 to 13)



Page 14

```
 1  form of the question.
 2       THE WITNESS:  In my career with
 3  Johnson & Johnson, in the specific time
 4  period, I was the person who would be
 5  involved in supply -- or helping to supply
 6  the answers to said interrogatories.
 7  BY MR. C. PLACITELLA:
 8     Q.  Okay.  Now, and you understand that
 9  you are here to answer questions as Johnson &
10  Johnson, the corporation, not Nancy Musco,
11  correct?
12     A.  Correct.
13     Q.  Okay.  And you understand that
14  information that we will address includes
15  what information Johnson & Johnson had in its
16  possession over time concerning the potential
17  hazards associated with the talc that it
18  sold, correct?
19       MR. BERNARDO:  Object to the
20  form of the question.
21       THE WITNESS:  I am here to talk
22  about the documents associated with this and
23  the discovery responses.
24  BY MR. C. PLACITELLA:
25     Q.  So the answer is yes?
```

Page 15

```
 1     A.  I'm here to talk about the --
 2  the -- as we said, as it says here in the
 3  notice.  Not here to talk about any dangers
 4  of talc, because talc used in cosmetic
 5  application of Johnson's Baby Powder is safe.
 6     Q.  All right.  You know that you are
 7  here to talk about what information Johnson &
 8  Johnson had in its possession concerning the
 9  asbestos content of talc and whether that
10  information was provided in response to
11  discovery in lawsuits historically, correct?
12       MR. BERNARDO:  Object to the
13  form of the question.
14       THE WITNESS:  Yes, that's
15  correct.
16  BY MR. C. PLACITELLA:
17     Q.  Okay.  Can you tell me everything
18  you did in order to prepare for today's
19  deposition?
20     A.  Yes, I did a lot.  I -- most
21  important thing is I looked at the documents
22  that you presented to me last time to help
23  ensure that they had been looked at by the
24  company.  I looked at depositions, testimony
25  of Dr. Hopkins.  I spoke to one of the people
```

Page 16

```
 1  responsible for conducting the searches to
 2  help ensure that we had all the information
 3  available for you that you requested.  And I
 4  also spoke directly with Dr. Hopkins.
 5     Q.  Okay.  And when did you speak to
 6  Dr. Hopkins?
 7     A.  Last week.
 8     Q.  And what was the substance of your
 9  conversation with him?
10     A.  We spoke specifically about the
11  documents that you and I had discussed in our
12  last deposition.
13     Q.  Did he tell you that he testified
14  in a case that's ongoing in California right
15  now?
16     A.  I know that he is, yes.
17     Q.  Did you know that he testified in
18  that case that the information that you
19  supplied in answers to interrogatories was
20  inaccurate --
21       MR. BERNARDO:  Object to form.
22  BY MR. C. PLACITELLA:
23     Q.  -- and incomplete?
24       MR. BERNARDO:  Object to the
25  form of the question and the characterization
```

Page 17

```
 1  of Mr. Hopkins' testimony.
 2       (Reporter clarification.)
 3       MR. BERNARDO:  Of Dr. Hopkins'
 4  testimony.
 5       THE WITNESS:  I don't know what
 6  Dr. Hopkins said in his testimony, no.
 7  BY MR. C. PLACITELLA:
 8     Q.  So you never had a conversation
 9  where he said under oath before a jury who is
10  listening to a case right now that the
11  information that you supplied that you swore
12  to was true was incomplete and inaccurate --
13       MR. BERNARDO:  Object.
14  BY MR. C. PLACITELLA:
15     Q.  -- you never knew that?
16       MR. BERNARDO:  Object to the
17  form of the question and the characterization
18  of Dr. Hopkins' testimony.
19       Do you have the testimony to
20  show her --
21       MR. C. PLACITELLA:  I'm going
22  to get there.
23       MR. BERNARDO:  -- Mr.
24  Placitella?
25       Okay.
```

5  (Pages 14 to 17)



Page 18

1          THE WITNESS:  I did not discuss
2    Dr. Hopkins' testimony that you're referring
3    to.
4    BY MR. C. PLACITELLA:
5          Q.  If he was asked specifically about
6    sworn information that you provided under
7    oath in a trial, wouldn't you have hoped as
8    part of your preparation that that's
9    something that he would have told you?
10         A.  He and I discussed the specifics of
11   the documents that you had asked for and
12   specifically what's involved in the notice
13   that you provided.
14         Q.  So how long did you talk to
15   Dr. Hopkins?
16         A.  Close to an hour.
17         Q.  Okay.  And you went over all of the
18   documents with him?
19         A.  I went over specific documents.
20         Q.  What documents were those?
21         A.  So many documents.  They were
22   specific documents that Dr. Hopkins had and
23   that were pertinent to the issues.  As I
24   said, the ones that you and I discussed.
25         Q.  And when you say the ones you and I

Page 19

1    discussed, what do you mean by that?
2          A.  They were brought up at my last
3    deposition.
4          I wanted to discuss these with
5    Dr. Hopkins to help ensure that he was
6    familiar with them and that he had answered
7    the questions.
8          Q.  Okay.  And did he tell you that
9    when I deposed him that a chart was created
10   concerning what was in the documents?
11         A.  We did not discuss his testimony at
12   all.  We discussed those particular
13   documents.
14         Q.  Okay.  So you spoke with
15   Dr. Hopkins, who is the person -- who was the
16   other person you spoke with?
17         A.  Miss Pam Downs (phonetic).
18         Q.  And who is she and what was her
19   job?
20         A.  She is one of the people
21   responsible for the searches of all of their
22   pertinent documents.
23         Q.  Okay.  And what was the substance
24   of your discussion with her?
25         A.  I wanted to be comfortable in the

Page 20

1    way that she conducted the search and just
2    help reassure myself that she had looked in
3    all the different avenues.
4          Q.  Approximately how much time have
5    you spent preparing for today's deposition?
6          A.  Approximately six, seven days.
7          Q.  Six or seven days, eight hours a
8    day?
9          A.  Approximately.
10         Q.  And you were compensated for that?
11         A.  Yes, I was compensated for my time.
12         Q.  At what rate?
13         A.  $185 an hour.
14         Q.  Okay.  And can you tell me
15   specifically what documents you reviewed in
16   preparation for today's deposition?
17         A.  As I mentioned earlier, any of the
18   documents that you asked for, made sure that
19   they were provided to you.  And anything that
20   had to do with the alleged asbestos content
21   of talc.
22         Q.  So you looked at all documents
23   related to asbestos testing for the Johnson &
24   Johnson talc?
25         A.  I --

Page 21

1          MR. BERNARDO:  Object to the
2    form of the question.
3          THE WITNESS:  I looked at them.
4    I -- I had counsel pull out which ones were
5    pertinent for me, because there's so many for
6    me to go through.  It would almost be
7    impossible.  I looked at so that I would know
8    which documents were pertinent.
9    BY MR. C. PLACITELLA:
10         Q.  Okay.  So am I under -- my
11   understanding correct that you began at
12   Johnson & Johnson in approximately 1983?
13         A.  1982.
14         Q.  1982.
15         And when you started there you were
16   the person who worked in -- on Johnson's Baby
17   Powder in the Marketing Department?
18         A.  No, I was actually part of
19   regulatory, which was part of Research and
20   Development.
21         Q.  Right.
22         And what was your job
23   responsibilities?
24         A.  My job responsibilities when I
25   first started was responding to consumers,



Page 22

1 whether it be by letter or phone with any
2 questions, concerns that they had about any
3 of the Johnson's baby products.
4      Q.  Including any talc-related product?
5      A.  Yes.
6      Q.  Okay.  And you had that
7 responsibility from 1982 until 2001?
8      A.  Approximately.
9      Q.  Okay.
10     A.  2000ish, yeah.
11     Q.  Okay.  And in 2001 you went to work
12 for the R&D Department; is that correct?
13     A.  Yes, it was part of the R&D
14 Department.
15     Q.  But your job basically stayed the
16 same, although you were in the R&D
17 Department --
18     A.  Some of the same responsibilities,
19 yes.
20     Q.  And you were the person in charge
21 of communicating to the public and health
22 care professionals information related to the
23 safety of Johnson's Baby Powder, correct?
24     A.  I was one of the people, yes.
25     Q.  Okay.  You, as I think you

Page 23

1 indicated, were also the person in charge of
2 gathering information to answer questions
3 that Johnson & Johnson was required to answer
4 fully and honestly when sued over injuries
5 alleged to have occurred from exposure to
6 baby powder, correct?
7          MR. BERNARDO:  Object to the
8 form of the question.
9          THE WITNESS:  Could you
10 rephrase that, please?
11 BY MR. C. PLACITELLA:
12     Q.  Sure.
13         You were the person in charge of
14 gathering information needed to answer
15 questions that were required to answer
16 discovery responses, fully and honestly, when
17 Johnson & Johnson was sued over exposure to
18 talc, correct?
19     A.  As part of my responsibilities I
20 would work with counsel to direct them to the
21 appropriate people to answer whatever
22 questions may have been put forth.
23     Q.  And those cases involved lung
24 disease, such as cancer and -- lung cancer
25 and ovarian cancer, correct?

Page 24

1      A.  There were some allegations of
2 that, yes.
3      Q.  All right.  In fact, you were the
4 point person for gathering discovery for
5 litigation historically at Johnson & Johnson,
6 correct?
7          MR. BERNARDO:  Object to the
8 form of the question.
9          THE WITNESS:  I did not gather
10 the information.  As I said, I -- I helped
11 counsel and told them the people that would
12 be most appropriate to answer their
13 questions.
14 BY MR. C. PLACITELLA:
15     Q.  And you started that sometime in
16 the early 1980s?
17     A.  Yes.
18     Q.  Okay.  And you were aware of the
19 records that were used that were available to
20 respond to discovery, correct?
21          MR. BERNARDO:  Object to the
22 form of the question.
23          THE WITNESS:  Well, there were
24 no specific records.  Again, I directed
25 counsel to the appropriate people who would

Page 25

1 answer based on their expertise or what
2 information they had.
3 BY MR. C. PLACITELLA:
4      Q.  And you were aware that Johnson &
5 Johnson was sued many times in cases alleging
6 injury from its talc-related products,
7 correct?
8          MR. BERNARDO:  Object to the
9 form of the question.
10         THE WITNESS:  I was aware that
11 there were cases, yes.
12 BY MR. C. PLACITELLA:
13     Q.  All right.  You understood that
14 information that was available to answer
15 questions in one case would be relevant to
16 answer similar questions in other cases,
17 correct?
18         MR. BERNARDO:  Object to the
19 form of the question.
20         THE WITNESS:  Yes, it could be.
21 BY MR. C. PLACITELLA:
22     Q.  Am I correct that the information
23 concerning what happened in prior cases came
24 from the Legal Department and that those
25 files were in the possession of the Legal

7 (Pages 22 to 25)



Page 26

1  Department?
2      A.  Could you rephrase that?
3      Q.  Sure.
4          When you were responding in a -- in
5  a case, you knew that the Legal Department
6  had information from prior cases, correct?
7          MR. BERNARDO:  Object to the
8  form of the question.
9          THE WITNESS:  Again, I don't
10  know specifically what information the Legal
11  Department may have had.  But when they
12  needed to have a specific answer, I would
13  help direct them to the person most
14  appropriate to answer that.
15  BY MR. C. PLACITELLA:
16      Q.  All right.  And at some point in
17  time you became aware of something known as a
18  litigation hold, correct?
19      A.  I'm familiar with that, yes.
20      Q.  What is a litigation hold?
21      A.  My understanding of that is when
22  our counsel would let us -- anybody in the
23  company hold to any documents related to a
24  specific legal case.
25      Q.  Okay.  And when is the first time

Page 27

1  that you became aware that Johnson & Johnson
2  had a -- any kind of litigation hold for talc
3  cases related to exposure to Johnson &
4  Johnson talc products?
5          MR. BERNARDO:  Object to the
6  form of the question.
7          THE WITNESS:  I don't remember
8  any specific dates.
9  BY MR. C. PLACITELLA:
10      Q.  What is the first evidence that you
11  have, when I say "you," Johnson & Johnson, as
12  to when a litigation hold was first imposed
13  in talc-related litigation?
14          MR. BERNARDO:  Object to the
15  form of the question, beyond the scope of the
16  notice and what we tendered this witness for.
17          You can answer in your personal
18  capacity, if you know.
19          THE WITNESS:  No, I do not
20  know.
21  BY MR. C. PLACITELLA:
22      Q.  So you as Johnson & Johnson here to
23  talk about the historic discovery responses
24  have no idea when a litigation hold was first
25  imposed, correct?

Page 28

1          MR. BERNARDO:  Same objection.
2          THE WITNESS:  Not the specific
3  dates, no.
4  BY MR. C. PLACITELLA:
5      Q.  Okay.  So am I correct that the
6  person charged with -- well, strike that.
7          You understand that discovery is a
8  pretrial process where the parties are
9  required to provide information relative to
10  the allegations and defendant -- and defenses
11  asserted in a case?
12      A.  I understand that discovery may be
13  specific questions presented by the
14  plaintiffs for the defendants to answer.
15      Q.  What is your understanding
16  concerning Johnson & Johnson's obligations
17  when responding truthfully and fully to
18  questions posed to it in litigation?
19          MR. BERNARDO:  Object to the
20  form of the question.  Call for --
21  conclusion.
22          THE WITNESS:  I fully
23  understand that they should and do answer
24  truthfully and completely.
25  BY MR. C. PLACITELLA:

Page 29

1      Q.  Okay.  When asked to provide
2  information, am I correct that Johnson &
3  Johnson recognizes -- well, let me ask, that
4  there is a material difference between
5  certifying that there is no evidence
6  whatsoever and that there is evidence, but
7  that you don't believe the evidence is
8  accurate?
9          MR. BERNARDO:  Object to the
10  form of the question.
11          THE WITNESS:  Could you ask
12  that again, please?
13  BY MR. C. PLACITELLA:
14      Q.  Sure.
15          You're asked a question about
16  whether evidence exists.  You understand
17  there is a difference, you, Johnson &
18  Johnson, about whether the evidence exists at
19  all versus that there is evidence, but you
20  just don't believe that it's accurate --
21          MR. BERNARDO:  Object.
22  BY MR. C. PLACITELLA:
23      Q.  -- or reliable?
24          MR. BERNARDO:  Object to the
25  form of the question.



Page 30

1    BY MR. C. PLACITELLA:
2        Q.   Do you understand the difference?
3        A.   I'm not sure I understand the
4    question.
5        Q.   Okay.  So let's try to break it
6    down.
7            When you're asked, Is there any
8    evidence that you got here today by car;
9    what's your understanding of that question?
10           MR. BERNARDO:  Object to the
11   form of the question.
12           THE WITNESS:  That, you know,
13   the answer that I got here by car.
14   BY MR. C. PLACITELLA:
15       Q.   So can there be circumstantial
16   evidence that you got here by car?
17           Do I have to have the car in front
18   of me or the photo of you driving the car?
19       A.   If you didn't believe me.
20       Q.   Okay.  So my question to you is
21   when Johnson & Johnson is asked in discovery,
22   Is there any evidence of asbestos content in
23   Johnson & Johnson talc; what is your
24   understanding as to what's being asked of
25   you?

Page 31

1        A.   You're asking if there's any
2    evidence that there is asbestos in the talc
3    of Johnson's Baby Powder.
4        Q.   Right.
5            And what -- and if there is testing
6    related to whether Johnson & Johnson talc
7    contained asbestos, is that evidence in your
8    mind --
9            MR. BERNARDO:  Object.
10   BY MR. C. PLACITELLA:
11       Q.   -- to Johnson & Johnson?
12           MR. BERNARDO:  Object to the
13   form of the question.
14           THE WITNESS:  Any, any evidence
15   would be something, yes.
16   BY MR. C. PLACITELLA:
17       Q.   Right.
18       A.   If there were.
19       Q.   So, for example, if a -- if a test
20   was run to determine whether Johnson's Baby
21   Powder contained asbestos and there were
22   results from that test, that would be
23   evidence, correct?
24           MR. BERNARDO:  Object to the
25   form of the question.

Page 32

1            THE WITNESS:  Yes.
2    BY MR. C. PLACITELLA:
3        Q.   Okay.  You understand that
4    Johnson & Johnson had a duty to provide
5    accurate and complete information when
6    responding to discovery in talc litigation,
7    correct?
8            MR. BERNARDO:  Object to the
9    form of the question.
10           THE WITNESS:  Yes.
11   BY MR. C. PLACITELLA:
12       Q.   Okay.  You understand that if
13   Johnson & Johnson did not provide accurate
14   and complete information, citizens could lose
15   the rights that were given to them to proceed
16   to trial, correct?
17           MR. BERNARDO:  Object to the
18   form of the question, calls for a legal
19   conclusion.
20           THE WITNESS:  I -- I can't
21   answer that legal-wise.  I don't understand
22   that.
23   BY MR. C. PLACITELLA:
24       Q.   You understand, you, Johnson &
25   Johnson understood that it was wrong to

Page 33

1    withhold information with the objective of
2    obtaining dismissals of cases that were filed
3    against Johnson & Johnson, correct?
4            MR. BERNARDO:  Object to the
5    form of the question.
6            THE WITNESS:  This seems like a
7    legal question and I'm not equipped to answer
8    that.
9    BY MR. C. PLACITELLA:
10       Q.   I'm not asking you -- I'm saying
11   you, Johnson & Johnson, not Nancy Musco,
12   understood that it was wrong to withhold
13   information with the objective of obtaining
14   dismissals of cases for lawsuits filed
15   against Johnson & Johnson, correct?
16       A.   Again, that's a -- seems to me like
17   a legal conclusion.  No.
18       Q.   "No" what?
19       A.   I can't -- I can't answer that,
20   because I don't know what that means.
21       Q.   So you don't know, Johnson &
22   Johnson does not know whether it's wrong to
23   withhold information with the objective of
24   obtaining dismissals of lawsuits, Johnson &
25   Johnson doesn't know that?

9  (Pages 30 to 33)



Page 34

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  I cannot comment
4  on any legal conclusions or any legal
5  directions.
6  BY MR. C. PLACITELLA:
7    Q.  When you were working on issues
8  concerning the safety of talc, you were
9  repeatedly -- well, let's just --
10    MR. C. PLACITELLA:  Can you
11  give me 412?
12    MR. BERNARDO:  Do you have a
13  copy for me?
14    MR. C. PLACITELLA:  Yeah, I
15  will, absolutely.
16    Here's one for you, for the
17  record.
18    (Exhibit J&J-412, Handwritten
19  document, is marked for identification.)
20  BY MR. C. PLACITELLA:
21    Q.  Now, I'm going to -- what's marked
22  here as Musco-1, do you recall this exhibit
23  from the last time that we were together and
24  I took your deposition?
25    A.  I don't recall specifically.

Page 35

1    Q.  Is there --
2    A.  I know that you wrote down some
3  things.
4    Q.  Okay.  So let me see if I can...
5  See if this refreshes your memory.
6    MR. C. PLACITELLA:  Where's
7  your audio?
8    (At which time the following
9  audio recording is played for the witness.)
10    "QUESTION:  Did the talc that
11  was used in any J&J Baby Powder product ever
12  contain any amount of asbestos; do you see
13  that?
14    "ANSWER:  Yeah, I see that.
15    "QUESTION:  That was a question
16  that -- or questions like that that you were
17  called upon to answer as part of your job at
18  Johnson & Johnson, correct?
19    "ANSWER:  Yes.
20    "QUESTION:  Okay.  And that
21  question was raised over and over again by
22  people outside of Johnson & Johnson from
23  almost the time you started working there,
24  correct?
25    "UNIDENTIFIED COUNSEL:  Object

Page 36

1  to the form of the question.
2    "You can answer.  Excuse me.
3    "ANSWER:  I know it was a
4  question that we received, yes."
5    (At which time the audio
6  playback is concluded.)
7  BY MR. C. PLACITELLA:
8    Q.  Do you recall giving that
9  testimony?
10    MR. BERNARDO:  Object to the
11  form of the question and the playing of the
12  prior testimony.
13    THE WITNESS:  Yes, I do.
14    (Reporter clarification.)
15    MR. BERNARDO:  And the playing
16  of the prior testimony.  I'll move my mic.
17  Object to the form of the question and the
18  playing of the prior testimony.
19  BY MR. C. PLACITELLA:
20    Q.  Do you recall giving that
21  testimony?
22    A.  I did.
23    Q.  Is that testimony fair and
24  accurate?
25    A.  Yes.

Page 37

1    Q.  Am I correct that the question that
2  was asked of you over and over again when you
3  worked for Johnson & Johnson in one way or
4  another was did the talc that was used in any
5  J&J product ever contain any amount of
6  asbestos?
7    A.  We were asked lots of different
8  questions through the years, not specifically
9  always in that form.
10    Q.  Do you --
11    A.  But, yes.
12    Q.  Okay.  And that same question or
13  questions like that was asked over and over
14  in litigation related to asbestos -- strike
15  that.
16    That same question was asked of
17  Johnson & Johnson or questions like that in
18  litigation related to Johnson's Baby Powder,
19  correct?
20    A.  Yes, I believe that's the question.
21    Q.  Okay.  And that was the -- one
22  of -- that was a question that you were the
23  point person for gathering information on to
24  respond to, correct?
25    MR. BERNARDO:  Object to the



Page 38

```
 1   form of the question.
 2         THE WITNESS:  I worked with
 3   counsel to provide specific -- help provide
 4   specific answers to specific questions that
 5   would be related to a Complaint.
 6   BY MR. C. PLACITELLA:
 7         Q.  And the answer to the question, Did
 8   the talc that was used in any Johnson &
 9   Johnson Baby Powder product ever contain any
10   amount of asbestos; when you answer it,
11   always was, There is no evidence that
12   Johnson's Baby Powder contained any amount of
13   asbestos.  There never was and there never
14   will be.
15         That was your response, correct?
16         MR. BERNARDO:  Object to the
17   form of the question.
18         THE WITNESS:  That's correct.
19   BY MR. C. PLACITELLA:
20         Q.  Okay.  And when Johnson & Johnson
21   was asked the same question in litigation
22   they gave the same response, that is, there
23   is no evidence that Johnson's Baby Powder
24   contained any amount of asbestos, correct?
25         MR. BERNARDO:  Object to the
```

Page 39

```
 1   form of the question.
 2         THE WITNESS:  That's the
 3   position of the company, that there's no
 4   asbestos used in the cosmetic talc of
 5   Johnson's Baby Powder.
 6   BY MR. C. PLACITELLA:
 7         Q.  My question is, was the answer
 8   that was provided every time the question was
 9   asked in the context of a lawsuit, correct?
10         MR. BERNARDO:  Object to the
11   form of the question.
12         THE WITNESS:  I do not know if
13   that was the specific answer that was
14   provided each time.
15   BY MR. C. PLACITELLA:
16         Q.  All right.  You know that when that
17   question was asked that Johnson & Johnson
18   always took the possession -- took position
19   in litigation that there is no evidence that
20   Johnson's Baby Powder contained any amount of
21   asbestos, correct?
22         MR. BERNARDO:  Object to the
23   form of the question.
24         THE WITNESS:  The position of
25   Johnson & Johnson is that there is no
```

Page 40

```
 1   asbestos in the cosmetic talc of Johnson's
 2   Baby Powder.
 3   BY MR. C. PLACITELLA:
 4         Q.  So the answer to my question is
 5   yes?
 6         A.  Yes.
 7         Q.  Okay.  And when you, Johnson &
 8   Johnson told the public that there is no
 9   evidence that Johnson's Baby Powder contained
10   any amount of asbestos and there never was
11   and there never will be, it was your intent,
12   that is, you, Johnson & Johnson, to convey
13   that there was zero chance of exposing
14   families to asbestos by using Johnson's Baby
15   Powder, correct?
16         A.  The -- the position is that there's
17   no asbestos in the cosmetic talc.  So
18   Johnson's Baby Powder would not be exposing
19   anyone to asbestos.
20         Q.  Your intent was to convey that
21   there was zero chance of exposing families to
22   asbestos by using Johnson's Baby Powder,
23   correct?
24         MR. BERNARDO:  Object to the
25   form of the question.
```

Page 41

```
 1         THE WITNESS:  Our intent was to
 2   inform whomever was asking that there is no
 3   asbestos in the cosmetic talc.
 4         MR. C. PLACITELLA:  I'm going
 5   to go to video.
 6   BY MR. C. PLACITELLA:
 7         Q.  I'm going to show you your
 8   testimony from last time.
 9         (At which time the following
10   audio recording is played for the witness.)
11         "QUESTION:  And when you had
12   these conversations, for example, with the
13   mothers and the consumers, your intent was to
14   convey to them that there was zero chance of
15   exposing their families to asbestos at any
16   level using Johnson's Baby Powder, correct?
17         "ANSWER:  I -- my job was to
18   reassure them that they could feel safe and
19   comfortable using Johnson's Baby Powder,
20   because it does not contain asbestos.
21         "QUESTION:  Right:
22         "So there was zero chance of
23   exposing their families to asbestos by using
24   Johnson's Baby Powder, that was your intent
25   to convey to them, correct?
```

11  (Pages 38 to 41)



| Page 42 |
|---|

1        "ANSWER:  That's correct.
2        "QUESTION:  Okay."
3        (At which time the audio
4 playback is concluded.)
5 BY MR. C. PLACITELLA:
6    Q.  Do you recall giving that
7 testimony?
8    A.  I see that's what I said.
9    Q.  Okay.
10      Am I correct that you're aware that
11 Johnson & Johnson also told the Federal
12 Government there was never any evidence of
13 asbestos in Johnson's Baby Powder?
14      MR. BERNARDO:  Object to the
15 form of the question, beyond the scope of the
16 notice.
17      You can answer in your
18 individual capacity.
19      THE WITNESS:  I cannot speak
20 about specific conversations, but there is no
21 asbestos in the cosmetic talc.
22 BY MR. C. PLACITELLA:
23    Q.  My question was, you knew that
24 Johnson & Johnson told the Federal Government
25 there was never any evidence of asbestos in

| Page 43 |
|---|

1 Johnson's Baby Powder, correct?
2      MR. BERNARDO:  Same objection.
3      THE WITNESS:  I can't answer
4 that.
5      MR. C. PLACITELLA:  Okay.  Go
6 back to the video, please.
7      That's fine.
8 BY MR. C. PLACITELLA:
9    Q.  Do you know what the National
10 Toxicology --
11      THE VIDEOTAPE OPERATOR:  You
12 have to let me...
13      MR. C. PLACITELLA:  Go ahead.
14      THE VIDEOTAPE OPERATOR:  Go
15 ahead.
16 BY MR. C. PLACITELLA:
17    Q.  Do you know what the National
18 Toxicology Program was?
19    A.  Yes.  I --
20    Q.  What was that?
21    A.  I'm familiar with it.
22    Q.  Was that a branch of the Federal
23 Government?
24    A.  No, it was not.
25    Q.  Had nothing to do with the Federal

| Page 44 |
|---|

1 Government?
2    A.  It worked with the Federal
3 Government, yes, but I -- I can't tell you
4 all the specifics of it.
5    Q.  Okay.  Did you tell the National
6 Toxicology Program that there was no evidence
7 of asbestos in Johnson's Baby Powder?
8      MR. BERNARDO:  Object to the
9 form of the question, beyond the scope of the
10 notice.
11      You can answer in your
12 individual capacity.
13      THE WITNESS:  I'm -- there were
14 meetings with the NTP, yes.
15 BY MR. C. PLACITELLA:
16    Q.  And you told them, you, Johnson &
17 Johnson, told the NTP that there was no
18 evidence whatsoever of asbestos in Johnson's
19 Baby Powder, correct?
20      MR. BERNARDO:  Object to the
21 form of the question.
22      THE WITNESS:  My understanding
23 that we're to talk about today the things
24 that you specifically put in the notice.  I
25 believe we talked about that last time we

| Page 45 |
|---|

1 met.
2 BY MR. C. PLACITELLA:
3    Q.  Yeah.  And what was your answer?
4      MR. BERNARDO:  Object to the
5 form of the question, asked and answered.
6      THE WITNESS:  Whatever you have
7 on record.
8 BY MR. C. PLACITELLA:
9    Q.  Okay.  Well, let's see if this
10 refreshes your memory.
11      MR. BERNARDO:  Before we
12 refresh her memory, let me just interject.
13      Mr. Placitella, the notice is
14 very clear what the scope of this deposition
15 is.  And statements made to the Federal
16 Government is well outside the scope of this
17 notice.  This witness is being prepared to
18 testify --
19      MR. C. PLACITELLA:  Well, we'll
20 let a judge decide that, Mr. Bernardo.
21      MR. BERNARDO:  Let me finish my
22 objection.
23      This witness is not being
24 tendered to testify on behalf of the company
25 with respect to statements to the Federal



Page 46

1    Government.
2            I'm trying not to interrupt the
3    deposition and letting her answer if she
4    knows in her individual capacity, but I just
5    want to make sure that my question is clear.
6    And you're absolutely right, a judge can
7    decide it.
8    BY MR. C. PLACITELLA:
9        Q.  When you say "individual capacity,"
10   you were working for Johnson & Johnson on the
11   National Toxicology Project, were you not?
12       A.  I was not specifically working on
13   the project, that was part of my
14   responsibilities.
15       Q.  Right.
16           Well, let me show you your
17   testimony from the last time.
18           THE VIDEOTAPE OPERATOR:  Stand
19   by.
20           (At which time the following
21   audio recording is played for the witness.)
22           "QUESTION:  My question to you
23   was, did you know that one of the primary
24   bases for battling the issue of talc before
25   the National Toxicology Project was the

Page 47

1    position asserted that there was never any
2    evidence of asbestos in the talc used in
3    Johnson's Baby Powder?
4            "UNIDENTIFIED COUNSEL:  Object
5    to the form of the question.
6            "QUESTION:  Just asking if you
7    know.  It's not a fight.
8            "UNIDENTIFIED COUNSEL:  Well,
9    it's a -- it's a hard question to follow, but
10   you can answer if you understand it.
11           "ANSWER:  Well, the basis was
12   that there's no asbestos in the talc used in
13   Johnson's Baby Powder."
14           (At which time the audio
15   playback is concluded.)
16   BY MR. C. PLACITELLA:
17       Q.  Do you recall giving that
18   testimony?
19           MR. BERNARDO:  Same objection.
20           THE WITNESS:  That's -- that's
21   my voice, yes.
22   BY MR. C. PLACITELLA:
23       Q.  Okay.  Now, based upon your
24   research and knowledge, when does Johnson &
25   Johnson say that the first lawsuit was filed

Page 48

1    against it alleging injury from exposure to
2    talc?
3            MR. BERNARDO:  Object to the
4    form of the question.
5    BY MR. C. PLACITELLA:
6        Q.  When was the first lawsuit filed?
7        A.  My recollection, in the late '90s.
8        Q.  It's your belief that the first
9    lawsuit alleging injury from exposure to talc
10   was the late '90s?
11       A.  I can't give you exact dates when
12   any lawsuits were filed.
13       Q.  Okay.  I'm not asking you, Nancy
14   Musco.  I'm asking you, Johnson & Johnson.
15   When was the first lawsuit filed against you,
16   Johnson & Johnson, alleging injury from
17   exposure to talc sold by Johnson & Johnson?
18           MR. BERNARDO:  Object to the
19   form of the question, beyond the scope of the
20   notice.
21           You can answer in your
22   individual capacity, if you know.
23           THE WITNESS:  Do not know.
24   BY MR. C. PLACITELLA:
25       Q.  Okay.  When was the -- Johnson --

Page 49

1    when was the first lawsuit filed against
2    Johnson & Johnson alleging injury from
3    exposure to talc sourced by mines owned by
4    Johnson & Johnson?
5            MR. BERNARDO:  Same objection.
6            THE WITNESS:  Again, I cannot
7    give you dates.
8    BY MR. C. PLACITELLA:
9        Q.  Did you do any research or speak to
10   anybody to find out when the first lawsuits
11   relating to baby powder were filed against
12   Johnson & Johnson?
13           MR. BERNARDO:  Same objection.
14           THE WITNESS:  Not specific
15   dates, no.
16   BY MR. C. PLACITELLA:
17       Q.  Why not?
18           MR. BERNARDO:  Same objection.
19           THE WITNESS:  Any of the
20   research that I did in preparation today was
21   specifically for the information that is
22   noted in the -- the -- the notice.  I didn't
23   get into specific dates.
24   BY MR. C. PLACITELLA:
25       Q.  Well, but the notice asks for your

13  (Pages 46 to 49)



Page 50

1  information on your historical responses.  So
2  how can you figure out what the information
3  was on historical responses if you don't know
4  when the first lawsuit was filed?
5      A.  Because it was -- my concentration
6  was on the responses, not on specific dates.
7      Q.  Okay.  Well, let me ask you this,
8  do you know how John -- Johnson & Johnson
9  Corporate was kept in the loop concerning
10 lawsuits involving baby powder?
11         MR. BERNARDO:  Object to the
12 form of the question.
13         Again, I'm going to renew my
14 objection.  Chris, I'm trying not to be
15 obstructive this early in the deposition, but
16 this is really well beyond what we understood
17 from the words in the notice the scope of
18 this deposition was to be.
19         But if you know that in your
20 individual capacity, please go ahead and
21 answer.
22         THE WITNESS:  I would assume
23 that they would be filed with the -- with the
24 Law Department in the company.
25 BY MR. C. PLACITELLA:

Page 51

1      Q.  Well, who was in charge of the
2  litigation involving Johnson & Johnson talc
3  products at Johnson & Johnson?
4         MR. BERNARDO:  Same objection.
5         THE WITNESS:  Different people.
6  BY MR. C. PLACITELLA:
7      Q.  Well, who's the person that you
8  reported to when you -- when you were working
9  on the cases?
10        MR. BERNARDO:  Object to the
11 form of the question, same objection.
12        THE WITNESS:  I did not report
13 to a specific person.
14 BY MR. C. PLACITELLA:
15     Q.  So as you sit here testifying on
16 behalf of Johnson & Johnson, it's your
17 testimony that you don't know who was in
18 charge of the talc litigation inside of
19 Johnson & Johnson?
20        MR. BERNARDO:  Object to the
21 form of the question.  And this witness is
22 not being tendered to testify as to who was
23 in charge of litigation or any other
24 litigation matters, other than the discovery
25 responses.

Page 52

1         THE WITNESS:  As I said, there
2  were -- there were different people.
3  BY MR. C. PLACITELLA:
4      Q.  Well, what people do you remember?
5      A.  I could give you names, but, again,
6  I didn't come prepared to talk about
7  different names.
8      Q.  Well, give me the names.
9      A.  One of the lawyers was John
10 O'Shaughnessy.
11     Q.  Okay.  Did you have interaction
12 with John O'Shaughnessy concerning discovery
13 responses in talc-related cases?
14        MR. BERNARDO:  Object to the
15 form of the question.
16        And go ahead and answer, but
17 just please be mindful of privileged
18 communications.  You can answer the question.
19        THE WITNESS:  Mr. O'Shaughnessy
20 and I would have conversations, yes.
21 BY MR. C. PLACITELLA:
22     Q.  And what was his role?
23        MR. BERNARDO:  Object to the
24 form of the question.
25        THE WITNESS:  I don't know his

Page 53

1  specific role.
2  BY MR. C. PLACITELLA:
3      Q.  Was he general counsel at the time?
4         MR. BERNARDO:  Object to the
5  form of the question.
6         THE WITNESS:  I already told
7  you, I don't know his exact title or his
8  role.
9  BY MR. C. PLACITELLA:
10     Q.  Who was the person, if you know --
11 well, you should know, who was the person in
12 charge of gathering evidence to supply
13 answers to discovery in talc cases involving
14 Johnson & Johnson?
15     A.  There'd be many different people
16 involved in that.
17     Q.  But who was the person in charge?
18     A.  I don't know who the person in
19 charge was.  We would prepare questions
20 accordingly and we were working with counsel.
21     Q.  So was it the lawyer that was in
22 charge?
23        MR. BERNARDO:  Object to the
24 form of the question.
25 BY MR. C. PLACITELLA:



Page 54

1     Q.  Was it Mr. O'Shaughnessy the one
2  that was in charge?
3     A.  I don't think it's a question of in
4  charge.  We all collaborated.  As I told you
5  earlier, that I worked with Mr. O'Shaughnessy
6  to help direct him to appropriate people.
7     Q.  You say "we all collaborated,"
8  who's "we all"?
9     A.  A lot of different people in the
10  company.
11     Q.  So you don't have any names?
12     A.  It would depend on the specific
13  questions asked.
14     Q.  So you don't remember any of the
15  names?
16     A.  I can tell you about different
17  names.  They'd be different names at
18  different times.
19     Q.  Okay.  When the evidence was
20  gathered, where was it stored?
21        MR. BERNARDO:  Object to the
22  form of the question.
23  BY MR. C. PLACITELLA:
24     Q.  In responding to discovery, where
25  was the evidence stored?

Page 55

1        MR. BERNARDO:  Object to the
2  form of the question.
3        THE WITNESS:  There would not
4  necessarily be evidence that was gathered.
5  It was in many times the form of responses
6  from individual person that might be most
7  knowledgeable.  So there was no particular
8  evidence that related to each question.
9  BY MR. C. PLACITELLA:
10     Q.  Well, you never turned over any
11  evidence in response to discovery?
12     A.  That was not my role.  And as I
13  said earlier, counsel would have
14  conversations with the appropriate people.
15  And there's -- their answers were based on
16  their own expertise.
17     Q.  My question is, you're here for --
18  as Johnson & Johnson, not Nancy Musco.  And
19  I'm asking you, Johnson & Johnson, where did
20  you store the evidence that was gathered in
21  order to respond to discovery in talc-related
22  cases?
23        MR. BERNARDO:  Object to the
24  form of the question, already answered.
25        THE WITNESS:  I think it's

Page 56

1  important for you to understand that there's
2  not necessarily a pile of evidence that goes
3  with each question.
4        Those questions are responded
5  to by the person most knowledgeable of that
6  area, which is based on their experience,
7  their expertise, years of it.
8  BY MR. C. PLACITELLA:
9     Q.  Listen to my question.
10        When evidence was gathered up,
11  physical evidence, where was it stored within
12  Johnson & Johnson when it was used to respond
13  to discovery in litigation?
14        MR. BERNARDO:  Object to the
15  form of the question, asked and answered
16  twice already.
17        THE WITNESS:  I'm trying to
18  answer your question that there was not
19  evidence or piles of information, papers to
20  go with the responses.  Those were based on
21  the individuals' expertise.
22        This is what they did all the
23  time.
24  BY MR. C. PLACITELLA:
25     Q.  So, as you sit here today, you have

Page 57

1  no information that Johnson & Johnson
2  actually turned over any documentary evidence
3  in any talc-related case?
4        MR. BERNARDO:  Object to the
5  form of the question.
6        THE WITNESS:  What I was
7  responding to were the -- the process that
8  we -- how we prepared answers for specific
9  questions and interrogatories.  And there's
10  no hard evidence to go with each question.
11  BY MR. C. PLACITELLA:
12     Q.  Well, was there hard evidence with
13  any of the questions that you recall that
14  you've researched?
15     A.  I don't recall that there were.
16     Q.  Okay.  And after the discovery
17  responses were provided, where were those
18  discovery responses stored at Johnson &
19  Johnson?
20        MR. BERNARDO:  Object to the
21  form of the question.
22        THE WITNESS:  Most probably
23  with the Complaint file.
24  BY MR. C. PLACITELLA:
25     Q.  And where was that?



Page 58

1     A.  It could be with the Legal
2   Department.
3     Q.  Who was in charge of overseeing the
4   Complaint file?
5       MR. BERNARDO:  Object to the
6   form of the question.
7       THE WITNESS:  I would assume it
8   would be, you know, the Legal Department, but
9   I don't know specific person, the files.
10  BY MR. C. PLACITELLA:
11    Q.  When Johnson & Johnson -- I just
12  want to be clear, when Johnson & Johnson was
13  sued in a talc-related case, is it Johnson &
14  Johnson's testimony that no physical evidence
15  was ever gathered and turned over to the
16  Plaintiffs in a lawsuit, as far as your
17  research demonstrated?
18      MR. BERNARDO:  Object, object
19  to the form of the question and
20  characterization of her prior testimony.
21      THE WITNESS:  If there had been
22  specific documents that were requested, they
23  would be made available, yes.
24  BY MR. C. PLACITELLA:
25    Q.  And where would those documents

Page 59

1   then be stored after they were made
2   available?
3     A.  They could be stored in different
4   places.
5     Q.  Where were they stored?
6     A.  If there was --
7       MR. BERNARDO:  Object to the
8   form of the question.
9       THE WITNESS:  If there were
10  documents, they could be stored in a legal --
11  internally in a legal department or maybe
12  with outside counsel.
13  BY MR. C. PLACITELLA:
14    Q.  Okay.  Now, did you understand that
15  Johnson & Johnson was involved -- strike
16  that.
17      Am I correct that Johnson & Johnson
18  was sued in talc cases that involved both
19  industrial talc and cosmetic talc?
20    A.  Yes.
21    Q.  And you understand that the
22  cosmetic and industrial talcs came from the
23  same mine?
24      MR. BERNARDO:  Object to the
25  form of the question.

Page 60

1       THE WITNESS:  I know they can
2   come from the same mine, but not necessarily
3   the same location.
4   BY MR. C. PLACITELLA:
5     Q.  So do you understand, for example,
6   that the talc that was used in Johnson's Baby
7   Powder came from the same mine that
8   industrial talc came from that was sold by
9   Johnson & Johnson?
10      MR. BERNARDO:  Object to the
11  form of the question.  Again, outside the
12  scope of the notice and what this witness is
13  being tendered for.
14      But if you know you can answer
15  in your individual capacity.
16      THE WITNESS:  I can't get into
17  industrial talc, because I'm here to talk
18  about cosmetic talc, as set forth in the
19  notice.
20  BY MR. C. PLACITELLA:
21    Q.  Well, you understand you provided
22  discovery responses that indicate that the
23  industrial talc and the cosmetic talc came
24  from the exact same source, correct?
25      MR. BERNARDO:  Object to the

Page 61

1   form of the question.
2       THE WITNESS:  I'm here today
3   to -- you know, as said in the notice, to
4   talk about cosmetic talk.
5   BY MR. C. PLACITELLA:
6     Q.  So the -- what's the answer to my
7   question?
8       You understand that Johnson &
9   Johnson provided discovery responses
10  indicating that the cosmetic and the
11  industrial talc came from the exact same
12  mine --
13      MR. BERNARDO:  Object.
14  BY MR. C. PLACITELLA:
15    Q.  -- correct?
16      MR. BERNARDO:  Object to the
17  form of the question.
18      If there's a specific response
19  to show the witness, I think that would make
20  this process quicker, and easier and more
21  accurate.
22      MR. C. PLACITELLA:  Please
23  don't, don't do that.
24      MR. BERNARDO:  Please don't
25  do --

16  (Pages 58 to 61)



1          MR. C. PLACITELLA:  It's not --
2          MR. BERNARDO:  -- what you're
3   doing.
4          MR. C. PLACITELLA:  It's not --
5   it's not proper under our rules.  You're here
6   under pro hac vice admission.  Please don't
7   do that.  Okay?
8          Your -- your responses are to
9   form and for form only.
10         MR. BERNARDO:  Well --
11         MR. C. PLACITELLA:  Otherwise
12  we'll get the judge on the phone and we'll
13  deal with you.  Okay?
14         MR. BERNARDO:  That's fine.
15         MR. C. PLACITELLA:  All right.
16         MR. BERNARDO:  But --
17         MR. C. PLACITELLA:  Can you
18  read my question back, please?
19         (At which time the following
20  question is read:
21         "QUESTION:  You understand that
22  Johnson & Johnson provided discovery
23  responses indicating that the cosmetic and
24  the industrial talc came from the exact same
25  mine?")

1          THE WITNESS:  I -- I --
2          MR. BERNARDO:  Object to the
3   form of the question.
4          THE WITNESS:  I don't know
5   that, no.
6   BY MR. C. PLACITELLA:
7      Q.  Do you -- do you -- have you ever
8   heard of the Hammondsville mine?
9      A.  I have heard of it, yes.
10     Q.  You understand that that was a
11  source of talc for Johnson's Baby Powder?
12     A.  I believe so, yes.
13     Q.  Do you understand that that was
14  also a source of talc for industrial talc
15  sold by Johnson & Johnson?
16         MR. BERNARDO:  Object to the
17  form of the question.
18         THE WITNESS:  Again, it may
19  have been.  I'm not the authority on anything
20  about the mines.
21  BY MR. C. PLACITELLA:
22     Q.  Okay.  Have you ever heard of the
23  Johnson mine?
24     A.  Yes, I have.
25     Q.  Do you understand that that was a

1   source of cosmetic talc for Johnson's Baby
2   Powder?
3          MR. BERNARDO:  Object to the
4   form of the question.
5          THE WITNESS:  I believe so.
6   BY MR. C. PLACITELLA:
7      Q.  Now, you understand that the
8   possibility that Johnson & Johnson was likely
9   to -- was going to be sued over Johnson &
10  Johnson's baby powder dated back to the
11  1960s, correct?
12     A.  Could you rephrase --
13         MR. BERNARDO:  Object --
14         THE WITNESS:  -- that question?
15         MR. BERNARDO:  Object to the
16  form of the question.
17  BY MR. C. PLACITELLA:
18     Q.  The possibility of facing lawsuits
19  involving Johnson & Johnson was recognized by
20  Johnson & Johnson going back to the 1960s,
21  correct?
22         MR. BERNARDO:  Object to the
23  form of the question, beyond the scope of the
24  notice.
25         You can answer in your

1   individual capacity, if you know.
2          THE WITNESS:  I don't know.
3          MR. C. PLACITELLA:  Can you
4   give me number 8?
5          (Exhibit J&J-8, April 15, 1969
6   Memo, is marked for identification.)
7          MR. BERNARDO:  Are these marked
8   as exhibits already, Chis?  Already marked --
9          MR. C. PLACITELLA:  Yeah, I've
10  premarked.
11         MR. BERNARDO:  Okay, great.
12         And what is -- what number is
13  this?
14         MR. C. PLACITELLA:  This is
15  J&J-8.
16         MR. BERNARDO:  Okay.
17         MR. C. PLACITELLA:  It's an
18  April 15, 1969 memo on Johnson & Johnson
19  stationery from Dr. Thompson.
20  BY MR. C. PLACITELLA:
21     Q.  Do you know who Dr. Thompson was?
22     A.  No, I do not.
23     Q.  You don't know that he was the
24  Medical Director of Johnson & Johnson at any
25  point in time?

17  (Pages 62 to 65)



Page 66

```
 1        A.  Other than I see MD after his name,
 2   I did not know that.
 3        Q.  What about Mr. Ashton, do you know
 4   who he was?
 5        A.  I believe he worked for the
 6   company, yes.
 7        Q.  Do you know that he worked for the
 8   company on talc?
 9        A.  I know that.
10        Q.  Do you know he worked on talc
11   lawsuits?
12             MR. BERNARDO:  Object to the
13   form of the question.
14             THE WITNESS:  I do not know
15   that specifically, no.
16   BY MR. C. PLACITELLA:
17        Q.  Do you know that he was known in
18   the company as Mr. Talc?
19        A.  No.
20             MR. BERNARDO:  Object to the
21   form of the -- okay.
22   BY MR. C. PLACITELLA:
23        Q.  Okay.  You go to the second page --
24   where Dr. Thompson writes, Since the usage of
25   these products is so widespread, and the
```

Page 67

```
 1   existence of pulmonary disease is increasing,
 2   it is not inconceivable that we could become
 3   involved in litigation in which pulmonary
 4   fibrosis or other changes might be rightfully
 5   or wrongfully attributed to inhalation of our
 6   powder formulations.  It might be that
 7   someone in the Law Department should be
 8   consulted with regard to the defensibility of
 9   our position in the event that such a
10   situation could ever arise.
11             Is this the first time you ever
12   heard that?
13             MR. BERNARDO:  Object to the
14   form of the question.
15             THE WITNESS:  I have read this
16   before.
17   BY MR. C. PLACITELLA:
18        Q.  You did?
19        A.  Mm-hmm.
20        Q.  Okay.  And in what context?
21        A.  In my preparation for this
22   deposition.
23        Q.  Okay.  And why did you look at this
24   in preparation for today's deposition?
25        A.  Because these are a part of the
```

Page 68

```
 1   documents concerning the content of asbestos.
 2        Q.  Okay.  And do you know how long
 3   after Dr. Thompson predicted that Johnson &
 4   Johnson would be sued in a baby powder case
 5   or a talc case Johnson & Johnson was actually
 6   sued for the first time?
 7             MR. BERNARDO:  Object to the
 8   form of the question.
 9             THE WITNESS:  No, I do not.
10   BY MR. C. PLACITELLA:
11        Q.  Okay.  Do you understand that when
12   Johnson & Johnson is sued over a product that
13   it manufactures that it's put on notice that
14   people were making complaints in a court of
15   law that they believe they were injured from
16   those products?
17             MR. BERNARDO:  Object to the
18   form of the question.
19             THE WITNESS:  I believe that's
20   the process, yes.
21   BY MR. C. PLACITELLA:
22        Q.  Okay.  When that happened do you
23   know whether there was a reporting
24   requirement for Johnson & Johnson to provide
25   that information to its auditors or its
```

Page 69

```
 1   insurers?
 2             MR. BERNARDO:  Object to the
 3   form of the question.
 4             Chris, we're just getting so
 5   beyond the scope of the notice.  You know,
 6   maybe we talk at a break, because maybe we do
 7   need to get Judge Viscomi on the phone --
 8             MR. C. PLACITELLA:  Sure.
 9             MR. BERNARDO.  This deposition
10   is not about legal duties, legal holds.  This
11   deposition, as we understood it, is about
12   written responses to discovery.  And this
13   witness is being tendered for that.  I'm
14   allowing her if she knows the answers in her
15   individual capacity.  But I just want to make
16   it very clear, we are not designating her as
17   the corporate representative on these topics.
18             MR. C. PLACITELLA:  Well,
19   actually, when we were in the judge's
20   chambers and Mr. Guard (phonetic) was there,
21   the judge specifically told Mr. Guard, he
22   saw -- she saw this deposition as relevant to
23   the issue of spoliation, in addition to the
24   notice.  So... And we're going to talk about
25   that.
```



Page 70

1    MR. BERNARDO:  Okay.  We will.
2    MR. C. PLACITELLA:  Okay.
3  BY MR. C. PLACITELLA:
4    Q.  So when is the first discovery
5  response, what year was that from that you
6  reviewed in preparing for today's deposition?
7    A.  I don't recall the exact years.
8    Q.  Well, do you have them with you?
9    A.  Yes, we have -- I -- I had asked
10  counsel to do a chart so that I could
11  remember, but I don't have it in front of me
12  right now.
13    Q.  Okay.
14    MR. C. PLACITELLA:  Can -- do
15  we have the chart and I --
16    MR. BERNARDO:  Yeah.
17    MR. C. PLACITELLA:  -- can take
18  a look at it.
19    MR. BERNARDO:  And, Chris,
20  when -- I don't want to interrupt your
21  questioning, but we've been going for about
22  an hour.  When you're at a breaking point,
23  just let us know.
24    MR. C. PLACITELLA:  Mm-hmm.
25    MR. BERNARDO:  Because I also

Page 71

1  think we ought to discuss this off the
2  record --
3    MR. C. PLACITELLA:  Mm-hmm.
4    MR. BERNARDO:  -- so we can
5  have some understanding here.
6    MR. C. PLACITELLA:  Why don't
7  we mark this.  Do you have an extra copy?
8    MR. BERNARDO:  Can probably get
9  something copied at a break.
10    MR. C. PLACITELLA:  Sure.
11    (Exhibit P-2, Chart, is marked
12  for identification.)
13    MR. C. PLACITELLA:  I'll put it
14  over here.  Can you switch this to Elmo?
15    THE VIDEOTAPE OPERATOR:  Yes.
16  Stand by.
17  BY MR. C. PLACITELLA:
18    Q.  So --
19    MR. BERNARDO:  I'm sorry.  What
20  number is this marked as?
21    THE COURT REPORTER:  P-2.
22    MR. C. PLACITELLA:  This is
23  marked P-2.  It was just handed to me by
24  counsel.
25  BY MR. C. PLACITELLA:

Page 72

1    Q.  Can you tell me what this is and
2  why it was prepared?
3    A.  I had asked counsel to prepare this
4  for me, just to really satisfy my curiosity
5  of the cases that you had cited in your
6  notice.
7    Q.  When you say "curiosity," what were
8  you curious about?
9    A.  I wanted to know specifically what
10  the injuries were that were alleged in these
11  Complaints, similar to what I would do when I
12  worked at the company.
13    Q.  Okay.  And the first record you
14  found of a Complaint involving baby powder
15  was the Gambino case in 1983?
16    MR. BERNARDO:  Object to the
17  form of the question.
18    THE WITNESS:  No, these --
19    MR. BERNARDO:  Characterization
20  of her prior testimony.
21    THE WITNESS:  These were the
22  list of the Complaints that you had mentioned
23  in your notice.
24  BY MR. C. PLACITELLA:
25    Q.  Well, what was the first record

Page 73

1  that you found of a lawsuit involving talc or
2  Johnson's Baby Powder?
3    MR. BERNARDO:  Object to the
4  form of the question.
5    THE WITNESS:  These were all
6  lawsuits.
7    I actually was able to review
8  interrogatories for both Shelby and then
9  there's a second page of Krushinski.
10  BY MR. C. PLACITELLA:
11    Q.  That wasn't my question.
12    My question is, what is the first
13  record that you found concerning a -- or that
14  you reviewed in terms of date or a year of a
15  lawsuit involving talc sold by Johnson &
16  Johnson?
17    Is it 1983?
18    MR. BERNARDO:  Object to the
19  form of the question.
20    THE WITNESS:  Well, that's the
21  year, that first year that's mentioned here,
22  yes.
23  BY MR. C. PLACITELLA:
24    Q.  So the answer is yes?
25    MR. BERNARDO:  Object to the

19  (Pages 70 to 73)



Page 74

```
 1   form of the question.
 2            THE WITNESS:  Yes, it would be
 3   1983.
 4            MR. C. PLACITELLA:  Okay.  So
 5   can you...
 6            (Exhibit J&J-486, Privilege
 7   log, is marked for identification.)
 8   BY MR. C. PLACITELLA:
 9       Q.  Now, I'm going to show you what's
10   been marked Johnson & Johnson-486.  I'll give
11   it to your attorney first.
12            MR. BERNARDO:  And I'll object
13   to this and state that this witness is not
14   being tendered to testify as to what I
15   believe is a privilege log.
16            BY MR. C. PLACITELLA:  Right.
17            And I'm going to tell you which
18   I -- this is -- this is the privilege log, an
19   excerpt from the privilege log supplied by
20   Johnson & Johnson in these cases.  And what
21   we did is we sorted it by date involving
22   lawsuits related to baby powder.
23   BY MR. C. PLACITELLA:
24       Q.  Can you take a look at that?
25            MR. BERNARDO:  Same objection.
```

Page 75

```
 1   BY MR. C. PLACITELLA:
 2       Q.  And you see that the first, the
 3   first date here is, at least on this exhibit,
 4   is 2/10/1971; do you see that?
 5            MR. BERNARDO:  Can you see it
 6   on there?
 7            THE WITNESS:  I see that it's
 8   highlighted here.
 9   BY MR. C. PLACITELLA:
10       Q.  And the description says,
11   Attachment to letter from counsel to client
12   regarding talc samples in connection with
13   ongoing and anticipated litigation.
14            Do you see that?
15       A.  I see that's highlighted here.
16       Q.  Do you see -- do you see on the
17   next one there's another entry, 4/9/1971, and
18   it talks about, Attachment by counsel
19   pursuant to pending and anticipated
20   litigation regarding Johnson's Baby Powder.
21            Do you see that?
22            MR. BERNARDO:  Object to the
23   form of the question.
24            THE WITNESS:  I see those
25   words.  I can't see the date.
```

Page 76

```
 1   BY MR. C. PLACITELLA:
 2       Q.  Well, the date is over here,
 3   4/9/71.  See it?
 4       A.  Okay.
 5       Q.  Okay.  And did you know that
 6   Johnson & Johnson was sued over baby powder
 7   in 1971?
 8            MR. BERNARDO:  Object to the
 9   form of the question.  Again, outside the
10   scope of the notice and not tendering --
11   outside the scope of the notice and not
12   tendering this witness for this topic, this
13   corporate representative.
14            THE WITNESS:  I don't know what
15   this is.  You said something about
16   privileged.  I don't even know what that
17   means.  So I don't know what I'm looking at.
18   BY MR. C. PLACITELLA:
19       Q.  It means that these are documents
20   that your lawyer withheld from production,
21   because they say that they are privileged.
22   But they are -- the log itself is still
23   evidential that the cases took place.
24            Did you ever -- were you ever
25   provided any files from lawsuits against
```

Page 77

```
 1   Johnson & Johnson involving baby powder from
 2   1971?
 3            MR. BERNARDO:  Object to the
 4   form of the question.
 5            THE WITNESS:  My understanding
 6   was that I was here today to talk about the
 7   specific things in your notice.  And I
 8   prepared my chart because of the specific
 9   cases that you have.
10   BY MR. C. PLACITELLA:
11       Q.  No, ma'am, that's not what you are
12   here to talk about.
13            You are here to talk about, the
14   corporate representative concerning the
15   discovery responses historically provided by
16   Johnson & Johnson concerning the asbestos
17   content of talc, Johnson's Baby Powder or
18   Shower to Shower.
19            Do you see that?
20       A.  Yes, I see that.
21       Q.  Historical responses mean, as long
22   as you've been sued.  There's not any
23   limitation by the number of the cases that I
24   set forth and I knew about.
25            You understand that, right?
```



Page 78

```
 1              MR. BERNARDO:  Object to the
 2    form of the question.
 3              THE WITNESS:  You're saying
 4    that there's no limitation.
 5    BY MR. C. PLACITELLA:
 6       Q.  Right.
 7         So what you did, is the only thing
 8    that you did to prepare for today's
 9    deposition is to look at information that I
10    asked you to bring with you, correct?
11       A.  No.
12              MR. BERNARDO:  Object to the
13    form of the question.
14              THE WITNESS:  That's -- that's
15    incorrect, that's not all I did.
16    BY MR. C. PLACITELLA:
17       Q.  Okay.
18       A.  I told you earlier, you know, the
19    depositions, the testimonies that I reviewed,
20    my conversations for almost an hour with
21    Dr. Hopkins.  Most importantly, to reassure
22    myself that he has seen everything that has
23    been provided and that there was nothing new
24    that the company has not seen.
25       Q.  Okay.  Well, no one showed you any
```

Page 79

```
 1    files, lawsuit files concerning baby powder
 2    from 1971, correct?
 3       A.  I did not specifically review any
 4    of those, no.
 5       Q.  They were not provided to you?
 6              MR. BERNARDO:  Object to the
 7    form of the question.
 8              THE WITNESS:  That's correct.
 9    BY MR. C. PLACITELLA:
10       Q.  All right.  Where are those records
11    from 1971?
12              MR. BERNARDO:  Object to the
13    form of the question.
14              THE WITNESS:  I do not know.
15    BY MR. C. PLACITELLA:
16       Q.  Okay.  Well, I'm not asking you,
17    I'm asking Johnson & Johnson.
18         Johnson & Johnson, where are the
19    records from the lawsuits from 1971 involving
20    Johnson's Baby Powder, where are they?
21              MR. BERNARDO:  Object to the
22    form of the question.
23              THE WITNESS:  I do not know.
24    They could be in different places.
25    BY MR. C. PLACITELLA:
```

Page 80

```
 1       Q.  Like where?
 2       A.  If -- they could be with their
 3    outside counsel files.  If there were actual
 4    discoveries even filed for any of these, I --
 5    I don't know.
 6       Q.  Let's go down to 1972.  Do you see
 7    there's an entry for 1972 concerning pending
 8    and anticipated litigation?
 9       A.  I see that.  It says that, yes.
10              MR. BERNARDO:  Object to the
11    form of the question.
12    BY MR. C. PLACITELLA:
13       Q.  Where are the file -- the lawsuit
14    files related to Johnson & Johnson from 1972?
15              MR. BERNARDO:  Object to the
16    form of the question.
17              THE WITNESS:  My answer would
18    be the same.
19    BY MR. C. PLACITELLA:
20       Q.  What about, do you see where it
21    says that you were sued in 1973 and that a
22    memorandum was prepared concerning Johnson's
23    Baby Powder regulatory matters in 1973; where
24    are those files?
25              MR. BERNARDO:  Object to the
```

Page 81

```
 1    form of the question.
 2              THE WITNESS:  I see that
 3    this is here.  I can't tell you where
 4    these -- these files were specifically,
 5    because I did not come prepared to speak
 6    about these.
 7    BY MR. C. PLACITELLA:
 8       Q.  Well, you are here to talk about
 9    the historical discovery responses.  How do
10    you know whether there were historical
11    discovery responses if you never looked at
12    the files?
13       A.  Well, what I did do is speak to one
14    of the people that is involved in doing
15    searches for us to make sure that we had
16    everything available.  And this is -- there
17    were no discovery responses in these cases.
18    I'm not prepared to speak about them.
19       Q.  How do you know there were no
20    discovery responses in these cases?
21       A.  I'm -- I believe that we're here
22    today to talk about the specific scope.  And
23    I guess we're interpreting it different.  It
24    sounds like we are.
25       Q.  So what about 1974, do you see that
```

21  (Pages 78 to 81)



Page 82

1    Johnson & Johnson was sued in talc cases in
2    1974, according to their own responses?
3        A.  That's what it says there, yes.
4        Q.  Okay.  And you see, if you turn it
5    over, they were sued in 1976?
6        A.  I see those dates, yes.
7        Q.  Okay.  You see they were sued in
8    1977?
9        A.  Again, I see those dates.
10       Q.  You see that they were sued in
11   1978?
12       A.  I see that, yes.
13       Q.  Okay.  Do you see that they were
14   sued in baby powder litigation in 1979?
15           MR. BERNARDO:  Object to the
16   form of the question.
17           THE WITNESS:  I see all this,
18   yes.
19   BY MR. C. PLACITELLA:
20       Q.  Okay.  And I'll ask you during the
21   break to look at this -- well, let me just
22   ask you about some specific cases.
23       Listed here in this log is 1981; do
24   you see that?
25       A.  I see what you highlighted, yes.

Page 83

1        Q.  Okay.  And you see where it talks
2    about pending litigation?
3        A.  I can't see it.
4        Q.  Sorry.
5        A.  I see that --
6        Q.  See that?
7        A.  -- what it says, yes.
8        Q.  And it talks about a case called
9    Westfall; do you see that?
10       A.  Yes, I see that.
11       Q.  What do you know about the Westfall
12   case?
13       A.  I believe that had to do with
14   industrial talc.
15       Q.  Okay.  Did you review the files
16   related to the Westfall case?
17       A.  I -- I -- vaguely familiar with it
18   when I saw that it had to deal with
19   industrial talc.  I didn't feel that that was
20   within the scope of this.
21       Q.  Did you know that the Westfall case
22   involved talc from the mines that you say
23   were used in baby powder?
24           MR. BERNARDO:  Object to the
25   form of the question and the characterization

Page 84

1    of prior testimony.
2            THE WITNESS:  As I said, I -- I
3    am not an authority on what mines were used.
4            Well, I do know specifically
5    the cosmetic talc used in Johnson's Baby
6    Powder does not contain asbestos.
7    BY MR. C. PLACITELLA:
8        Q.  What was my question?
9        A.  You would have to repeat that back
10   to me.
11       Q.  Do you have any idea what my
12   question was?
13       A.  You asked me if I was familiar with
14   Westfall.
15       Q.  What's that got to do with whether
16   it has asbestos?
17           Was that my question?
18           MR. BERNARDO:  Object to the
19   form of the question.
20   BY MR. C. PLACITELLA:
21       Q.  Or were you just, you know, wound
22   up and going to just give a response?
23           MR. BERNARDO:  Object to the
24   form of the question, that's completely
25   inappropriate.

Page 85

1            THE WITNESS:  No, I think it's
2    important that this was about industrial
3    talc.  And that was not my interpretation of
4    the notice today.
5    BY MR. C. PLACITELLA:
6        Q.  Did you skip the Westfall case
7    because you, Johnson & Johnson, knew that
8    there was proof in that case that there was
9    asbestos in the mine owned by Johnson &
10   Johnson?
11           MR. BERNARDO:  Object to the
12   form of the question.
13           THE WITNESS:  No, I did not.
14   BY MR. C. PLACITELLA:
15       Q.  You knew that, though, right?
16           MR. BERNARDO:  Objection.
17   BY MR. C. PLACITELLA:
18       Q.  You knew that the mine that was
19   owned by Johnson & Johnson that was the issue
20   in the Westfall case had asbestos in it,
21   right?
22           MR. BERNARDO:  Object to the
23   form of the question.
24   BY MR. C. PLACITELLA:
25       Q.  You knew that?



Page 86

```
1          You, Johnson & Johnson knew that?
2      A.  No, I did not.  I did not go into
3  detail with this, because it was industrial
4  talc.
5      Q.  Okay.  What about the next page,
6  from 1982 the Joly case?
7          What do you know about the Joly
8  case?
9      A.  I don't know anything about it.
10     Q.  You're sure about that?
11     A.  This is the first I'm seeing it.
12     Q.  You're sure about that?
13     A.  I don't recollect anything on this,
14  no.
15     Q.  So you did not review any records
16  concerning the Joly case?
17     A.  It's not familiar to me, no.
18     Q.  So before coming here today, were
19  you aware that Johnson & Johnson was sued in
20  a talc case, according to their own privilege
21  log from 1971 until 2010, each and every
22  year, except 1975?
23         MR. BERNARDO:  Object to the
24  form of the question.
25         THE WITNESS:  No, I'm not
```

Page 87

```
1  familiar with the dates, no.
2  BY MR. C. PLACITELLA:
3      Q.  Okay.  And you don't any of the
4  records and did not review any of the records
5  related to any of the cases on this privilege
6  log, other than what is marked on P-2?
7          MR. BERNARDO:  Object to the
8  form of the question.
9  BY MR. C. PLACITELLA:
10     Q.  Is that fair?
11     A.  Yes.
12     Q.  And other than the records, the
13  cases that are marked or set forth in P-2,
14  you have no idea whatsoever, that is you,
15  Johnson & Johnson, where the records are
16  related to the lawsuits filed against
17  Johnson & Johnson from 1971 until 2010 --
18         MR. BERNARDO:  Object to the --
19  BY MR. C. PLACITELLA:
20     Q.  -- correct?
21         MR. BERNARDO:  Object to the
22  form of the question.  Beyond the scope of
23  the notice.
24         You can answer in your
25  individual capacity if you know.
```

Page 88

```
1          THE WITNESS:  I don't know.
2  BY MR. C. PLACITELLA:
3      Q.  And you have no idea what discovery
4  responses were proffered by Johnson & Johnson
5  in any of the lawsuits that are referenced in
6  the log marked P-487 [verbatim]?
7          MR. BERNARDO:  Object to the
8  form of the question.
9          THE WITNESS:  Is that large
10  thing 487?
11  BY MR. C. PLACITELLA:
12     Q.  Yes.
13     A.  This is the first I've seen this.
14     Q.  So in preparing for today's
15  deposition, your attorneys never provided you
16  any records related to discovery responses
17  from any case on this exhibit, other than
18  what you have marked here as P-2; is that
19  fair?
20         MR. BERNARDO:  Object to the
21  form of the question.
22         THE WITNESS:  As I said, this
23  is the first I had seen this document.
24         MR. C. PLACITELLA:  Okay.  Why
25  don't we take a break now.
```

Page 89

```
1          THE VIDEOTAPE OPERATOR:  The
2  time is 11:20 a.m.  We're off the record.
3          (Brief recess.)
4          THE VIDEOTAPE OPERATOR:  Time
5  is 11:42 a.m.  We are on the record.
6          MR. C. PLACITELLA:  Okay, thank
7  you.
8  BY MR. C. PLACITELLA:
9      Q.  I have to ask the question.  I hope
10  I know the answer.
11         Am I fair to -- is it fair to
12  assume you didn't discuss your deposition
13  during the break?
14     A.  We did not.
15     Q.  Okay.  Good.
16         You said before you spoke to Pamela
17  Downs and she did the search.
18         What exactly did she search?
19     A.  My understanding is that she
20  search -- searched, excuse me, for the
21  documents that you have listed in the second
22  part of the deposition -- of the notice that
23  you had served us.
24     Q.  Okay.  And what did, what did she
25  use to search; was it a computer, was it a
```



Page 90

1  database, what?
2      A.  She used search terms.  I know that
3  she searched by name.  She searched by --
4  excuse me, she searched by product.
5      Q.  So she -- when she conducted her
6  search, she didn't look at all lawsuits
7  historically that Johnson & Johnson was
8  involved with concerning talc, only the
9  lawsuits that were mentioned on P-1; is that
10  fair?
11      A.  My understanding is that she did
12  the search for the documents that you
13  requested.
14      Q.  Okay.  So in your preparing
15  information concerning historical discovery
16  responses, you never went beyond the specific
17  cases that we were aware of and that were
18  listed on P-1 correct?
19          MR. BERNARDO:  Object to the
20  form of the question.
21          THE WITNESS:  My concentration
22  was on what is listed in the first part of
23  your notice.  And we ensured that Miss Downs
24  had searched for everything that was involved
25  in part 2.  Excuse me.

Page 91

1  BY MR. C. PLACITELLA:
2      Q.  But she didn't search for all
3  historical discovery responses in talc cases
4  that were provided by Johnson & Johnson, I
5  take it?
6      A.  That's my understanding.
7      Q.  And she certainly didn't search for
8  any of the cases that are set forth in this
9  log, 486, other than what's on your list,
10  correct?
11      A.  I don't believe so, no.
12      Q.  Where would the information be
13  stored for the lawsuits that were set forth
14  on the log, 486?
15      A.  They could be in various places.  I
16  don't know specifically where they would be.
17      Q.  Well, is it in the Legal
18  Department?
19      A.  Some of it could be in the Legal
20  Departments if -- if there were any documents
21  associated with it.  And they also could be
22  in outside counsels.
23      Q.  Well, we know that there were
24  documents associated with it, right?  Because
25  they actually list the documents.  So, for

Page 92

1  example, you know, in this first entry, the
2  first two entries, it lists documents.  So
3  they know that there were documents in the
4  Legal Department, correct?
5          MR. BERNARDO:  Object, object
6  to the form of the question.
7          THE WITNESS:  As I told you
8  earlier, this is the first time I've seen
9  this.  It says Privilege Description.  I
10  don't know really what that means.  Does it
11  mean they're documents or not?  I don't know.
12  BY MR. C. PLACITELLA:
13      Q.  Well, let's just look at it.  It
14  says, Attachment prepared by counsel.
15      Attachment is not an apple or an
16  orange, right?
17      It's a piece of paper, right?
18      A.  It says attachment here, yes.
19      Q.  All right.  Pursuant to pending and
20  anticipated litigation.
21      You understand that means current
22  cases and cases in the future?
23          MR. BERNARDO:  Object to the
24  form of the question.
25          THE WITNESS:  Again, I can't

Page 93

1  comment on any of this.
2  BY MR. C. PLACITELLA:
3      Q.  Regarding Johnson's Baby Powder
4  litigation, right?
5      A.  That's what it says, yes.
6      Q.  So according to this, there were
7  documents apparently in the department, in
8  the Legal Department related to a case file
9  in 1971 --
10          MR. BERNARDO:  Object.
11  BY MR. C. PLACITELLA:
12      Q.  -- correct?
13          MR. BERNARDO:  Object to the
14  form of the question.
15          THE WITNESS:  You're reading
16  what it says here.
17  BY MR. C. PLACITELLA:
18      Q.  And, for example, the very first
19  entry on here talks about letters concerning
20  samples in connection with ongoing and
21  anticipated litigation; do you see that?
22      A.  That's what it says, yes.
23      Q.  Well, what -- who had -- who
24  retained talc samples related to litigation,
25  to your knowledge?

24  (Pages 90 to 93)



Page 94

1          MR. BERNARDO:  Object to the
2   form of the question.
3   BY MR. C. PLACITELLA:
4       Q.  Is that the Legal Department?
5       A.  I don't know.  I can't
6   comment on this today.
7       Q.  Well, what does J&J know about talc
8   samples that were involved in litigation as
9   set forth in their own privilege log?
10         MR. BERNARDO:  Object to the
11  form of the question.  Beyond the scope of
12  the notice.
13         You can answer in your
14  individual capacity, if you know.
15         THE WITNESS:  I can't answer
16  that.
17  BY MR. C. PLACITELLA:
18      Q.  So in preparing historical -- to be
19  here today to talk about historical discovery
20  responses, you have no information whatsoever
21  about samples that were part of the
22  litigation discovery process, correct?
23         MR. BERNARDO:  Object, object
24  to the form of the question.
25         THE WITNESS:  I -- again, I

Page 95

1   cannot answer on any of these cases.  I'm not
2   familiar.
3   BY MR. C. PLACITELLA:
4       Q.  Now, in your preparation and in the
5   knowledge of Johnson & Johnson, do you have a
6   record or any information of a single case
7   where Johnson & Johnson turned over asbestos
8   testing data prior to 2017?
9          MR. BERNARDO:  Object to the
10  form of the question.
11         THE WITNESS:  Could you repeat
12  that question?
13  BY MR. C. PLACITELLA:
14      Q.  Yes, ma'am.
15         Am I correct -- well, strike that.
16         Do you have any evidence that
17  Johnson & Johnson turned over in a lawsuit
18  involving talc testing data related to
19  asbestos and talc prior to 2017?
20      A.  If it was requested, Johnson &
21  Johnson would have turned it over.
22      Q.  When does your research -- or when
23  does Johnson & Johnson maintain is the first
24  time that it turned over testing data
25  concerning asbestos in Johnson & Johnson talc

Page 96

1   in litigation?
2          When is the first time that
3   happened?
4       A.  I -- again, it would be whenever it
5   was requested.
6       Q.  But from your knowledge, so you
7   believe that the first time it was requested
8   it was turned over?
9          MR. BERNARDO:  Object to the
10  form of the question.
11         THE WITNESS:  If there were
12  specific documents requested, they would have
13  been.  I -- we're talking generally so I
14  don't know the answer to this.
15  BY MR. C. PLACITELLA:
16      Q.  Well, you know, for example, when
17  lawyers in cases involving cancer and baby
18  powder ask for testing data, Johnson &
19  Johnson took the position that they weren't
20  going to turn it over because it was
21  privileged.
22         MR. BERNARDO:  Object.
23  BY MR. C. PLACITELLA:
24      Q.  You know that, right?
25         MR. BERNARDO:  Object to the

Page 97

1   form of the question.
2   BY MR. C. PLACITELLA:
3       Q.  You saw that, right?
4       A.  I don't know this, no.
5       Q.  Okay.  That would be wrong,
6   wouldn't you say?
7          MR. BERNARDO:  Object to the
8   form of the question.
9          THE WITNESS:  I can't -- I
10  can't comment on that.
11  BY MR. C. PLACITELLA:
12      Q.  I mean, that would be a wrong thing
13  to do if you had testing data concerning
14  asbestos in a talc and you withheld it and
15  asserted privilege as a -- as a reason for
16  not turning it over, correct?
17         MR. BERNARDO:  Object, object
18  to the form of the question.
19         THE WITNESS:  If Johnson &
20  Johnson knew that anything about any of its
21  products were dangerous, they would take
22  steps to correct that.
23  BY MR. C. PLACITELLA:
24      Q.  Ma'am, that wasn't my question.
25         My question was, if you had

25  (Pages 94 to 97)



Page 98

1  information in your possession, that's you,
2  Johnson & Johnson, concerning testing data on
3  asbestos and talc that was requested in a
4  lawsuit, it would be wrong not to turn that
5  over, correct?
6           MR. BERNARDO:  Object to the
7  form of the question.
8           THE WITNESS:  I just have to
9  say, if it were requested they would turn
10 over whatever was appropriate.
11 BY MR. C. PLACITELLA:
12    Q.   Right.
13         And if they didn't turn it over,
14 that would be wrong, correct?
15         MR. BERNARDO:  Object to the
16 form of the question.
17         THE WITNESS:  I can't say wrong
18 or right, or whatever legal basis there would
19 be.  So I can't comment on that.
20 BY MR. C. PLACITELLA:
21    Q.   Okay.  You, Johnson & Johnson,
22 can't testify or attest to whether it would
23 be wrong or right to turn over asbestos
24 testing data if requested in a lawsuit;
25 Johnson & Johnson doesn't know if that's

Page 99

1  wrong or right?
2           MR. BERNARDO:  Object to the
3  form of the question.
4           THE WITNESS:  No, I'm not
5  saying that.
6           I'm just saying that if there
7  had been a legal decision as to why some
8  evidence or whatever you're asking for was
9  not given, I -- I can't even comment on that.
10 All I can say is that if there was ever
11 anything concrete and scientific saying that
12 any product was unsafe, Johnson & Johnson
13 would not hide that.
14 BY MR. C. PLACITELLA:
15    Q.   When you say "concrete and
16 scientific," what do you mean by that?
17    A.   I mean that scientific evidence
18 that had been peer reviewed, that had been
19 researched, Johnson & Johnson would take
20 steps to do something about the products.
21    Q.   When you say peer review, what do
22 you mean by that?
23    A.   Peer reviewed means that the -- the
24 particular expertise have reviewed a
25 particular medical journal or whatever it

Page 100

1  has -- whatever it is and made comments on
2  it.
3     Q.   So unless -- so if you have
4  evidence in your possession about asbestos in
5  baby powder, you're saying you don't have to
6  turn it over unless it's commented on or
7  reviewed by a medical journal?
8           MR. BERNARDO:  Object to the
9  form of the question.
10 BY MR. C. PLACITELLA:
11    Q.   Is that what you're saying?
12         MR. BERNARDO:  Object to the
13 form of the question.
14         THE WITNESS:  That's not what I
15 said.
16 BY MR. C. PLACITELLA:
17    Q.   All right.  So what I'm asking you,
18 if you have evidence in your possession
19 related to testing of asbestos in baby
20 powder, what was your obligation in
21 litigation to turn that over?
22         MR. BERNARDO:  Object to the
23 form of the question.  She's not here in the
24 capacity as a lawyer.  She's not -- this is
25 not within the scope of the notice.

Page 101

1           You can answer in your
2  individual capacity --
3           MR. C. PLACITELLA:  Is that an
4  objection to form?
5           MR. BERNARDO:  I'm -- given the
6  way you're conducting this deposition,
7  Mr. Placitella, I think I'm entitled to point
8  out that your questions are well beyond the
9  scope, and clarify the extent to which we are
10 tendering this witness as a corporate
11 representative.  So it is beyond form, but I
12 think --
13         MR. C. PLACITELLA:  Okay.
14         MR. BERNARDO:  -- it's
15 appropriate under the circumstances.
16 BY MR. C. PLACITELLA:
17    Q.   You understand that you're here to
18 talk about the historical discovery responses
19 provided by Johnson & Johnson, correct?
20    A.   My --
21    Q.   In lawsuits, correct?
22    A.   My understanding is that I'm here
23 today to talk about -- or the way that I have
24 interpreted the notice to be, which there
25 seems to be some disagreement with.

26 (Pages 98 to 101)



Page 102

```
1        So it's specifically discovery
2    responses concerning the asbestos content of
3    talc, Johnson & Johnson's Baby Powder, Shower
4    to Shower.
5    Q.  Correct.
6        So if Johnson & Johnson had
7    information in its possession concerning
8    asbestos content in baby powder, it would
9    have been wrong to not turn that over in a
10   lawsuit, correct?
11       MR. BERNARDO:  Object to the
12   form of the question.
13       THE WITNESS:  Again, I -- I
14   feel comfortable that Johnson & Johnson has
15   turned over everything that has been
16   requested.
17   BY MR. C. PLACITELLA:
18   Q.  Every time it was asked for?
19       MR. BERNARDO:  Object to the
20   form of the question.
21       THE WITNESS:  I can't comment
22   on other cases, on other notices or anything.
23   I don't know anything about that.
24   BY MR. C. PLACITELLA:
25   Q.  Okay.  I'm not asking you to
```

Page 103

```
1    comment.  I'm asking you, Johnson & Johnson.
2        Johnson & Johnson does not know
3    whether it turned over asbestos testing
4    evidence in lawsuits when requested?
5        Johnson & Johnson doesn't know
6    that?
7    A.  I'm representing Johnson & Johnson,
8    yes.  Because Johnson & Johnson is a company,
9    not a person.  But it is not -- I do not know
10   this, yes.
11   Q.  So Johnson & Johnson does not know?
12       MR. BERNARDO:  Object to the
13   form of the question, beyond the scope of the
14   notice.
15       THE WITNESS:  This is not what
16   I was prepared to speak about today.
17   BY MR. C. PLACITELLA:
18   Q.  You are here to talk about the
19   historical responses.  And I'm saying,
20   historically, you don't know whether
21   Johnson & Johnson has actually turned over
22   the evidence and when is the first time it
23   turned over the evidence?
24   A.  No, I do not know.
25   Q.  So Johnson & Johnson has no idea
```

Page 104

```
1    when the first time it turned over in the
2    context of a lawsuit asbestos testing
3    evidence, correct?
4        MR. BERNARDO:  Object, object
5    to the form of the question.  This witness is
6    not being tendered to address this.
7        And she can answer in her
8    individual capacity, if she knows.
9        THE WITNESS:  I do not know.
10   BY MR. C. PLACITELLA:
11   Q.  What do you know about the Joly
12   case?
13   A.  I told you earlier, I'm not
14   familiar with that case.
15   Q.  You're certain?
16   A.  I don't remember it.
17   Q.  You have no personal involvement in
18   the case?
19   A.  I didn't say that.  I don't
20   remember.  It's been, what?  Ten years, at
21   least, that I've been out of the company.  So
22   I -- and what year is this?  I don't even
23   know.
24   Q.  Well, you're here to talk about --
25   you're Johnson & Johnson.
```

Page 105

```
1        Does Johnson & Johnson know
2    anything about the Joly case?
3        MR. BERNARDO:  Object to the
4    form of the question.
5        THE WITNESS:  I'm not here
6    today to prepare to speak about the Joly
7    case.
8    BY MR. C. PLACITELLA:
9    Q.  What about the Yuhas case, did you
10   ever hear of that?
11   A.  No, I did not.
12   Q.  Does Johnson & Johnson know
13   anything about the Edley case?
14   A.  I'm not familiar with the cases
15   that you're citing now.
16   Q.  You do know something about the
17   Gambino case?
18   A.  I've heard of the name, yes.
19   Q.  What do you know about the Gambino
20   case?
21   A.  That is one of the ones that was
22   listed, which you requested documents, but
23   I -- that's why I had asked for that chart,
24   to refresh myself, because the top of my
25   head, I don't remember what Gambino was.
```



Page 106

1     Q.  Well, where are the records related
2   to the Gambino case?
3           MR. BERNARDO:  Object to the
4   form of the question.
5           THE WITNESS:  If there were any
6   records, they -- they would have been
7   provided to you as requested.
8   BY MR. C. PLACITELLA:
9     Q.  Well, did you review records
10  related to the Gambino case?
11    A.  I did review the Complaint, that's,
12  again, why, you know, the composite and the
13  chart so I could just remember.  I wanted to
14  know what the Complaint was.
15    Q.  So other than the Gambino
16  Complaint, you didn't review anything else as
17  related to the Gambino case in order to
18  testify here today?
19          MR. BERNARDO:  Object to the
20  form of the question.
21  BY MR. C. PLACITELLA:
22    Q.  Correct?
23    A.  I reviewed the documents for
24  which -- or the cases for which there were
25  documents and discovery responses, yes.

Page 107

1     Q.  What did you review in connection
2   with the Gambino case?
3     A.  As I said, I just reviewed the
4   Complaint and that was all that was
5   available.
6     Q.  Okay.  So do you know what the
7   source of the talc was that was at issue in
8   the Gambino case?
9           MR. BERNARDO:  Object to the
10  form of the question.
11          THE WITNESS:  I'm not familiar
12  with the sources of the talc for each
13  specific case, no.
14  BY MR. C. PLACITELLA:
15    Q.  What happened to the plaintiff in
16  the Gambino case?
17          What happened to that case?
18          MR. BERNARDO:  Object to the
19  form of the question.
20          THE WITNESS:  I don't remember.
21  BY MR. C. PLACITELLA:
22    Q.  Were the records from the Gambino
23  case when the case was over preserved?
24          MR. BERNARDO:  Object to the
25  form of the -- object to the form of the

Page 108

1   question.
2           THE WITNESS:  If there were
3   records for when a case was over, I would
4   have to believe that they were preserved,
5   yes.
6   BY MR. C. PLACITELLA:
7     Q.  Okay.  Where?
8     A.  I -- I don't know specifically.
9   They might even be outside counsel.
10    Q.  What about the Selby case, what do
11  you know about that?
12    A.  Again, I know that was one of the
13  ones listed.
14    Q.  And what do you know about the
15  Selby case?
16    A.  May I have the -- the chart that...
17          THE COURT REPORTER:  Here you
18  go.
19          THE WITNESS:  Thank you.
20          Now, what it says here, that I
21  was most interested in the Complaint that was
22  filed and this is talcosis.  It was filed in
23  1993.
24  BY MR. C. PLACITELLA:
25    Q.  What did you review in connection

Page 109

1   with the Selby case?
2     A.  If there were any discovery
3   responses for Selby.
4     Q.  And what -- what is it -- what do
5   you remember of -- from the discovery
6   responses?
7     A.  I think the important thing about
8   this, this was a talcosis case.
9     Q.  That's all you remember from the
10  discovery?
11    A.  Yes.
12    Q.  Okay.  And what happened to the
13  Selby case?
14    A.  I don't know.
15    Q.  Okay.  Have you ever heard of a
16  case called Andonian?
17    A.  No, I have not.
18    Q.  What about a case filed by Fae
19  Miller?
20    A.  No, not familiar.
21    Q.  What about the Coker case?
22    A.  Coker is -- is one of the ones
23  listed in your notice.
24    Q.  Okay.  And what do you know about
25  the Coker case?

28  (Pages 106 to 109)



Page 110

```
 1        A.  The Coker case was -- alleged
 2   injury was peritoneal mesothelioma.  And it
 3   was filed in 1997.
 4        Q.  What else do you know?
 5        A.  That is all I know about it.
 6        Q.  What do you know about the
 7   discovery responses provided in the Coker
 8   case?
 9             MR. BERNARDO:  Object to the
10   form of the question.
11             THE WITNESS:  I do not know if
12   there were discovery responses.
13   BY MR. C. PLACITELLA:
14        Q.  You're the person here to testify
15   about this, with the most knowledge
16   concerning the historical discovery responses
17   and you know nothing about the discovery
18   responses; is that what you're saying?
19             MR. BERNARDO:  Object to the
20   form of the question and the characterization
21   of her testimony.
22             THE WITNESS:  No, I'm not
23   saying that.
24             Remember, I -- I talked about
25   how we did the searches and -- and I
```

Page 111

```
 1   reassured myself that all searches were as
 2   thorough as could be.  And -- and there
 3   were -- there's no more information about the
 4   Coker case.
 5   BY MR. C. PLACITELLA:
 6        Q.  Other than a Complaint?
 7        A.  Yes.
 8        Q.  What about the Durham case; did you
 9   ever hear of that?
10        A.  No, I'm not familiar with that.
11        Q.  What about the Cooper case, what do
12   you know about the Cooper case?
13        A.  Seems that it was a rash was the
14   alleged complaint in 1986.
15        Q.  What happened to the Cooper case?
16        A.  I do not know.
17        Q.  Where -- did you review any
18   discovery responses related to the Cooper
19   case?
20        A.  If they had been made available, I
21   would have.  And I don't believe they were
22   available.
23        Q.  Okay.  What about the Cunningham
24   case, what do you know about that?
25        A.  That we couldn't find anything on
```

Page 112

```
 1   the Cunningham case.
 2        Q.  So you know nothing?
 3        A.  Yes.
 4             MR. BERNARDO:  Object --
 5   BY MR. C. PLACITELLA:
 6        Q.  What about the --
 7             MR. BERNARDO:  -- to the form
 8   of the question.
 9   BY MR. C. PLACITELLA:
10        Q.  -- Kreppel case?
11        A.  I don't know that name.
12        Q.  K-r-e-p-p-e-l, you know nothing
13   about that?
14        A.  Oh, Kreppel.  I thought you said...
15        Q.  Right.
16        A.  Yeah, that something was filed in
17   1988, but they could not identify it.
18        Q.  So you have no records, Johnson &
19   Johnson has no records related to the Kreppel
20   case?
21             MR. BERNARDO:  Object to the
22   form of the question.
23             THE WITNESS:  Nothing could be
24   found internally.  Again, something may have
25   been in outside counsel files.
```

Page 113

```
 1   BY MR. C. PLACITELLA:
 2        Q.  Well, what kind of search was done
 3   for the Kreppel case?
 4        A.  The same that I already explained
 5   to you was done on all the cases.  They were
 6   searched by as many terms as -- as provided.
 7        Q.  So you didn't review any discovery
 8   responses related to the Kreppel case?
 9        A.  If they had been made available, I
10   would have reviewed them, and there were none
11   available.
12        Q.  What about the Lopez case, what do
13   you know about that?
14        A.  The same thing, it's -- I think
15   it's important to note that it's industrial
16   talc, but I don't have any more information.
17        Q.  How do you know that?
18        A.  That was what was obvious, you
19   know, set forth in the actual Complaint.
20        Q.  So the only thing you had related
21   to the Lopez case was the Complaint?
22        A.  That was all that was available.
23   Again, I saw this was industrial talc, so I
24   did not go any further with this.  But if
25   there were any discovery responses or
```




Page 114

1  anything else associated with any of these
2  cases, it would have been made available to
3  me and to you.
4      Q.  What about the Ritter case, what do
5  you know about that?
6      A.  Same thing, this is industrial
7  talc.
8      Q.  Okay.  And what discovery responses
9  did you review?
10     A.  If there had been discovery
11 responses I would have reviewed them, and I
12 believe none were available.  And, again,
13 it's industrial talc.
14     Q.  What about the Roberts case?
15     A.  This is -- this concerns a
16 deodorant product, chronic lesions of the
17 armpits.
18     Q.  I don't care about that.
19         What about the case of Sheldon
20 Sullivan, what do you know about that?
21     A.  We don't know much.  The Complaint
22 did not specify what the injury was.
23     Q.  Am I correct that when you actually
24 at least in one case swore under oath that
25 information you were providing was true and

Page 115

1  accurate, to your knowledge, correct?
2          MR. BERNARDO:  Object to the
3  form of the question.
4          THE WITNESS:  Would you ask
5  that question again?
6  BY MR. C. PLACITELLA:
7      Q.  Sure.
8          You actually certified answers to
9  interrogatories in some cases, correct?
10     A.  From time to time, yes.
11     Q.  And when you did that, you swore
12 under oath that the information that you were
13 provided was true and accurate, to the best
14 of your knowledge, correct?
15     A.  Yes.
16     Q.  And you agree with me that when
17 swearing under oath, the information that
18 you're swearing to is only as good as the
19 information that you're provided, correct?
20     A.  I mean, I took it very seriously
21 when I would sign anything and swear that.
22 And I felt confident that the people that I
23 directed counsel to speak with would provide
24 the right answers.
25     Q.  Did you ever testify under oath

Page 116

1  that the -- that when swearing under oath the
2  information you were swearing to was only as
3  good as the information you were provided?
4      A.  No, I did not swear to that.
5          MR. C. PLACITELLA:  I'm going
6  to go video, please.
7          (At which time the following
8  audio recording is played for the witness.)
9          "QUESTION:  So if you're
10 getting information about the product, the
11 information --
12         (Multiple speakers,
13 unintelligible crosstalk.)
14         MR. BERNARDO:  Is this supposed
15 to be video?
16         THE WITNESS:  There's no video.
17         "ANSWER:  Yes, from our -- our
18 scientists, I believe and trust their
19 expertise, yes."
20         (At which time the audio
21 playback is concluded.)
22         MR. C. PLACITELLA:  She's not
23 seeing the video.
24         THE COURT REPORTER:  Can we cue
25 that up again, because...

Page 117

1          MR. C. PLACITELLA:  Sure.
2          Tell me when you're ready.
3          THE VIDEOTAPE OPERATOR:  Stand
4  by.  The time is 12:05 p.m.  Off the record.
5          (Off-the-record discussion.)
6          THE VIDEOTAPE OPERATOR:  Time
7  is 12:06 p.m. on the record.  Stand by.  Go
8  ahead.
9          (At which time the following
10 audio recording is played for the witness.)
11         "QUESTION:  So if you're
12 getting -- ")
13         MR. BERNARDO:  Still not coming
14 up.
15         "QUESTION:  -- information
16 about the product the information -- "
17         MR. BERNARDO:  There you go.
18         "QUESTION:  -- the information
19 that you're providing is only as good as the
20 information that's been provided to you,
21 correct?
22         "ANSWER:  Yes, from our -- our
23 scientists, I believe and trust their
24 expertise, yes.")
25         (At which time the audio

30  (Pages 114 to 117)



MAGNA ▶
LEGAL SERVICES

Page 118

1    playback is concluded.)
2    BY MR. C. PLACITELLA:
3        Q.  Do you recall that testimony?
4            THE VIDEOTAPE OPERATOR:  Okay,
5    counsel.
6    BY MR. C. PLACITELLA:
7        Q.  So the information that you relay
8    in answering interrogatories is only as good
9    as the information provided to you, correct?
10           MR. BERNARDO:  Object to the
11   form of the question.
12           THE WITNESS:  I wouldn't use
13   "only."
14           As I said before, that I -- I
15   trust these people.  I worked with them for
16   years.  These weren't just somebody down the
17   street that I grabbed and said, You know,
18   would you answer this?
19           These were people who were
20   experts in their fields.  And that's why they
21   were chosen.
22   BY MR. C. PLACITELLA:
23       Q.  Well, let me ask you some questions
24   about that.
25           Even though you were the person in

Page 119

1    charge of responding to consumer inquiries
2    and answering -- and certifying
3    interrogatories about talc safety, there were
4    discussions about the dangers of Johnson's
5    Baby Powder you were never privy to, correct?
6        A.  There -- I don't think there were
7    discussions about the dangers of Johnson's
8    Baby Powder.  In our normal course of
9    business, we would always discuss our
10   products, ensuring that they are safe.  So,
11   yeah, there would be discussions, but not
12   that it was unsafe.
13           MR. C. PLACITELLA:  Okay.  Can
14   I go to the video, please?
15           THE VIDEOTAPE OPERATOR:  Stand
16   by.  Go ahead, sir.
17           (At which time the following
18   audio recording is played for the witness.)
19           "QUESTION:  And they had
20   discussions outside of your presence about
21   the dangers or problems associated with baby
22   powder and those were never communicated to
23   you as the person who was in charge of
24   dealing with the public as it relates to baby
25   powder, right?

Page 120

1            "UNIDENTIFIED COUNSEL:  Same
2    objection, compound, vague and ambiguous.
3            "You can answer.
4            "ANSWER:  There may have been
5    conversations that I was not privy to, yes."
6            (At which time the audio
7    playback is concluded.)
8    BY MR. C. PLACITELLA:
9        Q.  Do you recall giving that
10   testimony?
11       A.  That's me.
12       Q.  Am I correct that although you were
13   the person who certified answers to
14   interrogatories, no asbestos testing evidence
15   was ever provided to you, correct?
16       A.  That was not my role.  They -- they
17   could have shown me study and research.  And
18   I really wouldn't understand it.  That's why
19   we had experts who would understand it.
20   That's who we relied on.
21       Q.  All right.  Let me ask the question
22   again.
23           Am I correct that no asbestos
24   testing evidence was ever provided to you in
25   any capacity, correct?

Page 121

1            MR. BERNARDO:  Object to the
2    form of the question.
3            THE WITNESS:  As -- as I said,
4    I did answer you, that I did not review any
5    of that.  That was not my role.
6    BY MR. C. PLACITELLA:
7        Q.  Even when you certified information
8    about asbestos testing evidence under oath,
9    correct?
10           MR. BERNARDO:  Object to the
11   form of the question.
12           THE WITNESS:  The same thing.
13   I felt comfortable.  I could verify, nothing
14   was jumping out at me as wrong.  It was the
15   company's position that there was no asbestos
16   in the cosmetic talc used in Johnson's Baby
17   Powder.  And I felt very comfortable in the
18   people who answered the questions.
19   BY MR. C. PLACITELLA:
20       Q.  What was my question?
21       A.  Repeat it, please.
22       Q.  Do you have any idea what it was?
23       A.  You asked me if I had ever seen or
24   reviewed any of the studies.  There was no
25   reason for me to.

31 (Pages 118 to 121)



Page 122

1      Q.  Even though you were certifying
2  under oath about what was or was not in the
3  studies?
4          MR. BERNARDO:  Object to the
5  form.
6  BY MR. C. PLACITELLA:
7      Q.  There was no reason for you to look
8  at them --
9      A.  I --
10     Q.  -- or even see them?
11     A.  I wasn't certifying what was in or
12  not in the studies.  I was certifying that
13  these questions had been answered.  Again, I
14  directed counsel to speak with those who
15  could most expertly answer the questions.
16     Q.  Ma'am, you certified under oath
17  under penalty of perjury that the information
18  provided was true and accurate, to the best
19  of your knowledge, did you not?
20     A.  Yes, that's correct.
21     Q.  And in doing that you never
22  reviewed a single piece of paper before
23  making that certification, correct?
24     A.  That's correct.  That was not my
25  role to do it.  I was representing the

Page 123

1  company, because the company can't sign.  But
2  I started the process by sending counsel to
3  speak with those who could best answer.  So I
4  knew right up front that the right people
5  were involved.
6      Q.  The answer to my question is,
7  ma'am, when you certified interrogatories
8  under oath, under penalty of perjury, and
9  said they were true and accurate, to the best
10  of your knowledge, you never reviewed a
11  single piece of paper before doing so,
12  correct?
13         MR. BERNARDO:  Object to the
14  form of the question, asked and answered.
15         THE WITNESS:  If there were
16  papers involved, I did not review them, no.
17  BY MR. C. PLACITELLA:
18     Q.  And you swore under oath that the
19  sources from what -- where Johnson Baby --
20  where Johnson & Johnson got its baby powder
21  never contained either asbestos or Tremolite;
22  you swore to that, correct?
23         MR. BERNARDO:  Object to the
24  form of the question.
25         THE WITNESS:  I verified the

Page 124

1  answers that were given to those questions.
2  BY MR. C. PLACITELLA:
3      Q.  Verify means you just signed them?
4      A.  No, I did not just sign them.  As I
5  said, if anything ever jumped out at me, but
6  I had the experts answer those questions.
7      Q.  You never reviewed any evidence
8  whatsoever before swearing under oath that
9  there was no evidence of asbestos or
10  Tremolite in Johnson's Baby Powder, correct?
11         MR. BERNARDO:  Object to the
12  form of the question.
13         THE WITNESS:  I did not review
14  any specific documents, but, again, the
15  people that I had answer these questions were
16  the right people to answer them and most
17  knowledgeable.  And...
18  BY MR. C. PLACITELLA:
19     Q.  Who's the person who told you that
20  there was no evidence of asbestos in
21  Johnson's -- or Tremolite in Johnson's talc
22  that you based your certification under
23  penalty of perjury on?
24          Who is that person?
25         MR. BERNARDO:  Object to the

Page 125

1  form of the question.
2          THE WITNESS:  I really don't
3  remember what specific person answered the
4  specific questions that were involved in a
5  specific interrogatory for a specific
6  Complaint.
7  BY MR. C. PLACITELLA:
8      Q.  Well, was it a scientist or a
9  lawyer?
10     A.  No, it was always a scientist.
11     Q.  Okay.  Who?
12          Who told you that, that there was
13  never any evidence whatsoever?
14     A.  The different scientists that I
15  worked with through the years.  As I said,
16  there was not one specific one that was
17  always the answer for.
18          These -- these were based on not
19  just one particular case.  These would be
20  studies, and research, and different
21  experiments and everything that were going
22  on, ongoing.  So it wasn't just, Aha, there's
23  a question here, let's go find the answer.
24          We were -- as a company, this was
25  our responsibility to be doing all the time.

32  (Pages 122 to 125)



Page 126

```
 1        Q.  Am I correct that ultimately what
 2   was provided and what you swore to was
 3   decided by the Johnson & Johnson lawyers --
 4           MR. BERNARDO:  Object to the
 5   form of the question.
 6   BY MR. C. PLACITELLA:
 7        Q.  -- correct?
 8        A.  No.  The responses were provided
 9   by, again, the experts in response to the
10   particular questions of the Complaint.
11        Q.  Ma'am, the lawyers ultimately
12   decided what was going to be communicated in
13   lawsuits related to baby powder, not you,
14   correct?
15        A.  It's not me or the lawyers.  It's
16   the excerpts for the particular question.
17           MR. C. PLACITELLA:  All right.
18   Can we go to video, please?
19           THE VIDEOTAPE OPERATOR:  Stand
20   by.  Okay.
21           (At which time the following
22   audio recording is played for the witness.)
23           "QUESTION:  So the lawyers made
24   a determination as to what was going to be
25   communicated and what was not going to be
```

Page 127

```
 1   communicated, it was not you; is that fair?
 2           "UNIDENTIFIED COUNSEL:  Object
 3   to the form of the question.
 4           "You may answer.
 5           "THE WITNESS:  They -- since it
 6   was a legal matter, they were the appropriate
 7   person to make the final decisions."
 8           (At which time the audio
 9   playback is concluded.)
10   BY MR. C. PLACITELLA:
11        Q.  Do you recall giving that
12   testimony?
13        A.  That was me in the video.
14        Q.  Okay.  In the answers to
15   interrogatories that you swore to, did you
16   ever mention the names of any of the
17   scientists that you said provided the
18   information that there was no asbestos,
19   evidence of asbestos in the Johnson &
20   talc?
21           MR. BERNARDO:  Object to the
22   form of the question.
23           THE WITNESS:  Are you referring
24   to the specific interrogatories?
25   BY MR. C. PLACITELLA:
```

Page 128

```
 1        Q.  Anytime.
 2           I couldn't find any, so I'm asking
 3   you if you have any recollection.
 4        A.  If -- if the question asked for a
 5   specific person, it was provided.
 6        Q.  So unless it was asked for a
 7   specific person, you never provided the basis
 8   for your verification that there was no
 9   evidence of asbestos in Johnson's Baby Powder
10   in lawsuits involving Johnson & Johnson
11   talc --
12           MR. BERNARDO:  Object.
13   BY MR. C. PLACITELLA:
14        Q.  -- correct?
15           MR. BERNARDO:  Object to the
16   form of the question.
17           THE WITNESS:  There -- again,
18   if there was a question where they required a
19   specific person's name, yes.  Other than
20   that, there was no need to.
21   BY MR. C. PLACITELLA:
22        Q.  Okay.  So you, Johnson & Johnson,
23   when you were verifying discovery in lawsuits
24   involving Johnson & Johnson talc, you did not
25   have any scientist certify that the
```

Page 129

```
 1   information provided under oath was true and
 2   accurate, correct?
 3           You never did that?
 4        A.  No, there was no need to.
 5        Q.  What they did is they had the
 6   person from Marketing just sign the
 7   interrogatories without ever reviewing a
 8   single document, correct?
 9        A.  No, that's --
10           MR. BERNARDO:  Object to the
11   form of the question.
12           THE WITNESS:  That's incorrect.
13   As I explained to you, that the appropriate
14   person would be answering the question, that
15   these weren't just some people who just
16   happened to be down the hall.  The specific,
17   whether it was a scientist, whoever was
18   necessary to answer the question.
19   BY MR. C. PLACITELLA:
20        Q.  But as Johnson & Johnson sits here
21   today, they can't identify a single scientist
22   who provided the information that was put in
23   sworn discovery responses that -- for the
24   basis for there was no evidence of asbestos
25   in Johnson & Johnson talc, correct?
```

33 (Pages 126 to 129)





Page 130

1       MR. BERNARDO:  Object to the
2   form of the question.
3       THE WITNESS:  There definitely
4   was basis for that.  We had many different
5   scientists.  I believe you've spoken to one
6   of them, Dr. Hopkins.
7   BY MR. C. PLACITELLA:
8       Q.  That wasn't my question.
9       As Johnson & Johnson sits here
10  today under oath on behalf of the
11  corporation, you can't identify a single
12  scientist that provided information that
13  justified your swearing under oath that there
14  was no evidence whatsoever of asbestos in any
15  Johnson & Johnson talc product, correct?
16      MR. BERNARDO:  Object to the
17  form of the question.
18      THE WITNESS:  As I said, there
19  were no names that required it.  So asking
20  for different complaints, different
21  interrogatories, I could sit here and give
22  you a lot of different names.  I just
23  mentioned one for you.
24  BY MR. C. PLACITELLA:
25      Q.  Oh, so you spoke to Dr. Hopkins in

Page 131

1   responding -- and certifying answers to
2   interrogatories; is that what you're saying?
3       A.  No.  As I explained earlier, my
4   role was not to speak directly to the
5   internal experts.  My role was to suggest and
6   direct counsel to speak to those experts.
7   And they may have had those conversations.
8   It would be different people for different
9   responses.
10      Q.  Okay.  So now we're getting
11  somewhere.
12      When you verified the
13  interrogatories under oath, you never had a
14  conversation with any of the scientists,
15  correct?
16      A.  Not for that specific case, but I
17  have worked with those scientists --
18      Q.  No, ma'am.
19      A.  -- 30 years and so I knew that they
20  would be the right person.
21      Q.  All right.  So that's -- that's --
22  that's where I'm -- let's be very specific
23  here.  When you certified interrogatories
24  under penalty of perjury indicating that
25  there was no asbestos or no evidence of

Page 132

1   asbestos in any Johnson & Johnson talc
2   product, you, Nancy Musco, never had a
3   conversation with any scientist in that
4   regard, correct?
5       MR. BERNARDO:  Object to the
6   form of the question.
7       THE WITNESS:  As I said, I had
8   many conversations with them throughout my
9   everyday work.  And that is why I asked them
10  to speak to counsel to respond to that.
11  BY MR. C. PLACITELLA:
12      Q.  All right, all right.  That's not
13  my question, ma'am.
14      I'm saying when you had to answer
15  and certify a specific question, is there any
16  evidence of asbestos in Johnson's Baby
17  Powder, you, in answering that question never
18  spoke to a single scientist, correct?
19      MR. BERNARDO:  Object to the
20  form of the question.
21      THE WITNESS:  Again, not in
22  relation to that specific question.  But
23  throughout my tenure at Johnson & Johnson,
24  yes, I did.
25  BY MR. C. PLACITELLA:

Page 133

1       Q.  Okay.  But in answering discovery
2   under oath and swearing to the veracity of a
3   statement provided that there was no evidence
4   of asbestos in Johnson's Baby Powder, in that
5   capacity you never spoke to a single
6   scientist, correct?
7       MR. BERNARDO:  Object to the
8   form of the question.
9       THE WITNESS:  There was no need
10  for me to have a conversation with them at
11  that particular time, because I was familiar
12  with what they knew and understood.  And I
13  knew what their answers would be.
14  BY MR. C. PLACITELLA:
15      Q.  Let me ask --
16      MR. C. PLACITELLA:  Can you
17  read my question back, please?
18      (At which time the following
19  question is read:
20      "QUESTION:  But in answering
21  discovery under oath and swearing to the
22  veracity of a statement provided that there
23  was no evidence of asbestos in Johnson's Baby
24  Powder, in that capacity you never spoke to a
25  single scientist, correct?")



MAGNA
LEGAL SERVICES

Page 134

1          MR. BERNARDO:  Object to the
2   form of the question.
3   BY MR. C. PLACITELLA:
4       Q.  Can you answer that question,
5   please?
6       A.  As I said, for that specific -- a
7   specific answer, I did not have a
8   conversation.
9          My role was to ensure that counsel
10  was speaking to the correct person to answer
11  it.
12         The reason that I went with those
13  people was because of those many
14  conversations I had throughout my tenure.
15      Q.  Okay.
16      A.  I spoke to them often.
17      Q.  What was my question, ma'am?
18      A.  You asked me if I spoke with them
19  each time that there was a question.  No, I
20  did not.  I spoke to them many times
21  throughout my tenure.
22      Q.  Okay.  And the -- what was
23  ultimately included in an answer, a discovery
24  response came through Johnson & Johnson's
25  lawyers, correct?

Page 135

1          MR. BERNARDO:  Object.
2   BY MR. C. PLACITELLA:
3       Q.  In other words, the chain of
4   information was that the scientists provided
5   the information to Johnson & Johnson's
6   lawyers and then Johnson & Johnson put
7   that -- lawyers put that information down in
8   response to discovery and then you certified
9   that it was true and accurate, correct?
10      A.  Yes, the process would be that the
11  counsel would have conversations with the
12  expert.  The expert would provide their
13  answers, and counsel compile it all and then
14  provided it back to whomever requested it.
15  But they did not change the answer or address
16  the answer, no.
17      Q.  "No," what?
18      A.  No, they -- they were the ones who
19  put it all together to communicate it to
20  whomever had requested it originally.  But it
21  was the experts who provided, the internal
22  experts who provided the answers.
23      Q.  When you swore under oath that
24  there was no evidence whatsoever of asbestos
25  in Johnson's Baby Powder, that was based upon

Page 136

1   an answer that was put down by the lawyers
2   who spoke to the experts, correct?
3          MR. BERNARDO:  Object to form
4   of question.
5          THE WITNESS:  Everybody I
6   worked with, we knew the company's position.
7   I verified that everything that was written
8   there was consistent with that position.
9   BY MR. C. PLACITELLA:
10      Q.  When you say "company's position,"
11  what do you mean by that?
12      A.  That there is no asbestos in the
13  cosmetic talc used for Johnson's Baby Powder.
14      Q.  There's no evidence of asbestos,
15  there never was and there never will be;
16  isn't that the company position?
17      A.  Yes, in the cosmetic talc used for
18  Johnson's Baby Powder.
19      Q.  You -- excuse me.
20         It was -- I'm looking at your
21  answer to P -- I want to go to Musco-1, it
22  was your position in responding to discovery
23  under oath that there were never any -- there
24  was no evidence, no studies and no reports
25  indicating that there was asbestos in any

Page 137

1   Johnson & Johnson Baby Powder product,
2   correct?
3          MR. BERNARDO:  Object to the
4   form of the question.
5          THE WITNESS:  Could you repeat
6   that question?
7          MR. C. PLACITELLA:  Can you
8   read it back, please?
9   BY MR. C. PLACITELLA:
10      Q.  And when I say "you," I mean
11  Johnson & Johnson.
12         (At which time the following
13  question is read:
14         "QUESTION:  I'm looking at your
15  answer to P -- I want to go to Musco-1, it
16  was your position in responding to discovery
17  under oath that there was no evidence, no
18  studies and no reports indicating that there
19  was asbestos in any Johnson & Johnson Baby
20  Powder product, correct?")
21         THE WITNESS:  That's correct.
22  BY MR. C. PLACITELLA:
23      Q.  Okay.  And that's what was told to
24  you by Dr. Hopkins, correct?
25      A.  It wasn't a question of just told



Page 138

1  to me. We discussed the various documents
2  that you had presented. My purpose of the
3  conversation with Dr. Hopkins was to reaffirm
4  that he was familiar with everything, that
5  there was nothing new that plaintiffs had
6  provided, and that he was familiar with all
7  the different paperwork and documents.
8      Q. So, as you sit here today, in
9  preparing for this deposition, you were not
10 aware that Dr. Hopkins in trial, under oath,
11 testified that there were, in fact, reports
12 or studies indicating there was asbestos in
13 Johnson & Johnson talc, correct?
14      MR. BERNARDO: Object to the
15 form of the question.
16 BY MR. C. PLACITELLA:
17      Q. You're not aware of that?
18      A. I'm not aware specifically what
19 Dr. Hopkins said or didn't say in his
20 testimony.
21      Q. And if he would have said that,
22 that would be completely at odds with what
23 you testified to here under oath and in
24 swearing to answers to interrogatories, true?
25      MR. BERNARDO: Object to the

Page 139

1  form of the question.
2      THE WITNESS: I don't know what
3  Dr. Hopkins said, so I -- I can't comment on
4  that. But consistent that there is not
5  asbestos in the cosmetic talc used in
6  Johnson's Baby Powder.
7  BY MR. C. PLACITELLA:
8      Q. Your statement is there's no
9  evidence. And there never was any evidence
10 of asbestos in any Johnson & Johnson cosmetic
11 talc product, correct?
12      A. Yes.
13      Q. That's your position?
14      A. Yes.
15      Q. And that's what you swore to
16 repeatedly under oath in answering
17 interrogatories and in your deposition,
18 correct?
19      MR. BERNARDO: Object to the
20 form of the question and the characterization
21 of prior testimony.
22      THE WITNESS: Yes.
23 BY MR. C. PLACITELLA:
24      Q. And that's what Johnson & Johnson
25 asserts here, before this jury, under oath

Page 140

1  that there was never any reports or evidence
2  that there was asbestos in any Johnson &
3  Johnson talcum powder product, correct?
4      A. That's correct.
5      MR. C. PLACITELLA: Can we go
6  to the video, please?
7      THE VIDEOTAPE OPERATOR: Stand
8  by.
9  BY MR. C. PLACITELLA:
10      Q. Do you recognize the person on
11 this --
12      THE VIDEOTAPE OPERATOR: Go
13 ahead.
14 BY MR. C. PLACITELLA:
15      Q. Do you recognize the person on this
16 screen?
17      A. Yes, I do.
18      Q. Who is that?
19      A. That's Dr. John Hopkins.
20      Q. Okay. I want to play you his
21 testimony.
22      MR. BERNARDO: Do you happen to
23 have the transcript she can read while
24 she's --
25      MR. C. PLACITELLA: I'm going

Page 141

1  to play it for you.
2      MR. BERNARDO: Well, I
3  understand that, I'm asking --
4      (At which time the following
5  audio recording is played for the witness.)
6      "ANSWER: Repeat the question,
7  please.
8      "QUESTION: Yes.
9      "Do you know for a fact studies
10 have indicated asbestos in your talc, which
11 you claim is asbestos-free, true?
12      "ANSWER: Studies have
13 reported."
14      (At which time the audio
15 playback is concluded.)
16      (Unintelligible by reporter.)
17      (Reporter clarification.)
18      THE WITNESS: Yeah, it's hard
19 for me to understand, too.
20      MR. C. PLACITELLA: We'll do it
21 again.
22      (Off-the-record discussion.)
23      (At which time the following
24 audio recording is played for the witness.)
25      "ANSWER: Repeat the question,




Page 142

1    please.
2         "QUESTION:  Yes.
3         "Do you know for a fact studies
4    have indicated asbestos in your talc, which
5    you claim is asbestos-free, true?
6         "ANSWER:  Studies have
7    reported, yes."
8         (At which time the audio
9    playback is concluded.)
10   BY MR. PLACITELLA:
11        Q.  Dr. Hopkins never -- Dr. Hopkins
12   never told you that he testified in a court
13   of law that, in fact, there were studies that
14   reported asbestos in the talc that you say is
15   asbestos-free?
16        MR. BERNARDO:  Object to the
17   form.
18   BY MR. C. PLACITELLA:
19        Q.  Correct?
20        MR. BERNARDO:  Object.
21   BY MR. C. PLACITELLA:
22        Q.  You never saw this before?
23        MR. BERNARDO:  Object to the
24   form of the question.
25        THE WITNESS:  I never saw this

Page 143

1    before and he and I did not discuss his
2    testimony, no.
3    BY MR. C. PLACITELLA:
4         Q.  That's completely at odds with what
5    you just testified to, isn't it?
6         MR. BERNARDO:  Object to the
7    form of the question.
8         THE WITNESS:  No, it's not.
9    BY MR. C. PLACITELLA:
10        Q.  How is it consistent?
11        A.  You know, again, I can't comment on
12   what Dr. Hopkins said here.  But, yeah, our
13   understanding that there are studies, we're
14   not saying that they are right or complete,
15   but, yeah, there have been studies saying
16   that.
17        Q.  All right.  So there is evidence of
18   asbestos in the Johnson & Johnson Baby Powder
19   and by the way of studies, correct?
20        MR. BERNARDO:  Object to the
21   form of the question.
22        THE WITNESS:  You know, I'm not
23   an expert on that, the studies, but
24   Dr. Hopkins is and he can best explain that
25   to you.

Page 144

1    BY MR. C. PLACITELLA:
2         Q.  Ma'am, you said there were no
3    studies, no evidence, but, in fact, we now
4    know based on Dr. Hopkins' sworn testimony
5    that there, in fact, are studies and that
6    they were testified to by the corporate
7    representative for Johnson & Johnson before a
8    jury, correct?
9         A.  Yes, we've just taken his testimony
10   out of context.  So I don't know what came
11   before, after.  And I don't want to comment
12   on his testimony.
13        Q.  You know now for the first time,
14   ma'am, that Johnson & Johnson has stated
15   under oath in a court of law, that despite
16   what you said and what you testified to on
17   behalf of Johnson & Johnson here that there
18   are, in fact, studies demonstrating that
19   there was asbestos in the talc that you say
20   was asbestos-free, correct?
21        MR. BERNARDO:  Object to the
22   form of the question.
23        THE WITNESS:  I don't want to
24   take Dr. Hopkins' testimony out of context.
25   I don't know what came before or after.  And

Page 145

1    that would be unfair to all involved.  And I
2    don't want to -- I -- I can't comment on what
3    he said.
4    BY MR. C. PLACITELLA:
5         Q.  Well, isn't it unfair to all
6    involved, ma'am, the fact that you never had
7    a conversation with Dr. Hopkins about whether
8    he knew that there were studies and he
9    testified that there were studies; isn't that
10   unfair?
11        MR. BERNARDO:  Object to the
12   form of the question.
13        THE WITNESS:  Dr. Hopkins and I
14   discussed, went through different research,
15   experiments, studies that were done.  I
16   wanted to make sure that he was familiar with
17   them, because he's the best person to talk
18   about them, I'm not.
19   BY MR. C. PLACITELLA:
20        Q.  So it was unfair to you, wasn't it,
21   if Dr. Hopkins testified under oath that
22   there were, in fact, studies showing there
23   was asbestos in the Johnson & Johnson product
24   and that was never relayed to you, correct?
25        That was unfair to you?

37  (Pages 142 to 145)



Page 146

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  No, it was not
4  unfair.
5  BY MR. C. PLACITELLA:
6    Q.  Okay.  You thought that was okay?
7    A.  Again, I don't want to comment on
8  his testimony, because I don't know what came
9  before or after.
10    Q.  Okay.  Now --
11    MR. C. PLACITELLA:  Do you have
12  the chart?  The chart, mm-hmm.
13    (Exhibit J&J-488, Chart, is
14  marked for identification.)
15  BY MR. C. PLACITELLA:
16    Q.  I'm going to show you what has been
17  marked Hopkin -- J&J-488.
18    You've seen this before?
19    MR. C. PLACITELLA:  You can --
20  I only have two, they're big.
21    We'll go to Elmo, please.
22  BY MR. C. PLACITELLA:
23    Q.  You have in front of you
24  Exhibit 488, which was marked as Exhibit 28
25  in Dr. Hopkins' deposition.  Did you ever --

Page 147

1  and you saw this the last time we were here,
2  correct?
3    A.  I believe so.
4    Q.  And after testifying -- and I think
5  the last time we were here you said that you
6  never had seen this chart before you gave
7  your deposition, correct?
8    A.  That's correct.
9    Q.  Okay.  And you actually knew
10  nothing about this chart, correct?
11    A.  I had not seen it before.
12    Q.  And you know now that this chart
13  was prepared at the deposition of Dr. Hopkins
14  live at the deposition, you know that,
15  correct?
16    A.  No, I don't know what it was used
17  for.
18    Q.  Have you -- when you spoke to
19  Dr. Hopkins and you were preparing for this
20  deposition, did you review this chart with
21  him?
22    A.  No, I did not.
23    Q.  All right.  Did you review the
24  chart at all?
25    A.  No, I did not.

Page 148

1    Q.  So even though you were asked about
2  this chart in the last deposition, you took
3  no steps to -- in preparing for today's
4  deposition concerning the -- the veracity of
5  historical discovery responses to look at
6  this chart or any of the evidence mentioned
7  in this chart, correct?
8    MR. BERNARDO:  Object, object
9  to the form of the question.
10    THE WITNESS:  I did not look at
11  this specific chart.  I looked at different
12  evidence, but I did not look at this specific
13  chart.
14  BY MR. C. PLACITELLA:
15    Q.  Okay.  And, for example, this chart
16  has the -- it's in chronological order, it
17  has the date; do you see that?
18    A.  I see that, yes.
19    Q.  The entity that did the test,
20  right, the author, correct?
21    A.  I see that, yes.
22    Q.  The test method, what was tested,
23  what the test actually revealed; do you see
24  that?
25    A.  I see that.

Page 149

1    Q.  Okay.  Any comments that
2  Dr. Hopkins had concerning the chart?
3    A.  I see Dr. Hopkins' --
4    Q.  Do you see that?
5    A.  -- comments.
6    Q.  Okay.
7    (Reporter clarification.)
8    THE WITNESS:  I see
9  Dr. Hopkins' comments.
10  BY MR. C. PLACITELLA:
11    Q.  All right.  But in testifying under
12  oath that there was no evidence whatsoever of
13  asbestos in any Johnson & Johnson talc
14  product, you never discussed the chart that
15  he created with him concerning that evidence,
16  correct?
17    MR. BERNARDO:  Object to the
18  form of the question.
19    THE WITNESS:  As I said, I did
20  not discuss the specific chart.
21  BY MR. C. PLACITELLA:
22    Q.  And this was not a chart that you
23  were shown in preparation for your deposition
24  today, correct?
25    MR. BERNARDO:  Object to the



MAGNA ▶
LEGAL SERVICES

Page 150

```
 1    form of the question.
 2         THE WITNESS:  No, it was not.
 3         MR. C. PLACITELLA:  Black book.
 4    BY MR. C. PLACITELLA:
 5    Q.   This was marked at your last
 6    deposition as Musco-2.  It's heavy, so I only
 7    brought one copy.
 8         Do you, do you -- do you want to
 9    flip through it?
10    A.   I see what it is.
11    Q.   Do you recall this book?
12    A.   I know that there was a large book.
13    Yes.
14    Q.   And what's in that book?
15    A.   It looks like an awful lot of
16    scientific information.
17    Q.   And did you discuss with anybody
18    from your -- between your last deposition and
19    this deposition the information that's in
20    that book?
21    A.   I don't know exactly what's in this
22    book.  I certainly didn't go through this.
23    But, yes, we -- we discussed specific
24    information.  I had conversations with
25    Dr. Hopkins about specific studies.  And I
```

Page 151

```
 1    would assume that they're in this book.
 2    Q.   Okay.  And prior to your deposition
 3    last time, although you were the person that
 4    swore under oath concerning Johnson &
 5    Johnson's historical discovery responses, you
 6    had never seen a single one of those
 7    documents marked in Musco-2, correct?
 8    A.   That's correct.  My role wasn't to
 9    look at the specific studies.
10    Q.   Right.
11    A.   But to ensure that the correct
12    people were response in -- responding.
13    Q.   When you swore under oath that
14    there was no evidence whatsoever, no one ever
15    showed you any of the studies or documents
16    that are in Musco-2, correct?
17    A.   I don't know everything that's in
18    here, but I did not look at any specific
19    studies in response to the depositions.
20         MR. C. PLACITELLA:  Let's --
21    give me 450.
22         MR. BERNARDO:  When you're at a
23    stopping place for lunch, we've been going
24    about an hour.
25         MR. C. PLACITELLA:  All right.
```

Page 152

```
 1    BY MR. C. PLACITELLA:
 2    Q.   I want to show you what has been
 3    marked as Exhibit 450.
 4         MR. BERNARDO:  I'm sorry, what
 5    was the exhibit number, please?
 6         MR. C. PLACITELLA:  450.
 7         (Exhibit J&J-450, Letter, is
 8    marked for identification.)
 9    BY MR. C. PLACITELLA:
10    Q.   450 is a letter from George Lee to
11    Roger Miller concerning the Joly case.  Do
12    you see that?
13    A.   I see it says that, yes.
14    Q.   And it's dated December 3, 1982,
15    correct?
16    A.   Correct.
17    Q.   This is not a document that was
18    provided to you by counsel, correct?
19         MR. BERNARDO:  Object to the
20    form of the question.
21         THE WITNESS:  That's correct.
22    BY MR. C. PLACITELLA:
23    Q.   But you know about this case from
24    your own knowledge, right?
25    A.   No.  As I told you earlier, I
```

Page 153

```
 1    didn't remember Joly at all.
 2    Q.   Okay.  Bruce Semple, MD, he was the
 3    Medical Director?
 4    A.   Yes, he was.
 5    Q.   And you had dealings with him,
 6    correct?
 7    A.   Yes, I did.
 8    Q.   Okay.  And George Lee is who?
 9    A.   I believe he was one of our
10    research scientists.
11    Q.   Okay.  And Roger Miller was the
12    President of Windsor Minerals owned by
13    Johnson & Johnson, correct?
14    A.   That's my recollection, yes.
15    Q.   Okay.  And what the research
16    scientist is writing to Dr. Miller and asking
17    if he has any information concerning ongoing
18    studies; do you see that?
19    A.   That's what it says.
20    Q.   Did you in your research on
21    historical discovery responses come across
22    any of the ongoing studies that were
23    referenced here in this letter?
24    A.   I'm not familiar with what -- what
25    he's referencing here, so...
```



Page 154

```
 1              MR. C. PLACITELLA:  Give me
 2  448.
 3              (Exhibit J&J-448, Memo, is
 4  marked for identification.)
 5              MR. C. PLACITELLA:  I want to
 6  switch it, this is 448.
 7  BY MR. C. PLACITELLA:
 8      Q.  448 is a May 10, 1985 memo entitled
 9  Ingestions and Inhalations - Johnson's Baby
10  Powder, January 1982 to January 1985.
11      Do you see that?
12      A.  Yes, I do.
13      Q.  And you are copied, correct?
14      A.  Yes, I am.
15      Q.  And the Medical Director for
16  Johnson & Johnson is copied, correct?
17      A.  Yes.
18      Q.  And who is Mr. McTernan?
19      A.  She is the --
20      Q.  Or she.
21      A.  -- Director of Regulatory.
22      Q.  So she's the Director of
23  Regulatory?
24      A.  That's correct.
25      Q.  And this references the Joly case,
```

Page 155

```
 1  doesn't it?
 2      A.  The Joly case is indicated here,
 3  yes.
 4      Q.  All right.  And the Complaint
 5  number for the Joly case is 02043; do you see
 6  that?
 7      A.  That's what it says, yes.
 8      Q.  Okay.  Now, you know, do you not,
 9  that Johnson & Johnson actually acknowledged
10  internally that Joly who filed a lawsuit
11  against Johnson & Johnson was injured from
12  Johnson & Johnson's talc; you know that,
13  correct?
14              MR. BERNARDO:  Object to the
15  form of the question.
16              THE WITNESS:  I don't know
17  that, no.
18              MR. C. PLACITELLA:  Okay.  Can
19  you give me 452, please?
20              (Exhibit J&J-452, Memo, is
21  marked for identification.)
22  BY MR. C. PLACITELLA:
23      Q.  452 is a June 17, 1985 memo from
24  Patricia Mills, who said was in charge of
25  Regulatory?
```

Page 156

```
 1      A.  No.
 2      Q.  Who she was what -- who?
 3  [Verbatim]
 4      A.  She was a nurse reporting to me at
 5  the time in Medical Services.
 6      Q.  Okay.  And copied on this
 7  memorandum is you --
 8      A.  Correct.
 9      Q.  -- correct?
10      And the memo went to the Medical
11  Director at Johnson & Johnson, correct?
12      A.  Bruce Semple, that's correct.
13      Q.  All right.
14              MR. BERNARDO:  I'm not going to
15  interrupt each time, because I just want a
16  running objection to the use of these
17  documents.  My position, it's outside the
18  scope of the notice --
19              MR. C. PLACITELLA:  Oh, yeah,
20  it's way outside the scope.
21              MR. BERNARDO:  She can --
22              MR. C. PLACITELLA:  It's
23  directly related.
24              MR. BERNARDO:  Let me finish my
25  objection.
```

Page 157

```
 1              And she can answer in her
 2  personal capacity.  We're not tendering her
 3  to talk about specific lawsuits --
 4              MR. C. PLACITELLA:  Well, we'll
 5  let the judge.
 6              MR. BERNARDO:  I think that's
 7  what happens with objections.
 8              MR. C. PLACITELLA:  Okay, okay.
 9  BY MR. C. PLACITELLA:
10      Q.  And the title is Ingestions and
11  Inhalations Requiring Medical Attention,
12  Johnson's Baby Powder; do you see that?
13      A.  That's what it says.
14      Q.  And under Complaint 2 -- 02043,
15  there's one for inhalation; do you see that?
16      A.  That's correct.
17      Q.  And that's Miss Joly, correct?
18      A.  That's what it comes back to, yes,
19  seems to be.
20      Q.  All right.  That's the person who
21  filed a lawsuit against you, correct?
22      A.  I assume it's the same person.
23      Q.  Right.
24      And it says, History:  Consumer
25  used Johnson's Baby Powder for years since
```



Page 158

1  unable to use deodorant due to allergies.
2      Do you see that?
3  A.  That's what it says.
4      Q.  And what it says is, Findings:
5  Scarring of lung tissue was noted on X-ray.
6  Pulmonary function studies revealed very
7  severe obstruction of the small airways.
8  Consumer did not respond to bronchodilators.
9  Talc crystals were identified in the
10  consumer's sputum.
11      Correct?
12  A.  That's what --
13      MR. BERNARDO:  Object to the
14  form of the question.
15      THE WITNESS:  That's what it
16  says.
17  BY MR. C. PLACITELLA:
18      Q.  Correct?
19      And -- and under Outcome, this is
20  the memo to the Medical Director of Johnson &
21  Johnson and copied to you, under Outcome it
22  talks about lung damage due to long-term
23  inhalation of talc from Johnson's Baby
24  Powder, correct?
25  A.  That's what it says.

Page 159

1      Q.  Okay.  And nowhere in any memo did
2  Johnson & Johnson dispute that, correct?
3      MR. BERNARDO:  Object to the
4  form of the question.  Again, outside the
5  scope of the notice.
6      THE WITNESS:  I don't know if
7  that was the purpose of this memo.
8  BY MR. C. PLACITELLA:
9      Q.  You have no recollection of this
10  information being provided by the person who
11  worked for you to the Medical Director of
12  Johnson & Johnson ever being disputed,
13  correct?
14      MR. BERNARDO:  Object to the
15  form of the question.
16      THE WITNESS:  I -- until you
17  put this in front of me, I didn't remember
18  anything about Joly.  It was, what?
19  Thirty-three years ago.
20  BY MR. C. PLACITELLA:
21      Q.  Right.
22      And you didn't -- and you were not
23  provided any of the information from the Joly
24  case in order to -- to testify here today,
25  correct?

Page 160

1      MR. BERNARDO:  Object to the
2  form of the -- of the question.
3      THE WITNESS:  That's correct.
4  BY MR. C. PLACITELLA:
5      Q.  Okay.  Clearly, your lawyers knew
6  about the Joly case, correct?
7      MR. BERNARDO:  Object to the
8  form of the question.
9      THE WITNESS:  I do not know.
10  MR. C. PLACITELLA:  Well, can
11  you give me the privilege log, please.
12      Can we go to the Elmo, please?
13  BY MR. C. PLACITELLA:
14      Q.  So I'm going to go back to the log.
15  See where it says here, 1/16/1982?
16  A.  Yes.
17      Q.  Okay.  And there's information from
18  George Lee.  He wasn't a lawyer, by the way,
19  right?
20  A.  No.
21      Q.  Okay.  And it went to John Beidler.
22  Who's that?
23  A.  I believe he's an attorney.
24      Q.  And it was also copied to the
25  Medical Director, correct?

Page 161

1  A.  That's what it says.
2      Q.  All right.  And it talks about
3  memos concerning the Joly case, correct?
4  A.  That's what it says.
5      Q.  Okay.  In fact, there are many
6  memos related to the Joly case, correct?
7  A.  The name is mentioned a few times,
8  yes.
9      Q.  So, clearly, if your lawyers put
10  this on a log of information they weren't
11  going to turn over, they had knowledge of the
12  Joly case, correct?
13      MR. BERNARDO:  Object to the
14  form of the question.
15      THE WITNESS:  I don't know what
16  the purpose of this log is.
17  BY MR. C. PLACITELLA:
18      Q.  Well, you're the person testifying
19  on historical discovery responses and you
20  have no idea what a privilege log purpose is?
21      MR. BERNARDO:  Object to the
22  form of the question.
23      THE WITNESS:  I'm not a lawyer.
24  BY MR. C. PLACITELLA:
25      Q.  You don't know that certain

41  (Pages 158 to 161)



Page 162

```
1   information is being withheld in this case
2   under claim of privilege related to lawsuits
3   against Johnson & Johnson?
4         MR. BERNARDO:  Object to the
5   form of the question, beyond the scope of the
6   notice.
7         She can answer in her
8   individual capacity.
9   BY MR. C. PLACITELLA:
10    Q.  You're asking -- I'm asking you on
11  behalf of Johnson & Johnson.
12        MR. BERNARDO:  And I --
13  BY MR. C. PLACITELLA:
14    Q.  Johnson & Johnson does not know
15  what a privilege log is?
16        MR. BERNARDO:  This witness --
17  BY MR. C. PLACITELLA:
18    Q.  In responding to historical
19  discovery responses, Johnson & Johnson does
20  not know when responding to discovery whether
21  it is withholding information or not; is that
22  what you're saying?
23        MR. BERNARDO:  Object to the
24  form of the question.  This witness is not
25  being tendered to explain or provide
```

Page 163

```
1   information about privilege logs provided in
2   this litigation, that is not within the scope
3   of the notice.  She can answer in her
4   individual capacity, but she's not here as a
5   corporate representative of Johnson & Johnson
6   with respect to this question.
7         MR. C. PLACITELLA:  With all
8   due respect, she's here on the historical
9   discovery responses provided by Johnson &
10  Johnson in talc litigation.
11        So I'm going to ask the
12  question again.
13  BY MR. C. PLACITELLA:
14    Q.  Johnson -- you, Johnson & Johnson
15  are saying here under oath that you have no
16  idea that information was being withheld
17  under claim of privilege in the Joly case,
18  correct?
19        MR. BERNARDO:  Object to the
20  form of the question.  Same objection as
21  before.
22        You can answer in your
23  individual capacity, if you know.
24        THE WITNESS:  I don't know.
25  BY MR. C. PLACITELLA:
```

Page 164

```
1     Q.  When you were being asked to
2   prepare for this deposition, even though
3   there was information that was withheld, so
4   Johnson & Johnson's lawyers obviously know
5   that the case existed, they didn't supply you
6   with a single piece of paper related to the
7   Joly case, correct?
8         MR. BERNARDO:  Object to the
9   form of the question.
10        THE WITNESS:  I did not review
11  the Joly case, no.
12  BY MR. C. PLACITELLA:
13    Q.  Even though the Johnson & Johnson
14  Medical Director got a memo indicating that
15  Miss Joly was injured from Johnson & Johnson
16  Baby Powder --
17        MR. BERNARDO:  Object --
18  BY MR. C. PLACITELLA:
19    Q.  -- correct?
20        MR. BERNARDO:  Object to the
21  form of the question, same objection.
22        THE WITNESS:  This is a memo
23  informing him of the case.
24  BY MR. C. PLACITELLA:
25    Q.  Right.
```

Page 165

```
1         And you were copied?
2     A.  Yes, I was.
3     Q.  And even though you were copied and
4   it involved the Medical Director at Johnson &
5   Johnson, in preparing for today's deposition
6   no information was provided for you about
7   this case, which, by the way, predates any
8   case that's on your list, correct?
9         MR. BERNARDO:  Object to the
10  form of the question.
11        THE WITNESS:  There seemed to
12  be several questions there.  Could you ask
13  that again?
14  BY MR. C. PLACITELLA:
15    Q.  Well, let me ask you this, this
16  case was pending at least in 1982, correct?
17    A.  1982 is listed there.
18    Q.  Right.
19        The first case on your list is from
20  what date?
21        1983, correct?
22    A.  That's what I have, yes.
23    Q.  All right.  So Johnson & Johnson's
24  attorneys had information in their possession
25  concerning a lawsuit filed by someone that
```



Page 166

1    Johnson & Johnson acknowledged internally was
2    hurt by baby powder and never showed you that
3    information in preparation for today's
4    deposition --
5         MR. BERNARDO:  Object to the
6    form --
7    BY MR. C. PLACITELLA:
8    Q.  -- correct?
9         MR. BERNARDO:  -- of the
10   question.
11        THE WITNESS:  My understanding
12   is that this is not within the scope, and I
13   don't have the answer.
14        MR. C. PLACITELLA:  Okay.  We
15   can take a break now.
16        MR. BERNARDO:  Before we go on
17   break, with all due respect, I just want to
18   make an objection on the record, for the
19   record.
20        Mr. Placitella, you and I had
21   numerous conversations about this deposition.
22   And, in fact, we filed a motion for
23   protective order with respect to this
24   deposition.  We withdrew the motion with the
25   understanding that this deposition would

Page 167

1    focus on discovery responses of the Johnson &
2    Johnson Defendants.
3         The company made significant
4    efforts to try and identify what could
5    reasonably be identified.  You and I spoke
6    about exactly what we did and what we didn't
7    do for purposes of this deposition.
8         We also spoke about the fact
9    that we would try and prepare this witness.
10   And we wanted copies of responses that would
11   be the subject.
12        We in good faith, I, in
13   particular, provided you with a letter that
14   specified what we did identify pursuant to
15   those responses.
16        You, in response provided us
17   some documents that the witness looked at the
18   other day.
19        We did not discuss any of these
20   types of questions.  This witness is not
21   prepared to address them, as you can see,
22   because this was not at all what our
23   understanding of what this deposition would
24   be.
25        I note that we have been now

Page 168

1    going for several hours and you've not yet
2    shown the witness a single discovery response
3    regarding the asbestos content of talc.
4         I know you have your position
5    and you're welcome to set it on the record,
6    but because these depositions end up in other
7    places, I just wanted to clarify what our
8    position is.
9         MR. C. PLACITELLA:  First of
10   all, your statement is incomplete.
11        What I said was that I would
12   provide you with any documents that I found
13   outside of what you had already produced
14   related to litigation, which I did.  So if I
15   did an independent examination and found it
16   in some court file, I gave it to you.
17        I also indicated and we had an
18   agreement that any documents that were
19   produced by Johnson & Johnson were fair game
20   for this witness.  And any documents that
21   were used in any trials or depositions of
22   Johnson & Johnson representatives were fair
23   game.
24        There is nothing unfair.  This
25   is a -- information on what did Johnson &

Page 169

1    Johnson provide in terms of historical
2    discovery responses.  And it is highly
3    relevant, highly relevant that there were
4    numerous cases that involved Johnson Baby
5    Powder and Johnson's talc powder where no
6    information is known by Johnson & Johnson
7    according to this witness.  She is Johnson &
8    Johnson.  She had the responsibility.  She is
9    the one who said she ordered the searches.
10   And, clearly, there was information available
11   in this case, directly related, because it's
12   right on your privilege log to Johnson &
13   Johnson cases that were never shown to her
14   and that were produced.
15        Moreover, it is troubling that
16   there are documents related to actual cases
17   involving Johnson & Johnson Baby Powder that
18   this witness was aware of and not prepared to
19   testify to.
20        So that's the completion of the
21   statement.
22        MR. BERNARDO:  Actually, I
23   think it isn't, Mr. Placitella.  And we could
24   go on, and we won't for some time.  But I
25   will just say that I disagree with what



Page 170

1  you're characterizing, what we discussed,
2  because we did have a specific discussion
3  about what the purpose of this deposition
4  was.  But if we need to, we'll just let the
5  judge address that.  I -- suffice it to say
6  that I disagree with what you're saying.
7          MR. C. PLACITELLA:  Well, let's
8  do that.
9          Okay.  How long do you need for
10  lunch?
11          THE VIDEOTAPE OPERATOR:  The
12  time is 12:53 p.m.  Off the record.
13          (Luncheon recess.)
14          THE VIDEOTAPE OPERATOR:  The
15  time is now 1:51 p.m.  We are on the record.
16          MR. C. PLACITELLA:  Okay.  Can
17  you give me 453?
18          (Exhibit J&J-453, Document
19  entitled George Lee's Talc Files, is marked
20  for identification.)
21  BY MR. C. PLACITELLA:
22      Q.  453 is a document entitled George
23  Lee's Talc Files, Transferred to CIS
24  July 1988.
25          And George Lee I think you told me

Page 171

1  was what?
2      A.  My recollection is he worked in
3  R&D.
4      Q.  Okay.  And what's CIS?
5      A.  Don't know.
6      Q.  And according to this document, as
7  of July 1988, George Lee had a file on the
8  Joly case, correct?
9      A.  I have never seen this document
10  before.  So all I see that it says Joly talc
11  suit.
12      Q.  Right.
13      A.  I don't know what he had or didn't
14  have.
15      Q.  So where's that information?
16          MR. BERNARDO:  Object to the
17  form of the question.
18          THE WITNESS:  I do not know.
19  BY MR. C. PLACITELLA:
20      Q.  Was that information from the Joly
21  talc suit ever made available to you when you
22  were certifying interrogatory answers on
23  behalf of Johnson & Johnson?
24      A.  If there was information available,
25  I would have reviewed it.  I don't know what

Page 172

1  information was or was not --
2      Q.  I thought you told me you never --
3      A.  -- involved in this.
4      Q.  I thought you told me you never
5  reviewed the information?
6      A.  I didn't.
7      Q.  So --
8          (Reporter clarification.)
9          THE WITNESS:  Didn't, did not.
10  BY MR. C. PLACITELLA:
11      Q.  Okay.  So although there was a Joly
12  talc suit file in 1988, Johnson & Johnson has
13  no idea where it is --
14          MR. BERNARDO:  Object --
15  BY MR. C. PLACITELLA:
16      Q.  -- correct?
17          MR. BERNARDO:  Object to the
18  form of the question.
19          THE WITNESS:  I do not know
20  where it is, no.
21  BY MR. C. PLACITELLA:
22      Q.  Now, one of the cases that you
23  certified interrogatory answers in was the
24  Krushinski case, correct?
25      A.  That's correct.

Page 173

1      Q.  Okay.  And...
2          MR. C. PLACITELLA:  Give me
3  277.
4          (Exhibit J&J-277, Answers to
5  Plaintiffs' Supplemental Interrogatories, is
6  marked for identification.)
7          MR. C. PLACITELLA:  By the way,
8  can you go to the Elmo for a second?
9  BY MR. C. PLACITELLA:
10      Q.  So in responding to -- into
11  discovery in the course of litigation, did
12  Johnson & Johnson see a difference in saying
13  there is no evidence versus there is
14  evidence, but we, Johnson & Johnson, don't
15  believe it's reliable; do you see that as
16  different?
17          MR. BERNARDO:  Object to the
18  form of the question.
19          THE WITNESS:  It's hard for me
20  to answer, taken out of context, but, yes,
21  they're different sentences.
22          MR. C. PLACITELLA:  Can we mark
23  this next, please?
24          (Exhibit P-4, Handwritten
25  document, is marked for identification.)

44  (Pages 170 to 173)



Page 174

1          MR. C. PLACITELLA: 277,
2    please.
3    BY MR. C. PLACITELLA:
4        Q.  Do you recognize 277 as a set of
5    interrogatories that you certified as true
6    and accurate under oath in the Krushinski
7    case?
8        A.  Yes, this appears to be that.
9        Q.  And I'm going to direct you to
10   interrogatory number 19, which asks if you
11   were basically ever sued before in a
12   Johnson's Baby Powder case; do you see that?
13       A.  I'd have to read it --
14       Q.  Go ahead.
15       A.  -- to see exactly.
16       Q.  Go ahead.
17       A.  (At which time the Witness reviews
18   the document.)
19          Okay.
20       Q.  Do you see that?
21       A.  Yes, I do.
22       Q.  And in response to whether you were
23   sued before in a Johnson's Baby Powder case,
24   you list the Selby case and the Gambino case,
25   correct?

Page 175

1          MR. BERNARDO:  Object to the --
2    object to the form of the question.
3          THE WITNESS:  No, I didn't say
4    that's the only time we were sued.  I said
5    that was what I had interrogatories.
6    BY MR. C. PLACITELLA:
7        Q.  Well, it says, Has Johnson &
8    Johnson ever received notice of any claim,
9    correct?
10       A.  Yes.
11       Q.  And the only two cases that you
12   listed were Selby and Gambino, correct?
13       A.  No, I have all these cases here.
14       Q.  No, no.
15       A.  I --
16       Q.  Ma'am, I'm asking you --
17       A.  Oh.
18       Q.  -- when you certified under oath,
19   under penalty of perjury whether Johnson &
20   Johnson was ever sued in a baby powder case,
21   you certified under oath that the only two
22   cases were the Selby case and the Gambino
23   case, correct?
24          MR. BERNARDO:  Object, object
25   to the form of the question.  It's beyond the

Page 176

1    scope of the notice, insofar as it's not a
2    question that has anything to do with the
3    asbestos content of talc.
4          But go ahead and answer if
5    you can.
6          MR. C. PLACITELLA:  Well, we'll
7    get there.
8          MR. BERNARDO:  I'm sure you
9    will.
10   BY MR. C. PLACITELLA:
11       Q.  Go ahead.
12       A.  Those two cases are listed in the
13   response, yes.
14       Q.  Okay.  You never mentioned the Joly
15   case, correct?
16       A.  There is no mention of it here, no.
17       Q.  Why not?
18          MR. BERNARDO:  Same objection.
19          THE WITNESS:  I think because
20   it was a different kind of case.
21   BY MR. C. PLACITELLA:
22       Q.  Well, it was a pulmonary
23   fibrosis --
24       A.  That's not what they were
25   asking for.

Page 177

1        Q.  -- case, wasn't it?
2        A.  I think it was talcosis, I'm not
3    sure.
4        Q.  Well, it asks for anything on
5    talcosis, doesn't it?
6          If they developed talcosis or
7    fibrosis, right?
8          That's what was asked of you.
9        A.  That's what it says, yes.
10       Q.  So why didn't you include the Joly
11   case?  You certainly knew about it, you
12   worked on it.
13          MR. BERNARDO:  Object to the
14   form of the question.
15          THE WITNESS:  There may not
16   have been any more information, I -- to
17   provide.
18   BY MR. C. PLACITELLA:
19       Q.  Ma'am, I just showed you documents
20   from the Johnson & Johnson's file, did I not?
21   Showing that Joly filed a lawsuit in 1982
22   before the Gambino case and that the
23   Johnson & Johnson Medical Director, as well
24   as yourself, knew about it?
25          MR. BERNARDO:  I object to the

45  (Pages 174 to 177)



Page 178

1 form of the question.
2 BY MR. C. PLACITELLA:
3    Q. Right?
4      MR. BERNARDO: Beyond the scope
5 of the notice.
6      THE WITNESS: Our -- my
7 understanding is that the Joly case was not
8 within the scope of the notice.
9 BY MR. C. PLACITELLA:
10    Q. Ma'am, why didn't you answer
11 correctly under oath interrogatory 19 in the
12 Krushinski case and indicate that you, in
13 fact, knew about the Joly case?
14      MR. BERNARDO: Object to --
15 BY MR. C. PLACITELLA:
16    Q. Why not?
17      MR. BERNARDO: Object to the
18 form of the question, beyond the scope of the
19 notice.
20      THE WITNESS: Again, my
21 understanding is it's not within the scope of
22 the notice.
23 BY MR. C. PLACITELLA:
24    Q. Scope of what notice?
25    A. The notice that you presented to

Page 179

1 have me here today and to speak about.
2    Q. Ma'am, I'm asking you, you swore
3 under oath, under penalty of perjury that
4 these were the only two cases. And I'm
5 asking you why you didn't mention the Joly
6 case?
7      MR. BERNARDO: Object to the
8 form of the question.
9      THE WITNESS: Again, it's not
10 within the scope.
11 BY MR. C. PLACITELLA:
12    Q. So you didn't answer the
13 information under oath, because it's not in
14 the scope of the notice here?
15    A. I -- I don't know why it was not
16 mentioned specifically in here. My
17 understanding was we were not to talk --
18 going to be talking about these other cases,
19 Joly that you keep talking about. I don't
20 know why it was not specifically mentioned
21 here.
22    Q. Well, it certainly should have
23 been, right?
24      MR. BERNARDO: Object to the
25 form of the question.

Page 180

1 BY MR. C. PLACITELLA:
2    Q. You swore under oath that you knew
3 about it.
4      MR. BERNARDO: Object to the
5 form of the question.
6      THE WITNESS: I can't say
7 whether it should have been or not.
8 BY MR. C. PLACITELLA:
9    Q. I mean, your Medical Director
10 actually had a memo to him saying that, what?
11 That the person had fibrosis?
12      Do we have it?
13      Here, let's go back and look at it.
14      Scarring of the lung tissue was
15 noted on X-ray. Consumer did not respond to
16 bronchodilators.
17      You certainly knew about it,
18 correct?
19      MR. BERNARDO: Object to the
20 form of the question.
21      THE WITNESS: My name is on the
22 memo, yes.
23      MR. C. PLACITELLA: And by the
24 way, can you give me that other document
25 while we're here. No, the one on the ad.

Page 181

1      (Exhibit P-5, Ad, is marked for
2 identification.)
3 BY MR. C. PLACITELLA:
4    Q. So I read this, I read this ad. I
5 think it was in the New York Times and you,
6 Johnson & Johnson states, that if you had any
7 reason to believe talc was unsafe, it would
8 never have been on your shelves, correct?
9    A. That's correct.
10    Q. Okay. So, but the Medical Director
11 had notice as far back as 1985 that someone
12 using your baby powder had scarring of the
13 lung that was evident on X-ray, very severe
14 obstruction of small airways, did not respond
15 to bronchodilators and actually found your
16 talc in the consumer's sputum, but you never
17 took it off the market, right?
18      MR. BERNARDO: Object to the
19 form of the question.
20      THE WITNESS: It was not taken
21 off market, no.
22 BY MR. C. PLACITELLA:
23    Q. Now, back to the Krushinski case,
24 if you can go to interrogatory number 17. In
25 interrogatory number 17 it says, Describe in

46 (Pages 178 to 181)



Page 182

```
 1    detail all processes, procedures and testing
 2    performed upon the talc used in the
 3    manufacture of Johnson's Baby Powder to
 4    reduce or eliminate the existence of
 5    asbestos, tremolite or other contaminants in
 6    Johnson's Baby Powder.
 7         Correct?
 8    A.  That's what it says, yes.
 9    Q.  And you verified under oath that to
10    the best of defendant's knowledge talc used
11    in the manufacture of Johnson & Johnson's
12    Baby Powder never contained asbestos in any
13    form, or tremolite.  Defendant's sources of
14    talc were selected for their lack of
15    contaminants and further, testing was
16    performed over a significant number of years
17    by outside laboratories which verified that
18    defendant's talc sources did not contain
19    asbestos or tremolite.
20         Do you see that?
21    A.  Yes, I do.
22    Q.  Okay.  Do you recall swearing to
23    that under oath?
24    A.  That's -- that's part of the
25    interrogatories, yes.
```

Page 183

```
 1    Q.  Okay.
 2         MR. C. PLACITELLA:  Now, can
 3    you give me Dr. Hopkins' testimony?
 4         (Exhibit P-3, Trial transcript
 5    of John Hopkins, Ph.D., is marked for
 6    identification.)
 7    BY MR. C. PLACITELLA:
 8    Q.  I'm going to give you the chance to
 9    look at the testimony of Dr. Hopkins that's
10    given during the trial that's going on now,
11    specifically about your answer under oath.
12    I'll give you a chance to take a look at it.
13    And we've marked it P-3.  Give it to counsel
14    first.
15         MR. BERNARDO:  And I'm going to
16    object to your asking the witness to review
17    somebody's trial testimony in real time to
18    determine what was said, particularly since
19    it was a long trial with a lot of testimony.
20    And I don't think any of us know here whether
21    there was additional to this or otherwise.
22         But subject to that
23    objection...
24         Do you have another copy of
25    that, Chris?
```

Page 184

```
 1         MR. C. PLACITELLA:  I have one
 2    copy, but I put it up there so everyone can
 3    see it.
 4    BY MR. C. PLACITELLA:
 5    Q.  When they're talking about -- here
 6    and I'll put the copy up right next to it.
 7         MR. BERNARDO:  Can you give her
 8    an opportunity to read it?
 9    BY MR. C. PLACITELLA:
10    Q.  Yeah, take your time, take your
11    time.
12    A.  (At which time the Witness reviews
13    the document.)
14    Q.  What do you want to look at it?
15    A.  Well, I was looking at the left
16    side --
17    Q.  No, I want you to look at the
18    transcript.
19    A.  -- and then it changed.
20         MR. BERNARDO:  He wants you to
21    look at the whole section that pertains to
22    that answer so you can answer.
23         THE WITNESS:  Yeah.
24         So where are we starting?
25    BY MR. C. PLACITELLA:
```

Page 185

```
 1    Q.  Under 105, where it talks about
 2    your interrogatory number 17.  "Those are the
 3    answers," "they are," "turn back to number
 4    17;" do you see it?
 5    A.  Just a minute.  I want to get the
 6    full context of it.  Okay.
 7         (At which time the Witness reviews
 8    the document.)
 9         MR. BERNARDO:  Let me also
10    object.  I'm not sure how much the witness
11    has read.  And you certainly can ask her
12    questions.  But I recall that that testimony
13    was interrupted by a long encounter with
14    Judge Seligman and that it was subsequently
15    re-addressed again.
16         So, again, I'm raising my
17    objection to asking this witness here in real
18    time to read trial testimony that is fairly
19    lengthy and comment on it.
20         MR. C. PLACITELLA:  Well, the
21    problem is that she said she consulted
22    Dr. Hopkins and relied upon him.  So I want
23    to see whether Dr. Hopkins was telling her
24    the truth.
25         MR. BERNARDO:  Well...
```

47 (Pages 182 to 185)


MAGNA
LEGAL SERVICES

Page 186

1    MR. C. PLACITELLA: Or whether
2  Johnson & Johnson ever conveyed to this
3  witness the truth --
4    MR. BERNARDO: Well --
5    MR. C. PLACITELLA: -- in -- in
6  getting this deposition prepared.
7    MR. BERNARDO: The truth is in
8  the entirety of Mr. Hopkins' testimony.
9    MR. C. PLACITELLA: Okay.
10    MR. BERNARDO: Not the two or
11  three pages that the witness has just had the
12  opportunity to read.
13    And I don't think your
14  characterization of the testimony earlier
15  today is the truth, but...
16    MR. C. PLACITELLA: Well, you
17  know what, you can ask her anything you want
18  on redirect.
19    MR. BERNARDO: I'm just
20  commenting on the process here and the
21  procedure and I object to that.
22    MR. C. PLACITELLA: Okay.
23  BY MR. C. PLACITELLA:
24    Q.  Did you not testify when you
25  started that the person you relied upon in

Page 187

1  preparing for today's deposition, one of them
2  was Dr. Hopkins; did you say that?
3    A.  Yes.
4    Q.  Okay.  And he was also one of the
5  people that was relied upon in swearing to
6  interrogatories under oath, correct?
7    A.  He has -- he -- we may have
8  consulted with him with different times,
9  since I -- as I told you earlier, I don't
10  remember exactly.
11    Q.  Right.
12    And in your sworn answers to
13  interrogatories under oath, you say, To the
14  best of defendant's knowledge, in
15  interrogatory 7 [verbatim], talc used in the
16  manufacture of Johnson & Johnson's Baby
17  Powder never contained asbestos in any form,
18  or tremolite.
19    Correct?
20    A.  You just said number 7?
21    Q.  17.
22    A.  Oh, 17, okay.
23    Q.  Then it goes on to say, Defendant's
24  sources of talc were selected for their lack
25  of contaminants and were further tested --

Page 188

1  and further, testing was performed over a
2  significant number of years by outside
3  laboratories who verified the defendant's
4  talc sources did not contain asbestos or
5  tremolite.
6    That's what you swore to, right?
7    A.  That's what it says, yes.
8    Q.  Okay.  And Dr. Hopkins under oath
9  before a jury just this past month is
10  directed to your response, your sworn
11  response, number 17; do you see that?
12    A.  It appears that way.  It's hard for
13  me to follow.
14    Q.  Well, if you look it says, it says,
15  As we read -- the first sentence here, I want
16  to read the second sentence of that answer.
17    And does not that track exactly
18  your answer, where it says, Defendant's
19  sources of talc were selected for their lack
20  of contaminants?
21    It's the exact duplicate, correct?
22    A.  It's the same sentence, yes.
23    Q.  Right.
24    And he says it goes to number 17,
25  which is your interrogatory answer, correct?

Page 189

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  Yes.
4  BY MR. C. PLACITELLA:
5    Q.  Okay.  And he then asks, And we
6  know, do we not -- we know, do we not,
7  Dr. Hopkins, that the Battelle
8  Laboratories -- do you know who they are?
9    A.  No, I don't.
10    Q.  No one ever told you about the
11  Battelle Laboratories?
12    A.  I -- I know the names, but I'm not
13  going to know which laboratory is which.
14    Q.  Okay.  At least for the Italian
15  talc, actually verified that the Italian talc
16  tanning source of talc [verbatim] -- for
17  Johnson & Johnson did contain tremolite,
18  correct?
19    And his answer was, the Battelle
20  reports from the '50s did mention trace
21  tremolite.
22    And the question is, And it did so
23  in hundreds of tests, correct?
24    And his answer was, Yes.  In
25  several hundred tests, they reported trace



Page 190

1  tremolite.
2      Correct?
3      A.  That's what it says, yes.
4      Q.  And despite that information in the
5  possession of Johnson & Johnson that several
6  hundred tests showed trace tremolite,
7  Johnson & Johnson asked you to certify under
8  oath that there was never any evidence
9  whatsoever of tremolite, correct?
10      MR. BERNARDO:  Object, object
11  to the form of the question, the
12  characterization of the response.
13      THE WITNESS:  I mean, I think
14  it's -- it's important to understand that,
15  just like you're taking the testimony out of
16  context, you're taking this particular
17  question out of context.  And as for
18  anything, I would like to look at the
19  Complaint it relates to, rather than just a
20  question on its own.  And that's what I did
21  in my preparation.
22  BY MR. C. PLACITELLA:
23      Q.  Ma'am, I'm going to ask you the
24  question again.
25      Do you believe me -- do you believe

Page 191

1  that an honest and forthright witness can
2  provide a simple answer to a simple question?
3      MR. BERNARDO:  Object to the
4  form of the question.  It's not an
5  appropriate question.
6      THE WITNESS:  To a simple
7  question, yes.
8  BY MR. C. PLACITELLA:
9      Q.  Okay.  And I am asking you, ma'am,
10  that when you swore under oath, under penalty
11  of perjury in the Krushinski case that there
12  was no evidence whatsoever of tremolite in
13  the Johnson products, Johnson & Johnson never
14  told you about the tests they had as
15  testified to by Dr. Hopkins that there were
16  hundreds of tests showing tremolite in the
17  talc used in Johnson -- you were never told
18  that, correct?
19      MR. BERNARDO:  Object to the
20  form of the question.
21      THE WITNESS:  I think it's
22  important to understand whether we're talking
23  about tremolite or tremolite asbestos, which
24  is what I wanted to make clear when I looked
25  at this Complaint.  And this Complaint

Page 192

1  specifically mentions the type of asbestos,
2  one included as tremolite asbestos.
3      I mean, it is confusing, I will
4  grant that.  But at the time this litigation
5  was talking about tremolite, we were always
6  talking about tremolite asbestos.
7  BY MR. C. PLACITELLA:
8      Q.  Ma'am, what's the difference
9  between tremolite and tremolite asbestos?
10      A.  Obviously, a big difference.
11      Q.  What's the difference, ma'am?
12      What's your understand -- what is
13  Johnson --
14      A.  One is asbestos and one is not.
15      Q.  Ma'am, what is the difference
16  between tremolite and tremolite asbestos?
17      What is Johnson & Johnson's
18  understanding of the difference, since you
19  said that?
20      A.  One is asbestos and one is not.
21      Q.  What makes it different?
22      MR. BERNARDO:  Object.
23  BY MR. C. PLACITELLA:
24      Q.  What differentiation, asbestos
25  tremolite versus non-asbestos tremolite?

Page 193

1      A.  I -- I can't go into the
2  configuration.  I know it's the different
3  shapes and all, but one is asbestos and one
4  is not.
5      Q.  Ma'am, tell me what exactly you
6  know when you swore under oath that there was
7  no evidence of tremolite, what you understood
8  the difference to be?
9      A.  My understanding is that this --
10      Q.  Ma'am, when you swore under oath --
11      MR. BERNARDO:  Object to the
12  form.  She --
13  BY MR. C. PLACITELLA:
14      Q.  -- when you answered the
15  interrogatories --
16      MR. BERNARDO:  Chris, you asked
17  her a question and she started answering and
18  you interrupted her.
19  BY MR. C. PLACITELLA:
20      Q.  When you answered under oath in the
21  Krushinski case, what was your understanding
22  at that time between the difference between
23  tremolite and tremolite asbestos?
24      MR. BERNARDO:  Object to the
25  form of the question.

49 (Pages 190 to 193)



Page 194

```
 1              THE WITNESS:  As I just said to
 2   you, the difference is one is asbestos and
 3   one is not.  And at the time of this
 4   interrogatory, which was specifically
 5   answered in response to a Complaint, it was
 6   dealing with tremolite asbestos.
 7   BY MR. C. PLACITELLA:
 8       Q.  This answer asks you the existence
 9   of asbestos or tremolite, does it not; isn't
10   that the question?
11       A.  Yeah, and I admitted, it's
12   confusing.  It could have been worded better.
13       Q.  Could have been worded better?
14       A.  Yes.
15       Q.  How do you word mistruths better?
16              MR. BERNARDO:  Object to the
17   form of the question.
18              THE WITNESS:  It's not a
19   mistruth.
20   BY MR. C. PLACITELLA:
21       Q.  So you believe that when you said
22   there's never any -- there's no evidence and
23   it never contained any form of tremolite,
24   that was an accurate statement?
25              MR. BERNARDO:  Object to the
```

Page 195

```
 1   form of the question and to the statement,
 2   the characterization of the words on the
 3   paper there.
 4              THE WITNESS:  Yeah, that's not
 5   what it said.  It says any form of asbestos
 6   or tremolite.
 7   BY MR. C. PLACITELLA:
 8       Q.  Correct.
 9          So when we're talking about
10   asbestos, they were saying any form, and then
11   they asked about tremolite in addition,
12   correct?
13          The question did not ask you
14   asbestos tremolite, it's asked about
15   tremolite, correct?
16       A.  My understanding and our
17   understanding at the time is we were talking
18   about tremolite asbestos, because I don't
19   know -- I -- would have been talking about
20   non-asbestos tremolite.  We were -- the
21   litigations would address tremolite asbestos,
22   that's why I went back to the Complaint to
23   make sure because it is confusing.
24       Q.  So your testimony today is that
25   when you provided the interrogatory answers
```

Page 196

```
 1   in the Krushinski case, you understood the
 2   difference between what you thought was
 3   tremolite and tremolite asbestos in every
 4   way, correct?
 5              MR. BERNARDO:  Object to the
 6   form of the question.
 7              THE WITNESS:  I'm saying that I
 8   understood the word tremolite to mean
 9   tremolite asbestos, because it was a
10   litigation about that.
11   BY MR. C. PLACITELLA:
12       Q.  Okay.  And when you answered that,
13   you -- you -- did you know what fibrous
14   tremolite was?
15       A.  That's -- that's kind of beyond
16   what I understand.  I don't know.
17       Q.  Well, did you know that under
18   Johnson & Johnson's definition of fibrous
19   tremolite that that's asbestos, did you know
20   that?
21              MR. BERNARDO:  Object to the
22   form of the question.
23              THE WITNESS:  I -- that's not
24   my specialty, I don't know.
25   BY MR. C. PLACITELLA:
```

Page 197

```
 1       Q.  The truth of the matter is you
 2   don't know anything about tremolite, what's
 3   fibrous, what's not fibrous, what's asbestos
 4   and what's not asbestos, true?
 5       A.  Well, I had conversations with
 6   Dr. Hopkins specifically about this, because,
 7   as I said, it's confusing.  And I believe he
 8   addressed it if you saw his entire testimony.
 9       Q.  Okay.  So you did read his entire
10   testimony?
11       A.  I did not read his entire -- I
12   read -- I read his testimony.  But do I
13   remember everything that's in there?  No.
14       Q.  Oh, so you were given Dr. Hopkins'
15   testimony in preparation for today's
16   deposition?
17       A.  Yes, as I told you earlier, I did
18   read some of his deposition and some of his
19   testimony.  Not all of it, nor do I remember
20   everything that was said.
21       Q.  Do you remember reading his
22   testimony in the Levitt case that I put in
23   front of you?
24       A.  No, I don't remember.
25              MR. BERNARDO:  Mr. Placitella,
```



Page 198

```
 1    for the record, we provided you with a box
 2    of -- which will clarify what she did and
 3    didn't read of the testimony that she read.
 4    BY MR. C. PLACITELLA:
 5        Q.   Okay.  So it's your testimony that
 6    when you said no evidence of tremolite, you
 7    meant asbestos tremolite; that's your
 8    testimony?
 9        A.   Yes.
10        Q.   Okay.  And at that point in time
11    you had no information whatsoever available
12    to Johnson & Johnson that any test done of
13    any Johnson & Johnson Baby Powder ever found
14    asbestos containing tremolite; is that
15    your -- is that your testimony?
16        A.   No.  My testimony is that there was
17    no tremolite asbestos.
18        Q.   Ma'am, when you signed under oath,
19    under penalty of perjury this answer, is it
20    your testimony that Johnson & Johnson had no
21    evidence whatsoever of any tests showing that
22    there was asbestos containing tremolite in
23    its baby powder or talc products?
24        A.   Yes, the position is that there is
25    no tremolite asbestos in the cosmetic talc of
```

Page 199

```
 1    Johnson's Baby Powder.
 2        Q.   And is it your position that when
 3    you signed this under oath, Johnson & Johnson
 4    had no evidence in its possession that there
 5    was fibrous tremolite in the Johnson's talc
 6    products?
 7             MR. BERNARDO:  Object to the
 8    form of the question.
 9             THE WITNESS:  As I said
10    earlier, I can't get into fibrous or not
11    fibrous.  I don't know what that means.
12    BY MR. C. PLACITELLA:
13        Q.   Well, in making this shouldn't you
14    know that when -- when it's referred to as
15    fibrous tremolite, Johnson & Johnson
16    considered that asbestos?
17             Shouldn't you know that?
18        A.   No.  Again, that's why we have
19    experts to be able to answer those things.
20        Q.   Okay.  Now, when I asked you
21    questions about this very question in our
22    last deposition, you never, ever mentioned,
23    did you, anything about a difference in your
24    perception between asbestos and non-asbestos
25    tremolite, correct?
```

Page 200

```
 1        A.   I don't remember exactly what I
 2    said.
 3        Q.   Do I need to show it to you?
 4        A.   If you would like to.
 5        Q.   Okay.  Well, we'll take a break and
 6    I'll show it to you.
 7             And it was after you met with the
 8    lawyers, now you came up with the explanation
 9    that there's a difference when you answered
10    the question between asbestos tremolite and
11    non-asbestos tremolite, correct?
12             MR. BERNARDO:  Object to the
13    form of the question.
14             THE WITNESS:  No, I -- I didn't
15    come up with this.  Actually, you asked me a
16    lot of different questions last time we met.
17    And there was some of those things that I
18    didn't have answers to.  So I don't like
19    being like that, and I wanted to clarify
20    things.  So I did ask to speak -- to see
21    different documents and that's why I had the
22    conversation, one of the reasons I had the
23    conversation with Dr. Hopkins.
24    BY MR. C. PLACITELLA:
25        Q.   Okay.  Well, we'll do some -- okay,
```

Page 201

```
 1    let's talk about -- we'll come back to that.
 2             By the way, so you looked -- you
 3    looked at the Krushinski discovery responses.
 4    What other cases did you actually look at the
 5    discovery responses?
 6        A.   Well, as indicated, we looked at
 7    Selby and Krushinski.
 8        Q.   That's -- those are the only two?
 9        A.   Those are the only two that they
10    had discovery responses available for.
11        Q.   So out of the thousands of cases
12    that Johnson & Johnson been involved in
13    since 1972, you only looked at two sets of
14    discovery responses in order to prepare for
15    today's deposition?
16             MR. BERNARDO:  Object to the --
17    BY MR. C. PLACITELLA:
18        Q.   Is that fair?
19             MR. BERNARDO:  Object to the
20    form of the question.
21             THE WITNESS:  I don't know
22    whether there were thousands, but it is our
23    understanding according to the notice that
24    you provided, and these were the discovery
25    responses that were available.
```

51 (Pages 198 to 201)



1  BY MR. C. PLACITELLA:
2      Q.  So, to your knowledge, from the
3  time Johnson & Johnson became involved in
4  baby powder litigation from 1972 until the
5  present -- up till the time you're preparing
6  for this deposition, there are only two sets
7  of discovery responses made available to you?
8          MR. BERNARDO:  Object to the
9  form of the question.
10  BY MR. C. PLACITELLA:
11      Q.  Is that right?
12      A.  There are only two that I looked
13  at, yes.
14      Q.  Okay.  Now --
15          MR. C. PLACITELLA:  Give me
16  294.
17          (Exhibit J&J-294, Deposition
18  transcript of Roger N. Miller, is marked for
19  identification.)
20          MR. BERNARDO:  What was the
21  number, Chris?
22          MR. C. PLACITELLA:  294.
23          MR. BERNARDO:  Thank you.
24  BY MR. C. PLACITELLA:
25      Q.  294 is the deposition of Roger

1  Miller given in the Westfall case.
2      Q.  Do you see that?
3      A.  That's what it says, yes.
4      Q.  And Roger Miller was the President
5  of Windsor Minerals, right?
6      A.  I believe so, yes.
7      Q.  And did your lawyers ever share
8  this deposition with you?
9      A.  No, I did not see this.
10      Q.  Okay.  And if you look at the
11  second page, do you see that Johnson &
12  Johnson had actually had lawyers there at
13  this deposition for Windsor?
14      A.  I guess that's what that means.
15      Q.  Okay.  And when is the first time
16  that Johnson & Johnson was given notice of
17  the Westfall case?
18          MR. BERNARDO:  Object to the
19  form of the question, beyond the scope of the
20  notice.
21          You can answer in your
22  individual capacity, if you know.
23          THE WITNESS:  I don't know.
24          (Exhibit J&J-483, Memo, is
25  marked for identification.)

1  BY MR. C. PLACITELLA:
2      Q.  483 is a memo from July 5, 1981 on
3  Johnson & Johnson stationery, entitled Talc
4  Suit, Westfall versus Metropolitan Talc.
5      Do you see that?
6      A.  That's what it says, yes.
7      Q.  And it says, Background:
8  Metropolitan Talc (our former source of
9  domestic ground Italian talc) is being sued
10  by survivors of Mr. Westfall.  His autopsy
11  report alleges his death was due to
12  mesothelioma.
13      Do you see that?
14      A.  That's correct, that's what it
15  says.
16      Q.  At some point in time, Johnson &
17  Johnson actually became a defendant in the
18  Westfall case, did it not?
19      A.  I don't know.
20      Q.  Okay.
21      A.  I do know that this involved
22  industrial talc, that's all I know.
23      Q.  It involved industrial talc out of
24  the Johnson mine, correct?
25      A.  Yes.

1      Q.  Okay.  And in addition to the
2  Italian talc?
3          MR. BERNARDO:  Object to the
4  form of the question.  Again, beyond the
5  scope of the notice.
6          If you know in your individual
7  capacity.
8          THE WITNESS:  I don't know.
9  BY MR. C. PLACITELLA:
10      Q.  Well, it says "Italian talc" right
11  on the top, right?  It's on your letterhead.
12      A.  Is there a question?  I'm sorry.
13      Q.  Yeah.  It says Italian talc right
14  on the top, right?
15      A.  Background, it says our former
16  source of domestic ground Italian talc.
17      Q.  Right.
18          And you're aware, I assume, that
19  the -- there were scientists who testified
20  with Johnson & Johnson's lawyers present that
21  they found asbestos in the Johnson mine,
22  correct?  You knew that?
23          MR. BERNARDO:  Object to the
24  form of the question, beyond the scope of the
25  notice.  Not answering in her corporate



MAGNA
LEGAL SERVICES

Page 206

1   capacity.
2         (Reporter clarification.)
3         MR. BERNARDO:  Sorry.
4   Objecting it's beyond the scope of the
5   notice, the witness is not responding as a
6   corporate representative on this issue.
7         MR. C. PLACITELLA:  Well,
8   that's -- that's your -- we'll see what the
9   judge says.  Okay?
10        MR. BERNARDO:  I'm just making
11  my objection and noting it.
12  BY MR. C. PLACITELLA:
13    Q.  You knew that, right?
14    A.  I don't know that.
15    Q.  So you never knew before you came
16  here today that Johnson & Johnson's lawyers
17  sat in a deposition where the scientists who
18  did the tests on the Johnson & Johnson mine
19  said they found asbestos in the mine; you
20  never knew that?
21        MR. BERNARDO:  Object to the
22  form of the question, same objection.
23        THE WITNESS:  I don't know.
24        MR. C. PLACITELLA:  Give me
25  172.

Page 207

1         (Exhibit J&J-172, Deposition
2   transcript of Glenn A. Hemstock, is marked
3   for identification.)
4   BY MR. C. PLACITELLA:
5     Q.  I'll show you what has been marked
6   J&J-172.  This is the deposition of Glenn
7   Hemstock taken in the Westfall case.
8         MR. BERNARDO:  And same
9   objection to asking the witness about
10  depositions.  It's beyond the scope of the
11  notice.  And she's not read the deposition.
12  BY MR. C. PLACITELLA:
13    Q.  And it's versus Windsor Minerals as
14  one of the defendants, correct?
15    A.  That's what it says.
16    Q.  Okay.  And if you go to the third
17  page, it actually indicates that Johnson &
18  Johnson's general counsel was at the
19  deposition, right?
20        MR. BERNARDO:  Object to the
21  form of the question.
22        THE WITNESS:  A name is listed
23  there, yes.
24  BY MR. C. PLACITELLA:
25    Q.  So he certainly knew and Johnson &

Page 208

1   Johnson certainly knew what information was
2   revealed in that deposition, correct?
3     A.  The lawyer's name is listed there,
4   yes.
5     Q.  Did you ever have any dealings with
6   John Beidler?
7     A.  I knew of him, yes.
8     Q.  Did he ever tell you that he
9   attended depositions where scientists
10  testified they found asbestos in the Vermont
11  mines once owned by Johnson & Johnson?
12        MR. BERNARDO:  Object to the
13  form of the question.
14        THE WITNESS:  No, he did not.
15        (Exhibit J&J-173, Continuation
16  deposition transcript of Glenn Hemstock, is
17  marked for identification.)
18  BY MR. C. PLACITELLA:
19    Q.  Okay.  Let me show you 173, which
20  is the continuation of Dr. Hemstock's
21  deposition.
22        I'll show you on the second page,
23  you'll see that Johnson & Johnson's lawyers
24  are there at the deposition again?
25        MR. BERNARDO:  Same objection

Page 209

1   with respect to all of these deposition
2   transcripts.
3         THE WITNESS:  I see them there,
4   yes.
5   BY MR. C. PLACITELLA:
6     Q.  And I flipped to page 17 of the
7   deposition.  You see where the scientist is
8   asked, "Now, you testified that your
9   department has tested both the processed talc
10  and the raw talc ore from the Emtal mine for
11  the presence of chrysotile asbestos; is that
12  correct?
13        "ANSWER:  Yes.
14        "Has your department in its
15  research found chrysotile asbestos in both
16  processed talc and raw ore from the Emtal
17  mine?
18        "ANSWER:  Yes."
19        Do you see that?
20        MR. BERNARDO:  Same objection.
21        THE WITNESS:  I see it says
22  that, yes.
23  BY MR. C. PLACITELLA:
24    Q.  That information was never relayed
25  to you as the person who was either



Page 210

1  testifying here today or certified
2  interrogatory answers on behalf of Johnson &
3  Johnson, correct?
4       A.  I have not seen this before, no.
5       MR. C. PLACITELLA:  Can you
6  give me 436, please?
7       (Exhibit J&J-436, Deposition
8  transcript of Peter N. Gale, is marked for
9  identification.)
10 BY MR. C. PLACITELLA:
11      Q.  I'm going to show you the
12 deposition of Peter Gale, who is another
13 scientist who testified in the case.
14      MR. BERNARDO:  Same objection
15 with respect to this testimony, as also with
16 respect to the other testimonies.
17 BY MR. C. PLACITELLA:
18      Q.  All right.  And you can see on the
19 second page that the lawyers for Johnson &
20 Johnson were at this deposition as well?
21      A.  I see the names listed, yes.
22      Q.  Okay.  And if you go to page 19, he
23 talks about the studies he did himself.  He
24 says, "What analysis did you run on the
25 second round of studies?

Page 211

1       "WITNESS:  Scanning electron
2  microscopy, transmission electron microscopy,
3  selected area diffraction.
4       "Where did you perform those tests?
5       "Georgia Tech.
6       "When were those tests performed?
7       "Late fall '78 and January and
8  February of '79, I believe.
9       "Do you recall today what those
10 tests revealed?
11      "I recall that there were fibers
12 found in those talcs, yes.
13      "Did you identify the nature,
14 mineralogic nature of the fibers that were
15 found?
16      "ANSWER:  Yes.
17      "What was the nature of those
18 fibers?
19      "ANSWER:  I determined those fibers
20 were chrysotile fibers.
21      "QUESTION:  How did you determine
22 those fibers were chrysotile fibers?
23      "ANSWER:  Using selected area
24 electron diffraction in conjunction with
25 transmission electron microscopy."

Page 212

1       Do you see that?
2       MR. BERNARDO:  Object to the
3  form of the question.  And object to your
4  reading into the transcript --
5  BY MR. C. PLACITELLA:
6       Q.  Do you see that?
7       MR. BERNARDO:  -- excerpts of
8  deposition testimony.
9       THE WITNESS:  I see that, yes.
10 BY MR. C. PLACITELLA:
11      Q.  And before today and in responding
12 to all these interrogatories under oath, no
13 one ever told you from Johnson & Johnson,
14 even though you knew the lawyers, that there
15 was testimony of scientists under oath that
16 found asbestos in the Vermont mines once
17 owned by Johnson & Johnson, correct?
18      A.  We did not review these
19 testimonies.
20      Q.  So is the answer correct, you were
21 never told?
22      A.  We did not review these specific
23 testimonies.
24      MR. C. PLACITELLA:  Now, give
25 me 441.

Page 213

1  BY MR. C. PLACITELLA:
2       Q.  Let me ask you the question this
3  way to keep it moving, do you know that that
4  case was settled confidentially under oath --
5       MR. BERNARDO:  Object to the
6  form of the question.
7  BY MR. C. PLACITELLA:
8       Q.  -- by Johnson & Johnson?
9       A.  I do not know that.
10      Q.  Now, in the same year that these
11 scientists testified under oath with
12 Johnson & Johnson lawyers present, you were
13 sued in the Gambino case, right?
14      MR. BERNARDO:  Object to the
15 form of the question, beyond the scope of the
16 notice.
17      THE WITNESS:  I don't know what
18 year what happened.
19 BY MR. C. PLACITELLA:
20      Q.  Well, what did your chart say about
21 Gambino?
22      A.  Gambino is listed as 1983.
23      Q.  And that's the date of this
24 deposition, correct?
25      A.  I have to go back to the deposition



Page 214

1  and see that.
2  Q.  1983?
3  A.  Okay.
4  Q.  Okay.  So in the same years that
5  the scientists testified that the mines once
6  owned by Johnson & Johnson contained
7  asbestos, you were sued in Middlesex County,
8  New Jersey in the Gambino case, correct?
9        MR. BERNARDO:  Object to the
10  form of the question, beyond the scope of the
11  notice. This witness isn't being tendered as
12  a corporate representative on the subject of
13  litigation.
14        You can go ahead answer in your
15  personal capacity.
16  BY MR. C. PLACITELLA:
17  Q.  Here, I put it up there for you,
18  it's 291; do you see it?
19  A.  All I know is the years are the
20  same.
21  Q.  Right.  In Middlesex County,
22  New Jersey; do you see that?
23  A.  I see it says that, yes.
24  Q.  And it involved Johnson's Baby
25  Powder, correct?

Page 215

1  A.  I see it says that.
2  Q.  And according to your earlier
3  testimony, your lawyers didn't have any other
4  information on Gambino to provide to you,
5  correct?
6        MR. BERNARDO:  Object to the
7  form of the question.
8        THE WITNESS:  There were no
9  discovery records.
10        MR. C. PLACITELLA:  Okay.  Can
11  you give me the...
12  BY MR. C. PLACITELLA:
13  Q.  Well, I want to show you again the
14  log of documents not turned over.  There were
15  plenty of documents related to the Gambino
16  case, you were just never shared them, were
17  you?
18        MR. BERNARDO:  Object to the
19  form of the question.
20  BY MR. C. PLACITELLA:
21  Q.  According to your own privilege
22  log, the -- the log that you put in this
23  courthouse, there were plenty of documents
24  related to the Gambino case --
25        MR. BERNARDO:  Object to the

Page 216

1  form of the question.
2  BY MR. C. PLACITELLA:
3  Q.  -- correct?
4        MR. BERNARDO:  Are you pointing
5  to a discovery response in there, Chris?  I
6  can't read it from here.
7        MR. C. PLACITELLA:  I'm
8  point -- I'm pointing to your entry that
9  there were memorandums, memorandums,
10  memorandums, memorandums.
11        MR. BERNARDO:  But you're not
12  pointing to a discovery response?  I just
13  want to be able to see it.
14  BY MR. C. PLACITELLA:
15  Q.  There were plenty of documents
16  never shared with you, that's all I'm asking.
17        MR. BERNARDO:  Object to the
18  form of the question.
19        THE WITNESS:  I was not shared
20  any interrogatories, no.
21  BY MR. C. PLACITELLA:
22  Q.  Okay.  And you see here who was
23  involved in defending the Gambino case.  Who
24  is Donald Jones?
25  A.  He's one of the scientists,

Page 217

1  Johnson & Johnson.
2  Q.  And, also, Mr. Ashton was involved?
3  A.  I see the names there.
4  Q.  Well, Mr. Ashton certainly knew
5  about the testing that showed asbestos in
6  Johnson's Baby Powder, right?
7        MR. BERNARDO:  Object to the
8  form of the question.  Again, I object to
9  this whole line of questioning and asking
10  this witness about a privilege log generated
11  by lawyers in litigation, Chris.  You know
12  that's inappropriate.  You know it's not
13  within the scope of this notice.
14        MR. C. PLACITELLA:  No, I think
15  it's totally within the scope.
16        MR. BERNARDO:  I think it's
17  completely inappropriate.  And you know this
18  witness is not here to address privilege
19  logs, lawsuits filed or other --
20        MR. C. PLACITELLA:  Okay.
21        MR. BERNARDO:  -- kinds of
22  questions that you've been asking for an hour
23  now.
24        MR. C. PLACITELLA:  Okay.
25  BY MR. C. PLACITELLA:



Page 218

```
1        Q.   What happened to Mr. Gambino's
2    case, do you know?  Mrs. Gambino's case?
3            MR. BERNARDO:  Object to the
4    form of the question, outside the scope of
5    the notice.
6            THE WITNESS:  I don't know.
7    BY MR. C. PLACITELLA:
8        Q.   It was non-suited, wasn't it?
9            MR. BERNARDO:  Object to the
10   form of the question.
11   BY MR. C. PLACITELLA:
12       Q.   Do know what non-suit means?
13       A.   No, I do not.
14       Q.   It means it was dismissed because
15   the information -- they didn't have the
16   information necessary to move forward.  Did
17   you know that?
18       A.   I told you, I did not know the
19   outcome.
20       Q.   Did you -- did you know that your
21   lawyer stated in court in California
22   concerning the Gambino case that the lawsuit
23   was ultimately dismissed without
24   adjudication?
25           MR. BERNARDO:  Object to the
```

Page 219

```
1    form of the question.
2    BY MR. C. PLACITELLA:
3        Q.   Did you know that?
4            MR. BERNARDO:  Beyond the scope
5    of the notice.
6            THE WITNESS:  I don't even know
7    what that means.
8    BY MR. C. PLACITELLA:
9        Q.   Okay.  And you didn't look at a
10   single document other than the Complaint
11   related to the Gambino case, correct?
12       A.   I -- my understanding was that we
13   were to talk about discovery responses, and
14   there were no discovery responses.
15       Q.   I want to get right to that now.
16           MR. C. PLACITELLA:  Give me
17   188.
18           THE WITNESS:  Where are we on
19   time, as far as a break?
20           MR. BERNARDO:  You want to take
21   a break?
22           THE WITNESS:  Yes, please.
23           MR. BERNARDO:  Chris, we've
24   been -- we have been going about an hour.
25   Can we take --
```

Page 220

```
1            MR. C. PLACITELLA:  Can we take
2    less than a half hour break this time?
3            MR. BERNARDO:  We have not been
4    taking half hour breaks.  We try to be very
5    conscious.  We came in four minutes after our
6    45-minute lunch.
7            MR. C. PLACITELLA:  Okay.  Take
8    a break.  Go ahead.
9            THE VIDEOTAPE OPERATOR:  The
10   time is 2:41 p.m.  Off the record.
11           (Brief recess.)
12           THE VIDEOTAPE OPERATOR:  The
13   time is 2:58 p.m.  On the record.
14   BY MR. C. PLACITELLA:
15       Q.   Okay.  So in preparation for
16   today's deposition, did your -- or did you
17   review the information concerning the Edley
18   case?
19       A.   I'm not familiar with that.
20           (Reporter clarification.)
21           MR. C. PLACITELLA:  Edley,
22   E-d-l-e-y.
23   BY MR. C. PLACITELLA:
24       Q.   You're not familiar with that?
25       A.   No.
```

Page 221

```
1        Q.   So Johnson & Johnson doesn't know
2    anything about the Edley case?
3            MR. BERNARDO:  Object to the
4    form of the question, beyond the scope of the
5    notice.
6            THE WITNESS:  In preparation
7    for today, I did not review that case.
8    BY MR. C. PLACITELLA:
9        Q.   Well, Johnson & Johnson certainly
10   knew about the Edley case, correct?
11           MR. BERNARDO:  Object.
12           THE WITNESS:  I did not review
13   it for today, no.
14   BY MR. C. PLACITELLA:
15       Q.   Did you know that the Edley case
16   was filed in the same courthouse as the
17   Gambino case?
18       A.   I did not --
19           MR. BERNARDO:  Object to the
20   form of the question.
21           THE WITNESS:  -- review that
22   question for -- that case for today.
23   BY MR. C. PLACITELLA:
24       Q.   Okay.  Did you know it was filed by
25   a well respected lawyer named Ronald Grayzel?
```



Page 222

1        MR. BERNARDO:  Object to the
2    form of the question.
3        THE WITNESS:  I did not review
4    that case for today.
5    BY MR. C. PLACITELLA:
6        Q.  Do you know what information
7    Mr. Grayzel asked for in terms of the
8    asbestos content of the talc sold by
9    Johnson & Johnson?
10       A.  I did not review that case, so I'm
11   not familiar with it.
12       Q.  Well, not -- but you're not here as
13   you, Nancy Musco.  You're here as Johnson &
14   Johnson.
15       Does Johnson & Johnson know --
16       MR. BERNARDO:  Object --
17   BY MR. C. PLACITELLA:
18       Q.   -- what happened in the Edley case?
19       MR. BERNARDO:  Object to the
20   form of the question, beyond the scope of the
21   notice.  She's not here as a corporate
22   representative with respect to the Edley
23   case.
24       MR. C. PLACITELLA:  That says
25   you.

Page 223

1        MR. BERNARDO:  That's exactly
2    right.
3        MR. C. PLACITELLA:  No, that
4    says you.  Well, the judge will decide that.
5    BY MR. C. PLACITELLA:
6        Q.  So Johnson & Johnson, as you sit
7    here today, knows nothing about the Edley
8    case --
9        MR. BERNARDO:  Object to the --
10   BY MR. C. PLACITELLA:
11       Q.  -- correct?
12       MR. BERNARDO:  -- form of the
13   question.
14       THE WITNESS:  I did not review
15   that case.
16   BY MR. C. PLACITELLA:
17       Q.  You knew, Johnson & Johnson, did
18   you not, that the Edley case has been brought
19   up in multiple trials related to Johnson's
20   Baby Powder; you knew that, right?
21       MR. BERNARDO:  Object to the
22   form of the question.
23       THE WITNESS:  I did not review
24   that case, so I don't know anything about it.
25   BY MR. C. PLACITELLA:

Page 224

1        Q.  You know that courts have ruled
2    that the Edley case was relevant to the
3    Johnson & Johnson Baby Powder cases; you know
4    that, right?
5        MR. BERNARDO:  Object to the
6    form.
7    BY MR. C. PLACITELLA:
8        Q.  You, Johnson & Johnson, you know
9    that?
10       A.  I --
11       MR. BERNARDO:  The witness is
12   not speaking on behalf of Johnson & Johnson
13   with respect to this question.
14       THE WITNESS:  I did not review
15   this case.
16   BY MR. C. PLACITELLA:
17       Q.  Okay.
18       (Exhibit J&J-188, Stipulation
19   of Dismissal, is marked for identification.)
20   BY MR. C. PLACITELLA:
21       Q.  I want to give you 188.  And I ask
22   you to look at the third page, which is the
23   Affidavit written by Roger Miller.
24       Do you see that?
25       A.  I see that's what it says, yes.

Page 225

1        Q.  Do you see that was an Affidavit
2    executed in the Edley case in Middlesex
3    County, New Jersey in 1987; do you see that?
4        MR. BERNARDO:  Object to the
5    form of the question.
6        THE WITNESS:  I see Middlesex.
7    I don't see the date.
8    BY MR. C. PLACITELLA:
9        Q.  And did you know that Johnson &
10   Johnson used this Affidavit to get -- to
11   obtain a dismissal from Mr. Edley who claimed
12   that he was injured from Johnson's talc; did
13   you know that?
14       MR. BERNARDO:  Object to the
15   form of the question, beyond the scope of the
16   notice.
17       THE WITNESS:  I did not review
18   the Edley case.
19   BY MR. C. PLACITELLA:
20       Q.  Okay.  You see Mr. Miller when he
21   says he was President of Windsor Minerals;
22   that's accurate, correct?
23       A.  I see that's what it says, yes.
24       Q.  And he says that in his paragraph 2
25   that, The exclusive business of Windsor

57  (Pages 222 to 225)



Page 226

1   Minerals is, and has been the last 18 years,
2   the mining and milling of talc from a single
3   mining district in Windsor, Vermont.  That
4   mining district is the exclusive source of
5   talc for all of the Johnson's Baby Powder
6   sold in the United States.
7          Did you know that?
8          MR. BERNARDO:  Object to the
9   form of the question.  Object to this
10  Affidavit as outside of the scope of the
11  notice.  And object to this witness answering
12  in her representative capacity.
13         THE WITNESS:  I did not review
14  this.
15  BY MR. C. PLACITELLA:
16  Q.  It says, In addition to supplying
17  the talc for Johnson's Baby Powder, Windsor
18  Minerals also sells a portion of its product
19  to independent industrial users.
20         Do you see that?
21         MR. BERNARDO:  Same objection.
22         THE WITNESS:  That's what's
23  written here.
24  BY MR. C. PLACITELLA:
25  Q.  Okay.  And what Mr. Miller swears

Page 227

1   to under oath in paragraph 3 is, All of the
2   talc mined by Windsor Minerals, Inc., whether
3   it is ultimately sold to industrial users or
4   used in Johnson's Baby Powder, is sampled and
5   tested for the presence of asbestos.
6          Do you see that?
7          MR. BERNARDO:  Same objection.
8          THE WITNESS:  That's what it
9   says.
10  BY MR. C. PLACITELLA:
11  Q.  He does not distinguish between
12  industrial and baby powder, does he, in terms
13  of source and testing?
14         MR. BERNARDO:  Same objection.
15         THE WITNESS:  That's what it
16  says here.
17  BY MR. C. PLACITELLA:
18  Q.  And he says, No evidence of the
19  presence of asbestos in Windsor Minerals'
20  product has ever been revealed by this
21  testing; do you see that?
22         MR. BERNARDO:  Same objection.
23         THE WITNESS:  That's what the
24  sentence says.
25  BY MR. C. PLACITELLA:

Page 228

1   Q.  And then what he does is, to back
2   that statement up he says, See Exhibit A, and
3   he attaches a report from McCrone, correct?
4          MR. BERNARDO:  Same objection.
5          THE WITNESS:  I see there's a
6   report here, yes.
7   BY MR. C. PLACITELLA:
8   Q.  And who is McCrone?
9   A.  I believe it's a testing service.
10  Q.  All right.  And that Affidavit is a
11  lie, isn't it?
12         MR. BERNARDO:  Object to the
13  form of the question, beyond the scope of the
14  notice.  The witness is not answering in her
15  capacity as a corporate representative with
16  respect to these questions.
17  BY MR. C. PLACITELLA:
18  Q.  Ma'am, that Affidavit is a lie;
19  isn't it?
20  A.  I have never seen this before and I
21  can't comment on it.
22  Q.  Well, you know what the information
23  was, you're here to testify on what the
24  historical discovery responses have been.
25  That Affidavit from the President of Windsor

Page 229

1   Minerals is a lie, isn't it?
2          MR. BERNARDO:  Object to the
3   form of the question, same objection.
4          THE WITNESS:  I'm not prepared
5   to answer this.
6   BY MR. C. PLACITELLA:
7   Q.  Okay.
8          MR. C. PLACITELLA:  Can you
9   give me 28?
10  BY MR. C. PLACITELLA:
11  Q.  By the way -- oops, can we go back?
12  You see on the first page, the letter written
13  to the lawyer for Mr. Edley by Johnson &
14  Johnson; do you see that?  It says --
15  A.  Do we have that document here?
16  Q.  Yeah, it's right, it's right in
17  front of your documents.
18  A.  This one.
19  Q.  Look at the first page, 188.
20         It says, Enclosed please find an
21  Affidavit on behalf of Windsor Minerals,
22  signed by Roger Miller, President of Windsor
23  Minerals since 1968.  Also enclosed you will
24  find an assay from a McCrone Environmental.
25  I trust these documents will now enable you




Page 230

1 to sign a dismissal as was done in the Yuhas
2 case.
3         Do you see that?
4             MR. BERNARDO:  Object to the
5 form of the question.
6             THE WITNESS:  That's what it
7 says.
8 BY MR. C. PLACITELLA:
9     Q.  Remember before you said you didn't
10 know anything about Yuhas case.  Now we know,
11 right?  The Yuhas case was dismissed as well,
12 wasn't it?
13     A.  I --
14             MR. BERNARDO:  Object to the
15 form of the question.
16             THE WITNESS:  -- don't know
17 anything about the Yuhas case.
18 BY MR. C. PLACITELLA:
19     Q.  You don't know that an Affidavit
20 was prepared by Johnson & Johnson in the
21 Yuhas case saying there was no evidence that
22 ever revealed the presence of asbestos and
23 that was responsible for getting that case
24 dismissed; you didn't know that?
25         You, Johnson & Johnson don't know

Page 231

1 that?
2             MR. BERNARDO:  Object to the
3 form of the question.  She's not testifying
4 on behalf of Johnson & Johnson with respect
5 to a topic that is wildly outside the scope
6 of the notice.
7             THE WITNESS:  I'm not here
8 prepared to talk about the Yuhas case.
9 BY MR. C. PLACITELLA:
10     Q.  It says, I trust these documents
11 will now enable you to sign a dismissal as
12 was done in the Yuhas.  I've taken the
13 liberty of drafting the dismissal and
14 enclosing same for your signature along with
15 a self-addressed stamped envelope.
16         Do you see that?
17     A.  I see that sentence, yes.
18     Q.  And the very first page of this
19 document is the Stipulation of Dismissal
20 signed by the lawyer for Mr. Edley after he
21 got the Miller Affidavit, right?
22             MR. BERNARDO:  Object to the
23 form of the question, beyond the scope of the
24 notice.  The witness is not answering in her
25 corporate representative capacity.

Page 232

1 BY MR. C. PLACITELLA:
2     Q.  So Mr. Edley gave up his rights to
3 proceed with his lawsuit after he received
4 the Affidavit from the President of Windsor
5 Minerals, right?
6             MR. BERNARDO:  Same objection.
7             THE WITNESS:  I -- I can't
8 comment on that.
9 BY MR. C. PLACITELLA:
10     Q.  The very first page talks about
11 supplemental answers to supplemental
12 interrogatories; do you see that?  The letter
13 to Mr. Grayzel.
14     A.  Yes.
15     Q.  Where are those interrogatories?
16     A.  I am not here prepared to talk
17 about this.  I don't know.
18     Q.  Okay.  So can we go to -- do you
19 see this -- this -- this statement here by
20 the President of Windsor Minerals, No
21 evidence of the presence of asbestos in
22 Windsor Mineral product has ever been
23 revealed by this testing.
24         Do you see that?
25     A.  I see that sentence.

Page 233

1     Q.  Okay.  Now focusing on the word
2 "revealed," got that?
3     A.  I see that word, yes.
4     Q.  Okay.  Now, can you go to this
5 Hopkin -- this chart Hopkins-28, please?
6         Do you see on Hopkins-28 created at
7 the Hopkins dep there's a paragraph that
8 talks about what the test revealed?
9     A.  I see that, yes.
10     Q.  Okay.  And let's just -- because --
11 because Mr. Miller relied on the McCrone
12 testing for his Affidavit, let's just talk
13 and look at the McCrone tests.  Okay?  To see
14 if that was the only test.  No test ever
15 revealed any evidence.  Okay.
16         So let's go to 1971; do you see
17 that?
18             MR. BERNARDO:  Object to the
19 form of the question.
20             THE WITNESS:  I -- there's --
21 yeah, there's a couple things under 1971.
22 BY MR. C. PLACITELLA:
23     Q.  Right.
24         And do you see where it says the
25 testing entity is McCrone?



Page 234

1  A.  Yes.
2  Q.  And do you see where it says that
3  the product that was tested was Shower to
4  Shower?
5  A.  Yes.
6  Q.  Okay.  And do you see where it
7  says, Fiber of chrysotile, was very clear.
8  Medicated powder we found one fiber of
9  chrysotile, Shower to Shower.  We feel
10  strongly it may be chrysotile.  Chrysotile is
11  very low.  Final report, Shower to Shower,
12  the fiber content of Shower to Shower is
13  quite low in comparison to previous samples
14  investigated.  We found three suspect fibers.
15  Of these two were found one field and
16  probably have the same source, very possibly
17  contamination.  It is still questionable
18  whether they are chrysotile.  We have,
19  however, found traces of chrysotile in G-11,
20  one of the additives to Shower to Shower, and
21  this might be a possible source of the
22  contaminant fibers.
23      Do you see that?
24      MR. BERNARDO:  Object to the
25  form of the question.  Object to the use of

Page 235

1  this document and this summary of the
2  document.  It's not in front of the witness,
3  that's been created by Plaintiff's counsel.
4  This is well beyond the scope of the notice.
5      MR. C. PLACITELLA:  That's
6  absolutely a false statement.  And I'm --
7  I'm -- and please don't do that, please don't
8  do that.  You are violating the court rules
9  and please don't do that.
10      MR. BERNARDO:  You are
11  violating the court rules by asking the
12  witness questions that are so wildly beyond
13  the scope of what this deposition is.
14      MR. C. PLACITELLA:  Okay.
15  Well, you know what, we'll let Judge Viscomi
16  make that decision.  Okay?
17      MR. BERNARDO:  You've said that
18  several times.  I'm happy to do that.
19      MR. C. PLACITELLA:  So...
20      MR. BERNARDO:  I'm just
21  preserving a record for my client.
22  BY MR. C. PLACITELLA:
23  Q.  And you see over here where it says
24  Hopkins Comments?
25  A.  I see those words.

Page 236

1  Q.  And you see he has no comments,
2  correct?
3      MR. BERNARDO:  Object to the
4  form of the question, same objection.
5  BY MR. C. PLACITELLA:
6  Q.  And you see where here it says,
7  Satisfies Johnson & Johnson's definition of
8  asbestos and the answer is yes; do you see
9  that?
10      MR. BERNARDO:  Object to the
11  form of the question.
12      THE WITNESS:  I can't comment
13  on these.  I don't know what this means.
14  It's all taken out of context.  I'm -- I
15  don't know what any of this means.
16  BY MR. C. PLACITELLA:
17  Q.  Ma'am, this particular study was
18  never referenced or alluded to in the Miller
19  Affidavit that said, No, the evidence -- the
20  presence of asbestos was never revealed by
21  any test, right?
22      This was not part of that?
23      MR. BERNARDO:  Object to the
24  form of the question, same objection.
25  BY MR. C. PLACITELLA:

Page 237

1  Q.  Correct?
2  A.  Again, I can't comment on this.
3  Q.  Okay.  Let's go down to 10/12/1971.
4  Again, testing entity was McCrone, correct?
5  A.  That's what it says, yes.
6  Q.  And it went to Goudie.  Who's
7  Goudie?
8  A.  I don't know.
9  Q.  Okay.  And, again, this was tested
10  Shower to Shower, correct?
11      MR. BERNARDO:  Same objection
12  to this whole line of questioning.
13      THE WITNESS:  You're reading
14  what's here, yes.
15  BY MR. C. PLACITELLA:
16  Q.  Right.
17      And what the chart says the test
18  revealed was traces of chrysotile in one of
19  the additives, correct?
20  A.  Those are the words that are here.
21  Q.  And under the top -- under the --
22  under the column whether that satisfies the
23  definition of asbestos of Johnson & Johnson,
24  the answer is yes, correct?
25      MR. BERNARDO:  Object to the



Page 238

```
 1    form of the question.
 2         THE WITNESS:  The word "yes" is
 3    written here, but I cannot interpret on what
 4    any of this means.
 5    BY MR. C. PLACITELLA:
 6       Q.  All right.  And this is nowhere
 7    referenced in the dep -- in the Affidavit of
 8    Mr. Miller, is it?
 9       A.  I can't comment on this chart.
10       Q.  Ma'am, these -- this test that's
11    set forth in this chart is nowhere referenced
12    in the Affidavit of Mr. Miller concerning
13    what was found in Johnson's Baby Powder,
14    correct?
15            MR. BERNARDO:  Object to the
16    form of the question.
17            THE WITNESS:  I don't see this
18    mentioned there, no.
19    BY MR. C. PLACITELLA:
20       Q.  And, ma'am, you know that that
21    binder that's in front of you has all of
22    these tests in there, correct?
23       A.  I don't know -- I cannot tell you
24    everything that's in that binder.
25       Q.  Well, I'm going to represent to
```

Page 239

```
 1    you, like I did the last time, that all of
 2    those tests are set forth in that binder.
 3    Did you look through that binder before you
 4    came here today?
 5       A.  I knew that the binder existed, I
 6    knew that it involves tests, but I did not
 7    look at every single one of them, no.
 8       Q.  Before you came here and testified
 9    under oath that there is no evidence
10    whatsoever of asbestos in baby powder, you
11    never went back and looked at the binder that
12    was shown to you last time under oath?
13       A.  Actually, I did better and had the
14    conversation with Dr. Hopkins, because I
15    could look at this all the time and it
16    wouldn't mean anything to me.  So I wanted to
17    make sure that he was familiar with all the
18    things that you're referencing.
19       Q.  Well, the last time you were with
20    me, you were told that that chart was created
21    at the deposition of Dr. Hopkins, right?
22       A.  I don't remember this chart.
23       Q.  You don't remember that chart?
24       A.  You're saying you showed it to me,
25    I don't remember.  And I don't --
```

Page 240

```
 1       Q.  Do I need to play the video that
 2    shows you that you knew about it?
 3       A.  If you say you did.  I said I don't
 4    remember.
 5       Q.  All right.  And you never discussed
 6    this chart or any of its contents with
 7    Dr. Hopkins in preparation for today's
 8    deposition, correct?
 9            MR. BERNARDO:  Object to the
10    form of the question.
11    BY MR. C. PLACITELLA:
12       Q.  Correct?
13            MR. BERNARDO:  Characterization
14    of what this witness says she's done.
15            THE WITNESS:  No.  As I said, I
16    did not discuss this specific chart, no.
17    BY MR. C. PLACITELLA:
18       Q.  Okay.  Let's go down to 11/11/1971.
19    Another McCrone test using TEM for Shower to
20    Shower.  The results of that test are
21    mentioned nowhere in the Miller Affidavit,
22    correct?
23       A.  I did not --
24            MR. BERNARDO:  Object to the
25    form of the question.
```

Page 241

```
 1            THE WITNESS:  -- see the...
 2    BY MR. C. PLACITELLA:
 3       Q.  In fact, none of these tests that
 4    we've simply looked at on the first page of
 5    this document were ever referenced by you or
 6    Johnson & Johnson in any answer to
 7    interrogatory ever, correct?
 8            MR. BERNARDO:  Object, object
 9    to the form of the question.
10    BY MR. C. PLACITELLA:
11       Q.  Correct?
12       A.  If they were pertinent to the
13    question asked in the interrogatory, they
14    would have been mentioned.  But since they
15    were not, I imagine they were not pertinent
16    to --
17       Q.  So when you were asked questions
18    under oath in interrogatories whether there
19    was any evidence of asbestos, you didn't
20    think that any of the documents that are set
21    forth in this chart have any relevance
22    whatsoever?
23            MR. BERNARDO:  Object to the
24    form of the question.
25            THE WITNESS:  I know that the
```



Page 242

```
 1    experts who provided those answers don't
 2    depend on just documents standing alone, that
 3    they use their experience and their
 4    expertise, along with any science that's
 5    available.
 6    BY MR. C. PLACITELLA:
 7         Q.  Yes, ma'am.
 8             And nowhere did you ever turn over
 9    before 19 -- before 2017 any of these tests,
10    you, Johnson & Johnson, correct?
11             MR. BERNARDO:  Object to the
12    form of the question, outside of the scope of
13    the notice.
14             If you know in your individual
15    capacity, you can answer.
16             THE WITNESS:  No, I don't know.
17    BY MR. C. PLACITELLA:
18         Q.  Okay, that's fine.
19             Let's go to 1972, another test by
20    McCrone.  Do you see where they use TEM
21    looking for the asbestos, presence of
22    asbestos in Johnson's Baby Powder; do you see
23    that?
24         A.  I see that's written, yes.
25         Q.  And what they found was both
```

Page 243

```
 1    samples contained an insignificant amount of
 2    tremolite, tremolite rods; do you see that?
 3         A.  That's what it says.
 4         Q.  And under the chart where does it
 5    satisfy the definition of asbestos under
 6    Johnson & Johnson, the answer is yes,
 7    correct?
 8             MR. BERNARDO:  Object to the
 9    form of the question, same objection as
10    prior.
11             THE WITNESS:  I see the word
12    "yes."
13    BY MR. C. PLACITELLA:
14         Q.  Right.
15             But even though there -- as
16    according to Dr. Hopkins's chart, a test from
17    1972 showing what Johnson & Johnson deems
18    satisfying its definition of asbestos in baby
19    powder, you never referenced that in your
20    answer to interrogatories in Krushinski,
21    correct?
22         A.  These -- these were not written
23    specifically in answer to any of those
24    answers.
25         Q.  Okay.  You never referenced this,
```

Page 244

```
 1    correct?
 2         A.  Again, I don't know what this is.
 3    You keep referring to it as Dr. Hopkins'
 4    chart.  Yes, you may have showed it to me, I
 5    don't remember.  But I don't know what each
 6    column means.  The entire testing is not
 7    here.  So I -- I can't -- I can't comment
 8    here.
 9         Q.  Yes, ma'am.
10             What I asked you was when you
11    answered the interrogatories in the
12    Krushinski case under oath, you never
13    referenced a 10/27/72 test from McCrone
14    finding samples of tremolite rods that
15    Johnson & Johnson admits satisfies its
16    definition of asbestos, correct?
17             MR. BERNARDO:  Object to the
18    form of the question.
19             THE WITNESS:  I did not provide
20    the answers.
21    BY MR. C. PLACITELLA:
22         Q.  Right.
23         A.  As I explained, I had the experts,
24    the internal experts provide the answers and
25    they would have used whatever science was
```

Page 245

```
 1    credible and available.
 2         Q.  Okay.  And this test was never
 3    referenced in -- in -- in Mr. Miller's
 4    Affidavit, correct, this McCrone test, when
 5    he said no presence ever revealed --
 6             MR. BERNARDO:  Object to the
 7    form --
 8    BY MR. C. PLACITELLA:
 9         Q.  -- correct?
10             MR. BERNARDO:  -- of the
11    question.
12    BY MR. C. PLACITELLA:
13         Q.  Wasn't, wasn't referenced, right?
14         A.  It's not referenced, no.
15         Q.  Okay.  Let's go to the next McCrone
16    test.
17             Here's one from 1974.  And that was
18    done, it says McCrone, Lee.  This was done at
19    the Hammondsville ore; do you see that?
20         A.  I see that, where it says, yes.
21         Q.  And it says, Chrysotile fibers
22    suppression was indicated.  Dartmouth finds
23    amphibole 100 to 200 parts per million in the
24    ore and 9,000 in the ore.  McCrone finds
25    chrysotile in ore and finished product.
```



Page 246

1    Do you see that?
2         MR. BERNARDO:  Object to the
3    form of the question, beyond the scope of the
4    notice.  The witness is not responding in her
5    corporate representative capacity --
6    BY MR. C. PLACITELLA:
7        Q.  Do you see that?
8         MR. BERNARDO:  -- to these
9    questions.
10         THE WITNESS:  All I could tell
11   you is that's what it says.
12   BY MR. C. PLACITELLA:
13       Q.  And under the column does it
14   satisfy Johnson & Johnson's definition of
15   asbestos, the answer is yes --
16         MR. BERNARDO:  Same objection.
17   BY MR. C. PLACITELLA:
18       Q.  -- correct?
19       A.  I see the word "yes."
20       Q.  Okay.  Not referenced anywhere in
21   Mr. Miller's Affidavit, correct?
22         MR. BERNARDO:  Same objection.
23         THE WITNESS:  I see that it's
24   not.
25   BY MR. C. PLACITELLA:

Page 247

1        Q.  Let's go to the next McCrone test,
2    4/24/74.
3         By the way, did Dr. Hopkins tell
4    you about any of this when you had this
5    conversation with him?
6        A.  We didn't discuss his chart, as you
7    refer to it.
8        Q.  Well, did he tell you about any of
9    these tests that found asbestos by McCrone?
10       A.  He did not talk about any kind of
11   tests that found asbestos.
12       Q.  Okay.  And here it talks about a
13   test done of the Argonaut mine.  And it says
14   again, TEM finds chrysotile and fibrous
15   tremolite; do you see that?
16       A.  That's what it says.
17       Q.  And that satisfies Johnson &
18   Johnson's definition of asbestos, right?
19       A.  The word "yes" is written there.
20       Q.  Okay.  And then there's another
21   test by McCrone in 1974, correct?
22       A.  Yes.
23         MR. BERNARDO:  Objection.
24   BY MR. C. PLACITELLA:
25       Q.  And another one under that in 1974,

Page 248

1    correct?
2         MR. BERNARDO:  Just a running
3    objection to this entire chart, so I don't
4    keep interrupting, on the basis that I
5    explained before.
6         THE WITNESS:  That's what's
7    written here.
8    BY MR. C. PLACITELLA:
9        Q.  Okay.  And then another test in
10   October 1974, correct?
11       A.  I see that, yes.
12       Q.  And another one by McCrone in --
13   and -- strike that.
14         And all the tests done by McCrone
15   in 1974 when you go to the column, does the
16   test satisfy the definition of asbestos, it
17   all is yes, right?
18       A.  The word "yes" is written there,
19   but I don't know what that means.  I don't
20   know what these testing mean, testing means.
21   Dr. Hopkins could describe this in much
22   better words than I could.  I don't know what
23   any of this means.
24       Q.  Yes, ma'am.  But we're here to
25   determine the veracity of the discovery

Page 249

1    responses that were provided historically by
2    Johnson & Johnson.  Discovery responses that
3    you certified and others certified, you
4    understand that, correct?
5        A.  Yes.
6        Q.  And no interrogatory ever certified
7    as true and accurate under oath by Johnson &
8    Johnson that you're aware of ever mentioned
9    any of these tests by McCrone, correct?
10         MR. BERNARDO:  Object to the
11   form of the question.
12         THE WITNESS:  As I said
13   earlier, there was no specific questions that
14   asked about any kind of testing.  The answers
15   were based on the internal experts'
16   experience, expertise and the accurate
17   science.
18         MR. C. PLACITELLA:  Can you
19   read my question back, please, and see if I
20   can get an answer to it?
21         (At which time the following
22   question is read:
23         "QUESTION:  And no
24   interrogatory ever certified as true and
25   accurate under oath by Johnson & Johnson that



Page 250

1  you're aware of ever mentioned any of these
2  tests by McCrone, correct?")
3        THE WITNESS:  That's correct.
4  They did not answer these -- they did not
5  cite these specifically, no.
6  BY MR. C. PLACITELLA:
7     Q.  Okay.  And then in 1975, according
8  to this, there's another test by McCrone,
9  correct?
10       And it says, Confirmed asbestos,
11  low to medium, bundles of amphiboles and that
12  satisfied Johnson & Johnson's definition of
13  asbestos, right?
14        MR. BERNARDO:  Object to the
15  form of the question.
16        THE WITNESS:  Again, the word
17  "yes" is written there.  I don't know what
18  any of this means.
19  BY MR. C. PLACITELLA:
20     Q.  Okay.  And, again, in 1975 another
21  test by McCrone, fibers of asbestos, answer
22  yes, correct?
23     A.  Those are the words written.
24     Q.  Okay.  Now we're up to 1975, that's
25  ten years -- 12 years before Miller executed

Page 251

1  his Affidavit.  And on McCrone tests alone, I
2  have one, two, three, four, five, six, seven,
3  eight, nine, ten, 11, 12, 13 tests that were
4  never mentioned by McCrone, that were never
5  mentioned in the Miller Affidavit, correct?
6        MR. BERNARDO:  Object to the
7  form of the question, same objection with
8  respect to scope as I've made numerous times.
9        (Reporter clarification.)
10        MR. BERNARDO:  That I've made
11  numerous times.
12        THE WITNESS:  I -- I cannot
13  comment on the Affidavit.  I'm not here to
14  talk about that, that particular Affidavit,
15  nor this chart.
16  BY MR. C. PLACITELLA:
17     Q.  And, ma'am, I'm not going to
18  belabor the point here, but in 1983 there was
19  another McCrone test, correct?
20        MR. BERNARDO:  Same objection.
21        THE WITNESS:  That's what it
22  says.
23  BY MR. C. PLACITELLA:
24     Q.  And then another McCrone test in
25  '84, correct?

Page 252

1        MR. BERNARDO:  Same objection.
2        THE WITNESS:  That's what it
3  says.
4  BY MR. C. PLACITELLA:
5     Q.  And another McCrone test in 1986?
6        MR. BERNARDO:  Same objection.
7  BY MR. C. PLACITELLA:
8     Q.  Correct?
9        MR. BERNARD:  Same objection,
10  same objection.
11        THE WITNESS:  That's what it
12  says.
13  BY MR. C. PLACITELLA:
14     Q.  Correct?
15     A.  That's what it says.
16     Q.  All right.  And what Miller did, he
17  cited a single test by McCrone for the
18  evidence that asbestos was never found in any
19  Johnson & Johnson product and omitted every
20  other McCrone test on this chart, correct?
21        MR. BERNARDO:  Object to the
22  form of the question.
23        THE WITNESS:  I cannot comment
24  on the Miller Affidavit, nor this chart.
25  BY MR. C. PLACITELLA:

Page 253

1     Q.  And, actually, when you looked at
2  the 1983 and '84 tests, right, Miller himself
3  received the tests that satisfied Johnson &
4  Johnson's definition of asbestos, according
5  to this chart, correct?
6        MR. BERNARDO:  Object to the
7  form of the question.
8        THE WITNESS:  I can't interpret
9  this, this chart.  And I'm not here to talk
10  about it.
11  BY MR. C. PLACITELLA:
12     Q.  Okay.  So I ask you again, Miss
13  Musco, is Mr. Miller's Affidavit a lie?
14        MR. BERNARDO:  Object to the
15  form of the question.
16  BY MR. C. PLACITELLA:
17     Q.  Based on what you've seen here
18  today.
19     A.  I'm not here today to talk about
20  Mr. Miller's Affidavit.  I can't comment.
21     Q.  Ma'am, you are here as designated
22  as Johnson & Johnson's representative on the
23  veracity of discovery responses provided
24  historically in talc litigation.  You
25  understand that, correct?



Page 254

1    A.  I believe that there's a
2 misunderstanding about the scope of our --
3 our notice, yes.
4    Q.  Ma'am, I asked you those questions
5 when we started.  Can we agree that every
6 test up until Miller signed his Affidavit in
7 1987 was never referenced, every test in this
8 chart, not one was referenced in Miller's
9 Affidavit when he certified under oath to get
10 Mr. Edley's case dismissed, not one of these
11 tests was ever referenced, correct?
12        MR. BERNARDO:  Objection to the
13 form of the question, beyond the scope.  This
14 witness is not here as a corporate
15 representative with respect to that
16 Affidavit.
17        THE WITNESS:  I -- I cannot
18 comment on the Affidavit.
19 BY MR. C. PLACITELLA:
20    Q.  You think that's okay to do that?
21        MR. BERNARDO:  Same objection.
22 BY MR. C. PLACITELLA:
23    Q.  To swear under oath to get some --
24 get somebody to give up their rights and only
25 provide half the truth?

Page 255

1    Do you think Johnson is -- does
2 Johnson & Johnson think that's okay?
3        MR. BERNARDO:  Object to the
4 form of the question, same objection with
5 respect to scope.
6        THE WITNESS:  I -- I can't
7 answer that kind of question.
8 BY MR. C. PLACITELLA:
9    Q.  I'm asking does Johnson & Johnson
10 believe it was okay to file an Affidavit in
11 this very state, in Middlesex County and get
12 somebody to give up their rights, saying
13 there's no evidence whatsoever, when they had
14 evidence from the same company over and over
15 for more than a decade; do you think that was
16 right on behalf of Johnson & Johnson?
17        MR. BERNARDO:  Object to the
18 form, same objection with respect to the
19 scope.
20        THE WITNESS:  I can't comment
21 on the Affidavit.
22 BY MR. C. PLACITELLA:
23    Q.  So Johnson & Johnson cannot comment
24 on whether it was proper to use an Affidavit
25 saying there was no evidence whatsoever to

Page 256

1 get somebody's case dismissed, when it
2 clearly had evidence to the contrary in its
3 possession; is that what you're saying?
4        MR. BERNARDO:  You've --
5 answered -- asked the question several times.
6 She's answered it.  We've objected based upon
7 the scope.  You're --
8        MR. C. PLACITELLA:  Please
9 don't do this.
10        MR. BERNARDO:  Don't tell me
11 "please don't do this."
12        MR. C. PLACITELLA:  Please.
13        MR. BERNARDO:  You're beginning
14 to become harassing, Mr. Placitella.
15        MR. C. PLACITELLA:  Okay.
16 Well, can you pull out -- do you have his
17 Affidavit?
18 BY MR. C. PLACITELLA:
19    Q.  Ma'am, can you answer my question?
20    A.  Would you please repeat the
21 question?
22        MR. C. PLACITELLA:  Could you
23 repeat the question, please?
24        (At which time the following
25 question is read:

Page 257

1        "QUESTION:  So Johnson &
2 Johnson cannot comment on whether it was
3 proper to use an Affidavit saying there was
4 no evidence whatsoever to get somebody's case
5 dismissed, when it clearly had evidence to
6 the contrary in its...")
7 BY MR. C. PLACITELLA:
8    Q.  Can you answer that?
9    A.  I -- I -- it didn't sound like it
10 was completed.
11        THE COURT REPORTER:  I need a
12 minute.
13        MR. C. PLACITELLA:  Take your
14 time.  You know what, let me just keep moving
15 I'll make you...
16        (Off-the-record discussion.)
17 BY MR. C. PLACITELLA:
18    Q.  Did you know that the reason that
19 Mr. Hopkins never told you about the Miller
20 Affidavit or the tests that were missing was
21 because he filed the same Affidavit in other
22 cases?
23        MR. BERNARDO:  Object to the
24 form.
25 BY MR. C. PLACITELLA:

65  (Pages 254 to 257)



Page 258

1    Q.  Did you know he filed the same
2  Affidavit in other cases?
3        MR. BERNARDO:  Object to the
4  form of the question.
5        THE WITNESS:  I can't answer
6  that, because I'm not familiar with the
7  Affidavit, because I'm not here to talk about
8  that.  It was my understanding that this was
9  not within the scope of the notice.
10 BY MR. C. PLACITELLA:
11   Q.  Ma'am, given the evidence that's on
12 Hopkins-28, would you sign that Affidavit?
13       MR. BERNARDO:  Object to the
14 form of the question, same as before.
15       THE WITNESS:  Are you referring
16 to the original --
17 BY MR. C. PLACITELLA:
18   Q.  The Affidavit signed by Miller in
19 the Edley case, would you sign that Affidavit
20 in order to get Mr. Edley to dismiss his
21 case, would you sign it?
22       MR. BERNARDO:  Objection.
23 BY MR. C. PLACITELLA:
24   Q.  Given everything that we've gone
25 through?

Page 259

1        MR. BERNARDO:  Object to the
2  form of the question.
3        THE WITNESS:  I can't even
4  answer that, that wouldn't be my role.  I
5  don't have complete information.  I don't
6  know enough about it.
7  BY MR. C. PLACITELLA:
8    Q.  Ma'am, could you just move that
9  book in -- in front of the camera so the
10 camera can pick it up, please?
11   A.  Are you referring to the --
12   Q.  Yes, ma'am.
13       That's the book of testing
14 documents that go along with this chart; you
15 know that, right?
16       MR. BERNARDO:  Object to the
17 form of the question.
18       THE WITNESS:  That's what you
19 have said, yes.
20 BY MR. C. PLACITELLA:
21   Q.  And have you gone back and verified
22 that when you swore to answers to
23 interrogatories under oath that you never
24 referenced a single one of the tests in that
25 book?

Page 260

1        MR. BERNARDO:  Object to the
2  form of the question.
3        THE WITNESS:  I told you
4  earlier, I could go back and read every one
5  of them, but it wouldn't make that much sense
6  to me, because this is not my expertise,
7  which is why I had the conversation with
8  Dr. Hopkins to ensure that he has read them.
9  He's the expert.  And that he understands
10 them.
11 BY MR. C. PLACITELLA:
12   Q.  Ma'am, that wasn't my question.
13       My question was, am I correct that
14 when you swore to interrogatories under oath
15 on behalf of Johnson & Johnson and others
16 swore to interrogatories under oath of
17 Johnson & Johnson, none of the tests in that
18 book were ever supplied or referenced in any
19 way, correct?
20       MR. BERNARDO:  Object to the
21 form of the question.
22       THE WITNESS:  It -- it was not
23 appropriate to do that, because, again, we
24 had the experts answering the questions based
25 on their information and their knowledge.

Page 261

1  There's no specific set of studies that goes
2  with each answer.
3  BY MR. C. PLACITELLA:
4    Q.  All right.  Let me ask the question
5  again, please.
6        When you answered interrogatories
7  under oath and others did the same thing on
8  behalf of Johnson & Johnson, you can't point
9  to a single instance where any of the results
10 that are in that book were ever supplied or
11 referenced by Johnson & Johnson, correct?
12   A.  Well, I can't speak for others who
13 have provided answers, but I can speak for
14 what I did.  And, again, I did not go back
15 and look at each one of these.  Again, I
16 trusted the people that I asked to respond to
17 the questions.
18   Q.  Ma'am, we'd like to finish --
19       MR. BERNARDO:  Listen to his
20 question.
21 BY MR. C. PLACITELLA:
22   Q.  -- at some point in time, okay?
23       MR. BERNARDO:  It's getting
24 late, but just listen to his question.
25 BY MR. C. PLACITELLA:

66  (Pages 258 to 261)



Page 262

1    Q.  Ma'am, please.
2         When you answered interrogatories
3    under oath, you never supplied or referenced
4    any of the studies that are set forth in that
5    book in front of you, true?
6    A.  No, I did not.
7    Q.  And as you sit here today, you
8    don't have any evidence that anybody else at
9    Johnson & Johnson when they were certifying
10   answers to interrogatories referenced or
11   supplied any of the testing documents in that
12   book in front of you, correct?
13   A.  Not in direct response, no.
14        MR. C. PLACITELLA:  Now, can
15   you give me 282?
16        (Exhibit J&J-282, is marked for
17   identification.)
18   BY MR. C. PLACITELLA:
19   Q.  Do you know how many times
20   Johnson & Johnson filed affidavits in courts
21   of law indicating that there was no evidence
22   whatsoever in order to get people's cases
23   dismissed?
24        MR. BERNARDO:  Object to the
25   form of the question.

Page 263

1         THE WITNESS:  No, I do not.
2    BY MR. C. PLACITELLA:
3    Q.  You have in front of you another
4    Affidavit signed by Roger Miller a year after
5    the Edley Affidavit in the Andonian case,
6    correct?
7         MR. BERNARDO:  Object to the
8    form of the question.
9         THE WITNESS:  I see those
10   names, yes.
11   BY MR. C. PLACITELLA:
12   Q.  Right.  And, again, Roger Miller
13   states under oath, All of the talc mined by
14   Windsor Minerals, Inc. has been regularly
15   sampled or tested for the presence of
16   asbestos.  No evidence of the presence of
17   asbestos in Windsor Minerals' product has
18   ever been revealed by this testing.
19        Correct?
20   A.  That's what it says.
21   Q.  And if I go to --
22        MR. C. PLACITELLA:  Where is
23   the chart?
24   BY MR. C. PLACITELLA:
25   Q.  By 1988 according to the Hopkins

Page 264

1    chart, there were one, two, three, four,
2    five, six, seven, eight, nine, ten, 11, 12,
3    13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,
4    24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34,
5    35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45;
6    do you see that?  Forty-five entries on
7    Dr. Hopkins' chart talking about testing
8    evidence on asbestos, correct?
9         MR. BERNARDO:  Object to the
10   form of the question, beyond the scope of the
11   notice.
12        You can answer in your
13   individual capacity, if you can.
14        THE WITNESS:  I heard you count
15   them up to those numbers, but...
16   BY MR. C. PLACITELLA:
17   Q.  Well, do you want to count it again
18   and see if I got it right?
19   A.  It's not necessary for me.  I
20   cannot comment on this chart.
21   Q.  And not one of the tests set forth
22   in that chart or in that book are referenced
23   anywhere on the Andonian Affidavit filed by
24   Roger Miller in order to get cases dismissed,
25   correct?

Page 265

1         MR. BERNARDO:  Object to the
2    form of the question.  Object, beyond the
3    scope of the notice.
4         You can answer in your
5    individual capacity, if you can.
6         THE WITNESS:  I can't comment
7    on it.
8    BY MR. C. PLACITELLA:
9    Q.  None of the tests referenced on the
10   chart up until the time he signed this
11   Affidavit in 1988 are referenced anywhere in
12   his Affidavit, correct?
13        MR. BERNARDO:  Same objection.
14        THE WITNESS:  I'm not prepared
15   to comment on the Affidavit or any of the
16   testing on the chart.
17   BY MR. C. PLACITELLA:
18   Q.  Ma'am, all I'm asking you is any of
19   the testing listed on the chart, any of them
20   reflected anywhere in his Affidavit?
21        MR. BERNARDO:  Same objection.
22        THE WITNESS:  I do not see them
23   listed here, no.
24   BY MR. C. PLACITELLA:
25   Q.  Okay.

67  (Pages 262 to 265)



Page 266

1      MR. C. PLACITELLA:  Now, can
2  you give me 195, please?
3      (Exhibit J&J-195, Affidavit, is
4  marked for identification.)
5  BY MR. C. PLACITELLA:
6    Q.  195.
7      MR. BERNARDO:  Same objection
8  with respect to the use of the document.
9  BY MR. C. PLACITELLA:
10   Q.  Is an Affidavit --
11     MR. BERNARDO:  I won't repeat
12  it, same objection with respect to the use of
13  this document.
14  BY MR. C. PLACITELLA:
15   Q.  -- signed by William Ashton in
16  Somerset County, New Jersey, do you see that?
17   A.  I see it's an Affidavit.  And I see
18  Mr. Ashton's name.
19   Q.  And Mr. Ashton is one of the
20  scientists who was knowledgeable and who
21  worked on the talc litigation, correct?
22   A.  He was assigned to Johnson &
23  Johnson, yes.
24   Q.  In fact, he was involved in the
25  defense of the Westfall case, correct?

Page 267

1    A.  I don't know for sure.
2    Q.  And he was known --
3      MR. C. PLACITELLA:  Okay.  Let
4  me -- can we go to the Elmo, please?  Sorry.
5  BY MR. C. PLACITELLA:
6    Q.  This is in the privilege log chart.
7  Do you see here talks about the Westfall
8  case?
9      MR. BERNARDO:  I'll renew my
10  objection with respect --
11  BY MR. C. PLACITELLA:
12   Q.  Do you see that?
13     MR. BERNARDO:  With respect --
14     THE WITNESS:  I see --
15     MR. BERNARDO:  -- to the use of
16  the privilege log.
17  BY MR. C. PLACITELLA:
18   Q.  Okay.
19   A.  I see what you've highlighted.
20   Q.  All right.  And do you see if you
21  go across that William Ashton was involved in
22  the case; do you see that?
23   A.  I see his name that you're
24  highlighting.
25   Q.  And he corresponded with the

Page 268

1  lawyers in the Westfall case, correct?
2    A.  I see you're highlighting names.  I
3  don't know what this all means.
4    Q.  And also involved according to this
5  log was the Medical Director for Johnson &
6  Johnson, he was involved in the Westfall case
7  according to this log, correct?
8    A.  I see you have highlighted those
9  names.
10   Q.  Okay.  So William Ashton clearly
11  knew what was going on in the Westfall case,
12  as did the Medical Director for Johnson &
13  Johnson, correct?
14     MR. BERNARDO:  Object to the
15  form of the question.
16     THE WITNESS:  I can't comment.
17  This was the first time I saw this.  I don't
18  know what it is and I was not here today to
19  talk about this.
20  BY MR. C. PLACITELLA:
21   Q.  Okay.  Well, let's look at --
22     MR. C. PLACITELLA:  Can we go
23  back to the iPad, please?
24  BY MR. C. PLACITELLA:
25   Q.  Ashton states in the beginning of

Page 269

1  his Affidavit that he has been involved in
2  the talc business for Johnson & Johnson for
3  35 years, correct?
4    A.  That's what it says.
5    Q.  Okay.  And he's been to the talc
6  deposits and knows all about them, correct?
7    A.  It says he was actively involved.
8    Q.  Okay.  And then can you go to the
9  next page of his Affidavit?  He says, From
10  the 1940s to the 1980s, talc mined in Vermont
11  and specifically, the talc mined by Engelhard
12  (and its predecessors) from the talc mine
13  located in Johnson, Vermont has been
14  considered to be talc free from contamination
15  of asbestos.
16     Do you see that?
17     MR. BERNARDO:  Object to the
18  form of the question, same objection --
19  BY MR. C. PLACITELLA:
20   Q.  Do you see that?
21     MR. BERNARDO:  -- with respect
22  to this Affidavit and the scope of this
23  notice.
24  BY MR. C. PLACITELLA:
25   Q.  Do you see that?



Page 270

1     A.  I see that's what those sentences
2  say.
3     Q.  That's a lie, right?
4         MR. BERNARDO:  Object to the
5  form of the question.
6         THE WITNESS:  I cannot comment
7  on this.  I was not here today prepared to
8  talk about this.  It's...
9  BY MR. C. PLACITELLA:
10    Q.  Well, you were here again today,
11  designated as to the veracity of the
12  discovery responses historically by Johnson &
13  Johnson, correct?
14    A.  It is my understanding that this is
15  not within the scope of what I was here today
16  to talk about.
17    Q.  Okay.  And if you look in the
18  Affidavit, Mr. Ashton actually attaches one
19  of the depositions from the Westfall case,
20  correct?
21        MR. BERNARDO:  Object to the
22  form of the question, same objection with
23  respect to the scope.
24        THE WITNESS:  It says that's
25  what it is.

Page 271

1  BY MR. C. PLACITELLA:
2     Q.  Right.
3         It was a videotaped deposition of
4  Alfred Chidester; do you see that?
5     A.  That's what it says.
6     Q.  And when he attaches the
7  deposition, he doesn't reference at all the
8  depositions of the scientists who testified
9  in the Westfall case who said they found
10  asbestos in the mine, does he?
11        MR. BERNARDO:  Object to the
12  form of the question.
13        THE WITNESS:  I'm not here
14  today to talk about this.  So I have no idea
15  what he did or didn't do or why he did or
16  didn't do.
17  BY MR. C. PLACITELLA:
18    Q.  Ma'am, why don't you take a look at
19  the Affidavit and see if he attaches anywhere
20  the transcripts of the actual scientists who
21  did the testing and who've testified under
22  oath, as we went through before, that they
23  found asbestos in the mine.  Take a look, see
24  if it's there.
25    A.  I don't see any other testimony,

Page 272

1  no.
2     Q.  He certainly didn't attach the
3  testimony of Dr. Hemstock that I put up here
4  on the screen, who testified that he found
5  chrysotile asbestos in the mine, did he?
6         MR. BERNARDO:  Object to the
7  form of the question.  Use of
8  this Affidavit.  And this testimony is beyond
9  the scope of this notice.
10        THE WITNESS:  I have not seen
11  this before.  My understanding is it beyond
12  the scope.  And I'm -- I would have to read
13  this whole thing.
14  BY MR. C. PLACITELLA:
15    Q.  Okay.  And, ma'am, so when this
16  Mr. Talc, Johnson & Johnson's Mr. Talc stated
17  under oath in an Affidavit that the talc and
18  the mine was asbestos-free, that was a fib,
19  right?
20        MR. BERNARDO:  Object to the
21  form of the question.  Same objection with
22  respect to the scope.
23        THE WITNESS:  Are you referring
24  to Mr. Ashton when you say --
25  BY MR. C. PLACITELLA:

Page 273

1     Q.  Yes, ma'am.
2     A.  -- "Mr. Talc"?
3     Q.  Yes, ma'am.
4     A.  I know him as Mr. Ashton.
5         I -- I can't comment on this.  I
6  did not come here today to discuss this.
7     Q.  Do you know how many cases were
8  dismissed for people by -- that -- how many
9  cases this Affidavit caused to be dismissed?
10        MR. BERNARDO:  Object to the
11  form of the question, beyond the scope.
12        You can answer in your personal
13  capacity if you can.
14        THE WITNESS:  I do not know.
15  BY MR. C. PLACITELLA:
16    Q.  Do you think this was an okay thing
17  to do?
18        MR. BERNARDO:  Same objection.
19  BY MR. C. PLACITELLA:
20    Q.  The Chief Scientist in talc for
21  Johnson & Johnson, does Johnson & Johnson
22  think this was an okay thing to do, to file
23  an Affidavit saying there's no evidence,
24  when, in fact, he was involved in the lawsuit
25  himself and saw the evidence, think that's



| Page 274 |
|---|

1  okay?
2          MR. BERNARDO:  Same objection.
3          THE WITNESS:  I can't answer
4  that.
5  BY MR. C. PLACITELLA:
6      Q.  Well, I'm not asking if you can
7  answer.  I'm asking you, Johnson & Johnson,
8  do you think that's okay --
9          MR. BERNARDO:  Same objection.
10 BY MR. C. PLACITELLA:
11     Q.  -- to do that?
12         MR. BERNARDO:  Not here to
13 answer questions beyond the scope of the
14 notice.
15         THE WITNESS:  I can't answer
16 that.
17 BY MR. C. PLACITELLA:
18     Q.  You can't or you won't?
19     A.  I'm not here today to talk about
20 that.
21     Q.  Okay.
22         MR. C. PLACITELLA:  Can you
23 give me 446?
24         (Exhibit J&J-446, Agreement, is
25 marked for identification.)

| Page 275 |
|---|

1  BY MR. C. PLACITELLA:
2      Q.  Take a second, because it's big.
3      Can you take a look at that,
4  please?
5      446 is an Agreement between Cypress
6  Minerals and Johnson & Johnson, dated
7  January 6, 1989; do you see that?
8          MR. BERNARDO:  Object to the
9  form of the question, beyond the scope of the
10 notice.
11 BY MR. C. PLACITELLA:
12     Q.  That was during the time that you
13 were working on the talc cases, right?
14     A.  This is during the time that I was
15 employed by Johnson & Johnson, yes.
16     Q.  Okay.  And according to Exhibit I,
17 Johnson & Johnson was named in numerous cases
18 as of 1989, correct?
19         MR. BERNARDO:  Object to the
20 form of the question.
21         THE WITNESS:  I've never seen
22 this before.  I don't know how to read it.
23 This doesn't seem to be within scope.  And so
24 I can't comment.
25 BY MR. C. PLACITELLA:

| Page 276 |
|---|

1      Q.  Ma'am, there's -- mentioned is the
2  Andonian case, correct?
3      A.  I see that name.
4      Q.  All right.  That's the Affidavit
5  that I just showed you, right --
6      A.  Yes, you did.
7      Q.  -- from Mr. Miller?
8      And then there's another one, the
9  Miller case; do you see that?
10     A.  I see those names.
11     Q.  Okay.  And in preparing for today's
12 deposition, did you look at any of the
13 discovery from any of those cases?
14         MR. BERNARDO:  Object to the
15 form of the question.
16         THE WITNESS:  No, I did not.
17 BY MR. C. PLACITELLA:
18     Q.  Okay.  And if you look at the next
19 page, do you see that they actually detail
20 where the cases are filed and they total that
21 as of 1989 there were 1,827 cases involving
22 Windsor at that point in time; do you see
23 that?
24         MR. BERNARDO:  Object to the
25 form of the question, beyond the scope of the

| Page 277 |
|---|

1  notice.  She's not here as a corporate
2  representative with respect to the litigation
3  profile.
4          THE WITNESS:  All I can see is
5  what you point out to me in the numbers and I
6  have not seen this before.
7  BY MR. C. PLACITELLA:
8      Q.  And you have not reviewed in
9  preparation for today's deposition any of the
10 discovery responses from any of those 1,800
11 cases, correct?
12         MR. BERNARDO:  Object to the
13 form of the question.
14         THE WITNESS:  It is my
15 understanding that these were not within the
16 scope of the notice.
17 BY MR. C. PLACITELLA:
18     Q.  And how do you say that?
19     A.  Excuse me?
20     Q.  Why is that?
21     Why is that?
22     Why aren't they in the scope?
23     A.  Because that was not our
24 interpretation of this and there seems to be
25 some misunderstanding about that.



Page 278

1    Q.  So you are -- Johnson & Johnson,
2  you have an interpretation or is that
3  something the lawyer told you?
4              MR. BERNARDO:  Object to the
5  form of the question.
6              THE WITNESS:  That is my
7  understanding.
8  BY MR. C. PLACITELLA:
9    Q.  Okay.  So when you prepared for
10  today's deposition, you didn't look at any of
11  the discovery responses from any of these
12  1,800 cases, correct?
13    A.  That's correct.
14    Q.  Okay.  And you didn't even know
15  about the false affidavits that Roger Miller
16  filed in connection with these cases, did
17  you?
18              MR. BERNARDO:  Object to the
19  form of the question, characterization of the
20  Affidavit.
21              THE WITNESS:  I can't comment
22  one way or the other on the affidavits.
23  BY MR. C. PLACITELLA:
24    Q.  Okay.  Now, at this same period of
25  time while you were handling these cases,

Page 279

1  Johnson & Johnson, or you were the point
2  person, destroyed all the records they had --
3              MR. BERNARDO:  Object.
4  BY MR. C. PLACITELLA:
5    Q.  -- at the mine, correct?
6              MR. BERNARDO:  Object to the
7  form of the question, outside the scope of
8  the notice.  This witness is not here to
9  testify with respect to documentation from
10  the mine.
11  BY MR. C. PLACITELLA:
12    Q.  Ma'am, you understand that part of
13  the obligation of a company is to turn over
14  the records it has in the context of
15  discovery, correct?
16    A.  I know that their obligation is to
17  turn over whatever is requested.
18    Q.  And to keep, when they're sued over
19  and over again, to keep those records,
20  correct?
21              MR. BERNARDO:  Object.
22  BY MR. C. PLACITELLA:
23    Q.  You know that?
24              MR. BERNARDO:  Object to the
25  form of the question, calls for a legal

Page 280

1  conclusion.
2              (Reporter clarification.)
3              MR. BERNARDO:  Calls for a
4  legal conclusion.  This witness is not here
5  to testify with respect to legal hold
6  obligations.
7              THE WITNESS:  I don't know the
8  specifics of any requirements.
9  BY MR. C. PLACITELLA:
10    Q.  Ma'am, when you certified answers
11  to interrogatories under oath in the
12  Krushinski case, you did it without the
13  benefit of any of the documents that were
14  kept at the mine where the product came out,
15  right?
16              MR. BERNARDO:  Object to the
17  form of the question.
18              THE WITNESS:  As I've -- I've
19  already addressed, that there were no
20  specific documents that were in response to
21  the questions.  That we relied upon the
22  knowledge and the expertise of the particular
23  people who answered the questions.
24  BY MR. C. PLACITELLA:
25    Q.  Ma'am, no one ever told you as the

Page 281

1  corporate representative of Johnson & Johnson
2  that all of the records related to the mine
3  were actually destroyed in 1989 while
4  litigation was pending?
5              You did not know that before you
6  came here today?
7              MR. BERNARDO:  Object to the
8  form of the question.
9              Chris, I've said this many
10  times and I'm going to begin to instruct the
11  witness not to answer, because this is
12  nothing short of harassment.
13              MR. C. PLACITELLA:  Yeah, well,
14  we'll see.
15              MR. BERNARDO:  No, no, let me
16  finish.
17              You know she is not here to
18  address this.  We've made that abundantly
19  clear.
20              MR. C. PLACITELLA:  I know what
21  you think.
22              MR. BERNARDO:  You continue --
23  it's not what I think.
24              MR. C. PLACITELLA:  That's what
25  you think.

71  (Pages 278 to 281)



Page 282

1      MR. BERNARDO: It's what we've
2  told you.  And we've made it abundantly
3  clear.  And you're now asking her questions
4  about legal holds and documents that you well
5  know the response and position on.
6      MR. C. PLACITELLA:  Okay, okay.
7  BY MR. C. PLACITELLA:
8      Q.  Ma'am, did you know that when you
9  were certifying answers to interrogatories
10  that all of the documents related to the
11  Hammondsville mine were destroyed; did you
12  know that?
13      MR. BERNARDO:  Object to the
14  form of the question and the
15  characterization.
16      THE WITNESS:  I don't know
17  anything about documents at the mines.
18  BY MR. C. PLACITELLA:
19      Q.  I'm going to show you what's been
20  marked J&J-456.
21      (Exhibit J&J-456, Memo, is
22  marked for identification.)
23  BY MR. C. PLACITELLA:
24      Q.  J&J-456 is a memo from R. Denton on
25  Johnson & Johnson letterhead.

Page 283

1      Who's R. Denton?
2      A.  I don't know.
3      Q.  To W. Ashton.  That's Bill Ashton,
4  right?
5      A.  I would assume so.
6      Q.  He's the same Ashton who executed
7  the Affidavit we just went through, correct?
8      A.  Yes, he is.
9      Q.  Okay.  And on page 3 of the
10  Johnson & Johnson memo it states, quote, The
11  specifics of the mining operation at
12  Hammondsville are uncertain, as most of the
13  pre-Luzenac records were destroyed by the
14  mine management just -- staff, just prior to
15  the J&J divestiture and the Cyprus purchase.
16      Do you see that?
17      MR. BERNARDO: Object to the
18  form of the question.
19  BY MR. C. PLACITELLA:
20      Q.  Do you see that?
21      MR. BERNARDO:  Outside the
22  scope of the notice and object to --
23      (Multiple speakers,
24  overlapping, unintelligible crosstalk.)
25  BY MR. C. PLACITELLA:

Page 284

1      Q.  Is today the first time that you
2  learned --
3      THE COURT REPORTER:  I'm sorry,
4  I didn't get the tail end of his objection.
5      MR. BERNARDO:  Sorry.  And
6  objected to asking the witness about this
7  document.  She's not answering in a corporate
8  capacity.
9  BY MR. C. PLACITELLA:
10      Q.  Is today the first time that you
11  learned that when you were certifying
12  interrogatories under oath that the documents
13  concerning the mining operation of
14  Hammondsville were destroyed before you ever
15  answered the interrogatory?
16      MR. BERNARDO:  Object to the
17  form.
18  BY MR. C. PLACITELLA:
19      Q.  Today's the first time you learned
20  that?
21      MR. BERNARDO:  Object to the
22  form of the question, same objections as
23  before.
24      THE WITNESS:  I have not seen
25  this before.  It's my understanding that this

Page 285

1  is not what I'm here to discuss.
2  BY MR. C. PLACITELLA:
3      Q.  Ma'am, I'm asking you a question.
4      When you certified interrogatories
5  under oath, is this the first time that you
6  learned that the documents from the mine, the
7  Hammondsville mine that was the source for
8  the baby powder were destroyed?  It's a yes
9  or no answer.
10      MR. BERNARDO:  Object to the
11  form of the question.
12      THE WITNESS:  I'm trying to
13  answer you.  I am not here today to talk
14  about this.  This is the first I have seen
15  it.
16      MR. C. PLACITELLA:  Okay.
17  Let's take a break.
18      THE VIDEOTAPE OPERATOR:  The
19  time is 3:56 p.m., off the record.
20      (Brief recess.)
21      THE VIDEOTAPE OPERATOR:  Time
22  is 4:18 p.m., on the record.
23      MR. BERNARDO:  So
24  Mr. Placitella and I discussed how much more
25  time he believes he needs to take this



Page 286

```
 1    deposition.  And I believe he indicated at
 2    least several more hours.
 3           I also have a direct
 4    examination that I would like to do of the
 5    witness.
 6           Miss Musco during the break
 7    told me that she's been here all day and
 8    getting tired.  And that if we're going to
 9    have to continue, she would prefer to do that
10    on a separate date.
11           Mr. Placitella and I obviously
12    from the transcript disagree as to what the
13    proper scope of this deposition is and should
14    be, but we will sort that out among ourselves
15    and possibly or probably with Judge Viscomi.
16           I will reserve my right to do a
17    direct exam of Miss Musco.
18           But, otherwise, we agree that
19    after marking and having Miss Musco describe
20    the box of documents that she has brought
21    with her today, we will adjourn for today and
22    meet and confer as to the remainder of the
23    deposition.
24           Is that a fair
25    characterization, Mr. Placitella?
```

Page 287

```
 1           MR. C. PLACITELLA:  We agree.
 2           MR. BERNARDO:  Look at that.
 3    See what happens on a Friday afternoon.
 4           MR. C. PLACITELLA:  We can
 5    always agree to disagree.
 6           MR. BERNARDO:  Well, do you
 7    want to ask her to -- or how do you --
 8           MR. C. PLACITELLA:  Well, I
 9    want to just go through these documents,
10    identify them and have them marked and this
11    way we'll save time next time.
12           MR. BERNARDO:  Do you
13    understand what he's asking you to do?
14           THE WITNESS:  Yes.
15    BY MR. C. PLACITELLA:
16       Q.  So the first one is --
17           MR. BERNARDO:  So let me just
18    for the record point out that -- that we
19    brought with us today a banker's box of
20    various binders and other documents that
21    Miss Musco had reviewed or otherwise
22    considered in connection with her preparation
23    for today's deposition.  And we're going to
24    have Miss Musco describe each of them for the
25    record.
```

Page 288

```
 1           (Exhibit P-6, Depositions and
 2    testimony of Dr. Hopkins, is marked for
 3    identification.)
 4    BY MR. C. PLACITELLA:
 5       Q.  All right.  What's that marked,
 6    P-6?
 7       A.  Yeah, P-6.
 8       Q.  All right.  Marked P-6, what's P-6?
 9       A.  P-6 is the depositions and
10    testimony of Dr. Hopkins, which I reviewed.
11       Q.  Okay.  Did you look at any of the
12    ones I took?
13       A.  Excuse me?
14           MR. BERNARDO:  Matter of fact,
15    I think she did.
16    BY MR. C. PLACITELLA:
17       Q.  Did you look at the ones I took?
18       A.  Oh, I was most interested in those.
19       Q.  Okay.  So then you know all about
20    the chart.
21           (Exhibit P-7, Testimonies and
22    interrogatories for Selby and Krushinski, is
23    marked for identification.)
24           THE WITNESS:  Okay.  These are
25    the specific interrogatories of Selby.
```

Page 289

```
 1    And -- yeah.
 2    BY MR. C. PLACITELLA:
 3       Q.  Just identify the exhibit number.
 4       A.  Oh, sorry.
 5       Q.  Please.
 6       A.  P-7.
 7       Q.  Okay.
 8           MR. BERNARDO:  Please make sure
 9    your description is complete for the record.
10           THE WITNESS:  Yes, these
11    include testimonies and interrogatories of
12    for Selby and Krushinski, the specific
13    complaints.
14           (Exhibit P-8A, Documents sent
15    to Dr. Hopkins, is marked for
16    identification.)
17           (Exhibit P-8B, Documents sent
18    to Dr. Hopkins, is marked for
19    identification.)
20           THE WITNESS:  These are
21    already --
22    BY MR. C. PLACITELLA:
23       Q.  No, stick...  Just --
24       A.  Oh, sorry.  Just P-8.
25       Q.  Mm-hmm.
```



Page 290

1    A.  Oh, P-8A, P-8B.  And if you put
2  them together these should be everything
3  that's contained in your big binder of all
4  the documents that were sent to Dr. Hopkins.
5         (Exhibit P-9, Unidentified
6  documents, is marked for identification.)
7         THE WITNESS:  P-9, these were
8  the specific documents I believe that you
9  sent us, yes, like, two days ago, yes.  What
10  they are, I don't know.
11  BY MR. C. PLACITELLA:
12    Q.  You don't know what's in there?
13    A.  It looks like a lot of scientific
14  stuff.
15    Q.  So am I correct that you didn't
16  review any of that in preparation --
17    A.  Yes, I went through it all.
18    Q.  Oh, you did?
19    A.  Yeah.
20    Q.  Oh, okay.
21         (Exhibit P-10, Deposition
22  transcript of Nancy Musco, is marked for
23  identification.)
24         THE WITNESS:  P-10 would be the
25  transcript of my deposition in November 28,

Page 291

1  yeah, 28th.
2         MR. BERNARDO:  You can just
3  identify all of these together.
4         THE WITNESS:  Yeah, these were
5  specific complaints that I asked to see,
6  Selby, Krushinski and Westfall.
7         (Exhibit P-11, Complaint, is
8  marked for identification.)
9         (Exhibit P-12, Complaint, is
10  marked for identification.)
11         (Exhibit P-13, Complaint, is
12  marked for identification.)
13         THE WITNESS:  Oh, I'm sorry,
14  P-13, I keep forgetting, 11, 12, and 13.
15         (Exhibit P-14, Notes, is marked
16  for identification.)
17         THE WITNESS:  These were the
18  notes that I took during my conversation with
19  Dr. Hopkins, P-14.
20         MR. BERNARDO:  That's
21  everything.
22  BY MR. C. PLACITELLA:
23    Q.  Is that everything?
24         MR. BERNARDO:  That's
25  everything that's in the box.

Page 292

1  BY MR. C. PLACITELLA:
2    Q.  All right.  We have to work out a
3  day.  Thank you for -- have a good weekend.
4         MR. PLACITELLA:  Happy
5  birthday.
6         (Off-the-record discussion.)
7         THE VIDEOTAPE OPERATOR:  This
8  concludes the deposition.  The time is
9  4:24 p.m.  We're off the record.
10         (Witness excused.)
11         (Testimony concluded at
12  4:24 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 293

1           C E R T I F I C A T E
2    I, Sharon L. Martin, a Notary Public,
3  Certified Court Reporter of the State of New
4  Jersey, Registered Professional Reporter, do
5  hereby certify that prior to the commencement
6  of the examination,
7           NANCY MUSCO
8  was duly sworn by me to testify to the truth,
9  the whole truth and nothing but the truth.
10  I do further certify that the foregoing is a
11  true and accurate transcript of the testimony
12  as taken stenographically by and before me at
13  the time, place and on the date hereinbefore
14  set forth.
15  I do further certify that I am neither a
16  relative nor employee nor attorney nor
17  counsel of any of the parties to this action,
18  and that I am neither a relative nor employee
19  of such attorney or counsel and that I am not
20  financially interested in this action.
21  _____

22  SHARON L. MARTIN, RPR, Cert-NJ-XI02021
23  Notary Public
24  My Commission Expires September 25, 2021
25  Date:  2/19/2019

74  (Pages 290 to 293)



**A**

**a.m** 1:18 11:16 89:2 89:5
**able** 73:7 199:19 216:13
**absolutely** 34:15 46:6 235:6
**abundantly** 281:18 282:2
**accurate** 29:8,20 32:5,13 36:24 61:21 115:1,13 122:18 123:9 129:2 135:9 174:6 194:24 225:22 249:7,16,25 293:11
**acknowledged** 155:9 166:1
**action** 1:2 2:2,14 3:2,14 4:2,12 5:2 5:11,20 293:17,20
**actively** 269:7
**actual** 80:3 113:19 169:16 271:20
**ad** 8:18 180:25 181:1,4
**addition** 69:23 195:11 205:1 226:16
**additional** 183:21
**additives** 234:20 237:19
**address** 14:14 104:6 135:15 167:21 170:5 195:21 217:18 281:18
**addressed** 197:8 280:19
**adjourn** 286:21
**adjudication** 218:24
**ADMINISTRAT...** 3:16

**admission** 62:6
**admits** 244:15
**admitted** 194:11
**Affidavit** 9:20 224:23 225:1,10 226:10 228:10,18 228:25 229:21 230:19 231:21 232:4 233:12 236:19 238:7,12 240:21 245:4 246:21 251:1,5,13 251:14 252:24 253:13,20 254:6,9 254:16,18 255:10 255:21,24 256:17 257:3,20,21 258:2 258:7,12,18,19 263:4,5 264:23 265:11,12,15,20 266:3,10,17 269:1 269:9,22 270:18 271:19 272:8,17 273:9,23 276:4 278:20 283:7
**affidavits** 262:20 278:15,22
**afternoon** 287:3
**ago** 159:19 290:9
**agree** 115:16 254:5 286:18 287:1,5
**agreement** 10:8 168:18 274:24 275:5
**Aha** 125:22
**ahead** 43:13,15 50:20 52:16 117:8 119:16 140:13 174:14,16 176:4 176:11 214:14 220:8
**airways** 158:7 181:14
**al** 1:8 2:8,20 3:8,22 4:7,17 5:7,16,24 11:12

**Alfred** 3:3 271:4
**allegations** 24:1 28:10
**alleged** 20:20 23:5 72:10 110:1 111:14
**alleges** 204:11
**alleging** 25:5 48:1,9 48:16 49:2
**allergies** 158:1
**allowing** 69:14
**alluded** 236:18
**Amax** 4:7 7:13
**ambiguous** 120:2
**AMERICA** 2:8,20 3:7,22 5:6,15,24
**amount** 35:12 37:5 38:10,12,24 39:20 40:10 243:1
**amphibole** 245:23
**amphiboles** 250:11
**analysis** 210:24
**Andonian** 109:16 263:5 264:23 276:2
**ANDREW** 6:11
**andrew.karp@s...** 6:13
**ANITA** 3:3
**answer** 14:9,25 23:2,3,14,15,21 24:12 25:1,14,16 26:12,14 27:17 28:14,23 30:13 32:21 33:7,19 35:14,17,19 36:2 36:3 38:7,10 39:7 39:13 40:4 41:17 42:1,17 43:3 44:11 45:3 46:3 47:10,11 48:21 50:21 52:16,18 56:18 60:14 61:6 64:25 73:24 80:17 87:24 89:10 94:13 94:15 95:1 96:14

101:1 104:7
116:17 117:22
118:18 120:3,4
121:4 122:15
123:3,6 124:6,15
124:16 125:17,23
127:4 129:18
132:14 134:4,7,10
134:23 135:15,16
136:1,21 137:15
141:6,12,25 142:6
157:1 162:7 163:3
163:22 166:13
173:20 176:4
178:10 179:12
183:11 184:22,22
188:16,18,25
189:19,24 191:2
194:8 198:19
199:19 203:21
209:13,18 211:16
211:19,23 212:20
214:14 229:5
236:8 237:24
241:6 242:15
243:6,20,23
246:15 249:20
250:4,21 255:7
256:19 257:8
258:5 259:4 261:2
264:12 265:4
273:12 274:3,7,13
274:15 281:11
285:9,13
**answered** 19:6 45:5 55:24 56:15
121:18 122:13
123:14 125:3
193:14,20 194:5
196:12 200:9
244:11 256:5,6
261:6 262:2
280:23 284:15
**answering** 118:8
119:2 129:14
132:17 133:1,20

139:16 193:17
205:25 226:11
228:14 231:24
260:24 284:7
**answers** 9:21 14:6
16:19 38:4 53:13
55:15 57:8 69:14
115:8,24 120:13
124:1 127:14
131:1 133:13
135:13,22 138:24
171:22 172:23
173:4 185:3
187:12 195:25
200:18 210:2
232:11 242:1
243:24 244:20,24
249:14 259:22
261:13 262:10
280:10 282:9
**anticipated** 75:13
75:19 80:8 92:20
93:21
**anybody** 26:22
49:10 150:17
262:8
**Anytime** 128:1
**apparently** 93:7
**Appearance** 11:25
**appears** 174:8
188:12
**apple** 92:15
**application** 15:5
**appropriate** 23:21
24:12,25 26:14
54:6 55:14 98:10
101:15 127:6
129:13 191:5
260:23
**approximately**
20:4,6,9 21:12
22:8
**April** 9:15 65:5,18
**area** 56:6 211:3,23
**Argonaut** 247:13
**armpits** 114:17



**ARPS** 6:10
**asbestos** 13:11 15:9
  20:20,23 30:22
  31:2,7,21 35:12
  37:6,14 38:10,13
  38:24 39:4,21
  40:1,10,14,17,19
  40:22 41:3,15,20
  41:23 42:13,21,25
  44:7,18 47:2,12
  68:1 77:16 84:6
  84:16 85:9,20
  95:7,19,25 97:14
  98:3,23 100:4,19
  102:2,8 103:3
  104:2 120:14,23
  121:8,15 123:21
  124:9,20 127:18
  127:19 128:9
  129:24 130:14
  131:25 132:1,16
  133:4,23 135:24
  136:12,14,25
  137:19 138:12
  139:5,10 140:2
  141:10 142:4,14
  143:18 144:19
  145:23 149:13
  168:3 176:3 182:5
  182:12,19 187:17
  188:4 191:23
  192:1,2,6,9,14,16
  192:20,24 193:3
  193:23 194:2,6,9
  195:5,10,14,18,21
  196:3,9,19 197:3
  197:4 198:7,14,17
  198:22,25 199:16
  199:24 200:10
  205:21 206:19
  208:10 209:11,15
  212:16 214:7
  217:5 222:8 227:5
  227:19 230:22
  232:21 236:8,20
  237:23 239:10

  241:19 242:21,22
  243:5,18 244:16
  246:15 247:9,11
  247:18 248:16
  250:10,13,21
  252:18 253:4
  263:16,17 264:8
  269:15 271:10,23
  272:5
**asbestos-free**
  141:11 142:5,15
  144:20 272:18
**Ashton** 66:3 217:2
  217:4 266:15,19
  267:21 268:10,25
  270:18 272:24
  273:4 283:3,3,6
**Ashton's** 266:18
**asked** 18:5,11
  20:18 29:1,15
  30:7,21,24 37:2,7
  37:13,16 38:21
  39:9,17 45:5
  54:13 56:15 70:9
  72:3 78:10 84:13
  102:18 105:23
  121:23 123:14
  128:4,6 132:9
  134:18 148:1
  164:1 177:8 190:7
  193:16 195:11,14
  199:20 200:15
  209:8 222:7
  241:13,17 244:10
  249:14 254:4
  256:5 261:16
  291:5
**asking** 31:1 33:10
  41:2 47:6 48:13
  48:14 55:19 79:16
  79:17 99:8 100:17
  102:25 103:1
  128:2 130:19
  141:3 153:16
  162:10,10 175:16
  176:25 179:2,5

  183:16 185:17
  191:9 207:9
  216:16 217:9,22
  235:11 255:9
  265:18 274:6,7
  282:3 284:6 285:3
  287:13
**asks** 13:7 49:25
  174:10 177:4
  189:5 194:8
**assay** 229:24
**asserted** 28:11 47:1
  97:15
**asserts** 139:25
**assigned** 266:22
**associated** 14:17,22
  91:21,24 114:1
  119:21
**assume** 50:22 58:7
  89:12 151:1
  157:22 205:18
  283:5
**attach** 272:2
**attached** 9:23
**attaches** 228:3
  270:18 271:6,19
**attachment** 75:11
  75:18 92:14,15,18
**attended** 208:9
**Attention** 157:11
**attest** 98:22
**attorney** 74:11
  160:23 293:16,19
**attorneys** 88:15
  165:24
**attributed** 67:5
**audio** 35:7,9 36:5
  41:10 42:3 46:21
  47:14 116:8,20
  117:10,25 119:18
  120:6 126:22
  127:8 141:5,14,24
  142:8
**auditors** 68:25
**author** 148:20
**authority** 63:19

  84:3
**autopsy** 204:10
**available** 16:3
  24:19 25:14 58:23
  59:2 81:16 107:5
  111:20,22 113:9
  113:11,22 114:2
  114:12 169:10
  171:21,24 198:11
  201:10,25 202:7
  242:5 245:1
**Avenue** 7:17
**avenues** 20:3
**Avon** 1:7 11:12
**aware** 24:18 25:4
  25:10 26:17 27:1
  42:10 86:19 90:17
  138:10,17,18
  169:18 205:18
  249:8 250:1
**awful** 150:15

_____
          **B**
**B** 8:8 9:1 10:1
**baby** 13:12 15:5
  21:16 22:3,23
  23:6 31:3,20
  35:11 37:18 38:9
  38:12,23 39:5,20
  40:2,9,14,18,22
  41:16,19,24 42:13
  43:1 44:7,19 47:3
  47:13 49:11 50:10
  60:6 63:11 64:1
  64:10 68:4 72:14
  73:2 74:22 75:20
  76:6 77:1,17 79:1
  79:20 80:23 82:14
  83:23 84:5 93:3
  96:17 100:5,19
  102:3,8 119:5,8
  119:21,24 121:16
  123:19,20 124:10
  126:13 128:9
  132:16 133:4,23
  135:25 136:13,18

  137:1,19 139:6
  143:18 154:9
  157:12,25 158:23
  164:16 166:2
  169:4,17 174:12
  174:23 175:20
  181:12 182:3,6,12
  187:16 198:13,23
  199:1 202:4
  214:24 217:6
  223:20 224:3
  226:5,17 227:4,12
  238:13 239:10
  242:22 243:18
  285:8
**back** 43:6 62:18
  64:10,20 84:9
  133:17 135:14
  137:8 157:18
  160:14 180:13
  181:11,23 185:3
  195:22 201:1
  213:25 228:1
  229:11 239:11
  249:19 259:21
  260:4 261:14
  268:23
**Background** 204:7
  205:15
**banker's** 287:19
**based** 25:1 47:23
  55:15 56:6,20
  124:22 125:18
  135:25 144:4
  249:15 253:17
  256:6 260:24
**bases** 46:24
**basically** 22:15
  174:11
**basis** 47:11 98:18
  128:7 129:24
  130:4 248:4
**Battelle** 189:7,11
  189:19
**battling** 46:24
**began** 21:11



**beginning** 256:13
268:25
**begins** 11:9
**behalf** 12:23 45:24
51:16 130:10
144:17 162:11
171:23 210:2
224:12 229:21
231:4 255:16
260:15 261:8
**Beidler** 160:21
208:6
**belabor** 251:18
**belief** 48:8
**believe** 29:7,20
30:19 37:20 44:25
63:12 64:5 66:5
68:15,19 74:15
81:21 83:13 91:11
96:7 108:4 111:21
114:12 116:18
117:23 130:5
147:3 153:9
160:23 173:15
181:7 190:25,25
194:21 197:7
203:6 211:8 228:9
254:1 255:10
286:1 290:8
**believes** 285:25
**benefit** 280:13
**BERNARD** 252:9
**Bernardo** 6:10
13:25 14:19 15:12
16:21,24 17:3,13
17:16,23 21:1
23:7 24:7,21 25:8
25:18 26:7 27:5
27:14 28:1,19
29:9,21,24 30:10
31:9,12,24 32:8
32:17 33:4 34:1
34:12 36:10,15
37:25 38:16,25
39:10,22 40:24
42:14 43:2 44:8

44:20 45:4,11,20
45:21 47:19 48:3
48:18 49:5,13,18
50:11 51:4,10,20
52:14,23 53:4,23
54:21 55:1,23
56:14 57:4,20
58:5,18 59:7,24
60:10,25 61:13,16
61:24 62:2,10,14
62:16 63:2,16
64:3,13,15,22
65:7,11,16 66:12
66:20 67:13 68:7
68:17 69:2,9 70:1
70:16,19,25 71:4
71:8,19 72:16,19
73:3,18,25 74:12
74:25 75:5,22
76:8 77:3 78:1,12
79:6,12,21 80:10
80:15,25 82:15
83:24 84:18,23
85:11,16,22 86:23
87:7,18,21 88:7
88:20 90:19 92:5
92:23 93:10,13
94:1,10,23 95:9
96:9,22,25 97:7
97:17 98:6,15
99:2 100:8,12,22
101:5,14 102:11
102:19 103:12
104:4 105:3 106:3
106:19 107:9,18
107:24 110:9,19
112:4,7,21 115:2
116:14 117:13,17
118:10 121:1,10
122:4 123:13,23
124:11,25 126:4
127:21 128:12,15
129:10 130:1,16
132:5,19 133:7
134:1 135:1 136:3
137:3 138:14,25

139:19 140:22
141:2 142:16,20
142:23 143:6,20
144:21 145:11
146:1 148:8
149:17,25 151:22
152:4,19 155:14
156:14,21,24
157:6 158:13
159:3,14 160:1,7
161:13,21 162:4
162:12,16,23
163:19 164:8,17
164:20 165:9
166:5,9,16 169:22
171:16 172:14,17
173:17 175:1,24
176:8,18 177:13
177:25 178:4,14
178:17 179:7,24
180:4,19 181:18
183:15 184:7,20
185:9,25 186:4,7
186:10,19 189:1
190:10 191:3,19
192:22 193:11,16
193:24 194:16,25
196:5,21 197:25
199:7 200:12
201:16,19 202:8
202:20,23 203:18
205:3,23 206:3,10
206:21 207:8,20
208:12,25 209:20
210:14 212:2,7
213:5,14 214:9
215:6,18,25 216:4
216:11,17 217:7
217:16,21 218:3,9
218:25 219:4,20
219:23 220:3
221:3,11,19 222:1
222:16,19 223:1,9
223:12,21 224:5
224:11 225:4,14
226:8,21 227:7,14

227:22 228:4,12
229:2 230:4,14
231:2,22 232:6
233:18 234:24
235:10,17,20
236:3,10,23
237:11,25 238:15
240:9,13,24 241:8
241:23 242:11
243:8 244:17
245:6,10 246:2,8
246:16,22 247:23
248:2 249:10
250:14 251:6,10
251:20 252:1,6,21
253:6,14 254:12
254:21 255:3,17
256:4,10,13
257:23 258:3,13
258:22 259:1,16
260:1,20 261:19
261:23 262:24
263:7 264:9 265:1
265:13,21 266:7
266:11 267:9,13
267:15 268:14
269:17,21 270:4
270:21 271:11
272:6,20 273:10
273:18 274:2,9,12
275:8,19 276:14
276:24 277:12
278:4,18 279:3,6
279:21,24 280:3
280:16 281:7,15
281:22 282:1,13
283:17,21 284:5
284:16,21 285:10
285:23 287:2,6,12
287:17 288:14
289:8 291:2,20,24
**best** 115:13 122:18
123:3,9 143:24
145:17 182:10
187:14
**better** 194:12,13,15

239:13 248:22
**beyond** 27:15 42:15
44:9 48:19 50:16
64:23 69:5 87:22
90:16 94:11 101:8
101:11 103:13
162:5 175:25
178:4,18 196:15
203:19 205:4,24
206:4 207:10
213:15 214:10
219:4 221:4
222:20 225:15
228:13 231:23
235:4,12 246:3
254:13 264:10
265:2 272:8,11
273:11 274:13
275:9 276:25
**Biddle** 1:16
**big** 146:20 192:10
275:2 290:3
**Bill** 283:3
**binder** 238:21,24
239:2,3,5,11
290:3
**binders** 287:20
**birthday** 292:5
**Black** 150:3
**book** 150:3,11,12
150:14,20,22
151:1 259:9,13,25
260:18 261:10
262:5,12 264:22
**BORGWARNER**
4:17
**box** 198:1 286:20
287:19 291:25
**BRAKE** 3:17,18,19
**branch** 43:22
**break** 30:5 69:6
71:9 82:21 88:25
89:13 166:15,17
200:5 219:19,21
220:2,8 285:17
286:6



**breaking** 70:22
**breaks** 220:4
**BRENNTAG** 2:8
  3:7,22 5:6,15
**Brief** 89:3 220:11
  285:20
**bring** 78:10
**bronchodilators**
  158:8 180:16
  181:15
**brought** 19:2 150:7
  223:18 286:20
  287:19
**Bruce** 153:2 156:12
**Building** 7:11
**bundles** 250:11
**business** 119:9
  225:25 269:2

**C**

**C** 6:1,17 7:1 8:5
  9:13 12:12 13:2,4
  14:7,24 15:16
  16:22 17:7,14,21
  18:4 21:9 23:11
  24:14 25:3,12,21
  26:15 27:9,21
  28:4,25 29:13,22
  30:1,14 31:10,16
  32:2,11,23 33:9
  34:6,10,14,20
  35:6 36:7,19 38:6
  38:19 39:6,15
  40:3 41:4,6 42:5
  42:22 43:5,8,13
  43:16 44:15 45:2
  45:8,19 46:8
  47:16,22 48:5,24
  49:8,16,24 50:25
  51:6,14 52:3,21
  53:2,9,25 54:23
  55:9 56:8,24
  57:11,24 58:10,24
  59:13 60:4,20
  61:5,14,22 62:1,4
  62:11,15,17 63:6

63:21 64:6,17
65:3,9,14,17,20
66:16,22 67:17
68:10,21 69:8,18
70:2,3,14,17,24
71:3,6,10,13,17
71:22,25 72:24
73:10,23 74:4,8
74:16,23 75:1,9
76:1,18 77:10
78:5,16 79:9,15
79:25 80:12,19
81:7 82:19 84:7
84:20 85:5,14,17
85:24 87:2,9,19
88:2,11,24 89:6,8
91:1 92:12 93:2
93:11,17 94:3,17
95:3,13 96:15,23
97:2,11,23 98:11
98:20 99:14
100:10,16 101:3
101:13,16 102:17
102:24 103:17
104:10 105:8
106:8,21 107:14
107:21 108:6,24
110:13 111:5
112:5,9 113:1
115:6 116:5,22
117:1 118:2,6,22
119:13 120:8
121:6,19 122:6
123:17 124:2,18
125:7 126:6,17
127:10,25 128:13
128:21 129:19
130:7,24 132:11
132:25 133:14,16
134:3 135:2 136:9
137:7,9,22 138:16
139:7,23 140:5,9
140:14,25 141:20
142:18,21 143:3,9
144:1 145:4,19
146:5,11,15,19,22

148:14 149:10,21
150:3,4 151:20,25
152:1,6,9,22
154:1,5,7 155:18
155:22 156:19,22
157:4,8,9 158:17
159:8,20 160:4,10
160:13 161:17,24
162:9,13,17 163:7
163:13,25 164:12
164:18,24 165:14
166:7,14 168:9
170:7,16,21
171:19 172:10,15
172:21 173:2,7,9
173:22 174:1,3
175:6 176:6,10,21
177:18 178:2,9,15
178:23 179:11
180:1,8,23 181:3
181:22 183:2,7
184:1,4,9,25
185:20 186:1,5,9
186:16,22,23
189:4 190:22
191:8 192:7,23
193:13,19 194:7
194:20 195:7
196:11,25 198:4
199:12 200:24
201:17 202:1,10
202:15,22,24
204:1 205:9 206:7
206:12,24 207:4
207:12,24 208:18
209:5,23 210:5,10
210:17 212:5,10
212:24 213:1,7,19
214:16 215:10,12
215:20 216:2,7,14
216:21 217:14,20
217:24,25 218:7
218:11 219:2,8,16
220:1,7,14,21,23
221:8,14,23 222:5
222:17,24 223:3,5

223:10,16,25
224:7,16,20 225:8
225:19 226:15,24
227:10,17,25
228:7,17 229:6,8
229:10 230:8,18
231:9 232:1,9
233:22 235:5,14
235:19,22 236:5
236:16,25 237:15
238:5,19 240:11
240:17 241:2,10
242:6,17 243:13
244:21 245:8,12
246:6,12,17,25
247:24 248:8
249:18 250:6,19
251:16,23 252:4,7
252:13,25 253:11
253:16 254:19,22
255:8,22 256:8,12
256:15,18,22
257:7,13,17,25
258:10,17,23
259:7,20 260:11
261:3,21,25
262:14,18 263:2
263:11,22,24
264:16 265:8,17
265:24 266:1,5,9
266:14 267:3,5,11
267:17 268:20,22
268:24 269:19,24
270:9 271:1,17
272:14,25 273:15
273:19 274:5,10
274:17,22 275:1
275:11,25 276:17
277:7,17 278:8,23
279:4,11,22 280:9
280:24 281:13,20
281:24 282:6,7,18
282:23 283:19,25
284:9,18 285:2,16
287:1,4,8,15
288:4,16 289:2,22

290:11 291:22
292:1 293:1,1
**California** 16:14
  218:21
**Call** 28:20
**CALLAHAN** 6:4
**called** 35:17 83:8
  109:16
**calls** 32:18 279:25
  280:3
**camera** 259:9,10
**cancer** 23:24,24,25
  96:17
**capacity** 27:18
  42:18 44:12 46:4
  46:9 48:22 50:20
  60:15 65:1 69:15
  87:25 94:14
  100:24 101:2
  104:8 120:25
  133:5,24 157:2
  162:8 163:4,23
  203:22 205:7
  206:1 214:15
  226:12 228:15
  231:25 242:15
  246:5 264:13
  265:5 273:13
  284:8
**CAPTION** 1:10
  2:25 3:25 4:25
**car** 30:8,13,16,17
  30:18
**care** 22:22 114:18
**career** 14:2
**CAROLE** 2:4
**case** 12:19 13:6
  16:14,18 17:10
  25:15 26:5,24
  28:11 57:3 58:13
  68:4,5 72:15 83:8
  83:12,16,21 85:6
  85:8,20 86:6,8,16
  86:20 88:17 93:8
  95:6 104:12,14,18
  105:2,7,9,13,17



105:20 106:2,10
106:17 107:2,8,13
107:16,17,23,23
108:3,10,15 109:1
109:8,13,16,18,21
109:25 110:1,8
111:4,8,11,12,15
111:19,24 112:1
112:10,20 113:3,8
113:12,21 114:4
114:14,19,24
125:19 131:16
152:11,23 154:25
155:2,5 159:24
160:6 161:3,6,12
162:1 163:17
164:5,7,11,23
165:7,8,16,19
169:11 171:8
172:24 174:7,12
174:23,24,24
175:20,22,23
176:15,20 177:1
177:11,22 178:7
178:12,13 179:6
181:23 191:11
193:21 196:1
197:22 203:1,17
204:18 207:7
210:13 213:4,13
214:8 215:16,24
216:23 218:2,2,22
219:11 220:18
221:2,7,10,15,17
221:22 222:4,10
222:18,23 223:8
223:15,18,24
224:2,15 225:2,18
230:2,10,11,17,21
230:23 231:8
244:12 254:10
256:1 257:4
258:19,21 263:5
266:25 267:8,22
268:1,6,11 270:19
271:9 276:2,9

280:12
**cases** 23:23 25:5,11
25:16,23 26:6
27:3 33:2,14 51:9
52:13 53:13 55:22
59:18 72:5 74:20
76:23 77:9,23
81:17,20 82:1,22
87:5,13 90:17
91:3,8 92:22,22
95:1 96:17 102:22
105:14 106:24
113:5 114:2 115:9
169:4,13,16
172:22 175:11,13
175:22 176:12
179:4,18 201:4,11
224:3 257:22
258:2 262:22
264:24 273:7,9
275:13,17 276:13
276:20,21 277:11
278:12,16,25
**caused** 273:9
**CCR-NJ-XI02021**
293:22
**Cedar** 7:5
**certain** 104:15
161:25
**certainly** 91:7
150:22 177:11
179:22 180:17
185:11 207:25
208:1 217:4 221:9
272:2
**certification** 122:23
124:22
**certified** 1:19 115:8
120:13 121:7
122:16 123:7
131:23 135:8
172:23 174:5
175:18,21 210:1
249:3,3,6,24
254:9 280:10
285:4 293:3

**certify** 128:25
132:15 190:7
293:5,10,15
**certifying** 29:5
119:2 122:1,11,12
131:1 171:22
262:9 282:9
284:11
**chain** 135:3
**chambers** 69:20
**chance** 40:13,21
41:14,22 183:8,12
**change** 135:15
**changed** 184:19
**changes** 67:4
**characterization**
16:25 17:17 58:20
72:19 83:25
110:20 139:20
186:14 190:12
195:2 240:13
278:19 282:15
286:25
**characterizing**
170:1
**charge** 22:20 23:1
23:13 51:1,18,23
53:12,17,19,22
54:2,4 58:3 119:1
119:23 155:24
**charged** 28:6
**chart** 8:15 10:17
19:9 70:10,15
71:11 77:8 105:23
106:13 108:16
146:12,12,13
147:6,10,12,20,24
148:2,6,7,11,13
148:15 149:2,14
149:20,22 213:20
233:5 237:17
238:9,11 239:20
239:22,23 240:6
240:16 241:21
243:4,16 244:4
247:6 248:3

251:15 252:20,24
253:5,9 254:8
259:14 263:23
264:1,7,20,22
265:10,16,19
267:6 288:20
**Chidester** 271:4
**Chief** 273:20
**Chis** 65:8
**chosen** 118:21
**Chris** 50:14 69:4
70:19 183:25
193:16 202:21
216:5 217:11
219:23 281:9
**CHRISTOPHER**
6:3
**chronic** 114:16
**chronological**
148:16
**chrysotile** 209:11
209:15 211:20,22
234:7,9,10,10,18
234:19 237:18
245:21,25 247:14
272:5
**circumstances**
101:15
**circumstantial**
30:15
**CIS** 170:23 171:4
**cite** 250:5
**cited** 72:5 252:17
**citing** 105:15
**citizens** 32:14
**CIVIL** 1:2 2:2,14
3:2,14 4:2,12 5:2
5:11,20
**claim** 141:11 142:5
162:2 163:17
175:8
**claimed** 225:11
**clarification** 17:2
36:14 141:17
149:7 172:8 206:2
220:20 251:9

280:2
**clarify** 101:9 168:7
198:2 200:19
**Clark** 6:20
**clear** 45:14 46:5
58:12 69:16
191:24 234:7
281:19 282:3
**clearly** 160:5 161:9
169:10 256:2
257:5 268:10
**client** 75:11 235:21
**Close** 18:16
**Cohen** 6:3 11:19
**Coker** 109:21,22,25
110:1,7 111:4
**Colgate-Palmolive**
7:7
**collaborated** 54:4,7
**College** 1:16 11:18
**Columbia** 6:17
**column** 237:22
244:6 246:13
248:15
**come** 52:6 60:2
81:5 153:21
200:15 201:1
273:6
**comes** 157:18
**comfortable** 19:25
41:19 102:14
121:13,17
**coming** 86:18
117:13
**commencement**
293:5
**commencing** 1:17
**comment** 34:3 93:1
94:6 97:10 98:19
99:9 102:21 103:1
139:3 143:11
144:11 145:2
146:7 185:19
228:21 232:8
236:12 237:2
238:9 244:7


MAGNA
LEGAL SERVICES

251:13 252:23 253:20 254:18 255:20,23 257:2 264:20 265:6,15 268:16 270:6 273:5 275:24 278:21
**commented** 100:6
**commenting** 186:20
**comments** 100:1 149:1,5,9 235:24 236:1
**Commerce** 6:5
**Commission** 293:24
**communicate** 135:19
**communicated** 119:22 126:12,25 127:1
**communicating** 22:21
**communications** 52:18
**company** 4:7 7:14 13:15 15:24 26:23 39:3 45:24 50:24 54:10 66:6,8,18 72:12 78:24 103:8 104:21 123:1,1 125:24 136:16 167:3 255:14 279:13
**company's** 121:15 136:6,10
**comparison** 234:13
**compensated** 20:10 20:11
**compile** 135:13
**complaint** 9:7,8,9 38:5 57:23 58:4 72:14 106:11,14 106:16 107:4 108:21 111:6,14 113:19,21 114:21

125:6 126:10 155:4 157:14 190:19 191:25,25 194:5 195:22 219:10 291:7,9,11
**complaints** 68:14 72:11,22 130:20 289:13 291:5
**complete** 32:5,14 143:14 259:5 289:9
**completed** 257:10
**completely** 28:24 84:24 138:22 143:4 217:17
**completion** 169:20
**composite** 106:12
**compound** 120:2
**computer** 89:25
**concentration** 50:5 90:21
**concerning** 13:9,11 14:16 15:8 19:10 25:23 28:16 34:8 50:9 52:12 68:1 73:13 77:14,16 79:1 80:7,22 86:16 90:8,15 93:19 95:25 97:13 98:2 102:2,7 110:16 148:4 149:2,15 151:4 152:11 153:17 161:3 165:25 218:22 220:17 238:12 284:13
**concerns** 22:2 114:15
**concluded** 36:6 42:4 47:15 116:21 118:1 120:7 127:9 141:15 142:9 292:11
**concludes** 292:8
**conclusion** 28:21 32:19 33:17 280:1

280:4
**conclusions** 34:4
**concrete** 99:11,15
**conducted** 20:1 90:5
**conducting** 16:1 101:6
**confer** 286:22
**confident** 115:22
**confidentially** 213:4
**configuration** 193:2
**Confirmed** 250:10
**confusing** 192:3 194:12 195:23 197:7
**conjunction** 211:24
**connection** 75:12 93:20 107:1 108:25 278:16 287:22
**conscious** 220:5
**considered** 199:16 269:14 287:22
**consistent** 136:8 139:4 143:10
**consulted** 67:8 185:21 187:8
**consumer** 119:1 157:24 158:8 180:15
**consumer's** 158:10 181:16
**consumers** 21:25 41:13
**contain** 35:12 37:5 38:9 41:20 84:6 182:18 188:4 189:17
**contained** 31:7,21 38:12,24 39:20 40:9 123:21 182:12 187:17 194:23 214:6 243:1 290:3

**containing** 198:14 198:22
**contaminant** 234:22
**contaminants** 182:5,15 187:25 188:20
**contamination** 234:17 269:14
**content** 13:12 15:9 20:20 30:22 68:1 77:17 102:2,8 168:3 176:3 222:8 234:12
**contents** 240:6
**context** 39:9 67:20 104:2 144:10,24 173:20 185:6 190:16,17 236:14 279:14
**continuation** 9:17 208:15,20
**continue** 281:22 286:9
**CONTINUED** 1:10 2:25 3:25 4:25 7:1 9:1 10:1
**contrary** 256:2 257:6
**conversation** 16:9 17:8 131:14 132:3 133:10 134:8 138:3 145:7 200:22,23 239:14 247:5 260:7 291:18
**conversations** 41:12 42:20 52:20 55:14 78:20 120:5 131:7 132:8 134:14 135:11 150:24 166:21 197:5
**convey** 40:12,20 41:14,25
**conveyed** 186:2

**COOK** 6:16
**Cooper** 111:11,12 111:15,18
**copied** 71:9 154:13 154:16 156:6 158:21 160:24 165:1,3
**copies** 167:10
**copy** 34:13 71:7 150:7 183:24 184:2,6
**corporate** 8:13 11:3 12:24 50:9 69:17 76:13 77:14 101:10 144:6 163:5 205:25 206:6 214:12 222:21 228:15 231:25 246:5 254:14 277:1 281:1 284:7
**corporation** 14:10 130:11
**correct** 12:24 14:11 14:12,18 15:11,15 21:11 22:12,23 23:6,18,25 24:6 24:20 25:7,17,22 26:6,18 27:25 28:5 29:2 31:23 32:7,16 33:3,15 35:18,24 37:1,19 37:24 38:15,18,24 39:9,21 40:15,23 41:16,25 42:1,10 43:1 44:19 59:17 60:24 61:15 64:11 64:21 78:10 79:2 79:8 87:20 90:18 91:10 92:4 93:12 94:22 95:15 97:16 97:22 98:5,14 101:19,21 102:5 102:10 104:3 106:22 114:23 115:1,9,14,19



117:21 118:9
119:5 120:12,15
120:23,25 121:9
122:20,23,24
123:12,22 124:10
126:1,7,14 128:14
129:2,8,25 130:15
131:15 132:4,18
133:6,25 134:10
134:25 135:9
136:2 137:2,20,21
137:24 138:13
139:11,18 140:3,4
142:19 143:19
144:8,20 145:24
147:2,7,8,10,15
148:7,20 149:16
149:24 151:7,8,11
151:16 152:15,16
152:18,21 153:6
153:13 154:13,16
154:24 155:13
156:8,9,11,12
157:16,17,21
158:11,18,24
159:2,13,25 160:3
160:6,25 161:3,6
161:12 163:18
164:7,19 165:8,16
165:21 166:8
171:18 172:16,24
172:25 174:25
175:9,12,23
176:15 180:18
181:8,9 182:7
187:6,19 188:21
188:25 189:18,23
190:2,9 191:18
195:8,12,15 196:4
199:25 200:11
204:14,24 205:22
207:14 208:2
209:12 210:3
212:17,20 213:24
214:8,25 215:5
216:3 219:11

221:10 223:11
225:22 228:3
236:2 237:1,4,10
237:19,24 238:14
238:22 240:8,12
240:22 241:7,11
242:10 243:7,21
244:1,16 245:4,9
246:18,21 247:21
248:1,10 249:4,9
250:2,3,9,22
251:5,19,25 252:8
252:14,20 253:5
253:25 254:11
260:13,19 261:11
262:12 263:6,19
264:8,25 265:12
266:21,25 268:1,7
268:13 269:3,6
270:13,20 275:18
276:2 277:11
278:12,13 279:5
279:15,20 283:7
290:15
**correctly** 178:11
**corresponded**
267:25
**cosmetic** 15:4 39:4
40:1,17 41:3
42:21 59:19,22
60:18,23 61:4,10
62:23 64:1 84:5
121:16 136:13,17
139:5,10 198:25
**counsel** 6:8,14,19
7:7,13,19 11:25
21:4 23:20 24:11
24:25 26:22 35:25
38:3 47:4,8 53:3
53:20 55:13 59:12
70:10 71:24 72:3
75:11,18 80:3
92:14 108:9
112:25 115:23
118:5 120:1
122:14 123:2

127:2 131:6
132:10 134:9
135:11,13 152:18
183:13 207:18
235:3 293:17,19
**counsels** 91:22
**count** 264:14,17
**County** 1:1 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:14
214:7,21 225:3
255:11 266:16
**couple** 233:21
**course** 119:8
173:11
**court** 1:1,20 2:1,12
3:1,13 4:1,11 5:1
5:10,19 11:13,23
12:2 68:14 71:21
108:17 116:24
142:12 144:15
168:16 218:21
235:8,11 257:11
284:3 293:3
**courthouse** 215:23
221:16
**courts** 224:1
262:20
**cplacitella@cprl...**
6:7
**created** 19:9
149:15 233:6
235:3 239:20
**credible** 245:1
**crosstalk** 116:13
283:24
**crystals** 158:9
**cue** 116:24
**Cunningham**
111:23 112:1
**curiosity** 72:4,7
**curious** 72:8
**current** 92:21
**Cypress** 275:5
**Cyprus** 4:7 7:13
283:15

**D**

**D** 8:1
**D'ANGELA** 5:3
**damage** 158:22
**dangerous** 97:21
**dangers** 15:3 119:4
119:7,21
**Daniels** 6:20
**Dartmouth** 245:22
**data** 95:8,18,24
96:18 97:13 98:2
98:24
**database** 90:1
**date** 73:14 74:21
75:3,25 76:2
148:17 165:20
213:23 225:7
286:10 293:13,25
**dated** 8:12 11:2
64:10 152:14
275:6
**dates** 27:8 28:3
48:11 49:7,15,23
50:6 82:6,9 87:1
**day** 20:8 167:18
286:7 292:3
**days** 20:6,7 290:9
**deal** 62:13 83:18
**dealing** 119:24
194:6
**dealings** 153:5
208:5
**death** 204:11
**DEBORAH** 3:17
3:19
**decade** 255:15
**DECEASED** 2:5,17
3:17
**December** 152:14
**decide** 45:20 46:7
223:4
**decided** 126:3,12
**decision** 99:7
235:16
**decisions** 127:7

**deems** 243:17
**defendant** 6:14,19
7:7,13,19 28:10
204:17
**defendant's** 182:10
182:13,18 187:14
187:23 188:3,18
**defendants** 1:9 2:9
2:21 3:9,23 4:8,18
5:7,17,25 28:14
167:2 207:14
**defending** 216:23
**defense** 266:25
**defenses** 28:10
**defensibility** 67:8
**definitely** 130:3
**definition** 196:18
236:7 237:23
243:5,18 244:16
246:14 247:18
248:16 250:12
253:4
**demonstrated**
58:17
**demonstrating**
144:18
**Denton** 282:24
283:1
**deodorant** 114:16
158:1
**dep** 233:7 238:7
**department** 21:17
22:12,14,17 25:24
26:1,5,11 50:24
58:2,8 59:11 67:7
91:18 92:4 93:7,8
94:4 209:9,14
**Departments** 91:20
**depend** 54:12 242:2
**deposed** 19:9
**deposition** 1:14
8:13 9:6,16,17
10:4,7 11:3,10,17
12:18 13:5 15:19
16:12 19:3 20:5
20:16 34:24 45:14



46:3 50:15,18
67:22,24 69:9,11
69:22 70:6 78:9
88:15 89:12,22
101:6 138:9
139:17 146:25
147:7,13,14,20
148:2,4 149:23
150:6,18,19 151:2
164:2 165:5 166:4
166:21,24,25
167:7,23 170:3
186:6 187:1
197:16,18 199:22
201:15 202:6,17
202:25 203:8,13
206:17 207:1,6,11
207:19 208:2,16
208:21,24 209:1,7
210:7,12,20 212:8
213:24,25 220:16
235:13 239:21
240:8 271:3,7
276:12 277:9
278:10 286:1,13
286:23 287:23
290:21,25 292:8
**depositions** 8:19
15:24 78:19
151:19 168:6,21
207:10 208:9
270:19 271:8
288:1,9
**deposits** 269:6
**describe** 181:25
248:21 286:19
287:24
**description** 8:10
9:3 10:3 75:10
92:9 289:9
**designated** 253:21
270:11
**designating** 69:16
**despite** 144:15
190:4
**destroyed** 279:2

281:3 282:11
283:13 284:14
285:8
**detail** 86:3 182:1
276:19
**determination**
126:24
**determine** 31:20
183:18 211:21
248:25
**determined** 211:19
**developed** 177:6
**Development** 21:20
**DICERBO** 2:5
**difference** 29:4,17
30:2 173:12 192:8
192:10,11,15,18
193:8,22 194:2
196:2 199:23
200:9
**different** 20:3 37:7
51:5 52:2,7 53:15
54:9,16,17,18
59:3 79:24 81:23
125:14,20 130:4
130:20,20,22
131:8,8 138:7
145:14 148:11
173:16,21 176:20
187:8 192:21
193:2 200:16,21
**differentiation**
192:24
**diffraction** 211:3
211:24
**direct** 23:20 26:13
54:6 131:6 174:9
262:13 286:3,17
**directed** 24:24
115:23 122:14
188:10
**directions** 34:5
**directly** 16:4 131:4
156:23 169:11
**Director** 65:24
153:3 154:15,21

154:22 156:11
158:20 159:11
160:25 164:14
165:4 177:23
180:9 181:10
268:5,12
**disagree** 169:25
170:6 286:12
287:5
**disagreement**
101:25
**discoveries** 80:4
**discovery** 13:9
14:23 15:11 23:16
24:4,20 27:23
28:7,12 30:21
32:6 51:24 52:12
53:13 54:24 55:11
55:21 56:13 57:16
57:18 60:22 61:9
62:22 69:12 70:4
77:15 81:9,11,17
81:20 88:3,16
90:15 91:3 94:19
94:22 101:18
102:1 106:25
109:2,5,10 110:7
110:12,16,17
111:18 113:7,25
114:8,10 128:23
129:23 133:1,21
134:23 135:8
136:22 137:16
148:5 151:5
153:21 161:19
162:19,20 163:9
167:1 168:2 169:2
173:11 201:3,5,10
201:14,24 202:7
215:9 216:5,12
219:13,14 228:24
248:25 249:2
253:23 270:12
276:13 277:10
278:11 279:15
**discuss** 18:1 19:4

19:11 71:1 89:12
119:9 143:1
149:20 150:17
167:19 240:16
247:6 273:6 285:1
**discussed** 16:11
18:10,24 19:1,12
138:1 145:14
149:14 150:23
170:1 240:5
285:24
**discussion** 19:24
117:5 141:22
170:2 257:16
292:6
**discussions** 119:4,7
119:11,20
**disease** 23:24 67:1
**dismiss** 258:20
**dismissal** 9:19
224:19 225:11
230:1 231:11,13
231:19
**dismissals** 33:2,14
33:24
**dismissed** 218:14
218:23 230:11,24
254:10 256:1
257:5 262:23
264:24 273:8,9
**dispute** 159:2
**disputed** 159:12
**distinguish** 227:11
**district** 226:3,4
**divestiture** 283:15
**Division** 1:1 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:13
**DOBBINS** 7:10
**Docket** 1:2 2:2,13
3:2,14 4:2,12 5:2
5:11,20 11:14
**document** 8:17
10:6,12 34:19
88:23 129:8
152:17 170:18,22

171:6,9 173:25
174:18 180:24
184:13 185:8
219:10 229:15
231:19 235:1,2
241:5 266:8,13
284:7
**documentary** 57:2
**documentation**
279:9
**documents** 8:14,23
8:24 9:5 11:5
14:22 15:21 16:11
18:11,18,19,20,21
18:22 19:10,13,22
20:15,18,22 21:8
26:23 58:22,25
59:10 68:1 76:19
89:21 90:12 91:20
91:24,25 92:2,3
92:11 93:7 96:12
105:22 106:23,25
124:14 138:1,7
151:7,15 156:17
167:17 168:12,18
168:20 169:16
177:19 200:21
215:14,15,23
216:15 229:17,25
231:10 241:20
242:2 259:14
262:11 280:13,20
282:4,10,17
284:12 285:6
286:20 287:9,20
289:14,17 290:4,6
290:8
**doing** 62:3 81:14
122:21 123:11
125:25
**domestic** 204:9
205:16
**Donald** 216:24
**Downs** 19:17 89:17
90:23
**Dr** 8:20,23,25



15:25 16:4,6 17:3
17:6,18 18:2,15
18:22 19:5,15
65:19,21 66:24
68:3 78:21 130:6
130:25 137:24
138:3,10,19 139:3
140:19 142:11,11
143:12,24 144:4
144:24 145:7,13
145:21 146:25
147:13,19 149:2,3
149:9 150:25
153:16 183:3,9
185:22,23 187:2
188:8 189:7
191:15 197:6,14
200:23 208:20
239:14,21 240:7
243:16 244:3
247:3 248:21
260:8 264:7 272:3
288:2,10 289:15
289:18 290:4
291:19
**drafting** 231:13
**Drinker** 1:16
**driving** 30:18
**due** 158:1,22 163:8
166:17 204:11
**DUFF-PETO** 4:14
**duly** 12:5 293:8
**duplicate** 188:21
**Durham** 111:8
**duties** 69:10
**duty** 32:4

**E**

**E** 2:16 5:21 6:1,1
7:1,1,23,23 8:1,1
8:8 9:1 10:1 293:1
293:1
**E-d-l-e-y** 220:22
**earlier** 20:17 54:5
55:13 78:18 92:8
104:13 131:3

152:25 186:14
187:9 197:17
199:10 215:2
249:13 260:4
**early** 24:16 50:15
**easier** 61:20
**East** 1:17 11:18
**Eastern** 13:14
**Edley** 105:13
220:17,21 221:2
221:10,15 222:18
222:22 223:7,18
224:2 225:2,11,18
229:13 231:20
232:2 258:19,20
263:5
**Edley's** 254:10
**efforts** 167:4
**eight** 20:7 251:3
264:2
**either** 123:21
209:25
**ekelly@hpylaw.c...**
7:19
**electron** 211:1,2,24
211:25
**eliminate** 182:4
**ELIZABETH** 7:16
**ELLIS** 7:4
**Elmo** 71:14 146:21
160:12 173:8
267:4
**EMMA** 4:3
**employed** 275:15
**employee** 293:16
293:18
**Emtal** 209:10,16
**enable** 229:25
231:11
**enclosed** 229:20,23
**enclosing** 231:14
**encounter** 185:13
**Engelhard** 269:11
**ensure** 15:23 16:2
19:5 134:9 151:11
260:8

**ensured** 90:23
**ensuring** 119:10
**entire** 197:8,9,11
244:6 248:3
**entirety** 186:8
**entitled** 10:12
101:7 154:8
170:19,22 204:3
**entity** 148:19
233:25 237:4
**entries** 92:2 264:6
**entry** 75:17 80:7
92:1 93:19 216:8
**envelope** 231:15
**Environmental**
229:24
**equipped** 33:7
**ESQUIRE** 6:3,4,10
6:11,17 7:4,10,16
**Estate** 2:4,16 3:16
3:18 11:11
**et** 1:7 2:8,20 3:7,22
4:7,17 5:6,15,24
11:12
**event** 67:9
**Everybody** 136:5
**everyday** 132:9
**evidence** 27:10
29:5,6,7,16,18,19
30:8,16,22 31:2,7
31:14,23 38:11,23
39:19 40:9 42:12
42:25 44:6,18
47:2 53:12 54:19
54:25 55:4,8,11
55:20 56:2,10,11
56:19 57:2,10,12
58:14 95:16 99:8
99:17 100:4,18
103:4,22,23 104:3
120:14,24 121:8
124:7,9,20 125:13
127:19 128:9
129:24 130:14
131:25 132:16
133:3,23 135:24

136:14,24 137:17
139:9,9 140:1
143:17 144:3
148:6,12 149:12
149:15 151:14
173:13,14 190:8
191:12 193:7
194:22 198:6,21
199:4 227:18
230:21 232:21
233:15 236:19
239:9 241:19
252:18 255:13,14
255:25 256:2
257:4,5 258:11
262:8,21 263:16
264:8 273:23,25
**evident** 181:13
**evidential** 76:23
**exact** 48:11 53:7
60:24 61:11 62:24
70:7 188:21
**exactly** 89:18
150:21 167:6
174:15 187:10
188:17 193:5
200:1 223:1
**exam** 286:17
**examination** 8:4
12:10 168:15
286:4 293:6
**examined** 12:6
**example** 31:19
41:12 60:5 92:1
93:18 96:16
148:15
**excerpt** 74:19
**excerpts** 126:16
212:7
**exclusive** 225:25
226:4
**excuse** 36:2 89:20
90:4,25 136:19
277:19 288:13
**excused** 292:10
**executed** 225:2

250:25 283:6
**exhibit** 8:10,12,15
8:16,17,18,19,21
8:23,24 9:3,5,6,7
9:8,9,10,15,16,17
9:19,20,21,23
10:3,4,6,7,8,9,10
10:11,12,14,15,16
10:17 11:2 34:18
34:22 65:5 71:11
74:6 75:3 88:17
146:13,24,24
152:3,5,7 154:3
155:20 170:18
173:4,24 181:1
183:4 202:17
203:24 207:1
208:15 210:7
224:18 228:2
262:16 266:3
274:24 275:16
282:21 288:1,21
289:3,14,17 290:5
290:21 291:7,9,11
291:15
**exhibits** 9:12 65:8
**existed** 164:5 239:5
**existence** 67:1
182:4 194:8
**exists** 29:16,18
**experience** 56:6
242:3 249:16
**experiments**
125:21 145:15
**expert** 135:12,12
143:23 260:9
**expertise** 25:1
55:16 56:7,21
99:24 116:19
117:24 242:4
249:16 260:6
280:22
**expertly** 122:15
**experts** 118:20
120:19 124:6
126:9 131:5,6



135:21,22 136:2
199:19 242:1
244:23,24 260:24
**experts'** 249:15
**Expires** 293:24
**explain** 143:24
162:25
**explained** 113:4
129:13 131:3
244:23 248:5
**explanation** 200:8
**exposing** 40:13,18
40:21 41:15,23
**exposure** 23:5,17
27:3 48:1,9,17
49:3
**extent** 101:9
**extra** 71:7

**F**

**F** 293:1
**facing** 64:18
**fact** 12:18,22 24:3
138:11 141:9
142:3,13 144:3,5
144:18 145:6,22
161:5 166:22
167:8 178:13
241:3 266:24
273:24 288:14
**Fae** 109:18
**fair** 36:23 87:10
88:19 89:11,11
90:10 127:1
168:19,22 201:18
286:24
**fairly** 185:18
**faith** 167:12
**fall** 211:7
**false** 235:6 278:15
**familiar** 19:6 26:19
43:21 83:17 84:13
86:17 87:1 95:2
104:14 105:14
107:11 109:20
111:10 133:11

138:4,6 145:16
153:24 220:19,24
222:11 239:17
258:6
**families** 40:14,21
41:15,23
**far** 58:16 181:11
219:19
**February** 1:12
11:15 211:8
**Federal** 42:11,24
43:22,25 44:2
45:15,25
**feel** 41:18 83:19
102:14 234:9
**felt** 115:22 121:13
121:17
**FERNANDEZ** 7:3
**fib** 272:18
**fiber** 234:7,8,12
**fibers** 211:11,14,18
211:19,20,22,22
234:14,22 245:21
250:21
**fibrosis** 67:4
176:23 177:7
180:11
**fibrous** 196:13,18
197:3,3 199:5,10
199:11,15 247:14
**field** 234:15
**fields** 118:20
**fight** 47:7
**figure** 50:2
**file** 57:23 58:4
80:13 93:8 168:16
171:7 172:12
177:20 255:10
273:22
**filed** 33:2,14 47:25
48:6,12,15 49:1
49:11 50:4,23
80:4 87:16 108:22
108:22 109:18
110:3 112:16
155:10 157:21

165:25 166:22
177:21 217:19
221:16,24 257:21
258:1 262:20
264:23 276:20
278:16
**files** 10:13 25:25
58:9 76:25 79:1,1
80:3,14,24 81:4
81:12 83:15
112:25 170:19,23
**final** 127:7 234:11
**financially** 293:20
**find** 49:10 111:25
125:23 128:2
229:20,24
**finding** 244:14
**Findings** 158:4
**finds** 245:22,24
247:14
**fine** 43:7 62:14
**finish** 45:21 156:24
261:18 281:16
**finished** 245:25
**first** 21:25 26:25
27:10,12,24 47:25
48:6,8,15 49:1,10
50:4 67:11 68:6
70:4 72:13,25
73:12,21 74:11
75:2,3 86:11
88:13,23 90:22
92:1,2,8 93:18
95:23 96:2,7
103:22 104:1
144:13 165:19
168:9 183:14
188:15 203:15
229:12,19 231:18
232:10 241:4
268:17 284:1,10
284:19 285:5,14
287:16
**five** 251:2 264:2
**flip** 150:9
**flipped** 209:6

**FLOM** 6:10
**Floor** 7:17
**Florham** 6:18
**focus** 167:1
**focusing** 233:1
**Foley** 1:4,4 11:11
**follow** 47:9 188:13
**following** 1:10 2:25
3:25 4:25 35:8
41:9 46:20 62:19
116:7 117:9
119:17 126:21
133:18 137:12
141:4,23 249:21
256:24
**follows** 12:6
**foregoing** 293:10
**forgetting** 291:14
**form** 14:1,20 15:13
16:21,25 17:17
21:2 23:8 24:8,22
25:9,19 26:8 27:6
27:15 28:20 29:10
29:25 30:11 31:13
31:25 32:9,18
33:5 34:2 36:1,11
36:17 37:9 38:1
38:17 39:1,11,23
40:25 42:15 44:9
44:21 45:5 47:5
48:4,19 50:12
51:11,21 52:15,24
53:5,24 54:22
55:2,5,24 56:15
57:5,21 58:6,19
59:8,25 60:11
61:1,17 62:9,9
63:3,17 64:4,16
64:23 66:13,21
67:14 68:8,18
69:3 72:17 73:4
73:19 74:1 75:23
76:9 77:4 78:2,13
79:7,13,22 80:11
80:16 81:1 82:16
83:25 84:19,24

85:12,23 86:24
87:8,22 88:8,21
90:20 92:6,24
93:14 94:2,11,24
95:10 96:10 97:1
97:8,18 98:7,16
99:3 100:9,13,23
101:4,11 102:12
102:20 103:13
104:5 105:4 106:4
106:20 107:10,19
107:25,25 110:10
110:20 112:7,22
115:3 118:11
121:2,11 122:5
123:14,24 124:12
125:1 126:5 127:3
127:22 128:16
129:11 130:2,17
132:6,20 133:8
134:2 136:3 137:4
138:15 139:1,20
142:17,24 143:7
143:21 144:22
145:12 146:2
148:9 149:18
150:1 152:20
155:15 158:14
159:4,15 160:2,8
161:14,22 162:5
162:24 163:20
164:9,21 165:10
166:6 171:17
172:18 173:18
175:2,25 177:14
178:1,18 179:8,25
180:5,20 181:19
182:13 187:17
189:2 190:11
191:4,20 193:12
193:25 194:17,23
195:1,5,10 196:6
196:22 199:8
200:13 201:20
202:9 203:19
205:4,24 206:22



207:21 208:13
212:3 213:6,15
214:10 215:7,19
216:1,18 217:8
218:4,10 219:1
221:4,20 222:2,20
223:12,22 224:6
225:5,15 226:9
228:13 229:3
230:5,15 231:3,23
233:19 234:25
236:4,11,24 238:1
238:16 240:10,25
241:9,24 242:12
243:9 244:18
245:7 246:3
249:11 250:15
251:7 252:22
253:7,15 254:13
255:4,18 257:24
258:4,14 259:2,17
260:2,21 262:25
263:8 264:10
265:2 268:15
269:18 270:5,22
271:12 272:7,21
273:11 275:9,20
276:15,25 277:13
278:5,19 279:7,25
280:17 281:8
282:14 283:18
284:17,22 285:11
**former** 204:8
205:15
**formulations** 67:6
**forth** 23:22 60:18
77:24 87:13 91:8
91:13 94:9 113:19
238:11 239:2
241:21 262:4
264:21 293:14
**forthright** 191:1
**Forty-five** 264:6
**forward** 218:16
**found** 72:14 73:1
73:13 112:24

168:12,15 181:15
198:13 205:21
206:19 208:10
209:15 211:12,15
212:16 234:8,14
234:15,19 238:13
242:25 247:9,11
252:18 271:9,23
272:4
**four** 220:5 251:2
264:1
**FRACE** 2:3
**free** 269:14
**Friday** 1:12 11:15
287:3
**front** 30:17 70:11
123:4 146:23
159:17 197:23
229:17 235:2
238:21 259:9
262:5,12 263:3
**full** 185:6
**fully** 23:4,16 28:17
28:22
**function** 158:6
**further** 113:24
182:15 187:25
188:1 293:10,15
**future** 92:22

## G

**G-11** 234:19
**Gale** 10:7 210:8,12
**Gambino** 72:15
105:17,19,25
106:2,10,15,17
107:2,8,16,22
174:24 175:12,22
177:22 213:13,21
213:22 214:8
215:4,15,24
216:23 218:22
219:11 221:17
**Gambino's** 218:1,2
**game** 168:19,23
**gather** 24:9

**gathered** 54:20
55:4,20 56:10
58:15
**gathering** 23:2,14
24:4 37:23 53:12
**GATMAITAN**
2:15
**general** 53:3
207:18
**generally** 96:13
**generated** 217:10
**George** 10:13
152:10 153:8
160:18 170:19,22
170:25 171:7
**Georgia** 211:5
**getting** 69:4 116:10
117:12 131:10
186:6 230:23
261:23 286:8
**give** 13:3 34:11
48:11 49:7 52:5,8
65:4 74:10 84:22
130:21 151:21
154:1 155:19
160:11 170:17
173:2 180:24
183:3,8,12,13
184:7 202:15
206:24 210:6
212:24 215:11
219:16 224:21
229:9 254:24
255:12 262:15
266:2 274:23
**given** 32:15 99:9
101:5 124:1
183:10 197:14
203:1,16 258:11
258:24
**giving** 36:8,20 42:6
47:17 120:9
127:11
**Glenn** 9:16,18
207:2,6 208:16
**go** 13:6 21:6 41:5

43:5,13,14 50:20
52:16 56:20 57:10
66:23 80:6 86:2
108:18 113:24
116:6 117:7,17
119:14,16 125:23
126:18 136:21
137:15 140:5,12
146:21 150:22
160:12,14 166:16
169:24 173:8
174:14,16 176:4
176:11 180:13
181:24 193:1
207:16 210:22
213:25 214:14
220:8 229:11
232:18 233:4,16
237:3 240:18
242:19 245:15
247:1 248:15
259:14 260:4
261:14 263:21
267:4,21 268:22
269:8 287:9
**goes** 56:2 187:23
188:24 261:1
**going** 17:21 34:21
41:4,7 50:13 64:9
64:20 69:24 70:21
74:9,17 84:22
96:20 116:5
125:21 126:12,24
126:25 140:25
146:16 151:23
156:14 160:14
161:11 163:11
168:1 174:9
179:18 183:8,10
183:15 189:13
190:23 210:11
219:24 238:25
251:17 268:11
281:10 282:19
286:8 287:23
**good** 12:13,15

89:15 115:18
116:3 117:19
118:8 167:12
292:3
**Goudie** 237:6,7
**Government** 42:12
42:24 43:23 44:1
44:3 45:16 46:1
**grabbed** 118:17
**GRABOWSKI** 3:3
3:4
**grant** 192:4
**Grayzel** 221:25
222:7 232:13
**great** 65:11
**GREENE** 3:15,17
3:19
**GRIFFIN** 4:3,4
**ground** 204:9
205:16
**Grove** 7:5
**Guard** 69:20,21
**guess** 81:23 203:14

## H

**H** 8:8 9:1 10:1
**hac** 62:6
**half** 220:2,4 254:25
**hall** 129:16
**Hammondsville**
63:8 245:19
282:11 283:12
284:14 285:7
**handed** 71:23
**handling** 278:25
**Handwritten** 8:17
10:6 34:18 173:24
**happen** 140:22
**happened** 25:23
68:22 96:3 107:15
107:17 109:12
111:15 129:16
213:18 218:1
222:18
**happens** 157:7
287:3



**happy** 235:18 292:4
**harassing** 256:14
**harassment** 281:12
**hard** 47:9 57:10,12 141:18 173:19 188:12
**HAWKINS** 7:16
**hazards** 14:17
**head** 105:25
**health** 22:21
**hear** 105:10 111:9
**heard** 63:8,9,22 67:12 105:18 109:15 264:14
**heavy** 150:6
**HEIRS** 3:18
**held** 1:15
**help** 15:22 16:2 19:5 20:2 26:13 38:3 54:6
**helped** 24:10
**helping** 14:5
**Hemstock** 9:16,18 207:2,7 208:16 272:3
**Hemstock's** 208:20
**HENDERSON** 7:9
**hereinbefore** 293:13
**hide** 99:13
**highlighted** 75:8,15 82:25 267:19 268:8
**highlighting** 267:24 268:2
**highly** 169:2,3
**historic** 27:23
**historical** 50:1,3 77:21 81:9,10 90:15 91:3 94:18 94:19 101:18 103:19 110:16 148:5 151:5 153:21 161:19 162:18 163:8

169:1 228:24
**historically** 13:10 15:11 24:5 77:15 90:7 103:20 249:1 253:24 270:12
**History** 157:24
**HODJERA** 4:13
**hold** 26:18,20,23 27:2,12,24 280:5
**holds** 69:10 282:4
**honest** 191:1
**honestly** 23:4,16
**hope** 89:9
**hoped** 18:7
**Hopkin** 146:17 233:5
**Hopkins** 8:16,20,23 8:25 15:25 16:4,6 17:6 18:15,22 19:5,15 78:21 130:6,25 137:24 138:3,10,19 139:3 140:19 142:11,11 143:12,24 145:7 145:13,21 147:13 147:19 149:2 150:25 183:5,9 185:22,23 187:2 188:8 189:7 191:15 197:6 200:23 233:7 235:24 239:14,21 240:7 247:3 248:21 257:19 260:8 263:25 288:2,10 289:15 289:18 290:4 291:19
**Hopkins'** 17:1,3,18 18:2 144:4,24 146:25 149:3,9 183:3 186:8 197:14 244:3 264:7
**Hopkins's** 243:16
**Hopkins-28** 233:5

233:6 258:12
**hour** 18:16 20:13 70:22 78:20 151:24 217:22 219:24 220:2,4
**hours** 20:7 168:1 286:2
**hundred** 189:25 190:6
**hundreds** 189:23 191:16
**hurt** 166:2
**HUSBAND** 1:4 3:4 4:4 5:22

---

**I**

**idea** 27:24 84:11 87:14 88:3 103:25 121:22 161:20 163:16 172:13 271:14
**identification** 11:5 34:19 65:6 71:12 74:7 146:14 152:8 154:4 155:21 170:20 173:6,25 181:2 183:6 202:19 203:25 207:3 208:17 210:9 224:19 262:17 266:4 274:25 282:22 288:3,23 289:16 289:19 290:6,23 291:8,10,12,16
**identified** 158:9 167:5
**identify** 112:17 129:21 130:11 167:4,14 211:13 287:10 289:3 291:3
**III** 3:15
**imagine** 241:15
**IMERYS** 2:20 5:24
**important** 15:21

56:1 85:2 109:7 113:15 190:14 191:22
**importantly** 78:21
**imposed** 27:12,25
**impossible** 21:7
**inaccurate** 16:20 17:12
**inappropriate** 84:25 217:12,17 289:11
**include** 177:10 289:11
**included** 134:23 192:2
**includes** 14:14
**Including** 22:4
**incomplete** 16:23 17:12 168:10
**inconceivable** 67:2
**incorrect** 78:15 129:12
**increasing** 67:1
**independent** 168:15 226:19
**indicate** 60:22 178:12
**indicated** 23:1 141:10 142:4 155:2 168:17 201:6 245:22 286:1
**indicates** 207:17
**indicating** 61:10 62:23 131:24 136:25 137:18 138:12 164:14 262:21
**individual** 3:18 42:18 44:12 46:4 46:9 48:22 50:20 55:6 60:15 65:1 69:15 87:25 94:14 101:2 104:8 162:8 163:4,23 203:22 205:6 242:14 264:13 265:5

**INDIVIDUALLY** 2:3,15 3:16
**individuals'** 56:21
**industrial** 59:19,22 60:8,17,23 61:11 62:24 63:14 83:14 83:19 85:2 86:3 113:15,23 114:6 114:13 204:22,23 226:19 227:3,12
**inform** 41:2
**information** 14:14 14:15 15:7,10 16:2,18 17:11 18:6 22:22 23:2 23:14 24:10 25:2 25:14,22 26:6,10 28:9 29:2 32:5,14 33:1,13,23 37:23 49:21 50:1,2 56:19 57:1 68:25 78:9 90:15 91:12 94:20 95:6 98:1 102:7 111:3 113:16 114:25 115:12,17,19 116:2,3,10,11 117:15,16,18,20 118:7,9 121:7 122:17 127:18 129:1,22 130:12 135:4,5,7 150:16 150:19,24 153:17 159:10,23 160:17 161:10 162:1,21 163:1,16 164:3 165:6,24 166:3 168:25 169:6,10 171:15,20,24 172:1,5 177:16 179:13 190:4 198:11 208:1 209:24 215:4 218:15,16 220:17 222:6 228:22 259:5 260:25



**informing** 164:23
**Ingestions** 154:9
  157:10
**inhalation** 67:5
  157:15 158:23
**Inhalations** 154:9
  157:11
**injured** 68:15
  155:11 164:15
  225:12
**injuries** 23:4 72:10
**injury** 25:6 48:1,9
  48:16 49:2 110:2
  114:22
**inquiries** 119:1
**inside** 51:18
**insignificant** 243:1
**insofar** 176:1
**instance** 261:9
**instruct** 281:10
**insurers** 69:1
**intent** 40:11,20
  41:1,13,24
**interaction** 52:11
**interested** 108:21
  288:18 293:20
**interject** 45:12
**internal** 131:5
  135:21 244:24
  249:15
**internally** 59:11
  112:24 155:10
  166:1
**interpret** 238:3
  253:8
**interpretation** 85:3
  277:24 278:2
**interpreted** 101:24
**interpreting** 81:23
**interrogatories**
  8:21 9:22 14:6
  16:19 57:9 73:8
  115:9 118:8 119:3
  120:14 123:7
  127:15,24 129:7
  130:21 131:2,13

131:23 138:24
  139:17 173:5
  174:5 175:5
  182:25 187:6,13
  193:15 212:12
  216:20 232:12,15
  241:18 243:20
  244:11 259:23
  260:14,16 261:6
  262:2,10 280:11
  282:9 284:12
  285:4 288:22,25
  289:11
**interrogatory**
  125:5 171:22
  172:23 174:10
  178:11 181:24,25
  185:2 187:15
  188:25 194:4
  195:25 210:2
  241:7,13 249:6,24
  284:15
**interrupt** 46:2
  70:20 156:15
**interrupted** 185:13
  193:18
**interrupting** 248:4
**investigated** 234:14
**involved** 14:5 18:12
  23:23 53:16 59:15
  59:18 67:3 81:14
  83:22 90:8,24
  94:8 123:5,16
  125:4 145:1,6
  165:4 169:4 172:3
  201:12 202:3
  204:21,23 214:24
  216:23 217:2
  266:24 267:21
  268:4,6 269:1,7
  273:24
**involvement**
  104:17
**involves** 239:6
**involving** 50:10
  51:2 53:13 64:19

72:14 73:1,15
  74:21 77:1 79:19
  95:18 96:17
  128:10,24 169:17
  276:21
**iPad** 268:23
**issue** 46:24 69:23
  85:19 107:7 206:6
**issues** 18:23 34:7
**Italian** 189:14,15
  204:9 205:2,10,13
  205:16

---
**J**

**J&J** 35:11 37:5
  94:7 283:15
**J&J-172** 9:16
  207:1,6
**J&J-173** 9:17
  208:15
**J&J-188** 9:19
  224:18
**J&J-195** 9:20
  266:3
**J&J-277** 9:21
  173:4
**J&J-282** 9:23
  262:16
**J&J-294** 10:4
  202:17
**J&J-412** 10:6
  34:18
**J&J-436** 10:7
  210:7
**J&J-446** 10:8
  274:24
**J&J-448** 10:9
  154:3
**J&J-450** 10:10
  152:7
**J&J-452** 10:11
  155:20
**J&J-453** 10:12
  170:18
**J&J-456** 10:14
  282:20,21,24

**J&J-483** 10:15
  203:24
**J&J-486** 10:16
  74:6
**J&J-488** 10:17
  146:13,17
**J&J-8** 9:15 65:5,15
**January** 154:10,10
  211:7 275:7
**JARED** 6:4
**Jersey** 1:1,17 2:1
  2:12 3:1,13 4:1,11
  5:1,10,19 11:13
  11:19 214:8,22
  225:3 266:16
  293:4
**jlee@mkclaw.us....**
  6:19
**jmplacitella@cp...**
  6:7
**job** 19:19 21:22,24
  22:15 35:17 41:17
**John** 8:16 50:8 52:9
  52:12 140:19
  160:21 183:5
  208:6
**Johnson** 6:14,14
  12:23,23 13:7,7
  13:10,10,13,13
  14:3,3,9,10,15,15
  15:7,8 20:23,24
  21:12,12 23:3,3
  23:17,17 24:5,5
  25:4,5 27:1,1,3,4
  27:11,11,22,22
  28:16 29:2,3,17
  29:18 30:21,21,23
  30:23 31:6,6,11
  31:11 32:4,4,13
  32:13,24,25 33:3
  33:3,11,11,15,15
  33:21,22,24,25
  35:18,18,22,22
  37:3,3,17,17 38:8
  38:9,20,20 39:17
  39:17,25,25 40:7

40:8,12,12 42:11
  42:11,24,24 44:16
  44:17 46:10,10
  47:24,25 48:14,14
  48:16,16,17,17,25
  49:2,2,4,4,12,12
  50:8,8 51:2,2,3,3
  51:16,16,19,19
  53:14,14 55:18,18
  55:19,19 56:12,12
  57:1,1,18,19
  58:11,11,12,12,13
  59:15,15,17,17
  60:9,9 61:8,9
  62:22,22 63:15,15
  63:23 64:8,8,9,19
  64:19,20,20 65:18
  65:18,24,24 68:3
  68:4,5,5,12,12,24
  68:24 73:15,16
  74:10,20,20 76:6
  76:6 77:1,1,16,16
  79:17,17,18,18
  80:14,14 82:1,1
  85:7,7,9,10,19,19
  86:1,1,19,19
  87:15,15,17,17
  88:4,4 90:7,7 91:4
  91:4 95:5,5,7,7,17
  95:17,20,21,23,23
  95:25,25 96:18,19
  97:19,20 98:2,2
  98:21,21,25,25
  99:12,12,19,19
  101:19,19 102:3,6
  102:6,14,14 103:1
  103:1,2,2,5,5,7,7
  103:8,8,11,11,21
  103:21,25,25
  104:25,25 105:1,1
  105:12,12 112:18
  112:19 123:19,20
  123:20 126:3,3
  127:19,19 128:10
  128:10,22,22,24
  128:24 129:20,20



129:25,25 130:9,9
130:15,15 132:1,1
132:23,23 134:24
135:5,6,6 137:1,1
137:11,11,19,19
138:13,13 139:10
139:10,24,24
140:2,3 143:18,18
144:7,7,14,14,17
144:17 145:23,23
149:13,13 151:4
153:13,13 154:16
154:16 155:9,9,11
155:11,12 156:11
156:11 158:20,21
159:2,2,12,12
162:3,3,11,11,14
162:14,19,19
163:5,5,9,10,14
163:14,14 164:4
164:13,13,15,15
165:4,5,23 166:1
166:1 167:1,2
168:19,19,22,22
168:25 169:1,4,6
169:6,7,8,12,13
169:17,17 171:23
171:23 172:12,12
173:12,12,14,14
175:7,8,19,20
177:20,23,23
181:6,6 182:11
186:2,2 187:16
189:17,17 190:5,5
190:7,7 191:13,13
191:13,17 192:13
192:17 196:18
198:12,12,13,13
198:20,20 199:3,3
199:15,15 201:12
201:12 202:3,3
203:11,12,16,16
204:3,3,16,17,24
205:20,21 206:16
206:18,18 207:17
207:25 208:1,11

208:11,23 210:2,3
210:19,20 212:13
212:13,17,17
213:8,8,12,12
214:6,6 217:1,1
221:1,1,9,9 222:9
222:9,13,14,15,15
223:6,6,17,17
224:3,3,8,8,12,12
225:9,10 229:13
229:14 230:20,20
230:25,25 231:4,4
236:7 237:23,23
241:6,6 242:10,10
243:6,6,17,17
244:15,15 246:14
247:17 249:2,2,7
249:8,25,25
250:12 252:19,19
253:3,22 255:1,2
255:2,9,9,16,16
255:23,23 257:1,2
260:15,15,17,17
261:8,8,11,11
262:9,9,20,20
266:22,23 268:5,6
268:12,13 269:2,2
269:13 270:12,13
272:16 273:21,21
273:21,21 274:7,7
275:6,6,15,15,17
275:17 278:1,1
279:1,1 281:1,1
282:25,25 283:10
283:10

**Johnson's** 13:12
  15:5 21:16 22:3
  22:23 28:16 31:3
  31:20 37:18 38:12
  38:23 39:5,20
  40:1,9,14,18,22
  41:16,19,24 42:13
  43:1 44:7,18 47:3
  47:13 58:14 60:6
  63:11 64:1,10
  73:2 75:20 77:17

79:20 80:22 84:5
93:3 102:3 119:4
119:7 121:16
124:10,21,21
128:9 132:16
133:4,23 134:24
135:5,25 136:13
136:18 139:6
151:5 154:9
155:12 157:12,25
158:23 164:4
165:23 169:5
174:12,23 177:20
182:3,6,11 187:16
192:17 196:18
199:1,5 205:20
206:16 207:18
208:23 214:24
217:6 223:19
225:12 226:5,17
227:4 236:7
238:13 242:22
246:14 247:18
250:12 253:4,22
272:16
**Johnson-486** 74:10
**Joly** 86:6,7,16
  104:11 105:2,6
  152:11 153:1
  154:25 155:2,5,10
  157:17 159:18,23
  160:6 161:3,6,12
  163:17 164:7,11
  164:15 171:8,10
  171:20 172:11
  176:14 177:10,21
  178:7,13 179:5,19
**JONATHAN** 6:17
**Jones** 216:24
**JOSEPH** 1:4
**journal** 99:25
  100:7
**judge** 45:20 46:6
  62:12 69:7,21
  157:5 170:5
  185:14 206:9

223:4 235:15
286:15
**judge's** 69:19
**July** 170:24 171:7
  204:2
**jumped** 124:5
**jumping** 121:14
**June** 155:23
**jury** 17:9 139:25
  144:8 188:9
**justified** 130:13

─────────

## K

**K-r-e-p-p-e-l**
  112:12
**KARP** 6:11
**Karwacki** 7:24
  11:22
**KATHLEEN** 5:22
**keep** 179:19 213:3
  244:3 248:4
  257:14 279:18,19
  291:14
**KELLY** 7:16
**kept** 50:9 280:14
**kind** 27:2 113:2
  176:20 196:15
  247:10 249:14
  255:7
**kinds** 217:21
**KLUGER** 6:16
**knew** 17:15 26:5
  42:23 77:24 85:7
  85:15,18,25 86:1
  97:20 123:4
  131:19 133:12,13
  136:6 145:8 147:9
  160:5 177:11,24
  178:13 180:2,17
  205:22 206:13,15
  206:20 207:25
  208:1,7 212:14
  217:4 221:10
  223:17,20 239:5,6
  240:2 268:11
**know** 15:6 16:16,17

17:5 21:7 26:10
27:18,20 30:12
33:20,21,22,25
35:2 36:3 39:12
39:16 43:9,17
46:23 47:7 48:22
48:23 50:3,8,19
51:17 52:25 53:7
53:10,11,18 58:8
58:9 60:1,14 61:3
63:4 65:1,2,21,23
66:2,3,7,9,10,14
66:17 68:2,23
69:5 70:23 72:9
76:5,14,16,17
78:18 79:14,23
80:5 81:10,19
83:11,21 84:4,21
86:7,9 87:25 88:1
89:10 90:2 91:16
91:23 92:1,3,10
92:11 94:5,7,14
96:14,16,24 97:4
98:25 102:23
103:2,5,9,11,20
103:24 104:9,11
104:23 105:1,12
105:16,19 106:12
106:14 107:6
108:8,11,12,14
109:14,24 110:4,5
110:6,11,17
111:12,16,24
112:2,11,12
113:13,17,19
114:5,20,21
118:17 139:2
141:9 142:3
143:11,22 144:4
144:10,13,25
146:8 147:12,14
147:16 150:12,21
151:17 152:23
155:8,12,16 159:6
160:9 161:15,25
162:14,20 163:23



163:24 164:4
168:4 171:5,13,18
171:25 172:19
179:15,20 183:20
186:17 189:6,6,8
189:12,13 193:2,6
195:19 196:13,16
196:17,19,24
197:2 199:11,14
199:17 201:21
203:22,23 204:19
204:21,22 205:6,8
206:14,23 213:3,9
213:17 214:19
217:11,12,17
218:2,6,12,17,18
218:20 219:3,6
221:1,15,24 222:6
222:15 223:24
224:1,3,8 225:9
225:13 226:7
228:22 230:10,10
230:16,19,24,25
232:17 235:15
236:13,15 237:8
238:20,23 241:25
242:14,16 244:2,5
248:19,20,22
250:17 257:14,18
258:1 259:6,15
262:19 267:1
268:3,18 273:4,7
273:14 275:22
278:14 279:16,23
280:7 281:5,17,20
282:5,8,12,16
283:2 288:19
290:10,12
**knowledge** 13:9
47:24 93:25 95:5
96:6 110:15 115:1
115:14 122:19
123:10 152:24
161:11 182:10
187:14 202:2
260:25 280:22

**knowledgeable**
55:7 56:5 124:17
266:20
**known** 26:17 66:17
169:6 267:2
**knows** 46:4 69:14
104:8 223:7 269:6
**Kreppel** 112:10,14
112:19 113:3,8
**Krushinski** 8:22
73:9 172:24 174:6
178:12 181:23
191:11 193:21
196:1 201:3,7
243:20 244:12
280:12 288:22
289:12 291:6

---

### L

**L** 1:18 7:23 293:2
293:22
**laboratories** 182:17
188:3 189:8,11
**laboratory** 189:13
**lack** 182:14 187:24
188:19
**large** 88:9 150:12
**late** 48:7,10 211:7
261:24
**law** 1:1,15 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:13
50:24 67:7 68:15
142:13 144:15
262:21
**lawsuit** 39:9 47:25
48:6,9,15 49:1
50:4 58:16 73:1
73:15 79:1 80:13
95:17 98:4,24
102:10 104:2
155:10 157:21
165:25 177:21
218:22 232:3
273:24
**lawsuits** 15:11

33:14,24 48:12
49:10 50:10 64:18
66:11 73:6 74:22
76:25 79:19 87:16
88:5 90:6,9 91:13
101:21 103:4
126:13 128:10,23
157:3 162:2
217:19
**lawyer** 53:21 76:20
100:24 125:9
160:18 161:23
218:21 221:25
229:13 231:20
278:3
**lawyer's** 208:3
**lawyers** 52:9 96:17
126:3,11,15,23
134:25 135:6,7
136:1 160:5 161:9
164:4 200:8 203:7
203:12 205:20
206:16 208:23
210:19 212:14
213:12 215:3
217:11 268:1
**ldobbins@rawle....**
7:13
**LEA** 6:4
**learned** 284:2,11
284:19 285:6
**Lee** 6:17 152:10
153:8 160:18
170:25 171:7
245:18
**Lee's** 10:13 170:19
170:23
**left** 184:15
**legal** 1:23 11:22,24
25:24,25 26:5,10
26:24 32:18 33:7
33:17 34:4,4 58:1
58:8 59:10,11
69:10,10 91:17,19
92:4 93:8 94:4
98:18 99:7 127:6

279:25 280:4,5
282:4
**legal-wise** 32:21
**lengthy** 185:19
**LEONARD** 5:21
**lesions** 114:16
**LESLIE** 7:4
**let's** 30:5 34:9 45:9
80:6 92:13 125:23
131:22 151:20
170:7 180:13
201:1 233:10,12
233:16 237:3
240:18 242:19
245:15 247:1
268:21 285:17
**letter** 8:12 10:10
11:2 22:1 75:11
152:7,10 153:23
167:13 229:12
232:12
**letterhead** 205:11
282:25
**letters** 93:19
**letting** 46:3
**level** 41:16
**Levitt** 197:22
**Lexington** 7:17
**liberty** 231:13
**lie** 228:11,18 229:1
253:13 270:3
**LIEU** 7:3
**limitation** 77:23
78:4
**LINDA** 7:10
**line** 217:9 237:12
**LISA** 2:3
**list** 72:22 91:9,25
165:8,19 174:24
**listed** 82:23 89:21
90:18,22 105:22
108:13 109:23
165:17 175:12
176:12 207:22
208:3 210:21
213:22 265:19,23

**listen** 56:9 261:19
261:24
**listening** 17:10
**lists** 92:2
**litigation** 24:5
26:18,20 27:2,12
27:13,24 28:18
32:6 37:14,18
38:21 39:19 51:2
51:18,23,24 56:13
67:3 75:13,20
80:8 82:14 83:2
92:20 93:4,21,24
94:8,22 96:1
100:21 163:2,10
168:14 173:11
192:4 196:10
202:4 214:13
217:11 253:24
266:21 277:2
281:4
**litigations** 195:21
**live** 147:14
**LLC** 4:17 7:3
**llombardy@osla...**
7:6
**LLP** 1:16 6:10 7:9
7:16
**located** 269:13
**location** 60:3
**log** 10:16 74:7,15
74:18,19 76:22
82:23 86:21 87:6
88:6 91:9,14 94:9
160:11,14 161:10
161:16,20 162:15
169:12 215:14,22
215:22 217:10
267:6,16 268:5,7
**logs** 163:1 217:19
**LOMBARDY** 7:4
**long** 18:14 68:2
77:21 170:9
183:19 185:13
**long-term** 158:22
**look** 67:23 70:18



74:24 78:9 82:21
90:6 92:13 122:7
148:5,10,12 151:9
151:18 180:13
183:9,12 184:14
184:17,21 188:14
190:18 201:4
203:10 219:9
224:22 229:19
233:13 239:3,7,15
261:15 268:21
270:17 271:18,23
275:3 276:12,18
278:10 287:2
288:11,17
**looked** 15:21,23,24
20:2,22 21:3,7
81:11 148:11
167:17 191:24
201:2,3,6,13
202:12 239:11
241:4 253:1
**looking** 76:17
136:20 137:14
184:15 242:21
**looks** 150:15
290:13
**loop** 50:9
**Lopez** 113:12,21
**LORETTA** 5:12
**lose** 32:14
**lot** 15:20 54:9
130:22 150:15
183:19 200:16
290:13
**lots** 37:7
**low** 234:11,13
250:11
**lunch** 151:23
170:10 220:6
**Luncheon** 170:13
**lung** 23:23,24 158:5
158:22 180:14
181:13

**M**

**M** 5:3 6:4
**ma'am** 77:11 95:14
97:24 122:16
123:7 126:11
131:18 132:13
134:17 144:2,14
145:6 175:16
177:19 178:10
179:2 190:23
191:9 192:8,11,15
193:5,10 198:18
228:18 236:17
238:10,20 242:7
244:9 248:24
251:17 253:21
254:4 256:19
258:11 259:8,12
260:12 261:18
262:1 265:18
271:18 272:15
273:1,3 276:1
279:12 280:10,25
282:8 285:3
**Magna** 1:23 11:22
11:24
**Magnesia** 13:14
**maintain** 95:23
**making** 68:14
122:23 199:13
206:10
**management**
283:14
**manufacture** 182:3
182:11 187:16
**manufactures**
68:13
**Maria** 1:4 11:11
**mark** 71:7 173:22
**marked** 11:5 34:19
34:21 65:6,7,8
71:11,20,23 74:7
74:10 87:6,13
88:6,18 146:14,17
146:24 150:5
151:7 152:3,8
154:4 155:21

170:19 173:6,25
181:1 183:5,13
202:18 203:25
207:2,5 208:17
210:8 224:19
262:16 266:4
274:25 282:20,22
287:10 288:2,5,8
288:23 289:15,18
290:6,22 291:8,10
291:12,15
**market** 6:5 181:17
181:21
**Marketing** 21:17
129:6
**marking** 286:19
**Martin** 1:18 11:24
293:2,22
**material** 29:4
**matter** 11:11 127:6
197:1 288:14
**matters** 51:24
80:23
**MATTHEW** 4:13
**McCrone** 228:3,8
229:24 233:11,13
233:25 237:4
240:19 242:20
244:13 245:4,15
245:18,24 247:1,9
247:21 248:12,14
249:9 250:2,8,21
251:1,4,19,24
252:5,17,20
**McGIVNEY** 6:16
**MCNEILL-GEO...**
5:3
**McTernan** 154:18
**MD** 66:1 153:2
**MEAGHER** 6:10
**mean** 19:1 77:21
92:11 97:12 99:16
99:17,22 115:20
136:11 137:10
180:9 190:13
192:3 196:8

239:16 248:20
**means** 33:20 76:17
76:19 92:10,21
99:23 124:3
199:11 203:14
218:12,14 219:7
236:13,15 238:4
244:6 248:19,20
248:23 250:18
268:3
**meant** 198:7
**medical** 65:24
99:25 100:7 153:3
154:15 156:5,10
157:11 158:20
159:11 160:25
164:14 165:4
177:23 180:9
181:10 268:5,12
**Medicated** 234:8
**medium** 250:11
**meet** 286:22
**meetings** 44:14
**MELISSA** 2:16
**memo** 9:15 10:9,11
10:14,15 65:6,18
154:3,8 155:20,23
156:10 158:20
159:1,7 164:14,22
180:10,22 203:24
204:2 282:21,24
283:10
**memorandum**
80:22 156:7
**memorandums**
216:9,9,10,10
**memory** 35:5 45:10
45:12
**memos** 161:3,6
**mention** 127:16
176:16 179:5
189:20
**mentioned** 20:17
72:22 73:21 90:9
130:23 148:6
161:7 176:14

179:16,20 199:22
238:18 240:21
241:14 249:8
250:1 251:4,5
276:1
**mentions** 192:1
**mesothelioma**
110:2 204:12
**met** 45:1 200:7,16
**method** 148:22
**Metropolitan** 204:4
204:8
**mic** 36:16
**microscopy** 211:2,2
211:25
**MID-L-2456-18**
3:14
**MID-L-3095-18**
1:2 11:14
**MID-L-4252-18**
2:13
**MID-L-4826-18**
4:2
**MID-L-5368-17**
4:12
**MID-L-598-18**
5:11
**MID-L-600-18** 2:2
**MID-L-6635-17**
5:20
**MID-L-6805-16**
3:2
**MID-L-7049-16**
5:2
**Middlesex** 1:1 2:1
2:13 3:1,13 4:1,11
5:1,10,19 11:13
214:7,21 225:2,6
255:11
**Miller** 10:5 109:19
152:11 153:11,16
202:18 203:1,4
224:23 225:20
226:25 229:22
231:21 233:11
236:18 238:8,12



240:21 250:25
251:5 252:16,24
253:2 254:6
257:19 258:18
263:4,12 264:24
276:7,9 278:15
**Miller's** 245:3
246:21 253:13,20
254:8
**milling** 226:2
**million** 245:23
**Mills** 155:24
**mind** 31:8
**mindful** 52:17
**mine** 59:23 60:2,7
61:12 62:25 63:8
63:23 85:9,18
204:24 205:21
206:18,19 209:10
209:17 247:13
269:12 271:10,23
272:5,18 279:5,10
280:14 281:2
282:11 283:14
285:6,7
**mined** 227:2
263:13 269:10,11
**Mineral** 232:22
**mineralogic** 211:14
**Minerals** 4:7 7:14
13:11,14 153:12
203:5 207:13
225:21 226:1,18
227:2 229:1,21,23
232:5,20 263:14
275:6
**Minerals'** 227:19
263:17
**mines** 49:3 63:20
83:22 84:3 208:11
212:16 214:5
282:17
**mining** 226:2,3,4
283:11 284:13
**minute** 185:5
257:12

**minutes** 220:5
**missing** 257:20
**mistruth** 194:19
**mistruths** 194:15
**misunderstanding**
254:2 277:25
**mm-hmm** 67:19
70:24 71:3 146:12
289:25
**month** 188:9
**morning** 12:13,15
**MORSE** 4:17
**mothers** 41:13
**motion** 166:22,24
**move** 36:16 218:16
259:8
**moving** 213:3
257:14
**multiple** 116:12
223:19 283:23
**Musco** 1:15 8:3 9:6
11:10 12:5,13
14:10 33:11 48:14
55:18 132:2
222:13 253:13
286:6,17,19
287:21,24 290:22
293:7
**Musco-1** 34:22
136:21 137:15
**Musco-2** 150:6
151:7,16

**N**

**N** 6:1 7:1,23 8:1,1
10:5,7 202:18
210:8
**name** 8:10 9:3 10:3
66:1 90:3 105:18
112:11 128:19
161:7 180:21
207:22 208:3
266:18 267:23
276:3
**named** 221:25
275:17

**names** 52:5,7,8
54:11,15,17,17
127:16 130:19,22
189:12 210:21
217:3 263:10
268:2,9 276:10
**Nancy** 1:15 8:3 9:6
11:10 12:5 14:10
33:11 48:13 55:18
132:2 222:13
290:22 293:7
**National** 43:9,17
44:5 46:11,25
**nature** 211:13,14
211:17
**necessarily** 55:4
56:2 60:2
**necessary** 129:18
218:16 264:19
**need** 69:7 128:20
129:4 133:9 170:4
170:9 200:3 240:1
257:11
**needed** 23:14 26:12
**needs** 285:25
**neither** 293:15,18
**never** 17:8,15 38:13
38:13 40:10,11
42:12,25 47:1
55:10 81:11 88:15
90:16 119:5,22
122:21 123:10,21
124:7 125:13
128:7 129:3
131:13 132:2,17
133:5,24 136:15
136:15,23 139:9
140:1 142:11,12
142:22,25 145:6
145:24 147:6
149:14 151:6
166:2 169:13
171:9 172:2,4
176:14 181:8,16
182:12 187:17
190:8 191:13,17

194:22,23 199:22
206:15,20 209:24
212:21 215:16
216:16 228:20
236:18,20 239:11
240:5 243:19,25
244:12 245:2
251:4,4 252:18
254:7 257:19
259:23 262:3
275:21
**new** 1:1,17 2:1,12
3:1,13 4:1,11 5:1
5:10,19 6:12 7:18
11:13,18 78:23
138:5 181:5 214:8
214:22 225:3
266:16 293:3
**nine** 251:3 264:2
**NJ** 6:18 7:5
**non-asbestos**
192:25 195:20
199:24 200:11
**non-suit** 218:12
**non-suited** 218:8
**normal** 119:8
**NORTH** 2:8 3:7,22
5:6,15
**Notary** 1:20 293:2
293:23
**note** 113:15 167:25
**noted** 12:1 49:22
158:5 180:15
**notes** 9:10 291:15
291:18
**notice** 8:13 11:4
13:5,6,24 15:3
18:12 27:16 42:16
44:10,24 45:13,17
48:20 49:22,25
50:17 60:12,19
61:3 64:24 68:13
69:5,24 72:6,23
76:10,11 77:7
85:4 87:23 89:22
90:23 94:12

100:25 101:24
103:14 109:23
156:18 159:5
162:6 163:3 175:8
176:1 178:5,8,19
178:22,24,25
179:14 181:11
201:23 203:16,20
205:5,25 206:5
207:11 213:16
214:11 217:13
218:5 219:5 221:5
222:21 225:16
226:11 228:14
231:6,24 235:4
242:13 246:4
254:3 258:9
264:11 265:3
269:23 272:9
274:14 275:10
277:1,16 279:8
283:22
**notices** 102:22
**noting** 206:11
**November** 290:25
**NTP** 44:14,17
**number** 11:9,14
65:4,12 71:20
77:23 152:5 155:5
174:10 181:24,25
182:16 185:2,3
187:20 188:2,11
188:24 202:21
289:3
**numbers** 264:15
277:5
**numerous** 166:21
169:4 251:8,11
275:17
**nurse** 156:4
**NY** 6:12 7:18

**O**

**O** 7:23
**O'Shaughnessy**
52:10,12,19 54:1



54:5
**O'TOOLE** 7:3
**oath** 17:9 18:7
114:24 115:12,17
115:25 116:1
121:8 122:2,16
123:8,18 124:8
129:1 130:10,13
131:13 133:2,21
135:23 136:23
137:17 138:10,23
139:16,25 144:15
145:21 149:12
151:4,13 163:15
174:6 175:18,21
178:11 179:3,13
180:2 182:9,23
183:11 187:6,13
188:8 190:8
191:10 193:6,10
193:20 198:18
199:3 212:12,15
213:4,11 227:1
239:9,12 241:18
244:12 249:7,25
254:9,23 259:23
260:14,16 261:7
262:3 263:13
271:22 272:17
280:11 284:12
285:5
**object** 13:25 14:19
15:12 16:21,24
17:13,16 21:1
23:7 24:7,21 25:8
25:18 26:7 27:5
27:14 28:19 29:9
29:21,24 30:10
31:9,12,24 32:8
32:17 33:4 34:1
35:25 36:10,17
37:25 38:16,25
39:10,22 40:24
42:14 44:8,20
45:4 47:4 48:3,18
50:11 51:10,20

52:14,23 53:4,23
54:21 55:1,23
56:14 57:4,20
58:5,18,18 59:7
59:24 60:10,25
61:13,16 63:2,16
64:3,13,15,22
66:12,20 67:13
68:7,17 69:2
72:16 73:3,18,25
74:12 75:22 76:8
77:3 78:1,12 79:6
79:12,21 80:10,15
80:25 82:15 83:24
84:18,23 85:11,22
86:23 87:7,18,21
88:7,20 90:19
92:5,5,23 93:10
93:13 94:1,10,23
94:23 95:9 96:9
96:22,25 97:7,17
97:17 98:6,15
99:2 100:8,12,22
102:11,19 103:12
104:4,4 105:3
106:3,19 107:9,18
107:24,25 110:9
110:19 112:4,21
115:2 118:10
121:1,10 122:4
123:13,23 124:11
124:25 126:4
127:2,21 128:12
128:15 129:10
130:1,16 132:5,19
133:7 134:1 135:1
136:3 137:3
138:14,25 139:19
142:16,20,23
143:6,20 144:21
145:11 146:1
148:8,8 149:17,25
152:19 155:14
158:13 159:3,14
160:1,7 161:13,21
162:4,23 163:19

164:8,17,20 165:9
166:5 171:16
172:14,17 173:17
175:1,2,24,24
177:13,25 178:14
178:17 179:7,24
180:4,19 181:18
183:16 185:10
186:21 189:1
190:10,10 191:3
191:19 192:22
193:11,24 194:16
194:25 196:5,21
199:7 200:12
201:16,19 202:8
203:18 205:3,23
206:21 207:20
208:12 212:2,3
213:5,14 214:9
215:6,18,25
216:17 217:7,8
218:3,9,25 221:3
221:11,19 222:1
222:16,19 223:9
223:21 224:5
225:4,14 226:8,9
226:11 228:12
229:2 230:4,14
231:2,22 233:18
234:24,25 236:3
236:10,23 237:25
238:15 240:9,24
241:8,8,23 242:11
243:8 244:17
245:6 246:2
249:10 250:14
251:6 252:21
253:6,14 255:3,17
257:23 258:3,13
259:1,16 260:1,20
262:24 263:7
264:9 265:1,2
268:14 269:17
270:4,21 271:11
272:6,7,20 273:10
275:8,19 276:14

276:24 277:12
278:4,18 279:3,6
279:21,24 280:16
281:7 282:13
283:17,22 284:16
284:21 285:10
**objected** 256:6
284:6
**Objecting** 206:4
**objection** 28:1 43:2
45:22 47:19 49:5
49:13,18 50:14
51:4,11 74:25
85:16 101:4 120:2
156:16,25 163:20
164:21 166:18
176:18 183:23
185:17 206:11,22
207:9 208:25
209:20 210:14
226:21 227:7,14
227:22 228:4
229:3 232:6 236:4
236:24 237:11
243:9 246:16,22
247:23 248:3
251:7,20 252:1,6
252:9,10 254:12
254:21 255:4,18
258:22 265:13,21
266:7,12 267:10
269:18 270:22
272:21 273:18
274:2,9 284:4
**objections** 157:7
284:22
**objective** 33:1,13
33:23
**obligation** 100:20
279:13,16
**obligations** 28:16
280:6
**obstruction** 158:7
181:14
**obstructive** 50:15
**obtain** 225:11

**obtaining** 33:2,13
33:24
**obvious** 113:18
**obviously** 164:4
192:10 286:11
**occurred** 23:5
**October** 248:10
**odds** 138:22 143:4
**Off-the-record**
117:5 141:22
257:16 292:6
**offices** 1:15
**Oh** 112:14 130:25
156:19 175:17
187:22 197:14
288:18 289:4,24
290:1,18,20
291:13
**okay** 13:1,18,22
14:8,13 15:17
16:5 17:25 18:17
19:8,14,23 20:14
21:10 22:6,9,11
22:25 24:18 26:25
28:5 29:1 30:5,20
32:3,12 35:4,20
37:12,21 38:20
40:7 42:2,9 43:5
44:5 45:9 47:23
48:13,25 50:7
52:11 54:19 57:16
59:14 62:7,13
63:22 65:11,16
66:21,23 67:20,23
68:2,11,22 70:1,2
70:13 72:13 74:4
76:4,5 78:17,25
79:16 82:4,7,13
82:20 83:1,15
86:5 87:3 88:24
89:6,15,24 90:14
97:5 98:21 101:13
102:25 107:6
108:7 109:12,15
109:24 111:23
114:8 118:4



119:13 125:11
126:20 127:14
128:22 131:10
133:1 134:15,22
137:23 140:20
146:6,6,10 147:9
148:15 149:1,6
151:2 153:2,8,11
153:15 155:8,18
156:6 157:8,8
159:1 160:5,17,21
161:5 166:14
170:9,16 171:4
172:11 173:1
174:19 176:14
181:10 182:22
183:1 185:6 186:9
186:22 187:4,22
188:8 189:5,14
191:9 196:12
197:9 198:5,10
199:20 200:5,25
200:25 202:14
203:10,15 204:20
205:1 206:9
207:16 208:19
210:22 214:3,4
215:10 216:22
217:20,24 219:9
220:7,15 221:24
224:17 225:20
226:25 229:7
232:18 233:1,4,10
233:13,15 234:6
235:14,16 237:3,9
240:18 242:18
243:25 245:2,15
246:20 247:12,20
248:9 250:7,20,24
253:12 254:20
255:2,10 256:15
261:22 265:25
267:3,18 268:10
268:21 269:5,8
270:17 272:15
273:16,22 274:1,8

274:21 275:16
276:11,18 278:9
278:14,24 282:6,6
283:9 285:16
288:11,19,24
289:7 290:20
**omitted** 252:19
**once** 208:11 212:16
214:5
**ones** 18:24,25 21:4
105:21 108:13
109:22 135:18
288:12,17
**ongoing** 16:14
75:13 93:20
125:22 153:17,22
**oops** 229:11
**operation** 283:11
284:13
**Operator** 7:24 11:7
12:7 43:11,14
46:18 71:15 89:1
89:4 117:3,6
118:4 119:15
126:19 140:7,12
170:11,14 220:9
220:12 285:18,21
292:7
**opportunity** 184:8
186:12
**Oral** 1:14
**orange** 92:16
**order** 15:18 55:21
106:17 148:16
159:24 166:23
201:14 258:20
262:22 264:24
**ordered** 169:9
**ore** 209:10,16
245:19,24,24,25
**original** 258:16
**originally** 135:20
**ought** 71:1
**outcome** 158:19,21
218:19
**outside** 35:22 45:16

59:12 60:11 76:9
76:11 80:3 91:22
108:9 112:25
119:20 156:17,20
159:4 168:13
182:17 188:2
218:4 226:10
231:5 242:12
279:7 283:21
**ovarian** 23:25
**overlapping** 283:24
**overseeing** 58:3
**owned** 49:3 85:9,19
153:12 208:11
212:17 214:6

---

**P**

**P** 6:1,1 7:1,1,23
136:21 137:15
**P-1** 8:12 11:2 13:3
13:5 90:9,18
**P-10** 9:6 290:21,24
**P-11** 9:7 291:7
**P-12** 9:8 291:9
**P-13** 9:9 291:11,14
**P-14** 9:10,12
291:15,19
**P-2** 8:15 71:11,21
71:23 87:6,13
88:18
**P-3** 8:16 183:4,13
**P-4** 8:17 173:24
**P-487** 88:6
**P-5** 8:18 181:1
**P-6** 8:19 9:12 288:1
288:6,7,8,8,9
**P-7** 8:21 288:21
289:6
**P-8** 289:24
**P-8A** 8:23 289:14
290:1
**P-8B** 8:24 289:17
290:1
**P-9** 9:5 290:5,7
**P.C** 6:3,16
**p.m** 117:4,7 170:12

170:15 220:10,13
285:19,22 292:9
292:12
**PA** 6:6 7:12
**page** 1:10 2:25 3:25
4:25 8:4,10 9:3
10:3 66:23 73:9
86:5 203:11
207:17 208:22
209:6 210:19,22
224:22 229:12,19
231:18 232:10
241:4 269:9
276:19 283:9
**pages** 186:11
**Pam** 19:17
**Pamela** 89:16
**paper** 92:17 122:22
123:11 164:6
195:3
**papers** 56:19
123:16
**paperwork** 138:7
**paragraph** 225:24
227:1 233:7
**PARALEGAL** 6:4
**Park** 6:18 7:5
**PARNELL** 7:16
**part** 18:8 21:18,19
22:13 23:19 35:17
46:13 67:25 89:22
90:22,25 94:21
182:24 236:22
279:12
**particular** 19:12
55:7 99:24,25
125:19 126:10,16
133:11 167:13
190:16 236:17
251:14 280:22
**particularly** 183:18
**parties** 28:8 293:17
**parts** 245:23
**Patricia** 155:24
**peer** 99:18,21,23
**penalty** 122:17

123:8 124:23
131:24 175:19
179:3 191:10
198:19
**pending** 75:19 80:7
83:2 92:19 165:16
281:4
**Penn** 7:11
**people** 15:25 19:20
22:24 23:21 24:11
24:25 35:22 51:5
52:2,4 53:15 54:6
54:9 55:14 68:14
81:14 115:22
118:15,19 121:18
123:4 124:15,16
129:15 131:8
134:13 151:12
187:5 261:16
273:8 280:23
**people's** 262:22
**perception** 199:24
**perform** 211:4
**performed** 182:2
182:16 188:1
211:6
**period** 14:4 278:24
**peritoneal** 110:2
**perjury** 122:17
123:8 124:23
131:24 175:19
179:3 191:11
198:19
**person** 13:20,23
14:4 19:15,16
21:16 22:20 23:1
23:13 24:4 26:13
28:6 37:23 51:7
51:13 53:10,11,17
53:18 55:6 56:5
58:9 103:9 110:14
118:25 119:23
120:13 124:19,24
125:3 127:7 128:5
128:7 129:6,14
131:20 134:10



| | | | | |
|---|---|---|---|---|
| 140:10,15 145:17 | 38:19 39:6,15 | 121:6,19 122:6 | 200:24 201:17 | 266:14 267:3,5,11 |
| 151:3 157:20,22 | 40:3 41:4,6 42:5 | 123:17 124:2,18 | 202:1,10,15,22,24 | 267:17 268:20,22 |
| 159:10 161:18 | 42:22 43:5,8,13 | 125:7 126:6,17 | 204:1 205:9 206:7 | 268:24 269:19,24 |
| 180:11 186:25 | 43:16 44:15 45:2 | 127:10,25 128:13 | 206:12,24 207:4 | 270:9 271:1,17 |
| 209:25 279:2 | 45:8,13,19 46:8 | 128:21 129:19 | 207:12,24 208:18 | 272:14,25 273:15 |
| **person's** 128:19 | 47:16,22 48:5,24 | 130:7,24 132:11 | 209:5,23 210:5,10 | 273:19 274:5,10 |
| **personal** 27:17 | 49:8,16,24 50:25 | 132:25 133:14,16 | 210:17 212:5,10 | 274:17,22 275:1 |
| 104:17 157:2 | 51:6,14 52:3,21 | 134:3 135:2 136:9 | 212:24 213:1,7,19 | 275:11,25 276:17 |
| 214:15 273:12 | 53:2,9,25 54:23 | 137:7,9,22 138:16 | 214:16 215:10,12 | 277:7,17 278:8,23 |
| **pertains** 184:21 | 55:9 56:8,24 | 139:7,23 140:5,9 | 215:20 216:2,7,14 | 279:4,11,22 280:9 |
| **pertinent** 18:23 | 57:11,24 58:10,24 | 140:14,25 141:20 | 216:21 217:14,20 | 280:24 281:13,20 |
| 19:22 21:5,8 | 59:13 60:4,20 | 142:10,18,21 | 217:24,25 218:7 | 281:24 282:6,7,18 |
| 241:12,15 | 61:5,14,22 62:1,4 | 143:3,9 144:1 | 218:11 219:2,8,16 | 282:23 283:19,25 |
| **Peter** 10:7 210:8,12 | 62:11,15,17 63:6 | 145:4,19 146:5,11 | 220:1,7,14,21,23 | 284:9,18 285:2,16 |
| **Ph.D** 8:16 183:5 | 63:21 64:6,17 | 146:15,19,22 | 221:8,14,23 222:5 | 285:24 286:11,25 |
| **Philadelphia** 6:6 | 65:3,9,14,17,20 | 148:14 149:10,21 | 222:17,24 223:3,5 | 287:1,4,8,15 |
| 7:12 | 66:16,22 67:17 | 150:3,4 151:20,25 | 223:10,16,25 | 288:4,16 289:2,22 |
| **phone** 22:1 62:12 | 68:10,21 69:8,18 | 152:1,6,9,22 | 224:7,16,20 225:8 | 290:11 291:22 |
| 69:7 | 70:2,3,14,17,24 | 154:1,5,7 155:18 | 225:19 226:15,24 | 292:1,4 |
| **phonetic** 19:17 | 71:3,6,10,13,17 | 155:22 156:19,22 | 227:10,17,25 | **plaintiff** 5:4,13,23 |
| 69:20 | 71:22,25 72:24 | 157:4,8,9 158:17 | 228:7,17 229:6,8 | 107:15 |
| **photo** 30:18 | 73:10,23 74:4,8 | 159:8,20 160:4,10 | 229:10 230:8,18 | **Plaintiff's** 235:3 |
| **physical** 56:11 | 74:16,23 75:1,9 | 160:13 161:17,24 | 231:9 232:1,9 | **plaintiffs** 1:5 2:6,18 |
| 58:14 | 76:1,18 77:10 | 162:9,13,17 163:7 | 233:22 235:5,14 | 3:5,20 4:5,15 6:8 |
| **pick** 259:10 | 78:5,16 79:9,15 | 163:13,25 164:12 | 235:19,22 236:5 | 28:14 58:16 138:5 |
| **piece** 92:17 122:22 | 79:25 80:12,19 | 164:18,24 165:14 | 236:16,25 237:15 | **Plaintiffs'** 9:21 |
| 123:11 164:6 | 81:7 82:19 84:7 | 166:7,14,20 168:9 | 238:5,19 240:11 | 173:5 |
| **pile** 56:2 | 84:20 85:5,14,17 | 169:23 170:7,16 | 240:17 241:2,10 | **play** 140:20 141:1 |
| **piles** 56:19 | 85:24 87:2,9,19 | 170:21 171:19 | 242:6,17 243:13 | 240:1 |
| **place** 76:23 151:23 | 88:2,11,24 89:6,8 | 172:10,15,21 | 244:21 245:8,12 | **playback** 36:6 42:4 |
| 293:13 | 91:1 92:12 93:2 | 173:2,7,9,22 | 246:6,12,17,25 | 47:15 116:21 |
| **places** 59:4 79:24 | 93:11,17 94:3,17 | 174:1,3 175:6 | 247:24 248:8 | 118:1 120:7 127:9 |
| 91:15 168:7 | 95:3,13 96:15,23 | 176:6,10,21 | 249:18 250:6,19 | 141:15 142:9 |
| **Placitella** 6:3,3,4 | 97:2,11,23 98:11 | 177:18 178:2,9,15 | 251:16,23 252:4,7 | **played** 35:9 41:10 |
| 8:5 9:13 11:19 | 98:20 99:14 | 178:23 179:11 | 252:13,25 253:11 | 46:21 116:8 |
| 12:12 13:2,4 14:7 | 100:10,16 101:3,7 | 180:1,8,23 181:3 | 253:16 254:19,22 | 117:10 119:18 |
| 14:24 15:16 16:22 | 101:13,16 102:17 | 181:22 183:2,7 | 255:8,22 256:8,12 | 126:22 141:5,24 |
| 17:7,14,21,24 | 102:24 103:17 | 184:1,4,9,25 | 256:14,15,18,22 | **playing** 36:11,15,18 |
| 18:4 21:9 23:11 | 104:10 105:8 | 185:20 186:1,5,9 | 257:7,13,17,25 | **please** 12:2 13:3 |
| 24:14 25:3,12,21 | 106:8,21 107:14 | 186:16,22,23 | 258:10,17,23 | 23:10 29:12 43:6 |
| 26:15 27:9,21 | 107:21 108:6,24 | 189:4 190:22 | 259:7,20 260:11 | 50:20 52:17 61:22 |
| 28:4,25 29:13,22 | 110:13 111:5 | 191:8 192:7,23 | 261:3,21,25 | 61:24 62:6,18 |
| 30:1,14 31:10,16 | 112:5,9 113:1 | 193:13,19 194:7 | 262:14,18 263:2 | 116:6 119:14 |
| 32:2,11,23 33:9 | 115:6 116:5,22 | 194:20 195:7 | 263:11,22,24 | 121:21 126:18 |
| 34:6,10,14,20 | 117:1 118:2,6,22 | 196:11,25 197:25 | 264:16 265:8,17 | 133:17 134:5 |
| 35:6 36:7,19 38:6 | 119:13 120:8 | 198:4 199:12 | 265:24 266:1,5,9 | 137:8 140:6 141:7 |



142:1 146:21
152:5 155:19
160:11,12 173:23
174:2 210:6
219:22 229:20
233:5 235:7,7,9
249:19 256:8,11
256:12,20,23
259:10 261:5
262:1 266:2 267:4
268:23 275:4
289:5,8
**plenty** 215:15,23
216:15
**point** 24:4 26:16
37:23 65:25 70:22
101:7 198:10
204:16 216:8
251:18 261:8,22
276:22 277:5
279:1 287:18
**pointing** 216:4,8,12
**portion** 226:18
**posed** 28:18
**position** 39:3,18,24
40:16 47:1 67:9
96:19 121:15
136:6,8,10,16,22
137:16 139:13
156:17 168:4,8
198:24 199:2
282:5
**possession** 14:16
15:8 25:25 39:18
98:1 100:4,18
102:7 165:24
190:5 199:4 256:3
**possibility** 64:8,18
**possible** 234:21
**possibly** 234:16
286:15
**potential** 14:16
**powder** 13:12 15:5
21:17 22:23 23:6
31:3,21 35:11
37:18 38:9,12,23

39:5,20 40:2,9,15
40:18,22 41:16,19
41:24 42:13 43:1
44:7,19 47:3,13
49:11 50:10 60:7
63:11 64:2,10
67:6 68:4 72:14
73:2 74:22 75:20
76:6 77:1,17 79:1
79:20 80:23 82:14
83:23 84:6 93:3
96:18 100:5,20
102:3,8 119:5,8
119:22,25 121:17
123:20 124:10
126:13 128:9
132:17 133:4,24
135:25 136:13,18
137:1,20 139:6
140:3 143:18
154:10 157:12,25
158:24 164:16
166:2 169:5,5,17
174:12,23 175:20
181:12 182:3,6,12
187:17 198:13,23
199:1 202:4
214:25 217:6
223:20 224:3
226:5,17 227:4,12
234:8 238:13
239:10 242:22
243:19 285:8
**pre-Luzenac**
283:13
**predates** 165:7
**predecessors**
269:12
**predicted** 68:3
**prefer** 286:9
**premarked** 65:10
**preparation** 18:8
20:16 49:20 67:21
67:24 95:4 149:23
166:3 190:21
197:15 220:15

221:6 240:7 277:9
287:22 290:16
**prepare** 15:18
53:19 72:3 78:8
105:6 164:2 167:9
201:14
**prepared** 45:17
52:6 57:8 72:2
77:8 80:22 81:5
81:18 92:14
103:16 147:13
167:21 169:18
186:6 229:4
230:20 231:8
232:16 265:14
270:7 278:9
**preparing** 20:5
70:6 88:14 90:14
94:18 138:9
147:19 148:3
165:5 187:1 202:5
276:11
**presence** 119:20
209:11 227:5,19
230:22 232:21
236:20 242:21
245:5 263:15,16
**present** 202:5
205:20 213:12
**presented** 15:22
28:13 138:2
178:25
**preserved** 107:23
108:4
**preserving** 235:21
**President** 153:12
203:4 225:21
228:25 229:22
232:4,20
**pretrial** 28:8
**previous** 234:13
**primary** 46:23
**Princeton** 1:17
11:18
**prior** 25:23 26:6
36:12,16,18 58:20

72:20 84:1 95:8
95:19 139:21
151:2 243:10
283:14 293:5
**privilege** 10:16
74:6,15,18,19
86:20 87:5 92:9
94:9 97:15 160:11
161:20 162:2,15
163:1,17 169:12
215:21 217:10,18
267:6,16
**privileged** 52:17
76:16,21 96:21
**privy** 119:5 120:5
**pro** 62:6
**probably** 57:22
71:8 234:16
286:15
**problem** 185:21
**problems** 119:21
**procedure** 186:21
**procedures** 182:1
**proceed** 12:8 32:15
232:3
**process** 28:8 57:7
61:20 68:20 94:22
123:2 135:10
186:20
**processed** 209:9,16
**processes** 182:1
**produce** 13:8
**produced** 168:13
168:19 169:14
**product** 22:4 35:11
37:5 38:9 68:12
90:4 99:12 114:16
116:10 117:16
130:15 132:2
137:1,20 139:11
140:3 145:23
149:14 226:18
227:20 232:22
234:3 245:25
252:19 263:17
280:14

**production** 8:14
11:4 76:20
**products** 1:7 11:12
22:3 25:6 27:4
51:3 66:25 68:16
97:21 99:20
119:10 191:13
198:23 199:6
**Professional** 1:19
293:4
**professionals** 22:22
**proffered** 88:4
**profile** 277:3
**Program** 43:18
44:6
**project** 46:11,13,25
**proof** 85:8
**proper** 62:5 255:24
257:3 286:13
**protective** 166:23
**provide** 28:9 29:1
32:4,13 38:3,3
68:24 115:23
135:12 162:25
168:12 169:1
177:17 191:2
215:4 244:19,24
254:25
**provided** 13:10
15:10 18:6,13
20:19 39:8,14
57:17 60:21 61:9
62:22 76:25 77:15
78:23 79:5 88:15
91:4 101:19 106:7
110:7 113:6
115:13,19 116:3
117:20 118:9
120:15,24 122:18
126:2,8 127:17
128:5,7 129:1,22
130:12 133:3,22
135:4,14,21,22
138:6 152:18
159:10,23 163:1,9
165:6 167:13,16



MAGNA
LEGAL SERVICES

195:25 198:1
201:24 242:1
249:1 253:23
261:13
**providing** 114:25
117:19
**public** 1:20 22:21
40:8 119:24 293:2
293:23
**pull** 21:4 256:16
**pulmonary** 67:1,3
158:6 176:22
**purchase** 283:15
**purpose** 138:2
159:7 161:16,20
170:3
**purposes** 167:7
**pursuant** 75:19
92:19 167:14
**put** 23:22 44:24
68:13 71:13
129:22 135:6,7,19
136:1 159:17
161:9 184:2,6
197:22 214:17
215:22 272:3
290:1

**Q**

**qualified** 13:23
**question** 14:1,20
15:13 16:25 17:17
21:2 23:8 24:8,22
25:9,19 26:8 27:6
27:15 28:20 29:10
29:15,25 30:4,9
30:11,20 31:13,25
32:9,18 33:5,7
34:2 35:10,15,15
35:20,21 36:1,4
36:11,17 37:1,12
37:16,20,22 38:1
38:7,17,21 39:1,7
39:8,11,17,23
40:4,25 41:11,21
42:2,15,23 44:9

44:21 45:5 46:5
46:22,22 47:5,6,9
48:4,19 50:12
51:11,21 52:15,18
52:24 53:5,24
54:3,22 55:2,8,17
55:24 56:3,9,15
56:18 57:5,10,21
58:6,19 59:8,25
60:11 61:1,7,17
62:18,20,21 63:3
63:17 64:4,14,16
64:23 66:13 67:14
68:8,18 69:3
72:17 73:4,11,12
73:19 74:1 75:23
76:9 77:4 78:2,13
79:7,13,22 80:11
80:16 81:1 82:16
83:25 84:8,12,17
84:19,24 85:12,23
86:24 87:8,22
88:8,21 89:9
90:20 92:6,24
93:14 94:2,11,24
95:10,12 96:10
97:1,8,18,24,25
98:7,16 99:3
100:9,13,23
102:12,20 103:13
104:5 105:4 106:4
106:20 107:10,19
108:1 110:10,20
112:8,22 115:3,5
116:9 117:11,15
117:18 118:11
119:19 120:21
121:2,11,20 123:6
123:14,24 124:12
125:1,23 126:5,16
126:23 127:3,22
128:4,16,18
129:11,14,18
130:2,8,17 132:6
132:13,15,17,20
132:22 133:8,17

133:19,20 134:2,4
134:17,19 136:4
137:4,6,13,14,25
138:15 139:1,20
141:6,8,25 142:2
142:24 143:7,21
144:22 145:12
146:2 148:9
149:18 150:1
152:20 155:15
158:14 159:4,15
160:2,8 161:14,22
162:5,24 163:6,12
163:20 164:9,21
165:10 166:10
171:17 172:18
173:18 175:2,25
176:2 177:14
178:1,18 179:8,25
180:5,20 181:19
189:2,22 190:11
190:17,20,24
191:2,4,5,7,20
193:17,25 194:10
194:17 195:1,13
196:6,22 199:8,21
200:10,13 201:20
202:9 203:19
205:4,12,24
206:22 207:21
208:13 211:21
212:3 213:2,6,15
214:10 215:7,19
216:1,18 217:8
218:4,10 219:1
221:4,20,22 222:2
222:20 223:13,22
224:13 225:5,15
226:9 228:13
229:3 230:5,15
231:3,23 233:19
234:25 236:4,11
236:24 238:1,16
240:10,25 241:9
241:13,24 242:12
243:9 244:18

245:11 246:3
249:11,19,22,23
250:15 251:7
252:22 253:7,15
254:13 255:4,7
256:5,19,21,23,25
257:1 258:4,14
259:2,17 260:2,12
260:13,21 261:4
261:20,24 262:25
263:8 264:10
265:2 268:15
269:18 270:5,22
271:12 272:7,21
273:11 275:9,20
276:15,25 277:13
278:5,19 279:7,25
280:17 281:8
282:14 283:18
284:22 285:3,11
**questionable**
234:17
**questioning** 70:21
217:9 237:12
**questions** 14:9 19:7
22:2 23:2,15,22
24:13 25:15,16
28:13,18 35:16
37:8,13,17 38:4
53:19 54:13 56:4
57:9,13 101:8
118:23 121:18
122:13,15 124:1,6
124:15 125:4
126:10 165:12
167:20 185:12
199:21 200:16
217:22 228:16
235:12 241:17
246:9 249:13
254:4 260:24
261:17 274:13
280:21,23 282:3
**quicker** 61:20
**quite** 234:13
**quote** 283:10

**R**

**R** 6:1 7:1,23 282:24
283:1 293:1
**R&D** 22:12,13,16
171:3
**raised** 35:21
**raising** 185:16
**rash** 111:13
**rate** 20:12
**raw** 209:10,16
**RAWLE** 7:9
**re-addressed**
185:15
**read** 62:18,20
67:15 133:17,19
137:8,13 140:23
174:13 181:4,4
184:8 185:11,18
186:12 188:15,16
197:9,11,12,12,18
198:3,3 207:11
216:6 249:19,22
256:25 260:4,8
272:12 275:22
**reading** 93:15
197:21 212:4
237:13
**ready** 117:2
**reaffirm** 138:3
**real** 183:17 185:17
**really** 50:16 72:4
92:10 120:18
125:2
**reason** 97:15
121:25 122:7
134:12 181:7
257:18
**reasonably** 167:5
**reasons** 200:22
**reassure** 20:2 41:18
78:21
**reassured** 111:1
**Reath** 1:16
**recall** 12:19 34:22
34:25 36:8,20



42:6 47:17 57:13
57:15 70:7 118:3
120:9 127:11
150:11 182:22
185:12 211:9,11
**received** 36:4 175:8
232:3 253:3
**recess** 89:3 170:13
220:11 285:20
**recognize** 140:10
140:15 174:4
**recognized** 64:19
**recognizes** 29:3
**recollect** 86:13
**recollection** 48:7
128:3 153:14
159:9 171:2
**record** 11:8 12:1
34:17 45:7 71:2
72:13,25 73:13
89:2,5 95:6 117:4
117:7 166:18,19
168:5 170:12,15
198:1 220:10,13
235:21 285:19,22
287:18,25 289:9
292:9
**recording** 35:9
41:10 46:21 116:8
117:10 119:18
126:22 141:5,24
**records** 24:19,24
79:10,19 86:15
87:4,4,12,15
88:16 106:1,6,9
107:22 108:3
112:18,19 215:9
279:2,14,19 281:2
283:13
**redirect** 186:18
**reduce** 182:4
**refer** 247:7
**reference** 271:7
**referenced** 88:5
153:23 236:18
238:7,11 241:5

243:19,25 244:13
245:3,13,14
246:20 254:7,8,11
259:24 260:18
261:11 262:3,10
264:22 265:9,11
**references** 154:25
**referencing** 153:25
239:18
**referred** 199:14
**referring** 18:2
127:23 244:3
258:15 259:11
272:23
**reflected** 265:20
**refresh** 45:12
105:24
**refreshes** 35:5
45:10
**regard** 67:8 132:4
**regarding** 75:12,20
93:3 168:3
**Registered** 1:19
293:4
**regularly** 263:14
**regulatory** 21:19
80:23 154:21,23
155:25
**related** 20:23 22:22
26:23 27:3 31:6
37:14,18 38:5
55:8 74:22 80:14
83:16 87:5,16
88:16 93:8,24
95:18 100:19
106:1,10,17
111:18 112:19
113:8,20 126:13
156:23 161:6
162:2 164:6
168:14 169:11,16
215:15,24 219:11
223:19 281:2
282:10
**relates** 119:24
190:19

**relating** 49:11
**relation** 132:22
**relative** 28:9
293:16,18
**relay** 118:7
**relayed** 145:24
209:24
**relevance** 241:21
**relevant** 25:15
69:22 169:3,3
224:2
**reliable** 29:23
173:15
**relied** 120:20
185:22 186:25
187:5 233:11
280:21
**remainder** 286:22
**remember** 27:7
52:4 54:14 70:11
104:16,20 105:25
106:13 107:20
109:5,9 110:24
125:3 153:1
159:17 187:10
197:13,19,21,24
200:1 230:9
239:22,23,25
240:4 244:5
**renew** 50:13 267:9
**repeat** 84:9 95:11
121:21 137:5
141:6,25 256:20
256:23 266:11
**repeatedly** 34:9
139:16
**rephrase** 23:10
26:2 64:12
**report** 51:12
204:11 228:3,6
234:11
**reported** 51:8
141:13 142:7,14
189:25
**reporter** 1:19 11:23
12:2 17:2 36:14

71:21 108:17
116:24 141:16,17
149:7 172:8 206:2
220:20 251:9
257:11 280:2
284:3 293:3,4
**Reporter-NJ** 1:20
**reporting** 68:23
156:4
**reports** 136:24
137:18 138:11
140:1 189:20
**represent** 238:25
**representative** 2:4
2:16 12:24 13:8
69:17 76:13 77:14
101:11 144:7
163:5 206:6
214:12 222:22
226:12 228:15
231:25 246:5
253:22 254:15
277:2 281:1
**representatives**
168:22
**representing** 103:7
122:25
**request** 8:13 11:4
11:19
**requested** 16:3
58:22 90:13 95:20
96:5,7,12 98:3,9
98:24 102:16
103:4 105:22
106:7 135:14,20
279:17
**required** 23:3,15
28:9 128:18
130:19
**requirement** 68:24
**requirements**
280:8
**Requiring** 157:11
**research** 21:19
47:24 49:9,20
58:17 95:22

120:17 125:20
145:14 153:10,15
153:20 209:15
**researched** 57:14
99:19
**reserve** 286:16
**respect** 45:25 163:6
163:8 166:17,23
209:1 210:15,16
222:22 224:13
228:16 231:4
251:8 254:15
255:5,18 266:8,12
267:10,13 269:21
270:23 272:22
277:2 279:9 280:5
**respected** 221:25
**respond** 13:23
24:20 37:24 55:21
56:12 132:10
158:8 180:15
181:14 261:16
**responded** 56:4
**responding** 21:25
26:4 28:17 32:6
54:24 57:7 119:1
131:1 136:22
137:16 151:12
162:18,20 173:10
206:5 212:11
246:4
**response** 15:10
38:15,22 55:11
61:18 70:5 84:22
126:9 134:24
135:8 151:12,19
167:16 168:2
174:22 176:13
188:10,11 190:12
194:5 216:5,12
262:13 280:20
282:5
**responses** 13:9
14:23 23:16 27:23
50:1,3,6 51:25
52:13 55:5 56:20



57:17,18 60:22
61:9 62:8,23
69:12 77:15,21
81:9,11,17,20
82:2 88:4,16
90:16 91:3 94:20
101:18 102:2
103:19 106:25
109:3,6 110:7,12
110:16,18 111:18
113:8,25 114:8,11
126:8 129:23
131:9 148:5 151:5
153:21 161:19
162:19 163:9
167:1,10,15 169:2
201:3,5,10,14,25
202:7 219:13,14
228:24 249:1,2
253:23 270:12
277:10 278:11
**responsibilities**
21:23,24 22:18
23:19 46:14
**responsibility** 22:7
125:25 169:8
**responsible** 16:1
19:21 230:23
**results** 31:22
240:20 261:9
**retained** 9:12 93:24
**revealed** 152:8
158:6 208:2
211:10 227:20
230:22 232:23
233:2,8,15 236:20
237:18 245:5
263:18
**review** 73:7 79:3
83:15 86:15 87:4
99:21 106:9,11,16
107:1 108:25
111:17 113:7
114:9 121:4
123:16 124:13
147:20,23 164:10

183:16 212:18,22
220:17 221:7,12
221:21 222:3,10
223:14,23 224:14
225:17 226:13
290:16
**reviewed** 20:15
70:6 73:14 78:19
99:18,23,24 100:7
106:23 107:3
113:10 114:11
121:24 122:22
123:10 124:7
171:25 172:5
277:8 287:21
288:10
**reviewing** 129:7
**reviews** 174:17
184:12 185:7
**Revlon** 7:19
**RICHARD** 6:10
**richard.bernard...**
6:13
**right** 15:6 16:14
17:10 21:21 24:3
25:13 26:16 31:4
31:17 39:16 41:21
46:6,15 62:15
70:12 74:16 77:25
78:6 79:10 85:15
85:21 91:24 92:16
92:17,19 93:4
96:24 97:3 98:12
98:18,23 99:1
100:17 112:15
115:24 119:25
120:21 123:4,4
124:16 126:17
131:20,21 132:12
132:12 143:14,17
147:23 148:20
149:11 151:10,25
152:24 155:4
156:13 157:20,23
159:21 160:19
161:2 164:25

165:18,23 169:12
171:12 177:7
178:3 179:23
181:17 184:6
187:11 188:6,23
202:11 203:5
205:10,11,13,14
205:17 206:13
207:19 210:18
213:13 214:21
217:6 219:15
223:2,20 224:4
228:10 229:16,16
230:11 231:21
232:5 233:23
236:21 237:16
238:6 239:21
240:5 243:14
244:22 245:13
247:18 248:17
250:13 252:16
253:2 255:16
259:15 261:4
263:12 264:18
267:20 270:3
271:2 272:19
275:13 276:4,5
280:15 283:4
286:16 288:5,8
292:2
**rightfully** 67:4
**rights** 32:15 232:2
254:24 255:12
**Ritter** 114:4
**Road** 1:16 7:5
11:18
**ROBERT** 3:15
**Roberts** 114:14
**rods** 243:2 244:14
**Roger** 10:5 152:11
153:11 202:18,25
203:4 224:23
229:22 263:4,12
264:24 278:15
**role** 52:22 53:1,8
55:12 120:16

121:5 122:25
131:4,5 134:9
151:8 259:4
**Ronald** 221:25
**ROONEY** 2:17
**Roth** 6:3 11:20
**round** 210:25
**RPR** 293:22
**ruled** 224:1
**rules** 62:5 235:8,11
**run** 31:20 210:24
**running** 156:16
248:2

_____
**S**
**S** 6:1 7:1,23,23 8:1
8:1,8 9:1 10:1
**safe** 15:5 41:18
119:10
**safety** 22:23 34:8
119:3
**sampled** 227:4
263:15
**samples** 75:12
93:20,24 94:8,21
234:13 243:1
244:14
**sat** 206:17
**satisfied** 250:12
253:3
**satisfies** 236:7
237:22 244:15
247:17
**satisfy** 72:4 243:5
246:14 248:16
**satisfying** 243:18
**save** 287:11
**saw** 69:22,22 83:18
97:3 113:23
142:22,25 147:1
197:8 268:17
273:25
**saying** 33:10 78:3
99:5,6,11 100:5
100:11 103:19
110:18,23 131:2

132:14 143:14,15
162:22 163:15
170:6 173:12
180:10 195:10
196:7 230:21
239:24 255:12,25
256:3 257:3
273:23
**says** 13:19 15:2
75:10 80:9,21
82:3 83:7 92:9,14
92:18 93:5,16,22
108:20 152:13
153:19 155:7
157:13,24 158:3,4
158:16,25 160:15
161:1,4 171:10
175:7 177:9
181:25 182:8
188:7,14,14,18,24
190:3 195:5 203:3
204:6,7,15 205:10
205:13,15 206:9
207:15 209:21
210:24 214:23
215:1 222:24
223:4 224:25
225:21,23,24
226:16 227:9,16
227:18,24 228:2
229:14,20 230:7
231:10 233:24
234:2,7 235:23
236:6 237:5,17
240:14 243:3
245:18,20,21
246:11 247:13,16
250:10 251:22
252:3,12,15
263:20 269:4,7,9
270:24 271:5
**Scanning** 211:1
**scarring** 158:5
180:14 181:12
**science** 242:4
244:25 249:17



**scientific** 99:11,16
99:17 150:16
290:13
**scientist** 125:8,10
128:25 129:17,21
130:12 132:3,18
133:6,25 153:16
209:7 210:13
273:20
**scientists** 116:18
117:23 125:14
127:17 130:5
131:14,17 135:4
153:10 205:19
206:17 208:9
212:15 213:11
214:5 216:25
266:20 271:8,20
**scope** 27:15 42:15
44:9 45:14,16
48:19 50:17 60:12
64:23 69:5 76:10
76:11 81:22 83:20
87:22 94:11
100:25 101:9
103:13 156:18,20
159:5 162:5 163:2
166:12 176:1
178:4,8,18,21,24
179:10,14 203:19
205:5,24 206:4
207:10 213:15
214:10 217:13,15
218:4 219:4 221:4
222:20 225:15
226:10 228:13
231:5,23 235:4,13
242:12 246:3
251:8 254:2,13
255:5,19 256:7
258:9 264:10
265:3 269:22
270:15,23 272:9
272:12,22 273:11
274:13 275:9,23
276:25 277:16,22

279:7 283:22
286:13
**screen** 140:16
272:4
**SCRIVO** 7:3
**search** 20:1 89:17
89:18,20,25 90:2
90:6,12 91:2,7
113:2
**searched** 89:20
90:3,3,4,24 113:6
**searches** 16:1 19:21
81:15 110:25
111:1 169:9
**second** 66:23 73:9
89:21 173:8
188:16 203:11
208:22 210:19,25
275:2
**section** 184:21
**see** 13:16 35:4,5,12
35:14 42:8 45:9
66:1 75:2,4,5,7,14
75:15,16,16,21,24
75:25 76:3 77:19
77:20 80:6,9,20
81:2,25 82:4,6,7,9
82:10,12,13,17,24
82:25 83:1,3,5,6,9
83:10 93:21
122:10 148:17,18
148:21,23,25
149:3,4,8 150:10
152:12,13 153:18
154:11 155:5
157:12,15 158:2
160:15 167:21
171:10 173:12,15
174:12,15,20
182:20 184:3
185:4,23 188:11
200:20 203:2,9,11
204:5,13 206:8
208:23 209:3,7,19
209:21 210:18,21
212:1,6,9 214:1

214:18,22,23
215:1 216:13,22
217:3 224:24,25
225:1,3,6,7,20,23
226:20 227:6,21
228:2,5 229:12,14
230:3 231:16,17
232:12,19,24,25
233:3,6,9,13,16
233:24 234:2,6,23
235:23,25 236:1,6
236:8 238:17
241:1 242:20,22
242:24 243:2,11
245:19,20 246:1,7
246:19,23 247:15
248:11 249:19
263:9 264:6,18
265:22 266:16,17
266:17 267:7,12
267:14,19,20,22
267:23 268:2,8
269:16,20,25
270:1 271:4,19,23
271:25 275:7
276:3,9,10,19,22
277:4 281:14
283:16,20 287:3
291:5
**seeing** 86:11 116:23
**seen** 78:22,24 88:13
88:23 92:8 121:23
146:18 147:6,11
151:6 171:9 210:4
228:20 253:17
272:10 275:21
277:6 284:24
285:14
**Selby** 8:21 108:10
108:15 109:1,3,13
174:24 175:12,22
201:7 288:22,25
289:12 291:6
**selected** 182:14
187:24 188:19
211:3,23

**self-addressed**
231:15
**Seligman** 185:14
**sells** 226:18
**SELVAGGIO** 5:12
**Semple** 153:2
156:12
**sending** 123:2
**sense** 260:5
**sent** 8:23,24 289:14
289:17 290:4,9
**sentence** 188:15,16
188:22 227:24
231:17 232:25
**sentences** 173:21
270:1
**separate** 286:10
**September** 8:12
11:3 293:24
**seriously** 115:20
**served** 89:23
**service** 228:9
**Services** 1:23 11:22
11:24 156:5
**set** 60:18 77:24
87:13 91:8,13
94:9 113:19 168:5
174:4 238:11
239:2 241:20
261:1 262:4
264:21 293:14
**sets** 201:13 202:6
**settled** 213:4
**seven** 20:6,7 251:2
264:2
**severe** 158:7
181:13
**shapes** 193:3
**share** 203:7
**shared** 215:16
216:16,19
**Sharon** 1:18 11:24
293:2,22
**Shelby** 73:8
**Sheldon** 114:19
**shelves** 181:8

**short** 281:12
**show** 17:20 41:7
46:16 61:19 74:9
146:16 152:2
200:3,6 207:5
208:19,22 210:11
215:13 282:19
**showed** 78:25
151:15 166:2
177:19 190:6
217:5 239:24
244:4 276:5
**Shower** 13:13,13
77:18,18 102:3,4
234:3,4,9,9,11,11
234:12,12,20,20
237:10,10 240:19
240:20
**showing** 145:22
177:21 191:16
198:21 243:17
**shown** 120:17
149:23 168:2
169:13 239:12
**shows** 240:2
**side** 184:16
**sign** 115:21 123:1
124:4 129:6 230:1
231:11 258:12,19
258:21
**signature** 231:14
**signed** 124:3
198:18 199:3
229:22 231:20
254:6 258:18
263:4 265:10
266:15
**significant** 167:3
182:16 188:2
**similar** 25:16 72:11
**simple** 191:2,2,6
**simply** 241:4
**single** 95:6 122:22
123:11 129:8,21
130:11 132:18
133:5,25 151:6



164:6 168:2
219:10 226:2
239:7 252:17
259:24 261:9
**sir** 119:16
**sit** 51:15 56:25
130:21 138:8
223:6 262:7
**sits** 129:20 130:9
**situation** 67:10
**six** 20:6,7 251:2
264:2
**SKADDEN** 6:10
**skip** 85:6
**SLATE** 6:10
**small** 158:7 181:14
**sold** 13:13 14:18
48:17 60:8 63:15
73:15 222:8 226:6
227:3
**somebody** 118:16
254:24 255:12
**somebody's** 183:17
256:1 257:4
**Somerset** 266:16
**sorry** 71:19 83:4
152:4 205:12
206:3 267:4 284:3
284:5 289:4,24
291:13
**sort** 286:14
**sorted** 74:21
**sound** 257:9
**sounds** 81:24
**source** 60:24 63:11
63:14 64:1 107:7
189:16 204:8
205:16 226:4
227:13 234:16,21
285:7
**sourced** 49:3
**sources** 107:12
123:19 182:13,18
187:24 188:4,19
**South** 7:11
**speak** 16:5 42:19

49:9 81:5,13,18
103:16 105:6
115:23 122:14
123:3 131:4,6
132:10 179:1
200:20 261:12,13
**speakers** 116:12
283:23
**speaking** 134:10
224:12
**specialty** 196:24
**specific** 14:3 18:19
18:22 24:24 26:12
26:24 27:8 28:2
28:13 38:3,4,4
39:13 42:20 49:14
49:23 50:6 51:13
53:1 54:12 57:8
58:9,22 61:18
77:7,8 81:22
82:22 90:16 96:12
107:13 124:14
125:3,4,5,5,16
127:24 128:5,7,19
129:16 131:16,22
132:15,22 134:6,7
148:11,12 149:20
150:23,25 151:9
151:18 157:3
170:2 212:22
240:16 249:13
261:1 280:20
288:25 289:12
290:8 291:5
**specifically** 16:10
18:5,12 20:15
26:10 34:25 37:8
44:24 46:12 49:21
66:15 69:21 72:9
79:3 81:4 84:4
91:16 102:1 108:8
138:18 179:16,20
183:11 192:1
194:4 197:6
243:23 250:5
269:11

**specifics** 18:10 44:4
280:8 283:11
**specified** 167:14
**specify** 114:22
**spent** 20:5
**spoke** 15:25 16:4
16:10 19:14,16
89:16 130:25
132:18 133:5,24
134:16,18,20
136:2 147:18
167:5,8
**spoken** 130:5
**spoliation** 69:23
**sputum** 158:10
181:16
**Square** 6:5,11 7:11
**SR** 5:21
**staff** 283:14
**stamped** 231:15
**Stand** 46:18 71:16
117:3,7 119:15
126:19 140:7
**standing** 242:2
**started** 21:15,25
24:15 35:23 123:2
186:25 193:17
254:5
**starting** 184:24
**state** 74:13 255:11
293:3
**stated** 144:14
218:21 272:16
**statement** 133:3,22
139:8 168:10
169:21 194:24
195:1 228:2
232:19 235:6
**statements** 45:15
45:25
**states** 181:6 226:6
263:13 268:25
283:10
**stationery** 65:19
204:3
**stayed** 22:15

**stenographic** 12:1
**stenographically**
293:12
**STEPEHEN** 3:17
**steps** 97:22 99:20
148:3
**stick** 289:23
**Stipulation** 9:19
224:18 231:19
**stopping** 151:23
**store** 55:20
**stored** 54:20,25
56:11 57:18 59:1
59:3,5,10 91:13
**street** 6:5 118:17
**strike** 28:6 37:14
59:15 95:15
248:13
**strongly** 234:10
**studies** 121:24
122:3,12 125:20
136:24 137:18
138:12 141:9,12
142:3,6,13 143:13
143:15,19,23
144:3,5,18 145:8
145:9,15,22
150:25 151:9,15
151:19 153:18,22
158:6 210:23,25
261:1 262:4
**study** 120:17
236:17
**stuff** 290:14
**subject** 167:11
183:22 214:12
**subsequently**
185:14
**substance** 16:8
19:23
**sued** 23:4,17 25:5
58:13 59:18 64:9
68:4,6,12 76:6
77:22 80:21 82:1
82:5,7,10,14
86:19 174:11,23

**stenographic** 175:4,20 204:9
213:13 214:7
279:18
**suffice** 170:5
**suggest** 131:5
**suit** 171:11,21
172:12 204:4
**Suite** 6:5
**Sullivan** 114:20
**summary** 235:1
**Superior** 1:1 2:1,12
3:1,13 4:1,11 5:1
5:10,19 11:12
**supplemental** 9:22
173:5 232:11,11
**supplied** 16:19
17:11 74:19
260:18 261:10
262:3,11
**supply** 14:5,5 53:12
164:5
**supplying** 226:16
**supposed** 116:14
**suppression** 245:22
**sure** 20:18 23:12
26:3 29:14 30:3
46:5 69:8 71:10
81:15 86:10,12
115:7 117:1
145:16 176:8
177:3 185:10
195:23 239:17
267:1 289:8
**survivors** 204:10
**suspect** 234:14
**swear** 12:3 115:21
116:4 254:23
**swearing** 115:17,18
116:1,2 124:8
130:13 133:2,21
138:24 182:22
187:5
**swears** 226:25
**switch** 71:14 154:6
**swore** 17:11 114:24
115:11 123:18,22



126:2 127:15
135:23 139:15
151:4,13 179:2
180:2 188:6
191:10 193:6,10
259:22 260:14,16
**sworn** 1:14 12:6
18:6 129:23 144:4
187:12 188:10
293:8
**SYLVIA** 4:13

**T**

**T** 6:10 7:23 8:1,8
9:1 10:1 293:1,1
**tail** 284:4
**take** 70:17 74:24
88:25 91:5 97:21
99:19 144:24
166:15 183:12
184:10,10 200:5
219:20,25 220:1,7
257:13 271:18,23
275:2,3 285:17,25
**taken** 11:17 12:18
144:9 173:20
181:20 207:7
231:12 236:14
293:12
**talc** 2:20 5:24 10:13
13:12,14 14:17
15:4,4,9 20:21,24
23:18 27:2,4
30:23 31:2,6 32:6
34:8 35:10 37:4
38:8 39:4 40:1,17
41:3 42:21 46:24
47:2,12 48:2,9,17
49:3 51:2,18
53:13 59:18,19,19
60:6,8,17,18,23
60:23 61:11 62:24
63:11,14,14 64:1
66:8,10,18 68:5
73:1,15 75:12
77:17 82:1 83:14

83:19,22 84:5
85:3 86:4,20 90:8
91:3 93:24 94:7
95:18,19,25 97:14
98:3 102:3 107:7
107:12 113:16,23
114:7,13 119:3
121:16 124:21
127:20 128:11,24
129:25 130:15
132:1 136:13,17
138:13 139:5,11
141:10 142:4,14
144:19 149:13
155:12 158:9,23
163:10 168:3
169:5 170:19,23
171:10,21 172:12
176:3 181:7,16
182:2,10,14,18
187:15,24 188:4
188:19 189:15,15
189:16 191:17
198:23,25 199:5
204:3,4,8,9,22,23
205:2,10,13,16
209:9,10,16 222:8
225:12 226:2,5,17
227:2 253:24
263:13 266:21
269:2,5,10,11,12
269:14 272:16,16
272:17 273:2,20
275:13
**talc-related** 22:4
25:6 27:13 52:13
55:21 57:3 58:13
**talcosis** 108:22
109:8 177:2,5,6
**talcs** 59:22 211:12
**talcum** 140:3
**talk** 14:21 15:1,3,7
18:14 27:23 44:23
52:6 60:17 61:4,4
69:6,24 77:6,12
77:13 81:8,22

94:19 101:18,23
103:18 104:24
145:17 157:3
179:17 201:1
219:13 231:8
232:16 233:12
247:10 251:14
253:9,19 258:7
268:19 270:8,16
271:14 274:19
285:13
**talked** 44:25
110:24
**talking** 96:13
179:18,19 184:5
191:22 192:5,6
195:9,17,19 264:7
**talks** 75:18 83:1,8
93:19 158:22
161:2 185:1
210:23 232:10
233:8 247:12
267:7
**tanning** 189:16
**TEC** 4:17
**Tech** 211:5
**telephone** 7:4,10,17
**tell** 15:17 16:13
19:8 20:14 44:3,5
54:16 72:1 74:17
81:3 117:2 193:5
208:8 238:23
246:10 247:3,8
256:10
**telling** 185:23
**TEM** 240:19
242:20 247:14
**ten** 104:20 250:25
251:3 264:2
**tendered** 27:16
45:24 51:22 60:13
69:13 74:14 104:6
162:25 214:11
**tendering** 76:10,12
101:10 157:2
**tenure** 132:23

134:14,21
**terms** 73:14 90:2
113:6 169:1 222:7
227:12
**test** 31:19,22
148:19,22,23
198:12 233:8,14
233:14 236:21
237:17 238:10
240:19,20 242:19
243:16 244:13
245:2,4,16 247:1
247:13,21 248:9
248:16 250:8,21
251:19,24 252:5
252:17,20 254:6,7
**tested** 148:22
187:25 209:9
227:5 234:3 237:9
263:15
**testified** 12:6 16:13
16:17 138:11,23
142:12 143:5
144:6,16 145:9,21
191:15 205:19
208:10 209:8
210:13 213:11
214:5 239:8 271:8
271:21 272:4
**testify** 45:18,24
51:22 74:14 98:22
106:18 110:14
115:25 159:24
169:19 186:24
228:23 279:9
280:5 293:8
**testifying** 12:22
51:15 147:4
149:11 161:18
210:1 231:3
**testimonies** 8:21
78:19 210:16
212:19,23 288:21
289:11
**testimony** 8:3,19
15:24 17:1,4,6,18

17:19 18:2 19:11
36:9,12,16,18,21
36:23 41:8 42:7
46:17 47:18 51:17
58:14,20 72:20
84:1 110:21 118:3
120:10 127:12
138:20 139:21
140:21 143:2
144:4,9,12,24
146:8 183:3,9,17
183:19 185:12,18
186:8,14 190:15
195:24 197:8,10
197:12,15,19,22
198:3,5,8,15,16
198:20 210:15
212:8,15 215:3
271:25 272:3,8
288:2,10 292:11
293:11
**testing** 20:23 31:5
95:8,18,24 96:18
97:13 98:2,24
100:19 103:3
104:2 120:14,24
121:8 182:1,15
188:1 217:5
227:13,21 228:9
232:23 233:12,25
237:4 244:6
248:20,20 249:14
259:13 262:11
263:18 264:7
265:16,19 271:21
**tests** 189:23,25
190:6 191:14,16
198:21 206:18
211:4,6,10 233:13
238:22 239:2,6
241:3 242:9 247:9
247:11 248:14
249:9 250:2 251:1
251:3 253:2,3
254:11 257:20
259:24 260:17



264:21 265:9
**thank** 89:6 108:19
202:23 292:3
**They'd** 54:17
**thing** 15:21 78:7
88:10 97:12 109:7
113:14,20 114:6
121:12 261:7
272:13 273:16,22
**things** 35:3 44:23
77:7 199:19
200:17,20 233:21
239:18
**think** 22:25 54:3
55:25 61:19 71:1
85:1 101:7,12
109:7 113:14
119:6 147:4 157:6
169:23 170:25
176:19 177:2
181:5 183:20
186:13 190:13
191:21 217:14,16
241:20 254:20
255:1,2,15 273:16
273:22,25 274:8
281:21,23,25
288:15
**third** 207:16
224:22
**Thirty-three**
159:19
**Thomas** 7:24 11:21
**Thompson** 65:19
65:21 66:24 68:3
**thorough** 111:2
**thought** 112:14
146:6 172:2,4
196:2
**thousands** 201:11
201:22
**three** 186:11
234:14 251:2
264:1
**till** 202:5
**time** 11:16 12:17

14:3,16 15:22
20:4,11 26:17,25
34:23 35:8,23
36:5 39:8,14 41:8
41:9 42:3 44:25
46:17,20 47:14
53:3 56:23 62:19
65:25 67:11 68:6
89:2,4 92:8 95:24
96:2,7 102:18
103:22 104:1
115:10,10 116:7
116:20 117:4,6,9
117:25 119:17
120:6 125:25
126:21 127:8
133:11,18 134:19
137:12 141:4,14
141:23 142:8
144:13 147:1,5
151:3 156:5,15
169:24 170:12,15
174:17 175:4
183:17 184:10,11
184:12 185:7,18
192:4 193:22
194:3 195:17
198:10 200:16
202:3,5 203:15
204:16 219:19
220:2,10,13 239:1
239:12,15,19
249:21 256:24
265:10 268:17
275:12,14 276:22
278:25 284:1,10
284:19 285:5,19
285:21,25 287:11
287:11 292:8
293:13
**times** 6:11 25:5
54:18 55:5 134:20
161:7 181:5 187:8
235:18 251:8,11
256:5 262:19

281:10
**tired** 286:8
**tissue** 158:5 180:14
**title** 53:7 157:10
**today** 11:15 12:21
30:8 44:23 49:20
56:25 61:2 77:6
81:22 85:4 86:18
94:6,19 101:23
103:16 105:6
106:18 129:21
130:10 138:8
149:24 159:24
179:1 186:15
195:24 206:16
210:1 211:9
212:11 221:7,13
221:22 222:4
223:7 239:4
253:18,19 262:7
268:18 270:7,10
270:15 271:14
273:6 274:19
281:6 284:1,10
285:13 286:21,21
287:19
**today's** 15:18 20:5
20:16 67:24 70:6
78:8 88:14 148:3
165:5 166:3 187:1
197:15 201:15
220:16 240:7
276:11 277:9
278:10 284:19
287:23
**told** 18:9 24:11
40:8 42:11,24
44:16,17 53:6
54:4 69:21 78:18
92:7 104:13
124:19 125:12
137:23,25 142:12
152:25 170:25
172:2,4 187:9
189:10 191:14,17
197:17 212:13,21

218:18 239:20
257:19 260:3
278:3 280:25
282:2 286:7
**top** 105:24 205:11
205:14 237:21
**topic** 76:12 231:5
**topics** 69:17
**total** 276:20
**totally** 217:15
**Toxicology** 43:10
43:18 44:6 46:11
46:25
**trace** 189:20,25
190:6
**traces** 234:19
237:18
**track** 188:17
**transcript** 8:16 9:6
9:16,18 10:4,7
140:23 183:4
184:18 202:18
207:2 208:16
210:8 212:4
286:12 290:22,25
293:11
**transcripts** 209:2
271:20
**Transferred**
170:23
**transmission** 211:2
211:25
**tremolite** 123:21
124:10,21 182:5
182:13,19 187:18
188:5 189:17,21
190:1,6,9 191:12
191:16,23,23
192:2,5,6,9,9,16
192:16,25,25
193:7,23,23 194:6
194:9,23 195:6,11
195:14,15,18,20
195:21 196:3,3,8
196:9,14,19 197:2
198:6,7,14,17,22

198:25 199:5,15
199:25 200:10,11
243:2,2 244:14
247:15
**trial** 8:16 18:7
32:16 138:10
183:4,10,17,19
185:18
**trials** 168:21
223:19
**troubling** 169:15
**true** 17:12 114:25
115:13 122:18
123:9 129:1 135:9
138:24 141:11
142:5 174:5 197:4
249:7,24 262:5
293:11
**trust** 116:18 117:23
118:15 229:25
231:10
**trusted** 261:16
**truth** 185:24 186:3
186:7,15 197:1
254:25 293:8,9,9
**truthfully** 28:17,24
**try** 30:5 167:4,9
220:4
**trying** 46:2 50:14
56:17 285:12
**turn** 82:4 96:20
98:4,9,13,23
100:6,21 102:9
161:11 185:3
242:8 279:13,17
**turned** 55:10 57:2
58:15 95:7,17,21
95:24 96:8 102:15
103:3,21,23 104:1
215:14
**turning** 97:16
**Turnpike** 6:17
**twice** 56:16
**two** 6:5 92:2 146:20
175:11,21 176:12
179:4 186:10



201:8,9,13 202:6
202:12 234:15
251:2 264:1 290:9
**type** 192:1
**types** 167:20

---

**U**

**ultimately** 126:1,11
134:23 218:23
227:3
**unable** 158:1
**uncertain** 283:12
**understand** 12:21
14:8,13 28:7,12
28:23 29:16 30:2
30:3 32:3,12,21
32:24 47:10 56:1
59:14,21 60:5,21
61:8 62:21 63:10
63:13,25 64:7
68:11 77:25 92:21
101:17 120:18,19
141:3,19 190:14
191:22 192:12
196:16 249:4
253:25 279:12
287:13
**understanding**
21:11 26:21 28:15
30:9,24 44:22
71:5 77:5 89:19
90:11 91:6 101:22
143:13 166:11,25
167:23 178:7,21
179:17 192:18
193:9,21 195:16
195:17 201:23
219:12 258:8
270:14 272:11
277:15 278:7
284:25
**understands** 260:9
**understood** 25:13
32:25 33:12 50:16
69:11 133:12
193:7 196:1,8

**unfair** 145:1,5,10
145:20,25 146:4
168:24
**Unidentified** 9:5
35:25 47:4,8
120:1 127:2 290:5
**unintelligible**
116:13 141:16
283:24
**United** 226:6
**unsafe** 99:12
119:12 181:7
**usage** 66:24
**use** 89:25 118:12
156:16 158:1
234:25 242:3,20
255:24 257:3
266:8,12 267:15
272:7
**users** 226:19 227:3

---

**V**

**vague** 120:2
**vaguely** 83:17
**VAN** 7:3
**various** 91:15
138:1 287:20
**veracity** 133:2,22
148:4 248:25
253:23 270:11
**verbatim** 88:6
156:3 187:15
189:16
**verification** 128:8
**verified** 123:25
131:12 136:7
182:9,17 188:3
189:15 259:21
**verify** 121:13 124:3
**verifying** 128:23
**Vermont** 208:10
212:16 226:3
269:10,13
**versus** 11:11 29:19
173:13 192:25
204:4 207:13

**vice** 62:6
**VICMAR** 2:15
**video** 41:5 43:6
116:6,15,16,23
119:14 126:18
127:13 140:6
240:1
**videographer**
11:21
**videotape** 7:24 11:7
11:9 12:7 43:11
43:14 46:18 71:15
89:1,4 117:3,6
118:4 119:15
126:19 140:7,12
170:11,14 220:9
220:12 285:18,21
292:7
**videotaped** 1:14
271:3
**Village** 7:5
**violating** 235:8,11
**Viscomi** 69:7
235:15 286:15
**voice** 47:21
**vs** 1:6 2:7,19 3:6,21
4:6,16 5:5,14,23

---

**W**

**W** 8:1 283:3
**WALTER** 4:3
**want** 46:5 58:12
69:15 70:20
136:21 137:15
140:20 144:11,23
145:2 146:7 150:8
152:2 154:5
156:15 166:17
184:14,17 185:5
185:22 186:17
188:15 215:13
216:13 219:15,20
224:21 264:17
287:7,9
**wanted** 19:4,25
72:9 106:13

145:16 167:10
168:7 191:24
200:19 239:16
**wants** 184:20
**wasn't** 73:11 97:24
122:11 125:22
130:8 137:25
145:20 151:8
160:18 177:1
218:8 230:12
245:13,13 260:12
**way** 20:1 37:3
101:6,23 143:19
156:20 160:18
165:7 173:7
180:24 188:12
196:4 201:2 213:3
229:11 247:3
260:19 278:22
287:11
**we'll** 45:19 62:12
62:12 141:20
146:21 157:4
170:4 176:6 200:5
200:25 201:1
206:8 235:15
281:14 287:11
**we're** 12:16 44:23
69:4,24 81:21,23
89:2 96:13 131:10
143:13 157:2
180:25 191:22
195:9 248:24
250:24 286:8
287:23 292:9
**we've** 70:21 144:9
151:23 183:13
219:23 241:4
256:6 258:24
281:18 282:1,2
**week** 16:7
**weekend** 292:3
**WEINER** 7:3
**welcome** 168:5
**WENDOWSKI**
5:21,22

**went** 18:17,19
22:11 90:16
134:12 145:14
156:10 160:21
195:22 237:6
239:11 271:22
283:7 290:17
**weren't** 96:19
118:16 129:15
161:10
**Westfall** 83:9,11,16
83:21 84:14 85:6
85:20 203:1,17
204:4,10,18 207:7
266:25 267:7
268:1,6,11 270:19
271:9 291:6
**whatsoever** 29:6
44:18 87:14 94:20
124:8 125:13
130:14 135:24
149:12 151:14
190:9 191:12
198:11,21 239:10
241:22 255:13,25
257:4 262:22
**Whittaker** 6:19
**who've** 271:21
**Widener** 7:11
**widespread** 66:25
**WIFE** 1:4 3:4 4:4
5:22
**wildly** 231:5 235:12
**William** 266:15
267:21 268:10
**Windsor** 13:11,14
153:12 203:5,13
207:13 225:21,25
226:3,17 227:2,19
228:25 229:21,22
232:4,20,22
263:14,17 276:22
**withdrew** 166:24
**withheld** 76:20
97:14 162:1
163:16 164:3



MAGNA
LEGAL SERVICES

**withhold** 33:1,12
33:23
**withholding** 162:21
**witness** 12:3,19,22
13:3 14:2,21
15:14 17:5 18:1
21:3 23:9 24:9,23
25:10,20 26:9
27:7,16,19 28:2
28:22 29:11 30:12
31:14 32:1,10,20
33:6 34:3 35:9
36:13 38:2,18
39:2,12,24 41:1
41:10 42:19 43:3
44:13,22 45:6,17
45:23 46:21 47:20
48:23 49:6,14,19
50:22 51:5,12,21
52:1,19,25 53:6
55:3,25 56:17
57:6,22 58:7,21
59:9 60:1,12,16
61:2,19 63:1,4,18
64:5,14 65:2
66:14 67:15 68:9
68:19 69:13 72:18
72:21 73:5,20
74:2,13 75:7,24
76:12,14 77:5
78:3,14 79:8,14
79:23 80:17 81:2
82:17 84:2 85:1
85:13 86:25 88:1
88:9,22 90:21
92:7,25 93:15
94:15,25 95:11
96:11 97:9,19
98:8,17 99:4
100:14 101:10
102:13,21 103:15
104:5,9 105:5
106:5 107:11,20
108:2,19 110:11
110:22 112:23
115:4 116:8,16

117:10 118:12
119:18 121:3,12
123:15,25 124:13
125:2 126:22
127:5,23 128:17
129:12 130:3,18
132:7,21 133:9
136:5 137:5,21
139:2,22 141:5,18
141:24 142:25
143:8,22 144:23
145:13 146:3
148:10 149:8,19
150:2 152:21
155:16 158:15
159:6,16 160:3,9
161:15,23 162:16
162:24 163:24
164:10,22 165:11
166:11 167:9,17
167:20 168:2,20
169:7,18 171:18
172:9,19 173:19
174:17 175:3
176:19 177:15
178:6,20 179:9
180:6,21 181:20
183:16 184:12,23
185:7,10,17 186:3
186:11 189:3
190:13 191:1,6,21
194:1,18 195:4
196:7,23 199:9
200:14 201:21
203:23 205:8
206:5,23 207:9,22
208:14 209:3,21
211:1 212:9
213:17 214:11
215:8 216:19
217:10,18 218:6
219:6,18,22 221:6
221:12,21 222:3
223:14,23 224:11
224:14 225:6,17
226:11,13,22

227:8,15,23 228:5
228:14 229:4
230:6,16 231:7,24
232:7 233:20
235:2,12 236:12
237:13 238:2,17
240:14,15 241:1
241:25 242:16
243:11 244:19
246:4,10,23 248:6
249:12 250:3,16
251:12,21 252:2
252:11,23 253:8
254:14,17 255:6
255:20 258:5,15
259:3,18 260:3,22
263:1,9 264:14
265:6,14,22
267:14 268:16
270:6,24 271:13
272:10,23 273:14
274:3,15 275:21
276:16 277:4,14
278:6,21 279:8
280:4,7,18 281:11
282:16 284:6,24
285:12 286:5
287:14 288:24
289:10,20 290:7
290:24 291:4,13
291:17 292:10
**word** 194:15 196:8
233:1,3 238:2
243:11 246:19
247:19 248:18
250:16
**worded** 194:12,13
**words** 50:17 75:25
135:3 195:2
235:25 237:20
248:22 250:23
**work** 22:11 23:20
132:9 292:2
**worked** 21:16 37:3
38:2 44:2 54:5
66:5,7,10 72:12

118:15 125:15
131:17 136:6
159:11 171:2
177:12 266:21
**working** 34:7 35:23
46:10,12 51:8
53:20 275:13
**wouldn't** 18:7 97:6
118:12 120:18
239:16 259:4
260:5
**wound** 84:21
**writes** 66:24
**writing** 153:16
**written** 69:12 136:7
224:23 226:23
229:12 238:3
242:24 243:22
247:19 248:7,18
250:17,23
**wrong** 32:25 33:12
33:22 97:5,12
98:4,14,17,23
99:1 102:9 121:14
**wrongfully** 67:5
**wrote** 35:2
**www.MagnaLS.c...**
1:25

**X**

**X** 8:1,8 9:1 10:1
**X-ray** 158:5 180:15
181:13

**Y**

**yeah** 22:10 34:14
35:14 45:3 65:9
70:16 112:16
119:11 141:18
143:12,15 156:19
184:10,23 194:11
195:4 205:13
229:16 233:21
281:13 288:7
289:1 290:19
291:1,4

**year** 70:5 73:14,21
73:21 86:22
104:22 213:10,18
263:4
**years** 37:8 56:7
70:7 104:20
118:16 125:15
131:19 157:25
159:19 182:16
188:2 214:4,19
226:1 250:25,25
269:3
**York** 6:12 7:18
181:5
**YOUNG** 7:16
**Yuhas** 105:9 230:1
230:10,11,17,21
231:8,12

**Z**

**zero** 40:13,21 41:14
41:22

**0**

**02043** 155:5 157:14
**07009** 7:5
**07932** 6:18

**1**

**1,800** 277:10
278:12
**1,827** 276:21
**1/16/1982** 160:15
**1:51** 170:15
**10** 154:8
**10/12/1971** 237:3
**10/27/72** 244:13
**10:11** 1:18 11:16
**100** 245:23
**10022** 7:18
**10036** 6:12
**105** 1:16 11:18
185:1
**11** 8:12 251:3 264:2
291:14
**11/11/1971** 240:18



**11:20** 89:2
**11:42** 89:5
**12** 8:5 250:25 251:3 264:2 291:14
**12:05** 117:4
**12:06** 117:7
**12:53** 170:12
**13** 8:12 11:3 251:3 264:3 291:14
**14** 7:5 264:3
**146** 10:17
**15** 1:12 9:15 11:15 65:5,18 264:3
**152** 10:10
**154** 10:9
**155** 10:11
**16** 264:3
**17** 155:23 181:24 181:25 185:2,4 187:21,22 188:11 188:24 209:6 264:3
**170** 10:12
**172** 206:25
**173** 8:17 9:21 208:19
**18** 6:17 226:1 264:3
**181** 8:18
**183** 8:16
**185** 20:13
**188** 219:17 224:21 229:19
**19** 174:10 178:11 210:22 242:9 264:3
**19103** 6:6
**19107** 7:12
**1940s** 269:10
**195** 266:2,6
**1960s** 64:11,20
**1968** 229:23
**1969** 9:15 65:5,18
**1971** 76:7 77:2 79:2 79:11,19 86:21 87:17 93:9 233:16 233:21 242:18

**1972** 80:6,7,14 201:13 202:4 242:19 243:17
**1973** 80:21,23
**1974** 81:25 82:2 245:17 247:21,25 248:10,15
**1975** 86:22 250:7 250:20,24
**1976** 82:5
**1977** 82:8
**1978** 82:11
**1979** 82:14
**1980s** 24:16 269:10
**1981** 82:23 204:2
**1982** 21:13,14 22:7 86:6 152:14 154:10 165:16,17 177:21
**1983** 21:12 72:15 73:17 74:3 165:21 213:22 214:2 251:18 253:2
**1985** 154:8,10 155:23 181:11
**1986** 111:14 252:5
**1987** 225:3 254:7
**1988** 112:17 170:24 171:7 172:12 263:25 265:11
**1989** 275:7,18 276:21 281:3
**1993** 108:23
**1997** 110:3

**2**
**2** 90:25 157:14 225:24
**2/10/1971** 75:4
**2/19/2019** 293:25
**2:41** 220:10
**2:58** 220:13
**20** 264:3
**200** 245:23
**2000ish** 22:10
**2001** 6:5 22:7,11

**2010** 86:21 87:17
**2017** 95:8,19 242:9
**2018** 8:12 11:3
**2019** 1:12 11:16
**202** 10:4
**2021** 293:24
**203** 10:15
**207** 9:16
**208** 9:17
**21** 264:3
**210** 10:7
**212** 6:12
**215** 6:6 7:12
**22** 264:3
**224** 9:19
**23** 264:3
**239-5700** 7:6
**24** 264:4
**25** 264:4 293:24
**26** 264:4
**262** 9:23
**266** 9:20
**27** 264:4
**274** 10:8
**277** 173:3 174:1,4
**28** 146:24 229:9 264:4 290:25
**282** 10:14 262:15
**288** 8:19,21
**289** 8:23,24
**28th** 291:1
**29** 264:4
**290** 9:5,6
**2900** 6:5
**291** 9:7,8,9,10 214:18
**294** 202:16,22,25

**3**
**3** 152:14 227:1 283:9
**3:56** 285:19
**30** 131:19 264:4
**31** 264:4
**32** 264:4
**33** 264:4

**34** 10:6 264:4
**35** 264:5 269:3
**36** 264:5
**37** 264:5
**38** 264:5
**39** 264:5

**4**
**4** 6:11
**4/24/74** 247:2
**4/9/1971** 75:17
**4/9/71** 76:3
**4:18** 285:22
**4:24** 292:9,12
**40** 264:5
**41** 264:5
**412** 34:11
**42** 264:5
**43** 264:5
**436** 210:6
**44** 264:5
**441** 212:25
**446** 274:23 275:5
**448** 154:2,6,8
**45** 264:5
**45-minute** 220:6
**450** 151:21 152:3,6 152:10
**452** 155:19,23
**453** 170:17,22
**483** 204:2
**486** 91:9,14
**487** 88:10
**488** 146:24

**5**
**5** 204:2
**50s** 189:20
**567-3500** 6:6
**575-4303** 7:12
**589-8722** 7:18

**6**
**6** 275:7
**600** 7:17
**624-6221** 1:24

**646** 7:18
**65** 9:15

**7**
**7** 187:15,20
**71** 8:15
**735-3453** 6:12
**74** 10:16
**78** 211:7
**79** 211:8

**8**
**8** 65:4
**822-1110** 6:18
**84** 251:25 253:2
**866** 1:24
**8th** 7:17

**9**
**9,000** 245:24
**90s** 48:7,10
**973** 6:18 7:6



Exhibit 3

Page 294

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. MID-L-3095-18 AS

-   -   -

|                                          |   |
|------------------------------------------|---|
|                                          | : |
| MARIA FOLEY AND JOSEPH FOLEY,            | : |
| husband and wife,                        | : |
|                                          | : |
|             Plaintiffs,                  | : |
|                                          | : |
|             vs.                          | : |
|                                          | : |
| AVON PRODUCTS, INC., et al.,             | : |
|                                          | : |
|             Defendants.                  | : |
|                                          | : |
| (Caption continued on following         | : |
| page)                                    | : |

-   -   -

Friday, March 8, 2019

-   -   -


VOLUME II

        Videotaped deposition of NANCY
MUSCO, taken pursuant to Notice at the l
Middlesex County Courthouse, 56 Paterson
Street, New Brunswick, New Jersey 08901,
commencing at 10:19 AM, on the above date,
before Constance S. Kent, Certified Court
Reporter and Notary Public for the State of
New Jersey.


*   *   *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 295

```
 1          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2           DOCKET NO. MID-L-600-18 AS
 3  LISA FRACE, Individually      :
    and as representative of the :
 4  Estate of Carole DiCerbo,     :
    deceased.                      :
 5                                 :
            Plaintiffs,           :
 6                                 :
            vs.                    :
 7                                 :
    BRENNTAG NORTH AMERICA,        :
 8  et al.,                        :
                                   :
 9          Defendants.           :
    -----------------------------------------
10
            SUPERIOR COURT OF NEW JERSEY
11       LAW DIVISION - MIDDLESEX COUNTY
            DOCKET NO. MID-L-4252-18 AS
12
    VICMAR GATMAITAN,             :
13  individually and as          :
    Representative of the         :
14  Estate OF MELISSA E.          :
    ROONEY,deceased,              :
15                                 :
            Plaintiffs,           :
16                                 :
            vs.                    :
17                                 :
    IMERYS TALC AMERICA, INC.,    :
18  et al.,                        :
                                   :
19          Defendants.           :
20
21
22
23
24
25   (Caption continued on following page.)
            MAGNA LEGAL SERVICES
```



Page 296

```
 1            SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2             DOCKET NO. MID-L-4826-18 AS
 3    EMMA GRIFFIN and WALTER        :
      GRIFFIN, husband and wife,     :
 4                                   :
               Plaintiffs,           :
 5                                   :
                   v.                :
 6                                   :
      CYPRUS AMAX MINERALS           :
 7    COMPANY, et al.,               :
                                     :
 8             Defendants.           :
      _____
 9
              SUPERIOR COURT OF NEW JERSEY
10        LAW DIVISION - MIDDLESEX COUNTY
             DOCKET NO. MID-L-5368-17 AS
11
      MATTHEW HODJERA and       :
12    SYLVIA DUFF-PETO,         :
                                :
13             Plaintiffs,      :
                                :
14                 v.           :
                                :
15    BORGWARNER MORSE TEC,     :
      LLC, et al,               :
16                              :
               Defendants.      :
17
18
19
20
21
22
23
24
25    (Caption continued on following page.)
               MAGNA LEGAL SERVICES
```



Page 297

```
 1           SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2            DOCKET NO. MID-L-6805-18 AS
 3
     ANITA GRABOWSKI and ALFRED    :
 4   GRABOWSKI, husband and wife,  :
                                   :
 5            Plaintiffs,          :
                                   :
 6            v.                   :
                                   :
 7   BRENNTAG NORTH AMERICA,       :
     et al.,                       :
 8                                 :
            Defendants.            :
 9
     _____
10
11           SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
12            DOCKET NO. MID-L-2456-18 AS
13   ROBERT GREENE, III,           :
     individually and as           :
14   Administrator of the          :
     Estate of Deborah             :
15   Greene Brake, deceased,       :
     Stephen A. Brake, and         :
16   the individual heirs of       :
     the Estate of Deborah         :
17   Green Brake,                  :
                                   :
18            Plaintiffs,          :
                                   :
19            v.                   :
                                   :
20   BRENNTAG NORTH AMERICA,       :
     et al.,                       :
21                                 :
            Defendants.            :
22
23
24
25   (Captioned continued on following page.)
                MAGNA LEGAL SERVICES
```



Page 298

```
 1          SUPERIOR COURT OF NEW JERSEY
          LAW DIVISION - MIDDLESEX COUNTY
 2           DOCKET NO. MID-L-7049-16 AS
 3   D'ANGELA M. McNEILL-           :
     GEORGE,                        :
 4                                  :
               Plaintiff,           :
 5                                  :
               v.                   :
 6                                  :
     BRENNTAG NORTH AMERICA,        :
 7   et al.,                        :
                                    :
 8             Defendants.          :
     _____
 9
            SUPERIOR COURT OF NEW JERSEY
10        LAW DIVISION - MIDDLESEX COUNTY
             DOCKET NO. MID-L-598-18 AS
11
     LORETTA SELVAGGIO,             :
12                                  :
               Plaintiff,           :
13                                  :
               v.                   :
14                                  :
     BREENTAG NORTH AMERICA,        :
15   et al.,                        :
                                    :
16             Defendants.          :
     _____
17
            SUPERIOR COURT OF NEW JERSEY
18        LAW DIVISION - MIDDLESEX COUNTY
             DOCKET NO. MID-L-6635-18 AS
19
     LEONARD E. WENDOWSKI, SR.,     :
20   and KATHLEEN WENDOWSKI,        :
     husband and wife,              :
21                                  :
               Plaintiff,           :
22                                  :
               v.                   :
23                                  :
     IMERYS TALC AMERICA, INC.,     :
24   et al.,                        :
                                    :
25             Defendants.          :
               MAGNA LEGAL SERVICES
```



```
                                                         Page 299
 1   A P P E A R A N C E S:
 2            COHEN, PLACITELLA, ROTH, P.C.
              BY: CHRISTOPHER PLACITELLA, ESQUIRE
 3                JARED M. PLACITELLA, ESQUIRE
              Two Commerce Square
 4            2001 Market Street, Suite 2900
              Philadelphia, PA 19103
 5            215.567.3500
              cplacitella@cprlaw.com
 6            jmplacitella@cprlaw.com
              Counsel for the Plaintiffs
 7
 8            SKADDEN, ARPS, SLATE, MEAGHER &
              FLOM, LLP
 9            BY: RICHARD T. BERNARDO, ESQUIRE
                  ANDREW KARP, ESQUIRE
10            4 Times Square
              New York, New York 10036
11            212.735.3453
              richard.bernardo@skadden.com
12            andrew.karp@skadden.com
              Counsel for the Defendant, Johnson &
13            Johnson
14
              McGIVNEY, KLUGER & COOK, P.C.
15            BY: JONATHAN C. LEE, ESQUIRE
              18 Columbia Turnpike
16            Florham Park, New Jersey 07932
              973.822.1110
17            jlee@mkclaw.us.com
              Counsel for the Defendant,
18            Whittaker, Clark & Daniels
19
              O'TOOLE, SCRIVO, FERNANDEZ, WEINER,
20            VAN LIEU, LLC
              BY: GARY VAN LIEU, ESQUIRE
21            14 Village Park Road
              Cedar Grove, New Jersey 07009
22            973.239.5700
              gvanlieu@oslaw.com
23            Counsel for the Defendant,
              Colgate-Palmolive Co.
24
25
                  MAGNA LEGAL SERVICES
```



Page 300

```
 1          APPEARANCES, continued
 2
            RAWLE & HENDERSON, LLP
 3          BY: SEBASTIAN GOLDSTEIN, ESQUIRE
            The Widener Building
 4          One South Penn Square
            Philadelphia, Pennsylvania 19107
 5          215.575.4303
            njasbestos@rawle.com
 6          Counsel for the Defendant, Cyprus
            Amax Minerals Company
 7
 8          HAWKINS, PARNELL & YOUNG, LLP
            BY: MANUEL A. GUEVARA, ESQUIRE
 9          600 Lexington Avenue, 8th Floor
            New York, New York 10022
10          646.589.8722
            mguevara@hpylaw.com
11          Counsel for the Defendant, Revlon,
            Inc.
12
13          ALSO PRESENT:
14
            Lea Callahan, Paralegal
15
            Ray Moore, Video Specialist
16
17
18
19
20
21
22
23
24
25
                 MAGNA LEGAL SERVICES
```



```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4
 5       Testimony of: NANCY MUSCO
 6       By Mr. Placitella              306
 7       By Mr. Bernardo                425
 8       By Mr. Placitella              446
 9
10
11                      -  -  -
12                E X H I B I T S
13                      -  -  -
14
         NO.           DESCRIPTION          PAGE
15
         Exhibit      Deposition of Dr.     316
16       P-6          Hopkins
17       Exhibit      Binder                317
         P-7
18
         Exhibit      Binder                318
19       P8-A
20       Exhibit      Binder                318
         P8-B
21
         Exhibit      Affidavit of Roger    333
22       P-9          Miller
23       Exhibit      Complaint and Demand for  336
         J&J-316      Trial by Jury, Gambino
24                    v. Johnson & Johnson
                      Baby Products Company
25
              MAGNA LEGAL SERVICES
```



Page 302

| | NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit J&J-337 | Defendant Johnson & Johnson Consumer Products, Inc's Supplemental Responses to Plaintiffs' Special Interrogatories, Bates Interim-Disco-00000062 through 68 | 380 |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | Exhibit J&J-326 | June 27th, 1995 memo entitled, "CTFA response to Cancer Prevention Coalition Citizen's Petition," Bates JNJ 000021285 through 322 | 382 |
| 8 | | | |
| 9 | | | |
| 10 | Exhibit J&J-216 | Memorandum dated 10/16/97, McKenna to Wiles, Sharp, Re: Coker v. Johnson & Johnson 54.212, Mesothelioma/Talc Medical Research, Bates JNJ 000319333 through 337 | 390 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | Exhibit J&J-217 | Email, Bates JNJ 000280280 | 395 |
| 16 | | | |
| 17 | Exhibit J&J-219 | Fax dated 4/17/98, Grange to O'Shaughnessy, Bates IMERYS 209394 through 397 | 397 |
| 18 | | | |
| 19 | Exhibit J&J-319 | Hobson documents | 401 |
| 20 | | | |
| 21 | Exhibit J&J-482 | Reuters article entitled, "Johnson & Johnson knew for decades that asbestos lurked in its baby powder" | 408 |
| 22 | | | |
| 23 | | | |
| 24 | Exhibit J&J-230 | Affidavit of John Hopkins | 415 |
| 25 | | | |

MAGNA LEGAL SERVICES



Page 303

```
1      NO.          DESCRIPTION              PAGE
2      Exhibit      Deposition transcript of
       J&J-294      Roger N. Miller          451
3
       Exhibit      Handwritten Notes        467
4      P-14
5      Exhibit      Copy of Hopkins chart    476
       J&J-414
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
            MAGNA LEGAL SERVICES
```



Page 304

```
 1                   -  -  -

 2           DEPOSITION SUPPORT INDEX

 3                   -  -  -

 4

 5   Direction to Witness Not to Answer

 6   Page Line     Page Line      Page Line

 7   87   20        88    17

 8

 9

10   Request for Production of Documents

11   Page Line     Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line     Page Line      Page Line

17   None

18

19

20   Question Marked

21   Page Line     Page Line      Page Line

22   None

23

24

25

              MAGNA LEGAL SERVICES
```



Page 305

```
 1                 THE VIDEOGRAPHER:  We are now
 2      on the record.
 3                 This begins DVD No. 1 in the
 4      deposition of Nancy Musco, in the matter of
 5      Foley versus Avon Products Incorporated, et
 6      al., in the Superior Court of New Jersey,
 7      Law Division, Middlesex County, Docket No.
 8      MID-L-3095-18.
 9                 Today is March 8th, 2019, and
10      the time is 10:19 AM.
11                 This deposition is being taken
12      at 56 Paterson Street, New Brunswick, New
13      Jersey, at the request of Cohen, Placitella
14      and Roth.
15                 The videographer is Ray Moore
16      of Magna Legal Services and the court
17      reporter is Connie Kent of Magna Legal
18      Services.
19                 Counsel will be noted on the
20      stenographic record.
21                 Will the court reporter please
22      swear in the witness.
23                 NANCY MUSCO, having been first
24      duly sworn, was examined and testified as
25      follows:
                   MAGNA LEGAL SERVICES
```



Page 306

```
 1                     -  -  -

 2               E X A M I N A T I O N

 3                     -  -  -

 4    BY MR. PLACITELLA:

 5         Q.    Okay.  Good morning, Ms. Musco.

 6    How are you?

 7         A.    Good morning.

 8         Q.    We're here for the second day

 9    of your deposition.

10               I think last time we were

11    together you told us that you spent

12    approximately six to seven business days

13    preparing for your deposition; is that

14    correct?

15         A.    That is correct.

16         Q.    Okay.  And since the last

17    deposition, did you review any additional

18    documents?

19         A.    I reviewed my deposition from

20    that day.

21         Q.    Other than the deposition you

22    gave your first day, did you review

23    anything else?

24         A.    I reviewed some complaint

25    files, yes.
```

MAGNA LEGAL SERVICES



Page 307

1          Q.    Okay.  What specifically did
2    you review?
3          A.    I specifically asked to see the
4    Joly file.
5          Q.    Okay.  And is there a Joly
6    file?
7          A.    When I say the file, I wanted
8    to see what the actual complaint was in
9    that case.
10         Q.    So when you said you reviewed
11   the Joly file, the only thing you asked for
12   was the complaint, nothing else?
13         A.    Well, I was curious to see what
14   the complaint was.  In this case it was not
15   talcosis, I believe it was an acute
16   bronchitis.
17         Q.    Did you understand my question?
18         A.    I believe so, yes.
19         Q.    Okay.  My question to you was:
20   Did you review -- did you ask to see
21   anything other than the complaint filed?
22         A.    I asked to see the complaint
23   filed, that was it.
24         Q.    Did you ask to see any of the
25   discovery from the Joly case?
                    MAGNA LEGAL SERVICES



Page 308

```
 1          A.     No, I did not because when I
 2     saw the complaint and saw it was acute
 3     bronchitis, I didn't think it was within
 4     the scope.
 5          Q.     Okay.  Let me ask the question
 6     again:  Did you ask to see any of the
 7     discovery from the Joly case?
 8               MR. BERNARDO:  Object to the
 9     form of the question.
10               THE WITNESS:  No, I did not.
11     BY MR. PLACITELLA:
12          Q.     Okay.  And you understand that
13     the Joly case involved alleged injury to
14     exposure to baby powder, correct?
15          A.     That was the alleged
16     allegation, yes.
17          Q.     In addition to the Joly
18     complaint, what other documents did you
19     look at?
20          A.     As I said earlier, my
21     deposition from last time we met.
22          Q.     So just the Joly complaint and
23     your deposition?
24          A.     That's correct.
25          Q.     Okay.  And did you speak to any
                 MAGNA LEGAL SERVICES
```



Page 309

1    fact witnesses?

2         A.    No, I did not.

3         Q.    Okay.  Did you discuss your --

4    the substance of your testimony with

5    Counsel?

6         A.    In general terms, yes.

7         Q.    Okay.  Did anything that -- any

8    of those discussions cause you to change

9    your testimony in any material way?

10             MR. BERNARDO:  Object to the

11   form of the question.

12             THE WITNESS:  No.

13   BY MR. PLACITELLA:

14        Q.    Okay.  And how much more time

15   did you spend between the last deposition

16   and today's deposition preparing?

17        A.    It was about three hours.

18        Q.    Three hours.

19             And during the last -- it's

20   been about three weeks since you were

21   deposed the last time?

22        A.    I believe so, yes.

23        Q.    Did you check with the Law

24   Department for any responsive answers that

25   were called for that we discussed the last

MAGNA LEGAL SERVICES



Page 310

1    time in your deposition?

2         A.    No, I had no communications

3    with them.

4         Q.    Did you check -- the last time

5    you told us that there -- there may be

6    materials that were responsive with outside

7    counsel.

8              Do you recall that?

9              MR. BERNARDO:  Object to the

10   form of the question.

11             THE WITNESS:  Yes.

12   BY MR. PLACITELLA:

13        Q.    Okay.  Did you check with

14   outside counsel to determine what

15   responsive materials were in possession of

16   your lawyers?

17        A.    No, I did not check with any

18   outside counsels.

19        Q.    Last time you told us you

20   verified interrogatories on more than one

21   occasion.

22             Do you recall that?

23        A.    Yes.

24        Q.    Did you look for any additional

25   interrogatories that you verified in



Page 311

1    addition to the Krushinski case?

2         A.    No, I did not.

3         Q.    Why not?

4         A.    Because I did not believe that

5    they were within the scope.

6         Q.    Okay.  And you, the witness,

7    were making a determination about what was

8    within and not within the scope of the

9    subpoena served on Johnson & Johnson?

10        A.    Yes, my interpretation of it

11   and also with advice of Counsel.

12        Q.    Okay.  Now, last time we

13   addressed a number of topics.  We addressed

14   Johnson & Johnson litigation history.

15             Do you recall that?

16        A.    Yes.

17        Q.    Okay.  We addressed discovery

18   Johnson -- discovery responses that Johnson

19   & Johnson says they were able to locate.

20             Do you recall that?

21        A.    Yes.

22        Q.    Okay.  We addressed

23   representations that were made in some of

24   those discovery responses.

25             Do you recall that?

                  MAGNA LEGAL SERVICES



Page 312

1        A.    Yes.

2        Q.    Okay.  We also discussed the

3   basis for the representations that were

4   made in Johnson & Johnson's discovery

5   responses, correct?

6        A.    Yes.

7        Q.    Okay.  Now, you understand

8   that -- and during the course of that

9   deposition, both you and your counsel

10  objected to the scope of a number of

11  questions that I asked you, correct?

12       A.    Yes.

13            MR. BERNARDO:  Object to the

14  form of the question.

15  BY MR. PLACITELLA:

16       Q.    Correct?

17       A.    Yes.

18       Q.    Okay.  And you understand that

19  we appeared before the court here in

20  Middlesex County to address the concerns

21  raised by your counsel, correct?

22            MR. BERNARDO:  Object to the

23  form of the question.

24            THE WITNESS:  I understand that

25  there was a conversation, yes.

                MAGNA LEGAL SERVICES



Page 313

```
 1   BY MR. PLACITELLA:

 2        Q.    And you understand that that's

 3   why we're here in the courthouse having

 4   your deposition taken as opposed to

 5   Counsel's office, correct?

 6             MR. BERNARDO:  Object to the

 7   form of the question.

 8             THE WITNESS:  I know that the

 9   venue was changed at the suggestion of the

10   court, but...

11   BY MR. PLACITELLA:

12        Q.    Okay.  Well -- so I'm going to

13   tell you what I'm going to do today so

14   we're all on the same page.  I'm going to

15   address the objections that you raised

16   directly and see if we can sort them out.

17   Okay?

18        A.    Okay.

19             MR. BERNARDO:  Objection.

20   BY MR. PLACITELLA:

21        Q.    And I'm going to hope to make

22   clear exactly what information you reviewed

23   in preparation for your deposition and what

24   was made available to you.  Okay?

25        A.    Okay.
```



Page 314

```
 1              MR. BERNARDO:  Object to the
 2    form of the question.
 3    BY MR. PLACITELLA:
 4         Q.    And when I'm done with that,
 5    I'm going to finish going through the
 6    information that we believe is relevant to
 7    this deposition.  Okay?
 8         A.    Okay.
 9         Q.    Okay.  So the last time we were
10    together, at the end of the deposition,
11    you, Johnson & Johnson, produced a number
12    of binders that were in a Bankers box.
13              Do you recall that?
14         A.    Yes, I do.
15         Q.    And you testified that those
16    binders were documents that you reviewed
17    and considered in conjunction with your
18    preparation for the deposition, correct?
19              MR. BERNARDO:  Object to the
20    form of the question and the
21    characterization of her testimony.
22              THE REPORTER:  I'm sorry.  Can
23    we go off the record for a second?
24              THE VIDEOGRAPHER:  The time is
25    now 10:27 AM.  We're going off the record.
                MAGNA LEGAL SERVICES
```



Page 315

1          (Discussion held off the

2    record.)

3          THE VIDEOGRAPHER:  The time is

4    now 10:28 AM.  We are back on the record.

5    BY MR. PLACITELLA:

6      Q.   You and your counsel

7    represented at the end of the deposition

8    that the binders that you produced were

9    documents that you reviewed and considered

10   in connection with your preparation for the

11   deposition, correct?

12         MR. BERNARDO:  Object to the

13   form of the question.

14         THE WITNESS:  Yes, there were a

15   number of binders that were in that box,

16   yes.

17   BY MR. PLACITELLA:

18      Q.   Okay.  And that you also sent

19   all of those binders with -- to John

20   Hopkins and had a conversation about them,

21   correct?

22         MR. BERNARDO:  Object to the

23   form of the question.

24         And Mr. Placitella, if we could

25   be specific because there are a lot of

               MAGNA LEGAL SERVICES



Page 316

1    binders and I don't think her testimony was

2    that all of them were sent.

3              I'm just asking that you let

4    her see so we can be clear as to what was

5    sent and not sent to have a clear record.

6              MR. PLACITELLA:  Okay.

7    BY MR. PLACITELLA:

8         Q.    So you have all the binders in

9    front of you to your right.

10              Do you see them?

11        A.    I see binders, yes.

12        Q.    Okay.  And do we need to go

13   through them again so we're all on the

14   same --

15        A.    Well, I need to be familiar

16   with what specifically they are, yes.

17        Q.    Okay.  So why don't we start

18   with the lowest numbered binder, which I

19   think is 6.

20        A.    Yes, 6 is the lowest.

21        Q.    Okay.  So what is 6?

22        A.    It is the deposition of

23   Dr. Hopkins --

24        Q.    Okay.

25        A.    -- and testimony.

                MAGNA LEGAL SERVICES



Page 317

1          Q.     And you reviewed that?

2          A.     I reviewed that, yes.  This --

3     I did not send this or we did not send this

4     to Dr. Hopkins, but I reviewed it.

5          Q.     Okay.  And then the next binder

6     is what?

7          A.     This would be P-7.

8          Q.     Uh-huh.  And P-7 is what?

9          A.     This looks to be different

10    complaint cases, first one being Selby.

11         Q.     Do you recall reviewing this

12    binder?

13         A.     Yes.

14         Q.     Okay.  And did you send this to

15    Dr. Hopkins?

16         A.     No.

17         Q.     Okay.  But it was one of the

18    binders that you --

19         A.     It was in the box that we

20    presented to you.

21         Q.     And that you relied upon?

22                MR. BERNARDO:  Object to the

23    form of the question.

24    BY MR. PLACITELLA:

25         Q.     You reviewed it in preparation

                  MAGNA LEGAL SERVICES



Page 318

1    for your deposition?

2          A.    I reviewed, yes.

3          Q.    Okay.  And what's the next

4    numbered binder?

5          A.    P-8A.

6          Q.    All right.  Is there an 8A and

7    an 8B?

8          A.    Yes, there is.

9          Q.    And what are they collectively?

10         A.    They are a lot of it looks like

11   testing material.

12         Q.    And this -- did you review 8A

13   and 8B in preparation for your deposition?

14         A.    I did not review each one of

15   these, but I was familiar with these and I

16   believe these were sent to Dr. Hopkins.

17         Q.    And then you had a conversation

18   with Dr. Hopkins about those binders?

19         A.    We had a conversation -- a

20   specific conversation about certain

21   testing.

22         Q.    But -- so those binders were

23   produced as documents you relied upon for

24   your deposition, correct?

25                MR. BERNARDO:  Object to the

                  MAGNA LEGAL SERVICES



Page 319

1    form of the question.

2              THE WITNESS:  I looked at them,

3    I cannot tell you everything that's in

4    them, and they were a basis, yes.

5    BY MR. PLACITELLA:

6         Q.    Okay.  And all those binders

7    were also sent to -- those binders were

8    sent to Dr. Hopkins, correct?

9         A.    Yes, 8A and 8B.

10        Q.    Okay.  And you identified them

11   at the end of the last deposition as part

12   of your reliance materials, correct?

13             MR. BERNARDO:  Object to the

14   form of the question.

15             THE WITNESS:  They're part of

16   what I saw, yes.

17   BY MR. PLACITELLA:

18        Q.    Okay.  And then what's the next

19   numbered --

20        A.    P-9.

21        Q.    P-9 is what?

22        A.    This was something that you

23   sent to -- to my counsel right before our

24   last deposition I believe.

25        Q.    Right.  You understand that I

                MAGNA LEGAL SERVICES



Page 320

```
 1   had an agreement with your counsel that any

 2   document that Johnson & Johnson did not

 3   produce directly and was not admitted into

 4   a trial or prior deposition that I located

 5   I would send to Counsel so they could share

 6   it with you.

 7           You understand that, correct?

 8           MR. BERNARDO:  Object to the

 9   form of the question.

10           THE WITNESS:  I don't know

11   exactly what your agreement was.

12   BY MR. PLACITELLA:

13      Q.   Okay.  Well, did you review

14   that binder?

15      A.   I did see this, yes.

16      Q.   Okay.  Now, in the last

17   deposition, you were asked specific

18   questions about the Edley -- the Edley

19   case.

20           Do you recall that?

21      A.   I remember the name.

22      Q.   Correct?

23      A.   I remember that name, yes.

24      Q.   Okay.  In fact, I asked you

25   multiple questions about the Edley case,
```

                    MAGNA LEGAL SERVICES



Page 321

1   correct?

2        A.    I believe so.

3        Q.    And every time I asked you a

4   question about the Edley case, your

5   response to me was basically you don't know

6   anything about the Edley case, you've never

7   seen anything about the Edley case,

8   correct?

9            MR. BERNARDO:  Object to the

10   form of the question.

11            THE WITNESS:  Yes, because my

12   understanding was it was not within the

13   scope of the notice.

14   BY MR. PLACITELLA:

15        Q.    Okay.  Well, let's make sure

16   we're on the same page here.  So if --

17            MR. PLACITELLA:  Do you have

18   the iPad?

19   BY MR. PLACITELLA:

20        Q.    Under oath on page 105, you

21   state:  I'm not familiar with the cases,

22   and that includes the Edley and the Yuhas

23   case, right?

24        A.    That's correct.

25        Q.    Okay.  And then on page 220 and

            MAGNA LEGAL SERVICES



Page 322

1    221, you were asked again whether in

2    preparation for the deposition you ever

3    reviewed any information concerning the

4    Edley case and you said no, correct?

5         A.    That's correct.

6         Q.    And then on 21, I said:

7              "So Johnson & Johnson doesn't

8    know anything about the Edley case?"

9              Mr. -- Mr. Bernardo objected

10   that it was beyond the scope, and you said:

11             "In preparation for today, I

12   did not review that case."

13             Correct?

14             MR. BERNARDO:  Objection to the

15   form of the question.

16             THE WITNESS:  That's correct.

17   BY MR. PLACITELLA:

18        Q.    And you repeated again in

19   response to questions on 221, that you knew

20   nothing about the Edley case, correct?

21        A.    That's correct.

22        Q.    And then on -- I'm sorry.

23   That's the problem.  Then on 2 -- page

24   223 or 224, I asked you -- and 225, I asked

25   you questions about an affidavit that was

                MAGNA LEGAL SERVICES



Page 323

1    filed in the Edley case by Roger Miller.

2              Do you recall that?

3              MR. BERNARDO:  Object to the

4    form of the question.

5              And I'm just going to renew the

6    same objections I made in the transcript

7    that you're referring to --

8              MR. PLACITELLA:  Okay.

9              MR. BERNARDO: -- so as not to

10   interrupt these questions.

11             MR. PLACITELLA:  All right.

12   BY MR. PLACITELLA:

13        Q.    Correct?  I asked you about the

14   Miller affidavit --

15        A.    Yes, you did.

16        Q.    -- from the Edley case?

17             And I showed you the affidavit

18   and you said you didn't know anything about

19   it, right?

20             MR. BERNARDO:  Object to the

21   form of the question.

22             THE WITNESS:  I was not

23   familiar with it, no.

24   BY MR. PLACITELLA:

25        Q.    Okay.  And then on page 227, I

                 MAGNA LEGAL SERVICES



Page 324

```
 1    asked you again about the Miller affidavit

 2    submitted in the Edley case.

 3              Do you see that?

 4        A.    Yes.

 5              MR. BERNARDO:  Object to the

 6    form of the question.  Same objection.

 7    BY MR. PLACITELLA:

 8        Q.    And then again your counsel

 9    objected and you said you didn't know

10    anything about it, right?

11              MR. BERNARDO:  Object to the

12    form of the question.  Same objection.

13              THE WITNESS:  Yes, because I

14    did not believe it was in the scope, so I

15    had not reviewed it, no.

16    BY MR. PLACITELLA:

17        Q.    Okay.  Can you go to the 8A

18    binder, please?

19              This is one of the binders you

20    reviewed in preparation for your

21    deposition, correct?

22        A.    This was the basis of one --

23    one of -- some of the conversations that I

24    had in preparation for this.

25        Q.    Okay.
```

                    MAGNA LEGAL SERVICES



Page 325

```
 1        A.    Yes.
 2        Q.    And under 8A, can you go to tab
 3   33, please?
 4        A.    33 in 8A?
 5        Q.    33 in 8A.
 6              Now, 33 in the -- in your
 7   binder, 8A, is captioned in the Edley case,
 8   correct?
 9        A.    I'm not seeing that it says
10   Edley here.  Oh, yes, okay.
11        Q.    Edley.  And can you turn to the
12   next page in your binder?  You see there's
13   an affidavit in the Edley case?
14        A.    Yes.
15        Q.    Right?  And that affidavit is
16   sworn to by Roger Miller, correct?
17        A.    I see that, yes.
18        Q.    All right.  And the date for
19   that affidavit -- and that's his signature,
20   and the date for that affidavit is 1991,
21   correct?
22        A.    Yes.
23        Q.    Okay.  And he was the president
24   of your mining company, correct?
25              MR. BERNARDO:  Object to the
                MAGNA LEGAL SERVICES
```



Page 326

```
 1   form of the question and beyond the scope
 2   of the notice.
 3              The witness can answer in her
 4   personal capacity, and I'll assert this for
 5   any questions on --
 6              MR. PLACITELLA:  You can assert
 7   all you want, but --
 8              MR. BERNARDO:  Mr.
 9   Placitella --
10              MR. PLACITELLA:  -- it's in her
11   review materials.
12              I just want to make clear so I
13   court that listens to your objections about
14   scope understands exactly what we're
15   talking about.
16              MR. BERNARDO:  And I appreciate
17   that, Mr. Placitella.  I'm not trying to
18   pick a fight here and you seem to be
19   getting angry.
20              MR. PLACITELLA:  I'm not angry.
21              MR. BERNARDO:  But you
22   interrupted my objection, and I'm simply
23   trying to preserve it for the record so
24   that I don't repeat it and interrupt your
25   questioning.
```

                    MAGNA LEGAL SERVICES



Page 327

```
 1                So I'm asking for a running

 2    objection with respect to questions about

 3    this affidavit.

 4                MR. PLACITELLA:  Okay.  You

 5    have any running objection you want about

 6    what's ever in the books that she reviewed.

 7    How's that?

 8                MR. BERNARDO:  Thank you.

 9                MR. PLACITELLA:  Okay.

10    BY MR. PLACITELLA:

11        Q.    So what he says is:

12                "I'm the president of Windsor

13    Minerals."

14                Correct?

15        A.    I see that in the second

16    paragraph, yes.

17        Q.    And what he says is that:

18                "The exclusive business of

19    Windsor Minerals has been for the last

20    18 years, the mining and milling of talc

21    from a single mining district in Windsor,

22    Vermont."

23                Correct?

24        A.    That's what it says here.

25        Q.    Okay.  And:

                MAGNA LEGAL SERVICES
```



Page 328

1              "The mining district is the

2      exclusive source for all of the Johnson's

3      Baby Powder sold in the United States."

4              Correct?

5      A.      That's what it says here.

6      Q.      Okay.  It says:

7              "In addition to supplying the

8      talc for Johnson's Baby Powder, Windsor

9      Minerals also sells a portion of its

10     product to independent industrial users."

11             Correct?

12     A.      That's what it says.

13     Q.      Okay.  And what he swears to

14     under oath, he says:

15             "All of the talc mined by

16     Windsor Minerals, Inc., whether it is

17     ultimately sold to industrial users or used

18     in Johnson's Baby Powder, is sampled and

19     tested for the presence of asbestos."

20             Correct?

21     A.      That's what he says.

22     Q.      And he swears under oath:

23             "No evidence of the presence of

24     asbestos in Windsor Minerals product has

25     ever been revealed by this testing."

                MAGNA LEGAL SERVICES



Page 329

```
 1              Correct?
 2       A.    That's what it says, yes.
 3       Q.    Okay.  And then this affidavit
 4  was then used to have Mr. Edley, right here
 5  in this courthouse, dismiss his lawsuit
 6  based upon the representations made by
 7  Windsor Minerals and Johnson & Johnson,
 8  correct?
 9              MR. BERNARDO:  Object to --
10  object to the form of the question.  Well
11  beyond the scope of the notice.
12              You can answer in your
13  individual capacity.
14              THE WITNESS:  I -- that seems
15  to be a legal question.  I don't know what
16  was used or what wasn't used.
17  BY MR. PLACITELLA:
18       Q.    Okay.  Well, let's go to the
19  cover letter that's in your binder.
20              You see there's a binder
21  here -- a letter on July 23rd, 1997?
22       A.    Which tab is that?
23       Q.    It's still under tab 33.
24              MR. BERNARDO:  And same
25  objection with respect to the use of this
```
                   MAGNA LEGAL SERVICES



Page 330

1    document and questions pertaining to it.

2            MR. PLACITELLA:  You can have a

3    running objection to every question I ask

4    about what's in her binder.

5            MR. BERNARDO:  Okay.  From time

6    to time --

7            MR. PLACITELLA:  You don't have

8    to keep doing it.

9            MR. BERNARDO:  From time to

10   time, I will renew it.

11           MR. PLACITELLA:  Okay.

12           THE WITNESS:  What are you

13   referring to here?

14   BY MR. PLACITELLA:

15       Q.    The July 23rd, 1987 letter.

16       A.    I see that, yes.

17       Q.    Okay.  And these -- this is

18   from your lawyers to Ronald Grayzel, who

19   has an office right here in Edison,

20   New Jersey.

21           Do you see that?

22       A.    I see that's the address here,

23   yes.

24       Q.    Right.  And your lawyer's

25   offices are right here two blocks from the

                    MAGNA LEGAL SERVICES



Page 331

1    courthouse.

2              Do you see that?

3        A.    I don't -- I see that there's

4    some of the addresses.  I don't even know

5    who any of these people are, so that's what

6    it says here.

7        Q.    And it says:

8              "Dear Mr. Grayzel, Enclosed

9    please find the affidavit on behalf of

10   Windsor Minerals signed by Roger Miller,

11   president of Windsor Minerals since 1968.

12   Also enclosed you'll find an assay from

13   McCrone Environmental Services."

14             Do you see that?

15       A.    That's what it says.

16       Q.    "I trust that these documents

17   will now enable you to sign a dismissal as

18   was done in the Yuhas file."

19             Do you see that?

20       A.    That's what it says.

21       Q.    Okay.  And then if you go to

22   the first page in your tab 33, on the same

23   exact date that your letter was sent,

24   Mr. Grayzel signed a stipulation of

25   dismissal with prejudice dismissing his

                MAGNA LEGAL SERVICES



Page 332

```
 1   client's case against your company,

 2   correct?

 3               MR. BERNARDO:  Object to the

 4   form of the question.

 5               THE WITNESS:  That's what it

 6   says here.

 7   BY MR. PLACITELLA:

 8       Q.    Right.  Now, you also stated in

 9   your prior deposition that you have no

10   knowledge of the Yuhas case and what

11   happened to it, correct?

12       A.    And that's correct.

13       Q.    But actually you do know what

14   happened to it because in your tab 33, your

15   lawyers make clear what happened to the

16   Yuhas file, it was dismissed just like the

17   Edley case, correct?

18               MR. BERNARDO:  Object --

19   BY MR. PLACITELLA:

20       Q.    That's what it says.

21               MR. BERNARDO:  Object to the

22   form of the question.

23               THE WITNESS:  That's what it

24   says here, yes.

25   BY MR. PLACITELLA:
```



MAGNA LEGAL SERVICES

Page 333

1          Q.     Now, do you recall I asked you

2    last time whether Mr. Miller had signed

3    other similar affidavits during the course

4    of the litigation that were used to get

5    people to dismiss their cases.

6                 Do you recall that?

7          A.     I don't recall that specific

8    question, no.

9          Q.     Do you recall whether I asked

10   you about the Faye Miller case?

11         A.     I don't remember that, no.

12         Q.     Can you go to your binder, P-9.

13   P-9, if you flip to, like, the third page

14   is an affidavit in the Faye Miller case

15   signed by Roger Miller.

16                Do you see that?  I put it up

17   on the screen.

18         A.     I see that on the screen, yes.

19         Q.     All right.  And again, Roger

20   Miller states under oath:

21                "All of the talc mined by

22   Windsor Minerals has been regularly sampled

23   and tested for the presence of asbestos.

24   No evidence of the presence of asbestos in

25   Windsor Minerals product has ever been

                 MAGNA LEGAL SERVICES



Page 334

```
 1    revealed by this testing."
 2              Correct?
 3              MR. BERNARDO:  Object to the
 4    form of the question.
 5    BY MR. PLACITELLA:
 6        Q.    That's what he says, right?
 7              MR. BERNARDO:  Beyond the
 8    scope.
 9              You can answer in your
10    individual capacity if you can.
11              THE WITNESS:  I see that it
12    says that there, yes.
13    BY MR. PLACITELLA:
14        Q.    Okay.  And the last time we
15    were together, you also testified under
16    oath that the only thing you reviewed in
17    reference to the Gambino case was the
18    complaint as that was all that was
19    available.
20              Do you recall that testimony?
21        A.    I remember talking about the
22    Gambino, yes.  And I reviewed -- or I --
23    the things that I reviewed were any
24    responses to discovery questions or
25    interrogatories.
```



Page 335

1          Q.    Okay.  So let's -- let's look

2     at, to be clear, what your testimony was as

3     it related to the Gambino case.

4                On page 105, I first raised the

5     Gambino case with you.  I said:

6                "What do you know about the

7     Gambino case?"

8                And you wrote (sic):

9                "That is the one -- one of the

10    ones that was listed which you requested

11    documents, but I -- that's why I asked for

12    that chart, to refresh myself, because the

13    top of my head (sic), I don't remember what

14    Gambino was."

15               Do you remember that?

16         A.    Yes.

17         Q.    Okay.  And then on page 214, I

18    asked you additional questions about the

19    Gambino case, and 215.  And I asked you:

20               "So in the same years that the

21    scientists testified that the mines once

22    owned by Johnson & Johnson contained

23    asbestos, you were sued in Middlesex County

24    in the Gambino case, correct?"

25               Mr. -- Mr. Bernardo objects to

                    MAGNA LEGAL SERVICES



Page 336

1    the scope of my question, and I said:

2              "Here, I put it up there for

3    you.  It's 291.  Do you see that?

4              "All I know is the years are

5    the same.

6              "Right.  In Middlesex County,

7    New Jersey.  Do you see that?

8              "I see that, yes.

9              "And it involved baby powder,

10   correct?

11             "Answer:  I see that.

12             "And according to your earlier

13   testimony, your lawyers didn't have any

14   other information on Gambino to provide to

15   you."

16             And you said under oath:

17             "There were no discovery

18   records."

19             Do you recall that testimony?

20        A.   Yes.

21        Q.   Okay.

22             MR. PLACITELLA:  Can you give

23   me J&J 316, please?

24   BY MR. PLACITELLA:

25        Q.   J&J-316 is the Gambino file

                  MAGNA LEGAL SERVICES



Page 337

1    obtained from the Middlesex County

2    Courthouse, and if you flip through it,

3    there are interrogatory answers on behalf

4    of Johnson & Johnson.

5              Do you see that?

6              MR. BERNARDO:  Object to the

7    form of the question.

8              I'm also going to object,

9    Chris, because, for purposes of allowing

10   the witness to be prepared, it was my

11   understanding, and perhaps I misunderstood,

12   that we had an agreement that if you were

13   going to ask the witness questions about

14   documents that you found or obtained from a

15   court file, that they would be provided in

16   advance so the witness would have an

17   opportunity to review them.

18             Having made that objection, the

19   witness can respond as she can.

20             MR. PLACITELLA:  Well, I'm

21   going to put a response to that on the

22   record when somebody reads this.

23             Our agreement was I would

24   provide you any documents that I located

25   that weren't used in prior Johnson &

                 MAGNA LEGAL SERVICES



Page 338

 1    Johnson depositions or admitted at trial

 2    against Johnson & Johnson.  That was our

 3    agreement.

 4    BY MR. PLACITELLA:

 5         Q.    Ms. Musco, did you know that

 6    this -- that these sets of interrogatories

 7    were testified to by Dr. Hopkins in his

 8    deposition?

 9              MR. BERNARDO:  Object to the

10    form of the question.

11              THE WITNESS:  No.

12    BY MR. PLACITELLA:

13         Q.    Did you know that they were

14    actually used in trial here in Middlesex

15    County in this very courtroom?

16         A.    No, I do not know that.

17         Q.    And when you said that there

18    were no discovery responses available in

19    the Gambino case under oath, these were

20    responses that were never supplied to you,

21    and I'm talking about you, I mean Johnson &

22    Johnson's representative --

23              MR. BERNARDO:  Object --

24    BY MR. PLACITELLA:

25         Q.    -- correct?

                  MAGNA LEGAL SERVICES



Page 339

 1                    MR. BERNARDO:  Object to the
 2      form of the question.
 3                    THE WITNESS:  I did not see
 4      these before, no.
 5      BY MR. PLACITELLA:
 6          Q.    Okay.  So when you testified
 7      before under oath that Johnson & Johnson
 8      did not have any discovery responses as it
 9      related to the Gambino case, that was, in
10      fact, a false statement, correct?
11                    MR. BERNARDO:  Object to the
12      form of the question.
13                    THE WITNESS:  To the best of my
14      understanding, it was true at the time.
15      BY MR. PLACITELLA:
16          Q.    But what -- but it really was a
17      false statement, ma'am.  I'm not talking
18      about you, Nancy Musco, I'm talking about
19      Johnson & Johnson.  You're here on behalf
20      of Johnson & Johnson, and clearly Johnson &
21      Johnson had this information in its
22      possession when you testified the first
23      time that there were no discovery responses
24      available from the Gambino case, correct?
25                    MR. BERNARDO:  Object to the
                     MAGNA LEGAL SERVICES



Page 340

1    form of the question and to the

2    characterization of her prior testimony.

3              THE WITNESS:  I don't know

4    that.

5    BY MR. PLACITELLA:

6        Q.    Okay.  You -- last time I asked

7    you about --

8              MR. PLACITELLA:  Do you have

9    the Hopkins chart?

10   BY MR. PLACITELLA:

11       Q.    Last time I asked you some

12   questions about a chart that Dr. Hopkins

13   prepared during his testimony.

14             Do you recall that?

15       A.    Yes.

16       Q.    And what you told me under oath

17   was that you never looked at the Hopkins

18   chart in preparation for your deposition,

19   correct?

20       A.    That was correct, yes.

21       Q.    And you said that you were

22   never shown the Hopkins chart in

23   preparation for your deposition, correct?

24       A.    I had not seen it specifically,

25   no.

              MAGNA LEGAL SERVICES



Page 341

1          Q.    And you further testified under

2     oath that you never discussed the Hopkins

3     chart with Dr. Hopkins himself, correct?

4          A.    No, I did not.

5          Q.    Okay.   Now, can you go to book

6     8B?  And can you turn to tab 78, please?

7                Now, in your book that you gave

8     me last -- at the end of the last

9     deposition -- are you with me?  Are you on

10    tab 78?  Yes?

11         A.    I am.

12         Q.    And what you have on tab 78 is

13    a chart with Exhibit No. Hopkins 28,

14    correct?

15         A.    That's what it says, yes.

16         Q.    Okay.  And what you have in

17    front of you, can you hold it up, is the

18    big version of that chart so you can read

19    it, correct?  I have one here.

20         A.    It looks to be the same, yes.

21         Q.    All right.  Hopkins-28, right?

22         A.    That's what it's called, yes.

23         Q.    Hopkins-28, the big version I

24    have, is the blowup of the same chart in

25    your book tab No. 78, correct?

                MAGNA LEGAL SERVICES



Page 342

1          A.     Yes.

2          Q.     Okay.  And the last time we

3     were together I asked you questions about

4     the Westfall case.

5               Do you recall that?

6          A.     Yes, I do.

7          Q.     Okay.  And I think you said

8     that you were vaguely familiar with the

9     Westfall case, is that fair?

10         A.     Yes.

11         Q.     And that you denied any

12    knowledge that the mine at issue in the

13    Westfall case had asbestos in it, correct?

14              MR. BERNARDO:  Object to the

15    form of the question, beyond the scope of

16    the notice, and the witness --

17              THE REPORTER:  I'm sorry, sir?

18              MR. BERNARDO:  Object to the

19    form of the question, beyond the scope of

20    the notice.

21              The witness may answer in her

22    personal capacity if she knows.

23              THE WITNESS:  What was the

24    question?

25    BY MR. PLACITELLA:

                   MAGNA LEGAL SERVICES



Page 343

```
 1        Q.    In your -- well, let's just go
 2   to your testimony.
 3              I asked you on page 85:
 4              "You knew the mine that was
 5   owned by Johnson & Johnson that was the
 6   issue in the Westfall case had asbestos in
 7   it."
 8              Mr. Bernardo objected.  I
 9   responded again:
10              "You knew that?"
11              And your response was:
12              "No, I did not.  I did not go
13   into that detail with this because it was
14   industrial talc."
15              Do you see that?
16        A.    Yes.
17        Q.    Okay.  And I then asked you if
18   you ever read the deposition of the
19   scientist who was deposed in the -- in the
20   Westfall case.
21              Do you recall that?
22        A.    Specifically, no.
23        Q.    Okay.  Well, let's go to your
24   testimony.
25              You see that on page 206, I
```



Page 344

1    said:

2              "You never knew before you came

3    here today that Johnson & Johnson's lawyers

4    sat in a deposition where the scientists

5    who did the tests on the Johnson & Johnson

6    mine said they found asbestos in the mine?

7    You never knew that?"

8              And then there was an objection

9    by Mr. Bernardo, artfully so, and --

10             MR. BERNARDO:  Which he renews

11   here.

12             MR. PLACITELLA:  Which he can

13   renew here all he wants.  Thank you.

14   BY MR. PLACITELLA:

15        Q.    And I handed you the transcript

16   of Dr. Glen Hemstock.

17             Do you see that?

18        A.    I see that, yes.

19        Q.    And then when I handed it to

20   you, your attorney, Mr. Bernardo said:

21             "And the same objection to

22   asking the witness about depositions.  It's

23   beyond the scope and she's not read the

24   deposition."

25             Do you see that?

                    MAGNA LEGAL SERVICES



Page 345

1       A.      Yes.

2       Q.      Okay.  And then I actually

3   pulled out the Hemstock deposition and

4   showed it to you and showed you where the

5   general counsel from Johnson & Johnson was

6   sitting in a deposition.

7               Do you recall that?

8       A.      I recall you showing me that,

9   yes.

10      Q.      Okay.

11              MR. BERNARDO:  Same objections

12  as stated in that transcript.

13  BY MR. PLACITELLA:

14      Q.      And do you recall that I --

15  that I --

16              MR. BERNARDO:  Same objections

17  as stated in that transcript.

18  BY MR. PLACITELLA:

19      Q.      That I pointed to you on page

20  17 of the transcript, and showed you where

21  the scientist testified under oath that he

22  found asbestos in the Johnson mine?

23              Do you see that?

24      A.      I see that conversation --

25      Q.      Okay.

                MAGNA LEGAL SERVICES



Page 346

1          A.      -- from last time, yes.

2          Q.      And I asked you:

3                  "That information was never

4     relayed to you as the person who was either

5     testifying here today or who certified

6     interrogatory answers on behalf of Johnson

7     & Johnson, correct?"

8                  And your answer to me was,

9     under oath:

10                 "I have not seen this before,

11    no. "

12                 Correct?

13         A.      I had not seen what you showed

14    me, no.

15         Q.      Okay.  Can you go to, in your

16    book, in your reliance book, 8B, tab 55.

17                 You see at tab 55 in your

18    reliance materials --

19         A.      I see --

20         Q.      -- is the deposition in the

21    Westfall case of Glen Hemstock?

22                 MR. BERNARDO:  Object to the

23    form of the question.

24    BY MR. PLACITELLA:

25         Q.      Do you see that?

                   MAGNA LEGAL SERVICES



Page 347

```
 1        A.    I see that.

 2        Q.    Okay.  And do you see that

 3   present at the deposition was the general

 4   counsel for Johnson & Johnson?

 5        A.    Where -- where am I seeing

 6   that?

 7        Q.    The third page, you flip it

 8   over, and in your book it says, John M.

 9   Beidler, Esquire, General Counsel, Johnson

10   & Johnson.

11              Do you see that?

12        A.    Yes.

13        Q.    Okay.  And then if you flip to

14   your tab 57, there's the continuation of

15   Dr. Hemstock's deposition in the Westfall

16   case, correct?

17        A.    That's what it says, yes.

18        Q.    Okay.  And if you turn to page

19   17 of the deposition in your book.  Got it?

20        A.    Yes.

21        Q.    The scientist is asked:

22              "Now, you testified that your

23   department has tested both processed talc

24   and raw talc ore from the Emtal mine for

25   the presence of chrysotile asbestos; is
```



Page 348

1    that correct?

2              "Answer:  Yes.

3              "Has your department in its

4    research found chrysotile asbestos in both

5    processed talc and raw ore from the Emtal

6    mine?

7              "Answer:  Yes."

8              Do you see that?

9       A.    I see it says that, yes.

10      Q.    Okay.  Now, in your deposition

11   at page 268, I asked you under oath if you

12   had any information related to the

13   affidavit signed by your scientist, William

14   Ashton.

15             Do you recall that?

16      A.    Yes.

17             MR. BERNARDO:  Object to the

18   form of the question, and a running

19   objection with respect to this affidavit

20   beyond the scope --

21             MR. PLACITELLA:  Okay.

22             MR. BERNARDO:  -- of the

23   notice.

24   BY MR. PLACITELLA:

25      Q.    Do you see that?

                MAGNA LEGAL SERVICES



Page 349

```
 1                  MR. BERNARDO:  She can answer
 2   in her individual capacity.
 3                  THE REPORTER:  I'm so sorry.
 4   Can we go off the record?
 5                  THE VIDEOGRAPHER:  The time is
 6   now 11:05 AM.  We are going off the record.
 7                  (Discussion held off the
 8   record.)
 9                  THE VIDEOGRAPHER:  The time is
10   now 11:07 AM.  We are back on the record.
11   BY MR. PLACITELLA:
12        Q.    Okay.  So I'm going to go to --
13   I asked you questions, if you recall, about
14   what was attached to Dr. Ashton's
15   affidavit, and I asked you whether he
16   had -- attached to that affidavit was
17   testimony from the Westfall case.
18                  Do you recall that?
19        A.    I recall discussing IT, yes.
20        Q.    Okay.  And do you recall your
21   telling me you had no idea what was
22   attached to the Ashton affidavit?
23        A.    I had not seen it before.
24        Q.    Right.  And what you testified
25   to under oath was that you had -- you had
```



Page 350

1    never seen and had -- did not have the

2    Ashton affidavit available to you, correct?

3                 MR. BERNARDO:  Object to the

4    form of the question.

5                 THE WITNESS:  I believe I told

6    you in the beginning when we talked about

7    Westfall that because it was dealing with

8    industrial talc, I did not feel it was

9    within -- within the scope of the notice

10   that you had sent.

11   BY MR. PLACITELLA:

12       Q.    Ma'am, you testified under oath

13   that you had never seen the Ashton

14   affidavit and you didn't know anything

15   about it, correct?

16                MR. BERNARDO:  Object to the

17   form of the question.

18                THE WITNESS:  Yes, that's

19   correct.

20   BY MR. PLACITELLA:

21       Q.    Okay.  So can we go to your

22   reliance materials on 8B, No. 53.

23                MR. BERNARDO:  Object to the

24   form of the question.

25   BY MR. PLACITELLA:

                MAGNA LEGAL SERVICES



Page 351

1          Q.    And actually, in your reliance

2    materials under tab 53 is the Ashton

3    affidavit, correct?

4               MR. BERNARDO:   Object to the

5    form of the question.

6               THE WITNESS:   That's what it

7    says here.

8    BY MR. PLACITELLA:

9          Q.    Okay.  And what Dr. Ashton says

10   in his affidavit is:

11              "From the 1940s through the

12   1980s, talc mined in Vermont, and

13   specifically the talc mined by Engelhard

14   and its predecessors from the talc mine

15   located in Johnson, Vermont, (the Johnson

16   mine), has been considered to be talc-free

17   from contamination by asbestos."

18              Correct?

19         A.    That's what it says.

20         Q.    Okay.  And in paragraph 8 of

21   your executive's affidavit, Mr. Ashton, he

22   talks about attaching the testimony of

23   Dr. Chidester.

24              Do you see that?

25         A.    I see it says that.

                 MAGNA LEGAL SERVICES



Page 352

1         Q.    It says:

2              "Dr. Chidester stated that he

3    never found veins of chrysotile asbestos in

4    talc located in Vermont."

5              Do you see that?

6         A.    I see that sentence, yes.

7         Q.    Okay.  And then what one of the

8    documents that you, Johnson & Johnson,

9    attached to this affidavit was the

10   deposition of Dr. Chidester from the

11   Westfall case, correct?

12             MR. BERNARDO:  Object to the

13   form of the question.  Also object to the

14   use of this document, beyond the scope of

15   the notice.

16             THE WITNESS:  I guess that's

17   attached.  I -- I don't know.

18   BY MR. PLACITELLA:

19        Q.    And that's the same case -- the

20   same docket number as the Hemstock

21   deposition that you have also attached to

22   your reliance materials as tab 57, right?

23             MR. BERNARDO:  Object to the

24   form of the question.

25             THE WITNESS:  I don't know.

              MAGNA LEGAL SERVICES



Page 353

1    BY MR. PLACITELLA:

2         Q.   Well, let's take a look.  I

3    flipped it for you.  You see Westfall,

4    Docket No. 0269?

5         A.   Yes, I see it says that.

6         Q.   Right.  You see the Chidester

7    deposition, Docket No. 0269 in your

8    reliance materials?

9         A.   Uh-huh, yes.

10        Q.   Okay.  Now, when you attached

11   that affidavit -- when you attached that

12   transcript to the -- to the -- to your

13   affidavit, I mean, you, Johnson & Johnson,

14   you knew that Dr. Chidester had told you

15   privately that he actually found asbestos

16   in Vermont mines, correct?

17             MR. BERNARDO:  Object to the

18   form of the question, beyond the scope of

19   the notice.

20             You can answer in your

21   individual capacity if you can.

22             THE WITNESS:  I know nothing

23   about that, no.

24   BY MR. PLACITELLA:

25        Q.   Okay.  Well --

             MAGNA LEGAL SERVICES



Page 354

1          MR. PLACITELLA:  Can you give

2    me P-7?

3    BY MR. PLACITELLA:

4          Q.    Can you go to your binder P-7,

5    please?

6               P-7, by the way, was this one

7    of the reliance documents that you sent to

8    Dr. Hopkins?

9          MR. BERNARDO:  Objection to the

10   form of the question.

11         THE WITNESS:  No.  8A and 8B

12   were sent to Dr. Hopkins.

13   BY MR. PLACITELLA:

14         Q.    Okay.  So can we go to tab 25?

15         A.    In P-7?

16         Q.    Yes, in P-7.  You see tab 25 in

17   P-7 are actually your answers to

18   interrogatories in the Westfall case?

19               Do you see that?

20         A.    Yes, they seem to be.

21         Q.    Okay.  And if you go to page

22   5 -- there's a thing that says, "As to AH

23   Chidester."

24               Do you see that?

25         A.    Yes.

                    MAGNA LEGAL SERVICES



Page 355

1        Q.    And it says, under Q5:

2              "Have you ever found asbestos

3     present in any testing of minerals taken

4     from Vermont?"

5              Do you see that?

6        A.    I see that question, yes.

7        Q.    And he -- and the response from

8     Dr. Chidester is:

9              "Yes.  Asbestos is not found

10    in -- is not found in a mineral, asbestos

11    was tested by chemical analysis, x-ray and

12    differential thermo analysis.  The asbestos

13    found was chrysotile."

14             Correct?

15             MR. BERNARDO:  Object to the

16    form of the question, beyond the scope of

17    the notice.

18             She can answer in her

19    individual capacity if she can.

20             THE WITNESS:  I see all that

21    written here.

22    BY MR. PLACITELLA:

23        Q.    That statement is directly

24    contrary to the sworn affidavit of Johnson

25    & Johnson in the Ashton affidavit saying

                    MAGNA LEGAL SERVICES



Page 356

```
 1   asbestos was never found in Vermont,
 2   correct?
 3            MR. BERNARDO:  Object to the
 4   form of the question.
 5            THE WITNESS:  I can't answer
 6   because it's taken out of content (sic).  I
 7   don't know what came before or after.
 8   BY MR. PLACITELLA:
 9       Q.   Okay.  Well, what content (sic)
10   do you need?  These are your answers.
11            MR. BERNARDO:  Object to the
12   form of the question.
13            THE WITNESS:  The complete
14   studies and what he's referring to and --
15   BY MR. PLACITELLA:
16       Q.   Well, where are they?
17       A.   Well, what was done, when I
18   talked to Dr. Hopkins, I wanted to make
19   sure that he was familiar with any
20   allegations and evidence that had been
21   brought forth, and so we had conversations
22   about all this and really renewed my
23   understanding that there is no asbestos in
24   the cosmetic talc used in Johnson's Baby
25   Powder.
```

MAGNA LEGAL SERVICES



Page 357

```
 1          Q.    Okay.  Ma'am, your -- I move to
 2    strike your answer as non-responsive.
 3                Let me move further to Section
 4    C, page 9.
 5                Do you see that?  In your
 6    answers to interrogatories.  Do you see
 7    that?
 8          A.    I see Section C, yes.
 9          Q.    And you see this goes -- and
10    it -- these are questions as it relates to
11    Dr. Frederick Pooley.
12                Do you see that?
13          A.    I see that name, yes.
14          Q.    He's your expert, right?
15                MR. BERNARDO:  Object to the
16    form of the question.
17                THE WITNESS:  I don't know who
18    he is.
19    BY MR. PLACITELLA:
20          Q.    He -- well, you signed lots of
21    interrogatories with his name in it, didn't
22    you?
23                MR. BERNARDO:  Object to the
24    form of the question.
25                THE WITNESS:  I did not sign
                  MAGNA LEGAL SERVICES
```



Page 358

1   interrogatories with his name.

2   BY MR. PLACITELLA:

3          Q.    You're sure?

4          A.    I don't remember doing that.

5          Q.    Okay.  You don't know that he

6   served as a consulting expert to Johnson &

7   Johnson in talc cases from the 1980s well

8   into the 2000s?  You didn't know that?

9                MR. BERNARDO:  Object to the

10  form of the question.

11               THE WITNESS:  I don't remember

12  his name specifically, no.

13  BY MR. PLACITELLA:

14         Q.    Did you know that he testified

15  as little as a year ago on behalf of

16  Johnson & Johnson under oath in -- in

17  New York?

18         A.    He may have.  I don't know

19  that.

20         Q.    Okay.  Did you -- you see here

21  where it talks about what he did?  It asks

22  if he ever actually looked at the tissue of

23  Mr. Westfall as the expert for Johnson &

24  Johnson?

25               MR. BERNARDO:  Object to the

MAGNA LEGAL SERVICES



Page 359

1    form of the question.

2    BY MR. PLACITELLA:

3        Q.    See here it says:

4            "How many tissue samples were

5    you" -- "were obtained from the autopsy

6    specimen for testing?"

7            Do you see that?

8        A.    I see that question, yes.

9        Q.    And it says:

10            "The tissue specimen from the

11    left lung included a mixture of lung tissue

12    and also tumor material."

13            Do you see that?

14        A.    I see the sentence, yes.

15        Q.    Okay.  And in question 5, they

16    asked you to detail the procedures that

17    were used in looking at the tissue and what

18    was found.

19            Do you see that?

20        A.    I'm reading it now.

21        Q.    And it talks about that they

22    took a sample and they used x-rays and

23    cameras and took all kinds of pictures, and

24    they also used a transmission electron

25    microscope.

                MAGNA LEGAL SERVICES



Page 360

1          Do you see that?

2          MR. BERNARDO:  Object to the

3    form of the question, beyond the scope of

4    the notice.

5          The witness can answer in her

6    individual capacity if she can.

7          THE WITNESS:  I see that that's

8    what they're talking about, yes.

9    BY MR. PLACITELLA:

10        Q.   Okay.  And on the next page,

11   they talk about:

12          "The definition of fibrous

13   particles adopted for the first stage

14   examination was that of a particle with a

15   3-to-1 axial ratio."

16          Do you see that?

17          MR. BERNARDO:  Object to the

18   form.

19          THE WITNESS:  I see it says

20   that, yes.

21   BY MR. PLACITELLA:

22        Q.   It says:

23          "In total, over 200 fibrous

24   particles were detected, analyzed and

25   sized, and the results are shown in Table 1

                MAGNA LEGAL SERVICES



Page 361

1    attached to these answers."

2              Do you see that?

3        A.    I see it says that, yes.

4        Q.    And it says:

5              "It can be seen in Table 1 that

6    the asbestos minerals were chrysotile,

7    amosite, tremolite and crocidolite."

8              Do you see that?

9        A.    I see that, yes.

10       Q.    And it says:

11             "They were detected in dust" --

12   "dust extracts with chrysotile being the

13   most commonly observed fiber, followed by

14   amosite, while fibers of tremolite and

15   crocidolite were scarce."

16             Do you see that?

17             MR. BERNARDO:  Object to the

18   form of the question, beyond the scope of

19   the notice.

20             The witness can answer in her

21   individual capacity if she can.

22             THE WITNESS:  I see these

23   sentences, yes.

24   BY MR. PLACITELLA:

25       Q.    Okay.  And if you flip to A-12,

                  MAGNA LEGAL SERVICES



Page 362

```
 1    they asked Dr. Pooley if he ever took any
 2    photographs of what he saw.
 3              Do you see that?
 4              MR. BERNARDO:  Same objection.
 5              THE WITNESS:  Yes.
 6    BY MR. PLACITELLA:
 7         Q.   And it says -- he asks the
 8    photographs -- the lawyers have the
 9    photographs, right?
10         A.   It says they're in the custody
11    of counsel, yes.
12         Q.   Okay.  So where are those
13    photographs today?
14              MR. BERNARDO:  Object to the
15    form of the question.
16              THE WITNESS:  I guess they're
17    in the custody of counsel.
18    BY MR. PLACITELLA:
19         Q.   Okay.  And if we flip to the
20    end, you can see Table 1.  You see where it
21    says:
22              "Number of fibers per gram
23    times ten to the sixth in dried tissue."
24              Do you see that?
25              MR. BERNARDO:  Same objections.
```

                    MAGNA LEGAL SERVICES



Page 363

```
 1                THE WITNESS:  I see it says

 2    that, yes.

 3    BY MR. PLACITELLA:

 4         Q.    Right.  So in a gram of

 5    Mr. Westfall's tissue, your expert found 29

 6    million chrysotile fibers, right?

 7         A.    I can't comment on this.  I

 8    don't understand any of this.  This is not

 9    within my expertise.

10         Q.    He also found 9,400,000 talc

11    fibers, correct, in the lung of

12    Mr. Westfall?

13                MR. BERNARDO:  Same objections.

14                THE WITNESS:  Again, I can't

15    interpret what this table is.

16    BY MR. PLACITELLA:

17         Q.    And he also found tremolite in

18    the lung of Mr. Westfall, correct?

19         A.    No, I cannot comment on what

20    any of this is.

21         Q.    Okay.  Now, in --

22                MR. PLACITELLA:  Give me back

23    8A and 8B.

24    BY MR. PLACITELLA:

25         Q.    When you, Johnson & Johnson,
                 MAGNA LEGAL SERVICES
```



Page 364

1    signed the affidavit -- when William Ashton

2    signed the affidavit on behalf of Johnson &

3    Johnson, he never mentioned the fact that

4    he was aware, as was your general counsel,

5    that the scientists in the Westfall case

6    found chrysotile asbestos in the Johnson

7    mine, correct?  It was never mentioned.

8              MR. BERNARDO:  Object to the

9    form of the question, beyond the scope of

10   the notice.

11             The witness can answer in her

12   individual capacity if she knows.

13             THE WITNESS:  I can't comment

14   on that.

15   BY MR. PLACITELLA:

16        Q.    Okay.  Now, that would be a

17   non-truth.  Do you agree?

18             MR. BERNARDO:  Object to the

19   form of the question.  Same objection.

20   BY MR. PLACITELLA:

21        Q.    Well, let me ask you the

22   question this way:  Do you think that was

23   an okay thing to do, you, Johnson &

24   Johnson, to do that, to have -- to sign an

25   affidavit saying there was no proof, there

                MAGNA LEGAL SERVICES



Page 365

```
 1   was no evidence, when you had the person

 2   signing the affidavit with contrary

 3   information?

 4              MR. BERNARDO:  Object to the

 5   form of the question, beyond the scope.

 6   BY MR. PLACITELLA:

 7        Q.    Was that okay?

 8        A.    I can't answer that question.

 9        Q.    Well, why not?  You're Johnson

10   & Johnson.  You're here to talk about what

11   you did right and what you did wrong.

12              MR. BERNARDO:  Object to the

13   form.

14   BY MR. PLACITELLA:

15        Q.    Are you saying that it was okay

16   or not okay --

17              MR. BERNARDO:  Object to the

18   form of the question.

19   BY MR. PLACITELLA:

20        Q.    -- to have your executive sign

21   this affidavit saying there was no proof

22   when, in fact, you know there was proof?

23              MR. BERNARDO:  Object to the

24   form of the question.

25              THE WITNESS:  I don't know that
```



Page 366

1    there indeed is proof, and I can't answer

2    that.

3    BY MR. PLACITELLA:

4         Q.    Well, do I have to show you

5    anything other than the transcripts that

6    you didn't attach to your affidavit or the

7    interrogatory answers that your company

8    filled out to tell you -- show what the

9    truth was?

10              MR. BERNARDO:  Object to the

11   form of the question.

12              THE WITNESS:  The proof is a

13   scientific proof, and I have had

14   conversations with the scientists who have

15   reviewed that, and I'm -- I'm comfortable

16   with what we have always believed.

17   BY MR. PLACITELLA:

18        Q.    So you talked to scientists who

19   reviewed the transcripts here and your own

20   interrogatory answers and they told you

21   everything you did was fine, is that what

22   you're saying?

23              MR. BERNARDO:  Object to the

24   form of the question, beyond the scope of

25   the notice.

                MAGNA LEGAL SERVICES



Page 367

```
 1                  THE WITNESS:  That's not what
 2    I'm saying, no.
 3    BY MR. PLACITELLA:
 4        Q.    Okay.  Now, you know, right,
 5    you, Johnson & Johnson, know that you used
 6    this affidavit to extricate yourself and
 7    have thousands of cases dismissed that you
 8    were involved in?
 9                  MR. BERNARDO:  Object to --
10    BY MR. PLACITELLA:
11        Q.    That was the point, you knew
12    that, correct?
13                  MR. BERNARDO:  Object to the
14    form of the question.
15                  Mr. Placitella, you asked her
16    this line of questioning at the last
17    deposition and I objected to it, you asked
18    her this question about an hour ago and she
19    said she doesn't know, and you asked it
20    again.
21                  I think this is becoming
22    argumentative and harassing and I do
23    question whether at a break we ought to ask
24    Judge Viscomi to discuss this because I
25    don't think this is appropriate in light of
```

MAGNA LEGAL SERVICES



Page 368

1    the testimony that's been given.

2              MR. PLACITELLA:  Okay.  Please,

3    don't do that.  If you want to make a

4    speaking objection, dismiss the witness

5    from the stand.  Okay?  Let's not do that.

6    BY MR. PLACITELLA:

7         Q.    Now, you know, you, Johnson &

8    Johnson know -- let me just -- can you go

9    to your 8 -- your tab -- your folder 8B

10   again?  And can you go to tab 58?

11             First of all, before we do

12   that, I apologize.  Can you go to tab 54?

13   Tab 54 in your reliance materials is a

14   privilege log of Johnson & Johnson.

15             Do you see that?

16             MR. BERNARDO:  Object to the

17   form of the question.

18             THE WITNESS:  I see it says

19   that, yes.

20   BY MR. PLACITELLA:

21        Q.    Okay.  And do you see all of

22   these entries related to Ashton?

23        A.    I see what you're highlighting,

24   yes.

25        Q.    And you see that they pre- --

                MAGNA LEGAL SERVICES



Page 369

```
 1                    MR. PLACITELLA:  Let's do that
 2     after the break.
 3     BY MR. PLACITELLA:
 4          Q.    And now, if you go to your tab
 5     58, please, in your binder?  You see this
 6     is a letter from May 17th, 1989?
 7                    This is in your binder,
 8     correct?
 9                    MR. BERNARDO:  Object to the
10     form of the question.
11                    THE WITNESS:  Yes, it's in the
12     binder.
13     BY MR. PLACITELLA:
14          Q.    Okay.  And can you see here
15     that what's sent to these lawyers is the
16     affidavit of -- your affidavit, your
17     Johnson & Johnson affidavit, and what's
18     represented is:
19                    "The unequivocal conclusion as
20     set forth in Ashton affidavit is that the
21     talc from the Johnson Vermont mine did not
22     contain asbestos."
23                    Do you see that?
24                    MR. BERNARDO:  Object to the
25     form of the question, beyond the scope of
```
MAGNA LEGAL SERVICES



Page 370

1   the notice.

2           The witness can answer in her

3   individual capacity if she can.

4           THE WITNESS:  I see those

5   words, yes.

6   BY MR. PLACITELLA:

7       Q.   And then what is urged here is

8   that:

9           "After you review this

10  affidavit, will you voluntarily agree to

11  voluntarily dismiss your case?"

12          Do you see that?

13      A.   I see it says that, yes.

14      Q.   Now, can you go to P-9 again?

15  Folder P-9.

16          MR. BERNARDO:  Chris, when

17  you're at a breaking point.

18          MR. PLACITELLA:  I'm almost

19  done.

20          MR. BERNARDO:  We've been going

21  for over an hour.

22          MR. PLACITELLA:  I'm almost

23  done.

24          MR. BERNARDO:  That's fine.

25  BY MR. PLACITELLA:

                MAGNA LEGAL SERVICES



Page 371

```
 1          Q.    P-9 is an -- the first page is

 2     an August 4th, 1992 letter.

 3               Do you see that?

 4          A.    I'm sorry?

 5          Q.    In your folder -- in your book,

 6     P-9?

 7          A.    In P-9.

 8          Q.    Right?

 9          A.    Where in P-9 is it?

10          Q.    The very first -- the flip-side

11     of the very first page.

12          A.    Oh, okay.  Yes, I see that.

13          Q.    It says:

14               "We recently learned that your

15     firm voluntarily dismissed Windsor

16     Mineral," that's you, right, Johnson &

17     Johnson, Windsor Mineral, right?

18               MR. BERNARDO:  Object to the

19     form of the question, beyond the scope of

20     the notice.

21               The witness can answer in her

22     individual capacity if she can.

23     BY MR. PLACITELLA:

24          Q.    That's you, right?  Windsor

25     Minerals is you?
```



Page 372

```
 1        A.     Yes.
 2        Q.     Okay.
 3               "From the Akron cases some time
 4    ago after reviewing an affidavit supplied
 5    by Windsor."
 6               Do you see that?
 7        A.     It says that, yes.
 8        Q.     Okay.  It says:
 9               "No evidence of the presence of
10    asbestos in Windsor Minerals' product has
11    ever been revealed by this testing."
12               That's right out of Miller's
13    affidavit, correct?
14               MR. BERNARDO:  Object to the
15    form of the question.  Same objections with
16    respect to scope.
17    BY MR. PLACITELLA:
18        Q.     Right out of your president's
19    affidavit?
20        A.     I can't comment on that.
21        Q.     Okay.  And can you see that the
22    affidavit is right on the very next page,
23    ma'am?  It's the Faye Miller affidavit that
24    we went through that was in your other
25    reliance materials, and the quote is
```



Page 373

```
 1    directly from paragraph 4 of your company's

 2    affidavit:

 3             "No evidence of the presence of

 4    asbestos in Windsor Minerals' products has

 5    ever been revealed by this testing."

 6             And that's what's quoted in

 7    this letter asking these lawyers to dismiss

 8    their cases; is that right?

 9             MR. BERNARDO:  Same objection.

10             THE WITNESS:  They -- they

11    attached that, yes.

12    BY MR. PLACITELLA:

13        Q.   And do you recall last time we

14    actually went through and I showed you the

15    dismissal notices filed in the Miller case

16    that were -- do you remember us doing that?

17        A.   Yes.

18        Q.   Okay.

19             MR. PLACITELLA:  This is a good

20    time to break.

21             THE VIDEOGRAPHER:  The time is

22    now 11:32 AM.  We are going off the record.

23             (Recess.)

24             THE VIDEOGRAPHER:  The time is

25    now 11:46 AM.  We are back on the record.
```



Page 374

1    BY MR. PLACITELLA:

2         Q.    Okay.  I just have a few more

3    questions on this then I'm going to move

4    on.

5              MR. PLACITELLA:  Can you give

6    me the Elmo?

7    BY MR. PLACITELLA:

8         Q.    Going back to your affidavit,

9    when I say you, I mean Johnson & Johnson,

10   that affidavit was signed by your

11   Mr. Ashton on May 8th, 1989, correct?

12        A.    That appears to be the name and

13   the date, yes.

14        Q.    Okay.  And if you go to the

15   next tab in your reliance materials --

16        A.    Would you tell me what tab it

17   is again, please?

18        Q.    Yes, ma'am, 54.

19             MR. BERNARDO:  Object to the

20   form of the question.

21   BY MR. PLACITELLA:

22        Q.    8B-54.  That's the log -- your

23   log.  It has an Exhibit No. 69.

24             Do you know what that exhibit

25   number is from, by the way?

                MAGNA LEGAL SERVICES



Page 375

```
 1        A.    I have no idea, and I don't
 2   even know what a privilege log is.
 3        Q.    Okay.  Well, you see in your
 4   privilege log on the same date, May 8,
 5   1989.
 6             Do you see that?
 7        A.    I see what you're pointing to.
 8        Q.    Okay.  And you see where it's
 9   from an Ira Dembrow?
10             Do you see that?
11        A.    I see that name, yes.
12        Q.    To William Ashton.
13             Do you see that?
14        A.    I see the name, yes.
15        Q.    To John O'Shaughnessy?
16             Do you see that?
17        A.    Yes.
18        Q.    He's the one of the lawyers who
19   worked with you in defending the talc
20   cases, right?
21        A.    Yes, he's one of the lawyers I
22   worked with.
23        Q.    Bruce Sempel, he was your
24   medical director?
25        A.    That's correct.
                MAGNA LEGAL SERVICES
```



Page 376

1          Q.    Howard Sloan, who is he?

2          A.    I don't know.

3          Q.    Okay.  And then again on the

4    same date is another memo between

5    Mr. Dembrow, Mr. Ashton, your lawyer and

6    your medical director, correct?

7          A.    I see those names listed, yes.

8          Q.    Okay.  And then there are a

9    number of other entries leading up to

10   May 8th.

11               Do you see that?

12         A.    I see lots of different dates,

13   yes.

14         Q.    Okay.  And then keeping in mind

15   those names, Dembrow, Sloan.  Do you see

16   that?

17               If you go to your tab --

18               MR. PLACITELLA:  What's the tab

19   number?  Hold on.

20   BY MR. PLACITELLA:

21         Q.    If you go to your tab No. 58,

22   this is a letter that attaches the

23   affidavit.

24               Do you recall that?  We just

25   went through that?

                    MAGNA LEGAL SERVICES



Page 377

```
 1        A.     We just talked about this, yes.

 2        Q.     All right.

 3               MR. BERNARDO:  Same objections

 4    as previously noted.

 5    BY MR. PLACITELLA:

 6        Q.     And you see that Mr. Dembrow

 7    and Mr. Sloan, the people on your privilege

 8    log, are on this letter?

 9        A.     I saw the name Sloan before.  I

10    don't know about who the other people are.

11        Q.     Dembrow?  Do you remember I

12    showed you he --

13        A.     Yeah.

14        Q.     He corresponded with Mr. Ashton

15    the day it was signed?

16        A.     I see those names, yes.

17        Q.     And he was one of the people

18    who was corresponding with Mr. Ashton along

19    with Mr. O'Shaughnessy and your medical

20    director.

21               Do you recall that?

22        A.     I saw those names on that log,

23    but again, I don't know what any of that

24    means.

25        Q.     Okay.

                 MAGNA LEGAL SERVICES
```



Page 378

1              MR. PLACITELLA:  So give me my

2    notes back.

3    BY MR. PLACITELLA:

4         Q.    Okay.  New subject.

5              Last time we spoke about -- or

6    you mentioned the Selby case.

7              Do you recall that?

8              Well, before that.  Do you

9    recall last time we went through various

10   discovery responses that spanned from,

11   like, 1971 to 1992?

12             Do you recall that?

13        A.    I recall I was talking about

14   different complaints, yes.

15             MR. BERNARDO:  Can we go off

16   the record for a moment?

17             MR. PLACITELLA:  Yeah.

18             THE VIDEOGRAPHER:  The time

19   is --

20             MR. BERNARDO:  I just want to

21   make sure you understand your outline is

22   being --

23             MR. PLACITELLA:  That's okay.

24   Thank you.  Nothing to be hidden here.

25             MR. BERNARDO:  I just wanted

              MAGNA LEGAL SERVICES



1    you to know.

2                    MR. PLACITELLA:  Okay.  But

3    thank you.

4                    MR. BERNARDO:  And me.

5                    MR. PLACITELLA:  That's fine.

6    Thank you, though.

7    BY MR. PLACITELLA:

8         Q.    And we ended up in 1992.

9               Do you recall that?

10        A.    I don't remember the specific

11   dates, no.

12        Q.    All right.  The Faye Miller

13   case was 1992.  Do you remember we went

14   through them, the Faye Miller case?

15        A.    I remember we now discussed

16   that, yes.

17        Q.    Okay.  And then the next case I

18   wanted to talk to you about was from 1993

19   and that was the Selby case.

20               Do you recall that?

21        A.    Yes.

22        Q.    And that's one of the responses

23   that you reviewed, correct?

24        A.    Yes.

25        Q.    Okay.  And --

                    MAGNA LEGAL SERVICES



Page 380

```
 1                MR. PLACITELLA:  Can you give
 2    the witness 337?  I'm going to the Elmo.
 3                THE WITNESS:  Thank you.
 4    BY MR. PLACITELLA:
 5         Q.    337 -- 337 are Johnson &
 6    Johnson's answers to interrogatories in the
 7    Selby case.
 8                Do you see that?
 9         A.    Yes.
10         Q.    You've seen these before,
11    correct?
12         A.    Yes.
13         Q.    Okay.  And if you go to the
14    final page, which is interrogatory answer
15    No. 36.  It says:
16                "Do you have any knowledge of
17    any tests and/or studies conducted
18    concerning the health effects of asbestos
19    on humans."
20                And your response is:
21                "There has been no asbestos in
22    the product during the time plaintiff
23    claims to have used it.  Accordingly, the
24    information sought by this interrogatory is
25    neither relevant to the subject matter of
```



Page 381

1   this action as to JJCPI nor is it

2   reasonably calculated to lead to

3   discoverable evidence."

4           Do you see that?

5       A.   I see that it says that, yes.

6       Q.   Okay.  And it says:

7           If plaintiff has evidence that

8   the product has contained asbestos at any

9   time that you, Johnson & Johnson, will

10  reconsider whether you're going to turn

11  over the information, right?

12          MR. BERNARDO:  Object to the

13  form of the question.

14          THE WITNESS:  That's not what

15  it says.

16  BY MR. PLACITELLA:

17      Q.   It says, "Will reconsider this

18  response."

19      A.   Yes.

20      Q.   That's what it says, right?

21      A.   Yes.

22      Q.   And who was Thomas Pulliam?

23      A.   I do not know.

24      Q.   Okay.

25          MR. PLACITELLA:  Can you give

                MAGNA LEGAL SERVICES



Page 382

1    Ms. Musco J&J-326?  Give a copy to Counsel.

2              MR. BERNARDO:  Thank you.

3    BY MR. PLACITELLA:

4         Q.   J&J-326 is a June 27th, 1995

5    memo entitled, "CTFA Response to Cancer

6    Prevention Coalition Citizen's Petition."

7              Did you see that?

8         A.   Yes.

9         Q.   And on here you're copied?

10        A.   Yes.

11        Q.   Right?  Mr. O'Shaughnessy

12   copied?

13        A.   Yes.

14        Q.   Right?  Mr. -- Dr. Hopkins is

15   copied, correct?

16        A.   Yes.

17        Q.   Do you recall this?

18        A.   A long time ago.

19        Q.   Okay.  Down at the bottom, also

20   is copied Mr. Ashton, Mr. Chudkowski and A.

21   Winner.

22              Do you see that?

23        A.   Yes.

24        Q.   Okay.  And who is A. Winner, do

25   you know?

                 MAGNA LEGAL SERVICES



Page 383

```
 1          A.    I don't remember exactly.  I
 2    remember the name, but I don't remember --
 3          Q.    Okay.  These are pretty much
 4    the same people who were working on the
 5    litigation for talc around the same time,
 6    right?
 7          A.    These are people who were
 8    involved, yes.
 9          Q.    Okay.  And in this particular
10    response, which went to the FDA, correct?
11          A.    Yes.
12          Q.    Okay.  In this particular
13    response you asserted that, again to the
14    FDA, that there's no evidence of asbestos
15    in your talc, correct?
16                MR. BERNARDO:  Object to the
17    form of the question.  The question is on
18    an FDA submissions by the witness who was
19    not put up for that topic.
20                She can answer in her
21    individual capacity if she can.
22                THE WITNESS:  That's what it
23    says, yes.
24    BY MR. PLACITELLA:
25          Q.    Okay.  Now, these were all the
```



Page 384

1    same people that were involved, other than

2    yourself, in actually defending the Coker

3    case, correct?

4         A.    I don't remember who was

5    involved specifically in the Coker case.

6         Q.    Okay.  Now, am I correct

7    that -- do you know anything about the

8    Coker case?

9         A.    I know that there was a

10   complaint.  I don't remember which one it

11   was.

12        Q.    Okay.  Last time when we were

13   together --

14             MR. PLACITELLA:  Give me a

15   second.

16   BY MR. PLACITELLA:

17        Q.    I asked you about the Coker

18   case.  I said:

19             "What about the Coker case?"

20             You said it's one of the ones

21   listed on your notice.

22             I said:

23             "And what do you know about the

24   Coker case:

25             And your response was:

                  MAGNA LEGAL SERVICES



Page 385

1           "The Coker case was (sic)
2   alleged injury was peritoneal mesothelioma
3   and it was filed in 1997."
4           Do you recall that?
5   A.    I see that, yes.
6   Q.    Does that refresh your memory?
7   A.    Uh-huh.
8   Q.    And it says:
9           "What else do you know about
10  it?"
11          And you said:
12          "That is all I know about it.
13          "What do you know about the
14  discovery responses provided in the Coker
15  case?"
16          And your response was:
17          "I do not know if there were
18  discovery responses."
19          Do you recall that?
20  A.    Yes.
21  Q.    Okay.  Now, can you look at
22  your P-9, please?  And if you flip about
23  halfway through P-9, there is an exhibit
24  entitled J&J-318.  See if you can find
25  that.  I put it up here to help you.

                MAGNA LEGAL SERVICES



Page 386

1        A.    Can you give me an idea of
2    where it is?
3              MR. PLACITELLA:  Do you want to
4    find it for her, Jared?
5    BY MR. PLACITELLA:
6        Q.    So in your binder, P-9, is, in
7    fact, a copy of court and discovery
8    materials from the Coker file, correct?
9              MR. BERNARDO:  Object to the
10   form of the question.
11             THE WITNESS:  It looks like a
12   lot of court material.
13   BY MR. PLACITELLA:
14       Q.    Right.  So you did have
15   material in the Coker case?
16       A.    I'm not seeing any discovery.
17             MR. BERNARDO:  Object to the
18   form of the question.
19   BY MR. PLACITELLA:
20       Q.    Okay.  Well, we're going to get
21   there.
22             You see there is something in
23   the file called Deposition Upon Written
24   Questions in the Coker case?  And I put it
25   up here on the screen.

                    MAGNA LEGAL SERVICES



Page 387

1            MR. BERNARDO:  Object to the

2    form of the question.  That's not the

3    document that's on the screen.

4            MR. PLACITELLA:  I'm putting it

5    up.  Let me see if I can help her out.

6    Wait, hold on.

7            Why don't we do it this way and

8    we'll come back to try to save some time.

9    BY MR. PLACITELLA:

10       Q.    You see that the material here,

11   there's a lot of material here related to

12   the Coker case, correct?

13       A.    Yeah, I'm seeing a lot of

14   medical records or requests for them.

15       Q.    Right.  And I'm going to come

16   back to that in a minute, but can you go to

17   your book 8B and go to tab 76, please?

18            In your book at tab 76 is a

19   letter from Alice Blount, April 23rd, 1998,

20   to your lawyers.

21            Do you see that?

22            MR. BERNARDO:  Object to the

23   form of the question, beyond the scope.

24            The witness can answer in her

25   individual capacity with respect to this

                MAGNA LEGAL SERVICES



Page 388

1   document.

2            THE WITNESS:   I see that it's a

3   letter signed by an Alice Blount.

4   BY MR. PLACITELLA:

5        Q.    You've seen this letter before,

6   right?

7        A.    Yes.

8        Q.    Okay.

9        A.    At the last deposition.

10       Q.    Right.  And in this letter

11  that -- Alice Blount told you that she had

12  analyzed Johnson & Johnson's Vermont talc,

13  right?  That's what she told you, right?

14       A.    That's what it seems to say,

15  yes.

16       Q.    And it says:

17            "As I told you, I believe that

18  Johnson & Johnson's Vermont talc contains

19  trace amounts of asbestos which are well

20  below those specified by OSHA."

21            Do you see that?

22       A.    I see that sentence, yes.

23       Q.    Okay.  And so that was part of

24  the Coker file that was available to you as

25  part of your review in this case, correct?



Page 389

1             MR. BERNARDO:  Object to the

2      form of the question.

3             THE WITNESS:  This letter was

4      part of the files that I sent to

5      Dr. Hopkins after our first deposition.

6      BY MR. PLACITELLA:

7         Q.    Yes, ma'am.  And so this letter

8      was one of the letters that was available

9      to you in preparing for today's deposition,

10     correct?

11        A.    It was in the binder, yes.

12        Q.    Right.  And this is about

13     what -- in essence what your expert was

14     telling you in the Coker case about what

15     she found in the baby powder, right?

16            MR. BERNARDO:  Object to the

17     form of the question.

18            THE WITNESS:  I see that it's a

19     letter from her.  I don't know anything

20     else other than that.

21     BY MR. PLACITELLA:

22        Q.    Well, you're here -- this is

23     not about Nancy Musco, whether she knows.

24     This came from Johnson & Johnson's files.

25     Johnson & Johnson was certainly aware that

                    MAGNA LEGAL SERVICES



Page 390

1    Dr. Alice Blount right here from Rutgers

2    University told them in the context of the

3    Coker case she found asbestos in Johnson's

4    Baby Powder.  Johnson & Johnson was

5    certainly aware of that, correct?

6              MR. BERNARDO:  Object to the

7    form of the question, beyond the scope of

8    the notice.

9              THE WITNESS:  I see that what

10   she has said in the letter here.

11   BY MR. PLACITELLA:

12       Q.    Okay.  And --

13             MR. PLACITELLA:  Where is my

14   book.  Can you give me 216?

15             MR. BERNARDO:  I'll also put an

16   objection on the record with respect to the

17   use of this document beyond the scope of

18   the notice.

19   BY MR. PLACITELLA:

20       Q.    In preparing your -- being

21   prepared for today's deposition to testify

22   about information that was available to

23   Johnson & Johnson when responding to

24   discovery, did you review this file from

25   the Johnson -- from Johnson & Johnson's

                MAGNA LEGAL SERVICES



Page 391

1   records dated (sic) J&J-216?

2            Did you review this?

3            MR. BERNARDO:  Object to the

4   form of the question.

5            THE WITNESS:  I have not seen

6   this, no.

7   BY MR. PLACITELLA:

8        Q.   Okay.  So in preparing you for

9   today's deposition concerning what

10  information was available to Johnson &

11  Johnson when preparing responses to

12  discovery, this document was not provided

13  to you, correct?

14           MR. BERNARDO:  Object to the

15  form of the question.

16           THE WITNESS:  I had not seen

17  this before, but my understanding was that

18  I was here to talk about the answers to the

19  interrogatories.

20  BY MR. PLACITELLA:

21       Q.   We're going to get to it.

22           Ma'am, this was not provided to

23  you, correct?

24       A.   No.  As I said, I had -- this

25  is the first I've seen it.

                    MAGNA LEGAL SERVICES



Page 392

```
 1        Q.    Okay.  And if we go to the

 2   second page, you see the paragraph that

 3   talks about reports of patients with

 4   mesothelioma.

 5             Do you see that?

 6        A.    I see that it says that, yes.

 7        Q.    And then it talks about,

 8   "Mesothelioma can be caused by non-

 9   occupational exposure to mineral fibers is

10   not in doubt."

11             Do you see that?

12        A.    I see the sentences you're

13   highlighting, yes.

14        Q.    And it says:

15             "In addition, communities built

16   around natural sources of tremolite have

17   experienced incidents of the disease

18   through non-occupational exposure."

19             Do you see that?

20        A.    I see that sentence, yes.

21        Q.    You go on to state:

22             "Mesothelioma may occur after

23   brief or indirect exposure to asbestos."

24             Do you see that yes?

25        A.    Yes, I see these sentences,
```

MAGNA LEGAL SERVICES



Page 393

1    yes.  I don't know who wrote this.

2         Q.    Well, do you have any doubt

3    that it came from your files and it was

4    written on behalf or for Johnson & Johnson?

5         A.    I don't know that it was.

6         Q.    Okay.  Then we go to the next

7    section on talc.

8              By the way, there's no question

9    it's labeled Coker versus Johnson &

10   Johnson, right?

11        A.    It says that, yes.

12        Q.    Okay.  So let's go onto the

13   section about talc, and it says:

14              "However, in several

15   mesothelioma patients studied, both talc

16   fibers and tremolite were detected.  In

17   fact, the majority of asbestos bodies

18   isolated from the lungs of women in the

19   general population have tremolite or

20   anthophyllite, and because tremolite and

21   anthophyllite are known contaminants of

22   talc, this data suggests that rare cases of

23   mesothelioma among women with no other

24   identifiable exposure might be related to

25   exposure to cosmetic talc."



Page 394

1              Did you see that?

2      A.    I see it says that, yes.

3      Q.    And then underneath that it

4    says:

5              "Environmental factors must be

6    given a mayor consideration in the

7    incidents of mesothelioma."

8              Do you see that?

9      A.    I see these sentences, yes.

10      Q.    And it talks about one of the

11    environmental factors being talc miners.

12    It says:

13              "Tremolite asbestos is a known

14    contaminant of some deposits of talc."

15              Do you see that?

16      A.    I see it says that, yes.

17      Q.    And my question to you is:

18    When you were relying upon the experts in

19    verifying answers to interrogatories, was

20    any of this information in this internal

21    Johnson & Johnson memo ever made known to

22    you?

23      A.    I was not the one supplying the

24    answers.  The appropriate person for that

25    particular issue would be supplying it, and

                 MAGNA LEGAL SERVICES



Page 395

1    I do know that our scientists were very

2    much aware of any data or specifically any

3    proof and evidence of the issues.

4        Q.    Okay.  So -- but my question to

5    you was:  When you were verifying the

6    interrogatories as true and accurate, was

7    this information shared with you, Nancy

8    Musco?

9        A.    No, it was not my job to be

10   reviewing these.  And frankly, I -- I'm not

11   an expert at this and I really wouldn't

12   know how to comment on this.

13       Q.    Okay.  Now --

14             MR. PLACITELLA:  Can you give

15   me 217?

16   BY MR. PLACITELLA:

17       Q.    217 is a memo from William

18   Ashton.

19             Do you see that?

20       A.    Yes, it says that, yes.

21       Q.    Is this the same William Ashton

22   who executed the affidavit we went through

23   earlier, correct?

24       A.    I would assume so, yes.

25       Q.    And he talks about a recent

                MAGNA LEGAL SERVICES



Page 396

1     publication that became important in the

2     Abraham Coker case alleging dusting powder

3     contains fibrous talc particles.

4               Do you see that?

5          A.    Yes.

6          Q.    And he copies Dr. Hopkins.

7               Do you see that?

8          A.    Yes.

9          Q.    Did you know that Dr. Hopkins

10    was involved in defending the Coker case?

11         A.    I don't know specifically what

12    cases Dr. Hopkins has been called for.

13         Q.    Okay.  These were some of the

14    same people who in the very same year were

15    part of the citizens petition that we went

16    through a little bit earlier, the response

17    to the citizens petition, correct?

18         A.    These people worked with

19    Johnson's Baby Powder and talc, yes.

20         Q.    Okay.  And who was Lusenac, do

21    you know?

22               MR. BERNARDO:  Object to the

23    form of the question.

24               THE WITNESS:  Lusenac I believe

25    was a supplier.  I don't know exactly.

                    MAGNA LEGAL SERVICES



Page 397

```
 1                  MR. PLACITELLA:  Okay.  Can you
 2     give me 219?
 3     BY MR. PLACITELLA:
 4          Q.    219 is a memo, Ray (sic) Coker
 5     versus Johnson & Johnson.
 6                  Do you see that?
 7          A.    That's what it says, yes.
 8          Q.    And it's from Lusenac to John
 9     O'Shaughnessy at Johnson & Johnson who was
10     in charge of the talc litigation at this
11     point in time, correct?
12          A.    Yes.
13          Q.    And was Lusenac says is:
14                  "I'm just coming back from
15     Italy where I met two scientists are (sic)
16     preparing documents to help solve your
17     case."
18                  Do you see that?
19          A.    I see that sentence, yes.
20          Q.    Okay.
21                  MR. PLACITELLA:  Sorry.  Put it
22     up here.
23     BY MR. PLACITELLA:
24          Q.    Do you see that?
25                  What information did Lusenac
```



Page 398

1    give you, Johnson & Johnson, to help you

2    fight the Coker case, if you know?

3         A.    I do not know.

4         Q.    It talks in here something

5    about the Rabino -- something about Rabino.

6              Do you know anything about

7    that?

8         A.    No.

9         Q.    Okay.  Now, in our last

10   deposition, I asked you specifically

11   whether you, Johnson & Johnson, ever

12   refused to turn over asbestos testing data

13   based upon an assertion of privilege.

14             Do you recall that?

15        A.    I recall some conversations

16   about that, yes.

17        Q.    Okay.  Let's go to it so we're

18   on the same page.  On page 95 -- blow it

19   up.  I asked you:

20             "Now, in your preparation and

21   knowledge of Johnson & Johnson, do you have

22   a record of any information of a single

23   case where Johnson & Johnson turned over

24   asbestos testing data prior to 2017?"

25             Mr. Bernardo objects.  You

                 MAGNA LEGAL SERVICES



Page 399

1   asked for me to repeat it, I do.  And then

2   I go on and I say:

3               "When does your research or

4   when does Johnson & Johnson maintain is the

5   first time that it turned over testing data

6   concerning asbestos in Johnson & Johnson

7   talc in litigation?  When is the first time

8   that happened?"

9               And you say:

10              "I -- again, it will be

11  whenever it was requested."

12              And I asked you again:

13              "But from your knowledge, so

14  you believe the first time it was requested

15  it was turned over?"

16              And you -- after an objection,

17  you say:

18              "If there were specific

19  documents requested, they would have been

20  if I were talking generally, so I don't

21  know the answer to this."

22              And then I asked you:

23              "Well, you know, for example

24  when lawyers in cases involving cancer and

25  baby powder asked for testing data, Johnson

                MAGNA LEGAL SERVICES



Page 400

1    & Johnson took the position that they

2    weren't going to turn it over because it

3    was privileged."

4              And there's an objection.  And

5    you said:

6              "I don't know this, no."

7              And I said:

8              "Well, that would be wrong,

9    wouldn't you say?"

10             And you said:

11             "I can't comment on that."

12             Now, in your review of the

13   materials in relation to the Coker case,

14   you're aware, are you not, that you

15   defended the Coker case exactly the same

16   way that you defended every other case,

17   which is, it was your position that there

18   was no evidence of any asbestos in any

19   Johnson & Johnson Baby Powder or Shower to

20   Shower, correct?

21             MR. BERNARDO:  Object to the

22   form of the question.

23             THE WITNESS:  I don't know.

24   You know, I can't comment on the legal

25   basis for it, but I do know that there is

                MAGNA LEGAL SERVICES



Page 401

1   no asbestos in the cosmetic talc for

2   Johnson's Baby Powder.

3   BY MR. PLACITELLA:

4        Q.    Right.  So in the context of

5   the Coker case, you didn't change your

6   position from prior cases, your position

7   still was there was no evidence, correct?

8        A.    Correct.

9             MR. BERNARDO:  Object to the

10  form of the question.

11  BY MR. PLACITELLA:

12       Q.    Okay.  And that's what was

13  related (sic) to the plaintiffs' lawyers,

14  correct?

15       A.    Yes.

16       Q.    Okay.  Now, if I go back to

17  319.  I want to make sure I get this right.

18            MR. PLACITELLA:  I'm sorry,

19  give her 319.  That's part of the --

20            MR. BERNARDO:  I'm sorry?  Can

21  I just see what it is?

22            MR. PLACITELLA:  Sure.  It was

23  in the binder.

24            MR. BERNARDO:  That's what I

25  was going to ask.

                 MAGNA LEGAL SERVICES



Page 402

1                MR. PLACITELLA:  It's in the

2    binder.

3    BY MR. PLACITELLA:

4        Q.    I'm -- I am referring

5    specifically in -- to the document in the

6    Coker case that says, "Defendants'

7    Objections to Plaintiff's Deposition on

8    Written Questions to the Commission of Nell

9    McCallum & Associates."

10               Do you see that?

11       A.    I see that it says that, yes.

12       Q.    And it says:

13               "Comes now Johnson & Johnson

14    Companies, a defendant in the above

15    lawsuit, and files this objection to

16    depositions on written questions to the

17    Colorado School of Mines Research Institute

18    and to the Commission of Nell McCallum &

19    Associates."

20               You've seen testing results in

21    the binders that you sent to Dr. Hopkins

22    related to Colorado School of Mines,

23    correct?

24       A.    I believe there were some, yes.

25       Q.    Right.  And on the next page,

                 MAGNA LEGAL SERVICES



Page 403

1    we're looking at --

2               MR. BERNARDO:  While you are

3    looking at -- I'm going to object to the

4    form of the question.

5               But I'm also going to object --

6    I'm sorry.  I'm not going to object to the

7    form of the question, I'm going to object

8    to the use of this document as beyond the

9    scope of the notice.

10              MR. PLACITELLA:  Okay.

11   BY MR. PLACITELLA:

12      Q.   On the next page, it -- let's

13   start with question 3 that you were

14   objecting to.

15              I'm sorry.  Let's look at 4.

16   I'm sorry.  It says:

17              "Please state if you found the

18   presence of asbestos or asbestiform

19   materials" -- "minerals."

20              Do you see that?

21      A.   I see it says that, yes.

22      Q.   And you -- and Johnson &

23   Johnson's response is, after saying it's

24   vague and ambiguous and assumes facts not

25   in evidence:

                   MAGNA LEGAL SERVICES



Page 404

```
 1                    "Furthermore, the question
 2   requires witness to speculate and provide
 3   an expert opinion that witness is not
 4   qualified to express.  Finally, the
 5   information requested from the witness is
 6   subject to proprietary and trade secret
 7   privileges of the defendant."
 8                    Do you see that?
 9        A.    Yes, I see that.
10        Q.    And then when it asks you to
11   produce documents, you further state that
12   the request violates the Texas Rules of
13   Civil Procedure, and you complain about the
14   subpoena, and then you say:
15                    "Finally, the information
16   requested from the witness is subject to
17   propriety" -- "proprietary and trade secret
18   privileges of the defendant."
19                    Do you see that?
20        A.    I see it says that, yes.
21        Q.    Okay.  And in the same group of
22   documents, you filed similar objections as
23   it relates to getting discovery from
24   McCrone and Associates.
25                    Do you see that?
                MAGNA LEGAL SERVICES
```



Page 405

```
 1              MR. BERNARDO:  Object to the
 2   form of the question.  Same objection with
 3   respect to the scope of the notice.
 4              THE WITNESS:  I see it says
 5   that.
 6   BY MR. PLACITELLA:
 7        Q.   Right.  And this is in the
 8   Coker case, and you know from your review
 9   of the binders you gave to Dr. Hopkins,
10   that there is testing information in those
11   binders related to work that was done by
12   McCrone and Associates, correct?
13        A.   Yes, I believe so.
14        Q.   Okay.  And Johnson & Johnson's
15   position in the Coker case as related to
16   getting information from McCrone and
17   Associates was that that information was
18   proprietary and a trade secret according to
19   your responses, correct?
20        A.   That's what the sentence says,
21   yes.
22        Q.   Now, as you sit here, do you
23   have any evidence that any information
24   related to McCrone or Colorado School of
25   Mines was ever turned over to the plaintiff
```



Page 406

1    in the Coker case?

2         A.    I don't know what was turned

3    over.

4         Q.    As you sit here, do you have

5    any evidence to prove that you turned over

6    any evidence to the plaintiff in the Coker

7    case related to the testing of asbestos?

8              MR. BERNARDO:  Object to the

9    form of the question.

10             THE WITNESS:  I don't know what

11   was turned over.  If it was appropriate to

12   be turned over, I would assume it would be.

13   BY MR. PLACITELLA:

14        Q.    But you don't know?

15        A.    No, I do not.

16        Q.    So Johnson & Johnson, as it

17   sits here, does not know what evidence it

18   turned over in the Coker case?

19             MR. BERNARDO:  Object to the

20   form of the question, beyond the scope of

21   the notice.

22             The witness can answer in her

23   individual capacity.

24             THE WITNESS:  I don't know.

25   BY MR. PLACITELLA:

                MAGNA LEGAL SERVICES



Page 407

```
 1          Q.    Okay.  And do you have any
 2     evidence, as you sit here, today that the
 3     information that Alice Blount gave you
 4     during the Coker case was ever turned over
 5     to the plaintiff in that case?
 6               MR. BERNARDO:  Same objections.
 7               THE WITNESS:  Again, I do not
 8     know what was turned over.
 9     BY MR. PLACITELLA:
10          Q.    Does that mean that Johnson &
11     Johnson does not know or you don't know?
12          A.    Since it's not within the scope
13     of the notice, I can't comment on it and I
14     don't know.
15          Q.    Ma'am, with all due respect, I
16     move to strike your answer, "It's not
17     within the scope of the notice."  That's
18     what the judge will decide.
19               My question to you was:  Do you
20     have any evidence, as you sit here today,
21     that Johnson & Johnson turned over any
22     evidence concerning asbestos testing to the
23     plaintiff in the Coker case?
24          A.    I do not know what was turned
25     over and what was not.
```
                  MAGNA LEGAL SERVICES



Page 408

```
 1        Q.    Okay.  And when you say you do
 2   not know, does that mean you do not know,
 3   Nancy Musco, or Johnson & Johnson does not
 4   know?
 5             MR. BERNARDO:  Object to the
 6   form of the question.
 7             THE WITNESS:  Since I'm right
 8   now answering for myself, I do not know.
 9   BY MR. PLACITELLA:
10        Q.    No, ma'am, with all due
11   respect, you're here answering for Johnson
12   & Johnson, but somebody else will make that
13   determination, and I strike -- I move to
14   strike your response.
15             Now, let's talk about a case,
16   we spent a couple minutes on it, so I'm not
17   going to spend a lot of time on it here.
18   The next case after 1998 -- by the way, do
19   you know what happened to the Coker case?
20        A.    No, I do not.
21        Q.    Okay.
22             MR. PLACITELLA:  Can you give
23   me 482?
24   BY MR. PLACITELLA:
25        Q.    482.  Marked J&J-482 is an
                MAGNA LEGAL SERVICES
```



Page 409

1    article that recently appeared in the

2    Reuters -- by Reuters entitled, "Johnson &

3    Johnson knew for decades that asbestos

4    lurked in its baby powder."

5                Have you ever seen this before?

6        A.    Yes, I have.

7        Q.    Okay.  And when?

8        A.    Soon after it came out.

9        Q.    Did you ever read it in

10   preparation for today's deposition?

11       A.    No.

12       Q.    Okay.  I just want to ask you

13   one question just in terms of information

14   on the Coker case.  I don't want to ask you

15   about the article itself.

16               MR. BERNARDO:  Object to the

17   question --

18   BY MR. PLACITELLA:

19       Q.    In the section --

20               MR. BERNARDO:  -- as beyond the

21   scope of the notice.

22   BY MR. PLACITELLA:

23       Q.    Herschel Hobson, who was the

24   lawyer in the Coker case, is quoted in this

25   article and he said that he asked Johnson &

                    MAGNA LEGAL SERVICES



Page 410

1    Johnson for any research it had into the

2    health of mine workers, top production

3    records from the mid-'40s through the '80s,

4    depositions from managers of three labs

5    that tested talc for J&J, and any documents

6    related to testing for fibrous or

7    asbestiform materials.

8            Do you have any information, as

9    you sit here today, to say that that is

10   incorrect?

11           MR. BERNARDO:  Object to the

12   form of the question.  Object, beyond the

13   scope of the notice.

14           THE WITNESS:  As I already told

15   you, I do not know what was or wasn't

16   handed over.

17   BY MR. PLACITELLA:

18       Q.   Okay.  And -- sorry, my last

19   question on this and I'll move on.

20           According to the article

21   Mr. Hobson said that:

22           "Without the evidence from

23   Johnson & Johnson and no hope of getting

24   any, he advised Coker to drop the suit."

25           Do you see that?

             MAGNA LEGAL SERVICES



Page 411

1          MR. BERNARDO:  Same objection.

2          THE WITNESS:  That's what it

3   says here.

4   BY MR. PLACITELLA:

5      Q.   Do you have any information, as

6   you sit here today, on behalf of Johnson &

7   Johnson to rebut that statement by Mr.

8   Hobson that he dismissed the case because

9   he just didn't have the proof and Johnson &

10  Johnson didn't turn anything over?

11     A.   Sounds like it would be kind of

12  a legal conclusion and I can't comment on

13  that.

14     Q.   I'm just saying, do you have

15  any evidence, as you sit here today, to

16  disprove what Mr. Hobson is saying here is

17  that he dropped the case because you didn't

18  turn any evidence over?

19          MR. BERNARDO:  Beyond the scope

20  of the notice.

21          The witness can answer in her

22  individual capacity.

23          THE WITNESS:  As I said, I

24  can't comment.  I don't know his reasonings

25  or what he did or didn't do.

                MAGNA LEGAL SERVICES



Page 412

1    BY MR. PLACITELLA:

2        Q.    Okay.  And now I want to just

3    talk to you hopefully about something

4    because we went through this, I just want

5    to put it in context.

6            You actually certified the

7    answers to interrogatories in the

8    Krushinski case, correct?

9        A.    That's correct.

10       Q.    Okay.  And came -- that case

11   was filed right after the Coker case was

12   dismissed, correct?

13       A.    I don't remember the dates.

14       Q.    Okay.  Do you remember it was

15   filed sometime in the late 1990s?

16       A.    Again, I would not say for

17   sure.  Whatever --

18       Q.    Do you remember that you

19   certified answers to interrogatories in the

20   year 2000 in those cases?

21       A.    I know I certified them.  I

22   guess that's the date, yes.

23       Q.    Right.  And --

24            MR. PLACITELLA:  Do you have

25   277?

                MAGNA LEGAL SERVICES



Page 413

1    BY MR. PLACITELLA:

2         Q.    Okay.  277, and I think you

3    have these in your binders, are the answers

4    to interrogatories that you certified.

5              Do you recognize those?

6         A.    Yes.

7         Q.    Okay.  And specifically -- and

8    let me just go to the end.

9              This is your signature?

10        A.    Yes, it is.

11        Q.    Correct?  Make sure I got it.

12             And you say:

13             "The foregoing answers are true

14   and accurate to the best of my knowledge.

15   I am aware that if any of the foregoing

16   statements made by me are willfully false,

17   I may be subject to punishment."

18             Correct?

19             MR. BERNARDO:  Object to the

20   form of the question.

21             THE WITNESS:  Yes, that's what

22   it says.

23   BY MR. PLACITELLA:

24        Q.    And I'm not going to go over

25   all of the things, we asked you about them

                 MAGNA LEGAL SERVICES



Page 414

```
 1    the last time, just in context, and answer
 2    to Interrogatory 17, says:
 3              "Describe in detail all
 4    processes, procedures and testing performed
 5    upon talc used" -- "the talc used in the
 6    manufacture of Johnson's Baby Powder to
 7    reduce or eliminate the existence of
 8    asbestos, tremolite or other contaminants
 9    in Johnson's Baby Powder."
10              Correct?
11         A.   Yes.
12         Q.   And what you state specifically
13    in the beginning of that answer is:
14              "To the best of defendant's
15    knowledge, talc used in the manufacture of
16    Johnson & Johnson's Baby Powder never
17    contained asbestos in any form or
18    tremolite."
19              Correct?
20              MR. BERNARDO:  Object to the
21    form of the question.
22              THE WITNESS:  That's what it
23    says, yes.
24    BY MR. PLACITELLA:
25         Q.   Okay.  Now, I forgot to ask you
              MAGNA LEGAL SERVICES
```



Page 415

```
 1    last time and then I'm going to move off of
 2    these.
 3              Did you ever -- before signing
 4    these interrogatories, did you ever
 5    actually read the questions and answers
 6    before signing them?
 7         A.   Yes, I did.
 8         Q.   Okay.  Now --
 9              MR. PLACITELLA:  Can you give
10    me 230?
11              I'll just do this one and maybe
12    we'll break, Rich?
13              MR. BERNARDO:  Sure.
14              MR. PLACITELLA:  So you can do
15    lunch.
16    BY MR. PLACITELLA:
17         Q.   230 is an affidavit filed by
18    John Hopkins in the Durham case.
19              Do you see this?
20         A.   Yes.
21         Q.   In preparation and in
22    discussing -- let's just go to the -- and
23    you see on the last page, the affidavit is
24    signed by John Hopkins.
25              Do you see that?
                MAGNA LEGAL SERVICES
```



Page 416

1        A.      Yes.

2        Q.      And he concludes saying:

3                "It may be concluded that there

4    has never been asbestos contamination of

5    the talc used by Johnson & Johnson in the

6    United States from the period in question,

7    1955 to 2002."

8                Correct?

9        A.      Yes.

10       Q.      And that's essentially what

11   Roger Miller signed in his affidavits,

12   correct?

13               MR. BERNARDO:  Object to the

14   form of the question, beyond the scope.

15               The witness may answer in her

16   individual capacity with respect to the

17   affidavit.

18               THE WITNESS:  Yes, this is the

19   position that there is no asbestos.

20   BY MR. PLACITELLA:

21       Q.      And it's consistent with the

22   affidavit signed by Mr. Ashton as well,

23   correct?

24       A.      This is the general statement,

25   yes.

                    MAGNA LEGAL SERVICES



Page 417

```
 1        Q.     And in preparing for today's
 2   deposition, did Dr. Hopkins ever tell you
 3   that he, himself, certified under oath that
 4   there was no evidence of any asbestos at
 5   any time in Johnson -- in Johnson &
 6   Johnson's cosmetic talc?
 7        A.     Yes, we did discuss that.
 8        Q.     Okay.
 9        A.     And I know that is what is his
10   understanding.
11        Q.     All right.  So he told you
12   about this affidavit?
13        A.     Not specifically about the
14   affidavit, no, but I know that that is his
15   understanding, but we did not discuss the
16   specific affidavit.
17        Q.     Did he tell you that based upon
18   this affidavit, the Durham case was
19   dismissed?
20             MR. BERNARDO:  Object to the
21   form of the question, beyond the scope of
22   the notice.
23             You can answer in your
24   individual capacity if you know.
25             THE WITNESS:  No, we did not
                MAGNA LEGAL SERVICES
```



Page 418

1    discuss that.

2    BY MR. PLACITELLA:

3         Q.    Okay.  Now -- and then we're

4    going to break for lunch.  I just want to

5    make sure I kind of -- I have some

6    questions.

7              Currently there is an appeal

8    before the New Jersey Appellate Division

9    related to Johnson & Johnson's Baby Powder

10   and talc.

11             Do you -- do you know about

12   that?

13             MR. BERNARDO:  Object to the

14   form of the question.

15             THE WITNESS:  I don't know what

16   specifically there is, no.

17   BY MR. PLACITELLA:

18        Q.    Do you know anything about the

19   appeal?

20        A.    No.

21        Q.    There's an issue before the

22   Appellate Division as to when or if Johnson

23   & Johnson ever told anybody before 2017

24   that they had testing evidence related to

25   Johnson & Johnson's talc or cosmetic talc

                MAGNA LEGAL SERVICES



Page 419

```
 1    products.  What's the answer?  Did you ever

 2    give to any plaintiff in any case prior to

 3    2017 any testing evidence related to the

 4    Johnson & Johnson's Baby Powder or its

 5    sources?

 6              MR. BERNARDO:  Object to the

 7    form of the question.

 8              THE WITNESS:  I can't answer

 9    that, no.

10    BY MR. PLACITELLA:

11         Q.   Well, you're Johnson & Johnson,

12    how could you not know?

13              MR. BERNARDO:  Objection.

14    BY MR. PLACITELLA:

15         Q.   You either did or you didn't.

16         A.   If it was requested and it was

17    appropriate to give the answers and -- or

18    the evidence, it was given.

19         Q.   So you know that for a fact

20    that's what happened?

21         A.   If it was appropriate, yes.

22         Q.   So as you sit here today, can

23    you point to a single case, do you have any

24    evidence in front of you, can you point to

25    a single case where you turned over the
```

                MAGNA LEGAL SERVICES



Page 420

1    evidence of a testing related to Johnson's

2    Baby Powder before 2017?

3               MR. BERNARDO:  Object to the

4    form of the question.

5    BY MR. PLACITELLA:

6         Q.    Can you point to a single

7    case --

8               MR. BERNARDO:  Object.

9    BY MR. PLACITELLA:

10        Q.    -- you Johnson & Johnson.

11              MR. BERNARDO:  Objection to the

12   form of the question, beyond the scope of

13   the notice, and asked and answered multiple

14   times.

15              You can answer in your

16   individual capacity if you know.

17              THE WITNESS:  No, I cannot.

18   BY MR. PLACITELLA:

19        Q.    Okay.  So as you sit here

20   today, Johnson & Johnson, to be clear,

21   cannot point to a single case prior to 2017

22   where it turned over evidence related to

23   the testing of Johnson & Johnson's talc,

24   baby powder or sources of that baby powder

25   related to asbestos, correct?

                MAGNA LEGAL SERVICES



Page 421

 1                MR. BERNARDO:  Same objections.

 2                THE WITNESS:  No, I cannot.

 3                MR. PLACITELLA:  Okay.  We can

 4    take a break for lunch now.  Thank you.

 5                THE VIDEOGRAPHER:  The time is

 6    now 12:40 PM.  We're going off the record.

 7                (Lunch recess.)

 8                THE VIDEOGRAPHER:  The time is

 9    now 1:34 PM.  We are back on the record.

10    BY MR. PLACITELLA:

11        Q.    Okay.  Do you have all of those

12    binders in front of you?  Okay.  I'm just

13    going to approach you for -- just help

14    organize some of this stuff.

15                So this P-8A, right?

16        A.    Correct.

17        Q.    And this is P-8B, correct?

18        A.    Correct.

19        Q.    Okay.  This is the evidence you

20    sent to Dr. Hopkins?

21        A.    Correct.

22        Q.    Okay.  This is evidence,

23    correct?

24                MR. BERNARDO:  Object to the

25    form of the question.

                 MAGNA LEGAL SERVICES



Page 422

```
 1                  THE WITNESS:  It's not
 2    evidence, it's lots -- just different
 3    documents.
 4    BY MR. PLACITELLA:
 5          Q.    Well, it's evidence we used
 6    today, correct?
 7          A.    Okay.
 8          Q.    And there's testing evidence in
 9    here?
10          A.    There's some, yes.
11                MR. BERNARDO:  Object to the
12    form of the question.
13    BY MR. PLACITELLA:
14          Q.    And this is Musco-2.  Do you
15    remember this from the last time?
16                Okay.  This is all the tests,
17    remember?
18          A.    I know it was a big book.
19          Q.    All right.  Do you want -- do
20    you want to look through it again to make
21    sure?  This is the testing evidence --
22          A.    Uh-huh.
23          Q.    -- from Dr. Hopkins'
24    deposition.
25                Do you recall that?
                  MAGNA LEGAL SERVICES
```



Page 423

```
 1          A.     Okay.   Are you trying to block

 2     me?

 3          Q.     No.   This is the testing

 4     evidence from Dr. Hopkins?

 5               MR. BERNARDO:  Object to the

 6     form of the question.

 7               THE WITNESS:  It seems to be a

 8     mixture of a lot of things from

 9     Dr. Hopkins.

10     BY MR. PLACITELLA:

11          Q.     Okay.  Am I correct that none

12     of this evidence, to your knowledge, he was

13     ever turned over to any plaintiff or you

14     have no evidence that any of this was ever

15     turned over to any plaintiff before 2017,

16     correct?

17               MR. BERNARDO:  Object to the

18     form of the question.

19               THE WITNESS:  I do not know.

20     BY MR. PLACITELLA:

21          Q.     As you sit here today, do you

22     have any evidence to prove that any of this

23     was ever turned over to any plaintiff

24     before 2017?

25               MR. BERNARDO:  Object to the
```



1    form of the question.

2              THE WITNESS:  I do not know

3    what was turned over or not turned over.

4    BY MR. PLACITELLA:

5        Q.    As you sit here today, do you

6    have any contemporaneous evidence to prove

7    that any of this was ever turned over to

8    any plaintiff before 2017?

9              MR. BERNARDO:  Object to the

10   form of the question, beyond the scope of

11   the notice.

12             THE WITNESS:  I do not know

13   what was turned over.

14   BY MR. PLACITELLA:

15       Q.    So Johnson & Johnson does not

16   know whether any of this evidence was ever

17   turned over to any plaintiff before 2017?

18             MR. BERNARDO:  Object to the

19   form of the question, beyond the scope of

20   the notice.

21             You can answer in your

22   individual capacity if you can.

23             THE WITNESS:  I don't know.

24   It's not something I had prepared for

25   within the scope for today.



Page 425

1            MR. PLACITELLA:  I'll pass the

2    witness and reserve the right for redirect.

3            MR. BERNARDO:  All right.

4    Could we go off the record?

5            THE VIDEOGRAPHER:  The time is

6    now 1:37 PM.  We are going off the record.

7            (Discussion held with the

8    Court.)

9            THE VIDEOGRAPHER:  The time is

10   now 1:44 PM.  We are back on the record.

11                  -  -  -

12            E X A M I N A T I O N

13                  -  -  -

14   BY MR. BERNARDO:

15       Q.    Good afternoon, Ms. Musco.  We

16   obviously already know each other, but let

17   me just introduce myself for the record

18   here.

19            I'm Rich Bernardo, and I'm

20   going to ask you some questions on behalf

21   of the Johnson & Johnson defendants.

22            And first, I appreciate you've

23   been here for now this is the second day

24   and there's been a passage of some time

25   between your first day and your second day,

MAGNA LEGAL SERVICES



Page 426

1   so if I ask you something that you don't

2   recall, let me know and I can help you

3   refresh your recollection perhaps with a

4   transcript or otherwise.

5        A.    Okay.

6        Q.    First, we didn't really get an

7   opportunity for you to introduce yourself

8   to the jury, Ms. Musco.  Just if you

9   wouldn't mind, tell the jury a little about

10  yourself, where you grew up, where you went

11  to school?

12       A.    Born and raised in New Jersey

13  so I'm a Jersey girl.

14            I went to college in

15  Connecticut, University of Bridgeport in

16  Connecticut.

17            I am a registered nurse.  That

18  is something I always wanted to be ever

19  since I was a little girl, so my first jobs

20  all revolved around that from volunteering

21  to working in the hospital.

22            I went from my clinical

23  experience taking care of severely burned

24  patients in St. Barnabas in Livingston.  So

25  I had skin trauma to taking care of healthy



Page 427

1    skin when I joined Johnson & Johnson in

2    1982, and I started out with Johnson's baby

3    products.

4         Q.    Okay.

5         A.    And then I had various

6    positions with Johnson & Johnson for

7    30 years, and then after that, I am now a

8    program manager for Dress For Success,

9    Central New Jersey, it's a nonprofit, where

10   I teach job development and life skills.

11              MR. PLACITELLA:  Move to

12   strike.  Beyond the scope of the

13   deposition.  Move to strike, nonresponsive

14   to the question.

15   BY MR. BERNARDO:

16        Q.    And how long were you a

17   practicing nurse, Ms. Musco?

18        A.    Well, I'm still a practicing

19   nurse.

20              MR. PLACITELLA:  Excuse me.

21              Objection, beyond the scope of

22   the deposition.

23              She's being here -- produced

24   here, as you told me, so the record is

25   clear, as a representative of Johnson &

                 MAGNA LEGAL SERVICES



Page 428

```
 1   Johnson and not a practicing nurse for

 2   litigation veracity.

 3             You can answer the question

 4   now.

 5             THE WITNESS:  I have been a

 6   registered nurse since 1975, and my

 7   capacity in my positions both in the

 8   hospital and Johnson & Johnson were that of

 9   a registered nurse.

10   BY MR. BERNARDO:

11        Q.   Okay.  And -- and why did you

12   stop nursing practice?

13        A.   I never stopped nursing

14   practice.

15             MR. PLACITELLA:  Excuse me,

16   before you start.

17             Objection, beyond the scope.

18             You can answer now.

19             MR. BERNARDO:  And you can have

20   a continuing objection to all of them if

21   you chose or you can raise it at each one.

22   That's fine with me.

23             MR. PLACITELLA:  I have to make

24   sure I articulate it.  Thank you.

25             MR. BERNARDO:  Okay.

                  MAGNA LEGAL SERVICES
```



Page 429

```
 1                  THE WITNESS:  I have just
 2   practiced nursing in different capacities.
 3   BY MR. BERNARDO:
 4        Q.    Okay.  And I'm sorry, what year
 5   did you go to Johnson & Johnson?
 6        A.    I started at Johnson & Johnson
 7   in 1982.
 8        Q.    Okay.  And -- and tell me about
 9   your experience at Johnson & Johnson.
10                  MR. PLACITELLA:  Objection to
11   the form.
12                  You can answer.
13                  THE WITNESS:  I had many
14   different positions at Johnson & Johnson.
15   I enjoyed them all.  I was able to work
16   with many talented, fantastic people.  It
17   was a very positive experience.
18   BY MR. BERNARDO:
19        Q.    Let's talk about why you're
20   here today and why you were testifying a
21   few weeks ago, which this deposition is the
22   continuation of.
23                  Ms. Musco, what is your
24   understanding of what this deposition would
25   be about?
```

                    MAGNA LEGAL SERVICES



Page 430

1              MR. PLACITELLA:  Objection to

2      form.

3              THE WITNESS:  My understanding

4      is that I am here today to talk about the

5      process of the obtaining the answers and

6      supplying the answers to specific

7      interrogatories for cases involving

8      Johnson's Baby Powder.

9      BY MR. BERNARDO:

10         Q.    And where did you get that

11     understanding?

12         A.    Well, it was my interpretation

13     of the notice and then also working with

14     Counsel.

15         Q.    Okay.  Did you do anything to

16     prepare for your testimony today and the

17     last day you were here on behalf of Johnson

18     & Johnson?

19         A.    Yes, I definitely did.

20         Q.    Can you tell us what you did?

21         A.    Well, after reading the notice

22     and understanding the notice, I first spoke

23     to the people -- one of the people who was

24     responsible for doing the searches to

25     understand the process, understanding

                MAGNA LEGAL SERVICES



Page 431

1    better where the requested information may

2    be found, did we search everywhere possible

3    for it, where was there even the

4    information that was requested, did it even

5    exist.  I did that.

6              I asked to look at some of the

7    complaint files really just to remind

8    myself.  I wasn't familiar with all the

9    cases.  I wanted to see what the complaints

10   were.

11             I read different documents.  In

12   particular, the last time I was deposed

13   there were a number of documents, a lot of

14   them that Mr. Placitella had presented to

15   me, that I had not seen before and I wasn't

16   familiar with, so I did ask that they be

17   sent to Dr. John Hopkins, who is the expert

18   on these matters, to make sure that he had

19   seen them.

20             And then I followed that up and

21   I had about an hour conversation with

22   Dr. Hopkins.  He went through specific

23   tests or allegations that had been

24   presented and explained them to me, not

25   that I remember them, because a little

                MAGNA LEGAL SERVICES



Page 432

```
 1    highly scientific, but it reassured what

 2    I've always known.  So you know, I felt

 3    much more comfortable after that.

 4         Q.    Let me back up.

 5               Ms. Musco, the documents that

 6    you sent or asked to be sent to

 7    Dr. Hopkins, can you identify them for the

 8    record by exhibit number so we're clear

 9    here?

10         A.    Oh, yes.  That would be

11    Exhibit 8 -- P-8A and P-8B.

12         Q.    Okay.  Thank you.

13               And Ms. Musco, did you

14    personally review each of the documents in

15    Exhibits 8A and 8B?

16         A.    No.

17         Q.    Did you -- did you conduct any

18    review of them?

19         A.    I looked at them to see what

20    they were.  There were a lot of things that

21    I don't understand so I certainly could not

22    tell you everything that was in there, but

23    because a lot of them had been brought up,

24    that's why I asked that they be sent to

25    Dr. Hopkins because he would be the most
```

MAGNA LEGAL SERVICES



Page 433

1    familiar with them.

2         Q.    And during the deposition,

3    Mr. Placitella referred to Exhibit 8A and

4    8B as reliance materials.

5              Do you agree with that

6    characterization?

7              MR. PLACITELLA:  Objection to

8    the form of the question.

9              THE WITNESS:  I didn't agree

10   with the word "reliance."  They were a

11   basis, but I did not rely on them for my

12   responses.  As I said, those were the

13   documents that I asked to be shared with

14   Dr. Hopkins because I wanted to feel

15   comfortable that he was familiar with them,

16   that this was nothing new.

17   BY MR. BERNARDO:

18        Q.    Okay.  During your deposition,

19   you discussed the fact that from time to

20   time you signed or certified or verified, I

21   think different words were used, responses

22   to interrogatories.

23              Do you recall that?

24        A.    Yes.

25        Q.    I'd like to take a step back

                    MAGNA LEGAL SERVICES



Page 434

1    and can you explain in your own

2    understanding what an interrogatory is in

3    case the jury is not familiar with that

4    term?

5         A.    My understanding is that

6    interrogatories are questions asked when a

7    complaint has been filed.

8         Q.    And do you have an

9    understanding of the process through which

10   interrogatory responses that are the

11   subject of the deposition notice were

12   prepared?

13        A.    Well, yes, I know that -- the

14   process that we used.  I was not always

15   involved in the process, but if there were

16   questions that Counsel needed direction who

17   the best person to speak with was, I would

18   direct them to that appropriate person.

19        Q.    Why -- why were you in

20   particular involved, if you know,

21   Ms. Musco?

22        A.    I was really involved because

23   throughout my tenure, I had the opportunity

24   to work with just about every department in

25   the company and the different experts that

                MAGNA LEGAL SERVICES



Page 435

1    would be the best ones to answer.  So it's

2    a big company, and I would help make that

3    process easier and direct Counsel to those

4    appropriate people.

5         Q.    Did you interview the

6    individuals yourself?

7         A.    No.

8         Q.    Why not?

9         A.    Because it wouldn't make sense,

10   you know, it was best that they speak

11   directly to Counsel because I -- I couldn't

12   relay their message.  It was a conversation

13   that needed to happen between Counsel and

14   the expert.

15        Q.    Why is that?

16        A.    Because I knew that the people

17   that I was choosing were the experts.  I --

18   as I said before, I wasn't just going down

19   the hall and grabbing somebody, you know,

20   Hey, can you answer this?  I carefully

21   chose the people that could best answer and

22   could best supply that answer to Counsel,

23   and my position was not to interview them.

24   That wasn't my responsibility.

25        Q.    We discussed from time to time

                MAGNA LEGAL SERVICES



Page 436

1    you -- you signed or certified or verified.

2    What does that mean to you to have done

3    that?

4         A.    It means that I did read every

5    answer -- every question, every answer to

6    help ensure that they had all been

7    answered, that I had directed Counsel to

8    the appropriate person.

9         Q.    How do you know the individuals

10   that you identified were providing accurate

11   information or do you know that?

12        A.    Because again, I knew the

13   people that I was directing Counsel to

14   speak with.  These were people I worked

15   with again throughout 30 years, and I knew

16   that they were the appropriate people.  I

17   got to work with them, I got to listen to

18   them.  I'd hear them at internal meetings,

19   I'd hear them at professional meetings.  So

20   I trusted that they had the complete

21   answers.

22        Q.    I want -- I want to move

23   forward to the present time as opposed to

24   talking now -- I think we've been talking

25   about your time when you were assisting

                MAGNA LEGAL SERVICES



```
 1   in -- in providing information or providing

 2   access to individuals for the responses.

 3            So when you were preparing for

 4   this deposition, did you do anything to

 5   ascertain the basis of the responses that

 6   you identified that were responsive to the

 7   notice?

 8        A.   Well, again, you know, the

 9   conversations that I had reviewing them,

10   the conversations that I had with

11   Dr. Hopkins to just solidify what I always

12   knew, that these were the correct

13   responses.

14        Q.   Did -- did you make any efforts

15   to identify if there were any compilations

16   of documents linked to these responses?

17            MR. PLACITELLA:  Objection to

18   form.

19            THE WITNESS:  Yes, that was

20   part of my original conversation with one

21   of the people who was responsible for the

22   searches.  I didn't think there were, but I

23   wanted to make sure that there was no pile

24   anywhere that was responsible for each

25   answer.  These were what people did every
```



Page 438

```
 1    day in their work, so it's not like they

 2    opened a drawer and said, you know, Here's

 3    the page that answers that.

 4    BY MR. BERNARDO:

 5         Q.    Let me -- let me take an aside

 6    here for a minute.

 7               At the end of your questioning

 8    by Mr. Placitella before I began, he asked

 9    you a number of questions about whether you

10    have any knowledge of any documents that

11    were produced or when they were produced.

12               Do you recall those questions?

13         A.    Yes, I do.

14         Q.    In connection with preparing

15    for this deposition, did you make any

16    efforts to determine what documents were

17    produced by Johnson & Johnson in response

18    to discovery requests, to document

19    requests?

20         A.    No, I specifically looked at

21    the notice and stayed within the scope of

22    the notice.  So my understanding of that

23    was it had to do with the discovery

24    responses.

25         Q.    Go back to, you mentioned you
```

MAGNA LEGAL SERVICES



Page 439

1    looked for or asked somebody to look for

2    documents.  Who did you ask, by the way, to

3    understand if there were documents that

4    were linked up to these responses?

5         A.    Well, the person I spoke to, I

6    can't right now think of her last name,

7    it's Pam.  As I said, she was one of the

8    people responsible for the searches, and in

9    understanding, you know, how she did the

10   searches, was there anything else, was

11   there any other file to understand that

12   better.  So that's the person I spoke with.

13        Q.    Okay.  Mr. Placitella asked you

14   a number of specific document -- I'm sorry,

15   specific questions about documents that you

16   couldn't answer, in particular documents in

17   binders 8A and 8B.

18             Do you recall that?

19        A.    Yes, I do.

20        Q.    Why didn't you conduct a

21   further review of those once you sent them

22   to Dr. Hopkins?

23             MR. PLACITELLA:  Objection,

24   mischaracterizes her prior testimony.

25   Object to form.



Page 440

1           THE WITNESS:  Well, some of

2    them that he asked I didn't feel were in

3    the scope because they had to do with

4    industrial talc, and my understanding was

5    that the notice had to do with cosmetic

6    talc and Johnson's Baby Powder and Shower

7    to Shower.

8    BY MR. BERNARDO:

9        Q.    Okay.  Also, Mr. Placitella

10   raised with you a number of affidavits.

11          Do you recall that?

12       A.    Yes.

13       Q.    Did you review those?

14       A.    No, I did not.

15       Q.    And why hadn't you reviewed

16   those?

17       A.    For the reason that I just

18   said, that these had to do with cases with

19   industrial talc and I didn't believe they

20   were within the scope.

21       Q.    Do you have any understanding

22   of why only a few sets of responses that

23   discuss the issue of asbestos and talc were

24   located?

25       A.    No, but my understanding is

                MAGNA LEGAL SERVICES



Page 441

```
 1   that there may not have been -- in the
 2   first place there may not have been
 3   discovery responses, or they may have been
 4   with an outside counsel and we didn't know
 5   where they were.  So you know, and I
 6   believe that we had agreed that we weren't
 7   going to search outside counsels, but every
 8   attempt was made to find whatever was
 9   available.
10        Q.    On the first day of your
11   testimony, Ms. Musco, a number of times you
12   testified that documents were not available
13   in one case or another other than the
14   complaint.
15             Do you -- do you recall --
16   first, do you recall that testimony?
17        A.    Yes.
18        Q.    And what -- what did you mean
19   by that?
20        A.    I meant the spec- -- I mean,
21   there may have been documents, but the
22   specific documents that had been requested
23   in the notice, which were answers to
24   interrogatories in discovery.
25        Q.    Do you have any knowledge one
```



Page 442

1   way or the other if there were documents

2   pertaining to those cases other than

3   whether there were discovery responses or

4   discovery correspondence?

5          A.     The other documents, no.

6          Q.     Did you make any efforts to

7   look for that?

8          A.     Other than discovery responses,

9   no, I did not.

10         Q.     Why not?

11         A.     Because, again, my

12   interpretation of the notice was that we

13   were talking about discovery responses.

14         Q.     Okay.  And do you have any

15  knowledge as to whether there were searches

16  that were done in addition to the searches

17  of the company files of the cases

18  specifically cited in the notices to see if

19  there were discovery responses?

20             MR. PLACITELLA:  Object to the

21  form.

22             THE WITNESS:  Could you ask

23  that again, please?

24  BY MR. BERNARDO:

25         Q.     Sure.

                MAGNA LEGAL SERVICES



Page 443

1          MR. PLACITELLA:  Do you object,
2     too?

3          MR. BERNARDO:  She objects,
4     too.

5          MR. PLACITELLA:  Okay.

6     BY MR. BERNARDO:

7     Q.    Ms. -- Ms. Musco, you testified
8     during your deposition that searches were
9     made with respect to the specific cases
10    listed in the notice.

11          Do you recall that?

12    A.    Yes.

13    Q.    Okay.  Do you have knowledge as
14    to whether there were searches done for
15    discovery -- responsive discovery responses
16    other than with respect to ones in those
17    cases?

18          MR. PLACITELLA:  Objection to
19    the form.

20          THE WITNESS:  No, I do not.

21    BY MR. BERNARDO:

22    Q.    Okay.  I'm going to switch
23    gears a little bit.

24          On the first day of your
25    deposition, Mr. Placitella asked you about

                 MAGNA LEGAL SERVICES



Page 444

1      the Johnson mine and whether talc from the

2      Johnson mine was used in Johnson's Baby

3      Powder.

4              Do you recall that testimony?

5      A.      Yes, I do.

6      Q.      And you said you believed it

7      did.

8              Do you recall that?

9      A.      Yes.

10     Q.      What did you mean by that?

11     A.      Well, now I -- my understanding

12     at the time was that when Mr. Placitella

13     said Johnson's mine, I thought he meant the

14     mines owned by Johnson's under the

15     Johnson's umbrella, you know, the

16     numerous -- the different ones that were

17     owned by Johnson & Johnson or used by

18     Johnson & Johnson.

19     Q.      Are you aware that there's a

20     mine that's actually called the Johnson

21     mine?

22     A.      I am now.

23     Q.      When did you first become aware

24     that there's a mine called the Johnson

25     mine?

                  MAGNA LEGAL SERVICES



Page 445

```
 1        A.     Yesterday.

 2        Q.     And how did you become aware of

 3    that?

 4        A.      In discussions with you.

 5               MR. PLACITELLA:  What?

 6               MR. BERNARDO:  In discussions

 7    with Counsel.

 8               MR. PLACITELLA:  Can you mark

 9    that, please?

10    BY MR. BERNARDO:

11        Q.     Do you have an understanding of

12    whether the Johnson mine supplied talc for

13    Johnson Baby Powder?

14        A.     No, I don't.  I'm not really

15    familiar which mine supplied what.  I'm not

16    an expert on the mines, and I think that's

17    why I just heard Johnson's, you know,

18    thinking like we say Johnson's Baby Powder,

19    it's Johnson's mine.

20        Q.     And last, Ms. Musco, you talked

21    about a number of discovery interrogatory

22    responses, I think there were a couple in

23    the Selby case and some in the Krushinski

24    case during your deposition.

25               Do you recall that?
```



Page 446

1          A.     Yes.

2          Q.     As you sit here today, do you

3    believe that those responses are truthful

4    and accurate?

5          A.     Yes.

6                 MR. BERNARDO:  I don't have any

7    further questions.

8                 MR. PLACITELLA:  Okay.  I'm

9    going to need five to ten minutes.

10                THE VIDEOGRAPHER:  The time is

11   now 2:02 PM.  We are going off the record.

12                (Recess.)

13                THE VIDEOGRAPHER:  The time is

14   now 2:16 PM.  We are back on the record.

15                     -  -  -

16             E X A M I N A T I O N

17                     -  -  -

18   BY MR. PLACITELLA:

19         Q.     Ma'am, do you have an

20   understanding of what the penalty of

21   perjury is in the state of New Jersey?

22                MR. BERNARDO:  Object to --

23   BY MR. PLACITELLA:

24         Q.     What it is?

25                MR. BERNARDO:  Object to the

                   MAGNA LEGAL SERVICES



Page 447

```
 1    form of the question.
 2              THE WITNESS:  I don't know the
 3    exact punishment, no.
 4    BY MR. PLACITELLA:
 5         Q.    And you, in fact, signed
 6    certifications indicating that you knew
 7    that if you told a non-truth, you were
 8    subject to punishment and could go to jail,
 9    correct?
10              MR. BERNARDO:  Object to the
11    form of the question.
12              THE WITNESS:  Yes.
13    BY MR. PLACITELLA:
14         Q.    And you knew that when you were
15    testifying here under oath that if you
16    perjured yourself, you could be subject to
17    penalties, correct?
18         A.    That's my understanding, yes.
19         Q.    Now, do you recall that when we
20    started this deposition, I was very
21    specific with you and I asked you questions
22    about whether you had spoken with anybody,
23    including your lawyers, and whether, based
24    on that discussion, you were going to
25    change your testimony in any way.
```



Page 448

 1              Do you recall me asking those

 2    questions?

 3              MR. BERNARDO:  Object to the

 4    form of the question, mischaracterizes the

 5    question, mischaracterizes the statement.

 6    BY MR. PLACITELLA:

 7        Q.    Do you recall me asking that

 8    question?

 9        A.    I know you asked me whether I

10    had conversations, yes.

11              MR. PLACITELLA:  Okay.  Can you

12    please, Court -- Madam Court Reporter, read

13    back the question and answer I asked you to

14    find in the -- that we started this

15    deposition with?

16              (Pertinent portion of the

17    record is read.)

18    BY MR. PLACITELLA:

19        Q.    Do you recall giving that

20    testimony under oath, ma'am --

21        A.    That's what I said.

22        Q.    -- here on the witness stand in

23    Middlesex County?

24        A.    That's what I said, yes.

25        Q.    Okay.  I'm going to show you

                MAGNA LEGAL SERVICES



Page 449

1    your testimony from the last time.

2                   MR. PLACITELLA:  Are you ready?

3                   THE VIDEOGRAPHER:  There's no

4    speakers hooked up to it.

5                   MR. PLACITELLA:  Right.  Why

6    are we getting no sound?

7                   THE VIDEOGRAPHER:  The time is

8    now 2:18 PM.  We're going off the record.

9                   (Recess.)

10                  THE VIDEOGRAPHER:  The time is

11   now 2:22 PM.  We are back on the record.

12   BY MR. PLACITELLA:

13        Q.    This is your testimony from

14   last time.  I want to play it for you.

15                  (Audio played.)

16                  Okay.  That was your testimony

17   before you had a conversation with your

18   lawyer and you changed your testimony,

19   correct?

20                  MR. BERNARDO:  Object to the

21   form of the question, and object to not

22   showing the witness the transcript in which

23   there is obviously important testimony

24   right before what you just showed her.

25   BY MR. PLACITELLA:

                        MAGNA LEGAL SERVICES



Page 450

```
 1        Q.    Ma'am, do you recall giving
 2   that testimony?
 3              Here, I'll play it again?
 4              (Audio played.)
 5              MR. BERNARDO:  Same objection.
 6   BY MR. PLACITELLA:
 7        Q.    Do you recall giving that
 8   testimony, ma'am?
 9        A.    That is my voice there.  I also
10   remember saying that I really don't know
11   much about the mines at all.
12        Q.    Ma'am, do you recall giving --
13   let me play it again for the record.
14              (Audio played.)
15              MR. BERNARDO:  Object to the
16   continued playing of the testimony in --
17   BY MR. PLACITELLA:
18        Q.    Do you recall giving that
19   testimony, ma'am?
20              MR. BERNARDO:  -- that is not
21   the prior statement.
22   BY MR. PLACITELLA:
23        Q.    Do you recall giving that
24   testimony under oath, ma'am?
25        A.    Yes, I -- that's what I said.
```
                    MAGNA LEGAL SERVICES



Page 451

```
 1        Q.    Okay.  Now --
 2              MR. PLACITELLA:  Can you give
 3   me J&J-294, please?
 4   BY MR. PLACITELLA:
 5        Q.    I'm going to show you up on the
 6   screen the deposition from your -- the
 7   president of your company, Roger Miller, in
 8   the Westfall case.
 9              Do you remember we went through
10   this the last time and I showed it to you?
11        A.    Yes.
12        Q.    Okay.  And you see on page 16
13   Mr. Miller is asked about the different
14   grades of talc that came out of the Johnson
15   mine.
16              Do you see that?
17        A.    I'm reading that now because
18   this is the first I've seen this.
19              MR. BERNARDO:  Object to the
20   form of the question, beyond the scope of
21   the notice.
22              You can answer in your
23   individual capacity.
24              MR. PLACITELLA:  Well, it's not
25   beyond the scope of the conversation you
              MAGNA LEGAL SERVICES
```



Page 452

1    had with her off the record.

2                MR. BERNARDO:  To correct what

3    was --

4                MR. PLACITELLA:  Okay.  Don't

5    even --

6                MR. BERNARDO:  -- beyond the

7    scope of the notice.

8                MR. PLACITELLA:  Don't even go

9    there.  Don't even go there, okay?  Just

10   don't go there.

11               THE WITNESS:  I see it.  You've

12   highlighted this, yes.

13   BY MR. PLACITELLA:

14       Q.    And you see where it says that

15   one of the grades from the Johnson mine is

16   the No. 500?

17               Here, I'll blow it up for you.

18       A.    I see --

19       Q.    "Was given the No. 500, and the

20   products of the floatation process of the

21   refining process are the 500 series

22   products."

23               Do you see that?

24       A.    I see it says that, yes.

25       Q.    Okay.  Now, go to your binder,

                 MAGNA LEGAL SERVICES



Page 453

1    8A.   8A-1, the very first document in your

2    binder that you sent to Dr. Hopkins, the

3    very first document.

4              Do you see that?

5         A.   Yes.

6         Q.   Do you have it in front of you?

7         A.   Yes.

8         Q.   You see where it says

9    Cosmetics?

10        A.   Yes, I do.

11        Q.   Okay.  You go to the second

12   page, see where it talks about Emtals for

13   cosmetics?

14        A.   That's what it says, yes.

15        Q.   Do you see where it talks about

16   Emtal 500 for cosmetics coming from the

17   Vermont -- Johnson, Vermont mine?

18             MR. BERNARDO:  Object to the

19   form of the question, beyond the scope of

20   the notice.

21             You can answer in your

22   individual capacity.

23             THE WITNESS:  That's what it

24   says, yes.

25   BY MR. PLACITELLA:

                    MAGNA LEGAL SERVICES



Page 454

```
 1        Q.    And it also talks about the
 2   Windsor 66 product being used in -- in
 3   cosmetic, too, correct?
 4              MR. BERNARDO:  Object to the
 5   form of the question.
 6              THE WITNESS:  I see those
 7   numbers and I see that.  I don't know what
 8   any of this means.
 9   BY MR. PLACITELLA:
10        Q.    Yes, ma'am.  And can you tell
11   me, as you sit here today, everything else
12   you discussed with your lawyers in
13   preparation for today's deposition and the
14   deposition the first time?
15              MR. BERNARDO:  Object to the
16   form of the question, instruct the witness
17   not to answer.  Calls for privileged
18   communications.  We can certainly call
19   Judge Viscomi if you like.
20              MR. PLACITELLA:  I'll file a
21   motion.
22   BY MR. PLACITELLA:
23        Q.    Ma'am, you had conversations
24   with your lawyers about the substance of
25   your testimony, correct?
```

MAGNA LEGAL SERVICES



Page 455

1              MR. BERNARDO:  Object to the

2    form of the question.

3              THE WITNESS:  As I told you

4    earlier, we discussed my deposition

5    generally, yes.

6    BY MR. PLACITELLA:

7         Q.    Okay.  Now -- and just so the

8    record is clear, and based upon those

9    discussions with your lawyers, you have

10   changed your testimony here today?

11             MR. BERNARDO:  Object to the

12   form.

13   BY MR. PLACITELLA:

14        Q.    True or false?

15             MR. BERNARDO:  Object to the

16   form of the question.

17             THE WITNESS:  False.

18   BY MR. PLACITELLA:

19        Q.    You haven't changed your

20   testimony?

21        A.    No.

22             MR. BERNARDO:  Objection to

23   form of the question.

24             MR. PLACITELLA:  Okay.

25   BY MR. PLACITELLA:

                   MAGNA LEGAL SERVICES



Page 456

```
 1        Q.    So let's have the record clear.
 2   On the record, tell me everything you
 3   discussed with your lawyers about your
 4   testimony --
 5              MR. BERNARDO:  Object --
 6   BY MR. PLACITELLA:
 7        Q.    -- that you gave the last time?
 8              MR. BERNARDO:  Object to the
 9   form of the question and instruct the
10   witness not to answer.  I'm asking that
11   this stop and that we call in Judge Viscomi
12   right now.  I'm making that request.
13              MR. PLACITELLA:  Well, I'm
14   not -- I'm done.  I'm going to file a
15   motion.
16              MR. BERNARDO:  No, no.
17              MR. PLACITELLA:  There's no
18   reason to do it now.
19              MR. BERNARDO:  No, no, no.
20              MR. PLACITELLA:  No, I'm not
21   doing it now.
22              MR. BERNARDO:  Mr. Placitella,
23   I'm asking --
24              MR. PLACITELLA:  I'm sorry.
25   It's my -- you can do whatever you want
```
                    MAGNA LEGAL SERVICES



Page 457

1   when I'm done with my questioning.  I'm

2   done.

3               MR. BERNARDO:  That's fine.

4               MR. PLACITELLA:  I'm done.

5   Okay?  All right?  I'm done with asking the

6   question.  You've directed her not to

7   answer it and -- and we're going to deal

8   with it --

9               MR. BERNARDO:  No, we're going

10  to --

11              MR. PLACITELLA:  -- in a motion

12  practice.  Yes, we are.

13              MR. BERNARDO:  We're going

14  to --

15              MR. PLACITELLA:  It's my

16  motion.  No, we're not dealing with it now.

17              MR. BERNARDO:  And I'm going to

18  ask if I'm allowed to redirect the witness,

19  and I'm planning to do that.  And in

20  connection with that, I'm going to ask for

21  Judge Viscomi.

22              And in fact, before I redirect

23  the witness, I think I'm going to take a

24  brief break and try to find the judge.

25              THE VIDEOGRAPHER:  The time is

                MAGNA LEGAL SERVICES



Page 458

1   now 2:29 PM.

2              We're going off the record.

3              MR. PLACITELLA:  I'm not done.

4              MR. BERNARDO:  You just said

5   you were.

6              MR. PLACITELLA:  I'm not done

7   with my questions.  I have a lot more

8   questions.  I'm not done.  I'm done with

9   this line of questioning.  You directed her

10  not to answer and I'll file a motion and

11  I'm going to keep asking my questions.

12             MR. BERNARDO:  I'm going to ask

13  for Judge Viscomi in any event.

14             (Discussion held with the

15  Court.)

16             THE VIDEOGRAPHER:  The time is

17  now 2:48 PM.  We are back on the record.

18  BY MR. PLACITELLA:

19      Q.    Okay.  We had a conversation

20  with the judge so I'm going to ask you this

21  question:  Did you understand it was a

22  material issue as to whether -- well,

23  scratch that.

24             When we started the deposition,

25  do you recall giving the following

                MAGNA LEGAL SERVICES



Page 459

1    testimony, and I'm going to play it out

2    loud because the video doesn't work, okay?

3    In terms of scope of the deposition.

4              Do you recall this?

5              (Audio played.)

6              Do you recall giving that

7    testimony?

8        A.    Yes, I do.

9        Q.    Okay.  Now, you recall from the

10   affidavits that I showed you from

11   Mr. Miller where he said under oath that

12   the cosmetic talc and the industrial talc

13   came from the same mine.

14             Do you recall that?

15             MR. BERNARDO:  Object to the

16   form of the question.

17             THE WITNESS:  I don't recall

18   that he said that, no.

19   BY MR. PLACITELLA:

20       Q.    Okay.  We went through this, do

21   you remember the Edley affidavit from this

22   morning?

23             MR. PLACITELLA:  Can I --

24             THE WITNESS:  I remember the

25   name, yes.

                MAGNA LEGAL SERVICES



Page 460

1   BY MR. PLACITELLA:

2       Q.    Do you recall --

3             THE VIDEOGRAPHER:  The time is

4   now 2:51 PM.  We're going off the record.

5   BY MR. PLACITELLA:

6       Q.    I'll read -- I'll read it while

7   you're trying to figure it out.

8             The affidavit that's in your

9   book --

10            MR. BERNARDO:  I'm sorry, are

11  we on the record, Chris?

12            MR. PLACITELLA:  Yes.

13            MR. BERNARDO:  I thought he

14  just said we're going off the record.

15            MR. PLACITELLA:  I'm trying to

16  finish this.  The judge told me I had an

17  hour.

18            MR. BERNARDO:  I know, Chris.

19  I'm not trying to be argumentative, but I

20  thought he said we're off the record.  I

21  thought you wanted to be on the record.

22            THE WITNESS:  He did say that.

23            THE VIDEOGRAPHER:  The time is

24  now 2:52 PM.  We are back on the record.

25  BY MR. PLACITELLA:

                MAGNA LEGAL SERVICES



Page 461

```
 1        Q.    This is the affidavit from the

 2   president of your company we went through

 3   this morning.

 4              Do you see that?

 5        A.    Yes, president of the mine,

 6   yes.

 7        Q.    Right.

 8              MR. PLACITELLA:  This is --

 9   BY MR. PLACITELLA:

10        Q.    And in the affidavit,

11   Mr. Miller states:

12              "The mining district is

13   exclusive source of talc for all Johnson's

14   Baby Powder sold in the United States.  In

15   addition to supplying the talc for

16   Johnson's Baby Powder, Windsor Minerals

17   also sells a portion of its products to

18   independent industrial users."

19              Do you see that?

20        A.    Yes, I see that.

21              MR. BERNARDO:  Objection.

22   BY MR. PLACITELLA:

23        Q.    On the back he says:

24              "All of the talc mined by

25   Windsor Minerals, Inc., whether it is
```

MAGNA LEGAL SERVICES



Page 462

1    ultimately sold to industrial users or used

2    in Johnson's Baby Powder, is sampled and

3    tested for presence of asbestos."

4              Right?

5        A.    Yes.

6        Q.    Okay.  Now, you have binders --

7    your attorney asked you about binders 8A

8    and 8B.

9              Do you see them in front of

10   you?

11       A.    Yes.

12       Q.    Who selected what was going to

13   be put in those binders, you or your

14   lawyers?

15       A.    Well, a lot of it was based on

16   my first deposition with you.  I had asked

17   that those things be sent to Dr. Hopkins so

18   that I would understand them, and as I

19   explained earlier, to make sure that he was

20   well aware of them.  So that's really what

21   a lot of it is.

22       Q.    I'm not asking -- who made the

23   selection, ma'am, as to what was going to

24   go in those binders?

25       A.    My attorneys and myself.

                MAGNA LEGAL SERVICES



Page 463

1      Q.    So your lawyers made the
2 selection with you and that was what was
3 sent to Dr. Hopkins, correct?
4           MR. BERNARDO:  Object to the
5 form of the question.
6 BY MR. PLACITELLA:
7      Q.    Correct?
8      A.    This is what was sent, yes.
9      Q.    And it did not include all of
10 the information that was -- is in Musco-2,
11 does it?
12      A.    What's Musco-2?
13      Q.    The big fat binder in front of
14 you.  All of that information is not in the
15 binders you sent to Dr. Hopkins, is it?
16      A.    You mean all of this
17 information?
18      Q.    Yes, ma'am.
19      A.    I don't believe so.  I don't
20 know.
21      Q.    So what happened was your
22 lawyers determined what was going -- what
23 you were going to review, they put it in 8A
24 and 8B, and then you sent that off to
25 Dr. Hopkins, correct?

                MAGNA LEGAL SERVICES



Page 464

1           MR. BERNARDO:  Object to the

2   form of the question.

3           THE WITNESS:  Based -- based on

4   our understanding of the notice, that

5   material was sent to Mr. -- Dr. Hopkins.

6   BY MR. PLACITELLA:

7       Q.   And that included the very

8   first document in your binder that talked

9   about the Johnson mine talc being used in

10  cosmetic talc, right?

11          MR. BERNARDO:  Object to the

12  form of the question.

13          THE WITNESS:  What's in 8A and

14  8B was sent to Dr. Hopkins.

15  BY MR. PLACITELLA:

16      Q.   Right.  And it's the very first

17  document in your binder that talks about

18  talc from the Johnson mine, we just went

19  through this, used in cosmetic talc, right?

20  Very first document.

21      A.   That's in here, yes.

22      Q.   Okay.  And then you called

23  Dr. Hopkins after you sent the material,

24  correct?

25      A.   Correct.

                MAGNA LEGAL SERVICES



Page 465

```
 1          Q.    Okay.  And Dr. Hopkins is not a
 2   Johnson & Johnson employee, correct?
 3          A.    Not at this time, no.
 4          Q.    And he never worked with you
 5   personally in answering any discovery
 6   related to lawsuits involving talc that you
 7   were involved with, correct?
 8          A.    Not directly, no.
 9          Q.    All right.  You never had a
10   single conversation with him about lawsuits
11   involving talc until Johnson & Johnson
12   arranged for you to call him in preparation
13   for this deposition, correct?
14               MR. BERNARDO:  Object to the
15   form of the question.
16               THE WITNESS:  We had had
17   conversations through the course of my
18   tenure at Johnson & Johnson, but not
19   directly related to any particular
20   complaints.
21   BY MR. PLACITELLA:
22          Q.    My question was, ma'am:  You
23   never had a conversation with Dr. Hopkins
24   about any lawsuit whatsoever until such
25   time that counsel for Johnson & Johnson put
```



Page 466

1    in touch with Dr. Hopkins, correct?

2              MR. BERNARDO:  Object to the

3    form of the question.

4              THE WITNESS:  That's correct.

5    BY MR. PLACITELLA:

6         Q.    And Dr. Hopkins is not an

7    employee of Johnson & Johnson, is he?

8         A.    Not at this time, no.

9         Q.    And what happened was that

10   Johnson & Johnson then paid Dr. Hopkins to

11   look at the material that you sent him and

12   then have a conversation to tell you what

13   he thinks the material means, correct?

14             MR. BERNARDO:  Object to the

15   form of the question.

16             THE WITNESS:  I don't know.

17   I'm sure he was paid for his time like all

18   of us, but I -- I don't know anything about

19   that.

20   BY MR. PLACITELLA:

21        Q.    Well, how much was he getting

22   paid in order to brief you for this

23   deposition?

24             MR. BERNARDO:  Object to the

25   form of the question.

                 MAGNA LEGAL SERVICES



Page 467

```
 1                THE WITNESS:  I have no idea.
 2   BY MR. PLACITELLA:
 3        Q.    And as a result of -- as a
 4   result of your conversation, you took down
 5   notes, correct?
 6        A.    That's correct.
 7        Q.    Okay.
 8                MR. PLACITELLA:  Do you have
 9   her notes?
10                MR. BERNARDO:  And I'm going to
11   object for the record.  This is not
12   something new that came up on her direct.
13   This is something that could have been
14   asked before and should have been asked
15   before.
16                Go ahead.
17                MR. PLACITELLA:  Okay.  Give
18   the witness a copy of her notes.
19   BY MR. PLACITELLA:
20        Q.    Okay.  You have in front of you
21   your notes?
22        A.    Yes.
23        Q.    Okay.  I have them here under
24   the Elmo.
25                These are your notes, correct?
                  MAGNA LEGAL SERVICES
```



Page 468

1          A.     Yes.

2          Q.     And they're P-14, correct?

3          A.     Yes.

4          Q.     And they're taken on Drinker,

5     Biddle & Reath station -- notepads?

6          A.     Yes, they are.

7          Q.     So did you take these while you

8     were at the law firm of Drinker, Biddle &

9     Reath?

10         A.     Yes, I did.

11         Q.     And was anybody in the room

12    with you while you were taking these notes?

13         A.     Yes.

14         Q.     And who was in the room with

15    you while you were taking these notes?

16         A.     Both my attorneys, Mr. Karp and

17    Mr. Bernardo.

18         Q.     So Mr. Bernardo and Mr. Karp

19    were in the room while you were speaking to

20    Dr. Hopkins and he was briefing you on his

21    perceptions of what was in the documents

22    you sent him, correct?

23              MR. BERNARDO:  Object to form

24    of the question.

25              THE WITNESS:  They were both in

                MAGNA LEGAL SERVICES



Page 469

1    the room at the other end of the table, but

2    I was having a conversation with

3    Dr. Hopkins.

4    BY MR. PLACITELLA:

5         Q.    Right.  And did your lawyers at

6    any point in time during your conversation

7    with Dr. Hopkins provide any additional

8    information or input?

9         A.    No, they did not.

10        Q.    So they sat there quietly the

11   whole time and listened?

12        A.    They were talking amongst

13   themselves.

14        Q.    Okay.  So did they have any --

15   did they say anything to Dr. Hopkins?

16        A.    No, they did not.

17        Q.    Okay.  And so -- and the

18   information you received from Dr. Hopkins

19   with the lawyers in the room was part of

20   the basis for the testimony that you've

21   given in this deposition, correct?

22             MR. BERNARDO:  Object to the

23   form of the question.

24             THE WITNESS:  I don't know that

25   I would call it the basis for the

                    MAGNA LEGAL SERVICES



Page 470

1    testimony.  I -- the reason that I spoke to

2    Dr. Hopkins is because I wanted, as I've

3    said before, to make sure that this was

4    nothing new, that he had reviewed -- he was

5    familiar with all the allegations and I

6    wanted to make sure of that.

7    BY MR. PLACITELLA:

8         Q.    Okay.  But then you wrote down

9    notes based on your conversation with

10   Dr. Hopkins while your lawyer was in the

11   room and you brought them to the -- to the

12   deposition to -- if I asked you questions,

13   you were going to refer to the notes,

14   right?

15             MR. BERNARDO:  Object to the

16   form of the question.

17             THE WITNESS:  No, I was told

18   that they had to be brought to the

19   deposition so they're here.

20   BY MR. PLACITELLA:

21        Q.    Okay.  So whatever is in these

22   notes is not the basis for anything you had

23   to say in this deposition?

24        A.    I really took notes.  I do this

25   every time I'm on the phone automatically.

MAGNA LEGAL SERVICES



Page 471

1    It's just to focus myself in the

2    conversation.  So I heard a lot from

3    Dr. Hopkins, a lot of it was science.  As I

4    said, I'm not the expert in that, so I

5    couldn't repeat back really what he said.

6         Q.    So do you remember what you

7    said about your notes the last time we were

8    together?

9         A.    Not exactly, no.

10        Q.    Okay.  And -- well, let's just

11   look at your notes.  Okay?  Let's -- so

12   let's look at your notes where it talks

13   about No. 6.

14             Do you see that?

15             MR. PLACITELLA:  Can you give

16   me book 6?

17   BY MR. PLACITELLA:

18        Q.    You see No. 6?

19        A.    Yes.

20        Q.    Okay.  And what that does is

21   that refers to Exhibit 6 in tab 5, correct?

22        A.    No, I -- this was numbers that

23   Dr. Hopkins was using on the phone, so

24   perhaps it was just his way of referring.

25   I don't know exactly what he was tying it

                  MAGNA LEGAL SERVICES



Page 472

1    into.  I just wrote it down as he said it.

2         Q.    Well, here, I'm looking at it.

3    Here's 1971, Colorado mine, right?  Your

4    notes.  And there's an Exhibit No. 6,

5    right?  Your notes say No. 6, 1971, and you

6    wrote down Colorado mine, correct?

7         A.    As I said, I wrote down what

8    Dr. Hopkins said, which was No. 6.

9         Q.    And then tell me what your

10   notes say about what Dr. Hopkins said.

11        A.    I have, "Colorado mine, trace

12   tremolite 1971.  Ashton, one sample that

13   Langer found.  Several labs.  Princeton,

14   MIT, FDA, Dartmouth all confirmed no

15   asbestos."

16        Q.    Okay.  And --

17             MR. PLACITELLA:  Sorry.

18   J&J-65.  My fault.  I'm sorry.  I should

19   let you know that I -- hold on.  It's still

20   not here.  Let's go to 22.

21   BY MR. PLACITELLA:

22        Q.    Can you go to your tab 8A-19?

23             MR. BERNARDO:  I'm sorry, 8A-

24   19?

25             MR. PLACITELLA:  Uh-huh.

                 MAGNA LEGAL SERVICES



Page 473

1    BY MR. PLACITELLA:

2        Q.    November 5th, 1975.

3              MR. PLACITELLA:  That's what

4    I'm missing, I'm doing this wrong.  I'm

5    back in sync.

6    BY MR. PLACITELLA:

7        Q.    All right.  So in your -- in

8    your notes you have a No. 25, "Don't know

9    if industrial or cosmetic."

10             Do you see that?

11       A.    Yes.

12       Q.    And 25 is at 8A-19, correct?

13       A.    It says Exhibit 25.

14       Q.    Correct?  And so I'm clear that

15   this exhibit under the Elmo, 25,

16   corresponds to your notes with Dr. Hopkins,

17   correct?

18       A.    As I said earlier, these were

19   the numbers that Dr. Hopkins gave me, so I

20   do not know for sure if it's -- that's what

21   it relates to.

22       Q.    Okay.  Let's go to -- let's go

23   to your notes 22.  Okay?  No. 22 talks

24   about what?  What does that say, 22?

25       A.    It says, "Imerys 1976, Vermont.

                MAGNA LEGAL SERVICES



Page 474

1    Don't know what the sample is.  Sediment

2    returned to test tube.  No baby powder

3    talc."

4        Q.    Right.  And is that your tab

5    No. 17, Exhibit 22?

6        A.    As I said earlier, I don't know

7    specifically.  These numbers were given to

8    me by Dr. Hopkins.

9        Q.    So although -- well, maybe I

10   can shortcut all this.

11            Although you wrote down notes

12   based on your conversations with

13   Dr. Hopkins, you have no idea what exhibits

14   in the binder you sent him they actually

15   refer to, correct?

16       A.    As I said earlier, these were

17   his numbers.  He specifically talked about

18   these kind of testing where there were

19   allegations to make it a little clearer to

20   me and reassure me, but I can't say for

21   sure what his numbering system was.

22       Q.    Okay.  So you don't know what

23   he was going through having a conversation

24   with him -- just so we're clear, you have

25   no idea from looking at anything in 8A or



Page 475

1  8B what he was talking about, correct?

2       A.    I don't know specifically his

3  numbering system, but you know, as you have

4  pointed out, the number, the place, it

5  seems to it, but it's Dr. Hopkins numbers,

6  you know, he gave me.

7       Q.    Right.  But you never connected

8  the two?

9       A.    No.

10       Q.    Okay.  So all you did was

11  basically listen to Dr. Hopkins, he gave

12  you a number, he told you what he thought

13  about that number and you wrote it down,

14  correct?

15       A.    Yes.  I asked for his

16  interpretation of the different allegations

17  and that's what he gave me.

18       Q.    Okay.  But you have no idea,

19  just so we're clear, what tab in either one

20  of these binders those notes even refer to,

21  correct?

22       A.    I don't know specifically.  He

23  gave me these numbers, yes.

24       Q.    Okay.  So we'd have to ask

25  Dr. Hopkins?

MAGNA LEGAL SERVICES



Page 476

```
 1          A.     Yes.

 2          Q.     Okay.  So did you ever ask

 3    Dr. Hopkins whether the -- by the way,

 4    did -- did -- were your lawyers taking

 5    notes while this was going on?

 6          A.     I don't think so.  As I said,

 7    they were at the other end of the table

 8    talking amongst themselves.  They were not

 9    part of the conversation.

10          Q.     Okay.  And -- okay.

11                 MR. PLACITELLA:  So give me the

12    Hopkins chart.

13    BY MR. PLACITELLA:

14          Q.     This is a big copy of the

15    Hopkins chart, J&J-414, Hopkins-28 that was

16    in your binder.

17                 Do you see that?

18          A.     Yes.

19          Q.     Okay.  Will you take the big

20    copy out?  And let's just talk about it.

21                 You see -- first of all, can

22    you look through this chart and you see how

23    the chart is headed, it's date, exhibit

24    number, testing entity, author, recipient,

25    purpose stated, test method, mine, what was
```



Page 477

1   tested, special preparation, what test

2   revealed, Hopkins comments.

3             Do you see that?

4        A.   I see that, yes.

5             MR. BERNARDO:  Object to the

6   form of the question.

7   BY MR. PLACITELLA:

8        Q.   And can you tell me -- so for

9   example, under J&J-257, it talks about

10  McCrone.

11            Do you see that?

12       A.   I see that, yes.

13       Q.   And by the way, when you talked

14  to Dr. Hopkins about this chart, did he

15  tell you how he created this chart?

16            MR. BERNARDO:  Object to the

17  form of the question.

18            THE WITNESS:  I did not talk to

19  him about this chart.  I don't know if he

20  created it or you created it based on his

21  comments, so I didn't talk to him

22  specifically about this.

23  BY MR. PLACITELLA:

24       Q.   So where he talks about find --

25  where the chart talks about chrysotile



Page 478

1    being found in Shower to Shower, you don't

2    know anything about that, correct?

3                MR. BERNARDO:  Object to the

4    form of the question.

5                THE WITNESS:  I don't know what

6    this is referring to here, no.

7    BY MR. PLACITELLA:

8        Q.    Okay.  So maybe I can get us

9    out of here early.

10               Am I correct that you don't

11   have any evidence, as you sit here today,

12   on behalf of Johnson & Johnson that a

13   single one of the tests that are set forth

14   in this chart were ever supplied to any

15   plaintiff before 2017 as part of discovery,

16   correct?

17               MR. BERNARDO:  Object to the

18   form of the question.

19   BY MR. PLACITELLA:

20       Q.    Take a look at it --

21               MR. BERNARDO:  Asked and

22   answered.

23   BY MR. PLACITELLA:

24       Q.    -- 'cause I don't -- I don't

25   want you -- I don't want you to do it

                MAGNA LEGAL SERVICES



Page 479

1    haphazardly.  Take a look at the chart,

2    please.

3         A.    I don't know what was supplied

4    to the plaintiffs.

5         Q.    Please take a look at the

6    chart.

7         A.    I don't have to look at it

8    because I really do not know what was

9    supplied to the plaintiff.

10        Q.    As you sit here today

11   testifying on behalf of Johnson & Johnson,

12   am I correct that you don't have any

13   evidence that you can show the court that

14   any of the tests that are set forth in this

15   chart were ever provided to a single

16   plaintiff before 2017, correct?

17             MR. BERNARDO:  Object to the

18   form of the question, beyond the scope of

19   the notice.

20             You can answer in your

21   individual capacity.

22             THE WITNESS:  I don't know

23   because my understanding was that was not

24   what I was here to talk about today.

25   BY MR. PLACITELLA:

                 MAGNA LEGAL SERVICES



Page 480

```
1        Q.    Okay.  And would you agree that

2   all of the test results, whether you agree

3   with them or not, on this chart are

4   evidence?

5              MR. BERNARDO:  Object to the

6   form of the question.

7              THE WITNESS:  That's kind of

8   hard for me to answer because I think of

9   evidence as proof, but if it was

10  appropriate for them to be given to the

11  plaintiffs and discussed, then I would

12  think they would be.

13  BY MR. PLACITELLA:

14       Q.    But you have no proof to that

15  effect at all, correct?

16       A.    No, I do not.

17       Q.    All right.  And you were the

18  one that was here produced by Johnson &

19  Johnson to testify under oath as to what

20  was in the possession of Johnson & Johnson

21  and what was turned over to the plaintiffs

22  as part of discovery?  That's the part I

23  just read you in the first question I asked

24  you in the deposition, correct?

25             MR. BERNARDO:  Object to the
```



Page 481

```
 1   form of the question.
 2               THE WITNESS:  My understanding
 3   that I was here today to discuss the
 4   discovery responses.
 5   BY MR. PLACITELLA:
 6        Q.    Ma'am, do you remember the
 7   first question I asked you and I just
 8   played it for you again, that you are here
 9   to testify about what information was in
10   possession of Johnson & Johnson and what
11   was turned over in the course of discovery?
12               Do you recall that?
13        A.    The specific discovery
14   responses.
15        Q.    Yes, ma'am.  And as you sit
16   here today, you don't have a single piece
17   of evidence to indicate that you ever
18   turned any test over related to the testing
19   of asbestos in Johnson & Johnson talc to a
20   single plaintiff, correct?
21               MR. BERNARDO:  Object to the
22   form of the question.
23               THE WITNESS:  My understanding
24   if it was appropriate to be turned over,
25   that it would have been, but I do not know
```

MAGNA LEGAL SERVICES



Page 482

1   what was or was not turned over.

2   BY MR. PLACITELLA:

3        Q.   Ma'am, I'm going to ask the

4   question again:  As you sit here today, you

5   do not have any evidence to prove that you

6   ever turned over a single test concerning

7   asbestos and Johnson & Johnson talc to any

8   plaintiff before 2017, correct?

9             MR. BERNARDO:  Object to the

10   form of the question.

11             THE WITNESS:  Again, I do not

12   know what was turned over or what was not

13   turned over.

14   BY MR. PLACITELLA:

15        Q.   Ma'am, I promise you you'll get

16   out of here on time.  Just please try to

17   answer my question.

18             MR. BERNARDO:  I believe she

19   has a couple times.

20   BY MR. PLACITELLA:

21        Q.   As you sit here today, you do

22   not have any evidence that any test related

23   to asbestos and Johnson & Johnson talc was

24   ever turned over to any plaintiff in any

25   case before 2017.  You have no evidence

MAGNA LEGAL SERVICES



Page 483

1    with you, do you?

2              MR. BERNARDO:  Object to the

3    form of the question.

4              THE WITNESS:  I'm trying to

5    answer it.  I don't know what was or

6    wasn't.  I did not come today prepared to

7    show you evidence of what was or was not

8    turned over.

9    BY MR. PLACITELLA:

10        Q.   Ma'am, all I'm asking you, as

11   you sit here today, do you have any

12   evidence that you turned over a single one

13   of these tests set forth in Musco-2 or on

14   this chart to any plaintiff before 2017?

15   That's my question.

16        A.   And my answer is still the

17   same:  I don't know what was or was not

18   turned over.

19        Q.   But, ma'am, you're here on

20   behalf of Johnson & Johnson as the person

21   to testify about what was and what was not

22   turned over.  And are you saying that you,

23   Johnson & Johnson, have no idea what was

24   turned over or not?

25              MR. BERNARDO:  Object to the

                 MAGNA LEGAL SERVICES



Page 484

1    form of the question.

2              THE WITNESS:  My understanding

3    is that I'm here today to discuss the

4    discovery responses.

5    BY MR. PLACITELLA:

6       Q.    Ma'am, yes or no:  Do you have

7    any evidence that you ever turned over a

8    single test for asbestos in Johnson &

9    Johnson talc before 2017?  Do you have any

10   evidence whatsoever?

11             MR. BERNARDO:  Object to the

12   form of the question.

13             THE WITNESS:  I can't answer

14   that because I don't know what was handed

15   over or what was not.

16             I'm trying to be helpful, but

17   I -- I do not have any knowledge of that

18   and I was not prepared to discuss that

19   today.

20   BY MR. PLACITELLA:

21      Q.    Okay.  Ma'am, in the

22   interrogatory responses that you signed,

23   and you said you verified a number of them,

24   do you have any evidence that when you

25   signed answers to interrogatories, that you

                MAGNA LEGAL SERVICES



Page 485

1    turned over, you, Johnson & Johnson, any

2    evidence related to the testing of Johnson

3    & Johnson talc for asbestos?

4                THE. BERNARDO:  Object to the

5    form of the question.

6                THE WITNESS:  If it was

7    requested and it was appropriate to send,

8    then it would have been sent.  So I do not

9    know if it was sent or not.

10   BY MR. PLACITELLA:

11       Q.    Ma'am, you certified answers to

12   interrogatories under oath, under penalty

13   of perjury in numerous cases, did you not?

14       A.    Yes.  There were different

15   ones, yes.

16       Q.    And what I'm asking you is:  Do

17   you have any proof, as you sit here today,

18   that when you did that, you ever turned

19   over a single document in conjunction with

20   those responses related to the testing of

21   Johnson Baby Powder for asbestos?

22                MR. BERNARDO:  Object to the

23   form of the question.

24                THE WITNESS:  I don't remember

25   turning it over.  I don't remember what was

                MAGNA LEGAL SERVICES



Page 486

1    turned over.  Again, that was not my

2    responsibilities.  I'm not here to discuss

3    that.  I don't know what was turned over or

4    not.

5    BY MR. PLACITELLA:

6         Q.    Ma'am, do you have any

7    evidence, as you sit here today, that in

8    any of the discovery responses that you

9    certified as true and accurate ever turned

10   over testing evidence related to Johnson &

11   Johnson Baby Powder for asbestos?  It's a

12   simple yes or no question.

13             MR. BERNARDO:  Object to the

14   form of the question.  She's answered it

15   multiple times.

16   BY MR. PLACITELLA:

17        Q.    Do you have any evidence?

18             MR. BERNARDO:  And she's

19   answered why she can't answer it yes or no

20   as well.

21             MR. PLACITELLA:  Please don't

22   do that.  That is not a form objection.

23   Please don't do that.

24             MR. BERNARDO:  Then please

25   don't harass the witness.

                 MAGNA LEGAL SERVICES



Page 487

1              MR. PLACITELLA:  Please don't

2    do that.  I'm just trying to get an answer

3    to my question.

4              THE WITNESS:  And I'm really

5    trying to answer it.  I don't believe it's

6    a yes or no.  I don't know one way or the

7    other.

8    BY MR. PLACITELLA:

9        Q.    Okay.  So as you sit here

10   today, Johnson & Johnson does not know

11   whether, when they were responding to

12   discovery -- because this is not Nancy

13   Musco.  I'm asking you, Johnson & Johnson,

14   as you sit here today, Johnson & Johnson

15   cannot produce any evidence that they ever

16   turned over a single test concerning

17   asbestos in Johnson & Johnson talc at any

18   point in time to any plaintiff, correct?

19             MR. BERNARDO:  Object to the

20   form of the question.

21             THE WITNESS:  Again, I can't

22   answer because my it's understanding today

23   that I was here to discuss the discovery

24   interrogatory responses.

25   BY MR. PLACITELLA:

                  MAGNA LEGAL SERVICES



Page 488

1          Q.    Yes, 'ma'am, and in conjunction
2   with the discovery responses, even under
3   your understanding, no discovery response
4   ever attached a single test that you
5   certified, a single test related to testing
6   of Johnson & Johnson Baby Powder for
7   asbestos, correct?
8               MR. BERNARDO:  Object to the
9   form of the question.
10              THE WITNESS:  At this point, I
11  don't even know what the question is.
12  BY MR. PLACITELLA:
13         Q.    Ma'am, when you signed
14  interrogatories, did you ever attach to any
15  of the interrogatories that you certified
16  as true and accurate under oath, did you
17  ever attach or supply a single test of
18  Johnson & Johnson talc for asbestos?
19              Did you ever do it?
20         A.    It wasn't my responsibility to
21  do that.  The questions were given to the
22  appropriate person, and if there was an
23  appropriate response that required testing
24  to be sent and it felt it was appropriate
25  to answer and send, it would have been.



Page 489

```
 1         Q.    Ma'am --

 2         A.    But I do not know whether they

 3    were sent or not.

 4         Q.    Ma'am, I'm not asking you,

 5    Nancy Musco, I'm asking you, Johnson &

 6    Johnson.

 7              You, Johnson & Johnson, have no

 8    idea whether you ever sent a single test to

 9    any plaintiff concerning testing for

10    asbestos in Johnson & Johnson talc,

11    correct?

12              MR. BERNARDO:  Object to the

13    form of the question.

14    BY MR. PLACITELLA:

15         Q.    You, Johnson & Johnson.  Not

16    Nancy Musco.

17              MR. BERNARDO:  Object to the

18    form of the question, beyond the scope of

19    the notice.

20              You can answer it if you can.

21              THE WITNESS:  I have -- because

22    I'm answering as Johnson & Johnson, it's

23    beyond the scope of what we're here to talk

24    about --

25    BY MR. PLACITELLA:
```

                    MAGNA LEGAL SERVICES



Page 490

```
 1        Q.    Ma'am --

 2        A.    -- so I do not know.

 3        Q.    Ma'am, you believe that it was

 4   your determination to figure out what the

 5   scope of this deposition was?  You thought

 6   that was your role?

 7        A.    That was part of my role, yes.

 8        Q.    Not your lawyers?  You didn't

 9   think your lawyers made that determination?

10   In preparing for this deposition, you made

11   the determination what the scope of the

12   deposition notice was.

13             MR. BERNARDO:  Object to the

14   form.

15   BY MR. PLACITELLA:

16        Q.    Is that -- is that your

17   testimony under oath?

18             MR. BERNARDO:  Object to the

19   form of the question.

20             THE WITNESS:  We both did.

21   BY MR. PLACITELLA:

22        Q.    So you decided what -- you,

23   based upon this notice -- is this marked by

24   the way?

25             MS. CALLAHAN:  P-2 I believe.

              MAGNA LEGAL SERVICES
```



Page 491

```
 1              MR. PLACITELLA:  Okay.
 2   BY MR. PLACITELLA:
 3        Q.    Based upon P-1 -- P-1 says,
 4   you're the person -- the representative of
 5   Johnson & Johnson with the most knowledge
 6   concerning discovery responses historically
 7   provided by Johnson & Johnson and Windsor
 8   Minerals concerning the asbestos content of
 9   talc, Johnson's Baby Powder, Shower to
10   Shower sold by Johnson & Johnson, Windsor
11   Minerals and Eastern Magnesia Talc Company.
12              Do you see that?
13        A.    Yes, I do.
14        Q.    And you understand that
15   discovery responses involve more than just
16   interrogatory answers, correct?
17        A.    My understanding is that
18   they're the direct responses to the
19   interrogatories in discovery.
20        Q.    Ma'am, you understand that
21   discovery responses are more than answers
22   to interrogatories, correct?
23        A.    My understanding is that these
24   were direct responses that was requested.
25        Q.    Well, you see on the very next
                MAGNA LEGAL SERVICES
```



Page 492

1    page it actually details information that

2    you were asked to bring and consider.  It

3    included correspondence related to

4    discovery, correct?

5         A.    For the specific complaints,

6    yes.

7         Q.    Okay.  Discovery responses,

8    ma'am, correct?

9         A.    For the specific cases, yes.

10        Q.    All right.  Affidavits, ma'am?

11        A.    Yes.

12        Q.    All right.  Certifications,

13   correct?

14        A.    Yes.

15        Q.    Okay.  And just so the record

16   is clear, although Johnson & Johnson was

17   involved based upon what we went through

18   last time in litigation involving baby

19   powder from 1971 to the present, you only

20   reviewed two sets of interrogatories in

21   order to prepare for your deposition,

22   correct?

23             MR. BERNARDO:  Object to the

24   form of the question.

25   BY MR. PLACITELLA:

                    MAGNA LEGAL SERVICES



Page 493

1      Q.    That's it?

2      A.    My understanding is that I was

3  to review and respond to discovery

4  responses and they were not available to me

5  any other discovery responses.

6      Q.    Okay.  Ma'am, let me ask the

7  question again.

8            Although Johnson & Johnson was

9  involved in litigation based on what we did

10  from 1971 to the present involving

11  Johnson's Baby Powder, you only reviewed

12  two interrogatory responses in preparation

13  for the -- this deposition, correct?

14      A.    That's correct.

15      Q.    Okay.

16            MR. BERNARDO:  Object to the

17  form of the question.

18  BY MR. PLACITELLA:

19      Q.    And you -- and out of all of

20  the interrogatory responses that you

21  certified yourself, you only reviewed one

22  set of interrogatory responses, correct?

23            MR. BERNARDO:  Object to the

24  form of the question.

25            THE WITNESS:  I believe there

             MAGNA LEGAL SERVICES



Page 494

1    was only one specific one that I did

2    certify myself.

3    BY MR. PLACITELLA:

4         Q.    You told me that you certified

5    multiple --

6         A.    Of the baby powder.

7         Q.    Right.  I'm sorry, what did you

8    say?

9         A.    Of the baby powder, yes.

10        Q.    Right.

11        A.    There's one.

12        Q.    Right.

13        A.    There's one.  And there may

14   have been others throughout the years that

15   I did.

16        Q.    Right.  And that --

17        A.    But they weren't necessarily

18   baby powder.

19        Q.    You don't have any

20   recollection?

21        A.    No, I don't.

22        Q.    Okay.  All right.  Well, then,

23   how do you know if they're baby powder or

24   not?

25        A.    Because I know that these were

                    MAGNA LEGAL SERVICES



Page 495

1    the ones that were discussed.  I mean,

2    30 years, there was a lot of products, a

3    lot of cases.

4         Q.    Okay.  So let me ask you the

5    following questions on behalf of Johnson &

6    Johnson.

7              Did Johnson & Johnson make any

8    mistakes in how they supplied discovery

9    responses in lawsuits involving baby powder

10   from your perspective on behalf of Johnson

11   & Johnson?

12             MR. BERNARDO:  Object to the

13   form of the question, beyond the scope of

14   the notice.

15             You can answer in your

16   individual capacity.

17             THE WITNESS:  I don't know what

18   you mean by mistakes.

19   BY MR. PLACITELLA:

20        Q.    Well, did they -- should they

21   have provided certain information that they

22   didn't -- did they make any mistakes?

23             MR. BERNARDO:  Same objection.

24   BY MR. PLACITELLA:

25        Q.    Here's what I'm trying to

                   MAGNA LEGAL SERVICES



Page 496

1   avoid, ma'am, to be clear.  I don't want to

2   see your lawyer get up in a -- in a -- in a

3   trial and say mistakes were made, but they

4   were innocent mistakes, and so I'm just

5   asking you:  From your -- from the

6   perspective of Johnson & Johnson, were any

7   mistakes made in how you responded to

8   discovery in terms of the information you

9   supplied related to Johnson's Baby Powder

10  and testing for asbestos?  Were any

11  mistakes made?

12          MR. BERNARDO:  Object to the

13  form of the question, beyond the scope of

14  the notice.

15          THE WITNESS:  I can't answer

16  that.

17  BY MR. PLACITELLA:

18      Q.   You can't answer it?

19      A.   No.

20      Q.   Okay.

21          MR. PLACITELLA:  Just give me

22  two minutes to look at my notes.

23          THE VIDEOGRAPHER:  Off the

24  record?

25          MR. PLACITELLA:  Yeah, you can

            MAGNA LEGAL SERVICES



Page 497

1    go off the record.

2              THE VIDEOGRAPHER:  The time is

3    now 3:29 PM.  We are going off the record.

4              (Brief recess.)

5              THE VIDEOGRAPHER:  The time is

6    now 3:31 PM.  We are back on the record.

7    BY MR. PLACITELLA:

8         Q.    Okay.  Do you have 8A-32 in

9    front of you?

10        A.    From where?

11        Q.    From your books.

12        A.    8A you said?

13        Q.    8A, No. 32.  This is from the

14   books that you and your counsel selected to

15   send to Dr. Hopkins, correct?

16        A.    This is the book sent to

17   Dr. Hopkins, yes.

18        Q.    Okay.  And 8A-32 is entitled,

19   "What did testing reveal?"

20              Do you see that?

21        A.    I see it says that, yes.

22        Q.    And over here on the left side

23   is a date and on the right is a result.

24              Do you see that?

25        A.    That's what it says, yes.

MAGNA LEGAL SERVICES



Page 498

1        Q.    And over here it says, for

2   example, date, 12/4/70, and the result is 5

3   to 10 percent fibrous talc, tremolite,

4   actinolite.

5             Do you see that?

6        A.    That's what it says, yes.

7        Q.    Were these results ever

8   provided to any plaintiff, to your

9   knowledge?

10            MR. BERNARDO:   Objection to the

11   form of the question.

12            THE WITNESS:   I do not know.

13   BY MR. PLACITELLA:

14        Q.    Okay.  Next, 7/7/71 under "What

15   did the testing reveal?  Tremolite and

16   actinolite."

17            Do you see that?

18        A.    I see it says that, yes.

19        Q.    Okay.  The next one, it says,

20   7/29/71, Johnson & Johnson.  Fibrous

21   minerals, tremolite, actinolite in terms of

22   what did the testing reveal.

23            Do you see that?

24        A.    I see it says that, yes.

25        Q.    Do you have any evidence that



Page 499

```
 1    this test was turned over to any plaintiff
 2    at any point in time?
 3              MR. BERNARDO:  Object to the
 4    form of question, beyond the scope of the
 5    notice.
 6              You can answer in your
 7    individual capacity if you know.
 8              THE WITNESS:  I don't know what
 9    this is and what it was from and who wrote
10    it.
11    BY MR. PLACITELLA:
12        Q.    Ma'am, this is in your book
13    that you sent to Dr. Hopkins, so you and
14    your lawyers put this together.  You must
15    have thought it was important or you
16    wouldn't have sent it.  So let me ask you
17    the questions.
18              Let's go to 2/26/73.  This
19    talks about from Colorado to Ashton,
20    tremolite, actinolite, asbestos-type
21    materials.
22              Was this test ever sent to any
23    plaintiff?
24        A.    I don't know.
25        Q.    Okay.  Next is a report -- I'll
                 MAGNA LEGAL SERVICES
```



Page 500

1    skip down.

2              Reference, 4/24/74, McCrone.

3    On the chart What the tests reveal, and it

4    talks about chrysotile, Argonaut.

5              Do you see that?

6         A.   I see it says that.

7         Q.   Does -- was this test ever

8    supplied to any plaintiff?

9         A.   I don't know.

10        Q.   Okay.  And the next is a --

11   under "What did the test reveal" chart,

12   there is a mention of a report from

13   McCrone.

14             Do you see that?  10/10/74?

15        A.   I see it says that, yes.

16        Q.   And it says chrysotile fibers.

17             Do you have any evidence that

18   this report was ever supplied to a single

19   plaintiff?

20             MR. BERNARDO:  Same objection

21   with respect to this entire document and

22   scope.

23             You may answer.

24             THE WITNESS:  I don't know.

25   BY MR. PLACITELLA:

                  MAGNA LEGAL SERVICES



Page 501

1          Q.    Okay.  Next is 2/2/75, entitled

2    Cyprus.  Result:  Asbestos mineral

3    tremolite, possibly chrysotile.

4               Do you have any evidence that

5    this test result --

6               MR. BERNARDO:  Object to the

7    form --

8    BY MR. PLACITELLA:

9          Q.    -- was supplied to any

10   plaintiff?

11              MR. BERNARDO:  Object to the

12   form of the question.

13              THE WITNESS:  I do not know.

14   BY MR. PLACITELLA:

15         Q.    Okay.  Next is a listing

16   10/8/65, Miller to McCrone, under Result:

17   Fibers of asbestos.

18              Do you have any evidence that

19   the test that was sent from Miller to

20   McCrone talking about fibers of asbestos

21   was ever turned over to a single plaintiff?

22         A.    I don't know.

23         Q.    Okay.  Next is 1/15/75 from

24   McCrone to Zeitz.  Under Result:  Fibers of

25   asbestos 10 times.

                    MAGNA LEGAL SERVICES



Page 502

```
 1                   Do you have any evidence that
 2      this test was ever turned over to a single
 3      plaintiff?
 4           A.    I --
 5                   MR. BERNARDO:  Same objection.
 6                   THE WITNESS:  I do not know.
 7      BY MR. PLACITELLA:
 8           Q.    Okay.  Next is a date, 1/25/77,
 9      Pooley to Roll (ph).  Under Result:  Fibers
10      of antigorite.
11                   Do you have any evidence that
12      this test was ever turned over to a single
13      plaintiff?
14           A.    I do not know.
15           Q.    Okay.  Next -- I'm skipping a
16      little bit because I was told by the judge
17      I had to get done by quarter of, so let's
18      just go from -- to -- skip up to 1978.
19                   10/6/78, McCrone to Windsor.
20      Result:  Chrysotile fibers.
21                   Do you have any evidence that
22      this test was ever turned over to a single
23      plaintiff?
24           A.    I do not, no.
25           Q.    Okay.  Next is a -- well, the
                    MAGNA LEGAL SERVICES
```



Page 503

```
 1    next two say mine unknown, so I'm going to

 2    skip those.

 3              Then it says 9/1/83, McCrone,

 4    and under Result, it says:  Fibers at

 5    Argonaut.

 6              Do you know Argonaut was a mine

 7    that was used for Johnson Baby Powder?

 8              MR. BERNARDO:  Object to the

 9    form of the question.

10              THE WITNESS:  As I said

11    earlier, I am not familiar with all the

12    names of the mines.

13    BY MR. PLACITELLA:

14         Q.   Do you have any evidence that

15    this test was ever turn over to a single

16    plaintiff?

17         A.   I do not know.

18         Q.   Okay.  There's another test

19    here, 11/2/84 from McCrone.  Chrysotile

20    fibers.

21              Do you see that result?

22         A.   I see it says that.

23         Q.   Is that the same McCrone that

24    you filed discovery responses saying that

25    the information that they had was a trade
```



Page 504

1    secret?

2              MR. BERNARDO:  Object to the

3    form of the question.

4              THE WITNESS:  I -- again, I

5    don't know what this is and what it relates

6    to.

7    BY MR. PLACITELLA:

8         Q.   But McCrone, that's the company

9    that you filed discovery responses in the

10   Coker case and said that information from

11   McCrone was a trade secret, right?

12             MR. BERNARDO:  Object to the

13   form of the question.

14   BY MR. PLACITELLA:

15        Q.   That's what you said, you

16   Johnson & Johnson.

17             Do you remember that?

18        A.   I don't believe -- I don't know

19   that that was said.

20        Q.   Okay.  You don't remember that

21   document?

22        A.   I remember there were

23   documents.  I don't remember what they

24   said.

25        Q.   All right.  A few more.

                  MAGNA LEGAL SERVICES



Page 505

```
 1                 8/22/85, test from McCrone.
 2    Result:  Chrysotile asbestos.
 3                 Do you have any evidence that
 4    this test was ever sent to a single
 5    plaintiff?
 6                 MR. BERNARDO:  Object to the
 7    form of the question.
 8                 THE WITNESS:  I do not know.
 9    BY MR. PLACITELLA:
10        Q.    Okay.  And 4/26/86, McCrone to
11    Miller, chrysotile asbestos.  Do you have
12    any evidence this test was ever sent to a
13    single plaintiff?
14        A.    I do not know.
15        Q.    Okay.  The next test, 9/8/86,
16    McCrone to Miller, Windsor Hammonsville,
17    Goodrock exposed to -- George Goodrock
18    exposed to fibers.
19                 Do you know who that is --
20        A.    No.
21        Q.    -- who worked for you?
22                 Okay.  And then the last one,
23    3/30/1987, tremolite, correct?
24        A.    That's what it says.
25        Q.    All right.  One more question,
                 MAGNA LEGAL SERVICES
```



Page 506

1    ma'am.  One more question and I'm done.

2                   MR. PLACITELLA:  Tab 33 and 34.

3    BY MR. PLACITELLA:

4         Q.    All of these tests that we just

5    went through, ma'am, every one of them

6    predated the affidavit signed by the

7    president of your company in July 1987

8    where you said that there was no testing

9    evidence ever showing asbestos in any

10   Johnson & Johnson product, correct?

11                  MR. BERNARDO:  Object to the

12   form.

13   BY MR. PLACITELLA:

14        Q.    Every one of the tests we just

15   went through?

16                  MR. BERNARDO:  Object to the

17   form of the question, beyond the scope of

18   the notice.

19                  You can answer in your

20   individual capacity if you know.

21                  THE WITNESS:  The dates seem to

22   be before, yes.

23                  MR. PLACITELLA:  Okay.  That's

24   all the questions I have.  Thank you.

25                  THE VIDEOGRAPHER:  The time is

                     MAGNA LEGAL SERVICES



Page 507

1   now 3:39 PM.  This concludes today's

2   deposition.

3               (Witness excused.)

4               (Deposition concluded at

5   approximately 3:39 PM.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 508

```
 1                    CERTIFICATE
 2            I, CONSTANCE S. KENT, a Notary
 3    Public and Certified Court Reporter of the
 4    State of New Jersey, do hereby certify that
 5    prior to the commencement of the
 6    examination, NANCY MUSCO, was duly sworn by
 7    me to testify to the truth, the whole truth
 8    and nothing but the truth.
 9            I DO FURTHER CERTIFY that the
10    foregoing is a verbatim transcript of the
11    testimony as taken stenographically by and
12    before me at the time, place and on the
13    date hereinbefore set forth, to the best of
14    my ability.
15            I DO FURTHER CERTIFY that I am
16    neither a relative nor employee nor
17    attorney nor counsel of any of the parties
18    to this action, and that I am neither a
19    relative nor employee of such attorney or
20    counsel, and that I am not financially
21    interested in the action.
22    _____
23    CONSTANCE S. KENT, CCR, RPR, CLR
      Notary Number:  2325233
24    Notary Expiration:  1/13/2020
      CCR Number:  30XI00118300
25    Dated:  March 13, 2019
```



Page 509

1                    LAWYER'S NOTES

2    PAGE  LINE

3    _____  _____    _____

4    _____  _____    _____

5    _____  _____    _____

6    _____  _____    _____

7    _____  _____    _____

8    _____  _____    _____

9    _____  _____    _____

10   _____  _____    _____

11   _____  _____    _____

12   _____  _____    _____

13   _____  _____    _____

14   _____  _____    _____

15   _____  _____    _____

16   _____  _____    _____

17   _____  _____    _____

18   _____  _____    _____

19   _____  _____    _____

20   _____  _____    _____

21   _____  _____    _____

22   _____  _____    _____

23   _____  _____    _____

24   _____  _____    _____

25   _____  _____    _____



**A**

**ability** 508:14
**able** 311:19 429:15
**Abraham** 396:2
**access** 437:2
**accurate** 395:6
  413:14 436:10
  446:4 486:9
  488:16
**actinolite** 498:4,16
  498:21 499:20
**action** 381:1 508:18
  508:21
**actual** 307:8
**acute** 307:15 308:2
**addition** 308:17
  311:1 328:7
  392:15 442:16
  461:15
**additional** 306:17
  310:24 335:18
  469:7
**address** 312:20
  313:15 330:22
**addressed** 311:13
  311:13,17,22
**addresses** 331:4
**Administrator**
  297:14
**admitted** 320:3
  338:1
**adopted** 360:13
**advance** 337:16
**advice** 311:11
**advised** 410:24
**affidavit** 301:21
  302:23 322:25
  323:14,17 324:1
  325:13,15,19,20
  327:3 329:3 331:9
  333:14 348:13,19
  349:15,16,22
  350:2,14 351:3,10
  351:21 352:9
  353:11,13 355:24

355:25 364:1,2,25
365:2,21 366:6
367:6 369:16,16
369:17,20 370:10
372:4,13,19,22,23
373:2 374:8,10
376:23 395:22
415:17,23 416:17
416:22 417:12,14
417:16,18 459:21
460:8 461:1,10
506:6
**affidavits** 333:3
  416:11 440:10
  459:10 492:10
**afternoon** 425:15
**ago** 358:15 367:18
  372:4 382:18
  429:21
**agree** 364:17
  370:10 433:5,9
  480:1,2
**agreed** 441:6
**agreement** 320:1
  320:11 337:12,23
  338:3
**AH** 354:22
**ahead** 467:16
**Akron** 372:3
**al** 294:7 295:8,18
  296:7,15 297:7,20
  298:7,15,24 305:6
**ALFRED** 297:3
**Alice** 387:19 388:3
  388:11 390:1
  407:3
**allegation** 308:16
**allegations** 356:20
  431:23 470:5
  474:19 475:16
**alleged** 308:13,15
  385:2
**alleging** 396:2
**allowed** 457:18
**allowing** 337:9
**Amax** 296:6 300:6

**ambiguous** 403:24
**AMERICA** 295:7
  295:17 297:7,20
  298:6,14,23
**amosite** 361:7,14
**amounts** 388:19
**analysis** 355:11,12
**analyzed** 360:24
  388:12
**ANDREW** 299:9
**andrew.karp@s...**
  299:12
**and/or** 380:17
**angry** 326:19,20
**ANITA** 297:3
**answer** 304:5 326:3
  329:12 334:9
  336:11 342:21
  346:8 348:2,7
  349:1 353:20
  355:18 356:5
  357:2 360:5
  361:20 364:11
  365:8 366:1 370:2
  371:21 380:14
  383:20 387:24
  399:21 406:22
  407:16 411:21
  414:1,13 416:15
  417:23 419:1,8
  420:15 424:21
  428:3,18 429:12
  435:1,20,21,22
  436:5,5 437:25
  439:16 448:13
  451:22 453:21
  454:17 456:10
  457:7 458:10
  479:20 480:8
  482:17 483:5,16
  484:13 486:19
  487:2,5,22 488:25
  489:20 495:15
  496:15,18 499:6
  500:23 506:19
**answered** 420:13

436:7 478:22
486:14,19
**answering** 408:8,11
  465:5 489:22
**answers** 309:24
  337:3 346:6
  354:17 356:10
  357:6 361:1 366:7
  366:20 380:6
  391:18 394:19,24
  412:7,19 413:3,13
  415:5 419:17
  430:5,6 436:21
  438:3 441:23
  484:25 485:11
  491:16,21
**anthophyllite**
  393:20,21
**antigorite** 502:10
**anybody** 418:23
  447:22 468:11
**apologize** 368:12
**appeal** 418:7,19
**APPEARANCES**
  300:1
**appeared** 312:19
  409:1
**appears** 374:12
**Appellate** 418:8,22
**appreciate** 326:16
  425:22
**approach** 421:13
**appropriate** 367:25
  394:24 406:11
  419:17,21 434:18
  435:4 436:8,16
  480:10 481:24
  485:7 488:22,23
  488:24
**approximately**
  306:12 507:5
**April** 387:19
**Argonaut** 500:4
  503:5,6
**argumentative**
  367:22 460:19

**ARPS** 299:8
**arranged** 465:12
**artfully** 344:9
**article** 302:20
  409:1,15,25
  410:20
**articulate** 428:24
**asbestiform** 403:18
  410:7
**asbestos** 302:22
  328:19,24 333:23
  333:24 335:23
  342:13 343:6
  344:6 345:22
  347:25 348:4
  351:17 352:3
  353:15 355:2,9,10
  355:12 356:1,23
  361:6 364:6
  369:22 372:10
  373:4 380:18,21
  381:8 383:14
  388:19 390:3
  392:23 393:17
  394:13 398:12,24
  399:6 400:18
  401:1 403:18
  406:7 407:22
  409:3 414:8,17
  416:4,19 417:4
  420:25 440:23
  462:3 472:15
  481:19 482:7,23
  484:8 485:3,21
  486:11 487:17
  488:7,18 489:10
  491:8 496:10
  501:2,17,20,25
  505:2,11 506:9
**asbestos-type**
  499:20
**ascertain** 437:5
**Ashton** 348:14
  349:22 350:2,13
  351:2,9,21 355:25
  364:1 368:22



369:20 374:11 375:12 376:5 377:14,18 382:20 395:18,21 416:22 472:12 499:19
**Ashton's** 349:14
**aside** 438:5
**asked** 307:3,11,22 312:11 320:17,24 321:3 322:1,24,24 323:13 324:1 333:1,9 335:11,18 335:19 340:6,11 342:3 343:3,17 346:2 347:21 348:11 349:13,15 359:16 362:1 367:15,17,19 384:17 398:10,19 399:1,12,22,25 409:25 413:25 420:13 431:6 432:6,24 433:13 434:6 438:8 439:1 439:13 440:2 443:25 447:21 448:9,13 451:13 462:7,16 467:14 467:14 470:12 475:15 478:21 480:23 481:7 492:2
**asking** 316:3 327:1 344:22 373:7 448:1,7 456:10,23 457:5 458:11 462:22 483:10 485:16 487:13 489:4,5 496:5
**asks** 358:21 362:7 404:10
**assay** 331:12
**assert** 326:4,6
**asserted** 383:13
**assertion** 398:13
**assisting** 436:25

**Associates** 402:9,19 404:24 405:12,17
**assume** 395:24 406:12
**assumes** 403:24
**attach** 366:6 488:14,17
**attached** 349:14,16 349:22 352:9,17 352:21 353:10,11 361:1 373:11 488:4
**attaches** 376:22
**attaching** 351:22
**attempt** 441:8
**attorney** 344:20 462:7 508:17,19
**attorneys** 462:25 468:16
**Audio** 449:15 450:4 450:14 459:5
**August** 371:2
**author** 476:24
**automatically** 470:25
**autopsy** 359:5
**available** 313:24 334:19 338:18 339:24 350:2 388:24 389:8 390:22 391:10 441:9,12 493:4
**Avenue** 300:9
**avoid** 496:1
**Avon** 294:7 305:5
**aware** 364:4 389:25 390:5 395:2 400:14 413:15 444:19,23 445:2 462:20
**axial** 360:15
**A-12** 361:25

---

**B**

**B** 301:12
**baby** 301:24 302:22

308:14 328:3,8,18 336:9 356:24 389:15 390:4 396:19 399:25 400:19 401:2 409:4 414:6,9,16 418:9 419:4 420:2 420:24,24 427:2 430:8 440:6 444:2 445:13,18 461:14 461:16 462:2 474:2 485:21 486:11 488:6 491:9 492:18 493:11 494:6,9,18 494:23 495:9 496:9 503:7
**back** 315:4 349:10 363:22 373:25 374:8 378:2 387:8 387:16 397:14 401:16 421:9 425:10 432:4 433:25 438:25 446:14 448:13 449:11 458:17 460:24 461:23 471:5 473:5 497:6
**Bankers** 314:12
**Barnabas** 426:24
**based** 329:6 398:13 417:17 447:23 455:8 462:15 464:3,3 470:9 474:12 477:20 490:23 491:3 492:17 493:9
**basically** 321:5 475:11
**basis** 312:3 319:4 324:22 400:25 433:11 437:5 469:20,25 470:22 302:17
**becoming** 367:21

**began** 438:8
**beginning** 350:6 414:13
**begins** 305:3
**behalf** 331:9 337:3 339:19 346:6 358:15 364:2 393:4 411:6 425:20 430:17 478:12 479:11 483:20 495:5,10
**Beidler** 347:9
**believe** 307:15,18 309:22 311:4 314:6 318:16 319:24 321:2 324:14 350:5 388:17 396:24 399:14 402:24 405:13 440:19 441:6 446:3 463:19 482:18 487:5 490:3,25 493:25 504:18
**believed** 366:16 444:6
**Bernardo** 299:9 301:7 308:8 309:10 310:9 312:13,22 313:6 313:19 314:1,19 315:12,22 317:22 318:25 319:13 320:8 321:9 322:9 322:14 323:3,9,20 324:5,11 325:25 326:8,16,21 327:8 329:9,24 330:5,9 332:3,18,21 334:3 334:7 335:25 337:6 338:9,23 339:1,11,25 342:14,18 343:8 344:9,10,20 345:11,16 346:22 348:17,22 349:1

350:3,16,23 351:4 352:12,23 353:17 354:9 355:15 356:3,11 357:15 357:23 358:9,25 360:2,17 361:17 362:4,14,25 363:13 364:8,18 365:4,12,17,23 366:10,23 367:9 367:13 368:16 369:9,24 370:16 370:20,24 371:18 372:14 373:9 374:19 377:3 378:15,20,25 379:4 381:12 382:2 383:16 386:9,17 387:1,22 389:1,16 390:6,15 391:3,14 396:22 398:25 400:21 401:9,20,24 403:2 405:1 406:8,19 407:6 408:5 409:16,20 410:11 411:1,19 413:19 414:20 415:13 416:13 417:20 418:13 419:6,13 420:3,8,11 421:1 421:24 422:11 423:5,17,25 424:9 424:18 425:3,14 425:19 427:15 428:10,19,25 429:3,18 430:9 433:17 438:4 440:8 442:24 443:3,6,21 445:6 445:10 446:6,22 446:25 447:10 448:3 449:20 450:5,15,20 451:19 452:2,6 453:18 454:4,15



455:1,11,15,22
456:5,8,16,19,22
457:3,9,13,17
458:4,12 459:15
460:10,13,18
461:21 463:4
464:1,11 465:14
466:2,14,24
467:10 468:17,18
468:23 469:22
470:15 472:23
477:5,16 478:3,17
478:21 479:17
480:5,25 481:21
482:9,18 483:2,25
484:11 485:4,22
486:13,18,24
487:19 488:8
489:12,17 490:13
490:18 492:23
493:16,23 495:12
495:23 496:12
498:10 499:3
500:20 501:6,11
502:5 503:8 504:2
504:12 505:6
506:11,16
**best** 339:13 413:14
414:14 434:17
435:1,10,21,22
508:13
**better** 431:1 439:12
**beyond** 322:10
326:1 329:11
334:7 342:15,19
344:23 348:20
352:14 353:18
355:16 360:3
361:18 364:9
365:5 366:24
369:25 371:19
387:23 390:7,17
403:8 406:20
409:20 410:12
411:19 416:14
417:21 420:12

424:10,19 427:12
427:21 428:17
451:20,25 452:6
453:19 479:18
489:18,23 495:13
496:13 499:4
506:17
**Biddle** 468:5,8
**big** 341:18,23
422:18 435:2
463:13 476:14,19
**binder** 301:17,18
301:20 316:18
317:5,12 318:4
320:14 324:18
325:7,12 329:19
329:20 330:4
333:12 354:4
369:5,7,12 386:6
389:11 401:23
402:2 452:25
453:2 463:13
464:8,17 474:14
476:16
**binders** 314:12,16
315:8,15,19 316:1
316:8,11 317:18
318:18,22 319:6,7
324:19 402:21
405:9,11 413:3
421:12 439:17
462:6,7,13,24
463:15 475:20
**bit** 396:16 443:23
502:16
**block** 423:1
**blocks** 330:25
**Blount** 387:19
388:3,11 390:1
407:3
**blow** 398:18 452:17
**blowup** 341:24
**bodies** 393:17
**book** 341:5,7,25
346:16,16 347:8
347:19 371:5

387:17,18 390:14
422:18 460:9
471:16 497:16
499:12
**books** 327:6 497:11
497:14
**BORGWARNER**
296:15
**Born** 426:12
**bottom** 382:19
**box** 314:12 315:15
317:19
**Brake** 297:15,15,17
**break** 367:23 369:2
373:20 415:12
418:4 421:4
457:24
**breaking** 370:17
**BREENTAG**
298:14
**BRENNTAG** 295:7
297:7,20 298:6
**Bridgeport** 426:15
**brief** 392:23 457:24
466:22 497:4
**briefing** 468:20
**bring** 492:2
**bronchitis** 307:16
308:3
**brought** 356:21
432:23 470:11,18
**Bruce** 375:23
**Brunswick** 294:17
305:12
**Building** 300:3
**built** 392:15
**burned** 426:23
**business** 306:12
327:18

_____

**C**

**C** 299:1,15 357:4,8
**calculated** 381:2
**call** 454:18 456:11
465:12 469:25
**Callahan** 300:14

490:25
**called** 309:25
341:22 386:23
396:12 444:20,24
464:22
**Calls** 454:17
**cameras** 359:23
**cancer** 302:7 382:5
399:24
**capacities** 429:2
**capacity** 326:4
329:13 334:10
342:22 349:2
353:21 355:19
360:6 361:21
364:12 370:3
371:22 383:21
387:25 406:23
411:22 416:16
417:24 420:16
424:22 428:7
451:23 453:22
479:21 495:16
499:7 506:20
**Caption** 294:9
295:25 296:25
**captioned** 297:25
325:7
**care** 426:23,25
**carefully** 435:20
**Carole** 295:4
**case** 307:9,14,25
308:7,13 311:1
320:19,25 321:4,6
321:7,23 322:4,8
322:12,20 323:1
323:16 324:2
325:7,13 332:1,10
332:17 333:10,14
334:17 335:3,5,7
335:19,24 338:19
339:9,24 342:4,9
342:13 343:6,20
346:21 347:16
349:17 352:11,19
354:18 364:5

370:11 373:15
378:6 379:13,14
379:17,19 380:7
384:3,5,8,18,19
384:24 385:1,15
386:15,24 387:12
388:25 389:14
390:3 396:2,10
397:17 398:2,23
400:13,15,16
401:5 402:6 405:8
405:15 406:1,7,18
407:4,5,23 408:15
408:18,19 409:14
409:24 411:8,17
412:8,10,11
415:18 417:18
419:2,23,25 420:7
420:21 434:3
441:13 445:23,24
451:8 482:25
504:10
**cases** 317:10
321:21 333:5
358:7 367:7 372:3
373:8 375:20
393:22 396:12
399:24 401:6
412:20 430:7
431:9 440:18
442:2,17 443:9,17
485:13 492:9
495:3
**cause** 309:8 478:24
**caused** 392:8
**CCR** 508:23,24
**Cedar** 299:21
**Central** 427:9
**certain** 318:20
495:21
**certainly** 389:25
390:5 432:21
454:18
**CERTIFICATE**
508:1
**certifications** 447:6



492:12
**certified** 294:19
346:5 412:6,19,21
413:4 417:3
433:20 436:1
485:11 486:9
488:5,15 493:21
494:4 508:3
**certify** 494:2 508:4
508:9,15
**change** 309:8 401:5
447:25
**changed** 313:9
449:18 455:10,19
**characterization**
314:21 340:2
433:6
**charge** 397:10
**chart** 303:5 335:12
340:9,12,18,22
341:3,13,18,24
476:12,15,22,23
477:14,15,19,25
478:14 479:1,6,15
480:3 483:14
500:3,11
**check** 309:23 310:4
310:13,17
**chemical** 355:11
**Chidester** 351:23
352:2,10 353:6,14
354:23 355:8
**choosing** 435:17
**chose** 428:21
435:21
**Chris** 337:9 370:16
460:11,18
**CHRISTOPHER**
299:2
**chrysotile** 347:25
348:4 352:3
355:13 361:6,12
363:6 364:6
477:25 500:4,16
501:3 502:20
503:19 505:2,11

**Chudkowski**
382:20
**cited** 442:18
**citizens** 396:15,17
**Citizen's** 302:8
382:6
**Civil** 404:13
**claims** 380:23
**Clark** 299:18
**clear** 313:22 316:4
316:5 326:12
332:15 335:2
420:20 427:25
432:8 455:8 456:1
473:14 474:24
475:19 492:16
496:1
**clearer** 474:19
**clearly** 339:20
**client's** 332:1
**clinical** 426:22
**CLR** 508:23
**Coalition** 302:8
382:6
**Cohen** 299:2
305:13
**Coker** 302:11
384:2,5,8,17,19
384:24 385:1,14
386:8,15,24
387:12 388:24
389:14 390:3
393:9 396:2,10
397:4 398:2
400:13,15 401:5
402:6 405:8,15
406:1,6,18 407:4
407:23 408:19
409:14,24 410:24
412:11 504:10
**Colgate-Palmolive**
299:23
**collectively** 318:9
**college** 426:14
**Colorado** 402:17
402:22 405:24

472:3,6,11 499:19
**Columbia** 299:15
**come** 387:8,15
483:6
**Comes** 402:13
**comfortable** 366:15
432:3 433:15
**coming** 397:14
453:16
**commencement**
508:5
**commencing**
294:18
**comment** 363:7,19
364:13 372:20
395:12 400:11,24
407:13 411:12,24
**comments** 477:2,21
**Commerce** 299:3
**Commission** 402:8
402:18
**commonly** 361:13
**communications**
310:2 454:18
**communities**
392:15
**Companies** 402:14
**company** 296:7
300:6 301:24
325:24 332:1
366:7 434:25
435:2 442:17
451:7 461:2
491:11 504:8
506:7
**company's** 373:1
**compilations**
437:15
**complain** 404:13
**complaint** 301:23
306:24 307:8,12
307:14,21,22
308:2,18,22
317:10 334:18
384:10 431:7
434:7 441:14

**complaints** 378:14
431:9 465:20
492:5
**complete** 356:13
436:20
**concerning** 322:3
380:18 391:9
399:6 407:22
482:6 487:16
489:9 491:6,8
**concerns** 312:20
**concluded** 416:3
507:4
**concludes** 416:2
507:1
**conclusion** 369:19
411:12
**conduct** 432:17
439:20
**conducted** 380:17
**confirmed** 472:14
**conjunction** 314:17
485:19 488:1
**connected** 475:7
**Connecticut** 426:15
426:16
**connection** 315:10
438:14 457:20
**Connie** 305:17
**consider** 492:2
**consideration**
394:6
**considered** 314:17
315:9 351:16
**consistent** 416:21
**Constance** 294:19
508:2,23
**consulting** 358:6
**Consumer** 302:2
**contain** 369:22
**contained** 335:22
381:8 414:17
**contains** 388:18
396:3
**contaminant**
394:14

**contaminants**
393:21 414:8
**contamination**
351:17 416:4
**contemporaneous**
424:6
**content** 356:6,9
491:8
**context** 390:2 401:4
412:5 414:1
**continuation**
347:14 429:22
**continued** 294:9
295:25 296:25
297:25 300:1
450:16
**continuing** 428:20
**contrary** 355:24
365:2
**conversation**
312:25 315:20
318:17,19,20
345:24 431:21
435:12 437:20
449:17 451:25
458:19 465:10,23
466:12 467:4
469:2,6 470:9
471:2 474:23
476:9
**conversations**
324:23 356:21
366:14 398:15
437:9,10 448:10
454:23 465:17
474:12
**COOK** 299:14
**copied** 382:9,12,15
382:20
**copies** 396:6
**copy** 303:5 382:1
386:7 467:18
476:14,20
**correct** 306:14,15
308:14,24 312:5
312:11,16,21



313:5 314:18
315:11,21 318:24
319:8,12 320:7,22
321:1,8,24 322:4
322:5,13,16,20,21
323:13 324:21
325:8,16,21,24
327:14,23 328:4
328:11,20 329:1,8
332:2,11,12,17
334:2 335:24
336:10 338:25
339:10,24 340:19
340:20,23 341:3
341:14,19,25
342:13 346:7,12
347:16 348:1
350:2,15,19 351:3
351:18 352:11
353:16 355:14
356:2 363:11,18
364:7 367:12
369:8 372:13
374:11 375:25
376:6 379:23
380:11 382:15
383:10,15 384:3,6
386:8 387:12
388:25 389:10
390:5 391:13,23
395:23 396:17
397:11 400:20
401:7,8,14 402:23
405:12,19 412:8,9
412:12 413:11,18
414:10,19 416:8
416:12,23 420:25
421:16,17,18,21
421:23 422:6
423:11,16 437:12
447:9,17 449:19
452:2 454:3,25
463:3,7,25 464:24
464:25 465:2,7,13
466:1,4,13 467:5
467:6,25 468:2,22

469:21 471:21
472:6 473:12,14
473:17 474:15
475:1,14,21 478:2
478:10,16 479:12
479:16 480:15,24
481:20 482:8
487:18 488:7
489:11 491:16,22
492:4,8,13,22
493:13,14,22
497:15 505:23
506:10
**corresponded**
377:14
**correspondence**
442:4 492:3
**corresponding**
377:18
**corresponds**
473:16
**cosmetic** 356:24
393:25 401:1
417:6 418:25
440:5 454:3
459:12 464:10,19
473:9
**cosmetics** 453:9,13
453:16
**counsel** 299:6,12,17
299:23 300:6,11
305:19 309:5
310:7,14 311:11
312:9,21 315:6
319:23 320:1,5
324:8 345:5 347:4
347:9 362:11,17
364:4 382:1
430:14 434:16
435:3,11,13,22
436:7,13 441:4
445:7 465:25
497:14 508:17,20
**counsels** 310:18
441:7
**Counsel's** 313:5

**County** 294:1,16
295:1,11 296:1,10
297:1,11 298:1,10
298:18 305:7
312:20 335:23
336:6 337:1
338:15 448:23
**couple** 408:16
445:22 482:19
**course** 312:8 333:3
465:17 481:11
**court** 294:1,19
295:1,10 296:1,9
297:1,11 298:1,9
298:17 305:6,16
305:21 312:19
313:10 326:13
337:15 386:7,12
425:8 448:12,12
458:15 479:13
508:3
**courthouse** 294:16
313:3 329:5 331:1
337:2
**courtroom** 338:15
**cover** 329:19
**cplacitella@cprl...**
299:5
**created** 477:15,20
477:20
**crocidolite** 361:7
361:15
**CTFA** 302:7 382:5
**curious** 307:13
**Currently** 418:7
**custody** 362:10,17
**Cyprus** 296:6
300:6 501:2

**D**
**D** 301:2
**Daniels** 299:18
**Dartmouth** 472:14
**data** 393:22 395:2
398:12,24 399:5
399:25

**date** 294:18 325:18
325:20 331:23
374:13 375:4
376:4 412:22
476:23 497:23
498:2 502:8
508:13
**dated** 302:10,16
391:1 508:25
**dates** 376:12
379:11 412:13
506:21
**day** 306:8,20,22
377:15 425:23,25
425:25 430:17
438:1 441:10
443:24
**days** 306:12
**deal** 457:7
**dealing** 350:7
457:16
**Dear** 331:8
**Deborah** 297:14,16
**decades** 302:21
409:3
**deceased** 295:4
297:15
**decide** 407:18
**decided** 490:22
**defendant** 299:12
299:17,23 300:6
300:11 302:2
402:14 404:7,18
**defendants** 294:8
295:9,19 296:8,16
297:8,21 298:8,16
298:25 402:6
425:21
**defendant's** 414:14
**defended** 400:15,16
**defending** 375:19
384:2 396:10
**definitely** 430:19
**definition** 360:12
**Demand** 301:23
**Dembrow** 375:9

376:5,15 377:6,11
**denied** 342:11
**department** 309:24
347:23 348:3
434:24
**deposed** 309:21
343:19 431:12
**deposition** 294:14
301:15 303:2
304:2 305:4,11
306:9,13,17,19,21
308:21,23 309:15
309:16 310:1
312:9 313:4,23
314:7,10,18 315:7
315:11 316:22
318:1,13,24
319:11,24 320:4
320:17 322:2
324:21 332:9
338:8 340:18,23
341:9 343:18
344:4,24 345:3,6
346:20 347:3,15
347:19 348:10
352:10,21 353:7
367:17 386:23
388:9 389:5,9
390:21 391:9
398:10 402:7
409:10 417:2
422:24 427:13,22
429:21,24 433:2
433:18 434:11
437:4 438:15
443:8,25 445:24
447:20 448:15
451:6 454:13,14
455:4 458:24
459:3 462:16
465:13 466:23
469:21 470:12,19
470:23 480:24
490:5,10,12
492:21 493:13
507:2,4



**depositions** 338:1
 344:22 402:16
 410:4
**deposits** 394:14
**Describe** 414:3
**DESCRIPTION**
 301:14 302:1
 303:1
**detail** 343:13
 359:16 414:3
**details** 492:1
**detected** 360:24
 361:11 393:16
**determination**
 311:7 408:13
 490:4,9,11
**determine** 310:14
 438:16
**determined** 463:22
**development**
 427:10
**DiCerbo** 295:4
**different** 317:9
 376:12 378:14
 422:2 429:2,14
 431:11 433:21
 434:25 444:16
 451:13 475:16
 485:14
**differential** 355:12
**direct** 434:18 435:3
 467:12 491:18,24
**directed** 436:7
 457:6 458:9
**directing** 436:13
**direction** 304:5
 434:16
**directly** 313:16
 320:3 355:23
 373:1 435:11
 465:8,19
**director** 375:24
 376:6 377:20
**discoverable** 381:3
**discovery** 307:25
 308:7 311:17,18

311:24 312:4
 334:24 336:17
 338:18 339:8,23
 378:10 385:14,18
 386:7,16 390:24
 391:12 404:23
 438:18,23 441:3
 441:24 442:3,4,8
 442:13,19 443:15
 443:15 445:21
 465:5 478:15
 480:22 481:4,11
 481:13 484:4
 486:8 487:12,23
 488:2,3 491:6,15
 491:19,21 492:4,7
 493:3,5 495:8
 496:8 503:24
 504:9
**discuss** 309:3
 367:24 417:7,15
 418:1 440:23
 481:3 484:3,18
 486:2 487:23
**discussed** 309:25
 312:2 341:2
 379:15 433:19
 435:25 454:12
 455:4 456:3
 480:11 495:1
**discussing** 349:19
 415:22
**discussion** 315:1
 349:7 425:7
 447:24 458:14
**discussions** 309:8
 445:4,6 455:9
**disease** 392:17
**dismiss** 329:5 333:5
 368:4 370:11
 373:7
**dismissal** 331:17,25
 373:15
**dismissed** 332:16
 367:7 371:15
 411:8 412:12

417:19
**dismissing** 331:25
**disprove** 411:16
**district** 327:21
 328:1 461:12
**Division** 294:1
 295:1,11 296:1,10
 297:1,11 298:1,10
 298:18 305:7
 418:8,22
**docket** 294:2 295:2
 295:11 296:2,10
 297:2,12 298:2,10
 298:18 305:7
 352:20 353:4,7
**document** 320:2
 330:1 352:14
 387:3 388:1
 390:17 391:12
 402:5 403:8
 438:18 439:14
 453:1,3 464:8,17
 464:20 485:19
 500:21 504:21
**documents** 302:19
 304:10 306:18
 308:18 314:16
 315:9 318:23
 331:16 335:11
 337:14,24 352:8
 354:7 397:16
 399:19 404:11,22
 410:5 422:3
 431:11,13 432:5
 432:14 433:13
 437:16 438:10,16
 439:2,3,15,16
 441:12,21,22
 442:1,5 468:21
 504:23
**doing** 330:8 358:4
 373:16 430:24
 456:21 473:4
**doubt** 392:10 393:2
**Dr** 301:15 316:23
 317:4,15 318:16

318:18 319:8
 338:7 340:12
 341:3 344:16
 347:15 349:14
 351:9,23 352:2,10
 353:14 354:8,12
 355:8 356:18
 357:11 362:1
 382:14 389:5
 390:1 396:6,9,12
 402:21 405:9
 417:2 421:20
 422:23 423:4,9
 431:17,22 432:7
 432:25 433:14
 437:11 439:22
 453:2 462:17
 463:3,15,25 464:5
 464:14,23 465:1
 465:23 466:1,6,10
 468:20 469:3,7,15
 469:18 470:2,10
 471:3,23 472:8,10
 473:16,19 474:8
 474:13 475:5,11
 475:25 476:3
 477:14 497:15,17
 499:13
**drawer** 438:2
**Dress** 427:8
**dried** 362:23
**Drinker** 468:4,8
**drop** 410:24
**dropped** 411:17
**due** 407:15 408:10
**DUFF-PETO**
 296:12
**duly** 305:24 508:6
**Durham** 415:18
 417:18
**dust** 361:11,12
**dusting** 396:2
**DVD** 305:3
**D'ANGELA** 298:3

_____
          **E**
_____

**E** 295:14 298:19
 299:1,1 301:2,12
 306:2 425:12
 446:16
**earlier** 308:20
 336:12 395:23
 396:16 455:4
 462:19 473:18
 474:6,16 503:11
**early** 478:9
**easier** 435:3
**Eastern** 491:11
**Edison** 330:19
**Edley** 320:18,18,25
 321:4,6,7,22
 322:4,8,20 323:1
 323:16 324:2
 325:7,10,11,13
 329:4 332:17
 459:21
**effect** 480:15
**effects** 380:18
**efforts** 437:14
 438:16 442:6
**either** 346:4 419:15
 475:19
**electron** 359:24
**eliminate** 414:7
**Elmo** 374:6 380:2
 467:24 473:15
**Email** 302:15
**EMMA** 296:3
**employee** 465:2
 466:7 508:16,19
**Emtal** 347:24 348:5
 453:16
**Emtals** 453:12
**enable** 331:17
**enclosed** 331:8,12
**ended** 379:8
**Engelhard** 351:13
**enjoyed** 429:15
**ensure** 436:6
**entire** 500:21
**entitled** 302:7,21
 382:5 385:24



409:2 497:18
501:1
**entity** 476:24
**entries** 368:22
376:9
**environmental**
331:13 394:5,11
**Esquire** 299:2,3,9,9
299:15,20 300:3,8
347:9
**essence** 389:13
**essentially** 416:10
**Estate** 295:4,14
297:14,16
**et** 294:7 295:8,18
296:7,15 297:7,20
298:7,15,24 305:5
**event** 458:13
**evidence** 328:23
333:24 356:20
365:1 372:9 373:3
381:3,7 383:14
395:3 400:18
401:7 403:25
405:23 406:5,6,17
407:2,20,22
410:22 411:15,18
417:4 418:24
419:3,18,24 420:1
420:22 421:19,22
422:2,5,8,21
423:4,12,14,22
424:6,16 478:11
479:13 480:4,9
481:17 482:5,22
482:25 483:7,12
484:7,10,24 485:2
486:7,10,17
487:15 498:25
500:17 501:4,18
502:1,11,21
503:14 505:3,12
506:9
**exact** 331:23 447:3
**exactly** 313:22
320:11 326:14

383:1 396:25
400:15 471:9,25
**examination**
360:14 508:6
**examined** 305:24
**example** 399:23
477:9 498:2
**exclusive** 327:18
328:2 461:13
**Excuse** 427:20
428:15
**excused** 507:3
**executed** 395:22
**executive** 365:20
**executive's** 351:21
**exhibit** 301:15,17
301:18,20,21,23
302:2,6,10,15,16
302:19,20,23
303:2,3,5 341:13
374:23,24 385:23
432:8,11 433:3
471:21 472:4
473:13,15 474:5
476:23
**exhibits** 432:15
474:13
**exist** 431:5
**existence** 414:7
**experience** 426:23
429:9,17
**experienced** 392:17
**expert** 357:14
358:6,23 363:5
389:13 395:11
404:3 431:17
435:14 445:16
471:4
**expertise** 363:9
**experts** 394:18
434:25 435:17
**Expiration** 508:24
**explain** 434:1
**explained** 431:24
462:19
**exposed** 505:17,18

**exposure** 308:14
392:9,18,23
393:24,25
**express** 404:4
**extracts** 361:12
**extricate** 367:6

---

**F**

**fact** 309:1 320:24
339:10 364:3
365:22 386:7
393:17 419:19
433:19 447:5
457:22
**factors** 394:5,11
**facts** 403:24
**fair** 342:9
**false** 339:10,17
413:16 455:14,17
**familiar** 316:15
318:15 321:21
323:23 342:8
356:19 431:8,16
433:1,15 434:3
445:15 470:5
503:11
**fantastic** 429:16
**fat** 463:13
**fault** 472:18
**Fax** 302:16
**Faye** 333:10,14
372:23 379:12,14
**FDA** 383:10,14,18
472:14
**feel** 350:8 433:14
440:2
**felt** 432:2 488:24
**FERNANDEZ**
299:19
**fiber** 361:13
**fibers** 361:14
362:22 363:6,11
392:9 393:16
500:16 501:17,20
501:24 502:9,20
503:4,20 505:18

**fibrous** 360:12,23
396:3 410:6 498:3
498:20
**fight** 326:18 398:2
**figure** 460:7 490:4
**file** 307:4,6,7,11
331:18 332:16
336:25 337:15
386:8,23 388:24
390:24 439:11
454:20 456:14
458:10
**filed** 307:21,23
323:1 373:15
385:3 404:22
412:11,15 415:17
434:7 503:24
504:9
**files** 306:25 389:4
389:24 393:3
402:15 431:7
442:17
**filled** 366:8
**final** 380:14
**Finally** 404:4,15
**financially** 508:20
**find** 331:9,12
385:24 386:4
441:8 448:14
457:24 477:24
**fine** 366:21 370:24
379:5 428:22
457:3
**finish** 314:5 460:16
**firm** 371:15 468:8
**first** 305:23 306:22
317:10 331:22
335:4 339:22
360:13 368:11
371:1,10,11 389:5
391:25 399:5,7,14
425:22,25 426:6
426:19 430:22
441:2,10,16
443:24 444:23
451:18 453:1,3

**454:14 462:16
464:8,16,20
476:21 480:23
481:7
**five** 446:9
**flip** 333:13 337:2
347:7,13 361:25
362:19 385:22
**flipped** 353:3
**flip-side** 371:10
**floatation** 452:20
**FLOM** 299:8
**Floor** 300:9
**Florham** 299:16
**focus** 471:1
**folder** 368:9 370:15
371:5
**Foley** 294:4,4 305:5
**followed** 361:13
431:20
**following** 294:9
295:25 296:25
297:25 458:25
495:5
**follows** 305:25
**foregoing** 413:13
413:15 508:10
**forgot** 414:25
**form** 308:9 309:11
310:10 312:14,23
313:7 314:2,20
315:13,23 317:23
319:1,14 320:9
321:10 322:15
323:4,21 324:6,12
326:1 329:10
332:4,22 334:4
337:7 338:10
339:2,12 340:1
342:15,19 346:23
348:18 350:4,17
350:24 351:5
352:13,24 353:18
354:10 355:16
356:4,12 357:16
357:24 358:10



359:1 360:3,18
361:18 362:15
364:9,19 365:5,13
365:18,24 366:11
366:24 367:14
368:17 369:10,25
371:19 372:15
374:20 381:13
383:17 386:10,18
387:2,23 389:2,17
390:7 391:4,15
396:23 400:22
401:10 403:4,7
405:2 406:9,20
408:6 410:12
413:20 414:17,21
416:14 417:21
418:14 419:7
420:4,12 421:25
422:12 423:6,18
424:1,10,19
429:11 430:2
433:8 437:18
439:25 442:21
443:19 447:1,11
448:4 449:21
451:20 453:19
454:5,16 455:2,12
455:16,23 456:9
459:16 463:5
464:2,12 465:15
466:3,15,25
468:23 469:23
470:16 477:6,17
478:4,18 479:18
480:6 481:1,22
482:10 483:3
484:1,12 485:5,23
486:14,22 487:20
488:9 489:13,18
490:14,19 492:24
493:17,24 495:13
496:13 498:11
499:4 501:7,12
503:9 504:3,13
505:7 506:12,17

**forth** 356:21
369:20 478:13
479:14 483:13
508:13
**forward** 436:23
**found** 337:14 344:6
345:22 348:4
352:3 353:15
355:2,9,10,13
356:1 359:18
363:5,10,17 364:6
389:15 390:3
403:17 431:2
472:13 478:1
**FRACE** 295:3
**frankly** 395:10
**Frederick** 357:11
**Friday** 294:11
**front** 316:9 341:17
419:24 421:12
453:6 462:9
463:13 467:20
497:9
**further** 341:1 357:3
404:11 439:21
446:7 508:9,15
**Furthermore** 404:1

**G**
**Gambino** 301:23
334:17,22 335:3,5
335:7,14,19,24
336:14,25 338:19
339:9,24
**GARY** 299:20
**GATMAITAN**
295:12
**gears** 443:23
**general** 309:6
345:5 347:3,9
364:4 393:19
416:24
**generally** 399:20
455:5
**George** 298:3
505:17

**getting** 326:19
404:23 405:16
410:23 449:6
466:21
**girl** 426:13,19
**give** 336:22 354:1
363:22 374:5
378:1 380:1
381:25 382:1
384:14 386:1
390:14 395:14
397:2 398:1
401:19 408:22
415:9 419:2,17
451:2 467:17
471:15 476:11
496:21
**given** 368:1 394:6
419:18 452:19
469:21 474:7
480:10 488:21
**giving** 448:19 450:1
450:7,12,18,23
458:25 459:6
**Glen** 344:16 346:21
**go** 314:23 316:12
324:17 325:2
329:18 331:21
333:12 341:5
343:1,12,23
346:15 349:4,12
350:21 354:4,14
354:21 368:8,10
368:12 369:4
370:14 374:14
376:17,21 378:15
380:13 387:16,17
392:1,21 393:6,12
398:17 399:2
401:16 413:8,24
415:22 425:4
429:5 438:25
447:8 452:8,9,10
452:25 453:11
462:24 467:16
472:20,22 473:22

473:22 497:1
499:18 502:18
**goes** 357:9
**going** 313:12,13,14
313:21 314:5,5,25
323:5 337:8,13,21
349:6,12 370:20
373:22 374:3,8
380:2 381:10
386:20 387:15
391:21 400:2
401:25 403:3,5,6
403:7 408:17
413:24 415:1
418:4 421:6,13
425:6,20 435:18
441:7 443:22
446:9,11 447:24
448:25 449:8
451:5 456:14
457:7,9,13,17,20
457:23 458:2,11
458:12,20 459:1
460:4,14 462:12
462:23 463:22,23
467:10 470:13
474:23 476:5
482:3 497:3 503:1
**GOLDSTEIN**
300:3
**good** 306:5,7
373:19 425:15
**Goodrock** 505:17
505:17
**grabbing** 435:19
**GRABOWSKI**
297:3,4
**grades** 451:14
452:15
**gram** 362:22 363:4
**Grange** 302:17
**Grayzel** 330:18
331:8,24
**Green** 297:17
**Greene** 297:13,15
**grew** 426:10

**GRIFFIN** 296:3,3
**group** 404:21
**Grove** 299:21
**guess** 352:16
362:16 412:22
**GUEVARA** 300:8
**gvanlieu@oslaw....**
299:22

**H**
**H** 301:12
**halfway** 385:23
**hall** 435:19
**Hammonsville**
505:16
**handed** 344:15,19
410:16 484:14
**Handwritten** 303:3
**haphazardly** 479:1
**happen** 435:13
**happened** 332:11
332:14,15 399:8
408:19 419:20
463:21 466:9
**harass** 486:25
**harassing** 367:22
**hard** 480:8
**HAWKINS** 300:8
**head** 335:13
**headed** 476:23
**health** 380:18
410:2
**healthy** 426:25
**hear** 436:18,19
**heard** 445:17 471:2
**heirs** 297:16
**held** 315:1 349:7
425:7 458:14
**help** 385:25 387:5
397:16 398:1
421:13 426:2
435:2 436:6
**helpful** 484:16
**Hemstock** 344:16
345:3 346:21
352:20



Hemstock's 347:15
HENDERSON 300:2
hereinbefore 508:13
Herschel 409:23
Hey 435:20
hidden 378:24
highlighted 452:12
highlighting 368:23 392:13
highly 432:1
historically 491:6
history 311:14
Hobson 302:19 409:23 410:21 411:8,16
HODJERA 296:11
hold 341:17 376:19 387:6 472:19
hooked 449:4
hope 313:21 410:23
hopefully 412:3
Hopkins 301:16 302:24 303:5 315:20 316:23 317:4,15 318:16 318:18 319:8 338:7 340:9,12,17 340:22 341:2,3,13 354:8,12 356:18 382:14 389:5 396:6,9,12 402:21 405:9 415:18,24 417:2 421:20 422:23 423:4,9 431:17,22 432:7 432:25 433:14 437:11 439:22 453:2 462:17 463:3,15,25 464:5 464:14,23 465:1 465:23 466:1,6,10 468:20 469:3,7,15 469:18 470:2,10 471:3,23 472:8,10

473:16,19 474:8 474:13 475:5,11 475:25 476:3,12 476:15 477:2,14 497:15,17 499:13
Hopkins-28 341:21 341:23 476:15
hospital 426:21 428:8
hour 367:18 370:21 431:21 460:17
hours 309:17,18
Howard 376:1
How's 327:7
humans 380:19
husband 294:4 296:3 297:4 298:20

I
idea 349:21 375:1 386:1 467:1 474:13,25 475:18 483:23 489:8
identifiable 393:24
identified 319:10 436:10 437:6
identify 432:7 437:15
II 294:12
III 297:13
Imerys 295:17 298:23 302:17 473:25
important 396:1 449:23 499:15
incidents 392:17 394:7
include 463:9
included 359:11 464:7 492:3
includes 321:22
including 447:23
Incorporated 305:5
incorrect 410:10
Inc's 302:3

independent 328:10 461:18
INDEX 304:2
indicate 481:17
indicating 447:6
indirect 392:23
individual 297:16 329:13 334:10 349:2 353:21 355:19 360:6 361:21 364:12 370:3 371:22 383:21 387:25 406:23 411:22 416:16 417:24 420:16 424:22 451:23 453:22 479:21 495:16 499:7 506:20
individually 295:3 295:13 297:13
individuals 435:6 436:9 437:2
industrial 328:10 328:17 343:14 350:8 440:4,19 459:12 461:18 462:1 473:9
information 313:22 314:6 322:3 336:14 339:21 346:3 348:12 365:3 380:24 381:11 390:22 391:10 394:20 395:7 397:25 398:22 404:5,15 405:10,16,17,23 407:3 409:13 410:8 411:5 431:1 431:4 436:11 437:1 463:10,14 463:17 469:8,18 481:9 492:1 495:21 496:8 503:25 504:10

injury 308:13 385:2
innocent 496:4
input 469:8
Institute 402:17
instruct 454:16 456:9
interested 508:21
Interim-Disco-00... 302:5
internal 394:20 436:18
interpret 363:15
interpretation 311:10 430:12 442:12 475:16
interrogatories 302:4 310:20,25 334:25 338:6 354:18 357:6,21 358:1 380:6 391:19 394:19 395:6 412:7,19 413:4 415:4 430:7 433:22 434:6 441:24 484:25 485:12 488:14,15 491:19,22 492:20
interrogatory 337:3 346:6 366:7 366:20 380:14,24 414:2 434:2,10 445:21 484:22 487:24 491:16 493:12,20,22
interrupt 323:10 326:24
interrupted 326:22
interview 435:5,23
introduce 425:17 426:7
involve 491:15
involved 308:13 336:9 367:8 383:8 384:1,5 396:10 434:15,20,22

injury 465:7 492:17 493:9
involving 399:24 430:7 465:6,11 492:18 493:10 495:9
iPad 321:18
Ira 375:9
isolated 393:18
issue 342:12 343:6 394:25 418:21 440:23 458:22
issues 395:3
Italy 397:15

J
jail 447:8
Jared 299:3 386:4
Jersey 294:1,17,21 295:1,10 296:1,9 297:1,11 298:1,9 298:17 299:16,21 305:6,13 330:20 336:7 418:8 426:12,13 427:9 446:21 508:4
JJCPI 381:1
jlee@mkclaw.us.... 299:17
jmplacitella@cp... 299:6
JNJ 302:8,13,15
job 395:9 427:10
jobs 426:19
John 302:23 315:19 347:8 375:15 397:8 415:18,24 431:17
Johnson 299:12,13 301:24,24 302:2,2 302:11,11,21,21 311:9,9,14,14,18 311:18,19 312:4 314:11,11 320:2,2 322:7,7 329:7,7 335:22,22 337:4,4



337:25 338:1,2,2
338:21 339:7,7,19
339:19,20,20,20
339:21 343:5,5
344:3,5,5 345:5,5
345:22 346:6,7
347:4,4,9,10
351:15,15 352:8,8
353:13,13 355:24
355:25 358:6,7,16
358:16,23,24
363:25,25 364:2,3
364:6,23,24 365:9
365:10 367:5,5
368:7,8,14,14
369:17,17,21
371:16,17 374:9,9
380:5 381:9,9
388:12,18 389:24
389:25,25 390:4,4
390:23,23,25,25
391:10,11 393:4,4
393:9,10 394:21
394:21 397:5,5,9
397:9 398:1,1,11
398:11,21,21,23
398:23 399:4,4,6
399:6,25 400:1,19
400:19 402:13,13
403:22 405:14
406:16,16 407:10
407:11,21,21
408:3,3,11,12
409:2,3,25 410:1
410:23,23 411:6,7
411:9,10 414:16
416:5,5 417:5,5
418:9,22,23,25
419:4,11,11
420:10,10,20,20
420:23 424:15,15
425:21,21 427:1,1
427:6,6,25 428:1
428:8,8 429:5,5,6
429:6,9,9,14,14
430:17,18 438:17

438:17 444:1,2,17
444:17,18,20,20
444:24 445:12,13
451:14 452:15
453:17 464:9,18
465:2,2,11,11,18
465:18,25,25
466:7,7,10,10
478:12,12 479:11
479:11 480:18,19
480:20,20 481:10
481:10,19,19
482:7,7,23,23
483:20,20,23,23
484:8,9 485:1,1,2
485:3,21 486:10
486:11 487:10,10
487:13,13,14,14
487:17,17 488:6,6
488:18,18 489:5,6
489:7,7,10,10,15
489:15,22,22
491:5,5,7,7,10,10
492:16,16 493:8,8
495:5,6,7,7,10,11
496:6,6 498:20,20
503:7 504:16,16
506:10,10
**Johnson's** 312:4
328:2,8,18 338:22
344:3 356:24
380:6 388:12,18
389:24 390:3,25
396:19 401:2
403:23 405:14
414:6,9,16 417:6
418:9,25 419:4
420:1,23 427:2
430:8 440:6 444:2
444:13,14,15
445:17,18,19
461:13,16 462:2
491:9 493:11
496:9
**joined** 427:1
**Joly** 307:4,5,11,25

308:7,13,17,22
**JONATHAN**
299:15
**JOSEPH** 294:4
**judge** 367:24
407:18 454:19
456:11 457:21,24
458:13,20 460:16
502:16
**July** 329:21 330:15
506:7
**June** 302:6 382:4
**jury** 301:23 426:8,9
434:3
**J&J** 336:23 410:5
**J&J-216** 302:10
391:1
**J&J-217** 302:15
**J&J-219** 302:17
**J&J-230** 302:24
**J&J-257** 477:9
**J&J-294** 303:2
451:3
**J&J-316** 301:23
336:25
**J&J-318** 385:24
**J&J-319** 302:19
**J&J-326** 302:7
382:1,4
**J&J-337** 302:2
**J&J-414** 303:5
476:15
**J&J-482** 302:21
408:25
**J&J-65** 472:18

―――――――――
**K**
**Karp** 299:9 468:16
468:18
**KATHLEEN**
298:20
**keep** 330:8 458:11
**keeping** 376:14
**Kent** 294:19 305:17
508:2,23
**kind** 411:11 418:5

474:18 480:7
**kinds** 359:23
**KLUGER** 299:14
**knew** 302:21
322:19 343:4,10
344:2,7 353:14
367:11 409:3
435:16 436:12,15
437:12 447:6,14
**know** 313:8 320:10
321:5 322:8
323:18 324:9
329:15 331:4
332:13 335:6
336:4 338:5,13,16
340:3 350:14
352:17,25 353:22
356:7 357:17
358:5,8,14,18
365:22,25 367:4,5
367:19 368:7,8
374:24 375:2
376:2 377:10,23
379:1 381:23
382:25 384:7,9,23
385:9,12,13,17
389:19 393:1,5
395:1,12 396:9,11
396:21,25 398:2,3
398:6 399:21,23
400:6,23,24,25
405:8 406:2,10,14
406:17,24 407:8
407:11,11,14,24
408:2,2,4,8,19
410:15 411:24
412:21 417:9,14
417:24 418:11,15
418:18 419:12,19
420:16 422:18
423:19 424:2,12
424:16,23 425:16
426:2 432:2
434:13,20 435:10
435:19 436:9,11
437:8 438:2 439:9

441:4,5 444:15
445:17 447:2
448:9 450:10
454:7 460:18
463:20 466:16,18
469:24 471:25
472:19 473:8,20
474:1,6,22 475:2
475:3,6,22 477:19
478:2,5 479:3,8
479:22 481:25
482:12 483:5,17
484:14 485:9
486:3 487:6,10
488:11 489:2
490:2 494:23,25
495:17 498:12
499:7,8,24 500:9
500:24 501:13,22
502:6,14 503:6,17
504:5,18 505:8,14
505:19 506:20
**knowledge** 332:10
342:12 380:16
398:21 399:13
413:14 414:15
423:12 438:10
441:25 442:15
443:13 484:17
491:5 498:9
**known** 393:21
394:13,21 432:2
**knows** 342:22
364:12 389:23
**Krushinski** 311:1
412:8 445:23

―――――――――
**L**
**l** 294:15
**labeled** 393:9
**labs** 410:4 472:13
**Langer** 472:13
**late** 412:15
**law** 294:1 295:1,11
296:1,10 297:1,11
298:1,10,18 305:7



309:23 468:8
**lawsuit** 329:5
402:15 465:24
**lawsuits** 465:6,10
495:9
**lawyer** 376:5
409:24 449:18
470:10 496:2
**lawyers** 310:16
330:18 332:15
336:13 344:3
362:8 369:15
373:7 375:18,21
387:20 399:24
401:13 447:23
454:12,24 455:9
456:3 462:14
463:1,22 469:5,19
476:4 490:8,9
499:14
**lawyer's** 330:24
509:1
**Lea** 300:14
**lead** 381:2
**leading** 376:9
**learned** 371:14
**LEE** 299:15
**left** 359:11 497:22
**legal** 294:24 295:25
296:25 297:25
298:25 299:25
300:25 301:25
302:25 303:25
304:25 305:16,17
305:25 306:25
307:25 308:25
309:25 310:25
311:25 312:25
313:25 314:25
315:25 316:25
317:25 318:25
319:25 320:25
321:25 322:25
323:25 324:25
325:25 326:25
327:25 328:25

329:15,25 330:25
331:25 332:25
333:25 334:25
335:25 336:25
337:25 338:25
339:25 340:25
341:25 342:25
343:25 344:25
345:25 346:25
347:25 348:25
349:25 350:25
351:25 352:25
353:25 354:25
355:25 356:25
357:25 358:25
359:25 360:25
361:25 362:25
363:25 364:25
365:25 366:25
367:25 368:25
369:25 370:25
371:25 372:25
373:25 374:25
375:25 376:25
377:25 378:25
379:25 380:25
381:25 382:25
383:25 384:25
385:25 386:25
387:25 388:25
389:25 390:25
391:25 392:25
393:25 394:25
395:25 396:25
397:25 398:25
399:25 400:24,25
401:25 402:25
403:25 404:25
405:25 406:25
407:25 408:25
409:25 410:25
411:12,25 412:25
413:25 414:25
415:25 416:25
417:25 418:25
419:25 420:25

421:25 422:25
423:25 424:25
425:25 426:25
427:25 428:25
429:25 430:25
431:25 432:25
433:25 434:25
435:25 436:25
437:25 438:25
439:25 440:25
441:25 442:25
443:25 444:25
445:25 446:25
447:25 448:25
449:25 450:25
451:25 452:25
453:25 454:25
455:25 456:25
457:25 458:25
459:25 460:25
461:25 462:25
463:25 464:25
465:25 466:25
467:25 468:25
469:25 470:25
471:25 472:25
473:25 474:25
475:25 476:25
477:25 478:25
479:25 480:25
481:25 482:25
483:25 484:25
485:25 486:25
487:25 488:25
489:25 490:25
491:25 492:25
493:25 494:25
495:25 496:25
497:25 498:25
499:25 500:25
501:25 502:25
503:25 504:25
505:25 506:25
**LEONARD** 298:19
**letter** 329:19,21
330:15 331:23

369:6 371:2 373:7
376:22 377:8
387:19 388:3,5,10
389:3,7,19 390:10
**letters** 389:8
**let's** 321:15 329:18
335:1,1 343:1,23
353:2 368:5 369:1
393:12 398:17
403:12,15 408:15
415:22 429:19
456:1 471:10,11
471:12 472:20
473:22,22 476:20
499:18 502:17
**Lexington** 300:9
**LIEU** 299:20,20
**life** 427:10
**light** 367:25
**line** 304:6,6,6,11,11
304:11,16,16,16
304:21,21,21
367:16 458:9
509:2
**linked** 437:16
439:4
**LISA** 295:3
**listed** 335:10 376:7
384:21 443:10
**listen** 436:17
475:11
**listened** 469:11
**listens** 326:13
**listing** 501:15
**litigation** 311:14
333:4 383:5
397:10 399:7
428:2 492:18
493:9
**little** 358:15 396:16
426:9,19 431:25
443:23 474:19
502:16
**Livingston** 426:24
**LLC** 296:15 299:20
**LLP** 299:8 300:2,8

**locate** 311:19
**located** 320:4
337:24 351:15
352:4 440:24
**log** 368:14 374:22
374:23 375:2,4
377:8,22
**long** 382:18 427:16
**look** 308:19 310:24
335:1 353:2
385:21 403:15
422:20 431:6
439:1 442:7
466:11 471:11,12
476:22 478:20
479:1,5,7 496:22
**looked** 319:2
340:17 358:22
432:19 438:20
439:1
**looking** 359:17
403:1,3 472:2
474:25
**looks** 317:9 318:10
341:20 386:11
**LORETTA** 298:11
**lot** 315:25 318:10
386:12 387:11,13
408:17 423:8
431:13 432:20,23
458:7 462:15,21
471:2,3 495:2,3
**lots** 357:20 376:12
422:2
**loud** 459:2
**lowest** 316:18,20
**lunch** 415:15 418:4
421:4,7
**lung** 359:11,11
363:11,18
**lungs** 393:18
**lurked** 302:22
409:4
**Lusenac** 396:20,24
397:8,13,25



**M**

**M** 298:3 299:3
306:2 347:8
425:12 446:16
**Madam** 448:12
**Magna** 294:24
295:25 296:25
297:25 298:25
299:25 300:25
301:25 302:25
303:25 304:25
305:16,17,25
306:25 307:25
308:25 309:25
310:25 311:25
312:25 313:25
314:25 315:25
316:25 317:25
318:25 319:25
320:25 321:25
322:25 323:25
324:25 325:25
326:25 327:25
328:25 329:25
330:25 331:25
332:25 333:25
334:25 335:25
336:25 337:25
338:25 339:25
340:25 341:25
342:25 343:25
344:25 345:25
346:25 347:25
348:25 349:25
350:25 351:25
352:25 353:25
354:25 355:25
356:25 357:25
358:25 359:25
360:25 361:25
362:25 363:25
364:25 365:25
366:25 367:25
368:25 369:25
370:25 371:25

372:25 373:25
374:25 375:25
376:25 377:25
378:25 379:25
380:25 381:25
382:25 383:25
384:25 385:25
386:25 387:25
388:25 389:25
390:25 391:25
392:25 393:25
394:25 395:25
396:25 397:25
398:25 399:25
400:25 401:25
402:25 403:25
404:25 405:25
406:25 407:25
408:25 409:25
410:25 411:25
412:25 413:25
414:25 415:25
416:25 417:25
418:25 419:25
420:25 421:25
422:25 423:25
424:25 425:25
426:25 427:25
428:25 429:25
430:25 431:25
432:25 433:25
434:25 435:25
436:25 437:25
438:25 439:25
440:25 441:25
442:25 443:25
444:25 445:25
446:25 447:25
448:25 449:25
450:25 451:25
452:25 453:25
454:25 455:25
456:25 457:25
458:25 459:25
460:25 461:25
462:25 463:25

464:25 465:25
466:25 467:25
468:25 469:25
470:25 471:25
472:25 473:25
474:25 475:25
476:25 477:25
478:25 479:25
480:25 481:25
482:25 483:25
484:25 485:25
486:25 487:25
488:25 489:25
490:25 491:25
492:25 493:25
494:25 495:25
496:25 497:25
498:25 499:25
500:25 501:25
502:25 503:25
504:25 505:25
506:25
**Magnesia** 491:11
**maintain** 399:4
**majority** 393:17
**making** 311:7
456:12
**manager** 427:8
**managers** 410:4
**MANUEL** 300:8
**manufacture** 414:6
414:15
**March** 294:11
305:9 508:25
**MARIA** 294:4
**mark** 445:8
**marked** 304:20
408:25 490:23
**Market** 299:4
**material** 309:9
318:11 359:12
386:12,15 387:10
387:11 458:22
464:5,23 466:11
466:13
**materials** 310:6,15

319:12 326:11
346:18 350:22
351:2 352:22
353:8 368:13
372:25 374:15
386:8 400:13
403:19 410:7
433:4 499:21
**matter** 305:4
380:25
**matters** 431:18
**MATTHEW**
296:11
**mayor** 394:6
**ma'am** 339:17
350:12 357:1
372:23 374:18
389:7 391:22
407:15 408:10
446:19 448:20
450:1,8,12,19,24
454:10,23 462:23
463:18 465:22
481:6,15 482:3,15
483:10,19 484:6
484:21 485:11
486:6 488:1,13
489:1,4 490:1,3
491:20 492:8,10
493:6 496:1
499:12 506:1,5
**McCallum** 402:9
402:18
**McCrone** 331:13
404:24 405:12,16
405:24 477:10
500:2,13 501:16
501:20,24 502:19
503:3,19,23 504:8
504:11 505:1,10
505:16
**McGIVNEY**
299:14
**McKenna** 302:10
**McNEILL** 298:3
**MEAGHER** 299:8

**mean** 338:21
353:13 374:9
407:10 408:2
436:2 441:18,20
444:10 463:16
495:1,18
**means** 377:24
436:4 454:8
466:13
**meant** 441:20
444:13
**medical** 302:13
375:24 376:6
377:19 387:14
**meetings** 436:18,19
**MELISSA** 295:14
**memo** 302:6 376:4
382:5 394:21
395:17 397:4
**Memorandum**
302:10
**memory** 385:6
**mention** 500:12
**mentioned** 364:3,7
378:6 438:25
**mesothelioma**
385:2 392:4,8,22
393:15,23 394:7
**Mesothelioma/T...**
302:12
**message** 435:12
**met** 308:21 397:15
**method** 476:25
**mguevara@hpyl...**
300:10
**microscope** 359:25
**mid** 410:3
**Middlesex** 294:1,16
295:1,11 296:1,10
297:1,11 298:1,10
298:18 305:7
312:20 335:23
336:6 337:1
338:14 448:23
**MID-L-2456-18**
297:12



MID-L-3095-18
294:2 305:8
MID-L-4252-18
295:11
MID-L-4826-18
296:2
MID-L-5368-17
296:10
MID-L-598-18
298:10
MID-L-600-18
295:2
MID-L-6635-18
298:18
MID-L-6805-18
297:2
MID-L-7049-16
298:2
Miller 301:22
303:2 323:1,14
324:1 325:16
331:10 333:2,10
333:14,15,20
372:23 373:15
379:12,14 416:11
451:7,13 459:11
461:11 501:16,19
505:11,16
Miller's 372:12
milling 327:20
million 363:6
mind 376:14 426:9
mine 342:12 343:4
344:6,6 345:22
347:24 348:6
351:14,16 364:7
369:21 410:2
444:1,2,13,20,21
444:24,25 445:12
445:15,19 451:15
452:15 453:17
459:13 461:5
464:9,18 472:3,6
472:11 476:25
503:1,6
mined 328:15

333:21 351:12,13
461:24
mineral 355:10
371:16,17 392:9
501:2
minerals 296:6
300:6 327:13,19
328:9,16,24 329:7
331:10,11 333:22
333:25 355:3
361:6 371:25
372:10 373:4
403:19 461:16,25
491:8,11 498:21
miners 394:11
mines 335:21
353:16 402:17,22
405:25 444:14
445:16 450:11
503:12
mining 325:24
327:20,21 328:1
461:12
minute 387:16
438:6
minutes 408:16
446:9 496:22
mischaracterizes
439:24 448:4,5
missing 473:4
mistakes 495:8,18
495:22 496:3,4,7
496:11
misunderstood
337:11
MIT 472:14
mixture 359:11
423:8
moment 378:16
Moore 300:15
305:15
morning 306:5,7
459:22 461:3
MORSE 296:15
motion 454:21
456:15 457:11,16

458:10
move 357:1,3 374:3
407:16 408:13
410:19 415:1
427:11,13 436:22
multiple 320:25
420:13 486:15
494:5
Musco 294:15
301:5 305:4,23
306:5 338:5
339:18 382:1
389:23 395:8
408:3 425:15
426:8 427:17
429:23 432:5,13
434:21 441:11
443:7 445:20
487:13 489:5,16
508:6
Musco-2 422:14
463:10,12 483:13

---

## N

N 299:1 301:2
303:2 306:2,2
425:12,12 446:16
446:16
name 320:21,23
357:13,21 358:1
358:12 374:12
375:11,14 377:9
383:2 439:6
459:25
names 376:7,15
377:16,22 503:12
Nancy 294:14
301:5 305:4,23
339:18 389:23
395:7 408:3
487:12 489:5,16
508:6
natural 392:16
necessarily 494:17
need 316:12,15
356:10 446:9

needed 434:16
435:13
neither 380:25
508:16,18
Nell 402:8,18
never 321:6 338:20
340:17,22 341:2
344:2,7 346:3
350:1,13 352:3
356:1 364:3,7
414:16 416:4
428:13 465:4,9,23
475:7
new 294:1,17,17,21
295:1,10 296:1,9
297:1,11 298:1,9
298:17 299:10,10
299:16,21 300:9,9
305:6,12,12
330:20 336:7
358:17 378:4
418:8 426:12
427:9 433:16
446:21 467:12
470:4 508:4
njasbestos@rawl...
300:5
non 392:8
nonprofit 427:9
nonresponsive
427:13
non-occupational
392:18
non-responsive
357:2
non-truth 364:17
447:7
NORTH 295:7
297:7,20 298:6,14
Notary 294:20
508:2,23,24
noted 305:19 377:4
notepads 468:5
notes 303:3 378:2
467:5,9,18,21,25
468:12,15 470:9

470:13,22,24
471:7,11,12 472:4
472:5,10 473:8,16
473:23 474:11
475:20 476:5
496:22 509:1
notice 294:15
321:13 326:2
329:11 342:16,20
348:23 350:9
352:15 353:19
355:17 360:4
361:19 364:10
366:25 370:1
371:20 384:21
390:8,18 403:9
405:3 406:21
407:13,17 409:21
410:13 411:20
417:22 420:13
424:11,20 430:13
430:21,22 434:11
437:7 438:21,22
440:5 441:23
442:12 443:10
451:21 452:7
453:20 464:4
479:19 489:19
490:12,23 495:14
496:14 499:5
506:18
notices 373:15
442:18
November 473:2
number 311:13
312:10 314:11
315:15 352:20
362:22 374:25
376:9,19 431:13
432:8 438:9
439:14 440:10
441:11 445:21
475:4,12,13
476:24 484:23
508:23,24
numbered 316:18



318:4 319:19
**numbering** 474:21
475:3
**numbers** 454:7
471:22 473:19
474:7,17 475:5,23
**numerous** 444:16
485:13
**nurse** 426:17
427:17,19 428:1,6
428:9
**nursing** 428:12,13
429:2

---

### O

**O** 306:2 425:12
446:16
**oath** 321:20 328:14
328:22 333:20
334:16 336:16
338:19 339:7
340:16 341:2
345:21 346:9
348:11 349:25
350:12 358:16
417:3 447:15
448:20 450:24
459:11 480:19
485:12 488:16
490:17
**object** 308:8 309:10
310:9 312:13,22
313:6 314:1,19
315:12,22 317:22
318:25 319:13
320:8 321:9 323:3
323:20 324:5,11
325:25 329:9,10
332:3,18,21 334:3
337:6,8 338:9,23
339:1,11,25
342:14,18 346:22
348:17 350:3,16
350:23 351:4
352:12,13,23
353:17 355:15

356:3,11 357:15
357:23 358:9,25
360:2,17 361:17
362:14 364:8,18
365:4,12,17,23
366:10,23 367:9
367:13 368:16
369:9,24 371:18
372:14 374:19
381:12 383:16
386:9,17 387:1,22
389:1,16 390:6
391:3,14 396:22
400:21 401:9
403:3,5,6,7 405:1
406:8,19 408:5
409:16 410:11,12
413:19 414:20
416:13 417:20
418:13 419:6
420:3,8 421:24
422:11 423:5,17
423:25 424:9,18
439:25 442:20
443:1 446:22,25
447:10 448:3
449:20,21 450:15
451:19 453:18
454:4,15 455:1,11
455:15 456:5,8
459:15 463:4
464:1,11 465:14
466:2,14,24
467:11 468:23
469:22 470:15
477:5,16 478:3,17
479:17 480:5,25
481:21 482:9
483:2,25 484:11
485:4,22 486:13
487:19 488:8
489:12,17 490:13
490:18 492:23
493:16,23 495:12
496:12 499:3
501:6,11 503:8

504:2,12 505:6
506:11,16
**objected** 312:10
322:9 324:9 343:8
367:17
**objecting** 403:14
**objection** 313:19
322:14 324:6,12
326:22 327:2,5
329:25 330:3
337:18 344:8,21
348:19 354:9
362:4 364:19
368:4 373:9
390:16 399:16
400:4 402:15
405:2 411:1
419:13 420:11
427:21 428:17,20
429:10 430:1
433:7 437:17
439:23 443:18
450:5 455:22
461:21 486:22
495:23 498:10
500:20 502:5
**objections** 313:15
323:6 326:13
345:11,16 362:25
363:13 372:15
377:3 402:7
404:22 407:6
421:1
**objects** 335:25
398:25 443:3
**observed** 361:13
**obtained** 337:1,14
359:5
**obtaining** 430:5
**obviously** 425:16
449:23
**occasion** 310:21
**occupational** 392:9
**occur** 392:22
**office** 313:5 330:19
**offices** 330:25

**Oh** 325:10 371:12
432:10
**okay** 306:5,16
307:1,5,19 308:5
308:12,25 309:3,7
309:14 310:13
311:6,12,17,22
312:2,7,18 313:12
313:17,18,24,25
314:7,8,9 315:18
316:6,12,17,21,24
317:5,14,17 318:3
319:6,10,18
320:13,16,24
321:15,25 323:8
323:25 324:17,25
325:10,23 327:4,9
327:25 328:6,13
329:3,18 330:5,11
330:17 331:21
334:14 335:1,17
336:21 339:6
340:6 341:5,16
342:2,7 343:17,23
345:2,10,25
346:15 347:2,13
347:18 348:10,21
349:12,20 350:21
351:9,20 352:7
353:10,25 354:14
354:21 356:9
357:1 358:5,20
359:15 360:10
361:25 362:12,19
363:21 364:16,23
365:7,15,16 367:4
368:2,5,21 369:14
371:12 372:2,8,21
373:18 374:2,14
375:3,8 376:3,8
376:14 377:25
378:4,23 379:2,17
379:25 380:13
381:6,24 382:19
382:24 383:3,9,12
383:25 384:6,12

385:21 386:20
388:8,23 390:12
391:8 392:1 393:6
393:12 395:4,13
396:13,20 397:1
397:20 398:9,17
401:12,16 403:10
404:21 405:14
407:1 408:1,21
409:7,12 410:18
412:2,10,14 413:2
413:7 414:25
415:8 417:8 418:3
420:19 421:3,11
421:12,19,22
422:7,16 423:1,11
426:5 427:4
428:11,25 429:4,8
430:15 432:12
433:18 439:13
440:9 442:14
443:5,13,22 446:8
448:11,25 449:16
451:1,12 452:4,9
452:25 453:11
455:7,24 457:5
458:19 459:2,9,20
462:6 464:22
465:1 467:7,17,20
467:23 469:14,17
470:8,21 471:10
471:11,20 472:16
473:22,23 474:22
475:10,18,24
476:2,10,10,19
478:8 480:1
484:21 487:9
491:1 492:7,15
493:6,15 494:22
495:4 496:20
497:8,18 498:14
498:19 499:25
500:10 501:1,15
501:23 502:8,15
502:25 503:18
504:20 505:10,15



505:22 506:23
**once** 335:21 439:21
**ones** 335:10 384:20
    435:1 443:16
    444:16 485:15
    495:1
**opened** 438:2
**opinion** 404:3
**opportunity** 337:17
    426:7 434:23
**opposed** 313:4
    436:23
**order** 466:22
    492:21
**ore** 347:24 348:5
**organize** 421:14
**original** 437:20
**OSHA** 388:20
**ought** 367:23
**outline** 378:21
**outside** 310:6,14,18
    441:4,7
**owned** 335:22
    343:5 444:14,17
**O'Shaughnessy**
    302:17 375:15
    377:19 382:11
    397:9
**O'TOOLE** 299:19

**P**
**P** 299:1,1
**PA** 299:4
**page** 294:10 295:25
    296:25 297:25
    301:14 302:1
    303:1 304:6,6,6
    304:11,11,11,16
    304:16,16,21,21
    304:21 313:14
    321:16,20,25
    322:23 323:25
    325:12 331:22
    333:13 335:4,17
    343:3,25 345:19
    347:7,18 348:11

354:21 357:4
    360:10 371:1,11
    372:22 380:14
    392:2 398:18,18
    402:25 403:12
    415:23 438:3
    451:12 453:12
    492:1 509:2
**paid** 466:10,17,22
**Pam** 439:7
**paragraph** 327:16
    351:20 373:1
    392:2
**Paralegal** 300:14
**Park** 299:16,21
**PARNELL** 300:8
**part** 319:11,15
    388:23,25 389:4
    396:15 401:19
    437:20 469:19
    476:9 478:15
    480:22,22 490:7
**particle** 360:14
**particles** 360:13,24
    396:3
**particular** 383:9,12
    394:25 431:12
    434:20 439:16
    465:19
**parties** 508:17
**pass** 425:1
**passage** 425:24
**Paterson** 294:16
    305:12
**patients** 392:3
    393:15 426:24
**penalties** 447:17
**penalty** 446:20
    485:12
**Penn** 300:4
**Pennsylvania** 300:4
**people** 331:5 333:5
    377:7,10,17 383:4
    383:7 384:1
    396:14,18 429:16
    430:23,23 435:4

435:16,21 436:13
    436:14,16 437:21
    437:25 439:8
**percent** 498:3
**perceptions** 468:21
**performed** 414:4
**period** 416:6
**peritoneal** 385:2
**perjured** 447:16
**perjury** 446:21
    485:13
**person** 346:4 365:1
    394:24 434:17,18
    436:8 439:5,12
    483:20 488:22
    491:4
**personal** 326:4
    342:22
**personally** 432:14
    465:5
**perspective** 495:10
    496:6
**pertaining** 330:1
    442:2
**Pertinent** 448:16
**petition** 302:8
    382:6 396:15,17
**ph** 502:9
**Philadelphia** 299:4
    300:4
**phone** 470:25
    471:23
**photographs** 362:2
    362:8,9,13
**pick** 326:18
**pictures** 359:23
**piece** 481:16
**pile** 437:23
**place** 441:2 475:4
    508:12
**Placitella** 299:2,2,3
    301:6,8 305:13
    306:4 308:11
    309:13 310:12
    312:15 313:1,11
    313:20 314:3

315:5,17,24 316:6
    316:7 317:24
    319:5,17 320:12
    321:14,17,19
    322:17 323:8,11
    323:12,24 324:7
    324:16 326:6,9,10
    326:17,20 327:4,9
    327:10 329:17
    330:2,7,11,14
    332:7,19,25 334:5
    334:13 336:22,24
    337:20 338:4,12
    338:24 339:5,15
    340:5,8,10 342:25
    344:12,14 345:13
    345:18 346:24
    348:21,24 349:11
    350:11,20,25
    351:8 352:18
    353:1,24 354:1,3
    354:13 355:22
    356:8,15 357:19
    358:2,13 359:2
    360:9,21 361:24
    362:6,18 363:3,16
    363:22,24 364:15
    364:20 365:6,14
    365:19 366:3,17
    367:3,10,15 368:2
    368:6,20 369:1,3
    369:13 370:6,18
    370:22,25 371:23
    372:17 373:12,19
    374:1,5,7,21
    376:18,20 377:5
    378:1,3,17,23
    379:2,5,7 380:1,4
    381:16,25 382:3
    383:24 384:14,16
    386:3,5,13,19
    387:4,9 388:4
    389:6,21 390:11
    390:13,19 391:7
    391:20 395:14,16
    397:1,3,21,23

401:3,11,18,22
    402:1,3 403:10,11
    405:6 406:13,25
    407:9 408:9,22,24
    409:18,22 410:17
    411:4 412:1,24
    413:1,23 414:24
    415:9,14,16
    416:20 418:2,17
    419:10,14 420:5,9
    420:18 421:3,10
    422:4,13 423:10
    423:20 424:4,14
    425:1 427:11,20
    428:15,23 429:10
    430:1 431:14
    433:3,7 437:17
    438:8 439:13,23
    440:9 442:20
    443:1,5,18,25
    444:12 445:5,8
    446:8,18,23 447:4
    447:13 448:6,11
    448:18 449:2,5,12
    449:25 450:6,17
    450:22 451:2,4,24
    452:4,8,13 453:25
    454:9,20,22 455:6
    455:13,18,24,25
    456:6,13,17,20,22
    456:24 457:4,11
    457:15 458:3,6,18
    459:19,23 460:1,5
    460:12,15,25
    461:8,9,22 463:6
    464:6,15 465:21
    466:5,20 467:2,8
    467:17,19 469:4
    470:7,20 471:15
    471:17 472:17,21
    472:25 473:1,3,6
    476:11,13 477:7
    477:23 478:7,19
    478:23 479:25
    480:13 481:5
    482:2,14,20 483:9



484:5,20 485:10
486:5,16,21 487:1
487:8,25 488:12
489:14,25 490:15
490:21 491:1,2
492:25 493:18
494:3 495:19,24
496:17,21,25
497:7 498:13
499:11 500:25
501:8,14 502:7
503:13 504:7,14
505:9 506:2,3,13
506:23
**plaintiff** 298:4,12
298:21 380:22
381:7 405:25
406:6 407:5,23
419:2 423:13,15
423:23 424:8,17
478:15 479:9,16
481:20 482:8,24
483:14 487:18
489:9 498:8 499:1
499:23 500:8,19
501:10,21 502:3
502:13,23 503:16
505:5,13
**plaintiffs** 294:5
295:5,15 296:4,13
297:5,18 299:6
302:4 401:13
479:4 480:11,21
**Plaintiff's** 402:7
**planning** 457:19
**play** 449:14 450:3
450:13 459:1
**played** 449:15
450:4,14 459:5
481:8
**playing** 450:16
**please** 305:21
324:18 325:3
331:9 336:23
341:6 354:5 368:2
369:5 374:17

385:22 387:17
403:17 442:23
445:9 448:12
451:3 479:2,5
482:16 486:21,23
486:24 487:1
**PM** 421:6,9 425:6
425:10 446:11,14
449:8,11 458:1,17
460:4,24 497:3,6
507:1,5
**point** 367:11
370:17 397:11
419:23,24 420:6
420:21 469:6
487:18 488:10
499:2
**pointed** 345:19
475:4
**pointing** 375:7
**Pooley** 357:11
362:1 502:9
**population** 393:19
**portion** 328:9
448:16 461:17
**position** 400:1,17
401:6,6 405:15
416:19 435:23
**positions** 427:6
428:7 429:14
**positive** 429:17
**possession** 310:15
339:22 480:20
481:10
**possible** 431:2
**possibly** 501:3
**powder** 302:22
308:14 328:3,8,18
336:9 356:25
389:15 390:4
396:2,19 399:25
400:19 401:2
409:4 414:6,9,16
418:9 419:4 420:2
420:24,24 430:8
440:6 444:3

445:13,18 461:14
461:16 462:2
474:2 485:21
486:11 488:6
491:9 492:19
493:11 494:6,9,18
494:23 495:9
496:9 503:7
**practice** 428:12,14
457:12
**practiced** 429:2
**practicing** 427:17
427:18 428:1
**pre** 368:25
**predated** 506:6
**predecessors**
351:14
**prejudice** 331:25
**preparation** 313:23
314:18 315:10
317:25 318:13
322:2,11 324:20
324:24 340:18,23
398:20 409:10
415:21 454:13
465:12 477:1
493:12
**prepare** 430:16
492:21
**prepared** 337:10
340:13 390:21
424:24 434:12
483:6 484:18
**preparing** 306:13
309:16 389:9
390:20 391:8,11
397:16 417:1
437:3 438:14
490:10
**presence** 328:19,23
333:23,24 347:25
372:9 373:3
403:18 462:3
**present** 300:13
347:3 355:3
436:23 492:19

493:10
**presented** 317:20
431:14,24
**preserve** 326:23
**president** 325:23
327:12 331:11
451:7 461:2,5
506:7
**president's** 372:18
**pretty** 383:3
**Prevention** 302:7
382:6
**previously** 377:4
**Princeton** 472:13
**prior** 320:4 332:9
337:25 340:2
398:24 401:6
419:2 420:21
439:24 450:21
508:5
**privately** 353:15
**privilege** 368:14
375:2,4 377:7
398:13
**privileged** 400:3
454:17
**privileges** 404:7,18
**problem** 322:23
**Procedure** 404:13
**procedures** 359:16
414:4
**process** 430:5,25
434:9,14,15 435:3
452:20,21
**processed** 347:23
348:5
**processes** 414:4
**produce** 320:3
404:11 487:15
**produced** 314:11
315:8 318:23
427:23 438:11,11
438:17 480:18
**product** 328:10,24
333:25 372:10
380:22 381:8

454:2 506:10
**production** 304:10
410:2
**products** 294:7
301:24 302:3
305:5 373:4 419:1
427:3 452:20,22
461:17 495:2
**professional** 436:19
**program** 427:8
**promise** 482:15
**proof** 364:25
365:21,22 366:1
366:12,13 395:3
411:9 480:9,14
485:17
**proprietary** 404:6
404:17 405:18
**propriety** 404:17
**prove** 406:5 423:22
424:6 482:5
**provide** 336:14
337:24 404:2
469:7
**provided** 337:15
385:14 391:12,22
479:15 491:7
495:21 498:8
**providing** 436:10
437:1,1
**Public** 294:20
508:3
**publication** 396:1
**pulled** 345:3
**Pulliam** 381:22
**punishment** 413:17
447:3,8
**purpose** 476:25
**purposes** 337:9
**pursuant** 294:15
**put** 333:16 336:2
337:21 383:19
385:25 386:24
390:15 397:21
412:5 462:13
463:23 465:25



499:14
**putting** 387:4
**P-1** 491:3,3
**P-14** 303:4 468:2
**P-2** 490:25
**P-6** 301:16
**P-7** 301:17 317:7,8
354:2,4,6,15,16
354:17
**P-8A** 318:5 421:15
432:11
**P-8B** 421:17 432:11
**P-9** 301:22 319:20
319:21 333:12,13
370:14,15 371:1,6
371:7,9 385:22,23
386:6
**P.C** 299:2,14
**P8-A** 301:19
**P8-B** 301:20

**Q**

**qualified** 404:4
**quarter** 502:17
**question** 304:20
307:17,19 308:5,9
309:11 310:10
312:14,23 313:7
314:2,20 315:13
315:23 317:23
319:1,14 320:9
321:4,10 322:15
323:4,21 324:6,12
326:1 329:10,15
330:3 332:4,22
333:8 334:4 336:1
337:7 338:10
339:2,12 340:1
342:15,19,24
346:23 348:18
350:4,17,24 351:5
352:13,24 353:18
354:10 355:6,16
356:4,12 357:16
357:24 358:10
359:1,8,15 360:3

361:18 362:15
364:9,19,22 365:5
365:8,18,24
366:11,24 367:14
367:18,23 368:17
369:10,25 371:19
372:15 374:20
381:13 383:17,17
386:10,18 387:2
387:23 389:2,17
390:7 391:4,15
393:8 394:17
395:4 396:23
400:22 401:10
403:4,7,13 404:1
405:2 406:9,20
407:19 408:6
409:13,17 410:12
410:19 413:20
414:21 416:6,14
417:21 418:14
419:7 420:4,12
421:25 422:12
423:6,18 424:1,10
424:19 427:14
428:3 433:8 436:5
447:1,11 448:4,5
448:8,13 449:21
451:20 453:19
454:5,16 455:2,16
455:23 456:9
457:6 458:21
459:16 463:5
464:2,12 465:15
465:22 466:3,15
466:25 468:24
469:23 470:16
477:6,17 478:4,18
479:18 480:6,23
481:1,7,22 482:4
482:10,17 483:3
483:15 484:1,12
485:5,23 486:12
486:14 487:3,20
488:9,11 489:13
489:18 490:19

492:24 493:7,17
493:24 495:13
496:13 498:11
499:4 501:12
503:9 504:3,13
505:7,25 506:1,17
**questioning** 326:25
367:16 438:7
457:1 458:9
**questions** 312:11
320:18,25 322:19
322:25 323:10
326:5 327:2 330:1
334:24 335:18
337:13 340:12
342:3 349:13
357:10 374:3
386:24 402:8,16
415:5 418:6
425:20 434:6,16
438:9,12 439:15
446:7 447:21
448:2 458:7,8,11
470:12 488:21
495:5 499:17
506:24
**quietly** 469:10
**quote** 372:25
**quoted** 373:6
409:24
**Q5** 355:1

**R**

**R** 299:1
**Rabino** 398:5,5
**raise** 428:21
**raised** 312:21
313:15 335:4
426:12 440:10
**rare** 393:22
**ratio** 360:15
**raw** 347:24 348:5
**RAWLE** 300:2
**Ray** 300:15 305:15
397:4
**read** 341:18 343:18

344:23 409:9
415:5 431:11
436:4 448:12,17
460:6,6 480:23
**reading** 359:20
430:21 451:17
**reads** 337:22
**ready** 449:2
**really** 339:16
356:22 395:11
426:6 431:7
434:22 445:14
450:10 462:20
470:24 471:5
479:8 487:4
**reason** 440:17
456:18 470:1
**reasonably** 381:2
**reasonings** 411:24
**reassure** 474:20
**reassured** 432:1
**Reath** 468:5,9
**rebut** 411:7
**recall** 310:8,22
311:15,20,25
314:13 317:11
320:20 323:2
333:1,6,7,9
334:20 336:19
340:14 342:5
343:21 345:7,8,14
348:15 349:13,18
349:19,20 373:13
376:24 377:21
378:7,9,12,13
379:9,20 382:17
385:4,19 398:14
398:15 422:25
426:2 433:23
438:12 439:18
440:11 441:15,16
443:11 444:4,8
445:25 447:19
448:1,7,19 450:1
450:7,12,18,23
458:25 459:4,6,9

459:14,17 460:2
481:12
**received** 469:18
**recess** 373:23 421:7
446:12 449:9
497:4
**recipient** 476:24
**recognize** 413:5
**recollection** 426:3
494:20
**reconsider** 381:10
381:17
**record** 305:2,20
314:23,25 315:2,4
316:5 326:23
337:22 349:4,6,8
349:10 373:22,25
378:16 390:16
398:22 421:6,9
425:4,6,10,17
427:24 432:8
446:11,14 448:17
449:8,11 450:13
452:1 455:8 456:1
456:2 458:2,17
460:4,11,14,20,21
460:24 467:11
492:15 496:24
497:1,3,6
**records** 336:18
387:14 391:1
410:3
**redirect** 425:2
457:18,22
**reduce** 414:7
**refer** 470:13 474:15
475:20
**reference** 334:17
500:2
**referred** 433:3
**referring** 323:7
330:13 356:14
402:4 471:24
478:6
**refers** 471:21
**refining** 452:21



**refresh** 335:12
385:6 426:3
**refused** 398:12
**registered** 426:17
428:6,9
**regularly** 333:22
**related** 335:3 339:9
348:12 368:22
387:11 393:24
401:13 402:22
405:11,15,24
406:7 410:6 418:9
418:24 419:3
420:1,22,25 465:6
465:19 481:18
482:22 485:2,20
486:10 488:5
492:3 496:9
**relates** 357:10
404:23 473:21
504:5
**relation** 400:13
**relative** 508:16,19
**relay** 435:12
**relayed** 346:4
**relevant** 314:6
380:25
**reliance** 319:12
346:16,18 350:22
351:1 352:22
353:8 354:7
368:13 372:25
374:15 433:4,10
**relied** 317:21
318:23
**rely** 433:11
**relying** 394:18
**remember** 320:21
320:23 333:11
334:21 335:13,15
358:4,11 373:16
377:11 379:10,13
379:15 383:1,2,2
384:4,10 412:13
412:14,18 422:15
422:17 431:25

450:10 451:9
459:21,24 471:6
481:6 485:24,25
504:17,20,22,23
**remind** 431:7
**renew** 323:5 330:10
344:13
**renewed** 356:22
**renews** 344:10
**repeat** 326:24
399:1 471:5
**repeated** 322:18
**report** 499:25
500:12,18
**reporter** 294:20
305:17,21 314:22
342:17 349:3
448:12 508:3
**reports** 392:3
**representations**
311:23 312:3
329:6
**representative**
295:3,13 338:22
427:25 491:4
**represented** 315:7
369:18
**request** 304:10
305:13 404:12
456:12
**requested** 335:10
399:11,14,19
404:5,16 419:16
431:1,4 441:22
485:7 491:24
**requests** 387:14
438:18,19
**required** 488:23
**requires** 404:2
**research** 302:13
348:4 399:3
402:17 410:1
**reserve** 425:2
**respect** 327:2
329:25 348:19
372:16 387:25

390:16 405:3
407:15 408:11
416:16 443:9,16
500:21
**respond** 337:19
493:3
**responded** 343:9
496:7
**responding** 390:23
487:11
**response** 302:7
321:5 322:19
337:21 343:11
355:7 380:20
381:18 382:5
383:10,13 384:25
385:16 396:16
403:23 408:14
438:17 488:3,23
**responses** 302:3
311:18,24 312:5
334:24 338:18,20
339:8,23 378:10
379:22 385:14,18
391:11 405:19
433:12,21 434:10
437:2,5,13,16
438:24 439:4
440:22 441:3
442:3,8,13,19
443:15 445:22
446:3 481:4,14
484:4,22 485:20
486:8 487:24
488:2 491:6,15,18
491:21,24 492:7
493:4,5,12,20,22
495:9 503:24
504:9
**responsibilities**
486:2
**responsibility**
435:24 488:20
**responsible** 430:24
437:21,24 439:8
**responsive** 309:24

310:6,15 437:6
443:15
**result** 467:3,4
497:23 498:2
501:2,5,16,24
502:9,20 503:4,21
505:2
**results** 360:25
402:20 480:2
498:7
**returned** 474:2
**Reuters** 302:20
409:2,2
**reveal** 497:19
498:15,22 500:3
500:11
**revealed** 328:25
334:1 372:11
373:5 477:2
**review** 306:17,22
307:2,20 318:12
318:14 320:13
322:12 326:11
337:17 370:9
388:25 390:24
391:2 400:12
405:8 432:14,18
439:21 440:13
463:23 493:3
**reviewed** 306:19,24
307:10 313:22
314:16 315:9
317:1,2,4,25
318:2 322:3
324:15,20 327:6
334:16,22,23
366:15,19 379:23
440:15 470:4
492:20 493:11,21
**reviewing** 317:11
372:4 395:10
437:9
**Revlon** 300:11
**revolved** 426:20
**Rich** 415:12 425:19
**RICHARD** 299:9

richard.bernard...
299:11
**right** 316:9 318:6
319:23,25 321:23
323:11,19 324:10
325:15,18 329:4
330:19,24,25
332:8 333:19
334:6 336:6
341:21,21 349:24
352:22 353:6
357:14 362:9
363:4,6 365:11
367:4 371:8,16,17
371:24 372:12,18
372:22 373:8
375:20 377:2
379:12 381:11,20
382:11,14 383:6
386:14 387:15
388:6,10,13,13
389:12,15 390:1
393:10 401:4,17
402:25 405:7
408:7 412:11,23
417:11 421:15
422:19 425:2,3
439:6 449:5,24
456:12 457:5
461:7 462:4
464:10,16,19
465:9 469:5
470:14 472:3,5
473:7 474:4 475:7
480:17 492:10,12
494:7,10,12,16,22
497:23 504:11,25
505:25
**Road** 299:21
**ROBERT** 297:13
**Roger** 301:21 303:2
323:1 325:16
331:10 333:15,19
416:11 451:7
**role** 490:6,7
**Roll** 502:9



Ronald 330:18
room 468:11,14,19
469:1,19 470:11
ROONEY,decea...
295:14
Roth 299:2 305:14
RPR 508:23
Rules 404:12
running 327:1,5
330:3 348:18
Rutgers 390:1

**S**

S 294:19 299:1
301:12 508:2,23
sample 359:22
472:12 474:1
sampled 328:18
333:22 462:2
samples 359:4
sat 344:4 469:10
save 387:8
saw 308:2,2 319:16
362:2 377:9,22
saying 355:25
364:25 365:15,21
366:22 367:2
403:23 411:14,16
416:2 450:10
483:22 503:24
says 311:19 325:9
327:11,17,24
328:5,6,12,14,21
329:2 331:6,7,15
331:20 332:6,20
332:24 334:6,12
341:15 347:8,17
348:9 351:7,9,19
351:25 352:1
353:5 354:22
355:1 359:3,9
360:19,22 361:3,4
361:10 362:7,10
362:21 363:1
368:18 370:13
371:13 372:7,8

380:15 381:5,6,15
381:17,20 383:23
385:8 388:16
392:6,14 393:11
393:13 394:2,4,12
394:16 395:20
397:7,13 402:6,11
402:12 403:16,21
404:20 405:4,20
411:3 413:22
414:2,23 452:14
452:24 453:8,14
453:24 461:23
473:13,25 491:3
497:21,25 498:1,6
498:18,19,24
500:6,15,16 503:3
503:4,22 505:24
scarce 361:15
school 402:17,22
405:24 426:11
science 471:3
scientific 366:13
432:1
scientist 343:19
345:21 347:21
348:13
scientists 335:21
344:4 364:5
366:14,18 395:1
397:15
scope 308:4 311:5,8
312:10 321:13
322:10 324:14
326:1,14 329:11
334:8 336:1
342:15,19 344:23
348:20 350:9
352:14 353:18
355:16 360:3
361:18 364:9
365:5 366:24
369:25 371:19
372:16 387:23
390:7,17 403:9
405:3 406:20

407:12,17 409:21
410:13 411:19
416:14 417:21
420:12 424:10,19
424:25 427:12,21
428:17 438:21
440:3,20 451:20
451:25 452:7
453:19 459:3
479:18 489:18,23
490:5,11 495:13
496:13 499:4
500:22 506:17
scratch 458:23
screen 333:17,18
386:25 387:3
451:6
SCRIVO 299:19
search 431:2 441:7
searches 430:24
437:22 439:8,10
442:15,16 443:8
443:14
SEBASTIAN 300:3
second 306:8
314:23 327:15
384:15 392:2
425:23,25 453:11
secret 404:6,17
405:18 504:1,11
section 357:3,8
393:7,13 409:19
Sediment 474:1
see 307:3,8,13,20
307:22,24 308:6
313:16 316:4,10
316:11 320:15
324:3 325:12,17
327:15 329:20
330:16,21,22
331:2,3,14,19
333:16,18 334:11
336:3,7,8,11
337:5 339:3
343:15,25 344:17
344:18,25 345:23

345:24 346:17,19
346:25 347:1,2,11
348:8,9,25 351:24
351:25 352:5,6
353:3,5,6 354:16
354:19,24 355:5,6
355:20 357:5,6,8
357:9,12,13
358:20 359:3,7,8
359:13,14,19
360:1,7,16,19
361:2,3,8,9,16,22
362:3,20,20,24
363:1 368:15,18
368:21,23,25
369:5,14,23 370:4
370:12,13 371:3
371:12 372:6,21
375:3,6,7,8,10,11
375:13,14,16
376:7,11,12,15
377:6,16 380:8
381:4,5 382:7,22
385:5,24 386:22
387:5,10,21 388:2
388:21,22 389:18
390:9 392:2,5,6
392:11,12,19,20
392:24,25 394:1,2
394:8,9,15,16
395:19 396:4,7
397:6,18,19,24
401:21 402:10,11
403:20,21 404:8,9
404:19,20,25
405:4 410:25
415:19,23,25
431:9 432:19
442:18 451:12,16
452:11,14,18,23
452:24 453:4,8,12
453:15 454:6,7
461:4,19,20 462:9
471:14,18 473:10
476:17,21,22
477:3,4,11,12

491:12,25 496:2
497:20,21,24
498:5,17,18,23,24
500:5,6,14,15
503:21,22
seeing 325:9 347:5
386:16 387:13
seen 321:7 340:24
346:10,13 349:23
350:1,13 361:5
380:10 388:5
391:5,16,25
402:20 409:5
431:15,19 451:18
Selby 317:10 378:6
379:19 380:7
445:23
selected 462:12
497:14
selection 462:23
463:2
sells 328:9 461:17
SELVAGGIO
298:11
Sempel 375:23
send 317:3,3,14
320:5 485:7
487:15 497:15
sense 435:9
sent 315:18 316:2,5
316:5 318:16
319:7,8,23 331:23
350:10 354:7,12
369:15 389:4
402:21 421:20
431:17 432:6,6,24
439:21 453:2
462:17 463:3,8,15
463:24 464:5,14
464:23 466:11
468:22 474:14
485:8,9 488:24
489:3,8 497:16
499:13,16,22
501:19 505:4,12
sentence 352:6



359:14 388:22
392:20 397:19
405:20
**sentences** 361:23
392:12,25 394:9
**series** 452:21
**served** 311:9 358:6
**Services** 294:24
295:25 296:25
297:25 298:25
299:25 300:25
301:25 302:25
303:25 304:25
305:16,18,25
306:25 307:25
308:25 309:25
310:25 311:25
312:25 313:25
314:25 315:25
316:25 317:25
318:25 319:25
320:25 321:25
322:25 323:25
324:25 325:25
326:25 327:25
328:25 329:25
330:25 331:13,25
332:25 333:25
334:25 335:25
336:25 337:25
338:25 339:25
340:25 341:25
342:25 343:25
344:25 345:25
346:25 347:25
348:25 349:25
350:25 351:25
352:25 353:25
354:25 355:25
356:25 357:25
358:25 359:25
360:25 361:25
362:25 363:25
364:25 365:25
366:25 367:25
368:25 369:25

370:25 371:25
372:25 373:25
374:25 375:25
376:25 377:25
378:25 379:25
380:25 381:25
382:25 383:25
384:25 385:25
386:25 387:25
388:25 389:25
390:25 391:25
392:25 393:25
394:25 395:25
396:25 397:25
398:25 399:25
400:25 401:25
402:25 403:25
404:25 405:25
406:25 407:25
408:25 409:25
410:25 411:25
412:25 413:25
414:25 415:25
416:25 417:25
418:25 419:25
420:25 421:25
422:25 423:25
424:25 425:25
426:25 427:25
428:25 429:25
430:25 431:25
432:25 433:25
434:25 435:25
436:25 437:25
438:25 439:25
440:25 441:25
442:25 443:25
444:25 445:25
446:25 447:25
448:25 449:25
450:25 451:25
452:25 453:25
454:25 455:25
456:25 457:25
458:25 459:25
460:25 461:25

462:25 463:25
464:25 465:25
466:25 467:25
468:25 469:25
470:25 471:25
472:25 473:25
474:25 475:25
476:25 477:25
478:25 479:25
480:25 481:25
482:25 483:25
484:25 485:25
486:25 487:25
488:25 489:25
490:25 491:25
492:25 493:25
494:25 495:25
496:25 497:25
498:25 499:25
500:25 501:25
502:25 503:25
504:25 505:25
506:25
**set** 369:20 478:13
479:14 483:13
493:22 508:13
**sets** 338:6 440:22
492:20
**seven** 306:12
**severely** 426:23
**share** 320:5
**shared** 395:7
433:13
**Sharp** 302:11
**shortcut** 474:10
**show** 366:4,8
448:25 451:5
479:13 483:7
**showed** 323:17
345:4,4,20 346:13
373:14 377:12
449:24 451:10
459:10
**Shower** 400:19,20
440:6,7 478:1,1
491:9,10

**showing** 345:8
449:22 506:9
**shown** 340:22
360:25
**sic** 335:8,13 356:6,9
385:1 391:1 397:4
397:15 401:13
**side** 497:22
**sign** 331:17 357:25
364:24 365:20
**signature** 325:19
413:9
**signed** 331:10,24
333:2,15 348:13
357:20 364:1,2
374:10 377:15
388:3 415:24
416:11,22 433:20
436:1 447:5
484:22,25 488:13
506:6
**signing** 365:2 415:3
415:6
**similar** 333:3
404:22
**simple** 486:12
**simply** 326:22
**single** 327:21
398:22 419:23,25
420:6,21 465:10
478:13 479:15
481:16,20 482:6
483:12 484:8
485:19 487:16
488:4,5,17 489:8
500:18 501:21
502:2,12,22
503:15 505:4,13
**sir** 342:17
**sit** 405:22 406:4
407:2,20 410:9
411:6,15 419:22
420:19 423:21
424:5 446:2
454:11 478:11
479:10 481:15

**showing** 482:4,21 483:11
485:17 486:7
487:9,14
**sits** 406:17
**sitting** 345:6
**six** 306:12
**sixth** 362:23
**sized** 360:25
**SKADDEN** 299:8
**skills** 427:10
**skin** 426:25 427:1
**skip** 500:1 502:18
503:2
**skipping** 502:15
**SLATE** 299:8
**Sloan** 376:1,15
377:7,9
**sold** 328:3,17
461:14 462:1
491:10
**solidify** 437:11
**solve** 397:16
**somebody** 337:22
408:12 435:19
439:1
**Soon** 409:8
**sorry** 314:22
322:22 342:17
349:3 371:4
397:21 401:18,20
403:6,15,16
410:18 429:4
439:14 456:24
460:10 472:17,18
472:23 494:7
**sort** 313:16
**sought** 380:24
**sound** 449:6
**Sounds** 411:11
**source** 328:2
461:13
**sources** 392:16
419:5 420:24
**South** 300:4
**spanned** 378:10
**speak** 308:25



434:17 435:10
436:14
**speakers** 449:4
**speaking** 368:4
468:19
**spec** 441:20
**special** 302:4 477:1
**Specialist** 300:15
**specific** 315:25
318:20 320:17
333:7 379:10
399:18 417:16
430:6 431:22
439:14,15 441:22
443:9 447:21
481:13 492:5,9
494:1
**specifically** 307:1,3
316:16 340:24
343:22 351:13
358:12 384:5
395:2 396:11
398:10 402:5
413:7 414:12
417:13 418:16
438:20 442:18
474:7,17 475:2,22
477:22
**specified** 388:20
**specimen** 359:6,10
**speculate** 404:2
**spend** 309:15
408:17
**spent** 306:11
408:16
**spoke** 378:5 430:22
439:5,12 470:1
**spoken** 447:22
**Square** 299:3,10
300:4
**SR** 298:19
**St** 426:24
**stage** 360:13
**stand** 368:5 448:22
**start** 316:17 403:13
428:16

**started** 427:2 429:6
447:20 448:14
458:24
**state** 294:20 321:21
392:21 403:17
404:11 414:12
446:21 508:4
**stated** 332:8 345:12
345:17 352:2
476:25
**statement** 339:10
339:17 355:23
411:7 416:24
448:5 450:21
**statements** 413:16
**states** 328:3 333:20
416:6 461:11,14
**station** 468:5
**stayed** 438:21
**stenographic**
305:20
**stenographically**
508:11
**step** 433:25
**Stephen** 297:15
**stipulation** 331:24
**Stipulations** 304:15
**stop** 428:12 456:11
**stopped** 428:13
**Street** 294:17 299:4
305:12
**strike** 357:2 407:16
408:13,14 427:12
427:13
**studied** 393:15
**studies** 356:14
380:17
**stuff** 421:14
**subject** 378:4
380:25 404:6,16
413:17 434:11
447:8,16
**submissions** 383:18
**submitted** 324:2
**subpoena** 311:9
404:14

**substance** 309:4
454:24
**Success** 427:8
**sued** 335:23
**suggestion** 313:9
**suggests** 393:22
**suit** 410:24
**Suite** 299:4
**Superior** 294:1
295:1,10 296:1,9
297:1,11 298:1,9
298:17 305:6
**Supplemental**
302:3
**supplied** 338:20
372:4 445:12,15
478:14 479:3,9
495:8 496:9 500:8
500:18 501:9
**supplier** 396:25
**supply** 435:22
488:17
**supplying** 328:7
394:23,25 430:6
461:15
**SUPPORT** 304:2
**sure** 321:15 356:19
358:3 378:21
401:17,22 412:17
413:11 415:13
418:5 422:21
428:24 431:18
437:23 442:25
462:19 466:17
470:3,6 473:20
474:21
**swear** 305:22
**swears** 328:13,22
**switch** 443:22
**sworn** 305:24
325:16 355:24
508:6
**SYLVIA** 296:12
**sync** 473:5
**system** 474:21
475:3

**T**

**T** 299:9 301:12
306:2 425:12
446:16
**tab** 325:2 329:22,23
331:22 332:14
341:6,10,12,25
346:16,17 347:14
351:2 352:22
354:14,16 368:9
368:10,12,13
369:4 374:15,16
376:17,18,21
387:17,18 471:21
472:22 474:4
475:19 506:2
**table** 360:25 361:5
362:20 363:15
469:1 476:7
**take** 353:2 421:4
433:25 438:5
457:23 468:7
476:19 478:20
479:1,5
**taken** 294:15
305:11 313:4
355:3 356:6 468:4
508:11
**talc** 295:17 298:23
327:20 328:8,15
333:21 343:14
347:23,24 348:5
350:8 351:12,13
351:14 352:4
356:24 358:7
363:10 369:21
375:19 383:5,15
388:12,18 393:7
393:13,15,22,25
394:11,14 396:3
396:19 397:10
399:7 401:1 410:5
414:5,5,15 416:5
417:6 418:10,25
418:25 420:23

440:4,6,19,23
444:1 445:12
451:14 459:12,12
461:13,15,24
464:9,10,18,19
465:6,11 474:3
481:19 482:7,23
484:9 485:3
487:17 488:18
489:10 491:9,11
498:3
**talcosis** 307:15
**talc-free** 351:16
**talented** 429:16
**talk** 360:11 365:10
379:18 391:18
408:15 412:3
429:19 430:4
476:20 477:18,21
479:24 489:23
**talked** 350:6
356:18 366:18
377:1 445:20
464:8 474:17
477:13
**talking** 326:15
334:21 338:21
339:17,18 360:8
378:13 399:20
436:24,24 442:13
469:12 475:1
476:8 501:20
**talks** 351:22 358:21
359:21 392:3,7
394:10 395:25
398:4 453:12,15
454:1 464:17
471:12 473:23
477:9,24,25
499:19 500:4
**teach** 427:10
**TEC** 296:15
**tell** 313:13 319:3
366:8 374:16
417:2,17 426:9
429:8 430:20



432:22 454:10
456:2 466:12
472:9 477:8,15
**telling** 349:21
389:14
**ten** 362:23 446:9
**tenure** 434:23
465:18
**term** 434:4
**terms** 309:6 409:13
459:3 496:8
498:21
**test** 474:2 476:25
477:1 480:2
481:18 482:6,22
484:8 487:16
488:4,5,17 489:8
499:1,22 500:7,11
501:5,19 502:2,12
502:22 503:15,18
505:1,4,12,15
**tested** 328:19
333:23 347:23
355:11 410:5
462:3 477:1
**testified** 305:24
314:15 334:15
335:21 338:7
339:6,22 341:1
345:21 347:22
349:24 350:12
358:14 441:12
443:7
**testify** 390:21
480:19 481:9
483:21 508:7
**testifying** 346:5
429:20 447:15
479:11
**testimony** 301:5
309:4,9 314:21
316:1,25 334:20
335:2 336:13,19
340:2,13 343:2,24
349:17 351:22
368:1 430:16

439:24 441:11,16
444:4 447:25
448:20 449:1,13
449:16,18,23
450:2,8,16,19,24
454:25 455:10,20
456:4 459:1,7
469:20 470:1
490:17 508:11
**testing** 318:11,21
328:25 334:1
355:3 359:6
372:11 373:5
398:12,24 399:5
399:25 402:20
405:10 406:7
407:22 410:6
414:4 418:24
419:3 420:1,23
422:8,21 423:3
474:18 476:24
481:18 485:2,20
486:10 488:5,23
489:9 496:10
497:19 498:15,22
506:8
**tests** 344:5 380:17
422:16 431:23
478:13 479:14
483:13 500:3
506:4,14
**Texas** 404:12
**thank** 327:8 344:13
378:24 379:3,6
380:3 382:2 421:4
428:24 432:12
506:24
**thermo** 355:12
**thing** 307:11
334:16 354:22
364:23
**things** 334:23
413:25 423:8
432:20 462:17
**think** 306:10 308:3
316:1,19 342:7

364:22 367:21,25
413:2 433:21
436:24 437:22
439:6 445:16,22
457:23 476:6
480:8,12 490:9
**thinking** 445:18
**thinks** 466:13
**third** 333:13 347:7
**Thomas** 381:22
**thought** 444:13
460:13,20,21
475:12 490:5
499:15
**thousands** 367:7
**three** 309:17,18,20
410:4
**time** 305:10 306:10
308:21 309:14,21
310:1,4,19 311:12
314:9,24 315:3
321:3 330:5,6,9
330:10 333:2
334:14 339:14,23
340:6,11 342:2
346:1 349:5,9
372:3 373:13,20
373:21,24 378:5,9
378:18 380:22
381:9 382:18
383:5 384:12
387:8 397:11
399:5,7,14 408:17
414:1 415:1 417:5
421:5,8 422:15
425:5,9,24 431:12
433:19,20 435:25
435:25 436:23,25
444:12 446:10,13
449:1,7,10,14
451:10 454:14
456:7 457:25
458:16 460:3,23
465:3,25 466:8,17
469:6,11 470:25
471:7 482:16

487:18 492:18
497:2,5 499:2
506:25 508:12
**times** 299:10
362:23 420:14
441:11 482:19
486:15 501:25
**tissue** 358:22 359:4
359:10,11,17
362:23 363:5
**today** 305:9 313:13
322:11 344:3
346:5 362:13
407:2,20 410:9
411:6,15 419:22
420:20 422:6
423:21 424:5,25
429:20 430:4,16
446:2 454:11
455:10 478:11
479:10,24 481:3
481:16 482:4,21
483:6,11 484:3,19
485:17 486:7
487:10,14,22
**today's** 309:16
389:9 390:21
391:9 409:10
417:1 454:13
507:1
**told** 306:11 310:5
310:19 340:16
350:5 353:14
366:20 388:11,13
388:17 390:2
410:14 417:11
418:23 427:24
447:7 455:3
460:16 470:17
475:12 494:4
502:16
**top** 335:13 410:2
**topic** 383:19
**topics** 311:13
**total** 360:23
**touch** 466:1

**trace** 388:19
472:11
**trade** 404:6,17
405:18 503:25
504:11
**transcript** 303:2
323:6 344:15
345:12,17,20
353:12 426:4
449:22 508:10
**transcripts** 366:5
366:19
**transmission**
359:24
**trauma** 426:25
**tremolite** 361:7,14
363:17 392:16
393:16,19,20
394:13 414:8,18
472:12 498:3,15
498:21 499:20
501:3 505:23
**trial** 301:23 320:4
338:1,14 496:3
**true** 339:14 395:6
413:13 455:14
486:9 488:16
**trust** 331:16
**trusted** 436:20
**truth** 366:9 508:7,7
508:8
**truthful** 446:3
**try** 387:8 457:24
482:16
**trying** 326:17,23
423:1 460:7,15,19
483:4 484:16
487:2,5 495:25
**tube** 474:2
**tumor** 359:12
**turn** 325:11 341:6
347:18 381:10
398:12 400:2
411:10,18 503:15
**turned** 398:23
399:5,15 405:25



406:2,5,11,12,18
407:4,8,21,24
419:25 420:22
423:13,15,23
424:3,3,7,13,17
480:21 481:11,18
481:24 482:1,6,12
482:13,24 483:8
483:12,18,22,24
484:7 485:1,18
486:1,3,9 487:16
499:1 501:21
502:2,12,22
**turning** 485:25
**Turnpike** 299:15
**two** 299:3 330:25
397:15 475:8
492:20 493:12
496:22 503:1
**tying** 471:25

**U**

**Uh-huh** 317:8
353:9 385:7
422:22 472:25
**ultimately** 328:17
462:1
**umbrella** 444:15
**underneath** 394:3
**understand** 307:17
308:12 312:7,18
312:24 313:2
319:25 320:7
363:8 378:21
430:25 432:21
439:3,11 458:21
462:18 491:14,20
**understanding**
321:12 337:11
339:14 356:23
391:17 417:10,15
429:24 430:3,11
430:22,25 434:2,5
434:9 438:22
439:9 440:4,21,25
444:11 445:11

446:20 447:18
464:4 479:23
481:2,23 484:2
487:22 488:3
491:17,23 493:2
**understands**
326:14
**unequivocal** 369:19
**United** 328:3 416:6
461:14
**University** 390:2
426:15
**unknown** 503:1
**urged** 370:7
**use** 329:25 352:14
390:17 403:8
**users** 328:10,17
461:18 462:1

**V**

v 296:5,14 297:6,19
298:5,13,22
301:24 302:11
**vague** 403:24
**vaguely** 342:8
**VAN** 299:20,20
**various** 378:9
427:5
**veins** 352:3
**venue** 313:9
**veracity** 428:2
**verbatim** 508:10
**verified** 310:20,25
433:20 436:1
484:23
**verifying** 394:19
395:5
**Vermont** 327:22
351:12,15 352:4
353:16 355:4
356:1 369:21
388:12,18 453:17
453:17 473:25
**version** 341:18,23
**versus** 305:5 393:9
397:5

**VICMAR** 295:12
**video** 300:15 459:2
**videographer**
305:1,15 314:24
315:3 349:5,9
373:21,24 378:18
421:5,8 425:5,9
446:10,13 449:3,7
449:10 457:25
458:16 460:3,23
496:23 497:2,5
506:25
**Videotaped** 294:14
**Village** 299:21
**violates** 404:12
**Viscomi** 367:24
454:19 456:11
457:21 458:13
**voice** 450:9
**VOLUME** 294:12
**voluntarily** 370:10
370:11 371:15
**volunteering**
426:20
**vs** 294:6 295:6,16

**W**

**Wait** 387:6
**WALTER** 296:3
**want** 326:7,12
327:5 368:3
378:20 386:3
401:17 409:12,14
412:2,4 418:4
422:19,20 436:22
436:22 449:14
456:25 478:25,25
496:1
**wanted** 307:7
356:18 378:25
379:18 426:18
431:9 433:14
437:23 460:21
470:2,6
**wants** 344:13
**wasn't** 329:16

410:15 431:8,15
435:18,24 483:6
488:20
**way** 309:9 354:6
364:22 374:25
387:7 393:8
400:16 408:18
439:2 442:1
447:25 471:24
476:3 477:13
487:6 490:24
**weeks** 309:20
429:21
**WEINER** 299:19
**WENDOWSKI**
298:19,20
**went** 372:24 373:14
376:25 378:9
379:13 383:10
395:22 396:15
412:4 426:10,14
426:22 431:22
451:9 459:20
461:2 464:18
492:17 506:5,15
**weren't** 337:25
400:2 441:6
494:17
**Westfall** 342:4,9,13
343:6,20 346:21
347:15 349:17
350:7 352:11
353:3 354:18
358:23 363:12,18
364:5 451:8
**Westfall's** 363:5
**we'll** 387:8 415:12
**we're** 306:8 313:3
313:14 314:25
316:13 321:16
326:14 386:20
391:21 398:17
403:1 418:3 421:6
432:8 440:8 457:7
457:9,13,16 458:2
460:4,14,20

**474:24 475:19
489:23
**we've** 370:20
436:24
**whatsoever** 465:24
484:10
**Whittaker** 299:18
**Widener** 300:3
**wife** 294:4 296:3
297:4 298:20
**Wiles** 302:11
**willfully** 413:16
**William** 348:13
364:1 375:12
395:17,21
**Windsor** 327:12,19
327:21 328:8,16
328:24 329:7
331:10,11 333:22
333:25 371:15,17
371:24 372:5,10
373:4 454:2
461:16,25 491:7
491:10 502:19
505:16
**Winner** 382:21,24
**witness** 304:5
305:22 308:10
309:12 310:11
311:6 312:24
313:8 315:14
319:2,15 320:10
321:11 322:16
323:22 324:13
326:3 329:14
330:12 332:5,23
334:11 337:10,13
337:16,19 338:11
339:3,13 340:3
342:16,21,23
344:22 350:5,18
351:6 352:16,25
353:22 354:11
355:20 356:5,13
357:17,25 358:11
360:5,7,19 361:20



361:22 362:5,16
363:1,14 364:11
364:13 365:25
366:12 367:1
368:4,18 369:11
370:2,4 371:21
373:10 380:2,3
381:14 383:18,22
386:11 387:24
388:2 389:3,18
390:9 391:5,16
396:24 400:23
404:2,3,5,16
405:4 406:10,22
406:24 407:7
408:7 410:14
411:2,21,23
413:21 414:22
416:15,18 417:25
418:15 419:8
420:17 421:2
422:1 423:7,19
424:2,12,23 425:2
428:5 429:1,13
430:3 433:9
437:19 440:1
442:22 443:20
447:2,12 448:22
449:22 452:11
453:23 454:6,16
455:3,17 456:10
457:18,23 459:17
459:24 460:22
464:3,13 465:16
466:4,16 467:1,18
468:25 469:24
470:17 477:18
478:5 479:22
480:7 481:2,23
482:11 483:4
484:2,13 485:6,24
486:25 487:4,21
488:10 489:21
490:20 493:25
495:17 496:15
498:12 499:8

500:24 501:13
502:6 503:10
504:4 505:8
506:21 507:3
**witnesses** 309:1
**women** 393:18,23
**word** 433:10
**words** 370:5 433:21
**work** 405:11
429:15 434:24
436:17 438:1
459:2
**worked** 375:19,22
396:18 436:14
465:4 505:21
**workers** 410:2
**working** 383:4
426:21 430:13
**wouldn't** 395:11
400:9 426:9 435:9
499:16
**written** 355:21
386:23 393:4
402:8,16
**wrong** 365:11
400:8 473:4
**wrote** 335:8 393:1
470:8 472:1,6,7
474:11 475:13
499:9
**www.MagnaLS.c...**
294:25

**X**

**X** 301:2,12 306:2
425:12 446:16
**x-ray** 355:11
**x-rays** 359:22

**Y**

**Yeah** 377:13
378:17 387:13
496:25
**year** 358:15 396:14
412:20 429:4
**years** 327:20

335:20 336:4
427:7 436:15
494:14 495:2
**Yesterday** 445:1
**York** 299:10,10
300:9,9 358:17
**YOUNG** 300:8
**Yuhas** 321:22
331:18 332:10,16

**Z**

**Zeitz** 501:24

**0**

**000021285** 302:9
**000280280** 302:15
**000319333** 302:13
**0269** 353:4,7
**07009** 299:21
**07932** 299:16
**08901** 294:17

**1**

**1** 305:3 360:25
361:5 362:20
**1/13/2020** 508:24
**1/15/75** 501:23
**1/25/77** 502:8
**1:34** 421:9
**1:37** 425:6
**1:44** 425:10
**10** 498:3 501:25
**10/10/74** 500:14
**10/16/97** 302:10
**10/6/78** 502:19
**10/8/65** 501:16
**10:19** 294:18
305:10
**10:27** 314:25
**10:28** 315:4
**10022** 300:9
**10036** 299:10
**105** 321:20 335:4
**11/2/84** 503:19
**11:05** 349:6
**11:07** 349:10

**11:32** 373:22
**11:46** 373:25
**12/4/70** 498:2
**12:40** 421:6
**13** 508:25
**14** 299:21
**16** 451:12
**17** 304:7 345:20
347:19 414:2
474:5
**17th** 369:6
**18** 299:15 327:20
**19** 472:24
**19103** 299:4
**19107** 300:4
**1940s** 351:11
**1955** 416:7
**1968** 331:11
**1971** 378:11 472:3
472:5,12 492:19
493:10
**1975** 428:6 473:2
**1976** 473:25
**1978** 502:18
**1980s** 351:12 358:7
**1982** 427:2 429:7
**1987** 330:15 506:7
**1989** 369:6 374:11
375:5
**1990s** 412:15
**1991** 325:20
**1992** 371:2 378:11
379:8,13
**1993** 379:18
**1995** 302:6 382:4
**1997** 329:21 385:3
**1998** 387:19 408:18

**2**

**2** 322:23
**2/2/75** 501:1
**2/26/73** 499:18
**2:02** 446:11
**2:16** 446:14
**2:18** 449:8
**2:22** 449:11

**2:29** 458:1
**2:48** 458:17
**2:51** 460:4
**2:52** 460:24
**20** 304:7
**200** 360:23
**2000** 412:20
**2000s** 358:8
**2001** 299:4
**2002** 416:7
**2017** 398:24 418:23
419:3 420:2,21
423:15,24 424:8
424:17 478:15
479:16 482:8,25
483:14 484:9
**2019** 294:11 305:9
508:25
**206** 343:25
**209394** 302:17
**21** 322:6
**212.735.3453**
299:11
**214** 335:17
**215** 335:19
**215.567.3500** 299:5
**215.575.4303** 300:5
**216** 390:14
**217** 395:15,17
**219** 397:2,4
**22** 472:20 473:23
473:23,24 474:5
**220** 321:25
**221** 322:1,19
**223** 322:24
**224** 322:24
**225** 322:24
**227** 323:25
**23rd** 329:21 330:15
387:19
**230** 415:10,17
**2325233** 508:23
**25** 354:14,16 473:8
473:12,13,15
**268** 348:11
**27th** 302:6 382:4



**277** 412:25 413:2
**28** 341:13
**29** 363:5
**2900** 299:4
**291** 336:3

---
**3**
**3** 403:13
**3-to-1** 360:15
**3/30/1987** 505:23
**3:29** 497:3
**3:31** 497:6
**3:39** 507:1,5
**30** 427:7 436:15
    495:2
**30XI00118300**
    508:24
**306** 301:6
**316** 301:15 336:23
**317** 301:17
**318** 301:18,20
**319** 401:17,19
**32** 497:13
**322** 302:9
**33** 325:3,4,5,6
    329:23 331:22
    332:14 506:2
**333** 301:21
**336** 301:23
**337** 302:14 380:2,5
    380:5
**34** 506:2
**36** 380:15
**380** 302:2
**382** 302:6
**390** 302:10
**395** 302:15
**397** 302:16,18

---
**4**
**4** 299:10 373:1
    403:15
**4th** 371:2
**4/17/98** 302:16
**4/24/74** 500:2
**4/26/86** 505:10

**40s** 410:3
**401** 302:19
**408** 302:20
**415** 302:23
**425** 301:7
**446** 301:8
**451** 303:2
**467** 303:3
**476** 303:5
**482** 408:23,25

---
**5**
**5** 354:22 359:15
    471:21 498:2
**5th** 473:2
**500** 452:16,19,21
    453:16
**53** 350:22 351:2
**54** 368:12,13
    374:18
**54.212** 302:12
**55** 346:16,17
**56** 294:16 305:12
**57** 347:14 352:22
**58** 368:10 369:5
    376:21

---
**6**
**6** 316:19,20,21
    471:13,16,18,21
    472:4,5,8
**600** 300:9
**624-6221** 294:24
**646.589.8722**
    300:10
**66** 454:2
**68** 302:5
**69** 374:23

---
**7**
**7/29/71** 498:20
**7/7/71** 498:14
**76** 387:17,18
**78** 341:6,10,12,25

---
**8**

**8** 294:11 351:20
    368:9 375:4
    432:11
**8A** 318:6,12 319:9
    324:17 325:2,4,5
    325:7 354:11
    363:23 432:15
    433:3 439:17
    453:1 462:7
    463:23 464:13
    472:23 474:25
    497:12,13
**8A-1** 453:1
**8A-19** 472:22
    473:12
**8A-32** 497:8,18
**8B** 318:7,13 319:9
    341:6 346:16
    350:22 354:11
    363:23 368:9
    387:17 432:15
    433:4 439:17
    462:8 463:24
    464:14 475:1
**8B-54** 374:22
**8th** 300:9 305:9
    374:11 376:10
**8/22/85** 505:1
**80s** 410:3
**85** 343:3
**866** 294:24
**87** 304:7
**88** 304:7

---
**9**
**9** 357:4
**9,400,000** 363:10
**9/1/83** 503:3
**9/8/86** 505:15
**95** 398:18
**973.239.5700**
    299:22
**973.822.1110**
    299:16



Exhibit 4

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF RHODE ISLAND

3    * * * * * * * * * * * * * * * * * * * *

4
     DAVID HOWARD WESTFALL, in his              *
5    capacity as Administrator of the
     Estate of Thomas Howard Westfall,          *
6    and in his capacity as Administrator
     of the Estate of BETTY F. WESTFALL         *
7
                    vs.                         *
8
     WHITTAKER, CLARK & DANIELS, et al          *    C. A. #79-0269
9
     * * * * * * * * * * * * * * * * * * * *
10

11

12

13        DEPOSITION of ROGER N. MILLER, a witness in the above-
     entitled cause, taken on behalf of the Plaintiffs, pursuant to
14   Notice, before Lynne S. Irons, a Notary Public in and for the
     State of Rhode Island, at the offices of Decof & Grimm, One
15   Smith Hill, Providence, Rhode Island on October 29, 1982 at
     1:00 P.M.

16

17

18

19

20

21

22

23

24



W|P  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

EXHIBIT
tabbies®  J&J 294

J&J-0129864
JNJ 000064796

A P P E A R A N C E S

For the Plaintiffs...........DECOF & GRIMM
                      BY:  R. DANIEL PRENTISS, ESQUIRE
                      and VINCENT T. CANNON, ESQUIRE

For the Defendant.............HINCKLEY & ALLEN
  (Whittaker, Clark &    BY:  ROBERT W. LOVEGREEN, ESQUIRE
   Daniels)

For the Defendant........NUTTER, McCLENNEN & FISH
  (Windsor)              BY:  EDWARD P. LEIBENSPERGER,
                                               ESQUIRE
                         and  JOSEPH BLUTE, ESQUIRE

For the Defendant........HANSON, CURRAN & PARKS
  (Metropolitan)         BY:  DENNIS McCARTEN, ESQUIRE

For the Defendant ......ROBERTS, CARROLL, FELDSTEIN &
  (Pfeizer)              TUCKER
                         BY:  BERNDT W. ANDERSON, ESQUIRE

For the Defendant ......RICE, DOLAN, KIERNAN & KERSHAW
  (Vermont Talc)         BY:  JOHN F. DOLAN, ESQUIRE

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129865
JNJ 000064797

# E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1 | LETTER DATED SEPTEMBER 12, 1966 TO MR. ESCKILSEN FROM THOMAS F. CURRY, WITH ATTACHMENT.................................... | 44 |
| 2 | BUREAU OF MINES REPORT DATED MARCH 29-30, 1966......................................... | 48 |
| 3 | LETTER DATED FEBRUARY 24, 1950 TO MR. MAGNUS FROM HARRY B. ASHE..................... | 48 |
| 4 | LETTER ON EASTERN MAGNESIA STATIONERY WITH A DATE CONTAINING THE FIRST SENTENCE OF AUGUST 21, 1958................................... | 48 |
| 5 | LETTER DATED MAY 20, 1966 TO MR. ESCKILSEN FROM HARRY B. ASHE.......................... | 48 |
| 6 | LETTER DATED APRIL 18, 1967 TO MR. ESCKILSEN FROM HARRY B. ASHE, WITH SUMMARY ATTACHED...... | 48 |
| 7 | LETTER DATED APRIL 12, 1965 TO MR. ESCKILSEN FROM MR. HARRY B. ASHE......................... | 48 |
| 8 | REPORT ON THE LETTERHEAD OF SKINNER, SHERMAN & LUERS, INC. DATED JANUARY 20, 1967........... | 48 |
| 9 | LETTER DATED DECEMBER 5, 1960 TO MR. MAGNUS FROM THOMAS F. CURRY, WITH ATTACHMENT.......... | 48 |
| 10 | LETTER DATED MARCH 27, 1962 TO MR. ESCKILSEN FROM THE C. P. HALL COMPANY, WITH ATTACHMENT... | 48 |
| 11 | SERIES OF LEDGER SHEET PAGES WHICH RELATE TO WHITTAKER, CLARK & DANIELS, INC., A TOTAL OF 12 PAGES..................................... | 48 |
| 12 | LEDGER SHEETS THAT CARRY AN ACCOUNT CALLED UNITED STATES RUBBER COMPANY, BAGS............ | 48 |

**W** *Woods & Irons*
Suite 300 ● 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129866
JNJ 000064798

# E X H I B I T S   (PAGE 2)

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|

**13** — SINGLE PAGE FROM A LEDGER THAT ALSO CONTAINS THE NAME UNITED STATES RUBBER COMPANY, BAGS..................................48

**14** — LIST OF FIRMS TOGETHER WITH CERTAIN STATISTICS ABOUT THOSE WITH THE DATE 1961 ENTITLED, "CARLOAD & TRUCKLOAD CUSTOMERS......48

**15** — SINGLE PAGE ENTITLED, "SHIPMENTS" DATED 1942-1957..................................48

**16** — ARTICLES OF ASSOCIATION OF EASTERN MAGNESIA TALC CO., INC..................................48

**17** — LETTER DATED FEBRUARY 2, 1959 TO MR. MAGNUS FROM A. PEARLEY FEEN, WITH ATTACHMENTS........48

**18** — ANNUAL REPORTS TO THE STATE OF VERMONT DATED 1950-1966..................................48

**19** — GRAPHS AND FIGURES WITH A TITLE, "EMTCO 1. Industry Sales 1960-1965"..................................48

**20** — SEVERAL PAGES OF FIGURES, A COPY WITH A TITLE PAGE, IT STATES, "13. Rubber."..................................48

**21** — SIXTEEN CONTRACTS BETWEEN EASTERN MAGNESIA TALC CO., INC. AND UNITED STATES RUBBER COMPANY..................................62



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129867

JNJ 000064799

# INDEX

WITNESS:   ROGER N. MILLER

Direct examination by Mr. Prentiss.................2

Cross-examination by Mr. Anderson................80

Cross-examination by Mr. Dolan...................82

Cross-examination by Mr. Lovegreen...............83

Recross-examination by Mr. Anderson..............87

Redirect examination by Mr. Prentiss.............88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129868
JNJ 000064800

2

### ROGER N. MILLER

Being duly sworn, deposes and testifies as follows:

### DIRECT EXAMINATION BY MR. PRENTISS

Q   Mr. Miller, by whom are you employed?

A   Windsor Minerals.

Q   How long have you been employed by that company?

A   Sixteen years.

Q   So what would be the year that you began working there?

A   1966.

Q   Where were you employed prior to that?

A   Buckman Laboratories, Memphis, Tennessee.

Q   How long did you work for -- was it Buckman Laboratories?

A   Yes.

Q   How long did you work there?

A   Nine-and-a-half years.

Q   What was your job there?

A   I was vice-president of manufacturing.

Q   What was the nature of the business of Buckman Laboratories?

A   They are manufacturers of industrial microorganism control chemicals.

Q   So you began there approximately 1956?

A   I believe that is right, yes, I don't have the exact date.

Q   Where did you work prior to that, Mr. Miller?



*Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129869

JNJ 000064801

3

1      A.     I worked for the International Talc Company in

2      Gouverneur, New York.

3   Q    What was your capacity with the International Talc Company?

4      A.     I was chief engineer.

5   Q    How long were you employed with that firm?

6      A.     With that firm and their predecessor firm, two-and-a-

7      half years, I believe.

8   Q    Where, sir, were you employed prior to going to work for

9      the International Talc Company and/or its predecessor

10      corporation?

11      A.     I was employed in the State of Washington for Border-

12      Lord Mining Company.

13   Q    Can you spell the name of that firm?

14      A.     Border, B-o-r-d-e-r, hyphen Lord, L-o-r-d Mining

15      Company.

16   Q    What part of Washington was that in?

17      A.     The office was in Seattle.

18   Q    Did it have mining operations in the State of Washington?

19      A.     It had mining operations in the North Cascades.

20   Q    What was the product that was mined?

21      A.     Tungsten.

22   Q    How long did you work for that firm?

23      A.     About one year.

24   Q    Where did you work prior to that?

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129870
JNJ 000064802

4

1     A    I was a student.

2   Q   Where?

3     A    University of Washington, Seattle, Washington.

4   Q   What was your area of concentration?

5     A    Mining engineering.

6   Q   Did you receive a degree?

7     A    Yes.

8   Q   Bachelor of Science degree?

9     A    Yes.

10   Q   What year?

11     A    I'll say 1952. I'm not certain, 1952.

12   Q   Were you raised in the Seattle area?

13     A    I was raised in a town called Coeur d'Alene, Idaho.

14   Q   When you went to work for the Windsor Minerals Company --

15      is that the correct name, sir?

16     A    Yes, Windsor Minerals, Inc.

17   Q   When you went to work for Windsor Minerals, Inc. in 1966,

18      what was your capacity?

19     A    Vice-president of operations.

20   Q   What was the business of the Windsor Company at the time

21      you joined?

22     A    They were miners -- their name at that time was

23      Eastern Magnesia Talc Company. Their business was mining

24      and processing of talc.



**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129871

JNJ 000064803

5

1   Q.  Where was it located?

2   A.  The offices were in South Burlington, Vermont.

3   Q.  Are you still vice-president of operations of Windsor?

4   A.  No, sir, I am now president of Windsor.

5   Q.  When did you become president?

6   A.  1969, I believe.

7   Q.  What were your responsibilities as vice-president of

8   operations?

9   A.  I oversaw the operations of the mines and mills and

10  shipping facility, packaging and shipping facilities.

11  Q.  Where were the mines located?

12  A.  The mines were located in Johnson, Vermont and in

13  Hammondsville, Vermont.

14  Q.  Was there one mine in each of those locations?

15  A.  There was one active mine in each of those locations.

16  Q.  Where is Hammondsville, Vermont in relation to Johnson?

17  A.  About 105 miles directly south.

18  Q.  Had the Eastern Magnesia Talc Company operated other mines

19  besides the Johnson and Hammondsville prior to your joining

20  the firm?

21  A.  To my knowledge, they had.

22  Q.  Where were those located?

23  A.  In Waterbury, Vermont and at -- not Essex, let me

24  think a minute, Payston, F-a-y-s-t-o-n.  Can I ask a question?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129872
JNJ 000064804

6

MR. LEIBENSPERGER: You can ask me a question. Off the record.

(OFF THE RECORD)

Q   Were there any other mines that were operated by Eastern Magnesia prior to your joining the firm than Waterbury and Fayston?

MR. LEIBENSPERGER:   Going back to what date?

MR. PRENTISS:   To the extent of your knowledge.

MR. LEIBENSPERGER:   I would object to anything prior to 1945, or you can say 1940, as not being relevant to this case.

MR. PRENTISS:   We'll go from 1940.

A   To my knowledge, only these properties were operating.

Q   So your testimony is that to the best of your knowledge, from 1940 on, the only mines that were operated by Eastern Magnesia were at Waterbury, Vermont, Fayston, Vermont, Johnson, Vermont and Hammondsville, Vermont, is that correct?

A   Yes.

Q   As vice-president of operations of Eastern Magnesia, did you become familiar to some extent with the history of that firm's operation in the talc business?

**WP**
*Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129873

JNJ 000064805

7

1    MR. LEIBENSPERGER:   Objection to the

2    form.  You can answer.

3    A    To some extent.

4  Q  Do you know whether Eastern Magnesia, prior to your joining

5    the firm, had purchased mines from other talc companies

6    in Vermont?

7    A    Can you expand on that question?  I'm not sure if you

8    are using the right language.

9  Q  I may well be using incorrect language.  Tell me if you

10    are familiar with a firm called Vermont Mineral Products,

11.   Incorporated.

12    A    I have seen records referring to Vermont Mineral

13    Products.

14  Q  Do you know whether that company, Vermont Mineral Products,

15    Inc. owned a mine at Chester Depot in Vermont?

16    A    No, I don't know.

17  Q  Do you know whether EMT, and by EMT I mean Eastern Magnesia

18    Talc Company, EMT purchased any mines from Vermont Mineral

19    Products, Inc.?

20                 MR. DOLAN:   Purchased any mines?

21                 MR. PRENTISS:   Yes.

22    A    It's my belief that the Hammondsville mine was

23    acquired from Vermont Mineral Products, but I don't know

24    that as a fact.

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129874
JNJ 000064806

8

1   Q   Do you have any familiarity at all with a talc mine in

2    Reading, Vermont?

3   A   That almost certainly is the Hammondsville mine.

4   Q   Mr. Miller, so that I can be clear on the corporate history,

5    when you joined Eastern Magnesia Talc Company, was that

6    firm, to your knowledge, a subsidiary of any other firms?

7   A   Yes.

8   Q   What firm?

9   A   Johnson & Johnson.

10   Q   Was it a wholly-owned subsidiary of Johnson & Johnson?

11   A   It's my understanding, yes.

12   Q   To your knowledge, when did Johnson & Johnson either acquire

13    or incorporate EMT?

14           MR. LEIBENSPERGER:  Objection to the

15    form.  Go ahead.

16   A   I believe 1964, but that answer is provided in the

17    Interrogatories.

18           MR. LEIBENSPERGER:  The answer is in

19    the Interrogatories.

20   Q   I have seen that.  Is your understanding that Johnson &

21    Johnson incorporated EMT in 1964?

22           MR. LEIBENSPERGER:  His understanding

23    I'm not so sure is relevant.  It is in the Answers to

24    Interrogatories.

**WP  WOODS & IRONS**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129875

JNJ 000064807

9

1          MR. PRENTISS:  It's his answer.

2          MR. LEIBENSPERGER:  What is?  That's

3    what I'm saying.  There is his answer.  He has sworn to it

4    in the Answers to Interrogatories.  For example, he says

5    1964 and his Answer to Interrogatories says 1965, so it

6    seems to me that the Answer to Interrogatory is there and

7    there's no reason to inquire of the same question that

8    you already have.  You can obviously inquire further.

9    Q    Mr. Miller, was there an Eastern Magnesia Talc Company in

10        existence prior to Johnson & Johnson acquiring or

11        incorporating a firm of that name in 1965?

12   A    Yes.

13   Q    And what was the business of that firm?

14   A    To my knowledge, mining and processing mineral talc.

15   Q    In your Answer to Interrogatories, you stated that Johnson

16        & Johnson acquired all of the assets and most of the

17        liabilities of Eastern Magnesia Talc on September 17, 1965.

18        To your knowledge, what did the assets of Eastern Magnesia

19        Talc consist of at that time?

20   A    Mining properties, mineral processing plants, a

21        corporate office; predominantly those.

22   Q    What were the liabilities that were assumed or acquired

23        by Johnson & Johnson in that transaction?

24   A    The financial obligations which carry through the



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129876
JNJ 000064808

10

transaction and responsibilities and the liabilities

related to the prior operations of the Eastern Magnesia

Talc Company.

Q    What liabilities were not acquired by Johnson & Johnson?

A    I don't know.

Q    When you say in your answer most of the liabilities, did

you have in mind that there were some liabilities that

were excluded from acquisition in that transaction?

A    No, my answer was intended to convey the fact that I

was not present nor privy to all of the negotiations and

the interactions that took place at that time and I didn't

want to suggest that I was.

Q    But you do not have any knowledge of any liabilities that

were excluded from acquisition in that purchase transaction

or whatever that transaction was?

A    No.

Q    When Johnson & Johnson acquired Eastern Magnesia, you

stated that it acquired its offices as well as its mining

properties.  Did it acquire all of the documents and files

and papers that were in that office at the time of the

acquisition?

A    To my knowledge, yes.

Q    In the course of answering interrogatories that were pro-

pounded by the Plaintiff to you, you made reference at



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129877

JNJ 000064809

11

1    different points to records that you reviewed and that you

2    referred to to formulate your answers.  Can you describe

3    what records Windsor today possesses going back to 1945

4    for the operations of Eastern Magnesia Talc from 1945 onward?

5                    MR. LEIBENSPERGER:  I'm going to object

6    to that question.  You have a Rule 34 request that we have

7    responded to.  We have described the records.  It is a

8    vague question and I don't know whether you think that he

9    will now be able to orally give you an index of what they

10   have or give you some general concept of what they have,

11   but I don't think it's a fair question.

12                    MR. PRENTISS:  Let me withdraw the

13   question, maybe that's too vague.

14 Q   Let's start with sales records.  Does Windsor have complete

15   sales records for EMT going back to 1945?

16 A   No.

17 Q   To what extent does Windsor have sales records of EMT going

18   back to 1945?

19                    MR. LEIBENSPERGER:  Again, I'm going

20   to object because that answer is in the interrogatories

21   and is in the documents that are being produced.  Now

22   you are asking him orally to repeat it.  If we are going

23   to take the time for him to look it up to make sure he now

24   remembers exactly what he put in the interrogatories, we

woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129878

JNJ 000064810

12

1   can do that, but I don't think we ought to trip him up

2   with it.

3                    MR. PRENTISS:   I'm not trying to trip

4   him up, I'm trying to, and I can say this on the record,

5   for your benefit, Mr. Miller, what I'm trying to do is

6   get from you a general description of the extent to which

7   you have complete records and the extent to which you have

8   holes in your records.

9   Q    So with regard to my question on sales records, do you have

10       a complete record for any period of time?

11  A    No.

12  Q    Not even up to date?

13                   MR. LEIBENSPERGER:   I object to the form

14  of the question.

15  A    It's my understanding that we are dealing with a

16  period of time from 1945 to 1967.  We have no complete

17  sales records for any of that period of time for Eastern

18  Magnesia Talc Company.

19  Q    Do you have records that are specific to certain mines for

20       that period of time?

21  A    We have records which allude to the products, to my

22  knowledge, that came from certain mines, identified those

23  products by the grade number of the material.

24  Q    I guess my question is, how do you know that your records

J&J-0129879

JNJ 000064811

13

1    from 1945 for sales to 1967 are incomplete?

2                    MR. LEIBENSPERGER:   Objection to the

3    form of the question.

4    A.   We were unable to find any of what I believe you

5    understand to be sales records for that period of time.

6    At the time Eastern Magnesia Talc Company was sold to

7    Minerals and Chemicals Phillip, they came with a truck

8    and we loaded every relevant document they asked for into

9    the vehicle and they took those away.  We made no record

10   nor list in detail of those materials.

11   Q    Let me go back.  There was an action that took place in

12        1967 whereby EMT's northern Vermont operations were sold

13        to Minerals and Chemicals Phillip Corporation of Maryland,

14        is that right?

15   A.   Yes.

16   Q    What assets or products did EMT retain of its own?  Do you

17        understand my question?

18   A.   Well, I understand your question, but EMT ceased to

19        exist at the time of that transaction.

20   Q    Then Windsor, what did Windsor have after it sold the

21        northern properties and the name EMT, the Minerals and

22        Chemicals Phillip?

23   A.   Windsor retained the mineral producing facility at

24        West Windsor, Vermont, the mill, the Hammondsville mine,

J&J-0129880
JNJ 000064812

14

1  certain other properties in southern counties and the

2  office in South Burlington.

3  Q.  At the time of that transaction, did Windsor, now Windsor,

4  transport to the Phillip Corporation all of the records

5  having to do with northern properties including the

6  Johnson mine?

7  A.  No.

8  Q.  What records were transported to the new corporation, the

9  Phillip Corporation?

10  A.  I cannot detail all of them.  Looking at what we now

11  have in hand, I am aware that all the sales records went.

12  I would expect that the cost records all went because I

13  found very few of them.  By-and-large, the records that

14  were transferred were those records which they would

15  require to understand the business, its  products and its

16  success or failure.  I'm sorry I'm being general.

17  Q.  I understand.  In your Answers to Interrogatories, you

18  state in Answer number four that all talc which was sold

19  by Windsor or its predecessors to Uniroyal and Whittaker,

20  Clark & Daniels, was mined by EMT prior to 1967 at the

21  Johnson mine in Johnson, Vermont.  On what do you base that

22  statement?

23  A.  We have accounts payable cards for U.S. Rubber, which

24  it's my understanding is now Uniroyal, concerning shipments

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129881

JNJ 000064813

15

1    of talc to the plant in Providence, Rhode Island in which

2    grade 40 is the only grade of material.  I know that the

3    products of the Johnson mill had 40 series numbers in the

4    first installation.  That's the basis for my understanding.

5  Q  Those are accounts receivable cards?

6  A    Accounts payable cards.  Aren't they, or are they

7    receivables?

8              MR. LEIBENSPERGER:  They would be sales

9    of products, right?

10              THE WITNESS:  Yes, they are sales.

11  Q  Do you have complete records of accounts receivable cards

12    regarding United States Rubber Company for the period 1945

13    through 1967?

14              MR. LEIBENSPERGER:  Objection.

15  A    No.

16  Q  How do you know that you don't have complete records of

17    accounts receivable cards for that period?

18              MR. LEIBENSPERGER:  Objection.

19  A    In answering the interrogatories, we searched for

20    records and as the interrogatories disclose, there was a

21    period of time in which there was no information at all.

22  Q  Do you have a copy of your Answers to Interrogatories in

23    front of you, sir?

24  A    Yes.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129882

JNJ 000064814

16

Q    I will refer you to Answer number 17 on page 16.

A    Yes.

Q    You show in the Answer at the middle of the page the period 1956 through 1959 where it is stated that there are not records.  Is that the period that you are referring to?

A    Yes.

Q    Other than that period of those four years, do you have complete accounts receivable card records regarding United States Rubber Company for Windsor or its predecessor corporations for the period 1945 through 1967?

A    I don't know.

          MR. LEIBENSPERGER:  You answered my question.  This Answer to Interrogatory stops at 1961 and you just included 1967 in your answer.

          MR. PRENTISS:  Mr. Miller's earlier statement was that he understood the inquiry to be between 1945 and 1967.

A    ...I don't know.  We have brought forward the documents we were able to find.  There may well have been other documents.

Q    In other words, you have certain accounts receivable cards that refer to United States Rubber Company plant in Providence, Rhode Island, is that right?

A    Yes.



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129883
JNJ 000064815

17

Q    Of those that you have, all of them refer to a grade of talc that you identify as having been produced at the Johnson mine in Johnson, Vermont, is that correct?

A    They refer to grade 40 talc, which I believed to have been consistently numbered with the other products at the Johnson mill and I therefore assume that grade 40 is part of the four series products out of the Johnson mine.  I was never present or involved when any grade 40 was ever produced or sold.

Q    So you don't know for a fact that the grade 40 talc of that type was only mined from the Johnson mine, is that correct?

         MR. LEIBENSPERGER:  Objection to the question.

A    Right.  No, I don't.

Q    To go to those grades for a moment, Mr. Miller, what does a grade number connotate?

         MR. LEIBENSPERGER:  Objection to the form.

A    To my understanding, the grade number connotates the source, the mill from which the material was produced.

Q    Was talc mined by EMT milled at the site of the mine?

A    Yes.  Excuse me, at a mill operated in conjunction with the mine.  They are a mile or two apart.  They are not at the mine site.

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129884
JNJ 000064816

18

Q   EMT had no central milling facilities that would provide milling for talc from more than one mine?

A   No.

Q   Could you turn to page 25 of your Answers to Interrogatories, sir.   Interrogatory number 29 --

MR. LOVEGREEN:   What page?

MR. PRENTISS:   Twenty-five.

Q   ...Your response number 29f you describe talc and talc grades and you relate that talc grades after processing with a series of numbers in the 40's and at grades after refining with a series of numbers, each 500 or in one case it says 5,490.   Can you describe the difference between processing and refining.

A   In the terminology which we have used, processing involved the direct production of a product by simply grinding or changing in particle size the ore.   Refining involves a process in which some component of the ore is separated from other components of the ore and one or more of them are sold as separate materials.   In this particular instance, the grade numbers beginning with four are products, or I presume to be products produced in what is called the dry mill, the direct grinding mill.   Somewhat after these products have been developed, another addition was built to the mill, was given the number 500 and the

WP   Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129885

JNJ 000064817

19

1     products of the flotation process of the refining process

2     are the 500 series products.

3  Q  So to your knowledge, all products that contain any of

4     these numbers that you have listed in response number 29f

5     would have come from what facility?

6  A  The ore would have been produced from the Johnson mine.

7     The products would have been produced from the Johnson mill.

8  Q  What were the numbers associated with the Hammondsville mine?

9  A  The Hammondsville mine products in the period to 1967

10    were processed in two facilities; one of them produced

11    grades 36 and 37, the other produced grades 66, 600, 649

12    and 699.

13  Q  Is the Hammondsville mine still operated by Windsor?

14  A  Yes.

15  Q  Has Windsor ever sold talc produced from the Hammondsville

16    mine to Whittaker, Clark & Daniels?

17  A  No, not to my knowledge.

18  Q  What records did you research to determine that?

19  A  This is information given to me by my predecessor.

20  Q  Who is that?

21  A  Mr. Esckilson.

22  Q  When did you speak to Mr. Esckilson on this question?

23  A  When I came to work in 1966, Mr. Esckilson explained

24    to me the products sold to the roofing industry had never

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129886
JNJ 000064818

20

1    been sold through an agent and the grade 66 or 36 and 37

2    are roofing industry products exclusively.

3  Q   The grades 36 and 37 are roofing products?

4  A   Yes.

5  Q   What about the grades 66 or 600 or the other grades that

6    you described as being produced by the Hammondsville

7    facility?

8  A   These were toiletries quality products.  They were

9    very highly refined products from flotation.

10  Q   What is the difference in the talc, the physical structure

11    of it, or chemical properties or anything else between

12    talc used for the roofing industry and the talc that was

13    produced by the Johnson mine?

14             MR. LEIBENSPERGER:  I object to the

15    form of the question.

16  A   The talc sold to the roofing industry is sold at a

17    very coarse particle size and is uniquely micaceous.

18  Q   Could you explain what that micaceous means.

19  A   With the form of a plate.

20  Q   To your knowledge, what was the use to which the grades,

21    40 grade talc was put when sold by Windsor?

22             MR. LEIBENSPERGER:  You mean by EMT.

23             MR. PRENTISS:  By EMT, excuse me.

24  A   To my understanding, they were sold in the rubber

J&J-0129887
JNJ 000064819

21

1   industry, the plastic industry, the paint industry, in

2   the gypsum wallboard industry, in the toiletries industry,

3   in the agricultural industry.

4   Q   Was there any one of those grades that was, to your know-

5   ledge, utilized by the rubber industry more predominantly

6   than another grade?

7          MR. LEIBENSPERGER:  Objection to the form.

8   A   I don't know.

9   Q   So as far as you know, there wasn't any one of those

10   numbers 40, 41, 44 or alike which was sold in greater

11   quantity for use in the rubber industry than the other

12   grades?

13          MR. LEIBENSPERGER:  Objection to the

14   form.

15   A   I don't know.

16   Q   After you went to work for EMT, did EMT continue to sell

17   talc for use in the rubber industry?

18   A   Yes.

19   Q   For how long?

20   A   I can only speak because I only worked in this

21   organization for about 15 months during that period of time.

22   They did, I know that, but I don't know anything else.

23   Q   Did they sell to Whittaker, Clark & Daniels during that

24   period of time?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129888
JNJ 000064820

1     A    I don't know.

2    Q    Do you know whether they sold to Uniroyal during that period

3    of time?

4    A    No.

5    Q    You don't know?

6    A    I don't know.

7    Q    Do you know whether any of the records that you have

8    produced or referred to in your Answers give that answer?

9    A    I believe the dates are included in the deposition,

10    I mean in the interrogatories.

11    Q    Do you know whether the talc or any talc mined at the

12    Waterbury, Vermont mine was sold for use in the rubber

13    industry?

14    A    No, I don't know.

15    Q    Can you tell me this, do you know what properties of talc

16    are sought for use in the rubber industry?

17    A    I don't know.

18    Q    Is the talc that was mined at the Waterbury, Vermont

19    mine similar in quality to the talc mined in Johnson?

20               MR. LEIBENSPERGER:  Objection to the form.

21    A    I don't know.  The Waterbury mine was closed long

22    before I got there.

23    Q    I will ask you the same questions with regard to the

24    Fayston, Vermont mine.  Do you have any knowledge at all



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129889

JNJ 000064821

23

1    about the quality or type of talc mined at Fayston, Vermont?

2    A    I know only that it was a program conducted during

3    the second World War in an attempt to find steatite grade

4    talc for military purposes and the operation was short-lived,

5    that's all I know about it.

6    Q    How many different processing facilities for talc were

7    owned by EMT?

8    A    Are you asking me with reference to a particular point

9    in time?

10   Q    To your knowledge, over the course of time between 1945 and

11   1967, how many different facilities did EMT have for the

12   processing of talc?

13   A    Four.

14   Q    And those were located where?

15   A    At Johnson, Vermont, at Waterbury, Vermont, at Gassetts

16   or Chester Depot, Vermont and at West Windsor, Vermont.

17   Q    The Chester Depot facility was for which mine?

18   A    For the Hammondsville mine.

19   Q    The West Windsor was for which mine?

20   A    The Hammondsville mine.

21   Q    To your knowledge, is the Johnson, Vermont mine still in

22   operation?

23   A    Yes.

24   Q    What was the sales organization for EMT -- did EMT undertake



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129890
JNJ 000064822

24

1     its own direct sales of talc to customers?

2     A.   Yes.

3   Q  Did EMT also sell to distributors?

4     A.   Yes.

5   Q  Did EMT have its own sales force going out into the field?

6     A.   Yes.

7   Q  Did EMT deal directly with either Uniroyal or United States

8     Rubber Company, Providence, Rhode Island?

9              MR. LEIBENSPERGER:  Objection to form.

10     A.   I don't know.

11.   Q  Do you know whether any talc sold by EMT to Whittaker,

12     Clark & Daniels were sold for end use at the Uniroyal

13     plant in Providence?

14     A.   I don't know.

15   Q  How was the talc sold by EMT delivered to its customers?

16     A.   The processed material was sold either in multi-wall

17     paper sacks or in bulk.  The bulk materials were shipped

18     by truck, or by rail.  The bagged materials were shipped

19     in either less truck load or full truck load or less car-

20     load or full carloads or rail cars.  So customers provided

21     their own vehicles.

22   Q  Do you know whether EMT ever sold talc to Whittaker, Clark

23     & Daniels for direct delivery to the Uniroyal plant in

24     Providence?

**W** *Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129891
JNJ 000064823

25

1    A.    I don't know.

2    Q.   Do you know if there's anyone who would be able to answer

3         that question?

4    A.    I don't know.

5    Q.   You referred to your predecessor at EMT, who was that?

6    A.    Mr. Emil Esckilson.

7    Q.   Who lives in Gouverneur, New York?

8    A.    Yes.

9    Q.   Do you know if he is still there?

10   A.    Yes.

11   Q.   Do you know where he works?

12   A.    He is retired.  He is an elderly man.

13   Q.   As vice-president of operations, did you have responsibility

14        for sales?

15   A.    No.

16   Q.   Who had responsibility for sales in EMT at the time that

17        you were vice-president of operations?

18   A.    Mr. Esckilson.

19   Q.   Did he continue to work there after you came on?

20   A.    Yes.

21   Q.   Who had responsibility for sales prior to your going to

22        work for EMT?

23   A.    Mr. Esckilson.

24   Q.   So you kind of took over part of his responsibilities and

Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129892
JNJ 000064824

26

1    he continued to have responsibility for sales, is that

2    correct?

3    A    Yes.

4    Q    Do you know how far prior to your coming on with EMT, Mr.

5    Esckilson had responsibility for sales?

6    A    It's my understanding that he began his responsibilities

7    in 1955.

8    Q    Do you know who his predecessor was?

9    A    Mr. E. W. Magnus, M-a-g-n-u-s.

10   Q    Who is deceased?

11   A    Who is deceased.

12   Q    Do you know whether Minerals and Chemicals Phillip

13   Corporation has been notified of this lawsuit?

14                MR. LEIBENSPERGER:   You can answer.

15   A    I believe they have.

16   Q    Did you communicate to that corporation regarding this

17   lawsuit?

18   A    No.

19   Q    Did someone at Windsor make that communication, to your

20   knowledge?

21   A    Well, what communication are you talking about?

22   Q    Any communication.

23                MR. LEIBENSPERGER:   Well, then I object

24   to the question.   I don't understand the question.   The

WP  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129893

JNJ 000064825

27

1    first question I thought was whether or not he knew whether

2    service had been made upon them.

3                    MR. PRENTISS:  No, whether they were

4    notified of this lawsuit, not service.

5        A    Okay, I didn't understand that.

6    Q   Why don't we go back.

7        A    Why don't you start over.

8    Q   Have you communicated to Minerals and Chemicals Phillip

9    Corporation the fact that Windsor has been sued in this

10   lawsuit?

11       A    Yes.

12   Q   To whom did you communicate that?

13       A    A gentleman from New Jersey.  I'm sorry, I don't

14   recall his name.

15   Q   Did you discuss with him the records that Phillip Corporation

16   obtained at the time that it acquired that northern operations

17   portion of the EMT business?

18       A    Yes.

19   Q   Did he tell you whether Phillip Corporation still retained

20   those documents?

21       A    This was a telephone conversation?

22   Q   Yes, sir.

23       A    He subsequently returned my call, said there had been

24   two floods in their office in New Jersey and that the

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129894
JNJ 000064826

28

1    records were no longer there.

2  Q    Does Phillip Corporation have offices in Johnson, Vermont?

3  A    Let me ask counsel a question.

4            (WITNESS AND COUNSEL CONFERRING)

5  A    ...Yes, they do.

6  Q    This gentleman that you conversed with told you that the

7    Phillip Corporation had transported all of the records that

8    it had obtained from EMT to New Jersey?

9  A    No.

10  Q    What records did he tell you had been transported to New

11    Jersey?

12  A    I asked about a specific movement of records, the

13    trailer, the guy backed the trailer in and we loaded all

14    the records.  The man who took those records told me that

15    they were going to New Jersey, so my inquiry related to what

16    had happened to the trailer load of records that had gone

17    to New Jersey.

18  Q    To your recollection, what records were put into that

19    trailer for transportation to New Jersey?

20  A    I answered that previously during this interrogation,

21    so you can refer back to that, the general records having

22    to do with sales and the business.

23  Q    What other records were there?

24            MR. LEIBENSPERGER:   That were not



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129895

JNJ 000064827

29

1    transported?

2             MR. PRENTISS:   To New Jersey in that

3    truck load.

4             MR. LEIBENSPERGER:   Again, I object to

5    the extent that you're asking him to orally give you an

6    index or page-by-page description.  To the extent he can

7    give you a generalized answer of what he remembers, I don't

8    have any objection.

9             MR. PRENTISS:   Or if you can refer me

10   to some better source for the information.

11   A    All of the correspondence files, all of the payroll

12   records, all of the tax records, surveying, engineering,

13   blueprints, designs, quotations, supplier catalogs, those

14   types of materials were present in the office in South

15   Burlington.

16   Q    When you say sales records, when you refer to sales records

17   as having been transported to New Jersey, can you just

18   state generically what you included as being sales records?

19   A    The records of purchase orders, copies of purchase

20   orders, the salesmen's reports of call, the materials

21   used in the selling campaign of the corporation, correspond-

22   ence to and from customers.

23   Q    Did the gentleman from New Jersey tell you that all of

24   those records were destroyed in the flood?

W    Woods & Irons
     Suite 300 ● 56 Washington Street
     Providence, R. I.  02903
     (401) 331-6434

J&J-0129896
JNJ 000064828

30

A     He told me that they could find none of them and they had had two floods, was I believe his entire answer to me.

Q     In the shipping of talc, did EMT have its own fleet of trucks?

A     No.

Q     Did it use common carriers?

A     To my understanding, common carriers and customer trucks.

Q     Now, in your Answer to Interrogatory number five, Mr. Miller, you stated that EMT produced talc between the period 1904 and 1967.  What is the basis on which you answered that?

A     The corporate records, when we searched for the old recorded documents, we found indications of initiation of operations around 1904.

Q     So your understanding is that Eastern Magnesia was formed in 1904?

A     No, there were predecessor corporations that we have answered elsewhere, the chain of construction.

Q     So the first predecessor of Eastern Magnesia was formed in 1904, is that what your answer is?

A     That was my understanding, yes.

Q     In your Answer to Interrogatory number six you state that the brand or commercial name of the talc was EMTAL.  Was

**W** *Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129897
JNJ 000064829

31

1      there a logo or similar kind of corporate symbol

2      incorporating those letters?

3      A.   Yes.

4  Q   Would you be able, if I gave you a piece of paper and a

5      pencil, to approximately draw what that corporate logo

6      looked like?

7      A.   I can describe it generally, I think, with adequate

8      clarity. It looks exactly like an interstate sign in that

9      it is a shield and above the bar on the shield it said

10     "EMTAL."  That's my recollection.

11  Q   It had all five of those letters of equal size?

12     A.   That was my understanding from my recollection, yes.

13  Q   What colors?

14     A.   I believe they were gray and blue, blue above and

15     gray below.  I'm not certain that that was consistent.

16  Q   What color were the letters EMTAL?

17     A.   They were white.  They showed basically through in

18     the examples that I saw.

19  Q   In your response number seven on page four, beginning on

20     page four, you have described a series of tests that were

21     done on talc produced in the Johnson mine.  Can you tell

22     me on what basis you have given that answer?

23     A.   My responsibilities included the operation of the

24     Johnson mill.  There were the tests that were being performed



*Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129898
JNJ 000064830

32

1    on the product of the Johnson mine, those grades of materials

2    that were listed at the time that I was there.  These were

3    my recollection of the tests that were being performed.

4  Q. As to letter G, microscopic examination to estimate

5    morphology of talc and associated minerals, was that test

6    done on-site?

7  A.  These examinations were done on-site and were an

8    ordinary part of most research and product development

9    programs.  So they might have been done also by consultants

10   who report their definitions of what they examine.

11 Q. Do you know whether EMT was in the habit of submitting

12   material for analysis by consultants?

13           MR. LEIBENSPERGER:  Objection to the form?

14 A.   I don't know.

15 Q. During the time that you were associated with EMT?

16 A.   Yes.

17 Q. And to whom did it submit those examples?

18 A.   Bartel Memorial Institute in Columbus, Ohio consulted

19   with Eastern Mag on minerals and processing and I believe

20   would have certainly as geologists and petrologists, would

21   have examined microscopically the materials.

22 Q. What was the purpose of the examination by Bartel?

23 A.   They were working with us in optimizing the processing

24   plants, the refining processes to make pure talc from mixed

J&J-0129899
JNJ 000064831

33

1    material.  It's necessary to separate the nontalc materials

2    from the talc materials.  That's achieved by subdividing

3    the material first to the size of which all nontalc is

4    separated from talc and you use a microscope to see when

5    the surfaces are clean.

6    Q    What were the associated minerals that you were trying to

7    separate from the pure talc at the Johnson mine?

8    A    Magnesite, a ferruginous variety of magnetite,

9    chlorite and calciferous  sulfide, iron sulfide.

10   Q    Was there serpentine associated with the talc deposit at

11   the Johnson mine?

12              MR. LEIBENSPERGER:  Objection to the

13   form of the question.

14   A    Yes.

15   Q    Was that a mineral that was sought to be separated from

16   the talc as a part of this refinement process?

17   A    No.

18   Q    Why not?

19   A    The talc and serpentine don't coexist in the minable,

20   the commercial sections of the mine.

21   Q    Can you explain what you mean by that, they they don't

22   coexist?

23   A    You are not dealing with an intermixture of talc and

24   serpentine.  Serpentine was the grandparent of the talc,

**W** *Woods & Irons*
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129900
JNJ 000064832

34

1   the talc formed around it.  The mining of the commercial

2   talc took place away from the serpentine, out of contact

3   with the serpentine.

4   Q   Was the deposit that was mined at the Johnson mine a

5       deposit that included both talc and serpentine?

6                    MR. LEIBENSPERGER:  I object to the

7       form.  What do you mean by "deposit"?

8   Q   Let me ask you if you understand what I'm saying when I

9       say "deposit", Mr. Miller.

10  A     The serpentine coexisted within the limits of mining

11      with talc, but not in the mining areas.  I don't know how

12      better to describe it to you.  I can't sell serpentine,

13      so there was no mining activity in serpentine.

14  Q   The Johnson mine, was that an open-pit mine?

15  A     No.

16  Q   It was a tunnel dug into some sort of a geologic structure?

17  A     It was an inclined shaft.

18  Q   How far down did that go?

19  A     To my knowledge, about 400 feet.

20  Q   Was there just that one shaft at the Johnson mine?

21  A     No.

22                    MR. LEIBENSPERGER:  We should probably

23      put a time period for these questions regarding the length

24      of the shaft and how many shafts, because it may have changed

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129901
JNJ 000064833

1   over time.

2   A.   I want to be sure you understand that.

3   Q   During the time that you worked at EMT, how many shafts

4   were in operation?

5   A.   One.

6   Q   How many other shafts had been in operation prior to that

7   shaft?

8   A.   It's my understanding from historical references that

9   there had been two prior shafts.

10   Q   Were they in the same geographic vicinity as the shaft

11   that was operating at the time that you were working with EMT?

12   A.   Yes, they were in the same ore body.

13   Q   Did that ore body contain both talc and serpentine?

14   A.   Well, serpentine isn't ore.  The ore body didn't

15   contain any serpentine.  The zone in which the ore body

16   occurs had serpentine in it, but it isn't in the ore body.

17   Q   In the zone in which the ore body occurred, was there also

18   serpentine existing?

19   A.   Yes.

20   Q   And the shaft went into the rocks that contained the ore

21   body, is that correct?

22   A.   The shaft was in the talc zone.

23   Q   Was there any serpentine anywhere present in that shaft,

24   the one that was operating while you were working there?



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129902
JNJ 000064834

36

1    A    I don't know.  It had been there for a long time

2    before I got there.

3    Q    Physically, by observation, in the shaft, can you tell

4    me the difference between serpentine and talc?

5    A    On fresh exposures, you can.

6    Q    On an old exposure, can you?

7    A    No, the dust accumulates on the surface and oxidizes

8    and everything is the color of that wall right there.

9    Q    Referring to kind of a buff color, tan color?

10    A    Darker.

11    Q    How physically is the talc mined?

12    A    You are referring to the Johnson mine?

13    Q    Yes, sir.

14    A    To my understanding, an inclined shaft is sunk in the

15    talc center.  Stations or levels are established plus or

16    minus 100 feet apart.  Horizontal drifts, d-r-i-f-t-s,

17    are driven under the overlying ore body.  Raises, inclined

18    openings upward are driven into the underbody of the ore

19    body and these are then enlarged into stopes, s-t-o-p-e-s,

20    from which the ore is extracted, dropped through the

21    raises into rail cars, transported to the shaft, dropped

22    into the skip, s-k-i-p, and hoisted to the surface.  That's

23    a short course.

24    Q    How is the ore loosened to be put into the rail car?

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129903
JNJ 000064835

37

1    A.    By drilling and blasting.

2    Q.   What is the nature of the drills used?  What does it look

3    like?

4    A.    A pneumatic drill.  It looks very much like a jackhammer

5    that you are familiar with.

6    Q.   While you were working at the EMT plant, did the workers

7    who were mining, actually mining, distinguish between

8    serpentine and talc in their drilling and blasting to

9    obtain ore to be transported up the shaft?

10    A.    The workers were directed by the supervisors who did.

11    Q.   Is the talc deposit at the Johnson mine, the talc ore body

12    a solid, monolithic deposit of pure talc?

13              MR. LEIBENSPERGER:  Objection to the form.

14    A.    No.

15    Q.   Is it an area of talc that's interspersed with different

16    kinds of impurities?

17              MR. LEIBENSPERGER:  Objection to the

18    form.

19    A.    I will give you another short course.  Talc is a

20    metamorphic mineral.  It's derived in place from something

21    else.  In the case of talc, it's derived from a class of

22    materials called ultramaphic materials, dark, very dark

23    materials.  In that process, it's accomplished geologically

24    in a zonal form.  The best way to conceive of a talc deposit



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129904
JNJ 000064836

38

1       is to think of an onion and you take off a layer at a time.

2       The character of the material changes as you go towards the

3       core of the onion.  That's what a talc deposit looks like.

4       Talc in the Johnson mine was commonly interspersed with

5       materials that are locally called cinders, c-i-n-d-e-r-s.

6       These are relics of talc parents, or of the wall rock

7       surrounding the talc.  They are largely composed of the

8       siliceous materials and of beatite, dark minerals which are

9       extremely deleterious to the talc which is sold by its

10      whiteness.

11   Q.  Now, you have analogized the talc deposit to an onion and

12      you said that the character of the material changes as you

13      penetrate to the core of this onion type structure.

14   A.     It's a three-dimensional material.

15   Q.  At the core of the onion is the pure talc, is that correct?

16   A.     No, at the core of the onion, in my experience, are

17      relatively rich in carbonate materials and relatively low

18      in talc.  The wall, the exterior surface is relatively

19      rich in talc and relatively low in carbonated material.

20      It's a zonal material.

21   Q.  Can you further analogize from the onion structure that

22      you have described as to where serpentine deposits or

23      contaminants would be in relation to these layers of the

24      onion-like structure?

WP
Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129905

JNJ 000064837

39

1       MR. LEIBENSPERGER:  Objection to the form.

2   A   From my own experience in the Johnson mine, I never

3   saw any there.  Subsequent information has come to me of

4   later developments in the mine which have identified

5   serpentine.  In my own knowledge, I never saw any serpentine.

6   Q   From your experience and education as a mining engineer,

7   are you familiar with the manner, physically, in which

8   serpentine would associate itself with talc deposits in

9   a geologic deposit area such as was present at the Johnson

10  mine?

11      MR. LEIBENSPERGER:  I am going to object

12  to the form of the question.  At the end of it you related

13  it to the Johnson mine, but you started out the question

14  sort of hypothetical, how the serpentine would be found

15  with talc.  I think it should be one or the other.  Do you

16  want a hypothetical or do you want to ask him about

17  Johnson & Johnson?

18      MR. PRENTISS:  I'm going with respect to

19  a deposit such as the Johnson mine.

20      MR. LEIBENSPERGER:  I object to the

21  form of that question.  I think you should ask him what

22  was the deposit at the Johnson mine, not such as or would

23  be, what it was.

24      MR. PRENTISS:  Well, I think he answered



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129906

JNJ 000064838

40

1   the question.

2            MR. LEIBENSPERGER:  I object to the form

3   of the question.  You can answer it if you understand it.

4   A.   Yes, I understand the relationships between talc and

5   serpentine.

6  Q   Physically, how does serpentine intersperse, if it does,

7   with talc in a deposit where talc and serpentine are

8   associated?

9            MR. LEIBENSPERGER:  I object to the

10   form of the question.

11   A.   To characterize this --

12            MR. LEIBENSPERGER:  Again, we are talk-

13   ing about the Johnson mine or are you getting into his

14   expert opinion?

15            MR. PRENTISS:  I'm talking about the

16   Johnson mine.

17   A.   ...I really can't describe the Johnson mine because

18   as I indicated earlier, I didn't ever see any serpentine

19   at the Johnson mine.

20  Q   What later information did you acquire that led you to

21   believe that there was serpentine associated with the

22   Johnson mine?

23   A.   I read a thesis produced by college students at the

24   University of Vermont.



WP woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129907

JNJ 000064839

41

1    Q    What was the name of that student?

2    A    I don't know.

3    Q    When did you read it?

4    A    Three months ago, perhaps three months ago.

5    Q    Do you know whether chrysotile asbestos was associated in

6    any way with the talc mined at the Johnson mine?

7    A    My own experience, I never saw any.

8    Q    Have you since acquired information that would suggest

9    that there was chrysotile asbestos associated with the

10   Johnson mine?

11   A    No.

12   Q    Did the paper by the student at the University of Vermont

13   make any suggestion or reference to chrysotile asbestos

14   as being associated with the Johnson mine?

15   A    Not to my recollection, no.

16   Q    Let me show you a document, Mr. Miller, that you produced

17   in response to one of our requests for discovery and it's

18   a letter dated September 12, 1966 to Mr. E. Esckilson,

19   president of Eastern Magnesia Talc Company.  Have you ever

20   seen that?

21   A    Yes.

22   Q    Can you tell me where you found that?

23   A    I believe I found it in the files that we have.

24   Q    That's one of the documents that you brought down here today

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129908
JNJ 000064840

42

1    in response to the request?

2    A    Yes.

3    Q    Was that Mr. E. Esckilson, that's the president of Eastern

4    Magnesia who was your predecessor at the time you took over

5    Vermont operations, is that correct?

6    A    Yes.

7    Q    And you found that document in the files of Windsor as

8    successor to EMT, is that right?

9    A    Yes, I had seen it before.

10   Q    Did you see it at the time that it came in or shortly after

11   that?

12   A    I don't know.  I probably did.

13   Q    Was that retained by EMT in the regular course of its

14   business, that record?

15   A    I believe so, yes.

16   Q    And that related to the business of EMT's operations in

17   the talc industry?

18   A    Yes.

19   Q    Was it a document, or did EMT receive documents like that

20   on a regular basis?

21              MR. LEIBENSPERGER:   Objection to the form.

22              MR. PRENTISS:   Let me rephrase that.

23   Q    Did EMT receive documents like that on a regular basis from

24   the government agency that produced that document?

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129909

JNJ 000064841

43

1          MR. LEIBENSPERGER:   Objection to the form.

2     A     No.

3   Q   Did EMT ask to have the United States Department of Interior

4       come in and do any kind of a survey of its mines?

5     A     No.

6   Q   Do you know the reason that the United States Department

-       of the Interior made the survey that it did which culminated

8       in this report?

9     A     Yes.

10  Q   What was the reason?

11    A     The United States Bureau of Mines of the Department

12       of the Interior is the predecessor in responsibility to

13       an organization now called MSHA, the Mining Safety Health

14       Administration.   They were responsible for safety surveil-

15       lance in the mines.

16  Q   Did they inspect the mines on a regular basis?

-                MR. LEIBENSPERGER:   Objection to the

18       form of the question.

19    A     On an irregular basis.

20  Q   About how many times a year, would you say?

21    A     I don't know.

22  Q   Would it be more than one time a year, Mr. Miller, to your

23       knowledge?

24    A     I don't know.

J&J-0129910
JNJ 000064842

44

(PLAINTIFFS' EXHIBIT #1 MARKED FOR IDENTIFICATION)

Q   I will refer you to page three of the enclosure that's accompanying this letter, an enclosure entitled, "Airborne Dust Survey Report, Johnson Mine and Mill, Eastern Magnesia Talc Company, Inc., Johnson, Vermont". At page three in the two paragraphs under the heading, "Settled Dust Samples," there is a statement, "Small amount of chrysolite," and that statement appears also in the second paragraph under that heading, chrysolite. What is chrysolite?

A   It's a mineral.

Q   Is that distinct from chrysotile?

A   Yes.

Q   What was the method used, if you know, for collection of dust by the United States Department of Interior for the preparation of this analysis?

A   Can I have a moment?

Q   Certainly.

A   Referring to page two, they indicate that airborne dust samples were collected at locations selected by company officials as those which would best represent airborne samples. In this period, to my understanding, they were taken by a technique called a midget impinger from which measured volumes of gases were educted against a membrane

J&J-0129911

JNJ 000064843

45

and the membrane was then projected on a screen and the

number of particles counted and by relating the temperature

and the volume of flow and the cross-sectional area of the

screen, it was possible to determine the weight, or the

number, excuse me, the number of particles per cubic foot

in the atmosphere at the point of the sample.  I'm sorry

I can't be anymore definite than that.

        MR. PRENTISS:  I think what I'd like to

do is have a recess and go through some of these documents

and resume in about 20 minutes or so.

        (SHORT BREAK)

        MR. PRENTISS:  For Exhibit #2, I've got

a U.S. Department of Interior, Bureau of Mines report dated

March 29 to 30, 1966.  Exhibit #3 is a letter, State of

Vermont, Department of Health stationery to Mr. E. W.

Magnus, dated February 24, 1950.  Exhibit #4 is a letter on

Eastern Magnesia stationery with a date containing the

first sentence of August 21, 1958.  There is no addressee

on that letter.

    Exhibit #5 is a letter, State of Vermont, Department of

Health to Mr. Esckilson dated May 20, 1966.  Exhibit #6 is

a letter from the State of Vermont, Department of Health

to Mr. Esckilson dated April 18, 1967, two pages.  Exhibit

#7 is a letter --



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129912
JNJ 000064844

46

1           MR. LEIBENSPERGE: Just to correct that

2   last one, you said two pages. I think the second one is

3   just a carbon of the first one. It's the same letter.

4           MR. PRENTISS: Exhibit #7 is a letter

5   from the State of Vermont, Department of Health to Mr.

6   Esckilson dated April 12, 1965. Exhibit #8 is a report

7   on the letterhead of Skinner, Sherman & Lukens dated

8   January 20, 1967.

9           Exhibit #9 is a letter to Mr. Magnus of Eastern

10  Magnesia Talc Company dated December 5, 1960 together with

11  an enclosure.

12          MR. LEIBENSPERGER: The enclosure

13  appears to be the 1960 U.S. Bureau of Mines report.

14          MR. PRENTISS: Exhibit #10 is a letter

15  containing two pages of enclosures to Eastern Magnesia

16  Talc Company from the C. P. Hall Company dated March 27,

17  1962. Exhibit #11 is a series of ledger sheet pages which

18  relate to Whittaker, Clark & Daniels, Inc., New York 7,

19  New York, a total of 12 pages.

20  Q   I will ask Mr. Miller, I have a loose bundle of pages here,

21  one actual bundle of pages is stapled, ledger sheet pages

22  entitled, "United States Rubber Company" and then there is

23  a loose sheet that also was entitled, "United States Rubber

24  Company".

WP

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129913
JNJ 000064845

47

1    A    1955, 1954.

2    Q    What does that date say?

3              MR. LEIBENSPERGER:   I think that's

4    through 1963, possibly.

5    A    1944, 1945, 1946, 1947, 1948, 1949, 1950, 1951, 1952, 1953,

6    1954, 1955.  This is a mistake, Mechanical Rubber Company,

7    that doesn't belong here.  I see, it says United States

8    Rubber Company.  Well, 1955, if that's it, 1955 and then

9    that's part of this.

10             MR. PRENTISS:  Why don't we mark it

11   separately if we can't identify it.  Number 12 is a stapled

12   bundle of ledger sheets that carry, apparently, an account

13   called United States Rubber Company of Providence.  Number

14   13 is a single page from a ledger that also contains the

15   name "United States Rubber Company, Bags".  Number 14 is a

16   list of firms together with certain statistics about those

17   with the date 1961.  It's entitled, "Car Load and Truck

18   Load Customers".

19             MR. LOVEGREEN:  Is that 1961 or 1960,

20   isn't it two years?

21             MR. LEIBENSPERGER:  There's a column for

22   1960 and a column for 1961.

23             MR. PRENTISS:  Number 15 is a single

24   page with handwritten figures and it's entitled, "Shipments"

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129914
JNJ 000064846

48

and the handwritten figures indicate the years 1942 through

1957.  Number 16 is a document entitled, "Articles of

Association of Eastern Magnesia Talc Company, Inc.".

Number 17 is a bundle of documents, six pages.  It's headed

with the letter on the stationery of A. Pearley Feen to

Mr. Magnus at Eastern Magnesia Talc Company carrying a

date of February 2, 1959.  Off the record.

        (OFF THE RECORD)

        MR. PRENTISS:  Number 18 is a bundle of

annual reports to the State of Vermont, it appears to be by

the Eastern Magnesia Talc Company.  The first report is

1950 and the bundle appears to go through 1966.

        MR. LEIBENSPERGER:  We haven't gone

through these to see if each year is there.

        MR. PRENTISS:  There may be other

years, but I will entitle  the whole bundle as Exhibit #18.

Number 19 is a several-page document of graphs and

figures with a title, "EMTCO. 1. Industry Sales. 1960-1965."

Number 20 is several pages of figures, a copy with a

title page, it states, "13. Rubber."

        (PLAINTIFFS' EXHIBITS #2 THROUGH #20
        MARKED FOR IDENTIFICATION)

Q   Mr. Miller, we have just marked documents as Exhibits #1

through #20.  Are all these documents documents that you

Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129915

JNJ 000064847

49

1    have brought with you today in response to the notice of

2    deposition that was issued concerning this deposition of

3    you?

4              MR. LEIBENSPERGER:   Well, in response

5    to the request for production of documents.

6    A    Yes.

7  Q  Where did you obtain all these documents?

8    A    From the files of Windsor Minerals.

9  Q  Are you, as the president of Windsor Minerals, the person

10   with the ultimate responsibility for  the  care, custody

11   and control of all of these documents?

12   A    Yes.

13 Q  To your knowledge, were these documents compiled in the

14   regular course of the business of Windsor Minerals or its

15   predecessor corporations?

16             MR. LEIBENSPERGER:   Objection to the form

17   of the question.

18   A    To my knowledge, yes.

19 Q  To your knowledge, was the business of Windsor Minerals

20   or its predecessors to keep such files and records as

21   part of its business.

22             MR. LEIBENSPERGER:   Objection to the

23   form of the question.

24   A    I have no certain knowledge of what the processes

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129916
JNJ 000064848

50

1      were in record-keeping.

2  Q  But you obtained these from the business files of Windsor

3      and from its predecessor corporations where appropriate?

4  A    Yes.

5  Q  Could you refer to your Answers to Interrogatories, Mr.

6      Miller.  I'd like you to refer to response number 11b.

7      You referred to the location of the plant or facility

8      involved in the sale and/or distribution of talc as being

9      in Burlington, Vermont prior to 1959 and in South Burlington,

10     Vermont from 1959 to 1967.  What was the change that

11     occurred in 1959?

12  A    The change in location of the corporation's offices

13     which included the sales offices.

14  Q  Was there any change in the milling facility or location

15     of the milling facility or any other processing facilities

16     at that time?

17  A    Not to my knowledge.

18  Q  You testified that you inquired of the Phillip Corporation

19     as to records in response to the discovery request that

20     was served on Windsor as a part of this lawsuit.  Did you

21     make inquiry of any other person regarding documents or

22     any other information in response to the discovery that

23     was served on you as part of this litigation?

24            MR. LEIBENSPERGER:  I object to the



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129917

JNJ 000064849

51

1    question to the extent that it would include inquiries

2    made to counsel as coming within the attorney/client

3    privilege.

4  Q.  With the exception, excluding inquiries of counsel, did you

5    inquire of any other person?

6    A.  Yes.

7  Q.  Who?

8    A.  Are you on question 11 still?

9  Q.  No, I'm talking in general as to your inquiries regarding

10   our request for discovery in this lawsuit.

11   A.  I believe that we have given you a list of all of the

12   parties to whom I have inquired as part of the Answer to

13   Interrogatories.

14               MR. LEIBENSPERGER:  No, we have not.

15   A.  ...Okay, Mr. Emil Esckilson, Lorenzo Rodizza.

16  Q.  Who is that?

17   A.  He is the controller of Windsor Minerals.

18  Q.  Rodizza; how do you spell that?

19   A.  R-o-d-i-z-z-a.

20  Q.  He is currently controller of Windsor?

21   A.  Yes.

22  Q.  Who else?

23   A.  Rose Buzzwell.

24  Q.  Who is she?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129918

JNJ 000064850

52

1    A    She is my secretary.  Frank Hasty, H-a-s-t-y.

2  Q  Who is he?

3    A    Office manager.  Emil Eskilson, that's the former

4    president, Eastern Mag.  Mr. Chittister.  *Chittester*

5  Q  Who is he?

6    A    He is a geologist.

7  Q  For whom?

8    A    United States Geological Survey.

9  Q  Anyone else?

10    A    William Gregg.

11.  Q  Who is he?

12    A    He is a geologist.

13  Q  For whom is he employed by?

14    A    He is a professor at the Michigan College of Mines

15    and Technologies.

16                    (SHORT BREAK)

17  Q  After Mr. Gregg, did you have any other person that you

18    inquired of regarding this?

19    A    Harry Ashe, A-s-h-e.

20  Q  Where is he?

21    A    He is in Williamstown, Vermont, Williamstown, Vermont.

22  Q  Who does he work for?

23    A    He is a former  director of occupational health, the

24    State Board of Health, State of Vermont.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129919
JNJ 000064851

53

1    Q    What other person?

2       A    Nancy Butera and Marge Gillian.

3    Q    Who was the woman Butera?

4       A    She is a clerk at the same office where Harry used to

5    work.

6    Q    And Marge Gillian?

7       A    She also worked for the Board of Health in occupational

8    health. I believe she is a clerk.

9    Q    Any other person?

10       A    W. A. Dezaine, D-e-z-a-i-n-e.

11    Q    Who is he?

12       A    He was an underground miner at the Johnson mine.

13    Q    The underground miner?

14       A    He was an underground miner at the Johnson mine.

15    Q    Does he still work for EMT?

16       A    He works for Windsor Minerals.

17    Q    Any other person?

18       A    Ed Padgorski, P-a-d-g-o-r-s-k-i.

19    Q    Who is he?

20       A    He was a former director of the United States Bureau

21    of Mines office in Albany, New York.

22    Q    Any other person?

23       A    Lucien Lemery.

24    Q    How do you spell that?

**WP** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129920
JNJ 000064852

54

1     A     L-a-m-e-r-y.

2   Q   Who is he?

3     A     He was a mill employee of Eastern Magnesia Talc

4   Company.

5   Q   Where is he employed now?

6     A     He works for Windsor Minerals at the present time.

7   Q   Any other person?

8     A     Roger Perkins, he is a former -- he is retired, he

9   was a former mill employee of Eastern Magnesia Talc.

10  Q   Where does he live?

11    A     Johnson, Vermont.

12  Q   Is there any other person?

13    A     Did I give you Mr. Esckilson?

14  Q   Yes, you did.

15    A     The gentleman from Englehart.

16  Q   What was his name?

17    A     I still haven't thought of it.  It's a Scotch name,

18  McIlwain, a name similar to McIlwain.

19  Q   You made reference just a moment ago to Englehart.  Who is

20  Englehart?

21    A     Phillip-Englehart, they have changed their name.  It

22  was Minerals and Chemicals Phillip when they bought

23  Eastern Mag and they have since changed their name, I

24  believe, to Englehart Minerals and Chemicals.

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129921
JNJ 000064853

55

1    Q    To your knowledge, those are one-in-the-same corporation?

2    A    It is my understanding.

3    Q    What was the purpose of your inquiry to Mr. Chittister

4         of the United States Geological Survey?

5                        MR. LEIBENSPERGER:  I object to that.

6         Mr. Chittister is a potential expert so I think the

7         inquiries to Mr. Chittister were in the nature of obtaining

8         expert testimony, which I think is proper discovery only

9         allowed under 26(b)(4), and not through this deposition.

10   Q    What was the nature of your inquiry of Mr. William Gregg?

11                       MR. LEIBENSPERGER:  I object on the

12        same grounds with respect to him.

13   Q    What was the nature of your inquiry to Mr. Barry Ashe?

14   A    I inquired of Mr. Ashe regarding records of sampling

15        and morphology of the materials when the State Board of

16        Health conducted their tests.

17   Q    Have you provided in response to our discovery requests

18        everything that Mr. Ashe was able to provide you?

19   A    Mr. Ashe led me to these materials, yes, sir.  I did

20        say that he was no longer a state employee, didn't I, he's

21        retired.

22   Q    Mr. Padgorski was the former director of the U.S. Bureau

23        of Mines office in Albany, New York, is that correct?

24   A    Yes.

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129922
JNJ 000064854

56

1   Q   What was the nature of your inquiry to him?

2   A   I asked him for copies of the U.S. Bureau of Mine

3   dust sampling reports of the Johnson mine.

4   Q   Is Mr. Rodizza still in the employ of Windsor?

5   A   Yes.

6   Q   Do you still have the Answers to Interrogatories in front

7   of you?

8   A   Yes.

9   Q   Would you turn to response number 29 on page 25.  In 29a,

10   response 29a, the question is, "State the date or dates

11   you first commenced operations involving the processing or

12   refining of talc," and your answer is, "Eastern Magnesia

13   Talc Company, circa 1933."  Earlier, or in response to an

14   earlier interrogatory and in earlier questions in this

15   deposition you stated your knowledge or understanding to

16   be that operations under either EMT or its predecessors

17   had begun in 1904.  Can you explain that?

18   A   The question added the word "refining" and the flotation

19   plant went in, I believe, in 1933.

20   Q   Was there processing carried on prior to that?

21   A   Yes.

22   Q   But the refining operation began in 1933?

23   A   Yes.

24   Q   What was the manner of packaging of talc that was sold by



woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129923

JNJ 000064855

1    EMT other than that which was sold in bulk?

2    A    Multi-wall, paper bags.

3    Q    What was the writing that was on those bags?

4    A    I don't know.

5    Q    Do you know whether EMT during the period 1945 and 1967

6    contained any warnings or other statements on its packaging

7    for talc which related dangers or any other hazards

8    associated with exposure to talc?

9    A    I don't know.

10   Q    Do you know if there is any person who would know that?

11                   MR. LEIBENSPERGER:   I object to the

12   form of that question.   I suppose if he knows, if somebody

13   that has told him that they know, that would be a fair

14   question, but you said who would know it.   You'd be

15   speculating about somebody else's knowledge.

16   A    I don't know of anyone.

17   Q    Did you ask this question of Mr. Esckilson?

18   A    No.

19   Q    Why not?

20                   MR. LEIBENSPERGER:   I object to the

21   form of that.   You don't need to answer.   It's not an

22   objection to form, it's an objection to substance.   It's

23   irrelevant.

24                   MR. PRENTISS:   Well, I don't think it is

*woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129924
JNJ 000064856

58

1    irrelevant.

2         MR. LEIBENSPERGER:  He has no obligation

3    to make inquiry of people outside of Windsor Minerals.

4    The interrogatories are directed to Windsor Minerals.  Now,

5    to the extent that he is talking with people, you can ask

6    him the substance of their conversations clearly, and you

7    have, but I don't think you have any right to have him

8    speculate on why he asks one thing or didn't ask another

9    thing.

10         MR. PRENTISS:  I think I do, actually.

11   He said he made inquiry of these people as part of his

12   efforts to answer these interrogatories and respond to

13   this discovery.

14         MR. LEIBENSPERGER:  I instruct you not

15   to answer.

16   Q    What did you ask Mr. Esckilson?

17   A    I asked Mr. Esckilson for any information or records

     he
18   I̶ might have concerning sales.

19   Q    Did you make any inquiry of him regarding any of the

20   substance of the interrogatories that were served on you

21   other than information regarding sales?

22   A    I asked him when the office was relocated, because

23   I didn't know that.  It turned out he was wrong.  I asked

24   him about sales or sales records, or records radiating to

J&J-0129925
JNJ 000064857

59

1    U. S. Rubber Company or Whittaker, Clark & Daniels.

2 Q    Windsor, more properly EMT, had contracts over a period

3    of time with the United States Rubber Company in New York,

4    New York. Are you familiar with the contents of any of

5    those contracts?

6 A    I am aware that they exist. We found them in the

7    files. I haven't studied them carefully.

8 Q    EMT also delivered and sold and delivered talc to United

9    States Rubber Company plants in various part of New England;

10    are you aware of that?

11 A    Yes, I am.

12 Q    Do you know whether the sales of talc to United States

13    Rubber Company factories in New England were made pursuant

14    to contracts between EMT and United States Rubber Company

15    of New York?

16 A    I don't know.

17        MR. PRENTISS:  I'm asking to have these

18    contracts marked.

19        MR. LEIBENSPERGER:  As one exhibit?

20        MR. PRENTISS:  To save time, I think we

21    might as well mark them as one exhibit. I'd like to recite

22    into the record the dates of the contracts so that we are

23    clear on that.

24 Q    I will show them to you, Mr. Miller, and I will finish up

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129926
JNJ 000064858

60

1    with them, so you can go ahead and take a look at them.

2                    MR. PRENTISS:  I have a contract between

3    Eastern Magnesia Talc Company and United States Rubber which

4    is dated December 14, 1954.  Another which is dated the 9th

5    of December, 1955 between EMT and U. S. Rubber.  I have

6    another which carries the same date.

7    Q    Can you tell me whether those are duplicates?

8                    MR. LEIBENSPERGER:  Well, I object to

9    that, unless you know from some prior investigations they

10   are duplicates.  If you are asking at the moment for him

11   to compare them word-for-word to see whether they are

12   duplicates, that's not a fair question.

13   Q    Do you know?  You compiled these documents to bring down

14   here, didn't you?

15   A     I don't know that they are.  On the face of it, they

16   are not, because the front page is different.

17                    MR. PRENTISS:  I have another contract

18   between Eastern Magnesia and United States Rubber dated

19   November 25, 1957.  Contract dated November 21, 1951 between

20   EMT and United States Rubber.  Contract dated February 17,

21   1948 between Eastern Magnesia and United States Rubber.

22   A three-page document, including a last-page contract that

23   carries a date of July 7, 1941.  A statement with attached

24   contract between Eastern Mangesia Talc Company and United



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129927
JNJ 000064859

61

1    States Rubber carrying a date of January 14, 1942.

2                    MR. LEIBENSPERGER:  I'm going to object

3    to 1941 and 1942 being outside the time period.  They

4    shouldn't have been included in the documents produced.

5    I thought we had pulled them out.  Maybe we should take

6    the ones before 1945 out of this exhibit.

7                    MR. PRENTISS:  Let me take a look at

8    them.  We can pull them out of the exhibit.

9                    MR. LEIBENSPERGER:  They are not within

10   your document request, so we are not going to produce them.

11                   MR. PRENTISS:  Contract between Eastern

12   Magnesia and United States Rubber carrying the date

13   December 21, 1946.  Contract between Eastern Magnesia and

14   United States Rubber carrying the date December 14, 1954.

15   Another contract between Eastern Magnesia and United States

16   Rubber carrying the date December 14, 1954.  Another con-

17   tract bearing the date December 14, 1954 between Eastern

18   Magnesia and United States Rubber.  Contract bearing the

19   date October 20, 1945 between Eastern Magnesia and U. S.

20   Rubber.  Another contract between Eastern Magnesia and

21   United States Rubber bearing the date December 12, 1952.

22   Next is a three-page contract between Eastern Magnesia and

23   United States Rubber dated December 9, 1948 and a contract

24   between Eastern Magnesia and U. S. Rubber dated December 22,

J&J-0129928
JNJ 000064860

62

1    1949.  A contract dated January 16, 1951 between Eastern

2    Magnesia and U. S. Rubber.  Finally, a contract dated

3    December 3, 1953 between Eastern Magnesia and United States

4    Rubber.  I'd like to have these marked as a single exhibit.

                    (PLAINTIFFS' EXHIBIT #21 MARKED FOR
                    IDENTIFICATION)

7    Q    Mr. Miller, where did you find those contracts?

8    A    In the accumulated record.  They were brought to me

9    by Mr. Hasty.

10   Q    And those were contained in the files of Windsor Minerals,

11   Inc.?

12   A    Yes.

13   Q    To your knowledge, were those contracts maintained in the

14   files of EMT, Eastern Magnesia in the regular course of its

15   business?

16   A    I presume so.  I don't know that.

17   Q    And you are custodian now as president of Windsor of the

18   files, of those files of EMT retained by Windsor, is that

19   correct?

20   A    Yes.

21   Q    To your knowledge, are those contracts that were entered

22   into by EMT in the course of its sale of talc?

23   A    Not to my knowledge, no.

24   Q    Do you have any knowledge that they were, that they are not

J&J-0129929
JNJ 000064861

63

1   authentic?

2   A    I have no knowledge that they form the basis of a

3   business relationship between Eastern Mag, all I have are

4   the contracts.

5   Q   Can you tell me, Mr. Miller, whether from the time you

6   began work at Eastern Magnesia there was any use of breath-

7   ing apparatus or masks of the like of a protective nature

8   used by miners who mined talc for Eastern Magnesia?

9   A    Yes.

10  Q   What was the kind of device that they used?

11  A    A permeable membrane.

12  Q   Was it a company policy to require use of those masks?

13  A    In some circumstances.

14  Q   What circumstances?

15  A    If a man was exposed to excessive burden.

16  Q   What was considered excessive dust burden?

17  A    Burden in excessive of the threshold limit values.

18  Q   What threshold limit values did EMT utilize?

19  A    The indsutry standard.

20  Q   Which industry standard is that?

21  A    The ACGIH.

22  Q   Can you tell me what those initials stand for?

23  A    American Conference of Governmental and Industrial

24  Hygienics.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129930
JNJ 000064862

64

1    Q    Were those standards published periodically?

2    A    Yes.

3    Q    How would EMT make the determination that dust at anytime

4         exceeded the level that was published as being the threshold

5         level?

6    A    They were guided by the Bureau of Mines in the State

7         of Vermont.

8    Q    Were there then some operations of the mining process that

9         were deemed to be areas where masks must be worn?

10   A    Yes.

11   Q    During the time that you worked for EMT, did EMT provide

12        communication to any of its customers as to those threshold

13        levels?

14   A    I don't know.

15   Q    You don't know?

16   A    No.

17   Q    You were vice-president of operations in that capacity.

18        Did you have any responsibility for communication of such

19        information to the customers of EMT?

20                    MR. LEIBENSPERGER:  Objection to the form.

21   A    No.

22   Q    Was there any person in EMT who had any responsibilities

23        for communication of such threshold limits to customers of

24        EMT?

J&J-0129931
JNJ 000064863

65

1    A    I don't know.

2  Q  Do you know what the purpose of protective masks was?

3    A    Yes.

4  Q  What?

5    A    To limit the burden on the lungs below 20 million

6  particles per cubic foot.

7  Q  Are you aware of any hazards that can result from inhalation

8  of dust in excess of whatever the threshold limit is?

9         MR. LEIBENSPERGER:  What dust are we

10  talking about?

11        MR. PRENTISS:  The dust that protective

12  masks were proposed to be on miners to protect against.

13    A    By indirection, I believe the standards were established

14  in response to a medical need.

15  Q  Do you know what the medical need was?

16    A    No.

17  Q  Do you know what diseases were claimed or feared to result

18  from inhalation of dust?

19        MR. LEIBENSPERGER:  Objection to the form.

20  Q  ...In the talc mines?

21        MR. LEIBENSPERGER:  Objection to the form.

22    A    I don't know.  I haven't read the deliberations of

23  the committee.

24  Q  So you were never told that by any person?

WP  woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129932
JNJ 000064864

66

1    A.   No.  In general, you are talking about pneumoconiosis?

2    Q.  What is pneumoconiosis versus a burden on a lung from

3    particulate material?

4    A.   Farmers, everyone breathing dust is susceptible to

5    this from a variety of dust.

6    Q.  What is talcosis?

7              MR. LEIBENSPERGER:  I'm going to object

8    to the question to the extent you are asking for an expert

9    medical opinion of what talcosis is.  Mr. Miller is not a

10    person with a medical background.

11    Q.  I'm going to show you what's been marked as Exhibit #6

12    in this deposition, Mr. Miller, and that's a letter from

13    the State of Vermont, Department of Health and there is a

14    letter to Mr. Esckilson.  It contains on it first the

15    number of total payroll, number X-rayed and then a line

16    that says, "Diagnosis, colon, quote, 'Talcosis,'" and the

17    number four.  Have you seen that before today?

18    A.   Yes.

19    Q.  Did you see that at the time that it came in?  It's dated

20    April 18, 1967.

21    A.   My initials are not on it.  I don't know.

22    Q.  Do you know what this word "talcosis" refers to on that

23    document?

24    A.   I believe it refers to an interpretation by this

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129933
JNJ 000064865

67

1     department of their reading of the X-rays.

2  Q  What is your understanding of what talcosis is as it

3     relates to that document?

4                MR. LEIBENSPERGER:  Objection and

5     instruct the witness not to answer.

6  Q  Mr. Miller, you were in charge of operations at Windsor

7     or at EMT, and that included the mining of the talc, didn't it?

8  A   Yes.

9  Q  And it included such things as health and safety of workers?

10  A   Yes.

11  Q  And  as  part of your responsibilities in charge of the

12     health and safety of the workers, did you know that some of

13     your workers were being diagnosed as having talcosis in

14     April, 1967?

15  A   In all probability, yes.

16  Q  What do you understand talcosis to be?

17                MR. LEIBENSPERGER:  I object.  You're

18     asking for a medical definition.

19                MR. PRENTISS:  I'm asking for his opinion.

20                MR. LEIBENSPERGER:  May I finish my

21     statement?  You are asking him for a definition of a

22     medical word that's totally irrelevant to this case.

23     There's no evidence anywhere at all in this case of talcosis,

24     so I object to the question and instruct the witness not to

WI Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129934
JNJ 000064866

68

1     answer.

2                 MR. PRENTISS:  I'm just asking, for the

3     record, for this gentleman's understanding of the matter

4     that was within his responsibility, his area of

5     responsibility by his own testimony.  Are you instructing

6     this witness not to answer questions regarding his under-

7     standing of what matters are within his responsibility?

8                 MR. LEIBENSPERGER:  Absolutely not,

9     I'm instructing the witness not to answer your prior

10    question, Mr. Prentiss.

11  Q    Mr. Miller, over the course of the time that you were in

12    charge of operations at EMT, how many workers had talcosis?

13  A    I don't know.

14  Q    And those workers who have talcosis, have further studies

15    been done regarding the nature of the problems or disease,

16    to your knowledge?

17                MR. LEIBENSPERGER:  May I ask a question

18    before I instruct the witness not to answer the question.

19    May I ask for some statement by the questioner as to why

20    this is relevant to this case.  This is the case of Westfall.

21                MR. PRENTISS:  Certainly.

22                MR. LEIBENSPERGER:  If it's relevant,

23    I will let the witness answer the question.

24                MR. PRENTISS:  Talcosis, to my

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129935
JNJ 000064867

69

understanding, is a very general and non-definitional term that has been used over the course of decades to describe any one of a number of lung diseases that are attributed to talc inhalation, including, but not limited to, mesothelioma, cancer of the lung, and mixed pneumoconiosis due to a variety of powder inhalation and so the mere statement of talcosis does not exclude any particular disease that happens to be at issue in this lawsuit.

MR. LEIBENSPERGER: So in your opinion, when you use the word "talcosis", it includes mesothelioma as a possible subdefinition of talcosis?

MR. PRENTISS: I'm not giving my opinion, I'm asking the witness' understanding, the witness who had responsibility for this aspect of the operation of this firm.

MR. LEIBENSPERGER: I don't think there is any medical evidence to support your opinion, but I will let it go a little further.

Q    It is my understanding that there were annual surveys similar to the study that you made reference to and those annual surveys are conducted by the State of Vermont?

A    Yes.

Q    Did EMT, to your knowledge, conduct any studies regarding the nature of the problem that those workers who were diagnosed by the State of Vermont as having talcosis?

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129936
JNJ 000064868

70

1    A.    Not to my knowledge.

2    Q    During the time that you were there?

3    A.    Yes.

4    Q    Do you know whether EMT did any such studies of its own

5    prior to the time that you came to work for EMT?

6    A.    I don't know.

7    Q    During any of the time that you were with EMT, did you have

8    any association or responsibility for sales?

9    A.    No.

10   Q    Do you know how long prior to your going to work for EMT

11   that there was a policy within EMT that miners in certain

12   aspects of the mining operation would wear prospective masks?

13   A.    No.

14   Q    That wasn't in effect when you arrived there?

15   A.    Yes.   I presume when you use the word "miner", you

16   are talking about miners and millers; you are talking about

17   the hourly employees in the mines and the processing plant

18   both.

19   Q    I was referring to people wh go down into the mines, but

20   were there other employees of EMT who were required, under

21   policies of EMT to wear protective masks?

22   A.    Yes.

23   Q    What other employees?

24   A.    Employees in the mill might under similar exposure be

WI   Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129937
JNJ 000064869

71

1   required to take the same preventative steps.

2   Q   Mr. Miller, on July 16, 1982 you executed an affidavit in

3   connection with this lawsuit.  Do you recall that?

4   A   Yes.

5   Q   In paragraph 11 of that affidavit you stated, "Windsor is

6   not a" quote,"'successor corporation,' to Eastern Magnesia

7   Talc Company, Inc. as is alleged in the complaint."  On

8   what basis did you make that statement?

9   A   I did it on the basis of my understanding of what

10  had gone before it.

11  Q   Did your understanding since that time change?

12  A   Yes.

13  Q   You also executed an affidavit on October 18, 1982 in

14  connection with this case.  Do you recall that?

15  A   Yes.

16  Q   Now, in that affidavit, you make reference to a W. H.

17  Ashton; who is he?

18  A   He is an employee of Johnson & Johnson.

19  Q   What is his capacity or position now?

20  A   He is a physical scientist.

21  Q   Where is his office?

22  A   In New Jersey.

23  Q   Did you call him in connection with this lawsuit?

24  A   No.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129938
JNJ 000064870

72

1   Q   Did he call you?

2   A   No.

3   Q   In your affidavit you state that in February, 1981 Mr.

4   Ashton, an employee of J&J, Johnson & Johnson was contacted

5   by William Curran, Esquire, an attorney representing

6   Metropolitan Talc Company in the present case.  Where did

7   you get that information?

8   A   Mr. Bolden, an attorney.

9   Q   Who is Mr. Bolden?

10  A   He is an attorney with Johnson & Johnson.

11  Q   Where is his office?

12  A   In New Jersey.

13  Q   Did Mr. Bolden contact you to relate that to you?

14              MR. LEIBENSPERGER:  At what time?  You

15  mean in preparation for submitting the affidavit?

16              MR. PRENTISS:  This affidavit.

17              MR. LEIBENSPERGER:  I'm still not sure

18  what contact you are referring to.

19              MR. PRENTISS:  I am trying to find out

20  where this affiant obtained the information that supported

21  his sworn testimony.

22  A   As I stated here, Mr. Curran's contact was made known

23  to Frank Bolden, an attorney employed by J&J.

24              MR. LEIBENSPERGER:  The question is with



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129939
JNJ 000064871

73

1    respect to the preparation of the affidavit and signing it.

2    You say Mr. Bolden provided the information and I think

3    the question was, did he contact you to provide it.

4                    THE WITNESS:  Yes.

5  Q    When did he contact you?

6  A        In early 1981.

7                    MR. LEIBENSPERGER:  Wait a minute, I'm

8    not sure of that, though.  The question was, when did he

9    contact you with respect to the preparation of this affidavit.

10                    THE WITNESS:  In recent months.

11  Q    Let me go to your answer, the earlier answer.  When did

12    you first hear from Mr. Bolden in relation to this subject

13    matter, that's the conversation with Mr. Curran?

14  A        It was early 1981, from my recollection.

15  Q    What did Mr. Bolden say to you in that conversation?

16                    MR. LEIBENSPERGER:  I'm going to

17    object, only to the extent -- I'm not going to object at all.

18                    MR. PRENTISS:  I understand the

19    difficulty of the attorney/client, but I think we've got

20    to answer these questions.

21                    MR. LEIBENSPERGER:  To the extent he

22    was just relating factual matters is not within the

23    privilege, so if there is any parts of the conversation

24    that was legal advice that would be privileged, but as I

J&J-0129940
JNJ 000064872

74

1   understand it, I'm not objecting.

2      A     Mr. Bolden contacted me, said he had been contacted

3   by an attorney for Metropolitan Talc who was involved with

4   the question regarding Italian Talc and Frank was inquiring

5   of me did I have information or test results in those

6   types of things which could be useful with regard to

7   Italian Talc and I told him No.

8      Q   Why didn't Mr. Bolden, do you know, did he tell you why

9   he contacted you to find out about Italian Talc?

10     A     I don't know why?

11     Q   Do you know whether Johnson & Johnson owns any other firms

12  or subsidiaries that are involved in the talc business

13  besides Windsor?

14     A     No.

15            MR. LEIBENSPERGER:   Was it No, that

16  you don't know or No?

17  A ...No, they don't own any others, to my knowledge.

18     Q   They don't own any other besides Windsor?

19     A     No.

20     Q   So you are it as far as talc for Johnson & Johnson is

21  concerned?

22     A     As far as Windsor Minerals is concerned.   I am it

23  as far as Windsor selling talc products.

24     Q   But you, the corporation, Windsor is the only talc

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129941
JNJ 000064873

75

1     manufacturer/miner to your knowledge that Johnson & Johnson

2     owns?

3     A.    Yes.

4   Q   Where is Mr. Bolden's office again; what part of New Jersey,

5     what city?

6     A.    New Brunswick, New Jersey.

7   Q   You said that -- did Mr. Bolden tell you that he had been

8     contacted by Mr. Curran?

9     A.    I believe that's what he told me.

10  Q   Your affidavit states that Mr. Curran contacted Mr. Ashton

11    and that Mr. Ashton contacted Mr. Bolden.  Is it possible

12    that Mr. Curran contacted both or that your recollection

13    is a little vague on that?

14    A.    I'm not sure of that.  I'm trying to state to you

15.   what my recollection was.

16  Q   How well do you recall that conversation that you had with

17    Mr. Bolden?

18    A.    Not well at all, because it wasn't a significant

19    conversation.  It didn't have anything to do with this.

20  Q   Are you certain Mr. Bolden told you he was only inquiring

21    about Italian Talc?

22    A.    Yes, I remember that.

23  Q   Why are you certain about that?

24    A.    Because I remember my answer, which was that I had no

J&J-0129942
JNJ 000064874

76

1    information regarding Italian Talc.

2  Q  Are you sure that he didn't say to you that it just

3    involved talc in general?

4  A   Yes, I'm sure that that was not the conversation.

5  Q  He couldn't have said that there was a lawsuit that

6    related to talc and that Mr. Curran was only involved in

7    Italian Talc, or Mr. Curran wants to know is Italian

8    Talc; could it have been that way?

9  A   No, that was not the conversation.

10  Q  Tell me what the conversation was, to the very best of your

11    recollection.

12  A   He called and said, my understanding is he called

13    that ~~contract~~ *Contact* had been made from Metropolitan Talc

14    inquiring whether Johnson & Johnson had information that

15    Metropolitan could use to defend Italian Talc from some

16    charges.  I'm not even sure he told me whether it was a

17    lawsuit, and that's the substance of the question that he

18    asked me, did we have information that they could use and

19    my answer was No.

20  Q  You didn't speak directly to Mr. Curran, did you?

21  A   No.

22  Q  Now, Mr. Bolden, in your affidavit, you state that he as

23    an attorney employed by Johnson & Johnson and assigned to

24    Johnson & Johnson's companies and subsidiaries dealing



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129943
JNJ 000064875

1   with talc.  How many subsidiaries does Johnson & Johnson

2   have dealing with talc?

3   A.   Two.

4   Q.   What is the other one?

5   A.   One is Johnson & Johnson Baby Products Company and

6   one is Windsor Minerals, Incorporated.

7   Q.   Now, is Mr. Bolden Windsor Minerals' corporate counsel?

8   A.   Mr. Bolden is on my Board.  He is in the office of

9   the general counsel of J&J.  He is on my Board as a

10   representative of the parent corporation and is the

11   consulting attorney to myself.

12   Q.   Is he in the corporate structure, is he assigned as the

13   corporate counsel for Windsor?

14   A.   Yes.

15   Q.   You don't have any other corporate counsel, do you?

16   A.   No.

17            MR. LEIBENSPERGER:  For this lawsuit,

18   you mean?

19            THE WITNESS:  Wait, I might not have

20   answered that correctly.  We, from time to time, in Vermont

21   use attorneys in land acquisition matters.

22   Q.   They are on a case-by-case basis, you may hire an attorney

23   to do something for you?

24   A.   Right.

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129944
JNJ 000064876

78

1   Q   Mr. Miller, in a couple of contracts which have been

2       marked as Exhibit #21 there is reference made to a talc

3       number 23. What is that?

4   A   I don't know.

5   Q   Can you tell me what Exhibit #15 purports to show? It's

6       the handwritten table of shipment years, 1942 through 1957.

7   A   In going through our records, attempting to define

8       the sales, you asked questions regarding the sales in

9       dollars and tons from the various operations. We had

10      very sketchy information. This piece of paper had this

11      table of dollar value of shipments from Johnson & Johnson

12      and it was unique because we didn't have those numbers

13      necessarily anywhere else, so I put it in wanting to be as

14      *inclusive* conclusive as I could.

15  Q   So you prepared Exhibit #15 from the materials in the file?

16  A   This was just a piece of paper in the file.

17  Q   You didn't actually draw these?

18  A   This is an old piece of paper that I found in the file.

19  Q   Do you know whether they are dollars or tons?

20  A   Yes, I'm sure they are dollars -- wait a minute, let

21      me look at that. These Goddamn guys reported tonnages in

22      tenths.

23              MR. LEIBENSPERGER: Off the record.

24              (OFF THE RECORD)



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129945
JNJ 000064877

THE WITNESS:  These are dollars.

MR. LEIBENSPERGER:  Off the record.

(OFF THE RECORD)

Q.   In your answer Number 36, response Number 36 to the Interrogatories, the question is whether you have destroyed documents or records pertaining to a variety of categories and your response is, quote "See response to Interrogatory Number 35." In answer Number 35, you state that there was no program of retention or destruction of records or documents for the company, to your knowledge?

A.   That is right.

Q.   Now, does that reach back to EMT and to your knowledge of the EMT operations prior to your coming on with the firm?

A.   To the degree I have knowledge of it, I have no knowledge or understanding of any program.

Q.   But the question Number 36 asks without regard to programs. Let me ask you then, without regard to your program, do you know if any documents were destroyed?

A.   I don't know. Well, wait a minute, 36-G, the guy from Englehart told me that the floods had destroyed those sales records.  These refer to the sales records.

MR. PRENTISS:  I don't have anything further, thank you.

CROSS-EXAMINATION BY MR. ANDERSON



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129946
JNJ 000064878

80

## CROSS-EXAMINATION BY MR. ANDERSON

1  Q.  Has the talc that was mined from the Johnson mine ever,

2      to your knowledge, been tested for any kind of asbestos

3      or asbestos-like material?

4                      MR. LEIBENSPERGER: Has it been tested

5      for it or has the test resulted in it?

6                      MR. ANDERSON:  Has it been tested

7      for it?

8                      MR. LEIBENSPERGER:  At any time?

9                      MR. ANDERSON:  At any time, to your

10     knowledge, we'll say from 1945 to '67?

11     A.  The information provided by the Bureau of Mines in

12     their two reports, and by the State of Vermont, it's

13     very closely descriptive of the mineralogical composition

14     of that ore body and you asked me has it been tested for

15     asbestos.  All I can refer you to are those documents which

16     on close analysis found none.  Now, I have to presume,

17     having mentioned none, they found none.

18     Q.  When you say the U.S. Mine Reports, you are talking about

19     the air samples they took that you described earlier?

20     A.  Yes.

21     Q.  The company has not, to your knowledge, done any testing,

22     is that correct?

23     A.  Not to my knowledge.

24     Q.  And they haven't hired anybody to do any testing, is that correct?

woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129947
JNJ 000064879

81

| | | |
|---|---|---|
| 1 | | MR. LEIBENSPERGER:  You're talking |
| 2 | | about what period? |
| 3 | | MR. ANDERSON:  '45 to '67. |
| 4 | A. | Not to my knowledge. |
| 5 | Q. | And your company doesn't own the Johnson Mine anymore? |
| 6 | A. | No, we don't. |
| 7 | Q. | Do you know if the talc at the Johnson Mine has been tes- |
| 8 | | ted after 1967 for the content of asbestos or asbestos-like |
| 9 | | material? |
| 10 | A. | By presumption only I know that. |
| 11 | Q. | You presume that it must have been? |
| 12 | A. | I presume that it must have been because I know that |
| 13 | | their products are offered as asbestos-free. |
| 14 | Q. | But you have no personal knowledge of the testing? |
| 15 | A. | No, I don't. |
| 16 | Q. | Do you know if the company that now owns the Johnson Mine |
| 17 | | is using the same shaft that was used from 1945 to 1967? |
| 18 | A. | Yes. |
| 19 | Q. | They are? |
| 20 | A. | Right. |
| 21 | | MR. ANDERSON:  I don't have anything |
| 22 | | else. |
| 23 | | MR. CURRAN:  I don't have any questions. |
| 24 | | CROSS-EXAMINATION BY MR. DOLAN |

**WI** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129948
JNJ 000064880

82

## CROSS-EXAMINATION BY MR. DOLAN

Q.   In your Answer to Interrogatory Number 17, you state in 17A that Windsor through EMT sold talc to Uniroyal in Providence from 1945 until 1954, and 1960 until 1961, and the records that have been introduced are your support for those statements?

A.   My source for that information.

Q.   Now, where did you get those records?

A.   These were in the files of Windsor Minerals.

Q.   But you don't know where the records are for the years, say 1904 until 1954 and 1960 or 1961 to 1965?

A.   I know where the records are up to 1945, but I was not inquired of prior to 1945.   You said 1904, that's why.

Q.   No, 1954 to 1960 and 1961 to 1965?

A.   I don't know where those records are.

Q.   The other thing that was in your Answer to Interrogatories, you indicate that Johnson & Johnson from 1965 to 1967 had control of that mine, right?

A.   Yes.

Q.   Do you have any records from 1965 to 1967?

A.   I have described the records that we previously produced.

Q.   So that Johnson & Johnson has custodian of the record?

A.   That Windsor Minerals has custodian of the records.

Q.   What do you have for 1965 to 1967?

A.   Correspondence.   It's better to say by exclusion.   We

**WP**  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129949
JNJ 000064881

83

1  know that we transferred the sales records, the sales

2  information, the sales correspondence, the pricing infor-

3  mation, the descriptive materials, those things that would

4  be a part of selling and we transferred those financial

5  records, cost accounting records which were not part of

6  our required retention for tax purposes.

7  Q.  Where did you transfer them to?

8  A.  To Englehart.

9  MR. LEIBENSPERGER:  You mean Minerals

10  and Chemicals Phillips.

11  Q.  So that for those two years you are saying also those were

12  destroyed by flood also?

13  A.  When we sold the company, they required or asked us

14  as for all their current sales, customer lists and the whole

15  thing.

16  MR. DOLAN:  That's all I have.

17  CROSS-EXAMINATION BY MR. LOVEGREEN

18  Q.  Mr. Miller, you were at Eastern Magnesia in 1965, is that

19  correct?

20  A.  No, I began in 1966.

21  Q.  From May 1966 until you sold a portion of the business to

22  I will call it Phillips, do you have any recollection of

23  sales of talc at Eastern Magnesia to Uniroyal in Providence?

24  A.  No.

WP
Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129950
JNJ 000064882

84

1   Q.  Were you involved in sales at all at that time?

2      A.  No.

3   Q.  Who was?

4      A.  Mr. Esckilson.

5   Q.  And he was the only person?

6      A.  No.

7   Q.  Who else was?

8      A.  Lee Esckilson, H. Mailer, J. Carpenter.

9   Q.  Are any of those people still working for Windsor?

10     A.  No.

11  Q.  Do you know where they are located at this time?

12     A.  Mr. Esckilson is in Gouverneur, New York.  Lee Esckilson,

13  even his father doesn't know where he is.  Howard Mailer

14  is dead, and John Carpenter  lives in Burlington, Vermont.

15  Q.  And they constituted the sales force, is that correct?

16     A.  That's my understanding, that is correct.

17  Q.  Now, you indicated that the records from 1965 forward were

18  given to Phillips when they purchased the northern part of

19  the business, yet in your contracts which are Number 21,

20  the contracts are dated and they are annual contracts, is

21  that correct?

22     A.  They are as they are.  They appear to be an annual suc-

23  cession of contracts, yes.

24  Q.  You have no knowledge of these contracts yourself?

WP  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129951
JNJ 000064883

85

1      A.  No.

2  Q.  Were there any contracts entered into between Eastern

3      Magnesia and U.S. Rubber Company while you were at Eastern

4      Magnesia?

5      A.  Not to my knowledge.

6  Q.  Do you know whether or not Exhibit 21 exhausts all of the

7      contracts between Eastern Magnesia and United States Rub-

8      ber Company?

9      A.  I do not know, no.

10 Q.  There may be other contracts around that aren't present

11     in this particular Exhibit?

12     A.  There may be.  I have no knowledge of that at all.

13 Q.  If they do exist, you have no knowledge of it, is that

14     what you are saying?

15     A.  Yes.

16 Q.  Referring to Exhibit 11, Mr. Miller, I believe we've got

17     the correct Number here, is that 11?

18                    MR. PRENTISS:  Yes.  You are refer-

19     ring to the Whittaker, Clark and Daniels ledger sheets?

20                    MR. LOVEGREEN:  Right.

21 Q.  They appear to be for the years 1955, is that correct?

22     A.  Yes, and '56, '57, '58, '59 and '60 in the bundle that I

23     have.

24 Q.  In the second bundle is '60 to '62, is that correct?

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129952
JNJ 000064884

86

A.   Through July of '62.

Q.   And the third bundle is '62 through July of '67, is that correct?

A.   Right, yes.

Q.   Now, in the column roughly in the middle of the page under where it says "shipped to" there are certain designations, is that correct?

A.   Yes.

Q.   Would it be fair for me to assume that the names indicated in that column would be the shipping destination of the products sold by you or Eastern Magnesia to Whittaker, Clark and Daniels?

A.   I really can't make an assumption about it. I didn't have anything to do with it.  I found these in the files and they have to be read as they are.

Q.   You have no way of interpreting these documents, is that fair to say?

A.   No, I don't have any way.  Some of the information is meaningful, some of it isn't.

Q.   Have you ever inquired of anybody regarding the interpretation of Exhibit 11?

A.   No.

Q.   Did you ever discuss this with Mr. Eackilson?

A.   Eackilson?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129953

JNJ 000064885

87

Q.   Yes.

A.   Yes, I discussed Whittaker, Clark and Daniels sales of Eastern Mag.

Q.   Did you ask him where the materials or products were shipped where there is a blank on the column shipped to?

A.   No.

Q.   Do you know, to your own knowledge, where they were shipped to?

A.   No, I don't.

Q.   Do you have any person at Whittaker, Clark and Daniels that Eastern Magnesia dealt with in a sale of any talc product at any time?

A.   No, sir, I don't.

MR. LOVEGREEN:   That's all I have, thank you.

RECROSS-EXAMINATION BY MR. ANDERSON

Q.   Plaintiff's Exhibit 20 for Identification, can you tell us what that document is?

A.   Can I tell you what this is?

Q.   Yes, do you know what it is?

A.   I can tell you what it appears to be.   This is a portion of a compilation which, it is my understanding, was prepared shortly after the acquisition as a document of explanation for the marketing and distribution of talc products

**woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129954
JNJ 000064886

88

from Eastern Magnesia Talc Co.

Q.   This was prepared by Eastern Magnesia Talc Co.?

A.   Yes, it was.  It is my understanding it was.

Q.   On page 4?

A.   Yes.

Q.   Roman numeral II, second paragraph Arabic number 2-B, the rubber is described apparently as having a high iron content; is that what that refers to? I'm sorry, I mean the talc?

A.   Come here and show me where you are talking about.

Q.   High iron content under filler and reinforcing?

A.   Yes.

Q.   Do you know, to your personal knowledge, that the talc sold by Eastern Magnesia Talc Co. had a high iron content relative to other types of talc?

A.   Yes.

Q.   Do you know what percent iron content it had?

A.   No.

                    MR. ANDERSON:  I have no further ques-
tions.

                    MR. PRENTISS:  I have just a couple
more.

REDIRECT EXAMINATION BY MR. PRENTISS

Q.   First, you answered Mr. Anderson by stating that the talc

**W**  Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129955
JNJ 000064887

89

1  mined at Johnson utilized the one shaft?

2  A.  Yes.

3  Q.  For the entire period from 1945 to 1967?

4  A.  That's my understanding.

5  Q.  What is the basis of that understanding?

6  A.  Conversations with the staff at the mine.  Do you know

7  what a shaft is?

8  Q.  Only from what you have explained today.

9  A.  The shaft is the primary opening through which men

10  and materials travel and out which the ore comes.  The

11  openings of the ground are not shafts.  To my knowledge,

12  that shaft has been in use since 1945.  I could be mistaken

13  but I believe it has.

14  Q.  But you did say there are two other shafts that were opera-

15  ted at one time at the Johnson mine?

16  A.  I said in the same ore body, yes.  Those that became

17  unusable, they moved over successfully  and used those.

18  Q.  Do you know the proximity of the shaft  that you think

19  was in operation for that entire period to the other shafts.

20  A.  In a general sense, I do.

21  Q.  About how far away?

22  A.  Quarter of a mile.

23  Q.  Each?

24  A.  No.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129956
JNJ 000064888

90

Q.   Quarter of a mile?

A.   One or two.  Three were fairly close together and four was about a quarter of a mile.  Two and three were very small exploratory operations.

Q.   Two and three are the ones that you don't think have been in operation since 1945?

A.   Yes.

Q.   But all of them were in the same ore body?

A.   It's my understanding that they were, yes.

Q.   How far did the risers--

A.   You mean the stopes.

Q.   The stopes, the lateral extensions from the shaft go before they were exhausted and moved onto the next stope?

A.   The mine is best viewed as a vertical deposit and the horizontal openings are in successively decreasing depth.  The vertical openings could be as high as 300 feet.  They pass more than one level.

Q.   So for the shaft end of the stope to the stone end of the stope, how long would that be?  Do you understand my question?

A.   No.

Q.   Am I correct in understanding that you have a shaft and from the shaft you have a hole that branches off of the shaft?

WP Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129957
JNJ 000064889

91

A.   No, you have horizontal openings.  The shaft is deeply *steeply* inclined.   You have a horizontal opening that goes out to the limit ore body and then you mine the panels.

Q.   You stated—that EMT Talc had a high iron content level relative to other talcs?

A.   Yes.

Q.   Was that the Johnson Talc or the Hammonsville Talc or both?

A.   Both.

Q.   Exhibit 20, which is the portion of the compilation, do you have the rest of that compilation?

A.   Yes.

Q.   Would we be able to get that if we filed our request, if I make a request for the compilation prepared by EMT for Phillips Co. in connection with the transfer?

A.   No, with J & J.

MR. LEIBENSPERGER:  This is the first transfer from Eastern Mag. to J & J.

MR. PRENTISS:  Do you know what I'm talking about?

MR. LEIBENSPERGER:  I know what you're talking about.  I'd have to see the request and look at the documents to see the relevance of objections, but subject to that I know what you are talking about.

W Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129958
JNJ 000064890

92

MR. PRENTISS:  Just to make it simple, we have an understanding, I will ask for the complete compilation of which Exhibit 20 for this deposition is a part.  Thank you, I have no further questions.

(DEPOSITION CLOSED)

* * * * * * * * * * * * * **

C E R T I F I C A T E

I, Lynne S. Irons, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Roger N. Miller, a Witness in the above-entitled cause, was taken by me on behalf of the Plaintiffs, pursuant to Notice, before Lynne S. Irons, a Notary Public in and for the State of Rhode Island at the offices of Decof & Grimm, One Smith Hill, Providence, Rhode Island on October 29, 1982 at 1:30 P.M.; that said witness personally appeared; that prior to the testimony of said witness he was first duly sworn and cautioned to tell the truth, the whole truth, and nothing but the truth and that Roger N. Miller thereupon testified as in the foregoing annexed deposition set out.

I further certify that the foregoing was taken down by me in stenotype and was reduced to typewriting ; it is a true and correct copy of my notes taken at the time of the above-entitled deposition.

IN WITNESS WHEREOF,  I have hereunto set my hand and affixed my official seal this 2ND day of November 1983.

LYNNE S. IRONS, NOTARY PUBLIC/ CERTIFIED COURT REPORTER

Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129959
JNJ 000064891

Exhibit 5

```
                                                      Page 1

 1                 SUPERIOR COURT OF NEW JERSEY
                   LAW DIVISION - MIDDLESEX COUNTY
 2                 DOCKET NO. MID-1809-17AS
                   APPELLATE DOCKET NO._____
 3
 4     DOUGLAS AND ROSALYN BARDEN,      )
                                        )  TRIAL
 5                  Plaintiff,          )
                                        )
 6                  v.                  )
                                        )  (VOLUME 1 OF 2)
 7     BRENNTAG NORTH AMERICA, et al., )
                    Defendants.         )
 8     ----------------------------- )
       DAVID CHARLES ETHERIDGE AND      )
 9     DARLENE PASTORE ETHERIDGE,       )  MID-L-0932-17AS
                                        )
10                  Plaintiffs,         )
                                        )
11                  v.                  )
                                        )
12     BRENNTAG NORTH AMERICA, et al., )
                                        )
13                  Defendants.         )
       ----------------------------- )
14     D'ANGELA McNEILL-GEORGE,         )
                                        )  MID-L-7049-16AS
15                  Plaintiff,          )
                                        )
16                  v.                  )
                                        )
17     BRENNTAG NORTH AMERICA, et al., )
                                        )
18                  Defendants.         )
       ----------------------------- )
19     WILLIAM AND ELIZABETH RONNING,   )
                                        )  MID-L-6040-17AS
20                  Plaintiffs,         )
                                        )
21                  v.                  )
                                        )
22     BRENNTAG NORTH AMERICA, et al., )
                                        )
23                  Defendants.         )
24
25     Job No. NJ3446610
```

Page 2

```
 1
 2        Place:  Middlesex County Courthouse
               56 Paterson Street
 3             New Brunswick, New Jersey  08903
 4
          Date:   Monday, July 22, 2019
 5             9:24 a.m.
               (Volume 1 of 2)
 6             (Pages 1 - 200)
 7
 8
 9
10
11  Before:
12        HON. ANA C. VISCOMI, J.S.C.,
13
14
15
16
17  TRANSCRIPT ORDERED BY:
18        MOSHE MAIMON ESQ.
          LEVY KONIGSBERG
19
20
21
          SILVIA P. WAGE, CCR CRR
22        PRIORITY ONE
          290 West Mount Pleasant Avenue
23        Livingston, New Jersey  07039
          (718) 983-1234
24        E-mail:  P1steno@veritext.com
25
```

Page 4

```
 1              I N D E X
 2  WITNESS: JOHN HOPKINS              PAGE
 3  DIRECT EXAMINATION BY MR  PANATIER      12
 4            E X H I B I T S
 5  NO         DESCRIPTION        PAGE
 6  Plaintiff's Exhibit 2064           190
    Plaintiff's Exhibit 2304           199
 7  Plaintiff's Exhibit 2345           121
    Plaintiff's Exhibit 2360           107
 8  Plaintiff's Exhibit 2364           199
    Plaintiff's Exhibit 2367           199
 9  Plaintiff's Exhibit 2368           199
    Plaintiff's Exhibit 2374           199
10  Plaintiff's Exhibit 2381           199
    Plaintiff's Exhibit 2382           199
11  Plaintiff's Exhibit 2385           199
    Plaintiff's Exhibit 2390           199
12  Plaintiff's Exhibit 2391           199
    Plaintiff's Exhibit 2393           199
13  Plaintiff's Exhibit 2403           199
    Plaintiff's Exhibit 2412           199
14  Plaintiff's Exhibit 2413           199
    Plaintiff's Exhibit 2434           199
15  Plaintiff's Exhibit 2594           111
    Plaintiff's Exhibit 2614           197
16  Plaintiff's Exhibit 2738            72
    Plaintiff's Exhibit 2836            90
17  Plaintiff's Exhibit 3162           118
    Plaintiff's Exhibit 3173           139
18  Plaintiff's Exhibit 3378           199
    Plaintiff's Exhibit 3624           148
19  Plaintiff's Exhibit 3695-14         82
    Plaintiff's Exhibit 3695-15         59
20  Plaintiff's Exhibit 3695-8          51
    Plaintiff's Exhibit 3695-22        199
21  Plaintiff's Exhibit 3695-23        161
    Plaintiff's Exhibit 3695-27        178
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S:
 2
    CHRISTOPHER PLACITELLA, ESQ
 3  COHEN PLACITELLA & ROTH
    127 Maple Avenue
 4  Red Bank, New Jersey  07701
    -and-
 5  MOSHE MAIMON, ESQ
    LEVY KONIGSBERG
 6  800 Third Avenue
    11th Floor
 7  New York, New York  10022
    -and-
 8  CHRIS J  PANATIER, ESQ
    SIMON GREENSTONE PANATIER
 9  1201 Elm Street
    Suite 3400
10  Dallas, Texas  75270
    Attorneys for Plaintiffs, Douglas and
11  Rosalyn Barden, Charles Etheridge and
    Darlene Pastore Etheridge, D'Angela
12  McNeill-George, William and Elizabeth
    Ronning
13
14  DIANE P SULLIVAN, ESQ
    JACK NOLAN, ESQ
15  WEIL GOTSCHAL & MANGES LLP
    17 Hulfish Street
16  Suite 201
    Princeton, New Jersey  08542
17  -and-
    JOHN C  GARDE, ESQ
18  JOHN FLAHERTY, ESQ
    McCARTER & ENGLISH
19  Four Gateway Center
    100 Mulberry Street
20  Newark, New Jersey  07102
    Attorneys for Defendants Johnson & Johnson,
21  and Johnson & Johnson Consumer, Inc
22
23
24
25
```

Page 5

```
 1        THE COURT:  Good morning, Dr.
 2  Hopkins.
 3        THE WITNESS:  Good morning, your
 4  Honor.
 5        (Sidebar.)
 6        THE COURT:  So we are at sidebar and
 7  we began argument on Friday.  I think all the
 8  arguments were in relative to --
 9        (There is a discussion off the
10  record.)
11        THE COURT:  I don't know.  Was there
12  additional argument that counsel wanted to make or
13  are we done with argument?  (INAUDIBLE.)
14        MS. SULLIVAN:  And just to emphasize,
15  your Honor, Evidence Rule 701 and lay opinion from
16  fact witnesses can be permitted, if it's consistent
17  with your experience in product -- particularly, in
18  product liability case.
19        And, specifically, citing the
20  Appellate Division's decision in Navarro v. George
21  Koch & Sons, 512 -- I'm sorry, 211 N.J. Super. 558
22  and, actually, the Court held it might be reversible
23  to not permit that kind of testimony.
24        MR. MAIMON:  Just a moment, your
25  Honor.
```

2 (Pages 2 - 5)

Page 6

1    THE COURT:  Sure.
2    MR. MAIMON:  So Rule 701 does allow
3  lay opinion testimony.  But that has to be based on
4  the perception of the witness.  And so the classic
5  example is that a witness can say how fast was a car
6  going but, for instance, the Appellate Division and
7  the Supreme Court has held that it would be error to
8  let a police officer say the car was going so fast
9  and the car was speeding based on the statements of
10  others because that's just a vehicle to admit
11  hearsay.  And I'm just looking at the commentary on
12  Rule 701.
13    Very clearly, the commentary makes
14  that a nonexpert may give his opinions on matters of
15  common knowledge and observation but not on areas
16  that would usurp the function of expert opinion.
17    The discussion of products liability
18  cases has been restricted to people who were
19  involved in the design so that the designers of
20  products such as a chair, and that's the Navarro
21  case, could say that providing an undersized chair,
22  this is the reason it was designed that way, so
23  that's somewhat of an opinion, but it's not an
24  opinion where it goes to the product defect.  It's
25  not an opinion that's an expert opinion.  It's

Page 7

1  opinion within not only the knowledge but the
2  perception of somebody.  And I think that we get --
3  we get confused when we say that a person's personal
4  knowledge is based on what other people have told
5  them.  And our courts have said that the party
6  opponent exception is -- is allowed to have those
7  statements.  But the same way in which we could
8  offer in the Answers to Interrogatories of Johnson &
9  Johnson, they could not offer in their own Answers
10  to Interrogatories.
11    We could offer the corporate
12  representative deposition of Johnson & Johnson.  The
13  rule on admissibility of depositions makes it clear
14  as well as the case law they could not offer their
15  own.  And so we do not believe that Dr. Hopkins can
16  offer any opinions where he lacks personal
17  knowledge.
18    MS. SULLIVAN:  And, your Honor, just
19  to follow up on the Navarro case, it wasn't the
20  chair case.  It actually involves the design of
21  latches and the Court held that the employee there
22  who was familiar with design manufacturer testing
23  issues should be able to testify consistent with his
24  knowledge and experience with the company.
25    MR. PLACITELLA:  And that employee

Page 8

1  had personal knowledge.
2    THE COURT:  Okay.  So here where this
3  is going to come in is the whole issue with his
4  cross-examination and so I previously ruled so
5  there's no personal use testimony coming in.
6  There's no expert testimony going to come in because
7  he's not an expert.  There is no hearsay testimony
8  coming in unless it meets one of the exceptions.
9    With regard to this whole area, I
10  believe, this is going to -- from what you've --
11  Counsel advised really kind of come up during
12  cross-examination of the witness.
13    So I've previously allowed testimony
14  within, I believe, the confines of 602 and 701.  We
15  have to remember his role at the company was as the
16  head of product safety for the time period that he
17  was there.  And so if it's within his personal
18  knowledge in that role, the Court will allow that
19  testimony.
20    This is going to be the situation
21  where, I mean, Counsel, if you feel that he's going
22  outside that role and not testifying within his
23  personal knowledge, then we can come to sidebar.
24    MR. PANATIER:  Yes, your Honor.
25    THE COURT:  Okay?

Page 9

1    MR. MAIMON:  Understood.
2    MS. SULLIVAN:  Yes, your Honor.
3    THE COURT:  Thank you.
4    MR. MAIMON:  Thank you, your Honor.
5    (Sidebar ends.)
6    THE COURT:  So let's get the Jurors
7  in.  Everything is working here now.
8    I'll step out so we can bring in the
9  Jurors.
10    (Recess taken 9:32 a.m.)
11    (Jury enters.)
12    THE COURT:  Good morning.  Please be
13  seated.  Make sure cell phones are turned off.
14  Officer, you can just give the envelopes to the
15  Jurors, they'll pass them around to the correct
16  individuals.
17    THE WITNESS:  May I approach?
18    THE COURT:  Yes, please.  Have a
19  seat, Dr. Hopkins.
20    Good morning, everyone.  Today is
21  July 22, 2019.  This is the trial in the matter of
22  Douglas and Rosalyn Barden versus Johnson &
23  Johnson -- Counsel, you may be seated -- Darlene and
24  David Etheridge versus Johnson & Johnson, D'Angela
25  McNeill versus Johnson & Johnson and William and

3 (Pages 6 - 9)

Page 10

1 Elizabeth Ronning versus Johnson & Johnson.
2          May I have appearances please for
3 the Plaintiffs.
4          MR. MAIMON:  Thank you, your Honor.
5 Good morning.  Good morning, everyone.  Moshe
6 Maimon, Chris Panatier and Chris Placitella for the
7 Bardens, the Etheridges, the Ronnings and Ms.
8 McNeill.
9          THE COURT:  Thank you.
10          And on behalf of the Defendant,
11 Johnson & Johnson and Johnson & Johnson Consumer,
12 Incorporated.
13          MS. SULLIVAN:  Thank you, your Honor,
14 good morning.  Hi, Jurors.  Good morning, everyone.
15 Diane Sullivan and Jack Nolan for J&J.
16          MR. NOLAN:  Good morning.
17          THE COURT:  Welcome back, Members of
18 the Jury.  As you may recall, we have not finished
19 the testimony of Dr. Compton who started his
20 testimony on Friday.  Similarly, we have not
21 completed the testimony of Dr. Webber.
22          In order to accommodate witnesses'
23 schedule, we're now going to move to a different
24 witness.
25          Plaintiffs may call their next

Page 11

1 witness.
2          MR. PANATIER:  Thank you, your Honor.
3 At this time Plaintiffs call the
4 corporate representative of Johnson & Johnson, John
5 Hopkins, who is already standing at the witness
6 stand.
7          DR. HOPKINS:  Thank you.  Good
8 morning, Jury.  Good morning, your Honor.
9          THE COURT:  Good morning.
10 Could you please remain seated,
11 Dr. Hopkins, momentarily, while you are administered
12 the oath.  If you could remain standing, I'm sorry.
13 If I said "seated," I apologize.
14          THE CLERK:  State your full name and
15 spell your last name, please.
16          THE WITNESS:  John Hopkins,
17 H-O-P-K-I-N-S.
18 J O H N   H O P K I N S,          SWORN.
19          THE COURT:  Officer, if you could
20 just remove the bible from there.
21 Please be seated.  Thank you.
22          MR. PANATIER:  And, your Honor, just
23 by way of organization, I have a testimony binder.
24 Can I give this to your Honor?
25          THE COURT:  Yes, please.

Page 12

1          MR. PANATIER:  And there's already a
2 binder there and I've provided Counsel with a binder
3 of Dr. Hopkins's prior testimony.  And we'll be
4 tendering exhibits to Defense Counsel as they come.
5 Dr. Hopkins has an exhibit binder there.  And here
6 is...
7          THE COURT:  Thank you.
8          MR. PANATIER:  There may be more
9 volumes but we're going to start on Volume 1.
10 DIRECT EXAMINATION BY MR. PANATIER:
11     Q.    Good morning, everybody.
12          So please introduce yourself.
13     A.    John -- yes, John Hopkins.
14     Q.    Okay.  Now, you are here as the
15 corporate representative for Johnson & Johnson and
16 Johnson & Johnson Consumer, Inc., correct?
17     A.    Yes.
18     Q.    You don't work for us, we have not
19 paid you to come here and testify, correct?
20     A.    That is correct.
21     Q.    Alright.  You currently do not work
22 for Johnson & Johnson, correct?
23     A.    Correct.
24     Q.    You are a consultant?
25     A.    Correct.

Page 13

1     Q.    And the last year that you worked at
2 Johnson & Johnson was, approximately, 2000?
3     A.    Correct.
4     Q.    So, since 2000, you have been a
5 consultant, a paid consultant, right?
6     A.    Yes.
7     Q.    To Johnson & Johnson and its other
8 companies, right?
9     A.    To Johnson & Johnson, yes.
10     Q.    Well, here, for instance, you're
11 being paid by both Johnson & Johnson and Johnson &
12 Johnson Consumer, Inc., even though you might get
13 just one check; fair?
14     A.    Fair.
15     Q.    Okay, alright.  And what is the rate
16 that you are charging them per hour?
17     A.    My company bills my time at 300 US
18 per hour.
19     Q.    Now, you've said your company.
20          Your company is a company that you run with
21 your wife, correct?
22     A.    Yes, and we employ some people as
23 well, yes.
24     Q.    Alright.  How many people do you
25 employ?

4 (Pages 10 - 13)

1    A.    Besides my wife and myself, there's
2 two full-time and one part-time.
3    Q.    So the two full-time are you and your
4 wife and one part-time?
5    A.    No.  Besides my wife and myself, two
6 full-time and one part-time.
7    Q.    That company is called Innova?
8    A.    Innovant Research Limited, yes.
9    Q.    Okay.  And that is the company that
10 then bills for your time and then pays you?
11    A.    Correct.
12    Q.    Okay.  So, even though you are not
13 currently an employee of Johnson & Johnson, you are
14 the face of Johnson & Johnson at this trial.  Do you
15 understand that?
16    A.    I am today, yes.
17    Q.    And do you understand that what you
18 say are the words of Johnson & Johnson, correct?
19    A.    Yes.
20    Q.    You have served in this capacity on,
21 can we say, numerous occasions now?
22    A.    Yes.
23    Q.    In fact, next week you're going to
24 Kentucky to do it again, correct?
25    A.    Yes.

1    Q.    You've already testified this year
2 several times in the same capacity at trial; isn't
3 that true?
4    A.    Yes.
5    Q.    You have done it last year at trial
6 several times, correct?
7    A.    Yes.
8    Q.    And the year before?
9    A.    Yes.
10    Q.    Now, let's talk a little -- let's get
11 our bearings a little bit about Johnson & Johnson
12 and baby powder.
13        Now Johnson & Johnson started selling
14 baby powder in the 1800s, correct?
15    A.    18 -- 1894, as I recollect, yes.
16    Q.    In fact, they were giving it away in
17 maternity kits, right?
18    A.    Originally, no, it was sold where
19 they -- a large giant dis-bandage to take away an
20 irritation and then later it became a mom's product.
21    Q.    That's fine.
22        At some point early on they were putting the
23 Johnson's Baby Powder into maternity kits in
24 hospitals, correct?
25    A.    Yes.

1    Q.    And they still sell -- they sell it
2 worldwide, correct?
3    A.    Yes.
4    Q.    Until about the early 1960s, the talc
5 that was used in Johnson & Johnson's Baby Powder was
6 Italian talc for the most part, right?
7    A.    Until around about '67, yes.
8    Q.    It was Italian?
9    A.    It was from a mine in Italy, yes.
10    Q.    The Val Chisone region, correct?
11    A.    The Fontana mine in the Val Chisone
12 region, a particular mine, yes.
13    Q.    Prior to 1967 or some time in the
14 '30s and '40s, they also used some domestic talcs
15 and California talc, correct?
16    A.    The only time it used domestic was
17 during the war when Nazi u-boats were sinking
18 shipments going from Italy.  That was around about
19 from 1941 to end of '45.  So there was that time
20 window when a domestic source was being used.
21    Q.    The Nazis were looking for the talc
22 boats and sinking the talc boats?
23    A.    The Nazis were sinking all boats.
24    Q.    Okay.  And they used California talc
25 during the '40s, correct?

1    A.    That is my understanding.  A
2 particular -- I don't know which mine, but a
3 particular California talc was used during the war,
4 during World War II.
5    Q.    Does the Grantham mine, a mine sound
6 familiar to you?
7    A.    The Grantham mine was a mine that was
8 evaluated but never used by Johnson & Johnson in the
9 1970s.  I have no...
10    Q.    You don't believe Grantham was ever
11 used prior to --
12    A.    No.  There's no evidence whatsoever
13 that Grantham was ever used and it has ever been
14 used.  It was evaluated briefly during the early
15 1970s along with 50 other mines as an alternative
16 source of domestic talc.  None of those were ever
17 approved, including the Grantham mine.
18    Q.    Okay.  We'll come back to the '40s
19 then.  We don't have anybody who was exposed in the
20 '40s here, so we might just address it briefly.
21        After '67, Johnson & Johnson had
22 purchased a mine in Vermont, correct?
23    A.    They did, yes.
24    Q.    Well, they purchased it prior to
25 1967, right?

5 (Pages 14 - 17)

Page 18

1    A.    They did, yes.
2    Q.    And they ran --
3    A.    Three or four years before.
4    Q.    Okay.  And they ran that mine through
5 a company called Windsor Minerals, right?
6    A.    The company that purchased the mine
7 was a subsidiary of Johnson & Johnson.  It was
8 purchased, I think, around about 1964, Windsor
9 Minerals did.  And it was not actually fully
10 approved and set in motion as a baby talc source
11 until the mid '60s, '67 and it was phased in and
12 Italian talc was phased out.  But the company that
13 owned the mine was a subsidiary called Windsor
14 Minerals.
15    Q.    Right.  And Johnson & Johnson used
16 the Vermont sourced talc for its -- all of its
17 domestic talc in the United States from,
18 approximately, 1967 or so until 2003; is that
19 correct?
20    A.    Correct.
21    Q.    Alright.  Now, there was some overlap
22 with the Italian talc and the Vermont talc, correct?
23    A.    Yes.  One was phased in and the other
24 was phased out during the 1967, '68 time frame.
25    Q.    Okay.  In 1980 there was a mine

Page 19

1 strike in Vermont, correct?
2    A.    There was.  And that was December
3 1980 and the mine was closed, so for about three
4 months until February '81.
5    Q.    Are you sure it wasn't --
6    A.    Sorry.
7    Q.    -- December 1979?
8    A.    Sorry.  December 1979 there was a
9 mine strike which ran into -- from 1980, January,
10 February, it was sourced from Italy.
11    Q.    Right.  And they went back to the
12 00000 Italian Val Chisone talc?
13    A.    Which is the same talc that they were
14 using in Europe at the same time, yes.
15    Q.    After 2003 all the talc that's been
16 sourced for Johnson's Baby Powder and Shower to
17 Shower sold here in the US is China, Guangxi,
18 correct?
19    A.    There is a mine in China, the Guangxi
20 mine, which is a, like a high grade cosmetic talc,
21 yes.
22    Q.    Johnson & Johnson owned the Vermont
23 mine until 1989 when it sold it to a company called
24 Cyprus, correct?
25    A.    Yes.

Page 20

1    Q.    And in 2012, we all know the Shower
2 to Shower product, that was sold by Johnson &
3 Johnson to a company called Valeant, right?
4    A.    It was, yes.
5    Q.    So Johnson & Johnson no longer owns
6 the Shower to Shower product line, right?
7    A.    Not since 2012, no.
8    Q.    It, obviously, still owns Johnson's
9 Baby Powder, correct?
10    A.    Yes.
11    Q.    Johnson & Johnson Corporate in New
12 Brunswick made all health and safety policy
13 decisions with regard to asbestos and talc products,
14 correct?
15    A.    The -- yes, the company in New Jersey
16 is the parent company for all the global companies
17 made those decisions, yes.
18    Q.    And testing results between Johnson &
19 Johnson and, for instance, Johnson & Johnson
20 Consumer, Inc., which I'm just going to call JJCI,
21 test results, health and safety information were
22 freely exchanged between those two companies,
23 correct?
24    A.    I've not seen any evidence that it
25 was not.  So, I guess, the answer is going to be,

Page 21

1 yes.  But I've not seen evidence that anything was
2 withheld.
3    Q.    Right.  Because you wouldn't want
4 Johnson & Johnson getting health and safety
5 information that was important to the products being
6 made and sold by JJCI and not given to them,
7 correct?
8    A.    Correct, yes.  Like I say, I've not
9 seen evidence that it was ever -- there was any ever
10 data withheld.
11    Q.    In fact, the evidence you've seen is
12 that any evidence -- any health and safety
13 information that Johnson & Johnson had was given to
14 JJCI and vice versa, correct?
15    A.    Yes.
16    Q.    Now, you have reviewed many thousands
17 of documents, correct?
18    A.    Yes.
19    Q.    And in this litigation, this talc
20 asbestos litigation, you have reviewed, I think,
21 you've told me, 10 to 15,000 documents?
22    A.    I guess it is, yes, yes.
23    Q.    Now, you know that Johnson & Johnson
24 has turned over around a million documents in this
25 litigation, correct?

6 (Pages 18 - 21)

Page 22

1    A.    So you tell me, yes.
2    Q.    Well, so my question is -- so I'm a
3  lawyer, right?  Well, presumably.
4    A.    I'll give you that.
5    Q.    Okay.  I don't work at Johnson &
6  Johnson as far as you know, do I?
7    A.    Correct.
8    Q.    The best person to tell us whether or
9  not you've looked at all the documents would be
10  Johnson & Johnson, right?
11    A.    Yes.
12    Q.    And that's you?
13    A.    Yes.
14    Q.    So have you looked at all their
15  documents?
16    A.    I've not looked at a million
17  documents.  I reckon I've looked at between 10 and
18  15,000, which from my understanding are pertinent to
19  the topic we're talking about today; in other words,
20  the documents that support the safety of talc.
21    Q.    Now, some of the questions we heard
22  last week of our experts were, they got the
23  documents from us, from the lawyers, okay.
24        Didn't you get the documents from the
25  Johnson & Johnson lawyers?

Page 23

1    A.    Not necessarily.  As part of my job
2  when I first joined the company in 1976, I met with
3  the then medical director, Dr. Semple, and he
4  regularly appraised me of the history because I was
5  the only toxicologist outside of the United States.
6  So I was responsible for Europe.  And he apprised me
7  of the recent history of talc, talc safety and talc
8  issues in the early '70s, late '60s, early '70s.
9  And we went through several binders of documentation
10  that Dr. Semple reviewed with me to get me up to
11  speed.  So not all of those, certainly, did not come
12  from the attorneys.
13        I was -- had a whole file of those in my
14  office in the UK, right back from the mid '70s.
15    Q.    So, if you will turn -- there is the,
16  I believe, the black notebook there.
17    A.    Uh-huh.
18    Q.    That one should have some of your
19  past testimony in it.
20    A.    Okay.
21    Q.    Okay.  If you would turn to the page
22  marked 2018-10-23.  So they're in date order from
23  earliest to latest and there is a deposition in
24  there that is 2018-10-23.
25    A.    It's in the middle, okay.

Page 24

1    Q.    Okay.  And if you can turn please,
2  sir, to Page 18.  Are you there?
3    A.    We have it, yes.
4    Q.    Alright.  On Line 6, starting on
5  Line 6 you were asked this.  "In the year and a half
6  since I first -- or not year and a half.  In the
7  13 months since I first deposed you in August of
8  2017, do you know whether you've looked at all the
9  documents?"
10        Your answer was, "Since 2017 I've looked at
11  many many thousands of documents, many binders, each
12  four or five inches thick.
13        Okay.  And you continue.
14        I've certainly gone through many, many
15  thousands of documents.  I've looked -- have I
16  looked at every one?  I don't know.  But I've looked
17  at every one that was provided to and by the
18  attorneys which were considered relevant to the
19  cases in question."
20        My follow-up question, "Well, just a
21  minute ago you said 'hundreds'; is it thousands?
22        Answer:  It's many thousands.  I can see in
23  my office several binders.  Each may be four inches
24  thick and there are many of those.  So it must run
25  into the thousands, yes."

Page 25

1        And my last question there.  "Did you
2  receive the binders there from the Johnson & Johnson
3  lawyers?
4        Answer:  Yes."
5        Was that all read correctly?
6    A.    Yes.  One does not exclude the other.
7    Q.    Let me ask you this question.
8        As the person who is the embodiment of
9  Johnson & Johnson here and as the person who has
10  done this numerous times over the past couple of
11  years, do you have freedom to go through Johnson &
12  Johnson's database to look at the documents?
13    A.    Yes.
14    Q.    Okay.  And how often have you done
15  that?
16    A.    Very simply, let's look at this in
17  the --
18    Q.    Can you answer the question?  How
19  often have you done that?
20        MS. SULLIVAN:  Your Honor, I'm going
21  to object to interrupting the witness in the middle
22  of an answer.
23        THE COURT:  You can answer the
24  question, Dr. Hopkins.
25        THE WITNESS:  I will, your Honor,

7 (Pages 22 - 25)

Page 26

1 yes.
2     A.    I have not had the occasion to
3 because I have many thousands of documents which
4 together provide me with the data that I need to
5 answer any question you may have.
6     Q.    Do you -- I'm sorry, did you say that
7 the "many thousand of documents" you looked at have
8 given you the information to answer all the
9 questions I might have?
10     A.    That is my understanding, yes.  I'm
11 not aware --
12     Q.    How do you know that?
13     A.    Because the documentation I have is a
14 very complex and full record and story that tells
15 that the story of the evaluation of talc, all the
16 various experts who are looking at it, the
17 correspondence with the Food and Drug Administration
18 here in the United States.
19     I have a -- I have binders and binders of
20 these in my office in the UK.  I don't think there's
21 any more that I don't have.
22     Q.    Okay.  Do you even know whether you
23 looked at 1 percent of all the documents that have
24 been turned over by Johnson & Johnson in this
25 litigation?

Page 27

1     A.    I believe I've looked at -- I say
2 between 10 and 15,000, which I don't know what
3 percent that is, because I don't know whether that
4 million that you talk about are even relevant.  They
5 may be comments from someone.  I visited someone
6 last week and this is what we talked about.  I don't
7 know that's relevant.  That could be part of the
8 million.
9     What I am saying is that the 10 to
10 15,000 that I've looked at provide me with the
11 evidence to say this product is safe and I can
12 answer any question you may have.
13     Q.    Well, first of all, 10,000 documents
14 would be 1 percent of a million, right?
15     A.    Yeah.
16     Q.    Okay.  And how can you know whether
17 or not the other 990,000 documents are relevant, if
18 you haven't looked at them?
19     A.    Well, like I say, if you have a
20 situation where you've got the information, I have
21 the information.  Getting duplicates or replicates
22 of the same ones from -- where three or four people
23 or five or six people are copied in, do I get all of
24 their individual copies?  If one suffices.  Because
25 that's very often the case, that you send a document

Page 28

1 and there about six or eight people copied in on it.
2     Did I get each of those six or eight
3 people's?  No, I got one copy and that was identical
4 no doubt to each of the copies that the other six or
5 eight people got.
6     So we look in a scenario where many
7 of those 990,000 or whatever it may be are totally
8 redundant.  They're duplicates.
9     Q.    If you haven't looked at them, how
10 can you testify to this jury that they're
11 "duplicates"?
12     A.    What I can say is that if you look at
13 any of those documents in here, you will see that
14 there's half a dozen, six, eight, ten different
15 people copied in on the same document.  Each of
16 those people will have had their own file and that
17 can well be part of your million documents.
18     What I'm saying is that the 10 or 15,000
19 that I have reviewed provides me with enough
20 information to answer any question you may have.
21     Q.    I'm sure there are some duplicates.
22 You and I have probably looked at duplicates before,
23 right?
24     A.    Yeah.  There's often ten people
25 copied in on the same document.

Page 29

1     Q.    Is it your testimony here under oath
2 that the other 990,000 documents are all duplicates
3 of the first 10,000?
4     A.    The answer is, I do not know.  What I
5 have told you is of the 10 or 15,000 --
6     MR. PANATIER:  Your Honor, I'm just
7 going to object to nonresponse.  He answered but he
8 did not --
9     MS. SULLIVAN:  Your Honor, I'm going
10 to object to the objection, to the interruption.
11 Also, this has been covered.
12     THE COURT:  Let's move on.  Thank
13 you.
14 BY MR. PANATIER:
15     Q.    Let me ask you this question.
16     Has Johnson & Johnson put all of those
17 documents on-line for the public to see?
18     A.    I don't know.
19     Q.    You don't know?
20     A.    I mean, you have documents that
21 are -- many are attorney/client privileged, you'll
22 have copies of those.  If you've been given a
23 million documents, then you have those.  And they're
24 between you and the company.
25     Q.    So you don't know if the documents

Page 30

1 have been put on-line by Johnson & Johnson's for all
2 people to see?
3    A.    I don't know whether they have or
4 whether they have not. What I can say is that I
5 have read probably between 10 and 15,000, which are
6 pertinent to the topic we're talking about. Whether
7 the other --
8    Q.    I'm not asking you about that
9 anymore. Now I'm asking you about something
10 specific.
11         You don't know whether or not Johnson
12 & Johnson has put those documents on-line for all to
13 see, do you?
14    A.    No.
15    Q.    Because we have heard that -- you
16 know Ms. Sullivan, right, correct?
17    A.    Yes, I know Ms. Sullivan.
18    Q.    Ms. Sullivan has put you on the stand
19 before, correct?
20    A.    Yes.
21    Q.    Did Ms. Sullivan tell you that she
22 told this jury that Johnson & Johnson's documents
23 were free for all to see on-line? Did you even know
24 that that existed?
25    A.    No.

Page 31

1    Q.    To the extent that it does, can you
2 tell us when they put them on-line?
3    A.    Well, like I say, you're telling me
4 or asking me something that I do not have knowledge
5 of. So I cannot answer that question.
6    Q.    Johnson & Johnson had a big medical
7 library, right?
8    A.    They had a library, yes, certainly,
9 when I was working there.
10   Q.    They had subscriptions to journals
11 like Journal of the American Medical Association,
12 right?
13   A.    We did, yes.
14   Q.    New England Journal of Medicine
15 right?
16   A.    Uh-huh, yep.
17   Q.    The Lancet --
18   A.    Yes.
19   Q.    -- right?
20        The New York Academy of Sciences, correct?
21   A.    Probably, yes. I can't remember that
22 one but, yes.
23   Q.    And I'll tell you for most of these,
24 if you want to see your testimony, I've asked you
25 these questions before.

Page 32

1    A.    You have, yes. You have, yeah.
2    Q.    And Johnson & Johnson was aware of
3 asbestos disease going back to the turn of the last
4 century, correct?
5    A.    When you say, "Johnson & Johnson,"
6 there are no doubt people in the medical department
7 who got a medical training or a toxicology training
8 who worked in the medical department who would have
9 knowledge of asbestos toxicology --
10   Q.    Sure. And Johnson & Johnson --
11   A.    -- whenever -- worldwide.
12   Q.    Yes. And Johnson & Johnson was aware
13 that in the 1930s, asbestos was associated with
14 cancer, correct?
15   A.    I'm sure there were individuals in
16 the medical department who would have that knowledge
17 as part of their medical training.
18   Q.    And you've testified before, sir,
19 that the knowledge of asbestos inhalation as a cause
20 of lung cancer and mesothelioma was known way before
21 1968, correct?
22   A.    Yeah, as a toxicologist, you're
23 taught that people who worked in World War I and gas
24 mask manufacturing, it was not a healthy profession.
25   Q.    Okay. But it wasn't just "gas

Page 33

1 masks," was it?
2    A.    Well, that was -- I gave that as one
3 example of why people are aware that asbestos is not
4 a healthy material.
5    Q.    Johnson & Johnson being already a
6 large company in the 1960s was well aware of the
7 hazard of asbestos, correct?
8    A.    I'm sure that there were one or two
9 medically qualified individuals, as we said, in the
10 medical department who would have had that
11 knowledge. Johnson & Johnson has not been in the
12 asbestos business, so it would not be widely
13 disseminated throughout the whole company.
14   Q.    Well, Johnson & Johnson has patented
15 asbestos containing products, correct?
16   A.    An individual has patented, I
17 believe, it was an ironing board cover, which was --
18 -- yeah, or something like that, but it was not part
19 -- it was never sold. The company has not sold
20 asbestos products.
21   Q.    You and I have gone through about
22 four patents that Johnson & Johnson patented
23 asbestos-containing products before, have we not?
24   A.    We have and there were people in the
25 surgical dressings division who were looking at

9 (Pages 30 - 33)

Page 34

1 asbestos materials as heat resistant, yes.
2     Q.     Now, let's talk about baby powder.
3     Johnson & Johnson understands -- first of
4 all, talc is a mineral, is it not?
5     A.     Talc is a mineral.  It's mined out
6 the ground, yes.
7     Q.     Correct.  And Johnson & Johnson,
8 actually, had their own mine and they mine and they
9 mined it out of the ground, correct?
10     A.     They did, yes.
11     Q.     Okay.  Baby powder, when it is used
12 on a baby, okay, that baby will inhale some of that
13 talc, correct?
14     A.     It's theoretically possible.  If you
15 put the powder on your hand and run it on baby's
16 bottom, it's theoretically possible.
17     Q.     Will you turn please, sir, to the tab
18 that is 2017, 8/15.  It should be the first tab.
19     Because, sir, it's not
20 "theoretically possible," right, it happens,
21 correct?
22     A.     Show me where you're referring.
23     Q.     Page 66.
24     MS. SULLIVAN:  I'm sorry, which page?
25     MR. PANATIER:  I'm sorry, hold on one

Page 35

1 second.
2 BY MR. PANATIER:
3     Q.     It is going to be Page 67, sorry,
4 bottom of the page, Line 25.
5     A.     Sorry.  Would you give me the
6 reference again?
7     Q.     Yes, sir.
8     A.     2017...
9     Q.     This is 2017, 8/15, August 15, 2017.
10 That's when I came to London to take your
11 deposition.  Do you remember that?
12     A.     Yes.  So Page 60...
13     Q.     Seven.
14     A.     We have that, yes.
15     Q.     Okay.  Down at Line 25.  Sir --
16 sorry, have you found it?
17     A.     Yes.
18     Q.     "Sir, Johnson & Johnson has
19 understood for decades that when talc powder is used
20 on an infant or a child, they will inhale some of
21 the talc into their lungs?"
22     Your answer, "there is always the
23 possibility when talc is used, we will inhale talc."
24     My question, "and it's not really a
25 possibility, right?"

Page 36

1     Your answer, "Yes."
2     "I mean, it happens?"
3     Your answer, "It happens, yes."
4     Do you still agree with your prior
5 testimony?
6     A.     Yes, that's what I said.  It's a
7 possibility.
8     Q.     By the way, that was the Herford
9 case, right?
10     A.     Yeah, probably.
11     Q.     If you could just look at the cover
12 page.
13     A.     Yes.
14     Q.     Sir --
15     A.     Yes.
16     Q.     -- baby powder is an extremely dusty
17 product, correct?
18     A.     I disagree.  It's not "dusty."  You
19 put it on your hands, it spreads all over your skin.
20 It doesn't -- you're not getting clouds of dust.
21     Q.     So, for any of us who have done this
22 with a squeeze, that squeezing motion --
23     A.     You're not meant to do that.  You're
24 meant to put it on your hand and spread it on the
25 kin.

Page 37

1     Q.     Oh, does the bottle say, don't
2 squeeze it?
3     A.     The bottle tells you how to use it.
4 The bottle tells you to put it on your hands and
5 spread it over baby's -- baby's bottom and legs.
6     Q.     So, for any of us who might have seen
7 dust come out, were we hallucinating?
8     MS. SULLIVAN:  Objection, your Honor,
9 argument, lawyer argument.
10     THE COURT:  Please rephrase.
11 And no speaking objections, thank you.
12 BY MR. PANATIER:
13     Q.     Sir -- sir, are you saying -- let's
14 go back to the initial question.  We're in 2017.
15 You said, yes, a child will inhale some of the talc,
16 right?
17     A.     Yes.
18     Q.     Do you still agree with that?
19     A.     We breathe in dust from the
20 atmosphere in this room.  Whether it's talc or
21 whatever, we can still inhale.  We inhale.  We
22 exhale.  That's what we do.
23     Q.     I'm not talking about dust in this
24 room.  I'm talking about Johnson's Baby Powder,
25 right?

10 (Pages 34 - 37)

Page 38

1    A.    Yes.
2    Q.    Okay. So let's stick to the product
3  that your company made.
4         When a parent or a sibling or
5  somebody in the family powders a child, a baby from
6  birth until whenever they're diaper trained,
7  diaper -- potty trained or out of diapers whether
8  it's age two or three or whatever, whenever they are
9  powdered, they breathe in some of that talc, do they
10  not, sir?
11    A.    We all do, yes.
12    Q.    The baby does?
13    A.    The baby does, adults do, yes.
14    Q.    Anybody who is powdered with
15  Johnson's Baby Powder, especially, as a child, is
16  going to breathe in some of that dust, are they not?
17    A.    Yeah, we breathe in, we breathe out,
18  yes.
19    Q.    Alright. Johnson & Johnson
20  understood that it would be very, very bad for
21  business and J&J's representation if it ever came
22  out that baby powder or any of its talc products
23  ever contained asbestos, correct?
24    A.    If the baby powder did contain
25  asbestos, it would be bad for business, if it did,

Page 39

1  yes.
2    Q.    Now, it's still your testimony here
3  almost two years after I first took your deposition
4  that there has never been any asbestos in Johnson's
5  Baby Powder, right?
6    A.    Not in the baby powder that's sold,
7  no, no.
8    Q.    Was it in the baby powder that wasn't
9  sold?
10    A.    No, not in the baby powder, no.
11    Q.    Okay. Sir, isn't it true that
12  Johnson & Johnson knows that baby powder shouldn't
13  be used on children at all?
14    A.    I don't agree with that.
15    Q.    Now, Johnson & Johnson owns a website
16  called BabyCenter.com, right?
17    A.    There is a website which is not --
18  it's not -- the web -- the web -- the link and the
19  web domain name is owned by Johnson & Johnson.
20    Q.    Johnson & Johnson owns and runs
21  BabyCenter.com, right?
22    A.    It does not run it. It is -- it's
23  run by a separate independent group. It's not part
24  of Johnson & Johnson. They own the domain name, but
25  they have no --

Page 40

1    Q.    Do you remember that in October of
2  2018 you and I went through a series of documents
3  about Baby Center where Johnson & Johnson was,
4  actually, talking about posting content on
5  BabyCenter.com? Do you remember that?
6    A.    No, you'd need to remind me. What
7  I've said, I believe in 2018, was that Johnson &
8  Johnson doesn't have the responsibility for the text
9  that goes on to that domain name.
10    Q.    Johnson & Johnson owns it, right?
11    A.    They own the domain name, but not the
12  content. The content is written by people who are
13  not part of Johnson & Johnson.
14    Q.    Right. And you and I talked about
15  this?
16    A.    We did. And I tried to make that
17  clear. It is -- what goes on to that website is not
18  the responsibility of Johnson & Johnson. It's done
19  by outside group.
20    Q.    Johnson & Johnson owns and controls
21  the website, correct?
22    A.    They own the domain name. They do
23  not control what goes onto that website.
24    Q.    They own it but they have no control
25  on what goes on the website?

Page 41

1    A.    Sounds crazy. That's my
2  understanding, that they own the domain name but
3  they do not control what goes onto the website.
4    Q.    I agree with you, it does sound
5  crazy. Because you're saying --
6         MS. SULLIVAN:  Objection, your Honor,
7  lawyer argument.
8         MR. PANATIER:  It does sound crazy.
9         THE COURT:  Objection sustained.
10         No speaking objections. That's the
11  second time.
12  BY MR. PANATIER:
13    Q.    Dr. Hopkins, your testimony to this
14  jury is that Johnson & Johnson -- by the way, this
15  is a huge company, right, everybody knows that?
16    A.    Yes.
17    Q.    Okay. That Johnson & Johnson owns a
18  website domain name and they conceded all control of
19  that domain name to somebody else; is that correct?
20    A.    I've not seen the terms of the
21  agreement. But what I do know is that the content
22  of what is written on that website is not approved
23  or disapproved by Johnson & Johnson. They don't
24  take responsibility for what is written on that
25  website.

11 (Pages 38 - 41)

Page 42

1     Q.     Let's take a look at BabyCenter.com.
2          MS. SULLIVAN:  Your Honor, based on
3  the testimony, objection as to hearsay.
4          THE COURT:  I'm going to allow him to
5  try to establish foundation for it.
6          Go ahead.
7          MR. PANATIER:  We'll get the
8  document.  We'll move ahead and do that.
9          THE COURT:  Okay.
10 BY MR. PANATIER:
11    Q.     We'll come back to Baby Center, okay.
12          We can bookmark this with this
13 question.
14          Johnson & Johnson, certainly, doesn't
15 put on its baby powder or any of its talc a warning
16 that says, this may contain asbestos, does it?
17    A.     No, it doesn't.
18    Q.     It doesn't put a warning on it that
19 says, do not use on babies?
20    A.     No, it doesn't.
21    Q.     Right.  Because it's, specifically,
22 marketed for babies, right?
23    A.     Yes.
24    Q.     Johnson & Johnson has always stated
25 that it has a zero tolerance policy for asbestos,

Page 43

1  correct?
2     A.     Yes.
3     Q.     And Johnson & Johnson has always told
4  the public that there's never been a single fiber of
5  asbestos in any of its talc for Johnson's Baby
6  Powder or Shower to Shower, correct?
7     A.     Yes.
8     Q.     It told that to customers, nurses,
9  doctors and regulators and hospitals, correct?
10    A.     Yes.
11    Q.     Johnson & Johnson has stated that
12 there should never ever ever be asbestos in baby
13 powder, not a single fiber, zero, correct?
14    A.     I can't remember the exact
15 phraseology, but the principle is the same.  I'll
16 agree with the principle, correct.
17    Q.     Well, okay.  And just to separate
18 that out, Johnson & Johnson agrees today now in 2019
19 that baby powder should never have any asbestos in
20 it, correct?
21    A.     Yes.
22    Q.     That means zero asbestos, correct?
23    A.     Yeah, it's non-detected.  You can't
24 find it.  There's none there, yes.
25    Q.     We're going to get into what

Page 44

1  "non-detect" means.
2          MS. SULLIVAN:  Objection, your Honor.
3          THE COURT:  Overruled.
4     Q.     There shouldn't be any asbestos in
5  baby powder, period, correct?
6     A.     Yes.
7     Q.     It should be asbestos-free, correct?
8     A.     Yes.
9     Q.     "Asbestos-free" means zero, correct?
10    A.     Yes.
11    Q.     As you have said before, any amount
12 of tremolite in the form of asbestos, quote, "those
13 needles," like you say, any amount is not allowed,
14 correct?
15    A.     Tremolite -- I know what I said.
16 Tremolite asbestos is not allowed.  Tremolite is a
17 relatively harmless mineral in its block or rock
18 form.
19    Q.     You have stated before that asbestos
20 in the form of needles such as tremolite shouldn't
21 be in the baby powder?
22    A.     Asbestos should not be in baby
23 powder.  Tremolite can occur -- most tremolite
24 occurs in the form of a nonasbestos form or rod
25 form.

Page 45

1     Q.     Has Johnson & Johnson always
2  internally believed in a zero tolerance policy for
3  asbestos?
4     A.     That is my understanding, yes.
5     Q.     You agree any asbestos in baby powder
6  is too much?
7     A.     Yeah, that's what we just said, yes.
8     Q.     The reason is that no mother or
9  father would ever buy any baby powder if it even had
10 one fiber of asbestos in it, correct?
11    A.     Well, you're asking me to speculate.
12 But if the product had asbestos in it, I wouldn't
13 buy it.
14    Q.     Right.
15          And Johnson & Johnson's expectation
16 would be that no one else would buy it either,
17 right?
18    A.     Well, it's speculative, but it's a
19 reasonable speculation.
20    Q.     And Johnson & Johnson knows that
21 asbestos in its talc could make people sick because
22 Johnson & Johnson knows that asbestos is a
23 carcinogen and causes mesothelioma, correct?
24    A.     Several questions there.
25          Asbestos causes -- can cause

12 (Pages 42 - 45)

Page 46

1 mesothelioma, correct, yes.
2      Q.     Well, let's just go to -- go to
3 8/15/17, it's the first one, Page 33.
4           MS. SULLIVAN:  What line, Counsel?
5           MR. PANATIER:  Give me a second.
6 BY MR. PANATIER:
7      Q.     Okay.  First of all, Johnson &
8 Johnson agrees asbestos is a carcinogen, correct?
9      A.     Yes.
10      Q.     And Johnson & Johnson agrees that no
11 carcinogen should be contained in the Johnson's Baby
12 Powder, correct?
13      A.     Yes.
14      Q.     Okay.  Go to 4/11/2018 on Page 108.
15 Are you there?
16      A.     Yes.
17      Q.     Okay.  On Line 18, you were asked
18 this question.
19           MS. SULLIVAN:  Objection, your Honor,
20 in terms of the procedure.  This is not (INAUDIBLE).
21 I'm not sure --
22           MR. PANATIER:  It is.
23           THE COURT:  Sidebar.
24           (Sidebar.)
25           THE COURT:  Okay.  Page, what are

Page 47

1 we --
2           MR. PANATIER:  108, Line 18 through
3 22.  This is the exact question I asked him before
4 and he didn't answer.  He said, I agree it's a
5 carcinogen, but that's not the question.  He said, I
6 agree it's a carcinogen --
7           THE COURT:  Well, this time the same
8 question.  You said it's a compound question.  So
9 I'll allow it.  Go ahead.
10           MR. PANATIER:  Thank you, your Honor.
11           MS. SULLIVAN:  Thank you.
12           (Sidebar ends.)
13 BY MR. PANATIER:
14      Q.     Doctor, you were asked this question,
15 "Johnson & Johnson knows that asbestos in its talc
16 could make people sick because Johnson & Johnson
17 knows asbestos is a carcinogen and can cause
18 mesothelioma?"
19           And what was your answer?
20      A.     What page are you on, again?
21      Q.     Same Page, 108.
22      A.     108.  Beg your pardon, I was on a
23 different page.
24      Q.     Line 18 through 22.  Your answer was,
25 "That is correct."

Page 48

1      A.     Yeah.  That's what I said five
2 minutes ago.
3      Q.     You said -- when I asked you the
4 question, you said, yes, asbestos is a carcinogen.
5 This was a slightly different question, but we can
6 move on.
7           Johnson & Johnson knows there is no safe
8 level of asbestos exposure, correct?
9      A.     Scientists have not shown a safe
10 level.  So, yeah, I would not disagree.
11      Q.     There is no known safe level of
12 asbestos exposure, especially, for children,
13 correct?
14      A.     Again, same answer.  There's no -- no
15 evidence to say otherwise, so we'll assume it's
16 correct.
17      Q.     Well, in fact, your answer, if you
18 could go right below on Page 108, you were asked
19 this question.  "Okay, and Johnson & Johnson knows
20 there's no safe level of asbestos exposure,
21 especially for children, correct, sir?"
22           And your answer was again, "There is
23 no known safe level," correct?
24      A.     Yes.  That's what I said.
25      Q.     And then the followup question was,

Page 49

1 "That's right, especially, for children, correct?"
2           And you said, "yes," correct?
3      A.     That's right.  That's what I agree,
4 yeah.
5      Q.     Alright.  Johnson & Johnson
6 understands that if you had just 1 percent by weight
7 of asbestos in a four-ounce bottle of the Johnson's
8 Baby Powder, you don't know if it would be trillions
9 or millions or billions of fibers, but it would be a
10 very large number, correct?
11      A.     Yes.
12      Q.     In eight ounces of Johnson's Baby
13 Powder there would be tens to hundreds of trillions
14 of particles, correct?
15      A.     I don't think anyone has ever counted
16 them.  But you could estimate that would be many,
17 many trillions, yes.
18      Q.     Okay.  And we can look at your
19 testimony from 2017 --
20      A.     Yeah.
21      Q.     -- but, I believe, you said there
22 could be tens to hundreds of trillions of particles?
23      A.     Yes.
24      Q.     Okay.  And if we just wanted to get
25 an understanding of what that would mean in terms of

13 (Pages 46 - 49)

Page 50

1 how much asbestos was present, you and I did this
2 calculation.
3      If you had .00001 percent chrysotile and
4 there are only a trillion particles in the whole
5 bottle, not tens or hundreds, you would still have
6 10 million fibers per container, correct?
7      A.    That's the math, yes.
8      Q.    Okay. Alright. Do you know whether
9 or not Johnson & Johnson has put together an
10 official good rocks, bad rocks company policy?
11     A.    I've not seen any such company
12 policy. The company policy is very clear on the
13 quality of talc and what specification a talc must
14 meet, absence of asbestos minerals.
15     Q.    Is there a good rocks, bad rocks list
16 that they keep?
17     A.    I've not seen such a document that's
18 kept.
19     Q.    Alright. So Johnson & Johnson
20 understood, of course, that not only would parents
21 be diapering their children, but that siblings would
22 help out, too, correct?
23     A.    Well, that's speculation. I don't
24 ever recollect my kids diapering their younger
25 brothers and sisters, but maybe some people do.

Page 51

1      Q.    If you would turn please, sir, to --
2 in the exhibit binder there, it should be
3 chronological and you should be looking for a
4 document that is -- the tab should say "1955" on it.
5 And you've already turned one tab, sir, so you might
6 be missing it. Is that it?
7      A.    Yes.
8      Q.    1955, February 22nd?
9      A.    Yeah. Yeah.
10     Q.    Okay. Do you see that that is a
11 document dated February 22, 1955 on Johnson &
12 Johnson letterhead?
13     A.    It is.
14     Q.    Okay.
15          MR. PANATIER: Your Honor, I offer
16 this into evidence as Plaintiffs Exhibit 3695-8.
17          MS. SULLIVAN: Your Honor, just a
18 second, please.
19     A.    Okay.
20          THE COURT: Hold on.
21          MS. SULLIVAN: No objection, your
22 Honor.
23          THE COURT: So admitted.
24          (Plaintiff's Exhibit 3695-8 was moved
25     into evidence.)

Page 52

1          THE COURT: You may proceed.
2 BY MR. PANATIER:
3      Q.    Dr. Hopkins, do you see this document
4 from 1955 where -- let me zoom in on this a little
5 bit. It's from W.B. Birchfield. "You recently
6 asked Mr. Quackenboss" -- that's a name -- "what we
7 were doing along the lines of providing educational
8 material to clinics conducting new mother classes.
9 In addition to rather extensive use of our bathing
10 time for baby film, we have been providing
11 quantities of a special occasional chart, a sample
12 of which is attached. This chart was first produced
13 in early 1954 and has been reprinted several times.
14 It is authentic and has enjoyed wide acceptance,
15 okay."
16         So have you seen this now?
17     A.    Yes.
18     Q.    Okay. Now, do you know when, for
19 instance, do you know when Mr. Etheridge was born,
20 David Ethridge?
21     A.    I don't.
22     Q.    Do you know who that is?
23     A.    I believe it's one of the -- your
24 Plaintiffs.
25     Q.    Right.

Page 53

1      A.    Clients, yes.
2      Q.    And you understand he has
3 mesothelioma?
4      A.    I do, yes.
5      Q.    Do you know when his sister started
6 powdering him?
7      A.    I do not.
8      Q.    So let's take a peak at one of these
9 brochures. You can see that they have a "How a Baby
10 Grows" brochure. Do you see that?
11     A.    I do, yes.
12     Q.    And then if you turn the page,
13 there's this document "How to Bathe a Baby." Do you
14 see that?
15     A.    Yes.
16     Q.    We can zoom in a little bit on it.
17 And you see it looks like a mother and older
18 daughter, right?
19     A.    Yeah, it looks 17, 18, yeah, yeah.
20     Q.    Well, look just right here. "A
21 visual chart for students who have baby brothers and
22 sisters at home or who serve as mother's helper or
23 babysitters or for those who are studying childcare
24 or may soon start families of their own."
25         So Johnson & Johnson certainly

14 (Pages 50 - 53)

Page 54

1 understood that brothers and sisters might be
2 helping out mom, right?  Right, I mean, this is --
3      A.     Well, it talks -- it talks about
4 those who are about to start families of their own
5 so -- yeah.
6      Q.     Well, that's the last part.
7      A.     But the photograph you're hiding
8 there is just -- if you can move it along, the jury
9 can see it, is a girl who is maybe an older brother
10 or older sister, but she looks about 16, 17.
11      Q.     Okay.  Well, I'm not an expert in
12 dating people.
13          But what it says is that it's a
14 visual chart for students who have baby brothers and
15 sisters at home, does it not?
16      A.     Yes, for students, yeah.
17      Q.     Or who serve as mother's helpers or
18 babysitters or for those who are studying childcare,
19 right?
20      A.     Yes.
21      Q.     It's not just for students, it's for
22 brothers and sisters as well as, correct?
23      A.     Those who are studying childcare,
24 yes.
25      Q.     Okay.

Page 55

1      A.     Like I say, the picture typifies a
2 typical teenager who's maybe learning not baby care,
3 childcare.
4      Q.     Sure.  And she's got a bottle of
5 something in her hand, right?
6      A.     Yes.
7      Q.     Okay.  Let's go over to this little
8 square up at the top.  You see, "place bath needs
9 within reach," and you see the fourth one to the
10 last is "baby powder," right?
11      A.     Yes, uh-huh.
12      Q.     And then if we go down to the
13 bottom -- I turned up the brightness on this thing.
14 Let me see if I can.  There we go.  There we go.
15          And do you see where it says,
16 "Sprinkle baby powder on cotton ball, pat lightly
17 over large areas of body," right?
18      A.     Yes.
19      Q.     So, as of 1955, Johnson & Johnson
20 understands that brothers and sisters are going to
21 help out diapering, bathing the children, correct?
22      A.     Well, as you say, in the very first
23 paragraph, it talks about students, people who were
24 going into childcare or child baby care management
25 who could well be brothers and sisters.

Page 56

1      Q.     Okay.  Because I just want to be
2 clear.  The word "brothers and sisters" is on this
3 document, right?
4      A.     Yes.
5      Q.     Okay.  So it wouldn't be speculation
6 to say that brothers and sisters would help out at
7 home because Johnson & Johnson published a document
8 called "How to Bathe a Baby" that deals,
9 specifically, with brothers and sisters helping out
10 at home, right?
11      A.     Yeah.  On the picture they show is a
12 girl who looks like 17.
13      Q.     Is Johnson & Johnson saying there's a
14 cutoff age?
15      A.     No.  The picture they show and that
16 they talk about students and childcare, it is of
17 that age.  They are not saying here's, you know,
18 here's something for a four-year old, go and bathe
19 or diaper your two-year old brother.  It's a picture
20 of a girl who is in her teens and they talk about
21 students getting into childcare.
22      Q.     They talk about a number of different
23 scenarios, right?
24      A.     But the theme here is about older
25 children.

Page 57

1      Q.     Does it say "older children"?
2      A.     Well, the picture is clearly one of a
3 17-year-old, 16 or 17-year-old.
4      Q.     How old was Linda Etheridge when she
5 started powdering David Etheridge?
6      A.     I don't know.
7      Q.     Have you read any of the depositions
8 of the actual people that are involved in this case?
9          MS. SULLIVAN:  Objection to the form.
10 Sorry.
11          THE COURT:  Overruled.
12          You can answer.
13 BY MR. PANATIER:
14      Q.     Have you read any of the depositions
15 of Mr. Etheridge, his sister, have you read those?
16      A.     No.
17      Q.     What about -- what about the
18 Ronnings?
19      A.     No.
20      Q.     How about the Bardens?
21      A.     No.
22      Q.     What about the D'Angela McNeill and
23 her brother and her mother?
24      A.     No.
25      Q.     If you'll turn to -- it should be --

15 (Pages 54 - 57)

Page 58

1 here you go, 2003, which I think is in Binder 4.
2 I'll bring you Binder 4.
3        MR. PANATIER:  And, your Honor, I'll
4 bring you Binder 4 as well.  There it is, your
5 Honor.
6        THE COURT:  Thank you, very much.
7        MR. PANATIER:  Sure.
8 BY MR. PANATIER:
9    Q.    Do you need help finding that one?
10   A.    2003?
11   Q.    2003.
12   A.    Yes.
13   Q.    That's all it says.  That's it right
14 there.  That's it right there.
15        Sir, do you see that this is a
16 presentation, "reactive usage for oil and powder of
17 Johnson's Baby Powder, a beauty essential"?  Do you
18 see that?
19   A.    Yes.
20   Q.    Let me ask you this.
21        Johnson & Johnson understood that people
22 would also sprinkle baby powder on the sheets of
23 their bed, correct?
24   A.    That's what -- yeah, I've heard that.
25 I've never heard of anyone doing it but, yeah.

Page 59

1    Q.    Do you know whether or not D'Angela
2 McNeill did it?
3    A.    I don't, no.
4    Q.    So go ahead and turn --
5        MR. PANATIER:  Oh, your Honor, this
6 is Exhibit 3695-15.  And we offer it into evidence.
7        MS. SULLIVAN:  No objection.
8        THE COURT:  I'm sorry?
9        MS. SULLIVAN:  No objection, your
10 Honor.
11        THE COURT:  So admitted.
12        (Plaintiff's Exhibit 3695-15 was
13 moved   into evidence.)
14   Q.    If you will turn to the last page,
15 sir.  It says, "reactive usage for oil and powder
16 alternative uses for Johnson's powder."
17        THE COURT:  Counsel, the word is not
18 "reactive."
19        MS. SULLIVAN:  I apologize, your
20 Honor.  I didn't realize this is not a J&J document.
21        MR. PANATIER:  Oh, I'm sorry,
22 "reactivate."
23        MS. SULLIVAN:  I do object --
24        THE COURT:  Hold on.
25        MS. SULLIVAN:  -- this is not a J&J

Page 60

1 document.
2        THE COURT:  Okay.  Sidebar.
3        (Sidebar.)
4        MS. SULLIVAN:  Your Honor, I object
5 on hearsay.  It's from a public relations firm.  It
6 doesn't have a J&J Bates number on it.  The
7 changeovers --
8        MR. PANATIER:  The native Power
9 Points when they produced them natively, so this is
10 the actual file.
11        THE COURT:  Wait.  What do you mean
12 by "native"?
13        MR. PANATIER:  So they produce
14 documents in two ways.  One is like when you've seen
15 a document like the previous one where they put a
16 Bates Stamp on it.  "Native" means instead of
17 producing a printout, they produced the actual Power
18 Point and the file has the Bates Stamp that was
19 produced by Johnson & Johnson in this case.  Counsel
20 knows that.  It is a Johnson & Johnson document.
21        MS. SULLIVAN:  It's a public
22 relations worldwide document.  I object on hearsay.
23        MR. PANATIER:  They have documents
24 that they have produced by third parties all the
25 time.  The documents are full of those.  This is a

Page 61

1 Johnson & Johnson document.  If Counsel is making a
2 representation that it's not Johnson & Johnson --
3        MS. SULLIVAN:  I'm not saying -- if
4 you're representing we produced it, I have no
5 evidence to dispute it, except I don't see a Bates
6 number.  But it's clearly not their document.
7        MR. PANATIER:  They contract with
8 third parties all the time to produce information
9 for them.  That's what this is.
10        THE COURT:  Okay.  I just need -- if
11 Counsel is asserting that this was not produced by
12 Johnson & Johnson, I just need the authentication.
13        MR. PANATIER:  I'll get the Bates
14 Stamp and come back to it.  That's fine.
15        MS. SULLIVAN:  And, your Honor, I
16 just ask that he point out that this is from a
17 public relations.  This is really misleading to say
18 it's Johnson & Johnson.  He should say it's public
19 relations.
20        THE COURT:  If Johnson & Johnson
21 hired PR firms to prepare advertisements for them
22 whether it be TV, print, et cetera, then I just need
23 the foundation on that.  I need the authentication
24 on that and then you can use it.
25        Alright.  Do you have it?

16 (Pages 58 - 61)

Page 62

1        MR. PANATIER:  Yes.  But we are going
2 to have to pull it up, because we didn't think that
3 they were going to object to their own document.
4 But we'll have to pull up the file --
5        THE COURT:  You can take that up on
6 cross-examination.
7        So do you have it or do you want to
8 move and --
9        MR. PANATIER:  Well, we'll have to --
10 we'll have to look it up.
11       THE COURT:  Okay.  Fine.  Thank you.
12       (Sidebar ends.)
13 BY MR. PANATIER:
14     Q.    Alright, let me ask you this
15 question:  Johnson & Johnson hired PR firms to put
16 together information for them, correct?
17     A.    Public relations --
18     Q.    On different subjects.
19     A.    Advertising firms and public
20 relations firms, they were often involved, say, come
21 in, give us some ideas.
22     Q.    Okay.  So you said you had never
23 heard of people putting baby powder in their sheets?
24     A.    I've heard of it.  But it's not
25 something that I've ever heard Johnson & Johnson

Page 63

1 saying this is something that you should do.
2     Q.    Johnson & Johnson knows people did
3 that, right?
4     A.    Well, I know that people have done
5 that.  I've heard of that.  But it's not something
6 that I've ever seen in Johnson & Johnson
7 correspondence that we're aware that people have
8 this use for it.
9     Q.    Is it possible that you haven't seen
10 it because it's in the 990,000 documents you haven't
11 looked at?
12     A.    It's possible, yes.
13     Q.    Alright.  We'll come back to that,
14 okay.
15           (There is a discussion off the
16       record.)
17 BY MR. PANATIER:
18     Q.    Dr. Hopkins, Johnson & Johnson
19 understood that any presence of amphibole mineral
20 whether in the form of asbestos as you say or not,
21 should not have been in the powder, correct?
22     A.    I don't -- I don't agree with that.
23 Amphibole -- amphiboles are present in just about
24 every county in the United States.  They're
25 invariably quite harmless.  It's a geological

Page 64

1 descriptor, but it doesn't mean it's harmful.
2        MR. PANATIER:  Your Honor, I would
3 move to strike everything after the initial answer
4 as non-responsive.  He's opining on whether or not
5 it's harmless --
6        THE COURT:  Objection is sustained.
7 Jury will disregard anything after the initial
8 response.
9        Continue.
10       MR. PANATIER:  Thank you, your Honor.
11 BY MR. PANATIER:
12     Q.    Sir, if you'll go ahead and turn to
13 the depositions' notebook there to 2017, 8-17, so
14 August 17, 2017.  Okay.
15     A.    What page?
16     Q.    It will be 1037, 1,037.  That was a
17 long deposition.
18     A.    Uh-huh.  We have it, yes.
19     Q.    I'm going to jump ahead here briefly
20 and I'm going to ask you to confirm that we've heard
21 about XRD, X-ray diffraction, that detection
22 technique.  You're familiar with that?
23     A.    Yes, sir.
24     Q.    XRD is not a microscope, correct?
25     A.    No, it's a piece of equipment.

Page 65

1     Q.    Right.  And all it tells you is
2 whether or not a mineral is present.  It doesn't
3 tell you what it looks like, right?
4     A.    No.
5     Q.    Correct?
6     A.    Correct, yes.
7     Q.    It doesn't tell you whether it's in
8 fibers or whether it's in chunks, correct?
9     A.    Yes.  You to have look at other
10 techniques.
11     Q.    Right.  So, if you could look,
12 please, sir, at Page 1037.  You were asked this
13 question.
14       MS. SULLIVAN:  Can I have the line,
15 Counsel?
16       MR. PANATIER:  Yeah, Line 8.
17 BY MR. PANATIER:
18     Q.    And to the --
19       MS. SULLIVAN:  I'm sorry, your Honor.
20 If I can just have a minute.
21       MR. PANATIER:  Counsel, are you
22 ready?
23       MS. SULLIVAN:  (INAUDIBLE)
24 impeachment is concerned.
25       THE COURT:  How about we do that at

17 (Pages 62 - 65)

1 sidebar.
2        (Sidebar.)
3        THE COURT:  So it's Line 8 through
4 what?
5        MR. PANATIER:  Line 8 through 24.
6        THE COURT:  Okay.  I'll hear you.
7        MR. PANATIER:  1037.
8        THE COURT:  Go ahead.
9        MS. SULLIVAN:  What are you
10 impeaching him on, saying it's inconsistent with
11 this?  What are you impeaching him on?
12        MR. PANATIER:  He said the presence
13 of the minerals is fine.  And I'm impeaching him
14 because here he says it should have been rejected.
15 That's direct impeachment.
16        MS. SULLIVAN:  Where is that?
17        MR. PANATIER:  Right here.  That's
18 grounds for rejection.
19        MS. SULLIVAN:  I don't think it's
20 impeachment, your Honor.
21        THE COURT:  It does qualify for
22 impeachment based upon his response relative to the
23 distinction whether or not with any amphiboles.
24        So go ahead.
25        MS. SULLIVAN:  Okay.  Thank you, your

1 Honor.
2        (Sidebar ends.)
3 BY MR. PANATIER:
4     Q.    Sir, it was Johnson & Johnson's
5 policy, correct, to reject any talc that had the
6 presence of the mineral at all, correct?
7     A.    Sorry, the mineral, what mineral?
8     Q.    Amphibole mineral.
9     A.    Amphibole, right.  The step is that
10 you look at X-ray diffraction and if you get a
11 positive result for an amphibole, you reject it
12 until you've done the next step, which is polarized
13 light microscopy so that you can actually see what
14 kind of amphibole it is, whether it's a harmless
15 material or an asbestiform material.
16     Q.    Let's look and see what you said,
17 okay.  Line 8.  "And to the extent that any, any
18 lots of talc were tested and there was a positive
19 XRD for amphiboles minerals at anytime, was that lot
20 placed on hold before it used?"
21        And your answer was, "The way the testing
22 would have been done, it was -- it would not have
23 been -- it was not have been filled," correct?
24     A.    Until it had polarized light, yes.
25     Q.    Oh, I'm sorry.  Did you say "until it

1 had polarized light" there?
2     A.    No, but I'm asking --
3     Q.    Okay.  Let's go to the next question.
4        "So, if a lot was positive just by XRD, it
5 would have been rejected?"
6        And your answer was, "That was my
7 belief," correct?
8     A.    Yeah, and that is the case.  It is
9 correct.  It would have been rejected until it had
10 come out of rejection by validated whether or not
11 polarized light showed a problem or not.
12     Q.    So you didn't say that here, did you?
13     A.    You didn't ask me.
14     Q.    I didn't ask you here either and you
15 volunteered it, didn't you?
16        MS. SULLIVAN:  Objection, you Honor,
17 that's argument.
18        THE COURT:  Objection sustained.
19        Let's not argue with the witness,
20 please.
21 BY MR. PANATIER:
22     Q.    Sir, look, let's look at what you
23 said.  "So if a lot was positive just by XRD" --
24 that's just the mineral, correct, sir?
25     A.    XRD would pick up amphibole.

1     Q.    "It would have been rejected, that is
2 my belief," correct?
3     A.    It would have been rejected until it
4 was de-rejected or un-rejected.  It would have been
5 held until you had done the test.  So you reject
6 it -- you can't fill it until you've clarified what
7 the problem was.
8     Q.    Did you say that here?
9     A.    Here -- just now?  No.
10    Q.    No.  We know you said it just now;
11 here?
12    A.    No, but you didn't ask me to go on
13 and explain it any further when you asked me that
14 question back in 2017.
15    Q.    Well, I asked you right after --
16        MS. SULLIVAN:  Objection, your Honor,
17 this is argument.
18        THE COURT:  Overruled.
19 BY MR. PANATIER:
20    Q.    "And by XRD, you're just detecting
21 the mineral presence, correct?"
22        Answer:  "Correct."
23        And I asked you again, "but that was grounds
24 of J&J for rejection; is that true?"
25        Answer:  "That is the specification,"

18 (Pages 66 - 69)

Page 70

1 correct?
2     A.     Yes.
3     Q.     So I asked it you about it again and
4 you didn't say anything about, well, until it's
5 un-rejected, did you?
6     A.     I didn't give you that additional
7 information because you didn't ask for it.
8     Q.     I didn't ask for it either and you
9 did, correct?  Correct?
10     A.     You -- okay.  I think I've explained
11 that you reject it until you've got reasons to
12 un-reject it.
13          (There is a discussion off the
14     record.)
15 BY MR. PANATIER:
16     Q.     You know Fred Pooley, right?
17     A.     Yes, I do.  I know him well.
18     Q.     We've heard a lot about Fred Pooley
19 in this case.
20          So, in 1996, you were at the company,
21 you were at Johnson & Johnson, right?
22     A.     Yes.
23     Q.     Okay.  If you will turn please, sir,
24 to the tab for 1996.  And we might be going into
25 another binder.  Nope.  I think it's in Binder 4.

Page 71

1 It should be January 29, 1996.
2     A.     Yes.
3     Q.     Okay.  And, sir, this is a memo that
4 is a Johnson & Johnson memo, correct?
5     A.     It is, yes.
6     Q.     There's really two communications
7 here.  The page before is a communication from Bill
8 Ashton to you, correct?
9     A.     Yes.
10     Q.     And then there's a follow-up from you
11 to Ian Philipson, the head of scientific services at
12 the Cosmetic, Toiletry and Perfume Association
13 Limited, correct?
14     A.     Yes.
15     Q.     Now, we've heard of CTFA, that was
16 the Cosmetics, Toiletries and Fragrances Association
17 here in the States, right?
18     A.     Yes.
19     Q.     And Great Britain had a similar
20 version called the CTPA, correct?
21     A.     Yes.
22     Q.     Alright.
23          MR. PANATIER:  Your Honor, at this
24 time we offer Plaintiff's Exhibit 2738 into
25 evidence.

Page 72

1          MS. SULLIVAN:  No objection.
2          THE COURT:  So admitted.
3          What is the numbering on this one?
4 I'm sorry.
5          MR. PANATIER:  2738, your Honor.
6          THE COURT:  Thank you.
7          (Plaintiff's Exhibit 2738 was moved
8     into evidence.)
9     Q.     So let's go back to January 22, 1996.
10 This is from Bill Ashton to you, right?
11     A.     Yes.
12     Q.     Okay.  And here it says, "From Bill,
13 attached is Page 11 of the current issue of a CTPA
14 guide wherein Fred Pooley makes the suggestion that
15 any batch of cosmetic talc which reads positive for
16 the presence of amphiboles should be rejected even
17 if subsequent examination establishes whether or not
18 the mineral is fibrous or non-fibrous."
19          Now, I've shown you this before,
20 correct?
21     A.     Yes.
22     Q.     "We need clarification on this since
23 it is in conflict in all the work here in US based
24 primarily on the mineral tremolite, which is present
25 in trace amounts in many high grade talcs, including

Page 73

1 Johnson & Johnson's," right?
2     A.     Yes.
3     Q.     Okay.  "The mineral tremolite is
4 chemically a calcium silicate and occurs in two
5 crystallographic habits, fibrous, which is called
6 tremolite asbestos and prismatic or non-fibrous,
7 which is non-asbestiform."  Did I read that, right?
8     A.     You did.
9     Q.     Okay.  So let's get our definitions
10 straight.
11          You agree with what Bill Ashton said
12 here --
13          MS. SULLIVAN:  Your Honor, I'm sorry.
14          THE COURT:  Wait, wait, wait.
15 Counsel, sidebar.
16          MR. PANATIER:  I'm sorry?
17          MS. SULLIVAN:  I was going to ask him
18 to read the line for completion.
19          MR. PANATIER:  Sure.
20 BY MR. PANATIER:
21     Q.     "Here in the US, a controversy has
22 been under way for the past 25 years."
23          MS. SULLIVAN:  And then the next one.
24          MR. PANATIER:  I'll read the whole
25 paragraph.

19 (Pages 70 - 73)

Page 74

1    MS. SULLIVAN:  No, just the next one.
2    MR. PANATIER:  No, I'll read the
3 whole paragraph.
4    MS. SULLIVAN:  Okay.
5 BY MR. PANATIER:
6    Q.    "All agencies and health oriented
7 groups have accepted the view that only the rare
8 fibrous tremolite might be hazard as opposed to the
9 harmless prismatic form.  This has been fought at
10 many meetings of science groups and in the courts
11 mainly spearheaded by the RT Vanderbilt Company who
12 sells large tonnage of trimellitic talc to the
13 ceramic industries here and abroad."
14    And, Dr. Hopkins, you know that
15 Johnson & Johnson actually attended some meetings
16 with RT Vanderbilt, right?
17    A.    I believe RT Vanderbilt attended
18 meetings with the Food and Drug Administration at
19 which Johnson & Johnson was also present.
20    Q.    So in this memo, Bill Ashton says
21 "fibrous tremolite," right?  It says "fibrous
22 tremolite."  "Fibrous," which is called tremolite
23 asbestos, right?  Correct, sir?
24    A.    Yeah, if it meets the definition of
25 tremolite asbestos, it would be asbestos.

Page 75

1    Q.    And what Bill Ashton says here is,
2 "Fibrous which is called tremolite asbestos,"
3 correct?
4    A.    That's what is written.
5    Q.    Okay.  And you agree with that,
6 right?
7    A.    Well, as I said, tremolite asbestos
8 is a fibrous form as opposed to a rod form or like
9 my pencil.
10    Q.    And let's look at what he quotes what
11 Dr. Pooley said in the CTPA.
12    So Dr. Pooley was, actually, writing the
13 CTPA guide in England, correct?
14    A.    He was part of a -- several people
15 who were writing a first draft, yes.
16    Q.    Oh, was this just a first draft?
17    A.    Well, I don't know on that date
18 whether it was a draft or what.  I don't -- yeah, my
19 cover letter said I showed bill a draft of the CPTA
20 guide for his comment.
21    Q.    Okay.  My question was, is it a first
22 draft, what you said?
23    A.    Well, I don't know whether it was a
24 first draft or second draft.  It was a draft.
25    Q.    So under section -- is that 5.2?

Page 76

1 Does that look like 5.2?
2    A.    Yes.
3    Q.    Fiber minerals amphiboles.  And it
4 says, "as the description of the mineralogical
5 processes involved in the formation of talc may have
6 shown, amphiboles are possible contaminants.  These
7 include tremolite, anthophyllite, actinolite, et
8 cetera.  Tremolite, the most common amphibole
9 contaminant occurs only rarely as the fibrous form
10 and the varieties of massive tremolite which under
11 the microscope appear to contain fibers commonly
12 comprise mainly thick fibers or cleavage fragments
13 which do not present the same health hazard."
14 "However --
15    MS. SULLIVAN:  And you left out "as
16 asbestos."
17    MR. PANATIER:  "As asbestos."
18 BY MR. PANATIER:
19    Q.    "However, in order to eliminate any
20 hazard to the consumer which might arise from the
21 need to interpret fiber shape and dimensions and to
22 facilitate routine screening the CTPA view is that
23 if an amphibole is detected by X-ray diffraction
24 that batch of talc is unacceptable for cosmetic use
25 whether or not subsequent examination by optical or

Page 77

1 electromicroscopy shows that the contaminant is not
2 fibrous.  In this respect, the CTPA specification is
3 even more stringent than others which refer only to
4 fibrous amphiboles."
5    Now that's consistent with what you
6 testified to about if there was a presence of
7 amphiboles by XRD at J&J, it was to be rejected,
8 correct?
9    A.    No.  It's not consistent.  What I
10 said in the J&J specification, and you know this, is
11 that if you find amphibole by X-ray diffraction, you
12 put the whole thing on hold.  You reject it until
13 you can show that the amphibole was the harmless
14 form or the rod form of tremolite or whatever it may
15 be, but not the fibrous one that looks flexible like
16 human hair, that's asbestos.  But in rod or cleavage
17 form, it looks like, than it's not asbestos.  So you
18 do the microscope piece.  You look at it under a
19 microscope.
20    Q.    We will get to all that.  Well, let's
21 compare what you said with this.
22    Here's what you said.  "If it's positive by
23 XRD, it would be rejected.  That is your belief,
24 right?
25    And I asked, "And by 'XRD,' you're just

20 (Pages 74 - 77)

Page 78

1 detecting the mineral, correct?
2      "Yes, that was grounds for rejection.
3 That's the specification."
4      Now we're looking at what Dr. Pooley
5 said. "Presence of XRD should be grounds for
6 rejection," correct?
7      A.   In this draft that you're referring
8 to --
9      MR. PANATIER:  Your Honor, at this
10 time I would object to non-responsive.
11      THE WITNESS:  I'm sorry.
12      MR. PANATIER:  I would just like a
13 yes or no.
14      THE COURT:  Please answer the
15 question.
16      A.   Yeah.  Would you rephrase the
17 question.  I'm getting lost.
18      Q.   Yes.  Dr. Pooley is saying that the
19 presence of the mineral at all is grounds for
20 rejection, correct?
21      A.   That's what he is saying on that
22 draft -- first draft, yes.
23      Q.   Well, you know that's the current
24 specification for the CTPA, don't you?
25      A.   No, it isn't.

Page 79

1      Q.   When did it change?
2      A.   I don't know.  But I looked more
3 recently and it's not the current specification.
4      Q.   What's "the current specification"?
5      A.   You would have to go on their website
6 and look it up.
7      Q.   Aren't you on the committee that
8 helps with that specification?
9      A.   Yes.  I'm on -- I'm on a scientific
10 committee, yes.
11      Q.   Well, let's look at the 2016 version,
12 okay?
13      A.   Well, why don't we look at 2018 or
14 '19 version.
15      Q.   This was the only one I as able to
16 get, but we can look at -- we can look and see if
17 they changed it after 2016, okay?
18      A.   Okay.
19      (There is a discussion off the
20      record.)
21      Q.   It should be right in the back of
22 your Binder 4.  It should be dated 2016.  It should
23 be entitled "Cosmetic Talc a CTPA Guide."  Do you
24 have that?
25      A.   I do, yes.

Page 80

1      Q.   Okay.  Great.  So just so we can get
2 our bearings a little bit, if you'll just turn to
3 the first page.
4      MS. SULLIVAN:  Your Honor, I'm going
5 to object because of the time frame here.
6      THE COURT:  Objection overruled.
7      You can go, proceed.
8 BY MR. PANATIER:
9      Q.   Do you see under "Acknowledgment,"
10 sir?
11      A.   Yes.
12      Q.   It says, "The Cosmetic, Toiletry and
13 Perfumery Association wishes to thank members of the
14 CTPA talc task force for their time and enthusiasm
15 in preparing the latest revision of this document."
16      And who is the last person listed?
17      A.   Myself.
18      Q.   You?
19      A.   Yes.
20      Q.   John Hopkins?
21      A.   Yes.
22      Q.   Innovant Research, right?
23      A.   Yes.
24      MR. PANATIER:  Your Honor, we offer
25 this into evidence.

Page 81

1      MS. SULLIVAN:  It's for 2016.
2      THE COURT:  Sidebar.
3      (Sidebar.)
4      THE COURT:  The purpose for which
5 you're seeking admission?
6      MR. PANATIER:  Yes, it's to impeach
7 the witness for purposes of what he just said, that
8 it's not part of the -- it's not of the protocol.
9 He's trying to fight it.  In 2016 he tried to fight
10 it, in 2017 in his depo.
11      MS. SULLIVAN:  The protocol in 2016
12 has nothing to do with this case, your Honor.
13      MR. PANATIER:  There was exposure in
14 2016.
15      THE COURT:  Okay.  Well, even if
16 there wasn't exposure, for the sake of argument, in
17 2016, I'm allowing its admission for purposes of
18 impeaching credibility based upon the testimony of
19 this witness relative to that Bill Ashton memo to
20 him referencing the CTPA guide and the language at
21 issue.
22      MS. SULLIVAN:  I don't see where the
23 impeachment is.  I don't understand.  All he showed
24 was the acknowledgment.
25      THE COURT:  Do you want to show

21 (Pages 78 - 81)

Page 82

1 Counsel?
2          MR. PANATIER: Yeah. I haven't gone
3 into it further yet; Page 13 and Page 16, where it
4 says the exact same thing.
5          MS. SULLIVAN: This is consistent,
6 your Honor. It says, tremolite occurs only rarely
7 in fibrous forms. It's not inconsistent and I'll
8 object because it's not proper impeachment.
9          MR. PANATIER: Your Honor, amphibole
10 detected by X-ray diffraction that matches
11 unacceptable or cosmetic uses --
12          THE COURT: As for impeachment
13 purposes. Thank you.
14          (Sidebar ends.)
15 BY MR. PANATIER:
16     Q.    Doctor, is it your --
17          THE COURT: Hold on a second.
18          MR. PANATIER: I'm sorry.
19          THE COURT: This document has been
20 offered into admission. The Court now accepts it
21 into admission.
22          (Plaintiff's Exhibit 3695-14 was moved
23          into evidence.)
24          MR. PANATIER: Thank you, your Honor.
25 It's Exhibit 3695-14.

Page 83

1 BY MR. PANATIER:
2     Q.    Now, Dr. Hopkins, barring some
3 C-change in the CTPA between 2016 and now, let's
4 look at this.
5          Let's take a look at Page 14. Okay. Tell
6 me when you're there. And if it's helpful, it's up
7 there, too.
8     A.    It's okay. No, I got Page 14, yeah.
9     Q.    Alright. Now, it says, "As the
10 description of the mineralogical processes involved
11 in the formation of talc may have shown, amphiboles
12 are possible contaminants, these include tremolite,
13 anthophyllite, actinolite, et cetera. Tremolite the
14 most common amphibole contaminant occurs only rarely
15 as the fibrous form and the varieties of massive
16 tremolite, which under the microscope appear to
17 contain fibers, commonly comprise mainly thick
18 fibers or cleavage fragments which do not present
19 the same hazard as asbestos."
20          Now, first of all, that's exactly
21 what he said in 1996 in the letter you got, isn't
22 it?
23     A.    Yes.
24     Q.    Okay.
25     A.    Yes. Yes --

Page 84

1     Q.    Let's see if the rest is consistent.
2 "However, in order to eliminate any hazard to the
3 consumer, which might arise from the need to
4 interpret fiber shape and dimensions and to
5 facilitate routine screening, the CTPA view is that
6 if an amphibole is detected by X-ray diffraction,
7 that batch of talc is unacceptable for cosmetic use
8 whether or not subsequent examination by optical or
9 electromicroscopy shows that the contaminant is not
10 fibrous." Did I read that right?
11     A.    You did.
12     Q.    And look here's from the previous
13 exhibit. Can you see that up on the screen, sir?
14     A.    Yes.
15     Q.    It says the same thing.
16     A.    It does. But there is an explanation
17 and I'm happy to give it.
18     Q.    Sir, this is 20 consistent years from
19 1996 to 2016 where they're saying the same thing,
20 correct?
21     A.    They're saying the same thing and
22 there is an explanation and I'm happy to give it.
23 If you --
24     Q.    And you gave that explanation --
25     A.    -- if you will allow me.

Page 85

1          THE COURT: Hold on.
2          THE WITNESS: Sorry.
3          THE COURT: It's okay.
4          MS. SULLIVAN: I object to the
5 interruption.
6          THE COURT: There is no question
7 pending.
8          Proceed.
9          MR. PANATIER: Thank you, your Honor.
10 BY MR. PANATIER:
11     Q.    You gave that explanation for the
12 first time today, you did not give that explanation
13 when I deposed you in 2017, did you?
14     A.    I have given the explanation -- the
15 test methodology requires you to do X-ray
16 diffraction followed by polarized light microscopy
17 and, if necessary, by other microscope methods.
18          (There is a discussion off the
19          record.)
20     Q.    We know this. Johnson & Johnson
21 never rejected a single lot for the presence of
22 amphibole or amphibole asbestos, correct? Correct?
23     A.    If a lot had failed the
24 specification, which is the test using X-ray
25 diffraction for amphibole followed by polarized

22 (Pages 82 - 85)

Page 86

1 light microscopy and transmission electron
2 microscopy, if it had failed those tests, which
3 would have picked up asbestos, it would have been
4 rejected.
5    Q.    No lot was ever rejected, correct?
6    A.    I don't know whether a lot was
7 rejected or not.  It could well have gone into
8 industrial talc.  I'm not going to speculate.  But
9 any lot that fails those three tests would not have
10 been used to make baby powder.
11        THE COURT:  This would be a good time
12 for a break, Counsel.
13        MR. PANATIER:  That's fine.
14        THE COURT:  Alright.  So Members of
15 the Jury, we're going to take a 15-minute break.  No
16 discussions with regard to this case, including the
17 testimony you've just heard.  No research of any
18 kind whatsoever.
19        Please be ready to come back upstairs
20 at five after.  Enjoy your break.
21        (Jury exits.)
22        THE COURT:  And we're off the record.
23 Dr. Hopkins, you may step down.
24        THE WITNESS:  Thank you.
25        (Recess taken 10:50 to 11:12 a.m.)

Page 87

1        (Jury enters.)
2        THE COURT:  Please be seated.  Make
3 sure cell phones are turned off.
4        You may continue.
5        MR. PANATIER:  Thank you, your Honor.
6    Q.    So, Dr. Hopkins, at this point we
7 have documentation, a policy to reject anything with
8 amphiboles.  We have that from 1996 CTPA, correct?
9    A.    That's the British --
10    Q.    Yes.
11    A.    -- document.  That is their document,
12 yes.  But, as I said, I'm happy to give an
13 explanation why but --
14        MR. PANATIER:  Your Honor, I'm going
15 to object at this time to nonresponsive and move to
16 strike.
17    A.    The answer is, yes.
18        THE COURT:  Thank you, Dr. Hopkins.
19    Q.    We also saw 2016 CTPA, same policy,
20 correct?
21    A.    We did, yes.
22    Q.    Also, we have your testimony from
23 2017 where you said presence by XRD, which only
24 detects the amphiboles would be grounds for
25 rejection, correct?

Page 88

1    A.    Yes.  And I explained until you've
2 done otherwise.
3    Q.    Okay.  Well, if you would turn to the
4 tab.  Actually, I think it's there already.  I
5 turned it there for you.
6        December 28, 2016, you got that tab?
7 The title is the, "The Process for Qualification and
8 Approval of a New or Alternate Source of Cosmetic
9 Talc"?
10    A.    Yes.
11    Q.    Okay.  That's a document you authored
12 correct?
13    A.    Yes, I gave guidance to an affiliate
14 in, I think, it's Indonesia as to their thinking
15 process, yes.
16    Q.    The title is, "The Process for
17 Qualification and Approval of a New Or Alternate
18 Source of Cosmetic Talc" and it regards the global
19 specification, correct?
20    A.    I don't see that title.
21    Q.    Okay.  Well --
22    A.    Let me read it.
23    Q.    We'll look at it together.
24        MR. PANATIER:  You Honor, I offer
25 this in evidence.

Page 89

1        THE COURT: Any objection?
2        MS. SULLIVAN:  Your Honor, just a
3 sidebar on this.
4        THE COURT: Sure.
5        MS. SULLIVAN:  Thank you.
6        THE COURT:  Just to be clear, this is
7 2836 being offered?
8        MR. PANATIER:  2836.
9        THE COURT:  Okay.
10        (Sidebar.)
11        MS. SULLIVAN:  Your Honor, I'm just
12 going to object.  The last document was a London
13 2016 standard that has been (INAUDIBLE).  This is an
14 Indonesian, you know, again post-dating the time
15 frame at issue in this case and the recommendations.
16 It's not relevant under the time period at issue and
17 we would object to the document.
18        THE COURT:  And the basis for which
19 you're seeking to introduce this?
20        MR. PANATIER:  Right here.  Dr.
21 Hopkins stated there are certain parameters for
22 which a minimum standard must be maintained on a
23 global basis.  These consist of freedom from
24 asbestos and amphibole minerals.
25        MR. MAIMON:  We also have evidence,

23 (Pages 86 - 89)

Page 90

1 your Honor, this document was used by J&J for its
2 specification for Johnson's Baby Powder everywhere
3 in the world including the United States and I
4 deposed one of their officials on this based just on
5 the document's fact.
6          THE COURT:  Based on the document and
7 how it reads, I'm going to admit it into evidence.
8 It does not exceed use; in other words, it's not
9 just looking outside of the country.  It's also
10 being what's specified on a global basis.
11          MS. SULLIVAN:  Thank you, your Honor.
12          (Sidebar ends.)
13          THE COURT:  This document is now
14 admitted into evidence.
15          You may proceed.
16          (Plaintiff's Exhibit 2836 was moved
17           into evidence.)
18          MR. PANATIER:  Thank you, your Honor.
19 BY MR. PANATIER:
20     Q.     This is a document you John Hopkins
21 offered, right?
22     A.     Yes, in response to a question, yes.
23     Q.     And it says, "Cosmetic grades of talc
24 to be used in Johnson & Johnson products must meet
25 standards for both mineralogical and microbial

Page 91

1 purity," correct?
2     A.     Yes.
3     Q.     That's true for the whole world,
4 correct?
5     A.     Yes.
6     Q.     Let's go down here to your bullet
7 point.  "There are, however, certain parameters for
8 which a minimum standard must be maintained on a
9 global basis."
10          "Global" includes the United States,
11 correct?
12     A.     Yes.
13     Q.     Okay.  "These consist of No. 1
14 freedom from asbestos and amphibole minerals,"
15 correct?
16     A.     Yes, that's what I wrote.  And I'm
17 happy to explain why I wrote that.
18     Q.     Well, I just want to talk about what
19 you wrote.
20          You wrote in 2005, on a global basis,
21 no asbestos and no amphibole minerals, correct, did
22 you write that?
23     A.     I wrote that.  And I'm happy to
24 explain why I wrote that to that individual in, I
25 believe, Indonesia.

Page 92

1     Q.     The truth is there is a robust
2 history of amphibole minerals in Johnson & Johnson's
3 talc that they used for baby powder, correct?
4     A.     You can find nonasbestos amphibole
5 minerals in pretty well every county in the United
6 States and you will find nonasbestos amphibole
7 material in many talc sources from around the world.
8          MR. PANATIER:  Your Honor, I'm going
9 to move to strike.
10     A.     Sorry, didn't I answer the question?
11          THE COURT:  No.  Doctor, if you could
12 please listen to the question and answer that
13 question only.
14          Why don't we do it one more time.
15     Q.     If you'll turn, please, sir, back to
16 the deposition binder, the first deposition
17 8/15/2017, Page 311.  It's, actually, 312.  Sorry,
18 these print over a page.  Page 312, starting with
19 Line 8.
20          MS. SULLIVAN:  I'm just going to
21 object because it's not inconsistent with what he
22 just said.
23          THE COURT:  I'm sorry, beginning
24 where?
25          MR. PANATIER:  Page 312/Line 8

Page 93

1 through 12.
2          THE COURT:  Objection overruled.
3          You may proceed.
4 MR. PANATIER:
5     Q.     Okay.  Doctor, I asked you this
6 question.  "We were discussing a document at the
7 time.
8          Well, he probably mentioned tremolite
9 because as we know there's a very robust record of
10 the mineral tremolite being present in the ores that
11 Johnson & Johnson uses, correct?"
12          And what was your answer?
13     A.     I'm sorry, what page are we on?
14     Q.     Page 312.
15     A.     What line?
16     Q.     Line 8 through 12.
17     A.     Okay.  Sorry.  The print is blurred.
18 Yeah.
19     Q.     Is your print "blurred"?
20     A.     Yeah, yeah.  It says, "As we know,
21 there is a very robust record of the mineral," and
22 then there's nothing.
23     Q.     Let me give you mine, if it's
24 blurred.
25     A.     Yeah, we can swap then.

24 (Pages 90 - 93)

Page 94

1    Q.    Hold on.
2    A.    See there's nothing there?
3    Q.    Yeah, here, look at my copy.
4    A.    Okay.
5    Q.    So, when I asked you, if there was a
6 robust record of tremolite in the source talc for
7 Johnson's Baby Powder, your answer was what?
8    A.    Yeah, correct, yeah.  I just said
9 that a few minutes ago.
10    Q.    There was a robust record, correct?
11    A.    Of tremolite, yes.
12    Q.    Okay.  For CTPA in 1996, 2016 your
13 global specification they all said no amphibole
14 minerals.
15        My question is tremolite is an amphibole
16 mineral, correct?
17    A.    My global specification was not a
18 global specification.
19        MR. PANATIER:  Your Honor, I'm going
20 to object as nonresponsive.
21        MS. SULLIVAN:  He didn't even answer
22 before you decided it's nonresponsive.
23        MR. PANATIER:  I asked if tremolite
24 was an amphibole.
25        THE COURT:  That response is stricken

Page 95

1 from the record.
2        Can you ask the question one more
3 time.
4        MR. PANATIER:  Yes.
5        THE COURT:  Please listen to the
6 question, Dr. Hopkins.
7    Q.    Is tremolite an amphibole?
8    A.    Tremolite is an amphibole.
9    Q.    Okay.  Anthophyllite is an amphibole,
10 right?
11    A.    Yes.
12    Q.    Actinolite is an amphibole?
13    A.    They all are, yes.
14    Q.    Chrysotile is a different type of
15 mineral, it's serpentine, correct?
16    A.    It is serpentine, yes.
17    Q.    Chrysotile -- anytime you see a
18 reference to chrysotile, we don't have to talk
19 whether it's good rock or a bad rock, that's
20 asbestos always, correct?
21    A.    Yes.
22    Q.    Sir, we have heard a little bit in
23 this case about the Battel Memorial Altitudes.
24        You're familiar with Battel, correct?
25    A.    I am, yes, yes.

Page 96

1    Q.    And you know that Battel found
2 tremolite in the Italian source or for Johnson's
3 baby powder several hundred times, correct?
4    A.    They found tremolite, not asbestos
5 tremolite.  They found tremolite, yes.
6        MR. PANATIER:  Your Honor, I move to
7 strike.  I asked whether they found tremolite.
8    A.    The answer is, yes.
9        THE COURT:  Thank you, Doctor.
10    Q.    Alright.  Alright.  Several hundred
11 times, correct?
12    A.    They found tremolite.
13    Q.    There is extensive testing
14 demonstrating tremolite in both the Italian and
15 Vermont ore, correct?
16    A.    Yeah.
17    Q.    And by the early 1970s Johnson &
18 Johnson had numerous reports of tremolite in both,
19 correct?
20    A.    Yes.
21    Q.    So I brought up Bill Ashton before
22 and I wrote down last night a series of people which
23 might help us speed this up, okay.  So can you see
24 my list of people here?
25    A.    I need my driving glasses.

Page 97

1    Q.    Yeah.  Can you --
2    A.    Yes.
3    Q.    Can you read them okay?
4    A.    I can read them, yes.
5    Q.    So, as documents come up, this might
6 help us keep track of the cast of characters, okay?
7    A.    Yes.
8    Q.    And I've entitled this, "J&J People
9 Involved in Talc Asbestos," with the caveat that
10 there are others, right?
11    A.    Probably.
12    Q.    You're not on there, right, you
13 weren't?
14    A.    Yeah, yeah.
15    Q.    So, just to get straight -- and I'd
16 love if you correct me if any of these are incorrect
17 and we can mark it out and we can make an
18 adjustment.  But let's just go through them.  This
19 will save us time moving forward as we go through
20 the documents, okay?
21    A.    Okay.
22    Q.    Is that alright?
23        Alright.  Bill Ashton, senior science, head
24 of talc, someone who you said was regarded as
25 Mr. Talc, correct?

25 (Pages 94 - 97)

Page 98

1    A.    Yes, he's an expert geologist, yes.
2    Q.    David R. Clare, he was the President
3 of J&J?
4    A.    He was at one time, yes.
5    Q.    In the '70s?
6    A.    Generally around '76, as I recollect,
7 yes.
8    Q.    Al Goudie was a J&J physician,
9 correct?
10    A.    As a scientist.
11    Q.    Was he not a physician?
12    A.    No.
13    Q.    He was not?
14    A.    I don't believe he was. I think he
15 was a scientist.
16    Q.    Okay. Well, we'll -- I'm not going
17 to mark it up. I'm going to put that in parentheses
18 because I think we might see a document on that, but
19 I'm going to write "scientist" and we'll put a
20 little question mark over "physician."
21        DD Johnston, President of J&J Baby Products
22 Company, correct?
23    A.    Yes.
24    Q.    Gavin Hildick-Smith was the Director
25 of Medical Affairs?

Page 99

1    A.    Yes, he was an MD, yeah.
2    Q.    And he was an MD, okay. We'll put
3 "MD."
4        General Johnson, there was actually -- so
5 was he a general, had he been a general?
6    A.    He was a World War II general, yes.
7    Q.    Did he have a first name?
8    A.    I can't remember. He did, obviously.
9    Q.    Yeah. I don't know it.
10    A.    I can't remember it now.
11    Q.    But they always refer to him General
12 Johnson.
13        But he's not like Johnson & Johnson Johnson,
14 is he?
15    A.    He was the grandson of the founder,
16 yes, or great grandson.
17    Q.    He was an executive, correct?
18    A.    Yes.
19    Q.    And George Lee was the Director of
20 Applied Research, true?
21    A.    Yes.
22    Q.    Tim McCarthy, he's more recent. He
23 was the Director of Toxicology for baby R&D and
24 products stewardship, correct?
25    A.    Yes.

Page 100

1    Q.    Roger Miller he was the President of
2 Windsor Minerals. That was the company that Johnson
3 & Johnson owned that mined the Vermont talc?
4    A.    The mining company, yes.
5    Q.    W. Nashed, now, do you know what his
6 first name was?
7    A.    I've forgotten. I do know, but it's
8 slipped my mind.
9    Q.    If I knew it, I would have written
10 it.
11        But Dr. Nashed, correct?
12    A.    Yes.
13    Q.    And he was the Director of Science
14 Information, true?
15    A.    Yes.
16    Q.    Okay. He had a big role when it came
17 to talc and asbestos, did he not?
18    A.    He was a coordinator. He was kind of
19 a central point and correspondence would go in and
20 go out.
21    Q.    D.R. Petterson medical director baby
22 products, right?
23    A.    He was, yes.
24    Q.    Robert Rolle, Assistant Director
25 Analytical Research Baby Powder Products, true?

Page 101

1    A.    Yes.
2    Q.    John Scheltz he was the CTPA task
3 force chairman on the committee to develop J4-1,
4 correct?
5    A.    He was 1 of 20 people on that
6 committee, yes.
7    Q.    He was the chairperson?
8    A.    He was chairperson, yes.
9    Q.    Bruce Semple, he's more recent,
10 correct?
11    A.    Yeah, he's an MD.
12    Q.    And he was a medical director?
13    A.    He was at one point, yes.
14    Q.    T.H. Shelley Research Director,
15 right?
16    A.    He was, yeah.
17    Q.    Lorena Telofski more recent again,
18 she's the scientific engagement leader, correct?
19    A.    Well, that's the title you've got
20 there. I don't know what the current title is but,
21 yes. I'll not argue.
22    Q.    In fairness, there's some documents
23 in the mid 2000s that she's uses the NATRA title at
24 the time, okay?
25    A.    Okay, yeah.

26 (Pages 98 - 101)

Page 102

1      Q.      Charles -- I can't say that --
2   W-a-h-s-c-z-u-k?
3      A.      I think it's pronounced Wajsczuk, but
4   I don't know him.
5      Q.      Okay, great; medical Safety Officer,
6   right?
7      A.      Yeah.
8      Q.      Okay.  Alright.  So this might help
9   us keep our bearings as we move forward.
10         Now, sir, Johnson & Johnson understands that
11   talc, specifically, for use on babies but really for
12   all purposes has no medicinal benefit, right?
13      A.      It's not a therapeutic medicinal, no,
14   there's no --
15      Q.      It doesn't have --
16      A.      It doesn't treat nor cure disease.
17      Q.      It doesn't have any health benefits?
18      A.      It helps cool the skin and keeps the
19   skin from chaffing.  It's -- call it dry lubricant.
20   The talc particles slide over each other so they
21   help stop chaffing but --
22      Q.      Okay.  Other than that --
23      A.      -- it's not medicinal, I don't know.
24      Q.      Other than chaffing, does it have any
25   health benefits, sir?

Page 103

1      A.      I'm not aware of any curative --
2   disease curative benefits, no.  It's a skin dry
3   lubricant.
4      Q.      You can turn, please, sir, it's going
5   to be in the big binder to June 17, 1966.  It should
6   be near the front.  Here it is.
7         Now, first of all, Johnson & Johnson refers
8   to the baby powder.  It's an important product to
9   Johnson & Johnson, right?
10      A.      Yes, it's been sold for over hundred
11   years.
12      Q.      It's not one that they ever made -- I
13   mean, they ever made a ton of money from relatively
14   speaking, right?
15      A.      No, virtually none.
16      Q.      It was far more important to Johnson
17   & Johnson in terms of reputation, correct?
18      A.      Yes, it was a historical product.
19      Q.      Johnson & Johnson?
20      A.      From the 1890s.
21      Q.      I'm sorry?
22      A.      From the 1890s.
23      Q.      Johnson & Johnson referred to the
24   baby powder as their flagship product, correct?
25      A.      I've seen that expression, yes.

Page 104

1      Q.      They referred to it as the
2   cornerstone of their baby products franchise,
3   correct?
4      A.      It was the first baby product, yes.
5      Q.      They've even referred to it as the
6   sacred cow, right?
7      A.      I've heard that expression from one
8   individual.
9      Q.      Right; in the Johnson & Johnson
10   documents, true?
11      A.      Yes.
12      Q.      Okay.  So let's look at this document
13   it's dated 1966.  It is from W.H. Steinberg to Gavin
14   Hildick-Smith, okay, Director of Medical Affairs,
15   correct?
16      A.      Yes.
17         MR. PANATIER:  Alright.  I'm going to
18   offer this into evidence, your Honor, Exhibit 2360.
19         MS. SULLIVAN:  Your Honor, this was
20   in limine issue and it's also --
21         THE COURT:  Sidebar.
22         (Sidebar.)
23         THE COURT:  What's the in limine
24   issue?
25         MS. SULLIVAN:  This was other adverse

Page 105

1   -- it's like a cancer -- this is the asphyxiation
2   issue.  It has nothing to do with mesothelioma.
3   These are the kids that choked or asphyxiated
4   because of the blocking air, yeah, from the powder.
5   It's a 403 issue and it's also hearsay, of course.
6         MR. PANATIER:  First of all, it's
7   here to -- to address hearsay within hearsay goes to
8   notice.
9         Second of all, as far as the overall
10   safety --
11         THE COURT:  Wait a minute.  One
12   person at a time.
13         MR. PANATIER:  Overall safety Counsel
14   for Johnson & Johnson brought this up in opening
15   statement.  She said the product is safe and it goes
16   to the fact that if they had heeded the doctor's
17   warnings for whatever reason and they stopped
18   selling the product, we don't have this case.
19         MS. SULLIVAN:  This is --
20         THE COURT:  So that's the issue?
21         MR. PANATIER:  That's correct.
22         THE COURT:  Thank you.
23         MS. SULLIVAN:  This is notice as
24   asphyxiation from blocking.  It has nothing to do
25   with cancer and mesothelioma.

27 (Pages 102 - 105)

1        MR. PANATIER:  Great point.  It's
2  actually --
3        MS. SULLIVAN:  And it's hearsay.
4  This is hearsay within hearsay.
5        MR. PANATIER:  Actually, in opening
6  Counsel argued that they put warnings on because
7  babies would poured it over their faces.
8        THE COURT:  Okay.  I'm going to allow
9  it.  It goes to the issue of notice.
10        Now having said that, this is not
11  what you pointed to Ms. Sullivan's opening statement
12  but it does not open the door --
13        MR. PANATIER:  To anything.  No, not
14  I'm not doing that.
15        THE COURT:  I want to be clear on
16  that.
17        And in terms of the hearsay upon
18  hearsay, so this is commenting upon an article in
19  (INAUDIBLE) corporate of spokesperson what issue
20  that you are looking to point out is, is what?
21        MR. PANATIER:  Is the hazard that
22  they were aware of, your Honor.
23        MS. SULLIVAN:  Which had nothing to
24  do with cancer.
25        MR. PANATIER:  It has no health

1  benefit, which we are talking about.
2        MR. SULLIVAN:  Which he's already
3  testified --
4        THE COURT:  Thank you.
5        MS. SULLIVAN:  Thank you, your Honor.
6        MR. PANATIER:  Thank you.
7        (Sidebar ends.)
8        MR. PANATIER:  It's 2360, your Honor.
9        THE COURT:  Yes, now admitted into
10  evidence.
11        (Plaintiff's Exhibit 2360 was moved
12        into evidence.)
13     Q.     Now, sir, let's take a peak at this
14  together.  It says, "subject Johnson's baby powder
15  talc aspiration."  That means breathing in, right?
16     A.     In context, it's blocking your nose,
17  yes.
18     Q.     "Reference is made to the attached
19  note from Mr. J. Detry forwarding an article by Drs.
20  Hughes and Colmer which appeared in June 1966
21  American Journal of Diseases of Children.  Baby
22  powder represents the cornerstone of our baby
23  products franchise.  In addition we have a large
24  investment in the talc mine."
25        At this point they had already bought the

1  Vermont mine, correct?
2     A.     Yes.
3     Q.     So "the cornerstone of our baby
4  powder's franchise" and "we have a large investment
5  in talc mine," Mr. Steinberg felt were important to
6  state when discussing this article about the
7  aspiration of talc for children, correct?
8     A.     Yeah, you read what was written.
9     Q.     And he quotes the article.  "In
10  conclusion, it is strongly urged that talcum powder
11  be removed from the environment of children and that
12  the traditional association of talcum powder and
13  babies be abandoned.  It has no medicinal value
14  wherever placed.  It serves as a foreign body and,
15  at least, three deaths in an unknown morbidity of
16  resulted from this talcum powder."
17        Now "morbidity" means sickness or illness,
18  correct?
19     A.     Yes.
20     Q.     Okay.  He writes, "Would it be
21  possible for us to initiate basic work to explore
22  this phenomenon either to obtain data to refute this
23  problem or to develop mechanisms to reduce the
24  hazard?"  Is that what he writes?
25     A.     Yes.  He commented on what was

1  written in the American Journal of Disease of
2  Children and then wrote what you read, yeah.
3     Q.     Okay, okay.  So Johnson & Johnson was
4  aware that doctors were recommending against the use
5  of baby powder as of 1966, true?
6     A.     Well, these particular doctors
7  responding to cases where children had choked or got
8  powder on their nose would breathe that comet.  So
9  that is noted in the Johnson's files, yes.
10     Q.     When did Johnson & Johnson first add
11  a safety lid to prevent that to its baby powder?
12     A.     A safety lid?
13     Q.     A safety cap to prevent from children
14  opening it and pouring on their faces and aspiring
15  talc?
16     A.     Well, there's always been a lid with
17  little holes in.  The issue is the size of the
18  holes.
19     Q.     Yeah.
20     A.     Yeah.
21     Q.     So is there a safety lid?
22     A.     As of today?
23     Q.     Yes.
24     A.     Well, there's -- the holes are
25  structured in a certain way that getting a large

28 (Pages 106 - 109)

Page 110

1 amount tipped on your face shouldn't happen. The
2 holes are certain tiny size and you have to turn it.
3     Q.    All there is the twisty we're all
4 familiar with?
5     A.    Yeah, yeah.
6     Q.    Let's skip ahead to 1976. That one
7 was 1966. If you'll turn to March 22, 1976, it
8 might be in Binder 2. Here you go.
9         MR. PANATIER: Your Honor, I have the
10 bad news of delivering you another binder.
11     Q.    Dr. Hopkins, let me just find this
12 one for you.
13     Dr. Hopkins, this is a document that you and
14 I have gone over before, true?
15     A.    Yes.
16     Q.    Okay. That is dated March 22, 1976
17 and it's a memo from Bruce Semple, Medical Director.
18 And it is to D.R. Petterson or Petterson, yeah,
19 medical director of, correct, baby products?
20     A.    Yeah.
21     Q.    And it is about a phone dialogue with
22 someone at NIOSH, correct?
23     A.    Yes.
24     Q.    NIOSH is the National Institute for
25 Occupational Safety and Health, true?

Page 111

1     A.    Yes.
2         MR. PANATIER: Your Honor, at this
3 time, we offer this into evidence 2594.
4     MS. SULLIVAN: No objection.
5     THE COURT: So admitted.
6         (Plaintiff's Exhibit 2594 was moved
7         into evidence.)
8     Q.    So this phone call they had was with
9 D.H. Groth, Doctor -- chief of the pathology
10 section, correct?
11     A.    Yes.
12     Q.    And to get our bearings, the J&J
13 person, this was Bruce Semple, says, "I identified
14 myself and the reason for phoning. He was pleasant
15 and cooperative. He recalled being phoned around
16 Wednesday, March 17th, '76 by a woman who he thought
17 was a Cincinnati newspaper. She said that she had
18 called Dr. Arthur Langer to inquire about nickel in
19 talk. He used the Christian name Tom for Langer and
20 first and then corrected it in the manner that would
21 lead one to suspect that he does not know Langer.
22 Langer had referred her to Groth as an expert in
23 trace medical toxicology. So we're talking about a
24 phone call that this reporter had with brother at
25 NIOSH, right?

Page 112

1     A.    Yes.
2     Q.    Okay. Let's skip down here. "She
3 then asked him about asbestos and he said that this
4 was a different problem and that he would not
5 recommend using talc on babies because of the
6 possibility of asbestos inhalation regardless of the
7 contamination level. He felt that this would
8 constitute an unnecessary risk."
9         MS. SULLIVAN: Can I just ask in the
10 interest of completeness, your Honor, that Counsel
11 read the next two lines as well.
12     Q.    "He seemed quite surprised when I
13 informed him that there was no asbestos in JBP and
14 that Langer himself agreed. We then discussed the
15 safety of pure talc and he affirmed that at the
16 cosmetic use exposure levels he did not believe that
17 there would be a safety problem." Did I read that
18 right?
19     A.    You did, yes.
20     Q.    Now, we're going to get to Dr.
21 Langer. And Dr. Langer -- are you here to say that
22 Dr. Langer retracted his results about asbestos in
23 Johnson's Baby Powder, or have you changed that
24 opinion?
25     A.    Dr. Langer published a paper with his

Page 113

1 colleague Dr. Rolle in 1976 where he gave the
2 results of his studies on Johnson's powder and many
3 other powders.
4     Q.    We'll discuss that.
5     Bottom line is Dr. Groth, NIOSH, 1976 says,
6 talcum powder shouldn't be used on babies, right?
7     A.    That's what he said based on his
8 misunderstanding.
9     Q.    "Based on his misunderstanding"?
10     A.    Yeah, because he thought mistakenly
11 that the possibility of asbestos inhalation.
12         (There is a discussion off the
13         record.)
14     THE COURT: Let's go off the record.
15     (Recess taken 11:38 to 11:40 p.m.)
16     THE COURT: Let's go back on the
17 record.
18     Whenever you're ready to continue.
19     MR. PANATIER: Sure.
20 BY MR. PANATIER:
21     Q.    Doctor, you're aware that Dr. Langer
22 tested Johnson's Baby Powder a number of times,
23 right?
24     A.    Yes.
25     Q.    And you're saying that in 1976 he

29 (Pages 110 - 113)

Page 114

1 published a paper where he did not report Johnson --
2 asbestos in Johnson & Johnson's, true?
3     A.    Yes, his peer reviewed scientific
4 publication with Dr. Rolle did not report asbestos
5 in baby powder.
6     Q.    You know that earlier he actually
7 brought Johnson & Johnson to his offices in Mount
8 Sinai and showed him the asbestos in earlier
9 samples, correct?
10     A.    Well, what I'm saying is when he did
11 his earlier experiments, he mistakenly claimed to
12 have found asbestos.  When he learned how to do his
13 test methods properly, he did not find it and that
14 was the data he published.
15     Q.    So you're saying that he retracted
16 his results?
17     A.    I'm not using the word retraction.
18 You're putting words there.
19     What I'm saying is that when he published
20 his final publication in a peer reviewed scientific
21 journal, he did not claim to have found asbestos in
22 Johnson's Baby Powder.
23     Q.    You know that those were two
24 different samples, two bottles, different samples,
25 than what he tested in '71, correct?

Page 115

1     A.    What he tested in '71 was when he was
2 developing his methodologies, by the time he had
3 learned how to do his technique correctly.  He was
4 not finding asbestos in -- not only Johnson's
5 powders, but others he was looking at.
6     Q.    Is it your testimony that Dr. Langer
7 maintained that he did not find asbestos then in
8 Johnson's Baby Powders?
9     A.    He wrote to -- an article to the, I
10 think, it was the New York Times where he claimed he
11 was mistaken and he did not find it.
12     Q.    If you can turn please, sir, to the
13 tab December 12, 2018.  It should be in the thin
14 binder.  Hold on.  I'll find it.
15     Okay.  Yep.  Here it is, right here.  It's
16 that tab right there.
17     And I just want you to turn to the page
18 marked 6-10.  See at the bottom, bottom right, they
19 say page number, out of ten?
20     A.    Yes, yes, I have that.
21     Q.    Go to 6 of 10.
22     A.    Yes.
23     MS. SULLIVAN:  Your Honor, can we
24 have a sidebar on this?
25     THE COURT:  Yeah, sure.

Page 116

1     (Sidebar.)
2     MS. SULLIVAN:  Your Honor, this is
3 the Reuters article from last year.  It's written by
4 both -- the New York Times were speaking to the
5 Plaintiffs' lawyers.  It has a picture of Martin
6 Lear (phonetic) attached to it.  It is -- he's going
7 to ask about hearsay.  It's not an ancient document.
8 He's going to ask what was said (INAUDIBLE) --
9 what's in the article.  It is completely improper
10 and I believe it's inadmissible (INAUDIBLE).
11     MR. PANATIER:  Your Honor, if I can,
12 first of all, this isn't Reuters.  This is the New
13 York Times.
14     Second of all, Dr. Langer -- Dr.
15 Hopkins just quoted saying Dr. Langer in the New
16 York Times was quoted as saying that he was
17 mistaken.  The quote that I'm interested right
18 here -- I'm not going to show pictures of Mark
19 Lear -- is right here.
20     THE COURT:  "In a recent interview,
21 Mr. Langer told the Times that Dr. Chalmers only
22 spoke for himself and for the institution, not our
23 research group.  He reiterated that his team had
24 detected asbestos in Johnson's Baby Powder.  I stand
25 by that today absolutely."

Page 117

1     MR. PANATIER:  That's all.
2     MS. SULLIVAN:  That's hearsay, your
3 Honor.  There's no exception.  It's 2018.
4     THE COURT:  Well -- right.  The
5 witness testified with regard to the New York Times
6 article referring to a letter to the editor --
7     MS. SULLIVAN:  It's during the '70s.
8     THE COURT:  -- that the Jury has
9 already seen.
10     MR. PANATIER:  That's correct.
11     THE COURT:  The same could be made by
12 the Court, admitted by the Court.  And based upon
13 his response, the Court will allow only this portion
14 of it to be shown.
15     MR. PANATIER:  So we'll offer it
16 subject to redaction.
17     THE COURT:  Yes.
18     MS. SULLIVAN:  And, your Honor, this
19 is not -- the prior argument is to hearsay
20 statements, such as ancient document and statement
21 against interest.  This meets neither.
22     MR. PANATIER:  This is to impeach the
23 witness's statement.
24     THE COURT:  I'll allow it for
25 impeachment purposes only.  Thank you.

30 (Pages 114 - 117)

1        (Sidebar ends.)
2 BY MR. PANATIER:
3     Q.    Have you found Page 6 of 10, sir?
4        THE COURT: Sir, subject to the
5 Court's ruling, this document, portions of it, are
6 now admitted into evidence.
7        (Plaintiff's Exhibit 3162 was moved
8      into evidence.)
9        THE WITNESS: Yes.
10 BY MR. PANATIER:
11    Q.    Okay. And just for purposes of
12 understanding what we're looking at, this is a New
13 York Times article --
14       THE COURT: I'm sorry. What was the
15 marking of this? I apologize.
16       MR. PANATIER: This one is 3162, your
17 Honor.
18       THE COURT: Thank you.
19 BY MR. PANATIER:
20    Q.    This is a New York Times article from
21 December of 2018, right, if you look at the front
22 page?
23    A.    Yes.
24    Q.    Okay. And let's go here to Page 6 of
25 10. You see where it says, "In a recent interview,

1 Mr. Langer told the times that Dr. Chalmers spoke
2 for himself and for the institution not our research
3 group. He reiterated that his team had detected
4 asbestos in Johnson's Baby Powder. I stand by that
5 today absolutely, he said." Do you see that?
6    A.    I see what is written in that
7 discussion with the New York Times.
8    Q.    Do you accept that Mr. Langer gave
9 this interview to the New York Times and he stated
10 that?
11    A.    Look, I said you read what was
12 written in an interview with the New York Times.
13    Q.    And what Dr. Langer said was that
14 they had found asbestos in the baby powder and that
15 he stands by it today, right?
16    A.    That's what he said.
17    Q.    Okay.
18    A.    Yes.
19    Q.    If you'll turn to the document marked
20 1959. It's in the big fat one right towards the
21 front. It just says "1959" on it. So it should be
22 fairly early. Here, let me help you.
23    A.    I've got it. No worry.
24    Q.    That's not it.
25    A.    That's not it.

1    Q.    It just says "1959" on it. So just
2 the tab should just say -- there you go, right
3 there. Well, that's my fault. You don't have one.
4 Here, I'm going to let you look at it briefly and
5 then we'll --
6        THE COURT: I'll give the witness
7 mine.
8        MR. PANATIER: Okay. Thank you, your
9 Honor. I'm sorry, sometimes they don't get copied
10 over.
11       THE COURT: That's alright.
12       Here you go, Dr. Hopkins.
13       THE WITNESS: Thank you, your Honor.
14 BY MR. PANATIER:
15    Q.    Thank you.
16    Alright. Dr. Hopkins, I'm sorry for that.
17    This is a February 17, 1959 memo that you
18 and I have gone over before, correct?
19    A.    Yes.
20    Q.    It's about a trip that Johnson &
21 Johnson took to Italy to the mine where they got the
22 Italian talc, right?
23    A.    Yes.
24    Q.    Okay.
25       MR. PANATIER: Your Honor, at this

1 time we offer Plaintiff's Exhibit 2345 into
2 evidence.
3        MS. SULLIVAN: No objection.
4        THE COURT: So admitted.
5        (Plaintiff's Exhibit 2345 was moved
6      into evidence.)
7    Q.    Okay. So here we go. This is the
8 memo and it says, "Important persons interviewed
9 titles and organizations represented: Nick Massey,
10 Johnson & Johnson; Dr. Stefano, MD, son-in-law of
11 Charles Matthew, Matthew & Company is sole North
12 American agent for Balcizone."
13    So Charles Matthew isn't a person, at least,
14 here, it's a company, correct?
15    A.    Yes.
16    Q.    And they imported the Italian talc
17 that Johnson & Johnson was using in the US, true?
18    A.    Yes.
19    Q.    Now, we're going to talk about Dr.
20 Stefano later, so I want to make sure we know who he
21 is.
22    He's the son-in-law of the owner of
23 Charles Matthew, correct?
24    A.    That's what it says.
25    Q.    His wife is the chief stockholder in

31 (Pages 118 - 121)

1 the company, true?
2    A.    That's what it says.
3    Q.    Okay.  Now, we're going to talk about
4 some of these studies, these Battelle studies.  So I
5 want to get our bearings on what was being looked
6 at.
7        So, if you go to synopsis, it says, "The
8 owners, mills and high grade mine of the Society
9 Talco Val Chisone were visited.  It was learned that
10 all of the high grade talc comes from one mine with
11 rare exception.  It was also learned that Grade 2 is
12 the same of run of mine and that Grade 1 is not a
13 specifically hand selected product."
14      So Grade 1 and 2 are both coming from --
15        MS. SULLIVAN:  It's not
16 "specifically."
17    Q.    "It's not especially a hand selected
18 product."
19        MR. PANATIER:  Thank you.
20    Q.    Correct?
21    A.    That's what's written, yes.
22    Q.    And they're coming from the same
23 mine, correct?
24    A.    One is run of mine, which means it's
25 kind of the end of the day stuff that's coming off

1 that's supposedly the premium.  "Run of mine" is a
2 manufacturing term.
3    Q.    Okay.
4    A.    They're different.
5    Q.    They're both coming out of the same
6 mine?
7    A.    Yes.
8    Q.    Go ahead and turn the page, if you
9 will, sir.
10        It says, "The Val Chisone company
11 brings in millions of dollars per year, much of
12 which goes to the personal fortunes of the
13 stockholders."
14        And is it, in Italian, do you know if it's
15 villa or villa?
16    A.    Villa.
17    Q.    "The Villa family is very wealthy and
18 holds a unique position in the modern world.  It
19 controls the Germanasca Valley in an almost futile
20 sense.  The Val Chisone miners were worried lest we
21 had found poisonous minerals in the talc or had
22 otherwise displeased.  When told we merely had
23 a scheme for improving their excellent talc, they
24 were most anxious to cooperate."
25        "Massey" -- now he's with J&J, right?

1    A.    Yes.
2    Q.    (Continuing.) "Explained that our
3 problem was not a matter of dissatisfaction but that
4 about one-third of the doctors are presently
5 advising against the use of baby talc in as much
6 starches and oils have a greater purity and there is
7 no dangerous dust to inhale."  Now, let's stop
8 there.
9        We have now this is 1959.  They're reporting
10 that one-third of doctors are recommending against
11 baby talc, true?
12    A.    Well, that's what's written.
13    Q.    Well, that's what the Johnson &
14 Johnson person said, true?
15    A.    Yes, that's what's written, yes.
16    Q.    Okay.  We saw that again in 1966,
17 seven years after this, right?
18    A.    Well, we saw that three -- two
19 doctors had written into the American Baby Journal
20 not to use talc, yes.
21    Q.    I'm just asking if we saw that in
22 '66?
23    A.    We did, yes.
24    Q.    And we saw it again in 1976 with
25 NIOSH, true?

1    A.    You need to refresh my mind on that.
2    Q.    That was the growth conversation.
3    A.    The growth, yeah -- well, he then --
4 I did a little more in that paragraph where you had
5 not yellow highlighted where he explained that he
6 was not so concerned and you read that out to me.
7    Q.    And then we established what Langer
8 still maintains, correct?
9    A.    You established what he wrote or
10 spoke in an interview to the New York Times,
11 correct.
12    Q.    "Massey explained that J&J has no
13 desire to get into the mining business."  And that
14 was true for another five years, right?
15    A.    Yes, yes.
16    Q.    Because they did get into the mining
17 business, right?
18    A.    Yes.
19    Q.    "Its objective is to produce a
20 superior powder to reverse the present market trend,
21 which is away from talc," right?
22    A.    Yes.
23    Q.    So they wanted to strengthen the
24 position of talc in the market, true?
25    A.    Well, you can only comment on what it

32 (Pages 122 - 125)

Page 126

1 says. The objective is to produce a superior
2 powder.
3      Q.     Okay. If you will, sir, turn to
4 Page 4. It's at the top. And they discuss this
5 whole run of mine and all of this. "When the whole
6 run of mine ore both chunks and fine is ground, it
7 is designated Grade 2. Grade 2, therefore, is the
8 same as run of mine. When primarily coarse chunks
9 are grounded, it's designated Grade 1. The logic in
10 the operation appears to be that whereas the coarse
11 contaminants have been removed at the picking shed
12 at the mine, the contaminants which are in the fine
13 particles are necessarily overlooked. Hence,
14 milling primarily coarse run of mine ore produces a
15 slightly purer product Grade 1 than does the milling
16 of the whole run of mine ore both chunks and fines
17 Grade 2."
18      Okay. So we've got Grade 1, Grade 2?
19      A.     Yes.
20      Q.     Let's look at some test results.
21 This one will be in the big binder May 23, 1958.
22      MR. PANATIER: Your Honor, this is
23 Exhibit 2344. It's already in evidence.
24      THE COURT: What was the date of?
25      MR. PANATIER: This one is May 23,

Page 127

1 1958.
2 BY MR. PANATIER:
3      Q.     You found that, sir?
4      A.     Uh-huh, yes.
5      Q.     Alright. This is a Battelle report,
6 right? What it looks like they're doing -- they're
7 studying the talc ores, right?
8      A.     Yeah, it's a study on floatation.
9      Q.     Right. "Floatation" is the process
10 that Johnson & Johnson was using only on the baby
11 powder, not on its industrial products, correct?
12      A.     Yes.
13      Q.     Okay. You can see here they say,
14 "Italian No. 2 talc likewise responded favorably to
15 floatation. The two methods were developed which
16 yielded products that contained 96 to 97 percent
17 platy talc and 2 to 3 percent fibrous talc.
18 Mineralogically, these products are superior to the
19 Italian No. 1 talc, which is being used by J&J for
20 baby powder," correct?
21      A.     Yes.
22      Q.     So floating the No. 2 they've got
23 something that was better than what J&J was already
24 using, right?
25      A.     Better than non-floated, yes, yes.

Page 128

1      Q.     So let's see what they found in this.
2 And can you just look up here. This is Table 1.
3      A.     Yeah.
4      Q.     Do you see here, sir, where they look
5 in the Italian No. 2 and No. 1 and they find
6 anywhere from 1 to less than 1 percent to trace
7 tremolite?
8      A.     Tremolite, yes.
9      Q.     Right, the mineral, correct?
10      A.     The mineral tremolite, yes.
11      Q.     Yes. And, of course, there are many
12 many many minerals, accessory minerals associated
13 with talc, correct?
14      A.     Yes, in the mine you get carbonates,
15 chalk.
16      Q.     Yes.
17      A.     Yeah, magnesium carbonate, calcium
18 carbonate.
19      Q.     There's dozens of accessory minerals
20 that are present often in the talc, correct?
21      A.     Not sure about "dozens." But,
22 certainly, probably into double figures you can
23 get --
24      Q.     Okay, double figures.
25      A.     -- different minerals, yes. It

Page 129

1 depends on the mine.
2      Q.     The three -- well, it looks like
3 three are picked out by the talc to focus on. The
4 talc, the carbonates and tremolite, right?
5      A.     Yes.
6      Q.     Now, they didn't include all the
7 other potential accessory minerals, right, they only
8 focused on these three, true?
9      A.     Well, if you add up 48, 43, 5 and 4
10 that's pretty well everything.
11      Q.     Let me ask you this.
12      Was the finding of tremolite something that
13 was good news to Johnson & Johnson?
14      A.     It wasn't bad news cause the other
15 studies had shown that the tremolite was the
16 harmless block form, the rod form.
17      Q.     This should have been rejected,
18 right, because there was amphibole, right?
19      A.     Not necessarily. Because back in --
20 even as far back as the late 1940s, the company was
21 using optical microscopy methods to look at the
22 talc. It wasn't just X-ray diffraction. In fact,
23 I'm not even sure X-ray diffraction was being used
24 much at that time. The results, of course --
25      MR. PANATIER: I'm going to object as

33 (Pages 126 - 129)

Page 130

1 nonresponsive, your Honor, move to strike.
2          MS. SULLIVAN:  Your Honor, he's
3 answering the question.
4          THE COURT:  Objection overruled.
5 BY MR. PANATIER:
6     Q.    Page 4, Table 2.  They find more
7 tremolite, right, in Italian 2 and Italian 1,
8 correct?
9     A.    Oh, I got the wrong page.  What page
10 is this?
11    Q.    Page 4.
12    A.    Yes.
13    Q.    Okay.  I'm just going to go through
14 this.  You probably -- you can just look at the page
15 up here, if it will be quicker for you.
16    Page 7, Table 5, they find more tremolite in
17 the Italian No. 11 and Italian No. 2, right?
18    A.    Yes.
19    Q.    That's -- the Italian 1 is the stuff
20 they are then using, right?
21    A.    Yes.
22    Q.    We know from the visit to the mine
23 that both Italian 1 and Italian 2 are coming from
24 the same source ore, correct?
25    A.    From the Fontana mine, yes.

Page 131

1     Q.    Yes.  If you turn to Page 10, four
2 more results with tremolite, correct?
3     A.    Yes.
4     Q.    If you turn to Page 14, there is
5 another result for tremolite for Italian 1 and
6 Italian 2, true?
7     A.    Yes.  There is trace of tremolite in
8 Italian talc, yeah.
9     Q.    Well, there it's full 2 percent and
10 under 1 percent, correct?
11    A.    On floated talc, it's less than one
12 per -- less than one, yes.
13    Q.    And then if you turn to the Appendix
14 A1 and A2, they run a bunch of tests on these,
15 right?
16    A.    Yes.
17    Q.    And they find tremolite numerous
18 times.  Can we agree on that?
19    A.    They do.  They find a mineral called
20 tremolite, yes.
21    Q.    Okay.  Sir, if you'll turn to
22 May 9th, 1958.
23          MR. PANATIER:  This is in evidence,
24 your Honor.  This is Exhibit 2343.
25 BY MR. PANATIER:

Page 132

1     Q.    Alright, sir.  We're just going to
2 look at this one briefly.  This is from 1958,
3 May 9th.  And it says that, "In the grit from this
4 talc," they say, "it occurs as aggregates of talc
5 and contaminants as acicular" -- and "acicular"
6 means needlelike, correct?
7     A.    Yes.
8     Q.    (Continuing.)  "And fibrous particles
9 of talc and amphibole as shards of granules of
10 amphibole or carbonate and titanite, rutile, zircon,
11 apatite and other accessory minerals."
12          Those would be some of those other
13 minerals that sometimes appear in the talc, true?
14    A.    Yes.
15    Q.    And then down at the bottom it says,
16 "The Italian No. 1 contains from less than 1 percent
17 to about 3 percent of contaminants.  The
18 contamination is natural and consists mostly of
19 carbonate with minor amphibole and rare accessory
20 minerals."
21    And down here you can see it says, "The
22 amphibole component has been established to be the
23 variety tremolite," right?
24    A.    Yes.
25    Q.    And, of course, if you look in the

Page 133

1 introduction page here, it says, "This is Russell's
2 copy," okay.  And I don't think that I have R.S.
3 Russell up here.
4          But who is R. Russell?  Who is Robert
5 Russell?
6     A.    Bob Russell was a scientist in the
7 research department.
8     Q.    Okay.  I'm just going to but Russell
9 as a scientist.
10    So it says this is his copy.  So he's
11 received this, right?
12    A.    Yes.
13    Q.    Okay.  You can set that aside, sir,
14 or if you're ready to turn to the next page.
15    Let's do July 31st, 1959.  This was
16 discussed last week.  This one is in evidence and
17 it's 2346.
18    This is, again, another Battelle study from
19 July 31st, 1959, correct?
20    A.    Yes.
21    Q.    And, again, sir, you're testing the
22 floatation and they're finding tremolite again and
23 again, correct?
24    A.    Yeah, you find tremolite, yeah.
25    Q.    Okay.  You see here they find it and

34 (Pages 130 - 133)

Page 134

1 they note that it's largely fine acicular particles.
2      "Acicular" means needlelike, right?
3      A.    Well, it's like the old Greek word,
4 yeah, I mean, it's like the shape of my pen.
5      Q.    Okay.  If you go to Page 32, although
6 you can just look up here.
7      There's many more results finding tremolite
8 over and over and over again, correct?
9      A.    You will find trace of tremolite in
10 Italian talc.
11      Q.    Johnson & Johnson absolutely knew
12 that tremolite was a consistent mineral that was
13 present in the Italian talc, correct?
14      A.    Yes, it's one of several minerals
15 that are present in talc.
16      Q.    Right, I mean, we can look through
17 this.  We are going to find it more often than not,
18 aren't we?
19      A.    You'll find it occasionally, yeah.
20      Q.    Okay.  Here it is, again, okay.
21 Johnson & Johnson received these tests and knew
22 about them, correct?
23      A.    Yes.
24      Q.    Let's go to December 31st, 1959.
25      MR. PANATIER:  This will be

Page 135

1 Exhibit 2349.  This is already in evidence, your
2 Honor.
3 BY MR. PANATIER:
4      Q.    Another Battelle study and I'm almost
5 done with the Battelle studies.  You see that,
6 December 31st, '59?
7      A.    Yeah.
8      Q.    And, again, sir, they found more and
9 more results for tremolite in the ore, correct?
10      A.    Yeah, yes, tremolite.
11      Q.    If you go to the very last page,
12 again, it's kind of small type.  But you can see
13 over and over again -- by the way, when it says,
14 less than one, that's not the same as trace,
15 correct, because when they find trace, they mark
16 trace, true?
17      A.    Sometimes they mark trace, yeah.  And
18 sometimes they mark less than one.
19      Q.    Okay.
20      A.    Yeah.
21      Q.    And they're not reporting on all
22 those other accessory minerals, the apatite, the
23 titanite, the other ones, they're reporting on
24 tremolite, dolomite and talc?
25      A.    They are.  But when you add up

Page 136

1 horizontally, that pretty well comes to a hundred.
2      Q.    Okay.
3      A.    Between platy, non-platy, yeah.
4 That's pretty well everything there.  So it doesn't
5 mean you're going to get apatite or rutile or any of
6 the minerals in those particular samples.
7      Q.    Next one -- go to -- this says
8 March 8th, 1960.  And this one is in evidence as
9 2350.
10      You see this is pilot plant
11 beneficiation of Italian run of mine talc,
12 March 8th, 1960, right?
13      A.    Yes.
14      Q.    Okay.  Let's just go to one of their
15 tables where they do characteristics of talc
16 products.  Tremolite, they find it in every single
17 one, right?
18      A.    What table is that?
19      Q.    This is Table 8.
20      A.    Yes, they report tremolite.
21      Q.    And, of course, they find it in a
22 Johnson & Johnson shelf product that was a sample
23 from 1958, right?
24      A.    August '58, yes.
25      Q.    Okay.  So we know -- they know by

Page 137

1 now, this is 1960, certainly, that even if they
2 benefitiate, they float the talc, that tremolite
3 makes it through that process and even into the
4 final product, right?
5      A.    Yes, if they -- yes.
6      Q.    Johnson & Johnson knew there was
7 tremolite unequivocally in the source ore and in the
8 final product, correct?
9      A.    Tremolite, yes, tremolite.
10      Q.    Yes, I understand.
11      A.    Yeah.
12      Q.    If you will turn, sir, to -- it
13 should just be marked 2,000.  So it's probably in
14 that final binder.  It should be marked 2,000 and
15 it's in that last binder.  Let me know when you have
16 it.
17      A.    Yeah, we have it.
18      Q.    Can you see, sir -- you know what
19 interrogatories are, right?
20      A.    Yes.
21      Q.    Interrogatories are questions in a
22 lawsuit where one person asks questions of the other
23 and the other has to answer them under oath, just
24 like you've taken the oath in a courtroom, right?
25      A.    Yes.

35 (Pages 134 - 137)

1    Q.    Okay.  And these are Johnson &
2 Johnson's answers to interrogatories filed here in
3 Middlesex County, right?
4    A.    Yes.
5    Q.    Okay.  In the Krishinsky case, do you
6 see that?
7    A.    Yes.
8    Q.    And if you go to the end, go to very
9 end, the last page, you'll see that there's a
10 certification by the person from Johnson & Johnson
11 who answered those interrogatories, Nancy Musco.  Do
12 you see that?
13   A.    I see that, yes.
14   Q.    And this is signed May 23, 2000,
15 right?
16   A.    Yes, it is, yeah.
17   Q.    That's 40 years give or take after
18 most of the Battelle studies we saw, right?
19   A.    Yes.
20   Q.    Okay.
21         MR. PANATIER:  Your Honor, we offer
22 these into evidence, Exhibit 3173.
23         MS. SULLIVAN:  I believe your Honor
24 has already ruled on this.
25         THE COURT:  Can I see you at sidebar.

1         (Sidebar.)
2         MS. SULLIVAN:  Your Honor, we have --
3         THE COURT:  Wait, wait, wait.  I
4 didn't hear you.  Just get closer.
5         MS. SULLIVAN:  Sure.
6         THE COURT:  Go ahead.
7         MS. SULLIVAN:  We had a continuing
8 objection to the line of lawsuits.  But your Honor
9 already ruled on that so...
10         THE COURT:  I did.  Okay.  Thank you.
11         (Sidebar ends.)
12         THE COURT:  It's now admitted into
13 evidence.
14         (Plaintiff's Exhibit 3173 was moved
15         into evidence.)
16         MR. PANATIER:  Thank you.
17 BY MR. PANATIER:
18   Q.    Sir, will you turn to Question 17,
19 please.
20   A.    Yes.
21   Q.    The question that Johnson & Johnson
22 was asked was, "Describe in detail all processes,
23 procedures and testing performed upon the talc used
24 in the manufacture of Johnson's Baby Powder to
25 reduce or eliminate the existence of asbestos,

1 tremolite or other contaminants in Johnson's baby
2 powder."
3         And what Johnson & Johnson wrote here in
4 2000 and verified was, "To the best of Defendant's
5 knowledge, talc used in the manufacture of Johnson &
6 Johnson's Baby Powder never contained asbestos in
7 any form or tremolite."  Did I read that right?
8    A.    You read what was written, yes.
9    Q.    And that's sworn answer was false,
10 correct?
11   A.    I'm not going to speculate it was
12 intended to be false.  It is not correct.
13   Q.    Let's parse that out, right.  It's
14 false, correct?
15   A.    It is not correct.
16   Q.    And it was certified -- it was
17 certified by Nancy Musco who is someone that you
18 have actually worked with in this litigation,
19 correct?
20   A.    I never actually met Nancy Musco.  I
21 think I may have spoken to her once on the phone,
22 but she was -- when I was based here in New Jersey,
23 she was in the same building, but I don't believe I
24 ever actually met her.
25   Q.    Have you met with any individuals

1 with Johnson & Johnson to help them prepare for
2 their depositions in this litigation?
3    A.    I don't really understand the
4 question.
5    Q.    Sure.  Did you help prepare any
6 Johnson & Johnson employees or former employees for
7 their depositions?
8    A.    I've not been involved in this
9 particular deposition, no.
10   Q.    I'm not asking about this case.
11   A.    Oh, right.
12   Q.    I'm asking for any depositions, have
13 you helped prepare any people whether it be Ms.
14 Musco or Nicholson or anybody else for their
15 depositions?
16         MS. SULLIVAN:  Your Honor, sidebar.
17         THE COURT:  Sure.
18         Don't answer.
19         (Sidebar.)
20         MS. SULLIVAN:  Your Honor, I don't
21 know what the answer is, but he's a consultant for
22 Johnson & Johnson.  And if the company had him
23 prepare employees, that's privileged and work
24 product.
25         THE COURT:  One person at a time.

36 (Pages 138 - 141)

1     MS. PLACITELLA:  I was at the
2 deposition, your Honor.  She testified under oath as
3 I recall that she spoke to Dr. Hopkins and that was
4 part of the basis for being prepared to testify as a
5 corporate representative for Johnson & Johnson in
6 these cases.  Dr. Nicholson and Nancy Musco, I
7 believe, said the exact same thing, not only that
8 but they were on the phone going over all the tests
9 and what they meant.
10     MR. MAIMON:  By designating this
11 gentleman as the corporate representative, your
12 Honor, they've waived attorney-client privilege.
13 He's no longer -- he's not -- by evoking the rule
14 what -- the Federal equivalent 30(b)(6) to designate
15 him, to educate him and so forth, they've waived any
16 attorney-client privilege with regard to him.
17     MS. SULLIVAN:  Not for preparation of
18 other witnesses.
19     MR. PLACITELLA:  I, actually, recall
20 Dr. Nicholson -- and I can probably find it -- bring
21 in the notes from her conversation, which were
22 marked at her deposition and she said she actually
23 relied upon them in her testimony.
24     THE COURT:  Okay.
25     MR. PANATIER:  Right now the question

1 is, did you help prepare them.
2     THE COURT:  That's not privileged and
3 I'll allow it.  Thank you.
4     (Sidebar ends.)
5     (There is a discussion off the
6     record.)
7     THE COURT:  You can answer the
8 question, Doctor.
9     THE WITNESS:  Would you repeat it?  I
10 just want to make sure it's top of mind.
11 BY MR. PANATIER:
12   Q.    Did you help in this litigation meet
13 with via in person or on the phone prepare Ms. Musco
14 or Ms. Nicholson for their testimony?
15   A.    In this litigation?
16   Q.    In this litigation.
17   A.    The answer is, no, not in this
18 litigation.
19     THE COURT:  No, wait, wait.  The
20 witness was pointing to the Answers to
21 Interrogatories.  So please be clear with what
22 you're asking.
23 BY MR. PANATIER:
24   Q.    This presently, me and you, this
25 litigation?

1   A.    Not in this litigation, no.
2   Q.    You did not, not this case or any
3 other cases?
4   A.    Wait a minute.  This litigation --
5 today, you mean in this particular case we're doing
6 today?
7   Q.    Let me back up.  I'm trying to make
8 this simple.  Let's back up.
9   A.    Yeah, I'd appreciate that.
10   Q.    Have you ever met and helped prepare
11 Ms. Nicholson or Ms. Musco for their testimony?
12   A.    The answer to that question is, yes.
13 Ms. -- Dr. Nicholson I spoke to last year and she
14 asked me a question and I -- or some questions and I
15 explained a little bit of background, yeah.
16   Q.    Let's read this answer a little bit
17 further.  "Defendant sources of talc were selected
18 for their lack of contaminants and further testing
19 was performed over a significant number of years by
20 outside laboratories which verified the talc sources
21 did not contain asbestos or tremolite."
22     Did I read that right?
23   A.    Yes, you read what was written.
24   Q.    That's entirely wrong, isn't it?
25   A.    Yeah, and, you know, I'm not going to

1 explain or speculate on whether she understood
2 asbestos in tremolite or did it mean asbestos
3 tremolite, yeah.
4   Q.    Let's see what she says about how she
5 got these answers.  She says, "I'm employed by
6 Johnson & Johnson Consumer Companies, Inc."
7     THE COURT:  Where are you reading
8 from, Counsel?
9     MR. PANATIER:  The same -- sorry, the
10 interrogatories, your Honor.
11     THE COURT:  Thank you.
12     MR. PANATIER:  This is the same
13 exhibit.  I was reading from before, the 2000
14 Krishinsky Exhibit 3173.
15 BY MR. PANATIER:
16   Q.    "The foregoing Answers to
17 Interrogatories were prepared with the assistance
18 and advice of Counsel for JJCI and upon whose advice
19 and information JJCI and I relied."
20     So the lawyers helped her put this together,
21 right?
22   A.    They used the word "Counsel," did
23 they?
24   Q.    Yes.
25   A.    Counsel, that was...

37 (Pages 142 - 145)

Page 146

1    Q.    That's lawyers, right?
2    A.    Yes.  It says "Counsel," yes.
3    Q.    Okay.  So Ms. Musco with the help of
4 the J&J lawyers said that there had never been
5 tremolite in Johnson & Johnson's source ore and
6 that's false, correct?
7    A.    No, we know that there is tremolite,
8 has been reported in the Italian talc many, many
9 times, yes.
10    Q.    And we know that the extensive
11 testing they refer to showed the tremolite to be
12 there, right?
13    A.    Yes, I'm not disputing that.
14    Q.    And these answers were provided to
15 someone who is representing someone with a disease,
16 correct?
17    A.    Well, the interrogatory is what it
18 is.
19    Q.    Right.
20    A.    It states what it is.
21    Q.    And you understand that people rely
22 upon those statements that are made by the company,
23 correct?
24    A.    Yes.
25    Q.    When they are trying to decide do I

Page 147

1 have a case, they're relying on your answers, you
2 know that, right?
3    A.    Yeah, and she did say or the person
4 who wrote it said, no asbestos.
5    Q.    Right.  And no tremolite?
6    A.    And they said that as well.
7    Q.    And those -- that verification, that
8 is done under oath, correct?
9    A.    Well, it is what it is.  It says what
10 it says.  It says, no asbestos or tremolite.
11    Q.    You have answered interrogatories,
12 have you not?
13    A.    Yes.
14    Q.    And those were under oath, you know
15 it's just like being here?
16    A.    Yes.
17    Q.    I have good news.  I am going to skip
18 some Battelle stuff.  We've done a lot of that.
19         Let's go to December 4, 1978.  It
20 should be in the -- it may be in the third binder
21 that I haven't given you yet.
22         MR. PANATIER:  Here you go.
23    Q.    Yeah, here's 78.
24         Okay, last binder.  Here you go.
25         MR. PANATIER:  Your Honor, here you

Page 148

1 go.
2         THE COURT:  Thank you.
3 BY MR. PANATIER:
4    Q.    Now, some of the tabs you'll see are
5 just marked 78, because there's no other date given.
6 But this one does have a date.  This is one is
7 December 4, 1978.
8    A.    Okay.
9    Q.    Okay.  And do you see, sir, that this
10 is a letter from George Lee, the Director of Applied
11 Science -- where is he?  There he is.  Director of
12 Applied Research, sorry, December 4th, 1978.  And
13 he's writing to NIOSH, correct?
14    A.    Yes.  Yes.
15         MR. PANATIER:  And, your Honor, I'll
16 offer this into evidence.
17         THE COURT:  What's the marking on it?
18         MR. PANATIER:  3624, your Honor.
19         MS. SULLIVAN:  No objection.
20         THE COURT:  So admitted.  Proceed.
21         (Plaintiff's Exhibit 3624 was moved
22     into evidence.)
23    Q.    Okay.  Doctor, it says, "Dear Dr.
24 Rose," who was at NIOSH.  "It was a privilege to
25 serve as the American Industrial Hygiene Association

Page 149

1 reviewer for the working draft of the criteria for a
2 recommended standard occupational exposure to talc.
3 Please find enclosed my comments and reply to the
4 list of questions furnished by NIOSH."
5         So NIOSH asked some questions and this
6 fellow from Johnson & Johnson answered them,
7 correct?
8    A.    Yes.
9    Q.    Really all I want to talk about is
10 the next page.  He discusses asbestos.  Know the
11 terms non-asbestiform and asbestiform, as they have
12 been used through the criteria document, are
13 technically imprecise and were further confused by
14 interchangeable use of terms such as fibrous talc,"
15 et cetera, et cetera.
16         Here's what I want to get to.
17         "If the ultimate purpose is to
18 categorize the tac bearing mineral dust according to
19 associated health affects, the following grouping
20 should be made on the basis of knowledge of their
21 compositions:  High purity grade of talcs, cosmetic
22 and pharmaceutical grades, which do not contain
23 detectable asbestos and do not contain detectable
24 quartz according to present commercial analytical
25 methods," and it has an asterisk, right?

38 (Pages 146 - 149)

1    A.    Uh-huh.
2    Q.    And then he gives the definition of
3 asbestos, correct?
4    A.    Yes.
5    Q.    "Asbestos is defined as the finally
6 fibrous form of serpentine known as chrysotile and
7 five fibrous forms of the amphibole group amosite,
8 anthophyllite, crocidolite, tremolite and
9 actinolite." Did I read that right?
10    A.    You did, yes.
11    Q.    Okay. And so the definition of
12 asbestos that Johnson & Johnson gives to NIOSH
13 doesn't say anything about how it grew in the
14 ground, just that it is fibrous, correct?
15    A.    It talks about the fibrous form means
16 it's asbestos.
17    Q.    Right, if it's fibrous, true?
18    A.    As opposed to the broad form.
19    Q.    Yes. Right, it says if it's fibrous,
20 it's asbestos, right?
21    A.    That's what that definition says,
22 yes.
23    Q.    Okay. So that's Exhibit 3624. Now,
24 let's look at -- this is January 10, '94, yeah.
25    MR. PANATIER: This is already in

1 evidence, your Honor. This is Exhibit 2729.
2 BY MR. PANATIER:
3    Q.    And, sir, I'll just show you this
4 one. It will be a little quicker, because it's
5 already in evidence.
6    January 10, '94, do you see that? You can
7 look on the screen if it's easier or struggle to
8 find the right binder.
9    A.    It's a different binder.
10    Q.    Yes.
11    A.    Okay.
12    Q.    You see this where it says, "Summary
13 of raw material and finished product testing for
14 baby powder talc," right?
15    A.    Yes.
16    Q.    So this is the testing protocol, what
17 they do for the different things they're testing for
18 as of '94, right?
19    A.    Yes.
20    Q.    Okay. And we're going to turn to
21 this page. And you can see this is the
22 specification -- at this time Cyprus owned the mine
23 that Johnson & Johnson used to own, correct?
24    A.    Yes.
25    Q.    And, by the way, Windsor 66, that's

1 baby powder, right?
2    A.    Yes.
3    Q.    Okay. They define asbestos again
4 under CTFA J4 and TM7024. So one of those is
5 XRD/optical and one of those electro microscope,
6 right?
7    A.    Yes.
8    Q.    Right?
9    They say, it has to be none detected, true?
10    A.    Yes.
11    Q.    And then they define it, "Asbestos is
12 defined to be the fibrous serpentine chrysotile and
13 the fibrous forms of the amphibole group as
14 represented by amosite, anthophyllite, crocidolite,
15 tremolite and actinolite," right?
16    A.    Yes.
17    Q.    They don't say anything about having
18 a geologist tell you how it grew in the ground, do
19 they?
20    A.    No, they describe whether it's
21 fibrous or not fibrous.
22    Q.    So I took those two documents and I
23 made us a poster, because we're going to start
24 looking through some documents probably at the
25 break -- after the break and we're going to compare

1 what those documents say to the definitions that
2 Johnson & Johnson has provided, okay? Do you see
3 those?
4    A.    Yes.
5    Q.    Can you read them okay?
6    A.    Well, let me get my driving glasses.
7    Q.    Because I want to double-check with
8 you that these are what we just looked at before we
9 go into a series of documents.
10    Are those quotations accurate from what we
11 just looked at?
12    A.    Those are from two documents, yes.
13 One is the specification and the other is a
14 memorandum written by an employee to NIOSH.
15    Q.    To NIOSH. The one we looked at just
16 before this, true?
17    A.    Yes.
18    Q.    Okay. So Johnson & Johnson
19 internally has defined asbestos as the fibers of any
20 of these minerals, chrysotile, amosite,
21 anthophyllite, crocidolite, tremolite or actinolite,
22 correct, sir?
23    A.    No. The fibrous form, not "fibers,"
24 fibrous form need to be -- that's what you've
25 written on the yellow highlight, "fibrous form."

39 (Pages 150 - 153)

Page 154

1    Q.    Is a fiber fibrous, sir?
2    A.    It may or may not be.  It depends on
3  the -- on the -- how the microscopist is defining
4  it.  So, for constancy, we should use the word
5  fibrous.  There's a definition for fibrous.
6    Q.    Well, let me just ask you.
7      Is a fiber fibrous?
8    A.    It can be.  But it may not be.
9    Q.    So you can have a fiber that is
10  fibrous and a fiber that's not fibrous?
11    A.    Yes.  And that's -- you have to talk
12  to geologist and microscopist to explain the fibrous
13  form of those minerals is the asbestos form.
14    Q.    Okay.  Hold on.  Let's see how --
15  let's see how Johnson & Johnson defines fiber then,
16  one second, and then we'll take a break.
17          This will be 1995, sir.
18          (There is a discussion off the
19      record.)
20    Q.    Have you found it?
21    A.    I'm sorry, what is the year?
22    Q.    1995.
23    A.    I thought you were going to put it on
24  the screen.
25    Q.    Yep.  It just says 1995 on it because

Page 155

1  that's the only date that's on the document.
2          (There is a discussion off the
3      record.)
4    Q.    Okay.  This is in evidence already as
5  Plaintiff's Exhibit 2736.  And I'll just show it to
6  you since it's already in evidence.
7    A.    Okay.  I was to have found it
8  otherwise.
9    Q.    This here is Johnson & Johnson's
10  TM7024, correct?
11    A.    Yes.
12    Q.    This is the test method that Johnson
13  & Johnson had for electron microscopy, the testing
14  of powder talc, right?
15    A.    Yes.
16    Q.    For asbestiform minerals, true?
17    A.    Yes.
18    Q.    If we go to how they define it,
19  definition of a fiber, "any elongated particle with
20  parallel sides and an aspect ratio greater than or
21  equal 3-to-1," right?
22    A.    The definition may vary with needs of
23  the client, yes.
24    Q.    Right.  So the only definition of
25  fiber that Johnson & Johnson has given us using

Page 156

1  their documents is a particle with parallel sides
2  and an aspect ratio greater or equal to three times
3  as long as it is wide, right?
4    A.    Well, that's a definition.
5    Q.    That is "the" definition that they've
6  given in their very method --
7    A.    That is a definition in that
8  particular methodology.
9    Q.    This was always their definition in
10  7024, correct?
11    A.    Yes.
12    Q.    In fact, it's the definition today,
13  isn't it?
14    A.    That is the same test effort today,
15  yes.
16    Q.    And that is an individual fiber that
17  is being described, correct?
18    A.    It is, yes.
19    Q.    Okay.
20          MR. PANATIER:  Your Honor, this is
21  probably a good time to break.
22          THE COURT:  Okay.  Members of the
23  Jury, we're going to take the lunch break now.
24  Please be ready to come back upstairs at 1:30.
25  Remember to wear your juror badges where they are

Page 157

1  visible.
2          No discussions with regard to this case,
3  including the testimony you just heard.  No research
4  of any kind whatsoever.
5          Enjoy your lunch.  You can please
6  leave your notebooks here.  At 1:30 be ready to come
7  back upstairs.
8          (Jury exits.)
9          THE COURT:  And we're off the record.
10          (Lunch recess taken 12:26 p.m. to
11      1:28 p.m.)
12          (Jury enters.)
13          THE COURT:  Please be seated.  Make
14  sure cell phones are turned off.  Whenever you are
15  ready you may continue.
16          MR. PANATIER:  Thank you, your Honor.
17  Good afternoon, everybody.
18  BY MR. PANATIER:
19    Q.    Okay.  Dr. Hopkins, let's come back
20  to BabyCenter.com.  Do you remember we started to
21  talk about that earlier this morning?
22    A.    Yes.
23    Q.    And you said that was a website that
24  Johnson & Johnson owned, right?
25    A.    It's a domain name, yes.

40 (Pages 154 - 157)

1    Q.    Is that their only involvement?
2    A.    As far as I know, they're not
3 responsible for the content, the written content.
4    Q.    Do you recall in October of 2018 when
5 I questioned you about Baby Center and we went over
6 a Johnson & Johnson press release about trying to
7 reach millennial moms?
8    A.    Yes.
9    Q.    And do you recall in that press
10 release where Johnson & Johnson said we're going to
11 use Baby Center as the engine to get our word out?
12       Do you recall that?
13    A.    I do, yes.
14    Q.    Okay.  Let me know if you need to see
15 it.  But what we went over was someone named at
16 Alison Lewis at J&J had said digital -- let's see.
17 "Digital marketing and communications will play an
18 important role in the relaunch and the company will
19 use its Baby Center On-line Parenting Community as
20 the engine.  Alison Lewis, the Global Chief
21 Marketing Officer at J&J told analysts earlier this
22 month."
23       Do you recall that?
24    A.    Yes.  They use the on-line community,
25 yes.

1    Q.    It's Baby Center as the engine,
2 correct?
3    A.    Read that again, because it's
4 important.  They talk about the on-line community.
5    Q.    Sure.  "Digital marketing and
6 communications will play an important role in the
7 relaunch and the company will use its Baby Center
8 On-Line Parenting Community as the engine.  Alison
9 Lewis the Global Chief Marketing Officer at J&J
10 consumer told analysts earlier this month."
11       Is that what you wanted to hear again?
12    A.    Yes, the on-line community, yes, yes.
13    Q.    Okay.
14       (There is a discussion off the
15       record.)
16       MR. PANATIER:  This will be 3695-23.
17    Q.    Do you see that this is a Power Point
18 entitled "Leadership and Insight" dated 2007 Johnson
19 & Johnson Baby GBU?
20    A.    Yes.
21       MR. PANATIER:  Okay.  And, your
22 Honor, at this time we offer this exhibit into
23 evidence.
24       MS. SULLIVAN:  Your Honor, it looks
25 like it stops at Page 4 and goes to Page 31.  So I'm

1 not sure where the rest of it is.
2       MR. PANATIER:  It's an excerpt for
3 just this purpose.
4       THE COURT:  Okay.  Subject to -- hold
5 on.  Sidebar.
6       MS. SULLIVAN:  I'm sorry.
7       (Sidebar.)
8       THE COURT:  Okay.  So it's
9 incomplete.  You say it's an excerpt.  What else?
10       MS. SULLIVAN:  This is -- it's not
11 relevant and proper for (INAUDIBLE) on its message
12 on its face and it has this little Trump summation
13 to baby powder, the financial numbers.
14       MR. PANATIER:  I'm not going to use
15 that.  I'm only going to use this page, this page
16 about Baby Center.  So we'll redact that.
17       MS. SULLIVAN:  Okay.
18       THE COURT:  And subject to then the
19 entire document unless, of course, there's other
20 issues with the rest of it, we'll deal with it at
21 sidebar.
22       MS. SULLIVAN:  No objection.  Thank
23 you.
24       (Sidebar ends.)
25       THE COURT:  So that's admitted into

1 evidence subject to the Court's specific ruling.
2       MR. PANATIER:  Thank you, your Honor.
3       (Plaintiff's Exhibit 3695-23 was
4       moved into evidence.)
5 BY MR. PANATIER:
6    Q.    Alright.  So here's our Power Point
7 and you see this would be on the page marked 31
8 which is the last page, "Johnson's CRM efforts."  Do
9 you know what "CRM" means?
10    A.    No, sorry, no.
11    Q.    I didn't either until I saw right
12 down here; customer relationship marketing, right?
13    A.    Well, there you go then.
14    Q.    Right?  You see here it says,
15 "Johnson CRM efforts."  And the first one is
16 reaching 90 percent of mommies through Baby Center.
17 Do you see that?
18    A.    Yes.
19    Q.    And do you see where they say they
20 own BabyCenter.com?
21    A.    That's what they said, they own --
22 yeah, that's a website name, BabyCenter.com.
23    Q.    Right.  They run their consumer
24 customer relationship marketing through Baby Center
25 as well as other on-line places, correct?

41 (Pages 158 - 161)

1    A.    Yes, they say -- they say they sent
2 6.7 million e-mails in 2007.
3    Q.    The fact that they own
4 BabyCenter.com, the fact that the director of
5 marketing said, we're going to use that as an engine
6 to get out information about our products and this
7 together, sir, can you accept the fact that Johnson
8 & Johnson is active in Baby Center and does control
9 it?
10    A.    They're certainly "active" in it.
11 But the point I made was that they were not
12 responsible for every text that's written on the
13 website.
14    Q.    So are you saying that even though
15 they own this website that they actively use to try
16 to promote their products, that they just ignore the
17 content, they don't vet the content; is that what
18 they're saying?
19    A.    That is true, they do not vet the
20 content.  There are things on there that may or may
21 not agree, but they do not vet it.  It's written by
22 external pediatricians and others who play a role in
23 putting the text together.
24    Q.    So they don't actually vet what goes
25 on this website that they own?  Doesn't that sound

1 irresponsible?
2        MS. SULLIVAN:  Objection, your Honor,
3 that's argument.
4        THE COURT:  Objection sustained.
5        Please rephrase.
6 BY MR. PANATIER:
7    Q.    So they don't vet anything that goes
8 on this domain name they own, Johnson & Johnson?
9    A.    They don't -- they don't control it.
10 They don't say, take that off, whatever.  They may
11 have a dialogue.  But it sounds difficult to explain
12 and it is difficult to explain, but they don't fully
13 own the text that goes on there.
14    Q.    So let's explore -- let's vet, if you
15 will, some of your foundation for these statements,
16 okay?
17    A.    Yes.
18    Q.    When was BabyCenter.com purchased by
19 Johnson & Johnson?
20    A.    Several years ago.  I don't remember
21 the exact year.  It was maybe early 2000s from my
22 recollection.
23    Q.    Early 2000s?
24    A.    I think it was the early 2000s.
25    Q.    Who runs it?

1    A.    It's run by an external organization.
2    Q.    What are they called?
3    A.    I don't know what they're called.
4    Q.    Who at Johnson & Johnson is the
5 liaison with this third party?
6    A.    Again, I do not know who that
7 individual is.  It is run as an external system for
8 educating moms with babies.
9    Q.    What meetings did you go to about
10 BabyCenter.com?
11    A.    I personally have not been to
12 meetings with -- about BabyCenter.com.
13    Q.    What pamphlets or information did you
14 receive about what they vet; what they don't vet;
15 how much control they exercise over it?
16    A.    I have not received pamphlets as to
17 what they vet or do not vet.
18    Q.    What about any correspondence?
19    A.    Well, I've not seen correspondence in
20 the recent years.
21    Q.    Can you point to one thing you've
22 actually seen that can back up what you're telling
23 the jury today about how they have no control over
24 the content, over BabyCenter.com?
25    A.    Yes.  I've discussed this with --

1        MR. PANATIER:  Your Honor, I'm going
2 to object to hearsay.
3        THE COURT:  Objection sustained.
4        The question was, have you seen
5 anything?
6 BY MR. PANATIER:
7    Q.    Have you seen anything?
8    A.    No.
9        MR. PANATIER:  Your Honor, at this
10 time we're going to ask to put up BabyCenter.com on
11 its current form on the Internet.
12        MS. SULLIVAN:  And, you Honor, I'm
13 just going to object to all the hearsay statements
14 from outside of J&J.
15        MR. PANATIER:  They own it, your
16 Honor.
17        THE COURT:  Objection overruled.
18        You can go right ahead.
19        What's the marking for that?
20        MR. PANATIER:  We would print this
21 out and we would make it 3695-24.
22        THE COURT:  Thank you.
23        MR. PANATIER:  Whenever you shut your
24 laptop, you have to go back on-line.
25        (There is a discussion off the

1     record.)
2 BY MR. PANATIER:
3     Q.    Let's see if I'm on-line.  There we
4 go.  It looks like it.  Can you see Baby Center up
5 there?
6     A.    Yes.
7     Q.    Okay.  Let's go to babies.  Let's see
8 -- there we go.  Okay.  We'll go down here.  Let's
9 see here.  Diaper, diapering and bottom care.
10 That's probably where we will find baby powder,
11 right?  Right above "poop 101"?
12     A.    Yes, it's a good place as any.
13     Q.    Let's go to "diaper rash."  Alright.
14 Let's see here.  "Diaper rash," let's click on this
15 article.
16         It actually says here that --
17 underneath there it says, "written by Baby Center
18 staff, reviewed by Baby Center Medical Advisory
19 Board updated February 2017," right?
20     A.    Yes.
21     Q.    So it is, certainly, vetted by the
22 Board as referenced right there, correct?
23     A.    Well, the Baby Center Medical
24 Advisory Board is what I was talking about, the
25 external advisors, medical physicians and others,

1 nurses.
2     Q.    How do you know that's who you were
3 talking about?  When I asked you who you were
4 talking about, you said, I didn't know.
5     A.    I thought I did.  I thought I said it
6 was an external group.
7     Q.    And you're telling us now that's the
8 group?
9     A.    Well, that's one of the names of it,
10 yes.
11     Q.    So let's look and see what they say
12 about diaper rashes.  Let's go to how do I -- let's
13 see.  How do I treat it?  Let's see if that works.
14 There we go.  You see this right
15 here?  "Don't use powders or cornstarch because the
16 particles can be harmful to a child's lungs if
17 inhaled.  Also some experts think cornstarch can
18 make a yeast diaper rash worse."  Do you see that?
19     A.    Yes.
20     Q.    And I've shown you that before,
21 haven't I?
22     A.    You have, yes.  And I don't disagree
23 with it.
24     Q.    So Baby Center, the website that
25 Johnson & Johnson owns says that you shouldn't use

1 powder or cornstarch at all on children,
2 specifically, because the particles can be harmful
3 to their lungs, right?
4     A.    If inhaled, yes.  And we talked about
5 that.  If you look on the pack, it talks about
6 avoiding tipping a powder on your face and blocking
7 your nose.
8     Q.    So the only way that a baby inhales
9 powder is if you dump it in their face?
10     A.    No.  But that's the one that causes
11 most concern is if a baby grabs a carton of baby
12 powder, tips it on its face, blocks the nose and
13 mouth, that's dangerous.
14     Q.    This doesn't say that, though, does
15 it?
16     A.    It's only saying it in a -- five
17 words in a sentence.
18     Q.    Right.  It says, "don't use it."
19 Pretty simple, right?
20     A.    That's what it says.
21     Q.    And let me ask, does Johnson &
22 Johnson on its baby powder that it sells say, don't
23 use this on your children?
24     A.    No, it's baby powder.
25     Q.    It still doesn't have anything but

1 the twisty lid, right?
2     A.    If you look at the cap.
3     Q.    Just can you just answer that
4 question?
5     A.    It has a twist --
6         MS. SULLIVAN:  Your Honor --
7     A.    What am I about to say --
8         THE COURT:  Wait, wait.  Hold on.  I
9 can't have three people talking at the same time.
10         The question was?
11     Q.    All that the bottle currently has is
12 the twist lid at the top that opens and shuts the
13 holes, correct?
14     A.    It has a twist lid which opens and
15 closes holes which are around the perimeter which
16 retard or reduce the amount of powder that can come
17 out and cause a nasal blockage.
18     Q.    As opposed to just taking off and
19 having the full mouth of the container?
20     A.    Well, they've never had the full
21 mouth of the container.  They always had a series of
22 ten or seven holes in there.
23     Q.    Alright.  So we were talking about
24 tremolite earlier today.  Do you recall that?
25     A.    Yes, yes.

43 (Pages 166 - 169)

Page 170

1    Q.    I'm sure you do.
2    A.    Yes.
3    Q.    One of the documents that we saw last
4 week from defense Counsel was Defense Exhibit 7044.
5 It's in evidence.  That's this document right here.
6        And this is Fred Pooley, right?  We've
7 talked about Fred Pooley, you and I already, haven't
8 we?
9    A.    Yes.
10   Q.    And Fred Pooley in 1972 he reported
11 that he had looked at some samples going back to
12 1949 as well as in the 00000 talc, that's the
13 Italian, right?
14   A.    Yes.
15   Q.    And you can see he says that, "No
16 chrysotile was found at the mine or in samples
17 taken.  Some tremolite was located but was not
18 asbestiform in character and has not been detected
19 in 00000 talc imported into Great Britain for the
20 past year nor in shipments dating back to 1949."
21        When Johnson & Johnson received this,
22 did they send to Dr. Pooley all of those Battelle
23 memorial reports that you and I had showing
24 tremolite again and again and again in the Italian
25 talc?

Page 171

1    A.    I don't know.  But I can tell you
2 that Dr. --
3        MR. PANATIER:  Your Honor, I would
4 object as to nonresponsive.
5    A.    I don't know then.
6        THE COURT:  Just -- thank you, thank
7 you.
8        MR. PANATIER:  This will be
9 Exhibit 3127.
10   Q.    This is dated March 3rd, '72.  So it
11 should be in your first binder.  Does that one go to
12 March 3rd, '72?
13   A.    Give me a second.
14   Q.    Sure.
15   A.    Yep.
16   Q.    Yep, you found it.
17   A.    Yep.
18   Q.    Okay, great.
19        Do you see that this is a Johnson & Johnson
20 memo.  It is from, I believe, it's from Mr. Russell.
21 Yes, R.S. Russell dated March 3rd, 1972?
22   A.    Yes.
23   Q.    And the subject is "domestic talc
24 sources 101, North Carolina"?
25   A.    Yes.

Page 172

1    Q.    Now, Johnson & Johnson would from
2 time to time vet other talc sources, correct?
3    A.    I wouldn't use the word "vet."  This
4 Project 101 was to look at some like 50 different
5 talc sources in the United States as options for
6 when the Vermont mine ran of talc.
7    Q.    Okay.
8    A.    So they looked at that particular
9 mine, yes.
10   Q.    They looked at alternative sources?
11   A.    They looked at about 50 different
12 mines.
13   Q.    Right.  North Carolina never ended up
14 being a source that they used, right?
15   A.    They never ever use any source other
16 than in Vermont.
17   Q.    Now, if you will turn to the page
18 that he signed, the page marked three.  Do you see
19 that?
20   A.    Yes.
21   Q.    Right.  They decided not to use the
22 North Carolina, correct?
23   A.    Yes, correct.
24   Q.    Right.  And you see under
25 "conclusions" they've got some complaints.  One they

Page 173

1 said it's badly off color, but they say, also the
2 presence of tremolitic amphibole is "bad," right?
3    A.    That's what is written, yes.
4    Q.    We know that tremolitic amphibole was
5 all throughout the Italian and in Vermont, correct?
6    A.    We know that tremolite is present in
7 the Italian talc, yes.
8    Q.    Literally tremolitic amphibole is
9 present --
10   A.    Well, amphibole is a --
11   Q.    Let me finish the question first.
12 Sorry.
13        Tremolitic amphibole is in the Vermont and
14 the Italian talc, correct?
15   A.    There was amphibole in the Italian
16 and Vermont talc, which can be in the form of
17 tremolite.
18   Q.    Okay.  And that's what he's saying
19 here.  They decide not to use it for two reasons,
20 the color and the fact that there's tremolitic
21 amphibole?
22   A.    Yes, it's unpleasant on the skin.  If
23 you have a lot, it's very prickly.
24   Q.    Oh, that's why, because it doesn't
25 feel good on the skin?

44 (Pages 170 - 173)

Page 174

1      A.      It, certainly, does not.  If it's
2 needlelike and prickly, it does not feel good on the
3 skin.
4      Q.      Let's take a peak at it.  Go ahead
5 and look at the second page where it says,
6 "tremolitic amphibole."  "The amphibole appears to
7 be tremolitic and occurs in columnar bundles and
8 individual long, thin prismatic crystals," correct?
9      A.      Yes.
10      Q.      And we know that that description,
11 right, if you have long thin, whatever you want to
12 call it, bundles or prismatic crystals, that's going
13 to meet the definition that Johnson & Johnson has
14 set out for asbestos, correct?
15      A.      No.  To meet the definition for
16 asbestos, it has to be what's called asbestiform.
17 That's a geological and mineralogical definition.
18      Q.      Hold on.  Let us step back to Johnson
19 & Johnson's own definitions.  That's the
20 asbestiform?
21      A.      No, but I did.
22      Q.      Yeah, I know you did.  Did J&J?
23      A.      They talk about the fibrous forms of
24 those minerals.
25      Q.      Is that the asbestiform?

Page 175

1      A.      No, it's defining asbestos.
2      Q.      Right.
3      A.      Which has to be the asbestiform
4 version.
5      Q.      Wait.  Okay.  I don't want to keep
6 going back and forth.  But the reason I put these up
7 here was so we can see exactly how J&J defines them.
8 And you keep saying "asbestiform."
9      That word doesn't appear in Johnson &
10 Johnson's own definition, does it?
11      A.      It doesn't appear on those
12 definitions.  It does appear in other definitions on
13 the specification of the product.
14      Q.      It appears -- right, in 7024 the word
15 "asbestiform" appears, correct?
16      A.      The word "asbestiform" appears where
17 it's used to describe a mineral in the -- of the
18 asbestos character.
19      Q.      Right.  And it describes it as a
20 fiber that's 3-to-1, doesn't it?
21      A.      Well, that's one definition.
22      Q.      That's the only definition in 7024.
23      A.      But geologists give a bigger -- okay.
24      Q.      Just try to -- just answer the
25 question.

Page 176

1      MR. SULLIVAN:  Your Honor, I'm just
2 going to object.  Counsel keeps interrupting Dr.
3 Hopkins.
4      MR. PANATIER:  I'm going to object.
5      THE COURT:  Okay.  The Court Reporter
6 can't take multiple people speaking at the same
7 time.
8      Dr. Hopkins you are not answering the
9 question.  The objection is overruled.
10      MR. PANATIER:  I'll move to strike,
11 your Honor.
12      THE COURT:  Stricken.
13      The Jury is not to consider that last
14 response.
15      One more time.
16 BY MR. PANATIER:
17      Q.      Dr. Hopkins, testing method 7024 put
18 together by J&J, right, they're TEM method, defines
19 asbestiform as a fiber of 3-to-1, does it not?
20      A.      The definition of fiber is 3-to-1.
21 Yes, we saw that this morning.
22      Q.      And they don't say anything about
23 what it means from a geological perspective or what
24 it might mean from a commercial perspective, do
25 they?

Page 177

1      A.      Not in that short sentence version,
2 no.
3      Q.      But that's the protocol that people
4 are supposed to use to determine whether asbestos is
5 present when they test J&J talc by TEM, right?
6      A.      People who test it use that protocol,
7 correct.
8      Q.      Okay.  So let's go back to this
9 document.  He finds some "long thin prismatic
10 crystals of tremolitic amphibole," correct?
11      A.      You read what is written.
12      Q.      Right?  And he says it's "bad."
13      Now you said, well, it's bad because it
14 feels prickly on the skin, right?
15      A.      It does feel prickly on the skin.
16 You wouldn't simulate nice soft baby powder, which
17 is prickly.
18      Q.      You know that Johnson & Johnson
19 actually admits in documents that I've shown you
20 that that was never the case?  You know that, right?
21      MS. SULLIVAN:  Objection, your Honor,
22 foundation and argumentative.
23      MR. PANATIER:  I'm just asking if he
24 knows.
25      THE COURT:  Objection is overruled.

45 (Pages 174 - 177)

Page 178

1        You can answer.
2        A.    No, I don't -- I stand by my answer,
3 that if you've got prickly particles, it doesn't
4 feel good on the skin.
5        Q.    I would agree, generally, with you.
6 Right, if something is prickly, you don't want that
7 on your skin?
8        A.    Yeah, and, therefore, you consider it
9 "bad," as he said.
10       Q.    Does he mention that at all as the
11 reason they didn't want tremolite?
12       A.    Not in that letter, no.
13       Q.    And, in fact, sir, by '72, Johnson &
14 Johnson was well into the issue of asbestos in talc,
15 correct?
16       A.    The company was fully aware of the
17 controversy and the discussions on asbestos in talc
18 by '72.
19            MR. PANATIER:  We offer this document
20 into evidence, 3127, your Honor.
21            MS. SULLIVAN:  No objection.
22            THE COURT:  Okay.  So admitted.
23            (Plaintiff's Exhibit 3695-27 was
24        moved into evidence.)
25 BY MR. PANATIER:

Page 179

1        Q.    He doesn't say anything about skin,
2 true?
3        A.    No, it's a very short memo talking
4 about a particular mine in the State of North
5 Carolina.
6        Q.    The question I asked is, does he say
7 anything about tremolite being "bad" because of how
8 it feels on the skin?
9        A.    He does not specify that, no.
10       Q.    Alright.  So here's a thing I wanted
11 to talk to you about, which is when you were at
12 Johnson & Johnson up until 2000, at some point were
13 you an executive there?
14       A.    Yes.
15       Q.    An executive, I guess, did you have
16 your own desk?
17       A.    Yes.
18       Q.    Okay.  And on your desk, I guess,
19 part of this era was an e-mail era and part of it
20 was probably in the more analog era, correct?
21       A.    Yes.
22       Q.    So we think inbox/outbox now as being
23 e-mail, but did you, actually, have an inbox and an
24 outbox on your desk where people would bring you
25 documents or you might send something out?

Page 180

1        A.    Paper, paper, letters you mean?
2        Q.    Paper, yeah.
3        A.    No, I tended to use the phone and
4 e-mail but, yeah, the idea of using paper, no.  I
5 didn't have an inbox and outbox.  I mean, I would
6 have seen documents.  But I, personally, avoided
7 writing letters on paper when I could pick up the
8 phone.
9        Q.    You know what an inbox in?
10       A.    Yes, I do recollect that.
11       Q.    When something comes in, it goes in
12 the inbox, right?
13       A.    Yes.  It's like on my e-mail.
14       Q.    Right.  Outbox would be the reverse,
15 it is when something goes out, right?
16       A.    Yes.
17       Q.    So, as we go forward, what I want to
18 do is, I want to kind of examine what was in Johnson
19 & Johnson's inbox, okay, what information they were
20 receiving and then what information was in their
21 outbox, what they were sending out to people, okay?
22       A.    Sure.
23       Q.    Alright.  And so we can kind of keep
24 this organized, I actually made an inbox, you see,
25 right?

Page 181

1        Okay.  And what we're going to put in this
2 inbox is any information --
3            MS. SULLIVAN:  I'm sorry, Counsel,
4 can I just see what you put in there?
5            MR. PANATIER:  Yeah.
6 BY MR. PANATIER:
7        Q.    Any information to Johnson & Johnson
8 about asbestos fibers, needles or amphiboles, okay.
9 And so we're going to put -- we'll put the inbox
10 right there.
11            And then so we can evaluate what
12 Johnson & Johnson sent out to other people, we have
13 an outbox, okay.  And this one says, out to
14 customers, nurses, doctors, regulators, employees
15 and the public, okay?  Is that okay with you?
16       A.    If that's the game you want to play.
17            THE COURT:  Can you show it to
18 Counsel.
19            MR. PANATIER:  Yeah.
20            MS. SULLIVAN:  Okay.
21 BY MR. PANATIER:
22       Q.    I'm sorry, if that's "the game" I
23 want to play?
24       A.    Yeah.
25       Q.    You think it's a "game"?

46 (Pages 178 - 181)

Page 182

1    A.    Well, it's a lot of props there.
2    Q.    Well, if you think inbox and outbox
3 are "props," do you have an objection to us
4 demonstrating?
5    A.    No, I have no objection.  I have no
6 objection.  You carry on with your demonstration.
7    Q.    Do you have an objection showing the
8 jury what Johnson & Johnson had at its disposal
9 about what might be in the talc it was selling for
10 babies?  Do you have any objection to that?
11    A.    None whatsoever.
12    Q.    Do you have an objection to my
13 showing the jury what Johnson & Johnson told other
14 people about what was in their products, such as
15 nurses, doctors, regulators and their own employees
16 and the public?
17    A.    None whatsoever.
18    Q.    Alright.  So our first entry into the
19 outbox is going to be those interrogatories that we
20 went over for the year 2000 earlier this morning
21 that Ms. Musco signed.  Do you remember that?
22    A.    Yes.  I do, yes.
23    Q.    Where they said, after decades and
24 decades, they said no tremolite, right?
25    A.    Yes.

Page 183

1    Q.    What they had in the inbox, of
2 course, was lots of tremolite from Battelle,
3 correct?
4    A.    Yes.  There's never been any denial
5 of that.
6    Q.    Except for right here?
7    A.    Well, I think she made a mistake
8 there, by the way.
9    Q.    Well, it would have to be not just
10 she making a mistake, right, because she answered
11 the questions based on help from the lawyers, right?
12    A.    Well, we saw the word "Counsel," yes.
13    Q.    Right.  So let me ask you this
14 question.
15    At this time do you remember the millions of
16 documents you and I have talked about, have they
17 been released by Johnson & Johnson in 2000?
18    A.    I don't know.
19    Q.    Had Johnson & Johnson released those
20 Battelle studies before 2016?
21    A.    I don't know.
22    Q.    Because what you said was, yes, it's
23 wrong, but I don't know whether it was intentional.
24 That would have to be, at least, assuming only one
25 lawyer, at least, two people, right, if you have

Page 184

1 Musco and Counsel?
2    A.    Yeah.
3    Q.    Anyway, we know this is what was said
4 publically, correct?
5    A.    It was said in an interrogatory, yes.
6    Q.    Right.  In a lawsuit, correct?
7    A.    I believe so.
8    Q.    Okay.  We talked this morning about
9 how Dr. Langer maintained that there was asbestos in
10 the baby powder, correct?
11    A.    That's what he said, yeah.
12    THE COURT:  Counsel, if you are
13 placing documents in certain categories, you need to
14 specify for the record that cannot see what you're
15 doing.
16    MR. PANATIER:  Okay.  I will say it.
17 I will say it.
18    THE COURT:  Thank you.
19 BY MR. PANATIER:
20    Q.    In the Russell memo, "tremolite is
21 bad" we're going to put that in the inbox, too.
22    So let's come back to this concept of
23 the use of Johnson's Baby Powder and how people will
24 use it.
25    Johnson & Johnson recommended all sorts of

Page 185

1 uses for the baby powder outside of just putting it
2 on babies, right?
3    A.    Well, you need to be a bit more
4 specific.  I'm happy to comment, if I have some
5 sentence to comment on.
6    Q.    I can do that.
7    A.    Thank you.
8    MR. PANATIER:  This will be
9 Exhibit 3695-25.  Here you go, your Honor.
10    THE COURT:  Thank you.
11 BY MR. PANATIER:
12    Q.    There you go, sir.
13    A.    Thank you.
14    Q.    Sir, do you see that this is a memo
15 with the Johnson's baby logo at the top?
16    A.    Yes.
17    Q.    And you see that it has Johnson's
18 Baby Oil, Johnson's Baby Powder and then a series of
19 uses for these products, correct, that are
20 recommended?
21    A.    You're showing me a memo, but it
22 doesn't say whose written it or when it was written.
23 What was this done by a press release agency or is
24 this from Johnson & Johnson?
25    Q.    Well, that's a great question, but I

47 (Pages 182 - 185)

Page 186

1  got the documents from you.  So this one is not --
2  this one is not dated, but this is a Johnson &
3  Johnson -- for the record, it's Bates range J&J Talc
4  000628263 produced by Johnson & Johnson.
5          MS. SULLIVAN:  I'll just note,
6  Counsel, the one you gave me has no Bates number on
7  it.  It is J&J ine.
8          MR. PANATIER:  It was produced in
9  native format, your Honor.  I had to go look up the
10  Bates range?
11          Is there anything else.
12          MS. SULLIVAN:  I don't know why he
13  can't use the Bates numbers.
14          THE COURT:  Sidebar.
15          (Sidebar.)
16          MR. PANATIER:  If Counsel doesn't
17  understand how their own production works, I can't
18  work with that.  This is -- they produced a certain
19  number of documents in their, quote, unquote,
20  "native" format, which means, not a copy of the
21  document, it's in the actual -- like, for instance,
22  in a Power Point, they would produce the actual
23  Power Point, not a copy of the Power Point.
24          THE COURT:  So they never Bates
25  range?

Page 187

1          MR. PANATIER:  So they don't Bates
2  range native documents.
3          THE COURT:  So how did J&J Bates
4  numbers become created?
5          MR. PANATIER:  I have to go look up
6  on the document management software what Bates label
7  they gave to the native.  But when you print the
8  native because it's native and they don't want it
9  messed with, it doesn't print with the Bates Stamp.
10  It's not on the native.  But I am telling the Court
11  that this is the correct Bates number for this
12  document.
13          THE COURT:  JJ0006286 what was after
14  that?
15          MR. PANATIER:  Three.
16          MS. SULLIVAN:  Your Honor, just for
17  the record, we have given Bates numbers to every
18  single document we've produced.  In every other
19  trial people are using the Bates stamp numbers so we
20  can tell whose file it comes from.  I'm not sure why
21  Counsel can't just use the Bates numbers.
22          MR. PANATIER:  This is not a Bates
23  stamped document.  Counsel can go look at her own
24  documents.
25          THE COURT:  So I'm trying to

Page 188

1  understand this.
2          MR. PANATIER:  Yeah.
3          THE COURT:  When you go and print out
4  these documents that are produced, quote, unquote,
5  in their "native" --
6          MR. PANATIER:  Right.
7          THE COURT:  -- whatever that
8  terminology is --
9          MR. PANATIER:  Right.
10          THE COURT:  -- A Bates number does
11  not come out?
12          MR. PANATIER:  Correct.  That's a
13  Power Point, an Excel spreadsheet, a Word document,
14  if they produce them in native, they're not going to
15  add a Bates stamp to the original file.  Now, if
16  they produce -- for instance, a lot of these memos
17  are old, old memos, they are photocopies, they put
18  the Bate Stamp right on them.  So they produce them
19  in two ways.
20          MS. SULLIVAN:  Counsel has the Bates
21  numbers.  They've been given them.  I don't know why
22  he just doesn't use them.
23          THE COURT:  He's indicated now what
24  the Bates number is.  I would ask your office to
25  verify this information, if you're concerned.

Page 189

1          MR. PANATIER:  I'd like to come back
2  to it.  If they want to verify it, it's not a big
3  deal.
4          MS. SULLIVAN:  I mean, I just don't
5  know if it's from a third party.  I have no idea
6  where it's coming from.
7          MR. PANATIER:  How about this.  I'll
8  set it aside, if Counsel wants to check and verify,
9  if they have issues with it, that's fine, I'll just
10  come back to it.
11          THE COURT:  Okay.  Definitely, that's
12  what we'll do.
13          MR. PANATIER:  We'll come back to
14  this.
15  BY MR. PANATIER:
16      Q.    Okay.  You should have a document
17  that has a tab that says "1985" on it.  So, if you
18  go into that range, it's probably the second or
19  third notebook.
20          (There is a discussion off the
21          record.)
22      Q.    You found that, sir?
23      A.    Yes.
24      Q.    Okay, great.  This will be
25  Exhibit 2064.

48 (Pages 186 - 189)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 190

1        And do you see, Doctor, that is a
2 document called "Technological Forecast Powders"?
3 Do you see that?
4        A.    Yes.
5        MR. PANATIER:  Okay.  Your Honor, at
6 this time I would offer this into evidence.
7        THE COURT:  Any objection?
8        MS. SULLIVAN:  A second, your Honor,
9 until I look at it.  No objection.
10       THE COURT:  So admitted.
11       (Plaintiff's Exhibit 2064 was
12       moved into evidence.)
13       THE COURT:  What does the cover sheet
14 say on that, Counsel?
15       MR. PANATIER:  "Technological
16 Forecast."
17       THE COURT:  From 1984.  Okay,
18 proceed.
19 BY MR. PANATIER:
20       Q.    Okay.  Sure.
21             Alright.  So this is the type of
22 document that a company will do to talk about how
23 their products are doing, what they forecast them to
24 doing in coming years, correct?
25       A.    Yes.

Page 191

1        Q.    If we go to the third page under
2 "Safety Factors."  Can you see that, sir?
3        A.    Yes.
4        Q.    "Safety of cosmetic powders has been
5 a concern especially among health professionals.
6 They have decided that powders provide no health
7 benefit.  Therefore, the potential for harm from
8 respirables or accidental overexposure should be
9 avoided.  Mothers are now being advised not to use
10 baby powder especially talc baby powders."
11             Okay.  Did I read that right?
12       A.    You did, yes.
13       Q.    Okay.  If you'll turn please, sir, to
14 the page marked eight.  They have a section called
15 "Market Dynamics."  You can see there it says,
16 "Second, baby care professionals now sometimes
17 recommend against the use of talcum or cornstarch
18 powders" -- and then they give some statistics --
19 "because perceived risk exists that there are no
20 health benefits."
21             Now you've confirmed for us, there are no
22 health benefits, correct?
23       A.    Well, there are no medical benefits,
24 yeah.
25       Q.    And then they have, at least, for

Page 192

1 this year which, I believe, is '84, '85, they have
2 Johnson's Baby Powder and they have the amount of
3 money.  They have market share and then the ounces,
4 total ounces sold.  Do you see that?
5        A.    Yes.
6        Q.    So, if you look at the talc and
7 cornstarch section that they have there, the market
8 share for that was 115 million; is that right?
9 Right here.
10       A.    I see, yeah, yeah, yeah.
11       Q.    And they got, approximately, oh, 41
12 percent of that, right?
13       A.    Yes.
14       Q.    Okay.  And they got about -- they got
15 218 million ounces out of the 564 million ounces
16 sold, true?
17       A.    Yes.
18       Q.    Under "Major Issue," "Major Issue is
19 the future of a category under a safety cloud and
20 without an alternate reason for being."
21             Okay.  Now, when you got to the
22 company in '76 -- right, that was when you got
23 there?
24       A.    Yes.
25       Q.    At some point did you have a

Page 193

1 responsibility for evaluating the safety of the baby
2 powder?
3        A.    Yes.
4        Q.    In fact, it became -- by the '90s,
5 were you the head person in charge of the safety of
6 the baby powder?
7        A.    In the UK, certainly, yes, until I
8 moved here to the US in '90 -- end of '94.
9        Q.    Okay.  And at the end of '94, did you
10 continue in that same role here?
11       A.    Yes.
12       Q.    Alright.  So what do they mean when
13 they say "a safety cloud"?
14       A.    Well, because if you -- and I'm sure
15 you're going to show it.  There are -- there have
16 been in the early '70s a number of reports, later
17 shown to be erroneous, were people claimed they
18 found asbestos in the product.  And that like a bad
19 smell, it doesn't blow away, that was kind of
20 hanging around.  So there was an issue, although, in
21 reality the company was confident that there was no
22 asbestos.  But there is that cloud.
23       Q.    When you say, that were later -- what
24 did you say later disproven?
25       A.    Yeah.

49 (Pages 190 - 193)

Page 194

1    Q.    We're not talking about Dr. Langer,
2 though, right?
3    A.    Yes, Dr. Langer published a paper
4 back in '76 with Dr. Rolle.
5    Q.    Are you just going to ignore what he
6 said six months ago?
7        MS. SULLIVAN:  Objection, your Honor,
8 that's argument.
9        THE COURT:  Overruled.
10        You can answer.
11    A.    What he said is what he said, but it
12 was not what he wrote in a peer reviewed published
13 literature of scientific literature.
14    Q.    You're aware that he tested more than
15 two bottles of baby powder ever, correct?
16    A.    Yes, he tested a lot of bottles.
17    Q.    Then you see here it says, "It is
18 possible to hypothesize that pursuit of technologies
19 which would create talc based powders of higher
20 interest than JPB to adults could be profitable.
21 Major effort should be expended to prove a health
22 benefit for cosmetic dusting powders," right?
23    A.    Well, that's what someone has written
24 they're suggesting, yeah.
25    Q.    "Someone" at Johnson & Johnson,

Page 195

1 correct?
2    A.    Well, that's why I'm puzzled, because
3 I'm not sure who wrote this.
4    Q.    Are you saying that someone else is
5 doing all this analysis and writing about all these
6 issues other than Johnson & Johnson in a document
7 with a Johnson & Johnson Bates Stamp that you
8 produced to us?
9    A.    I don't know.  But what I'm saying is
10 there is no author.  So I don't know -- you asked me
11 who wrote it or who the -- if it was a Johnson &
12 Johnson, but I said there's no author.  But the
13 document speaks to itself.  I'm not disputing what
14 is written.
15        (There is a discussion off the
16        record.)
17    Q.    So they said they wanted to try to
18 provide a health benefit, right?
19    A.    Well, the person who is writing this
20 document, whoever he or she is, is going down that
21 route, yeah.
22        (There is a discussion off the
23        record.)
24    Q.    Alright.  This document is
25 Exhibit 2614 and it is dated July 30, 1971.

Page 196

1        MR. PANATIER:  Here's your copy.  I'm
2 using the July 30th and then I'll use that one.
3        MS. SULLIVAN:  I don't see an exhibit
4 number.
5        MR. PANATIER:  This will be
6 Exhibit 2614.
7 BY MR. PANATIER:
8    A.    Well, there you go, because I'm not
9 sure which volume that is in.
10    Q.    Probably -- this one, July 30, '71.
11    A.    Yeah, here it is.
12    Q.    Okay.  So that's a memo from
13 Hildick-Smith.  There is a stamp over his name on
14 the bottom, but that's from Hildick-Smith received
15 by Nashed and it's to Dr. Fuller regarding a
16 conversation with Dr. Clark Cooper at the School of
17 Public Health University of California, right?
18    A.    Yes.
19    Q.    Okay.  1971, true?
20    A.    Yes.
21    Q.    Okay.
22        MR. PANATIER:  I offer this into
23 evidence, your Honor, Exhibit 2614.
24        MS. SULLIVAN:  No objection.
25        THE COURT:  So admitted.

Page 197

1        (Plaintiff's Exhibit 2614 was
2        moved into evidence.)
3 BY MR. PANATIER:
4    Q.    He says, "At Dr. Crowley's
5 suggestion, conversation was held with Dr. Clark
6 Cooper of the School of Public Health University of
7 California Berkeley.  Dr. Cooper had worked at the
8 National Center for Urban and Industrial Health and
9 later moved to the School of Public Health at
10 Berkeley.  Dr. Cooper was chairman of the National
11 Research Council, review of asbestos and its
12 potential health hazards which published an
13 excellent review on the subject.  Dr. Cooper was
14 called in the hope that he might be able to attend
15 the FDA meeting on August 3rd.  He is in a position
16 to oversee epidemiological studies, conduct
17 analytical studies on talc and allied materials and
18 conduct animal studies on appropriate materials.  He
19 would be pleased to discuss this area at anytime.
20        In asking Dr. Cooper his thoughts concerning
21 the asbestos content of talc and the use of talcs
22 for cosmetics, he indicated that in his opinion
23 there is no place for asbestos in cosmetic talcs and
24 would withdraw from the market any talcs that
25 contained asbestos."

50 (Pages 194 - 197)

Page 198

1    First of all -- let me stop there.
2    Johnson & Johnson agrees that if the baby
3 powder has asbestos, it should be withdrawn from the
4 market immediately, correct?
5    A.    It wouldn't be sold in the first
6 place.
7    Q.    Can you answer my question?
8    A.    So the answer would be, yes.
9    Q.    Right?  It is possible that a company
10 could sell a product and then discover a problem at
11 which point they would need to recall it, right?
12    A.    That's the normal operation, yes.
13    Q.    It continues that Dr. Cooper said
14 that he did not believe that there was a low level
15 of asbestos content in talc which would be
16 acceptable for cosmetic ore.
17    And Johnson & Johnson agrees with that, the
18 acceptable level of asbestos in cosmetic talc zero,
19 right?
20    A.    Yes.
21    Q.    Okay.  So this is another
22 third-party.  This person at Berkeley, who has
23 opined that asbestos in cosmetic talc to Johnson &
24 Johnson would be a hazard, correct?
25    A.    Yes.

Page 199

1    Q.    Okay.  I'll put that in the inbox.
2    Let's look at the next document,
3 which is April 13, 1976.  So, if you'll turn to
4 April 13, 1976.  And, actually, this tab just says
5 "1976," so it will likely be the first 1976 document
6 that you have.  Keep going back.
7    A.    Okay.  It's March.
8    Q.    Keep going back.  Yeah.  It's
9 probably -- it's one of those.  Okay.  So go ahead
10 and turn the page.  It's one of those three there.
11 So let's go to the next one there.  Yeah, keep
12 going.  Next one.  That's it.
13    Okay.  Sorry about that.
14    Okay.  You see this is a memo from
15 D.R. Petterson to D.D. Johnston, right?
16    A.    It is, yes.
17    Q.    Now, D.D. Johnston was President of
18 the Baby Products Company, true?
19    A.    I think he was at that time, yes,
20 yes.
21    Q.    Petterson, medical director, right?
22    A.    He was, yes.
23    (Continuation of the day's
24 proceedings in Volume 2.)
25

Page 200

1    CERTIFICATION
2
3    I, SILVIA P. WAGE, C.S.R., License Number
4 30X100182700, a Certified Court Reporter in and for
5 the State of New Jersey, do hereby certify the
6 foregoing to be prepared in full compliance with the
7 current Transcript Format for Judicial Proceedings
8 . . . . . . . . . . . . . e non-compressed transcript
9 . . . . . . . . . . . dge and ability.
10
11
12 SILVIA P. WAGE            JULY 22, 2019
13 CERTIFIED COURT REPORTER        DATE
14 MIDDLESEX COUNTY COURTHOUSE
15
16
17
18
19
20
21
22
23
24
25

51 (Pages 198 - 200)

## &

**&**   3:3,15,18,20,21
5:21 7:8,12 9:22
9:24,25 10:1,11,11
11:4 12:15,16,22
13:2,7,9,11,11
14:13,14,18 15:11
15:13 16:5 17:8
17:21 18:7,15
19:22 20:2,5,11,18
20:19 21:4,13,23
22:5,10,25 25:2,9
25:11 26:24 29:16
30:1,12,22 31:6
32:2,5,10,12 33:5
33:11,14,22 34:3,7
35:18 38:19 39:12
39:15,19,20,24
40:3,7,10,13,18,20
41:14,17,23 42:14
42:24 43:3,11,18
45:1,15,20,22 46:7
46:10 47:15,16
48:7,19 49:5 50:9
50:19 51:11 53:25
55:19 56:7,13
58:21 60:19,20
61:1,2,12,18,20
62:15,25 63:2,6,18
67:4 70:21 71:4
73:1 74:15,19
85:20 90:24 92:2
93:11 96:17 99:13
100:3 102:10
103:7,9,17,19,23
104:9 105:14
109:3,10 114:2,7
120:20 121:10,11
121:17 124:13
127:10 129:13
134:11,21 136:22

137:6 138:1,10
139:21 140:3,5
141:1,6,22 142:5
145:6 146:5 149:6
150:12 151:23
153:2,18 154:15
155:9,13,25
157:24 158:6,10
159:19 162:8
163:8,19 164:4
167:25 168:21
170:21 171:19
172:1 174:13,19
175:9 177:18
178:13 179:12
180:19 181:7,12
182:8,13 183:17
183:19 184:25
185:24 186:2,4
194:25 195:6,7,11
198:2,17,23

## 0

**00000**   19:12
170:12,19
**00001**   50:3
**000628263**   186:4
**07039**   2:23
**07102**   3:20
**07701**   3:4
**08542**   3:16
**08903**   2:3
**0932-17as**   1:9

## 1

**1**   1:6 2:5,6 12:9
26:23 27:14 49:6
91:13 101:5
122:12,14 126:9
126:15,18 127:19
128:2,5,6,6 130:7
130:19,23 131:5

137:6 131:10 132:16,16
155:21 175:20
176:19,20
**1,037**   64:16
**10**   21:21 22:17
27:2,9 28:18 29:5
30:5 50:6 115:21
118:3,25 131:1
150:24 151:6
**10,000**   27:13 29:3
**100**   3:19
**10022**   3:7
**101**   166:11 171:24
172:4
**1037**   64:16 65:12
66:7
**107**   4:7
**108**   46:14 47:2,21
47:22 48:18
**10:50**   86:25
**11**   72:13 130:17
**111**   4:15
**115**   192:8
**118**   4:17
**11:12**   86:25
**11:38**   113:15
**11:40**   113:15
**11th**   3:6
**12**   4:3 93:1,16
115:13
**1201**   3:9
**121**   4:7
**127**   3:3
**12:26**   157:10
**13**   24:7 82:3 199:3
199:4
**139**   4:17
**14**   83:5,8 131:4
**148**   4:18
**15**   35:9 86:15

**15,000**   21:21 22:18
27:2,10 28:18
29:5 30:5
**16**   54:10 57:3 82:3
**161**   4:21
**17**   3:15 53:19
54:10 56:12 57:3
57:3 64:14 103:5
120:17 139:18
**178**   4:21
**17th**   111:16
**18**   15:15 24:2
46:17 47:2,24
53:19
**1800s**   15:14
**1809-17as**   1:2
**1890s**   103:20,22
**1894**   15:15
**19**   79:14
**190**   4:6
**1930s**   32:13
**1940s**   129:20
**1941**   16:19
**1949**   170:12,20
**1954**   52:13
**1955**   51:4,8,11
52:4 55:19
**1958**   126:21 127:1
131:22 132:2
136:23
**1959**   119:20,21
120:1,17 124:9
133:15,19 134:24
**1960**   136:8,12
137:1
**1960s**   16:4 33:6
**1964**   18:8
**1966**   103:5 104:13
107:20 109:5
110:7 124:16

**[1967 - 3rd]**                                                    Page 2

**1967**   16:13 17:25 18:18,24
**1968**   32:21
**197**   4:15
**1970s**   17:9,15 96:17
**1971**   195:25 196:19
**1972**   170:10 171:21
**1976**   23:2 110:6,7 110:16 113:1,5,25 124:24 199:3,4,5,5
**1978**   147:19 148:7 148:12
**1979**   19:7,8
**1980**   18:25 19:3,9
**1984**   190:17
**1985**   189:17
**1989**   19:23
**199**   4:6,8,8,9,9,10 4:10,11,11,12,12 4:13,13,14,14,18 4:20
**1995**   154:17,22,25
**1996**   70:20,24 71:1 72:9 83:21 84:19 87:8 94:12
**1:28**   157:11
**1:30**   156:24 157:6

**2**

**2**   1:6 2:5 110:8 122:11,14 126:7,7 126:17,18 127:14 127:17,22 128:5 130:6,7,17,23 131:6,9 199:24
**2,000**   137:13,14
**20**   84:18 101:5
**200**   2:6

**2000**   13:2,4 138:14 140:4 145:13 179:12 182:20 183:17
**2000s**   101:23 163:21,23,24
**2003**   18:18 19:15 58:1,10,11
**2005**   91:20
**2007**   159:18 162:2
**201**   3:16
**2012**   20:1,7
**2016**   79:11,17,22 81:1,9,11,14,17 83:3 84:19 87:19 88:6 89:13 94:12 183:20
**2017**   24:8,10 34:18 35:8,9,9 37:14 49:19 64:13,14 69:14 81:10 85:13 87:23 166:19
**2018**   40:2,7 79:13 115:13 117:3 118:21 158:4
**2018-10-23**   23:22 23:24
**2019**   2:4 9:21 43:18 200:12
**2064**   4:6 189:25 190:11
**211**   5:21
**218**   192:15
**22**   2:4 9:21 47:3 47:24 51:11 72:9 110:7,16 200:12
**22nd**   51:8
**23**   126:21,25 138:14
**2304**   4:6

**2343**   131:24
**2344**   126:23
**2345**   4:7 121:1,5
**2346**   133:17
**2349**   135:1
**2350**   136:9
**2360**   4:7 104:18 107:8,11
**2364**   4:8
**2367**   4:8
**2368**   4:9
**2374**   4:9
**2381**   4:10
**2382**   4:10
**2385**   4:11
**2390**   4:11
**2391**   4:12
**2393**   4:12
**24**   66:5
**2403**   4:13
**2412**   4:13
**2413**   4:14
**2434**   4:14
**25**   35:4,15 73:22
**2594**   4:15 111:3,6
**2614**   4:15 195:25 196:6,23 197:1
**2729**   151:1
**2736**   155:5
**2738**   4:16 71:24 72:5,7
**28**   88:6
**2836**   4:16 89:7,8 90:16
**29**   71:1
**290**   2:22

**3**

**3**   127:17 132:17 155:21 175:20 176:19,20

**30**   142:14 195:25 196:10
**300**   13:17
**30s**   16:14
**30th**   196:2
**30x100182700**   200:4
**31**   159:25 161:7
**311**   92:17
**312**   92:17,18,25 93:14
**3127**   171:9 178:20
**3162**   4:17 118:7,16
**3173**   4:17 138:22 139:14 145:14
**31st**   133:15,19 134:24 135:6
**32**   134:5
**33**   46:3
**3378**   4:18
**3400**   3:9
**3624**   4:18 148:18 148:21 150:23
**3695-14**   4:19 82:22,25
**3695-15**   4:19 59:6 59:12
**3695-22**   4:20
**3695-23**   4:21 159:16 161:3
**3695-24**   165:21
**3695-25**   185:9
**3695-27**   4:21 178:23
**3695-8**   4:20 51:16 51:24
**3rd**   171:10,12,21 197:15

[4 - advice]

**4**

**4**  58:1,2,4 70:25 79:22 126:4 129:9 130:6,11 147:19 148:7 159:25
**4/11/2018**  46:14
**40**  138:17
**403**  105:5
**40s**  16:14,25 17:18 17:20
**41**  192:11
**43**  129:9
**45**  16:19
**48**  129:9
**4th**  148:12

**5**

**5**  129:9 130:16
**5.2**  75:25 76:1
**50**  17:15 172:4,11
**51**  4:20
**512**  5:21
**558**  5:21
**56**  2:2
**564**  192:15
**58**  136:24
**59**  4:19 135:6

**6**

**6**  24:4,5 115:21 118:3,24 142:14
**6-10**  115:18
**6.7**  162:2
**60**  35:12
**602**  8:14
**6040-17as**  1:19
**60s**  18:11 23:8
**66**  34:23 124:22 151:25
**67**  16:7 17:21 18:11 35:3

**68**  18:24

**7**

**7**  130:16
**701**  5:15 6:2,12 8:14
**7024**  156:10 175:14,22 176:17
**7044**  170:4
**7049-16as**  1:14
**70s**  23:8,8,14 98:5 117:7 193:16
**71**  114:25 115:1 196:10
**718**  2:23
**72**  4:16 171:10,12 178:13,18
**75270**  3:10
**76**  98:6 111:16 192:22 194:4
**78**  147:23 148:5

**8**

**8**  65:16 66:3,5 67:17 92:19,25 93:16 136:19
**8-17**  64:13
**8/15**  34:18 35:9
**8/15/17**  46:3
**8/15/2017**  92:17
**800**  3:6
**81**  19:4
**82**  4:19
**84**  192:1
**85**  192:1
**8th**  136:8,12

**9**

**90**  4:16 161:16 193:8
**90s**  193:4
**94**  150:24 151:6,18 193:8,9

**96**  127:16
**97**  127:16
**983-1234**  2:23
**990,000**  27:17 28:7 29:2 63:10
**9932**  200:11
**9:24**  2:5
**9:32**  9:10
**9th**  131:22 132:3

**a**

**a.m.**  2:5 9:10 86:25
**a1**  131:14
**a2**  131:14
**abandoned**  108:13
**ability**  200:9
**able**  7:23 79:15 197:14
**abroad**  74:13
**absence**  50:14
**absolutely**  116:25 119:5 134:11
**academy**  31:20
**accept**  119:8 162:7
**acceptable**  198:16 198:18
**acceptance**  52:14
**accepted**  74:7
**accepts**  82:20
**accessory**  128:12 128:19 129:7 132:11,19 135:22
**accidental**  191:8
**accommodate**  10:22
**accurate**  153:10 200:8
**acicular**  132:5,5 134:1,2
**acknowledgment**  80:9 81:24

**actinolite**  76:7 83:13 95:12 150:9 152:15 153:21
**active**  162:8,10
**actively**  162:15
**actual**  57:8 60:10 60:17 186:21,22
**add**  109:10 129:9 135:25 188:15
**addition**  52:9 107:23
**additional**  5:12 70:6
**address**  17:20 105:7
**adjustment**  97:18
**administered**  11:11
**administration**  26:17 74:18
**admissibility**  7:13
**admission**  81:5,17 82:20,21
**admit**  6:10 90:7
**admits**  177:19
**admitted**  51:23 59:11 72:2 90:14 107:9 111:5 117:12 118:6 121:4 139:12 148:20 160:25 178:22 190:10 196:25
**adults**  38:13 194:20
**adverse**  104:25
**advertisements**  61:21
**advertising**  62:19
**advice**  145:18,18

advised  8:11 191:9
advising  124:5
advisors  166:25
advisory  166:18
 166:24
affairs  98:25
 104:14
affiliate  88:13
affirmed  112:15
afternoon  157:17
age  38:8 56:14,17
agencies  74:6
agency  185:23
agent  121:12
aggregates  132:4
ago  24:21 48:2
 94:9 163:20 194:6
agree  36:4 37:18
 39:14 41:4 43:16
 45:5 47:4,6 49:3
 63:22 73:11 75:5
 131:18 162:21
 178:5
agreed  112:14
agreement  41:21
agrees  43:18 46:8
 46:10 198:2,17
ahead  42:6,8 47:9
 59:4 64:12,19
 66:8,24 110:6
 123:8 139:6
 165:18 174:4
 199:9
air  105:4
al  1:7,12,17,22
 98:8
alison  158:16,20
 159:8
allied  197:17
allow  6:2 8:18
 42:4 47:9 84:25

106:8 117:13,24
 143:3
allowed  7:6 8:13
 44:13,16
allowing  81:17
alright  12:21
 13:15,24 18:21
 24:4 38:19 49:5
 50:8,19 61:25
 62:14 63:13 71:22
 83:9 86:14 96:10
 96:10 97:22,23
 102:8 104:17
 120:11,16 127:5
 132:1 161:6
 166:13 169:23
 179:10 180:23
 182:18 190:21
 193:12 195:24
alternate  88:8,17
 192:20
alternative  17:15
 59:16 172:10
altitudes  95:23
america  1:7,12,17
 1:22
american  31:11
 107:21 109:1
 121:12 124:19
 148:25
amosite  150:7
 152:14 153:20
amount  44:11,13
 110:1 169:16
 192:2
amounts  72:25
amphibole  63:19
 63:23 67:8,9,11,14
 68:25 76:8,23
 77:11,13 82:9
 83:14 84:6 85:22

85:22,25 89:24
 91:14,21 92:2,4,6
 94:13,15,24 95:7,8
 95:9,12 129:18
 132:9,10,19,22
 150:7 152:13
 173:2,4,8,10,13,15
 173:21 174:6,6
 177:10
amphiboles  63:23
 66:23 67:19 72:16
 76:3,6 77:4,7
 83:11 87:8,24
 181:8
ana  2:12
analog  179:20
analysis  195:5
analysts  158:21
 159:10
analytical  100:25
 149:24 197:17
ancient  116:7
 117:20
animal  197:18
answer  20:25
 24:10,22 25:4,18
 25:22,23 26:5,8
 27:12 28:20 29:4
 31:5 35:22 36:1,3
 47:4,19,24 48:14
 48:17,22 57:12
 64:3 67:21 68:6
 69:22,25 78:14
 87:17 92:10,12
 93:12 94:7,21
 96:8 137:23 140:9
 141:18,21 143:7
 143:17 144:12,16
 169:3 175:24
 178:1,2 194:10
 198:7,8

answered  29:7
 138:11 147:11
 149:6 183:10
answering  130:3
 176:8
answers  7:8,9
 138:2 143:20
 145:5,16 146:14
 147:1
anthophyllite  76:7
 83:13 95:9 150:8
 152:14 153:21
anxious  123:24
anybody  17:19
 38:14 141:14
anymore  30:9
anytime  67:19
 95:17 197:19
anyway  184:3
apatite  132:11
 135:22 136:5
apologize  11:13
 59:19 118:15
appear  76:11
 83:16 132:13
 175:9,11,12
appearances  10:2
appeared  107:20
appears  126:10
 174:6 175:14,15
 175:16
appellate  1:2 5:20
 6:6
appendix  131:13
applied  99:20
 148:10,12
appraised  23:4
appreciate  144:9
apprised  23:6
approach  9:17

**appropriate** 197:18

**approval** 88:8,17

**approved** 17:17 18:10 41:22

**approximately** 13:2 18:18 192:11

**april** 199:3,4

**area** 8:9 197:19

**areas** 6:15 55:17

**argue** 68:19 101:21

**argued** 106:6

**argument** 5:7,12 5:13 37:9,9 41:7 68:17 69:17 81:16 117:19 163:3 194:8

**argumentative** 177:22

**arguments** 5:8

**arthur** 111:18

**article** 106:18 107:19 108:6,9 115:9 116:3,9 117:6 118:13,20 166:15

**asbestiform** 67:15 73:7 149:11,11 155:16 170:18 174:16,20,25 175:3,8,15,16 176:19

**asbestos** 20:13 21:20 32:3,9,13,19 33:3,7,12,15,20,23 34:1 38:23,25 39:4 42:16,25 43:5,12,19,22 44:4 44:7,9,12,16,19,22 45:3,5,10,12,21,22

45:25 46:8 47:15 47:17 48:4,8,12,20 49:7 50:1,14 63:20 73:6 74:23 74:25,25 75:2,7 76:16,17 77:16,17 83:19 85:22 86:3 89:24 91:14,21 95:20 96:4 97:9 100:17 112:3,6,13 112:22 113:11 114:2,4,8,12,21 115:4,7 116:24 119:4,14 139:25 140:6 144:21 145:2,2 147:4,10 149:10,23 150:3,5 150:12,16,20 152:3,11 153:19 154:13 174:14,16 175:1,18 177:4 178:14,17 181:8 184:9 193:18,22 197:11,21,23,25 198:3,15,18,23

**ashton** 71:8 72:10 73:11 74:20 75:1 81:19 96:21 97:23

**aside** 133:13 189:8

**asked** 24:5 31:24 46:17 47:3,14 48:3,18 52:6 65:12 69:13,15,23 70:3 77:25 93:5 94:5,23 96:7 112:3 139:22 144:14 149:5 167:3 179:6 195:10

**asking** 30:8,9 31:4 45:11 68:2 124:21

141:10,12 143:22 177:23 197:20

**asks** 137:22

**aspect** 155:20 156:2

**asphyxiated** 105:3

**asphyxiation** 105:1,24

**aspiration** 107:15 108:7

**aspiring** 109:14

**asserting** 61:11

**assistance** 145:17

**assistant** 100:24

**associated** 32:13 128:12 149:19

**association** 31:11 71:12,16 80:13 108:12 148:25

**assume** 48:15

**assuming** 183:24

**asterisk** 149:25

**atmosphere** 37:20

**attached** 52:12 72:13 107:18 116:6

**attend** 197:14

**attended** 74:15,17

**attorney** 29:21 142:12,16

**attorneys** 3:10,20 23:12 24:18

**august** 24:7 35:9 64:14 136:24 197:15

**authentic** 52:14

**authentication** 61:12,23

**author** 195:10,12

**authored** 88:11

**avenue** 2:22 3:3,6

**avoided** 180:6 191:9

**avoiding** 168:6

**aware** 26:11 32:2 32:12 33:3,6 63:7 103:1 106:22 109:4 113:21 178:16 194:14

**b**

**b** 4:4 142:14

**babies** 42:19,22 102:11 106:7 108:13 112:5 113:6 164:8 166:7 182:10 185:2

**baby** 15:12,14,23 16:5 18:10 19:16 20:9 34:2,11,12,12 36:16 37:24 38:5 38:12,13,15,22,24 39:5,6,8,10,12 40:3 42:11,15 43:5,12,19 44:5,21 44:22 45:5,9 46:11 49:8,12 52:10 53:9,13,21 54:14 55:2,10,16 55:24 56:8 58:17 58:22 62:23 86:10 90:2 92:3 94:7 96:3 98:21 99:23 100:21,25 103:8 103:24 104:2,4 107:14,21,22 108:3 109:5,11 110:19 112:23 113:22 114:5,22 115:8 116:24 119:4,14 124:5,11 124:19 127:10,20

139:24 140:1,6
151:14 152:1
158:5,11,19 159:1
159:7,19 160:13
160:16 161:16,24
162:8 166:4,10,17
166:18,23 167:24
168:8,11,11,22,24
177:16 184:10,23
185:1,15,18,18
191:10,10,16
192:2 193:1,6
194:15 198:2
199:18
**baby's** 34:15 37:5
37:5
**babycenter.com**
39:16,21 40:5
161:20 162:4
163:18 164:10,24
165:10
**babycenter.com.**
42:1 157:20
161:22 164:12
**babysitters** 53:23
54:18
**back** 10:17 17:18
19:11 23:14 32:3
37:14 42:11 61:14
63:13 69:14 72:9
79:21 86:19 92:15
113:16 129:19,20
144:7,8 156:24
157:7,19 164:22
165:24 170:11,20
174:18 175:6
177:8 184:22
189:1,10,13 194:4
199:6,8
**background**
144:15

**bad** 38:20,25
50:10,15 95:19
110:10 129:14
173:2 177:12,13
178:9 179:7
184:21 193:18
**badges** 156:25
**badly** 173:1
**balcizone** 121:12
**ball** 55:16
**bandage** 15:19
**bank** 3:4
**barden** 1:4 3:11
9:22
**bardens** 10:7
57:20
**barring** 83:2
**based** 6:3,9 7:4
42:2 66:22 72:23
81:18 90:4,6
113:7,9 117:12
140:22 183:11
194:19
**basic** 108:21
**basis** 89:18,23
90:10 91:9,20
142:4 149:20
**batch** 72:15 76:24
84:7
**bate** 188:18
**bates** 60:6,16,18
61:5,13 186:3,6,10
186:13,24 187:1,3
187:6,9,11,17,19
187:21,22 188:10
188:15,20,24
195:7
**bath** 55:8
**bathe** 53:13 56:8
56:18

**bathing** 52:9
55:21
**battel** 95:23,24
96:1
**battelle** 122:4
127:5 133:18
135:4,5 138:18
147:18 170:22
183:2,20
**bearing** 149:18
**bearings** 15:11
80:2 102:9 111:12
122:5
**beauty** 58:17
**bed** 58:23
**beg** 47:22
**began** 5:7
**beginning** 92:23
**behalf** 10:10
**belief** 68:7 69:2
77:23
**believe** 7:15 8:10
8:14 17:10 23:16
27:1 33:17 40:7
49:21 52:23 74:17
91:25 98:14
112:16 116:10
138:23 140:23
142:7 171:20
184:7 192:1
198:14
**believed** 45:2
**beneficiation**
136:11
**benefit** 102:12
107:1 191:7
194:22 195:18
**benefitiate** 137:2
**benefits** 102:17,25
103:2 191:20,22
191:23

**berkeley** 197:7,10
198:22
**best** 22:8 140:4
200:9
**better** 127:23,25
**bible** 11:20
**big** 31:6 100:16
103:5 119:20
126:21 189:2
**bigger** 175:23
**bill** 71:7 72:10,12
73:11 74:20 75:1
75:19 81:19 96:21
97:23
**billions** 49:9
**bills** 13:17 14:10
**binder** 11:23 12:2
12:2,5 51:2 58:1,2
58:4 70:25,25
79:22 92:16 103:5
110:8,10 115:14
126:21 137:14,15
147:20,24 151:8,9
171:11
**binders** 23:9 24:11
24:23 25:2 26:19
26:19
**birchfield** 52:5
**birth** 38:6
**bit** 15:11 52:5
53:16 80:2 95:22
144:15,16 185:3
**black** 23:16
**block** 44:17
129:16
**blockage** 169:17
**blocking** 105:4,24
107:16 168:6
**blocks** 168:12
**blow** 193:19

[blurred - changed]

**blurred** 93:17,19 93:24

**board** 33:17 166:19,22,24

**boats** 16:17,22,22 16:23

**bob** 133:6

**body** 55:17 108:14

**bookmark** 42:12

**born** 52:19

**bottle** 37:1,3,4 49:7 50:5 55:4 169:11

**bottles** 114:24 194:15,16

**bottom** 34:16 35:4 37:5 55:13 113:5 115:18,18 132:15 166:9 196:14

**bought** 107:25

**break** 86:12,15,20 152:25,25 154:16 156:21,23

**breathe** 37:19 38:9,16,17,17 109:8

**breathing** 107:15

**brenntag** 1:7,12 1:17,22

**briefly** 17:14,20 64:19 120:4 132:2

**brightness** 55:13

**bring** 9:8 58:2,4 142:20 179:24

**brings** 123:11

**britain** 71:19 170:19

**british** 87:9

**broad** 150:18

**brochure** 53:10

**brochures** 53:9

**brother** 54:9 56:19 57:23 111:24

**brothers** 50:25 53:21 54:1,14,22 55:20,25 56:2,6,9

**brought** 96:21 105:14 114:7

**bruce** 101:9 110:17 111:13

**brunswick** 2:3 20:12

**building** 140:23

**bullet** 91:6

**bunch** 131:14

**bundles** 174:7,12

**business** 33:12 38:21,25 125:13 125:17

**buy** 45:9,13,16

**c**

**c** 2:12 3:1,17 83:3 102:2

**c.s.r.** 200:3

**calcium** 73:4 128:17

**calculation** 50:2

**california** 16:15 16:24 17:3 196:17 197:7

**call** 10:25 11:3 20:20 102:19 111:8,24 174:12

**called** 14:7 18:5,13 19:23 20:3 39:16 56:8 71:20 73:5 74:22 75:2 111:18 131:19 164:2,3 174:16 190:2 191:14 197:14

**cancer** 32:14,20 105:1,25 106:24

**cap** 109:13 169:2

**capacity** 14:20 15:2

**car** 6:5,8,9

**carbonate** 128:17 128:18 132:10,19

**carbonates** 128:14 129:4

**carcinogen** 45:23 46:8,11 47:5,6,17 48:4

**care** 55:2,24 166:9 191:16

**carolina** 171:24 172:13,22 179:5

**carry** 182:6

**carton** 168:11

**case** 5:18 6:21 7:14,19,20 27:25 36:9 57:8 60:19 68:8 70:19 81:12 86:16 89:15 95:23 105:18 138:5 141:10 144:2,5 147:1 157:2 177:20

**cases** 6:18 24:19 109:7 142:6 144:3

**cast** 97:6

**categories** 184:13

**categorize** 149:18

**category** 192:19

**cause** 32:19 45:25 47:17 129:14 169:17

**causes** 45:23,25 168:10

**caveat** 97:9

**ccr** 2:21

**cell** 9:13 87:3 157:14

**center** 3:19 40:3 42:11 158:5,11,19 159:1,7 160:16 161:16,24 162:8 166:4,17,18,23 167:24 197:8

**central** 100:19

**century** 32:4

**ceramic** 74:13

**certain** 89:21 91:7 109:25 110:2 184:13 186:18

**certainly** 23:11 24:14 31:8 42:14 53:25 128:22 137:1 162:10 166:21 174:1 193:7

**certification** 138:10 200:1

**certified** 140:16 140:17 200:4,13

**certify** 200:5

**cetera** 61:22 76:8 83:13 149:15,15

**chaffing** 102:19,21 102:24

**chair** 6:20,21 7:20

**chairman** 101:3 197:10

**chairperson** 101:7 101:8

**chalk** 128:15

**chalmers** 116:21 119:1

**change** 79:1 83:3

**changed** 79:17 112:23

**changeovers** 60:7
**character** 170:18
  175:18
**characteristics**
  136:15
**characters** 97:6
**charge** 193:5
**charging** 13:16
**charles** 1:8 3:11
  102:1 121:11,13
  121:23
**chart** 52:11,12
  53:21 54:14
**check** 13:13 153:7
  189:8
**chemically** 73:4
**chief** 111:9 121:25
  158:20 159:9
**child** 35:20 37:15
  38:5,15 55:24
**child's** 167:16
**childcare** 53:23
  54:18,23 55:3,24
  56:16,21
**children** 39:13
  48:12,21 49:1
  50:21 55:21 56:25
  57:1 107:21 108:7
  108:11 109:2,7,13
  168:1,23
**china** 19:17,19
**chisone** 16:10,11
  19:12 122:9
  123:10,20
**choked** 105:3
  109:7
**chris** 3:8 10:6,6
**christian** 111:19
**christopher** 3:2
**chronological** 51:3

**chrysotile** 50:3
  95:14,17,18 150:6
  152:12 153:20
  170:16
**chunks** 65:8 126:6
  126:8,16
**cincinnati** 111:17
**citing** 5:19
**claim** 114:21
**claimed** 114:11
  115:10 193:17
**clare** 98:2
**clarification** 72:22
**clarified** 69:6
**clark** 196:16 197:5
**classes** 52:8
**classic** 6:4
**clear** 7:13 40:17
  50:12 56:2 89:6
  106:15 143:21
**clearly** 6:13 57:2
  61:6
**cleavage** 76:12
  77:16 83:18
**clerk** 11:14
**click** 166:14
**client** 29:21
  142:12,16 155:23
**clients** 53:1
**clinics** 52:8
**closed** 19:3
**closer** 139:4
**closes** 169:15
**cloud** 192:19
  193:13,22
**clouds** 36:20
**coarse** 126:8,10,14
**cohen** 3:3
**colleague** 113:1
**colmer** 107:20

**color** 173:1,20
**columnar** 174:7
**come** 8:3,6,11,23
  12:4,19 17:18
  23:11 37:7 42:11
  61:14 62:20 63:13
  68:10 86:19 97:5
  156:24 157:6,19
  169:16 184:22
  188:11 189:1,10
  189:13
**comes** 122:10
  136:1 180:11
  187:20
**comet** 109:8
**coming** 8:5,8
  122:14,22,25
  123:5 130:23
  189:6 190:24
**comment** 75:20
  125:25 185:4,5
**commentary** 6:11
  6:13
**commented**
  108:25
**commenting**
  106:18
**comments** 27:5
  149:3
**commercial**
  149:24 176:24
**committee** 79:7,10
  101:3,6
**common** 6:15 76:8
  83:14
**commonly** 76:11
  83:17
**communication**
  71:7
**communications**
  71:6 158:17 159:6

**community**
  158:19,24 159:4,8
  159:12
**companies** 13:8
  20:16,22 145:6
**company** 7:24
  8:15 13:17,19,20
  13:20 14:7,9 18:5
  18:6,12 19:23
  20:3,15,16 23:2
  29:24 33:6,13,19
  38:3 41:15 50:10
  50:11,12 70:20
  74:11 98:22 100:2
  100:4 121:11,14
  122:1 123:10
  129:20 141:22
  146:22 158:18
  159:7 178:16
  190:22 192:22
  193:21 198:9
  199:18
**compare** 77:21
  152:25
**complaints** 172:25
**completed** 10:21
**completely** 116:9
**completeness**
  112:10
**completion** 73:18
**complex** 26:14
**compliance** 200:6
**component** 132:22
**compositions**
  149:21
**compound** 47:8
**compressed** 200:8
**comprise** 76:12
  83:17
**compton** 10:19

[conceded - correct]

conceded  41:18
concept  184:22
concern  168:11
   191:5
concerned  65:24
   125:6 188:25
concerning  197:20
conclusion  108:10
conclusions
   172:25
conduct  197:16,18
conducting  52:8
confident  193:21
confines  8:14
confirm  64:20
confirmed  191:21
conflict  72:23
confused  7:3
   149:13
consider  176:13
   178:8
considered  24:18
consist  89:23
   91:13
consistent  5:16
   7:23 77:5,9 82:5
   84:1,18 134:12
consists  132:18
constancy  154:4
constitute  112:8
consultant  12:24
   13:5,5 141:21
consumer  3:21
   10:11 12:16 13:12
   20:20 76:20 84:3
   145:6 159:10
   161:23
contain  38:24
   42:16 76:11 83:17
   144:21 149:22,23

contained  38:23
   46:11 127:16
   140:6 197:25
container  50:6
   169:19,21
containing  33:15
   33:23
contains  132:16
contaminant  76:9
   77:1 83:14 84:9
contaminants  76:6
   83:12 126:11,12
   132:5,17 140:1
   144:18
contamination
   112:7 132:18
content  40:4,12,12
   41:21 158:3,3
   162:17,17,20
   164:24 197:21
   198:15
context  107:16
continuation
   199:23
continue  24:13
   64:9 87:4 113:18
   157:15 193:10
continues  198:13
continuing  124:2
   132:8 139:7
contract  61:7
control  40:23,24
   41:3,18 162:8
   163:9 164:15,23
controls  40:20
   123:19
controversy  73:21
   178:17
conversation
   125:2 142:21
   196:16 197:5

cool  102:18
cooper  196:16
   197:6,7,10,13,20
   198:13
cooperate  123:24
cooperative
   111:15
coordinator
   100:18
copied  27:23 28:1
   28:15,25 120:9
copies  27:24 28:4
   29:22
copy  28:3 94:3
   133:2,10 186:20
   186:23 196:1
cornerstone  104:2
   107:22 108:3
cornstarch  167:15
   167:17 168:1
   191:17 192:7
corporate  7:11
   11:4 12:15 20:11
   106:19 142:5,11
correct  9:15 12:16
   12:19,20,22,23,25
   13:3,21 14:11,18
   14:24 15:6,14,24
   16:2,10,15,25
   17:22 18:19,20,22
   19:1,18,24 20:9,14
   20:23 21:7,8,14,17
   21:25 22:7 30:16
   30:19 31:20 32:4
   32:14,21 33:7,15
   34:7,9,13,21 36:17
   38:23 40:21 41:19
   43:1,6,9,13,16,20
   43:22 44:5,7,9,14
   45:10,23 46:1,8,12
   47:25 48:8,13,16

48:21,23 49:1,2,10
   49:14 50:6,22
   54:22 55:21 58:23
   62:16 63:21 64:24
   65:5,6,8 67:5,6,23
   68:7,9,24 69:2,21
   69:22 70:1,9,9
   71:4,8,13,20 72:20
   74:23 75:3,13
   77:8 78:1,6,20
   84:20 85:22,22
   86:5 87:8,20,25
   88:12,19 91:1,4,11
   91:15,21 92:3
   93:11 94:8,10,16
   95:15,20,24 96:3
   96:11,15,19 97:16
   97:25 98:9,22
   99:17,24 100:11
   101:4,10,18
   103:17,24 104:3
   104:15 105:21
   108:1,7,18 110:19
   110:22 111:10
   114:9,25 117:10
   120:18 121:14,23
   122:20,23 125:8
   125:11 127:11,20
   128:9,13,20 130:8
   130:24 131:2,10
   132:6 133:19,23
   134:8,13,22 135:9
   135:15 137:8
   140:10,12,14,15
   140:19 146:6,16
   146:23 147:8
   148:13 149:7
   150:3,14 151:23
   153:22 155:10
   156:10,17 159:2
   161:25 166:22

169:13 172:2,22
172:23 173:5,14
174:8,14 175:15
177:7,10 178:15
179:20 183:3
184:4,6,10 185:19
187:11 188:12
190:24 191:22
194:15 195:1
198:4,24
**corrected** 111:20
**correctly** 25:5
115:3
**correspondence**
26:17 63:7 100:19
164:18,19
**cosmetic** 19:20
71:12 72:15 76:24
79:23 80:12 82:11
84:7 88:8,18
90:23 112:16
149:21 191:4
194:22 197:23
198:16,18,23
**cosmetics** 71:16
197:22
**cotton** 55:16
**council** 197:11
**counsel** 5:12 8:11
8:21 9:23 12:2,4
46:4 59:17 60:19
61:1,11 65:15,21
73:15 82:1 86:12
105:13 106:6
112:10 145:8,18
145:22,25 146:2
170:4 176:2 181:3
181:18 183:12
184:1,12 186:6,16
187:21,23 188:20
189:8 190:14

**counted** 49:15
**country** 90:9
**county** 1:1 2:2
63:24 92:5 138:3
200:14
**couple** 25:10
**course** 50:20
105:5 128:11
129:24 132:25
136:21 160:19
183:2
**court** 1:1 5:1,6,11
5:22 6:1,7 7:21
8:2,18,25 9:3,6,12
9:18 10:9,17 11:9
11:19,25 12:7
25:23 29:12 37:10
41:9 42:4,9 44:3
46:23,25 47:7
51:20,23 52:1
57:11 58:6 59:8
59:11,17,24 60:2
60:11 61:10,20
62:5,11 64:6
65:25 66:3,6,8,21
68:18 69:18 72:2
72:6 73:14 78:14
80:6 81:2,4,15,25
82:12,17,19,20
85:1,3,6 86:11,14
86:22 87:2,18
89:1,4,6,9,18 90:6
90:13 92:11,23
93:2 94:25 95:5
96:9 104:21,23
105:11,20,22
106:8,15 107:4,9
111:5 113:14,16
115:25 116:20
117:4,8,11,12,12
117:13,17,24

118:4,14,18 120:6
120:11 121:4
126:24 130:4
138:25 139:3,6,10
139:12 141:17,25
142:24 143:2,7,19
145:7,11 148:2,17
148:20 156:22
157:9,13 160:4,8
160:18,25 163:4
165:3,17,22 169:8
171:6 176:5,5,12
177:25 178:22
181:17 184:12,18
185:10 186:14,24
187:3,10,13,25
188:3,7,10,23
189:11 190:7,10
190:13,17 194:9
196:25 200:4,13
**court's** 118:5
161:1
**courthouse** 2:2
200:14
**courtroom** 137:24
**courts** 7:5 74:10
**cover** 33:17 36:11
75:19 190:13
**covered** 29:11
**cow** 104:6
**cpta** 75:19
**crazy** 41:1,5,8
**create** 194:19
**created** 187:4
**credibility** 81:18
**criteria** 149:1,12
**crm** 161:8,9,15
**crocidolite** 150:8
152:14 153:21
**cross** 8:4,12 62:6

**crowley's** 197:4
**crr** 2:21
**crystallographic**
73:5
**crystals** 174:8,12
177:10
**ctfa** 71:15 152:4
**ctpa** 71:20 72:13
75:11,13 76:22
77:2 78:24 79:23
80:14 81:20 83:3
84:5 87:8,19
94:12 101:2
**curative** 103:1,2
**cure** 102:16
**current** 72:13
78:23 79:3,4
101:20 165:11
200:7
**currently** 12:21
14:13 169:11
**customer** 161:12
161:24
**customers** 43:8
181:14
**cutoff** 56:14
**cyprus** 19:24
151:22

### d

**d** 4:1
**d'angela** 1:14 3:11
9:24 57:22 59:1
**d.d.** 199:15,17
**d.h.** 111:9
**d.r.** 100:21 110:18
199:15
**dallas** 3:10
**dangerous** 124:7
168:13
**darlene** 1:9 3:11
9:23

**data** 21:10 26:4
  108:22 114:14
**database** 25:12
**date** 2:4 23:22
  75:17 126:24
  148:5,6 155:1
  200:13
**dated** 51:11 79:22
  104:13 110:16
  159:18 171:10,21
  186:2 195:25
**dating** 54:12 89:14
  170:20
**daughter** 53:18
**david** 1:8 9:24
  52:20 57:5 98:2
**day** 122:25
**day's** 199:23
**dd** 98:21
**de** 69:4
**deal** 160:20 189:3
**deals** 56:8
**dear** 148:23
**deaths** 108:15
**decades** 35:19
  182:23,24
**december** 19:2,7,8
  88:6 115:13
  118:21 134:24
  135:6 147:19
  148:7,12
**decide** 146:25
  173:19
**decided** 94:22
  172:21 191:6
**decision** 5:20
**decisions** 20:13,17
**defect** 6:24
**defendant** 10:10
  144:17

**defendant's** 140:4
**defendants** 1:7,13
  1:18,23 3:20
**defense** 12:4 170:4
  170:4
**define** 152:3,11
  155:18
**defined** 150:5
  152:12 153:19
**defines** 154:15
  175:7 176:18
**defining** 154:3
  175:1
**definitely** 189:11
**definition** 74:24
  150:2,11,21 154:5
  155:19,22,24
  156:4,5,7,9,12
  174:13,15,17
  175:10,21,22
  176:20
**definitions** 73:9
  153:1 174:19
  175:12,12
**delivering** 110:10
**demonstrating**
  96:14 182:4
**demonstration**
  182:6
**denial** 183:4
**department** 32:6,8
  32:16 33:10 133:7
**depends** 129:1
  154:2
**depo** 81:10
**deposed** 24:7
  85:13 90:4
**deposition** 7:12
  23:23 35:11 39:3
  64:17 92:16,16
  141:9 142:2,22

**depositions** 7:13
  57:7,14 64:13
  141:2,7,12,15
**describe** 139:22
  152:20 175:17
**described** 156:17
**describes** 175:19
**description** 4:5
  76:4 83:10 174:10
**descriptor** 64:1
**design** 6:19 7:20
  7:22
**designate** 142:14
**designated** 126:7
  126:9
**designating**
  142:10
**designed** 6:22
**designers** 6:19
**desire** 125:13
**desk** 179:16,18,24
**detail** 139:22
**detect** 44:1
**detectable** 149:23
  149:23
**detected** 43:23
  76:23 82:10 84:6
  116:24 119:3
  152:9 170:18
**detecting** 69:20
  78:1
**detection** 64:21
**detects** 87:24
**determine** 177:4
**detry** 107:19
**develop** 101:3
  108:23
**developed** 127:15
**developing** 115:2
**dialogue** 110:21
  163:11

**diane** 3:14 10:15
**diaper** 38:6,7
  56:19 166:9,13,14
  167:12,18
**diapering** 50:21
  50:24 55:21 166:9
**diapers** 38:7
**different** 10:23
  28:14 47:23 48:5
  56:22 62:18 95:14
  112:4 114:24,24
  123:4 128:25
  151:9,17 172:4,11
**difficult** 163:11,12
**diffraction** 64:21
  67:10 76:23 77:11
  82:10 84:6 85:16
  85:25 129:22,23
**digital** 158:16,17
  159:5
**dimensions** 76:21
  84:4
**direct** 4:3 12:10
  66:15
**director** 23:3
  98:24 99:19,23
  100:13,21,24
  101:12,14 104:14
  110:17,19 148:10
  148:11 162:4
  199:21
**dis** 15:19
**disagree** 36:18
  48:10 167:22
**disapproved** 41:23
**discover** 198:10
**discuss** 113:4
  126:4 197:19
**discussed** 112:14
  133:16 164:25

**discusses** 149:10

**discussing** 93:6
108:6

**discussion** 5:9
6:17 63:15 70:13
79:19 85:18
113:12 119:7
143:5 154:18
155:2 159:14
165:25 189:20
195:15,22

**discussions** 86:16
157:2 178:17

**disease** 32:3
102:16 103:2
109:1 146:15

**diseases** 107:21

**displeased** 123:22

**disposal** 182:8

**disproven** 193:24

**dispute** 61:5

**disputing** 146:13
195:13

**disregard** 64:7

**dissatisfaction**
124:3

**disseminated**
33:13

**distinction** 66:23

**division** 1:1 6:6
33:25

**division's** 5:20

**docket** 1:2,2

**doctor** 47:14
82:16 92:11 93:5
96:9 111:9 113:21
143:8 148:23
190:1

**doctor's** 105:16

**doctors** 43:9 109:4
109:6 124:4,10,19

**document** 27:25
28:15,25 42:8
50:17 51:4,11
52:3 53:13 56:3,7
59:20 60:1,15,20
60:22 61:1,6 62:3
80:15 82:19 87:11
87:11 88:11 89:12
89:17 90:1,6,13,20
93:6 98:18 104:12
110:13 116:7
117:20 118:5
119:19 149:12
155:1 160:19
170:5 177:9
178:19 186:21
187:6,12,18,23
188:13 189:16
190:2,22 195:6,13
195:20,24 199:2,5

**document's** 90:5

**documentation**
23:9 26:13 87:7

**documents** 21:17
21:21,24 22:9,15
22:17,20,23,24
24:9,11,15 25:12
26:3,7,23 27:13,17
28:13,17 29:2,17
29:20,23,25 30:12
30:22 40:2 60:14
60:23,25 63:10
97:5,20 101:22
104:10 152:22,24
153:1,9,12 156:1
170:3 177:19
179:25 180:6
183:16 184:13
186:1,19 187:2,24
188:4

**doing** 52:7 58:25
106:14 127:6
144:5 184:15
190:23,24 195:5

**dollars** 123:11

**dolomite** 135:24

**domain** 39:19,24
40:9,11,22 41:2,18
41:19 157:25
163:8

**domestic** 16:14,16
16:20 17:16 18:17
171:23

**door** 106:12

**double** 128:22,24
153:7

**doubt** 28:4 32:6

**douglas** 1:4 3:10
9:22

**dozen** 28:14

**dozens** 128:19,21

**dr** 5:1 7:15 9:19
10:19,21 11:7,11
12:3,5 23:3,10
25:24 41:13 52:3
63:18 74:14 75:11
75:12 78:4,18
83:2 86:23 87:6
87:18 89:20 95:6
100:11 110:11,13
111:18 112:20,21
112:22,25 113:1,5
113:21 114:4
115:6 116:14,14
116:15,21 119:1
119:13 120:12,16
121:10,19 142:3,6
142:20 144:13
148:23 157:19
170:22 171:2
176:2,8,17 184:9

**doing** 194:1,3,4 196:15
196:16 197:4,5,7
197:10,13,20
198:13

**draft** 75:15,16,18
75:19,22,24,24,24
78:7,22,22 149:1

**dressings** 33:25

**driving** 96:25
153:6

**drs** 107:19

**drug** 26:17 74:18

**dry** 102:19 103:2

**dump** 168:9

**duplicates** 27:21
28:8,11,21,22 29:2

**dust** 36:20 37:7,19
37:23 38:16 124:7
149:18

**dusting** 194:22

**dusty** 36:16,18

**dynamics** 191:15

**e**

**e** 2:24 3:1,1 4:1,4
162:2 179:19,23
180:4,13

**earlier** 114:6,8,11
157:21 158:21
159:10 169:24
182:20

**earliest** 23:23

**early** 15:22 16:4
17:14 23:8,8
52:13 96:17
119:22 163:21,23
163:24 193:16

**easier** 151:7

**editor** 117:6

**educate** 142:15

**educating** 164:8

**educational** 52:7
**effort** 156:14
194:21
**efforts** 161:8,15
**eight** 28:1,2,5,14
49:12 191:14
**either** 45:16 68:14
70:8 108:22
161:11
**electro** 152:5
**electromicroscopy**
77:1 84:9
**electron** 86:1
155:13
**eliminate** 76:19
84:2 139:25
**elizabeth** 1:19
3:12 10:1
**elm** 3:9
**elongated** 155:19
**embodiment** 25:8
**emphasize** 5:14
**employ** 13:22,25
**employed** 145:5
**employee** 7:21,25
14:13 153:14
**employees** 141:6,6
141:23 181:14
182:15
**enclosed** 149:3
**ended** 172:13
**ends** 9:5 47:12
62:12 67:2 82:14
90:12 107:7 118:1
139:11 143:4
160:24
**engagement**
101:18
**engine** 158:11,20
159:1,8 162:5

**england** 31:14
75:13
**english** 3:18
**enjoy** 86:20 157:5
**enjoyed** 52:14
**enters** 9:11 87:1
157:12
**enthusiasm** 80:14
**entire** 160:19
**entirely** 144:24
**entitled** 79:23 97:8
159:18
**entry** 182:18
**envelopes** 9:14
**environment**
108:11
**epidemiological**
197:16
**equal** 155:21
156:2
**equipment** 64:25
**equivalent** 142:14
**era** 179:19,19,20
**erroneous** 193:17
**error** 6:7
**especially** 38:15
48:12,21 49:1
122:17 191:5,10
**esq** 2:18 3:2,5,8,14
3:14,17,18
**essential** 58:17
**establish** 42:5
**established** 125:7
125:9 132:22
**establishes** 72:17
**estimate** 49:16
**et** 1:7,12,17,22
61:22 76:7 83:13
149:15,15
**etheridge** 1:8,9
3:11,11 9:24

52:19 57:4,5,15
**etheridges** 10:7
**ethridge** 52:20
**europe** 19:14 23:6
**evaluate** 181:11
**evaluated** 17:8,14
**evaluating** 193:1
**evaluation** 26:15
**everybody** 12:11
41:15 157:17
**evidence** 5:15
17:12 20:24 21:1
21:9,11,12 27:11
48:15 51:16,25
59:6,13 61:5
71:25 72:8 80:25
82:23 88:25 89:25
90:7,14,17 104:18
107:10,12 111:3,7
118:6,8 121:2,6
126:23 131:23
133:16 135:1
136:8 138:22
139:13,15 148:16
148:22 151:1,5
155:4,6 159:23
161:1,4 170:5
178:20,24 190:6
190:12 196:23
197:2
**evoking** 142:13
**exact** 43:14 47:3
82:4 142:7 163:21
**exactly** 83:20
175:7
**examination** 4:3
8:4,12 12:10 62:6
72:17 76:25 84:8
**examine** 180:18
**example** 6:5 33:3

**exceed** 90:8
**excel** 188:13
**excellent** 123:23
197:13
**exception** 7:6
117:3 122:11
**exceptions** 8:8
**excerpt** 160:2,9
**exchanged** 20:22
**exclude** 25:6
**executive** 99:17
179:13,15
**exercise** 164:15
**exhale** 37:22
**exhibit** 4:6,6,7,7,8
4:8,9,9,10,10,11
4:11,12,12,13,13
4:14,14,15,15,16
4:16,17,17,18,18
4:19,19,20,20,21
4:21 12:5 51:2,16
51:24 59:6,12
71:24 72:7 82:22
82:25 84:13 90:16
104:18 107:11
111:6 118:7 121:1
121:5 126:23
131:24 135:1
138:22 139:14
145:13,14 148:21
150:23 151:1
155:5 159:22
161:3 170:4 171:9
178:23 185:9
189:25 190:11
195:25 196:3,6,23
197:1
**exhibits** 12:4
**existed** 30:24
**existence** 139:25

exists  191:19
exits  86:21 157:8
expectation  45:15
expended  194:21
experience  5:17
  7:24
experiments
  114:11
expert  6:16,25 8:6
  8:7 54:11 98:1
  111:22
experts  22:22
  26:16 167:17
explain  69:13
  91:17,24 145:1
  154:12 163:11,12
explained  70:10
  88:1 124:2 125:5
  125:12 144:15
explanation  84:16
  84:22,24 85:11,12
  85:14 87:13
explore  108:21
  163:14
exposed  17:19
exposure  48:8,12
  48:20 81:13,16
  112:16 149:2
expression  103:25
  104:7
extensive  52:9
  96:13 146:10
extent  31:1 67:17
external  162:22
  164:1,7 166:25
  167:6
extremely  36:16

**f**

face  14:14 110:1
  160:12 168:6,9,12

faces  106:7 109:14
facilitate  76:22
  84:5
fact  5:16 14:23
  15:16 21:11 48:17
  90:5 105:16
  129:22 156:12
  162:3,4,7 173:20
  178:13 193:4
factors  191:2
failed  85:23 86:2
fails  86:9
fair  13:13,14
fairly  119:22
fairness  101:22
false  140:9,12,14
  146:6
familiar  7:22 17:6
  64:22 95:24 110:4
families  53:24
  54:4
family  38:5 123:17
far  22:6 103:16
  105:9 129:20
  158:2
fast  6:5,8
fat  119:20
father  45:9
fault  120:3
favorably  127:14
fda  197:15
february  19:4,10
  51:8,11 120:17
  166:19
federal  142:14
feel  8:21 173:25
  174:2 177:15
  178:4
feels  177:14 179:8
fellow  149:6

felt  108:5 112:7
fiber  43:4,13
  45:10 76:3,21
  84:4 154:1,7,9,10
  154:15 155:19,25
  156:16 175:20
  176:19,20
fibers  49:9 50:6
  65:8 76:11,12
  83:17,18 153:19
  153:23 181:8
fibrous  72:18,18
  73:5,6 74:8,21,21
  74:22 75:2,8 76:9
  77:2,4,15 82:7
  83:15 84:10
  127:17 132:8
  149:14 150:6,7,14
  150:15,17,19
  152:12,13,21,21
  153:23,24,25
  154:1,5,5,7,10,10
  154:12 174:23
fight  81:9,9
figures  128:22,24
file  23:13 28:16
  60:10,18 62:4
  187:20 188:15
filed  138:2
files  109:9
fill  69:6
filled  67:23
film  52:10
final  114:20 137:4
  137:8,14
finally  150:5
financial  160:13
find  43:24 77:11
  92:4,6 110:11
  114:13 115:7,11
  115:14 128:5

130:6,16 131:17
  131:19 133:24,25
  134:9,17,19
  135:15 136:16,21
  142:20 149:3
  151:8 166:10
finding  58:9 115:4
  129:12 133:22
  134:7
finds  177:9
fine  15:21 61:14
  62:11 66:13 86:13
  126:6,12 134:1
  189:9
fines  126:16
finish  173:11
finished  10:18
  151:13
firm  60:5
firms  61:21 62:15
  62:19,20
first  23:2 24:6,7
  27:13 29:3 34:3
  34:18 39:3 46:3,7
  52:12 55:22 75:15
  75:16,21,24 78:22
  80:3 83:20 85:12
  92:16 99:7 100:6
  103:7 104:4 105:6
  109:10 111:20
  116:12 161:15
  171:11 173:11
  182:18 198:1,5
  199:5
five  24:12 27:23
  48:1 86:20 125:14
  150:7 168:16
flagship  103:24
flaherty  3:18
flexible  77:15

**[float - go]**

**float** 137:2
**floatation** 127:8,9
  127:15 133:22
**floated** 127:25
  131:11
**floating** 127:22
**floor** 3:6
**focus** 129:3
**focused** 129:8
**follow** 7:19 24:20
  71:10
**followed** 85:16,25
**following** 149:19
**followup** 48:25
**fontana** 16:11
  130:25
**food** 26:17 74:18
**force** 80:14 101:3
**forecast** 190:2,16
  190:23
**foregoing** 145:16
  200:6
**foreign** 108:14
**forgotten** 100:7
**form** 44:12,18,20
  44:24,24,25 57:9
  63:20 74:9 75:8,8
  76:9 77:14,14,17
  83:15 129:16,16
  140:7 150:6,15,18
  153:23,24,25
  154:13,13 165:11
  173:16
**format** 186:9,20
  200:7
**formation** 76:5
  83:11
**former** 141:6
**forms** 82:7 150:7
  152:13 174:23

**forth** 142:15 175:6
**fortunes** 123:12
**forward** 97:19
  102:9 180:17
**forwarding**
  107:19
**fought** 74:9
**found** 35:16 96:1,4
  96:5,7,12 114:12
  114:21 118:3
  119:14 123:21
  127:3 128:1 135:8
  154:20 155:7
  170:16 171:16
  189:22 193:18
**foundation** 42:5
  61:23 163:15
  177:22
**founder** 99:15
**four** 3:19 18:3
  24:12,23 27:22
  33:22 49:7 56:18
  131:1
**fourth** 55:9
**fragments** 76:12
  83:18
**fragrances** 71:16
**frame** 18:24 80:5
  89:15
**franchise** 104:2
  107:23 108:4
**fred** 70:16,18
  72:14 170:6,7,10
**free** 30:23 44:7,9
**freedom** 25:11
  89:23 91:14
**freely** 20:22
**friday** 5:7 10:20
**front** 103:6 118:21
  119:21

**full** 11:14 14:2,3,6
  26:14 60:25 131:9
  169:19,20 200:6
**fuller** 196:15
**fully** 18:9 163:12
  178:16
**function** 6:16
**furnished** 149:4
**further** 69:13 82:3
  144:17,18 149:13
**futile** 123:19
**future** 192:19

**g**

**game** 181:16,22,25
**garde** 3:17
**gas** 32:23,25
**gateway** 3:19
**gavin** 98:24
  104:13
**gbu** 159:19
**general** 99:4,5,5,6
  99:11
**generally** 98:6
  178:5
**gentleman** 142:11
**geological** 63:25
  174:17 176:23
**geologist** 98:1
  152:18 154:12
**geologists** 175:23
**george** 1:14 3:12
  5:20 99:19 148:10
**germanasca**
  123:19
**getting** 21:4 27:21
  36:20 56:21 78:17
  109:25
**giant** 15:19
**girl** 54:9 56:12,20
**give** 6:14 9:14
  11:24 22:4 35:5

46:5 62:21 70:6
  84:17,22 85:12
  87:12 93:23 120:6
  138:17 171:13
  175:23 191:18
**given** 21:6,13 26:8
  29:22 85:14
  147:21 148:5
  155:25 156:6
  187:17 188:21
**gives** 150:2,12
**giving** 15:16
**glasses** 96:25
  153:6
**global** 20:16 88:18
  89:23 90:10 91:9
  91:10,20 94:13,17
  94:18 158:20
  159:9
**go** 25:11 37:14
  42:6 46:2,2,14
  47:9 48:18 55:7
  55:12,14,14 56:18
  58:1 59:4 64:12
  66:8,24 68:3
  69:12 72:9 79:5
  80:7 91:6 97:18
  97:19 100:19,20
  110:8 113:14,16
  115:21 118:24
  120:2,12 121:7
  122:7 123:8
  130:13 134:5,24
  135:11 136:7,14
  138:8,8 139:6
  147:19,22,24
  148:1 153:9
  155:18 161:13
  164:9 165:18,24
  166:4,7,8,8,13
  167:12,14 171:11

174:4 177:8
180:17 185:9,12
186:9 187:5,23
188:3 189:18
191:1 196:8 199:9
199:11
**goes** 6:24 40:9,17
40:23,25 41:3
105:7,15 106:9
123:12 159:25
162:24 163:7,13
180:11,15
**going** 6:6,8 8:3,6
8:10,20,21 10:23
12:9 14:23 16:18
20:20,25 25:20
29:7,9 32:3 35:3
38:16 42:4 43:25
55:20,24 62:1,3
64:19,20 70:24
73:17 80:4 86:8
86:15 87:14 89:12
90:7 92:8,20
94:19 98:16,17,19
103:4 104:17
106:8 112:20
116:6,8,18 120:4
121:19 122:3
129:25 130:13
132:1 133:8
134:17 136:5
140:11 142:8
144:25 147:17
151:20 152:23,25
154:23 156:23
158:10 160:14,15
162:5 165:1,10,13
170:11 174:12
175:6 176:2,4
181:1,9 182:19
184:21 188:14

193:15 194:5
195:20 199:6,8,12
**good** 5:1,3 9:12,20
10:5,5,14,14,16
11:7,8,9 12:11
50:10,15 86:11
95:19 129:13
147:17 156:21
157:17 166:12
173:25 174:2
178:4
**gotschal** 3:15
**goudie** 98:8
**grabs** 168:11
**grade** 19:20 72:25
122:8,10,11,12,14
126:7,7,9,15,17,18
126:18 149:21
**grades** 90:23
149:22
**grandson** 99:15,16
**grantham** 17:5,7
17:10,13,17
**granules** 132:9
**great** 71:19 80:1
99:16 102:5 106:1
170:19 171:18
185:25 189:24
**greater** 124:6
155:20 156:2
**greek** 134:3
**greenstone** 3:8
**grew** 150:13
152:18
**grit** 132:3
**groth** 111:9,22
113:5
**ground** 34:6,9
126:6 150:14
152:18

**grounded** 126:9
**grounds** 66:18
69:23 78:2,5,19
87:24
**group** 39:23 40:19
116:23 119:3
150:7 152:13
167:6,8
**grouping** 149:19
**groups** 74:7,10
**grows** 53:10
**growth** 125:2,3
**guangxi** 19:17,19
**guess** 20:25 21:22
179:15,18
**guidance** 88:13
**guide** 72:14 75:13
75:20 79:23 81:20

**h**

**h** 4:4 11:17,18,18
102:2
**habits** 73:5
**hair** 77:16
**half** 24:5,6 28:14
**hallucinating** 37:7
**hand** 34:15 36:24
55:5 122:13,17
**hands** 36:19 37:4
**hanging** 193:20
**happen** 110:1
**happens** 34:20
36:2,3
**happy** 84:17,22
87:12 91:17,23
185:4
**harm** 191:7
**harmful** 64:1
167:16 168:2
**harmless** 44:17
63:25 64:5 67:14
74:9 77:13 129:16

**hazard** 33:7 74:8
76:13,20 83:19
84:2 106:21
108:24 198:24
**hazards** 197:12
**head** 8:16 71:11
97:23 193:5
**health** 20:12,21
21:4,12 74:6
76:13 102:17,25
106:25 110:25
149:19 191:5,6,20
191:22 194:21
195:18 196:17
197:6,8,9,12
**healthy** 32:24 33:4
**hear** 66:6 139:4
159:11
**heard** 22:21 30:15
58:24,25 62:23,24
62:25 63:5 64:20
70:18 71:15 86:17
95:22 104:7 157:3
**hearsay** 6:11 8:7
42:3 60:5,22
105:5,7,7 106:3,4
106:4,17,18 116:7
117:2,19 165:2,13
**heat** 34:1
**heeded** 105:16
**held** 5:22 6:7 7:21
69:5 197:5
**help** 50:22 55:21
56:6 58:9 96:23
97:6 102:8,21
119:22 141:1,5
143:1,12 146:3
183:11
**helped** 141:13
144:10 145:20

**helper** 53:22
**helpers** 54:17
**helpful** 83:6
**helping** 54:2 56:9
**helps** 79:8 102:18
**herford** 36:8
**hi** 10:14
**hiding** 54:7
**high** 19:20 72:25
    122:8,10 149:21
**higher** 194:19
**highlight** 153:25
**highlighted** 125:5
**hildick** 98:24
    104:14 196:13,14
**hired** 61:21 62:15
**historical** 103:18
**history** 23:4,7
    92:2
**hold** 34:25 51:20
    59:24 67:20 77:12
    82:17 85:1 94:1
    115:14 154:14
    160:4 169:8
    174:18
**holds** 123:18
**holes** 109:17,18,24
    110:2 169:13,15
    169:22
**home** 53:22 54:15
    56:7,10
**hon** 2:12
**honor** 5:4,15,25
    7:18 8:24 9:2,4
    10:4,13 11:2,8,22
    11:24 25:20,25
    29:6,9 37:8 41:6
    42:2 44:2 46:19
    47:10 51:15,17,22
    58:3,5 59:5,10,20
    60:4 61:15 64:2

64:10 65:19 66:20
67:1 68:16 69:16
71:23 72:5 73:13
78:9 80:4,24
81:12 82:6,9,24
85:9 87:5,14
88:24 89:2,11
90:1,11,18 92:8
94:19 96:6 104:18
104:19 106:22
107:5,8 110:9
111:2 112:10
115:23 116:2,11
117:3,18 118:17
120:9,13,25
126:22 130:1,2
131:24 135:2
138:21,23 139:2,8
141:16,20 142:2
142:12 145:10
147:25 148:15,18
151:1 156:20
157:16 159:22,24
161:2 163:2 165:1
165:9,12,16 169:6
171:3 176:1,11
177:21 178:20
185:9 186:9
187:16 190:5,8
194:7 196:23
**hope** 197:14
**hopkins** 4:2 5:2
    7:15 9:19 11:5,7
    11:11,16 12:5,13
    25:24 41:13 52:3
    63:18 74:14 80:20
    83:2 86:23 87:6
    87:18 89:21 90:20
    95:6 110:11,13
    116:15 120:12,16
    142:3 157:19

176:3,8,17
**hopkins's** 12:3
**horizontally** 136:1
**hospitals** 15:24
    43:9
**hour** 13:16,18
**huge** 41:15
**hughes** 107:20
**huh** 23:17 31:16
    55:11 64:18 127:4
    150:1
**hulfish** 3:15
**human** 77:16
**hundred** 96:3,10
    103:10 136:1
**hundreds** 24:21
    49:13,22 50:5
**hygiene** 148:25
**hypothesize**
    194:18

**i**

**ian** 71:11
**idea** 180:4 189:5
**ideas** 62:21
**identical** 28:3
**identified** 111:13
**ignore** 162:16
    194:5
**ii** 17:4 99:6
**illness** 108:17
**immediately** 198:4
**impeach** 81:6
    117:22
**impeaching** 66:10
    66:11,13 81:18
**impeachment**
    65:24 66:15,20,22
    81:23 82:8,12
    117:25
**important** 21:5
    103:8,16 108:5

121:8 158:18
    159:4,6
**imported** 121:16
    170:19
**imprecise** 149:13
**improper** 116:9
**improving** 123:23
**inadmissible**
    116:10
**inaudible** 5:13
    46:20 65:23 89:13
    106:19 116:8,10
    160:11
**inbox** 179:22,23
    180:5,9,12,19,24
    181:2,9 182:2
    183:1 184:21
    199:1
**inches** 24:12,23
**include** 76:7 83:12
    129:6
**includes** 91:10
**including** 17:17
    72:25 86:16 90:3
    157:3
**incomplete** 160:9
**inconsistent** 66:10
    82:7 92:21
**incorporated**
    10:12
**incorrect** 97:16
**independent** 39:23
**indicated** 188:23
    197:22
**individual** 27:24
    33:16 91:24 104:8
    156:16 164:7
    174:8
**individuals** 9:16
    32:15 33:9 140:25

**indonesia** 88:14
91:25
**indonesian** 89:14
**industrial** 86:8
127:11 148:25
197:8
**industries** 74:13
**ine** 186:7
**infant** 35:20
**information** 20:21
21:5,13 26:8
27:20,21 28:20
61:8 62:16 70:7
100:14 145:19
162:6 164:13
180:19,20 181:2,7
188:25
**informed** 112:13
**inhalation** 32:19
112:6 113:11
**inhale** 34:12 35:20
35:23 37:15,21,21
124:7
**inhaled** 167:17
168:4
**inhales** 168:8
**initial** 37:14 64:3,7
**initiate** 108:21
**innova** 14:7
**innovant** 14:8
80:22
**inquire** 111:18
**insight** 159:18
**instance** 6:6 13:10
20:19 52:19
186:21 188:16
**institute** 110:24
**institution** 116:22
119:2
**intended** 140:12

**intentional** 183:23
**interchangeable**
149:14
**interest** 112:10
117:21 194:20
**interested** 116:17
**internally** 45:2
153:19
**internet** 165:11
**interpret** 76:21
84:4
**interrogatories**
7:8,10 137:19,21
138:2,11 143:21
145:10,17 147:11
182:19
**interrogatory**
146:17 184:5
**interrupting** 25:21
176:2
**interruption** 29:10
85:5
**interview** 116:20
118:25 119:9,12
125:10
**interviewed** 121:8
**introduce** 12:12
89:19
**introduction**
133:1
**invariably** 63:25
**investment** 107:24
108:4
**involved** 6:19 57:8
62:20 76:5 83:10
97:9 141:8
**involvement** 158:1
**involves** 7:20
**ironing** 33:17
**irresponsible**
163:1

**irritation** 15:20
**issue** 8:3 72:13
81:21 89:15,16
104:20,24 105:2,5
105:20 106:9,19
109:17 178:14
192:18,18 193:20
**issues** 7:23 23:8
160:20 189:9
195:6
**italian** 16:6,8
18:12,22 19:12
96:2,14 120:22
121:16 123:14
127:14,19 128:5
130:7,7,17,17,19
130:23,23 131:5,6
131:8 132:16
134:10,13 136:11
146:8 170:13,24
173:5,7,14,15
**italy** 16:9,18 19:10
120:21

## j

**j** 3:8 11:18 107:19
**j&j** 10:15 59:20,25
60:6 69:24 77:7
77:10 90:1 97:8
98:3,8,21 111:12
123:25 125:12
127:19,23 146:4
158:16,21 159:9
165:14 174:22
175:7 176:18
177:5 186:3,7
187:3
**j&j's** 38:21
**j.s.c.** 2:12
**j4** 152:4
**j4-1** 101:3

**jack** 3:14 10:15
**january** 19:9 71:1
72:9 150:24 151:6
**jbp** 112:13
**jersey** 1:1 2:3,23
3:4,16,20 20:15
140:22 200:5
**jj0006286** 187:13
**jjci** 20:20 21:6,14
145:18,19
**job** 1:25 23:1
**john** 3:17,18 4:2
11:4,16 12:13,13
80:20 90:20 101:2
**johnson** 3:20,20
3:21,21 7:8,9,12
7:12 9:22,23,24,24
9:25,25 10:1,1,11
10:11,11,11 11:4,4
12:15,15,16,16,22
12:22 13:2,2,7,7,9
13:9,11,11,11,12
14:13,13,14,14,18
14:18 15:11,11,13
15:13 16:5 17:8,8
17:21,21 18:7,7,15
18:15 19:22,22
20:2,3,5,5,11,11
20:18,19,19,19
21:4,4,13,13,23,23
22:5,6,10,10,25,25
25:2,2,9,9,11
26:24,24 29:16,16
30:1,11,12,22 31:6
31:6 32:2,2,5,5,10
32:10,12,12 33:5,5
33:11,11,14,14,22
33:22 34:3,3,7,7
35:18,18 38:19,19
39:12,12,15,15,19
39:19,20,20,24,24

40:3,3,7,8,10,10
40:13,13,18,18,20
40:20 41:14,14,17
41:17,23,23 42:14
42:14,24,24 43:3,3
43:11,11,18,18
45:1,1,15,20,20,22
45:22 46:7,8,10,10
47:15,15,16,16
48:7,7,19,19 49:5
49:5 50:9,9,19,19
51:11,12 53:25,25
55:19,19 56:7,7,13
56:13 58:21,21
60:19,19,20,20
61:1,1,2,2,12,12
61:18,18,20,20
62:15,15,25,25
63:2,2,6,6,18,18
67:4 70:21,21
71:4,4 73:1 74:15
74:15,19,19 85:20
85:20 90:24,24
92:2 93:11,11
96:17,18 99:4,12
99:13,13,13 100:2
100:3 102:10,10
103:7,7,9,9,16,17
103:19,19,23,23
104:9,9 105:14,14
109:3,3,10,10
114:1,2,7,7 120:20
120:21 121:10,10
121:17,17 124:13
124:14 127:10,10
129:13,13 134:11
134:11,21,21
136:22,22 137:6,6
138:1,10,10
139:21,21 140:3,3
140:5 141:1,1,6,6

141:22,22 142:5,5
145:6,6 146:5
149:6,6 150:12,12
151:23,23 153:2,2
153:18,18 154:15
154:15 155:9,12
155:13,25,25
157:24,24 158:6,6
158:10,10 159:18
159:19 161:15
162:7,8 163:8,8,19
163:19 164:4,4
167:25,25 168:21
168:22 170:21,21
171:19,19 172:1,1
174:13,13,18
175:9 177:18,18
178:13,14 179:12
179:12 180:18
181:7,7,12,12
182:8,8,13,13
183:17,17,19,19
184:25,25 185:24
185:24 186:2,3,4,4
194:25,25 195:6,6
195:7,7,11,12
198:2,2,17,17,23
198:24

**johnson's**   15:23
16:5 19:16 20:8
25:12 30:1,22
37:24 38:15 39:4
43:5 45:15 46:11
49:7,12 58:17
59:16 67:4 73:1
90:2 92:2 94:7
96:2 107:14 109:9
112:23 113:2,22
114:2,22 115:4,8
116:24 119:4
138:2 139:24

140:1,6 146:5
155:9 161:8
174:19 175:10
180:19 184:23
185:15,17,18
192:2

**johnston**   98:21
199:15,17

**joined**   23:2

**journal**   31:11,14
107:21 109:1
114:21 124:19

**journals**   31:10

**jpb**   194:20

**judicial**   200:7

**july**   2:4 9:21
133:15,19 195:25
196:2,10 200:12

**jump**   64:19

**june**   103:5 107:20

**juror**   156:25

**jurors**   9:6,9,15
10:14

**jury**   9:11 10:18
11:8 28:10 30:22
41:14 54:8 64:7
86:15,21 87:1
117:8 156:23
157:8,12 164:23
176:13 182:8,13

---

### k

**k**   11:17,18 102:2

**keep**   50:16 97:6
102:9 175:5,8
180:23 199:6,8,11

**keeps**   102:18
176:2

**kentucky**   14:24

**kept**   50:18

**kids**   50:24 105:3

**kin**   36:25

**kind**   5:23 8:11
67:14 86:18
100:18 122:25
135:12 157:4
180:18,23 193:19

**kits**   15:17,23

**knew**   100:9
134:11,21 137:6

**know**   5:11 17:2
20:1 21:23 22:6
24:8,16 26:12,22
27:2,3,7,16 29:4
29:18,19,25 30:3
30:11,16,17,23
41:21 44:15 49:8
50:8 52:18,19,22
53:5 56:17 57:6
59:1 63:4 69:10
70:16,17 74:14
75:17,23 77:10
78:23 79:2 85:20
86:6 89:14 93:9
93:20 96:1 99:9
100:5,7 101:20
102:4,23 111:21
114:6,23 121:20
123:14 130:22
136:25,25 137:15
137:18 141:21
144:25 146:7,10
147:2,14 149:10
158:2,14 161:9
164:3,6 167:2,4
171:1,5 173:4,6
174:10,22 177:18
177:20 180:9
183:18,21,23
184:3 186:12
188:21 189:5
195:9,10

**knowledge** 6:15 7:1,4,17,24 8:1,18 8:23 31:4 32:9,16 32:19 33:11 140:5 149:20 200:9
**known** 32:20 48:11,23 150:6
**knows** 39:12 41:15 45:20,22 47:15,17 48:7,19 60:20 63:2 177:24
**koch** 5:21
**konigsberg** 2:18 3:5
**krishinsky** 138:5 145:14

**l**

**l** 1:9,14,19
**label** 187:6
**laboratories** 144:20
**lack** 144:18
**lacks** 7:16
**lancet** 31:17
**langer** 111:18,19 111:21,22 112:14 112:21,21,22,25 113:21 115:6 116:14,15,21 119:1,8,13 125:7 184:9 194:1,3
**language** 81:20
**laptop** 165:24
**large** 15:19 33:6 49:10 55:17 74:12 107:23 108:4 109:25
**largely** 134:1
**latches** 7:21
**late** 23:8 129:20

**latest** 23:23 80:15
**law** 1:1 7:14 121:10,22
**lawsuit** 137:22 184:6
**lawsuits** 139:8
**lawyer** 22:3 37:9 41:7 183:25
**lawyers** 22:23,25 25:3 116:5 145:20 146:1,4 183:11
**lay** 5:15 6:3
**lead** 111:21
**leader** 101:18
**leadership** 159:18
**lear** 116:6,19
**learned** 114:12 115:3 122:9,11
**learning** 55:2
**leave** 157:6
**lee** 99:19 148:10
**left** 76:15
**legs** 37:5
**lest** 123:20
**letter** 75:19 83:21 117:6 148:10 178:12
**letterhead** 51:12
**letters** 180:1,7
**level** 48:8,10,11,20 48:23 112:7 198:14,18
**levels** 112:16
**levy** 2:18 3:5
**lewis** 158:16,20 159:9
**liability** 5:18 6:17
**liaison** 164:5
**library** 31:7,8
**license** 200:3

**lid** 109:11,12,16 109:21 169:1,12 169:14
**light** 67:13,24 68:1 68:11 85:16 86:1
**lightly** 55:16
**likewise** 127:14
**limine** 104:20,23
**limited** 14:8 71:13
**linda** 57:4
**line** 20:6 24:4,5 29:17 30:1,12,23 31:2 35:4,15 46:4 46:17 47:2,24 65:14,16 66:3,5 67:17 73:18 92:19 92:25 93:15,16 113:5 139:8 158:19,24 159:4,8 159:12 161:25 165:24 166:3
**lines** 52:7 112:11
**link** 39:18
**list** 50:15 96:24 149:4
**listed** 80:16
**listen** 92:12 95:5
**literally** 173:8
**literature** 194:13 194:13
**litigation** 21:19,20 21:25 26:25 140:18 141:2 143:12,15,16,18 143:25 144:1,4
**little** 15:10,11 52:4 53:16 55:7 80:2 95:22 98:20 109:17 125:4 144:15,16 151:4 160:12

**livingston** 2:23
**llp** 3:15
**located** 170:17
**logic** 126:9
**logo** 185:15
**london** 35:10 89:12
**long** 64:17 156:3 174:8,11 177:9
**longer** 20:5 142:13
**look** 25:12,16 28:6 28:12 36:11 42:1 49:18 53:20 62:10 65:9,11 67:10,16 68:22,22 75:10 76:1 77:18 79:6 79:11,13,16,16 83:4,5 84:12 88:23 94:3 104:12 118:21 119:11 120:4 126:20 128:2,4 129:21 130:14 132:2,25 134:6,16 150:24 151:7 167:11 168:5 169:2 172:4 174:5 186:9 187:5 187:23 190:9 192:6 199:2
**looked** 22:9,14,16 22:17 24:8,10,15 24:16,16 26:7,23 27:1,10,18 28:9,22 63:11 79:2 122:5 153:8,11,15 170:11 172:8,10 172:11
**looking** 6:11 16:21 26:16 33:25 51:3 78:4 90:9 106:20 115:5 118:12

152:24
**looks** 53:17,19
54:10 56:12 65:3
77:15,17 127:6
129:2 159:24
166:4
**lorena** 101:17
**lost** 78:17
**lot** 67:19 68:4,23
70:18 85:21,23
86:5,6,9 147:18
173:23 182:1
188:16 194:16
**lots** 67:18 183:2
**love** 97:16
**low** 198:14
**lubricant** 102:19
103:3
**lunch** 156:23
157:5,10
**lung** 32:20
**lungs** 35:21
167:16 168:3

**m**

**magnesium**
128:17
**mail** 2:24 179:19
179:23 180:4,13
**mails** 162:2
**maimon** 2:18 3:5
5:24 6:2 9:1,4
10:4,6 89:25
142:10
**maintained** 89:22
91:8 115:7 184:9
**maintains** 125:8
**major** 192:18,18
194:21
**making** 61:1
183:10

**management**
55:24 187:6
**manges** 3:15
**manner** 111:20
**manufacture**
139:24 140:5
**manufacturer**
7:22
**manufacturing**
32:24 123:2
**maple** 3:3
**march** 110:7,16
111:16 136:8,12
171:10,12,21
199:7
**mark** 97:17 98:17
98:20 116:18
135:15,17,18
**marked** 23:22
115:18 119:19
137:13,14 142:22
148:5 161:7
172:18 191:14
**market** 125:20,24
191:15 192:3,7
197:24 198:4
**marketed** 42:22
**marketing** 158:17
158:21 159:5,9
161:12,24 162:5
**marking** 118:15
148:17 165:19
**martin** 116:5
**mask** 32:24
**masks** 33:1
**massey** 121:9
123:25 125:12
**massive** 76:10
83:15
**matches** 82:10

**material** 33:4 52:8
67:15,15 92:7
151:13
**materials** 34:1
197:17,18
**maternity** 15:17
15:23
**math** 50:7
**matter** 9:21 124:3
**matters** 6:14
**matthew** 121:11
121:11,13,23
**mccarter** 3:18
**mccarthy** 99:22
**mcneill** 1:14 3:12
9:25 10:8 57:22
59:2
**md** 99:1,2,3
101:11 121:10
**mean** 8:21 29:20
36:2 49:25 54:2
60:11 64:1 103:13
134:4,16 136:5
144:5 145:2
176:24 180:1,5
189:4 193:12
**means** 43:22 44:1
44:9 60:16 107:15
108:17 122:24
132:6 134:2
150:15 161:9
176:23 186:20
**meant** 36:23,24
142:9
**mechanisms**
108:23
**medical** 23:3 31:6
31:11 32:6,7,8,16
32:17 33:10 98:25
100:21 101:12
102:5 104:14

110:17,19 111:23
166:18,23,25
191:23 199:21
**medically** 33:9
**medicinal** 102:12
102:13,23 108:13
**medicine** 31:14
**meet** 50:14 90:24
143:12 174:13,15
**meeting** 197:15
**meetings** 74:10,15
74:18 164:9,12
**meets** 8:8 74:24
117:21
**members** 10:17
80:13 86:14
156:22
**memo** 71:3,4
74:20 81:19
110:17 120:17
121:8 171:20
179:3 184:20
185:14,21 196:12
199:14
**memorandum**
153:14
**memorial** 95:23
170:23
**memos** 188:16,17
**mention** 178:10
**mentioned** 93:8
**merely** 123:22
**mesothelioma**
32:20 45:23 46:1
47:18 53:3 105:2
105:25
**message** 160:11
**messed** 187:9
**met** 23:2 140:20
140:24,25 144:10

**[method - name]**                                            Page 22

**method**  155:12 156:6 176:17,18
**methodologies** 115:2
**methodology** 85:15 156:8
**methods**  85:17 114:13 127:15 129:21 149:25
**microbial**  90:25
**microscope**  64:24 76:11 77:18,19 83:16 85:17 152:5
**microscopist** 154:3,12
**microscopy**  67:13 85:16 86:1,2 129:21 155:13
**mid**  1:2,9,14,19 18:11 23:14 101:23
**middle**  23:25 25:21
**middlesex**  1:1 2:2 138:3 200:14
**millennial**  158:7
**miller**  100:1
**milling**  126:14,15
**million**  21:24 22:16 27:4,8,14 28:17 29:23 50:6 162:2 192:8,15,15
**millions**  49:9 123:11 183:15
**mills**  122:8
**mind**  100:8 125:1 143:10
**mine**  16:9,11,12 17:2,5,5,7,7,17,22 18:4,6,13,25 19:3 19:9,19,20,23 34:8

34:8 93:23 107:24 108:1,5 120:7,21 122:8,10,12,23,24 123:1,6 126:5,6,8 126:12,14,16 128:14 129:1 130:22,25 136:11 151:22 170:16 172:6,9 179:4
**mined**  34:5,9 100:3
**mineral**  34:4,5 44:17 63:19 65:2 67:6,7,7,8 68:24 69:21 72:18,24 73:3 78:1,19 93:10,21 94:16 95:15 128:9,10 131:19 134:12 149:18 175:17
**mineralogical** 76:4 83:10 90:25 174:17
**mineralogically** 127:18
**minerals**  18:5,9,14 50:14 66:13 67:19 76:3 89:24 91:14 91:21 92:2,5 94:14 100:2 123:21 128:12,12 128:19,25 129:7 132:11,13,20 134:14 135:22 136:6 153:20 154:13 155:16 174:24
**miners**  123:20
**mines**  17:15 172:12

**minimum**  89:22 91:8
**mining**  100:4 125:13,16
**minor**  132:19
**minute**  24:21 65:20 86:15 105:11 144:4
**minutes**  48:2 94:9
**misleading**  61:17
**missing**  51:6
**mistake**  183:7,10
**mistaken**  115:11 116:17
**mistakenly**  113:10 114:11
**misunderstanding** 113:8,9
**modern**  123:18
**mom**  54:2
**mom's**  15:20
**moment**  5:24
**momentarily** 11:11
**mommies**  161:16
**moms**  158:7 164:8
**monday**  2:4
**money**  103:13 192:3
**month**  158:22 159:10
**months**  19:4 24:7 194:6
**morbidity**  108:15 108:17
**morning**  5:1,3 9:12,20 10:5,5,14 10:14,16 11:8,8,9 12:11 157:21 176:21 182:20 184:8

**moshe**  2:18 3:5 10:5
**mother**  45:8 52:8 53:17 57:23
**mother's**  53:22 54:17
**mothers**  191:9
**motion**  18:10 36:22
**mount**  2:22 114:7
**mouth**  168:13 169:19,21
**move**  10:23 29:12 42:8 48:6 54:8 62:8 64:3 87:15 92:9 96:6 102:9 130:1 176:10
**moved**  51:24 59:13 72:7 82:22 90:16 107:11 111:6 118:7 121:5 139:14 148:21 161:4 178:24 190:12 193:8 197:2,9
**moving**  97:19
**mulberry**  3:19
**multiple**  176:6
**musco**  138:11 140:17,20 141:14 142:6 143:13 144:11 146:3 182:21 184:1

**n**

**n**  3:1 4:1 11:17,18 11:18
**n.j.**  5:21
**name**  11:14,15 39:19,24 40:9,11 40:22 41:2,18,19 52:6 99:7 100:6

111:19 157:25
161:22 163:8
196:13
**named** 158:15
**names** 167:9
**nancy** 138:11
140:17,20 142:6
**nasal** 169:17
**nashed** 100:5,11
196:15
**national** 110:24
197:8,10
**native** 60:8,12,16
186:9,20 187:2,7,8
187:8,10 188:5,14
**natively** 60:9
**natra** 101:23
**natural** 132:18
**navarro** 5:20 6:20
7:19
**nazi** 16:17
**nazis** 16:21,23
**near** 103:6
**necessarily** 23:1
126:13 129:19
**necessary** 85:17
**need** 26:4 40:6
58:9 61:10,12,22
61:23 72:22 76:21
84:3 96:25 125:1
153:24 158:14
184:13 185:3
198:11
**needlelike** 132:6
134:2 174:2
**needles** 44:13,20
181:8
**needs** 55:8 155:22
**neither** 117:21
**never** 17:8 33:19
39:4 43:4,12,19

58:25 62:22 85:21
140:6,20 146:4
169:20 172:13,15
177:20 183:4
186:24
**new** 1:1 2:3,3,23
3:4,7,7,16,20
20:11,15 31:14,20
52:8 88:8,17
115:10 116:4,12
116:15 117:5
118:12,20 119:7,9
119:12 125:10
140:22 200:5
**newark** 3:20
**news** 110:10
129:13,14 147:17
**newspaper** 111:17
**nice** 177:16
**nicholson** 141:14
142:6,20 143:14
144:11,13
**nick** 121:9
**nickel** 111:18
**night** 96:22
**niosh** 110:22,24
111:25 113:5
124:25 148:13,24
149:4,5 150:12
153:14,15
**nj3446610** 1:25
**nolan** 3:14 10:15
10:16
**non** 43:23 44:1
64:4 72:18 73:6,7
78:10 127:25
136:3 149:11
200:8
**nonasbestos** 44:24
92:4,6

**nonexpert** 6:14
**nonresponse** 29:7
**nonresponsive**
87:15 94:20,22
130:1 171:4
**nope** 70:25
**normal** 198:12
**north** 1:7,12,17,22
121:11 171:24
172:13,22 179:4
**nose** 107:16 109:8
168:7,12
**note** 107:19 134:1
186:5
**notebook** 23:16
64:13 189:19
**notebooks** 157:6
**noted** 109:9
**notes** 142:21
**notice** 105:8,23
106:9
**number** 49:10
56:22 60:6 61:6
113:22 115:19
144:19 186:6,19
187:11 188:10,24
193:16 196:4
200:3
**numbering** 72:3
**numbers** 160:13
186:13 187:4,17
187:19,21 188:21
**numerous** 14:21
25:10 96:18
131:17
**nurses** 43:8 167:1
181:14 182:15

**o**

**o** 11:17,18,18
**oath** 11:12 29:1
137:23,24 142:2

147:8,14
**object** 25:21 29:7
29:10 59:23 60:4
60:22 62:3 78:10
80:5 82:8 85:4
87:15 89:12,17
92:21 94:20
129:25 165:2,13
171:4 176:2,4
**objection** 29:10
37:8 41:6,9 42:3
44:2 46:19 51:21
57:9 59:7,9 64:6
68:16,18 69:16
72:1 80:6 89:1
93:2 111:4 121:3
130:4 139:8
148:19 160:22
163:2,4 165:3,17
176:9 177:21,25
178:21 182:3,5,6,7
182:10,12 190:7,9
194:7 196:24
**objections** 37:11
41:10
**objective** 125:19
126:1
**observation** 6:15
**obtain** 108:22
**obviously** 20:8
99:8
**occasion** 26:2
**occasional** 52:11
**occasionally**
134:19
**occasions** 14:21
**occupational**
110:25 149:2
**occur** 44:23
**occurs** 44:24 73:4
76:9 82:6 83:14

132:4 174:7
**october**  40:1 158:4
**offer**  7:8,9,11,14
  7:16 51:15 59:6
  71:24 80:24 88:24
  104:18 111:3
  117:15 121:1
  138:21 148:16
  159:22 178:19
  190:6 196:22
**offered**  82:20 89:7
  90:21
**office**  23:14 24:23
  26:20 188:24
**officer**  6:8 9:14
  11:19 102:5
  158:21 159:9
**offices**  114:7
**official**  50:10
**officials**  90:4
**oh**  37:1 59:5,21
  67:25 75:16 130:9
  141:11 173:24
  192:11
**oil**  58:16 59:15
  185:18
**oils**  124:6
**okay**  8:2,25 12:14
  13:15 14:9,12
  16:24 17:18 18:4
  18:25 22:5,23
  23:20,21,25 24:1
  24:13 25:14 26:22
  27:16 32:25 34:11
  34:12 35:15 38:2
  39:11 41:17 42:9
  42:11 43:17 46:7
  46:14,17,25 48:19
  49:18,24 50:8
  51:10,14,19 52:15
  52:18 54:11,25

55:7 56:1,5 60:2
61:10 62:11,22
63:14 64:14 66:6
66:25 67:17 68:3
70:10,23 71:3
72:12 73:3,9 74:4
75:5,21 79:12,17
79:18 80:1 81:15
83:5,8,24 85:3
88:3,11,21 89:9
91:13 93:5,17
94:4,12 95:9
96:23 97:3,6,20,21
98:16 99:22 100:16
101:24,25 102:5,8
102:22 104:12,14
106:8 108:20
109:3,3 110:16
112:2 115:15
118:11,24 119:17
120:8,24 121:7
122:3 123:3
124:16 126:3,18
127:13 128:24
130:13 131:21
133:2,8,13,25
134:5,20,20
135:19 136:2,14
136:25 138:1,5,20
139:10 142:24
146:3 147:24
148:8,9,23 150:11
150:23 151:11,20
152:3 153:2,5,18
154:14 155:4,7
156:19,22 157:19
158:14 159:13,21
160:4,8,17 163:16
166:7,8 171:18
172:7 173:18
175:5,23 176:5

177:8 178:22
179:18 180:19,21
181:1,8,13,15,15
181:20 184:8,16
189:11,16,24
190:5,17,20
191:11,13 192:14
192:21 193:9
196:12,19,21
198:21 199:1,7,9
199:13,14
**old**  56:18,19 57:3
  57:3,4 134:3
  188:17,17
**older**  53:17 54:9
  54:10 56:24 57:1
**once**  140:21
**ones**  27:22 135:23
**open**  106:12
**opening**  105:14
  106:5,11 109:14
**opens**  169:12,14
**operation**  126:10
  198:12
**opined**  198:23
**opining**  64:4
**opinion**  5:15 6:3
  6:16,23,24,25,25
  7:1 112:24 197:22
**opinions**  6:14 7:16
**opponent**  7:6
**opposed**  74:8 75:8
  150:18 169:18
**optical**  76:25 84:8
  129:21 152:5
**options**  172:5
**order**  10:22 23:22
  76:19 84:2
**ordered**  2:17
**ore**  96:15 126:6,14
  126:16 130:24

135:9 137:7 146:5
  198:16
**ores**  93:10 127:7
**organization**
  11:23 164:1
**organizations**
  121:9
**organized**  180:24
**oriented**  74:6
**original**  188:15
**originally**  15:18
**ounce**  49:7
**ounces**  49:12
  192:3,4,15,15
**outbox**  179:22,24
  180:5,14,21
  181:13 182:2,19
**outside**  8:22 23:5
  40:19 90:9 144:20
  165:14 185:1
**overall**  105:9,13
**overexposure**
  191:8
**overlap**  18:21
**overlooked**  126:13
**overruled**  44:3
  57:11 69:18 80:6
  93:2 130:4 165:17
  176:9 177:25
  194:9
**oversee**  197:16
**owned**  18:13
  19:22 39:19 100:3
  151:22 157:24
**owner**  121:22
**owners**  122:8
**owns**  20:5,8 39:15
  39:20 40:10,20
  41:17 167:25

**p**

**p** 2:21 3:1,1,14
11:17,18 200:3,12
**p.m.** 113:15
157:10,11
**p1steno** 2:24
**pack** 168:5
**page** 4:2,5 23:21
24:2 34:23,24
35:3,4,12 36:12
46:3,14,25 47:20
47:21,23 48:18
53:12 59:14 64:15
65:12 71:7 72:13
80:3 82:3,3 83:5,8
92:17,18,18,25
93:13,14 115:17
115:19 118:3,22
118:24 123:8
126:4 130:6,9,9,11
130:14,16 131:1,4
133:1,14 134:5
135:11 138:9
149:10 151:21
159:25,25 160:15
160:15 161:7,8
172:17,18 174:5
191:1,14 199:10
**pages** 2:6
**paid** 12:19 13:5,11
**pamphlets** 164:13
164:16
**panatier** 3:8,8 4:3
8:24 10:6 11:2,22
12:1,8,10 29:6,14
34:25 35:2 37:12
41:8,12 42:7,10
46:5,6,22 47:2,10
47:13 51:15 52:2
57:13 58:3,7,8
59:5,21 60:8,13,23

61:7,13 62:1,9,13
63:17 64:2,10,11
65:16,17,21 66:5,7
66:12,17 67:3
68:21 69:19 70:15
71:23 72:5 73:16
73:19,20,24 74:2,5
76:17,18 78:9,12
80:8,24 81:6,13
82:2,9,15,18,24
83:1 85:9,10
86:13 87:5,14
88:24 89:8,20
90:18,19 92:8,25
93:4 94:19,23
95:4 96:6 104:17
105:6,13,21 106:1
106:5,13,21,25
107:6,8 110:9
111:2 113:19,20
116:11 117:1,10
117:15,22 118:2
118:10,16,19
120:8,14,25
122:19 126:22,25
127:2 129:25
130:5 131:23,25
134:25 135:3
138:21 139:16,17
142:25 143:11,23
145:9,12,15
147:22,25 148:3
148:15,18 150:25
151:2 156:20
157:16,18 159:16
159:21 160:2,14
161:2,5 163:6
165:1,6,9,15,20,23
166:2 171:3,8
176:4,10,16
177:23 178:19,25

181:5,6,19,21
184:16,19 185:8
185:11 186:8,16
187:1,5,15,22
188:2,6,9,12 189:1
189:7,13,15 190:5
190:15,19 196:1,5
196:7,22 197:3
**paper** 112:25
114:1 180:1,1,2,4
180:7 194:3
**paragraph** 55:23
73:25 74:3 125:4
**parallel** 155:20
156:1
**parameters** 89:21
91:7
**pardon** 47:22
**parent** 20:16 38:4
**parentheses** 98:17
**parenting** 158:19
159:8
**parents** 50:20
**parse** 140:13
**part** 14:2,4,6 16:6
23:1 27:7 28:17
32:17 33:18 39:23
40:13 54:6 75:14
81:8 142:4 179:19
179:19
**particle** 155:19
156:1
**particles** 49:14,22
50:4 102:20
126:13 132:8
134:1 167:16
168:2 178:3
**particular** 16:12
17:2,3 109:6
136:6 141:9 144:5
156:8 172:8 179:4

**particularly** 5:17
**parties** 60:24 61:8
**party** 7:5 164:5
189:5 198:22
**pass** 9:15
**pastore** 1:9 3:11
**pat** 55:16
**patented** 33:14,16
33:22
**patents** 33:22
**paterson** 2:2
**pathology** 111:9
**pays** 14:10
**peak** 53:8 107:13
174:4
**pediatricians**
162:22
**peer** 114:3,20
194:12
**pen** 134:4
**pencil** 75:9
**pending** 85:7
**people** 6:18 7:4
13:22,24 27:22,23
28:1,5,15,16,24
30:2 32:6,23 33:3
33:24 40:12 45:21
47:16 50:25 54:12
55:23 57:8 58:21
62:23 63:2,4,7
75:14 96:22,24
97:8 101:5 141:13
146:21 169:9
176:6 177:3,6
179:24 180:21
181:12 182:14
183:25 184:23
187:19 193:17
**people's** 28:3
**perceived** 191:19

**percent** 26:23 27:3 27:14 49:6 50:3 127:16,17 128:6 131:9,10 132:16 132:17 161:16 192:12
**perception** 6:4 7:2
**performed** 139:23 144:19
**perfume** 71:12
**perfumery** 80:13
**perimeter** 169:15
**period** 8:16 44:5 89:16
**permit** 5:23
**permitted** 5:16
**person** 22:8 25:8,9 80:16 105:12 111:13 121:13 124:14 137:22 138:10 141:25 143:13 147:3 193:5 195:19 198:22
**person's** 7:3
**personal** 7:3,16 8:1,5,17,23 123:12
**personally** 164:11 180:6
**persons** 121:8
**perspective** 176:23,24
**pertinent** 22:18 30:6
**petterson** 100:21 110:18,18 199:15 199:21
**pharmaceutical** 149:22
**phased** 18:11,12 18:23,24

**phenomenon** 108:22
**philipson** 71:11
**phone** 110:21 111:8,24 140:21 142:8 143:13 180:3,8
**phoned** 111:15
**phones** 9:13 87:3 157:14
**phonetic** 116:6
**phoning** 111:14
**photocopies** 188:17
**photograph** 54:7
**phraseology** 43:15
**physician** 98:8,11 98:20
**physicians** 166:25
**pick** 68:25 180:7
**picked** 86:3 129:3
**picking** 126:11
**picture** 55:1 56:11 56:15,19 57:2 116:5
**pictures** 116:18
**piece** 64:25 77:18
**pilot** 136:10
**place** 2:2 55:8 166:12 197:23 198:6
**placed** 67:20 108:14
**places** 161:25
**placing** 184:13
**placitella** 3:2,3 7:25 10:6 142:1 142:19
**plaintiff** 1:5,15
**plaintiff's** 4:6,6,7 4:7,8,8,9,9,10,10

4:11,11,12,12,13 4:13,14,14,15,15 4:16,16,17,17,18 4:18,19,19,20,20 4:21,21 51:24 59:12 71:24 72:7 82:22 90:16 107:11 111:6 118:7 121:1,5 139:14 148:21 155:5 161:3 178:23 190:11 197:1
**plaintiffs** 1:10,20 3:10 10:3,25 11:3 51:16 52:24 116:5
**plant** 136:10
**platy** 127:17 136:3 136:3
**play** 158:17 159:6 162:22 181:16,23
**pleasant** 2:22 111:14
**please** 9:12,18 10:2 11:10,15,21 11:25 12:12 24:1 34:17 37:10 51:1 51:18 65:12 68:20 70:23 78:14 86:19 87:2 92:12,15 95:5 103:4 115:12 139:19 143:21 149:3 156:24 157:5,13 163:5 191:13
**pleased** 197:19
**point** 15:22 60:18 61:16 87:6 91:7 100:19 101:13 106:1,20 107:25 159:17 161:6

162:11 164:21 179:12 186:22,23 186:23 188:13 192:25 198:11
**pointed** 106:11
**pointing** 143:20
**points** 60:9
**poisonous** 123:21
**polarized** 67:12,24 68:1,11 85:16,25
**police** 6:8
**policy** 20:12 42:25 45:2 50:10,12,12 67:5 87:7,19
**pooley** 70:16,18 72:14 75:11,12 78:4,18 170:6,7,10 170:22
**poop** 166:11
**portion** 117:13
**portions** 118:5
**position** 123:18 125:24 197:15
**positive** 67:11,18 68:4,23 72:15 77:22
**possibility** 35:23 35:25 36:7 112:6 113:11
**possible** 34:14,16 34:20 63:9,12 76:6 83:12 108:21 194:18 198:9
**post** 89:14
**poster** 152:23
**posting** 40:4
**potential** 129:7 191:7 197:12
**potty** 38:7
**poured** 106:7

pouring 109:14
powder 15:12,14
  15:23 16:5 19:16
  20:9 34:2,11,15
  35:19 36:16 37:24
  38:15,22,24 39:5,6
  39:8,10,12 42:15
  43:6,13,19 44:5,21
  44:23 45:5,9
  46:12 49:8,13
  55:10,16 58:16,17
  58:22 59:15,16
  62:23 63:21 86:10
  90:2 92:3 94:7
  96:3 100:25 103:8
  103:24 105:4
  107:14,22 108:10
  108:12,16 109:5,8
  109:11 112:23
  113:2,6,22 114:5
  114:22 116:24
  119:4,14 125:20
  126:2 127:11,20
  139:24 140:2,6
  151:14 152:1
  155:14 160:13
  166:10 168:1,6,9
  168:12,22,24
  169:16 177:16
  184:10,23 185:1
  185:18 191:10
  192:2 193:2,6
  194:15 198:3
powder's 108:4
powdered 38:9,14
powdering 53:6
  57:5
powders 38:5
  113:3 115:5,8
  167:15 190:2
  191:4,6,10,18

194:19,22
power 60:8,17
  159:17 161:6
  186:22,23,23
  188:13
pr 61:21 62:15
premium 123:1
preparation
  142:17
prepare 61:21
  141:1,5,13,23
  143:1,13 144:10
prepared 142:4
  145:17 200:6
preparing 80:15
presence 63:19
  66:12 67:6 69:21
  72:16 77:6 78:5
  78:19 85:21 87:23
  173:2
present 50:1 63:23
  65:2 72:24 74:19
  76:13 83:18 93:10
  125:20 128:20
  134:13,15 149:24
  173:6,9 177:5
presentation
  58:16
presently 124:4
  143:24
president 98:2,21
  100:1 199:17
press 158:6,9
  185:23
presumably 22:3
pretty 92:5 129:10
  136:1,4 168:19
prevent 109:11,13
previous 60:15
  84:12

previously 8:4,13
prickly 173:23
  174:2 177:14,15
  177:17 178:3,6
primarily 72:24
  126:8,14
princeton 3:16
principle 43:15,16
print 61:22 92:18
  93:17,19 165:20
  187:7,9 188:3
printout 60:17
prior 12:3 16:13
  17:11,24 36:4
  117:19
priority 2:22
prismatic 73:6
  74:9 174:8,12
  177:9
privilege 142:12
  142:16 148:24
privileged 29:21
  141:23 143:2
probably 28:22
  30:5 31:21 36:10
  93:8 97:11 128:22
  130:14 137:13
  142:20 152:24
  156:21 166:10
  179:20 189:18
  196:10 199:9
problem 68:11
  69:7 108:23 112:4
  112:17 124:3
  198:10
procedure 46:20
procedures 139:23
proceed 52:1 80:7
  85:8 90:15 93:3
  148:20 190:18

proceedings
  199:24 200:7
process 88:7,15,16
  127:9 137:3
processes 76:5
  83:10 139:22
produce 60:13
  61:8 125:19 126:1
  186:22 188:14,16
  188:18
produced 52:12
  60:9,17,19,24 61:4
  61:11 186:4,8,18
  187:18 188:4
  195:8
produces 126:14
producing 60:17
product 5:17,18
  6:24 8:16 15:20
  20:2,6 27:11
  36:17 38:2 45:12
  103:8,18,24 104:4
  105:15,18 122:13
  122:18 126:15
  136:22 137:4,8
  141:24 151:13
  175:13 193:18
  198:10
production 186:17
products 6:17,20
  20:13 21:5 33:15
  33:20,23 38:22
  90:24 98:21 99:24
  100:22,25 104:2
  107:23 110:19
  127:11,16,18
  136:16 162:6,16
  182:14 185:19
  190:23 199:18
profession 32:24

**professionals** 191:5,16

**profitable** 194:20

**project** 172:4

**promote** 162:16

**pronounced** 102:3

**proper** 82:8 160:11

**properly** 114:13

**props** 182:1,3

**protocol** 81:8,11 151:16 177:3,6

**prove** 194:21

**provide** 26:4 27:10 191:6 195:18

**provided** 12:2 24:17 146:14 153:2

**provides** 28:19

**providing** 6:21 52:7,10

**public** 29:17 43:4 60:5,21 61:17,18 62:17,19 181:15 182:16 196:17 197:6,9

**publically** 184:4

**publication** 114:4 114:20

**published** 56:7 112:25 114:1,14 114:19 194:3,12 197:12

**pull** 62:2,4

**purchased** 17:22 17:24 18:6,8 163:18

**pure** 112:15

**purer** 126:15

**purity** 91:1 124:6 149:21

**purpose** 81:4 149:17 160:3

**purposes** 81:7,17 82:13 102:12 117:25 118:11

**pursuit** 194:18

**put** 29:16 30:1,12 30:18 31:2 34:15 36:19,24 37:4 42:15,18 50:9 60:15 62:15 77:12 98:17,19 99:2 106:6 145:20 154:23 165:10 175:6 176:17 181:1,4,9,9 184:21 188:17 199:1

**putting** 15:22 62:23 114:18 162:23 185:1

**puzzled** 195:2

**q**

**quackenboss** 52:6

**qualification** 88:7 88:17

**qualified** 33:9

**qualify** 66:21

**quality** 50:13

**quantities** 52:11

**quartz** 149:24

**question** 22:2 24:19,20 25:1,7,18 25:24 26:5 27:12 28:20 29:15 31:5 35:24 37:14 42:13 46:18 47:3,5,8,8 47:14 48:4,5,19,25 62:15 65:13 68:3 69:14 75:21 78:15

78:17 85:6 90:22 92:10,12,13 93:6 94:15 95:2,6 98:20 130:3 139:18,21 141:4 142:25 143:8 144:12,14 165:4 169:4,10 173:11 175:25 176:9 179:6 183:14 185:25 198:7

**questioned** 158:5

**questions** 22:21 26:9 31:25 45:24 137:21,22 144:14 149:4,5 183:11

**quicker** 130:15 151:4

**quite** 63:25 112:12

**quotations** 153:10

**quote** 44:12 116:17 186:19 188:4

**quoted** 116:15,16

**quotes** 75:10 108:9

**r**

**r** 3:1 98:2 133:4

**r&d** 99:23

**r.s.** 133:2 171:21

**ran** 18:2,4 19:9 172:6

**range** 186:3,10,25 187:2 189:18

**rare** 74:7 122:11 132:19

**rarely** 76:9 82:6 83:14

**rash** 166:13,14 167:18

**rashes** 167:12

**rate** 13:15

**ratio** 155:20 156:2

**raw** 151:13

**ray** 64:21 67:10 76:23 77:11 82:10 84:6 85:15,24 129:22,23

**reach** 55:9 158:7

**reaching** 161:16

**reactivate** 59:22

**reactive** 58:16 59:15,18

**read** 25:5 30:5 57:7,14,15 73:7,18 73:24 74:2 84:10 88:22 97:3,4 108:8 109:2 112:11,17 119:11 125:6 140:7,8 144:16,22,23 150:9 153:5 159:3 177:11 191:11

**reading** 145:7,13

**reads** 72:15 90:7

**ready** 65:22 86:19 113:18 133:14 156:24 157:6,15

**reality** 193:21

**realize** 59:20

**really** 8:11 35:24 61:17 71:6 102:11 141:3 149:9

**reason** 6:22 45:8 105:17 111:14 175:6 178:11 192:20

**reasonable** 45:19

**reasons** 70:11 173:19

**recall** 10:18 142:3
142:19 158:4,9,12
158:23 169:24
198:11
**recalled** 111:15
**receive** 25:2
164:14
**received** 133:11
134:21 164:16
170:21 196:14
**receiving** 180:20
**recess** 9:10 86:25
113:15 157:10
**reckon** 22:17
**recollect** 15:15
50:24 98:6 180:10
**recollection**
163:22
**recommend** 112:5
191:17
**recommendations**
89:15
**recommended**
149:2 184:25
185:20
**recommending**
109:4 124:10
**record** 5:10 26:14
63:16 70:14 79:20
85:19 86:22 93:9
93:21 94:6,10
95:1 113:13,14,17
143:6 154:19
155:3 157:9
159:15 166:1
184:14 186:3
187:17 189:21
195:16,23
**red** 3:4
**redact** 160:16

**redaction** 117:16
**reduce** 108:23
139:25 169:16
**redundant** 28:8
**refer** 77:3 99:11
146:11
**reference** 35:6
95:18 107:18
**referenced** 166:22
**referencing** 81:20
**referred** 103:23
104:1,5 111:22
**referring** 34:22
78:7 117:6
**refers** 103:7
**refresh** 125:1
**refute** 108:22
**regard** 8:9 20:13
86:16 117:5
142:16 157:2
**regarded** 97:24
**regarding** 196:15
**regardless** 112:6
**regards** 88:18
**region** 16:10,12
**regularly** 23:4
**regulators** 43:9
181:14 182:15
**reiterated** 116:23
119:3
**reject** 67:5,11 69:5
70:11,12 77:12
87:7
**rejected** 66:14
68:5,9 69:1,3,4,4
70:5 72:16 77:7
77:23 85:21 86:4
86:5,7 129:17
**rejection** 66:18
68:10 69:24 78:2
78:6,20 87:25

**relations** 60:5,22
61:17,19 62:17,20
**relationship**
161:12,24
**relative** 5:8 66:22
81:19
**relatively** 44:17
103:13
**relaunch** 158:18
159:7
**release** 158:6,10
185:23
**released** 183:17,19
**relevant** 24:18
27:4,7,17 89:16
160:11
**relied** 142:23
145:19
**rely** 146:21
**relying** 147:1
**remain** 11:10,12
**remember** 8:15
31:21 35:11 40:1
40:5 43:14 99:8
99:10 156:25
157:20 163:20
182:21 183:15
**remind** 40:6
**remove** 11:20
**removed** 108:11
126:11
**repeat** 143:9
**rephrase** 37:10
78:16 163:5
**replicates** 27:21
**reply** 149:3
**report** 114:1,4
127:5 136:20
**reported** 146:8
170:10

**reporter** 111:24
176:5 200:4,13
**reporting** 124:9
135:21,23
**reports** 96:18
170:23 193:16
**representation**
38:21 61:2
**representative**
7:12 11:4 12:15
142:5,11
**represented** 121:9
152:14
**representing** 61:4
146:15
**represents** 107:22
**reprinted** 52:13
**reputation** 103:17
**requires** 85:15
**research** 14:8
80:22 86:17 99:20
100:25 101:14
116:23 119:2
133:7 148:12
157:3 197:11
**resistant** 34:1
**respect** 77:2
**respirables** 191:8
**responded** 127:14
**responding** 109:7
**response** 64:8
66:22 90:22 94:25
117:13 176:14
**responsibility**
40:8,18 41:24
193:1
**responsible** 23:6
158:3 162:12
**responsive** 64:4
78:10

**rest** 84:1 160:1,20
**restricted** 6:18
**result** 67:11 131:5
**resulted** 108:16
**results** 20:18,21
  112:22 113:2
  114:16 126:20
  129:24 131:2
  134:7 135:9
**retard** 169:16
**retracted** 112:22
  114:15
**retraction** 114:17
**reuters** 116:3,12
**reverse** 125:20
  180:14
**reversible** 5:22
**review** 197:11,13
**reviewed** 21:16,20
  23:10 28:19 114:3
  114:20 166:18
  194:12
**reviewer** 149:1
**revision** 80:15
**right** 13:5,8 15:17
  16:6 17:25 18:5
  18:15 19:11 20:3
  20:6 21:3 22:3,10
  23:14 27:14 28:23
  30:16 31:7,12,15
  31:19 34:20 35:25
  36:9 37:16,25
  39:5,16,21 40:10
  40:14 41:15 42:21
  42:22 45:14,17
  48:18 49:1,3
  52:25 53:18,20
  54:2,2,19 55:5,10
  55:17 56:3,10,23
  58:13,14 63:3
  65:1,3,11 66:17

67:9 69:15 70:16
70:21 71:17 72:10
73:1,7 74:16,21,23
75:6 77:24 79:21
80:22 84:10 89:20
90:21 95:10 97:10
97:12 100:22
101:15 102:6,12
103:9,14 104:6,9
107:15 111:25
112:18 113:6,23
115:15,16,18
116:17,19 117:4
118:21 119:15,20
120:2,22 123:25
124:17 125:14,17
125:21 127:6,7,9
127:24 128:9
129:4,7,18,18
130:7,17,20
131:15 132:23
133:11 134:2,16
136:12,17,23
137:4,19,24 138:3
138:15,18 140:7
140:13 141:11
142:25 144:22
145:21 146:1,12
146:19 147:2,5
149:25 150:9,17
150:19,20 151:8
151:14,18 152:1,6
152:8,15 155:14
155:21,24 156:3
157:24 161:11,12
161:14,23 165:18
166:11,11,19,22
167:14 168:3,18
168:19 169:1
170:5,6,13 172:13
172:14,21,24

173:2 174:11
175:2,14,19
176:18 177:5,12
177:14,20 178:6
180:12,14,15,25
181:10 182:24
183:6,10,11,13,25
184:6 185:2 188:6
188:9,18 191:11
192:8,9,12,22
194:2,22 195:18
196:17 198:9,11
198:19 199:15,21
**risk** 112:8 191:19
**robert** 100:24
  133:4
**robust** 92:1 93:9
  93:21 94:6,10
**rock** 44:17 95:19
  95:19
**rocks** 50:10,10,15
  50:15
**rod** 44:24 75:8
  77:14,16 129:16
**roger** 100:1
**role** 8:15,18,22
  100:16 158:18
  159:6 162:22
  193:10
**rolle** 100:24 113:1
  114:4 194:4
**ronning** 1:19 3:12
  10:1
**ronnings** 10:7
  57:18
**room** 37:20,24
**rosalyn** 1:4 3:11
  9:22
**rose** 148:24
**roth** 3:3

**route** 195:21
**routine** 76:22 84:5
**rt** 74:11,16,17
**rule** 5:15 6:2,12
  7:13 142:13
**ruled** 8:4 138:24
  139:9
**ruling** 118:5 161:1
**run** 13:20 24:24
  34:15 39:22,23
  122:12,24 123:1
  126:5,6,8,14,16
  131:14 136:11
  161:23 164:1,7
**runs** 39:20 163:25
**russell** 133:3,4,5,6
  133:8 171:20,21
  184:20
**russell's** 133:1
**rutile** 132:10
  136:5

**s**

**s** 3:1 4:1 11:17,18
  102:2
**sacred** 104:6
**safe** 27:11 48:7,9
  48:11,20,23
  105:15
**safety** 8:16 20:12
  20:21 21:4,12
  22:20 23:7 102:5
  105:10,13 109:11
  109:12,13,21
  110:25 112:15,17
  191:2,4 192:19
  193:1,5,13
**sake** 81:16
**sample** 52:11
  136:22
**samples** 114:9,24
  114:24 136:6

170:11,16
**save** 97:19
**saw** 87:19 124:16
  124:18,21,24
  138:18 161:11
  170:3 176:21
  183:12
**saying** 27:9 28:18
  37:13 41:5 56:13
  56:17 61:3 63:1
  66:10 78:18,21
  84:19,21 113:25
  114:10,15,19
  116:15,16 162:14
  162:18 168:16
  173:18 175:8
  195:4,9
**says** 42:16,19
  54:13 55:15 58:13
  59:15 66:14 72:12
  74:20,21 75:1
  76:4 80:12 82:4,6
  83:9 84:15 90:23
  93:20 107:14
  111:13 113:5
  118:25 119:21
  120:1 121:8,24
  122:2,7 123:10
  126:1 132:3,15,21
  133:1,10 135:13
  136:7 145:4,5
  146:2 147:9,10,10
  148:23 150:19,21
  151:12 154:25
  161:14 166:16,17
  167:25 168:18,20
  170:15 174:5
  177:12 181:13
  189:17 191:15
  194:17 197:4
  199:4

**scenario** 28:6
**scenarios** 56:23
**schedule** 10:23
**scheltz** 101:2
**scheme** 123:23
**school** 196:16
  197:6,9
**science** 74:10
  97:23 100:13
  148:11
**sciences** 31:20
**scientific** 71:11
  79:9 101:18 114:3
  114:20 194:13
**scientist** 98:10,15
  98:19 133:6,9
**scientists** 48:9
**screen** 84:13 151:7
  154:24
**screening** 76:22
  84:5
**seat** 9:19
**seated** 9:13,23
  11:10,13,21 87:2
  157:13
**second** 35:1 41:11
  46:5 51:18 75:24
  82:17 105:9
  116:14 154:16
  171:13 174:5
  189:18 190:8
  191:16
**section** 75:25
  111:10 191:14
  192:7
**see** 24:22 28:13
  29:17 30:2,13,23
  31:24 51:10 52:3
  53:9,10,14,17 54:9
  55:8,9,14,15 58:15
  58:18 61:5 67:13

67:16 79:16 80:9
  81:22 84:1,13
  88:20 94:2 95:17
  96:23 98:18
  115:18 118:25
  119:5,6 127:13
  128:1,4 132:21
  133:25 135:5,12
  136:10 137:18
  138:6,9,12,13,25
  145:4 148:4,9
  151:6,12,21 153:2
  154:14,15 158:14
  158:16 159:17
  161:7,14,17,19
  166:3,4,7,9,14
  167:11,13,13,14
  167:18 170:15
  171:19 172:18,24
  175:7 180:24
  181:4 184:14
  185:14,17 190:1,3
  191:2,15 192:4,10
  194:17 196:3
  199:14
**seeking** 81:5 89:19
**seen** 20:24 21:1,9
  21:11 37:6 41:20
  50:11,17 52:16
  60:14 63:6,9
  103:25 117:9
  164:19,22 165:4,7
  180:6
**selected** 122:13,17
  144:17
**sell** 16:1,1 198:10
**selling** 15:13
  105:18 182:9
**sells** 74:12 168:22
**semple** 23:3,10
  101:9 110:17

111:13
**send** 27:25 170:22
  179:25
**sending** 180:21
**senior** 97:23
**sense** 123:20
**sent** 162:1 181:12
**sentence** 168:17
  177:1 185:5
**separate** 39:23
  43:17
**series** 40:2 96:22
  153:9 169:21
  185:18
**serpentine** 95:15
  95:16 150:6
  152:12
**serve** 53:22 54:17
  148:25
**served** 14:20
**serves** 108:14
**services** 71:11
**set** 18:10 133:13
  174:14 189:8
**seven** 35:13
  124:17 169:22
**shape** 76:21 84:4
  134:4
**shards** 132:9
**share** 192:3,8
**shed** 126:11
**sheet** 190:13
**sheets** 58:22 62:23
**shelf** 136:22
**shelley** 101:14
**shipments** 16:18
  170:20
**short** 177:1 179:3
**show** 34:22 56:11
  56:15 77:13 81:25
  116:18 151:3

similar 71:19
similarly 10:20
simon 3:8
simple 144:8
168:19
simply 25:16
simulate 177:16
sinai 114:8
single 43:4,13
85:21 136:16
187:18
sinking 16:17,22
16:23
sir 24:2 32:18
34:17,19 35:7,15
35:18 36:14 37:13
37:13 38:10 39:11
48:21 51:1,5
58:15 59:15 64:12
64:23 65:12 67:4
68:22,24 70:23
71:3 74:23 80:10
84:13,18 92:15
95:22 102:10,25
103:4 107:13
115:12 118:3,4
123:9 126:3 127:3
128:4 131:21
132:1 133:13,21
135:8 137:12,18
139:18 148:9
151:3 153:22
154:1,17 162:7
178:13 185:12,14
189:22 191:2,13
sister 53:5 54:10
57:15
sisters 50:25 53:22
54:1,15,22 55:20
55:25 56:2,6,9

155:5 181:17
193:15
showed 68:11
75:19 81:23 114:8
146:11
shower 19:16,17
20:1,2,6,6 43:6,6
showing 170:23
182:7,13 185:21
shown 48:9 72:19
76:6 83:11 117:14
129:15 167:20
177:19 193:17
shows 77:1 84:9
shut 165:23
shuts 169:12
sibling 38:4
siblings 50:21
sick 45:21 47:16
sickness 108:17
sidebar 5:5,6 8:23
9:5 46:23,24
47:12 60:2,3
62:12 66:1,2 67:2
73:15 81:2,3
82:14 89:3,10
90:12 104:21,22
107:7 115:24
116:1 118:1
138:25 139:1,11
141:16,19 143:4
160:5,7,21,24
186:14,15
sides 155:20 156:1
signature 200:11
signed 138:14
172:18 182:21
significant 144:19
silicate 73:4
silvia 2:21 200:3
200:12

situation 8:20
27:20
six 27:23 28:1,2,4
28:14 194:6
size 109:17 110:2
skin 36:19 102:18
102:19 103:2
173:22,25 174:3
177:14,15 178:4,7
179:1,8
skip 110:6 112:2
147:17
slide 102:20
slightly 48:5
126:15
slipped 100:8
small 135:12
smell 193:19
smith 98:24
104:14 196:13,14
society 122:8
soft 177:16
software 187:6
sold 15:18 19:17
19:23 20:2 21:6
33:19,19 39:6,9
103:10 192:4,16
198:5
sole 121:11
somebody 7:2
38:5 41:19
somewhat 6:23
son 121:10,22
sons 5:21
soon 53:24
sorry 5:21 11:12
19:6,8 26:6 34:24
34:25 35:3,5,16
57:10 59:8,21
65:19 67:7,25
72:4 73:13,16

78:11 82:18 85:2
92:10,17,23 93:13
93:17 103:21
118:14 120:9,16
145:9 148:12
154:21 160:6
161:10 173:12
181:3,22 199:13
sorts 184:25
sound 17:5 41:4,8
162:25
sounds 41:1
163:11
source 16:20
17:16 18:10 88:8
88:18 94:6 96:2
130:24 137:7
146:5 172:14,15
sourced 18:16
19:10,16
sources 92:7
144:17,20 171:24
172:2,5,10
speaking 37:11
41:10 103:14
116:4 176:6
speaks 195:13
spearheaded
74:11
special 52:11
specific 30:10
161:1 185:4
specifically 5:19
42:21 56:9 102:11
122:13,16 168:2
specification
50:13 69:25 77:2
77:10 78:3,24
79:3,4,8 85:24
88:19 90:2 94:13
94:17,18 151:22

153:13 175:13
**specified** 90:10
**specify** 179:9
   184:14
**speculate** 45:11
   86:8 140:11 145:1
**speculation** 45:19
   50:23 56:5
**speculative** 45:18
**speed** 23:11 96:23
**speeding** 6:9
**spell** 11:15
**spoke** 116:22
   119:1 125:10
   142:3 144:13
**spoken** 140:21
**spokesperson**
   106:19
**spread** 36:24 37:5
**spreads** 36:19
**spreadsheet**
   188:13
**sprinkle** 55:16
   58:22
**square** 55:8
**squeeze** 36:22
   37:2
**squeezing** 36:22
**staff** 166:18
**stamp** 60:16,18
   61:14 187:9,19
   188:15,18 195:7
   196:13
**stamped** 187:23
**stand** 11:6 30:18
   116:24 119:4
   178:2
**standard** 89:13,22
   91:8 149:2
**standards** 90:25

**standing** 11:5,12
**stands** 119:15
**starches** 124:6
**start** 12:9 53:24
   54:4 152:23
**started** 10:19
   15:13 53:5 57:5
   157:20
**starting** 24:4
   92:18
**state** 11:14 108:6
   179:4 200:5
**stated** 42:24 43:11
   44:19 89:21 119:9
**statement** 105:15
   106:11 117:20,23
**statements** 6:9 7:7
   117:20 146:22
   163:15 165:13
**states** 18:17 23:5
   26:18 63:24 71:17
   90:3 91:10 92:6
   146:20 172:5
**statistics** 191:18
**stefano** 121:10,20
**steinberg** 104:13
   108:5
**step** 9:8 67:9,12
   86:23 174:18
**stewardship** 99:24
**stick** 38:2
**stockholder**
   121:25
**stockholders**
   123:13
**stop** 102:21 124:7
   198:1
**stopped** 105:17
**stops** 159:25
**story** 26:14,15

**straight** 73:10
   97:15
**street** 2:2 3:9,15
   3:19
**strengthen** 125:23
**stricken** 94:25
   176:12
**strike** 19:1,9 64:3
   87:16 92:9 96:7
   130:1 176:10
**stringent** 77:3
**strongly** 108:10
**structured** 109:25
**struggle** 151:7
**students** 53:21
   54:14,16,21 55:23
   56:16,21
**studies** 113:2
   122:4,4 129:15
   135:5 138:18
   183:20 197:16,17
   197:18
**study** 127:8
   133:18 135:4
**studying** 53:23
   54:18,23 127:7
**stuff** 122:25
   130:19 147:18
**subject** 107:14
   117:16 118:4
   160:4,18 161:1
   171:23 197:13
**subjects** 62:18
**subscriptions**
   31:10
**subsequent** 72:17
   76:25 84:8
**subsidiary** 18:7,13
**suffices** 27:24
**suggesting** 194:24

**suggestion** 72:14
   197:5
**suite** 3:9,16
**sullivan** 3:14 5:14
   7:18 9:2 10:13,15
   25:20 29:9 30:16
   30:17,18,21 34:24
   37:8 41:6 42:2
   44:2 46:4,19
   47:11 51:17,21
   57:9 59:7,9,19,23
   59:25 60:4,21
   61:3,15 65:14,19
   65:23 66:9,16,19
   66:25 68:16 69:16
   72:1 73:13,17,23
   74:1,4 76:15 80:4
   81:1,11,22 82:5
   85:4 89:2,5,11
   90:11 92:20 94:21
   104:19,25 105:19
   105:23 106:3,23
   107:2,5 111:4
   112:9 115:23
   116:2 117:2,7,18
   121:3 122:15
   130:2 138:23
   139:2,5,7 141:16
   141:20 142:17
   148:19 159:24
   160:6,10,17,22
   163:2 165:12
   169:6 176:1
   177:21 178:21
   181:3,20 186:5,12
   187:16 188:20
   189:4 190:8 194:7
   196:3,24
**sullivan's** 106:11
**summary** 151:12

summation  160:12
super  5:21
superior  1:1
  125:20 126:1
  127:18
support  22:20
supposed  177:4
supposedly  123:1
supreme  6:7
sure  6:1 9:13 19:5
  28:21 32:10,15
  33:8 46:21 55:4
  58:7 73:19 87:3
  89:4 113:19
  115:25 121:20
  128:21 129:23
  139:5 141:5,17
  143:10 157:14
  159:5 160:1 170:1
  171:14 180:22
  187:20 190:20
  193:14 195:3
  196:9
surgical  33:25
surprised  112:12
suspect  111:21
sustained  41:9
  64:6 68:18 163:4
  165:3
swap  93:25
sworn  11:18 140:9
synopsis  122:7
system  164:7

**t**

t  4:4
t.h.  101:14
tab  34:17,18 51:4
  51:5 70:24 88:4,6
  115:13,16 120:2
  189:17 199:4

table  128:2 130:6
  130:16 136:18,19
tables  136:15
tabs  148:4
tac  149:18
take  15:19 35:10
  41:24 42:1 53:8
  62:5 83:5 86:15
  107:13 138:17
  154:16 156:23
  163:10 174:4
  176:6
taken  9:10 86:25
  113:15 137:24
  157:10 170:17
talc  16:4,6,15,21
  16:22,24 17:3,16
  18:10,12,16,17,22
  18:22 19:12,13,15
  19:20 20:13 21:19
  22:20 23:7,7,7
  26:15 34:4,5,13
  35:19,21,23,23
  37:15,20 38:9,22
  42:15 43:5 45:21
  47:15 50:13,13
  67:5,18 72:15
  74:12 76:5,24
  79:23 80:14 83:11
  84:7 86:8 88:9,18
  90:23 92:3,7 94:6
  97:9,24,25 100:3
  100:17 102:11,20
  107:15,24 108:5,7
  109:15 112:5,15
  120:22 121:16
  122:10 123:21,23
  124:5,11,20
  125:21,24 127:7
  127:14,17,17,19
  128:13,20 129:3,4

129:22 131:8,11
132:4,4,9,13
134:10,13,15
135:24 136:11,15
137:2 139:23
140:5 144:17,20
146:8 149:2,14
151:14 155:14
170:12,19,25
171:23 172:2,5,6
173:7,14,16 177:5
178:14,17 182:9
186:3 191:10
192:6 194:19
197:17,21 198:15
198:18,23
talco  122:9
talcs  16:14 72:25
  149:21 197:21,23
  197:24
talcum  108:10,12
  108:16 113:6
  191:17
talk  15:10 27:4
  34:2 56:16,20,22
  91:18 95:18
  111:19 121:19
  122:3 149:9
  154:11 157:21
  159:4 174:23
  179:11 190:22
talked  27:6 40:14
  168:4 170:7
  183:16 184:8
talking  22:19 30:6
  37:23,24 40:4
  107:1 111:23
  166:24 167:3,4
  169:9,23 179:3
  194:1

talks  54:3,3 55:23
  150:15 168:5
task  80:14 101:2
taught  32:23
team  116:23 119:3
technically  149:13
technique  64:22
  115:3
techniques  65:10
technological
  190:2,15
technologies
  194:18
teenager  55:2
teens  56:20
tell  22:1,8 30:21
  31:2,23 65:3,7
  83:5 152:18 171:1
  187:20
telling  31:3 164:22
  167:7 187:10
tells  26:14 37:3,4
  65:1
telofski  101:17
tem  176:18 177:5
ten  28:14,24
  115:19 169:22
tended  180:3
tendering  12:4
tens  49:13,22 50:5
term  123:2
terminology  188:8
terms  41:20 46:20
  49:25 103:17
  106:17 149:11,14
test  20:21 69:5
  85:15,24 114:13
  126:20 155:12
  156:14 177:5,6
tested  67:18
  113:22 114:25

115:1 194:14,16
**testified** 15:1
  32:18 77:6 107:3
  117:5 142:2
**testify** 7:23 12:19
  28:10 142:4
**testifying** 8:22
**testimony** 5:23 6:3
  8:5,6,7,13,19
  10:19,20,21 11:23
  12:3 23:19 29:1
  31:24 36:5 39:2
  41:13 42:3 49:19
  81:18 86:17 87:22
  115:6 142:23
  143:14 144:11
  157:3
**testing** 7:22 20:18
  67:21 96:13
  133:21 139:23
  144:18 146:11
  151:13,16,17
  155:13 176:17
**tests** 86:2,9 131:14
  134:21 142:8
**texas** 3:10
**text** 40:8 162:12
  162:23 163:13
**thank** 9:3,4 10:4,9
  10:13 11:2,7,21
  12:7 29:12 37:11
  47:10,11 58:6
  62:11 64:10 66:25
  72:6 80:13 82:13
  82:24 85:9 86:24
  87:5,18 89:5
  90:11,18 96:9
  105:22 107:4,5,6
  117:25 118:18
  120:8,13,15
  122:19 139:10,16

143:3 145:11
  148:2 157:16
  160:22 161:2
  165:22 171:6,6
  184:18 185:7,10
  185:13
**theme** 56:24
**theoretically**
  34:14,16,20
**therapeutic**
  102:13
**thick** 24:12,24
  76:12 83:17
**thin** 115:13 174:8
  174:11 177:9
**thing** 55:13 77:12
  82:4 84:15,19,21
  142:7 164:21
  179:10
**things** 151:17
  162:20
**think** 5:7 7:2 18:8
  21:20 26:20 49:15
  58:1 62:2 66:19
  70:10,25 88:4,14
  98:14,18 102:3
  115:10 133:2
  140:21 163:24
  167:17 179:22
  181:25 182:2
  183:7 199:19
**thinking** 88:14
**third** 3:6 60:24
  61:8 124:4,10
  147:20 164:5
  189:5,19 191:1
  198:22
**thought** 111:16
  113:10 154:23
  167:5,5

**thoughts** 197:20
**thousand** 26:7
**thousands** 21:16
  24:11,15,21,22,25
  26:3
**three** 18:3 19:3
  27:22 38:8 86:9
  108:15 124:18
  129:2,3,8 156:2
  169:9 172:18
  187:15 199:10
**tim** 99:22
**time** 8:16 11:3
  13:17 14:2,2,3,4,6
  14:6,10 16:13,16
  16:19 18:24 19:14
  41:11 47:7 52:10
  60:25 61:8 71:24
  78:10 80:5,14
  85:12 86:11 87:15
  89:14,16 92:14
  93:7 95:3 97:19
  98:4 101:24
  105:12 111:3
  115:2 121:1
  129:24 141:25
  151:22 156:21
  159:22 165:10
  169:9 172:2,2
  176:7,15 183:15
  190:6 199:19
**times** 15:2,6 25:10
  52:13 96:3,11
  113:22 115:10
  116:4,13,16,21
  117:5 118:13,20
  119:1,7,9,12
  125:10 131:18
  146:9 156:2
**tiny** 110:2

**tipped** 110:1
**tipping** 168:6
**tips** 168:12
**titanite** 132:10
  135:23
**title** 88:7,16,20
  101:19,20,23
**titles** 121:9
**tm7024** 152:4
  155:10
**today** 9:20 14:16
  22:19 43:18 85:12
  109:22 116:25
  119:5,15 144:5,6
  156:12,14 164:23
  169:24
**toiletries** 71:16
**toiletry** 71:12
  80:12
**told** 7:4 21:21 29:5
  30:22 43:3,8
  116:21 119:1
  123:22 158:21
  159:10 182:13
**tolerance** 42:25
  45:2
**tom** 111:19
**ton** 103:13
**tonnage** 74:12
**top** 55:8 126:4
  143:10 169:12
  185:15
**topic** 22:19 30:6
**total** 192:4
**totally** 28:7
**toxicologist** 23:5
  32:22
**toxicology** 32:7,9
  99:23 111:23
**trace** 72:25 111:23
  128:6 131:7 134:9

135:14,15,16,17
**track** 97:6
**traditional** 108:12
**trained** 38:6,7
**training** 32:7,7,17
**transcript** 2:17
200:7,8
**transmission** 86:1
**treat** 102:16
167:13
**tremolite** 44:12,15
44:16,16,20,23,23
72:24 73:3,6 74:8
74:21,22,22,25
75:2,7 76:7,8,10
77:14 82:6 83:12
83:13,16 93:8,10
94:6,11,15,23 95:7
95:8 96:2,4,5,5,7
96:12,14,18 128:7
128:8,10 129:4,12
129:15 130:7,16
131:2,5,7,17,20
132:23 133:22,24
134:7,9,12 135:9
135:10,24 136:16
136:20 137:2,7,9,9
140:1,7 144:21
145:2,3 146:5,7,11
147:5,10 150:8
152:15 153:21
169:24 170:17,24
173:6,17 178:11
179:7 182:24
183:2 184:20
**tremolitic** 173:2,4
173:8,13,20 174:6
174:7 177:10
**trend** 125:20
**trial** 1:4 9:21
14:14 15:2,5

187:19
**tried** 40:16 81:9
**trillion** 50:4
**trillions** 49:8,13
49:17,22
**trimellitic** 74:12
**trip** 120:20
**true** 15:3 39:11
69:24 91:3 99:20
100:14,25 104:10
109:5 110:14,25
114:2 121:17
122:1 124:11,14
124:25 125:14,24
129:8 131:6
132:13 135:16
150:17 152:9
153:16 155:16
162:19 179:2
192:16 196:19
199:18 200:8
**trump** 160:12
**truth** 92:1
**try** 42:5 162:15
175:24 195:17
**trying** 81:9 144:7
146:25 158:6
187:25
**turn** 23:15,21 24:1
32:3 34:17 51:1
53:12 57:25 59:4
59:14 64:12 70:23
80:2 88:3 92:15
103:4 110:2,7
115:12,17 119:19
123:8 126:3 131:1
131:4,13,21
133:14 137:12
139:18 151:20
172:17 191:13
199:3,10

**turned** 9:13 21:24
26:24 51:5 55:13
87:3 88:5 157:14
**tv** 61:22
**twist** 169:5,12,14
**twisty** 110:3 169:1
**two** 14:2,3,5 20:22
33:8 38:8 39:3
56:19 60:14 71:6
73:4 112:11
114:23,24 124:18
127:15 152:22
153:12 173:19
183:25 188:19
194:15
**type** 95:14 135:12
190:21
**typical** 55:2
**typifies** 55:1

### u

**u** 16:17 102:2
**uh** 23:17 31:16
55:11 64:18 127:4
150:1
**uk** 23:14 26:20
193:7
**ultimate** 149:17
**un** 69:4 70:5,12
**unacceptable**
76:24 82:11 84:7
**underneath**
166:17
**undersized** 6:21
**understand** 14:15
14:17 53:2 81:23
137:10 141:3
146:21 186:17
188:1
**understanding**
17:1 22:18 26:10
41:2 45:4 49:25

118:12
**understands** 34:3
49:6 55:20 102:10
**understood** 9:1
35:19 38:20 50:20
54:1 58:21 63:19
145:1
**unequivocally**
137:7
**unique** 123:18
**united** 18:17 23:5
26:18 63:24 90:3
91:10 92:5 172:5
**university** 196:17
197:6
**unknown** 108:15
**unnecessary** 112:8
**unpleasant** 173:22
**unquote** 186:19
188:4
**updated** 166:19
**upstairs** 86:19
156:24 157:7
**urban** 197:8
**urged** 108:10
**usage** 58:16 59:15
**use** 8:5 37:3 42:19
52:9 61:24 63:8
76:24 84:7 90:8
102:11 109:4
112:16 124:5,20
149:14 154:4
158:11,19,24
159:7 160:14,15
162:5,15 167:15
167:25 168:18,23
172:3,15,21
173:19 177:4,6
180:3 184:23,24
186:13 187:21
188:22 191:9,17

196:2 197:21
**uses**  59:16 82:11
93:11 101:23
185:1,19
**usurp**  6:16

**v**

**v**  1:6,11,16,21 5:20
**val**  16:10,11 19:12
122:9 123:10,20
**valeant**  20:3
**validated**  68:10
**valley**  123:19
**value**  108:13
**vanderbilt**  74:11
74:16,17
**varieties**  76:10
83:15
**variety**  132:23
**various**  26:16
**vary**  155:22
**vehicle**  6:10
**verification**  147:7
**verified**  140:4
144:20
**verify**  188:25
189:2,8
**veritext.com**  2:24
**vermont**  17:22
18:16,22 19:1,22
96:15 100:3 108:1
172:6,16 173:5,13
173:16
**versa**  21:14
**version**  71:20
79:11,14 175:4
177:1
**versus**  9:22,24,25
10:1
**vet**  162:17,19,21
162:24 163:7,14
164:14,14,17,17

172:2,3
**vetted**  166:21
**vice**  21:14
**view**  74:7 76:22
84:5
**villa**  123:15,15,16
123:17
**virtually**  103:15
**viscomi**  2:12
**visible**  157:1
**visit**  130:22
**visited**  27:5 122:9
**visual**  53:21 54:14
**volume**  1:6 2:5
12:9 196:9 199:24
**volumes**  12:9
**volunteered**  68:15

**w**

**w**  100:5 102:2
**w.b.**  52:5
**w.h.**  104:13
**wage**  2:21 200:3
200:12
**wait**  60:11 73:14
73:14,14 105:11
139:3,3,3 143:19
143:19 144:4
169:8,8 175:5
**waived**  142:12,15
**wajsczuk**  102:3
**want**  21:3 31:24
56:1 62:7 81:25
91:18 106:15
115:17 121:20
122:5 143:10
149:9,16 153:7
174:11 175:5
178:6,11 180:17
180:18 181:16,23
187:8 189:2

**wanted**  5:12 49:24
125:23 159:11
179:10 195:17
**wants**  189:8
**war**  16:17 17:3,4
32:23 99:6
**warning**  42:15,18
**warnings**  105:17
106:6
**way**  6:22 7:7
11:23 32:20 36:8
41:14 67:21 73:22
109:25 135:13
151:25 168:8
183:8
**ways**  60:14 188:19
**we've**  64:20 70:18
71:15 126:18
147:18 170:6
187:18
**wealthy**  123:17
**wear**  156:25
**web**  39:18,18,19
**webber**  10:21
**website**  39:15,17
40:17,21,23,25
41:3,18,22,25 79:5
157:23 161:22
162:13,15,25
167:24
**wednesday**  111:16
**week**  14:23 22:22
27:6 133:16 170:4
**weight**  49:6
**weil**  3:15
**welcome**  10:17
**went**  19:11 23:9
40:2 158:5,15
182:20
**west**  2:22

**whatsoever**  17:12
86:18 157:4
182:11,17
**wide**  52:14 156:3
**widely**  33:12
**wife**  13:21 14:1,4
14:5 121:25
**william**  1:19 3:12
9:25
**window**  16:20
**windsor**  18:5,8,13
100:2 151:25
**wishes**  80:13
**withdraw**  197:24
**withdrawn**  198:3
**withheld**  21:2,10
**witness**  4:2 5:3 6:4
6:5 8:12 9:17
10:24 11:1,5,16
25:21,25 68:19
78:11 81:7,19
85:2 86:24 117:5
118:9 120:6,13
143:9,20
**witness's**  117:23
**witnesses**  5:16
10:22 142:18
**woman**  111:16
**word**  56:2 59:17
114:17 134:3
145:22 154:4
158:11 172:3
175:9,14,16
183:12 188:13
**words**  14:18 22:19
90:8 114:18
168:17
**work**  12:18,21
22:5 72:23 108:21
141:23 186:18

[worked - zoom]

**worked** 13:1 32:8
  32:23 140:18
  197:7
**working** 9:7 31:9
  149:1
**works** 167:13
  186:17
**world** 17:4 32:23
  90:3 91:3 92:7
  99:6 123:18
**worldwide** 16:2
  32:11 60:22
**worried** 123:20
**worry** 119:23
**worse** 167:18
**write** 91:22 98:19
**writes** 108:20,24
**writing** 75:12,15
  148:13 180:7
  195:5,19
**written** 40:12
  41:22,24 75:4
  100:9 108:8 109:1
  116:3 119:6,12
  122:21 124:12,15
  124:19 140:8
  144:23 153:14,25
  158:3 162:12,21
  166:17 173:3
  177:11 185:22,22
  194:23 195:14
**wrong** 130:9
  144:24 183:23
**wrote** 91:16,17,19
  91:20,23,24 96:22
  109:2 115:9 125:9
  140:3 147:4
  194:12 195:3,11

**x**

**x** 4:1,4 64:21
  67:10 76:23 77:11
  82:10 84:6 85:15
  85:24 129:22,23
**xrd** 64:21,24
  67:19 68:4,23,25
  69:20 77:7,23,25
  78:5 87:23 152:5

**y**

**yeah** 27:15 28:24
  32:1,22 33:18
  36:10 38:17 43:23
  45:7 48:1,10 49:4
  49:20 51:9,9
  53:19,19,19 54:5
  54:16 56:11 58:24
  58:25 65:16 68:8
  74:24 75:18 78:16
  82:2 83:8 93:18
  93:20,20,25 94:3,8
  94:8 96:16 97:1
  97:14,14 99:1,9
  101:11,16,25
  102:7 105:4 108:8
  109:2,19,20 110:5
  110:5,18,20
  113:10 115:25
  125:3 127:8 128:3
  128:17 131:8
  133:24,24 134:4
  134:19 135:7,10
  135:17,20 136:3
  137:11,17 138:16
  144:9,25 145:3
  147:3,23 150:24
  161:22 174:22
  178:8 180:2,4
  181:5,19,24 184:2
  184:11 188:2

191:24 192:10,10
  192:10 193:25
  194:24 195:21
  196:11 199:8,11
**year** 13:1 15:1,5,8
  24:5,6 56:18,19
  57:3,3 116:3
  123:11 144:13
  154:21 163:21
  170:20 182:20
  192:1
**years** 18:3 25:11
  39:3 73:22 84:18
  103:11 124:17
  125:14 138:17
  144:19 163:20
  164:20 190:24
**yeast** 167:18
**yellow** 125:5
  153:25
**yep** 31:16 115:15
  154:25 171:15,16
  171:17
**yielded** 127:16
**york** 3:7,7 31:20
  115:10 116:4,13
  116:16 117:5
  118:13,20 119:7,9
  119:12 125:10
**younger** 50:24

**z**

**z** 102:2
**zero** 42:25 43:13
  43:22 44:9 45:2
  198:18
**zircon** 132:10
**zoom** 52:4 53:16

Exhibit 6

**JOHNSON & JOHNSON BABY POWDER
QUESTIONS AND ANSWERS**

– LIST OF NEW/CHANGED QUESTIONS –
OCTOBER, 1985

<u>New Questions:</u>

II.   Talc – Inhalation

    Qs: 7, 8  (page 12)

III. Talc – Translocation

    Qs: 2, 3, 4, 5  (pages 15 – 17)

IV.  Talc – Misuse

    Qs: 7, 8  (page 23)

IX.  Baby Cornstarch

    Q: 3  (page 36)

X.   Test Market – Baby Powder with Cornstarch

    Qs: 1 – 8 (New Section, pages 39 – 41)

<u>Changed Questions:</u>

II.   Talc – Inhalation

    Q: 4  (page 10)

III. Talc – Translocation

    Qs: 1, 6, 9  (pages 15, 17, 18)

IV.  Talc – Misuse

    Q: 6  (page 23)

VI.  Baby Powder Manufacturing

    Q: 3  (page 28)

JNJ 000011777

# JOHNSON & JOHNSON BABY POWDER

## QUESTIONS AND ANSWERS

CONFIDENTIAL

October, 1985

JNJ 000011778

The attached Question and Answer document has been developed for limited internal distribution in response to the need for clarification of issues relating to baby powder and talc. Specifically, its sole purpose at this time is to provide designated company spokespersons with answers to questions which could be raised by the press. It is <u>not</u> meant for distribution to anyone other than the individuals who will act as company spokespersons as necessary. Those recommended as spokespersons are:

> James Murray, Assistant Director, Corporate Public Relations
> James Utaski, President, Johnson & Johnson Baby Products Co.
> Tom Gardner, Vice President, General Manager
> Jim Dettre, Director of Communications

The 82 answers in the document were written in anticipation of potential questions. Many questions and answers were intentionally developed as versions of others already in the document in an effort to anticipate all angles of questioning and to prepare the spokespersons with responses which

> 1) Stand on their own as reflective of the corporate position.
> 2) Reflect and reinforce the approved communications objectives developed during a media training session. These communications objectives are:

JNJ 000011779

a) Johnson & Johnson Baby Powder, used properly, is safe. Extensive, scientifically documented evidence supports this claim as does the Food and Drug Administration (FDA).

b) No one knows more about safe, high quality baby care than the Johnson & Johnson Baby Products Company. To ensure continued confidence in our baby powder, we will conduct research as needed to reconfirm the safety of the product.

The Q & A document will be revised and updated as events or new research findings impact on the scope of potential questions or on existing responses.

October, 1985

JNJ 000011780

# JOHNSON'S BABY POWDER

## Questions and Answers

|       |                                                    | Page |
|-------|----------------------------------------------------|------|
| I.    | Talc – Cancer                                      | 1    |
| II.   | Talc – Inhalation                                  | 9    |
| III.  | Talc – Translocation                               | 14   |
| IV.   | Talc – Misuse                                      | 20   |
| V.    | Baby Powder – Benefits and Uses                    | 25   |
| VI.   | Baby Powder – Manufacturing                        | 28   |
| VII.  | Baby Powder – General                             | 32   |
| VIII. | Medicated Talcs                                    | 34   |
| IX.   | Baby Cornstarch                                    | 36   |
| X.    | Test Market – Baby Powder with Cornstarch          | 39   |
| XI.   | Johnson & Johnson Policy and General Questions     | 43   |
| XII.  | Index of Questions                                | 49   |

October, 1985

JNJ 000011781

**I.   TALC — CANCER**

October, 1985

JNJ 000011782

1. **Q: Does talc cause cancer?**

   A: Extensive research in both animals and humans has not shown talc to be carcinogenic nor to have any potential for causing cancer.

2. **Q: Dr. Daniel Cramer in the journal _Cancer_ has linked the use of talcum powder to ovarian cancer.  Could you comment?**

   A: Thorough research and testing by the FDA, the medical community and Johnson & Johnson does not support Cramer's hypothesis of such a link.  The most recent study in this area contradicts Dr. Cramer's findings.  In an October 14, 1983 JAMA letter to the editor, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. conducted research that supports existing studies that show no overall association between talc use and risk of ovarian cancer.  Dr. Cramer's study is an epidemiological one, which merely examined factors which might be associated with the disease.  The author of the study has himself acknowledged that the evidence is rather tenuous.  It does not show a cause and effect relationship.  As a retrospective study, it relied on individuals' memories to recall events and habits that took place over a 20-year period.

                                                    October, 1985

JNJ 000011783

3.   Q: We know that asbestos causes cancer, do we not?

A: We are not experts on asbestos, but there is strong evidence that very heavy exposure to asbestos fibers can cause cancer, especially in those people that smoke.

4.   Q: Haven't they found traces of asbestos in talcum powders?

A: Not in JOHNSON'S Baby Powder. Since the 1940's, when the testing technology first became available, Johnson & Johnson has regularly tested its talc to insure no asbestos contamination. Years ago, before quality controls were in place, some talcum powders could have contained asbestiform particles. Since 1976, however, the FDA has been conducting tests on a regular basis and has declared all talc-based baby powders to be free of such particles. Johnson & Johnson's quality control techniques ensure that JOHNSON'S Baby Powder is made from the purest, safest talc.

5.   Q: If your own studies should link talc to ovarian cancer, will you pull Baby Powder off the market?

A: If our tests confirmed a cause and effect relationship, naturally we would remove it. The consumer and the safety of our products are our primary concerns.

October, 1985

JNJ 000011784

6.   Q: Why didn't you find this link in your own testing?

     A: This link is a hypothesis and is contradicted by the fact
        that independent scientists, the FDA as well as Johnson &
        Johnson have tested the chemical properties of our talc
        and found no evidence of carcinogenicity.

7.   Q: When did you first become aware of the carcinogenic
        properties of your product?

     A: Research shows there are none.  Our product, JOHNSON's
        Baby Powder has been thoroughly tested.  Our research, as
        well as that of the government and the medical community,
        confirms its safety.

8.   Q: In 1976, scientists found asbestos in 10 of 19 baby
        powders tested.  How is that possible?

     A: Prior to 1976, when strict quality control was initiated,
        some talcum powders contained asbestiform particles, not
        JOHNSON's Baby Powder, however.  The FDA has since been
        conducting tests on a regular basis and has declared talc
        available, Johnson & Johnson has regularly tested its
        talc to insure that it is not contaminated with asbestos.
        Johnson & Johnson's talc is a pure, fine grade talc, safe
        for proper use among infants and adults.

                                        October, 1985

JNJ 000011785

9.   Q: **What is the relationship between talc and ovarian cancer?**

    A: There is no scientific evidence which shows that talc causes any form of cancer. In fact, the weight of extensive scientific evidence shows that talc is safe. As recently as October 14, 1983 in a letter to the editor of JAMA, evidence questioning such a link came to light. In that letter, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. state that their research reveals "no overall association between talc use and risk of ovarian cancer." Time and again research undertaken by the medical community, the government and by Johnson & Johnson confirms the safety of talc.

10.   Q: **Don't you test for those sorts of things?**

    A: Yes, we do. Johnson & Johnson is deeply concerned with the safety of its products and is continously testing them for safety. Extensive research to date reaffirms our confidence in the safety of baby powder.

11.   Q: **Are you presently conducting tests for this?**

    A: Yes, Johnson & Johnson sells only talc that is thoroughly tested for safety. We are committed to on-going testing.

October, 1985

JNJ 000011786

12.  Q: **What kinds of tests does Johnson & Johnson conduct?**

A: First, to ensure the talc is free from other elements or impurities, it is cleansed and tested at the mining site, The testing for purity and safety has been ongoing since the 1940's and includes a specific microscopic examination. This process is repeated during packaging at the factory. The result is the purest, finest grade talc used in JOHNSON 's Baby Powder.

Moreover, over the years, Johnson & Johnson has joined independent researchers, and the government in extensive research which has not shown talc to be a carcinogen.

13.  Q: **Dr. Cramer's study indicates that women who use talc have three times the risk of contracting ovarian cancer than those who do not use it. As a manufacturer, how do you respond to this?**

A: Thorough research and testing by the FDA, the medical community and Johnson & Johnson has not shown talc to be carcinogenic. The most recent study in this area contradicts Dr. Cramer's findings. In an October 14, 1983 JAMA letter to the editor, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. conducted research that supports existing studies showing no overall association between talc use and risk

October, 1985

JNJ 000011787

of ovarian cancer.  Dr. Cramer's study is an epidemio-
logical one, which merely examined factors which <u>might</u> be
associated with the disease.  The author of the study
himself acknowledged that the evidence is rather tenuous.
It does not show a cause and effect relationship.  As a
retrospective study, it depended on individuals' memories
to recall events and habits that took place over a 20-
year period.

14.  Q: Talc is closely related to asbestos.  Isn't it likely
     that the two react in the same way?

     A: Talc and asbestos are two chemically distinct minerals
     which can be found close together in geologic formations.
     J&J talc source was selected because it is rich in talc
     and free of asbestos.  We own the talc mine which gives
     us complete control ever the quality of talc used in our
     products.  Since 1976 the FDA has been conducting tests
     on a regular basis and declared talc safe.  Furthermore,
     medical testing shows that talc and asbestos act very
     differently in human tissues, and has not shown talc to
     be carcinogenic.

                                        October, 1985

JNJ 000011788

15. **Q:** What other studies have been done to determine the validity of this link between talc and cancer?

**A:** There are no studies confirming such a link.  On the contrary, the FDA and many other independent scientists have confirmed that there is no evidence linking pure talc to cancer.  JOHNSON'S Baby Powder does not contain asbestos, and we ourselves conduct exhaustive quality testing to assure its purity and safety.

October, 1985

JNJ 000011789

– 9 –

## II.   TALC – INHALATION

October, 1985

JNJ 000011790

1.  Q: **How about the allegations that talc can cause granulomas in the lungs?**

    A: These allegations result from rare reports of unusually large exposures not found in normal use of baby powder.

2.  Q: **What exactly are granulomas?**

    A: Talc granulomas are nodules of fibrous or scar tissue.

3.  Q: **Have studies been done linking disease to the miners of talc?**

    A: Studies indicate that talc dust exposure to millers of cosmetic grade talc is not injurious to health, whereas miners of industrial talcs may contract lung scarring because of the mixed dusts they are exposed to.

4.  Q: **Describe the kind of testing Johnson & Johnson has done on the safety of Baby Powder?**

    A: First, to ensure the talc is free from other elements or impurities, it is cleansed and tested at the mining site. The testing for purity and safety has been ongoing since the 1940's and includes electron microscopic examination. This process is repeated during packaging at the factory. The result is the finest grade talc used to give JOHNSON's Baby Powder its purest protection quality.

October, 1985

JNJ 000011791

Moreover, Johnson & Johnson, as well as the medical community and the government have been conducting research on talc for over 40 years to reaffirm its safety under various animal, laboratory and human conditions.  A study involving the inhalation of exaggerated levels of cosmetic talc during the life of hamsters showed no exposure-related problems.  A subsequent inhalation study with hamsters found no translocation of talc to the liver, kidneys, ovaries or other parts of the body. A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys did not migrate to the ovaries. Johnson & Johnson is committed to ongoing research for its talc products.

5.   Q: Isn't it dangerous to inhale talc?

A: Our research has shown that exposure to talc during normal cosmetic use is safe; however inhaling large quantities of any dust or dust-like particles could cause a medical problem.

6.   Q: What is "normal" use?

A: By normal use we mean, for instance, powdering after diapering, a shower or bath.

October, 1985

JNJ 000011792

- 12 -

7.  Q: **Why don't you put labels on your product to warn parents about "abnormal" use of talc?**

    A: Several years ago the FDA was asked to impose such labeling. At the time we agreed with their decision that warning labels were neither necessary or effective. Today, however, studies show that consumers are more apt to read package labeling.  Given this environment, J&J has decided to modify our package label, and are in the process of developing more detailed instructional and cautionary information.


8.  Q: **You're now test marketing J&J Baby Powder with cornstarch.  Why does that product package have a warning label and not Baby Powder with talc, which is more dangerous?**

    Our research has shown that normal use of cosmetic talc is safe.  As you said, J&J Baby Powder with cornstarch is in the test market stage, and does offer instructional and cautionary labeling.  We are in the process of developing this kind of labeling for J&J Baby Powder.


                                        October, 1985

JNJ 000011793

9.    Q: **Don't talc particles stay in your lungs?**

      A: The air we normally breathe contains alot of dust and our
         lungs are able to clear themselves very effectively.  It
         takes very heavy exposures to overburden this normal
         clearing ability.  Normal cosmetic use is hundreds of
         times less than exposure to animals that have not
         produced any talc-related effects.


10.   Q: **How long does it take to clear your lungs of talc?**

      A: Research *in animals* has shown that even with huge exposures, most
         talc is removed within 8 days, with the remainder being
         cleared within 3 months.


11.    Q: **Could talc cause emphysema?**

      A: Emphysema, a degenerative disease of the lungs caused by
         breakdown of the normal air sacks, has not been
         associated with talc under normal cosmetic use
         conditions.




                                                October, 1985

JNJ 000011794

III.   TALC – TRANSLOCATION

October, 1985

JNJ 000011795

1.   Q: Can talc migrate from the external environment into the body?

A: Numerous scientific studies have supported what we have always known as the inherent, biological implausibility of translocation of talc to the liver, kidneys, ovaries, and other parts of the body.

Studies on hamsters found that after massive inhalation of talc, there was no translocation of talc to the liver, kidneys, ovaries or other parts of the body.  Studies in rabbits show that talc, placed in the vagina, does not migrate to the ovaries.

And further evidence was provided by a 1984 study (performed by Battelle, Pacific Northwest Laboratories) using monkeys, which shows that talc, placed in the vagina, does not translocate to the oviducts or ovaries.

2.   Q: If there is no evidence for translocation of talc, why has it become an issue?

A: Some scientists theorize that talc is able to translocate to parts of the body.  The fact is, however, that the weight of scientific evidence falls heavily against this hypothesis.

October, 1985

JNJ 000011796

16

3.   Q: **What studies have been done to disprove translocation of talc?**

A: Numerous scientific studies show that talc does not translocate to the ovaries, liver, kidneys, or other parts of the body.

Studies on hamsters found that after massive inhalation of talc, no translocation occurred.  Studies in rabbits show that talc, placed in the vagina, does not migrate to the ovaries.

And further evidence was provided in a 1984 study (performed by Battelle, Pacific Northwest Laboratories) using monkeys, which shows that talc, when placed in the vagina, does not translocate to the oviducts or ovaries.

4.   Q: **But haven't there been studies proving translocation of talc?**

A: We are not aware of any studies that proved such a theory.  Numerous scientific studies show that talc does not translocate.  Most recently, in fact, a study (performed by Battelle, Pacific Northwest Laboratories, 1984) shows that talc, when placed in the vagina, does not translocate to the oviducts or ovaries.

October, 1985

JNJ 000011797

5.   Q: **What about the study by Egli & Newton that proved translocation of talc to the ovaries?**

     A: The 1961 Egli & Newton study, which used carbon black particles, did not prove translocation of talc to the ovaries.  Moreover, a study by Battelle, Pacific Northwest Laboratories (1984) followed closely the procedures used in the 1961 study, and found that talc does not translocate to the ovaries -- despite a number of controls added to make translocation easier.

     In this study, neutron-activated talc -- as well as the carbon black particles used in the 1961 study -- were deposited in the vaginas of monkeys.  Neutron-activated talc is easier to monitor, and reduces the problem of contamination from the environment.  Carbon is one of the most common air pollutants, and this could easily account for the carbon particles found in the 1961 study.

6.   Q: **Explain the process by which talc moves from the outside of the body to the ovaries.**

     A: This is a hypothesis only, and it is hard to imagine that the body's natural protective mechanisms would permit it. Moreover, the weight of scientific evidence falls heavily against this hypothesis.  In fact, a recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

                                              October, 1985

JNJ 000011798

7.   Q: **Does talc cause pelvic inflammatory disease?**

     A: Talc like any other foreign matter, will be irritating if introduced in unusual quantities into body cavities or tissues.  There is no scientific evidence that talc can migrate to those cavities and tissues from normal everyday use of talcum baby powder.


8.   Q: **What is "normal" use?**

     A: By normal use we mean, for instance, powdering after diapering, a shower or bath.


9.   Q: **Describe the kind of testing Johnson & Johnson has done on the safety of baby powder?**

     A: First, to insure the talc is safe and free from other elements or impurities, it is cleansed and tested at the mining site.  The testing process is repeated during packaging at the factory.  The result is the purest, finest grade talc used in J&J Baby Powder.


     Johnson & Johnson, as well as the medical community and the government have been testing talc for over 40 years to reaffirm its safety in various animal, laboratory and human tests.  A study involving the inhalation of exaggerated levels of cosmetic talc during the life of


                                              October, 1985

JNJ 000011799

hamsters showed exposure-related problems.  A subsequent inhalation study with hamsters found no translocation of talc to the liver, kidneys, ovaries or other parts of the body.

A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

A survey of 150 people who had talc placed around a lung to stabilize it against recurrent lung collapse showed this talc did not cause any increased cancer even with this severe direct exposure which had taken place 14-42 years previously.

October, 1985

JNJ 000011800

# IV.  TALC – MISUSE

October, 1985

JNJ 000011801

1.  Q: In Nassau County, in the first six months of 1980, there
       were 40 cases of babies who ingested or inhaled various
       baby powders.  How serious is this?

    A: By any standard this is serious and unfortunate, but
       these cases represent the misuse of various baby powders
       which, fortunately, did not have any long-term effects.
       Large amounts of any small particle entering the nose or
       mouth can overwhelm the normal defenses and form a
       physical barrier to breathing.  Parents must remember
       these products are not toys, and must exercise care
       around infants.  In this time period there were more than
       4,200 cases of accidental ingestions of various household
       products.  This underscores the need for proper parental
       supervision of infants and children.

2.  Q: How many suffocation deaths have there been?

    A: We are not aware of any such deaths over the past 20
       years.  The deaths recorded in the scientific literature
       prior to then occurred when the entire contents of a
       container were accidentally emptied into a baby's mouth,
       causing actual physical obstruction.

3.  Q: Aren't medicated powders even more dangerous?

    A: This would depend upon the nature and potential toxicity
       of the medicating ingredient.

October, 1985

JNJ 000011802

4.   Q: **Why haven't you changed the shape of your bottle, since it looks like a nurser and babies are prone to suck on it?**

A: We have looked into incidents of misuse carefully and have concluded that the shape of the bottle is not the cause of accidents, since babies will tend to put almost anything in their mouths.  The problem is in misuse -- parents who give the bottle to infants or leave it within the grasp of infants.  We do not feel that changing the shape of our bottle will eliminate the rare incidents of mishandling or of parental negligence.  Reports of inhalation due to misuse, though very unfortunate, are rare.  With reasonable parental care, inhalation accidents can be prevented.

5.   Q: **Why are there no safety caps on J&J Baby Powder?**

A: To try to prevent misuse, which is really the issue here, we provide extensive information along with our product on its proper usage.  The best way to prevent acute, i.e., one-time massive, inhalation by dumping in a baby's mouth is to keep the product out of the reach of babies, as indicated in our proper use information -- advertising, booklets, and packaging.

October, 1985

JNJ 000011803

6.   Q: If accidents are occuring, why aren't you warning parents
        about accidents in your labeling?

     A: Several years ago the FDA was asked to impose such
        labeling.  At the time we agreed with their decision that
        warning labels were neither necessary or effective.
        Today, however, studies show that consumers are more apt
        to read package labeling.  Given this environment, J&J
        has decided to modify our package label, and are in the
        process of developing more detailed instructional and
        cautionary information.  We have recently introduced J&J
        Baby Powder with cornstarch in test markets in
        California, and the product package has this kind of
        detailed labeling.


7.   Q: You're now test marketing J&J Baby Powder with
        cornstarch.  Why does that product package have a warning
        label and not Baby Powder with talc?

     A: As you said, J&J Baby Powder with cornstarch is in the
        test market stage, and does offer instructional and
        cautionary labeling.  We are in the process of developing
        this kind of labeling for J&J Baby Powder.


8.   Q: Why do you have to caution consumers about these
        products?  Are they unsafe?

     A: Of course these products are safe.  As a responsible


                                              October, 1985

JNJ 000011804

company, we feel that any time we can provide consumers with valuable information about the proper use of our products, we should do so.  In the current environment where consumers are more apt than ever before to read package labeling, we could provide yet another value-added service to consumers.

October, 1985

JNJ 000011805

- 25 -

V.   BABY POWDER — BENEFITS AND USES

October, 1985

JNJ 000011806

- 26 -

1.  Q: Baby Powder is no longer being used in hospitals.  Why
       not?

    A: This is not true of all hospitals.  Given the frequency
       of diaper changing in a hospital -- to help keep the skin
       dry and prevent diaper rash -- there is less dependence
       on a drying agent like talc or corn starch.

    B: Baby Powder is used in hospitals for general bed care.
       Nursery use of talc is limited and probably always has
       been limited because the frequency of diaper changing
       helps keep the skin dry and prevents diaper rash.  There
       is, therefore, less dependence on a drying agent like
       talc or corn starch.

2.  Q: There's no medical benefit to baby powder, is there?

    A: Talc is not presented as having a medical benefit, it is
       not a drug.  Baby powder is a dry lubricant for use after
       a shower, exercise or a diaper change.  The flat
       platelike talc particles slide easily over one another to
       provide lubricity.  J&J Baby Powder is moisture repellent
       and has been proven effective in reducing friction and
       providing cool, dry comfort for nearly 100 years.  For
       infants, the use of baby powder can encourage parental
       touching and caressing which fulfills documented
       psychological needs for "touching and bonding."

                                          October, 1985

JNJ 000011807

3.   Q: Does baby powder prevent diaper rash?

   A: Talc is a dry lubricant and a moisture repellent to be
   used after a diaper change.  Its lubricity has been
   proven effective in reducing friction and its moisture
   repellent action helps protect skin from the irritation
   of wet diapers.


4.   Q: **The Lancet**, a leading British medical journal says:
   "There is no reason to believe that normal exposure to
   talc in the past led to cancer."  What constitutes
   "normal" exposure?

   A: Normal exposure is the reasonable, everyday use of baby
   powder.  This means application after a shower, exercise
   or after a diaper change.


October, 1985

JNJ 000011808

VI.  BABY POWDER - MANUFACTURING

October, 1985

JNJ 000011809

1.   Q: **Where does talc come from?**

     A: It is a mineral, occurring naturally in the earth.  Talc
     is from deposits around the world.  Johnson & Johnson's
     own talc mine is located in Vermont.


2.   Q: **How is it mined?**

     A: Johnson & Johnson mines only the highest grade talc.  It
     is ground, then "washed" and purged of impurities.  It is
     then transported to the manufacturing plant in specially
     sanitized containers.  Before packaging, again it is
     tested for impurities.  Johnson & Johnson uses the utmost
     care and responsibility in bringing the highest possible
     quality baby powder to market.


3.   Q: **Describe the kind of testing Johnson & Johnson has done
     on the safety of baby powder?**

     A: J&J Baby Powder consists of pure talc.  To insure the
     talc is safe and free from other elements or impurities,
     it is washed and tested at the mining site.  The testing
     for purity and safety has been ongoing since the 1940's
     and includes a specific microscopic examination.  The
     testing process is repeated during packaging at the
     factory.  The result is the purest, finest grade talc
     used in J&J Baby Powder.


                                        October, 1985

JNJ 000011810

Moreover, Johnson & Johnson, as well as the medical community and the government have been testing talc for over 40 years to reaffirm its safety under various animal, laboratory and human conditions.  A study involving the inhalation of exaggerated levels of cosmetic talc during the life of hamsters showed no exposure related problems.  A subsequent inhalation study with hamsters found no translocation of cosmetic talc to the liver, kidneys, ovaries or other parts of the body.

A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

A survey of 150 people who had talc placed around a lung to stabilize it against recurrent lung collapse showed this talc did not cause any increased cancer even with this severe direct exposure which had taken place 14-42 years previously.

4.   Q: **Mineral talc and asbestos are often found in the same mines.  What safety controls do you have to maintain purity of product?**

A: Johnson & Johnson is one of the few consumer product companies in the U.S. that owns its own talc mine.  This allows us to have complete control over the quality of

October, 1985

JNJ 000011811

talc used in our product.  The mine was chosen because of the absence of asbestos deposits and the veins from which our talc is mined are specially and carefully selected. This selected high purity talc ore undergoes an extensive cleansing process to remove impurities and scientific analysis and microscopic examination to confirm the absence of asbestos.  The process selects the platy form of talc for superior lubricity.  The selection process is especially effective in eliminating non-platy shapes. The talc is shipped to our plant in specially sanitized containers to maintain this purity.  Before packaging, it is once more scientifically tested to insure this purity.

October, 1985

JNJ 000011812

## VII.  BABY POWDER — GENERAL

October, 1985

JNJ 000011813

1.  Q: **If your wife asked how safe baby powder is for your own baby, what would you tell her?**

    A: I would tell her that J&J Baby Powder is safe and I would assure her that nearly 100 years of use and extensive scientific evidence supports this.  Johnson & Johnson is recognized around the world as an extraordinarily responsible company, concerned first with the safety of our products and the health of the consumer.

2.  Q: **What's in J&J Baby Powder?**

    A: J&J Baby Powder contains pure, high grade talc, a naturally occurring mineral, and a very small amount of perfume (the most recognized smell in the world!)

3.  Q: **Is there any difference between mineral talc and cosmetic dusting powder?**

    A: Mineral talc is the naturally occuring element; cosmetic dusting powder is a particularly platy grade of mineral talc carefully processed with fragrances added.

4.  Q: **Is baby powder safe?**

    A: J&J Baby Powder, nearly 100 years on the market, can be used properly with confidence by consumers.  Thorough testing, undertaken by the scientific community, the Food and Drug Administration and by Johnson & Johnson has continuously reaffirmed the safety of baby powder.

                                            October, 1985

JNJ 000011814

VIII.   MEDICATED TALCS

October, 1985

JNJ 000011815

1.  Q: **Isn't it better to use medicated talc?**

    A: If the skin is irritated and requires a medicine to help in its treatment, a physician should be consulted, particularly if there is persistent or recurring irritation of the skin.

2.  Q: **Are there toxic elements in medicated talcs?**

    A: Medicated talcs contain drugs to treat minor skin irritations.  As with all drugs, safety and effectiveness depend on following the directions for its intended use. All talcs, including medicated ones, are for external skin applications only.

October, 1985

JNJ 000011816

# IX.   BABY CORNSTARCH

October, 1985

JNJ 000011817

1.   Q: **Why did you introduce a cornstarch powder?**

     A: While talc provides a moisture repellent barrier on the skin, Cornstarch absorbs moisture to make skin feel dry. It was found that some consumers preferred it, and we wanted to provide them with a superior cosmetic grade cornstarch.

2.   Q: **Isn't it because it is safer?**

     A: Not at all.  First, the safety of talcum powder has been continuously re-affirmed by Johnson & Johnson, the medical community and by the government.  And, we are always conducting research to ensure its safety.  For some consumers who prefer the absorbency effect of cornstarch, we have J&J Baby Cornstarch.  For the consumer who prefers more softness and lubricity, there is J&J Baby Powder.

3.   Q: **What's in J&J Baby Cornstarch?**

     A: J&J Baby Cornstarch consists of pure cornstarch (99%), tricalcium phosphate, and fragrance.  It is the highest quality cornstarch available.

October, 1985

JNJ 000011818

4.  Q: **What is tricalcium phosphate?  What is it used for?**

    A: It's a very safe food grade material.  It is added in small amounts to cornstarch to enable it to flow easily out of the container.

5.  Q: **When did you introduce your cornstarch product?**

    A: 1980.

6.  Q: **Surgeons who used to dust their gloves with talc now use cornstarch.  Do they know something we don't?**

    A: Cornstarch is a biodegradable substance which is better for use in surgical procedures where some of the powder on the surgeon's gloves could be left in the body cavity or tissues.

October, 1985

JNJ 000011819

X. TEST MARKET -- BABY POWDER WITH CORNSTARCH

October, 1985

JNJ 000011820

1.   Q: **What is J&J Baby Powder with cornstarch?**

A: J&J Baby Powder with cornstarch is a baby powder for consumers who prefer the absorbency of cornstarch.  For the consumer who prefers more softness and lubricity, there is J&J Baby Powder with talc.  J&J Baby Powder with cornstarch is the highest quality cornstarch available. It consists of pure cornstarch (99%), tricalcium phosphate, and fragrance.

J&J Baby Powder with cornstarch is currently in the test market stage.  It is being test marketed in Los Angeles, San Francisco and Las Vegas.  Our intent at this point is to take it national some time in 1986.

2.   Q: **What is tricalcium phosphate?  What is it used for?**

A: It's a very safe food grade material.  It is added in small amounts to cornstarch to enable it to flow easily out of the container.

3.   Q: **Why is baby powder cornstarch offered only in a few parts of the country?**

A: J&J Baby Powder with cornstarch is currently in the test market stage.  It is being test marketed in Los Angeles, San Francisco and Las Vegas.  Our intent at this point is to take it national some time in 1986.

October, 1985

JNJ 000011821

- 41 -

4.   Q: **Why is J&J changing its flagship product to contain cornstarch?**

   A: We are not changing our flagship product.  J&J Baby Powder has been on the market nearly 100 years and it remains the baby powder preferred by consumers.  We are expanding the product line to offer consumers a choice. For some consumers who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.  For the consumer who prefers more softness and lubricity, there is J&J Baby Powder with talc.

5.   Q: **What's the purpose of changing the name but not the product?**

   A: It is a marketing decision.  Our cornstarch product has proven it is worthy of the name of J&J Baby Powder.

6.   Q: **Are you putting cornstarch in J&J Baby Powder because you think talc is not safe?**

   A: The safety of talcum powder continuously has been re-affirmed by Johnson & Johnson, the medical community, and by the government.  Consumers who prefer more softness and lubricity will be able to continue to use J&J Baby Powder with talc.  For those who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.

October, 1985

JNJ 000011822

7.  Q: When are you going to discontinue using talc in J&J Baby Powder?

    A: We are not changing J&J Baby Powder.  We are expanding the product line to offer consumers a choice.  For some consumers who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.  For those who prefer more softness and lubricity, there is J&J Baby Powder with talc.


8.  Q: Why is there a warning label on J&J Baby Powder with cornstarch and not on J&J Baby Powder?

    A: J&J Baby Powder with cornstarch is in a test market.  We are in the process of including similar labelling on J&J Baby Powder.

October, 1985

JNJ 000011823

## XI.   JOHNSON & JOHNSON POLICIES AND GENERAL QUESTIONS

October, 1985

JNJ 000011824

1.  Q: Why are so many products being tested for safety today?

    A: As scientific techniques are becoming more and more advanced, researchers are able to conduct even more rigorous studies on chemicals and products and reaffirm their safety.  J&J Baby Powder has been on the market for more than 90 years.  It has been examined again and again, and all the evidence continues to say that it's a safe product for normal cosmetic use.

2.  Q: How has the Tylenol incident affected Johnson & Johnson Baby Products?

    A: The whole country now understands that Tylenol was subject to criminal tampering.  It has reaffirmed my faith that Johnson & Johnson will only market the safest product possible and will always keep consumers' interests above all others.

3.  Q: If your own studies link talc to ovarian cancer, will you pull your talc products off the market?

    A: If such tests prove a cause and effect relationship, yes we would remove our talc products.  Johnson & Johnson would never place baby powder users at unacceptable risk. The safety of the consumer is our primary concern.

October, 1985

JNJ 000011825

4.  Q: **You've had a lot of problems at Johnson & Johnson.  How many other products are under investigation?**

    A: Talc is not under investigation, except to the extent that it like many products, is continually tested for safety.  Johnson & Johnson's primary responsibilities are to the consumer and as such we sell only the highest quality baby care products.  We also investigate our medical products thoroughly, including post-marketing surveillance after they have FDA approval.


5.  Q: **Will Johnson & Johnson pull its baby powder from the market if these allegations that baby powder causes ovarian cancer are true?**

    A: If removal from the market were required to protect the public, yes.  The consumer has been and will continue to be our concern, and our actions will reflect this philosophy in all decisions.  At Johnson & Johnson, the effectiveness and safety of Baby Powder have been proven for nearly 100 years.  As recently as October 14, 1983 in a letter to the editor of JAMA, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. state that their research reveals "no overall association between talc use and ovarian cancer."  We at Johnson & Johnson, along with the scientific community

October, 1985

JNJ 000011826

and the government, have vast knowledge and understanding of talc.  This extensive research shows that Baby Powder, properly used, is safe.

6.   Q: **How are you people handling the crisis?**

A: There is no crisis involving baby powder.  The tremendous body of evidence attesting to the safety of talc remains valid.  We would just like to inform consumers that J&J Baby Powder, a product nearly 100 years old, is safe and that we are always conducting research to affirm this. We have always placed the consumer's safety above all else and will continue to do so.

7.   Q: **When were you first aware of the problems with baby powder?**

A: In examining all the research undertaken on baby powder we are not aware of problems with it.  Extensive research indicates that baby powder, used properly, is safe.  We do see an opportunity to clear up some public misunderstanding about our product and its use so it's a pleasure to talk to you about Johnson's Baby Powder.

October, 1985

JNJ 000011827

8.    Q: In light of all this controversy, when will you be
         pulling Baby Powder off the market?

      A: The safety and effectiveness of Baby Powder have been
         proven for nearly 100 years.  At Johnson & Johnson,
         concern for the consumer's safety and health is our1
         priority.  As always, we will continue to act
         accordingly, reflecting this philosophy in all decisions.

9.  .Q: What other products does Johnson & Johnson Baby Products
        Division manufacture?

      A: Johnson & Johnson has a long history as a leading
         supplier of quality baby care products.  Besides Baby
         Powder and Cornstarch, we also have Baby Cream, Baby Oil,
         Baby Lotion and Baby Shampoo.  We also sell J&J wash
         cloths, cotton swabs, gift sets, baby bath, soap, Sundown
         sun screen, Affinity Shampoo and Johnson & Johnson Child
         Development Toys.

10.   Q: Do you anticipate problems with those products in the
         future?

      A: We have no reason to believe there are problems with any
         of our products.  All are thoroughly tested for safety
         before they are introduced, and on a continuing basis
         thereafter.  Johnson & Johnson is deeply committed to
         continuing to provide its customers with the highest
         quality and safest baby products.

                                              October, 1985

JNJ 000011828

- 48 -

11.   Q: **Are you conducting any tests right now to reassure your Baby Powder users?**

A: To reaffirm the existing and extensive evidence supporting the safety of Baby Powder, Johnson & Johnson conducts tests on an ongoing basis.  For instance, since the 1940's, we have been testing our talc to ensure that it is free from other elements or impurities.  After a thorough cleansing process at the mine site, Johnson & Johnson talc undergoes a specific microscopic examination.  This process is repeated during packaging at the factory.  The result is the purest, finest grade talc used in J&J Baby Powder.

October, 1985

JNJ 000011829

XII.   INDEX

October, 1985

JNJ 000011830

## INDEX OF QUESTIONS

Page

**I.   TALC – CANCER**

1. Does talc cause cancer?............................ 2

2. Dr. Daniel Cramer in the journal Cancer has linked the use of talcum powder to ovarian cancer.  Could you comment?...................................... 2

3. We know that asbestos causes cancer, do we not?..... 3

4. Haven't they found traces of asbestos in talcum powders?.......................................... 3

5. If your own studies should link talc to ovarian cancer, will you pull Baby Powder off the market?... 3

6. Why didn't you find this link in your own testing?.......................................... 4

7. When did you first become aware of the carcinogenic properties of your product?............ 4

8. In 1976, scientists found asbestos in 10 of 19 baby powders tested.  How is that possible?......... 4

9. What is the relationship between talc and ovarian cancer?................................... 5

10. Don't you test for those sorts of things?.......... 5

11. Are you presently conducting tests for this?........ 5

12. What kinds of tests does Johnson & Johnson conduct?.......................................... 6

13. Dr. Cramer's study indicates that women who use talc have three times the risk of contracting ovarian cancer than those who do not use it.  As a manufacturer, how do you respond to this?......... 6

14. Talc is closely related to asbestos.  Isn't it likely that the two react in the same way?.......... 7

15. What other studies have been done to determine the validity of this link between talc and cancer?.......................................... 8

October, 1985

JNJ 000011831

Page

**II. TALC - INHALATION**

   1. How about the allegations that talc can cause granulomas in the lungs............................ 10

   2. What exactly are granulomas?........................ 10

   3. Have studies been done linking disease to the miners of talc?..................................... 10

   4. Describe the kind of testing Johnson & Johnson has done on the safety of Baby Powder?.............. 10

   5. Isn't it dangerous to inhale talc?.................. 11

   6. What is "normal" use?.............................. 11

   7. Why don't you put labels on your product to warn parents about "abnormal" use of talc?.............. 12

   8. You're now test marketing J&J Baby Powder with cornstarch.  Why does that product package have a warning label and not Baby Powder with talc, which is more dangerous?........................... 12

   9. Don't talc particles stay in your lungs?............ 13

  10. How long does it take to clear your lungs of talc... 13

  11. Could talc cause emphysema?........................ 13

**III. TALC - TRANSLOCATION**

   1. Can talc migrate from the external environment into the body?..................................... 15

   2. If there is no evidence for translocation of talc, why has it become an issue?........................ 15

   3. What studies have been done to disprove translocation of talc?.............................. 16

   4. But haven't there been studies proving translocation of talc?.............................. 16

   5. What about the study by Egli & Newton that proved translocation of talc to the ovaries?.............. 17

   6. Explain the process by which talc moves from the outside of the body to the ovaries................. 17

October, 1985

JNJ 000011832

Page

**III. (con't)**

   7. Does talc cause pelvic inflammatory disease?........ 18

   8. What is "normal" use?............................... 18

   9. Describe the kind of testing Johnson & Johnson
      has done on the safety of Baby Powder?.............. 18

**IV.   TALC — MISUSE**

   1. In Nassau County, in the first six months of 1980
      there were 40 cases of babies who ingested or
      inhaled various baby powders.  How serious is
      this?............................................... 21

   2. How many suffocation deaths have there been?........ 21

   3. Aren't medicated powders even more dangerous?....... 21

   4. Why haven't you changed the shape of your bottle,
      since it looks like a nurser and babies are prone
      to suck on it?..................................... 22

   5. Why are there no safety caps on J&J Baby Powder?.... 22

   6. If accidents are occurring, why aren't you warning
      parents about accidents in your labeling?........... 23

   7. You're now test marketing J&J Baby Powder with
      cornstarch.  Why does that product package have
      a warning label and not Baby Powder with talc?...... 23

   8. Why do you have to caution consumers about these
      products?  Are they unsafe?......................... 23

**V.   BABY POWDER — BENEFITS AND USES**

   1. Baby Powder is no longer being used in hospitals
      any more.  Why not?................................. 26

   2. There's no medical benefit to Baby Powder, is
      there?.............................................. 26

   3. Does baby powder prevent diaper rash?.............. 27

   4. The Lancet, a leading British medical journal,
      says: "There is no reason to believe that normal
      exposure to talc in the past led to cancer."
      What constitutes "normal" exposure?................ 27

October, 1985

JNJ 000011833

Page

**VI.  BABY POWDER – MANUFACTURING**

1. Where does talc come from?........................... 29

2. How is it mined?.................................... 29

3. Describe the kind of testing Johnson & Johnson
   has done on the safety of Baby Powder?.............. 29

4. Mineral talc and asbestos are often found in the
   same mines.  What safety controls do you have to
   maintain purity of product?........................ 30

**VII. BABY POWDER – GENERAL**

1. If your wife asked how safe Baby Powder is for
   your own baby, what would you tell her?............. 33

2. What's in J&J Baby Powder?......................... 33

3. Is there any difference between mineral talc and
   cosmetic dusting powder?........................... 33

4. Is Baby Powder safe?............................... 33

**VIII. MEDICATED TALCS**

1. Isn't it better to use medicated talc?............. 35

2. Are there toxic elements in medicated talcs?........ 35

**IX.  BABY CORNSTARCH**

1. Why did you introduce a cornstarch powder?.......... 37

2. Isn't it because it is safer?...................... 37

3. What's in J&J Baby Cornstarch?..................... 37

4. What is tricalcium phosphate?  What is it used
   for?............................................... 38

5. When did you introduce your cornstarch product?..... 38

6. Surgeons who used to dust their gloves with talc
   now use cornstarch.  Do they know something we
   don't?............................................. 38

October, 1985

JNJ 000011834

Page

**X.   TEST MARKET -- BABY POWDER WITH CORNSTARCH**

1. What is J&J Baby Powder with cornstarch?............ 40

2. What is tricalcium phosphate?  What is it used for?................................................ 40

3. Why is baby powder cornstarch offered only in a few parts of the country?......................... 40

4. Why is J&J changing its flagship product to contain cornstarch?................................. 41

5. What's the purpose of changing the name but not the product?................................... 41

6. Are you putting cornstarch in J&J Baby Powder because you think talc is not safe?................ 41

7. When are you going to discontinue using talc in J&J Baby Powder?................................ 42

8. Why is there a warning label on J&J Baby Powder with cornstarch and not on J&J Baby Powder?........ 42

**XI.   JOHNSON & JOHNSON POLICIES AND GENERAL QUESTIONS**

1. Why are so many products being tested for safety today?............................................. 44

2. How has the Tylenol incident affected Johnson & Johnson Baby Products?........................... 44

3. If your own studies link talc to ovarian cancer, will you pull your talc products off the market?.......................................... 44

4. You've had a lot of problems at Johnson & Johnson. How many other products are under investigation?.... 45

5. Will Johnson & Johnson pull its Baby Powder from the market if these allegations that Baby Powder causes ovarian cancer are true?.................... 45

6. How are you people handling the crisis?............ 46

7. When were you first aware of the problems with Baby Powder?................................. 46

8. In light of all this controversy, when will you be pulling Baby Powder off the market?............. 47

October, 1985

JNJ 000011835

**XI.  (con't)**

9. What other products does Johnson & Johnson Baby
   Products Division manufacture?..................... 47

10. Do you anticipate problems with those products in
    the future?........................................ 47

11. Are you conducting any tests right now to reassure
    your Baby Powder users?............................ 48

October, 1985

D/00/02

JNJ 000011836

Exhibit 7

**Johnson-Johnson**

201960

**New Brunswick, N. J.**

November 3, 1964

**Subject:** Pure Food Powdered Corn Starch
A. E. Staley Manufacturing Company

Mr W. H. Ashton:

About two weeks ago I discussed with you a proposed visit by representatives of the A. E. Staley Manufacturing Company to this office. It was indicated these representatives wanted to talk about the possibility of substituting corn starch in our Baby Powder to replace all or a portion of the talc. You indicated at that time you would like to have a small sample of the corn starch Staley proposed for our use, and also price information on this starch.

A sample of the Pure Food Powdered Starch is on its way into us, and as soon as received will be sent to you. The current price is $6.73 per cwt. delivered to New Brunswick in 100 lb. paper bags in carload quantities of 50,000 lbs. minimum.

A. E. Staley Manufacturing Company states their Pure Food Powdered Starch is a fine powdered form of unmodified corn starch. They process it by flash-drying to a bulk density (loose) of 32-33 pounds per cubic foot. It is then densified to approximately 45 pounds per cubic foot. They state this gives them a product of approximately 10% moisture that is free flowing and with less dust than a micro-pulverized product. The particle size specification is 0.05% maximum on a 10XX silk. They claim virtually all of the product will pass through a U.S. 325 mesh screen.

This supplier further points out there are two possible advantages of starch in Baby Powder. One is its ability to hold more than 50% water, and the second the fact that starch can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc.

M. R. Stalker

am

J&J-0161396

JNJ 000331979

Exhibit 8

PLAINTIFF'S EXHIBIT

P1 262
cje 4/16/21



# A change for the better

## from Johnson & Johnson

Presentation Brochure   " Introducing New Construction "
(reclaims)   1984

J&J-0161682

JNJ 000332195

# The baby powder market is changing

**Cornstarch is being used by more and more mothers in changing their babies' diapers**

- About 50% of mothers who use a baby powder on their infants now use a <u>cornstarch</u> baby powder

- The cornstarch segment is the <u>growth</u> <u>segment</u> of the category —up 32% since 1981*



Cornstarch growth*
(MM oz)

46.1  58.1  61.0
81    82    83

*A.C. Nielsen



_Johnson's_ baby powder

Johnson & Johnson

_Johnson's_ baby corn starch

—HELPS PREVENT CHAFING—

Johnson & Johnson

# *Johnson's* baby corn starch is growing

## *Johnson's* baby corn starch is the fastest-growing cornstarch baby powder

- Up 12% in food outlets*
- Up 5% in drug stores*

*Johnson's*
baby
corn
starch



HELPS PREVENT CHAFING

Johnson & Johnson

A. C. Neilsen, 1983

# *Johnson's* baby corn starch is one of the best ways to help protect baby's skin from irritation due to wetness

• It's 98% pure, natural cornstarch

• It's manufactured to unsurpassed Johnson & Johnson standards

• Only an anti-caking ingredient and a clean, fresh fragrance are added





Johnson & Johnson

# Now we're changing for the better...

J&J-0161685

JNJ 000332198

# Mothers want a more absorbent cornstarch



**Johnson's baby cornstarch**

Johnson & Johnson

• Wetness in the diaper area is a big concern because it can promote irritation and chafing

• Johnson & Johnson now has a cornstarch that is 25% more absorbent because it's made with a special cornstarch

• New extra absorbent JOHNSON'S Baby Cornstarch helps keep baby's skin drier

## Extra absorbency means extra sales for you.

P1.00000262.0005

J&J-0161686

JNJ 000332199

# PLUS – Strong new advertising and promotion support



**Full-Page Ads** in the magazines mothers read most for baby care information

• All top baby magazines plus additional publications to expand coverage

• Reaches 87% of the target market more than 4 times during the second half of 1984

**Targeted, high-visibility coupons to insure that first purchase**

2.5 MILLION 30¢ pop-up coupons in *Parents* and *American Baby* in July

2.4 MILLION 20¢ pop-up coupons in Johnson & Johnson *New Parenting Series Magazines*

625 THOUSAND 30¢ direct mail coupons to new mothers in August, September and October





**Money saving consumer offer at point-of-sale**

• $1.00 mail-in coupon offer in peak summer season

J&J-0161687

JNJ 000332200

# Exhibit 9

1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF NEW JERSEY
                     - - -
3   IN RE:  JOHNSON &      :  MDL NO.
    JOHNSON TALCUM POWDER   :  16-2738 (FLW)
4   PRODUCTS MARKETING,     :  (LHG)
    SALES PRACTICES AND     :
5   PRODUCTS LIABILITY      :
    LITIGATION              :
6                           :
    This Document Relates   :
7   to:  All Cases          :

8           IN THE CIRCUIT COURT
         OF THE CITY OF ST. LOUIS
9             STATE OF MISSOURI
                     - - -
10  VICKIE FORREST, et al,  :
                            :  CASE NO.
11        Plaintiffs,       :  1522-CC00419-
                            :  02
12        vs.               :
                            :  Division 1
13  JOHNSON & JOHNSON, et   :
    al.,                    :
14                          :
          Defendants.       :
15                   - - -
             September 27, 2021
16                   - - -
17        Videotaped remote deposition of
    JOHN McKEEGAN, taken pursuant to notice,
18  was held via Zoom Videoconference,
    beginning at 10:02 a.m. EST, on the above
19  date, before Michelle L. Gray, a
    Registered Professional Reporter,
20  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
21
                     - - -
22        GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672
23            deps@golkow.com
24

Page 2

ZOOM APPEARANCES:

LEVIN PAPANTONIO RAFFERTY PROCTOR
BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
BY:  CHRISTOPHER V. TISI, ESQ.
CAMERON STEPHENSON, ESQ.
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
(888) 435-7001
ctisi@levinlaw.com
Cstephenson@levinlaw.com
Representing the Plaintiffs

LUNDY LUNDY SOILEAU & SOUTH LLP
BY:  KRISTIE M. HIGHTOWER, ESQ.
NICHOLAS J. KOHRS, ESQ.
501 Broad Street
Lake Charles, Louisiana 70601
(337) 439-0707
Khightower@lundylawllp.com
Nkohrs@lundylawllp.com
Representing the Plaintiffs

ROBINSON CALCAGNIE
BY:  GENEVIEVE OUTLAW, ESQ.
19 Corporate Plaza Drive
Newport Beach, California 92660
(949) 720-8855
Goutlaw@robinsonfirm.com
Representing the Plaintiffs

Page 3

ZOOM APPEARANCES:  (Cont'd.)

SHOOK HARDY BACON
BY:  KATHLEEN FRAZIER, ESQ.
JP Morgan Chase Tower
600 Travis Street, Suite 3400
Houston, Texas 77002
(713) 546-5611
Kfrazier@shb.com
Representing the Defendants, Johnson &
Johnson entities

SEYFARTH SHAW, LLP
BY:  THOMAS J. LOCKE, ESQ.
975 F Street, NW
Washington, D.C. 20004
(202) 463-2400
tlocke@seyfarth.com
Representing the Defendant, PCPC

TUCKER ELLIS, LLP
BY:  ELIZABETH J. CUMMINGS, ESQ.
100 South Fourth Street
Suite 600
St. Louis, Missouri 63102
(314) 571-4963
Elizabeth.cummings@tuckerellis.com
Representing the Defendants, PTI Royston,
LLC and PTI Union, LLC

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Carolin de la Rosa

LITIGATION TECHNICIAN:
Dan Lawlor

Page 4

- - -
I N D E X
- - -

Testimony of:          JOHN McKEEGAN

By Mr. Tisi          11, 273

By Ms. Frazier          261

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION          PAGE
P1.446          Memo, 2/4/94          116
Subject, Talc
Symposium Followup
JNJ 000022605

P1.603          E-mail Thread          166
12/7/02
Subject, Talc
Assessment/Nichols
Dezenhall
JNJ 000019592-94

Page 5

- - -
E X H I B I T S  (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
P1.605          E-mail Thread          19
9/1/99
Subject, Confidential
Article Genital Talc
Exposure and Risk of
Ovarian Cancer
JNJ 000020043-45

P1.610          E-mail Thread          246
12/15/00
Subject, Ken Rothman
JNJ 000404480-81

P1.626          CTFA Memorandum          220
10/20/97
Subject, Proposal
From Nichols/Dezenhall
On Talc
PCPC_MDL00144426-35

P1.637          E-mail Thread          59
2/13/98
Subject, Talc
JNJ 000038708
Statement on Talcum
Powder
JNJ 000020045

P1.640          E-mail Thread          158
2/4/00
Subject, FYI HealthScout
Article
JNJTALC000440752-56

Page 6

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION              PAGE

P1.643        E-mail Thread         68
3/10/00
Subject, Stockholders
Meeting Powder Questions
JNJ 000404529
Annual Stockholders Meeting
Powder Questions
JNJ 000020073

P1.645        E-mail Thread         97
11/28/00
Subject, Talc
JNJ 000576337
National Toxicology
Program Draft Reaction
Statement
JNJ 000576338

P1.646        E-mail Thread         83
12/5/00
Subject, Talc -
Not for Further
Distribution
JNJ 000563635-38

P1.647        E-mail Thread         86
10/11/01
Subject, Expanded
Talc Q&A
JNJ 000562923-25

P1.655        E-mail Thread         31
7/1/99
Subject, Talc Review
JNJ 000564698-99

Page 7

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION              PAGE

P1.658        E-mail Thread         191
11/14/00
Subject, Talc Nov 9th
JNJ 000404424-29

P1.663        E-mail Thread         176
11/17/00
Subject, Monday 11/20
Talc Meeting
JNJ 00368160-63

P1.665        E-mail Thread         74
12/4/00
Subject, Talc
JNJ 000404553

P1.667        Curriculum Vitae      12
John McKeegan
McKeegan-00000001-2

P1.669        FDA's Cosmetics       133
Program
2/16/98
PCPC 0058604-654

P1.670        Talc: Consumer Uses   59
And Health Perspectives
JNJ 00039511-15

P2.6          Genital Talc Exposure 26
And Risk of Ovarian
Cancer
(Cramer)

Page 8

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE  LINE PAGE LINE    PAGE LINE
None.

Request for Production of Documents
PAGE  LINE PAGE LINE    PAGE LINE
247  14
259   6

Stipulations

PAGE  LINE PAGE LINE    PAGE LINE
None.

Questions Marked

PAGE  LINE PAGE LINE    PAGE LINE
None.

Page 9

THE VIDEOGRAPHER: We are now on the record.

My name is Carolin De La Rosa, the videographer for Golkow Litigation Services.

Today's date is September 27, 2021, and the time is 10:02 a.m.

This deposition is being held in the matter of In Re talcum powder litigation.

The deponent today is John McKeegan.

All parties are noted on the stenographic record.

Will the court reporter please swear in the witness.

- - -

... JOHN McKEEGAN, having been first duly sworn, was examined and testified as follows:

- - -

MR. TISI: Just a couple of

Page 10

1  preliminary things before we
2  actually start the deposition.
3      First of all, I do
4  understand that I asked this
5  question, that this was noted --
6  this is supposed to also be noted
7  in the Missouri cases.
8      I'll be representing the
9  plaintiffs in both the Missouri
10  and the MDL litigation.
11      I understand that there was
12  no notice of deposition in the
13  Missouri cases, but for all
14  intents and purposes, I've never
15  had this before, we will agree
16  that this is a New Jersey -- a
17  Missouri deposition as well.
18      Kat, are you okay with that?
19      MS. FRAZIER:  I'm okay with
20  that.
21      MR. TISI:  Okay.  I don't
22  know what happened with the
23  notice, but I did notice that as
24  well.

Page 11

1      Secondly, we provided you
2  with documents ahead of time, as
3  we had agreed to do.  There are
4  some documents that either were
5  incomplete, so we've substituted
6  them, that won't be in his binder
7  or some additional documents.  And
8  we'll just have to use them on the
9  screen.  We did our best effort to
10  try to provide you stuff ahead of
11  time as we had agreed, just so you
12  know that.
13      And you can certainly open
14  your binders as well.  Open your
15  documents as well.
16      Okay?  With that, may we
17  start the deposition?
18      MS. FRAZIER:  John, you okay
19  to start?
20      THE WITNESS:  Sure.
21          - - -
22      EXAMINATION
23          - - -
24  BY MR. TISI:

Page 12

1      Q.   Please state your name for
2  the record, sir.
3      A.   John McKeegan.
4      Q.   And would you go to the
5  Exhibit Tab 75 in the binder we provided
6  you?
7      A.   75, you said?
8      Q.   Correct.
9      MR. TISI:  You can bring
10  that up as well, Dan.
11      TRIAL TECH:  Okay.
12      MR. TISI:  I'm sorry,
13  Exhibit 1.667.
14      (Document marked for
15  identification as Exhibit
16  P1.667.)
17      THE WITNESS:  Okay.  My
18  resumé?
19  BY MR. TISI:
20      Q.   Yeah.  We're going to ask
21  you to look at P1.667.  Is this a copy of
22  your CV, sir?
23      A.   Yes.
24      Q.   Is this your current CV or

Page 13

1  resumé?
2      A.   Yes.
3      Q.   If you go to Page 2, on
4  page -- it indicates between 1997 and
5  2001 you were the manager of corporate
6  communications for Johnson & Johnson; is
7  that correct?
8      A.   Yes.
9      Q.   Okay.  What was role and
10  responsibilities of your job as corporate
11  communications for Johnson & Johnson?
12      A.   The main job was to respond
13  to questions that would come into Johnson
14  & Johnson from the media.
15      In terms of areas of
16  responsibility, I was kind of the
17  secondary corporate spokesman working for
18  Jeff Leebaw who was the -- I think at the
19  time that I started he was director of
20  media relations.
21      And I also had a secondary
22  responsibility to answer media questions
23  based on Johnson & Johnson Consumer
24  Products.  At least for those products

Page 14

¹ where the operating company did not have
² its own spokesperson.
³      Q.   Okay.  And you kind of raise
⁴ a point that I was going to make later.
⁵           You work for Johnson &
⁶ Johnson corporate, correct?
⁷      A.   Correct.
⁸      Q.   Okay.  And Johnson & Johnson
⁹ has several -- Johnson & Johnson is the
¹⁰ parent and there are several other
¹¹ companies that are affiliates of Johnson
¹² & Johnson, including J&J Consumer
¹³ Products, correct?
¹⁴           MS. FRAZIER:  Object to
¹⁵      form.
¹⁶           THE WITNESS:  I don't think
¹⁷      that was the name of the operating
¹⁸      company.
¹⁹ BY MR. TISI:
²⁰      Q.   Okay.  What was the
²¹ operating company, if you can recall?
²²           MS. FRAZIER:  Object to
²³      form.
²⁴           THE WITNESS:  It was a

Page 15

¹      Consumer Products companies.  I
²      think there were a few underneath
³      the umbrella.
⁴ BY MR. TISI:
⁵      Q.   Okay.  The company that --
⁶ okay.  Let's move forward.
⁷           In your capacity for -- as
⁸ manager for corporate communication for
⁹ Johnson & Johnson corporate in the late
¹⁰ '90s to 2001, did you have occasion to
¹¹ communicate both internally and
¹² externally about the safety of talcum
¹³ powder products manufactured by Johnson &
¹⁴ Johnson Consumer?
¹⁵           MS. FRAZIER:  Object to
¹⁶      form.
¹⁷           THE WITNESS:  I was not on
¹⁸      safety, per se.  I would be
¹⁹      answering media questions about
²⁰      talc as one of my
²¹      responsibilities.
²² BY MR. TISI:
²³      Q.   And when we say talcum, talc
²⁴ or talcum powder products, you understand

Page 16

¹ I'm referring to Johnson & Johnson Baby
² Powder or Shower to Shower?
³      A.   You know, I don't remember
⁴ if Shower to Shower was one of our
⁵ products at that time.
⁶      Q.   Okay.  But certainly --
⁷      A.   But, yes, certainly
⁸ Johnson's Baby Powder.
⁹      Q.   And I think you testified in
¹⁰ a prior deposition that you understood
¹¹ that Johnson's Baby Powder was an
¹² important legacy product for Johnson &
¹³ Johnson overall, correct?
¹⁴      A.   As more of an indicator of
¹⁵ responsibility -- I'm sorry, not
¹⁶ responsibility.
¹⁷           As an indication of the
¹⁸ reputation of the company, because it was
¹⁹ one of the few companies that had the
²⁰ Johnson & Johnson name on it at that
²¹ time.  I think they've changed things
²² since.
²³           So in terms of baby
²⁴ products, they were a legacy brand that

Page 17

¹ had a great deal to do with the corporate
² reputation.
³      Q.   And you mentioned your boss
⁴ at Johnson & Johnson corporate was
⁵ Mr. Leebaw?
⁶      A.   Yes.
⁷      Q.   And do you understand or
⁸ know or recall that Mr. Leebaw was part
⁹ of a joint committee with Johnson &
¹⁰ Johnson Consumer called the Worldwide
¹¹ Talc Screening Committee?
¹²      A.   I do not.
¹³           MS. FRAZIER:  Object to
¹⁴      form.
¹⁵ BY MR. TISI:
¹⁶      Q.   Now, we mentioned you were
¹⁷ primarily involved with J&J corporate on
¹⁸ behalf of the J&J family of companies.
¹⁹           A couple questions about the
²⁰ J&J family, if I could broaden it a
²¹ little bit.
²²           Was there a subsidiary
²³ called Johnson & Johnson Consumer, Inc.?
²⁴           MS. FRAZIER:  Object to

Page 18

1  form.
2        THE WITNESS:  I don't know
3  if that was the exact name of the
4  operating company.  But I do
5  remember that, you know, Consumer
6  Products did have their own
7  operating company.
8  BY MR. TISI:
9        Q.   Okay.  And were you actively
10  involved with JJCI or Consumer Products
11  on a talc committee to assert the
12  position with respect to articles that
13  might appear in the press or medical
14  journals?
15        MS. FRAZIER:  Object to
16  form.
17        THE WITNESS:  I think I
18  was -- I don't remember being on a
19  committee at the beginning.  I
20  think when we got -- when the
21  issue was raised about whether
22  talc was going to be part of a
23  listing by the national toxicology
24  program, that I was representing

Page 19

1  what the media questions would be
2  to a group on that.  I don't
3  remember how many times they met
4  or anything like that.
5        MR. TISI:  Actually, Dan,
6  would you please take the CV down.
7  Thank you.
8  BY MR. TISI:
9        Q.   Would you go to Tab
10  Number 13, if I -- if you could,
11  Mr. Leebaw (sic).
12        And that's Exhibit P1.605.
13        (Document marked for
14  identification as Exhibit
15  P1.605.)
16        MR. TISI:  And that's
17  Exhibit P1.605.
18        THE WITNESS:  Okay.
19  BY MR. TISI:
20        Q.   Okay.  Do you see that this
21  is an e-mail string in September of 1999?
22        A.   I do see the e-mail.
23        Q.   And it's a -- the subject
24  matter is Confidential:  Article:

Page 20

1  "Genital Talc Exposure and the Risk of
2  Ovarian Cancer"?
3        A.   Yes.
4        Q.   Okay.  And in the middle of
5  the page, there is an e-mail from Nancy
6  Musco.  Do you remember Ms. Musco?
7        A.   No.
8        Q.   And she indicates with
9  respect to an article, it says, "No
10  response was prepared by us or the CFTA."
11        You know who the CFTA is,
12  correct?
13        A.   C-T-F-A.
14        Q.   Yes, correct.  That's --
15        A.   It was an association of
16  companies that had various consumer
17  products, as I recall.
18        Q.   Okay.  And it's in response
19  to a 1999 study.  Do you see that?
20        A.   Yes.
21        Q.   And she indicates that
22  within her company that contact be made
23  with "John McKeegan, corporate PR, for
24  any response to the media.  John is

Page 21

1  actively involved with ... us on the talc
2  committee."
3        Do you see that?
4        A.   I do.
5        Q.   Okay.  Does that help
6  refresh your recollection at least as to
7  the time frame in which you were on a
8  talc committee?
9        A.   No.
10        Q.   Okay.  And your response
11  says, "This is the statement we have been
12  using to respond to inquiries based upon
13  previous studies.  Can someone fax me a
14  copy of the study?"  And you provide your
15  fax.
16        Do you see that?
17        A.   Yes.
18        Q.   And attached to this, which
19  we'll talk about in a moment, is a -- and
20  this is not in your binder, this was one
21  of those incomplete documents.  But I'll
22  bring it up on the screen.  It's
23  P1.605.3.
24        MR. TISI:  Could you go to

John McKeegan

Page 22

1 the third page in this document,
2 Dan?
3      MS. FRAZIER: Hey, Chris,
4 just so that we don't get confused
5 with exhibits, is this -- is
6 Tab 13 Exhibit Number 2 for you?
7      MR. TISI: No. It's 605.3.
8      MS. FRAZIER: So, I know.
9 But in terms of --
10      TRIAL TECH: I'll change the
11 marking to match the P number.
12      MS. FRAZIER: Okay. Okay.
13 That -- that's going to be tricky
14 for me, but that's okay. I'll
15 figure it out.
16      MR. TISI: Okay. I'm sorry.
17 I will try to use -- we were
18 trying -- we're trying, Kat, and
19 just kind of take a quick break
20 here. We're trying to use a
21 common set of exhibits across
22 depositions, and so we're using --
23      THE VIDEOGRAPHER: I'm sorry
24 to interrupt, Counselor, would you

Page 23

1 like to go off the record?
2      MR. TISI: Sure.
3      THE VIDEOGRAPHER: Okay.
4 The time is 10:14 a.m. Off the
5 record.
6      (Short break.)
7      THE VIDEOGRAPHER: The time
8 is 10:16 a.m., on the record.
9 BY MR. TISI:
10      Q. Okay. Mr. McKeegan, we had
11 a little housekeeping thing to take care
12 of over the break. But let me see if I
13 can reorient us if I could.
14      MR. TISI: Dan, would you
15 please bring up Exhibit 605 from
16 his Binder Tab 13 again. And if
17 you go to Page 1.
18 BY MR. TISI:
19      Q. Mr. McKeegan, at the very
20 top of this e-mail from September 1st,
21 1999, entitled Confidential: Article:
22 "Genital Talc Exposure and Risk of
23 Ovarian Cancer," you state that "This is
24 a statement we have been using in

Page 24

1 response to inquiries based on previous
2 studies."
3      And then you asked that
4 somebody fax you a copy of the study
5 entitled "Genital Talc Exposure and Risk
6 of Ovarian Cancer."
7      Is that correct?
8      A. Yes.
9      Q. Okay. And attached on
10 Page 3 is a statement that you have been
11 using on talcum powder.
12      Do you see that?
13      A. Yes.
14      Q. Okay. And is this the
15 statement that corporate, J&J corporate
16 PR had been using to respond to media
17 inquiries and other inquiries relating to
18 talcum powder during the time of this
19 e-mail?
20      MS. FRAZIER: Object to
21 form.
22      THE WITNESS: I couldn't say
23 with any specificity whether this
24 is what we were using at the time

Page 25

1 of this e-mail. But it looks like to
2 be consistent with the statements
3 that we may have been using.
4 BY MR. TISI:
5      Q. Okay. Well, it indicates,
6 if you look at your e-mail, it indicates
7 that attached is the statement that you
8 have been using.
9      So I mean, would you have
10 been correct when you wrote that?
11      A. Like I said, I don't have
12 any ideas since we don't have file
13 Talc1197.doc to say that this is at the
14 top. But this looks like it's consistent
15 with statements that we would have been
16 making around that time.
17      Q. Okay. Okay. And the second
18 thing that you say is somebody asked --
19 you asked that somebody fax you a copy of
20 the study, correct?
21      A. Yes.
22      Q. And do you have any reason
23 to believe that you would not have been
24 faxed a copy of the study that was the

Page 26

¹ subject of this e-mail?
² A. No.
³ MS. FRAZIER: Object to
⁴ form.
⁵ MR. TISI: For the record,
⁶ I'm going to attach Exhibit
⁷ P-20 -- P2.6. If you would bring
⁸ that up.
⁹ (Document marked for
¹⁰ identification as Exhibit
¹¹ P2.6.)
¹² BY MR. TISI:
¹³ Q. And that's not in your
¹⁴ binder.
¹⁵ MR. TISI: Would you bring
¹⁶ that up, Dan?
¹⁷ No, not that one, please.
¹⁸ It's P2.6.
¹⁹ BY MR. TISI:
²⁰ Q. Now, Mr. McKeegan, as you
²¹ will see here, this is a 1999 article
²² entitled Genital Talc Exposure and Risk
²³ of Ovarian Cancer. Do you see that?
²⁴ A. Yes.

Page 27

¹ Q. Okay. And this matches the
² subject matter of the e-mail we just
³ looked at?
⁴ A. Yes.
⁵ Q. And if you would go to the
⁶ back of the article on page -- if you ask
⁷ for an article and it is sent to you,
⁸ would you -- can we agree that you likely
⁹ would have read it?
¹⁰ MS. FRAZIER: Object to
¹¹ form.
¹² THE WITNESS: Yes. Yes.
¹³ BY MR. TISI:
¹⁴ Q. In the back of the article
¹⁵ on page -- Page 6 of the article, which
¹⁶ we'll bring up on the screen. And this
¹⁷ would have been in 1999.
¹⁸ MR. TISI: Would you blow up
¹⁹ the last paragraph, please, Dan.
²⁰ BY MR. TISI:
²¹ Q. It says, We have
²² demonstrated a consistent that appears
²³ unlikely to be explained by recall and
²⁴ confounding. The dose-response

Page 28

¹ relationship is weak but improved by
² considering factors such as closure of
³ the female tract, ovulation and exposure
⁴ prior to pregnancy, and we have outlined
⁵ a possible biologic rationale for this
⁶ association. We estimate that avoidance
⁷ of talc in genital hygiene might reduce
⁸ the occurrence of highly lethal form of
⁹ cancer by at least 10 percent. Balanced
¹⁰ against what are primarily aesthetic
¹¹ reasons for using talc in genital
¹² hygiene, the risk/benefit is not complex.
¹³ Appropriate warnings should be provided
¹⁴ to women about the potential of regular
¹⁵ use of talc in the genital area.
¹⁶ Did I read that correctly?
¹⁷ A. No.
¹⁸ Q. Okay. How was it incorrect?
¹⁹ A. In the second sentence,
²⁰ dose-response relationship sentence, you
²¹ did not use the word "have outlined a
²² plausible biologic rationale." You
²³ missed the word "plausible."
²⁴ Q. Okay. Fair. I wanted to

Page 29

¹ focus on the last sentence for a moment.
² "Appropriate warnings should
³ be provided to women about the potential
⁴ risks of regular use of talc in the
⁵ genital area?"
⁶ Do you see that?
⁷ A. Yes.
⁸ Q. That was something that you
⁹ understood was being discussed at
¹⁰ about -- in 1999, correct?
¹¹ MS. FRAZIER: Object to
¹² form.
¹³ THE WITNESS: I don't
¹⁴ actually get that from the e-mail
¹⁵ string that you sent me. So I
¹⁶ can't answer that.
¹⁷ BY MR. TISI:
¹⁸ Q. Okay. Is this -- since this
¹⁹ was in the published medical literature,
²⁰ can we agree that the question about
²¹ whether or not appropriate warnings
²² should be on the talcum powder products
²³ was something that was at least in the
²⁴ public domain at that time?

John McKeegan

Page 30

1        MS. FRAZIER:  Object to
2   form.  Foundation.
3        THE WITNESS:  That would
4   have been outside my area of
5   expertise.  I would have been
6   dealing with questions from the
7   media.
8   BY MR. TISI:
9        Q.   All right.  But you agree
10  that this article likely would have been
11  sent to you since you requested it,
12  correct?
13       A.   Yes.
14       MS. FRAZIER:  Object to
15  form.
16  BY MR. TISI:
17       Q.   Now, at the time you were
18  with J&J corporate communications in the
19  late 1990s, you also attended meetings
20  where the questions about talc and
21  ovarian cancer were raised and the
22  questions of warnings were discussed.
23       Do you remember that?
24       A.   No.

Page 31

1        MS. FRAZIER:  Object to
2   form.
3        MR. TISI:  Would you go to
4   Exhibit Number P1.655.
5        (Document marked for
6   identification as Exhibit
7   P1.655.)
8        MS. FRAZIER:  Is that a tab,
9   Chris?
10       MR. TISI:  I'm about ready
11  to give it to you.  That is Tab
12  Number 63.
13  BY MR. TISI:
14       Q.   This is an e-mail from
15  Ms. Musco to, among other people, you.
16  Do you see that?
17       A.   Yes.
18       Q.   Okay.  And it says,
19  "Attached please find minutes from the
20  talc review held in June of 1999.  Please
21  call with any questions."
22       A.   Yes.
23       Q.   And do you see that there's
24  actually a memo attached?

Page 32

1        A.   Yes.
2        Q.   And the memo says, "A
3   meeting was held on June 29, 1999."
4        Do you see that?
5        A.   Yes.
6        Q.   Okay.  And you were actually
7   listed in this document, correct?
8        A.   Yes.
9        Q.   Okay.  John McKeegan, you
10  are the third person listed there?
11       A.   I am the fourth person
12  listed there.
13       Q.   Oh, okay.  Correct.
14       And the meeting was held in
15  1999 to review the history of talc and
16  publicity circulated about talc and
17  Johnson's Baby Powder.  Do you see that?
18       A.   Yes.
19       Q.   And it says that
20  "Representatives of medical, regulatory,
21  toxicology, marketing, packaging, and
22  public relations and legal presented
23  information and data."
24       Do you see that?

Page 33

1        A.   Yes.
2        Q.   Okay.  And it further says,
3   "The controversial issues raised in the
4   media are identified as allegations of
5   inhalation disease and ovarian cancer.
6   There are many sources alleging these
7   disease processes from the use of talc,
8   as well as many sources refuting these
9   allegations."
10       Do you see that?
11       A.   Yes.
12       Q.   Okay.  And it uses the word
13  "controversial issues."  Did you
14  understand -- does this indicate to you
15  that there was discussion at meetings in
16  which you attended about the controversy
17  surrounding talc and ovarian cancer?
18       MS. FRAZIER:  Object to
19  form.
20       THE WITNESS:  I actually
21  have no memory of the content of
22  these meetings.
23  BY MR. TISI:
24       Q.   Okay.  I understand that

Page 34

1 sitting here in 2021, that you may not
2 have precise memory of the contents of
3 these meetings, but this appears -- do
4 you have any reason to believe that you
5 were not informed of a controversy
6 surrounding talc and ovarian cancer since
7 your name is on this document?
8          MS. FRAZIER:  Object to
9      form.
10          THE WITNESS:  According to
11      this memo, these are the things
12      that would have been discussed.
13 BY MR. TISI:
14     Q.   Okay.  And one of the things
15 that was discussed was the controversial
16 issues raised about ovarian cancer and
17 talc, correct?
18          MS. FRAZIER:  Object to
19      form.
20          THE WITNESS:  That looks to
21      be correct.
22 BY MR. TISI:
23     Q.   Okay.  And the next
24 paragraph says, "We discussed the impact

Page 35

1 of issues on professional marketing."
2 And it says, "Healthcare providers
3 caution against the use of these
4 products."
5          Do you see that?
6     A.   Yes.
7     Q.   Okay.  Now, remember before
8 I asked you whether or not there was
9 any -- any questions being raised about
10 whether or not caution or warnings should
11 be provided.  And I showed you Cramer
12 article from 1999.
13          Do you remember that?
14     A.   Yes.
15     Q.   So this -- in this document,
16 this meeting, would you agree with me
17 that at least the issue was raised as to
18 whether or not healthcare providers would
19 provide a caution against the use of talc
20 products?
21     A.   I have no memory of this
22 meeting --
23          MS. FRAZIER:  Object to
24      form.  Misstates the document.

Page 36

1          Wait a minute, John.  Let
2 me --
3          THE WITNESS:  Sure.
4          MS. FRAZIER:  -- let me
5 object real quick.
6          Object to form.  Misstates
7 the document.
8          MR. TISI:  I think, Kat,
9 your objections really are limited
10 to form, and we have been --
11          MS. FRAZIER:  Not in
12 Missouri.
13          Wait a minute, Chris.  Not
14 in Missouri.
15          MR. TISI:  Wait, wait, wait,
16 wait.  Let me finish.
17          I think including in
18 depositions that were
19 cross-noticed in Missouri with
20 experts, the question of how we
21 object was squarely decided by
22 Judge Schneider and we have all
23 been adhering to that.
24          Are you telling me it

Page 37

1 doesn't apply to depositions that
2 are cross-noticed?  Because I
3 understood that was the case.
4          MS. FRAZIER:  Well, first of
5 all, the expert depositions are
6 taking place only in the MDL, as I
7 understand it --
8          MR. TISI:  They are not.
9          MS. FRAZIER:  Okay.  Well --
10          MR. TISI:  They are not.
11 They are cross-noticed.
12          MS. FRAZIER:  Okay.  Well,
13 then it would be related to, you
14 know, that expert.  This is a fact
15 witness who has been noticed in
16 the -- in a state court case, and
17 so I don't want to waive any
18 objections by not giving a full
19 basis.
20          MR. TISI:  You're not.  I
21 will tell you as -- and we can
22 certainly get Judge Schneider on
23 the phone because he has been
24 overseeing this for both the MDL

Page 38

1  and for Missouri.
2      I'm quite certain he will
3  instruct you to object only as to
4  form and that would encompass all
5  of the other objections that we're
6  making here.
7      If you want to do that, we
8  can even do it by agreement or we
9  can take a break and call Judge
10 Schneider.
11     MS. FRAZIER:  Let's take a
12 break and I want to talk to Susan
13 Sharko and we'll see about talking
14 to Judge Schneider.
15     MR. TISI:  Mm-hmm.
16     THE VIDEOGRAPHER:  The time
17 is 10:29 a.m.  Off the record.
18     (Short break.)
19     THE VIDEOGRAPHER:  The time
20 is 10:40 a.m.
21     MS. FRAZIER:  Okay.  So
22 we're -- okay.  So we're back on
23 the record after a brief
24 discussion about objections.

Page 39

1      And I want to note on the
2  record that this is a deposition
3  that was noticed in a Missouri
4  case, that being Forrest/Giese,
5  and was cross-noticed in the MDL.
6      Under Missouri law, if you
7  don't state the basis for your
8  objections, they are waived.
9      And so having spoken with
10 Mr. Tisi, he is in agreement that
11 my objections are preserved going
12 forward in this deposition as long
13 as I object to form only and that
14 I won't be waiving anything
15 otherwise.
16     Chris, are you in agreement?
17     MR. TISI:  I agree
18 100 percent.  In fact, that's how
19 I think we've been instructed to
20 proceed in depositions that have
21 been cross-noticed in both
22 Missouri and in federal court.
23     And I think it makes things
24 go a lot quicker.

Page 40

1      So I will agree that all of
2  your objections are preserved if
3  you simply say objection to form.
4      MS. FRAZIER:  All right.
5      MR. TISI:  All right.  So
6  let's see if we can go back on and
7  start questioning and see if we
8  can get moving through this
9  deposition.
10     Go ahead.
11 BY MR. TISI:
12     Q.   Mr. McKeegan, we were
13 talking about Exhibit 552 which is Tab
14 Number 63 in your notebook, Page 2, which
15 is the memo from the June 29, 1999
16 meeting.
17     And just to recap, since
18 there was a break between our prior
19 discussion and this question, this
20 meeting discussed controversial issues
21 regarding, among other things, talc and
22 ovarian cancer, correct?
23     A.   That is very close to what
24 the memo says.

Page 41

1      Q.   And this was a meeting where
2  it indicates you were at, correct?
3      A.   I was actually looking for
4  that.  It doesn't say I was there.
5      Q.   Okay.
6      A.   It doesn't say who was
7  there.
8      It says who the memo was
9  sent to.
10     Q.   Well, it says
11 representatives from medical, regulatory
12 toxicology, marketing, packaging, and
13 public relations --
14     A.   Yeah.
15     Q.   -- were there.  And you were
16 with public relations, correct?
17     A.   That is true.
18     Q.   Okay.  Now, the other
19 thing -- and you were certainly provided
20 with a copy of this as well, correct; you
21 saw the cover e-mail?
22     A.   That is correct.
23     Q.   Okay.  As part of this, it
24 indicates not only there was a

John McKeegan

Page 42

1 controversy about ovarian cancer, but it
2 indicates that "marketing informed us
3 that adult women is the big user of talc
4 products and that J&J is the largest
5 manufacturer of talc products."
6         Do you see that?
7     A.   Yes.
8     Q.   And do you have any reason
9 to disbelieve that?
10     A.   I would have no
11 information --
12         MS. FRAZIER:  Object to
13     form.
14         THE WITNESS:  I'm sorry.
15     I would have no information
16     about that at all.
17 BY MR. TISI:
18     Q.   And this provides -- this
19 also provides notice that there was a
20 discussion about the impact of the issues
21 on professional marketing.  Do you see
22 that?
23     A.   Yes.
24     Q.   And it also indicates, there

Page 43

1 is a statement here, "Healthcare
2 providers caution against the use of talc
3 products," correct?
4     A.   Yes.
5     Q.   And previously we looked at
6 the statement in the 1999 article where
7 Dr. Cramer and his colleagues at Harvard
8 indicated that women should be warned
9 against the use of talc products as well,
10 correct?
11         MS. FRAZIER:  Object to
12     form.
13         THE WITNESS:  We did see the
14     memo from, yeah, from that study.
15 BY MR. TISI:
16     Q.   And you would agree with me,
17 and since both of those -- both of these
18 documents are in 1999, the question about
19 whether or not talc is implicated in
20 ovarian cancer and whether or not women
21 should be warned against using the
22 product were at least on the radar screen
23 based upon these two documents, correct?
24         MS. FRAZIER:  Object to

Page 44

1     form.
2         THE WITNESS:  I would agree
3     with that.
4 BY MR. TISI:
5     Q.   Okay.  Now, you know that I
6 represent women -- and I didn't get a
7 chance to truly introduce myself.  You
8 know that I represent women who claim
9 that J&J failed to take steps for decades
10 that would prevent exposure to talc which
11 they claim cause ovarian cancer.
12         Do you understand that?
13         MS. FRAZIER:  Object to
14     form.
15 BY MR. TISI:
16     Q.   Do you understand that, sir?
17     A.   Yes.
18     Q.   And do you understand that
19 ovarian cancer is a serious and deadly
20 disease?
21         MS. FRAZIER:  Object to
22     form.
23         THE WITNESS:  Yes.
24 BY MR. TISI:

Page 45

1     Q.   And it's something you
2 understood while you were working for J&J
3 in the '90s and 2000s, correct?
4         MS. FRAZIER:  Object to
5     form.
6         THE WITNESS:  I would agree
7     that -- that it was a serious
8     disease, but my role had nothing
9     to do with -- with medicine.
10         My role was strictly to deal
11     with questions from media.
12         MR. TISI:  Understood.  And
13     move to strike as being
14     nonresponsive.
15 BY MR. TISI:
16     Q.   You understood in the 2000s
17 when you were speaking to the media that
18 ovarian cancer is a serious disease,
19 correct?
20         MS. FRAZIER:  Object to
21     form.
22         THE WITNESS:  Yes.
23         MS. FRAZIER:  Foundation.
24 BY MR. TISI:

John McKeegan

Page 46

1   Q.   Okay.  And you also
2  understood, since you were speaking to
3  the media on issues relating to talc and
4  ovarian cancer, that Johnson's Baby
5  Powder is a cosmetic and not a medicine,
6  correct?
7          MS. FRAZIER:  Object to
8      form.  Foundation.
9          THE WITNESS:  I don't
10     understand the question actually.
11 BY MR. TISI:
12     Q.   Okay.  Do you understand
13 that you don't need a prescription from a
14 doctor to get Johnson's Baby Powder?
15     A.   Yes.
16     Q.   Okay.  And you understand
17 anybody can go into any drugstore, at
18 least at the time, can go in any
19 drugstore or Kmart or Walmart and buy
20 Johnson's Baby Powder?
21     A.   Yes.
22     Q.   Okay.  Now, before I ask you
23 questions about your involvement with the
24 issues, let me ask you a couple of

Page 47

1  questions about how you and I got to this
2  deposition.  You are not here
3  voluntarily, are you?
4      A.   No.
5      Q.   And we had to subpoena you
6  to come for deposition, correct?
7      A.   Correct.
8      Q.   And you fought the subpoena
9  in front of a judge in New Jersey, you're
10 aware of that, correct?
11     A.   Well, my attorneys --
12         MS. FRAZIER:  Object to
13     form.
14         THE WITNESS:  -- would have
15     done that.
16 BY MR. TISI:
17     Q.   Correct.
18         And although you don't
19 currently work for J&J, J&J's lawyers are
20 representing you in this deposition
21 today, correct?
22     A.   Correct.
23     Q.   And you understand that the
24 testimony that you are giving today is

Page 48

1  being recorded and it may be shown to a
2  judge and jury, correct?
3      A.   Yes.
4      Q.   And you understand that you
5  have an obligation, being under oath, to
6  answer my questions to the best of your
7  ability, correct?
8      A.   Yes.
9      Q.   And you have an
10 understanding that it is not -- it is not
11 appropriate to try to avoid answering
12 questions, true?
13         MS. FRAZIER:  Object to
14     form.
15         THE WITNESS:  I'm not sure
16     what you're asking.
17 BY MR. TISI:
18     Q.   Well, you understand that
19 even if you don't have a precise
20 recollection, as good a recollection as
21 you have, you have an obligation to
22 provide me with information if I ask you
23 a question, true?
24     A.   With the best information

Page 49

1  that I have --
2          MS. FRAZIER:  Object to
3      form.
4  BY MR. TISI:
5      Q.   Correct.  And you were
6  deposed before by another lawyer who
7  represented people who claimed they had
8  lung disease from talc and asbestos.  Do
9  you recall that?
10     A.   Yes.
11     Q.   Okay.  And have you re-read
12 that deposition in preparation for your
13 testimony here today?
14     A.   Yes.
15     Q.   You recall that you were
16 shown a lot of documents in that
17 deposition but testified that you could
18 not remember many of the things that were
19 being asked of you?
20     A.   That is correct.
21         MS. FRAZIER:  Object to
22     form.
23         Wait a second, John, let --
24     pause for just a minute and let me

Page 50

1    object before you answer.  Thanks.
2  BY MR. TISI:
3    Q.    Between July and today, and
4  we are in late September, did you do
5  anything to try and refresh your
6  recollection on the issues relating to
7  talc and ovarian cancer so that you could
8  try and give full and complete answers to
9  my questions here today?
10      MS. FRAZIER:  Object to
11    form.
12      THE WITNESS:  Besides
13    discussion with Kat Frazier and
14    another attorney about the --
15    about this deposition --
16      MS. FRAZIER:  Wait a minute,
17    wait, wait, wait, John.  Okay.  Go
18    ahead.
19      Wait a second.  Let me just
20    remind Mr. McKeegan not to
21    disclose any substance of any
22    communications we would have had,
23    but other than that, that's okay.
24  BY MR. TISI:

Page 51

1    Q.    Did you -- and I'm not
2  asking any discussions you may have had,
3  but did you actually review documents
4  before today's deposition?
5    A.    No.
6    Q.    All right.  Let's talk
7  first -- the first thing that I would
8  like to talk to you about Mr. McKeegan
9  are the corporate statements and messages
10  that were sent out to the public or to
11  the media or to other groups to defend
12  talc products in the 1990s.  Okay?
13      MS. FRAZIER:  Object to
14    form.
15      THE WITNESS:  Okay.
16  BY MR. TISI:
17    Q.    Okay.  All right.  I would
18  ask that --
19      MR. TISI:  Dan, bring up
20    Exhibit 1.605 which is Tab 13 of
21    your binder.  And I believe this
22    is the e-mail we discussed earlier
23    with the attached statement.
24  BY MR. TISI:

Page 52

1    Q.    Do you see that?
2      And if you would go to the
3  attached statement which you indicated
4  was consistent with the statements that
5  you recall sending out at that time.
6      Could you take a look at
7  that, please?
8      Would you please read it?
9    A.    "Johnson's Baby Powder has
10  been used safely for more than 100 years.
11  It contains pure, high-grade cosmetic
12  talc that is free of impurities and is
13  not carcinogenic.  A number of studies to
14  investigate a possible association
15  between talc use and ovarian tumors were
16  reviewed in 1994 at a workshop sponsored
17  by the FDA.  The workshop concluded no
18  hazards to health had been demonstrated
19  in connection with the normal use of
20  cosmetic talc.  We continue to review new
21  research that is in the public domain."
22    Q.    And this is the statement
23  that you recall and the message you
24  recall giving to the press at about that

Page 53

1  time in the late '90s, 2000 time frame
2  with respect to talc and ovarian cancer,
3  true?
4    A.    Like I had said before, this
5  is consistent with what I remember that
6  we would have told to the media at that
7  time.  But I don't know if there was, you
8  know, specific statements that we made
9  that included answers to specific
10  questions or something like that.
11    Q.    Okay.  And it specifically
12  refers to a 1994 workshop co-sponsored by
13  the FDA.  Do you see that?
14    A.    Yes.
15    Q.    And you specifically -- the
16  statement that was being provided for
17  discussions with the press specifically
18  focused on the FDA.  True?
19      MS. FRAZIER:  Object to
20    form.
21      THE WITNESS:  That is --
22    that is what this statement says.
23  BY MR. TISI:
24    Q.    Okay.  And this statement --

John McKeegan

Page 54

¹ and the purpose for including the FDA,
² would you agree with me, is to assure the
³ public that the FDA had also concluded
⁴ that talc was safe?
⁵          MS. FRAZIER:  Object to
⁶      form.
⁷ BY MR. TISI:
⁸      Q.    That was the implication,
⁹ true?
¹⁰          MS. FRAZIER:  Object to
¹¹      form.
¹²          THE WITNESS:  I don't recall
¹³      why that was put in here.
¹⁴      Certainly 1994 workshop was before
¹⁵      my time.
¹⁶ BY MR. TISI:
¹⁷      Q.    Okay.  But including it in a
¹⁸ statement to the press and in responding
¹⁹ to the press, you were responsible as a
²⁰ spokesperson for understanding the
²¹ statements that you were giving, true?
²²          MS. FRAZIER:  Object to
²³      form.
²⁴          THE WITNESS:  I -- like I

Page 55

¹      said, I have no memory of this
²      1994 workshop or why it would have
³      been included in here.
⁴ BY MR. TISI:
⁵      Q.    I understand.  My question
⁶ is more broad than that.
⁷          Why would this statement
⁸ contain information, we agreed before in
⁹ response to one of my questions, the
¹⁰ purpose for including the FDA is to give
¹¹ some credibility to the assertion that
¹² there is no risk associated with talc and
¹³ ovarian cancer.  True?
¹⁴          MS. FRAZIER:  Object to
¹⁵      form.
¹⁶          THE WITNESS:  Like I said, I
¹⁷      don't know why this would have
¹⁸      been included in this statement.
¹⁹      This workshop was going to be
²⁰      before my time at Johnson &
²¹      Johnson.
²² BY MR. TISI:
²³      Q.    Right.  But this statement
²⁴ was in 1999.  It was supposed to be given

Page 56

¹ by you, and, in fact, you produced it in
² response to an e-mail by -- by Ms. Musco,
³ correct?
⁴          MS. FRAZIER:  Objection to
⁵      form.
⁶          THE WITNESS:  I did provide,
⁷      according to these e-mails and
⁸      your statement that this is what
⁹      was attached, that this is what I
¹⁰      would have provided to Ms. Musco.
¹¹ BY MR. TISI:
¹²      Q.    Right.  And in addition to
¹³ that, and then we're going to see, this
¹⁴ statement is repeated over and over and
¹⁵ over again.  But this would have been the
¹⁶ statement that would have been provided
¹⁷ by J&J corporate to any of the media
¹⁸ that -- that requested information on
¹⁹ talc, right?
²⁰          MS. FRAZIER:  Objection to
²¹      form.
²²          THE WITNESS:  I don't recall
²³      if these statements changed over
²⁴      time during this period that I was

Page 57

¹      there.  But this would have been
²      consistent.
³ BY MR. TISI:
⁴      Q.    We're going to look at that.
⁵ We're going to look at that.
⁶          But my question more broadly
⁷ is, even though the 1994 workshop
⁸ happened before your time, this is a
⁹ statement that was consistent with
¹⁰ statements that were provided to the
¹¹ media, or anybody that would make an
¹² inquiry, to public -- corporate public
¹³ relations for Johnson & Johnson in 1999.
¹⁴ True?
¹⁵          MS. FRAZIER:  Object to
¹⁶      form.
¹⁷          THE WITNESS:  I believe I
¹⁸      already said that this looks
¹⁹      consistent.
²⁰ BY MR. TISI:
²¹      Q.    Okay.  And one of the things
²² that would have included in 1999, if the
²³ press told you, would be reference to a
²⁴ workshop co-sponsored by the FDA.  True?

Page 58

1    MS. FRAZIER:  Objection to
2  form.
3    THE WITNESS:  According to
4  this statement on the screen, that
5  is what was included in this
6  statement.
7  BY MR. TISI:
8    Q.   And the purpose of
9  specifically referencing the FDA would be
10 to give reassurance that it was safe,
11 that talc was safe, true?
12   MS. FRAZIER:  Objection to
13 form.
14   THE WITNESS:  Like I said, I
15 don't know why this was in there.
16 I don't know.
17 BY MR. TISI:
18   Q.   Okay.  All right.  So let's
19 go to --
20   MR. TISI:  I'm going to
21 attach for purposes of -- and this
22 is not in your binder.
23   But I will attach Exhibit
24 Number P1.670, and ask that you

Page 59

1    just take a look at it.
2    (Document marked for
3    identification as Exhibit
4    P1.670.)
5  BY MR. TISI:
6    Q.   And this is an article by
7  Carr in 1994.  It's an article entitled
8  Talc:  Consumer Uses and Health
9  Perspectives.
10   And you'll see it's a 1994
11 document, correct?
12   A.   Yes.
13   Q.   And I will represent to you
14 that this is the document to which
15 this -- and meeting, to which this
16 refers, this statement refers.
17   MR. TISI:  With that, let me
18 go to exhibit number -- and
19 Tab 45, which is Exhibit
20 Number P1.367 [sic].
21   (Document marked for
22   identification as Exhibit
23   P1.637.)
24   MR. TISI:  Can you go to

Page 60

1    that one please, Dan?
2    MS. FRAZIER:  Hey, Chris, do
3  you -- are you done with the
4  exhibit that's up on the screen
5  right now?
6    MR. TISI:  Correct.  I am
7  done with it.
8    MS. FRAZIER:  Okay.
9    TRIAL TECH:  Chris, can you
10 say the number one more time for
11 me?
12   MR. TISI:  Yeah, it's 637 --
13 I'm sorry, 670.
14   I'm sorry, it's 637.  Yeah.
15 BY MR. TISI:
16   Q.   Now, Mr. McKeegan, this is
17 an e-mail, have you seen this -- you've
18 seen -- take a look at this document.
19   This is an e-mail from you
20 to a gentleman by the name of Michael
21 Chudkowski dated February 13, 1998.
22   Do you see that?
23   A.   Yes.
24   Q.   And it's entitled Talc, do

Page 61

1  you see that?
2    A.   Yes.
3    Q.   And it's forwarding an
4  e-mail between you and Johns Hopkins --
5  John Hopkins and John O'Shaughnessy.  Do
6  you see that?
7    A.   Yes.
8    Q.   And this is an e-mail in
9  which you say you got a call from the
10 CTFA, which is the industry trade group,
11 correct?
12   A.   Correct.
13   Q.   That a -- CBS Morning News
14 and a producer named Doug Longine about
15 talc and ovarian cancer.
16   Do you see that?
17   A.   Yes.
18   Q.   And it said, "Irene called
19 us to alert us and get our statement on
20 talc before they responded back.  She is
21 doing the same with other manufacturers."
22   Do you see that?
23   A.   Yes.
24   Q.   It says, "CBS apparently

Page 62

¹ talked to John Bailey at the FDA who
² expressed to them concern about talc and
³ ovarian cancer.  We do not know much more
⁴ and certainly don't know exactly what he
⁵ said."
⁶        Do you see that?
⁷    A.   Yes.
⁸    Q.   And so this indicates to you
⁹ and provides you with some notice that
¹⁰ John Bailey at the FDA expressed concern
¹¹ about the risk of talc and ovarian
¹² cancer.  Do you see that?
¹³        MS. FRAZIER:  Objection to
¹⁴    form.
¹⁵        THE WITNESS:  I do see that
¹⁶    that is here in this e-mail.
¹⁷ BY MR. TISI:
¹⁸    Q.   Okay.  And, again, this is
¹⁹ an e-mail from you to, among others, the
²⁰ company lawyer, true?
²¹    A.   Yeah --
²²    Q.   John O'Shaughnessy --
²³    A.   I believe John O'Shaughnessy
²⁴ was an attorney at J&J.

Page 63

¹    Q.   Okay.  And it says, "We have
² not gotten a call from CBS yet, but we
³ should be prepared in case we need to
⁴ tweak our statement at all.  If you could
⁵ each call me next week, we can talk more
⁶ about what we know and what we may need
⁷ to do."
⁸        Do you see that?
⁹    A.   Yes.
¹⁰    Q.   And you say, "The most
¹¹ recent statement is attached."
¹²    A.   Okay.
¹³    Q.   Do you see that?
¹⁴    A.   Yes.
¹⁵    Q.   Okay.  And if you look, if
¹⁶ you look at Page 2 of this document, the
¹⁷ statement that we just reviewed from your
¹⁸ 1999 e-mail is exactly the same statement
¹⁹ that is attached to this e-mail.  True?
²⁰    A.   That is correct.
²¹    Q.   So this 1999 e-mail to,
²² among others, the company -- the J&J
²³ corporate lawyer, says that this is the
²⁴ statement that you have been using,

Page 64

¹ correct?
²        MS. FRAZIER:  Objection to
³    form.
⁴        THE WITNESS:  That is the
⁵    e-mail that -- that is what it
⁶    says in the e-mail.
⁷ BY MR. TISI:
⁸    Q.   Okay.  And, again, this
⁹ statement refers to the 1994 workshop
¹⁰ co-sponsored by the FDA.
¹¹    A.   Yes.
¹²    Q.   And it indicates, the e-mail
¹³ that you wrote, indicates that we may
¹⁴ need to tweak this statement.  Do you see
¹⁵ that?
¹⁶    A.   Yes.
¹⁷    Q.   Okay.  And asked that the
¹⁸ company lawyer and John Hopkins call you
¹⁹ individually to discuss that issue.  Do
²⁰ you see that?
²¹    A.   Yes.
²²    Q.   Do you have any reason to
²³ believe that when the head of corporate
²⁴ communications, the manager of corporate

Page 65

¹ communications as you were at that time
² asks --
³        A.   I was not the head of
⁴ corporate communications.
⁵    Q.   Okay.  You were the -- I'm
⁶ sorry, you were the manager, correct?
⁷ Mr. Leebaw --
⁸    A.   That's correct.
⁹    Q.   Okay.  That when you made
¹⁰ this request, that people would not have
¹¹ responded to you?
¹²        MS. FRAZIER:  Objection to
¹³    form.
¹⁴        THE WITNESS:  I'm sorry, I
¹⁵    don't understand your question.
¹⁶ BY MR. TISI:
¹⁷    Q.   Yeah.  You asked two people
¹⁸ to call you about the statement by
¹⁹ Dr. Bailey at the FDA that he had a
²⁰ concern about the risk of ovarian cancer
²¹ and talc, right?
²²    A.   Yes.
²³        MS. FRAZIER:  Objection to
²⁴    form.

Page 66

BY MR. TISI:
  Q.   You indicate that the statement may need to be tweaked, correct?
  A.   That is what is in the e-mail.
  Q.   And just to be clear, the statement would be one that would be used to communicate with the media and through the media to the public, correct?
       MS. FRAZIER:  Objection to form.
       THE WITNESS:  According to this e-mail, specifically with CBS.
BY MR. TISI:
  Q.   Right.  And CBS broadcasts to the public, correct?
  A.   Yes.
  Q.   Okay.  And this statement was one that you indicate was being used, correct?
  A.   Yes.
  Q.   And it's the same statement

Page 67

that was used the following year, in 1999, that you attached to the e-mail that we just talked about before, correct?
  A.   It does have the same name, yes.
  Q.   And you asked that people contact you in case this information needed to be tweaked, correct?
       MS. FRAZIER:  Objection to form.
       THE WITNESS:  That is what -- that is what the e-mail says.
BY MR. TISI:
  Q.   Okay.  Now, John Bailey at the FDA, this document indicates John Bailey is at the FDA.  The FDA is specifically referred to in the statement that you are using with the press, correct?
       MS. FRAZIER:  Objection to form.
       THE WITNESS:  It does say

Page 68

that John Bailey was at the FDA.
BY MR. TISI:
  Q.   Okay.  And the FDA was actually referred to in your statement, correct?
  A.   That is the statement that would have been used by corporate communications at that time.
  Q.   And it had the phrase "FDA" in it, correct?
  A.   That is correct.
       MR. TISI:  Would you go to Exhibit Number 51.
       (Document marked for identification as Exhibit P1.643.)
       MR. TISI:  Tab 51.  That's Exhibit 643.
BY MR. TISI:
  Q.   Now we're marching ahead to 2000.  And this is an e-mail to a Fritz Grutzner from a Gordon Rawlston.
       Do you see that?
  A.   Yes.

Page 69

  Q.   Okay.  And it says Stockholders Meeting - Powder Questions, correct?
  A.   Yes.
  Q.   Okay.  And, "Attached are two draft questions and answers.  The answers are based on approved responses from our Info Center and corporate PR.  John McKeegan has given his okay."
       Do you see that?
  A.   Yes.
  Q.   Okay.  Do you have any reason to believe that you did not give your approval for the statement provided to -- at the stockholders meeting as indicated in this e-mail?
       MS. FRAZIER:  Objection to form.
       THE WITNESS:  Based on how things would go on, that at that time I would only be commenting on whether this was consistent with statements that we would have been making.

Page 70

BY MR. TISI:
Q. Okay.
A. That had already been prior approved by the experts at Johnson & Johnson.
Q. Okay. So let's go to the second page. And it says, "Why does Johnson's Baby Powder still sell talcum powder when it's been proven to cause ovarian cancer?"
Do you see that question?
A. Yes.
Q. And underneath is a statement, which is exactly the same statement we've been talking about from 1999 and 1998. Do you see that?
A. Yes.
Q. And it specifically refers to the FDA, correct?
A. Yes.
Q. And it does not appear that that statement was tweaked at all, does it, from the 1990 --
MS. FRAZIER: Objection to

Page 71

form.
BY MR. TISI:
Q. From the 1998 e-mail that you indicated that the statement might need to be tweaked?
MS. FRAZIER: Objection to form.
THE WITNESS: As I recall from the earlier e-mail, it was a question as to whether it would need to be tweaked. This does seem to be the same statement in Question 1.
BY MR. TISI:
Q. Okay. And so it does not appear that the statement was tweaked at all with respect to any aspect of this, including the FDA and the comments that allegedly Dr. Bailey had made, correct?
A. Dr. Bailey?
Q. Dr. Bailey. In the e-mail we looked at before, Dr. Bailey from the FDA indicated a concern about talc and ovarian cancer. Do you remember that?

Page 72

A. Oh, I see what you're saying. It does not -- it looks to be the same statement. And this was what year?
Q. 2000.
A. 2000. So this does seem -- appear to be the same statement.
Q. Okay. And so just to be clear, this statement was a statement that was being used in 1998, 1999, and, again, it's being used in 2000, true?
A. That is correct.
Q. And it refers specifically to the workshop co-sponsored by the FDA, correct?
A. Yes.
Q. Now, just to back up for a second. You would agree with me that it is J&J's -- J&J corporate responsibility not to be misleading in any fashion with the public or, in this case, the shareholders?
MS. FRAZIER: Form.
THE WITNESS: It would be

Page 73

our role in corporate communications be making sure that the statements that we provide are accurate to the best of our information, according to the experts at Johnson & Johnson.
BY MR. TISI:
Q. Let's go -- now I looked in the documents that were produced. Do you ever remember Mr. O'Shaughnessy or Mr. Hopkins getting back to you to ask you questions about whether or not the statement needed to be tweaked in 1998 when you asked them to?
MS. FRAZIER: Objection to form.
THE WITNESS: No, that was 20 years ago.
BY MR. TISI:
Q. That's -- so the answer to the question is you do not recall?
A. I do not recall.
Q. If you did have a conversation with the corporate lawyer

Page 74

1 about the statements of -- in this
2 statement or Mr. Hopkins or Dr. Hopkins,
3 would that have been something that in
4 your corporate -- in your practice you
5 would have made note of by writing it
6 down somewhere either in an e-mail --
7        MS. FRAZIER:  Objection to
8    form.
9        MR. TISI:  I'm sorry, I'm
10   not finished.
11 BY MR. TISI:
12   Q.   Either in a memo or form in
13 some fashion?
14       MS. FRAZIER:  Objection to
15   form.
16       THE WITNESS:  I don't recall
17   that I ever would have done that,
18   no.
19 BY MR. TISI:
20   Q.   Now, I'd like you to go to
21 Tab Number 73 which would be 655 -- 665,
22 excuse me.
23       (Document marked for
24   identification as Exhibit

Page 75

1   P1.665.)
2 BY MR. TISI:
3   Q.   We're fast forwarding to
4 December of 2000.  Do you see that?
5   A.   Yes.
6   Q.   And this is an e-mail from
7 you?
8   A.   Yes.
9   Q.   And this is to mostly people
10 who are in J&J corporate, correct?
11   A.   Does not appear to be.
12   Q.   Do you know who Colleen
13 Goggins was?
14   A.   I believe at this time she
15 was the head of the Consumer Products
16 companies.
17   Q.   Okay.  For Johnson & Johnson
18 corporate, correct?
19   A.   That is not correct.  That
20 was a separate operating company.
21   Q.   Okay.  What about any of
22 the -- if there's an e-mail that says
23 JJCUS, Doesn't that indicate that they
24 were with J&J corporate?

Page 76

1        A.   Yes, it does.  Colleen
2 Goggins though, as an example, was CPCUS.
3        Q.   Okay.  All right.  And it
4 says, "These are the finals of the
5 statements and Q&A."
6        Do you see that?
7        A.   Yes.
8        Q.   Okay.  Now, this is slightly
9 different, if you look at Page 2.  "Does
10 perineal talc use cause ovarian cancer?"
11        Do you see that?
12        A.   Yes.
13        Q.   Okay.  It says, "In
14 conventional animal dosing studies, there
15 is no evidence of ovarian cancer.  Based
16 on available scientific data, no cause
17 and effect ... has been established
18 showing that the use of talc can cause
19 ovarian cancer."
20        Do you see that?
21        A.   Yes.
22        Q.   Okay.  And it goes on to
23 say, "The 1994 panel, co-sponsored by the
24 FDA concluded" -- and then it

Page 77

1 indicates -- it quotes from the document.
2        Do you see that?
3        A.   Yes.
4        Q.   Do you know -- and this
5 document, again in use in late 2000,
6 refers specifically to the 1994 workshop,
7 correct?
8        A.   Yes.
9        Q.   And this is the final
10 statement of the Q&A that was being used
11 for talc.
12        Do you see that?
13        MS. FRAZIER:  Object to
14    form.
15        THE WITNESS:  That is what
16    is stated in the e-mail.
17 BY MR. TISI:
18        Q.   Now, in the cover e-mail
19 here, your boss Jeff Leebaw is listed,
20 correct?
21        A.   Yes.
22        Q.   And is John O'Shaughnessy on
23 here as well?
24        A.   Yes, he is.

John McKeegan

1    Q.   And this is called a
2 reactive statement, correct?
3    A.   Well, the e-mail, no.
4    Q.   Okay.
5    A.   The Q&A, no.  But on the
6 fourth page, there does seem to be a
7 draft of a reaction statement.
8    Q.   And what is a reactive
9 statement?
10    A.   This would be a statement
11 that we are providing in case somebody
12 called us for our reaction to some sort
13 of event.
14    Q.   Okay.  On Page 3, the
15 question is asked:  "Are women at risk if
16 they have used talc?"
17       Do you see that?
18    A.   Yes.
19    Q.   Okay.  It says that "there
20 is no convincing evidence that cosmetic
21 talc, when used as intended, presents a
22 health risk to consumers."
23       Do you see that?
24    A.   I see that.

1    Q.   Okay.  Is it your
2 understanding, do you have any
3 understanding as to whether or not
4 evidence has to be convincing to J&J
5 before women are warned?
6       MS. FRAZIER:  Objection to
7    form.  Foundation.
8       THE WITNESS:  That would
9    have been well beyond my role as
10    somebody who was answering media
11    questions.
12 BY MR. TISI:
13    Q.   If I was with the media and
14 I said, Well, Dr. -- Mr. McKeegan, there
15 is evidence out there.  You may not be
16 convinced of it.  But don't you think
17 women have the right to know.  What would
18 your answer have been?
19       MS. FRAZIER:  Objection to
20    form.
21       THE WITNESS:  I can't say
22    what my answer would have been
23    20 years ago, because I'm not just
24    that close to these issues.

1 BY MR. TISI:
2    Q.   You don't know whether or
3 not you would have said anything about a
4 risk that women might need to know that
5 there was a controversy surrounding talc
6 and a deadly disease?
7    A.   The --
8       MS. FRAZIER:  Objection to
9    form.  Foundation.
10       THE WITNESS:  The
11    information that I would be
12    providing would be the information
13    that I could get from our experts
14    so that we could provide the most
15    accurate information to them -- to
16    the public, through the media, and
17    we'd be responding to media
18    questions.
19 BY MR. TISI:
20    Q.   Okay.  And so if I was with
21 CBS News, and I looked at this question
22 and answer and said, you know, I am
23 reading in the medical literature, and
24 I'm just a reporter, and I'm reading in

1 the medical literature there are some
2 doctors like Dr. Cramer, we looked at the
3 article before, who thought women should
4 be told of the potential risk with a
5 product that you can buy on the shelves
6 of any Kmart or Walmart, that women have
7 a right to know, what would you have
8 said?
9       MS. FRAZIER:  Objection to
10    form.  Foundation.
11       THE WITNESS:  I would have
12    been providing a statement that
13    was based on the best information
14    that I was able to gather from our
15    experts at Johnson & Johnson.
16 BY MR. TISI:
17    Q.   And what would you have
18 said?
19       MS. FRAZIER:  Same
20    objection.
21       THE WITNESS:  It looks like
22    I would have said -- it looks like
23    I would have said, you know, what
24    was in these statements or Q&A.

John McKeegan

Page 82

¹ BY MR. TISI:
²    Q.   Okay.  And so what would --
³    A.   According to what we have
⁴ here in front of us.
⁵    Q.   Okay.  And so what you would
⁶ have done in response to that question,
⁷ you would have simply said, well, we're
⁸ not convinced?
⁹      MS. FRAZIER:  Objection to
¹⁰    form.  Foundation.
¹¹ BY MR. TISI:
¹²    Q.   The evidence isn't
¹³ convincing to us?
¹⁴      MS. FRAZIER:  Same
¹⁵    objection.
¹⁶      THE WITNESS:  I would have
¹⁷    been providing information that
¹⁸    was based on the information that
¹⁹    I had gathered from the experts at
²⁰    Johnson & Johnson, and they would
²¹    have reviewed those answers before
²²    I provided them.
²³ BY MR. TISI:
²⁴    Q.   Right.  And if I was with

Page 83

¹ the media and I asked you the question,
² do -- shouldn't women be told about a
³ potential risk, your response would have
⁴ been, we are not convinced?
⁵      MS. FRAZIER:  Objection to
⁶    form.  Foundation.
⁷      THE WITNESS:  I can't
⁸    speculate on what we would have
⁹    said.  I don't recall getting that
¹⁰    question.
¹¹ BY MR. TISI:
¹²    Q.   Please go to exhibit -- Tab
¹³ Number 54.
¹⁴      (Document marked for
¹⁵    identification as Exhibit
¹⁶    P1.646.)
¹⁷ BY MR. TISI:
¹⁸    Q.   Now this is a Lorena
¹⁹ Telofski.  Do you remember who
²⁰ Ms. Telofski was?
²¹    A.   No.
²²    Q.   She's forwarding -- she's
²³ with the consumer product company,
²⁴ correct, based upon her e-mail address?

Page 84

¹    A.   Based on her e-mail address,
² that appears to be correct.
³    Q.   And she's forwarding your
⁴ final talc statement to folks, other
⁵ folks on December 5, 2000, correct?
⁶    A.   Yes.
⁷    Q.   And it says, "As previously
⁸ requested, you are to direct all outside
⁹ inquiries to John McKeegan at corporate."
¹⁰    A.   Yes.
¹¹    Q.   And -- so all media
¹² questions relating to talc and ovarian
¹³ cancer, I'm going to separate this into
¹⁴ two questions, were referred to J&J
¹⁵ corporate, correct?
¹⁶    A.   All media questions,
¹⁷ correct.
¹⁸    Q.   And within J&J corporate,
¹⁹ they were directed to you, correct?
²⁰    A.   That is correct.
²¹    Q.   And so J&J corporate would
²² have been in charge of interfacing with
²³ the public and the media about talc
²⁴ questions, correct?

Page 85

¹      MS. FRAZIER:  Objection to
²    form.
³      THE WITNESS:  We would have
⁴    been answering questions that were
⁵    presented to us by the media.
⁶ BY MR. TISI:
⁷    Q.   Okay.  And when we say we,
⁸ we're talking about J&J corporate,
⁹ correct?
¹⁰    A.   That's correct.
¹¹    Q.   And attached to this
¹² document is the Q&A statement that we
¹³ talked about -- we've been talking about,
¹⁴ about talc and ovarian cancer, correct?
¹⁵      MS. FRAZIER:  Objection to
¹⁶    form.
¹⁷      THE WITNESS:  There do
¹⁸    appear to be some edits here.
¹⁹ BY MR. TISI:
²⁰    Q.   Okay.  And -- but it does
²¹ also indicate, in response to the
²² question about talc and ovarian cancer,
²³ it refers to the panel meeting
²⁴ co-sponsored by the FDA, correct?

Page 86

1    A.  Yes, it does.
2        MR. TISI:  Go to Tab
3    Number 55.
4        (Document marked for
5        identification as Exhibit
6        P1.647.)
7    BY MR. TISI:
8    Q.  And this is forwarding an
9    e-mail from Mike Chudkowski to, among
10   other people, you?
11   A.  Yes.
12   Q.  And attached to that e-mail
13   is an e-mail from Irene Malbin, who I'll
14   represent to you is with the CFTA, which
15   is the industry trade group.  If you look
16   on Page 2?
17   A.  Okay.
18   Q.  Do you see that?
19   A.  Yes.
20   Q.  And if you look in the -- on
21   the list of people that were being copied
22   on this e-mail, among other people were
23   you, correct?
24   A.  Yes.

Page 87

1    Q.  Okay.  And your boss Jeff
2    Leebaw, correct?
3    A.  Correct.
4    Q.  And a woman by the name of
5    Sarah Colamarino.  Do you see that?
6    A.  Hold on please, I'm sorry.
7        MR. TISI:  You can highlight
8        that if you don't mind, Dan.
9    BY MR. TISI:
10   Q.  You can look at the screen
11   if you'd like.  Do you see Sarah
12   Colamarino?
13   A.  Yes.
14   Q.  Okay.  And who is Sarah
15   Colamarino?
16   A.  Sarah was -- I guess around
17   this time she had moved over to the
18   consumer products companies to lead
19   public relations at those companies.
20   Q.  Okay.  And so she would have
21   been your counterpart at the consumer
22   products company and you were at
23   corporate, true?
24   A.  Yes.

Page 88

1    Q.  And so this e-mail was going
2    to both you in corporate, your boss at
3    corporate, and Sarah Colamarino at the
4    consumer products company.  True?
5    A.  True.
6    Q.  And it indicates, it's
7    forwarding a Q&A to, among other people,
8    other companies that manufacture talc,
9    Avon, Unilever, et cetera, correct?
10   A.  I don't know actually if
11   they -- I mean there's some on here that
12   I don't know that they would have.  Like
13   Dow Corning.
14       But there are a number of
15   consumer products companies as well as
16   apparently some pharmaceutical companies
17   on this e-mail list.
18   Q.  Okay.  So, sir, just to be
19   clear so that the jury understands what's
20   going on here is, this is an e-mail from
21   the consumer trade group CFTA, which I'll
22   later represent to you later became PCPC.
23   A.  C-T-F-A.
24   Q.  CTFA.  I always switch

Page 89

1    those, and I apologize ahead of time for
2    doing that.
3        CTFA which later became
4    PCPC.  This is the industry trade group
5    that represents talc manufacturers among
6    other things, correct?
7    A.  Yes.
8    Q.  And this is dated
9    December 12, 2000 and -- 2000.
10   A.  Yes.
11   Q.  And it provides questions
12   and answers like we've been discussing
13   you used internally, correct?
14   A.  Yes.
15   Q.  Okay.  And Number 6, does --
16   the question is, "Does perineal talc
17   use" -- "use cause ovarian cancer?"
18       Do you see that?
19   A.  Yes.
20   Q.  And it looks like this is
21   the exact same language that was drafted
22   at J&J corporate for communications to
23   the media if J&J was contacted directly,
24   correct?

1    MS. FRAZIER:  Objection to
2  form.
3    THE WITNESS:  It does appear
4  to be very similar.  I don't know
5  that it's exact.  It seems to be
6  some things missing at the end.
7  More talc use than anything else.
8  BY MR. TISI:
9    Q.   Okay.  All right.  And it
10  specifically refers to a 1994 workshop
11  co-sponsored by the FDA.  Do you see
12  that?
13    A.   Yes.
14    Q.   And it specifically again
15  talks about the FDA, correct?
16    A.   Yes.
17    Q.   Okay.  This is the
18  year 2000, correct?
19    A.   Yes.
20    Q.   And Question Number 8 is the
21  question:  "Are women at risk for using
22  talc?"
23    The same question and answer
24  that was provided, that we talked about

1  BY MR. TISI:
2    Q.   I'm sorry, say it again,
3  sir.
4    A.   Very similar.
5    Q.   So now we've looked at the
6  J&J and industry message on talc and
7  ovarian cancer over time, from 1998,
8  1999, and now we are in late 2000.
9    And you would agree that all
10  of those statements refer to the 1994
11  conference co-sponsored by the FDA?
12    A.   Yes.
13    Q.   And as somebody in PR, you
14  would agree that words matter and need to
15  be chosen carefully, correct?
16    MS. FRAZIER:  Objection to
17  form.
18    THE WITNESS:  I agree that
19  we have to be accurate with what
20  we are saying, yes.
21  BY MR. TISI:
22    Q.   And you can't be if you omit
23  information, that could be -- that could
24  be misleading, true?

1  internally that was developed at J&J,
2  correct?
3    MS. FRAZIER:  Object to
4  form.
5    THE WITNESS:  It does appear
6  to be the same.
7  BY MR. TISI:
8    Q.   And so would you agree with
9  me that what was being used by the
10  industry appears to be, in large part,
11  what was being drafted at J&J, and
12  specifically J&J corporate?
13    MS. FRAZIER:  Objection to
14  form.
15    THE WITNESS:  I really have
16  no way of knowing that at this
17  point.  This was 20 years ago.
18  BY MR. TISI:
19    Q.   Okay.  Well, it appears to
20  be the same -- or virtually identical
21  language, true?
22    A.   Very similar, yes.
23    MS. FRAZIER:  Objection to
24  form.

1    MS. FRAZIER:  Objection to
2  form.
3    THE WITNESS:  I'm not sure
4  what your question is.
5  BY MR. TISI:
6    Q.   Well, would you -- if you
7  miss -- if you -- if in response to a
8  media question, you do not include all of
9  the relevant information, it can be
10  misleading, true?
11    MS. FRAZIER:  Objection to
12  form.
13    THE WITNESS:  I'm not sure
14  what you're trying to ask.
15  BY MR. TISI:
16    Q.   Well, one of the reasons, if
17  you go back to your 1998 reason where you
18  indicated your statement may need to
19  be tweaked based upon what Dr. Bailey
20  said, that there was concern at the FDA
21  about talc and ovarian cancer.  You put
22  that in your e-mail for the reason of
23  saying, you know, we may need to tweak
24  this to make sure it's accurate.  We

Page 94

1  don't want to mislead the public as to
2  what the FDA was saying, correct?
3         MS. FRAZIER:  Objection to
4     form.
5         THE WITNESS:  The only thing
6     I know is what you showed me in
7     that e-mail.
8  BY MR. TISI:
9     Q.   Correct.  And what would be
10 the reason why you would reach out and
11 suggest that your media statement might
12 need to be tweaked based upon what
13 Dr. Bailey was saying?
14        MS. FRAZIER:  Objection to
15    form.
16        THE WITNESS:  My --
17    according to that e-mail, my
18    question would have been whether
19    the statement needed to be
20    adjusted or tweaked in any way.
21 BY MR. TISI:
22    Q.   Based upon what Dr. Bailey
23 was talking about concerning talc and
24 ovarian cancer, true?

Page 95

1         MS. FRAZIER:  Objection to
2     form.
3         THE WITNESS:  Who was
4     Dr. Bailey?
5  BY MR. TISI:
6     Q.   Dr. Bailey was at the FDA.
7     A.   Okay.  Who was he?
8     Q.   All right.  We can go back
9  to the document if you'd like.  I'm happy
10 to do that.
11    A.   Yeah, I don't know what -- I
12 have not seen these e-mails in years and
13 years and years.
14        So who was Dr. Bailey?
15    Q.   Dr. Bailey was the head of
16 the -- I'll represent to you Dr. Bailey
17 at the time was the head of the division
18 involving cosmetics and colors at the FDA
19 that had responsibility for talc.  And he
20 got on TV apparently and indicated there
21 was concern at the FDA about talc and
22 ovarian cancer.
23        Okay?  Your question was, do
24 we need to tweak our statement?  Do you

Page 96

1  see that?
2     A.   That was apparently what was
3  in the e-mail.
4     Q.   All right.  So now my
5  question is, did Dr. -- and it was
6  specifically addressed to doctor -- to
7  Mr. -- to Dr. Hopkins, if you can recall,
8  and Mr. O'Shaughnessy, correct?
9     A.   Yes.
10    Q.   And you asked that they
11 actually call you, true?
12    A.   That is in the e-mail.
13    Q.   Okay.  And based upon our
14 looking at the statement, the statements
15 over time, there was no adjustment that
16 would account for the FDA had concern
17 about the risk of talc and ovarian
18 cancer.  Was there --
19        MS. FRAZIER:  Objection to
20    form.
21        THE WITNESS:  I don't recall
22    exactly what the circumstances
23    around this would have been.
24 BY MR. TISI:

Page 97

1     Q.   Would you go to exhibit
2  number -- Tab 53 which is Exhibit 645.
3         (Document marked for
4     identification as Exhibit
5     P1.645.)
6         MR. TISI:  I'm sorry, can
7     you go to Exhibit 645, Dan?
8  BY MR. TISI:
9     Q.   This was an e-mail from you
10 dated November 28, 2000, while you were
11 drafting the final Q&A.
12        Do you see that?
13    A.   Yes.
14    Q.   And you indicated in -- this
15 is an e-mail from you?
16    A.   Yes.
17    Q.   It indicates to you, "These
18 are prepared based upon where we left off
19 at our last meeting, that we would have
20 outside experts review this again."
21        Do you see that?
22    A.   Yes.
23    Q.   Do you know what outside
24 experts reviewed your Q&A?

John McKeegan

Page 98

1     MS. FRAZIER:  Objection to
2  form.
3     THE WITNESS:  I have no
4  idea.
5  BY MR. TISI:
6     Q.   Do you know if they would be
7  paid experts by Johnson & Johnson?
8     MS. FRAZIER:  Objection to
9  form.
10     THE WITNESS:  Since I would
11  not have been any -- involved in
12  hiring anybody, I would have no
13  idea.
14  BY MR. TISI:
15     Q.   It says you "consciously
16  here left out the names of the products
17  to shield them as much as possible."
18     Do you see that?
19     A.   I do.
20     Q.   Why would you want to shield
21  any discussion about Johnson's Baby
22  Powder or Shower to Shower in connection
23  with the issues relating to talc and
24  ovarian cancer?

Page 99

1     MS. FRAZIER:  Objection to
2  form.
3     THE WITNESS:  Since this is
4  nearly 21 years ago, I do not
5  know.
6  BY MR. TISI:
7     Q.   And attached to this
8  draft -- this article is a draft of the
9  two questions that we talked about which
10  is does perineal use of talc -- use --
11  I'm sorry.
12     It says "Does perineal talc
13  use cause ovarian cancer?" on Page 3.
14     Do you see that?
15     A.   Yes.
16     Q.   And it doesn't have any
17  reference to Johnson's Baby Powder or
18  Shower to Shower, does it?
19     MS. FRAZIER:  Objection to
20  form.
21     THE WITNESS:  I do not see
22  any reference to those products.
23  BY MR. TISI:
24     Q.   Any -- to the -- but it does

Page 100

1  specifically refer to the FDA, true?
2     A.   Yes.
3     Q.   And it asks the question we
4  love talking about:  "Are women at risk
5  if they use talc?"  And it again talks
6  about no convincing evidence.
7     Do you see that?
8     A.   Yes.
9     Q.   And when you say no
10  convincing evidence, do you know who
11  you're referring to here as to who needs
12  to be convinced?
13     MS. FRAZIER:  Objection to
14  form.
15     THE WITNESS:  I really don't
16  understand what you're trying to
17  ask.
18  BY MR. TISI:
19     Q.   I'm asking you convincing
20  evidence.  Who is the -- who is the
21  people making the decision about what
22  evidence is convincing or not?
23     MS. FRAZIER:  Objection to
24  form.

Page 101

1     THE WITNESS:  At this point
2  20 years ago, I have no idea how
3  this language came about.
4  BY MR. TISI:
5     Q.   I'm going to --
6     MR. TISI:  This is probably
7  a good time to take a quick break,
8  unless you want to keep going,
9  Mr. McKeegan, I have no problem
10  keeping going.  I just -- this is
11  a -- if we're going to take a
12  break, this is probably a good
13  time to do it.
14     THE WITNESS:  That sounds
15  good.
16     MR. TISI:  Kat, do you want
17  to do five minutes just so
18  everyone can stretch their legs.
19     MS. FRAZIER:  That sounds
20  good to me.  Is that enough time
21  for you, John?
22     THE WITNESS:  I do need to
23  make a quick phone call so if I'm
24  a little late, I'll be back very

John McKeegan

Page 102

1 quickly.
2        MR. TISI:  How about we make
3 it ten so you don't feel like you
4 have to kill yourself to get off
5 the phone.
6        THE WITNESS:  Okay.
7        MR. TISI:  All right?
8        MS. FRAZIER:  Sounds good.
9        THE VIDEOGRAPHER:  The time
10 is 11:35 a.m.  Off the record.
11        (Short break.)
12        THE VIDEOGRAPHER:  It's
13 11:52 a.m.  On the record.
14 BY MR. TISI:
15    Q.   Okay.  All right.  So,
16 Mr. McKeegan, I'm going to ask you a
17 couple questions now.
18        We talked before about the
19 media statement that was prepared by J&J
20 corporate, and to be used with, among
21 other things, the media and shareholders.
22 Do you remember that?
23        MS. FRAZIER:  Objection to
24 form.

Page 103

1        THE WITNESS:  Yes, I
2 remember.
3 BY MR. TISI:
4    Q.   Okay.  And, again, to set
5 the table for the questions that I'm
6 about ready to ask you, it referred
7 specifically to the FDA and the FDA
8 conference.  Do you remember that?
9    A.   Yes.
10        MS. FRAZIER:  Objection to
11 form.
12 BY MR. TISI:
13    Q.   And you became aware, at
14 least in 1998, there was some suggestion
15 that that media statement might need to
16 be tweaked to reflect what the FDA, and
17 specifically a Dr. Bailey at the FDA, was
18 saying about the concern about talc and
19 ovarian cancer, correct?
20        MS. FRAZIER:  Objection to
21 form.
22        THE WITNESS:  I was made
23 aware of a media inquiry from
24 the -- by the CTFA about CBS News

Page 104

1 making an inquiry based on some
2 statements that somebody at the
3 FDA had made.
4 BY MR. TISI:
5    Q.   Right.  And if -- again, if
6 we can go to Exhibit Number 637, which is
7 Tab 45 of your notebook, the statement
8 was "John Bailey at the FDA expressed to
9 them some concern about the risk of talc
10 and ovarian cancer.  We do not know much
11 more than that and certainly don't know
12 exactly what he said."
13        Do you see that?
14    A.   Yes.
15    Q.   Okay.  And that was a
16 statement that -- that was of some
17 interest and why you were forwarding it
18 to Mr. O'Shaughnessy and Mr. Hopkins with
19 a cc to your boss Jeff Leebaw.
20        Do you see that?
21    A.   Yes.
22        MS. FRAZIER:  Objection to
23 form.
24 BY MR. TISI:

Page 105

1    Q.   And the question was, you
2 wanted to speak to both Mr. Hopkins and
3 Mr. O'Shaughnessy about whether or not
4 what you were telling the public through
5 the media and your shareholders needed to
6 be tweaked, right?
7        MS. FRAZIER:  Objection to
8 form.
9        THE WITNESS:  Incorrect.
10 This is 1998.
11 BY MR. TISI:
12    Q.   Okay.
13    A.   And this was a question
14 about whether this statement was still
15 accurate to use in terms of a potential
16 inquiry from CBS News.
17        And from this e-mail, I
18 can't tell whether we actually ever
19 received a call or not.
20    Q.   Okay.  And you specifically
21 say, "If you could each call me next
22 week," referring to Mr. Hopkins,
23 Dr. Hopkins, and Mr. O'Shaughnessy,
24 correct?

Page 106

1    A.   Correct.
2    Q.   Okay.  "And we can talk more
3 about what we know and what we may need
4 to do," correct?
5    A.   Correct.
6    Q.   And it says, and
7 specifically the statement before is that
8 your statement to the media may need to
9 be tweaked.  And you attached the
10 statement, correct?
11        MS. FRAZIER:  Objection to
12    form.
13        THE WITNESS:  The question
14    is, to them, is "in case we need
15    to tweak our statement at all."
16 BY MR. TISI:
17    Q.   Okay.  And this statement is
18 the one that is attached to this
19 document, which you had indicated is the
20 one that is consistent with what you had
21 been telling the media in this time
22 frame, correct?
23    A.   Correct.
24        MS. FRAZIER:  Objection to

Page 107

1    form.
2 BY MR. TISI:
3    Q.   And so, this, you know, just
4 from a real practical standpoint, a
5 statement from the FDA expressing concern
6 about the risk of talc and ovarian cancer
7 was enough to make you make this inquiry
8 of both the -- Dr. Hopkins and the
9 company lawyer, right?
10        MS. FRAZIER:  Objection to
11    form.
12        THE WITNESS:  The potential
13    for a question to Johnson &
14    Johnson based -- from CBS News,
15    was the impetus for the e-mail
16    based on what I'm reading here.
17 BY MR. TISI:
18    Q.   Correct.  Okay.  So now --
19 and you were made aware of this through
20 the CTFA, right?
21    A.   Correct.
22    Q.   Right.  And what we have
23 here are four different people or groups,
24 we have Dr. Hopkins and

Page 108

1 Mr. O'Shaughnessy, we have your boss
2 Jeffrey Leebaw, and we have the trade
3 organization through Ms. Malbin, correct?
4        MS. FRAZIER:  Objection to
5    form.
6        THE WITNESS:  When you are
7    talking about that, you are
8    talking about the people that
9    would have been made aware based
10    on my e-mail?
11 BY MR. TISI:
12    Q.   Yes.
13    A.   Irene is not on this.
14    Q.   Well, Irene, you had gotten
15 a call from Irene so she was aware of it.
16 That's what you said?
17    A.   Right.  But I was making
18 John Hopkins, John O'Shaughnessy, and
19 Jeff Leebaw aware of this, according to
20 this e-mail.
21    Q.   Correct.  Okay.  And so my
22 point is, there are three different
23 entities that are involved in this,
24 what's going on at the time in 1998.

Page 109

1 There's J&J corporate through corporate
2 communications, through you and
3 Mr. Leebaw, correct?
4    A.   Okay.
5    Q.   Right.  There's the CTFA who
6 called you about this, correct?
7    A.   Okay.
8    Q.   Am I incorrect or no?
9    A.   I'm waiting for your
10 question.
11    Q.   Well, no, how about
12 answering the question I posed.
13    A.   I said okay.
14    Q.   You got a call from CTFA,
15 right?
16    A.   Okay.
17    Q.   Is that a yes or no?
18    A.   I'm only going based on what
19 this e-mail says.
20        MS. FRAZIER:  Objection to
21    form.
22 BY MR. TISI:
23    Q.   Right.  And the e-mail says
24 you got a call from the CTFA.

Page 110

1    A.    And I said okay.
2    Q.    Does "okay" mean yes or no?
3    A.    It means, apparently,
4 according to this e-mail, I received a
5 call from Irene Malbin at the CTFA.
6    Q.    Okay. So we've got CTFA at
7 one end, we've got J&J corporate,
8 corporate communications through
9 yourself, and you are forwarding this on
10 to the company lawyer and to Johns
11 Hopkins, who as you understand was with
12 consumer products, true?
13    A.    I actually have no memory of
14 John --
15        MS. FRAZIER:  Objection to
16    form.
17        THE WITNESS:  I'm sorry.
18 BY MR. TISI:
19    Q.    Okay.
20        MS. FRAZIER:  Object to
21    form.
22        THE WITNESS:  I have no
23    memory of John Hopkins.
24 BY MR. TISI:

Page 111

1    Q.    I'll represent to you that
2 he was a consultant, a former employee
3 but consulting with J&J on talc issues at
4 the time.
5        MS. FRAZIER:  Objection to
6    form. Look at the -- hey, Chris,
7    just look at the year on that.
8        MR. TISI:  Okay. All right.
9 BY MR. TISI:
10    Q.    Anyway, let's move on. I
11 don't want to get bogged down on this.
12        And you notified your boss
13 Dr. -- Mr. Leebaw, correct?
14    A.    Yes.
15    Q.    And we indicated you do not
16 recall Mr. O'Shaughnessy or Dr. Hopkins
17 ever contacting you as you requested that
18 they do, right?
19        MS. FRAZIER:  Objection to
20    form.
21        THE WITNESS:  I have no
22    memory.
23 BY MR. TISI:
24    Q.    Did you ever remember

Page 112

1 speaking to Mr. Leebaw about this?
2    A.    No specific memory, no.
3    Q.    Would you agree that if any
4 one of these people told you that the FDA
5 believed in 1994, even after the
6 co-sponsorship of the symposium on talc,
7 that the evidence supported the
8 possibility that talc could pose a risk
9 of ovarian cancer, you most likely would
10 have suggested that the -- that the
11 statement be tweaked to reflect that?
12        MS. FRAZIER:  Objection to
13    form.
14        THE WITNESS:  My -- the way
15    that we would do things in
16    corporate communications, we would
17    reach back to the people with the
18    most direct knowledge of this and
19    ask them the questions about
20    whether these statements needed to
21    be changed. That is apparently
22    what happened here.
23 BY MR. TISI:
24    Q.    And if it turned out that

Page 113

1 the FDA still had concerns, that would be
2 material to what you were telling
3 shareholders in the media, true?
4        MS. FRAZIER:  Objection to
5    form. Foundation.
6        THE WITNESS:  Johnson &
7    Johnson -- Johnson & Johnson
8    experts would have instructed if
9    we needed to change these
10    statements in any way.
11 BY MR. TISI:
12    Q.    Well, as somebody involved
13 in corporate communications and public
14 relations, you don't want to be
15 misleading, do you?
16        MS. FRAZIER:  Objection to
17    form.
18        THE WITNESS:  Apparently
19    according to this e-mail, I did
20    reach back to them to make sure
21    that our statement was still going
22    to be accurate or whether it
23    needed to be changed in any way.
24 BY MR. TISI:

Page 114

1    Q.   Right.  Because what
2  Dr. Bailey had apparently talked about
3  openly was that there was still a concern
4  at the FDA about talc and ovarian cancer.
5  And that would have been a material fact,
6  true or not true?
7         MS. FRAZIER:  Objection to
8     form.
9         THE WITNESS:  I have no idea
10    what Dr. Bailey would have said.
11 BY MR. TISI:
12    Q.   I'm asking you from the
13 perspective of corporate PR, it raised a
14 question in your mind as to whether or
15 not the corporate statement should
16 reflect a concern about talc and ovarian
17 cancer.
18        MS. FRAZIER:  Objection to
19     form.
20 BY MR. TISI:
21    Q.   That's why you wrote the --
22 that's why you wrote this e-mail, right?
23        MS. FRAZIER:  Objection to
24     form.

Page 115

1         THE WITNESS:  It looks like
2      I sent this e-mail to ask for
3      their input to see whether we
4      needed to make any changes in our
5      statement about talc.
6  BY MR. TISI:
7     Q.   Correct.  And the reason why
8  you did that is because this statement by
9  somebody at the FDA communicated to your
10 trade organization, at least in your
11 mind, created a question as to whether or
12 not the statement needed to be tweaked,
13 using your phrase?
14        MS. FRAZIER:  Objection to
15     form.
16        THE WITNESS:  The question
17     is about a potential media inquiry
18     that could come to us from CBS
19     News, and so we asked that the
20     opinion of the people who would be
21     closest to the issue to see
22     whether this would have been
23     anything that we would need to
24     change our statement or make any

Page 116

1  adjustments to our statement.
2  BY MR. TISI:
3     Q.   And you don't recall them
4  ever contacting you about that, correct?
5         MS. FRAZIER:  Objection to
6      form.
7         THE WITNESS:  According to
8      the e-mail, this is 23 years ago,
9      and I have no memory of the -- if
10     we ever spoke of that.
11        MR. TISI:  I'd like to go to
12     exhibit number -- this is not in
13     your notebook because I put this
14     in late.  But it's a very short
15     memorandum.  P1.0446.
16        Could you please bring that
17     up please, Dan.
18        (Document Marked for
19     identification as Exhibit
20     P1.446.
21 BY MR. TISI:
22    Q.   Let me ask you to take a
23 look at this.  First of all, this is a
24 fax from Stephen Gettings.  I'll

Page 117

1  represent to you he is with CTFA.  And
2  the date is February 4, 1994.  And if you
3  look at the top left-hand corner, it's
4  sent to some of the very same people who
5  you made your inquiry about in 1998,
6  specifically Mr. Hopkins,
7  Mr. O'Shaughnessy, and your boss
8  Mr. Leebaw.
9         Do you see that?
10        MS. FRAZIER:  Objection to
11     form.
12        THE WITNESS:  I do see their
13     names on the to list of the memo.
14 BY MR. TISI:
15    Q.   Okay.  And these are the
16 people who you specifically made a
17 request to about the FDA's concerns about
18 ovarian cancer.
19        Do you see that?
20        MS. FRAZIER:  Object.
21     Objection to form.
22        THE WITNESS:  According to
23     this timeline of events, I would
24     have asked -- been asking them

Page 118

1    four years later --
2  BY MR. TISI:
3    Q.   Correct.
4    A.   -- than what this memo was
5  indicating.
6    Q.   Right.  So this would have
7  been presumably -- and I asked
8  Mr. O'Shaughnessy about this.  This would
9  have been a document that would have been
10 received at the time you made the inquiry
11 to, among others, Mr. O'Shaughnessy,
12 about the FDA's position, correct?
13      MS. FRAZIER:  Objection to
14    form.  Foundation.
15      THE WITNESS:  I have no -- I
16    have no knowledge of this
17    memorandum.
18 BY MR. TISI:
19    Q.   Okay.
20    A.   At all.
21    Q.   That's because -- that's
22 because Mr. O'Shaughnessy, Mr. Leebaw and
23 Mr. Hopkins never told you about it, did
24 they?

Page 119

1      MS. FRAZIER:  Objection to
2    form.
3      THE WITNESS:  I didn't even
4    start at J&J until three years
5    after this.
6  BY MR. TISI:
7    Q.   Correct.  And when you
8  reached back to them and said, we saw
9  something that Dr. Bailey had said, this
10 would have been -- assuming the date is
11 correct in 1994 -- this would have been
12 in their possession for some four years,
13 correct?
14      MS. FRAZIER:  Objection to
15    form.
16      THE WITNESS:  I have no
17    knowledge --
18 BY MR. TISI:
19    Q.   Okay.  Let's see what it --
20    A.   I have no knowledge about
21 that document.
22    Q.   Let's see -- let's see what
23 it says.
24      It says Talc Symposium

Page 120

1  Follow-up.  Do you see that?
2    A.   Yes.
3    Q.   And we agree that the
4  corporate statement that you said was in
5  use cite to talc symposium co-sponsored
6  by the FDA, correct?
7    A.   Chris, let me read the
8  document.  Okay.
9    Q.   Now, so then my question to
10 you is, when you reached out -- did
11 Dr. -- let's take them one at a time.
12      Did Mr. Leebaw, your boss,
13 tell you that the FDA had a concern after
14 that meeting of the possibility of a risk
15 of ovarian cancer could not be dismissed,
16 did he tell you that at any time that you
17 can recall?
18      MS. FRAZIER:  Objection to
19    form.  Foundation.
20      THE WITNESS:  I have no
21    memory of any discussion like
22    that.
23 BY MR. TISI:
24    Q.   Did Mr. O'Shaughnessy, to

Page 121

1  whom you sent your inquiry in 1998, say,
2  you know, we had this follow-up with the
3  FDA and the possibility of the risk of
4  ovarian cancer could not be totally
5  dismissed?
6      MS. FRAZIER:  Objection to
7    form.  And I'll instruct the
8    witness not to respond to the
9    extent that responding to
10    questions about what
11    Mr. O'Shaughnessy, who was inhouse
12    counsel at Johnson & Johnson said
13    to Mr. McKeegan is attorney/client
14    privileged.
15      And to the extent it
16    requires him to disclose such
17    communications, I'll instruct him
18    not to answer.
19      MR. TISI:  Well, I don't
20    think it does, but let me see
21    if I can --
22 BY MR. TISI:
23    Q.   Do you ever remember
24 Mr. O'Shaughnessy calling you and talking

John McKeegan

Page 122

1  about his involvement with the talc
2  symposium?
3          MS. FRAZIER:  You're just
4      asking -- wait a minute.  You're
5      just asking about the fact of,
6      rather than the content?
7          MR. TISI:  Correct.
8      Correct.
9          MS. FRAZIER:  Okay.
10         MR. TISI:  Let's just take
11     it one piece at a time, Kat.
12 BY MR. TISI:
13     Q.   Do you ever remember
14 Mr. O'Shaughnessy, in response to your
15 question that he contact you in 1998,
16 call you and say -- tell you that he was
17 at the talc symposium and received
18 information about the FDA following that
19 symposium?
20         MS. FRAZIER:  Object to
21     form.
22         THE WITNESS:  I have no
23     memory of any such discussions.
24 BY MR. TISI:

Page 123

1      Q.   Do you ever remember
2  Mr. Hopkins or Dr. Hopkins calling you
3  and telling you that the FDA's impression
4  after the meeting that you used in your
5  statement to the press and to the
6  shareholders is that the possibility of
7  risk of ovarian cancer cannot be totally
8  dismissed?
9          MS. FRAZIER:  Objection to
10     form.
11         THE WITNESS:  I have no
12     memory of any discussions with
13     John Hopkins at all.
14 BY MR. TISI:
15     Q.   And we -- and do you know
16 whether or not, in 1998, when you spoke
17 to the CTFA representative Ms. Malbin,
18 whether or not she said, you know, we
19 received a call -- we made a call to the
20 FDA and they raised that there was a
21 possibility of a risk of ovarian cancer
22 in 1994 that could not be totally
23 dismissed?
24         MS. FRAZIER:  Objection to

Page 124

1      form.
2          THE WITNESS:  I do not
3      recall any specific conversations
4      I had with Irene Malbin during
5      that time.
6  BY MR. TISI:
7      Q.   But in any event, your
8  statement was never changed to include
9  this information, was it?
10         MS. FRAZIER:  Objection to
11     form.
12         THE WITNESS:  Our statement
13     would have been evaluated by the
14     experts at Johnson & Johnson and
15     they would have used their
16     knowledge to provide information
17     back to me that I could then use
18     to answer questions from the
19     media.
20 BY MR. TISI:
21     Q.   Okay.  That wasn't my
22 question.
23     A.   That was my answer.
24     Q.   No, it's not -- you need to

Page 125

1  answer my question.
2          My question is, was the
3  statement that you prepared or that was
4  being used in 1998, 1999 and 2000, ever
5  tweaked, to use your phrase, to indicate
6  that the FDA continued to have concerns
7  about the possibility of the risk of
8  ovarian cancer?
9          MS. FRAZIER:  Objection to
10     form.
11 BY MR. TISI:
12     Q.   Was it ever --
13         MS. FRAZIER:  Objection to
14     form.
15         THE WITNESS:  We would have
16     had these statements evaluated
17     periodically based on things that
18     would have been occurring at the
19     time.  That was the usual
20     practice.
21         From what you've just shown
22     me about the statement between
23     '98, '99 and 2000, the statements
24     appear to be largely the same.

John McKeegan

Page 126

BY MR. TISI:

Q.   Okay.  And they did not include any suggestion the FDA had concern about the risk of ovarian cancer either as reflected in the e-mail that you had from 1998 or as reflected in this memorandum to the people who you requested information from, true?

MS. FRAZIER:  Objection to form.

THE WITNESS:  According to the -- what you showed me from the statements, the statements only talk about the FDA in the specific context.

BY MR. TISI:

Q.   Right.  About the talc symposium, true?

A.   That's correct.

MS. FRAZIER:  Objection to form.

BY MR. TISI:

Q.   It doesn't talk about any follow-up statements that the FDA made

Page 127

expressing concern about the possibility of the risk of ovarian cancer, correct?

MS. FRAZIER:  Objection to form.

THE WITNESS:  When those experts evaluated those documents, if they had concerns about the current wording of it, they would have provided that to me --

BY MR. TISI:

Q.   Right.

A.   -- and we would have adjusted it appropriately.

Q.   Right.  But you don't even remember whether they even got back to you, do you?

A.   No, that was 20-something years ago.

MS. FRAZIER:  Objection to form.

BY MR. TISI:

Q.   Okay.  And we all -- we agree, I think we can, that the statement wasn't tweaked at all in 1998, 1999,

Page 128

correct, to reflect this information?

MS. FRAZIER:  Objection to form.

Same objection.

THE WITNESS:  The statement appears to be largely the same during those time frames.

BY MR. TISI:

Q.   Now, do you know, were you ever told as a result of this communication that what apparently John Bailey at the FDA had with -- in the media about --

MR. TISI:  You could take that off the screen.

Actually, bring up Exhibit 637.1 again.

BY MR. TISI:

Q.   As a result of this statement that was important enough for you to forward by the FDA official expressing concern about the risk of ovarian cancer, do you know whether or not anybody ever followed up with the FDA

Page 129

or made an inquiry of the FDA as to what their current thinking was, so that you could amend, if necessary, the -- what you were telling the press and your shareholders?

MS. FRAZIER:  Objection to form.  Foundation.

THE WITNESS:  The -- ask your question again, please.

BY MR. TISI:

Q.   Yeah.  My question was, as a result of this statement by the FDA in the press about concerns of talc and ovarian cancer, do you know of anybody at the company who reached out to find out exactly what Dr. Bailey said or meant about his concerns?

MS. FRAZIER:  Objection to form.  Foundation.

THE WITNESS:  I would have no memory of that, since it was so long ago.

BY MR. TISI:

Q.   Okay.  And would you agree

John McKeegan

Page 130

1 with me that that would have been one of
2 the things that you would have expected
3 as somebody who is the face of J&J
4 corporate with the media?
5          MS. FRAZIER:  Objection to
6     form.  Foundation.
7          THE WITNESS:  I can't say
8     what I would have expected.  I
9     don't think -- I don't remember if
10    we received this call from CBS
11    News.
12 BY MR. TISI:
13    Q.   Right.  Doesn't matter
14 whether you received it directly from CBS
15 News, or you received it from CTFA.  What
16 is important, wouldn't you agree, is
17 whether the FDA had concerns about the
18 risk of talc and ovarian cancer, right,
19 as a subject matter?
20          MS. FRAZIER:  Objection to
21    form.  Foundation.
22          THE WITNESS:  Whether the
23    FDA had concerns about talc
24    products, or specifically Johnson

Page 131

1     & Johnson products, would not have
2     been within my area.
3 BY MR. TISI:
4    Q.   Right.
5    A.   I was specifically charged
6 with answering questions that we would
7 have received from the media.
8    Q.   Right.  So -- so that being
9 the case, and I'm accepting you as you --
10 accepting your answer as you just gave
11 it -- you being the interface with the
12 media, would you have expected J&J, the
13 scientists and regulatory people at J&J,
14 to speak to the people at the FDA so that
15 when you are asked these questions, you
16 can give accurate answers?
17          MS. FRAZIER:  Objection to
18    form.  Foundation.
19          THE WITNESS:  I can't say
20    what I would have expected at this
21    time.
22          I can say that based on what
23    you're showing me in this e-mail,
24    that I reached back to two people

Page 132

1     who presumably would have had
2     knowledge of this issue and asked
3     them if we needed to adjust this
4     statement.
5 BY MR. TISI:
6    Q.   Well, it's not just two
7 people.  You copied your boss, Dr. --
8 Mr. Leebaw, correct, to whom that prior
9 statement by the FDA that I showed you
10 from 1994 was sent, correct?
11          MS. FRAZIER:  Objection to
12    form.
13          THE WITNESS:  No.  The --
14    this was to John Hopkins and John
15    O'Shaughnessy.  Jeff would have
16    been copied as my supervisor.
17 BY MR. TISI:
18    Q.   Right.  And you got the call
19 from CTFA, who is the trade organization,
20 right?
21    A.   Yes.
22          MR. TISI:  I'm going to show
23    you exhibit number -- and this is
24    not -- again, this is a document

Page 133

1 that is not in your stack, so I'm
2 going to ask you to bear with me
3 for a moment.
4          This is a document dated
5 February 10, 1998.
6          Would you please bring up
7 P1.669.
8          (Document marked for
9    identification as Exhibit
10    P1.669.)
11 BY MR. TISI:
12    Q.   Now, just for timeline
13 purposes, the e-mail that we have been
14 talking about with -- from you to
15 Mr. Hopkins and John O'Shaughnessy, was
16 February 13, 1988, correct?
17    A.   Yes.
18    Q.   Okay.  So this document is
19 dated February 10, 1988, three days
20 before, correct?
21    A.   Correct.
22    Q.   Okay.  And this is a
23 document -- it was not in your file so
24 I'm not suggesting you would have seen

Page 134

1 it.  I'm just going to ask you a question
2 about this.
3         It says the FDA's Cosmetics
4 Program.  Do you see that?
5         A.   Yes.
6         Q.   And it's prepared by, if you
7 look at the bottom left, it's prepared by
8 the FDA, correct?
9         MS. FRAZIER:  Objection to
10 form.  Foundation.
11 BY MR. TISI:
12         Q.   The Office of Cosmetics and
13 Color.
14         A.   That's apparently what this
15 says.
16         Q.   And I'm going to show you a
17 very specific page.  And I will suggest
18 to you this came from the PCPC, or CTFA,
19 the folks who called you, to let you know
20 about Dr. Bailey's FDA statement.
21         If you go to page -- the
22 document that has exhibit -- 509 Bates at
23 the end.
24         MR. TISI:  I think it's

Page 135

1         about six pages in, Dan.  Seven
2         pages.
3             Go back.  Back.  Right
4         there.  Next page.
5 BY MR. TISI:
6         Q.   It has a statement on talc
7 in this FDA document, do you see that?
8         A.   Yes, I see that.
9         Q.   It says, and we'll read it
10 together.  "Talc is a commonly used
11 ingredient used in a variety of cosmetic,
12 drugs, and medical device preparations."
13         Do you see that?
14         A.   Yes.
15         Q.   Okay.  Next statement:
16 "Perineal talc has been linked to
17 increased risk of ovarian cancer."
18         Do you see that?
19         A.   I see that.
20         Q.   It says, "FDA sponsored a
21 workshop on talc safety in 1994."
22         Do you see that?
23         A.   Yes.
24         Q.   Okay.  And, of course, your

Page 136

1 statement to the press refers to the
2 workshop on talc safety from 1994,
3 correct?
4         A.   Yes.
5         Q.   Okay.  And it says,
6 "Additional data ... since then further
7 suggests a health hazard."
8         Do you see that?
9         MS. FRAZIER:  Objection to
10 form.  Foundation.
11         THE WITNESS:  I see that
12 sentence.
13 BY MR. TISI:
14         Q.   And did anybody -- now we
15 have -- we talked about before, the 1994
16 fax memorandum sent to Mr. Leebaw and
17 Mr. O'Shaughnessy and Mr. Hopkins from
18 CTFA about a call with the FDA expressing
19 concern, still expressing concern after
20 that meeting at that workshop about talc
21 and ovarian cancer.
22         You remember that, right?
23         MS. FRAZIER:  Objection to
24 form.

Page 137

1         THE WITNESS:  I remember
2         that memo.
3 BY MR. TISI:
4         Q.   Okay.  And now we have in
5 1998, the FDA referring to that workshop
6 in 1994 and saying, "Additional data
7 obtained since then further suggests a
8 health hazard," correct?
9         MS. FRAZIER:  Objection to
10 form.  Foundation.
11         THE WITNESS:  I see that
12 sentence in this document.
13 BY MR. TISI:
14         Q.   Right.  And you were made
15 aware of a statement that the FDA through
16 Dr. Bailey made to CBS that there was
17 still a concern about talc and ovarian
18 cancer, true?
19         MS. FRAZIER:  Objection to
20 form.
21 BY MR. TISI:
22         Q.   At the FDA?
23         A.   I recall that in the e-mail
24 you showed me.

Page 138

1    Q.   All right.  And these three
2  documents, the one from 1994, your e-mail
3  from 1998, and this document, would
4  suggest, at least would you agree with
5  me, suggests that FDA still had concerns?
6         MS. FRAZIER:  Objection to
7    form.  Foundation.
8         THE WITNESS:  I can't
9    speculate on what the FDA was
10   doing.
11 BY MR. TISI:
12   Q.   You can't read -- that's
13 exactly what the e-mail you wrote said,
14 right?
15        MS. FRAZIER:  Objection to
16   form.  Foundation.
17        THE WITNESS:  I can only go
18   by what you're showing me here.  I
19   cannot remember exactly what was
20   going on at this time.  I would
21   have no idea what would have been
22   going on within the FDA.
23 BY MR. TISI:
24   Q.   My question to you, Mr. --

Page 139

1  Mr. McKeegan, in public statements you
2  made until you left the company, you left
3  this position in 2001, did not tell the
4  public that the FDA still had concerns
5  about talc and ovarian cancer, did it?
6         MS. FRAZIER:  Objection to
7    form.
8         THE WITNESS:  Our statements
9    would have been based on the best
10   information that we would have had
11   from the Johnson & Johnson
12   experts.
13        MR. TISI:  Okay.  Move to
14   strike.
15 BY MR. TISI:
16   Q.   My question is, you looking
17 at that statement, and we can bring --
18        MR. TISI:  Let's bring up
19   exhibit -- let's bring up
20   Exhibit 637.  Look at Page 2, the
21   Statement on Talcum Powder.
22 BY MR. TISI:
23   Q.   Can you tell me where, as
24 the guy who was responsible for

Page 140

1  interfacing with the media and approving
2  statements to the shareholders, where in
3  this statement that it indicates that the
4  FDA continued to have concerns about talc
5  and ovarian cancer and that there is a
6  suggestion of a health hazard?
7         MS. FRAZIER:  Objection to
8    form.
9  BY MR. TISI:
10   Q.   Is there anything in here
11 that would suggest that to you?
12        MS. FRAZIER:  Objection to
13   form.  Foundation.
14        THE WITNESS:  This statement
15   would have been based on the best
16   information we had from the
17   experts at Johnson & Johnson.
18 BY MR. TISI:
19   Q.   I'm not asking --
20   A.   If the FDA was going to be
21 making information available about how
22 they felt about talc, I presume that they
23 would have done so.
24   Q.   Okay.  Well, you are

Page 141

1  referring to the FDA and that workshop in
2  this statement, correct?
3    A.   As we've stated before, that
4  is in this statement.
5    Q.   Okay.  And so my question
6  is, having referred to the 1994 workshop
7  and the FDA, you now -- I have now shown
8  you three pieces of information that the
9  FDA was -- still remained concerned.
10        So if you wanted to be
11 complete, that information about the
12 FDA's concern is not in your corporate
13 statement, was it?
14        MS. FRAZIER:  Objection to
15   form.  Foundation.
16        THE WITNESS:  Our corporate
17   statement would have been based on
18   the best information available to
19   us from Johnson & Johnson's
20   experts.
21 BY MR. TISI:
22   Q.   Sir, with all due respect,
23 you are not answering my question.  Okay?
24 I'm not asking you what it's based on.

John McKeegan

Page 142

1  I'm asking you what it says.
2        Is there anything -- can you
3  point to me a statement in this statement
4  on talcum powder that was being used by
5  you and J&J corporate in 2000 -- between
6  1998 and earlier and 2000, that reflects
7  any suggestion that the FDA had concern
8  about the risk?
9        MS. FRAZIER:  Objection to
10      form.  Foundation.
11 BY MR. TISI:
12      Q.   And if your answer is yes,
13 I'd like you to tell me where it says
14 that.
15      MS. FRAZIER:  Objection to
16      form.  Foundation.
17      THE WITNESS:  Our statement
18      would have been based on the best
19      available information that we had
20      to us from the Johnson & Johnson
21      experts who would have reviewed
22      these statements and provided any
23      input to us.
24 BY MR. TISI:

Page 143

1      Q.   That's not my question.  My
2  question is not what it's based on.  I'm
3  asking you what it says.
4        Would you agree with me that
5  this statement doesn't -- which refers to
6  the FDA, does not reflect any concern
7  that the FDA had about talc and ovarian
8  cancer and the science?
9        MS. FRAZIER:  Objection to
10      form.  Foundation.
11      THE WITNESS:  Our statement
12      would have been a statement from
13      Johnson & Johnson.  It would have
14      been a statement based on the best
15      information we had available to us
16      from the experts at Johnson &
17      Johnson.
18 BY MR. TISI:
19      Q.   Okay.  And it makes no
20 reference to the documents or the
21 communications that -- that we just
22 talked about, that the FDA continued to
23 have concerns, does it?
24      MS. FRAZIER:  Objection to

Page 144

1      form.  Foundation.
2        THE WITNESS:  It provides
3      the best information that we had
4      available to us from the experts
5      at Johnson & Johnson.
6  BY MR. TISI:
7      Q.   And so if the FDA -- if
8  you're referring to the FDA and the
9  workshop in this statement, you don't
10 think it's fair that -- that the media
11 and the public also needs to know that
12 the FDA continued to have concerns, you
13 don't think that that's necessary?
14      MS. FRAZIER:  Objection to
15      form.  Foundation.
16      THE WITNESS:  This again is
17      a statement from Johnson &
18      Johnson, based on the best
19      information that we had available
20      to us from Johnson & Johnson's
21      experts.
22 BY MR. TISI:
23      Q.   Sir, who were those experts?
24      A.   I can only go by what you

Page 145

1  are showing me in terms of the e-mails
2  that would have been coming from those
3  times.
4        So the people on those
5  e-mails presumably would have been --
6  included the experts who had helped to
7  develop this statement originally and who
8  would have been reviewing it after this.
9      Q.   Okay.  So that would have
10 been, among other people, the company
11 lawyer, right?
12      MS. FRAZIER:  Objection to
13      form.
14      THE WITNESS:  John
15      O'Shaughnessy is copied on these
16      for review, as well as other
17      people.
18 BY MR. TISI:
19      Q.   Okay.  And you saw, I showed
20 you, an e-mail where these other people
21 knew and understood that J -- the
22 company -- that the FDA still had concern
23 of the possibility of talc and ovarian
24 cancer even after the 1994 workshop

John McKeegan

Page 146

1 referred to in this document, true?
2         MS. FRAZIER:  Objection to
3     form.  Foundation.
4         THE WITNESS:  I was not at
5     J&J at that time.  And I have no
6     knowledge of that document.
7 BY MR. TISI:
8     Q.   I didn't ask you that
9 question.
10         I'm asking you, you reached
11 out to the people who did get that
12 document and they never told you that,
13 did they?
14         MS. FRAZIER:  Objection to
15     form.  Foundation.
16         THE WITNESS:  Any statements
17     that we would have made from
18     corporate communications would
19     have gone back to the experts for
20     their review, and if there was
21     changes to be made, they would
22     have provided that information
23     back to us.
24 BY MR. TISI:

Page 147

1     Q.   And they didn't do that, did
2 they?  They provided no --
3         MS. FRAZIER:  Objection to
4     form.
5 BY MR. TISI:
6     Q.   They provided no tweaks to
7 your corporate statement that would have
8 reflected that the FDA not only had
9 concerns, but they thought that
10 information gained since the 1994
11 workshop suggested a health hazard,
12 correct?
13         MS. FRAZIER:  Objection to
14     form.  Foundation.
15         THE WITNESS:  Based on what
16     you've shown me here, the
17     statement appears to be the same
18     from '98 through 2000.
19 BY MR. TISI:
20     Q.   And doesn't reflect the
21 documents that I showed you about the FDA
22 having concern about talc being a health
23 hazard.  True?
24         MS. FRAZIER:  Objection to

Page 148

1     form.  Foundation.
2         THE WITNESS:  I would have
3     no direct knowledge about what
4     information the Johnson & Johnson
5     experts would have used to
6     evaluate these statements.
7 BY MR. TISI:
8     Q.   Sir, I didn't ask you that.
9         I'm asking you as the guy
10 who provided these statements, spoke to
11 the press, who approved information for
12 the shareholders, who participated with
13 the CTFA on crafting their statement on
14 talc and ovarian cancer.  There is
15 nothing in any of the materials that we
16 reviewed that you were involved with that
17 reflect -- that reflected after the 1994
18 workshop the FDA continued to have
19 concerns, there is nothing, isn't there?
20         MS. FRAZIER:  Objection to
21     form.  Foundation.
22         THE WITNESS:  Johnson &
23     Johnson's experts, I'm sure, would
24     have been using a great many

Page 149

1     things in order to evaluate the
2     accuracy of the statements.  But I
3     would have no direct knowledge of
4     what they were being used to
5     evaluate.
6 BY MR. TISI:
7     Q.   But in any event, your media
8 statements to the media upon inquiry by
9 anybody would be talc is safe and the
10 workshop convened by the FDA in 1994
11 showed there was no connection.  True?
12         MS. FRAZIER:  Objection to
13     form.
14         THE WITNESS:  We had gone
15     through the statement several
16     times.  So the statement is what
17     the statement is.
18 BY MR. TISI:
19     Q.   Okay.  But you --
20     A.   And it doesn't appear to
21 have changed between '98 and 2000.
22     Q.   It sounds like you refuse to
23 say what the statement says.
24         The statement says that

John McKeegan

Page 150

1 there is no hazards to health that have
2 been demonstrated in connection with the
3 normal use of talc. True?
4          MS. FRAZIER: Objection to
5     form.
6          THE WITNESS: It says, "The
7     workshop concluded" --
8 BY MR. TISI:
9     Q. Right.
10    A. -- "no hazards to health has
11 been demonstrated in connection with the
12 normal use of cosmetic talc."
13    Q. And you saw -- we just
14 showed you three pieces of information,
15 including one that you got in real time
16 in 1998, that would suggest that the FDA
17 didn't agree with what the workshop
18 concluded, true?
19          MS. FRAZIER: Objection to
20     form. Foundation.
21          THE WITNESS: I would have
22     no direct knowledge about what the
23     FDA was considering or anything
24     like that --

Page 151

1 BY MR. TISI:
2     Q. I didn't ask you --
3     A. -- so I can't answer your
4 question.
5          MS. FRAZIER: Hey. Hey,
6     Chris, Chris, let's stop here.
7     You are badgering the witness.
8     He's told you --
9          MR. TISI: How?
10          MS. FRAZIER: He's told you
11     numerous times that he does not
12     have the background to be able to
13     interpret --
14          MR. TISI: Kat --
15          MS. FRAZIER: -- the
16     documents you're putting up and
17     trying to have him agree with you.
18     It's not going to happen.
19          MR. TISI: Kat, I'm not --
20     I'm not asking -- Kat, I am not
21     asking him to interpret --
22          MS. FRAZIER: You are asking
23     him to interpret the documents.
24          MR. TISI: I'm asking him

Page 152

1 whether -- I'm asking whether it's
2 there or not there. Okay? And
3 it's --
4          MS. FRAZIER: No, you're
5 asking him whether or not FDA had
6 concerns --
7          MR. TISI: All right. Let
8 me --
9          MS. FRAZIER: -- and showing
10 him the documents and trying to
11 get him to agree. That is not the
12 same thing.
13          MR. TISI: Let me -- okay.
14 Let me rephrase.
15          MS. FRAZIER: He does not
16 have that background. Move on.
17          MR. TISI: Let me rephrase
18 the statement.
19 BY MR. TISI:
20    Q. Okay. In this statement, is
21 there anything that would reflect what
22 the FDA believed after the 1994 workshop?
23          MS. FRAZIER: Objection to
24 form. Foundation.

Page 153

1          THE WITNESS: The statement
2 says that the workshop concluded
3 no hazards to health had been
4 demonstrated in connection with
5 the normal use of cosmetic talc.
6 BY MR. TISI:
7    Q. And it doesn't reflect any
8 information about what the FDA was doing
9 or telling the companies between 1994 and
10 2000?
11          MS. FRAZIER: Objection to
12 form. Foundation.
13          THE WITNESS: These
14 statements would have been
15 reviewed by experts at Johnson &
16 Johnson. If there was changes to
17 be made to these statements, I'm
18 sure they would have made them.
19 BY MR. TISI:
20    Q. And so you're refusing to
21 say whether the statement has any
22 information after 1994?
23          MS. FRAZIER: Objection to
24 form. Foundation.

Page 154

1        THE WITNESS:  I would have
2   no knowledge about anything that
3   would have happened after 1994.
4  BY MR. TISI:
5       Q.   I guess you --
6       A.   I started at Johnson &
7  Johnson in 1997.
8       Q.   I did not ask you whether
9  you had any information after 1994.  I'm
10 asking you whether this statement that
11 you would read or communicate to people,
12 has any information after 1994.  I'm not
13 asking what that information would have
14 been.  I'm asking you, is there any
15 reference to information between 1994 and
16 2000.
17       MS. FRAZIER:  Objection to
18   form.  Foundation.
19       We're getting into the same
20   territory, Chris.  You're heading
21   the same direction, asking him
22   about knowledge of what the FDA
23   thinks and what they are doing,
24   when he's already said a million

Page 155

1   times he doesn't have the
2   knowledge.
3       MR. TISI:  I'm not asking
4   that -- I am not asking that at
5   all, Kat, and you know it full
6   well.
7       MS. FRAZIER:  I can hear it
8   too.  I do know that.
9       MR. TISI:  I'm asking
10   whether --
11       MS. FRAZIER:  You are
12   badgering him.
13       MR. TISI:  I am asking --
14       MS. FRAZIER:  You're
15   bullying him and you're badgering
16   him.  You need to move on.
17       MR. TISI:  He's not
18   answering -- he is not answering
19   the question.
20       MS. FRAZIER:  He's -- he's
21   answering it to the best of his
22   ability.  Just because --
23       MR. TISI:  He is not.
24       MS. FRAZIER:  -- he's not

Page 156

1   giving you the sound bites you
2   want doesn't mean --
3       MR. TISI:  It's not a sound
4   bite --
5       MS. FRAZIER:  -- he should
6   answer it the way you want him to.
7       MR. TISI:  I think the sound
8   bite of him being evasive on this
9   question is better than if simply
10   asked the question -- answered the
11   question.
12       MS. FRAZIER:  No, no.
13   You're asking him to answer
14   something he has no knowledge of.
15  BY MR. TISI:
16       Q.   I'm asking is there any --
17  this is a statement that you would have
18  given to the media had a request been
19  given, correct?
20       A.   If a media request came in,
21  this appears to be what we were using
22  from 1998 through 2000, according to what
23  you have shown me.
24       Q.   And is there anything in

Page 157

1  here that refers to any information after
2  1994?
3       A.   I have no idea --
4       MS. FRAZIER:  Objection to
5   form.  Foundation.
6  BY MR. TISI:
7       Q.   Okay.
8       A.   I have no idea what people
9  who would have reviewed this would have
10 used in order to determine that this
11 statement was an accurate representation
12 of Johnson & Johnson, and the best
13 information that the corporation at its
14 disposal.
15       Q.   Now, I'm going to turn to --
16 change my -- to a different topic.
17       Number -- in your role you
18 became aware as an employee of J&J
19 corporate that the medical and scientific
20 community in this time frame, that there
21 was some that were suggesting that women
22 either be told of a potential risk, or
23 that they be -- it's suggested that they
24 not use talcum powder products or that

Page 158

1 the product even -- they switch to
2 cornstarch.  You aware of that?
3          MS. FRAZIER:  Objection to
4     form.
5          THE WITNESS:  I do recall
6     some articles about things like
7     that.
8          MR. TISI:  Let's go to
9     exhibit number -- Tab Number 48,
10    which is Exhibit 640.
11         (Document Marked for
12    identification as Exhibit
13    P1.640.)
14 BY MR. TISI:
15    Q.   Okay.  Is this an e-mail
16 from you to John O'Shaughnessy, the
17 company lawyer, again?
18    A.   It is to John O'Shaughnessy,
19 Catherine Murphy, Michael Chudkowski,
20 Nancy Musco, Gary Noble, and Jeff Leebaw.
21    Q.   And it reflects a
22 communication that you had with a media
23 outlet regarding talc and ovarian cancer,
24 and this is in February of 2000, correct?

Page 159

1          MS. FRAZIER:  Objection to
2     form.
3          THE WITNESS:  It looks like
4     it's an article from February 3rd
5     of 2000.
6 BY MR. TISI:
7    Q.   Okay.  And the article
8 begins on Page 2, and it concerns the
9 risk of ovarian cancer.
10         Do you see that?
11    A.   Yes.
12         MS. FRAZIER:  Objection to
13    form.
14 BY MR. TISI:
15    Q.   And underneath it says, "A
16 small but significant association between
17 the use of talc-containing products and
18 one of a kind ovarian cancer has emerged
19 from a long-term study Harvard Medical
20 School researchers report."
21         Do you see that?  First
22 paragraph?
23    A.   Yes, I see that.
24    Q.   In the second paragraph it

Page 160

1 says that there is an increase in
2 perineal talc use may increase the risk
3 of invasive serious ovarian cancer in
4 quotes.
5          Do you see that?
6          MS. FRAZIER:  Objection to
7     form.
8          THE WITNESS:  I see that.
9 BY MR. TISI:
10    Q.   And on the second page, the
11 first full paragraph it says women who
12 used talc had invasive cancer 1.4 times
13 larger -- higher than that of women who
14 never used it.  Do you see that?
15         I'm just asking you whether
16 you see it, sir.
17    A.   I'm reading the paragraph.
18 Sorry, Chris.
19    Q.   That's okay.
20    A.   I'm confused by this.
21         It says, "We did not observe
22 an overall association with the use of
23 talc and epithelial ovarian cancer.
24 There was also no elevation in risk among

Page 161

1 daily users of perineal talc."
2          And then it paraphrases,
3 "But women who used talc had a risk of
4 invasive cancer 1.4 times higher than
5 that of women who never used it."
6    Q.   Right.  So I -- I read that
7 statement in correctly, true?
8    A.   That's the statement that's
9 here, yes.
10    Q.   Okay.  And if you go to the
11 prior page, it was a recommendation by a
12 Dr. Cramer, do you see that?
13         And it's the same Dr. Cramer
14 we talked about in the article from 1999
15 where he says women who apply such
16 products to the perineal genital area to
17 avoid or reduce sweating, Cramer says.
18 "We're talking about an exposure that has
19 aesthetic benefits only, he says.  So for
20 people who say the relationship is not
21 strong enough to warrant a warning, I
22 come back and say, what's the benefit of
23 continued use?  My advice is, don't use
24 it?"

Page 162

1      Do you see that?
2      A.  I see that.
3      Q.   And then there's a back and
4  forth in this article where you and
5  Dr. Cramer kind of respond and they
6  summarize what you both said.
7      It says, "Cramer recommends
8  that women switch from products
9  containing talc to those with starch,
10  which he says have the same benefits and
11  carry no risks."
12      MR. TISI:  Next page please,
13  Dan.  Very bottom of the page.
14  Yeah.  Third paragraph up.
15  BY MR. TISI:
16      Q.   "Cramer recommends that
17  women switch from products containing
18  talc to those with starch, which he says
19  carry" -- "have the same benefits and
20  carry no risk."
21      Do you see that?
22      A.   Yes.
23      Q.   Okay.  And you respond by
24  saying, "John McKeegan, a spokesman for

Page 163

1  Johnson & Johnson, which makes the
2  talc-containing products, says the
3  company 'is taking a very close look at
4  the study.'"
5      A.   I see that.
6      Q.   And it says, What to do.  It
7  says, "It's your call.  Overall, the
8  study says, the risk is small.  But if
9  you use a talc product, ask yourself is
10  it worthwhile and whether another product
11  may do the trick."
12      Do you see that?
13      A.   It looks like it's
14  presumably from the author.
15      Q.   Correct.
16      So now my question is, would
17  you agree with me that, at least this is
18  consistent with what you told me before,
19  that there was some of the medical
20  community who were suggesting that women
21  be told of a potential risk, that they be
22  told not to use talc, and that they
23  switch to cornstarch?
24      MS. FRAZIER:  Objection to

Page 164

1  form.
2      THE WITNESS:  I'm aware that
3  those statements were being made.
4  BY MR. TISI:
5      Q.   Okay.
6      THE WITNESS:  Can we take a
7  break?
8      MR. TISI:  I'm sorry?
9      THE WITNESS:  Can we take a
10  break?
11      MR. TISI:  Absolutely.
12      THE VIDEOGRAPHER:  The time
13  is 12:44 p.m.  Off the record.
14          - - -
15      (Whereupon, a luncheon
16  recess was taken.)
17          - - -
18      THE VIDEOGRAPHER:  The time
19  is 1:02 p.m.  We're on the record.
20  BY MR. TISI:
21      Q.   So, Mr. McKeegan, let's see
22  if we can kind of summarize where we were
23  just before we took the break, and then
24  hopefully complete this deposition in the

Page 165

1  most efficient way that we can.
2      Before the deposition --
3  before the break, I asked you some
4  questions about whether or not at the
5  time you were the PR -- involved in PR
6  for J&J corporate, you were aware of
7  recommendations that had been floated in
8  the press, in the medical community,
9  about either warning women, instructing
10  women not to use talcum powder, or
11  perhaps switching to cornstarch or even
12  replacing cornstarch.
13      Do you remember that
14  testimony?
15      A.   I do.
16      MS. FRAZIER:  Objection to
17  form.
18  BY MR. TISI:
19      Q.   And we showed you an
20  example, Exhibit Number 640, which is an
21  article that you commented on that
22  discussed some of those things, correct?
23      A.   Yes.
24      MS. FRAZIER:  Objection to

Page 166

¹      form.
² BY MR. TISI:
³      Q.   Okay.  I'd like to show you
⁴ Tab 11 which is a document, it's Exhibit
⁵ Number 603.  It's an e-mail from
⁶ Ms. Malbin at CTFA, to, among other
⁷ people, yourself, dated December 7th.
⁸      (Document marked for
⁹      identification as Exhibit
¹⁰      P1.603.)
¹¹ BY MR. TISI:
¹²      Q.   Do you see that?
¹³      A.   Yes.
¹⁴      Q.   And this is an e-mail to you
¹⁵ and Ms. Colamarino at Consumer Products,
¹⁶ as well as other people in different
¹⁷ companies that fall under the PCPC or
¹⁸ CTFA umbrella, correct?
¹⁹      A.   Yes.
²⁰      Q.   Luzenac, Avon, Unilever,
²¹ L'Oreal, et cetera.  Is that true?
²²      A.   Yeah, apparently also
²³ Bristol-Myers Squibb is on this.
²⁴      Q.   Correct.

Page 167

¹      The point being -- the point
² being this was distributed to those
³ members of CTFA that were involved in
⁴ talc issues, correct?
⁵      MS. FRAZIER:  Objection to
⁶      form.
⁷      THE WITNESS:  I haven't read
⁸      this yet so I will take what you
⁹      say about it.
¹⁰ BY MR. TISI:
¹¹      Q.   Okay.  Well, the subject
¹² matter is talc
¹³ assessment/Nichols-Dezenhall.
¹⁴      A.   Okay, yes.
¹⁵      Q.   Okay.  And it says, "I think
¹⁶ you will fine" -- I think that means
¹⁷ find -- "the Nichols-Dezenhall assessment
¹⁸ of the talc 'landscape' very helpful and
¹⁹ informative.  Irene."
²⁰      Do you see that?
²¹      A.   Yes.
²²      Q.   And just for context, this
²³ is on the eve of -- and we'll talk about
²⁴ this in a moment.  In mid December 2000

Page 168

¹ there was a meeting of what was called
² the National Toxicology Program which was
³ considering listing talc as a possible
⁴ human carcinogen, correct?
⁵      A.   I believe --
⁶      MS. FRAZIER:  Objection to
⁷      form.
⁸      THE WITNESS:  I believe it
⁹      was not possible but potential,
¹⁰      was the -- is the correct thing,
¹¹      but it's been a while.
¹² BY MR. TISI:
¹³      Q.   I think the word is
¹⁴ "reasonably expected."  But we'll talk
¹⁵ about that in a moment.
¹⁶      But in any event, this is
¹⁷ December 7th.  And I believe that meeting
¹⁸ was the 13th or 14th of December, so this
¹⁹ would have been before that, true?
²⁰      A.   Yes.
²¹      MS. FRAZIER:  Objection to
²²      form.
²³ BY MR. TISI:
²⁴      Q.   All right.  So -- and CTFA,

Page 169

¹ you were aware were -- was involved in
² preparing for that meeting in mid
³ December of 2020 (sic), correct?
⁴      MS. FRAZIER:  Objection to
⁵      form.
⁶      THE WITNESS:  It -- I'm kind
⁷      of reading this as we're
⁸      discussing, so I'm --
⁹ BY MR. TISI:
¹⁰      Q.   Yeah, I'm sorry, maybe --
¹¹ maybe -- you can read it certainly for
¹² sure, but I'm just trying to set the
¹³ table as to where this kind of fits in in
¹⁴ the -- kind of the constellation of what
¹⁵ we are talking about here, right?
¹⁶      So this document was sent to
¹⁷ you and others on -- as the National
¹⁸ Toxicology Program was considering --
¹⁹ whatever question you were considering,
²⁰ we'll get the exact language in a moment,
²¹ about talc and ovarian cancer.
²²      A.   That sounds right.
²³      MS. FRAZIER:  Objection to
²⁴      form.

Page 170

BY MR. TISI:

Q.   All right.  And it's dated December 7, 2000, and it kind of tries to summarize the kinds of things that were, at that point, being said, the landscape, do you see that?

A.   Yes.

Q.   Okay.  And for example, and it talks about -- and you can certainly read it for sure, but I'm going to pick you out some things and ask you some questions.

But it's consistent with what you told me before, that at the time in 2000, there were various suggestions about what to do to protect women prophylactically on the possibility or probability, or however you want to characterize it, of talc and ovarian cancer.

And it includes the kinds of things we have been talking about.  Switching to cornstarch.  Warnings.  Instructions.  Those kinds of things.

Page 171

True?

MS. FRAZIER:  Objection to form.  Foundation.

THE WITNESS:  There were discussions along those lines, I'm sure.

BY MR. TISI:

Q.   Okay.  So for example, the first one is a doctor who we've been talking about periodically, is Dr. Cramer, Harvard professor of obstetrics and gynecology, member of the research team whose study appeared in the 2/1/2000 issue of the National Cancer Institute, recommends that women switch from talc to cornstarch.  Do you see that?

A.   I see that.

Q.   All right.  The advocacy community, if you go down three or four, it says the American Cancer Society, "Website states, 'Until additional information is available, women may wish to consider avoiding these products or

Page 172

substituting cornstarch-based products that contain no talc.'"

Do you see that?

A.   I see that.

Q.   Okay.  And it says -- and referring to the study, I think, that we were talking about before in the article that you commented on, it says, "The most recent publication on this topic, a prospective study (considered to generally be the most informative) found no effect on ovarian cancer overall but a 40 percent increase ... in one type, invasive serous cancer."

Do you see that?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I see that.

BY MR. TISI:

Q.   Okay.  And let's -- on the next page it says the Colorado Ovarian Cancer Resource at the very top of the page.  It says, "Several studies have examined the relationship between talcum

Page 173

powder and cancer of the ovary.  Findings are mixed, with some studies reporting a slightly increased risk and some reporting no association.  Until additional information is available, women may wish to consider avoiding these products or substituting cornstarch-based powders with no talc."

Do you see that?

A.   I see that.

MS. FRAZIER:  Objection to form.

BY MR. TISI:

Q.   Okay.  The Gilda Radner Familial Ovarian Cancer Registry.  "The website states, 'The following things may increase your chances of getting ovarian cancer.'"

And it lists use of talcum powder on the genital area.  Do you see that?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I see that.

Page 174

BY MR. TISI:

Q.    Okay.  But the point being, and I think we agreed before, that these are the kinds of things that were being actively discussed in a community that at least you were aware of at the time, correct?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I'm not aware of these things specifically.  But I was aware of the general issues.

BY MR. TISI:

Q.    Okay.  Okay.  So -- okay.

MR. TISI:  Let's put that document aside for a moment.

BY MR. TISI:

Q.    And let's talk about the NTP, which is the National Toxicology Program that we mentioned before that was -- there was a meeting in mid December in 2000 -- in 2000.  Do you recall that?

A.    I recall the meeting.  I

Page 175

don't recall the date.

Q.    Okay.  We'll find that out in a moment.  I think -- I think you'll find it is the 13th or 14th of December.

But this was something that -- as -- and we'll look at documents.

But, generally speaking, you understood that the National Toxicology Program, talc had been nominated by the national -- nominated, that was a substance that was reasonably anticipated to be a human carcinogen.  Do you remember that?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I recall that they were going to be evaluating that question.

BY MR. TISI:

Q.    Okay.  And that was something that both J&J corporate and the talc industry through the CTFA were concerned about, true?

Page 176

MS. FRAZIER:  Objection to form.  Foundation.

THE WITNESS:  That is -- you know, it would have been a true statement.

BY MR. TISI:

Q.    And -- just give me a second.  I apologize.  Having a document issue.

MR. TISI:  Would you go to Tab 71.

(Document marked for identification as Exhibit P1.663.)

BY MR. TISI:

Q.    And this is 6 -- P1.663.1.

Okay.  Now this is an e-mail from a person by the name of Owen Rankin at Consumer Products dated November 17, 2000, to among other people, Sarah Colamarino who was the PR person at Consumer Products and John McKeegan who was the media person for corporate. True?

Page 177

A.    Among other people, yes.

Q.    Okay.  Among other people, including John O'Shaughnessy, the company lawyer, true?

MS. FRAZIER:  Objection to form.

THE WITNESS:  John O'Shaughnessy is -- John O'Shaughnessy is there.  John Crisan is there.  Colleen Goggins.  Someone named Fritz Grutzner --

BY MR. TISI:

Q.    Colleen Goggins -- Colleen Goggins was a high ranking executive within the company?

A.    I believe -- and I could be wrong -- but I believe at this time she was the executive in charge of all -- the entire consumer products group of companies worldwide.

Q.    Okay.  And you aware at one point Ms. Goggins was kind of in line to become chairman of the board of J&J?

MS. FRAZIER:  Objection to

Page 178

¹ form.
²        THE WITNESS:  I am not aware
³ of that.
⁴ BY MR. TISI:
⁵        Q.   All right.  So in the -- in
⁶ this e-mail, it says, "Attached is an
⁷ agenda background document for Monday's
⁸ discussion on talc.  Please review the
⁹ backgrounder before the meeting."
¹⁰        Do you see that?
¹¹        A.   Yes.  I see that.
¹²        Q.   And this refers -- and one
¹³ of the things I'm going to try to do is
¹⁴ try to keep track of dates here because I
¹⁵ think for this next series of questions,
¹⁶ dates may matter.
¹⁷        So this is an e-mail dated
¹⁸ November 17th, and it's circulating a
¹⁹ background document for a meeting of
²⁰ these corporate officials for both J&J
²¹ corporate and J&J Consumer Products, that
²² was going to occur on Monday, the 20th of
²³ November.
²⁴        Is that correct?

Page 179

¹        A.   I see that, yes.
²        Q.   If you go to the next page,
³ there was an agenda.  And the agenda
⁴ would be "Background on NTP," which is
⁵ something you were going to be presenting
⁶ on.
⁷        Do you see that?
⁸        A.   I see that.
⁹        Q.   Okay.  And at the very
¹⁰ bottom, Number 5, is a U.S. Positioning
¹¹ Statement by Sarah Colamarino who is your
¹² counterpart at Consumer Products.
¹³        A.   I see that.
¹⁴        Q.   Okay.  So both you and
¹⁵ Ms. Colamarino were both going to be
¹⁶ presenting both on the background of the
¹⁷ NTP and what the positioning would be
¹⁸ about talc and -- talc issues, correct?
¹⁹        MS. FRAZIER:  Objection to
²⁰ form.
²¹        THE WITNESS:  According to
²² this agenda, I was presenting on
²³ the background of the National
²⁴ Toxicology Program, and I don't

Page 180

¹ know what U.S. Positioning
² Statement is, but that's what
³ Sarah is down as.
⁴ BY MR. TISI:
⁵        Q.   We'll certainly be talking
⁶ about that in a moment.
⁷        The next page is a
⁸ background on the National Toxicology
⁹ Program, which is the topic you were
¹⁰ presenting on.  Do you see that?
¹¹        A.   I see that.
¹²        Q.   It says, if you go down
¹³ to the middle of the page, and this is why I
¹⁴ said we're going to get into what they
¹⁵ exactly were considering, the NTP.
¹⁶        "The Report groups entries
¹⁷ in two categories:
¹⁸        "Known to be a human
¹⁹ carcinogen."
²⁰        And, "Reasonably anticipated
²¹ to be a human carcinogen."
²²        And, "Talc is under
²³ consideration for the latter category
²⁴ based on inhalation studies and perineal

Page 181

¹ use studies," correct?
²        A.   That is what the document
³ says, yes.
⁴        Q.   Okay.  And it says talc --
⁵ when we say perineal use, we're talking
⁶ about for feminine hygiene correct?
⁷        MS. FRAZIER:  Objection to
⁸ form.
⁹        THE WITNESS:  I actually
¹⁰ have no idea.
¹¹ BY MR. TISI:
¹²        Q.   Okay.  Well, we'll talk
¹³ about that in a minute.
¹⁴        And it says -- it says, if
¹⁵ you go down to the bottom, the "NTP Board
¹⁶ of Scientific Counselors, Report on
¹⁷ Carcinogens Subcommittee" was being held
¹⁸ on December 14th, 15th, and 16th in
¹⁹ Washington D.C.
²⁰        MS. FRAZIER:  Chris, you got
²¹ the dates wrong.  Not that it
²² matters, but --
²³        MR. TISI:  13th, 14th, and
²⁴ 15th, excuse me.  I apologize.

Page 182

1      THE WITNESS:  I see that.
2  BY MR. TISI:
3      Q.   Okay.  So we asked before
4  whether or not there was -- the meeting
5  was scheduled for mid December and we
6  have three dates here, 13, 14, and 15.
7          Would you agree, because
8  this would have been the topic you were
9  presenting on, that would have been the
10 time frame?
11         MS. FRAZIER:  Objection to
12     form.
13         THE WITNESS:  That
14     appears -- that -- it looks like
15     the dates, according to this
16     document, yes.
17 BY MR. TISI:
18     Q.   And on the back page, it
19 indicates the Impact Report on
20 Carcinogens.
21         Actually the brief summary
22 of the scientific data is below, do you
23 see that?
24     A.   Yes.

Page 183

1      Q.   And you'll see again, if you
2  look at the second -- feel free to read
3  it if you -- if you want.
4          It talks about the 1974
5  (sic) panel review co-sponsored by the
6  FDA?
7      A.   Yes, I see that.
8      Q.   It doesn't -- it doesn't
9  talk at all about the FDA's evolving
10 position since 1994 that we talked about
11 before the break, does it?
12         MS. FRAZIER:  Objection to
13     form.  Foundation.
14         THE WITNESS:  This only
15     appears to be talking about the
16     unanimous conclusion after the
17     1994 panel review.
18 BY MR. TISI:
19     Q.   Okay.  So it doesn't include
20 for example -- I showed you a document
21 from 1998 where the FDA had concluded
22 that -- that information since the
23 meeting indicated that talc was a
24 potential health hazard, it doesn't

Page 184

1  include that information, does it?
2          MS. FRAZIER:  Objection to
3      form.  Foundation.
4          THE WITNESS:  It does talk
5      in the last paragraph there of the
6      2000 -- February 2000 study.
7  BY MR. TISI:
8      Q.   Right.
9      A.   And the modest elevation of
10 risk for ever talc use.
11     Q.   Okay.  All right.  And so --
12 and so it was, just to kind of capsulize
13 where we are right now.
14         This is -- you were
15 preparing for a meeting of
16 representatives of both J&J corporate and
17 J&J Consumer Products on the 20th of
18 November for an NTP meeting that was
19 happening in mid December.  True?
20         MS. FRAZIER:  Objection to
21     form.
22         THE WITNESS:  That appears
23     to be the timeline.
24 BY MR. TISI:

Page 185

1      Q.   Okay.  And among other
2  things, there was going to be a
3  presenting by Ms. Colamarino a
4  position -- U.S. positioning statement.
5          MS. FRAZIER:  Objection to
6      form.
7  BY MR. TISI:
8      Q.   Correct?
9      A.   That is according to the
10 agenda.
11         Can I ask who wrote this
12 background on the National Toxicology
13 Program?  I don't remember ever
14 writing this --
15     Q.   I don't know.  But it
16 says -- it says you were actually
17 presenting on the question.
18     A.   Right, but I don't ever
19 remember writing this.
20     Q.   Okay.  I understand.  But
21 you are -- it says this is something you
22 were prepared to present, right?
23     A.   That's what the agenda says,
24 yeah.  I don't remember writing this

John McKeegan

Page 186

1 document at all.
2     Q.    And attached -- and attached
3 is a document that says background on the
4 National Toxicology Program, right?
5     A.    This may have been provided
6 by somebody else.  I don't remember ever
7 writing it.
8     Q.    Okay.  But in any event,
9 whether you wrote it or not, this was
10 part of your -- this was part of the
11 topic upon which you were presenting to
12 senior executives at both J&J corporate
13 and Consumer Products, true?
14          MS. FRAZIER:  Objection to
15     form.
16          THE WITNESS:  I actually
17     don't have any memory about what I
18     would have used to discuss about
19     it.  I don't know that I would
20     have been using this, because my
21     role was more about answering
22     questions from the media.
23 BY MR. TISI:
24     Q.    Well, at least --

Page 187

1     A.    I don't know who wrote this.
2     Q.    Well, at least the agenda
3 indicates you were tasked with that,
4 right?
5          MS. FRAZIER:  Objection to
6     form.
7          THE WITNESS:  The agenda
8     says I would be talking about this
9     in general.  But I don't know
10     exactly what I would have been
11     talking about for National
12     Toxicology Program.
13 BY MR. TISI:
14     Q.    And before the meeting the
15 background on the National Toxicology
16 Program, the topic on -- upon which were
17 you presenting, was circulated to you on
18 that Friday before the Monday meeting?
19     A.    Oh, did this come from Owen
20 Rankin?
21     Q.    I'm asking you -- yes, we
22 just discussed that.  An e-mail from Owen
23 Rankin attaches "the agenda and a
24 background document for Monday's

Page 188

1 discussion on talc.  Please review the
2 backgrounder before the meeting."
3     A.    Okay.  So I did not write
4 this.  But this is being provided as
5 background.
6     Q.    I don't know whether you --
7 John.  Mr. McKeegan, I don't know whether
8 or not you wrote it or not.
9          I'm asking you whether this
10 was a topic that you were assigned to
11 discuss at a meeting of --
12          MS. FRAZIER:  Hey, Chris,
13     he's trying to understand the
14     document.  Let him get his feel
15     for the document.  You're kind of
16     arguing with him before he can
17     even --
18          MR. TISI:  I'm not arguing
19     with him.
20          MS. FRAZIER:  -- put it in
21     context.
22          MR. TISI:  I think he's
23     anticipating my questions, and
24     candidly, he's had three,

Page 189

1 four months since his last
2 deposition to review documents,
3 and he clearly didn't do it.
4          MS. FRAZIER:  Chris, Chris,
5     you know that that's not his duty
6     to get up to speed on everything.
7     He's been gone from the company
8     for 20 years --
9          MR. TISI:  So refresh --
10          MS. FRAZIER:  He's moved
11     on --
12          MR. TISI:  So you prep
13     him --
14          MS. FRAZIER:  He is not
15     working for J&J.  That is not his
16     job.
17          MR. TISI:  So when you
18     prepare him, you show him
19     documents.  But we won't -- we
20     won't go there.
21 BY MR. TISI:
22     Q.    Okay.  I'm not going to fuss
23 with you, doctor -- Mr. McKeegan, here.
24          The truth of the matter is,

John McKeegan

Page 190

1 just to again put it on a timeline. We
2 have Mr. Rankin at Consumer Products
3 sending you backgrounder information for
4 both -- with a talc agenda and a document
5 on the NTP background, on Friday,
6 November 17th, for a meeting of what we
7 both agree are high officials within J&J
8 and -- corporate and J&J Consumer
9 Products that were meeting on Monday for
10 talc. True?
11      MS. FRAZIER: Objection to
12   form.
13      THE WITNESS: That appears
14   to be what is in this e-mail, yes.
15 BY MR. TISI:
16   Q.   Okay. And this was in
17 anticipation of an NTP meeting in mid
18 December where the scientific advisors
19 were going to answer the question of
20 whether or not in their view, looking at
21 all the evidence, talc was, according to
22 the backgrounder, reasonably anticipated
23 to be a human carcinogen.
24      MS. FRAZIER: Objection to

Page 191

1      form.
2      THE WITNESS: That is
3   correct according to the
4   documents, yes.
5 BY MR. TISI:
6   Q.   Okay. So this meeting was
7 occurring somewhere in the range of three
8 to four weeks before the meeting of the
9 NTP, right?
10      MS. FRAZIER: Objection to
11   form.
12      THE WITNESS: That appears
13   to be the correct timeline.
14 BY MR. TISI:
15   Q.   Okay. Now let's -- let's
16 back up the timeline a bit.
17      MR. TISI: Please go to
18   Tab 66, Exhibit 658.
19      (Document Marked for
20   identification as Exhibit
21   P1.658.)
22 BY MR. TISI:
23   Q.   Okay. This is an e-mail --
24 actually an e-mail string before the

Page 192

1 meeting on the 20th, dating November --
2 it's dated November 9th, actually. It's
3 an e-mail from Kate Triggs at
4 Branston-Marsettler, which is a public
5 relations firm, correct?
6   A.   Burson-Marsteller.
7   Q.   Burson. Yes. They are a
8 public relations firm, right?
9   A.   That is correct.
10   Q.   Fair enough. And it's an
11 e-mail from the public relations firm --
12 and they are involved in things like
13 crisis management, those kinds of things
14 for companies, correct?
15      MS. FRAZIER: Objection to
16   form. Foundation.
17      THE WITNESS: That is, I
18   believe, one of the things that
19   Burson-Marsteller was known for.
20   I don't know what else they were
21   doing.
22 BY MR. TISI:
23   Q.   Okay. And so you were
24 meeting with these public relations

Page 193

1 crisis management people, and they
2 provided -- they actually had a telephone
3 call with you and Ms. Colamarino on the
4 8th, correct?
5      And if we go to the second
6 page of the document, there's an e-mail
7 to Sarah Colamarino, Owen Rankin, and
8 John McKeegan. Do you see that?
9   A.   Yes.
10   Q.   It's dated November 9th. Re
11 the talc issue.
12      "Further to our conference
13 call on November 8th."
14      Do you see that?
15   A.   I do see that.
16   Q.   Okay. And who was Owen
17 Rankin, by the way?
18   A.   I think Owen was the head of
19 the consumer products companies in the
20 U.S. at this time.
21   Q.   And so, you, the public
22 relations person for J&J corporate, Sarah
23 Colamarino, the head of public relations
24 for Consumer Products, and Owen Rankin

Page 194

1 who was the head of consumer products
2 were meeting with Burson-Marsteller, who
3 is involved in crisis management, on
4 November 8th, and this memo was
5 November 9th regarding talc.  True?
6       A.   I'm just trying to
7 double-check.  You said our conference
8 call itself was on the 8th?
9       Q.   Well, it says, "Further to
10 our conference call on November 8th" --
11 "November 8th," correct?
12       A.   Yes, that's true.  I missed
13 that, sorry.
14       Q.   Okay.  And "we've developed
15 the following documents."
16            So the documents that are
17 attached here are developed by this
18 crisis management public relations firm
19 after having spoken to the head of
20 consumer products, the PR person at
21 consumer products, and the PR person for
22 corporate.  True?
23            MS. FRAZIER:  Objection to
24       form.

Page 195

1            THE WITNESS:  That is true.
2 BY MR. TISI:
3       Q.   Okay.  And there are three
4 things that are attached:
5            "A positioning brief for
6 discussion with senior management.
7            "A summary document for
8 quick briefing."
9            And, "A draft holding
10 statement for use in the U.S."
11       A.   I see that.
12       Q.   Okay.  So the positioning
13 brief was for discussion with senior
14 management.  True?
15       A.   I see that.
16       Q.   Okay.  And, in fact, as we
17 just outlined before, Owen Rankin sent
18 you an e-mail on the 17th, a week later,
19 for a meeting on the 20th with senior
20 management, true?
21            MS. FRAZIER:  Objection to
22       form.
23            THE WITNESS:  I don't know
24       who the meeting on the 20th was

Page 196

1            with.  I don't --
2 BY MR. TISI:
3       Q.   Well, let's again go back to
4 Exhibit 663, if we could.  It's Tab 71.
5            And this is for a meeting on
6 Monday regarding talc, right?
7       A.   So you're talking about
8 Colleen Goggins as being senior
9 management?
10       Q.   Well, I mean, you said Owen
11 Rankin was the head of consumer products,
12 right?  John Mc -- I mean, these are
13 senior people, right?
14       A.   I remember Colleen.  I
15 remember Owen.  I remember Sarah.  And I
16 don't know that I remember the rest of
17 these people.
18       Q.   Okay.
19       A.   So that's why I'm asking.
20       Q.   Okay.  But these are -- the
21 ones that you know are senior people,
22 true?
23       A.   That's true.
24       Q.   Okay.  And if you notice,

Page 197

1 again, going to the second page of this
2 document, there was going to be a
3 presentation of a positioning statement
4 by Sarah Colamarino.
5       A.   That is what the agenda
6 says.
7       Q.   Okay.  So now if you go back
8 to the e-mail that we were talking about
9 with Burson-Marstettler from November
10 9th --
11       A.   Burson.
12       Q.   Burson.  I mean I'm going to
13 mispronounce it every time.
14            From Burson-Marsteller on
15 November 9th, they include a positioning
16 brief to aid in discussion with senior
17 management.
18       A.   Okay.
19       Q.   All right.
20       A.   I see that.
21       Q.   And on the agenda for the
22 meeting on the 20th is Sarah Colamarino
23 discussing a positioning brief, right?
24            MS. FRAZIER:  Objection to

Page 198

¹    form.
² BY MR. TISI:
³    Q.   Am I correct?  There -- that
⁴ is on the agenda, right?
⁵    A.   For the 20th meeting.
⁶    Q.   Correct.
⁷    A.   Yes.
⁸         MS. FRAZIER:  Same
⁹    objection.
¹⁰ BY MR. TISI:
¹¹    Q.   And Sarah Colamarino then
¹² forwards this document and she says,
¹³ "Here is the current thinking."
¹⁴         Do you see that?
¹⁵    A.   I see that e-mail.
¹⁶    Q.   And so, just kind of again
¹⁷ to set the table, okay, you met with the
¹⁸ crisis management team at
¹⁹ Burson-Marsteller on the 8th of November.
²⁰ As a result of those discussions, they
²¹ developed and sent to you, among other
²² things, a position paper to discuss with
²³ senior management.  So far so good,
²⁴ right?

Page 199

¹         MS. FRAZIER:  Objection to
²    form.
³         THE WITNESS:  I see that in
⁴    this e-mail, yes.
⁵ BY MR. TISI:
⁶    Q.   Okay.  A week later on the
⁷ 17th an agenda is circulated for a
⁸ meeting on the 20th with, among other
⁹ things, a presentation about a
¹⁰ positioning brief to senior management,
¹¹ correct?
¹²    A.   I saw that.
¹³         MS. FRAZIER:  Objection to
¹⁴    form.
¹⁵ BY MR. TISI:
¹⁶    Q.   Okay.  So let's kind of --
¹⁷ and this document says -- and this was in
¹⁸ anticipation of a meeting of the NTP in
¹⁹ mid December, I think we said the 13th,
²⁰ 14th, and 15th, correct?
²¹    A.   I believe that is correct.
²²    Q.   Okay.  So what we have here,
²³ and the statement by Ms. Colamarino is
²⁴ that the information that was being

Page 200

¹ forwarded to Consumer Products, this
² Nancy Musco, reflects the current
³ thinking, right?
⁴         MS. FRAZIER:  Objection to
⁵    form.  Foundation.
⁶         THE WITNESS:  I see that in
⁷    the e-mail.
⁸ BY MR. TISI:
⁹    Q.   Okay.  All right.  So let's
¹⁰ talk about what is in this position
¹¹ statement.
¹²         What is a positioning --
¹³ actually, let's -- let's -- let me back
¹⁴ up for a minute.
¹⁵         If you go to Page 3 of the
¹⁶ document, it includes Johnson & Johnson
¹⁷ Consumer NTP talc positioning brief.  See
¹⁸ that?
¹⁹    A.   I see that.
²⁰    Q.   It starts out by saying, "A
²¹ controversy" -- and again, this was
²² developed after speaking to you and
²³ Ms. Colamarino and Mr. Owen on the 8th,
²⁴ right?

Page 201

¹         MS. FRAZIER:  Objection to
²    form.
³ BY MR. TISI:
⁴    Q.   That's what the document
⁵ says --
⁶    A.   It appears to be the dates,
⁷ yes.
⁸    Q.   Okay.  So they didn't send
⁹ you this out of the blue.  They sent you
¹⁰ this after actually speaking to you,
¹¹ right?
¹²         MS. FRAZIER:  Objection to
¹³    form.
¹⁴         THE WITNESS:  That appears
¹⁵    to be the timeline.
¹⁶ BY MR. TISI:
¹⁷    Q.   Okay.  And so now there is a
¹⁸ background.  "A controversy surrounding
¹⁹ talc has arisen in connection with a
²⁰ review of the National Toxicology
²¹ Program, a program within the U.S.
²² Department of Health & Human Services.
²³ The NTP has added talc to its list of
²⁴ Carcinogenic Agents, Substances Or

John McKeegan

Page 202

1  Mixtures in a preliminary draft of its
2  Report on Carcinogens."
3          Okay.  And it goes on to say
4  this is the first step of a lengthy
5  review process.  Do you see that?
6      A.    I see that.
7      Q.    Again, this is in
8  anticipation of a meeting in mid
9  December, right?
10          MS. FRAZIER:  Objection to
11  form.  Foundation.
12          THE WITNESS:  That appears
13      to be the timeline, yes.
14  BY MR. TISI:
15      Q.    Okay.  Proposed Position.
16      "J&J believes that the
17  science shows talc is safe."
18          That's J&J's belief,
19  correct?
20      A.    That is being stated in this
21  draft positioning brief.
22      Q.    Well, it's not a draft
23  positioning brief.  It says positioning
24  brief.  Doesn't say draft.  It says a

Page 203

1  brief that is going to be discussed with
2  senior management, right?
3      A.    That means it's a draft.
4  Until it's approved, it's still a draft.
5      Q.    Okay.  But involved in this
6  is the head of consumer product, this
7  Mr. Owen, right?
8      A.    Yes.
9          MS. FRAZIER:  Objection to
10      form.
11  BY MR. TISI:
12      Q.    Okay.  And it says,
13  Controversy surrounding the product in
14  some markets may reflect our consumer's
15  peace of mind, right?
16      A.    "Affect our customer's peace
17  of mind."
18      Q.    Correct.  If I misstated, I
19  apologize.
20          "This in turn could impact
21  the commercial viability of the product
22  in that market."
23          Do you see that?
24      A.    I see that.

Page 204

1      Q.    Okay.  And so the proposal
2  is that "while we stand by the safety of
3  talc, J&J in the U.S. has made a decision
4  to switch manufacturing entirely to
5  cornstarch to ensure commercial viability
6  of its powder products and to ensure
7  consumer peace of mind."
8          It says, "This switch will
9  take place by December 1st, 2000."
10          Do you see that?
11      A.    I see that.
12      Q.    Okay.  It indicates, does it
13  not, that the switch would take place
14  that was being proposed by, among other
15  people, Mr. Owen, the head of consumer
16  products, the switch would take place
17  before the NTP ever considers the
18  question?
19          MS. FRAZIER:  Objection to
20      form.  Foundation.
21          THE WITNESS:  This appears
22      to be something that was being
23      floated as a potential action to
24      take.

Page 205

1  BY MR. TISI:
2      Q.    Okay.  And the switch would
3  take place, not as a contingency based
4  upon what the NTP decides to do in mid
5  December, but before we know what the NTP
6  was doing in mid December.  True?
7          MS. FRAZIER:  Objection to
8      form.  Foundation.
9          THE WITNESS:  That --
10  BY MR. TISI:
11      Q.    Well, just in terms -- just
12  in terms of the timeline, that would be
13  correct, true?
14      A.    That --
15          MS. FRAZIER:  Same
16      objection.
17          THE WITNESS:  That timeline
18      of December 1st, 2000 is listed as
19      a proposed position.
20          But I'm sure we'll get to
21      it, whether this was ever adopted.
22  BY MR. TISI:
23      Q.    Okay.  I understand.
24          So on the table by this

John McKeegan

Page 206

[1] time, by both you as the PR person, as
[2] the PR person for consumer products, and
[3] the head of consumer products, was that
[4] there would be a switch to cornstarch by
[5] December 1st, 2000, before the NTP makes
[6] a decision one way or the other, right?
[7]     A.   That is incorrect.
[8]         MS. FRAZIER:  Objection to
[9]     form.
[10] BY MR. TISI:
[11]     Q.   Why --
[12]     A.   Any decision about what they
[13] would do with the product was going to be
[14] specifically done by the company itself.
[15] It was -- certainly was not going to be
[16] anything in my position where I would
[17] be --
[18]     Q.   Understood.
[19]     A.   -- able to comment on that,
[20] whether that was a good thing to do or
[21] not.
[22]     Q.   Okay.
[23]     A.   I was only going to be
[24] involved in necessarily answering

Page 207

[1] questions to the media if we did do this,
[2] about why we did this.
[3]     Q.   Okay.  So again, I'm simply
[4] trying to get the timeline here.  So the
[5] timeline is this, and maybe you can
[6] follow me, so far.
[7]         We have a meeting between
[8] yourself, Sarah Colamarino, who is the
[9] head of public relations for the consumer
[10] products -- you were public relations for
[11] corporate, right?  And Mr. Owen, who was
[12] the head of consumer products.  And the
[13] crisis management group on the 8th.
[14]         True?
[15]         MS. FRAZIER:  Objection to
[16]     form.
[17]         THE WITNESS:  That is,
[18]     according to these documents, what
[19]     happened.
[20] BY MR. TISI:
[21]     Q.   Okay.  On the 9th, based
[22] upon what you discussed with the crisis
[23] management group, they develop a
[24] positioning brief for use with

Page 208

[1] discussions with senior management.
[2] That's what it says, right?
[3]     A.   That is what these documents
[4] say.
[5]     Q.   Okay.
[6]         MS. FRAZIER:  Objection to
[7]     form.  Late objection.
[8] BY MR. TISI:
[9]     Q.   And the positioning brief
[10] says that J&J -- the proposed position is
[11] that J&J has made a decision to switch
[12] manufacturing entirely to cornstarch to
[13] ensure the commercial viability of its
[14] powder products and ensure customer peace
[15] of mind, correct?
[16]     A.   That is incorrect.  That is
[17] a proposed position.
[18]     Q.   Correct.
[19]     A.   And it looks like it's being
[20] floated at that time.
[21]     Q.   With senior management.
[22]         MS. FRAZIER:  Objection to
[23]     form.
[24] BY MR. TISI:

Page 209

[1]     Q.   Right?
[2]     A.   Certainly it seems to be
[3] something that would have been under
[4] discussion at this November 20th date.
[5]     Q.   Okay.  And this is
[6] consistent with, and why I asked you the
[7] questions, with some of the other things
[8] that are being said outside the company
[9] by doctors like Dr. Cramer, et cetera,
[10] about switching to cornstarch, right?
[11]         MS. FRAZIER:  Objection to
[12]     form.
[13]         THE WITNESS:  No.
[14] BY MR. TISI:
[15]     Q.   Okay.
[16]     A.   This would be a positioning
[17] statement, because if the National
[18] Toxicology Program made a decision that
[19] said the use of talc was a -- I can't
[20] remember what we said the exact language
[21] is, but had the potential to cause
[22] cancer.
[23]     Q.   Okay.
[24]     A.   That would impact the

John McKeegan

Page 210

1 reputation of Johnson & Johnson as well
2 as the potential viability of these
3 products.
4        So what we were reading
5 here, it appears to be, you know, what we
6 should be looking at considering as a
7 potential business option, or at least,
8 you know, the business people doing it.
9    Q.   And for consumer's peace of
10 mind, right?
11   A.   Yes.
12   Q.   That's what it says.  Okay.
13 And the switch would take place before
14 the -- before the NTP even considers the
15 question.  True?
16   A.   That looks to be --
17        MS. FRAZIER:  Objection to
18   form.
19        THE WITNESS:  That looks to
20   be what the proposal was that this
21   action take place before the NTP
22   made any evaluation.
23 BY MR. TISI:
24   Q.   Now, if you look at the next

Page 211

1 page, it's the NTP talc Johnson & Johnson
2 Consumer.
3        It says, "A draft report,"
4 the second paragraph, "is to be presented
5 on the 13, 14 of December to the NTP
6 Board of Scientific Counselors, report
7 on" -- the Report on Carcinogens
8 Committee.
9        Do you see that?
10   A.   I see that.
11   Q.   So again, you know, in our
12 time frame here, the proposed switch to
13 cornstarch would be made for, among other
14 things, consumer peace of mind, the
15 proposal was made for it to be done
16 before the NTP ever takes up the
17 question, the Board of Scientific
18 Counselors?
19        MS. FRAZIER:  Objection to
20   form.
21        THE WITNESS:  That appears
22   to be the timeline that we were
23   discussing.
24 BY MR. TISI:

Page 212

1    Q.   Okay.  And the draft holding
2 statement, which is the last page -- now
3 this is a draft.
4        The other document that we
5 looked at doesn't say it's a draft, does
6 it?
7    A.   No, but it's a positioning
8 statement.  And if it has not been
9 adopted by the company, then it is a
10 draft.
11   Q.   Okay.  This one says a
12 draft.  And it says, "This is a draft
13 holding statement which is prepared,"
14 which would be -- tell us what a holding
15 statement is.
16   A.   This would be a statement
17 that we would be providing to the media
18 anticipating that something could occur.
19   Q.   Okay.
20   A.   It would be just getting
21 everybody's thinking in line so that if
22 that thing does come to pass, then we are
23 ready to provide a statement to the
24 media.

Page 213

1    Q.   Okay.
2    A.   It's always done in advance.
3    Q.   Okay.  Right.  And so this
4 is, as a result of your communications
5 and the head of consumer products and the
6 people of -- you, on behalf of corporate,
7 and Sarah Colamarino, who is PR for
8 consumer products, as a result of your
9 discussions, the recommendation would be
10 to withdraw the product.  True?
11        MS. FRAZIER:  Objection to
12   form.
13        THE WITNESS:  I cannot say
14   that I would have been proposing
15   that, because that would not be my
16   position -- in my position as
17   somebody who would respond to
18   media, that would not be part of
19   my responsibilities.  That would
20   have to be the decision of the
21   consumer products companies
22   themselves.
23 BY MR. TISI:
24   Q.   Right.  But the consumer

Page 214

1 products companies were actually involved
2 in input in the information that resulted
3 in both the positioning document for use
4 with senior management, and the holding
5 statement, true?
6          MS. FRAZIER:  Objection to
7     form.
8          THE WITNESS:  We would be
9     there -- as public relations
10    people, we would be there to, you
11    know, talk about, you know, how
12    these actions would be perceived
13    in media.
14 BY MR. TISI:
15    Q.   Correct.  It's how to -- how
16 to present it in the most palatable way,
17 correct?
18    A.   It's how to portray it and
19 providing the best information that we
20 can to the public.
21    Q.   Okay.  But also involved in
22 drafting this holding statement was
23 Mr. Owen, who is the head of consumer
24 products, right?

Page 215

1          MS. FRAZIER:  Objection to
2     form.
3          THE WITNESS:  Mr. Rankin.
4 BY MR. TISI:
5    Q.   Mr. Rankin.  Owen Rankin.
6 Excuse me, I'm sorry.
7    A.   Drafting it, no.  Evaluating
8 it, yes.
9    Q.   Well, inputting to what
10 would go in -- in fact, just to be clear,
11 there was a meeting with the three of you
12 on the 8th.  Based upon the information
13 that was gleaned during that meeting,
14 Burson-Marsteller drafted these documents
15 and sent them on the 9th, right?
16    A.   That is correct.
17    Q.   All right.  So the
18 information -- I mean
19 Burson-Marsteller -- if it isn't your
20 job, it certainly isn't their job to talk
21 about withdrawing the product, is it?
22    A.   This was --
23          MS. FRAZIER:  Objection to
24     form.  Foundation.

Page 216

1          THE WITNESS:  This is a
2     proposed positioning and a
3     potential draft statement.
4          So they are providing a
5     suggestion to, I guess, Owen
6     Rankin and others as to how
7     something could potentially go.
8 BY MR. TISI:
9    Q.   Okay.
10    A.   So it is not that they've
11 made a decision.  They are making a
12 proposal.
13    Q.   I understand.
14          But again, when you say
15 they, okay, Burson-Marsteller are simply
16 trying to help you craft the document.
17 They are getting the information from the
18 head of consumer products, Mr. Rankin,
19 right?
20          MS. FRAZIER:  Objection to
21     form.  Foundation.
22          THE WITNESS:  They would
23     have had input and they would have
24     been drafting the document.  I

Page 217

1 believe that would be accurate.
2 BY MR. TISI:
3    Q.   Okay.  And this would be in
4 anticipation of a December 1st switch
5 from talc to cornstarch before the NTP
6 ever lays eyes on that report in mid
7 December, true?
8    A.   That is the proposal --
9          MS. FRAZIER:  Objection to
10     form.
11 BY MR. TISI:
12    Q.   Okay.  Let's go back further
13 in time.
14    A.   I'm sorry, I do need to take
15 a short break.  I -- you know, if we can
16 just do this in three minutes --
17          MR. TISI:  No, no, no.  Take
18     your break.  I'm going to work on
19     a new document --
20          THE WITNESS:  Okay.
21          MR. TISI:  -- that's totally
22     fine.  And this is -- we're
23     actually moving fast so I
24     appreciate that.  I've got two

Page 218

1   more pages left of my outline.  So
2   go ahead, take your -- do what you
3   need to do and we'll be right
4   back.
5           THE VIDEOGRAPHER:  The time
6   is 1:51 p.m.  Off the record.
7           (Short break.)
8           THE VIDEOGRAPHER:  The time
9   is 1:58 p.m.  On the record.
10  BY MR. TISI:
11      Q.   All right.  Mr. McKeegan, we
12  talked about, again, before the break,
13  just to kind of give a sense of where we
14  are, we talked about a meeting that was
15  occurring on the 20th with senior
16  management, and we talked about a
17  proposal that was drafted after
18  consulting you and Consumer Products,
19  Mr. Rankin, on the 8th and 9th.
20      I've looked in vain for any
21  documents relating to the meeting on the
22  20th.
23          Have you ever seen any
24  documents relating to the meeting, senior

Page 219

1   management meeting on the 20th where the
2   proposal was presented to withdraw talc?
3           MS. FRAZIER:  Objection to
4   form.
5           THE WITNESS:  I don't recall
6   any summary document of it.  And I
7   don't have any specific memory of
8   the meeting itself.
9   BY MR. TISI:
10      Q.   But an agenda on that
11  meeting was -- we agreed the presenting
12  of this position to senior management for
13  a decision, correct?
14          MS. FRAZIER:  Objection to
15  form.
16          THE WITNESS:  I presume that
17  Sarah was presenting this
18  document, but I don't remember the
19  specifics of what the -- occurred
20  at this meeting.
21  BY MR. TISI:
22      Q.   Okay.  In any event, we know
23  that talc was not withdrawn and replaced
24  with cornstarch, correct?

Page 220

1       A.   I believe that's true, yes.
2       Q.   Okay.  Let's go back in
3   time, even before you met with
4   Burson-Marsteller on the 8th.
5           I'd like to go to late
6   October of 2000.
7           MR. TISI:  If you would go
8   to Tab 34 in your binder.
9           (Document marked for
10  identification as Exhibit
11  P1.626.)
12  BY MR. TISI:
13      Q.   This is a document from the
14  CFTA, which again for the members of the
15  jury, is the trade organization
16  representing all of the member talc
17  manufacturers, right?
18          MS. FRAZIER:  Objection to
19  form.  Foundation.
20          THE WITNESS:  I don't -- I
21  couldn't tell you if all the talc
22  manufacturers were part of this
23  organization.  But it does -- it
24  is a representation and

Page 221

1   association that was involved with
2   many consumer products companies,
3   including Johnson & Johnson.
4   BY MR. TISI:
5       Q.   Okay.  And including -- and
6   specifically they were involved with
7   dealing with the talc issue on behalf of
8   not just J&J, but other companies who
9   produced talcum powder products as well,
10  true?
11          MS. FRAZIER:  Objection to
12  form.  Foundation.
13          THE WITNESS:  According to
14  these documents, that appears to
15  be true.
16  BY MR. TISI:
17      Q.   Okay.  And this is a
18  memorandum from your trade organization
19  to, among others, you, Bristol-Myers
20  Squibb, Luzenac, and Unilever from the
21  vice -- to -- from Irene Malbin who is
22  the person who we've spoken to -- spoken
23  about before, who you communicated with,
24  right?

Page 222

1    A.   That is true.
2    Q.   And this is dated
3  October 27, 2000.  And it's the proposal
4  from Nichols-Dezenhall on talc.
5    A.   That is what the document
6  says.
7    Q.   And you recognize
8  Nichols-Dezenhall also as a crisis
9  management firm.  True?
10       MS. FRAZIER:  Objection to
11  form.
12       THE WITNESS:  I believe that
13  is -- I believe that is accurate.
14  BY MR. TISI:
15    Q.   And they were making a
16  proposal.  And, in fact, if you remember,
17  they were the authors of the talc
18  landscape article -- e-mail, that was
19  forwarded to you on December 7th which is
20  Exhibit 603 in Tab 11, correct?
21    A.   That is correct.
22    Q.   And the article, the
23  memorandum says, "Attached is the
24  proposal from Nichols-Dezenhall on the

Page 223

1  Talc issue."
2    A.   Yes.
3    Q.   And Ms. Malbin is asking for
4  comments immediately, within three days,
5  correct?
6    A.   That is correct.
7    Q.   And this would have been
8  about a week or so before you met with
9  your own crisis management team at
10  Burson-Marsteller on the 8th, correct?
11       MS. FRAZIER:  Objection to
12  form.
13       THE WITNESS:  That appears
14  to be the correct timeline, yes.
15  BY MR. TISI:
16    Q.   Okay.  Now, if you will go
17  to the second page, which is the
18  confidential memorandum from
19  Nichols-Dezenhall.
20       Oh, actually before we do
21  that, let's go to the back of the
22  document.  Page 626.9.
23       There is an e-mail fax
24  transmission from Irene Malbin, to Avon,

Page 224

1  the chair of the PAC.  Do you see that?
2    A.   I see that.
3    Q.   That stands for public
4  affairs committee?
5       MS. FRAZIER:  Objection to
6  form.  Foundation.
7       THE WITNESS:  I see that.
8  BY MR. TISI:
9    Q.   Okay.  Is that correct,
10  public affairs committee, is that what
11  PAC stands for?
12    A.   I would have no idea.
13       MS. FRAZIER:  Same
14  objections.
15  BY MR. TISI:
16    Q.   Well, okay.  Then let's see
17  if we can refresh your recollection.
18       MR. TISI:  Let's go to
19  Page 7.
20  BY MR. TISI:
21    Q.   There's a document, CFTA
22  public affairs list.  Johnson & Johnson
23  had two members on that list.  Both you
24  for Johnson & Johnson corporate, and

Page 225

1  Sarah Colamarino for Johnson & Johnson
2  Consumer Products, correct?
3    A.   I see that.
4    Q.   Okay.  And it says public
5  affairs.  Does this appear to be a
6  committee, a public affairs committee?
7       MS. FRAZIER:  Objection to
8  form.
9       THE WITNESS:  I don't know
10  what this is.  I don't know what
11  the public affairs committee is.
12  This looks just to have our fax
13  numbers to share information with
14  us.
15  BY MR. TISI:
16    Q.   Right.  And -- but the memo
17  from Kathleen Walas, the chair of the
18  PAC, which would correspond with public
19  affairs committee says, "My attached
20  cover memo went to public affairs people
21  from the four companies that have given
22  money to the Interested Party Talc Task
23  Force.  Irene."
24       Do you see that?

Page 226

1    A.   I see that.
2    Q.   Okay.  So this indicates --
3  this tells Ms. Walas, the chair of the
4  committee, that four other people on the
5  committee, including yourself and Sarah
6  Colamarino, were sent this document,
7  true?
8          MS. FRAZIER:  Objection to
9      form.
10         THE WITNESS:  Actually the
11     document that says we received the
12     document is the first page of
13     this.  I don't know who Kathleen
14     Walas is or what the public
15     affairs committee did.
16  BY MR. TISI:
17     Q.   Okay.  But this, again, is
18  the -- is the list -- this provides a
19  confidential memorandum.  This is a week
20  ahead of your meeting with
21  Burson-Marsteller, your own crisis
22  management team, and this is a proposal
23  to the entire -- to the public affairs
24  committee of CTFA, right?

Page 227

1          MS. FRAZIER:  Objection to
2      form.
3          THE WITNESS:  I don't know
4      anything about a public affairs
5      committee.  I know that our name
6      is on here because we would be
7      interested members --
8  BY MR. TISI:
9     Q.   Okay.
10    A.   -- based on having talc as a
11  product.  But I don't know what a public
12  affairs committee of the CTFA was.  We
13  would have dealt with Irene Malbin.
14    Q.   Okay.  So -- and, again, it
15  shows that this was faxed to you,
16  correct?
17         If you look at the --
18    A.   Yes, it does appear to be
19  faxed to me, yes.
20    Q.   Okay.  Now, if you go to the
21  document, the confidential memorandum
22  itself, let's go through it.
23         "As you know, over the
24  years, we've stood shoulder-to-shoulder

Page 228

1  with CTFA and its members in unbending
2  defense of the safety of several
3  cosmetics ingredients.  More often than
4  not, together, we've prevailed."
5          Do you see that?
6     A.   I see that.
7     Q.   "Like you, we have never
8  shied away from a tough battle, and we're
9  not going to start now.  We're with you
10  100 percent of the way."
11         See that?
12    A.   I see that.
13    Q.   Okay.  And, again, the date
14  is October 27, 2000.  This is before the
15  NTP ever got the question of whether
16  talc -- the NTP scientific committee ever
17  got the question about whether or not
18  talc was a human carcinogen or
19  anticipated to be a human carcinogen,
20  right?
21         MS. FRAZIER:  Objection to
22     form.  Foundation.
23         THE WITNESS:  It is
24     definitely before their meeting to

Page 229

1      make those decisions, but I would
2      have no idea if they had received
3      any information to review
4      beforehand.
5  BY MR. TISI:
6     Q.   There comes -- it goes on to
7  say, "There comes a time, however, when
8  it is essential that - together - we
9  fully assess and appreciate what we're up
10  against."
11         Do you see that?
12    A.   I see that.
13    Q.   "While the objective of our
14  forthcoming effort - to vigorously defend
15  the safety of talc use in cosmetics
16  products - is not in question, we need to
17  be mindful of the following."
18         Do you see that?
19    A.   I see that.
20    Q.   And I read that correctly,
21  true?
22    A.   Yes.
23    Q.   And this is something you
24  most likely would have received before

Page 230

1 meeting with your own PR folks.  True?
2       MS. FRAZIER:  Objection to
3    form.
4       THE WITNESS:  Well, it says
5    on the first page of this document
6    that this was sent to me, correct?
7 BY MR. TISI:
8    Q.   Yes.
9    A.   Okay.
10   Q.   Okay.  And it goes to say,
11 "A federally funded scientific
12 organization may declare that cosmetic
13 talc is 'reasonably anticipated to be a
14 human carcinogen.'"
15      The draft report on talc use
16 in the perineal and on sanitary napkins.
17 This is alarming if scientifically flimsy
18 declaration, according to the PR folks,
19 right?
20   A.   I see that.
21   Q.   "Potential consumer outrage
22 over its continued use in products with
23 babies and for female hygiene purposes
24 may go off the charts."

Page 231

1       Do you see that?
2    A.   I see that.
3    Q.   It says, "Consumer groups,
4 media, and potentially regulatory
5 pressure to transition out of talc, given
6 that there is an alternative, may be
7 overwhelming."
8       Do you see that?
9    A.   I see that.
10   Q.   And you understood that the
11 alternative, and we've talked about this
12 several times today, was cornstarch,
13 right?
14      MS. FRAZIER:  Objection to
15   form.  Foundation.
16      THE WITNESS:  That was
17   actually another product that
18   Johnson & Johnson was selling I
19   believe at this time.
20 BY MR. TISI:
21   Q.   All right.  And it was
22 ultimately proposed, at least after you
23 met with your own crisis management team,
24 the proposal was made to get out of talc

Page 232

1 entirely by December 1st, 2000, right?
2       MS. FRAZIER:  Objection to
3    form.
4       THE WITNESS:  That is what
5    Burson-Marsteller proposed.
6 BY MR. TISI:
7    Q.   It says, "The legal
8 liabilities of continuing sales of talc
9 products, not to mention Prop 65
10 implications, are profound."
11      Do you see that?
12   A.   I see that.
13   Q.   And it says, "Pediatricians
14 and gynecologists have been advocating
15 the use of cornstarch powder for years
16 and will now become more vocal in their
17 concerns about talc."
18      Do you see that?
19   A.   I see that.
20   Q.   That's kind of consistent
21 with what we talked about before with
22 Dr. Cramer saying, you know, in light of,
23 you know, the evidence, why would you
24 even use talc, switch to cornstarch,

Page 233

1 right?
2       MS. FRAZIER:  Objection to
3    form.
4       THE WITNESS:  And Johnson &
5    Johnson offered both products, as
6    I think we just discussed.
7 BY MR. TISI:
8    Q.   Correct, correct.
9       Okay.  They go on to say,
10 "We could go on and on in laying out the
11 negatives, but the bottom line - except
12 for a very few number of recruited
13 scientific experts - the cosmetics
14 industry will be a lone voice in handling
15 a very tough issue," correct?
16   A.   I see that.
17   Q.   Can you think of a single
18 scientific expert that you -- you said
19 that you deferred to the expert in terms
20 of the drafting of your statements.  Can
21 you think of any scientific expert,
22 either who worked for J&J, or who was
23 recruited by J&J, who advocated that
24 women should use talc instead of

John McKeegan

Page 234

1 cornstarch?
2        MS. FRAZIER:  Objection to
3 form.  Foundation.
4        THE WITNESS:  I think that
5 question is incorrect.  I think
6 there would not have been a
7 recommendation from experts as to
8 whether people should use one
9 product over another.  Both
10 products were being offered in the
11 market.
12        If your question is if
13 they -- am I aware of any J&J
14 experts who felt there was a risk
15 of using talc products, I am not
16 aware of anybody who --
17 BY MR. TISI:
18    Q.   Okay.  That was not my
19 question.  That was not my question so I
20 move to strike.
21        My question was:  Other than
22 J&J employees and recruited scientific
23 experts by J&J or the talc industry, can
24 you think of anybody who recommended that

Page 235

1 people use talc instead of cornstarch for
2 feminine hygiene?
3        MS. FRAZIER:  Objection to
4 form.  Foundation.
5        THE WITNESS:  That's a -- I
6 just can't answer a question like
7 that.  That's too broad a
8 question.  I have no way of
9 knowing if there was people out
10 there, or if there is an
11 assumption that women should use
12 one product or another for
13 feminine hygiene.
14        So if you're asking if
15 there's anybody in the universe of
16 experts who might recommend one or
17 the other, I have no -- no idea
18 and no way of answering the
19 question.
20 BY MR. TISI:
21    Q.   Well, this document says
22 pediatricians and gynecologists have been
23 advocating use of cornstarch powder for
24 years and will now become more vocal in

Page 236

1 their concerns about talc, true?
2    A.   That's what this document
3 says.
4    Q.   Okay.  It also says "It
5 serves to remind us of the relative
6 regulatory freedom of the cosmetics
7 industry depends, in large part, on the
8 hard won perception it takes
9 self-policing action when confronted with
10 credible information about ingredient
11 safety issue."
12        Do you see that?
13    A.   I see that.
14    Q.   Okay.  So what these crisis
15 management said -- is saying, and I'm
16 paraphrasing is, is people rely on, the
17 public relies on, the cosmetic industry
18 to police itself when confronted with
19 information about a safety issue, true?
20        MS. FRAZIER:  Objection to
21 form.  Foundation.
22        THE WITNESS:  It does say
23 that the cosmetic industry
24 performs self-policing action when

Page 237

1 confronted with credible
2 information about an ingredient
3 safety issue.
4 BY MR. TISI:
5    Q.   And the failure to act on
6 talc may threaten that, correct?
7        MS. FRAZIER:  Objection to
8 form.
9        THE WITNESS:  I think I
10 would agree with that statement,
11 if the National Toxicology Program
12 had taken an action and said that
13 there was a reasonable expectation
14 of -- that a product could be
15 conceived of causing cancer, that
16 there would be a risk of
17 continuing to sell such a product.
18 BY MR. TISI:
19    Q.   Going on to the next page,
20 it said -- it says, it would -- last
21 paragraph, last sentence in the first
22 paragraph.  It says, "It would not be" --
23 "it would not be unwise for companies
24 marketing talc-based products for use

John McKeegan

Page 238

1 with babies and infants to consider ways
2 to reformulate if necessary."
3         Do you see that?
4     A.   I see that.
5     Q.   So in fairness -- so now you
6 have two crisis management firms, one
7 with CFTA, the talc industry trade
8 representative who does lobbying and
9 those kinds of things, recommending the
10 company should look to reformulate the
11 product, true?
12         MS. FRAZIER:  Objection to
13 form.
14         THE WITNESS:  No, that's not
15 the case.  You know, they were
16 saying that -- they were saying
17 there is a potential here that
18 must be considered.
19         And if that -- if it does
20 come about, then it should be
21 considered to reformulate.
22         And Burson-Marsteller made a
23 recommendation for a proposal --
24 because I don't know if it was a

Page 239

1 recommendation -- that the talc
2 products be moved out of consumer
3 products before the National
4 Toxicology Program met.
5 BY MR. TISI:
6     Q.   Right.  And we also looked
7 at other organizations and doctors that
8 said that perhaps maybe women should be
9 using cornstarch instead of talc, right?
10         MS. FRAZIER:  Objection to
11 form.
12         THE WITNESS:  There were
13 other -- I'm not even sure they
14 were organizations.  There were
15 other people who were saying that
16 women should not use talc.  I'm
17 not even sure that they were
18 saying they should use one product
19 or another product.
20 BY MR. TISI:
21     Q.   So in light of these facts,
22 the fact that outside organizations and
23 doctors, and according to this doctor,
24 gynecologist, were suggesting that women

Page 240

1 use cornstarch and not talc, in light of
2 the fact that your -- the CFTA crisis
3 management folks said, you know, the time
4 may be right to consider reformulating
5 the product, it would not be unwise, the
6 proposal of Burson-Marsteller to switch
7 out of talc by December 1st, who made the
8 decision not to do that in early
9 December?
10         MS. FRAZIER:  Objection to
11 form.  Foundation.
12         THE WITNESS:  I have -- I
13 don't have any idea as to who
14 specifically would have made the
15 decision.
16         You know, it would have been
17 a business decision as much as a
18 reputational decision as to
19 whether to do it.
20         And then when the National
21 Toxicology Program met, they
22 decided not to add talc to that
23 list.
24 BY MR. TISI:

Page 241

1     Q.   Well, we'll talk about that
2 in a moment.  But let's kind of freeze
3 frame in early December of 2000, before
4 the National Toxicology Program did
5 anything, right?
6         There was a meeting of
7 senior management on the 20th.  We've
8 never seen any meeting minutes relating
9 to that.  You've never seen any meeting
10 minutes, but you were at the meeting,
11 true?
12         MS. FRAZIER:  Objection to
13 form.
14 BY MR. TISI:
15     Q.   You were -- let me rephrase
16 the question.
17         You were slated to present
18 at a meeting on the 20th, true?
19     A.   That is true.
20         MS. FRAZIER:  Objection to
21 form.
22 BY MR. TISI:
23     Q.   Colamarino -- Colamarino was
24 set to present the proposal that was

John McKeegan

Page 242

¹ drafted in conjunction with you and
² Burson-Marsteller that the talc be
³ discontinued within ten days, by
⁴ December 1st, correct?
⁵          MS. FRAZIER:  Objection to
⁶      form.
⁷          THE WITNESS:  That is, as I
⁸      recall from what we've looked at
⁹      before, what was on the agenda,
¹⁰      yes.
¹¹ BY MR. TISI:
¹²      Q.   And that would have been --
¹³ I think we can both agree, that would
¹⁴ have been a pretty important business
¹⁵ decision, correct?
¹⁶          MS. FRAZIER:  Objection to
¹⁷      form.  Foundation.
¹⁸          THE WITNESS:  I'm sure it
¹⁹      would have been a very important
²⁰      business issue.
²¹ BY MR. TISI:
²²      Q.   I mean this wasn't a
²³ decision about whether to use powdered
²⁴ creamer or half and half in the coffee,

Page 243

¹ was it?
²          MS. FRAZIER:  Objection to
³      form.  Foundation.
⁴ BY MR. TISI:
⁵      Q.   This is a big deal,
⁶ withdrawing a product.  And the proposal
⁷ was made that this be done on
⁸ December 1st, 2000, correct?
⁹          MS. FRAZIER:  Objection to
¹⁰      form.
¹¹          THE WITNESS:  This proposal
¹²      was made by a crisis public
¹³      relations firm, and it was up to
¹⁴      the business unit to decide
¹⁵      whether this was something that
¹⁶      they thought should be done.
¹⁷ BY MR. TISI:
¹⁸      Q.   And you were at that
¹⁹ meeting, Ms. Colamarino was at that
²⁰ meeting, and all these high level folks
²¹ were at that meeting on November 20,
²² 2000.  And you have never seen any
²³ minutes of that meeting, have you?
²⁴          MS. FRAZIER:  Objection to

Page 244

¹      form.
²          THE WITNESS:  I don't know
³      if I have.  I don't -- I don't
⁴      remember any.
⁵ BY MR. TISI:
⁶      Q.   And you don't remember that
⁷ meeting, true?
⁸      A.   I mean, it was 20-something
⁹ years ago.  I don't have any specific
¹⁰ recollection of that meeting.
¹¹      Q.   And in the end of the day,
¹² the recommendation that it would not be
¹³ unwise to switch, that the company should
¹⁴ discontinue and just sell cornstarch,
¹⁵ that women should switch to cornstarch,
¹⁶ all those recommendations that were in
¹⁷ the ether in 2000, never came to pass,
¹⁸ did they?
¹⁹          MS. FRAZIER:  Objection to
²⁰      form.
²¹          THE WITNESS:  Johnson &
²²      Johnson continued -- continued to
²³      sell talc products.
²⁴ BY MR. TISI:

Page 245

¹      Q.   Without a warning that said
² they are a potential for cancer, true?
³          MS. FRAZIER:  Objection to
⁴      form.  Foundation.
⁵          THE WITNESS:  The National
⁶      Toxicology Program never
⁷      determined that there was
⁸      potential to cause cancer and
⁹      there was never any action that
¹⁰      I'm aware of that said that such a
¹¹      warning would need to be placed on
¹²      the product.
¹³          MR. TISI:  Move to strike.
¹⁴ BY MR. TISI:
¹⁵      Q.   The question is:  The
¹⁶ information was never provided by J&J to
¹⁷ women that would allow them to make the
¹⁸ decision, do I want to use cornstarch, or
¹⁹ do I want to use talc.  They were never
²⁰ given that information, were they?
²¹          MS. FRAZIER:  Objection to
²²      form.  Foundation.
²³          THE WITNESS:  Johnson &
²⁴      Johnson provided both products,

Page 246

1  cornstarch and talc, to the market
2  and it was up to the consumers to
3  decide whether they wanted to use
4  one or the other.
5       There was no regulatory
6  action that I'm aware of that
7  would have made a determination
8  that any kind of warning label
9  should have been put on the
10  product, or that one product or
11  the other should have been removed
12  from the market.
13  BY MR. TISI:
14      Q.   Let's go to what the NTP
15  actually did.
16           MR. TISI:  Let's look at
17      Exhibit Number 610.
18           (Document Marked for
19      identification as Exhibit
20      P1.610.)
21           THE WITNESS:  Which tab is
22      that?
23           MR. TISI:  Sorry.  Tab 18.
24      First of all, while we were

Page 247

1  on a break, while we're just
2  looking at that -- Kat, I will
3  tell you I looked up and down for
4  anything related to the meeting on
5  the 20th.  And I would ask that
6  you -- I know we've asked you on
7  occasion to go back and take a
8  look for things that very
9  specifically we believe exists or
10  not.
11           But any documents
12      surrounding the meeting on the
13      20th, I would ask that you take a
14      look at and I'll follow up with a
15      letter on that.
16           MS. FRAZIER:  That's fine.
17      We'll do that.
18           MR. TISI:  Okay.  Thank you.
19  BY MR. TISI:
20      Q.   All right.  Mr. McKeegan,
21  before you is Exhibit Number 610, is an
22  e-mail dated December 15th from Gary
23  Noble to yourself and John McKeegan --
24  I'm sorry, and Sarah Colamarino, correct?

Page 248

1      A.   I see that, yes.
2      Q.   And it forwards an e-mail
3  that you received on the 14th, following
4  the decision of the NTP, do you see that?
5      A.   I see that, yes.
6      Q.   Now, it says, "I'm sure
7  you've heard that the panel voted 7 to 3
8  not to list non-asbestiform talc."
9           Do you see that?
10      A.   I see that.
11      Q.   Okay.  But they indicate
12  what the decision was based on.  Do you
13  see that?
14           "The decision was primarily
15  due to the fact there was no consensus as
16  to the definition of asbestiform or
17  non-asbestiform talc."
18           Do you see that?
19      A.   I see that.
20      Q.   It was not -- and I think
21  there's been testimony in this case, the
22  NTP deferred the question about whether
23  talc can cause ovarian cancer.  Do you
24  remember that?

Page 249

1           MS. FRAZIER:  Objection to
2      form.
3           THE WITNESS:  I actually --
4      I actually don't remember the
5      specifics of that.  I just
6      remember the outcome, that it was
7      not added to the list.
8  BY MR. TISI:
9      Q.   And I will represent to you
10  that the issue was deferred, the question
11  was deferred to a later time.
12           But there were three members
13  of the committee who did vote and thought
14  that it should be listed then, correct?
15           MS. FRAZIER:  Objection to
16      form.  Foundation.
17  BY MR. TISI:
18      Q.   That's what it says, right?
19      A.   I am looking at your e-mail,
20  and that is -- the e-mail that you
21  forwarded, and that is -- the count was 7
22  to 3 --
23      Q.   Okay.
24      A.   -- not to list

Page 250

1  non-asbestiform talc.
2      Q.   Right.  So there are
3  three -- there are -- this again
4  represents what we've started our
5  deposition about today, that there
6  were -- remember, we looked at those
7  meeting notes from 1995, which had
8  some -- excuse me, 1998, where some
9  evidence went one way, some evidence went
10 another way, there was a question, do you
11 remember that?
12         MS. FRAZIER:  Objection to
13     form.
14         THE WITNESS:  Yes.
15 BY MR. TISI:
16     Q.   And this indicates that
17 there was still an open question, true;
18 some people thought there were, some
19 people thought there weren't based upon a
20 definitional question, true?
21         MS. FRAZIER:  Objection to
22     form.
23         THE WITNESS:  I am not aware
24     of how the National Toxicology

Page 251

1      Program makes its decisions, but
2      it seems to, from this e-mail,
3      that they make decisions based on
4      a vote of a majority of the panel.
5      And that decision of the panel was
6      not to list it as a -- as --
7      non-asbestiform talc as a -- on
8      the list of potential carcinogens.
9  BY MR. TISI:
10     Q.   But ultimately you know and
11 understand, just as we talked about
12 before, the decision whether to switch
13 from talc to -- from talc to cornstarch
14 for example, lied solely within the
15 company, true?
16         MS. FRAZIER:  Objection to
17     form.
18         THE WITNESS:  The company --
19         MS. FRAZIER:  Foundation.
20     Go ahead.
21         THE WITNESS:  The company at
22     this time sold both products.
23 BY MR. TISI:
24     Q.   Right.

Page 252

1      A.   So consumers could make an
2  informed decision as to which product
3  they preferred.
4      Q.   How could they be -- how
5  could they be informed, sir, if there is
6  no information on the bottle or in your
7  advertising or in your public relations
8  that gives anybody any suggestion that
9  there is a question about whether talc is
10 safe or not?
11         MS. FRAZIER:  Objection to
12     form.  Foundation.
13         THE WITNESS:  I'm only going
14     by what you've presented here
15     today.
16 BY MR. TISI:
17     Q.   Okay.
18     A.   There have been a number of
19 articles and studies that you've
20 presented that say that this was a
21 question.
22         There is also the vote here
23 by the National Toxicology Program panel
24 that says it is not a potential

Page 253

1  carcinogen.  And I apologize if I'm not
2  getting the wording correctly.
3      Q.   Well, do you know that
4  the -- subsequently IARC concluded that
5  it was a possible carcinogen?
6      A.   I'm not aware --
7         MS. FRAZIER:  Objection to
8     form -- wait a second, John.  Wait
9     a second, John.  Let me object.
10         Objection to form.
11     Foundation.
12 BY MR. TISI:
13     Q.   My question though -- my
14 question though, Doctor, is taking --
15     A.   Doctor?
16     Q.   Doctor, I'm sorry.  I just
17 promoted you, Mr. McKeegan.
18         Taking NTP out of it, the
19 decision about whether to market
20 cornstarch exclusively and remove talc
21 products from the market was something
22 that was being considered independent of
23 what NTP ultimately did.  You agree with
24 that, right?

Page 254

1      MS. FRAZIER:  Objection to
2  form.  Foundation.
3      THE WITNESS:  I can't -- I
4  can't remember what if any
5  business decision was made about
6  that --
7  BY MR. TISI:
8      Q.   I didn't ask that --
9      A.   -- you had asked something
10  before -- you had made something before
11  about it being added to another list.
12  And I have no information about that.
13  And I left Johnson & Johnson more than
14  20 years ago, approximately 20 years ago.
15      Q.   That really isn't my
16  question.  Maybe my question was
17  inartfully worded.  So I'll either move
18  to strike it or withdraw the question.
19      But my question was, we went
20  through a series of documents, including
21  from Burson-Marsteller,
22  Nichols-Dezenhall, CFTA, Mr. Rankin, and
23  yourself, and Ms. Colamarino, the
24  positioning statement, and all those

Page 255

1  things we just talked about, that talked
2  about withdrawing talc products in favor
3  of cornstarch products.
4      First of all, do you
5  remember that?
6      A.   Yes, I remember those.
7      Q.   And all of those things were
8  done independent of NTP and could have
9  been done at any time, true?
10      A.   Not true.
11      Q.   Okay.  You don't think that
12  the company could have withdrawn the
13  product?
14      A.   The company could have
15  withdrawn the product, but those
16  considerations were being brought up
17  because of the potential for a decision
18  by the NTP.
19      Q.   Okay.  All right.  Let me
20  ask you this -- a couple more questions.
21      MS. FRAZIER:  Excuse me.
22  Can you -- can you guys hear me?
23      MR. TISI:  Yes.
24      THE WITNESS:  Yes.

Page 256

1      MS. FRAZIER:  Okay.  Well,
2  because I lost audio and so I've
3  missed the last, I don't know how
4  long, probably 30, 45 seconds
5  worth.  So I object to everything
6  that you asked, Chris, on form.
7      MR. TISI:  Okay.  And I will
8  accept your objection in the dark.
9  BY MR. TISI:
10      Q.   Okay.  One other question.
11  You left J&J in January within -- or
12  February 1st, I think, you know, within
13  six weeks of the NTP decision, true?
14      A.   What?
15      Q.   You left your J -- you left
16  your position as --
17      A.   Oh.
18      Q.   -- I think it was director
19  of public relations, and I probably am
20  mangling the title.
21      But you left the position
22  you were in in January or early February
23  of 2001, correct?
24      A.   February 2001 I did move

Page 257

1  over to a Johnson & Johnson operating
2  company, Johnson & Johnson Healthcare
3  Systems, taking the position that Sarah
4  Colamarino had had when she moved over to
5  the Consumer Products company.
6      Q.   Okay.  Did your -- do you
7  typically have -- when you have to switch
8  companies, or switch positions, like
9  this, or switch companies like you did,
10  are you typically -- do you do any kind
11  of -- did you have to interview for that?
12      A.   Yes.
13      Q.   Were there any evaluations
14  or recommendations done of your work with
15  talc that immediately preceded your
16  leaving that position and going over to
17  Ms. Colamarino's old job?
18      MS. FRAZIER:  Objection to
19  form.
20      THE WITNESS:  Not that I'm
21  aware of.
22      MR. TISI:  Can I ask you,
23  Kat, had you looked for any
24  evaluations relating to, as we

John McKeegan

Page 258

1  talked about before, has been our
2  agreement?  Because I didn't get
3  any, and I didn't know if there
4  were any such.
5     MS. FRAZIER:  Yeah.  I
6  think, I'm pretty sure that Rich
7  or somebody that is working with
8  him let you know that there
9  weren't any.  We sent you what we
10  were able to locate.
11     MR. TISI:  Okay.
12  BY MR. TISI:
13     Q.   Did your leaving J&J
14  corporate have anything to do with your
15  experience dealing with the talc issue
16  that immediately preceded your leaving?
17     A.   Not that I'm aware.
18     Q.   Were you asked to change
19  positions or was it something you sought?
20     A.   I was asked to fill this
21  position from Sarah.  It was a promotion
22  that was offered to me, and I was being
23  asked to take this by Rud Nielsen, the
24  head of the department.

Page 259

1     MR. TISI:  I don't think I
2  have any other questions.  But if
3  you don't mind taking a break, I'd
4  like to speak to some of my
5  colleagues here and see what we
6  can do.
7     But I would reiterate for
8  sure my request, Kat, on documents
9  related -- because I think it is
10  surprising to us that we saw no
11  documents related to that
12  November 20th meeting.  And
13  just -- I'm not saying that
14  it's -- that there are documents.
15  I don't know.  But it surprises us
16  that there aren't.
17     So if you would check on
18  that, I would appreciate that.
19     MS. FRAZIER:  Okay.  That's
20  the same request you made just a
21  few minutes ago, right?
22     MR. TISI:  Correct.
23     MS. FRAZIER:  Yeah, let me
24  see if I can --

Page 260

1     MR. TISI:  If you don't mind
2  taking a ten-minute -- are you
3  going to have any redirect at all?
4     MS. FRAZIER:  Yeah, just a
5  little bit.
6     MR. TISI:  Okay.  All right.
7     So if you don't mind, just
8  to keep things moving, if you
9  don't mind me just taking a break
10  and speaking to Nick and Cameron,
11  I appreciate it.
12     MS. FRAZIER:  I'm sure,
13  that's fine.  So do you want to
14  come back at 2:50?
15     MR. TISI:  Sure.
16     THE VIDEOGRAPHER:  The time
17  is 2:37 p.m.  Off the record.
18     (Short break.)
19     THE VIDEOGRAPHER:  The time
20  is 2:54 p.m.  On the record.
21     MS. FRAZIER:  Chris, are you
22  done?  I want to make sure.
23     MR. TISI:  Oh, yeah, yeah,
24  yeah, I apologize.  Yes.

Page 261

1     At this point we rest,
2  subject to our request for
3  additional documents.  But go
4  ahead.
5     MS. FRAZIER:  Okay.
6     - - -
7     EXAMINATION
8     - - -
9  BY MS. FRAZIER:
10     Q.   Good afternoon,
11  Mr. McKeegan.
12     A.   Hello.
13     Q.   When -- so you've been asked
14  a lot of questions today about your time
15  when you were at Johnson & Johnson.
16  About how long were you at the company
17  total?
18     A.   I think it was five years
19  total.
20     Q.   Okay.  And how long have you
21  been gone from the company?
22     A.   About 20 years.
23     Q.   Okay.  And you've had --
24  have you had a number of different

Page 262

1  positions, job positions, since you left
2  Johnson & Johnson?
3      A.   Yes, I have.
4      Q.   Did any of those positions
5  require you to engage on any issues
6  involving talc?
7      A.   No.
8      Q.   And have you followed the
9  science on talc since you left the
10 company 20 years ago?
11     A.   No.
12     Q.   And have you followed even
13 the news stories on talc in the last
14 20 years?
15     A.   I've seen the occasional
16 story that's come across.
17     Q.   Okay.  But it's not
18 something -- is it something that you
19 would follow up on from time to time to
20 make sure that you're up on talc issues?
21     A.   No.
22     Q.   Okay.  And even when you
23 were at the company, was following the
24 science of talc something that you would

Page 263

1  have done?
2      A.   No.  I was strictly in media
3  relations.
4      Q.   And to the extent that you
5  were going to issue a statement that
6  pertained to talc, from a scientific
7  standpoint, including talc safety, how
8  would that statement have come about?
9          MR. TISI:  I'm sorry -- I'm
10     sorry, Kat, I don't mean to
11     interrupt.  I'm not objecting to
12     the question.  I didn't hear it.
13     It got cut off so if you would
14     just restate the question, I'd
15     appreciate it.
16         MS. FRAZIER:  Okay.
17 BY MS. FRAZIER:
18     Q.   So when you were at the
19 company, Mr. McKeegan, and if you were
20 going to issue a statement on talc as it
21 pertained to safety and scientific
22 issues, how would that statement have
23 come about?
24     A.   There would be a discussion

Page 264

1  among the people who would know the
2  information best, and we would then draft
3  a statement after discussing it with
4  them, send it back to them for their
5  review.  And once it had received the
6  necessary approvals, then we would be
7  free to use it.
8      Q.   And were the people that
9  you're talking about who reviewed those
10 statements, were they subject matter
11 experts?
12     A.   Yes.
13     Q.   In science?
14     A.   Yes, they were.
15     Q.   Okay.
16         MR. TISI:  Objection -- let
17     me just place an objection.  Go
18     ahead.
19 BY MS. FRAZIER:
20     Q.   Okay.  Okay.  And were
21 you -- did you make sure that all of the
22 scientific statements were accurate --
23 let me reword that.
24         Was it your job to ensure

Page 265

1  that the scientific statements that were
2  issued were accurate from a scientific
3  standpoint?
4      A.   Let me just correct it.  We
5  did not issue scientific statements.  We
6  issued statements to media.  And we would
7  have gone back to the scientists and the
8  subject matter experts to make sure that
9  we were providing accurate information to
10 the media.
11     Q.   So you would have relied on
12 others rather than interpreting them
13 yourself?
14     A.   Yes.
15         MR. TISI:  Objection to
16     form.
17         I'm sorry, Mr. McKeegan,
18     you've got to give me a chance to
19     object.
20         THE WITNESS:  Sorry.
21         MR. TISI:  It's okay.  We
22     all do it.
23 BY MS. FRAZIER:
24     Q.   When you were at the

1 company, was -- and by company, I mean
2 Johnson & Johnson -- was Baby Powder the
3 only product that you had responsibility
4 for?
5     A.   No.  I was -- my
6 responsibilities included a number of
7 consumer products for a number of
8 different operating companies, especially
9 those that did not have their own inhouse
10 public relations person.
11         So if a question came in on
12 a, you know, whole variety of different
13 consumer products, I would -- they would
14 come to me and then I would get the
15 appropriate answers.
16     Q.   So about how many products,
17 if you can estimate, would you say that
18 you would have been responsible for in
19 terms of responding to media questions?
20     A.   I would have no way of
21 answering that.  Many, many products, but
22 I couldn't give you even a guesstimate.
23 It was a lot of them.
24     Q.   Okay.  Fair enough.

1         And you were asked some
2 questions about whether you had tried to
3 refresh your memory by reviewing
4 documents.  Do you remember that question
5 or those questions?
6     A.   Yes.
7     Q.   If you had been provided
8 with every single document that you had
9 ever seen while you were at the company,
10 every single e-mail that you were on or
11 drafted, and you had reviewed those for
12 weeks and weeks, day in and day out,
13 would that have refreshed your memory and
14 put you back in the place where you
15 remembered exactly what was going on
16 during the time you were at the company?
17         MR. TISI:  Let me just
18     object to form.  Thank you.
19         THE WITNESS:  No.  You know,
20     I would not have been able to put
21     those within context within my
22     mind and remember all of the
23     events that would have been going
24     on 20 years ago.

1 BY MS. FRAZIER:
2     Q.   Okay.  You were asked many
3 times about an e-mail where you made a
4 comment about possibly needing to tweak a
5 statement.  Do you remember that?
6     A.   Yes.
7     Q.   Do you have any recollection
8 about what tweaking the statement was in
9 context to, what the purpose of
10 potentially tweaking the statement was?
11         MR. TISI:  Objection.
12         THE WITNESS:  According to
13     the e-mail that we saw, that was
14     in relation to a CBS News report
15     that was being done about talc and
16     asking -- and something that had
17     been stated by somebody at the
18     FDA.  I don't remember who that
19     was.
20 BY MS. FRAZIER:
21     Q.   And did you rely on others
22 to determine whether or not any
23 statements would need to be tweaked?
24     A.   Yes, I did.

1     Q.   And who did you rely on
2 generally?
3     A.   The -- generally it was
4 going to be the scientists with direct
5 knowledge of that product.
6     Q.   You were shown a page, a
7 single page, actually it was two pages, a
8 cover page that was entitled FDA's
9 Cosmetics Program, and then you were
10 shown a specific page that appeared to be
11 something from the FDA.  Do you recall
12 that?
13     A.   This was the -- are you
14 talking about the 1994 memo from CTFA?
15     Q.   No.  It was a document where
16 you were shown the cover page and then
17 you were shown something.  We can put it
18 back up there.
19         But my question is, would
20 you have ever reviewed a document that
21 described FDA's cosmetics program during
22 the course of your work at J&J?
23     A.   I can't imagine that I would
24 have.  I don't see how that would have

Page 270

1 pertained to the job that I was supposed
2 to do.
3     Q.   Okay.  You were asked a lot
4 of questions about a Burson-Marsteller
5 document authored by Kate Triggs that
6 contained a proposal, and part of that
7 proposal was to remove talc-based powder
8 from the market.  Do you remember that?
9     A.   Yes.
10     Q.   Do you recall whether or
11 not, first of all, that proposal was ever
12 presented at a meeting, whether it was
13 the November meeting or otherwise, to
14 senior management at Johnson & Johnson?
15         MR. TISI:  Objection.
16         THE WITNESS:  I have no
17     recollection as to whether that
18     was discussed or not.
19 BY MS. FRAZIER:
20     Q.   Do you recall whose idea
21 this proposal was?
22     A.   No.
23     Q.   You were also shown a
24 Nichols-Dezenhall proposal that had

Page 271

1 bullet points on -- containing several
2 recommendations.  Do you remember that?
3     A.   Yes.
4     Q.   Okay.  And
5 Nichols-Dezenhall, I think you mentioned,
6 was a public relations company; is that
7 right?
8     A.   As I recall that, that is
9 what they did for a living.
10     Q.   Okay.  And companies like
11 that are -- you've worked for companies
12 similar in nature, in terms of working on
13 media relations and things like that,
14 public relations -- let me -- let me
15 start over here.
16         You've worked for companies
17 who work with other companies on media
18 relations; is that right?
19     A.   Yes.
20         MR. TISI:  Objection.
21 BY MS. FRAZIER:
22     Q.   Okay.  And from your
23 experience, do these media relations
24 companies generally advise on scientific

Page 272

1 issues from a scientific standpoint?
2         MR. TISI:  Objection.
3         THE WITNESS:  No.  They --
4     they don't.
5 BY MS. FRAZIER:
6     Q.   And from your experience, do
7 these companies tend to advise from a PR
8 standpoint, rather than a scientific
9 standpoint?
10         MR. TISI:  Objection.
11         THE WITNESS:  That is what
12     they are hired to do.  That is
13     what they are experts in.
14 BY MS. FRAZIER:
15     Q.   And from your review of the
16 Nichols-Dezenhall document, and I think
17 you said you don't recall it
18 specifically; is that right?
19     A.   I do not recall it.
20     Q.   And from your brief review
21 of the Nichols-Dezenhall document, and we
22 can pull it back up if we need to.
23         But was there any question
24 in your mind as to whether or not

Page 273

1 Nichols-Dezenhall's proposals was based
2 on the idea that talc is not safe?
3         MR. TISI:  Objection.
4         THE WITNESS:  Just from what
5     little I read of that, that does
6     not seem to be what they were
7     basing their document on.  It was
8     more about public -- potential
9     public perception.
10         MS. FRAZIER:  Okay.  That's
11     all the questions I have.  Thank
12     you, Mr. McKeegan.
13         MR. TISI:  I just have -- I
14     just have a couple of very quick
15     questions.
16         - - -
17         EXAMINATION
18         - - -
19 BY MR. TISI:
20     Q.   First of all, with regard to
21 the media statements that you had --
22 first of all, can you hear me?
23     A.   Yes.
24     Q.   Okay.  We went through

John McKeegan

Page 274

¹ several media statements that you had.
² And in fairness to you, when you got that
³ note from CTFA about Dr. Bailey at the
⁴ FDA expressing concern about talc and
⁵ ovarian cancer, your first reaction, as I
⁶ read it, is you reached out to both the
⁷ company lawyer and the company doctor,
⁸ Dr. Hopkins, and informed your boss, I
⁹ mean that's what you do, right?
¹⁰      MS. FRAZIER:  Object to
¹¹    form.
¹²      THE WITNESS:  I would have
¹³    been looking to these people, not
¹⁴    just to inform them, but also to
¹⁵    get their input.
¹⁶ BY MR. TISI:
¹⁷    Q.   Correct.
¹⁸    A.   And Jeff Leebaw as my boss,
¹⁹ he would have been -- he would have known
²⁰ about this beforehand because he and I
²¹ spoke many times informally during the
²² day.
²³    Q.   Correct.  And my questions
²⁴ to you were -- in fact, you asked them to

Page 275

¹ call you, right?  You asked them to say,
² you know, the position -- we may have to
³ tweak this, this strikes me as important
⁴ that we got this FDA person on there
⁵ saying it's a concern, what do you guys
⁶ think, that's what you were doing, right?
⁷      MS. FRAZIER:  Objection to
⁸    form.
⁹      THE WITNESS:  I was
¹⁰    forwarding the statement back
¹¹    to -- according to this e-mail, I
¹²    don't have any direct recollection
¹³    of it.  But according to the
¹⁴    e-mail I was forwarding it back to
¹⁵    them to see if there was any need
¹⁶    to adjust the statement in any
¹⁷    way.
¹⁸ BY MR. TISI:
¹⁹    Q.   Right.  And that's what
²⁰ somebody who is good at their job and
²¹ trying to get information about science,
²² that they try to do, right?
²³      MS. FRAZIER:  Objection to
²⁴    form.

Page 276

¹      THE WITNESS:  I'm not trying
² to get information about science.
³    My job would be to respond to
⁴    media questions.
⁵ BY MR. TISI:
⁶    Q.   Correct.  And you want to
⁷ have accurate information, and you
⁸ reached out to people who could provide
⁹ you that information, right?
¹⁰    A.   That's correct.
¹¹    Q.   Okay.  And when I asked you
¹² whether or not you had done any follow-up
¹³ to see if you could answer some questions
¹⁴ from the last deposition, I wouldn't ask
¹⁵ you to look at every document that you'd
¹⁶ ever done for the thousands of products.
¹⁷ But that was a document that actually you
¹⁸ were shown at your prior deposition,
¹⁹ right?
²⁰    A.   That is correct.
²¹    Q.   Okay.  And did you reach out
²² and say, you know, look, I'd like to
²³ know, did anybody ever respond to me when
²⁴ I reached out and asked them, did

Page 277

¹ Mr. O'Shaughnessy or Mr. Hopkins ever get
² back to me, because I'd like to know
³ because I want to answer Mr. Tisi's
⁴ questions as accurately as possible?
⁵      MS. FRAZIER:  Objection to
⁶    form.
⁷      THE WITNESS:  I don't know
⁸    how I would do that.  I don't --
⁹ BY MR. TISI:
¹⁰    Q.   You ask your lawyer --
¹¹    A.   I haven't talked to John
¹² O'Shaughnessy in many years.  And I don't
¹³ remember who John Hopkins is.
¹⁴    Q.   Right.  But you would ask --
¹⁵ you would ask your lawyer, say give me
¹⁶ any documents that would refer to what I
¹⁷ did with talc, right?
¹⁸      MS. FRAZIER:  Objection to
¹⁹    form.
²⁰ BY MR. TISI:
²¹    Q.   Did you do that?
²²    A.   No, I didn't do that.
²³      MS. FRAZIER:  Same
²⁴    objection.

Page 278

BY MR. TISI:

Q.   Okay.  So did you understand that I would have requested that you look at the thousands of documents for the thousands of products that you had, or that information that you may have didn't know in June or July, that you might have been asked in September when we're sitting here asking you questions under oath?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I can't answer what would have been in your mind.  So I can't answer your question.

BY MR. TISI:

Q.   All right.  So my question, then, what I asked you earlier was, did you do anything to refresh your recollection, even about the questions you were asked and you didn't remember in June, so that you could answer my questions here today?

MS. FRAZIER:  Objection to

Page 279

form.

THE WITNESS:  I reviewed the transcript of the deposition in June.

BY MR. TISI:

Q.   And you saw the transcript, a lot of times you couldn't answer questions, right?

A.   That's --

MS. FRAZIER:  Same objection.

BY MR. TISI:

Q.   And now, in this deposition, unlike the last deposition, you're being represented by Johnson & Johnson lawyers, right?

MS. FRAZIER:  Objection to form.

THE WITNESS:  That is incorrect.

BY MR. TISI:

Q.   Are you being represented by Ms. Frazier?

A.   I was represented in June as

Page 280

well, by different lawyers for J&J.

Q.   Okay.  So let me ask you this.  Do you remember at any time anybody ever -- you reached out.  You said we may need to tweak the statement.  You reached out.  You asked them.  Do you remember anyone ever getting back to you and saying, you know, the FDA did or did not change its opinion with respect to the 1994 co-sponsored meeting?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I have no recollection of these discussions.  These were so long ago.

BY MR. TISI:

Q.   Okay.  But at least in your mind, when you saw that an FDA employee got on television or spoke to a television reporter and --

MR. TISI:  It is my aunt.  I'm sorry, I knew she was going to do that.

BY MR. TISI:

Page 281

Q.   At least in your mind, your immediate reaction when you saw an FDA employee get on -- get on television or speak to a reporter about concerns about talc, your immediate reaction was, we may need to tweak the statement, right?

MS. FRAZIER:  Objection to form.

THE WITNESS:  My immediate reaction according to the e-mail that we read was to ask them whether there was a need to review and adjust the statement.

BY MR. TISI:

Q.   It didn't take somebody with a scientific degree to figure that out, did it?

MS. FRAZIER:  Objection to form.

THE WITNESS:  I'm a media relations, you know, person at that point in time.  So my concern would have been the potential to receive a call from CBS News.

Page 282

¹ BY MR. TISI:
²     Q.   Okay.  Now the other thing
³ is, you were asked some questions about
⁴ the proposals of Nichols-Dezenhall and
⁵ Burson-Marsteller by your lawyer.
⁶         Do you remember that, those
⁷ questions?
⁸     A.   Yes.
⁹     Q.   At least with respect to the
¹⁰ Burson-Marsteller, they didn't just come
¹¹ to you with a draft proposal to withdraw
¹² the product, did they?
¹³         MS. FRAZIER:  Objection to
¹⁴     form.
¹⁵         THE WITNESS:  I did not read
¹⁶     the entire -- the memo.  And they
¹⁷     did not come to us at all.  They
¹⁸     went to the CTFA.
¹⁹ BY MR. TISI:
²⁰     Q.   Did I say -- I meant to say
²¹ Burson-Marsteller.  I meant to say them.
²²         Burson-Marsteller didn't
²³ come to you and say, you know, I think we
²⁴ ought to consider withdrawing talc.  They

Page 283

¹ actually had a meeting with you, with
² Ms. Colamarino, and the head of consumer
³ products, and after spending time with
⁴ you and them, you came up with this joint
⁵ proposal.  They came up with this
⁶ joint -- they wrote up the proposal,
⁷ right?
⁸         MS. FRAZIER:  Objection to
⁹     form.
¹⁰         THE WITNESS:  That seems to
¹¹     be the basis of the memo, yes.
¹² BY MR. TISI:
¹³     Q.   Right.  So any suggestion
¹⁴ that out of the blue a crisis management
¹⁵ firm came to Johnson & Johnson and said,
¹⁶ you know, I think we ought to think
¹⁷ about, in the current environment, think
¹⁸ about withdrawing the product.  That's
¹⁹ not how that happened, right?
²⁰         MS. FRAZIER:  Objection to
²¹     form.
²²         THE WITNESS:  I don't
²³     understand your question,
²⁴     actually.

Page 284

¹     Q.   The question was:  This was
² a meeting that you and the head of
³ consumer products and the head of public
⁴ relations for that consumer products
⁵ company got together and there was an
⁶ exchange of information.  And coming out
⁷ of that meeting was the proposal that
⁸ they wrote up, true?
⁹         MS. FRAZIER:  Objection to
¹⁰     form.
¹¹         THE WITNESS:  That is --
¹²     that does appear to be the
¹³     timeline of what happened, from
¹⁴     what we saw today.
¹⁵         MR. TISI:  I don't have any
¹⁶     other questions.
¹⁷         Thank you very much, sir, I
¹⁸     appreciate your time.
¹⁹         MS. FRAZIER:  I don't have
²⁰     anything else either.
²¹         MR. TISI:  Thank you.
²²         Kat, always good to see you.
²³     Have a good day everybody.
²⁴

Page 285

¹         MS. FRAZIER:  We've got to
² get off the record, Chris.
³         THE VIDEOGRAPHER:  The time
⁴ is 3:16 p.m.  Off the record.
⁵         (Excused.)
⁶         (Deposition concluded at
⁷ approximately 3:16 p.m.)
⁸
⁹
¹⁰
¹¹
¹²
¹³
¹⁴
¹⁵
¹⁶
¹⁷
¹⁸
¹⁹
²⁰
²¹
²²
²³
²⁴

Page 286

CERTIFICATE

    I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

    It was requested before completion of the deposition that the witness, JOHN McKEEGAN, have the opportunity to read and sign the deposition transcript.

_____
MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
Reporter, Certified Realtime
Reporter and Notary Public
Dated: October 13, 2021

    (The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 287

INSTRUCTIONS TO WITNESS

    Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

    After doing so, please sign the errata sheet and date it.

    You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

    It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 288

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____
_____ _____ _____
    REASON: _____

Page 289

ACKNOWLEDGMENT OF DEPONENT

    I,_____, do hereby certify that I have read the foregoing pages, 1 - 290, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JOHN McKEEGAN                DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

John McKeegan

Page 290

LAWYER'S NOTES

PAGE  LINE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Exhibit 10



# MATERIAL DATA SAFETY SHEET
# TALC

| Section 1. | Product and Company Identification | | | |
|---|---|---|---|---|
| **Product Names** | IMPERIAL 200 USP | IMPERIAL 500 USP | OLYMPIC H USP | GRADE 25 USP |
| | IMPERIAL 250 USP | IMPERIAL 700 FCC | SUPREME H USP | |
| | IMPERIAL 400 USP | SUPRA H USP | SUPRAFINO H USP | |
| **Synonyms** | Talcum powder, Soapstone, Steatite | | | |
| **Chemical Name** | Talc ; Hydrous magnesium silicate | **CAS#**  14807-96-6 | **Chemical Family**  Phyllosilicates | |
| **Manufacturer** | Luzenac America, Inc. | **Emergency Health** | | |
| | 345 Inverness Drive South | **Information (24 hrs)** | | |
| | Centennial, CO  80112 | 303-623-5716 | | |
| | Toll-free  800–325-0299 | | | |

| Section 2. | Composition/Information on Ingredients | | |
|---|---|---|---|
| **Substance** | **CAS#** | **% by Weight** | **TLV - TWA** |
| Talc | 14807-96-6 | 98-100 | 2 mg/m3 respirable fraction (ACGIH) |
| Dolomite | 16389-88-1 | 0-2 | Use Talc TLV for total exposure measurements |

| Section 3. | Health Hazards Identification and Emergency Overview |
|---|---|
| Emergency Overview | Under normal conditions of use, this product is not expected to create any unusual emergency hazards. This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire. |

Potential Health Effects from Acute and Chronic Occupational Exposures to Talc
**TARGET ORGANS**

**LUNGS, RESPIRATORY SYSTEM**

| Inhalation | ACUTE: Exposure to a large concentration of air-born dust of this material may cause mechanical irritation of the mucous membranes and respiratory tract. CHRONIC: Repeated or prolonged inhalation of air-born dust of this material may cause scarring of the lungs (pulmonary fibrosis), with shortness of breath, chronic cough, and respiratory assisted heart failure. Prolonged exposure to talc can produce symptomatic talc pneumoconiosis (talcosis). |
|---|---|
| Skin Contact | ACUTE: Direct contact may cause dryness, or may cause mild irritation if an allergic predisposition exists. CHRONIC: Prolonged contact may cause dryness of the skin, or may cause mild irritation if an allergic pre-disposition exists |
| Eye Contact | ACUTE: Direct contact with dust may cause mechanical irritation of the eyes. CHRONIC: Repeated exposure may cause conjunctivae inflammation. |
| Ingestion | ACUTE: This material is considered to be harmless and inert when ingested. CHRONIC: Repeated ingestion of large doses of talc for 13 and 10 successive days by rabbits and mice revealed negative teratogenic and carcinogenic results. |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

Talc
CAS #14807-96-6
Page 1 of 5

Protected Document – Subject to Protective Order

IMERYS 081218

| Section 4. | First Aid Measures |
|---|---|
| Inhalation | Remove from exposure area to fresh air. If breathing has stopped, perform artificial respiration and get medical attention immediately. Keep person warm and at rest. Treat symptomatically and supportively. |
| Skin Contact | Apply common skin moisturizers to relieve dryness. Irritations are uncommon; however, if irritation or redness develops, seek medical attention. Broken skin can be cleansed with mild soap and water. |
| Eye Contact | Wash eyes with large amounts of water or normal saline solution. If irritation or redness develops, seek medical attention. |

| Section 5. | Fire Fighting Measures |
|---|---|
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire. Firefighters require **NO** special protective equipment or precautions. |

| Section 6. | Accidental Release Measures |
|---|---|
| Small Spill | Use vacuum to clean up spillage. Place in sealed container. |
| Large Spill | For large spills, shovel or sweep up (while keeping dispersion of dust in air to a minimum) and place into suitable sealed containers for reclamation or later disposal. Residue should be cleaned up using a high-efficiency particulate filter vacuum. The use of water wash-down is not recommended. Wet material can cause a surface used for walking to become extremely slippery. Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261). |

| Section 7. | Handling and Storage |
|---|---|
| Handling & Storage | Handle in ways to minimize the creation of dust. Preserve product in sealed containers. |

| Section 8. | Exposure Controls & Personal Protection |
|---|---|
| Personal Protection | Use NIOSH approved dust respirator. Use safety glasses or dust tight goggles. No special skin protection is usually required, but gloves should be worn by workers susceptible to skin irritation. |
| | Dust Respirator    Safety Glasses    Gloves |
| Controls | Provide local exhaust or process enclosure ventilation to meet published exposure limits (TLV). |

| Section 9. | Physical & Chemical Properties |
|---|---|
| Appearance | White to grayish-white powder |
| Odor | Slight earthy odor. |
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point. |
| Specific Gravity | 2.8 (water = 1.0) |
| Melting Point | None |
| pH | Slightly basic (10% slurry in water) |
| Solubility | Water: <1 mg/mL @ 21 C          Acetone : <1 mg/mL @ 21 C |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 2 of 5

Protected Document – Subject to Protective Order

IMERYS 081219

| Ethanol: <1 mg/mL @ 21 C | Cold acids: Insoluble | Alkalies: Insoluble |

| **Section 10.** | **Stability & Reactivity Data** |
|---|---|
| Stability | This product is stable, non-reactive, and non-corrosive. |
| Incompatibility with various substances | Non reactive/none known. |

| **Section 11.** | **Toxicological Information** |
|---|---|
| Toxicology | NIOSH Registry Number**: WW2710000** |

SAX Toxicity Evaluation: THR: Not available

Carcinogenic Status**:**

    IARC: (2006 in preparation) Has concluded that perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B).  This is not a route of exposure relevant for workers and applies to one specific use of talc only.

    IARC: (2006 in preparation) Inhaled talc not containing asbestos or asbestiform fibres not classifiable as a human carcinogen (Group 3)

    OSHA: Not listed.

    ACGIH: A4 – Not Classifiable as a Human Carcinogen

    NTP: Not listed.  A 2-year inhalation study demonstrated clear evidence of carcinogenic activity in female rats at exposure levels of 18 mg/m3.  Some evidence of carcinogenic activity was observed in male rats at the same level.  No evidence of carcinogenic activity was found in mice (NTP TR-421).

Tumorigenic Data:

    TCLo: ihl-rat 11 mg/m3/1Y-I

    TDLo: imp-rat 200 mg/kg

Other Toxicity Data:

    Skin and Eye Irritation Data: skn-hmn 300 ug/3D-I MLD

Teratogenicity (Reproductive Effects Data): Not available.

Mutation Data: Not available.

| **Section 12.** | **Ecological Information** |
|---|---|

Ecological Data

| Species Test | Alga ((*Selenastrum capricornutum*)) Growth inhibition | *Daphnia Magna* Acute immobilization | *Daphnia Magna* Reproduction |
|---|---|---|---|
| Endpoint | Growth rate 48hr-EC50  48hr-NOEC AUG 72hr-EC50  72hr-NOEC | 48hr-EC50 | 21 day-EC50  21 day-NOEC |
| Conc. (mg/L) | | | |
| FY | | | |
| References | | | |

  *AUG=Area Under Growth curve

| **Section 13.** | **Disposal Considerations** |
|---|---|
| Waste Disposal Information | Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261).  Dry material can usually be land-filled.  State and Local regulations/restrictions are complex and may differ from Federal regulations. Responsibility for proper waste disposal is with the owner of the waste. |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 3 of 5

Protected Document – Subject to Protective Order

IMERYS 081220

| Section 14. | Transport Information |
| --- | --- |
| Transport Information | U.S. Department of Transportation - DOT: No classification assigned<br>CANADIAN Transportation of Dangerous Goods: No classification assigned<br>LAND Transport - ADR/RID: No classification assigned<br>AIR Transport - IATA/ICAO: No classification assigned (International Air Transport<br>       Association/International Civil Aviation Organization)<br>MARITIME Transport - IMDG: No classifications assigned International Maritime Dangerous Goods)<br>HARMONIZED Tariff Code: Talc – crushed or powdered. 2526.20.00. (Stat. Suffix 00)<br>EPA TSCA 12(B) Export Notification: Not listed |

| Section 15. | Regulatory Information |
| --- | --- |
| Chemical Inventories | EPA TSCA Status: Listed (CAS # 14807-96-6)   EINECS (European No: 238-877-9)<br>CEPA Domestic Substance List – DSL: Listed   CEPA Non-domestic substance List – NDSL: Not listed<br>AICS (Australian – NICNAS   ECL (Korean No: KE-32773)<br>SWISS (Giftliste No: G-6939)   PICCS (Philippines)<br>ENCS/MITI (Japan) – Talc exempt   IECSC (China): Listed |
| Other Pertinent Classifications/ Regulations | CALIFORNIA PROP 65 Status:  Talc not listed<br>STATE RIGHT-TO-KNOW: Talc listed – Illinois; Massachusetts; New Jersey; Pennsylvania; Florida<br>CLEAN AIR ACT – Ozone Depleting Chemicals (ODC's): None<br>CONEG Approved Packaging: Yes<br>NFPA RATINGS: (Scale 0-4) Health = 1, Fire = 0, Reactivity = 0<br><br>NPCA:  National Paint and Coatings Association – Hazardous Material Identification System<br>HMIS)<br><br>        HEALTH:  1* (Chronic Potential)<br>        FLAMMABILITY:  0<br>        PHYSICAL:  0<br>        PERSONAL PROTECTION:  dust respirator, glasses or goggles, gloves |

| Section 16. | Other Information |
| --- | --- |
| Label Hazard Warning | **CAUTION - PROLONGED EXCESSIVE INHALATION MAY CAUSE LUNG INJURY** |
| Label Precautions | **UTILIZE DUST RESPIRATOR AND EXHAUST VENTILATION.  REFER TO MSDS FOR COMPLETE DETAILS** |



TYPICAL APPERANCE OF PRODUCT  LABEL

| Primary References | ACGIH - Documentation of TLV's 2001<br>OSHA - Chemical Sampling Information: Talc (Containing no asbestos) (Revised 1/15/1999) |

Luzenac America, Inc.                 **Talc**
MSDS Group USP                **CAS #14807-96-6**
Issued 07/01/2006               Page 4 of 5

Protected Document – Subject to Protective Order

| for Key Data | OSHA - TALC (Containing no asbestos).  OSHA comments from the June 19, 1988 Final Rule on Air Contaminants Project extracted from 54FR2324 *et. seq.*<br>OSHA - Compliance Interpretation Letter dated August 22, 2000 regarding talc products containing less than 1% quartz.<br>OSHA - Guidelines for Employer Compliance (Advisory) 1910.1200 App E<br>NIOSH - Pocket Guide to Chemical Hazards. Talc (containing no asbestos and less than 1% quartz).<br>NIOSH - REL's and General Recommendations for Safety and Health. [TALC (containing no asbestos).<br>AIHA - **Hygienic Guides Series – Talc (1982)**<br>IARC - Talc Vol.: 42 (1987) (p.185) 5. Summary of Data Reported and Evaluation; Supplement 7: (1987) (p.349)  Talc Not Containing Asbestiform Fibers (Group 3).<br>CCOHS – Database MSDS FTSS. Network Version 2002.<br>NTP – RoC/NIEHS Database. Network Version 2002. |
|---|---|
| Glossary | ACGIH – American Conference of Governmental Industrial Hygienists<br>AIHA – American Industrial Hygiene Association<br>CCOHS – Canadian Centre for Occupational Health and Safety<br>IARC – International Agency for Research on Cancer<br>NIOSH – National Institute of Occupational Safety and Health<br>NTP – National Toxicological Program<br>OSHA – Occupational Safety and Health Association<br>PEL – Permissible Exposure Level<br>TLV – Threshold Limit Value<br>TWA – Time Weighted Average |
| Important Notice | Luzenac America, Inc. provides the information contained herein in good faith but makes no representation as to its comprehensiveness or accuracy. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using this product. Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. |
| Issued by | Richard J. Zazenski<br>Regulatory Affairs Manager<br>E-mail: rich.zazenski@america.luzenac.com<br>Phone: 1-303-643-0404          Fax: 1-303-643-0446 |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 5 of 5

Protected Document – Subject to Protective Order                                                            IMERYS 081222