Exhibit 98

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY

IN RE:

| | |
|---|---|
| FOLEY V. AVON PRODUCTS, INC. ET AL. | MID-L-3095-18 AS |
| FRACE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-600-18 AS |
| GATMAITAN V. IMERYS TALC AMERICA, ET AL. | MID-L-4252-18 AS |
| GRABOWSKI V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-6805-16 AS |
| GREENE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-2456-18 AS |
| GRIFFIN V. CYPRUS AMAX MINERALS COMPANY, ET AL. | MID-L-4826-18 AS |
| HODJERA V. BORGWARNER MORSE TEC, LLC, ET AL. | MID-L-5368-17 AS |
| MCNEILL-GEORGE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-7049-16 AS |
| SELVAGGIO V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-598-18 AS |
| WENDOWSKI V. IMERYS TALC AMERICA, INC., ET AL. | MID-L-6635-17 AS |

VIDEOTAPE DEPOSITION OF SUSAN NICHOLSON, MD

Transcript of the deposition of the witness, called for Oral Examination in the above-captioned matter, said deposition being taken pursuant to Superior Court Rules of Practice and Procedure by and before MARC BRODY, a Notary Public and Certified Court Reporter of the State of New Jersey, at the law offices of DRINKER, BIDDLE & REATH, 105 College Road East, Princeton, New Jersey, on Tuesday, February 19, 2019, commencing at approximately 10:00 in the forenoon.

BRODY DEPOSITION SERVICES
235 East Broad Street, Suite 1
Westfield, New Jersey 07090

Phone: 908-789-2000  Fax: 908-789-2007

Page 2   (Pages 2-5)

Page 2

1
2
3    APPEARANCES:

3    COHEN, PLACITELLA & ROTH, P.C.
     127 Maple Avenue
4    Red Bank, New Jersey 07701
     732-747-9003
5    BY: CHRISTOPHER PLACITELLA, ESQ.
     AND: DENNIS GEIER, ESQ.
6    Attorneys for Plaintiff
7
8    RAWLE & HENDERSON, LLP       (Via speakerphone)
     1339 Chestnut Street, 16th floor
9    Philadelphia, Pennsylvania 19107
     215-575-4200
10   BY: ANISHA S. ABRAHAM, ESQ.
     Attorneys for Defendants, Imerys Talc,
11   Cyprus Amax Minerals
12
13   McGIVNEY, KLUGER & COOK, P.C.   (Via speakerphone)
     18 Columbia Turnpike, 3rd floor
14   Florham Park, New Jersey 07932
     973-822-1110
15   BY: ELIZABETH BARNA, ESQ.
     Attorneys for Defendant, Whittaker, Clark &
16   Daniels
17
18   BLANK ROME, LLP
     One Logan Square
19   Philadelphia, Pennsylvania 19103
     215-569-5397
20   BY: REBECCA D. WARD, ESQ.
     AND: JAMES T. SMITH, ESQ.
21   Attorneys for Defendant, Johnson & Johnson
22
23
24
25

Page 4

1              INDEX
2    WITNESS              PAGE
3    SUSAN NICHOLSON, MD
4     Direct by Mr. Placitella    5
5
6
7
8
9
10
11           EXHIBITS
12   NO.      DESCRIPTION      PAGE
13   P-1     Deposition Notice      5
14   P-2     5 pages of notes by S. Nicholson   10
15   P-3     Notebook of J&J Documents    54
16   P-4     Notebook of J&J Documents    54
17   P-5     Notebook of J&J Documents    54
18
19
20
21
22   Note: ALL DOCUMENTS REFERRED TO DURING DEPOSITION
           ARE LISTED ON PAGES 201-202.
23
24
25

Page 3

1    APPEARANCES  (Cont'd):
2
3    O'TOOLE, FERNANDEZ, WEINER &    (Via speakerphone)
     VAN LIEU
4    14 Village Park Road
     Cedar Grove, New Jersey 07009
5    973-239-5700
     BY: LESLIE LOMBARDY, ESQ.
6    Attorneys for Defendant, Colgate-Palmolive
7
8
9
10
11   ALSO PRESENT:
12   Carolyn McNelis, Paralegal, Cohen Placitella & Roth, PC
13   Erik Davidson, Videographer, Dynamic Evidence
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         MR. PLACITELLA:  Mark this P-1.
2         (The above notice is marked P-1.)
3
4         THE VIDEOGRAPHER:  We are now on the
5    record.  My name is Erik Davidson representing
6    Dynamic Evidence.  The date is Tuesday, February 19,
7    2019 and the time is approximately 10:00 a.m.  The
8    appearances will be noted on the stenographic
9    record.
10        Our court reporter, Marc Brody, will now
11   swear in the witness.
12
13   SUSAN  NICHOLSON, sworn.
14
15   DIRECT EXAMINATION BY MR. PLACITELLA:
16
17   Q    Good morning, Dr. Nicholson, how are you?
18   A    Good thanks.  Good morning.
19   Q    You are a doctor by training.  Is that
20   correct?
21   A    Yes, a medical doctor.
22   Q    When did you graduate medical and from
23   where?
24   A    1992 from the University of
25   Pittsburgh.

Page 3   (Pages 6-9)

Page 6

1  Q   Am I correct that you have never, as a
2  medical doctor, you have never seen any actual
3  patients?
4  A   That's not correct.
5  Q   When is the last time you actually saw a
6  patient as a medical doctor?
7  A   I don't have a precise date.  For ten
8  years I was a rounding consulting physician at
9  Cornell New York Hospital in New York City, and my
10 activities petered out -- I probably haven't seen a
11 patient in ten years.
12 Q   You started at Johnson and Johnson in
13 2006.  Is that correct?
14 A   That's correct.
15 Q   In what capacity?
16 A   As a senior director in clinical research
17 in our pharmaceutical division.
18 Q   Did you ever have any personal interaction
19 with the FDA concerning the issue of asbestos and
20 talc?
21 A   No, I didn't.
22 Q   Am I correct you have no training in
23 geology?
24 A   That's correct.
25 Q   And you are not an expert in testing talc

Page 7

1  for asbestos?
2  A   I'm not.
3  Q   You have in front of you P-1, which is the
4  deposition notice for today.  The deposition notice
5  calls for Johnson and Johnson to produce a corporate
6  representative with the most knowledge concerning
7  testing information provided to the Food and Drug
8  Administration by Johnson and Johnson concerning the
9  asbestos content of cosmetic talc, and any responses
10 from the FDA in relation thereto.  Do you see that?
11 A   Yes, I do.
12 Q   Why are you the person most qualified?
13 A   I'm the person most qualified because I've
14 reviewed all of the documents related to the
15 communications back and forth between the FDA
16 starting in the late '60s up until the present.
17     I have interviewed and interacted
18 with the individuals who currently do the testing,
19 people who are involved historically with the
20 testing, so I understand what was communicated and
21 how the testing methodology evolved over time.
22 Q   Any people still work for Johnson and
23 Johnson who were involved in communicating with the
24 FDA concerning the testing for asbestos in talc?
25 A   Not that I'm aware of, no.

Page 8

1  Q   And the documents you reviewed,
2  specifically are what?
3  A   I reviewed documents specifically going
4  back and forth between Johnson and Johnson to the
5  FDA, the FDA back to Johnson and Johnson and
6  documents from the industry group CTFA, now PCPC
7  relating to talc and asbestos testing as they were
8  acting on behalf of the industry as general
9  background, and also some of the contextual
10 documents for those decades.  It has been 50 years
11 of communications and an evolution of science, so
12 some contextual documents were necessary to
13 understand the context.
14 Q   Am I correct that those documents are with
15 you today?
16 A   They are.
17 Q   We will mark them at a break so not to
18 take up any time.
19     Am I correct that you are not the
20 author or the recipient of any of the documents in
21 these books?
22 A   I'm not specifically, no.
23 Q   So you were the person designated on
24 behalf of the Johnson and Johnson to speak for the
25 company, but you have no personal knowledge of any

Page 9

1  of the evidence you brought with you today?
2  A   That's not correct.  I didn't say that.  I
3  was involved in more contemporary communications and
4  discussions about communications with the FDA, but
5  your question previously was about whether or not
6  they were to me specifically or from me
7  specifically.  That answer is no.
8      But I was involved in discussions
9  related to the communications.
10 Q   Have you communicated yourself with the
11 FDA either in writing or verbally?
12 A   I was at a meeting in June of last year
13 with a group of individuals from Johnson and Johnson
14 and the FDA to discuss the quality systems and
15 methods for testing asbestos.
16 Q   June 19, 2018?
17 A   Correct.
18 Q   You said you interviewed.  By the way, who
19 made the determination as to what documents you were
20 going to review in preparation for today's
21 deposition?
22 A   The attorneys assisted in searching the
23 database.  It is quite a large and extensive
24 database for FDA communications related to the
25 request for today.

Page 10

1  Q   So the lawyers made the decision what
2  documents you were going to review?
3  A   The actual communications, yes. With
4  regard to context, we discussed that and
5  collaborated on which documents were most relevant.
6  Q   Now, you said you interviewed people in
7  connection with today's deposition. Who was that?
8  A   I'm going to refer to my notes here, if
9  you don't mind.
10  Q   Sure.
11        MR. PLACITELLA: Why don't we just
12  mark your notes as P-2.
13        (Dr. Nicholson's notes are marked
14  P-2.)
15  Q   Why don't you describe what P-2 is.
16  A   P-2 are a number of notes during
17  preparation for today. It is a lot of information
18  and I wanted to organize my thinking by decades,
19  '60s, '70s, '80s, '90s, 2000s and 2010 to current.
20        In addition, I made some notations
21  about individuals that I would speak to about
22  various topics, and just some contextual notes for
23  my own -- a memoir, if you will.
24  Q   So who are the people you spoke with?
25  A   That's what where I was headed. I spoke

Page 11

1  to Linda Szczepaniak.
2  Q   Spell that for the reporter and me.
3  A   I wish I could. S C Z and the rest is we
4  will have to -- P H O N I K, maybe.
5  Q   What was her job?
6  A   Global head of regulatory affairs for our
7  consumer division.
8  Q   For what period of time?
9  A   I don't know when she started. At least
10  four years.
11  Q   Currently?
12  A   That's correct. Currently.
13  Q   Who else?
14  A   Bobbette Williams.
15  Q   Bobbette?
16  A   Williams.
17  Q   And what is her job?
18  A   She's Vice-President in our quality group.
19  Q   Okay. Who else?
20  A   I spoke to Tim McCarthy who has been with
21  the company a number of years. He is a
22  toxicologist.
23  Q   Is he still with the company?
24  A   He is.
25  Q   Who else?

Page 12

1  A   Previous conversations I've had with John
2  Hopkins and Don Hicks. Don Hicks is a director of
3  quality. He since retired.
4  Q   Did John Hopkins have any dealing with the
5  FDA to your knowledge?
6  A   Yes. He started with the company in 1976
7  and retired in 2000.
8  Q   You know for a fact he spoke with the FDA
9  about the issue of asbestos and testing?
10  A   He and I discussed communications back and
11  forth. I don't know that he actually was the person
12  speaking on any given case, but he had the
13  historical knowledge.
14  Q   But do you know whether or not he had any
15  personal involvement with the FDA?
16  A   I believe he did, yes.
17  Q   Now, anybody else?
18  A   Not that I recall.
19  Q   I want to talk to you about what Johnson
20  and Johnson understands or understood historically
21  its role was as it related to communications with
22  the FDA.
23        Am I correct that Johnson and Johnson
24  understands that cosmetic talc does not require
25  premarket approval from the FDA?

Page 13

1  A   Yes.
2  Q   Am I correct that the FDA promulgated
3  regulations that remain in effect today followed by
4  Johnson and Johnson that require each ingredient
5  used in cosmetic product, any finished cosmetic
6  product be adequately substantiated for safety prior
7  to marketing?
8        MR. SMITH: Objection.
9  A   Yes, we are aware of that.
10  Q   And is Johnson and Johnson further aware
11  that the regulations state that any ingredient or
12  product whose safety is not adequately substantiated
13  prior to marketing, is misbranded unless it contains
14  the following conspicuous statement on the principal
15  display panel. "Warning, the safety of this product
16  has not been determined."
17        MR. SMITH: Objection.
18  Q   Are you aware of that?
19        MR. SMITH: Could I just ask you to
20  put a little pause in there before you answer so I
21  can pipe in once in a while and earn my fee?
22  A   Yes.
23  Q   Johnson and Johnson understood that a
24  manufacturer who has not adequately substantiated
25  the safety of their cosmetic product or their

Page 14

1  ingredients cannot ship their product in interstate
2  commerce?
3         MR. SMITH: Objection.
4    A   Yes.
5    Q   In addition, a manufacturer of a cosmetic
6  product must assure that the cosmetic label shall
7  bear a warning statement whenever necessary or
8  appropriate to prevent a health hazard that may be
9  associated with the product?
10        MR. SMITH: Objection.
11   A   Yes.
12   Q   Johnson and Johnson understands that the
13 regulations require that an ingredient or product
14 having a history of use in or as a cosmetic may at
15 any time have its safety brought into question by
16 new information that in and of itself is not
17 conclusive?
18        MR. SMITH: Objection.
19   A   I don't know what that means.
20   Q   It is not proven beyond more probable than
21 not. Just the risk is there.
22   A   Can you repeat?
23   Q   Sure the regulations require that an
24 ingredient or product having a history of use as a
25 cosmetic may at any time have its safety brought

Page 15

1  into question by new information that in itself is
2  not conclusive?
3         MR. SMITH: Objection.
4    Q   You understood that?
5    A   I understand that. I didn't understand. I
6  hear you, but that last piece, I'm not sure what
7  that means.
8         But let me just say we do understand
9  that the safety of products are overseen on a
10 continuous basis, and if there's new information
11 that comes in, that calls into question the safety
12 of a product that, yes, we are obligated to research
13 that, understand it, determine if there's been any
14 change in the safety profile that's actionable, if
15 that's your question, yes.
16        MR. SMITH: While there's no question
17 bending, let me put on the record my understanding,
18 as we discussed before we started the deposition
19 with opposing counsel, placing the word objection on
20 the record preserves all bases?
21        MR. PLACITELLA: You could say
22 objection to form, if that is your objection.
23        MR. SMITH: I'm objecting to beyond
24 the scope. This witness is here as a 30(b)6. She
25 is being asked questions that in my view are outside

Page 16

1  the scope.
2         MR. PLACITELLA: You can make that
3  objection. I think it is not proper, but you can
4  make it. If you have a form objection, that's what
5  is permitted. You can raise scope with the judge.
6  I think it is clearly within the scope.
7         MR. SMITH: Again, I know we are not
8  going to figure that out today. I want to make sure
9  we are all on the same page. Do you want me to put
10 the basis for the objection on the record?
11        MR. PLACITELLA: That's fine, the way
12 you are --
13        MR. SMITH: Just objection preserves
14 everything so we can keep --
15        MR. PLACITELLA: Fair enough.
16
17   Q   Johnson and Johnson understands that a
18 cosmetic is considered adulterated if it bears or
19 contains any poisonous or deleterious substance
20 which may render it injurious to users?
21        MR. SMITH: Objection.
22   A   Yes.
23   Q   Johnson and Johnson understands that
24 information provided to the FDA concerning the
25 testing of Johnson and Johnson talc is voluntary,

Page 17

1  correct?
2         MR. SMITH: Objection.
3    A   Yes.
4    Q   Johnson and Johnson understands that
5  without a regulation, the FDA has no authority to
6  require information on safety testing related to
7  talc from Johnson and Johnson, correct?
8         MR. SMITH: Objection.
9    A   I'm not sure that's correct. If the FDA
10 has a concern about safety and they ask us for
11 information, I believe we are obligated to give it
12 to them.
13   Q   Okay. Johnson and Johnson understands now
14 and historically that the FDA only has very limited
15 resources to commit to cosmetic product review,
16 monitoring or safety?
17        MR. SMITH: Objection.
18   A   I can't speak to the resources of the FDA.
19   Q   Have you looked at documents that in fact
20 indicate that the FDA has limited resources on the
21 issue of talc testing and asbestos? You are aware
22 of that, aren't you?
23   A   I know there's one document that makes
24 reference to that at a point in time about a very
25 extensive testing program that was discussed. I

Page 18

1  don't think that's a general statement that's
2  applicable to the FDA.
3       Q   So it is your position that the FDA has
4  more than adequate resources to do its own testing
5  of the Johnson and Johnson talc for asbestos?
6            MR. SMITH:  Objection.
7       A   I'm not in a position to comment on the
8  FDA's resources.
9       Q   Does Johnson and Johnson agree that the
10 FDA regulatory authority over cosmetics is less
11 comprehensive than over food and drugs?
12           MR. SMITH:  Objection.
13      A   I'm aware of that, yes.
14      Q   Does Johnson and Johnson understand that
15 in its oversight of the cosmetic industry, the FDA
16 must rely on part on voluntary industry cooperation?
17           MR. SMITH:  Objection.
18      A   Yes, I understand that.
19      Q   Does Johnson and Johnson understand that
20 the FDA does not have authority to require Johnson
21 and Johnson to do safety testing and provide injury
22 reports concerning its talc?
23           MR. SMITH:  Objection.
24      A   I can't agree that we understand that in
25 totality.  If the FDA made a specific request for

Page 19

1  information, I believe we would be obligated to
2  respond to it.
3            We don't regularly and routinely
4  share safety information with the FDA, unless it is
5  required, or we feel that it is important and
6  helpful.
7       Q   Does Johnson and Johnson agree that a
8  cosmetic manufacturer has a responsibility to
9  substantiate the safety of their product or they
10 must warn consumers the safety of the product has
11 not been determined?
12           MR. SMITH:  Objection.
13      A   Yes.
14      Q   Does Johnson and Johnson understand that
15 if there's a health hazard associated with the product,
16 it must include a warning on that product?
17           MR. SMITH:  Objection.
18      A   Yes.
19      Q   Do you know what the Cosmetic Ingredient
20 Review or CIR is?
21      A   Yes.
22      Q   What is that?
23      A   The Cosmetic Ingredient Review is a
24 process and a system essentially of reviewing the
25 safety of cosmetic ingredients.

Page 20

1       Q   And is that something that was established
2  by the cosmetic trade association as far back as
3  1976?
4       A   I don't remember the specific historical
5  details.
6       Q   You don't know who was responsible for
7  forming the CIR?
8       A   Exactly.
9       Q   Or what entity?
10      A   Exactly, no, I'm not.
11      Q   Do you know that the CIR is an industry
12 funded panel that reviews the safety of ingredients
13 used in cosmetic talc?
14           MR. SMITH:  Objection.
15      A   I know they get funding from the industry,
16 yes.
17      Q   Am I correct that the purpose of the CIR
18 is to determine cosmetic ingredients for which
19 there's reasonable certainty in the judgment of
20 competent scientists that the ingredient is safe
21 under the conditions of use?
22           MR. SMITH:  Objection.
23      A   Yes.
24      Q   Has the CIR in fact stated that safe or
25 safety means there's no evidence in the available

Page 21

1  information that demonstrates or suggests reasonable
2  grounds to suspect a hazard to the public under the
3  conditions of use that are now current or that might
4  reasonably be expected in the future?
5            MR. SMITH:  Objection.
6       A   I can't answer that because I haven't
7  reviewed CIR's definitions as of the recent
8  past.
9       Q   How much work did you do in reference to
10 the CIR to prepare for today's deposition?
11      A   None.
12      Q   None at all?
13      A   No.
14      Q   Does Johnson and Johnson agree that it has
15 a responsibility to assure that there's reasonable
16 certainty there's no evidence to suspect that their
17 cosmetic talc products may cause any harm to the
18 consumer?
19           MR. SMITH:  Objection.
20      A   Could you repeat that?
21      Q   Does Johnson and Johnson recognize it has
22 a responsibility to assure that there's reasonable
23 certainty that there is no evidence to suspect that
24 their cosmetic talc products may cause harm to the
25 consumer?

Page 22

1   MR. SMITH: Objection.
2   A   Yes.
3   Q   Does Johnson and Johnson recognize that if
4   there is evidence that there are reasonable grounds
5   to suspect that the cosmetic talc product may cause
6   harm for the proposed use, such product does not
7   meet industry standards for safety?
8   MR. SMITH: Objection.
9   A   Yes.
10  Q   Does Johnson and Johnson recognize that
11  talc with asbestiform fibers are recognized as known
12  human carcinogens?
13  MR. SMITH: Objection.
14  A   Asbestos is a known carcinogen, yes.
15  Q   And Johnson and Johnson recognizes that if
16  asbestos or asbestiform fibers are found in the
17  talcum powder products, those products would be
18  adulterated under the Federal Food Drug and Cosmetic
19  Act?
20  MR. SMITH: Objection.
21  A   To clarify, if there's asbestos in talc,
22  yes, I would agree.
23  Q   Am I correct, and I asked you this before,
24  but I want to tease it out a little bit. Is it
25  Johnson and Johnson's position that it is not aware

Page 23

1   that FDA has limited resources when it comes to
2   testing cosmetic talc for asbestos?
3   MR. SMITH: Objection.
4   A   I can't speak to the FDA'S resources.
5   Q   Do you know who John Stuart is, who worked
6   at the FDA?
7   A   I don't recall off the top of my head, no.
8   The name sounds familiar, but I don't remember
9   exactly.
10  Q   Do you know that John Stuart left the FDA
11  in 1976?
12  A   No.
13  Q   Do you know that when John Stuart left the
14  FDA, there was no one at FDA any experience in
15  testing talc for asbestos?
16  MR. SMITH: Objection.
17  A   I can't speak to FDA'S expertise or
18  resources.
19  Q   D-12 is a document from 1975 that was
20  provided to me by Dr. Hopkins at his deposition.
21  Has Dr. Hopkins shared this document with you?
22  A   I don't recall seeing this. It refers to
23  aerosols and hair preparations.
24  MR. SMITH: Counsel, while there's no
25  question pending, this document doesn't have Bates

Page 24

1   numbers.
2   MR. PLACITELLA: It was given to me
3   by Dr. Hopkins in his deposition. It was marked
4   at his deposition as D-12, so that's your issue.
5   Q   Do you see where it talks about a program,
6   the first thing says cosmetics. Do you see that?
7   A   Yes.
8   Q   If you flip through it, you see that it
9   refers to multiple years and multiple projects. Do
10  you see that?
11  A   I do.
12  Q   I'm going to refer you to the entry for
13  1976. I'll blow it up for you. Under the project
14  titled Determination of Asbestos in Talc. Do you
15  see that?
16  MR. SMITH: What page are we on,
17  Counsel?
18  A   I need to look at it.
19  Q   Your pages aren't numbered, unfortunately.
20  MR. SMITH: Some are.
21  Q   Project number 00679.
22  MR. SMITH: There are multiple pages
23  with that project.
24  Q   There are multiple pages and I'm on the
25  page that talks about description of this quarter's

Page 25

1   activities, and the first paragraph stating, the
2   purpose of this project is to develop one or several
3   methods for sufficient sensitivity and reliability
4   which will permit the determination of asbestos and
5   other contaminants in talc-containing products with
6   the necessary degree of accuracy and at a
7   concentration at which such contaminants present a
8   potential health hazard. Do you see that?
9   MR. SMITH: I don't.
10  A   Yes.
11  Q   When you met with, when you spoke with Dr.
12  Hopkins, he didn't discuss any of these reports with
13  you, even though they refer directly to the FDA --
14  MR. SMITH: Objection.
15  Q   In testing of asbestos?
16  A   Let me point out, number one, that this
17  starts with aerosols and hair preparations. Number
18  two, this doesn't look like a communication to or
19  from Johnson and Johnson to the FDA, so I did not
20  review that in preparation for today. And this is a
21  bit of a confusing document. I'm not exactly sure
22  what we are supposed to focus on since every page
23  seemed to be marked project 679.
24  Q   What we are focusing on the page that
25  talks about the determination of asbestos in talc.

Page 26

1    A   Yes, I realize that.
2    Q   And what is listed in this document, and
3  this came from Johnson and Johnson.  I didn't get it
4  on my own.  You understand that, right?
5    A   That's fair.  I'm just trying to find the
6  page you are on.
7          MR. SMITH:  In fairness, I don't know
8  that it came from Johnson and Johnson.
9          MR. PLACITELLA:  You don't know?
10          MR. SMITH:  It doesn't have Johnson
11  and Johnson Bates numbers on it.
12          MR. PLACITELLA:  Mr. Hicks is the one
13  who brought it to a deposition and went over it.
14          MR. SMITH:  I don't quarrel.  It may
15  have come from the FDA.  I don't know.
16    Q   Do you see where it says, "Due to
17  separation of John Stuart from government service,
18  no methods development investigations were done
19  during the first quarter of 1976."  Do you see that?
20    A   I do see that.
21    Q   If you go to the next page, it states,
22  "Due to lack of specialized personnel in certain
23  necessary instrumentation, no significant work was
24  done on methods developments during the second
25  quarter of '76."  Do you see that?

Page 27

1    A   I do.
2    Q   Do you see where it says, "Because of
3  limited resources and in regard to instrumentation
4  and trained personnel, the only project plan
5  relating to the methods development and sample
6  enrichment floatation in order to detect lower
7  levels of certainty by DPA."  Do you see that?
8    A   I do.
9    Q   Now, you are aware, are you not, that the
10  FDA has done no testing on Vermont talc since 1979
11  itself?  You know that, correct?
12          MR. SMITH:  Objection.
13    A   I don't know the exact dates of testing
14  that's been done, but there are multiple
15  publications and test reports related to the Vermont
16  mines.
17    Q   I'm asking you whether you know from your
18  preparation and review of the documents in your
19  possession that the FDA had itself its own
20  personnel, has done no testing on any Vermont talc
21  since 1979?
22          MR. SMITH:  Objection.
23    A   I'm not aware of what dates they did
24  Vermont testing.
25    Q   Do you know if the FDA ever did any

Page 28

1  testing itself on Vermont talcs?
2    A   Well, I'm aware of FDA doing testing
3  multiple times.  Several times during the '70s, in
4  the '80s, 2009 testing cosmetic talc products,
5  including testing of raw materials, and some of
6  those would have been from the Vermont mines.
7          The exact dates of when they tested
8  materials that came from the Vermont mines, I cannot
9  speak to that exactly.
10    Q   So you don't know when the last time the
11  FDA personnel was involved in testing talc from the
12  Vermont mine?
13          MR. SMITH:  Objection.
14    Q   Correct?
15    A   What I just said, if there's material that
16  came out of Vermont and was some in some of those
17  cosmetic talcs that were tested several times
18  in the '70s, in the '80s and 2009.  I don't know
19  that there was an exact date that FDA stopped
20  testing Vermont talc because I don't know if there's
21  Vermont talc in those samples that were tested in
22  2009.
23    Q   As you sit here today, you can't point to
24  a single test done by the FDA itself on Vermont talc
25  after 1979, correct?

Page 29

1          MR. SMITH:  Objection.
2    A   So again, there was a survey of cosmetic
3  talcs done in 2009.  Multiple samples that were
4  used.  I don't know the origin of all of those
5  cosmetic products.  They not Johnson and Johnson
6  products.  It is possible they may have been from of
7  the Vermont mine, but I can't speak to that
8  directly.
9    Q   What was my question?
10          MR. SMITH:  Objection.
11    A   Your question was when was the last date
12  did FDA test Vermont talc after 1979.  And as I
13  said, they tested in the '80s, and again in 2009.
14  It is possible some of that material came from the
15  Vermont mine.
16    Q   Ma'am, here is my question, please.  As
17  you sit here today, you have no evidence in front of
18  you to indicate that the FDA itself ever did any
19  testing of talc from the Vermont mine after 1979,
20  correct?
21    A   As I --
22          MR. SMITH:  Objection.
23    A   As I said, there are multiple surveys that
24  were done.
25    Q   I'm not asking you about multiple surveys.

Page 30

1  Please, I'm asking you specifically --
2          MR SMITH:  You can't talk over the
3  witness.
4          MR. PLACITELLA:  I can talk over the
5  witness if she refuses to answer the question.
6          MR. SMITH:  She is not refusing to
7  answer the question.
8          MR. PLACITELLA:  I'll withdraw the
9  question.
10         MR. SMITH:  Okay.  Question
11  withdrawn.
12    Q   Do you believe an honest and forthright
13  witness can provide a simple answer to a simple
14  question?
15         MR. SMITH:  Objection.
16    A   If there's a simple answer, yes.  If
17  there's not a direct answer to your question, I'll
18  give you the related information.
19    Q   Ma'am, can you show me in any of the books
20  that you have in front of you today any testing done
21  by the FDA of Vermont source talc after 1979?  Show
22  it to me.
23    A   I would be happy to review the results
24  from the 1986 survey that was done by FDA and I'll
25  be happy to review the 2009 results from the FDA.

Page 31

1          As I said, I don't know the source of
2  that talc.  It is not all Johnson and Johnson talc.
3  It may have come from Vermont.
4    Q   But you don't know?
5    A   As I said, I don't know specifically if
6  those cosmetic products tested in '86 and in 2009
7  came from the Vermont mine, but testing was done by
8  FDA in those two periods.
9          You asked me did the FDA test after
10  1979.  Maybe.  I don't know the provenance of those
11  cosmetic samples that came from those other
12  companies.
13    Q   Ma'am, with all due respect, as you sit
14  here today, you can't point me to any evidence that
15  demonstrates that the FDA tested Vermont talc after
16  1979, can you?
17         MR. SMITH:  Objection.
18    Q   True?
19         MR. SMITH:  Objection.
20    A   As I said, the FDA has tested in '86 and
21  again in 2009.  I don't know if that cosmetic
22  material that came from other companies was from
23  Vermont or not, but FDA did do testing.
24          So again, I don't know if they tested
25  from the Vermont mines or not because I don't know

Page 32

1  the provenance of the samples they tested in 1986
2  and in 2009.
3    Q   So you don't know as you sit here today
4  that the FDA ever performed any tests on Vermont
5  mines after 1979?  You don't know that, true?
6          MR. SMITH:  Objection.
7    A   What I know is the FDA did testing in 1986
8  and in 2009.  I don't know the provenance of those
9  cosmetic samples because they are not J and J
10  samples of cosmetic material.  They may have come
11  from the Vermont mine.  I don't know for sure.  They
12  are not Johnson and Johnson products.
13    Q   Let me ask you the question this way.  Do
14  you have any evidence as you sit here today that the
15  FDA ever tested a Johnson and Johnson product after
16  1979 that was sourced from the Vermont mine?
17    A   Well, I'll have to check and see when we
18  sourced material from the Vermont mine.
19    Q   Yes, Ma'am.  Go ahead.
20    A   Maybe we can go to the 1986 test results.
21          MR. SMITH:  Go to whatever you need
22  to go to.
23    Q   Can you tell me what exhibit you are
24  looking at first?
25    A   This will be the 1986.

Page 33

1    Q   The marking on the exhibit for the folder.
2    A   It says D-237.  I don't know what you mean
3  by the marking.
4    Q   The binder is marked with an exhibit
5  number, it is not?  Look at these and we will mark
6  them at a break.
7    A   This is 1984.  November 15, 1984, the
8  Food Additives Valuation Branch did an assessment
9  and review of talcum powder used for cosmetics,
10  which included any relationship to any potential
11  asbestos contamination.
12          I'm looking to see if there's a list
13  here that can tell us what samples -- where the
14  samples came from.
15    Q   Why don't we do this.  Take a look during
16  the break and we will have everything marked and we
17  will get back to that.
18    A   Okay.
19    Q   So we are not wasting time.  Put a sticker
20  on that so you know to go back to it.
21    A   I know exactly where it is.  No sticker
22  needed.
23    Q   Am I correct that even when Johnson and
24  Johnson provided information to the FDA, Johnson and
25  Johnson controlled what the public could know about

**Page 34**

1  the product safety testing?
2      MR. SMITH:  Objection.
3      A   Johnson and Johnson is responsible for
4  whatever is on the packaging of the cosmetic talc
5  products, if that's what you mean, in compliance
6  with the FDA regulations.
7      Q   No, Ma'am.  What I'm asking you is when
8  you gave testing information or reports on your talc
9  to the FDA, you, Johnson and Johnson, were in
10  control of what the FDA could release to the public,
11  correct?
12      MR. SMITH:  Objection.
13      A   Well, our communications with the FDA,
14  that's a privileged proprietary information.  So
15  that would not be generally publically available.
16      I understand people can make a
17  request through the Freedom of Information Act to
18  get redacted information.  I don't know the exact
19  process and procedures, but certainly any citizen
20  can make that request.
21      Q   But whether or not the information is
22  released by the FDA to the citizen making that
23  request is totally within the control of Johnson and
24  Johnson, correct?
25      MR. SMITH:  Objection.

**Page 35**

1      A   I don't know that that's true, no.
2      Q   Do you know that Johnson and Johnson
3  actually stopped information on asbestos testing
4  that it provided to the FDA from being released to
5  the public.  You know that, correct?
6      MR. SMITH:  Objection.
7      A   I don't know what you are referring to.
8  I'm happy to look at whatever documents you are
9  referring to.
10      Q   I'm not asking if you are happy to look at
11  documents.  You are Johnson and Johnson.  I'm asking
12  you, Johnson and Johnson.  You, Johnson and Johnson,
13  know that you were controlling exactly what the
14  public could see that you gave to the FDA.  You know
15  that you were doing that, correct?
16      MR. SMITH:  Objection.
17      A   That's not correct.
18      Q   Okay.  465 is a memo from Mr. Nashed to
19  D.E. Johnston on June 7, 1973, with subject matter
20  talc asbestos, correct?
21      A   Yes.
22      Q   Who are these people, Nashed and Johnston?
23      A   Dr. Nashed is a J and J employee in our
24  research and development group at this time.
25      Q   Who is D.E. Johnston?

**Page 36**

1      A   Mr. Johnston, I don't know.
2      Q   And Mr. Nashed writes to Mr. Johnston,
3  "Dr. A. Weisler of the Division of Colors and
4  Cosmetics, FDA, informed me today by phone that Dr.
5  Zeitz of the Nader Group has asked him to provide
6  him with information available to them on the talc
7  asbestos question."  Do you see that?
8      A   Yes.
9      Q   And Dr. Weisler said that Johnson and
10  Johnson had submitted reports at various times, most
11  of them under a confidentiality statement which are
12  not subject to release to the public under the
13  Freedom of Information Act.  Do you see that?
14      A   Yes.
15      Q   Then he goes on to talk about what he told
16  the FDA.  He said, "I told Dr. Weisler that Johnson
17  and Johnson will be happy to discuss release of
18  information if it is deemed helpful to the FDA.
19  However, since our reports include correspondence
20  and opinions from experts, we have submitted such
21  reports with the understanding that they are the
22  exclusive use of the FDA."  Do you see that?
23      A   Yes.
24      Q   He goes on to state, does he not, that
25  "Unless permission is given, all reports should be

**Page 37**

1  held in confidence by the FDA."  Correct?
2      A   I see that, yes.
3      Q   466 is a November 7, 1973 memo from D.R.
4  Pederson.  Who is that?
5      A   I'm not sure.
6      Q   It is on Johnson and Johnson letterhead?
7      A   Yes, it is.
8      Q   What Mr. Pederson writes is, "I want you
9  to be aware that certain material previously
10  provided to the FDA will be released from our
11  confidential disclosure.  At that time information
12  was given to the FDA in confidence.  We have decided
13  to release that data pertinent to Shower to Shower
14  and Johnson's Medicated Powder, which would dispute
15  the information presented in the Lewin report,
16  recently released by the FDA.  We have decided not
17  to release the data either on the Italian mine or on
18  Johnson's Baby Powder and Vermont 66 Talc."
19  Correct?
20      A   I see that, yes.
21      Q   And you understand that one of the missions
22  of Johnson and Johnson, when it was dealing with the
23  FDA, was to submit rebuttals every time an
24  allegation was made that there was asbestos in the
25  Johnson and Johnson talc, correct?

Page 38

1   A   Not correct.
2   Q   And Johnson and Johnson, internally what
3   they said they were doing was actually putting out
4   fires, right?  You have seen that document, correct?
5   A   You have to show me the document.  I don't
6   know which document you are referring to.
7   Q   I'm going to show you what's been marked
8   462, and it is entitled Historical Review.  Have you
9   ever seen this document before?
10  A   I need a minute to look at it.
11      Okay.
12  Q   I'm looking at the paragraph on the second
13  page that talks about when the Food and Drug
14  Administration brought talc issue to a head.
15  Approximately two years ago, their consultant, Dr.
16  Lewin, strongly asserted he had found asbestos in
17  Johnson and Johnson powder.
18      Johnson and Johnson quickly reacted
19  with consultants of their own and after several
20  meetings in Washington, Dr. Lewin's original report
21  was later amended and he retracted his statements on
22  the occurrence of asbestos in Johnson and Johnson
23  powder.
24      In addition, we have transmitted to
25  the FDA formidable rebuttals of any question of the

Page 39

1   Occurrence of chrysotile in Johnson and Johnson
2   powder.  Do you see that?
3   A   I do.
4   Q   Do you see on the next page where it talks
5   about Johnson and Johnson is putting out fires with
6   respect to the specific question of asbestos in
7   talc?
8   A   I see that.
9   Q   Now, am I correct that Johnson and Johnson
10  had intimate access to FDA officials when product
11  safety issues arose concerning talc?
12  A   So the documents you are showing me are
13  from the '70s.
14  Q   That's not my question.  I'm not asking
15  about these documents.  I'm asking you another
16  question.  So listen to it.
17      MR. SMITH:  Objection to the
18  question.  If you are not withdrawing it, she is
19  going to finish her answer.
20      MR. PLACITELLA:  No, I'll withdraw it
21  and I'll ask it again.
22  Q   I'm not asking you about the documents
23  we just went through.  I'm asking you a different
24  question.
25      Johnson and Johnson had intimate

Page 40

1   access to FDA officials when safety issues arose
2   concerning talc and asbestos, correct?
3   A   I never heard the term intimate used in
4   relation to our relationship with the FDA.
5   Q   You agree that Johnson and Johnson had a
6   far greater access to FDA officials when it came to
7   asbestos and talc than an ordinary citizen, correct?
8   A   That is correct.
9   Q   And in fact, Johnson and Johnson had a
10  greater access than the medical community that was
11  in charge of caring for patients hurt by Johnson and
12  Johnson when it came to issues of product safety,
13  correct?
14      MR. SMITH:  Objection.
15  A   Johnson and Johnson did not hurt any
16  individuals, so I object to the basis of that
17  question.
18  Q   Let me ask you.  Do you agree with me that
19  Johnson and Johnson had far greater access to the
20  general medical community on issues of asbestos in
21  talc, correct?
22      MR. SMITH:  Objection.
23  A   Greater access to the medical community?
24  I don't know what the question is.
25  Q   Johnson and Johnson had far greater access

Page 41

1   to the FDA officials in dealing with issues of
2   asbestos in talc than the general medical community
3   did, correct?
4       MR. SMITH:  Objection.
5   A   Now I understand your question.  Yes, we
6   are regulated by the FDA, so of course, we have
7   regular and structured interactions with the FDA.
8   Q   You are aware that FDA officials have left
9   government service and went to work for Johnson and
10  Johnson, correct?
11      MR. SMITH:  Objection.
12  A   Yes, I'm aware of that.
13  Q   And you are aware the FDA officials have
14  left government service and went to work for the
15  industry trade organization that you are a member
16  of, correct?
17      MR. SMITH:  Objection.
18  A   Yes, I'm aware of that.
19  Q   And can you tell me as you sit here today
20  which government, former government officials you
21  are aware of that went to work for Johnson and
22  Johnson, former FDA officials?
23      MR. SMITH:  Objection.
24  A   The ones the pops into my mind is Dr. Sam
25  Maldonado, who leads our Pediatric Center of

**Page 42**

1 Excellence.
2 Q  Any other?
3 A  Michelle McMurry is a physician in our
4 clinical group in our Device Sector.
5 Q  Any others?
6 A  I'm sure there's a long list, but I don't
7 know the list.
8 Q  You are also aware that former executives
9 for Johnson and Johnson went to work for the FDA,
10 correct?
11      MR. SMITH: Objection.
12 A  Yes.
13 Q  Which former executives of Johnson and
14 Johnson are you aware of that went to work for the
15 FDA?
16 A  Again, I think Sam Maldonado went to the
17 FDA and then came back to Johnson and Johnson and it
18 is common in the industry for people who work at the
19 FDA for a period of time during their career.
20 Q  You actually had former executives who
21 worked at Johnson and Johnson and then went to work
22 at the FDA specifically on the issue of talc safety,
23 correct?
24      MR. SMITH: Objection.
25 A  I'm not aware of that, no.

**Page 43**

1 Q  You are not aware that you had former
2 executives who went to work at the FDA on the issue
3 of asbestos in Johnson and Johnson's powder?
4      MR. SMITH: Objection.
5 A  No.
6 Q  Take a look at 465.  Remember 465 is the
7 memo that talks about Johnson and Johnson giving the
8 FDA permission to release certain information under
9 the Freedom of Information Act.  Do you remember
10 that?
11      MR. SMITH: Objection.
12 A  Yes.
13 Q  Can you look at the bottom paragraph where
14 Mr. Nashed states, "He added that Dr. Eiermann is now
15 on deck and will be taking over as Director of the
16 Division of Cosmetics and that he, himself is
17 phasing out of the area."  Do you see that?
18 A  Yes, I see that.
19 Q  Did you know Dr. Eiermann was a former
20 Johnson and Johnson executive?
21      MR. SMITH: Objection.
22 A  No, I did not.
23 Q  So you didn't know in preparing for
24 today's deposition that a former Johnson and Johnson
25 executive actually took control, or was one of the

**Page 44**

1 leading officials at the FDA involved with the issue
2 of asbestos and talc?  You didn't know that?
3      MR. SMITH: Objection.
4 A  I was asked to look at the communications
5 between Johnson and Johnson and the FDA on asbestos
6 testing and talc safety.  I didn't look into the
7 background of Mr. Eiermann, so no, I was not aware of
8 that.
9 Q  So when you were looking at all these
10 documents, you saw documents referencing Mr. Eiermann,
11 correct?
12 A  Yes, I did.
13 Q  When you looked at all these documents, no
14 one in all of Johnson and Johnson told you, hey, that
15 guy used to work for us?
16      MR. SMITH: Objection.
17 Q  In fact, was he was one of our executives?
18 No one ever told you that?
19      MR. SMITH: Objection.
20 A  No, and I wouldn't expect that because we
21 were looking at these documents based on the facts
22 and the scientific merit and the context of the
23 documents, not where people came from.  That's not
24 relevant.
25 Q  So it wasn't relevant that the FDA and

**Page 45**

1 Johnson and Johnson had a revolving door in terms of
2 executives and people working on safety issues?
3 That wasn't relevant to you?
4      MR. SMITH: Objection.
5 A  I disagree with the context of that
6 question.
7 Q  Well, Ma'am, you didn't think it was
8 important to know that the person who was one of the
9 people in charge of talc safety and asbestos at the
10 FDA was your former executive?  You didn't think
11 that was important?
12      MR. SMITH: Objection.
13 A  I don't know of the scope of Mr. Eiermann's
14 job at FDA or the scope of his job at Johnson and
15 Johnson, and there certainly is no revolving door.
16 I really can't speak to that history and what you
17 are implying with your question.
18 Q  Ma'am, you know that when citizens raised
19 product safety issues with the FDA concerning talc,
20 the first thing the FDA did was pick up the phone
21 and call Johnson and Johnson to give them a heads
22 up.  You knew that, right?
23      MR. SMITH: Objection.
24 A  I don't know what you are referring to
25 specifically.

Page 46

1    Q   Do you know as a general matter that any
2  time a safety issue was raised concerning Johnson
3  and Johnson tale, somebody at the FDA picked up the
4  phone and called Johnson and Johnson to give them a
5  heads up.  You know that happened, correct?
6         MR. SMITH: Objection.
7    A   Well, Johnson and Johnson cosmetics are
8  under the regulatory authority of the FDA, so if
9  somebody brought up a safety issue concerning one of
10 our products, it would be appropriate that they
11 reach out to us directly.
12        I don't know if they called or sent
13 an email or a letter, but absolutely Johnson and
14 Johnson should be notified.
15   Q   Right.  But they didn't send a letter
16 saying we got this complaint, how do you respond?
17 What they did, your relationship at the FDA was such
18 that if you got a complaint, they picked up the
19 phone and they told you about it first thing, right?
20 That's what happened.
21        MR. SMITH: Objection.
22   Q   That's what happened.
23        MR. SMITH: Objection.
24   A   I don't know that's true.
25   Q   In fact, you kept a file at Johnson and

Page 47

1  Johnson that was dedicated entirely to phone calls
2  that the FDA gave you in order to give you a heads
3  up, correct?
4         MR. SMITH: Objection.
5    A   Well, I don't agree with the
6  characterization that there's a heads up phone call
7  file, but of course, it would have been in the
8  natural course of business that we would have kept
9  track of memos related to the content of
10 conversations we had with the FDA.  That would have
11 been standard procedure, absolutely.
12   Q   There was an FDA call file, correct?
13   A   I don't know if that's what they called
14 it, but any communication with the FDA we absolutely
15 should be keeping that as a record.
16   Q   Did you review the Johnson and Johnson
17 call file in preparation for today's deposition?
18   A   I have numerous memos from Johnson and
19 Johnson related to calls with FDA.  I don't know
20 that they specifically came out of this file you are
21 calling the call file, but, yes, I have memos.
22   Q   Ma'am, that's not my question.  Did you
23 review the Johnson and Johnson call file in
24 preparation for today's deposition?
25   A   I have not seen a file characterized as

Page 48

1  such, but I have memos related to calls between
2  Johnson and Johnson and the FDA.
3    Q   So in preparing for today's deposition the
4  lawyers never gave you access to the FDA call file,
5  correct?
6         MR. SMITH: Objection.
7    A   You are characterizing a file as a call
8  file. I have not heard that terminology.
9    Q   Can you look at 491, please.  491 is a
10 memo on Johnson and Johnson letterhead dated January
11 4, 1984 and the memo is to the FDA call file.  Do
12 you see that?
13   A   Yes.
14   Q   And the re: is talc, correct?
15   A   Yes.
16   Q   So I'm asking you again, in preparing for
17 today's deposition, the lawyers for Johnson and
18 Johnson, or anybody else at Johnson and Johnson,
19 never gave you access to the complete FDA call file,
20 correct?
21        MR. SMITH: Objection.
22   A   So we don't -- you are asking if I had
23 access to something called a call file.  All of the
24 documents are no longer in paper files.  They are in
25 digital form in a database, and they were searched

Page 49

1  for FDA communications to us, Johnson and Johnson
2  communications to FDA, and they would have included
3  documents related to the phone calls.
4    Q   What you are saying is all that paper
5  was destroyed?
6         MR. SMITH: Objection.
7    A   I don't know how our records are kept.
8    Q   You said it is only digital, so what
9  happened to the FDA paper call file?
10        MR. SMITH: Objection.
11   A   I don't know what our retention procedures
12 are, so I can't speak to that.
13   Q   You understand you didn't have the right
14 or authority to destroy any paper, because you were
15 already sued in talc cases in 1984.  You knew that,
16 right?
17        MR. SMITH: Objection.
18   A   I don't know about suits in 1984 and I
19 don't know about our retention policy related to
20 talc, so I really can't speak to that.
21   Q   Let me ask you the question again.  In
22 preparation for today's deposition, you never were
23 provided access, nor did you review, the FDA call
24 file, true?
25        MR. SMITH: Objection.

Page 50

1    A   Our documents are in digital form.  We no
2   longer have physical folders, physical files that
3   you are referring to.  So I reviewed documents that
4   were pulled out of our digital files based on a
5   search related to the communications with the FDA
6   and I do have memos and documents related to those
7   communications that I have reviewed.
8          There's not a physical form of a file
9   that you are referring to, so I wouldn't have had it
10  in my hands.  So your characterization doesn't match
11  up with the way we currently maintain the records.
12   Q   What was my question?
13   A   Your question was about the FDA call file.
14   Q   What was my question?
15   A   You can read the question again.
16   Q   Do you have any idea what my question was?
17          MR. SMITH:  Objection.
18   A   I have answered your question.
19   Q   What was it, if you know you answered the
20  question?
21          MR. SMITH:  Objection.
22   A   Did I review documents from the FDA call
23  file.
24   Q   That wasn't the question.  Look at January
25  4, 1984.  Did you review this document in

Page 51

1   preparation for today's deposition?
2          MR. SMITH:  Objection.
3    A   I don't recall seeing this specific
4   document.
5    Q   Although this came from the FDA call file
6   and related directly to the issue of asbestos in
7   talc, this was not provided to you, fair?
8          MR. SMITH:  Objection.
9    A   I don't recall seeing this specific memo,
10  but I have many other memos that I reviewed.
11   Q   Ma'am, I'm not the asking you about other
12  memos.  We will do that later.  I'm saying in
13  preparation for today's deposition, you were never
14  provided with this memo from the FDA call file
15  related to asbestos talc testing, correct?
16   A   I don't recall seeing this specific memo.
17   Q   So the answer to my question is you were
18  never provided it, correct?
19          MR. SMITH:  Objection.
20   A   So the answer to your question is I don't
21  recall seeing this specific memo.
22   Q   So you did get it, you just don't
23  remember?
24          MR. SMITH:  Objection.
25   A   If I don't remember, how can I tell you if

Page 52

1   I -- I don't recall.
2    Q   Is this memo in any of the documents you
3   brought with you today?
4    A   No.  We brought the substantive documents
5   of the content of exchanges between Johnson and
6   Johnson and the FDA.
7    Q   Okay.
8    A   This is not a substantive document.
9    Q   What this document says is, "In 1984 at
10  9:10 a.m. I received a telephone call from John
11  Weidinger, Deputy Director, Cosmetic Technology
12  Division of FDA.  Mr. Weidinger informed me that FDA
13  had received a citizen petition from a Philip
14  Durelay of Stony Brook, New York requesting a warning
15  statement against asbestos contamination in baby
16  powder.  John called to request an a copy of an
17  article referenced in the petition."
18          Do you see that?
19   A   Yes.
20   Q   Am I correct that Johnson and Johnson
21  knew, and was aware, that when need be, it could
22  bypass FDA staff and go directly to the FDA
23  commissioner if it wanted to.
24          MR. SMITH:  Objection.
25   A   So there's a process to escalate to the

Page 53

1   commissioner if there's an issue of sufficient
2   import and merit.
3    Q   And when it came to Johnson's Baby Powder,
4   Johnson and Johnson had both the power and the
5   access to bypass FDA staff and go directly to the
6   FDA commissioner, if it wanted to, correct?
7          MR. SMITH:  Objection.
8    A   As I said, for topics of significant
9   import, absolutely we could escalate to the
10  commissioner as needed.
11   Q   No citizen or doctor had that kind of
12  access, correct?
13          MR. SMITH:  Objection.
14   A   I believe the citizens' petition process
15  is the mechanism by which citizens can approach the
16  FDA when they have certain concerns apropos the memo
17  you showed me.
18   Q   So you think an average citizen can just
19  bypass the FDA staff and go right to the
20  commissioner when it has issue?  That's what you
21  believe?
22          MR. SMITH:  Objection.
23   Q   Just like Johnson and Johnson can?
24          MR. SMITH:  Objection.
25   A   We don't bypass.  We escalate, meaning if

Page 54

1   there's an issue that's been discussed with the FDA
2   staff members as appropriate to preview a topic and
3   there's some issue that arises that needs a higher
4   level of interaction, those issues can be escalated,
5   but we do not bypass the communication process.
6          MR. SMITH: While there is no
7   question pending, can we have a bathroom break?
8          THE VIDEOGRAPHER: The time is
9   approximately 11:03 a.m and we are going off the
10  record.
11          (Recess taken)
12          (Notebooks are marked P-3, 4 and 5.)
13
14          THE VIDEOGRAPHER: We are back on the
15  record. The time is approximately 11:14 a.m.
16
17  BY MR. PLACITELLA:
18
19   Q   Dr. Nicholson, before we broke you talked
20  about the ability to escalate an issue to the
21  commissioner. What was the process for doing that?
22   A   I don't know the exact process.
23   Q   What kind of issues got escalated to the
24  commissioner?
25          MR. SMITH: Objection.

Page 55

1    Q   By Johnson and Johnson.
2    A   I think escalations were extremely rare.
3   If there's a discussion about a specific topic at a
4   certainly level of management, whether it be with
5   the director of the cometic division, then that
6   could be escalated to the commissioner.
7    Q   Does the ordinary citizen have the ability
8   to do that?
9    A   An ordinary citizen would use the citizen
10  petition process to interact with the FDA.
11   Q   So the ordinary citizen has no ability to
12  get directly to the FDA commissioner like Johnson
13  and Johnson does, correct?
14   A   I don't know if they can or cannot reach
15  the commissioner.
16   Q   What about medical doctors who are
17  concerned about the safety and health of their
18  patients? Do they have direct access to the
19  commissioner?
20          MR. SMITH: Objection.
21   A   I don't know.
22   Q   What about members of Congress, can they
23  just call up the commissioner and demand access to
24  the commissioner?
25          MR. SMITH: Objection.

Page 56

1    A   I don't know.
2    Q   Now, when Johnson and Johnson feels like
3   it is suffering from adverse public relations
4   concerning the safety of its products, is that the
5   type of thing they escalate to the commissioner of
6   the FDA?
7          MR. SMITH: Objection.
8    A   No. Public relations has nothing to do
9   with FDA interactions and what things would
10  escalate.
11   Q   Well, you did understand and consider
12  escalating the issues related to the safety of baby
13  powder and asbestos to the commissioner, correct?
14          MR. SMITH: Objection.
15   A   Not the safety of asbestos and baby
16  powder. The issue was testing of asbestos in baby
17  powder, and the fact that there was incorrect
18  testing results and people were making significant
19  decisions based on incorrect testing methods.
20   Q   And it was Johnson and Johnson's position
21  that they needed to go directly to the commissioner
22  and voice their position, correct?
23          MR. SMITH: Objection.
24   A   No. That's not correct.
25   Q   I'm not correct? What is correct?

Page 57

1          MR. SMITH: Objection.
2    A   Johnson and Johnson deals directly with
3   the individuals responsible for the oversight of
4   cosmetics. If there's some issue that needs to be
5   escalated based on various considerations of the
6   importance and impact, that could be escalated to
7   the commissioner.
8    Q   Well, Johnson and Johnson took the
9   position that it had access to the commissioner on
10  the issue of whether asbestos was in baby powder,
11  correct?
12   A   Incorrect.
13   Q   476 is an addendum to memorandum from
14  March 23, 1972. Have you seen this before?
15   A   I need one minute to look at it.
16   Q   Sure.
17   A   I have seen communications related to this
18  topic. I don't know if I've seen this exact
19  addendum. Without seeing the rest of the documents,
20  it is hard to tell.
21   Q   It is not part of the information you
22  reviewed in preparation for today's deposition?
23          MR. SMITH: Objection.
24   A   I didn't say that. I reviewed -- if I
25  reviewed it, I reviewed the whole letter. You only

Page 58

1 gave me a page.
2    Q   Do you have the whole letter, because I
3 don't have it?
4    A   I may.  If you would like, I'll take time
5 to look through.
6    Q   Let's make a note of things we want to
7 look at during the break.
8        Do you see here it talks about a call
9 with the Deputy Director, Bureau of Foods?  Do you
10 see that?
11   A   Yes.
12   Q   About Johnson's Baby Powder.
13   A   I see that.
14   Q   Do you see it says, "I reviewed further
15 with Mr. Bernard the advisability of Johnson and
16 Johnson going to the commissioner to inform him of
17 our data regarding our baby powder being free of
18 asbestos so that he will be prepared to allay the
19 panic of the mothers which may result from the
20 consumer initiated publicity."
21   A   Yes.
22   Q   Do you see that?
23   A   Yes.
24   Q   Did that ever happen?
25   A   That they discussed with the commissioner.

Page 59

1 I believe there was a discussion with the
2 commissioner.
3    Q   Now when the FDA is responding to citizens
4 concerns about the safety of baby powder, it, in
5 fact, relied upon Johnson and Johnson for research
6 and support in order to respond to those concerns.
7 Is that true?
8        MR. SMITH:  Objection.
9    A   In 1972, there was a lot of work being
10 done around asbestos testing and incorrect test
11 results coming out.  Johnson and Johnson's Baby
12 Powder is free of asbestos.  So there were some
13 concerns about incorrect information being
14 attributable to our products.
15   Q   That wasn't my question.  My question was
16 when the FDA is responding to citizens concerns
17 about the safety of Johnson's Baby Powder, it
18 actually relied upon Johnson and Johnson to help
19 write and respond to the citizens concerns, correct?
20       MR. SMITH:  Objection.
21   A   I'm not sure I agree with that
22 characterization, but I'll say that Johnson and
23 Johnson was very involved in the technologic
24 methodological development of asbestos testing because
25 we had significant expertise in this area.

Page 60

1    Q   When the FDA made a decision how they were
2 going to respond to citizens raising questions about
3 the safety of baby powder, they actually went to
4 Johnson and Johnson and said, can you give us the
5 research to support our decision, correct?
6        MR. SMITH:  Objection.
7    Q   Even after they made the decision,
8 correct?
9        MR. SMITH:  Objection.
10   A   I'm sorry, I'm confused by your question.
11   Q   When the FDA was responding to concerns
12 that were raised by citizens about the safety of
13 baby powder, it actually went to Johnson and Johnson
14 and said, this is what we decided, but we need you to
15 give us the backup for our analysis.  That's what
16 happened, right?
17       MR. SMITH:  Objection.
18   Q   That's how intimate the connection was
19 between the two of you.
20       MR. SMITH:  Objection.
21   Q   Correct?
22   A   No.  I disagree with your
23 characterization.
24   Q   497 is correspondence from Craig Bernard
25 dated November 3, 2008, subject, meeting with J and

Page 61

1 J.  Do you see that?
2    A   Yes, I do.
3    Q   It states, "Hi, Mark.  You recall a couple
4 of months ago we met with Bill Casalarius' office
5 and spoke about the citizens petition with the FDA
6 that is requesting to have warning labels placed on
7 products containment.  Here is an update on that
8 activity.  Kathy Willie,"  do you know who Kathy
9 Willie is?
10   A   She's a former Johnson and Johnson
11 employee.
12   Q   What was her job?
13   A   I don't recall her exact title.
14   A   "Kathy Willie at Johnson and Johnson
15 informed me that at a recent science meeting in
16 Washington, D.C. she had a side conversation with a
17 key figure from the FDA cosmetic group that is
18 responsible for responding to the citizens
19 petition."
20       Do you know anything about a side
21 conversation?
22   A   I'm reading this here.
23       MR. SMITH:  Objection.
24   A   I'm looking at this here.  This is an
25 Imerys document.

Page 62

1   Q   Do you know anything about the side
2  conversation that you, Johnson and Johnson, had with
3  the FDA official in 2008 referenced here?
4        MR. SMITH: Objection.
5   A   This is the only reference I've seen to
6  that conversation. I'll point out, again, this is
7  an Imerys document.
8   Q   But it is their business record about a
9  meeting it had with you, Johnson and Johnson.
10 Right?
11       MR. SMITH: Objection.
12  A   It is an e-mail from one person to another
13 with an Imerys referring to some conversation that
14 was had, that's correct.
15  Q   With Johnson and Johnson?
16  A   Correct.
17  Q   He indicated the "FDA would rule against
18 the petition and would not require a warning label
19 on cosmetic products, but the FDA is looking for
20 scientific support from industry that will help
21 justify their position." Do you know anything about
22 that?
23  A   I don't know about this side conversation,
24 but I'm reading down further and I know what they
25 are referring to with regard to development of a review

Page 63

1  article related to talc safety.
2   Q   But you don't know anything about the side
3  conversation with the FDA asking Johnson and Johnson
4  for support in order to deny the citizen's petition.
5  Do you know about that side conversation?
6        MR. SMITH: Objection.
7   A   I'm reading this along with you and
8  I see the FDA had already made their decision about
9  the petition and they were looking for some
10 scientific support, and supposedly that was part of
11 this conversation that you are pointing out in this
12 memo that is an Imerys memo.
13  Q   That's exactly my point. So even after
14 the FDA had made its decision, it went to Johnson
15 and Johnson and said, can you give us some support
16 for we are about to say. That's what happened,
17 according to this memo.
18       MR. SMITH: Objection.
19  Q   Right?
20  A   I believe in your question you are
21 implying they had scientific support, but they were
22 going to rule against it. I think that's an
23 incorrect characterization.
24       I'm well aware of the Muscat and
25 Huncharek epidemiologic review of talc safety that was

Page 64

1  done and that was a review of the scientific
2  literature related to a specific safety concern,
3  which was prepared and available to the FDA.
4   Q   Ma'am, what I'm asking you is do you know
5  anything about these side conversations that Johnson
6  and Johnson executives were having with people at
7  the FDA asking for support for denying citizen
8  petitions. That's all I'm asking.
9        Do you know anything, since you are
10 here on behalf of Johnson and Johnson and the
11 communications it had with the FDA. Do you know
12 anything about those side conversations?
13       MR. SMITH: Objection. This witness
14 is here about communications.
15       MR. PLACITELLA: Please don't do
16 this.
17       MR. SMITH: Regarding testing for
18 asbestos. That's why she is here.
19  Q   Do you know anything about the side
20 conversation, Ma'am?
21  A   I only know what's written here in this
22 Imerys document. I have not seen this before and it
23 is not related to asbestos testing.
24  Q   It says on the bottom, I'll highlight it
25 for you.

Page 65

1        "We also know the FDA is looking to
2  include in their comments that talc does not contain
3  asbestos, and thus talc use would not cause a
4  concern from this risk perspective. We know this
5  because FDA asked Personal Care Products Council for
6  their updated specifications for talc, which the
7  council in turn asked J and J and RTM for assistance
8  with." Do you see that?
9   A   Yes.
10  Q   So this document does talk about asbestos
11 testing and information available from
12 Johnson and Johnson, correct?
13       MR. SMITH: Objection.
14  A   That's not correct. It says that the talc
15 does and they are making reference to the industry
16 specification they are getting, not from Johnson and
17 Johnson, but the Personal Care and Product Council.
18  Q   Who went to Johnson and Johnson and asked
19 for help, correct?
20       MR. SMITH: Objection.
21  A   I can't follow who went to what for whom.
22 There are probably four different people mentioned
23 in that sentence.
24  A   Says counsel in turn asked Johnson and
25 Johnson for assistance. Is it that hard to read?

Page 66

1    MR. SMITH: Objection.
2    A   I hear your question.  They are referring
3    to the J41 specification for cosmetic talc that you
4    get off of internet, so I don't see they would need
5    J and J's assistance to Google it and print it out.
6    Q   Ma'am, did I ask you anything about Google
7    or J41?
8    A   You did.
9    Q   I didn't.
10   A   You asked about this updated specification
11   for talc.
12   Q   Ma'am, all I asked you was, does this memo,
13   in fact, reference asbestos testing and the issue of
14   asbestos in talc.  That was my question.
15   A   This memo specifically said talc, not
16   containing asbestos in the current product
17   specifications, which would go to the fact that this
18   is talc not containing asbestos.
19       I'm well aware of this time period
20   and the topic at hand, and it is not about asbestos
21   testing.
22   Q   Let me read it for the record and then
23   I'll move on.  "We also know the FDA is looking
24   to include in their comments that talc does not
25   contain asbestos, and thus talc use would not cause

Page 67

1    a concern from this risk perspective."  That's what
2    it says, correct?
3    A   That's what it says, yes.
4    Q   I want to talk a minute about potential
5    hazards related to talc that were known and
6    discussed inside Johnson and Johnson relevant to
7    whether talc was misbranded under FDA regulations.
8    Okay?  Are you with me?
9    A   Yes.
10   Q   Am I correct, and can we agree, that
11   Johnson and Johnson was concerned about the medical
12   effect of tremolite for decades prior to the 2008
13   petitions?
14       MR. SMITH: Objection.
15   A   Not for the decades prior to 2008.
16   Q   Can we agree that as far back as 1969 the
17   Johnson and Johnson medical director expressed
18   concern about the medical effects of tremolite?
19       MR. SMITH:
20   A   In the late '60S and early '70s there were
21   questions about tremolite and that was dealt with
22   with some preclinical animal studies.
23   Q   Am I correct as far back as 1969 the
24   medical director of Johnson and Johnson was
25   concerned about the health effects of tremolite?

Page 68

1    A   That is correct.  In the late '60s and
2    early '70s, people were talking about the health
3    effects of tremolite and those issues were dealt
4    with with preclinical animal testing.
5    Q   I didn't ask you about animal testing.
6    I'm asking you a very specific question.  Am I
7    correct that as far back as 1969, Johnson and
8    Johnson's medical director had concerns about the
9    health effects related to tremolite, that's my
10   question.
11       MR. SMITH: Objection.
12   Q   Not what you did in response.  I'll ask
13   that as a separate question.  Do you understand
14   that?
15       MR. SMITH: Objection.
16   A   I understand your question.  The way you
17   are phrasing it is misleading, and it implies that
18   for many years starting in 1969, people were
19   concerned about tremolite, and that's incorrect.
20   It was a very small period of time people were
21   concerned and that scientific question was dealt
22   with in the early '70s with preclinical animal
23   testing.
24   Q   And it was totally resolved from Johnson
25   and Johnson's perspective in the early '70s, the

Page 69

1    potential health effects from tremolite.  Is that
2    what you are saying?
3        MR. SMITH: Objection.
4    A   Yes.
5    Q   Can we agree that Johnson and Johnson's
6    Baby Powder products contained tremolite and
7    actinolite that were classified as fiber by federal
8    regulations?
9        MR. SMITH: Objection.
10   A   That is a compound question that you are
11   asking.  Tremolite and actinolite are not asbestos.
12   Q   Ma'am, that's not my question.  My
13   question is can we agree that talc baby products
14   that contained tremolite and actinolite were
15   classifiable as fiber under federal regulations?
16       MR. SMITH: Objection.
17   A   You have to show me the regulations you
18   are referring to.
19   Q   J44 is an April 26, 1973 memo to Mr.
20   Johnston on Johnson and Johnson letterhead,
21   correct?
22   A   Yes.
23   Q   This was after the time you say Johnson
24   and Johnson hadn't resolved the issue of whether
25   there was a danger related to tremolite, correct?

Page 70

1       MR. SMITH: Objection.
2     A   That's correct, in preclinical animal
3   testing.
4     Q   You are familiar with this document?
5     A   I've seen this document, yes.
6     Q   In this document it talks about a visit to
7   the mine by Mr. Ashton and Mr. Miller and Mr.
8   Zeitz, correct?
9     A   Yes.
10     Q   And it says, "It is our joint conclusion
11   that we should not rely on the clean mine approach
12   as a protective device for baby powder in the
13   current asbestos or asbestiform controversy. We
14   believe this mine to be very clean, however, we are
15   also confident that fiber forming or fiber type
16   materials could be found. Usefulness of the clean
17   mine approach for asbestos only is over." Do you
18   see that?
19     A   Yes.
20     Q   When you go to the second page, the reason
21   I'm asking you this because it is about the FDA. It
22   says, "if the FDA Food Division, which is moving
23   more rapidly than the cosmetic division, publishes a
24   standard, it will be probably to ban an asbestiform
25   or fibrous material in talc. That could eliminate

Page 71

1   the current uses of talc in packaging materials.
2   These talc contained wildly varying amounts of
3   tremolite or fibrous talc. Our Baby Powder contains
4   talc fragments classifiable as fiber. Occasionally
5   subtrace quantities of tremolite or actinolite are
6   identifiable on the microscope and these might be
7   classified as asbestos fibers." Did I read that
8   correctly?
9     A   You did.
10     Q   Now, you understand that it was, and can
11   we agree that the FDA's position was that "non
12   asbestiform tremolite could be ground up so that it
13   conformed to the definition of fiber requiring
14   regulation and that it would be as indistinguishable
15   from asbestos tremolite." You, Johnson and Johnson,
16   knew that, correct?
17       MR. SMITH: Objection.
18     A   You are showing me documents from the
19   early '70s, so I need to know what documents you are
20   referring to because whatever was done before 1976
21   is during methods developments, so any definitive
22   statements during that time around the
23   characterization of asbestos are probably incorrect.
24     Q   Ma'am, that's not my question, please. My
25   question is, it was the position of the FDA that

Page 72

1   non-asbestiform tremolite, as of at least 1974, could
2   be ground up and satisfy the definition of
3   asbestiform tremolite, correct?
4       MR. SMITH: Objection.
5     A   I don't recall that specific statement,
6   but I'll restate anything before 1976 with the J41
7   standard is likely to be confused and incorrect with
8   regard to the characterization of asbestos.
9     Q   We are going to get to that, I promise
10   you.
11       364 is a memo from the FDA dated May
12   14, 1974. You have seen this, correct?
13     A   I need one minute to look at it, please.
14   Go ahead.
15     Q   In this memo, the FDA states, "Tremolite
16   is the commonest asbestos mineral found as a
17   contaminant of talc. It occurs in asbestiform and
18   non-asbestiform varieties. This sample is a chunky
19   tremolite, not the asbestiform variety. But when it
20   is ground, it produces some thin, straight particles
21   which conform to the definition of fibers in the
22   method which our distinguishable produced by
23   asbestiform tremolite on grinding."
24       That is something that Johnson and
25   Johnson understood as of this time, correct?

Page 73

1       MR. SMITH: Objection.
2     A   That is correct. This in the context of
3   developing methods. They are not saying tremolite
4   is asbestos. They are trying to figure out what is
5   the right method to use to distinguish between other
6   particles and the type of asbestos that could be
7   harmful.
8     Q   Ma'am, I know you have a story to tell and
9   you can do it when your lawyer asks you questions.
10   But I would ask you, please, to just answer my
11   question.
12       My question was not -- didn't ask for
13   a long explanation. You understand that, right?
14       MR. SMITH: Let me state for the
15   record, Dr. Nicholson, just ignore those insulting
16   comments. Just ignore them. Okay. You are here.
17   Listen to the question, answer it.
18       The gratuitous comments we can't
19   stop. I'm told this is how he behaves at a
20   deposition, but just ignore it, okay?
21     A   Yes. Could you restate your question,
22   please?
23     Q   Sure. In this memo, the FDA is stating a
24   position concerning tremolite. That's all I'm
25   asking you, correct?

Page 74

1    A   That's incorrect.  In this memo the FDA is
2 talking about methods to distinguish asbestos, real
3 asbestos using different microscopic techniques.
4 This is not a declaration of a position, it is a
5 discussion of methods.
6    Q   Can you show me, Ma'am, in any of the
7 materials you brought with you today where the FDA
8 changed its position concerning non-asbestiform
9 tremolite being -- and if you can tag that, we will
10 do that after lunch can you do that?
11          MR. SMITH:  Objection to the form.
12    Q   Let me ask you this question.  Am I
13 correct, and can we agree that five to eight percent
14 of the Johnson and Johnson talc, talc sold by
15 Johnson and Johnson, contained particles that are
16 capable of damaging the lungs of human beings?
17          MR. SMITH:  Objection.
18    A   No.
19    Q   467 is an August 13, 1971 memo on Johnson
20 and Johnson letterhead, the subject being talc. I'm
21 going to refer you to Section G.  It states, "It is
22 generally accepted that the lung damaging particles
23 of minerals are below ten microns.  Roughly we have
24 about five to eight percent of such in our talc."
25 Did I read that correctly?

Page 75

1    A   You did read that correctly, but we don't
2 know this refers to cosmetic talc.  We have to go
3 back and review the beginning of the document.
4 Absolutely incorrect for our cosmetic talc and has
5 always been true.
6    Q   So it has been true for your industrial
7 talc, but not your cosmetic talc.  Is that what you
8 are saying?
9    A   What I'm saying is I'll need to go back
10 and look because cosmetic talc does not contain
11 particles.
12    Q   Okay.  Go back and look.  Let me help you.
13 Look at Section C.  It says the, Bureau of Mines
14 expert who testified at the behest of the FDA
15 commented on the poor grade talc in our Windsor
16 Mine, but mentioned the ore next to the outlying
17 rock contained asbestos.  It is imperative that
18 careful selection of the ore be maintained at the
19 mines.  It is always possible that the FDA may
20 inspect the mines and our records."  Do you see
21 that?
22    A   Yes.
23    Q   What they are talking about, and when you
24 look at B, they are talking about the Shower to
25 Shower and your medicated product, correct?

Page 76

1    A   Let me review the document.  There are
2 multiple points in here, not necessarily related.
3          Okay.  Go ahead.  Your question,
4 please.  Please ask the question again.
5    Q   This particular document talks about talc
6 that was being mined and sold by Johnson and
7 Johnson, correct?
8    A   That is correct, from Windsor Minerals,
9 which contain industrial talc as well as cosmetic
10 talc, and it is very difficult to see what they are
11 referring to in different points.  There's a
12 mixture.
13    Q   You understand that both the industrial
14 talc and the cosmetic talc sold by Johnson and
15 Johnson came out of the exact same Hammondsville
16 mine.  You know that, correct?
17    A   That is not correct.  There were different
18 mines, mine shafts and geographic locations for
19 cosmetic versus industrial talc.
20    Q   That wasn't my question.  Do you
21 understand, Ma'am, that the cosmetic and industrial
22 talc sold by Johnson and Johnson came out of the
23 Hammondsville mine, correct?
24          MR. SMITH:  Objection.
25    Q   You know that?

Page 77

1    A   That wasn't your question before.  You
2 said the exact same mine.  They come from different
3 mine shafts, different quality of talc, just to be
4 clear.
5    Q   Can we agree, Ma'am, that the cosmetic
6 talc and industrial talc that was sold by Johnson
7 and Johnson came out of the Hammondsville mine owned
8 by Johnson and Johnson?
9          MR. SMITH:  Objection.
10    A   I don't know the names of all the mines.
11 I don't believe Hammondsville was the only source of
12 talc, so I can't answer that specifically.  But I
13 know that cosmetic talc did not come from the
14 same geologic formations.
15    Q   How do you know that?
16    A   I've read many documents, spoken to many
17 experts in the field including John Hopkins and
18 other consultants that we have.  They are expert
19 geologists.
20    Q   So let's just be clear where we are.  Are
21 you saying that the cosmetic talc and the industrial
22 talc sold by Johnson and Johnson did not come from
23 the Hammondsville mine?
24          MR. SMITH:  Objection.
25    A   I didn't say that.

Page 78

1    Q   So my question was, according to Johnson
2  and Johnson, it is generally accepted that lung
3  damaging particles of minerals are below ten microns
4  and that according to Johnson and Johnson, you had
5  about five to eight percent of such minerals in your
6  talc as of 1971, correct?
7         MR. SMITH: Objection.
8    A   I'm reading the statement here as you are.
9  That's what it says.
10   Q   Now, am I correct that the talc in Johnson
11 and Johnson products is capable of reaching, when
12 inhaled, is capable of reaching deep into the human
13 organs?
14        MR. SMITH: Objection.
15   A   I'm not an inhalation toxicology expert.
16   Q   Do you agree with me that inhaled talc
17 could reach deep into the lungs?
18        MR. SMITH: Objection.
19   A   I'm not an inhalation toxicology expert.
20   Q   You don't know that?  You, Johnson and
21 Johnson, don't know that?
22        MR. SMITH: Objection.
23   A   I'm not -- I personally am not an
24 inhalation toxicology expert, so I can't comment on
25 that.

Page 79

1    Q   Do you know whether Johnson and Johnson
2  ever related to the FDA that inhaling its talc could
3  reach deep into the lungs?
4         MR. SMITH: Objection.
5    A   Since I'm not an expert in that area, I
6  would not recall specifics of that information.
7    Q   So as you sit here today, you, Johnson and
8  Johnson, don't know whether you ever told the FDA
9  that inhaled talc could reach deep into the lungs?
10        MR. SMITH: Objection.
11   A   I'm not an inhalation toxicology expert.
12 I can't comment on that.
13   Q   I'm not asking whether you are an expert.
14 I'm asking about what information Johnson and
15 Johnson had that was related to the FDA.
16        As you sit here today, you, Johnson
17 and Johnson, have no evidence that you ever told the
18 FDA that inhaled talc could reach deep into the
19 lungs, correct?
20        MR. SMITH: objection.
21   A   My scope for today was information about
22 asbestos testing communications between the FDA and
23 Johnson and Johnson.  Your question is outside of
24 the scope.
25   Q   With all due respect, you are not a

Page 80

1  lawyer.  I'm asking you to answer my question.
2         As you sit here today you no evidence
3  that Johnson and Johnson ever revealed to the FDA
4  that it was of the opinion that inhaled talc could
5  reach deep into the lungs, correct?
6         MR. SMITH: Objection.
7    A   I have not reviewed the inhalation
8  communications between the FDA and Johnson and
9  Johnson.
10   Q   Now, am I correct, or can we agree that
11 Johnson and Johnson internally acknowledged that
12 very low levels of chrysotile asbestos found as a
13 contaminant in talc pose a severe health hazard?
14        MR. SMITH: Objection.  Can you read
15 that question back.
16        (The above question is read.)
17        MR. SMITH: Note my objection.
18   A   I didn't understand the question.
19   Q   Can we agree internally at Johnson and
20 Johnson that you acknowledged that very low levels
21 of exposure to chrysotile asbestos found as a
22 contaminant in talc, pose a severe health hazard?
23        MR. SMITH: Objection.
24   A   No.
25   Q   69 is the Johnson and Johnson Baby Powder

Page 81

1  fact book, July 1974.  I'm going to refer you -- who
2  is Vernon Zeitz?  Do you know?
3    A   I don't know Vernon Zeitz.
4    Q   And I'm going to refer you to page 5,
5  under summary and remarks.  It states, "The use of
6  citric acid in the depression of chrysotile asbestos
7  and other mineral species has been developed at
8  Windsor Minerals in response to the potential need
9  for means to exclude extremely local levels of these
10 contaminants from the finished product of the
11 benefaction process.  The use of these systems is
12 strongly urged by the writer to provide the
13 protection against what are currently considered to
14 be materials presenting a severe health hazard and
15 are potentially present in all talc ores in use at
16 this time."  Did I read that correctly?
17   A   You did.
18   Q   Did you ever see this before?
19   A   I haven't.  This document is called a
20 floatation method and so it would take some review
21 and discussion with an expert to really understand
22 what this is about, what it is referring to.
23   Q   So you never saw this document at any time
24 in preparation for testimony you have given
25 anywhere?

Page 82

1       MR. SMITH:  Objection.
2    A   I don't recall seeing it before.  I may
3  have, but I certainly did not review it in detail
4  for today.
5    Q   Can we agree that Johnson and Johnson
6  those and acknowledges that talc containing
7  asbestiform fibers is a known human carcinogen?
8       MR. SMITH:  Objection.
9    A   Can you read that again?  There was a bit
10  confusing to me.
11    Q   Yes.  Can we agree that you, Johnson and
12  Johnson, acknowledge that talc containing
13  asbestiform fibers is a known human carcinogen?
14       MR. SMITH:  Objection.
15    A   We know that asbestos is a carcinogen, if
16  that's your question.
17    Q   My question is, talc containing
18  asbestiform fibers is a known human carcinogen.
19  That's something you know at Johnson and Johnson,
20  correct?
21       MR. SMITH:  Objection.
22    A   That is correct, that asbestos is a
23  carcinogen.  If it were any of our products, it
24  would still be a carcinogen.
25    Q   Now, Johnson and Johnson, can we agree

Page 83

1  that Johnson and Johnson knows and acknowledges
2  people can development the disease mesothelioma from
3  non occupational exposure to asbestos?
4       MR. SMITH:  Objection.
5    A   Yes.
6    Q   Can we agree that studies that Johnson and
7  Johnson were aware of demonstrate that both talc and
8  asbestos have been found in women who are non
9  occupationally exposed to asbestos?
10       MR. SMITH:  Objection.
11    A   Yes.
12    Q   Can we agree that tremolite and
13  anthopyllite are known contaminants of talc?
14       MR. SMITH;  Objection.
15    A   They can be.  They are not asbestos.
16    Q   Can we agree that talc, contaminated talc,
17  has been implicated as a cause of mesothelioma in
18  women?
19       MR. SMITH:  Objection.
20    A   Contaminated talc.  You have to be more
21  specific.
22    Q   Talc contaminated with asbestos has been
23  implicated as a cause of mesothelioma in women.
24       MR. SMITH:  Objection.
25    A   What do you mean by implicated, please?

Page 84

1  Can you clarify?
2    Q   Sure.  Let me ask you.  Maybe that was a
3  bad question.
4       Can we agree that were reports in the
5  scientific literature indicating that talc
6  contaminated with asbestos is a cause of
7  mesothelioma in women?
8       MR. SMITH:  Objection.
9    A   I'm not aware of that literature.
10    Q   Am I correct that, and can we agree, that
11  Johnson and Johnson internally has acknowledged that
12  because tremolite and anthophyllite are known
13  contaminants of talc, date suggests that rare cases
14  of mesothelioma among women with no other
15  identifiable exposure might be related to exposure
16  to cosmetic talc?
17       MR. SMITH:  Objection.
18    A   No.
19    Q   216 is a memo from 1977 entitled
20  Mesothelioma Talc Medical Research.  Do you see
21  that?
22    A   Yes.
23    Q   With Johnson and Johnson Bates number on
24  it.  Do you see that?
25    A   Yes.

Page 85

1    Q   If we go to the section of the memo on
2  talc, it states, "However, in several mesothelioma
3  patients studied both talc fibers and tremolite were
4  detected.  In fact, the majority of asbestos bodies
5  isolated from the lungs of women in the general
6  population have tremolite or anthophyllite, and
7  because tremolite and anthophyllite are known
8  contaminants of talc, this data suggests that rare
9  cases of mesothelioma among women with no other
10  identifiable exposure might be related to exposure
11  to cosmetic talc." Did I read that correctly?
12    A   You read that correctly, but I disagree
13  with that conclusion.
14    Q   I wasn't asking you what you agree with.
15  I was asking you whether this was information in the
16  possession of Johnson and Johnson.
17    A   This is information in the possession of
18  Johnson and Johnson, but there are rare cases with
19  no identifiable, might be related.  It is not
20  scientific data, it is a hypothesis.
21    Q   Ma'am, I'm just asking whether the
22  information contained in this Johnson and Johnson
23  document was information known to Johnson and
24  Johnson, at least in 1997.  That's all I wanted to
25  know.

Page 86

1    MR. SMITH:  Objection.
2    A   It is written down here on this piece of
3  paper.  That's what I can agree to.
4    Q   So the answer to my question is yes?
5    MR. SMITH:  Objection.
6    A   I say it is written down on this piece of
7  paper.  This is not a sort of factual acknowledgment
8  that this association was something Johnson and
9  Johnson thought was scientific, rigorous, robust and
10  legitimate.
11    Q   My question to you was, the information in
12  this Johnson and Johnson document was information as
13  of 1997 that Johnson and Johnson looked at and
14  considered and was part of its business records,
15  correct?
16    MR. SMITH:  Objection.
17    A   This was written down on a Johnson and
18  Johnson document.  That, I can degree to.
19    Q   Can we agree that Johnson and Johnson is
20  required to be honest and forthright when dealing
21  with government agencies on product safety?
22    MR. SMITH:  Objection?
23    A   Yes.
24    Q   Can we agree that when relating
25  information to the FDA on product safety, the whole

Page 87

1  truth is required and not just part of the truth.
2  Can we have agree to that?
3    A   The truth related to whatever the issue at
4  hand is, yes, I'll agree to that.
5    Q   And it is considered a crime to
6  intentionally mislead a government agency.  Do you
7  understand that?
8    MR. SMITH:  Objection.
9    A   Yes, I do.
10    Q   Now, am I correct whether there was
11  asbestos in the Johnson and Johnsn talc products
12  was raised repeatedly by the FDA beginning in the
13  early '70s?
14    A   It was raised.  I don't know what that
15  means.
16    Q   The issue was -- the question came up over
17  and over again beginning in the 1970s and was posed
18  to Johnson and Johnson, whether any Johnson and
19  Johnson talc product contained asbestos.  Can we
20  agree with that?
21    MR. SMITH:  Objection.
22    A   That's correct, and Johnson and Johnson
23  talc never contained asbestos.
24    Q   We will get to that part.  All I'm asking
25  you, Ma'am, at this point is whether there was

Page 88

1  asbestos in Johnson and Johnson talc products, was a
2  question that was repeatedly raised by the FDA
3  beginning at least in the early '70s, correct?
4    A   The way you are saying it implies it was a
5  specific question about Johnson and Johnson talc
6  powders.  It was not.  It was about cosmetic talc in
7  general.
8      Johnson and Johnson was not
9  questioning specifically about the integrity of our
10  products per se by your question.
11    Q   So, is your testimony today that Johnson
12  and Johnson -- excuse me, that the FDA never raised
13  the issue with Johnson and Johnson as to whether
14  there was any evidence of asbestos in any Johnson
15  and Johnson products?
16    A   I didn't say that.  The FDA asked us in
17  the '70s, or we offered in the '70s, information on
18  our testing of our products around the issue of
19  asbestos.
20    Q   Did the FDA ask you whether there was any
21  evidence of any amount of asbestos in any Johnson
22  and Johnson cosmetic talc product?
23    A   I'm sure there was some question to that
24  effect asked.
25    Q   And the answer by Johnson and Johnson was

Page 89

1  always the same, correct, that is there is no
2  evidence of any asbestos of -- scratch that.
3      The answer provided by Johnson and
4  Johnson was always the same, there's no evidence of
5  any amount of any asbestos in any of Johnson and
6  Johnson cosmetic products, correct?
7    A   There was no asbestos in Johnson and
8  Johnson products, correct.
9    Q   Now, Johnson and Johnson specifically told
10  the FDA that there was no asbestos or tremolite in
11  Johnson's Baby Powder, correct?
12    A   Can you repeat that question?
13    Q   Yes, Ma'am.  Johnson and Johnson told the
14  FDA that there was no asbestos or tremolite in any
15  Johnson's Baby Powder, correct?
16    A   I don't recall seeing that, no.
17    Q   464.  So you have in front of you a memo
18  from July 27, 1971, about the special talc project
19  and it memorializes a meeting that was held with
20  Johnson and Johnson and the FDA, correct?
21    A   Yes.
22    Q   And you reviewed this in preparation for
23  today's deposition?
24    A   Yes.
25    Q   The memo says a Dr. Weisler worked for the

Page 24   (Pages 90-93)

**Page 90**

1  FDA, correct?
2     A  Yes.
3     Q  Wanted to know if tremolite or fibrous
4  talc was found.  We stated that our information is
5  that no asbestos was found and that we will have a
6  full, detailed report on the findings in about a
7  week, correct?
8     A  Yes.
9     Q  Now, as a follow up to that, you, Johnson
10  and Johnson told the FDA had that you had conclusive
11  proof that there was no asbestos in Johnson's Baby
12  Powder, correct?
13     A  I don't recall those exact words, but we
14  did send extensive reports to the FDA about the
15  testing qualification of the materials.
16     Q  474 is a memo a couple weeks later,
17  September 21, 1971, from Johnson and Johnson to the
18  FDA.  Do you see that?
19     A  Yes.
20     Q  And what you state on the second page is,
21  "It is seen that the data conclusively proves that
22  Johnson's Baby Powder is free of asbestos," correct?
23     A  Yes.
24     Q  And that you further told the FDA that
25  there was not ever a shred of evidence that there

**Page 91**

1  was asbestos in either Johnson's Baby Powder or
2  Shower to Shower, correct?
3     A  That sounds familiar.
4     Q  Do I need to show you that document?
5     A  Sure, go ahead.
6     Q  483.  This is a memo concerning a meeting
7  you had with the FDA in 1972, correct?
8     A  Yes.
9     Q  And what you told the FDA was that there
10  wasn't a shred of evidence to support the idea that
11  either Johnson and Johnson's Baby Powder or Shower
12  to Shower contained any chrysotile asbestos,
13  correct?
14        MR. SMITH:  Objection.
15     A  Correct.
16     Q  Not a shred of evidence?
17        MR. SMITH:  Objection.
18     A  Yes.
19     Q  You told the FDA that there was absolutely
20  no evidence of asbestos in any of the mines the baby
21  powder came from using every method of analysis.
22  You told them that, correct?
23        MR. SMITH:  Objection.
24     A  I don't recall saying that about the
25  maintenance per se.

**Page 92**

1     Q  475 is another letter from 1973 written by
2  Johnson and Johnson to the FDA, correct?
3     A  Yes.
4     Q  And it talks about Shower to Shower as a
5  product, correct?
6     A  Yes.
7     Q  And what you state on the second page of
8  your letter to the FDA is, "It should be noted that
9  the talc in our medicated powder is from our Vermont
10  mine source which has been exhaustively studied and
11  reported on in various previous submissions.  It was
12  shown to be free of detectable asbestos by all
13  available methods of analysis."  Correct?
14     A  That is correct.  This says it is from the
15  mine source.  It doesn't stay it is a mine survey.
16  That's where your question before was a little bit
17  confusing.
18     Q  Johnson and Johnson told the FDA that "the
19  source of the talc used in the powder from their
20  Vermont mine was free of any detectable asbestos by
21  all available analysis and methods."  Correct?
22     A  You are misstating that.  It says, "It
23  should be noted that talc in our medicated powder is
24  from our Vermont mine which has been exhaustively
25  studied.  It was shown to be free of detectable

**Page 93**

1  asbestos by all methods of analysis."
2        It is unclear to me whether that's
3  referring to the mine or the medicated powder.  We
4  have to go to the Pooley reports to determine what
5  exactly was done in the Vermont mines.
6     Q  You don't know what this refers to as you
7  sit here?
8     A  I'm saying I'm not sure of the "it."  It
9  is sentence structure whether the it refers to the
10  powder or the mine.
11        If we are going to talk about the
12  mine, I would say that we should look specifically
13  at the report of the mine.
14     Q  I'm going to do that later today.  I want
15  to know what you told the FDA and you represented.
16  You understand that part of the purpose today is to
17  determine whether Johnson and Johnson told the FDA
18  the whole truth.  You understand that, correct?
19        MR. SMITH:  Objection.
20     A  Yes, I do understand it.  That's why I'm
21  referring to that more comprehensive mine survey
22  that was done.
23     Q  All I want to know now is exactly what
24  Johnson and Johnson represented to the FDA.  Then we
25  will get to what they actually told the FDA.  Do you

Page 94

1  follow me?
2     A   No, I don't know the differences between
3  represented and told.
4     Q   Let's focus on what Johnson and Johnson
5  represented in terms of whether the talc mine or any
6  of the products contained asbestos.  That is what
7  I'm focusing on, okay?
8     A   Okay.
9     Q   We are on the same page?
10    A   Um-hum.
11    Q   Is it your testimony that Johnson and
12 Johnson told the FDA that there might be asbestos in
13 the Vermont mines that it owned?
14    A   So we will have to go to the Pooley report
15 to look at the mine.  The products made from ore
16 that came out of the Vermont mines is free of
17 asbestos, based on the limits of detection of the
18 methodology used.  You are mixing two things,
19 product and mines.
20    Q   No, I'm not mixing anything.  You are
21 mixing it in your answer.  I'm asking you
22 specifically did Johnson and Johnson represent to
23 the FDA that the mines that it owned, that the talc
24 came from, that was used in its products, did it tell
25 the FDA that those mines were free of asbestos?

Page 95

1     MR. SMITH: Objection.
2     A   We sent the report from Dr. Pooley of the
3  Italian mines and Vermont mines to the FDA.  We will
4  have to go to those reports to see exactly what it
5  says.  I have those here, I'm happy to pull those
6  out.
7     Q   Ma'am, I'm asking you a very specific
8  question.  Did Johnson and Johnson represent to the
9  FDA that the mines that were used to make Johnson's
10 Baby Powder or Shower to Shower were free of
11 asbestos?  That is my question.  Did you make that
12 representation?
13    A   I don't recall any specific statement to
14 that effect, but I do know that we sent
15 comprehensive surveys of the mines that were used to
16 the FDA and I have those here and I'm happy to review
17 them.
18    Q   I'm going to do that with you.  All I want
19 to know, the only thing I'm focusing on is what you
20 told the FDA about whether the mines that you own
21 that were used for baby powder and Shower to Shower,
22 whether you ever told them they had asbestos anywhere
23 in the mine, and your answer is what?
24    MR. SMITH: Objection.
25    Q   You don't know?

Page 96

1     MR. SMITH: Objection.
2     A   My honest answer is we have a very
3  comprehensive report here that we can look at and
4  see exactly what was said, and that was sent to the
5  FDA.
6     Q   Other than looking at the report, which we
7  are going to get to, you don't know, you, Johnson
8  and Johnson, don't know as you sit here today
9  whether you ever represented to the FDA specifically
10 that there's no evidence of asbestos in the mines
11 used to manufacture baby powder or Shower to Shower?
12    MR. SMITH: Objection.
13    A   I don't know what -- I keep giving, you
14 have the answer, which is in the report that
15 went to the FDA, and we can look at that point and
16 see exactly what it says.
17    Q   Does the report, Ma'am, as you sit here
18 today, do you have any evidence, do you have any
19 recollection of seeing a report to the FDA that
20 admitted that there was asbestos in any of the mines
21 used to manufacture baby powder or Shower to Shower?
22    MR. SMITH: Objection.
23    A   Would you like to look at the report?
24    Q   I'm asking you what you know, Ma'am.  We will
25 get to the reports later.  Do you have any

Page 97

1  independent memory?
2     A   I have an independent memory that reports
3  are complex and they have multiple testing in them
4  and you have to go to the conclusion to see what the
5  report said to understand the meaning of what was
6  communicated between J and J and the FDA.
7     Q   Do we agree, as you sit here, you don't
8  have any independent knowledge of what was
9  represented to the FDA about whether the mine that
10 was used to manufacture baby powder or Shower to
11 Shower had asbestos in it?
12    MR. SMITH: Objection.
13    Q   You have no independent recollection?
14    MR. SMITH: Objection.
15    A   My recollection is based on the report
16 that was sent to the FDA, which I would be very
17 happy to review with you.
18    Q   Without looking at that report, what is
19 your recollection?
20    A   My recollection is it is a very complex
21 report, but that material there comes out of that
22 mine that is used to make baby powder does not
23 contain asbestos.
24    MR. SMITH:  What time do we want to
25 break for lunch?

Page 98

1      MR. PLACITELLA:  Why don't you give
2  me another fifteen minutes and then we can break.
3
4      Q   Am I correct you told the FDA that there
5  isn't a single instance where a test result showed
6  there was chrysotile asbestos in any Johnson and
7  Johnson product?
8      A   No product released to the market ever
9  contained chrysotile asbestos.
10     Q   My question is, did you affirmatively
11 represent to the FDA that there is not a single
12 instance, not a single report of chrysotile in any
13 of the Johnson and Johnson products?
14     A   We have said over and over again there's
15 no asbestos in our products, so I would say that
16 includes chrysotile asbestos.
17     Q   A single instance?  Not one?
18     A   No product has been released to the market
19 there contains a single instance of asbestos.
20     Q   Now, you understand that tremolite is
21 something known as an amphibole?
22     A   Yes.
23     Q   Did you represent specifically to the FDA
24 that there are no amphiboles or serpentine materials
25 ever detected in a Johnson and Johnson product?

Page 99

1      A   No, because that wouldn't be correct.
2      Q   Exhibit 60 is the submission that your
3  trade association gave to the FDA, which included a
4  letter from Johnson and Johnson, correct?
5      A   It is a little hard to read.  It is so
6  tiny.  I'm looking.  Give me one minute, please.
7  Yes, I've seen this.
8      Q   And can you go to the part of the
9  submission that is authored by Johnson and Johnson,
10 the March 19, 1976 letter.
11     A   I see March 14th.  Hold on.
12     Q   March 15th.
13     A   March 15th.  You said 19th.
14     Q   Okay.  And what you say to the FDA, no
15 amphibole materials have been detected, correct?
16     A   That's what it says beginning in October
17 1973 to whatever date in 1976.
18     Q   Right.  Now, I'll show you 492.  492 is
19 your March 17, 2016 letter to the FDA on Johnson and
20 Johnson letterhead, correct?
21     A   Yes.
22     Q   And in that letter, what you did is in the
23 face of lawsuits and verdicts, you went back to the
24 FDA and told them, again, that from the perspective
25 of Johnson and Johnson, no asbestos structures have

Page 100

1  been found in any testing ever.  Correct?
2      MR. SMITH:  Objection.
3      A   This refers to -- hold on, let me find the
4  page.  This refers to the worldwide survey for body
5  powders.  This is off the shelf Johnson and Johnson
6  body powders that are collected all over the
7  world and tested for asbestos and that's
8  correct, that no asbestos has ever been found in
9  those materials.
10     Q   Ever?
11     A   Referring specifically to the worldwide
12 surveys of Johnson and Johnson baby powders that are
13 taken off the shelf and tested for asbestos, and
14 during that program no asbestos has be detected in
15 materials that is out for consumers to buy.
16     Q   So no matter where they got the asbestos
17 anywhere in the world, it is Johnson and Johnson's
18 position that there's never been a single test
19 showing that there's asbestos in the Johnson and
20 Johnson products, correct?
21     MR. SMITH:  Objection.
22     A   So you said we went around the world to
23 get asbestos?  We went around the world to get
24 Johnson and Johnson baby products off the shelf,
25 test for asbestos and those have not shown asbestos

Page 101

1  in that material that is out on the shelf for
2  consumers to buy.
3      Q   That's my question.  It is your position
4  that no matter where you go in the world, if you
5  tested the Johnson Baby Powder, it has no evidence
6  of asbestos and never did.  That's your position,
7  correct?
8      MR. SMITH:  Objection.
9      A   That is the facts related to this
10 worldwide survey we shared with the FDA in March of
11 2016.
12     Q   It had no asbestos and never did, correct?
13     A   It says no asbestos was found in that
14 worldwide survey.
15     Q   And never did?
16     A   It does not say never did.
17     Q   Well, was it ever?
18     A   Was it ever what?
19     Q   Found asbestos in any Johnson's Baby
20 Powder?
21     A   Not production product that's on the shelf
22 for consumers to buy, no.
23     Q   So it is Johnson and Johnson's position as
24 we are sit here today that no testing ever showed
25 any amounts of any asbestos in any Johnson and

Page 102

1  Johnson consumer product, correct?
2        MR. SMITH:  Objection.
3     A   When you refer to Johnson and Johnson
4  consumer product, that is product that has been
5  released to the market.  No, there's not been
6  asbestos in that product that has been tested by
7  legitimate means.
8     Q   When you stay legitimate means, what do
9  you mean by that?
10    A   Some individuals have bought products off
11 of Ebay and other sources and tested them and
12 claimed to have found asbestos, and I believe that
13 is incorrect methodology and unreliable test
14 results.
15    Q   And you are competent to testify about the
16 methodology used by experts testing asbestos?
17    A   No, but I'm competent to testify if you
18 buy something on Ebay that's been opened in an
19 environment that is uncontrolled, you cannot rely on
20 those results.
21    Q   What about testing products that are in
22 Johnson and Johnson's historical files?  Is that a
23 legitimate methodology?
24    A   It is a legitimate source of material, but
25 the methodology is another issue.

Page 103

1     Q   One more and we will break for lunch.
2        498 comes from an advertisement that
3  you ran in December of last year all over the United
4  States.  You have seen this before, correct?
5     A   Yes.
6     Q   You say, "We know that we have always
7  cooperated fully and openly with the FDA and other
8  regulators and have given them full access to our
9  testing, our talc testing results."  Do you see
10 that?
11    A   Yes.
12    Q   That means you gave them all the test
13 results in your possession?
14    A   Full access.  We have not sent them every
15 single test result.  I don't think they would
16 appreciate that very much.
17    Q   So who decided what test results were
18 going to be sent to the FDA and which ones were not?
19 Who made that decision?
20    A   Full access means that if there's any
21 issue to be discussed where test results would be
22 helpful, they absolutely would share those results
23 with the FDA.
24    Q   Did you ever tell the FDA that we have
25 other test results we didn't send you, but you are

Page 104

1  happy, welcome to come look at them?  Did you ever
2  tell them that?
3     A   In effect, we have.
4     Q   And who did you tell specifically that?
5  And who said that?
6     A   Until June of this past year a number of
7  individuals, myself included, met with the FDA and
8  discussed test results and asbestos testing in our
9  quality assurance system that starts qualifying of
10 the mines and goes through multiple testing to the
11 finished products, and that they are more than
12 welcome to see any of those tests.
13        They didn't want to see the tests.
14 They wanted our specifications and our methodology
15 and so forth, all of which was sent to them.
16    Q   So before -- did you say this year?
17    A   You asked me if we ever had --
18    Q   I want to get the date right.  This year?
19    A   2018.
20    Q   So before June of 2018, have you ever made
21 all of your test results available for inspection by
22 the FDA?
23    A   The FDA can inspect us at any time and we
24 would have certainly worked with them and cooperated
25 to make whatever tests results they wanted

Page 105

1  available to them.
2     Q   Ma'am, before June of 2018, had you ever
3  told the FDA that you had test results related to
4  asbestos in talc that you did not provide them?
5     A   No, not that I know of.
6     Q   You also say in your advertisement, "We
7  know that we did not hide anything.  Our openness and
8  collaboration with the FDA and regulatory agencies
9  is well documented."  Correct?
10    A   Correct.
11    Q   The books you have in front of you, let's
12 identify them and go take a break for lunch
13 and I'll look at them at lunchtime.  Okay?
14        So tell me what is in each of the
15 books generally that you have in front of you.
16    A   So P-3 is volume 1 and contains
17 communications back and forth between Johnson and
18 Johnson and the FDA and some other contextual
19 documents are included as well.
20        Volume 2 is the March 2016
21 communication that we sent to the FDA and all of the
22 associated attachments.  In addition, there's a
23 July 2018 communication in volume number 2.
24        Volume 3 are contextual documents
25 that indicate what was going on at different points

Page 28  (Pages 106-109)

Page 106

1  in time during the history of talc and asbestos
2  starting in the late '60s up until present day,
3  giving you context for understanding the development
4  of asbestos testing, citizens petitions and other
5  related events.
6      Q  That's it?
7      A  That's it.
8      Q  In these three volumes, does that include
9  all the information that you provided to the FDA
10 concerning the testing of Johnson and Johnson talc
11 for asbestos?
12     A  As far as I'm aware, yes, it does.
13         MR. PLACITELLA:  This is a good place
14 to take a break.
15         THE VIDEOGRAPHER:  The time is
16 approximately 12:32 p.m.  We are going off the
17 record.
18         (Luncheon recess taken)
19
20         THE VIDEOGRAPHER:  We are back on the
21 record.  The time is approximately 1:12 p.m.
22
23 CONTINUED DIRECT BY MR. PLACITELLA:
24
25     Q  Dr. Nicholson, I asked this morning, and I

Page 107

1  know you looked it over at a break, I asked you
2  questions about the FDA itself testing for
3  Vermont sourced products, and you said you believe
4  there was testing in the '84, '86, but you weren't
5  sure what they tested for.  Did you find what you
6  were referencing?
7      A  I found three different things, and so one
8  is a 1986 FDA petition denial, which is more
9  mathematical analysis of some theoretical exposure
10 limits.
11         So the one thing of importance was
12 around the exposure risk assessment.
13     Q  I'm familiar with that document, but that
14 had nothing to do with the physical testing of a
15 Johnson and Johnson product for asbestos, correct?
16     A  That is correct.  Then there was the
17 Boundy Study, which did review --
18     Q  That's on what tab and what exhibit?
19     A  This is tab 9 of P-5.  This refers to
20 NIOSH, which is the National -- I don't remember
21 what NIOSH stands for.
22         This is from Maryanne Boundy and
23 others from Environmental Health Sciences from
24 Harvard.  This is in the late '70s.  They looked at
25 bulk Vermont talc.

Page 108

1      Q  There's no testing done on Johnson and
2  Johnson Baby Powder related to the 1980s, correct?
3      A  Correct.  Then there's -- one last
4  document, which is tab 13, which is the McCrone
5  letter that says that for the previous fifteen
6  years, and this letter is dated May 1987, that they
7  had been testing routinely material for a number of
8  companies, including Johnson and Johnson over the
9  years, and have the product is free of asbestos,
10 second to the last line.  That is not FDA, but
11 that's an independent organization testing talc for
12 industry.
13     Q  Right.  But they were paid by Johnson and
14 Johnson.
15     A  They were.
16     Q  So my question this morning was, you don't
17 have any evidence, as you sit here today, of any
18 test run by the FDA of Johnson talc products from a
19 Vermont source after 1979, correct?
20     A  Correct.  The FDA didn't do their own
21 testing.  They, too, used outside sources.
22     Q  But there was no testing by any outside
23 source hired by the FDA of Vermont based products
24 after 1979, correct?
25     A  That is correct.  We have a calculations

Page 109

1  by FDA and the McCrone letter saying talc is
2  free from asbestos for fifteen years.  But you are
3  correct, FDA, not until 2009, did a survey of
4  cosmetic talc.
5      Q  And when the FDA did their survey of
6  cosmetic talc in 2009, Johnson and Johnson was no
7  longer using a Vermont mine as the source for its
8  cosmetic talc, correct?
9      A  That's correct.  In 2003 we switched to
10 China.
11     Q  So from 1979 until any time thereafter,
12 the FDA never did a test to determine whether the
13 Johnson and Johnson talc contained asbestos that was
14 sourced from a Vermont mine, true?
15         MR. SMITH:  Objection.
16     A  So FDA did not do a test of Johnson and
17 Johnson product.  That is correct, but Johnson and
18 Johnson was testing their product, McCrone was
19 testing the product.
20         We know it was free of asbestos, but
21 you are correct, Johnson and Johnson did not test
22 the product that I'm aware of.
23     Q  So without everything else stuffed in, all
24 I want to know is as we sit here today can we agree
25 that there was no testing done by the FDA of any

Page 110

1 Johnson and Johnson product that came from a Vermont
2 mine after 1979?
3    A   Not that I'm aware of that we have
4 evidence in these documents.
5    Q   So any time after 1979, any test results
6 that were considered by the FDA were done for
7 Johnson's Baby Powder, were done by Johnson and
8 Johnson or the experts that it hired, correct?
9    A   I can't speak to others outside of that
10 circle, for example, academics that did testing on
11 product that would have been Johnson and Johnson
12 product.  But in the documents prepared for today, I
13 have just the McCrone letter saying free from
14 asbestos and that includes Vermont talc.
15    Q   So from your perspective in the FDA
16 assessing the safety of the Johnson and Johnson
17 product in terms of whether it ever contained
18 asbestos, the only test result you can point to
19 after 1979 is the McCrone letter that you
20 referenced?
21    A   Well, we have internally thousands and
22 thousands of test results.
23    Q   That wasn't my question, Ma'am.  My
24 question was test results considered by the FDA and
25 assessing the safety of the Johnson and Johnson's

Page 111

1 talc products, the only test results that you have
2 that was supplied to the FDA and considered by the
3 FDA after 1979 was the McCrone 1987 letter, true?
4    A   So I'm confused by your question because
5 it was the 2009 survey that included Johnson and
6 Johnson baby products and raw materials.
7    Q   Let me rephrase it then.  It is my fault.
8        From 1979 forward, the FDA had no
9 information in its possession that you are aware of
10 concerning Johnson's talc products sourced from a
11 Vermont mine on the issue of asbestos content, other
12 than the McCrone letter from 1987, correct?
13    A   Well, they had information we would have
14 been following the J41 standard that basically
15 required us to test everything for asbestos.  So we
16 were in compliance with the standard and therefore,
17 testing regularly for asbestos.
18    Q   Ma'am, my question to you is after 1979,
19 the only document that you gave to the FDA to
20 support the proposition that Vermont sourced talc
21 products were asbestos free was the McCrone letter
22 from 1987, true?
23    A   That I recall related to Vermont talc.
24    Q   So the answer is yes?
25    A   You put so many qualifications in there,

Page 112

1 I'm trying to be very specific in my answer.
2    Q   The answer is that for Vermont talc, the
3 only test you gave to the FDA and that you
4 understand was considered by the FDA was the 1987
5 McCrone letter in terms of whether the Johnson
6 product was asbestos free, correct?
7    A   That the FDA had, that's correct, but
8 again, we were following the J41 standard.
9    Q   We will get to that.  Let me ask you some
10 more questions about the binder before we get to the
11 standard.
12        The binder, I don't know which one it
13 was, had an expert report from a lawsuit from a Mr.
14 Bailey.  You gave that to the FDA?
15    A   No.  The reason we included that, you
16 recall I explained about the binders is that this
17 was also to create context so those communications
18 and why would we been talking about any given thing
19 would be understood.
20        Dr. Bailey gave a very comprehensive
21 review of what was done and how things progressed
22 from the '60s through to more recent times.  That's
23 why it was included.
24    Q   But his report was never given to the FDA?
25    A   Not that I'm aware of.

Page 113

1    Q   So if we wanted to be very specific now,
2 as to what scientific information you provided to
3 the FDA on the issue of whether there was ever
4 asbestos found in any Johnson and Johnson talc
5 product, they are included in what binder?
6    A   They are in this binder.
7    Q   When you say this binder, be specific.
8    A   Volume 1, P-3.
9    Q   So we don't have to worry ourselves, binder
10 2 or 3 on this specific topic of testing information
11 that you gave to the FDA concerning asbestos and
12 Johnson talc, correct?
13    A   Except volume 2 contains the entirety of
14 the two most recent communications to the FDA.
15    Q   So let me be specific then.  Other than
16 the communications you had with the FDA after 2017,
17 all of the scientific information that you provided
18 to the FDA concerning whether the Johnson's Baby
19 Powder contained asbestos at any point in time, or
20 Shower to Shower, is contained in volume 1.  Is that
21 fair?
22    A   Yes.
23    Q   Except you said 2017, not 2016.
24    Q   2016.  Okay.
25        Now, 457 is a document, looks like

Page 114

1  from 1977, listing all of the information you
2  supplied to the FDA as of 1977.  Is that true?
3      A   That's true.  And this is contained in
4  this binder.
5          MR. SMITH:  Which binder?
6      A   Volume 1, P-3.
7      Q   So everything that is on that list is
8  contained in binder number 1?
9      A   Everything we could find in our records is
10  contained herein.  There are some documents that we
11  can note that we couldn't find that were referenced in
12  other material with the original documents was not
13  in our records and could not be located.
14      Q   Did somebody go back and look for the
15  paper and see if there was a paper file of the
16  original document?
17      A   Yes.
18      Q   That doesn't exist?
19      A   Not that we have found.
20      Q   Can we agree that no one at the FDA knew
21  more about the flaws or shortcomings in the asbestos
22  testing methods than Johnson and Johnson and the
23  experts that it hired?
24          MR. SMITH:  Objection.
25      A   I can't speak to what the FDA knew or

Page 115

1  didn't know.
2      Q   Do you understand that in the process of
3  trying to come up with a way to reliably test for
4  asbestos, that the FDA wanted a method that had a
5  sensitivity greater than 1 percent.  You know that,
6  correct?
7          MR. SMITH:  Objection.
8      A   At one point of the discussions that
9  one percent number was contemplated.  The actual
10  sensitivity is significantly lower than that.
11      Q   Am I correct that Johnson and Johnson
12  recommended to the FDA a testing method that Johnson
13  and Johnson knew would not find amphiboles,
14  including tremolite, at low levels?
15      A   I don't know what you are referring to.
16      Q   Well, am I correct that of all the testing
17  methods that were available for the determination of
18  whether there was asbestos or tremolite in Johnson
19  and Johnson talc, Johnson and Johnson urged the FDA
20  to pick the two worst methods for figuring that out?
21      A   That is not correct.
22          MR. SMITH:  Objection.
23      Q   489.  I want to show you a document marked
24  April 18, 1973, business records of Whittaker, Clark
25  and Daniels memorializing a meeting of March 21,

Page 116

1  1973, attended by Johnson and Johnson.  If you go to
2  the page where you see where it says, meeting of talc
3  group March 21, 1973 and it says Dr. Ashton from
4  Johnson and Johnson was present?
5      A   Yes.
6      Q   It talks about what Dr. Ashton discussed
7  at the meeting on the third page.  It says Dr.
8  W.H. Ashton, J and J, began discussion of
9  methodology for determining asbestos or fibers by
10  reviewing J and J experience with different
11  instruments.  Least sensitive is optical microscope.
12          Next in order of increasing
13  sensitivity and cost and difficulty to run are x-ray
14  scan, x-ray step scan, electron scan, electron
15  differential scan and DPA differential thermal
16  atomizer.  Do you see that?
17      A   Yes.
18      Q   And what Johnson and Johnson ultimately
19  urged the FDA to adopt what was the two worst in
20  this list, right, the least sensitive, the optical
21  microscope the X-ray diffraction, correct?
22          MR. SMITH:  Objection.
23      A   You are mischaracterizing that.  You are
24  looking at them as individual tests, and it has been
25  discussed in numerous documents that using multiple

Page 117

1  tests, the correct multiple tests together, is what
2  gives you the best results.  So you are
3  mischaracterizing what is being stated.
4      Q   I'm not.  All I'm asking you is ultimately
5  the two tests in combination that Johnson and
6  Johnson recommended that the FDA use were the two
7  least sensitive tests, according to Dr. Ashton, that
8  is, the optical microscope and the X-ray diffraction
9  method, right?
10      A   Wrong.  You are mischaracterizing that.
11  You have said in combination and then in combination
12  they are the best method.  That's why they are in
13  the J41.
14      Q   What Johnson and Johnson recommended was
15  first you use the X-ray diffraction and then, if
16  that comes up positive, you then you use the optical
17  microscope, correct?
18      A   That's how you figure out if you have
19  asbestos in your sample.  A step one screening.
20      Q   They used the two least sensitive methods
21  as articulated by Dr. Ashton in this document,
22  correct?
23      A   Not correct.  You are totally
24  misunderstanding what is being said.
25      Q   I don't think so.  We are going to get to

Page 118

1  that.
2       130 is the J41 method we have been
3  discussing, correct?
4    A   Yes.
5    Q   What it does is, it uses X-ray diffraction
6  and the optical microscope, correct?
7    A   Yes.
8    Q   And it acknowledges that the other tests
9  available are more sensitive for finding amphibole
10  minerals, but for economic reasons, they
11  weren't recommended, right?  That's what it says?
12    A   Where are you looking?
13    Q   Is says, "The method which has been
14  adopted for the detection of amphibole minerals in
15  cosmetic talc is generally accepted method of x-ray
16  diffraction.  Methods which appear in the literature
17  for the detection of fibers amphibole, such as
18  transmission electron microscope, diffraction and
19  electron microbe have also been considered since
20  they are capable of a lower level of detection than
21  by x-ray diffraction."  Did I read that correctly?
22    A   You did, but the next sentence says they
23  suffer from drawbacks and the amount of material
24  they look at is quite small.
25       You have to measure sensitivity and

Page 119

1  specificity and combine methods to get the right
2  answer.
3    Q   What it says is, "The time for analysis
4  the expertise required and the expense of the
5  equipment."  Correct?
6    A   That's what it says.
7    Q   So, the J41 method selected was a
8  combination of x-ray diffraction first, correct?
9    A   Correct.
10    Q   Intended to find amphiboles, not
11  chrysotile asbestos, correct?
12    A   You can rule out amphiboles with x-ray
13  diffraction.  That's correct.
14    Q   This was the method that J and J urged the
15  FDA to adopt, correct?
16    A   That is correct.
17    Q   When Johnson and Johnson ran this method
18  on samples known to have asbestos in them, the
19  method did not find asbestos, correct?
20    A   Not correct.
21    Q   148 are minutes from your trade
22  association from May 1977, which is after you came
23  up with the J41 specification, correct?
24    A   Correct.
25    Q   And present at that meeting was George

Page 120

1  Lee, from your office, correct?
2    A   That is correct.
3    Q   And what is concluded at the bottom is
4  test and verified CTFA method J 41 for this purpose,
5  assurance that method is accurate, reliable and
6  practical.  He then reported the objectives have not
7  been achieved.  Do you see that?
8    A   I see he reported that, yes.
9    Q   If you look at the second page, it talks
10  about using the CTFA method with spiked tremolite.
11  In other words, they actually put the tremolite in
12  the -- they actually put tremolite and spiked it.
13  Do you see that?
14    A   I don't see that.
15    Q   Do you see where it says CTFA tremolite
16  spiked talc where they took the talc and spiked it
17  with tremolite?
18    A   Tremolite is an asbestos.  That's what I'm
19  trying to understand here.
20    Q   Ma'am, I'm saying to you that the J41
21  method failed to find amphiboles including tremolite
22  that was known to be tremolite by your own testing,
23  correct?
24    A   If you give me a second to review the
25  whole document.  I think it is easy to misinterpret

Page 121

1  if you only look at a line or two.  I would prefer a
2  minute to look at the entire document.
3    Q   You didn't look at that in preparation for
4  today?
5    A   I've seen this before.
6    Q   Okay.
7    A   I would like to look at, if you don't
8  mind.
9       MR. SMITH:  You can.
10    A   Go ahead.
11    Q   So let's go back to the front page.  It
12  talks about the purpose of the test was to determine
13  whether or not any 1976 production of major
14  commercial talc products contained asbestiform
15  amphibole contaminants.  Test and verify CTFA method
16  J41 for this purpose.  Assurance that the method is
17  accurate, reliable and practical.
18       The report is that the objectives
19  were not reached, and immediately after that, are
20  the test results, correct?
21    A   That is correct.
22    Q   It says that they took tremolite, which
23  was a talc, talc which was spiked with tremolite and
24  talc that was spiked with anthophyllite and they let a
25  number of different laboratories to run tests on

Page 122

1  that. Do you see that?
2      A   I do.
3      Q   What it shows is from looking for
4  tremolite, only one laboratory found tremolite using
5  the CTFA method and six did not. Do you see that?
6      A   I do.
7      Q   That was tremolite that was spiked, in
8  other words, they put the tremolite in the talc,
9  correct, so you could see if they could find it,
10 right?
11     A   That is correct.
12     Q   When they used the CTFA method, six out of
13 seven couldn't find it using the CTFA method,
14 correct?
15     A   Six out of seven reported a negative test.
16 That's correct.
17     Q   Now, you are aware, are you not, that
18 internally Johnson and Johnson actually wrote down
19 that the CFTA method was not good enough and not
20 sensitive enough to find low levels of tremolite.
21 You are aware of that, right?
22         MR. SMITH: Objection.
23     A   Are we still talking about this document?
24     Q   No, I'm asking you another question.
25     A   Okay.

Page 123

1      Q   You are aware that internally Johnson and
2  Johnson had discussions where they acknowledged that
3  the CFTA, J41 method was not good enough for the
4  detection of low levels of tremolite, correct?
5      A   It is the CTFA, not the CTFA and we always
6  use transmission electron microscopy adjunct, so that
7  may have been discussed and perhaps validated while
8  we continue to this day to use test TEM, which is
9  the most sensitive method.
10     Q   You didn't recommend to the FDA to use
11 TEM, your recommendation to the FDA was for the J41
12 method, correct?
13     A   The Cosmetics Toiletry and Fragrance
14 Association recommended the J41. We continued to do
15 TEM.
16         One of the major limitations at the
17 time is that TEM was not universally available.
18 We, however, had that equipment. We used all of
19 that equipment all the time.
20     Q   That wasn't my question, please. We've
21 got to finish this deposition, so if you could just
22 answer my question.
23         My question is this, that Johnson and
24 Johnson did not recommend to the FDA that TEM be
25 used for the testing to determine whether asbestos

Page 124

1  was in cosmetic talc, correct?
2          MR. SMITH: Objection.
3      A   So TEM was discussed extensively during
4  the meeting and we are going back to that document
5  you just showed me. But practical, reliable and
6  sensitive. So if people did not have the machine for
7  the testing, it could not be suggested and adopted
8  as a universal standard for the industry.
9      Q   Yes, Ma'am. The answer to my question is
10 Johnson and Johnson did not recommend to the FDA
11 that the standard that should be adopted for testing
12 talc for asbestos was TEM, correct?
13     A   I can't answer that question because it
14 was a scientific discussion of many methods and
15 there were multiple participants in the
16 conversation.
17         Johnson and Johnson wasn't in a
18 position to have a definitive recommendation, but
19 rather come to a consensus agreement with FDA and
20 the industry partners.
21         So you are asking me if they had
22 a separate opinion. I have not seen any
23 documents to that effect, but I've seen other
24 documents discuss all of the various methods that
25 were available, like the one we talked about a

Page 125

1  minute ago.
2      Q   What was recommended by Johnson and
3  Johnson and its trade association for the analysis
4  of asbestos in talc was the CFTA J41 method,
5  correct?
6          MR. SMITH: Objection.
7      A   It is the CTFA J41 method, and the
8  document you showed me a minute ago, the industry
9  was continuing to look at that method and refining
10 it to make sure it was accurate, reliable and
11 practical.
12         So not at that time did we definitively
13 say this is the one and only standard, we are not
14 going to evolve our thinking. This was something
15 being actively tested and refined in 1977 and has
16 been revisited since then. So I'm not sure what you
17 are implying with the question.
18     Q   You were still using it in 1995, right?
19     A   Who is we?
20     Q   The CTFA Method. Johnson and Johnson.
21     A   We used that method. It is an industry
22 standard and in addition, we do TEM testing.
23     Q   And internally you acknowledge, did you
24 not, that the CTFA method was not sensitive enough
25 to find low levels of tremolite. You acknowledge

Page 126

1  that.
2      A    That's true.  Every test method has a limit
3  of detection, but we still use TEM, which increases
4  our abilities in sensitivity of our testing.
5      Q    Ma'am, all I'm asking you is internally
6  you acknowledged, you, Johnson and Johnson, that the
7  CTFA J41 method was not sensitive enough to find low
8  levels of tremolite, correct?
9          MR. SMITH:  Objection.
10     A    Every test method, combination of test
11 methods has their limits of detection, so that would
12 have been acknowledged by FDA, CTFA, Johnson and
13 Johnson and many others.
14     Q    So the answer to my question is internally
15 Johnson and Johnson acknowledged that the CTFA J41
16 method was not sensitive enough to find low levels
17 of tremolite when testing the powder, correct?
18     A    First of all, tremolite is not asbestos.
19 Second of all, the CTFA method, every method of
20 detection does have its limits.  So everyone would
21 have acknowledged that, including J and J.
22     Q    In fact, when you were testing your
23 products in Great Britain, you specifically rejected
24 using the CTFA method, didn't you?
25     A    I have not reviewed that topic in

Page 127

1  preparation for today.
2      Q    You spoke to Dr. Hopkins, correct?
3      A    We didn't discuss that particular issue.
4      Q    Dr. Hopkins never told that you he
5  actually wrote a memo indicating that in Great
6  Britain they recommended against using the CTFA
7  method because it wasn't sensitive enough?
8      A    I haven't reviewed that to prepare for
9  today's deposition.
10     Q    Did Dr. Hopkins ever tell you that he was
11 of the opinion, and expressed it to Johnson and
12 Johnson in written form, that tremolite in any form
13 should not be allowed in cosmetic talc products?
14     A    I have not discussed that with Dr.
15 Hopkins.
16     Q    357 is a December 21, 1995 memo from
17 John Hopkins entitled CTPA talc monograph.  Do you
18 know what the CTPA was?
19     A    I think it is a toiletry fragrance group
20 in Britain, but I'm not positive.
21     Q    It is the British counterpart to the CTFA
22 in the United States, correct?
23     A    I don't know.  I'm not familiar with them
24 as an organization.
25     Q    You mentioned Dr. Pooley.  There's a

Page 128

1  forward in this written by Dr. Pooley?
2      A    Yes.
3      Q    Do you see it actually says, and I blew it
4  up so you can read it.  In the second paragraph,
5  "Incidents of disease among talc workers has been
6  closely linked to the mineralogic impurities found in
7  raw material such as asbestos minerals and quartz."
8  Do you see that?
9      A    I do.
10     Q    Was that fact ever discussed with Dr.
11 Hopkins by you internally at Johnson and Johnson?
12     A    No, because there's not asbestos contained
13 in any of the cosmetic talc mines that went into our
14 cosmetic products.
15     Q    We will get to that.  Do you see in Dr.
16 Hopkins' memo, 5.2 fibrous amphiboles, where
17 he states, "the inhalation hazards of fibrous minerals
18 have long been recognized.  The CTPA view is that
19 fibrous minerals should not be detectable in
20 cosmetic talc by state of the art methods."
21          And then he goes on to say, "However,
22 in order to eliminate any hazards to the consumer,
23 which might arise from the need to interpret fiber
24 and shape dimensions and to facilitate routine
25 screening, the CTPA view is that if an amphibole is

Page 129

1  detected by x-ray diffraction, that batch of talc is
2  unacceptable for cosmetic use, whether or not
3  subsequent examination by optical or electron
4  microscopy shows the contaminant is not fibrous."
5  Were you aware that was being discussed at Johnson
6  and Johnson?
7      A    This isn't Johnson and Johnson.  This is
8  the industry group in Britain.  So they are just
9  saying take the first step of the J41 and no need to
10 do the second step.
11     Q    What they are basically saying is once you
12 are find tremolite, that's it.  Don't use it.
13 That's what Dr. Hopkins says.
14     A    That is not what this says.  This says
15 unacceptable for cosmetic use.  And the reason they
16 are doing this is to make sure that it is a cheap,
17 basically quick way to do it.  But you are going to
18 throw a lot of material out potentially without any
19 hazard to humans.
20     Q    Whether or not subsequent examination by
21 optical or electron microscope shows the
22 contamination is not fibrous.  That is what he says,
23 correct?
24     A    That is correct.
25     Q    What does he say about whether Johnson and

Page 130

1 Johnson should be using this CTFA method in Great
2 Britain?
3   A   I haven't seen this document before, so I
4 haven't reviewed it. I don't know what he said.
5   Q   Go to Bates number 77498. Do you see
6 where I blew it up, he talks about the detection
7 limits for the J41 method and he says, "You should
8 use another method called the step scanning method."
9 Correct? What he states is you should use a method
10 beyond the J41 method, and he states the increased
11 sensitivity is critical for better detection of
12 amphiboles, which otherwise using XRD procedures
13 alone would go undetected. Members urged strongly
14 to use this increased sensitivity, if at all
15 possible, particularly in light of the various new
16 foreign talcs that are emerging in the marketplace."
17 Correct?
18   A   I don't see exactly where you pointed to.
19   Q   Right where I have the -- I even pulled a
20 lateral for you.
21   A   I see that.
22   Q   So in Great Britain Dr. Hopkins was saying
23 use something more sensitive than the XRD. Did you
24 ever recommend to the FDA, and did you ever let the
25 FDA know that internally you were using a method in

Page 131

1 Great Britain that you were not recommending to the
2 FDA?
3   A   I'll go back and say we have always used
4 transmission electron microscopy, in addition to the
5 J41.
6       So with regard to the sensitivity of
7 Johnson and Johnson's methods, we are very confident
8 with the sensitivity, even more sensitive than what
9 Dr. Hopkins notes here.
10       I have not reviewed this document
11 before. I've not discussed it with Dr. Hopkins, so
12 I really don't know the context in which this was
13 discussed.
14   Q   In Great Britain Johnson and Johnson was
15 recommending an XRD procedure that was more
16 sensitive than the one that they were recommending
17 to the FDA, correct?
18   A   Again, I haven't had the opportunity to
19 discuss this with Dr. Hopkins. I had not seen this
20 before today.
21       As we were talking about FDA
22 communications between Johnson and Johnson and FDA
23 regarding asbestos testing, and the J41 was a method
24 that was developed in the early '70s, based upon
25 what was practical and reliable at the time.

Page 132

1       This is a 1995 document. I would
2 have to review it to really understand what the
3 context for this was.
4   Q   Let me show you a document from 2001
5 marked Exhibit 361, identified as a memo from Rich
6 Zazenski to Donna Dennis, subject talc
7 specification. Luzenac, this is a Luzenac business
8 record. Am I correct that Luzenac was one of your
9 suppliers of talc?
10       MR. SMITH: Objection.
11   A   Luzenac was the predecessor, I think, of
12 Imerys.
13   Q   They were a part of the trade association
14 that you were a member of, the CTFA?
15   A   Yes.
16   Q   They were part of the group that made
17 recommendations as to what testing methods should be
18 used to the FDA?
19       MR. SMITH: Objection.
20   A   Whoever the supplier was at that time was
21 participating.
22   Q   Do you see where they state, "Additionally
23 we can discuss an asbestos specification option
24 which required that cosmetic talc does not contain
25 detectable asbestos when analyzed by a transmission

Page 133

1 electron microscopy TEM. I think we all recognize
2 XRD, PCM and PLM are simply not sensitive enough to
3 provide complete assurance that talc is free of
4 detectable asbestos." Do you see that?
5   A   Yes, I do.
6   Q   Johnson and Johnson was aware of that,
7 correct?
8       MR. SMITH: Objection.
9   Q   That the XRD, PCM and PLM methods are
10 simply not sensitive enough to provide complete
11 assurance that talc is free of detectable asbestos."
12       MR. SMITH: Objection.
13   A   If you look at the method, the J41 and the
14 sensitivity of that method, and it is covered in
15 that 1986 response to the citizen petition, it is
16 more sensitive, it can pick up asbestos even more
17 sensitive than what is in the environment.
18       In other words, if you find any
19 asbestos using those methods, it is more likely to
20 come from the air than it is from that sample.
21       So I see what it is saying about
22 increased sensitivity using different methodologies,
23 and that's why the would be important for me to
24 speak to Dr. Hopkins to understand the context.
25 What are they looking for there, when you have an

Page 134

1  environmental level that's many, many times higher
2  than what your sensitivity is you that are striving
3  for. It is a strange line of discussion, so I think
4  the context is critical.
5      Q   What was my question Ma'am?
6          MR. SMITH: Objection.
7      A   Did I know there was more sensitivity than
8  what was currently being used to pick up asbestos.
9      Q   No. That's not what I asked. I move to
10  strike your entire statement, Ma'am. Please answer
11  this question. This is the question I'm asking
12  you.
13          Was Johnson and Johnson aware that
14  the XRD and the PLM method are not sensitive enough
15  to provide complete assurance that talc is free of
16  detectable asbestos? Was Johnson and Johnson aware
17  of that?
18          MR. SMITH: Objection.
19      A   I'm going to disagree that is it a correct
20  statement based on what I've seen in the 1986 FDA
21  response to the citizens petition. So why would you
22  get more sensitive testing than would be -- more
23  sensitive than what's in the environment?
24          That's the part that doesn't make
25  sense.

Page 135

1      Q   You do not agree with this statement?
2      A   The method may be -- there may be a more
3  sensitive method, but if the ambient air and the
4  water and everything, there's more asbestos in the
5  environment than you are trying to find here with a
6  testing method. It doesn't make sense to me.
7  That's what I'm saying.
8      Q   Ma'am, respectfully again, I move to
9  strike your testimony. You testified in the
10  beginning of this deposition that you are not a
11  geologist and you are not an expert in asbestos
12  testing.
13          All I'm asking you, Johnson and
14  Johnson, is whether you agreed that the SRD and PLM
15  are not sensitive enough to give complete assurance
16  that talc is free of detectable asbestos. If you
17  don't agree, say it. If you do agree, say it. We
18  don't need a speech.
19          MR. SMITH: Objection, ignore those
20  comments.
21      A   I appreciate that you don't like my answer
22  because we don't need a more sensitive method and
23  that's covered very specifically in that 1986
24  response to the citizens petition that I made
25  reference to earlier.

Page 136

1          We don't need a more sensitive method
2  based on that analysis. That is why I would like to
3  talk to Dr. Hopkins and understand the context for
4  this discussion.
5      Q   So you are not able to testify here today
6  without having another conversation with Dr.
7  Hopkins. Is that what you are saying?
8          MR. SMITH: Objection.
9      A   I have provided you with the document I'm
10  making reference to.
11      Q   I'm going to get to that, I promise you.
12          MR. SMITH: Don't talk over the
13  witness.
14      Q   I promise you. I'm asking you, Ma'am, do
15  you need to speak to Dr. Hopkins again before I talk
16  to you more about this document?
17          MR. SMITH: Were you finished with
18  your last answer?
19      A   I don't recall.
20          MR. SMITH: Can you read back where
21  she was in her last answer before opposing counsel
22  talked over her.
23          MR. PLACITELLA: I'm going to
24  withdraw that question and ask you this question.
25      Q   Ma'am, in order to answer any more

Page 137

1  questions about detection methods, do you need to
2  speak with Dr. Hopkins? That is all I'm asking.
3      A   No.
4      Q   Can we agree that Johnson and Johnson and
5  the CTFA understood that the J41 method was not
6  sensitive enough for testing for chrysotile
7  asbestos?
8          MR. SMITH: Objection.
9      Q   Can we agree to that?
10          MR. SMITH: Objection.
11      A   No.
12      Q   266. I'm going to show you what's been
13  marked October 31, 1972 on Johnson and Johnson
14  letterhead.
15          MR. SMITH: I think you misspoke.
16      Q   October 31, 1972?
17          MR. SMITH: This document has been
18  marked Exhibit 266.
19          MR. PLACITELLA: You are correct.
20          MR. SMITH: It is a letter.
21          MR. PLACITELLA: You are correct.
22  266.
23      Q   The subject is analysis of Johnson's Baby
24  Powder for chrysotile asbestos. Do you see that?
25      A   Yes.

Page 36   (Pages 138-141)

Page 138

1    Q   It talks about using the X-ray diffraction
2  method, correct?
3    A   Yes.
4    Q   What Johnson and Johnson says is that
5  method has been demonstrated that it was possible to
6  detect chrysotile and talc at a level of 2 to 3
7  percent by weight, correct?
8        MR. SMITH:  Objection.
9    A   Yes.
10    Q   Am I correct that the FDA wanted to
11  regulate chrysotile asbestos, but Johnson and
12  Johnson took the position that was no reason to do
13  so because there was never no evidence ever that
14  there was asbestos chrysotile in Johnson's talc?
15        MR. SMITH:  Objection.
16    A   That's correct, because chrysotile is an
17  industrial asbestos.  It is not found with talc in
18  the cosmetic mines.
19    Q   So what Johnson and Johnson told the FDA
20  was there's no reason for you to regulate it
21  because there was no chrysotile ever found in any
22  mine that was the source of Johnson's Baby Powder,
23  correct?
24        MR. SMITH;  Objection.
25    A   Chrysotile is an environmental issue.  So

Page 139

1  it is an EPA regulated material.  So that's correct,
2  it should not be regulated by the FDA.
3    Q   I know from reading your prior testimony
4  you have been asked questions about the methodology
5  that Johnson and Johnson considered called the
6  pre-concentration method.  Do you know what I'm
7  talking about?
8    A   Yes.
9    Q   And do you understand that at one point in
10  time the FDA was considering using the
11  pre-concentration method for testing for asbestos in
12  talc, correct?
13    A   Correct.
14    Q   And that NIOSH actually recognized the
15  viability of that methodology, correct.  You knew
16  that?
17    A   No, I wasn't aware of that.  And Johnson
18  and Johnson's own experts recommended that it adopt
19  or use the pre-concentration method for determining
20  whether there was asbestos in Johnson and Johnson
21  talc, correct?
22        MR. SMITH:  Objection.
23    A   I don't know that, but I do know that
24  Johnson and Johnson offered to explore the
25  concentration method with the group during the '70s

Page 140

1  when they were working out this industry standard
2  for asbestos testing.
3    Q   You know that what Johnson and Johnson
4  ultimately did was try to discourage the FDA from
5  using that method, right?
6    A   I'm not aware of that.
7    Q   You are not aware as you sit here today
8  that Johnson and Johnson's own experts recommended
9  to them repeatedly that the pre-concentration method
10  be been used by Johnson and Johnson?
11    A   No.  I'm not aware of that.
12        MR. SMITH:  Objection.
13    Q   You have in front of you a memo from
14  February 26, 1973 to Mr. Ashton at Johnson and
15  Johnson from the Colorado School of mines.  Do you
16  see that?
17    A   Yes.
18    Q   Have you ever seen this document before?
19    A   I don't specifically recall that I have.
20    Q   The Colorado School of Mines is one of the
21  entities that you relied upon when you were
22  communicating with the FDA concerning the testing of
23  asbestos in baby powder, correct?
24    A   Yes.
25    Q   Do you see at the top it talks about

Page 141

1  sample grounded talc ore separated using a
2  centrifuge?  I colored it so you can see.
3    A   Yes.
4    Q   That's a pre-concentration method,
5  correct?
6    A   I don't know that is specifically the
7  pre-concentration method.  It is a concentration
8  method, yes.
9    Q   And when they did that, if you go to the
10  page that references February 26, 1973, according to
11  this document when that method was used, the
12  Colorado School of Mines found tremolite and
13  actinolite.  Do you see that?
14    A   Yes.
15    Q   Do you see where it says relative to
16  possible asbestos type minerals the above table
17  shows that samples 3071S contained slight traces of
18  tremolite, actinolite minerals.  Sample 3271S
19  suspected to contain very minor amount of
20  serpentine, which may be chrysotile?  Do you see
21  that?
22    A   I do.
23    Q   Is this the first time you learned that
24  the Colorado School of Mines was using the
25  centrifuge method and found tremolite asbestos and

Brody Deposition Services

Page 142

1  chrysotile in their testing?
2     A   I'm looking at this document and I don't
3  think this has anything to do with cosmetic testing
4  of talc. So the fact that they use a concentration
5  method is completely unrelated to cosmetic testing.
6            And I know that if you look at the
7  table on page 8087 you can see at one where 41.6
8  percent weight of major magnesite -- it is just the
9  members here do not look like cosmetic talc. I
10  don't know what they were testing and why they were
11  using that method.
12     Q   But you are not an expert in the testing
13  methods, right?
14     A   I understand the general methodology, but
15  I'm not an -- I'm looking at this and telling you
16  this isn't cosmetic testing.
17     Q   Well, that wasn't the point of my
18  question. My question was whether this methodology
19  was recommended for the testing of asbestos by
20  Colorado School of Mines to Johnson and Johnson, and
21  that was the focus of my question.
22     A   The answer to your question is no, because
23  this has nothing to do with cosmetic testing.
24     Q   Well, let's go to 263. 263 is a report
25  from the Colorado School of Mines, and the title is,

Page 143

1  A Procedure to Examine Talc for the Presence of
2  Chrysotile and Tremolite, Actinolite Fibers, Johnson
3  and Johnson. Do you see that?
4     A   Yes.
5     Q   Go to the introduction. It says the
6  purpose of this document is to report the methods
7  used at Colorado School of Mines Institute for the
8  detection of chrysotile and/or tremolite actinolite
9  in samples predominantly composed of talc. Do you
10  see there?
11     A   Yes.
12     Q   It goes on to say, "As the impurity level
13  becomes very low, less than one percent, it is
14  necessary to examine increasingly larger amounts of
15  sample in order to detect the impurity. As a result
16  of requirement to detect the proverbial needle in a
17  haystack, we have evolved a procedure which
18  pre-concentrates the impurities prior to
19  examination." Do you see that?
20     A   Yes.
21     Q   And what they did is they again used a
22  centrifuge, correct?
23     A   Yes.
24     Q   And that was a method that was discussed
25  with Johnson and Johnson, the pre-concentration

Page 144

1  method when you have to find something like a needle
2  in a haystack, correct?
3            MR. SMITH: Objection.
4     A   They are not specifically saying this is a
5  a pre-concentration method, but they use a radiant
6  separation method and again, nothing in here that I
7  could see, although this is the first time I've seen
8  this, has anything about cosmetic testing and new
9  standards.
10     Q   You don't think this is about the
11  pre-concentration method?
12            MR. SMITH: Objection.
13     A   The pre-concentration method, that's a
14  very specific method.
15     Q   Can you go to where it says objective?
16  "The objective of the work was to develop a
17  procedure to screen for the talc for the presence of
18  chrysotile and tremolite and actinolite asbestos
19  minerals. Based on past experience with detecting
20  and identifying minerals when present at low levels
21  a concentration of the phases could be detected, was
22  considered essential to the success of any suggested
23  the procedure." Do you see that?
24     A   I do.
25            MR. PLACITELLA: Let's take a break

Page 145

1  now.
2            THE VIDEOGRAPHER: The time is
3  approximately 2:11. We are going off the record.
4            (Recess taken)
5
6            THE VIDEOGRAPHER: We are back on the
7  record. The time is approximately 2:23 p.m.
8  BY MR. PLACITELLA:
9     Q   Okay. Before you had referenced a couple
10  of times Dr. Pooley. Do you remember that?
11     A   Yes.
12     Q   You are aware, or can we agree, that Dr.
13  Pooley also recommended to Johnson and Johnson they
14  use of the pre-concentration method when using X-ray
15  diffraction?
16            MR. SMITH: Objection.
17     A   No, I'm not aware of that.
18     Q   You are not aware of that?
19     A   No.
20     Q   45 is a memo from May 16, 1973 on Johnson
21  and Johnson letterhead. Do you see that?
22     A   Yes.
23     Q   I assume you have seen this before?
24     A   I don't believe I have.
25     Q   Do you know who T.H. Shelley is?

Page 146

1  A  No.
2  Q  Who is Dr. A.J. Goudie?
3  A  I don't know.
4  Q  Do you see where it says Dr. T. Shelley is
5  going to go to England on May 25th?
6  A  Yes.
7  Q  That is where Dr. Pooley was, correct?
8  A  Yes.
9  Q  And it says that "England is considering
10 method of pre-concentrating the asbestos so as to be
11 able to analyze by x-ray." Do you recall see that?
12 A  Yes.
13 Q  It says, "They find no asbestos by doing
14 this with Italian talc." Do you see that?
15 A  Yes.
16 Q  It says they find Pooley, Dr. Pooley,
17 right?
18 A  Yes.
19 Q  Point zero five percent of a tremolite in
20 Vermont, correct?
21 A  I see that, yes.
22 Q  Is this the first time you learned that
23 Dr. Pooley used a pre-concentration method on
24 Vermont talc and found tremolite?
25        MR. SMITH: Objection.

Page 147

1  A  We know that there can be tremolite in
2  association with talc.  It doesn't say asbestos.  So
3  that's news.
4          Pre-concentration method, is not
5  recommending -- this in 1973.  The J41 was developed
6  and published in '76.  How he used it and when he
7  used it and why he used, it is not immediately
8  apparent on this sheet.
9  Q  But it say he used a pre-concentration
10 method and the .05 percent and when they were talking
11 about -- let's just read it.  "England is
12 considering method of pre-concentrating the asbestos
13 so as to be able to analyze by x-ray."  Correct?
14 A  Yes.
15 Q  And they find no asbestos, in quotes, by
16 doing this with the Italian talc.  They find, that
17 is Pooley, .05 percent of a tremolite type in
18 Vermont."  Correct?
19 A  Yes.
20 Q  Now, 46 is the follow up memo dated June
21 4, 1973.  The re: is talc.  Do you see that?
22 A  Yes.
23 Q  It states, it is to Dr. Robert F. Rolle.
24 Do you know who that is?
25 A  He was in Johnson and Johnson, I believe,

Page 148

1  in the research and development group.
2  Q  It says, "The British Toiletry Preparation
3  Federation is in the process of drafting
4  specifications on talc.  These will involve density
5  concentration techniques followed by x-ray analysis.
6  Fred Pooley has developed the methods and checked
7  the Italian talc for chrysotile and other asbestos
8  contaminants.  He found none.  However, I'm
9  concerned that our Vermont talc will from time to
10 time show traces of tremolite." Do you see that?
11 A  I do.
12 Q  Have you ever seen this before?
13 A  No.  Tremolite is not asbestos.
14 Q  My question is have you ever seen this
15 document before?
16 A  Yes, I understand.
17 Q  Did you know before today that Dr. Pooley
18 was involved in putting specifications together for
19 Great Britain that recommended the concentration
20 technique for testing?
21        MR. SMITH: Objection.
22 A  I was not, and I have not seen the full
23 recommendation on the specification.
24 Q  Today is the first time you learned that
25 Dr. Pooley was working on the concentration method

Page 149

1  in Great Britain and that was found in the Johnson
2  and Johnson documents, the first time you knew that?
3        MR. SMITH: Objection.
4  A  It is not the first time I knew that.
5  Johnson and Johnson knew about the concentration
6  method, was willing to discuss it with the FDA, so
7  this is not -- I was not aware Pooley specifically
8  had been working on it for the British Toiletry
9  Association.  That was your question.  The answer
10 was no.
11 Q  47.  Did you know that Dr. Pooley ran the
12 concentration method on Vermont talc and found
13 actinolite?
14        MR. SMITH: Objection.
15 A  No.
16 Q  You have in front of you a June 6, 1973
17 memo on Johnson and Johnson stationery.  I blew up
18 the right portion.  It says, it talks about the note
19 from June 4th.  Do you remember that, we just went
20 through it?
21 A  Yes.
22 Q  It says, "Note the concentration
23 techniques in the drafted specification for analysis
24 of asbestos."  Do you see that?
25 A  Yes.

Page 150

1    Q    Then it goes on and says, "Shelley reports
2  that Pooley had found actinolite in our Vermont talc
3  by his concentrating technique."  Do you see that?
4    A    I do.  Actinolite is not asbestos.
5    Q    All I asked you was, do you see that.
6    A    I do see it.
7    Q    Okay.  Is today the first time you learned
8  that Pooley found actinolite in the Vermont talc
9  using the concentration method?
10        MR. SMITH:  Objection.
11    A    Yes, but actinolite is not asbestos.
12    Q    Ma'am, I'm asking you a simple question.
13  Is today the first time you learned that Pooley
14  found actinolite in Vermont talc using the
15  concentration method?
16    A    Yes, and actinolite is not asbestos.
17    Q    Ma'am, did I ask you whether your opinion
18  was whether it was asbestos or not?  What can you
19  tell me?  Tell me everything you know about
20  actinolite.
21    A    We can go to the 1986 --
22    Q    No, Ma'am.  I want to know everything you
23  know about actinolite.  I don't want you to refer to
24  anything.  Tell me everything you know about
25  actinolite.

Page 152

1  mention actinolite, the complication I hear and how
2  you ask the question, that as asbestos, which it is
3  not.  The clarification is important.
4    Q    Ma'am, move to strike your testimony, with
5  all due respect.  My question to you is tell me
6  everything that you, Dr. Nicholson, know from your
7  own mind, without reference to any documents about
8  actinolite.  Tell me everything you know.
9        MR. SMITH:  Objection.
10    A    Extremely rare asbestos.
11    Q    And based on what reference, besides the
12  1986 report that you are talking about?
13    A    The 1986 report contains multiple
14  documents.  One of them is a document called The
15  Misclassification of Asbestos.  An excellent
16  reference that talks about all of the 1970s and of
17  the confusion and misrepresentation of various
18  finding by different microscopic techniques.  It is
19  an excellent reference that clarifies many of the
20  things that you are pointing out today.
21    Q    My question was what?
22        MR. SMITH:  Objection.
23    Q    What was my question?
24    A    Repeat your question.
25    Q    Do you have any idea what my question was?

Page 151

1        MR. SMITH:  Let me say that you can't
2  do that.
3        MR. PLACITELLA:  Yes, I can do that,
4  and I will call the judge.
5        MR. SMITH:  You can't --
6        MR. PLACITELLA:  I will call the
7  judge.
8        MR. SMITH:  If you want to call the
9  judge, call the judge.  You can't in the middle of
10  an answer just talk over the witness.
11        MR. PLACITELLA:  I can when the
12  witness will not answer the question, Counsel.
13        MR. SMITH:  The witness -
14    Q    I'll withdraw the last question and the
15  ask the question again.  Tell me everything you know
16  from your own knowledge without reference to any
17  documents, everything you know about actinolite?
18    A    Because the specificity of words are
19  critical here, and very easy to confuse individuals,
20  whether they know this area or not, with language.
21  Using documents and referring to tables and decision
22  treatises, very nicely outlined in the 1986 FDA had
23  response to the citizens petition, is the right way
24  to review this subject, not shooting from hip.
25        So when you mention tremolite, you

Page 153

1    A    Well, sometimes I don't, but if you repeat
2  it I will.
3    Q    Because you are going to wind up and say
4  whatever you are going to say regardless of my
5  question, right?
6        MR. SMITH:  Objection.
7    A    Incorrect.
8    Q    Ma'am, can an honest and forthright
9  witness provide a simple answer to a simple
10  question?
11    A    If it is asked clearly, yes, I can.
12        MR. SMITH:  Excuse me.  If we are
13  going to go down this trail, we are going to stop.
14        MR. PLACITELLA:  You can stop at any
15  time you want.  We will go to the judge.  We will
16  let her read the transcript and she will decide
17  whether the witness is being responsive.  If you
18  want to stop the deposition, stop the deposition,
19  otherwise I'm asking my questions.
20        MR. SMITH:  You can't insult people.
21        MR. PLACITELLA:  No one is being
22  insulted.
23        MR. SMITH:  She is being insulted.
24        MR. PLACITELLA:  No she isn't.
25        MR. SMITH:  Yes, she is.  You can't

Page 154

1  do that.
2          MR. PLACITELLA: No, she isn't.
3          MR. SMITH: You can't do that. You
4  can't cut witnesses off in the middle of an answer.
5  You have got to stop that. If you want to keep it
6  up, if you are saying you have a right to do that
7  and you have a right to make insulting comments,
8  then we will stop and we will give the transcript to
9  the judge.
10          MR. PLACITELLA: You know what, you
11  stop the transcript any time you need to do it.
12          MR. SMITH: I'm asking you to stop
13  insulting the witness.
14          MR. PLACITELLA: I'm not insulting
15  the witness.
16          MR. SMITH: Stop cutting her off in
17  the middle of an answer. That's all I'm asking you
18  to do. Ask her a question, she answers it and if
19  you think she is not responsive, you move to strike.
20  You don't insult her. You don't talk over her.
21          MR. PLACITELLA: Are you done with
22  your speech?
23          MR. SMITH: But I'm asking you to
24  just behave like that.
25          MR. PLACITELLA: I'm asking you to

Page 155

1  just let me ask my questions, and if the witness
2  will respond to the questions, we will get through
3  the deposition.
4          MR. SMITH: The witness is responding
5  to the questions.
6      Q   Ma'am --
7          MR. SMITH: If she wants to refer to
8  a document, she is allowed to do that.
9          MR. PLACITELLA: She can when you ask
10  her questions. If I don't refer her to a document,
11  then she can't.
12          MR. SMITH: She's here as a corporate
13  representative. She brought these documents to help
14  refresh her recollection.
15          MR. PLACITELLA: This is not form
16  objection. You are way out of bounds here.
17          MR. SMITH: No, you are out of
18  bounds.
19          MR. PLACITELLA: You are way out of
20  bounds. I'm asking you not to do it.
21          MR. SMITH: I'm happy to take this
22  transcript to the judge, if that is what you want
23  want to do.
24          MR. PLACITELLA: Let's keep going.
25          MR. SMITH: Not if you keep talking

Page 156

1  over her.
2      Q   Ma'am, do you agree with me that an honest
3  and forthright witness can provide a simple answer
4  to a simple question?
5          MR. SMITH: Objection. I'm
6  instructing you not to answer. That question is
7  just to harass her and we are not doing that.
8      Q   Ma'am, did Dr. Pooley find actinolite
9  using the pre-concentration method in Vermont talc?
10          MR. SMITH: Objection.
11      Q   Yes or no?
12          MR. SMITH: Objection.
13      Q   Yes or no? Can you not answer my question
14  yes or no, Ma'am? Why don't we ask that question
15  first. Answer my question, yes or no, did Dr. Pooley
16  find actinolite using the pre-concentration method
17  in Vermont talc? Can you answer that question, yes
18  or no?
19          MR. SMITH: Objection.
20      A   Yes, but he did not specify whether or not
21  it was asbestiform or not.
22      Q   I just asked you whether you could answer
23  it yes or no. I didn't ask you anything more. Are
24  you able to answer my question yes or no, whether
25  Dr. Pooley found actinolite in Vermont talc using

Page 157

1  the pre-concentration method?
2          MR. SMITH: Objection.
3      Q   Can you answer that question yes or no?
4          MR. SMITH: Objection.
5      A   I cannot answer it without misleading the
6  jury.
7      Q   Did you rely upon Dartmouth College as one
8  of the authorities for your submissions to the FDA
9  on the issue of asbestos and Johnson's Baby Powder?
10          MR. SMITH: Objection.
11      A   Yes.
12      Q   Are you aware that Dartmouth College used
13  and recommended the concentration method when
14  testing Johnson's talc?
15          MR. SMITH: Objection.
16      A   I would have to go back and look at the
17  exact documents to review their methods.
18      Q   The question is are you aware, as you sit
19  here today, whether they did that or not?
20      A   I would have to go back and look at the
21  documents to verify the testing methods.
22      Q   As you sit here today, you don't know
23  whether Dartmouth College ever used the
24  concentration method in assessing whether there was
25  asbestos in Vermont talc?

Page 158

1      MR. SMITH:  Objection.
2      A   I prefer to refer to the actual report to
3  be sure of what I'm answering, so I'll not answer
4  until I've had a chance to look at it.
5      Q   Find any document you want.  Go ahead and
6  look.
7      A   They did use centrifugation.  Just on a
8  quick glance I can't tell if all of their testing
9  used centrifugation or not.
10     Q   Did any of their testing find -- do you
11 know whether any of the Dartmouth College testing
12 ever found actinolite in the Vermont talc?
13     A   Based on the conclusion I see here, I
14 don't see actinolite mentioned, but I do see no
15 amphibole or garnet or asbestos impurities were
16 observed.
17     Q   In terms of the information that was
18 conveyed by Johnson and Johnson concerning the tests
19 that were done by Dartmouth College, the FDA was
20 never told one way or the other whether actinolite
21 or they found no actinolite.  What is the answer?
22     A   I'm looking at the conclusions and I don't
23 see any reference to actinolite.
24     Q   Does it say no amphiboles were found,
25 regardless of whether they are asbestiform?

Page 159

1      A   Yes.
2      Q   I'll show you J and J 58.  Did you provide
3  J and J 58 to the FDA at any point in time?
4      A   That document I was just looking is dated
5  June 28, 1971.  I see numerous documents from March
6  of 1974, but I don't see that specific document.
7      Q   This document is entitled, from Dartmouth
8  College, Confidential, by the way, Analysis of Talc
9  Products and Ores for Asbestiform Amphiboles.  Do you
10 see that?
11     A   Yes.
12     Q   And Dartmouth College is one of the
13 experts that you relied upon in your submissions to
14 the FDA, correct?
15     A   At least in 1971, yes.
16     Q   And again in 1976?
17     A   Perhaps.  I would have to go through this
18 and see.
19     Q   In this document dated March 1974, it
20 states, "The purpose of the study is to develop
21 methods for measuring the concentration of
22 asbestiform amphiboles in fine grain talc products.
23 Do you see that?
24     A   Yes.
25     Q   You see on the second page it talks about

Page 160

1  using the concentration technique because it brings
2  amphiboles into a reasonable concentration range and
3  it says that is mandatory?
4      A   Yes, but it is important to look before
5  that.  There's a whole discussion about how you can't
6  tell -- you could do grain counts, but you can't see
7  the specificity of the grain whether or not it is an
8  amphibole without concentrating.
9      Q   I'm fine with that.  It say the reasons
10 stated, as you just stated, a concentration
11 technique is mandatory because it brings the
12 amphiboles into a reasonable concentration range for
13 optical and other methods of analysis, correct?
14     A   That is what it says.
15     Q   And if you go to page 6 where it says
16 results, and now they are testing for asbestiform
17 minerals.  Do you recall that?  It says, "Two gram
18 samples of ore and ore spiked with actinolite
19 were separated and analyzed as described above."  Do
20 you see that?
21     A   Yes.
22     Q   Then it talks about results are in table
23 2.  It says table 3 shows concentrations of heavy
24 fractions, mostly carbonite and actinolite and talc
25 ore and talc product.  Do you see that?

Page 161

1      A   Yes.
2      Q   So you see that here they are actually
3  using the concentration method and recommending it
4  in order to determine whether amphiboles are in the
5  Vermont product, correct?
6          MR. SMITH:  Objection.
7      A   What I've seen, and again I'm not an
8  expert in all the methodology from just what you
9  have shown me, is that they needed it for this
10 specific methodology.
11         I don't know that you can universally
12 say you have to use the concentration method with
13 this optical microscopic technique.  That's what
14 they are saying.
15     Q   What they are saying to Johnson and
16 Johnson is that it is mandatory.  Isn't that their
17 words?
18     A   You can't take that out of context though.
19 It is mandatory when using the optical microscopic
20 technique they are using, not for every method
21 available.
22     Q   It talks about on page 7 when they use
23 the concentration method, they found ore samples
24 contain 2300 parts per million actinolite and the
25 talc product contains 170 parts per million

Page 42  (Pages 162-165)

Page 162

1 actinolite. Actinolite is the dominant fiber form
2 amphibole in the ore and talc product provided by
3 Windsor Minerals. Small amounts of anthopyllite
4 might be present.
5          That is what they wrote, correct?
6    A  I see that. I'll say that that does not
7 mean it is asbestos.
8    Q  Ma'am, I'm just asking if that's what they
9 wrote.
10    A  Yes, I understand. I don't want the
11 answer to be misleading.
12    Q  When up told the FDA that there was no
13 amphibole of any sort ever found in a Johnson and
14 Johnson talc product, you did not include this
15 report, correct?
16    A  I didn't see the report here, so I can't
17 say that we had sent it for sure. And I don't know
18 what the sample was that they tested, so I would
19 have to go back and verify that to answer your
20 question definitively.
21    Q  You never even saw this report until as
22 you are sitting here right now, right?
23    A  Well, I've looked at a lot of reports and
24 they are kind of technical. So you have to really
25 look at them very carefully. I don't recall this

Page 163

1 one specifically, but again, I have not dug through
2 again to see if this matches up to the one I have.
3    Q  And it is not in that book in front of you
4 of test results given to the FDA, correct?
5    A  I didn't see it there.
6    Q  352. Are you aware that after Johnson and
7 Johnson got this report they actually discussed it
8 internally and verified the method?
9    A  No, I was not aware of.
10    Q  You have in front you 3-11-74, March 11,
11 1974 memo on Johnson and Johnson letterhead. The
12 subject, method of concentration of asbestos in
13 talc. Do you see that?
14    A  Yes.
15    Q  It talks about the procedure used by Dr.
16 Reynolds from Dartmouth, correct?
17    A  Yes.
18    Q  What you write internally is, "The
19 procedure for heavy fibers actinolite and tremolite
20 permit the detection of asbestos at original
21 concentration as low as .02 percent by weight while
22 the existing procedures, step scanning, X-ray
23 diffraction, are effective to .02 percent. The
24 dispersion staining technique of optical microscopy
25 was employed to detect tremolite fibers in the

Page 164

1 concentrate. The method is straightforward and
2 rapid requiring about 20 minutes of operator time
3 and about one hour overall. If removal of
4 carbonates is desired, these times may become 30
5 minutes to two hours respectively." Do you have see
6 that?
7    A  Yes.
8    Q  To be fair to you, you had never seen this
9 before today, correct?
10    A  No, but I can -- I see it now and I've
11 read through it.
12    Q  We are going to be back here again, so
13 I'll ask you more questions when you have some
14 time to digest.
15    A  I don't need time. I can see what it
16 means.
17    Q  Am I correct that internally, as a follow
18 up to this, Johnson and Johnson actually
19 acknowledged that the concentration method was the
20 best method?
21          MR. SMITH: Objection.
22    A  I doubt that because this basically says
23 it is a very difficult method and hard to quantify.
24 It sounds like it is extremely difficult to
25 execute.

Page 165

1    Q  Johnson and Johnson, after having
2 discussions about the concentration method with Dr.
3 Pooley, Dartmouth University and Colorado School of
4 Mines, after having all those discussions, fought
5 against the FDA using that method, didn't
6 they?
7          MR. SMITH: Objection.
8    A  I don't think we fought against anybody.
9    Q  Did you actually conclude, Johnson and
10 Johnson, that adoption of a pre-concentration method
11 by the FDA would be disturbing and troublesome for
12 Johnson and Johnson?
13    A  Well, based on the documents you just gave
14 me, I would not be surprised if that was a
15 recommendation, but it sounds like it is very
16 difficult to do, hard to repeat, technically
17 intense, so probably not the kind of thing that most
18 individuals could execute.
19    Q  Ma'am, I'm asking you whether internally
20 you, Johnson and Johnson, determined that you were
21 going to oppose adopting the pre-concentration
22 method by the FDA because it was disturbing and
23 troublesome to Johnson and Johnson?
24          MR. SMITH: Objection.
25    A  I don't think it would be disturbing and

Page 166

1  troublesome to Johnson and Johnson.  As I just said,
2  it sounds like it is a very difficult method to
3  execute.
4     Q  471 is a memo from Mr. Ashton dated
5  November 24, 1976.  Do you see that?  Have you ever
6  seen this document before?
7     A  I don't believe I have.
8     Q  Here it says, Mr. Ashton, by the way, was
9  known inside of Johnson and Johnson as Mr. Talc,
10  correct?
11     A  I don't know.
12     Q  Do you see where it says Mr. Ashton writes
13  to George Lee, "Attached is a copy of a disturbing
14  proposal request which the FDA has currently made
15  available to qualified bidders.  The scope of the
16  work is the separation of asbestos and food, drugs
17  and talc for Identification and determination."  Do
18  you see that?
19     A  Yes.
20     Q  369. And Johnson and Johnson, actually
21  after hearing recommendations from their own
22  experts, came to the conclusion that using the
23  concentration method was not in the interest of
24  Johnson and Johnson, correct?
25        MR. SMITH:  Objection.

Page 167

1     A  Are you looking at this document that you
2  just gave me?
3     Q  No, I'm asking a different question.
4     A  Can you please repeat that?
5     Q  Yes, Ma'am.  After getting advice from
6  your experts about the viability of the
7  concentration method and its usefulness.  Johnson
8  and Johnson came to the conclusion that the adoption
9  would not be in the interest of Johnson and Johnson
10  worldwide, correct?
11        MR. SMITH:  Objection.
12     A  I don't know what you are looking at, but
13  I would accept that's true because of the other
14  documents you have gave me that is a technically
15  difficult method to execute.
16     Q  You have in front of you 369?
17     A  Yes.
18     Q  This is a memo from 1975, again, on
19  Johnson and Johnson letterhead?
20     A  Yes.
21     Q  And it talks about Dr. Pooley again and
22  his recommendations?  Correct?
23     A  Yes, I see that.
24     Q  And what you say is we deliberately have
25  not included a concentration technique as we felt it

Page 168

1  would not be in the worldwide company interest to do
2  this, correct?
3        MR. SMITH:  Objection.
4     A  Yes.
5     Q  And what you ultimately determined was
6  that you wanted to avoid using this technique at all
7  costs and keep it quiet, right?
8        MR. SMITH:  Objection.
9     A  No.
10     Q  353.  I'm going to show you what's been
11  marked February 28, 1975, on Johnson and Johnson
12  letterhead.  Subject, review of CTFA methodology for
13  the detection of asbestos in talc as well as
14  comments on PPF methodology.  Do you see that?
15     A  Yes.
16     Q  It goes through here the methodology that
17  Johnson and Johnson wants adopted, correct?
18     A  This looks like a proposed methodology.
19     Q  And how Johnson and Johnson concludes the
20  memo is, "We really want to exclude concentration
21  techniques in any proposed analytical procedure and
22  are really looking at this method very quietly.  So
23  that we will be well informed and up to date with
24  this technology.  We want to avoid promotion of
25  this approach."  Did you ever see that before?

Page 169

1        MR. SMITH:  Objection.
2     A  I have not, but I've seen in documents
3  noting that discussions where Johnson and Johnson
4  has said we will be happy to discuss this method.
5     Q  This document says you want to avoid the
6  promotion of this approach, doesn't it, when it
7  talks about your methodologies?
8        MR. SMITH:  Objection.
9     Q  That's what it says.
10     Q  That's what it says, but it doesn't mean
11  we were trying to suppress it.  It means we weren't
12  promoting it.
13     Q  You didn't want it adopted?
14     A  You showed me documents just a minute ago
15  that showed it was technically intense and difficult
16  to execute.
17     Q  You say you wanted to keep this very
18  quiet.  That is what the document says, right?
19        MR. SMITH:  Objection.
20     A  So, my experience dealing with the FDA,
21  especially when there are multiple other companies,
22  if you raise an issue, everybody starts talking
23  about it and it can be real conversations.
24        We did say very explicitly to the
25  FDA, if you would like to discuss it we would be

Page 44  (Pages 170-173)

Page 170

1  happy to talk to you about it. We were not
2  oppressing it, but we didn't think it was a good
3  methodology, and you just showed me a document that
4  says it was technically difficult to perform. So it
5  wouldn't be in a standard methodology that others
6  perhaps could not get and repeat consistently.
7      Q   But your experts did it multiple times
8  over, didn't they?
9          MR. SMITH: Objection.
10     A   They are experts.
11     Q   That is the point, Ma'am, isn't it?
12  Experts in the testing could use the methodology and
13  in fact your experts did and were successful in
14  using it, true?
15         MR. SMITH: Objection.
16     A   In the discussion of the developments of
17  methodologies, correct.
18     Q   But even though your expert used the
19  methodology and recommended it, it was your position
20  that you wanted to look at it very quietly and avoid
21  promotion, correct?
22         MR. SMITH: Objection.
23     Q   That was your position, Johnson and
24  Johnson's position?
25         MR. SMITH: Objection.

Page 171

1      A   So I'll say again. I'm reading this and I
2  see this, and based on the other information that we
3  have seen, it makes sense to me we would not want it
4  to it to become a prominent part of the discussion
5  because it is a technically difficult method to
6  execute, and when people who are not experts try to
7  reproduce it, even people in Johnson and Johnson's
8  labs, they were getting variable results. You
9  showed me that document a couple minutes ago.
10         MR. PLACITELLA: This is a good time
11  to take a break.
12         THE VIDEOGRAPHER: The time is
13  approximately 3:00 p.m. and we are going off the
14  record.
15         (Recess taken)
16
17         THE VIDEOGRAPHER: The time is
18  approximately 3:13 p.m. and we are back on the
19  record.
20
21  BY MR. PLACITELLA:
22     Q   I assume that you are aware that Johnson
23  and Johnson hired experts to test Johnson's Baby
24  Powder that used the concentration technique and
25  found asbestos?

Page 172

1          MR. SMITH: Objection.
2      A   I'll have to look at what you are
3  referring to.
4      Q   Are you aware of that as you sit here
5  today?
6      A   No, I'm not. Not in production material,
7  talcum powder.
8      Q   So you are not, as you sit here, just so
9  we are clear, you are not aware of any test done for
10 Johnson and Johnson on Johnson's Baby Powder using
11 the concentration technique that found asbestos?
12     A   No.
13     Q   If you are not aware of it, you certainly
14 didn't provide it to the FDA. Is that fair?
15     A   Yes.
16     Q   I want to focus a little bit, at least get
17 some background on the Lewin report and the
18 exchanges with the FDA by Johnson and Johnson on the
19 Lewin report, okay?
20     A   Yes.
21     Q   Hopefully we won't get too much
22 controversy over this.
23         Is it your understanding that Dr.
24 Lewin tested a series of talc based products in the
25 early 1970s for the FDA? You are aware of that?

Page 173

1      A   Yes.
2      Q   And you are aware that Dr. Lewin,
3  according to his analysis, found asbestos in some of
4  those products, yes.
5      A   Thought he found asbestos in some of those
6  products, yes.
7      Q   Do you know if he issued a report -- let's
8  make sure we are on the same page, August 3, 1972.
9  You have seen that, correct?
10     A   Yes.
11     Q   I'll put it on the screen. August 3,
12 1972, a letter from Lewin to the FDA enclosing his
13 final analytical results, correct?
14     A   Yes.
15     Q   Is this report one of the results he had
16 was that in this analysis he found chrysotile
17 asbestos in Johnson's Baby Powder, correct?
18     A   He thought he did. That's what he said,
19 later refuted.
20     Q   Ma'am, I'm just asking you. I didn't what
21 ask you what he thought. I said in this analysis as
22 reported in this particular document, he found
23 asbestos in the Johnson's Baby Powder, correct?
24         MR. SMITH: Objection. Let me ask,
25 were you in the middle of your answer?

Page 174

1   A   I'm okay.
2   Q   I'm not asking you whether he changed
3   later on. We will get to that. I'm giving you every
4   opportunity.
5       I'm saying in this report, what he
6   reported in his analysis was finding asbestos in the
7   Johnson and Johnson product, correct?
8   A   He thinks he found asbestos. So that is
9   what he said, but his methods were not sufficient to
10  say that.
11  Q   In this report does it say anything about
12  his methods not being efficient to say that?
13  A   He didn't know that at the time.
14  Q   All I'm asking you, please, is in this
15  report what he reported in his analysis was that he
16  found asbestos in Johnson Baby Powder, correct?
17  A   He reported he thought he found asbestos.
18  That's correct.
19  Q   And after that report came down, Johnson
20  and Johnson had conversations with the FDA about the
21  report, correct?
22  A   Yes.
23  Q   And in those conversations the FDA
24  promised Johnson and Johnson not to release the
25  Lewin Report publically until Johnson and Johnson

Page 175

1   had a chance to review it, fair?
2   A   Yes, that's correct.
3   Q   347 in this report, in this particular
4   letter dated August 29, 1972, Johnson and Johnson
5   writes on the subject of talc in asbestos in Shower
6   to Shower brand body powder, correct?
7   A   Yes.
8   Q   What is reported is that the author spoke
9   with the FDA on two different occasions, correct?
10  A   Yes.
11  Q   And brought them up to speed on the
12  findings of Professor Pooley, correct?
13  A   Yes.
14  Q   That no chrysotile was found in the
15  Italian talc, correct?
16  A   Yes.
17  Q   Not reflected anywhere in here is the
18  findings of Professor Pooley finding actinolite in
19  the Vermont talc, correct?
20  A   That is correct.
21  Q   It goes on to say that Dr. Schaffner at the
22  FDA agreed not to release the Lewin Report until
23  after Johnson and Johnson had a chance to go over
24  it, fair?
25  A   Yes.

Page 176

1   Q   Right about that time Johnson and Johnson
2   found out that the FDA had hired a second contractor to
3   test the talc products, that being Sperry-Rand, correct?
4   A   Where would I see that in this document?
5   Q   I'm asking whether you know that.
6   A   I know that multiple people tested the talc.
7   Sperry-Rand, I don't remember the name specifically.
8   Q   I'm talking about who the FDA hired. Do
9   you know that they hired Sperry-Rand to test the
10  Johnson and Johnson talc?
11  A   I know they hired an outside group to do
12  that. I don't remember the exact name, if it is
13  Sperry-Rand or somebody else.
14  Q   Have you seen any of the reports by
15  Sperry-Rand?
16  A   I've seen the reports of the FDA testing
17  or their contracted testing of the Lewin samples, if
18  that is what you are referring to.
19  Q   Sperry-Rand is -- I'm sorry. 29 is an
20  August 24, 1972 memo entitled Talc Asbestos Shower
21  to Shower Talc. Have you seen this before?
22  A   I don't recall this specific document.
23  Q   And apparently, and this document was not
24  provided at any time to the FDA, correct?
25  A   Not that I recall specifically.

Page 177

1   Q   What this does, and we will go through it
2   slowly, since you haven't seen it. It says, "Dr.
3   Weisler, Director, Division of Cosmetics, FDA,
4   called us this afternoon to report they had
5   submitted a sample of Shower to Shower previously
6   examined by Dr. Lewin to the Sperry-Rand scanning
7   electronic microscopy this afternoon." Do you see
8   that?
9   A   Yes.
10  Q   Does that refresh your memory?
11  A   Yes. I'm familiar with another master
12  table that was not Sperry-Rand of retesting for the
13  Lewin samples. That's why it took me a minute.
14  Q   Are you aware of this and did you
15  investigate this conversation that Johnson and
16  Johnson had with the Director at the FDA concerning
17  the Sperry-Rand testing?
18  A   No, because I was looking at this January
19  7, 1976 Lewin retest document.
20  Q   We are going to get there. I promise.
21  Right now I'm focusing on the conversations that
22  Johnson and Johnson had with the FDA concerning the
23  Shower to Shower Sperry-Rand testing. Are you with
24  me?
25  A   Yes.

Page 178

1  Q  It states, "Report from Sperry-Rand was
2  that asbestos fibers could be detected in the
3  sample. Dr. Weisler said that he has in front of
4  him photographs of six fields at 12,000 X
5  magnification showing fibers with length to width
6  ratios of 10 to 1, to 50 to 1. One of them
7  appearing on the top talc plate." Do you see that?
8  A  Yes.
9  Q  It goes on to say that, "Johnson and
10  Johnson asked the FDA if Sperry-Rand handles
11  minerals, and the response was that they do a lot of
12  work with chrysotile." Correct?
13  A  Yes.
14  Q  The FDA further told Johnson and Johnson
15  that they believed that, "the man who did the work is
16  conservative and he would not have reported
17  chrysotile unless he was sure." Correct?
18  A  Yes.
19  Q  And Johnson and Johnson asked, "if he has
20  assured himself, that is the FDA, that the fibers
21  were not tremolite, which could be present in trace
22  amounts." And the response was, "He said the fibers
23  are characteristic of chrysotile and not tremolite."
24  Do you see that?
25  A  Yes.

Page 179

1  Q  Do you have any knowledge of this conversation?
2  A  I don't, but I'm not concerned because
3  chrysotile is an industrial asbestos fiber and not
4  found in talc material, so this speaks to me of
5  laboratory contamination.
6  Q  Ma'am there's nothing in here about
7  laboratory contamination. I'm just asking if you
8  know anything about the conversation.
9  A  I know what you are asking me, and I just
10  want to make sure you understand that chrysotile
11  does not occur in talc materials unless it is an
12  environmental contaminant.
13  Q  Ma'am. did I ask you that question?
14  A  No. But I thought it might be helpful to
15  your understanding.
16  Q  I'm not asking you to help me with my
17  understanding. I'm asking you to answer questions
18  that are posed.
19      My question is, do you have any
20  information in your investigation about this
21  conversation that Johnson and Johnson had with the
22  FDA where the FDA related their contractor
23  found chrysotile asbestos in the Johnson and Johnson
24  products? That's all I'm asking.
25  A  Not specifically, no, but I'm not

Page 180

1  surprised again, because chrysotile would not be
2  found in talc.
3  Q  Did I ask you that Ma'am, whether you were
4  surprised or not? Do you really want me to have a
5  judge read this and make a determination of whether
6  you are truly being responsive?
7      MR. SMITH: Objection.
8  Q  Are we really going to do this?
9      MR. SMITH: Objection. Just ignore
10  those comments.
11  Q  Are we really going to do this?
12      MR. SMITH: Please don't do that.
13  Please don't do that. It is not helpful.
14  Q  Do you know anything about this conversation?
15  A  Not until you showed it to me today.
16  Q  It goes on to say that, "That information
17  is completely at variance with Johnson and Johnson's
18  information," correct?
19  A  Specifically from McCrone, and we have a
20  letter here that says that 1971 through '76 McCrone
21  never found any asbestos in our talc material, so
22  yes, I'm well aware of that.
23  Q  As you stand here as the witness for
24  Johnson and Johnson, let's be very clear. Are you
25  telling this jury that from 1971 to 1976 McCrone

Page 181

1  never found asbestos in any Johnson and Johnson
2  material? Is that what you are saying?
3  A  Our production material, tested by McCrone,
4  did not have asbestos in it from 1971 to 1976.
5  Q  I'm asking you Ma'am, are you telling this
6  jury, because it is important, that no test by
7  McCrone ever found asbestos from 1971 to 1976 in
8  Johnson and Johnson talc? Is that what you are saying?
9      MR. SMITH: Objection.
10  A  There were two instances that were
11  referred to in that letter I mentioned that was
12  written in 1976 referring to 1971 to 1976. They
13  said in the last five years, and we have the letter
14  here that we can look at, and they did mention, I
15  believe, or maybe it was in a later letter, that
16  they had two instances of asbestos contamination
17  from external sources and they were able to verify
18  where those asbestos materials came from.
19  Q  What was my question?
20  A  You asked me if they never found any
21  asbestos, and there were some contaminant events.
22  I'm answering your question.
23  Q  Your answer to the question is but for two
24  contamination events, McCrone never found any
25  evidence of asbestos when testing Johnson and

Page 47 (Pages 182-185)

Page 182

1 Johnson talc. Is that what you are saying?
2   A   That is my understanding of talc cosmetic powders.
3   Q   Did McCrone ever find asbestos when testing
4 the talc mine sources that were used for Johnson
5 and Johnson cosmetic talc products?
6        MR. SMITH: Objection.
7   A   We would have to look at those reports.
8 There are extensive surveys of the shafts that are
9 used for cosmetic talc and they are complex
10 documents that need to be looked at specifically to
11 go through that.
12   Q   Ma'am, I'm just asking whether you know,
13 as the representative of Johnson and Johnson,
14 whether McCrone ever tested talc that was used in
15 the Johnson and Johnson cosmetic talc products and
16 found asbestos. That is my question.
17        MR. SMITH: Objection.
18   A   I think you have changed the question.
19   Q   That is my question. Can you answer that
20 question?
21   A   Did McCrone ever find asbestos in cosmetic
22 talc products. That was your question.
23   Q   No, Ma'am. My question was, did McCrone
24 ever find asbestos in the talc that was used to
25 manufacture -- I'll make it easier. I'll start over.

Page 183

1        Did McCrone ever find asbestos in
2 any form in the source of the talc that was used for
3 Johnson's cosmetic talc products?
4   A   They never found asbestos in the material
5 that was used to make Johnson's Baby Powder.
6   Q   And that is what you told the FDA, you,
7 Johnson and Johnson, correct?
8   A   That's correct.
9   Q   And you have actually met with the FDA and
10 told them, in reviewing the Lewin reports, that
11 there was never even a trace of chrysotile asbestos
12 found in any Johnson and Johnson cosmetic talc
13 product, true?
14   A   True.
15        MR. SMITH: Objection.
16   Q   At some point you sat down with the FDA
17 and actually discussed that issue about the Lewin
18 results, correct?
19   A   Yes.
20   Q   And what you arranged at Johnson and
21 Johnson was a private meeting with the FDA that you
22 would have with the officials at the FDA and then
23 you could agree with the FDA who would be allowed to
24 speak at the meeting involving people other than
25 Johnson and Johnson, correct?

Page 184

1   A   I recall, and I have read documents,
2 minutes from the meeting where the FDA came to
3 Johnson and Johnson to discuss testing. I know
4 there were other individuals there. I don't recall
5 any conditions of who was going to speak, but I'm
6 not surprised that there was a very specific agenda
7 agreed to, if that's what you are referring to.
8   Q   Well, you know that before you had the
9 meeting with other industry members, you had a
10 private meeting with the FDA about the Lewin
11 results, true?
12   A   Yes, and that is not unusual, if we are
13 talking about our specific products.
14   Q   You, Johnson and Johnson, actually got an
15 advanced copy of the Lewin Report before it was ever
16 made available to any consumers or doctors or
17 members of Congress, correct?
18        MR. SMITH: Objection.
19   A   Yes.
20   Q   When you met with the FDA, you assured the
21 FDA that you gave them your entire background file
22 on asbestos talc testing as it related to your
23 cosmetic talc products, correct?
24   A   I don't know that specifically. I would
25 have to go back and look at those documents to see

Page 185

1 what exactly was given.
2   Q   Exhibit 40 is a December 13, 1972 memo
3 that discusses the meeting that you had with the FDA
4 on November 1, 1972, correct?
5   A   Yes.
6   Q   What you indicated is that you pointed out
7 and provided information and ordered your complete
8 background files concerning talc and asbestos, correct?
9   A   Yes.
10   Q   Did you actually provide the FDA with your
11 complete background files?
12   A   In November 29, 1972, we sent a number of
13 documents. These are reports of retained samples
14 from two lots that were examined by multiple
15 different organizations.
16   Q   At that point in time did you provide the
17 FDA with all of the asbestos testing evidence you
18 had related to your cosmetic talc products?
19        MR. SMITH: Objection.
20   A   What I show here is we sent a number of
21 different reports, testing of certainly lots.
22 That's what I show that we sent to the FDA.
23   Q   That wasn't my question.
24        MR. PLACITELLA: Are you able to read
25 my question back.

Page 186

1        (The above question is read.)
2        MR. SMITH:  Note my objection.
3    A   So, I as I said, November 29, 1972, as
4  pointed out in this December 13th memo, I pointed out
5  providing information, offered our complete
6  background files.  Not all the tests have
7  backgrounds files, to the administration prior to
8  public disclosure, et cetera, and I have that here.
9  It was provided to you in binder P-3.
10   Q   Can you identify the letter that you are
11 referring to by date?
12   A   Tab C, November 29, 1972 letter.
13   Q   So on November 29, 1972, it is your
14 testimony here under oath that Johnson and Johnson
15 provided the FDA with all the testing evidence that
16 it had related to whether there was asbestos in
17 Johnson and Johnson cosmetic talc products, correct?
18       MR. SMITH:  Objection.
19   A   As I corrected you before, not all of the
20 testing information, complete background files.
21 This is one, two, three, four, five different sets
22 of documents around testing, and it refers to two
23 specific lots.
24       So you are saying all of the
25 extensive testing.  I don't know if there's other

Page 187

1  testing that would fall under the umbrella you are
2  putting up.  This is what was sent to the FDA and it
3  is comprehensive related to these two lots.
4    Q   So everything you sent to the FDA is in
5  that binder?
6    A   That is correct.
7    Q   In your meeting you express your concern
8  to the FDA about the Lewin results, correct?
9    A   Yes.
10   Q   And you actually got the FDA official to
11 agree not to release the Lewin results.  I think he
12 actually said, "Over my dead body will I release
13 them."  Is that right?
14       MR. SMITH:  Objection.
15   A   Yes, he did say that.
16   Q   At that point in time was your former
17 executive working at the FDA?
18   A   I'm sorry?
19   Q   Your former executive who worked on talc,
20 was he working at the FDA at that point in
21 time?
22       MR. SMITH:  Objection.
23   A   I don't know which executive you are
24 referring to.
25   Q   Dr. Eiermann.  Yes or no?

Page 188

1    A   I don't know.
2    Q   And ultimately was a letter generated from
3  the FDA summarizing the information and a product of
4  what your discussions were and the input you provided?
5    A   From FDA?
6    Q   Yes, Ma'am.
7    A   There was a letter from the FDA.
8    Q   I'll show you what's been marked Exhibit
9  50.  50 is a July 31, 1973 memo, a letter from the
10 FDA talking about a summary and comments on
11 Professor Lewin's analytical results for asbestos,
12 correct?
13   A   Yes.
14   Q   You have seen that before?
15   A   Yes.
16   Q   That was part and parcel of the product of
17 the discussion and submissions that you had given to
18 the FDA on this subject, true?
19   A   This is from the FDA, not from us.
20   Q   No, we are talking this was the product
21 of, in part, of the discussions you had with the
22 FDA and the submissions you gave them.
23   A   That's correct.
24   Q   And in fact, the FDA notes on the second
25 page of the document that you dispute the findings

Page 189

1  of Lewin using your own analysis and that no
2  chrysotile was found, right?
3    A   Yes.
4    Q   38.  So we are all on the same page, I
5  think this is what you referenced.  I'm going to
6  give you what's been marked J and J 38, and J and J
7  38 is your letter to the FDA enclosing various
8  expert testing results, correct?
9    A   Yes.
10   Q   And those included reports from McCrone,
11 correct?
12   A   Yes.
13   Q   They included reports from Dr. Brown at
14 Princeton?
15   A   Yes.
16   Q   Correct?  They included reports from the
17 Colorado School of Mines?
18   A   Yes.
19   Q   Your notes that have been marked as P-2, I
20 don't really see anything in your notes related to,
21 I'll call it the Lewin related testing, correct?
22   A   All in the binders here.
23   Q   I'm asking whether it is in your notes.
24   A   Not that I remember.  Something about the
25 1971 EPA State of New York symposia that it leads to

Page 190

1  Lewin testing.
2      Q   What do you know about that?
3      A   Just what I wrote down.
4      Q   That's all you know?
5      A   No.  There was a 1971 meeting and the
6  issue of asbestos testing and talc came up.  Dr.
7  Lewin was hired by FDA to do some testing and that
8  led to the test results we have been discussing.
9      Q   I'm looking at your notes, on the second
10  page it talks about, it says on page 2, "Reuters
11  article lays out the theme."  What does that mean?
12      A   There was a recent Reuters article written
13  about talc, Johnson and Johnson and talcum powder,
14  and some of the legal activities.
15      Q   That's something you read in preparation
16  for today's deposition?
17      A   I did.  I reread it.
18      Q   And then it says pivot back to.  What do
19  you mean by pivot back to?
20      A   I would have to look at the notes there.
21  This refers to the fact that when you are talking
22  about testing, you could easily pick out one
23  document and present that as if it told the whole
24  story of what people understood about asbestos
25  testing and talc, and that is not correct.  That

Page 191

1  there's years of discussion and scientific debate
2  about what is the appropriate testing for talc.  And
3  what is the right methodology, and Lewin really
4  opened that up.  And you see that laid out over a
5  number of years leading to the J41.
6          And so pivot back to a framework that
7  lays out the context in which these documents lie so
8  that nobody is misled to something that may not be true.
9      Q   I want to make sure we are -- you say
10  Reuters articles lays out the theme.  Pivot back to.
11          Then you say, "We are not playing
12  games with language.  Go to McCrone letters."  What
13  does that mean?
14      A   That means when you say Tremolite, that
15  does not mean asbestos.  When you say actinolite,
16  that does not mean asbestos.  You say amphibole,
17  that does not mean asbestos.
18          It is very easy to confuse individuals
19  by using a lot of geologic, numerology, nameology,
20  and so just in plain speak, asbestos is what asbestos
21  is, and you have to understand that.  It is a disease
22  causing febrile formations that are of concern that
23  we have to make sure are not in our products.
24  That's the bottom line.
25      Q   But we are going to the Reuters article

Page 192

1  and the response is pivot back to.  We are not
2  playing games with language.
3          MR. SMITH:  Objection.
4      A   We are talking about asbestos.  That's
5  what I mean.
6      Q   It says, "No documentation validated
7  positive test for asbestos.  Then that material was
8  used.  That's why we use standards."  That is your
9  response to the Reuters article?
10      A   As we have done here today, you can pick
11  out a little note here and a note there and imply
12  that reflects that Johnson and Johnson products are
13  contaminated with asbestos.
14          There's no evidence to show that we
15  ever released product to market that contained
16  asbestos.  And that's just a fact, and the McCrone
17  letters in 1986 and 1976 refer to many, many years
18  of negative testing of production material of
19  Johnson's Baby Powder and Shower to Shower.
20      Q   I'm just trying to understand your notes.
21      A   I think they are good notes.  Thanks for
22  bringing it up.
23      Q   I was curious why, in preparation for
24  today's deposition, you were talking about pivoting
25  from the Reuters article.

Page 193

1          Did you think I was going to ask you
2  about the Reuters article?
3      A   No, but I think the Reuters article picked
4  up on some flashy facts and to make a story, and
5  those facts were taken out of context of the
6  framework of what's been going on in the last 50
7  years around understanding asbestos testing and
8  talcum powder.
9      Q   Were there discussions inside of Johnson
10  and Johnson that you were a party to that were in
11  response to the Reuters article?
12      A   Many people have asked me about talc
13  safety in light of the Reuters article.
14      Q   When you say many people, I'm talking
15  about inside of Johnson and Johnson.
16      A   Yes.
17      Q   Did you have a conversation with the
18  CEO about it?
19      A   No.
20      Q   Who did you speak to inside of Johnson and
21  Johnson about the response to the Reuters article?
22      A   Well, many people in the company know that
23  that I have been -- number one, I was essentially
24  the chief safety officer for our consumer group for
25  three years and did a lot of work on talc safety.

Page 194

1      So many individuals and regular
2  employees, including security guards, asked me what
3  I think, and I tell them.
4      Q   What executives did you discuss the
5  Reuters article with?  What Johnson and Johnson
6  executives?
7      A   Outside of our legal team, only the
8  individuals that I mentioned earlier today.
9      Q   That being, so we clear, we are not
10  talking about security guards?
11     A   We are talking Lynn Szczepaniak, Bobbette
12  Williams.  Individuals in our quality organization.
13  Don Hicks, who is responsible for talc safety for
14  many years.
15     Q   Did you talk to any PR people?
16         MR. SMITH:  Objection.
17     A   I did talk to our communications people.
18  They were asking for my help and advice.
19     Q   Who was that?
20     A   Ernie Knewitz.
21     Q   Ernie Knewitz works for Johnson and Johnson?
22     A   Yes.
23     Q   Were you involved in any way in shaping
24  the message that was put forth by Johnson and
25  Johnson in response to the Reuters article?

Page 195

1         MR. SMITH:  Objection.
2      A   No.  They asked me to fact check.
3      Q   Fact check what?
4      A   References to scientific literature, how
5  things were discussed to make sure that the language
6  was appropriate and scientifically correct.
7      Q   Who asked you to do that fact check?
8      A   Ernie.
9      Q   So we are clear, Ernie --
10     A   Knewitz.
11     Q   And his job specifically was what?
12     A   Communications.
13     Q   Did Johnson and Johnson actually hire outside
14  consultants to help them with this public relations?
15         MR. SMITH:  Objection.
16     A   I wouldn't know that.
17     Q   That was something we would have to ask
18  Ernie Knewitz?
19     A   Correct.
20     Q   Just so the record is clear, going back to
21  the Lewin scenario and what you gave to the FDA, up
22  on the screen is a November 29, 1972 submission,
23  correct?  That is what you have in front of you?
24     A   Yes.
25     Q   And again, we have McCrone, Colorado

Page 196

1  school, Gordon Brown, Professor Pooley and Johnson
2  and Johnson, correct?
3      A   Yes.
4      Q   Now, 265.  265 is a report on the Johnson
5  and Johnson's Baby Powder that Gordon Brown
6  provided you, correct?
7      A   Yes.
8      Q   And that was the report that you gave to
9  the FDA, correct?
10     A   It looks to be, yes.
11     Q   And the methodology that Gordon Brown used
12  in analyzing the baby powder was X-ray diffraction,
13  correct?
14     A   Yes.
15     Q   And he concluded that there was no
16  evidence of chrysotile or tremolite found using that
17  technique, correct?
18     A   Yes.
19     Q   But you, Johnson and Johnson, knew that
20  the X-ray diffraction was not going to find
21  chrysotile under 2 or 3 percent, correct?  We went
22  through that.
23     A   We did, but this is in 1972.  So these are
24  early days in asbestos testing.
25     Q   Yes, Ma'am.  And you also knew that the

Page 197

1  x-ray diffraction was not going to find low levels of
2  tremolite, correct?
3      A   Yes.
4      Q   35 is an October 27, 1972 report to
5  Johnson and Johnson from the Colorado School of
6  Mines, correct?
7      A   Yes.
8      Q   And that, again, was the report you gave
9  to the FDA, correct?
10     A   Yes.
11     Q   Again, the Colorado School of Mines used
12  X-ray diffraction as the testing method at the
13  request of Johnson and Johnson.  That's what it
14  says, right?
15     A   No.  X-ray diffraction step scanning,
16  which is a more sensitive X-ray diffraction.
17     Q   That's what was used?
18     A   Yes.
19     Q   And based upon the x-ray diffraction test,
20  the Colorado School of Mines didn't find any
21  chrysotile asbestos, correct?
22     A   They didn't find serpentine, so, yes,
23  chrysotile would fall into that category.
24     Q   They did not use the preconcentration
25  method that they were recommending in performing

Page 51  (Pages 198-201)

**Page 198**

1  these tests, correct?
2  A  Well, in a different context.  They were
3  looking -- Lewin said there was 3 percent chrysotile
4  in there.  So you would not need a concentration
5  method to detect that level of chrysotile.
6  Q  You would need it if you wanted to go
7  lower than that.
8  A  You would.
9  Q  And they did not use the concentration
10  method in analyzing these samples, correct?
11  A  Correct.
12  Q  461.  Now, 461 is a subsequent submission
13  that Johnson and Johnson made to the FDA concerning
14  the Lewin samples.  Is that fair?
15  A  Yes.
16  Q  Dated May 25, 1973?
17  A  That is correct.
18  Q  And that was by a Martin J. Borger (ph.) or
19  Burger?
20  A  I don't know.  However you say it is fine
21  with me.
22  Q  What you used was X-ray diffraction,
23  correct?
24  A  Yes.
25  Q  And using X-ray diffraction, he didn't

**Page 199**

1  find any chrysotile, fair?
2  A  That is correct.
3  Q  Or tremolite?
4  A  Or any number of, they list a whole bunch
5  of things he didn't find.
6  Q  And he did not also apply the
7  concentration method, correct?
8  A  Right.  Again, it would be unnecessary
9  since Lewin was suggesting 2 and 3 percent of
10  chrysotile.
11  Q  But if you wanted to find out if there was
12  any asbestos in there, you would use the
13  concentration method.  You were just trying to
14  disprove Dr. Lewin.  Is that what was going on?
15  A  Actually, that was what was going on
16  because his methods were flawed.
17        MR. PLACITELLA:  It is 3:58.  I have
18  other things, but I think this is a place to stop
19  since we are about to change subjects.  So why don't
20  we end for today and consult our calendars.
21        MR. SMITH:  Fine.
22        THE VIDEOGRAPHER:  The time is
23  approximately 3:59 p.m.  This concludes today's
24  portion of the deposition.
25        (The deposition is adjourned.)

**Page 200**

1            C E R T I F I C A T E
2
3        I, MARC BRODY, Notary Public and
4  Certified Shorthand Reporter of the State
5  of New Jersey, do hereby certify that prior
6  to the commencement of the examination
7  the witness was duly sworn by me to
8  testify the truth, the whole truth and
9  nothing but the truth.
10        I DO FURTHER CERTIFY that the
11  foregoing is a true and accurate transcript
12  of the testimony as taken stenographically
13  by and before me at the time, place and on
14  the date hereinbefore set forth.
15        I DO FURTHER CERTIFY that I am neither
16  a relative of nor employee nor attorney nor
17  counsel for any of the parties to this
18  action, and that I am neither a relative
19  nor employee of such attorney or counsel,
20  and that I am not financially interested in
21  the action.
22
23
24        Notary Public of the State of New Jersey
25

**Page 201**

D O C U M E N T   L I S T

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| J&J-491 | J&J memo, 1/4/84 | 48 |
| J&J-476 | Addendum to memo, 3/23/72 | 57 |
| J&J-497 | J&J memo, 11/3/08 | 60 |
| J&J-44 | J&J memo, 4/26/73 | 69 |
| J&J-364 | Memo, FDA, 5/14/74 | 72 |
| J&J-464 | J&J memo, 8/13/71 | 74 |
| J&J-69 | J&J Baby Powder Fact Book, July, 1974 | 81 |
| J&J-216 | Memo, Mesothelioma Talc Medical Research, 1997 | 84 |
| J&J-467 | J&J memo, 7/27/71 | 89 |
| J&J-474 | J&J memo, 9/21/71 | 90 |
| J&J-483 | J&J memo, 1972, Nicholson to FDA | 91 |
| J&J-475 | Letter, J&J to FDA, 1973 | 92 |
| J&J-60 | J&J memo, FDA, 7/31/73 | 99 |
| J&J-492 | Letter, J&J to FDA, 3/17/16 | 99 |
| J&J-498 | J&J advertisement | 103 |
| J&J-457 | List, J&J to FDA, 1971-1977 | 114 |
| J&J-489 | Meeting of Talc Group, 3/21/73 | 116 |
| J&J-148 | J&J Trade Association Minutes, May, 1977 | 119 |
| J&J-357 | Memo, John Hopkins, 12/21/95 | 127 |
| J&J-361 | Memo, Rich Zazenski, 2001 | 132 |
| J&J-266 | J&J memo, 10/31/72 | 137 |

Page 52  (Pages 202-202)

Page 202

DOCUMENT LIST

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| J&J-263 | Report, Colorado School of Mines | 142 |
| J&J-45 | J&J memo, 5/16/73 | 145 |
| J&J-46 | J&J memo, 6/4/73 | 147 |
| J&J-58 | Analysis of Talc, Dartmouth College, 3/74 | 159 |
| J&J-352 | J&J memo, 3/11/74 | 163 |
| J&J-471 | J&J memo, 11/24/76 | 166 |
| J&J-369 | J&J memo, 1975 | 167 |
| J&J-353 | Letter, J&J, 2/28/75 | 168 |
| J&J-347 | Report, 8/29/72 | 175 |
| J&J-29 | J&J memo, 8/24/72 | 176 |
| J&J-40 | J&J memo, 12/13/72 | 185 |
| J&J-50 | J&J memo, 7/31/73 | 188 |
| J&J-38 | Letter, J&J, 11/29/72 | 189 |
| J&J-265 | Report, 1972 | 196 |
| J&J-35 | Report, 10/27/72 | 197 |
| J&J-461 | J&J Submission to FDA, 5/25/73 | 198 |

Brody Deposition Services

**A**

A.J 146:2
abilities 126:4
ability 54:20
  55:7, 55:11
able 136:5
  146:11, 147:13
  156:24, 181:17
  185:24
above-captioned
  1:11
ABRAHAM
  2:10
absolutely 46:13
  47:11, 47:14
  53:9, 75:4
  91:19, 103:22
academics
  110:10
accept 167:13
accepted 74:22
  78:2, 118:15
access 39:10
  40:1, 40:6
  40:10, 40:19
  40:23, 40:25
  48:4, 48:19
  48:23, 49:23
  53:5, 53:12
  55:18, 55:23
  57:9, 103:8
  103:14, 103:20
accuracy 25:6
accurate 120:5
  121:17, 125:10
  200:11
achieved 120:7
acid 81:6
acknowledge
  82:12, 125:23
  125:25
acknowledged
  80:11, 80:20
  84:11, 123:2
  126:6, 126:12

126:15, 126:21
  164:19
acknowledges
  82:6, 83:1
  118:8
acknowledgment
  86:7
Act 22:19, 34:17
  36:13, 43:9
acting 8:8
actinolite 69:7
  69:11, 69:14
  71:5, 141:13
  141:18, 143:2
  143:8, 144:18
  149:13, 150:2
  150:4, 150:8
  150:11, 150:14
  150:16, 150:20
  150:23, 150:25
  151:17, 152:1
  152:8, 156:8
  156:16, 156:25
  158:12, 158:14
  158:20, 158:21
  158:23, 160:18
  160:24, 161:24
  162:1, 162:1
  163:19, 175:18
  191:15
action 200:18
  200:21
actionable
  15:14
actively 125:15
activities 6:10
  25:1, 190:14
activity 61:8
actual 6:2, 10:3
  115:9, 158:2
added 43:14
addendum
  57:13, 57:19
  201:4
addition 10:20
  14:5, 38:24

105:22, 125:22
  131:4
Additionally
  132:22
Additives 33:8
adequate 18:4
adequately 13:6
  13:12, 13:24
adjourned
  199:25
adjunct 123:6
administration
  7:8, 38:14
  186:7
admitted 96:20
adopt 116:19
  119:15, 139:18
adopted 118:14
  124:7, 124:11
  168:17, 169:13
adopting 165:21
adoption 165:10
  167:8
adulterated
  16:18, 22:18
advanced
  184:15
adverse 56:3
advertisement
  103:2, 105:6
  201:18
advice 167:5
  194:18
advisability
  58:15
aerosols 23:23
  25:17
affairs 11:6
affirmatively
  98:10
afternoon 177:4
  177:7
agencies 86:21
  105:8
agency 87:6
agenda 184:6

ago 38:15, 61:4
  125:1, 125:8
  169:14, 171:9
agree 18:9
  18:24, 19:7
  21:14, 22:22
  40:5, 40:18
  47:5, 59:21
  67:10, 67:16
  69:5, 69:13
  71:11, 74:13
  77:5, 78:16
  80:10, 80:19
  82:5, 82:11
  82:25, 83:6
  83:12, 83:16
  84:4, 84:10
  85:14, 86:3
  86:19, 86:24
  87:2, 87:4
  87:20, 97:7
  109:24, 114:20
  135:1, 135:17
  135:17, 137:4
  137:9, 145:12
  156:2, 183:23
  187:11
agreed 135:14
  175:22, 184:7
agreement
  124:19
ahead 32:19
  72:14, 76:3
  91:5, 121:10
  158:5
air 133:20
  135:3
AL 1:3, 1:3, 1:4
  1:4, 1:5, 1:5, 1:6
  1:6, 1:7, 1:7
allay 58:18
allegation 37:24
allowed 127:13
  155:8, 183:23
Amax 1:5, 2:11
ambient 135:3

amended 38:21
AMERICA 1:3
  1:4, 1:4, 1:5, 1:6
  1:7, 1:7
amount 88:21
  89:5, 118:23
  141:19
amounts 71:2
  101:25, 143:14
  162:3, 178:22
amphibole
  98:21, 99:15
  118:9, 118:14
  118:17, 121:15
  128:25, 158:15
  160:8, 162:2
  162:13, 191:16
amphiboles
  98:24, 115:13
  119:10, 119:12
  120:21, 128:16
  130:12, 158:24
  159:9, 159:22
  160:2, 160:12
  161:4
analysis 60:15
  91:21, 92:13
  92:21, 93:1
  107:9, 119:3
  125:3, 136:2
  137:23, 148:5
  149:23, 159:8
  160:13, 173:3
  173:16, 173:21
  174:6, 174:15
  189:1, 202:6
analytical
  168:21, 173:13
  188:11
analyze 146:11
  147:13
analyzed 132:25
  160:19
analyzing
  196:12, 198:10
and/or 143:8

animal 67:22
  68:4, 68:5
  68:22, 70:2
ANISHA 2:10
answer 9:7
  13:20, 21:6
  30:5, 30:7
  30:13, 30:16
  30:17, 39:19
  51:17, 51:20
  73:10, 73:17
  77:12, 80:1
  86:4, 88:25
  89:3, 94:21
  95:23, 96:2
  96:14, 111:24
  112:1, 112:2
  119:2, 123:22
  124:9, 124:13
  126:14, 134:10
  135:21, 136:18
  136:21, 136:25
  142:22, 149:9
  151:16, 151:12
  153:9, 154:4
  154:17, 156:3
  156:6, 156:13
  156:15, 156:17
  156:22, 156:24
  157:3, 157:5
  158:3, 158:21
  162:11, 162:19
  173:25, 179:17
  181:23, 182:19
answered 50:18
  50:19
answering
  158:3, 181:22
answers 154:18
anthophyllite
  84:12, 85:6
  85:7, 121:24
anthopyllite
  83:13, 162:3
anybody 12:17
  48:18, 165:8

apparent 147:8
apparently
  176:23
appear 118:16
appearances 5:8
appearing 178:7
applicable 18:2
apply 199:6
appreciate
  103:16, 135:21
approach 53:15
  70:11, 70:17
  168:25, 169:6
appropriate
  14:8, 46:10
  54:2, 191:2
  195:6
approval 12:25
approximately
  1:15, 5:7, 38:15
  54:9, 54:15
  106:16, 106:21
  145:3, 145:7
  171:13, 171:18
  199:23
April 69:19
  115:24
apropos 53:16
area 43:17
  59:25, 79:5
  151:20
arises 54:3
arose 39:11
  40:1
arranged
  183:20
art 128:20
article 52:17
  63:1, 190:11
  190:12, 191:25
  192:9, 192:25
  193:2, 193:3
  193:11, 193:13
  193:21, 194:5
  194:25
articles 191:10

articulated
  117:21
asbestiform
  22:11, 22:16
  70:13, 70:24
  71:12, 72:3
  72:17, 72:19
  72:23, 82:7
  82:13, 82:18
  121:14, 156:21
  158:25, 159:9
  159:22, 160:16
asbestos 6:19
  7:1, 7:9, 7:24
  8:7, 9:15, 12:9
  17:21, 18:5
  22:14, 22:16
  22:21, 23:2
  23:15, 24:14
  25:4, 25:15
  25:25, 33:11
  35:3, 35:20
  36:7, 37:24
  38:16, 38:22
  39:6, 40:2, 40:7
  40:20, 41:2
  43:3, 44:2, 44:5
  45:9, 51:6
  51:15, 52:15
  56:13, 56:15
  56:16, 57:10
  58:18, 59:10
  59:12, 59:24
  64:18, 64:23
  65:3, 65:10
  66:13, 66:14
  66:16, 66:18
  66:20, 66:25
  69:11, 70:13
  70:17, 71:7
  71:15, 71:23
  72:8, 72:16
  73:4, 73:6, 74:2
  74:3, 75:17
  79:22, 80:12
  80:21, 81:6

  82:15, 82:22
  83:3, 83:8, 83:9
  83:15, 83:22
  84:6, 85:4
  87:11, 87:19
  87:23, 88:1
  88:14, 88:19
  88:21, 89:2
  89:5, 89:7
  89:10, 89:14
  90:5, 90:11
  90:22, 91:1
  91:12, 91:20
  92:12, 92:20
  93:1, 94:6
  94:12, 94:17
  94:25, 95:11
  95:22, 96:10
  96:20, 97:11
  97:23, 98:6
  98:9, 98:15
  98:16, 98:19
  99:25, 100:7
  100:8, 100:13
  100:14, 100:16
  100:19, 100:23
  100:25, 100:25
  101:6, 101:12
  101:13, 101:19
  101:25, 102:6
  102:12, 102:16
  104:8, 105:4
  106:1, 106:4
  106:11, 107:15
  108:9, 109:2
  109:13, 109:20
  110:14, 110:18
  111:11, 111:15
  111:17, 111:21
  112:6, 113:4
  113:11, 113:19
  114:21, 115:4
  115:18, 116:9
  117:19, 119:11
  119:18, 119:19
  120:18, 123:25

  124:12, 125:4
  126:18, 128:7
  128:12, 131:23
  132:23, 132:25
  133:4, 133:11
  133:16, 133:19
  134:8, 134:16
  135:4, 135:11
  135:16, 137:7
  137:24, 138:11
  138:14, 138:17
  139:11, 139:20
  140:2, 140:23
  141:16, 141:25
  142:19, 144:18
  146:10, 146:13
  147:2, 147:12
  147:15, 148:7
  148:13, 149:24
  150:4, 150:11
  150:16, 150:18
  152:2, 152:10
  152:15, 157:9
  157:25, 158:15
  162:7, 163:12
  163:20, 166:16
  168:13, 171:25
  172:11, 173:3
  173:5, 173:17
  173:23, 174:6
  174:8, 174:16
  174:17, 175:5
  176:20, 178:2
  179:3, 179:23
  180:21, 181:1
  181:4, 181:7
  181:16, 181:18
  181:21, 181:25
  182:3, 182:16
  182:21, 182:24
  183:1, 183:4
  183:11, 184:22
  185:8, 185:17
  186:16, 188:11
  190:6, 190:24
  191:15, 191:16

191:17, 191:20
191:20, 192:4
192:7, 192:13
192:16, 193:7
196:24, 197:21
199:12
**Ashton** 70:7
116:3, 116:6
116:8, 117:7
117:21, 140:14
166:4, 166:8
166:12
**asked** 15:25
22:23, 31:9
36:5, 44:4, 65:5
65:7, 65:18
65:24, 66:10
66:12, 88:16
88:24, 104:17
106:25, 107:1
134:9, 139:4
150:5, 153:11
156:22, 178:10
178:19, 181:20
193:12, 194:2
195:2, 195:7
**asking** 27:17
29:25, 30:1
34:7, 35:10
35:11, 39:14
39:15, 39:22
39:23, 48:16
48:22, 51:11
63:3, 64:4, 64:7
64:8, 68:6
69:11, 70:21
73:25, 79:13
79:14, 80:1
85:14, 85:15
85:21, 87:24
94:21, 95:7
96:24, 117:4
122:24, 124:21
126:5, 134:11
135:13, 136:14
137:2, 150:12

153:19, 154:12
154:17, 154:23
154:25, 155:20
162:8, 165:19
167:3, 173:20
174:2, 174:14
176:5, 179:7
179:9, 179:16
179:17, 179:24
181:5, 182:12
189:23, 194:18
**asks** 73:9
**asserted** 38:16
**assessing** 110:16
110:25, 157:24
**assessment** 33:8
107:12
**assistance** 65:7
65:25, 66:5
**assisted** 9:22
**associated** 14:9
19:15, 105:22
**association** 20:2
86:8, 99:3
119:22, 123:14
125:3, 132:13
147:2, 149:9
201:21
**assume** 145:23
171:22
**assurance** 104:9
120:5, 121:16
133:3, 133:11
134:15, 135:15
**assure** 14:6
21:15, 21:22
**assured** 178:20
184:20
**atomizer** 116:16
**Attached**
166:13
**attachments**
105:22
**attended** 116:1
**attorney** 200:16
200:19

**attorneys** 2:6
2:10, 2:15, 2:21
3:6, 9:22
**attributable**
59:14
**August** 74:19
173:8, 173:11
175:4, 176:20
**author** 8:20
175:8
**authored** 99:9
**authorities**
157:8
**authority** 17:5
18:10, 18:20
46:8, 49:14
**available** 20:25
34:15, 36:6
64:3, 65:11
92:13, 92:21
104:21, 105:1
115:17, 118:9
123:17, 124:25
161:21, 166:15
184:16
**Avenue** 2:3
**average** 53:18
**avoid** 168:6
168:24, 169:5
170:20
**AVON** 1:3
**aware** 7:25
13:9, 13:10
13:18, 17:21
18:13, 22:25
27:9, 27:23
28:2, 37:9, 41:8
41:12, 41:13
41:18, 41:21
42:8, 42:14
42:25, 43:1
44:7, 52:21
63:24, 66:19
83:7, 84:9
106:12, 109:22
110:3, 111:9

112:25, 122:17
122:21, 123:1
129:5, 133:6
134:13, 134:16
139:17, 140:6
140:7, 140:11
145:12, 145:17
145:18, 149:7
157:12, 157:18
163:6, 163:9
171:22, 172:4
172:9, 172:13
172:25, 173:2
177:14, 180:22

**B**

**baby** 37:18
52:15, 53:3
56:12, 56:15
56:16, 57:10
58:12, 58:17
59:4, 59:11
59:17, 60:3
60:13, 69:6
69:13, 70:12
71:3, 80:25
89:11, 89:15
90:11, 90:22
91:1, 91:11
91:20, 95:10
95:21, 96:11
96:21, 97:10
97:22, 100:12
100:24, 101:5
101:19, 108:2
110:7, 111:6
113:18, 137:23
138:22, 140:23
157:9, 171:23
172:10, 173:17
173:23, 174:16
183:5, 192:19
196:5, 196:12
201:9
**back** 7:15, 8:4

8:5, 12:10, 20:2
33:17, 33:20
42:17, 54:14
67:16, 67:23
68:7, 75:3, 75:9
75:12, 80:15
99:23, 105:17
106:20, 114:14
121:11, 124:4
131:3, 136:20
145:6, 157:16
157:20, 162:19
164:12, 171:18
184:25, 185:25
190:18, 190:19
191:6, 191:10
192:1, 195:20
**background** 8:9
44:7, 172:17
184:21, 185:8
185:11, 186:6
186:20
**backgrounds**
186:7
**backup** 60:15
**bad** 84:3
**Bailey** 112:14
112:20
**ban** 70:24
**Bank** 2:4
**BARNA** 2:15
**based** 44:21
50:4, 56:19
57:5, 94:17
97:15, 108:23
131:24, 134:20
136:2, 144:19
152:11, 158:13
165:13, 171:2
172:24, 197:10
**bases** 15:20
**basically** 111:14
129:11, 129:17
164:22
**basis** 15:10
16:10, 40:16

**batch** 129:1
**Bates** 23:25
26:11, 84:23
130:5
**bathroom** 54:7
**bear** 14:7
**bears** 16:18
**began** 116:8
**beginning** 75:3
87:12, 87:17
88:3, 99:16
135:10
**behalf** 8:8, 8:24
64:10
**behave** 154:24
**behaves** 73:19
**behest** 75:14
**beings** 74:16
**believe** 12:16
17:11, 19:1
30:12, 53:14
53:21, 59:1
63:20, 70:14
77:11, 102:12
107:3, 145:24
147:25, 166:7
181:15
**believed** 178:15
**bending** 15:17
**benefaction** 81:11
**Bernard** 58:15
60:24
**best** 117:2
117:12, 164:20
**better** 130:11
**beyond** 14:20
15:23, 130:10
**bidders** 166:15
**BIDDLE** 1:14
**Bill** 61:4
**binder** 33:4
112:10, 112:12
113:5, 113:6
113:7, 113:9
114:4, 114:5

114:8, 186:9
187:5
**binders** 112:16
189:22
**bit** 22:24, 25:21
82:9, 92:16
172:16
**BLANK** 2:18
**blew** 128:3
130:6, 149:17
**blow** 24:13
**Bobbette** 11:14
11:15, 194:11
**bodies** 85:4
**body** 100:4
100:6, 175:6
187:12
**book** 81:1
163:3, 201:9
**books** 8:21
30:19, 105:11
105:15
**Borger** 198:18
**BORGWARN...**
1:6
**bottom** 43:13
64:24, 120:3
191:24
**bought** 102:10
**bounds** 155:16
155:18, 155:20
**Boundy** 107:17
107:22
**Branch** 33:8
**brand** 175:6
**break** 8:17, 33:6
33:16, 54:7
58:7, 97:25
98:2, 103:1
105:12, 106:14
107:1, 144:25
171:11
**BRENNTAG**
1:3, 1:4, 1:5, 1:6
1:7
**bringing** 192:22

**brings** 160:1
160:11
**Britain** 126:23
127:6, 127:20
129:8, 130:2
130:22, 131:1
131:14, 148:19
149:1
**British** 127:21
148:2, 149:8
**Broad** 1:22
**Brody** 1:13
1:22, 5:10
200:3
**broke** 54:19
**Brook** 52:14
**brought** 9:1
14:15, 14:25
26:13, 38:14
46:9, 52:3, 52:4
74:7, 155:13
175:11
**Brown** 189:13
196:1, 196:5
196:11
**bulk** 107:25
**bunch** 199:4
**Bureau** 58:9
75:13
**Burger** 198:19
**business** 47:8
62:8, 86:14
115:24, 132:7
**buy** 100:15
101:2, 101:22
102:18
**bypass** 52:22
53:5, 53:19
53:25, 54:5

**C**

**calculations** 108:25
**calendars** 199:20

**call** 45:21, 47:6
47:12, 47:17
47:21, 47:23
48:4, 48:7
48:11, 48:19
48:23, 49:9
49:23, 50:13
50:22, 51:5
51:14, 52:10
55:23, 58:8
151:4, 151:6
151:8, 151:9
189:21
**called** 1:11, 46:4
46:12, 47:13
48:23, 52:14
81:19, 130:8
139:5, 152:14
177:4
**calling** 47:21
**calls** 7:5, 15:11
47:1, 47:19
48:1, 49:3
**capable** 74:16
78:11, 78:12
118:20
**capacity** 6:15
**carbonates** 164:4
**carbonite** 160:24
**carcinogen** 22:14, 82:7
82:13, 82:15
82:18, 82:23
82:24
**carcinogens** 22:12
**Care** 65:5
65:17
**career** 42:19
**careful** 75:18
**carefully** 162:25
**caring** 40:11
**Carolyn** 3:12
**Casalarius** 61:4

**case** 12:12
**cases** 49:15
84:13, 85:9
85:18
**category** 197:23
**cause** 21:17
21:24, 22:5
65:3, 66:25
83:17, 83:23
84:6
**causing** 191:22
**Cedar** 3:4
**Center** 41:25
**centrifugation** 158:7, 158:9
**centrifuge** 141:2
141:25, 143:22
**CEO** 193:18
**certain** 26:22
37:9, 43:8
53:16
**certainly** 34:19
45:15, 55:4
82:3, 104:24
172:13, 185:21
**certainty** 20:19
21:16, 21:23
27:7
**Certified** 1:13
200:4
**certify** 200:5
200:10, 200:15
**cetera** 186:8
**CFTA** 122:19
123:3, 125:4
**chance** 158:4
175:1, 175:23
**change** 15:14
199:19
**changed** 74:8
174:2, 182:18
**characteristic** 178:23
**characterization** 47:6, 50:10
59:22, 60:23

63:23, 71:23
72:8
**characterized**
47:25
**characterizing**
48:7
**charge** 40:11
45:9
**cheap** 129:16
**check** 32:17
195:2, 195:3
195:7
**checked** 148:6
**Chestnut** 2:8
**chief** 193:24
**China** 109:10
**CHRISTOPH...**
2:5
**chrysotile** 39:1
80:12, 80:21
81:6, 91:12
98:6, 98:9
98:12, 98:16
119:11, 137:6
137:24, 138:6
138:11, 138:14
138:16, 138:21
138:25, 141:20
142:1, 143:2
143:8, 144:18
148:7, 173:16
175:14, 178:12
178:17, 178:23
179:3, 179:10
179:23, 180:1
183:11, 189:2
196:16, 196:21
197:21, 197:23
198:3, 198:5
199:1, 199:10
**chunky** 72:18
**CIR** 19:20, 20:7
20:11, 20:17
20:24, 21:10
**CIR's** 21:7
**circle** 110:10

**citizen** 34:19
34:22, 40:7
52:13, 53:11
53:18, 55:7
55:9, 55:9
55:11, 64:7
133:15
**citizen's** 63:4
**citizens** 45:18
53:14, 53:15
59:3, 59:16
59:19, 60:2
60:12, 61:5
61:18, 106:4
134:21, 135:24
151:23
**citric** 81:6
**City** 6:9
**claimed** 102:12
**clarification**
152:3
**clarifies** 152:19
**clarify** 22:21
84:1
**Clark** 2:15
115:24
**classifiable**
69:15, 71:4
**classified** 69:7
71:7
**clean** 70:11
70:14, 70:16
**clear** 77:4
77:20, 172:9
180:24, 194:9
195:9, 195:20
**clearly** 16:6
153:11
**clinical** 6:16
42:4
**closely** 128:6
**Cohen** 2:3, 3:12
**Colgate-Palmol...**
3:6
**collaborated**
10:5

**collaboration**
105:8
**collected** 100:6
**College** 1:14
157:7, 157:12
157:23, 158:11
158:19, 159:8
159:12, 202:6
**Colorado**
140:15, 140:20
141:12, 141:24
142:20, 142:25
143:7, 165:3
189:17, 195:25
197:5, 197:11
197:20, 202:3
**colored** 141:2
**Colors** 36:3
**Columbia** 2:13
**combination**
117:5, 117:11
117:11, 119:8
126:10
**combine** 119:1
**come** 26:15
31:3, 32:10
77:2, 77:13
77:22, 104:1
115:3, 124:19
133:20
**comes** 15:11
23:1, 97:21
103:2, 117:16
**cometic** 55:5
**coming** 59:11
**commencement**
200:6
**commencing**
1:15
**comment** 18:7
78:24, 79:12
**commented**
75:15
**comments** 65:2
66:24, 73:16
73:18, 135:20

154:7, 168:14
180:10, 188:10
**commerce** 14:2
**commercial**
121:14
**commissioner**
52:23, 53:1
53:6, 53:10
53:20, 54:21
54:24, 55:6
55:12, 55:15
55:19, 55:23
55:24, 56:5
56:13, 56:21
57:7, 57:9
58:16, 58:25
59:2
**commit** 17:15
**common** 42:18
**commonest**
72:16
**communicated**
7:20, 9:10, 97:6
**communicating**
7:23, 140:22
**communication**
25:18, 47:14
54:5, 105:21
105:23
**communications**
7:15, 8:11, 9:3
9:4, 9:9, 9:24
10:3, 12:10
12:21, 34:13
44:4, 49:1, 49:2
50:5, 50:7
57:17, 64:11
64:14, 79:22
80:8, 105:17
112:17, 113:14
113:16, 131:22
194:17, 195:12
**community**
40:10, 40:20
40:23, 41:2
**companies**

31:12, 31:22
108:8, 169:21
**company** 1:5
8:25, 11:21
11:23, 12:6
168:1, 193:22
**competent**
20:20, 102:15
102:17
**complaint** 46:16
46:18
**complete** 48:19
133:3, 133:10
134:15, 135:15
185:7, 185:11
186:5, 186:20
**completely**
142:5, 180:17
**complex** 97:3
97:20, 182:9
**compliance** 34:5·
111:16
**complication**
152:1
**composed** 143:9
**compound**
69:10
**comprehensive**
18:11, 93:21
95:15, 96:3
112:20, 187:3
**concentrate**
164:1
**concentrating**
150:3, 160:8
**concentration**
25:7, 139:25
141:7, 142:4
144:21, 148:5
148:19, 148:25
149:5, 149:12
149:22, 150:9
150:15, 157:13
157:24, 159:21
160:1, 160:2
160:10, 160:12

161:3, 161:12
161:23, 163:12
163:21, 164:19
165:2, 166:23
167:7, 167:25
168:20, 171:24
172:11, 198:4
198:9, 199:7
199:13
**concentrations**
160:23
**concern** 17:10
64:2, 65:4, 67:1
67:18, 187:7
191:22
**concerned**
55:17, 67:11
67:25, 68:19
68:21, 148:9
179:2
**concerning** 6:19
7:6, 7:8, 7:24
16:24, 18:22
39:11, 40:2
45:19, 46:2
46:9, 56:4
73:24, 74:8
91:6, 106:10
111:10, 113:11
113:18, 140:22
158:18, 177:16
177:22, 185:8
198:13
**concerns** 53:16
59:4, 59:6
59:13, 59:16
59:19, 60:11
68:8
**conclude** 165:9
**concluded** 120:3
196:15
**concludes**
168:19, 199:23
**conclusion**
70:10, 85:13
97:4, 158:13

166:22, 167:8
**conclusions**
158:22
**conclusive**
14:17, 15:2
90:10
**conclusively**
90:21
**conditions**
20:21, 21:3
184:5
**confidence** 37:1
37:12
**confident** 70:15
131:7
**confidential**
37:11, 159:8
**confidentiality**
36:11
**conform** 72:21
**conformed**
71:13
**confuse** 151:19
191:18
**confused** 60:10
72:7, 111:4
**confusing** 25:21
82:10, 92:17
**confusion**
152:17
**Congress** 55:22
184:17
**connection** 10:7
60:18
**consensus**
124:19
**conservative**
178:16
**consider** 56:11
**considerations**
57:5
**considered**
16:18, 81:13
86:14, 87:5
110:6, 110:24
111:2, 112:4

118:19, 139:5
144:22
**considering**
139:10, 146:9
147:12
**consistently**
170:6
**conspicuous**
13:14
**consult** 199:20
**consultant**
38:15
**consultants**
38:19, 77:18
195:14
**consulting** 6:8
**consumer** 11:7
21:18, 21:25
58:20, 102:1
102:4, 128:22
193:24
**consumers**
19:10, 100:15
101:2, 101:22
184:16
**Cont'd** 3:1
**contain** 65:2
66:25, 75:10
76:9, 97:23
132:24, 141:19
161:24
**contained** 69:6
69:14, 71:2
74:15, 75:17
85:22, 87:19
87:23, 91:12
94:6, 98:9
109:13, 110:17
113:19, 113:20
114:3, 114:8
114:10, 121:14
128:12, 141:17
192:15
**containing**
66:16, 66:18
82:6, 82:12

82:17
**containment**
61:7
**contains** 13:13
16:19, 71:3
98:19, 105:16
113:13, 152:13
161:25
**contaminant**
72:17, 80:13
80:22, 129:4
179:12, 181:21
**contaminants**
25:5, 25:7
81:10, 83:13
84:13, 85:8
121:15, 148:8
**contaminated**
83:16, 83:20
83:22, 84:6
192:13
**contamination**
33:11, 52:15
129:22, 179:5
179:7, 181:16
181:24
**contemplated**
115:9
**contemporary**
9:3
**content** 7:9
47:9, 52:5
111:11
**context** 8:13
10:4, 44:22
45:5, 73:2
106:3, 112:17
131:12, 132:3
133:24, 134:4
136:3, 161:18
191:7, 193:5
198:2
**contextual** 8:9
8:12, 10:22
105:18, 105:24
**continue** 123:8

**continued**
106:23, 123:14
**continuing**
125:9
**continuous**
15:10
**contracted**
176:17
**contractor**
176:2, 179:22
**control** 34:10
34:23, 43:25
**controlled** 33:25
**controlling**
35:13
**controversy**
70:13, 172:22
**conversation**
61:16, 61:21
62:2, 62:6
62:13, 62:23
63:3, 63:5
63:11, 64:20
124:16, 136:6
177:15, 179:1
179:8, 179:21
180:14, 193:17
**conversations**
12:1, 47:10
64:5, 64:12
169:23, 174:20
174:23, 177:21
**conveyed**
158:18
**COOK** 2:13
**cooperated**
103:7, 104:24
**cooperation**
18:16
**copy** 52:16
166:13, 184:15
**Cornell** 6:9
**corporate** 7:5
155:12
**correct** 5:20, 6:1
6:4, 6:13, 6:14

6:22, 6:24, 8:14
8:19, 9:2, 9:17
11:12, 12:23
13:2, 17:1, 17:7
17:9, 20:17
22:23, 27:11
28:14, 28:25
29:20, 33:23
34:11, 34:24
35:5, 35:15
35:17, 35:20
37:1, 37:19
37:25, 38:1
38:4, 39:9, 40:2
40:7, 40:8
40:13, 40:21
41:3, 41:10
41:16, 42:10
42:23, 44:11
46:5, 47:3
47:12, 48:5
48:14, 48:20
51:15, 51:18
52:20, 53:6
53:12, 55:13
56:13, 56:22
56:24, 56:25
56:25, 57:11
59:19, 60:5
60:8, 60:21
62:14, 62:16
65:12, 65:14
65:19, 67:2
67:10, 67:23
68:1, 68:7
69:21, 69:25
70:2, 70:8
71:16, 72:3
72:12, 72:25
73:2, 73:25
74:13, 75:25
76:7, 76:8
76:16, 76:17
76:23, 78:6
78:10, 79:19
80:5, 80:10

82:20, 82:22
84:10, 86:15
87:10, 87:22
88:3, 89:1, 89:6
89:8, 89:11
89:15, 89:20
90:1, 90:7
90:12, 90:22
91:2, 91:7
91:13, 91:15
91:22, 92:2
92:5, 92:13
92:14, 92:21
93:18, 98:4
99:1, 99:4
99:15, 99:20
100:1, 100:8
100:20, 101:7
101:12, 102:1
103:4, 105:9
105:10, 107:15
107:16, 108:2
108:3, 108:19
108:20, 108:24
108:25, 109:3
109:8, 109:9
109:17, 109:21
110:8, 111:12
112:6, 112:7
113:12, 115:6
115:11, 115:16
115:21, 116:21
117:1, 117:17
117:22, 117:23
118:3, 118:6
119:5, 119:8
119:9, 119:11
119:13, 119:15
119:16, 119:19
119:20, 119:23
119:24, 120:1
120:2, 120:23
121:20, 121:21
122:9, 122:11
122:14, 122:16
123:4, 123:12

124:1, 124:12
125:5, 126:8
126:17, 127:2
127:22, 129:23
129:24, 130:9
130:17, 131:17
132:8, 133:7
134:19, 137:19
137:21, 138:2
138:7, 138:10
138:16, 138:23
139:1, 139:12
139:13, 139:15
139:21, 140:23
141:5, 143:22
144:2, 146:7
146:20, 147:13
147:18, 159:14
160:13, 161:5
162:5, 162:15
163:4, 163:16
164:9, 164:17
166:10, 166:24
167:10, 167:22
168:2, 168:17
170:17, 170:21
173:9, 173:13
173:17, 173:23
174:7, 174:16
174:18, 174:21
175:2, 175:6
175:9, 175:12
175:15, 175:19
175:20, 176:3
176:24, 178:12
178:17, 180:18
183:7, 183:8
183:18, 183:25
184:17, 184:23
185:4, 185:8
186:17, 187:6
187:8, 188:12
188:23, 189:8
189:11, 189:16
189:21, 190:25
195:6, 195:19

195:23, 196:2
196:6, 196:9
196:13, 196:17
196:21, 197:2
197:6, 197:9
197:21, 198:1
198:10, 198:11
198:17, 198:23
199:2, 199:7
**corrected**
186:19
**correctly** 71:8
74:25, 75:1
81:16, 85:11
85:12, 118:21
**correspondence**
36:19, 60:24
**cosmetic** 7:9
12:24, 13:5
13:5, 13:25
14:5, 14:6
14:14, 14:25
16:18, 17:15
18:15, 19:8
19:19, 19:23
19:25, 20:2
20:13, 20:18
21:17, 21:24
22:5, 22:18
23:2, 28:4
28:17, 29:2
29:5, 31:6
31:11, 31:21
32:9, 32:10
34:4, 52:11
61:17, 62:19
66:3, 70:23
75:2, 75:4, 75:7
75:10, 76:9
76:14, 76:19
76:21, 77:5
77:13, 77:21
84:16, 85:11
88:6, 88:22
89:6, 109:4
109:6, 109:8

118:15, 124:1
127:13, 128:13
128:14, 128:20
129:2, 129:15
132:24, 138:18
142:3, 142:5
142:9, 142:16
142:23, 144:8
182:2, 182:5
182:9, 182:15
182:21, 183:3
183:12, 184:23
185:18, 186:17
**cosmetics** 18:10
24:6, 33:9, 36:4
43:16, 46:7
57:4, 123:13
177:3
**cost** 116:13
**costs** 168:7
**council** 65:5
65:7, 65:17
**counsel** 15:19
23:24, 24:17
65:24, 136:21
151:12, 200:17
200:19
**counterpart**
127:21
**counts** 160:6
**COUNTY** 1:1
**couple** 61:3
90:16, 145:9
171:9
**course** 41:6
47:7, 47:8
**court** 1:1, 1:12
1:13, 5:10
**covered** 133:14
135:23
**Craig** 60:24
**create** 112:17
**crime** 87:5
**critical** 130:11
134:4, 151:19
**CTFA** 8:6

120:4, 120:10
120:15, 121:15
122:5, 122:12
122:13, 123:5
123:5, 125:7
125:20, 125:24
126:7, 126:12
126:15, 126:19
126:24, 127:6
127:21, 130:1
132:14, 137:5
168:12
**CTPA** 127:17
127:18, 128:18
128:25
**curious** 192:23
**current** 10:19
21:3, 66:16
70:13, 71:1
**currently** 7:18
11:11, 11:12
50:11, 81:13
134:8, 166:14
**cut** 154:4
**cutting** 154:16
**Cyprus** 1:5
2:11

**D**

**D-12** 23:19, 24:4
**D-237** 33:2
**D.C** 61:16
**D.E** 35:19
35:25
**D.R** 37:3
**damaging** 74:16
74:22, 78:3
**danger** 69:25
**Daniels** 2:16
115:25
**Dartmouth**
157:7, 157:12
157:23, 158:11
158:19, 159:7
159:12, 163:16

165:3, 202:6
**data** 37:13
37:17, 58:17
85:8, 85:20
90:21
**database** 9:23
9:24, 48:25
**date** 5:6, 6:7
28:19, 29:11
84:13, 99:17
104:18, 168:23
186:11, 200:14
**dated** 48:10
60:25, 72:11
108:6, 147:20
159:4, 159:19
166:4, 175:4
198:16
**dates** 27:13
27:23, 28:7
**Davidson** 3:13
5:5
**day** 106:2, 123:8
**days** 196:24
**dead** 187:12
**dealing** 12:4
37:22, 41:1
86:20, 169:20
**deals** 57:2
**dealt** 67:21
68:3, 68:21
**debate** 191:1
**decades** 8:10
10:18, 67:12
67:15
**December** 103:3
127:16, 185:2
186:4
**decide** 153:16
**decided** 37:12
37:16, 60:14
103:17
**decision** 10:1
60:1, 60:5, 60:7
63:8, 63:14
103:19, 151:21

**decisions** 56:19
**deck** 43:15
**declaration** 74:4
**dedicated** 47:1
**deemed** 36:18
**deep** 78:12
78:17, 79:3
79:9, 79:18
80:5
**Defendant** 2:15
2:21, 3:6
**Defendants** 2:10
**definition** 71:13
72:2, 72:21
**definitions** 21:7
**definitive** 71:21
124:18
**definitively**
125:12, 162:20
**degree** 25:6
86:18
**deleterious**
16:19
**deliberately**
167:24
**demand** 55:23
**demonstrate**
83:7
**demonstrated**
138:5
**demonstrates**
21:1, 31:15
**denial** 107:8
**Dennis** 2:5
132:6
**density** 148:4
**deny** 63:4
**denying** 64:7
**deposition** 1:9
1:11, 1:12, 1:22
4:13, 4:22, 7:4
7:4, 9:21, 10:7
15:18, 21:10
23:20, 24:3
24:4, 26:13
43:24, 47:17

47:24, 48:3
48:17, 49:22
51:1, 51:13
57:22, 73:20
89:23, 123:21
127:9, 135:10
153:18, 153:18
155:3, 190:16
192:24, 199:24
199:25
**depression** 81:6
**Deputy** 52:11
58:9
**describe** 10:15
**described**
160:19
**description** 4:12
24:25, 201:2
202:2
**designated** 8:23
**desired** 164:4
**destroy** 49:14
**destroyed** 49:5
**detail** 82:3
**detailed** 90:6
**details** 20:5
**detect** 27:6
138:6, 143:15
143:16, 163:25
198:5
**detectable** 92:12
92:20, 92:25
128:19, 132:25
133:4, 133:11
134:16, 135:16
**detected** 85:4
98:25, 99:15
100:14, 129:1
144:21, 178:2
**detecting**
144:19
**detection** 94:17
118:14, 118:17
118:20, 123:4
126:3, 126:11
126:20, 130:6

130:11, 137:1
143:8, 163:20
168:13
**determination**
9:19, 24:14
25:4, 25:25
115:17, 166:17
180:5
**determine** 15:13
20:18, 93:4
93:17, 109:12
121:12, 123:25
161:4
**determined**
13:16, 19:11
165:20, 168:5
**determining**
116:9, 139:19
**develop** 25:2
144:16, 159:20
**developed** 81:7
131:24, 147:5
148:6
**developing** 73:3
**development**
26:18, 27:5
35:24, 59:24
62:25, 83:2
106:3, 148:1
**developments**
26:24, 71:21
170:16
**device** 42:4
70:12
**differences** 94:2
**different** 39:23
65:22, 74:3
76:11, 76:17
77:2, 77:3
105:25, 107:7
116:10, 121:25
133:22, 152:18
167:3, 175:9
185:15, 185:21
186:21, 198:2
**differential**

116:15, 116:15
**difficult** 76:10
  164:23, 164:24
  165:16, 166:2
  167:15, 169:15
  170:4, 171:5
**difficulty**
  116:13
**diffraction**
  116:21, 117:8
  117:15, 118:5
  118:16, 118:18
  118:21, 119:8
  119:13, 129:1
  138:1, 145:15
  163:23, 196:12
  196:20, 197:1
  197:12, 197:15
  197:16, 197:19
  198:22, 198:25
**digest** 164:14
**digital** 48:25
  49:8, 50:1, 50:4
**dimensions**
  128:24
**direct** 4:4, 5:15
  30:17, 55:18
  106:23
**directly** 25:13
  29:8, 46:11
  51:6, 52:22
  53:5, 55:12
  56:21, 57:2
**director** 6:16
  12:2, 43:15
  52:11, 55:5
  58:9, 67:17
  67:24, 68:8
  177:3, 177:16
**disagree** 45:5
  60:22, 85:12
  134:19
**disclosure** 37:11
  186:8
**discourage**
  140:4

**discuss** 9:14
  25:12, 36:17
  124:24, 127:3
  131:19, 132:23
  149:6, 169:4
  169:25, 184:3
  194:4
**discussed** 10:4
  12:10, 15:18
  17:25, 54:1
  58:25, 67:6
  103:21, 104:8
  116:6, 116:25
  123:7, 124:3
  127:14, 128:10
  129:5, 131:11
  131:13, 143:24
  163:7, 183:17
  195:5
**discusses** 185:3
**discussing** 118:3
  190:8
**discussion** 55:3
  59:1, 74:5
  81:21, 116:8
  124:14, 134:3
  136:4, 160:5
  170:16, 171:4
  188:17, 191:1
**discussions** 9:4
  9:8, 115:8
  123:2, 165:2
  165:4, 169:3
  188:4, 188:21
  193:9
**disease** 83:2
  128:5, 191:21
**dispersion**
  163:24
**display** 13:15
**disprove** 199:14
**dispute** 37:14
  188:25
**distinguish** 73:5
  74:2
**distinguishable**

72:22
**disturbing**
  165:11, 165:22
  165:25, 166:13
**division** 1:1
  6:17, 11:7, 36:3
  43:16, 52:12
  55:5, 70:22
  70:23, 177:3
**doctor** 5:19
  5:21, 6:2, 6:6
  53:11
**doctors** 55:16
  184:16
**document** 17:23
  23:19, 23:21
  23:25, 25:21
  26:2, 38:4, 38:5
  38:6, 38:9
  50:25, 51:4
  52:8, 52:9
  61:25, 62:7
  64:22, 65:10
  70:4, 70:5, 70:6
  75:3, 76:1, 76:5
  81:19, 81:23
  85:23, 86:12
  86:18, 91:4
  107:13, 108:4
  111:19, 113:25
  114:16, 115:23
  117:21, 120:25
  121:2, 122:23
  124:4, 125:8
  130:3, 131:10
  132:1, 132:4
  136:9, 136:16
  137:17, 140:18
  141:11, 142:2
  143:6, 148:15
  152:14, 155:8
  155:10, 158:5
  159:4, 159:6
  159:7, 159:19
  166:6, 167:1
  169:5, 169:18

170:3, 171:9
  173:22, 176:4
  176:22, 176:23
  177:19, 188:25
  190:23
**documentation**
  192:6
**documented**
  105:9
**documents** 4:15
  4:16, 4:17, 4:22
  7:14, 8:1, 8:3
  8:6, 8:10, 8:12
  8:14, 8:20, 9:19
  10:2, 10:5
  17:19, 27:18
  35:8, 35:11
  39:12, 39:15
  39:22, 44:10
  44:10, 44:13
  44:21, 44:23
  48:24, 49:3
  50:1, 50:3, 50:6
  50:22, 52:2
  52:4, 57:19
  71:18, 71:19
  77:16, 105:19
  105:24, 110:4
  110:12, 114:10
  114:12, 116:25
  124:23, 124:24
  149:2, 151:17
  151:21, 152:7
  152:14, 155:13
  157:17, 157:21
  159:5, 165:13
  167:14, 169:2
  169:14, 182:10
  184:1, 184:25
  185:13, 186:22
  191:7
**doing** 28:2
  35:15, 38:3
  54:21, 129:16
  146:13, 147:16
  156:7

**dominant** 162:1
**Don** 12:2, 12:2
  194:13
**Donna** 132:6
**door** 45:1, 45:15
**doubt** 164:22
**DPA** 27:7
  116:15
**Dr** 5:17, 10:13
  23:20, 23:21
  24:3, 25:11
  35:23, 36:3
  36:4, 36:9
  36:16, 38:15
  38:20, 41:24
  43:14, 43:19
  54:19, 73:15
  89:25, 95:2
  106:25, 112:20
  116:3, 116:6
  116:7, 117:7
  117:21, 127:2
  127:4, 127:10
  127:14, 127:25
  128:1, 128:10
  128:15, 129:13
  130:22, 131:9
  131:11, 131:19
  133:24, 136:3
  136:6, 136:15
  137:2, 145:10
  145:12, 146:2
  146:4, 146:7
  146:16, 146:23
  147:23, 148:17
  148:25, 149:11
  152:6, 156:8
  156:15, 156:25
  163:15, 165:2
  167:21, 172:23
  173:2, 175:21
  177:2, 177:6
  178:3, 187:25
  189:13, 190:6
  199:14
**drafted** 149:23

| | | | | |
|---|---|---|---|---|
| **drafting** 148:3 | **efficient** 174:12 | **entry** 24:12 | 21:16, 21:23 | 172:18 |
| **drawbacks** 118:23 | **Eiermann** 43:14 43:19, 44:7 | **environment** 102:19, 133:17 134:23, 135:5 | 22:4, 29:17 31:14, 32:14 79:17, 80:2 | **exclude** 81:9 168:20 |
| **DRINKER** 1:14 | 44:10, 187:25 | **environmental** | 88:14, 88:21 | **exclusive** 36:22 |
| **Drug** 7:7, 22:18 38:13 | **Eiermann's** 45:13 | 107:23, 134:1 138:25, 179:12 | 89:2, 89:4 90:25, 91:10 | **excuse** 88:12 153:12 |
| **drugs** 18:11 166:16 | **eight** 74:13 74:24, 78:5 | **EPA** 139:1 189:25 | 91:16, 91:20 96:10, 96:18 | **execute** 164:25 165:18, 166:3 |
| **due** 26:16, 26:22 31:13, 79:25 152:5 | **either** 9:11 37:17, 91:1 91:11 | **epidemiologic** 63:25 | 101:5, 108:17 110:4, 138:13 181:25, 185:17 | 167:15, 169:16 171:6 |
| **dug** 163:1 | **electron** 116:14 | **equipment** 119:5, 123:18 | 186:15, 192:14 | **executive** 43:20 43:25, 45:10 |
| **duly** 200:7 | 116:14, 118:18 118:19, 123:6 | 123:19 | 196:16 | 187:17, 187:19 187:23 |
| **Durelay** 52:14 | 129:3, 129:21 131:4, 133:1 | **Erik** 3:13, 5:5 **Ernie** 194:20 | **evolution** 8:11 **evolve** 125:14 | **executives** 42:8 42:13, 42:20 |
| **Dynamic** 3:13 5:6 | **electronic** 177:7 128:22 | 194:21, 195:8 195:9, 195:18 **escalate** 52:25 | **evolved** 7:21 143:17 **exact** 27:13 | 43:2, 44:17 45:2, 64:6 194:4, 194:6 |
| **E** | **eliminate** 70:25 128:22 | 53:9, 53:25 54:20, 56:5 | 28:7, 28:19 34:18, 54:22 | **exhaustively** 92:10, 92:24 |
| | **ELIZABETH** 2:15 | 56:10 | 57:18, 61:13 | **exhibit** 32:23 |
| **e-mail** 62:12 | **email** 46:13 | **escalated** 54:4 | 76:15, 77:2 | 33:1, 33:4, 99:2 |
| **earlier** 135:25 194:8 | **emerging** 130:16 | 54:23, 55:6 57:5, 57:6 | 90:13, 157:17 176:12 | 107:18, 132:5 137:18, 185:2 |
| **early** 67:20 68:2, 68:22 | **employed** 163:25 | **escalating** 56:12 **escalations** 55:2 | **exactly** 20:8 20:10, 23:9 | 188:8 **exist** 114:18 |
| 68:25, 71:19 87:13, 88:3 | **employee** 35:23 61:11, 200:16 | **especially** 169:21 | 25:21, 28:9 33:21, 35:13 | **existing** 163:22 **expect** 44:20 |
| 131:24, 172:25 196:24 | 200:19 | **ESQ** 2:5, 2:5 2:10, 2:15, 2:20 | 63:13, 93:5 93:23, 95:4 | **expected** 21:4 **expense** 119:4 |
| **earn** 13:21 | **employees** 194:2 | 2:20, 3:5 | 96:4, 96:16 | **experience** |
| **easier** 182:25 | **enclosing** | **essential** 144:22 | 130:18, 185:1 | 23:14, 116:10 |
| **easily** 190:22 | 173:12, 189:7 | **essentially** | **examination** | 144:19, 169:20 |
| **East** 1:14, 1:22 | **England** 146:5 | 19:24, 193:23 | 1:11, 5:15 | **expert** 6:25 |
| **easy** 120:25 | 146:9, 147:11 | **established** 20:1 | 129:3, 129:20 | 75:14, 77:18 |
| 151:19, 191:18 | **enrichment** | **et** 1:3, 1:3, 1:4 | 143:19, 200:6 | 78:15, 78:19 |
| **Ebay** 102:11 | 27:6 | 1:4, 1:5, 1:5, 1:6 | **examine** 143:1 | 78:24, 79:5 |
| 102:18 | **entire** 121:2 | 1:6, 1:7, 1:7 | 143:14 | 79:11, 79:13 |
| **economic** | 134:10, 184:21 | 186:8 | **examined** 177:6 | 81:21, 112:13 |
| 118:10 | **entirely** 47:1 | **events** 106:5 | 185:14 | 135:11, 142:12 |
| **effect** 13:3 | **entirety** 113:13 | 181:21, 181:24 | **example** 110:10 | 161:8, 170:18 |
| 67:12, 88:24 | **entities** 140:21 | **everybody** | **Excellence** 42:1 | 189:8 |
| 95:14, 104:3 | **entitled** 38:8 | 169:22 | **excellent** 152:15 | **expertise** 23:17 |
| 124:23 | 84:19, 127:17 | **evidence** 3:13 | 152:19 | 59:25, 119:4 |
| **effective** 163:23 | 159:7, 176:20 | 5:6, 9:1, 20:25 | **exchanges** 52:5 | **experts** 36:20 |
| **effects** 67:18 67:25, 68:3 68:9, 69:1 | **entity** 20:9 | | | |

| | | | | |
|---|---|---|---|---|
| 77:17, 102:16 | 188:24, 190:21 | 28:11, 28:19 | 60:11, 61:5 | 107:8, 108:10 |
| 110:8, 114:23 | 192:16, 195:2 | 28:24, 29:12 | 61:17, 62:3 | 108:18, 108:20 |
| 139:18, 140:8 | 195:3, 195:7 | 29:18, 30:21 | 62:17, 62:19 | 108:23, 109:1 |
| 159:13, 166:22 | 201:9 | 30:24, 30:25 | 63:3, 63:8 | 109:3, 109:5 |
| 167:6, 170:7 | **facts** 44:21 | 31:8, 31:9 | 63:14, 64:3 | 109:12, 109:16 |
| 170:10, 170:12 | 101:9, 193:4 | 31:15, 31:20 | 64:7, 64:11 | 109:25, 110:6 |
| 170:13, 171:6 | 193:5 | 31:23, 32:4 | 65:1, 65:5 | 110:15, 110:24 |
| 171:23 | **factual** 86:7 | 32:7, 32:15 | 66:23, 67:7 | 111:2, 111:3 |
| **explained** | **failed** 120:21 | 33:24, 34:6 | 70:21, 70:22 | 111:8, 111:19 |
| 112:16 | **fair** 16:15, 26:5 | 34:9, 34:10 | 71:25, 72:11 | 112:3, 112:4 |
| **explanation** | 51:7, 113:21 | 34:13, 34:22 | 72:15, 73:23 | 112:7, 112:14 |
| 73:13 | 164:8, 172:14 | 35:4, 35:14 | 74:1, 74:7 | 112:24, 113:3 |
| **explicitly** | 175:1, 175:24 | 36:4, 36:16 | 75:14, 75:19 | 113:11, 113:14 |
| 169:24 | 198:14, 199:1 | 36:18, 36:22 | 79:2, 79:8 | 113:16, 113:18 |
| **explore** 139:24 | **fairness** 26:7 | 37:1, 37:10 | 79:15, 79:18 | 114:2, 114:20 |
| **exposed** 83:9 | **fall** 187:1 | 37:12, 37:16 | 79:22, 80:3 | 114:25, 115:4 |
| **exposure** 80:21 | 197:23 | 37:23, 38:25 | 80:8, 86:25 | 115:12, 115:19 |
| 83:3, 84:15 | **familiar** 23:8 | 39:10, 40:1 | 87:12, 88:2 | 116:19, 117:6 |
| 84:15, 85:10 | 70:4, 91:3 | 40:4, 40:6, 41:1 | 88:12, 88:16 | 119:15, 123:10 |
| 85:10, 107:9 | 107:13, 127:23 | 41:6, 41:7, 41:8 | 88:20, 89:10 | 123:11, 123:24 |
| 107:12 | 177:11 | 41:13, 41:22 | 89:14, 89:20 | 124:10, 124:19 |
| **express** 187:7 | **far** 20:2, 40:6 | 42:9, 42:15 | 90:1, 90:10 | 126:12, 130:24 |
| **expressed** 67:17 | 40:19, 40:25 | 42:17, 42:19 | 90:14, 90:18 | 130:25, 131:2 |
| 127:11 | 67:16, 67:23 | 42:22, 43:2 | 90:24, 91:7 | 131:17, 131:21 |
| **extensive** 9:23 | 68:7, 106:12 | 43:8, 44:1, 44:5 | 91:9, 91:19 | 131:22, 132:18 |
| 17:25, 90:14 | **fault** 111:7 | 44:25, 45:10 | 92:2, 92:8 | 134:20, 138:10 |
| 182:8, 186:25 | **Fax** 1:24 | 45:14, 45:19 | 92:18, 93:15 | 138:19, 139:2 |
| **extensively** | **FDA** 6:19, 7:10 | 45:20, 46:3 | 93:17, 93:24 | 139:10, 140:4 |
| 124:3 | 7:15, 7:24, 8:5 | 46:8, 46:17 | 93:25, 94:12 | 140:22, 149:6 |
| **external** 181:17 | 8:5, 9:4, 9:11 | 47:2, 47:10 | 94:23, 94:25 | 151:22, 157:8 |
| **extremely** 55:2 | 9:14, 9:24, 12:5 | 47:12, 47:14 | 95:3, 95:9 | 158:19, 159:3 |
| 81:9, 152:10 | 12:8, 12:15 | 47:19, 48:2 | 95:16, 95:20 | 159:14, 162:12 |
| 164:24 | 12:22, 12:25 | 48:4, 48:11 | 96:5, 96:9 | 163:4, 165:5 |
| | 13:2, 16:24 | 48:19, 49:1 | 96:15, 96:19 | 165:11, 165:22 |
| **F** | 17:5, 17:9 | 49:2, 49:9 | 97:6, 97:9 | 166:14, 169:20 |
| | 17:14, 17:18 | 49:23, 50:5 | 97:16, 98:4 | 169:25, 172:14 |
| **face** 99:23 | 17:20, 18:2 | 50:13, 50:22 | 98:11, 98:23 | 172:18, 172:25 |
| **facilitate** 128:24 | 18:3, 18:10 | 51:5, 51:14 | 99:3, 99:14 | 173:12, 174:20 |
| **fact** 12:8, 17:19 | 18:15, 18:20 | 52:6, 52:12 | 99:19, 99:24 | 174:23, 175:9 |
| 20:24, 40:9 | 18:25, 19:4 | 52:12, 52:22 | 101:10, 103:7 | 175:22, 176:2 |
| 44:17, 46:25 | 23:1, 23:6 | 52:22, 53:5 | 103:18, 103:23 | 176:8, 176:16 |
| 56:17, 59:5 | 23:10, 23:14 | 53:6, 53:16 | 103:24, 104:7 | 176:24, 177:3 |
| 66:13, 66:17 | 23:14, 25:13 | 53:19, 54:1 | 104:22, 104:23 | 177:16, 177:22 |
| 81:1, 85:4 | 25:19, 26:15 | 55:10, 55:12 | 105:3, 105:8 | 178:10, 178:14 |
| 126:22, 128:10 | 27:10, 27:19 | 56:6, 56:9, 59:3 | 105:18, 105:21 | 178:20, 179:22 |
| 142:4, 170:13 | 27:25, 28:2 | 59:16, 60:1 | 106:9, 107:2 | 179:22, 183:6 |

183:9, 183:16
183:21, 183:22
183:23, 184:2
184:10, 184:20
184:21, 185:3
185:10, 185:17
185:22, 186:15
187:2, 187:4
187:8, 187:10
187:17, 187:20
188:3, 188:5
188:7, 188:10
188:18, 188:19
188:22, 188:24
189:7, 190:7
195:21, 196:9
197:9, 198:13
201:7, 201:14
201:15, 201:16
201:17, 201:19
202:19
**FDA's** 18:8
23:4, 23:17
71:11
**febrile** 191:22
**February** 1:14
5:6, 140:14
141:10, 168:11
**federal** 22:18
69:7, 69:15
**Federation**
148:3
**fee** 13:21
**feel** 19:5
**feels** 56:2
**felt** 167:25
**FERNANDEZ**
3:3
**fiber** 69:7, 69:15
70:15, 70:15
71:4, 71:13
128:23, 162:1
179:3
**fibers** 22:11
22:16, 71:7
72:21, 82:7

82:13, 82:18
85:3, 116:9
118:17, 143:2
163:19, 163:25
178:2, 178:5
178:20, 178:22
**fibrous** 70:25
71:3, 90:3
128:16, 128:17
128:19, 129:4
129:22
**field** 77:17
**fields** 178:4
**fifteen** 98:2
108:5, 109:2
**figure** 16:8
61:17, 73:4
117:18
**figuring** 115:20
**file** 46:25, 47:7
47:12, 47:17
47:20, 47:21
47:23, 47:25
48:4, 48:7, 48:8
48:11, 48:19
48:23, 49:9
49:24, 50:8
50:13, 50:23
51:5, 51:14
114:15, 184:21
**files** 48:24, 50:2
50:4, 102:22
185:8, 185:11
186:6, 186:7
186:20
**final** 173:13
**financially**
200:20
**find** 26:5, 100:3
107:5, 114:9
114:11, 115:13
119:10, 119:19
120:21, 122:9
122:13, 122:20
125:25, 126:7
126:16, 129:12

133:18, 135:5
144:1, 146:13
146:16, 147:15
147:16, 156:8
156:16, 158:5
158:10, 182:3
182:21, 182:24
183:1, 196:20
197:1, 197:20
197:22, 199:1
199:5, 199:11
**finding** 118:9
152:18, 174:6
175:18
**findings** 90:6
175:12, 175:18
188:25
**fine** 16:11
159:22, 160:9
198:20, 199:21
**finish** 39:19
123:21
**finished** 13:5
81:10, 104:11
136:17
**fires** 38:4, 39:5
**first** 24:6, 25:1
26:19, 32:24
45:20, 46:19
117:15, 119:8
126:18, 129:9
141:23, 144:7
146:22, 148:24
149:2, 149:4
150:7, 150:13
156:15
**five** 74:13, 74:24
78:5, 146:19
181:13, 186:21
**flashy** 193:4
**flawed** 199:16
**flaws** 114:21
**flip** 24:8
**floatation** 27:6
81:20
**floor** 2:8, 2:13

**Florham** 2:14
**focus** 25:22
94:4, 142:21
172:16
**focusing** 25:24
94:7, 95:19
177:21
**folder** 33:1
**folders** 50:2
**FOLEY** 1:3
**follow** 65:21
90:9, 94:1
147:20, 164:17
**followed** 13:3
148:5
**following** 13:14
111:14, 112:8
**food** 7:7, 18:11
22:18, 33:8
38:13, 70:22
166:16
**Foods** 58:9
**foregoing**
200:11
**foreign** 130:16
**forenoon** 1:15
**form** 15:22
16:4, 48:25
50:1, 50:8
74:11, 127:12
127:12, 155:15
162:1, 183:2
**formations**
77:14, 191:22
**former** 41:20
41:22, 42:8
42:13, 42:20
43:1, 43:19
43:24, 45:10
61:10, 187:16
187:19
**formidable**
38:25
**forming** 20:7
70:15
**forth** 7:15, 8:4

12:11, 104:15
105:17, 194:24
200:14
**forthright** 30:12
86:20, 153:8
156:3
**forward** 111:8
128:1
**fought** 165:4
165:8
**found** 22:16
38:16, 70:16
72:16, 80:12
80:21, 83:8
90:4, 90:5
100:1, 100:8
101:13, 101:19
102:12, 107:7
113:4, 114:19
122:4, 128:6
138:17, 138:21
141:12, 141:25
146:24, 148:8
149:1, 149:12
150:2, 150:8
150:14, 156:25
158:12, 158:21
158:24, 161:23
162:13, 171:25
172:11, 173:3
173:5, 173:16
173:22, 174:8
174:16, 174:17
175:14, 176:2
179:4, 179:23
180:2, 180:21
181:1, 181:7
181:20, 181:24
182:16, 183:4
183:12, 189:2
196:16
**four** 11:10
65:22, 186:21
**FRACE** 1:3
**fractions** 160:24
**fragments** 71:4

fragrance 123:13, 127:19
framework 191:6, 193:6
Fred 148:6
free 58:17 59:12, 90:22 92:12, 92:20 92:25, 94:16 94:25, 95:10 108:9, 109:2 109:20, 110:13 111:21, 112:6 133:3, 133:11 134:15, 135:16
Freedom 34:17 36:13, 43:9
front 7:3, 29:17 30:20, 89:17 105:11, 105:15 121:11, 140:13 149:16, 163:3 163:10, 167:16 178:3, 195:23
full 90:6, 103:8 103:14, 103:20 148:22
fully 103:7
funded 20:12
funding 20:15
further 13:10 58:14, 62:24 90:24, 178:14 200:10, 200:15
future 21:4

**G**

games 191:12 192:2
garnet 158:15
GATMAITAN 1:4
GEIER 2:5
general 8:8 18:1, 40:20

41:2, 46:1, 85:5 88:7, 142:14
generally 34:15 74:22, 78:2 105:15, 118:15
generated 188:2
geographic 76:18
geologic 77:14 191:19
geologist 135:11
geologists 77:19
geology 6:23
George 119:25 166:13
getting 65:16 167:5, 171:8
give 17:11 30:18, 45:21 46:4, 47:2, 60:4 60:15, 63:15 98:1, 99:6 120:24, 135:15 154:8, 189:6
given 12:12 24:2, 36:25 37:12, 81:24 103:8, 112:18 112:24, 163:4 185:1, 188:17
gives 117:2
giving 43:7 96:13, 106:3 174:3
glance 158:8
Global 11:6
go 26:21, 32:19 32:20, 32:21 32:22, 33:20 52:22, 53:5 53:19, 56:21 66:17, 70:20 72:14, 75:2 75:9, 75:12 76:3, 85:1, 91:5 93:4, 94:14

95:4, 97:4, 99:8 101:4, 105:12 114:14, 116:1 121:10, 121:11 130:5, 130:13 131:3, 141:9 142:24, 143:5 144:15, 146:5 150:21, 153:13 153:15, 157:16 157:20, 158:5 159:17, 160:15 162:19, 175:23 177:1, 182:11 184:25, 191:12 198:6
goes 36:15 36:24, 104:10 128:21, 143:12 150:1, 168:16 175:21, 178:9 180:16
going 8:3, 9:20 10:2, 10:8, 16:8 24:12, 38:7 39:19, 54:9 58:16, 60:2 63:22, 72:9 74:21, 81:1 81:4, 93:11 93:14, 95:18 96:7, 103:18 105:25, 106:16 117:25, 124:4 125:14, 129:17 134:19, 136:11 136:23, 137:12 145:3, 146:5 153:3, 153:4 153:13, 153:13 155:24, 164:12 165:21, 168:10 171:13, 177:20 180:8, 180:11 184:5, 189:5 191:25, 193:1

193:6, 195:20 196:20, 197:1 199:14, 199:15
good 5:17, 5:18 5:18, 106:13 122:19, 123:3 170:2, 171:10 192:21
Google 66:5 66:6
Gordon 196:1 196:5, 196:11
Goudie 146:2
government 26:17, 41:9 41:14, 41:20 41:20, 86:21 87:6
GRABOWSKI 1:4
grade 75:15
graduate 5:22
grain 159:22 160:6, 160:7
gram 160:17
gratuitous 73:18
Great 126:23 127:5, 130:1 130:22, 131:1 131:14, 148:19 149:1
greater 40:6 40:10, 40:19 40:23, 40:25 115:5
GREENE 1:5
GRIFFIN 1:5
grinding 72:23
ground 71:12 72:2, 72:20
grounded 141:1
grounds 21:2 22:4
group 8:6, 9:13 11:18, 35:24

36:5, 42:4 61:17, 116:3 127:19, 129:8 132:16, 139:25 148:1, 176:11 193:24, 201:20
Grove 3:4
guards 194:2 194:10
guy 44:15

**H**

hair 23:23 25:17
Hammondsville 76:15, 76:23 77:7, 77:11 77:23
hand 66:20 87:4
handles 178:10
hands 50:10
happen 58:24
happened 46:5 46:20, 46:22 49:9, 60:16 63:16
happy 30:23 30:25, 35:8 35:10, 36:17 95:5, 95:16 97:17, 104:1 155:21, 169:4 170:1
harass 156:7
hard 57:20 65:25, 99:5 164:23, 165:16
harm 21:17 21:24, 22:6
harmful 73:7
Harvard 107:24
haystack 143:17 144:2
hazard 14:8

| | | | | |
|---|---|---|---|---|
| 19:15, 21:2 25:8, 80:13 80:22, 81:14 129:19 | **hired** 108:23 110:8, 114:23 171:23, 176:2 176:8, 176:9 176:11, 190:7 | **hypothesis** 85:20 | **impurities** 128:6, 143:18 158:15 | 127:5 **indistinguishable** 71:14 |
| **hazards** 67:5 128:17, 128:22 | **historical** 12:13 20:4, 38:8 | **I** | **impurity** 143:12 143:15 | **individual** 116:24 |
| **head** 11:6, 23:7 38:14 | 102:22 | **idea** 50:16 91:10, 152:25 | **Incidents** 128:5 **include** 19:16 | **individuals** 7:18 9:13, 10:21 |
| **headed** 10:25 | **historically** 7:19 12:20, 17:14 | **identifiable** 71:6 84:15, 85:10 | 36:19, 65:2 66:24, 106:8 | 40:16, 57:3 102:10, 104:7 |
| **heads** 45:21 46:5, 47:2, 47:6 | **history** 14:14 14:24, 45:16 | 85:19 **Identification** | 162:14 **included** 33:10 | 151:19, 165:18 184:4, 191:18 |
| **health** 14:8 19:15, 25:8 | 106:1 **HODJERA** 1:6 | 166:17 **identified** 132:5 | 49:2, 99:3 104:7, 105:19 | 194:1, 194:8 194:12 |
| 55:17, 67:25 68:2, 68:9, 69:1 | **hold** 99:11 100:3 | **identify** 105:12 186:10 | 111:5, 112:15 112:23, 113:5 | **industrial** 75:6 76:9, 76:13 |
| 80:13, 80:22 81:14, 107:23 | **honest** 30:12 86:20, 96:2 | **identifying** 144:20 | 167:25, 189:10 189:13, 189:16 | 76:19, 76:21 77:6, 77:21 |
| **hear** 15:6, 66:2 152:1 | 153:8, 156:2 **Hopefully** | **ignore** 73:15 73:16, 73:20 | **includes** 98:16 110:14 | 138:17, 179:3 **industry** 8:6 |
| **heard** 40:3, 48:8 | 172:21 | 135:19, 180:9 | **including** 28:5 | 8:8, 18:15 |
| **hearing** 166:21 | **Hopkins** 12:2 | **Imerys** 1:4, 1:7 | 77:17, 108:8 | 18:16, 20:11 |
| **heavy** 160:23 163:19 | 12:4, 23:20 23:21, 24:3 | 2:10, 61:25 62:7, 62:13 | 115:14, 120:21 126:21, 194:2 | 20:15, 22:7 41:15, 42:18 |
| **held** 37:1, 89:19 | 25:12, 77:17 | 63:12, 64:22 | **incorrect** 56:17 | 62:20, 65:15 |
| **help** 59:18 62:20, 65:19 | 127:2, 127:4 127:10, 127:15 | 132:12 **immediately** | 56:19, 57:12 59:10, 59:13 | 108:12, 124:8 124:20, 125:8 |
| 75:12, 155:13 179:16, 194:18 | 127:17, 128:11 128:16, 129:13 | 121:19, 147:7 **impact** 57:6 | 63:23, 68:19 71:23, 72:7 | 125:21, 129:8 140:1, 184:9 |
| 195:14 | 130:22, 131:9 | **imperative** | 74:1, 75:4 | **inform** 58:16 |
| **helpful** 19:6 36:18, 103:22 | 131:11, 131:19 133:24, 136:3 | 75:17 **implicated** | 102:13, 153:7 **increased** | **information** 7:7 10:17, 14:16 |
| 179:14, 180:13 | 136:7, 136:15 | 83:17, 83:23 | 130:10, 130:14 | 15:1, 15:10 |
| **HENDERSON** 2:8 | 137:2, 201:22 **Hospital** 6:9 | 83:25 **implies** 68:17 | 133:22 **increases** 126:3 | 16:24, 17:6 17:11, 19:1 |
| **hereinbefore** 200:14 | **hour** 164:3 | 88:4 **imply** 192:11 | **increasing** 116:12 | 19:4, 21:1 30:18, 33:24 |
| **hey** 44:14 | **hours** 164:5 | **implying** 45:17 | **increasingly** | 34:8, 34:14 |
| **Hi** 61:3 | **human** 22:12 74:16, 78:12 | 63:21, 125:17 | 143:14 | 34:17, 34:18 |
| **Hicks** 12:2, 12:2 26:12, 194:13 | 82:7, 82:13 82:18 | **import** 53:2 53:9 | **independent** 97:1, 97:2, 97:8 | 34:21, 35:3 36:6, 36:13 |
| **hide** 105:7 | **humans** 129:19 | **importance** 57:6, 107:11 | 97:13, 108:11 **indicate** 17:20 | 36:18, 37:11 37:15, 43:8 |
| **higher** 54:3 134:1 | **Huncharek** 63:25 | **important** 19:5 45:8, 45:11 | 29:18, 105:25 **indicated** 62:17 | 43:9, 57:21 59:13, 65:11 |
| **highlight** 64:24 | **hurt** 40:11 | 133:23, 152:3 | 185:6 | 79:6, 79:14 |
| **hip** 151:24 **hire** 195:13 | 40:15 | 160:4, 181:6 | **indicating** 84:5 | 79:21, 85:15 |

85:17, 85:22
85:23, 86:11
86:12, 86:25
88:17, 90:4
106:9, 111:9
111:13, 113:2
113:10, 113:17
114:1, 158:17
171:2, 179:20
180:16, 180:18
185:7, 186:5
186:20, 188:3
**informed** 36:4
52:12, 61:15
168:23
**ingredient** 13:4
13:11, 14:13
14:24, 19:19
19:23, 20:20
**ingredients** 14:1
19:25, 20:12
20:18
**inhalation** 78:15
78:19, 78:24
79:11, 80:7
128:17
**inhaled** 78:12
78:16, 79:9
79:18, 80:4
**inhaling** 79:2
**initiated** 58:20
**injurious** 16:20
**injury** 18:21
**input** 188:4
**inside** 67:6
166:9, 193:9
193:15, 193:20
**inspect** 75:20
104:23
**inspection** 104:21
**instance** 98:5
98:12, 98:17
98:19
**instances** 181:10, 181:16

**Institute** 143:7
**instructing** 156:6
**instrumentation** 26:23, 27:3
**instruments** 116:11
**insult** 153:20
154:20
**insulted** 153:22
153:23
**insulting** 73:15
154:7, 154:13
154:14
**integrity** 88:9
**Intended** 119:10
**intense** 165:17
169:15
**intentionally** 87:6
**interact** 55:10
**interacted** 7:17
**interaction** 6:18
54:4
**interactions** 41:7, 56:9
**interest** 166:23
167:9, 168:1
**interested** 200:20
**internally** 38:2
80:11, 80:19
84:11, 110:21
122:18, 123:1
125:23, 126:5
126:14, 128:11
130:25, 163:8
163:18, 164:17
165:19
**internet** 66:4
**interpret** 128:23
**interstate** 14:1
**interviewed** 7:17, 9:18, 10:6
**intimate** 39:10
39:25, 40:3

60:18
**introduction** 143:5
**investigate** 177:15
**investigation** 179:20
**investigations** 26:18
**involve** 148:4
**involved** 7:19
7:23, 9:3, 9:8
28:11, 44:1
59:23, 148:18
194:23
**involvement** 12:15
**involving** 183:24
**isolated** 85:5
**issue** 6:19, 12:9
17:21, 24:4
38:14, 42:22
43:2, 44:1, 46:2
46:9, 51:6, 53:1
53:20, 54:1
54:3, 54:20
56:16, 57:4
57:10, 66:13
69:24, 87:3
87:16, 88:13
88:18, 102:25
103:21, 111:11
113:3, 127:3
138:25, 157:9
169:22, 183:17
190:6
**issued** 173:7
**issues** 39:11
40:1, 40:12
40:20, 41:1
45:2, 45:19
54:4, 54:23
56:12, 68:3
**Italian** 37:17
95:3, 146:14

147:16, 148:7
175:15

**J**

**J&J** 4:15, 4:16
4:17, 201:3
201:5, 201:6
201:8, 201:9
201:12, 201:13
201:14, 201:15
201:16, 201:17
201:18, 201:19
201:21, 201:24
202:4, 202:5
202:7, 202:9
202:10, 202:11
202:13, 202:14
202:15, 202:16
202:19
**J&J-148** 201:21
**J&J-216** 201:10
**J&J-263** 202:3
**J&J-265** 202:17
**J&J-266** 201:24
**J&J-29** 202:13
**J&J-347** 202:12
**J&J-35** 202:18
**J&J-352** 202:7
**J&J-353** 202:11
**J&J-357** 201:22
**J&J-361** 201:23
**J&J-364** 201:7
**J&J-369** 202:10
**J&J-38** 202:16
**J&J-40** 202:14
**J&J-44** 201:6
**J&J-45** 202:4
**J&J-457** 201:19
**J&J-46** 202:5
**J&J-461** 202:19
**J&J-464** 201:8
**J&J-467** 201:12
**J&J-471** 202:9
**J&J-474** 201:13
**J&J-475** 201:15

**J&J-476** 201:4
**J&J-483** 201:14
**J&J-489** 201:20
**J&J-491** 201:3
**J&J-492** 201:17
**J&J-497** 201:5
**J&J-498** 201:18
**J&J-50** 202:15
**J&J-58** 202:6
**J&J-60** 201:16
**J&J-69** 201:9
**J's** 66:5
**J41** 66:3, 66:7
72:6, 111:14
112:8, 117:13
118:2, 119:7
119:23, 120:20
121:16, 123:3
123:11, 123:14
125:4, 125:7
126:7, 126:15
129:9, 130:7
130:10, 131:5
131:23, 133:13
137:5, 147:5
191:5
**J44** 69:19
**JAMES** 2:20
**January** 48:10
50:24, 177:18
**Jersey** 1:1, 1:13
1:14, 1:23, 2:4
2:14, 3:4, 200:5
200:24
**job** 11:5, 11:17
45:14, 45:14
61:12, 195:11
**John** 12:1, 12:4
23:5, 23:10
23:13, 26:17
52:10, 52:16
77:17, 127:17
201:22
**Johnson** 2:21
2:21, 6:12, 6:12
7:5, 7:5, 7:8, 7:8

| | | | | |
|---|---|---|---|---|
| 7:22, 7:23, 8:4 | 37:22, 37:25 | 55:13, 56:2 | 79:15, 79:16 | 93:24, 94:4 |
| 8:4, 8:5, 8:5 | 37:25, 38:2 | 56:2, 56:20 | 79:17, 79:23 | 94:4, 94:11 |
| 8:24, 8:24, 9:13 | 38:2, 38:17 | 57:2, 57:2, 57:8 | 79:23, 80:3 | 94:12, 94:22 |
| 9:13, 12:19 | 38:17, 38:18 | 57:8, 58:15 | 80:3, 80:8, 80:9 | 94:22, 95:8 |
| 12:20, 12:23 | 38:18, 38:22 | 58:16, 59:5 | 80:11, 80:11 | 95:8, 96:7, 96:8 |
| 12:23, 13:4 | 38:22, 39:1 | 59:5, 59:11 | 80:19, 80:20 | 98:6, 98:7 |
| 13:4, 13:10 | 39:1, 39:5, 39:5 | 59:18, 59:18 | 80:25, 80:25 | 98:13, 98:13 |
| 13:10, 13:23 | 39:9, 39:9 | 59:22, 59:23 | 82:5, 82:5 | 98:25, 98:25 |
| 13:23, 14:12 | 39:25, 39:25 | 60:4, 60:4 | 82:11, 82:12 | 99:4, 99:4, 99:9 |
| 14:12, 16:17 | 40:5, 40:5, 40:9 | 60:13, 60:13 | 82:19, 82:19 | 99:9, 99:19 |
| 16:17, 16:23 | 40:9, 40:11 | 61:10, 61:10 | 82:25, 82:25 | 99:20, 99:25 |
| 16:23, 16:25 | 40:12, 40:15 | 61:14, 61:14 | 83:1, 83:1, 83:6 | 99:25, 100:5 |
| 16:25, 17:4 | 40:15, 40:19 | 62:2, 62:2, 62:9 | 83:7, 84:11 | 100:5, 100:12 |
| 17:4, 17:7, 17:7 | 40:19, 40:25 | 62:9, 62:15 | 84:11, 84:23 | 100:12, 100:17 |
| 17:13, 17:13 | 40:25, 41:9 | 62:15, 63:3 | 84:23, 85:16 | 100:19, 100:20 |
| 18:5, 18:5, 18:9 | 41:10, 41:21 | 63:3, 63:14 | 85:16, 85:18 | 100:24, 100:24 |
| 18:9, 18:14 | 41:22, 42:9 | 63:15, 64:5 | 85:18, 85:22 | 101:5, 101:23 |
| 18:14, 18:19 | 42:9, 42:13 | 64:6, 64:10 | 85:22, 85:23 | 101:25, 102:1 |
| 18:19, 18:20 | 42:14, 42:17 | 64:10, 65:12 | 85:24, 86:8 | 102:3, 102:3 |
| 18:21, 19:7 | 42:17, 42:21 | 65:12, 65:16 | 86:9, 86:12 | 102:22, 105:17 |
| 19:7, 19:14 | 42:21, 43:3 | 65:17, 65:18 | 86:12, 86:13 | 105:18, 106:10 |
| 19:14, 21:14 | 43:7, 43:7 | 65:18, 65:24 | 86:13, 86:17 | 106:10, 107:15 |
| 21:14, 21:21 | 43:20, 43:20 | 65:25, 67:6 | 86:18, 86:19 | 107:15, 108:1 |
| 21:21, 22:3 | 43:24, 43:24 | 67:6, 67:11 | 86:19, 87:11 | 108:2, 108:8 |
| 22:3, 22:10 | 44:5, 44:5 | 67:11, 67:17 | 87:11, 87:18 | 108:8, 108:13 |
| 22:10, 22:15 | 44:14, 44:14 | 67:17, 67:24 | 87:18, 87:18 | 108:14, 108:18 |
| 22:15, 22:25 | 45:1, 45:1 | 67:24, 68:7 | 87:19, 87:22 | 109:6, 109:6 |
| 25:19, 25:19 | 45:14, 45:15 | 68:24, 69:5 | 87:22, 88:1 | 109:13, 109:13 |
| 26:3, 26:3, 26:8 | 45:21, 45:21 | 69:20, 69:20 | 88:1, 88:5, 88:5 | 109:16, 109:17 |
| 26:8, 26:10 | 46:2, 46:3, 46:4 | 69:23, 69:24 | 88:8, 88:8 | 109:17, 109:18 |
| 26:11, 29:5 | 46:4, 46:7, 46:7 | 71:15, 71:15 | 88:11, 88:12 | 109:21, 109:21 |
| 29:5, 31:2, 31:2 | 46:13, 46:14 | 72:24, 72:25 | 88:13, 88:13 | 110:1, 110:1 |
| 32:12, 32:12 | 46:25, 47:1 | 74:14, 74:14 | 88:14, 88:15 | 110:7, 110:8 |
| 32:15, 32:15 | 47:16, 47:16 | 74:15, 74:15 | 88:21, 88:22 | 110:11, 110:11 |
| 33:23, 33:24 | 47:18, 47:19 | 74:19, 74:20 | 88:25, 88:25 | 110:16, 110:16 |
| 33:24, 33:25 | 47:23, 47:23 | 76:6, 76:7 | 89:3, 89:4, 89:5 | 110:25, 111:5 |
| 34:3, 34:3, 34:9 | 48:2, 48:2 | 76:14, 76:15 | 89:6, 89:7, 89:8 | 111:6, 112:5 |
| 34:9, 34:23 | 48:10, 48:10 | 76:22, 76:22 | 89:9, 89:9 | 113:4, 113:4 |
| 34:24, 35:2 | 48:17, 48:18 | 77:6, 77:7, 77:8 | 89:13, 89:13 | 113:12, 114:22 |
| 35:2, 35:11 | 48:18, 48:18 | 77:8, 77:22 | 89:20, 89:20 | 114:22, 115:11 |
| 35:11, 35:12 | 49:1, 49:1, 52:5 | 77:22, 78:1 | 90:9, 90:10 | 115:11, 115:12 |
| 35:12, 35:12 | 52:6, 52:20 | 78:2, 78:4, 78:4 | 90:17, 90:17 | 115:13, 115:18 |
| 35:12, 36:9 | 52:20, 53:4 | 78:10, 78:11 | 91:11, 92:2 | 115:19, 115:19 |
| 36:10, 36:16 | 53:4, 53:23 | 78:20, 78:21 | 92:2, 92:18 | 115:19, 116:1 |
| 36:17, 37:6 | 53:23, 55:1 | 79:1, 79:1, 79:7 | 92:18, 93:17 | 116:1, 116:4 |
| 37:6, 37:22 | 55:1, 55:12 | 79:8, 79:14 | 93:17, 93:24 | 116:4, 116:18 |

| | | | | |
|---|---|---|---|---|
| 116:18, 117:5 | 158:18, 158:18 | 182:4, 182:5 | 173:17, 173:23 | 114:25, 115:13 |
| 117:6, 117:14 | 161:15, 161:16 | 182:13, 182:13 | 180:17, 183:3 | 139:15, 149:2 |
| 117:14, 119:17 | 162:13, 162:14 | 182:15, 182:15 | 183:5, 192:19 | 149:4, 149:5 |
| 119:17, 122:18 | 163:6, 163:7 | 183:7, 183:7 | 196:5 | 196:19, 196:25 |
| 122:18, 123:1 | 163:11, 163:11 | 183:12, 183:12 | **Johnston** 35:19 | **Knewitz** 194:20 |
| 123:2, 123:23 | 164:18, 164:18 | 183:20, 183:21 | 35:22, 35:25 | 194:21, 195:10 |
| 123:24, 124:10 | 165:1, 165:1 | 183:25, 183:25 | 36:1, 36:2 | 195:18 |
| 124:10, 124:17 | 165:9, 165:10 | 184:3, 184:3 | 69:20 | **know** 11:9, 12:8 |
| 124:17, 125:2 | 165:12, 165:12 | 184:14, 184:14 | **joint** 70:10 | 12:11, 12:14 |
| 125:3, 125:20 | 165:20, 165:20 | 186:14, 186:14 | **judge** 16:5 | 14:19, 16:7 |
| 125:20, 126:6 | 165:23, 165:23 | 186:17, 186:17 | 151:4, 151:7 | 17:23, 19:19 |
| 126:6, 126:12 | 166:1, 166:1 | 190:13, 190:13 | 151:9, 151:9 | 20:6, 20:11 |
| 126:13, 126:15 | 166:9, 166:9 | 192:12, 192:12 | 153:15, 154:9 | 20:15, 23:5 |
| 126:15, 127:11 | 166:20, 166:20 | 193:9, 193:10 | 155:22, 180:5 | 23:10, 23:13 |
| 127:12, 128:11 | 166:24, 166:24 | 193:15, 193:15 | **judgment** 20:19 | 26:7, 26:9 |
| 128:11, 129:5 | 167:7, 167:8 | 193:20, 193:21 | **July** 81:1, 89:18 | 26:15, 27:11 |
| 129:6, 129:7 | 167:9, 167:9 | 194:5, 194:5 | 105:23, 188:9 | 27:13, 27:17 |
| 129:7, 129:25 | 167:19, 167:19 | 194:21, 194:21 | 201:9 | 27:25, 28:10 |
| 130:1, 131:7 | 168:11, 168:11 | 194:24, 194:25 | **June** 9:12, 9:16 | 28:18, 28:20 |
| 131:14, 131:14 | 168:17, 168:17 | 195:13, 195:13 | 35:19, 104:6 | 29:4, 31:1, 31:4 |
| 131:22, 131:22 | 168:19, 168:19 | 196:1, 196:2 | 104:20, 105:2 | 31:5, 31:10 |
| 133:6, 133:6 | 169:3, 169:3 | 196:4, 196:19 | 147:20, 149:16 | 31:21, 31:24 |
| 134:13, 134:13 | 170:23, 171:7 | 196:19, 197:5 | 149:19, 159:5 | 31:25, 32:3 |
| 134:16, 134:16 | 171:22, 171:23 | 197:5, 197:13 | **jury** 157:6 | 32:5, 32:7, 32:8 |
| 135:13, 135:14 | 172:10, 172:10 | 197:13, 198:13 | 180:25, 181:6 | 32:11, 33:2 |
| 137:4, 137:4 | 172:18, 172:18 | 198:13 | **justify** 62:21 | 33:20, 33:21 |
| 137:13, 137:13 | 174:7, 174:7 | **Johnson's** 22:25 | | 33:25, 34:18 |
| 138:4, 138:4 | 174:16, 174:19 | 37:14, 37:18 | **K** | 35:1, 35:2, 35:5 |
| 138:11, 138:12 | 174:20, 174:24 | 43:3, 53:3 | | 35:7, 35:13 |
| 138:19, 138:19 | 174:24, 174:25 | 56:20, 58:12 | **Kathy** 61:8 | 35:14, 36:1 |
| 139:5, 139:5 | 174:25, 175:4 | 59:11, 59:17 | 61:8, 61:14 | 38:6, 40:24 |
| 139:17, 139:20 | 175:4, 175:23 | 68:8, 68:25 | **keep** 16:14 | 42:7, 43:19 |
| 139:20, 139:24 | 175:23, 176:1 | 69:5, 89:11 | 96:13, 154:5 | 43:23, 44:2 |
| 139:24, 140:3 | 176:1, 176:10 | 89:15, 90:11 | 155:24, 155:25 | 45:8, 45:13 |
| 140:3, 140:8 | 176:10, 177:15 | 90:22, 91:1 | 168:7, 169:17 | 45:18, 45:24 |
| 140:10, 140:10 | 177:16, 177:22 | 91:11, 95:9 | **keeping** 47:15 | 46:1, 46:5 |
| 140:14, 140:15 | 177:22, 178:9 | 100:17, 101:19 | **kept** 46:25, 47:8 | 46:12, 46:24 |
| 142:20, 142:20 | 178:10, 178:14 | 101:23, 102:22 | 49:7 | 47:13, 47:19 |
| 143:2, 143:3 | 178:14, 178:19 | 110:7, 110:25 | **key** 61:17 | 49:7, 49:11 |
| 143:25, 143:25 | 178:19, 179:21 | 111:10, 113:18 | **kind** 53:11 | 49:18, 49:19 |
| 145:13, 145:13 | 179:21, 179:23 | 131:7, 137:23 | 54:23, 162:24 | 50:19, 54:22 |
| 145:20, 145:21 | 179:23, 180:17 | 138:14, 138:22 | 165:17 | 55:14, 55:21 |
| 147:25, 147:25 | 180:24, 180:24 | 139:18, 140:8 | **KLUGER** 2:13 | 56:1, 57:18 |
| 149:1, 149:2 | 181:1, 181:1 | 157:9, 157:14 | **knew** 45:22 | 61:8, 61:20 |
| 149:5, 149:5 | 181:8, 181:8 | 170:24, 171:7 | 49:15, 52:21 | 62:1, 62:21 |
| 149:17, 149:17 | 181:25, 182:1 | 171:23, 172:10 | 71:16, 114:20 | 62:23, 62:24 |

63:2, 63:5, 64:4
64:9, 64:11
64:19, 64:21
65:1, 65:4
66:23, 71:19
73:8, 75:2
76:16, 76:25
77:10, 77:13
77:15, 78:20
78:21, 79:1
79:8, 81:2, 81:3
82:15, 82:19
85:25, 87:14
90:3, 93:6
93:15, 93:23
94:2, 95:14
95:19, 95:25
96:7, 96:8
96:13, 96:24
103:6, 105:5
105:7, 107:1
109:20, 109:24
112:12, 115:1
115:5, 115:15
127:18, 127:23
130:4, 130:25
131:12, 134:7
139:3, 139:6
139:23, 139:23
140:3, 141:6
142:6, 142:10
145:25, 146:3
147:1, 147:24
148:17, 149:11
150:19, 150:22
150:23, 150:24
151:15, 151:17
151:20, 152:6
152:8, 154:10
157:22, 158:11
161:11, 162:17
166:11, 167:12
173:7, 174:13
176:5, 176:6
176:9, 176:11
179:8, 179:9

180:14, 182:12
184:3, 184:8
184:24, 186:25
187:23, 188:1
190:2, 190:4
193:22, 195:16
198:20
**knowledge** 7:6
8:25, 12:5
12:13, 97:8
151:16, 179:1
**known** 22:11
22:14, 67:5
82:7, 82:13
82:18, 83:13
84:12, 85:7
85:23, 98:21
119:18, 120:22
166:9
**knows** 83:1

**L**

**label** 14:6, 62:18
**labels** 61:6
**laboratories** 121:25
**laboratory** 122:4, 179:5
179:7
**labs** 171:8
**lack** 26:22
**laid** 191:4
**language** 151:20
191:12, 192:2
195:5
**large** 9:23
**larger** 143:14
**late** 7:16, 67:20
68:1, 106:2
107:24
**lateral** 130:20
**law** 1:1, 1:13
**lawsuit** 112:13
**lawsuits** 99:23
**lawyer** 73:9

80:1
**lawyers** 10:1
48:4, 48:17
**lays** 190:11
191:7, 191:10
**leading** 44:1
191:5
**leads** 41:25
189:25
**learned** 141:23
146:22, 148:24
150:7, 150:13
**led** 190:8
**Lee** 120:1
166:13
**left** 23:10, 23:13
41:8, 41:14
**legal** 190:14
194:7
**legitimate** 86:10
102:7, 102:8
102:23, 102:24
**length** 178:5
**LESLIE** 3:5
**letter** 46:13
46:15, 57:25
58:2, 92:1, 92:8
99:4, 99:10
99:19, 99:22
108:5, 108:6
109:1, 110:13
110:19, 111:3
111:12, 111:21
112:5, 137:20
173:12, 175:4
180:20, 181:11
181:13, 181:15
186:10, 186:12
188:2, 188:7
188:9, 189:7
201:15, 201:17
202:11, 202:16
**letterhead** 37:6
48:10, 69:20
74:20, 99:20
137:14, 145:21

163:11, 167:19
168:12
**letters** 191:12
192:17
**level** 54:4, 55:4
118:20, 134:1
138:6, 143:12
198:5
**levels** 27:7
80:12, 80:20
81:9, 115:14
122:20, 123:4
125:25, 126:8
126:16, 144:20
197:1
**Lewin** 37:15
38:16, 172:17
172:19, 172:24
173:2, 173:12
174:25, 175:22
176:17, 177:6
177:13, 177:19
183:10, 183:17
184:10, 184:15
187:8, 187:11
189:1, 189:21
190:1, 190:7
191:3, 195:21
198:3, 198:14
199:9, 199:14
**Lewin's** 38:20
188:11
**lie** 191:7
**LIEU** 3:3
**light** 130:15
193:13
**limit** 126:2
**limitations** 123:16
**limited** 17:14
17:20, 23:1
27:3
**limits** 94:17
107:10, 126:11
126:20, 130:7
**Linda** 11:1

**line** 108:10
121:1, 134:3
191:24
**linked** 128:6
**list** 33:12, 42:6
42:7, 114:7
116:20, 199:4
201:19
**listed** 4:22, 26:2
**listen** 39:16
73:17
**listing** 114:1
**literature** 64:2
84:5, 84:9
118:16, 195:4
**little** 13:20
22:24, 92:16
99:5, 172:16
192:11
**LLC** 1:6
**LLP** 2:8, 2:18
**local** 81:9
**located** 114:13
**locations** 76:18
**Logan** 2:18
**LOMBARDY** 3:5
**long** 42:6, 73:13
128:18
**longer** 48:24
50:2, 109:7
**look** 24:18
25:18, 33:5
33:15, 35:8
35:10, 38:10
43:6, 43:13
44:4, 44:6, 48:9
50:24, 57:15
58:5, 58:7
72:13, 75:10
75:12, 75:13
75:24, 93:12
94:15, 96:3
96:15, 96:23
104:1, 105:13
114:14, 118:24

120:9, 121:1
121:2, 121:3
121:7, 125:9
133:13, 142:6
142:9, 157:16
157:20, 158:4
158:6, 160:4
162:25, 170:20
172:2, 181:14
182:7, 184:25
190:20
**looked** 17:19
44:13, 86:13
107:1, 107:24
162:23, 182:10
**looking** 32:24
33:12, 38:12
44:9, 44:21
61:24, 62:19
63:9, 65:1
66:23, 96:6
97:18, 99:6
116:24, 118:12
122:3, 133:25
142:2, 142:15
158:22, 159:4
167:1, 167:12
168:22, 177:18
190:9, 198:3
**looks** 113:25
168:18, 196:10
**lot** 10:17, 59:9
129:18, 162:23
178:11, 191:19
193:25
**lots** 185:14
185:21, 186:23
187:3
**low** 80:12, 80:20
115:14, 122:20
123:4, 125:25
126:7, 126:16
143:13, 144:20
163:21, 197:1
**lower** 27:6
115:10, 118:20

198:7
**lunch** 74:10
97:25, 103:1
105:12
**Luncheon**
106:18
**lunchtime**
105:13
**lung** 74:22, 78:2
**lungs** 74:16
78:17, 79:3
79:9, 79:19
80:5, 85:5
**Luzenac** 132:7
132:7, 132:8
132:11
**Lynn** 194:11

## M

**Ma'am** 29:16
30:19, 31:13
32:19, 34:7
45:7, 45:18
47:22, 51:11
64:4, 64:20
66:6, 66:12
69:12, 71:24
73:8, 74:6
76:21, 77:5
85:21, 87:25
89:13, 95:7
96:17, 96:24
105:2, 110:23
111:18, 120:20
124:9, 126:5
134:5, 134:10
135:8, 136:14
136:25, 150:12
150:17, 150:22
152:4, 153:8
155:6, 156:2
156:8, 156:14
162:8, 165:19
167:5, 170:11
173:20, 179:6

179:13, 180:3
181:5, 182:12
182:23, 188:6
196:25
**machine** 124:6
**magnesite** 142:8
**magnification**
178:5
**maintain** 50:11
**maintained**
75:18
**maintenance**
91:25
**major** 121:13
123:16, 142:8
**majority** 85:4
**making** 34:22
56:18, 65:15
136:10
**Maldonado**
41:25, 42:16
**man** 178:15
**management**
55:4
**mandatory**
160:3, 160:11
161:16, 161:19
**manufacture**
96:11, 96:21
97:10, 182:25
**manufacturer**
13:24, 14:5
19:8
**Maple** 2:3
**Marc** 1:13, 5:10
200:3
**March** 57:14
99:10, 99:11
99:12, 99:13
99:19, 101:10
105:20, 115:25
116:3, 159:5
159:19, 163:10
**mark** 5:1, 8:17
10:12, 33:5
61:3

**marked** 5:2
10:13, 24:3
25:23, 33:4
33:16, 38:7
54:12, 115:23
132:5, 137:13
137:18, 168:11
188:8, 189:6
189:19
**market** 98:8
98:18, 102:5
192:15
**marketing** 13:7
13:13
**marketplace**
130:16
**marking** 33:1
33:3
**Martin** 198:18
**Maryanne**
107:22
**master** 177:11
**match** 50:10
**matches** 163:2
**material** 28:15
29:14, 31:22
32:10, 32:18
37:9, 70:25
97:21, 101:1
102:24, 108:7
114:12, 118:23
128:7, 129:18
139:1, 172:6
179:4, 180:21
181:2, 181:3
183:4, 192:7
192:18
**materials** 28:5
28:8, 70:16
71:1, 74:7
81:14, 90:15
98:24, 99:15
100:9, 100:15
111:6, 179:11
181:18
**mathematical**

107:9
**matter** 1:12
35:19, 46:1
100:16, 101:4
**McCarthy**
11:20
**McCrone** 108:4
109:1, 109:18
110:13, 110:19
111:3, 111:12
111:21, 112:5
180:19, 180:20
180:25, 181:3
181:7, 181:24
182:3, 182:14
182:21, 182:23
183:1, 189:10
191:12, 192:16
195:25
**McGIVNEY**
2:13
**McMurry** 42:3
**MCNEILL-GE...**
1:6
**McNelis** 3:12
**MD** 1:9, 4:3
**mean** 33:2, 34:5
83:25, 102:9
162:7, 169:10
190:11, 190:19
191:13, 191:15
191:16, 191:17
192:5
**meaning** 53:25
97:5
**means** 14:19
15:7, 20:25
81:9, 87:15
102:7, 102:8
103:12, 103:20
164:16, 169:11
191:14
**measure** 118:25
**measuring**
159:21
**mechanism**

| | | | | |
|---|---|---|---|---|
| 53:15 | 91:6, 127:5 | 201:10 | 145:14, 146:10 | 93:1, 114:22 |
| **medical** 5:21 | 127:16, 128:16 | **message** 194:24 | 146:23, 147:4 | 115:17, 115:20 |
| 5:22, 6:2, 6:6 | 132:5, 140:13 | **met** 25:11, 61:4 | 147:10, 147:12 | 117:20, 118:16 |
| 40:10, 40:20 | 145:20, 147:20 | 104:7, 183:9 | 148:25, 149:6 | 119:1, 124:14 |
| 40:23, 41:2 | 149:17, 163:11 | 184:20 | 149:12, 150:9 | 124:24, 126:11 |
| 55:16, 67:11 | 166:4, 167:18 | **method** 72:22 | 150:15, 156:9 | 128:20, 131:7 |
| 67:17, 67:18 | 168:20, 176:20 | 73:5, 81:20 | 156:16, 157:1 | 132:17, 133:9 |
| 67:24, 68:8 | 185:2, 186:4 | 91:21, 115:4 | 157:13, 157:24 | 133:19, 137:1 |
| 84:20, 201:11 | 188:9, 201:3 | 115:12, 117:9 | 161:3, 161:12 | 142:13, 143:6 |
| **medicated** | 201:4, 201:5 | 117:12, 118:2 | 161:20, 161:23 | 148:6, 157:17 |
| 37:14, 75:25 | 201:6, 201:7 | 118:13, 118:15 | 163:8, 163:12 | 157:21, 159:21 |
| 92:9, 92:23 | 201:8, 201:10 | 119:7, 119:14 | 164:1, 164:19 | 160:13, 174:9 |
| 93:3 | 201:12, 201:13 | 119:17, 119:19 | 164:20, 164:23 | 174:12, 199:16 |
| **meet** 22:7 | 201:14, 201:16 | 120:4, 120:5 | 165:2, 165:5 | **Michelle** 42:3 |
| **meeting** 9:12 | 201:22, 201:23 | 120:10, 120:21 | 165:10, 165:22 | **microbe** 118:19 |
| 60:25, 61:15 | 201:24, 202:4 | 121:15, 121:16 | 166:2, 166:23 | **microns** 74:23 |
| 62:9, 89:19 | 202:5, 202:7 | 122:5, 122:12 | 167:7, 167:15 | 78:3 |
| 91:6, 115:25 | 202:9, 202:10 | 122:13, 122:19 | 168:22, 169:4 | **microscope** 71:6 |
| 116:2, 116:7 | 202:13, 202:14 | 123:3, 123:9 | 171:5, 197:12 | 116:11, 116:21 |
| 119:25, 124:4 | 202:15 | 123:12, 125:4 | 197:25, 198:5 | 117:8, 117:17 |
| 183:21, 183:24 | **memoir** 10:23 | 125:7, 125:9 | 198:10, 199:7 | 118:6, 118:18 |
| 184:2, 184:9 | **memorandum** | 125:20, 125:21 | 199:13 | 129:21 |
| 184:10, 185:3 | 57:13 | 125:24, 126:2 | **methodological** | **microscopic** |
| 187:7, 190:5 | **memorializes** | 126:7, 126:10 | 59:24 | 74:3, 152:18 |
| 201:20 | 89:19 | 126:16, 126:19 | **methodologies** | 161:13, 161:19 |
| **meetings** 38:20 | **memorializing** | 126:19, 126:24 | 133:22, 169:7 | **microscopy** |
| **member** 41:15 | 115:25 | 127:7, 130:1 | 170:17 | 123:6, 129:4 |
| 132:14 | **memory** 97:1 | 130:7, 130:8 | **methodology** | 131:4, 133:1 |
| **members** 54:2 | 97:2, 177:10 | 130:8, 130:9 | 7:21, 94:18 | 163:24, 177:7 |
| 55:22, 130:13 | **memos** 47:9 | 130:10, 130:25 | 102:13, 102:16 | **MID-L-2456-18** |
| 142:9, 184:9 | 47:18, 47:21 | 131:23, 133:13 | 102:23, 102:25 | 1:5 |
| 184:17 | 48:1, 50:6 | 133:14, 134:14 | 104:14, 116:9 | **MID-L-3095-18** |
| **memo** 35:18 | 51:10, 51:12 | 135:2, 135:3 | 139:4, 139:15 | 1:3 |
| 37:3, 43:7 | **mention** 151:25 | 135:6, 135:22 | 142:14, 142:18 | **MID-L-4252-18** |
| 48:10, 48:11 | 152:1, 181:14 | 136:1, 137:5 | 161:8, 161:10 | 1:4 |
| 51:9, 51:14 | **mentioned** | 138:2, 138:5 | 168:12, 168:14 | **MID-L-4826-18** |
| 51:16, 51:21 | 65:22, 75:16 | 139:6, 139:11 | 168:16, 168:18 | 1:5 |
| 52:2, 53:16 | 127:25, 158:14 | 139:19, 139:25 | 170:3, 170:5 | **MID-L-5368-17** |
| 63:12, 63:12 | 181:11, 194:8 | 140:5, 140:9 | 170:12, 170:19 | 1:6 |
| 63:17, 66:12 | **merit** 44:22 | 141:4, 141:7 | 191:3, 196:11 | **MID-L-598-18** |
| 66:15, 69:19 | 53:2 | 141:8, 141:11 | **methods** 9:15 | 1:7 |
| 72:11, 72:15 | **mesothelioma** | 141:25, 142:5 | 25:3, 26:18 | **MID-L-600-18** |
| 73:23, 74:1 | 83:2, 83:17 | 142:11, 143:24 | 26:24, 27:5 | 1:3 |
| 74:19, 84:19 | 83:23, 84:7 | 144:1, 144:5 | 56:19, 71:21 | **MID-L-6635-17** |
| 85:1, 89:17 | 84:14, 84:20 | 144:6, 144:11 | 73:3, 74:2, 74:5 | 1:7 |
| 89:25, 90:16 | 85:2, 85:9 | 144:13, 144:14 | 92:13, 92:21 | **MID-L-6805-16** |

Brody Deposition Services

1:4
**MID-L-7049-16**
1:6
**middle** 151:9
154:4, 154:17
173:25
**MIDDLESEX**
1:1
**Miller** 70:7
**million** 161:24
161:25
**mind** 10:9
41:24, 121:8
152:7
**mine** 28:12
29:7, 29:15
29:19, 31:7
32:11, 32:16
32:18, 37:17
70:7, 70:11
70:14, 70:17
75:16, 76:16
76:18, 76:23
77:2, 77:3, 77:7
77:23, 92:10
92:15, 92:15
92:20, 92:24
93:3, 93:10
93:12, 93:13
93:21, 94:5
94:15, 95:23
97:9, 97:22
109:7, 109:14
110:2, 111:11
138:22, 182:4
**mined** 76:6
**mineral** 72:16
81:7
**mineralogic**
128:6
**minerals** 1:5
2:11, 74:23
76:8, 78:3, 78:5
81:8, 118:10
118:14, 128:7
128:17, 128:19

141:16, 141:18
144:19, 144:20
160:17, 162:3
178:11
**mines** 27:16
28:6, 28:8
31:25, 32:5
75:13, 75:19
75:20, 76:18
77:10, 91:20
93:5, 94:13
94:16, 94:19
94:23, 94:25
95:3, 95:3, 95:9
95:15, 95:20
96:10, 96:20
104:10, 128:13
138:18, 140:15
140:20, 141:12
141:24, 142:20
142:25, 143:7
165:4, 189:17
197:6, 197:11
197:20, 202:3
**minor** 141:19
**minute** 38:10
57:15, 67:4
72:13, 99:6
121:2, 125:1
125:8, 169:14
177:13
**minutes** 98:2
119:21, 164:2
164:5, 171:9
184:2, 201:21
**misbranded**
13:13, 67:7
**mischaracterizi...**
116:23, 117:3
117:10
**Misclassification**
152:15
**misinterpret**
120:25
**mislead** 87:6
**misleading**

68:17, 157:5
162:11
**misled** 191:8
**misrepresentat...**
152:17
**missions** 37:21
**misspoke**
137:15
**misstating**
92:22
**misunderstand...**
117:24
**mixing** 94:18
94:20, 94:21
**mixture** 76:12
**monitoring**
17:16
**monograph**
127:17
**months** 61:4
**morning** 5:17
5:18, 106:25
108:16
**MORSE** 1:6
**mothers** 58:19
**move** 66:23
134:9, 135:8
152:4, 154:19
**moving** 70:22
**multiple** 24:9
24:9, 24:22
24:24, 27:14
28:3, 29:3
29:23, 29:25
76:2, 97:3
104:10, 116:25
117:1, 124:15
152:13, 169:21
170:7, 176:6
185:14
**Muscat** 63:24

| N |
| --- |

**Nader** 36:5
**name** 5:5, 23:8

176:7, 176:12
**nameology**
191:19
**names** 77:10
**Nashed** 35:18
35:22, 35:23
36:2, 43:14
**National** 107:20
**natural** 47:8
**necessarily** 76:2
**necessary** 8:12
14:7, 25:6
26:23, 143:14
**need** 24:18
32:21, 38:10
52:21, 57:15
60:14, 66:4
71:19, 72:13
75:9, 81:8, 91:4
128:23, 129:9
135:18, 135:22
136:1, 136:15
137:1, 154:11
164:15, 182:10
198:4, 198:6
**needed** 33:22
53:10, 56:21
161:9
**needle** 143:16
144:1
**needs** 54:3, 57:4
**negative** 122:15
192:18
**neither** 200:15
200:18
**never** 6:1, 6:2
40:3, 48:4
48:19, 49:22
51:13, 51:18
81:23, 87:23
88:12, 100:18
101:6, 101:12
101:15, 101:16
109:12, 112:24
127:4, 138:13
158:20, 162:21

164:8, 180:21
181:1, 181:20
181:24, 183:4
183:11
**new** 1:1, 1:13
1:14, 1:23, 2:4
2:14, 3:4, 6:9
6:9, 14:16, 15:1
15:10, 52:14
130:15, 144:8
189:25, 200:5
200:24
**news** 147:3
**nicely** 151:22
**Nicholson** 1:9
4:3, 4:14, 5:17
54:19, 73:15
106:25, 152:6
201:14
**Nicholson's**
10:13
**NIOSH** 107:20
107:21, 139:14
**non** 71:11, 83:3
83:8
**non-asbestiform**
72:1, 72:18
74:8
**NORTH** 1:3
1:4, 1:5, 1:6, 1:7
**Notary** 1:13
200:3, 200:24
**notations** 10:20
**note** 4:22, 58:6
80:17, 114:11
149:18, 149:22
186:2, 192:11
192:11
**Notebook** 4:15
4:16, 4:17
**Notebooks**
54:12
**noted** 5:8, 92:8
92:23
**notes** 4:14, 10:8
10:12, 10:13

| | | | | |
|---|---|---|---|---|
| 10:16, 10:22 | 16:3, 16:4 | 60:20, 61:23 | 144:3, 144:12 | 137:13, 137:16 |
| 131:9, 188:24 | 16:10, 16:13 | 62:4, 62:11 | 145:16, 146:25 | 197:4 |
| 189:19, 189:20 | 16:21, 17:2 | 63:6, 63:18 | 148:21, 149:3 | **offered** 88:17 |
| 189:23, 190:9 | 17:8, 17:17 | 64:13, 65:13 | 149:14, 150:10 | 139:24, 186:5 |
| 190:20, 192:20 | 18:6, 18:12 | 65:20, 66:1 | 152:9, 152:22 | **office** 61:4 |
| 192:21 | 18:17, 18:23 | 67:14, 68:11 | 153:6, 155:16 | 120:1 |
| **notice** 4:13, 5:2 | 19:12, 19:17 | 68:15, 69:3 | 156:5, 156:10 | **officer** 193:24 |
| 7:4, 7:4 | 20:14, 20:22 | 69:9, 69:16 | 156:12, 156:19 | **offices** 1:14 |
| **notified** 46:14 | 21:5, 21:19 | 70:1, 71:17 | 157:2, 157:4 | **official** 62:3 |
| **noting** 169:3 | 22:1, 22:8 | 72:4, 73:1 | 157:10, 157:15 | 187:10 |
| **November** 33:7 | 22:13, 22:20 | 74:11, 74:17 | 158:1, 161:6 | **officials** 39:10 |
| 37:3, 60:25 | 23:3, 23:16 | 76:24, 77:9 | 164:21, 165:7 | 40:1, 40:6, 41:1 |
| 166:5, 185:4 | 25:14, 27:12 | 77:24, 78:7 | 165:24, 166:25 | 41:8, 41:13 |
| 185:12, 186:3 | 27:22, 28:13 | 78:14, 78:18 | 167:11, 168:3 | 41:20, 41:22 |
| 186:12, 186:13 | 29:1, 29:10 | 78:22, 79:4 | 168:8, 169:1 | 44:1, 183:22 |
| 195:22 | 29:22, 30:15 | 79:10, 79:20 | 169:8, 169:19 | **okay** 11:19 |
| **number** 10:16 | 31:17, 31:19 | 80:6, 80:14 | 170:9, 170:15 | 17:13, 30:10 |
| 11:21, 24:21 | 32:6, 34:2 | 80:17, 80:23 | 170:22, 170:25 | 33:18, 35:18 |
| 25:16, 25:17 | 34:12, 34:25 | 82:1, 82:8 | 172:1, 173:24 | 38:11, 52:7 |
| 33:5, 84:23 | 35:6, 35:16 | 82:14, 82:21 | 180:7, 180:9 | 67:8, 73:16 |
| 104:6, 105:23 | 39:17, 40:14 | 83:4, 83:10 | 181:9, 182:6 | 73:20, 75:12 |
| 108:7, 114:8 | 40:22, 41:4 | 83:14, 83:19 | 182:17, 183:15 | 76:3, 94:7, 94:8 |
| 115:9, 121:25 | 41:11, 41:17 | 83:24, 84:8 | 184:18, 185:19 | 99:14, 105:13 |
| 130:5, 185:12 | 41:23, 42:11 | 84:17, 86:1 | 186:2, 186:18 | 113:24, 121:6 |
| 185:20, 191:5 | 42:24, 43:4 | 86:5, 86:16 | 187:14, 187:22 | 122:25, 145:9 |
| 193:23, 199:4 | 43:11, 43:21 | 86:22, 87:8 | 192:3, 194:16 | 150:7, 172:19 |
| **numbered** | 44:3, 44:16 | 87:21, 91:14 | 195:1, 195:15 | 174:1 |
| 24:19 | 44:19, 45:4 | 91:17, 91:23 | **objective** 144:15 | **once** 13:21 |
| **numbers** 24:1 | 45:12, 45:23 | 93:19, 95:1 | 144:16 | 129:11 |
| 26:11 | 46:6, 46:21 | 95:24, 96:1 | **objectives** 120:6 | **ones** 41:24 |
| **numerology** | 46:23, 47:4 | 96:12, 96:22 | 121:18 | 103:18 |
| 191:19 | 48:6, 48:21 | 97:12, 97:14 | **obligated** 15:12 | **opened** 102:18 |
| **numerous** 47:18 | 49:6, 49:10 | 100:2, 100:21 | 17:11, 19:1 | 191:4 |
| 116:25, 159:5 | 49:17, 49:25 | 101:8, 102:2 | **observed** 158:16 | **openly** 103:7 |
| | 50:17, 50:21 | 109:15, 114:24 | **Occasionally** | **openness** 105:7 |
| | 51:2, 51:8 | 115:7, 115:22 | 71:4 | **operator** 164:2 |
| **O** | 51:19, 51:24 | 116:22, 122:22 | **occasions** 175:9 | **opinion** 80:4 |
| | 52:24, 53:7 | 124:2, 125:6 | **occupational** | 124:22, 127:11 |
| **O'TOOLE** 3:3 | 53:13, 53:22 | 126:9, 132:10 | 83:3 | 150:17 |
| **oath** 186:14 | 53:24, 54:25 | 132:19, 133:8 | **occupationally** | **opinions** 36:20 |
| **object** 40:16 | 55:20, 55:25 | 133:12, 134:6 | 83:9 | **opportunity** |
| **objecting** 15:23 | 56:7, 56:14 | 134:18, 135:19 | **occur** 179:11 | 131:18, 174:4 |
| **objection** 13:8 | 56:23, 57:1 | 136:8, 137:8 | **occurrence** | **oppose** 165:21 |
| 13:17, 14:3 | 57:23, 59:8 | 137:10, 138:8 | 38:22, 39:1 | **opposing** 15:19 |
| 14:10, 14:18 | 59:20, 60:6 | 138:15, 138:24 | **occurs** 72:17 | 136:21 |
| 15:3, 15:19 | 60:9, 60:17 | 139:22, 140:12 | **October** 99:16 | **oppressing** |
| 15:22, 15:22 | | | | |

170:2
**optical** 116:11
116:20, 117:8
117:16, 118:6
129:3, 129:21
160:13, 161:13
161:19, 163:24
**option** 132:23
**Oral** 1:11
**order** 27:6, 47:2
59:6, 63:4
116:12, 128:22
136:25, 143:15
161:4
**ordered** 185:7
**ordinary** 40:7
55:7, 55:9
55:11
**ore** 75:16, 75:18
94:15, 141:1
160:18, 160:18
160:25, 161:23
162:2
**ores** 81:15
159:9
**organization**
41:15, 108:11
127:24, 194:12
**organizations**
185:15
**organize** 10:18
**organs** 78:13
**origin** 29:4
**original** 38:20
114:12, 114:16
163:20
**outlined** 151:22
**outlying** 75:16
**outside** 15:25
79:23, 108:21
108:22, 110:9
176:11, 194:7
195:13
**overall** 164:3
**overseen** 15:9
**oversight** 18:15

57:3
**owned** 77:7
94:13, 94:23

### P

**P-1** 4:13, 5:1
5:2, 7:3
**P-2** 4:14, 10:12
10:14, 10:15
10:16, 189:19
**P-3** 4:15, 54:12
105:16, 113:8
114:6, 186:9
**P-4** 4:16
**P-5** 4:17, 107:19
**P.C** 2:3, 2:13
**p.m** 106:16
106:21, 145:7
171:13, 171:18
199:23
**packaging** 34:4
71:1
**page** 4:2, 4:12
16:9, 24:16
24:25, 25:22
25:24, 26:6
26:21, 38:13
39:4, 58:1
70:20, 81:4
90:20, 92:7
94:9, 100:4
116:2, 116:7
120:9, 121:11
141:10, 142:7
159:25, 160:15
161:22, 173:8
188:25, 189:4
190:10, 190:10
201:2, 202:2
**pages** 4:14, 4:22
24:19, 24:22
24:24
**paid** 108:13
**panel** 13:15
20:12

**panic** 58:19
**paper** 48:24
49:4, 49:9
49:14, 86:3
86:7, 114:15
114:15
**paragraph** 25:1
38:12, 43:13
128:4
**Paralegal** 3:12
**parcel** 188:16
**Park** 2:14, 3:4
**part** 18:16
57:21, 63:10
86:14, 87:1
87:24, 93:16
99:8, 132:13
132:16, 134:24
171:4, 188:16
188:21
**participants**
124:15
**participating**
132:21
**particles** 72:20
73:6, 74:15
74:22, 75:11
78:3
**particular** 76:5
127:3, 173:22
175:3
**particularly**
130:15
**parties** 200:17
**partners** 124:20
**parts** 161:24
161:25
**party** 193:10
**patient** 6:6, 6:11
**patients** 6:3
40:11, 55:18
85:3
**pause** 13:20
**PC** 3:12
**PCM** 133:2
133:9

**PCPC** 8:6
**Pederson** 37:4
37:8
**Pediatric** 41:25
**pending** 23:25
54:7
**Pennsylvania**
2:9, 2:19
**people** 7:19
7:22, 10:6
10:24, 34:16
35:22, 42:18
44:23, 45:2
45:9, 56:18
64:6, 65:22
68:2, 68:18
68:20, 83:2
124:6, 153:20
171:6, 171:7
176:6, 183:24
190:24, 193:12
193:14, 193:25
194:15, 194:17
**percent** 74:13
74:24, 78:5
115:5, 115:9
138:7, 142:8
143:13, 146:19
147:10, 147:17
163:21, 163:23
196:21, 198:3
199:9
**perform** 170:4
**performed** 32:4
**performing**
197:25
**period** 11:8
42:19, 66:19
68:20
**periods** 31:8
**permission**
36:25, 43:8
**permit** 25:4
163:20
**permitted** 16:5
**person** 7:12

7:13, 8:23
12:11, 45:8
62:12
**personal** 6:18
8:25, 12:15
65:5, 65:17
**personally**
78:23
**personnel** 26:22
27:4, 27:20
28:11
**perspective** 65:4
67:1, 68:25
99:24, 110:15
**pertinent** 37:13
**petered** 6:10
**petition** 52:13
52:17, 53:14
55:10, 61:5
61:19, 62:18
63:4, 63:9
107:8, 133:15
134:21, 135:24
151:23
**petitions** 64:8
67:13, 106:4
**ph** 198:18
**pharmaceutical**
6:17
**phases** 144:21
**phasing** 43:17
**Philadelphia**
2:9, 2:19
**Philip** 52:13
**phone** 1:24
36:4, 45:20
46:4, 46:19
47:1, 47:6, 49:3
**photographs**
178:4
**phrasing** 68:17
**physical** 50:2
50:2, 50:8
107:14
**physician** 6:8
42:3

pick 45:20
  115:20, 133:16
  134:8, 190:22
  192:10
picked 46:3
  46:18, 193:3
piece 15:6, 86:2
  86:6
pipe 13:21
Pittsburgh 5:25
pivot 190:18
  190:19, 191:6
  191:10, 192:1
pivoting 192:24
place 106:13
  199:18, 200:13
placed 61:6
placing 15:19
Placitella 2:3
  2:5, 3:12, 4:4
  5:1, 5:15, 10:11
  15:21, 16:2
  16:11, 16:15
  24:2, 26:9
  26:12, 30:4
  30:8, 39:20
  54:17, 64:15
  98:1, 106:13
  106:23, 136:23
  137:19, 137:21
  144:25, 145:8
  151:3, 151:6
  151:11, 153:14
  153:21, 153:24
  154:2, 154:10
  154:14, 154:21
  154:25, 155:9
  155:15, 155:19
  155:24, 171:10
  171:21, 185:24
  199:17
plain 191:20
Plaintiff 2:6
plan 27:4
plate 178:7
playing 191:11

192:2
please 29:16
  30:1, 48:9
  64:15, 71:24
  72:13, 73:10
  73:22, 76:4
  76:4, 83:25
  99:6, 123:20
  134:10, 167:4
  174:14, 180:12
  180:13
PLM 133:2
  133:9, 134:14
  135:14
point 17:24
  25:16, 28:23
  31:14, 62:6
  63:13, 87:25
  96:15, 110:18
  113:19, 115:8
  139:9, 142:17
  146:19, 159:3
  170:11, 183:16
  185:16, 187:16
  187:20
pointed 130:18
  185:6, 186:4
  186:4
pointing 63:11
  152:20
points 76:2
  76:11, 105:25
poisonous 16:19
policy 49:19
Pooley 93:4
  94:14, 95:2
  127:25, 128:1
  145:10, 145:13
  146:7, 146:16
  146:16, 146:23
  147:17, 148:6
  148:17, 148:25
  149:7, 149:11
  150:2, 150:8
  150:13, 156:8
  156:15, 156:25

165:3, 167:21
  175:12, 175:18
  196:1
poor 75:15
pops 41:24
population 85:6
portion 149:18
  199:24
pose 80:13
  80:22
posed 87:17
  179:18
position 18:3
  18:7, 22:25
  56:20, 56:22
  57:9, 62:21
  71:11, 71:25
  73:24, 74:4
  74:8, 100:18
  101:3, 101:6
  101:23, 124:18
  138:12, 170:19
  170:23, 170:24
positive 117:16
  127:20, 192:7
possession
  27:19, 85:16
  85:17, 103:13
  111:9
possible 29:6
  29:14, 75:19
  130:15, 138:5
  141:16
potential 25:8
  33:10, 67:4
  69:1, 81:8
potentially
  81:15, 129:18
powder 22:17
  33:9, 37:14
  37:18, 38:17
  38:23, 39:2
  43:3, 52:16
  53:3, 56:13
  56:16, 56:17
  57:10, 58:12

58:17, 59:4
  59:12, 59:17
  60:3, 60:13
  69:6, 70:12
  71:3, 80:25
  89:11, 89:15
  90:12, 90:22
  91:1, 91:11
  91:21, 92:9
  92:19, 92:23
  93:3, 93:10
  95:10, 95:21
  96:11, 96:21
  97:10, 97:22
  101:5, 101:20
  108:2, 110:7
  113:19, 126:15
  137:24, 138:22
  140:23, 157:9
  171:24, 172:7
  172:10, 173:17
  173:23, 174:16
  175:6, 183:5
  190:13, 192:19
  193:8, 196:5
  196:12, 201:9
powders 88:6
  100:5, 100:6
  100:12, 182:2
power 53:4
PPF 168:14
PR 194:15
practical 120:6
  121:17, 124:5
  125:11, 131:25
Practice 1:12
pre-concentrates
  143:18
pre-concentrati...
  146:10, 147:12
pre-concentrati...
  139:6, 139:11
  139:19, 140:9
  141:4, 141:7
  143:25, 144:5
  144:11, 144:13

145:14, 146:23
  147:4, 147:9
  156:9, 156:16
  157:1, 165:10
  165:21
precise 6:7
preclinical
  67:22, 68:4
  68:22, 70:2
preconcentration
  197:24
predecessor
  132:11
predominantly
  143:9
prefer 121:1
  158:2
premarket
  12:25
preparation
  9:20, 10:17
  25:20, 27:18
  47:17, 47:24
  49:22, 51:1
  51:13, 57:22
  81:24, 89:22
  121:3, 127:1
  148:2, 190:15
  192:23
preparations
  23:23, 25:17
prepare 21:10
  127:8
prepared 58:18
  64:3, 110:12
preparing 43:23
  48:3, 48:16
presence 143:1
  144:17
present 3:11
  7:16, 25:7
  81:15, 106:2
  116:4, 119:25
  144:20, 162:4
  178:21, 190:23
presented 37:15

presenting
  81:14
preserves 15:20
  16:13
prevent 14:8
preview 54:2
previous 12:1
  92:11, 108:5
previously 9:5
  37:9, 177:5
Princeton 1:14
  189:14
principal 13:14
print 66:5
prior 13:6
  13:13, 67:12
  67:15, 139:3
  143:18, 186:7
  200:5
private 183:21
  184:10
privileged 34:14
probable 14:20
probably 6:10
  65:22, 70:24
  71:23, 165:17
procedure 1:12
  47:11, 131:15
  143:1, 143:17
  144:17, 144:23
  163:15, 163:19
  168:21
procedures
  34:19, 49:11
  130:12, 163:22
process 19:24
  34:19, 52:25
  53:14, 54:5
  54:21, 54:22
  55:10, 81:11
  115:2, 148:3
produce 7:5
produced 72:22
produces 72:20
product 13:5
  13:6, 13:12

13:15, 13:25
14:1, 14:6, 14:9
14:13, 14:24
15:12, 17:15
19:9, 19:10
19:15, 19:16
22:5, 22:6
32:15, 34:1
39:10, 40:12
45:19, 65:17
66:16, 75:25
81:10, 86:21
86:25, 87:19
88:22, 92:5
94:19, 98:7
98:8, 98:18
98:25, 101:21
102:1, 102:4
102:4, 102:6
107:15, 108:9
109:17, 109:18
109:19, 109:22
110:1, 110:11
110:12, 110:17
112:6, 113:5
160:25, 161:5
161:25, 162:2
162:14, 174:7
183:13, 188:3
188:16, 188:20
192:15
production
  101:21, 121:13
  172:6, 181:3
  192:18
products 1:3
  15:9, 21:17
  21:24, 22:17
  22:17, 25:5
  28:4, 29:5, 29:6
  31:6, 32:12
  34:5, 46:10
  56:4, 59:14
  61:7, 62:19
  65:5, 69:6
  69:13, 78:11

82:23, 87:11
88:1, 88:10
88:15, 88:18
89:6, 89:8, 94:6
94:15, 94:24
98:13, 98:15
100:20, 100:24
102:10, 102:21
104:11, 107:3
108:18, 108:23
111:1, 111:6
111:10, 111:21
121:14, 126:23
127:13, 128:14
159:9, 159:22
172:24, 173:4
173:6, 176:3
179:24, 182:5
182:15, 182:22
183:3, 184:13
184:23, 185:18
186:17, 191:23
192:12
Professor
  175:12, 175:18
  188:11, 196:1
profile 15:14
program 17:25
  24:5, 100:14
progressed
  112:21
project 24:13
  24:21, 24:23
  25:2, 25:23
  27:4, 89:18
projects 24:9
prominent
  171:4
promise 72:9
  136:11, 136:14
  177:20
promised
  174:24
promoting
  169:12
promotion

168:24, 169:6
170:21
promulgated
  13:2
proof 90:11
proper 16:3
proposal 166:14
proposed 22:6
  168:18, 168:21
proposition
  111:20
proprietary
  34:14
protection
  81:13
protective 70:12
proven 14:20
provenance
  31:10, 32:1
  32:8
proverbial
  143:16
proves 90:21
provide 18:21
  30:13, 36:5
  81:12, 105:4
  133:3, 133:10
  134:15, 153:9
  156:3, 159:2
  172:14, 185:10
  185:16
provided 7:7
  16:24, 23:20
  33:24, 35:4
  37:10, 49:23
  51:7, 51:14
  51:18, 89:3
  106:9, 113:2
  113:17, 136:9
  162:2, 176:24
  185:7, 186:9
  186:15, 188:4
  196:6
providing 186:5
public 1:13
  21:2, 33:25

34:10, 35:5
35:14, 36:12
56:3, 56:8
186:8, 195:14
200:3, 200:24
publically 34:15
  174:25
publications
  27:15
publicity 58:20
published 147:6
publishes 70:23
pull 95:5
pulled 50:4
  130:19
purpose 20:17
  25:2, 93:16
  120:4, 121:12
  121:16, 143:6
  159:20
pursuant 1:12
put 13:20, 15:17
  16:9, 33:19
  111:25, 120:11
  120:12, 122:8
  173:11, 194:24
putting 38:3
  39:5, 148:18
  187:2

Q

qualification
  90:15
qualifications
  111:25
qualified 7:12
  7:13, 166:15
qualifying 104:9
quality 9:14
  11:18, 12:3
  77:3, 104:9
  194:12
quantify 164:23
quantities 71:5
quarrel 26:14

**quarter** 26:19
26:25
**quarter's** 24:25
**quartz** 128:7
**question** 9:5
14:15, 15:1
15:11, 15:15
15:16, 23:25
29:9, 29:11
29:16, 30:5
30:7, 30:9
30:10, 30:14
30:17, 32:13
36:7, 38:25
39:6, 39:14
39:16, 39:18
39:24, 40:17
40:24, 41:5
45:6, 45:17
47:22, 49:21
50:12, 50:13
50:14, 50:15
50:16, 50:18
50:20, 50:24
51:17, 51:20
54:7, 59:15
59:15, 60:10
63:20, 66:2
66:14, 68:6
68:10, 68:13
68:16, 68:21
69:10, 69:12
69:13, 71:24
71:25, 73:11
73:12, 73:17
73:21, 74:12
76:3, 76:4
76:20, 77:1
78:1, 79:23
80:1, 80:15
80:16, 80:18
82:16, 82:17
84:3, 86:4
86:11, 87:16
88:2, 88:5
88:10, 88:23

89:12, 92:16
95:8, 95:11
98:10, 101:3
108:16, 110:23
110:24, 111:4
111:18, 122:24
123:20, 123:22
123:23, 124:9
124:13, 125:17
126:14, 134:5
134:11, 134:11
136:24, 136:24
142:18, 142:18
142:21, 142:22
148:14, 149:9
150:12, 151:12
151:14, 151:15
152:2, 152:5
152:21, 152:23
152:24, 152:25
153:5, 153:10
154:18, 156:4
156:6, 156:13
156:14, 156:15
156:17, 156:24
157:3, 157:18
162:20, 167:3
179:13, 179:19
181:19, 181:22
181:23, 182:16
182:18, 182:19
182:20, 182:22
182:23, 185:23
185:25, 186:1
**questioning**
88:9
**questions** 15:25
60:2, 67:21
73:9, 107:2
112:10, 137:1
139:4, 153:19
155:1, 155:2
155:5, 155:10
164:13, 179:17
**quick** 129:17
158:8

**quickly** 38:18
**quiet** 168:7
169:18
**quietly** 168:22
170:20
**quite** 9:23
118:24
**quotes** 147:15

## R

**radiant** 144:5
**raise** 16:5
169:22
**raised** 45:18
46:2, 60:12
87:12, 87:14
88:2, 88:12
**raising** 60:2
**ran** 103:3
119:17, 149:11
**range** 160:2
160:12
**rapid** 164:2
**rapidly** 70:23
**rare** 55:2, 84:13
85:8, 85:18
152:10
**ratios** 178:6
**raw** 28:5, 111:6
128:7
**RAWLE** 2:8
**reach** 46:11
55:14, 78:17
79:3, 79:9
79:18, 80:5
**reached** 121:19
**reaching** 78:11
78:12
**reacted** 38:18
**read** 50:15
65:25, 66:22
71:7, 74:25
75:1, 77:16
80:14, 80:16
81:16, 82:9

85:11, 85:12
99:5, 118:21
128:4, 136:20
147:11, 153:16
164:11, 180:5
184:1, 185:24
186:1, 190:15
**reading** 61:22
62:24, 63:7
78:8, 139:3
171:1
**real** 74:2
169:23
**realize** 26:1
**really** 45:16
49:20, 81:21
131:12, 132:2
162:24, 168:20
168:22, 180:4
180:8, 180:11
189:20, 191:3
**reason** 70:20
112:15, 129:15
138:12, 138:20
**reasonable**
20:19, 21:1
21:15, 21:22
22:4, 160:2
160:12
**reasonably** 21:4
**reasons** 118:10
160:9
**REATH** 1:14
**REBECCA**
2:20
**rebuttals** 37:23
38:25
**recall** 12:18
23:7, 23:22
51:3, 51:9
51:16, 51:21
52:1, 61:3
61:13, 72:5
79:6, 82:2
89:16, 90:13
91:24, 95:13

111:23, 112:16
136:19, 140:19
146:11, 160:17
162:25, 176:22
176:25, 184:1
184:4
**received** 52:10
52:13
**recess** 54:11
106:18, 145:4
171:15
**recipient** 8:20
**recognize** 21:21
22:3, 22:10
133:1
**recognized**
22:11, 128:18
139:14
**recognizes**
22:15
**recollection**
96:19, 97:13
97:15, 97:19
97:20, 155:14
**recommend**
123:10, 123:24
124:10, 130:24
**recommendation**
123:11, 124:18
148:23, 165:15
**recommendati...**
132:17, 166:21
167:22
**recommended**
115:12, 117:6
117:14, 118:11
123:14, 125:2
127:6, 139:18
140:8, 142:19
145:13, 148:19
157:13, 170:19
**recommending**
131:1, 131:15
131:16, 147:5
161:3, 197:25
**record** 5:5, 5:9

15:17, 15:20
16:10, 47:15
54:10, 54:15
62:8, 66:22
73:15, 106:17
106:21, 132:8
145:3, 145:7
171:14, 171:19
195:20
**records** 49:7
50:11, 75:20
86:14, 114:9
114:13, 115:24
**Red** 2:4
**redacted** 34:18
**refer** 10:8
24:12, 25:13
74:21, 81:1
81:4, 102:3
150:23, 155:7
155:10, 158:2
192:17
**reference** 17:24
21:9, 62:5
65:15, 66:13
135:25, 136:10
151:16, 152:7
152:11, 152:16
152:19, 158:23
**referenced**
52:17, 62:3
110:20, 114:11
145:9, 189:5
**references**
141:10, 195:4
**referencing**
44:10, 107:6
**referred** 4:22
181:11
**referring** 35:7
35:9, 38:6
45:24, 50:3
50:9, 62:13
62:25, 66:2
69:18, 71:20
76:11, 81:22

93:3, 93:21
100:11, 115:15
151:21, 172:3
176:18, 181:12
184:7, 186:11
187:24
**refers** 23:22
24:9, 75:2, 93:6
93:9, 100:3
100:4, 107:19
186:22, 190:21
**refined** 125:15
**refining** 125:9
**reflected** 175:17
**reflects** 192:12
**refresh** 155:14
177:10
**refuses** 30:5
**refusing** 30:6
**refuted** 173:19
**regard** 10:4
27:3, 62:25
72:8, 131:6
**regarding** 58:17
64:17, 131:23
**regardless**
153:4, 158:25
**regular** 41:7
194:1
**regularly** 19:3
111:17
**regulate** 138:11
138:20
**regulated** 41:6
139:1, 139:2
**regulation** 17:5
71:14
**regulations** 13:3
13:11, 14:13
14:23, 34:6
67:7, 69:8
69:15, 69:17
**regulators**
103:8
**regulatory** 11:6
18:10, 46:8

105:8
**rejected** 126:23
**related** 7:14, 9:9
9:24, 12:21
17:6, 27:15
30:18, 47:9
47:19, 48:1
49:3, 49:19
50:5, 50:6, 51:6
51:15, 56:12
57:17, 63:1
64:2, 64:23
67:5, 68:9
69:25, 76:2
79:2, 79:15
84:15, 85:10
85:19, 87:3
101:9, 105:3
106:5, 108:2
111:23, 179:22
184:22, 185:18
186:16, 187:3
189:20, 189:21
**relating** 8:7
27:5, 86:24
**relation** 7:10
40:4
**relations** 56:3
56:8, 195:14
**relationship**
33:10, 40:4
46:17
**relative** 141:15
200:16, 200:18
**release** 34:10
36:12, 36:17
37:13, 37:17
43:8, 174:24
175:22, 187:11
187:12
**released** 34:22
35:4, 37:10
37:16, 98:8
98:18, 102:5
192:15
**relevant** 10:5

44:24, 44:25
45:3, 67:6
**reliability** 25:3
**reliable** 120:5
121:17, 124:5
125:10, 131:25
**reliably** 115:3
**relied** 59:5
59:18, 140:21
159:13
**rely** 18:16
70:11, 102:19
157:7
**remain** 13:3
**remarks** 81:5
**remember** 20:4
23:8, 43:6, 43:9
51:23, 51:25
107:20, 145:10
149:19, 176:7
176:12, 189:24
**removal** 164:3
**render** 16:20
**repeat** 14:22
21:20, 89:12
152:24, 153:1
165:16, 167:4
170:6
**repeatedly**
87:12, 88:2
140:9
**rephrase** 111:7
**report** 37:15
38:20, 90:6
93:13, 94:14
95:2, 96:3, 96:6
96:14, 96:17
96:19, 96:23
97:5, 97:15
97:18, 97:21
98:12, 112:13
112:24, 121:18
142:24, 143:6
152:12, 152:13
158:2, 162:15
162:16, 162:21

163:7, 172:17
172:19, 173:7
173:15, 174:5
174:11, 174:15
174:19, 174:21
174:25, 175:3
175:22, 177:4
178:1, 184:15
196:4, 196:8
197:4, 197:8
202:3, 202:12
202:17, 202:18
**reported** 92:11
120:6, 120:8
122:15, 173:22
174:6, 174:15
174:17, 175:8
178:16
**reporter** 1:13
5:10, 11:2
200:4
**reports** 18:22
25:12, 27:15
34:8, 36:10
36:19, 36:21
36:25, 84:4
90:14, 93:4
95:4, 96:25
97:2, 150:1
162:23, 176:14
176:16, 182:7
183:10, 185:13
185:21, 189:10
189:13, 189:16
**represent** 94:22
95:8, 98:11
98:23
**representation**
95:12
**representative**
7:6, 155:13
182:13
**represented**
93:15, 93:24
94:3, 94:5, 96:9
97:9

**representing** 5:5
**reproduce** 171:7
**request** 9:25 18:25, 34:17 34:20, 34:23 52:16, 166:14 197:13
**requesting** 52:14, 61:6
**require** 12:24 13:4, 14:13 14:23, 17:6 18:20, 62:18
**required** 19:5 86:20, 87:1 111:15, 119:4 132:24
**requirement** 143:16
**requiring** 71:13 164:2
**reread** 190:17
**research** 6:16 15:12, 35:24 59:5, 60:5 84:20, 148:1 201:11
**resolved** 68:24 69:24
**resources** 17:15 17:18, 17:20 18:4, 18:8, 23:1 23:4, 23:18 27:3
**respect** 31:13 39:6, 79:25 152:5
**respectfully** 135:8
**respectively** 164:5
**respond** 19:2 46:16, 59:6 59:19, 60:2

155:2
**responding** 59:3 59:16, 60:11 61:18, 155:4
**response** 68:12 81:8, 133:15 134:21, 135:24 151:23, 178:11 178:22, 192:1 192:9, 193:11 193:21, 194:25
**responses** 7:9
**responsibility** 19:8, 21:15 21:22
**responsible** 20:6 34:3, 57:3 61:18, 194:13
**responsive** 153:17, 154:19 180:6
**rest** 11:3, 57:19
**restate** 72:6 73:21
**result** 58:19 98:5, 103:15 110:18, 143:15
**results** 30:23 30:25, 32:20 56:18, 59:11 102:14, 102:20 103:9, 103:13 103:17, 103:21 103:22, 103:25 104:8, 104:21 104:25, 105:3 110:5, 110:22 110:24, 111:1 117:2, 121:20 160:16, 160:22 163:4, 171:8 173:13, 173:15 183:18, 184:11 187:8, 187:11 188:11, 189:8 190:8

**retained** 185:13
**retention** 49:11 49:19
**retest** 177:19
**retesting** 177:12
**retired** 12:3 12:7
**retracted** 38:21
**Reuters** 190:10 190:12, 191:10 191:25, 192:9 192:25, 193:2 193:3, 193:11 193:13, 193:21 194:5, 194:25
**revealed** 80:3
**review** 9:20 10:2, 17:15 19:20, 19:23 25:20, 27:18 30:23, 30:25 33:9, 38:8 47:16, 47:23 49:23, 50:22 50:25, 62:25 63:25, 64:1 75:3, 76:1 81:20, 82:3 95:16, 97:17 107:17, 112:21 120:24, 132:2 151:24, 157:17 168:12, 175:1
**reviewed** 7:14 8:1, 8:3, 21:7 50:3, 50:7 51:10, 57:22 57:24, 57:25 57:25, 58:14 80:7, 89:22 126:25, 127:8 130:4, 131:10
**reviewing** 19:24 116:10, 183:10
**reviews** 20:12
**revisited** 125:16

**revolving** 45:1 45:15
**Reynolds** 163:16
**Rich** 132:5 201:23
**right** 26:4, 38:4 45:22, 46:15 46:19, 49:13 49:16, 53:19 60:16, 62:10 63:19, 73:5 73:13, 99:18 104:18, 108:13 116:20, 117:9 118:11, 119:1 122:10, 122:21 125:18, 130:19 140:5, 142:13 146:17, 149:18 151:23, 153:5 154:6, 154:7 162:22, 162:22 168:7, 169:18 176:1, 177:21 187:13, 189:2 191:3, 197:14 199:8
**rigorous** 86:9
**risk** 14:21, 65:4 67:1, 107:12
**Road** 1:14, 3:4
**Robert** 147:23
**robust** 86:9
**rock** 75:17
**role** 12:21
**Rolle** 147:23
**ROME** 2:18
**Roth** 2:3, 3:12
**Roughly** 74:23
**rounding** 6:8
**routine** 128:24
**routinely** 19:3 108:7
**RTM** 65:7
**rule** 62:17

63:22, 119:12
**Rules** 1:12
**run** 108:18 116:13, 121:25

**S**

**safe** 20:20 20:24
**safety** 13:6 13:12, 13:15 13:25, 14:15 14:25, 15:9 15:11, 15:14 17:6, 17:10 17:16, 18:21 19:4, 19:9 19:10, 19:25 20:12, 20:25 22:7, 34:1 39:11, 40:1 40:12, 42:22 44:6, 45:2, 45:9 45:19, 46:2 46:9, 55:17 56:4, 56:12 56:15, 59:4 59:17, 60:3 60:12, 63:1 63:25, 64:2 86:21, 86:25 110:16, 110:25 193:13, 193:24 193:25, 194:13
**Sam** 41:24 42:16
**sample** 27:5 72:18, 117:19 133:20, 141:1 141:18, 143:15 162:18, 177:5 178:3
**samples** 28:21 29:3, 31:11 32:1, 32:9 32:10, 33:13

| | | | | |
|---|---|---|---|---|
| 33:14, 119:18 | 146:4, 146:9 | 16:1, 16:5, 16:6 | 84:20, 84:24 | **seeing** 23:22 |
| 141:17, 143:9 | 146:13, 146:16 | 45:13, 45:14 | 90:18, 95:4 | 51:3, 51:9 |
| 160:18, 161:23 | 148:2, 149:18 | 79:21, 79:24 | 96:4, 96:16 | 51:16, 51:21 |
| 176:17, 177:13 | 149:22, 150:1 | 166:15 | 97:4, 99:11 | 57:19, 82:2 |
| 185:13, 198:10 | 160:3, 160:14 | **scratch** 89:2 | 103:9, 104:12 | 89:16, 96:19 |
| 198:14 | 160:15, 160:17 | **screen** 144:17 | 104:13, 114:15 | **seen** 6:2, 6:10 |
| **sat** 183:16 | 160:23, 164:22 | 173:11, 195:22 | 116:2, 116:16 | 38:4, 38:9 |
| **satisfy** 72:2 | 166:8, 166:12 | **screening** | 120:7, 120:8 | 47:25, 57:14 |
| **saw** 6:5, 44:10 | 169:5, 169:9 | 117:19, 128:25 | 120:13, 120:14 | 57:17, 57:18 |
| 81:23, 162:21 | 169:10, 169:18 | **se** 88:10, 91:25 | 120:15, 122:1 | 62:5, 64:22 |
| **saying** 46:16 | 170:4, 177:2 | **search** 50:5 | 122:5, 122:9 | 70:5, 72:12 |
| 49:4, 51:12 | 180:20, 190:10 | **searched** 48:25 | 128:3, 128:8 | 90:21, 99:7 |
| 69:2, 73:3, 75:8 | 190:18, 192:6 | **searching** 9:22 | 128:15, 130:5 | 103:4, 121:5 |
| 75:9, 77:21 | 197:14 | **second** 26:24 | 130:18, 130:21 | 124:22, 124:23 |
| 88:4, 91:24 | **scan** 116:14 | 38:12, 70:20 | 132:22, 133:4 | 130:3, 131:19 |
| 93:8, 109:1 | 116:14, 116:14 | 90:20, 92:7 | 133:21, 137:24 | 134:20, 140:18 |
| 110:13, 120:20 | 116:15 | 108:10, 120:9 | 140:16, 140:25 | 144:7, 145:23 |
| 129:9, 129:11 | **scanning** 130:8 | 120:24, 126:19 | 141:2, 141:13 | 148:12, 148:14 |
| 130:22, 133:21 | 163:22, 177:6 | 128:4, 129:10 | 141:15, 141:20 | 148:22, 161:7 |
| 135:7, 136:7 | 197:15 | 159:25, 176:2 | 142:7, 143:3 | 164:8, 166:6 |
| 144:4, 154:6 | **scenario** 195:21 | 188:24, 190:9 | 143:10, 143:19 | 169:2, 171:3 |
| 161:14, 161:15 | **Schaffner** | **section** 74:21 | 144:7, 144:23 | 173:9, 176:14 |
| 174:5, 181:2 | 175:21 | 75:13, 85:1 | 145:21, 146:4 | 176:16, 176:21 |
| 181:8, 182:1 | **school** 140:15 | **Sector** 42:4 | 146:11, 146:14 | 177:2, 188:14 |
| 186:24 | 140:20, 141:12 | **security** 194:2 | 146:21, 147:21 | **selected** 119:7 |
| **says** 24:6, 26:16 | 141:24, 142:20 | 194:10 | 148:10, 149:24 | **selection** 75:18 |
| 27:2, 33:2, 52:9 | 142:25, 143:7 | **see** 7:10, 24:5 | 150:3, 150:5 | **SELVAGGIO** |
| 58:14, 64:24 | 165:3, 189:17 | 24:6, 24:8 | 150:6, 158:13 | 1:7 |
| 65:14, 65:24 | 196:1, 197:5 | 24:10, 24:15 | 158:14, 158:14 | **send** 46:15 |
| 67:2, 67:3 | 197:11, 197:20 | 25:8, 26:16 | 158:23, 159:5 | 90:14, 103:25 |
| 70:10, 70:22 | 202:3 | 26:19, 26:20 | 159:6, 159:10 | **senior** 6:16 |
| 75:13, 78:9 | **science** 8:11 | 26:25, 27:2 | 159:18, 159:23 | **sense** 134:25 |
| 89:25, 92:14 | 61:15 | 27:7, 32:17 | 159:25, 160:6 | 135:6, 171:3 |
| 92:22, 95:5 | **Sciences** 107:23 | 33:12, 35:14 | 160:20, 160:25 | **sensitive** 116:11 |
| 96:16, 99:16 | **scientific** 44:22 | 36:7, 36:13 | 161:2, 162:6 | 116:20, 117:7 |
| 101:13, 108:5 | 62:20, 63:10 | 36:22, 37:2 | 162:16, 163:2 | 117:20, 118:9 |
| 116:2, 116:3 | 63:21, 64:1 | 37:20, 39:2 | 163:5, 163:13 | 122:20, 123:9 |
| 116:7, 118:11 | 68:21, 84:5 | 39:4, 39:8 | 164:5, 164:10 | 124:6, 125:24 |
| 118:13, 118:22 | 85:20, 86:9 | 43:17, 43:18 | 164:15, 166:5 | 126:7, 126:16 |
| 119:3, 119:6 | 113:2, 113:17 | 48:12, 52:18 | 166:12, 166:18 | 127:7, 130:23 |
| 120:15, 121:22 | 124:14, 191:1 | 58:8, 58:10 | 167:23, 168:14 | 131:8, 131:16 |
| 128:3, 129:13 | 195:4 | 58:13, 58:14 | 168:25, 171:2 | 133:2, 133:10 |
| 129:14, 129:14 | **scientifically** | 58:22, 61:1 | 176:4, 177:7 | 133:16, 133:17 |
| 129:22, 130:7 | 195:6 | 63:8, 65:8, 66:4 | 178:7, 178:24 | 134:14, 134:22 |
| 138:4, 141:15 | **scientists** 20:20 | 70:18, 75:20 | 184:25, 189:20 | 134:23, 135:3 |
| 143:5, 144:15 | **scope** 15:24 | 76:10, 81:18 | 191:4 | 135:15, 135:22 |

136:1, 137:6
197:16
**sensitivity** 25:3
115:5, 115:10
116:13, 118:25
126:4, 130:11
130:14, 131:6
131:8, 133:14
133:22, 134:2
134:7
**sent** 46:12, 95:2
95:14, 96:4
97:16, 103:14
103:18, 104:15
105:21, 162:17
185:12, 185:20
185:22, 187:2
187:4
**sentence** 65:23
93:9, 118:22
**separate** 68:13
124:22
**separated** 141:1
160:19
**separation**
26:17, 144:6
166:16
**September**
90:17
**series** 172:24
**serpentine**
98:24, 141:20
197:22
**service** 26:17
41:9, 41:14
**SERVICES**
1:22
**set** 200:14
**sets** 186:21
**seven** 122:13
122:15
**severe** 80:13
80:22, 81:14
**shafts** 76:18
77:3, 182:8
**shape** 128:24

**shaping** 194:23
**share** 19:4
103:22
**shared** 23:21
101:10
**sheet** 147:8
**shelf** 100:5
100:13, 100:24
101:1, 101:21
**Shelley** 145:25
146:4, 150:1
**ship** 14:1
**shooting** 151:24
**shortcomings**
114:21
**Shorthand**
200:4
**show** 30:19
30:21, 38:5
38:7, 69:17
74:6, 91:4
99:18, 115:23
132:4, 137:12
148:10, 159:2
168:10, 185:20
185:22, 188:8
192:14
**showed** 53:17
98:5, 101:24
124:5, 125:8
169:14, 169:15
170:3, 171:9
180:15
**Shower** 37:13
37:13, 75:24
75:25, 91:2
91:2, 91:11
91:12, 92:4
92:4, 95:10
95:10, 95:21
95:21, 96:11
96:11, 96:21
96:21, 97:10
97:11, 113:20
113:20, 175:5
175:6, 176:20

176:21, 177:5
177:5, 177:23
177:23, 192:19
192:19
**showing** 39:12
71:18, 100:19
178:5
**shown** 92:12
92:25, 100:25
161:9
**shows** 122:3
129:4, 129:21
141:17, 160:23
**shred** 90:25
91:10, 91:16
**side** 61:16
61:20, 62:1
62:23, 63:2
63:5, 64:5
64:12, 64:19
**significant**
26:23, 53:8
56:18, 59:25
**significantly**
115:10
**simple** 30:13
30:13, 30:16
150:12, 153:9
153:9, 156:3
156:4
**simply** 133:2
133:10
**single** 28:24
98:5, 98:11
98:12, 98:17
98:19, 100:18
103:15
**sit** 28:23, 29:17
31:13, 32:3
32:14, 41:19
79:7, 79:16
80:2, 93:7, 96:8
96:17, 97:7
101:24, 108:17
109:24, 140:7
157:18, 157:22

172:4, 172:8
**sitting** 162:22
**six** 122:5
122:12, 122:15
178:4
**slight** 141:17
**slowly** 177:2
**small** 68:20
118:24, 162:3
**SMITH** 2:20
13:8, 13:17
13:19, 14:3
14:10, 14:18
15:3, 15:16
15:23, 16:7
16:13, 16:21
17:2, 17:8
17:17, 18:6
18:12, 18:17
18:23, 19:12
19:17, 20:14
20:22, 21:5
21:19, 22:1
22:8, 22:13
22:20, 23:3
23:16, 23:24
24:16, 24:20
24:22, 25:9
25:14, 26:7
26:10, 26:14
27:12, 27:22
28:13, 29:1
29:10, 29:22
30:2, 30:6
30:10, 30:15
31:17, 31:19
32:6, 32:21
34:2, 34:12
34:25, 35:6
35:16, 39:17
40:14, 40:22
41:4, 41:11
41:17, 41:23
42:11, 42:24
43:4, 43:11
43:21, 44:3

44:16, 44:19
45:4, 45:12
45:23, 46:6
46:21, 46:23
47:4, 48:6
48:21, 49:6
49:10, 49:17
49:25, 50:17
50:21, 51:2
51:8, 51:19
51:24, 52:24
53:7, 53:13
53:22, 53:24
54:6, 54:25
55:20, 55:25
56:7, 56:14
56:23, 57:1
57:23, 59:8
59:20, 60:6
60:9, 60:17
60:20, 61:23
62:4, 62:11
63:6, 63:18
64:13, 64:17
65:13, 65:20
66:1, 67:14
67:19, 68:11
68:15, 69:3
69:9, 69:16
70:1, 71:17
72:4, 73:1
73:14, 74:11
74:17, 76:24
77:9, 77:24
78:7, 78:14
78:18, 78:22
79:4, 79:10
79:20, 80:6
80:14, 80:17
80:23, 82:1
82:8, 82:14
82:21, 83:4
83:10, 83:14
83:19, 83:24
84:8, 84:17
86:1, 86:5

| | | | | |
|---|---|---|---|---|
| 86:16, 86:22 | 165:7, 165:24 | 23:4, 23:17 | **specification** | 125:13, 125:22 |
| 87:8, 87:21 | 166:25, 167:11 | 28:9, 29:7 | 65:16, 66:3 | 140:1, 170:5 |
| 91:14, 91:17 | 168:3, 168:8 | 45:16, 49:12 | 66:10, 119:23 | **standards** 22:7 |
| 91:23, 93:19 | 169:1, 169:8 | 49:20, 110:9 | 132:7, 132:23 | 144:9, 192:8 |
| 95:1, 95:24 | 169:19, 170:9 | 114:25, 133:24 | 148:23, 149:23 | **stands** 107:21 |
| 96:1, 96:12 | 170:15, 170:22 | 136:15, 137:2 | **specifications** | **start** 182:25 |
| 96:22, 97:12 | 170:25, 172:1 | 183:24, 184:5 | 65:6, 66:17 | **started** 6:12 |
| 97:14, 97:24 | 173:24, 180:7 | 191:20, 193:20 | 104:14, 148:4 | 11:9, 12:6 |
| 100:2, 100:21 | 180:9, 180:12 | **speakerphone** | 148:18 | 15:18 |
| 101:8, 102:2 | 181:9, 182:6 | 2:8, 2:13, 3:3 | **specificity** 119:1 | **starting** 7:16 |
| 109:15, 114:5 | 182:17, 183:15 | **speaking** 12:12 | 151:18, 160:7 | 68:18, 106:2 |
| 114:24, 115:7 | 184:18, 185:19 | **speaks** 179:4 | **specifics** 79:6 | **starts** 25:17 |
| 115:22, 116:22 | 186:2, 186:18 | **special** 89:18 | **specify** 156:20 | 104:9, 169:22 |
| 121:9, 122:22 | 187:14, 187:22 | **specialized** | **speech** 135:18 | **state** 1:13, 13:11 |
| 124:2, 125:6 | 192:3, 194:16 | 26:22 | 154:22 | 36:24, 73:14 |
| 126:9, 132:10 | 195:1, 195:15 | **species** 81:7 | **speed** 175:11 | 90:20, 92:7 |
| 132:19, 133:8 | 199:21 | **specific** 18:25 | **Spell** 11:2 | 128:20, 132:22 |
| 133:12, 134:6 | **sold** 74:14, 76:6 | 20:4, 39:6, 51:3 | **Sperry-Rand** | 189:25, 200:4 |
| 134:18, 135:19 | 76:14, 76:22 | 51:9, 51:16 | 176:3, 176:7 | 200:24 |
| 136:8, 136:12 | 77:6, 77:22 | 51:21, 55:3 | 176:9, 176:13 | **stated** 20:24 |
| 136:17, 136:20 | **somebody** 46:3 | 64:2, 68:6, 72:5 | 176:15, 176:19 | 90:4, 117:3 |
| 137:8, 137:10 | 46:9, 114:14 | 83:21, 88:5 | 177:6, 177:12 | 160:10, 160:10 |
| 137:15, 137:17 | 176:13 | 95:7, 95:13 | 177:17, 177:23 | **statement** 13:14 |
| 137:20, 138:8 | **sorry** 60:10 | 112:1, 113:1 | 178:1, 178:10 | 14:7, 18:1 |
| 138:15, 138:24 | 176:19, 187:18 | 113:7, 113:10 | **spiked** 120:10 | 36:11, 52:15 |
| 139:22, 140:12 | **sort** 86:7 | 113:15, 144:14 | 120:12, 120:16 | 72:5, 78:8 |
| 144:3, 144:12 | 162:13 | 159:6, 161:10 | 120:16, 121:23 | 95:13, 134:10 |
| 145:16, 146:25 | **sounds** 23:8 | 176:22, 184:6 | 121:24, 122:7 | 134:20, 135:1 |
| 148:21, 149:3 | 91:3, 164:24 | 184:13, 186:23 | 160:18 | **statements** |
| 149:14, 150:10 | 165:15, 166:2 | **specifically** 8:2 | **spoke** 10:24 | 38:21, 71:22 |
| 151:1, 151:5 | **source** 30:21 | 8:3, 8:22, 9:6 | 10:25, 11:20 | **states** 26:21 |
| 151:8, 151:13 | 31:1, 77:11 | 9:7, 30:1, 31:5 | 12:8, 25:11 | 43:14, 61:3 |
| 152:9, 152:22 | 92:10, 92:15 | 42:22, 45:25 | 61:5, 127:2 | 72:15, 74:21 |
| 153:6, 153:12 | 92:19, 102:24 | 47:20, 66:15 | 175:8 | 81:5, 85:2 |
| 153:20, 153:23 | 108:19, 108:23 | 77:12, 88:9 | **spoken** 77:16 | 103:4, 127:22 |
| 153:25, 154:3 | 109:7, 138:22 | 89:9, 93:12 | **Square** 2:18 | 128:17, 130:9 |
| 154:12, 154:16 | 183:2 | 94:22, 96:9 | **SRD** 135:14 | 130:10, 147:23 |
| 154:23, 155:4 | **sourced** 32:16 | 98:23, 100:11 | **staff** 52:22, 53:5 | 159:20, 178:1 |
| 155:7, 155:12 | 32:18, 107:3 | 104:4, 126:23 | 53:19, 54:2 | **stating** 25:1 |
| 155:17, 155:21 | 109:14, 111:10 | 135:23, 140:19 | **staining** 163:24 | 73:23 |
| 155:25, 156:5 | 111:20 | 141:6, 144:4 | **stand** 180:23 | **stationery** |
| 156:10, 156:12 | **sources** 102:11 | 149:7, 163:1 | **standard** 47:11 | 149:17 |
| 156:19, 157:2 | 108:21, 181:17 | 176:7, 176:25 | 70:24, 72:7 | **stay** 92:15 |
| 157:4, 157:10 | 182:4 | 179:25, 180:19 | 111:14, 111:16 | 102:8 |
| 157:15, 158:1 | **speak** 8:24 | 182:10, 184:24 | 112:8, 112:11 | **stenographic** |
| 161:6, 164:21 | 10:21, 17:18 | 195:11 | 124:8, 124:11 | 5:8 |

stenographically 137:23, 151:24
200:12
step 116:14
117:19, 129:9
129:10, 130:8
163:22, 197:15
sticker 33:19
33:21
Stony 52:14
stop 73:19
153:13, 153:14
153:18, 153:18
154:5, 154:8
154:11, 154:12
154:16, 199:18
stopped 28:19
35:3
story 73:8
190:24, 193:4
straight 72:20
straightforward
164:1
strange 134:3
Street 1:22, 2:8
strike 134:10
135:9, 152:4
154:19
striving 134:2
strongly 38:16
81:12, 130:13
structure 93:9
structured 41:7
structures 99:25
Stuart 23:5
23:10, 23:13
26:17
studied 85:3
92:10, 92:25
studies 67:22
83:6
study 107:17
159:20
stuffed 109:23
subject 35:19
36:12, 60:25
74:20, 132:6

137:23, 151:24
163:12, 168:12
175:5, 188:18
subjects 199:19
submission 99:2
99:9, 195:22
198:12, 202:19
submissions
92:11, 157:8
159:13, 188:17
188:22
submit 37:23
submitted 36:10
36:20, 177:5
subsequent
129:3, 129:20
198:12
substance 16:19
substantiate
19:9
substantiated
13:6, 13:12
13:24
substantive 52:4
52:8
subtrace 71:5
success 144:22
successful
170:13
sued 49:15
suffer 118:23
suffering 56:3
sufficient 25:3
53:1, 174:9
suggested 124:7
144:22
suggesting
199:9
suggests 21:1
84:13, 85:8
Suite 1:22
suits 49:18
summarizing
188:3
summary 81:5
188:10

Superior 1:1
1:12
supplied 111:2
114:2
supplier 132:20
suppliers 132:9
support 59:6
60:5, 62:20
63:4, 63:10
63:15, 63:21
64:7, 91:10
111:20
supposed 25:22
supposedly
63:10
suppress 169:11
sure 10:10
14:23, 15:6
16:8, 17:9
25:21, 32:11
37:5, 42:6
57:16, 59:21
73:23, 84:2
88:23, 91:5
93:8, 107:5
125:10, 125:16
129:16, 158:3
162:17, 173:8
178:17, 179:10
191:9, 191:23
195:5
surprised
165:14, 180:1
180:4, 184:6
survey 29:2
30:24, 92:15
93:21, 100:4
101:10, 101:14
109:3, 109:5
111:5
surveys 29:23
29:25, 95:15
100:12, 182:8
SUSAN 1:9, 4:3
suspect 21:2
21:16, 21:23

22:5
suspected
141:19
swear 5:11
switched 109:9
sworn 5:13
200:7
symposia
189:25
system 19:24
104:9
systems 9:14
81:11
Szczepaniak
11:1, 194:11

T

T.H 145:25
tab 107:18
107:19, 108:4
186:12
table 141:16
142:7, 160:22
160:23, 177:12
tables 151:21
tag 74:9
take 8:18, 33:15
43:6, 58:4
81:20, 105:12
106:14, 129:9
144:25, 155:21
161:18, 171:11
taken 1:12
54:11, 100:13
106:18, 145:4
171:15, 193:5
200:12
talc 1:4, 1:7
2:10, 6:20, 6:25
7:9, 7:24, 8:7
12:24, 16:25
17:7, 17:21
18:5, 18:22
20:13, 21:17
21:24, 22:5

22:11, 22:21
23:2, 23:15
24:14, 25:25
27:10, 27:20
28:4, 28:11
28:20, 28:21
28:24, 29:12
29:19, 30:21
31:2, 31:2
31:15, 34:4
34:8, 35:20
36:6, 37:18
37:25, 38:14
39:7, 39:11
40:2, 40:7
40:21, 41:2
42:22, 44:2
44:6, 45:9
45:19, 46:3
48:14, 49:15
49:20, 51:7
51:15, 63:1
63:25, 65:2
65:3, 65:6
65:14, 66:3
66:11, 66:14
66:15, 66:18
66:24, 66:25
67:5, 67:7
69:13, 70:25
71:1, 71:2, 71:3
71:4, 72:17
74:14, 74:14
74:20, 74:24
75:2, 75:4, 75:7
75:7, 75:10
75:15, 76:5
76:9, 76:10
76:14, 76:14
76:19, 76:22
77:3, 77:6, 77:6
77:12, 77:13
77:21, 77:22
78:6, 78:10
78:16, 79:2
79:9, 79:18

80:4, 80:13
80:22, 81:15
82:6, 82:12
82:17, 83:7
83:13, 83:16
83:16, 83:20
83:22, 84:5
84:13, 84:16
84:20, 85:2
85:3, 85:8
85:11, 87:11
87:19, 87:23
88:1, 88:5, 88:6
88:22, 89:18
90:4, 92:9
92:19, 92:23
94:5, 94:23
103:9, 105:4
106:1, 106:10
107:25, 108:11
108:18, 109:1
109:4, 109:6
109:8, 109:13
110:14, 111:1
111:10, 111:20
111:23, 112:2
113:4, 113:12
115:19, 116:2
118:15, 120:16
120:16, 121:14
121:23, 121:23
121:24, 122:8
124:1, 124:12
125:4, 127:13
127:17, 128:5
128:13, 128:20
129:1, 132:6
132:9, 132:24
133:3, 133:11
134:15, 135:16
138:6, 138:14
138:17, 139:12
139:21, 141:1
142:4, 142:9
143:1, 143:9
144:17, 146:14

146:24, 147:2
147:16, 147:21
148:4, 148:7
148:9, 149:12
150:2, 150:8
150:14, 156:9
156:17, 156:25
157:14, 157:25
158:12, 159:8
159:22, 160:24
160:25, 161:25
162:2, 162:14
163:13, 166:9
166:17, 168:13
172:24, 175:5
175:15, 175:19
176:3, 176:6
176:10, 176:20
176:21, 178:7
179:4, 179:11
180:2, 180:21
181:1, 181:8
182:1, 182:2
182:4, 182:5
182:9, 182:14
182:15, 182:22
182:24, 183:2
183:3, 183:12
184:22, 184:23
185:8, 185:18
186:17, 187:19
190:6, 190:13
190:25, 191:2
193:12, 193:25
194:13, 201:10
201:20, 202:6
**talc-containing**
25:5
**talcs** 28:1, 28:17
29:3, 130:16
**talcum** 22:17
33:9, 172:7
190:13, 193:8
**talk** 12:19, 30:2
30:4, 36:15
65:10, 67:4

93:11, 136:3
136:12, 136:15
151:10, 154:20
170:1, 194:15
194:17
**talked** 54:19
124:25, 136:22
**talking** 68:2
74:2, 75:23
75:24, 112:18
122:23, 131:21
139:7, 147:10
152:12, 155:25
169:22, 176:8
184:13, 188:10
188:20, 190:21
192:4, 192:24
193:14, 194:10
194:11
**talks** 24:5, 24:25
25:25, 38:13
39:4, 43:7, 58:8
70:6, 76:5, 92:4
116:6, 120:9
121:12, 130:6
138:1, 140:25
149:18, 152:16
159:25, 160:22
161:22, 163:15
167:21, 169:7
190:10
**team** 194:7
**tease** 22:24
**TEC** 1:6
**technical** 162:24
**technically**
165:16, 167:14
169:15, 170:4
171:5
**technique**
148:20, 150:3
160:1, 160:11
161:13, 161:20
163:24, 167:25
168:6, 171:24
172:11, 196:17

**techniques** 74:3
148:5, 149:23
152:18, 168:21
**technologic**
59:23
**technology**
52:11, 168:24
**telephone** 52:10
**tell** 32:23, 33:13
41:19, 51:25
57:20, 73:8
94:24, 103:24
104:2, 104:4
105:14, 127:10
150:19, 150:19
150:24, 151:15
152:5, 152:8
158:8, 160:6
194:3
**telling** 142:15
180:25, 181:5
**TEM** 123:8
123:11, 123:15
123:17, 123:24
124:3, 124:12
125:22, 126:3
133:1
**ten** 6:7, 6:11
74:23, 78:3
**term** 40:3
**terminology**
48:8
**terms** 45:1, 94:5
110:17, 112:5
158:17
**test** 27:15, 28:24
29:12, 31:9
32:20, 59:10
98:5, 100:18
100:25, 102:13
103:12, 103:15
103:17, 103:21
103:25, 104:8
104:21, 105:3
108:18, 109:12
109:16, 109:21

110:5, 110:18
110:22, 110:24
111:1, 111:15
112:3, 115:3
120:4, 121:12
121:15, 121:20
122:15, 123:8
126:2, 126:10
126:10, 163:4
171:23, 172:9
176:3, 176:9
181:6, 190:8
192:7, 197:19
**tested** 28:7
28:17, 28:21
29:13, 31:6
31:15, 31:20
31:24, 32:1
32:15, 100:7
100:13, 101:5
102:6, 102:11
107:5, 125:15
162:18, 172:24
176:6, 181:3
182:14
**testified** 75:14
135:9
**testify** 102:15
102:17, 136:5
200:8
**testimony** 81:24
88:11, 94:11
135:9, 139:3
152:4, 186:14
200:12
**testing** 6:25, 7:7
7:18, 7:20, 7:21
7:24, 8:7, 9:15
12:9, 16:25
17:6, 17:21
17:25, 18:4
18:21, 23:2
23:15, 25:15
27:10, 27:13
27:20, 27:24
28:1, 28:2, 28:4

| | | | | |
|---|---|---|---|---|
| 28:5, 28:11 | 176:17, 177:17 | 127:19, 132:11 | 145:7, 146:22 | 199:20 |
| 28:20, 29:19 | 177:23, 181:25 | 133:1, 134:3 | 148:9, 148:10 | **today's** 9:20 |
| 30:20, 31:7 | 182:3, 184:3 | 137:15, 142:3 | 148:24, 149:2 | 10:7, 21:10 |
| 31:23, 32:7 | 184:22, 185:17 | 144:10, 154:19 | 149:4, 150:7 | 43:24, 47:17 |
| 34:1, 34:8, 35:3 | 185:21, 186:15 | 165:8, 165:25 | 150:13, 153:15 | 47:24, 48:3 |
| 44:6, 51:15 | 186:20, 186:22 | 170:2, 182:18 | 154:11, 159:3 | 48:17, 49:22 |
| 56:16, 56:18 | 186:25, 187:1 | 187:11, 189:5 | 164:2, 164:14 | 51:1, 51:13 |
| 56:19, 59:10 | 189:8, 189:21 | 192:21, 193:1 | 164:15, 171:10 | 57:22, 89:23 |
| 59:24, 64:17 | 190:1, 190:6 | 193:3, 194:3 | 171:12, 171:17 | 127:9, 190:16 |
| 64:23, 65:11 | 190:7, 190:22 | 199:18 | 174:13, 176:1 | 192:24, 199:23 |
| 66:13, 66:21 | 190:25, 191:2 | **thinking** 10:18 | 176:24, 185:16 | **toiletry** 123:13 |
| 68:4, 68:5 | 192:18, 193:7 | 125:14 | 187:16, 187:21 | 127:19, 148:2 |
| 68:23, 70:3 | 196:24, 197:12 | **thinks** 174:8 | 199:22, 200:13 | 149:8 |
| 79:22, 88:18 | **tests** 32:4 | **third** 116:7 | **times** 28:3, 28:3 | **told** 36:15 |
| 90:15, 97:3 | 104:12, 104:13 | **thought** 86:9 | 28:17, 36:10 | 36:16, 44:14 |
| 100:1, 101:24 | 104:25, 116:24 | 173:5, 173:18 | 112:22, 134:1 | 44:18, 46:19 |
| 102:16, 102:21 | 117:1, 117:1 | 173:21, 174:17 | 145:10, 164:4 | 73:19, 79:8 |
| 103:9, 103:9 | 117:5, 117:7 | 179:14 | 170:7 | 79:17, 89:9 |
| 104:8, 104:10 | 118:8, 121:25 | **thousands** | **tiny** 99:6 | 89:13, 90:10 |
| 106:4, 106:10 | 158:18, 186:6 | 110:21, 110:22 | **title** 61:13 | 90:24, 91:9 |
| 107:2, 107:4 | 198:1 | **three** 106:8 | 142:25 | 91:19, 91:22 |
| 107:14, 108:1 | **thanks** 5:18 | 107:7, 186:21 | **titled** 24:14 | 92:18, 93:15 |
| 108:7, 108:11 | 192:21 | 193:25 | **today** 7:4, 8:15 | 93:17, 93:25 |
| 108:21, 108:22 | **theme** 190:11 | **throw** 129:18 | 9:1, 9:25, 10:17 | 94:3, 94:12 |
| 109:18, 109:19 | 191:10 | **Tim** 11:20 | 13:3, 16:8 | 95:20, 95:22 |
| 109:25, 110:10 | **theoretical** | **time** 5:7, 6:5 | 25:20, 28:23 | 98:4, 99:24 |
| 111:17, 113:10 | 107:9 | 7:21, 8:18, 11:8 | 29:17, 30:20 | 105:3, 127:4 |
| 114:22, 115:12 | **thereto** 7:10 | 14:15, 14:25 | 31:14, 32:3 | 138:19, 158:20 |
| 115:16, 120:22 | **thermal** 116:15 | 17:24, 28:10 | 32:14, 36:4 | 162:12, 178:14 |
| 123:25, 124:7 | **thin** 72:20 | 33:19, 35:24 | 41:19, 52:3 | 183:6, 183:10 |
| 124:11, 125:22 | **thing** 24:6 | 37:11, 37:23 | 74:7, 79:7 | 190:23 |
| 126:4, 126:17 | 45:20, 46:19 | 42:19, 46:2 | 79:16, 79:21 | **top** 23:7, 140:25 |
| 126:22, 131:23 | 56:5, 95:19 | 54:8, 54:15 | 80:2, 82:4 | 178:7 |
| 132:17, 134:22 | 107:11, 112:18 | 58:4, 66:19 | 88:11, 93:14 | **topic** 54:2, 55:3 |
| 135:6, 135:12 | 165:17 | 68:20, 69:23 | 93:16, 96:8 | 57:18, 66:20 |
| 137:6, 139:11 | **things** 56:9 | 71:22, 72:25 | 96:18, 101:24 | 113:10, 126:25 |
| 140:2, 140:22 | 58:6, 94:18 | 81:16, 81:23 | 108:17, 109:24 | **topics** 10:22 |
| 142:1, 142:3 | 107:7, 112:21 | 97:24, 104:23 | 110:12, 121:4 | 53:8 |
| 142:5, 142:10 | 152:20, 195:5 | 106:1, 106:15 | 127:1, 131:20 | **totality** 18:25 |
| 142:12, 142:16 | 199:5, 199:18 | 106:21, 109:11 | 136:5, 140:7 | **totally** 34:23 |
| 142:19, 142:23 | **think** 16:3, 16:6 | 110:5, 113:19 | 148:17, 148:24 | 68:24, 117:23 |
| 144:8, 148:20 | 18:1, 42:16 | 119:3, 123:17 | 150:7, 150:13 | **toxicologist** |
| 157:14, 157:21 | 45:7, 45:10 | 123:19, 125:12 | 152:20, 157:19 | 11:22 |
| 158:8, 158:10 | 53:18, 55:2 | 131:25, 132:20 | 157:22, 164:9 | **toxicology** 78:15 |
| 158:11, 160:16 | 63:22, 103:15 | 139:10, 141:23 | 172:5, 180:15 | 78:19, 78:24 |
| 170:12, 176:16 | 117:25, 120:25 | 144:7, 145:2 | 192:10, 194:8 | 79:11 |

**trace** 178:21
183:11
**traces** 141:17
148:10
**track** 47:9
**trade** 20:2
41:15, 99:3
119:21, 125:3
132:13, 201:21
**trail** 153:13
**trained** 27:4
**training** 5:19
6:22
**transcript** 1:11
153:16, 154:8
154:11, 155:22
200:11
**transmission**
118:18, 123:6
131:4, 132:25
**transmitted**
38:24
**treatises** 151:22
**tremolite** 67:12
67:18, 67:21
67:25, 68:3
68:9, 68:19
69:1, 69:6
69:11, 69:14
69:25, 71:3
71:5, 71:12
71:15, 72:1
72:3, 72:15
72:19, 72:23
73:3, 73:24
74:9, 83:12
84:12, 85:3
85:6, 85:7
89:10, 89:14
90:3, 98:20
115:14, 115:18
120:10, 120:11
120:12, 120:15
120:17, 120:18
120:21, 120:22
121:22, 121:23

122:4, 122:4
122:7, 122:8
122:20, 123:4
125:25, 126:8
126:17, 126:18
127:12, 129:12
141:12, 141:18
141:25, 143:2
143:8, 144:18
146:19, 146:24
147:1, 147:17
148:10, 148:13
151:25, 163:19
163:25, 178:21
178:23, 191:14
196:16, 197:2
199:3
**troublesome**
165:11, 165:23
166:1
**true** 31:18, 32:5
35:1, 46:24
49:24, 59:7
75:5, 75:6
109:14, 111:3
111:22, 114:2
114:3, 126:2
167:13, 170:14
183:13, 183:14
184:11, 188:18
191:8, 200:11
**truly** 180:6
**truth** 87:1, 87:1
87:3, 93:18
200:8, 200:8
200:9
**try** 140:4, 171:6
**trying** 26:5
73:4, 112:1
115:3, 120:19
135:5, 169:11
192:20, 199:13
**Tuesday** 1:14
5:6
**turn** 65:7, 65:24
**Turnpike** 2:13

**two** 25:18, 31:8
38:15, 60:19
94:18, 113:14
115:20, 116:19
117:5, 117:6
117:20, 121:1
160:17, 164:5
175:9, 181:10
181:16, 181:23
185:14, 186:21
186:22, 187:3
**type** 56:5, 70:15
73:6, 141:16
147:17

## U

**ultimately**
116:18, 117:4
140:4, 168:5
188:2
**Um-hum** 94:10
**umbrella** 187:1
**unacceptable**
129:2, 129:15
**unclear** 93:2
**uncontrolled**
102:19
**understand**
7:20, 8:13, 15:5
15:5, 15:8
15:13, 18:14
18:18, 18:19
18:24, 19:14
26:4, 34:16
37:21, 41:5
49:13, 56:11
68:13, 68:16
71:10, 73:13
76:13, 76:21
80:18, 81:21
87:7, 93:16
93:18, 93:20
97:5, 98:20
112:4, 115:2
120:19, 132:2

133:24, 136:3
139:9, 142:14
148:16, 162:10
179:10, 191:21
192:20
**understanding**
15:17, 36:21
106:3, 172:23
179:15, 179:17
182:2, 193:7
**understands**
12:20, 12:24
14:12, 16:17
16:23, 17:4
17:13
**understood**
12:20, 13:23
15:4, 72:25
112:19, 137:5
190:24
**undetected**
130:13
**unfortunately**
24:19
**United** 103:3
127:22
**universal** 124:8
**universally**
123:17, 161:11
**University** 5:24
165:3
**unnecessary**
199:8
**unrelated** 142:5
**unreliable**
102:13
**unusual** 184:12
**update** 61:7
**updated** 65:6
66:10
**urged** 81:12
115:19, 116:19
119:14, 130:13
**use** 14:14, 14:24
20:21, 21:3
22:6, 36:22

55:9, 65:3
66:25, 73:5
81:5, 81:11
81:15, 117:6
117:15, 117:16
123:6, 123:8
123:10, 126:3
129:2, 129:12
129:15, 130:8
130:9, 130:14
130:23, 139:19
142:4, 144:5
145:14, 158:7
161:12, 161:22
170:12, 192:8
197:24, 198:9
199:12
**usefulness** 70:16
167:7
**users** 16:20
**uses** 71:1, 118:5

## V

**validated** 123:7
192:6
**Valuation** 33:8
**VAN** 3:3
**variable** 171:8
**variance** 180:17
**varieties** 72:18
**variety** 72:19
**various** 10:22
36:10, 57:5
92:11, 124:24
130:15, 152:17
189:7
**varying** 71:2
**verbally** 9:11
**verdicts** 99:23
**verified** 120:4
163:8
**verify** 121:15
157:21, 162:19
181:17
**Vermont** 27:10

27:15, 27:20
27:24, 28:1
28:6, 28:8
28:12, 28:16
28:20, 28:21
28:24, 29:7
29:12, 29:15
29:19, 30:21
31:3, 31:7
31:15, 31:23
31:25, 32:4
32:11, 32:16
32:18, 37:18
92:9, 92:20
92:24, 93:5
94:13, 94:16
95:3, 107:3
107:25, 108:19
108:23, 109:7
109:14, 110:1
110:14, 111:11
111:20, 111:23
112:2, 146:20
146:24, 147:18
148:9, 149:12
150:2, 150:8
150:14, 156:9
156:17, 156:25
157:25, 158:12
161:5, 175:19
**Vernon** 81:2
81:3
**versus** 76:19
**viability** 139:15
167:6
**Vice-President**
11:18
**Videographer**
3:13, 5:4, 54:8
54:14, 106:15
106:20, 145:2
145:6, 171:12
171:17, 199:22
**VIDEOTAPE**
1:9
**view** 15:25

128:18, 128:25
**Village** 3:4
**visit** 70:6
**voice** 56:22
**volume** 105:16
105:20, 105:23
105:24, 113:8
113:13, 113:20
114:6
**volumes** 106:8
**voluntary** 16:25
18:16

**W**

**W.H** 116:8
**want** 12:19
16:8, 16:9
22:24, 37:8
58:6, 67:4
93:14, 93:23
95:18, 97:24
104:13, 104:18
109:24, 115:23
150:22, 150:23
151:8, 153:15
153:18, 154:5
155:22, 155:23
158:5, 162:10
168:20, 168:24
169:5, 169:13
171:3, 172:16
179:10, 180:4
191:9
**wanted** 10:18
52:23, 53:6
85:24, 90:3
104:14, 104:25
113:1, 115:4
138:10, 168:6
169:17, 170:20
198:6, 199:11
**wants** 155:7
168:17
**WARD** 2:20
**warn** 19:10

**warning** 13:15
14:7, 19:16
52:14, 61:6
62:18
**Washington**
38:20, 61:16
**wasting** 33:19
**water** 135:4
**way** 9:18, 16:11
32:13, 50:11
68:16, 88:4
115:3, 129:17
151:23, 155:16
155:19, 158:20
159:8, 166:8
194:23
**We've** 123:20
**week** 90:7
**weeks** 90:16
**Weidinger**
52:11, 52:12
**weight** 138:7
142:8, 163:21
**WEINER** 3:3
**Weisler** 36:3
36:9, 36:16
89:25, 177:3
178:3
**welcome** 104:1
104:12
**WENDOWSKI**
1:7
**went** 26:13
39:23, 41:9
41:14, 41:21
42:9, 42:14
42:16, 42:21
43:2, 60:3
60:13, 63:14
65:18, 65:21
96:15, 99:23
100:22, 100:23
128:13, 149:19
196:21
**Westfield** 1:23
**Whittaker** 2:15

115:24
**width** 178:5
**wildly** 71:2
**Williams** 11:14
11:16, 194:12
**Willie** 61:8, 61:9
61:14
**willing** 149:6
**wind** 153:3
**Windsor** 75:15
76:8, 81:8
162:3
**wish** 11:3
**withdraw** 30:8
39:20, 136:24
151:14
**withdrawing**
39:18
**withdrawn**
30:11
**witness** 1:11
4:2, 5:11, 15:24
30:3, 30:5
30:13, 64:13
136:13, 151:10
151:12, 151:13
153:9, 153:17
154:13, 154:15
155:1, 155:4
156:3, 180:23
200:7
**witnesses** 154:4
**women** 83:8
83:18, 83:23
84:7, 84:14
85:5, 85:9
**word** 15:19
**words** 90:13
120:11, 122:8
133:18, 151:18
161:17
**work** 7:22, 21:9
26:23, 41:9
41:14, 41:21
42:9, 42:14
42:18, 42:21

43:2, 44:15
59:9, 144:16
166:16, 178:12
178:15, 193:25
**worked** 23:5
42:21, 89:25
104:24, 187:19
**workers** 128:5
**working** 45:2
140:1, 148:25
149:8, 187:17
187:20
**works** 194:21
**world** 100:7
100:17, 100:22
100:23, 101:4
**worldwide**
100:4, 100:11
101:10, 101:14
167:10, 168:1
**worry** 113:9
**worst** 115:20
116:19
**write** 59:19
163:18
**writer** 81:12
**writes** 36:2
37:8, 166:12
175:5
**writing** 9:11
**written** 64:21
86:2, 86:6
86:17, 92:1
127:12, 128:1
181:12, 190:12
**Wrong** 117:10
**wrote** 122:18
127:5, 162:5
162:9, 190:3

**X**

**x-ray** 116:13
116:14, 116:21
117:8, 117:15
118:5, 118:15

118:21, 119:8
119:12, 129:1
138:1, 145:14
146:11, 147:13
148:5, 163:22
196:12, 196:20
197:1, 197:12
197:15, 197:16
197:19, 198:22
198:25
**XRD** 130:12
130:23, 131:15
133:2, 133:9
134:14

**Y**

**year** 9:12, 103:3
104:6, 104:16
104:18
**years** 6:8, 6:11
8:10, 11:10
11:21, 24:9
38:15, 68:18
108:6, 108:9
109:2, 181:13
191:1, 191:5
192:17, 193:7
193:25, 194:11
**York** 6:9, 6:9
52:14, 189:25

**Z**

**Zazenski** 132:6
201:23
**Zeitz** 36:5, 70:8
81:2, 81:3
**zero** 146:19

**0**

**00679** 24:21
**02** 163:21
163:23
**05** 147:10

147:17
**07009** 3:4
**07090** 1:23
**07701** 2:4
**07932** 2:14

**1**

**1** 1:22, 105:16
113:8, 113:20
114:6, 114:8
115:5, 178:6
178:6, 185:4
**1/4/84** 201:3
**1:12** 106:21
**10** 4:14, 178:6
**10/27/72** 202:18
**10/31/72** 201:24
**10:00** 1:15, 5:7
**103** 201:18
**105** 1:14
**11** 163:10
**11/24/76** 202:9
**11/29/72** 202:16
**11/3/08** 201:5
**11:03** 54:9
**11:14** 54:15
**114** 201:19
**116** 201:20
**119** 201:21
**12,000** 178:4
**12/13/72** 202:14
**12/21/95** 201:22
**12:32** 106:16
**127** 2:3, 201:22
**13** 74:19, 108:4
185:2
**130** 118:2
**132** 201:23
**1339** 2:8
**137** 201:24
**13th** 186:4
**14** 3:4, 72:12
**142** 202:3
**145** 202:4
**147** 202:5

**148** 119:21
**14th** 99:11
**15** 33:7
**159** 202:6
**15th** 99:12
99:13
**16** 145:20
**163** 202:7
**166** 202:9
**167** 202:10
**168** 202:11
**16th** 2:8
**17** 99:19
**170** 161:25
**175** 202:12
**176** 202:13
**18** 2:13, 115:24
**185** 202:14
**188** 202:15
**189** 202:16
**19** 1:14, 5:6
9:16, 99:10
**19103** 2:19
**19107** 2:9
**196** 202:17
**1969** 67:16
67:23, 68:7
68:18
**197** 202:18
**1970s** 87:17
152:16, 172:25
**1971** 74:19, 78:6
89:18, 90:17
159:5, 159:15
180:20, 180:25
181:4, 181:7
181:12, 189:25
190:5
**1971-1977**
201:19
**1972** 57:14, 59:9
91:7, 137:13
137:16, 173:8
173:12, 175:4
176:20, 185:2
185:4, 185:12

186:3, 186:12
186:13, 195:22
196:23, 197:4
201:14, 202:17
**1973** 35:19, 37:3
69:19, 92:1
99:17, 115:24
116:1, 116:3
140:14, 141:10
145:20, 147:5
147:21, 149:16
188:9, 198:16
201:15
**1974** 72:1, 72:12
81:1, 159:6
159:19, 163:11
201:9
**1975** 23:19
167:18, 168:11
202:10
**1976** 12:6, 20:3
23:11, 24:13
26:19, 71:20
72:6, 99:10
99:17, 121:13
159:16, 166:5
177:19, 180:25
181:4, 181:7
181:12, 181:12
192:17
**1977** 84:19
114:1, 114:2
119:22, 125:15
201:21
**1979** 27:10
27:21, 28:25
29:12, 29:19
30:21, 31:10
31:16, 32:5
32:16, 108:19
108:24, 109:11
110:2, 110:5
110:19, 111:3
111:8, 111:18
**198** 202:19
**1980s** 108:2

**1984** 33:7, 33:7
48:11, 49:15
49:18, 50:25
52:9
**1986** 30:24, 32:1
32:7, 32:20
32:25, 107:8
133:15, 134:20
135:23, 150:21
151:22, 152:12
152:13, 192:17
**1987** 108:6
111:3, 111:12
111:22, 112:4
**1992** 5:24
**1995** 125:18
127:16, 132:1
**1997** 85:24
86:13, 201:11
**19th** 99:13

**2**

**2** 105:20, 105:23
113:10, 113:13
138:6, 160:23
190:10, 196:21
199:9
**2/28/75** 202:11
**2:11** 145:3
**2:23** 145:7
**20** 164:2
**2000** 12:7
**2000s** 10:19
**2001** 132:4
201:23
**2003** 109:9
**2006** 6:13
**2008** 60:25, 62:3
67:12, 67:15
**2009** 28:4, 28:18
28:22, 29:3
29:13, 30:25
31:6, 31:21
32:2, 32:8
109:3, 109:6

111:5
**2010** 10:19
**201-202** 4:22
**2016** 99:19
  101:11, 105:20
  113:23, 113:24
**2017** 113:16
  113:23
**2018** 9:16
  104:19, 104:20
  105:2, 105:23
**2019** 1:14, 5:7
**21** 90:17, 115:25
  116:3, 127:16
**215-569-5397**
  2:19
**215-575-4200**
  2:9
**216** 84:19
**23** 57:14
**2300** 161:24
**235** 1:22
**24** 166:5, 176:20
**25** 198:16
**25th** 146:5
**26** 69:19, 140:14
  141:10
**263** 142:24
  142:24
**265** 196:4, 196:4
**266** 137:12
  137:18, 137:22
**27** 89:18, 197:4
**28** 159:5, 168:11
**29** 175:4, 176:19
  185:12, 186:3
  186:12, 186:13
  195:22

---

**3**

**3** 60:25, 105:24
  113:10, 138:6
  160:23, 173:8
  173:11, 196:21
  198:3, 199:9

---

**3/11/74** 202:7
**3/17/16** 201:17
**3/21/73** 201:20
**3/23/72** 201:4
**3/74** 202:6
**3:00** 171:13
**3:13** 171:18
**3:58** 199:17
**3:59** 199:23
**30** 164:4
**30(b)6** 15:24
**3071S** 141:17
**31** 137:13
  137:16, 188:9
**3-11-74** 163:10
**3271S** 141:18
**347** 175:3
**35** 197:4
**352** 163:6
**353** 168:10
**357** 127:16
**361** 132:5
**364** 72:11
**369** 166:20
  167:16
**38** 189:4, 189:6
  189:7
**3rd** 2:13

---

**4**

**4** 48:11, 50:25
  54:12, 147:21
**4/26/73** 201:6
**40** 185:2
**41** 120:4
**41.6** 142:7
**45** 145:20
**457** 113:25
**46** 147:20
**461** 198:12
  198:12
**462** 38:8
**464** 89:17
**465** 35:18, 43:6
  43:6

---

**466** 37:3
**467** 74:19
**47** 149:11
**471** 166:4
**474** 90:16
**475** 92:1
**476** 57:13
**48** 201:3
**483** 91:6
**489** 115:23
**491** 48:9, 48:9
**492** 99:18, 99:18
**497** 60:24
**498** 103:2
**4th** 149:19

---

**5**

**5** 4:4, 4:13, 4:14
  54:12, 81:4
**5.2** 128:16
**5/14/74** 201:7
**5/16/73** 202:4
**5/25/73** 202:19
**50** 8:10, 178:6
  188:9, 188:9
  193:6
**54** 4:15, 4:16
  4:17
**57** 201:4
**58** 159:2, 159:3

---

**6**

**6** 149:16, 160:15
**6/4/73** 202:5
**60** 99:2, 201:5
**60s** 7:16, 10:19
  67:20, 68:1
  106:2, 112:22
**66** 37:18
**679** 25:23
**69** 80:25, 201:6

---

**7**

**7** 35:19, 37:3
  161:22, 177:19
**7/27/71** 201:12
**7/31/73** 201:16
  202:15
**70s** 10:19, 28:3
  28:18, 39:13
  67:20, 68:2
  68:22, 68:25
  71:19, 87:13
  88:3, 88:17
  88:17, 107:24
  131:24, 139:25
**72** 201:7
**732-747-9003**
  2:4
**74** 201:8
**76** 26:25, 147:6
  180:20
**77498** 130:5

---

**8**

**8/13/71** 201:8
**8/24/72** 202:13
**8/29/72** 202:12
**8087** 142:7
**80s** 10:19, 28:4
  28:18, 29:13
**81** 201:9
**84** 107:4, 201:11
**86** 31:6, 31:20
  107:4
**89** 201:12

---

**9**

**9** 107:19
**9/21/71** 201:13
**9:10** 52:10
**90** 201:13
**908-789-2000**
  1:24
**908-789-2007**

---

1:24
**90s** 10:19
**91** 201:14
**92** 201:15
**973-239-5700**
  3:5
**973-822-1110**
  2:14
**99** 201:16
  201:17