# Exhibit 161

US EPA ARCHIVE DOCUMENT

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION IX

**Response to the November 2005 National Stone, Sand & Gravel Association
Report Prepared by the R.J. Lee Group, Inc
"Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos
Evaluation Project"**

**April 20, 2006**



United States Environmental Protection Agency Region 9
**Response to the November 2005 National Stone, Sand & Gravel Association report prepared by the R.J. Lee Group, Inc:**
**"Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project"**

This document constitutes the United States Environmental Protection Agency Region 9 (EPA Region 9) response to the major findings and conclusions of the National Stone, Sand & Gravel Association report "Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project" prepared by the R. J. Lee Group (R. J. Lee Report). A more detailed analysis will be completed after additional information is received from the R. J. Lee Group and the National Stone, Sand & Gravel Association,[1] and the United States Geological Survey (USGS).

The R. J. Lee Report draws conclusions that are contradicted by the El Dorado Hills data and by generally accepted scientific principles for measuring asbestos exposure.

**Overview**

The R. J. Lee Group review of the EPA data was contracted by the National Stone, Sand & Gravel Association. The El Dorado County Office of Education funded the three reviewers who wrote letters in support of the R. J. Lee Report and whose reviews are included in this response.

The EPA Region 9 El Dorado Hills Naturally Occurring Asbestos Exposure Assessment was designed to measure the exposures to asbestos fibers, if any, that resulted from sports and play activities that disturbed dust and soil. EPA Region 9 adhered to accepted EPA standards for sampling and analysis, including rigorous quality assurance/quality control, and to the standard methodologies of EPA exposure and risk assessment.

**The R. J. Lee Report Criticizes EPA Region 9 for Using Established Scientific and Public Health Protocols -** In assessing naturally occurring asbestos exposures in El Dorado Hills, EPA evaluated asbestos exposures using the PCME (phase contrast microscopy equivalent) asbestos fiber size classification. The PCME classification was used because human epidemiological studies, which form the basis of knowledge of asbestos health effects, measured asbestos fiber concentrations using phase contrast microscopy (PCM) analytical methods. PCME is the standard term for fibers counted by more modern analytical methods that are of equivalent size to those fibers that would be seen by PCM analysis, and includes fibers with a length to width aspect ratio of 3 to 1 or greater. EPA considered PCME fibers in our analysis of the El Dorado data to be consistent with the existing health databases and risk assessment

---

[1]On March 9, 2006, EPA Region 9 sent a letter to the R.J. Lee Group and the National Stone, Sand, & Gravel Association asking for additional information to support the findings and conclusions of the R.J. Lee Report.

procedures used by EPA, California EPA (Cal/EPA), the World Health Organization, and other federal agencies and international organizations. This approach was rejected by the R.J. Lee Group, which instead advocates use of asbestos fiber definitions which are not health based or supported by the majority of experts in the health community, and which would not allow comparison to the existing epidemiologic data on asbestos related cancers.

**The R. J. Lee Report Claims that EPA Region 9 Misapplied Fiber Counting Protocols -** The R. J. Lee Report claims that EPA Region 9 inflated the fiber counts in the El Dorado Hills air data by misapplying the International Standards Organization (ISO) method 10312 (the analytical method used by EPA to analyze the El Dorado air samples) and including PCME structures with a 3 to 1 length to width aspect ratio in our analysis. The R. J. Lee Report maintains that EPA should only have counted structures which met the general 5 to 1 aspect ratio fiber size definition described in the body of the ISO 10312 method. However, Annex C and Annex E of the ISO 10312 method specifically authorize the counting of PCME structures with a 3 to 1 aspect ratio. Another example of misleading information is the R.J. Lee Report's statistical evaluation and resulting conclusions regarding the concentrations of asbestos structures detected in the EPA air samples. All of the established EPA, National Institute of Occupational Safety and Health (NIOSH), and ISO analytical methods require the counting of asbestos bundles, recognizing the significance of bundles to proper characterization of asbestos fiber levels. The R.J. Lee Report did not include asbestos bundles in its analysis of the data, thereby undercounting the number of structures.

**The R. J. Lee Report Claims that EPA Region 9 Misidentified Amphibole Minerals -** The R. J. Lee Report concludes that EPA misidentified actinolite asbestos fibers in the El Dorado soil samples by using inappropriate extinction angle criteria. The R. J. Lee Group conclusion is contradicted by the National Institute of Standards and Technology (NIST) and the major analytical methods used for analysis of asbestos in soil and bulk samples. The R. J. Lee Report also cites an unpublished 1980 draft report to support its contention that structures found in the EPA air samples are not asbestos, and ignores a subsequent 1981 published report by the same author that actually supports the EPA approach.

**The R. J. Lee Report Applies a Geologic Definition rather than a Public Health Definition to Characterize Microscopic  Structures -** The R. J. Lee Report relies heavily on the geologic distinction between asbestos fibers and cleavage fragments of the same dimensions, with the implication that exposure to cleavage fragments is benign and of little or no health significance. For the purposes of public health assessment and protection, EPA makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape. The EPA Region 9 approach, which is supported by most public health agencies and scientists, as well as the American Thoracic Society, is based on the following:  (1) The epidemiologic and health studies underlying EPA and Cal/EPA cancer risk assessment methods were based on exposures to both cleavage fragments and fibers, and were unable to distinguish between the two, (2)  The most recent panel of experts to review asbestos risk assessment methods, the 2003 Peer Consultation Panel convened by EPA, concluded that "it is prudent at

this time to conclude equivalent potency [of cleavage fragments and fibers] for cancer,"[2] (3)  No well-designed animal or epidemiological studies have adequately tested the hypothesis that cleavage fragments with the same dimensions as a fiber are benign or that the human body makes any distinction, (4) Studies that purport to show that cleavage fragments are benign are questioned by many asbestos health experts, (5) There are no routine asbestos air analytical methods, including those used by EPA, NIOSH, the Mine Safety and Health Administration (MSHA), the American Society for Testing and Materials (ASTM), and ISO which differentiate between cleavage fragments and crystalline fibers on an individual fiber basis.

**The R. J. Lee Report's  "Virtual" Review of EPA Region 9's Air Samples is Inconsistent with Established Laboratory Practices -** The R.J. Lee Group did not have access to EPA's actual air samples, nor did it collect any air samples of its own.  Rather it reviewed limited pictures and spectra data of a small number of EPA's air samples and drew conclusions based on those representations.  Such a virtual review is not consistent with the National Voluntary Laboratory Assurance Program (NVLAP) quality assurance procedures nor the verification methods of the National Institutes of Standards and Technology.

**Federal Courts Have Supported EPA -** Many of the assertions of the R. J. Lee Report are consistent with positions that the R.J. Lee Group took as an expert witness for W.R. Grace in the Libby, Montana litigation.  In this litigation, the written opinions of the District and Appeals courts, while not specifically addressing the opinions of the R.J. Lee Group, rule in favor of EPA and expressly hold that EPA's experts and science are credible.[3]

**Background**

In October 2004, the EPA Region 9 Superfund site assessment program conducted an assessment of exposures to naturally occurring asbestos (NOA) in El Dorado Hills, California.  Specifically, EPA Region 9 simulated the sports activities of children and adults at three schools and a community park and, using personal air monitors, measured asbestos levels in the breathing zones of participants.  EPA Region 9 also collected samples of ambient air in the area of the sampling at the same time the simulations were conducted to serve as reference samples.  The personal activity-based samples were then compared to the reference samples.  The Asbestos Hazard Emergency Response Act (AHERA)[4] regulation Z-test for statistical

---

[2]USEPA (U.S. Environmental Protection Agency) (2003).  Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report.  Office of Solid Waste and Emergency Response, Washington D.C.  Page viii.

[3] See U.S. v. W.R. Grace, 280 F Supp 2d 1149 (2003): U.S. v. W.R. Grace, 429 F. 3d 1224, 1245 (9th Cir. 2005) (Although debate regarding testing methodology and data analysis is "exceedingly complex", EPA did not ignore accepted scientific principles)

[4]The Asbestos Hazard Emergency Response Act (AHERA) was passed by Congress in 1986 to provide for the inspection and mitigation of asbestos in school buildings.  Regulations implementing the Act were promulgated by EPA in 1987.

significance was applied to determine whether there were any statistically significant differences between the personal exposure samples and the ambient reference samples. EPA Region 9 collected over 400 air samples and generated over 7000 data points. All of EPA Region 9's's analyses were conducted by accredited laboratories using recognized methods and procedures with strict quality assurance control, including blind performance samples to check analytical accuracy.

Amphibole asbestos, which many health scientists consider to be even more toxic than chrysotile asbestos, was found in almost all the reference and activity-based samples. Of the 29 different sets of activity-based scenario measurements, application of the Z-test determined that personal exposures from 24 scenarios were significantly elevated over the reference samples. Most importantly, the data showed that children and adults participating in sports activities in areas where asbestos occurs naturally in the surface soils, as it does in El Dorado Hills, can be exposed to asbestos fibers of health concern at up to 62 times the corresponding reference levels.

EPA Region 9 released the data from the assessment in May 2005 and held a public meeting in El Dorado Hills that was attended by more than 1000 members of the public. From the outset of the assessment, EPA Region 9 made clear to the community that EPA's only intent was to gather data on potential exposures. The community and the State and local regulatory agencies could then use the information to make decisions about the significance of those exposures and determine appropriate control measures. Both EPA Region 9 and the Agency for Toxic Substances and Disease Registry (ATSDR) have informed the community that exposure levels are a main determinant of the risk of developing asbestos-related cancers and non-cancer diseases, and that reducing the exposures reduces the risk. Consistent with its intent, EPA Region 9 has actively engaged the State and local regulatory agencies to improve naturally occurring asbestos mapping, monitoring, dust control, and regulation. El Dorado County has recently adopted more stringent dust control ordinances.

**Detailed Comments on the R. J. Lee Report**

**R.J. Lee Finding #1: "Based on Mineralogy, Sixty-Three Percent (63%) of the Amphibole Particles Identified as Asbestos Fibers can not be Asbestos."**

The R. J. Lee Report argues that there is too much aluminum in 63% of EPA Region 9's identified fibers for the fibers to be asbestiform.[5] In addition, the remaining 37% (sometimes the Report uses 35%) are not asbestos fibers based on their particle dimensions.

**EPA Response**

**Aluminum -** Analysis of the EPA Region 9 El Dorado air samples was performed using the International Standards Organization (ISO) method 10312, a state-of-the-art

---

[5]Asbestiform: Having the form or structure of asbestos.

Transmission Electron Microscope (TEM)[6] method with energy dispersive spectroscopy (EDS)[7] that has strict counting rules and characterizes the dimensions and chemistry of every fiber identified by the microscopist. Identification of fiber type was performed according to the general guidelines of the International Mineralogical Association (IMA) (Leake, 1997)[8], the international standard for amphibole nomenclature. This same approach for asbestos classification is recommended in the "Research Method for Sampling and Analysis of Fibrous Amphibole in Vermiculite Attic Insulation", EPA 600/R-04/004, January 2004, and was one of the tools used by Meeker et al (2003)[9] to determine the composition and morphology of amphiboles from Libby, Montana.

The R. J. Lee Report claims that 63% of the amphibole fibers identified by the EPA laboratory[10] as actinolite asbestos have concentrations of total aluminum that are too high to form asbestos fibers. According to page 2 of the R. J. Lee Report, "Particles with more than 0.3 aluminum atoms pfu [per formula unit] or about 1.5 percent $Al_2O_3$ cannot form in the asbestos habit due to crystal lattice constraints." To support its argument, the R. J. Lee Report cites three references. However, on close examination, two of the three references do not agree with the upper threshold limit that the R.J. Lee Group puts on total aluminum content (Leake et al, 1997) (Deer, Howie and Zussman, 1997)[11]. The third reference (Verkouteren & Wylie, 2000)[12] draws its conclusions on examination of a

---

[6]Transmission Electron Microscopy (TEM) produces images of a sample by illuminating the sample with an electron beam in a vacuum, and detecting the electrons that are transmitted through the sample.

[7]Energy Dispersive Spectroscopy (EDS) uses measurement of the energy and intensity of X-rays generated when a selected area of a sample is irradiated with an electron beam to identify the mineralogical composition of a structure.

[8]B.E. Leake et al (1997). Nomenclature of Amphibole: Report of the Subcommittee on Amphiboles of the International Mineralogical Association, Commission on New Minerals and Mineral Names. American Mineralogist, Volume 82, pages 1019-1037.

[9]G.P. Meeker et al (2003). The Composition and Morphology of Amphiboles from the Rainy Creek Complex, Near Libby, Montana. American Mineralogist, Volume 88, pages 1955-1969.

[10]In this document, the terms "EPA laboratory" and "EPA Region 9 laboratory" refer to the private laboratories that conducted the analysis of the EPA soil and air samples under contract to EPA Region 9.

[11]W.A. Deer, R.A. Howie, and J. Zussman (1997). Rock-Forming Minerals: Double Chain Silicates, Vol 2, second edition, p 137 - 145.

[12]J.R. Verkouteren and A.G. Wylie (2000). The Tremolite-Actinolite-Ferro-Actinolite Aeries: Systematic Relationships Among Cell Parameters, Composition, Optical Properties, and

small set of fibrous actinolite asbestos samples which the authors partition into asbestos and fibrous "non-asbestos" byssolite using criteria which the IMA specifically recommends against, and which is inconsistent with all standard asbestos analytical methods.  Perhaps most important is the fact that all three references agree that it is the IMA criteria which primarily govern the general classification of amphibole type, not the total aluminum content. These references therefore actually support the classification approach taken by the EPA laboratory.

The R.J. Lee Group did not have access to the EPA air samples to conduct their own analyses.  Instead, the R.J. Lee Group looked at a limited number of photographs of the recorded EDS spectra.  Interferences by other elements in the sample can affect the aluminum total in the spectra.  This is especially important because the EPA samples were of air releases from soil, not processed asbestos material.  Soils contain non-asbestos mineral and biological particles that can influence element totals in an EDS spectrum, most notably clay particles, which are high in aluminum.  The laboratory used by EPA Region 9 identified aluminum-rich actinolite asbestos, by applying the IMA classification guidelines to its direct analysis of the actual sample.[13]

**Particle Dimension -** As previously stated, the R. J. Lee Report claims that 37% of the fibers counted by EPA in the El Dorado Hills air samples are not asbestos fibers based on their particle dimensions.  The report claims that EPA Region 9 inflated the fiber counts by including asbestos structures which do not meet the definition of a fiber as described in ISO 10312.  The general ISO 10312 method requires the counting of every asbestos structure with a length to width aspect ratio of 5:1 or greater.  As directed by Region 9, the EPA laboratory counted structures with a 3:1 or greater aspect ratio.  The R. J. Lee Report states that EPA erred in counting structures with aspect ratios less than 5:1. **Annex C and Annex E of the ISO method clearly authorize the counting of PCME structures with a 3:1 aspect ratio if the data are to be used for exposure or risk assessment purposes, the stated goal of the El Dorado Hills assessment.  In fact, the ISO method contains numerous references to PCME fibers.  PCME fibers are defined as fibers greater than 5 microns in length, and 0.25 to 3 microns in width with a 3:1 aspect ratio.[14]  PCME fibers form the basis for EPA's IRIS toxicity database and the asbestos risk models of California EPA and other federal and international organizations.[15]**

---

Habit, and Evidence of Discontinuities.  American Mineralogist, 85, p. 1239 - 1254.

[13]Personal communication with John Harris, Lab/Cor, January 2006.

[14]World Health Organization (1986).  Environmental Health Criteria 53, International Programme on Chemical Safety, Asbestos and Other Natural Mineral Fibres, section 2.3.2.2.

[15]The IRIS asbestos cancer inhalation unit risk, a measure of asbestos cancer potency, is based on the EPA 1986 Airborne Asbestos Health Assessment Update (EPA/600/8-84/003F; 1986). Cal/EPA used a similar approach and data sets to derive its cancer unit risk.  Both the IRIS and the Cal/EPA cancer potency values rely on human epidemiological studies that were conducted using phase contrast microscopy (PCM) analytical methods (some were midget

The R.J. Lee Group also manipulates its statistical analysis of the El Dorado Hills air data by ignoring counts of asbestos fiber bundles in its evaluations. Bundles are two or more attached parallel asbestos fibers which can have a significant health impact when they are inhaled and separate into individual fibers. Bundles were counted in the historical epidemiological studies which form the basis of our knowledge of asbestos-related health effects and EPA's IRIS database. **All of the established EPA, NIOSH, and ISO analytical methods require the counting of asbestos bundles, recognizing the significance of bundles to proper characterization of asbestos fiber levels.**

The R. J. Lee Report further states that EPA's data inflated the asbestos fiber count by ignoring the Agency's own "definition" of asbestos. To support this claim, the R.J. Lee Report cites the glossary of "Method for Determination of Asbestos in Bulk Building Materials", EPA 600/R-93/116, 1993, which states, in part, "With the light microscope, the asbestiform habit is generally recognized by the following characteristics: Mean aspect ratios ranging from 20:1 to 100:1 or higher for fibers longer than 5 microns." The building material analytical method is designed to detect commercially processed asbestos in items like floor tiles, roofing felts, paper insulation, paints, and mastics, not naturally occurring asbestos on air filters or in soil samples. To present the 20:1 aspect ratio for commercial grade asbestos as a universal EPA policy, and to advocate its use as an appropriate standard for analyzing air samples of naturally occurring asbestos is inappropriate and contradictory to use of the PCME dimensional criteria as a tool for assessing exposure risk.

The R. J. Lee Report also states that the diffraction pattern analyses produced by the EPA laboratory for the El Dorado Hills air samples demonstrates that the particles identified by the laboratory are not asbestos.[16] The report cites a 1980 unpublished draft study by S.J. Ring to support its conclusion. The R. J. Lee Report does not mention a 1981 published article by the same author which revises the findings such that they no longer support the conclusion of the R. J. Lee Report and, in fact, support the data produced by

---

impinger data converted to PCM counts) that could not distinguish fibers that were 5 microns in length or less. PCM cannot distinguish between fibers and cleavage fragments. PCM is not as powerful as current Transmission Electron Microscope (TEM) methods (400X vs 20,000X) as TEM can see the thinner/shorter fibers. However, since EPA's (and Cal/EPA 's) toxicity database relies on human health studies that used PCM, current EPA risk procedures use the more powerful TEM method but report the PCM equivalent (PCME) fibers and only use the PCME counted fibers in a risk assessment. This is because the IRIS asbestos file specifies that only PCME fiber counts be used with inhalation unit risk for risk calculation. See also the reference cited in footnote 11.

[16]Diffraction pattern analyses irradiates a sample with x-rays and then takes an x-ray photograph.

-7-

EPA.[17]

**R.J. Lee Finding #2: "The Laboratory Procedures did not Comply With the NVLAP Quality Assurance Standard."**

The R. J. Lee Report says that the false positive rate in our air samples was 35% when the acceptable limit in the National Voluntary Laboratory Accreditation Program (NVLAP) is 10%.

**EPA Response**

The laboratories used by EPA Region 9 for analysis of the El Dorado Hills air and soil samples are accredited through the National Voluntary Laboratory Accreditation Program (NVLAP). NVLAP is administered by the National Institute of Standards and Technology, a non-regulatory agency within the U.S. Commerce Department. A large part of the accreditation process involves on-site audits performed by NVLAP-certified inspectors who review laboratory operational and quality assurance compliance parameters, including documentation proving compliance with NVLAP requirements for verification analyses. A laboratory must demonstrate that all analysts reporting data meet the false negative and false positive requirements set forth by NVLAP before an accreditation certificate is issued. To make a determination that a laboratory did not comply with NVLAP verification standards would require a very detailed examination of all laboratory generated raw data, project specific information, such as a site-specific EPA issued Quality Assurance Project Plan, laboratory instrument log books, and other data and information not supplied in an analytical report. Interviews with the laboratory manager, quality assurance manager, and involved analysts are also mandatory to make judgement on a laboratory's possible non-compliance. The R.J. Lee Report's conclusion that the EPA laboratory was not in compliance with NVLAP, based on a cursory review of count sheet and other limited data without the in-depth examination detailed above, is therefore invalid and cannot be used to question EPA's analytical results.

EPA chose NVLAP-accredited laboratories for the El Dorado Hills assessment as a minimum quality requirement. For supplemental quality assurance, the laboratories were subjected to on-site audits performed by EPA's Quality Assurance Technical Support group, and both laboratories were sent performance evaluation samples prior to analysis of the El Dorado samples. In addition, the laboratory conducting the air sample analysis was sent double blind performance evaluation samples during the sampling event. In all cases, the laboratories successfully identified the amounts and types of asbestos present on the blind samples within acceptable limits. Further, the El Dorado Hills air and soil data were validated by a third party in accordance with standard EPA quality assurance

---

[17]S.J. Ring (1981). Identification of Amphibole Fibers, Including Asbestos, Using Common Electron Diffraction Patterns. In Russell P.A. and Hutchings A.E. (Eds), Electron Microscopy and X-ray Applications to Environmental and Occupational Health Analysis, Vol. 2:175-198, Ann Arbor Science Publ., Inc.

procedures and were found to be acceptable for all uses.

**R. J. Lee Finding #3: "The Soil Samples do not Demonstrate the Presence of Amphibole Asbestiform Minerals."**

The R. J. Lee Report states that the actinolite asbestos fibers identified in the El Dorado Hills soil samples contain too much aluminum to be asbestiform and that the extinction angles of the fibers indicate that they are non-fibrous cleavage fragments. The R.J. Lee Group's analysis of 23 split soil samples from EPA's October 2004 sampling event found no asbestos in the samples.

**EPA Response**

**Aluminum -** The R. J. Lee Report states that the aluminum content of the fibers in the soil samples was too high to be asbestiform actinolite and that it was indicative of non-asbestiform actinolite and another amphibole, hornblende, which contains approximately 10-20% by weight $Al_2O_3$ (5.3-10.6% by weight aluminum). Both the laboratory performing EPA's El Dorado soil sample analysis and the laboratory which analyzed the EPA air samples noted significant quantities of hornblende in the samples, but did not count or report those particles as asbestos. Please see the EPA response to Finding #1 for a further discussion of the aluminum issue.

**Extinction Angles -** The extinction angle of a fiber evaluated by polarized light microscopy is one of many criteria used to identify mineralogical composition. The extinction angle for amphibole asbestos fibers is the difference in degrees between the long axis of the fiber and the angle at which the fiber optically disappears (the polarization direction where the light passing through it becomes "extinct") when the fiber is rotated under a polarized light microscope. The R.J. Lee Report states that amphibole asbestos fibers have a zero-degree extinction angle and that non-asbestos cleavage fragments have non-zero extinction angles. Therefore, because the EPA soil sample analysis reported extinction angles which, according to the R.J. Lee Group, averaged 12°, the report alleges EPA incorrectly identified cleavage fragments as asbestos fibers.

**The R.J. Lee Report's conclusion regarding extinction angles is contradicted by the National Institute of Standards and Technology (NIST) and the major analytical methods used for analysis of asbestos in soil and bulk samples.** NIST certifies and provides Standard Reference Materials (SRM) for laboratory instrument calibration and laboratory accuracy measurement. The NIST Tremolite/Actinolite SRM 1867A is a special set of three samples certified by NIST to be of ultra-high purity tremolite, actinolite, and anthophyllite asbestos and is considered the "gold standard" for asbestos analytical laboratories. The material is rigorously characterized and is accompanied by a six-page document that describes the properties of each sample. It is required that all analytical laboratories accredited by NIST/NVLAP have the material in their possession and that they use it to calibrate their operations and to test their analysts. The NIST SRM

1867A certificate which accompanies the samples of tremolite and actinolite states that the reference tremolite can have an extinction angle of up to $16.6 \pm 0.3°$ and that the actinolite can have an extinction angle of up to $15.9 \pm 0.2°$. When the EPA laboratory processed the NIST actinolite standard in the manner of the El Dorado Hills soil samples, the extinction angles of the fibers in the processed standard sample were consistent with allowed maximum extinction angles for tremolite/actinolite asbestos (~ 10° to 20°) and the extinction angles of the fibers seen in the EPA soil samples.[18]

Further, the laboratory methods of EPA, NIOSH, and other agencies for analysis of asbestos in bulk material all state that tremolite-actinolite asbestos fibers may have zero (parallel) or *non-zero* (inclined or oblique) extinction angles. EPA Method 600/R-93/116[19], the standard method used by all NIST/NVLAP accredited laboratories to test building materials for the presence of asbestos, states in Table 2-2, Optical Properties of Asbestos Fibers, that tremolite-actinolite asbestos has extinction "parallel and oblique (up to 21°)." NIOSH Method 9002[20], the method used for analysis of the El Dorado Hills soil samples, states directly that actinolite and tremolite fibers exhibiting inclined extinction are to be considered asbestos. The method further states that "If anisotropic fibers are found (during PLM analysis), rotate the stage to determine the angle of extinction. Except for tremolite-actinolite asbestos which has oblique extinction at 10-20°, the other forms of asbestos exhibit parallel extinction... Tremolite may show both parallel and oblique extinction."[21]

### R.J. Lee Finding #4: "The ISO 10312 Analytical Method can not Distinguish Between Asbestos Fibers and Non-Asbestos Cleavage Fragments."

The R.J. Lee Report states that the ISO 10312 method contains the disclaimer that "The method cannot discriminate between individual fibers of asbestos and non-asbestos analogues of the same amphibole material," and, therefore, EPA inflated the asbestos air concentrations by counting "cleavage fragments."

### EPA Response

The ISO 10312 method cannot differentiate between fibers and cleavage fragments with

---

[18]M. Bailey (2006). Identification of Asbestiform Tremolite/Actinolite. Naturally Occurring Asbestos Workgroup Meeting Presentation.

[19]USEPA (U.S. Environmental Protection Agency) (1993). Method for the Determination of Asbestos if Bulk Building Materials. EPA Method 600/R-93/116.

[20]NIOSH (National Institute for Occupational Safety and Health) (1992). Asbestos (Bulk) by PLM.. Method 9002 (Issue 2).

[21]NIOSH (National Institute for Occupational Safety and Health) (1992). Asbestos (Bulk) by PLM.. Method 9002 (Issue 2). Qualitative Assessment, Item c, page 4.

the same dimensions and chemical composition.  No routine analytical method has a protocol for distinguishing fibers from cleavage fragments on an individual particle basis.  Additionally, from a health standpoint, there is no evidence that supports making the distinction.

Cleavage fragment is a geologic term which refers to structures that form when non-fibrous forms of asbestos minerals split along crystallographic planes, as opposed to asbestos fibers which form from crystalline growth.  The R.J. Lee Report maintains that there is a toxicological difference between asbestos structures which formed as fiber crystals and fibers which formed by cleavage plane separation.  Page 3 of the R.J. Lee Report states that cleavage fragments are "not known to produce asbestos-like disease." **It is the position of EPA, the U.S. Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry (ATSDR) and National Institute for Occupational Safety and Health (NIOSH), and the American Thoracic Society, among others, that microscopic structures of amphibole and serpentine minerals that are asbestiform and meet the size definition of PCM fibers, should be counted as asbestos, regardless of the manner by which they were formed.**  There are four reasons why the health agencies have taken this position:  (1) The epidemiologic and health studies underlying EPA, and California EPA, cancer risk assessment methods were based on exposures to both cleavage fragments and fibers, but were unable to  distinguish between the two,  (2)  The most recent panel of experts to review asbestos risk assessment methods, the 2003 Peer Consultation Panel convened by EPA, concluded that "it is prudent at this time to conclude equivalent potency [of cleavage fragments and fibers] for cancer,"[22] (3)  No well-designed animal or human epidemiological studies have been conducted to date to test the hypothesis that cleavage fragments with the same dimensions of a fiber are benign, or that the human body makes any distinction, and studies that purport to show that cleavage fragments are benign are questioned by many asbestos health experts,[23] (4) There are no routine air analytical methods, including those used by EPA, NIOSH, the Mine Safety and Health Administration (MSHA), the American Society for Testing and Materials (ASTM), and the ISO which differentiate between cleavage fragments and crystalline fibers.

---

[22]USEPA (U.S. Environmental Protection Agency) (2003).  Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report.  Office of Solid Waste and Emergency Response, Washington D.C.  Page viii.

[23]Both Addison (Addison J, Davies LST. 1990. Analysis of amphibole asbestos in chrysotile and other minerals.  Ann Occ Hyg, Apr;34(2):159-75) and members of the U.S. EPA 2003 Peer Consultation panel raised concerns about interpretation of the Davis study (Davis JM, McIntosh C, Miller BG, Niven K. 1991. Variations in the carcinogenicity of tremolite dust samples of differing morphology. Ann NY Acad Sci, Dec;643:473-90 ), which attempted to compare the toxicity of asbestos fibers and cleavage fragments.  These concerns reflected the lack of peer review, use of intra peritoneal injection instead of inhalation exposure, significance of mesotheliomas caused by structures reported as cleavage fragments, purity of the cleavage fragment samples and issues related to fiber dimensions.

In terms of epidemiological data and health outcomes, the cleavage fragment argument is without merit. For the purposes of public health assessment and protection, EPA makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape.

**There are no recognized analytical protocols, including those used by EPA, NIOSH, MSHA, ASTM, and ISO, which include criteria to differentiate between cleavage fragments and crystalline fibers.** All these methods require that structures which meet their definition of the specific counting rules for an asbestos fiber be counted. The requirements are based on the fact that, in the words of an expert from the United States Geological Survey, "At a microscopic level, distinguishing between these forms on single [asbestos] particles, can be extremely difficult to impossible."[24] As noted above, R.J. Lee made a very similar claim with regard to cleavage fragments as the expert witness for W.R. Grace in the Libby, Montana, Superfund cost recovery litigation. The EPA analytical experts who reviewed the R.J. Lee Group's testing methodology related to the Libby site found that the R.J. Lee laboratory could not demonstrate any reliable criteria with which to distinguish, at the microscopic level, asbestos cleavage fragments from asbestos fibers of the same size, shape, and composition. The Ninth Circuit Court of Appeals recognized the competing scientific arguments but found that EPA's position was consistent with the record of evidence and accepted scientific principles.[25]

### R.J. Lee Finding #5: "Applying the Latest Science and Definitional Techniques, the El Dorado Hills Study Shows no Significant Exposure to the Type of Amphibole Asbestos Fiber Connected To Health Risk."

The R. J. Lee Report claims that the latest science for measuring the risk posed by asbestos is the Berman-Crump Asbestos Risk Assessment Protocol ("Berman-Crump") which proposes that amphibole asbestos fibers which are more than 10 microns long and less than 0.5 microns wide (protocol fibers) are the most toxic. Of the 2,386 fibers which the R. J. Lee Report states the EPA laboratory identified, the R.J. Lee Report concludes that only 7 fibers meet the "Berman-Crump" definition. Therefore, the R.J. Lee Group maintains that EPA has overstated the risk from exposure to asbestos fibers in El Dorado Hills.

**EPA Response**

The "Berman-Crump" protocol that the R.J. Lee Report references is in fact a draft EPA method. EPA had the method reviewed by a peer consultation panel in 2003. The panel made a number of important recommendations that must be addressed before the method can be used for EPA risk assessments. A number of important revisions have been made

---

[24]G.P. Meeker, USGS, (2002). Review of Expert Report of R.J. Lee.

[25]U.S. v. W.R. Grace, 429 F.3d at 1245.

to the draft method since 2003, but at this time the method has not been independently peer reviewed.  It will not be adopted by EPA as a risk assessment tool unless and until it passes rigorous internal and external peer review.

The expert peer panel has recommended that the fiber size for the draft EPA risk assessment method be adjusted to include fibers greater than 5 microns in length and up to 1.5 microns in width.[26]  The change is designed to account for lung deposition of fibers that results when fibers are inhaled through the mouth, and not filtered by the nasal passages.  The broadening of the fiber definition to include inhalation by "mouth breathers" is especially relevant to the El Dorado Hills data.  Our investigation measured personal asbestos exposures of individuals participating in sports activities, where physical exertion would likely increase breathing through the mouth.  **The PCME fibers counted in the EPA air samples are actually consistent with the latest science of EPA, as reflected in the recommendations of the peer consultation panel.**  In addition, the EPA peer consultation expert panel recommended that cleavage fragments be treated as any other asbestos fiber of the same morphology and chemical composition.[27]

EPA Region 9 focused on obtaining an accurate count of PCME structures, consistent with our risk assessment protocols and those of Cal/EPA and other health agencies.  The counting rules which EPA set for the laboratory were designed to stop counting when a statistically-significant number of PCME fibers were detected.  By concentrating on PCME structures, other fiber size classifications may not have been counted to statistical significance.  This may have resulted in under counts of other fiber sizes (e.g. the "Berman Crump" protocol fibers referred to in the R. J. Lee Report).  **EPA Region 9's study counted PCME structures so that the data could be directly compared to human health epidemiological studies.**  These epidemiological studies form the basis for risk assessment models currently used by EPA, Cal/EPA and other federal agencies and international organizations.

### R. J. Lee Report Peer Reviews

The R. J. Lee Report was reviewed by three individuals, although research of one of the individuals was extensively quoted in the report and therefore the independence of the reviewer is debatable.  The three reviewers generally agree with the conclusions of the R. J. Lee Report regarding aluminum content, fiber chemistry, cleavage fragments, and extinction angles.

Both the R. J. Lee Report and one of the reviewers support use of the original "Berman-

---

[26]USEPA (U.S. Environmental Protection Agency) (2003).  Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report.  Office of Solid Waste and Emergency Response, Washington D.C.  Page 5-5.

[27]Ibid, page 5-1.

Crump" protocol and calculate a "Berman-Crump" fiber air concentration of 0.0002 fibers/cubic centimeter, using the EPA fibers which they assert meet the "Berman-Crump" definition. The peer reviewer then compares that concentration with an ambient concentration of 0.0008 fibers/milliliter measured in New York City, and states that the "Berman-Crump" value in El Dorado Hills is extremely low. This comparison is flawed for at least two reasons. Significantly, the New York City numbers are based on fibers counted against a totally different size classification (essentially comparing apples to oranges), but **the reviewer also fails to recognize that a concentration of 0.0002 f/cc translates in the protocol to an increased cancer risk of 1 in 1,000 exposed individuals.** This number is disturbingly high and is outside the acceptable cancer risk ranges of EPA, Cal/EPA, and most other state and federal health agencies.

### Conclusions

EPA Region 9 has carefully reviewed the R. J. Lee Report and believes that it makes largely unsupported and incorrect conclusions about the EPA Region 9 El Dorado Hills Naturally Occurring Asbestos Exposure Assessment. EPA Region 9 has asked the United States Geological Survey (USGS) to conduct an independent study of the El Dorado County area to address several mineralogical questions raised by the R. J. Lee Report. The USGS study will use sophisticated analytical techniques (such as electron probe micro analysis) to more completely characterize the naturally occurring asbestos in terms of mineral identification and particle morphology.

All of the EPA Region 9 work in El Dorado Hills was, and continues to be, consistent with the EPA's standard operating and quality control procedures for asbestos work throughout the country.

Exhibit 162

*Johnson&Johnson*

*For Tate testing*
*may c J. Bendles*
*Slv.*

**BABY PRODUCTS COMPANY**

October 4, 1984                                        SKILLMAN, N. J. 08558

TO:        B. Semple, M.D.

SUBJECT:   Evaluation Program for Talc


The following tests are run on all biweekly composite samples from Windsor Minerals and on yearly International Talc Audit samples.

1)   X-ray diffraction for qualitative minerological composition.

2)   Slow scanning x-ray diffraction for amphibole minerals (CTFAJ4-1).

3)   Presence of free crystalline silica (quartz) by x-ray diffraction (CTFAJ6-1).

In addition, a quarterly composite is made from the biweekly Windsor Minerals samples and analyzed by Transmission Election Microscopy (BPC Test Method 7024) for serpentine minerals.


James A. Molnar

JAM:rp
0522R

Protected Document--Subject to Protective Order

JNJMX68_000002913

# Exhibit 163

```
                                                        Page 1

  1                    SUPERIOR COURT OF NEW JERSEY
                       LAW DIVISION: MIDDLESEX COUNTY
  2                    DOCKET NO. MID-1809-17AS
                       APPELLATE DOCKET NO._____
  3
  4      DOUGLAS AND ROSLYN BARDEN,         )
                                            ) TRIAL
  5                         Plaintiffs,     )
                                            )
  6            v.                           )
                                            )
  7      BRENNTAG NORTH AMERICA, et al.,    ) (VOLUME 1 OF 2)
                                            )
  8                         Defendants.     )
         _____   ) MID-L-0932-17AS
  9                                         )
         DAVID CHARLES ETHERIDGE AND        )
 10      DARLENE PASTORE ETHERIDGE,         )
                                            )
 11                         Plaintiffs,     )
                                            )
 12            v.                           )
                                            )
 13      BRENNTAG NORTH AMERICA, et al.,    )
                                            )
 14                         Defendants.     )
         _____   ) MID-L-7049-16AS
 15                                         )
         D'ANGELA MCNEILL-GEORGE,           )
 16                                         )
                            Plaintiff,      )
 17                                         )
               v.                           )
 18                                         )
         BRENNTAG NORTH AMERICA, et al.,    )
 19                                         )
                            Defendants.     )
 20      _____   ) MID-L-6040-17AS
                                            )
 21      WILLIAM AND ELIZABETH RONNING,     )
                                            )
 22                         Plaintiffs,     )
                                            )
 23            v.                           )
                                            )
 24      BRENNTAG NORTH AMERICA, et al.,    )
                                            )
 25                         Defendants.
```

Page 2

1        Place:  Middlesex County Courthouse
                56 Paterson Street
2              New Brunswick, New Jersey 08903
3

        Date:  Wednesday, January 29, 2020
4              9:05 a.m.
              (Volume 1 of 2)
5              (Pages 1 - 200)
6

7

8

9  BEFORE:
10     HON. ANA C. VISCOMI, J.S.C. and JURY
11

12

13

14

15  TRANSCRIPT ORDERED BY:
16     MOSHE MAIMON, ESQ.
       LEVY KONIGSBERG
17

18

19

          ANDREA F. NOCKS, CCR, CRR
20     PRIORITY ONE
          290 West Mount Pleasant Avenue
21     Livingston, New Jersey  07039
          (718) 983-1234
22     E-mail:  p1steno@veritext.com
23

24

25

Page 3

1  APPEARANCES:
2    CHRISTOPHER PLACITELLA, ESQ
     COHEN, PLACITELLA & ROTH
3    127 Maple Avenue
     Red Bank, New Jersey  07701
4    -and-
     MOSHE MAIMON, ESQ
5    LEVY KONIGSBERG
     800 3rd Avenue
6    11th Floor
     New York, New York 10022
7    -and-
     CHRIS J PANATIER, ESQ
8    SIMON GREENSTONE PANATIER
     1201 Elm Street
9    Suite 3400
     Dallas, Texas  75270
10   Attorneys for Plaintiffs,
     Douglas and Roslyn Barden,
11   David Charles Etheridge and
     Darlene Pastore Etheridge,
12   D'Angela McNeill-George,
     William and Elizabeth Ronning
13
14   ALLISON M  BROWN, ESQ
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15   4 Times Square
     New York, New York  10036l
16   -and-
     ORRICK
17   MORTON DUBIN, ESQ
     KEVIN HYNES, ESQ
18   51 West 52nd Street
     New York, New York  10019
19   Attorneys for Defendants,
     Johnson & Johnson, and
20   Johnson & Johnson Consumer, Inc
21
22
23
24
25

Page 4

1          INDEX
2
3  WITNESS                PAGE
4  FOR THE DEFENDANTS:
5
6    MATTHEW SANCHEZ
7  CROSS-EXAMINATION BY MR. PANATIER    7,194
8  REDIRECT EXAMINATION BY MR. DUBIN    136,212
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         I N D E X
2       E X H I B I T S
3  NO.            ID      EVD
4  S-4           19
     S-5           84
5  S-6          110
     S-7          173
6  Plaintiff's              103
     Exhibit 3695-247
7  Plaintiff's              125
     Exhibit 3695-249
8  Plaintiff's              103
     Exhibit 3695-252
9  Plaintiff's              103
     Exhibit 3695-253
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1        COURT OFFICER:  All rise.  Jury
2 entering.
3        (Jury enters.)
4        THE COURT:  Good morning.  Please be
5 seated.  Make sure cell phones are turned off.
6        Good morning, Dr. Sanchez.  If you
7 could please come back up.
8        Today is January 29, 2020.  This is
9 the continued trial in the matter of Douglas and
10 Roslyn Barden versus Johnson & Johnson, David and
11 Darlene Etheridge versus Johnson & Johnson, D'Angela
12 McNeill versus Johnson & Johnson, and William and
13 Elizabeth Ronning versus Johnson & Johnson.
14        May I have appearances, please, for
15 the plaintiff.
16        MR. PANATIER:  Yes.  Good morning,
17 your Honor.  Good morning, jurors.  Chris Panatier,
18 Moshe Maimon, Chris Placitella for the plaintiffs in
19 the case, your Honor.  Thank you.
20        THE COURT:  Thank you.
21        For the defendants.
22        MS. BROWN:  Good morning, your Honor.
23 Good morning, jurors.  Alli Brown, Morty Dubin,
24 Kevin Hynes, for J&J.
25        THE COURT:  Thank you.

Page 7

1        So, members of the jury, you may
2 recall yesterday we commenced with the defendants'
3 portion of this case and their expert witness,
4 Matthew Sanchez, is testifying now on
5 cross-examination.
6        Mr. Panatier, you may continue.
7        MR. PANATIER:  Okay.  Thank you, your
8 Honor.
9        THE COURT:  Just a reminder, you were
10 here yesterday and placed under oath.  We are not
11 going to re-administer the oath, but just a reminder
12 you are under oath.
13        THE WITNESS:  Understand.
14        THE COURT:  There is a microphone
15 that is placed there now that will amplify your
16 voice.
17        THE WITNESS:  Thank you.
18 M A T T H E W   S A N C H E Z, previously sworn.
19 CONTINUED CROSS-EXAMINATION BY MR. PANATIER:
20    Q.    You have a personal speaker now.
21        So yesterday you and Mr. Dubin spent
22 some time going through these boards.  I'm sure you
23 recall all that?
24    A.    I do.
25    Q.    So to make it very clear, nothing,

Page 8

1 and nothing that was on these boards was inaccurate?
2    A.    I'm sorry?
3    Q.    Nothing on these boards failed to
4 report exactly what was in the documents that
5 they're talking about, correct?
6    A.    I believe that's correct.
7    Q.    Okay.  So, you know, many times you
8 were asked this question, does that say asbestos.
9        Now, let's just take, for instance,
10 tremolite asbestos.  Before you have tremolite
11 asbestos you have to have tremolite, right?
12    A.    Well, yes, tremolite asbestos would
13 also be, the correct mineral name for the
14 identification would also have tremolite part of it.
15    Q.    You have to have the actual mineral
16 tremolite present; true?
17    A.    That's true.
18    Q.    And so same question for something
19 like anthophyllite; if you have anthophyllite
20 asbestos, you have to have anthophyllite, the
21 mineral, present, correct?
22    A.    Correct.  It would be the asbestiform
23 variety of anthophyllite, yes.
24    Q.    And if we go to some of the earliest
25 studies that Johnson & Johnson had, and you're

Page 9

1 familiar with Battelle Memorial?
2    A.    I am.
3    Q.    They were looking for the presence of
4 certain minerals, right?
5    A.    I don't know if that was their
6 purpose.  A lot -- they were doing it for a variety
7 of purposes and they were reporting on minerals they
8 were seeing, yes.
9    Q.    I don't want to have to get too
10 detailed with you on this, but within these talc
11 deposits there can be upwards of 20 or 25 other
12 minerals in with the talc, correct?
13    A.    Depending on the deposit and other
14 factors, there could be many minerals present.
15    Q.    Right.
16        And you're aware from looking at the
17 Battelle studies in the '50s, '60s and early '70s,
18 that they were really focused on about three or
19 four; they looked at chlorite, they looked at
20 dolomite, they looked at tremolite.  Correct?
21    A.    I don't understand that question.
22 I'm sorry.
23    Q.    They looked at, of the 20, 25,
24 however many possible minerals could be present in
25 the talc, they looked at about four, five of them,

3 (Pages 6 - 9)

1 correct?

2    A.    I don't understand that.  They were
3 characterizing what they saw, dominant in the talc.
4 Talc was the dominant mineral.  Then you're going to
5 be chlorite and the dolomites and carbonates would
6 be the next most frequent, and then on some of the
7 reports there was a small amount of tremolite they
8 observed.

9    Q.    In fact, tremolite came up quite a
10 bit in those reports, correct?

11    A.    Well, many of those are testing of
12 the same samples, so yes, you wouldn't expect a
13 repeat finding if it was actually there.

14    Q.    You're not saying these are repeat
15 samples, are you?

16    A.    If you look at, many of those tests
17 are of Italian 1 and Italian 2 that are repeated
18 over and over again, so a lot of those are just
19 testing of the same material for different purposes.

20    Q.    Italian 1 and Italian 2 were two
21 different grades that were coming out of the same
22 mine, correct?

23    A.    That's correct.

24    Q.    All right.  So you guys spent some
25 time going through the boards and looking at the

1 documents and I'd like to do a little bit of that,
2 too, to sort of give us the full picture on the
3 story.  And I think you said yesterday, you said you
4 really have to dig into the documents and learn what
5 you can, right?

6    A.    As much as possible, yes.

7    Q.    So I'd like to do that a little bit.

8         The first thing I want to do is show
9 you, this is the Fred Pooley 1972 Italian study that
10 he did, and you guys talked about that, correct?

11    A.    We did.

12    Q.    It's like 150 pages long.  But if you
13 go right to the conclusions, it says this:  "The
14 talc specimens were, however, plate-like in
15 appearance with varying quantities of lath-like
16 particles coupled with fibers which were textile in
17 appearance.

18         "Both lath and textile types of
19 particles were not composed of minerals associated
20 with the commercial asbestos industry.  Particles
21 formed from amphibole mineral found at the mine were
22 hardly fibrous in character, the majority of the
23 tremolite breaking to give compact particles."

24         Right?  Did I read that correctly?

25    A.    You did.

1    Q.    He says they were hardly fibrous,
2 right?

3    A.    That is the word he uses, yes.

4    Q.    Now, when you dig into the documents,
5 have you looked at Dr. Pooley's testimony by -- that
6 was, I believe, Mr. Bicks, who is Mr. Dubin's
7 partner, was present at the deposition.

8         Have they shown you this testimony
9 about this section?

10    A.    I don't believe so.

11    Q.    Let me show it to you and ask you
12 some questions.

13         MR. DUBIN:  Your Honor, I would
14 object.

15         THE COURT:  Sure.

16         (Sidebar.)

17         MR. DUBIN:  I didn't understand he
18 was intending to cross-examine this witness with the
19 portion of the transcript they're not introducing
20 into evidence that he says he hasn't reviewed.  I
21 wasn't even allowed to ask him about things like the
22 Blount transcript that he has reviewed and
23 considered for purposes of his opinion.

24         It's not part of his opinion in the
25 case, nor litigation deposition of Dr. Pooley, what

1 I understand your Honor's guidelines to be part of
2 the record for purposes of punitive damages.

3         MR. PANATIER:  The Blount situation
4 was one of what the disclosure was and what the four
5 corners of the report was.  That was a scope issue
6 having to do with notice.  This is not.  This is
7 what have you reviewed when he commented on this.
8 And Dr. Pooley -- I can actually lay a foundation.
9 I can ask him --

10         THE COURT:  Let him just complete,
11 let him finish --

12         MR. DUBIN:  Okay.

13         THE COURT:  -- what he was saying.

14         MR. PANATIER:  I can lay a
15 foundation.  I can ask him if Dr. Pooley clarified
16 what he meant by hardly fibrous.  Would you like to
17 see it?  I'm happy to do that.  If he says no, fine.

18         MR. DUBIN:  That is a gamesmanship
19 technique to ask that in front of the jury to try to
20 get something in that's not admissible.  He also
21 looks like he's going to hand him a page of what was
22 a full day deposition which the witness would need
23 an opportunity to have reviewed in full before
24 answering questions.

25         MR. PANATIER:  An expert can consider

1 matters that are hearsay, that are inadmissible and
2 he can evaluate it. If he believes he needs more
3 context, it's three questions. And if he says I
4 need more context, he can say he needs more context.
5 But he's not gonna. And this came in in Phase I. I
6 crossed John Hopkins with it.
7         THE COURT: Okay. So during his
8 direct you went through plaintiffs' boards and went
9 through documents --
10        MR. DUBIN: Correct.
11        THE COURT: -- as to whether or not
12 it was asbestiform, non-asbestiform, how it was
13 categorized. Was this document one that plaintiff
14 was --
15        MR. PANATIER: This is.
16        THE COURT: I'm sorry, the defendants
17 went through on direct?
18        MR. PANATIER: This document is.
19        MR. DUBIN: I did not go through --
20 this is a multipage deposition. We're talking about
21 historical documents what they actually said. He's
22 questioning him now about what the historical
23 documents says which goes to whatever Johnson &
24 Johnson's knowledge was at the time. If this
25 witness -- we're now getting into litigation

1 depositions.
2         First of all, the witness would need
3 an opportunity to review the deposition and comment
4 on whether the plaintiffs would put that into
5 evidence if they wish, but not with this witness.
6 Otherwise, I don't see why I can't ask him about
7 things that Dr. Blount said about her findings.
8         THE COURT: Well, he was limited to
9 the four corners of his report. Dr. Blount was not
10 in the four corners of his report. Here this is a
11 document, the underlying document which you went
12 through with him on direct.
13        This is permissible cross-examination
14 and you'll have the opportunity for redirect.
15        MR. DUBIN: I would ask the witness
16 be given a full copy of the transcript and enough
17 time to read the transcript before being asked the
18 questions about two lines from the transcript. I
19 think that is only fair.
20        THE COURT: I think that you could
21 find if counsel is mischaracterizing those sections
22 you have the opportunity on redirect.
23        MR. DUBIN: Do you have the full
24 transcript?
25        MR. PANATIER: I don't have --

1         MR. DUBIN: Then --
2         THE COURT: You will have it before
3 redirect. Have someone work on that.
4         MR. PANATIER: We will.
5         (Sidebar ends.)
6         THE COURT: Proceed.
7 BY MR. PANATIER:
8     Q.    All right. So I'm going to hand you
9 an excerpt from Dr. Pooley's deposition and do you
10 see at the top it says, "Fred Pooley, Ph.D."?
11    A.    It does.
12    Q.    That's the same Pooley that authored
13 this report and the Pooley that you talked about at
14 length?
15    A.    Yes.
16    Q.    Right? Okay.
17         If you go to the second page there's
18 a reference, there's some highlights there and
19 there's a reference to Mr. Bicks, and the question
20 you're asked, the question you're asked is,
21 "Mr. Bicks has inadequately quoted this report.
22 Particles formed from the amphibole mineral found at
23 the mine were hardly fibrous."
24         And you and I just read that, right?
25    A.    That's correct.

1     Q.    Dr. Pooley said yeah.
2         Next question, "The majority broke to
3 give compact particles. They got too small.
4 Doesn't mean all of them did, does it?"
5         And Dr. Pooley, he has to ask it
6 again, "Doesn't mean all of them did, does it?"
7         And Dr. Pooley says nope.
8         The next question was, "So he didn't
9 quote it here, but you found tremolite that was
10 asbestiform that didn't break apart, didn't you?"
11         And he said, "Yes, a few particles.
12 Yes."
13         Correct?
14    A.    You read that correctly.
15    Q.    Okay. Dr. Pooley did find
16 asbestiform tremolite, correct?
17    A.    No. That is not what he says in his
18 report and this question is confusing.
19    Q.    Well, we can look at it with our
20 eyes. We just saw this section here.
21         Oops, can I go to the Elmo, please?
22 Thank you.
23         We just saw this section here,
24 "particles formed from the amphibole mineral found
25 at the mine were hardly fibrous," right?

Page 18

1    A.    Yes.
2    Q.    And the lawyer there asks this
3  question, "Doesn't mean all of them did, does it?
4    "Nope.
5    "So he didn't quote it here, but you
6  found tremolite that was asbestiform that didn't
7  break apart, didn't you?
8    "ANSWER:  Yes, a few particles.
9  Yes."
10    Did I read that right?
11    A.    You did.
12    Q.    When you're talking about TEM with
13  the electron microscope, if you see just a few
14  particles in this tiny, tiny, tiny little bit,
15  depending on the dilution and all of that, you could
16  be talking about thousands to millions to billions
17  of fibers, depending; correct?
18    A.    I don't know if you'd ever get to
19  billions on only a few, but again, it would depend
20  on the math on where the concentration would go.
21    THE COURT:  Counsel, for the record,
22  could you identify that Pooley report by exhibit
23  number?
24    MR. PANATIER:  I'm sorry.  We didn't
25  have it marked, but we would mark it as, I think we

Page 19

1  have an S-4 --
2    MR. DUBIN:  Defense 7038.
3    THE COURT:  Defense 7038?
4    MR. DUBIN:  I believe so.
5    MR. PANATIER:  The Pooley report?
6    THE COURT:  Yes.
7    MR. PANATIER:  We would mark the
8  deposition excerpt just as S-4 for identification.
9    THE COURT:  Thank you.
10    (S-4 was marked for identification.)
11  BY MR. PANATIER:
12    Q.    You also talked about Colorado School
13  of Mines, some of their findings, right?
14    A.    I did.
15    Q.    And some of the things that I had put
16  on our boards?
17    A.    That's correct.
18    Q.    You talked about this document from
19  July 23rd, 1973?
20    THE COURT:  For the record, what was
21  that marked as?
22    MR. PANATIER:  I don't remember.
23  They didn't have -- they didn't have the exhibit
24  numbers up that I saw.
25    THE COURT:  You're going to have

Page 20

1  to --
2    MR. DUBIN:  I'm sorry, which
3  document?
4    MR. PANATIER:  July 23rd, '71.  Do
5  you guys have it marked?
6    MR. DUBIN:  I'm sure we did.
7    MR. HYNES:  That's 2386.
8    THE COURT:  Thank you very much.
9    MR. PANATIER:  This is 2386.
10  BY MR. PANATIER:
11    Q.    All right.  July 23rd, 1971.  They're
12  looking at the baby powder talc, correct?
13    A.    One of the samples, yes.
14    Q.    Right.
15    And they said, "Trace amounts of a
16  mineral with a lattice spacing of 3.05 A was noted
17  in the head and tail samples," correct?
18    A.    Correct.
19    Q.    They don't even identify what
20  amphibole that would be, correct?
21    A.    That's not what I said.  May I go
22  further?
23    Q.    Sure, go ahead.
24    A.    Okay.  Thank you.
25    When you have a mineral and you do

Page 21

1  your X-ray diffraction on it, we showed you the one,
2  we showed the jury the one graph we had all those
3  different peaks.  So every mineral will have a set
4  of peaks.  Some of those peaks will be unique to
5  that mineral, some of the peaks will not be unique
6  to that mineral.
7    So the specific peak that would
8  correspond to that 3 Angstrom, that 305 A, as they
9  referred to in the document, that is not a unique
10  peak for an amphibole.  That could be any number of
11  materials.  The unique peak for amphiboles are at
12  different positions which they don't make any
13  mention of.
14    So you assume they weren't seeing the
15  unique features of the amphibole, but they had some
16  peak that they couldn't match up.  An amphibole is
17  only one of many possibilities that could match for
18  that peak.
19    Q.    Okay.  Well, I'm going to show you
20  Plaintiffs' Exhibit 3695-25.  This is eight days
21  later.  August 3rd.
22    Do you see that?
23    A.    I do.
24    Q.    Do you see where they say
25  anthophyllite, and they say 3.05 A?

6 (Pages 18 - 21)

Page 22

1    A.    That's correct.  That is a, that is
2  one of many peaks for anthophyllite.
3    Q.    Okay.  So they identified in the
4  Vermont 66, 305 A, eight days later, they identified
5  that as anthophyllite, correct?
6    A.    No.  That's incorrect.  They're
7  simply reporting, so if you pull up the -- may I
8  explain further?  I'm sorry.
9    Q.    I'm just going to ask you, sir, do
10  they identify eight days later anthophyllite as
11  having major anthophyllite lines at 8.5 A and 3.05
12  A?
13    A.    That is correct.  Anthophyllite would
14  have -- those are two of the many reflections for
15  anthophyllite that they identified there.
16    Q.    Okay.  Let's look at, this is
17  Plaintiffs' Exhibit 2808, because I want to now get
18  the full story.  You said you had to dig into the
19  documents, so let's do that a little bit.
20          This is June 30, 1971.  And you can
21  see here, Colorado School of Mines.  And they report
22  that "Based upon X-ray diffraction and microscopical
23  analyses of the Vermont finished product plant run
24  sample 344 L" -- now, you know 344 L was a
25  production sample of Johnson's Baby Powder, correct?

Page 23

1    A.    I believe it was.
2    Q.    -- "and six monthly Vermont finished
3  product samples, only very trace amounts of
4  tremolite actinolite were identified."  Right?
5    A.    That's correct.
6    Q.    They looked at seven things, they
7  looked at one 344 L, which was baby powder, and then
8  they looked at the finished product samples for six
9  other monthly Vermont runs of the product, correct?
10    A.    I don't know the number here based on
11  what you're showing me.
12    Q.    Right there it says six.
13    A.    I apologize.
14    Q.    Okay.
15    A.    Thank you.
16    Q.    No problem.
17    A.    I'm sorry, I need to go back, I don't
18  know the number of samples.  They're just saying
19  samples that represented six monthly runs.  I just
20  want to make sure we're talking about the correct
21  number of samples.
22    Q.    That's fine.  They tell us.
23          MR. DUBIN:  Do you have a copy?
24          MR. PANATIER:  I'm pulling these
25  straight out of the admitted exhibits that we've --

Page 24

1          MR. DUBIN:  I am just asking --
2          THE COURT:  Excuse me, can you
3  provide a copy to the witness?
4          MR. PANATIER:  Your Honor, I pulled
5  these straight out in response to cross.  They have
6  been provided to counsel.
7          THE COURT:  Does anyone have a copy
8  for the witness?
9          MR. PANATIER:  I'll let the witness
10  look at it first if he wants to look at it.
11          THE COURT:  Thank you.
12          MR. PANATIER:  Here you go.
13  (Handing.)
14          MR. DUBIN:  What is the exhibit
15  number?
16          MR. PANATIER:  That was 2808.
17  BY MR. PANATIER:
18    Q.    That's their methodology that they go
19  through and they detail, correct?
20    A.    Yes, they do talk about their
21  methodology there.
22    Q.    This next document, I think, might
23  help us understand whether they were looking at
24  separate samples.  If you want to look at this.
25  This is Plaintiffs' Exhibit 2378.  I'll show it to

Page 25

1  you.  July 7, 1971.
2          Does this help right here?
3    A.    Let me finish this document.
4    Q.    Okay.
5    A.    I'll go to the next one.  Thank you.
6          MS. BROWN:  Your Honor, we do have
7  extra copies of what counsel's asking about that we
8  can give to the witness.
9          THE COURT:  Thank you very much.
10          MS. BROWN:  Chris, this is the first
11  one.
12  BY MR. PANATIER:
13    Q.    Now we're looking at this one, and
14  this one is from July 7, 1971, right?
15    A.    Yes.  This one is.
16    Q.    Do you see here that they look at
17  sample 344 L and then six production samples, right?
18    A.    Okay.
19    Q.    And those are all different samples,
20  correct?
21    A.    Yes.
22    Q.    So they are six independent samples,
23  plus a seventh finished product sample, right?
24    A.    Correct.
25    Q.    And you could see, sir, that they

7 (Pages 22 - 25)

1 find tremolite/actinolite in six of the seven,
2 including the bottle of baby powder, 344 L, right?
3     A.     Again, I'm not sure if 344 L is a
4 baby powder, but yes, they identify trace tremolite
5 actinolite by X-ray diffraction in that sample.
6     Q.     And I asked you if that was a bottle
7 of baby powder, you said you believed it was?
8     A.     I'm trusting you on that.  I don't
9 know for sure without checking more documentation.
10     Q.     Okay.  Well, you told this jury about
11 the Langer story yesterday, right?
12     A.     Um-hum.
13     Q.     And the bottle that he was looking at
14 was 344 L, correct?
15     A.     Okay.
16     Q.     Okay.  So here they report, and this
17 is on July 7, they report tremolite/actinolite in
18 six production samples and a bottle of baby powder,
19 right?
20     A.     Five production samples and the 344 L
21 sample, yes.
22     Q.     Correct.
23         One of the production samples was
24 non-detect, correct?
25     A.     True.

1     Q.     The next exhibit is Plaintiffs'
2 Exhibit 2385.  I'll let you look at it and then I'll
3 retrieve it.  Okay?
4     A.     Okay.
5     Q.     Okay.  You got it?
6     A.     I do.
7     Q.     So this is now July 29.  So we just
8 looked at July 7.  Now we're looking 22 days later.
9 And you can see this is an internal memo, right?
10     A.     I see that.
11     Q.     And you can see here it just says,
12 "The talc used in Johnson's Baby Powder is obtained
13 from a selected mine in Vermont where the ore
14 consists mainly of platy talc with only trace
15 amounts of fibrous minerals tremolite/asbestos
16 contaminated talc."
17         They call them fibrous minerals,
18 correct?
19     A.     Correct.
20     Q.     "It is free of chrysotile fibers
21 which may be called pure asbestos by the layman,"
22 and they go on and they talk.
23         But down here you could see that they
24 have, they're discussing the Colorado School of
25 Mines' research reports that we have now looked at,

1 right; June 30 and July 27, correct?
2     A.     They do reference that.  Yes.
3     Q.     Now we go four days later.  There's a
4 meeting at the FDA on August 3rd, 1971; correct,
5 sir?
6     A.     I believe so.
7     Q.     And this is Plaintiffs' Exhibit 2390.
8 I'll let you peek at this.  Here is a copy if you
9 want.
10     A.     Yeah.  That's fine.
11     Q.     Here's the last one, if you want to
12 look at it.
13     A.     Thank you.
14     Q.     All right.  So August 3rd, 1971,
15 there's a meeting at the FDA.  And if we want to
16 know who was there, at the end there's a attendance
17 list, correct?
18     A.     Yes.  On page 6.
19     Q.     Johnson & Johnson brought one, two,
20 three, four, five, six, seven, eight, nine people,
21 correct?
22     A.     Appears correct.
23     Q.     Mr. Caneer is from the Colorado
24 School of Mines, right?
25     A.     That's correct.

1     Q.     And you could see that they --
2     A.     Which page are you on now?
3     Q.     I'm just paging through it just to
4 give us a general appreciation.
5         Each person or many of the people
6 actually stood up and presented, correct?
7     A.     That's typically what would happen at
8 a meeting like this, yes.
9     Q.     All right.  The next exhibit is 2391,
10 also 8/3rd.  To get our bearings, what I'm showing
11 you now is Johnson & Johnson's minutes, their memo.
12 And now I'm going to show you the FDA's.  Okay?
13 This is the FDA's copy.  It's not quite as good.
14         But if you could see at the top
15 that's 8/3/71.  And feel free to page through it, if
16 you'd like.
17         All right, sir.  On the first page we
18 could see this is from August 3rd, '71, and this is
19 the FDA version.
20         Do you see that?
21     A.     Yes, I do see that.
22     Q.     And it says, "To specify a laboratory
23 purpose -- to specify a laboratory procedure for the
24 determination of asbestos in cosmetic talc powders
25 which will give consistent, meaningful results, this

1 may require answers to questions such as:  Is there
2 a need to count not only asbestos fibers but also
3 non-asbestos fibers and fibrous talc," and it goes
4 on, correct?
5      A.      Correct.
6      Q.      I just want to go to the attendance
7 list on the next page.  Starts here.  Malcolm Ross,
8 and then you see the folks from Johnson & Johnson,
9 right?
10     A.      Yes.
11     Q.      And there's Mr. Caneer again, he's
12 from Colorado School of Mines; true?
13     A.      Correct.
14     Q.      And on the next page they have
15 presentations, Analytical Methods For Asbestos.  And
16 there's Mr. Caneer again from Colorado School of
17 Mines, right?
18     A.      Correct.
19     Q.      If you turn to, again, this thing is
20 a rough copy, if you go to the page at the top it's
21 marked 5.  So under the date --
22     A.      Yes.
23     Q.      -- go halfway down, there's what
24 Mr. Caneer said.  "W.T. Caneer, Colorado School of
25 Mines Research Institute.  Reviewed petrographic and

1 electron probe studies of J&J."  He's talking about
2 the Johnson & Johnson talc, right?
3      A.      Correct.
4      Q.      "Showed clean fiber"?
5      A.      That's what it says.
6      Q.      Right?
7              Do you know what that means?
8      A.      By that term, no, I'm not sure what
9 the author of this memo meant by that.
10     Q.      Okay.  Whatever he's saying, he's
11 saying the powder was clean somehow; fair?
12     A.      Well, again, I don't know.  Just
13 says, "showed clean fiber."  You'd have to ask the
14 person who made the minutes to know what he meant at
15 that time.
16     Q.      Okay.  Then there was a mention here
17 about Mr. Geiger or Geiger.  Geiger or Geiger was
18 with McCrone, correct?
19     A.      I'm sorry, what page are you on.
20     Q.      The very next page, page 6.
21     A.      Yes.  Mr. Geiger was at McCrone.
22     Q.      And the author of this memo just
23 says, "Geiger questioned some of Art Langer's
24 identification of chrysotile fibrils.  This was a
25 smokescreen, but a good counter-offensive to Langer

1 finding chrysotile everywhere."  Right?
2      A.      You asked me if you read that
3 correctly?
4      Q.      Yeah.
5      A.      You read that correctly.
6      Q.      That's what's in the reported
7 minutes, right?
8      A.      Whoever wrote the minutes, that was
9 their interpretation.
10     Q.      Right.
11             So we know there's this meeting on
12 8/3/71.  So before that, we have the results of the
13 344 L, the baby powder, and the six production
14 samples where five are positive for tremolite
15 actinolite, correct?
16     A.      For those minerals, yes.
17     Q.      Then within a month or a month and a
18 half, there's a meeting at the FDA where Mr. Caneer
19 says the Johnson & Johnson samples represented clean
20 fiber, whatever that means, right?
21     A.      I don't know what Mr. Caneer said.
22 That's what -- whoever wrote the minutes, that's
23 what they wrote.  I don't know what Mr. Caneer would
24 have said at that time.
25     Q.      That's fine.

1              This is Exhibit 2381, Plaintiffs'
2 Exhibit 2381.  This is three days later.  And this
3 is a memo that you and Mr. Dubin went over
4 yesterday.  This is three days after that meeting
5 with the FDA.  And this is from the Colorado School
6 of Mines to Johnson & Johnson, right?
7      A.      Correct.
8      Q.      And it's from Maurice Pattengill,
9 M.G. Pattengill, right?
10     A.      Yes.
11     Q.      And it says, "After attending the
12 Washington meeting August 3rd, '71, and listening to
13 the arguments and data presented, I have the
14 following to add to the data previously sent to you
15 concerning the Vermont talc samples.  In the report
16 of July 7, 1971, there is some question relative to
17 the presence of tremolite actinolite."
18             Remember, this is the one where they
19 found the tremolite actinolite in the baby powder
20 and the five of six production runs, correct?
21     A.      That's correct, by X-ray diffraction,
22 yes.
23     Q.      He says there's some question.  "The
24 samples were prepared in a room that was not
25 entirely clean and were prepared in conjunction with

9 (Pages 30 - 33)

Page 34

1 standard type asbestos samples. Subsequent X-ray
2 work on six monthly production samples and the 344 L
3 product sample shows no definite indications of any
4 asbestos type minerals within our limits of
5 detectability. The trace amounts I saw were
6 evidently contamination from standard asbestos
7 samples."
8         So three days after the meeting with
9 the FDA, this guy from Colorado School of Mines
10 writes to Johnson & Johnson and said, you know, I've
11 been thinking about it, and I just realized that it
12 was actually contamination, right?
13     A.    That's what he reports.  Yes.
14     Q.    Now, if you are aware that there's a
15 contamination issue in a lab, right, you immediately
16 rerun the samples, don't you; clean it up, you rerun
17 it?
18     A.    Once you become aware there may be an
19 issue, you would look into it.  So depending when
20 your knowledge came that there may be an issue with
21 contamination is when you would take action.
22     Q.    And apparently this fellow's
23 knowledge came three days after a meeting with the
24 FDA, correct?
25     A.    That's what he states.

Page 35

1     Q.    And he said, "After attending the
2 Washington meeting," right?
3     A.    Yes.
4     Q.    And it's signed by Maurice
5 Pattengill, right?
6     A.    That's correct.
7     Q.    Maurice Pattengill.
8         Here's the meeting.  Let's go to the
9 attendance list.  Did Maurice Pattengill attend this
10 meeting according to the attendance list?
11     A.    Well, the list is a prospective
12 participants list.  So again, we're talking about he
13 may not have participated.  He may have been in
14 attendance, but he was not giving any information or
15 presenting any information.
16     Q.    Hold on, hold on.  Look.  Look at the
17 top.  "The following people attended the symposium."
18     A.    Well, I'm looking at the FDA minutes
19 which talks about participant list.
20     Q.    So he's not on either.  He's not on
21 the prospective participants list and he's not on
22 the attendance list, is he?
23     A.    I would have to check, but if you're
24 asking me the question, I assume he was not in
25 attendance, or at least he's not recorded as being

Page 36

1 in attendance.
2     Q.    And there's the whole list.  Do you
3 see his name on it?
4     A.    I can't do that.  I'm going to go
5 crazy.
6     Q.    Here.
7     A.    That's fine.  I have the document
8 here.
9         You are correct, I do not see his
10 name.
11     Q.    So when we dig into the documents
12 what we see is that they had detected what they
13 detected.  Then they had a meeting at the FDA.  Then
14 a guy who wasn't there said after being there, I
15 remembered now that it was all contamination.
16         Pretty good summary?
17     A.    No, I don't think -- again, we do not
18 know what these lists represent.  He says he was
19 there in the one letter.  I have no idea how to
20 verify whether he's telling the truth or not.
21     Q.    Well, sir, we do know what the lists
22 represent; one is a prospective attendees list and
23 one is an attendees list, right?
24     A.    No.  They talk about participants.
25 Being an attendee to a meeting and a participant in

Page 37

1 a meeting are different things.
2     Q.    Is his name on either of those?
3     A.    As I've stated, his name is not on
4 either of the documents.
5     Q.    That's the Colorado School of Mines.
6         Let's talk a little bit about
7 Professor Lewin.  This will be Exhibit 2852.
8         Dr. Lewin was at NYU, right?
9     A.    That's my understanding.  Yes.
10     Q.    And in August of 1972, in August of
11 1972, Dr. Lewin, who has been retained by the FDA,
12 reports a series of findings of asbestos in
13 different commercial talcs, correct?
14     A.    By X-ray diffraction, yes.
15     Q.    By XRD.  Right.  That's just to get
16 our bearings.  That's August 3rd, 1972.
17         He reports asbestos in two of 11 of
18 the Johnson & Johnson samples, correct?
19     A.    I believe that's accurate.
20     Q.    Now, XRD, at this time, had a
21 detection limit of about half a percent, correct?
22     A.    Actually with Dr. Lewin's work, I'm
23 not sure.  I don't think he ever showed what his
24 detection limit was.
25     Q.    You wouldn't have expected it to be

10 (Pages 34 - 37)

Page 38

1 less than that, correct?
2    A.   Not less than that, no.
3    Q.   Right.
4       So even if we have something as low
5 as half a percent detection limit by XRD, asbestos
6 can be present in millions and billions of fibers
7 per gram even at half a percent detection, correct?
8    A.   If it's there, it would just depend
9 on how much is there.
10    Q.   Right.
11       But you could have millions to
12 billions of fibers per gram and not see it at all at
13 half a percent detection limit?
14    A.   Well, by X-ray diffraction you can't
15 even determine whether something is actually
16 asbestos or not. But if you're talking about from a
17 numerical count, yes, there would be many fibers of
18 asbestos present in a sample which would have a
19 concentration of, let's say, .1 percent.
20    Q.   XRD can detect chrysotile, can't it?
21    A.   No, it cannot. It only can -- it
22 only is able to identify crystal structures, so it
23 can detect whether you have serpentine minerals.
24 There are other serpentine minerals other than
25 chrysotile, so you have to still do further work.

Page 39

1    Q.   Serpentine is the class into which
2 chrysotile falls, correct?
3    A.   Mineral group, yes.
4    Q.   Then he issues a final report on
5 7/31/73, and you and Mr. Dubin talked about his
6 final results, right?
7    A.   I believe we showed some of them,
8 yes.
9    Q.   I want to talk about what happened
10 between those two dates, right, as we dig into the
11 documents. But before that, so this is Exhibit
12 1297.
13       Professor Lewin was hired by the FDA
14 to do this work because he was a renowned scientist,
15 right?
16    A.   I'm sorry?
17    Q.   Dr. Lewin was hired by the FDA
18 because he was a renowned scientist?
19    A.   Well, let's just read the language.
20 They state, "The Internationally recognized expert
21 on mineralogical chemistry."
22    Q.   Okay. All right. That's fine.
23       The FDA says, "I chose Dr. Lewin for
24 this work because he is an Internationally
25 recognized expert on mineralogical chemistry and

Page 40

1 because he is a member of the academic community and
2 therefore, likely to be impartial in a confrontation
3 between industry and Government.
4       "Furthermore, his competence had
5 previously been recognized by industry by virtue of
6 their own use of him as a consultant which appeared
7 to confer a desirable immunity against possible
8 industry attacks on the validity of the results."
9       Did I read that right?
10    A.   You did.
11    Q.   Of course, that didn't happen. His
12 results were assailed by Johnson & Johnson and its
13 consultants, correct?
14    A.   And others. But again, you look at,
15 you look at what he was doing and whether it was
16 feasible or not, what he was claiming, and it's not.
17    Q.   Okay. So let's look at some other
18 documents and see what happened.
19       So he did his first batch of testing
20 by, I'll use a different marker, by XRD, right?
21    A.   He was using powder X-ray
22 diffraction, yes.
23    Q.   This will be Exhibit 3441.
24       Now, you're aware, sir, are you not,
25 that Johnson & Johnson actually looked at some of

Page 41

1 Lewin's samples on its own internally?
2    A.   I am aware of that.
3    Q.   One of the folks who was at Johnson &
4 Johnson was a fellow named Robert Rolle, and
5 here's -- this is from his files; do you see that,
6 from Robert Rolle or R. Rolle's files?
7    A.   I do.
8    Q.   Do you see, sir, that here's some
9 notes about the Lewin samples of Shower to Shower,
10 and he's dated August 10, 1972. That's seven
11 days after the FDA first got the report, correct?
12    A.   On that date, yes.
13    Q.   It says, "About one fiber or
14 rod/needle every 500 particles." Correct?
15    A.   You read that correctly.
16    Q.   And that's in the Lewin sample of
17 Shower to Shower, right?
18    A.   Yeah. I mean, the header says,
19 "Lewin samples of Shower to Shower."
20    Q.   And you see it says, "Approximately
21 one-third of these are tremolite"?
22    A.   Of the rods and needles that they're
23 seeing for every 500 particles, yes.
24    Q.   Correct.
25       And so on 8/10/72, J&J ID's, he says,

11 (Pages 38 - 41)

1 he uses three terms, fibers, rod, needle, tremolite,
2 correct?
3      A.    He says -- I'm sorry.  Let's just
4 read it.  "One fiber or rod needle every 500
5 particles."
6      Q.    Right.
7      A.    "One-third of these are tremolite.
8 Two-three rolled talc or talc shards."
9      Q.    So he identified fiber/rod/needle of
10 tremolite?
11     A.    Yes.  In this context for quantities.
12     Q.    Now, for us to understand or to
13 characterize how much -- how many tremolite fibers
14 rods or needles that is, we kind of need to have an
15 understanding about what's in a bottle.  So he says
16 they identify one every 500 particles.
17           Now, 99.9 percent of what's in those
18 bottles is talc flakes, right?
19     A.    I've never done those calculations.
20 I don't know.
21     Q.    It's mainly talc?
22     A.    The majority of the mineral in a
23 cosmetic talc is talc, yes.
24     Q.    So as -- now, you're a mineralogist?
25     A.    I a m.

1      Q.    And a geologist?
2      A.    Kind of the same thing, but yes.
3      Q.    Okay.  So if we have one, let's say,
4 22-ounce bottle, the number of total particles in
5 that bottle is astronomical, right?
6      A.    It would be a very large number of
7 particles, depending on the grind.
8      Q.    Let's say J&J, since that's what
9 we're here for.
10     A.    Um-hum.
11     Q.    That number easily would exceed
12 hundreds of trillions of particles, correct?
13     A.    I've never done the calculation, but
14 it would be a very large number.
15     Q.    I mean, we can agree it would exceed
16 hundreds of trillions of particles, can't we?
17     A.    Again, I would have to do the
18 calculations.  These numbers get very big and are
19 hard to visualize.  I'd have to make some assumption
20 and do a calculation.
21     Q.    Can we agree it would be trillions of
22 fibers -- I mean trillions of particles?
23     A.    It would be many, many particles.  If
24 it's over trillions or hundreds of trillions or even
25 more, I wouldn't know as I sit here today.  I'm

1 completely guessing.
2      Q.    Let's just, for example, just do
3 something in the middle.  Let's say it's ten
4 trillion.  Okay?
5      A.    Okay.
6      Q.    Now, if you wanted to say, by in
7 terms of percentage of total particles, right, let's
8 say there was hypothetically, let's say there's
9 asbestos and the asbestos represents .00001.  Okay?
10     A.    Percent by weight, not by particle.
11     Q.    Of the particles.  We're going to say
12 it's of the particles because we can't do it by
13 weight, can we?
14     A.    You can do it all by weight.  Yes.
15 You can do it either way.
16     Q.    Let's do it both ways then.  I have
17 my calculator on my phone, so we can do that.
18           So in terms of total particles, you
19 tell me, you said you haven't done the math.  Let's
20 do the math.  You tell me what math we have to do.
21     A.    So you want particle by particle
22 count?
23     Q.    Let's do particle first, then we do
24 weight.
25     A.    That's fine.  You take your ten

1 trillion --
2      Q.    So, let me see.  Here, put it up
3 here.
4           That's ten billion, right?
5      A.    Yes.  There you go.
6      Q.    Is that ten trillion?
7      A.    That's ten trillion, yes.
8      Q.    Okay.  Then what do I do?
9      A.    I believe you times that by .00 -- do
10 that, four zeros and a one, that gives you, then you
11 would have to convert from the percentage, you have
12 to also divide by another hundred.
13     Q.    Okay.
14     A.    If my math on the fly up here is
15 accurate.
16     Q.    That would be a million particles of
17 asbestos, right?
18     A.    Under your hypothetical, yes, and
19 present at that concentration.
20     Q.    Right.
21           If there's only a trillion, right?
22     A.    Ten trillion.
23     Q.    If there's only ten trillion.
24           Now, you said you wanted to do it by
25 weight.  How do we do it by weight?

1    A.    We would just -- well, we have a
2  22-ounce bottle, you have to take that percentage,
3  would be -- sorry.  We have a 22-ounce bottle.
4    Q.    Right.
5    A.    And you are saying we have 0.0001
6  percent.  So you divide 22 by that number again, and
7  I believe you'd still have to correct for the
8  percentage and divide by another hundred -- or, I'm
9  sorry, you'd times by a hundred, I apologize.  Math
10  on the fly is always --
11    Q.    That's all right.
12           22 divided by .00001 equals, and now
13  what do I do?
14    A.    I believe you times it by a hundred
15  to take it out of the percent.
16    Q.    220 million, correct?
17    A.    Doesn't seem right.  We've done
18  something wrong in the math.  We can't have more
19  than the starting mass.
20    Q.    You know what, instead of putting you
21  on the spot for math 'cause you are a
22  geologist/mineralogist, not a mathematician, neither
23  am I.
24    A.    I can figure it out, just give me
25  time.

1    Q.    That's fine.  Let's do this, in terms
2  of sheer quantity, it's a lot of asbestos fibers
3  under this hypothetical, correct?
4    A.    I mean, again, it's all in context.
5  You're talking about -- I think we need to time
6  that -- it's not one million 'cause that would also
7  be times by a hundred, so it would be 100 million.
8    Q.    It would be 100 million particles?
9    A.    I believe that's correct.  The math
10  is wrong.
11           But again, you're looking -- so at
12  the end of that calculation, it's 100 million
13  particles out of ten trillion particles.
14    Q.    That's right.
15           If there's ten trillion particles
16  there, at this concentration you would have 100
17  million particles?
18    A.    That's correct.
19    Q.    Okay.  The reason I wanted to do that
20  is because he's saying about one fiber out of every
21  500 was a rod or needle and then a third of those
22  would be tremolite, right?
23    A.    That's what he reports.
24    Q.    Meaning, if we did the conversion on
25  that, he would be seeing about one fiber/rod/needle

1  of tremolite every 1500 particles.  Is that
2  accurate?
3    A.    According to these numbers, yes.
4    Q.    So he would be seeing something like
5  one out of every 1500.  But if we have trillions and
6  trillions, that adds up, doesn't it?
7    A.    Again, it would depend on how you
8  want to calculate the result, what those numbers
9  would be from a concentration standpoint.
10    Q.    Going back to the Lewin story, this,
11  of course, is an internal document that Johnson &
12  Johnson had regarding his samples, correct?
13    A.    Mr. Rolle, yes.
14    Q.    The next document is Exhibit 2424.
15           This is going to be August 10, it's
16  dated August 10.  It's a summary of an FDA meeting
17  from August 11, 1972.  So we have talked about one
18  meeting about a year earlier.  That was August 3rd,
19  1971.  Now we're talking about almost exactly a year
20  later, right, if we're in August '72, correct?
21    A.    Correct.
22    Q.    So I'm going to go here to 8/11/72.
23  There's a meeting with FDA.
24           All right.  Sir, do you see that this
25  is a summary of that FDA meeting that took place on

1  8/11?
2    A.    I do.
3    Q.    And it says, "The CTFA, FDA and
4  Johnson & Johnson meeting can be summarized as
5  follows."  And they give us some context.
6           "Johnson & Johnson provided hard data
7  showing that Shower to Shower is free of chrysotile
8  asbestos by electron microscopy, X-ray and light
9  microscopy on 15 batches, as well as on the actual
10  sample tested by Lewin.
11           "Lewin did not agree with McCrone's
12  interpretation of X-ray data; however, he could not
13  satisfactorily explain the absence of chrysotile
14  asbestos fibers in the electron microscopy grids.
15  He said it may be asbestos growing inside the
16  platelets of talc.
17           "On the basis of our data, CTFA was
18  able to say that the Lewin report is incomplete
19  since it relied only on an X-ray assay which must be
20  confirmed by microscopy."  Right?
21    A.    You read that correctly.
22    Q.    So they are saying look, it's got to
23  go confirmed by, and this would be light microscope,
24  correct, optical?
25    A.    They don't specify.  The earlier

1 paragraph speaks of electron microscopy of the Lewin
2 samples.
3     Q.     We can turn the page and see what it
4 says.  Paragraph 7, "Dr. Schaffner" -- who we know
5 is FDA, we've heard his name before -- "asked
6 Dr. Lewin to tell the group what work he proposed to
7 do to confirm his X-ray findings.  After some
8 discussion, Dr. Lewin said to be able to say
9 that a sample contained asbestos, the X-ray results
10 have to be confirmed by light microscopy."
11         All right?  Do you see that?
12     A.     That's what Lewin proposed to do,
13 yes.
14     Q.     That's right.
15         "If no asbestos tremolite or
16 chrysotile is seen, the sample is declared to be
17 free of asbestos.
18         "In subsequent discussions, Mr. Ian
19 Stewart pointed out that light microscopy may not
20 detect chrysotile fibers.  Dr. Weissler said they
21 recognize that some samples will be passed on that
22 basis, but they are willing to live with that."
23         First of all, did I read it right?
24     A.     You did.
25     Q.     So what they're doing now is the

1 proposal is that he confirm his results, he did it
2 with XRD, this non-microscope, and then confirm it
3 with optical microscopy, right?
4     A.     I don't agree with how you
5 characterized that.  Dr. Schaffner asked Dr. Lewin
6 to tell the group what he had proposed to confirm.
7 Dr. Lewin said he would confirm it with light
8 microscopy.
9     Q.     Okay.  That's fine.  I agree with
10 you.
11         So Lewin says he'll confirm -- "Lewin
12 to confirm with optical, but a problem is identified
13 with" --
14     A.     Dr. Ian Stewart of McCrone.
15     Q.     By McCrone, right?
16     A.     Correct.
17     Q.     And McCrone says it may not detect
18 the chrysotile fibers, right?
19     A.     That's correct.
20     Q.     Okay.  Now, many, in fact, the
21 majority of Lewin's findings were chrysotile,
22 correct?
23     A.     By X-ray diffraction, yes.
24     Q.     This approach was approved by the
25 whole group, wasn't it?

1     A.     Are you reading something now?
2     Q.     I'm asking -- you've been supplied
3 many, many hundreds of Johnson & Johnson documents,
4 correct?
5     A.     I have.  Yes.
6     Q.     And I presume you've gone through
7 them all?
8     A.     I have, the ones that have been given
9 to me.
10     Q.     Okay.  Let's just read it together
11 then.
12         "Dr. Schaffner said that this
13 procedure will be adopted in the proposed policy
14 statement.  He asked if anyone present had any
15 toxicological objections to the allowance of one
16 percent weight for weight asbestos in talc.  One
17 percent is the limit of detection by X-ray, i.e., a
18 non-detectable asbestos X-ray result may mean up to
19 one percent asbestos being present.  No objections
20 were raised."
21         Did I read that right, first of all?
22     A.     That's correct.
23     Q.     So what they were proceeding with was
24 to verify Lewin with a method that, one, would not
25 see all the chrysotile fibers, correct?

1     A.     May not see it, yes.
2     Q.     Okay.  And no one objected to a one
3 percent allowance of asbestos, including Johnson &
4 Johnson, correct?
5     A.     Again, this was -- I think you're
6 mischaracterizing what is happening here.
7         May I explain?
8     Q.     Let's see if we could clarify it.
9         "He asked if anyone present" --
10 Johnson & Johnson was present, correct?
11     A.     The FDA asked if anybody was present.
12 This is what they proposed to do to resolve the
13 Lewin issue that was presently facing the committee.
14     Q.     I appreciate that.
15         "He asked if anyone present" --
16 Johnson & Johnson was present, correct?
17     A.     Um-hum.
18     Q.     Yes?
19     A.     Yes.  Sorry.
20     Q.     Sorry.
21     A.     Non-verbal, I apologize.
22     Q.     For Andrea, I'm sorry.
23         "If anyone present had any
24 toxicological objections to the allowance of one
25 percent by weight asbestos in talc."  Right?

Page 54

1    A.    That was the question.
2    Q.    "And that a non-detectable XRD or
3 X-ray result may mean up to one percent asbestos is
4 actually present."  Correct?
5    A.    That's correct.
6    Q.    Nobody objected, including Johnson &
7 Johnson, correct?
8    A.    That is -- nobody objected, yes.
9    Q.    And it says that "Dr. Lewin promised
10 to complete his confirmatory phase 43 samples by
11 October 1st."  Right?
12    A.    That's what it states.
13    Q.    Now, the optical that Ian Stewart,
14 who at the time was Johnson & Johnson's consultant,
15 right?
16    A.    That's correct.
17    Q.    He said optical won't find the
18 chrysotile, correct?
19    A.    May not find the finest fibers of
20 chrysotile, yes.
21    Q.    And so when he issued his final
22 report, the optical did not confirm the chrysotile,
23 did it?
24    A.    That is, nobody found any chrysotile
25 in the samples by optical microscopy, true.

Page 55

1    Q.    He confirmed a result using a method
2 that they knew might not see the chrysotile,
3 correct?
4    A.    No.  That's incorrect.  There's
5 issues of sometimes when you have very small
6 chrysotile fibers, PLM will not be able to resolve
7 them.  That is the concern raised by Ian Stewart of
8 Walter McCrone.
9    Q.    Right.
10        Ian Stewart said it might not see all
11 the chrysotile present, correct?
12    A.    Correct.
13    Q.    That method is what Lewin used to,
14 quote, unquote, confirm his previous findings,
15 correct?
16    A.    That is what Lewin proposed to do,
17 and the FDA agreed to it and told him to do it.
18    Q.    Now, another document -- let's see
19 here.  Before I move on from Lewin, which I'm about
20 to do, some of the documents you went through
21 yesterday talked about some of Johnson & Johnson's
22 consultants.  There was Buerger, is it B-e-u --
23    A.    B-u-e-r-g-e-r.
24    Q.    Buerger, M.I.T.  He did XRD, right?
25    A.    That's correct.

Page 56

1    Q.    Which is, at least according to that
2 meeting minutes from August 11, '72, that was good
3 to about one percent, right?
4    A.    Well, what Lewin was doing he said
5 was down to one percent.  Buerger may have had a
6 lower detection limit.
7    Q.    May have.  Do you know what it was?
8    A.    I'd have to review his report if it's
9 in there or not.
10    Q.    In all fairness, just us talking
11 here, it's probably between half a percent and one
12 percent; is it not, sir?
13    A.    It can get down to .1 depending on
14 the instrumentation and how it's run.  But the
15 lowest you could probably get it with what they were
16 doing back then was .01.
17    Q.    Do you know what --
18    A.    0.1, I apologize.
19    Q.    Do you know what his sensitivity was?
20    A.    I'm not sure.  I'd have to --
21    Q.    Whether it was --
22    A.    -- whether he reported or not.
23    Q.    -- one or .1?
24    A.    Again, I'd have to review.  That's
25 all I'm saying.

Page 57

1    Q.    I'm going to put a question mark.
2        The next guy was Brown at Princeton,
3 and he did XRD as well, right?
4    A.    That's correct.
5    Q.    Then there was Colorado School of
6 Mines, and they did XRD, correct?
7    A.    In part, yes.
8    Q.    Then there was Carnegie, and they did
9 XRD, right?
10    A.    That's correct.
11    Q.    And then there was Pooley.  He did a
12 few things, including electron microscopy, right?
13    A.    Correct.
14    Q.    And then there was McCrone, who did a
15 few things, including TEM, right?
16    A.    Correct.
17    Q.    Now, we did this hypothetical, you
18 and I, where we said, and this is just assuming,
19 just assuming there's only ten trillion in a bottle
20 and it's present at .00 -- 00001, right, XRD, it
21 would be negative, negative, negative, negative.
22 Correct?
23    A.    If that was the actual situation.
24    Q.    Okay.  XRD is still the first step of
25 Johnson & Johnson's biweekly testing for its talc,

Page 58

1 isn't it?
2     A.    No, it is not.
3     Q.    Johnson & Johnson uses J4-1, correct?
4     A.    Not for the testing we do for them.
5 We follow the current U.S.P., but we do mandatory
6 microscopy.  We don't rely upon the results of
7 powder X-ray diffraction.
8     Q.    Right.
9           We're talking about their actual
10 testing frequency.  Okay?
11     A.    Yes.
12           MR. PANATIER:  I'm sorry?
13           MR. DUBIN:  We're having trouble
14 hearing.
15     A.    Okay.
16           THE COURT:  Even with the microphone,
17 you do have to speak up.
18     A.    I'll bring it closer.  Hopefully that
19 helps.
20           MR. MAIMON:  If he wants to put it on
21 the ledge, it would be higher.
22           THE COURT:  Try the ledge.  Let's see
23 how that works.
24           Thank you.
25 BY MR. PANATIER:

Page 59

1     Q.    So now you actually, you have a large
2 number of children, don't you?
3     A.    I have children, yes.
4     Q.    Just speak like you're trying to get
5 them to dinner.  Okay?  All right.
6           Now, let's talk about J4-1.  Okay?
7 J4-1 was the industry test adopted in about 1977,
8 correct, or '76?
9     A.    In conjunction with the FDA, but yes,
10 it was the industry standard at that time.
11     Q.    Okay.  And the way that worked, quite
12 simply, is an XRD test is done, right?
13     A.    I described this in my direct.  Yes.
14     Q.    Okay.  If XRD finds nothing, nothing
15 further is done, right?
16     A.    If you are following the method
17 exactly, yes.
18     Q.    If it finds something, then you do
19 optical or light microscope, correct?
20     A.    That is correct.
21     Q.    Okay.  There is no TEM in J4-1,
22 correct?
23     A.    That is correct.
24     Q.    Okay.  And so they actually describe
25 a .5 detection limit, correct?

Page 60

1     A.    I think the requirement is you have
2 to at least get to .5 to be able to run the method
3 as stated, yes.
4     Q.    So if XRD doesn't pick up the
5 presence of one of the minerals that can constitute
6 asbestos, under that method you stop and you sell
7 the talc, correct?
8     A.    If you follow that method explicitly,
9 yes.
10     Q.    Only if you pick it up at greater
11 than half a percent or thereabouts do you go and do
12 optical microscopy, correct?
13     A.    That's correct.
14     Q.    And the method is only for amphibole,
15 correct?
16     A.    As written, yes.
17     Q.    Not chrysotile, correct?
18     A.    That is correct.
19     Q.    Let's chat about this document that
20 you discussed yesterday with Mr. Dubin.  Here you
21 go, sir.  And this is exhibit -- I don't know what
22 exhibit this is.  Here you go.  But it's in
23 evidence.
24           It's dated August 6, 1971.  And
25 interestingly, that's the same day that

Page 61

1 Mr. Pattengill wrote to Johnson & Johnson saying
2 that he remembered that all those results were
3 contamination.
4           Do you recall that?
5     A.    That's not what he said.  He reported
6 that based upon him attending the FDA meeting, he
7 had reason to question what he had -- what had been
8 reported.  And then he went back, it appears, and
9 tried to -- investigated that and reported to
10 Johnson & Johnson.
11     Q.    Three days after the meeting, he said
12 he remembered it, right?
13     A.    No.  He says from attending the
14 meeting, something happened at the meeting that made
15 him think of that as a possibility, I am assuming.
16 But he attended the meeting, obtained some
17 information, went back to check some of his reports
18 and thought there was an issue and reported it.
19     Q.    Is it reasonable to think that what
20 made him think about this, maybe it was
21 contamination all of a sudden, is that Mr. Caneer
22 was reporting clean fibers to the FDA?
23     A.    I can't draw those -- I have no idea
24 what was said at that meeting and what was meant by
25 clean fiber in the FDA meeting minutes.

16 (Pages 58 - 61)

1    Q.    You talked about this document from
2 August 6, '71.
3    A.    Yes.
4    Q.    Where Mr. Ashton says, "I have
5 checked into the mineralization of that part of the
6 territory"?
7    A.    Correct.
8    Q.    You recall that?
9    A.    I do.
10    Q.    And he said that the minerals
11 included, you know, a number of things, but there's
12 chrysotile, tremolite and actinolite, right?
13    A.    Yes.
14    Q.    Okay.  And he's talking about
15 shipping a drum from the Crosetto mine in the
16 Chisone Valley of the Italian Alps, right?
17    A.    That's what it states.
18    Q.    Now, the Johnson & Johnson mine that
19 they actually got their talc from is called the
20 Fontaine or the Fontana mine, correct?
21    A.    It can be called that.  Yes.
22    Q.    Okay.  And, sir, did you say
23 something about does this have anything to do with
24 Fontana yesterday?
25    A.    Mr. Dubin said that.

1    Q.    Yeah.  I think you agreed with him,
2 didn't you?
3    A.    No.  I've reviewed my testimony, but
4 where Crosetto is and Fontana, they're across the
5 valley.  Those are both located at Val Germanasca.
6        I made the distinction, I believe,
7 when I answered Mr. Dubin's question, that Val
8 Chisone is a different valley where the mills are
9 located.  The actual mines are all up in Val
10 Chisone.  Both Crosetto area and in the Fontana
11 area.
12    Q.    Right.
13        So this would be the talc that they
14 are talking about putting into their baby powder,
15 correct?
16    A.    Possibly, assuming they were getting
17 it from the Crosetto side.  The records appear to be
18 they were getting it from the other side of the
19 valley, but it potentially could be.
20    Q.    It's the same overall geological
21 deposit, isn't it?
22    A.    Yes.  You literally have this, you
23 have like a fold of a talc body in there and then
24 the mountains have gone up and then erosion has cut
25 out the center part.

1    Q.    Let's talk about Dr. Langer.  And I
2 only have a couple documents for Dr. Langer.  This
3 one will be Exhibit 2374.
4        So Dr. Langer, the story you told
5 about Dr. Langer was that Dr. Langer had said he
6 found asbestos and then unsaid he found asbestos
7 basically, right?
8    A.    No.  I think his article said he may
9 have been mistaken.  He actually didn't do the
10 analytical work necessary to conclude that he had
11 found asbestos.
12    Q.    Okay.  Tell me if this sounds right
13 as to what the story was.
14        Initially they had a preliminary
15 report that said five to 25 percent asbestos.  He
16 said that was incorrect, that was preliminary.
17 Correct?
18    A.    The numbers escape me exact, but I'll
19 take your representation.
20    Q.    All right.  That doesn't sound like
21 it's incorrect, does it?
22    A.    No, it doesn't.
23    Q.    He always maintained there was trace
24 asbestos.  And, by the way, when we talk about these
25 numbers of .00001, that's scientifically, you call

1 that trace or sub trace, correct?
2    A.    It really depends.  Usually you
3 report out something as trace that's below your
4 detection limit.  So depending on the methodology
5 you are using would define what you're meaning by
6 trace.
7    Q.    Okay.  So it differs from scientist
8 to scientist?
9    A.    No.  It would differ between the
10 testing being done.  For example, if you were
11 performing X-ray diffraction and there was an
12 amphibole in there that was below your limit of
13 detection, you could report it out as trace.  Or you
14 lower your ability to quantify it, you would be
15 trace.
16        If you're doing TEM, a concentration
17 below your ability to quantify it would be a trace
18 amount.  You wouldn't be able to give any number to
19 it.  So you just report it as trace, meaning it's
20 less than your detection limit with the methodology.
21    Q.    Meaning you identify it there, but
22 based on your methodology you can't quantify it.
23 Correct?
24    A.    That is one way to use trace, yes.
25    Q.    So this is from, you should have

17 (Pages 62 - 65)

1  this, this is a Johnson & Johnson note, and it's a
2  report of a call from June 19, and I'll represent
3  this is 1972. Okay?
4        "Dr. Langer, Mount Sinai School of
5  Medicine, called just before lunch. He has a favor
6  to ask. Would Dr. Nashed please have sent to him a
7  sample of sodium sesquicitrate. He has been trying
8  to get a sample for some time and has not been
9  successful."
10        That is not important. Here's what's
11  important. Down here. Right here.
12        2:30 p.m., "Dr. Nashed called. I
13  gave message and he questioned: Would it be to our
14  interest to have a comparison of sodium
15  sesquicitrate and chrysotile? Would it get
16  Dr. Langer away from insisting that he believes we
17  may have trace amounts of asbestos in our talc? He
18  said, Call Dr. Rolle."
19        See that?
20  A.    I do.
21  Q.    "Called Dr. Rolle. He said he didn't
22  see any harm in sending it to Langer, but he feels
23  that Langer is not going to retract his statement
24  and as a scientist, will stick by his feeling that
25  there may be traces of asbestos in our talc."

1  Right?
2  A.    You read that correctly.
3  Q.    At least as of June 1972, he's saying
4  there's traces of asbestos in talc, correct?
5  A.    That's not what he's saying. This is
6  what Dr. Rolle thinks is that he will say.
7  Q.    The Johnson & Johnson person reported
8  this in this memo, correct?
9  A.    Yes. He says he feels, meaning
10  Dr. Rolle feels, that Dr. Langer is not going to
11  retract his statement.
12  Q.    Okay. Well, that's fine. I think we
13  have some information directly from Dr. Langer. So
14  that was 6/19/71. The next exhibit is 2382. I'll
15  just show you this one.
16  A.    Thank you.
17  Q.    Okay. Sir, do you see that this is a
18  memo of a meeting with Dr. Langer about three weeks
19  later on July 9?
20  A.    That's correct.
21  Q.    It says, "Meeting with Dr. Langer on
22  July 9 concerning analytical analysis of talc."
23  Right?
24  A.    Correct.
25  Q.    They actually met with the guy; true?

1  A.    They met with him on numerous
2  occasions, but yes.
3  Q.    If you turn to the third page, "light
4  and electron microscopy of Johnson's Baby Powder."
5        Do you see that?
6  A.    I do.
7  Q.    "Langer demonstrated his technique
8  for observing fibrous minerals in Johnson's Baby
9  Powder." And it talks about his process.
10        "After examining the sample in the
11  light microscope for a short time, he stated that he
12  could pick up some non-plate particles that could be
13  amphiboles or other asbestos forms or fibrous talc
14  or in my opinion," that's the Johnson & Johnson
15  writer, "talc fragments."
16        Now, that's light microscope, right?
17  A.    That's correct.
18  Q.    He said, "He estimates the amount in
19  the sample to be on the order of one or two
20  percent."
21        Let's go down to electron. "Using
22  electron microscopy, Dr. Langer has demonstrated to
23  me the presence of some very fine fibers at
24  moderately high magnification which he identifies as
25  chrysotile asbestos." Correct?

1  A.    You read that correctly.
2  Q.    So this is three weeks later he shows
3  them what he was talking about in the previous phone
4  call, correct?
5  A.    He shows what he believes is the
6  chrysotile that he's seeing, yes.
7  Q.    All right. He's at Mount Sinai,
8  right?
9  A.    That's correct.
10  Q.    This next one is Plaintiffs' 2403.
11  He actually writes them a letter, doesn't he, later
12  that year? Actually, this was the year before.
13  A.    This is from 1971. Yes.
14  Q.    November 10, '71, he actually wrote
15  them a letter; true?
16  A.    Correct.
17  Q.    You see this is from Mount Sinai?
18  A.    I do.
19  Q.    To Gavin Hildick-Smith?
20  A.    Yes.
21  Q.    At J&J, right?
22  A.    Correct.
23  Q.    He says that "Electron
24  diffraction" -- meaning he's doing electron
25  microscopy, correct?

18 (Pages 66 - 69)

1    A.    Yes.

2    Q.    "Electron diffraction on these grains
3 again yield the grains -- again yields a talc
4 pattern which is very definitely defined --
5 well-defined hexagonal array of spots.  We also
6 observed trace amounts of chrysotile asbestos only
7 when the talc was sonified and markedly dispersed."
8          Sonified just means that, as far as
9 my understanding is, you put it in a solution and
10 then you use a sonicator, which is a very, very
11 rapidly vibrating pad, and you stick it on there and
12 it goes "bzzz," and it disperses everything inside
13 that tube, correct?

14   A.    That's one type of sonication device.

15   Q.    So anyway, he writes them and says
16 they identify chrysotile asbestos, correct?

17   A.    After the sonication, yes.

18   Q.    It says, "The amounts are relatively
19 small occurring in amounts we estimate at less than
20 .01 percent."  He says, "The J&J baby talc is of
21 quite high quality and as a matter of fact, in
22 relation to the number of samples we have examined
23 thus far, it is the purest."  Right?

24   A.    That's what he states.

25   Q.    Still contains asbestos, right?

1    A.    That's what he's reporting here, yes.

2    Q.    So this is the third communication
3 from Dr. Langer that you and I have discussed where
4 he reaffirms the presence of asbestos; true?

5    A.    I don't think it's reaffirming
6 anything.  We're talking about an original report
7 here versus subsequent work that was being done.

8    Q.    Well, one time he writes a letter
9 where he said he did work, found it, right?

10   A.    In '71, yes.

11   Q.    Then in '72 they call him and he
12 reiterates it's there, correct?

13   A.    No.  No.  Dr. Rolle, they were
14 calling Dr. Rolle to see if it was worth sending him
15 the sodium sesquihydrate.  Sodium sesquihydrate has
16 a very similar appearance to chrysotile.  That was
17 an issue back then.

18         And so the discussion was whether
19 sending the sodium sesquihydrate to Langer would be
20 good for him to be able to look at that material and
21 see if it was the same as the material he was seeing
22 in the powders that he was calling chrysotile.

23         Dr. Rolle said that he wouldn't, he
24 didn't know what would happen, he would thought that
25 Dr. Langer would stand by what he said.

1    Q.    And he said I don't see any issue
2 in --

3    A.    Sending him the sodium sesquihydrate
4 so he could look at that, yes.

5    Q.    Then three weeks later they're in
6 Langer's lab and they're looking at it and he says
7 here's the chrysotile?

8    A.    They're looking at it, but again, if
9 you read the memo, they're not doing the diffraction
10 work.  It's simply again looking at the morphology
11 of the particles.

12         Which is important about the sodium
13 sesquihydrate because again, it has an appearance
14 similar to chrysotile.  So if you're only looking at
15 the appearance of the particles, that is an
16 interference.

17   Q.    You didn't ever look at any of these
18 particles, this is just your speculation as to what
19 could have happened, correct?

20   A.    It is my interpretation of looking at
21 the documents and the records.  The sodium
22 sesquihydrate was known to be an interference of
23 chrysotile in creating very thin, tubular-like
24 fibers.  So there was concern when you're not doing
25 the diffraction, which Langer was not doing in the

1 '72, he was simply looking for tubular fibers.

2          So again, if you're not doing your
3 analytical work to the rigor necessary, you cannot
4 conclude that you have something.  Langer's results
5 are incomplete.  They're not scientifically
6 reliable.

7    Q.    Sir, you never looked at a single one
8 of his samples, have you?

9    A.    That has nothing to do with it, sir.
10 I am looking at the record.  We are talking about
11 the record of what he was doing to make these
12 findings.  His analytical procedures, what he says
13 he was doing is incapable of drawing those
14 conclusions scientifically.

15   Q.    We'll see what he says because he's
16 talked about this, okay, which we'll get to.

17         This is from June 17, 1972.  And this
18 is a memo to file by, I believe it's, yeah, Nashed.

19         THE COURT:  What's the marking on
20 that, please?

21         MR. PANATIER:  This one is 2364, your
22 Honor.

23         THE COURT:  Thank you.

24 BY MR. PANATIER:

25   Q.    Here's a copy.

19 (Pages 70 - 73)

Page 74

1        Top of page 2.  "I asked Langer if he
2 can state that our baby powder is free of asbestos
3 as a result of the conference and review of August
4 3rd, 1971, with the FDA.  He said he still knows
5 Johnson & Johnson's product contains minute traces
6 of asbestos and he believes he can find asbestos
7 fibers after breaking down the platelets with
8 ultrasonic energy."  Correct?
9     A.    That's correct.
10    Q.    That's June '72.
11        Sir, you know that as recently as
12 last year he reaffirmed what he did at Mount Sinai,
13 correct?
14    A.    I don't know that.
15        MR. DUBIN:  I object.
16        MR. PANATIER:  It's in evidence.
17        THE COURT:  Sidebar.
18        (Sidebar.)
19        MR. DUBIN:  Just for the record --
20        THE COURT:  Well, now I'm here.
21        MR. DUBIN:  We're now talking about
22 whatever Dr. Langer said in the New York Times
23 article that post-dates historical documents that
24 we've been discussing during a time period when, for
25 example, Dr. Sanchez has done all the testing work,

Page 75

1 advised the company about what he has and has not
2 found back in the 1970s.  I'm not permitted to get
3 into a long with the fact that I'm not allowed to
4 get into real changes and things that their experts
5 have said.  And I think this is far afield from what
6 I was allowed to ask Dr. Sanchez about, which was
7 the historical record of these documents.  So I
8 would object with this witness.
9        MR. PANATIER:  He asked him, they
10 went completely over Langer, and they said that we
11 had misrepresented Langer's findings on the boards.
12 And he said we have to dig into the documents.
13 That's what I'm doing.
14        THE COURT:  I'll allow it.
15        Before we leave, Ercilyn notified me
16 that she can hear your conversations.  I -- the
17 official record cannot have that.  So if you need to
18 get closer --
19        MR. DUBIN:  Okay.  I'm just trying to
20 gather all the documents.
21        THE COURT:  I know.  The voices that
22 I'm concerned about, I don't want your discussions
23 to be on the record.
24        MR. DUBIN:  Okay.  No problem.
25        THE COURT:  Take a break at 10:30.

Page 76

1        MR. PANATIER:  Yeah.
2        (Sidebar ends.)
3 BY MR. PANATIER:
4     Q.    All right.  So this is the last
5 Langer thing we're going to look at.  I'll just let
6 you see it.
7        You see this is an article from The
8 New York Times from December 14, 2018?
9     A.    Okay.
10    Q.    Go ahead and turn to the next page.
11 Just take a look at that excerpt and then I'll ask
12 you some questions about it.
13        MS. BROWN:  Counsel, we have a copy.
14        MR. PANATIER:  That's fine.  Hold
15 onto that one then, Dr. Sanchez.
16 BY MR. PANATIER:
17    Q.    Now, assume nothing from the
18 blackout.  Sometimes courts, we have to do this for
19 different reasons.  Okay?
20        But you see this is from The New York
21 Times, we don't know the title, but from
22 December 14, 2018?
23        Do you see that?
24    A.    I do.
25    Q.    Okay.  And there's a quote from

Page 77

1 Dr. Langer.  "In a recent interview, Dr. Langer --
2 Mr. Langer told the times that Dr. Chalmers spoke
3 for himself and for the institution, not our
4 research group.  He reiterated that his team had
5 detected asbestos in Johnson's Baby Powder.  I stand
6 by that today, absolutely," he said.
7        Now, did I read that right?
8     A.    You did.
9     Q.    Is that the first time you've seen
10 that?
11    A.    I don't know if I've seen this or not
12 before with all the redactions.  I'm sorry.
13    Q.    Sir, you're aware -- you talked about
14 the FDA.  You're aware, in approximately '73 or '74,
15 the FDA found approximately 107,000 fibers per gram
16 of tremolite in Johnson's Shower to Shower, correct?
17    A.    I've seen an internal document from
18 the FDA using an optical technique reporting that,
19 yes.
20    Q.    When you were talking about
21 Dr. Pooley -- maybe I'll come back to that.  I don't
22 know it's that important.
23        Okay.  We will do this one.  This
24 will be Exhibit 2049.  It's Argonaut.
25        Johnson & Johnson was aware, sir,

Page 78

1 that both its Hammondsville ore body and its
2 Argonaut ore body contained levels of chrysotile
3 asbestos by virtue of their own core sampling,
4 correct?
5     A.    In certain areas, yes.
6     Q.    This is Exhibit 2049. The jury has
7 seen this. "Examination of talc samples from the
8 ore body." And all I want to do is look at some of
9 these percentages.
10          First of all, they took core samples,
11 38 core samples, right?
12    A.    Correct. This is discussing the
13 Argonaut ore body, yes.
14    Q.    Right.
15          But they also compared it to three
16 then current which are listed here at the very
17 bottom of Table 1.
18    A.    Current.
19    Q.    Have you reviewed this before, sir?
20    A.    I have. Yes.
21    Q.    Okay. If you go under the summary on
22 the first printed page --
23    A.    I'm there.
24    Q.    -- do you see at the end of the first
25 comparison they say, "For comparison, three core

Page 79

1 samples from the current ore body were also
2 examined"?
3     A.    Correct. Again, this is all
4 Argonaut, but yes.
5     Q.    No, the current ore body then was
6 Hammondsville. Argonaut was not yet approved until
7 '76.
8     A.    Not approved for baby powder
9 production, yes.
10    Q.    Not approved for anything, sir.
11    A.    I'd have to check the records for
12 that.
13    Q.    Okay. You don't know, do you?
14    A.    Not with specificity. But whether or
15 not it was being used for other purposes, I believe
16 it was, but I would have to review the records since
17 you're challenging me --
18    Q.    I'll just ask you: I asked
19 Dr. Hopkins in this case, the jury has seen this,
20 that Argonaut was first approved in 1976.
21          Do you disagree with that?
22    A.    I would have to look at the context.
23    Q.    Here's all I want to ask you about is
24 they say that only one exceeded .0005 percent,
25 right?

Page 80

1     A.    Correct.
2     Q.    Okay. So when we go back to our
3 math, what they said was they had one that exceeded
4 .0005 percent, which in a matter of percentage is
5 greater than .00001 percent, correct?
6     A.    Correct.
7     Q.    And they had 15 where they found
8 chrysotile asbestos, right, in the 38 core samples
9 for Argonaut; true?
10    A.    Is that what they said? Hold on.
11 Give me a second to check that.
12          Correct. They said 15 samples that
13 did show an asbestiform mineral, only one exceeded
14 the estimated level.
15    Q.    Chrysotile, if you find chrysotile,
16 that's asbestos; there's no dispute?
17    A.    If it's been identified correctly,
18 yes.
19    Q.    If you go to Table 1, they did X-ray
20 diffraction, right?
21    A.    Correct.
22    Q.    XRD is that one that has something
23 like one percent detection limit, half a percent
24 maybe down to .1, right?
25    A.    Somewhere in that range, yes.

Page 81

1     Q.    And they didn't find any asbestiform
2 minerals using XRD. It's all over here.
3 Non-detect. One maybe chrysotile, correct?
4     A.    That's correct.
5     Q.    But, and actually Moshe just pointed
6 out to me, which he does sometimes, that they
7 actually state what their detection limit was in
8 here, so we don't have to speculate.
9     A.    Oh, for the X-ray diffraction? Good.
10    Q.    Yeah, for the XRD.
11          Here we go. "By XRD, in no instance
12 was any asbestos or potentially asbestiform mineral
13 identified by XRD, the limit of whose sensitivity is
14 between half and one percent for amphibole and
15 probably slightly higher for this chrysotile
16 asbestos." Right?
17    A.    You read that correctly.
18    Q.    So when they get all those
19 non-detects, that's only credible down to about one
20 percent or so, at least in this report, right?
21    A.    Yes. Of course. Any time you
22 analyze something, it's always within the scope of
23 what that analysis can tell you.
24    Q.    Right.
25          When you are using a more powerful

21 (Pages 78 - 81)

Page 82

1 tool like electron microscopy, that's when they
2 actually got the hits for chrysotile and they also
3 found amphibole, correct?
4       A.    They do report both chrysotile and
5 amphibole detections.
6       Q.    All right.
7             MR. PANATIER:  Your Honor, good time
8 for a break?
9             THE COURT:  Yes.
10            Members of the jury, we'll take the
11 morning break now.  15 minutes.  Leave your
12 notebooks here.
13            Remember my instructions:  Do not
14 discuss this case, including the testimony you've
15 just heard.  No research of any kind whatsoever.
16            You may choose either all to stay up
17 here in the jury room or to go downstairs.  You just
18 need to be in agreement.
19            All right.  So be ready to come back
20 up at quarter of.  Thank you.  Enjoy.
21            (Jury exits.)
22            THE COURT:  Thank you, Dr. Sanchez.
23 You can step down.
24            Thanks, everyone.  Quarter of.
25            (Recess:  10:29 a.m. to 10:46 a.m.)

Page 83

1             COURT OFFICER:  Jury entering.
2             (Jury enters.)
3             THE COURT:  Please be seated.  Make
4 sure cell phones are turned off.
5             Mr. Panatier, whenever you're ready.
6             MR. PANATIER:  Thank you, your Honor.
7 BY MR. PANATIER:
8       Q.    Dr. Sanchez, I just wanted to make
9 sure I understood what you said.  Were you saying
10 that Dr. Langer was not getting diffraction patterns
11 on what he was looking at?
12      A.    Depending on the -- I'm sorry, excuse
13 me.  When you look at the specific document, there
14 was one from '72 which was notes from somebody from
15 Johnson & Johnson going to go meet with him.
16      Q.    Okay.
17      A.    And that description, no, he was
18 simply looking at the external, the morphology of
19 the particles.  He was not doing diffraction work.
20      Q.    Okay.  So I just wanted to be clear.
21 Do you still have the letter that he sent them in
22 '71?
23      A.    That's not what I was thinking.
24      Q.    I understand.
25      A.    That's fine.

Page 84

1             So I do have it up here.  What is the
2 date on that one?
3       Q.    That's November 10, '71.
4             THE COURT:  For the record, what's
5 the exhibit number?
6             MR. PANATIER:  2403.
7             THE COURT:  Thank you.
8 BY MR. PANATIER:
9       Q.    And he very clearly is using electron
10 diffraction; he is getting patterns in this letter,
11 correct?
12      A.    In that letter, yes.  It was the
13 other letter I was speaking to.
14      Q.    One of my items got out of order, so
15 I just wanted to ask you about it real fast.  We
16 talked about some pamphlets that your company had
17 distributed for the Defense Research Institute.
18            This will be Exhibit S-5.
19            (S-5 was marked for identification.)
20 BY MR. PANATIER:
21      Q.    Sir, you see this is a newsletter
22 from the American Industrial Hygiene Association?
23      A.    I see that.
24      Q.    You've seen this before, correct?
25      A.    I've been shown this before, yes.

Page 85

1       Q.    And so it's a newsletter.  If we go
2 to the second page, who's that guy?
3       A.    We've already seen that photo of me.
4       Q.    Okay.  And it says, "As an industrial
5 forensics laboratory, we go beyond data delivery.
6 We provide solutions."  Right?
7       A.    That's what it states.
8       Q.    So this is connect with an expert,
9 right?
10      A.    That's what it states.
11      Q.    Do you get residuals for any of
12 these, for anything?
13      A.    I don't know what that means.
14      Q.    I was making a joke.  You know when
15 stuff gets published, do you get -- never mind.  I'm
16 not very funny.
17      A.    No.  I have no part in our marketing
18 efforts in the company and how they use my image.
19      Q.    Another document you talked about,
20 and this is Plaintiffs' Exhibit 2363 in evidence.
21            Here you go, your Honor.
22            Do you recall discussing the
23 Baby-Mate entry on the boards?
24      A.    I do.
25      Q.    And Mr. Dubin said that's not even

22 (Pages 82 - 85)

Page 86

1 Johnson & Johnson, right?
2     A.    That's correct.
3     Q.    Let's see what they say.  Okay.
4 January 30, '67.  Baby-Mate powder.  They are
5 investigating the Baby-Mate powder, correct?
6     A.    It appears so.
7     Q.    It says that "The talc base used in
8 this product is better than 97 percent pure talc.
9 The remainder is associated with carbonate and less
10 than half a percent of fibrous -- of the fibrous
11 tremolite."
12         Right?  So they're saying it's fibers
13 of tremolite, correct?
14    A.    They report fibrous tremolite, yes.
15    Q.    And that means fibers of tremolite?
16    A.    Correct.
17    Q.    Okay.  "This about compares with
18 Italian Number 1 talc and is slightly less pure
19 chemically than Ental EXTRA talc."
20         Now, earlier today you brought up
21 Italian Number 1.  Italian Number 1 was the talc
22 used by Johnson & Johnson, correct?
23    A.    I believe that is one of the names
24 for it.  Yes.
25    Q.    So it says this about compares with

Page 87

1 the Italian talc that Johnson & Johnson was using,
2 right?
3     A.    That's what it states.
4     Q.    And, in fact, they say, they're
5 trying to determine the talc source and they say,
6 "The structure of the particles, however, and the
7 presence of the associated carbonates and talc
8 lead me to believe this is an Italian talc, Robert
9 Russell."  Right?
10    A.    That's what it states.
11    Q.    So that would be the relation to
12 Johnson's Baby Powder, wouldn't it; they're using
13 Italian talc, correct?
14    A.    Again, what it says here, this guy
15 doesn't know, he believes it may be an Italian talc.
16 That's not saying it's Italian talc.  We don't know
17 what the source of Baby-Mate is.
18    Q.    But what he is saying is the
19 percentage of fibrous tremolite, he says this about
20 compares with Italian Number 1 talc which they were
21 using, right?
22    A.    I think overall, that's what he says
23 here.
24    Q.    Okay.  Now, you also serve as an
25 expert witness, or have in the past, for Imerys,

Page 88

1 correct?
2     A.    In the past, yes.
3     Q.    Imerys is the supplier of the raw
4 talc and has been since 19 -- about 1989, 1990, to
5 Johnson & Johnson?
6     A.    In one of its entity firms.
7     Q.    Right.
8         It's been called Luzenac, it's been
9 called Rio Tinto and so forth, right?
10    A.    Those are some -- some of the names,
11 yes.
12    Q.    All right.  Let me give you, this is
13 Exhibit 3695-247.
14         MR. DUBIN:  We're going to have to
15 approach about this.
16         THE COURT:  Sure.
17         (Sidebar.)
18         MR. DUBIN:  This appears we're going
19 to be cross-examining Dr. Sanchez with Imerys
20 documents.
21         At this phase of the trial, your
22 Honor, the issue is what Johnson & Johnson should
23 have known and understood.  The cross-examining him
24 with Imerys documents in a case with state of mind,
25 I think, is improper.

Page 89

1         You've looked at this Imerys
2 document, does that inform how you reviewed that
3 document, then he would have to also rely on all the
4 testing he personally has done because that
5 similarly would inform how he read these documents.
6 We've kept it to J&J notice issues.  I think that's
7 where it should be.
8         MR. PANATIER:  This is their
9 supplier.  Known or should have known, they asked
10 the supplier, this is what they get.  That's pretty
11 clear.
12         And this is -- I have two documents,
13 or three, I have three.  I have this one which
14 covers Argonaut, still in Argonaut.  Then I have two
15 Chinese.  And he's an expert for them and he's seen
16 all of this.  If he wants to try and say he hasn't
17 seen it, that's fine, but he's seen all of it.
18         And, again, counsel brought up all of
19 the Chinese.  He said we never had a positive
20 result.  But on knew or should have known, I think
21 it's a pretty -- it's not attenuated to say if you
22 ask your supplier, here's what you get.
23         THE COURT:  Thank you.
24         Anything further?
25         MR. DUBIN:  Yes, your Honor.  Then,

23 (Pages 86 - 89)

1 again, if he's permitted to go into this area and
2 wants to cross, the ideal is what he should be and
3 what should he (inaudible) looked at the products
4 themselves and (inaudible) asbestos and how is it
5 not relevant that (inaudible) he would have told us
6 there's no asbestos.
7          So I feel like it's part and parcel,
8 we're getting far afield from what Johnson &
9 Johnson's state of mind.
10          MR. PANATIER: One is regular
11 testing. The other is litigation testing. Quite
12 clear there's a delineation. Yesterday we got into
13 the regular routine testing with Dr. Sanchez and
14 this is the regular routine testing.
15          THE COURT: Since Imerys or one of
16 its predecessors was a Johnson & Johnson supplier
17 and due to the fact that this is what Johnson &
18 Johnson either knew or should have known, this is
19 permissible cross-examination and I will allow it.
20          MR. DUBIN: Will I be allowed to then
21 ask this doctor about his own testing, how that
22 relates to what he understands Johnson & Johnson
23 should have known?
24          THE COURT: No. I mean, this is now
25 about the conduct of Johnson & Johnson. This is

1 about the disclosures that were made on his report.
2 This does not open the door now to anything that was
3 not within his report that is proper at this phase.
4          MR. DUBIN: I'm sorry, I understand.
5 I'll sit down. I just wanted to ask about that.
6          THE COURT: Sure.
7          MR. DUBIN: Obviously his testing is
8 in his report. We do think it's within the scope of
9 (inaudible) is aware historical documents
10 (inaudible). We'll make that proffer again. I
11 understand the court's ruling, so I can't do that
12 but I do want to make that proffer formally, but we
13 believe that's responsive to those issues.
14          THE COURT: Thank you.
15          Anything on that issue?
16          Thank you. Let's continue.
17          (Sidebar ends.)
18 BY MR. PANATIER:
19     Q.    All right. Have you had a chance to
20 look at that?
21     A.    I have.
22     Q.    And you have reviewed that, as well
23 as probably thousands of Imerys documents? We have
24 a very long list you've been given.
25     A.    If this is a part of that list, then

1 yes, I have reviewed this.
2     Q.    This is Exhibit 3695, and you could
3 see that this is a summary of some testing that
4 Imerys did, correct?
5     A.    That's correct.
6     Q.    And you understand that Grade 66 is
7 the domestic baby powder powder and Grade 96 is what
8 they were selling to Canada, correct?
9     A.    From the Vermont source, yes.
10     Q.    Right.
11          It's the same source, it just was
12 going International, Canada, right?
13     A.    I'm foggy on the details as I sit
14 here today. I can't verify that.
15     Q.    That's fine. Let's look at their
16 results. Chrysotile structures, you see that this
17 is the quarterly testing, right?
18     A.    For this time period, yes.
19     Q.    Okay. And you can see here that they
20 have one, two, three, four positive results for
21 chrysotile, correct?
22     A.    Correct. Observations of one fiber.
23     Q.    And this is by transmission electron
24 microscopy, they're looking at that super teeny tiny
25 amount of talc, right?

1     A.    That's correct.
2     Q.    And the analyst here has calculated
3 what the concentration would be of structures per
4 gram, correct?
5     A.    That's correct.
6     Q.    So just by finding one chrysotile
7 fiber here, that equates to, it's expressed in terms
8 of less than 132 million structures per gram,
9 correct?
10     A.    Ten to the sixth. I believe that's
11 accurate.
12     Q.    Okay. So when they find one here in
13 2002, that's approximately 133 million fibers per
14 gram, correct?
15     A.    No. It's less than 100 -- this is
16 one of those, in the noise of the measurement, but
17 again, they are reporting out their -- the
18 concentration that they can quantify to by -- with
19 the data and the method they're using is 133 million
20 structures per gram. What they're observing is less
21 than that.
22     Q.    Okay. Well, I think this might help
23 us. Look in the ones where they don't find
24 anything, right. They don't see any fibers there?
25     A.    Correct.

24 (Pages 90 - 93)

Page 94

1   Q.   Their analytical sensitivity is 80
2   million fibers per gram, correct?
3   A.   Well, again, you're calling this
4   analytical sensitivity. I believe this is a
5   detection limit, which is based upon a Poisson
6   distribution over the observed count.
7   Q.   Right.
8   A.   So the upper limit of your Poisson
9   would always -- would vary when you're in that
10  insignificant value.
11  Q.   What this means is when they find
12  zero, all they can say is if it's present, it's
13  present at less than 80 million structures per gram,
14  correct?
15  A.   They can't even say it's present.
16  They're saying this test certifies there is no
17  chrysotile detected or asbestos detected above that
18  detection limit.
19  Q.   That's right.
20  A.   That's all it says.
21  Q.   That's right.
22       And the inverse is true, it's also
23  pointing out to say that it cannot draw conclusions
24  below 80 million structures per gram, correct?
25  A.   Exactly. You cannot draw any

Page 95

1   conclusion about what's in there below the method by
2   the test.
3   Q.   Right.
4        Because if you don't have an
5   analytical sensitivity or detection limit that goes
6   below 80 million structures per gram, you cannot
7   draw conclusions one way or another as to what might
8   be in that concentration?
9   A.   It would be improper to draw any
10  conclusion over what's there because you have no
11  information to say it's there.
12  Q.   I gotcha.
13       But then we have these positives,
14  one, two, three and four, and there you can see the
15  concentration per gram jumps, doesn't it?
16  A.   In this example, yes.
17  Q.   And this would be saying, look,
18  there's something up to 132 million structures per
19  gram, correct?
20  A.   No, it's saying the same thing.
21  Whatever they're calculating here, I don't know. I
22  need to see the full report. But whatever they're
23  calculating here, whether it's a -- appears to be a
24  detection limit to me, their detection limit is what
25  it is for the method based upon what the method

Page 96

1   states how you calculate that. All they're saying
2   is whatever they observed in there, it's less than
3   that value.
4   Q.   Okay. So they don't say what it
5   exactly is, do they?
6   A.   They can't say what exactly it is.
7   The measurement is -- it's an insignificant
8   measurement. You cannot take insignificant
9   information and calculate out concentrations from
10  it.
11  Q.   We know that in these tests they're
12  looking at, they're looking at some millionth
13  fraction of a gram, aren't they?
14  A.   By nature of the TEM, that's just --
15  there's no other way of doing it by TEM.
16  Q.   That's right.
17       So they're only looking at, let's
18  just say, to make it easy, a millionth of a gram,
19  and in looking at a millionth of a gram they find
20  one fiber, right?
21  A.   No. Well, this is what they're
22  reporting based upon their analytical data.
23  Whatever that is, we don't have in front of us, so
24  I'd hate to characterize it as a millionth of a gram
25  without more information.

Page 97

1        But again, this is based on their
2   analysis, they saw one chrysotile structure less
3   than five microns in length. That's all this is
4   telling me here, which is below their detection
5   limit of their methodology. It's in the noise of
6   the method, of the analytical technique.
7   Q.   They found asbestos four times,
8   correct?
9   A.   They found one particle which they
10  can't quantify and it's within the noise of the
11  analysis and they report it out.
12  Q.   And we may actually go and look at
13  how much they were looking at, but if they're only
14  looking at one millionth of a gram, right, and if
15  it's a homogenized sample, then what you can say is
16  if they're looking at one millionth of a gram, that
17  there have to be a million fibers there for them to
18  see one, correct?
19  A.   In the gram of talc, yes.
20  Q.   That's right.
21  A.   It's always the, it's just a way
22  to calculate concentrations and you need to look at
23  it in context of the full concentration calculation.
24  Q.   Pretty simply, if you're looking at a
25  millionth of a gram, there have to be a million

25 (Pages 94 - 97)

1 present for you to see one?
2    A.   I don't think that's accurate.
3    Q.   That's what you just said.
4    A.   No, that's not what I said.  I
5 disagreed with your characterization there.
6         The issue is you look at the
7 detection, what that is.  That detection there is,
8 what was it, 132 million fibers per gram, based on
9 the data they did for their analysis.
10   Q.   Um-hum.
11   A.   That's saying for every gram of talc,
12 that's their analytical sensitivity.  It would be
13 less than whatever that 133 million would be.  I
14 don't think that's what you said.
15   Q.   What I was saying pretty simply is,
16 if you look at, if you have a homogenized sample,
17 meaning everything is evenly distributed, and you
18 take one millionth of that sample and you find one
19 fiber, then scientifically you can say in order to
20 find that one fiber in a homogenized sample and I
21 only look at one million, there need to be a million
22 evenly distributed, correct?
23   A.   No, because again, you're confusing
24 particle counts with masses.  So again, it doesn't
25 work that way.

1    Q.   I'm not, I'm asking you particle
2 counts.
3    A.   No.  These reports -- the idea of it
4 being in there in a gram of talc, we still have that
5 mass component.  So again, it depends on how --
6 there's all sorts of ways you can calculate these.
7 We're getting lost in different ways to calculate
8 the same type of data.
9    Q.   Okay.  I'm asking you to do -- by the
10 way, the ASTM D-5756 that you have utilized, the one
11 that did not become validated, remember that?
12   A.   That's not accurate.  It was not --
13 they didn't have validated information, so they
14 withdrew it.
15   Q.   Okay.  Fine.
16        That was a mass concentration method,
17 right?
18   A.   Yes.  You would take your fiber
19 counts and then assign masses based on the size of
20 the particles and do a weight percent calculation.
21   Q.   And then there's D-5755, which is a
22 particle structure per gram?
23   A.   Correct.  You do the same approach.
24 It's just how you treat the end data.
25   Q.   There's one way is to say there's

1 this much asbestos by weight and there's one way to
2 say there's this much asbestos by particles?
3    A.   No.  Particles by gram.  There's
4 still a mass component to that calculation.
5    Q.   Right.
6         It's how many particles in a gram,
7 right?
8    A.   Correct.
9    Q.   As opposed to how much asbestos
10 weight there is per gram, correct?
11   A.   Again, yes, a weight percent would be
12 mass by mass.  Fibers per gram would be a particle
13 count per gram.
14   Q.   This is Exhibit 3695-253.  This is
15 another Imerys document.
16        MR. DUBIN:  Same objection.
17        THE COURT:  Noted.  Overruled.
18 BY MR. PANATIER:
19   Q.   Can you see here, sir, Guangxi; this
20 is China now, right?
21   A.   That's correct.
22   Q.   And do you see here that under
23 chrysotile structures there's another hit in January
24 2003?
25   A.   I see that.

1    Q.   Okay.  Then if you go to the very
2 next page, at the bottom, there's another hit for
3 chrysotile asbestos in November 2001, right?
4    A.   I see that.
5    Q.   Guangxi is where Johnson & Johnson
6 gets its talc, correct?
7    A.   Yes, for the U.S. market, yes.
8    Q.   All right.  And then the last one of
9 these reports that we'll look at, sir, here, your
10 Honor, here you go, sir, this is 3695-252.  And this
11 is a duplicate, just so we're clear, you see there's
12 right here, 3199-2?
13   A.   I see that.
14   Q.   And then the one I just handed you
15 has 3199-2?
16   A.   I see that.
17   Q.   That has the finding of the number of
18 structures, right?
19   A.   Correct.
20   Q.   The reason I'm giving you that is
21 because this one actually provides us with the count
22 sheet.  And if you go to the very last page, that's
23 the one for the positive where they got 3199-2 and
24 they found the one structure, correct?
25   A.   Okay.

1    Q.    Do you see that?

2    A.    I do.

3    Q.    First of all, we know the length and

4 width of this fiber, this fiber is, what is that,

5 14-to-1?

6    A.    It's .7 by .05. I think I would do

7 that on a calculator to make sure that was right.

8    Q.    Okay. That's fine.

9    A.    I think you're right, but just to

10 make sure.

11    Q.    14.

12    A.    Thank you.

13    Q.    Here the analyst tells us, again, the

14 structure concentration in terms of structures per

15 gram, correct?

16    A.    Where are you looking now? I don't

17 see it here anymore. I have to turn around now.

18 Okay. I want to make sure I'm looking at the same

19 place for what you're saying.

20    Q.    That's fine.

21    A.    So what was your question?

22    Q.    So my question is, again, the analyst

23 gives us the approximate structure concentration in

24 terms of structures per gram, correct?

25    A.    Correct.

1    Q.    And it says 202 million, correct?

2    A.    That's what it states.

3    Q.    Now, so that's Chinese talc.

4        I need to offer these.

5        MR. PANATIER: Your Honor, we offer

6 3695-252, 253 and 247.

7        MR. DUBIN: Objection based on what

8 we've discussed.

9        THE COURT: Thank you.

10        Objection is overruled. These are

11 now in evidence.

12        (Plaintiff's Exhibit 3695-252 was

13 moved into evidence.)

14        (Plaintiff's Exhibit 3695-253 was

15 moved into evidence.)

16        (Plaintiff's Exhibit 3695-247 was

17 moved into evidence.)

18 BY MR. PANATIER:

19    Q.    Sir, I'd like to show you another

20 document. This one is Rio Tinto, but that's the

21 same company, correct, or the same entity that was

22 supplying talc to Johnson & Johnson, right? Is that

23 right? Sorry, sir? Is that correct?

24    A.    I'm sorry. I was reading it. What

25 was your question?

1    Q.    Rio Tinto, again, that's what later

2 became Imerys?

3    A.    That's correct.

4    Q.    Okay. And you've seen this document

5 before; correct, sir?

6    A.    Yes, I have.

7    Q.    Now, this is --

8        MR. DUBIN: May we approach about

9 this document?

10        THE COURT: Sure.

11        (Sidebar.)

12        MR. DUBIN: Johnson & Johnson

13 (inaudible) being asked about fibrous material

14 identify (inaudible) Dr. Sanchez was asked about

15 this these pictures (inaudible) what he reviewed

16 actual product, and we're really getting hamstrung

17 here having things --

18        THE COURT: You already discontinued

19 use at Argonaut.

20        MR. HYNES: (Inaudible).

21        THE COURT: The purpose for which

22 you're seeking to use this document?

23        MR. PANATIER: It goes to the fact

24 that he said that based on what's in Argonaut

25 there's -- nothing shows, they went through all

1 yesterday. And this goes to show that had they, it

2 doesn't matter what the timing is, had they looked

3 in the Argonaut and had this analysis done, this

4 would have been the result on any date. That's the

5 point. It's there. It's a mine. It's millions and

6 millions of years old.

7        MR. DUBIN: Your Honor, if the

8 question is had we looked at bottles from around

9 that time period or from the Argonaut mine and done

10 analysis on it would we have found this. This

11 expert knows from looking at the bottles themselves

12 what we would have found.

13        THE COURT: That was relevant in the

14 compensatory phase and a jury determined that there

15 was asbestos in the product during the relevant time

16 frame and that it caused the mesothelioma of these

17 plaintiffs, so that issue is not in dispute. The

18 issue now is the conduct of Johnson & Johnson. So

19 what did Johnson & Johnson know or should have known

20 and what kind of testing they did. And you

21 established all of that on direct yesterday, the

22 kind of testing, what was known about the mines,

23 selective mining, all of that.

24        So on cross-examination as to what's

25 known or what should have been known, this is

27 (Pages 102 - 105)

1 permissible cross-examination.  To have him go
2 through his testing of the product, that was already
3 resolved by the prior jury.  It's not the issue for
4 this jury.
5          MR. DUBIN:  I want to put one thing
6 on the record.
7          THE COURT:  Sure.
8          MR. DUBIN:  Your Honor, we disagree
9 that the jury's finding precludes us from responding
10 to something like this with this testing.  Although
11 a jury may have found that at some point during the
12 period of exposure for these plaintiffs there was
13 some asbestos exposure, that does not mean that they
14 found at every point that there was asbestos
15 exposure or that they found material similar to this
16 in Johnson & Johnson's product.  And we are being
17 precluded, we're now making an assumption that the
18 jury found at all times there was asbestos and that
19 there was this kind of material in the products made
20 from Argonaut in Johnson & Johnson, and we are -- we
21 would like to be able to respond to that with
22 evidence that Dr. Sanchez has tested products made
23 from ore sources from Argonaut and has not found
24 these kind of materials in them.  And I have made my
25 statement.

1          THE COURT:  Thank you.
2          Whether or not asbestos was found in
3 every single bottle is not the issue, and because a
4 jury determined below that there was asbestos in the
5 product in sufficient quantities that it became a
6 substantial factor in the development of the
7 mesotheliomas.  If we have testing or testimony by
8 Dr. Sanchez as to, well, these bottles or none of
9 the bottles I tested was it in there, then we get
10 into a second trial, a retrial of what happened
11 below, and let's bring Dr. Longo back and do that,
12 and that's not the issue in front of this jury.
13          So your exception is noted.  This is
14 permissible cross-examination.  You may continue.
15          (Sidebar ends.)
16 BY MR. PANATIER:
17     Q.     All right.  Did I give you a copy?
18     A.     Yes, I have a copy.
19     Q.     So this is from Julie Pier at Rio
20 Tinto/Imerys, the supplier.
21          Now, in fairness, this report is five
22 years after Johnson & Johnson stopped using this
23 deposit, correct?
24     A.     Yes.  This is from 2008.
25     Q.     Okay.  But what is in a deposit is

1 millions and millions of years old, right?
2     A.     I'm sorry?
3     Q.     What is in a deposit is millions and
4 millions of years old, billions?
5     A.     It can vary, but it would depend.
6     Q.     The earth is about 3.8 billion years
7 old, right?
8     A.     I think it's older than that.
9     Q.     Okay.  All right.  That's fair.  It's
10 old?
11     A.     It is old, yes.  That's correct.
12     Q.     These deposits are old?
13     A.     We're talking about Vermont here?
14     Q.     Yes.
15     A.     They are old deposits, but not as old
16 as the earth.
17     Q.     Okay.  All right.
18          Now, you see there's a sample, it
19 says, "Request."  3685-248.  This is a sample of
20 acicular mineral material collected at the Argonaut
21 mine which was submitted for identification.  And
22 the result was, "The sample was identified as
23 asbestiform actinolite amphibole."  Correct?
24     A.     That's correct.
25     Q.     That's asbestos?

1     A.     Yes.  This is clearly asbestos here.
2     Q.     These are SEM images, which are
3 scanning electron microscopy, correct?
4     A.     That's correct.
5     Q.     That first one, I don't know, can you
6 see the magnification on that one?
7     A.     This is a bulk sample, but it's 100
8 times.
9     Q.     That's 100.  And then what's the
10 bottom picture?
11     A.     Appears to be -- it's a thousand
12 times.
13     Q.     All right.  So they're not looking at
14 it at 20,000 times or anything like that.  We're
15 getting a picture, a visual, of kind of what this
16 material looks like in its bulk state, correct?
17     A.     That's correct.
18     Q.     Now, let's chat about the test method
19 a little bit.  You know what, one last thing on
20 Italian talc.  This is the Paoletti paper that you
21 and Mr. Dubin talked about yesterday.
22          Do you recall that?
23     A.     I do.
24          THE COURT:  What's the marking on it
25 for identification?

Page 110

1          MR. PANATIER:  For identification,
2  this would be S-6.
3          THE COURT:  Thank you.
4          MR. DUBIN:  In evidence?
5          MR. PANATIER:  I'm not going to
6  offer.
7          (S-6 was marked for identification.)
8  BY MR. PANATIER:
9      Q.    All right.  This is the paper that
10  you had discussed yesterday.  "Evaluation by
11  electron microscopy from 1984, techniques of
12  asbestos contamination in industrial, cosmetic and
13  pharmaceutical talcs."
14          And one of the questions Mr. Dubin
15  asked you was, well, does this say anything about
16  Johnson's Baby Powder, and it doesn't say anything
17  about Johnson's Baby Powder directly?
18      A.    That's correct.
19      Q.    Okay.  Typically in academic papers,
20  if a product is being studied, they typically don't
21  name the product?
22      A.    I would think that would be accurate.
23  Yes.
24      Q.    It can happen, but it doesn't happen
25  often; fair?

Page 111

1      A.    Not normally, yes.
2      Q.    Here, under introduction, it says,
3  "The most common minerals that may be found mixed
4  with talc in mineral deposits are listed in Table 1.
5  Among them, two fibrous kinds of amphibole,
6  tremolite and anthophyllite, and a fibrous kind of
7  serpentine mineral, chrysotile, constitute some of
8  the best known varieties of asbestos."
9          And I think you had told me earlier
10  that serpentine is the general category for
11  chrysotile, correct?
12      A.    Serpentine is a mineral group name.
13  It's like an amphibole.  You would then go from the
14  group into the individual species.  So chrysotile is
15  part of the serpentine group.  There's a bunch of
16  other ones as well.
17      Q.    Right.
18          So serpentine would be the category
19  that chrysotile would be in?
20      A.    It's a mineral group.  Yes.
21      Q.    Okay.  If we go to results, page 227,
22  they say, "29 different samples" --
23      A.    I'm sorry.  227, you said?
24      Q.    227 on the top.  There you go.
25      A.    Okay.

Page 112

1      Q.    "29 different samples of talc for
2  industrial, cosmetic and pharmaceutical uses have
3  been analyzed; 15 from the Italian market and 14
4  provided by the European pharmacopeia from the
5  International market and from various geographic
6  areas."
7          So we're just going to focus on
8  Italian here.  Okay?
9      A.    Okay.
10      Q.    And, of course, Johnson & Johnson was
11  using Italian talc for use in the United States
12  through the late '60s and then again in the early
13  '80s because of the mine strike.
14          Do you recall that?
15      A.    That's my recollection.
16      Q.    "To evaluate the pollution due to
17  asbestos in the studied talcs, the fibrous kinds of
18  amphiboles, tremolite and anthophyllite and the
19  fibrous kind of serpentine, chrysotile, have been
20  investigated."  And then they refer us to a table.
21          "As reported in Table 7 through 9, in
22  eight out of the 15 Italian talcs the presence of
23  asbestos fibers has been revealed, in seven samples
24  there were fibers of tremolite and in one sample
25  there were fibers of chrysotile."

Page 113

1          Right?  That's what it says?
2      A.    You read that correctly.
3      Q.    And we could go to the tables.  I
4  want to look at cosmetic and pharmaceutical.  And
5  they said Table 7 through 9.  So 7 is industrial
6  talc, they found some there.  Then we go to
7  pharmaceutical.  This is the Italian, correct?
8      A.    These are samples out of the Italian
9  market, correct.
10      Q.    Correct.
11          They found four out of five that
12  contained tremolite asbestos?
13      A.    They are reporting tremolite fibers,
14  yes.
15      Q.    Under what is the heading there?
16      A.    Asbestos fibers, yes.  I'm not
17  disagreeing with you.
18      Q.    And for cosmetic talc, they found two
19  out of six to contain tremolite asbestos, correct?
20      A.    That's correct.
21      Q.    They even provide us some nice
22  pictures, right?  There's a tremolite fiber,
23  correct, on Figure 4?
24      A.    That's correct.  That's what they
25  identify it as.

29 (Pages 110 - 113)

1   Q.   And Figure 5, you can see the
2   chrysotile fibers, right?
3       A.   It appears so.  Yes.
4       Q.   Okay.  Now, you're aware, sir, that
5   Johnson & Johnson was concerned about this article,
6   correct?
7       A.   I'm not aware of that.
8       Q.   This is Exhibit 3695-250.  And the
9   reason I want to show this to you is because you had
10  said well, we don't know whether it has anything to
11  do with Johnson's Baby Powder.  That's why I'm
12  showing it to you.
13          Do you see this is a memo from
14  September 26, 1984, Johnson & Johnson?
15      A.   Yeah.  Let me please read it first.
16      Q.   Sure.  And this is in evidence
17  already.  Go ahead and read it.  Let me know when
18  you're ready.
19      A.   Okay.
20      Q.   And you see that Bill Ashton, William
21  Ashton states, "Attached is a copy," and he's
22  sending this to Talc de Luzenac; that's what later
23  became Imerys, right?
24      A.   Yes.  Imerys was -- I'm sorry, what
25  was that question?  I'm not following.

1       Q.   Luzenac is the entity that later
2   became Imerys?
3       A.   Yes.  Imerys Talc bought some of the
4   talc deposits from Luzenac.
5       Q.   "Attached is a copy of a paper which
6   is very important to the talc industry in your
7   territory.  It alleges that a substantial number of
8   talcs contain fibers and/or asbestos.  It is
9   published by a reputable organization in Rome.  It
10  has just appeared in this month's issue of
11  Regulatory Toxicology and Pharmacology here in the
12  states."
13          And it references the article you and
14  I just looked at, right?
15      A.   It appears to.
16      Q.   So Mr. Ashton, from Johnson &
17  Johnson, says this paper comes from a reputable
18  organization, right, or published by a reputable
19  organization, correct?
20      A.   That's correct.
21      Q.   This is already in evidence.  This is
22  3695-251.  You see that?  That is a memo, October
23  23rd, '84?
24      A.   I see that.
25      Q.   That's a little less than a month

1   after the letter to Talc de Luzenac?
2       A.   Time-wise, yes.
3       Q.   Do you see that it's signed by the
4   same individual, Mr. Ashton?
5       A.   I see that.
6       Q.   If you turn to the second page,
7   please, sir, under talc --
8       A.   Can I have a chance to skim through
9   this?  Sorry.
10      Q.   Of course.  Sure.  Sure.
11      A.   Okay.  I read it.
12      Q.   Do you see where Mr. Ashton
13  references the Paoletti article again?
14      A.   I see that.
15      Q.   And he says, "I spoke to some of the
16  ASTM and ISO officials about the uncomfortable
17  business aspects of the recent Paoletti article
18  hoping they might have some ideas on how to
19  compromise it."
20          Is that what he said?
21      A.   He did say that.
22      Q.   So what we know is that Paoletti put
23  out an article that addressed Italian talcs; true?
24      A.   Markets bought off of the Italian
25  market, yes.

1       Q.   And that Mr. Ashton was aware of this
2   at Johnson & Johnson, correct?
3       A.   It appears so.
4       Q.   He said that it was published by a
5   reputable organization?
6       A.   He did.
7       Q.   And a couple weeks later, he said we
8   need to figure out ways to compromise it, correct?
9       A.   He was talking to these other
10  committee groups looking into it, whether it's
11  reasonable.  But yes, that's the language he used.
12      Q.   Compromising?
13      A.   That's the language that was used.
14      Q.   Let's chat, I think this is the last
15  issue and then you and I will be finished.  Let's
16  chat about Johnson & Johnson testing method 7024.
17  This is Defense 8393.
18          So this is the test method that
19  Johnson & Johnson uses for transmission electron
20  microscopy, correct?
21      A.   This is their internal method, yes.
22      Q.   Okay.  And the title is, Analysis of
23  Powdered Talc for Asbestiform Minerals by
24  Transmission Electron Microscopy.  So what they're
25  trying to find is asbestos, correct?

1    A.    Asbestiform minerals, yes.
2    Q.    Asbestiform minerals is a long way of
3 saying asbestos, right?
4    A.    Not entirely, but it can be used that
5 way.
6    Q.    Are they looking for asbestos or are
7 they not?
8    A.    They are, but there's other minerals
9 that can be asbestiform that aren't asbestos, so
10 there's just a nuance there.
11        I'm not trying to disagree with you.
12 I'm just trying to be precise.
13    Q.    Okay.  If we go to the page marked 3
14 of 6 or 5 of 9, however you like it.
15    A.    I'm there.
16    Q.    All right.  A few things it says
17 here.  First of all, I want to go to 9.0,
18 "Preparation time per sample, including preparation
19 of related materials, is one hour.  Analysis search
20 time per sample is a maximum of two hours."  Right?
21    A.    I see that.
22    Q.    So there's a top amount of time that
23 the analyst can actually spend on this if you're
24 following the method?
25    A.    I don't interpret it that way.  This

1 is talking about routine, routine sampling and
2 analysis.  This is what you'd expect, about an hour
3 to do it and no more than two hours to analyze it.
4    Q.    Okay.  Under definition of a fiber,
5 it says, "An elongated particle with parallel sides
6 and an aspect ratio," that's length to width,
7 "3-to-1."  Greater than or equal to 3-to-1, right?
8    A.    Correct.
9    Q.    "The definition employed may vary
10 with the needs of the client."
11        And then it says you scan your grid
12 squares, et cetera, each asbestiform mineral is
13 recorded as to type, chrysotile, tremolite,
14 anthophyllite, et cetera, structure, whether it's a
15 bundle, a clump, a fiber and dimensions, length and
16 width.  Right?
17    A.    That's correct.
18    Q.    It also has something that you have
19 brought up once or twice called the limit of
20 quantifiable detection, right?
21    A.    That's correct.
22    Q.    And what this says here --
23    A.    Which page are you on now?
24    Q.    2 of 6.  4 of 9.
25    A.    4 of 9.  Thank you.

1    Q.    Yep.
2        What this says here is "The detection
3 of five or more asbestiform minerals of one variety
4 in an analysis constitutes a quantifiable level of
5 detection.  When no asbestiform minerals are
6 detected, a representative fiber size is used to
7 calculate a detection limit."
8        Okay.  So, what that means is, is
9 that in order to say that asbestos is present, you
10 have to have five or more fibers of any one type,
11 correct?
12    A.    In order to quantify how much is
13 present, yes.
14    Q.    Right.
15        To say that, to report it as asbestos
16 present, quantifiable, correct?
17    A.    Correct.  This is defining what the
18 statistical basis, what would be a level that you
19 could actually put a number on.
20    Q.    Because we've seen this.  The jury
21 has seen this.  Below quantifiable limit of
22 detection in a number of reports, right?  That would
23 mean, in this context, that if you saw -- I'll
24 change colors so I don't get too confusing here.
25        So if you saw four chrysotile fibers

1 in this tiny, tiny, tiny bit of talc, you would
2 report it, you could report it as below quantifiable
3 limit of detection, correct?
4    A.    If the statistics you're using is a
5 five, what they're doing here, then yes.
6    Q.    And so I'm just asking you under the
7 method, that is how you could report it, correct?
8    A.    Yes.
9    Q.    If you had four anthophyllite fibers,
10 and this is all we're saying asbestos, we're not
11 saying anything else, if you had four anthophyllite
12 asbestos fibers, you could report below quantifiable
13 limit of detection, correct?
14    A.    According to the statistics, yes,
15 that would be a statistically valid way of reporting
16 results.
17    Q.    If you had four tremolite fibers, you
18 could report below quantifiable limit of detection,
19 correct?
20    A.    Same answer.  Yes.
21    Q.    And lastly, if you had four
22 actinolite fibers, same answer, correct?
23    A.    That's correct.
24    Q.    So in practical terms, let's say
25 you've got your grid, right, and you're looking

31 (Pages 118 - 121)

1 down, you're looking in the -- you actually don't
2 look down in the TEM, you just look at a screen,
3 right?
4     A.    You do look at a screen, but you are
5 leaning forward.
6     Q.    Okay, leaning forward.
7     A.    It is projected below you, so...
8     Q.    Not in the eye pieces?
9     A.    At times you are, yes.
10    Q.    All right.  Well --
11    A.    Again, I'm not trying to quibble.
12    Q.    That's fine.  That's fine.  Let's
13 just talk about how this method works.
14          So you're looking in the view, and
15 typically you're looking at ten grid openings,
16 correct?
17    A.    I think if you follow this method,
18 yes, I then we're doing ten grid openings over two
19 grid preparations.
20    Q.    We talked about that yesterday; five
21 grid openings on two different hundred-space grids?
22    A.    Correct.
23    Q.    Let's say you're looking down and
24 your entire area that you looked at summarized in
25 this square, okay, and you have four, you see

1 objectively, you see four fibers of chrysotile
2 asbestos, correct?
3     A.    It's all hypothetical.  Okay.
4     Q.    Yeah.  Under Johnson & Johnson's
5 method, you're allowed to report that as below
6 quantifiable limit of detection, correct?
7     A.    It would be below your ability to
8 quantify, yes.
9     Q.    Let's say you also see four fibers of
10 tremolite.  Same answer, correct?
11    A.    That's correct.
12    Q.    And you also see four fibers of
13 actinolite.  Same answer, correct?
14    A.    That's correct.
15    Q.    And you also see -- where's my green?
16 -- four fibers of anthophyllite, correct?
17    A.    Again, hypothetical, yes.
18    Q.    Well, in fact, sir, I've shown you
19 this before, this is 3695-249.
20          Sir, you've seen that document
21 before, correct?
22    A.    I have.
23    Q.    And that is from Julie Pier, and she
24 worked at Imerys, right?
25          MR. DUBIN:  Same objection as before,

1 your Honor.
2          THE COURT:  Thank you.  Objection
3 noted.  Overruled.
4          Continue.
5     A.    What was your question?  I'm sorry.
6     Q.    It's from Julie Pier?
7     A.    Yes, it is.
8     Q.    To Tim Hicks.  And she's explaining
9 the detection limit on Johnson & Johnson's method,
10 correct?
11    A.    That's correct.
12    Q.    And she says -- thanks.
13          She says, "Recently you asked for an
14 explanation of the reported detection limit of
15 method TM 7024 analysis of powdered talc for
16 asbestiform minerals by TEM performed on Grade 66."
17          That's the baby powder, right?
18    A.    Correct.
19    Q.    "The method states that the limit of
20 quantifiable detection is five fibers.  In other
21 words, if only three fibers are detected, we could
22 say that the amount detected is below the
23 quantifiable detection limit."  Right?
24    A.    Following the method, correct.
25    Q.    So under this method, the technician,

1 the analyst, can objectively see asbestos present in
2 the sample of baby powder and they are permitted,
3 under the method, to then put in the report below
4 the quantifiable limit of detection, correct?
5     A.    Based on the statistical uncertainty
6 chosen, yes.
7     Q.    Lastly -- yeah.
8          So I'll offer that one I just used,
9 your Honor.  3695-249.
10         MR. DUBIN:  Same objection, your
11 Honor.
12         THE COURT:  Thank you.  Noted.
13 Overruled.  Now admitted into evidence.
14         (Plaintiff's Exhibit 3695-249 was moved
15 into evidence.)
16 BY MR. PANATIER:
17    Q.    And Moshe pointed out to me, he asked
18 me to go back to this, paragraph 8, background
19 correction.  'Cause I think you brought this up
20 yesterday that, I think you said, you know, early
21 on --
22    A.    I'm sorry.  Which page are you on?
23    Q.    Sure.  This is 3 of 6, 5 of 9.
24          You said there was a time where
25 people expected more asbestos as a potential

Page 126

1 contaminant, correct?
2     A.     In the past it was much more a
3 problem from an environmental perspective, yes.
4     Q.     Okay.
5     A.     But you still have to determine your
6 background levels within your laboratory and also
7 within the analysis you're performing.
8     Q.     Yeah.
9          What this says here is that, under
10 background correction, "As of the time of this
11 writing" -- and this is 1995 -- "background
12 correction has not been necessary. The amount of
13 background asbestos detected has been insignificant
14 in comparison to the levels of asbestos found in
15 contaminated samples."
16          You're aware that's in there,
17 correct?
18     A.     I am.
19     Q.     Okay. I want to take you back to the
20 start of our conversation yesterday. And we have
21 talked about the sensitivity of different methods,
22 right?
23     A.     Correct. To some degree, but yes.
24     Q.     We've talked about how TEM as a tool
25 can be more sensitive than light microscopy,

Page 127

1 correct?
2     A.     I think it's incorrectly to
3 characterize it that way. It is better at looking
4 at the -- it is able, it's sensitive from a particle
5 size, it's more sensitive for a particle size
6 aspect, yes.
7          To know what those finest particle
8 sizes are you have to use TEM. There's no other way
9 to look at those. But as an overall sensitivity
10 comparison you can do PLM analyses that would give
11 you a much finer sensitivity than a TEM.
12          But again, it's based upon what the
13 analysis is and the scope of what it can and cannot
14 do every time.
15     Q.     Let me ask a more simple question.
16          TEM can see some things that the
17 light microscope can't?
18     A.     And vice versa, yes. That's true.
19     Q.     Right.
20          Like you said, if we've got this big
21 fat fiber or bundle of fibers under PLM and I'm
22 looking through this microscope, right, well, I
23 could see that there?
24     A.     Yes.
25     Q.     But with TEM, we would be taking a

Page 128

1 very, very small electron beam and it might go right
2 past that big guy?
3     A.     It wouldn't be that way. The issue
4 is the larger particles, you can't even look at
5 them. I mean, your magnifications are -- you would
6 never -- you don't use TEM to look at the big
7 particles. You use TEM only to look at the fines.
8     Q.     You would be looking at a teeny
9 little dot --
10     A.     Yes.
11     Q.     All right. So we talked about how,
12 in each test, there's about .00002 grams that are
13 actually evaluated. Can you tell me, in terms of
14 actual weight, how many grams are actually analyzed
15 in the ten grid openings that are looked at? Is it
16 a millionth of a gram?
17     A.     I've never done the calculation.
18     Q.     It's less than this, right?
19     A.     Yes. It would be less than that.
20     Q.     Substantially less than that?
21     A.     It would be less than that.
22          THE COURT: For the record, you're
23 pointing at less than --
24 BY MR. PANATIER:
25     Q.     Less than .00002 grams. Right?

Page 129

1     A.     That's correct. It would be, it's
2 less than that.
3     Q.     But let's say it was this. Let's say
4 it was this amount that was being analyzed with
5 every test.
6          Now, I've asked you this before.
7 Johnson & Johnson, generally speaking, starting in
8 the mid '70s or so, was doing quarterly tests with
9 TEM, correct?
10     A.     Quarterly composite testing, yes.
11     Q.     Right.
12          And what that meant was, first of
13 all, they would take, they would do J4-1 on every
14 two silos, correct?
15     A.     I'd have to review the documents for
16 the specific testing frequencies at that
17 specificity.
18     Q.     Well, do you know how big their silos
19 were?
20     A.     Not as I sit here today.
21     Q.     Okay. That's fine.
22          They would do quarterly composite
23 testing, which would mean that they would take, they
24 would take kind of a mixture of things they had
25 pulled over the quarter and they would test it one

1 time?
2      A.     That's correct.  The material that
3 was being processed, they were taking, they were
4 taking samples and then compositing those samples
5 into a quarterly composite over that period.
6      Q.     Right.
7            And they would do one TEM testing
8 each quarter, right?
9      A.     I believe that's accurate.
10     Q.     And then a later time came where they
11 went to doing biweekly TEM test, every two weeks,
12 right?
13     A.     No, I think they changed the
14 frequency of their compositing to, from -- to a
15 biweekly composite.
16     Q.     Okay.  Let me just cut to the chase.
17     A.     Thank you.
18     Q.     You've reviewed a lot of documents;
19 Imerys documents, Johnson & Johnson documents.  And
20 you and I have been through this before.
21            Overall, there are about, the last
22 time you and I talked about it, 365, but let's say
23 about 400 total TEM tests on Johnson & Johnson's
24 talc.
25     A.     Okay.

1      Q.     Would you agree with that?
2      A.     Somewhere in that ballpark.
3      Q.     Okay.  It's in the ballpark of 400
4 tests.  So 400.  And I'm going to put a little
5 baseball diamond there 'cause that's in the
6 ballpark.
7            Okay.  Now, if we want to know how
8 much talc then has been evaluated, we could -- we
9 know the way less than this per test, the .00002,
10 but if we just took this and we wanted to ballpark
11 how much total asbestos -- total talc that Johnson &
12 Johnson has actually evaluated by TEM in terms of
13 weight, you just take that times that?
14     A.     Well, you're going extrapolation, but
15 you could do it that way.
16     Q.     I'm not talking about extrapolating.
17 I'm talking about the actual amount analyzed.
18     A.     Sure.
19     Q.     Okay.  And we could do that.  I still
20 have my calculator.  We just multiply, right?
21     A.     I believe that's accurate.  Yes, I
22 believe that's correct.
23     Q.     So it would be, if it's 400 tests,
24 400 times .00002 equals .008, right?
25     A.     Grams, yes.

1      Q.     I'm going to put approx, approximate,
2 total talc tested.  I'm going to put J&J talc, J&J
3 talc, by TEM is about .008 grams, right?  That's
4 what our math was, right?
5      A.     In your hypothetical, yes.
6      Q.     Well, in my hypothetical I've
7 overestimated the amount that was actually studied
8 for each TEM test, haven't I?
9      A.     Well, you're ignoring a few things,
10 but yes.  Using the numbers that we just discussed,
11 that is the correct number.
12     Q.     Right.
13            Now, when we talk about sensitivity
14 of different tests, I've asked you before, in really
15 kind of simple terms, we could say if you have a
16 bathroom scale, that's less sensitive than a
17 scientific scale, right?
18     A.     Not -- again, depending on what you
19 need to weigh, you use different scales.  That's the
20 way to look at it.
21     Q.     Right.
22     A.     So if you're trying to weigh your
23 weight of a person to a certain precision, you would
24 then choose a scale that would be appropriate to
25 measure that person to the precision you wish to

1 measure them.
2      Q.     Not a bathroom scale.
3      A.     That does not appear to be a bathroom
4 scale.
5      Q.     This would be a scientific scale,
6 right?
7      A.     It is a scale.  Yes.
8      Q.     Okay.  Maybe you have a better one.
9 It's the Gemini 20.  Is that any good, do you know?
10     A.     I don't know anything about your
11 scale.  But again, when we use scales, we always
12 calibrate them to know if they work or not.
13            So even with a scientific scale, you
14 still have to go through calibration of the unit.
15     Q.     Okay.  So this one is showing zero
16 and it's got this little guy.  Do you know what this
17 is for?
18     A.     I assume it's to check the weight.
19     Q.     And it says 10G.  Does that mean ten
20 grams?
21     A.     That's correct.
22     Q.     So if you put this on here, it should
23 give us close to ten grams.  Oops.  Sorry.
24            10.01415.  So it's very, very close,
25 correct?  Can you see that?

34 (Pages 130 - 133)

Page 134

1    A.    I see that.
2    Q.    Sorry.  This thing kind of --
3    A.    You shaded it at one point.  I think
4 it helped.
5    Q.    Oh, light.  Okay.  That helps.  Okay.
6          We see that it's -- there.  If I
7 shadow it, we're very close to 10 grams.  Okay?
8    A.    Don't move.
9    Q.    Okay.  So we're going to take that
10 off.  And actually I think it's got this feature
11 called tare, and if we press that I think
12 that zeros us out.  Okay.  Never mind.
13          Okay.  We're back to zero.  Okay.  So
14 here's where I'm going.  Total amount of talc tested
15 by TEM by Johnson & Johnson.  If we want to know if
16 that's less than the weight of one of these Ice
17 Breaker breath mints, we can just weigh it, right?
18    A.    That's true.
19    Q.    So an Ice Breakers brand breath mint
20 weighs about 8/10ths or thereabout of a gram, would
21 you say?
22    A.    That one does, yes.
23    Q.    This one does.
24          And so a mint weighs .8 grams and we
25 have these convenient 8s here.  How much heavier is

Page 135

1 that mint than the total amount of talc that Johnson
2 & Johnson, by our discussions, has tested by TEM?
3    A.    It would be 100 times more.
4    Q.    100 times.
5    A.    Two orders of magnitude.
6    Q.    So if we wanted to visualize for our
7 jury that amount, we would have to take this mint
8 and we would to divide it by a hundred times,
9 correct?
10    A.    No.  The density of the mint and the
11 density of the talc are different, so you wouldn't
12 be -- the volumes wouldn't be the same.
13    Q.    I'm not talking about cutting it into
14 tiny pieces.  We would take 1/100th of this mint?
15    A.    To do what?
16    Q.    In terms of weight.
17    A.    For weight perspective, yeah.
18    Q.    We would take 1/100th of the mint to
19 get .008 grams, right?
20    A.    Yes.
21          MR. PANATIER:  Those are all the
22 questions I have.
23          THE COURT:  Thank you.
24          Redirect?
25          MR. DUBIN:  Yes, thank you.

Page 136

1          I doubt I'll finish before lunch, so
2 what time would your Honor like me to go until?
3          THE COURT:  No later than one
4 o'clock.
5          MR. DUBIN:  It won't matter to me to
6 stop, so I'll just pick whenever.  I'll see when
7 people look hungry.
8 REDIRECT EXAMINATION BY MR. DUBIN:
9    Q.    All right.  Hi, Dr. Sanchez.  How are
10 you?
11    A.    I'm well.
12    Q.    So I want to start with one of the
13 questions that you were asked early on about these
14 boards.  Okay?  And the question you were asked is
15 whether the boards are accurate, right?
16          You recall that?
17    A.    From Mr. Panatier?
18    Q.    Right.
19    A.    Yes.  I recall.
20    Q.    And in that sense, if we look in
21 these documents can we find these words there,
22 right?
23    A.    Yes, we can.
24    Q.    But if we want to talk about these
25 boards as a whole, if someone were to suggest that

Page 137

1 these boards represent actually scientific valid
2 findings of asbestos in Johnson & Johnson's
3 products, would that be accurate?
4    A.    No, it would not be.
5    Q.    Okay.  And we talked a lot about this
6 yesterday, but I want to go through some of the
7 documents that you were shown and discuss them.
8          One thing that you were asked about
9 fairly early on was Dr. Pooley's report.  And what
10 the plaintiffs showed you, I'm truly awful about
11 this, is a section of a very long report that he
12 wrote regarding, a section of a very long report
13 that he wrote about his mine visit in Italy.
14          And just even looking at the document
15 itself, they read to you this part.  It says,
16 "Particles formed from the amphibole mineral found
17 at the mine were hardly fibrous in character, the
18 majority of the tremolite breaking to give compact
19 particles.  Those fibers formed were short and had a
20 very large diameter when compared with the
21 commercial varieties of asbestos."
22          You see that?
23    A.    I do.
24    Q.    And I'm going to come back to that,
25 but first I'd just like to point out what

35 (Pages 134 - 137)

Page 138

1 plaintiffs' counsel did not read in the next
2 sentence from this document.
3          What does it say?
4     A.     You want me to read it?
5     Q.     Yeah.
6     A.     "No amphibole or chrysotile mineral
7 was detected in any of the numerous powders
8 examined."
9     Q.     So here he's talking about the mine
10 site, right?
11    A.     Yes.
12    Q.     Is there any question about whether
13 Dr. Pooley, in the very document they asked you
14 about, whether he said -- what did he say about
15 whether there was asbestos in any of the Johnson &
16 Johnson powders?
17    A.     Well, the powders he tested here, he
18 says they were not detecting any asbestiform
19 minerals in those powders.
20    Q.     Was there any asbestos in any of the
21 Johnson & Johnson product that he evaluated?
22    A.     Not to my recollection.
23          THE COURT:  Counsel, for the record,
24 you're going to need to identify that.
25          MR. DUBIN:  Sorry.  This was the

Page 139

1 document that they had used.  It was part of Defense
2 8372.
3          THE COURT:  Thank you.
4          MR. DUBIN:  No problem.
5 BY MR. DUBIN:
6     Q.     And let's just assume for a second
7 that we're going back again to see whether it was
8 true or not.  Let's assume, let's go with the
9 plaintiffs' idea that somehow this document says
10 there's asbestos in Johnson & Johnson.  Okay?
11 Forget what we just talked about for one minute.
12 Okay?
13    A.     Okay.
14    Q.     We went through this yesterday, and
15 this is a slide made from admitted exhibit, Defense
16 8372.
17          Who did Johnson & Johnson give that
18 very same Pooley report to that we were just looking
19 at?
20    A.     This was part of their submission to
21 the FDA at this time.
22    Q.     So this very document that they
23 cross-examined you about and said that it found
24 asbestos, who did Johnson & Johnson give it to?
25    A.     The FDA.

Page 140

1     Q.     And in terms of whether Dr. Pooley
2 actually did think there was asbestos in those
3 samples, there was a cover letter for that report,
4 right?
5     A.     There was.
6     Q.     And we looked at that cover letter
7 yesterday, Dr. Pooley writing to Dr. Shelley at
8 Johnson & Johnson.  And what did he conclude
9 about -- what did he tell Johnson & Johnson about
10 whether there was asbestos in that Italian mine they
11 were using?
12    A.     He says, "No chrysotile was found at
13 the mine or in the samples taken.  Some tremolite
14 was located, but was not asbestiform in character
15 and has not been detected in the 00000 talc imported
16 into Great Britain for the past year, nor in
17 shipments dating back to 1949.  I hope that it is of
18 some interest to you."
19    Q.     And despite Dr. Pooley saying that,
20 is that entry on plaintiffs' board of J&J's internal
21 documentation in this case having to do with
22 asbestos?
23    A.     No.
24    Q.     Is it listed on their board?
25    A.     It is on their board.

Page 141

1     Q.     Is that a finding of asbestos?
2     A.     It is not.
3     Q.     And then you were asked a little bit
4 about Dr. Pooley's testimony, and again, that's not
5 something you've reviewed.
6          Just to put it in context a little
7 bit, this was the deposition that he was talking
8 about, just to show you some additional parts of it,
9 talking about looking at the batches of talc and old
10 samples, "What did you conclude after looking at
11 those shipments and all the various samples?  No
12 fibrous asbestos minerals detected."
13          So that's something that you weren't
14 shown from Dr. Pooley's deposition.
15          Do you see that?
16    A.     I do.
17    Q.     Okay.  And he was also asked, "And do
18 you believe that all the testing that indicated
19 there's no asbestos in Johnson & Johnson's talc are
20 conclusions that, as you're sitting here today
21 looking at all this material, do you stand by the
22 work that you did?"
23          And what was his answer?
24    A.     "Yes."
25    Q.     Again, so is it important in some of

36 (Pages 138 - 141)

Page 142

1 these contexts to look at some additional
2 information?
3    A.    It's always good to have more
4 information.
5    Q.    And when I say whether all of these
6 findings were, represent scientifically valid, you
7 know, one of the other ones I thought was very
8 interesting we didn't go back to with -- plaintiffs'
9 counsel didn't go back to is this Dutch Consumer
10 Organization. I want to talk about that. 12/13/73.
11    MR. PANATIER: Your Honor, that's
12 beyond the scope.
13    THE COURT: Sidebar.
14    (Sidebar.)
15    THE COURT: It does seem to exceed
16 the scope of cross-examination.
17    What's the purpose?
18    MR. DUBIN: Yes. He asked the
19 witness, your Honor, are these boards accurate,
20 right. And so he put into play the accuracy of the
21 boards. And now I'm trying to explain the witness's
22 answer when he said it was accurate, what it meant
23 and what it didn't mean, these board entries. He
24 asked about the boards in their entirety and then
25 I'm going into that very same issue.

Page 143

1    THE COURT: Thank you.
2    Yes?
3    MR. PANATIER: I asked him if the
4 boards, if what is reported on the boards is in the
5 documents and he said yes. Now he's trying to get
6 into the substance of the board. I didn't talk
7 about the Dutch Consumer Organization.
8    THE COURT: He's using it by way of
9 an example.
10    How many of these ways of example are
11 you doing?
12    MR. DUBIN: Most of them focus on
13 specific documents that he did instead of other
14 ones. I don't think I have --
15    THE COURT: Okay, fine.
16    (Sidebar ends.)
17 BY MR. DUBIN:
18    Q.    So again, the reason I'm asking this
19 is 'cause he asked you whether the boards were
20 accurate, so I'm just trying to put in context your
21 response. Otherwise, I'll talk more about specific
22 documents he raised.
23    Just as an example, you were asked
24 were the boards accurate. And is it accurate that
25 there's a document from the Dutch Consumer

Page 144

1 Organization, 12/13/73, that says the word asbestos?
2    A.    Yes.
3    Q.    Does that mean that the Dutch
4 Consumer Organization, in fact, found asbestos in
5 Johnson & Johnson's product?
6    A.    No. It does not.
7    Q.    And we looked at an issue like this.
8 This is one of the examples we looked at yesterday.
9    Can you remind the jury what the
10 problem was with what the Dutch Consumer
11 Organization did?
12    A.    Yes. Their definition of asbestos
13 would include talc. Any mineral that would have
14 magnesium and silicate in it like talc, if it had an
15 elongated or needle form would be called asbestos
16 under that method.
17    Q.    And so is it any surprise that the
18 Dutch Consumer Organization could find talc in
19 talcum powder?
20    A.    No. Again, you would -- in any
21 talcum powder sample you will find some fibrous
22 talc. You will see talc that are elongated, that
23 have a fiber shape. In any talc you look at you
24 will find those.
25    Q.    Is it an accurate characterization to

Page 145

1 somehow say that that's a finding -- internal
2 documentation by J&J of a finding of asbestos in
3 this product?
4    A.    No. That would be incorrect.
5    THE COURT: Counsel, for the record,
6 what was that?
7    MR. DUBIN: I'm sorry. The document
8 that I'm displaying right now is Defense 7070
9 admitted.
10    THE COURT: 77 what?
11    MR. DUBIN: I'm sorry, 7070 admitted.
12    THE COURT: Thank you.
13 BY MR. DUBIN:
14    Q.    So let me focus on some of the
15 documents you were specifically asked about then,
16 because I don't want to repeat myself.
17    So one of the documents you were
18 asked about also, and we'll talk a little bit more
19 about the whole Lewin thing, but you were asked
20 about this analysis of Italian medicated Grantham
21 talc from Rolle's files that includes also
22 discussion of Lewin Shower to Shower.
23    You see here where it says that
24 there's a finding of rod or needle tremolite? Does
25 that mean that's asbestos?

37 (Pages 142 - 145)

Page 146

1    A.    Not necessarily. No.
2    Q.    And we know that also if we look at
3  what the FDA found --
4         THE COURT: Counsel, I don't want to
5  interrupt you, but --
6         MR. DUBIN: I am just assuming the
7  plaintiffs --
8         THE COURT: No. You're creating a
9  record. The record can't see what was said.
10        MR. DUBIN: I understand. It's 3441,
11 Plaintiffs' Exhibit.
12        THE COURT: Thank you.
13 BY MR. DUBIN:
14   Q.    And then if we look at what we looked
15 at yesterday, this D-8869, this whole idea about
16 tremolite and tremolite being found in the 1970s,
17 what does this show about whether the FDA was aware
18 of tremolite, that tremolite could be in talc dating
19 all the way back into the 1970s?
20        MR. PANATIER: Your Honor, I object
21 to this on outside the scope and I have more
22 actually, I mean, sidebar.
23        THE COURT: Sure.
24        MR. PANATIER: Sorry.
25        THE COURT: Can you take that down,

Page 147

1  please?
2         (Sidebar.)
3         MR. PANATIER: So it's scope. I
4  asked him about Sample 84. The FDA, in the '70s,
5  found asbestos in Sample 84, 107,000 fibers per
6  gram, and he said yes and I moved on. This now he's
7  putting up some other samples of 196 which he did
8  yesterday. It's outside the scope. Again, it's not
9  part of this.
10        THE COURT: Sorry. I thought I was
11 going to sneeze.
12        MR. PANATIER: Bless you.
13        MR. DUBIN: Your Honor, we're trying
14 to put the documents that he used with the witness
15 in cross in context that this idea of somehow
16 Johnson & Johnson is finding tremolite, some hidden
17 (inaudible) with the FDA. I'm simply putting his
18 document into context quickly.
19        You know, his idea of scope is
20 incredibly tight at this point as if I can only ask
21 about the precise document that he puts on the
22 screen whether there's a topic.
23        THE COURT: That's generally what
24 scope means. I'm not going to allow it. If you
25 have a question about that precise document, but

Page 148

1  otherwise, that confuses the jury.
2         Listen, I let you do the one as an
3  example, but if you're going to use that, you're
4  going to have to tell the jurors that this was not
5  the document that was referenced or not the test
6  that was referenced by counsel. That's fair.
7         MR. DUBIN: I understand that.
8         THE COURT: You have a choice.
9         MR. DUBIN: Okay. I'm fine to
10 identify, that's fine.
11        THE COURT: Right. But then not
12 exceeding the scope means not exceeding the scope.
13        MR. DUBIN: I understand.
14        THE COURT: That's what it means in
15 this jurisdiction.
16        MR. DUBIN: I understand, your Honor.
17 As I articulated, I am trying to stay within the
18 scope. I will be mindful of your Honor's
19 admonishments.
20        THE COURT: You're going to stay
21 within the scope.
22        MR. PANATIER: I didn't even use the
23 document, by the way. I just asked him a question.
24        THE COURT: He's allowed to use the
25 document if it was a document that you referenced.

Page 149

1         MR. PANATIER: Sure. And that's not.
2         THE COURT: That would be within the
3  scope. Stay within the scope.
4         (Sidebar ends.)
5  BY MR. DUBIN:
6    Q.    We just showed a document about the
7  internal discussion of tremolite at Johnson &
8  Johnson.
9         Have we also discussed documents, and
10 plaintiffs' counsel discussed them with you, showing
11 that the FDA was aware, in the 1970s, that there
12 could be tremolite in cosmetic talcs?
13   A.    Yes.
14   Q.    And so I want to talk a little then
15 about the documents that you went through with
16 Dr. -- about Dr. Lewin, and this was one of the
17 first ones that the plaintiff showed you. It's
18 Plaintiffs' Trial Exhibit 2852, or it would be if we
19 could see it.
20        And so we all understand where we
21 are, sometime in the early 1972, Dr. Lewin claimed
22 to find asbestos in a number of different products,
23 primarily by using a technique called XRD, right?
24   A.    Yes.
25   Q.    And then again, to provide some

38 (Pages 146 - 149)

Page 150

1  context to that, we talked about the fact that, and
2  this we discussed yesterday, just to provide a
3  little historical context, Defense 7073, what
4  happened after Dr. Lewin made those initial claims?
5      A.   Again, there was a lot of research
6  that was done about what was found and whether that
7  was accurate or not.
8      Q.   And we also, again, for context, went
9  through this, Defense 9262.  And what ultimately was
10  the conclusion about whether those initial
11  allegations by Dr. Lewin were correct or not?
12      A.   Again, this is Walter C. McCrone
13  speaking here.  He calls that the original report
14  was grossly wrong.
15      Q.   Okay.  And you were asked
16  specifically about some of the testing that was
17  done, you know, he put up on the board the specific
18  ones that were done by XRD, right?
19      A.   Correct.
20      Q.   And can you remind the jury why
21  Johnson & Johnson was having certain experts look at
22  Dr. Lewin's findings by using the technique XRD?
23      A.   Yes.  At that time, Lewin was using
24  powder X-ray diffraction and claiming to find
25  asbestos.  So Johnson & Johnson went to experts in

Page 151

1  the field of powder X-ray diffraction to have them
2  evaluate those results and test samples by that same
3  methodology to see what they were seeing.
4      Q.   And again, these were written up on
5  the board by plaintiffs' counsel, so let's again
6  look at what people actually concluded.
7          We looked at Defense 8372 with this
8  expert from M.I.T., and what was he saying about
9  Dr. Lewin's findings?
10      A.   He says, "My conclusion is that no
11  tenable evidence has been advanced to show that any
12  Johnson & Johnson product was made with talc which
13  contains chrysotile asbestos, and no tenable
14  evidence has been advanced to show that the product
15  as sold and manufactured contains chrysotile
16  asbestos."
17      Q.   And we looked at this conclusion from
18  Dr. Gordon that they asked you about on
19  cross-examination.  This was Defense 8372.  And did
20  he conclude whether there was asbestos or not?
21      A.   Based on the X-ray diffraction
22  testing, he says no evidence for chrysotile or
23  tremolite was found.
24      Q.   We looked at the Colorado School of
25  Mines, Defense 8372, and what did they conclude

Page 152

1  about whether Dr. Lewin was right?
2      A.   It says, "The above data does" --
3  this is speaking, again, to x-ray diffraction data.
4  "The above data does not indicate the presence of
5  chrysotile."
6      Q.   We looked at experts from Carnegie
7  Mellon.  That was Defense 8372 --
8          MR. PANATIER:  Your Honor, scope and
9  leading, your Honor.
10          THE COURT:  Scope is fine.  Just
11  don't lead.
12          MR. DUBIN:  I'm just asking did --
13  okay.
14  BY MR. DUBIN:
15      Q.   Did we look at this document
16  yesterday?
17      A.   We did.
18      Q.   8372?
19      A.   Sorry.  We did.
20      Q.   And I don't think what did they find
21  is leading; what did they find?
22      A.   Again, looking at the X-ray
23  diffraction information, he agrees there is no
24  positive evidence for the presence of chrysotile in
25  the Shower to Shower product.

Page 153

1      Q.   And so we've now talked about some
2  XRD analysis, and I want to talk about the other
3  document that plaintiffs asked you about, about
4  this.
5          THE COURT:  For the record.
6  BY MR. DUBIN:
7      Q.   This was a document, Plaintiffs'
8  Trial Exhibit 2424, and it was a summary of a FDA
9  meeting back in, I think that's August 11, 1972 --
10  1972, and one of the things they focused on with you
11  is this.
12          So again, the plaintiffs' counsel
13  asked you about what was being done to verify
14  whether or not Dr. Lewin's results were correct.
15          Do you recall that discussion?
16      A.   I do.
17      Q.   And two parts of this document were
18  highlighted.  I want to focus on the first with you.
19          It says, "In subsequent discussion,
20  Mr. Ian Stewart pointed out that light microscopy
21  may not detect chrysotile fibers."
22          You see that?
23      A.   I do.
24      Q.   And so what's going on there?
25      A.   The proposal of Dr. Lewin to look at

39 (Pages 150 - 153)

Page 154

1 his results to try to do some verification work was
2 to go to the optical microscopy, to use optical
3 microscopy. Ian Stewart of McCrone rightly points
4 out there is a chance, using only optical, that some
5 of the find -- fine fibers of chrysotile present,
6 you wouldn't be able to see them.
7      Q.    And so, if I am framing this wrong
8 correct me, but was one of the criticisms that
9 plaintiffs' counsel was making is that they
10 shouldn't have been using optical microscopy to
11 verify whether Dr. Lewin is right?
12     A.    Say that again. I'm sorry.
13     Q.    I think there was a suggestion that
14 you shouldn't be using optical microscopy to verify
15 whether Dr. Lewin was right or not because of what
16 Dr. Stewart said.
17     A.    No. I don't think -- optical
18 microscopy isn't bad for this, especially at the
19 ranges that Dr. Lewin is reporting, two or three
20 percent. But there is always the chance if you do
21 have some, a little bit in there and it's only in
22 the fines, you wouldn't be able to see it by PLM.
23         So there's nothing wrong with what
24 he's saying here, it's correct.
25     Q.    Let's also just say hypothetically,

Page 155

1 hypothetically, if Mr. Stewart from McCrone wanted
2 the FDA to miss asbestos if it's there, to not find
3 it if it's there, is there any reason to tell them
4 this?
5      A.    You want me to assume that Mr. Ian
6 Stewart would not want the FDA to find asbestos?
7      Q.    Right. If that was their motive.
8      A.    Okay.
9      Q.    So is that something they would say?
10     A.    I don't think somebody would say that
11 if that was their motive.
12     Q.    Are they telling the FDA maybe you
13 should use a different method if you want to really
14 find it?
15     A.    Say that one again, I'm sorry.
16     Q.    What are they advising the FDA you
17 should do?
18     A.    He's raising the concern that only
19 using light microscopy, you could miss if there were
20 chrysotile fibers.
21     Q.    So what kind of microscopy would you
22 then use if you had that concern?
23     A.    At this point, transmission electron
24 microscopy.
25     Q.    So if we look then at what Johnson &

Page 156

1 Johnson actually did, we looked at this document
2 yesterday --
3         THE COURT: Again, for the record.
4         MR. DUBIN: Defense 8372.
5 BY MR. DUBIN:
6      Q.    In evaluating whether Dr. Lewin's
7 findings were correct, did Johnson & Johnson do more
8 than having its consultants look at the samples with
9 optical microscopy?
10     A.    Yes, they did.
11     Q.    What else did they have them do?
12     A.    Again, they were doing -- they had
13 their consultants look powder X-ray diffraction,
14 which we just talked about, they had electron
15 microscopy conducted and in some cases, some optical
16 microscopy was also conducted.
17     Q.    So did Johnson & Johnson have its
18 experts do more, less or the same amount of work to
19 verify these allegations than the FDA was
20 suggesting?
21     A.    I think Lewin was suggesting it at
22 that point, but they were doing more than what was
23 suggested by Lewin to verify his findings.
24     Q.    And in that respect, is that in any
25 way comparable to what Johnson & Johnson did in its

Page 157

1 routine testing for cosmetic talc?
2      A.    As I've stated in my direct
3 testimony, they always went beyond the industry
4 standard.
5      Q.    And was McCrone, this is Defense
6 8372. Was McCrone the only consultant that Johnson
7 & Johnson asked to go beyond optical microscopy and
8 do something else to try to evaluate whether
9 Dr. Lewin was correct?
10     A.    No. They had additional people look
11 at it.
12     Q.    Who else looked at it that way?
13     A.    We covered this, but Dr. Fred Pooley.
14     Q.    And what did he conclude about
15 whether Dr. Lewin's findings were correct?
16     A.    In the conclusions to be drawn from
17 the examination are that no detectable chrysotile or
18 amphibole asbestos is present in the Shower to
19 Shower talc sample.
20     Q.    And another document you were asked
21 about, 'cause we've talked about a number of people
22 who were consultants to Johnson & Johnson, but
23 another document that the plaintiffs asked you
24 about, I guess it's Plaintiffs' Exhibit 1297. And
25 they asked you about this part about why Dr. Lewin

Page 158

1 was selected to do this initial work, right?
2     A.    That's correct.
3     Q.    Now, this document actually also
4 discusses some other labs that looked at Dr. Lewin's
5 findings and evaluated whether they were correct, so
6 I want to point that out.
7           This is Dr. Schaffner writing.  It
8 says, "I've compared Dr. Lewin's results for
9 chrysotile with those obtained for some of the same
10 samples by four other laboratories.  The additional
11 two laboratories included in this part of the study
12 are Columbia Scientific Industries of Austin, Texas
13 who sell the stone apparatus for differential
14 thermal analysis, and the health protection branch
15 of the Department of National Health and Welfare of
16 the Canadian Government in Ottawa.
17           "The agreement of results from
18 different laboratories is much less satisfactory for
19 chrysotile than discussed above for tremolite.  For
20 example, Samples 89 and 173 were found by Dr. Lewin
21 to contain five and 10 percent of chrysotile,
22 respectively, but chrysotile was not found in these
23 samples by the other laboratories."
24           Do you see that?
25     A.    Yeah.  It was 163, but yes, I see

Page 159

1 that.
2     Q.    163.
3           So were there other outside labs that
4 were not consultants to Johnson & Johnson that also
5 disagreed with Dr. Lewin's findings?
6     A.    They were not able to replicate them
7 at those percentages, yes.
8     Q.    Including the health branch, health
9 protection branch of the Department of National
10 Health and Welfare of the Canadian Government
11 Ottawa, correct?
12     A.    That was one of these entities they
13 list here.
14     Q.    We've looked at Defense 7058.
15           What did even Dr. Lewin say about
16 Dr. Lewin's results?
17     A.    I'm sorry?
18     Q.    What did Dr. Lewin say about his own
19 results?
20     A.    I'm sorry.  Is this -- can I see the
21 whole thing here?  I'm sorry.  I'm not sure if this
22 is --
23     Q.    Well, if you can't read it enough,
24 I'll skip it.  It's already in evidence.
25           There was also a lot of discussion

Page 160

1 with the plaintiffs' counsel about Dr. Langer.  And
2 to put this in -- I do have the full copy.  I'll
3 give you a copy.
4           So now that we have a copy, I will go
5 ahead and show the --
6           MR. PANATIER:  Your Honor, I make a
7 scope objection.
8           THE COURT:  Sidebar.  Bring that up.
9           MR. PANATIER:  I got it.
10           (Sidebar.)
11           MR. DUBIN:  Your Honor, he brought up
12 Dr. Lewin and discussed all Dr. Lewin and whether
13 the findings were right, whether there were proper
14 procedures used in order to verify or not verify
15 Dr. Lewin's results.  And I'm simply asking about
16 this document that's in evidence about Dr. Lewin
17 saying that he himself wouldn't stand behind his
18 results.
19           MR. PANATIER:  It's outside the
20 scope.  I didn't do this.  I discussed all of their
21 testing.  And, in fact, I went directly at what
22 counsel did yesterday.  I didn't bring up newspaper
23 articles or anything.
24           THE COURT:  I must be confused.  You
25 brought up newspaper articles with regard to --

Page 161

1           MR. PANATIER:  Langer.
2           THE COURT:  -- Langer years later.
3           This is permissible.  I mean, it's
4 within the scope.  It just uses a document that you
5 didn't use.
6           MR. PANATIER:  All right.
7           THE COURT:  It's on that issue.
8           Go ahead.
9           (Sidebar ends.)
10 BY MR. DUBIN:
11     Q.    So we were just finishing off
12 Dr. Lewin.
13           THE COURT:  Can you just give a
14 marking to that?
15           MR. DUBIN:  This is Defense Exhibit
16 7058.  This is just a full copy of it.
17           THE COURT:  Okay.  I see.  Thank you.
18           MR. DUBIN:  The full copy is in
19 evidence.
20 BY MR. DUBIN:
21     Q.    Even Dr. Lewin himself, what did he
22 say about his results?
23     A.    He says in the article referred to,
24 "I was erroneously quoted as having reported that
25 Johnson & Johnson's talcum powder contained two to

41 (Pages 158 - 161)

1 three percent asbestos.  In actual fact, I reported
2 that of 11 samples of the products of this company,
3 I found no evidence of asbestos in nine of the
4 samples and the other two samples fell into the
5 inconclusive category described above."
6     Q.   And so you were also asked a lot
7 about Dr. Langer, and you were shown a comment that
8 he made in a newspaper article very recently.
9         But to start out with Dr. Langer, we
10 did see an earlier newspaper article before, Defense
11 7032, that dates from the actual time around which
12 he's doing his work.  And what did even Dr. Langer
13 say about Dr. Langer's work?
14     A.   Well, I'm just going to read this.
15         "The data were very preliminary in
16 nature and what is more, I may have mistaken long
17 talcum fibers for asbestos fibers.  They have
18 similar properties, the doctor said."
19     Q.   And we looked at another article
20 previously.  This was back again at the time,
21 Defense Exhibit 8402.  And what are they reporting
22 back then about what Dr. Langer and Mount Sinai had
23 found with regard to Johnson's Baby Powder and
24 medicated powder?
25     A.   It states, "The products that the

1 researchers found uncontaminated with asbestos
2 fibers were Ammens Medicated Powder; Avon Bird of
3 Paradise Beauty Dust; Diaperene Medicated Body
4 Powder; two Johnson's Baby Powders, one made here
5 and one in Britain; Johnson's Medicated Powder;
6 Mennen Bath Talc; Yardley Aftershave Powder and
7 Yardley Original Body Powder."
8     Q.   And again, rather than things in the
9 newspaper, before we also looked at an actual
10 published paper, Defense Exhibit 8096, where
11 Dr. Langer and his colleagues at Mount Sinai
12 published a paper about various talcum powder
13 products that they looked for the presence of
14 asbestos, right?
15     A.   That's correct.
16     Q.   Did they report any asbestos in any
17 of the Johnson & Johnson products?
18     A.   They did not.
19     Q.   So then you were shown this comment
20 from December of 2018, and that's many decades after
21 the actual work was done?
22     A.   This would be.  Yes.
23     Q.   And the comment you were shown is "In
24 recent interview, Dr. Langer told The Times that
25 Dr. Chalmers spoke for himself and not for the

1 institution, not for our research group.  He
2 reiterated that his team had detected asbestos in
3 Johnson's Baby Powder.  I stand by that today.
4 Absolutely."
5         Right?  You were shown that?
6     A.   I was.
7     Q.   I want to talk about what that
8 Dr. Chalmers thing is and what happened.
9         MR. PANATIER:  Your Honor, we have to
10 approach on scope.
11         THE COURT:  Sure.
12         (Sidebar.)
13         MR. PLACITELLA:  It may be
14 unintentional, but every time Mr. Panatier makes an
15 objection counsel should not be throwing his hands
16 in front of the jury.
17         MR. DUBIN:  You're right.  I
18 apologize.
19         THE COURT:  You won't do that again.
20         MR. DUBIN:  I won't.
21         THE COURT:  After we finish Langer,
22 we'll take the lunch break.
23         Your --
24         MR. PANATIER:  My objection is that
25 this is outside the scope.  What they're going to do

1 is they're now getting into, is that the press
2 release?
3         THE COURT:  Right, Chalmers.
4         MR. PANATIER:  Right.
5         So the fact that he said that in
6 order to, in order to read the full sentence, which
7 it's one full sentence to talk about how Langer
8 stands by his results, I had to read the full
9 sentence.
10         But we didn't talk about the Chalmers
11 press release.  We didn't get into it at all.
12         THE COURT:  It doesn't matter.  You
13 raised the issue.  And what you read to the jury was
14 Chalmers spoke for himself.
15         So by, going beyond the scope would
16 be like a totally separate issue.  This is the
17 issue.
18         MR. PANATIER:  It's -- okay.  That's
19 fine.
20         THE COURT:  That's my ruling.
21         MR. PANATIER:  I'll come back with
22 the meeting where they met with her, that's fine.
23         THE COURT:  You'll approach me first
24 before you do that.
25         (Sidebar ends.)

42 (Pages 162 - 165)

1 BY MR. DUBIN:

2     Q.     So the reference to Dr. Chalmers, I
3 want to make sure we understood what that was. This
4 is Defense Exhibit 7506.

5     A.     Do you have the full --

6     Q.     (Handing.)

7          So, this was from the archives of
8 Mount Sinai, the Office of the President and Dean,
9 Thomas C. Chalmers, from back in 1976. And it's
10 regarding "Recent media reports concerning research
11 on talcum powder carried out by the Mount Sinai
12 Medical Center created considerable confusion on the
13 part of the public.

14          "The Medical Center has issued the
15 following statement in order to correct any
16 misinterpretations or mis-impressions that media
17 reports may have given."

18          And then one of the things they go on
19 to talk about --

20     A.     I'm sorry, you're on page 3 of 7?

21     Q.     I'm now going to page 2.

22     A.     Page 2. Okay.

23     Q.     Two of the things that they said,
24 Dr. -- or Dr. Langer's institution, The Mount Sinai,
25 it says, "Although the news media specifically

1 emphasized the dangers of talcum powders advertised
2 for babies, the only baby powder tested that was
3 reported to show asbestos represents less than one
4 percent of the market and that sample was five years
5 old. The most commonly used baby talc has been
6 consistently free of asbestos."

7     Do you see that?

8     A.     I do.

9     Q.     And do you understand that to be
10 Johnson & Johnson?

11     A.     I would -- I would make that
12 assumption, yes.

13     Q.     And the other thing that Mount Sinai
14 wrote back in 1976 is, "It is the opinion of Mount
15 Sinai's Department of Pediatrics that baby talc is a
16 useful and safe product."

17     Do you see that?

18     A.     I do.

19     Q.     And then what we see on the next page
20 in terms of why this was done, there's a memo --

21     A.     I'm sorry. You're now on page 4 --

22     Q.     I'm now on page 4 of 7.

23          There's a memo between a Dr. Irving
24 Selikoff and Dr. Thomas Chalmers.

25          You see that?

1     A.     I do.

2     Q.     And Dr. Chalmers writes, "I do feel
3 that we should not be afraid to admit it when we
4 have made a mistake."

5     Do you see that?

6     A.     Yes, I do.

7     Q.     And that was Dr. Langer's
8 institution?

9     A.     This is from Dr. Thomas Chalmers to
10 Dr. Irving Selikoff, both at Mount Sinai at this
11 time, I believe.

12     MR. DUBIN: Okay. I think it's time
13 for a lunch break.

14     THE COURT: Members of the jury,
15 we're going to take the lunch break now. Leave your
16 notebooks here.

17          Remember the instructions I've
18 provided: No discussions with regard to this case,
19 including the testimony you've just heard. No
20 research of any kind whatsoever.

21          Please be ready to come back upstairs
22 at 1:25. Thank you. Enjoy your lunch. Wear your
23 juror badges where they are visible. Thank you.

24          (Jury exits.)

25          THE COURT: We're off the record.

1          (Luncheon recess taken from
2 12:22 p.m. to 1:28 p.m.)

3     A F T E R N O O N   S E S S I O N

4     COURT OFFICER: Jury's entering.

5     (Jury enters.)

6     THE COURT: Please be seated. Make
7 sure cell phones are turned off

8     Mr. Dubin, whenever you're ready

9     Do you want us to go off the record?

10     MR. DUBIN: No. We're fine.

11 BY MR. DUBIN:

12     Q.     Hi, Dr. Sanchez. How are you?

13     A.     I'm well.

14     Q.     So we left off talking about some of
15 these boards, and again, I'm not going to go through
16 all the ones that we went through yesterday, that
17 plaintiffs' counsel didn't ask you, but again, there
18 were a number of these entries where they say
19 something like tremolite or amphibole, were those
20 asbestos; in other words, things like the Battelle
21 documents?

22     A.     No, you have to look at the specific
23 documents and what do they mean.

24     Q.     So let's then move on.

25          I want to talk about some of the new

43 (Pages 166 - 169)

1 documents that were shown to you today by the
2 plaintiffs' counsel. And I'm going to start here.
3 This was marked as Plaintiffs' Exhibit 3695-247.
4 And to make sure we know what we're looking at here,
5 there's a stamp on the bottom that says, "Imerys."
6 And I don't think it's disputed, but that this is
7 not a Johnson & Johnson document or a document from
8 Johnson & Johnson's files, just to put that in
9 context.
10        Do you see here one of the things
11 they've noted is that this company, Imerys, has
12 printed out some data regarding some old test
13 results where, in something called Grade 96
14 composite, they've identified, in a couple tests,
15 one chrysotile structure in those tests; right?
16    A.    Correct.
17    Q.    So I want to talk a little bit about
18 the significance of finding or not finding one
19 chrysotile structure in a test like this.
20        And we have sort of alluded to this
21 yesterday when we talked about these standards about
22 detection limits. Can you just describe again to
23 the jury what a detection limit is and how it's
24 used?
25    A.    I'll try. It's somewhat of a

1 difficult concept. I appreciate that.
2        When you're doing particle counts
3 such as this bench sheet represents, the idea here
4 is if you go through and you analyze and you don't
5 see anything, meaning you have a zero count, there's
6 a 95 probability if you go and analyze again you
7 could see anywhere from nothing again up to three.
8        If you go in and you do an analysis
9 and you see one particle, there's a 95 percent
10 probability that you go back in and you will see no
11 particles, or you could see one particle or two
12 particles.
13        So as you go through and you look at
14 the probability on the counts, up until you get to
15 about three, assuming your background is completely
16 clean, a count of one, if you are trying to
17 reproduce that, you have a likelihood of getting
18 nothing detected on your second round.
19        So because of that, it's in what I
20 call the noise of the analysis. It's in the
21 uncertainty of the measurement. So we use detection
22 limits to ensure that whatever is being observed is
23 above and can be distinguished from the zero count.
24 That's all these methods are protecting against.
25    Q.    And is that a common concept in

1 methods used throughout the study of asbestos,
2 including Government regulations and standards?
3    A.    It is.
4    Q.    Okay. And, in fact, we looked at
5 this document, it cites to an ASTM standard. Do you
6 see that, ASTM D?
7    A.    I do.
8    Q.    And first of all, what's the ASTM
9 again, if you can remind the jury?
10    A.    It's the American Standard and
11 Testing -- and Materials, or I forget what it is
12 exactly, something like that.
13    Q.    And has the ASTM written about the
14 purposes and significance of these kind of detection
15 limits?
16    A.    They do. They have a method
17 specifically for the determination of detection
18 limit based on counts.
19    Q.    I want to look at that and see what
20 the actual method says based on the significance of
21 finding something like one chrysotile fiber. And
22 I'm going to use this.
23        And I'm not going to introduce it,
24 but do you want us to still assign a number to it?
25        THE COURT: Still assign a number to

1 it.
2        MR. DUBIN: We'll call it S-7.
3        THE COURT: Thank you.
4        (S-7 was marked for identification.)
5 BY MR. DUBIN:
6    Q.    Here we're looking at something by
7 the ASTM called Standard Practice For Asbestos
8 Detection Limit Based on Counts. Is this something
9 you're familiar with?
10    A.    I am.
11    Q.    So we have here discussion of this
12 idea of needing to find a certain amount of fibers
13 for a positive. And one of the first things it
14 discusses is just the general concept. And this is
15 not something written by Johnson & Johnson, right?
16    A.    Correct.
17    Q.    What it says is, "The detection limit
18 is one of a number of characteristics used to
19 describe the expected performance of a measurement
20 method. The DL concept addresses certain potential
21 measurement interpretation errors. Specifically, a
22 measurement is reported as being below the DL if the
23 measurement cannot be distinguished from zero or
24 from the randomly varying background contamination
25 level."

1       So can you describe what that part
2  means?  What does it mean that it's reported as
3  below the DL if the measured level cannot be
4  distinguished from zero or the randomly varying
5  background contamination level?
6       A.    It's just what I described when you
7  were with those very low counts, it's within just
8  the analytical uncertainty of the measurement, you
9  could analyze the same talc over and over again and
10 never see anything again.  So you can't establish
11 that count of one from the background of zero.
12      So again, it just has to do with the
13 counts.  And again, it reflects the noise of the
14 analysis or the uncertainty of the measurement.
15      Q.    And what it says right after that is
16 that "Stated differently, the DL provides protection
17 against a false positive finding."
18      What does that mean?
19      A.    A false positive finding is where
20 asbestos is reported when it really is not there.
21 So that's one of the reasons why DLs are used is to
22 protect against the false positive finding.
23      Q.    And these kind of findings that we
24 see from the, even internal to the supplier about
25 this one chrysotile structure here or there, how

1  does that relate to the concept of detection limit?
2       A.    Well, within D-6620, which we were
3  just looking at, this is all within that noise of
4  the analysis, and so when they're reporting out
5  their concentrations it's less than whatever that DL
6  is for that method that they're employing.
7       Q.    So are all of these under the levels
8  of detection limit that is intended to provide
9  protection against the false positive finding?
10      A.    Yes.  They would be.
11      Q.    Okay.  And then another document that
12 you looked at from the time period of Vermont was
13 again an Imerys document.  That was Plaintiffs'
14 Exhibit 3695-248.  Imerys, again this is an Imerys
15 document, not a Johnson & Johnson document, right?
16      A.    Correct.
17      Q.    Okay.  And do you know whether
18 something like this would even have been shared with
19 Johnson & Johnson?
20      A.    I have no knowledge to that.
21      Q.    Okay.  But irrespective, this is
22 somebody at the supplier at a company called Rio
23 Tinto Minerals discussing an analysis of a fibrous
24 material from Argonaut and it says, "A sample of
25 acicular mineral material collected at the Argonaut

1  mine was submitted for identification."
2       Do you see that?
3       A.    I do.
4       Q.    Is this, does this indicate anywhere
5  that this is an analysis of a production run or sold
6  talc or anything like that?
7       A.    No.  My recollection of other
8  documents, this is dealing with a material they were
9  looking at potentially using for road-based
10 material.
11      Q.    So does this even have anything to do
12 with talc used in baby powder?
13      A.    No.  This has nothing to do directly
14 with the production of a cosmetic grade talc in that
15 deposit.
16      Q.    And one of the interesting things I
17 think we see here, do you see the way that they
18 describe it.  It says, "The sample was identified as
19 asbestiform actinolite amphibole."
20      You see that?
21      A.    I do.
22      Q.    Does that indicate to you what we
23 should -- now, you don't disagree that whatever
24 they're analyzing here is asbestos, right?
25      A.    No.  It looks like an amphibole type

1  asbestos.
2       Q.    But when we're evaluating other
3  documents that may just say actinolite or may say
4  tremolite, does this help us understand what we
5  should be seeing if people are really identifying
6  asbestos?
7       A.    If they're being specific in their
8  usage of the terms, yes.
9       Q.    And in many instances in many
10 documents where we've seen just the word tremolite,
11 does it have that qualifier saying that it's
12 asbestiform?
13      A.    No.  They do not.
14      Q.    Again, is this a positive finding of
15 asbestos in Johnson & Johnson's Baby Powder?
16      A.    No.
17      Q.    Another thing you were shown are some
18 more documents.  We're trying to ask exactly what
19 this is, but I think, was this -- anyway, we'll ask
20 how it is, but it doesn't have any Bates stamp from
21 anybody on this.
22      THE COURT:  It does?
23      MR. DUBIN:  It doesn't.  I don't
24 think so.  It just has a plaintiffs' number.
25      THE COURT:  It's a means of

1 identification you can use if you're going to put it
2 up there. I understand what you're saying in terms
3 of a Bates number, but you have to use the
4 identification number.
5          MR. DUBIN: I understand, your Honor.
6 And again, we're working with plaintiffs' counsel in
7 getting this.
8          MR. PANATIER: It's got a sticker on
9 it.
10          THE COURT: I know.
11          MR. DUBIN: Fine. It has a
12 plaintiffs' sticker on it, 3695-253. I believe we
13 understand this is a printout of some spreadsheet,
14 but anyway...
15 BY MR. DUBIN:
16     Q.     It says, what it has here is it has,
17 again, a finding of one chrysotile fiber back in
18 January of 2003, and then they have something, I
19 guess one, January 2001.
20          First of all, do you know whether
21 Johnson & Johnson was even using Chinese talc at
22 this time in 2001?
23     A.     My understanding, they were not.
24     Q.     Okay. So these kind of fibers, are
25 we talking about the same thing where you find one

1 stray chrysotile fiber in an analysis?
2     A.     Again, they're applying the
3 statistical uncertainty of the measurement for their
4 detection limits, so one would be below their
5 detection limit.
6     Q.     Okay. And presumably if the
7 supplier, and this is not -- if the supplier is
8 doing analysis back here 2001, 2003, do you have an
9 understanding of whether they continued to look at
10 these kind of talcs for a long time thereafter?
11     A.     I believe they -- yes. I have seen
12 other testing records in those other years from the
13 supplier.
14     Q.     So if plaintiffs are coming to you
15 with an indication of like one chrysotile fiber in
16 2001 and one in 2003, what does that suggest to you
17 about whether they're really finding chrysotile from
18 the ore in the product here?
19     A.     Again, this is just suggesting
20 whatever they're seeing, it's below the method's
21 ability to really say what was there. You're still
22 within that noise of the analysis.
23     Q.     And then we see a number of other
24 zeros and presumably others in different time
25 periods, right?

1     A.     Correct.
2     Q.     So finally, I want to get back to
3 this idea of whether the testing boards we discussed
4 were accurate. And you were asked about this
5 document, the Crosetto ore document.
6          Do you recall that?
7     A.     I do.
8     Q.     It was talking about the
9 mineralization of the general valley, right?
10     A.     Correct.
11     Q.     Again, we covered this yesterday. Is
12 it different to say what kind of minerals are in a
13 valley versus what are found in a part of an area
14 like a mine that's being actually processed for
15 consumer talc?
16     A.     Yeah. I mean, what's being done here
17 is he's saying, if you look at the geology of the
18 whole valley, these are the things that we're
19 finding potentially there, and then here's some
20 samples from the talc mine itself, test those. So
21 we need to look at the test results of the material.
22     Q.     And in terms of the boards, you know,
23 whether they're accurate or not, is there a lot of
24 other testing that doesn't appear on the boards
25 about talc used by Johnson & Johnson?

1     A.     Yes.
2     Q.     And even in this specific instance
3 about Crosetto, it says one drum of Italian rock,
4 the actual -- was sent for analysis. And then we
5 looked yesterday at Defense 7026 and when that was
6 actually analyzed, what did the Colorado School of
7 Mines report?
8     A.     Again, it looks like they hand-picked
9 through the bucket of rocks and the materials and
10 they didn't find any amphibole serpentine phases;
11 recognizes they were picking through it, and then
12 also when they were running the powdered samples
13 through the X-ray diffractometer they were also not
14 detecting any amphibole or serpentine phases.
15     Q.     And you were also asked by
16 plaintiffs' counsel about this, again, about this
17 Paoletti article, right?
18     A.     Yes.
19     Q.     And just to point out, first of all,
20 they were talking here about and analyzing talcs
21 used in that market, including various different
22 industrial and cosmetic talcs, right?
23     A.     Correct.
24     Q.     And does it still, do you still have
25 an opinion, sitting here today, whether anywhere in

Page 182

1 here they say they found asbestos in the talc that
2 Johnson & Johnson was using -- is there more than
3 one Italian talc?
4     A.    It's not even saying that.  It's
5 saying they're purchasing talcum powders from the
6 Italian market.  You don't know the source of any of
7 those products.  They could be from Italy, they
8 could be from other sources.  All we know is they
9 were purchased in Italy.  We don't know anything
10 about the provenance of the talcs being tested.
11    Q.    Again, is there anything on this
12 study that's on the board that said they tested
13 Johnson & Johnson talc and found asbestos in it?
14    A.    There's nothing in the document that
15 says that.
16    Q.    And, you know, as we walk through
17 things in the boards, if you see, you know, an
18 individual questioned issue in a particular document
19 or another document, is it important to consider the
20 evidence as a whole in terms of interpreting them
21 and understanding them?
22    A.    As much as you can, yes.
23    Q.    Okay.  And so, we talked about things
24 like the board having Dr. Pooley's Italian on there.
25 That was 7044.  But we also know that, you know,

Page 183

1 when we saw, for example, something about Grade 66
2 or 96, which was Vermont, we looked at another
3 document which was from Dr. Pooley about 7046; did
4 he also do an analysis of the Vermont talc?
5     A.    He did.
6         MR. PANATIER:  Scope.
7         THE COURT:  Sidebar.
8         (Sidebar.)
9         THE COURT:  How is Pooley and Vermont
10 raised on cross-examination?
11        MR. DUBIN:  They're showing
12 individual Grade 66 or 96 where he was crossed on
13 finding.  As Dr. Sanchez pointed out, understand
14 things like that, whether they're really positive
15 findings, also have to look at other evidence, the
16 totality of the evidence and briefly pointing out
17 what some of that totality of the evidence is.
18        THE COURT:  Okay.
19        MR. DUBIN:  To put it in context.
20 I've only got a few slides left.
21        THE COURT:  Thank you.
22        You wish to be heard on that?
23        MR. PANATIER:  Sure.
24        I didn't get into Vermont stuff at
25 all.  And to try to gateway it by saying we have to

Page 184

1 consider the totality of the evidence, as counsel
2 just said, it opens the door to the totality of the
3 evidence.
4         MR. DUBIN:  I'll withdraw my
5 question, that's fine.  I'll move on from Pooley.
6 There's some (inaudible).
7         THE COURT:  Thank you.
8         (Sidebar ends.)
9 BY MR. DUBIN:
10    Q.    Okay.  I won't belabor the point.
11        We did look at a number of other
12 documents that are not listed on here about people's
13 evaluation of Johnson & Johnson talc, right?
14    A.    We did.
15    Q.    And did that include some of the
16 preeminent experts in the fields of microscopy and
17 asbestos analysis?
18    A.    At that time, yes.
19    Q.    And as a final issue, I just want to
20 ask you a few things.
21        One of the things that you were asked
22 about was the amount of material that you can test
23 by TEM and whether it's a breath mint or something
24 else.  First, I know you seem like you were trying
25 to clarify something about weight, but I'm not sure

Page 185

1 what that was.
2     A.    Well, if you're calculating out a
3 structures per gram, which is what we're dealing
4 with, you're always dealing with a mass.  So I was
5 just trying to clarify that when the conversation
6 was being confused of only particles by particles.
7     Q.    Okay.  And when we talk about the
8 idea that you can only look at a small amount of
9 material by weight in TEM, what does that have to do
10 with?
11    A.    It's limitations of that technique.
12 It's by nature of how high a magnification it is,
13 you only ever can look at very small amounts of
14 material and only very small particles just by
15 nature of what it is.
16    Q.    But when you're looking at that small
17 amount of material, can you get down still to a
18 very, very low level of sensitivity in terms of
19 being able to detect something?
20    A.    Yes.
21    Q.    Like approximately how low are we
22 talking about here?
23    A.    Again, it depends on the analysis.
24 You have to look at the amount of material, how it
25 was prepared in order to arrive at it, but you're

47 (Pages 182 - 185)

Page 186

1 generally in the parts per million or parts per
2 billion range.
3     Q.    And because of that limitation of
4 TEM, what do you then do when you're evaluating talc
5 in order to try to look at a larger amount of
6 material?
7     A.    Well, this goes back to the approach
8 of looking at the material in the mine itself, using
9 powder X-ray diffraction is looking at two grams of
10 material per test.  And all these things that you're
11 sampling, again, you're trying to sample these
12 things in a way that's representative of larger
13 material and you extrapolate out to the larger
14 material.
15         But, again, you use X-ray
16 diffraction, you use polarized light microscopy and
17 you use TEM.  You use those things all in
18 conjunction.
19     Q.    I guess you're making a good point.
20         Let's just focus on the microscope
21 part first, or machine.  Are there other types of
22 analysis besides the transmission electron
23 microscope that Johnson & Johnson has used that will
24 allow you to look at a larger amount of material?
25     A.    Yes.

Page 187

1     Q.    Which are those?
2     A.    One of those would be polarizing
3 light microscopy.  Another one is powder X-ray
4 diffraction.
5     Q.    And then if you want to take a step
6 back and no longer be just looking at something
7 zoomed in under a microscope, are there other ways
8 that you can evaluate a mine or deposit or areas
9 within it to determine whether it's likely to have
10 asbestos?
11     A.    Yes.  If you can actually go and look
12 at the rock before it's turned into a powder you can
13 see whether there's veins of asbestos in the
14 material before it ever would be processed.  You can
15 evaluate things of that nature in the field.
16     Q.    Is that something Johnson & Johnson
17 also did?
18     A.    That is.  Yes, they did.
19     Q.    And finally, you were asked a little
20 bit about money, and I just wanted to make it clear,
21 as part of the work you've done that your company
22 has been compensated for, you know, can you give the
23 jury a sense of the volume and number of documents
24 that you've reviewed to satisfy yourself about your
25 opinions?

Page 188

1     A.    Thousands of pages of documents,
2 looking into the older techniques of the time.
3 Again, when I'm reading the documents, where I can,
4 especially with the testing methodologies through
5 time as they have changed and again, some of the
6 uncertainty in the early '70s I was discussing,
7 actually looking at the documents for what they were
8 doing in their methodology, and then to evaluate, by
9 following that methodology, could you actually
10 arrive at a scientifically supportable conclusion
11 asbestos was present.
12         So again, you look into that, you
13 look at the properties they're measuring and take
14 that into account.
15     Q.    And again, we're not going to talk
16 about the substance of it given where we are in the
17 trial, but again, can you give the jury a sense
18 of the volume of work that has been conducted by you or
19 at your direction at RJ Lee to look back at
20 historical samples of Johnson & Johnson products?
21         MR. PANATIER:  Sidebar, your Honor.
22         THE COURT:  Sidebar.
23         (Sidebar.)
24         MR. PANATIER:  They're trying to get
25 the fact that he's done testing.  And he kind of did

Page 189

1 this already in -- first of all, this is outside the
2 scope.
3         Second of all, when they started
4 yesterday they kind of squeezed this in where he
5 said, oh, I tested Johnson & Johnson, I stand by my
6 results.  This is another opportunity for him to say
7 that.  I think that goes way too far.
8         MR. DUBIN:  The one I asked him about
9 when he said he stands by his results was outside
10 litigation testing.  He went through the exact
11 dollar numbers that he's been paid in all of these
12 cases where you know that what he was doing in part
13 was generating gigantic reports, doing analyses,
14 responding to Dr. Longo.  How can I not at least
15 say, you know, we're not just giving him free money
16 and that he's actually worked for it like he's done
17 with the analysis.
18         MR. PANATIER:  I think it's perfectly
19 fine to say have you been paid for testing.  That's
20 it.  We're talking about historical samples, say
21 that is, they're trying to get that in however they
22 can.  And he did it yesterday.  He actually was
23 asked about not just Johnson & Johnson samples,
24 about historical tests.  And he said we stand by our
25 results.  Ask him if he's done testing and if they

48 (Pages 186 - 189)

1  got paid for it.
2          MR. DUBIN:  Your Honor, again, I
3  think once you get into a dollar number, how can I
4  not ask how much work did you do for that?  But I
5  leave it to your Honor.  I'm not going to continue
6  to argue it.
7          THE COURT:  How much work he's done
8  is fine.  Do not ask any question to elicit the
9  results of his tests.
10          MR. DUBIN:  I'm going to remind him
11  again, as I tried to do in the preface, and I'm
12  going to say --
13          THE COURT:  I think it's a little bit
14  better than yesterday, so thank you for chatting
15  with him, but let's wrap this up.
16          I agree it's important in terms of,
17  to counter the issue of payment, work that he has
18  done, but no results.
19          MR. DUBIN:  Okay.  I'll try to remind
20  him of that in preface in my question.
21          THE COURT:  Yes.  Thank you.
22          (Sidebar ends.)
23  BY MR. DUBIN:
24      Q.    Where this trial is now we're not
25  talking about results.  We're just, you know, just

1  in terms of you were asked about the amount of money
2  that has been paid to the company, so I want to ask
3  about the volume of work that you've done, you know,
4  at RJ Lee, what the compensation for it is in terms
5  of analyzing how many historical samples and the
6  volume of reports and materials that have been
7  prepared.
8      A.    Yeah.  Not speaking of any results of
9  that testing, but again, we have tested over a
10  hundred samples directly tied to the litigation.  We
11  have examined the documents.  We have done many
12  hours of literature search trying to understand the
13  science of the time.
14          There's a lot of data that comes in
15  from plaintiffs' experts that we need to evaluate.
16  Every time there's a diffraction pattern we have to
17  go in there and make measurements and match those
18  measurements up to try to verify the findings.  So
19  there has been a lot of work done.
20      Q.    Okay.  And so if we end where we
21  started, just to make clear, if we look at the
22  evidence that you discussed with us and with
23  plaintiffs' counsel, did Johnson & Johnson hire a
24  number of prominent experts to look at its talc?
25      A.    They did.

1      Q.    And did many of those experts report
2  to Johnson & Johnson that there was no asbestos?
3      A.    They did.
4      Q.    And were there also Government
5  findings and investigations that had reported that
6  there was no asbestos in Johnson & Johnson's talc?
7      A.    There were.
8          MR. DUBIN:  Okay.  Thank you very
9  much.
10          THE COURT:  Sidebar with regard to
11  any proposed recross.  Thank you.
12          (Sidebar.)
13          THE COURT:  What are you seeking to
14  do by way of recross and how do you think it's
15  appropriate?
16          MR. PANATIER:  Yes, your Honor.
17          The 2008 report from Argonaut, he
18  said that was for road material.  That's incorrect.
19          THE COURT:  Right.
20          MR. PANATIER:  This one is.  So I
21  need to straighten that out.
22          THE COURT:  Okay.  I'll allow that.
23          MR. PANATIER:  The Chalmers, the
24  press release.
25          THE COURT:  Yes.

1          MR. PANATIER:  So I have the Johnson
2  & Johnson memo about their meeting with Chalmers.
3          THE COURT:  That's fine.
4          MR. PANATIER:  And then lastly, he
5  brought up the detection --
6          THE COURT:  ASTM.
7          MR. PANATIER:  ASTM.  I'm just going
8  to ask a question about that in relation to this.
9          THE COURT:  About the ASTM?
10          MR. PANATIER:  Yes.
11          THE COURT:  Okay.
12          MR. DUBIN:  Your Honor --
13          THE COURT:  You get the final.
14          MR. DUBIN:  No, it's fine.  I'm
15  trying to explain the reason for confusion, I guess,
16  one of the documents seems to be a printout of part
17  of a spreadsheet, so I don't know whether we have
18  the -- he sent it to me now.  We may seek to
19  introduce an additional part of that when he's off
20  the stand.  I don't know, having not looked at the
21  whole thing.
22          MR. PANATIER:  You have it as it was
23  produced to us by Imerys.
24          MR. DUBIN:  I get it.  I'll take a
25  look at that.

49 (Pages 190 - 193)

1          THE COURT:  All right.  Go ahead.
2          (Sidebar ends.)
3          THE COURT:  Mr. Panatier, whenever
4  you're ready.
5          MR. PANATIER:  Thank you, your Honor.
6  RECROSS-EXAMINATION BY MR. PANATIER:
7      Q.    All right.  Dr. Sanchez, just a few
8  things.
9          By way of example, we look at these
10  results, right; you talked about that for every lab
11  they have to determine and under that method, that
12  ASTM method, they have to determine what the
13  background is for that lab, correct?
14      A.    That is correct.
15      Q.    And do you know what the background
16  is for the lab that did this work?
17      A.    Again, I believe that they have a
18  zero background level, which still encompasses
19  counts up to three.
20      Q.    They have a zero background level,
21  right?
22      A.    Based upon how you determine that,
23  yes.
24          THE COURT:  For the record, that was
25  what document?

1          MR. PANATIER:  3695-247.
2          THE COURT:  Thank you.
3  BY MR. PANATIER:
4      Q.    They have objectively, when they
5  report chrysotile findings, someone is seeing the
6  actual asbestos in the sample, they are measuring it
7  and analyzing it, correct?
8      A.    They saw something that they
9  identified as chrysotile, yes.
10      Q.    That's right.
11          You're not saying that it's some
12  imaginary hypothesis, they actually saw the fiber?
13      A.    Correct.  That is why something is
14  counted.
15      Q.    You were asked about -- you were
16  asked about a press release that Mount Sinai put out
17  on March 23rd, 1976.
18          Do you recall that?
19      A.    I do.
20      Q.    Now, sir, you know the day before
21  Mount Sinai issued that press release, five
22  employees were in the offices at Mount Sinai,
23  correct?
24      A.    I don't know the number, but I
25  believe I have seen that document.

1      Q.    Well, this is Exhibit 3049.  It's in
2  evidence.  And we can, if we need to, we can count
3  the folks, 'cause it says here on March 22nd, 1976.
4          Now, the press release goes out the
5  next day, right?
6      A.    I believe that's correct.
7      Q.    Okay.  A meeting was held with
8  Dr. Thomas Chalmers, and he's the one that issued
9  the press release, correct?
10      A.    Correct.
11      Q.    President of the Mount Sinai School
12  of Medicine.  Dr. S.D. Pomrinse, that's an
13  interesting name, Pomrinse of the medical school and
14  Mr. Samuel Rovner, I got it, someone's trying to
15  tell me to highlight.
16          Let's see, Johnson & Johnson was
17  represented by Mr. D.D. Johnston, Mr. J.E. Burke,
18  D.D. Petterson, Mr. L. Foster and Mr. Gavin
19  Hildick-Smith; one, two, three, four, five people,
20  right?
21      A.    That's correct.
22      Q.    Now, at the time, were you aware that
23  D.D. Johnston was the president of the Baby Products
24  Company?
25      A.    I don't know what these people's

1  positions are.
2      Q.    We've got five people from Johnson &
3  Johnson showing up in the offices, right?
4      A.    Correct.
5      Q.    This is a Johnson & Johnson memo
6  about that meeting, correct?
7      A.    Yes, I believe that's correct.
8      Q.    The object of the meeting was to
9  review with the Mount Sinai school management the
10  need for a statement from them correcting the record
11  in the press to indicate that baby talc is safe, the
12  samples of talc assayed by the Selikoff group were
13  at least three years old and that nickel containing
14  talc was not a hazard.
15          Now, they put out an article, they
16  wrote a literature article that came out in 1976,
17  correct?
18      A.    Who did?  I'm sorry.
19      Q.    Mount Sinai.
20      A.    Some individuals from Mount Sinai.
21  Yes.
22      Q.    Right.  Okay.
23          So Johnson & Johnson is saying that
24  they need to issue a statement about that, correct?
25      A.    I'm not sure what they're referring

Page 198

1  to here.  It sounds like this is a press release
2  that they're looking into, not an article.
3      Q.     Okay.  All right.  That's fine.
4  That's fine.
5          "Initially, Dr. Chalmers, who had
6  clearly given a lot of thought to the issue,
7  suggested that it might be wisest if all parties
8  forgot the whole incident and that nothing would be
9  gained by obtaining a retraction from the Mount
10  Sinai medical school.  It was pointed out that a
11  follow-up story in the media and press would have
12  less impact than the initial story.
13          "Johnson & Johnson representatives,
14  however, clearly expressed their desire to have a
15  retraction statement not only to allay the fears of
16  many anxious parents, but to correct the record
17  concerning the safety of baby talc and the fact that
18  Mount Sinai scientists had failed to report that the
19  samples studied were at least three years old."
20          So they wanted a retraction and one
21  of the things they say is to allay the fears of
22  parents, right?
23      A.     You read the document.  That's what
24  it says.
25      Q.     "The Mount Sinai group indicated that

Page 199

1  over the weekend the Selikoff group had been
2  studying six new samples of talc and had reported
3  that all of them contained minimal amounts of
4  asbestos.  The Mount Sinai management thought that
5  this information should be in the retraction
6  statement, but the Johnson & Johnson group assured
7  the Mount Sinai management that such a statement
8  should be avoided in case it turns out that it was
9  wrong."  Right?
10      A.     Yes.
11      Q.     So Mount Sinai, they show up in the
12  offices.  Mount Sinai said we did some work over the
13  weekend, six more samples all contain asbestos.
14  Johnson & Johnson says no, you might be wrong, so
15  you shouldn't include those in the retraction,
16  right?
17      A.     I would agree that you shouldn't be
18  reporting findings if they're not verified.
19      Q.     Well, they didn't say they weren't
20  verified.  Johnson & Johnson says you could be in
21  error, so you shouldn't include them.  That's all we
22  know from this.  Isn't that true?
23          (Continuation of the day's
24  proceedings in Volume 2.)
25

Page 200

1          CERTIFICATION
2
3      I, ANDREA F. NOCKS, C.S.R., License
4  Number 30XI00157300, a Certified Court Reporter in
5  and for the State of New Jersey, do hereby certify
6  the foregoing to be prepared in full compliance with
7  the current Transcript Format for Judicial
8  Proceedings and is a true and accurate
9  non-compressed transcript to the best of my
10  knowledge and ability.
11
12
13  ANDREA F. NOCKS          JANUARY 29, 2020
14  CERTIFIED COURT REPORTER
15  MIDDLESEX COUNTY COURTHOUSE
16
17
18
19
20
21
22
23
24
25

51 (Pages 198 - 200)

| & |
| --- |
| **&**  3:2,14,19,20 6:10,11,12,13 8:25 14:23 28:19 29:11 30:8 31:2 32:19 33:6 34:10 37:18 40:12,25 41:3 48:11 49:4,6 52:3 53:3,10,16 54:6,14 55:21 57:25 58:3 61:1,10 62:18 66:1 67:7 68:14 74:5 77:25 83:15 86:1,22 87:1 88:5 88:22 90:8,16,17 90:22,25 101:5 103:22 104:12 105:18,19 106:16 106:20 107:22 112:10 114:5,14 115:16 117:2,16 117:19 123:4 124:9 129:7 130:19,23 131:11 134:15 135:2 137:2 138:15,21 139:10,17,24 140:8,9 141:19 144:5 147:16 149:7 150:21,25 151:12 155:25 156:7,17,25 157:7 157:22 159:4 161:25 163:17 167:10 170:7,8 173:15 175:15,19 177:15 178:21 180:25 182:2,13 184:13 186:23 187:16 188:20 189:5,23 191:23 |

192:2,6 193:2 196:16 197:2,5,23 198:13 199:6,14 199:20

| 0 |
| --- |
| **0.0001**  46:5 **0.1**  56:18 **00**  45:9 57:20 **00000**  140:15 **00001**  44:9 46:12 57:20 64:25 80:5 **00002**  128:12,25 131:9,24 **0005**  79:24 80:4 **008**  131:24 132:3 135:19 **01**  56:16 70:20 **05**  102:6 **07039**  2:21 **07701**  3:3 **08903**  2:2 **0932-17as**  1:8 |

| 1 |
| --- |
| **1**  1:7 2:4,5 10:17 10:20 38:19 56:13 56:23 78:17 80:19 80:24 86:18,21,21 87:20 102:5 111:4 119:7,7 **1/100th**  135:14,18 **10**  41:10 48:15,16 69:14 84:3 134:7 158:21 **10.01415.**  133:24 **100**  47:7,8,12,16 93:15 109:7,9 135:3,4 **10019**  3:18 **10022**  3:6 |

**10036l**  3:15
**103**  5:6,8,9
**10613**  200:12
**107,000**  77:15 147:5
**10:29**  82:25
**10:30**  75:25
**10:46**  82:25
**10g**  133:19
**11**  37:17 48:17 56:2 153:9 162:2
**110**  5:5
**11th**  3:6
**12/13/73**  142:10 144:1
**1201**  3:8
**125**  5:7
**127**  3:3
**1297**  39:12 157:24
**12:22**  169:2
**132**  93:8 95:18 98:8
**133**  93:13,19 98:13
**136,212**  4:8
**14**  76:8,22 102:5 102:11 112:3
**15**  49:9 80:7,12 82:11 112:3,22
**150**  11:12
**1500**  48:1,5
**163**  158:25 159:2
**17**  73:17
**173**  5:5 158:20
**1809-17as**  1:2
**19**  5:4 66:2 88:4
**1949**  140:17
**196**  147:7
**1970s**  75:2 146:16 146:19 149:11
**1971**  20:11 22:20 25:1,14 28:4,14

**33**:16 48:19 60:24 69:13 74:4
**1972**  11:9 37:10,11 37:16 41:10 48:17 66:3 67:3 73:17 149:21 153:9,10
**1973**  19:19
**1976**  79:20 166:9 167:14 195:17 196:3 197:16
**1977**  59:7
**1984**  110:11 114:14
**1989**  88:4
**1990**  88:4
**1995**  126:11
**1:25**  168:22
**1:28**  169:2
**1st**  54:11

| 2 |
| --- |
| **2**  1:7 2:4 10:17,20 74:1 119:24 166:21,22 199:24 **20**  9:11,23 133:9 **20,000**  109:14 **200**  2:5 **2001**  101:3 178:19 178:22 179:8,16 **2002**  93:13 **2003**  100:24 178:18 179:8,16 **2008**  107:24 192:17 **2018**  76:8,22 163:20 **202**  103:1 **2020**  2:3 6:8 200:13 **2049**  77:24 78:6 **22**  27:8 43:4 46:2 46:3,6,12 |

**220**  46:16
**227**  111:21,23,24
**22nd**  196:3
**2363**  85:20
**2364**  73:21
**2374**  64:3
**2378**  24:25
**2381**  33:1,2
**2382**  67:14
**2385**  27:2
**2386**  20:7,9
**2390**  28:7
**2391**  29:9
**23rd**  19:19 20:4,11
  115:23 195:17
**2403**  69:10 84:6
**2424**  48:14 153:8
**247**  103:6
**25**  9:11,23 64:15
**253**  103:6
**26**  114:14
**27**  28:1
**2808**  22:17 24:16
**2852**  37:7 149:18
**29**  2:3 6:8 27:7
  111:22 112:1
  200:13
**290**  2:20
**2:30**  66:12

**3**

**3**  21:8 118:13
  119:7,7 125:23
  166:20
**3.05**  20:16 21:25
  22:11
**3.8**  108:6
**30**  22:20 28:1 86:4
**3049**  196:1
**305**  21:8 22:4
**30xi00157300**
  200:4

**3199-2**  101:12,15
  101:23
**3400**  3:9
**344**  22:24,24 23:7
  25:17 26:2,3,14,20
  32:13 34:2
**3441**  40:23 146:10
**365**  130:22
**3685-248**  108:19
**3695**  92:2
**3695-247**  5:6
  88:13 103:16
  170:3 195:1
**3695-248**  175:14
**3695-249**  5:7
  123:19 125:9,14
**3695-25**  21:20
**3695-250**  114:8
**3695-251**  115:22
**3695-252**  5:8
  101:10 103:6,12
**3695-253**  5:9
  100:14 103:14
  178:12
**38**  78:11 80:8
**3rd**  3:5 21:21 28:4
  28:14 29:18 33:12
  37:16 48:18 74:4

**4**

**4**  3:15 5:4 19:1,8
  19:10 113:23
  119:24,25 167:21
  167:22
**400**  130:23 131:3,4
  131:23,24
**43**  54:10

**5**

**5**  5:4 30:21 59:25
  60:2 84:18,19
  114:1 118:14

125:23
**500**  41:14,23 42:4
  42:16 47:21
**50s**  9:17
**51**  3:18
**52nd**  3:18
**56**  2:1
**5755**  99:21
**5756**  99:10

**6**

**6**  5:5 28:18 31:20
  60:24 62:2 110:2
  110:7 118:14
  119:24 125:23
**6/19/71**  67:14
**6040-17as**  1:20
**60s**  9:17 112:12
**66**  22:4 92:6
  124:16 183:1,12
**6620**  175:2
**67**  86:4

**7**

**7**  5:5 25:1,14
  26:17 27:8 33:16
  50:4 102:6 112:21
  113:5,5 166:20
  167:22 173:2,4
**7,194**  4:7
**7/31/73**  39:5
**7024**  117:16
  124:15
**7026**  181:5
**7032**  162:11
**7038**  19:2,3
**7044**  182:25
**7046**  183:3
**7049-16as**  1:14
**7058**  159:14
  161:16

**7070**  145:8,11
**7073**  150:3
**70s**  9:17 129:8
  147:4 188:6
**71**  20:4 29:18
  33:12 62:2 69:14
  71:10 83:22 84:3
**718**  2:21
**72**  48:20 56:2
  71:11 73:1 74:10
  83:14
**73**  77:14
**74**  77:14
**7506**  166:4
**75270**  3:9
**76**  59:8 79:7
**77**  145:10

**8**

**8**  125:18 134:24
**8.5**  22:11
**8/10/72**  41:25
**8/10ths**  134:20
**8/11**  49:1
**8/11/72**  48:22
**8/3/71**  29:15 32:12
**8/3rd**  29:10
**80**  94:1,13,24 95:6
**800**  3:5
**8096**  163:10
**80s**  112:13
**8372**  139:2,16
  151:7,19,25 152:7
  152:18 156:4
  157:6
**8393**  117:17
**84**  5:4 115:23
  147:4,5
**8402**  162:21
**8869**  146:15
**89**  158:20

**8s**  134:25

**9**

**9**  67:19,22 112:21
  113:5 118:14
  119:24,25 125:23
**9.0**  118:17
**9262**  150:9
**95**  171:6,9
**96**  92:7 170:13
  183:2,12
**97**  86:8
**983-1234**  2:21
**99.9**  42:17
**9:05**  2:4

**a**

**a.m.**  2:4 42:25
  82:25,25
**ability**  65:14,17
  123:7 179:21
  200:10
**able**  38:22 49:18
  50:8 55:6 60:2
  65:18 71:20
  106:21 127:4
  154:6,22 159:6
  185:19
**absence**  49:13
**absolutely**  77:6
  164:4
**academic**  40:1
  110:19
**account**  188:14
**accuracy**  142:20
**accurate**  37:19
  45:15 48:2 93:11
  98:2 99:12 110:22
  130:9 131:21
  136:15 137:3
  142:19,22 143:20
  143:24,24 144:25

150:7 180:4,23
  200:8
**acicular**  108:20
  175:25
**actinolite**  23:4
  26:1,5,17 32:15
  33:17,19 62:12
  108:23 121:22
  123:13 176:19
  177:3
**action**  34:21
**actual**  8:15 49:9
  57:23 58:9 63:9
  104:16 128:14
  131:17 162:1,11
  163:9,21 172:20
  181:4 195:6
**add**  33:14
**additional**  141:8
  142:1 157:10
  158:10 193:19
**addressed**  116:23
**addresses**  173:20
**adds**  48:6
**administer**  7:11
**admissible**  13:20
**admit**  168:3
**admitted**  23:25
  125:13 139:15
  145:9,11
**admonishments**
  148:19
**adopted**  52:13
  59:7
**advanced**  151:11
  151:14
**advertised**  167:1
**advised**  75:1
**advising**  155:16
**afield**  75:5 90:8

**afraid**  168:3
**aftershave**  163:6
**agree**  43:15,21
  49:11 51:4,9
  131:1 190:16
  199:17
**agreed**  55:17 63:1
**agreement**  82:18
  158:17
**agrees**  152:23
**ahead**  20:23 76:10
  114:17 160:5
  161:8 194:1
**al**  1:7,13,18,24
**allay**  198:15,21
**allegations**  150:11
  156:19
**alleges**  115:7
**alli**  6:23
**allison**  3:14
**allow**  75:14 90:19
  147:24 186:24
  192:22
**allowance**  52:15
  53:3,24
**allowed**  12:21
  75:3,6 90:20
  123:5 148:24
**alluded**  170:20
**alps**  62:16
**america**  1:7,13,18
  1:24
**american**  84:22
  172:10
**ammens**  163:2
**amount**  10:7
  65:18 68:18 92:25
  118:22 124:22
  126:12 129:4
  131:17 132:7
  134:14 135:1,7

156:18 173:12
  184:22 185:8,17
  185:24 186:5,24
  191:1
**amounts**  20:15
  23:3 27:15 34:5
  66:17 70:6,18,19
  185:13 199:3
**amphibole**  11:21
  16:22 17:24 20:20
  21:10,15,16 60:14
  65:12 81:14 82:3
  82:5 108:23 111:5
  111:13 137:16
  138:6 157:18
  169:19 176:19,25
  181:10,14
**amphiboles**  21:11
  68:13 112:18
**amplify**  7:15
**ana**  2:10
**analyses**  22:23
  127:10 189:13
**analysis**  67:22
  81:23 97:2,11
  98:9 105:3,10
  117:22 118:19
  119:2 120:4
  124:15 126:7
  127:13 145:20
  153:2 158:14
  171:8,20 174:14
  175:4,23 176:5
  179:1,8,22 181:4
  183:4 184:17
  185:23 186:22
  189:17
**analyst**  93:2
  102:13,22 118:23
  125:1

**analytical** 30:15
64:10 67:22 73:3
73:12 94:1,4 95:5
96:22 97:6 98:12
174:8
**analyze** 81:22
119:3 171:4,6
174:9
**analyzed** 112:3
128:14 129:4
131:17 181:6
**analyzing** 176:24
181:20 191:5
195:7
**andrea** 2:19 53:22
200:3,13
**angstrom** 21:8
**answer** 18:8
121:20,22 123:10
123:13 141:23
142:22
**answered** 63:7
**answering** 13:24
**answers** 30:1
**anthophyllite** 8:19
8:19,20,23 21:25
22:2,5,10,11,13,15
111:6 112:18
119:14 121:9,11
123:16
**anxious** 198:16
**anybody** 53:11
177:21
**anymore** 102:17
**anyway** 70:15
177:19 178:14
**apart** 17:10 18:7
**apologize** 23:13
46:9 53:21 56:18
164:18

**apparatus** 158:13
**apparently** 34:22
**appear** 63:17
133:3 180:24
**appearance** 11:15
11:17 71:16 72:13
72:15
**appearances** 3:1
6:14
**appeared** 40:6
115:10
**appears** 28:22
61:8 86:6 88:18
95:23 109:11
114:3 115:15
117:3
**appellate** 1:2
**applying** 179:2
**appreciate** 53:14
171:1
**appreciation** 29:4
**approach** 51:24
88:15 99:23 104:8
164:10 165:23
186:7
**appropriate** 132:24 192:15
**approved** 51:24
79:6,8,10,20
**approx** 132:1
**approximate** 102:23 132:1
**approximately** 41:20 77:14,15
93:13 185:21
**archives** 166:7
**area** 63:10,11 90:1
122:24 180:13
**areas** 78:5 112:6
187:8

**argonaut** 77:24
78:2,13 79:4,6,20
80:9 89:14,14
104:19,24 105:3,9
106:20,23 108:20
175:24,25 192:17
**argue** 190:6
**arguments** 33:13
**arps** 3:14
**array** 70:5
**arrive** 185:25
188:10
**art** 31:23
**article** 64:8 74:23
76:7 114:5 115:13
116:13,17,23
161:23 162:8,10
162:19 181:17
197:15,16 198:2
**articles** 160:23,25
**articulated** 148:17
**asbestiform** 8:22
14:12,12 17:10,16
18:6 80:13 81:1
81:12 108:23
117:23 118:1,2,9
119:12 120:3,5
124:16 138:18
140:14 176:19
177:12
**asbestos** 8:8,10,11
8:12,20 11:20
27:15,21 29:24
30:2,3,15 34:1,4,6
37:12,17 38:5,16
38:18 44:9,9
45:17 47:2 49:8
49:14,15 50:9,15
50:17 52:16,18,19
53:3,25 54:3 60:6
64:6,6,11,15,24

66:17,25 67:4
68:13,25 70:6,16
70:25 71:4 74:2,6
74:6 77:5 78:3
80:8,16 81:12,16
90:4,6 94:17 97:7
100:1,2,9 101:3
105:15 106:13,14
106:18 107:2,4
108:25 109:1
110:12 111:8
112:17,23 113:12
113:16,19 115:8
117:25 118:3,6,9
120:9,15 121:10
121:12 123:2
125:1,25 126:13
126:14 131:11
137:2,21 138:15
138:20 139:10,24
140:2,10,22 141:1
141:12,19 144:1,4
144:12,15 145:2
145:25 147:5
149:22 150:25
151:13,16,20
155:2,6 157:18
162:1,3,17 163:1
163:14,16 164:2
167:3,6 169:20
172:1 173:7
174:20 176:24
177:1,6,15 182:1
182:13 184:17
187:10,13 188:11
192:2,6 195:6
199:4,13
**ashton** 62:4
114:20,21 115:16
116:4,12 117:1

**asked** 8:8 15:17
16:20,20 26:6
32:2 50:5 51:5
52:14 53:9,11,15
74:1 75:9 79:18
89:9 104:13,14
110:15 124:13
125:17 129:6
132:14 136:13,14
137:8 138:13
141:3,17 142:18
142:24 143:3,19
143:23 145:15,18
145:19 147:4
148:23 150:15
151:18 153:3,13
157:7,20,23,25
162:6 180:4
181:15 184:21
187:19 189:8,23
191:1 195:15,16
**asking** 24:1 25:7
35:24 52:2 99:1,9
121:6 143:18
152:12 160:15
**asks** 18:2
**aspect** 119:6 127:6
**aspects** 116:17
**assailed** 40:12
**assay** 49:19
**assayed** 197:12
**assign** 99:19
172:24,25
**associated** 11:19
86:9 87:7
**association** 84:22
**assume** 21:14
35:24 76:17
133:18 139:6,8
155:5

**assuming** 57:18,19
61:15 63:16 146:6
171:15
**assumption** 43:19
106:17 167:12
**assured** 199:6
**astm** 99:10 116:16
172:5,6,8,13 173:7
193:6,7,9 194:12
**astronomical** 43:5
**attached** 114:21
115:5
**attacks** 40:8
**attend** 35:9
**attendance** 28:16
30:6 35:9,10,14,22
35:25 36:1
**attended** 35:17
61:16
**attendee** 36:25
**attendees** 36:22,23
**attending** 33:11
35:1 61:6,13
**attenuated** 89:21
**attorneys** 3:10,19
**august** 21:21 28:4
28:14 29:18 33:12
37:10,10,16 41:10
48:15,16,17,18,20
56:2 60:24 62:2
74:3 153:9
**austin** 158:12
**author** 31:9,22
**authored** 16:12
**avenue** 2:20 3:3,5
**avoided** 199:8
**avon** 163:2
**aware** 9:16 34:14
34:18 40:24 41:2
77:13,14,25 91:9
114:4,7 117:1

126:16 146:17
149:11 196:22
**awful** 137:10

**b**

**b** 5:2 55:22,23
**babies** 167:2
**baby** 20:12 22:25
23:7 26:2,4,7,18
27:12 32:13 33:19
63:14 68:4,8
70:20 74:2 77:5
79:8 85:23 86:4,5
87:12,17 92:7
110:16,17 114:11
124:17 125:2
162:23 163:4
164:3 167:2,5,15
176:12 177:15
196:23 197:11
198:17
**back** 6:7 23:17
48:10 56:16 61:8
61:17 71:17 75:2
77:21 80:2 82:19
107:11 125:18
126:19 134:13
137:24 139:7
140:17 142:8,9
146:19 153:9
162:20,22 165:21
166:9 167:14
168:21 171:10
178:17 179:8
180:2 186:7 187:6
188:19
**background**
125:18 126:6,10
126:11,13 171:15
173:24 174:5,11
194:13,15,18,20

**bad** 154:18
**badges** 168:23
**ballpark** 131:2,3,6
131:10
**bank** 3:3
**barden** 1:4 3:10
6:10
**base** 86:7
**baseball** 131:5
**based** 22:22 23:10
61:6 65:22 94:5
95:25 96:22 97:1
98:8 99:19 103:7
104:24 125:5
127:12 151:21
172:18,20 173:8
176:9 194:22
**basically** 64:7
**basis** 49:17 50:22
120:18
**batch** 40:19
**batches** 49:9 141:9
**bates** 177:20 178:3
**bath** 163:6
**bathroom** 132:16
133:2,3
**battelle** 9:1,17
169:20
**beam** 128:1
**bearings** 29:10
37:16
**beauty** 163:3
**belabor** 184:10
**believe** 8:6 12:6,10
19:4 23:1 28:6
37:19 39:7 45:9
46:7,14 47:9 63:6
73:18 79:15 86:23
87:8 91:13 93:10
94:4 130:9 131:21
131:22 141:18

168:11 178:12 179:11 194:17 195:25 196:6 197:7
**believed** 26:7
**believes** 14:2 66:16 69:5 74:6 87:15
**bench** 171:3
**best** 111:8 200:9
**better** 86:8 127:3 133:8 190:14
**beyond** 85:5 142:12 157:3,7 165:15
**bicks** 12:6 16:19 16:21
**big** 43:18 127:20 128:2,6 129:18
**bill** 114:20
**billion** 45:4 108:6 186:2
**billions** 18:16,19 38:6,12 108:4
**bird** 163:2
**bit** 10:10 11:1,7 18:14 22:19 37:6 109:19 121:1 141:3,7 145:18 154:21 170:17 187:20 190:13
**biweekly** 57:25 130:11,15
**blackout** 76:18
**bless** 147:12
**blount** 12:22 13:3 15:7,9
**board** 140:20,24 140:25 142:23 143:6 150:17 151:5 182:12,24

**boards** 7:22 8:1,3 10:25 14:8 19:16 75:11 85:23 136:14,15,25 137:1 142:19,21 142:24 143:4,4,19 143:24 169:15 180:3,22,24 182:17
**body** 63:23 78:1,2 78:8,13 79:1,5 163:3,7
**bottle** 26:2,6,13,18 42:15 43:4,5 46:2 46:3 57:19 107:3
**bottles** 42:18 105:8,11 107:8,9
**bottom** 78:17 101:2 109:10 170:5
**bought** 115:3 116:24
**branch** 158:14 159:8,9
**brand** 134:19
**break** 17:10 18:7 75:25 82:8,11 164:22 168:13,15
**breaker** 134:17
**breakers** 134:19
**breaking** 11:23 74:7 137:18
**breath** 134:17,19 184:23
**brenntag** 1:7,13 1:18,24
**briefly** 183:16
**bring** 58:18 107:11 160:8,22
**britain** 140:16 163:5

**broke** 17:2
**brought** 28:19 86:20 89:18 119:19 125:19 160:11,25 193:5
**brown** 3:14 6:22 6:23 25:6,10 57:2 76:13
**brunswick** 2:2
**bucket** 181:9
**buerger** 55:22,24 56:5
**bulk** 109:7,16
**bunch** 111:15
**bundle** 119:15 127:21
**burke** 196:17
**business** 116:17
**bzzz** 70:12

### c

**c** 2:10 7:18 150:12 166:9
**c.s.r.** 200:3
**calculate** 48:8 96:1,9 97:22 99:6 99:7 120:7
**calculated** 93:2
**calculating** 95:21 95:23 185:2
**calculation** 43:13 43:20 47:12 97:23 99:20 100:4 128:17
**calculations** 42:19 43:18
**calculator** 44:17 102:7 131:20
**calibrate** 133:12
**calibration** 133:14
**call** 27:17 64:25 66:2,18 69:4

71:11 171:20 173:2
**called** 27:21 62:19 62:21 66:5,12,21 88:8,9 119:19 134:11 144:15 149:23 170:13 173:7 175:22
**calling** 71:14,22 94:3
**calls** 150:13
**canada** 92:8,12
**canadian** 158:16 159:10
**caneer** 28:23 30:11,16,24,24 32:18,21,23 61:21
**carbonate** 86:9
**carbonates** 10:5 87:7
**carnegie** 57:8 152:6
**carried** 166:11
**case** 6:19 7:3 12:25 79:19 82:14 88:24 140:21 168:18 199:8
**cases** 156:15 189:12
**categorized** 14:13
**category** 111:10 111:18 162:5
**cause** 46:21 47:6 125:19 131:5 143:19 157:21 196:3
**caused** 105:16
**ccr** 2:19
**cell** 6:5 83:4 169:7
**center** 63:25 166:12,14

**certain** 9:4 78:5
132:23 150:21
173:12,20
**certification** 200:1
**certified** 200:4,14
**certifies** 94:16
**certify** 200:5
**cetera** 119:12,14
**challenging** 79:17
**chalmers** 77:2
163:25 164:8
165:3,10,14 166:2
166:9 167:24
168:2,9 192:23
193:2 196:8 198:5
**chance** 91:19
116:8 154:4,20
**change** 120:24
**changed** 130:13
188:5
**changes** 75:4
**character** 11:22
137:17 140:14
**characteristics**
173:18
**characterization**
98:5 144:25
**characterize** 42:13
96:24 127:3
**characterized**
51:5
**characterizing**
10:3
**charles** 1:9 3:11
**chase** 130:16
**chat** 60:19 109:18
117:14,16
**chatting** 190:14
**check** 35:23 61:17
79:11 80:11
133:18

**checked** 62:5
**checking** 26:9
**chemically** 86:19
**chemistry** 39:21
39:25
**children** 59:2,3
**china** 100:20
**chinese** 89:15,19
103:3 178:21
**chisone** 62:16 63:8
63:10
**chlorite** 9:19 10:5
**choice** 148:8
**choose** 82:16
132:24
**chose** 39:23
**chosen** 125:6
**chris** 3:7 6:17,18
25:10
**christopher** 3:2
**chrysotile** 27:20
31:24 32:1 38:20
38:25 39:2 49:7
49:13 50:16,20
51:18,21 52:25
54:18,20,22,24
55:2,6,11 60:17
62:12 66:15 68:25
69:6 70:6,16
71:16,22 72:7,14
72:23 78:2 80:8
80:15,15 81:3,15
82:2,4 92:16,21
93:6 94:17 97:2
100:23 101:3
111:7,11,14,19
112:19,25 114:2
119:13 120:25
123:1 138:6
140:12 151:13,15
151:22 152:5,24

153:21 154:5
155:20 157:17
158:9,19,21,22
170:15,19 172:21
174:25 178:17
179:1,15,17 195:5
195:9
**cites** 172:5
**claimed** 149:21
**claiming** 40:16
150:24
**claims** 150:4
**clarified** 13:15
**clarify** 53:8
184:25 185:5
**class** 39:1
**clean** 31:4,11,13
32:19 33:25 34:16
61:22,25 171:16
**clear** 7:25 83:20
89:11 90:12
101:11 187:20
191:21
**clearly** 84:9 109:1
198:6,14
**client** 119:10
**close** 133:23,24
134:7
**closer** 58:18 75:18
**clump** 119:15
**cohen** 3:2
**colleagues** 163:11
**collected** 108:20
175:25
**colorado** 19:12
22:21 27:24 28:23
30:12,16,24 33:5
34:9 37:5 57:5
151:24 181:6
**colors** 120:24

**columbia** 158:12
**come** 6:7 77:21
82:19 137:24
165:21 168:21
**comes** 115:17
191:14
**coming** 10:21
179:14
**commenced** 7:2
**comment** 15:3
162:7 163:19,23
**commented** 13:7
**commercial** 11:20
37:13 137:21
**committee** 53:13
117:10
**common** 111:3
171:25
**commonly** 167:5
**communication**
71:2
**community** 40:1
**compact** 11:23
17:3 137:18
**company** 75:1
84:16 85:18
103:21 162:2
170:11 175:22
187:21 191:2
196:24
**comparable**
156:25
**compared** 78:15
137:20 158:8
**compares** 86:17
86:25 87:20
**comparison** 66:14
78:25,25 126:14
127:10
**compensated**
187:22

**compensation**
191:4
**compensatory**
105:14
**competence** 40:4
**complete** 13:10
54:10
**completely** 44:1
75:10 171:15
**compliance** 200:6
**component** 99:5
100:4
**composed** 11:19
**composite** 129:10
129:22 130:5,15
170:14
**compositing** 130:4
130:14
**compressed** 200:9
**compromise**
116:19 117:8
**compromising**
117:12
**concentration**
18:20 38:19 45:19
47:16 48:9 65:16
93:3,18 95:8,15
97:23 99:16
102:14,23
**concentrations**
96:9 97:22 175:5
**concept** 171:1,25
173:14,20 175:1
**concern** 55:7
72:24 155:18,22
**concerned** 75:22
114:5
**concerning** 33:15
67:22 166:10
198:17

**conclude** 64:10
73:4 140:8 141:10
151:20,25 157:14
**concluded** 151:6
**conclusion** 95:1,10
150:10 151:10,17
188:10
**conclusions** 11:13
73:14 94:23 95:7
141:20 157:16
**conduct** 90:25
105:18
**conducted** 156:15
156:16 188:18
**confer** 40:7
**conference** 74:3
**confirm** 50:7 51:1
51:2,6,7,11,12
54:22 55:14
**confirmatory**
54:10
**confirmed** 49:20
49:23 50:10 55:1
**confrontation**
40:2
**confused** 160:24
185:6
**confuses** 148:1
**confusing** 17:18
98:23 120:24
**confusion** 166:12
193:15
**conjunction** 33:25
59:9 186:18
**connect** 85:8
**consider** 13:25
182:19 184:1
**considerable**
166:12
**considered** 12:23

**consistent** 29:25
**consistently** 167:6
**consists** 27:14
**constitute** 60:5
111:7
**constitutes** 120:4
**consultant** 40:6
54:14 157:6
**consultants** 40:13
55:22 156:8,13
157:22 159:4
**consumer** 3:20
142:9 143:7,25
144:4,10,18
180:15
**contain** 113:19
115:8 158:21
199:13
**contained** 50:9
78:2 113:12
161:25 199:3
**containing** 197:13
**contains** 70:25
74:5 151:13,15
**contaminant**
126:1
**contaminated**
27:16 126:15
**contamination**
34:6,12,15,21
36:15 61:3,21
110:12 173:24
174:5
**context** 14:3,4,4
42:11 47:4 49:5
79:22 97:23
120:23 141:6
143:20 147:15,18
150:1,3,8 170:9
183:19

**contexts** 142:1
**continuation**
199:23
**continue** 7:6 91:16
107:14 124:4
190:5
**continued** 6:9 7:19
179:9
**convenient** 134:25
**conversation**
126:20 185:5
**conversations**
75:16
**conversion** 47:24
**convert** 45:11
**copies** 25:7
**copy** 15:16 23:23
24:3,7 28:8 29:13
30:20 73:25 76:13
107:17,18 114:21
115:5 160:2,3,4
161:16,18
**core** 78:3,10,11,25
80:8
**corners** 13:5 15:9
15:10
**correct** 8:5,6,13
8:21,22 9:12,20
10:1,10,22,23
11:10 14:10 16:25
17:13,16 18:17
19:17 20:12,17,18
20:20 22:1,5,13,25
23:5,9,20 24:19
25:20,24 26:14,22
26:24 27:18,19
28:1,4,17,21,22,25
29:6 30:4,5,13,18
31:3,18 32:15
33:7,20,21 34:24
35:6 36:9 37:13

37:18,21 38:1,7
39:2 40:13 41:11
41:14,24 42:2
43:12 46:7,16
47:3,9,18 48:12,20
48:21 49:24 51:16
51:19,22 52:4,22
52:25 53:4,10,16
54:4,5,7,16,18
55:3,11,12,15,25
57:4,6,10,13,16,22
58:3 59:8,19,20,22
59:23,25 60:7,12
60:13,15,17,18
62:7,20 63:15
64:17 65:1,23
67:4,8,20,24 68:17
68:25 69:4,9,16,22
69:25 70:13,16
71:12 72:19 74:8
74:9,13 77:16
78:4,12 79:3 80:1
80:5,6,12,21 81:3
81:4 82:3 84:11
84:24 86:2,5,13,16
86:22 87:13 88:1
92:4,5,8,21,22
93:1,4,5,9,14,25
94:2,14,24 95:19
97:8,18 98:22
99:23 100:8,10,21
101:6,19,24
102:15,24,25
103:1,21,23 104:3
104:5 107:23
108:11,23,24
109:3,4,16,17
110:18 111:11
113:7,9,10,19,20
113:23,24 114:6
115:19,20 117:2,8

117:20,25 119:8
119:17,21 120:11
120:16,17 121:3,7
121:13,19,22,23
122:16,22 123:2,6
123:10,11,13,14
123:16,21 124:10
124:11,18,24
125:4 126:1,17,23
127:1 129:1,9,14
130:2 131:22
132:11 133:21,25
135:9 150:11,19
153:14 154:8,24
156:7 157:9,15
158:2,5 159:11
163:15 166:15
170:16 173:16
175:16 180:1,10
181:23 194:13,14
195:7,13,23 196:6
196:9,10,21 197:4
197:6,7,17,24
198:16
**correcting** 197:10
**correction** 125:19
126:10,12
**correctly** 11:24
17:14 32:3,5
41:15 49:21 67:2
69:1 80:17 81:17
113:2
**correspond** 21:8
**cosmetic** 29:24
42:23 110:12
112:2 113:4,18
149:12 157:1
176:14 181:22
**counsel** 15:21
18:21 24:6 76:13
89:18 138:1,23

142:9 145:5 146:4
148:6 149:10
151:5 153:12
154:9 160:1,22
164:15 169:17
170:2 178:6
181:16 184:1
191:23
**counsel's** 25:7
**count** 30:2 38:17
44:22 94:6 100:13
101:21 171:5,16
171:23 174:11
196:2
**counted** 195:14
**counter** 31:25
190:17
**counts** 98:24 99:2
99:19 171:2,14
172:18 173:8
174:7,13 194:19
**county** 1:1 2:1
200:15
**couple** 64:2 117:7
170:14
**coupled** 11:16
**course** 40:11
48:11 81:21
112:10 116:10
**court** 1:1 6:1,4,20
6:25 7:9,14 12:15
13:10,13 14:7,11
14:16 15:8,20
16:2,6 18:21 19:3
19:6,9,20,25 20:8
24:2,7,11 25:9
58:16,22 73:19,23
74:17,20 75:14,21
75:25 82:9,22
83:1,3 84:4,7
88:16 89:23 90:15

90:24 91:6,14
100:17 103:9
104:10,18,21
105:13 106:7
107:1 109:24
110:3 124:2
125:12 128:22
135:23 136:3
138:23 139:3
142:13,15 143:1,8
143:15 145:5,10
145:12 146:4,8,12
146:23,25 147:10
147:23 148:8,11
148:14,20,24
149:2 152:10
153:5 156:3 160:8
160:24 161:2,7,13
161:17 164:11,19
164:21 165:3,12
165:20,23 168:14
168:25 169:4,6
172:25 173:3
177:22,25 178:10
183:7,9,18,21
184:7 188:22
190:7,13,21
192:10,13,19,22
192:25 193:3,6,9
193:11,13 194:1,3
194:24 195:2
200:4,14
**court's** 91:11
**courthouse** 2:1
200:15
**courts** 76:18
**cover** 140:3,6
**covered** 157:13
180:11
**covers** 89:14

**crazy** 36:5
**created** 166:12
**creating** 72:23
  146:8
**credible** 81:19
**criticisms** 154:8
**crosetto** 62:15
  63:4,10,17 180:5
  181:3
**cross** 4:7 7:5,19
  12:18 15:13 24:5
  88:19,23 90:2,19
  105:24 106:1
  107:14 139:23
  142:16 147:15
  151:19 183:10
**crossed** 14:6
  183:12
**crr** 2:19
**crystal** 38:22
**ctfa** 49:3,17
**current** 58:5 78:16
  78:18 79:1,5
  200:7
**cut** 63:24 130:16
**cutting** 135:13

**d**

**d** 5:1 99:10,21
  146:15 172:6
  175:2
**d'angela** 1:15 3:12
  6:11
**d.d.** 196:17,18,23
**dallas** 3:9
**damages** 13:2
**dangers** 167:1
**darlene** 1:10 3:11
  6:11
**data** 33:13,14 49:6
  49:12,17 85:5
  93:19 96:22 98:9

  99:8,24 152:2,3,4
  162:15 170:12
  191:14
**date** 2:3 30:21
  41:12 84:2 105:4
**dated** 41:10 48:16
  60:24
**dates** 39:10 74:23
  162:11
**dating** 140:17
  146:18
**david** 1:9 3:11
  6:10
**day** 13:22 60:25
  195:20 196:5
**day's** 199:23
**days** 21:20 22:4,10
  27:8 28:3 33:2,4
  34:8,23 41:11
  61:11
**de** 114:22 116:1
**dealing** 176:8
  185:3,4
**dean** 166:8
**decades** 163:20
**december** 76:8,22
  163:20
**declared** 50:16
**defendants** 1:8,14
  1:19,25 3:19 4:4
  6:21 7:2 14:16
**defense** 19:2,3
  84:17 117:17
  139:1,15 145:8
  150:3,9 151:7,19
  151:25 152:7
  156:4 157:5
  159:14 161:15
  162:10,21 163:10
  166:4 181:5

**define** 65:5
**defined** 70:4,5
**defining** 120:17
**definite** 34:3
**definitely** 70:4
**definition** 119:4,9
  144:12
**degree** 126:23
**delineation** 90:12
**delivery** 85:5
**demonstrated**
  68:7,22
**density** 135:10,11
**department**
  158:15 159:9
  167:15
**depend** 18:19 38:8
  48:7 108:5
**depending** 9:13
  18:15,17 34:19
  43:7 56:13 65:4
  83:12 132:18
**depends** 65:2 99:5
  185:23
**deposit** 9:13 63:21
  107:23,25 108:3
  176:15 187:8
**deposition** 12:7,25
  13:22 14:20 15:3
  16:9 19:8 141:7
  141:14
**depositions** 15:1
**deposits** 9:11
  108:12,15 111:4
  115:4
**describe** 59:24
  170:22 173:19
  174:1 176:18
**described** 59:13
  162:5 174:6

**description** 83:17
**desirable** 40:7
**desire** 198:14
**despite** 140:19
**detail** 24:19
**detailed** 9:10
**details** 92:13
**detect** 26:24 38:20
  38:23 50:20 51:17
  81:3 153:21
  185:19
**detectability** 34:5
**detectable** 52:18
  54:2 157:17
**detected** 36:12,13
  77:5 94:17,17
  120:6 124:21,22
  126:13 138:7
  140:15 141:12
  164:2 171:18
**detecting** 138:18
  181:14
**detection** 37:21,24
  38:5,7,13 52:17
  56:6 59:25 65:4
  65:13,20 80:23
  81:7 94:5,18 95:5
  95:24,24 97:4
  98:7,7 119:20
  120:2,5,7,22 121:3
  121:13,18 123:6
  124:9,14,20,23
  125:4 170:22,23
  171:21 172:14,17
  173:8,17 175:1,8
  179:4,5 193:5
**detections** 82:5
**detects** 81:19
**determination**
  29:24 172:17

**determine** 38:15 87:5 126:5 187:9 194:11,12,22
**determined** 105:14 107:4
**development** 107:6
**device** 70:14
**diameter** 137:20
**diamond** 131:5
**diaperene** 163:3
**differ** 65:9
**different** 10:19,21 21:3,12 25:19 37:1,13 40:20 63:8 76:19 99:7 111:22 112:1 122:21 126:21 132:14,19 135:11 149:22 155:13 158:18 179:24 180:12 181:21
**differential** 158:13
**differently** 174:16
**differs** 65:7
**difficult** 171:1
**diffraction** 21:1 22:22 26:5 33:21 37:14 38:14 40:22 51:23 58:7 65:11 69:24 70:2 72:9 72:25 80:20 81:9 83:10,19 84:10 150:24 151:1,21 152:3,23 156:13 186:9,16 187:4 191:16
**diffractometer** 181:13
**dig** 11:4 12:4 22:18 36:11 39:10

75:12
**dilution** 18:15
**dimensions** 119:15
**dinner** 59:5
**direct** 14:8,17 15:12 59:13 105:21 157:2
**direction** 188:19
**directly** 67:13 110:17 160:21 176:13 191:10
**disagree** 79:21 106:8 118:11 176:23
**disagreed** 98:5 159:5
**disagreeing** 113:17
**disclosure** 13:4
**disclosures** 91:1
**discontinued** 104:18
**discuss** 82:14 137:7
**discussed** 60:20 71:3 103:8 110:10 132:10 149:9,10 150:2 158:19 160:12,20 180:3 191:22
**discusses** 158:4 173:14
**discussing** 27:24 74:24 78:12 85:22 175:23 188:6
**discussion** 50:8 71:18 145:22 149:7 153:15,19 159:25 173:11
**discussions** 50:18 75:22 135:2

168:18
**dispersed** 70:7
**disperses** 70:12
**displaying** 145:8
**dispute** 80:16 105:17
**disputed** 170:6
**distinction** 63:6
**distinguished** 171:23 173:23 174:4
**distributed** 84:17 98:17,22
**distribution** 94:6
**divide** 45:12 46:6 46:8 135:8
**divided** 46:12
**division** 1:1
**dl** 173:20,22 174:3 174:16 175:5
**dls** 174:21
**docket** 1:2,2
**doctor** 90:21 162:18
**document** 14:13 14:18 15:11,11 19:18 20:3 21:9 24:22 25:3 36:7 48:11,14 55:18 60:19 62:1 77:17 83:13 85:19 89:2 89:3 100:15 103:20 104:4,9,22 123:20 137:14 138:2,13 139:1,9 139:22 143:25 145:7 147:18,21 147:25 148:5,23 148:25,25 149:6 152:15 153:3,7,17 156:1 157:20,23

158:3 160:16 161:4 170:7,7 172:5 175:11,13 175:15,15 180:5,5 182:14,18,19 183:3 194:25 195:25 198:23
**documentation** 26:9 140:21 145:2
**documents** 8:4 11:1,4 12:4 14:9 14:21,23 22:19 36:11 37:4 39:11 40:18 52:3 55:20 64:2 72:21 74:23 75:7,12,20 88:20 88:24 89:5,12 91:9,23 129:15 130:18,19,19 136:21 137:7 143:5,13,22 145:15,17 147:14 149:9,15 169:21 169:23 170:1 176:8 177:3,10,18 184:12 187:23 188:1,3,7 191:11 193:16
**doing** 9:6 40:15 50:25 56:4,16 65:16 69:24 72:9 72:24,25 73:2,11 73:13 75:13 83:19 96:15 121:5 122:18 129:8 130:11 143:11 156:12,22 162:12 171:2 179:8 188:8 189:12,13
**dollar** 189:11 190:3

**dolomite** 9:20
**dolomites** 10:5
**domestic** 92:7
**dominant** 10:3,4
**door** 91:2 184:2
**dot** 128:9
**doubt** 136:1
**douglas** 1:4 3:10
  6:9
**downstairs** 82:17
**dr** 6:6 12:5,25
  13:8,15 15:7,9
  16:9 17:1,5,7,15
  37:8,11,22 39:17
  39:23 50:4,6,8,20
  51:5,5,7,14 52:12
  54:9 64:1,2,4,5,5
  66:4,6,12,16,18,21
  67:6,10,10,13,18
  67:21 68:22 71:3
  71:13,14,23,25
  74:22,25 75:6
  76:15 77:1,1,2,21
  79:19 82:22 83:8
  83:10 88:19 90:13
  104:14 106:22
  107:8,11 136:9
  137:9 138:13
  140:1,7,7,19 141:4
  141:14 149:16,16
  149:21 150:4,11
  150:22 151:9,18
  152:1 153:14,25
  154:11,15,16,19
  156:6 157:9,13,15
  157:25 158:4,7,8
  158:20 159:5,15
  159:16,18 160:1
  160:12,12,15,16
  161:12,21 162:7,9
  162:12,13,22

163:11,24,25
164:8 166:2,24,24
167:23,24 168:2,7
168:9,10 169:12
182:24 183:3,13
189:14 194:7
196:8,12 198:5
**draw** 61:23 94:23
  94:25 95:7,9
**drawing** 73:13
**drawn** 157:16
**drum** 62:15 181:3
**dubin** 3:17 4:8
  6:23 7:21 12:13
  12:17 13:12,18
  14:10,19 15:15,23
  16:1 19:2,4 20:2,6
  23:23 24:1,14
  33:3 39:5 58:13
  60:20 62:25 74:15
  74:19,21 75:19,24
  85:25 88:14,18
  89:25 90:20 91:4
  91:7 100:16 103:7
  104:8,12 105:7
  106:5,8 109:21
  110:4,14 123:25
  125:10 135:25
  136:5,8 138:25
  139:4,5 142:18
  143:12,17 145:7
  145:11,13 146:6
  146:10,13 147:13
  148:7,9,13,16
  149:5 152:12,14
  153:6 156:4,5
  160:11 161:10,15
  161:18,20 164:17
  164:20 166:1
  168:12 169:8,10
  169:11 173:2,5

177:23 178:5,11
178:15 183:11,19
184:4,9 189:8
190:2,10,19,23
192:8 193:12,14
193:24
**dubin's** 12:6 63:7
**due** 90:17 112:16
**duplicate** 101:11
**dust** 163:3
**dutch** 142:9 143:7
  143:25 144:3,10
  144:18

**e**

**e** 2:22 5:1,2 7:18
  7:18 55:22,23,23
  169:3,3
**earlier** 48:18
  49:25 86:20 111:9
  162:10
**earliest** 8:24
**early** 9:17 112:12
  125:20 136:13
  137:9 149:21
  188:6
**earth** 108:6,16
**easily** 43:11
**easy** 96:18
**efforts** 85:18
**eight** 21:20 22:4
  22:10 28:20
  112:22
**either** 35:20 37:2,4
  44:15 82:16 90:18
**electron** 18:13
  31:1 49:8,14 50:1
  57:12 68:4,21,22
  69:23,24 70:2
  82:1 84:9 92:23
  109:3 110:11
  117:19,24 128:1

155:23 156:14
186:22
**elicit** 190:8
**elizabeth** 1:21
  3:12 6:13
**elm** 3:8
**elmo** 17:21
**elongated** 119:5
  144:15,22
**emphasized** 167:1
**employed** 119:9
**employees** 195:22
**employing** 175:6
**encompasses**
  194:18
**ends** 16:5 76:2
  91:17 107:15
  143:16 149:4
  161:9 165:25
  184:8 190:22
  194:2
**energy** 74:8
**enjoy** 82:20
  168:22
**ensure** 171:22
**ental** 86:19
**entering** 6:2 83:1
  169:4
**enters** 6:3 83:2
  169:5
**entire** 122:24
**entirely** 33:25
  118:4
**entirety** 142:24
**entities** 159:12
**entity** 88:6 103:21
  115:1
**entries** 142:23
  169:18
**entry** 85:23
  140:20

environmental 126:3
equal 119:7
equals 46:12 131:24
equates 93:7
ercilyn 75:15
erosion 63:24
erroneously 161:24
error 199:21
errors 173:21
escape 64:18
especially 154:18 188:4
esq 2:16 3:2,4,7,14 3:17,17
establish 174:10
established 105:21
estimate 70:19
estimated 80:14
estimates 68:18
et 1:7,13,18,24 119:12,14
etheridge 1:9,10 3:11,11 6:11
european 112:4
evaluate 14:2 112:16 151:2 157:8 187:8,15 188:8 191:15
evaluated 128:13 131:8,12 138:21 158:5
evaluating 156:6 177:2 186:4
evaluation 110:10 184:13
evd 5:3
evenly 98:17,22

evidence 12:20 15:5 60:23 74:16 85:20 103:11,13 103:15,17 106:22 110:4 114:16 115:21 125:13,15 151:11,14,22 152:24 159:24 160:16 161:19 162:3 182:20 183:15,16,17 184:1,3 191:22 196:2
evidently 34:6
exact 64:18 189:10
exactly 8:4 48:19 59:17 94:25 96:5 96:6 172:12 177:18
examination 4:7,8 7:5,19 15:13 78:7 90:19 105:24 106:1 107:14 136:8 142:16 151:19 157:17 183:10 194:6
examine 12:18
examined 70:22 79:2 138:8 139:23 191:11
examining 68:10 88:19,23
example 44:2 65:10 74:25 95:16 143:9,10,23 148:3 158:20 183:1 194:9
examples 144:8
exceed 43:11,15 142:15

exceeded 79:24 80:3,13
exceeding 148:12 148:12
exception 107:13
excerpt 16:9 19:8 76:11
excuse 24:2 83:12
exhibit 5:6,7,8,9 18:22 19:23 21:20 22:17 24:14,25 27:1,2 28:7 29:9 33:1,2 37:7 39:11 40:23 48:14 60:21 60:22 64:3 67:14 77:24 78:6 84:5 84:18 85:20 88:13 92:2 100:14 103:12,14,16 114:8 125:14 139:15 146:11 149:18 153:8 157:24 161:15 162:21 163:10 166:4 170:3 175:14 196:1
exhibits 23:25
exits 82:21 168:24
expect 10:12 119:2
expected 37:25 125:25 173:19
expert 7:3 13:25 39:20,25 85:8 87:25 89:15 105:11 151:8
experts 75:4 150:21,25 152:6 156:18 184:16 191:15,24 192:1
explain 22:8 49:13 53:7 142:21

193:15
explaining 124:8
explanation 124:14
explicitly 60:8
exposure 106:12 106:13,15
expressed 93:7 198:14
external 83:18
extra 25:7 86:19
extrapolate 186:13
extrapolating 131:16
extrapolation 131:14
eye 122:8
eyes 17:20

## f

f 2:19 169:3 200:3 200:13
facing 53:13
fact 10:9 51:20 70:21 75:3 87:4 90:17 104:23 123:18 144:4 150:1 160:21 162:1 165:5 172:4 188:25 198:17
factor 107:6
factors 9:14
failed 8:3 198:18
fair 15:19 31:11 108:9 110:25 148:6
fairly 137:9
fairness 56:10 107:21
falls 39:2

**false** 174:17,19,22
175:9
**familiar** 9:1 173:9
**far** 70:8,23 75:5
90:8 189:7
**fast** 84:15
**fat** 127:21
**favor** 66:5
**fda** 28:4,15 29:19
32:18 33:5 34:9
34:24 35:18 36:13
37:11 39:13,17,23
41:11 48:16,23,25
49:3 50:5 53:11
55:17 59:9 61:6
61:22,25 74:4
77:14,15,18
139:21,25 146:3
146:17 147:4,17
149:11 153:8
155:2,6,12,16
156:19
**fda's** 29:12,13
**fears** 198:15,21
**feasible** 40:16
**feature** 134:10
**features** 21:15
**feel** 29:15 90:7
168:2
**feeling** 66:24
**feels** 66:22 67:9,10
**fell** 162:4
**fellow** 41:4
**fellow's** 34:22
**fiber** 31:4,13
32:20 41:13 42:4
42:9 47:20,25
61:25 92:22 93:7
96:20 98:19,20
99:18 102:4,4
113:22 119:4,15

120:6 127:21
144:23 172:21
178:17 179:1,15
195:12
**fibers** 11:16 18:17
27:20 30:2,3 38:6
38:12,17 42:1,13
43:22 47:2 49:14
50:20 51:18 52:25
54:19 55:6 61:22
68:23 72:24 73:1
74:7 77:15 86:12
86:15 93:13,24
94:2 97:17 98:8
100:12 112:23,24
112:25 113:13,16
114:2 115:8
120:10,25 121:9
121:12,17,22
123:1,9,12,16
124:20,21 127:21
137:19 147:5
153:21 154:5
155:20 162:17,17
163:2 173:12
178:24
**fibrils** 31:24
**fibrous** 11:22 12:1
13:16 16:23 17:25
27:15,17 30:3
68:8,13 86:10,10
86:14 87:19
104:13 111:5,6
112:17,19 137:17
141:12 144:21
175:23
**field** 151:1 187:15
**fields** 184:16
**figure** 46:24
113:23 114:1
117:8

**file** 73:18
**files** 41:5,6 145:21
170:8
**final** 39:4,6 54:21
184:19 193:13
**finally** 180:2
187:19
**find** 15:21 17:15
26:1 54:17,19
74:6 80:15 81:1
93:12,23 94:11
96:19 98:18,20
117:25 136:21
144:18,21,24
149:22 150:24
152:20,21 154:5
155:2,6,14 173:12
178:25 181:10
**finding** 10:13 32:1
93:6 101:17 106:9
141:1 145:1,2,24
147:16 170:18,18
172:21 174:17,19
174:22 175:9
177:14 178:17
179:17 180:19
183:13
**findings** 15:7
19:13 37:12 50:7
51:21 55:14 73:12
75:11 137:2 142:6
150:22 151:9
156:7,23 157:15
158:5 159:5
160:13 174:23
183:15 191:18
192:5 195:5
199:18
**finds** 59:14,18
**fine** 13:17 23:22
28:10 32:25 36:7

39:22 44:25 47:1
51:9 67:12 68:23
76:14 83:25 89:17
92:15 99:15 102:8
102:20 122:12,12
129:21 143:15
148:9,10 152:10
154:5 165:19,22
169:10 178:11
184:5 189:19
190:8 193:3,14
198:3,4
**finer** 127:11
**fines** 128:7 154:22
**finest** 54:19 127:7
**finish** 13:11 25:3
136:1 164:21
**finished** 22:23
23:2,8 25:23
117:15
**finishing** 161:11
**firms** 88:6
**first** 11:8 15:2
24:10 25:10 29:17
40:19 41:11 44:23
50:23 52:21 57:24
77:9 78:10,22,24
79:20 102:3 109:5
114:15 118:17
129:12 137:25
149:17 153:18
165:23 172:8
173:13 178:20
181:19 184:24
186:21 189:1
**five** 9:25 26:20
28:20 32:14 33:20
64:15 97:3 107:21
113:11 120:3,10
121:5 122:20
124:20 158:21

167:4 195:21 196:19 197:2
**flakes** 42:18
**flom** 3:14
**floor** 3:6
**fly** 45:14 46:10
**focus** 112:7 143:12 145:14 153:18 186:20
**focused** 9:18 153:10
**foggy** 92:13
**fold** 63:23
**folks** 30:8 41:3 196:3
**follow** 58:5 60:8 122:17 198:11
**following** 33:14 35:17 59:16 114:25 118:24 124:24 166:15 188:9
**follows** 49:5
**fontaine** 62:20
**fontana** 62:20,24 63:4,10
**foregoing** 200:6
**forensics** 85:5
**forget** 139:11 172:11
**forgot** 198:8
**form** 144:15
**formally** 91:12
**format** 200:7
**formed** 11:21 16:22 17:24 137:16,19
**forms** 68:13
**forth** 88:9
**forward** 122:5,6

**foster** 196:18
**found** 11:21 16:22 17:9,24 18:6 33:19 54:24 64:6 64:6,11 71:9 75:2 77:15 80:7 82:3 97:7,9 101:24 105:10,12 106:11 106:14,15,18,23 107:2 111:3 113:6 113:11,18 126:14 137:16 139:23 140:12 144:4 146:3,16 147:5 150:6 151:23 158:20,22 162:3 162:23 163:1 180:13 182:1,13
**foundation** 13:8 13:15
**four** 9:19,25 13:4 15:9,10 28:3,20 45:10 92:20 95:14 97:7 113:11 120:25 121:9,11 121:17,21 122:25 123:1,9,12,16 158:10 196:19
**fraction** 96:13
**fragments** 68:15
**frame** 105:16
**framing** 154:7
**fred** 11:9 16:10 157:13
**free** 27:20 29:15 49:7 50:17 74:2 167:6 189:15
**frequencies** 129:16
**frequency** 58:10 130:14

**frequent** 10:6
**front** 13:19 96:23 107:12 164:16
**full** 11:2 13:22,23 15:16,23 22:18 95:22 97:23 160:2 161:16,18 165:6,7 165:8 166:5 200:6
**funny** 85:16
**further** 20:22 22:8 38:25 59:15 89:24
**furthermore** 40:4

## g

**g** 55:23
**gained** 198:9
**gamesmanship** 13:18
**gateway** 183:25
**gather** 75:20
**gavin** 69:19 196:18
**geiger** 31:17,17,17 31:17,21,23
**gemini** 133:9
**general** 29:4 111:10 173:14 180:9
**generally** 129:7 147:23 186:1
**generating** 189:13
**geographic** 112:5
**geological** 63:20
**geologist** 43:1 46:22
**geology** 180:17
**george** 1:15 3:12
**germanasca** 63:5
**getting** 14:25 63:16,18 83:10 84:10 90:8 99:7 104:16 109:15

165:1 171:17 178:7
**gigantic** 189:13
**give** 11:2,23 17:3 25:8 29:4,25 46:24 49:5 65:18 80:11 88:12 107:17 127:10 133:23 137:18 139:17,24 160:3 161:13 187:22 188:17
**given** 15:16 52:8 91:24 166:17 188:16 198:6
**gives** 45:10 102:23
**giving** 35:14 101:20 189:15
**go** 8:24 11:13 14:19 16:17 17:21 18:20 20:21,23 23:17 24:12,18 25:5 27:22 28:3 30:6,20,23 35:8 36:4 45:5 48:22 49:23 60:11,21,22 68:21 76:10 78:21 80:2,19 81:11 82:17 83:15 85:1 85:5,21 90:1 97:12 101:1,10,22 106:1 111:13,21 111:24 113:3,6 114:17 118:13,17 125:18 128:1 133:14 136:2 137:6 139:8 142:8 142:9 154:2 157:7 160:4 161:8 166:18 169:9,15 171:4,6,8,10,13

187:11 191:17
194:1
**goes** 14:23 30:3
70:12 95:5 104:23
105:1 186:7 189:7
196:4
**going** 7:11,22 10:4
10:25 13:21 16:8
19:25 21:19 22:9
29:12 36:4 44:11
48:10,15,22 57:1
66:23 67:10 76:5
83:15 88:14,18
92:12 110:5 112:7
131:4,14 132:1,2
134:9,14 137:24
138:24 139:7
142:25 147:11,24
148:3,4,20 153:24
162:14 164:25
165:15 166:21
168:15 169:15
170:2 172:22,23
178:1 188:15
190:5,10,12 193:7
**gonna** 14:5
**good** 6:4,6,16,17
6:22,23 29:13
31:25 36:16 56:2
71:20 81:9 82:7
133:9 142:3
186:19
**gordon** 151:18
**gotcha** 95:12
**government** 40:3
158:16 159:10
172:2 192:4
**grade** 92:6,7
124:16 170:13
176:14 183:1,12

**grades** 10:21
**grains** 70:2,3
**gram** 38:7,12
77:15 93:4,8,14,20
94:2,13,24 95:6,15
95:19 96:13,18,19
96:24 97:14,16,19
97:25 98:8,11
99:4,22 100:3,6,10
100:12,13 102:15
102:24 128:16
134:20 147:6
185:3
**grams** 128:12,14
128:25 131:25
132:3 133:20,23
134:7,24 135:19
186:9
**grantham** 145:20
**graph** 21:2
**great** 140:16
**greater** 60:10 80:5
119:7
**green** 123:15
**greenstone** 3:8
**grid** 119:11
121:25 122:15,18
122:19,21 128:15
**grids** 49:14 122:21
**grind** 43:7
**grossly** 150:14
**group** 39:3 50:6
51:6,25 77:4
111:12,14,15,20
164:1 197:12
198:25 199:1,6
**groups** 117:10
**growing** 49:15
**guangxi** 100:19
101:5

**guess** 157:24
178:19 186:19
193:15
**guessing** 44:1
**guidelines** 13:1
**guy** 34:9 36:14
57:2 67:25 85:2
87:14 128:2
133:16
**guys** 10:24 11:10
20:5

**h**

**h** 5:2 7:18,18
**half** 32:18 37:21
38:5,7,13 56:11
60:11 80:23 81:14
86:10
**halfway** 30:23
**hammondsville**
78:1 79:6
**hamstrung** 104:16
**hand** 13:21 16:8
181:8
**handed** 101:14
**handing** 24:13
166:6
**hands** 164:15
**happen** 29:7 40:11
71:24 110:24,24
**happened** 39:9
40:18 61:14 72:19
107:10 150:4
164:8
**happening** 53:6
**happy** 13:17
**hard** 43:19 49:6
**harm** 66:22
**hate** 96:24
**hazard** 197:14
**he'll** 51:11

**head** 20:17
**header** 41:18
**heading** 113:15
**health** 158:14,15
159:8,8,10
**hear** 75:16
**heard** 50:5 82:15
168:19 183:22
**hearing** 58:14
**hearsay** 14:1
**heavier** 134:25
**held** 196:7
**help** 24:23 25:2
93:22 177:4
**helped** 134:4
**helps** 58:19 134:5
**hexagonal** 70:5
**hi** 136:9 169:12
**hicks** 124:8
**hidden** 147:16
**high** 68:24 70:21
185:12
**higher** 58:21
81:15
**highlight** 196:15
**highlighted**
153:18
**highlights** 16:18
**hildick** 69:19
196:19
**hire** 191:23
**hired** 39:13,17
**historical** 14:21,22
74:23 75:7 91:9
150:3 188:20
189:20,24 191:5
**hit** 100:23 101:2
**hits** 82:2
**hold** 35:16,16
76:14 80:10

**homogenized**
97:15 98:16,20
**hon**  2:10
**honor**  6:17,19,22
7:8 12:13 24:4
25:6 73:22 82:7
83:6 85:21 88:22
89:25 101:10
103:5 105:7 106:8
124:1 125:9,11
136:2 142:11,19
146:20 147:13
148:16 152:8,9
160:6,11 164:9
178:5 188:21
190:2,5 192:16
193:12 194:5
**honor's**  13:1
148:18
**hope**  140:17
**hopefully**  58:18
**hoping**  116:18
**hopkins**  14:6
79:19
**hour**  118:19 119:2
**hours**  118:20
119:3 191:12
**hum**  26:12 43:10
53:17 98:10
**hundred**  45:12
46:8,9,14 47:7
122:21 135:8
191:10
**hundreds**  43:12
43:16,24 52:3
**hungry**  136:7
**hygiene**  84:22
**hynes**  3:17 6:24
20:7 104:20
**hypothesis**  195:12

**hypothetical**
45:18 47:3 57:17
123:3,17 132:5,6
**hypothetically**
44:8 154:25 155:1

**i**

**i.e.**  52:17
**ian**  50:18 51:14
54:13 55:7,10
153:20 154:3
155:5
**ice**  134:16,19
**id's**  41:25
**idea**  36:19 61:23
99:3 139:9 146:15
147:15,19 171:3
173:12 180:3
185:8
**ideal**  90:2
**ideas**  116:18
**identification**  8:14
19:8,10 31:24
84:19 108:21
109:25 110:1,7
173:4 176:1 178:1
178:4
**identified**  22:3,4
22:15 23:4 42:9
51:12 80:17 81:13
108:22 170:14
176:18 195:9
**identifies**  68:24
**identify**  18:22
20:19 22:10 26:4
38:22 42:16 65:21
70:16 104:14
113:25 138:24
148:10
**identifying**  177:5
**ignoring**  132:9

**image**  85:18
**images**  109:2
**imaginary**  195:12
**imerys**  87:25 88:3
88:19,24 89:1
90:15 91:23 92:4
100:15 104:2
107:20 114:23,24
115:2,3 123:24
130:19 170:5,11
175:13,14,14
193:23
**immediately**  34:15
**immunity**  40:7
**impact**  198:12
**impartial**  40:2
**important**  66:10
66:11 72:12 77:22
115:6 141:25
182:19 190:16
**imported**  140:15
**impressions**
166:16
**improper**  88:25
95:9
**inaccurate**  8:1
**inadequately**
16:21
**inadmissible**  14:1
**inaudible**  90:3,4,5
91:9,10 104:13,14
104:15,20 147:17
184:6
**incapable**  73:13
**incident**  198:8
**include**  144:13
184:15 199:15,21
**included**  62:11
158:11
**includes**  145:21

**including**  26:2
53:3 54:6 57:12
57:15 82:14
118:18 159:8
168:19 172:2
181:21
**incomplete**  49:18
73:5
**inconclusive**  162:5
**incorrect**  22:6
55:4 64:16,21
145:4 192:18
**incorrectly**  127:2
**incredibly**  147:20
**independent**  25:22
**index**  4:1
**indicate**  152:4
176:4,22 197:11
**indicated**  141:18
198:25
**indication**  179:15
**indications**  34:3
**individual**  111:14
116:4 182:18
183:12
**individuals**  197:20
**industrial**  84:22
85:4 110:12 112:2
113:5 181:22
**industries**  158:12
**industry**  11:20
40:3,5,8 59:7,10
115:6 157:3
**inform**  89:2,5
**information**  35:14
35:15 61:17 67:13
95:11 96:9,25
99:13 142:2,4
152:23 199:5
**initial**  150:4,10
158:1 198:12

**initially** 64:14 198:5
**inside** 49:15 70:12
**insignificant** 94:10 96:7,8 126:13
**insisting** 66:16
**instance** 8:9 81:11 181:2
**instances** 177:9
**institute** 30:25 84:17
**institution** 77:3 164:1 166:24 168:8
**instructions** 82:13 168:17
**instrumentation** 56:14
**intended** 175:8
**intending** 12:18
**interest** 66:14 140:18
**interesting** 142:8 176:16 196:13
**interestingly** 60:25
**interference** 72:16 72:22
**internal** 27:9 48:11 77:17 117:21 140:20 145:1 149:7 174:24
**internally** 41:1
**international** 92:12 112:5
**internationally** 39:20,24
**interpret** 118:25
**interpretation** 32:9 49:12 72:20

173:21
**interpreting** 182:20
**interrupt** 146:5
**interview** 77:1 163:24
**introduce** 172:23 193:19
**introducing** 12:19
**introduction** 111:2
**inverse** 94:22
**investigated** 61:9 112:20
**investigating** 86:5
**investigations** 192:5
**irrespective** 175:21
**irving** 167:23 168:10
**iso** 116:16
**issue** 13:5 34:15 34:19,20 53:13 61:18 71:17 72:1 88:22 91:15 98:6 105:17,18 106:3 107:3,12 115:10 117:15 128:3 142:25 144:7 161:7 165:13,16 165:17 182:18 184:19 190:17 197:24 198:6
**issued** 54:21 166:14 195:21 196:8
**issues** 39:4 55:5 89:6 91:13
**italian** 10:17,17,20 10:20 11:9 62:16

86:18,21,21 87:1,8 87:13,15,16,20 109:20 112:3,8,11 112:22 113:7,8 116:23,24 140:10 145:20 181:3 182:3,6,24
**italy** 137:13 182:7 182:9
**items** 84:14

**j**

**j** 3:7
**j&j** 6:24 31:1 41:25 43:8 69:21 70:20 89:6 132:2 132:2 145:2
**j&j's** 140:20
**j.e.** 196:17
**j.s.c.** 2:10
**j4-1** 58:3 59:6,7,21 129:13
**january** 2:3 6:8 86:4 100:23 178:18,19 200:13
**jersey** 1:1 2:2,21 3:3 200:5
**john** 14:6
**johnson** 3:19,19 3:20,20 6:10,10,11 6:11,12,12,13,13 8:25,25 14:23 28:19,19 29:11 30:8,8 31:2,2 32:19,19 33:6,6 34:10,10 37:18,18 40:12,12,25,25 41:3,4 48:11,12 49:4,4,6,6 52:3,3 53:3,4,10,10,16,16 54:6,7,14 55:21 57:25 58:3,3 61:1

61:1,10,10 62:18 62:18 66:1,1 67:7 67:7 68:14,14 74:5 77:25,25 83:15,15 86:1,1,22 86:22 87:1,1 88:5 88:5,22,22 90:8,16 90:16,17,18,22,22 90:25,25 101:5,5 103:22,22 104:12 104:12 105:18,18 105:19,19 106:16 106:20,20 107:22 107:22 112:10,10 114:5,5,14,14 115:16,17 117:2,2 117:16,16,19,19 123:4 124:9 129:7 129:7 130:19,19 130:23 131:11,12 134:15,15 135:1,2 137:2 138:15,16 138:21,21 139:10 139:10,17,17,24 139:24 140:8,8,9,9 141:19 144:5 147:16,16 149:7,8 150:21,21,25,25 151:12,12 155:25 156:1,7,7,17,17,25 156:25 157:6,7,22 157:22 159:4,4 161:25 163:17,17 167:10,10 170:7,7 170:8 173:15,15 175:15,15,19,19 177:15 178:21,21 180:25,25 182:2,2 182:13,13 184:13 184:13 186:23,23 187:16,16 188:20

188:20 189:5,5,23
189:23 191:23,23
192:2,2,6 193:1,2
196:16,16 197:2,3
197:5,5,23,23
198:13,13 199:6,6
199:14,14,20,20
**johnson's** 14:24
22:25 27:12 29:11
54:14 55:21 57:25
68:4,8 74:5 77:5
77:16 87:12 90:9
106:16 110:16,17
114:11 123:4
124:9 130:23
137:2 141:19
144:5 161:25
162:23 163:4,5
164:3 170:8
177:15 192:6
**johnston** 196:17
196:23
**joke** 85:14
**judicial** 200:7
**julie** 107:19
123:23 124:6
**july** 19:19 20:4,11
25:1,14 26:17
27:7,8 28:1 33:16
67:19,22
**jumps** 95:15
**june** 22:20 28:1
66:2 67:3 73:17
74:10
**jurisdiction**
148:15
**juror** 168:23
**jurors** 6:17,23
148:4
**jury** 2:10 6:1,3 7:1
13:19 21:2 26:10

78:6 79:19 82:10
82:17,21 83:1,2
105:14 106:3,4,11
106:18 107:4,12
120:20 135:7
144:9 148:1
150:20 164:16
165:13 168:14,24
169:5 170:23
172:9 187:23
188:17
**jury's** 106:9 169:4

### k

**kept** 89:6
**kevin** 3:17 6:24
**kind** 42:14 43:2
82:15 105:20,22
106:19,24 109:15
111:6 112:19
129:24 132:15
134:2 155:21
168:20 172:14
174:23 178:24
179:10 180:12
188:25 189:4
**kinds** 111:5
112:17
**knew** 55:2 89:20
90:18
**know** 8:7 9:5
18:18 22:24 23:10
23:18 26:9 28:16
31:7,12,14 32:11
32:21,23 34:10
36:18,21 42:20
43:25 46:20 50:4
56:7,17,19 60:21
62:11 71:24 74:11
74:14 75:21 76:21
77:11,22 79:13
85:13,14 87:15,16

95:21 96:11 102:3
105:19 109:5,19
114:10,17 116:22
125:20 127:7
129:18 131:7,9
133:9,10,12,16
134:15 142:7
146:2 147:19
150:17 170:4
175:17 178:10,20
180:22 182:6,8,9
182:16,17,25,25
184:24 187:22
189:12,15 190:25
191:3 193:17,20
194:15 195:20,24
196:25 199:22
**knowledge** 14:24
34:20,23 175:20
200:10
**known** 72:22
88:23 89:9,9,20
90:18,23 105:19
105:22,25,25
111:8
**knows** 105:11
**konigsberg** 2:16
3:5

### l

**l** 1:8,14,20 22:24
22:24 23:7 25:17
26:2,3,14,20 32:13
34:2 196:18
**lab** 34:15 72:6
194:10,13,16
**laboratories**
158:10,11,18,23
**laboratory** 29:22
29:23 85:5 126:6
**labs** 158:4 159:3

**langer** 26:11 31:25
64:1,2,4,5,5 66:4
66:16,22,23 67:10
67:13,18,21 68:7
68:22 71:3,19,25
72:25 74:1,22
75:10 76:5 77:1,1
77:2 83:10 160:1
161:1,2 162:7,9,12
162:22 163:11,24
164:21 165:7
**langer's** 31:23
72:6 73:4 75:11
162:13 166:24
168:7
**language** 39:19
117:11,13
**large** 43:6,14 59:1
137:20
**larger** 128:4 186:5
186:12,13,24
**lastly** 121:21
125:7 193:4
**late** 112:12
**lath** 11:15,18
**lattice** 20:16
**law** 1:1
**lawyer** 18:2
**lay** 13:8,14
**layman** 27:21
**lead** 87:8 152:11
**leading** 152:9,21
**leaning** 122:5,6
**learn** 11:4
**leave** 75:15 82:11
168:15 190:5
**ledge** 58:21,22
**lee** 188:19 191:4
**left** 169:14 183:20
**length** 16:14 97:3
102:3 119:6,15

**letter** 36:19 69:11 69:15 71:8 83:21 84:10,12,13 116:1 140:3,6

**level** 80:14 120:4 120:18 173:25 174:3,5 185:18 194:18,20

**levels** 78:2 126:6 126:14 175:7

**levy** 2:16 3:5

**lewin** 37:7,8,11 39:13,17,23 41:9 41:16,19 48:10 49:10,11,18 50:1,6 50:8,12 51:5,7,11 51:11 52:24 53:13 54:9 55:13,16,19 56:4 145:19,22 149:16,21 150:4 150:11,23 152:1 153:25 154:11,15 154:19 156:21,23 157:9,25 158:20 159:15,18 160:12 160:12,16 161:12 161:21

**lewin's** 37:22 41:1 51:21 150:22 151:9 153:14 156:6 157:15 158:4,8 159:5,16 160:15

**license** 200:3

**light** 49:8,23 50:10 50:19 51:7 59:19 68:3,11,16 126:25 127:17 134:5 153:20 155:19 186:16 187:3

**likelihood** 171:17

**limit** 37:21,24 38:5 38:13 52:17 56:6 59:25 65:4,12,20 80:23 81:7,13 94:5,8,18 95:5,24 95:24 97:5 119:19 120:7,21 121:3,13 121:18 123:6 124:9,14,19,23 125:4 170:23 172:18 173:8,17 175:1,8 179:5

**limitation** 186:3

**limitations** 185:11

**limited** 15:8

**limits** 34:4 170:22 171:22 172:15 179:4

**lines** 15:18 22:11

**list** 28:17 30:7 35:9,10,11,12,19 35:21,22 36:2,22 36:23 91:24,25 159:13

**listed** 78:16 111:4 140:24 184:12

**listen** 148:2

**listening** 33:12

**lists** 36:18,21

**literally** 63:22

**literature** 191:12 197:16

**litigation** 12:25 14:25 90:11 189:10 191:10

**little** 11:1,7 18:14 22:19 37:6 109:19 115:25 128:9 131:4 133:16 141:3,6 145:18

149:14 150:3 154:21 170:17 187:19 190:13

**live** 50:22

**livingston** 2:21

**llp** 3:14

**located** 63:5,9 140:14

**long** 11:12 75:3 91:24 118:2 137:11,12 162:16 179:10

**longer** 187:6

**longo** 107:11 189:14

**look** 10:16 17:19 22:16 24:10,10,24 25:16 27:2 28:12 34:19 35:16,16 40:14,15,17 49:22 71:20 72:4,17 76:5,11 78:8 79:22 83:13 91:20 92:15 93:23 95:17 97:12,22 98:6,16 98:21 101:9 113:4 122:2,2,4 127:9 128:4,6,7 132:20 136:7,20 142:1 144:23 146:2,14 150:21 151:6 152:15 153:25 155:25 156:8,13 157:10 169:22 171:13 172:19 179:9 180:17,21 183:15 184:11 185:8,13,24 186:5 186:24 187:11 188:12,13,19 191:21,24 193:25

194:9

**looked** 9:19,19,20 9:23,25 12:5 23:6 23:7,8 27:8,25 40:25 73:7 89:1 90:3 105:2,8 115:14 122:24 128:15 140:6 144:7,8 146:14 151:7,17,24 152:6 156:1 157:12 158:4 159:14 162:19 163:9,13 172:4 175:12 181:5 183:2 193:20

**looking** 9:3,16 10:25 20:12 24:23 25:13 26:13 27:8 35:18 47:11 72:6 72:8,10,14,20 73:1 73:10 83:11,18 92:24 96:12,12,17 96:19 97:13,14,16 97:24 102:16,18 105:11 109:13 117:10 118:6 121:25 122:1,14 122:15,23 127:3 127:22 128:8 137:14 139:18 141:9,10,21 152:22 170:4 173:6 175:3 176:9 185:16 186:8,9 187:6 188:2,7 198:2

**looks** 13:21 109:16 176:25 181:8

**lost** 99:7

**lot** 9:6 10:18 47:2
130:18 137:5
150:5 159:25
162:6 180:23
191:14,19 198:6
**low** 38:4 174:7
185:18,21
**lower** 56:6 65:14
**lowest** 56:15
**lunch** 66:5 136:1
164:22 168:13,15
168:22
**luncheon** 169:1
**luzenac** 88:8
114:22 115:1,4
116:1

**m**

**m** 3:14 7:18
**m.g.** 33:9
**m.i.t.** 55:24 151:8
**machine** 186:21
**magnesium**
144:14
**magnification**
68:24 109:6
185:12
**magnifications**
128:5
**magnitude** 135:5
**mail** 2:22
**maimon** 2:16 3:4
6:18 58:20
**maintained** 64:23
**major** 22:11
**majority** 11:22
17:2 42:22 51:21
137:18
**making** 85:14
106:17 154:9
186:19

**malcolm** 30:7
**management**
197:9 199:4,7
**mandatory** 58:5
**manufactured**
151:15
**maple** 3:3
**march** 195:17
196:3
**mark** 18:25 19:7
57:1
**marked** 18:25
19:10,21 20:5
30:21 84:19 110:7
118:13 170:3
173:4
**markedly** 70:7
**marker** 40:20
**market** 101:7
112:3,5 113:9
116:25 167:4
181:21 182:6
**marketing** 85:17
**markets** 116:24
**marking** 73:19
109:24 161:14
**mass** 46:19 99:5
99:16 100:4,12,12
185:4
**masses** 98:24
99:19
**match** 21:16,17
191:17
**mate** 85:23 86:4,5
87:17
**material** 10:19
71:20,21 104:13
106:15,19 108:20
109:16 130:2
141:21 175:24,25
176:8,10 180:21

184:22 185:9,14
185:17,24 186:6,8
186:10,13,14,24
187:14 192:18
**materials** 21:11
106:24 118:19
172:11 181:9
191:6
**math** 18:20 44:19
44:20,20 45:14
46:9,18,21 47:9
80:3 132:4
**mathematician**
46:22
**matter** 6:9 70:21
80:4 105:2 136:5
165:12
**matters** 14:1
**matthew** 4:6 7:4
**maurice** 33:8 35:4
35:7,9
**maximum** 118:20
**mccrone** 31:18,21
51:14,15,17 55:8
57:14 150:12
154:3 155:1 157:5
157:6
**mccrone's** 49:11
**mcneill** 1:15 3:12
6:12
**meagher** 3:14
**mean** 17:4,6 18:3
41:18 43:15,22
47:4 52:18 54:3
90:24 106:13
120:23 128:5
129:23 133:19
142:23 144:3
145:25 146:22
161:3 169:23
174:2,18 180:16

**meaning** 47:24
65:5,19,21 67:9
69:24 98:17 171:5
**meaningful** 29:25
**means** 31:7 32:20
70:8 85:13 86:15
94:11 120:8
147:24 148:12,14
174:2 177:25
**meant** 13:16 31:9
31:14 61:24
129:12 142:22
**measure** 132:25
133:1
**measured** 174:3
**measurement**
93:16 96:7,8
171:21 173:19,21
173:22,23 174:8
174:14 179:3
**measurements**
191:17,18
**measuring** 188:13
195:6
**media** 166:10,16
166:25 198:11
**medical** 166:12,14
196:13 198:10
**medicated** 145:20
162:24 163:2,3,5
**medicine** 66:5
196:12
**meet** 83:15
**meeting** 28:4,15
29:8 32:11,18
33:4,12 34:8,23
35:2,8,10 36:13,25
37:1 48:16,18,23
48:25 49:4 56:2
61:6,11,14,14,16
61:24,25 67:18,21

153:9 165:22
193:2 196:7 197:6
197:8
**mellon** 152:7
**member** 40:1
**members** 7:1
82:10 168:14
**memo** 27:9 29:11
31:9,22 33:3 67:8
67:18 72:9 73:18
114:13 115:22
167:20,23 193:2
197:5
**memorial** 9:1
**mennen** 163:6
**mention** 21:13
31:16
**mesothelioma**
105:16
**mesotheliomas**
107:7
**message** 66:13
**met** 67:25 68:1
165:22
**method** 52:24 55:1
55:13 59:16 60:2
60:6,8,14 93:19
95:1,25,25 97:6
99:16 109:18
117:16,18,21
118:24 121:7
122:13,17 123:5
124:9,15,19,24,25
125:3 144:16
155:13 172:16,20
173:20 175:6
194:11,12
**method's** 179:20
**methodologies**
188:4

**methodology**
24:18,21 65:4,20
65:22 97:5 151:3
188:8,9
**methods** 30:15
126:21 171:24
172:1
**microns** 97:3
**microphone** 7:14
58:16
**microscope** 18:13
49:23 51:2 59:19
68:11,16 127:17
127:22 186:20,23
187:7
**microscopical**
22:22
**microscopy** 49:8,9
49:14,20 50:1,10
50:19 51:3,8
54:25 57:12 58:6
60:12 68:4,22
69:25 82:1 92:24
109:3 110:11
117:20,24 126:25
153:20 154:2,3,10
154:14,18 155:19
155:21,24 156:9
156:15,16 157:7
184:16 186:16
187:3
**mid** 1:2,8,14,20
129:8
**middle** 44:3
**middlesex** 1:1 2:1
200:15
**million** 45:16
46:16 47:6,7,8,12
47:17 93:8,13,19
94:2,13,24 95:6,18
97:17,25 98:8,13

98:21,21 103:1
186:1
**millions** 18:16
38:6,11 105:5,6
108:1,1,3,4
**millionth** 96:12,18
96:19,24 97:14,16
97:25 98:18
128:16
**mills** 63:8
**mind** 85:15 88:24
90:9 134:12
**mindful** 148:18
**mine** 10:22 11:21
16:23 17:25 27:13
62:15,18,20 105:5
105:9 108:21
112:13 137:13,17
138:9 140:10,13
176:1 180:14,20
186:8 187:8
**mineral** 8:13,15
8:21 10:4 11:21
16:22 17:24 20:16
20:25 21:3,5,6
39:3 42:22 80:13
81:12 108:20
111:4,7,12,20
119:12 137:16
138:6 144:13
175:25
**mineralization**
62:5 180:9
**mineralogical**
39:21,25
**mineralogist**
42:24 46:22
**minerals** 9:4,7,12
9:14,24 11:19
27:15,17 32:16
34:4 38:23,24

60:5 62:10 68:8
81:2 111:3 117:23
118:1,2,8 120:3,5
124:16 138:19
141:12 175:23
180:12
**mines** 19:13 22:21
27:25 28:24 30:12
30:17,25 33:6
34:9 37:5 57:6
63:9 105:22
151:25 181:7
**minimal** 199:3
**mining** 105:23
**mint** 134:19,24
135:1,7,10,14,18
184:23
**mints** 134:17
**minute** 74:5
139:11
**minutes** 29:11
31:14 32:7,8,22
35:18 56:2 61:25
82:11
**mis** 166:16
**mischaracterizing**
15:21 53:6
**misinterpretations**
166:16
**misrepresented**
75:11
**mistake** 168:4
**mistaken** 64:9
162:16
**mixed** 111:3
**mixture** 129:24
**moderately** 68:24
**money** 187:20
189:15 191:1
**month** 32:17,17
115:25

**month's** 115:10

**monthly** 23:2,9,19
34:2

**morning** 6:4,6,16
6:17,22,23 82:11

**morphology** 72:10
83:18

**morton** 3:17

**morty** 6:23

**moshe** 2:16 3:4
6:18 81:5 125:17

**motive** 155:7,11

**mount** 2:20 66:4
69:7,17 74:12
162:22 163:11
166:8,11,24
167:13,14 168:10
195:16,21,22
196:11 197:9,19
197:20 198:9,18
198:25 199:4,7,11
199:12

**mountains** 63:24

**move** 55:19 134:8
169:24 184:5

**moved** 103:13,15
103:17 125:14
147:6

**multipage** 14:20

**multiply** 131:20

## n

**n** 5:1 7:18 169:3,3
169:3

**name** 8:13 36:3,10
37:2,3 50:5
110:21 111:12
196:13

**named** 41:4

**names** 86:23 88:10

**nashed** 66:6,12
73:18

**national** 158:15
159:9

**nature** 96:14
162:16 185:12,15
187:15

**necessarily** 146:1

**necessary** 64:10
73:3 126:12

**need** 13:22 14:4
15:2 23:17 30:2
42:14 47:5 75:17
82:18 95:22 97:22
98:21 103:4 117:8
132:19 138:24
180:21 191:15
192:21 196:2
197:10,24

**needing** 173:12

**needle** 41:14 42:1
42:4,9 47:21,25
144:15 145:24

**needles** 41:22
42:14

**needs** 14:2,4
119:10

**negative** 57:21,21
57:21,21

**neither** 46:22

**never** 42:19 43:13
73:7 85:15 89:19
128:6,17 134:12
174:10

**new** 1:1 2:2,2,21
3:3,6,6,15,15,18
3:18 74:22 76:8
76:20 169:25
199:2 200:5

**news** 166:25

**newsletter** 84:21
85:1

**newspaper** 160:22
160:25 162:8,10
163:9

**nice** 113:21

**nickel** 197:13

**nine** 28:20 162:3

**nocks** 2:19 200:3
200:13

**noise** 93:16 97:5
97:10 171:20
174:13 175:3
179:22

**non** 14:12 26:24
30:3 51:2 52:18
53:21 54:2 68:12
81:3,19 200:9

**nope** 17:7 18:4

**normally** 111:1

**north** 1:7,13,18,24

**note** 66:1

**notebooks** 82:12
168:16

**noted** 20:16
100:17 107:13
124:3 125:12
170:11

**notes** 41:9 83:14

**notice** 13:6 89:6

**notified** 75:15

**november** 69:14
84:3 101:3

**nuance** 118:10

**number** 18:23
21:10 23:10,18,21
24:15 43:4,6,11,14
46:6 59:2 62:11
65:18 70:22 84:5
86:18,21,21 87:20
101:17 115:7
120:19,22 132:11
149:22 157:21

169:18 172:24,25
173:18 177:24
178:3,4 179:23
184:11 187:23
190:3 191:24
195:24 200:4

**numbers** 19:24
43:18 48:3,8
64:18,25 132:10
189:11

**numerical** 38:17

**numerous** 68:1
138:7

**nyu** 37:8

## o

**o** 169:3,3,3

**o'clock** 136:4

**oath** 7:10,11,12

**object** 12:14 74:15
75:8 146:20 197:8

**objected** 53:2 54:6
54:8

**objection** 100:16
103:7,10 123:25
124:2 125:10
160:7 164:15,24

**objections** 52:15
52:19 53:24

**objectively** 123:1
125:1 195:4

**observations**
92:22

**observed** 10:8
70:6 94:6 96:2
171:22

**observing** 68:8
93:20

**obtained** 27:12
61:16 158:9

**obtaining** 198:9

**obviously** 91:7
**occasions** 68:2
**occurring** 70:19
**october** 54:11
115:22
**offensive** 31:25
**offer** 103:4,5
110:6 125:8
**office** 166:8
**officer** 6:1 83:1
169:4
**offices** 195:22
197:3 199:12
**official** 75:17
**officials** 116:16
**oh** 81:9 134:5
189:5
**okay** 7:7 8:7 13:12
14:7 16:16 17:15
20:24 21:19 22:3
22:16 23:14 25:4
25:18 26:10,15,16
27:3,4,5 29:12
31:10,16 39:22
40:17 43:3 44:4,5
44:9 45:8,13
47:19 51:9,20
52:10 53:2 57:24
58:10,15 59:5,6,11
59:14,21,24 62:14
62:22 64:12 65:7
66:3 67:12,17
73:16 75:19,24
76:9,19,25 77:23
78:21 79:13 80:2
83:16,20 85:4
86:3,17 87:24
92:19 93:12,22
96:4 99:9,15
101:1,25 102:8,18
104:4 107:25

108:9,17 110:19
111:21,25 112:8,9
114:4,19 116:11
117:22 118:13
119:4 120:8 122:6
122:25 123:3
126:4,19 129:21
130:16,25 131:3,7
131:19 133:8,15
134:5,5,7,9,12,13
134:13 136:14
137:5 139:10,12
139:13 141:17
143:15 148:9
150:15 152:13
155:8 161:17
165:18 166:22
168:12 172:4
175:11,17,21
178:24 179:6
182:23 183:18
184:10 185:7
190:19 191:20
192:8,22 193:11
196:7 197:22
198:3
**old** 105:6 108:1,4
108:7,10,11,12,15
108:15 141:9
167:5 170:12
197:13 198:19
**older** 108:8 188:2
**once** 34:18 119:19
190:3
**ones** 52:8 93:23
111:16 142:7
143:14 149:17
150:18 169:16
**oops** 17:21 133:23
**open** 91:2

**openings** 122:15
122:18,21 128:15
**opens** 184:2
**opinion** 12:23,24
68:14 167:14
181:25
**opinions** 187:25
**opportunity** 13:23
15:3,14,22 189:6
**opposed** 100:9
**optical** 49:24 51:3
51:12 54:13,17,22
54:25 59:19 60:12
77:18 154:2,2,4,10
154:14,17 156:9
156:15 157:7
**order** 68:19 84:14
98:19 120:9,12
160:14 165:6,6
166:15 185:25
186:5
**ordered** 2:15
**orders** 135:5
**ore** 27:13 78:1,2,8
78:13 79:1,5
106:23 179:18
180:5
**organization**
115:9,18,19 117:5
142:10 143:7
144:1,4,11,18
**original** 71:6
150:13 163:7
**orrick** 3:16
**ottawa** 158:16
159:11
**ounce** 43:4 46:2,3
**outside** 146:21
147:8 159:3
160:19 164:25
189:1,9

**overall** 63:20
87:22 127:9
130:21
**overestimated**
132:7
**overruled** 100:17
103:10 124:3
125:13

**p**

**p.m.** 66:12 169:2,2
**p1steno** 2:22
**pad** 70:11
**page** 4:3 13:21
16:17 28:18 29:2
29:15,17 30:7,14
30:20 31:19,20,20
50:3 68:3 74:1
76:10 78:22 85:2
101:2,22 111:21
116:6 118:13
119:23 125:22
166:20,21,22
167:19,21,22
**pages** 2:5 11:12
188:1
**paging** 29:3
**paid** 189:11,19
190:1 191:2
**pamphlets** 84:16
**panatier** 3:7,8 4:7
6:16,17 7:6,7,19
13:3,14,25 14:15
14:18 15:25 16:4
16:7 18:24 19:5,7
19:11,22 20:4,9,10
23:24 24:4,9,12,16
24:17 25:12 58:12
58:25 73:21,24
74:16 75:9 76:1,3
76:14,16 82:7
83:5,6,7 84:6,8,20

89:8 90:10 91:18
100:18 103:5,18
104:23 107:16
110:1,5,8 125:16
128:24 135:21
136:17 142:11
143:3 146:20,24
147:3,12 148:22
149:1 152:8 160:6
160:9,19 161:1,6
164:9,14,24 165:4
165:18,21 178:8
183:6,23 188:21
188:24 189:18
192:16,20,23
193:1,4,7,10,22
194:3,5,6 195:1,3
**paoletti** 109:20
116:13,17,22
181:17
**paper** 109:20
110:9 115:5,17
163:10,12
**papers** 110:19
**paradise** 163:3
**paragraph** 50:1,4
125:18
**parallel** 119:5
**parcel** 90:7
**parents** 198:16,22
**part** 8:14 12:24
13:1 57:7 62:5
63:25 85:17 90:7
91:25 111:15
137:15 139:1,20
147:9 157:25
158:11 166:13
174:1 180:13
186:21 187:21
189:12 193:16,19

**participant** 35:19
36:25
**participants** 35:12
35:21 36:24
**participated** 35:13
**particle** 44:10,21
44:21,23 97:9
98:24 99:1,22
100:12 119:5
127:4,5,7 171:2,9
171:11
**particles** 11:16,19
11:20,23 16:22
17:3,11,24 18:8,14
41:14,23 42:5,16
43:4,7,12,16,22,23
44:7,11,12,18
45:16 47:8,13,13
47:15,17 48:1
68:12 72:11,15,18
83:19 87:6 99:20
100:2,3,6 128:4,7
137:16,19 171:11
171:12 185:6,6,14
**particular** 182:18
**parties** 198:7
**partner** 12:7
**parts** 141:8 153:17
186:1,1
**passed** 50:21
**pastore** 1:10 3:11
**paterson** 2:1
**pattengill** 33:8,9
35:5,7,9 61:1
**pattern** 70:4
191:16
**patterns** 83:10
84:10
**payment** 190:17
**peak** 21:7,10,11
21:16,18

**peaks** 21:3,4,4,5
22:2
**pediatrics** 167:15
**peek** 28:8
**people** 28:20 29:5
35:17 125:25
136:7 151:6
157:10,21 177:5
196:19 197:2
**people's** 184:12
196:25
**percent** 37:21 38:5
38:7,13,19 42:17
44:10 46:6,15
52:16,17,19 53:3
53:25 54:3 56:3,5
56:11,12 60:11
64:15 68:20 70:20
79:24 80:4,5,23,23
81:14,20 86:8,10
99:20 100:11
154:20 158:21
162:1 167:4 171:9
**percentage** 44:7
45:11 46:2,8 80:4
87:19
**percentages** 78:9
159:7
**perfectly** 189:18
**performance**
173:19
**performed** 124:16
**performing** 65:11
126:7
**period** 74:24
92:18 105:9
106:12 130:5
175:12
**periods** 179:25
**permissible** 15:13
90:19 106:1

107:14 161:3
**permitted** 75:2
90:1 125:2
**person** 29:5 31:14
67:7 132:23,25
**personal** 7:20
**personally** 89:4
**perspective** 126:3
135:17
**petrographic**
30:25
**petterson** 196:18
**ph.d.** 16:10
**pharmaceutical**
110:13 112:2
113:4,7
**pharmacology**
115:11
**pharmacopeia**
112:4
**phase** 14:5 54:10
88:21 91:3 105:14
**phases** 181:10,14
**phone** 44:17 69:3
**phones** 6:5 83:4
169:7
**photo** 85:3
**pick** 60:4,10 68:12
136:6
**picked** 181:8
**picking** 181:11
**picture** 11:2
109:10,15
**pictures** 104:15
113:22
**pieces** 122:8
135:14
**pier** 107:19 123:23
124:6
**place** 2:1 48:25
102:19

**placed**  7:10,15
**placitella**  3:2,2
  6:18 164:13
**plaintiff**  1:16 6:15
  14:13 149:17
**plaintiff's**  5:6,7,8
  5:9 103:12,14,16
  125:14
**plaintiffs**  1:5,11
  1:22 3:10 6:18
  14:8 15:4 21:20
  22:17 24:25 27:1
  28:7 33:1 69:10
  85:20 105:17
  106:12 137:10
  138:1 139:9
  140:20 142:8
  146:7,11 149:10
  149:18 151:5
  153:3,7,12 154:9
  157:23,24 160:1
  169:17 170:2,3
  175:13 177:24
  178:6,12 179:14
  181:16 191:15,23
**plant**  22:23
**plate**  11:14 68:12
**platelets**  49:16
  74:7
**platy**  27:14
**play**  142:20
**pleasant**  2:20
**please**  6:4,7,14
  17:21 66:6 73:20
  83:3 114:15 116:7
  147:1 168:21
  169:6
**plm**  55:6 127:10
  127:21 154:22
**plus**  25:23

**point**  105:5 106:11
  106:14 134:3
  137:25 147:20
  155:23 156:22
  158:6 181:19
  184:10 186:19
**pointed**  50:19 81:5
  125:17 153:20
  183:13 198:10
**pointing**  94:23
  128:23 183:16
**points**  154:3
**poisson**  94:5,8
**polarized**  186:16
**polarizing**  187:2
**policy**  52:13
**pollution**  112:16
**pomrinse**  196:12
  196:13
**pooley**  11:9 12:25
  13:8,15 16:10,12
  16:13 17:1,5,7,15
  18:22 19:5 57:11
  77:21 138:13
  139:18 140:1,7,19
  157:13 183:3,9
  184:5
**pooley's**  12:5 16:9
  137:9 141:4,14
  182:24
**portion**  7:3 12:19
**positions**  21:12
  197:1
**positive**  32:14
  89:19 92:20
  101:23 152:24
  173:13 174:17,19
  174:22 175:9
  177:14 183:14
**positives**  95:13

**possibilities**  21:17
**possibility**  61:15
**possible**  9:24 11:6
  40:7
**possibly**  63:16
**post**  74:23
**potential**  125:25
  173:20
**potentially**  63:19
  81:12 176:9
  180:19
**powder**  20:12
  22:25 23:7 26:2,4
  26:7,18 27:12
  31:11 32:13 33:19
  40:21 58:7 63:14
  68:4,9 74:2 77:5
  79:8 86:4,5 87:12
  92:7,7 110:16,17
  114:11 124:17
  125:2 144:19,21
  150:24 151:1
  156:13 161:25
  162:23,24 163:2,4
  163:5,6,7,12 164:3
  166:11 167:2
  176:12 177:15
  186:9 187:3,12
**powdered**  117:23
  124:15 181:12
**powders**  29:24
  71:22 138:7,16,17
  138:19 163:4
  167:1 182:5
**powerful**  81:25
**practical**  121:24
**practice**  173:7
**precise**  118:12
  147:21,25
**precision**  132:23
  132:25

**precluded**  106:17
**precludes**  106:9
**predecessors**
  90:16
**preeminent**
  184:16
**preface**  190:11,20
**preliminary**  64:14
  64:16 162:15
**preparation**
  118:18,18
**preparations**
  122:19
**prepared**  33:24,25
  185:25 191:7
  200:6
**presence**  9:3 33:17
  60:5 68:23 71:4
  87:7 112:22 152:4
  152:24 163:13
**present**  8:16,21
  9:14,24 12:7 38:6
  38:18 45:19 52:14
  52:19 53:9,10,11
  53:15,16,23 54:4
  55:11 57:20 94:12
  94:13,15 98:1
  120:9,13,16 125:1
  154:5 157:18
  188:11
**presentations**
  30:15
**presented**  29:6
  33:13
**presenting**  35:15
**presently**  53:13
**president**  166:8
  196:11,23
**press**  134:11 165:1
  165:11 192:24
  195:16,21 196:4,9

[press - quoted]                                                                Page 27

197:11 198:1,11
**presumably** 179:6
179:24
**presume** 52:6
**pretty** 36:16 89:10
89:21 97:24 98:15
**previous** 55:14
69:3
**previously** 7:18
33:14 40:5 162:20
**primarily** 149:23
**princeton** 57:2
**printed** 78:22
170:12
**printout** 178:13
193:16
**prior** 106:3
**priority** 2:20
**probability** 171:6
171:10,14
**probably** 56:11,15
81:15 91:23
**probe** 31:1
**problem** 23:16
51:12 75:24 126:3
139:4 144:10
**procedure** 29:23
52:13
**procedures** 73:12
160:14
**proceed** 16:6
**proceeding** 52:23
**proceedings**
199:24 200:8
**process** 68:9
**processed** 130:3
180:14 187:14
**produced** 193:23
**product** 22:23
23:3,8,9 25:23
34:3 74:5 86:8

104:16 105:15
106:2,16 107:5
110:20,21 138:21
144:5 145:3
151:12,14 152:25
167:16 179:18
**production** 22:25
25:17 26:18,20,23
32:13 33:20 34:2
79:9 176:5,14
**products** 90:3
106:19,22 137:3
149:22 162:2,25
163:13,17 182:7
188:20 196:23
**professor** 37:7
39:13
**proffer** 91:10,12
**projected** 122:7
**prominent** 191:24
**promised** 54:9
**proper** 91:3
160:13
**properties** 162:18
188:13
**proposal** 51:1
153:25
**proposed** 50:6,12
51:6 52:13 53:12
55:16 192:11
**prospective** 35:11
35:21 36:22
**protect** 174:22
**protecting** 171:24
**protection** 158:14
159:9 174:16
175:9
**provenance**
182:10
**provide** 24:3 85:6
113:21 149:25

150:2 175:8
**provided** 24:6
49:6 112:4 168:18
**provides** 101:21
174:16
**public** 166:13
**published** 85:15
115:9,18 117:4
163:10,12
**pull** 22:7
**pulled** 24:4 129:25
**pulling** 23:24
**punitive** 13:2
**purchased** 182:9
**purchasing** 182:5
**pure** 27:21 86:8,18
**purest** 70:23
**purpose** 9:6 29:23
104:21 142:17
**purposes** 9:7
10:19 12:23 13:2
79:15 172:14
**put** 15:4 19:15
45:2 57:1 58:20
70:9 106:5 116:22
120:19 125:3
131:4 132:1,2
133:22 141:6
142:20 143:20
147:14 150:17
160:2 170:8 178:1
183:19 195:16
197:15
**puts** 147:21
**putting** 46:20
63:14 147:7,17

**q**

**qualifier** 177:11
**quality** 70:21
**quantifiable**
119:20 120:4,16

120:21 121:2,12
121:18 123:6
124:20,23 125:4
**quantify** 65:14,17
65:22 93:18 97:10
120:12 123:8
**quantities** 11:15
42:11 107:5
**quantity** 47:2
**quarter** 82:20,24
129:25 130:8
**quarterly** 92:17
129:8,10,22 130:5
**question** 8:8,18
9:21 16:19,20
17:2,8,18 18:3
33:16,23 35:24
54:1 57:1 61:7
63:7 102:21,22
103:25 105:8
114:25 124:5
127:15 136:14
138:12 147:25
148:23 184:5
190:8,20 193:8
**questioned** 31:23
66:13 182:18
**questioning** 14:22
**questions** 12:12
13:24 14:3 15:18
30:1 76:12 110:14
135:22 136:13
**quibble** 122:11
**quickly** 147:18
**quite** 10:9 29:13
59:11 70:21 90:11
**quote** 17:9 18:5
55:14 76:25
**quoted** 16:21
161:24

**r**

**r**  41:6 55:23,23 169:3
**raised**  52:20 55:7 143:22 165:13 183:10
**raising**  155:18
**randomly**  173:24 174:4
**range**  80:25 186:2
**ranges**  154:19
**rapidly**  70:11
**ratio**  119:6
**raw**  88:3
**ray**  21:1 22:22 26:5 33:21 34:1 37:14 38:14 40:21 49:8,12,19 50:7,9 51:23 52:17,18 54:3 58:7 65:11 80:19 81:9 150:24 151:1,21 152:3,22 156:13 181:13 186:9,15 187:3
**read**  11:24 15:17 16:24 17:14 18:10 32:2,5 39:19 40:9 41:15 42:4 49:21 50:23 52:10,21 67:2 69:1 72:9 77:7 81:17 89:5 113:2 114:15,17 116:11 137:15 138:1,4 159:23 162:14 165:6,8,13 198:23
**reading**  52:1 103:24 188:3
**ready**  82:19 83:5 114:18 168:21 169:8 194:4

**reaffirmed**  74:12
**reaffirming**  71:5
**reaffirms**  71:4
**real**  75:4 84:15
**realized**  34:11
**really**  9:18 11:4 65:2 104:16 132:14 155:13 174:20 177:5 179:17,21 183:14
**reason**  47:19 61:7 101:20 114:9 143:18 155:3 193:15
**reasonable**  61:19 117:11
**reasons**  76:19 174:21
**recall**  7:2,23 61:4 62:8 85:22 109:22 112:14 136:16,19 153:15 180:6 195:18
**recess**  82:25 169:1
**recognize**  50:21
**recognized**  39:20 39:25 40:5
**recognizes**  181:11
**recollection**  112:15 138:22 176:7
**record**  13:2 18:21 19:20 73:10,11 74:19 75:7,17,23 84:4 106:6 128:22 138:23 145:5 146:9,9 153:5 156:3 168:25 169:9 194:24 197:10 198:16

**recorded**  35:25 119:13
**records**  63:17 72:21 79:11,16 179:12
**recross**  192:11,14 194:6
**red**  3:3
**redactions**  77:12
**redirect**  4:8 15:14 15:22 16:3 135:24 136:8
**refer**  112:20
**reference**  16:18,19 28:2 166:2
**referenced**  148:5 148:6,25
**references**  115:13 116:13
**referred**  21:9 161:23
**referring**  197:25
**reflections**  22:14
**reflects**  174:13
**regard**  160:25 162:23 168:18 192:10
**regarding**  48:12 137:12 166:10 170:12
**regular**  90:10,13 90:14
**regulations**  172:2
**regulatory**  115:11
**reiterated**  77:4 164:2
**reiterates**  71:12
**relate**  175:1
**related**  118:19
**relates**  90:22

**relation**  70:22 87:11 193:8
**relative**  33:16
**relatively**  70:18
**release**  165:2,11 192:24 195:16,21 196:4,9 198:1
**relevant**  90:5 105:13,15
**reliable**  73:6
**relied**  49:19
**rely**  58:6 89:3
**remainder**  86:9
**remember**  19:22 33:18 82:13 99:11 168:17
**remembered**  36:15 61:2,12
**remind**  144:9 150:20 172:9 190:10,19
**reminder**  7:9,11
**renowned**  39:14 39:18
**repeat**  10:13,14 145:16
**repeated**  10:17
**replicate**  159:6
**report**  8:4 13:5 15:9,10 16:13,21 17:18 18:22 19:5 22:21 26:16,17 33:15 39:4 41:11 49:18 54:22 56:8 64:15 65:3,13,19 66:2 71:6 81:20 82:4 86:14 91:1,3 91:8 95:22 97:11 107:21 120:15 121:2,2,7,12,18 123:5 125:3 137:9

137:11,12 139:18
140:3 150:13
163:16 181:7
192:1,17 195:5
198:18
**reported** 32:6
56:22 61:5,8,9,18
67:7 112:21
124:14 143:4
161:24 162:1
167:3 173:22
174:2,20 192:5
199:2
**reporter** 200:4,14
**reporting** 9:7 22:7
61:22 71:1 77:18
93:17 96:22
113:13 121:15
154:19 162:21
175:4 199:18
**reports** 10:7,10
27:25 34:13 37:12
37:17 47:23 61:17
99:3 101:9 120:22
166:10,17 189:13
191:6
**represent** 36:18
36:22 66:2 137:1
142:6
**representation**
64:19
**representative**
120:6 186:12
**representatives**
198:13
**represented** 23:19
32:19 196:17
**represents** 44:9
167:3 171:3
**reproduce** 171:17

**reputable** 115:9
115:17,18 117:5
**request** 108:19
**require** 30:1
**requirement** 60:1
**rerun** 34:16,16
**research** 27:25
30:25 77:4 82:15
84:17 150:5 164:1
166:10 168:20
**researchers** 163:1
**residuals** 85:11
**resolve** 53:12 55:6
**resolved** 106:3
**respect** 156:24
**respectively**
158:22
**respond** 106:21
**responding** 106:9
189:14
**response** 24:5
143:21
**responsive** 91:13
**result** 48:8 52:18
54:3 55:1 74:3
89:20 105:4
108:22
**results** 29:25
32:12 39:6 40:8
40:12 50:9 51:1
58:6 61:2 73:4
92:16,20 111:21
121:16 151:2
153:14 154:1
158:8,17 159:16
159:19 160:15,18
161:22 165:8
170:13 180:21
189:6,9,25 190:9
190:18,25 191:8
194:10

**retained** 37:11
**retract** 66:23
67:11
**retraction** 198:9
198:15,20 199:5
199:15
**retrial** 107:10
**retrieve** 27:3
**revealed** 112:23
**review** 15:3 56:8
56:24 74:3 79:16
129:15 197:9
**reviewed** 12:20,22
13:7,23 30:25
63:3 78:19 89:2
91:22 92:1 104:15
130:18 141:5
187:24
**right** 8:11 9:4,15
10:24 11:5,13,24
12:2 16:8,16,24
17:25 18:10 19:13
20:11,14 23:4,12
25:2,14,17,23 26:2
26:11,19 27:9
28:1,14,24 29:9,17
30:9,17 31:2,6
32:1,7,10,20 33:6
33:9 34:12,15
35:2,5 36:23 37:8
37:15 38:3,10
39:6,10,15,22 40:9
40:20 41:17 42:6
42:18 43:5 44:7
45:4,17,20,21 46:4
46:11,17 47:14,22
48:20,24 49:20
50:11,14,23 51:3
51:15,18 52:21
53:25 54:11,15
55:9,24 56:3 57:3

57:9,12,15,20 58:8
59:5,12,15 61:12
62:12,16 63:12
64:7,12,20 66:11
67:1,23 68:16
69:7,8,21 70:23,25
71:9 76:4 77:7
78:11,14 79:25
80:8,20,24 81:16
81:20,24 82:6,19
85:6,9 86:1,12
87:2,9,21 88:7,9
88:12 91:19 92:10
92:12,17,25 93:24
94:7,19,21 95:3
96:16,20 97:14,20
99:17 100:5,7,20
101:3,8,12,18
102:7,9 103:22,23
107:17 108:1,7,9
108:17 109:13
110:9 111:17
113:1,22 114:2,23
115:14,18 118:3
118:16,20 119:7
119:16,20 120:14
120:22 121:25
122:3,10 123:24
124:17,23 126:22
127:19,22 128:1
128:11,18,25
129:11 130:6,8,12
131:20,24 132:3,4
132:12,17,21
133:6 134:17
135:19 136:9,15
136:18,22 138:10
140:4 142:20
145:8 148:11
149:23 150:18
152:1 154:11,15

155:7 158:1
160:13 161:6
163:14 164:5,17
165:3,4 170:15
173:15 174:15
175:15 176:24
179:25 180:9
181:17,22 184:13
192:19 194:1,7,10
194:21 195:10
196:5,20 197:3,22
198:3,22 199:9,16
**rightly**   154:3
**rigor**   73:3
**rio**   88:9 103:20
104:1 107:19
175:22
**rise**   6:1
**rj**   188:19 191:4
**road**   176:9 192:18
**robert**   41:4,6 87:8
**rock**   181:3 187:12
**rocks**   181:9
**rod**   41:14 42:1,4,9
47:21,25 145:24
**rods**   41:22 42:14
**rolle**   41:4,6 48:13
66:18,21 67:6,10
71:13,14,23
**rolle's**   41:6 145:21
**rolled**   42:8
**rome**   115:9
**ronning**   1:21 3:12
6:13
**room**   33:24 82:17
**roslyn**   1:4 3:10
6:10
**ross**   30:7
**roth**   3:2
**rough**   30:20

**round**   171:18
**routine**   90:13,14
119:1,1 157:1
**rovner**   196:14
**ruling**   91:11
165:20
**run**   22:23 56:14
60:2 176:5
**running**   181:12
**runs**   23:9,19 33:20
**russell**   87:9

**s**

**s**   5:2,4,4,5,5 7:18
19:1,8,10 84:18,19
110:2,7 169:3,3,3
173:2,4
**s.d.**   196:12
**safe**   167:16 197:11
**safety**   198:17
**sample**   22:24,25
25:17,23 26:5,21
34:3 38:18 41:16
49:10 50:9,16
66:7,8 68:10,19
97:15 98:16,18,20
108:18,19,22
109:7 112:24
118:18,20 125:2
144:21 147:4,5
157:19 167:4
175:24 176:18
186:11 195:6
**samples**   10:12,15
20:13,17 23:3,8,18
23:19,21 24:24
25:17,19,22 26:18
26:20,23 32:14,19
33:15,24 34:1,2,7
34:16 37:18 41:1
41:9,19 48:12
50:2,21 54:10,25

70:22 73:8 78:7
78:10,11 79:1
80:8,12 111:22
112:1,23 113:8
126:15 130:4,4
140:3,13 141:10
141:11 147:7
151:2 156:8
158:10,20,23
162:2,4,4 180:20
181:12 188:20
189:20,23 191:5
191:10 197:12
198:19 199:2,13
**sampling**   78:3
119:1 186:11
**samuel**   196:14
**sanchez**   4:6 6:6
7:4 74:25 75:6
76:15 82:22 83:8
88:19 90:13
104:14 106:22
107:8 136:9
169:12 183:13
194:7
**satisfactorily**
49:13
**satisfactory**
158:18
**satisfy**   187:24
**saw**   10:3 17:20,23
19:24 34:5 97:2
120:23,25 183:1
195:8,12
**saying**   10:14 13:13
23:18 31:10,11
46:5 47:20 49:22
56:25 61:1 67:3,5
83:9 86:12 87:16
87:18 94:16 95:17
95:20 96:1 98:11

98:15 102:19
118:3 121:10,11
140:19 151:8
154:24 160:17
177:11 178:2
180:17 182:4,5
183:25 195:11
197:23
**says**   11:13 12:1,20
13:17 14:3,23
16:10 17:7,17
23:12 27:11 29:22
31:5,13,23 32:19
33:11,23 36:18
39:23 41:13,18,20
41:25 42:3,15
49:3 50:4 51:11
51:17 54:9 61:13
62:4 67:9,21
69:23 70:15,18,20
72:6 73:12,15
85:4 86:7,25
87:14,19,22 94:20
103:1 108:19
111:2 113:1
115:17 116:15
118:16 119:5,11
119:22 120:2
124:12,13 126:9
133:19 137:15
138:18 139:9
140:12 144:1
145:23 151:10,22
152:2 153:19
158:8 161:23
166:25 170:5
172:20 173:17
174:15 175:24
176:18 178:16
181:3 182:15
196:3 198:24

199:14,20
**scale** 132:16,17,24
  133:2,4,5,7,11,13
**scales** 132:19
  133:11
**scan** 119:11
**scanning** 109:3
**schaffner** 50:4
  51:5 52:12 158:7
**school** 19:12 22:21
  27:24 28:24 30:12
  30:16,24 33:5
  34:9 37:5 57:5
  66:4 151:24 181:6
  196:11,13 197:9
  198:10
**science** 191:13
**scientific** 132:17
  133:5,13 137:1
  158:12
**scientifically**
  64:25 73:5,14
  98:19 142:6
  188:10
**scientist** 39:14,18
  65:7,8 66:24
**scientists** 198:18
**scope** 13:5 81:22
  91:8 127:13
  142:12,16 146:21
  147:3,8,19,24
  148:12,12,18,21
  149:3,3 152:8,10
  160:7,20 161:4
  164:10,25 165:15
  183:6 189:2
**screen** 122:2,4
  147:22
**search** 118:19
  191:12

**seated** 6:5 83:3
  169:6
**second** 16:17
  80:11 85:2 107:10
  116:6 139:6
  171:18 189:3
**section** 12:9 17:20
  17:23 137:11,12
**sections** 15:21
**see** 13:17 15:6
  16:10 18:13 21:22
  21:24 22:21 25:16
  25:25 27:9,10,11
  27:23 29:1,14,18
  29:20,21 30:8
  36:3,9,12 38:12
  40:18 41:5,8,20
  45:2 48:24 50:3
  50:11 52:25 53:1
  53:8 55:2,10,18
  58:22 66:19,22
  67:17 68:5 69:17
  71:14,21 72:1
  73:15 76:6,7,20,23
  78:24 84:21,23
  86:3 92:3,16,19
  93:24 95:14,22
  97:18 98:1 100:19
  100:22,25 101:4
  101:11,13,16
  102:1,17 108:18
  109:6 114:1,13,20
  115:22,24 116:3,5
  116:12,14 118:21
  122:25 123:1,9,12
  123:15 125:1
  127:16,23 133:25
  134:1,6 136:6
  137:22 139:7
  141:15 144:22
  145:23 146:9

149:19 151:3
  153:22 154:6,22
  158:24,25 159:20
  161:17 162:10
  167:7,17,19,25
  168:5 170:10
  171:5,7,9,10,11
  172:6,19 174:10
  174:24 176:2,17
  176:17,20 179:23
  182:17 187:13
  196:16
**seeing** 9:8 21:14
  41:23 47:25 48:4
  69:6 71:21 151:3
  177:5 179:20
  195:5
**seek** 193:18
**seeking** 104:22
  192:13
**seen** 50:16 77:9,11
  77:17 78:7 79:19
  84:24 85:3 89:15
  89:17,17 104:4
  120:20,21 123:20
  177:10 179:11
  195:25
**selected** 27:13
  158:1
**selective** 105:23
**selikoff** 167:24
  168:10 197:12
  199:1
**sell** 60:6 158:13
**selling** 92:8
**sem** 109:2
**sending** 66:22
  71:14,19 72:3
  114:22
**sense** 136:20
  187:23 188:17

**sensitive** 126:25
  127:4,5 132:16
**sensitivity** 56:19
  81:13 94:1,4 95:5
  98:12 126:21
  127:9,11 132:13
  185:18
**sent** 33:14 66:6
  83:21 181:4
  193:18
**sentence** 138:2
  165:6,7,9
**separate** 24:24
  165:16
**september** 114:14
**series** 37:12
**serpentine** 38:23
  38:24 39:1 111:7
  111:10,12,15,18
  112:19 181:10,14
**serve** 87:24
**sesquicitrate** 66:7
  66:15
**sesquihydrate**
  71:15,15,19 72:3
  72:13,22
**set** 21:3
**seven** 23:6 26:1
  28:20 41:10
  112:23
**seventh** 25:23
**shaded** 134:3
**shadow** 134:7
**shape** 144:23
**shards** 42:8
**shared** 175:18
**sheer** 47:2
**sheet** 101:22 171:3
**shelley** 140:7
**shipments** 140:17
  141:11

**shipping** 62:15
**short** 68:11 137:19
**show** 11:8 12:11
  21:19 24:25 29:12
  67:15 80:13
  103:19 105:1
  114:9 141:8
  146:17 151:11,14
  160:5 167:3
  199:11
**showed** 21:1,2
  31:4,13 37:23
  39:7 137:10 149:6
  149:17
**shower** 41:9,9,17
  41:17,19,19 49:7,7
  77:16,16 145:22
  145:22 152:25,25
  157:18,19
**showing** 23:11
  29:10 49:7 114:12
  133:15 149:10
  183:11 197:3
**shown** 12:8 84:25
  123:18 137:7
  141:14 162:7
  163:19,23 164:5
  170:1 177:17
**shows** 34:3 69:2,5
  104:25
**side** 63:17,18
**sidebar** 12:16 16:5
  74:17,18 76:2
  88:17 91:17
  104:11 107:15
  142:13,14 143:16
  146:22 147:2
  149:4 160:8,10
  161:9 164:12
  165:25 183:7,8
  184:8 188:21,22

188:23 190:22
  192:10,12 194:2
**sides** 119:5
**signature** 200:12
**signed** 35:4 116:3
**significance**
  170:18 172:14,20
**silicate** 144:14
**silos** 129:14,18
**similar** 71:16
  72:14 106:15
  162:18
**similarly** 89:5
**simon** 3:8
**simple** 127:15
  132:15
**simply** 22:7 59:12
  72:10 73:1 83:18
  97:24 98:15
  147:17 160:15
**sinai** 66:4 69:7,17
  74:12 162:22
  163:11 166:8,11
  166:24 167:13
  168:10 195:16,21
  195:22 196:11
  197:9,19,20
  198:10,18,25
  199:4,7,11,12
**sinai's** 167:15
**single** 73:7 107:3
**sir** 22:9 25:25 28:5
  29:17 36:21 40:24
  41:8 48:24 56:12
  60:21 62:22 67:17
  73:7,9 74:11
  77:13,25 78:19
  79:10 84:21
  100:19 101:9,10
  103:19,23 104:5
  114:4 116:7

123:18,20 195:20
**sit** 43:25 91:5
  92:13 129:20
**site** 138:10
**sitting** 141:20
  181:25
**situation** 13:3
  57:23
**six** 23:2,8,12,19
  25:17,22 26:1,18
  28:20 32:13 33:20
  34:2 113:19 199:2
  199:13
**sixth** 93:10
**size** 99:19 120:6
  127:5,5
**sizes** 127:8
**skadden** 3:14
**skim** 116:8
**skip** 159:24
**slate** 3:14
**slide** 139:15
**slides** 183:20
**slightly** 81:15
  86:18
**small** 10:7 17:3
  55:5 70:19 128:1
  185:8,13,14,16
**smith** 69:19
  196:19
**smokescreen**
  31:25
**sneeze** 147:11
**sodium** 66:7,14
  71:15,15,19 72:3
  72:12,21
**sold** 151:15 176:5
**solution** 70:9
**solutions** 85:6
**somebody** 83:14
  155:10 175:22

**someone's** 196:14
**somewhat** 170:25
**sonication** 70:14
  70:17
**sonicator** 70:10
**sonified** 70:7,8
**sorry** 8:2 9:22
  14:16 18:24 20:2
  22:8 23:17 31:19
  39:16 42:3 46:3,9
  53:19,20,22 58:12
  77:12 83:12 91:4
  103:23,24 108:2
  111:23 114:24
  116:9 124:5
  125:22 133:23
  134:2 138:25
  145:7,11 146:24
  147:10 152:19
  154:12 155:15
  159:17,20,21
  166:20 167:21
  197:18
**sort** 11:2 170:20
**sorts** 99:6
**sound** 64:20
**sounds** 64:12
  198:1
**source** 87:5,17
  92:9,11 182:6
**sources** 106:23
  182:8
**space** 122:21
**spacing** 20:16
**speak** 58:17 59:4
**speaker** 7:20
**speaking** 84:13
  129:7 150:13
  152:3 191:8
**speaks** 50:1

species 111:14
specific 21:7 83:13
 129:16 143:13,21
 150:17 169:22
 177:7 181:2
specifically 145:15
 150:16 166:25
 172:17 173:21
specificity 79:14
 129:17
specify 29:22,23
 49:25
specimens 11:14
speculate 81:8
speculation 72:18
spend 118:23
spent 7:21 10:24
spoke 77:2 116:15
 163:25 165:14
spot 46:21
spots 70:5
spreadsheet
 178:13 193:17
square 3:15
 122:25
squares 119:12
squeezed 189:4
stamp 170:5
 177:20
stand 71:25 77:5
 141:21 160:17
 164:3 189:5,24
 193:20
standard 34:1,6
 59:10 157:4 172:5
 172:10 173:7
standards 170:21
 172:2
standpoint 48:9
stands 165:8 189:9

start 126:20
 136:12 162:9
 170:2
started 189:3
 191:21
starting 46:19
 129:7
starts 30:7
state 39:20 74:2
 81:7 88:24 90:9
 109:16 200:5
stated 37:3 60:3
 68:11 157:2
 174:16
statement 52:14
 66:23 67:11
 106:25 166:15
 197:10,24 198:15
 199:6,7
states 34:25 54:12
 62:17 70:24 85:7
 85:10 87:3,10
 96:1 103:2 112:11
 114:21 115:12
 124:19 162:25
statistical 120:18
 125:5 179:3
statistically
 121:15
statistics 121:4,14
stay 82:16 148:17
 148:20 149:3
step 57:24 82:23
 187:5
stewart 50:19
 51:14 54:13 55:7
 55:10 153:20
 154:3,16 155:1,6
stick 66:24 70:11
sticker 178:8,12

stone 158:13
stood 29:6
stop 60:6 136:6
stopped 107:22
story 11:3 22:18
 26:11 48:10 64:4
 64:13 198:11,12
straight 23:25
 24:5
straighten 192:21
stray 179:1
street 2:1 3:8,18
strike 112:13
structure 87:6
 97:2 99:22 101:24
 102:14,23 119:14
 170:15,19 174:25
structures 38:22
 92:16 93:3,8,20
 94:13,24 95:6,18
 100:23 101:18
 102:14,24 185:3
studied 110:20
 112:17 132:7
 198:19
studies 8:25 9:17
 31:1
study 11:9 158:11
 172:1 182:12
studying 199:2
stuff 85:15 183:24
sub 65:1
submission 139:20
submitted 108:21
 176:1
subsequent 34:1
 50:18 71:7 153:19
substance 143:6
 188:16
substantial 107:6
 115:7

substantially
 128:20
successful 66:9
sudden 61:21
sufficient 107:5
suggest 136:25
 179:16
suggested 156:23
 198:7
suggesting 156:20
 156:21 179:19
suggestion 154:13
suite 3:9
summarized 49:4
 122:24
summary 36:16
 48:16,25 78:21
 92:3 153:8
super 92:24
superior 1:1
supplied 52:2
supplier 88:3 89:9
 89:10,22 90:16
 107:20 174:24
 175:22 179:7,7,13
supplying 103:22
supportable
 188:10
sure 6:5 7:22
 12:15 20:6,23
 23:20 26:3,9 31:8
 37:23 56:20 83:4
 83:9 88:16 91:6
 102:7,10,18
 104:10 106:7
 114:16 116:10,10
 125:23 131:18
 146:23 149:1
 159:21 164:11
 166:3 169:7 170:4
 183:23 184:25

197:25
**surprise** 144:17
**sworn** 7:18
**symposium** 35:17

**t**

**t** 5:2 7:18,18 169:3
**table** 78:17 80:19
  111:4 112:20,21
  113:5
**tables** 113:3
**tail** 20:17
**take** 8:9 34:21
  44:25 46:2,15
  64:19 75:25 76:11
  82:10 96:8 98:18
  99:18 126:19
  129:13,23,24
  131:13 134:9
  135:7,14,18
  146:25 164:22
  168:15 187:5
  188:13 193:24
**taken** 140:13
  169:1
**talc** 9:10,12,25
  10:3,4 11:14
  20:12 27:12,14,16
  29:24 30:3 31:2
  33:15 42:8,8,18,21
  42:23,23 49:16
  52:16 53:25 57:25
  60:7 62:19 63:13
  63:23 66:17,25
  67:4,22 68:13,15
  70:3,7,20 78:7
  86:7,8,18,19,21
  87:1,5,8,13,15,16
  87:20 88:4 92:25
  97:19 98:11 99:4
  101:6 103:3,22
  109:20 111:4

112:1,11 113:6,18
114:22 115:3,4,6
116:1,7 117:23
121:1 124:15
130:24 131:8,11
132:2,2,3 134:14
135:1,11 140:15
141:9,19 144:13
144:14,18,22,22
144:23 145:21
146:18 151:12
157:1,19 163:6
167:5,15 174:9
176:6,12,14
178:21 180:15,20
180:25 182:1,3,13
183:4 184:13
186:4 191:24
192:6 197:11,12
197:14 198:17
199:2
**talcs** 37:13 110:13
112:17,22 115:8
116:23 149:12
179:10 181:20,22
182:10
**talcum** 144:19,21
161:25 162:17
163:12 166:11
167:1 182:5
**talk** 24:20 27:22
36:24 37:6 39:9
59:6 64:1,24
122:13 132:13
136:24 142:10
143:6,21 145:18
149:14 153:2
164:7 165:7,10
166:19 169:25
170:17 185:7
188:15

**talked** 11:10 16:13
19:12,18 39:5
48:17 55:21 62:1
73:16 77:13 84:16
85:19 109:21
122:20 126:21,24
128:11 130:22
137:5 139:11
150:1 153:1
156:14 157:21
170:21 182:23
194:10
**talking** 8:5 14:20
18:12,16 23:20
31:1 35:12 38:16
47:5 48:19 56:10
58:9 62:14 63:14
69:3 71:6 73:10
74:21 77:20
108:13 117:9
119:1 131:16,17
135:13 138:9
141:7,9 169:14
178:25 180:8
181:20 185:22
189:20 190:25
**talks** 35:19 68:9
**tare** 134:11,11
**team** 77:4 164:2
**technician** 124:25
**technique** 13:19
68:7 77:18 97:6
149:23 150:22
185:11
**techniques** 110:11
188:2
**teeny** 92:24 128:8
**tell** 23:22 44:19,20
50:6 51:6 64:12
81:23 128:13
140:9 148:4 155:3

196:15
**telling** 36:20 97:4
155:12
**tells** 102:13
**tem** 18:12 57:15
59:21 65:16 96:14
96:15 122:2
124:16 126:24
127:8,11,16,25
128:6,7 129:9
130:7,11,23
131:12 132:3,8
134:15 135:2
184:23 185:9
186:4,17
**ten** 44:3,25 45:4,6
45:7,22,23 47:13
47:15 57:19 93:10
122:15,18 128:15
133:19,23
**tenable** 151:11,13
**term** 31:8
**terms** 42:1 44:7,18
47:1 93:7 102:14
102:24 121:24
128:13 131:12
132:15 135:16
140:1 167:20
177:8 178:2
180:22 182:20
185:18 190:16
191:1,4
**territory** 62:6
115:7
**test** 59:7,12 94:16
95:2 109:18
117:18 128:12
129:5,25 130:11
131:9 132:8 148:5
151:2 170:12,19
180:20,21 184:22

186:10
**tested**   49:10
   106:22 107:9
   132:2 134:14
   135:2 138:17
   167:2 182:10,12
   189:5 191:9
**testifying**   7:4
**testimony**   12:5,8
   63:3 82:14 107:7
   141:4 157:3
   168:19
**testing**   10:11,19
   40:19 57:25 58:4
   58:10 65:10 74:25
   89:4 90:11,11,13
   90:14,21 91:7
   92:3,17 105:20,22
   106:2,10 107:7
   117:16 129:10,16
   129:23 130:7
   141:18 150:16
   151:22 157:1
   160:21 172:11
   179:12 180:3,24
   188:4,25 189:10
   189:19,25 191:9
**tests**   10:16 96:11
   129:8 130:23
   131:4,23 132:14
   170:14,15 189:24
   190:9
**texas**   3:9 158:12
**textile**   11:16,18
**thank**   6:19,20,25
   7:7,17 17:22 19:9
   20:8,24 23:15
   24:11 25:5,9
   28:13 58:24 67:16
   73:23 82:20,22
   83:6 84:7 89:23

91:14,16 102:12
   103:9 107:1 110:3
   119:25 124:2
   125:12 130:17
   135:23,25 139:3
   143:1 145:12
   146:12 161:17
   168:22,23 173:3
   183:21 184:7
   190:14,21 192:8
   192:11 194:5
   195:2
**thanks**   82:24
   124:12
**thereabout**   134:20
**thereabouts**   60:11
**thermal**   158:14
**thin**   72:23
**thing**   11:8 30:19
   43:2 76:5 95:20
   106:5 109:19
   134:2 137:8
   145:19 159:21
   164:8 167:13
   177:17 178:25
   193:21
**things**   12:21 15:7
   19:15 23:6 37:1
   57:12,15 62:11
   75:4 104:17
   118:16 127:16
   129:24 132:9
   153:10 163:8
   166:18,23 169:20
   170:10 173:13
   176:16 180:18
   182:17,23 183:14
   184:20,21 186:10
   186:12,17 187:15
   194:8 198:21

**think**   11:3 15:19
   15:20 18:25 24:22
   36:17 37:23 47:5
   53:5 60:1 61:15
   61:19,20 63:1
   64:8 67:12 71:5
   75:5 87:22 88:25
   89:6,20 91:8
   93:22 98:2,14
   102:6,9 108:8
   110:22 111:9
   117:14 122:17,18
   125:19,20 127:2
   130:13 134:3,10
   134:11 140:2
   143:14 152:20
   153:9 154:13,17
   155:10 156:21
   168:12 170:6
   176:17 177:19,24
   189:7,18 190:3,13
   192:14
**thinking**   34:11
   83:23
**thinks**   67:6 74:4
**third**   41:21 42:7
   47:21 68:3 71:2
**thomas**   166:9
   167:24 168:9
   196:8
**thought**   61:18
   71:24 142:7
   147:10 198:6
   199:4
**thousand**   109:11
**thousands**   18:16
   91:23 188:1
**three**   9:18 14:3
   28:20 33:2,4 34:8
   34:23 42:1,8
   61:11 67:18 69:2

72:5 78:15,25
   89:13,13 92:20
   95:14 124:21
   154:19 162:1
   171:7,15 194:19
   196:19 197:13
   198:19
**throwing**   164:15
**tied**   191:10
**tight**   147:20
**tim**   124:8
**time**   7:22 10:25
   14:24 15:17 31:15
   32:24 37:20 46:25
   47:5 54:14 59:10
   66:8 68:11 71:8
   74:24 77:9 81:21
   82:7 92:18 105:9
   105:15 116:2
   118:18,20,22
   125:24 126:10
   127:14 130:1,10
   130:22 136:2
   139:21 150:23
   162:11,20 164:14
   168:11,12 175:12
   178:22 179:10,24
   184:18 188:2,5
   191:13,16 196:22
**times**   3:15 8:7
   45:9 46:9,14 47:7
   74:22 76:8,21
   77:2 97:7 106:18
   109:8,12,14 122:9
   131:13,24 135:3,4
   135:8 163:24
**timing**   105:2
**tinto**   88:9 103:20
   104:1 107:20
   175:23

**tiny** 18:14,14,14
92:24 121:1,1,1
135:14
**title** 76:21 117:22
**tm** 124:15
**today** 6:8 43:25
77:6 86:20 92:14
129:20 141:20
164:3 170:1
181:25
**told** 26:10 55:17
64:4 77:2 90:5
111:9 163:24
**tool** 82:1 126:24
**top** 16:10 29:14
30:20 35:17 74:1
111:24 118:22
**topic** 147:22
**total** 43:4 44:7,18
130:23 131:11,11
132:2 134:14
135:1
**totality** 183:16,17
184:1,2
**totally** 165:16
**toxicological**
52:15 53:24
**toxicology** 115:11
**trace** 20:15 23:3
26:4 27:14 34:5
64:23 65:1,1,3,6
65:13,15,17,19,24
66:17 70:6
**traces** 66:25 67:4
74:5
**transcript** 2:15
12:19,22 15:16,17
15:18,24 200:7,9
**transmission**
92:23 117:19,24
155:23 186:22

**treat** 99:24
**tremolite** 8:10,10
8:11,12,14,16 9:20
10:7,9 11:23 17:9
17:16 18:6 23:4
26:1,4,17 27:15
32:14 33:17,19
41:21 42:1,7,10,13
47:22 48:1 50:15
62:12 77:16 86:11
86:13,14,15 87:7
87:19 111:6
112:18,24 113:12
113:13,19,22
119:13 121:17
123:10 137:18
140:13 145:24
146:16,16,18,18
147:16 149:7,12
151:23 158:19
169:19 177:4,10
**trial** 1:4 6:9 88:21
107:10 149:18
153:8 188:17
190:24
**tried** 61:9 190:11
**trillion** 44:4 45:1,6
45:7,21,22,23
47:13,15 57:19
**trillions** 43:12,16
43:21,22,24,24
48:5,6
**trouble** 58:13
**true** 8:16,17 26:25
30:12 54:25 67:25
69:15 71:4 80:9
94:22 116:23
127:18 134:18
139:8 199:22
200:8

**truly** 137:10
**trusting** 26:8
**truth** 36:20
**try** 13:19 58:22
89:16 154:1 157:8
170:25 183:25
186:5 190:19
191:18
**trying** 59:4 66:7
75:19 87:5 117:25
118:11,12 122:11
132:22 142:21
143:5,20 147:13
148:17 171:16
177:18 184:24
185:5 186:11
188:24 189:21
191:12 193:15
196:14
**tube** 70:13
**tubular** 72:23 73:1
**turn** 30:19 50:3
68:3 76:10 102:17
116:6
**turned** 6:5 83:4
169:7 187:12
**turns** 199:8
**twice** 119:19
**two** 10:20 15:18
22:14 28:19 37:17
39:10 42:8 68:19
89:12,14 92:20
95:14 111:5
113:18 118:20
119:3 122:18,21
129:14 130:11
135:5 153:17
154:19 158:11
161:25 162:4
163:4 166:23
171:11 186:9

196:19
**type** 34:1,4 70:14
99:8 119:13
120:10 176:25
**types** 11:18 186:21
**typically** 29:7
110:19,20 122:15

**u**

**u** 55:22,23
**u.s.** 101:7
**u.s.p.** 58:5
**ultimately** 150:9
**ultrasonic** 74:8
**um** 26:12 43:10
53:17 98:10
**uncertainty** 125:5
171:21 174:8,14
179:3 188:6
**uncomfortable**
116:16
**uncontaminated**
163:1
**underlying** 15:11
**understand** 7:13
9:21 10:2 12:17
13:1 24:23 42:12
83:24 91:4,11
92:6 146:10 148:7
148:13,16 149:20
167:9 177:4 178:2
178:5,13 183:13
191:12
**understanding**
37:9 42:15 70:9
178:23 179:9
182:21
**understands** 90:22
**understood** 83:9
88:23 166:3
**unintentional**
164:14

**unique** 21:4,5,9,11
  21:15
**unit** 133:14
**united** 112:11
**unquote** 55:14
**unsaid** 64:6
**upper** 94:8
**upstairs** 168:21
**upwards** 9:11
**usage** 177:8
**use** 40:6,20 65:24
  70:10 85:18
  104:19,22 112:11
  127:8 128:6,7
  132:19 133:11
  148:3,22,24 154:2
  155:13,22 161:5
  171:21 172:22
  178:1,3 186:15,16
  186:17,17
**useful** 167:16
**uses** 12:3 42:1
  58:3 112:2 117:19
  161:4
**usually** 65:2
**utilized** 99:10

**v**

**v** 1:6,12,17,23
**val** 63:5,7,9
**valid** 121:15 137:1
  142:6
**validated** 99:11,13
**validity** 40:8
**valley** 62:16 63:5
  63:8,19 180:9,13
  180:18
**value** 94:10 96:3
**varieties** 111:8
  137:21
**variety** 8:23 9:6
  120:3

**various** 112:5
  141:11 163:12
  181:21
**vary** 94:9 108:5
  119:9
**varying** 11:15
  173:24 174:4
**veins** 187:13
**verbal** 53:21
**verification** 154:1
**verified** 199:18,20
**verify** 36:20 52:24
  92:14 153:13
  154:11,14 156:19
  156:23 160:14,14
  191:18
**veritext.com** 2:22
**vermont** 22:4,23
  23:2,9 27:13
  33:15 92:9 108:13
  175:12 183:2,4,9
  183:24
**versa** 127:18
**version** 29:19
**versus** 6:10,11,12
  6:13 71:7 180:13
**vibrating** 70:11
**vice** 127:18
**view** 122:14
**virtue** 40:5 78:3
**viscomi** 2:10
**visible** 168:23
**visit** 137:13
**visual** 109:15
**visualize** 43:19
  135:6
**voice** 7:16
**voices** 75:21
**volume** 1:7 2:4
  187:23 188:18
  191:3,6 199:24

**volumes** 135:12

**w**

**w** 7:18
**w.t.** 30:24
**walk** 182:16
**walter** 55:8 150:12
**want** 9:9 11:8
  22:17 23:20 24:24
  28:9,11,15 30:6
  39:9 44:21 48:8
  75:22 78:8 79:23
  91:12 102:18
  106:5 113:4 114:9
  118:17 126:19
  131:7 134:15
  136:12,24 137:6
  138:4 142:10
  145:16 146:4
  149:14 153:2,18
  155:5,6,13 158:6
  164:7 166:3 169:9
  169:25 170:17
  172:19,24 180:2
  184:19 187:5
  191:2
**wanted** 44:6 45:24
  47:19 83:8,20
  84:15 91:5 131:10
  135:6 155:1
  187:20 198:20
**wants** 24:10 58:20
  89:16 90:2
**washington** 33:12
  35:2
**way** 44:15 59:11
  64:24 65:24 95:7
  96:15 97:21 98:25
  99:10,25 100:1
  118:2,5,25 121:15
  127:3,8 128:3
  131:9,15 132:20

**143:8 146:19
  148:23 156:25
  157:12 176:17
  186:12 189:7
  192:14 194:9
**ways** 44:16 99:6,7
  117:8 143:10
  187:7
**we've** 23:25 46:17
  50:5 74:24 85:3
  89:6 103:8 120:20
  126:24 127:20
  153:1 157:21
  159:14 177:10
  197:2
**wear** 168:22
**wednesday** 2:3
**weekend** 199:1,13
**weeks** 67:18 69:2
  72:5 117:7 130:11
**weigh** 132:19,22
  134:17
**weighs** 134:20,24
**weight** 44:10,13
  44:14,24 45:25,25
  52:16,16 53:25
  99:20 100:1,10,11
  128:14 131:13
  132:23 133:18
  134:16 135:16,17
  184:25 185:9
**weissler** 50:20
**welfare** 158:15
  159:10
**went** 14:8,8,17
  15:11 33:3 55:20
  61:8,17 75:10
  104:25 130:11
  139:14 149:15
  150:8,25 157:3
  160:21 169:16

**[went - zoomed]**

189:10
**west** 2:20 3:18
**whatsoever** 82:15
168:20
**width** 102:4 119:6
119:16
**william** 1:21 3:12
6:12 114:20
**willing** 50:22
**wise** 116:2
**wisest** 198:7
**wish** 15:5 132:25
183:22
**withdraw** 184:4
**withdrew** 99:14
**witness** 4:3 7:3,13
7:17 12:18 13:22
14:25 15:2,5,15
24:3,8,9 25:8 75:8
87:25 142:19
147:14
**witness's** 142:21
**word** 12:3 144:1
177:10
**words** 124:21
136:21 169:20
**work** 16:3 34:2
37:22 38:25 39:14
39:24 50:6 64:10
71:7,9 72:10 73:3
74:25 83:19 98:25
133:12 141:22
154:1 156:18
158:1 162:12,13
163:21 187:21
188:18 190:4,7,17
191:3,19 194:16
199:12
**worked** 59:11
123:24 189:16

**working** 178:6
**works** 58:23
122:13
**worth** 71:14
**wrap** 190:15
**writer** 68:15
**writes** 34:10 69:11
70:15 71:8 168:2
**writing** 126:11
140:7 158:7
**written** 60:16
151:4 172:13
173:15
**wrong** 46:18 47:10
150:14 154:7,23
199:9,14
**wrote** 32:8,22,23
61:1 69:14 137:12
137:13 167:14
197:16

### x

**x** 5:1,2 21:1 22:22
26:5 33:21 34:1
37:14 38:14 40:21
49:8,12,19 50:7,9
51:23 52:17,18
54:3 58:7 65:11
80:19 81:9 150:24
151:1,21 152:3,22
156:13 181:13
186:9,15 187:3
**xrd** 37:15,20 38:5
38:20 40:20 51:2
54:2 55:24 57:3,6
57:9,20,24 59:12
59:14 60:4 80:22
81:2,10,11,13
149:23 150:18,22
153:2

### y

**yardley** 163:6,7
**yeah** 17:1 28:10
32:4 41:18 63:1
73:18 76:1 81:10
114:15 123:4
125:7 126:8
135:17 138:5
158:25 180:16
191:8
**year** 48:18,19
69:12,12 74:12
140:16
**years** 105:6
107:22 108:1,4,6
161:2 167:4
179:12 197:13
198:19
**yep** 120:1
**yesterday** 7:2,10
7:21 11:3 26:11
33:4 55:21 60:20
62:24 90:12 105:1
105:21 109:21
110:10 122:20
125:20 126:20
137:6 139:14
140:7 144:8
146:15 147:8
150:2 152:16
156:2 160:22
169:16 170:21
180:11 181:5
189:4,22 190:14
**yield** 70:3
**yields** 70:3
**york** 3:6,6,15,15
3:18,18 74:22
76:8,20

### z

**z** 7:18
**zero** 94:12 133:15
134:13 171:5,23
173:23 174:4,11
194:18,20
**zeros** 45:10 134:12
179:24
**zoomed** 187:7

Exhibit 164

| Date | Exhibit # | Testing Entity | Author | Recipients | Purpose Stated | Test method | Mine | What was tested | Special Preperation | What tests revealed | Hopkins Comments | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/1957 | J&J-309 | Battelle | Smith | | | | | Italian talc | | " the Italian talc averages about 10% fibrous or acicular particles" | | |
| 5/9/1968 | J&J-1 | Battelle | Smith | Dr. Lycan | | petrograph | Val Chisone | processed talc: Italian 1 | | tremolite | | |
| 5/9/1958 | J&J-2 | Battelle | Smith | Dr. Lycan | | microscope | Val Chisone | processed talc-Italian 1 | | tremolite; 6 to 10 % fibrous talc | | |
| 12/4/1970 | J&J-9 | Colorado School of Mines | Colorado School of Mines | Miller | | XRD & petrograph | Hammondsville | 38 core samples | | tremolite-actinolite; fibrous talc | | |
| 3/9/1971 | J&J-257 | McCrone | Grieger | Goudie | | SAED; XRD | | Shower to Shower; medicated powder | | "fiber of chrysotile.. Was very clear"; "medicated powder we found one fiber of chrysotile"; Shower to Shower ...we feel stronglythat it may be chrysotile ..chrysotile is very low"; >>> Final Report >>>"Shower to Shower The fiber content of Shower to Shower is quite low in comparison to previous samples which we have investigated...We found three suspect fibers . Of these, two were found in one field and probably have the same source, very possibly contamination ..It is still questionable whether they are chrysotile. We have, however, found traces of chrysotile in G-11 one of the additives to Shower to Shower , and this might be a possible source of these contaminant fibers." | YES | |
| 5/14/1971 | J&J-255 | J&J | Ashton | Smith | | XRD | | Baby Powder (production batch) | | tremolite; tremolite-actinolite | | |
| 7/2/1971 | J&J-256 | Colorado School of Mines | Pattengill | Ashton | | XRD; PLM | | six monthly plant-run samples | | 5 of 6 show tremolite-actinolite; "no other.forms of nontalc minerals approaching asbestos types were identified" | | |
| 7/7/1971 | J&J-15 | Colorado School of Mines | Pattengill | Ashton | | XRD | Vermont talc | processed talc-344-L | | tremolite & actinolite | | |
| 7/26/1971 | J&J-19 | Colorado School of Mines, McCrone, Dartmouth | Nasheid | Foster | | | Vermont talc | | | "trace amounts of fibrous minerals; (tremolite/actinolite) " | | |
| 10/12/1971 | J&J-23 | McCrone | Grieger | Goudie | appearance and fiber content | electron diffraction | | Shower to Shower | | traces of chrysotile in one of additives | YES | |
| 11/11/1971 | J&J-376 | McCrone | Grieger | Goudie | | TEM | | Shower to Shower | | "The Shower to Shower appeared to have a few more fibers than the other two samples ,however I think that mighbbe due to possible contamination from the G-11.In the G-11 we did find.two positively  identified chrysotile fibers and some other fibers which at first glance peeared to be chrysotile, when you look atthe electron diffraction pattern. I believe that most.of the fibers in Shower.to Shower which are suspect.may come from G-11.  .I left out.the comments on G-11.from the report becuase I felt you might.want to change your supplier or investigate your supplier , and this would only tend to confuse the issue perhaps.with the PDA. " | | |

EXHIBIT
Hopkins-28
Date: 11-5-78
MLG, CSR, RPR, CRR

EXHIBIT
J&J-414

| Date / ID | Lab | Analyst 1 | Analyst 2 | Test description | Technique | Sample | Finding | Notes | Asbestos? |
|---|---|---|---|---|---|---|---|---|---|
| 8/3/1972 J&J-28 | NYU | Seymour Lewin | Dr. Weisler (FDA) | | XRD | Shower to Shower sample 84 | 5% chrysotile | | YES |
| 8/10/1972 J&J-373 | J&J | | | | PLM | Shower to Shower | "About 1 fiber or rod/needle every 500 particles. Approx. 1/3 of these are tremolite." | | YES |
| 8/24/1972 J&J-29 | Sperry Rand | Nashed | Dr. R.A. Fuller | FDA submits Lewin sample | SEM | Shower to Shower | "asbestos fibers could be detected in the sample", "reported chrysotile" Dr. Weisler used SEM "to study general shape of chrysotile asbestos." "Dr. Weissler he did find fibers which had the general shape of chrysotile" Also found "asbestos form fibers" in samples brought by JJ which were photographed" | | YES |
| 8/31/1972 J&J-348 | Sperry Rand | J.J. Wehrung | | | SEM | Shower to Shower | Observation of asbestiform "more correctly be called fiberform". SEM "very able to identify fiberforms which may be chrysotile" | | YES? |
| 9/8/1972 D-7 | Sperry Rand | J.J. Wehrung | | | SEM | Shower to Shower | | | |
| 9/26/1972 J&J-31 | Dr. Lewin | Dr. Nashed | Dr. Fuller | | | J&J Medicated Powder; Johnson's Baby Powder; J&J Shower to Shower | Medicated Powder: tremolite 4%, Baby Powder 2-3% chrysotile; Shower to Shower 2-5% chrysotile | | YES |
| 10/27/1972 J&J-34,36,37 | McCrone | Stewart | Goudie | "the presence of asbestiform minerals" & occurrence of any asbestos type minerals | XRD, TEM | Johnson's Baby Powder batch #108T & 109T (Lewin Samples) | "both samples contained an insignificant amount of tremolite", tremolite rods | | YES |
| 2/26/1973 J&J-100 | Colorado School of Mines | Reid | Ashton | | XRD | processed talc (centrifuge) | tremolite-actinolite, slight trace of anthophillite? Chrysotile?, "asbestos type materials" | | YES? |
| 4/26/1973 J&J-44 | J&J | Petterson | Johnston | | PLM | Johnson's Baby Powder | "tremolite or actinolite are indentifiable (optical microscope)and these might be classified as asbestos fiber" | | No |
| 4/27/1973 J&J-335 | J&J | | Petterson | | optical microscope | Johnston's Baby Powder | "trace amounts of amphiboles in all samples. The optical properties of the asperities are closer to actinolite than tremolite" | | |
| 5/1/1973 J&J-367 | J&J | Miller | Petterson | | | Hammondsville ore | "the ore body contains tremolite" | Doesn't say which mine | |
| 5/8/1973 J&J-368 | J&J | Petterson | Petterson | | | Hammondsville ore | "Your question this morning was how did Lewin assay timing relate to actinolite showings? Baby Powder lots 106T & 109T were alleged to contain asbestosforms by Lewin. Talc shipments checked by microscope hard always all lots clean just prior to and right after that time. The first showing of actinolite we know about is October 1972. The indications are that things were in good shape when Lewin picked up the above two lots for his assay." | | |
| 6/6/1973 J&J-47 | Cardiff | Podety | Ashton | "determination of asbestos" | XRD, PLM | our Vermont talc Shower to Shower sample 84 (concentration technique) | actinolite | | Yes |
| 9/6/1973 J&J-258 | FDA | Stuart | | | | Vermont talc samples | "fibers of tremolite/actinolite" | | Yes |
| 12/21/1973 J&J-263 | Colorado School of Mines | Reid | Ashton | "examined for chrysotile and/or tremolite" | TEM | Vermont talc samples centrifuge | "identified chrysotile at a level of less than 10 ppm in the Vermont sample" | | Yes |

| Date / ID | Lab | Person | Location | Report / Purpose | Method | Source | Sample | Process | Finding | Notes | Conclusion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/1974 J&J-57 | McCrone, Dartmouth | | Lee | | TEM, XRD | Hammondsville | ore & product | | "chrysotile fiber suppression was indicated"; Dartmouth finds amphibole 100 to 200 ppm in ore and 9000 in ore, Microne finds chrysotile in ore and finished product | | Yes |
| Mar-74 J&J-58 | Dartmouth | Reynolds | Windsor Minerals | develop methods for measuring the concentration of asbestiform amphiboles" | XRD & XRF | talc product & ore from Windsor | ore & product | centrifuge to float talc and settle denser materials | "ore sample contains 2000ppm actinolite and the talc product contains 170 ppm actinolite", "small amounts of anthophyllite may be present" | | Yes |
| 4/24/1974 J&J-65 | McCrone | Stewart | Zeitz | determine "whether or not there was any significant content of asbestiform minerals." | XRD, TEM | Argonaut | ore | | TEM finds chrysotile and fibrous tremolite | | Yes |
| 5/8/1974 J&J-66 | McCrone | | | | optical microscope & TEM | | Windsor 66 ore & product | | ore-fiber probably tremolite & chrysotile, product: one chrysotile fiber | Possible contamination of 1 test | YES |
| 5/9/1974 J&J-366 | McCrone | | | | TEM | Argonaut | ore & product | | chrysotile fibers in ore and product of 1/3 of samples tested | | YES |
| 5/24/1974 J&J-370 | McCrone, Dartmouth Zeitz | | | analysis for "asbestiform fibers" | TEM | Hammondsville | Windsor 66 ore & product | | Table 15 McCrone Summary-probable chrysotile in 2 samples and chrysotile in 2 other samples >>>>Attachment A Dated 05-08-74>>>>>> "Sample 66-AC ore showed chrysotile fibers but in the product from the same ore beneficiation had reduced the chrysotile content to 1 fibril as mentioned above. The chrysotile fiber content of Sample 66-AC-ore represents an estimated chrysotile content of <1 ppm, thus, even in the worst case, the level of asbestos contamination present in these ores is minimal.">>>>>>>>>Attachment B>>>>>>>>"fibrous form of anthophyllite which occurs as a rare mineral in the Hammondsville ore body." | | |
| 10/31/1974 J&J-74 | McCrone | Shings | Zeitz | | | | product | | "fibrous asbestiform material" "chrysotile fibers were found" | | YES |
| 7/1/1975 J&J-89 | McCrone | Grieger | Zeitz | "determine the extent of amphibole or serpentine contamination" "we kept a running tabulation of the asbestos we could possibly identify" | TEM, SAED | | "from your ore body", Johnson's Baby Powder | | "confirmed asbestos" low to medium, "bundles of amphiboles" | | YES |
| 9/9/1975 J&J-92 | Mt. Sinai | Langer | | | TEM, PLM, XRD | | | | anthophyllite & tremolite | | |
| 11/5/1975 J&J-97 | McCrone | Grieger | Zeitz | supplement report of 7-03-75 | TEM | | ore | | Table 1 lists "fibers of asbestos" | | YES |

| Date / Bates | Lab | Author | Author | Method | Analysis note | Sample / Product | Location | Findings | Type of fiber note | YES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/25/1977 JBJ-141 | Cardiff | Pooley | | XRD | | Vermont composite sample | | fibers of antigorite composite samples-large and small fibrous tremolite | Source unknown- Mr. Ricks says look in Metadata | YES? |
| 6/14/1977 JBJ-246 | EMV | | | SEM, XRD | | ore & product | | tremolite & actinolite | | |
| 2/9/1979 JBJ-164 | George Lee's Group | Cohen | | | | 6 composite samples | | tremolite & actinolite | | YES |
| 9/1/1983 JBJ-175 | McCrone | Palenik | Miller | NIOSH method | "airborne fiber concentrations" | air samples | Argonaut, Rainbow | Argonaut -118 fibers, Rainbow- 2650 fibers | Type of fiber not specified | |
| 11/2/1984 JBJ-176 | McCrone | Palenik | Miller | TEM, EPA method | "analysis for asbestos" | air samples | | 6,600 to 60,000 chrysotile asbestos fibers All samples found asbestos | | YES |
| 5/15/1985 JBJ-177 | MSHA | Olson | | PLM, XRD | analysis for "asbestiform minerals" | Italian talc | Italian talc | 71.2% fibrous talc & "5.8% anthophyllite, an asbestiform amphibole" | | YES |
| 8/5/1986 JBJ-184 | McCrone | Laubenthal | Miller | PCM | | air samples | Hammondsville | fibers in both samples | Type of fiber not specified | YES |
| 3/30/1987 JBJ-185 | JBJ | Schmidt | Miller | | | Processed talc | Raymond Mill | "Tremolite is present in the fines (minus 100 plus 200 mesh) in six volume percent as free needles" | | |
| 4/15/1988 JBJ-190 | Skyline Laboratories, Aquatec Environmental | | | XRD | | random and composite process samples | Chester/Hamm samples | actinolite | | |
| 2/25/1992 JBJ-202 | Cyprus | Munro | | | | ore | Argonaut, Hammondsville, Black Bear | "fibrous tremolite was identified..in exposures and cores at the east Argonaut 7 Black Bear mines. Cyprus staff report past tremolite from the Hammondsville and Clifton deposits." | | |
| 0/00/0000 JBJ-298 | McCrone | | | | | Windsor grade 56 | | chrysotile | | |
| 02/09/1979 JBJ-341 | JBJ | Lee | | | | Windsor 66 composite sample | | "massive amphiboles in the 66 composite sample of Nov 6-10. the sample was forwarded to George Lee's group where the present of amphiboles was confirmed. They were identified as tremolite & actinolite" | duplicate of JBJ-164 | |
| 05/08/1958 JBJ-311 | Battelle | Smith | JBJ | Petrograph? | | Italian Talc | Italian talc | "acicular and fibrous particles of talc", the 8 to 10% of nonplaty talcds presumed to be derived from tremolite or enstatite" actinolite. The tremolite-acinolite in the sample is considered to be asbestos by current government regulations, however, it appeared to be cleavage fragments of the massive form rather than true asbestiform. typical tremolite fibers | | |
| 1/12/1984 JBJ-305 | McCrone | Palenik | Miller | PLM | | Talc powder, grade EV | | "3 to 10% non platy with trace amounts of tremolite" | | |
| 1/24/1958 JBJ-310 | Battelle | Brown | Lynch/JBJ | | | Italian talc | Italian talc | " four of the samples are suspected of containing tremolite based on the finding of one or two "fibers" per sample which satisfy the color/morphology criteria." | | |
| 4/19/1973 JBJ-296 | JBJ | Hamer | | Dispersion staining | | Johnson's Baby Powder | | | | |

| Date | J&J ID | Company | Author | Author | Author | Method | Sample | Finding | Notes |
|---|---|---|---|---|---|---|---|---|---|
| 4/27/1973 | J&J-385 | J&J | | | | petrographic optical microscope | Johnson's Baby Powder | "trace amounts of amphibole" in all 4 samples tested, "Shape- prismatic, columnar, parallel-sided rods". Size: from 20X4 microns to 200X50 microns; indentity: the optical properties of the particles are closer to actinolite than tremolite" | |
| 7/05/1976 | J&J-303 | Colorado School of Mines | | | | optical microscope | Johnson's Baby Powder | "small (1%?) amounts of amphibole needles" | No chrysotile observed |
| 8/09/1972 | J&J-342 | J&J | | | | | Shower to Shower | "trace tremolite" in 1970 and 1971 samples | |
| 8/27/1973 | J&J-299 | Dutch consumer organization | | | | electron microscope (REM) | Johnson's Baby Powder | " asbestos = content of 1.59%" | |
| 9/11/1975 | J&J-257 | McCrune | Stewart | | Zeitz | | A-HC | chrysotile fiber | Plate 4682 A-HC 51,000X Chrysotile fiber |
| 9/18/1961 | J&J-313 | Battelle | Smith | Ashton | | petrograph | Hammondsville core | 2 percent non platy talc in upper core; 14% (granular and fibrous) non platy talc with 1.2% altered amphiboles in lower core | |
| ?/?/???? | | Dutch Consumers | | | | | Johnson's Baby Powder | claimed to have found asbestos | |
| ?/?/1972 | J&J-33 | University of Minnesota | | | | determine possible content of fibrous chrysotile asbestos | TEM | Shower to Shower | "chrysotile asbestos does exist in the specimens of shower to shower" | |
| 0/00/1991 | J&J-327 | Cypress | Munro | | | | Argonaut mine | "Aggoautmain ore body open pit ...high incidence of fibre bearing zones encountered in the mean ore body" | |
| 0/00/1991 | J&J-327 | Cypress | Munro | | | | Hann mine; | "areas with fibrous actinolita" | |
| 7/9/?? | J&J-17 | Mt. Sinai | J&J | | | electron microscopy | Johnson's Baby Powder | chrysodile asbestos | |
| 10/27/1972 | J&J-26 | J&J | Nashed | Goudie | | | Johnson's Baby Powder batch # 108T & 109T (Lewin Samples) | "There are trace quantities [tremolite] present confirmed both by McCrone & Blikshton Levels are extremely low but occasionally can be seen optically. This is not new." | |

Exhibit 165

# The Cosmetic, Toiletry and Fragrance Association, Inc.

1133 15th STREET, N.W., WASHINGTON, D.C. 20005 · 202/331-1770 · TELEX 89-2673

James H. Merritt
*President*

Norman F. Estrin, Ph.D.
*Vice President—Science*

March 15th, 1976

Mr. Heinz J. Eiermann
Food and Drug Administration
200 C Street, S.W.
Washington, D.C. 20204

On March 11th, 1976, Mr. Eiermann --

-- the CTFA Talc Subcommittee met to discuss the current status of talc. It was recognized that a need exists to bring to your attention a profile of the analyses for asbestos form materials in talc used in the U.S. production of cosmetics and toiletry products.

The attached letters demonstrate responsibility of industry in monitoring its talcs. We are certain that the summary will give you assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products.

Individual companies are more than willing to discuss the detailed data with you at your convenience.

Cordially,

Norman F. Estrin, Ph.D.
Vice President - Science

NFE:jj
Attachments

J&J-0074372

JNJ 000330157

Exhibit 166

*Johnson&Johnson*

BABY PRODUCTS COMPANY                    NEW BRUNSWICK, N. J. 08903

March 15, 1976

Dr. Norman F. Estrin
Vice President - Science
Cosmetic, Toiletries, and
    Fragrance Association
1133  15th Street, N.W.
Washington, D.C. 20005

Re:  Examination for Asbestos In Talc

Dear Dr. Estrin:

The talc which is used by Johnson & Johnson is solely derived from
its own mine in Vermont, where the ore is mined selectively and
then beneficiated by the process of flotation.

Shipments of this highly purified talc are routinely examined by
our own laboratory to verify the absence of asbestos minerals.

Historically, Johnson & Johnson has always been concerned about the
mineralogical integrity of its talcs and even its earliest speci-
fications have required the examination for acicular particulates.
When it was erroneously reported in 1971 that our powder contained
asbestos, we sponsored a scientific seminar of mineralogical and
analytical experts for the FDA to prove that our talc is not con-
taminated with asbestos.  At that time numerous samples were
analyzed by experienced consultants such as McCrone Associates,
Colorado School of Mines, Professor F. D. Pooley (of the University
College, Cardiff), Professor G. Brown (of Princeton), and Professor
M. Buerger (of M.I.T.).  These examinations included X-ray diffrac-
tion analysis, differential thermal analysis, and transmission electron
microscopy.

During the period December 1972 to October 1973, 93 lots were indi-
vidually sampled and examined by X-ray diffractometry for the presence
of asbestos minerals.  No amphiboles or serpentine minerals were
detected in any sample.

---

Dr. N. F. Estrin
C.T.F.A.                              -2-                    March 15, 1976

Beginning in October 1973, differential thermal analysis was added
to our specified requirement.  Both, differential thermal analysis
and X-ray diffractometry were instituted for the routine examination
of sequential lots.  A further 100 lots have since been examined,
applying both methods to each sample.  Again, no amphibole or ser-
pentine minerals have been detected.

I would like to advise that we are continuing to employ differential
thermal analysis and X-ray diffractometry in the examination of
sequential lots for the detection of amphibole and serpentine min-
erals.

It should be pointed out that we also maintain a worldwide monitoring
of talcs used by our Johnson & Johnson affiliates, employing these
same techniques.

Finally, let me add that periodically, we also submit sub-samples
for Transmission Electron Microscope examination and these have
always verified the absence of asbestiform minerals.

It is our understanding that you would wish to submit this information
to the FDA.  Please regard this letter as non-confidential.

Sincerely yours,

George Lee
Director of Applied Research

GL/mm

WCD000009.

Exhibit 167



# The Cosmetic, Toiletry and Fragrance Association, Inc.

1133 15th STREET, N.W., WASHINGTON, D.C. 20005 · 202/331-1770 · TELEX 89-2673

James H. Merritt
*President*

Norman F. Estrin, Ph.D.
*Vice President—Science*

### TALC SUBCOMMITTEE

### M I N U T E S

A meeting of the Talc Subcommittee was held on March 31, 1976, at Bristol-Myers, 225 Long Avenue, Hillside, New Jersey. Those in attendance were:

    George Sandland, Bristol-Myers (CHAIRMAN)
    John Clements, Pfizer, Inc.
    Christopher Costello, Colgate-Palmolive
    John Facq, Colgate-Palmolive
    Allan Harvey, R.T. Vanderbilt Co., Inc.
    George Lee, Johnson & Johnson
    Ray Krammes, Whittaker, Clark & Daniels
    Roderick Mundy, Sterling Drug Inc.
    Louis Murino, Cyprus Industrial Minerals
    Fred Roesch, Whittaker, Clark & Daniels
    Robert Rolle, Johnson & Johnson
    Joseph Simko, Colgate-Palmolive
    Terry Smith, Faberge
    Harold Stanley, Charles Pfizer Co.
    Ian Stewart, Walter C. McCrone Assoc., Inc.
    Robert Suffis, Mennen Co.
    John Travers, Avon Products, Inc.
    Ronald Yakupcin, Kolmar Labs.
    Norman Estrin, CTFA

Mr. Sandland opened the meeting and proceeded with the agenda.

1. Collaborative Study

   Mr. Lee and Dr. Rolle updated the Subcommittee on reports of recent gathering of samples by the Mt. Sinai group. A suggestion was made that individual companies write directly to Mt. Sinai's management on the lack of creditability of Dr. Langer's results when applied to their specific products.

J&J-0088617

JNJ 000299024

-2-

The advantages and disadvantages were discussed in detail of engaging in a collaborative study. It was generally felt the study could not be successful if there are restrictions on which talcs can be gathered. Many members favored engaging a collaborative study. Dr. Estrin suggested a proposal be put together to be presented to the CTFA Board of Directors (as was done in the case of the microbiological contents study several years ago). A subcommittee was organized to draw up this proposal consisting of Mr. Suffis, Mr. Lee and chaired by Mr. Sandland.

2. Periodic Reporting

The Subcommittee agreed on the success of the presentation of summary reports given to the FDA. Dr. Estrin suggested the Subcommittee should not obligate itself to give periodic reports to FDA but urged members to build their data base so that at some time in the future the Subcommittee can decide whether the time is right to present FDA with an update on industry analysis.

3. Review of Talc

The planned review of talc by the Miscellaneous OTC Drug Panel was noted. It was suggested CTFA begin at once to plan for a presentation to be made by a panel of experts, including independent experts, talc suppliers and manufacturers. The actual data for consideration by the Miscellaenous Panel of summary information on talc was not known.

5. Animal Studies

Dr. Estrin suggested consideration be given to planning animal studies on talc which may not be covered adequately by previous studies. Dr. Travers, Mr. Roesch and Mr. Lee will coordinate activities involving Dr. Gressel and Dr. Finkelstein to investigate this possibility.

6. Sampling

The Subcommittee agreed CTFA should not address the issue raised by Mr. Eiermann and Dr. Schaffner further with the FDA.

There being no further business, the meeting adjourned.

Norman F. Estrin, Ph.D.
Vice President - Science

NFE:mp

J&J-0088618

JNJ 000299025

Exhibit 168

*Johnson&Johnson*

George Lee

Talc Committee
— CTFA

C O N F I D E N T I A L

DOMESTIC OPERATING COMPANY

NEW BRUNSWICK, N. J.

March 1, 1978

Mr. Charles Haynes
The Cosmetic, Toiletry and Fragrance Association, Inc.
1133 15th Street, N.W.
Washington, D.C.  20005

Dear Mr. Haynes:

I am enclosing a table which breaks the code for the recently completed CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals.  The names, addresses, and phone numbers are also included for those industrial participants whose products were involved.

In accordance with your discussions with Norm Estrin and George Sandland, Chairman CTFA Talc Subcommittee, we would request your assistance in the dissemination of these round robin results as follows:

1.   Please contact me (201/524/5518) upon receipt of this letter so that I may destroy the only other copy of this table, which is in my possession.

2.   Contact each of the industrial participants to inform them of the round robin results for their product only, as well as the actual lot tested.  Please emphasize that no talcum product failed CTFA Method J4-1, Parts I and II; i.e., no product was found to contain asbestiform amphibole at a level equal to or greater than 0.5% by weight. "Nonasbestiform Amphibole Detected" means that the product was found by CTFA Method J4-1 to contain only nonasbestiform amphibole at a level equal to approximately 0.5% or greater.

1978

J&J-0083118

Protected Document--Subject to Protective Order

JNJNL61_000062534

-2-                                    March 1, 1978

    3.  Destroy your copy of the table.

        Your participation in this final important phase of
the round robin is appreciated.  Thank you very much.

                        Sincerely,

                        John P. Schele  Chairman
                        CTFA Task Force on
                        Round Robin Testing of
                        Consumer Talcum Products

JS/gm
Enclosure

cc   (without table):  Dr. N. F. Estrin
                       Vice President-Science, CTFA
                       Mr. G. Sandland
                         Bristol-Myers Products

J&J-0083119

Protected Document--Subject to Protective Order                    JNJNL61_000062535

Exhibit 169

### Johnson & Johnson
CONSUMER PRODUCTS WORLDWIDE
SKILLMAN, NJ 08558-9418

June 27, 1995

SUBJECT:   CTFA Response to Cancer Prevention Coalition Citizen's Petition

| | |
|---|---|
| B. Fleming | J. O'Shaughnessy |
| C. Hammes | K. Schroeher |
| J. Freedman | M. McTernan |
| J. Hopkins | N. Matheson |
| J. Leebaw | N. Musco |
| J. Nugent | W. Slivka |

This forwards a copy of the subject response (submitted to FDA June 9, 1995) for your information and use.

The response was developed by members of the Talc Interested Party Task Force, edited by Dr. Steve Gettings, and reviewed by CTFA legal. As you might guess, we played a significant role in writing, editing, and providing references for the comments. Mike Chudkowski and consultants Bill Ashton and Dr. Al Wehner all contributed a great deal to the final product.

As you will see when reading the response, the petition addressed issues which had been thoroughly examined in January 1994 in a two-day FDA sponsored workshop. The comments we made point out the conclusion of the workshop participants - that cosmetic talc is safe for consumer use.

I will keep you informed of any response we receive. For perspective, the last talc citizen's petition was in FDA review for three years before a response was published.

*Donald F. Jones /es*

Donald F. Jones

es
Enclosure

cc:   W. Ashton
      M. Chudkowski
      A. Wehner

0037w.dj

Protected Document--Subject to Protective Order     JNJ 000021285

# COMMENTS

OF

# THE COSMETIC, TOILETRY, AND FRAGRANCE ASSOCIATION

IN RESPONSE TO

# A CITIZENS PETITION

FILED WITH

# THE FOOD AND DRUG ADMINISTRATION

ON NOVEMBER 17, 1994

# WHICH WOULD REQUIRE CARCINOGENIC LABELLING

ON ALL

# COSMETIC TALC PRODUCTS

FDA Docket No. 94P-0420/CP 1

June 1995

Protected Document--Subject to Protective Order

JNJ 000021286

# Table of Contents

I.   INTRODUCTION

II.  THERE IS NO EVIDENCE TO SUGGEST THAT COSMETIC-GRADE TALC IS
     A HUMAN CARCINOGEN

     A.   The Contention That Cosmetic-Grade Talc Contains Asbestos is
          Unsupportable

     B.   Talc is a Rat Carcinogen Only Under Conditions Which Produce Particle
          Overload and Related Chronic Toxicity

     C.   Consumer Exposure to Respirable Talc Particles is Several Orders of
          Magnitude Lower Than Exposures Which Result in Rat Lung Tumors

III. THERE IS NO CONVINCING EVIDENCE TO SUPPORT THE CONTENTION
     THAT FREQUENT TALC APPLICATION IN THE FEMALE GENITAL AREA
     MAY INCREASE THE RISK OF OVARIAN CANCER

     A.   Evidence for the Role of Intrinsic and Extrinsic Risk Factors in the Etiology
          of Ovarian Epithelial Cancer is Inconclusive

     B.   Epidemiological Evidence Supports Only a Weak Statistical Association
          Between Perineal Talc Use and Ovarian Cancer, the Significance of Which is
          Not Considered Meaningful

     C.   Any Weak Statistical Association is Unsupported by Evidence of a Plausible
          Biological Mechanism by Which Talc Could Cause Ovarian Cancer

IV.  CONCLUSIONS

V.   REFERENCES

Protected Document--Subject to Protective Order

## I.   INTRODUCTION

The Cosmetic, Toiletry, and Fragrance Association (CTFA)[1] is filing these comments in response to a citizens petition filed by Ms. Jill A. Cashen and Samuel S. Epstein, M.D. on behalf of the Cancer Prevention Coalition ("Petitioner") on November 17, 1994 (FDA Docket No. 94P-0420/CP 1).  Petitioner urges the Food and Drug Administration (FDA) to require "cosmetic talcum powder" products to bear labels with warnings such as "Talcum powder causes cancer in laboratory animals.  Frequent talc application in the female genital area increases the risk of ovarian cancer".  CTFA contends that such labelling is without scientific basis and is unnecessary to protect the health of consumers.

Talc (CAS No. 14807-96-6) comprises pulverized, natural, foliated, hydrous magnesium silicates (Harvey, 1988).  As a pure mineral compound, talc is mineralogically defined as hydrous magnesium silicate, with the approximate chemical formula:

$$Mg_3(Si_2O_5)_2(OH)_2$$

The largest commercial uses of talc are in industrial applications such as paint, plastics, paper, ceramics, and construction materials.  Talc utilized in direct cosmetic applications accounts for a relatively small percentage of the overall talc market.  In 1992, approximately 48,000 tons of talc were used in the United States for cosmetics, pharmaceuticals, and food products (American Westmin, Inc./Luzenac America, unpublished data).

Pharmaceutical tableting and various food applications account for approximately 8% of

---

[1]The Cosmetic, Toiletry, and Fragrance Association is the national trade association representing the cosmetic, toiletry and fragrance industry in the United States.  CTFA, founded in 1894, represents over 500 companies involved in the personal care products industry.  CTFA's active members manufacture and distribute the vast majority of personal care products marketed in the United States.  CTFA's associate member companies supply goods and services such as raw materials and packaging to the industry's manufacturers and distributors.  The personal care products industry prides itself on a long history of providing safe, reliable products to meet the diverse needs and personal tastes of the American consumer.

direct consumer uses of talc products; the greatest proportion (approximately 92%) is used in cosmetic applications. Used for decades in a wide variety of cosmetic and other applications, talc has proven to be among the safest of all consumer products. The talc industry has adopted stringent quality assurance standards set by the Food Chemical Codex, the United States Pharmacopeia and the Cosmetic, Toiletry and Fragrance Association. The focus of all three specifications is similar in that they place limits on certain extractable elements and other potential chemical contaminants. Only relatively pure talc products are capable of meeting these specifications.

Petitioner contends that labelling of cosmetic talc products is required in order to adequately warn consumers of the risk of ovarian cancer. However, the available literature and the experience of manufacturers provides no evidence that cosmetic talc, when used as intended, presents any health risk to the consumer. All current available safety information on cosmetic talc has been thoroughly reviewed (Wehner, 1994). Moreover, a panel of experts at a workshop organized by FDA and the International Society of Regulatory Toxicology and Pharmacology (ISRTP) convened to review the latest toxicological and epidemiological studies on talc concluded that the "probability of human risk [from talc] is likely non-existent under customary conditions of use "and that "while some weak association between talc exposure and ovarian tumors has been reported, it [is] not sufficient warning for concern" (Carr, 1995).

In summary, there is no evidence to suggest that cosmetic-grade talc is a human carcinogen and in particular there is no convincing evidence to show that frequent talc application in the female genital area may increase the risk of ovarian cancer. Specifically, CTFA will show that:

- the contention that cosmetic-grade talc contains asbestos is unsupportable;

Protected Document--Subject to Protective Order

09:13 JUN 07, 1995

- talc is a rat carcinogen only under conditions which produce particle overload and related chronic toxicity;

- consumer exposure to respirable talc particles is several orders of magnitude lower than exposures which result in rat lung tumors;

- evidence for the role of intrinsic and extrinsic risk factors in the etiology of ovarian epithelial cancer is inconclusive;

- epidemiological evidence supports only a weak statistical association between perineal talc use and ovarian cancer, the significance of which is not considered meaningful; and

- any weak statistical association is unsupported by evidence of a plausible biological mechanism by which talc could cause ovarian cancer.

In short, there is no scientific justification to support the Petitioners contention that cosmetic talc products should bear labels warning that "[t]alcum powder causes cancer in laboratory animals" and that "[f]requent talc application in the female genital area increases the risk of ovarian cancer".

II.   *THERE IS NO EVIDENCE TO SUGGEST THAT COSMETIC-GRADE TALC IS A HUMAN CARCINOGEN*

### A.   The Contention that Cosmetic-Grade Talc Contains Asbestos is Unsupportable

Petitioner contends that talc used in cosmetic applications contains asbestos.  This contention is based on outdated and erroneous evidence which FDA has previously refuted. Petitioner quotes early mineralogical research done by Cralley *et al* (1968) and Rohl *et al* (1976)

Protected Document--Subject to Protective Order

which sought to identify asbestos contamination in cosmetic talc. During the early 1970's FDA became concerned that cosmetic talc contained significant amounts of asbestos. However, in response to an earlier Citizens Petition "... FDA considered all analytical results to be of questionable reliability. This assessment proved to be correct because many questions were subsequently raised about results reported in the literature in the early 1970's" (letter from FDA Acting Associate Commissioner for Regulatory Affairs, 1986). In denying the Petition, FDA noted "we find that there is no basis at this time for the agency to conclude that there is a health hazard attributable to asbestos in cosmetic talc" (*Id*).

The historical association between talc and asbestos is an extremely unfortunate one. Precipitated in large part by the use of overly broad definitions of asbestos and nonspecific analytical techniques (Rohl, 1974; Rohl and Langer, 1974; Krause and Ashton, 1978; Parmentier and Gill, 1978), the idea that asbestos is commonly and intimately associated with talc is simply incorrect. As a retrograde mineral, talc may be found in association with chrysotile in serpentinites and other hydrous minerals. However, the geologic conditions under which talc and asbestos form are dissimilar. Many talc-bearing rocks form from ultramafic rocks, the central core of which is composed of serpentinite surrounded, successively, by shells of talc-carbonate rock and talc-bearing steatite (steatite is synonymous with soapstone). Usually a thin wall schistose rock, composed essentially of chlorite, separates the steatite from the country rock. The serpentinite is composed mostly of non-fibrous serpentine minerals (lizardite and antigorite), but small amounts of chrysotile asbestos may also occur within the serpentinite. The talc-carbonate and steatite shells which surround the serpentinite core contain abundant talc but do not contain asbestos. Careful mining procedures enable the serpentinite core to be avoided and thus possible contamination of talc ore with asbestos is obviated. Confirmation of the absence of asbestiform

JNJ 000021291

minerals in the finished talc product is established using x-ray diffraction, optical microscopy and electron microscopy techniques (CTFA, 1990).

**B.    Talc is a Rat Carcinogen Only Under Conditions Which Produce Particle Overload and Related Chronic Toxicity**

Petitioner contends that "[t]alc is a carcinogen, with or without the presence of asbestos-like fibers". In support of this contention, Petitioner relies on the results of studies published by the National Toxicology Program (NTP). Petitioner's reliance is misplaced in that NTP showed talc to be a rat (but not a mouse) carcinogen, and only under circumstances indicative of a secondary mechanism involving particle overload and resultant chronic toxicity. In 1992, NTP reported the results of 2 year inhalation studies designed to determine the effect of talc in experimental animals (NTP, 1993); male and female F344/N rats and B6C3F$_1$ mice were exposed to target aerosol talc concentrations of 0, 6, or 18 mg/m$^3$ for 6 hours/day, 5 days/week, for 2 years. NTP concluded that:

> *Under the conditions of these inhalation studies, there was some evidence of carcinogenic activity of talc in male F344/N rats based on an increased incidence of benign and malignant pheochromocytomas of the adrenal gland. There was clear evidence of carcinogenic activity of talc in female F344/N rats based on increased incidences of alveolar/bronchiolar adenomas and carcinomas of the lung and benign and malignant pheochromocytomas of the adrenal gland. There was no evidence of carcinogenic activity of talc in male or female B6C3F$_1$ mice exposed to 6 to 18 mg/m$^3$.*

Since its publication, the findings of NTP have been criticized by several experts in the field of inhalation toxicology with regard to both study design and conduct. Most notably these

Protected Document--Subject to Protective Order

studies were the subject of a joint ISRTP/FDA scientific workshop held in 1994 (*Talc: Consumer Uses and Health Perspectives;* January 31/February 1, 1994) which discussed the relevance of the NTP findings with regard to consumer exposure and consumer safety. Criticisms of the study made at the workshop may be summarized as follows:

*Test Article/Particle Size:* The NTP study has questionable relevance with regard to prediction of human risk due to consumer exposure since the talc sample utilized in the NTP study was of a kind which is used in industrial applications, and was not a product that would be used in a cosmetic powder application because of its extreme fineness (Zazenski et al., 1995). The test material used by NTP is an industrial grade product typically used in specialty coatings and high performance polymeric applications. The median particle size of the NTP talc sample was approximately 1.2 microns and had a top size of approximately 10 microns. In contrast, typical commercial loose talc powder has a median particle size of approximately 10 microns and a top size of approximately 45 microns (Zazenski et al., 1995).

*Exposure Levels Resulted in Lung Particle Overload:* The major criticism of the NTP study is the failure to include exposure levels which did not lead to lung particle overload. The concept of "particle overload" in chronic inhalation studies with highly insoluble particles of relatively low toxicity is now widely accepted (Morrow, 1988). Typically, exposure concentrations are relatively high and result in retained particulate lung burdens which are also high. Such retained lung burdens lead to a sequence of inflammatory responses, altered particle-clearance/retention and altered morphology, leading to chronic disease states including fibrosis and the induction of benign/malignant tumors (see Oberdörster, 1995).

Highly insoluble particles deposited in the lower respiratory tract are removed by two important mechanisms (see Oberdörster, 1995). The mucociliary escalator removes particles

JNJ 000021293

deposited in the conducting airways; particles deposited in the alveolar region are phagocytosed by alveolar macrophages (AM) which then migrate towards the mucociliary escalator and are removed (Schlesinger, 1985, Oberdörster, 1988; Snipes, 1989). When deposition rate in the alveolar region exceeds the AM-medicated clearance rate, alveolar retention halftime is considerably increased (often irreversibly) and results in excessive accumulation of particles in the lung. One further consequence of excessive accumulation is increased translocation of particles to the pulmonary interstitium which eventually results in the induction of pulmonary fibrosis (Adamson et al., 1989; Bowden et al., 1989), activation of macrophages and release of cytokines resulting in increased epithelial cell proliferation (Driscoll et al., 1990).

Based on the actual talc burdens of exposed rats (ie., as measured by NTP), Oberdörster (1995) has estimated that the pulmonary retention halftimes of the retained talc particles range between 250 and 300 days, ie., is markedly longer than the normal retention halftime for highly insoluble particles in rat lungs of ~70 days. Oberdörster has concluded that these results are indicative of lung particle overload. Oberdörster has also shown that the talc-exposed mice exhibited a marked increase in pulmonary retention halftime for talc particles with increasing lung burdens (i.e., a severe retardation of normal AM-mediated particle clearance) compared to a normal retention halftime in mice lungs. In summary, the lung particle clearance was impaired in both rats and mice in the NTP study, resulting in altered accumulation kinetics of talc particles chronically inhaled at concentrations of 6 and 18 mg/m³. The rat tumor response is thus very likely a secondary effect of the particle overload phenomenon ie., due to altered lung clearance kinetics resulting in excessively high lung burdens leading to chronic inflammatory and cell proliferative processes (Oberdörster, 1995). Conceivably, the difference in tumor response between male and female rats may be merely temporal since hyperplasia and an interstitial fibrosis

JNJ 000021294

was observed in both sexes. Oberdörster attributes the lack of pulmonary tumors in mice to the fact that rat lung tumors associated with a high pulmonary particle load appears to be a very species-specific response to non-fibrous particles (Oberdörster, 1995).

*Exposure Levels Exceeded the MTD:* The highest dose in carcinogenicity studies is generally designed to be equivalent to the maximum tolerated dose (MTD). Although this principle has become increasingly subject to criticism, high-dose testing at the MTD remains the practice of NTP. In general, the MTD is estimated following a careful analysis of data from appropriate subchronic toxicity tests. The need to consider a broad range of biological information when selecting the MTD has become increasingly clear. For example, data concerning changes in body/ organ weight, clinically significant alterations in hematologic, urinary and clinical chemistry measurements, as well as more definitive toxic, gross or histopathologic endpoints can be used to estimate the MTD.

For chronic inhalation studies with highly insoluble particles of low cytotoxicity, the phenomenon of particle overload and the question of exceeding the MTD are intimately interrelated. Recommendations of a NTP Workshop on Maximal Aerosol Exposure Concentrations in Inhalation Studies (Lewis *et al.*, 1989) included "[the] chronic study should *not* (emphasis supplied) be performed at the highest technologically feasible concentration, three concentrations should be used of which only the highest should show some interference with lung defense mechanisms, i.e., clearance impairment; and the two lower concentrations should show no interference with clearance and particle accumulation". Based on these criteria, the MTD was clearly exceeded in the studies conducted by NTP on talc.

In the NTP study, talc-induced lung tumors were not detected in male rats, female mice or male mice. In rats, the principal toxic lesions associated with inhalation exposure to talc included

Protected Document--Subject to Protective Order   JNJ 000021295

09:18 JUN 07, 1995

chronic granulomatous inflammation, alveolar epithelial hyperplasia, squamous metaplasia and squamous cysts, and interstitial fibrosis of the lung. These lesions were accompanied by impaired pulmonary function. While the talc burden in the lungs of males and females was similar, the degree of chronic toxicity and inflammation was substantially higher in females. In mice, inhalation exposure to talc produced some chronic inflammation. In contrast to rats, alveolar epithelial hyperplasia, squamous metaplasia, and interstitial fibrosis were not observed. Overall, markedly less talc-induced lung toxicity was produced in mice than in rats. In summary, it is apparent that an increase in lung tumors was seen only in the test animals that clearly exhibited the highest degree of chronic lung toxicity, (ie., the female rats exposed to 18 mg/m$^3$ talc). Similarly, the increased incidence of pheochromocytomas is most likely attributable to the stressful conditions (eg., as a result of physiological, metabolic or endocrine changes) to which the test animals were exposed. In addition, the F344/N rat is known to have a high background incidence of pheochromocytomas (NTP, 1993). The relevance of these responses with regard to extrapolation to humans is thus highly suspect (Goodman, 1995).

The unmistakable conclusion from these observations is that the MTD was exceeded in the female rats exposed to the high dose, and that talc is not expected to cause lung tumors under conditions of exposure that fail to result in marked chronic lung toxicity (Goodman, 1995). In contrast to Petitioner's characterization of the results of the NTP study, clear evidence of carcinogenic activity of talc was seen *only* in female rats (not male or female mice) exposed to the high dose of talc and *only* under circumstances in which there was evidence of particle overload and marked chronic lung toxicity. In summarizing it's assessment of the NTP study, the panel of experts at the ISRTP/FDA workshop *Talc: Consumer Uses and Health Perspectives* characterized the positive results in female F344/N rats as "likely experimental artifact...[a] non-

JNJ 000021296

specific generic response of dust overload of the lungs, and not a reflection of a direct activity of talc. Given the gross differences of rodent and human lungs, the lung clearance capabilities of humans and the possible conditions of customary human exposures, the NTP bioassay results in F344/N rats cannot be considered as relevant predictors of human risk" (Carr, 1995).

**C.   Consumer Exposure to Respirable Talc Particles is Several Orders of Magnitude Lower Than Exposures Which Result in Rat Lung Tumors**

Although Petitioner would require warning labels to the effect that "[t]alcum powder causes cancer in laboratory animals", the implication is that talc exposure constitutes human risk of cancer. Such an implication is unwarranted since consumer exposure to talc is considerably lower than exposures which result in rat lung tumors. Consumers are exposed to talc during the application and use of body powders. In this regard, human exposure occurs principally via the dermal route, but primary concern has focused on exposure via the respiratory tract. Talc miners and millers are exposed to long-term, relatively high concentrations of airborne talc; the results of human cohort studies involving cosmetic grade talc miners and millers thus provide a useful basis against which pulmonary risk to consumers may be estimated (Scansetti et al., 1963; El-Ghawabi et al., 1970; Rubino et al., 1976; Gamble et al., 1982; Wegman et al., 1982; Leophonte et al., 1983; Wergeland et al., 1990). These studies show that a pneumoconiosis (talcosis) risk does exist but only when respirable talc dust levels are significantly greater than worst-case consumer exposures (described below) and exposure is over an extended period of time (several years).

While there may be disagreement over the amount of exposure required to induce pneumoconiosis, such studies suggest that talc poses a low to moderate pulmonary risk in an industrial setting. For example, in a mortality and morbidity study of Italian talc miners and millers, radiographic abnormalities consistent with pneumoconiosis were found among talc

workers after an average duration of exposure for 22 years, with an average respirable dust concentration of approximately 11 mppcf (Rubino, et al., 1976); in contrast, in a study involving French talc workers, no cases of pneumoconiosis at a level of 15 mppcf were reported (Leophonte, et al., 1983). Although it is difficult to reliably convert respirable particle count data (mppcf) into respirable gravimetric data (mg/m$^3$), such levels typically fall into the 1-2 mg/m3 range (e.g., in a study of Vermont talc miners and millers (Boundy et al., 1979), pneumoconiosis was observed when respirable dust levels ranged from 0.5 to 2.9 mg/m3). Despite the incidence of pneumoconiosis at high industrial exposure levels it is important to note that an excess prevalence of lung cancer in talc mining populations has not been observed (Selevan et al 1979; Leophonte et al., 1983; Wergeland et al., 1990; Rubino et al., 1976).

Electrostatic, Van der Waal's and valance charges present on the particulate surfaces of a dry powder such as talc result in substantial particle-to-particle agglomeration, thereby increasing effective mass, diameter, and settling velocity (Carta et al., 1981; Gajewski, 1990). These factors are important with regard to influencing the respirability of dry particles. Two studies have been conducted to evaluate exposures to respirable particles during application of talc as an adult body powder and as a baby powder (Russell et al., 1979; Aylott, et al., 1979). In both studies, respirable particles (≤ 10 microns) were collected usig a cyclone particle fractionation system operating at an air flow rate of 1.7-1.9 liters/minute. Adult exposure was assessed during normal face/body powdering practices by placing cyclone collection units on shelves at appropriate face height, or by positioning a cyclone attached to a headband near the nose (i.e., in the subjects breathing zone). To evaluate the exposure of babies to talc, sampling units were placed on the changing table near the infants' (or doll's) heads during normal powdering practices (i.e., while changing a diaper). Talc was dispensed using common twist-top, sprinkle-type containers, or in

Protected Document--Subject to Protective Order

JNJ 000021298

09:21 JUN 07, 1995

the case of face powder, powder puffs. Exposure of adults to respirable particles during application of talc ranged from 0.48 to 2.03 mg/m$^3$, while the exposure to babies ranged from 0.19 to 0.21 mg/m$^3$. When these numbers are extrapolated to 8-hour time weighted average exposures, they range from <0.001 to 0.005 mg/m$^3$ (Zazenski et al., 1995). For comparison purposes, the current OSHA/ACGIH permissible industrial exposure limit for talc is 2.0 mg/m$^3$ as an 8 hour time-weighted average (ACGIH, 1992), i.e., the industrial permissible limit is approximately 350 times greater than the worst case consumer use of cosmetic grade talc.

Based upon the determinations reported in the literature, human exposure to respirable talc particles during normal product use are approximately 2,000-20,000 times lower than those used to expose rats and mice in inhalation studies conducted by the NTP (Zazenski et al., 1995). Although a direct comparison of the dosimetry of inhaled materials between rodents and humans is far from simple (Dahl et al., 1991), such a broad difference in exposure level is quite striking. The incidence of tumors resulting from massive exposures such as those involved in the NTP talc inhalation study are more likely to reflect a particle overloading effect in the experimental animals (Morrow, 1988; Morrow, 1992; Oberdörster, 1988) than any genotoxic effect associated with the test material (Endo-Capron et al., 1993).

As previously noted, the talc sample utilized in the NTP study was not a product that would be used in a cosmetic powder application because of its extreme fineness (SECTION II. B). Further, the NTP talc aerosol was exposed to Kr-85 gamma radiation immediately prior to its introduction into the exposure chambers containing the experimental animals. Use of ionizing radiation was intended to neutralize the electrical charge imparted on the talc particles during aerosolization. Charge neutralization tends to decrease agglomeration and results in deposition of particles in the deep lung of exposed animals. Thus, while selection of an ultra-fine product

Protected Document--Subject to Protective Order

combined with procedures designed to maximize particle dispersion may be entirely appropriate from a toxicological perspective, such an artificial environment has questionable relevance with regard to actual human exposure from commercial cosmetic talc products under use conditions.

## SECTION II. SUMMARY

The issues raised by Petitioner with regard to asbestos contamination of cosmetic-grade talc have previously been addressed by FDA. In 1986, FDA concluded that there was no health hazard attributable to asbestos in cosmetic talc. Since that time no new evidence has arisen which would suggest a conclusion to the contrary; moreover, appropriate selection of mine site, careful mining procedures and the utilization of modern beneficiation techniques have further safeguarded against asbestos contamination. Accordingly, CTFA believes that FDA's response to the issue of asbestos contamination raised by Petitioner should be no different than its response in 1986.

With regard to Petitioner's assertion that talc is an animal carcinogen, the NTP chronic inhalation study has been subject to severe criticism. The test material used by NTP was characterized by an extremely small particle size and is not characteristic of material used for cosmetic talc applications. Further, the exposure levels chosen by NTP clearly exceeded the MTD for talc and were such that exposure resulted in impairment of lung clearance mechanisms and a condition known as particle overload. Because any highly persistent particulate compound of low cytotoxicity has carcinogenic potential, particularly in rats, when chronically inhaled at such high concentrations, the classification of such particles with respect to pulmonary carcinogenicity must be carefully evaluated. In the absence of any evidence of a toxic or genotoxic effect *per se*, the only reasonable conclusion which may be drawn from the studies conducted by NTP is that the carcinogenic effect of talc is a secondary phenomenon which does

JNJ 000021300

not occur in the absence of chronic toxicity which is itself a result of particle overload.

In summary, the application of the results of the NTP study with regard to human risk assessment are highly questionable. Consumer exposure to respirable talc particles is several orders of magnitude lower than exposures which result in rodent tumors. There is no evidence of chronic toxicity following consumer exposure to talc, thus use of the lung tumor endpoint in female rats as the basis of extrapolation to human risk is inappropriate. Clearly, Petitioner's request that FDA require warnings such as "[t]alcum powder causes cancer in laboratory animals", with it's implicit message that talc may cause human risk of cancer, is both misleading and may cause consumers unnecessary concern. As such, Petitioner's request should be denied.

III.  *THERE IS NO CONVINCING EVIDENCE TO SUPPORT THE CONTENTION THAT FREQUENT TALC APPLICATION IN THE FEMALE GENITAL AREA MAY INCREASE THE RISK OF OVARIAN CANCER*

A.  **Evidence For The Role Of Either Intrinsic Or Extrinsic Risk Factors In The Etiology Of Ovarian Epithelial Cancer Is Inconclusive**

The etiology of human ovarian epithelial cancer is not clearly understood. Ovarian tumors of epithelial origin, which include serous, mucinous, endometrioid, clear cell and undifferentiated adenocarcinomas and the Brenner tumor, are responsible for the majority of ovarian malignancies (Cannistra, 1993; Slotman and Roa, 1988). The purported extrinsic and intrinsic risk factors which contribute to the incidence of epithelial cancer of the ovary have been the subject of numerous reviews (Shoham, 1994; Kelsey et al., 1994; Dietl and Marzusch, 1993; Parazzini et al., 1991; Baylis et al., 1986; Heintz et al., 1985). While a number of scientists have attempted to identify various extrinsic risk factors, including environmental (e.g. tobacco and talc), infectious disease (e.g. mumps, rubella), and dietary intake (e.g. lactose, animal fat, alcohol, caffeine) as

Protected Document--Subject to Protective Order

potential etiologic agents, the data are inconclusive. At best, some studies have demonstrated a relationship between dietary factors and the incidence of ovarian epithelial cancer: in particular, an increased risk for ovarian cancer has been reported for women who consume diets which are high in animal fat (Shu et al., 1989; Mori and Miyake, 1988; La Vecchia, et al., 1987) and lactose (Cramer, 1989; Cramer et al., 1989).

Research investigating intrinsic risk factors has provided evidence which suggests that reproductive history and molecular factors are strongly linked to carcinogenesis of the ovarian epithelium. It is well documented that suppression of ovulation, either by pregnancy or by oral contraceptive use, decreases the risk for developing ovarian cancer (McGowan et al., 1979; Wu et al., 1988; Mori et al., 1988; Booth et al., 1989). Ovulation is a physiologic process which is mediated by hormones (gonadotropins) and results in repeated ruptures in the surface epithelia of the ovary. Following ovulation, a repair process takes place whereby there is an increase in epithelial cell mitotic activity. The reduced risk afforded by pregnancy or by oral contraceptive use is postulated to be meditated by the subsequent decrease in circulating gonadotropins and/or the suppression of ovulation (Whittemore, et al., 1992). Evidence supporting the etiologic role of ovulation has been provided by *in vitro* studies demonstrating that the repeated cell division of ovarian surface epithelial cells results in a malignant transformation (Godwin et al., 1993).

Molecular events associated with the initiation of ovarian cancer have recently been reviewed (Berek and Martinez-Maza, 1994; Godwin et al., 1993). Genetic mutations are molecular events which can lead to tumor formation. Studies assessing family history have reported a genetic predisposition to ovarian cancer (Patel and Obrams, 1993; Hartge et al., 1989) which appears to be inherited on an autosomal dominant gene (Slotman and Rao, 1988). Specific loss of a gene at the *6q* chromosomal loci has been identified in ovarian tumors (Lee et al., 1990);

Protected Document--Subject to Protective Order                    JNJ 000021302

09:24 JUN 07, 1995

additionally, genetic alterations on chromosomes 1,3, 14 and 17 have been identified in certain ovarian carcinomas (Daly, 1992). Mutations can result in chromosome alterations and the subsequent inactivation of a particular gene. Studies conducted by Hoffman and colleagues (1993) have demonstrated a reduced expression of a cell adhesion molecule (E-cadherin) in an *in vitro* model of ovarian epithelial carcinogenesis. Genetic alterations can also lead to the overexpression of a gene. Proteins encoding certain chemical messengers (cytokines), such as IL-6 (interleukin 6), M-CSG (macrophage colony stimulating factor) and TNF (tumor necrosis factor) have been found to be increased in epithelial ovarian cancer cells (Malik and Balkwill, 1991).

In summary, the events which lead to development of ovarian epithelial cancer are not clearly understood. A variety of intrinsic and extrinsic risk factors may be involved. However, in light of the fact that cancer is a disease which evolves at the molecular level, it is likely that research investigating the molecular aspects of ovarian cancer may provide important insight how such risk factors relate to incidence. It is significant in this respect that a thorough review of the toxicology of talc reveals no evidence any genotoxicity (Wehner, 1994).

B.    **Epidemiological Evidence Suggests Only a Weak Statistical Association Between Perineal Talc Use and Ovarian Cancer, the Significance of Which is Not Considered Meaningful**

Although several studies on the possible association between perineal talc use and ovarian cancer have been published, any evidence of such an association remains equivocal. At most, the statistical association is weak and in the absence of evidence of a plausible biological mechanism (SECTION III. C) is insufficient to warrant public health concern. There have been seven case-control studies and one cohort study that have been published containing information regarding

Protected Document--Subject to Protective Order

the risk of ovarian cancer in women using talc in their perineal region (Cramer et al., 1982; Hartge et al., 1983; Whittemore et al., 1988; Booth et al., 1989; Harlow and Weiss, 1989; Harlow et al., 1992; Rosenblatt et al., 1992; Hankinson et al., 1993). Talc exposure was the primary focus in only four of these studies (Cramer et al., 1982; Hartge et al., 1983; Harlow and Weiss, 1989; Harlow et al., 1992).

Cramer *et al* (1982) investigated whether there is an association between exposure to certain hydrous magnesium silicates (including talc), and the incidence of ovarian cancer. Population-based matched controls were randomly selected, and stratification and logistic regression were used to accommodate confounders. Overall, 42.8% of cases and 28.4% of controls reported exposure to talc, via direct application to the perineum, by dusting sanitary napkins, or both. The unadjusted odds ratio (OR) of ovarian cancer for any perineal exposure as opposed to no perineal exposure was 1.89 (95% CI 1.27-2.82). Adjustment was then made for parity and menopausal status. Women who used talc on both the perineum and sanitary napkin had an adjusted OR of 3.28 (95% CI 1.68-6.42) and for any exposure, 1.61 (95% CI 1.04-2.49). The reduction in risk from 1.89 to 1.61 for perineal talc exposure due to logistic regression is largely unexplained and may be due to residual confounding. No dose-response or duration data were reported. While a major strength of the study is the use of neighborhood controls, the nonparticipation rate among controls was relatively high (260/475=55%).

Hartge *et al* (1983) investigated the association between talc use and the risk of ovarian cancer but reported no significant finding. The cases were women with pathologically confirmed primary epithelial ovarian cancer, while the hospital based controls had non-gynecological conditions (psychiatrically disturbed women, pregnant women, and women with other malignancies were excluded). Controls were frequency matched on age, race and hospital. For

Protected Document--Subject to Protective Order

JNJ 000021304

09:26 JUN 07, 1995                                                    #23706  PAGE: 22/39

the group of women who did not use talc versus the group of women who did, the unadjusted OR of ovarian cancer was 0.776 (95% CI 0.47-1.20). Although no attempt was made to control for potential confounding variables, this nonsignificant odds ratio was unaffected by adjustment for parity, race and age.

Lifetime consumption of coffee, tobacco and alcohol were the principal exposure factors studied by Whittemore *et al* (1988). Women diagnosed with ovarian cancer in the San Francisco Bay area between 1983-5 provided the cases for this study. Matched controls from two groups, hospital and population, were obtained. The hospital controls were selected from the same hospitals as the cases, whereas the population controls were selected using random digit dialing. All controls were matched to cases on age, race, and having at least one ovary. Logistic regression was used to adjust for confounders. While this study examined other potential risk factors as well as talc exposure in relation to ovarian cancer, the study did not find evidence of an association between genital talc exposure and an increased risk of ovarian cancer. While women who reported regular use of talc on the perineum showed a marginally significant increase in relative risk, no other differences were noted between cases and controls when considering other types of perineal talc exposure either alone or taken in combination. The unadjusted OR of ovarian cancer for any perineal exposure as opposed to no perineal exposure was 1.19 (95% CI 0.85-1.66). Adjusted for parity, the OR was 1.40 (95% CI 0.98-1.99). Other odds ratios also failed to produce significant associations. Several sources of bias were identified, including failure to interview all eligible cases, the potential pitfalls in combining hospital and population controls, confounding by differential talc use among women with characteristics predictive of ovarian cancer and random error in reported talc use tending to attenuate relative risk estimates. The study raises the possibility that a hormonal factor that may place women at a higher risk for the

Protected Document--Subject to Protective Order
JNJ 000021305

disease may also promote their use of talc.

Booth *et al* (1989) studied various potential risk factors for ovarian cancer including infertility, oral contraceptive use, parity, age at menopause, and genital talc use. Women with a diagnosis of ovarian cancer and treated at a London cancer hospital were each age matched to two hospital controls at 15 other hospitals. Non-participation rates were not provided, and one hospital providing more than 25% of the cases provided no controls. In addition, cases were generally older and in a higher social class than controls. All odds ratios were adjusted for social class in six categories. Maximum likelihood estimates of the odds ratios with the corresponding 95% confidence intervals were obtained. Logistic regression was used to test for trends. The results were inconclusive since weekly talc use showed a higher OR of ovarian cancer (2.0) than did daily use (1.3), (95% CI 1.3-3.4 and 0.8-1.9, respectively). Furthermore, there was no significant difference between cases and controls who used talc in conjunction with a diaphragm. The unadjusted OR of ovarian cancer with regard to talc use was a statistically nonsignificant 1.29 (95% CI 0.92-1.81). Overall, the study does not support the hypothesis that use of perineal talc increases the risk of ovarian cancer.

Harlow and Weiss (1989) investigated whether application of perineal talc application is associated with an increased risk of serous and mucinous borderline ovarian tumors. Cases (residents of three urban, western Washington state counties diagnosed as having a serious or mucinous borderline ovarian tumor) were identified from the corresponding population-based cancer reporting system. Controls were population-based and located through random digit dialing. Women who reported any perineal use of dusting powders had an adjusted OR of 1.1 (95% CI 0.7-2.1) for borderline ovarian tumor. The adjustment was for age, parity, and use of oral contraceptives but not for other possible confounders. Women using deodorizing powder

JNJ 000021306

09:27 JUN 07, 1995

with or without baby powder (the only powder reported by women using a second powder) showed an increased risk of borderline tumor development, OR of 2.8 (95% CI 1.1-11.7). The elevated risk of borderline ovarian cancer among women who specifically used deodorizing powders may have been due to chance or applicable only to borderline but not malignant tumors.

Harlow *et al* (1992) investigated whether the use of talc increases the risk for epithelial ovarian cancer. Between July, 1984, and September, 1989, cases were diagnosed with borderline or malignant epithelial ovarian cancer at 10 different Boston metropolitan hospitals. Population controls were age matched and were all Caucasian. The influence of confounders and effect modifiers was assessed through stratification and logistic regression. Overall, 49% of cases and 39% of controls reported exposure to talc, yielding an OR of 1.5 (95% CI 1.0-2.1) for ovarian cancer. Among women with perineal exposure to talc, the risk was significantly elevated in subgroups of women who applied it directly as body powder (OR of 1.7; 95% CI 1.1-2.7). Women with an intact genital tract (and who had at least 10,000 applications while ovulating) showed an OR of 2.8 (95% CI 1.4-5.4). Although this study seemingly suggests a small increased risk of epithelial ovarian cancer due to lifetime use of perineal talc, the association is still not entirely clear. One important potential confounder that was not accounted for in this study was oral contraceptive use. More controls used oral contraceptives than cases, and oral contraceptive use was associated with less reported talc exposure. Thus, use of oral contraceptives is a possible strong confounder that, if properly considered, could eliminate any observed effect.

Rosenblatt *et al* (1992) studied the relationship between "fiber" exposure (Note: these investigators mischaracterize talc as "fiber"; other exposures include asbestos and fiberglass) and epithelial ovarian cancer. Controls, who were hospital-based and free of gynecological and malignant conditions, were matched to cases by age, race and date of diagnostic admission. Due

Protected Document--Subject to Protective Order

to the strict inclusion criteria, controls could not be found for each case. Thus although 140 new cases were located and 108 were successfully interviewed, only 77 cases were entered into the study. The OR (adjusted for number of live births) was 1.0 (95% CI 0.2-4.0) for women reporting any genital "fiber" use versus those women who were not so exposed; the unadjusted OR was 0.84 (95% CI 0.27-2.63). An increased risk of ovarian cancer was observed for women who used talc on their sanitary napkins with an OR of 4.79 (95% CI 1.29-17.79). However, among the remaining eight odds ratios, none was statistically significant. While there seems to be an elevated risk of ovarian cancer in women who used talc on sanitary napkins, this finding is not supported by other studies (eg., Harlow *et al.*, (1992) did not report an elevated risk in this category).

The most recent study in which an indirect comparison of ovarian cancer incidence in talc users versus nonusers can be made was reported by Hankinson *et al* (1993). The purpose of this study was to assess whether tubal ligation and hysterectomy affected subsequent risk of ovarian cancer based upon the hypothesis that such procedures could prevent translocation of talc to the ovaries. In reporting a finding of no association between talc use and an increased risk of ovarian cancer the authors found that tubal ligation was "highly protective in women who reported never using talc". Such a finding tends to discount the talc translocation hypothesis discussed in SECTION III.C, below).

In reviewing evidence of the proposed association of talc exposure and ovarian cancer, the panel of experts at the ISRTP/FDA workshop *Talc: Consumer Uses and Health Perspectives* found that the "epidemiologic data are conflicting and remain equivocal" (Carr, 1995). The panel noted the problems connected with the epidemiology of weak associations and the fact that any properly designed study to determine the association between perineal talc use and ovarian cancer

Protected Document--Subject to Protective Order

must account for other possible risk factors. These other factors include (but are not necessarily limited to) age, oral contraceptive use, number of term pregnancies, menopausal status, and other, environmental factors such as smoking status, alcohol and caffeine consumption. Other confounding variables, such as vulvovaginal diseases and obesity may also be causally related to ovarian cancer (Rosenblatt et al., 1992). In such instances (where talc use is associated with such conditions because of the degree of comfort it imparts to those affected), any statistical association between talc use and ovarian cancer may be merely coincidental.

In summary, the results of epidemiological studies are inconsistent and ambiguous. Any reported association between perineal talc use and ovarian cancer is weak and statistically barely significant. The biological significance (and hence public health significance) of any such weak association remains obscure.

### C.   Any Weak Statistical Association is Unsupported by Evidence of a Plausible Biological Mechanism by Which Talc Could Cause Ovarian Cancer

As previously described (SECTION III. B), several investigators have proposed that, based on weak epidemiological evidence, chronic perineal use of talc, including direct application or application to under garments, sanitary napkins or diaphragms, may increase the risk of ovarian cancer. In order for this to occur, talc particles (which have no inherent locomotive capability) would have to migrate from the perineum to the ovaries of exposed individuals. In order to try to identify such a potential translocation process, several studies have been conducted in various species, including humans. Many of these studies are so fraught with problems as to render the results of such studies ambiguous.

Egli and Newton (1961) have claimed that half an hour following vaginal deposition of carbon black particles, translocation occurred from the vagina to the oviducts in two of three

Protected Document--Subject to Protective Order

JNJ 000021309

female patients. The results of this study are subject to considerable doubt since the investigators failed to utilize either solution or filter blanks as negative controls. Wehner *et al* (1985) subsequently conducted a similar study in cynomolgus monkeys and found no difference in the number of carbon black particles in the blanks compared to the oviduct rinse solution.

In a study conducted by De Boer (1972), carbon black particles were deposited in the uterus, cervical canal, or vagina of over 100 patients prior to abdominal surgery. Subsequent evaluation showed that when deposited in the uterus, carbon black particles translocated to the oviducts and beyond; particles placed in the cervical canal migrated to a lesser extent. Translocation from the vagina occurred in only 2 of 37 patients: in both cases the patients were placed in the Trendelenburg position, resulting in a negative intra-abdominal pressure. Such negative pressure was considered by the investigator to have been sufficient to draw up material from the vagina, especially when the patient was anesthetized and had a relaxed cervix.

Translocation studies have also been performed in laboratory animals. Henderson *et al* (1986) injected a suspension of talc particles into the cervical canal of 8 female ex-breeder Sprague-Dawley rats. A group of four animals was sacrificed 5 days later, while the remaining 4 animals received additional installations 6 and 15 days following initial treatment. Two of these animals were further administered the talc suspension at 22 and 30 days; six other animals received intra-vaginal injections of talc particles. Subsequent evaluation showed that all animals receiving intrauterine deposition of talc (and 2 of 6 receiving intra-vaginal administration) resulted in the detection of talc particles in the ovaries. Wehner (1994) has suggested that the hydrostatic pressure of the saline solution enhanced the potential for translocation under such conditions. In contrast Phillips *et al* (1978) found no radiolabel in the ovaries of rabbits given either single or multiple intra-vaginal doses of $^3$H-labelled talc.

JNJ 000021310

An attempt to quantify the amount of talc supposedly found in human ovarian tissue (normal ovaries, cystic ovaries, and ovarian adenocarcinomas) has been made by Henderson *et al* (1979). According to these investigators, normal ovarian tissue contained up to 55,100 particles of talc per gram of wet weight of tissue, while cystic ovaries and ovarian adenocarcinomas contained up to 24,300 particles. However, because talc is ubiquitous, especially in a laboratory or surgical setting, it is difficult to determine if the talc observed in such clinical specimens is due to a specific exposure or contamination. In order to specifically and clearly evaluate the potential for translocation of talc from the vagina to the ovaries, Wehner *et al.* (1986) used neutron-activated talc with subsequent gamma-ray analysis in order to rule out contamination. These investigators used cynomolgus monkeys since the physiological and anatomical characteristics of this species resembles the human female more closely than any other readily available laboratory animal (cynomolgus monkeys have an estrous cycle of 28 days and menstruation lasts 2-7 days). Neutron-activated talc was deposited in the vagina for 30 consecutive working days (45 calendar days); thus exposure occurred through at least one menstrual cycle. Oxytocin was administered once per week during the study to induce the type of uterine contractions thought to occur during coitus and which may enhance the translocation process. The vagina/cervix, uterus, oviduct, ovaries and peritoneal lavage fluid of exposed animals were subsequently examined. Talc was observed only at the site of administration (vagina/cervix) and none was found in the ovaries.

In the carcinogenicity studies conducted by NTP (see SECTION II. B) male and female F344/N rats and B6C3F1 mice were exposed to target aerosol concentrations of 0,6 and 18 mg/m³ talc for 6 hours daily, 5 days per week, for two years. Such conditions resulted in exposure via inhalation, oral and dermal (including perineal) routes. Initial tissue examination found no exposure-related lesions in either rat or mouse ovaries (NTP, 1993). Subsequent

Protected Document--Subject to Protective Order

histological examination of the ovaries and ovarian bursa from rats confirmed this finding and demonstrated no material consistent with the appearance of talc in any animals from any group (Boorman and Seely, 1995).

In summary, available histologic and physiologic studies provide no concrete basis to conclude that talc can plausibly migrate to the ovaries from the perineal region. In the absence of such biological evidence, conflicting and equivocal evidence of a weak statistical association between perineal talc use and ovarian cancer is insufficient to "raise concern at level sufficient to warrant regulatory or public health measures" (Carr, 1995).

## SECTION III. SUMMARY

Although several possible intrinsic and extrinsic risk factors have been suggested, the etiology of ovarian epithelial cancer is presently unknown. Critics of the supposed association between talc and ovarian cancer highlight the reported weak associations and the numerous confounding variables (e.g., interview case/control comparisons, failure to adequately address key independent risk factors, etc.) which characterize much of the epidemiological research in this area. Further, experimental studies in which neutron-activated talc was repeatedly introduced into the vagina of cynomolgus monkeys, failed to demonstrate translocation to the cervix, uterus or ovaries. The results of these studies in monkeys suggest that any increased risk of ovarian cancer following perineal exposure to talc is biologically implausible. While deserving of further study, a causal association between perineal talc application and ovarian cancer appears improbable at this time.

## IV.   CONCLUSIONS

Protected Document--Subject to Protective Order

JNJ 000021312

In January 31- February 1, 1994, a workshop organized by FDA and the International Society of Regulatory Toxicology and Pharmacology (ISRTP) was convened to provide a forum for an updated discussion of the origins, manufacture, characterization, toxicology and epidemiology of talc.[2]  The principal focus of the meeting was on the latest toxicologic and epidemiologic studies and their significance with regard to the safe uses of talc in consumer products.

At the conclusion of the workshop, a panel of independent experts were able to reach a series of unanimous conclusions.  With regard to the NTP talc bioassay in rodents, the panel found that "because of the extreme doses and the unrealistic particle sizes of the talc employed, because of the negative results in mice and male rats, because of the lack of tumor excess at the low doses, and because of the clear biochemical and cytological markers of excessive toxicity in female rats, the positive talc bioassay results in female F344/N rats are likely the result of experimental artifact and a non-specific, generic response of dust overload of the lungs, and not a reflection of a direct activity of talc.  Given the gross differences of rodent and human lungs, the lung clearance capabilities of humans and the possible conditions of customary human exposures, the NTP bioassay results in F344/N female rats cannot be considered as relevant predictors of human risk" (Carr, 1995).

With regard to the proposed association of talc exposure and ovarian cancer, the panel found that "epidemiologic data are conflicting and remain equivocal".  "Diet, parity, contraceptive use, ovulatory frequency, familial predisposition, age to menarche and menopause amongst other factors [are] associat[ed] strongly (and plausibly) with ovarian cancer incidence" (Carr, 1995).

---

[2] These conclusions are in large part based upon an Executive Summary which prefaced a series of papers published as the proceedings of the FDA/ISRTP Conference, *Talc: Consumer Uses and Health Perspectives* (Carr, 1995).

Protected Document--Subject to Protective Order

JNJ 000021313

09:33 JUN 07, 1995

These possible confounders, as well as control selection biases, etc., interviewer and interviewee biases, as well as other factors, may well explain the conflicting results that have appeared in the literature. In summary "...epidemiologic studies have provided weak and conflicting risk signals for [the] association [between talc use and ovarian cancer], and it is unlikely that further studies may prove adequate to raise concern at a level sufficient to warrant regulatory or public health measures " (Carr, 1995).

In conclusion, there is no basis to Petitioner's request that cosmetic talc products should bear warning labels to the effect that talcum powder causes cancer in laboratory animals or the "[F] requent talc application in the female genital area increases the risk of ovarian cancer". When used as intended, talc presents no health risk to the consumer. Accordingly Petitioner's request for warning labels on talc-containing cosmetic products should be denied.

## V. *REFERENCES*

### SECTION L

Carr, C.J. (1995). Papers presented at the *International Society of Regulatory Toxicology and Pharmacology/U.S. FDA Workshop on Talc: Consumer Uses and Health Perspectives,* Bethesda, Maryland, January 31-February 1, 1994. Workshop participants and Executive Summary. *Regul. Toxol. Pharmacol.* **21**, 211-215.

Harvey, A.M. (1988). Talc. In *Pigment Handbook (2nd Edition) (Vol. I. Properties and Economics)* (P.A. Lewis, Ed.) pp. 219-225. John Wiley & Sons, Inc., New York, NY.

Wehner, A.P. (1994). Biological effects of cosmetic talc. *Fd. Chem. Toxicol.* **32**(12), 1173-1184.

### SECTION II. A

Cralley, L.L., Key, M.M., Goth, D.H., Lainhart, W.S., and Ligo, R.M. (1968). Fibrous and mineral content of cosmetic talcum products. *Am. In. Hyg. Assoc. J.* **29**(4), 350-354.

Protected Document--Subject to Protective Order

JNJ 000021314

CTFA (1990). CTFA Method J4-1, Asbestiform Amphibole Minerals in Cosmetic Talc. In *Compendium of Cosmetic Ingredient Composition. Methods.* Cosmetic, Toiletry and Fragrance Association, Washington, D.C.

Krause, J.B., and Ashton, W.H. (1978). Misidentification of asbestos in talc. In *National Bureau of Standards Special Publication 506. Proceedings of the Workshop on Asbestos: Definitions and Measurement Methods held at NBS, Gaithersburg, MD, July 18-20, 1977,* pp. 339-353.

Parmentier, C.J. and Gill, G.J. (1978). Practical aspects of talc and asbestos. In *National Bureau of Standards Special Publication 506. Proceedings of the Workshop on Asbestos: Definitions and Measurement Methods held at NBS, Gaithersburg, MD, July 18-20, 1977,* pp. 403-411.

Rohl, A.N. (1974). Asbestos in talc. *Environ. Health Perspect.* **9**, 129-132.

Rohl, A.N., and Langer, A.M. (1974). Identification and quantitation of asbestos in talc. *Environ. Health Perspect.* **9**, 95-109.

Rohl, A.N., Langer, A.M., Selikoff, J., Tordini, A., and Klimentidis, R. (1976). Consumer talcums and powders: Mineral and chemical characterization. *J. Toxicol. Environ. Health* **2**, 255-284.

## SECTION II. B

Adamson, I.Y.R., Letourneau, H.L., and Bowden, D.H. (1989). Enhanced macrophage-fibroblast interactions in the pulmonary interstitium increases fibrosis after silica injection to monocyte-depleted mice. *Am. J. Pathol.* **134**(2), 411-418.

Bowden, D.H., Hedecock, C., and Adamson, I.Y.R. (1989). Silica-induced pulmonary fibrosis involves the reaction of particles with interstitial rather than alveolar macrophages. *J. Pathol.* **158**, 73-80.

Carr, C.J. (1995). Papers presented at the *International Society of Regulatory Toxicology and Pharmacology/U.S. FDA Workshop on Talc: Consumer Uses and Health Perspectives,* Bethesda, Maryland, January 31-February 1, 1994. Workshop participants and Executive Summary. *Regul. Toxicol. Pharmacol.* **21**, 211-215.

Driscoll, K.E., Maurer, J.K., and Crosby, L.L. (1990). Overload of lung clearance is associated with activation of alveolar macrophage tumor necrosis factor and fibrorectin release. *J. Aerosol Med.* **3** (Suppl. 1), S83-S91.

Lewis, T.R., Morrow, P.E., McClellan, R.O., Raabe, O.B. Kennedy, G.R., Schwetz, B.A., Goehl,

JNJ 000021315



T.J., Roycroft, J.H., and Chhabra, R.S. (1989). Establishing aerosol exposure concentrations for inhalation toxicity studies. *Toxicol. Appl. Pharmacol.* **99**, 377-383.

Morrow, P.E. (1988). Possible mechanisms to explain dust overloading of the lungs. *Fund. & Appl. Toxicol.* **10**, 369-384.

National Toxicology Program (NTP) (1993). NTP technical report on the toxicology and carcinogenesis studies of talc in F344/N and B6C3F1 mice. NTP TR 421. U.S. Dept. Health and Human Services, National Institute of Health.

Oberdörster, G. (1988). Lung clearance of inhaled insoluble and soluble particles. *J. Aerosol Med.* **1**(4), 289-330.

Oberdörster, G. (1995). The NTP talc inhalation study: A critical appraisal focused on lung particle overload. *Regul. Toxicol. Pharmacol.* **21**, 233-241.

Schlesinger, R.B. (1985). Clearance from the respiratory tract. *Fund. & Appl. Toxicol.* **5**, 435-450.

Snipes, M.B. (1989). Long-term retention and clearance of particles inhaled by mammalian species. *Toxicol.* **20** (3), 175-211.

Zazenski, R., Ashton, W.H., Briggs, D., Chudkowski, M., Kelse, J.W., MacEachern, L., McCarthy, E.F., Nordhauser, M.A., Roddy, M.T., Teetsel, N.M., Wells, A.B., and Gettings, S.D. (1995). Talc: Occurrence, characterization and consumer applications. *Regul. & Toxicol. Pharmacol.* **21**, 218-229.

## SECTION II. C.

ACGIH (1992). *1992-1993 Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices.* American Conference of Governmental Industrial Hygienists, Cincinnati, OH.

Aylott, R.I., Byrne, G.A., Middleton, J.D., and Roberts, M.E. (1979). Normal use levels of respirable cosmetic talc: Preliminary study. *Int. J. Cosm. Sci.* **1**, 177-186.

Boundy, M.G., Gold, K., Martin, K.P., Jr., Burgess, W.A., and Dement, J.M. (1979). Occupational exposures to non-asbestiform talc in Vermont. In *Dust and Disease* (R. Lemen and J.M. Dement, Eds.), pp. 365-378. Pathotox Publishers, Inc., Park Forest South, IL.

Carta, M., Alfano, G., Carbini, P., Ciccu, R., and Del Fa', C. (1981). Triboelectric phenomena in mineral processing. Theoretic fundamentals and applications. *J. Electrostatics* **10**, 177-182.

Dahl, A.R., Schlesinger, R.B., Heck, H.A., Medinsky, M.A. and Lucier, G.W. (1991). Symposium Overview: Comparative dosimetry of inhaled materials: Differences among animal species and extrapolation to man. *Fund. & Appl. Toxicol.* **16**, 1-13.

El-Ghawabi, S.H., El-Samra, G.H., and Mehasseb, H. (1970). Talc pneumoconiosis. *J. Egypt. Med. Assoc.* **53**, 330-340.

Endo-Capron, S., Renier, A., Janson, X., Kheuang, L., and Jaurand, M.C. (1993). *In vitro* response of rat pleural mesothelial cells to talc samples in genotoxicity assays (sister chromatatid exchanges and DNA repair). *Toxicol. In Vitro* **7**(1), 7-14.

Gamble, J., Greife, A., and Hancock, J. (1982). An epidemiological-industrial hygiene study of talc workers. *Ann. Occup. Hyg.* **26**(1-4), 841-859.

Gajewski, J.B. (1990). Assessment of electrostatic hazards due to the flow of charged solid particles in pneumatic transport. *Materials Science* **16**(1-3), 299-305.

Leophonte, P., Basset, M.F., Pincemin, J., Louis, A., Pernet, R., and Delaude, A. (1983). Mortalite des travailleurs de talc en France. Etude epidemidologique retrospective. *Rev. Fr. Mal. Respir.* **11**, 489-490.

Morrow, P.E. (1988). Possible mechanisms to explain dust overloading of the lungs. *Fund. & Appl. Toxicol.* **10**, 369-384.

Morrow, P.E. (1992). Dust overloading of the lungs: Update and appraisal. *Toxicol. & Appl. Pharmacol.* **113**, 1-12.

Oberdörster, G. (1988). Lung clearance of inhaled insoluble and soluble particles. *J. Aerosol Med.* **1**(4), 289-330.

Rubino, G.F., Scansetti, G. Piolatto, G., and Romano, C.A. (1976). Mortality study of talc miners and millers. *J. Occup. Med.* **18**(3), 186-193.

Russell, R.S., Merz, R.D., Sherman, W.T., and Sivertson, J.N. (1979). The determination of respirable particles in talcum powder. *Fd. Cosmet. Toxicol.* **17**, 117-122.

Scansetti, G., Rosetti, L., and Ghemi, F. (1963). Clinical and radiological evolution of pneumoconiosis in the talc extracting industry. *Medicina del Lavoro* **54**(11), 746-749.

Selevan, S.G., Dement, J.M., Wagoner, J.K., and Froines, J.R. (1979). Mortality patterns among miners and millers of non-asbestiform talc: Preliminary report. In *Dusts & Diseases* (R. Lemen and J.M. Dement, Eds.), pp. 379-388. Pathotox Publishers, Inc., Park Forest South, IL.

JNJ 000021317

09:37 JUN 07, 1995

Wegman, D.G., Peters, J.M., Boundy, M.G., and Smith, T.J. (1982). Evaluation of respiratory effects in miners and millers exposed to talc free of asbestos and silica. *Br. J. Ind. Med.* **39**, 233-238.

Wehner, A.P. (1994). Biological effects of cosmetic talc. *Fd. Chem. Toxicol.* **32**(12), 1173-1184.

Wergeland, E., Andersen, A., and Baerheim, A. (1990). Morbidity and mortality in talc exposed workers. *Am. J. Ind. Med.* **17**, 505-513.


## SECTION II. D.

Goodman, J.I. (1995). An analysis of the National Toxicology Program's (NTP) Technical Report (NTP TR 421) on the toxicology and carcinogenesis studies of talc. *Regul. Toxicol. Pharmacol.* **21**, 244-249.


## SECTION III. A

Baylis, M.S., Henderson, W.J., Pierrepoint, C.G., and Griffiths, L. (1986). The aetiology of ovarian cancer. In *Gynecological Oncology*, (C.P. Morrow and G.E. Smart, Eds.), pp. 157-165. Springer-Verlag, New York.

Berek, J.S. and Martinez-Maza, O. (1994). Molecular and biologic factors in the pathogenesis of ovarian cancer. *J. Reprod. Med.* **39**, 241-248.

Booth, M., Beral, V. and Smith, P. (1989). Risk factors for ovarian cancer-control study. *Br. J. Cancer* **60**, 592-598.

Cannistra, S.A. (1993). Cancer of the ovary. *New England J. Med.* **329**(21), 1550-1559.

Cramer, D.W. (1989). Lactase persistence and milk consumption as determinants of ovarian cancer risk. *Am. J. Epidem.* **130**(5), 904-910.

Cramer, D.W., Willett, W.C., Bell, D.A., Ng, W.G., Harlow, B.L., Welch, W.R., Scully, R.E., and Knapp, R.C. (1989). Galactose consumption and metabolism in relation to the risk of ovarian cancer. *Lancet* **2**, 66-71.

Daly, M.B. (1992). The epidemiology of ovarian cancer. *Hematol. Oncol. Clin. North Am.* **6**(4), 729-738.

Dietl, J., and Marzusch, K. (1993). Ovarian surface epithelian ovarian cancer. *Gynecol. Obstet. Invest.* **35**, 129-135.

Protected Document--Subject to Protective Order

JNJ 000021318

Godwin, A.K., Testa, J.R., and Hamilton, T.C. (1993). The biology of ovarian cancer development. *Cancer Supplement* **71**(2), 530-536.

Hartge, P., Schiffman, M.H., Hoover, R., McGowan, L., Lesher, L., and Norris, H.J. (1989). A case-control study of epithelial ovarian cancer. *Am. J. Obstet. Gynecol.* **161**(1), 10-16.

Heintz, A.P., Hacker, N.F., and Lagasse, L.D. (1985). Epidemiology and etiology of ovarian cancer: A review. *Obstet. Gynecol.* **66**(1), 127-135.

Hoffman, A.G., Burghardt, R.C., Tilley, R., and Auersperg, N. (1993). An in vitro model of ovarian epithelial carcinogenesis: changes in cell-cell communication and adhesion occurring during neoplastic progression. *Int. J. Cancer* **54**, 828-838.

Kelsey, J.L. and Whittemore, A.S. (1994). Epidemiology and primary prevention of cancers of the breast, endometrium, and ovary. A brief overview. *Ann. Epidemiol.* **4**(2), 89-95.

La Vecchia, C., Decarli, A., Negri, E., Parazzini, F., Gentile, A., Cecchetti, G., Fasoll, M., and Franceschi, S. (1987). Dietary factors and the risk of epithelial ovarian cancer. *J. Natl. Cancer Inst.* **79**(4), 663-669.

Lee, J.H., Kavanagh, J.J., Wildrick, D.M., Wharton, J.T., and Blick, M. (1990). Frequent loss of heterozygosity on chromosomes 6q, 11, and 17 in human ovarian carcinomas. *Cancer Res.* **50**, 2724-2728.

Malik, S., and Balkwill, F. (1991). Epithelial ovarian cancer: a cytokine propelled disease? [editorial] *Br. J. Cancer* **64**, 617-620.

Mori, M., Harabuchi, I, Miyake, H., Casagrande, J.T., Henderson, B.E., and Ross, R.K. (1988). Reproductive, genetic and dietary risk factors for ovarian cancer. *Am. J. Epidem.* **128**(4), 771-777.

Mori, M., and Miyake, H. (1988). Dietary and other risk factors of ovarian cancer among elderly women. *Jpn. J. Cancer Res.* **79**, 997-1004.

McGowan, L., Parent, L., Lednar, W., and Norris, H.J. (1979). The women at risk for developing ovarian cancer. *Gynecol. Oncol.* **7**, 325-344.

Parazzini, F., Franceschi, S., La Vecchia, C., and Fasoli, M. (1991). The epidemiology of ovarian cancer. *Gynecol. Oncol.* **43**, 9-23.

Patel, A.R., and Obrams, G.I. (1993). Epidemiology of ovarian cancer. *Cancer Eidemiol. Biomarkers Prev.* **2**, 79-83.

Shoham, Z. (1994). Epidemiology, etiology, and fertility drugs in ovarian epithelial carcinoma: where are we today? *Fertil. Steril.* **62**(3), 433-48.

Protected Document--Subject to Protective Order

JNJ 000021319

Shu, X.O., Gao., Y.T., Yuan, J.M., Ziegler, R.G., and Brinton, L.A. (1989). Dietary factors and epithelial ovarian cancer. *Br. J Cancer* 59(4), 92-96.

Slotman, B.J., and Rao, R. (1988). Ovarian cancer (review). *Anticancer Res.* 8, 417-434.

Wehner, A.P. (1994). Biological effects of cosmetic talc. *Fd. Chem. Toxicol.* 32(12), 1173-1184.

Whittemore, A.S., Harris, R., Itnyre, J., and the Collaborative Ovarian Cancer Group (1992). Characteristics relating to ovarian cancer risk: collaborative analysis of 12 US case-control studies. *Am. J. Epidem.* 136(10), 1212-1220.

Wu, M.L., Whittemore, A.S., Paffenbarger, R.S., Jr., Sarles, D.L., Kampert, J.B., Grosser, S., Jung, D.L., Ballon, S., Hendrickson, M., and Mohle-Boetani, J. (1988). Personal and environmental characteristics related to epithelial ovarian cancer. *Am. J. Epidem.* 128(6), 1216-1227.

## SECTION III. B

Booth, M., Beral, V., and Smith, P. (1989). Risk factors for ovarian cancer: A case-control study. *Br. J. Cancer* 60, 592-598.

Carr, C.J. (1995). Papers presented at the *International Society of Regulatory Toxicology and Pharmacology/U.S. FDA Workshop on Talc: Consumer Uses and Health Perspectives*, Bethesda, Maryland, January 31-February 1, 1994. Workshop participants and Executive Summary. *Regul. Toxicol. Pharmacol.* 21, 211-215.

Cramer, D.W., Welch, W.R., Scully, R.E., and Wojciechowski, C.A. (1982). Ovarian cancer and talc: A case-control study. *Cancer* 50, 372-376.

Hankinson, S.E., Hunter, D.J., Colditz, G.A., Willett, W.C., Stampfer, M.J., Rosner, B., Hennekens, C.H., and Speizer, F.E. (1993). Tubal ligation, hysterectomy, and risk of ovarian cancer: A prospective study. *JAMA* 270(23), 2813-2818.

Harlow, B.L., and Weiss, N.S. (1989). A case-control study of borderline ovarian tumors: The influence of perineal exposure to talc. *Am. J. Epidemiol.* 130(2), 390-394.

Harlow, B.L., Cramer, D.W., Bell, D.A., and Welch, W.R. (1992). Perineal exposure to talc and ovarian cancer risk. *Obstet. Gynecol.* 80(1), 19-26.

Hartge, P., Hoover, R., Lesher, L.P., and McGowan, L. (1983). Talc and ovarian cancer. *JAMA* 250(14), 1844.

Rosenblatt, K.A., Szklo, M., and Rosenshein, N.B. (1992). Mineral fiber exposure and the development of ovarian cancer. *Gynecol. Oncol.* 45, 20-25.

Protected Document--Subject to Protective Order

09:39 JUN 07, 1995

Whittemore, A.S., Wu, M.L., Paffenbarger, R.S. Jr., Sarles, D.L., Kampert, J.B. Grosser, S., Jung, D.L., Ballon, S., and Hendrickson, M. (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* **128**(6), 1228-1240.

Whittemore, A.S., Harris, R., Itnyre, J., Halpern, J. and the Collaborative Ovarian Cancer Group (1992). Characteristics relating to ovarian cancer risk: Collaborative analysis of 12 US case-control studies. I. Methods. *Am. J. Epidemiol.* **136**(10, 1175-1183.


## SECTION III. C

Boorman, G.A., and Seely, J.C. (1995). The lack of an ovarian effect of lifteime talc exposure in F344/N rats and B6C3F, mice. *Regul. Toxicol. Pharmacol.* **21**, 242-243.

Carr, C.J. (1995). Papers presented at the *International Society of Regulatory Toxicology and Pharmacology/U.S. FDA Workshop on Talc: Consumer Uses and Health Perspectives*, Bethesda, Maryland, January 31-February 1, 1994. Workshop participants and Executive Summary. *Regul. Toxicol. Pharmacol.* **21**, 211-215.

De Boer, C.H. (1972). Transport of particulate matter through the human female genital tract. *J. Reprod. Fertil.* **28**, 295-297.

Egli, G.E., and Newton, M.D. (1961). The transport of carbon particles in the human female reproductive tract. *Fertil. Steril.* **12**, 151-155.

Henderson, W.J., Hamilton, T.C., Baylis, M.S., Pierrepoint, C.G., and Griffiths, K. (1986). The demonstration of the migration of talc from the vagina and posterior uterus to the ovary in the rat. *Environ. Res.* **40**, 247-250.

Henderson, W.J., Hamilton, T.C., and Griffiths, K. (1979). Talc in normal and malignant ovarian tissue. *Lancet* **1**, 499.

National Toxicology Program (NTP) (1993). NTP technical report on the toxicology and carcinogenesis studies of talc in F344/N and B6C3F1 mice. NTP TR 421. U.S. Dept. Health and Human Services, National Institute of Health.

Phillips, J.C., Young, P.J., Hardy, K., and Gangolli, S.D. (1978). Studies on the absorption and disposition of 3H-labelled talc in the rat, mouse, guinea-pig and rabbit. *Fd. Cosmet. Toxicol.* **16**, 161-163.

Wehner, A.P. (1994). Biological effects of cosmetic talc. *Fd. Chem. Toxicol.* **32**(12), 1173--1184.

Wehner, A.P., Hall, A.S., Weller, R.E., Lepel, E.A., and Schirmer, R.E. (1985). Do particles translocate from the vagina to the oviducts and beyond? *Fd. Chem. Toxicol.* **23**(3), 367-372.

Protected Document--Subject to Protective Order

JNJ 000021321

Wehner, A.P., and Weller, R.E. (1986). On talc translocation from the vagina to the oviducts and beyond. *Fd. Chem. Toxicol.* **24**(4), 329-338.


## SECTION IV

Carr, C.J. (1995). Papers presented at the *International Society of Regulatory Toxicology and Pharmacology/U.S. FDA Workshop on Talc: Consumer Uses and Health Perspectives,* Bethesda, Maryland, January 31-February 1, 1994. Workshop participants and Executive Summary. *Regul. Toxicol. Pharmacol.* **21**, 211-215.

Protected Document--Subject to Protective Order