# Exhibit 171

**==DRAFT  1 – Copy for SafetyandCareCommitment Website==**

*On Home Page of SafetyandCareCommitment.com website, at bottom right, under Key Topic, replace Microbeads with the following copy:*

## Key Topic

Talc has over 100 years of ~~safe~~ use in personal care products.  Learn more …

*(Link to Ingredient Policies page, insert new item under "Other Materials" and after "Triclosan", copy to read)*

## Talc

### The Use of **Cosmetic** Talc in Personal Care Products

Few ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc, which has been used for over 100 _(I don't think we can link cosmetic talc to 100 years of use)_ years by millions of people around the world.  Talcum powder is made from the mineral, talc.  In a powder form, talc helps reduce friction, making it useful for keeping skin dry and helping to prevent rashes.  Talc is a common ingredient found in cosmetic products such as baby powder and adult body and facial powders, and in a range of other consumer products such as toothpaste, chewing gum, and aspirin.

JOHNSON'S® talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. Our talc-based consumer products are~~have always been~~_(we cannot say "always")_ asbestos free, as confirmed by regular testing conducted since the 1970s. We also make JOHNSON'S® Baby Powder that contains cornstarch.

## Our Position on Talc

At the Johnson & Johnson Family of Consumer Companies, our confidence in the using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities. Various agencies and governmental bodies have examined whether talc is a carcinogen, and none have concluded that it is. These include the U.S Food and Drug Administration (FDA) and National Toxicology Program, part of the U.S. Department of Health and Human Services.  California does not list cosmetic talc as a carcinogen under its Prop 65 list of substances identified as possible causes of cancer.

The Cosmetic Ingredient Review (CIR) is an independent scientific body that assesses the safety of ingredients and publishes results in peer-reviewed science journals.  In April 2013 it published its most recent assessment of talc used in cosmetics.  Its Expert Panel reviewed all information, data, studies spanning from 1976 through today, and concluded that talc was safe for use in personal care products.  The U.S. FDA considers the CIR review, as well as other information, in policy making.

Various independent researchers have studied talc and perineal use and found it to be safe.  A detailed meta-analysis done by Muscat/Huncharek in 2007, reviewed all available studies and showed no cause and effect relationship between perineal use and ovarian cancer.  In 2011, Neill et al also was not able to find any association between perineal talc use and ovarian cancer.  Publications based on the Nurses' Health Study, the only large-scale prospective study looking at talc and ovarian cancer, have found no causal relationship between talc and ovarian cancer (Gertig 2000; Gates 2009).

## References and Resources:

*NOTE TO CAROL/JAY:*  Besides those below, there are other links to consider, but they are not as definitive or supportive and could be interpreted as suggesting a causal effect, such as the American Cancer Society and IARC.  Even some of the studies we cite send mixed messages.  For example, Gertig et al concludes:
"Our results provide little support for any substantial association between perineal talc use and ovarian cancer risk overall; however, perineal talc use may modestly increase the risk of invasive serous ovarian cancers."

National Toxicology Program
http://ntp.niehs.nih.gov/index.cfm?objectid=03CA6E02-FBD5-5C52-9699F9DD00863ED7

Cosmetic Ingredient Review
http://www.cir-safety.org/sites/default/files/talc122012tent_faa_final%20for%20posting.pdf

Gertig, Prospective Study of Talc Use and Ovarian Cancer, *Journal of the National Cancer Institute*
http://jnci.oxfordjournals.org/content/92/3/249.full

Neill, Use of talcum powder and endometrial cancer risk, *Cancer Causes and Control*
http://rd.springer.com/article/10.1007%2Fs10552-011-9894-5

Muscat, Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology, *European Journal of Cancer Prevention*
http://www.ncbi.nlm.nih.gov/pubmed/21712717

From Homer:

http://www.fda.gov/Cosmetics/ProductandIngredientSafety/SelectedCosmeticIngredients/ucm293184.htm?source=govdelivery

FDA sponsored a workshop in 1994 ("ISRTP/FDA Talc workshop").  I don't have a copy of the report but there are many references to the conclusions, such as those below.   Experts agreed that there was no evidence to conclude that talc is capable of reaching the ovaries.  And … the experts attending the ISRTP/FDA Talc workshop concluded that the epidemiology studies did not demonstrate a real association between talc and ovarian cancer.

http://www.cosmeticsinfo.org/HBI/26

http://www.thefactsabout.co.uk/content.asp?pageid=8&menuname=Talc&menu=hidden

**File Provided Natively**

Protected Document--Subject to Protective Order

JNJTALC000067661

## JNJTALC000067661

## Metadata

| Applic | Microsoft Word Document | ORIGINAL |
|---|---|---|
| AttachCount | 0 | ORIGINAL |
| Author | pballman | ORIGINAL |
| BegAttach | JNJTALC000067661 | ORIGINAL |
| Confidentiality | Y | ORIGINAL |
| Custodian | Goodrich, Carol | ORIGINAL |
| DateCreated | 10/07/2013 07:43 PM | ORIGINAL |
| DateMod | 10/07/2013 07:43 PM | ORIGINAL |
| DocExt | doc | ORIGINAL |
| DocumentType | E-Doc | ORIGINAL |
| EmailDateSort | 10/07/2013 07:43 PM | ORIGINAL |
| EndAttach | JNJTALC000067661 | ORIGINAL |
| FileName | Talc website copy 10 7 13.doc | ORIGINAL |
| FileSize | 39936.00 | ORIGINAL |
| HashValue | 967ccb81646ba286c7973fdb7d929087 | ORIGINAL |
| LastModBy | Carol Goodrich | ORIGINAL |
| ProdVol | TALC_PROD_027 | ORIGINAL |

Exhibit 172

```
 1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                 STATE OF MISSOURI
 2

                       - - - - -
 3

     VICKIE FORREST, et al.,
 4          Plaintiffs,
 5          vs.         Cause No.
                        1522-CC0419-02
 6

     JOHNSON & JOHNSON, et al.
 7          Defendants.
 8                 - - - - -
 9          UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
10

                       - - - - -
11

     IN RE:  JOHNSON & JOHNSON    MDL NO:
12   TALCUM POWDER PRODUCTS       16-2738 (FLW)(LGH)
     MARKETING, SALES PRACTICES,
13   AND PRODUCTS LIABILITY
     LITIGATION
14                 - - - - -
15
                 Tuesday, June 29, 2021
16
17                 - - - - -
18          Videotaped Oral Deposition of JOHN C.
19   O'SHAUGHNESSY, taken at the Crowne Plaza Princeton,
20   900 Scudders Mill Road, Plainsboro, New Jersey,
21   commencing at 10:35 a.m., by and before Robin L.
22   Clark, Registered Professional Reporter and Notary
23   Public in and for the State of New Jersey.
24                 - - - - -
```

Page 2

1  APPEARANCES:
2
3      LEVIN, PAPATONIO, RAFFERTY, PROCTOR,
       BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
4      BY:  CHRISTOPHER V. TISI, ESQ.
       316 South Baylen Street, Suite 600
5      Pensacola, Florida 32502-5996
       850-435-7176
6      ctisi@levinlaw.com
           For the Plaintiff, Vickie
7      Forrest
8      COHEN, PLACITELLA & ROTH
       BY:  CHRISTOPHER M. PLACITELLA, ESQ.
9      127 Maple Avenue
       Red Bank, New Jersey 07701
10     732-749-9003
       cplacitella@cprlaw.com
11         For the MDL Plaintiffs
12
13     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       BY:  ALLISON M. BROWN, ESQ.
14     and RICHARD T. BERNARDO, ESQ.
       One Manhattan West
15     New York, New York 10001-8602
       212-735-3000
16     allison.brown@skadden.com
       richard.bernardo@skadden.com
17         For the Defendant,
       Johnson & Johnson
18
19     YETTER COLEMAN LLP
       BY:  COLLIN J. COX, ESQ.
20     811 Main Street, Suite 4100
       Houston, Texas 77002
21     713-632-8000
       ccox@yettercoleman.com
22         For the Witness
23  ALSO PRESENT:
24     JOEL SCHNEIDER, USMJ (Retired)

Page 3

1  ALSO PRESENT, continued:
2
3      WILLIAM GEIGERT, VIDEOGRAPHER
4      MICHAEL KUTYS, EXHIBIT TECH
5  REMOTE APPEARANCES:
6
7      BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
       MILES, P.C.
8      BY:  LEIGH O'DELL, ESQ.
       218 Commerce Street
9      Montgomery, Alabama 36104
       800-898-2034
10     leigh.odell@beasleyallen.com
           For the Plaintiff, Vickie
11     Forrest
12     LEVIN, PAPATONIO, RAFFERTY, PROCTOR,
       BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
13     BY:  W. CAMERON STEPHENSON, ESQ.
       316 South Baylen Street, Suite 600
14     Pensacola, Florida 32502-5996
       850-435-7176
15     cstephenson@levinlaw.com
           For the Plaintiff, Vickie
16     Forrest
17
18     ASHCRAFT & GEREL, LLP
       BY:  MICHELLE A. PARFITT, ESQ.
19     1825 K Street, N.W., Suite 700
       Washington, D.C. 20006
20     202-759-7648
       mparfitt@ashcraftlaw.com
21         For the Plaintiff, Vickie
       Forrest
22
23
24

Page 4

1  REMOTE APPEARANCES, continued:
2
3      COHEN, PLACITELLA & ROTH
       BY:  DENNIS M. GEIER, ESQ.
4      127 Maple Avenue
       Red Bank, New Jersey 07701
5      732-749-9003
       dgeier@cprlaw.com
6          For the MDL Plaintiffs
7      GOLOMB SPIRT GRUNFELD PC
       BY:  RICHARD GOLOMB, ESQ
8      1835 Market Street, Suite 2900
       Philadelphia, Pennsylvania 19103
9      215-985-9177
       rgolomb@golomblegal.com
10         For the MDL Plaintiffs
11
12     BARNES LAW GROUP, LLP
       BY:  JOHN R. BEVIS, ESQ.
13     31 Atlanta Street
       Marietta, Georgia 30060
14     678-290-2240
       bevis@barneslawgroup.com
15         For the Plaintiffs
16
17     ROBINSON CALCAGNIE, INC.
       BY:  GENEVIEVE R. OUTLAW, ESQ.
18     19 Corporate Plaza Drive
       Newport Beach, California 92660
19     949-720-1288
       goutlaw@robinsonfirm.com
20         For the Plaintiffs in JCCP 4872
21
22
23
24

Page 5

1  REMOTE APPEARANCES, continued:
2
3      BLASINGAME, BURCH, GARRARD & ASHLEY, PC
       BY:  LEANNA BANKESTER PITTARD, ESQ.
4      and SARA SCHRAMM, ESQ.
       2100 Southbridge Parkway
5      Suite 650
       Birmingham, Alabama 35209
6      866-354-3544
       lpittard@bbga.com
7      sschramm@bbga.com
           For the MDL Plaintiffs
8
9      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       BY:  CATHERINE I. MULLALEY, ESQ.
10     500 Boylston Street
       Boston, Massachusetts 02116
11     617-573-4851
       kate.mullaley@skadden.com
12         For the Defendant,
       Johnson & Johnson
13
14     FAEGRE DRINKER BIDDLE & REATH LLP
       BY:  SUSAN M. SHARKO, ESQ.
15     600 Campus Drive
       Florham Park, New Jersey 07932
16     susan.sharko@faegredrinker.com
       973-549-7000
17         For the Defendant, Johnson &
18     Johnson
19
20     SEYFARTH SHAW LLP
       BY:  THOMAS T. LOCKE, ESQ.
21     975 F Street, N.W.
       Washington, D.C. 20004
22     202-828-5376
       tlocke@seyfarth.com
23         Appearing on behalf of Personal
       Care Products Council
24

Page 6

1 REMOTE APPEARANCES, continued:
2
3    TUCKER ELLIS, LLP
     BY:  ELIZABETH J. CUMMINGS, ESQ.
     100 South 4th Street
4    St. Louis, Missouri 63102
     314-571-4969
5    elizabeth.cummings@tuckerellis.com
          For the Defendants, PTI
6    Royston, LLC and PTI Union, LLC
7
   ALSO PRESENT:
8
9    LEA CALLAHAN, Paralegal

     JEN SECRIST, Paralegal
10
11   STEPHANIE E. MARTIN

            - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1          I N D E X
2 WITNESS                    PAGE
3 JOHN C. O'SHAUGHNESSY
   BY MR. TISI:              18
4
5       E X H I B I T S
6 NUMBER     DESCRIPTION       MARKED
7 O'Shaughnessy
8 Exhibit 3    J&J Worldwide Talc Steering    98
              Committee Meeting
9             Pre-Meeting Materials Bates
              JNJNL61__000104822 to
10            104915
11 Exhibit 7    Paper titled "Talc:    132
              Consumer Uses and Health
12            Perspectives"  Bates JNJ
              000050464 to 468
13
   Exhibit 11    Letter 3/16/98 Bates JNJ    189
14            000064591 to 64592
15 Exhibit 12    Letter dated 4/23/98 Bates    189
              JNJH61__000052427 to 52449
16
   Exhibit 13    Blount Article Bates    189
17            JNJNL61_000014431 to 14437
18 Exhibit 14    Blount Article Bates IMERYS    189
              211157 to 211165
19
   Exhibit 16    Email dated 2/13/98 and    181
20            Attachment Bates JNJ
              000038708
21
   Exhibit 35D  Email String and Attachment    219
22            Bates JNJ 000404424 to
              404429
23
   Exhibit 41A  Email dated 5/17/01 Bates    385
24            IMERYS 230591

Page 8

1 Exhibit 45A   Email dated 7/8/04 Bates    347
              JNJ 000369184
2
3 Exhibit 56    Email String and Attachment    49
              Bates JNJ 000405333 to 5392
4 Exhibit 57    Berg Complaint Bates    60
              P1.00000104.1 to 104.19
5
6 Exhibit 58    Email String Bates    61
              JNJTALC000793075 to 76
7 Exhibit 60    Letter dated 11/10/04 Bates    156
              JNJ 000016645 to 16646
8
9 Exhibit 61    Letter dated 11/23/94 and    153
              Attachment Bates JNJ
              000018407 to 18416
10
11 Exhibit 63    Email dated 11/30/94 Bates    150
              JNJ 000047064
12 Exhibit 64    Email dated 12/8/94 Bates    166
              JNJTALC000887279
13
14 Exhibit 67    Memo dated 8/13/00 and    231
              Attachment Bates
15            JNJTALC000019590 to 19604
16 Exhibit 68    Letter dated 3/14/01 Bates    194
              JNJ 000013359
17 Exhibit 69    Memo dated 11/11/03 Bates    206
              JNJ 000014476
18
19 Exhibit 70    Harlow Paper Bates    124
              P2.00000010.001 to 008
20 Exhibit 71    Memorandum dated 2/4/94    143
              Bates JNJ 000022605
21
22 Exhibit 72    Letter dated 6/2/94 Bates    293
              JNJTALC000887316 to 887318
23 Exhibit 73    Letter dated 10/31/94 with    288
              Attachments A and B Bates
24            JNJ 000023436

Page 9

1 Exhibit 74    Memo dated 1/24/98 Bates    254
              JNJ 000000081 to 83
2
3 Exhibit 75    "J&J History with AHF"    277
              Document Bates
4             JNJTALC001243432
5 Exhibit 76    Email dated 2/18/95 Bates    274
              JNJ 000023426
6 Exhibit 77    Letter dated 4/17/95 Bates    182
              JNJ 00000043
7
8 Exhibit 78    Handwritten Notes Bates    270
              J&J-0107458 to 107459
9 Exhibit 79    Letter dated 3/5/97 Bates    315
              JNJ 000015543 to 15544
10
11 Exhibit 80    Letter dated 6/21/97 Bates    317
              000015474
12 Exhibit 81    Gross Article Bates JNJ    240
              000018452 to 18466
13
14 Exhibit 82    Deposition Excerpts of    314
              Joshua E. Muscat Deposition
15            Bates P4-00000100.1 to
              100.5
16 Exhibit 84    Email String Bates    337
              JNJTALC000852873 to 852875
17
18 Exhibit 85    Email String and Attachment    368
              Bates JNJ 000389794 to
19            389289
20 Exhibit 87    Letter dated 10/12/00 Bates    354
              JNJ 000017587 to 17612
21 Exhibit 88    Letter dated 10/19/00 Bates    362
              JNJ 000020391 to 20392
22
23 Exhibit 90    Fax transmittal dated    358
              11/27/00 and Attachment
24            Bates JNJTALC000593555 and
              JNJ 000017613 to 17627

Page 310

1    A.  No.
2    Q.  Okay.  So let's go back 25
3  years to 1995 then and talk about it.  I
4  want to ask you a question that I asked
5  you, from the date of Dr. Muscat's study
6  that wasn't done until 2018 when you left,
7  are you aware of any study conducted by
8  Johnson & Johnson looking specifically at
9  the relationship between talc and ovarian
10  cancer?
11          MS. BROWN:  Objection.
12       Lacks foundation.
13  BY MR. TISI:
14    Q.  If you don't know, then the
15  answer is I don't know.
16    A.  I'm not aware of what they may
17  have conducted, what studies they did or
18  did not.  I just wouldn't have that
19  knowledge.
20    Q.  Have you seen any come up in
21  litigation?
22          MS. BROWN:  Objection.
23       He's not going to talk about
24       litigation.

Page 311

1  BY MR. TISI:
2    Q.  You made public statements
3  about litigation, did you not?
4    A.  I don't recall that.
5    Q.  In any of the press releases
6  that you reviewed, did they comment on
7  litigation?
8          MS. BROWN:  Objection,
9       lacks foundation, assumes facts,
10       misstates the evidence.
11          THE WITNESS:  I think
12       there might have been -- a press
13       release?
14  BY MR. TISI:
15    Q.  Yeah.
16    A.  I don't recall.
17    Q.  Press release or comments to
18  the public relations or any of those
19  things.
20    A.  You know, I do recall seeing
21  public communications documents that talked
22  about the litigation that has happened,
23  yes.
24    Q.  In any of those, did you ever

Page 312

1  see the press releases or communications
2  refer to any study that Johnson & Johnson
3  did or funded?
4          MS. BROWN:  Objection.
5       Lacks foundation.  Misstates the
6       evidence.
7          THE WITNESS:  I think
8       they're two different things from
9       what I'm recalling.  I'm recalling
10       some public communication
11       statements and you're asking me did
12       those statements contain what
13       again?
14  BY MR. TISI:
15    Q.  Do you ever remember, I mean,
16  this really isn't that complicated a
17  question.  Do you remember, as you sit here
18  today, any of the communications that were
19  made by the company that refer to any study
20  that Johnson & Johnson did?
21          MS. BROWN:  Objection.
22       Lacks foundation.
23          THE WITNESS:  The only
24       thing I recall, Johnson & Johnson

Page 313

1       referred to the studies that were
2       done by outside agencies and that
3       sort of thing.
4  BY MR. TISI:
5    Q.  Okay.  But Johnson & Johnson,
6  to your knowledge, never did any of their
7  own, did they?
8          MS. BROWN:  Lacks
9       foundation.
10          THE WITNESS:  On what?
11  BY MR. TISI:
12    Q.  On talc and ovarian cancer?
13    A.  On what though, studies?
14    Q.  Yes.
15    A.  On talc and ovarian cancer?
16    Q.  Yes.
17    A.  I'm not aware of what they did
18  or didn't do.
19    Q.  Okay.  But what you did do and
20  what was recommended to you was to attack
21  the studies done by others, true?
22          MS. BROWN:  Objection.
23       Misstates the evidence.  Lacks
24       foundation.

Exhibit 173

**In the Matter Of:**

TERESA LEAVITT/FONG and WONG vs JOHNSON & JOHNSON, et al.,

---

**JAMES MITTENTHAL (PMQ/COR)**

*October 18, 2018*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ◆ San Francisco ◆ San Jose**

**Sacramento ◆ Irvine ◆ Los Angeles**

877.451.1580

www.aikenwelch.com



1           SUPERIOR COURT OF THE STATE OF CALIFORNIA
                      COUNTY OF ALAMEDA
2                         ---O0O---

3    TERESA ELIZABETH LEAVITT
     and DEAN J. MCELROY,
4          Plaintiffs,
     vs.
5    JOHNSON & JOHNSON, et          No. RG17882401
     al.,
6          Defendants.
     _____/

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA
                      COUNTY OF LOS ANGELES
9                         ---O0O---
     PUI FONG and THAI WONG,
10         Plaintiff,
                                    JCCP CASE NO. 4674
11   vs.                           No. BC675449
     JOHNSON & JOHNSON, et al.,
12
           Defendants.
13   _____/

14

                      TRIAL PRESERVATION
15      VIDEOTAPED DEPOSITION OF JAMES PETER MITTENTHAL
         (PMQ/COR Johnson & Johnson; Johnson & Johnson
16                    Consumer, Inc.)

17                VOLUME II, Pages 219 - 443

18

19      Taken before EARLY K. LANGLEY, B.A., RMR, RSA, CLR
                      CSR No. 3537
20
                      October 18, 2018
21

22
                  Aiken Welch Court Reporters
23               One Kaiser Plaza, Suite 250
                 Oakland, California 94612
24            (510) 451-1580/(877) 451-1580
                   Fax:  (510) 451-3797
25                  www.aikenwelch.com

```
 1                        I N D E X

 2
                                                    PAGE
 3
    JAMES PETER MITTENTHAL                            225
 4
    DIRECT EXAMINATION BY MR. SWANSON (Cont'd)        225
 5

 6

 7

 8                      E X H I B I T S

 9  EXHIBIT NO.                                      PAGE

10  Exhibit 20       Spreadsheet, "Additional         232
                     Investigation Regarding Scope of
11                   Searches Conducted Mid-2018 for
                     Category 3 and 4 Methods"
12
    Exhibit 21       Spreadsheet re history of Johnson 242
13                   & Johnson holds, consumer talc

14  Exhibit 22       "Mittenthal -- Leavitt/Fong       246
                     Deposition Topics"
15
    Exhibit 23       WWRIM Policy, Version 4.0,        247
16                   12/31/2014

17  Exhibit 24       WWRIM Standard RIMS-1, Version    247
                     5.0, 12/31/2016
18
    Exhibit 25       WWRIM Policy 1.0, 7/31/2009       248
19
    Exhibit 26       Mr. Mittenthal's notes for Hayes  260
20                   deposition

21  Exhibit 27       WWRIM Policy Version 1.1,         289
                     9/30/2009
22
    Exhibit 28       WWRIM Policy, Version 2.0,        289
23                   1/31/2011

24  Exhibit 29       WWRIM Policy, Version 3.0,        289
                     12/31/2013
25
```

1    Exhibit 30        Records Retention Schedule        311

2    Exhibit 31        Document entitled "People         381
                       Interviewed in Talc Fact Finding"
3
     Exhibit 32        Document preservation notice,     416
4                      11/11/1999, Krushinski v JJCP

5    Exhibit 33        Document preservation notice,     425
                       12/15/2009, Deane Berg v JJCP
6
     Exhibit 34        Legal hold notice, Chesteen v     429
7                      JJCC, 2/6/2014

8    Exhibit 35        Revised Legal Hold Notice,        430
                       5/14/2014, Estrada v JJ and JJCC
9
     Exhibit 36        Legal Hold Notice, 7/19/2014,     430
10                     State of Mississippi v J&J and
                       JJCP
11
     Exhibit 37        Talc Ovarian Cancer PL            431
12                     Litigation, Updated Legal Hold
                       Notice

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DEPOSITION OF JAMES PETER MITTENTHAL

 2

 3          BE IT REMEMBERED, that pursuant to Notice, and

 4   on October 18, 2018, commencing at the hour of 9:05

 5   a.m., in the offices of Kazan, McClain, Satterley &

 6   Greenwood, 55 Harrison Street, Suite 400, Oakland,

 7   California 94607, before me, EARLY LANGLEY, a Certified

 8   Shorthand Reporter, State of California, personally

 9   appeared JAMES PETER MITTENTHAL, produced as a witness

10   in said action, and being previously duly sworn, was

11   thereupon examined as a witness in said cause.

12                         ---oOo---

13   APPEARANCES:

14

15   For the Plaintiffs:

16          MARK SWANSON
            Kazan, McClain, Satterley & Greenwood
17          55 Harrison Street, Suite 400
            Oakland, California 94607
18          (510) 302-1000
            Mswanson@kazanlaw.com
19

20   For the Defendants Imerys Talc America, Inc.; Cyprus
     Mines Corporation; Imerys Talc Vermont, Inc.;
21   Specially appearing for Defendant Imerys USA, Inc.:

22
            ERIN CARPENTER
23          Dentons US LLP
            4675 MacArthur Court, Suite 1250
24          Newport Beach, California 92660
            (213) 623-9300
25          erin.carpenter@dentons.com
```

```
 1   For the Defendants Johnson & Johnson; Johnson & Johnson
     Consumer, Inc.:
 2
             CHRISTOPHER COX
 3           RICHARD T. BERNARDO (Via phone)
             Skadden Arps, Slate, Meagher & Flom, LLP
 4           4 Times Square
             New York, New York 10036
 5           (212) 735-3453
             christopher.cox@skadden.com
 6           richard.bernardo@skadden.com

 7
     Also present:
 8
             Jonathan Jaffe
 9           ESI Consultant

10           Jim Partridge
             Tele-Video Production Services
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         --oOo--

2               P R O C E E D I N G S

3                         --oOo--

4               THE VIDEOGRAPHER:  We're on the record.

5     My name is Jim Partridge.  I'm a qualified video

6     technician video recording on behalf of Tele-Video

7     Production Services.

8               The court reporter today is Early Langley

9     of Aiken Welch Reporters.

10              Today's date is October 18, 2018.  The

11    time is now 9:05 a.m.  The location of this

12    deposition is the Kazan and McClain law firm in

13    Oakland, California.

14              Today's witness is James Mittenthal.  This

15    is Volume Number II in the case of Leavitt and

16    McElroy, et al. v. Johnson & Johnson and Fong, et

17    al. v. Imerys Talc America, Inc.

18              This is Case Number RG17882401 filed in

19    the Superior Court of California in and for the

20    County of Alameda.

21              This deposition was noticed by the Kazan

22    law firm for the plaintiff.

23              Would the counsel for the parties please

24    identify themselves and for whom they are

25    appearing.
```

```
 1          MR. SWANSON:  Mark Swanson appearing on

 2   behalf of the plaintiffs.

 3          MR. CARPENTER:  Good morning, sir.  Erin

 4   Carpenter appearing on behalf of Imerys Talc

 5   America, Inc.; Imerys Talc Vermont; and Cyprus

 6   Mines Corporation.

 7          MR. COX:  Christopher Cox on behalf of

 8   defendants Johnson & Johnson and Johnson & Johnson

 9   Consumer, Inc.

10          THE VIDEOGRAPHER:  And on the telephone,

11   please.

12          MR. BERNARDO:  Richard Bernardo, also

13   counsel for the Johnson & Johnson defendants.

14              JAMES PETER MITTENTHAL

15           previously sworn as a witness,

16              testified as follows:

17          THE VIDEOGRAPHER:  Would the counsel

18   please state any stipulations or statements they

19   would like on the record.

20          None.

21          Counsel, you may proceed.

22   DIRECT EXAMINATION BY MR. SWANSON (Cont'd):

23      Q.  Good morning, Mr. Mittenthal.

24      A.  Good morning.

25      Q.  You understand that you're still under
```

1  oath?

2      A.  Yes, I do.

3      Q.  Okay.  What work have you done in

4  connection with the Fong and/or Leavitt cases

5  since I deposed you on September 21st in the first

6  volume?

7      A.  So I gathered additional materials,

8  retention schedules.  I conducted follow-on

9  interviews with Pamela Downs and Laura Giacino,

10  and a woman named Tina French was also present for

11  that other interview for the purpose of

12  understanding additional information about Fong

13  and Leavitt collection activities.

14      Q.  Okay.

15      A.  I obtained -- requested and obtained a

16  list of legal holds that encompassed consumer talc

17  and I made a list of those holds.

18      Q.  From whom did you --

19          MR. SWANSON:  Before I ask the question,

20  Early could you read that entire answer back to me

21  please.

22          (Record read by the court reporter.)

23  BY MR. SWANSON:

24      Q.  Okay.  And those retention schedules that

25  you gathered, did you actually do the search for

```
 1   those and obtain those or did you get those from

 2   counsel?

 3        A.  I got those from counsel.

 4        Q.  Okay.  And those holds are for what period

 5   of time?

 6        A.  The holds cover -- the earliest hold that

 7   I received was dated 1999.

 8        Q.  And these were additional holds that had

 9   not previously been produced to the plaintiffs; is

10   that correct?

11        A.  These were holds that were related to, to

12   my understanding, issues other than mesothelioma.

13        Q.  Now, these legal holds that you're talking

14   about -- well, let me -- let me -- because I think

15   I got myself confused or maybe you confused me.

16   The additional materials that you gathered were

17   retention policies; right?

18        A.  I -- I gathered -- that was one of the

19   things I got, yes, were additional retention

20   schedules.

21        Q.  And you gathered those -- you got those

22   from counsel; correct?

23        A.  Yes.

24        Q.  And why did you get those?

25        A.  I was -- in an effort to respond to issues
```

1    raised in the last time to provide the most

2    thorough coverage of the retention schedules

3    during the applicable times, I sought to get

4    what -- the retention schedules that were

5    available.

6        Q.  So those were retention schedules that

7    hadn't been produced to the plaintiffs in Fong and

8    Leavitt up to that point; is that correct?

9            MR. COX:  Object to form.

10           THE WITNESS:  Some of them had not been

11   produced yet.

12   BY MR. SWANSON:

13       Q.  Have they all been produced now?

14           MR. COX:  Object to form.

15           THE WITNESS:  That's -- that's my

16   understanding.

17   BY MR. SWANSON:

18       Q.  And what period -- can you give me the

19   period of time that those holds cover?

20       A.  I'm sorry?

21       Q.  The range of years for those retention --

22   did I say "holds"?

23       A.  Yes, sir.

24       Q.  I apologize.  I'm getting myself confused.

25           For those retention schedules that you

1    obtained from counsel after your first volume of

2    your deposition that you say have been produced,

3    what's the range of years they cover?

4         A.   They went back to the 1997.

5         Q.   And did you bring those with you today?

6         A.   I believe they're all -- I'm not sure

7    what's in this binder.  I believe that everything

8    has been brought today.

9         Q.   Okay.  For your information, the binder

10   contains the exhibits to the first volume of your

11   deposition.  So that if I have a question for --

12   and that was the binder that you brought to that

13   deposition.

14            Do you remember that?

15        A.   Yes.

16        Q.   Okay.  So if I have questions about a

17   prior exhibit, then you can refer to what's in the

18   binder, okay?

19        A.   Okay.

20        Q.   All right.  So what was produced

21   subsequent to the first volume of your deposition

22   to us were additional retention schedules for the

23   period 2004 through 2012.  Now, we did have a

24   prior retention schedule that had previously been

25   introduced and was marked for the record in your

```
 1    original binder going back to 1997.
 2            Does that refresh your memory about what
 3    you've seen recently or did you see additional
 4    retention schedules going back to '97 that either
 5    weren't produced in this 2004 to 2012 range that
 6    was subsequently produced and wasn't produced in
 7    the initial production?
 8        A.   The former.  That refreshes my memory.
 9        Q.   So you spoke to Pamela Downs, Tina French,
10    and Laura Giacino?
11        A.   That's correct.
12        Q.   All in the same place?
13        A.   There was a conversation with Ms. Downs
14    and then there was a second conversation with
15    Ms. Giacino and Ms. French.
16        Q.   Remind us again.  Pam Downs, she -- Pamela
17    Downs she worked for Triality; is that right?
18        A.   That's right.
19        Q.   And where did that interview take place?
20        A.   That was -- that was at Skadden offices.
21        Q.   And what day did that take place?
22        A.   I'd have to double-check.  It was -- it
23    was last week.
24        Q.   How long did it last?
25        A.   A couple of hours.
```

1    Q.  Who else was there?

2    A.  Chris Cox.

3    Q.  And what additional information specific

4  to either what we spoke about in Volume I of your

5  deposition or that's related to these two cases,

6  Leavitt and Fong, did you discuss with Pam Downs?

7    A.  I wanted to clarify and understand the

8  extent of the -- her -- her involvement in

9  specific searches related to Fong and Leavitt

10  beyond what had been captured in my original notes

11  from her.

12    Q.  And what did she tell you with respect to

13  that?

14    A.  Well, basically I -- I created -- as we

15  were talking, I created a Word table on my

16  computer and that table contained six or seven

17  columns, and as we spoke, I filled out the -- the

18  table, and that table is with me today.

19    Q.  Okay.  Do you have a copy of that table

20  for me?

21        MR. COX:  I do.

22        MR. SWANSON:  Okay.  And do you have a

23  copy I can mark or his copy -- oh, his copy I can

24  mark.

25        Mr. Mittenthal, can I mark your -- put an

```
1    exhibit tag on your copy?

2            THE WITNESS:  Sure.

3            MR. SWANSON:  Okay.

4            (Whereupon, Plaintiff's Exhibit 20 was

5            marked for identification.)

6    BY MR. SWANSON:

7        Q.  And how many pages -- this is four pages.

8            So the Word doc -- the Word table that you

9    created with respect to Pam Downs that's marked as

10   Exhibit 20, that's a four-page document, and we'll

11   just have to make sure to keep these separate from

12   these others.

13           Is that okay if I separate these?

14       A.  Sure.

15       Q.  Okay.  There you go.  And I'll hand those

16   back to you.

17           And it looks like you also included in

18   this information that you've gathered from Laura

19   Giacino; correct?

20       A.  Yes.  I took the same document and I

21   continued it.

22       Q.  And so does this document summarize what

23   you learned from both of them regarding searches

24   specific to Leavitt and Fong?

25       A.  Yes.
```

```
 1        Q.  How long did you speak to Laura Giacino?
 2        A.  It was about an hour and a half, as I
 3   recall.
 4        Q.  And who else was there during that
 5   conversation?
 6        A.  That was a telephone call.  Tina French
 7   was present with Ms. Giacino.
 8        Q.  And who is Tina French?
 9        A.  She is an assistant corporate secretary.
10        Q.  Did you speak to them while -- let's start
11   with Pamela Downs.
12            Did you speak to her about anything other
13   than just what specific searches had been done
14   related to Leavitt and Fong?
15        A.  That's my recollection, yes.
16        Q.  And is that the same with Laura Giacino?
17        A.  Yes.
18        Q.  Was there any information that Tina French
19   provided?
20        A.  I mean, there were -- there were times
21   when they were both talking.  It was -- it was
22   really an interview with Ms. Giacino.  It was
23   announced that Ms. French was also on the phone
24   and she occasionally piped in with information.
25   It was not always clear which one was talking.
```

1    Generally, Ms. Giacino led the call.

2        Q.  Can you explain to me by giving me an

3    example how this table works that you created?

4        A.  Well, the -- it was initially to be tied,

5    and I worked with counsel to get the -- in terms

6    of those, the specific case, Leavitt or Fong, and

7    the request so that I could tie the searches back

8    to a specific request for production.

9            The -- the next element is a -- is a --

10   simply a category, and the -- this table, for the

11   sake of convenience, the post- -- the later

12   searches specific to Leavitt and Fong materials,

13   and those -- and the requests for production.  But

14   the later searches were categorized for the -- for

15   the sake of understanding the circumstances for

16   each.

17           This table speaks to what -- denoted as

18   Category 3 and 4, which, as per the legend, are

19   additional searches of company sources and

20   first-time searches of company sources.

21           The other two categories that relate to

22   the additional collection efforts, Category 1

23   target searches of the global production and

24   refiltering of the previously collected unproduced

25   material, did not involve additional on-the-ground

```
 1   document-gathering.  So they -- only the
 2   on-the-ground collection activities were included
 3   in this table.
 4       Q.  Okay.  And I see there's a column here for
 5   "people consulted."
 6          What does that refer to?
 7       A.  So I -- in my conversations with
 8   Ms. Downs, I said, who did you go to, to identify
 9   this -- sources of this additional information,
10   where it might be, what might be obtainable, and
11   so the people consulted would be the people who
12   would be -- either have a custodial relationship
13   to the data or knowledge of where it might be.
14       Q.  And then "areas searched," that is
15   physically what they were actually searching?
16       A.  Yes.
17       Q.  Do you know, from your notes or from your
18   memory if we went through, who did the actual
19   searches?
20       A.  I -- I don't.  I understand that the
21   people consulted were involved.  I don't know who
22   physically did the hands-on searches.  Or, in the
23   case of the computer systems, I guess I would call
24   those hands-on as well.  But the actual searches.
25   It was certainly under attorney supervision.
```

1        Q.  And then you've got another column,

2   "search criteria"; correct?

3        A.  Yes.

4        Q.  So just looking at this second one under

5   "industrial hygiene" for Leavitt.  It's Request

6   Number 46 and Request for Production Set Number 3,

7   it says here the search criteria is "knowledge of

8   file names and key words for talc and asbestos."

9            So what do they actually look -- first of

10  all, let me see if I can get an idea of what

11  happened in that search.  What was -- whoever

12  did -- do we know who did the search, the actual

13  search here?

14       A.  I don't know who performed the search

15  except to say that it was based on the knowledge

16  of Vivian Pai and Reed Holbrook.

17       Q.  And it says, "Looked for missing

18  information from earlier archive searches,

19  departmental share."

20           So what were they actually searching?  Was

21  this a database search that they are's doing?  Are

22  they doing a search of physical archives?  What's

23  actually being searched?

24       A.  I would understand that they looked in

25  both the -- the ERMS archive as well as the

1   network share drive.

2       Q.  Now, on some of these others, you actually

3   did put EMRS (sic) here and you didn't put that

4   here, so I'm curious.  Are you guessing when you

5   say they looked at ERMS?

6       A.  Well, when Ms. Downs used the word

7   "archive searches," that's what I interpreted her

8   to be referring to.

9       Q.  Okay.  And that's what we discussed at

10  length in Volume I was the ERMS searches that --

11  it's kind of an indexing system; correct?

12      A.  For files in off-site --

13          MR. COX:  Object to form.

14          THE WITNESS:  Sorry.

15          MR. COX:  Go ahead.

16          THE WITNESS:  Files in off-site storage

17  and in certain cases files that are on -- in

18  company facilities.

19  BY MR. SWANSON:

20      Q.  It says, "Knowledge of file names and key

21  words for talc and asbestos."

22          That's the search criteria.  What does

23  that mean?

24      A.  I understood that to mean that, with

25  respect to the file shares, that between Ms. Pai

```
 1   and Mr. Holbrook, they looked for certain -- they
 2   scanned the list of file names in the departmental
 3   share and looked for files that they knew would be
 4   named accordingly.
 5           The key words I took to mean terms that
 6   were applied to the searches of the ERMS.
 7           MR. SWANSON:  Madam Court Reporter, can
 8   you read that back, please.
 9           (Record read by the court reporter.)
10   BY MR. SWANSON:
11       Q.  I don't understand.  They're looking for
12   file names where?
13       A.  In the share drive.  So, for instance, it
14   may be denoted as the L drive or the whatever
15   drive letter is associated with an area on the
16   company's computer network where they -- everyone
17   can contribute and deposit files, Microsoft office
18   files, other files that are at the departmental or
19   work group level.
20       Q.  So this is -- which company are we talking
21   about here?  The share files?
22       A.  My understanding would be corporate --
23       Q.  Go ahead.
24       A.  Well, Ms. -- Ms. Pay -- Pai would have
25   been in the corporate area, so she would have
```

1    consulted a corporate share.

2         Q.   Okay.  So when you say "corporate share,"

3    you mean Johnson & Johnson proper?

4         A.   That's my understanding.

5         Q.   Are you guessing or that's what you --

6         A.   Well, the notation for her title was WW.

7    So "Worldwide" would -- I believe, and I -- that's

8    what I took "WW" to denote.

9              I did not follow up and determine her

10   corporate affiliation.  I see that I

11   wrote "corporate," so I -- by all indicia, she is

12   part of the corporate organization as opposed to

13   consumer.  I did not independently reference

14   her -- you know, look her up in the directory or

15   anything like that.

16        Q.   And how far back is the information

17   that's -- or documents and information there on

18   their share drives, do you know?

19        A.   My understanding is that the -- the

20   information in share drives is generally

21   persistent.  It is not -- it is not subject to

22   disposition.  There may be -- they may have the

23   ability to perform retention on it, but I -- my

24   understanding is that that material is -- just

25   stays on the share drive.

1      Q.  And what's the original source of those

2  materials?

3      A.  Oh, those would be documents that authors

4  had placed there or people who had received them

5  had placed there.  So it is -- you know, because

6  it's a share drive, it does not necessarily tell

7  us how something got there.  It -- we may be able

8  to look at meta data and see who put it there

9  originally, but there's not really a story that's

10  told in the -- in the file share as to how

11  something got there.  Therefore, I believe

12  Ms. Downs relied on these people's memory to

13  understand where to look in the share drive that

14  would be for the relevant information.

15      Q.  So are these share drives like small

16  companies have where a bunch of information just

17  gets dumped in shared files -- in a shared drive?

18          MR. COX:  Object to the form.

19          THE WITNESS:  Well, I -- I understand that

20  at Johnson & Johnson -- and I've heard that the

21  term "L drive" being referred to denote areas

22  where there is a shared directory.

23          Now, that might be different for, let's

24  say, marketing versus R&D, but, generally

25  speaking, the company makes share drives available

1   to users to place information on, and that's

2   determined by the department as to how people use

3   it.

4        Q.  Is there -- is there some kind of standard

5   operating procedure about what gets put there and

6   what gets retained there and what gets removed and

7   who removes it?

8            MR. COX:  Object to the form.

9            THE WITNESS:  Well, to my understanding,

10  the company's retention policies do not speak to

11  what I call "containers" or "vehicles."

12           So, in other words, the L drive, the share

13  drive, would be simply a place to store

14  information.  The -- the policies or retention

15  schedules relate to the purpose, the use of the

16  document, the fact that it may be classified

17  according to a retention schedule based on its --

18  its content and purpose.  That's what would

19  determine how it's treated as opposed to whether

20  it's on a share drive or some other location.

21  BY MR. SWANSON:

22       Q.  I'm sure I'll have questions about that

23  later.

24           So you gathered a list of holds; correct?

25       A.  Yes, I did.

1       Q.   Okay.  And can you -- do you have multiple

2   copies of that?

3           MR. SWANSON:  So let's mark that as -- let

4   me mark yours -- as Exhibit 21 to your deposition.

5           (Whereupon, Plaintiff's Exhibit 21 was

6           marked for identification.)

7   BY MR. SWANSON:

8       Q.   When did you compile the list of holds?

9       A.   Last week.

10      Q.   Okay.  And I know some of these were

11  produced to us previously and some were produced

12  subsequently to the plaintiffs in these cases.  I

13  have seen these.

14          Is this a complete list of all of the

15  Johnson & Johnson holds with respect to talc

16  litigation?

17          MR. COX:  Object to the form.

18          THE WITNESS:  I requested holds relating

19  to consumer -- consumer talc.

20  BY MR. SWANSON:

21      Q.   And is this the complete list of

22  historical holds related to consumer talc?

23          MR. COX:  Object to the form of the

24  question.

25          THE WITNESS:  This is my understanding of

1   what was -- what was found to satisfy my request.

2   BY MR. SWANSON:

3       Q.  What specifically was your request?

4       A.  For holds relating to consumer talc.

5       Q.  And is the spokesperson for Johnson &

6   Johnson, then, this -- you have no information of

7   any prior legal holds related to consumer talc,

8   consumer talc litigation; correct?

9           MR. COX:  Object to the form.

10          THE WITNESS:  That's correct.

11  BY MR. SWANSON:

12      Q.  Did you interview anybody about legal

13  holds or did you ask -- just ask counsel for

14  whatever legal holds they had?

15      A.  I spoke with counsel.

16      Q.  And by the way, in between the two

17  depositions, how much time have you spent speaking

18  to Johnson & Johnson's counsel?

19      A.  I was on site probably five or six times,

20  either working by myself or working with counsel.

21  Probably -- with counsel, perhaps 15 to 20 hours.

22      Q.  And you say "on site," you mean at the

23  Skadden law firm offices?

24      A.  Yes.

25      Q.  Is there anything that you spoke to Pamela

```
 1   Downs or Laura Giacino related to Johnson &
 2   Johnson that is not summarily reflected in your
 3   notes?
 4            MR. COX:  Object to the form.
 5            Go ahead.
 6            THE WITNESS:  Of course, my prior
 7   conversations with Ms. Downs are in my other
 8   notes.  But in terms of the current time period,
 9   it's all in here.
10   BY MR. SWANSON:
11       Q.  Were any searches done or inquiries done
12   to -- were any inquiries or searches done to
13   locate responsive documents, other than you
14   requesting holds and retention schedules,
15   responsive documents to the plaintiff's requests
16   in the Leavitt and Fong cases subsequent to your
17   first volume of your deposition?
18            MR. COX:  Object to the form.
19            THE WITNESS:  I -- if I understand your
20   question correctly, I don't have complete
21   knowledge of that.  I know that additional
22   materials have been provided to plaintiffs,
23   additional retention schedules of company
24   policies.  I updated -- some of my materials that
25   I worked on with counsel that were updated had
```

1    been provided.

2             I don't know about searches.

3        Q.   Okay.  So, other than the additional

4    retention schedules and the worldwide records and

5    information policy being produced and the

6    additional holds, you're not aware of any other

7    searches being done since September 24th; correct?

8        A.   Well, I wouldn't -- I wouldn't be aware.

9    I mean, I'm not privy to that -- to that in terms

10   of the ongoing communications between plaintiff

11   and defendants.

12       Q.   I understand.  But your role here is to

13   talk about searches that were done, and I'm just

14   simply asking, since September 24th, are you aware

15   of any other searches being done other than for

16   the items that we just mentioned with respect to

17   holds, retention policies and...

18       A.   I see.  No.  I'm only aware of that, that

19   which has been listed in the sheet.

20       Q.   And I believe that -- you just mentioned

21   that you've updated some notes specific to these

22   cases; is that correct?

23       A.   Yes.

24             MR. SWANSON:  Do you have a copy of that,

25   Chris?  Thank you.

1           So let's mark this as Exhibit 22 to your

2    deposition.  If you give me your copy, let me mark

3    that.

4           THE WITNESS, oh sure.

5           (Whereupon, Plaintiff's Exhibit 22 was

6           marked for identification.)

7    BY MR. SWANSON:

8       Q.  What is Exhibit Number 22?

9       A.  This was an updated version of a document

10   that I worked on with counsel, and it's basically

11   simply a list of the noticed deposition topics

12   that I received, coupled with some of the produced

13   materials that correspond to them.

14      Q.  And this is an update of a document you

15   previously produced; is that right?

16      A.  Yes.

17      Q.  And I believe we previously attached that,

18   but I'll sort that out later.

19           Did you -- are there any other reports or

20   writings or notes that you made subsequent to

21   September 24th regarding this deposition in the

22   Leavitt and Fong cases?

23      A.  No.

24      Q.  I've just been provided today worldwide's

25   records and information management policies, so

1    I'm not going to get into the particulars of

2    the -- all the prior ones, but I do want to go

3    over some basics on those based on the ones that

4    I've actually had an opportunity to review up

5    until now.

6              MR. COX:  Mark, I'll just note for the

7    record that the revision history of the documents

8    that you're referring to are actually referenced

9    in the copies you've had for a while now.

10             MR. SWANSON:  Oh, okay.

11   BY MR. SWANSON:

12       Q.  And we may go over the other ones later or

13   we may just jump to them now if we need to.  But

14   I'm going to hand you two of them, which is

15   Version 4.

16             MR. SWANSON:  And that's Exhibit 23.

17             (Whereupon, Plaintiff's Exhibit 23 was

18             marked for identification.)

19             MR. SWANSON:  And Version 5, which will

20   be -- whoops, that's my copy with my notes on

21   it -- Version 5 of Johnson & Johnson's worldwide

22   records and information management -- records and

23   information management program standard will be

24   Exhibit 24 to your deposition.

25             (Whereupon, Plaintiff's Exhibit 24 was

```
 1              marked for identification.)

 2   BY MR. SWANSON:

 3        Q.  Do you have those in front of you?

 4        A.  I do.

 5        Q.  Okay.  So, yeah, there's some language at

 6   the beginning of this.  If you look at Exhibit 23,

 7   do you see what it says the policy is at the top?

 8        A.  Yes, I do.

 9        Q.  And can you read that out loud?

10        A.  "Records and information shall be created,

11   valued, protected, managed, and disposed in

12   accordance with applicable laws, regulations, and

13   the requirements of the worldwide records and

14   information management policy and standards and

15   other applicable Johnson & Johnson policies."

16        Q.  This is Version 4 of this, but you've seen

17   prior policies; correct?

18        A.  In the past I have, yes.

19        Q.  And the initial policy, Version 1, that

20   goes back to 2009; correct?

21        A.  I don't recall.

22             MR. SWANSON:  Can I mark yours and then

23   print another one?  I apologize.

24             (Whereupon, Plaintiff's Exhibit 25 was

25             marked for identification.)
```

```
 1    BY MR. SWANSON:
 2         Q.  I'm just going to go ahead and hand you
 3    what's marked as Exhibit Number 25.  You have that
 4    in front of you.  And that indicates that the
 5    Version 1 of 1.0 of Johnson & Johnson's worldwide
 6    records and information management policy was
 7    created or -- the date of this policy is July 31,
 8    2009; correct?
 9         A.  Yes.
10         Q.  So their -- Johnson & Johnson's worldwide
11    records and information management policy only
12    goes back to 2009; correct?
13         A.  This particular policy document, yes, was
14    created in 2009.
15         Q.  Well, this is Version 1.0; correct?
16         A.  Yes.
17         Q.  There's no prior version to that, is
18    there?
19         A.  I'm not aware of a worldwide prior
20    version.
21         Q.  So this was the first worldwide standard
22    for records and information management policy at
23    Johnson & Johnson; correct?
24              MR. COX:  Object to the form.
25              THE WITNESS:  Yes.
```

1    BY MR. SWANSON:

2        Q.  And this policy, if you look back at

3    Number 23, Exhibit 23, the policy that is

4    described there at the top of creating, valuing,

5    protecting, managing, disposing in accordance with

6    applicable laws, you know, records and

7    information, that -- does that accurately describe

8    the policy?

9            MR. COX:  Object to the form.

10           THE WITNESS:  I -- I believe it describes

11   this version of the policy.  This is the language

12   of the policy.  I don't understand.  This is

13   the -- the language from the policy is, I believe,

14   what you were referring to, and that is -- that is

15   the preamble to the policy.

16   BY MR. SWANSON:

17       Q.  Okay.  So let me ask you this:  Is it --

18   since 2009 part of Johnson & Johnson's record and

19   information management policy to create, value,

20   protect, manage, and dispose of information and

21   records in accordance with applicable laws,

22   regulations, and requirements of that policy?

23           MR. COX:  Object to the form.

24           THE WITNESS:  Well, yes, I've seen it in

25   that language in the Version 1.0, and I believe

1    you're referring to the 4.0 version.  I see it

2    there as well.

3    BY MR. SWANSON:

4        Q.  Okay.  And is that still Johnson &

5    Johnson's philosophy that a record -- their

6    worldwide records and information management

7    policy has to do with managing and disposing of

8    records and information in accordance with various

9    laws, regulations, and legal requirements?

10       A.  Is it still the policy today?

11       Q.  Yes.

12       A.  My understanding is that it is -- it is

13   still the policy today.  There is a new category

14   of -- of management of information which is

15   archive, and that archive may be encompassed in

16   the phrase "disposition."  In the later versions

17   of the program standard, the archive option was

18   made more explicit.

19       Q.  So we have Version 5 here.  Is that the

20   most recent version?

21           And that's Exhibit -- what did we mark

22   that as?  24?

23       A.  24.

24       Q.  Is that -- is this the most recent

25   version, Exhibit 24?

```
 1        A.  I'd want to check my notes to confirm
 2   that.
 3        Q.  Now, if you look at Exhibit 24 -- 23, if
 4   you look at the second page of this, you see
 5   under "provisions"?
 6        A.  I'm sorry, did you say "24" or "23"?
 7        Q.  23.
 8        A.  Yes.  I'm there.
 9        Q.  Okay.  And here -- it says here, "Records
10   and information shall be retained in accordance
11   with the Johnson & Johnson enterprise retention
12   schedule in accordance with applicable legal
13   holds.  When a record or information retention
14   requirement is reached, it shall be disposed of in
15   accordance with this policy and associated WWRAM
16   (sic) standards and in compliance with operating
17   company procedure."
18           Do you see that?
19        A.  Yes.
20        Q.  So the idea of having this management
21   policy is that it -- it's addressing how to
22   preserve and dispose of documents and the two
23   tools that are being used in conjunction to make
24   those determination are retention schedules and
25   legal holds; correct?
```

```
 1        A.  Yes.

 2        Q.  And that's still the policy; correct?

 3        A.  To my understanding, yes.

 4        Q.  And so -- and it says there, when -- when

 5   a retention requirement is reached, a record

 6   information "shall be disposed of."  Right?  In

 7   accordance with the policies.

 8            So when you reach a retention schedule,

 9   the limit of how long something has to be held, if

10   there's no legal hold in place, it gets disposed

11   of typically; correct?  That's the idea of this

12   policy; true?

13        A.  Yes.

14            MR. COX:  Object to the form and

15   mischaracterizes the document.

16   BY MR. SWANSON:

17        Q.  Would you agree -- does Johnson & Johnson

18   agree that for a records retention policy to be

19   effective it has to be complied with?

20            True?

21            MR. COX:  Object to the form.

22            THE WITNESS:  The -- the company creates

23   policies that are -- that express its -- its

24   intentions and procedures under them that enable

25   employees to comply with those policies.
```

```
 1   BY MR. SWANSON:
 2       Q.  Sure.  Of course.  That's what a policy
 3   is.  But if you've got a policy and you don't
 4   comply with it, then it's not an effective policy;
 5   correct?
 6       A.  Except -- yes, I would agree except to the
 7   extent that policies don't necessarily in
 8   themselves contain a mechanism to comply.  You
 9   need procedures to comply.
10           So the policy expresses what the
11   procedures should accomplish.
12       Q.  Right.  So there have to be procedures to
13   accomplish it, there has to be understanding by
14   employees; correct?
15       A.  Yes.
16       Q.  And that includes training of employees;
17   correct?
18       A.  Yes.
19       Q.  And whatever policies and mechanisms there
20   are need to be -- the employees who have records
21   or information need to know about those; correct?
22       A.  Yes.
23       Q.  So, for example, if there's a legal hold
24   and people don't know about a legal hold that --
25   that's theoretically applicable to documents or
```

1   information they have, then it's -- it has no

2   effect; correct?

3         MR. COX:  Object to the form.

4         THE WITNESS:  No effect in and of itself.

5   I mean, certainly there are other reasons why

6   people retain information such as retention

7   schedules.

8   BY MR. SWANSON:

9       Q.  But if there wasn't a retention schedule,

10  they wouldn't be -- I mean, if there was -- if it

11  wasn't under a retention policy, then it wouldn't

12  be retained.  Then -- and they didn't know about a

13  legal hold, then there would be no reason for them

14  to preserve that document; correct?

15        MR. COX:  Object to the form.

16        THE WITNESS:  There would be no business

17  reason for them to preserve them.

18  BY MR. SWANSON:

19      Q.  They might preserve it sort of by accident

20  or by the fact of just not -- not getting around

21  to it, something like that.  But otherwise they

22  would dispose of it; true?

23        MR. COX:  Object to the form.

24        THE WITNESS:  From the standpoint of the

25  policy documents, I would agree.

1    BY MR. SWANSON:

2        Q.  You're aware that the plaintiffs demanded

3    all retention schedules from Johnson & Johnson,

4    correct, in this case?

5        A.  I'm generally aware of that.

6        Q.  And you're aware that it has been

7    represented to the plaintiffs in this case that

8    all of those policies have been produced; correct?

9            MR. COX:  Object to the form.

10           THE WITNESS:  I'm aware that those

11   policies that could be located have been provided

12   have been produced.

13   BY MR. SWANSON:

14       Q.  And the oldest policy that you've seen is

15   1997; correct?

16       A.  That is the oldest retention schedule I've

17   seen at the Consumer level.

18       Q.  And what do you mean "at the Consumer

19   level"?

20       A.  Well, the Johnson & Johnson Consumer, Inc.

21   or Consumer Products are, as it's been known over

22   the different names over the years, has, since the

23   early '90s, created its own retention schedules.

24           MR. SWANSON:  Can I have that answer read

25   back, please.

```
1              (Record read by the court reporter.)
2    BY MR. SWANSON:
3         Q.  Okay.  So Johnson & Johnson -- you're
4    talking about the Johnson & Johnson Consumer
5    company that was the -- the subsidiary of Johnson
6    & Johnson that was specifically tasked with
7    marketing and distributing and manufacturing
8    Johnson's Baby Powder and Shower to Shower;
9    correct?
10        A.  Yes.
11        Q.  And there's a history of companies that
12   goes back to Johnson & Johnson Consumer Companies,
13   Inc.; Johnson & Johnson Consumer Products, Inc.;
14   Johnson's -- different-named companies; correct?
15        A.  Yes.
16        Q.  And you're telling me that those companies
17   had retention policies going back to the early
18   '90s?
19             MR. COX:  Object to the form.
20             THE WITNESS:  I'm -- in my fact-finding, I
21   interviewed Rosina Bruno-Sheerin who was one of
22   the company's records managers.  She and -- and
23   others, too, perhaps Michelle Anderson, others
24   that I spoke to, indicated that there were --
25   there was at least a schedule created in the early
```

1    '90s that was based on the McNeil Company's

2    schedule.

3    BY MR. SWANSON:

4        Q.  And where is that policy?

5        A.  I have requested and through counsel have

6    requested what policies and schedules could be

7    provided by the consumer companies.  What's been

8    provided thus far is what they were able to come

9    up with.  I understand that they continue to

10   research the availability of additional materials.

11       Q.  Okay.  And you realize that -- so I'll

12   just cut to the chase here.  You've seen the 1997

13   records retention schedule; correct?

14       A.  Yes.

15       Q.  So in 1997 in the records retention

16   schedule, Johnson & Johnson has a retention

17   schedule or retention period for records retention

18   schedules; correct?

19           MR. COX:  Object to the form.

20           Go ahead.

21           THE WITNESS:  I'm sorry.  When you say

22   "Johnson & Johnson," which entity are you

23   referring to?

24   BY MR. SWANSON:

25       Q.  It says "Johnson & Johnson Consumer

```
 1    Products Companies."  It was the -- you had
 2    mentioned that the earliest one that you've seen
 3    is 1997; correct?
 4         A.  Yes.
 5         Q.  And I have that here, and you have that.
 6    And, in fact, that has been marked as Exhibit 13.
 7    If you want to go ahead and pull that out.
 8         A.  Yes, I have it.
 9         Q.  If you look at page, I believe it's 251,
10    of Exhibit 13, which is the 1997 retention
11    schedule for Johnson & Johnson Consumer Products
12    Company.
13            And what does it say there about how long
14    records retention schedules documentations are
15    supposed to be maintained by the company?
16         A.  Life of corporation.
17         Q.  Okay.  So if any records retention
18    schedules that Johnson & Johnson had were
19    destroyed or were lost or not preserved, disposed
20    of, whatever you want to call it, they weren't
21    following their own records retention policy, were
22    they?
23            MR. COX:  Object to the form.
24            THE WITNESS:  I mean, in response to that
25    hypothetical, I would agree.
```

1    BY MR. SWANSON:

2        Q.  And Johnson & Johnson's Consumer Products

3    Companies, those are the folks who are making and

4    marketing and distributing the baby powder;

5    correct?

6        A.  That's my understanding.

7        Q.  So let's go to the notes.  If you look

8    at -- if you kind of peel under the rest of those

9    exhibits, you find -- you can put that '97

10   schedule aside for now.  I don't want to bog you

11   down with too many things, but if you look at

12   Exhibit 18, those are your notes.  And those are

13   the notes that you created, I believe, in

14   preparation for your deposition in June in the

15   Hayes case; is that correct?

16       A.  Yes.

17       Q.  And we attached those as Exhibit 18.  We

18   talked about this at some length.

19           MR. SWANSON:  What I'd like to do is give

20   you another copy of those that we can work off of

21   more easily.

22           (Whereupon, Plaintiff's Exhibit 26 was

23           marked for identification.)

24           MR. SWANSON:  I'm handing you Exhibit 26

25   to your deposition.  And let me explain what that

```
 1   is.
 2             And I think I have a copy for you, Chris.
 3             MR. COX:   Thank you.
 4   BY MR. SWANSON:
 5        Q.  Do you have Exhibit 26 in front of you?
 6        A.  Yes.
 7        Q.  And those are your notes that you prepared
 8   in preparation for your deposition in the Hayes
 9   case; correct?
10        A.  Appear to be, yes.
11        Q.  And what I've -- you see what I've done
12   here, I've had those paginated at the top right?
13        A.  I see.
14        Q.  And the reason is, is because I'm going to
15   have a number of questions about these and I
16   wanted to make it so that we could easily refer
17   each other to where we're -- where we're looking,
18   where your answer -- where it's related to my
19   question.
20             And so that's what I've done here.
21             And just, again, to summarize, you
22   prepared these notes from the conversations that
23   you had had with various Johnson & Johnson
24   business employees and also the people who are --
25   who deal with records retention, searches,
```

1   maintenance of document platforms, and that sort

2   of stuff; right?

3       A.  I would agree except that I would say, and

4   I didn't really prepare them from the

5   conversations.  They are the real-time record of

6   what people were saying as I was asking.  So I was

7   typing as I was talking.

8       Q.  So these are -- these are the best

9   verbatim records that you could take at the time?

10      A.  Yes.

11      Q.  And you mentioned a Rosina Bruno-Sheerin,

12  I think.

13      A.  Yes.

14      Q.  Making a reference to earlier retention

15  schedules prior to 1997; is that correct?

16      A.  Yes.

17      Q.  And can you direct that -- direct me to

18  that in your interview?

19      A.  Yeah.  First, I'm going to look in

20  Exhibit 19, which is just the index of the notes,

21  and I see that she's about halfway through.  So

22  I'm going to...

23          So that's page 36.

24      Q.  Okay.  And where in your notes is the

25  reference to retention schedules of the Johnson &

1    Johnson Consumer Companies going back to the early

2    '90s?

3         A.  On the first page, she noted that she came

4    to the company, to the -- what she calls the

5    "office side" in 1990, and she noted that she

6    created a retention schedule and aligned boxes and

7    used the McNeil versions as her basis.

8              Excuse me.

9         Q.  Do you know what -- do you know what the

10   retention schedule entailed in terms of what

11   departments or companies it was for?

12        A.  Simply what was put there, that there were

13   a few -- that there were not a large number of

14   boxes at that time.  She references some specific

15   material such as batch records and R&D.  It's not

16   clear from her notes what -- you know, what every

17   records type would have been at that point,

18   although one can conclude that the McNeil

19   schedules were already in existence at that point

20   and would have -- would have been -- had similar

21   content.

22              MR. SWANSON:  Move to strike based on

23   speculation.  It's also nonresponsive.

24   BY MR. SWANSON:

25        Q.  So the retention schedule that you

1    created, was that only as to those boxes, those

2    few boxes that are referenced there?  And if you

3    don't know, just tell me you don't know.

4        A.  Yeah, like I said, my recollection is that

5    she's -- she told me and I wrote it down that she

6    based the schedule on the McNeil schedule.  So

7    I -- by that, I infer or deduce that it was not

8    just covering the boxes in front of her but was

9    a -- meant to be a representative schedule.

10       Q.  For what?

11       A.  For the Fort Washington operation.

12       Q.  And what was the Fort Washington operation

13   doing at that time?  What specifically was their

14   involvement in baby powder?

15          MR. COX:  Object to the form.

16          THE WITNESS:  I'm not an expert on the

17   precise locations.  I don't know that they -- that

18   side of the business was involved.  I believe

19   there was -- there was more activity on the

20   Skillman side related to the baby powder but

21   that eventually the two sides came together.

22   BY MR. SWANSON:

23       Q.  So you don't know whether these --

24   whatever retention schedule there was that she

25   created -- first of all, we don't have it.  You

```
 1    don't know the particulars of that, although she

 2    said it was based on McNeil.

 3             Have you reviewed the Neil Fort Washington

 4    schedule?

 5        A.  No.

 6        Q.  So you don't -- as the representative for

 7    Johnson & Johnson, you don't know what was in that

 8    retention schedule, do you?

 9        A.  Correct.

10        Q.  You don't know what the periods of

11    retention were for; correct?

12        A.  Correct.

13        Q.  And you don't know whether or not that

14    applied specifically what it applied to other than

15    something at Fort Washington; correct?

16        A.  Correct.

17        Q.  So if we wanted more information about

18    this, we would have to speak to Rosina

19    Bruno-Sheerin; correct?

20             MR. COX:  Object to form.

21             THE WITNESS:  Well, I've done my best to

22    summarize her recollection.  Then there's other

23    references to those schedules in my notes.  She is

24    a person with knowledge.

25    BY MR. SWANSON:
```

1      Q.  What other references to early '90s

2  schedules are there in your notes?

3           Well, first of all, you said she's a

4  person of knowledge; she has more knowledge with

5  you about these issues of course; correct?

6           MR. COX:  Object to form.

7           THE WITNESS:  In terms of the specific

8  question about when -- when and how the schedules

9  were creating, she has that knowledge.

10  BY MR. SWANSON:

11      Q.  Or even what the purview of those

12  schedules was in terms of that to which they were

13  applicable; correct?

14      A.  I would agree.

15      Q.  And where else in your notes?

16      A.  I'm just running through the various

17  records notes.

18           Yeah.  There's one reference in Cindy

19  Aden's notes about talking to Rosina regarding

20  historical schedules.  I -- I'm continuing to look

21  for other -- other references.

22      Q.  Okay.  Let's -- we've got a lot to cover,

23  so if you see something later you can mention it

24  and we'll go over it, if there are other

25  references from other people, who had firsthand

```
 1    knowledge of those schedules.
 2              MR. COX:  Mark, if you're going to move on
 3    to a new topic, could we take a short break?
 4    We've been going for about an hour.
 5              MR. SWANSON:  Let me ask one -- one
 6    follow-up there.
 7    BY MR. SWANSON:
 8         Q.  If you look at page 31 of your notes.
 9    This is Exhibit 26 again.
10         A.  "31" you said?
11         Q.  Yeah.  There was -- I'm trying to find it.
12    Looks like this ERMS was launched in 2014;
13    correct?
14         A.  Yes.
15         Q.  And you see where it says, "Now have
16    integrated retention schedule management in ERMS."
17         A.  Yes.
18         Q.  Was the -- was the retention schedule of
19    management not integrated prior to 2014 at
20    Johnson & Johnson?
21              MR. COX:  Object to the form.
22              THE WITNESS:  Well, I took that to mean
23    that the schedule had to be applied to TRIM to
24    GIFTS to Versatile independently as opposed to
25    being able to practice retention from a single
```

```
 1  vantage point.
 2          MR. SWANSON:  Chris, did you say you want
 3  a break?
 4          MR. COX:  Yeah.  I figured you were going
 5  to move on to a different topic.
 6          MR. SWANSON:  Well, yeah.  I mean, there's
 7  a lot to cover, so if you -- if he needs a break,
 8  you need a break, that's fine.
 9          MR. COX:  Okay.  Let's take a short break.
10          MR. SWANSON:  Let's try to keep our
11  breaks --
12          THE VIDEOGRAPHER:  This marks the end of
13  Video Media Number 1 in the deposition of James
14  Mittenthal.
15          Off the record at 10:13.
16              (Recess taken.)
17          THE VIDEOGRAPHER:  On the record at
18  10:34 a.m.
19          This marks the start of Media Number 2 in
20  the deposition of James Mittenthal.
21          Counsel, you may continue.
22  BY MR. SWANSON:
23      Q.  When you spoke to Rosina Bruno-Sheerin
24  about earlier schedules that have not been
25  produced and Johnson & Johnson hasn't located, did
```

```
 1    she tell you that those were the first retention

 2    schedules produced -- created by Johnson &

 3    Johnson?

 4              MR. COX:  Object to form.

 5              THE WITNESS:  She indicated that there

 6    were -- and I'm going to refer to her exact words

 7    if that's okay.

 8    BY MR. SWANSON:

 9        Q.  That's fine.

10        A.  Or what I -- what I wrote from her words.

11              So this is on page 36, a few lines down.

12    "Created retention schedule and aligned boxes."

13              I took that to mean that she created the

14    retention schedule where none had existed for that

15    department or facility.

16        Q.  But anything more than that, you don't

17    know as to whether or not those were the first

18    retention schedules applicable to her department

19    or something broader than her department; correct?

20        A.  Correct.

21        Q.  Are the current Johnson & Johnson record

22    retention schedules for the consumer companies and

23    the global retention -- well, let's start with the

24    consumer companies.

25              Are they mandatory?
```

```
 1              MR. COX:  Object to the form.
 2              THE WITNESS:  They describe periods by
 3    which information in the various categories must
 4    be held -- held for.  So, to the extent that
 5    they -- that a piece of information is viewed to
 6    be subject to a retention schedule, then it is
 7    required that that information be held at least as
 8    long as that retention schedule prescribes.
 9    BY MR. SWANSON:
10         Q.  So that's a "shall" as opposed to a "may";
11    correct?  Something that's mandatory that
12    employees are required to follow; is that true?
13         A.  I would agree.
14         Q.  And since what year have the retention
15    schedules for Johnson & Johnson been mandatory?
16         A.  Well, I don't know.  Johnson & Johnson
17    is -- is -- which Johnson & Johnson entity would
18    that refer to?
19         Q.  Let's talk about the consumer companies
20    who are marketing and manufacturing, selling
21    Johnson & Johnson talc -- cosmetic talc products.
22         A.  Okay.  I would refer to my notes with
23    Darren Harris, which is going to be -- I'm sorry.
24    I'm looking at the wrong copy.  This is the
25    paginated one.  Page 27.
```

1              So in that note he indicated that ten

2    years ago in approximately 2009, the Skillman and

3    Fort Washington materials were -- were

4    consolidated.

5         Q.  Where is that note on the page?

6         A.  About ten lines down.

7         Q.  Okay.  It says, "Ten years ago Skillman

8    went under Fort Washington team, had different

9    SOPs for each."

10             What does that mean?

11        A.  Standard operating procedures.

12        Q.  As to what?  Document retention?

13        A.  How to effectuate document retention, yes.

14        Q.  How does that answer my question about

15   whether or not the policies were mandatory?  When

16   they became mandatory.

17        A.  Yes.  I -- I didn't see the precise answer

18   to that question in -- in his comments.  I -- I

19   have a retention schedule from 1997 that applies

20   to Johnson & Johnson Consumer Products Companies.

21   That's the earliest schedule I'm aware of.  There

22   may be mandatory schedules prior to that time.

23        Q.  Now, did that 1997 schedule, which is

24   marked as Exhibit 13 to your deposition, that

25   doesn't say on there that it's mandatory, does it?

1    In fact, it calls it a "guideline."  Doesn't it

2    say "guideline" right in the title, "Johnson &

3    Johnson Consumer Products Companies Guideline

4    Records Retention Schedule"?  True?

5         A.  Yes, I see that.

6         Q.  But the current ones don't say

7    "guideline," do they?

8         A.  I don't see that on the current ones.

9         Q.  And when you were speaking to Rosina

10   Bruno-Sheerin, she told you that the prior global

11   records retention schedules were not mandatory but

12   were only a suggestion.

13            Do you recall that?

14        A.  I'd like to reference...

15        Q.  It's page 37.

16        A.  Can you reference me to that point on

17   page 37?

18        Q.  Yes.  It's about -- a little more than

19   halfway down, it says, "in 2006 tried to make

20   records, titles more uniform in standardized

21   retention periods.  Old corporate program called

22   'global records retention scheduled' was only a

23   suggestion."

24            Do you see that?

25        A.  Yes, I do.

```
 1        Q.  So until 2006 or sometime around there --
 2   well, let me ask you, because she's referring to a
 3   2006 date and trying to standardize the retention
 4   schedules.  When she says this global records
 5   retention schedule is only a suggestion, until
 6   what year after 2006 was it still only a
 7   suggestion?
 8             MR. COX:  Object to the form.
 9             THE WITNESS:  Well, the GRRS was not a
10   consumer products schedule.  That was a corporate
11   schedule.  That is a schedule that the Johnson &
12   Johnson corporate had devised to be available to
13   the franchise companies if they wished to use it.
14             In 2015, the GRRS was replaced with the
15   ERS, the enterprise retention schedule.  At that
16   point adoption or harmonization with the ERS
17   became mandatory.
18   BY MR. SWANSON:
19        Q.  So until 2015, if a particular Johnson &
20   Johnson operating company or department didn't
21   have its own retention schedule, then it could
22   comply with corporate's global record retention
23   schedule, which was only a suggestion; correct?
24             MR. COX:  Object to the form.
25             THE WITNESS:  My understanding is that it
```

```
 1   was available to be used by the -- the entities if

 2   they wished.

 3   BY MR. SWANSON:

 4        Q.  And that would include -- would that

 5   include overseas entities?  And if you don't know,

 6   just say you don't know.

 7        A.  Yeah.  I don't know.

 8        Q.  Okay.  And, again, is Rosina Bruno-Sheerin

 9   the person we should be talking to about that?

10             MR. COX:  Object to form.

11             THE WITNESS:  About which topic?

12   BY MR. SWANSON:

13        Q.  About whether or not the global records

14   retention schedules were applicable to overseas

15   operating divisions or subsidiaries of Johnson &

16   Johnson corporate.

17        A.  Well, inasmuch as GRRS is a corporate

18   vehicle or was a corporate vehicle, I would think

19   a person in the corporate records program would be

20   the best person to elicit that from.

21        Q.  Who would that be?

22        A.  That could be Cindy Aden.  That could be

23   Karen Skellington.

24        Q.  Did you speak to them about that issue,

25   the applicability of the global records retention
```

1    schedule to Johnson & Johnson International or

2    Johnson & Johnson Hong Kong or Johnson & Johnson

3    Philippines, for example?

4        A.  I don't recall speaking about that.

5        Q.  So -- but until 2015, this global records

6    retention schedule was just a suggestion because

7    it existed until 2015 when it was replaced by the

8    ER -- the enterprise retention schedule; true?

9        A.  Yes.

10       Q.  So that just means by definition, then, if

11   an operating division or unit or department of

12   Johnson & Johnson did not have its own retention

13   schedule at the time, they either wouldn't have a

14   retention schedule or they could use this global

15   records retention schedule; true?

16           MR. COX:  Object to the form.

17           THE WITNESS:  I'm not familiar if both of

18   those alternatives were available.  I know that

19   the schedule existed prior to 2015.  I don't know

20   whether it was mandatory or not in the absence of

21   another schedule.

22   BY MR. SWANSON:

23       Q.  Well, Rosina Bruno-Sheerin said it was

24   only a suggestion; true?

25           MR. COX:  Object to the form.

1    BY MR. SWANSON:

2         Q.  Old corporate program, that's referring to

3    GRRS, was only a suggestion.  That's what she

4    meant; correct?

5              MR. COX:  Object to the form.

6              THE WITNESS:  In the -- in the 2006 time

7    frame I believe she was referring.  Yes.  I -- she

8    was referring to the 2006 period.

9    BY MR. SWANSON:

10        Q.  How -- why do you say that that refers to

11   2006 period?  The old corporate program you just

12   told me was GRRS and it wasn't replaced until 2015

13   by ERS.  So the old program is GRRS; true?

14        A.  Yes.

15             MR. COX:  Object to the form.

16   BY MR. SWANSON:

17        Q.  Okay.  So are you telling me that, even

18   though she said the old corporate program called

19   GRRS was only a suggestion, are you telling me

20   that GRRS went from only being a suggestion to

21   being mandatory at some point?

22        A.  No.

23        Q.  Okay.  So it was only a suggestion until

24   it was replaced by ERS; true?

25        A.  That's my -- my understanding.  But I

1    don't know the particulars.  In other words, was

2    it a suggestion if the operating company didn't

3    have a schedule in place or was it a suggestion if

4    the operating company had a schedule in place they

5    could opt to use either.  I don't know the

6    particulars between those two scenarios.

7        Q.  Okay.  But, to the extent it was being

8    used, it was, when it existed, only a suggestion;

9    true?

10           MR. COX:  Object to the form.

11           THE WITNESS:  Yes.

12   BY MR. SWANSON:

13       Q.  And -- which means if a company or

14   division or department did not at the time have an

15   operative record retention schedule, then it could

16   have the option of using the GRRS; true?

17       A.  That is my understanding.

18       Q.  But if they had their own records

19   retention schedule, then they may or may not use

20   the GRRS; true?  Because it wasn't mandatory.

21       A.  There are other in-between possibilities.

22       Q.  What's the in-between possibility?

23       A.  They take the GRS, use it as a model, and

24   then alter it to suit their own requirements.

25       Q.  You don't have any specific information

1   about any division or subsidiary doing that with

2   the GRRS, do you?

3        A.  Correct.

4        Q.  So I think we discussed this, but Johnson

5   & Johnson agrees that in order to follow its own

6   retention schedules -- well, its own document and

7   information policies and programs, people need to

8   be trained; correct?

9        A.  Yes.

10       Q.  And you learned from your interviews that

11  until 2008, a large number of people at Johnson &

12  Johnson were still untrained in records retention

13  policy; true?

14            MR. COX:  Object to the form.

15            THE WITNESS:  Can we reference a citation

16  for that somewhere in my notes?

17  BY MR. SWANSON:

18       Q.  Yes.  It's page 29 of your notes.

19            Okay.  Let's be specific here.  This is an

20  interview of Joan -- Joann Dodd?

21       A.  Yes.

22       Q.  Senior analyst, records management; true?

23       A.  Yes.

24       Q.  And she started in 2007-2008 according to

25  your notes; is that right?

1      A.  In the records program, yes.

2      Q.  And so she's in the records program.

3  Records program for which companies?

4      A.  Consumer, Inc.

5      Q.  Johnson & Johnson Consumer, Inc.  And,

6  again, that's the company that's marketing and

7  manufacturing the cosmetic talc products including

8  baby powder and Shower to Shower; correct?

9      A.  Yes.

10      Q.  And do you see here where you wrote, "Back

11  in 2008, 56 percent participation in recurring

12  departmental training.  Now 98.  But would not" --

13  "but would perform departmental audits."

14          So in 2008, only 56 percent of the

15  employees at Johnson & Johnson Consumer, Inc.,

16  only 56 were trained in the records policies; is

17  that right?

18      A.  No.

19      Q.  What does that mean?

20      A.  Recurring training, meaning that the --

21  you come to the company as an employee, you

22  receive records training.  You were then required

23  to get recurring training once or twice a year as

24  you go forward in your -- in your job.

25      Q.  Does it say anything in your notes

1    about -- well, before I get there, what's the

2    purpose of recurring training?

3        A.  To reinforce the objectives and the

4    procedures for record retention, to inform

5    employees of any changes in those procedures.

6        Q.  Okay.  And that's done currently at

7    Johnson & Johnson Consumer, Inc.  How often is

8    that done, these reoccurring trainings?

9        A.  A couple times a year.

10       Q.  And so there's 44 percent of the people as

11   of 2008 were not getting recurring training; true?

12       A.  In 2008, I -- I would agree that that was

13   her point.

14       Q.  And what was the participate -- when

15   did -- do you have any information as of 2008

16   whether or not any initial training was done?

17       A.  I understand initial training was required

18   for people to get started in their job.  I

19   understand that was mandatory.  I could go back to

20   understand if that was a hundred percent or some

21   lesser number.  I don't have that number at hand.

22       Q.  Where did you get the understanding that

23   there was as of 2008 a mandatory, or initial

24   training?

25       A.  I have -- it may be in my notes; it may

 1  not.  Over the years I have spoken to Johnson &

 2  Johnson employees and understand that there is an

 3  onboarding process that includes records training.

 4       Q.  And so that initial training was something

 5  that would be done -- well, first of all, who --

 6  do you remember who that was who told you that?

 7  And do you know if it was as to Johnson & Johnson

 8  Consumer, Inc. or the Johnson & Johnson Consumer

 9  Companies?

10       A.  I would have to look through my notes.  I

11  don't recall -- I know there have been references

12  to it.  I don't recall the context for whom I

13  heard it from, and, to the extent that it's in my

14  notes, I can check.

15       Q.  And when -- what is -- I don't want you to

16  guess, but do you have any information about when,

17  what year Johnson & Johnson instituted records

18  retention and records policy training for new

19  employees?

20       A.  With your permission, I'm just going to

21  look through a couple of my notes and see if I

22  can't get some references to that.

23       Q.  Sure.  Go ahead.

24       A.  Well, the first one I just found off the

25  bat was that Ms. Dodd just a few lines above from

1   when we were talking about indicated that training

2   must be accomplished in 30 days for a new

3   employee.

4         Q.  Where does it say that?

5         A.  Your page 29, right after that section

6   that says the five SOPs.

7         Q.  Oh, "need training within 30 days"?

8             So that's referring to records management

9   training and records retention schedule training?

10        A.  Further down it indicates, "Training

11  included legal hold, departing associates,

12  retention procedures, roles."

13        Q.  Okay, but again, I believe the question

14  was, do you have any information of when that

15  started, training within 30 days of a new

16  employee?

17        A.  I do not.

18        Q.  And so you don't know even if that was

19  happening in 2005; true?

20        A.  I don't have specific information about

21  that.

22        Q.  And you don't know whether or not that

23  was being -- people were being trained at all as

24  to that 1997 records retention schedule, do you?

25        A.  I do not.

1      Q.  Now, if 44 percent of the folks aren't

2  going to reoccurring training as to 2008 and

3  somebody started a long time ago, they may have

4  never had the training; true?

5           MR. COX:  Object to the form.

6           THE WITNESS:  It's possible.  I -- I think

7  Ms. Dodd made the point afterwards that there were

8  departmental audits that were conducted outside

9  the training to verify participation and

10  knowledge.

11  BY MR. SWANSON:

12      Q.  Do you know the particulars of those

13  audits?

14      A.  No.

15      Q.  So, again, Joann Dodd would be the person

16  to talk -- for us to talk to about that; correct?

17           MR. COX:  Object to the form.

18           THE WITNESS:  With respect to that topic,

19  yes.

20  BY MR. SWANSON:

21      Q.  And would you agree with me that, even if

22  training had started at the time of the initial

23  record retention schedules or going back to 1997,

24  that if somebody started right around then and

25  didn't have retraining, whatever knowledge they

1    had about the records retention would be variable

2    and it could be pretty stale, couldn't it?

3            MR. COX:  Object to the form.

4            THE WITNESS:  It's -- it's possible.  Her

5    point, to follow on to that statistic, was that

6    audits would detect a nonparticipation.

7    BY MR. SWANSON:

8        Q.  Where's the reference to audits again?

9        A.  Just under the 98 percent.

10       Q.  Well, you said something about detecting.

11   It just says here "but would perform departmental

12   audits."

13           Other than what you wrote there, those

14   five words, "but would perform departmental

15   audits," do you have any information about those

16   audits?

17       A.  Not about the audits themselves.

18       Q.  And were there any audits prior to 2008?

19       A.  She didn't indicate when the audits

20   started.

21       Q.  So there may not have been; true?

22       A.  I can't speak one way or the other.

23       Q.  I want to ask you about something

24   called -- referred to in your notes as "cleanout."

25           Are you familiar with that?

1      A.  Yes.

2      Q.  Okay.  And what was -- what does cleanout

3  in your notes in the several people you discuss

4  cleanout about, what does that refer to?

5      A.  Cleanout was a reference to a retired

6  WWRIM standard entitled "Records Cleanout

7  Standard."

8      Q.  And the cleanout was a -- it was called

9  the "cleanout event"; correct?

10      A.  Yes.

11      Q.  And the cleanout event was something that

12  happened annually; correct?

13      A.  Generally.

14      Q.  And it was mandatory; true?

15      A.  It was a participatory event, the -- like

16  an inventory day in a business.

17      Q.  So a manager of a department would oversee

18  the cleanout event, correct, or some manager in

19  the department?

20      A.  Managers and records coordinators and

21  records officers.

22      Q.  And they did that to ensure that everybody

23  was complying with the policy in doing the

24  cleanout event annually; true?

25      A.  Yes.  Compliance was also the individual

1    employee's responsibility, but in terms of

2    disposal of information, they were also there to

3    sign off on disposal of information.

4        Q.  And generally speaking, the cleanout event

5    was essentially if something is not currently

6    being held because of a retention schedule or a

7    legal hold, it should -- it has to be destroyed;

8    correct?

9            MR. COX:  Object to the form.

10           THE WITNESS:  The -- the purpose of the

11   cleanout day was to give opportunity to the

12   employees to go through their materials, identify

13   those that were candidates for disposition, and

14   basically get themselves organized.

15   BY MR. SWANSON:

16       Q.  But when you say "disposition," what

17   you're really talking about is if the documents

18   were not subject to a hold or to a retention

19   period still, those documents, when you say

20   "disposition," you mean they were to be destroyed;

21   correct?

22       A.  That's right.

23           MR. COX:  Object to form.

24   BY MR. SWANSON:

25       Q.  They can't keep them around.  You

```
 1    destroyed those records; true?

 2             MR. COX:  Object to the form.

 3             THE WITNESS:  That's right.

 4    BY MR. SWANSON:

 5        Q.  Now, I just got some of these today, these

 6    WW worldwide records and information management

 7    policies.  So I apologize if I fumble around on

 8    them a little bit, but I'm going to -- I want to

 9    go through them a little bit with you.

10             You know, we probably should just for

11    your -- let's take that stack over there and put

12    it on top over there, I think, will help you out.

13    And then see what you've got underneath.  Probably

14    keep the notes around.  You're going to need

15    those.

16             Okay.  And I think we marked, and

17    hopefully I can locate it, the Version 1.0 is

18    marked as Exhibit Number 25, and I believe you

19    have that.

20             I can show it to you there so you can see

21    what it looks like.

22        A.  25.  Here it is.

23        Q.  You got 25.  Okay.

24             Do you have that in front of you?

25        A.  Yes, I do.
```

```
 1        Q.  And so this is the worldwide's record

 2   information management policy Version 1.0 dated

 3   July 2009; true?

 4        A.  Yes.

 5        Q.  And the Version 1.1, which was also

 6   produced and we will mark that, too, and the rest

 7   of the versions that were provided have quite a

 8   few pages, I don't know, 30, 40 pages, something

 9   like that.  This one looks to be about four or

10   five pages.

11            Do you know where the rest of this

12   document is?

13            MR. COX:  Object to the form.

14            THE WITNESS:  Did you say 1.1?

15   BY MR. SWANSON:

16        Q.  No.  1.0 is what we're looking at.

17        A.  Okay.

18        Q.  I just referenced the other ones because

19   they're --

20            I need to get some water.  I'll be back in

21   two seconds.  Pardon me.

22            Okay.  So you have Exhibit 25 in front of

23   you?

24        A.  Yes.

25        Q.  And let's go ahead and --
```

```
 1            Do you have -- do you have Policy 1.1?

 2        A.  I don't believe I do.

 3            MR. SWANSON:  Let's see.  Let's mark this

 4   one for you.

 5            (Whereupon, Plaintiff's Exhibit 27 was

 6            marked for identification.)

 7   BY MR. SWANSON:

 8        Q.  So Johnson & Johnson worldwide records and

 9   information management policy Version 1.1,

10   September 30, 2009, that is marked as Exhibit 27.

11            Do you have that one in front of you?

12        A.  I do.

13        Q.  Okay.  Let me just go ahead and give you

14   the rest of them, too, so you've got them in front

15   of you.

16            MR. SWANSON:  And Version 2 of the WWRIM

17   policy dated 2011 is Exhibit 28.

18            (Whereupon, Plaintiff's Exhibit 28 was

19            marked for identification.)

20            (Whereupon, Plaintiff's Exhibit 29 was

21            marked for identification.)

22   BY MR. SWANSON:

23        Q.  And Version 3.0 of the WWRIM policy dated

24   April 1, 2014, is Exhibit 29.

25            Do you have that in front of you?
```

```
 1        A.  Yes.

 2        Q.  And we had already marked Versions 4 and

 3   5.

 4             Okay.  So going back to Exhibit 25,

 5   Version Number 1.0, from July 31, 2009, where is

 6   the rest of the policy in terms of these various

 7   what you call "RIMS"?

 8             MR. COX:  Object to the form.

 9             THE WITNESS:  Assuming this is complete, I

10   don't see the standards in Version 1.0.

11   BY MR. SWANSON:

12        Q.  So as of July -- but you said assuming

13   this is complete.

14             Do you know if this is complete?

15        A.  I have not seen this Version 1.0 before

16   today.

17        Q.  Okay.  Do you see on all of these WWRIM

18   policies that were just produced today to us this

19   morning, Versions 1.0 through Version 3, why are

20   there no Bates numbers on those documents?

21        A.  I -- I can't speak to that.  I -- that

22   would be a lawyer question.

23        Q.  Now, the record retention schedule that

24   was produced, the first one that you have, goes

25   back to 1997.
```

1            Was there a records and information

2    management policy or policies that went back to

3    1997?

4            MR. COX:  Object to the form.

5            THE WITNESS:  My understanding is that

6    there were policies that accompanied the

7    schedules.

8    BY MR. SWANSON:

9        Q.  Okay.  And I did not see those policies

10   produced with the records retention schedules that

11   were produced to us.

12            Do you have those?

13       A.  No.

14       Q.  Do you know where those are?

15       A.  My understanding is that the records

16   department is continuing to research those

17   materials.

18       Q.  Is it also fair to say that those -- those

19   record retention policies prior to 2009 would have

20   also been documents that should have been kept for

21   the -- left for the corporation?

22       A.  I'd have to go back to the schedule and

23   see how the schedule is defined.

24            Do we have a reference to that?

25       Q.  Is that page 251 of Exhibit 13, I believe?

1    That's the section on records management.

2            You see records management training

3    information, records destruction authorization,

4    records.  Oh, sorry -- yeah, 251, records

5    retention documentation.

6            And if you don't know, that's fine.  Oh,

7    if you see records -- if you look at -- let me

8    just ask you differently:  Do you know what the

9    retention period was on records and information

10   management policy prior to --

11       A.  Well, I was looking.

12       Q.  -- 2009?

13       A.  I was looking and I found on page 248 of

14   the '97 schedule an indication that policy

15   documents, which are defined as written

16   descriptives of the operating principles, are

17   directives pertaining to the organization, are to

18   be held S plus 8.

19       Q.  S plus 8.  So that would be 2009 to 2017;

20   true?

21       A.  So, in other words, the year that they

22   were superseded plus 8.

23       Q.  Oh, okay.  I see.  So presumably, then,

24   you would expect that there should be some

25   policies still, although we'd have to look at

1   subsequent record retention schedule to see if

2   that stayed consistent; true?

3       A.  I'd have to do the arithmetic, frankly.

4       Q.  All right.  Okay.  Let me ask you about --

5   I've got some questions on Number -- Version 1.1,

6   that's Exhibit 27.  Okay.

7           If you go to RIMS Number 3 in that

8   document, which is about, looks like about eight

9   pages in?

10      A.  Records cleanout events standard.

11      Q.  You got that right?

12      A.  Okay.

13      Q.  And this is referring to the cleanout

14  event, the annual cleanout event that we were

15  talking about earlier; right?

16      A.  Yes.

17      Q.  And this indicates that this -- this would

18  have been in effect September 30, 2009; true?

19      A.  Yes.

20      Q.  Were there cleanout events prior to

21  September 2009?

22      A.  I have general knowledge -- and it may not

23  be reflected in my notes -- I have general

24  knowledge that -- that there were.

25      Q.  How far back were there cleanout events

1    prior to 2009?

2        A.  I don't have specific answers to that.  My

3    understanding is that it was a -- had been in

4    place for a number of years based on the fact that

5    the company was working primarily in paper going

6    back many years and that the cleanout standard and

7    event was organized to organize -- was held to

8    help employees organize paper documents primarily.

9        Q.  And do you know -- you don't know

10   specifically how many years that goes back,

11   though; true?

12       A.  Correct.

13       Q.  And this was -- the policy -- this policy

14   WWRIM is a worldwide policy; correct?

15       A.  Yes.

16       Q.  So that would affect what's going on in

17   the Philippines, J&J Philippines, J&J Hong Kong;

18   true?

19       A.  It -- by implication worldwide, yes, would

20   apply worldwide.

21       Q.  Because it says it provides requirements

22   for Johnson & Johnson operating companies; true?

23       A.  Yes.

24       Q.  It says, "Reference terms" -- under

25   "definitions," it says, "Reference terms used in

```
 1    the standard are found in the worldwide's record
 2    and information management program glossary."
 3            Had that been provided to us?
 4       A.  I'm looking at the definitions section at
 5    the front of the policy.  I don't know if that is
 6    the glossary that's being referenced or not.
 7       Q.  What page is that?
 8       A.  The first page.
 9       Q.  That doesn't look like a glossary to me.
10            Does that look like a glossary to you,
11    under "definitions"?
12       A.  I don't know.
13       Q.  Wouldn't a glossary list the various terms
14    that are used and define each of the terms?
15       A.  Yes.
16       Q.  Okay.  And this definition just is a
17    definition of disposition, standard document hold,
18    records retention schedule, compliance, and
19    standard; true?
20       A.  I don't believe it's compliance.
21       Q.  Okay.  But the rest of those terms that
22    are in -- the six italicized terms are the ones
23    that are defined there; right?
24       A.  Yes.
25       Q.  Now, this says, "Management program
```

1   glossary," the reference that I was referring to

2   under "cleanout event standard."  And I don't see

3   anything here that says -- do you see anything in

4   this document that's been provided to us called

5   "Worldwide records and information management

6   program glossary"?

7        A.  What I'm going to do is look at a later

8   version and see if that language is still...

9        Q.  Okay.  But please just answer my question

10  first.

11       A.  I do not.

12       Q.  Do you see something called a glossary in

13  this document, Exhibit 27?

14       A.  I do not.

15       Q.  Okay.  So you didn't -- you didn't find a

16  glossary, did you?

17       A.  Correct.

18           MR. SWANSON:  Counsel, can you please

19  provide the glossary to us that's being referred

20  to there?

21           MR. COX:  Take the request under

22  advisement.

23  BY MR. SWANSON:

24       Q.  Going back to Exhibit 27.  You got that in

25  front of you; right?  We're at RIMS 3, page 1?

1        A.   Yes.

2        Q.   Okay.  If you look at -- and, again,

3    "cleanout" in this context means disposition,

4    which means destruction; true?

5             MR. COX:  Object to the form.

6             THE WITNESS:  It may result in that.  It

7    may just result in materials being better

8    organized.

9    BY MR. SWANSON:

10       Q.   Where does it say that, "organized"?

11       A.   Well, that is what I understand the

12   purpose of the day is, is to allow employees a

13   chance to look at their materials, determine what

14   needs to be better aligned with the records

15   schedule, dispositions, organized.  It is an

16   organizational day which may result in the

17   materials being earmarked for disposition.

18       Q.   Now, you said before and I don't want to

19   have to redo all this, but on cleanout day, if

20   it's not under retention pursuant to the schedule

21   and it's not under a legal hold, it gets

22   destroyed; right?

23             MR. COX:  Object to the form.

24             THE WITNESS:  Generally I would agree.

25   BY MR. SWANSON:

1        Q.   Okay.   Is there some specific instance

2    you're aware of where you don't agree with that?

3        A.   No.   But I think -- I think we're talking

4    about the same thing.   The purpose of the day, the

5    day itself, is an organizational day that then

6    results in the ability to clean out certain

7    materials that are candidates for destruction.

8        Q.   And do you see under 4.2, under "minimum,"

9    these are minimum implementation standards; true?

10       A.   I see that, yes.

11       Q.   And under 4.2, it says, "The operating

12   company shall conduct a cleanout event on an

13   annual basis."

14             So it means it's mandatory and it has to

15   be done annually; true?

16       A.   Based on this, yes.

17       Q.   And if you turn to the next page, Page

18   Number 2 of RIMS Number 3 in the WWRIM version

19   from September 30, 2009, under 4.3, it defines all

20   of the -- it lists all of the types of documents

21   that are subject to the cleanout; true?

22       A.   Yes.

23       Q.   And it says, "The cleanout event conducted

24   by the operating company shall apply the

25   requirements of the records retention schedule to

1    all media formats, hardcopy and electronic,

2    originals or copies, and draft documents during

3    the cleanout event activities."

4          True?

5        A.  Yes.

6        Q.  So it -- it pertains to all types of

7    documents, not just paper documents; correct?

8        A.  Correct.

9        Q.  There is a reference to a cleanout

10   communication kit.

11         Have you seen a cleanout communication

12   kit?

13       A.  Can you reference me to that sentence?

14       Q.  That is under 4.5.  "Instructions for

15   accessing and reviewing hold notes will be

16   provided in the cleanout communication kit."

17       A.  Yes, I see that.

18       Q.  Do you see that?

19       A.  Yes.  I do now.

20       Q.  What is the "cleanout communication kit"?

21       A.  I don't know.

22       Q.  Did it set forth the methods of destroying

23   or disposing of documents that were no longer

24   under legal hold or retention?

25       A.  Well, I can't speak to the contents of the

1   kit itself, but I have general knowledge that

2   users were provided instructions, and I also have

3   an understanding that users were provided lists of

4   legal holds.

5        Q.  And the list of instructions would include

6   how to go about destroying documents that weren't

7   under a legal hold or retention; correct?

8            MR. COX:  Object to the form.

9            THE WITNESS:  They would include

10  instructions how to identify them and bring them

11  to the manager or records officers for approval.

12  BY MR. SWANSON:

13       Q.  But would it include instructions about

14  how to go about destroying them?  I mean, because,

15  for example, if I've got emails on my computer and

16  they're not under a legal hold or a retention and

17  I've come to the cleanout event for the year and I

18  know if those aren't on retention when I'm going

19  through my stuff, these have to be thrown out,

20  right, destroyed, disposed of, does this cleanout

21  communication kit tell me how to go about doing

22  that so that I eliminate all trace of them?

23           MR. COX:  Object to the form.

24           THE WITNESS:  I can -- I can't speak to

25  the content of the instructions.  I can speak to

1    my general knowledge of how users were using email

2    at that point and how the cleanout days operated

3    in general.

4    BY MR. SWANSON:

5        Q.  I didn't ask that.  So you don't know if

6    this cleanup communication kit had those

7    instructions about how to go about destroying

8    emails that were -- should no longer be

9    retained -- or other documents; true?

10       A.  The reason I can speak to email is my

11   knowledge of how emails were retained at that

12   point in time.

13       Q.  Okay.  But you're not answering the

14   question.  I understand you have information that

15   you want to tell me, but I'm just asking you a

16   very simple question, which is:  Do you know if

17   this kit told them how -- employees how they

18   should destroy the records?  Let me give you an

19   example.  Forget email for a second.

20           Paper documents, okay?  I've got documents

21   in my office, I'm a Johnson & Johnson employee.

22   They're not under records retention, they're not

23   under a hold anymore, and I know I'm supposed to

24   destroy them.

25           Do I have an instruction on destroying

1    them?  For example, shredding them?

2              MR. COX:  Object to the form.

3              THE WITNESS:  I don't know, as I mentioned

4    before, what's in the cleanout instructions.  I do

5    know that for those paper documents, in your

6    example, on cleanout days they wheeled these blue

7    containers on to the floor to be used for

8    destruction of paper materials, if approved.

9    BY MR. SWANSON:

10        Q.  So the approved materials for destruction,

11   they're in a bin that wheels out; is that right?

12        A.  That is how a cleanout day was described

13   to me for the sake of paper materials.

14        Q.  So somebody was given the task of wheeling

15   this to each office or was it put in a central

16   location, do you know?

17        A.  No.

18        Q.  And then if you are -- if the records were

19   supposed to be destroyed under this cleanout event

20   policy, you'd put them in that bin; is that right?

21        A.  With approvals, yes.

22        Q.  What do you mean "with approvals"?

23        A.  With the managers and records coordinators

24   approvals, they could be put in the bin.

25        Q.  And what did that approval consist of?

1    A.   That the employee has been verified to

2  have confirmed the records period and the lack of

3  an applicable legal hold or other reason why the

4  records should be retained.

5    Q.   And is that in the WWRIM policy?  Is that

6  written out, that there had to be approval?

7    A.   I don't know.

8    Q.   So where did you get that information

9  specifically that somebody had to specifically

10  approve an employee's destruction of records

11  pursuant to the cleanout policy?

12    A.   I had interviewed in the past Karen

13  Skellington and other records officers who

14  described the procedure.  I'm not sure if it's in

15  these notes or not.

16    Q.   And specifically what did Karen

17  Skellington say about what the manager or

18  whoever's role was in signing off on that and

19  approving it?

20    A.   I don't have more specifics than -- than

21  that at this point.

22    Q.   Do you know if there was any kind of

23  documentation created?

24    A.   I have general knowledge that the

25  sign-offs were in physical form, that there

1  were -- they were physical sign-offs.  What

2  documentation that created I don't know.

3      Q.  Do you know -- have you seen that

4  documentation?

5          MR. COX:  Object to the form.

6          THE WITNESS:  I don't recall.

7  BY MR. SWANSON:

8      Q.  What's the retention policy of that

9  documentation of sign-offs, if you know?

10      A.  I don't.

11      Q.  The cleanout day, would that include

12  videos?

13          MR. COX:  Object to the form.

14  BY MR. SWANSON:

15      Q.  It says all media formats; correct?

16      A.  Yeah.  I don't have any better

17  interpretation than that.

18      Q.  Would include CDs, correct, all media

19  formats, including hardcopy, electronic?

20      A.  That would suggest to me that CDs would be

21  included.

22      Q.  Did it include, for example, talc samples?

23      A.  I would not conclude that based on my read

24  of the policy.

25      Q.  What -- and why is that?

```
 1          A.  I don't see where samples would be defined
 2   as a -- as a record.
 3          Q.  Was there an equivalent cleanout policy
 4   for talc samples and talc grids, if you know?
 5          A.  I'm not aware of such a policy.
 6          Q.  But samples, things like samples and grids
 7   that were relating to, let's say, testing, if it
 8   was -- if talc was being tested and a particular
 9   sample was tested and there were -- do you know
10   what a TEM grid is that's generated from
11   electronic microscopy?  Generally, you know,
12   you've heard of it; right?
13          A.  I've heard the term "grids."
14          Q.  Okay.  And do you know -- the policies --
15   at some point, did the retention policies have
16   something to say about that kind of physical
17   evidence like a sample or a grid?
18              MR. COX:  Object to the form.
19              THE WITNESS:  Not that I'm aware.
20   BY MR. SWANSON:
21          Q.  So at page 2 of RIMS 3, you see under
22   4.33, and it just puts in writing there what we
23   had talked about, which is that essentially a
24   document hold suspends the direction -- the
25   destruction or deletion of records; correct?
```

1        A.   Yes.   Suspends operation of the policy.

2        Q.   Right.   Okay.   If you look at RIMS 3,

3   page 3.   Here it is.   I knew I saw that in there.

4             You see under 4.6 it talks about a

5   cleanout communication kit which will contain at

6   minimum the information listed below?

7        A.   Yes.

8        Q.   And that includes the proper methods of

9   destruction and deletion; correct?

10       A.   I see that, yes.

11       Q.   So presumably if we had the cleanout

12   communications kit, that would tell us

13   specifically how to destroy, like, paper documents

14   and that sort of thing; true?

15       A.   For that particular event, yes.

16       Q.   And under 4.7 it says, "The activities and

17   participation shall be documented and reported."

18             Again, does Johnson & Johnson -- you don't

19   know how long it retains those reports, do you?

20       A.   Correct.

21       Q.   Do you know if it still has them, back to

22   2009, for example?

23       A.   I don't know one way or the other.

24       Q.   Under -- at the very bottom it says, "new

25   standard."

```
1              Do you see that, "Version 1.0"?
2       A.   Yes.
3       Q.   It says, "new document issued," has the
4  date 30th of September 2009.
5              But it has that under -- it says "revision
6  history."
7              So was that a revision or not?
8       A.   Well, I believe that the -- the
9  overarching policy is 1.1, but this is the first
10 release of the records cleanout standards, so it's
11 designated 1.0.
12      Q.   So let's look at the subsequent version of
13 this.  Exhibit 28.
14             Do you have that in front of you?
15      A.   Yes, I do.
16      Q.   If you go to RIMS 3.  It's seven pages in
17 or something like that.
18             Do you have that in front of you?
19      A.   Yes.
20      Q.   And this version, Version 2.0, was dated
21 January 31, 2011; right?
22      A.   Yes.
23      Q.   And do you see now that it's called the
24 "records cleanup events standard"?
25      A.   Yes.
```

1        Q.  This is the same basic policy, though;

2    correct?

3            MR. COX:  Object to the form.

4            THE WITNESS:  I mean, subject to the

5    revision history on page 3, yes.

6    BY MR. SWANSON:

7        Q.  Okay.  So there was some sort of changes,

8    fine-tuning to the policy at that point; is that

9    right?

10       A.  Yeah.  They are listed in the -- in the

11   table.

12       Q.  Why was the name changed from "cleanout"

13   to "cleanup"?

14       A.  Well, I can only point to the revision

15   history that says that for the law department,

16   that change was requested.

17       Q.  Do you know why the law department decided

18   to call it a "cleanup" instead of a "cleanout"?

19       A.  No.

20       Q.  Did the -- now, when you interviewed

21   folks -- and I think there were four or five of

22   them -- about this, they all referred to it as

23   "cleanout," didn't they?

24       A.  I would have to check.  There's some sort

25   of a search.  I can do some quick searches.

```
 1          Q.  So let me -- if you look at -- I can give
 2     you some references there to help you out.
 3     Page 5 -- page 30, 31, 34, and 55.  And you're
 4     looking at your notes, and the paginated version
 5     of your notes is Exhibit 26.
 6          A.  I'm sorry, one more time, please?
 7          Q.  Oh.  5 is, I think, the first reference,
 8     to about two-thirds of the way down, the "annual
 9     cleanout days."  This was...
10          A.  Yes.  Kate Gillespie.
11          Q.  And then the next one was, I think, Dodd
12     at page 30.
13              You see "cleanout" at the bottom?
14          A.  Yes.
15          Q.  "Cleanout days" stopped around 2011?
16          A.  Yes.
17          Q.  So we don't need to go through each and
18     every one of them, but these folks were still
19     talking about "cleanout" at the point you
20     interviewed them in 2018; correct?
21          A.  Yes.
22          Q.  So -- and yet the policy was to call it
23     "cleanup" as of 2011.  So it sounds like that
24     never really caught on, did it, "cleanup" as
25     opposed to "cleanout"?
```

```
 1              MR. COX:  Object to the form.
 2              THE WITNESS:  I just wrote down as they
 3   told me.
 4   BY MR. SWANSON:
 5       Q.  But when I first asked you about
 6   "cleanout," you understood what I meant
 7   immediately; right?
 8       A.  Yes.
 9       Q.  From those conversations?
10       A.  Yes.
11       Q.  And did they continue to -- did Johnson &
12   Johnson continue to call those kits "cleanout
13   communication kits," do you know?
14       A.  I don't know.
15              MR. COX:  Are we at a good point for a
16   short break?
17              MR. SWANSON:  Sure.  Yeah.
18              THE VIDEOGRAPHER:  This marks the end of
19   Media Number 2 in the deposition of James
20   Mittenthal.  We are going off the record at 11:46.
21              (Recess taken.)
22              THE VIDEOGRAPHER:  On the record at
23   12:03 p.m.  This marks the start of Media Number 3
24   in the deposition of James Mittenthal.
25              Counsel, you may continue.
```

```
 1              (Whereupon, Plaintiff's Exhibit 30 was

 2              marked for identification.)

 3    BY MR. SWANSON:

 4         Q.  Mr. Mittenthal, I'm handing you Exhibit 30

 5    and, Counsel, if you need to look at this, it's a

 6    portion of a records retention schedule, it

 7    appears to be.

 8              Do you have that in front of you?

 9         A.  I do.

10         Q.  So this is the Johnson & Johnson Consumer

11    records and information management records

12    retention schedule department records and

13    information management; right?

14         A.  It appears to be.

15         Q.  And this is -- is this the current one?

16         A.  I don't know.  I'm just looking at the

17    effective date, 14 May 2018, what it says on it.

18         Q.  It's recent, it's not current, but you're

19    not sure if this is current; is that true?

20         A.  I would have to confirm that.

21         Q.  Okay.  If you look at Page Number 2, do

22    you see there's a retention schedule for records

23    cleanup there?

24         A.  Yes.

25         Q.  And that would be -- that says for the
```

1    annual cleanup for Consumer U.S.

2          Do you see that?

3      A.  Yes.

4      Q.  "May include approval memos, cleanup kits

5    and/or housekeeping information"; right?

6      A.  Yes.

7      Q.  So that's -- that's the cleanout or

8    cleanup event that we were talking about before;

9    true?  That's what that's referring to, the

10   records retention on the kits related to that?

11          MR. COX:  Object to the form.

12          THE WITNESS:  It appears to be so, yes.

13   BY MR. SWANSON:

14     Q.  And so -- and the records retention on

15   that was how many years?

16     A.  The time it's active plus ten years.

17     Q.  So if there was a cleanout communication

18   kit as part of, let's say, the 2009 Version 1.1

19   policy that was being used, would "active" -- how

20   long would "active" be?

21     A.  I don't know.  I would want to consult the

22   definitions.

23     Q.  Okay.  So -- well, you don't believe that

24   in the WWRIM policy what is meant in this records

25   retention is defined by the term "active," do you?

1        A.  I have seen somewhere here, on -- on

2   WWRIM, RIMS 12.

3        Q.  Which exhibit is this?

4        A.  This is -- the first version I grabbed was

5   Version 2.0.

6        Q.  Okay.  That's fine.  Got it.

7        A.  RIMS 12, page 2.  And I may be able to

8   reference a later version that I was just looking

9   for a basic definition of "active."

10        Q.  That's fine.

11        A.  And it says, "Retain the record or

12   information while the document is active, in

13   force, or in use.  Once the document is no longer

14   active, then the retention period starts and is

15   calculated."

16        Q.  Good.  So, in other words, the 2009 RIMS

17   got replaced by this 2011 one in January 2011.  So

18   for the 2' -- those cleanout kits from the 2009

19   policy, they would be retained until 2021,

20   correct, according the that policy?

21        A.  Yeah.  I don't want to interpret what they

22   mean by the document being active.  I don't know

23   how to interpret that against the cleanout

24   information.  It may be that's the case.

25        Q.  Okay.  But at a minimum, it would be

```
 1    10 years past the date of that policy; right?

 2         A.  Yes.

 3         Q.  Okay.  That's all I have about that one.

 4              Now, we had talked about how the cleanout

 5    policy included various formats of records and

 6    documentation; correct?

 7         A.  Yes.

 8         Q.  And -- "including hardcopy, all media

 9    formats, electronic," that would include x-ray

10    imagery; true?

11         A.  I don't know.

12         Q.  Well, if there were -- if there were TEM

13    or SEM images on any of these media, that would be

14    a document included in the policy; right?

15              MR. COX:  Object to the form.

16              THE WITNESS:  I would want to look and

17    check the policy and see how they -- how they

18    define "document," if it includes that type of

19    media.  I just don't know.

20    BY MR. SWANSON:

21         Q.  Well, it says, "all media formats,

22    hardcopy and electronic, originals or copies, and

23    draft documents."

24              You're not thinking that this pertains

25    only to written words, are you?
```

1      A.  No.

2      Q.  Okay.  So it would include images;

3  correct?  It would include sound recordings on

4  those types of media?

5          MR. COX:  Object to the form.

6          THE WITNESS:  I'm going to double-check

7  the worldwide RIMS and see if there is a complete

8  definition of what they consider a record to be.

9          Okay.  Actually, it's on the first page.

10  I'm once again looking at the 2.0 policy.

11  BY MR. SWANSON:

12      Q.  Okay.

13      A.  "The form of records and information

14  includes but is not limited to paper, electronic,

15  microfilm, microfiche, photograph, map, magnetic

16  or optical disk or tape, software or video, or

17  other recorded information."

18      Q.  So that would include images?

19      A.  I'm just checking the current -- the 5.0

20  version to see if that definition has changed.  I

21  don't see a -- I checked the definition version of

22  4.0 and it appears to be similar.

23      Q.  Okay.

24      A.  I recognize that an x-ray is a media that

25  contains recorded information.

1     Q.  This is an inclusive policy, because when

2  it says "any form of recorded information created,

3  maintained, or received by Johnson & Johnson," it

4  says those records and information include but are

5  not limited to.  So this is an included -- this is

6  a very inclusive policy, correct, in terms of the

7  kinds of information that these cleanout days were

8  affecting?

9          MR. COX:  Object to the form.

10          THE WITNESS:  Yeah.  I just note that

11  they -- that they inserted audiovisual material in

12  the later definition.  Maybe some other changes,

13  too.

14  BY MR. SWANSON:

15     Q.  But in Version 2.0, it said "microfilm,

16  microfiche, photographs," so that information was

17  included in there, too; correct?

18     A.  Yes.

19     Q.  Did you consult with Johnson & Johnson on

20  any of the changes that went into these various

21  WWRIM policies?

22     A.  I have -- I believe in my notes from Karen

23  Skellington possibly there are some references to

24  some of the changes.

25     Q.  Let me ask a different question.  Were any

```
 1    of -- were you -- did you give input on any
 2    changes that were made in these policies before
 3    they were made, or at the time they were made?
 4         A.  I did not.
 5         Q.  Now, you mentioned Karen Skellington.  You
 6    talked to her about the changes in the WWRIM; is
 7    that right?
 8         A.  Some of the changes.
 9         Q.  Where is that in your notes?
10         A.  Page 59 of your numbering.
11         Q.  Can you point me to it?
12         A.  Oh, sure.  It's about 15 lines down.
13    There's a line by itself.  "WWRIM assigns every op
14    code," and below that it starts, "18 standards put
15    out in 2009, now '17.  Other guidelines existed
16    pre2009.  Karen came in, in 2008 and worked to
17    consolidate, remove cleanup standard."  Moving --
18    moving down the document of 5.0 is "current
19    version effective April '17."  Some notes about
20    how the standards evolved, et cetera.
21         Q.  Now, each of these standards subsequent to
22    1.0 has a revision history; is that right?  If you
23    look within the first few pages, for example, you
24    know, you go to 3 or 4, you take Version 3, for
25    example.
```

1          Do you have that?

2          Which is marked as Exhibit 29.

3          And I think --

4     A.  I do see "revision histories."

5     Q.  And do you have the WWRIM policy Version 3

6  in front of you?

7     A.  Yes, I do.

8     Q.  And six pages in to that is a revision

9  history generally of this document; correct?

10     A.  Well, the -- the top document.  The actual

11  policy document as opposed to the standards

12  underneath it, yes.

13     Q.  Now, what do you mean "as opposed to the

14  standards underneath it"?  because the standards

15  underneath it include the RIMS 1 through how many

16  ever it goes to; correct?

17     A.  Well, RIMS -- RIMS 1 is actually the

18  standard and then prior to RIMS 1 -- and I'm

19  looking at the 3.0 version that we're talking

20  about -- there is a policy, call it a preamble, or

21  an introductory section which is denoted as the

22  worldwide records and information management

23  policy.  And then the things beneath that are

24  known as -- are denoted as standards.

25     Q.  Okay.  But so this -- but this history

1   that's given on the policy, it includes changes --

2   detail -- it's a -- would you agree that that's a

3   detailed accounting of what the changes were made

4   in terms of the language of the policy?  If you

5   look at page 6 there again?

6       A.  Yeah.  I'm looking at it and it appears to

7   be changes just made to these first few pages

8   which constitute the policy.  Then, within that,

9   each standard also has its own change history.

10      Q.  And you see there in terms of this Version

11  3.0 of the WWRIM policy, it notes that the -- and

12  by this time, they were calling it the "cleanup

13  event," it says "retired RIMS 3."

14          Do you see that?

15      A.  I'm sorry.  What page are we on?

16      Q.  We're page 6 still.  And this is the WWRIM

17  policy December 31, 2013.

18      A.  Yes, I see it.

19      Q.  And is -- is this an accurate accounting

20  of the changes that are made in the policy from

21  one to the next?

22          MR. COX:  Object to the form.

23          THE WITNESS:  Yes.  Inasmuch as now the

24  standards jump from RIMS 2 to RIMS 4.

25  BY MR. SWANSON:

1    Q.   Okay.   And the way that these histories

2  are written is that it's written with a lot of

3  detail; right?   Going back to page 6, it says

4  "paragraph 2, removed sentence redundant tied with

5  paragraph 3."  You know, above there it

6  says "where applicable change throughout

7  'employee' to 'associate.'"

8         These are very specific references to

9  where the changes are being made, specifically

10  what changes are being made in the policies as we

11  get to subsequent versions; right?

12    A.   Yes.

13    Q.   So in theory, we should be able to take a

14  subsequent version like Version 3 and if we didn't

15  have 2 and 1, reconstitute, rewrite from it the

16  prior version; correct?

17         MR. COX:   Object to the form.

18         THE WITNESS:   It would depend on the

19  nature of the changes.   To the extent that they --

20  they were word level, you could back -- back your

21  way through it.

22         In this case, there appear to be -- I

23  mean, there were references and sentences removed

24  that might make it difficult to reconstitute it

25  completely.   But the -- you could create a rough

1    facsimile of an earlier version.

2    BY MR. SWANSON:

3        Q.  But it should -- it's supposed to be an

4    accurate accounting of what has been changed

5    version to version; correct?

6        A.  Yes.

7        Q.  And that accounting includes, you know,

8    everything that's changed from the beginning to

9    the current version; correct?

10       A.  Yes.

11       Q.  And so if you go to -- this was Version 3.

12   And we saw in Version 3 there was a reference,

13   right, at page 6 to the cleanup event that was

14   specified under RIMS Standard 3 in a previous

15   version having been suspended or removed; correct?

16       A.  Yes.

17       Q.  And, in fact, in this Version 3, it's --

18   if you thumb through it, you can see that there is

19   no RIMS Standard 3; correct?

20       A.  Correct.

21       Q.  And if you go to 4, Version 4, again, if

22   you go to the revision history, page 6, it has --

23   again it states how -- the revision history in the

24   same sort of way that it did under Number 3 and it

25   includes that reference to the cleanup event;

```
 1    correct?
 2         A.  Yes.
 3         Q.  And it has a full history from Version 1.0
 4    up to this current version stating what the
 5    changes were; true?
 6         A.  Yes.
 7         Q.  And if you go to Version 5, which is
 8    Exhibit 24, and you go to page, looks like 5
 9    through 8 -- do you see that? -- is the revision
10    history?
11         A.  Yes.
12         Q.  And you see there were a lot of revisions
13    made from 4 to 5?
14         A.  Yes.
15         Q.  Is there a Version 6 or is this the latest
16    version, Number 5?
17         A.  Well, I noted that when I spoke to Karen
18    Skellington she said that 5.0 is the current
19    version and that that was effective in April of
20    2017 which is what is reflected in this document
21    (indicating).
22         Q.  Good.  Now if we go to -- and you see the
23    changes are reflected for Number 4; right?
24         A.  Yes.
25         Q.  Now, if you go to Version Number 3 in its
```

1    version history, you see that?

2        A.  Yes.

3        Q.  Where is the reference to cleanout event?

4    Or cleanup event in this history?

5        A.  I don't see it.

6        Q.  So if all we had in front of us was this

7    Version 5, we wouldn't know about the cleanout

8    event, would we?

9            MR. COX:  Object to the form.

10           THE WITNESS:  Well, we certainly wouldn't

11   know about it from the revision history pertaining

12   to 3.0.

13   BY MR. SWANSON:

14       Q.  Well, is -- well, if I've got a current

15   version in front of me and I've got this history

16   that's supposed to be a faithful history of these

17   changes, I don't know about this history of a

18   cleanout event, do I?

19           True?

20       A.  I don't see it in the history.

21       Q.  Okay.  So -- so this is no longer an

22   accurate accounting -- the version history is no

23   longer an accurate accounting of the version

24   histories; true?

25           MR. COX:  Object to the form.

1    BY MR. SWANSON:

2        Q.  You have in front of you, it's not in the

3    version history; correct?

4        A.  Right.  I'm just checking to -- to

5    understand if the numbering of the standards is

6    still as it was before, and the document does go

7    from RIMS 2 to RIMS 4 with no RIMS 3.  So there is

8    an artifact in the sense that that RIMS 3 is still

9    not represented.

10       Q.  Right.  It's gone, because it was gone

11   after Version 3 of the WWRIM; true?

12       A.  Yes.

13       Q.  And that's when -- and then the version

14   history, though, in Number 3 and 4 accurately

15   reflected that that section had been removed

16   because that event was no longer in force;

17   correct?

18       A.  Correct.

19       Q.  And in Version 5 of the history, that

20   disappears; right?  It's not there; true?

21       A.  I don't see it.

22       Q.  Okay.  So this version history has been

23   changed and it no longer accurately reflects what

24   happened; true?

25       A.  It no longer reflects the -- in that area

1    in the revision history no longer reflects the

2    removal of the cleanout standard.

3        Q.  And do you know who made the decision to

4    remove the reference to the cleanout days from the

5    Version Number 5 WWRIM Johnson & Johnson worldwide

6    policy?

7            It's not in your notes, is it?

8        A.  I don't believe so.

9        Q.  I didn't see it there.

10       A.  I was just looking in my notes to

11   understand who -- who would have been a point

12   person at that point in time.

13       Q.  Did the lawyers make that decision?

14       A.  I don't know.

15       Q.  Did you see -- going back to Version

16   Number 4 of the WWRIM policy, it says

17   "Exhibit 23."  If you go to Page Number 6.

18           Do you have that in front of you?

19       A.  Yes.

20       Q.  It -- it states there that Johnson &

21   Johnson -- in the reference to the cleanup event

22   states that Johnson & Johnson has changed its

23   philosophy on annual cleanups; right?

24       A.  Yes.

25       Q.  So that reference to a change in

1    philosophy is now gone in Version 5; correct?

2         A.  I don't see it.

3         Q.  And that change in philosophy, do you have

4    an understanding of what that change in philosophy

5    was specifically?

6         A.  Simply as -- as is stated in the notes,

7    "Associates shall independently manage their

8    records and information during the normal course

9    of business."

10        Q.  Okay.  Now, you know that -- I'm going to

11   switch gears a little here on you.

12             You know that there's an issue of exposure

13   in the Philippines in this case; correct?

14        A.  Yes.

15        Q.  In the Leavitt case.  And of exposure in

16   Hong Kong in the Fong case; true?

17        A.  Yes.

18        Q.  And that -- are you aware that the talc

19   that was used for Johnson's Baby Powder that was

20   manufactured or packaged at those locations came

21   from Korea?

22        A.  I'm -- I have a general awareness of that.

23        Q.  Okay.  Now, of the retention schedules --

24   I want to get back into the retention schedules

25   briefly here.

```
 1              What is the earliest retention schedule
 2    that has been produced to us that you're aware of
 3    that affects Johnson & Johnson Philippines,
 4    Johnson & Johnson Hong Kong, or the Asia Pacific?
 5    Well, let me -- let me ask a foundational question
 6    first.
 7              Are those -- I noticed there was some
 8    references in your notes to APAC, A-P-A-C.  Does
 9    that sound familiar to you?  And I assumed that
10    that referred to Asian Pacific?  Asia Pacific or
11    something like that?
12        A.  I think -- I'd have to see it in context.
13        Q.  Let me see if I can find a reference.
14              Oh, there's a reference here at page 3 of
15    your notes.
16        A.  Your page 3?
17        Q.  Yes.  Right.  That's correct.  This is
18    again Exhibit 26.
19        A.  So this is Tom Doyle and Judy Dowling?
20        Q.  Yes.  Do you see in the first paragraph
21    there, there's a reference to APAC?
22        A.  Yes.
23        Q.  And without having you read through the
24    rest of your notes right now, I'll just represent
25    to you there are other references where you use
```

```
 1    that acronym, APAC.

 2              What does that stand for?

 3         A.  I believe it's Asia Pacific, but I don't

 4    recall --

 5         Q.  Okay.  Let's --

 6         A.  -- confirming that.

 7         Q.  Sorry.  Didn't mean to cut you off.

 8              Can you turn to page 20.  I see another

 9    reference to it.

10              Do you see where you were speaking to an

11    individual named Nicholas Zhu?

12         A.  Yes.

13         Q.  And it says "responsible for APAC."  Then

14    it says "Thailand, China, Philippines," et cetera;

15    correct?

16         A.  Yes.

17         Q.  So do you believe that refers something to

18    Asia Pacific; correct?

19         A.  Yes.

20         Q.  So let me ask you questions broadly about

21    any retention schedules or policies that would

22    have impacted -- been in effect in the

23    Philippines, in Hong Kong.  Let's start with those

24    two and we'll probably include China, but that

25    might be more recent.
```

```
1                 But so -- and Korea.
2                 What was the first retention policies that
3      would have been in effect and controlled retention
4      of documents -- retention and disposition of
5      documents at Johnson & Johnson Philippines?
6          A.  I don't know the year that that would have
7      been applicable, the first year.
8          Q.  Do you -- was the 1997 policy, which is
9      the first policy that has been produced to us, the
10     oldest policy and the oldest one that you've seen,
11     according to your testimony, did that apply to
12     Johnson & Johnson Philippines?
13         A.  I would have to confirm that.
14         Q.  Okay.  And before you go about -- and does
15     the policy itself say whether or not it affects
16     it, whether or not that policy is the policy for
17     the Philippines or the Asia Pacific, or whether
18     it's just domestic?
19         A.  Yeah.  The document itself does not have a
20     scope associated with it.
21         Q.  So you don't -- you don't know whether or
22     not this records retention guideline schedule
23     applied to Asia Pacific, to Hong Kong, or the
24     Philippines; correct?
25         A.  That's correct.
```

1    Q.  Do you know if any of the records

2    retention schedules that Johnson & Johnson has

3    apply to Johnson & Johnson Philippines?

4    A.  I would have to look at the scope of each

5    one.  I don't know offhand.

6    Q.  But there's nothing in this 1997 guideline

7    for records retention schedule that tells you what

8    applies broadly to all of their operating

9    companies; correct?

10    A.  Correct.

11    Q.  And I don't want you to guess, but would

12    you agree with me that the natural inference

13    looking at this is that it did not apply; correct?

14        MR. COX:  Object to the form.

15    BY MR. SWANSON:

16    Q.  Since it says Johnson & Johnson Consumer

17    Products Companies.  I don't want you to

18    speculate.  So.  Okay.

19        And you can't tell me right now what the

20    first year is that there is a retention policy

21    that applies to the Philippines, to J&J China, or

22    J&J Hong Kong; true?

23    A.  You know, I have a general knowledge from

24    talking to people at the company that there were

25    retention practices.  I can't speak to the

1  specific schedules that apply.

2       Q.  And we'll get into that in a minute.

3          So you're not sure if any of the retention

4  schedules apply, and if you have, you know,

5  information about that even after the break as to

6  whether these did or not, we can revisit it.

7          Now, when you say you have information

8  generally about retention practices, is this

9  something that's reflected in your notes?

10      A.  Yes.

11      Q.  And these are retention practices at which

12  locations?

13      A.  It was not location-specific.  It was

14  simply an indication of how long certain materials

15  were held.

16      Q.  By whom?  In other words, which operating

17  company are we talking about now?  because I'm

18  obviously interested in asking right now, but just

19  about the Philippines, Hong Kong, China, Korea.

20      A.  I would need to reference a couple of

21  pieces of my notes here.

22      Q.  I don't know what page you're at, but if

23  you look at pages 20 and 21, there are references

24  to overseas operations.  I don't know if that --

25  any of that helps you.

```
 1          A.  Yes.  And I was looking at Don Hicks who
 2    indicated that in 2009, a global specification was
 3    created.  I'm jumping now to page 20.
 4          Q.  Okay.  Page 20.  This is Don Hicks?
 5          A.  Well, this is now Nicholas Zhu --
 6          Q.  Wait.  Let's go -- since you are the one
 7    who raised the reference to Don Hicks --
 8          A.  Okay.
 9          Q.  -- what page of that, that were you
10    looking at specifically?
11          A.  Oh, that was -- just lost it.  Page 13.
12          Q.  Okay.  This is talking about a global talc
13    spec created in 2009; correct?
14          A.  Yes.
15          Q.  Okay.  I'm asking about retention
16    policies.
17          A.  Okay.
18          Q.  So if you can locate the place in your
19    notes, if you have -- you haven't been specific as
20    to the Philippines or Hong Kong or Asia Pacific or
21    Korea, remember, my query is directed to finding
22    out what retention schedules; policies with
23    respect to retaining documents; destroying,
24    disposing of documents, as to those areas.  That's
25    what I'm looking for.
```

1        A.  Right.  Okay.

2        Q.  And if you find information that, that you

3    have as a representative of Johnson & Johnson,

4    tell me.

5            MR. SWANSON:  While he's doing that, let's

6    go off the transcript record briefly, and I'm

7    going to go check on something and you keep

8    looking.

9            MR. COX:  Let's go off the record

10   entirely.

11           MR. SWANSON:  What's that?

12           MR. COX:  Let's go off the video record,

13   too.

14           MR. SWANSON:  Why?  I mean, I'm going to

15   be back in two seconds.  I mean, we don't need to

16   do that whole thing of getting off it.  I'll be

17   back in two seconds.  I want him to have time to

18   look through that.

19           (Off the stenographic record.)

20           MR. SWANSON:  Back on the record.

21   BY MR. SWANSON:

22       Q.  Have you located some information about

23   retention policies or retention guidelines that

24   would have been in effect -- or practices in

25   effect in the Philippines, Korea, China, or Hong

 1  Kong?

 2      A.  Well, I spoke to -- this is on page 42.  I

 3  have a reference to a conversation with Uday

 4  Sharan who was a sourcing manager who was based in

 5  the -- in that region, and he was specifically

 6  talking about Thailand, but he indicated that

 7  the -- from his perspective, they kept documents

 8  for -- and he was talking about the manufacturing

 9  records, that the retention on those was five

10  years.  I don't -- I have not yet found other

11  references to any retention schedules for those

12  particular regions.

13      Q.  Now, you knew coming in to this deposition

14  as -- you knew -- you knew that your assignment

15  here, part of it, was to talk about retention

16  schedules; right?

17      A.  Yes.

18      Q.  And so as a representative for Johnson &

19  Johnson sitting here today, knowing that this was

20  part of the assignment and knowing that these

21  areas of the world and their retention policies

22  were relevant to the case, you don't have any

23  information to provide today; correct?

24          MR. COX:  Object to the characterization.

25  Object to the form of the question.

1          THE WITNESS:  What I do know is that there

2    were retention schedules in those regions, the

3    retention practices and/or schedules; that there

4    was information saved for periods of time.  For

5    example, Don Hicks indicated that the -- and Uday

6    indicated that those materials were saved five

7    years plus one, six years.

8          I have an understanding that information

9    in those regions that was stored in the United

10   States was subject to the retention schedules that

11   we've already discussed.

12         I have also the understanding that

13   those -- there are physical files in those regions

14   of the world that were consulted and searched for

15   materials, and that there were materials that were

16   stored off site there were consulted.

17         I don't have the particular retention

18   schedule that they were responsive to, but I

19   understand that there was a practice for

20   maintaining information in those regions.

21   BY MR. SWANSON:

22       Q.  Specifically as to the Philippines, do you

23   know if there's ever been a formal retention

24   schedule for documents archived, retained, kept,

25   generated at J&J Philippines?

1        A.  I don't know at this moment.

2        Q.  And do you know if there has ever been a

3   formal policy for J&J Hong Kong for the retention,

4   archiving of documents?

5        A.  I would -- once again, I don't know, and

6   it may be that the schedules I have apply to --

7   the current schedules apply to that time period.

8   I just don't know.

9        Q.  I understand.

10       A.  I'm sorry, applied to that --

11       Q.  You say maybe.

12       A.  I --

13       Q.  You say maybe --

14       A.  Let me correct what I said.  Not applied

15   to that time period.  Applied to that region.  I

16   misspoke.

17       Q.  Now, just briefly, this reference you made

18   to Uday Sharan, that's for Thailand; right?

19       A.  Yes.

20       Q.  He's not talking about the Philippines.

21       A.  I understand that.

22       Q.  Right.  And he's not talking about Hong

23   Kong; correct?  And -- right?

24       A.  Correct.

25       Q.  And the source of that talc was European

```
 1   talc, correct, not Korean talc?
 2        A.  He was speaking to the retention of
 3   materials in Thailand, and I drew from my
 4   understanding of my conversation with him that
 5   those materials, there were retention practices in
 6   that area and in the Asia Pacific region.
 7             MR. SWANSON:  Move to strike.
 8   Nonresponsive.
 9             I think that's a good time to break for
10   lunch.
11             Let's go off the record.
12             THE VIDEOGRAPHER:  Off the record.
13             Time is now 12:52 p.m.
14                 (Lunch break taken.)
15             THE VIDEOGRAPHER:  On the record at
16   1:55 p.m.  Counsel, you may continue.
17             MR. CARPENTER:  Counsel, can I make that
18   quick --
19             MR. SWANSON:  Sure.
20             MR. CARPENTER:  This is Erin Carpenter.  I
21   failed earlier when I was putting my appearance on
22   the record to also indicate that I am here -- I'm
23   specially appearing on behalf of Imerys U.S.A.,
24   Inc.  That's it.  Thank you.
25   BY MR. SWANSON:
```

1        Q.  Good afternoon, Mr. Mittenthal.  We're

2   back on the record after the lunch break.

3        A.  Good afternoon.

4        Q.  I was asking you about retention policies,

5   schedules, procedures that apply to the Asia

6   Pacific or to the Philippines, Hong Kong, China,

7   and I'd asked you about the policies that have

8   been produced in this case going back to 1997 and

9   you weren't sure which of any of those policies

10  applied to J&J's operating companies in those

11  regions and countries; correct?

12       A.  Correct.

13       Q.  Have you -- have you looked at any of

14  those policies since we were discussing that

15  earlier?

16       A.  I've determined that I will -- I'm not

17  able to ascertain based on what I have at my

18  disposal right now.

19       Q.  And, based on your conversations with

20  various folks that are reflected in your notes or

21  any subsequent conversations you have, other than

22  what we've already discussed, you're not -- well,

23  strike that.

24            We've discussed what you had in your notes

25  with respect to any retentions over -- overseas;

1    correct?

2         A.  Generally, yes.

3         Q.  And you're not -- then just to kind of

4    close the loop, you're not aware of what, if any,

5    retention policies were in effect at the J&J

6    Philippines; correct?

7         A.  Correct.

8         Q.  And you're not aware of any retention

9    schedule that was in effect at J&J Hong Kong;

10   correct?

11        A.  Correct.

12        Q.  Are you familiar with worldwide talc

13   surveys?  Did you hear anything about that?

14        A.  I have an understanding of that, yes.

15        Q.  Other than the survey documents themselves

16   that were produced -- and there were a few of

17   those produced -- do you have any information

18   about retention for documents related to Korean

19   talc that was used in Johnson's Baby Powder in

20   Hong Kong and the Philippines?

21        A.  I don't, no.

22        Q.  What is the current retention schedule

23   for -- and this may include different types of

24   documents, but for documents related to the

25   testing of talc for mineral contaminants like

1   asbestos?

2       A.  Well, I would have to consult the -- the

3   schedule.

4       Q.  Why don't you go ahead and do that.  In

5   fact -- well, before you consult the schedule,

6   because obviously I want to be -- I want us to be

7   as efficient as we can be with our time -- have

8   you seen something in the retention schedules that

9   you believe applies to analytical testing reports

10  that would be reports or, for example, the actual

11  films or digital images from microscopy or the

12  images or charts that would come from, I think,

13  EDS or, you know, spectrographs, that sort of

14  thing?

15      A.  I don't recall with specificity.  I have

16  seen in the departmental schedules references to

17  testing.  I've seen references to testing in

18  supplier agreements and I've seen references to

19  testing in legal hold notices.

20      Q.  Would you know where to look in the

21  retention policies for something like that?  Would

22  it be under R&D?

23      A.  Well, I -- because the schedules are

24  departmental in scope, I would look under R&D.  I

25  would look under manufacturing.  I might look

 1    under quality.  There's a couple places where I

 2    might look.

 3        Q.  Okay.  I'd like to find out what the

 4    retention on these testing documents was as of

 5    1997.  And then if we need to talk about it

 6    currently, I want to know what the retention on

 7    that would be.  And to be clear, what I'm looking

 8    for is testing-related documents on both finished

 9    product and on the cosmetic talc products and also

10    on talc ore.  And milled -- milled ore also, just

11    to be clear.

12            I don't know if this helps you.  But at

13    page 190 of the 1997 policy, there's a reference

14    to manufacturing and material analyst reports.  I

15    mean...

16        A.  Yeah.  I just about caught up to you, I

17    was on 188.

18        Q.  Okay.

19        A.  I mean, I'm not an expert on the testing

20    process.  I see -- I'm just looking for the

21    word "test."

22            I see, for instance, test cases on 188.  I

23    don't know if that applies or not.  I'm going

24    to -- I guess from there, I see material analysis

25    reports as you mentioned.

1          I'm looking under -- I'm now up to

2     "quality," page 221.  And I see an entry called

3     "analytical chemistry testing finished product

4     devices."

5          Q.  I'm sorry.  Where is that again?

6          A.  The top of 221.  Once again, I don't know.

7     I'm not an expert on the testing process.  I don't

8     know if that applies.  I'm just looking for places

9     where the word "testing" appears in relevant

10    categories.

11         Q.  And what's the minimum retention for --

12    well, first of all, let's go back, and I should

13    have asked you as you were going here.  We talked

14    about material analyst analysis reports.

15         What's the minimum retention for those as

16    of 1997?

17         A.  I think that was LP, if I remember

18    correctly.  That was page 188.

19         Q.  190.

20         A.  Oh, I was on 188.  Yeah, 190.  LP plus 6.

21         Q.  What does that mean?

22         A.  Life of the product.  In other words, the

23    expected life of the product in the marketplace

24    plus six years.

25         Q.  Does that mean like shelf life?

1        A.   I don't know if it equates to shelf life.

2   It may.

3        Q.   What else would it equate or would it

4   reference life of the product as in its baby

5   powder, and baby powder is going to continue to be

6   around, so essentially it would always be under

7   retention.  See what I'm saying?

8        A.   Actually, I don't.  I'm sorry.

9        Q.   Well, life of the product.  I mean,

10  there's a life of a product, the period of time

11  during which a company manufactures a given

12  product; right?

13       A.   Oh, yes.

14       Q.   You know, under various specifications or

15  particular specification and it's a product like

16  Johnson's Baby Powder.  I mean, that could be

17  called "life of the product"; right?

18       A.   Yes.  You're right.

19       Q.   But life of product here under "material

20  analyst reports," you're not sure what that means

21  in that context?  I mean, is that shelf life?  Is

22  it something more than shelf life?  Is it, you

23  know, how long they've been -- they are going to

24  manufacture Johnson's Baby Powder?

25       A.   Yes.  And I -- you know, I don't think I

1  want to interpret that without a little bit more

2  research.

3       Q.  So I know there's a lot of questions here

4  today.  But you were aware that these were central

5  issues about testing in these cases, right, in

6  talc testing, correct?

7            MR. COX:  Object to the form of the

8  question.  Object to the characterization that

9  this is a central issue or that a lot of the

10 questions today regard central issues in the

11 deposition notice or this case -- these cases.

12            THE WITNESS:  I was aware that the -- one

13 of the noticed topics had to do with retention.

14 BY MR. SWANSON:

15      Q.  And you also, though, know that in these

16 cases, even though you're not an expert on

17 testing, that testing and test results and the

18 retention of those testing is an important issue

19 to these cases; correct?  The talc testing I'm

20 referring to.

21      A.  Well, I wouldn't want to give an opinion,

22 but I understand that it has been raised as an

23 issue.

24      Q.  So.  And you understood that as a

25 spokesperson for Johnson & Johnson, you were to be

1    prepared to speak on these issues, correct,

2    because we've asked about them?

3            MR. COX:  Object to the form.

4            THE WITNESS:  I understand that the

5    retention of documentation is a topic and that I

6    am prepared to speak on that.

7    BY MR. SWANSON:

8        Q.  Okay.  But, as you sit here right now,

9    you're not prepared to tell me what in 1997 life

10   of the product meant as to these material analyst

11   reports; correct?

12       A.  That's right.

13       Q.  Can you point -- and if we go to -- I

14   think you referenced 221 of this 1997 retention

15   schedule, "analytical chemistry testing finished

16   product devices"?

17       A.  Yes.  And, once again, I'm not an expert.

18   I don't know if that even applies, but I noted the

19   word "testing" was -- was in there.

20       Q.  Okay.  But you don't even know if that

21   applies to talc, do you?

22       A.  Correct.

23       Q.  Going three down, you see where it says

24   "analytical reports and requests"?

25       A.  Yes.

1      Q.  On page 221.  What does that refer to?

2      A.  I can only speak to it's -- it's plain

3   English.  I don't -- I'm not here to interpret

4   what that means.

5      Q.  I don't want to waste time going through

6   each of the policies like this.

7           Are you prepared, as you sit here today,

8   to talk about specifically what the retention

9   schedule is and the retention period for testing

10  reports?

11     A.  Well, as I mentioned, I'm not specifically

12  able to sit here and say LP is identical to shelf

13  life or make that assessment.  What I can say is

14  that I -- in addition to gathering the schedules,

15  I interviewed people.  I spoke to, for instance,

16  Don Hicks, and Mr. Hicks gave a -- an appraisal

17  that -- of testing, quality testing for talc that

18  it was used in conjunction with the manufacturing

19  process, that it's -- retention of those materials

20  is tied to the expected shelf life of the product.

21  Now, it may be the shelf life of the product plus

22  a year; it may be double the shelf life of the

23  product.  It has changed over time, but I have a

24  general understanding from Mr. Hicks that testing

25  materials are generally held at least the expected

 1    shelf life of the product plus some additional

 2    amount of time.

 3        Q.  And how long is the shelf life of

 4    Johnson's Baby Powder?

 5        A.  Well, I'm going to just refer to my

 6    discussion with Mr. Hicks.  And that's at the top

 7    of -- I'm sorry.  I'm on the marked copy.  Let me

 8    pull that out.  I can find it.  Here it is.  So

 9    now I'm looking at page 12.  And the third,

10    fourth, fifth lines down.  "Testing" -- "test,

11    manufacturing, inventory, shipping records tend to

12    be kept for a shorter period per schedule times to

13    when the product would be in the marketplace,

14    generally about six years."

15        Q.  Okay.  So that's not quite shelf life,

16    then.  That's something longer than shelf life?

17        A.  Once again, I -- I'm not an expert in

18    interpreting what shelf life is or how long the

19    product would be in the marketplace.  I'm just --

20    I basically tried to gather that information from

21    Mr. Hicks as best as I could.

22        Q.  If you look at page 37 of your notes.

23        A.  Yes.

24        Q.  And this was from your discussion with

25    Rosina Bruno-Sheerin.

```
 1        A.  Yes.

 2        Q.  Well, first of all, before I get there,

 3   and I apologize.  Don Hicks, those records --

 4   testing, manufacturing -- what kind of testing are

 5   we talking about and where?

 6        A.  I interpreted his comment to be those

 7   testing records that accompany batches or lots in

 8   the manufacturing process, such as certificates of

 9   analysis.

10        Q.  And those certificates of analysis, were

11   those something that were being generated by

12   Johnson & Johnson or that came with the talc that

13   came in?

14           MR. COX:  Object to the form.

15   BY MR. SWANSON:

16        Q.  Let me -- let me start that over again.

17   What was included in the certificate of analysis?

18   Did that include whether or not -- was there --

19   did that include a test for asbestos?

20        A.  I'm not an expert on the testing process.

21   I have a general understanding that there were --

22   there was testing done for asbestos.  The best

23   summary of the testing records I have is from Mark

24   Zappa on page 19.

25        Q.  But specifically what were they testing?
```

1      Now, Don Hicks was at the North Brunswick

2      location, the manufacturing location; is that

3      right?

4           A.   I know he had various responsibilities.

5      He was at one point in North Brunswick.  I really

6      don't know.  I think he was at various locations.

7      But he had -- you know, in the -- during the

8      2000s, he had a responsibility for quality issues

9      related to talc manufacturing.

10          Q.   So the records he was referring -- those

11     testing records, you think it includes

12     certificates of analysis?

13          A.   Well, this is where I come to the

14     follow-on conversation with Mr. Zappa on page 19.

15          Q.   Okay.  You said 19?

16          A.   Yes.

17          Q.   All right.

18          A.   And this is under "follow-up."

19          Q.   Got it.

20          A.   And in this conversation, I sought to

21     determine the flow of documentation through the --

22     through the life cycle so that there is testing

23     done at the mine level.  There is testing done

24     when the -- when the material goes to Imerys,

25     there is a -- the certificate of analysis is

```
 1    transferred.  There is testing that is done by
 2    Imerys itself.  And then another C of A is
 3    created.  I mean, I'm just basically reading from
 4    it.  But then from Imerys to Pharma Tech, there
 5    are C of As sent and then additional testing done.
 6         Q.  Okay.
 7         A.  So there's -- that's kind of the flow of
 8    testing documentation.
 9         Q.  And so the mine -- and that would be prior
10    to -- well, that would be the Vermont mines;
11    right?
12              MR. COX:  Object to the form.
13              THE WITNESS:  Yeah.  Once again, I mean,
14    I'm not...
15              MR. CARPENTER:  I'll join in that last
16    objection.  Also state lacks foundation.
17    BY MR. SWANSON:
18         Q.  I'm sorry?
19         A.  Yeah, I'm just going to say, I'm not an
20    expert on which mines were in use at which point.
21         Q.  So this certificate -- now, the mine did
22    its own testing.  It says that; right?
23              Now, Johnson & Johnson would get that
24    certificate of analysis regarding that testing; is
25    that right?
```

1     A.  Well --

2          MR. COX:  Object to the form.  Beyond the

3     scope of the notice.

4          Go ahead.

5          THE WITNESS:  Just going through the

6     workflow that Mr. Zappa established, the mine

7     would create a C of A which then is forwarded.

8     BY MR. SWANSON:

9     Q.  Let me try to cut to the chase on this

10    stuff.

11         Is it true that you don't know

12    specifically whether these tests that are

13    reflected there were tests for asbestos content?

14    A.  My general understanding is that the --

15    the tests did involve asbestos testing.  The

16    appearance and odor and fineness testing may not

17    have included asbestos testing, but the -- my

18    general understanding -- and once again, I'm not

19    here to speak on anything but my general

20    understanding of the testing process, but those --

21    those initial tests did include asbestos testing.

22    Q.  And what was the retention on those; do

23    you know?

24    A.  Well, that goes back to -- to Mr. Hicks's

25    comment to the applicable items in the retention

```
 1    schedule.  But it's going to be associated with

 2    the batch and lot six to seven years, and then

 3    there would also be a notation on that in the

 4    supplier agreement with PTI as to the retention

 5    period there.

 6         Q.  Now, if you go to page 37 -- this is

 7    Rosina Bruno-Sheerin.

 8             Do you see that?

 9         A.  Yes.

10         Q.  The second page of the notes about what

11    she told you.  It refers to R&D records being kept

12    long-term.

13             Do you see that?

14         A.  Yes.

15         Q.  "Permanent or life of the product plus N

16    years"?

17         A.  Yes.

18         Q.  What does "life of product" mean in that

19    context?

20         A.  It would appear she was talking about how

21    long the product was being made.

22             MR. SWANSON:  I'm sorry, can I have that

23    read back, please.

24             (Record read by the court reporter.)

25    BY MR. SWANSON:
```

1      Q.  So if she's referring to how long the

2   product is being made, in other words, like

3   Johnson's Baby Powder?

4      A.  Yes.

5      Q.  Not shelf life or anything like that;

6   right?

7      A.  Well, based on her comment about

8   "permanent," I would say no.

9      Q.  So but in the context of the retention

10  schedule we looked at, we were -- we saw life of

11  product plus 6, correct, for testing, that the

12  manufacturing material analyst -- analysis

13  reports?

14         Do you see that?

15     A.  Yes, I did.  That's on 190.

16     Q.  So wouldn't that indicate that -- that

17  what Don Hicks told you, doesn't that indicate

18  they weren't at that facility following the

19  retention policy, he said, shelf life plus

20  6 years, that's what that meant?

21         MR. COX:  Object -- object to the form of

22  the question.

23         THE WITNESS:  Well, I believe you had

24  guided me to the material analysis reports, that

25  section, and I don't know -- I don't know enough

```
 1   about what material analysis reports are to

 2   determine if they are associated with a batch or

 3   if there's some other type of -- I mean, I'm

 4   reading the text below it, and I see that they --

 5   they talk about DMR and DHR; device master record,

 6   device history record.  Based on that, I'm not

 7   sure that this section applies to lots of batches.

 8   I just don't know what material analysis reports

 9   are.

10   BY MR. SWANSON:

11       Q.  Right.  So, I mean, this kind of runs up

12   against the problem I raised earlier, which is

13   that you're here to speak on behalf of Johnson &

14   Johnson.  I'm trying to get this information from

15   you and it seems to me like we're kind of guessing

16   about what the proper retention schedule was.  I

17   mean, if Don Hicks told you it was shelf life plus

18   6 years in manufacturing but it was actually

19   something different and required to be different,

20   that's something we want to know about, and I

21   can't get from you what the formal policies were

22   with respect to retention of testing results

23   and -- and not only testing results but the

24   testing documents themselves:  things like TEM

25   images, x-ray diffraction, EDSs, that sort of
```

 1    thing.

 2          So who is it we should be talking to, to

 3    get this information about what Johnson &

 4    Johnson's policies are and have been with respect

 5    to retention of testing records?

 6          MR. COX:  Object to the form of the

 7    question.  Object to the extent that this line of

 8    questioning goes beyond the scope of the notice

 9    insofar as you're asking Mr. Mittenthal to give

10    testimony about testing.  He's not the corporate

11    representative regarding different types of

12    testing that was done by Johnson & Johnson or

13    Johnson & Johnson Consumer, Inc.

14          MR. SWANSON:  Counsel, what I'm trying to

15    get at is -- I'm trying to get at what the

16    retention schedules were and how long documents

17    were supposed to be kept and whether or not there

18    was an actual retention schedule as to any kind of

19    testing reports to do with talc or milled talc,

20    finished cosmetic talc products.  And that's what

21    is at issue in this case.

22    BY MR. SWANSON:

23        Q.  And so, Mr. Mittenthal, let me ask you

24    again, who is it that I should be talking to, to

25    find this out?

1          A.  Well, I learned it from Don Hicks and from

2     others in my notes.  I did not go out and take

3     every interval described by Mr. Hicks and tie it

4     back to every version of a retention schedule.

5     I -- it would certainly be something that could be

6     done.  I did not do that step as part of my

7     preparation.  I did not view it as within my scope

8     of preparation.  There -- the -- I would expect

9     that the retention schedules would be reflective

10    of the comments that Mr. Hicks and others made to

11    me.

12             MR. SWANSON:  Move to strike that last

13    sentence as being speculative.

14    BY MR. SWANSON:

15        Q.  Does Johnson & Johnson have a formal

16    retention policy as to retention of talc?  And

17    when I say "talc," I mean milled and talc ore

18    testing results today?

19        A.  Yes.  My understanding is that it does,

20    and I would look to the schedules, I would look to

21    the supplier agreements to determine that.

22        Q.  But you can't tell us what those retention

23    periods are; correct?

24        A.  Well, we were looking at the '97 schedule.

25    I believe I can find it in the quality agreement.

1      Q.  Okay.  And where -- can you point me to

2  the quality agreement?

3      A.  So this is Exhibit 1.  The quality

4  agreements are provided under Tab 2D.

5          So I have -- on the first quality system,

6  there's two different sets of numbers.  The top

7  says "9 of 16"; the lower one says "11 of 19."

8      Q.  Can you direct me to where you're at

9  specifically?

10      A.  Yeah.

11      Q.  This is 2D, Exhibit 2D?

12      A.  Yes.  2D.  That's right.  And it's the --

13          MR. COX:  How many pages?

14          THE WITNESS:  Well, it appears to be nine

15  pages in.

16  BY MR. SWANSON:

17      Q.  These are --

18      A.  I don't know why there's two sets of page

19  numbers, but there's...

20      Q.  Is this under "validation"?

21      A.  I'm looking under 17.0, that section

22  called "records."

23      Q.  Oh, is this -- oh, yours aren't tabbed

24  that way.

25          Sorry, did you say "inspection measures

 1   and tests"?

 2        A.  17.0.  "Records."  Under the first quality

 3   system procedure which is Exhibit 2D.

 4        Q.  Okay.  I think I've got it.  Yeah.

 5             So what does that say about retention of

 6   testing results?

 7        A.  It says, "All documentation, including

 8   manufacturing records, packaging records,

 9   inspection records, QA records, batch tickets,

10   cards records, et cetera, during the manufacturing

11   process shall be maintained by PTI for six years

12   from the date of manufacture."

13             Then it goes on to say, "The validation

14   records are to be kept by PTI as long as the

15   product is manufactured until the last batch of

16   any discontinued product has expired."

17        Q.  Just to be clear for the record, Pharma

18   Tech Industries, PTI, was -- did the packaging of

19   the manufacturing powder -- packaging of Johnson's

20   Baby Powder for Johnson & Johnson; is that right?

21        A.  That's my understanding.

22        Q.  And where it says "records," and it says

23   "six years," I notice "manufacturing records,

24   packaging."  Does it list testing?

25        A.  It doesn't say testing per se, but it

1    speaks of testing in the sections that describe

2    documentation prior to that.  Sections 8, 9, 10.

3        Q.  So PTI --

4        A.  13.

5        Q.  I'm sorry.  PTI started manufacturing in

6    2004 or '5, around there; right?

7        A.  I need to check my notes on that.

8            So I show that in 2004 was the sale of the

9    Royston plant to PTI.

10       Q.  And do you know what the records retention

11   was for Royston prior to that, if it had one?

12       A.  Once again, I would be looking through

13   these schedules to make that determination.

14       Q.  Do you have a table of contents?

15       A.  I'm going to see if there's a schedule

16   closer to -- I'm sorry.  Is that -- is this my

17   pile here or that's?  Not my pile.

18       Q.  Any of those are ones you can -- those are

19   all marked as exhibits, so.

20       A.  Okay.  So I found one in my pile that's

21   2002.  So that would be closer to the sale to PTI.

22       Q.  And what is that marked as?  What's the

23   exhibit number, I mean?  Exhibit number?

24       A.  Oh, I'm sorry.  It's 12.

25       Q.  Thank you.

1    A.  And I do note that there are additional

2  definitions at the bottom of the schedule.

3    Q.  Okay.  And you're looking at a 2002

4  records retention schedule of Johnson & Johnson

5  Consumer and Personal Care companies; correct?

6    A.  Yes.

7    Q.  And is there something in here -- I had

8  asked you about Royston or whoever was doing the

9  manufacturing prior to PTI, but is there something

10  in this record schedule from 2002 that you see

11  with respect to a retention policy and testing of

12  talc finished product or talc ore or milled talc?

13    A.  I'm looking for it.  It's --

14    Q.  Did you find anything?

15    A.  I mean, this is also -- half the pages are

16  flipped, so I'm -- I would expect that there

17  should be a section in here that would relate to

18  batch record retention.  I'm not finding it right

19  now.  I could continue to search on the break.

20    Q.  Okay.  Batch record retention.  I'm

21  specifically asking about any kind of testing of

22  the finished product and of the talc that went

23  into the finished product.  So that could be a

24  research and development document of the research

25  department or it could be the manufacturing

```
 1    department.
 2            You understand that; right?
 3        A.  Yes.
 4        Q.  Okay.  So that's what you're looking for.
 5        A.  Well, once again, I can try to match up
 6    the comments from Mr. Hicks and others to specific
 7    provisions of the schedule.  I certainly would not
 8    say I'm qualified without exception to determine
 9    every place in the retention schedule that's
10    responsive to that question.  I can -- I can look
11    for the word "testing" and make those
12    determinations, but I can't speak to an
13    interpretation of every category of the schedule.
14            MR. SWANSON:  Move to strike as
15    nonresponsive.
16    BY MR. SWANSON:
17        Q.  Okay.  So whatever information that you
18    have about the retention of testing reports or
19    things associated with testing is in your notes;
20    is that what you're saying?
21            MR. COX:  Object to the form.
22            THE WITNESS:  My notes would be the
23    primary source of my knowledge of that
24    information.
25    BY MR. SWANSON:
```

1    Q.  Do you know what the retention was on

2    transmission electron microscopy grids that were

3    created in testing Johnson's Baby Powder or in the

4    talc ore or milled talc for asbestos content at

5    any time?

6         MR. COX:  Object to the form.

7         THE WITNESS:  No, I don't know that.

8    BY MR. SWANSON:

9    Q.  Do you know what the retention was on

10   transmission electron microscopy images of testing

11   of talc ore, milled talc, or cosmetic talc

12   finished product at any time by Johnson & Johnson?

13        MR. COX:  Object to the form.

14        THE WITNESS:  Unless those have other

15   common terms that I'm familiar with, I don't --

16   I'm not familiar with those terms.

17   BY MR. SWANSON:

18   Q.  Do you know the retention schedule for

19   those?

20   A.  I'm not familiar with those -- those --

21   those categories, so I would not --

22   Q.  They would be images taken from testing --

23   photomicrographs from testing.  They might be

24   included in a testing report.

25   A.  Would they be associated with

```
 1   manufacturing?  Would they be associated with
 2   audits?  Would they be associated with other steps
 3   of the process?  I would -- if -- if, for
 4   instance, they were associated with the
 5   manufacturing process, Mr. Hicks has an answer for
 6   that, that I elicited.  If they are associated
 7   with audits, there was an answer for that, that I
 8   elicited.
 9        Q.  What testing was done -- what do you mean
10   by "audits" in -- with respect to testing of talc
11   for the presence of asbestos?
12        A.  My understanding is that a third party, RJ
13   Lee and potentially other organizations, was
14   contracted to perform quarterly testing of talc.
15   That would have included a range of testing
16   activities.  That would have been -- those test
17   results would have been captured and saved
18   separate and apart from any ongoing manufacturing
19   process and preserved.
20        Q.  Okay.  And where is that information
21   either in the -- in the retention policy, if you
22   know?
23        A.  Yeah.  As I did note, just flipping
24   through it, there were some categories called
25   "audits," but I have not undertaken to tie
```

1    Mr. Hicks or Mr. Zappa or other people's comments

2    to specific sections of the schedule.

3         Q.  Now, with respect to your notes, who did

4    you speak to regarding the testing that was done

5    by outside laboratories, what you called "audit

6    testing"?

7         A.  I did speak to Mr. Hicks about that.  I

8    spoke to members of the supplier quality team.

9    That included -- get my table of contents.

10              So amongst the people I spoke to in that

11   regard were David Allen, Don Hicks, Lisa Kaiser,

12   Mark Zappa, Nicholas Zhu, Pankaj Verma, and Sean

13   Park.  Lorena Telofski may have mentioned it as

14   well.  I would then look through those people's

15   notes to see who specifically referenced it.  But

16   those were the -- those were the people in the

17   supplier quality area that I spoke to.

18        Q.  And what was -- was there a formal --

19   did -- well, let me start this way:  When was

20   the -- from what you gathered, first of all,

21   generally speaking, what was your understanding of

22   Johnson & Johnson's retention policies on talc

23   testing by third parties that were hired by

24   Johnson & Johnson to do these quarterly tests or

25   audits?

1         A.  My understanding is that those were

2    considered part of a system of record.  They were

3    stored in a system called "TrackWise" and also in

4    a system called "Microsoft SharePoint" and subject

5    to indefinite retention.

6         Q.  And where is that in your notes?

7         A.  Well, there is a -- there were pieces of

8    it in different parts of my notes.

9              So, for instance, the RJ Lee testing was

10   on page 14 of my Don Hicks discussion.

11        Q.  Okay.  Are you talking about this

12   quarterly global testing in 2009?

13        A.  Yes.

14        Q.  Okay.

15        A.  Then on page --

16        Q.  Hold on a second, since we're talking

17   about that.  So it says here that "start tested

18   quarterly global testing 2009" -- "started

19   quarterly" testing in 2009.  And then in

20   parentheses, "also tested at an earlier time."

21              And it said that Don requested 500-gram

22   samples from every manufacturing site.

23              And this you understand to be as of 2009?

24              MR. COX:  Object to the form.

25              THE WITNESS:  The -- the context was for

1    the quarterly global testing, yes.

2    BY MR. SWANSON:

3         Q.  And then it says -- then he sent to RJ

4    Lee.  "Did not retain anything."

5              You mean Don Hicks didn't retain anything;

6    is that what that means?

7         A.  Correct.

8         Q.  And what did you ask him that elicited

9    that answer that he didn't retain anything?  What

10   was that in reference to?  That he didn't have a

11   record of it?

12        A.  No, not the records.  It was whether he

13   maintained any elements of the samples themselves.

14        Q.  And what did he do with whatever remainder

15   of the sample that he didn't send to RJ Lee?

16             MR. COX:  Object to the form.

17   Mischaracterizes the testimony just given.

18             THE WITNESS:  My understanding is that he

19   requested 500-gram samples and he sent them along

20   500-gram samples to RJ Lee.

21   BY MR. SWANSON:

22        Q.  What's the next reference you were

23   referring to in terms of this quarterly testing,

24   because this doesn't say anything about how long

25   the testing results or the documents about the

1    testing should be retained; correct?

2        A.  Correct.

3        Q.  Where is the next one?

4        A.  Page 18, which is the Mark Zappa

5    discussion and that is about -- about 18 lines

6    from the bottom.

7        Q.  I'm sorry.  Where?

8        A.  18 lines from the bottom of page 18.

9        Q.  And what are you looking at?

10       A.  "Quarterly mine results also scanned into

11   SharePoint.  Dedicated talc SharePoint site

12   includes testing.  Don kept records in physical

13   binder until he left and then it was migrated to

14   SharePoint until 2014.  No additional steps needed

15   to conform to legal hold.  Already hold

16   everything."

17           Then it notes the mine assessment may

18   routinely come through email, and the -- also

19   notes that the supplier tests were managed in the

20   TrackWise system.

21       Q.  It says that this -- well, first of all,

22   Don kept records in a physical binder.

23           Do you have any idea how far back those

24   records went, without guessing?

25       A.  I can only note that he -- his involvement

1   with manufacturing quality started in 2001.

2       Q.  Don Hicks' did?

3       A.  Yes.

4       Q.  And do you know whether or not that

5   binder -- do you know if that binder contained the

6   testing results?  It just says "kept records."  I

7   know there's some discussion about testing, but

8   I'm trying to figure out if Don kept records in

9   physical binders, what specific records was he

10  keeping in a physical binder?

11      A.  I interpreted that, the conversation, to

12  be regarding the testing results, the quarterly

13  test results.  That was my understanding.

14      Q.  And did you ask -- I mean, I'm looking at

15  your notes here of Hicks and Zappa, and when you

16  were asking people who were responsible for

17  records and information management, you were

18  asking all about hold periods, holds and retention

19  periods, and the policies from what we've seen in

20  the notes.  But I see here -- I don't see you

21  asking either of these people, Mark or Don, why --

22  or what their understanding was of the retention

23  schedule or any holds at the time.

24          In other words, did you ask them, well,

25  what was the policy -- what was the -- what was

```
 1   the company policy on holds?  What policy were you

 2   following on retention schedules for any of these

 3   records that you were generating or receiving?

 4           MR. COX:  Object to the form of the

 5   question.

 6           THE WITNESS:  Well, I would disagree in

 7   part in the sense that in the page 18 discussion

 8   with Mr. Zappa, he indicated no additional steps

 9   needed to conform to legal hold.  They were

10   already holding everything going forward.

11   BY MR. SWANSON:

12       Q.  Well, specifically what did you ask him

13   about?  What did he say other than -- what did you

14   ask about legal holds?

15       A.  I asked if the system had any provision or

16   capability to enable a legal hold of those

17   materials.

18       Q.  And those materials, again, you're talking

19   about these quarterly testing results; is that

20   right?

21       A.  Yes.

22       Q.  So -- and that -- what happened to the

23   physical binder that Don had?

24       A.  I don't know.

25       Q.  Was it destroyed?
```

```
 1               MR. COX:  Object as asked and answered.
 2               THE WITNESS:  I don't know.
 3   BY MR. SWANSON:
 4        Q.  And because Mark started in 2006 and you
 5   didn't specifically ask Don that, you don't know
 6   if his binder included quarterly testing results
 7   going all the way back to 2001, do you?
 8        A.  I did not ask the date range of the
 9   binder.
10        Q.  What other reference do you have about --
11   in your notes regarding retention periods -- or
12   let's add holds to this -- for quarterly testing?
13   And if you see anything in there on any other type
14   of asbestos testing of the talc or the finished
15   talc products, I want to know about it -- that we
16   haven't discussed already.
17        A.  Well, the next --
18               MR. COX:  Objection to form.
19               Go ahead.
20               THE WITNESS:  I'm sorry.
21               The next place this is referenced is in
22   the Nicholas Zhu section on page 20.
23               MR. SWANSON:  Before you get into that,
24   hold that thought.
25               Let's go off the record so that the
```

1    digital media can be changed on the video

2    recorder.

3                THE VIDEOGRAPHER:  Thank you.

4                This marks the end of Media Disk 3 in the

5    deposition of James Mittenthal.

6                We are going off the record at 2:55 p.m.

7                    (Off the record.)

8                THE VIDEOGRAPHER:  We are on the record at

9    3:12 p.m.

10               This marks the start of Media Number 4 in

11   the deposition of James Mittenthal.

12               Counsel, you may continue.

13   BY MR. SWANSON:

14       Q.  Mr. Mittenthal, I think we were going

15   through -- we were talking about quarterly reports

16   and also other testing of the talc or finished

17   product for the presence of asbestos and the

18   retention periods or practices related to those.

19   And I think we had sort of exhausted what you

20   could say about the policies.  But as to your

21   notes, were there other references in your notes

22   that you had in mind that are the basis of your

23   understanding?

24       A.  Yes.  So in the previous conversation, I

25   was simply walking through places in my notes

1   where quarterly audit testing or RJ Lee testing

2   had been captured, and the next place I had come

3   to was Nicholas Zhu, which is page 20.

4           So there are sections that talk about

5   batch records and mining and processing.  Then it

6   goes down to about eight, nine lines from the

7   bottom, "quarterly testing third-party RJ Lee

8   cites in India, China, Thailand sent talc samples

9   to RJ Lee.  Test results stored in SharePoint and

10  shared with manufacturing sites via email.  Global

11  SharePoint site with folder dedicated to APAC

12  source quality team may have test results back to

13  2012."

14      Q.  So that would correspond to the six years,

15  is that right, that we saw with Don Hicks?  From

16  memory he was talking about six years.

17      A.  I would actually suggest that Mr. Hicks

18  was talking about batch retention as opposed to

19  quarterly testing retention.

20      Q.  Okay.  He was talking about -- but he was

21  talking about testing, batch testing; correct?

22      A.  Among other things, certificates of

23  analysis and other things associated with the

24  batch or a lot.

25      Q.  And that would include testing of

```
1    asbestos?

2         A.  Testing, yes.

3         Q.  In here, what -- to be clear, Nicholas

4    Zhu, he's a supply -- is in supplier quality

5    management.

6              Does he work in China?

7         A.  Yes.

8         Q.  And did you speak to him on the phone?

9         A.  Yes.

10        Q.  And he's been there at Johnson & Johnson

11   China for five years; is that right?

12        A.  Yes.

13        Q.  And his understanding is that these

14   quarterly test results go back to 2012?

15        A.  Yes.

16        Q.  And do you have any other information as

17   to how far back -- well, do you know if they've

18   only been retained for that five or six-year

19   period or, in other words, there were prior

20   results and they had been retained six years, or

21   they've only been doing that testing back to 2012?

22        A.  Yeah.  I simply note that he said, you

23   know, don't believe they have anything prior to

24   that.

25        Q.  Okay.  So that doesn't answer the question
```

1    in the sense that we don't know the answer to that

2    question from what you learned from him, correct,

3    as to whether or not they only retained it for six

4    years or they didn't start this practice of

5    testing -- quarterly testing until 2012; true?

6         A.   True.  I just want to go back to my Don

7    Hicks notes for a quick second just to make sure

8    I'm answering that fully.

9              Okay.  I checked.  And I agree.

10        Q.   Okay.  Are there any other references that

11   you have to testing of the talc or the finished

12   product in terms of records retention?

13        A.   Well, as I mentioned, the walk-through

14   that was encompassed before the break and now it

15   was -- I was really just looking for instances of

16   audit testing and how that was retained.  I could

17   do another sweep just for any references to

18   retention of batches.  I was -- I was really

19   focusing on looking -- looking for the retention

20   of quarterly audit.  I may -- I may have found

21   additional places where there's batch information,

22   but I was -- I had been looking for the RJ Lee

23   quarterly audit information while we were looking

24   for it.

25        Q.   On the break?

1    A.  No.  While we were going through this

2    exercise, I was focusing on the quarterly audits.

3         Q.  And what I asked the last couple of

4    questions was go ahead and expand that.  I mean,

5    initially we started with Don Hicks and some of

6    the testing that had been related to

7    manufacturing; right?

8              And so, since we're taking the time to go

9    through your notes on this, I'm interested in all

10   references to retention of testing records that

11   would involve testing for asbestos, whether that's

12   testing at the manufacturing facility or the

13   quarterly.

14        A.  Uh-huh.

15        Q.  Okay?

16        A.  Okay.

17        Q.  All right.  So --

18        A.  So the next one was Pankaj Verma, page 21.

19        Q.  Okay.

20        A.  And he indicated that "audit reports were

21   stored in TrackWise, a validated system."  And his

22   comments about a validated system I understood

23   that to mean, among other things, that the -- that

24   this was a system of record and that the

25   information would be stored indefinitely in that

1    system.

2          And that TrackWise was, in fact, a global

3    system, meaning information that he input or that

4    happened in his region would be visible anywhere

5    around the world.

6          He --

7       Q.  This is -- okay.  So let's just back up

8    for a second there now.

9          Mr. Verma is director of APAC external

10   manufacturing quality; right?

11      A.  Yes.

12      Q.  And he's been working there for seven

13   years at J&J.

14          Does that mean including four years at J&J

15   India Mumbai?

16      A.  You know, it's ambiguous because he then

17   says he was responsible for management and mining

18   for the last ten years.  I'd have to double-check

19   that.

20      Q.  You said that this audit reports -- now,

21   how do you know that those audit reports that are

22   being referred to there are auditing actual

23   testing -- testing results, testing talc for

24   asbestos?

25      A.  The -- up above where it says "raw and

1    packaging materials suppliers, talc part of his

2    portfolio" then below that "audit of talc

3    manufacturing site ensuring that talc supplier

4    follows specs, testing, and overall global specs."

5         Q.  So but there's a number of things in

6    there.  So following specs.  What was the talc

7    supplier for -- which talc supplier are we talking

8    about now?  Do you know?  Is it China?

9         A.  Well, it appeared from the conversation he

10   was referring to both India and China.

11        Q.  Okay.  And you said that the audit reports

12   are stored in TrackWise.  Is there -- you said

13   that you thought that that was -- well, strike

14   that.

15             How far back do these audit reports go?

16   Do you know?

17        A.  I do not.

18        Q.  And how long have they been stored in

19   TrackWise?  For how many years?

20        A.  I'm going to look at my -- if I can find

21   it quickly, my spreadsheet.  I might need some

22   help.

23        Q.  Well, it says right here -- maybe this

24   helps you -- "audit reports stored in TrackWise, a

25   validated system.  Prior to that, ETQ Symphony,

1  including corrective actions, 2014."  That's in

2  your notes on this same page.

3       A.  Yes.  For that region.  I was looking --

4  okay.  I wanted to see TrackWise in general.  But,

5  yes, for that region it is in my notes.

6       Q.  Right.  So for that region, the

7  information wasn't being entered into TrackWise

8  until 2014; right?

9       A.  Yes.

10      Q.  And it came -- and it transferred over

11  from a different system?  Well, let me ask you

12  what that reference means.  "...a validated

13  system.  Prior to that, ETQ Symphony, including

14  corrective actions."  What does that mean?

15      A.  So the first line, "Audit report stored in

16  TrackWise, a validated system," that stands on its

17  own.

18          And then the system prior to that for

19  storing audit reports was ETQ Symphony, and that

20  system also happened to store corrective actions.

21      Q.  And do you know if that information was

22  transferred over that was in ETQ?

23      A.  It doesn't say explicitly in here.

24      Q.  Was the switch to TrackWise in 2014?

25      A.  That's my understanding.  I also wanted to

1  find my -- I don't see my -- is there something I

2  can lay my hands on?  The list of -- is that one

3  of the exhibits floating around the table

4  possibly?

5      Q.  I'm sorry.  What are you looking for?

6      A.  Sort of a Jim Mittenthal set of lists.  I

7  think it might be in one of those maybe.

8      Q.  I think -- it's got to be in like

9  Exhibit 2?

10      A.  No.  It's like the three tables of the

11  applications, the timeline, and the names.

12      Q.  Talking about this?

13      A.  Well, that would have been the most recent

14  edition to it.

15      Q.  This?

16      A.  No.  There's one more.

17      Q.  I can't guess about what you... sorry.

18      A.  I thought it had been marked.

19      Q.  It probably has been.  I think we marked

20  pretty much everything.

21          Describe what that document is that you're

22  looking for.

23      A.  It's about a -- well, it's -- would be

24  printed on both sides.  It's about a four or

25  five-page total, and it has a table that has a

1    timeline, it has a table that has a list of

2    applications, and a table that has a list of

3    people.

4          Q.  I'm sorry.  I'm not -- it's not ringing a

5    bell right now.

6          A.  Okay.  This is the document (indicating).

7          Q.  Oh.  I guess it's a document I haven't

8    seen yet.  Or have I?  Okay.

9              MR. COX:  I think you have.  It was part

10   of his notes.

11             MR. SWANSON:  Yeah.  Okay.

12   BY MR. SWANSON:

13         Q.  This is a list of people that you

14   interviewed; right?

15         A.  That's part of the list, yeah.

16             MR. SWANSON:  Chris, was this in the

17   binder?  This (indicating)?  I just want to figure

18   out if we marked it or not.

19             MR. COX:  No.  He had it with him on the

20   first day, though.  I don't know if you marked it

21   or not.

22             MR. SWANSON:  I might not have.

23             MR. COX:  There were a couple of things

24   that were not marked.

25             MR. SWANSON:  Let's go ahead and mark

```
 1    that.
 2              Mr. Mittenthal, so we that we've got a
 3    copy of it and so we just have a record of what
 4    you're looking at there.
 5              That's going to be Exhibit 31.
 6              (Whereupon, Plaintiff's Exhibit 31 was
 7              marked for identification.)
 8    BY MR. SWANSON:
 9        Q.  Just for the record, can you tell me what
10    Exhibit 31 is?
11        A.  Yes.  It's three lists, and they are lists
12    that I compiled going through my notes.  The first
13    part of the lists are just simply the people I
14    spoke to.  The second part of the lists were the
15    applications that were discussed.  And the third
16    part of the lists were dates mentioned by people
17    that I spoke to.
18              And I have gone to the second area of the
19    list, the applications discussed, in order to
20    ascertain information about TrackWise.  And I just
21    have a general note that it was effective in 2014
22    and preceded by ETQ.
23        Q.  Okay.  All right.  Let's see.  We were on
24    page, I think it was 21?
25        A.  Yes.
```

1        Q.  And I apologize if I asked a question I've

2    already asked.

3             How far back did those talc testing audit

4    reports go?

5        A.  I don't know.

6        Q.  Okay.  What's the next -- and you don't

7    know if this policy and practice or practice that

8    was happening for the last several years as to, I

9    think India and Thailand, were also practiced in

10   the Philippines or Hong Kong, do you?

11       A.  Just the first part of the sentence again,

12   please?

13       Q.  Do you know if this practice with respect

14   to these audit reports and currently putting them

15   in TrackWise and prior to that into ETQ Symphony,

16   do you know if that was -- if that applied to the

17   Philippines or Hong Kong?

18       A.  Well, in the earlier conversation,

19   Mr. Nicholas Zhu identified himself as responsible

20   for the Philippines and noted that the use of --

21   noted the SharePoint site.

22       Q.  Didn't we talk about that?

23       A.  Yes.

24       Q.  All right.  As to talc -- are there any

25   other references that you have into retention

1  of -- retention policies or practices that you

2  know about that we haven't discussed already?

3       A.  Well, in the -- further on in the section

4  about Pankaj Verma, which is page 21, there is a

5  notation, "expect a defined period of retention

6  for suppliers.  Typically shelf life plus one

7  year."

8            So there is a general statement about

9  document retention that once again echos the

10  "expected shelf life plus one year" notion.

11       Q.  So that's the six years basically; right?

12       A.  Yes.

13       Q.  And that would include testing?

14       A.  Yes.

15            MR. COX:  Object to the form.

16  BY MR. SWANSON:

17       Q.  And here's another reference, and I think

18  this is consistent with what you just said.  If

19  you go to page 61, 62.  This is as to Pam Downs.

20       A.  Yes.

21       Q.  And Pam Downs is the person you've had the

22  most discussions with overall about Johnson &

23  Johnson's record searches and production and that

24  sort of thing other than perhaps the attorneys;

25  correct?

1       A.  I would generally agree.

2       Q.  And she's the principal at Triality which

3   is a company that works for Johnson & Johnson

4   dealing with their document searches and

5   productions on various levels; correct?

6       A.  Yes.  Evidence management.

7       Q.  Evidence management.  Okay.

8           If you look at what she said here on

9   page 62, near the top of the page it says, "Some

10  testing records maintained by third parties," and

11  then it says, "evaluate testing quarterly."

12          I don't know, do you know what that meant,

13  "evaluate testing quarterly" meant, when you spoke

14  to her initially then back in April of 2018?

15      A.  Yeah.  It's kind of mashed together.  But

16  I would say "evaluate the talc by testing

17  quarterly" would be a more complete version of the

18  sentence.

19      Q.  And then she also says retention of

20  testing docs was generally shelf life, a product

21  plus one year; correct?

22      A.  Yes.

23      Q.  So, again, that's -- then the shelf life

24  of the product is considered to be five years for

25  Johnson's Baby Powder; true?

```
 1              MR. COX:  Object to the form.
 2              THE WITNESS:  I would conclude that.  I
 3    wouldn't be able to speak on it with authority,
 4    but that sounds in the range based on what Don
 5    Hicks said as well as these other comments.
 6    BY MR. SWANSON:
 7         Q.  So generally it seems like people are
 8    saying it's shelf life, which is about five years,
 9    plus a year for the preservation of the testing
10    results except in these instances recently where
11    you've said that some of the information got put
12    into -- I forget what the name of the platform
13    was.
14              MR. COX:  Object to the form.
15              THE WITNESS:  Well, going back to
16    Mr. Hicks, he indicated that, I think it was
17    Mr. Hicks, if not Mr. Zappa, that RJ Lee started
18    testing in 2009 and that that quarterly testing
19    was kept.
20    BY MR. SWANSON:
21         Q.  So prior to 2009, at least in practice,
22    even though we haven't really determined it from
23    you looking at the policies because you haven't
24    been able to quite straighten that out, although
25    there was a reference in a policy.
```

```
 1          But in terms of what practices you've
 2   gathered from interviewing these witnesses was
 3   that it was generally about six years for testing
 4   results.
 5          MR. COX:  Object to the form.
 6   BY MR. SWANSON:
 7      Q.  For testing; correct?
 8      A.  I would seek to make a clean separation
 9   between testing from -- that accompanies batches
10   or the manufacturing process as opposed to testing
11   that stands apart from -- from a particular batch
12   or a lot, and whereas Mr. Hicks indicated that
13   that regular quarterly audit started in 2009, he
14   also indicated that there were other testing that
15   was done separate and apart, from batches and
16   audits -- sorry -- separate and apart from batches
17   and lots that occurred prior to 2009.
18          So batch lot testing with its shelf
19   life-based retention here; quarterly audits and
20   prior to 2009 an occasional audit-like testing
21   over here (indicating).
22      Q.  Now, when Pam Downs is talking about this,
23   retention of testing, she's talking about the
24   quarterly audits or is she talking about -- do you
25   know, or is she talking about testing done in
```

1    conjunction with manufacturing?

2         A.   She's -- when she talks about shelf life

3    of a product plus one year, it's in connection

4    with manufacturing.

5         Q.   Okay.  Now, go to page -- before I leave

6    generally this area of testing for talc or

7    finished product for asbestos and the retention of

8    those records, do you have any other information

9    as the representative of Johnson & Johnson to add

10   as far as when specific retention practices or

11   policies came into place and how long the

12   retention periods were that we haven't spoken

13   about?

14              MR. COX:  Object to the form.

15              THE WITNESS:  When I spoke of the places

16   in my notes, and I believe we've captured many of

17   those places both for the quarterly audits and for

18   the manufacturing-related testing, there are

19   references in the retention schedules I -- I had

20   difficulty tying them one by one.  But they're --

21   the retention schedule would specify those

22   applicable periods as well.

23              The supplier audits -- the external

24   supplier audit agreements -- or the external

25   supplier agreement also encompassed retention

1    periods in them as we went through.  And I think,

2    as I mentioned when we first started talking about

3    this, the legal holds would also specify testing

4    as a category to be held.

5    BY MR. SWANSON:

6        Q.  Now, on retention schedules, we talked

7    about 1997 being the first actual retention

8    schedule.  And you couldn't really tell from

9    looking at that whether that applied to the talc

10   testing, correct, at least from the preliminary

11   look that you took a couple of hours ago when we

12   looked at that; right?

13           MR. COX:  Object to the form.

14           THE WITNESS:  My understanding is that

15   those schedules would cover those intervals.  I

16   would just need further study to tie the specific

17   references made by Mr. Hicks, Ms. Downs, Mr. Zhu,

18   Mr. Zappa, Mr. Verma, and others back to their

19   accompanying periods in the schedules themselves.

20   BY MR. SWANSON:

21       Q.  Do you have any information -- and I may

22   ask you that tomorrow, because I don't want to

23   continue your deposition indefinitely into the

24   future, and I'm sure you probably agree with me

25   there.  So I may come back on that to see if we

1   can specifically locate those.

2          But setting that aside, do you have any

3   information that there was any kind of formal

4   retention policy as to testing -- now you've said

5   the first hold was in 1999; correct?

6      A.  Yes.

7      Q.  And the first policy we have for retention

8   is 1997; correct?

9      A.  Yes.

10     Q.  So do you have any information that there

11  was -- that Johnson & Johnson had a retention

12  schedule or retention hold prior to 1997 that

13  would dictate the retention of any kind of testing

14  of Johnson's Baby Powder, or cosmetic talc

15  products, or the talc ore, or the milled talc that

16  was used in those products for asbestos?

17         MR. COX:  Object to the form.

18         THE WITNESS:  Insofar as holds, I have no

19  knowledge of anything before that.  Insofar as

20  retention schedules, I have information from the

21  company that there were retention schedules

22  created in the early '90s.  The earliest one made

23  available to me has been 1997.  It's my

24  understanding that the retention schedules are

25  intended to cover topics such as retention of

1    testing documentation.

2              I have not seen anything earlier to 1997.

3    I have just a general understanding that the --

4    the very purpose of the retention schedules is

5    to -- is to address the retention of materials

6    that would be classified in the company's business

7    operations which would include testing.

8              I haven't seen anything prior to 1997.

9    BY MR. SWANSON:

10       Q.   Okay.  And we had -- and I wish I could

11   remember who it was you spoke to -- and we spoke

12   at length about a retention policy that was

13   referred -- retention, some kind of retention

14   policy that was referred to in your notes as of

15   the early 1990s.  Remember that?  And it was

16   supposedly based on the McNeil subsidiary's

17   retention policy?

18       A.   That was -- well, that was authored by

19   Rosina Sheerin.  There may have been references to

20   it, both from her discussion and possibly Michelle

21   Anderson.

22       Q.   And when I asked you about that at that

23   time, you told me you didn't know the particulars

24   of that retention policy.

25              Do you remember that?

1      A.  That's right.

2      Q.  And you still don't know the particulars

3  of the retention policy; true?

4      A.  That's right.

5      Q.  And Lorena, she didn't tell you that this

6  retention policy was for testing results of the

7  talc for asbestos, did she?

8      A.  I believe you mean Rosina?

9      Q.  Rosina, yes.

10     A.  Correct.

11     Q.  You mentioned earlier, before I started

12  asking you these questions, that you -- you had

13  that understanding that that policy would be.

14         Are you speculating those earlier -- the

15  earlier policy from the earlier 1990s?

16     A.  I'm simply saying that the purpose of a

17  retention policy is to cover the documents that

18  the company uses in the course of its business.

19  I -- I haven't seen them.  I don't know one way or

20  the other whether testing is on there.  I have

21  seen the 1997 schedule, which makes reference to

22  some types of testing.  I'm not able to interpret

23  every category of testing and what that means.  I

24  just know I've seen testing in the '97 schedule.

25     Q.  What I want to do tomorrow so that I

1    don't -- I think I've closed that out for now, and

2    I hate to give you homework, but before we start

3    tomorrow, if you could look at those retention

4    schedules so I can ask this question again because

5    I do want to get to the bottom of this, because

6    you're referring to 1997, and you weren't sure

7    when I asked you if those were really regarding

8    talc testing.  So that if you could look at a more

9    recent policy or two in 1997 that would help us

10   and it wouldn't take us very long to get through

11   it at that point as opposed to us slogging through

12   it page by page.

13            Is that something you can do?

14            MR. COX:  Hold on.  First of all, we

15   object to the continuation of this deposition

16   beyond today, and we can talk about that more at a

17   break, Mark.  But we can also talk about whether

18   Mr. Mittenthal can look at what you're asking him

19   to look at, at a break today.

20            MR. SWANSON:  Sure.

21   BY MR. SWANSON:

22       Q.  All right.  I want you to look at page 24

23   of your notes, please.

24       A.  I'm there.

25       Q.  Now, prior to PTI doing the manufacturing

1    of the domestic Johnson's Baby Powder, it was done

2    by Royston, is that right, or did it go from -- is

3    that correct?

4        A.  Well, my general understanding is that

5    Royston was the name of a company facility.

6        Q.  And that was in Georgia?

7        A.  Yes.

8        Q.  And do you know if the Royston facility

9    had any retention policy with respect to any

10   testing that they did for certificates of analysis

11   on the presence of asbestos in the product or in

12   the talc that was coming in?

13       A.  My understanding was that Royston would be

14   part of the company and would be subject to any

15   consumer -- consumer retention policies in place.

16       Q.  And Royston did the manufacturing up until

17   2004 or '5 when it went to PTI; is that correct?

18       A.  Well, Johnson & Johnson did the

19   manufacturing at its Royston facility.  That's my

20   understanding.

21       Q.  And do you know how far back that went,

22   that Royston did the manufacturing?

23           MR. COX:  Objection.  Beyond the scope of

24   the notice.

25   BY MR. SWANSON:

1          Q.  Strike that.

2               But if we went from Royston, Johnson &

3     Johnson Royston to PTI in 2004 or '5, we talked

4     about that; right?

5          A.  Yes.

6          Q.  The question is, do you have any

7     information that at the Royston facility, the

8     manufacturing facility, there was a retention

9     policy as to any testing documents that were being

10    generated by them, or received by them, in other

11    words, generated during manufacturing or received

12    by them in terms of, like, talc supply that they

13    received?

14         A.  My understanding is that those would have

15    been subject to the franchise level retention

16    policies that we discussed for which we have '97

17    and others, and also, where applicable, subject to

18    a legal hold within the appropriate time frames.

19         Q.  Now, going back before Royston,

20    manufacturing was done at New Brunswick; correct?

21    North Brunswick, sorry.

22         A.  Well, I certainly am not able to speak --

23         Q.  This is at page 24.  I understand.  But

24    obviously -- I mean, we can both agree that you

25    have been hired to act as a representative for

1  Johnson & Johnson and you've done certain

2  research.  And so, with that in mind, your notes

3  from your interview with Lorena Telofski at

4  page 24 of your notes indicates that the

5  manufacturing was done at North Brunswick?

6          MR. COX:  Object.

7  BY MR. SWANSON:

8      Q.  Correct?

9          MR. COX:  Sorry.  Object to the extent

10  you're seeking to elicit testimony from someone

11  who's not designated about topics as to where the

12  product was manufactured.

13          MR. SWANSON:  These are document issues,

14  Chris.  I'm just trying to get to document issues,

15  since that's what we're talking about.

16          MR. COX:  That's not a document question.

17          THE WITNESS:  She -- I asked her some

18  questions.  This was part of her answer.  I wrote

19  it down.

20  BY MR. SWANSON:

21      Q.  Okay.  So from that you understood that

22  the manufacturing went from North Brunswick to the

23  Royston plant; correct?

24      A.  That's what she indicated.

25      Q.  And some of the manufacturing was done by

1    Kolmar Laboratories in Port Jervis, New York;

2    correct?

3           MR. COX:  Object to the form.  Object to

4    the extent it's beyond the scope of the notice.

5    BY MR. SWANSON:

6       Q.  From your notes.

7       A.  That is in my notes.

8       Q.  And that's all we've been talking about.

9    I mean, your understanding from what you learned

10   from talking to people.  I understand you have

11   more expertise about documents and retention and

12   that sort of thing, but all this is information

13   that you've gained from talking to people; right?

14      A.  Well, I wrote down the -- the -- what was

15   elicited during our conversation, so.

16      Q.  So I want to get to the document issues,

17   though.  You see that the -- the North Brunswick

18   plant closed down; correct?  You see down there

19   where it says, "All buildings in North Brunswick

20   have been sold and taken down"?

21      A.  Yes, I do.

22      Q.  What happened to the records that were at

23   North Brunswick?

24      A.  I don't have that information in my notes.

25      Q.  Were they destroyed?

```
 1              MR. COX:  Objection.  Asked and answered.
 2              THE WITNESS:  I don't know.
 3   BY MR. SWANSON:
 4       Q.  Now, if you look -- Don -- your notes
 5   regarding Don Hicks -- and kind of you could hold
 6   on to that Lorena Telofski page 2.  But if you
 7   look at page 12.
 8       A.  Yes.
 9       Q.  You see about six lines down he says,
10   "Responsibility of maintaining records resides
11   with the site doing the work"?
12       A.  Yes.
13       Q.  Okay.  So North Brunswick had the
14   responsibility for those records; correct?
15       A.  I can only infer that from -- from
16   Mr. Hicks' comment.  I don't know that as a fact,
17   but it could be inferred.
18       Q.  Do you know what year that that happened,
19   that the North Brunswick buildings were taken
20   down?
21       A.  No.
22       Q.  Do you know -- from your notes I see that
23   they were doing testing at the manufacturing
24   facilities; correct?
25              MR. COX:  Object to the form.
```

```
 1              THE WITNESS:  Can you cite me to a place
 2   in my notes for that?
 3   BY MR. SWANSON:
 4       Q.  I lost the cite, but I know that that was
 5   done.  Let me see if I can find it that they had
 6   testing records.
 7              I saw this at page 24 and I apologize.
 8   I'm not...
 9              Oh, you see at 24, it says -- you see the
10   reference to "PO, specs, test records, quality
11   SOPs," about two-thirds of the way down?
12       A.  Yes.
13       Q.  And that's -- those are records regarding
14   these facilities that were manufacturing; is that
15   right?
16              MR. COX:  Object to the form.
17   BY MR. SWANSON:
18       Q.  You see below that "testing both for
19   what's in it, what's not in it, purity, et
20   cetera"?
21       A.  Absolutely.  Although I'm not -- it's not
22   clear whether Ms. Telofski is talking about
23   Kolmar, North Brunswick, or Georgia in this -- in
24   this portion.
25       Q.  But they are talking about manufacturing
```

 1   plants having -- and it also says "certificate of

 2   conformance and basic testing on inbound talc."

 3   So they're receiving testing records and

 4   generating their own at manufacturing facilities;

 5   right?

 6        A.   That's my interpretation of her comment.

 7        Q.   Okay.  And, as you sit here today, you

 8   don't know what happened with those testing

 9   records from North Brunswick, New Jersey plant

10   when that was -- when that manufacturing operation

11   was transferred, or when the buildings were taken

12   down; true?

13        A.   Correct.

14        Q.   And I think Mark Zappa at the bottom of

15   page 17, he said -- this is just sort of -- at

16   page 17, he says that the shipments of talc had to

17   have a certificate analysis of them that came in.

18   Let me see if I can find that.

19           You see the certificate of -- oh, it says,

20   "Certificate of analysis would include test for

21   asbestos."

22           MR. COX:  Object to the form.

23   BY MR. SWANSON:

24        Q.   Do you see that?

25        A.   Yes, I do.

1     Q.  From Lorena Telofski's notes, it would

2   appear that these manufacturing facilities

3   receiving testing records and generating their

4   own, that would have included the Kolmar facility,

5   too; correct?

6          MR. COX:  Object to the form.  Beyond the

7   scope of the notice.  Other than what's in his

8   notes.

9   BY MR. SWANSON:

10    Q.  Page 24.

11    A.  Oh, thank you.  I can't confirm that --

12  which facilities she's talking about, as I

13  mentioned, whether it's Kolmar, North Brunswick,

14  or Georgia, or all of them.

15    Q.  And again, I understand that you're not

16  here as the PMQ on where all the manufacturing

17  sites were, but these are all records questions.

18  I'm just asking a foundational question here.

19          Do you know when Kolmar Laboratories

20  started and during what period of time it was

21  manufacturing Johnson's Baby Powder?

22          MR. COX:  Objection.  Beyond the scope of

23  the notice.

24  BY MR. SWANSON:

25    Q.  And if you don't know, that's fine.

1      A.  I don't know.

2      Q.  Okay.  And do you know whatever records it

3  had regarding certificates of analysis, testing

4  records for asbestos, manufacturing

5  specifications, those sorts of records, do you

6  know how they were archived at that facility?

7      A.  I have a general comment from Ms. Telofski

8  that there was material put into, I believe it was

9  Iron Mountain, but I'm not sure which -- which

10  materials she is referring to.

11      Q.  And where is that?

12      A.  Looking on page 2.  Let me see if I can

13  find it.  Oh.  She was talking about APRs, so I

14  know that some of records she referenced are in

15  Iron Mountain.  I don't know which other ones

16  besides the APRs.

17      Q.  APRs is authorization for product release?

18      A.  Yes.

19      Q.  That's not testing records, is it?

20      A.  Not that I'm aware of.

21      Q.  And it says it includes formula safety.

22          Do you know what plant that is applying to

23  or what plants?

24      A.  Well, the discussion at that time was

25  about Skillman, but I don't know the scope of what

```
 1   was stored in Iron Mountain under her

 2   jurisdiction.

 3        Q.  Okay.  So as to Kolmar, let me get back to

 4   the question, do you know at the Kolmar

 5   manufacturing packaging facility what they did

 6   with respect to the retention and archiving of

 7   records?

 8        A.  No.

 9        Q.  And do you know when that facility no

10   longer was manufacturing Johnson's Baby Powder,

11   what it did with whatever records it had?

12        A.  No.

13        Q.  Were those records destroyed?

14            MR. COX:  Objection.  Asked and answered.

15            THE WITNESS:  I don't know.

16   BY MR. SWANSON:

17        Q.  I touched on this earlier, but I want to

18   go into this just briefly:  Do you have any

19   information regarding the Johnson & Johnson's

20   policies, if any, with respect to what are called

21   "grids" associated with transmission electron

22   microscopy testing?

23            MR. COX:  Objection.  Asked and answered.

24            THE WITNESS:  I don't --

25   BY MR. SWANSON:
```

1      Q.  I apologize if I asked.  But --

2      A.  I don't have information on grids.

3      Q.  Do you have information with respect to

4  what the current retention schedule period is for

5  talc samples?  And that would be talc ore, milled

6  talc, or baby powder samples that are tested?

7      A.  My understanding is based on the legal

8  hold notice, which is -- which is -- specifies

9  that samples are to be retained.

10      Q.  And the legal hold notice -- now, there's

11  been a sequence of legal hold notices going back

12  to 1999, correct, with respect to talc litigation?

13      A.  Yes.

14      Q.  Okay.  And is it your understanding that

15  those -- that's essentially been continuously in

16  effect since 1999 with respect to anything that

17  was under that original hold?

18      A.  I read each of the notices.  They have

19  descriptions of subject matter.  I've noted that

20  those subject matter descriptions have evolved

21  over time.

22      Q.  Okay.  But with respect to samples.  And

23  we will talk a little bit more about holds.  But

24  just -- well, let me -- let me get off of that and

25  just stay on the retentions for a second.

```
 1              I noticed in Exhibit 2D, or Tab 2D, which
 2   is Exhibit 2D, the PTI agreement appeared to be
 3   for retention of talc samples for four years.  And
 4   perhaps we should look at that and I'll ask you
 5   about that.  And that's at page 9 of 2D.  Oh, we
 6   get into this page issue with this, don't we?
 7              Did you see it in there?
 8        A.   Yes.  7 of 16 and below that, 9 of 19.  So
 9   it's Section 12.4.
10        Q.   Okay.  And what is the -- first of all,
11   what samples is this referring to?  This is --
12   these are product samples that they're referring
13   to?
14        A.   Yes.  So this -- this Section 12.4 falls
15   under 12.0 product controls, which relate to the
16   identification sampling and testing of finished
17   product.
18        Q.   Okay.  And so the retention on finished
19   product was for what period?
20        A.   Four years from date of manufacture or one
21   year after expiration date.
22        Q.   What's the -- that's the expiration date,
23   for example, that you'd see on the actual bottle
24   or container?  Is that what that refers to?
25        A.   I don't know.
```

1      Q.  What's the date of this quality system

2  procedure or quality responsibility agreement?

3      A.  February 2005.

4      Q.  Do you know -- at this point in 2005,

5  there had already been talc litigation hold in

6  place as early as 2' -- sorry, 1999.

7          Do you know if it affected this retention

8  as to the talc that was -- the Johnson -- the baby

9  powder that was being manufactured by Pharma Tech

10  Industries in 2005?

11          MR. COX:  Object to the form.

12  BY MR. SWANSON:

13      Q.  In other words, did the legal hold sort of

14  suspend this policy?

15          MR. COX:  You're asking as to the samples

16  described in that document?

17          MR. SWANSON:  Yes.

18          THE WITNESS:  I'm -- I would want to check

19  the legal holds.  I'm not aware that the holds in

20  that time referred to samples.

21  BY MR. SWANSON:

22      Q.  Okay.  Do you have any information other

23  than -- and we'll get to the legal holds shortly.

24          Do you have any other information in terms

25  of retention policies with respect to retention of

```
 1   talc samples, either, you know, the talc ore or
 2   the milled talc that may have been tested on a
 3   quarterly or some other basis, or of actual
 4   product test -- finished product test samples?
 5        A.  I have a general understanding that
 6   samples -- that the universe of samples comprised
 7   those that were associated with a batch or a lot
 8   and retained in accordance with -- with the
 9   company's retention schedules.
10             As a second category was samples that were
11   used specifically for testing purposes, and those
12   samples were not retained until the last year.
13             And a third category would be historical
14   samples that would be obtained from the museum and
15   other sources.
16        Q.  Thank you for that answer.
17             So I think that was pretty clear.  So let
18   me just -- as to the samples related to testing of
19   the talc, you said until a year ago those were not
20   retained; correct?
21        A.  That's correct.
22        Q.  So they were destroyed?
23        A.  The samples used specifically for creating
24   test results were not retained.
25        Q.  Okay.  And now they are being retained?
```

```
 1        A.  Yes.

 2        Q.  And do you know why that policy was

 3   changed in the last year?

 4        A.  My understanding is that within the past

 5   year a request was made to the testing body to

 6   retain that information.

 7        Q.  And what testing body is that?

 8        A.  Well, that would include RJ Lee, anyone

 9   else doing testing.

10        Q.  Okay.  So --

11             MR. SWANSON:  Do you want one last break?

12             MR. COX:  Sure.

13             MR. SWANSON:  And then we'll go until the

14   end of the day?

15             MR. COX:  Yeah.

16             MR. SWANSON:  And if we need to discuss

17   anything, we can discuss it.

18             MR. COX:  Sounds good.

19             MR. SWANSON:  Let's go off the record.

20             THE VIDEOGRAPHER:  This marks the end of

21   Media Number 4 in the deposition of James

22   Mittenthal.

23             Going off the record at 4:13 p.m.

24             (Recess taken.)

25             THE VIDEOGRAPHER:  On the record at
```

1    4:49 p.m.  This marks the start of Media Number 5

2    in the deposition of James Mittenthal.

3            You may continue, Counsel.

4    BY MR. SWANSON:

5        Q.  Okay, Mr. Mittenthal, I'm going to try to

6    be real efficient here for the rest of the part of

7    the day that we have, and we're going to get into

8    talking about holds now which we've touched on a

9    few times, but I want to go over some information

10   about that.

11           THE VIDEOGRAPHER:  Is your microphone on?

12           Okay.

13   BY MR. SWANSON:

14       Q.  So, in the most basic sense, a legal hold

15   is an instruction to custodians or possessors of

16   certain kinds of specified documents to preserve

17   them and not destroy those documents as long as --

18   documents and information as long as the hold is

19   in effect; is that correct?

20       A.  I would agree.

21       Q.  And a hold stays in effect until a hold --

22   a release notice is issued; is that right?

23       A.  I would generally agree.  There may be

24   other circumstances besides a release by which a

25   receiver of a hold could be relieved of that

1    obligation.

2           But certainly the counterpart to a hold is

3    a release.

4         Q.  Okay.  And you've got -- you've prepared a

5    history of holds, which is Exhibit 21; correct?

6         A.  Is that -- just make sure I've got my

7    version in front of me somewhere.

8         Q.  You should have your copy there.  I know

9    you've got a lot of stuff.  You know, maybe we can

10   get some of your things there out of the way and

11   put them in a stack.

12        A.  Here it is.

13        Q.  Okay.  So Exhibit 21 is a list of Johnson

14   & Johnson holds with respect to talc litigation

15   that you've compiled; correct?

16        A.  Yes.

17        Q.  Okay.  And the first one that you've got

18   there is Theresa Krushinski on November 11, 19199,

19   and that was a talcosis case; correct?

20        A.  Yes.

21        Q.  And then the next one you've got is 2000,

22   which is a mesothelioma case; correct?

23        A.  Yes.

24        Q.  And both Johnson & Johnson's Baby Powder;

25   true?

```
 1        A.   Johnson's Baby Powder.
 2        Q.   Sorry.   Johnson's Baby Powder.   And I
 3   think the third one listed there is 2003, the
 4   Hozeny case.
 5             Do you see that?
 6        A.   Yes.
 7        Q.   And I know that's been produced to us.
 8   Let me find this.   At Exhibit 1B.
 9             Do you have that with you?   Oh, it's in
10   your -- those exhibits are marked per tab.
11        A.   Okay.
12        Q.   Exhibit 1B.   So in Exhibit 1, you have
13   several holds and then some were produced after
14   that.   And you see there, in that hold, this was
15   hold notice issued by the legal department;
16   correct?
17        A.   Yes.
18        Q.   And this puts folks on notice in the
19   company that if you fail to preserve materials
20   that are under a hold, it can result in the court
21   imposing penalties or sanctions; right?
22        A.   Yes.
23        Q.   Now, you had previously testified that you
24   had acted as consultant and a witness in the
25   Ethicon litigation for Johnson & Johnson; correct?
```

1        A.  Consultant and a witness meaning the

2   same -- the same role?

3        Q.  Yeah.  In the same -- in the Ethicon

4   litigation.  Yeah.  In other words, you were a

5   witness and you were also their consultant in that

6   litigation; true?

7        A.  I was a witness.

8        Q.  A witness.

9        A.  Not a --

10       Q.  Were you working?  Were you hired by

11  Johnson & Johnson?

12       A.  I was hired to be a 30(b)(6) only.

13       Q.  Okay.  All right.  And you testified in

14  the case; right?

15       A.  Yes.

16       Q.  And you know that there was an allegation

17  by the plaintiffs in the case that there was a

18  failure to preserve evidence that had been subject

19  to a hold; right?

20       A.  I -- I recall that those issues arose,

21  yes.

22       Q.  And you investigated that issue; correct?

23       A.  Yes.

24       Q.  And you gave a deposition about it?

25       A.  Yes.

1       Q.  And you discovered through your

2    investigation something you testified about that

3    potentially responsive documents and information

4    were destroyed that had been subject to a hold;

5    correct?

6              MR. COX:  Object to the form.  Object that

7    this is beyond the scope of the notice.

8              THE WITNESS:  I investigated and I

9    testified as to certain occasions where I had

10   observed custodians not preserving materials that

11   they could have.

12   BY MR. SWANSON:

13      Q.  And those materials were materials that

14   were under holds at the time; correct?

15      A.  Yes.

16      Q.  Have there been any -- have there been any

17   issues of loss with respect to talc litigation by

18   Johnson & Johnson that have not been disclosed to

19   plaintiffs that you're aware of from your work in

20   these talc cases?

21      A.  I'm not.

22      Q.  Now, we've talked about hold release

23   notices.  You said that was one way that hold

24   would no longer be in effect.  What's the other

25   way that a hold would no longer be in effect if it

```
 1    wasn't pursuant to a hold release being issued by
 2    the legal department?
 3         A.  There could be a direct communication with
 4    the custodian saying this is not something that's
 5    required anymore.  There could be circumstances
 6    that -- that result in the obligation for the
 7    custodian going away.
 8         Q.  Have you -- we haven't received any -- or
 9    in this case that I've seen, no legal hold
10    releases were produced.
11              Are you aware of any Johnson & Johnson
12    talc litigation legal hold releases that have been
13    issued?
14         A.  I'm not.
15         Q.  Are you aware of any of the holds having
16    been any -- any custodians having been released
17    from any of the talc litigation holds that have
18    been issued since 1999?
19         A.  No.
20         Q.  And is it fair to say that each of the
21    holds that you've documented starting in 1999
22    through 2017 has essentially been incorporating
23    whatever was already under a hold pursuant to the
24    prior hold and then adding some more details to
25    it; is that -- is that correct?
```

1          MR. COX:  Object to the form of the

2    question.

3          THE WITNESS:  Well, to my recollection,

4    the 2017 holds serve to -- serve that function to

5    gather earlier holds.  The holds between 1999 and

6    2017 refer to specific cases.

7    BY MR. SWANSON:

8       Q.  Okay.  Now, you said that you weren't

9    aware of any releases of those holds.  So, even

10   though those holds refer to specific cases, they

11   weren't released or no longer in effect just

12   because those cases ended, were they?

13         MR. COX:  Object to the form.

14         THE WITNESS:  As I mentioned, I hadn't

15   seen any releases of those -- of those holds.

16   BY MR. SWANSON:

17      Q.  I understand that.  But it's an additional

18   question, which is, were those holds still in

19   effect on Johnson & Johnson that had been issued

20   in specific cases even after the issues of the

21   case resolved?

22      A.  Well, the -- the instructions were -- were

23   still out there.  In terms of the legal

24   obligation, I can't speak to that.  That's a legal

25   determination.  The holds themselves had not been

1    subject to releases.

2        Q.  Earlier you mentioned that the holds were

3    related to, I think you said something like

4    consumer talc or something like that.

5            Are there -- are there releases related to

6    other kind of talc -- not releases.  Are there any

7    litigation holds that were ever put on Johnson &

8    Johnson's businesses with respect to any other

9    type of talc, like industrial talc, that you're

10   aware of?

11       A.  I'm not aware.  I specifically requested

12   consumer talc holds as being reflective of my

13   obligations under the notice.  I'm not aware of

14   other holds.

15       Q.  Okay.  And you've asked -- you've asked

16   witnesses about holds, is that correct, people

17   that you've spoke to?

18       A.  The -- the interview subjects, the topic.

19   Not in every case but in some cases, it did come

20   up.

21       Q.  Did you ask them if -- did you ask -- did

22   you do anything to audit whether or not they were

23   complying with holds?

24       A.  I -- I did not see a compliance audit as

25   part of my investigation.  I asked in some cases

1   the records personnel about the mechanism for

2   holds.  I did not personally audit any compliance.

3        Q.  Did you audit any of the cleanout?

4   Remember, we talked about the annual cleanout

5   procedure.  Did you audit any cleanout notices or

6   documents documenting the cleanout procedures to

7   see if any records had been destroyed that were

8   under legal holds or retention schedules?

9        A.  No.  That was not part of my

10  investigation.

11       Q.  Now, the 1999, let's start with the first

12  one here.  Let me see if I can locate this.  Here

13  we go.

14            (Whereupon, Plaintiff's Exhibit 32 was

15            marked for identification.)

16  BY MR. SWANSON:

17       Q.  I'm handing you Exhibit Number 32 to your

18  deposition.  And for the record, what is

19  Exhibit 32?

20       A.  A document preservation notice dated

21  November 11, 1999.

22       Q.  And that's the one in the Krushinski case;

23  correct?

24       A.  Yes.

25       Q.  And that is the first one that you're

1    aware of; true?

2        A.   Yes.

3        Q.   And this one was directed as pertaining to

4    Johnson's Baby Powder.  It says that on the second

5    page of this.  And it says on the first page that

6    it just -- in the first paragraph there it says

7    "JJCP" --

8             That would be Johnson & Johnson Consumer

9    products; is that right?

10       A.   That's my read.

11       Q.   -- "is party to a lawsuit involving

12   allegations of manufacturing or design defect or

13   failure to warn in connection with the below

14   product."  And it mentions Johnson's Baby Powder.

15           To which companies, Johnson & Johnson

16   companies, operating units, divisions was this

17   document preservation notice directed?

18       A.   It's not specified.

19       Q.   Do you have any information as to this

20   hold whether or not it applied, for example, to

21   operating units overseas such as in Hong Kong and

22   the Philippines?

23       A.   I don't have information as to who it was

24   distributed to.

25       Q.   Do you know any of the individual

 1   recipients of this hold notice?

 2       A.  That was not part of my investigation.

 3       Q.  Does that information still exist as to

 4   who the recipients were of the hold in 1999?

 5       A.  I don't know.

 6       Q.  In 1999, what was the policy of Johnson &

 7   Johnson with respect to distribution of holds, if

 8   it had one?

 9       A.  I can check my notes with respect to that.

10   I'm noting on page 34 in the Renay Lawson section,

11   simply that Renay would send holds and releases as

12   directed by legal and upload to Web site.  Had

13   different distribution lists.

14       Q.  And she had been there since 2009;

15   correct?  It says nine years --

16       A.  Okay.

17       Q.  -- at Consumer.

18           This is Renay Lawson, the records

19   information management lead; right?

20       A.  Yes.

21       Q.  Okay.

22       A.  I have further information on page 36 from

23   Rosina Sheerin that both she and Renay would send

24   hold notices at different times and that they

25   maintained distribution lists based on a cover

1    page.

2        Q.  Okay.  And do you know if those

3    distribution lists still exist?

4        A.  I know that I have seen distributions on

5    some of the hold notices.

6        Q.  Okay.  And we're going to go through each

7    one in a little bit, so we'll get to that, if

8    there's a distribution list.

9            With respect to 1999 Krushinski case hold,

10   you don't have a distribution list for that, do

11   you?

12       A.  Correct.

13       Q.  And again, as the Johnson & Johnson's

14   representative on this issue, this is the first

15   talc litigation hold that was issued in 1999;

16   correct?

17       A.  Consumer talc.

18       Q.  Consumer talc.

19           All right.  So you're not aware of any --

20   well, let me ask you this way:  And not to get off

21   on another sort of substantive issues too much.

22   But do you have information that there were holds

23   related to talc that wasn't consumer talc?

24       A.  No.

25       Q.  If you look at your binder there, Tab 1C.

1    This is the January 7, 2000 document preservation

2    notice in the Barbara Bloch case.

3              Do you see that?

4         A.   Yes.

5         Q.   And this was, says "JJCPI, et al. is a

6    party to a lawsuit involving allegations of

7    manufacturing or design defect or failure to warn

8    in connection with the below product."

9              And, again, this is in regards to the

10   Johnson's Baby Powder; true?  It's on the next

11   page there?  Oh, you've got it in your summary.

12        A.   Yes.  Yes.

13        Q.   And by the way, just to make this clear on

14   the record, "document preservation notice" means

15   the same thing as a legal hold notice; correct?

16        A.   Generally, yes.

17        Q.   And Johnson & Johnson at some point just

18   changed the language that they used to refer to

19   it?  They called it -- later they called it a

20   "legal hold notice"; true?  We can get to those

21   later.

22              So, as far as this one, do you know who --

23   which operating units or companies of Johnson &

24   Johnson received that, whether or not it was

25   anybody beyond just Johnson & Johnson Consumer

```
 1   Products, Inc.?
 2        A.  I do not.
 3        Q.  Okay.  And do you know to whom -- what
 4   individuals received this notice?
 5        A.  I do not.
 6        Q.  Do you have any information about what
 7   training was done of individuals about how to
 8   effectuate this notice?
 9            MR. COX:  Object to the form.
10            THE WITNESS:  I have a general
11   understanding from the records officer that there
12   was training in the records program and that that
13   included legal hold instructions.
14   BY MR. SWANSON:
15        Q.  And did you say "records manager"?
16        A.  Training in records management issues.
17        Q.  Who was it that you were speaking to about
18   that issue?
19        A.  Possibly Lisa Kaiser.  Let me...
20        Q.  Before I make you look that up -- and if
21   you need to look it up to get into the heart of
22   it, what did she tell you about what the training
23   was?
24        A.  Actually, I'm looking at the Joann Dodd
25   information.
```

1      Q.  Can you give me a page number on that,

2  please?

3      A.  Oh, yes.  29.  Sure.

4          So Ms. Dodd spoke about the training that

5  was -- that was provided.

6      Q.  Can you direct me to that, please?

7      A.  Yes.  The bottom of -- near the bottom of

8  page 1.  "Training included legal hold, departing

9  associates, retention procedures, roles."

10     Q.  And she was the -- she is this analyst

11  records management, J&J Consumer, Inc.; right?

12     A.  Yes.

13     Q.  And do you know -- she started in 2007 or

14  '8?

15     A.  Yes.

16     Q.  Do you know at what point those -- the

17  training started that she's referring to?

18     A.  Not the exact start date, no.

19     Q.  And do you know how -- do you have any

20  information about how far that training goes back

21  and whether there was any training in the year

22  2000 at the time of the Barbara Bloch case?

23     A.  I don't have specifics on that.

24     Q.  At Tab 1B there's a hold in the Hozeny --

25  Hozeny case versus Johnson & Johnson Consumer

1    Companies, Inc.

2            Do you see that?

3        A.  Yes.

4        Q.  And, again, this is called the "document

5    preservation notice."  The date is May 16, 2003.

6            And this is Exhibit 1B, for the record.

7            And what was -- this looks similar to

8    the '99 and 2000 holds that we've seen.  But does

9    it -- it looks like it may add something

10   additional.  Can you tell me what is the subject

11   of this hold?

12       A.  You mean what is the -- the --

13       Q.  Well, what product was at issue and --

14       A.  It generally referred to talc products.

15       Q.  And the basic language is the same,

16   correct, of the hold?  As the holds we had

17   discussed for the 1999 and 2000 cases?

18           MR. COX:  Object to the form.

19   BY MR. SWANSON:

20       Q.  But then you get to the details of what

21   materials are to be held, and there's a bit more

22   detail.  It's fleshed out a bit more; correct?

23       A.  The language has evolved.  There are eight

24   categories as opposed to four categories with

25   earlier notices.  It is -- it is somewhat

1    different.

2       Q.  We had earlier -- I should hit on this now

3    so I don't forget, but we had talked about talc

4    samples.  And in this 2003 hold looking at the

5    list of materials that were subjects -- subject

6    matters of documents to be preserved, did that

7    include talc samples in 2003?

8       A.  I do not believe it did.

9       Q.  Okay.  And just looking back quickly on

10   this, the 1999 and 2000, those didn't include --

11   wouldn't include talc samples either; correct?

12      A.  There is references to information about

13   samples, not samples themselves.

14      Q.  Okay.  Can you point me to that, under

15   which?

16      A.  Under Section 4 in both the '99 and the

17   2000 documents.

18      Q.  But not the samples themselves; true?

19      A.  Correct.  And only those records about the

20   samples pertaining to the event.

21      Q.  And the 2003 legal hold in the Hozeny

22   case, and I apologize if I asked this, do you know

23   if this applied to any overseas operating

24   companies of Johnson & Johnson, like Johnson &

25   Johnson Philippines or Johnson & Johnson Hong

1  Kong?

2      A.  My general understanding is that it did

3  not.

4      Q.  And your general understanding as to it

5  not applying, would that be the same as to the

6  1999 and 2000 holds, too?

7      A.  Yes.

8      Q.  And what's the source of that

9  understanding?

10     A.  That information came from counsel.

11     Q.  Okay.  And I believe the next hold is a

12  2009 hold; is that correct?

13     A.  Yes.

14     Q.  You have a copy of that with you?  I know

15  I have it here somewhere.

16         MR. COX:  I have extra copies if you need.

17         MR. SWANSON:  That would be great, thanks,

18  Chris.  I'm sorry -- oh, wait.  Is this it?  I've

19  got it.  Yeah.  Okay.  Good.  I have it.  Thank

20  you.

21         Okay.  I have marked as Exhibit 33 to your

22  deposition this hold in the Berg case.

23         (Whereupon, Plaintiff's Exhibit 33 was

24         marked for identification.)

25  BY MR. SWANSON:

1      Q.  Can you take a look at that and, just for

2   the record, is that the Deane Berg v. Johnson &

3   Johnson Consumer Companies, et al. hold dated

4   December 15, 2009?

5      A.  Yes.

6      Q.  And that's Exhibit 33.  And this hold

7   again is with respect to Johnson & Johnson's Baby

8   Powder and this time it also specifically

9   references Shower to Shower powder; right?

10     A.  Yes.

11     Q.  And Shower to Shower is another cosmetic

12  talc product that Johnson & Johnson made; true?

13     A.  At the time, yes.

14     Q.  And this one in 2009 we get quite a bit

15  more detail; correct?

16     A.  Yes.

17     Q.  And there's even, it looks like a

18  distribution list, is that right, in terms of what

19  units it's distributed to?

20     A.  Yes.

21     Q.  And it indicates here in the units that

22  this legal hold were issued to is -- are

23  identified that they're checked and it looks like

24  they're also highlighted in yellow; true?

25     A.  I see that, yes.

1       Q.  And that includes Johnson & Johnson

2  Consumer Companies, Inc.; Johnson & Johnson

3  Consumer and Personal Products Worldwide, Division

4  of Johnson & Johnson Consumer Products, Inc.  Then

5  it says Johnson & Johnson Corporate, Corporate

6  Communications, and then also under Corporate

7  Consumer and Personal Care and Quality and

8  Compliance World -- is that "Worldwide"?  WW?

9       A.  Yes.

10      Q.  This notice was not issued to Johnson &

11  Johnson Philippines, was it?  Or Johnson & Johnson

12  China?

13      A.  No.

14      Q.  Okay.  Do we -- do you know who the

15  individuals -- do you know -- there are identified

16  Johnson & Johnson operating units and companies

17  that were issued this legal hold notice.  Do you

18  know what individuals received it other than those

19  listed as receiving this document on the first

20  page, it looks like?  And there's about, what,

21  15 -- 15 to 20 individuals there listed.

22          Do you see that?

23      A.  Yes.  It would be under "attachments"?

24      Q.  Yeah.

25      A.  "Cc."

1        Q.  Well, there's only, I guess, about --

2    well, under "attachment," those are people who

3    received this document preservation notice; is

4    that right?

5            MR. COX:  Object to the form.

6            THE WITNESS:  I'm sorry.  One more time,

7    please.

8    BY MR. SWANSON:

9        Q.  Under -- next to "cc," where it says the

10   people who were copied, they received this;

11   correct?

12       A.  Yes.

13       Q.  Okay.  What about the other people in the

14   right -- more to the right column?  Did they

15   receive it?  What are they listed as here?  Or do

16   you have an understanding?

17       A.  Well, I would just generally conclude that

18   this is a long cc list and they -- there is no --

19   it appears to be in alphabetical order starting

20   with Braunreuther going up to Will -- Will Wiley.

21       Q.  Do you know of anybody -- do you know of

22   any other individuals received this notice other

23   than these indicated here?

24       A.  Well, the recipients of the communication

25   were Debbie Staneruck and Edith Mendez, and they

1   were directed to distribute the notice companywide

2   to the attached companies as well as anyone else

3   that they may understand might be knowledgeable of

4   these issues.

5        Q.  Okay.  And when you say "distributed

6   companywide," do you know in 2009 -- strike that.

7            The next one that I want to ask you about

8   is -- there were three different holds in 2014.

9            Have you seen those?

10       A.  Yes.

11       Q.  Okay.  And that would be the Chesteen

12   case, Estrada, and the State of Mississippi;

13   right?

14       A.  Yes.

15       Q.  And these were all issued as a result of

16   lawsuits against Johnson & Johnson Consumer

17   Companies, Inc.?

18       A.  That's my understanding.

19            MR. SWANSON:  Okay.  I'm not going to

20   spend much time on these, but I do want to get

21   them marked and attached.

22            So 34 will be the hold in the Chesteen

23   case.

24            (Whereupon, Plaintiff's Exhibit 34 was

25            marked for identification.)

```
 1              MR. SWANSON:  35 will be the hold in the

 2    Estrada case.

 3              (Whereupon, Plaintiff's Exhibit 35 was

 4              marked for identification.)

 5              MR. SWANSON:  And 36 will be the 2014 hold

 6    in the State of Mississippi v. Johnson & Johnson

 7    and Johnson & Johnson Consumer Companies, Inc.

 8    case.

 9              (Whereupon, Plaintiff's Exhibit 36 was

10              marked for identification.)

11    BY MR. SWANSON:

12         Q.  And, again, if you look at these, and you

13    can go ahead and look at them, each of these

14    notices in 2014, they relate -- related to

15    Johnson's Baby Powder and Shower to Shower

16    products; correct?

17         A.  Well, Estrada is only baby powder.

18         Q.  Okay.

19         A.  The other two from 2014 mention both

20    products.

21         Q.  Okay.  Thank you.

22              And, again, there's a recipient or a

23    distribution list in terms of what operating units

24    or companies received this, correct, these three

25    holds?
```

```
 1          A.  Well, this is a sector-based distribution.

 2          Q.  Okay.  And these were just domestic

 3   companies that received these holds; correct?

 4          A.  Yes.

 5          Q.  So this was not issued to Johnson &

 6   Johnson Philippines or Johnson & Johnson Hong

 7   Kong; correct?

 8          A.  Correct.

 9          Q.  Or Johnson & Johnson Korea, correct, if

10   there was a Johnson & Johnson --

11          A.  Correct.

12          Q.  -- Korea at that time?

13              MR. SWANSON:  And then finally we have

14   here a 2017 hold, which we'll mark as Exhibit 37.

15              (Whereupon, Plaintiff's Exhibit 37 was

16              marked for identification.)

17   BY MR. SWANSON:

18          Q.  I'll go ahead and hand you that one.  And

19   this is what you've referred to in Exhibit 21 your

20   summary list of holds as talc asbestos.  You say

21   "PL litigation."

22              What does that stand for?

23              MR. COX:  Object to the form.

24              THE WITNESS:  My understanding is that

25   that is a product liability.  But this is not that
```

```
 1    one.
 2    BY MR. SWANSON:
 3         Q.  Oh, this isn't.  Okay.  Well, this is the
 4    talc ovarian cancer litigation hold that I handed
 5    you; correct?
 6         A.  Yes.
 7              MR. SWANSON:  Chris, do you have a copy of
 8    this other one?
 9              MR. COX:  It should be in the binder, 1C.
10              MR. SWANSON:  Thank you.
11              MR. COX:  Sure.
12              MR. SWANSON:  Appreciate that.
13    BY MR. SWANSON:
14         Q.  Well, let's just -- since I've attached
15    this 37, this legal hold, was it -- that's
16    attached as 37 as a talc ovarian cancer litigation
17    hold; correct?
18         A.  Yes.
19         Q.  Do you know what year -- is this the
20    current -- this is the current one?
21         A.  This is the most recent one for ovarian
22    cancer of which I'm aware.
23         Q.  Okay.  And if you look at Exhibit 1A to
24    your deposition, which is Tab 1A, we can go to the
25    one that you referred to in your list as the talc
```

1    asbestos litigation hold.

2              Do you have that in front of you?

3        A.  Yes, I do.

4        Q.  Is this the current legal hold for talc

5    asbestos litigation?

6        A.  This is the most recent one I've received

7    that I'm aware of.

8        Q.  And I don't know if you use this word, but

9    I think you indicated earlier that your

10   understanding was this was sort of an attempt to

11   consolidate the various holds; is that right?

12       A.  With respect to those mesothelioma-related

13   matters, yes.

14       Q.  Now, in terms of what information is being

15   held either under ovarian talc litigation hold or

16   a case that was a talcosis case like the

17   Krushinski case, these are all holds since 1999

18   that we're talking about that are related to the

19   Johnson & Johnson's Baby Powder and Shower to

20   Shower; correct?

21       A.  Yes.

22       Q.  And -- so in terms of the sort of universe

23   of documents, types of documents and records that

24   would be held, it's pretty much the same universe,

25   correct --

```
 1              MR. COX:  Object to the form.
 2   BY MR. SWANSON:
 3       Q.  -- from what your evaluation of these
 4   holds has been in terms of looking at what records
 5   and information are supposed to be held?
 6              MR. COX:  Object to the form.
 7              THE WITNESS:  I -- I would concur that the
 8   body of documents being held generally relates to
 9   both families of cases.  I would not agree that
10   every document from one family is connected to the
11   other family of cases.  I -- I'm not competent to
12   decide that, but they are being held.  Both --
13   both sets of holds concern a body of information.
14   BY MR. SWANSON:
15       Q.  Right.  And the body of information is
16   about -- in terms of what's actually being held,
17   people are being instructed to hold and preserve,
18   it's essentially almost the exact same body of
19   information; correct?
20       A.  Yes.
21              MR. COX:  Object to the form.
22   BY MR. SWANSON:
23       Q.  Okay.  Now, the 2017 talc asbestos
24   litigation hold is the first one that specifically
25   references talc, but there were prior holds that
```

1    were issued in cases where the injury being

2    alleged was mesothelioma; correct?

3         A.   I'm sorry.   The first one that references

4    talc?

5         Q.   No.   Did I say that?   If so.

6              It's the first one that specifically

7    references asbestos; is that right?   From what you

8    saw?

9         A.   You know, I don't recall that.   I did not

10   look for the word "asbestos" in earlier holds.

11        Q.   Okay.   But in any case, regardless, the

12   2000 and 2002 to 2003 holds were done in cases

13   where there was an allegation of mesothelioma by

14   the plaintiff; right?

15        A.   Yes.

16        Q.   And this talc asbestos litigation hold,

17   the current one that we have here, or the most

18   recent one you're aware of, what Johnson & Johnson

19   entities is that one directed to?

20        A.   This hold notice is directed at individual

21   custodians rather than specific entities.

22        Q.   And is there a list of custodians anywhere

23   that you've seen that this is directed to?

24        A.   Not that I've seen.

25        Q.   Have you -- do you have information about

1  at which Johnson & Johnson -- you know, operating

2  units, subsidiaries, divisions, companies -- at

3  which of those companies individuals were

4  recipients of this current hold notice?

5       A.  Only that the legal department has made a

6  determination of the appropriate custodians to

7  deliver the notice to.

8       Q.  Do you know if any of those custodians are

9  at Johnson & Johnson Philippines?

10      A.  Yes.

11      Q.  Okay.  And as far as you -- and who is

12 that individual or individuals at Johnson &

13 Johnson Philippines?

14      A.  I -- I'm not aware.

15      Q.  But you got information from some source

16 that Johnson & Johnson -- somebody at Johnson &

17 Johnson Philippines received this notice; is that

18 correct?

19      A.  Yes.

20      Q.  And what's the source of that information?

21      A.  You mean how did I learn that?

22      Q.  Yes.

23      A.  From counsel.

24      Q.  Okay.  And based on our review of the

25 prior notices, was this the first notice that

```
 1   Johnson & Johnson issued legal hold notice for
 2   talc litigation issued to Johnson & Johnson
 3   Philippines?
 4        A.  It's the first I'm aware of.
 5        Q.  Now, you saw in the 2014, in the prior
 6   ones going back, there was no indication that it
 7   went to Johnson & Johnson Philippines.  In fact,
 8   the distribution list from 2014 and 2009
 9   specifically showed that it was not distributed to
10   Johnson & Johnson Philippines; correct?
11        A.  In 2009 it specifically showed that.  In
12   2014 it simply denoted "US," "OUS."  It didn't
13   have a country-by-country listing.
14        Q.  Okay.  If you look at -- if you don't have
15   those in front of you -- I think you do.
16           If you look at 34, for example, 35?
17        A.  Yes.
18        Q.  It says "U.S. only"; right?
19        A.  Correct.
20        Q.  So those don't -- they did not go to
21   Johnson & Johnson Philippines; correct?
22        A.  They didn't go outside the U.S.
23        Q.  Right.  That was all I was confirming.
24   Okay.  And that would be the same -- did this
25   2' -- the current Johnson & Johnson talc
```

1  litigation -- talc asbestos litigation hold, go to

2  Johnson & Johnson Hong Kong?

3       A.   Individuals in Hong Kong.

4       Q.   And where did you learn that?

5       A.   From counsel.

6       Q.   Did it go to Johnson & Johnson China?

7       A.   I don't know.

8       Q.   Okay.  And when did it go to Johnson &

9  Johnson Philippines?

10      A.   Well, as I mentioned, it didn't go to an

11 entity; it went to individuals in those areas.

12 And that was on May 26th of 2017.

13      Q.   And was the -- is that the date that that

14 hold was issued?

15      A.   Yes.

16      Q.   And do you specifically know that it went

17 to those individuals on that date, at Johnson &

18 Johnson Philippines and Hong Kong?

19      A.   I know that the -- the -- I don't know

20 that specifically.  I know that the hold -- the

21 custodians were notified on that date.  I have no

22 reason to believe that the Philippines or any

23 other area were treated differently.

24           MR. SWANSON:  Are you okay to continue

25 some more?

```
 1            I mean, you guys tell me, because I'm --
 2   I'm moving right along, but.
 3            THE WITNESS:  I thought that was a good
 4   stopping point, but I -- I --
 5            MR. SWANSON:  Well, I mean, you know,
 6   since we do have a little bit of an issue here
 7   about when we're going to finish tomorrow, I
 8   certainly --
 9            MR. COX:  Are you about to start a new
10   topic?
11            MR. SWANSON:  It's related, but it's
12   getting into an area that's going to take some
13   time.
14            MR. COX:  Why don't we go off the record,
15   let's talk for a couple minutes, and we'll see.
16            MR. SWANSON:  All right.  Let's go off the
17   record.
18            THE VIDEOGRAPHER:  Off the record at 5:47.
19               (Off the record.)
20            THE VIDEOGRAPHER:  On the record at 6:01.
21   You may continue, Counsel.
22            MR. SWANSON:  So we have an agreement
23   about tomorrow's deposition and the conclusion of
24   the deposition, and Mr. Cox will state that for
25   the record, and if there's anything I disagree
```

1   with, we'll hammer it out.

2           MR. COX:  Yes.  First, the Johnson &

3   Johnson defendants object to the continuation of

4   the deposition given the two days of testimony of

5   this witness has already sat for, given the number

6   and nature of the subject matters for which this

7   witness has been tendered, and the limited

8   relevance to the claimed defenses in the case, we

9   don't believe additional time is necessary or

10  appropriate.

11          Nevertheless, in the spirit of compromise,

12  as Mr. Swanson indicated, because the witness and

13  counsel are here, we've agreed to continue the

14  deposition tomorrow under the following

15  circumstances:  The deposition will begin at

16  9:00 a.m.  There will be reasonable breaks.

17  Plaintiffs will conclude their questioning by

18  1:45 p.m. at which time the J&J defendants will

19  have an opportunity to ask direct -- pose the

20  direct testimony from the witness and after which

21  plaintiffs will be permitted a recross that's

22  limited to the issues raised on the direct.

23          MR. SWANSON:  That's our agreement, yes.

24          We can go off the record.

25          THE VIDEOGRAPHER:  The marks the end of

1    Media Number 5 in the deposition of James

2    Mittenthal and we are going off the record and

3    adjourning for the day at 6:02 p.m.

4

5                        (Whereupon, the deposition was

6                        adjourned at 6:02 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SIGNATURE OF DEPONENT

 2

 3         I, the undersigned, JAMES PETER MITTENTHAL, do

 4    hereby certify that I have read the foregoing

 5    deposition and find it to be a true and accurate

 6    transcription of my testimony, with the following

 7    corrections, if any:

 8

 9    PAGE     LINE                    CHANGE

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23

24                   _____
                     JAMES PETER MITTENTHAL, Date
25
```

```
 1   STATE OF CALIFORNIA      )

 2                            )     ss.

 3   COUNTY OF ALAMEDA        )

 4

 5          I, EARLY LANGLEY, a Certified Shorthand

 6   Reporter, State of California, do hereby certify:

 7          That JAMES PETER MITTENTHAL, in the foregoing

 8   deposition named, was present and by me sworn as a

 9   witness in the above-entitled action at the time and

10   place therein specified;

11          That said deposition was taken before me at

12   said time and place, and was taken down in shorthand by

13   me, a Certified Shorthand Reporter of the State of

14   California, and was thereafter transcribed into

15   typewriting, and that the foregoing transcript

16   constitutes a full, true and correct report of said

17   deposition and of the proceedings that took place;

18   IN WITNESS WHEREOF, I have hereunder subscribed my hand

19   on October 22, 2018.

20

21          _____

22          EARLY LANGLEY, CSR NO. 3537
            State of California

23

24

25
```

**Exhibits**

**Ex 20 Mittenthal, J**
220:10 232:4,10

**Ex 21 Mittenthal, J**
220:12 242:4,5 409:5,
13 431:19

**Ex 22 Mittenthal, J**
220:14 246:1,5,8

**Ex 23 Mittenthal, J**
220:15 247:16,17 248:6
250:3 325:17

**Ex 24 Mittenthal, J**
220:17 247:24,25
251:25 252:3 322:8

**Ex 25 Mittenthal, J**
220:18 248:24 249:3
287:18 288:22 290:4

**Ex 26 Mittenthal, J**
220:19 260:22,24 261:5
267:9 309:5 327:18

**Ex 27 Mittenthal, J**
220:21 289:5,10 293:6
296:13,24

**Ex 28 Mittenthal, J**
220:22 289:17,18
307:13

**Ex 29 Mittenthal, J**
220:24 289:20,24 318:2

**Ex 30 Mittenthal, J**
221:1 311:1,4

**Ex 31 Mittenthal, J**
221:2 381:5,6,10

**Ex 32 Mittenthal, J**
221:3 416:14,17,19

**Ex 33 Mittenthal, J**
221:5 425:21,23 426:6

**Ex 34 Mittenthal, J**
221:6 429:24

**Ex 35 Mittenthal, J**
221:8 430:3

**Ex 36 Mittenthal, J**
221:9 430:9

**Ex 37 Mittenthal, J**
221:11 431:14,15

**-**

**---ooo---** 222:12

**--ooo--** 224:1,3

**1**

**1** 234:22 248:19 249:5
268:13 289:24 296:25
318:15,17,18 320:15
357:3 410:12 422:8

**1.0** 249:5,15 250:25
287:17 288:2,16 290:5,
10,15,19 307:1,11
317:22 322:3

**1.1** 288:5,14 289:1,9
293:5 307:9 312:18

**10** 314:1 359:2

**10036** 223:4

**10:13** 268:15

**10:34** 268:18

**11** 357:7 409:18 416:21

**11:46** 310:20

**12** 313:2,7 347:9 359:24
397:7

**12.0** 404:15

**12.4** 404:9,14

**1250** 222:23

**12:03** 310:23

**12:52** 337:13

**13** 259:6,10 271:24
291:25 332:11 359:4

**14** 311:17 365:10

**15** 243:21 317:12 426:4
427:21

**16** 357:7 404:8 423:5

**17** 317:15,19 399:15,16

**17.0** 357:21 358:2

**18** 222:4 224:10 260:12,
17 317:14 367:4,5,8
369:7

**188** 341:17,22 342:18,
20

**19** 262:20 348:24
349:14,15 357:7 404:8

**190** 341:13 342:19,20
353:15

**19199** 409:18

**1990** 263:5

**1990s** 390:15 391:15

**1997** 229:4 230:1
256:15 258:12,15
259:3,10 262:15
271:19,23 282:24
283:23 290:25 291:3
329:8 330:6 338:8
341:5,13 342:16 345:9,
14 388:7 389:8,12,23
390:2,8 391:21 392:6,9

**1999** 227:7 389:5
403:12,16 405:6
413:18,21 414:5
416:11,21 418:4,6
419:9,15 423:17 424:10
425:6 433:17

**1:45** 440:18

**1:55** 337:16

**1A** 432:23,24

**1B** 410:8,12 422:24
423:6

**1C** 419:25 432:9

**2**

**2** 268:19 289:16 298:18
305:21 310:19 311:21
313:7 319:24 320:4,15
324:7 379:9 397:6
401:12

**2'** 313:18 405:6 437:25

**2.0** 307:20 313:5 315:10
316:15

**20** 232:4,10 243:21
328:8 331:23 332:3,4
370:22 372:3 427:21

**2000** 409:21 420:1
422:22 423:8,17
424:10,17 425:6 435:12

**2000s** 349:8

**2001** 368:1 370:7

**2002** 359:21 360:3,10
435:12

**2003** 410:3 423:5 424:4,
7,21 435:12

**2004** 229:23 230:5
359:6,8 393:17 394:3

**2005** 282:19 405:3,4,10

**2006** 272:19 273:1,3,6
276:6,8,11 370:4

**2007** 422:13

**2007-2008** 278:24

**2008** 278:11 279:11,14
280:11,12,15,23 283:2
284:18 317:16

**2009** 248:20 249:8,12,
14 250:18 271:2 288:3
289:10 290:5 291:19
292:12,19 293:18,21
294:1 298:19 306:22
307:4 312:18 313:16,18
317:15 332:2,13
365:12,18,19,23
385:18,21 386:13,17,20
418:14 425:12 426:4,14
429:6 437:8,11

**2011** 289:17 307:21
309:15,23 313:17

**2012** 229:23 230:5
372:13 373:14,21 374:5

**2013** 319:17

**2014** 267:12,19 289:24
367:14 378:1,8,24
381:21 429:8 430:5,14,
19 437:5,8,12

**2015** 273:14,19 275:5,7,
19 276:12

**2017** 292:19 322:20
413:22 414:4,6 431:14
434:23 438:12

**2018** 222:4 224:10
309:20 311:17 384:14

**2021** 313:19

**21** 242:4,5 331:23
375:18 381:24 383:4

409:5,13 431:19

**212 735-3453** 223:5

**213 623-9300** 222:24

**21st** 226:5

**22** 246:1,5,8

**221** 342:2,6 345:14 346:1

**23** 247:16,17 248:6 250:3 252:3,6,7 325:17

**24** 247:24,25 251:22,23, 25 252:3,6 322:8 392:22 394:23 395:4 398:7,9 400:10

**248** 292:13

**24th** 245:7,14 246:21

**25** 248:24 249:3 287:18, 22,23 288:22 290:4

**251** 259:9 291:25 292:4

**26** 260:22,24 261:5 267:9 309:5 327:18

**26th** 438:12

**27** 270:25 289:5,10 293:6 296:13,24

**28** 289:17,18 307:13

**29** 278:18 282:5 289:20, 24 318:2 422:3

**2:55** 371:6

**2D** 357:4,11,12 358:3 404:1,2,5

_____

**3**

**3** 234:18 236:6 290:19 293:7 296:25 298:18 305:21 306:2,3 307:16 308:5 310:23 317:24 318:5 319:13 320:5,14 321:11,12,14,17,19,24 322:25 324:7,8,11,14 327:14,16 371:4

**3.0** 289:23 318:19 319:11 323:12

**30** 282:2,7,15 288:8 289:10 293:18 298:19 309:3,12 311:1,4

**30(b)(6)** 411:12

**30th** 307:4

**31** 249:7 267:8,10 290:5 307:21 309:3 319:17 381:5,6,10

**32** 416:14,17,19

**33** 425:21,23 426:6

**34** 309:3 418:10 429:22, 24 437:16

**35** 430:1,3 437:16

**36** 262:23 269:11 418:22 430:5,9

**37** 272:15,17 347:22 352:6 431:14,15 432:15,16

**3:12** 371:9

_____

**4**

**4** 223:4 234:18 247:15 248:16 290:2 317:24 319:24 321:21 322:13, 23 324:7,14 325:16 371:10 407:21 424:16

**4.0** 251:1 315:22

**4.2** 298:8,11

**4.3** 298:19

**4.33** 305:22

**4.5** 299:14

**4.6** 306:4

**4.7** 306:16

**40** 288:8

**400** 222:6,17

**42** 334:2

**44** 280:10 283:1

**46** 236:6

**4:13** 407:23

**4:49** 408:1

_____

**5**

**5** 247:19,21 251:19

290:3 309:3,7 322:7,8, 13,16 323:7 324:19 325:5 326:1 359:6 393:17 394:3 408:1 441:1

**5.0** 315:19 317:18 322:18

**500-gram** 365:21 366:19,20

**510 302-1000** 222:18

**55** 222:6,17 309:3

**56** 279:11,14,16

**59** 317:10

**5:47** 439:18

_____

**6**

**6** 319:5,16 320:3 321:13,22 322:15 325:17 342:20 353:11, 20 354:18

**61** 383:19

**62** 383:19 384:9

**6:01** 439:20

**6:02** 441:3,6

_____

**7**

**7** 404:8 420:1

_____

**8**

**8** 292:18,19,22 322:9 359:2 422:14

_____

**9**

**9** 357:7 359:2 404:5,8

**90s** 256:23 257:18 258:1 263:2 266:1 389:22

**92660** 222:24

**94607** 222:7,17

**97** 230:4 260:9 292:14 356:24 391:24 394:16

**98** 279:12 284:9

**99** 423:8 424:16

**9:00** 440:16

**9:05** 222:4 224:11

_____

**A**

**A-P-A-C** 327:8

**a.m.** 222:5 224:11 268:18 440:16

**ability** 239:23 298:6

**absence** 275:20

**Absolutely** 398:21

**accessing** 299:15

**accident** 255:19

**accompanied** 291:6

**accompanies** 386:9

**accompany** 348:7

**accompanying** 388:19

**accomplish** 254:11,13

**accomplished** 282:2

**accordance** 248:12 250:5,21 251:8 252:10, 12,15 253:7 406:8

**accounting** 319:3,19 321:4,7 323:22,23

**accurate** 319:19 321:4 323:22,23

**accurately** 250:7 324:14,23

**acronym** 328:1

**act** 394:25

**acted** 410:24

**action** 222:10

**actions** 378:1,14,20

**active** 312:16,19,20,25 313:9,12,14,22

**activities** 226:13 235:2 299:3 306:16 363:16

**activity** 264:19

**actual** 235:18,24 236:12 318:10 340:10 355:18 376:22 388:7 404:23 406:3

**add** 370:12 387:9 423:9

**adding** 413:24

**addition** 346:14

**additional** 226:7,12 227:8,16,19 229:22 230:3 231:3 234:19,22, 25 235:9 244:21,23 245:3,6 258:10 347:1 350:5 360:1 367:14 369:8 374:21 414:17 423:10 440:9

**address** 390:5

**addressing** 252:21

**Aden** 274:22

**Aden's** 266:19

**adjourned** 441:6

**adjourning** 441:3

**adoption** 273:16

**advisement** 296:22

**affect** 294:16

**affected** 405:7

**affecting** 316:8

**affects** 327:3 329:15

**affiliation** 239:10

**afternoon** 338:1,3

**agree** 253:17,18 254:6 255:25 259:25 262:3 266:14 270:13 280:12 283:21 297:24 298:2 319:2 330:12 374:9 384:1 388:24 394:24 408:20,23 434:9

**agreed** 440:13

**agreement** 352:4 356:25 357:2 387:25 404:2 405:2 439:22 440:23

**agreements** 340:18 356:21 357:4 387:24

**agrees** 278:5

**ahead** 237:15 238:23 244:5 249:2 258:20 259:7 281:23 288:25 289:13 340:4 351:4 370:19 375:4 380:25 430:13 431:18

**Aiken** 224:9

**Alameda** 224:20

**aligned** 263:6 269:12 297:14

**allegation** 411:16 435:13

**allegations** 417:12 420:6

**alleged** 435:2

**Allen** 364:11

**alphabetical** 428:19

**alter** 277:24

**alternatives** 275:18

**ambiguous** 376:16

**America** 222:20 224:17 225:5

**amount** 347:2

**analysis** 341:24 342:14 348:9,10,17 349:12,25 350:24 353:12,24 354:1,8 372:23 393:10 399:17,20 401:3

**analyst** 278:22 341:14 342:14 343:20 345:10 353:12 422:10

**analytical** 340:9 342:3 345:15,24

**and/or** 226:4 312:5 335:3

**Anderson** 257:23 390:21

**announced** 233:23

**annual** 293:14 298:13 309:8 312:1 325:23 416:4

**annually** 285:12,24 298:15

**answering** 301:13 374:8

**answers** 294:2

**anymore** 301:23 413:5

**APAC** 327:8,21 328:1, 13 372:11 376:9

**apologize** 228:24 248:23 287:7 348:3 382:1 398:7 403:1 424:22

**appearance** 337:21 351:16

**APPEARANCES** 222:13

**appeared** 222:9 377:9 404:2

**appearing** 222:21 224:25 225:1,4 337:23

**appears** 311:7,14 312:12 315:22 319:6 342:9 357:14 428:19

**applicability** 274:25

**applicable** 228:3 248:12,15 250:6,21 252:12 254:25 266:13 269:18 274:14 303:3 320:6 329:7 351:25 387:22 394:17

**applications** 379:11 380:2 381:15,19

**applied** 238:6 265:14 267:23 329:23 336:10, 14,15 338:10 382:16 388:9 417:20 424:23

**applies** 271:19 330:8, 21 340:9 341:23 342:8 345:18,21 354:7

**apply** 294:20 298:24 329:11 330:3,13 331:1, 4 336:6,7 338:5

**applying** 401:22 425:5

**appraisal** 346:16

**approval** 300:11 302:25 303:6 312:4

**approvals** 302:21,22, 24

**approve** 303:10

**approved** 302:8,10

**approving** 303:19

**approximately** 271:2

**April** 289:24 317:19 322:19 384:14

**APRS** 401:13,16,17

**archive** 236:18,25 237:7 251:15,17

**archived** 335:24 401:6

**archives** 236:22

**archiving** 336:4 402:6

**are's** 236:21

**area** 238:15,25 324:25 337:6 364:17 381:18 387:6 438:23 439:12

**areas** 235:14 240:21 332:24 334:21 438:11

**arithmetic** 293:3

**arose** 411:20

**Arps** 223:3

**artifact** 324:8

**asbestos** 236:8 237:21 340:1 348:19,22 351:13,15,17,21 362:4 363:11 370:14 371:17 373:1 375:11 376:24 387:7 389:16 391:7 393:11 399:21 401:4 431:20 433:1,5 434:23 435:7,10,16 438:1

**ascertain** 338:17 381:20

**Asia** 327:4,10 328:3,18 329:17,23 332:20 337:6 338:5

**Asian** 327:10

**assessment** 346:13 367:17

**assignment** 334:14,20

**assigns** 317:13

**assistant** 233:9

**associate.'** 320:7

**associates** 282:11 326:7 422:9

**assumed** 327:9

**assuming** 290:9,12

**attached** 246:17 260:17 429:2,21 432:14,16

**attachment** 428:2

**attachments** 427:23

**attempt** 433:10

**attorney** 235:25

**attorneys** 383:24

**audiovisual** 316:11

**audit** 364:5 372:1 374:16,20,23 375:20 376:20,21 377:2,11,15, 24 378:15,19 382:3,14 386:13 387:24 415:22, 24 416:2,3,5

**audit-like** 386:20

**auditing** 376:22

**audits** 279:13 283:8,13 284:6,8,12,15,16,17,18, 19 363:2,7,10,25 364:25 375:2 386:16, 19,24 387:17,23

**authored** 390:18

**authority** 385:3

**authorization** 292:3 401:17

**authors** 240:3

**availability** 258:10

**aware** 245:6,8,14,18 249:19 256:2,5,6,10 271:21 298:2 305:5,19 326:18 327:2 339:4,8 344:4,12 401:20 405:19 412:19 413:11,15 414:9 415:10,11,13 417:1 419:19 432:22 433:7 435:18 436:14 437:4

**awareness** 326:22

**B**

**baby** 257:8 260:4 264:14,20 279:8 326:19 339:19 343:4,5,16,24 347:4 353:3 358:20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:8 409:24 410:1,2 417:4,14 420:10 426:7 430:15,17 433:19

**back** 226:20 229:4 230:1,4 232:16 234:7 238:8 239:16 248:20 249:12 250:2 256:25 257:12,17 263:1 279:10 280:19 283:23 288:20 290:4,25 291:2,22 293:25 294:6,10 296:24 306:21 320:3,20 325:15 326:24 333:15,17,20 338:2,8 342:12 351:24 352:23 356:4 367:23 370:7 372:12 373:14, 17,21 374:6 376:7 377:15 382:3 384:14 385:15 388:18,25 393:21 394:19 402:3 403:11 422:20 424:9 437:6

**Barbara** 420:2 422:22

**based** 236:15 241:17 247:3 258:1 263:22 264:6 265:2 294:4 298:16 304:23 334:4 338:17,19 353:7 354:6 385:4 390:16 403:7 418:25 436:24

**basic** 308:1 313:9 399:2 408:14 423:15

**basically** 231:14 246:10 286:14 347:20 350:3 383:11

**basics** 247:3

**basis** 263:7 298:13 371:22 406:3

**bat** 281:25

**batch** 263:15 352:2 354:2 358:9,15 360:18,

20 372:5,18,21,24 374:21 386:11,18 406:7

**batches** 348:7 354:7 374:18 386:9,15,16

**Bates** 290:20

**Beach** 222:24

**begin** 440:15

**beginning** 248:6 321:8

**behalf** 224:6 225:2,4,7 337:23 354:13

**bell** 380:5

**beneath** 318:23

**Berg** 425:22 426:2

**Bernardo** 223:3 225:12

**bin** 302:11,20,24

**binder** 229:7,9,12,18 230:1 367:13,22 368:5, 10 369:23 370:6,9 380:17 419:25 432:9

**binders** 368:9

**bit** 287:8,9 344:1 403:23 419:7 423:21,22 426:14 439:6

**Bloch** 420:2 422:22

**blue** 302:6

**body** 407:5,7 434:8,13, 15,18

**bog** 260:10

**bottle** 404:23

**bottom** 306:24 309:13 360:2 367:6,8 372:7 392:5 399:14 422:7

**boxes** 263:6,14 264:1, 2,8 269:12

**Braunreuther** 428:20

**break** 267:3 268:3,7,8,9 310:16 331:5 337:9,14 338:2 360:19 374:14,25 392:17,19 407:11

**breaks** 268:11 440:16

**briefly** 326:25 333:6 336:17 402:18

**bring** 229:5 300:10

**broader** 269:19

**broadly** 328:20 330:8

**brought** 229:8,12

**Bruno-sheerin** 257:21 262:11 265:19 268:23 272:10 274:8 275:23 347:25 352:7

**Brunswick** 349:1,5 394:20,21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

**buildings** 396:19 397:19 399:11

**bunch** 240:16

**business** 255:16 261:24 264:18 285:16 326:9 390:6 391:18

**businesses** 415:8

**C**

**calculated** 313:15

**California** 222:7,8,17, 24 224:13,19

**call** 233:6 234:1 235:23 241:11 259:20 290:7 308:18 309:22 310:12 318:20

**called** 272:21 276:18 284:24 285:8 296:4,12 307:23 342:2 343:17 357:22 363:24 364:5 365:3,4 402:20 420:19 423:4

**calling** 319:12

**calls** 263:4 272:1

**cancer** 432:4,16,22

**candidates** 286:13 298:7

**capability** 369:16

**captured** 231:10 363:17 372:2 387:16

**cards** 358:10

**Care** 360:5 427:7

**Carpenter** 222:22 225:3,4 337:17,20 350:15

**case** 224:15,18 234:6 235:23 256:4,7 260:15 261:9 313:24 320:22 326:13,15,16 334:22 338:8 344:11 355:21 409:19,22 410:4 411:14,17 413:9 414:21 415:19 416:22 419:9 420:2 422:22,25 424:22 425:22 429:12,23 430:2,8 433:16,17 435:11 440:8

**cases** 226:4 231:5 237:17 242:12 244:16 245:22 246:22 341:22 344:5,11,16,19 412:20 414:6,10,12,20 415:19, 25 423:17 434:9,11 435:1,12

**categories** 234:21 270:3 342:10 362:21 363:24 423:24

**categorized** 234:14

**category** 234:10,18,22 251:13 361:13 388:4 391:23 406:10,13

**caught** 309:24 341:16

**CDS** 304:18,20

**central** 302:15 344:4,9, 10

**certificate** 348:17 349:25 350:21,24 399:1,17,19,20

**certificates** 348:8,10 349:12 372:22 393:10 401:3

**Certified** 222:7

**cetera** 317:20 328:14 358:10 398:20

**chance** 297:13

**change** 308:16 319:9 320:6 325:25 326:3,4

**changed** 308:12 315:20 321:4,8 324:23

325:22 346:23 371:1 407:3 420:18

**characterization** 334:24 344:8

**charts** 340:12

**chase** 258:12 351:9

**check** 252:1 281:14 308:24 314:17 333:7 359:7 405:18 418:9

**checked** 315:21 374:9 426:23

**checking** 315:19 324:4

**chemistry** 342:3 345:15

**Chesteen** 429:11,22

**China** 328:14,24 330:21 331:19 333:25 338:6 372:8 373:6,11 377:8,10 427:12 438:6

**Chris** 231:2 245:25 261:2 268:2 380:16 395:14 425:18 432:7

**Christopher** 223:2 225:7

**christopher.cox@ skadden.com** 223:5

**Cindy** 266:18 274:22

**circumstances** 234:15 408:24 413:5 440:15

**citation** 278:15

**cite** 398:1,4

**cites** 372:8

**claimed** 440:8

**clarify** 231:7

**classified** 241:16 390:6

**clean** 298:6 386:8

**cleanout** 284:24 285:2, 4,5,6,8,9,11,18,24 286:4,11 293:10,13,14, 20,25 294:6 296:2 297:3,19 298:12,21,23 299:3,9,11,16,20

300:17,20 301:2 302:4, 6,12,19 303:11 304:11 305:3 306:5,11 307:10 308:12,18,23 309:9,13, 15,19,25 310:6,12 312:7,17 313:18,23 314:4 316:7 323:3,7,18 325:2,4 416:3,4,5,6

**cleanup** 301:6 307:24 308:13,18 309:23,24 311:23 312:1,4,8 317:17 319:12 321:13, 25 323:4 325:21

**cleanups** 325:23

**clear** 233:25 263:16 341:7,11 358:17 373:3 398:22 406:17 420:13

**close** 339:4

**closed** 392:1 396:18

**closer** 359:16,21

**code** 317:14

**collected** 234:24

**collection** 226:13 234:22 235:2

**column** 235:4 236:1 428:14

**columns** 231:17

**commencing** 222:4

**comment** 348:6 351:25 353:7 397:16 399:6 401:7

**comments** 271:18 356:10 361:6 364:1 375:22 385:5

**common** 362:15

**communication** 299:10,11,16,20 300:21 301:6 306:5 310:13 312:17 413:3 428:24

**communications** 245:10 306:12 427:6

**companies** 240:16 257:11,12,14,16 258:7 259:1 260:3 263:1,11 269:22,24 270:19 271:20 272:3 273:13 279:3 281:9 294:22

330:9,17 338:10 360:5 417:15,16 420:23 423:1 424:24 426:3 427:2,16 429:2,17 430:7,24 431:3 436:2,3

**company** 234:19,20 237:18 238:20 240:25 244:23 252:17 253:22 257:5 259:12,15 263:4 273:20 277:2,4,13 279:6,21 294:5 298:12, 24 330:24 331:17 343:11 369:1 384:3 389:21 391:18 393:5,14 410:19

**company's** 238:12 241:10 257:22 258:1 390:6 406:9

**companywide** 429:1,6

**competent** 434:11

**compile** 242:8

**compiled** 381:12 409:15

**complete** 242:14,21 244:20 290:9,13,14 315:7 384:17

**completely** 320:25

**compliance** 252:16 285:25 295:18,20 415:24 416:2 427:8

**complied** 253:19

**comply** 253:25 254:4, 8,9 273:22

**complying** 285:23 415:23

**comprised** 406:6

**compromise** 440:11

**computer** 231:16 235:23 238:16 300:15

**concern** 434:13

**conclude** 263:18 304:23 385:2 428:17 440:17

**conclusion** 439:23

**concur** 434:7

**conduct** 298:12

**conducted** 226:8 283:8 298:23

**confirm** 252:1 311:20 329:13 400:11

**confirmed** 303:2

**confirming** 328:6 437:23

**conform** 367:15 369:9

**conformance** 399:2

**confused** 227:15 228:24

**conjunction** 252:23 346:18 387:1

**connected** 434:10

**connection** 226:4 387:3 417:13 420:8

**considered** 365:2 384:24

**consist** 302:25

**consistent** 293:2 383:18

**consolidate** 317:17 433:11

**consolidated** 271:4

**constitute** 319:8

**consult** 312:21 316:19 340:2,5

**consultant** 223:9 410:24 411:1,5

**consulted** 235:5,11,21 239:1 335:14,16

**consumer** 223:1 225:9 226:16 239:13 242:19, 22 243:4,7,8 256:17,18, 20,21 257:4,12,13 258:7,25 259:11 260:2 263:1 269:22,24 270:19 271:20 272:3 273:10 279:4,5,15 280:7 281:8 311:10 312:1 330:16 355:13 360:5 393:15 415:4,12 417:8 418:17 419:17,18,23 420:25 422:11,25 426:3 427:2, 3,4,7 429:16 430:7

**Cont'd** 225:22

**contained** 231:16 368:5

**container** 404:24

**containers** 241:11 302:7

**contaminants** 339:25

**content** 241:18 263:21 300:25 351:13 362:4

**contents** 299:25 359:14 364:9

**context** 281:12 297:3 327:12 343:21 352:19 353:9 365:25

**continuation** 392:15 440:3

**continue** 258:9 268:21 310:11,12,25 337:16 343:5 360:19 371:12 388:23 408:3 438:24 439:21 440:13

**continued** 232:21

**continuing** 266:20 291:16

**continuously** 403:15

**contracted** 363:14

**contribute** 238:17

**controlled** 329:3

**controls** 404:15

**convenience** 234:11

**conversation** 230:13, 14 233:5 334:3 337:4 349:14,20 368:11 371:24 377:9 382:18 396:15

**conversations** 235:7 244:7 261:22 262:5 310:9 338:19,21

**coordinators** 285:20 302:23

**copied** 428:10

**copies** 242:2 247:9 299:2 314:22 425:16

**copy** 231:19,23 232:1 245:24 246:2 247:20 260:20 261:2 270:24 347:7 381:3 409:8 425:14 432:7

**corporate** 233:9 238:22,25 239:1,2,10, 11,12 272:21 273:10,12 274:16,17,18,19 276:2, 11,18 355:10 427:5,6

**corporate's** 273:22

**corporation** 222:20 225:6 259:16 291:21

**correct** 227:10,22 228:8 230:11 232:19 236:2 237:11 241:24 243:8,10 245:7,22 248:17,20 249:8,12,15, 23 252:25 253:2,11 254:5,14,17,21 255:2, 14 256:4,8,15 257:9,14 258:13,18 259:3 260:5, 15 261:9 262:15 265:9, 11,12,15,16,19 266:5, 13 267:13 269:19,20 270:11 273:23 276:4 278:3,8 279:8 283:16 285:9,12,18 286:8,21 294:12,14 296:17 299:7,8 300:7 304:15, 18 305:25 306:9,20 308:2 309:20 313:20 314:6 315:3 316:6,17 318:9,16 320:16 321:5, 9,15,19,20 322:1 324:3, 17,18 326:1,13 327:17 328:15,18 329:24,25 330:9,10,13 332:13 334:23 336:14,23,24 337:1 338:11,12 339:1, 6,7,10,11 344:6,19 345:1,11,22 353:11 356:23 360:5 366:7 367:1,2 372:21 374:2 383:25 384:5,21 386:7 388:10 389:5,8 391:10 393:3,17 394:20 395:8, 23 396:2,18 397:14,24 399:13 400:5 403:12 406:20,21 408:19 409:5,15,19,22 410:16, 25 411:22 412:5,14 413:25 415:16 416:23 418:15 419:12,16

**copy** 420:15 423:16,22 424:11,19 425:12 426:15 428:11 430:16, 24 431:3,7,8,9,11 432:5,17 433:20,25 434:19 435:2 436:18 437:10,19,21

**corrective** 378:1,14,20

**correctly** 244:20 342:18

**correspond** 246:13 372:14

**cosmetic** 270:21 279:7 341:9 355:20 362:11 389:14 426:11

**counsel** 224:23 225:13,17,21 227:2,3, 22 229:1 234:5 243:13, 15,18,20,21 244:25 246:10 258:5 268:21 296:18 310:25 311:5 337:16,17 355:14 371:12 408:3 425:10 436:23 438:5 439:21 440:13

**counterpart** 409:2

**countries** 338:11

**country-by-country** 437:13

**County** 224:20

**couple** 230:25 280:9 281:21 331:20 341:1 375:3 380:23 388:11 439:15

**coupled** 246:12

**court** 222:23 224:8,19 226:22 238:7,9 257:1 352:24 410:20

**cover** 227:6 228:19 229:3 266:22 268:7 388:15 389:25 391:17 418:25

**coverage** 228:2

**covering** 264:8

**Cox** 223:2 225:7 228:9, 14 231:2,21 237:13,15 240:18 241:8 242:17,23 243:9 244:4,18 247:6

249:24 250:9,23
253:14,21 255:3,15,23
256:9 257:19 258:19
259:23 261:3 264:15
265:20 266:6 267:2,21
268:4,9 269:4 270:1
273:8,24 274:10
275:16,25 276:5,15
277:10 278:14 283:5,17
284:3 286:9,23 287:2
288:13 290:8 291:4
296:21 297:5,23 300:8,
23 302:2 304:5,13
305:18 308:3 310:1,15
312:11 314:15 315:5
316:9 319:22 320:17
323:9,25 330:14 333:9,
12 334:24 344:7 345:3
348:14 350:12 351:2
353:21 355:6 357:13
361:21 362:6,13 365:24
366:16 369:4 370:1,18
380:9,19,23 383:15
385:1,14 386:5 387:14
388:13 389:17 392:14
393:23 395:6,9,16
396:3 397:1,25 398:16
399:22 400:6,22
402:14,23 405:11,15
407:12,15,18 412:6
414:1,13 421:9 423:18
425:16 428:5 431:23
432:9,11 434:1,6,21
439:9,14,24 440:2

**create** 250:19 320:25
351:7

**created** 231:14,15
232:9 234:3 248:10
249:7,14 256:23 257:25
260:13 263:6 264:1,25
269:2,12,13 303:23
304:2 316:2 332:3,13
350:3 362:3 389:22

**creates** 253:22

**creating** 250:4 266:9
406:23

**criteria** 236:2,7 237:22

**curious** 237:4

**current** 244:8 269:21
272:6,8 311:15,18,19
315:19 317:18 321:9
322:4,18 323:14 336:7

339:22 403:4 432:20
433:4 435:17 436:4
437:25

**custodial** 235:12

**custodian** 413:4,7

**custodians** 408:15
412:10 413:16 435:21,
22 436:6,8 438:21

**cut** 258:12 328:7 351:9

**cycle** 349:22

**Cyprus** 222:20 225:5


**D**

**Darren** 270:23

**data** 235:13 240:8

**database** 236:21

**date** 224:10 249:7
273:3 307:4 311:17
314:1 358:12 370:8
404:20,21,22 405:1
422:18 423:5 438:13,
17,21

**dated** 227:7 288:2
289:17,23 307:20
416:20 426:3

**dates** 381:16

**David** 364:11

**day** 230:21 285:16
286:11 297:12,16,19
298:4,5 302:12 304:11
380:20 407:14 408:7
441:3

**days** 282:2,7,15 301:2
302:6 309:9,15 316:7
325:4 440:4

**deal** 261:25

**dealing** 384:4

**Deane** 426:2

**Debbie** 428:25

**December** 319:17
426:4

**decide** 434:12

**decided** 308:17

**decision** 325:3,13

**dedicated** 367:11
372:11

**deduce** 264:7

**defect** 417:12 420:7

**Defendant** 222:21

**defendants** 222:20
223:1 225:8,13 245:11
440:3,18

**defenses** 440:8

**define** 295:14 314:18

**defined** 291:23 292:15
295:23 305:1 312:25
383:5

**defines** 298:19

**definition** 275:10
295:16,17 313:9 315:8,
20,21 316:12

**definitions** 294:25
295:4,11 312:22 360:2

**deletion** 305:25 306:9

**deliver** 436:7

**demanded** 256:2

**denote** 239:8 240:21

**denoted** 234:17 238:14
318:21,24 437:12

**Dentons** 222:23

**departing** 282:11
422:8

**department** 241:2
269:15,18,19 273:20
275:11 277:14 285:17,
19 291:16 308:15,17
311:12 360:25 361:1
410:15 413:2 436:5

**departmental** 236:19
238:2,18 279:12,13
283:8 284:11,14
340:16,24

**departments** 263:11

**depend** 320:18

**deposed** 226:5

**deposit** 238:17

**deposition** 222:1
224:12,21 229:2,11,13,
21 231:5 242:4 244:17
246:2,11,21 247:24
260:14,25 261:8
268:13,20 271:24
310:19,24 334:13
344:11 371:5,11 388:23
392:15 407:21 408:2
411:24 416:18 425:22
432:24 439:23,24
440:4,14,15 441:1,5

**depositions** 243:17

**describe** 250:7 270:2
359:1 379:21

**describes** 250:10

**descriptions** 403:19,
20

**descriptives** 292:16

**design** 417:12 420:7

**designated** 307:11
395:11

**destroy** 301:18,24
306:13 408:17

**destroyed** 259:19
286:7,20 287:1 297:22
300:20 302:19 369:25
396:25 402:13 406:22
412:4 416:7

**destroying** 299:22
300:6,14 301:7,25
332:23

**destruction** 292:3
297:4 298:7 302:8,10
303:10 305:25 306:9

**detail** 319:2 320:3
423:22 426:15

**detailed** 319:3

**details** 413:24 423:20

**detect** 284:6

**detecting** 284:10

**determination** 252:24
359:13 414:25 436:6

**determinations**
361:12

**determine** 239:9

JAMES MITTENTHAL (PMQ/COR)     10/18/2018

241:19 297:13 349:21 354:2 356:21 361:8

**determined** 241:2 338:16 385:22

**development** 360:24

**device** 354:5,6

**devices** 342:4 345:16

**devised** 273:12

**DHR** 354:5

**dictate** 389:13

**different-named** 257:14

**differently** 292:8 438:23

**difficult** 320:24

**difficulty** 387:20

**diffraction** 354:25

**digital** 340:11 371:1

**direct** 225:22 262:17 357:8 413:3 422:6 440:19,20,22

**directed** 332:21 417:3, 17 418:12 429:1 435:19,20,23

**direction** 305:24

**directives** 292:17

**director** 376:9

**directory** 239:14 240:22

**disagree** 369:6 439:25

**disappears** 324:20

**disclosed** 412:18

**discontinued** 358:16

**discovered** 412:1

**discuss** 231:6 285:3 407:16,17

**discussed** 237:9 278:4 335:11 338:22,24 370:16 381:15,19 383:2 394:16 423:17

**discussing** 338:14

**discussion** 347:6,24 365:10 367:5 368:7 369:7 390:20 401:24

**discussions** 383:22

**disk** 315:16 371:4

**disposal** 286:2,3 338:18

**dispose** 250:20 252:22 255:22

**disposed** 248:11 252:14 253:6,10 259:19 300:20

**disposing** 250:5 251:7 299:23 332:24

**disposition** 239:22 251:16 286:13,16,20 295:17 297:3,17 329:4

**dispositions** 297:15

**distribute** 429:1

**distributed** 417:24 426:19 429:5 437:9

**distributing** 257:7 260:4

**distribution** 418:7,13, 25 419:3,8,10 426:18 430:23 431:1 437:8

**distributions** 419:4

**division** 275:11 277:14 278:1 427:3

**divisions** 274:15 417:16 436:2

**DMR** 354:5

**doc** 232:8

**docs** 384:20

**document** 232:10,20, 22 241:16 246:9,14 249:13 253:15 255:14 262:1 271:12,13 278:6 288:12 293:8 295:17 296:4,13 305:24 307:3 313:12,13,22 314:14,18 317:18 318:9,10,11 322:20 324:6 329:19 360:24 379:21 380:6,7 383:9 384:4 395:13,14, 16 396:16 405:16

**discussion** 347:6,24

416:20 417:17 420:1,14 423:4 427:19 428:3 434:10

**document-gathering** 235:1

**documentation** 292:5 303:23 304:2,4,9 314:6 345:5 349:21 350:8 358:7 359:2 390:1

**documentations** 259:14

**documented** 306:17 413:21

**documenting** 416:6

**documents** 239:17 240:3 244:13,15 247:7 252:22 254:25 255:25 286:17,19 290:20 291:20 292:15 294:8 298:20 299:2,7,23 300:6 301:9,20 302:5 306:13 314:23 329:4,5 332:23,24 334:7 335:24 336:4 339:15,18,24 341:4,8 354:24 355:16 366:25 391:17 394:9 396:11 408:16,17,18 412:3 416:6 424:6,17 433:23 434:8

**Dodd** 278:20 281:25 283:7,15 309:11 421:24 422:4

**domestic** 329:18 393:1 431:2

**Don** 332:1,4,7 335:5 346:16 348:3 349:1 353:17 354:17 356:1 364:11 365:10,21 366:5 367:12,22 368:2,8,21 369:23 370:5 372:15 374:6 375:5 385:4 397:4,5

**double** 346:22

**double-check** 230:22 315:6 376:18

**Dowling** 327:19

**Downs** 226:9 230:9,13, 16,17 231:6 232:9 233:11 235:8 237:6

240:12 244:1,7 383:19, 21 386:22 388:17

**Doyle** 327:19

**draft** 299:2 314:23

**drew** 337:3

**drive** 237:1 238:13,14, 15 239:25 240:6,13,17, 21 241:12,13,20

**drives** 239:18,20 240:15,25

**duly** 222:10

**dumped** 240:17

**E**

**earlier** 236:18 262:14 268:24 293:15 321:1 337:21 338:15 354:12 365:20 382:18 390:2 391:11,14,15 402:17 414:5 415:2 423:25 424:2 433:9 435:10

**earliest** 227:6 259:2 271:21 327:1 389:22

**early** 222:7 224:8 226:20 256:23 257:17, 25 263:1 266:1 389:22 390:15 405:6

**earmarked** 297:17

**easily** 260:21 261:16

**echos** 383:9

**Edith** 428:25

**edition** 379:14

**EDS** 340:13

**EDSS** 354:25

**effect** 255:2,4 293:18 328:22 329:3 333:24,25 339:5,9 403:16 408:19, 21 412:24,25 414:11,19

**effective** 253:19 254:4 311:17 317:19 322:19 381:21

**effectuate** 271:13 421:8

**efficient** 340:7 408:6

**effort** 227:25

**efforts** 234:22

**electron** 362:2,10 402:21

**electronic** 299:1 304:19 305:11 314:9,22 315:14

**element** 234:9

**elements** 366:13

**elicit** 274:20 395:10

**elicited** 363:6,8 366:8 396:15

**eliminate** 300:22

**email** 301:1,10,19 367:18 372:10

**emails** 300:15 301:8,11

**employee** 279:21 282:3,16 301:21 303:1 320:7

**employee's** 286:1 303:10

**employees** 253:25 254:14,16,20 261:24 270:12 279:15 280:5 281:2,19 286:12 294:8 297:12 301:17

**EMRS** 237:3

**enable** 253:24 369:16

**encompassed** 226:16 251:15 374:14 387:25

**end** 268:12 310:18 371:4 407:14,20 440:25

**ended** 414:12

**English** 346:3

**ensure** 285:22

**ensuring** 377:3

**entailed** 263:10

**entered** 378:7

**enterprise** 252:11 273:15 275:8

**entire** 226:20

**entities** 274:1,5 435:19,21

**entitled** 285:6

**entity** 258:22 270:17 438:11

**entry** 342:2

**equate** 343:3

**equates** 343:1

**equivalent** 305:3

**ER** 275:8

**Erin** 222:22 225:3 337:20

**erin.carpenter@ dentons.com** 222:25

**ERMS** 236:25 237:5,10 238:6 267:12,16

**ERS** 273:15,16 276:13, 24

**ESI** 223:9

**essentially** 286:5 305:23 343:6 403:15 413:22 434:18

**established** 351:6

**Estrada** 429:12 430:2, 17

**et al** 224:16 420:5 426:3

**Ethicon** 410:25 411:3

**ETQ** 377:25 378:13,19, 22 381:22 382:15

**European** 336:25

**evaluate** 384:11,13,16

**evaluation** 434:3

**event** 285:9,11,15,18, 24 286:4 293:14 294:7 296:2 298:12,23 299:3 300:17 302:19 306:15 312:8 319:13 321:13,25 323:3,4,8,18 324:16 325:21 424:20

**events** 293:10,20,25 307:24

**eventually** 264:21

**evidence** 305:17 384:6,7 411:18

**evolved** 317:20 403:20 423:23

**exact** 269:6 422:18 434:18

**EXAMINATION** 225:22

**examined** 222:11

**exception** 361:8

**Excuse** 263:8

**exercise** 375:2

**exhausted** 371:19

**exhibit** 229:17 232:1,4, 10 242:4,5 246:1,5,8 247:16,17,24,25 248:6, 24 249:3 250:3 251:21, 25 252:3 259:6,10 260:12,17,22,24 261:5 262:20 267:9 271:24 287:18 288:22 289:5, 10,17,18,20,24 290:4 291:25 293:6 296:13,24 307:13 309:5 311:1,4 313:3 318:2 322:8 325:17 327:18 357:3,11 358:3 359:23 379:9 381:5,6,10 404:1,2 409:5,13 410:8,12 416:14,17,19 423:6 425:21,23 426:6 429:24 430:3,9 431:14,15,19 432:23

**exhibits** 229:10 260:9 359:19 379:3 410:10

**exist** 418:3 419:3

**existed** 269:14 275:7, 19 277:8 317:15

**existence** 263:19

**expand** 375:4

**expect** 292:24 356:8 360:16 383:5

**expected** 342:23 346:20,25 383:10

**expert** 264:16 341:19 342:7 344:16 345:17 347:17 348:20 350:20

**expertise** 396:11

**expiration** 404:21,22

**expired** 358:16

**explain** 234:2 260:25

**explicit** 251:18

**explicitly** 378:23

**exposure** 326:12,15

**express** 253:23

**expresses** 254:10

**extent** 231:8 254:7 270:4 277:7 281:13 320:19 355:7 395:9 396:4

**external** 376:9 387:23, 24

**extra** 425:16

**F**

**facilities** 237:18 397:24 398:14 399:4 400:2,12

**facility** 269:15 353:18 375:12 393:5,8,19 394:7,8 400:4 401:6 402:5,9

**facsimile** 321:1

**fact** 241:16 255:20 259:6 272:1 294:4 321:17 340:5 376:2 397:16 437:7

**fact-finding** 257:20

**fail** 410:19

**failed** 337:21

**failure** 411:18 417:13 420:7

**fair** 291:18 413:20

**faithful** 323:16

**falls** 404:14

**familiar** 275:17 284:25 327:9 339:12 362:15, 16,20

**families** 434:9

**family** 434:10,11

**February** 405:3

**figure** 368:8 380:17

**figured** 268:4

**file** 236:8 237:20,25 238:2,12 240:10

**filed** 224:18

**files** 237:12,16,17 238:3,17,18,21 240:17 335:13

**filled** 231:17

**films** 340:11

**finally** 431:13

**find** 260:9 267:11 296:15 327:13 333:2 341:3 347:8 355:25 356:25 360:14 377:20 379:1 398:5 399:18 401:13 410:8

**finding** 332:21 360:18

**fine** 268:8 269:9 292:6 313:6,10 400:25

**fine-tuning** 308:8

**fineness** 351:16

**finish** 439:7

**finished** 341:8 342:3 345:15 355:20 360:12, 22,23 362:12 370:14 371:16 374:11 387:7 404:16,18 406:4

**firm** 224:12,22 243:23

**first-time** 234:20

**firsthand** 266:25

**five-page** 379:25

**fleshed** 423:22

**flipped** 360:16

**flipping** 363:23

**floating** 379:3

**Flom** 223:3

**floor** 302:7

**flow** 349:21 350:7

**focusing** 374:19 375:2

**folder** 372:11

**folks** 260:3 283:1 308:21 309:18 338:20 410:18

**follow** 239:9 270:12 278:5 284:5

**follow-on** 226:8 349:14

**follow-up** 267:6 349:18

**Fong** 224:16 226:4,12 228:7 231:6,9 232:24 233:14 234:6,12 244:16 246:22 326:16

**force** 313:13 324:16

**forget** 301:19 385:12 424:3

**form** 228:9,14 237:13 240:18 241:8 242:17,23 243:9 244:4,18 249:24 250:9,23 253:14,21 255:3,15,23 256:9 257:19 258:19 259:23 264:15 265:20 266:6 267:21 269:4 270:1 273:8,24 274:10 275:16,25 276:5,15 277:10 278:14 283:5,17 284:3 286:9,23 287:2 288:13 290:8 291:4 297:5,23 300:8,23 302:2 303:25 304:5,13 305:18 308:3 310:1 312:11 314:15 315:5,13 316:2,9 319:22 320:17 323:9,25 330:14 334:25 344:7 345:3 348:14 350:12 351:2 353:21 355:6 361:21 362:6,13 365:24 366:16 369:4 370:18 383:15 385:1,14 386:5 387:14 388:13 389:17 396:3 397:25 398:16 399:22 400:6 405:11 412:6 414:1,13 421:9 423:18 428:5 431:23 434:1,6,21

**formal** 335:23 336:3 354:21 356:15 364:18 389:3

**formats** 299:1 304:15,

19 314:5,9,21

**formula** 401:21

**Fort** 264:11,12 265:3,15 271:3,8

**forward** 279:24 369:10

**forwarded** 351:7

**found** 243:1 281:24 292:13 295:1 334:10 359:20 374:20

**foundation** 350:16

**foundational** 327:5 400:18

**four-page** 232:10

**fourth** 347:10

**frame** 276:7

**frames** 394:18

**franchise** 273:13 394:15

**frankly** 293:3

**French** 226:10 230:9, 15 233:6,8,18,23

**front** 248:3 249:4 261:5 264:8 287:24 288:22 289:11,14,25 295:5 296:25 307:14,18 311:8 318:6 323:6,15 324:2 325:18 409:7 433:2 437:15

**full** 322:3

**fully** 374:8

**fumble** 287:7

**function** 414:4

**future** 388:24

**G**

**gained** 396:13

**gather** 347:20 414:5

**gathered** 226:7,25 227:16,18,21 232:18 241:24 364:20 386:2

**gathering** 346:14

**gave** 346:16 411:24

**gears** 326:11

**general** 293:22,23 300:1 301:1,3 303:24 326:22 330:23 346:24 348:21 351:14,18,19 378:4 381:21 383:8 390:3 393:4 401:7 406:5 421:10 425:2,4

**generally** 234:1 239:20 240:24 256:5 285:13 286:4 297:24 305:11 318:9 331:8 339:2 346:25 347:14 364:21 384:1,20 385:7 386:3 387:6 408:23 420:16 423:14 428:17 434:8

**generated** 305:10 335:25 348:11 394:10, 11

**generating** 369:3 399:4 400:3

**Georgia** 393:6 398:23 400:14

**Giacino** 226:9 230:10, 15 232:19 233:1,7,16, 22 234:1 244:1

**GIFTS** 267:24

**Gillespie** 309:10

**give** 228:18 246:2 260:19 286:11 289:13 301:18 309:1 317:1 344:21 355:9 392:2 422:1

**giving** 234:2

**global** 234:23 269:23 272:10,22 273:4,22 274:13,25 275:5,14 332:2,12 365:12,18 366:1 372:10 376:2 377:4

**glossary** 295:2,6,9,10, 13 296:1,6,12,16,19

**good** 225:3,23,24 310:15 313:16 322:22 337:9 338:1,3 407:18 425:19 439:3

**grabbed** 313:4

**great** 425:17

**Greenwood** 222:6,16

**grid** 305:10,17

**grids** 305:4,6,13 362:2 402:21 403:2

**group** 238:19

**GRRS** 273:9,14 274:17 276:3,12,13,19,20 277:16,20 278:2

**GRS** 277:23

**guess** 235:23 281:16 330:11 341:24 379:17 380:7 428:1

**guessing** 237:4 239:5 354:15 367:24

**guided** 353:24

**guideline** 272:1,2,3,7 329:22 330:6

**guidelines** 317:15 333:23

**guys** 439:1

**H**

**half** 233:2 360:15

**halfway** 262:21 272:19

**hammer** 440:1

**hand** 232:15 247:14 249:2 280:21 431:18

**handed** 432:4

**handing** 260:24 311:4 416:17

**hands** 379:2

**hands-on** 235:22,24

**happened** 236:11 285:12 324:24 369:22 376:4 378:20 396:22 397:18 399:8

**happening** 282:19 382:8

**hardcopy** 299:1 304:19 314:8,22

**harmonization** 273:16

**Harris** 270:23

**Harrison** 222:6,17

**hate** 392:2

**Hayes** 260:15 261:8

**hear** 339:13

**heard** 240:20 281:13 305:12,13

**heart** 421:21

**held** 253:9 270:4,7 286:6 292:18 294:7 331:15 346:25 388:4 423:21 433:15,24 434:5,8,12,16

**helps** 331:25 341:12 377:24

**Hicks** 332:1,4,7 335:5 346:16,24 347:6,21 348:3 349:1 353:17 354:17 356:1,3,10 361:6 363:5 364:1,7,11 365:10 366:5 368:15 372:15,17 374:7 375:5 385:5,16,17 386:12 388:17 397:5

**Hicks'** 368:2 397:16

**Hicks's** 351:24

**highlighted** 426:24

**hired** 364:23 394:25 411:10,12

**historical** 242:22 266:20 406:13

**histories** 318:4 320:1 323:24

**history** 247:7 257:11 307:6 308:5,15 317:22 318:9,25 319:9 321:22, 23 322:3,10 323:1,4,11, 15,16,17,20,22 324:3, 14,19,22 325:1 354:6 409:5

**hit** 424:2

**Holbrook** 236:16 238:1

**hold** 227:6 253:10 254:23,24 255:13 282:11 286:7,18 295:17 297:21 299:15,24

300:7,16 301:23 303:3 305:24 340:19 365:16 367:15 368:18 369:9,16 370:24 389:5,12 392:14 394:18 397:5 403:8,10, 11,17 405:5,13 408:14, 18,21,25 409:2 410:14, 15,20 411:19 412:4,22, 23,25 413:1,9,12,23,24 417:20 418:1,4,24 419:5,9,15 420:15,20 421:13 422:8,24 423:11,16 424:4,21 425:11,12,22 426:3,6, 22 427:17 429:22 430:1,5 431:14 432:4, 15,17 433:1,4,15 434:17,24 435:16,20 436:4 437:1 438:1,14, 20

**holding** 369:10

**holds** 226:16,17 227:4, 6,8,11,13 228:19,22 241:24 242:8,15,18,22 243:4,7,13,14 244:14 245:6,17 252:13,25 300:4 368:18,23 369:1, 14 370:12 388:3 389:18 403:23 405:19,23 408:8 409:5,14 410:13 412:14 413:15,17,21 414:4,5,9, 10,15,18,25 415:2,7,12, 14,16,23 416:2,8 418:7, 11 419:22 423:8,16 425:6 429:8 430:25 431:3,20 433:11,17 434:4,13,25 435:10,12

**homework** 392:2

**Hong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 333:25 336:3,22 336:6 339:9,20 382:10, 17 417:21 424:25 431:6 438:2,3,18

**hour** 222:4 233:2 267:4

**hours** 230:25 243:21 388:11

**housekeeping** 312:5

**Hozeny** 410:4 422:24, 25 424:21

**hundred** 280:20

**hygiene** 236:5

**hypothetical** 259:25

**I**

**idea** 236:10 252:20 253:11 367:23

**identical** 346:12

**identification** 232:5 242:6 246:6 247:18 248:1,25 260:23 289:6, 19,21 311:2 381:7 404:16 416:15 425:24 429:25 430:4,10 431:16

**identified** 382:19 426:23 427:15

**identify** 224:24 235:8 286:12 300:10

**II** 224:15

**imagery** 314:10

**images** 314:13 315:2, 18 340:11,12 354:25 362:10,22

**Imerys** 222:20,21 224:17 225:4,5 337:23 349:24 350:2,4

**immediately** 310:7

**impacted** 328:22

**implementation** 298:9

**implication** 294:19

**important** 344:18

**imposing** 410:21

**in-between** 277:21,22

**inbound** 399:2

**include** 274:4,5 300:5, 9,13 304:11,18,22 312:4 314:9 315:2,3,18 316:4 318:15 328:24 339:23 348:18,19 351:21 372:25 383:13 390:7 399:20 407:8 424:7,10,11

**included** 232:17 235:2 282:11 304:21 314:5,14

316:5,17 348:17 351:17 362:24 363:15 364:9 370:6 400:4 421:13 422:8

**includes** 254:16 281:3 306:8 314:18 315:14 319:1 321:7,25 349:11 367:12 401:21 427:1

**including** 279:7 304:19 314:8 358:7 376:14 378:1,13

**inclusive** 316:1,6

**incorporating** 413:22

**indefinite** 365:5

**indefinitely** 375:25 388:23

**independently** 239:13 267:24 326:7

**index** 262:20

**indexing** 237:11

**India** 372:8 376:15 377:10 382:9

**indicating** 322:21 380:6,17 386:21

**indication** 292:14 331:14 437:6

**indicia** 239:11

**individual** 285:25 328:11 417:25 435:20 436:12

**individuals** 421:4,7 427:15,18,21 428:22 436:3,12 438:3,11,17

**industrial** 236:5 415:9

**Industries** 358:18 405:10

**infer** 264:7 397:15

**inference** 330:12

**inferred** 397:17

**inform** 280:4

**information** 226:12 229:9 231:3 232:18 233:18,24 235:9 236:18 239:16,17,20 240:14,16

241:1,14 243:6 245:5 246:25 247:22,23 248:10,14 249:6,11,22 250:7,19,20 251:6,8,14 252:10,13 253:6 254:21 255:1,6 265:17 270:3,5, 7 277:25 278:7 280:15 281:16 282:14,20 284:15 286:2,3 287:6 288:2 289:9 291:1 292:3,9 295:2 296:5 301:14 303:8 306:6 311:11,13 312:5 313:12,24 315:13,17,25 316:2,4,7,16 318:22 326:8 331:5,7 333:2,22 334:23 335:4,8,20 339:17 347:20 354:14 355:3 361:17,24 363:20 368:17 373:16 374:21, 23 375:25 376:3 378:7, 21 381:20 385:11 387:8 388:21 389:3,10,20 394:7 396:12,24 402:19 403:2,3 405:22,24 407:6 408:9,18 412:3 417:19,23 418:3,19,22 419:22 421:6,25 422:20 424:12 425:10 433:14 434:5,13,15,19 435:25 436:15,20

**initial** 230:7 248:19 280:16,17,23 281:4 283:22 351:21

**initially** 234:4 375:5 384:14

**injury** 435:1

**input** 317:1 376:3

**inquiries** 244:11,12

**inserted** 316:11

**inspection** 357:25 358:9

**instance** 238:13 298:1 341:22 346:15 363:4 365:9

**instances** 374:15 385:10

**instituted** 281:17

**instructed** 434:17

**instruction** 301:25 408:15

**instructions** 299:14 300:2,5,10,13,25 301:7 302:4 414:22 421:13

**integrated** 267:16,19

**intended** 389:25

**intentions** 253:24

**interested** 331:18 375:9

**International** 275:1

**interpret** 313:21,23 344:1 346:3 391:22

**interpretation** 304:17 361:13 399:6

**interpreted** 237:7 348:6 368:11

**interpreting** 347:18

**interval** 356:3

**intervals** 388:15

**interview** 226:11 230:19 233:22 243:12 262:18 278:20 395:3 415:18

**interviewed** 257:21 303:12 308:20 309:20 346:15 380:14

**interviewing** 386:2

**interviews** 226:9 278:10

**introduced** 229:25

**introductory** 318:21

**inventory** 285:16 347:11

**investigated** 411:22 412:8

**investigation** 412:2 415:25 416:10 418:2

**involve** 234:25 351:15 375:11

**involved** 235:21 264:18

**involvement** 231:8

264:14 367:25

**involving** 417:11 420:6

**Iron** 401:9,15 402:1

**issue** 274:24 326:12 344:9,18,23 355:21 404:6 411:22 419:14 421:18 423:13 439:6

**issued** 307:3 408:22 410:15 413:1,13,18 414:19 419:15 426:22 427:10,17 429:15 431:5 435:1 437:1,2 438:14

**issues** 227:12,25 266:5 344:5,10 345:1 349:8 395:13,14 396:16 411:20 412:17 414:20 419:21 421:16 429:4 440:22

**italicized** 295:22

**items** 245:16 351:25

**J**

**J&j** 294:17 330:21,22 335:25 336:3 339:5,9 376:13,14 422:11 440:18

**J&j's** 338:10

**Jaffe** 223:8

**James** 222:1,9 224:14 225:14 268:13,20 310:19,24 371:5,11 407:21 408:2 441:1

**January** 307:21 313:17 420:1

**Jersey** 399:9

**Jervis** 396:1

**Jim** 223:10 224:5 379:6

**JJCP** 417:7

**JJCPI** 420:5

**Joan** 278:20

**Joann** 278:20 283:15 421:24

**job** 279:24 280:18

**Johnson** 223:1 224:16 225:8,13 239:3 240:20 242:15 243:5,6,18 244:1,2 247:21 248:15 249:5,10,23 250:18 251:4 252:11 253:17 256:3,20 257:3,4,5,6, 12,13 258:16,22,25 259:11,18 260:2 261:23 262:25 263:1 265:7 267:20 268:25 269:2,3, 21 270:15,16,17,21 271:20 272:2,3 273:11, 12,19,20 274:15,16 275:1,2,12 278:4,5,11, 12 279:5,15 280:7 281:1,2,7,8,17 289:8 294:22 301:21 306:18 310:11,12 311:10 316:3,19 325:5,20,21, 22 327:3,4 329:5,12 330:2,3,16 333:3 334:18,19 344:25 348:12 350:23 354:13, 14 355:3,12,13 356:15 358:20 360:4 362:12 364:22,24 373:10 383:22 384:3 387:9 389:11 393:18 394:2,3 395:1 402:19 405:8 409:13,14,24 410:25 411:11 412:18 413:11 414:19 415:7 417:8,15 418:6,7 419:13 420:17, 23,24,25 422:25 424:24,25 426:2,3,7,12 427:1,2,4,5,10,11,16 429:16 430:6,7 431:5,6, 9,10 433:19 435:18 436:1,9,12,13,16,17 437:1,2,7,10,21,25 438:2,6,8,9,17,18 440:2,3

**Johnson's** 243:18 247:21 249:5,10 250:18 251:5 257:8,14 260:2 326:19 339:19 343:16, 24 347:4 353:3 355:4 358:19 362:3 364:22 383:23 384:25 389:14 393:1 400:21 402:10,19 409:24 410:1,2 415:8 417:4,14 419:13 420:10 426:7 430:15 433:19

**join** 350:15

**Jonathan** 223:8

**Judy** 327:19

**July** 249:7 288:3 290:5, 12

**jump** 247:13 319:24

**jumping** 332:3

**June** 260:14

**jurisdiction** 402:2

**K**

**Kaiser** 364:11 421:19

**Karen** 274:23 303:12, 16 316:22 317:5,16 322:17

**Kate** 309:10

**Kazan** 222:5,16 224:12, 21

**keeping** 368:10

**key** 236:8 237:20 238:5

**kind** 237:11 241:4 260:8 303:22 305:16 339:3 348:4 350:7 354:11,15 355:18 360:21 384:15 389:3,13 390:13 397:5 415:6

**kinds** 316:7 408:16

**kit** 299:10,12,16,20 300:1,21 301:6,17 306:5,12 312:18

**kits** 310:12,13 312:4,10 313:18

**knew** 238:3 306:3 334:13,14

**knowing** 334:19,20

**knowledge** 235:13 236:7,15 237:20 244:21 265:24 266:4,9 267:1 283:10,25 293:22,24 300:1 301:1,11 303:24 330:23 361:23 389:19

**knowledgeable** 429:3

**Kolmar** 396:1 398:23

400:4,13,19 402:3,4

**Kong** 275:2 294:17 326:16 327:4 328:23 329:23 330:22 331:19 332:20 334:1 336:3,23 338:6 339:9,20 382:10, 17 417:21 425:1 431:7 438:2,3,18

**Korea** 326:21 329:1 331:19 332:21 333:25 431:9,12

**Korean** 337:1 339:18

**Krushinski** 409:18 416:22 419:9 433:17

**L**

**laboratories** 364:5 396:1 400:19

**lack** 303:2

**lacks** 350:16

**Langley** 222:7 224:8

**language** 248:5 250:11,13,25 296:8 319:4 420:18 423:15,23

**large** 263:13 278:11

**latest** 322:15

**launched** 267:12

**Laura** 226:9 230:10 232:18 233:1,16 244:1

**law** 224:12,22 243:23 308:15,17

**laws** 248:12 250:6,21 251:9

**Lawson** 418:10,18

**lawsuit** 417:11 420:6

**lawsuits** 429:16

**lawyer** 290:22

**lawyers** 325:13

**lay** 379:2

**lead** 418:19

**learn** 436:21 438:4

**learned** 232:23 278:10

356:1 374:2 396:9

**leave** 387:5

**Leavitt** 224:15 226:4,13 228:8 231:6,9 232:24 233:14 234:6,12 236:5 244:16 246:22 326:15

**led** 234:1

**Lee** 363:13 365:9 366:4, 15,20 372:1,7,9 374:22 385:17 407:8

**left** 291:21 367:13

**legal** 226:16 227:13 243:7,12,14 251:9 252:12,25 253:10 254:23,24 255:13 282:11 286:7 297:21 299:24 300:4,7,16 303:3 340:19 367:15 369:9,14,16 388:3 394:18 403:7,10,11 405:13,19,23 408:14 410:15 413:2,9,12 414:23,24 416:8 418:12 420:15,20 421:13 422:8 424:21 426:22 427:17 432:15 433:4 436:5 437:1

**legend** 234:18

**length** 237:10 260:18 390:12

**lesser** 280:21

**letter** 238:15

**level** 238:19 256:17,19 320:20 349:23 394:15

**levels** 384:5

**liability** 431:25

**life** 259:16 342:22,23,25 343:1,4,9,10,17,19,21, 22 345:9 346:13,20,21, 22 347:1,3,15,16,18 349:22 352:15,18 353:5,10,19 354:17 383:6,10 384:20,23 385:8 387:2

**life-based** 386:19

**limit** 253:9

**limited** 315:14 316:5

440:7,22

**lines** 269:11 271:6 281:25 317:12 347:10 367:5,8 372:6 397:9

**Lisa** 364:11 421:19

**list** 226:16,17 238:2 241:24 242:8,14,21 246:11 295:13 300:5 358:24 379:2 380:1,2, 13,15 381:19 409:13 419:8,10 424:5 426:18 428:18 430:23 431:20 432:25 435:22 437:8

**listed** 245:19 306:6 308:10 410:3 427:19,21 428:15

**listing** 437:13

**lists** 298:20 300:3 379:6 381:11,13,14,16 418:13,25 419:3

**litigation** 242:16 243:8 403:12 405:5 409:14 410:25 411:4,6 412:17 413:12,17 415:7 419:15 431:21 432:4,16 433:1, 5,15 434:24 435:16 437:2 438:1

**LLP** 222:23 223:3

**locate** 244:13 287:17 332:18 389:1 416:12

**located** 256:11 268:25 333:22

**location** 224:11 241:20 302:16 349:2

**location-specific** 331:13

**locations** 264:17 326:20 331:12 349:6

**long** 230:24 233:1 253:9 259:13 270:8 283:3 306:19 312:20 331:14 343:23 347:3,18 352:21 353:1 355:16 358:14 366:24 377:18 387:11 392:10 408:17, 18 428:18

**long-term** 352:12

**longer** 299:23 301:8 313:13 323:21,23 324:16,23,25 325:1 347:16 402:10 412:24, 25 414:11

**looked** 236:17,24 237:5 238:1,3 338:13 353:10 388:12

**loop** 339:4

**Lorena** 364:13 391:5 395:3 397:6 400:1

**loss** 412:17

**lost** 259:19 332:11 398:4

**lot** 266:22 268:7 320:2 322:12 344:3,9 352:2 372:24 386:12,18 406:7 409:9

**lots** 348:7 354:7 386:17

**loud** 248:9

**lower** 357:7

**LP** 342:17,20 346:12

**lunch** 337:10,14 338:2

**M**

**Macarthur** 222:23

**Madam** 238:7

**made** 226:17 246:20 251:18 283:7 317:2,3 319:3,7,20 320:9,10 322:13 325:3 336:17 352:21 353:2 356:10 388:17 389:22 407:5 426:12 436:5

**magnetic** 315:15

**maintained** 259:15 316:3 358:11 366:13 384:10 418:25

**maintaining** 335:20 397:10

**maintenance** 262:1

**make** 232:11 252:23 261:16 272:19 320:24 325:13 337:17 346:13 359:13 361:11 374:7

386:8 409:6 420:13 421:20

**makes** 240:25 391:21

**making** 260:3 262:14

**manage** 250:20 326:7

**managed** 248:11 367:19

**management** 246:25 247:22,23 248:14 249:6,11,22 250:19 251:6,14 252:20 267:16,19 278:22 282:8 287:6 288:2 289:9 291:2 292:1,2,10 295:2, 25 296:5 311:11,13 318:22 368:17 373:5 376:17 384:6,7 418:19 421:16 422:11

**manager** 285:17,18 300:11 303:17 334:4 421:15

**managers** 257:22 285:20 302:23

**managing** 250:5 251:7

**mandatory** 269:25 270:11,15 271:15,16, 22,25 272:11 273:17 275:20 276:21 277:20 280:19,23 285:14 298:14

**manufacture** 343:24 358:12 404:20

**manufactured** 326:20 358:15 395:12 405:9

**manufactures** 343:11

**manufacturing** 257:7 270:20 279:7 334:8 340:25 341:14 346:18 347:11 348:4,8 349:2,9 353:12 354:18 358:8, 10,19,23 359:5 360:9, 25 363:1,5,18 365:22 368:1 372:10 375:7,12 376:10 377:3 386:10 387:1,4 392:25 393:16, 19,22 394:8,11,20 395:5,22,25 397:23 398:14,25 399:4,10 400:2,16,21 401:4

402:5,10 417:12 420:7

**manufacturing-related** 387:18

**map** 315:15

**mark** 222:16 225:1 231:23,24,25 242:3,4 246:1,2 247:6 248:22 251:21 267:2 288:6 289:3 348:23 364:12 367:4 368:21 370:4 380:25 392:17 399:14 431:14

**marked** 229:25 232:5,9 242:6 246:6 247:18 248:1,25 249:3 259:6 260:23 271:24 287:16, 18 289:6,10,19,21 290:2 311:2 318:2 347:7 359:19,22 379:18,19 380:18,20,24 381:7 410:10 416:15 425:21,24 429:21,25 430:4,10 431:16

**marketing** 240:24 257:7 260:4 270:20 279:6

**marketplace** 342:23 347:13,19

**marks** 268:12,19 310:18,23 371:4,10 407:20 408:1 440:25

**mashed** 384:15

**master** 354:5

**match** 361:5

**material** 234:25 239:24 263:15 316:11 341:14, 24 342:14 343:19 345:10 349:24 353:12, 24 354:1,8 401:8

**materials** 226:7 227:16 234:12 240:2 244:22,24 246:13 258:10 271:3 286:12 291:17 297:7, 13,17 298:7 302:8,10, 13 331:14 335:6,15 337:3,5 346:19,25 369:17,18 377:1 390:5 401:10 410:19 412:10, 13 423:21 424:5

matter 403:19,20

matters 424:6 433:13 440:6

Mcclain 222:5,16 224:12

Mcelroy 224:16

Mcneil 258:1 263:7,18 264:6 265:2 390:16

Meagher 223:3

meaning 279:20 376:3 411:1

means 275:10 277:13 297:3,4 298:14 343:20 346:4 366:6 378:12 391:23 420:14

meant 264:9 276:4 310:6 312:24 345:10 353:20 384:12,13

measures 357:25

mechanism 254:8 416:1

mechanisms 254:19

media 268:13,19 299:1 304:15,18 310:19,23 314:8,13,19,21 315:4, 24 371:1,4,10 407:21 408:1 441:1

members 364:8

memory 230:2,8 235:18 240:12 372:16

memos 312:4

Mendez 428:25

mention 266:23 430:19

mentioned 245:16,20 259:2 262:11 302:3 317:5 341:25 346:11 364:13 374:13 381:16 388:2 391:11 400:13 414:14 415:2 438:10

mentions 417:14

mesothelioma 227:12 409:22 435:2,13

mesothelioma-related 433:12

meta 240:8

methods 299:22 306:8

Michelle 257:23 390:20

microfiche 315:15 316:16

microfilm 315:15 316:15

microphone 408:11

microscopy 305:11 340:11 362:2,10 402:22

Microsoft 238:17 365:4

migrated 367:13

milled 341:10 355:19 356:17 360:12 362:4,11 389:15 403:5 406:2

mind 371:22 395:2

mine 349:23 350:9,21 351:6 367:10,17

mineral 339:25

mines 222:20 225:6 350:10,20

minimum 298:8,9 306:6 313:25 342:11,15

mining 372:5 376:17

minute 331:2

minutes 439:15

mischaracterizes 253:15 366:17

missing 236:17

Mississippi 429:12 430:6

misspoke 336:16

Mittenthal 222:1,9 224:14 225:14,23 231:25 268:14,20 310:20,24 311:4 338:1 355:9,23 371:5,11,14 379:6 381:2 392:18 407:22 408:2,5 441:2

model 277:23

moment 336:1

morning 225:3,23,24 290:19

Mountain 401:9,15 402:1

move 263:22 267:2 268:5 337:7 356:12 361:14

moving 317:17,18 439:2

Mswanson@ kazanlaw.com 222:18

multiple 242:1

Mumbai 376:15

museum 406:14


N

named 226:10 238:4 328:11

names 236:8 237:20 238:2,12 256:22 379:11

natural 330:12

nature 320:19 440:6

necessarily 240:6 254:7

needed 367:14 369:9

Neil 265:3

network 237:1 238:16

Newport 222:24

Nicholas 328:11 332:5 364:12 370:22 372:3 373:3 382:19

nonparticipation 284:6

nonresponsive 263:23 337:8 361:15

normal 326:8

North 349:1,5 394:21 395:5,22 396:17,19,23 397:13,19 398:23 399:9 400:13

notation 239:6 352:3 383:5

note 247:6 271:1,5 316:10 360:1 363:23 367:25 373:22 381:21

noted 263:3,5 322:17 345:18 382:20,21 403:19

notes 231:10 235:17 244:3,8 245:21 246:20 247:20 252:1 260:7,12, 13 261:7,22 262:20,24 263:16 265:23 266:2, 15,17,19 267:8 270:22 278:16,18,25 279:25 280:25 281:10,14,21 284:24 285:3 287:14 293:23 299:15 303:15 309:4,5 316:22 317:9, 19 319:11 325:7,10 326:6 327:8,15,24 331:9,21 332:19 338:20,24 347:22 352:10 356:2 359:7 361:19,22 364:3,15 365:6,8 367:17,19 368:15,20 370:11 371:21,25 374:7 375:9 378:2,5 380:10 381:12 387:16 390:14 392:23 395:2,4 396:6,7,24 397:4,22 398:2 400:1,8 418:9

notice 222:3 344:11 351:3 355:8 358:23 393:24 396:4 400:7,23 403:8,10 408:22 410:15,18 412:7 415:13 416:20 417:17 418:1 420:2,14,15,20 421:4,8 423:5 427:10,17 428:3, 22 429:1 435:20 436:4, 7,17,25 437:1

noticed 224:21 246:11 327:7 344:13 404:1

notices 340:19 403:11, 18 412:23 416:5 418:24 419:5 423:25 430:14 436:25

notified 438:21

noting 418:10

notion 383:10

November 409:18

416:21

**number** 224:15,18
236:6 246:8 249:3
250:3 261:15 263:13
268:13,19 278:11
280:21 287:18 290:5
293:5,7 294:4 298:18
310:19,23 311:21
321:24 322:16,23,25
324:14 325:5,16,17
359:23 371:10 377:5
407:21 408:1 416:17
422:1 440:5 441:1

**numbering** 317:10
324:5

**numbers** 290:20 357:6,
19

---

**O**

**Oakland** 222:6,17
224:13

**oath** 226:1

**object** 228:9,14 237:13
240:18 241:8 242:17,23
243:9 244:4,18 249:24
250:9,23 253:14,21
255:3,15,23 256:9
257:19 258:19 259:23
264:15 265:20 266:6
267:21 269:4 270:1
273:8,24 274:10
275:16,25 276:5,15
277:10 278:14 283:5,17
284:3 286:9,23 287:2
288:13 290:8 291:4
297:5,23 300:8,23
302:2 304:5,13 305:18
308:3 310:1 312:11
314:15 315:5 316:9
319:22 320:17 323:9,25
330:14 334:24,25
344:7,8 345:3 348:14
350:12 351:2 353:21
355:6,7 361:21 362:6,
13 365:24 366:16 369:4
370:1 383:15 385:1,14
386:5 387:14 388:13
389:17 392:15 395:6,9
396:3 397:25 398:16
399:22 400:6 405:11
412:6 414:1,13 421:9
423:18 428:5 431:23

434:1,6,21 440:3

**objection** 350:16
370:18 393:23 397:1
400:22 402:14,23

**objectives** 280:3

**obligation** 409:1 413:6
414:24

**obligations** 415:13

**observed** 412:10

**obtain** 227:1

**obtainable** 235:10

**obtained** 226:15 229:1
406:14

**occasional** 386:20

**occasionally** 233:24

**occasions** 412:9

**occurred** 386:17

**October** 222:4 224:10

**odor** 351:16

**off-site** 237:12,16

**offhand** 330:5

**office** 238:17 263:5
301:21 302:15

**officer** 421:11

**officers** 285:21 300:11
303:13

**offices** 222:5 230:20
243:23

**oldest** 256:14,16
329:10

**on-the-ground** 234:25
235:2

**onboarding** 281:3

**ongoing** 245:10 363:18

**op** 317:13

**operated** 301:2

**operating** 241:5
252:16 271:11 273:20
274:15 275:11 277:2,4
292:16 294:22 298:11,
24 330:8 331:16 338:10
417:16,21 420:23

424:23 427:16 430:23
436:1

**operation** 264:11,12
306:1 399:10

**operations** 331:24
390:7

**operative** 277:15

**opinion** 344:21

**opportunity** 247:4
286:11 440:19

**opposed** 239:12
241:19 267:24 270:10
309:25 318:11,13
372:18 386:10 392:11
423:24

**opt** 277:5

**optical** 315:16

**option** 251:17 277:16

**order** 278:5 381:19
428:19

**ore** 341:10 356:17
360:12 362:4,11 389:15
403:5 406:1

**organization** 239:12
292:17

**organizational** 297:16
298:5

**organizations** 363:13

**organize** 294:7,8

**organized** 286:14
294:7 297:8,10,15

**original** 230:1 231:10
240:1 403:17

**originally** 240:9

**originals** 299:2 314:22

**OUS** 437:12

**ovarian** 432:4,16,21
433:15

**overarching** 307:9

**overseas** 274:5,14
331:24 338:25 417:21
424:23

**oversee** 285:17

---

**P**

**p.m.** 310:23 337:13,16
371:6,9 407:23 408:1
440:18 441:3,6

**Pacific** 327:4,10 328:3,
18 329:17,23 332:20
337:6 338:6

**packaged** 326:20

**packaging** 358:8,18,
19,24 377:1 402:5

**pages** 232:7 288:8,10
293:9 307:16 317:23
318:8 319:7 331:23
357:13,15 360:15

**paginated** 261:12
270:25 309:4

**Pai** 236:16 237:25
238:24

**Pam** 230:16 231:6
232:9 383:19,21 386:22

**Pamela** 226:9 230:9,16
233:11 243:25

**Pankaj** 364:12 375:18
383:4

**paper** 294:5,8 299:7
301:20 302:5,8,13
306:13 315:14

**paragraph** 320:4,5
327:20 417:6

**Pardon** 288:21

**parentheses** 365:20

**Park** 364:13

**part** 239:12 250:18
312:18 334:15,20 356:6
365:2 369:7 377:1
380:9,15 381:13,14,16
382:11 393:14 395:18
408:6 415:25 416:9
418:2

**participate** 280:14

**participation** 279:11
283:9 306:17

**participatory** 285:15

particulars 247:1 265:1 277:1,6 283:12 390:23 391:2

parties 224:23 364:23 384:10

Partridge 223:10 224:5

parts 365:8

party 363:12 417:11 420:6

past 248:18 303:12 314:1 407:4

Pay 238:24

peel 260:8

penalties 410:21

people 235:5,11,21 240:4 241:2 254:24 255:6 261:24 262:6 266:25 278:7,11 280:10,18 282:23 285:3 330:24 346:15 364:10, 16 368:16,21 380:3,13 381:13,16 385:7 396:10,13 415:16 428:2,10,13 434:17

people's 240:12 364:1, 14

percent 279:11,14 280:10,20 283:1 284:9

perform 239:23 279:13 284:11,14 363:14

performed 236:14

period 227:4 228:18,19 229:23 244:8 258:17 276:8,11 286:19 292:9 303:2 313:14 336:7,15 343:10 346:9 347:12 352:5 373:19 383:5 400:20 403:4 404:19

periods 265:10 270:2 272:21 335:4 356:23 368:18,19 370:11 371:18 387:12,22 388:1,19

permanent 352:15 353:8

permission 281:20

permitted 440:21

persistent 239:21

person 265:24 266:4 274:9,19,20 283:15 325:12 383:21

Personal 360:5 427:3,7

personally 222:8 416:2

personnel 416:1

perspective 334:7

pertaining 292:17 323:11 417:3 424:20

pertains 299:6 314:24

PETER 222:1,9 225:14

Pharma 350:4 358:17 405:9

Philippines 275:3 294:17 326:13 327:3 328:14,23 329:5,12,17, 24 330:3,21 331:19 332:20 333:25 335:22, 25 336:20 338:6 339:6, 20 382:10,17,20 417:22 424:25 427:11 431:6 436:9,13,17 437:3,7,10, 21 438:9,18,22

philosophy 251:5 325:23 326:1,3,4

phone 223:3 233:23 373:8

photograph 315:15

photographs 316:16

photomicrographs 362:23

phrase 251:16

physical 236:22 303:25 304:1 305:16 335:13 367:12,22 368:9,10 369:23

physically 235:15,22

piece 270:5

pieces 331:21 365:7

pile 359:17,20

piped 233:24

PL 431:21

place 230:12,19,21 241:1,13 253:10 277:3, 4 294:4 332:18 361:9 370:21 372:2 387:11 393:15 398:1 405:6

places 341:1 342:8 371:25 374:21 387:15, 17

plain 346:2

plaintiff 224:22 245:10 435:14

plaintiff's 232:4 242:5 244:15 246:5 247:17,25 248:24 260:22 289:5, 18,20 311:1 381:6 416:14 425:23 429:24 430:3,9 431:15

plaintiffs 222:15 225:2 227:9 228:7 242:12 244:22 256:2,7 411:17 412:19 440:17,21

plant 359:9 395:23 396:18 399:9 401:22

plants 399:1 401:23

platform 385:12

platforms 262:1

PMQ 400:16

PO 398:10

point 228:8 263:17,19 268:1 272:16 273:16 276:21 280:13 283:7 284:5 301:2,12 303:21 305:15 308:8,14 309:19 310:15 317:11 325:11, 12 345:13 349:5 350:20 357:1 392:11 405:4 420:17 422:16 424:14 439:4

policies 227:17 241:10, 14 244:24 245:17 246:25 248:15,17 253:7,23,25 254:7,19 256:8,11 257:17 258:6 271:15 278:7 279:16 287:7 290:18 291:2,6,9, 19 292:25 305:14,15

316:21 317:2 320:10 328:21 329:2 332:16,22 333:23 334:21 338:4,7, 9,14 339:5 340:21 346:6 354:21 355:4 364:22 368:19 371:20 383:1 385:23 387:11 393:15 394:16 402:20 405:25

policy 245:5 248:7,14, 19 249:6,7,11,13,22 250:2,3,8,11,12,13,15, 19,22 251:7,10,13 252:15,21 253:2,12,18 254:2,3,4,10 255:11,25 256:14 258:4 259:21 278:13 281:18 285:23 288:2 289:1,9,17,23 290:6 291:2 292:10,14 294:13,14 295:5 302:20 303:5,11 304:8,24 305:3,5 306:1 307:9 308:1,8 309:22 312:19, 24 313:19,20 314:1,5, 14,17 315:10 316:1,6 318:5,11,20,23 319:1,4, 8,11,17,20 325:6,16 329:8,9,10,15,16 330:20 336:3 341:13 353:19 356:16 360:11 363:21 368:25 369:1 382:7 385:25 389:4,7 390:12,14,17,24 391:3, 6,13,15,17 392:9 393:9 394:9 405:14 407:2 418:6

Port 396:1

portfolio 377:2

portion 311:6 398:24

pose 440:19

possessors 408:15

possibilities 277:21

possibility 277:22

possibly 316:23 379:4 390:20 421:19

post- 234:11

potentially 363:13 412:3

powder 257:8 260:4 264:14,20 279:8 326:19

339:19 343:5,16,24 347:4 353:3 358:19,20 362:3 384:25 389:14 393:1 400:21 402:10 403:6 405:9 409:24 410:1,2 417:4,14 420:10 426:8,9 430:15, 17 433:19

**practice** 267:25 335:19 374:4 382:7,13 385:21

**practiced** 382:9

**practices** 330:25 331:8,11 333:24 335:3 337:5 371:18 383:1 386:1 387:10

**pre2009** 317:16

**preamble** 250:15 318:20

**preceded** 381:22

**precise** 264:17 271:17

**preliminary** 388:10

**preparation** 260:14 261:8 356:7,8

**prepare** 262:4

**prepared** 261:7,22 345:1,6,9 346:7 409:4

**prescribes** 270:8

**presence** 363:11 371:17 393:11

**present** 223:7 226:10 233:7

**preservation** 385:9 416:20 417:17 420:1,14 423:5 428:3

**preserve** 252:22 255:14,17,19 408:16 410:19 411:18 434:17

**preserved** 259:19 363:19 424:6

**preserving** 412:10

**pretty** 284:2 379:20 406:17 433:24

**previous** 321:14 371:24

**previously** 222:10

225:15 227:9 229:24 234:24 242:11 246:15, 17 410:23

**primarily** 294:5,8

**primary** 361:23

**principal** 384:2

**principles** 292:16

**print** 248:23

**printed** 379:24

**prior** 229:17,24 243:7 244:6 247:2 248:17 249:17,19 262:15 267:19 271:22 272:10 275:19 284:18 291:19 292:10 293:20 294:1 318:18 320:16 350:9 359:2,11 360:9 373:19, 23 377:25 378:13,18 382:15 385:21 386:17, 20 389:12 390:8 392:25 413:24 434:25 436:25 437:5

**privy** 245:9

**problem** 354:12

**procedure** 241:5 252:17 303:14 358:3 405:2 416:5

**procedures** 253:24 254:9,11,12 271:11 280:4,5 282:12 338:5 416:6 422:9

**proceed** 225:21

**process** 281:3 341:20 342:7 346:19 348:8,20 351:20 358:11 363:3,5, 19 386:10

**processing** 372:5

**produced** 222:9 227:9 228:7,11,13 229:2,20 230:5,6 242:11 245:5 246:12,15 256:8,12 268:25 269:2 288:6 290:18,24 291:10,11 327:2 329:9 338:8 339:16,17 410:7,13 413:10

**product** 341:9 342:3, 22,23 343:4,9,10,12,15,

17,19 345:10,16 346:20,21,23 347:1,13, 19 352:15,18,21 353:2, 11 358:15,16 360:12, 22,23 362:12 371:17 374:12 384:20,24 387:3,7 393:11 395:12 401:17 404:12,15,17,19 406:4 417:14 420:8 423:13 426:12 431:25

**production** 223:10 224:7 230:7 234:8,13, 23 236:6 383:23

**productions** 384:5

**products** 256:21 257:13 259:1,11 260:2 270:21 271:20 272:3 273:10 279:7 330:17 341:9 355:20 370:15 389:15,16 417:9 421:1 423:14 427:3,4 430:16, 20

**program** 247:23 251:17 272:21 274:19 276:2,11,13,18 279:1,2, 3 295:2,25 296:6 421:12

**programs** 278:7

**proper** 239:3 306:8 354:16

**protect** 250:20

**protected** 248:11

**protecting** 250:5

**provide** 228:1 296:19 334:23

**provided** 233:19 244:22 245:1 246:24 256:11 258:7,8 288:7 295:3 296:4 299:16 300:2,3 357:4 422:5

**provision** 369:15

**provisions** 252:5 361:7

**PTI** 352:4 358:11,14,18 359:3,5,9,21 360:9 392:25 393:17 394:3 404:2

**pull** 259:7 347:8

**purity** 398:19

**purpose** 226:11 241:15,18 280:2 286:10 297:12 298:4 390:4 391:16

**purposes** 406:11

**pursuant** 222:3 297:20 303:11 413:1,23

**purview** 266:11

**put** 231:25 237:3 240:8 241:5 260:9 263:12 287:11 302:15,20,24 317:14 385:11 401:8 409:11 415:7

**puts** 305:22 410:18

**putting** 337:21 382:14

**Q**

**QA** 358:9

**qualified** 224:5 361:8

**quality** 341:1 342:2 346:17 349:8 356:25 357:2,3,5 358:2 364:8, 17 368:1 372:12 373:4 376:10 398:10 405:1,2 427:7

**quarterly** 363:14 364:24 365:12,18,19 366:1,23 367:10 368:12 369:19 370:6,12 371:15 372:1,7,19 373:14 374:5,20,23 375:2,13 384:11,13,17 385:18 386:13,19,24 387:17 406:3

**query** 332:21

**question** 226:19 229:11 242:24 244:20 261:19 266:8 271:14,18 282:13 290:22 296:9 301:14,16 316:25 327:5 334:25 344:8 353:22 355:7 361:10 369:5 373:25 374:2 382:1 392:4 394:6 395:16 400:18 402:4 414:2,18

**questioning** 355:8

440:17

**questions** 229:16
241:22 261:15 293:5
328:20 344:3,10 375:4
391:12 395:18 400:17

**quick** 308:25 337:18
374:7

**quickly** 377:21 424:9

**R**

**R&d** 240:24 263:15
340:22,24 352:11

**raised** 228:1 332:7
344:22 354:12 440:22

**range** 228:21 229:3
230:5 363:15 370:8
385:4

**raw** 376:25

**reach** 253:8

**reached** 252:14 253:5

**read** 226:20,22 238:8,9
248:9 256:24 257:1
304:23 327:23 352:23,
24 403:18 417:10

**reading** 350:3 354:4

**real** 408:6

**real-time** 262:5

**realize** 258:11

**reason** 255:13,17
261:14 301:10 303:3
438:22

**reasonable** 440:16

**reasons** 255:5

**recall** 233:3 248:21
272:13 275:4 281:11,12
304:6 328:4 340:15
411:20 435:9

**receive** 279:22 428:15

**received** 227:7 240:4
246:12 316:3 394:10,
11,13 413:6 420:24
421:4 427:18 428:3,10,
22 430:24 431:3 433:6
436:17

**receiver** 408:25

**receiving** 369:3 399:3
400:3 427:19

**recent** 251:20,24
311:18 328:25 379:13
392:9 432:21 433:6
435:18

**recently** 230:3 385:10

**recess** 268:16 310:21
407:24

**recipient** 430:22

**recipients** 418:1,4
428:24 436:4

**recognize** 315:24

**recollection** 233:15
264:4 265:22 414:3

**reconstitute** 320:15,24

**record** 224:4 225:19
226:22 229:25 238:9
247:7 250:18 251:5
252:13 253:5 257:1
262:5 268:15,17 269:21
273:22 277:15 280:4
283:23 288:1 290:23
291:19 293:1 295:1
305:2 310:20,22 313:11
315:8 333:6,9,12,19,20
337:11,12,15,22 338:2
352:24 354:5,6 358:17
360:10,18,20 365:2
366:11 370:25 371:6,7,
8 375:24 381:3,9
383:23 407:19,23,25
416:18 420:14 423:6
426:2 439:14,17,18,19,
20,25 440:24 441:2

**recorded** 315:17,25
316:2

**recorder** 371:2

**recording** 224:6

**recordings** 315:3

**records** 245:4 246:25
247:22 248:10,13
249:6,11,22 250:6,21
251:6,8 252:9 253:18
254:20 257:22 258:13,
15,17 259:14,17,21
261:25 262:9 263:15,17

266:17 272:4,11,20,22
273:4 274:13,19,25
275:5,15 277:18
278:12,22 279:1,2,3,16,
22 281:3,17,18 282:8,9,
24 284:1 285:6,20,21
287:1,6 289:8 291:1,10,
15 292:1,2,3,4,7,9
293:10 295:18 296:5
297:14 298:25 300:11
301:18,22 302:18,23
303:2,4,10,13 305:25
307:10,24 311:6,11,12,
22 312:10,14,24 314:5
315:13 316:4 318:22
326:8 329:22 330:1,7
334:9 347:11 348:3,7,
23 349:10,11 352:11
355:5 357:22 358:2,8,9,
10,14,22,23 359:10
360:4 366:12 367:12,
22,24 368:6,8,9,17
369:3 372:5 374:12
375:10 384:10 387:8
396:22 397:10,14
398:6,10,13 399:3,9
400:3,17 401:2,4,5,14,
19 402:7,11,13 416:1,7
418:18 421:11,12,15,16
422:11 424:19 433:23
434:4

**recross** 440:21

**recurring** 279:11,20,23
280:2,11

**redo** 297:19

**redundant** 320:4

**Reed** 236:16

**refer** 229:17 235:6
261:16 269:6 270:18,22
285:4 346:1 347:5
414:6,10 420:18

**reference** 239:13
262:14,25 266:18
272:14,16 278:15 284:8
285:5 291:24 294:24,25
296:1 299:9,13 309:7
313:8 321:12,25 323:3
325:4,21,25 327:13,14,
21 328:9 331:20 332:7
334:3 336:17 341:13
343:4 366:10,22 370:10
378:12 383:17 385:25

391:21 398:10

**referenced** 247:8
264:2 288:18 295:6
345:14 364:15 370:21
401:14

**references** 263:14
265:23 266:1,21,25
281:11,22 309:2 316:23
320:8,23 327:8,25
331:23 334:11 340:16,
17,18 371:21 374:10,17
375:10 382:25 387:19
388:17 390:19 424:12
426:9 434:25 435:3,7

**referred** 240:21 284:24
296:19 308:22 327:10
376:22 390:13,14
405:20 423:14 431:19
432:25

**referring** 237:8 247:8
250:14 251:1 258:23
273:2 276:2,7,8 282:8
293:13 296:1 312:9
344:20 349:10 353:1
366:23 377:10 392:6
401:10 404:11,12
422:17

**refers** 276:10 328:17
352:11 404:24

**refiltering** 234:24

**reflected** 244:2 293:23
322:20,23 324:15 331:9
338:20 351:13

**reflective** 356:9 415:12

**reflects** 324:23,25
325:1

**refresh** 230:2

**refreshes** 230:8

**regard** 344:10 364:11

**region** 334:5 336:15
337:6 376:4 378:3,5,6

**regions** 334:12 335:2,
9,13,20 338:11

**regular** 386:13

**regulations** 248:12
250:22 251:9

**reinforce** 280:3

**relate** 234:21 241:15 360:17 404:15 430:14

**related** 227:11 231:5,9 233:14 242:22 243:7 244:1 261:18 264:20 312:10 339:18,24 349:9 371:18 375:6 406:18 415:3,5 419:23 430:14 433:18 439:11

**relates** 434:8

**relating** 242:18 243:4 305:7

**relationship** 235:12

**release** 307:10 401:17 408:22,24 409:3 412:22 413:1

**released** 413:16 414:11

**releases** 413:10,12 414:9,15 415:1,5,6 418:11

**relevance** 440:8

**relevant** 240:14 334:22 342:9

**relied** 240:12

**relieved** 408:25

**remainder** 366:14

**remember** 229:14 281:6 332:21 342:17 390:11,15,25 416:4

**REMEMBERED** 222:3

**Remind** 230:16

**removal** 325:2

**remove** 317:17 325:4

**removed** 241:6 320:4, 23 321:15 324:15

**removes** 241:7

**Renay** 418:10,11,18,23

**reoccurring** 280:8 283:2

**replaced** 273:14 275:7 276:12,24 313:17

**report** 362:24 378:15

**reported** 306:17

**reporter** 222:8 224:8 226:22 238:7,9 257:1 352:24

**Reporters** 224:9

**reports** 246:19 306:19 340:9,10 341:14,25 342:14 343:20 345:11, 24 346:10 353:13,24 354:1,8 355:19 361:18 371:15 375:20 376:20, 21 377:11,15,24 378:19 382:4,14

**represent** 327:24

**representative** 264:9 265:6 333:3 334:18 355:11 387:9 394:25 419:14

**represented** 256:7 324:9

**request** 234:7,8 236:5, 6 243:1,3 296:21 407:5

**requested** 226:15 242:18 258:5,6 308:16 365:21 366:19 415:11

**requesting** 244:14

**requests** 234:13 244:15 345:24

**required** 270:7,12 279:22 280:17 354:19 413:5

**requirement** 252:14 253:5

**requirements** 248:13 250:22 251:9 277:24 294:21 298:25

**research** 258:10 291:16 344:2 360:24 395:2

**resides** 397:10

**resolved** 414:21

**respect** 231:12 232:9 237:25 242:15 245:16 283:18 332:23 338:25 354:22 355:4 360:11 363:10 364:3 382:13 393:9 402:6,20 403:3,

12,16,22 405:25 409:14 412:17 415:8 418:7,9 419:9 426:7 433:12

**respond** 227:25

**response** 259:24

**responsibilities** 349:4

**responsibility** 286:1 349:8 397:10,14 405:2

**responsible** 328:13 368:16 376:17 382:19

**responsive** 244:13,15 335:18 361:10 412:3

**rest** 260:8 288:6,11 289:14 290:6 295:21 327:24 408:6

**result** 297:6,7,16 410:20 413:6 429:15

**results** 298:6 344:17 354:22,23 356:18 358:6 363:17 366:25 367:10 368:6,12,13 369:19 370:6 372:9,12 373:14, 20 376:23 385:10 386:4 391:6 406:24

**retain** 255:6 313:11 366:4,5,9 407:6

**retained** 241:6 252:10 255:12 301:9,11 303:4 313:19 335:24 367:1 373:18,20 374:3,16 403:9 406:8,12,20,24, 25

**retaining** 332:23

**retains** 306:19

**retention** 226:8,24 227:17,19 228:2,4,6,21, 25 229:22,24 230:4 239:23 241:10,14,17 244:14,23 245:4,17 252:11,13,24 253:5,8, 18 255:6,9,11 256:3,16, 23 257:17 258:13,15, 16,17 259:10,14,17,21 261:25 262:14,25 263:6,10,25 264:24 265:8,11 267:16,18,25 269:1,12,14,18,22,23 270:6,8,14 271:12,13, 19 272:4,11,21,22

273:3,5,15,21,22 274:14,25 275:6,8,12, 14,15 277:15,19 278:6, 12 280:4 281:18 282:9, 12,24 283:23 284:1 286:6,18 290:23 291:10,19 292:5,9 293:1 295:18 297:20 298:25 299:24 300:7, 16,18 301:22 304:8 305:15 311:6,12,22 312:10,14,25 313:14 326:23,24 327:1 328:21 329:2,3,4,22 330:2,7, 20,25 331:3,8,11 332:15,22 333:23 334:9,11,15,21 335:2,3, 10,17,23 336:3 337:2,5 338:4 339:5,8,18,22 340:8,21 341:4,6 342:11,15 343:7 344:13,18 345:5,14 346:8,9,19 351:22,25 352:4 353:9,19 354:16, 22 355:5,16,18 356:4,9, 16,22 358:5 359:10 360:4,11,18,20 361:9, 18 362:1,9,18 363:21 364:22 365:5 368:18,22 369:2 370:11 371:18 372:18,19 374:12,18,19 375:10 382:25 383:1,5, 9 384:19 386:19,23 387:7,10,12,19,21,25 388:6,7 389:4,7,11,12, 13,20,21,24,25 390:4,5, 12,13,17,24 391:3,6,17 392:3 393:9,15 394:8, 15 396:11 402:6 403:4 404:3,18 405:7,25 406:9 416:8 422:9

**retentions** 338:25 403:25

**retired** 285:5 319:13

**retraining** 283:25

**review** 247:4 436:24

**reviewed** 265:3

**reviewing** 299:15

**revision** 247:7 307:5,7 308:5,14 317:22 318:4, 8 321:22,23 322:9 323:11 325:1

**revisions** 322:12

**revisit** 331:6

**rewrite** 320:15

**RG17882401** 224:18

**Richard** 223:3 225:12

**richard.bernardo@ skadden.com** 223:6

**RIMS** 290:7 293:7 296:25 298:18 305:21 306:2 307:16 313:2,7, 16 315:7 318:15,17,18 319:13,24 321:14,19 324:7,8

**ringing** 380:4

**RJ** 363:12 365:9 366:3, 15,20 372:1,7,9 374:22 385:17 407:8

**role** 245:12 303:18 411:2

**roles** 282:12 422:9

**Rosina** 257:21 262:11 265:18 266:19 268:23 272:9 274:8 275:23 347:25 352:7 390:19 391:8,9 418:23

**rough** 320:25

**routinely** 367:18

**Royston** 359:9,11 360:8 393:2,5,8,13,16, 19,22 394:2,3,7,19 395:23

**running** 266:16

**runs** 354:11

**S**

**safety** 401:21

**sake** 234:11,15 302:13

**sale** 359:8,21

**sample** 305:9,17 366:15

**samples** 304:22 305:1, 4,6 365:22 366:13,19, 20 372:8 403:5,6,9,22 404:3,11,12 405:15,20

406:1,4,6,10,12,14,18, 23 424:4,7,11,13,18,20

**sampling** 404:16

**sanctions** 410:21

**sat** 440:5

**satisfy** 243:1

**Satterley** 222:5,16

**saved** 335:4,6 363:17

**scanned** 238:2 367:10

**scenarios** 277:6

**schedule** 229:24 241:17 252:12 253:8 255:9 256:16 257:25 258:2,13,16,17 259:11 260:10 263:6,10,25 264:6,9,24 265:4,8 267:16,18,23 269:12,14 270:6,8 271:19,21,23 272:4 273:5,10,11,15, 21,23 275:1,6,8,13,14, 15,19,21 277:3,4,15,19 282:9,24 286:6 290:23 291:22,23 292:14 293:1 295:18 297:15,20 298:25 311:6,12,22 327:1 329:22 330:7 335:18,24 339:9,22 340:3,5 345:15 346:9 347:12 352:1 353:10 354:16 355:18 356:4,24 359:15 360:2,4,10 361:7,9,13 362:18 364:2 368:23 387:21 388:8 389:12 391:21,24 403:4

**scheduled** 272:22

**schedules** 226:8,24 227:20 228:2,4,6,25 229:22 230:4 241:15 244:14,23 245:4 252:24 255:7 256:3,23 258:6, 18 259:14,18 262:15,25 263:19 265:23 266:2,8, 12,20 267:1 268:24 269:2,18,22 270:15 271:22 272:11 273:4 274:14 278:6 283:23 291:7,10 326:23,24 328:21 330:2 331:1,4 332:22 334:11,16

335:2,3,10 336:6,7 338:5 340:8,16,23 346:14 355:16 356:9,20 359:13 369:2 387:19 388:6,15,19 389:20,21, 24 390:4 392:4 406:9 416:8

**scope** 329:20 330:4 340:24 351:3 355:8 356:7 393:23 396:4 400:7,22 401:25 412:7

**Sean** 364:12

**search** 226:25 236:2,7, 11,12,13,14,21,22 237:22 308:25 360:19

**searched** 235:14 236:23 335:14

**searches** 231:9 232:23 233:13 234:7,12,14,19, 20,23 235:19,22,24 236:18 237:7,10 238:6 244:11,12 245:2,7,13, 15 261:25 308:25 383:23 384:4

**searching** 235:15 236:20

**seconds** 288:21 333:15,17

**secretary** 233:9

**section** 282:5 292:1 295:4 318:21 324:15 353:25 354:7 357:21 360:17 370:22 383:3 404:9,14 418:10 424:16

**sections** 359:1,2 364:2 372:4

**sector-based** 431:1

**seek** 386:8

**seeking** 395:10

**selling** 270:20

**SEM** 314:13

**send** 366:15 418:11,23

**Senior** 278:22

**sense** 324:8 369:7 374:1 408:14

**sentence** 299:13 320:4

356:13 382:11 384:18

**sentences** 320:23

**separate** 232:11,13 363:18 386:15,16

**separation** 386:8

**September** 226:5 245:7,14 246:21 289:10 293:18,21 298:19 307:4

**sequence** 403:11

**serve** 414:4

**Services** 223:10 224:7

**set** 236:6 299:22 379:6

**sets** 357:6,18 434:13

**setting** 389:2

**Sharan** 334:4 336:18

**share** 236:19 237:1 238:3,13,21 239:1,2,18, 20,25 240:6,10,13,15, 25 241:12,20

**shared** 240:17,22 372:10

**Sharepoint** 365:4 367:11,14 372:9,11 382:21

**shares** 237:25

**Sheerin** 390:19 418:23

**sheet** 245:19

**shelf** 342:25 343:1,21, 22 346:12,20,21,22 347:1,3,15,16,18 353:5, 19 354:17 383:6,10 384:20,23 385:8 386:18 387:2

**shipments** 399:16

**shipping** 347:11

**short** 267:3 268:9 310:16

**shorter** 347:12

**Shorthand** 222:8

**shortly** 405:23

**show** 287:20 359:8

**showed** 437:9,11

**Shower** 257:8 279:8 426:9,11 430:15 433:19,20

**shredding** 302:1

**sic** 237:3 252:16

**side** 263:5 264:18,20

**sides** 264:21 379:24

**sign** 286:3

**sign-offs** 303:25 304:1, 9

**signing** 303:18

**similar** 263:20 315:22 423:7

**simple** 301:16

**simply** 234:10 241:13 245:14 246:11 263:12 326:6 331:14 371:25 373:22 381:13 391:16 418:11 437:12

**single** 267:25

**sir** 225:3 228:23

**sit** 345:8 346:7,12 399:7

**site** 243:19,22 335:16 365:22 367:11 372:11 377:3 382:21 397:11 418:12

**sites** 372:10 400:17

**sitting** 334:19

**six-year** 373:18

**Skadden** 223:3 230:20 243:23

**Skellington** 274:23 303:13,17 316:23 317:5 322:18

**Skillman** 264:20 271:2, 7 401:25

**Slate** 223:3

**slogging** 392:11

**small** 240:15

**software** 315:16

**sold** 396:20

**SOPS** 271:9 282:6

398:11

**sort** 246:18 255:19 262:1 306:14 308:7,24 321:24 340:13 354:25 371:19 379:6 383:24 396:12 399:15 405:13 419:21 433:10,22

**sorts** 401:5

**sought** 228:3 349:20

**sound** 315:3 327:9

**sounds** 309:23 385:4 407:18

**source** 240:1 336:25 361:23 372:12 425:8 436:15,20

**sources** 234:19,20 235:9 406:15

**sourcing** 334:4

**speak** 233:1,10,12 241:10 265:18 274:24 284:22 290:21 299:25 300:24,25 301:10 330:25 345:1,6 346:2 351:19 354:13 361:12 364:4,7 373:8 385:3 394:22 414:24

**speaking** 240:25 243:17 272:9 275:4 286:4 328:10 337:2 364:21 421:17

**speaks** 234:17 359:1

**spec** 332:13

**specially** 222:21 337:23

**specific** 231:3,9 232:24 233:13 234:6,8,12 245:21 263:14 266:7 277:25 278:19 282:20 294:2 298:1 320:8 331:1 332:19 361:6 364:2 368:9 387:10 388:16 414:6,10,20 435:21

**specifically** 243:3 257:6 264:13 265:14 294:10 303:9,16 306:13 320:9 326:5 332:10 334:5 335:22 346:8,11

348:25 351:12 357:9 360:21 364:15 369:12 370:5 389:1 406:11,23 415:11 426:8 434:24 435:6 437:9,11 438:16, 20

**specification** 332:2 343:15

**specifications** 343:14 401:5

**specificity** 340:15

**specifics** 303:20 422:23

**specifies** 403:8

**specs** 377:4,6 398:10

**spectrographs** 340:13

**speculate** 330:18

**speculating** 391:14

**speculation** 263:23

**speculative** 356:13

**spend** 429:20

**spent** 243:17

**spirit** 440:11

**spoke** 230:9 231:4,17 243:15,25 257:24 268:23 322:17 334:2 346:15 364:8,10,17 381:14,17 384:13 387:15 390:11 415:17 422:4

**spoken** 281:1 387:12

**spokesperson** 243:5 344:25

**spreadsheet** 377:21

**Square** 223:4

**stack** 287:11 409:11

**stale** 284:2

**stand** 328:2 431:22

**standard** 241:4 247:23 249:21 251:17 271:11 285:6,7 293:10 294:6 295:1,17,19 296:2 306:25 307:24 317:17 318:18 319:9 321:14,19

325:2

**standardize** 273:3

**standardized** 272:20

**standards** 248:14 252:16 290:10 298:9 307:10 317:14,20,21 318:11,14,24 319:24 324:5

**standpoint** 255:24

**stands** 378:16 386:11

**Staneruck** 428:25

**start** 233:10 268:19 269:23 310:23 328:23 348:16 364:19 365:17 371:10 374:4 392:2 408:1 416:11 422:18 439:9

**started** 278:24 280:18 282:15 283:3,22,24 284:20 359:5 365:18 368:1 370:4 375:5 385:17 386:13 388:2 391:11 400:20 422:13, 17

**starting** 413:21 428:19

**starts** 313:14 317:14

**state** 222:8 225:18 350:16 429:12 430:6 439:24

**stated** 326:6

**statement** 383:8

**statements** 225:18

**states** 321:23 325:20, 22 335:10

**stating** 322:4

**statistic** 284:5

**stay** 403:25

**stayed** 293:2

**stays** 239:25 408:21

**stenographic** 333:19

**step** 356:6

**steps** 363:2 367:14 369:8

**stipulations** 225:18

**stopped** 309:15

**stopping** 439:4

**storage** 237:16

**store** 241:13 378:20

**stored** 335:9,16 365:3 372:9 375:21,25 377:12,18,24 378:15 402:1

**storing** 378:19

**story** 240:9

**straighten** 385:24

**Street** 222:6,17

**strike** 263:22 337:7 338:23 356:12 361:14 377:13 394:1 429:6

**study** 388:16

**stuff** 262:2 300:19 351:10 409:9

**subject** 239:21 270:6 286:18 298:21 308:4 335:10 365:4 393:14 394:15,17 403:19,20 411:18 412:4 415:1 423:10 424:5 440:6

**subjects** 415:18 424:5

**subsequent** 229:21 244:16 246:20 293:1 307:12 317:21 320:11, 14 338:21

**subsequently** 230:6 242:12

**subsidiaries** 274:15 436:2

**subsidiary** 257:5 278:1

**subsidiary's** 390:16

**substantive** 419:21

**suggest** 304:20 372:17

**suggestion** 272:12,23 273:5,7,23 275:6,24 276:3,19,20,23 277:2,3, 8

**suit** 277:24

**Suite** 222:6,17,23

**summarily** 244:2

**summarize** 232:22 261:21 265:22

**summary** 348:23 420:11 431:20

**Superior** 224:19

**superseded** 292:22

**supervision** 235:25

**supplier** 340:18 352:4 356:21 364:8,17 367:19 373:4 377:3,7 387:23, 24,25

**suppliers** 377:1 383:6

**supply** 373:4 394:12

**supposed** 259:15 301:23 302:19 321:3 323:16 355:17 434:5

**supposedly** 390:16

**survey** 339:15

**surveys** 339:13

**suspend** 405:14

**suspended** 321:15

**suspends** 305:24 306:1

**Swanson** 222:16 225:1,22 226:19,23 228:12,17 231:22 232:3,6 237:19 238:7, 10 241:21 242:3,7,20 243:2,11 244:10 245:24 246:7 247:10,11,16,19 248:2,22 249:1 250:1, 16 251:3 253:16 254:1 255:8,18 256:1,13,24 257:2 258:3,24 260:1, 19,24 261:4 263:22,24 264:22 265:25 266:10 267:5,7 268:2,6,10,22 269:8 270:9 273:18 274:3,12 275:22 276:1, 9,16 277:12 278:17 283:11,20 284:7 286:15,24 287:4 288:15 289:3,7,16,22 290:11 291:8 296:18,23 297:9,

25 300:12 301:4 302:9 304:7,14 305:20 308:6 310:4,17 311:3 312:13 314:20 315:11 316:14 319:25 321:2 323:13 324:1 330:15 333:5,11, 14,20,21 335:21 337:7, 19,25 344:14 345:7 348:15 350:17 351:8 352:22,25 354:10 355:14,22 356:12,14 357:16 361:14,16,25 362:8,17 366:2,21 369:11 370:3,23 371:13 380:11,12,16,22,25 381:8 383:16 385:6,20 386:6 388:5,20 390:9 392:20,21 393:25 395:7,13,20 396:5 397:3 398:3,17 399:23 400:9,24 402:16,25 405:12,17,21 407:11, 13,16,19 408:4,13 412:12 414:7,16 416:16 421:14 423:19 425:17, 25 428:8 429:19 430:1, 5,11 431:13,17 432:2,7, 10,12,13 434:2,14,22 438:24 439:5,11,16,22 440:12,23

**sweep** 374:17

**switch** 326:11 378:24

**sworn** 222:10 225:15

**Symphony** 377:25 378:13,19 382:15

**system** 237:11 357:5 358:3 365:2,3,4 367:20 369:15 375:21,22,24 376:1,3 377:25 378:11, 13,16,18,20 405:1

**systems** 235:23

---

**T**

**tab** 357:4 404:1 410:10 419:25 422:24 432:24

**tabbed** 357:23

**table** 231:15,16,18,19 232:8 234:3,10,17 235:3 308:11 359:14 364:9 379:3,25 380:1,2

**tables** 379:10

**tag** 232:1

**taking** 375:8

**talc** 222:20 224:17 225:4,5 226:16 236:8 237:21 242:15,19,22 243:4,7,8 270:21 279:7 304:22 305:4,8 326:18 332:12 336:25 337:1 339:12,19,25 341:9,10 344:6,19 345:21 346:17 348:12 349:9 355:19,20 356:16,17 360:12,22 362:4,11 363:10,14 364:22 367:11 370:14, 15 371:16 372:8 374:11 376:23 377:1,2,3,6,7 382:3,24 384:16 387:6 388:9 389:14,15 391:7 392:8 393:12 394:12 399:2,16 403:5,6,12 404:3 405:5,8 406:1,2, 19 409:14 412:17,20 413:12,17 415:4,6,9,12 419:15,17,18,23 423:14 424:3,7,11 426:12 431:20 432:4,16,25 433:4,15 434:23,25 435:4,16 437:2,25 438:1

**talcosis** 409:19 433:16

**talk** 245:13 270:19 283:16 334:15 341:5 346:8 354:5 372:4 382:22 392:16,17 403:23 439:15

**talked** 260:18 305:23 314:4 317:6 342:13 388:6 394:3 412:22 416:4 424:3

**talking** 227:13 231:15 233:21,25 238:20 257:4 262:7 266:19 274:9 282:1 286:17 293:15 298:3 309:19 312:8 318:19 330:24 331:17 332:12 334:6,8 336:20, 22 348:5 352:20 355:2, 24 365:11,16 369:18 371:15 372:16,18,20,21 377:7 379:12 386:22, 23,24,25 388:2 395:15

396:8,10,13 398:22,25 400:12 401:13 408:8 433:18

**talks** 306:4 387:2

**tape** 315:16

**target** 234:23

**task** 302:14

**tasked** 257:6

**team** 271:8 364:8 372:12

**Tech** 350:4 358:18 405:9

**technician** 224:6

**Tele-video** 223:10 224:6

**telephone** 225:10 233:6

**telling** 257:16 276:17, 19

**tells** 330:7

**Telofski** 364:13 395:3 397:6 398:22 401:7

**Telofski's** 400:1

**TEM** 305:10 314:12 354:24

**ten** 271:1,6,7 312:16 376:18

**tend** 347:11

**tendered** 440:7

**term** 240:21 305:13 312:25

**terms** 234:5 238:5 244:8 245:9 263:10 266:7,12 286:1 290:6 294:24,25 295:13,14, 21,22 316:6 319:4,10 362:15,16 366:23 374:12 386:1 394:12 405:24 414:23 426:18 430:23 433:14,22 434:4,16

**test** 341:21,22 344:17 347:10 348:19 363:16 368:13 372:9,12 373:14 398:10 399:20 406:4,24

**tested** 305:8,9 365:17, 20 403:6 406:2

**testified** 225:16 410:23 411:13 412:2,9

**testimony** 329:11 355:10 366:17 395:10 440:4,20

**testing** 305:7 339:25 340:9,17,19 341:4,19 342:3,7,9 344:5,6,17, 18,19 345:15,19 346:9, 17,24 347:10 348:4,7, 20,22,23,25 349:11,22, 23 350:1,5,8,22,24 351:15,16,17,20,21 353:11 354:22,23,24 355:5,10,12,19 356:18 358:6,24,25 359:1 360:11,21 361:11,18,19 362:3,10,22,23,24 363:9,10,14,15 364:4,6, 23 365:9,12,18,19 366:1,23,25 367:1,12 368:6,7,12 369:19 370:6,12,14 371:16 372:1,7,19,21,25 373:2, 21 374:5,11,16 375:6, 10,11,12 376:23 377:4 382:3 383:13 384:10, 11,13,16,20 385:9,18 386:3,7,9,10,14,18,20, 23,25 387:6,18 388:3, 10 389:4,13 390:1,7 391:6,20,22,23,24 392:8 393:10 394:9 397:23 398:6,18 399:2, 3,8 400:3 401:3,19 402:22 404:16 406:11, 18 407:5,7,9

**testing-related** 341:8

**tests** 351:12,13,15,21 358:1 364:24 367:19

**text** 354:4

**Thailand** 328:14 334:6 336:18 337:3 372:8 382:9

**theoretically** 254:25

**theory** 320:13

**Theresa** 409:18

**thing** 298:4 306:14

333:16 340:14 355:1 383:24 396:12 420:15

**things** 227:19 260:11 305:6 318:23 354:24 361:19 372:22,23 375:23 377:5 380:23 409:10

**thinking** 314:24

**third-party** 372:7

**thought** 370:24 377:13 379:18 439:3

**thrown** 300:19

**thumb** 321:18

**tickets** 358:9

**tie** 234:7 356:3 363:25 388:16

**tied** 234:4 320:4 346:20

**time** 224:11 227:5 228:1,19 243:17 244:8 262:9 263:14 264:13 271:22 275:13 276:6 277:14 283:3,22 301:12 309:6 312:16 317:3 319:12 325:12 333:17 335:4 336:7,15 337:9, 13 340:7 343:10 346:5, 23 347:2 362:5,12 365:20 368:23 375:8 390:23 394:18 400:20 401:24 403:21 405:20 412:14 422:22 426:8,13 428:6 429:20 431:12 439:13 440:9,18

**timeline** 379:11 380:1

**times** 223:4 228:3 233:20 243:19 280:9 347:12 408:9 418:24

**Tina** 226:10 230:9 233:6,8,18

**title** 239:6 272:2

**titles** 272:20

**today** 224:8 229:5,8 231:18 246:24 251:10, 13 287:5 290:16,18 334:19,23 344:4,10 346:7 356:18 392:16,19 399:7

**Today's** 224:10,14

**told** 240:10 264:5 272:10 276:12 281:6 301:17 310:3 352:11 353:17 354:17 390:23

**Tom** 327:19

**tomorrow** 388:22 391:25 392:3 439:7 440:14

**tomorrow's** 439:23

**tools** 252:23

**top** 248:7 250:4 261:12 287:12 318:10 342:6 347:6 357:6 384:9

**topic** 267:3 268:5 274:11 283:18 345:5 415:18 439:10

**topics** 246:11 344:13 389:25 395:11

**total** 379:25

**touched** 402:17 408:8

**trace** 300:22

**Trackwise** 365:3 367:20 375:21 376:2 377:12,19,24 378:4,7, 16,24 381:20 382:15

**trained** 278:8 279:16 282:23

**training** 254:16 279:12, 20,22,23 280:2,11,16, 17,24 281:3,4,18 282:1, 7,9,10,15 283:2,4,9,22 292:2 421:7,12,16,22 422:4,8,17,20,21

**trainings** 280:8

**transcript** 333:6

**transferred** 350:1 378:10,22 399:11

**transmission** 362:2,10 402:21

**treated** 241:19 438:23

**Triality** 230:17 384:2

**TRIM** 267:23

**true** 253:12,20 255:22

270:12 272:4 275:8,15, 24 276:13,24 277:9,16, 20 278:13,22 280:11 282:19 283:4 284:21 285:14,24 287:1 288:3 292:20 293:2,18 294:11,18,22 295:19 297:4 298:9,15,21 299:4 301:9 306:14 311:19 312:9 314:10 322:5 323:19,24 324:11,20,24 326:16 330:22 351:11 374:5,6 384:25 391:3 399:12 409:25 411:6 417:1 420:10,20 424:18 426:12,24

**turn** 298:17 328:8

**two-thirds** 309:8 398:11

**tying** 387:20

**type** 263:17 314:18 354:3 370:13 415:9

**types** 298:20 299:6 315:4 339:23 355:11 391:22 433:23

**typically** 253:11 383:6

**typing** 262:7

___

**U**

**U.S.** 312:1 437:18,22

**U.S.A.** 337:23

**Uday** 334:3 335:5 336:18

**Uh-huh** 375:14

**underneath** 287:13 318:12,14,15

**understand** 225:25 231:7 235:20 236:24 238:11 240:13,19 244:19 245:12 250:12 258:9 280:17,19,20 281:2 297:11 301:14 324:5 325:11 335:19 336:9,21 344:22 345:4 361:2 365:23 394:23 396:10 400:15 414:17 429:3

**understanding** 226:12 227:12 228:16 234:15 238:22 239:4,19,24 241:9 242:25 251:12 253:3 254:13 260:6 273:25 276:25 277:17 280:22 291:5,15 294:3 300:3 326:4 335:8,12 337:4 339:14 346:24 348:21 351:14,18,20 356:19 358:21 363:12 364:21 365:1 366:18 368:13,22 371:23 373:13 378:25 388:14 389:24 390:3 391:13 393:4,13,20 394:14 396:9 403:7,14 406:5 407:4 421:11 425:2,4,9 428:16 429:18 431:24 433:10

**understood** 237:24 310:6 344:24 375:22 395:21

**undertaken** 363:25

**uniform** 272:20

**unit** 275:11

**United** 335:9

**units** 417:16,21 420:23 426:19,21 427:16 430:23 436:2

**universe** 406:6 433:22, 24

**unproduced** 234:24

**untrained** 278:12

**update** 246:14

**updated** 244:24,25 245:21 246:9

**upload** 418:12

**USA** 222:21

**users** 241:1 300:2,3 301:1

___

**V**

**validated** 375:21,22 377:25 378:12,16

**validation** 357:20

358:13

**valued** 248:11

**valuing** 250:4

**vantage** 268:1

**variable** 284:1

**vehicle** 274:18

**vehicles** 241:11

**verbatim** 262:9

**verified** 303:1

**verify** 283:9

**Verma** 364:12 375:18 376:9 383:4 388:18

**Vermont** 222:20 225:5 350:10

**Versatile** 267:24

**version** 246:9 247:15, 19,21 248:16,19 249:5, 15,17,20 250:11,25 251:1,19,20,25 287:17 288:2,5 289:9,16,23 290:5,10,15,19 293:5 296:8 298:18 307:1,12, 20 309:4 312:18 313:4, 5,8 315:20,21 316:15 317:19,24 318:5,19 319:10 320:14,16 321:1,5,9,11,12,15,17, 21 322:3,4,7,15,16,19, 25 323:1,7,15,22,23 324:3,11,13,19,22 325:5,15 326:1 356:4 384:17 409:7

**versions** 251:16 263:7 288:7 290:2,19 320:11

**versus** 240:24 422:25

**video** 224:5,6 268:13 315:16 333:12 371:1

**videos** 304:12

**view** 356:7

**viewed** 270:5

**visible** 376:4

**Vivian** 236:16

**volume** 224:15 226:6 229:1,10,21 231:4

237:10 244:17

___

**W**

**wait** 332:6 425:18

**walk-through** 374:13

**walking** 371:25

**wanted** 231:7 261:16 265:17 378:4,25

**warn** 417:13 420:7

**Washington** 264:11,12 265:3,15 271:3,8

**waste** 346:5

**water** 288:20

**Web** 418:12

**week** 230:23 242:9

**Welch** 224:9

**wheeled** 302:6

**wheeling** 302:14

**wheels** 302:11

**whoever's** 303:18

**whoops** 247:20

**Wiley** 428:20

**wished** 273:13 274:2

**witnesses** 386:2 415:16

**woman** 226:10

**word** 231:15 232:8 237:6 320:20 341:21 342:9 345:19 361:11 433:8 435:10

**words** 236:8 237:21 238:5 241:12 269:6,10 277:1 284:14 292:21 313:16 314:25 331:16 342:22 353:2 368:24 373:19 394:11 405:13 411:4

**work** 226:3 238:19 260:20 373:6 397:11 412:19

**worked** 230:17 234:5 244:25 246:10 317:16

**workflow** 351:6

**working** 243:20 294:5 376:12 411:10

**works** 234:3 384:3

**world** 334:21 335:14 376:5 427:8

**worldwide** 239:7 245:4 247:21 248:13 249:5, 10,19,21 251:6 287:6 289:8 294:14,19,20 296:5 315:7 318:22 325:5 339:12 427:3,8

**worldwide's** 246:24 288:1 295:1

**writing** 305:22

**writings** 246:20

**written** 292:15 303:6 314:25 320:2

**wrong** 270:24

**wrote** 239:11 264:5 269:10 279:10 284:13 310:2 395:18 396:14

**WW** 239:6,8 287:6 427:8

**WWRAM** 252:15

**WWRIM** 285:6 289:16, 23 290:17 294:14 298:18 303:5 312:24 313:2 316:21 317:6,13 318:5 319:11,16 324:11 325:5,16

---

**X**

---

**x-ray** 314:9 315:24 354:25

---

**Y**

---

**year** 270:14 273:6 279:23 280:9 281:17 292:21 300:17 329:6,7 330:20 346:22 383:7,10 384:21 385:9 387:3 397:18 404:21 406:12, 19 407:3,5 422:21 432:19

**years** 228:21 229:3 256:22 271:2,7 281:1 294:4,6,10 312:15,16 314:1 334:10 335:7 342:24 347:14 352:2,16 353:20 354:18 358:11, 23 372:14,16 373:11,20 374:4 376:13,14,18 377:19 382:8 383:11 384:24 385:8 386:3 404:3,20 418:15

**yellow** 426:24

**York** 223:4 396:1

---

**Z**

---

**Zappa** 348:24 349:14 351:6 364:1,12 367:4 368:15 369:8 385:17 388:18 399:14

**Zhu** 328:11 332:5 364:12 370:22 372:3 373:4 382:19 388:17

Exhibit 174

 1       IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF NEW JERSEY
 3                    -  -  -
 4

        IN RE:  JOHNSON &        :
 5      JOHNSON TALCUM POWDER     :
        PRODUCTS MARKETING,       :
 6      SALES PRACTICES, AND      :  NO. 16-2738
        PRODUCTS LIABILITY        :  (FLW) (LHG)
 7      LITIGATION                :
                                  :
 8      THIS DOCUMENT RELATES     :
        TO ALL CASES              :
 9

10                    -  -  -
11                 July 12, 2018
12                    -  -  -
13

14            Videotaped deposition of
       MARGARET M. GUROWITZ, taken pursuant to
15     notice, was held at the law offices of
       Drinker Biddle & Reath, 105 College Road
16     East, Princeton, New Jersey, beginning at
       9:29 a.m., on the above date, before
17     Michelle L. Gray, a Registered
       Professional Reporter, Certified
18     Shorthand Reporter, Certified Realtime
       Reporter, and Notary Public.
19

20                    -  -  -
21

            GOLKOW LITIGATION SERVICES
22        877.370.3377 ph| 917.591.5672
              deps@golkow.com
23

24

1    APPEARANCES:

2

        WILENTZ GOLDMAN & SPITZER, P.A.
3       BY:  DANIEL R. LAPINSKI, ESQ.
        90 Woodbridge Center Drive
4       Suite 900 Box 10
        Woodbridge, New Jersey 07095
5       (732) 855-6066
        dlapinski@wilentz.com
6
            - and -
7

        BEASLEY ALLEN, P.C.
8       BY:  P. LEIGH O'DELL, ESQ.
        218 Commerce Street
9       Montgomery,  AL  36104
        (334) 269-2343
10      leigh.odell@beasleyallen.com
11          - and -
12      ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT, ESQ.
13      4900 Seminary Road, Suite 650
        Alexandria, VA 22311
14      (703) 931-5500
        mparf@aol.com
15      Representing the Plaintiffs'
        Steering Committee
16

17

18

19

20

21

22

23

24

Margaret M. Gurowitz

```
1        APPEARANCES:   (Cont'd.)

2

         ORRICK, HERRINGTON & SUTCLIFFE, LLP
3        BY:  KRISTEN RENEE FOURNIER, ESQ.
         51 West 52nd street
4        New York, New York 10019
         (212) 506-3767
5        kfournier@orrick.com
6           - and -
7        DRINKER, BIDDLE & REATH, LLP
         BY:  JULIE L. TERSIGNI, ESQ.
8        500 Campus Drive
         Florham Park, New Jersey 07932
9        (973) 549-7000
         Julie.tersigni@dbr.com
10

            - and -
11

         SKADDEN ARPS, LLP
12       BY:  ANDREW M. KARP, ESQ.
         Four Times Square
13       New York, New York 10036
         (212) 735-3000
14       Andrew.karp@skadden.com
         Representing the Defendants,
15       Johnson & Johnson entities
16

17

18

19

20

21

22

23

24
```

Margaret M. Gurowitz

```
 1        APPEARANCES:  (Cont'd.)
 2
          GORDON & REES, LLP
 3        BY: JAMES E. ROBINSON, ESQ.
          Three Logan Square
 4        1717 Arch Street, Suite 610
          Philadelphia, Pennsylvania 19103
 5        (215) 717-4007
          Jrobinson@grsm.com
 6
             - and -
 7
          COUGHLIN DUFFY L.L.P.
 8        BY: MARK K. SILVER, ESQ.
          350 Mount Kemble Avenue
 9        Morristown, NJ 07962
          973-267-0058
10        Msilver@coughlinduffy.com
          Representing the Defendant, Imerys
11        Talc America, Inc.
12
          SEYFARTH SHAW, LLP
13        BY:  JAMES R. BILLINGS-KANG, ESQ.
          975 F Street, NW
14        Washington, D.C. 20004
          (202) 463-2400
15        jbillingskang@seyfarth.com
          Representing the Defendant, PCPC
16
17        TUCKER ELLIS, LLP
          BY:  JENNIFER L. STEINMETZ, ESQ.
18        950 Main Avenue Suite 1100
          Cleveland, Ohio 44113
19        (216) 696-3499
          Jennifer.steinmetz@tuckerellis.com
20        Representing the Defendant, PTI
          Royston LLC and PTI Union LLC
21
22
          VIDEOTAPE TECHNICIAN:
23           Devyn Mulholland
24
```

Margaret M. Gurowitz

```
1                    -  -  -

2                  I N D E X

3                    -  -  -

4

   Testimony of:        MARGARET M. GUROWITZ

5

          By Mr. Lapinski          18, 371

6

          By Ms. Fournier             353

7

8

9                    -  -  -

10               E X H I B I T S

11                   -  -  -

12

13   NO.            DESCRIPTION           PAGE

14   Gurowitz-1   PSC Second Amended    23
                  Notice of Deposition

15

     Gurowitz-2   PSC Second Amended    24

16                Notice of Deposition

17   Gurowitz-3   Agreed Order and      29
                  Stipulation Regarding

18                J&J Production of
                  Talcum Powder Products

19                And Talc Samples

20   Gurowitz-4   Curriculum Vitae      50
                  Of Margaret Gurowitz

21

     Gurowitz-5   E-mail Thread         65

22                6/27/18
                  Subject, Follow Up

23                To Phone Meeting
                  Last Friday

24                (No Bates)
```

Margaret M. Gurowitz

```
 1                    -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Gurowitz-6       Letter, 3/19/82          136
                        RE:  Kilmer Museum
 7                      JNJTALC000536396
 8     Gurowitz-7       Letter, 3/9/51           154
                        Subject, Draft
 9                      JNJTALC000536395
10     Gurowitz-8       Paperwork Retention      168
                        JNJTALC000536392-94
11
       Gurowitz-9       Handwritten Note         170
12                      JNJTALC000536391
13     Gurowitz-10      Evidence List            190
                        JNJTALC000536623-34
14
       Gurowitz-11      Evidence List            195
15                      JNJTALC000536610-22
16     Gurowitz-12      Copy of Photograph       197
                        JNJTALC000536604
17
       Gurowitz-13      Copy of Photograph       198
18                      JNJTALC000536605
19     Gurowitz-14      Copy of Photograph       200
                        JNJTALC000536602
20
       Gurowitz-15      Copy of Photograph       201
21                      JNJTALC000536601
22     Gurowitz-16      Copy of Photograph       202
                        JNJTALC000536600
23
24
```

Margaret M. Gurowitz

```
 1                     -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Gurowitz-17  Copy of Photograph          202
                   JNJTALC000536603
 7
      Gurowitz-18  Iron Mountain               203
 8                 Box Details, Box
                   History
 9                 JNJTALC000536856-76
10    Gurowitz-19  Evidence List               229
                   JNJTALC000536657-80
11
      Gurowitz-20  FedEx Receipt               240
12                 Alliance Technologies
                   JNJTALC000536777
13
      Gurowitz-21  Laboratory Chain            242
14                 Of Custody Form
                   JNJTALC000536706-30
15
      Gurowitz-22  Laboratory Chain            243
16                 Of Custody Form
                   JNJTALC000536768-76
17
      Gurowitz-23  Laboratory Chain            249
18                 Of Custody Form
                   JNJTALC000536734-58
19
      Gurowitz-24  Laboratory Chain            249
20                 Of Custody Form
                   JNJTALC000536759-67
21
      Gurowitz-25  Johnson's Baby Powder 253
22                 Copy of Photograph
                   JNJTALC000536841-46
23
24
```

Margaret M. Gurowitz

```
 1                    -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.            DESCRIPTION            PAGE
 6    Gurowitz-26  Johnson's Baby Powder 255
                   Copy of Photograph
 7                 JNJTALC000536836-40
 8    Gurowitz-27  Johnson's Baby Powder 279
                   Copy of Photograph
 9                 JNJTALC000536819-29
10    Gurowitz-28  Johnson's Baby and    258
                   Toilet Powder
11                 Copy of Photograph
                   JNJTALC000536830-35
12
      Gurowitz-29  Shower to Shower      258
13                 Body Powder
                   Copy of Photograph
14                 STS033
15    Gurowitz-30  Shower to Shower      267
                   Body Powder
16                 Copy of Photograph
                   STS036
17
      Gurowitz-31  Shower to Shower      269
18                 Body Powder
                   Copy of Photograph
19                 STS042
20    Gurowitz-32  Shower to Shower      269
                   Body Powder
21                 Copy of Photograph
                   STS043
22
23
24
```

Margaret M. Gurowitz

```
 1                   -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                   -   -   -
 4
 5    NO.             DESCRIPTION              PAGE
 6    Gurowitz-33  Shower to Shower           272
                   Body Powder
 7                 Copy of Photograph
                   STS046
 8
      Gurowitz-34  Shower to Shower           273
 9                 Body Powder
                   Copy of Photograph
10                 STS051
11    Gurowitz-35  Shower to Shower           275
                   Body Powder
12                 Copy of Photograph
                   STS053
13
      Gurowitz-36  Shower to Shower           276
14                 Body Powder
                   Copy of Photograph
15                 STS055
16    Gurowitz-37  Shower to Shower           279
                   Body Powder
17                 Copy of Photograph
                   STS067
18
      Gurowitz-38  Shower to Shower           280
19                 Body Powder
                   Copy of Photograph
20                 STS065
21    Gurowitz-39  Johnson's                  281
                   Body Powder
22                 Copy of Photograph
                   JBP-001
23
24
```

Margaret M. Gurowitz

```
 1                   -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                   -  -  -
 4
 5    NO.            DESCRIPTION            PAGE
 6    Gurowitz-40  Johnson's              282
                   Body Powder
 7                 Copy of Photograph
                   JBP-006
 8
      Gurowitz-41  Johnson's              284
 9                 Body Powder
                   Copy of Photograph
10                 JBP-085
11    Gurowitz-42  Johnson's              285
                   Body Powder
12                 Copy of Photograph
                   JBP-087
13
      Gurowitz-43  Johnson's              286
14                 Body Powder
                   Copy of Photograph
15                 JBP-096
16    Gurowitz-44  Johnson's              287
                   Body Powder
17                 Copy of Photograph
                   JBP-097
18
      Gurowitz-45  Johnson's              289
19                 Body Powder
                   Copy of Photograph
20                 JBP-099
21    Gurowitz-46  Johnson's              290
                   Body Powder
22                 Copy of Photograph
                   JBP-107
23
24
```

Margaret M. Gurowitz

```
1                      -   -   -
2              E X H I B I T S  (Cont'd.)
3                      -   -   -
4
5     NO.             DESCRIPTION              PAGE
6     Gurowitz-47  Johnson's                292
                   Body Powder
7                  Copy of Photograph
                   JBP-119
8
      Gurowitz-48  Johnson's                294
9                  Body Powder
                   Copy of Photograph
10                 JBP-133
11    Gurowitz-49  Johnson's                295
                   Body Powder
12                 Copy of Photograph
                   JBP-135
13
      Gurowitz-50  Johnson's                296
14                 Body Powder
                   Copy of Photograph
15                 JBP-165
16    Gurowitz-51  Johnson's                298
                   Body Powder
17                 Copy of Photograph
                   JBP-166
18
      Gurowitz-52  Johnson's                299
19                 Body Powder
                   Copy of Photograph
20                 JBP-167
21    Gurowitz-53  Johnson's                300
                   Body Powder
22                 Copy of Photograph
                   JBP-169
23
24
```

Margaret M. Gurowitz

```
 1                     -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5     NO.             DESCRIPTION              PAGE
 6     Gurowitz-54  Johnson's                 302
                    Body Powder
 7                  Copy of Photograph
                    JBP-175
 8
       Gurowitz-55  Johnson's                 305
 9                  Body Powder
                    Copy of Photograph
10                  JBP-177
11     Gurowitz-56  Johnson's                 306
                    Body Powder
12                  Copy of Photograph
                    JBP-183
13
       Gurowitz-57  Johnson's                 307
14                  Body Powder
                    Copy of Photograph
15                  JBP-190
16     Gurowitz-58  Johnson's                 309
                    Body Powder
17                  Copy of Photograph
                    JBP-215
18
       Gurowitz-59  Johnson's                 310
19                  Body Powder
                    Copy of Photograph
20                  JBP-232
21     Gurowitz-60  Johnson's                 312
                    Body Powder
22                  Copy of Photograph
                    JBP-237
23
24
```

Margaret M. Gurowitz

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Gurowitz-61   Johnson's                  313
                     Body Powder
 7                   Copy of Photograph
                     JBP-294
 8
       Gurowitz-62   Johnson's                  318
 9                   Body Powder
                     Copy of Photograph
10                   JBP-295
11     Gurowitz-63   Shower to Shower           320
                     Copy of Photograph
12                   STS001
13     Gurowitz-64   Shower to Shower           323
                     Copy of Photograph
14                   STS002
15     Gurowitz-65   Shower to Shower           325
                     Copy of Photograph
16                   STS003
17     Gurowitz-66   Shower to Shower           328
                     Copy of Photograph
18                   STS004
19     Gurowitz-67   Shower to Shower           331
                     Copy of Photograph
20                   STS005
21     Gurowitz-68   Shower to Shower           332
                     Copy of Photograph
22                   STS011
23
24
```

Margaret M. Gurowitz

```
1                        -   -   -
2           E X H I B I T S  (Cont'd.)
3                        -   -   -
4
5      NO.               DESCRIPTION            PAGE
6      Gurowitz-69   Shower to Shower        334
                     Copy of Photograph
7                    STS012
8      Gurowitz-70   Shower to Shower        335
                     Copy of Photograph
9                    STS013
10     Gurowitz-71   Shower to Shower        338
                     Copy of Photograph
11                   STS016
12     Gurowitz-72   Shower to Shower        340
                     Copy of Photograph
13                   STS017
14     Gurowitz-73   Shower to Shower        341
                     Copy of Photograph
15                   STS018
16     Gurowitz-74   Shower to Shower        342
                     Copy of Photograph
17                   STS021
18     Gurowitz-75   Shower to Shower        342
                     Copy of Photograph
19                   STS031
20     Gurowitz-76   Leahy Product           345
                     And Museum Number
21                   JNJ 000660416-80
22
23
24
```

Margaret M. Gurowitz

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Gurowitz-77     Itemization              346
                       Record Title Range
 7                     Date
                       3/14/83
 8                     JNJ000087993-97
 9     Gurowitz-78     Johnson's Baby           364
                       Powder
10                     JBP-071
                       JNJTALC000449246
11
       Gurowitz-79     Sample from              365
12                     Mr. Burchfield
                       JBP-015
13                     JNJTALC000448941
14
15
16
17
18
19
20
21
22
23
24
```

Margaret M. Gurowitz

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      None.

16

17

18

19

20

21

22

23

24
```

Margaret M. Gurowitz

```
 1              THE VIDEOGRAPHER:  We are
 2       now on the record.
 3              My name is Devyn Mulholland.
 4       I'm a videographer for Golkow
 5       Litigation Services.
 6              Today's date is July 12,
 7       2018.  The time is 9:29 a.m.
 8              This video deposition is
 9       being held in Princeton, New
10       Jersey, in the matter of Talcum
11       Powder Litigation MDL.
12              The deponent is Margaret
13       Gurowitz.
14              Counsel will be noted on the
15       stenographic record.
16              The court reporter is
17       Michelle Gray and will now swear
18       in the witness.
19                   -  -  -
20              ... MARGARET M. GUROWITZ,
21       having been first duly sworn, was
22       examined and testified as follows:
23                   -  -  -
24              MS. FOURNIER:  For purposes
```

Margaret M. Gurowitz

1          of the record, Ms. Gurowitz is

2          being produced today pursuant to a

3          March set of deposition notices

4          served by the Plaintiffs' Steering

5          Committee as amended, adjusted,

6          whatever is the right word, by

7          both the Court and the agreement

8          of the parties.

9               She will be representing

10         both J&J and JJCI today, and she

11         is being presented on Topic 3.4.

12              MR. LAPINSKI:  You just took

13         three quarters of my outline.

14                   -   -   -

15                   EXAMINATION

16                   -   -   -

17     BY MR. LAPINSKI:

18         Q.    Good morning, Ms. Gurowitz.

19     How are you this morning?

20         A.    Good.

21         Q.    I introduced myself to you

22     earlier today.  My name is Dan Lapinski,

23     and I'm here on behalf of the Plaintiffs'

24     Steering Committee.

Margaret M. Gurowitz

1   MR. LAPINSKI:  This

2   deposition is being taken pursuant

3   to the February 6, 2018 order of

4   Special Master Pisano and

5   subsequent modifications to that

6   order and on topics permitted to

7   be discovered, which include

8   composition, testing, sampling and

9   bias.

10   The deposition is also being

11   taken pursuant to the Plaintiffs'

12   Steering Committee's second

13   amended notice of 30(b)(6)

14   depositions served on defendants

15   Johnson & Johnson and Johnson &

16   Johnson Consumer Incorporated.

17   The Plaintiffs' Steering

18   Committee reserves the right to

19   notice and conduct follow-up

20   depositions, including depositions

21   of individual witnesses identified

22   during this 30(b)(6) deposition

23   and on topics discussed by

24   Ms. Gurowitz.

Margaret M. Gurowitz

1          Ms. Gurowitz has been

2     designated to testify today in

3     response to deposition notices

4     served upon both by Johnson &

5     Johnson and Johnson & Johnson

6     Consumer, and it's our expectation

7     that her testimony will be binding

8     upon both defendants.

9          To the extent Ms. Gurowitz

10    is unable to offer testimony as to

11    the conduct of one or both of the

12    J&J defendants, Plaintiffs'

13    Steering Committee reserves the

14    right to request a supplemental

15    deposition, so --

16         MS. FOURNIER:  Can I add one

17    thing?

18         MR. LAPINSKI:  You can.

19         MS. FOURNIER:  In response

20    to the mention of the amended

21    notices, I just want to note for

22    the record our ongoing objection

23    to the definition and specifically

24    the definition of asbestos that

Margaret M. Gurowitz

1     was added into the second notice.

2     I don't believe that will have any

3     impact on this particular topic

4     today, but good to note for the

5     record.

6            MR. LAPINSKI:  Very good.

7  BY MR. LAPINSKI:

8       Q.    So now we're -- now we're

9  set, Ms. Gurowitz.  Good morning.  Have

10  you ever been deposed before?

11      A.    No.

12      Q.    Okay.  I'm going to give you

13  a little bit of background and

14  instruction.  This is just a question and

15  answer session that we're -- we're going

16  to be involved in today.

17            We're on video, but more

18  importantly, as we discussed a little

19  while ago, everything that's said is

20  being taken down stenographically.  So

21  there's a couple different things that we

22  need to keep in consideration because of

23  that.

24            One, make sure that all of

Margaret M. Gurowitz

1    your answers are verbal answers so that

2    the court reporter is able to take them

3    down.

4              Try and speak slowly and

5    clearly, and as you'll see as the day

6    goes by, I can't do that.  I'm from New

7    Jersey, so I speak very quickly.

8              I'm going to assume that if

9    I ask a question and you answer it, that

10   you understood my question, so that if

11   for any reason you're not sure of a

12   question that I asked, please ask me to

13   repeat or rephrase the question.  Is that

14   understood?

15        A.    Yes.

16        Q.    Very good.  We're going to

17   try not to speak over each other as well.

18   If I'm asking a question, even if you can

19   anticipate the answer, please try to give

20   me an opportunity to finish it, and I

21   will try to do the same as far as your

22   answers are concerned, okay.

23        A.    Yes.

24        Q.    This is not an endurance

Margaret M. Gurowitz

1  contest, it's not a marathon.  If for any

2  reason you need a break, please let me

3  know, and then at an appropriate time

4  we'll make arrangements to be able to

5  take a break.  Okay?

6          Ms. Gurowitz, I'm going to

7  hand to you what's been marked as

8  Exhibit 1.

9          (Document marked for

10          identification as Exhibit

11          Gurowitz-1.)

12  BY MR. LAPINSKI:

13      Q.    And, Ms. Gurowitz, if you

14  would take that deposition -- the

15  Exhibit 1, and just look at it for a

16  minute.

17          This document is the

18  Plaintiffs' Steering Committee's second

19  amended notice of 30(b)(6) deposition of

20  defendant Johnson & Johnson.  I'm going

21  to ask you if you've seen that deposition

22  notice before.

23      A.    I have seen something

24  similar.  I don't know that I've seen

Margaret M. Gurowitz

1    this exact one.

2         Q.    Okay.  And do you recall

3    when the first time was that you saw that

4    notice?

5         A.    It was a little bit ago,

6    maybe a week or two.

7         Q.    Okay.  And where did you

8    receive that document from?

9         A.    I received it from Kristen.

10             (Document marked for

11             identification as Exhibit

12             Gurowitz-2.)

13   BY MR. LAPINSKI:

14        Q.    I'm also going to now hand

15   you what has been marked as Exhibit 2.

16             Actually, if I could take

17   that back for a second.

18        A.    Sure.

19        Q.    I think what I did was --

20   I'm going to hand to you what I've marked

21   as Exhibit 2 and ask you to take a look

22   at that for a minute.

23             And Exhibit 2 is the

24   Plaintiffs' Steering Committee's second

Margaret M. Gurowitz

1    amended notice of 30(b)(6) deposition

2    from defendant Johnson & Johnson Consumer

3    Incorporated.

4              Ms. Gurowitz, have you seen

5    that document before?

6         A.    I have seen the back part of

7    this document.  In terms of the front

8    part, I'm not sure how it differs from

9    the first one.

10         Q.    When you say the back part

11    of the document, what are you referring

12    to?

13         A.    The listing of all the

14    samples.

15         Q.    Okay.  And the front part,

16    you're not sure whether you've seen the

17    front part before?

18         A.    Correct.

19         Q.    Okay.  Ms. Gurowitz, you

20    understand that you're testifying here

21    today on both -- on behalf of both

22    defendant Johnson & Johnson and defendant

23    Johnson & Johnson Consumer Incorporated?

24         A.    Yes, I understand.

Margaret M. Gurowitz

1          Q.     And your testimony is being

2    offered today in your capacity as a

3    corporate representative of both of those

4    defendants, correct?

5          A.     Correct.

6          Q.     You understand that you're

7    not testifying here today as an

8    individual?

9          A.     I understand that.

10         Q.     Okay.  And you understand

11   that your testimony today will be binding

12   upon both of those defendants?

13         A.     I understand.

14         Q.     As we move forward generally

15   I'll be referring to J&J or the Johnson &

16   Johnson defendants.  And unless I

17   distinguish otherwise, can we just agree

18   that when I refer to J&J or I refer

19   Johnson & Johnson defendants, I'm

20   referring to both of the defendants

21   collectively?

22         A.     Yes.

23         Q.     Okay.  And what I would ask

24   is that unless -- unless you distinguish

Margaret M. Gurowitz

1  otherwise, I'm going to assume that your

2  references are references that relate to

3  both of the defendants.  Is that a fair

4  assumption?

5      A.    Yes.

6      Q.    Okay.  And then I would just

7  ask you if for any reason your answer is

8  going to be specific to Johnson & Johnson

9  or specific to Johnson & Johnson Consumer

10 Incorporated, that you let me know that

11 the response is specific to one of those

12 defendants.

13     A.    I understand.

14     Q.    Thank you.  We're also going

15 to be talking today about talcum powder

16 and talcum powder products.  And in

17 regard to this deposition, I'd like to

18 have an understanding, as long as you'll

19 agree, that when we reference talcum

20 powder products we're talking about

21 Johnson's Baby Powder and Johnson's

22 Shower to Shower product.

23     A.    I understand.

24     Q.    Okay.  To the extent that

Margaret M. Gurowitz

1   there is going to be discussion about a

2   single product, I will try to make clear

3   that I'm talking about a particular

4   product and I would ask that you do the

5   same, if that's okay.

6         A.    I understand.

7         Q.    If you would look at Page 1

8   of Exhibit 1.  At the bottom of Page 1 it

9   has your name listed as a witness,

10  Ms. Gurowitz.

11            Do you see that?

12        A.    Yes.

13        Q.    And are you here today to

14  testify only as to Topic 3.4 of that

15  deposition notice?

16        A.    Yes.

17        Q.    Okay.  And if you would

18  please turn to Page 17 of that deposition

19  notice.  At the bottom of Page 17 if you

20  would look at Number 4, chain of custody

21  for identified samples.  Are you here

22  today to testify as to the storage and

23  chain of custody for any and all samples

24  that have been identified as being in

Margaret M. Gurowitz

1    defendant's possession?

2         A.    Yes.

3              (Document marked for

4         identification as Exhibit

5         Gurowitz-3.)

6    BY MR. LAPINSKI:

7         Q.    Ms. Gurowitz, I'm handing

8    you a document that has been marked as

9    Exhibit 3.  And if you would please take

10   a minute to just review that document.

11   Exhibit 3 is the January 31st, 2018

12   agreed order and stipulation regarding

13   the Johnson & Johnson defendants'

14   production of talcum powder products and

15   talc samples.

16              If you'd let me know when

17   you're done reviewing that document.

18        A.    Sure.  Okay, I've reviewed

19   it.

20        Q.    Very good.  Is this the

21   first time that you've seen that

22   document?

23        A.    Yes.

24        Q.    Okay.  Do you have an

Margaret M. Gurowitz

1  understanding as to what that document

2  is?

3          A.     Yes.

4          Q.     Okay.  What's your

5  understanding as to what that document

6  is?

7          A.     My understanding is that

8  this document sets forth the process by

9  which identified samples of historic talc

10  products that have been discovered would

11  be sent to a lab and then divided.  And

12  it talks about the presentation -- the

13  preservation of those samples, the

14  original containers, et cetera, et

15  cetera.

16          Q.     Okay.  Now at the back of

17  the order, Exhibit 3, there is a

18  list of -- there's a list of samples.

19  And what I'm going to represent to you is

20  that the list of samples that is

21  contained within the order is the same

22  list of samples that is in Exhibit 1, the

23  deposition notice for Johnson & Johnson

24  and 2, the deposition notice for

Margaret M. Gurowitz

1    Johnson & Johnson Consumer Incorporated,

2    okay?

3         A.    Yes.

4         Q.    And those three lists are

5    the same.  We're going to be dealing with

6    the list today, which I'd like to just

7    refer to it as the sample list if that's

8    okay, unless you have a different phrase

9    or different term that you use for it?

10        A.    No, that's fine.

11        Q.    Okay.  In regard to the

12   sample list, did you play any role in

13   preparing that sample list?

14        A.    I prepared a role in

15   preparing part of that sample list.

16        Q.    And what part of that sample

17   list did you play a role in preparing?

18        A.    That is the part of the

19   sample list that has as the leftmost

20   column museum number.

21        Q.    And am I correct that the

22   section that has -- the section that

23   deals with museum number would actually

24   be Exhibit 2 of the sample list?

Margaret M. Gurowitz

1    A.    I'm not sure where it says

2    that.

3    Q.    Well, it -- the prior page

4    that you were just looking at --

5    A.    Exhibit 2.

6    Q.    -- says Exhibit 2.  And just

7    between you and I for purposes of today,

8    there's confusing marks all over these

9    things.  Sometimes it's Exhibit 1,

10   sometimes it's Exhibit 2, A, B.  But

11   we're going to try to stay on the same

12   page.

13         The important thing as far

14   as the current question is concerned, you

15   were responsible for -- strike that.

16         You played a role in

17   preparing the list that at the top says,

18   "Supplemental inventory of agreed upon

19   museum samples"?

20   A.    Correct.

21   Q.    Now, staying with that list

22   for now, could you please tell me the

23   purpose of the museum number that's on

24   the left-hand side.  And specifically, as

Margaret M. Gurowitz

1  an example, if you go down to the fifth

2  entry, which is 2014.001.0086.

3           Do you see that?

4      A.    I see that.

5           So in -- in 2014 and 2015,

6  we had the collection of artifacts,

7  items, in the corporate archives museum

8  collection professionally catalogued for

9  the first time ever by a team of

10 professional archivists.  It was part of

11 our project to restore the Johnson &

12 Johnson museum.

13          So those numbers represent

14 catalogue numbers, individual catalogue

15 numbers, so we can identify each artifact

16 in a new database that was created.  The

17 2014 at the beginning represents the year

18 in which that artifact was catalogued.

19 Some of them will have a 2014 in the

20 front.  Some of them will have a 2015

21 that represents the years 2014 and 2015.

22     Q.    Okay.  In regard to the

23 .001, what is the significance of that

24 number?

Margaret M. Gurowitz

1       A.    That is -- I looked back at

2  the documents that the archivists -- when

3  they created the numbers.  I couldn't

4  find anything that documented the

5  significance of that number.  It's just a

6  cataloguing system they used.

7       Q.    And then how about the last

8  four digits set of numbers, and in the

9  example we're looking at it's .0086?

10       A.    The last four digits

11  represent the individual -- the

12  individual unique catalogue number for

13  each particular item in the collection.

14  So that's -- that would be how we can

15  find it.  So if you're looking for item

16  .0086, I could look that up in the

17  database and see where it was stored and

18  be able to access it.

19       Q.    You just referred to a

20  database.  Could you give me some more

21  detail as to the database you're

22  referring to?

23       A.    It's actually an online

24  system that is used by small and midsize

Margaret M. Gurowitz

1    museums to manage their collections.  So

2    Johnson & Johnson has a contract with

3    them.  And we utilize that software to

4    manage our collection.

5        Q.    And for how long have you

6    been using that software?

7        A.    Since about 2016 maybe.

8        Q.    And was there any type of

9    software system used prior to 2016 in

10   order for Johnson & Johnson to manage

11   their archives?

12       A.    There was not.

13       Q.    What's the name of that

14   software system?

15       A.    It's called TMS, which

16   stands for The Museum System.

17       Q.    Ms. Gurowitz, what was the

18   role that you played in compiling this

19   list, this section of the sample list

20   that you said you played a role in?

21       A.    This section.  I was asked

22   to locate any Johnson's Baby Powder or

23   Shower to Shower products that were in

24   the corporate archives collection.  So I

Margaret M. Gurowitz

1  used key word searches to find them.  And

2  these are the items that were identified.

3        Q.    Can you explain to me what

4  the corporate archives collection is?

5        A.    The corporate archives

6  collection is a collection of physical

7  artifacts which would be historical

8  products and objects, and also paper

9  artifacts that have been in our museum

10  building for many, many decades.

11        Q.    When you did your -- when

12  you did your search, what keywords did

13  you use --

14        A.    Johnson --

15        Q.    -- to conduct your search?

16        A.    Johnson's Baby Powder, Baby

17  Powder, JBP, Shower to Shower, and STS.

18        Q.    You had also referenced

19  earlier that you had archive consultants

20  who helped you to develop your inventory

21  and archive list; is that correct?

22        A.    That is correct.

23        Q.    What was the name of those

24  archive consultants?

Margaret M. Gurowitz

```
1              A.    It's a company called
2   History Associates.
3              Q.    And do you know where
4   they're based?
5              A.    They're based somewhere down
6   around the Washington D.C. area.
7              Q.    When you conducted your
8   search for samples that are included in
9   the list that you prepared, did your
10  search for samples go beyond the
11  Johnson & Johnson archive collection?
12             A.    My particular search did
13  not.  But the general search did.
14             Q.    And what is your
15  understanding of what the general search
16  was?
17             A.    The general search was -- a
18  request had gone out to locate any other
19  samples that might be in existence.  And
20  so a search was conducted, I believe by
21  our law department initially, and
22  additional samples were discovered that
23  had been in offsite storage.  There are
24  also samples from PTI, which is the
```

Margaret M. Gurowitz

1   contract manufacturer for Johnson's Baby

2   Powder.

3        Q.    Are you aware of any samples

4   other than the offsite samples that you

5   just referred to?

6        A.    I am not.

7        Q.    Were there any -- are you

8   aware of any samples that may have been

9   produced by other departments within

10  Johnson & Johnson that were not in any

11  type of offsite storage?

12       A.    If I might ask, are you

13  asking about samples that are not part of

14  this list?

15       Q.    Well, let's break that out.

16  First of all, in regard to samples that

17  are included on this list, are you aware

18  of any samples that were included on this

19  list that came from Johnson & Johnson

20  organizations other than the archives and

21  other than offsite storage?

22       A.    There are a few.  There are

23  four samples that came from a retired

24  employee in the United Kingdom.

Margaret M. Gurowitz

1    Q.    Would they be the Hopkins

2  samples?

3    A.    Yes.

4    Q.    Other than the Hopkins

5  samples, are you aware of samples coming

6  from anywhere else?

7    A.    There are samples identified

8  that did come from offsite storage.

9  They're not finished products.  They're

10  rocks.  I -- in doing research to try to

11  track their origins, I understand that

12  before they went into offsite storage,

13  some of them were brought -- were brought

14  back to Johnson & Johnson Consumer by the

15  daughter of an employee who passed away

16  who had a collection of rocks in his

17  home.

18    Q.    Are you able to identify

19  those samples that were brought back to

20  Johnson & Johnson by the daughter of a

21  former employee?

22    A.    Not specifically.  But they

23  would be among the items listed on the

24  offsite storage list as rocks.

Margaret M. Gurowitz

1    Q.    And are you aware of this

2  individual bringing any samples back to

3  Johnson & Johnson other than rocks?

4    A.    From my conversation, it was

5  relayed to me that his daughter brought

6  rocks back.  But he -- there may have

7  been some product samples stored in his

8  area that never left the company, but

9  they would have been part of the offsite

10  storage list.

11    Q.    But you have no knowledge of

12  any specific sample that would have been

13  stored in his work area?

14    A.    Let me -- actually, if I can

15  look through the list, I can see what --

16    Q.    Sure.  And as you look

17  through that list, are you looking

18  through the museum list or are you

19  looking through the offsite list?

20    A.    I'm looking through the

21  offsite list.

22        Most of them I marked by

23  department, research and development, are

24  the rocks.  But there are one, two,

Margaret M. Gurowitz

1  three, four, five samples that are

2  labeled Johnson's Baby Powder that came

3  from research and development.

4              I was not able to -- we

5  were -- in my research into the origins

6  of these, I was not -- not able to track

7  down exactly who owned those samples

8  because it's beyond the memory of anyone

9  who is still at Johnson & Johnson.  But

10 it was in the area, the research and

11 development area, the area that this

12 employee who passed away had been in.

13             And then they moved offices,

14 everything was boxed up, and then later

15 there was construction and everything was

16 sent to offsite storage.  So there are --

17 there are a very few sample bottles from

18 that.

19         Q.   So let me try and clarify

20 what was just said here.  First of all,

21 in regard to the specific samples that

22 you're referring to, on the list there

23 are sample numbers.  Can you identify for

24 me the sample numbers that you're

1    referring to?

2         A.    Yes.   The sample numbers are

3    JBP-001, 002, 003, 004, and 006.

4         Q.    And it's your understanding

5    that those five samples are samples that

6    were provided by the daughter of a former

7    employee, correct?

8              MS. FOURNIER:  Objection.

9              THE WITNESS:  No.  That is

10             not correct.  It is my

11             understanding that these are

12             samples that were found in the

13             research and development area, the

14             area of the building that research

15             and development had occupied and

16             had been sent to offsite storage.

17   BY MR. LAPINSKI:

18        Q.    The former employee who you

19   referenced earlier, what was that

20   employee's name?

21        A.    His name was Bill Ashton.

22        Q.    And what was Bill Ashton's

23   role while he was an employee at

24   Johnson & Johnson?

Margaret M. Gurowitz

1    A.    He was in research and

2    development.  He was a scientist.

3         Q.    And is it your understanding

4    that the five samples that we've been

5    talking about were found in Mr. Ashton's

6    office?

7         A.    It is my understanding that

8    they were found in a common area that had

9    shelving and other means of storage that

10   had been at one point -- that he had been

11   located in or around this area.

12        Q.    And approximately when were

13   those items moved from the common area to

14   offsite storage?

15        A.    So they were, initially they

16   were moved, it is my understanding that

17   this whole group moved floors, and so

18   everything was boxed up, and the person

19   who boxed that up put them in -- kept

20   them in boxes in her office on another

21   floor.

22             And then around 2016, they

23   went to open plan work space with no

24   storage.  And so everything had to be

Margaret M. Gurowitz

1  moved to offsite storage.

2          Q.    Okay.  You said that samples

3  were boxed up because there was a move?

4          A.    Correct.

5          Q.    Did I understand you

6  correctly?

7          A.    Yes.

8          Q.    Okay.  When was that move?

9          A.    The move would have been

10  around -- it was related to me that it

11  was ten years prior to that.  So it would

12  have been somewhere in the 2006 time

13  frame.

14          Q.    And prior to -- prior to the

15  move, where were the offices located that

16  you're referring to?

17          A.    Prior to the move to offsite

18  storage or the move between floors?

19          Q.    No, now -- research and

20  development department -- strike that.

21                The research and development

22  department you indicated was in the

23  process of a move when they packed up

24  these samples, correct?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    Okay.  Where was the

3  research and development department

4  located prior to that move?

5    A.    It was located at the

6  consumer company in Skillman, New Jersey.

7    Q.    At J&J Consumer

8  Incorporated?

9    A.    Yes.

10    Q.    And was Mr. Ashton an

11  employee of Johnson & Johnson Consumer

12  Incorporated?

13    A.    He was.

14    Q.    You indicated that there was

15  a woman who had packed these samples into

16  boxes and kept them in her office,

17  correct?

18    A.    Correct.

19    Q.    Okay.  Do you know the name

20  of that woman?

21    A.    Yes.

22    Q.    And what's that woman's

23  name?

24    A.    Her name is Lorena Telofski.

Margaret M. Gurowitz

1    Q.    And is Ms. Telofski an

2    employee of Johnson & Johnson Consumer?

3    A.    Yes.

4    Q.    Okay.  Do you know what role

5    she plays within Johnson & Johnson

6    Consumer?

7    A.    I don't know her official

8    title, but she would be in the R&D group.

9    Q.    And is she still a member of

10   JJCI's research and development group?

11   A.    I believe she is, yes.

12   Q.    Okay.  If we continue to

13   look at the part of the sample list that

14   relates to offsite storage.  If you go

15   down below the research and development

16   listings, the next listings are marketing

17   listings, correct?

18   A.    Correct.

19   Q.    Okay.  Can you describe for

20   me where samples from the marketing

21   department came from?

22   A.    As best as I've been able to

23   determine, the sample -- the samples that

24   are denoted as being from marketing, many

Margaret M. Gurowitz

1   of them came from the original museum

2   collection that had been in New

3   Brunswick.

4        Q.    How was a sample

5   distinguished from a marketing sample,

6   which would be listed in the offsite

7   storage listing, and a museum sample that

8   you would help to compile?

9        A.    The ones that are labeled as

10  museum samples are currently in the

11  corporate archives in museum.  The ones

12  that are labeled as marketing samples had

13  been sent to offsite storage in 1982.

14       Q.    When they were sent to

15  offsite storage in '82, were they sent to

16  offsite storage by the J&J museum?

17       A.    No, they were not.

18       Q.    Were they sent to offsite

19  storage by members of the marketing

20  department?

21       A.    They were sent to offsite

22  storage by the Johnson & Johnson Consumer

23  company.

24       Q.    Staying with the list of

Margaret M. Gurowitz

1  offsite storage -- the sample list for

2  offsite storage, there is also a

3  department name referenced there as QA,

4  which I think is towards the back.

5          If you look at the top of

6  the page, there is page references that

7  go up to Number 91.  And if you look for

8  Page 37 of 91, there are references to

9  quality assurance.

10          Do you see that?

11      A.    I see that.

12      Q.    Okay.  And that's for Sample

13  Numbers JBP-294 and 295.  What does the

14  quality assurance reference refer to?

15      A.    Those refer to two samples

16  that were discovered in offsite storage

17  that had been marked with the department

18  name of quality assurance.

19      Q.    Were those two samples

20  stored offsite along with the marketing

21  samples that we just referred to?

22      A.    I don't know whether they

23  were in the same box, but they were all

24  pulled from the offsite storage.

Margaret M. Gurowitz

1       Q.    Is it your -- is it your

2    understanding, Ms. Gurowitz, that all

3    samples of talcum powder products in the

4    possession of Johnson & Johnson and

5    Johnson & Johnson Consumer are contained

6    here in these two lists?

7       A.    All the ones that were

8    located, yes.

9       Q.    When was it that you were

10   first asked to work on the exhibit -- the

11   sample list that you worked on for the

12   museum?

13      A.    Oh, it was a while ago.  I'm

14   try -- it was months and months ago.  So

15   I'm trying to -- trying to remember if it

16   was entirely in 2018 or it was a little

17   before.  I feel like I've been working on

18   it for a long time.  I'm trying to

19   remember.  It was a while ago though.

20      Q.    Okay.  And since the time

21   that you first started working on --

22   strike that.

23            Since the time that you

24   finished this list, have you discovered

Margaret M. Gurowitz

1    any additional samples?

2         A.    There were some that were

3    donated.  So we get a lot of donations.

4    And there were some that were donated.

5    They are marked at the beginning of the

6    museum list.

7         Q.    So they are included on this

8    list?

9         A.    Yes.

10        Q.    Are you aware of any samples

11   that are not on this list?

12        A.    I am not.

13             (Document marked for

14             identification as Exhibit

15             Gurowitz-4.)

16   BY MR. LAPINSKI:

17        Q.    Ms. Gurowitz, I'm going to

18   hand to you a document that we are

19   marking as Exhibit 4.

20             Ms. Gurowitz, this document

21   was provided to us by counsel for

22   Johnson & Johnson.  Is this your current

23   CV?

24        A.    Yes.

Margaret M. Gurowitz

```
1        Q.    And when was this CV first
2    created?
3        A.    This CV was first created
4    last year.  I was asked to do it because
5    somebody had requested it and I kept it
6    as, and updated it as needed.
7        Q.    And who had requested it?
8        A.    Initially when we
9    re-launched the museum, there were a
10   number of news stories, and our media
11   team had asked, somebody had asked them
12   for a CV, so they asked me to create it.
13       Q.    And when was the last time
14   this CV was updated?
15       A.    Perhaps at the beginning of
16   2018.
17       Q.    And you are a graduate of
18   Douglas College in New Brunswick?
19       A.    That's correct.
20       Q.    Okay.  And your degree was
21   in medieval history?
22       A.    That's correct.
23       Q.    Fair to say that you don't
24   have any educational background in
```

Margaret M. Gurowitz

1    science?

2         A.    That's correct.

3         Q.    You began working at

4    Johnson & Johnson in 1983?

5         A.    Yes.

6         Q.    And you've worked for

7    Johnson & Johnson for your entire career?

8         A.    That's correct.

9         Q.    And for purposes of

10   clarification, Johnson & Johnson -- is it

11   Johnson & Johnson company or is it just

12   Johnson & Johnson if we are trying to

13   distinguish between Johnson & Johnson and

14   Johnson & Johnson Consumer?  That's a lot

15   of Johnsons in a row right there.

16        A.    It's just Johnson & Johnson.

17        Q.    Just Johnson & Johnson.  You

18   were an employee of Johnson & Johnson

19   since 1983?

20        A.    Yes.  I was -- I was hired

21   full-time in 1988.  Before then I was a

22   research assistant.

23        Q.    And you're still employed by

24   Johnson & Johnson, correct?

Margaret M. Gurowitz

1        A.    That's correct.

2        Q.    And your paychecks come from

3   Johnson & Johnson?

4        A.    They do.  Johnson & Johnson

5   Services, which is the legal entity.

6        Q.    And you've been with that

7   same legal -- you've been with the same

8   legal entity, Johnson & Johnson,

9   throughout your entire career?

10        A.    I have.

11        Q.    And where is your office

12   located?

13        A.    My office is located in our

14   museum building in New Brunswick.

15        Q.    And is it fair to say or to

16   categorize your job as a historian for

17   Johnson & Johnson?

18        A.    Yes.

19        Q.    In the positions that you've

20   held at Johnson & Johnson during your

21   career, have you had any responsibilities

22   that are specific to talcum powder

23   products?

24        A.    No, I have not.

Margaret M. Gurowitz

1      Q.    Are you personally

2   responsible for the -- any talc samples

3   that are maintained in the Johnson &

4   Johnson museum?

5      A.    Yes.

6      Q.    Okay.  And for how long have

7   you had that responsibility?

8      A.    Officially since about 2011.

9   Unofficially since 2006.

10     Q.    Prior to 2011, was there

11  someone else who had responsibility for

12  maintaining the samples in the museum?

13     A.    No.  It was me.  It was

14  not -- my title was different.  So it was

15  part of my job, but not the entirety, if

16  that makes sense.

17     Q.    I think it makes sense, but

18  let me just ask a question to clarify.

19          From 2006 forward, other

20  than yourself has there been anybody else

21  who has had responsibility for

22  maintaining the samples in the museum?

23     A.    No.

24     Q.    How about prior to 2006?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    And who was responsible for
3 maintaining the samples prior to 2006?

4    A.    It was the corporate
5 librarian in the corporate communication
6 group.

7    Q.    And I'm sorry.  Did you say
8 the corporate librarian in the corporate
9 communications group?

10    A.    Yes.

11    Q.    Okay.  And who was that
12 corporate librarian?

13    A.    It was a woman named
14 Elizabeth King.

15    Q.    Do you know how long
16 Ms. King had that responsibility?

17    A.    I do not.

18    Q.    Is Ms. King still an
19 employee of Johnson & Johnson?

20    A.    No, she's not.

21    Q.    Okay.  Is she retired?

22    A.    Yes.

23    Q.    And do you know
24 approximately when she retired?

Margaret M. Gurowitz

 1          A.    I do not know, but it was --
 2    it had to be more than ten years ago,
 3    so...
 4          Q.    And do you know how long she
 5    had worked for Johnson & Johnson before
 6    she retired?
 7          A.    I do not know that.
 8          Q.    Are you able to give me an
 9    estimate as to for how long prior to 2006
10    she was responsible for maintaining the
11    samples in the museum?
12          A.    I do not know when she
13    started, but it would have been -- you
14    know, certainly through the 1990s, that
15    decade.  And I'm not sure when she
16    started with that responsibility.  But
17    certainly during the '90s.
18          Q.    Do you have a recollection
19    when you started working there in 1983 as
20    to whether or not Ms. King was the
21    corporate librarian?
22          A.    Yes, she was.  So it would
23    have been certainly before that.
24          Q.    What are your

Margaret M. Gurowitz

1    responsibilities as it relates to the

2    maintenance of talc samples that are in

3    the museum?

4          A.    Well, the talc -- the talc

5    samples are some of the many, many

6    artifacts in our museum.  So since we had

7    them professionally catalogued in 2014

8    and 2015, they were put for the first

9    time in acid-free storage that's designed

10   to preserve them, so they're in high

11   density acid-free climate-controlled

12   storage.

13              And so my responsibility is

14   to maintain them in that storage.  So

15   they're pretty much -- it's a

16   climate-controlled facility, our

17   archives.  It's high density storage.

18   They are in acid-free boxes on shelves in

19   that storage area.

20         Q.    And for how long have they

21   been in that type of storage condition?

22         A.    Since 2016.

23         Q.    And has that storage

24   condition a -- you've been using the word

Margaret M. Gurowitz

1   museum.  Is that storage condition a

2   physical museum where people are able to

3   see the different samples on display?

4          A.    It is -- they are stored in

5   the building, but the samples in storage

6   are not on display.

7          Q.    Are there any talc samples

8   that are on display?

9          A.    There are two.

10         Q.    And which two are they?

11         A.    It is a container from 1896

12  and one from, I believe, maybe the early

13  1950s.

14         Q.    And are those two contained

15  on the exhibit list?

16         A.    I would have to look up

17  their number to confirm that.

18         Q.    And are you able to do that

19  with the documents that you have in front

20  of you?

21         A.    I am not.

22         Q.    Okay.  If you were going to

23  do that, how would you go about doing

24  that?

Margaret M. Gurowitz

1       A.    I would use the database

2   that sort of -- that runs our -- that

3   manages our archives.  It's a cloud-based

4   system.  So I would need my computer to

5   do that.

6       Q.    So when you went into that

7   cloud based system, what would you do in

8   order to be able to identify and locate

9   the two samples that you're referring to?

10      A.    I would do a keyword search

11  and I would look to see which ones in

12  location were noted on display.

13      Q.    So your keyword search would

14  be "on display"?

15      A.    My keyword search would be

16  Johnson's Baby Powder.

17      Q.    And then once you did that

18  search, you would have an indication as

19  to which ones were on display as compared

20  to being in storage?

21      A.    Yes.  I would need to look

22  through each entry.

23      Q.    Okay.  I'm sorry.  You said

24  one of them was a container from the

Margaret M. Gurowitz

1    1950s?

2         A.    But not -- it was from the

3    United Kingdom in the 1950s, I believe.

4    Both of the ones on display are just in

5    very fragile containers.

6         Q.    The second one that you

7    referred to was a container as well,

8    correct?

9         A.    Yes.

10        Q.    And approximately when was

11   that from?

12        A.    1896.

13        Q.    Are you aware of whether

14   there was any product in either of those

15   two containers?

16        A.    Not offhand.

17        Q.    Then the remaining samples

18   are not on display, they're in storage,

19   correct?

20        A.    Yes.  Some -- yeah, they are

21   in storage, some in our museum and some

22   were moved offsite to the lab.  So you

23   have -- I mean, they're generally -- they

24   would be in storage, but they were moved

Margaret M. Gurowitz

1    offsite to the laboratory.

2          Q.     Okay.  So just talking about

3    the museum samples, you have the two that

4    are on display.  And the remainder at

5    some point in time were all in storage as

6    you had described it earlier in your

7    testimony, correct?

8          A.     Correct.

9          Q.     Some of them samples have

10   since been moved from that storage

11   facility to a lab?

12         A.     Correct.

13         Q.     Okay.  What lab were they

14   moved to?

15         A.     It's a lab in Monmouth

16   Junction.

17         Q.     And were those, the samples

18   that you're referring to, were they moved

19   as part of the order that we looked at

20   earlier that is Exhibit 3?

21         A.     Yes.

22         Q.     Other than the samples that

23   were moved to the facility in Monmouth

24   Junction pursuant to the court order, are

Margaret M. Gurowitz

1   you aware of any of this store -- these

2   samples in museum storage being moved

3   anywhere else?

4         A.    No.

5         Q.    Okay.  Ms. Gurowitz, you are

6   here today in order to testify about the

7   chain of custody of these various

8   samples, correct?

9         A.    Correct.

10        Q.    Okay.  Do you have any

11  personal knowledge of the chain of

12  custody of any of these samples?

13        A.    I have personal knowledge of

14  the partial chain of custody of the ones

15  that are specifically marked museum

16  samples.

17        Q.    And in what way did you

18  acquire that personal knowledge?

19        A.    I worked with the team to

20  identify these samples and then to pull

21  them from the corporate archives.  They

22  were packed up and sent to the lab.

23        Q.    And what team did you work

24  with, when you refer to team?

Margaret M. Gurowitz

1      A.    I worked with the legal

2   team.

3            Q.    Is that the Johnson &

4   Johnson legal team or is that Johnson --

5   strike that.

6                  The legal team that you're

7   referring to, are they J&J employees?

8      A.    They are outside counsel.

9            Q.    Everybody who was on that

10  legal team is outside counsel?

11     A.    Everyone who I worked

12  directly with.

13           Q.    Is there anyone that you

14  worked indirectly with that was not

15  outside counsel?

16     A.    Can I ask you to clarify?

17  You mean indirectly in packing up the

18  samples or indirectly in somebody said,

19  "Hey, these guys are going to come and

20  they want to pack up samples"?

21           Q.    Well, we'll get -- we'll get

22  to the packing -- we'll get to the

23  packing of the samples.  But I guess --

24  let me ask it this way.

Margaret M. Gurowitz

1       How were you first put in
2  touch with the legal team?
3       A.    Somebody from the Johnson &
4  Johnson law department contacted me.
5       Q.    And what was the purpose
6  that they contacted you?
7       A.    They said that they -- we
8  were asked to produce samples and
9  somebody would -- they would be putting
10 somebody in touch with me who would then
11 work with me to identify samples and then
12 pull them.
13      Q.    And is that the only outside
14 counsel that you worked with in regard to
15 the talc samples?  Strike that.
16            Is that the only non-outside
17 counsel person that you worked with in
18 regard to the collection of these
19 samples?
20      A.    Yes.
21      Q.    And what was that person's
22 name?
23      A.    Kim Giganti.
24      Q.    Ms. Gurowitz, is it fair to

Margaret M. Gurowitz

1    say that you're not going to be offering

2    testimony today regarding the chemical

3    composition of the talcum powder

4    products?

5          A.    Yes, correct, I will not.

6          Q.    That would not be part of

7    your education?

8          A.    No.

9          Q.    And that would not be part

10   of your job function at J&J?

11         A.    No.

12         Q.    That would not be within

13   your area of expertise, correct?

14         A.    That is correct.

15         Q.    And it's also outside the

16   topic area for which you have been

17   designated today, correct?

18         A.    Correct.

19               (Document marked for

20         identification as Exhibit

21         Gurowitz-5.)

22   BY MR. LAPINSKI:

23         Q.    Ms. Gurowitz, I'm going to

24   hand to you what I've marked as

Margaret M. Gurowitz

1  Exhibit 5.  And if you would take a

2  minute to look at that.

3          A.    Okay.

4          Q.    And let me know when you're

5  ready to answer some questions in regard

6  to that exhibit.

7          A.    I'm ready.

8          Q.    Before we move on to this,

9  let me go back to the museum list if we

10  could just for a minute.

11          A.    Sure.

12          Q.    Am I correct that you had

13  testified that certain of the samples

14  that are maintained in the museum were

15  donated?

16          A.    Some of them, yes.

17          Q.    Okay.  Other than the

18  samples that we had talked about that

19  came from Mr. Ashton, are you able to

20  identify which samples were donated?

21          A.    Yes, the ones that were

22  donated when I was keeping track.  There

23  may have been others that were donated

24  decades ago but records -- records were

Margaret M. Gurowitz

1    not kept.

2        Q.    But you have no knowledge,

3    other than while you were keeping track,

4    of any of the samples being donated?

5        A.    Correct.   Although it's

6    been, historically and today, lots of

7    people donate, you know, vintage

8    packaging to us.

9        Q.    But you have no knowledge as

10   far as the samples that are listed on

11   here of any of them being donated, other

12   than the ones that you're going to point

13   to now?

14       A.    Correct.

15       Q.    And which ones are those?

16       A.    Let me just turn to that

17   section.

18            Those are the first -- one

19   two -- those are the first four under --

20   on Page 2 of 8 for the museum samples.

21   The ones marked "New artifact donated on

22   9/19/17" and "New museum" 1, 3 and 4.

23       Q.    Okay.   And do you have

24   information as to who these specific

Margaret M. Gurowitz

1   samples were donated by?

2        A.    Most of them, yes.  The New

3   Museum 3, the regular scent Shower to

4   Shower, somebody left that in an unmarked

5   envelope at the security desk in the

6   front of the museum.  There was no name

7   on it, no note with it.  And it was an

8   empty bottle.  So I have no information

9   on who donated that.

10        Q.    When was that?

11        A.    That was sometime within the

12   last year.  I don't have the date with

13   me.  It was sometime within the last

14   year.

15        Q.    Does the museum have a

16   policy in place for the receipt of

17   donated samples?

18        A.    Yes.

19        Q.    And is it a written policy?

20        A.    It is not a written policy,

21   but generally when something is donated,

22   we make sure it's a Johnson -- a product

23   from the Johnson & Johnson family of

24   companies.  We would want it to be in

Margaret M. Gurowitz

1  good condition.  And we would take the

2  donor name and information.

3            That being said, a lot of

4  things, like that Shower to Shower

5  bottle, do get left.  They're just

6  dropped off with no -- you know, with no

7  information, no name, no note, no return

8  address on the envelope.  So there's no

9  way to track it in those cases.

10       Q.    And it was you who received

11  New Museum 3 which is the Shower to

12  Shower bottle we're talking about?

13       A.    Yes.

14       Q.    Okay.  And what was it about

15  that particular bottle that made you

16  decide to keep it in the museum?

17       A.    I had already been asked to

18  pull Johnson's Baby Powder and Shower to

19  Shower artifacts.  So when that arrived,

20  I let the legal team know somebody just

21  donated this.  And so I kept it.

22       Q.    You said it was left in an

23  unmarked envelope at the --

24       A.    Security desk.

Margaret M. Gurowitz

1      Q.    At the security desk.  Is

2  that the museum security desk?

3      A.    Yes.

4      Q.    Okay.  So Johnson & Johnson

5  museum has a -- has a separate security

6  desk from the rest of Johnson & Johnson

7  corporate?

8      A.    Yes.  Because it's a -- it's

9  in its own building, so...

10      Q.    In order to be able to get

11  to the museum, would you first have to be

12  able to go through Johnson & Johnson

13  corporate security to get on the grounds?

14      A.    No.

15      Q.    So is the Johnson & Johnson

16  museum open to the public?

17      A.    No, it is not.

18      Q.    However, the public has the

19  ability to get to the museum and interact

20  with security personnel specifically

21  assigned to the museum?

22      A.    That's correct.

23      Q.    Okay.  How about the other

24  three samples that we talked about that

Margaret M. Gurowitz

1   were donated?  What information can you

2   give me about the first one that was

3   donated on September 19, 2017?

4           A.    That is -- it's listed as

5   cardboard metal.  So if it's a cardboard

6   container, it's likely one of the rare

7   containers from the 1940s era, World War

8   II era, in which the packaging was

9   switched to cardboard because metal was

10  not available due to the war effort.

11          Q.    Okay.  And this was donated

12  in September of 2017, correct?

13          A.    Correct.

14          Q.    This would have gone through

15  your process, and you would have been the

16  one who accepted it into the museum,

17  correct?

18          A.    Correct.

19          Q.    Do you have the name of the

20  individual who donated that product?

21          A.    I would have back at the

22  museum.  I didn't know that I needed to

23  bring it, so I do not.

24          Q.    And then same in regard to

Margaret M. Gurowitz

1  New Museum 3, would you have available to

2  you the name of the person who donated

3  the item designated as New Museum 3?

4       A.    No, I would not.  That's the

5  one that came in anonymously in the

6  envelope.

7       Q.    I'm sorry.  That's the one

8  that we -- that we've been talking about.

9  How about New Museum 1.

10      A.    New Museum 1.  I would have

11 to look.  Again, a lot of them just sort

12 of show up.  Sometimes people leave a

13 note.  Sometimes they don't.  So I would

14 have to go back and look.

15      Q.    Now, when you say a lot of

16 them just show up, we're only talking

17 about four.  Right now we're limited to

18 these four that were donated.

19      A.    Correct.  We get other

20 donations, vintage Band-Aid brand

21 adhesive bandage tins for safety, things

22 like that.

23      Q.    And then how about New

24 Museum 4?  Do you have any knowledge as

Margaret M. Gurowitz

1  to whether you know the person who

2  donated that particular product?

3        A.    Again, I would need to go

4  look through the record.  But -- but I --

5  as long as it's not donated anonymously

6  with no information, I do take the donor

7  name.

8        Q.    Earlier you had testified

9  about the Johnson & Johnson librarian who

10 had responsibility for overseeing the

11 museum samples before you took on that

12 responsibility.

13           Do you recall that?

14       A.    Yes.

15       Q.    What's the difference

16 between Johnson & Johnson librarian and

17 you as the Johnson & Johnson historian?

18       A.    I am a trained historian by

19 my educational background.  I also -- I

20 also work to research and tell stories

21 from the company's -- the history of the

22 company.

23           I maintain our current

24 museum.  The corporate librarian was a

Margaret M. Gurowitz

1  librarian.  She kept -- at the time they

2  had a library with books and periodicals.

3  She kept that.  She would look up

4  articles in those periodicals for people

5  who needed to see them.  And she also had

6  charge of what was in the old museum.

7        Q.    And is corporate librarian

8  still a position within Johnson &

9  Johnson?

10       A.    Not in corporate.  It may be

11  somewhere in Johnson & Johnson around the

12  world, but not that I'm aware of.

13       Q.    Okay.  Looking at your CV

14  for a second, which is Exhibit 4.  Your

15  first bullet point under your current

16  position, it references, "The Johnson &

17  Johnson Our Story At the Power House."

18             That's the current Johnson &

19  Johnson museum?

20       A.    Correct.

21       Q.    And where is that museum

22  located?

23       A.    It is located on our campus

24  in New Brunswick, New Jersey.

Margaret M. Gurowitz

1    Q.    And how long has that museum

2    been open?

3          A.    In its current state?

4          Q.    Yes.

5          A.    Since May of 2016 -- wait,

6    so this is 2018, which I can't -- I can't

7    believe.  We opened in 2016.

8          Q.    Okay.  Going back to

9    Exhibit 5.  Could you please tell me what

10   this document is?

11         A.    Yes.  This document

12   represents the research I conducted to

13   try to put together partial chains of

14   custody for the entirety of this list of

15   samples.

16               So these represent the

17   people I spoke to.  My handwriting

18   represents the people I spoke to in the

19   different groups that represent the

20   groups -- if you look at the leftmost

21   column that says department name -- that

22   are represented by those groups.

23               So some of the samples were

24   marked marketing.  So I asked to speak

Margaret M. Gurowitz

1  with folks in the marketing group who

2  might be able to shed some light on the

3  chain of custody for those.  The same

4  with R&D and quality, and also PTI.

5        I also spoke to Pam Downs

6  who does records management for our law

7  department because she had also sent out

8  a call for -- around Johnson -- around

9  Johnson & Johnson to try to identify any

10  samples that might be somewhere.  And the

11  typed list represents the people that Pam

12  spoke with.

13    Q.    Okay.  So as far as this

14  e-mail is concerned, the people on this

15  e-mail who you spoke with are Pam Downs,

16  correct?

17    A.    Yes.

18    Q.    Lorena Telofski?

19    A.    Correct.

20    Q.    Sarita Finnie from

21  marketing?

22    A.    Yes.

23    Q.    Barbara Brewer from

24  marketing?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    Mark Zappa from quality?

3    A.    Yes.

4    Q.    And Janet Stanish from PTI?

5    A.    Yes.

6    Q.    Okay.  And you spoke with

7    them in order to be able to get chain of

8    custody information in regard to offsite

9    samples; is that correct?

10   A.    That is correct.

11   Q.    Okay.  Did you have any

12   conversations with them in regard to any

13   of the museum samples that are contained

14   in the museum list?

15   A.    No, I did not.

16   Q.    Now, you referred to Janet

17   Stanish from PTI.  What were the

18   conversations that you had with Janet

19   Stanish from PTI?

20   A.    Well, so PTI is the one that

21   we actually can put a chain of custody

22   together for.  So what I asked Janet --

23   and the PTI samples are the ones in the

24   back that just say lot number, sample

Margaret M. Gurowitz

1    number.

2             And so what I asked -- so

3    PTI as the contract manufacturer, they

4    are required by their contract to keep

5    samples for either four years from date

6    of manufacture or one year after

7    expiration date, whichever comes first.

8             And so they send -- they

9    received a request to send their samples

10   to the lab.  They did so.

11            So I asked Janet how the

12   samples were stored, whether they were

13   stored onsite at PTI or offsite, how they

14   sent -- packaged the samples up to send

15   to the lab, and also what it meant, on

16   the one that has the four columns across,

17   what the quantity column referred to.

18        Q.    So I'm going to interrupt

19   you for a second because now you're

20   starting to refer to a document.  And I

21   just want to make sure we are all looking

22   at the document?

23        A.    Sorry.

24        Q.    So when you said -- you were

Margaret M. Gurowitz

1    referring to -- you asked her a question

2    about a column?

3         A.    Yes.

4         Q.    What document are you

5    looking at right now?

6         A.    So that is in the documents

7    I have here.  It's marked --

8         Q.    The sample list?

9         A.    The sample document.  The

10   sample list.  So this would be the

11   Exhibit C part of the sample list.

12        Q.    And then for clarity, why

13   don't we work off of the numbers that are

14   at the top of the page where it says --

15   the one that I'm looking at right now is

16   Page 71 of 91.  If you could refer to the

17   specific page that you were looking at.

18        A.    Sure.  I am looking at Page

19   64 of 91.  It is part of that same

20   subset.

21        Q.    And you said you had

22   questions in regard to the fourth column,

23   which was sample number?

24        A.    So it was part of my

Margaret M. Gurowitz

1   conversation with Janet, just to put

2   together -- because this area is the area

3   that we can do the most complete chain of

4   custody for.  The others are just little

5   pieces.  But I was not able to put

6   together full chains of custody.

7                  So Janet said the samples

8   were stored at a storage room at the PTI

9   facility.  They were stored in containers

10  on shelves.

11                 The quantity column, the one

12  represents a sealed container of

13  Johnson's Baby Powder.  So where they had

14  more than one sample, they were able to

15  send a sealed container.  Where they only

16  had one, what they did was they took out

17  a portion of that and put it in a sealed

18  cup, which they labeled, that would be

19  represented by the columns that say --

20  the entries that say 0.5.

21                 She said they then put them

22  on pallets and took them by truck to a

23  lab in Georgia where they initially

24  thought that the separation, the

Margaret M. Gurowitz

1  splitting was going to happen.  And then

2  when it was determined that it was going

3  to happen in New Jersey, they Federal

4  Expressed them from that lab to

5  Georgia -- from the lab in Georgia to New

6  Jersey, to the lab in New Jersey.

7        Q.    Other than discussions that

8  you had with Ms. Stanish in regard to the

9  PTI samples, did you have any other

10 discussions with her at all?

11       A.    No.

12       Q.    When was it that you first

13 spoke with Ms. Stanish?

14       A.    It was earlier this week.

15 So it was the very beginning of the week.

16       Q.    For how long did you speak

17 with her?

18       A.    It was 15 minutes, maybe.

19 It was a very short conversation.

20       Q.    And is that the only time

21 that you spoke with her?

22       A.    Correct, yes.

23       Q.    And did you take any notes

24 during that particular conversation?

Margaret M. Gurowitz

1      A.    No, I did not.

2            MR. LAPINSKI:  Why don't we

3      go off the record.

4            THE VIDEOGRAPHER:  The time

5      is 10:36 a.m.  We are off the

6      record.

7            (Short break.)

8            THE VIDEOGRAPHER:  We are

9      back on the record at 10:52 a.m.

10  BY MR. LAPINSKI:

11      Q.    Ms. Gurowitz, before the

12  break we were talking about several

13  samples that had been donated to the J&J

14  museum.  Do you recall that?

15      A.    Yes.

16      Q.    And I believe you had

17  testified that to the extent you had

18  recorded the names of individuals who had

19  donated particular items, they would be

20  available to you in a database that you

21  maintain; is that correct?

22      A.    Yes.

23      Q.    And that's a cloud-based

24  database?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    If on a break we were to

3  make -- give you access to a computer,

4  would you be able to access that database

5  and get the names of any individuals who

6  donated product?

7        Excuse me.

8    A.    I have the -- I have the

9  connection from my laptop.  So I wouldn't

10  be able to.  So it's -- it's like a path,

11  a specific pathway.  So I wouldn't be

12  able to without the login screens and

13  things like that.

14    Q.    Okay.  Before the break I

15  had given you Exhibit 5, which was an

16  e-mail that you were -- that was sent to

17  you in regard to potential individuals to

18  speak to about chain of custody, correct?

19    A.    This e-mail was sent to me

20  as -- the typed part of the e-mail from

21  Pam Downs is a list of people that she

22  spoke to trying to find out if there were

23  any more samples around.

24    Q.    Okay.  And then the

Margaret M. Gurowitz

1    handwritten names are the names of the

2    people that you spoke to, correct?

3         A.    Correct.

4         Q.    We were talking about your

5    conversation with Janet Stanish from PTI

6    before the break.  You said you did speak

7    with miss Stanish once, correct?

8         A.    Correct.

9         Q.    And you spoke with her for

10   about 15 minutes?

11        A.    About that, yes.

12        Q.    Okay.  Did you do any other

13   research in regard to the 400-plus PTI

14   samples that are identified as it relates

15   to chain of custody?

16        A.    I just -- I just looked at

17   the list and then I spoke with Janet.

18        Q.    If -- as we sit here today,

19   if I were to pick out a specific sample

20   from the list of PTI, would you be able

21   to discuss the chain of custody -- chain

22   of custody for a specific sample?

23             MS. FOURNIER:  Objection.

24             THE WITNESS:  As part of the

Margaret M. Gurowitz

1    overall set, I would, because I

2    did talk to Janet about the chain

3    of custody for the collection of

4    samples.

5  BY MR. LAPINSKI:

6        Q.    Okay.  You had testified

7  that -- and why don't we -- why don't we

8  go to, so that we're looking at the list

9  of samples that had been provided by PTI.

10       A.    Okay.

11       Q.    And just for point of

12 reference, why don't we work off of the

13 same page that we were working off of

14 before, which I believe was Page 64.

15       A.    I think we may be looking at

16 different iterations of this, because

17 mine says Exhibit 2.

18       Q.    Mine is just stacked

19 differently.  I think we're getting to

20 the same page.

21       A.    Okay.

22       Q.    Because this isn't my --

23 that's not my PTI stuff.

24       A.    Oh, okay.

Margaret M. Gurowitz

1       Q.    So if you're looking at Page

2  64 of 91, the first lot number should be

3  2362 RB, correct?

4       A.    Correct.

5       Q.    Okay.  So you had -- you had

6  testified that in the quantity column, if

7  there is a one listed in the quantity

8  column, then that means that PTI had at

9  least one sealed sample; is that correct?

10       A.    That means that PTI had more

11  than one sealed sample.

12       Q.    PTI had more than one sealed

13  sample, but they only produced one

14  sample, correct?

15       A.    That is correct.

16       Q.    Okay.  Do you know how many

17  additional samples are in the possession

18  of PTI that have not been produced?

19       A.    I do not know.  I do know,

20  through my conversation with Janet, that

21  they are required by their contract with

22  Johnson & Johnson that they need to keep

23  samples of the finished product.  So they

24  were -- so if they had more than one

Margaret M. Gurowitz

1    sealed bottle of the finished product,

2    they could then send an entire sealed

3    bottle.  So, for example, if they had two

4    bottles, hypothetically, of a product,

5    they could send one bottle to the lab and

6    they would keep one bottle as part of

7    their contractual obligations.

8              If they only had one bottle

9    total of that particular product, then

10   they had to divide it.  And that's what

11   the 0.5's represent.

12        Q.    And is it your understanding

13   that all of the samples that were

14   produced by PTI were finished products

15   that were in a sealed bottle?

16        A.    No.  That was not my

17   understanding.  The ones on the pages

18   that have four columns across were the

19   finished product samples.

20              The ones on the pages that

21   only have three columns across --

22        Q.    Okay.  So I'll interrupt you

23   for a second, and let's turn.  I'm

24   looking at Page 72 of 91 right now.

Margaret M. Gurowitz

1        A.    Okay.  I can't used to
2   double-sided.
3        Q.    I was just about to say,
4   I've made it a little more difficult on
5   you in order to save the trees.  I have
6   them double-sided, so it's becoming a
7   little more difficult for you.
8            We're looking at Page 72 of
9   91?
10       A.    Yes.
11       Q.    And you started to provide
12  some testimony in regard to the samples
13  that are listed on the page with three
14  columns.  Is this what you're referring
15  to?
16       A.    That is what I'm referring
17  to.
18       Q.    And what is your
19  understanding of these samples?
20       A.    It is my understanding that
21  these samples are raw talc and not
22  finished product.
23       Q.    Okay.  If we can go back
24  to -- first of all, staying with PTI for

Margaret M. Gurowitz

1  a minute.  Is there anyone other than

2  Janet Stanish that you spoke with in

3  regard to PTI samples?

4        A.    No.  It was just Janet.

5        Q.    Going back to Exhibit 5 and

6  the other people that you spoke with.

7  You wrote down Mark Zappa from quality,

8  correct?

9        A.    Correct.

10       Q.    Okay.  And you had a

11  conversation with Mark Zappa in regard to

12  chain of custody?

13       A.    I did.

14       Q.    Okay.  When was the first

15  time that you spoke with Mr. Zappa?

16       A.    Oh, it was -- I don't have

17  the date.  It was a few weeks ago.

18       Q.    And for how long did you

19  speak with Mr. Zappa?

20       A.    Again, it was not a

21  tremendously long conversation.  It would

22  have been under 30 minutes.

23       Q.    Okay.  And what was the

24  substance of the conversation that you

Margaret M. Gurowitz

1   had with Mr. Zappa?

2          A.    So I was trying to piece

3   together chain of custody for the samples

4   that are marked quality assurance.  And I

5   will turn to those and let you know what

6   page those are on as soon as I find them.

7   I'm sorry.  I always forget to look on

8   the other side of the double-sided.

9          Q.    If I can find it, I'll let

10  you know.

11         A.    On Page 37 of 91.

12         Q.    So on Page 37 of 91, there

13  are two samples that are listed as coming

14  from the quality assurance department; is

15  that correct?

16         A.    That is correct.

17         Q.    And that's Samples JBP-294

18  and JBP-295, correct?

19         A.    That is correct.

20         Q.    Are they the only two

21  samples that you spoke with Mr. Zappa

22  about?

23         A.    Yes, I believe they are.  I

24  think those are the only two marked

Margaret M. Gurowitz

1   quality assurance on the list.

2         Q.    And did you take notes while

3   you were speaking with Mr. Zappa?

4         A.    No, I did not.

5         Q.    So you spoke with Mr. Zappa

6   for about a half hour in regard to these

7   two samples, correct?

8         A.    Yes.

9         Q.    And what did Mr. Zappa tell

10  you in regard to these two samples?

11        A.    Mr. Zappa said that these

12  particular samples are from 1984 so they

13  are beyond the memory of any employee

14  still in quality assurance, in that area.

15             They were found in -- they

16  were pulled from offsite storage in a box

17  of general products, not just Johnson's

18  Baby Powder, but other products and other

19  items.  And the box was labeled quality

20  assurance.

21             I asked Mark if it were the

22  practice of quality assurance to send

23  samples to offsite storage.  He said no,

24  it was not their practice.  They did not

Margaret M. Gurowitz

1  send samples to offsite storage.  So he

2  was not sure how or why they initially

3  got in those boxes.

4           In the conversation, we

5  determined that it's possible that these

6  were just things that were boxed up from

7  the quality assurance area, whatever area

8  they occupied, and they found their way

9  into that box, and it was labeled quality

10 assurance because that's the area of the

11 building they had occupied.

12      Q.    Okay.  So did Mr. Zappa have

13 any other information in regard to these

14 two samples other than what you just

15 shared?

16      A.    He did not.

17      Q.    Did he give -- did he say

18 that he was aware that the bottles were

19 damaged in any way?

20      A.    He did not mention that.

21      Q.    Did he indicate at all that

22 he had knowledge of the bottles having

23 been tampered with at any particular

24 time?

Margaret M. Gurowitz

1    A.    He did not.

2    Q.    Did he indicate that the

3  bottles had been previously donated by

4  someone outside of Johnson & Johnson?

5    A.    He did not.  Again, they

6  were so old that they were beyond the

7  memory of anyone -- of certainly him and

8  anyone in that area.  Nobody was --

9  nobody was -- is currently there who was

10  there when these were sent to offsite

11  storage.

12    Q.    Did Mr. Zappa refer you to

13  any documents during your conversation?

14    A.    No, he did not.

15    Q.    Did he send you any

16  documents prior to or subsequent to your

17  conversation?

18    A.    He did not.

19    Q.    And you said you didn't take

20  any notes when you spoke with Mr. Zappa?

21    A.    I wrote down his name.

22    Q.    Did the two of you discuss

23  anything else?

24    A.    No.

Margaret M. Gurowitz

1    Q.    You also noted here that you

2  spoke with Barbara Brewer from marketing,

3  correct?

4    A.    That is correct.

5    Q.    And before we get to

6  Ms. Brewer, did Mr. Zappa indicate to you

7  that there was anyone else from within

8  marketing who may have -- I'm sorry.

9        Did Mr. Zappa indicate to

10 you that there was anyone else within the

11 quality department who may have

12 information in regard to these two

13 samples?

14   A.    No, he did not.

15   Q.    Now, you wrote down that you

16 had also spoken with Barbara Brewer from

17 the marketing department, correct?

18   A.    That is correct.

19   Q.    And how many times did you

20 speak with Ms. Brewer?

21   A.    Just once.

22   Q.    Okay.  And when was it that

23 you spoke with Ms. Brewer?

24   A.    It was a few weeks ago.

Margaret M. Gurowitz

1    Q.    Okay.  For how long did that

2    conversation last?

3    A.    Anywhere between half hour,

4    45 minutes.

5    Q.    And what was the subject of

6    your conversation with Ms. Brewer?

7    A.    An attempt to piece together

8    chain of custody for the offsite samples

9    that are labeled marketing as department

10   name.

11   Q.    And looking at the list,

12   would you agree that the majority of

13   offsite samples are samples that fall

14   under the marketing department?

15   A.    Yes.

16   Q.    Okay.  And what was the

17   substance of the conversation that you

18   had with Ms. Brewer?

19   A.    The substance of the

20   conversation was that these were sent to

21   offsite storage so long ago that they

22   were again beyond the memory of any

23   employee still there.  And Barbara Brewer

24   is an employee who has been with the

Margaret M. Gurowitz

1    company a long time.  And it was still

2    outside of her memory as an employee.

3              So -- but, so we -- we

4    discussed that.  She did say that it is

5    not the practice of marketing to send

6    samples to offsite storage and that these

7    boxes were labeled marketing, but since

8    it is not part of marketing's policy and

9    practice to send samples to offsite

10   storage, she doubted whether the

11   marketing group that long ago had sent

12   them.

13             And so that was part of my

14   attempt to piece together the chain of

15   custody.  And we had determined that

16   probably the bulk of the samples that are

17   labeled marketing had been separated from

18   the old Johnson & Johnson museum in 1982,

19   sent back to the consumer company, and

20   then somebody there sent them to offsite

21   storage, and they had gotten -- they were

22   labeled marketing likely because they

23   were product samples.

24             Q.    You say that Ms. Brewer

Margaret M. Gurowitz

1    indicated that it was not the practice of

2    the marketing department to send samples

3    to offsite storage; is that correct?

4         A.    That is correct.

5         Q.    Do you know whether or not

6    it is the practice of the marketing

7    department to maintain product samples?

8         A.    I do not.  I think she said

9    if they maintained something, it would be

10   for really -- I was trying to -- since we

11   were trying to track chain of custody, it

12   was not part of the discussion because I

13   was concerned with these particular

14   samples.  She said -- she did say that it

15   was not their practice to send them to

16   offsite storage.

17        Q.    And what else did you

18   discuss with Ms. Brewer?

19        A.    It was -- that was it.  Just

20   around these samples and how they had

21   gotten into offsite storage originally.

22        Q.    Okay.  It indicates here

23   that you also spoke with Ms. Finnie from

24   the marketing department?

Margaret M. Gurowitz

1      A.      That is correct.

2      Q.      Okay.  And did you speak

3   with Ms. Finnie before or after you had

4   spoken with Ms. Brewer?

5      A.      At the same time on the same

6   call.

7      Q.      The two of them were on the

8   same call?

9      A.      Correct.

10      Q.      Okay.  And what information

11   did Ms. Finnie share with you in regard

12   to marketing samples?

13      A.      Sarita Finnie has a much

14   shorter tenure with the company.  So she

15   asked Barbara Brewer, who is a long-term

16   employee, to be on the call, because

17   Sarita did not have any information about

18   the samples.

19      Q.      And it was -- if I

20   understand correctly, Ms. Downs had

21   recommended that you contact either

22   Sarita Finnie or Katie Decker from

23   marketing in regard to chain of custody;

24   is that correct?

Margaret M. Gurowitz

1      A.     That is not --

2             MS. FOURNIER:  Objection.

3             THE WITNESS:  That is not

4      correct.  The typed list

5      represents people that Pam Downs

6      reached out to because she thought

7      they might know of samples.

8  BY MR. LAPINSKI:

9      Q.     Okay.  When you reached out

10 to the marketing department, who was the

11 person in the marketing department that

12 you first reached out to?

13     A.     I asked the legal team if I

14 could find, if I could speak with

15 somebody in the marketing group.  Sarita

16 who leads that team was identified.  And

17 then she asked Barbara to participate

18 because she has a much shorter tenure

19 with the company and she did not have any

20 information.  And she was hoping that

21 Barbara would.

22     Q.     And do you know what

23 Ms. Finnie's title is?

24     A.     I don't know exactly.  We

Margaret M. Gurowitz

1  could -- we could find out for you.

2       Q.    And do you know what

3  Ms. Brewer's title is?

4       A.    I don't know her exact

5  title, but she's an administrative

6  assistant.

7       Q.    Was there anyone else on the

8  call other than Ms. Finnie and Ms. Brewer

9  when you spoke with them?

10       A.    Just one of the legal folks

11  who facilitated the call.

12       Q.    Okay.  Was it an outside

13  attorney or was it an inside attorney?

14       A.    Outside.

15       Q.    Do you know who that

16  attorney was?

17       A.    It was Andrew Karp.

18       Q.    Okay.  Did Ms. Finnie or

19  Ms. Brewer share any other information

20  with you other than what we discussed?

21       A.    No.

22       Q.    You also indicate here that

23  you spoke with Lorena Telofski from

24  research and development; is that

Margaret M. Gurowitz

1   correct?

2          A.     That is correct.

3          Q.     Okay.  And when did you

4   first speak with Ms. Telofski?

5          A.     It was a few weeks ago.

6          Q.     And for how long did that

7   telephone conversation last?

8          A.     Again, probably somewhere

9   between half hour, 45 minutes.

10         Q.     Taking a step back to the

11  marketing people that we spoke about.

12  Did the marketing people send you any

13  documents in regard to -- in follow-up to

14  the conversations that you had?

15         A.     They did not.

16         Q.     Did they send you any

17  documents prior to the conversation that

18  you had?

19         A.     They did not.

20         Q.     Okay.  Going back to Ms.

21  Telofski.  You said you spoke with her a

22  couple weeks ago?

23         A.     Yes.

24         Q.     And the conversation lasted

Margaret M. Gurowitz

1  about a half hour?

2        A.    Somewhere between half hour,

3  45 minutes.

4        Q.    Okay.  And what did you

5  speak to Ms. Telofski about?

6        A.    I was attempting to try to

7  piece together a chain of custody for the

8  samples on the list that are marked

9  research and development.  That would

10 start on Page 18 of 91.

11       Q.    What information did

12 Ms. Telofski give you in regard to these

13 samples?

14       A.    Ms. Telofski, the first set

15 of samples are actual Johnson's Baby

16 Powder.  Again, they were -- they were

17 much older, and she didn't have

18 information specifically.  She did say

19 that research and development again did

20 not have a practice of sending things to

21 offsite storage.  She did say that the

22 ones that were not United States products

23 would likely have been kept by someone as

24 souvenirs because it was interesting

Margaret M. Gurowitz

1  because they were from outside of the

2  U.S.

3       Q.    And just for purposes of

4  clarification, the first five research

5  and development samples that we're

6  talking about which are JBP-1, 2, 3, 4

7  and 6 are samples which originated from

8  Mr. Ashton's office; is that correct?

9       A.    Or the area around

10  Mr. Ashton's office.  There was, as I

11  understand it, an open common area.  And

12  these things were in that space.

13       Q.    Did Ms. Telofski -- did

14  Ms. Telofski indicate that she had any

15  knowledge that the samples -- the

16  research and development samples were

17  part of any type of research project?

18       A.    She did not.

19       Q.    If you turn to Page 46 of

20  91.

21       A.    I'm not seeing it.  I'm

22  sorry.

23       Q.    Take your time.

24       A.    They've gotten maybe a

Margaret M. Gurowitz

1  little out of order.  48 of 91?

2          Q.     46.

3          A.     46.  Okay.

4          Q.     And at the bottom of Page

5  46, there's an entry for a sample from

6  the research and development department

7  and it starts RR-001; is that correct?

8          A.     That is correct.

9          Q.     And do you know what the RR

10 designation refers to?

11         A.     I do not.

12         Q.     Do you know where the RR

13 designation came from?

14         A.     I do not.  But I believe the

15 sample number, those were -- the legal

16 team that collected these, those are

17 their sample numbers.  So the one

18 directly above RR-001, STS would be

19 Shower to Shower, but I don't know what

20 the RR stands for.

21         Q.     And did you inquire at all

22 from Ms. Telofski what that represented?

23         A.     I did not, because it was

24 pretty clear from the label column that

Margaret M. Gurowitz

1  we were talking about rocks.

2      Q.    Okay.  And is it your

3  assumption that all of these samples that

4  are labeled with a sample number

5  beginning with RR refers to a raw rock?

6      A.    Yes, they would appear to do

7  that.

8      Q.    And is that your testimony,

9  that they all refer to raw rock?

10      A.    If that's -- they all refer

11  to -- they all refer to rocks, yes.

12      Q.    Okay.  And what was the

13  specific testimony -- what was the

14  specific information that Ms. Telofski

15  had given to you?

16      A.    Ms. Telofski said that these

17  rocks were in that common area that

18  Mr. Ashton, who retired -- she said he

19  was active I believe during the '60s,

20  '70s and part of the '80s, retired, and

21  then subsequently passed away.

22              He collected things when he

23  traveled around the world.  And the rocks

24  were part of his collection.

Margaret M. Gurowitz

1    Q.    And did Ms. Telofski tell

2  you anything else in regard to the

3  samples that are from the research and

4  development department?

5    A.    She said that after

6  Mr. Ashton passed away, that his daughter

7  said -- came with a box of rocks that he

8  had at his house and gave them to

9  Ms. Telofski.

10   Q.    And from this list, are you

11 able to identify which samples would have

12 been samples that came from Mr. Ashton's

13 daughter's home?

14   A.    I am not.

15   Q.    Okay.  Did you make any

16 further inquiry in regard to that?

17   A.    About which samples came

18 from his daughter?

19   Q.    Yes.

20   A.    It was relayed to me that

21 they were just put in boxes with the

22 other rocks.

23   Q.    Do you know what

24 Mr. Ashton's daughter's name is?

Margaret M. Gurowitz

1    A.    I do not.

2    Q.    Did you speak with

3  Ms. Telofski in regard to any samples

4  other than those from the research and

5  development department?

6    A.    No, I did not.

7    Q.    Is there anything else that

8  you discussed with Ms. Telofski that you

9  have not yet mentioned?

10    A.    Just sort of the movement of

11  these items, the rocks that were not

12  brought back by Mr. Ashton's daughter

13  were in -- on shelves, you know, some

14  sort of storage unit in sort of the

15  common area that had been outside of the

16  area -- around the area that his office

17  had been in.

18         And then Ms. Telofski had to

19  box these up at some point somewhere

20  around 2006 when her group moved floors.

21  She boxed them up and they sat in boxes

22  in her office for quite a number of

23  years.  Around the 2016 time frame, they

24  were informed that there was going to be

Margaret M. Gurowitz

1  construction on that space in the

2  building and it was moving to open plan

3  work space which would have no storage.

4  And at that time these items were sent to

5  offsite storage.

6           Q.    And you said that was around

7  2016?

8           A.    Yes.  In that time frame.

9           Q.    Okay.  And then lastly, you

10  indicated that in preparation you spoke

11  with Pam Downs, correct?

12           A.    I spoke with -- Pam Downs

13  was the next-to-last conversation I had,

14  yes.

15           Q.    Okay.  And when did you

16  speak with Ms. Downs?

17           A.    Maybe a week or two ago.

18           Q.    And for how long did you

19  speak with Ms. Downs?

20           A.    Probably less than

21  30 minutes.

22           Q.    Okay.  And what was your

23  conversation with Ms. Downs in regard to?

24           A.    My conversation with Pam

Margaret M. Gurowitz

1  Downs was whether she had identified

2  any -- any other samples or she, in this

3  list of people that she spoke to, that

4  they had -- they were able to provide any

5  information regarding the chain of

6  custody for the samples on this list.

7       Q.    And did she give you any

8  additional information?

9       A.    She said they -- the folks

10 that she spoke to were not able to

11 identify any other samples, and they had

12 no information about chain of custody.  I

13 mean other than -- you know, because she

14 spoke with some of the folks I spoke

15 with, although I spoke with the folks

16 before I spoke with Pam.  So other than

17 what was relayed to me by them.

18      Q.    So it's your understanding

19 that other -- other than the people who

20 you spoke with, there's no one who has

21 any knowledge as it relates to chain of

22 custody of the offsite samples?

23      A.    That is my understanding.

24      Q.    Now, you said that Pam Downs

1   was the next-to-last person that you had

2   spoken with?

3        A.    Correct.

4        Q.    Is there someone else that

5   you spoke with who we've not discussed?

6        A.    No.

7        Q.    Okay.  What did you mean

8   when you said she was the next to last

9   person you spoke with?

10        A.    I spoke with Janet Stanish

11   from PTI after I spoke with Pam.

12        Q.    Okay.  So you're talking

13   just in the chronology of things,

14   Ms. Downs was the second-to-last person

15   that you had spoken with?

16        A.    Correct.

17        Q.    Okay.  Ms. Gurowitz, when

18   were you first contacted about this

19   deposition?

20        A.    Oh, I'm trying to think.

21   I'm trying to think back of the entire

22   chronology of pulling the samples and the

23   deposition.

24            It was a few weeks ago.  I'm

Margaret M. Gurowitz

1   sorry.  I don't remember the exact date.

2          Q.    By whom were you contacted?

3          A.    I was contacted by the

4   outside legal folks who were working with

5   us.

6          Q.    Okay.  Is providing

7   testimony regarding chain of custody a

8   normal part of your job function?

9          A.    I've never done it before.

10          Q.    Okay.  Have you in the past

11   ever had to provide any type of an

12   affidavit in regard to the chain of

13   custody for any type of Johnson & Johnson

14   product in your capacity as the

15   historian?

16          A.    I have not had to provide an

17   affidavit.

18          Q.    And as we've discussed,

19   you've had to educate yourself in order

20   to prepare for the testimony today,

21   correct?

22          A.    That is correct.

23          Q.    Okay.  Other than talking to

24   the people who we just spoke with, what

Margaret M. Gurowitz

1  have you done in order to prepare to

2  testify today?

3      A.    I looked at documents that

4  were in the corporate archives.

5      Q.    And did you -- did you

6  search out those specific documents in

7  order to educate yourself?

8      A.    Yes, I did.

9      Q.    Okay.  And what documents

10  did you look at?

11      A.    I believe you have them.

12  There is an internal memo from about the

13  1981, 1982 time frame that said that the

14  law department, which was in charge of

15  the old Johnson & Johnson museum, was

16  going to disband and close the museum and

17  eliminate the collection because they no

18  longer had space.  They were keeping it

19  for the purposes of keeping a trademark

20  history.  So, you know, the changes over

21  time in the labels and the packaging and

22  the colors used, things like that.

23          And so this memo said that

24  they would then be sending the relevant

1    artifacts back to the operating

2    companies.

3         Q.    And what other documents did

4    you look at?

5         A.    There was another document

6    that, from the same time frame from the

7    then head of public relations who said

8    whatever does not get sent back we're

9    going to keep a part of this collection,

10   because it helps us tell the story of the

11   history of Johnson & Johnson.

12        Q.    Now, when you went to look

13   at documents in the corporate archives,

14   what was the process -- what was the

15   process that you used when you were in

16   the corporate archives?  What was it

17   first that you were looking at where you

18   then came upon these documents?

19        A.    So what I was trying to do

20   is I was trying to track -- piece

21   together as much of a chain of custody as

22   was possible for the -- for the sample

23   items labeled marketing that had been in

24   offsite storage, because most of them,

Margaret M. Gurowitz

1   many or most of them had at one point

2   been in the old museum collection.

3              So I went and looked at

4   documents in the archives that related to

5   the historical management of that old

6   museum and found that document from about

7   the 1982 time frame saying that the

8   museum, the collection would be disbanded

9   and the artifacts, the items would be

10  sent back to the operating companies.

11         Q.    Okay.  Now, when you talk

12  about looking at documents in the

13  corporate archives, is this something

14  that you're able to do by going online on

15  an internal J&J database to access the

16  documents --

17         A.    It is --

18         Q.    -- or are you going to a --

19         A.    It's that --

20         Q.    -- file and pulling a file?

21         A.    It's that cloud-based

22  database, which tells me the location of

23  what I'm looking for.  And then I would

24  go back into the archives, look for the

Margaret M. Gurowitz

1    relevant shelf and acid-free file box and

2    then pull those.

3         Q.    So you said that the cloud

4    is able to tell you where to go for what

5    you're looking for.  When you started the

6    process, what was the -- what was the

7    search term or terms that you used in

8    order to start this document search

9    process?

10        A.    So those -- there are a few

11   boxes, and when I say boxes, they are

12   slim boxes of museum records, files, and

13   so I looked for those.

14        Q.    So this is before you

15   went -- before you went online, you

16   looked at a physical box of documents?

17        A.    So I went into the database

18   that helps us manage the collection,

19   tells us where everything is.

20        Q.    Okay.

21        A.    I looked up the location,

22   and then pulled those boxes and found

23   that document that I had mentioned

24   before.

Margaret M. Gurowitz

1    Q.    So just so that I can
2  clarify.  When you went into the database
3  in order to look for the boxes, what were
4  the search term or terms that you used in
5  order to be pointed to those boxes?
6    A.    So I used museum management
7  records as the search term, because it
8  would have been part of the museum
9  management records.
10    Q.    And that search term led you
11  to -- I'm sorry -- you said one or two
12  boxes?
13    A.    Yes.  It's just a very few
14  boxes.  And when I say boxes I'm not
15  talking about, you know, those big sort
16  of banker boxes, file boxes.  These are
17  sort of slim, acid free storage boxes in
18  which there are acid free file folders
19  and the documents were in those folders.
20    Q.    And how many documents in
21  total do you think you reviewed in
22  preparation for the deposition?
23    A.    I -- there were two that
24  applied specifically to putting together

Margaret M. Gurowitz

1  chain of custody, so those were the ones

2  that I reviewed.

3      Q.   And they're the two

4  documents that you referenced, the 1982

5  document and the memo in and around that

6  time?

7      A.   Yes.

8      Q.   Okay.  Were there any other

9  documents that you reviewed that you did

10  not consider to be relevant?

11      A.   There were other things that

12  had complete non-relevance.  They were,

13  you know, research inquiries from

14  students that date back, you know, things

15  like that, completely irrelevant.

16      Q.   Okay.  So approximately how

17  many pages in total did you review as you

18  were looking for materials of relevance

19  to you?

20      A.   So I looked through the file

21  folders in those boxes.  I don't have a

22  count on pages.  But those were the two

23  documents that were of relevance.

24      Q.   Okay.  They're the only two

Margaret M. Gurowitz

1  documents that you feel provided you with

2  any type of information that you're able

3  to share here today?

4        A.    Regarding the dispersal of

5  the collection.  Again, I was trying to

6  piece together as much of a chain of

7  custody as I could for the ones that were

8  labeled marketing on the list.

9        Q.    Okay.  And as far as the

10 other samples that are on the list,

11 whether for the offsite samples or for

12 the museum samples, was there any

13 other -- any other work that you did in

14 order to prepare yourself?

15       A.    I spoke to people who I had

16 hoped would have information about those

17 particular items.

18       Q.    Okay.  Now, how about within

19 the museum itself.  Did you speak with

20 anybody in the museum in regard to chain

21 of custody and samples?

22       A.    It's just me, so...

23       Q.    Okay.  So other than doing a

24 search for and pulling some documents,

Margaret M. Gurowitz

1  the remainder -- and speaking to the --

2  speaking to the people who you spoke

3  with, there is no other work that you did

4  in preparation for the deposition?

5       A.    That was it.  There's one

6  other set of documents that was provided

7  to me.  It was a set marked Drawer 5E

8  that seems to represent at least some of

9  the items that are in the -- listed as

10 marketing in the samples.  And so I could

11 not make a direct correlation with

12 everything on that list with everything

13 here.  But there's some that you can say,

14 okay, yes, so these do look like they

15 came from the collection of the old

16 museum, were sent back to the operating

17 unit, and the operating unit sent them to

18 offsite storage.

19       Q.    And by whom was this Drawer

20 5E file provided?

21       A.    It was -- it was obtained as

22 part of this process.  And so it was

23 provided so that I could try to -- you

24 know, I was -- in doing research, it was

Margaret M. Gurowitz

1  provided so that I could try to piece

2  together, again, chain of custody for the

3  items marked marketing.

4       Q.    Okay.  You said it was

5  obtained as part of this process.  Who --

6  let's go back to my original question.

7  Who gave it to you?  Who gave the Drawer

8  5E file to you?

9       A.    So I believe originally the

10 outside legal folks.

11      Q.    Okay.  And did you have any

12 role in compiling the information that

13 was in drawer -- the drawer 5E file?

14      A.    No.  It very much predates

15 my tenure at Johnson & Johnson.

16      Q.    Okay.  But the file is a

17 Johnson & Johnson file?

18      A.    What they were -- it's -- it

19 was -- it was -- there were copies of old

20 typed transfer sheets to transfer the

21 items to offsite storage from about 1982.

22      Q.    And other -- other than the

23 old typed transfer sheets, was there

24 anything else in that -- in that

Margaret M. Gurowitz

```
 1   particular file?

 2         A.     I believe that was it.

 3         Q.     And did you meet with

 4   counsel in preparing for today's

 5   deposition, with your -- the attorneys

 6   for Johnson & Johnson?

 7         A.     Yes.

 8         Q.     Okay.  When was the first

 9   time that you met with them?

10         A.     To prepare for the

11   deposition --

12         Q.     Correct?

13         A.     -- or to pull the samples?

14                I'm trying to remember

15   exactly.  Maybe in the past few weeks to

16   month or so.  It was after I was notified

17   that I would be deposed.

18         Q.     Okay.  And how many times

19   did you end up meeting with counsel?

20         A.     I don't have a -- it would

21   be single digits, but I don't have -- I

22   don't know if I could give you an exact

23   number.

24         Q.     Okay.  But less than ten?
```

Margaret M. Gurowitz

1      A.      Yeah.

2      Q.      Okay.  And approximately how

3  long did you meet with them each time you

4  met?

5      A.      Two were most of the day

6  meetings.  The other ones were short.

7  Maybe just an hour, few hours, hour or

8  so.

9      Q.      And telephone or in person?

10      A.      Both.

11      Q.      Okay.  And if you could just

12  make sure to speak up a little bit.

13      A.      Sure.  I'm sorry.

14      Q.      That's quite all right.  I

15  want to make sure we're able to hear

16  everything.

17              Now, you mentioned that that

18  you met with counsel in order to prepare

19  for the deposition.  But you also had

20  meetings with counsel for purposes of

21  gathering samples, correct?

22      A.      That is correct.

23      Q.      Okay.  What role did you

24  play in gathering samples?

Margaret M. Gurowitz

1    A.    I gathered the samples that

2  were specifically from the current

3  museum, the ones on -- that are marked

4  museum collection.  I can give you a page

5  number on which to start.

6           So the ones -- it should --

7  it starts with Page 2 of 8, page ID is

8  13369.

9           So that was the ones that --

10  where the leftmost column is museum

11  number.

12    Q.    Okay.  And you were

13  responsible for gathering all of these

14  samples and providing them to counsel?

15    A.    Yes.

16    Q.    Okay.  Did you also -- were

17  you also responsible for packing these

18  samples?

19    A.    I worked with the legal

20  folks on that, just because it's a

21  massive job, and it helps if there's more

22  than one person doing it.

23    Q.    And what was -- what was the

24  process that was followed in preparing

Margaret M. Gurowitz

1  all of these samples for shipment?

2          A.    So I pulled them from the

3  archival storage, and I wear gloves,

4  obviously, when I handle fragile and old

5  artifacts.

6                They were then taken out of

7  the acid free tissue paper that they were

8  wrapped in out of the archival boxes.

9  They were noted by the legal folks.  They

10 were put into boxes for transport to the

11 lab.  And then they were -- each item was

12 checked off on a transfer sheet and

13 signed and initialed.

14         Q.    So when you say they did --

15 when you say they were noted by counsel,

16 what do you mean noted by counsel?

17         A.    So there are -- and I

18 apologize if I'm not using the right

19 name -- transfer sheets --

20         Q.    Okay.

21         A.    -- that you have to -- like

22 a chain of custody sheet.  And so it was

23 that with -- you know, it had a listing

24 of, this is X, Y, Z, this is the number

Margaret M. Gurowitz

1  A, B, C.  And so I would need to initial

2  next to each one, yes, we put this in

3  this box, took it from this box, put it

4  in this box.

5       Q.    And was it you who prepared

6  each sample for shipping?

7       A.    When you say prepared for

8  shipping, what do you mean?

9       Q.    You said, as you had

10 testified to, you take the -- you wear

11 gloves when handling the samples in order

12 to be able to, I would, assume have a

13 level of care when you're handling the

14 samples, correct?

15      A.    Correct.  Well, skin oils

16 can damage a fragile old artifact, so you

17 don't want to touch it directly.

18      Q.    Okay.  So now I want to

19 transfer that over to the packaging

20 process when we're getting ready to ship.

21           Did you oversee or do the

22 packaging of the products when they were

23 being prepared for shipment?

24      A.    So I put them, with the

Margaret M. Gurowitz

1   assistance of counsel, again it was a

2   massive job.  We put them in -- took them

3   out of the archival storage, put them in

4   boxes, signed the transfer sheet.

5   Counsel then took the boxes.

6          Q.    And is there packing around

7   each of the samples when they were in the

8   boxes?

9          A.    There was some -- not around

10  each individual sample.  But to prevent

11  them from jostling around.

12         Q.    Okay.  How was each sample

13  stored at the museum when it's in --

14  strike that.

15              You had said that for each

16  sample you would take it out of an

17  acetate wrapping, correct?

18         A.    Acid-free tissue paper.

19         Q.    Acid-free tissue paper.  So

20  when it's stored, it's in acid-free

21  tissue paper, correct?

22         A.    Most of them, yes.  The ones

23  that would have acid-free tissue paper

24  are some of the older ones where the

Margaret M. Gurowitz

1    printing was done on the metal container

2    because it might -- you know, you don't

3    want the paint to flake off at a certain

4    point in time.  So the ones that

5    didn't -- were not completely wrapped in

6    acid-free tissue paper had a spacer of

7    acid-free tissue paper in between, in the

8    boxes.

9           Q.    In the boxes that are

10   packed?

11          A.    In the -- in the archival

12   boxes in the archives.

13          Q.    In the boxes where they're

14   stored?

15          A.    Yes.

16          Q.    Okay.  When they're taken

17   out of those storage boxes and put into

18   the packing boxes, was each bottle

19   also -- each sample separated from the

20   other samples?

21          A.    Some were, some were not.  I

22   believe they were just packed upright so

23   that they wouldn't jostle.

24          Q.    Okay.  Let's talk about the

Margaret M. Gurowitz

1    J&J museum.  I think you had testified

2    that there is a new J&J museum that

3    opened in May of 2016; is that correct?

4         A.    Correct.

5         Q.    Okay.  Is that the only

6    Johnson & Johnson museum?

7         A.    That is the only one at

8    corporate.  There might be other groups

9    that consider they have a museum.  But it

10   might be just a glass case with things in

11   it.

12        Q.    Okay.  So are you aware of

13   any other subsidiaries of Johnson &

14   Johnson that might have what they

15   consider to be a museum?

16        A.    No.

17        Q.    Is the museum owned by

18   Johnson & Johnson?

19        A.    Yes.

20        Q.    Is the museum operated by

21   Johnson & Johnson?

22        A.    Yes.

23        Q.    You testified earlier that

24   there is a -- there's security at the

Margaret M. Gurowitz

1  museum, correct?

2      A.    There is security three days

3  a week when we are open for visits.

4      Q.    And can you describe for me

5  what you mean by open for visits?

6      A.    So the museum is open

7  Mondays, Wednesdays, and Fridays between

8  10:00 a.m. and 5:00 p.m. for employees,

9  contractors who work on the campus,

10 retirees, and their escorted guests to

11 visit.

12      Q.    When you say escorted

13 guests, can you explain to me what you

14 mean by escorted guests?

15      A.    Sure.  Partners they are

16 working with.  A lot of employees want to

17 bring their families to visit the museum,

18 so families, spouses, families.

19      Q.    And I guess what I'm trying

20 to understand is when you say escorted

21 guest, if I'm a J&J employ -- if I'm a

22 Johnson & Johnson employee and I go to

23 the museum, I can bring my family and I'm

24 considered to be the escort?

Margaret M. Gurowitz

1       A.     That is correct.  They would

2  have to register in advance and sign in

3  like any visitor to our campus.  But yes,

4  that is correct.

5       Q.     And is -- as it relates

6  specifically to talcum powder products,

7  the current museum that opened May of

8  2016, there are only the two items that

9  we previously discussed that are on

10  display in the museum; is that correct?

11      A.     That is correct.

12      Q.     Okay.  Is the storage area

13  of the museum physically connected to the

14  actual museum itself?

15      A.     It is in the same building.

16  But it is card key access, restricted

17  access.

18      Q.     And who has access to that

19  storage facility?

20      A.     I do.  Some facilities folks

21  do, because they need to do cleaning and

22  maintenance, and the general manager of

23  the museum has access.

24      Q.     And who's the general

Margaret M. Gurowitz

1    manager of the museum?

2         A.    Lauren Haber.

3         Q.    H-A-B-E-R?

4         A.    Yes, that is correct.

5         Q.    And do you report to Lauren

6    Haber?

7         A.    No, I do not.  She manages

8    the space, events and things like that,

9    if people want to register to visit,

10   things like that.  But she does not work

11   with the archives.

12        Q.    And other than yourself and

13   Lauren, who is it that you said has

14   access to the room?

15        A.    There are facilities

16   cleaning staff have access so they can

17   clean.  When I say the space, it's

18   through the office space, the restricted

19   access space, so they clean the office

20   space.

21        Q.    Facilities people

22   wouldn't -- wouldn't have a need to go

23   into the storage space for any reason

24   that you're aware of, would they?

Margaret M. Gurowitz

1          MS. FOURNIER:  Objection.

2          THE WITNESS:  They

3     shouldn't.

4  BY MR. LAPINSKI:

5          Q.    Okay.  You said that there

6  is a -- it's a card key access.  Is

7  entrance to the storage area tracked?

8          A.    I believe if it's card key

9  access, they would have the ability to

10 track it.

11         Q.    Okay.  And do you know -- do

12 you know by whom that's tracked?

13         A.    Security.

14         Q.    Are you aware of any

15 unauthorized people entering the storage

16 area during the time that it's been in

17 existence?

18         A.    I'm not aware of that.

19         Q.    And like the museum, is this

20 current storage -- has this current

21 storage facility been in existence since

22 May of 2016?

23         A.    Correct.

24         Q.    I think I asked you this

Margaret M. Gurowitz

1  earlier.  Are there employees who work in

2  the museum?

3          A.    Just me and occasionally the

4  general manager.  And three days a week

5  there's security at the front desk.

6          Q.    And when you're working --

7  working in the museum, what is the role

8  that you're playing inside of the museum

9  while you're working there?

10          A.    So my office space is there,

11  and so I do what I generally do over the

12  course of my -- with the course of my

13  workday.

14              Did you want me to go

15  into --

16          Q.    Unless you were going to

17  add -- unless you were going to add

18  something else that you do.

19          A.    No.

20          Q.    Okay.  What are -- what are

21  your job responsibilities within the

22  museum?

23          A.    So as noted on my CV, I do

24  sort of all of the things there.  So I

Margaret M. Gurowitz

1   manage and maintain the archives.  I

2   research stories from Johnson & Johnson

3   history, so I'd go into the archives to

4   do research for that.

5           I respond to requests.  A

6   lot of people have questions about some

7   aspect of the company history.  So I

8   would respond to those things.  I curate

9   exhibits in our museum.

10       Q.    Prior to May of 2016, was

11  there a Johnson & Johnson museum located

12  at a different location?

13       A.    It was located at the same

14  location.

15       Q.    And like the current museum,

16  was it a museum that was accessible to

17  employees and personnel?

18       A.    Only by appointment.

19       Q.    And for how long had that

20  museum been in place before the new

21  museum opened in 2016?

22       A.    Since the 1960s in that

23  building.

24       Q.    And was it in the same

Margaret M. Gurowitz

1  location since the 1960s?

2       A.    It was.

3       Q.    And what is that location?

4       A.    That is our power house

5  building.  It is a 1907-built building on

6  our campus.

7            MS. FOURNIER:  Counsel, when

8       you find a natural breaking point,

9       do you mind?  We are at not quite

10      an hour.  But I would like to take

11      a break.

12           MR. LAPINSKI:  That's fine.

13      We can go off the record.

14           THE VIDEOGRAPHER:  The time

15      is 11:42 a.m.  We are off the

16      record.

17           (Lunch break.)

18           THE VIDEOGRAPHER:  We are

19      back on the record at 12:46 p.m.

20  BY MR. LAPINSKI:

21      Q.    Good afternoon,

22  Ms. Gurowitz.  Before the break we were

23  talking about physical locations of J&J

24  museums.  I believe you testified prior

Margaret M. Gurowitz

1    to May of 2016 there was a J&J museum

2    that had been in existence since the

3    1960s; is that correct?

4         A.    That is correct.

5         Q.    Okay.  I'm going to hand you

6    a document that I've marked as Exhibit 6.

7              (Document marked for

8              identification as Exhibit

9              Gurowitz-6.)

10   BY MR. LAPINSKI:

11        Q.    And this is a document dated

12   March 19, 1982.  And it's on Johnson &

13   Johnson letterhead.  If you would just

14   take a minute and review that document

15   and then let me know after you've had an

16   opportunity to review it.

17        A.    I'm familiar with this

18   document.

19        Q.    Okay.  Earlier you had

20   testified that you had done a search for

21   documents that may be relevant to your

22   testimony, correct?

23        A.    Correct.

24        Q.    Is this one of the documents

Margaret M. Gurowitz

1   that you found in that search that you

2   considered to be relevant to your

3   testimony?

4          A.    Yes.

5          Q.    Okay.  And if you wouldn't

6   mind, could you please describe for me

7   what this document is?

8          A.    This is a document.  It's

9   titled "The Kilmer Museum," which was the

10  name of the old Johnson & Johnson museum

11  that had been in this building since the

12  '60s.

13              And it is from L.G. Foster,

14  who at the time was the vice president of

15  public relations at Johnson & Johnson.

16              And the addressees, J.E.

17  Burke was the chairman and CEO of the

18  company.  D.R. Clare was the president.

19              And in this memo Mr. Foster

20  states that he and George Frazza who was

21  the head counsel of Johnson --

22  senior-most person at Johnson & Johnson

23  in charge of our law group, decided that

24  when we moved to the new building -- and

Margaret M. Gurowitz

1  what they are referencing is Johnson &

2  Johnson's new world headquarters, which

3  was completed and opened in 1982, that

4  the Kilmer Museum, the old museum would

5  be divided into two areas of

6  responsibility and that public relations

7  would assume the responsibility for

8  maintaining the history of the company.

9       Q.    So couple questions based

10 upon what you just said.

11      A.    Sure.

12      Q.    And you can tell that she is

13 a J&J historian, because she does her

14 research or knows.

15            It references the Kilmer

16 Museum.

17            Was the Kilmer Museum -- is

18 it fair to say that the Kilmer Museum is

19 the name of the Johnson & Johnson museum

20 from the 1960s up until the new museum --

21 new museum opened in May of 2016?

22      A.    Yes.  I did say that the

23 museum had been in that building since

24 the 1960s.  It had existed in some form

Margaret M. Gurowitz

1  before that in a building that is no

2  longer existing.

3       Q.    Okay.  So let's -- let's

4  take a step back.  From the 1960s until

5  1982, the Kilmer Museum was in the power

6  house building, correct?

7       A.    Correct.

8       Q.    Now, in 1982, this memo

9  talks about a move to a new building,

10  correct?

11      A.    Yes.  What they're

12  referencing is the newly constructed

13  Johnson & Johnson world headquarters in

14  New Brunswick.

15           And so what they are talking

16  about was they would take -- they would

17  turn what had been the museum, which had

18  been a collection of showcases with just

19  stuff, items in them, and then products

20  in storage, develop an audio-visual

21  presentation, and then have a very

22  limited number of, as they put it, old

23  product samples in this memo on display

24  in the outer lobby of the tower, which is

Margaret M. Gurowitz

1   part of the new world headquarters

2   building.

3          Q.    And when was the new world

4   headquarters building completed?

5          A.    It opened in 1982.

6          Q.    And at the time that the new

7   world headquarters opened, did they have

8   a museum in that building as anticipated

9   by this memo?

10         A.    In the new world

11  headquarters building?

12         Q.    Yes.

13         A.    Not as we consider the

14  museum.  What they had was, they

15  referenced the outer lobby by the tower.

16  There was sort of a very shallow showcase

17  there.  And inside that showcase was sort

18  of a graphic timeline with very few

19  artifacts in it.

20         Q.    Are you aware of whether or

21  not within that showcase there were any

22  samples that are contained on the sample

23  list that we have here?

24         A.    I do not know.  We don't

Margaret M. Gurowitz

1  have information on exactly what was in

2  the showcase.

3       Q.   And how long was that

4  showcase in existence?

5       A.   It was in existence from

6  sometime circa 1982 to sometime in the

7  1990s or late 1990s, maybe.

8       Q.   Do you have any -- do you

9  have any records in your museum files

10 that would lead you to believe that there

11 were sample products -- talcum powder

12 sample products that were put on display

13 in that outer lobby?

14      A.   There may have been.  It was

15 sort of a historical timeline of the

16 corporation.  So it's possible that in

17 that showcase there might have been

18 Johnson's Baby Powder artifact among the

19 other artifacts that was ultimately

20 decommissioned, and a flat screen monitor

21 was put in its place.

22      Q.   But you have -- you have no

23 documentation or knowledge that there

24 actually was a Baby Powder product that

Margaret M. Gurowitz

1  was in that display?

2       A.    I don't.  At the time

3  documentation was not kept, so presumably

4  when they took whatever was in there out

5  of it they just would have put it in a

6  box along with all the other boxed up

7  artifacts without documenting what was

8  put and where it was put.

9       Q.    Is there a -- are there

10  boxes of artifacts that came from the

11  world headquarter display that we are

12  talking about that were ultimately

13  removed and put somewhere?

14       A.    We do not have records of

15  exactly where those products went from

16  the world headquarters display, if they

17  were returned to the collection that was

18  in what was left of the old museum.

19  They -- it would not have been noted.

20       Q.    Okay.  Going back to the

21  Kilmer Museum, was the Kilmer Museum a

22  public access museum?

23       A.    No, it was not.

24       Q.    Could you describe for me

Margaret M. Gurowitz

1    what the Kilmer Museum was?

2         A.    The Kilmer Museum was a

3    collection of artifacts in sort of, you

4    know, wood and glass showcases, sort of

5    very old school.  There was no

6    interactivity.  They were just sort of in

7    these showcases with no explanation.

8              There was no climate

9    control, so there was no air

10   conditioning.  In the summer, it got very

11   hot in there.  There was no light

12   control, so if the light was hitting

13   those cases it would fade whatever was in

14   it or, you know, interact with it.

15        Q.    In addition to the

16   collection of glass cases that you just

17   referenced, did that museum also have a

18   storage area?

19        A.    It did.  It had a room with

20   boxes, unlabeled boxes, like, you know,

21   the cardboard banker boxes with the lids,

22   with product artifacts in it.

23        Q.    Prior to the 1960s, did J&J

24   have any type of museum?

Margaret M. Gurowitz

1          A.     From the research I
2    conducted in our archives, the company
3    did.  It was the same sort of showcase
4    museum with glass and wood showcases.
5          Q.     And do you know where that
6    museum was located?
7          A.     It was in a building that no
8    longer exists.
9          Q.     And do you know the period
10   of time for which that museum was in
11   existence?
12         A.     We have a photograph or two
13   from company newsletters from the 1950s
14   that photographs were taken in that.  So
15   certainly it was in existence in the
16   1950s.
17         Q.     Okay.  And do you have -- do
18   you have any documentation in regard to
19   the samples that are contained on this
20   sample list, that any of those samples
21   were displayed in the Kilmer Museum?
22         A.     We don't have documentation.
23   But some -- when we restored the museum,
24   obviously everything had to be taken out

Margaret M. Gurowitz

1    of the building so that construction

2    would happen.  There were some that were

3    in showcases.  They were taken out and

4    packed up along with what was in storage.

5           Q.    When you say restored the

6    museum, what are you referring to?

7           A.    So the old museum, again I

8    mentioned it's a building that was built

9    in 1907.  The museum had been put in

10   there sometime in the early 1960s.  And

11   so when the determination was made to

12   restore the museum and make it sort of a

13   modern state-of-the-art museum as we

14   understand museums to be, everything was

15   removed to offsite storage so that the

16   building could be restored, and then the

17   current museum constructed, and along

18   with the proper climate-controlled

19   archival storage inside it.

20          Q.    So when -- when you are

21   talking about restoring the museum, are

22   you referring to building the new museum

23   on the main campus?

24          A.    Well, so the new museum is

Margaret M. Gurowitz

1    in that same building.  We restored the

2    1907 building and then created a modern

3    state-of-the-art, interactive,

4    climate-controlled museum with

5    climate-controlled archival storage in

6    the back.

7           Q.    So your reference to the

8    restoration of the museum is, after the

9    restoration was complete, you opened the

10   current museum in May 2016, correct?

11          A.    Correct, in that same

12   building.

13          Q.    Okay.  So you were a J&J

14   employee employed as a historian at the

15   time that the old museum samples were

16   boxed up and moved to an offsite

17   facility, correct?

18          A.    Correct.  And if you

19   remember before, we talked about hiring a

20   team of professional archivists who

21   catalogued the collection for the first

22   time.  They are the ones who boxed it up.

23   We moved it to offsite storage during

24   construction.  And then once the archives

Margaret M. Gurowitz

1   in the building was completed, we moved

2   it back into its new climate-controlled

3   archival storage.

4        Q.    Now, do you know whether the

5   archivists at the time that they were

6   boxing up the various samples were

7   recording where those samples had been

8   taken from?

9        A.    They were not, because it

10  was not relevant moving forward.  So

11  there were some samples that were in a

12  showcase that, again, there was no air

13  conditioning in there.  No light control.

14  And others were stored in boxes in a

15  room.

16        So but it wasn't relevant to

17  moving forward.  I mean, they all got new

18  catalogue numbers so we could find them

19  in the new storage.  But it wasn't

20  relevant to note for the museum purposes

21  where we had -- where they had taken them

22  out of, whether it was from one of those

23  old showcase cabinets or a box.

24        Q.    Was there any policy that

Margaret M. Gurowitz

1   was in place when these -- when samples

2   were being boxed by the archivists,

3   whether they were supposed to document

4   anything beyond a product number for the

5   particular product?

6          A.   Well, they documented what

7   was written on the label, which is also

8   reflected on this sheet.  So they

9   documented that.  Occasionally they might

10  document condition, is it in good

11  condition?  Is the artifact in such

12  fragile condition that you need to get it

13  restored right away?  That kind of a

14  thing.

15         Q.   Was there a policy in place

16  that they were to document whether or not

17  there was damage -- strike that.

18              Was there a policy in place

19  where they would document recognizable

20  damage to packaging?

21         A.   Yes.  They generally would

22  document recognizable damage to

23  packaging.

24         Q.   And was that documentation

Margaret M. Gurowitz

1    provided to you as the historian for the

2    museum?

3            A.    Yes.

4            Q.    And do you maintain that

5    documentation now?

6            A.    I do.

7            Q.    Is that on the cloud system

8    that you had previously mentioned?

9            A.    Some of it is.  If there

10   were significant damage to an artifact,

11   it was listed.  But they would provide me

12   a list.  Most of those, the things with

13   significant damage, were things that were

14   in paper or cardboard packaging.  So it

15   really didn't apply to the powder

16   artifacts, because they were either in

17   tins or plastic.

18           Q.    Ms. Gurowitz, going back to

19   your search for documents when you found

20   Exhibit 6, which was the 1982 memo, what

21   were you using as a basis in order to

22   determine whether or not a document was

23   relevant?

24           A.    Whether either it related to

Margaret M. Gurowitz

1  Johnson's Baby Powder samples, for

2  example, but mostly related to the museum

3  collection, because I was trying to piece

4  together chain of custody for the samples

5  labeled marketing that were sent to

6  offsite storage in this 1982 time frame.

7          I had mentioned before that

8  they sent the products back to the

9  relevant operating company, and then the

10  consumer company put those in offsite

11  storage.  So I was trying to piece

12  together chain of custody.

13          Q.    Okay.  Are you -- and going

14  back to the documentation that we

15  discussed that the archivists would

16  document if they saw damage to a

17  particular product while they were

18  packing it up at the old Kilmer Museum,

19  are you aware of any documentation of

20  talc samples that were damaged in any

21  way?

22          A.    There was one plastic

23  container, I remember it was damaged.  So

24  if there's a -- plastic gets very brittle

Margaret M. Gurowitz

1   with age sometimes.  So there was one

2   that -- an older plastic container that

3   the top was off, and so that would have

4   been noted.  And I think that actually

5   was -- I think that was one of the

6   samples that went to the lab.  So it was

7   noted.

8          Q.    Okay.

9          A.    And it was just that the

10  plastic had broken over time.

11         Q.    If the top is removed from

12  one of the plastic talc bottles, are you

13  able to put that top back on and secure

14  that top again?

15         A.    It depends on the condition

16  of the bottle and the age of the bottle.

17  The older plastic bottles get very

18  brittle.  So the act of removal could

19  just cause the plastic to fracture into

20  little pieces.  So it would depend.

21         Q.    Other than the one bottle

22  you're referring to, you're not aware of

23  any other bottles that were listed as

24  damaged when they were packed and stored

Margaret M. Gurowitz

1  from the Kilmer house?

2         A.    Not off the top of my head.

3  There were some where there were cracks

4  in the caps, I remember, when we were

5  packing them up.  But there was one where

6  the top had completely come off.

7         Q.    And to the extent that there

8  were cracks within the cap, would that

9  have been documented as well?

10        A.    By the archivists or?

11        Q.    Well, you had said that it

12 was the archivists who were documenting

13 it.  If -- would it have the been

14 documented by the archivists?  That would

15 be my first question.

16        A.    They were documenting

17 significant damage, so it may have.  But

18 they were looking at thousands of

19 artifacts beyond just powder artifacts.

20        Q.    Right.

21        A.    So it's -- so I would have

22 to check and see.  It's possible that

23 they were documenting significant damage

24 like, you know, half of this package has

Margaret M. Gurowitz

1    come apart from the other half or

2    something like that, versus there's a

3    crack in a cap.

4         Q.    Now, would they document --

5    was anyone else documenting any type of

6    damage?

7         A.    When I worked with the legal

8    folks to pack up the samples from the

9    corporate archives to go to the lab, I

10   believe we noticed -- we documented if

11   things were significantly damaged.

12        Q.    And that was you that was

13   documenting it, or someone from the legal

14   team that was documenting it?

15        A.    It was both of us in tandem.

16        Q.    Okay.  And is that -- is

17   that documentation something that you

18   maintain now as the historian?

19        A.    I believe it was in -- it

20   might be -- I would have to look.

21   It's -- it might be on the transfer

22   sheets or the materials that went with

23   the objects to the lab.

24        Q.    Okay.  I'm going to give you

Margaret M. Gurowitz

1   another exhibit.

2              (Document marked for

3        identification as Exhibit

4        Gurowitz-7.)

5   BY MR. LAPINSKI:

6        Q.    We'll mark this as

7   Exhibit 7.  This is a little bit

8   difficult to read.  This is how it was

9   produced to us.

10             This is a March 9, 1951,

11   draft memo on Johnson & Johnson

12   letterhead.

13             If you would take a minute

14   to review that and just let me know after

15   you've had an opportunity to review it.

16        A.    Sure.

17             I have reviewed it.

18        Q.    Okay.  Before we -- I ask

19   you questions about this document, going

20   back to the talcum powder bottle that we

21   discussed where the top was off.

22             Do you recall what the

23   sample number was of that particular

24   bottle?

Margaret M. Gurowitz

1        A.    I don't offhand.  But it was

2   one that had a very square profile.  So

3   it would not have been a super recent

4   one.

5              It would have been --

6   anytime between 1963 and the late 1980s.

7        Q.    And are you aware of whether

8   there was any powder inside of the

9   container?

10       A.    There was, which is why we

11  were concerned to store it upright,

12  because if it tipped over it would spill.

13  I believe it was put in a bag so that --

14  and baggy so it wouldn't -- in case it

15  did get jostled the contents wouldn't

16  come out.

17       Q.    And that was put in a bag at

18  the time that you prepared it for

19  shipment to the lab?

20       A.    We did -- I believe -- we

21  did something to it so that it would --

22  that the top was secure in case it got

23  jostled because we realized that the top

24  was open.

Margaret M. Gurowitz

1      Q.    Okay.  And just so that I

2  can confirm on my end, the timing that we

3  are talking about with that particular

4  sample deals with you preparing the

5  samples to go to the lab as compared to

6  that sample being taken from the old

7  museum and put in storage until the new

8  museum was complete, correct?

9      A.    That's correct.  Although it

10  had been stored upright for obvious

11  reasons so that it didn't spill.

12      Q.    Okay.  Going back to the

13  document that I handed you, which is

14  Exhibit 7.  Have you seen that document

15  before?

16      A.    It's -- it's hard -- from

17  the copy, it's hard to tell.  I may have.

18  But I couldn't say for sure.

19      Q.    Is this one of the documents

20  that you found when you were doing a

21  document search in preparation for today?

22      A.    I honestly don't remember.

23      Q.    This document was produced

24  to us, and I understand that it's a draft

Margaret M. Gurowitz

1  document.  But I have a couple questions

2  about some information that's in here.

3           And again, this is a

4  March 1951 document.  And if you look on

5  the first line, it says, "Henceforth the

6  law department museum will be located on

7  the ground floor directly beneath the law

8  department."

9           My question is, are you

10  familiar with the law department museum?

11      A.   The law department museum, I

12  think what they are referring to here is

13  that collection that's later referred to

14  as the Kilmer Museum.  And the law

15  department kept it because they wanted to

16  keep a trademark history so they can tell

17  when labeling or package shape changed.

18      Q.   And are you aware of whether

19  or not there were any talcum powder

20  products that were part of the law

21  department museum?

22      A.   I don't have any

23  documentation that says they definitely

24  would -- were, but I think it's safe for

Margaret M. Gurowitz

1    us to assume that the collection that was

2    in the old Johnson & Johnson Kilmer

3    Museum was what they're more or less

4    referring to here.

5         Q.    Okay.  Now, the Kilmer

6    Museum, starting in the 1960s and this

7    memo being from 1951, there's a nine-year

8    period of time between that where there

9    may have been products that came and

10   went, were discarded, et cetera?

11        A.    It's possible.

12        Q.    And there's no documentation

13   to confirm that products that were law

14   department museum actually did make their

15   way into the Kilmer Museum, correct?

16        A.    We do not have that

17   documentation.

18        Q.    Now, if you go to the second

19   paragraph.  The second sentence in the

20   second paragraph says, "It has not always

21   been the practice to forward samples of

22   each of our products to the museum, and

23   unfortunately some appear to be missing."

24             Is there now a policy in

Margaret M. Gurowitz

1  place for samples of Johnson & Johnson

2  products to be forwarded to the museum?

3       A.    There is not.

4       Q.    Do you know of any period of

5  time that there was actually a written

6  policy put in place where product samples

7  would be forwarded to the museum?

8       A.    Yes, I do.

9       Q.    Okay.  When -- when was that

10  policy first put in place?

11       A.    As best as we can -- as best

12  as can be pieced together from the

13  documentation we do have, sometime from

14  the 1950s through the 1970s.  That was

15  discontinued when it was decided to

16  disband the museum as per the 1982 memo.

17       Q.    And what specifically was

18  that policy?

19       A.    As best as I was able to

20  piece together from the existing records,

21  it was a policy that when the packaging

22  or labeling of something changed, they

23  were to send a sample to the museum.

24  Again, the law department was keeping

Margaret M. Gurowitz

1  this as a trademark history so if they

2  needed to look back on all of the

3  historical iterations of a trademark,

4  they would be able to do that.

5       Q.   Other than with the change

6  of packaging, were there any other

7  requirements or policies that samples be

8  sent to the museum?

9       A.   I'm sorry.  I'm not sure I

10  understand the question.

11       Q.   I believe what you just

12  testified was that the policy that was in

13  place from the 1950s to the 1970s was

14  that product samples would be sent to the

15  museum when there was some type of a

16  label change, correct?

17       A.   Yes.

18       Q.   Other than the requirement

19  that samples be sent to the museum upon a

20  label change, were there any other

21  requirements for samples to be forwarded

22  to the museum?

23       A.   If the packaging changed in

24  some -- in some way.  If they changed the

Margaret M. Gurowitz

1  shape of the packaging or they decided on

2  a new size or a new style, then that

3  would have met those requirements.

4      Q.    And those samples that were

5  sent to the museum, is it your

6  understanding that to the extent any such

7  samples were sent to the museum, they are

8  now part of the sample list that we're

9  discussing here today?

10     A.    I was able to trace some and

11 to determine that yes, you can make

12 correlation with some of them.  That is

13 on the list that is labeled as marketing,

14 that department name list, the things

15 that were sent to offsite storage in

16 1982.

17     Q.    So pursuant to the policy

18 that we were just discussing, any

19 products that were produced to the museum

20 pursuant to that policy were ultimately

21 sent to offsite storage and are contained

22 in the offsite storage list that we have

23 here?

24     A.    Yes.  They would have -- so

Margaret M. Gurowitz

1    the collection was culled, as we know

2    from that memo.  Things were sent back to

3    the operating companies.  The operating

4    company then sent that to offsite

5    storage.  A much smaller part of that

6    collection was kept in the corporate

7    museum, and those are reflected in the

8    museum -- the part -- the section with

9    the museum number that were catalogued by

10   the archivists.

11              That being said, obviously

12   there are samples and artifacts that

13   predate this 1950s policy.  We have no

14   idea how they got into the collection.

15   There is no documentation about that.

16       Q.    Okay.  In your answer you

17   had referenced a memo, and you said

18   pursuant to the memo samples were sent

19   back to the operating companies.

20              Did I hear you correctly?

21       A.    Yeah.  So there's this memo

22   from March 19th, 1982.  And then there

23   were the transfer sheets from 1982.

24       Q.    Okay.  So that's what I'm --

Margaret M. Gurowitz

1    I wanted to be able to clarify.  When you

2    referred to the memo, you were referring

3    to the 1982 memo which is Exhibit 6 that

4    discusses, for lack of a better term, the

5    breakdown of the museum, correct?

6         A.    Correct.

7         Q.    Okay.  So samples that had

8    been collected and maintained from the

9    1950s to the 1970s pursuant to the policy

10   were stored at the museum, correct?

11        A.    At one time, yes.

12        Q.    And then in and around 1982,

13   the samples that were at the museum were

14   sent back to the various operating

15   companies from which they had been

16   produced, correct?

17        A.    Many of them were, yes.  A

18   smaller amount was kept in the corporate

19   collection.

20        Q.    Okay.  So using the sample

21   list, the documents that are listed on

22   the offsite storage list will also

23   include some samples that had been

24   maintained at the museum for years prior

Margaret M. Gurowitz

1    to 1982?

2          A.    That's correct.

3          Q.    For the -- strike that.

4                Other than the law

5    department museum that is referenced in

6    the 1951 draft memo, the Kilmer Museum

7    that we've spoken about.  And the latest

8    Johnson & Johnson museum that you oversee

9    have there been any other Johnson &

10   Johnson museums?

11        A.    There have been things that

12   were referred to as museum.  But they may

13   not be a museum in the way that we

14   understand it.

15               There is a Shower to Shower

16   sample that says, "Property of the PPC

17   Museum," Personal Products Company.  It

18   was an operating unit that no longer

19   exists at one time that marketed Shower

20   to Shower.

21               I don't have -- it's in a

22   building that's no longer there.  There's

23   nobody left who would remember that.

24               And so we don't know what

Margaret M. Gurowitz

1    they mean by museum.  Probably it was not

2    a museum the way we understand -- the way

3    we understand a museum to be.  It likely

4    was probably a showcase somewhere.

5                And also the -- four

6    samples, the samples that were sent from

7    the UK, they were referenced as having

8    been on a museum on site.  But the person

9    who made that reference said that the

10   museum was actually a glass case with

11   stuff in it.

12        Q.    Okay.  To your knowledge,

13   there -- other than the three museums

14   that we talked about from a Johnson &

15   Johnson perspective, there were no other

16   official museums?

17        A.    To my knowledge, that's

18   correct.

19        Q.    In your current role

20   overseeing the museum, is there a written

21   policy in place for the procurement of

22   product samples for the museum?

23        A.    There is not.

24        Q.    And has there ever been any

Margaret M. Gurowitz

1   type of written policy in regard to the

2   procurement of product samples for the

3   museum?

4        A.    There is this 1951 policy

5   that's Exhibit 7 that said that samples

6   should be sent.  And again, when they had

7   a change in trademark somehow, they would

8   send a sample.

9        Q.    And other than this draft

10  document, are you aware of any other

11  written documentation that would outline

12  those policies and procedures?

13       A.    Are you referring to --

14  you're referring to the old policy?

15       Q.    Well, the 1951 policy is

16  just a draft memo.  And I'm just asking

17  whether or not there were any type of

18  actual written policies that were

19  incorporated that you're aware of.

20       A.    I think there was something

21  else that was provided as part of me

22  looking through the records and finding

23  it.  But other than that specific policy

24  that's encompassed by those documents,

1   I'm not aware of other specific policies.

2         Q.    And are they documents that

3   you reviewed in preparation for today's

4   deposition?

5         A.    Yes.

6         Q.    And do you -- can you

7   describe for me what those documents were

8   as far as the date of those documents,

9   and any other information you may have in

10  regard to those documents?

11        A.    I think -- I think one of

12  them was undated.  So I don't know when

13  the date was.  Although it looks like it

14  was typewritten, so we can infer that

15  they used a typewriter that it's

16  certainly not recent.

17              It did say something about

18  when there was a change to the labeling

19  or packaging, send a sample to the

20  Johnson & Johnson museum.

21              And they were referenced by,

22  you know, merchandising notices that said

23  you are supposed to list which

24  merchandising notice this would be.  So

Margaret M. Gurowitz

1   in other words, if they made the type

2   bigger, they would -- might be -- they

3   might -- they would list that and say

4   this is the packaging change that

5   happened as a result of -- we made the

6   logo bigger, or something like that.

7            (Document marked for

8       identification as Exhibit

9       Gurowitz-8.)

10   BY MR. LAPINSKI:

11       Q.    I'm going to mark this as

12   Exhibit 8.  I'm going to hand that to

13   you, and I'll ask you to take a look at

14   that and describe it.

15            MS. FOURNIER:  She is so

16       good at describing.

17            THE WITNESS:  Yes, that is

18       the document.

19   BY MR. LAPINSKI:

20       Q.    All right.  Before we

21   start -- before we start talking about

22   this document that I've marked as

23   Exhibit 8, the documents that, similar to

24   Exhibit 8 that you had looked at when --

Margaret M. Gurowitz

1   let me take a step back.

2              Did you bring any documents

3   with you here today other than the

4   document that we previously marked as

5   Exhibit 5, which was the e-mail with the

6   various peoples names?

7        A.    No, I did not.

8        Q.    Okay.  Other than the

9   document that you have in front of you

10  now which has been marked as Exhibit 8,

11  approximately how many other documents

12  were there that you reviewed and relied

13  upon in order to refresh your

14  recollection in preparation for today?

15             MS. FOURNIER:  Objection to

16        form.

17             THE WITNESS:  I think other

18        than what's in front of me --

19        front of us, that's it.  That's

20        what I reviewed.

21  BY MR. LAPINSKI:

22        Q.    If we can go back to

23  Exhibit 8.  And you had started to

24  describe the document in great detail

Margaret M. Gurowitz

1    before I had it in front of me.  So I'm

2    going to ask you to kind of go through

3    this again.

4              Is it your understanding

5    that Exhibit 8 is the written policy that

6    you had been referring to about the

7    provision of product samples to the

8    museum?

9         A.    It appears to be that, yes.

10        Q.    And it's your understanding

11   that this policy was in place from

12   approximately the 1950s to the 1970s?

13        A.    Well this references a date

14   in 1979 and '82.  So it certainly was in

15   place -- certainly some iterations of

16   this policy were in place over that time.

17        Q.    Okay.  And then it's your

18   understanding that after 1982, that was

19   no longer a policy?

20        A.    Correct.

21             (Document marked for

22        identification as Exhibit

23        Gurowitz-9.)

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1     Q.    I'm going to hand you a

2  document that's going to be marked as

3  Exhibit 9.  I'll ask you to just take a

4  minute and take a look at that.  Just let

5  me know when you're done reviewing and

6  ready to answer questions on that.

7     A.    I'm done reviewing.

8     Q.    Okay.  Have you seen this

9  document before?

10     A.    I don't believe I have, no.

11     Q.    Okay.  This is a document

12  that was produced, and it's a handwritten

13  document with some notes on it.

14          First of all, do you know

15  who Marilyn Rondelli is?

16     A.    No, I do not.

17     Q.    There is -- the next line

18  says, "Baby products, test materials

19  sent."  And I believe that's 1/1983.

20          Do you have any idea what

21  that would be a reference to?

22     A.    I do not.

23     Q.    Do you know whether in and

24  around the January 1983 time frame,

Margaret M. Gurowitz

1  talcum powder products would be included

2  in baby products?

3       A.    I don't have any information

4  they would or not.  So I'm unable to

5  determine that.

6       Q.    If you go to the second

7  line, it refers to ortho products.  Do

8  you know who Harry Grigg is?

9       A.    I do not.

10      Q.    On the third line it refers

11 to McNeil Consumers.  Do you know who

12 Jack McCann is?

13      A.    No, I do not.

14      Q.    Next line that refers to

15 McNeil Pharmaceutical.  Do you know who

16 Ron Dahlen is?

17      A.    I do not.

18      Q.    And then the last line it

19 refers to personal -- well, there's no

20 name there with Personal Products.

21           Do you know whether or not

22 Baby Powder products would have been

23 considered a group of personal care

24 products or Personal Products in 1983?

Margaret M. Gurowitz

1        A.    Personal Products was the

2    name of an operating unit.  So they would

3    not have marketed baby products from that

4    operating unit.

5        Q.    Do you currently have a

6    written policy in place for the

7    maintenance of historical samples at the

8    J&J museum?

9        A.    When you say historical

10   samples, are you referring to them in the

11   sense of the 1951 memo where they said

12   send samples, or are you referring to the

13   collection that's part of the corporate

14   archives in the museum?

15       Q.    I'm referring to the

16   collection that's part of the corporate

17   archives now.

18            So we previously -- we've

19   previously discussed that there are

20   samples of all sorts of products that are

21   on display in the current museum, and

22   then there are also samples of all sorts

23   of products that are currently maintained

24   in archives, correct?

Margaret M. Gurowitz

1        A.      Correct.

2        Q.      Okay.  And my question is
3   whether or not there is a written policy
4   in regard to the maintenance of those
5   archive samples.

6        A.      I would have to look back
7   and see if the policy is written.  But
8   the policy as it is followed would be the
9   policy of any archives, that they must be
10  maintained in a climate and
11  light-controlled storage area in
12  acid-free storage.

13       Q.      And if the policy was a
14  written policy, where would that written
15  policy be maintained?

16       A.      I would have an electronic
17  copy of that.

18       Q.      Do you know when that policy
19  would have gone into effect?

20       A.      It would have been created
21  by the archivists who professionally
22  catalogued the collection.  So sometime
23  in the 2014, 2015 time frame.

24       Q.      And prior to that 2014 or

Margaret M. Gurowitz

1   2015 time frame, are you aware of any

2   type of written policy that was in place

3   in regard to the storage of samples?

4        A.    No, I'm not.  There was no

5   policy as far as I'm aware of.

6        Q.    Prior to 2014, one of your

7   responsibilities as the historian was to

8   be able to maintain samples, correct?

9        A.    When you're referring -- you

10  mean -- I just want to ensure that I

11  understand the question correctly.  Do

12  you mean the artifacts in the museum

13  building in the corporate archives

14  collection?

15       Q.    Correct, yes.  So -- and let

16  me -- let me rephrase the question so

17  that I actually understand along with

18  you.

19            Prior to -- prior to the

20  archivist policy that was put in place in

21  and around 2014, you were responsible for

22  the care and maintenance of product

23  samples that were at the museum, correct?

24       A.    Correct, to the best of my

Margaret M. Gurowitz

1  ability, under the conditions they were

2  in before the museum restoration project.

3             As I mentioned, they were

4  not stored in a climate-controlled area.

5  I was not -- there was nothing to be done

6  to influence that.  So I maintained them

7  as best I could under those conditions.

8        Q.   Okay.  Was there -- is there

9  currently a policy in place regarding the

10  intake of samples into the museum?

11        A.   Yes.  We have an

12  accessioning policy.

13        Q.   And is that a written

14  policy?

15        A.   It's -- I believe I may have

16  a draft of it.  But it's -- right now it

17  may be largely unwritten.

18        Q.   Okay.  When you're in a

19  situation where the only employee that's

20  there, it's not necessarily necessary to

21  have the written policies since you are

22  the only one that's enforcing it?

23        A.   That's true.  And -- you

24  know, so it probably exists in a draft

Margaret M. Gurowitz

 1    form.  It may not exist in a final form

 2    right now.  But...

 3            Q.    So what is that -- what is

 4    that policy?

 5            A.    So the policy is that the

 6    artifact have to be relevant to major

 7    stories in Johnson & Johnson history.

 8    They have to be in good to excellent

 9    condition.

10            They -- so in other words,

11    if something were in very bad shape,

12    rusty, dirty, falling apart, it would not

13    meet the accessioning criteria.  If it

14    was an artifact that was a product from

15    another company, that wouldn't meet the

16    accessioning criteria.  If it were -- if

17    it were something that -- so if it was,

18    you know, something that did not help us

19    illustrate a major story about Johnson &

20    Johnson history, it also might not meet

21    the accessioning criteria.

22            Q.    And about how long ago did

23    you start to implement that particular

24    policy?

Margaret M. Gurowitz

1      A.    With the restoration and

2  opening of the new museum.

3      Q.    Okay.  Prior to -- prior to

4  the opening of the museum, was there any

5  policy that you had in place as far as

6  the intake of samples?

7      A.    Just that -- basically that

8  possibly informally.  But as I mentioned

9  before we get a lot of donations.

10          Sometimes I would come back

11  from lunch to find an anonymous donation

12  on my desk.  No note, no identifying

13  information.  I would ask people, "Did

14  you see who dropped this off?"  They

15  hadn't.  So things would show up on my

16  doorstep as it were.

17      Q.    Now, as it relates to talc

18  samples, there's only one instance that

19  you're aware of where that happened with

20  talc samples, correct?

21      A.    Correct.  Most of them were

22  other products.

23      Q.    Okay.  Is there any type of

24  policy in place for the current museum as

Margaret M. Gurowitz

1  far as the removal of samples from the

2  museum?

3        A.    Yeah.   Something could be

4  deaccessioned if its condition was so

5  deteriorated that it posed a danger to

6  the artifacts stored around it.

7              For example, if it was a

8  product that was liquid in it and that

9  was leaking or something like that, or if

10  it was in such bad condition that we

11  could never exhibit it and it wasn't the

12  only one of its kind, so those would be

13  examples of why something might be

14  deaccessioned.  Or if it had completely

15  no relation to Johnson & Johnson or its

16  history.  Those could be reasons why

17  something would be deaccessioned.

18        Q.    Now, would that apply to

19  both items that are on display as well as

20  items that are maintained in storage?

21        A.    It would be, although, you

22  know, we try to ensure all of the items

23  that are on display are in -- the ones

24  that are in better condition.

Margaret M. Gurowitz

1    Q.    How about -- well --

2    A.    With some exceptions

3 obviously.

4    Q.    In a -- in a situation that

5 you just described, if there was a

6 product that was in such a condition that

7 you were going to remove it, what would

8 you do with that product?

9    A.    It depends on what it --

10 what it was.  We would dispose of it.  We

11 would work with our facilities folks to

12 dispose of it in the best -- whatever

13 manner they advised.

14    Q.    So it would be disposed of,

15 but it would be disposed of in a way

16 that, for example, environmentally may

17 have been the environmentally appropriate

18 way to dispose of it?

19    A.    Correct.

20    Q.    How about removal of samples

21 from the museum not for purposes of

22 disposal, but because someone wants to

23 take something out of the museum?  Is

24 there a policy in place for that?

Margaret M. Gurowitz

1      MS. FOURNIER:  Objection.

2  Outside the scope.  You can go

3  ahead and answer.

4      THE WITNESS:  Okay.  We

5  don't allow people to borrow

6  things from the museum or

7  archives.  It's not a lending

8  library.

9      Occasionally we might get a

10  request from another museum who

11  asks for a loan for something to

12  go on exhibit.

13      The protocol among museums

14  is they fill out paperwork that

15  details the climate and humidity

16  control they have, how they're

17  going to safely transport it and

18  exhibit it and things like that.

19  And you can either agree to the

20  loan or not agree to the loan.

21  BY MR. LAPINSKI:

22  Q.   Are you aware of any

23  situations since you've been in your

24  position at Johnson & Johnson where

Margaret M. Gurowitz

1    you've loaned a talc sample to another

2    museum?

3         A.    No.

4         Q.    Are you aware of any time

5    during your tenure at Johnson & Johnson

6    that you have loaned any sample that's on

7    these lists to anyone other than a

8    museum?

9         A.    I am not aware.  But I did

10   not have charge of the archives until

11   2006.  So I -- there is no information

12   about what was done before then.

13        Q.    Okay.  If there -- similar

14   to what you talked about with the museum

15   protocol, was there a policy in place

16   when you started in 2006 that if a sample

17   were to be removed from the museum, the

18   removal of that sample would be

19   documented?

20        A.    I would have documented it.

21   When I started in 2006, nobody --

22   nobody -- before that, nobody really had

23   charge of the archives.  They were in the

24   museum building, and lots of people had

Margaret M. Gurowitz

1  access to that building.  The corporate

2  art, like the stuff that people, when

3  they moved into the office, they wanted

4  artwork to hang on their walls, was

5  stored in the back of the building.  So

6  there were people in and out of the

7  building looking at corporate art.

8               The room that the

9  archives -- the artifacts were stored in

10  was not locked.  Anyone could go in and

11  out of there.  I put a lock on the door.

12  So before that it was open to whoever

13  accessed the building.  So -- and we had

14  -- there was no way of knowing if, you

15  know, who came in and out of that room.

16       Q.    And are you aware at any

17  time of anyone accessing the storage in

18  the archives at any time prior to you

19  putting a lock on the door?

20       A.    Well, people would have gone

21  in.  Certainly the corporate librarian

22  would have gone in.  She had charge of

23  that before I did.  So -- and there might

24  have been -- I don't remember, I'm sorry,

Margaret M. Gurowitz

1   when she retired.  But there might have

2   been an interim time where sort of nobody

3   really had really charge of that.

4              So it's possible that people

5   did go in and out.

6              There are things I remember

7   looking at when I was first hired as a

8   research assistant that were not part of

9   the archives when I took over charge of

10  it.

11             So clearly -- they were

12  paper documents.  So clearly, you know,

13  some things had been removed.

14       Q.    So you said when you were an

15  intern -- when you were an intern, you

16  recall looking at things that were

17  maintained in the archives that were no

18  longer there when you started --

19       A.    So, yeah, when I was first

20  hired as a research assistant.  And let

21  me preface, they were paper artifacts.

22  They weren't related to talc.  They were

23  letters from U.S. presidents.  And so

24  when I got the management of the archives

Margaret M. Gurowitz

1  they were no longer in the paper

2  archives.  That's what I was referring

3  to.

4        Q.    Okay.  Understood.  Do you

5  have any knowledge of any talc-related

6  archives being removed from storage prior

7  to you putting a lock on the door?

8        A.    I do not knowledge of that.

9        Q.    Okay.  Do you have any

10  knowledge of anyone accessing any of the

11  talc samples prior to 2006 before you put

12  the lock on the door?

13        A.    I do not have knowledge of

14  that.

15        Q.    Since 2006 when you assumed

16  responsibility, are you aware of any talc

17  samples being removed from the archives?

18        A.    I am not aware of that.

19        Q.    Are you aware of any talc

20  samples having been destroyed that had

21  previously been maintained in the

22  archives?

23        A.    I'm not aware of that.

24        Q.    Since 2006, are you aware of

Margaret M. Gurowitz

1   any talc samples being temporarily

2   removed from the archives for purposes of

3   testing?

4         A.    I'm not aware of that.

5         Q.    To the extent that any

6   archive had been removed for such a

7   purpose, is that something that you would

8   have documented?

9         A.    If -- if I knew about it,

10  yes.  I mean, I had a key and obviously

11  our facilities people had a key to the

12  door.  But, I mean, these are historic

13  artifacts.  So, you know, so there was

14  very little interest in them.

15            MR. LAPINSKI:  Let's go off

16        the record.  Let's take a

17        five-minute break.

18            THE VIDEOGRAPHER:  The time

19        is 1:35 p.m.  We are off the

20        record.

21            (Short break.)

22            THE VIDEOGRAPHER:  We are

23        back on the record at 1:54 p.m.

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

1    Q.    Ms. Gurowitz, we've talked

2    previously about the -- briefly about the

3    four samples that were sent from the

4    United Kingdom by Dr. Hopkins correct?

5    A.    Yes.

6    Q.    And we also talked about

7    certain samples that are on our list that

8    were provided to Johnson & Johnson by

9    Bill Ashton's daughter at some point in

10   time, correct?

11   A.    That's correct.

12   Q.    And we also talked about the

13   item New Museum 3, which was an item that

14   was left at the security area at the

15   museum and you don't know where that came

16   from, correct?

17   A.    Yes, correct.

18   Q.    Other than those three --

19   those three examples there, are you aware

20   of -- strike that.

21   Other than those three

22   examples there, is it fair to say that

23   the other samples have been in the

24   control of Johnson & Johnson since the

Margaret M. Gurowitz

1    time they were manufactured?

2                   MS. FOURNIER:  Objection.

3                   THE WITNESS:  We cannot say

4           that.  While I was able to piece

5           together pieces of their history

6           and continuity and where they've

7           been, there's not enough

8           information to place -- to create

9           an entire chain of custody.

10                  The only thing that I was

11          able to create or to research or

12          really more or less complete chain

13          of custody for were the PTI

14          samples, because there was good

15          information.

16                  For the others, we just do

17          not know how they got into the

18          collection originally for many of

19          them.

20                  There are, as I mentioned

21          before, many samples that are

22          older than those marketing

23          notices, that said, "Hey, if you

24          change your packaging, send us a

Margaret M. Gurowitz

1    sample."  We don't know how those

2    got into the collection.  So --

3    and as well as, you know, other

4    ones that you cannot piece

5    together a complete chain of

6    custody.  You can piece together

7    pieces of chains of custody, but

8    not a complete chain of custody.

9  BY MR. LAPINSKI:

10    Q.    And other than the three

11  examples that we spoke about, when you

12  did your research, you didn't come across

13  any information to show that the

14  remaining samples were not in J&J's

15  control at any time since the time of

16  manufacture, correct?

17          MS. FOURNIER:  Objection.

18          THE WITNESS:  There is no

19    information.  So I don't have any

20    data or information to base that

21    on.  I cannot come to a conclusion

22    about it.

23  BY MR. LAPINSKI:

24    Q.    Okay.  Going back to the

Margaret M. Gurowitz

1  policy we had talked about that was in

2  place from the '50s up until the early

3  1980s about the provision of samples to

4  the museum.

5              Was there a policy in place

6  as to how those samples were supposed to

7  be provided to the museum?

8       A.    I haven't seen anything

9  other than those documents.  So they were

10  interested in the packaging, how the

11  packaging had changed and the labeling.

12              So I haven't seen any

13  information about how they were provided,

14  whether they had to be full, whether they

15  could be empty.  Certainly the packages

16  weren't sealed.  Safety seals are a very

17  modern phenomena that happened after the

18  1980s.  So historically, you know,

19  products were not sealed.

20              So they could have been

21  provided a variety of ways.  It just said

22  whenever you change the label or the

23  packaging, provide a sample.

24              (Document marked for

Margaret M. Gurowitz

1          identification as Exhibit

2          Gurowitz-10.)

3   BY MR. LAPINSKI:

4          Q.    I'm going to hand to you a

5   document that we are marking as

6   Exhibit 10.  And if you could review that

7   document and let me know when you've had

8   an opportunity to review it.

9          A.    Yes, I've reviewed it.

10         Q.    And have you seen this

11  document before?

12         A.    Yes, I have.

13         Q.    And what is your

14  understanding of what this document is?

15         A.    These are the chain of

16  custody sheets that were filled out when

17  the product artifact or samples, as we

18  call them, were transferred from the J&J

19  museum to the legal folks for

20  transportation to the lab.

21         Q.    And on the first page of the

22  document, and actually running throughout

23  the entire document, there's a section

24  that is labeled release by.  And there

Margaret M. Gurowitz

1  are initials there.  Are they your

2  initials?

3          A.    They are.

4          Q.    Okay.  So this chain of

5  custody you released on February 22nd,

6  2018.  You released custody of all of the

7  museum samples to a representative of

8  DBR, correct?

9          A.    All the museum samples

10  listed in this document, yes.

11          Q.    Okay.  And going back to

12  testimony that you provided earlier,

13  could you just run through the process

14  that you went through in preparing these

15  samples for shipping?

16          A.    So I pulled them from the

17  storage boxes they were in in the

18  corporate archives.

19              As I mentioned before, I

20  wear gloves when I handle artifacts so as

21  not to potentially damage the artifact

22  from, you know, oils on your skin and

23  things like that.

24              So they were taken out of

Margaret M. Gurowitz

1  those boxes and they were -- you know,

2  sometimes they were -- I don't remember

3  whether we un- -- some of them had

4  acid-free tissue paper around them.  I

5  don't remember whether we unwrapped some

6  of them.  Some of them may have,

7  depending on there fragility, been

8  transported with that in place, some not.

9          And then they were then

10 placed in the boxes that were going to be

11 used to transport them to the lab, and

12 then these sheets were filled out.

13     Q.    Okay.  And when they were

14 placed into the boxes, after you placed

15 them into the boxes, did you seal those

16 boxes?

17     A.    The top was put on.  I don't

18 know if it was -- I don't remember

19 whether it was sealed with tape or

20 anything like that.  They were, you know,

21 like bankers boxes kind of things.

22     Q.    And if you would turn to --

23 if you look in the lower right-hand

24 corner, there are Bates numbers on there.

Margaret M. Gurowitz

 1    All the way -- yes.

 2            A.    Is this what you're --

 3            Q.    Yes.  If you would turn to

 4    the page that ends in 628.

 5                  And the second entry on that

 6    page is for Package Number 2014.001.2455.

 7                  Do you see that?

 8            A.    I do.

 9            Q.    And there's a notation on

10    there in parentheses "Top off."

11            A.    I see that.

12            Q.    Is that referring to the

13    particular museum sample that you

14    testified to earlier that was produced

15    with the top off?

16            A.    I believe that would, yes.

17            Q.    And are you aware of any

18    other samples that were produced from the

19    museum that had the top removed at the

20    time it was produced?

21            A.    At the time it was produced,

22    no.  That's one that came to mind,

23    because at some point in the artifact's

24    history, the top, the plastic top had

Margaret M. Gurowitz

1  broken completely off.

2      Q.    Is it fair to say if there

3  were other samples that you had taken

4  from the museum in order to produce that

5  were missing the top, you would have

6  documented it for those samples as well?

7      A.    If the top was completely

8  off at the time of transfer, yes.  It

9  would have -- I'm sure it would have been

10  documented.

11      Q.    That was Exhibit 10 that I

12  gave you, right?  That's what I marked it

13  as?

14      A.    Mm-hmm, yes.

15          (Document marked for

16          identification as Exhibit

17          Gurowitz-11.)

18  BY MR. LAPINSKI:

19      Q.    I'm going to hand you a

20  document that we're marking as

21  Exhibit 11.  Take a moment to look at

22  that and let me know when you've had an

23  opportunity to review it.

24      A.    Okay.  Okay.

Margaret M. Gurowitz

1    Q.    Okay.  Have you seen this

2  document before?

3    A.    I don't believe I have.

4    Q.    Okay.  This is a -- this is

5  a chain of custody document.  The first

6  Bates number on it is JNJTALC000536610.

7         Ms. Gurowitz, what's your

8  understanding of what this document is?

9    A.    It's a chain of custody

10  sheet.  It says samples from J&J museum,

11  collected 2/22/18.  This is not the set

12  of sheets I signed.

13    Q.    Okay.  This does indicate

14  that for the -- as you indicated samples

15  from the J&J museum collected on

16  February 22, 2018.  Those samples in

17  boxes were transferred from a

18  representative of DBR to Alliance

19  Technologies; is that correct, if you

20  look at the chain of custody line?

21    A.    That is what it says on the

22  document.

23    Q.    Okay.  Are you aware of

24  whether or not in between the time you

Margaret M. Gurowitz

1   transferred the documents to DBR and they

2   were subsequently transferred to Alliance

3   Technologies there was anything that was

4   done to the samples?

5          A.    I am not aware of any.  I

6   have no information on that.

7          Q.    Are you aware of whether or

8   not the boxes that are listed here were

9   opened?

10         A.    I do not know.

11         Q.    Are you aware of whether

12  there was any testing that was done on

13  the product?

14         A.    Ultimately?  Or --

15         Q.    No, in between --

16         A.    I do not know.

17         Q.    In between --

18         A.    I do not know.

19         Q.    In between the period of

20  time of February 22nd and March 2nd.

21         A.    I do not know.

22              (Document marked for

23         identification as Exhibit

24         Gurowitz-12.)

Margaret M. Gurowitz

1    BY MR. LAPINSKI:

2         Q.    I'm going to hand you a

3    document that's been marked as

4    Exhibit 12.  The first Bates number on

5    this group of documents is JNJTALC005 --

6    actually you know what?  You've got to

7    bring them all back in for a second.  I

8    apologize.  I have them the wrong way.

9              I'm going to give you just

10   that document that's marked as

11   Exhibit 12.

12             Ms. Gurowitz, have you seen

13   this photograph before?

14        A.    I have not.

15        Q.    Do you know what it's a

16   photograph of?

17        A.    It is a photograph of

18   storage boxes.

19        Q.    And do you know where this

20   photograph was taken?

21        A.    I do not.

22        Q.    Do you know whether it was

23   taken at a J&J facility?

24        A.    I have no information.  I do

Margaret M. Gurowitz

1    not know that.

2              (Document marked for

3         identification as Exhibit

4         Gurowitz-13.)

5    BY MR. LAPINSKI:

6         Q.    I'm going to hand you a

7    document that's being marked as

8    Exhibit 13.

9              Ms. Gurowitz, have you seen

10   this photograph before?

11        A.    I have not.

12        Q.    Are you aware of what it is

13   a photograph of?

14        A.    It is a photograph of

15   storage boxes.

16        Q.    Do you know where this

17   photograph was taken?

18        A.    I do not.

19        Q.    Is there anything on --

20   anything marked on the boxes in this

21   photograph that would enable you to

22   identify what these boxes are?

23        A.    Well, there are Post-It

24   notes that say partial JBP-02 done,

Margaret M. Gurowitz

1   partial JBP-06 done, 03 done, and 04

2   done.  So presumably the contents of

3   these relate to Johnson's Baby Powder.

4          Q.    But you don't know where

5   these pictures generated from?

6          A.    I do not.

7                (Document marked for

8          identification as Exhibit

9          Gurowitz-14.)

10  BY MR. LAPINSKI:

11         Q.    Okay.  I'll give that to

12  you.  And that's Exhibit 14.

13                Ms. Gurowitz, have you seen

14  this photo before?

15         A.    I have not.

16         Q.    Do you have an understanding

17  as to what that photograph is?

18         A.    Again, it's a photograph of

19  storage boxes.

20         Q.    And are you aware of where

21  that photograph was taken?

22         A.    I am not.

23         Q.    Are you aware of when that

24  photograph was taken?

Margaret M. Gurowitz

1       A.    I do not know when it was

2   taken.

3       Q.    And as to the other

4   photographs that we've looked at which

5   would collectively be Exhibits 12, 13,

6   and 14, are you aware of when those

7   photographs may have been taken?

8       A.    I am not aware of when they

9   would have been taken.

10              (Document marked for

11          identification as Exhibit

12          Gurowitz-15.)

13   BY MR. LAPINSKI:

14       Q.    I'm going to hand you

15   Exhibit 15.

16              Ms. Gurowitz, have you seen

17   this photograph before?

18       A.    I have not.

19       Q.    Are you aware of where this

20   photograph was taken?

21       A.    I am not aware of that.

22       Q.    Are you aware of when it was

23   taken?

24       A.    I do not know when it was

Margaret M. Gurowitz

1    taken.

2         Q.    And do you have any

3    information -- strike that.

4              Do you have any information

5    as to who may have taken this photograph?

6         A.    I do not know that.

7              (Document marked for

8         identification as Exhibit

9         Gurowitz-16.)

10   BY MR. LAPINSKI:

11        Q.    I've marked this photograph

12   as Exhibit 16.

13             Have you seen this

14   photograph before?

15        A.    I have not.

16        Q.    Are you aware of when this

17   photograph was taken?

18        A.    I don't have any information

19   about when it was taken.

20        Q.    And are you aware of where

21   this photograph was taken?

22        A.    I do not know where it was

23   taken.

24             (Document marked for

Margaret M. Gurowitz

1    identification as Exhibit

2    Gurowitz-17.)

3  BY MR. LAPINSKI:

4    Q.    I've handed you what's been

5  marked as Exhibit 17.

6         Have you seen this

7  photograph before?

8    A.    I have not.

9    Q.    Okay.  Are you aware of when

10  this photograph was taken?

11    A.    I am not.

12    Q.    Are you aware when the

13  photograph was taken?

14    A.    I am not.

15         (Document marked for

16    identification as Exhibit

17    Gurowitz-18.)

18  BY MR. LAPINSKI:

19    Q.    I'm handing you a document

20  that's being marked as Exhibit 18.  I'll

21  ask you to take a minute or two to review

22  that document.

23    A.    Sure.

24    Q.    All set?

Margaret M. Gurowitz

1    A.    Yes.

2    Q.    Okay.  I've handed you a --

3    before I get to the document.

4    Ms. Gurowitz, how many offsite storage

5    facilities does J&J have for where talc

6    samples are stored?

7    A.    Are you talking about -- if

8    I can ask you to clarify.  Physical

9    facilities or vendors?

10   Q.    Let's start with vendors.

11   A.    I believe that Iron Mountain

12   is Johnson & Johnson's offsite storage

13   vendor for anything the company stores

14   offsite.

15   Q.    And do you know how long

16   Iron Mountain has been Johnson &

17   Johnson's storage company?

18   A.    I do not know that.

19   Q.    And just for purposes of

20   clarification, when we say Iron Mountain

21   is Johnson & Johnson's storage company,

22   are we referring to both Johnson &

23   Johnson defendants?

24   A.    I believe so.

Margaret M. Gurowitz

1    Q.    The talc samples that are
maintained in the museum, to whom do
those talc samples belong?

4    A.    The ones that are in the
corporate archives?

6    Q.    Yes.

7    A.    Those are property of
Johnson & Johnson.

9    Q.    Okay.  And how about the
offsite samples that are maintained --

11    A.    In the offsite storage?

12    Q.    Yes.

13    A.    Those are property of
Johnson & Johnson Consumer.

15    Q.    And I don't know if I asked
you this.  Do you know for how long Iron
Mountain has been the offsite storage
facility for Johnson & Johnson?

19    A.    I do not know that.

20    Q.    Do you know which
location -- strike that.

22        Do you know which Iron
Mountain location the Johnson & Johnson
offsite samples were stored at?

Margaret M. Gurowitz

1      A.    I believe there are two in

2   New Jersey that they were stored at.  One

3   is in Monroe, and the other is in

4   Freehold.

5      Q.    And have you ever been to

6   either of those locations?

7      A.    I have not.

8      Q.    Do you know how long the

9   offsite samples have been stored at the

10  Iron Mountain facility?

11     A.    I do not know.  The transfer

12  sheets, I have seen from 1982.  So they

13  were sent to Leahy Business Archives.  So

14  at some point they must have been

15  transferred to Iron Mountain when

16  Johnson & Johnson must have at some point

17  switched providers.

18     Q.    You said those transfer

19  sheets were from 1982?

20     A.    Yes.

21     Q.    When was it that you saw

22  those transfer sheets?

23     A.    During the process of trying

24  to put together a chain of custody for

Margaret M. Gurowitz

1  the offsite samples that were labeled

2  marketing.

3       Q.    Is it fair to say that the

4  transfer sheets from 1982 were used by

5  you in order to prepare yourself for the

6  deposition today?

7       A.    Yes.

8       Q.    Did they provide you with

9  background in regard to the chain of

10  custody of the museum samples?

11      A.    They helped shed some light

12  on a very tiny piece of the chain of

13  custody for just the samples marked

14  marketing and offsite storage.

15      Q.    So the 1982 transfer sheets

16  did not relate to any of the research and

17  development samples that were maintained

18  in offsite storage?

19      A.    No, they do not appear to.

20  Just the marketing ones.

21      Q.    And it's your understanding

22  that those transfer sheets document the

23  transfer of marketing samples from

24  Johnson & Johnson to the Leahy Business

Margaret M. Gurowitz

1    Storage facility?

2         A.    That is what they appeared

3    to do, yes.  They are transfer sheets

4    listing items that were moved to offsite

5    storage for Leahy.

6         Q.    And included in those items,

7    was it all of the marketing samples that

8    we've been discussing here on the offsite

9    storage list?

10        A.    It was -- if not all, it was

11   certainly a good portion of them.

12        Q.    Are you able to determine

13   with the information that you have in

14   front of you which marketing samples

15   would have not been included on that

16   transfer sheet?

17        A.    In some cases, I can make a

18   correlation with marketing samples that

19   were included.  In other cases, you can

20   get close enough to say this either could

21   or could not be included.  But not in all

22   cases, there's not enough information

23   there.

24        Q.    And upon what would you rely

Margaret M. Gurowitz

1    in order to be able to get yourself as

2    close as possible as you indicated?

3           A.    So I would compare the

4    information on the transfer sheet --

5    excuse me.  I'm just going to find the

6    relevant sheet.

7                 So I'm looking at Page 11883

8    under offsite storage.  And so what I

9    would do is I look at --

10          Q.    I'm going to interrupt you

11   for a second just so we can keep the

12   record straight.  You are right now

13   referring to what is marked as Page 36 of

14   91, and it is Page ID 11883, correct?

15          A.    That is correct.

16          Q.    Okay.  So go ahead.

17          A.    So what I would do is look

18   at the information contained in the

19   columns that say label, date on

20   container, or wrapping medium, and

21   container volume which references how

22   much volume the container held.  It would

23   have been material printed on the

24   container, and then tried to match it up

Margaret M. Gurowitz

1  with items that were on the transfer

2  sheet to see if they correlated.

3       Q.    Again, you're referring to

4  the 1982 transfer sheet, correct?

5       A.    Correct.

6       Q.    And you did not bring those

7  transfer sheets here with you today,

8  correct?

9       A.    I did not.

10           MR. LAPINSKI:  Counsel, I'm

11      going to make a request that those

12      transfer sheets be produced

13      because I don't think that --

14           MS. FOURNIER:  They've been

15      produced.

16           MR. LAPINSKI:  They've been

17      produced?  Were they just recently

18      produced?

19           MS. FOURNIER:  I don't they

20      were, no.  They were previously

21      produced.

22  BY MR. LAPINSKI:

23       Q.    Are you aware of how long

24  the offsite sample -- are you aware of

Margaret M. Gurowitz

1  how long the offsite samples were in

2  storage at Leahy business?

3       A.    Certainly since 1982.  But I

4  do not have an ending date when they

5  ceased to be stored at Leahy.

6       Q.    And do you know -- do you

7  know at what point of time -- do you know

8  what facility the offsite samples were

9  stored at just prior to being produced by

10 Johnson & Johnson?

11      A.    I do not know what specific

12 facility, but I know there were two

13 facilities in New Jersey that they were

14 stored at.  But I don't know which were

15 stored at either one.

16      Q.    Is it -- is it fair to say

17 that prior to production by Johnson &

18 Johnson, they were at an Iron Mountain

19 facility?

20      A.    It is -- the marketing

21 samples?

22      Q.    Yes, the marketing samples.

23      A.    It is fair to say that.

24      Q.    And do you know at what

Margaret M. Gurowitz

1  point in time the marketing samples were

2  moved from storage in Leahy business to

3  storage at Iron Mountain?

4       A.    I do not know.  We don't

5  have the records that indicate that.

6       Q.    Are you familiar at all with

7  the Leahy storage facility?

8       A.    I am not.

9       Q.    Do you know where it's

10  located?

11       A.    I do not.

12       Q.    Are you aware of the

13  contractual relationship that Johnson &

14  Johnson had with the Leahy storage

15  facility?

16       A.    I am not aware of the

17  specific contractual relationship.  But

18  at the time, since the items were moved

19  there, they would have been the storage

20  vendor for the company.

21       Q.    And is it -- would it be

22  your position that as a storage vendor of

23  Johnson & Johnson, Leahy Business would

24  not open any of the boxes that it was

Margaret M. Gurowitz

1  storing on behalf of Johnson & Johnson?

2           MS. FOURNIER:  Objection.

3           THE WITNESS:  That -- that

4       would be a question for our

5       records management folks.  I don't

6       know what the terms of the

7       contract with them was.

8  BY MR. LAPINSKI:

9       Q.    Are you aware of any reason

10  why representatives of Leahy business

11  would go into boxes that were being

12  stored at this facility?

13      A.    Again, I -- that would be a

14  question for records management folks.

15  They manage all of the offsite storage.

16      Q.    As it relates to chain of

17  custody, is there any reason why you

18  would believe that while the -- while the

19  samples were being stored at Leahy

20  business, they were tampered with at all?

21      A.    I have no information about

22  that.

23      Q.    And do you know how to spell

24  Leahy in Leahy business?

Margaret M. Gurowitz

1    A.    I believe it's L-E-A-H-Y or

2  something very close to that.

3    Q.    I don't know whether or not

4  I asked this question, but are they a New

5  Jersey organization?

6    A.    That, I do not know.

7    Q.    Okay.  Do you know if the

8  facilities are located in New Jersey?

9    A.    That, I don't know.  I don't

10  think they're -- I'm not even sure they

11  are still in business actually.

12    Q.    When the marketing samples

13  were sent to Leahy business, where were

14  they sent from?

15    A.    The marketing samples had

16  been sent, as we've established by

17  looking at the other documents, in 1982.

18  They were closing the Kilmer Museum.

19  They were sent back to the operating

20  unit, so it would have been someone at

21  the consumer company who would have sent

22  them to offsite storage.

23    Q.    Is it fair to say that if

24  Leahy had to open any of the boxes that

Margaret M. Gurowitz

1   were in storage for Johnson & Johnson

2   they would have notified Johnson &

3   Johnson beforehand?

4               MS. FOURNIER:  Objection.

5               THE WITNESS:  That, again,

6         would have been part of whatever

7         agreement they had with our

8         records management folks.

9   BY MR. LAPINSKI:

10        Q.    As the corporate

11  representative for Johnson & Johnson

12  testifying on chain of custody, is

13  there -- do you have any knowledge of

14  Leahy business tampering with any of the

15  boxes that it held in storage?

16        A.    Again, that's sort of --

17  although I am -- I've researched chain of

18  custody, the relationship with our

19  records management organization is

20  outside sort of the area that I look at.

21               So if -- so I don't know

22  what the relationship was, if they had to

23  open a box, did they have to notify

24  records management.  I do not know.

Margaret M. Gurowitz

1          Q.    In your preparation for this

2   deposition and research that you did in

3   order to prepare yourself to testify on

4   chain of custody, do you have any

5   information that would indicate that

6   Leahy Business had at all opened and

7   tampered with the marketing samples that

8   were stored offsite?

9          A.    We don't have any

10   information about Leahy Business, what

11   Leahy Business did with the boxes they

12   were storing.

13          Q.    And, again, you previously

14   indicated that you don't know when the

15   boxes were transferred to Iron Mountain,

16   correct?

17          A.    No.  And when I asked the

18   folks I talked to in the marketing group,

19   they -- before it was discovered that

20   these boxes were in offsite storage, they

21   didn't even know they had existed, they'd

22   been there so long.

23          Q.    They had been there so long

24   meaning they'd been --

Margaret M. Gurowitz

1    A.    Since 1982.

2    Q.    I'm sorry.  Let me -- let me

3  finish my --

4    A.    I'm sorry.

5    Q.    That's okay.

6          When you say they had been

7  there so long, they had been at Iron

8  Mountain so long?

9    A.    They had been in offsite

10  storage so long.

11    Q.    Just in offsite storage so

12  long?

13    A.    Yes.

14    Q.    If you look at the document

15  that I have given you which we marked as

16  Exhibit -- is that 18?

17    A.    Yes.

18    Q.    The Iron Mountain documents?

19    A.    Mm-hmm.

20    Q.    Have you ever seen these

21  documents before?

22    A.    I believe I have.  If not,

23  it was something very similar.

24    Q.    Okay.  What's your

Margaret M. Gurowitz

1   understanding of what these documents

2   are?

3        A.   My understanding is these

4   are internal Iron Mountain records.

5        Q.   Did you review these records

6   in preparation for your testimony today?

7        A.   If this is the same set of

8   records, then yes, I've seen them before.

9        Q.   Okay.  And when was the

10  first time that you saw them?

11       A.   Maybe just a -- two weeks

12  ago maybe, something in that time frame.

13  So very recently.

14       Q.   If you would take a look at

15  the description information that's about

16  a third of the way down the page.  And if

17  you see, there is an SKP box/barcode

18  number?

19       A.   Mm-hmm.

20       Q.   Okay.  Do you know what that

21  number represents?

22       A.   I do not.  But I can make an

23  educated inference that it represents a

24  unique number for a particular box.

Margaret M. Gurowitz

1    Q.    Okay.  If you would now go

2   back to Exhibit 16, which is one of the

3   photographs.  If you would look in the

4   upper left-hand corner of that

5   photograph, there is a box that has a

6   barcode number of 15140487.

7         Do you see that?

8    A.    I do.

9    Q.    And does that number

10  correspond to this Iron Mountain shipment

11  statement?

12   A.    It corresponds to the

13  barcode number on the statement.

14   Q.    Okay.  That particular box

15  that ends with 0487 in the picture, is

16  there any way that we're able to identify

17  the contents of that box?

18   A.    It says partial JBP.  So one

19  can infer that there might be Johnson's

20  Baby Powder in it.

21   Q.    But you don't -- as you sit

22  here, you're not able to make that

23  determination other than making the

24  assumption based upon that?

Margaret M. Gurowitz

1      A.    Not having seen the contents

2  of the box or an exact listing of the

3  contents, I cannot say.

4      Q.    Okay.  If you would look at

5  the bottom of the first page of

6  Exhibit 18 where it has a box history.

7      A.    Mm-hmm.

8      Q.    And if you start at the

9  bottom, you'll see it says, "12/12/94

10 received at Iron Mountain"?

11     A.    Mm-hmm.

12     Q.    Above that it says, "7/26/96

13 checked out."

14          Do you know who Hernando

15 Arbelaez is?

16     A.    I do not.

17     Q.    Do you know why if at all

18 that particular box may have been checked

19 out by Johnson & Johnson in July of 1996?

20          MS. FOURNIER:  Objection.

21          THE WITNESS:  We don't know

22      that that represents a checkout by

23      Johnson & Johnson because we don't

24      know if Hernando Arbelaez was a

Margaret M. Gurowitz

1    Johnson & Johnson employee or an

2    Iron Mountain employee.

3    BY MR. LAPINSKI:

4        Q.    Do you know of any reason

5    why anyone other than a representative of

6    Johnson & Johnson would be able to check

7    a box out from Iron Mountain that was a

8    Johnson & Johnson box?

9            MS. FOURNIER:  Objection.

10            THE WITNESS:  Well,

11        presumably some of -- some of

12        these could represent internal

13        movement, you know, moving things

14        from one place to another in their

15        storage facility.

16    BY MR. LAPINSKI:

17        Q.    Well, that's a presumption

18    that you're making though?  You don't

19    know that?

20        A.    Well, you'd have to

21    determine who these contact folks were,

22    whether they were Johnson & Johnson

23    people or Iron Mountain people.

24        Q.    Okay.  Let's go to -- let's

Margaret M. Gurowitz

1  jump up on this to September 21st, 2017,

2  which is on the box history the last time

3  the box was checked out.

4      A.    Mm-hmm.

5      Q.    Do you know who AnneMarie

6  Braman is?

7      A.    I do not.

8      Q.    Okay.  In September of 2017,

9  would offsite samples have been part of

10  your responsibility as the J&J historian?

11      A.    No, they would not.

12      Q.    Okay.  Do you as the J&J

13  historian use Iron Mountain for the

14  storage of any offsite samples?

15      A.    No.

16      Q.    Okay.  Did you speak with

17  anybody in regard to offsite samples and

18  the storage policies for those samples at

19  Iron Mountain?

20      A.    I spoke with Sarita Finnie

21  and Barbara Brewer about the marketing

22  samples.  Also Mark Zappa and Lorena

23  Telofski.  And they had told me that it

24  was not the practice of marketing or

Margaret M. Gurowitz

1  quality or R&D to send samples to offsite

2  storage, that it would not be part of

3  their regular practice to do so.

4       Q.    But these were samples that

5  were maintained by Iron Mountain on

6  behalf of J&J, correct?

7       A.    That's correct.

8       Q.    And if I understand your

9  testimony correctly, none of the people

10  that you spoke to had an awareness of how

11  these boxes were maintained at Iron

12  Mountain?

13       A.    No.  I think it actually

14  came as a surprise to them that there

15  were boxes of samples there.

16       Q.    And if you could remind me

17  again.  You had stated that as far as the

18  relationship between Johnson & Johnson

19  and Iron Mountain, there was an

20  individual within Johnson & Johnson who

21  would have a better understanding as to

22  the contractual relationship between the

23  two organizations, correct?

24       A.    Johnson & Johnson has a

Margaret M. Gurowitz

1  worldwide records management group.  And

2  that's a large organization, as you might

3  imagine.  And so the people in that group

4  would partner with people in different

5  areas of the company.  So somebody --

6  folks in that group would have an

7  understanding of the contract -- the

8  contract we have with the service

9  provider.

10        Q.    So as you sit here, you have

11  no knowledge of how the boxes were

12  maintained at Iron Mountain?

13        A.    I do not.

14        Q.    Okay.  Do you know whether

15  or not when the boxes were sent to the

16  Iron Mountain facility they were sealed?

17        A.    I do not have that

18  information.  I can say though these just

19  look like they are banker boxes.  It

20  doesn't look like there are seals on

21  them.  You can see from the photos.

22        Q.    Okay.  You don't know where

23  those photographs were taken though?

24        A.    I do not.

Margaret M. Gurowitz

1     Q.    Okay.  So you don't know if

2  they were photographs of the boxes at

3  Iron Mountain?

4     A.    I don't know.

5     Q.    Okay.  And do you know who

6  within worldwide records management group

7  might be the best person to speak to in

8  regard to the maintenance of the offsite

9  samples at Iron Mountain?

10     A.    I do not.  It would be

11  whoever works with the consumer company.

12     Q.    Meaning Johnson & Johnson

13  Consumer Incorporated?

14     A.    Yeah, there would be

15  somebody that -- who they would partner

16  with in records management if they needed

17  to store things offsite.

18     Q.    In the preparation that you

19  did in order to testify as to chain of

20  custody for these offsite samples, do you

21  have any knowledge of these boxes being

22  tampered with while they were at --

23  strike that.

24          Do you have any knowledge of

Margaret M. Gurowitz

1  the offsite samples being tampered with

2  while they were in the control of Iron

3  Mountain?

4       A.    We -- I do not have any

5  information about how these offsite

6  samples were treated or stored when they

7  were at Iron Mountain.

8       Q.    Do you know who Kelly Starr

9  is?

10      A.    I do not.

11      Q.    Do you know who Samantha

12 Floyd is?

13      A.    I do not.

14      Q.    Do you have any reason to

15 believe that the offsite samples stored

16 at Iron Mountain would have been tampered

17 with?

18      A.    When you say tampered, can

19 you clarify?

20      Q.    In any way damaged, opened,

21 accessed at all by Iron Mountain?

22      A.    Well, without knowing

23 exactly what these checkouts refer to,

24 are they just internal moves because they

Margaret M. Gurowitz

1  need to move things around in their

2  storage facility or do they -- it's hard

3  to say.  So I do not have enough

4  information to have an opinion about

5  that.

6          Q.    Are you aware of the names

7  of the individuals who would have sent

8  samples to offsite storage?

9          A.    Would you -- can I ask what

10 time frame?

11         Q.    At any time frame.  Are you

12 aware of any individuals who would have

13 said offsite marketing samples to Iron

14 Mountain?

15         A.    No.  When I talked to Sarita

16 Finnie and certainly Barbara Brewer who

17 has been with the company a long time,

18 they didn't know these samples existed in

19 offsite storage.  None of us knew they

20 had been there because they had been

21 there so long.  So I do not know of

22 anyone who would have done it, and both

23 of them said that it was not the policy

24 or practice of marketing to send samples

Margaret M. Gurowitz

1    to offsite storage.

2         Q.    And would the same hold true

3    for quality assurance?

4         A.    Yes.

5         Q.    And would the same hold true

6    for research and development?

7         A.    Yes.

8         Q.    Going back to the Iron

9    Mountain records, which is Exhibit 18.

10   It indicates that the customer is

11   Johnson & Johnson Consumer Products,

12   correct?

13        A.    That is what it says, yes.

14        Q.    Do you have any reason to

15   believe that a non-Johnson & Johnson --

16   any non-Johnson & Johnson personnel would

17   have been able to send sample boxes to

18   Iron Mountain for storage?

19             MS. FOURNIER:  Objection.

20             THE WITNESS:  Do you mean

21        somebody who's not an employee of

22        either Johnson & Johnson or the

23        consumer company --

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1    Q.    Correct.

2    A.    -- or just the consumer

3  company?

4    Q.    Both.

5    A.    No, I don't think so.  Not

6  under these parameters, no.  I mean, that

7  being said I'm sure there are a lot of

8  companies who use Iron Mountain.

9         (Document marked for

10        identification as Exhibit

11        Gurowitz-19.)

12  BY MR. LAPINSKI:

13    Q.    I'm going to hand you a

14  document that's been marked as

15  Exhibit 19.  If you would review that

16  document and just let me know when you're

17  finished I'm sorry are you ready.

18         I apologize.  I thought I

19  asked you to let me know when you're

20  ready.

21    A.    Oh, I'm sorry.

22    Q.    No, that's okay.

23         Ms. Gurowitz, I've handed

24  you Exhibit 19.  Is this a document that

Margaret M. Gurowitz

1    you've ever seen before?

2         A.    No.

3         Q.    The first page of this

4    document is Bates-stamped

5    JNJTALC00536657.  And it is a chain of

6    custody document.

7              Ms. Gurowitz, if you would

8    look in the upper left-hand corner under

9    description, it says JBP Sample 01.  I

10   believe that says partial next to it.  Do

11   you know what that refers to?

12        A.    Not -- I do not know exactly

13   what that refers to.

14        Q.    Do you know whether or not

15   it corresponds to sample JP -- JBP-001 on

16   the sample list that we've been

17   discussing?

18        A.    Let me take a look.  I'm

19   sorry I'm having a hard time to get it

20   with the double-sided it.  It continues

21   to throw me off.  I think these are

22   slightly out of order somehow.

23              Just to be clear, you're

24   referring to the -- oh, that's 91.  I'm

Margaret M. Gurowitz

1    sorry.

2         Q.    I'm looking at page ID 11865

3    if that helps.

4         A.    11865.  Okay.  I've got it.

5    The one that's JBP-001?

6         Q.    Yes.

7         A.    Well, this says JBP Sample

8    01 partial, and this says JBP-001 full.

9              So if this refers to a

10   container that's partially full, it does

11   not match up with this one, because this

12   states that the container is full.

13        Q.    Okay.  If you look -- and

14   it's a difficult copy looking at

15   Exhibit 19.  But going across the

16   different columns, there is a column for

17   packing contents that on this first page

18   is blank.  And then if you see the second

19   column it says time and date.  Can you

20   make that out?  Actually, date and time.

21   Are you able to make that out?

22        A.    This one, yes.

23        Q.    And then the next one after

24   that says "released by."

Margaret M. Gurowitz

1    Do you see that?

2        A.    I do.

3        Q.    Okay.  Do you know what IT

4    lead is?

5        A.    I do not.  IT usually refers

6    to information technology.  But I don't

7    know what it means in this case.

8        Q.    How about in the received by

9    section, "entrusted advisors."  Do you

10   know who entrusted advisors are?

11       A.    I do not.

12       Q.    If you go to the third line

13   down, the entry dated February 21st,

14   2018.  There is an entry there, it looks

15   like initials.  And under that is QA.  Do

16   you know who those initials would be?

17       A.    Can I ask you to clarify?

18   You are looking for the signature column?

19       Q.    Yeah.

20       A.    The signature directly

21   above --

22       Q.    In the "received by" column

23   there are initials and a signature, and

24   below that it says QA.  Okay.

Margaret M. Gurowitz

1      A.    I do not know.  I can't make

2  out the handwriting.  It could be an S or

3  an A.  I can't really tell from the

4  writing.

5      Q.    Okay.  If you go to the next

6  page, under description it says JBP

7  Sample Number 01.  Do you have any idea

8  what that refers to?

9      A.    I do not.

10     Q.    If you turn to the next

11  page, which has Bates numbers ending in

12  659.  The description is, "JBP sample

13  partial Number 2 done."  Do you know what

14  that refers to?

15     A.    Not offhand.  It's possible

16  that it refers to JBP-002.  But I could

17  not say without more information.

18     Q.    Okay.  What additional

19  information would you need in order to be

20  able to say?

21     A.    Well, so, on this -- the

22  chain of custody sheet, it's listed as

23  JBP Sample 02.  But the sample numbers on

24  the sheet of all of the samples of two

Margaret M. Gurowitz

1  zeros before the other numbers.  So they

2  don't exactly correspond.

3          Q.    On the following page, JBP

4  Sample 02, do you know what that refers

5  to?

6          A.    Without more information I

7  could not say.

8          Q.    On the following page, JBP

9  Sample 03 partial, do you know what that

10  refers to?

11          A.    Again, without more

12  information, I could not say.

13          Q.    Do you know whether any of

14  these are referring to offsite samples

15  that have been produced and included on

16  the sample list?

17          A.    Without more information I

18  could not say, again.

19          Q.    If you could -- if you could

20  take a minute and just look at the

21  various pages that are included in this

22  document, and in particular the

23  description page of each of these, and

24  tell me whether or not there are any

Margaret M. Gurowitz

1   descriptions on there that can correspond

2   to the sample lists that we have been

3   talking about today?

4          A.     Again, without more

5   information, I couldn't say because the

6   numbering system is different on the

7   chain of custody list.  And the sample

8   list.  And the chain of custody list does

9   not provide information, like, for

10  instance, what it says on the label or a

11  date if given.  So I don't have enough

12  information to make that determination.

13         Q.     You had testified earlier in

14  regard to the PTI Royston samples that

15  you had had a conversation with an

16  individual in regard to those samples,

17  correct?

18         A.     That is correct.

19         Q.     And who was it that you

20  spoke to in regard to the PTI samples?

21         A.     A woman named Janet Stanish

22  at PTI.  I took an approximate guess on

23  the spelling on the last name.  I can't

24  confirm that it's spelled exactly how I

Margaret M. Gurowitz

1   wrote it.

2          Q.     And do you know what

3   Ms. Stanish's position is at PTI?

4          A.     I do not know what her title

5   is.

6          Q.     And what was it that she

7   told you in regard to the samples that

8   were maintained for Johnson & Johnson at

9   PTI?

10          A.     She told me that as per

11   their contract, and it's listed in the

12   contracts, that they need to maintain

13   samples as per the contract for either

14   four years from date of manufacture or

15   one year after date of expiration,

16   whichever comes first.

17                 She said that the room, the

18   retaining room they kept them in was in

19   fact located at PTI.  They were kept in,

20   you know, on shelves in boxes in

21   containers and there was climate control.

22                 And then she told me that

23   when the samples were requested, if there

24   was more than one bottle of a product,

Margaret M. Gurowitz

1  they were able to send an entire bottle,

2  because as part of their contractual

3  obligation with Johnson & Johnson they

4  need to retain samples.

5           So for instance, if, say,

6  there were two bottles of a particular

7  sample, they were able to keep one bottle

8  as per the contract and send the other.

9           If, however, there was only

10 one bottle, they had to open and divide

11 that sample and send part of that sample.

12      Q.    And when you say when the

13 samples were requested, are you referring

14 to the point in time where the samples

15 were requested pursuant to the order that

16 was entered by the court?

17      A.    Yes.

18      Q.    Are you aware of any time

19 prior to the -- the request being made

20 pursuant to this order that PTI had

21 released samples to anybody?

22           MS. FOURNIER:  Objection.

23      Outside the scope.

24           THE WITNESS:  I am not,

Margaret M. Gurowitz

1      because I was only trying to track

2      chain of custody for the items

3      listed in this list.

4  BY MR. LAPINSKI:

5      Q.    To the extent that PTI

6  maintained multiple samples from the same

7  Johnson Baby Powder lot, are you aware of

8  what other samples were sent out for

9  testing?

10          MS. FOURNIER:  Objection.

11      Outside the scope.

12          THE WITNESS:  I am only

13      aware of the samples that are

14      included as part of this list,

15      because that's what I was

16      researching the chain of custody

17      for.

18  BY MR. LAPINSKI:

19      Q.    You had indicated that to

20  the extent that there was only one sample

21  available, and if you look at Page ID

22  11911 as a point of reference.

23      A.    I am there.

24      Q.    Actually, strike that.

Margaret M. Gurowitz

1          Do you have any independent

2    knowledge of the samples that were

3    maintained at PTI Royston on behalf of

4    J&J?

5          A.    Other than tracking them for

6    the purposes of establishing chain of

7    custody for what is on this list, no.

8          Q.    And you did that only for

9    purposes of this deposition today,

10   correct?

11         A.    Correct.

12         Q.    Maintaining records on PTI's

13   samples is not part of your job

14   responsibility as a J&J historian,

15   correct?

16         A.    No, it is not.

17         Q.    Who other than yourself

18   within Johnson & Johnson would have

19   knowledge of the samples that are

20   maintained at PTI?

21              MS. FOURNIER:  Objection.

22         Outside the scope.

23              THE WITNESS:  I don't know

24         people's names.  But it would be

Margaret M. Gurowitz

1    whoever that they work with on the

2    Johnson & Johnson side.

3  BY MR. LAPINSKI:

4    Q.    And the samples that were

5  maintained by PTI on behalf of Johnson &

6  Johnson were in sealed Johnson & Johnson

7  containers, correct?

8         MS. FOURNIER:  Objection.

9         THE WITNESS:  The samples

10    were -- they were in packages, in

11    Johnson's Baby Powder packages.

12    So I have not seen photographs of

13    those packages.  So I couldn't

14    tell you if they were sealed or

15    not.

16  BY MR. LAPINSKI:

17    Q.    Is it your understanding

18  that the samples maintained by PTI on

19  behalf of Johnson & Johnson were in

20  sealed packages?

21    A.    That, I do not know.  I

22  have -- again, I have not seen

23  photographs of the actual samples, so I

24  do not know.

Margaret M. Gurowitz

1              (Document marked for

2         identification as Exhibit

3         Gurowitz-20.)

4    BY MR. LAPINSKI:

5         Q.    I'm going to mark this

6    document as Exhibit 20.  Ms. Gurowitz,

7    I've handed you a Federal Express

8    shipping -- shipping receipt.

9              The question I have for you

10   is that, in the upper left-hand corner,

11   the shipment is from Kelly Smith at

12   Bureau Veritas.  Do you know what Bureau

13   Veritas is?

14        A.    I do not know what Bureau

15   Veritas is.  It's in Kennesaw, Georgia.

16   When I spoke with Janet Stanish at PTI,

17   she told me initially their samples were

18   sent to a lab in Georgia before it was

19   determined that they would be examined by

20   a lab in New Jersey.

21             So I could -- although I

22   could make a personal educated inference

23   that that might represent the facility in

24   Georgia.  But I do not have factual

Margaret M. Gurowitz

1  information that I could point to

2  regarding that.

3              (Document marked for

4          identification as Exhibit

5          Gurowitz-21.)

6  BY MR. LAPINSKI:

7          Q.    I'm going to hand you a

8  document that's marked as Exhibit 21.  If

9  you could review that document and just

10 let me know after you've had an

11 opportunity to review it.

12         A.    I have reviewed it.

13         Q.    Okay.  Do you know what this

14 document is?

15         A.    It is laboratory chain of

16 custody form.  It says so right at the

17 top.

18         Q.    Have you seen this document

19 before?

20         A.    I have not.

21         Q.    Okay.  As indicated, this

22 document is entitled "Laboratory Chain of

23 Custody Form."

24              And it says it's from PTI

Margaret M. Gurowitz

1    Royston, LLC, to Maxxam Analytics,

2    M-A-X-X-A-M, Analytics in Kennesaw,

3    Georgia.  And it's a relinquish date of

4    9/12/17 of samples.

5              Would you agree with that?

6         A.    That is what it says on the

7    paper, yes.

8         Q.    And if you would take a

9    minute just to review these samples that

10   are included as part of this list to

11   confirm that the samples on this list

12   include all samples that are part of the

13   PTI inventory that has been produced in

14   this litigation?

15        A.    Did you want me to look at

16   each one or just --

17        Q.    Actually why don't we do it

18   this way.  I'm going to give you another

19   document that's Exhibit 22.

20              (Document marked for

21         identification as Exhibit

22         Gurowitz-22.)

23   BY MR. LAPINSKI:

24        Q.    And this is a second

Margaret M. Gurowitz

1   laboratory chain of custody form, Bates

2   Number JNJTALC00553768.  And it's, like

3   Exhibit 21, it's dated September 12th,

4   2017, from PTI Royston to Maxxam

5   Analytics.

6            Would you agree?

7       A.   Yes.

8       Q.   As the representative for

9   Johnson & Johnson here to testify on

10  chain of custody, are you aware of PTI

11  sample, included on this sample list

12  being sent from PTI Royston to Maxxam

13  Analytics in September of 2017?

14       A.   I am aware that samples were

15  sent from PTI.  I did not know the name

16  of the lab in Georgia till now.

17       Q.   Is it your understanding

18  that Maxxam Analytics is a lab?

19       A.   This is the first time I'm

20  seeing the name.  So I -- without looking

21  them up or confirming that, I could not

22  confirm just by looking at the paper.

23       Q.   And do you know who Alan

24  Seagrave is?

Margaret M. Gurowitz

1      A.     I do not.

2      Q.     Do you know why the PTI

3   samples would have been sent from PTI

4   Royston in Georgia to Maxxam Analytics in

5   September of 2017?

6      A.     Well, presumably it was per

7   a request for this matter.  Janet Stanish

8   at PTI did tell me that they were

9   requested to send their samples to a lab

10  in Georgia, and then it was decided that

11  they would in fact be reviewed at a lab

12  in New Jersey.

13     Q.     There was -- there was a

14  request to PTI to send the samples to a

15  laboratory in September of 2017?

16     A.     She did not tell me exactly

17  what the date of the request was.  But

18  she said they were requested to send

19  samples.

20     Q.     And do you know who made

21  that request?

22     A.     I do not know the specific

23  person who made that request to them.

24     Q.     We had talked briefly

Margaret M. Gurowitz

1   earlier today in regard to the process

2   that PTI followed when preparing the

3   samples for shipping.

4            Do you recall that?

5       A.   Yes.

6       Q.   Okay.  What is your

7   understanding of how PTI Royston prepared

8   the PTI samples on our sample list for

9   shipping in September of 2017 when they

10  sent them to Maxxam Analytics?

11       A.   My understanding from

12  speaking to Janet at PTI was that if more

13  than one sample existed of any given

14  bottle, that they were able to send a

15  full sample because they were still able

16  to send a sample and meet their

17  contractual obligation to Johnson &

18  Johnson to retain a sample.

19            In the case that there was

20  only container of a sample, in order to

21  meet both obligations, they had to divide

22  that sample, and so they did do that.

23  And they put the section they sent to the

24  lab in a sealed cup.

Margaret M. Gurowitz

1    Q.    And as far as the shipping

2    of the products, all of the samples from

3    PTI to Maxxam Analytics, are you aware of

4    how those samples were packed for

5    shipping?

6    A.    She told me they were packed

7    in boxes.  In her words, they were

8    palletized, which means they were put on

9    pallets.  And they actually drove them

10   from PTI to the lab in Georgia.  She said

11   they were FedExed from the Georgia

12   facility to New Jersey.

13   Q.    And do you have any

14   information that would lead you to

15   believe that during that process any of

16   the PTI samples were tampered with?

17   A.    I do not have information to

18   indicate that.  I was trying to trace

19   their chain of custody from PTI through

20   every step till they got to the lab.

21           So I was looking at, you

22   know, who had them, had they packed them,

23   how they got from one place to another.

24   Q.    Are you aware of whether or

Margaret M. Gurowitz

1   not the samples that were delivered to

2   Maxxam Analytics were unpacked?

3          A.    I do not know.

4          Q.    Do you know whether or not

5   those samples were opened when they were

6   at Maxxam Analytics?

7          A.    I do not know.

8          Q.    Do you know whether any of

9   those samples were tested while they were

10  at Maxxam Analytics?

11         A.    I do not know.

12         Q.    Do you know whether any

13  samples were destroyed while they were at

14  Maxxam Analytics?

15         A.    I do not know.  I can't

16  imagine they would have destroyed them

17  though.

18         Q.    But you have no knowledge?

19         A.    I do not.

20         Q.    You have no knowledge

21  whether they were tested either?

22         A.    No.

23         Q.    Do you have any idea what if

24  anything at all was done with the samples

Margaret M. Gurowitz

1  when they were at Maxxam Analytics?

2      A.    It's my understanding they

3  sent them to Maxxam Analytics.  They were

4  there for a period of time.  It was then

5  decided that they would be looked at at a

6  lab in New Jersey, and so Maxxam

7  Analytics Federal Expressed them to the

8  facility in New Jersey.

9      Q.    Do you know whether there's

10  any relationship between Maxxam Analytics

11  and Bureau Veritas?

12      A.    I do not.

13          (Document marked for

14          identification as Exhibit

15          Gurowitz-23.)

16  BY MR. LAPINSKI:

17      Q.    We'll mark this as

18  Exhibit 23.  If you could just take a

19  look at that document and let me know

20  whether you've seen that document before.

21      A.    Unless you showed it to me

22  earlier today, I do not believe I've seen

23  this.

24          (Document marked for

Margaret M. Gurowitz

1      identification as Exhibit

2      Gurowitz-24.)

3  BY MR. LAPINSKI:

4      Q.    Okay.  I'm also going to

5  mark Exhibit 24.  Have you ever seen

6  Exhibit 24 before?

7      A.    I don't believe I have.

8      Q.    Exhibits 23 and 24 are

9  laboratory chain of custody forms,

10  correct?

11      A.    That is what it says on the

12  documents.

13      Q.    And both of the documents

14  show that there is laboratory -- that

15  there is a shipment going from Maxxam

16  Analytics in Kennesaw, Georgia to

17  Jonathan Chun at Alliance Technologies,

18  correct?

19      A.    That is what it says on the

20  document, yes.

21      Q.    Do you have an understanding

22  of the purpose of this document?

23      A.    It's a chain of custody form

24  designed to document, just from looking

Margaret M. Gurowitz

1  at the information on it, it would be

2  designed to document this transfer of

3  whatever is listed inside it from one

4  organization to the other.

5       Q.   Do you have an understanding

6  that the PTI samples that are contained

7  on our sample list were transferred from

8  Maxxam Analytics to Alliance Technologies

9  in February of 2018?

10       A.   That is what it says on the

11  document.

12       Q.   And as the representative of

13  the Johnson & Johnson defendants

14  testifying in regard to chain of custody,

15  is that the date that the transfer

16  occurred?

17       A.   According to the information

18  written here, yes.

19       Q.   Are you aware of what if

20  anything was done with the PTI samples

21  for the five-month period of time that

22  they were at Maxxam Analytics?

23       A.   I am not.

24       Q.   Did you make any attempt

Margaret M. Gurowitz

1   to -- in preparation for today's

2   deposition to determine what if anything

3   was done with those samples during that

4   five-month period of time?

5           A.    I did not.  When I spoke

6   with Janet, she said they -- they put

7   them on pallets, they drove them by truck

8   over to the lab in Georgia, and then it

9   was decided that they needed to be looked

10  at at a lab in New Jersey.  And so they

11  were then FedExed.

12          But from the way she told it

13  to me, it didn't seem -- it sounded like

14  it was a much shorter time frame.  So I

15  did not pursue that further, because it

16  seemed like it was a very sort of short

17  time frame where one thing followed from

18  the next.

19          MR. LAPINSKI:  Why don't we

20      go off the record take a

21      five-minute break.

22          THE VIDEOGRAPHER:  The time

23      is 3:08 p.m.  We are off the

24      record.

Margaret M. Gurowitz

1            (Short break.)

2            THE VIDEOGRAPHER:  We are

3       back on the record at 3:27 p.m.

4  BY MR. LAPINSKI:

5       Q.    Ms. Gurowitz, I'm going to

6  hand you a document that's been marked as

7  Exhibit 25.

8            (Document marked for

9       identification as Exhibit

10       Gurowitz-25.)

11  BY MR. LAPINSKI:

12       Q.    There are several

13  photographs that were produced of a Baby

14  Powder container.  If you could just take

15  a minute and review those and let me know

16  whether or not you've seen those

17  photographs before?

18       A.    I have seen the photograph

19  of the front, but not the back and sides.

20       Q.    Okay.  What is your

21  understanding of what that is a

22  photograph of?

23       A.    This is a photograph of a

24  Johnson's Baby Powder tin that was

Margaret M. Gurowitz

1    manufactured and marketed in England.  It

2    was one of a small handful of samples

3    provided by a Johnson & Johnson retiree

4    named John Hopkins.

5         Q.   So would this be one of the

6    Hopkins samples that we've referred to

7    previously?

8         A.   Yes.

9         Q.   And are you able to identify

10   which of the samples on the sample list

11   these photos relate to?

12        A.   Yes.  If you give me a

13   moment to find that on the list.

14        Q.   Sure.

15        A.   Absolutely.  I still can't

16   get used to the double-sided.

17        Q.   Are these going to be on the

18   museum list or on the offsite sample

19   list?  These are going to be on the

20   offsite sample list, correct?

21        A.   Correct.

22        Q.   Okay.  It's going to be the

23   last two pages of the offsite sample

24   list.  Page ID 1189 and 1190, if that

Margaret M. Gurowitz

1    helps.

2              MS. FOURNIER:  You can go

3         ahead.

4              THE WITNESS:  Okay.  This

5         looks like it would be the sample

6         that is referred to as UK Facility

7         2, because it is a metal container

8         from the early 1950s.  The

9         photograph of the bottom has a

10        label that says early 1950s.

11             (Document marked for

12        identification as Exhibit

13        Gurowitz-26.)

14   BY MR. LAPINSKI:

15        Q.    I'm going to hand you

16   Exhibit 26.  I'll ask you to take a look

17   at those photos.  And similarly we're

18   going to look to identify if that is one

19   of the Hopkins samples which one it is.

20        A.    Judging by the photograph at

21   the bottom with the label it says late

22   1950s.  This looks like it would be the

23   sample labeled UK Facility 3.

24             (Document marked for

Margaret M. Gurowitz

1   identification as Exhibit

2   Gurowitz-27.)

3   BY MR. LAPINSKI:

4      Q.    This is Exhibit 27.  Take a

5   look at that and let me know if you've

6   ever seen those photographs before.

7      A.    I have seen a photograph of

8   just the front of this container, not the

9   sides or top or bottom.

10     Q.    And is it your understanding

11  that this is photographs of the -- one of

12  the Hopkins products as well?

13     A.    It is labeled October '66

14  and UK Facility 4, sample number is

15  identified as saying October 1966 on the

16  container, so that would -- that would

17  correspond.

18     Q.    If you would do me a favor.

19  If you could please turn to -- if you

20  look on the bottom right-hand corner with

21  the Bates number.  The Bates number that

22  ends in 6825.  And if you can describe

23  that picture for me, I would appreciate

24  it.

Margaret M. Gurowitz

1    A.    It is the picture of a top

2  of a container with the labeling separate

3  by the side.  I have not seen this

4  artifact in person.  So that's what I can

5  make out from the photograph.

6    Q.    Are you familiar at any time

7  of Johnson & Johnson having a promotion

8  for a free trip to Disneyland that would

9  be able to be slid off of a Baby Powder

10  bottle?

11    A.    I am not.  But Johnson &

12  Johnson throughout a good portion of its

13  history was highly decentralized.  That

14  would be something that was conducted in

15  the United Kingdom where this sample was

16  from.  We don't have a representative --

17  a good representation of a wide variety

18  of artifacts, product artifacts from the

19  UK in the corporate archives collection.

20          So before these matters,

21  this is the first time I had seen this

22  particular packaging.  So being

23  decentralized in this time, October of

24  1966, the UK would have done -- it

Margaret M. Gurowitz

1  wouldn't have been a central thing that

2  was done necessarily in the States or all

3  over the world.  The UK would have sort

4  of run its own promotions.

5            (Document marked for

6        identification as Exhibit

7        Gurowitz-28.)

8  BY MR. LAPINSKI:

9        Q.    This is Exhibit 28.  And if

10  you could just look at those pictures.

11  Let me know if you've ever seen those

12  pictures before.

13        A.    I have seen the picture of

14  the front, so the first one on this.

15        Q.    And what is your

16  understanding that that's a picture of?

17        A.    This is a picture that it's

18  labeled on the bottom late 1940.  It

19  would correspond to Sample Number UK

20  Facility 1.

21            (Document marked for

22        identification as Exhibit

23        Gurowitz-29.)

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

1        Q.    I'm going to hand you a

2   document that's been marked as

3   Exhibit 29.  Ms. Gurowitz, have you ever

4   seen that photograph before?

5        A.    I believe so.  There were

6   two that I looked at that had the

7   "Property of PPC Museum" on them.  If you

8   look at the second in the set.

9        Q.    And what is your

10  understanding of what the "Property of

11  PPC Museum" refers to?

12       A.    So we don't have any records

13  relating to a museum, as we understand a

14  museum to be at Personal Products.

15  Personal Products is a historical

16  operating unit of Johnson & Johnson that

17  no longer exists.

18            At one point in time it

19  marketed Shower to Shower among other

20  products.  It was located in Milltown,

21  New Jersey in a building that likely no

22  longer exists now either.

23            At some point in time, this

24  artifact belonged to or was labeled

Margaret M. Gurowitz

1   property of whatever that was.  And so we

2   don't know.  It probably was not a museum

3   in the way that we think of museums or

4   the way the current Johnson & Johnson

5   museum power house is.  It may have been

6   as simple as a case, the museum,

7   quote-unquote, in the UK that those four

8   UK samples were taken from, was a

9   glass-fronted case.  So it may have been

10  something like that.

11        Q.    And I'm sorry.  You said --

12  what does PPC stand for?

13        A.    PPC is an acronym for

14  Personal Products Corporation.  It is a

15  no longer existing historical operating

16  unit of Johnson & Johnson.

17        Q.    So it is a -- it was a

18  Johnson & Johnson entity?

19        A.    At one point, yes.

20        Q.    Okay.  And if you look at

21  the label on the bottom.  It says,

22  "Property of PPC museum, Milltown, New

23  Jersey."  And it says, "Must be returned

24  to consumer affairs."

Margaret M. Gurowitz

1    Do you know what that refers

2    to?

3        A.    Presumably consumer affairs

4    was in charge of whatever the PPC museum

5    was.

6        Q.    And would that be Johnson &

7    Johnson consumer affairs?  Is that your

8    understanding?

9        A.    Or PPC consumer affairs.

10        Q.    But consumer -- consumer

11    affairs of a J&J entity?

12        A.    Yes.

13        Q.    At the top of that photo

14    there's a reference to Doyle/B&PD.  Do

15    you know what that refers to?

16        A.    I do not know what

17    Doyle/B&PD refers to.

18        Q.    Okay.  And you had said

19    earlier that you assumed this was housed

20    at PPC?

21        A.    At one time.  It has --

22    elsewhere on that upper label, it says

23    MDSE notice which stands for

24    merchandising notice.  This may have been

Margaret M. Gurowitz

1   something related to that policy that was

2   in place for a few decades that whenever

3   you change the packaging shape or the

4   label style, send a sample.  That would

5   correspond to merchandising notices.

6           So this may reflect that

7   this was one of those.  And it is from

8   1968.  So it would fall inside those

9   parameters.  So it is possible that this

10  was one of those items that resulted

11  in -- they did something, they changed

12  the label, changed the colors on the

13  label or something like that.

14          And then one point in time,

15  we don't know when, it belonged to

16  whatever the PPC museum in Milltown was.

17      Q.   If you look at the first

18  page of the document, and it's indicated

19  that this is STS033.

20          Do you see that?

21      A.   I do.

22      Q.   And is it your understanding

23  that this is a photograph of the offsite

24  storage sample STS033?

Margaret M. Gurowitz

1          A.    Yes.  The year corresponds.

2    I'm looking at that right now.  It's on

3    Page 41 of 91 of the big list.  And that

4    says it's -- STS033 is 1968.  That

5    corresponds with the date on the label on

6    the back.  So there we can make a

7    correlation.

8          Q.    And is that an authentic

9    Shower to Shower container?

10         A.    It looks to be from the

11   photograph.

12         Q.    And is there any reason to

13   believe that that cap was removed from

14   the container at any time?

15              MS. FOURNIER:  Objection.

16              THE WITNESS:  I have no

17         information on that products back

18         then they didn't have seals.

19         Safety seems did not become a

20         thing until 1980s.  No consumer

21         products really had them.  So I

22         don't -- it certainly wasn't

23         sealed.

24              I don't have any information

Margaret M. Gurowitz

1    about whether the cap was removed

2    or opened.

3  BY MR. LAPINSKI:

4        Q.    Based upon your review of

5  the photograph, is there any evidence in

6  the photograph that the cap was removed

7  at any time?

8            MS. FOURNIER:  Objection.

9            THE WITNESS:  I cannot tell

10       from the photograph.  I couldn't

11       tell -- I don't even know if you

12       could tell by looking at the

13       artifact.  I can't see what the

14       top of it looks like.  So I cannot

15       tell from just the photographs

16       here.

17  BY MR. LAPINSKI:

18       Q.    Were you responsible -- were

19  you responsible for preparing this sample

20  for production?

21       A.    No.  This was from offsite

22  storage.  So this was pulled in from

23  offsite storage.

24       Q.    The samples that were pulled

Margaret M. Gurowitz

1    in from offsite storage who was

2    responsible for preparing them for

3    production?

4         A.    So when you say preparing

5    for production, do you mean doing all

6    this, labeling?

7         Q.    Yes.

8         A.    So they were -- they were

9    identified.  I mean, they had -- as I

10   mentioned earlier, they had been there so

11   long that until the search commenced for

12   samples that might be located in offsite

13   storage or other places that nobody even

14   realized that these were there.  And so

15   they were pulled in.

16             So this would have been --

17   they would have been requested by

18   somebody at the consumer company records

19   management.  And this particular -- these

20   numbers, the STS033, the sample numbers

21   were signed by the legal folks.  So this

22   would have been photographed by somebody

23   on the legal team.

24        Q.    Do you know who at Johnson &

Margaret M. Gurowitz

1   Johnson Consumer was responsible for

2   bringing the samples back from offsite

3   storage?

4         A.    I do not know.

5         Q.    Do you know who at Johnson &

6   Johnson Consumer was responsible for

7   taking the samples from the offsite

8   storage boxes and preparing them for

9   shipment to innovative technologies?

10        A.    No, I do not know that.

11        Q.    Do you know the process that

12  was used in order to transfer any of the

13  offsite samples from the offsite storage

14  facility to the lab in Eatontown?

15        A.    I do not know that process.

16  When I was looking at tracing the chain

17  of custody, I was looking at tracing the

18  chain of custody from the other end,

19  not -- you know, not once they were

20  identified and pulled and sent to the

21  lab.  I was looking at tracing the

22  historical chain of custody as to how

23  they got to offsite storage, where they

24  might have been before they got to

Margaret M. Gurowitz

1   offsite storage.  That's the side I was

2   looking at.

3          Q.   Okay.  And would that --

4   would that statement pertain to all of

5   the offsite storage samples that we've

6   talked about, other than the Ashton

7   samples, the Hopkins samples and the

8   sample that was left at your museum

9   security?

10          A.   Yes.

11          MS. FOURNIER:  Objection.

12          THE WITNESS:  Sorry.

13          Yes, because that's the part

14      of the chain of custody that we

15      didn't have.

16          (Document marked for

17      identification as Exhibit

18      Gurowitz-30.)

19   BY MR. LAPINSKI:

20          Q.   I'm going to hand you a

21   document that's been marked as

22   Exhibit 30.  I apologize.  That was not

23   stapled.

24          MS. FOURNIER:  Can we go off

Margaret M. Gurowitz

1  the record for a second?

2          THE VIDEOGRAPHER:  The time

3      is 3:44 p.m.  We are off the

4      record.

5          (Brief pause.)

6          THE VIDEOGRAPHER:  We are

7      back on the record at 3:45 p.m.

8  BY MR. LAPINSKI:

9      Q.    Excuse me, Ms. Gurowitz.

10 I've handed you what's been marked as

11 Exhibit 30.  Have you seen that

12 photograph before?

13     A.    I may have.  I have looked

14 at a lot of them.

15     Q.    And the first page of that

16 photograph has a Post-It note

17 representing that is sample STS036.

18 Based upon your review of the photograph,

19 does that comport with the sample list?

20     A.    Based upon my review of the

21 photograph, it does comport with the

22 sample list.  They're both noted from

23 being from 1975.  And the product name,

24 the label name is the same, is

Margaret M. Gurowitz

1   consistent.

2        Q.    In your role as historian,

3   have you personally seen any of these

4   offsite samples?

5        A.    No, I have not.

6             (Document marked for

7             identification as Exhibit

8             Gurowitz-31.)

9   BY MR. LAPINSKI:

10       Q.    I'm going to hand you a

11  document that has been marked as

12  Exhibit 31.  Ms. Gurowitz, can you tell

13  me what that's a photograph of?

14       A.    It's a photograph of a

15  Shower to Shower product artifact labeled

16  STS042.  It's labeled as being from 1969.

17  That corresponds to the listing on the --

18  of the same number on the offsite, the

19  things from offsite storage.

20       Q.    And based upon your review

21  of this picture, does this -- does this

22  look like it's an authentic Shower to

23  Shower container?

24       A.    As far as I can tell from

Margaret M. Gurowitz

1    the picture, it does.

2                    (Document marked for

3            identification as Exhibit

4            Gurowitz-32.)

5    BY MR. LAPINSKI:

6            Q.    I'll hand you a document

7    that's been marked as Exhibit 32.

8                    MR. LAPINSKI:  I'm going to

9            go off the record for a second.

10                   THE VIDEOGRAPHER:  The time

11           is 3:48 p.m.  We're off the

12           record.

13                   (Brief pause.)

14                   THE VIDEOGRAPHER:  Back on

15           the record at 3:49 p.m.

16   BY MR. LAPINSKI:

17           Q.    Ms. Gurowitz, I just handed

18   you what exhibit number?

19           A.    32.

20           Q.    That's STS043?

21           A.    Yes.

22           Q.    Very good.  Ms. Gurowitz

23   I've handed you a document that's been

24   marked Exhibit 32.  Have you seen this

Margaret M. Gurowitz

1  photograph before?

2      A.   It's possible.  I've seen a

3  lot of the -- the Shower to Shower

4  packaging was more consistent over the

5  years historically, so they all look much

6  more similar than the Johnson's Baby

7  Powder.

8      Q.   And this photo -- this

9  photograph is labeled STS043, correct?

10      A.   That is correct.

11      Q.   And does that photograph

12  correspond with the sample entry that's

13  listed in the sample list?

14      A.   It does.

15      Q.   And based upon your review

16  of the photograph, is that an authentic

17  Shower to Shower bottle?

18      A.   As far as I can tell from

19  the photograph.

20      Q.   And do you think that the

21  photograph is an accurate depiction of

22  that particular bottle?

23          MS. FOURNIER:  Objection.

24          THE WITNESS:  I'm not sure

Margaret M. Gurowitz

1    exactly what you mean by that, but

2    as far as I can tell.

3  BY MR. LAPINSKI:

4        Q.    The photograph itself, it

5  doesn't look like the photograph has been

6  doctored in any way?

7        A.    Not that I can tell.

8            (Document marked for

9        identification as Exhibit

10       Gurowitz-33.)

11 BY MR. LAPINSKI:

12       Q.    I'm going to hand you a

13 document that's been marked as

14 Exhibit 33.  Ms. Gurowitz, this document

15 has a Post-It note on it indicating

16 sample STS046.

17            Do you see that?

18       A.    I do.

19       Q.    And your review of the

20 picture, does this photograph correspond

21 to the STS046 listed on the sample list?

22       A.    Based on the information on

23 both, it appears to correspond.

24       Q.    And does the photograph look

Margaret M. Gurowitz

1   like it is an authentic Shower to Shower

2   bottle?

3           A.    As far as I can tell from

4   the photograph, yes.

5           Q.    And is there anything from

6   that photograph that would lead you to

7   believe that is not an accurate picture?

8           A.    Not that I could see from

9   the photograph.

10              (Document marked for

11              identification as Exhibit

12              Gurowitz-34.)

13   BY MR. LAPINSKI:

14           Q.    I'm going to hand you a

15   document that has been marked as

16   Exhibit 34.  Ms. Gurowitz, this document

17   has a Post-It on it indicating sample

18   STS051.

19              Do you see that?

20           A.    I do.

21           Q.    And your review of the

22   picture, does this photograph correspond

23   to STS051 that is listed on the sample

24   list?

Margaret M. Gurowitz

1       A.      Based on the information on

2   the photograph, on the sample list it

3   appears to correspond.

4       Q.      And based upon your review

5   of the photograph, does this appear to be

6   an authentic Shower to Shower bottle?

7               MS. FOURNIER:  I'm just

8           going to -- so I don't have to

9           keep doing it.  Object to that

10          question and the one you do after

11          about, does the picture look

12          tampered with.  And I do that for

13          all the pictures.

14              MR. LAPINSKI:  I changed the

15          tampered with one, so you'll have

16          to.

17  BY MR. LAPINSKI:

18      Q.      Is -- okay, based upon your

19  review of the photograph, does this

20  appear to be an authentic Shower to

21  Shower bottle?

22      A.      As far as I can tell it

23  appears to be.

24      Q.      Is there anything about the

Margaret M. Gurowitz

1  photograph that would make you question

2  whether it's an authentic Shower to

3  Shower bottle?

4      A.    Not that I can tell from the

5  photograph.

6      Q.    And is there anything about

7  the photograph that would lead you to

8  believe that the photograph is not

9  accurate?

10      A.    Not that I can tell from

11  this.  It's a black-and-white.  So as far

12  as I can tell from the photograph.

13          (Document marked for

14          identification as Exhibit

15          Gurowitz-35.)

16  BY MR. LAPINSKI:

17      Q.    I'm going to hand you a

18  document that's been marked as

19  Exhibit 35.  Ms. Gurowitz, this is a

20  photograph with a Post-It note indicating

21  Sample Number STS053.

22          In your review of the

23  photograph, does this photograph

24  correspond with the sample on the sample

Margaret M. Gurowitz

1  list STS053?

2       A.    Based on the information in

3  the photograph and on the sample list, it

4  appears to correspond.

5       Q.    Is there anything about the

6  photograph that would lead you to believe

7  that this is not an authentic Shower to

8  Shower bottle?

9       A.    Not that I can tell from a

10 black-and-white photograph of a color

11 bottle, no.

12      Q.    And is there anything in the

13 photograph that would lead you to believe

14 that it is not an accurate picture of the

15 bottle?

16      A.    Not that I could tell from

17 the photograph.

18            (Document marked for

19       identification as Exhibit

20       Gurowitz-36.)

21 BY MR. LAPINSKI:

22      Q.    I'll hand you Exhibit 36.

23 This is a photograph with a Post-It note

24 indicating STS055.  Based upon your

Margaret M. Gurowitz

1  review of the photograph does this

2  photograph correspond with STS055 that is

3  listed in the offsite storage list?

4       A.    Based on what I can see from

5  the photograph, it appears to correspond.

6       Q.    Okay.  And this particular

7  photograph indicates that it is -- it

8  says "museum" on it.

9            Do you see that?

10       A.    No, I don't.

11       Q.    On the -- on the front?

12       A.    Oh.

13       Q.    There's some type of sticker

14  that's on the product itself.

15       A.    Yes, I see that.

16       Q.    Do you have any

17  understanding as to why that would say

18  museum on it?

19       A.    I do not know.  It was in

20  offsite storage.  So it is possible it is

21  one of those artifacts from the old

22  museum that was sent back to the

23  operating company.

24       Q.    And then below that it says

Margaret M. Gurowitz

1  19 --

2       A.    Although it's after.  I'm

3  sorry.  It's after the time period.

4       Q.    So then you don't have an

5  understanding as to why museum would be

6  written on there as you sit here?

7       A.    I don't.  So it's -- as the

8  memo we discussed from 1982 referenced

9  the closing of the museum.  This is from

10  the year after.  So they would have

11  stopped sending samples to that museum

12  entity.  So I don't have any information

13  as to why that would say museum.

14       Q.    And it also says underneath

15  that, "1983 sealed container," "tamper,"

16  and something is scribbled out.

17              Do you see that?

18       A.    I do see that.

19       Q.    Do you have an understanding

20  of what that stands for?

21       A.    1938 was about the time

22  consumer products decided to have

23  tamper-evident seals on them.  So that

24  was a new thing in society at that time.

Margaret M. Gurowitz

1    And that's -- that may be why that was

2    noted.

3           Q.    Based upon your review of

4    the picture, do you believe that that's

5    an authentic Shower to Shower bottle?

6           A.    As far as I can tell from a

7    black-and-white photograph of a color

8    artifact, yeah.

9           Q.    And is there anything that

10   would lead you to believe that it is not

11   an accurate photo?

12          A.    Not that I can tell from the

13   photograph.

14                (Document marked for

15          identification as Exhibit

16          Gurowitz-37.)

17   BY MR. LAPINSKI:

18          Q.    I'm going to hand you a

19   document that has been marked as Exhibit

20   37.  This photograph is labeled STS062.

21   Based upon your review of the photograph,

22   does it correspond with STS062 in the

23   sample list?

24          A.    It appears to correspond.

Margaret M. Gurowitz

1    Q.    Based upon your review of

2  the photograph, do you believe that

3  that's an authentic Shower to Shower

4  bottle?

5    A.    As far as I can tell, again,

6  from a black-and-white photograph of a

7  color artifact, yes.

8    Q.    And is there anything about

9  that picture that would lead you to

10  believe that it is not an accurate

11  picture?

12    A.    Not that I could tell from

13  the picture.

14         (Document marked for

15         identification as Exhibit

16         Gurowitz-38.)

17  BY MR. LAPINSKI:

18    Q.    I'm going to hand you

19  Exhibit 38, which is a photograph that

20  looks like it was taken going about

21  60 miles an hour past the Shower to

22  Shower bottle.

23         If you could look at the

24  second page of that, which is, has a

Margaret M. Gurowitz

1    Post-It note STS065.  And based upon the

2    three photographs that are here, do you

3    believe that this photograph would

4    correspond to the sample that's listed in

5    the sample list as STX -- STS065?

6            A.    There is less evidence

7    because the first one is so blurry.  So I

8    can't read the number of ounces in the

9    package.  That's one of the things that

10   I've been basing it on.  And I can't read

11   the number in the first one.  But based

12   on the Post-Its on the other two pages,

13   it would appear to correspond as best I

14   can tell without really being able to see

15   the bottles clearly.

16            (Document marked for

17            identification as Exhibit

18            Gurowitz-39.)

19   BY MR. LAPINSKI:

20            Q.    I'm going to hand you a

21   document that's been marked as

22   Exhibit 39.  And this is a photograph

23   with a Post-It note that indicates

24   JBP-001 and based upon your review of

Margaret M. Gurowitz

1   these photographs, does this photograph

2   correspond with the sample list

3   production JP-001?

4        A.    As far as I can tell it

5   appears to correspond.

6        Q.    Is there anything in that

7   photograph that would lead you to believe

8   that the photograph of JP-001 is not an

9   authentic bottle?

10       A.    Not -- again, not that I

11   could tell from a black-and-white

12   photograph of a color artifact.

13       Q.    Anything to lead you to

14   believe that that picture is not

15   accurate?

16       A.    Not that I could tell from

17   the photograph, the black-and-white

18   photograph.

19            MS. FOURNIER:  I'll have the

20            same series of objections about

21            authentic bottle and inaccurate

22            photograph, et cetera, for the

23            Johnson's Baby Powder series.

24            (Document marked for

Margaret M. Gurowitz

1          identification as Exhibit

2          Gurowitz-40.)

3      BY MR. LAPINSKI:

4          Q.    What did I mark that one as?

5          A.    40.

6          Q.    40?

7          A.    40.

8          Q.    Okay.  I've handed you a

9      document that has been marked as

10     Exhibit 40.  And that indicates with a

11     Post-It note it's a picture of JBP-006.

12     Based upon your review of the photograph

13     does that correspond with JP-006 in the

14     sample list?

15         A.    Based upon the information

16     given, it appears to correspond.

17         Q.    Based upon your review of

18     the photograph, is there anything that

19     would lead you to believe that is not an

20     authentic J&J bottle?

21         A.    Not that I can tell, again,

22     from a black-and-white photograph of a

23     color artifact, it really helps you to

24     see it in color because you know if the

Margaret M. Gurowitz

1    branding is a certain color and if for

2    some reason that's not captured in a

3    photograph and the branding was some

4    color that never appeared on a bottle,

5    you could question it.  But based on -- I

6    can't tell from the black and white.

7              (Document marked for

8         identification as Exhibit

9         Gurowitz-41.)

10   BY MR. LAPINSKI:

11        Q.    I'm going to hand you a

12   document that has been marked as

13   Exhibit 41.  And these are photographs

14   that are marked as JBP-085.  Based upon

15   your review, do the photographs

16   correspond with the sample list JBP-085?

17        A.    I -- based on my review it

18   appears to correspond.

19        Q.    Does that appear to be a

20   picture of an authentic Johnson's Baby

21   Powder bottle?

22        A.    Again, you can't really tell

23   from the black-and-white photograph of a

24   color artifact.  It appears to be, but I

Margaret M. Gurowitz

1  would really have to see it in color to

2  make an absolute determination.

3          Q.    Is there anything that would

4  lead you to believe that is not an

5  accurate picture?

6          A.    Not from this, no.  But

7  again it helps to see it in color.

8              (Document marked for

9              identification as Exhibit

10             Gurowitz-42.)

11  BY MR. LAPINSKI:

12         Q.    I'm going to hand you

13  Exhibit 42.  Exhibit 42 is photographs of

14  JBP 087.  Based upon your review of

15  Exhibit 42, does it appear to be -- does

16  it appear to correspond with the sample

17  list JBP-087 entry?

18         A.    It appears to correspond.

19         Q.    Anything that would lead you

20  to believe that it's not an authentic

21  Johnson's Baby Powder bottle?

22         A.    Not that I could tell from a

23  black-and-white photograph of a color

24  artifact.

Margaret M. Gurowitz

1      Q.    And would it -- is there

2   anything that would lead you to believe

3   that it's not an accurate picture?

4      A.    Not that I could tell from

5   this photograph.

6              (Document marked for

7         identification as Exhibit

8         Gurowitz-43.)

9   BY MR. LAPINSKI:

10     Q.    Let me hand you a document

11  that has been marked as Exhibit 43.  And

12  the Post-It note here indicates that this

13  is photographs of sample JBP-096.  Based

14  upon your review of the photograph do the

15  photographs correspond with the sample

16  listing JBP-096?

17     A.    They -- it appears to

18  correspond.

19     Q.    And does that appear to be

20  an accurate depiction -- I'm sorry.

21  Strike that.

22              Does that appear to be an

23  authentic J&J bottle?

24     A.    As best I can tell from a

Margaret M. Gurowitz

1  black and white photograph of a color

2  artifact, it does.  But I'd really have

3  to see it in color.

4          Q.    Is there anything that would

5  lead you to believe that it is not an

6  accurate picture?

7          A.    Well, if you showed me

8  something in color and for some reasons

9  the Johnson's was in orange, I would say

10  I know for a fact that that has never

11  been part of the branding, so I would

12  question it.  That's why I've been saying

13  it's hard to say from a black and white.

14          Q.    But there's nothing there

15  that leads you to believe that it is

16  inaccurate?

17          A.    Not that I could tell from a

18  black-and-white photograph of a color

19  artifact.

20              Document marked for

21          identification as Exhibit

22          Gurowitz-44.)

23  BY MR. LAPINSKI:

24          Q.    Exhibit 44.  This is --

Margaret M. Gurowitz

1  Post-It note indicating this is a

2  photograph of JBP 097.  Based upon your

3  review of the photographs, does this

4  correspond with the sample list and the

5  entry for JBP-097?

6          A.    Yes, it appears to

7  correspond.

8          Q.    Is there anything about the

9  photograph that would lead you to believe

10 that it's not an authentic J&J bottle?

11         A.    Again, I cannot tell

12 100 percent from a black and white

13 photograph of a color artifact.  But

14 there is nothing that appears in the

15 black and white, but I'd really have to

16 see a color photograph.

17         Q.    If you would turn to the

18 fourth page of the photographs of

19 JBP-097.  And there is a sticker on there

20 that indicates that it's a Merchandise

21 Notice 6963.

22              Do you see that?

23         A.    I do.

24         Q.    And what does that refer to?

Margaret M. Gurowitz

1          A.     So that would refer back to

2    that policy that was in effect from about

3    the '50s to the '70s, that whenever there

4    was a change made to the packaging, or

5    the labeling, that they were to send a

6    sample.

7                 And in fact it says on that

8    label, "Delete 'family size' from front

9    label."  So that would have been a change

10   to the label that would have caused them

11   to send a sample.

12          Q.     So, these pictures depict a

13   sample that was sent to offsite storage

14   by a Johnson & Johnson entity?

15          A.     They do.  This is among the

16   marketing samples that were found in

17   offsite storage.  So at some point they

18   were sent to offsite storage.

19                 (Document marked for

20          identification as Exhibit

21          Gurowitz-45.)

22   BY MR. LAPINSKI:

23          Q.     I'll hand you a document

24   that's been marked as Exhibit 45.

Margaret M. Gurowitz

1    Post-It note indicates this is sample

2    JBP-099.  Based upon your review, do

3    these photographs comport with the sample

4    list entry for JBP-099?

5         A.    Based on my review it

6    appears to correspond.

7         Q.    On the fourth page, there is

8    a photograph and it has a label on the

9    bottle itself.  Do you have -- can you

10   give me an indication of what that label

11   refers to?

12        A.    Sure.  Again the top says --

13   I'm assuming MD -- the part is cut-off.

14   It goes around the bottle.  That would

15   correspond to a merchandising notice.  So

16   something about the package was changed,

17   whether it was the label or the size or

18   the shape.  And therefore, they -- as per

19   that policy that was in effect for a few

20   decades, they would have sent a sample.

21        Q.    So this is a sample that

22   would have been -- would have been sent

23   by J&J Consumer to the museum?

24        A.    To the old J&J museum.

Margaret M. Gurowitz

1    Q.    And then eventually moved to

2    offsite storage?

3    A.    Yes.  At some point.

4          (Document marked for

5          identification as Exhibit

6          Gurowitz-46.)

7    BY MR. LAPINSKI:

8    Q.    I'm going to hand you

9    Exhibit 46.  Post-It note indicates that

10   Exhibit 46, pictures of sample JBP 107.

11   Based upon your review of the

12   photographs, does this comport with the

13   listing on the sample list for JBP 107?

14   A.    It sort of appears to.  But

15   the sample -- the JBP 107 on the sample

16   list has a date of 1973.  But the actual

17   photograph of the artifact has three

18   dates.  1973, 1974, and one where I can't

19   see because the date is cut off.  1975.

20          So on this one I couldn't

21   say exactly, because the dates are so

22   different.  The one on the sample list

23   does not list three dates.  It only lists

24   one date.

Margaret M. Gurowitz

1    Q.    And the dates that you're

2  referring to are on the third page of the

3  photographs?

4    A.    Correct.

5    Q.    Okay.  And --

6    A.    The second and third.

7    Q.    Or the third and fourth?

8    A.    Or the -- that too.

9    Q.    The -- and those dates that

10 you're referring to, what do those labels

11 for those particular dates refer to?

12   A.    So, again, it has that

13 merchandise notice number up top.  So

14 there would have been some sort of change

15 to either the label or the package shape

16 or size.  And if you look at Page three,

17 the bottom label says something -- I

18 can't make on you the first word.

19 Something spaced lettering.  So that

20 looks like that would have been a label

21 change.

22   Q.    And this is a bottle that

23 would have been produced to the J&J

24 museum pursuant to the policies that were

Margaret M. Gurowitz

1   in place at that time?

2        A.    At the old museum, yes.  It

3   would have been -- it falls in that time

4   frame.

5             (Document marked for

6        identification as Exhibit

7        Gurowitz-47.)

8   BY MR. LAPINSKI:

9        Q.    Exhibit 47.  Do the

10  photographs in Image 47 correspond to

11  sample JBP-119 on the sample list?

12       A.    Yes, it appears to

13  correspond.

14       Q.    And on the fourth page,

15  there's a label on the packaging on the

16  fourth page.  What's your understanding

17  of that labeling?

18       A.    It says -- are you referring

19  to the one that says, "New good sheet,

20  Number 5928?

21       Q.    Yes.

22       A.    That again, would have been

23  in relation to a packaging change and as

24  noted, if you look -- it says new

Margaret M. Gurowitz

1  plastic, it's from 1963.  That is the

2  first year that the product was in a

3  plastic container as opposed a metal

4  container.  So that would have been most

5  likely a packaging change.

6       Q.    And this would have been a

7  sample that would have been sent to the

8  museum pursuant to the written policy

9  that was in place at that time?

10      A.    As best I can tell from

11  this, yes.

12            (Document marked for

13            identification as Exhibit

14            Gurowitz-48.)

15  BY MR. LAPINSKI:

16      Q.    I'm going to hand you what's

17  been marked as Exhibit 48.  And these

18  photographs correspond to the entries on

19  the sample list for JBP-133?

20      A.    Perhaps.  The reason I say

21  perhaps is there is a label.  And I can't

22  tell.  On Page 3 and 4, the label goes

23  over two sides of the container, so it's

24  hard to say.

Margaret M. Gurowitz

1          On Page 3 it says Leahy "box

2    number."  And then on Page 4, there's a

3    61.  So I don't know if it refers to Box

4    Number 61 or the year 1961.

5          If it refers to a year, then

6    they don't correspond because on the list

7    JBP-133 is listed as being from 1960.

8          (Document marked for

9          identification as Exhibit

10         Gurowitz-49.)

11    BY MR. LAPINSKI:

12         Q.    I'll hand you Exhibit 49.

13    These are photographs of JBP-135.  Based

14    upon your review of the photographs do

15    these images correspond with the product

16    that's listed as JBP-135 on the sample

17    list?

18         A.    I can't tell.  There is a

19    handwritten label taped onto it that has

20    a date of 1963.  But if you look at Page

21    2, the photo on Page 2, it looks like it

22    says -- there's a label toward the

23    bottom.  It says, "Filed 11/8/54."

24         Q.    And below that writing it

1  says, "Reg number 74,097."  Do you have

2  any idea what that indicates?

3          A.    I can take an educated guess

4  that it relates to the big label,

5  handwritten label that's taped that says

6  "Trademark application."  Potentially

7  that could be a registration number from

8  that.  But without more information I

9  couldn't say 100 percent sure.

10         Q.    Is it possible that that

11  represents a trademark application that

12  was filed in November of 1954?

13         A.    It's possible.  But it's got

14  two dates.  1963 and 1964.  So that to me

15  would raise an issue right there.

16         Q.    And I'm sorry.  Where are

17  the two dates that you're referring to?

18         A.    So there's a bigger

19  handwritten label that says -- on Page 3

20  it says, "U.S. trade sample."  And then

21  on Page 4 it says, "Trademark

22  application."  That's got the one -- it's

23  got a date, the month is obscured.  It

24  might be a one.  It may not.  Something,

Margaret M. Gurowitz

1    17/63.

2              And then on Page 2, it says,

3    "Filed 11/8/54."

4              (Document marked for

5         identification as Exhibit

6         Gurowitz-50.)

7    BY MR. LAPINSKI:

8         Q.    I'm handing you a document

9    that has been marked Exhibit 50.  And

10   these are photographs relating to sample

11   JBP 165.

12             Based upon your review of

13   the photographs, do the photographs

14   correspond with the sample list entry JBP

15   165?

16        A.    As far as I can determine

17   from the information on the photograph

18   and on the list, it appears to

19   correspond.

20        Q.    And on Page 3 of the

21   photographs, there are change labels that

22   are depicted here, correct?

23        A.    That is correct.

24        Q.    And there are three

Margaret M. Gurowitz

1  different change labels.  One is Number

2  6715, the other is 7231, and the last one

3  is 7344, correct?

4        A.    That is correct.

5        Q.    And are they change labels

6  that would represent changes to the

7  labeling of the bottle?

8        A.    Changes to something on the

9  bottle.  Either the labeling -- something

10  to do with the labeling or the shape or

11  size of the package.

12        Q.    And would these samples have

13  been produced to the J&J museum based

14  upon the written protocol that was in

15  place at the time?

16        A.    They fall in that time

17  frame.  So presumably they would have.

18              (Document marked for

19        identification as Exhibit

20        Gurowitz-51.)

21  BY MR. LAPINSKI:

22        Q.    I'm going to hand to you a

23  document that has been marked Exhibit 51.

24              And these relate to JBP-166.

Margaret M. Gurowitz

1   Based upon your review of the

2   photographs, do these photographs comport

3   with the sample list entry JBP-166?

4          A.    Based upon the information

5   it appears to comport.  Although the big

6   listing of stuff does not reference that.

7   It has a sample of baby lotion attached

8   to it.

9          Q.    I'm sorry.  Could you just

10  repeat what you said?

11         A.    Sure.  They appear to

12  comport.  Although the listing for Number

13  166 on the list of offsite storage

14  samples does not mention that it has a

15  sample of baby lotion attached to it.

16         Q.    So other -- other than the

17  absence of the reference to baby lotion,

18  do you believe that they comport?

19         A.    It appears to.

20             (Document marked for

21             identification as Exhibit

22             Gurowitz-52.)

23  BY MR. LAPINSKI:

24         Q.    I'm going to hand you

Margaret M. Gurowitz

1    Exhibit 52.  These are photos of sample

2    JBP-167.  Based upon your review of the

3    photos, do these comport with the entry

4    for JBP-167 on the sample list?

5         A.    It appears to, yes.

6         Q.    Anything that would lead you

7    to believe that these are not accurate

8    photos of JBP 167?

9         A.    Not that I can tell from the

10   photograph.

11        Q.    And in 1960 J&J was still

12   using metal cans; is that correct?

13        A.    That's -- in the U.S.,

14   that's correct, yes.

15        Q.    Anything about the

16   photograph that would lead you to believe

17   that it's not an authentic J&J container?

18        A.    I cannot tell from a black

19   and white photograph of a color artifact.

20   I'd really need to see it in color to

21   make that 100 percent determination.

22             (Document marked for

23             identification as Exhibit

24             Gurowitz-53.)

Margaret M. Gurowitz

1  BY MR. LAPINSKI:

2       Q.    I'm going to hand you

3  Exhibit 53.  And these are photographs of

4  sample JBP 169.  Based upon your review

5  of the photographs, do you believe these

6  photographs relate to the sample list JBP

7  169?

8       A.    Based on the photographs and

9  the information on the sample list, it

10  appears to.

11       Q.    And on the fourth page of

12  the document, there is a label reflecting

13  J -- the picture has -- strike that.

14            On the fourth page, the

15  bottle has a label on it indicating that

16  there was a change to the product,

17  correct?

18       A.    The bottle has a product

19  change label indicating that there was

20  some sort of change to something.

21       Q.    And do you know who the --

22  may have signed -- may have signed this

23  D-E-T-T-R-E?

24       A.    I do not.  1966 is beyond

Margaret M. Gurowitz

1  the institutional memory of any employee

2  currently at Johnson & Johnson.

3          Q.    How about B&PD that says

4  next -- that's next to the name.  Do you

5  know what that refers to?

6          A.    I do not.

7          Q.    Is this a sample that would

8  have been produced to the Johnson &

9  Johnson museum pursuant to the written

10  protocol that was in place at the time?

11          A.    It is in that time frame,

12  and it has a product change number.  So

13  likely it would -- it falls within that

14  time frame.

15              (Document marked for

16          identification as Exhibit

17          Gurowitz-54.)

18  BY MR. LAPINSKI:

19          Q.    This is Exhibit 54.  These

20  are photographs of JBP-175.  Based upon

21  your review of the photos, do these

22  photos align with JBP-175 that is listed

23  on the sample list?

24          A.    Based upon the photos and

Margaret M. Gurowitz

1    the information, it does appear to align.

2         Q.    And on the fourth page there

3    is a label referencing the change that

4    was made to the bottle; is that correct?

5         A.    That is correct.

6         Q.    And that was in 1972?

7         A.    That is correct.

8         Q.    And this sample would have

9    been produced to the J&J museum pursuant

10   to the policies that were in place at the

11   time?

12        A.    It is during the time frame

13   that those policies were in place, so

14   likely it would have been.

15        Q.    And the -- next to the label

16   reflecting the change there's a second

17   label that says SE-116.  Do you see that?

18        A.    I do.

19        Q.    Do you know what that refers

20   to?

21        A.    I believe that's a five,

22   actually, 5E-116.  That refers to

23   something that was labeled -- I've seen

24   papers and on those transfer sheets

Margaret M. Gurowitz

1  Drawer 5E.

2            Apparently that all of the

3  baby -- Johnson's Baby Powder artifacts

4  that were sent from the old Kilmer Museum

5  back to the operating company, they are

6  listed as being from Drawer 5E.  Based on

7  the volume of those samples, I don't

8  think that there could physically exist a

9  drawer that big.  So it had to refer to

10  some sort of unknown filing system.

11        Q.    The 5E refers to a museum

12  filing system?

13        A.    Some sort of filing system

14  that was used in the old law department

15  Kilmer Museum.  Maybe more like a Dewey

16  decimal system like in a library, because

17  based on the amount of -- if you look at

18  how many things are labeled marketed, I

19  don't think you can physically construct

20  a drawer that big.

21        Q.    Okay.  Is it your

22  understanding that -- excuse me.  Is it

23  your understanding that all of the

24  marketing samples that are listed in the

Margaret M. Gurowitz

1  offsite storage list had a 5E designation

2  to them?

3        A.    I don't know that every

4  single one of them did.  But there were

5  things on the transfer sheets where it

6  said Drawer 5E and it had Johnson's Baby

7  Powder.

8        Q.    And the transfer sheets that

9  you're referring to are the transfer

10 sheets of the -- well, strike that.

11             Which transfer sheets are

12 you referring to?

13       A.    I'm referring to the 1982

14 transfer sheets to Leahy Business

15 Archives.

16             MR. LAPINSKI:  I'm going to

17       go off the record for a minute.  I

18       need two minutes.

19             THE VIDEOGRAPHER:  The time

20       is 4:28 p.m.  We are off the

21       record.

22             (Short break.)

23             THE VIDEOGRAPHER:  We are

24       back on the record at 4:42 p.m.

Margaret M. Gurowitz

1          (Document marked for

2          identification as Exhibit

3          Gurowitz-55.)

4    BY MR. LAPINSKI:

5          Q.    Ms. Gurowitz, I'm going to

6    hand you a document that's been marked as

7    Exhibit 55.

8              I'm going to try to get you

9    one that doesn't have highlighting on it.

10             These photos indicate that

11   these are pictures of sample JBP 177.

12   Your review of the photographs, do these

13   photos correspond with the sample list

14   entry of JBP 177?

15         A.    Yes, they appear to

16   correspond.

17         Q.    And on the last page, if you

18   would look, there is a -- excuse me.  A

19   change label on the bottle in the last

20   image, correct?

21         A.    Correct.

22         Q.    And that change label would

23   relate to the policy that was in place at

24   the time they produced this to the J&J

Margaret M. Gurowitz

1  museum?

2       A.    Yes, the date of 1966 is

3  within that time frame.

4            (Document marked for

5       identification as Exhibit

6       Gurowitz-56.)

7  BY MR. LAPINSKI:

8       Q.    I'm going to hand you a

9  document that has been labeled as

10 Exhibit 56.  And this indicates that it

11 is a sample associated -- it is photos

12 associated with sample JBP-183.  If you

13 would review the photographs.  Do these

14 photographs correspond with the sample

15 list entry of JBP-183?

16      A.    Yes, it appears to

17 correspond.

18      Q.    And on the fourth page, the

19 last photograph, there is a product

20 change label attached to the bottle,

21 correct?

22      A.    That is correct.

23      Q.    And would this bottle have

24 been produced pursuant to the written

Margaret M. Gurowitz

1   policy that was in place at the time?

2        A.    It was in that time frame.

3   So I think we could assume that it was.

4             (Document marked for

5             identification as Exhibit

6             Gurowitz-57.)

7   BY MR. LAPINSKI:

8        Q.    Next exhibit is Exhibit 57.

9   And these are photographs of JBP-190.

10  And if you would review the photographs.

11  Based upon your review of the

12  photographs, do these samples -- these

13  photos correspond with the entry on the

14  sample list of JBP 190?

15       A.    As best I could tell, they

16  can.  Some of the photographs are blurry

17  so I cannot make out some of the

18  information.

19       Q.    On the last photograph,

20  there is a sticker with the indication of

21  5E-154.  Is that an indication that this

22  bottle would have been transferred from

23  the J&J museum at one point in time?

24       A.    That is an indication.  It

Margaret M. Gurowitz

1  refers to whatever was meant by Drawer

2  5E.  So since that was on that transfer

3  information, it would be a fairly strong

4  indicator that this likely is one of

5  those.

6       Q.    And while the image is

7  blurry on the second page, there's an

8  image of a product change label, correct?

9       A.    That is correct.

10       Q.    And that's dated 1967?

11       A.    I can't make out the date on

12  that.  It's too blurry to see.

13       Q.    Is that the label the type

14  of label that you would normally see on a

15  product that was sent to the J&J museum

16  after a label change?

17       A.    That -- it looks like one of

18  those kind of change labels.

19       Q.    And that would have been

20  sent pursuant to the policy that was in

21  place at J&J at the time?

22       A.    If this is from 1967 that

23  falls within that time frame.

24               (Document marked for

Margaret M. Gurowitz

1      identification as Exhibit

2      Gurowitz-58.)

3  BY MR. LAPINSKI:

4      Q.    Next exhibit is Exhibit 58.

5  This is photographs of JBP-215.  Based

6  upon your review of these photographs do

7  these photographs correlate with the

8  sample list entry JBP-215?

9      A.    Yes, it appears to

10  correlate.

11      Q.    And on the last page there

12  is a sticker with the designation 5E-146.

13  As we've discussed, would that relate to

14  transfer of this product from the J&J

15  museum?

16      A.    It related to whatever

17  filing system the old museum used at that

18  time.

19      Q.    And at the same page, the

20  top portion of the bottle has a label on

21  it, a sticker on it.  It says 44-133.

22          Do you see that?

23      A.    I do see that.

24      Q.    Do you know what that would

Margaret M. Gurowitz

1   refer to?

2          A.    I do not.

3                Document marked for

4          identification as Exhibit

5          Gurowitz-59.)

6   BY MR. LAPINSKI:

7          Q.    I'll hand you Exhibit 59.

8   This is for sample JBP-232.  And if you

9   would review those pictures.  Do the

10  photographs relate to the entry on the

11  sample list for JBP 232?

12         A.    As best I can tell, I don't

13  see anything on the photograph of the

14  actual artifact that references container

15  volume or a year.  So I cannot say for

16  100 percent certain.

17         Q.    Has it been a common

18  practice for J&J to have container volume

19  and product year on their bottles?

20         A.    No, not necessarily.

21  Container volume certainly, but year, not

22  necessarily.

23         Q.    So it's not -- it's not

24  uncommon for a J&J -- a Johnson's Baby

Margaret M. Gurowitz

1  Powder product to not have a year

2  designated on it?

3          A.    That's correct.  Some of --

4  some of the historical artifacts had been

5  labeled at some point in their past with

6  a stick-on label with a year, which is

7  helpful in helping identify when they

8  might be from.

9          Q.    And the last page of this

10  photograph has a sticker on it with the

11  designation 5E-102, correct?

12          A.    That is correct.

13          Q.    And that is a designation

14  for the Johnson & Johnson museum filing

15  system?

16          A.    That is a designation for

17  the old filing system in the old

18  Johnson & Johnson museum.

19              (Document marked for

20          identification as Exhibit

21          Gurowitz-60.)

22  BY MR. LAPINSKI:

23          Q.    This is Exhibit 60.  And

24  Exhibit 60 relates to sample JBP-237?

Margaret M. Gurowitz

1    A.    Yes.  It appears to

2  correspond.

3    Q.    And the second page has

4  designation 5E-149 relating to the old

5  museum filing system, correct?

6    A.    Yes.  It does refer to that

7  old filing system.

8    Q.    And above that there's a

9  sticker with a designation, excuse me,

10  45-133.  Do you know what that refers to?

11    A.    I do not.  We don't have any

12  information about what that would refer

13  to.

14          (Document marked for

15          identification as Exhibit

16          Gurowitz-61.)

17  BY MR. LAPINSKI:

18    Q.    I'm going to hand you

19  Exhibit 61.  Exhibit 61 relates to sample

20  JBP-294.  Based upon your review of the

21  photographs, are these do these

22  photographs correspond with entry JBP-294

23  in the sample list?

24    A.    JBP-294, no, they do not.

Margaret M. Gurowitz

1  There are more than one, so actually I'm

2  just paging through it.  On the sample

3  list, JBP-294 is listed as Johnson's Baby

4  Powder from 1984 for two 9-ounce bottles

5  in a cardboard box.  That corresponds

6  with the photographs on Page 4 and

7  subsequent, but there is also on the

8  first three pages, there is a photograph

9  of a round container that's also listed

10  as JBP 294.  This round container does

11  not correspond with that.  It is not from

12  1984.

13        Q.    So if we can, let's break

14  this down a little bit.  The second half

15  of the exhibit that's been marked as

16  Exhibit 61 where there is -- beginning

17  with the photograph that has two 9-ounce

18  bottles of the Johnson's Baby Powder,

19  based upon your review of the -- of those

20  five total photos of the dual pack, we'll

21  call it, do those photos relate to the

22  sample entry JBP-294 on the sample list?

23        A.    The photos of the two-pack

24  of Johnson's Baby Powder in the plastic

1    containers do appear to relate to JBP-294

2    on the sample list.

3         Q.    And just to -- just to

4    confirm, if you could go through the

5    photos that are after the front image of

6    JBP 294 and just confirm that those

7    photos, to your knowledge, relate to the

8    double pack?

9         A.    To my knowledge those photos

10   appear to relate to the double pack.

11        Q.    And the second-to-last photo

12   has a change sticker on it, correct?

13        A.    It does.  But this one is

14   from 1984.  This is after the date of

15   1982 that references when the old Kilmer

16   Museum, the Johnson & Johnson museum was

17   closed.  And samples were no longer being

18   sent there.

19             So clearly this was

20   preserved somewhere and sent to offsite

21   storage.  This was actually a -- it's

22   294.  This was in quality assurance.

23   This is not part of things that were sent

24   from the old Johnson & Johnson museum.

Margaret M. Gurowitz

1      Q.    So this is -- this is a

2  sample that was maintained by the quality

3  assurance department?

4      A.    This -- when I spoke to --

5  I'm sorry, just going to -- Mark Zappa in

6  quality, he checked around and he said

7  that it was not the policy or practice of

8  quality assurance to send samples to

9  offsite storage.  So these had been

10 packed up in boxes with other stuff that

11 were labeled quality assurance and sent

12 to offsite storage.

13          So we don't know necessarily

14 how or who put them in those boxes or why

15 they were sent to offsite storage, but

16 they were among the things labeled

17 quality assurance.  Clearly this is a

18 merchandising notice.  But this postdates

19 anytime where it would have been sent to

20 the museum in New Brunswick.

21     Q.    But the merchandising note

22 that's on it is a merchandising notice

23 that would typically be affixed to a

24 product by a J&J department?

Margaret M. Gurowitz

1          A.     It would have been, as I
2     mentioned, in the 1980s Johnson & Johnson
3     was a decentralized organization.  So the
4     individual operating units had their --
5     had their own ways of doing things.
6                So clearly this indicates
7     that somebody in the consumer operating
8     unit was still sending out merchandising
9     notices.  But they were not -- the
10    samples were not being preserved in New
11    Brunswick, because that museum had been
12    disbanded for those purposes by that
13    time.
14         Q.     And as a separate operating
15    unit, you're referring to Johnson &
16    Johnson Consumer, Inc.?
17         A.     Correct.
18         Q.     If we can go to the first
19    three pages of that exhibit?
20         A.     Sure.
21         Q.     Based upon your review of
22    the first three pages of the exhibit, do
23    you have an understanding as to the year
24    of the Johnson's Baby Powder product

Margaret M. Gurowitz

1  that's represented there?

2       A.    Yes, I do.  If you'll note

3  that it is a cylindrical container.  And

4  if you look at Page 2, the picture on

5  Page 2.  At the very bottom of the back,

6  it says, "Wartime container," so that

7  would have been circa 1942 during World

8  War II.

9            Metal was needed by the

10  United States for the war effort, so

11  Johnson & Johnson switched the containers

12  of Johnson's Baby Powder to a round

13  cardboard container at that time.

14       Q.   So based upon your review of

15  the picture this is a round cardboard

16  container that's depicted?

17       A.    It appears to be.  It's hard

18  to tell on the picture on the first page,

19  but if you look at the back it says,

20  "Wartime container," which clearly

21  references World War II.

22            MS. FOURNIER:  Can you give

23       us a copy?

24  BY MR. LAPINSKI:

Margaret M. Gurowitz

 1          Q.    That was Exhibit 61?

 2          A.    Correct.

 3                (Document marked for

 4          identification as Exhibit

 5          Gurowitz-62.)

 6    BY MR. LAPINSKI:

 7          Q.    This is Exhibit 62.  And

 8    these are photos of JBP 295.  And based

 9    upon your review of these photographs, do

10    the photos correspond with the sample

11    list entry JBP 295?

12          A.    Based upon the photograph,

13    they appear to correspond with that

14    sample entry.

15                MR. LAPINSKI:  Do you want

16          to go off the record for a minute?

17                MS. FOURNIER:  Yes.

18                THE VIDEOGRAPHER:  The time

19          is 4:58 p.m.  We are off the

20          record.

21                (Brief pause.)

22                THE VIDEOGRAPHER:  Back on

23          record at 5:00 p.m.

24    BY MR. LAPINSKI:

Margaret M. Gurowitz

1      Q.    Ms. Gurowitz, you have in

2   front of you Exhibit 62.   And I believe

3   you had already testified that this does

4   appear to correspond with the sample list

5   entry JBP 295, correct?

6      A.    As best as I can tell.   It

7   appears to.   In the -- in the column that

8   says, "Approximate contents of container,

9   one bottle only."   These are clearly two

10   packs.   So I'm not sure what that

11   reference is.

12      Q.    The container -- going to

13   the sample list, just to confirm.   The

14   container volume does say two 9-ounce

15   bottles in cardboard box, correct?

16      A.    Yes, it does.

17      Q.    Okay.   And on the fourth

18   page there is again one of the

19   merchandising label change stickers,

20   correct?

21      A.    That is correct.

22           (Document marked for

23           identification as Exhibit

24           Gurowitz-63.)

Margaret M. Gurowitz

1    BY MR. LAPINSKI:

2          Q.    We're switching back now no

3    Shower to Shower.

4          A.    That means I have to re-find

5    that.

6          Q.    We're going to be starting

7    with the beginning of the Shower to

8    Shower.  So it's actually going to be --

9          A.    I can't get used to the

10   double-sided.

11         Q.    Page ID 11884.

12         A.    1884.  Okay.

13         Q.    Now, the page that you're

14   looking at, you're looking at the top of

15   the page.  Are you starting there with

16   STS003?

17         A.    The top of Page 11884 --

18         Q.    You have the --

19         A.    -- on mine has JBP-288.

20         Q.    Okay.  We're on the same

21   page.

22               This is Exhibit 63.  And

23   this is indicated to be photographs of

24   STS001.  Based upon your review of the

Margaret M. Gurowitz

```
1    photographs, do these photographs

2    correspond to the sample list entry

3    STS001?

4            A.    It appears to correspond,

5    yes.

6            Q.    Okay.  On the second page,

7    there is a sticker that says, "1982,

8    55M-645."

9                  Do you know what that refers

10   to?

11           A.    1982, obviously would refer

12   to the year.  55M-645 was some sort of

13   identifying number.

14           Q.    And do you know the purpose

15   of that identifying number?

16           A.    I do not.

17           Q.    Would that have been a

18   practice within J&J to affix that

19   identifying number to some type of a

20   sample product?

21           A.    The samples, the ones with

22   the marketing notices had a much longer

23   number.  And it would say merchandise

24   notice with a multi-digit number.  So
```

Margaret M. Gurowitz

1   this looks like it was not relating maybe

2   to a marketing notice but some other type

3   of filing system.

4            Again, this is from 1982,

5   which was the year that the old museum

6   was closed.  So I don't know whether this

7   would have been sent to that museum

8   before the closing was done or if it was

9   after.  It's possible it never was sent

10  to New Brunswick.

11       Q.   If it wasn't sent to New

12  Brunswick, then it would have been

13  maintained at J&J consumer Inc.?

14       A.   Potentially.  This is -- it

15  is labeled -- it was in the box with the

16  marketing materials according to the

17  list.

18       Q.   And are you able to -- are

19  you able to ascertain the year on the

20  bottle, other than the date that written

21  on the sticker based upon the

22  photographs?

23       A.   Based upon the photographs I

24  am not able to do that.

Margaret M. Gurowitz

1          (Document marked for

2          identification as Exhibit

3          Gurowitz-64.)

4    BY MR. LAPINSKI:

5          Q.    This is Exhibit 64,

6    photographs of STS002.

7                Based upon your review, do

8    these photographs -- are these

9    photographs correspond to STS002 in the

10   sample list?

11         A.    It appears to correspond.

12         Q.    And on the second page of

13   the photographs, there is a marketing

14   label change sticker, correct?

15         A.    That is correct.

16         Q.    And this is a sample that

17   normally would have been produced to the

18   museum pursuant to the policy that was in

19   place at that time?

20         A.    It's dated 1980.  So it is

21   two years before the memo saying it was

22   going to close.  So it's possible that it

23   was.

24         Q.    Is there anything that would

Margaret M. Gurowitz

1   lead you to believe that it was not

2   produced pursuant to the policies that

3   were in place at that time?

4          A.    I don't have enough

5   information to make that determination.

6          Q.    There's nothing that would

7   indicate that it was not produced

8   pursuant to that policy, correct?

9          A.    Again, there's not enough

10  information either way.  One can assume

11  based on that sticker and the date on it.

12              (Document marked for

13              identification as Exhibit

14              Gurowitz-65.)

15  BY MR. LAPINSKI:

16          Q.    I'm going to hand to you a

17  document that's been marked as Exhibit

18  65.  This is photographs of STS003.

19  Based upon your review of the

20  photographs, do these photos correspond

21  with the listing in the sample list of

22  STS003?

23          A.    It appears to correspond,

24  yes.

Margaret M. Gurowitz

1        Q.    And this particular product

2   has a couple different stickers on it.

3   On the front page there is a sticker with

4   the number 707A.  Do you know what that

5   refers to?

6        A.    I do not.

7        Q.    And there is also a sticker

8   indicated property of PPC museum,

9   correct?

10       A.    Correct.

11       Q.    And as we discussed before,

12  what does PPC stand for?

13       A.    PPC stands for Personal

14  Products Corporation.  It is a

15  no-longer-existing historical subsidiary

16  of Johnson & Johnson.

17       Q.    And then on the second page

18  there is a merchandising notice change

19  label, correct?

20       A.    That is correct.

21       Q.    And I can't make out the

22  date on that label change.  But do you

23  know what the approximate date of this

24  product is?

Margaret M. Gurowitz

1      A.    On the -- on the list it
2  says -- it says 1969.
3              The date is blurry.  It
4  looks like 11/6, and the year is too
5  blurry to make out.
6      Q.    If this were a product from
7  1969, this would have been produced to
8  the museum pursuant to the policies that
9  were in place at that time?
10     A.    It falls in those time
11  parameters, yes.  I do note that in the
12  column, approximate contents of
13  container, this one is not full.  So
14  somehow in whatever journey it took to
15  get wherever it went, it ended up as
16  three-quarters full instead of full.
17              So again, since we cannot
18  put together an end-to-end chain of
19  custody for one of these historic
20  artifacts, appears from about 1969, we
21  don't know how, when, or why it ended up
22  with some contents missing.
23     Q.    And as far as chain of
24  custody is concerned, there is nothing in

Margaret M. Gurowitz

1  the photograph or on the bottle itself

2  that would lead you to believe that at

3  any time the bottle was out of the

4  custody of Johnson & Johnson?

5      A.   We don't know.  At some

6  point it was clearly opened because there

7  are contents missing.  So we have no way

8  to determine whether it was -- no way to

9  determine what the full chain of custody

10 is.  There's just not enough historical

11 information.

12     Q.   Well, even if the bottle was

13 sealed and full, there's no indication

14 that it was ever outside of the custody

15 of Johnson & Johnson, correct?

16     A.   Well, the bottle wasn't

17 sealed.  Safety seals on consumer

18 packaging was not a thing until the

19 1980s.  So a bottle from 1969 would never

20 have been sealed.

21          And we don't know.  We do

22 know that this is noted as being

23 three-quarters full.  So clearly at some

24 point contents were removed.  We don't

Margaret M. Gurowitz

1    know how or by who or for what purpose.

2    And so that is just part of not being

3    able to trace an end-to-end chain of

4    custody for this artifact.

5              (Document marked for

6         identification as Exhibit

7         Gurowitz-66.)

8    BY MR. LAPINSKI:

9         Q.    I'll hand you Exhibit 66.

10             These are photographs of

11   STS004.  Based upon your review of the

12   photographs, does this bottle correspond

13   to the entry in the sample list for

14   STS004?

15        A.    As best as I can tell, it

16   does.  One of the things that I've been

17   looking at is not just the number on the

18   Post-It.  But the volume listed on the

19   package.  And this has stickers on it, so

20   I cannot see if there is a volume listed.

21   So I'm basing that on the number, because

22   I also don't see a date -- oh, yeah.

23   There's a '68 date on here, so that also

24   corresponds.

Margaret M. Gurowitz

1  Q.   And where is the '68 date

2  that you're looking at?

3  A.   On the second page, the

4  photograph of the back, there's a

5  merchandising notice label.  And you can

6  just make that out at the top of that

7  label.

8  Q.   So it's the 3/20/68 date

9  that you're referring to on the

10 merchandising label?

11 A.   Yes.

12 Q.   Okay.  And that

13 merchandising notice label is the label

14 that would be affixed to the product when

15 it was sent to the museum pursuant to the

16 policy in place, correct?

17 A.   Sent to -- well, it was --

18 it would have been, but it also says

19 property of PPC, Milltown, New Jersey.

20 It was sent to either the old law

21 department Kilmer museum or the PPC

22 museum.  I don't have enough information

23 to determine which one.

24 Q.   Both of those facilities are

Margaret M. Gurowitz

1    Johnson & Johnson facilities, correct?

2          A.    The Kilmer Museum is

3    definitely a Johnson & Johnson facility.

4    I don't have enough information about the

5    PPC museum or what it was to make that

6    determination.  It does say it was in

7    Milltown, New Jersey, and the

8    headquarters of Personal Products was in

9    Milltown.  So that's as far as a

10   determination I could make.

11         Q.    Personal products was a J&J

12   company, correct?

13         A.    It's a historical,

14   no-longer-existing company.

15         Q.    It was a J&J company in

16   March of 1968 correct?

17         A.    I would have to research

18   that to confirm that.  I couldn't tell

19   you.  I mean, I don't know when that

20   sticker from -- it's a historical

21   company.  I would have to look through

22   records to determine whether that was

23   around in '68.

24                (Document marked for

Margaret M. Gurowitz

1       identification as Exhibit

2       Gurowitz-67.)

3   BY MR. LAPINSKI:

4       Q.     Exhibit 67.  This is for

5   STS005.  Based upon your review of these

6   photographs, do the photographs

7   correspond with the sample list entry for

8   STS005?

9       A.     Yes, they appear to

10  correspond.

11      Q.     And on the back there is a

12  sticker.  It says 1982, and below that it

13  says 55M-644.  Do you have any

14  understanding as to what that refers to?

15      A.     I do not.  I would assume

16  1982 would be the date though.

17             (Document marked for

18      identification as Exhibit

19      Gurowitz-68.)

20  BY MR. LAPINSKI:

21      Q.     This is Exhibit 68.  This is

22  STS011.  And in your review of the

23  photographs, do these photos correspond

24  to the sample list entry STS011?

Margaret M. Gurowitz

1   　　　　A.　　They appear to correspond,

2   yes.

3   　　　　Q.　　And there is a sticker on

4   the first page that says, "New STS Spice

5   with baking soda" -- "baking

6   soda/cornstarch," correct?

7   　　　　A.　　Correct.

8   　　　　Q.　　And do you know what that's

9   a reference to?

10  　　　　A.　　Obviously -- so potentially

11  a label change because it's noted on the

12  label.  However, this one is from 1985,

13  this is after the old museum closed.  So

14  this would not have been sent to that

15  museum in New Brunswick.

16  　　　　Q.　　And are you aware whether it

17  continued to be a practice after 1982

18  when the museum closed for Johnson &

19  Johnson Consumer to retain product

20  samples after there was a change to the

21  label?

22  　　　　　　MS. FOURNIER:  Objection.

23  　　　Outside the scope.

24  　　　　　　THE WITNESS:  There is no

Margaret M. Gurowitz

1    information that we have regarding

2    the policy of a no-longer-existing

3    operating unit.

4   BY MR. LAPINSKI:

5        Q.    In 1980 -- in 1985, who was

6   the manufacturer of Shower to Shower?

7        A.    If you look at the second --

8   the photograph of the back, it says

9   Personal Products Company, Milltown, New

10  Jersey.

11       Q.    And do you know when

12  Personal Products Company went out of

13  existence?

14       A.    I would have to look that

15  up.

16            (Document marked for

17       identification as Exhibit

18       Gurowitz-69.)

19  BY MR. LAPINSKI:

20       Q.    This is Exhibit 69.  And

21  these photos pertain to STS012.  Based

22  upon your review of the photos, do the

23  photos correspond to sample list entry

24  STS012?

Margaret M. Gurowitz

1      A.      They appear to correspond.

2      Q.      And on the second page there

3  is a promotional bulletin from November

4  of 1980, correct?

5      A.      That is correct.

6      Q.      And that would be during the

7  period of time that there was a policy in

8  place for samples to be sent from the

9  Johnson & Johnson unit to the Johnson &

10  Johnson museum?

11      A.      That would fall before 1982,

12  so presumably, yes.

13          (Document marked for

14          identification as Exhibit

15          Gurowitz-70.)

16  BY MR. LAPINSKI:

17      Q.      Exhibit 70.  These

18  correspond to STS013.  And if you would

19  review the photographs, do the

20  photographs depict what is in the sample

21  list entry STS013?

22      A.      They appear to do so, yes.

23      Q.      And on the second page there

24  is a merchandise notice from September of

Margaret M. Gurowitz

1    1976, correct?

2           A.    That is correct.

3           Q.    And that notice and this

4    product would fall within the time period

5    where there was a policy for sample

6    products with label changes to be sent to

7    the J&J museum, correct?

8           A.    They would.  But on the

9    photograph of the front of this, it says

10   property of PPC museum Milltown, New

11   Jersey.  So we don't have any information

12   on whether this was sent to New Brunswick

13   or sent to whatever the PPC museum in

14   Milltown was.

15          Q.    The PPC museum was a

16   Johnson & Johnson-owned company, correct?

17          A.    Personal Products was a

18   Johnson & Johnson affiliate --

19   subsidiary, affiliate.

20          Q.    Personal Products Company

21   was an affiliate of Johnson & Johnson,

22   correct?

23          A.    Yes.

24          Q.    And is it your understanding

Margaret M. Gurowitz

1 that the PPC museum was part of Personal

2 Products?

3          A.    There is no one at Johnson &

4 Johnson currently who dates back that far

5 regarding employment, so nobody knows.

6                It was obviously in Milltown

7 where personal products was

8 headquartered.  That's about as far as we

9 can go without having any more

10 information.

11          Q.    Is there anything that would

12 lead you to believe that the product

13 depicted in Exhibit 70 for STS013 was not

14 at the personal products organization in

15 Milltown?

16          A.    There's just not enough

17 historical information existing.  This

18 one interestingly is also noted as being

19 half full.  So sometime during its

20 existence it was opened and half the

21 contents are no longer there.

22                So we don't know, again,

23 when that happened.  That's just part of

24 not being able to recreate an entire sort

Margaret M. Gurowitz

1   of chain of where this was at every

2   moment in its history.

3        Q.   Well, do you have any

4   evidence that would indicate that there

5   was any point in time where this sample

6   bottle was not in the custody of

7   Johnson & Johnson or a Johnson & Johnson

8   subsidiary?

9        A.   We do not have enough

10  information to make that determination.

11            (Document marked for

12            identification as Exhibit

13            Gurowitz-71.)

14  BY MR. LAPINSKI:

15       Q.   I'll hand you Exhibit 71.

16  These are photographs related to STS016.

17  And if you look at these photographs, do

18  these photographs correspond to the

19  sample list entry STS016?

20       A.   Yes, they do appear to

21  correspond.

22       Q.   And on the second -- second

23  page, there is a promotional bulletin

24  notice reflecting a change, correct?

Margaret M. Gurowitz

1    A.    That is correct.

2    Q.    And that's from 11/7/1980,

3  which is during the period of time that

4  Johnson & Johnson had a policy in place

5  for label changes to be produced to the

6  museum?

7    A.    That is correct.  This one

8  also is half full.  So we don't know --

9  so we don't know why this is half full.

10  Again, we can't trace an entire chain of

11  custody.  Just sort of very small pieces

12  of that.  So we don't know why this is

13  half full.  Was it something that was --

14  stayed within Johnson & Johnson.  Did

15  somebody at one point in time say, "We

16  need an example of this kind of

17  packaging," and this was donated by

18  somebody because it was the type of

19  packaging they needed.  We just don't

20  know.

21    Q.    That's just speculation on

22  your part?

23    A.    It is speculation.

24    Q.    You have no evidence that

Margaret M. Gurowitz

1    would indicate that this was any period

2    of time that this particular sample was

3    out of the custody of either Johnson &

4    Johnson or a Johnson & Johnson company?

5         A.    That's because we don't have

6    evidence regarding its entire chain of

7    custody.  There's just not enough

8    information to piece together a full

9    enough chain of custody for this.

10        Q.    So you -- so you don't have

11   evidence that would indicate that it was

12   ever out of the control of Johnson &

13   Johnson or Johnson & Johnson company?

14        A.    We don't.  But we also don't

15   have evidence to show that it -- there's

16   not enough evidence to prove that it --

17   or to show that it was in control.  It

18   could have been either way.  There's just

19   not enough evidence.

20             (Document marked for

21        identification as Exhibit

22        Gurowitz-72.)

23   BY MR. LAPINSKI:

24        Q.    I'll hand you Exhibit 72.

Margaret M. Gurowitz

1                And these are photographs

2     related to STS017.  Based upon your

3     review of the photographs do these

4     photographs relate to sample list entry

5     STS017?

6          A.    They appear to correspond,

7     yes.

8          Q.    And on the second page of

9     the photographs, there are merchandise

10    notice labels attached to it, correct?

11         A.    That is correct.

12         Q.    And they're from 1974?

13         A.    Yes.

14         Q.    And that's during a period

15    of time when Johnson & Johnson had a

16    policy in place that changes to the

17    label, samples would be sent to the

18    Johnson & Johnson museum?

19         A.    That is correct.  It does

20    fall during that time.

21              (Document marked for

22         identification as Exhibit

23         Gurowitz-73.)

24    BY MR. LAPINSKI:

Margaret M. Gurowitz

1          Q.     Exhibit 73.  This is related

2    to STS018.  Based upon your review of the

3    photographs, do these photos relate to

4    the sample list entry STS018?

5          A.     They appear to relate to it,

6    yes.  Here again, this is from -- marked

7    as being from 1985, which is after the

8    old Johnson & Johnson museum was closed.

9    So this was not something that would have

10   been sent to that entity in New

11   Brunswick.

12         Q.     But this is something that

13   was maintained in Johnson & Johnson's

14   offsite storage, correct?

15         A.     It was found in offsite

16   storage among boxes that were labeled

17   marketing.  But we do not know how it

18   originally got into those.

19             (Document marked for

20             identification as Exhibit

21             Gurowitz-74.)

22   BY MR. LAPINSKI:

23         Q.     Exhibit 74.  And these

24   photographs relate to STS021.  Based upon

Margaret M. Gurowitz

1    review of the photographs, do these

2    photographs relate to the entry on the

3    sample list for STS021?

4         A.    It appears to correspond.

5    And, again, this is half full.

6              (Document marked for

7              identification as Exhibit

8              Gurowitz-75.)

9    BY MR. LAPINSKI:

10        Q.    This is Exhibit 75.  These

11   are related to STS031.  Based upon your

12   review of these photographs, do these

13   photos correspond with the sample list

14   entry STS031?

15        A.    It appears to.  This notes

16   that this was part of a twin pack but

17   there is only one bottle from that twin

18   pack.  If that's the case, it appears to

19   correspond based on this information.

20        Q.    Based upon the two

21   photographs that are there, are you able

22   to make a definitive determination that

23   there's only one bottle, or is it

24   possible that there's a second bottle and

Margaret M. Gurowitz

1  these are stacked one on top of another?

2       A.    I cannot tell from the

3  photograph.

4       Q.    Okay.  There is a sticker on

5  the second page of the photograph,

6  correct?

7       A.    Yes.  There are several

8  stickers.

9       Q.    Okay.  And the sticker at

10 the top does refer to a merchandise

11 notice change from 1969?

12      A.    That's correct.

13      Q.    And it also refers to

14 12-and-a-half-ounce twin pack, correct?

15      A.    That is correct.

16      Q.    And would that -- the

17 references on that sticker conform to the

18 entry and the information in the sample

19 list for STS031?

20      A.    It would.  The sample list

21 notes that there's -- it says plastic

22 curved bottle.  So I assume that means

23 there's only one bottle.

24      Q.    And the merchandise notice

Margaret M. Gurowitz

1   on the second page, that notice from 1969

2   was during the period of time where the

3   Johnson & Johnson company would send a

4   sample of the product to the Johnson &

5   Johnson museum at the time there was a

6   change, correct?

7        A.    It was during that time.

8   However, the label at the bottom of the

9   back says "Property of PPC Museum,

10  Milltown, New Jersey."  We do not know if

11  this was sent to the old Johnson &

12  Johnson museum in New Brunswick or the

13  PPC museum, whatever that might have

14  been.

15       Q.    Okay.  PPC was a Johnson &

16  Johnson company at the time that it was

17  in existence, correct?

18       A.    I believe it was in

19  existence in 1959.  But I would have

20  to -- would have to look it up to confirm

21  that.

22       Q.    My question was when it was

23  in existence it was a Johnson & Johnson

24  company?

Margaret M. Gurowitz

1    A.    Yes.

2          (Document marked for

3    identification as Exhibit

4    Gurowitz-76.)

5  BY MR. LAPINSKI:

6    Q.    Ms. Gurowitz, I'm going to

7  hand you a document that has been marked

8  as Exhibit 76.  If you can take a minute

9  to review that, I would appreciate it.

10  If you would let me know when you are

11  ready for me to ask a couple questions

12  regarding this exhibit.

13    A.    I'm ready.

14    Q.    Ms. Gurowitz, earlier today

15  you had mentioned a couple times that

16  there were transfer records that you had

17  reviewed in preparation for your

18  deposition, correct?

19    A.    Correct.

20    Q.    And they related to the

21  transfer of offsite storage materials

22  from Johnson & Johnson to Leahy business,

23  correct?

24    A.    Correct.

Margaret M. Gurowitz

1        Q.    Is Exhibit 76 the document

2   that you were referring to?

3        A.    Yes, it appears to be so.

4             (Document marked for

5             identification as Exhibit

6             Gurowitz-77.)

7   BY MR. LAPINSKI:

8        Q.    I'm going to hand you a

9   document that has been marked as

10  Exhibit 77.

11       A.    And I just want to say, it

12  was -- these were the -- transferred from

13  the operating unit, the consumer.  This

14  is -- here it's called -- it says

15  Johnson & Johnson Baby Products.

16       Q.    Okay.  So -- so I understand

17  correctly, the purpose for your

18  clarification is that it was not

19  transferred by Johnson & Johnson.  It was

20  transferred by their operating unit, was

21  Johnson & -- at the time was Johnson &

22  Johnson Baby Products?

23       A.    Correct.

24       Q.    I think I was going to hand

Margaret M. Gurowitz

1   you, did I hand you Exhibit 77?

2        A.    Yes.

3        Q.    Ms. Gurowitz, have you seen

4   this document before?

5        A.    I believe I have, yeah.

6        Q.    And is this a document that

7   you reviewed in preparation for your

8   deposition?

9        A.    I believe so, yes.

10       Q.    And on the first page

11  there's a listing of advertisements and

12  promotional materials.

13            Do you see that?

14       A.    I do.

15       Q.    And were ads also sent to

16  storage?

17       A.    It appears from these

18  documents that they were, yes.

19       Q.    Are you aware, other than

20  Exhibits 76 and 77, are you aware of any

21  other transfer documents related to

22  talcum powder products or the samples

23  that are contained on the sample list?

24       A.    I am not.  I don't see

Margaret M. Gurowitz

1    Shower to Shower on here.  But I'm not

2    aware, that I can think of, of any

3    others.

4         Q.    If you would go back to

5    Exhibit 49, please.

6              Got it?

7         A.    Yes.

8         Q.    Okay.  And we had talked

9    briefly in regard to Exhibit 49 and the

10   sample JBP-135.

11             If you would turn to the

12   second page, which again has the Reg

13   Number 74,097.

14             Do you see that?

15        A.    Yes, I do.

16        Q.    Did you testify earlier that

17   that was a trademark registration number?

18        A.    I don't know that for a

19   fact, but I said based on the fact that

20   the larger label that you can see on Page

21   3 and 4 says "U.S. trademark

22   application," it's possible that could

23   refer to that.

24        Q.    And if that were a trademark

Margaret M. Gurowitz

1  registration, would this sample have been

2  kept as part of a retention policy?

3          A.    It likely -- it falls into

4  those time parameters, so it's possible

5  that it was.  We don't have any

6  information regarding keeping samples for

7  trademark registration, just for labeling

8  changes.

9          Q.    If I recall, did you testify

10  earlier that it was a practice of the

11  Johnson & Johnson legal department to

12  retain samples related to trademark?

13          A.    Related to trademark

14  history, yes.

15          Q.    Okay.  If you would go to --

16  lastly, go back to Exhibit 61.  The first

17  three pages of -- I'll wait till you get

18  to it.

19              This is the exhibit that had

20  two different products for JBP-294.  And

21  what I'd like you to do is just look at

22  the first three pictures that relate to

23  the old canister we discussed that I

24  believe was a wartime canister.

Margaret M. Gurowitz

1              If you would look at STS016

2    in the sample list -- I'm sorry, JBP-016

3    in the sample list.

4         A.    I'm going to get there.

5         Q.    It's on Page ID 11866.

6         A.    I have Page 11866.  I'm

7    sorry.  Could you repeat the number?

8         Q.    Sure.  JBP-016?

9         A.    Okay.

10        Q.    And as based upon your

11   review of those three documents, do those

12   photographs correspond with the sample

13   list entry JBP-016?

14        A.    They appear to.

15        Q.    Okay.

16             MR. LAPINSKI:  Off the

17        record.

18             THE VIDEOGRAPHER:  The time

19        is 5:34 p.m.  We are off the

20        record.

21             (Brief pause.)

22             THE VIDEOGRAPHER:  We are

23        back on the record at 5:35 p.m.

24   BY MR. LAPINSKI:

Margaret M. Gurowitz

1        Q.    Ms. Gurowitz, you have been

2   responsible for the maintenance of

3   samples at the J&J museum since 2006,

4   correct?

5        A.    Correct.

6        Q.    Okay.  Were you ever

7   provided with a litigation hold notice by

8   Johnson & Johnson?

9              MS. FOURNIER:  Objection.

10        Outside the scope.

11             THE WITNESS:  For this I

12        was, yes.

13   BY MR. LAPINSKI:

14        Q.    And when -- when were you

15   provided with that?

16             MS. FOURNIER:  Objection.

17             THE WITNESS:  I don't

18        remember when it came out.  So I'd

19        have to go back and look.

20   BY MR. LAPINSKI:

21        Q.    Within the last year?

22   Within the last two years?

23        A.    It's safe to say within the

24   last two years.

Margaret M. Gurowitz

```
 1              MR. LAPINSKI:  Okay.  I have
 2       no further questions.
 3              THE VIDEOGRAPHER:  The time
 4       is 5:35 p.m.  We are off the
 5       record.
 6              (Brief pause.)
 7              THE VIDEOGRAPHER:  We are
 8       back on the record at 5:37 p.m.
 9              MS. FOURNIER:  As I begin,
10       because I've now been reprimanded
11       by my colleagues multiple times,
12       I'm going to put on the record
13       what we discussed, which is an
14       objection by one is an objection
15       for all.
16              Do you have any issue with
17       that?
18              MR. LAPINSKI:  No problem
19       with that.
20              MS. FOURNIER:  Thank you.
21                   -  -  -
22              EXAMINATION
23                   -  -  -
24    BY MS. FOURNIER:
```

Margaret M. Gurowitz

1          Q.    Good afternoon,

2    Ms. Gurowitz.  I have a couple questions

3    to ask you on behalf of Johnson &

4    Johnson.

5                I want to start by having

6    you look at the list, the sample list.

7    We've spent a lot of time talking about

8    the section that is -- we're just sort of

9    referring to as the offsite storage,

10   right?

11         A.    Correct.

12         Q.    Can you just walk us

13   through, so that everyone is on the same

14   page, the sequence of where the bottles

15   on that section sort of start to finish,

16   where they were?

17         A.    Sure.  So I have been

18   researching and attempting to put

19   together a chain of custody.  And

20   unfortunately, we do not have enough good

21   information to do that.

22                So when the call went out to

23   locate any potential samples that might

24   be around, these samples were discovered

Margaret M. Gurowitz

1  in offsite storage.  They had been there

2  so long that nobody literally knew that

3  they were there, it came as a surprise to

4  everyone.  I had -- I had long heard that

5  in many cases, when the objects were sent

6  back to the operating units from the old

7  Johnson & Johnson museum, that, you know,

8  nobody knows what happened to them

9  because nobody is still around from that

10  time.

11         So I think that nobody knew

12  that these had been in offsite storage.

13  And so it was discovered that they were

14  in offsite storage.  And then I attempted

15  to put together, based -- you know, if I

16  could, based on the information that

17  still existed, a chain of custody.

18         And unlike the PTI samples,

19  where they're modern, people keep

20  records, now there are electronic

21  records, these are so old that they're

22  just -- the records were not there.

23         We can assume from those

24  marketing notices that in the time

1   between the '50s and the '70s, maybe

2   perhaps up to 1982 or close to that, that

3   whenever there are -- as per the law

4   department, whenever there was a

5   packaging change or a change to the

6   label, that they sent a sample to the old

7   Johnson & Johnson museum, which was run

8   by the law department, so they could

9   preserve trademark history of the

10  products.

11              There are a lot of products

12  that are labeled as marketing that fall

13  outside those parameters.  The people I

14  talked to in marketing, including Barbara

15  Brewer, who is one of the longest -- she,

16  I think, was the longest-tenured person

17  that Sarita Finnie could find, and she

18  even did not know how those got there.

19              So there are things that

20  were in those -- in those boxes labeled

21  marketing that may not have come from the

22  old law department museum.  They just --

23  whoever made that determination might

24  have seen, okay, these are product

Margaret M. Gurowitz

1    samples.  We'll just call them marketing

2    in the same way that if you had a box

3    full of staplers, you might call it

4    office supplies.

5         Q.    Okay.  And so part of the

6    bottles or some of the bottles, you do

7    believe came from the old museum; is that

8    right?

9         A.    That is correct.

10        Q.    And then at some point those

11   were sent back to what you keep referring

12   to as the, quote, operating companies,

13   correct?

14        A.    Correct.

15        Q.    And do we have any

16   information about, when those were sent

17   to the operating companies, what did

18   people do with them?

19        A.    Based on the transfer sheets

20   and based on the memo about closing the

21   old law department, the Kilmer Museum, it

22   looks like that was done in the 1982 time

23   frame.

24                  And so when we were engaged

Margaret M. Gurowitz

1   in the project to restore the museum in

2   the 2014 to 2016 time frame, I had

3   reached out to folks at the operating

4   companies because we were looking for

5   artifacts to display from a variety of --

6   a variety of places in the company.

7           And I said, "Do you have any

8   of these old products?"  And nobody knew

9   anything about them.  They said, "No,

10  this is way before our time.  We would

11  presume we don't have these.  Nobody

12  knows.  Nobody has even heard of this."

13       Q.    So all we know is that

14  sometime after 1982, but when exactly we

15  don't know; is that fair?

16       A.    Correct.

17       Q.    Okay.  So shifting gears

18  slightly, we then talked about the

19  merchandise notice change -- change

20  orders, right?  And one of the questions

21  that I wanted to ask you about is we

22  looked at that policy.  And does that

23  policy have -- does that policy state

24  that the samples sent have to be new

Margaret M. Gurowitz

1    samples?

2           MR. LAPINSKI:  Object to the

3        form of the question.

4           THE WITNESS:  They do not.

5    BY MS. FOURNIER:

6        Q.    Does it state whether they

7    have -- they can be open or closed?

8        A.    The policy did not mention

9    anything about open or closed.  It just

10   said we need to capture examples of

11   changes to the labeling or package shape.

12          MR. LAPINSKI:  Objection.

13   BY MS. FOURNIER:

14       Q.    Does the policy refer to

15   whether the package needs to be sourced

16   from J&J or an outside source?

17       A.    It did not.

18       Q.    So do you know with respect

19   to the bottles that have those

20   merchandise notice change on them, what

21   the original source of the bottle is?

22       A.    No, we do not.

23       Q.    In addition, during that

24   period of time of the 1960s to 1980s, is

Margaret M. Gurowitz

1    it fair to say that there was some

2    collection of bottles that did not come

3    into the possession of the museum because

4    of merchandise notice changes?

5              MR. LAPINSKI:  Object to the

6         form of the question.

7              THE WITNESS:  That is

8         correct.

9    BY MS. FOURNIER:

10        Q.    So if you can go and dig out

11   of your pile, I want you to take out

12   Exhibit 43 and 45.

13        A.    I have to dig.

14        Q.    It's relatively early in the

15   Johnson's Baby Powder set?

16        A.    Okay.  I'm looking.  They

17   start in the '70s for some unknown

18   reason.

19              MR. LAPINSKI:  What are the

20        JBP numbers that they relate to?

21              MS. FOURNIER:  Exhibit 45 is

22        JBP-099, and Exhibit 43 is

23        JBP-096.

24              THE WITNESS:  It was -- I'm

Margaret M. Gurowitz

1   sorry.  Could you just tell me

2   exhibit --

3   BY MS. FOURNIER:

4      Q.    45 and 43.  43 and 45 is

5   probably the order you'll come across

6   them.

7      A.    Here is 45.

8      Q.    Let's start with 45 then.

9      A.    Sure.

10     Q.    Turn to the fourth page of

11  45.  It's a picture of one of the sides.

12     A.    Yes.

13     Q.    And it has taped to it a

14  sticker.  What is your understanding of

15  what that -- that label or whatever you

16  want to call it taped to it is?

17     A.    My understanding is that

18  corresponds to a merchandising notice

19  from 1/15/1970, Johnson's Baby Powder

20  hospital, four ounces.  I do not know

21  what Hadley PPD refers to.

22     Q.    And so earlier in your

23  testimony you said that you could surmise

24  that this came into the possession of the

Margaret M. Gurowitz

1    museum because of the merchandise notice

2    changes; is that right?

3         A.    That's possible.  Yes.

4         Q.    So let's look at Exhibit 43

5    if you will.  Okay.  If you look at

6    Exhibit 43, do any of the pictures

7    contain a label like the one we were

8    looking at on Exhibit 45?

9         A.    No, they do not.

10        Q.    Do we have any knowledge of

11   how this particular bottle came into

12   possession of the old museum?

13        A.    We do not.  We do not.

14        Q.    Okay.  I'd also like you to

15   take a quick look at Exhibit 49, which we

16   have looked at a couple times now.  What

17   can you tell us, if anything, about these

18   sorts of containers and how the lid

19   works?

20        A.    Okay.  So these are slightly

21   older containers.  This one has two

22   dates, 1963 and 1964.  So as I mentioned,

23   products were not sealed until the 1980s.

24   So this would have been open.  You could

Margaret M. Gurowitz

1  open it and access the contents at any

2  time.

3          The top, there's not a

4  photograph of the top, I believe.  But

5  the top was sort of a twist container

6  where you would just twist it, and it

7  would line up holes, which would open,

8  and then you could access the contents.

9      Q.    And can you screw this top

10  all the way off?

11      A.    You can take that top off.

12  If you notice, there's kind of a -- lip

13  isn't the right word, but the top -- the

14  top part that has the very top of the

15  container, it's a separate piece from the

16  rest of the container.  So you would be

17  able to pull that off.

18      Q.    And so do you know if the

19  contents of the powder in this particular

20  container, do we have any way of knowing

21  whether it was the original powder from

22  this container?

23          MR. LAPINSKI:  Object to

24      form of the question.

Margaret M. Gurowitz

1           THE WITNESS:  We don't.  And

2       if you look -- if you look at the

3       first photograph, the front page,

4       if you look at the right side of

5       that container, it looks like

6       there is a gap there.  And it's a

7       little higher than on the left.

8           So it looks like that may

9       have been pulled off at some

10      point.

11   BY MS. FOURNIER:

12       Q.    During this period of time,

13   do you know if the museum also received

14   donations?

15       A.    The museum has received

16   donations for many decades.  So yes, it

17   would be likely we received donations.

18           MS. FOURNIER:  Can I get

19       some stickers?  Thank you.

20           (Document marked for

21       identification as Exhibit

22       Gurowitz-78.)

23   BY MS. FOURNIER:

24       Q.    I'm going to pass you

Margaret M. Gurowitz

1    something.  I think we're on 78.

2            Actually, I've handed you

3    something that we marked as Exhibit 78,

4    which is two pages.  First can you just

5    look at those and tell me if they appear

6    to be the same picture just one in black

7    and white and one in color?

8        A.    They appear to be the same

9    picture.

10        Q.    Okay.  And have you seen

11    these pictures before?

12        A.    Yes.

13        Q.    What can you tell us about

14    this particular bottle based on these

15    pictures?

16        A.    This is a very rusted tin, a

17    Johnson's Baby Powder tin in very poor

18    condition.  By the trademark, it's got

19    the red chain, the circular logo.  So

20    that looks like it was marketed outside

21    of the United States.  And this was one

22    that was found in a shipwreck.  So

23    presumably it was somewhere at the bottom

24    of the ocean.

Margaret M. Gurowitz

1    BY MS. FOURNIER:

2        Q.    So do you think this is

3    potentially an example of a donation

4    during the period?

5        A.    I think this is absolutely

6    an example of something that was donated.

7            (Document marked for

8            identification as Exhibit

9            Gurowitz-79.)

10   BY MS. FOURNIER:

11       Q.    Let me mark the next one as

12   79.  Let's start with 79.  The same

13   question.  If you can just look at the

14   two pages and confirm that this is a

15   black-and-white but then a color photo of

16   the same bottle?

17       A.    Yes, I can confirm that.

18       Q.    And can you read for us what

19   this particular bottle says on it?

20       A.    Sure.  It says, "Sample from

21   Mr. Burchfield's cabinet, return 1928."

22       Q.    Any idea who Mr. Burchfield

23   is?

24       A.    No idea.

Margaret M. Gurowitz

1    Q.    Do you know if he worked at

2  J&J or was outside the company?

3    A.    We have no way of knowing

4  that or tracking that down.

5    Q.    Any idea if Mr. Burchfield

6  is responsible for any of the other

7  containers on the list?

8    A.    Not unless it was noted.

9  The only thing we know is clearly

10  somebody did not return this to

11  Mr. Burchfield.

12    Q.    Fair enough.  Let me switch

13  gears a little bit.  You talked about, if

14  we think about the second section of that

15  list, that's the section that was sourced

16  from today's museum.

17           And you, I believe,

18  testified that you were part of the group

19  or you were responsible for finding those

20  and then actually putting them down in

21  packages to ship off to the lab; is that

22  correct?

23    A.    That is correct.

24    Q.    Now, as to the first

Margaret M. Gurowitz

1  section, the section that we spent more

2  time, the stuff that came from marketing

3  and offsite storage, I believe you

4  testified that you didn't know who

5  exactly put that into boxes and sent that

6  off; is that correct?

7       A.    That's correct.

8       Q.    But do you have an

9  understanding of what group of people

10  were responsible to do that once they

11  were found?

12      A.    Yes, it would have been some

13  combination of the legal folks, the

14  records management folks, and the folks

15  that worked at the consumer company.

16      Q.    So was it the same group of

17  people who worked with you on your

18  section of the bottles?

19      A.    Presumably some of them

20  would probably have been the same.

21      Q.    Okay.  And then the last

22  question I have for you is, can we go

23  back to the very last picture that we

24  looked at.  It was the one that was

Margaret M. Gurowitz

1  attached to the double pack.  And we were

2  trying to figure out maybe if we could

3  understand which sample that was.

4            MS. FOURNIER:  What was the

5        exhibit number?  Does anybody have

6        that?  75?  Okay.  Thank you.

7            MR. LAPINSKI:  I think it

8        was 61.

9            MS. FOURNIER:  Oh, Exhibit

10       61.  Thank you.

11           THE WITNESS:  This is

12       Exhibit 61, the one that had that

13       anomalous --

14  BY MS. FOURNIER:

15       Q.    That's right.

16       A.    Yeah.

17       Q.    And we just went through on

18  this exhibit listing and found that it

19  potentially matches to JBP-016, right?

20  Is that correct?

21       A.    Potentially it could match

22  to that, yes.

23       Q.    Okay.  I'd like you to take

24  a look at the entry for JBP-223.  And let

Margaret M. Gurowitz

1    me know whether you think that it could

2    potentially match that entry as well?

3              MR. LAPINSKI:  Did you say

4         JBP-223?

5              MS. FOURNIER:  223.  I'm

6         looking at Page 11880, Page ID.

7         Page 33 of 91.

8              THE WITNESS:  JBP-223?

9    BY MS. FOURNIER:

10        Q.    That's correct.

11        A.    That does say it is -- it is

12   a cardboard cylinder from the right time.

13   I think the volume is different though.

14        Q.    Okay.  Are there other

15   cardboard cylinder samples on this list?

16        A.    Yes.  I believe there are.

17        Q.    And do you know with

18   certainty if that one is 016?

19        A.    We cannot determine with

20   certainty which one that is.  I would

21   have to look and see what the sizes were,

22   if there's another cardboard cylinder

23   that was one and three-quarters ounces.

24   We would not be able to tell which one is

1   which.

2        MS. FOURNIER:  Got it.

3   Those are all my questions.

4        THE VIDEOGRAPHER:  The time

5   is --

6        MR. LAPINSKI:  Two

7   questions, so let's go off for

8   now.

9        THE VIDEOGRAPHER:  The time

10  is 5:54 p.m.  We're off the

11  record.

12       (Brief pause.)

13       THE VIDEOGRAPHER:  Back on

14  the record at 5:55 p.m.

15            -  -  -

16            EXAMINATION

17            -  -  -

18  BY MR. LAPINSKI:

19       Q.   Ms. Gurowitz if you can

20  refer to Exhibit 78?

21       A.   I'll just need a moment to

22  find it.

23       Q.   We're going to look at 78

24  and 79, which were the last two given to

Margaret M. Gurowitz

1  you by counsel.

2       A.    Yes.  Okay.

3       Q.    Exhibit 78 you said was

4  photographs of a sample that was donated

5  to Johnson & Johnson, correct?

6       A.    Correct.

7       Q.    And if you look at the color

8  photo on Page 2, I believe it says --

9  what we can see is, "Photo taken from,"

10 and then it has a July date, correct?

11      A.    Correct.

12      Q.    And would you agree that

13 someone within Johnson & Johnson took

14 steps to label this product that had been

15 donated to Johnson & Johnson?

16      A.    No, I would not agree.

17 Somebody labeled it.  But we don't know

18 if it was a Johnson & Johnson person or

19 the person who donated it.

20      Q.    But it's a donated -- as a

21 donated product, it's labeled as such,

22 correct?

23      A.    It is labeled, but we don't

24 know who labeled it.

Margaret M. Gurowitz

1      Q.    As far as -- if you would go

2   to Exhibit 79.  And Exhibit 79 is a

3   sample that came from Mr. Burchfield's

4   cabinet, correct?

5      A.    Correct.

6      Q.    And someone did label this

7   as a sample that came from an outside

8   source, correct?

9      A.    Correct.

10      Q.    In regard to Exhibit 49,

11   which was one that you should have it

12   on -- pretty close to the top because we

13   just talked about it.

14           Okay.  You testified that

15   you had not examined or handled any of

16   the offsite -- any of the offsite

17   samples, correct?

18      A.    Correct.

19      Q.    So you haven't examined

20   Exhibit Number 49, correct?

21      A.    Not in person, no.

22      Q.    So your testimony about the

23   top possibly being off is based only on

24   the photograph and is speculation

Margaret M. Gurowitz

1    otherwise?

2         A.    It is based on the

3    photograph and the fact that there's a

4    gap here and it looks like it -- it looks

5    like it was -- there's more space here

6    than there is on the other side.  So it's

7    based on that.

8         Q.    And the top of that is a

9    removable top, correct?

10         A.    If you are referring to this

11    entire top, yes.  You can pull that off.

12         Q.    Okay.  And there became a

13    point in time where Johnson & Johnson

14    changed the design of their Baby Powder

15    bottles so that the top was no longer

16    removable, correct?

17         A.    Well, initially the oldest

18    samples did not have this type of top.

19    Then for a number of decades they had

20    this type of top, and then they moved

21    away from it.

22         Q.    And when did they move away

23    from that?

24         A.    I believe this was moved

Margaret M. Gurowitz

1   away from when they changed to plastic

2   packaging in 1963 time frame.

3              MR. LAPINSKI:  Okay.  No

4        more questions.

5              THE VIDEOGRAPHER:  This

6        concludes today's deposition.  The

7        time is 5:58 p.m.  We are off the

8        record.

9              (Excused.)

10             (Deposition concluded at

11        approximately 5:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Margaret M. Gurowitz

1

2                      CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, MARGARET M. GUROWITZ, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12   _____

     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  July 20, 2018

16

17

18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24

Margaret M. Gurowitz

1            INSTRUCTIONS TO WITNESS

2

3            Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8            After doing so, please sign

9   the errata sheet and date it.

10           You are signing same subject

11  to the changes you have noted on the

12  errata sheet, which will be attached to

13  your deposition.

14           It is imperative that you

15  return the original errata sheet to the

16  deposing attorney within thirty (30) days

17  of receipt of the deposition transcript

18  by you.  If you fail to do so, the

19  deposition transcript may be deemed to be

20  accurate and may be used in court.

21

22

23

24

Margaret M. Gurowitz

```
 1                    –    –    –    –    –    –

                          E   R   R   A   T   A

 2                    –    –    –    –    –    –

 3

 4      PAGE    LINE    CHANGE

 5      _____   _____   _____

 6          REASON:     _____

 7      _____   _____   _____

 8          REASON:     _____

 9      _____   _____   _____

10          REASON:     _____

11      _____   _____   _____

12          REASON:     _____

13      _____   _____   _____

14          REASON:     _____

15      _____   _____   _____

16          REASON:     _____

17      _____   _____   _____

18          REASON:     _____

19      _____   _____   _____

20          REASON:     _____

21      _____   _____   _____

22          REASON:     _____

23      _____   _____   _____

24          REASON:     _____
```

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5   hereby certify that I have read the

6   foregoing pages, 1 - 380, and that the

7   same is a correct transcription of the

8   answers given by me to the questions

9   therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16   MARGARET M. GUROWITZ                DATE

17

18

19  Subscribed and sworn
    to before me this

20  _____ day of _____, 20_____.

21  My commission expires:_____

22

    _____

23  Notary Public

24

Margaret M. Gurowitz

1                    LAWYER'S NOTES

2       PAGE   LINE

3       _____   _____   _____

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

# Exhibit 175



mccrone environmental services, inc.
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

RECEIVED

FEB 2 1987

W. M. I.

28 January 19876

Windsor Minerals, Inc.
P. O. Box 680
Windsor, Vermont  05089

Attention:  Mr. Roger N. Miller, President

    Re:  McCrone Project No. ME-3241

Dear Mr. Miller:

    Under your Purchase Order QC-0548, we received nineteen talc
samples for asbestos analysis by transmission electron microscopy.
The samples were labelled as follows:

    WMI 86-10    WMI 86-14    WMI 86-18    WMI 86-22    WMI 86-26
    WMI 86-11    WMI 86-15    WMI 86-19    WMI 86-23    WMI 86-27
    WMI 86-12    WMI 86-16    WMI 86-20    WMI 86-24    WMI 86-32
    WMI 86-13    WMI 86-17    WMI 86-21    WMI 86-25

    Examination found no quantifiable amounts of asbestiform
minerals.  The limit of detection for each sample is below
0.001 weight percent.

    Thank you for consulting McCrone Environmental Services, Inc.

                            Sincerely,

                            Thomas Kremer
                            Thomas Kremer
                            Electron Microscopist

                            James R. Millette
                            James R. Millette, Ph.D.
                            Manager, Laboratory Services

TK/JRM/mtw

cc:  1)  Windsor Minerals, Inc.
         Windsor VT
     1)  Mr. Roger N. Miller, President

a subsidiary of walter c. mccrone associates, inc.
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

**EXHIBIT
J&J-355**

Protected Document--Subject to Protective Order

JNJTALC00038714



**mccrone environmental services, inc.**
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

RECEIVED
FEB 2 1987
W. M. I.

### PLEASE NOTE

It is our present policy to hold samples for 30 days after issuance of the analysis report at no additional charge to the client. At the end of the 30 day period, samples will be disposed of unless a written request to return has been received in our office. A sample return fee in the amount of U.S. certified postage plus 15% will be charged for each group of samples mailed. McCrone Environmental Services, Inc. will archive samples upon receipt of written notification from the client at a charge of $ 0.50 per sample per month. Special arrangements will be made for samples received under specific "chain of custody" orders. Please contact our office if special handling is needed for your samples.

Sincerely,

James R. Millette, Ph.D.
Manager, Laboratory Operations

a subsidiary of **walter c. mccrone associates, inc.**
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

Protected Document--Subject to Protective Order

JNJTALC000387715

WINDSOR MINERALS, INC.

Samples to McCrone Environmental Services

October 13, 1986

### West Windsor

| | | |
|---|---|---|
| Float Feed | April, 1986 | WMI 86-10 |
| Float Feed | May, 1986 | WMI 86-11 |
| Float Feed | June, 1986 | WMI 86-12 |
| Float Feed | July, 1986 | WMI 86-13 |
| Float Feed | August, 1986 | WMI 86-14 |
| Float Feed | September, 1986 | WMI 86-15 |

### Columbia

| | | |
|---|---|---|
| Grade 36 | April, 1986 | WMI 86-16 |
| Grade 36 | May, 1986 | WMI 86-17 |
| Grade 36 | June, 1986 | WMI 86-18 |
| Grade 36 | July, 1986 | WMI 86-19 |
| Grade 36 | August, 1986 | WMI 86-20 |
| Grade 36 | September, 1986 | WMI 86-21 |

### Columbia

| | | |
|---|---|---|
| Alpha Beta Product | April, 1986 | WMI 86-22 |
| Alpha Beta Product | May, 1986 | WMI 86-23 |
| Alpha Beta Product | June, 1986 | WMI 86-24 |
| Alpha Beta Product | July, 1986 | WMI 86-25 |
| Alpha Beta Product | August, 1986 | WMI 86-26 |
| Alpha Beta Product | September, 1986 | WMI 86-27 |

### Other

| | | |
|---|---|---|
| 66 product from Rainbow test run, September 26, 1986 | | WMI 86-31 |

Cheryl Hill-Bennett
CC:  Roger Miller
     Robert Goff

Protected Document--Subject to Protective Order

JNJTALC000387716

Exhibit 176

# Memo

| | |
|---|---|
| **To:** | William Ashton |
| **cc:** | Regina Gallagher, Lorena Telofski, Mike Chudkowski |
| **From:** | Joyce Payeur |
| **Date:** | 10/20/00 |
| **Re:** | TALC CLOSET CLEANOUT & STORAGE |

I was requested by Research Support Sciences to remove all powder items from the storage closet in Research North, second floor. The majority of items were from previous world talc surveys and Chinese competitor brands. These items were discarded today as standard chemical waste through Skillman Environmental Affairs.

I have relabeled and repackaged the following items for long-term storage in the Research North Sub-Basement Room, first corridor:

Historical Talc from Kilmer Museum  - 1 Box
Asbestiform Mineral samples and purchased standards - 1 Box
Tremolite & Carbonate 95%- 1 Kilo Poly Jar
NY State Tremolite labeled XRD Std - 1 gallon paint can
Card File with Mine Locations and Photomicrographs of Talc

Please be aware of their presence and location.

Joyce Payeur - Technical Assurance

Technical Assurance

EXHIBIT J&J-800

11

Protective Order

JNJNL61_000015761

Exhibit 177

**From:**        McCarthy, Timothy [CPCUS]
**Sent:**        Friday, November 21, 2008 1:55 PM
**To:**          Bernhofer, Lauren [CPCUS]
**Subject:**     RE: Baby Powder

Monica Popescu has been running these surveys since I've been here.
unless you have run anything recently, I am guessing your surveys are out of date.  ergo,
PITCH them.

thanks

        -----Original Message-----
    From:  Bernhofer, Lauren [CPCUS]
    Sent:  Friday, November 21, 2008 8:52 AM
    To:    McCarthy, Timothy [CPCUS]
    Subject:       RE: Baby Powder

    Tim,

    Do you have an idea of what the retention time would be on information related to the
CTFA ingredient surveys we have responded to over the past few years?  I can show you if you
come over to see the Talc files.

    Thanks,
    Lauren

        -----Original Message-----
    From:  McCarthy, Timothy [CPCUS]
    Sent:  Friday, November 21, 2008 8:46 AM
    To:    Bernhofer, Lauren [CPCUS]
    Subject:       RE: Baby Powder

    great reading!
    I may take a walk up north to familiarize myself with the talc goodies you have.

    thanks

        -----Original Message-----
    From:  Bernhofer, Lauren [CPCUS]
    Sent:  Friday, November 21, 2008 8:41 AM
    To:    McCarthy, Timothy [CPCUS]; Casalvieri, Joan [CPCUS]
    Subject:       RE: Baby Powder

    Hi Tim,

    I don't think you would want to share this document, but FYI, I thought
you would find it interesting.  Not exactly hundreds of years old, but close to it.  Dr. Lord
was the Director of the Research Foundation when I first came to J&J, but retired shortly
after.  He just passed away this last year at a very respectable old age!

        More seriously, we have about 4 file drawers of info on Talc over here.

        Lauren

1

JNJ 000368489

<< File: Talc_1978.pdf >>

```
     -----Original Message-----
From:   McCarthy, Timothy [CPCUS]
Sent:   Friday, November 21, 2008 8:15 AM
To:     Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
Subject:        FW: Baby Powder
```

I can surmise that any tox studies conducted on J Baby Powder precede even Lauren's tenure by several thousands of years.

best I could probably cough up would be a literature review on talc plus an IFRA compliance statement.

any better ideas?

```
     -----Original Message-----
From:   Clayton, Tom [MEDGB]
Sent:   Friday, November 21, 2008 7:47 AM
To:     McCarthy, Timothy [CPCUS]; Auld, Karen [CPCUS Non J&J]
Cc:     Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
Subject:        RE: Baby Powder
```

Hi Tim,
Thanks for the info. I am after the toxicological / biocompatibility data for the J&J Baby powder in order for our product safety officer to say that it is ok for us to use this as a processing aid. The only reason why we need this information, is that the processes that it will be used on, it will be in direct contact with our devices that, in turn, come into contact with skin / open lesions etc..

Do you have this information available? I presume that the powder has had this data compiled during development?
Thanks,
Tom.

```
     -----Original Message-----
From:   McCarthy, Timothy [CPCUS]
Sent:   19 November 2008 17:11
To:     Auld, Karen [CPCUS Non J&J]; Clayton, Tom [MEDGB]
Cc:     Bernhofer, Lauren [CPCUS]; Casalvieri, Joan [CPCUS]
Subject:        FW: Baby Powder
```

Tom/Karen: Johnson's Baby Powder is a cosmetic product, not a device or OTC drug.

Although we use talc, USP in our North America manufacture of J Baby Powder, it contains a small amount (< 0.5%) fragrance, itself a complex blend of chemicals. I am uncertain how fragrance components may impact your process.

J&J Consumer has a very good relationship with our vendor of talc (Rio Tinto, formerly known as Luzenac). Would it be better to go right to our source of talc, USP?

2

JNJ 000368490

It just so happens that I have a meeting this afternoon on-site with the Regulatory Affairs Manager from Rio-Tinto to discuss some talc issues.

if you want to go right to R-T on this:
Mark Zamek, Sr Key Account Manager, Rio-Tinto Minerals, 610 530-7850 (cell:  908 334-0850); mark.zamek@riotinto.com
Kent Cutler, VP Sales, 303 713-5500; kent.cutler@riotinto.com

please get back to us, if this is not helpful

Tim

908 874-1232

    -----Original Message-----
From:    Bernhofer, Lauren [CPCUS]
Sent:    Tuesday, November 18, 2008 10:05 AM
To:      Clayton, Tom [MEDGB]
Cc:      McCarthy, Timothy [CPCUS]
Subject:       FW: Baby Powder

Hi Tom,

I am forwarding you question to Tim McCarthy, who is our Toxicologist responsible for baby powder support.  He is probably the best person to help you.

Tim - Please see Toms question at the bottom of this email string, regarding the proposed use of J&J Baby Powder in manufacturing of wound care products.

Best Regards,
Lauren

    -----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Tuesday, November 18, 2008 9:34 AM
To:      Bernhofer, Lauren [CPCUS]
Subject:       FW: Baby Powder

Hi Lauren,
I have been given your name as a possible contact for the information I requested below.  Please would you be able to help?

Kind regards,
Tom.

    Tom Clayton
    Quality Engineer
    Johnson & Johnson Wound Management
    Airebank Mill, Gargrave, North Yorkshire, BD23 3RX
    Tel:  +44 (0) 1756 747249
    Fax:  +44 (0) 1756 748403

    <mailto:tclayto1@its.jnj.com>

3

JNJ 000368491

Confidentiality notice:  The information contained in this e-mail is intended only for the individual or entity to whom it is addressed. It may contain privileged and confidential information and if you are not an intended recipient you must not copy, distribute or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately. Please also destroy and delete the message from your computer.

Johnson & Johnson Medical Limited, Po Box 1988, Kirkton Campus, Livingston, West Lothian, EH54 0AB.  Registered in Scotland, No SC 132162

P  Before printing this message, make sure that it's necessary.

-----Original Message-----
From:    Auld, Karen [CPCUS Non J&J]
Sent:    18 November 2008 14:32
To:      Clayton, Tom [MEDGB]
Subject:       RE: Baby Powder

Tom,

I don't have access to that type of information.

I would recommend you try Lauren Bernhofer.  See works in toxicology and may be able to provide you with the information you need.

Hope this helps.

Karen

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Tuesday, November 18, 2008 9:25 AM
To:      Auld, Karen [CPCUS Non J&J]
Subject:       RE: Baby Powder

Hi Karen,
Our Product Safety Officer has asked if you can provide biocompatibility data including cytotoxic data, and clinical studies for the talc baby powder?

This information, if available, would be of great use when completing the product safety approval request.
Thanks in advance,
Tom.

-----Original Message-----
From:    Auld, Karen [CPCUS Non J&J]
Sent:    14 November 2008 18:14
To:      Clayton, Tom [MEDGB]
Cc:      Carbonetta, Lou [CPCUS]
Subject:       RE: Baby Powder

Tom,

Attached are North American MSDSs.  Not sure if you needed talc or corn starch so I attached both.

4

JNJ 000368492

Hope this helps.

Karen Auld
EHS Consultant

<< File: MSDS Baby Powder Cornstarch.pdf >>   << File: MSDS Baby Powder Talc.pdf >>

-----Original Message-----
From:    Carbonetta, Lou [CPCUS]
Sent:    Friday, November 14, 2008 1:07 PM
To:      Clayton, Tom [MEDGB]
Cc:      Auld, Karen [CPCUS Non J&J]
Subject:        RE: Baby Powder

Tom,

I was given the name Karen Auld. Try her. She is on the e-mail system.  Let me know the results of your search.

Lou

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Friday, November 14, 2008 3:17 AM
To:      Carbonetta, Lou [CPCUS]
Subject:        RE: Baby Powder

Thanks Lou,
I appreciate your help.
Tom.

-----Original Message-----
From:    Carbonetta, Lou [CPCUS]
Sent:    13 November 2008 22:48
To:      Clayton, Tom [MEDGB]
Subject:        RE: Baby Powder

I will look into it.

Lou

-----Original Message-----
From:    Clayton, Tom [MEDGB]
Sent:    Thursday, November 13, 2008 11:05 AM
To:      Carbonetta, Lou [CPCUS]
Cc:      Whaites, Adam [MEDGB]; Lewis, Joanne [MEDGB]
Subject:        Baby Powder

Hi Lou,
I'm hoping you can help me with something totally unrelated to UltraHeal!

We are currently using BIOSORB* powder on one of our machines as a processing aid, and the supply of this is becoming very sparse.  The operators are wanting to use Johnson's Baby Powder as a replacement, but I would like to get a health hazard assessment on the powder before saying yes.

5

JNJ 000368493

As you are the only person I know in the Consumer group, I am wondering if you know anybody who would be able to provide an MSDS or data sheet relating to J&J baby powder?  I'll then be able to use this as a starting block to formulating a risk assessment.

Thanks in advance,

Tom.


Tom Clayton
Quality Engineer
Johnson & Johnson Wound Management
Airebank Mill, Gargrave, North Yorkshire, BD23 3RX
Tel:  +44 (0) 1756 747249
Fax:  +44 (0) 1756 748403

<mailto:tclayto1@its.jnj.com>


Confidentiality notice:  The information contained in this e-mail is intended only for the individual or entity to whom it is addressed. It may contain privileged and confidential information and if you are not an intended recipient you must not copy, distribute or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately. Please also destroy and delete the message from your computer.

Johnson & Johnson Medical Limited, Po Box 1988, Kirkton Campus, Livingston, West Lothian, EH54 0AB.  Registered in Scotland, No SC 132162

P  Before printing this message, make sure that it's necessary.

JNJ 000368494

# JNJ000368489

## Metadata

| AttachCount | 0 | ORIGINAL |
|---|---|---|
| BegAttach | JNJ 000368489 | ORIGINAL |
| Confidentiality | N | ORIGINAL |
| Custodian | McCarthy, Timothy | ORIGINAL |
| DateCreated | 01/09/2010 12:00 AM | ORIGINAL |
| DateMod | 11/21/2008 12:00 AM | ORIGINAL |
| EndAttach | JNJ 000368494 | ORIGINAL |
| FileName | RE: Baby Powder | ORIGINAL |
| FileSize | 68096.00 | ORIGINAL |
| PgCount | 6 | ORIGINAL |

# Exhibit 178



mccrone environmental services, inc.
1412 OAKBROOK DRIVE • SUITE 100
NORCROSS, GA 30093 • 404-368-9600

**FILE COPY**

26 November 1990

Mr. Michael J. Keener
Quality Control Manager
Cyprus Windsor Minerals Corporation
P.O. Box 680
Windsor, Vermont  05089

Dear Mr. Keener:

Under your letter of authorization dated 02 November 1990, we received three (3) talc samples for asbestos analysis by transmission electron microscopy.  The samples were labelled as follows:

              CWM 90-28
              CWM 90-29
              CWM 90-30

Examination found no quantifiable amounts of asbestiform minerals.  Thank you for consulting McCrone Environmental Services, Inc.

                    Sincerely,


                    E. Kent Sprague
                    Electron Microscopist

EKS:ljf
ME-7882

a member of **the mccrone group**

850 PASQUINELLI DRIVE • WESTMONT, ILLINOIS 60559 • 708-887-7100

J&J-0007794

Protected Document--Subject to Protective Order                    JNJMX68_000012851

Quot #
911453

ME-7882
MA90009

CYPRUS WINDSOR MINERALS CORP.
P.O.BOX 680
WINDSOR, VERMONT 05089
TELEPHONE (802) 484-7763

Mr. James R. Millette, Ph.D.                November 2, 1990
Electron Optics Group
McCrone Environmental Services, Inc.
1412 Oakbrook Dr. #100
Norcross, GA  30093 - 2243

Dear Mr. Millette:

    We are sending the next series of three samples for

asbestiform analysis via transmission electron microscopy.

The samples are designated per attached list.

    You may charge this work to our Purchase Order QC26388W.

    Please send the results to Michael J. Keener, Quality

Control Manager, Eastern Operations, Cyprus Windsor Minerals.

    Thank You

                            Sincerely,
                            Joan R. Johnson
                            Joan R. Johnson
                            Quality Assurance Lab Supervisor

jrj
Enclosure

**J&J-0007795**

Protected Document--Subject to Protective Order                            **JNJMX68_000012852**

CYPRUS WINDSOR MINERALS CORPORATION

SAMPLES TO MCCRONE ENVIRONMENTAL SERVICES

NOVEMBER 1990


CWM 90 - 28

CWM 90 - 29

CWM 90 - 30

J&J-0007796

Protected Document--Subject to Protective Order

JNJMX68_000012853

## EPA LEVEL II TEM ANALYSIS

ME # *90009-1*   McCRONE ID# _____

PROJECT  *Cyprus Windsor*

CLIENT ID  *I Cwm 90-28*

CLIENT
COMMENTS _____

VOLUME/AREA
SAMPLED _____

FILTER AREA
(mm2) _____

AVG GRID SQ AREA
(SQum) _____

ANALYST  *RR*

CAL MAG  *20,520 x* *5.100*

# SQUARES
COUNTED  *20*

TOTAL
STRUCTURES
COUNTED  *1*

DATA ENTRY BY _____

DISC # _____

DATE ANALYZED  *11/19/90*

PRIORITY
- RUSH ☐
- REGULAR ☑

LOADING
- LIGHT ☐
- MEDIUM ☑
- HEAVY ☐

PLATE #
- ED1 _____
- ED2 _____
- IMAGE _____

SAMPLE TYPE
- ☐ EPA II AIR *cm⁻²*
- ☐ DUST (BY AREA) *cm⁻²*
- ☐ DUST (BY WT) *mg*
- ☐ WATER
- ☑ TALC
- ☐ LUNG TISSUE
- ☐ OTHER

NOTES  *Fibers record @ 20,520*

Scope *400*  Acc.Volt / *20* kV

GRID 1

GRID 2

GRID MAPS

| OBS | G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES | |
|-----|-----|--------|------|--------|-------|----------|-----------|-----------|------|-----|-------|---|
| 6, | S1 | | | | | | | | | | | 20,540 |
| | S2 | | | | | | | | | | | |
| | S3 | | | | | | | | | | | |
| | S4 | | | | | | | | | | | 5,400 |
| | S5 | | | | | | | | | | | |
| | S6 | (20.0) | TA(1.5) | 20.0 | 1.5 | | | | ✓ | ✓ | ANThykyl/R | |
| | S7 | | | | | | | | | | | |
| | S8 | | | | | | | | | | | |
| | S9 | | | | | | | | | | | |
| | S10 | | | | | | | | | | | |
| *1, | S11 | | | | | | | | | | | 20,540 |
| | S12 | | | | | | | | | | | |
| | S13 | | | | | | | | | | | |
| | S14 | | | | | | | | | | | 5,400 |
| | S15 | | | | | | | | | | | |
| | S16 | | | | | | | | | | | |
| | S17 | | | | | | | | | | | |
| | S18 | | | | | | | | | | | |
| | S19 | | | | | | | | | | | |
| | S20 | | | | | | | | | | | |

McCrone Environmental Services, Inc.

J&J-0007797

Protected Document--Subject to Protective Order

JNJMX68_000012854

QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:MA90009-1 ANTHOPHYLLITE

POSSIBLE IDENTIFICATION
    SI  KA  OR   RB  LA?
    CU  KA  KB
    MG  KA  OR   AS  LA?
    FE  KA  KB
    CL  KA

            PEAK LISTING
        ENERGY     AREA    EL. AND LINE
    1    1.254      3413   MG  KA  OR  AS  LA?
    2    1.739     10078   SI  KA  OR  RB  LA?
    3    2.627       320   CL  KA
    4    6.400      1153   FE  KA
    5    7.057       188   FE  KB
    6    8.037      5079   CU  KA
    7    8.894       774   CU  KB



McCrone Environmental Services Inc.        MON 19-NOV-90   12:13
Cursor: 0.300keV = 0        ROI (SiKa) 1.670: 1.810=7518

MA90009-9 ANTHOPHYLLITE        VFS = 1024    10.240

J&J-0007798

Protected Document--Subject to Protective Order        JNJMX68_000012855



McCrone Environmental Services, Inc.          MON 19-NOV-90   09:09
Cursor: 0.000KeV = 0          ROI (SiKα) 1.670: 1.812=171

PARTICLE, MANY IN FORMVAR, ELLIPTICA

J&J-0007799

Protected Document--Subject to Protective Order

JNJMX68_000012856

```
QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:MAS0009-1

POSSIBLE IDENTIFICATION
    CU KA KB LA
    SI KA OR  RB LA?
    FE KA KB
    MG KA OR  AS LA?
    CA KA
    CL KA
    MN KA
    K  KA OR  IN LA?

            PEAK LISTING
        ENERGY   AREA  EL. AND LINE
  1     0.941      261 CU LA
  2     1.255     2260 MG KA OR AS LA?
  3     1.739     8078 SI KA OR RB LA?
  4     2.615      474 CL KA
  5     3.317      217 K  KA OR IN LA?
  6     3.696     1009 CA KA
  7     5.907      236 MN KA
  8     6.396     2560 FE KA
  9     7.042      329 FE KB
 10     8.038    64354 CU KA
 11     8.898     9058 CU KB
```



```
McCrone Environmental Services Inc.     MON 19-NOV-90  11:56
Cursor: 0.300KeV = 0          ROI (SiKα) 1.670: 1.810=6259
```

MAS0009-1

J&J-0007800

Protected Document--Subject to Protective Order

JNJMX68_000012857

EPA LEVEL II TEM ANALYSIS



ME # 90009-2  McCRONE ID#_____

PROJECT  Cyphus Windsor
CLIENT iD  /  Cwm 90-29

CLIENT
COMMENTS _____

VOLUME/AREA
SAMPLED _____          DATE ANALYZED  11/20/90
FILTER AREA  7.07          PRIORITY          SAMPLE TYPE
(mm2) _____             PUSH      □    □ EPA II AIR          GRID 1
AVG GRID SQ AREA           REGULAR ☑    □ DUST (BY AREA)/c m⁻
(SQum) _____            LOADING          □ DUST (BY WT) mg.
ANALYST _____           LIGHT    □
CAL MAG 24,520 - 5,400     MEDIUM ☑    □ WATER
                      x    HEAVY    □    ☑ TALC
# SQUARES  20              PLATE #          □ LUNG TISSUE
COUNTED                    ED1 _____  □ OTHER
TOTAL                      ED2 _____
STRUCTURES                 IMAGE _____
COUNTED _____                                           GRID 2
DATA ENTRY BY _____     NOTES Amtzourt
DISC # _____                                           GRID MAPS
                           Scope 400 Acc.Volt/20 kV

| OBS G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES | |
|---------|--------|------|--------|-------|----------|------------|-----------|------|-----|-------|---|
| S1 | | | | | | | | | | | 20,520 |
| S2 | | | | | | | | | | | |
| S3 | | | | | | | | | | | |
| S4 | | | | | | | | | | | 5.400 |
| S5 | | | | | | | | | | | |
| S6 | | | | | | | | | | | |
| S7 | | | | | | | | | | | |
| S8 | | | | | | | | | | | |
| S9 | | | | | | | | | | | |
| S10 | | | | | | | | | | | |
| S11 | | | | | | | | | | | 23,520 |
| S12 | | | | | | | | | | | |
| 313 | | | | | | | | | | | |
| S14 | | | | | | | | | | | |
| 35 | | | | | | | | | | | |
| S16 | | | | | | | | | | | |
| 187 | | | | | | | | | | | |
| S18 | | | | | | | | | | | |
| 49 | | | | | | | | | | | |

McCrone Environmental Services, Inc.

Protected Document--Subject to Protective Order

J&J-0007801

JNJMX68_000012858

EPA LEVEL II TEM ANALYSIS

ME # 90009-3  McCRONE ID# _____

PROJECT _____
CLIENT ID ___ CVM 90-30

CLIENT _____
COMMENTS _____

VOLUME/AREA SAMPLED _____
FILTER AREA (mm2) _____
AVG GRID SQ AREA (5Qum) _____
ANALYST __ JH
CAL MAG 19440x   5.962X
# SQUARES COUNTED _____
TOTAL STRUCTURES COUNTED _____

DATA ENTRY BY _____
DISC # _____

DATE ANALYZED 11/9/90
PRIORITY
PUSH ☐
REGULAR ☑
LOADING
LIGHT ☐
MEDIUM ☑
6 HEAVY ☐
PLATE #
ED1 _____
ED2 _____
IMAGE _____

SAMPLE TYPE
☐ EPA II AIR
☐ DUST (BY AREA) km²
☐ DUST (BY WT) m²
☐ WATER
☑ TALC
☐ LUNG TISSUE
☐ OTHER

GRID 1
GRID 2

NOTES
Scope / ZCOZ / Acc. Volt / 2V kV

GRID MAPS

| OBS | G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES |
|-----|-----|--------|------|--------|-------|----------|------------|-----------|------|-----|-------|
| | 515/1 | | | | | | | | | | |
| | 52 | | | | | | | | | | 20 over |
| | 53 | E | C | 1.0 | 0.15 | | | | ✓ | ✓ | |
| | 54 | | | | | | | | | | |
| | 55 | | | | | | | | | | |
| | 56 | | | | | | | | | | 6 over |
| | 57 | | | | | | | | | | |
| | 58 | | | | | | | | | | |
| | 59 | | | | | | | | | | |
| | 510 | | | | | | | | | | |
| | 7251/ | | | | | | | | | | |
| | 512 | | | | | | | | | | 2i over |
| | 513 | | | | | | | | | | |
| | 514 | | | | | | | | | | |
| | 515 | | | | | | | | | | |
| | 516 | | | | | | | | | | 6 over |
| | 517 | | | | | | | | | | |
| | 518 | | | | | | | | | | |
| | 519 | | | | | | | | | | |
| | 520 | | | | | | | | | | |

McCrone Environmental Services, Inc.

Protected Document--Subject to Protective Order

J&J-0007802

JNJMX68_000012859

QUALITATIVE ELEMENT IDENTIFICATION

SAMPLE ID:90009-3   CHRYSOTILE FIBER

POSSIBLE IDENTIFICATION
   CU KA KB
   SI KA OR  SR LA?

         PEAK LISTING
     ENERGY     AREA   EL. AND LINE
  1   1.750       130 SI KA OR SR LA?
  2   8.053     12306 CU KA
  3   8.921      1756 CU KB

McCRONE ENVIRONMENTAL - JEOL 1200EX        MON 19-NOV-90  12:14
Cursor: 1.270KeV = 10        ROI   (SI) 1.670: 1.810=154
                             ROI   (MG) 1.190: 1.330=130

0.000                                      VFS = 128      10.240
  58       90009-3    CHRYSOTILE FIBER

J&J-0007803

Protected Document--Subject to Protective Order

JNJMX68_000012860

Exhibit 179

*Johnson&Johnson*
CONSUMER PRODUCTS, INC.
SKILLMAN, NJ 08558-9418

**DATE:**      November 23, 1993

**TO:**        W. Ashton, D. Jones

**FROM:**      R. Denton

**SUBJECT:**   **TRIP REPORT**
              **TALC VALIDATION TEAM MEETING · NOVEMBER 16, 1993**
              **WINDSOR, VERMONT**

**TUESDAY MORNING MEETING  HIGHLIGHTS:**

- Flocculant was removed from the process as of 9/28/93 (i.e., just subsequent to farmhouse meeting).

- Luzenac will return to the exclusive use of "conventional" (i.e., horizontal) flotation cells.

- Luzenac has begun investigating possible alternative methods of particle size analysis (e.g., a "dry" coulter counter, etc.), but will continue to utilize the Micromeritics Corporation's "sedigraph" instrument. They have accumulated a large body of data on their talc with this device, and it is one of the most generally accepted methods for mineral particle size analysis in the 0.5 to 50 micron size range. It is also an accepted technique within the talc and mica industries.  We expressed concern that the sedigraph, which analyzes samples as an aqueous dispersion, may not give data reflecting the respirable particle distribution. We also brought up the possibility of using an aerodynamic technique (e.g., Aerosizer).

- Luzenac has produced "high, loose bulk density" talc powder by minimal passage of material through the air classifier, thereby increasing the loose bulk density from 25.5 to approx. 27.0 lbs/cu ft..

- Luzenac is placing considerable emphasis on our acceptance of the V-96 special material (< 3.0% acid solubles).  We have promised to continue reviewing the data, but expressed great caution in any hasty judgement as to the acceptability of the V-96 grade.

- Randy Corder gave a brief review of the effort to reduce microbial contamination of the talc. Prior to 1986, he mentioned that a large number of talc shipments were rejected due to contamination (spec. is ≤ 100 c.f.u.'s/gram and no harmfuls in 0.1 gram).  After chlorination of the dewatering tank was begun (1986),  there have been no rejections based on microbial content.   However, due to technical problems with the chlorination (i.e.,  pH control, destruction of equipment due to corrosive HCl vapor, etc.) there continues to be emphasis on the acceptance of a brominating agent for microbial control.  However Luzenac will keep the process as it currently is being run.

29-491

Protected Document--Subject to Protective Order

JNJ 000240739

Pltf_JNJ_000240739

-2-

- In order to create a "benchmark" talc for our characterization and specification work, we agreed that there will be a "moratorium" on any further process changes, to avoid chasing a "moving target" on particle size, odor changes, density, etc..

  Here is a summary of major ore reduction/purification ('front-end") processing changes over the past 16 years.

  Pre-1976
  Crusher-----Roller Mill----Delaminator----Flotation*-----Dewatering----Finishing

  1976-1991
  Crusher-----Roller Mill----Shear Disc-----Flotation*-----Dewatering----Finishing

  1991-1993
  Crusher-----Roller Mill----Shear Disc-----Flotation----Dewatering-----Vertical Mill------Fin.

  1993 to present
  Crusher-----Roller Mill----Shear Disc----Flotation*---Dewatering-----Air Classifier Mill---Fin.

  Planned Changes (1994 Onward)
  Crusher-----Roller Mill--------------------Flotation*---Dewatering-----Air Classifier Mill---Fin.
  (*-indicates use of "conventional" flotation cells.)

- We will be provided with samples of the processing stream from immediately before and after the shear disc. Johnson & Johnson (Bob Denton) will analyze these samples for any changes in morphology, surface area, surface energy, and especially delamination or edge rounding. Until this analysis is carried out and the results evaluated, the shear disc will not be removed from the process stream.

## PLANT AND MINE TOUR:

Ore Typology:

- High Grade, "A" Type - Platy, opaque, schist-like fracturing, wavelly banded ore with large talc crystal plates. Often with smoky quartz inclusions occurring as lens shaped pods. Very soft, and easily delaminated (sheets can be separated with a pocket knife or fingernail). Low carbonate level (< 35 percent solubles). Usually occurs at the margins of the ore body (shear zone).

- "B" Type - Fine platy to granular, grainy fracture, semi-translucent ore. Ham material is typically light green with dark magnetite and chlorite inclusions. Contains from 45 percent to 35 percent solubles (moderate carbonate level). Makes up the majority of the commercially useful cosmetic talc ore body at the Ham mine. Harder than high grade ore.

Protected Document--Subject to Protective Order

JNJ 000240740

Pltf_JNJ_000240740

-3-

- "C" Type · Dark colored, translucent, granular ore with a grainy fracture. Ham material is greenish gray with numerous dark inclusions of magnetite and chlorite. High carbonate level (>45 percent soluble material). Highest hardness of all commercially useful cosmetic ores due to high magnesite levels.

**PLANT TOUR HIGHLIGHTS:** (Conducted by M. Keener)

- Use of too much high grade ore has had a history of producing "slimes" which tended to block up the filters. This was attributed to the fact that the high grade ore delaminated easily into very thin, soft talc plates which tended to yield a large amount of fines during the grinding process. Both the fines and the thin plates contributed to the clogging of the filters and production of excessive foam during flotation.

- Higher carbonate rocks ("B" and "C" type ores) were easier to crush, float, filter, and processed more efficiently in general. Thus, quantities of the "B" and "C" type ore were blended into the high grade material even when Hammondsville was in operation, especially after the advent of continuous mining techniques. However, the exact percentages used in this blending at Hammondsville are currently unknown.

- The Ham production has consisted of primarily "B" grade ore, although as much as 10 to 15 percent of the "A" type ore continues to be mined there. The quantities of "A" ore incorporated into the grind could be even higher, but this facies often contains an unacceptable level of arsenides at this locality.

- All column flotation tanks were removed from process in late 1992. Column flotation was never used exclusively as the material produced by this technique tended to be inconsistent in quality.

**MINE TOUR HIGHLIGHTS:** (Conducted by Lance Meade)

- Polished thin sections are prepared as part of the prospecting routine to assess crystallinity and mineral types in the bench extensions.

- Hammondsville Mine (open pit/underground · Reading, Vermont) is at the north end of the Chester Dome structural zone. R. Denton collected a sample of a high grade (type A) ore. Lance explained that the underground mining operation was probably* more selective than the current surface mining techniques, and utilized a mixture of primarily high grade and "B" type ore.

  *(Note The specifics of the mining operation at Hammondsville are uncertain, as most of the pre Luzenac records were destroyed by the mine management staff just prior to the J&J divestiture and the Cyprus purchase. However, several former Hammondsville miners are still employed at the Ham mine, and they provided us with useful information as to the nature of the underground works.)

Protected Document--Subject to Protective Order

JNJ 000240741

Pltf_JNJ_000240741

-4-

- Ham mine (Open pit- Windham, Vermont) is on the western flank of the Chester Dome.  Although the ore body exhibits a steeper dip, the basic geological setting is similar to Hammondsville.  The ore bodies at both localities are theorized to have originated as serpentinites which were altered by acidic aqueous intrusions to magnesite (magnesium carbonate).  Then, the magnesite was partially altered to talc by the intrusion of water-containing dissolved silica into a process known as "steatization".  This incomplete steatization gave rise to a biphasic rock containing both talc and magnesite, the so-called "Talc Carbonate".

- The country rock in both locations varies from a phyllosilicate schist (hanging wall) to a garnetiferrous gneiss (footwall), with the ore body lying in between.  There is an adjacent deposit of serpentine, grading into the magnesite facies, which has been steatized outwards forming the commercially usable talc.  At both locations the flaky high grade ore (A type) is a border deposit lying in the shear zones, especially near the contact with the schist (although there are intraformational shear zones as well).

c:  **Skillman:**
   R. Gallagher
   A. Kulkarni
   E. Lukenbach
   V. McCluskey
   J. Molnar
   K. Scisorek

   **Royston:**
   R. Corder
   D.Dye
   J. Flaska
   M. Roser

Protected Document--Subject to Protective Order

JNJ 000240742

Pltf_JNJ_000240742

# JNJ000240739

# Metadata

| BegAttach | JNJ 000240739 | ORIGINAL |
|---|---|---|
| Confidentiality | Y | ORIGINAL |
| Custodian | Legacy 1 | ORIGINAL |
| DocumentType | Physical | ORIGINAL |
| EndAttach | JNJ 000240742 | ORIGINAL |
| PgCount | 4 | ORIGINAL |
| Text Path | TEXT\0236\JNJ 000240739.txt | ORIGINAL |
| Trial_Ex_Number | Pltf_JNJ_00031594 | ORIGINAL |

Exhibit 180

## Johnson & Johnson

**BABY PRODUCTS COMPANY**

TO:  File                    DATE:  May 10, 1985     SKILLMAN, N. J. 08558

RE:  INGESTIONS AND INHALATIONS - JOHNSON'S BABY POWDER
     JANUARY, 1982 - JANUARY, 1985

| COMPLAINT # | NAME | DATE RECEIVED | NATURE OF COMPLAINT | MEDICAL ATTENTION RECEIVED | CHILD OR ADULT |
|---|---|---|---|---|---|
| 02043 | Joly | 5/4/82 | Inhalation | Yes | Adult |

Patricia J. Mills

PJM:mmn
cc:  M. McTernan
     N. Musco
     B. Semple

PLAINTIFF'S
TRIAL EXHIBIT
JJ 448

Protected Document--Subject to Protective Order                    JNJ 000058414

Exhibit 181

FROM THE DESK OF

**W.H. ASHTON**

Bill –

Here is a list of THLC
files from the last case.
Please call me at x 2760 to
discuss what is included in
this list.

Rebecca Farlow
Records Mgmt

Protected Document--Subject to Protective Order



EXHIBIT
FARLOW 1
1-4-19

JNJ 000089346

| PlusBoxNo | PlusFileSeqNO | FromDate | ToDate | FileDesc1 | FileDesc22 | CustBoxNo |
|---|---|---|---|---|---|---|
| T43734076 | 1 | 10/23/1970 | | DUNN SIDING CALIFORNIA | PROGRESS REPORT 1 NOT COPIED | TALC001 |
| T43734076 | 2 | 10/18/1972 | | OSHA REGULATION NONABESTIFORM | TREMOLITE ANTHOPHYLLITE | TALC001 |
| T43734076 | 3 | 01/17/1984 | | CORRESPONDENCE TALC-ASBESTOS | ARTICLE KOHLER-ASHTON | TALC001 |
| T43734076 | 4 | | | OSHAS MAIN ARBUMENTS | | TALC001 |
| T43734076 | 5 | | | OSHA DEFINITIONS ANALY METHOD | SUFFICIENT TO DISTINGUISH | TALC001 |
| T43734076 | 6 | 06/01/1976 | 07/31/1976 | CORR G LEE B SEMPLE TALC CARDF | MEETING | TALC001 |
| T43734076 | 7 | 11/01/1975 | 01/31/1976 | TALC CARDIFF MEETING | | TALC001 |
| T43734076 | 8 | 07/01/1971 | | COMPARISON OF VT TALC W/SPECAL | DELAMINATION METHOD | TALC001 |
| T43734076 | 9 | 01/01/1971 | | TALC CARDIFF COLORADO CHICAGO | REPORTS | TALC001 |
| T43734076 | 10 | 02/28/1977 | | TALC TRACE METALS 2 | | TALC001 |
| T43734076 | 11 | 05/25/1972 | | CHARACTERIZATION/TREMOLITE | TALC FD-14 | TALC001 |
| T43734076 | 12 | 06/02/1972 | | IDPARTICLES IN TISSUES USING | DECORATION TECHNIQUE TENOVUS | TALC001 |
| T43734076 | 13 | 01/01/1974 | 12/31/1975 | TALC FLOTATION AIDS-WINDSOR | | TALC001 |
| T43734076 | 14 | 01/01/1974 | | TALC INFORMATION WORKING COPY | VOL 9 1 | TALC001 |
| T43734076 | 15 | 01/01/1983 | | SUMMARY OF CONTROVERSIAL | RESEARCH&PUBLICITY E FAXSTEIN | TALC001 |
| T43734076 | 16 | | | CARDIFF-REPORT EXAM OF SAMPLES | FROM VT MINE | TALC001 |
| T43734076 | 17 | 01/01/1977 | 12/31/1981 | TALC-ASBESTOS CYPRUS | | TALC001 |
| T43734076 | 18 | 01/01/1976 | 12/31/1977 | TALC-ASBESTOS | | TALC001 |
| T43734076 | 19 | 04/01/1973 | 08/31/1973 | TALC-ASBESTOS | | TALC001 |
| T43734076 | 20 | | | MICROSCOPY OF TALC | | TALC001 |
| T43734076 | 21 | 09/01/1973 | 12/31/1973 | TALC-ASBESTOS | | TALC001 |
| T43734077 | 1 | 01/01/1973 | | ESTIMATIONTALC DUST EXPOSURE | INFANTS | TALC002 |
| T43734077 | 2 | 01/01/1977 | 12/31/1979 | TALC ADVISORY BOARD | | TALC002 |
| T43734077 | 3 | 01/01/1979 | | TALC ACADEMY/SCIENCES STUDY | ASBESTOS&OTHER FIBROUS MATL | TALC002 |
| T43734077 | 4 | 09/01/1973 | | TALC AVON | | TALC002 |
| T43734077 | 5 | 12/01/1972 | | TALC OTC OVER-THE-COUNTER | | TALC002 |
| T43734077 | 6 | 01/01/1978 | | TALC ALTERNATE SOURCES | | TALC002 |
| T43734077 | 7 | 01/01/1972 | | BATTELLE MEMORIAL INSTITUTE | AGREEMENTS | TALC002 |
| T43734077 | 8 | 01/01/1975 | | INV-PULMONARY DISPOSITION | HAMSTERS | TALC002 |
| T43734077 | 9 | 01/01/1975 | | INVESTIGATION-PULM DISP | HAMSTERS | TALC002 |
| T43734077 | 10 | 07/01/1977 | 12/31/1977 | TALC-CTFA | | TALC002 |
| T43734077 | 11 | 01/01/1974 | | TALC-CTFA | | TALC002 |
| T43734077 | 12 | 01/01/1977 | 03/31/1977 | TALC-CTFA | | TALC002 |
| T43734077 | 13 | 09/01/1975 | | TALC MINERALOGY EXAM/BRITISH | TALC POWDERS | TALC002 |
| T43734077 | 14 | 01/01/1975 | 08/31/1975 | TALC ADVISORY GROUP | | TALC002 |
| T43734077 | 15 | 05/18/1973 | | TALC JOHNS-MANVILLE FDA | SUBMISSIONS | TALC002 |
| T43734077 | 16 | 08/01/1976 | 12/31/1976 | TALC CARDIFF MEETING | | TALC002 |
| T43734077 | 17 | 01/01/1983 | | QUARTERLY REPORT TALC POWDER | RESEARCH 3RD QUARTER 1983 | TALC002 |
| T43734077 | 18 | 01/01/1982 | | ARTICLES ON TALC LINK-CANCER | | TALC002 |
| T43734077 | 19 | 01/01/1974 | 12/31/1988 | DOCUMENTS CONSIDERED MOST | IMPORTANT | TALC002 |

Protected Document--Subject to Protective Order

JNJ 000089347

| ID | No. | Date 1 | Date 2 | Description 1 | Description 2 | Code |
|---|---|---|---|---|---|---|
| T4373407T | 20 | 01/01/1967 | | ANALYSIS OF TALC PRODUCTION | WINDSOR | TALC002 |
| T4373407T | 21 | | | BASIC POWDER TECHNOLOGY | | TALC002 |
| T4373407T | 22 | 01/01/1969 | | REPORT ON BENEFICATION OF VT | TALC CONCENTRATES | TALC002 |
| T4373407B | 1 | 01/01/1972 | | CHARACTERIZATION/TREMOLITE | TALC FD-14 | TALC003 |
| T4373407B | 2 | 04/01/1977 | 06/30/1977 | TALC-CTFA | | TALC003 |
| T4373407B | 3 | | | BABY POWDER STUDY | | TALC003 |
| T4373407B | 4 | 01/01/1973 | 12/31/1974 | TALC ASBESTOS | | TALC003 |
| T4373407B | 5 | 01/01/1971 | | HISTOLOGICAL EVAL OF TISSUE | RESPONSE TO INTRADERMAL INJECT | TALC003 |
| T4373407B | 6 | 01/01/1976 | | CHARACTERIZATION OF TALC 141 | USP LOT NO 11-16-17 | TALC003 |
| T4373407B | 7 | 01/01/1973 | 12/31/1974 | OPTICAL MICROSCOPY OF ASBESTOS | CTFA ROUND ROBIN ANAL | TALC003 |
| T4373407B | 8 | | | TALC WINDSOR MINERALS VT EXAM | SAMPLES | TALC003 |
| T4373407B | 9 | 01/01/1971 | | TALC-COLORADO SCHOOL OF MINES | . | TALC003 |
| T4373407B | 10 | 01/01/1975 | 12/31/1976 | WINDSOR TALC SAMPLES | | TALC003 |
| T4373407B | 11 | 01/01/1973 | | TALC-COLORADO SCHOOL OF MINES | SYTHESIS OF TALC | TALC003 |
| T4373407B | 12 | 01/01/1972 | | TALC-COLORADO SCHOOL OF MINES | | TALC003 |
| T4373407B | 13 | 05/01/1973 | 08/31/1973 | TALC SPECIAL STUDIES 0503 | | TALC003 |
| T4373407B | 14 | 01/01/1974 | | TALC SPECIAL STUDIES PROJECT | 503 | TALC003 |
| T4373407B | 15 | 01/01/1978 | | SPECIAL TALC STUDIES TRACE | METALS IN TALC | TALC003 |
| T4373407B | 16 | | | TALC-SPECIAL TALC STUDY 7008 | MANNEQUIN & INFANT DUSTING | TALC003 |
| T4373407B | 17 | 01/01/1972 | | TALC SUBSTITUTES | | TALC003 |
| T4373407B | 18 | 05/01/1971 | 09/30/1972 | TALC SPECIAL STUDIES89-001-503 | NON-RESPIRABLE | TALC003 |
| T4373407B | 19 | 01/01/1971 | | TALC-DEVELOPMENT/STERILIZATION | CYCLES BULK TALC | TALC003 |
| T4373407B | 20 | 01/01/1973 | | TALC-CTFA | | TALC003 |
| T4373407B | 21 | 08/01/1975 | 12/31/1975 | TALC CORPORATE PRESS PR | STATEMENTS | TALC003 |
| T4373407B | 22 | 01/01/1975 | 07/31/1975 | TALC CORPORATE PRESS | PR STATEMENTS | TALC003 |
| T4373407B | 23 | 01/01/1974 | 06/30/1974 | TALC-CTFA | | TALC003 |
| T4373407B | 24 | 07/01/1974 | 12/31/1974 | TALC-CTFA | | TALC003 |
| T4373407B | 25 | 01/01/1975 | | TALC-CTFA | | TALC004 |
| T4373407B | 1 | 01/01/1973 | 04/30/1973 | TALC SPECIAL STUDIES 0503 | | TALC004 |
| T4373407B | 2 | 10/01/1976 | 12/31/1976 | TALC-CTFA | | TALC004 |
| T4373407B | 3 | 01/01/1972 | | TALC-CTFA | | TALC004 |
| T4373407B | 4 | 08/01/1976 | 09/30/1976 | TALC-CTFA | | TALC004 |
| T4373407B | 5 | 04/01/1976 | 07/31/1976 | TALC-CTFA | | TALC004 |
| T4373407B | 6 | 06/01/1975 | | CTFA ANTIPERSPIRANT TASK FORCE | MEETING | TALC004 |
| T4373407B | 7 | 01/01/1971 | | TALC-CTFA | | TALC004 |
| T4373407B | 8 | 01/01/1974 | 12/31/1975 | MOUNT SINAI SPECIAL TALC STUDY | | TALC004 |
| T4373407B | 9 | 01/01/1973 | | TALC-ASBESTOS | | TALC004 |
| T4373407B | 10 | 01/01/1973 | | CONFERENCE ON INGES TED ASBEST | MICROBIOLOGY-DURHAM NC | TALC004 |
| T4373407B | 11 | 01/01/1976 | | TALC SPECIAL STUDY MICROPHAGE | STUDY RATS 7008 | TALC004 |
| T4373407B | 12 | 01/01/1975 | | ALTERNATE SOURCES OF TALC | ARGONAUT TALC & OTHER | TALC004 |
| T4373407B | 13 | 01/01/1974 | 12/31/1974 | TALC-CORPORATE PRESS | PR STATEMENTS | TALC004 |

Protected Document--Subject to Protective Order

JNJ 000089348

| Bates | No. | Date | Date 2 | Description | Note | Code |
|---|---|---|---|---|---|---|
| T43734079 | 14 | 01/01/1975 | 12/31/1979 | TALC INTERNATIONAL | | TALC004 |
| T43734079 | 15 | 01/01/1971 | | TALC-SPECIAL STUDIES 0503-00 | | TALC004 |
| T43734079 | 16 | 09/01/1973 | 12/31/1973 | TALC SPECIAL STUDIES 0505 | | TALC004 |
| T43734079 | 17 | 01/01/1973 | | COLORADO SCHOOL OF MINES | MINERALOGICAL EXAMINATION | TALC004 |
| T43734079 | 18 | 01/01/1976 | | TALC ARGONAUT | | TALC004 |
| T43734079 | 19 | 01/01/1969 | 12/31/1970 | TALC-COLORADO SCHOOL OF MINES | | TALC004 |
| T43734079 | 20 | 01/01/1979 | | TALC SPECIAL STUDY 7006 | | TALC004 |
| T43734080 | 1 | 01/01/1972 | 12/31/1973 | TALC WINDSOR MINERALS | | TALC005 |
| T43734080 | 2 | | | TALC WINDSOR MINERALS TASK | | TALC005 |
| T43734080 | 3 | 01/01/1973 | | WINDSOR MINERALS SHEAR DISC | FORCE | TALC005 |
| T43734080 | 4 | 01/01/1977 | 12/31/1988 | TALC WINDSOR MINERALS | PROJ 0124 00 | TALC005 |
| T43734080 | 5 | 01/01/1976 | | TALC WINDSOR MINERALS | | TALC005 |
| T43734080 | 6 | | | TALC WINDSOR MINERALS | VERMONT/UNIV PERSP STUDY | TALC005 |
| T43734080 | 7 | 01/01/1972 | 12/31/1975 | TALC WINDSOR MINERALS MINES | EPIDERMIOLOGICAL STUDY G GREEN | TALC005 |
| T43734080 | 8 | 01/01/1975 | 12/31/1977 | TALC MOUNT SINAI STUDY LIASON | ENVIRONMENTAL LABS | TALC005 |
| T43734080 | 9 | 120/01/1973 | | ESTIMATION OF TALC DUST | EXPOSURE ON INFANTS | TALC005 |
| T43734080 | 10 | 01/01/1992 | | NTP TECH-TOXICOLOGY & CARCIN | CTFA PERINEAL EXPOSURE TO TALC | TALC005 |
| T43734080 | 11 | 01/01/1983 | | STATUS REPORTS-DEFENSE OF TALC | SAFETY & PRE-1976 CHRONOLOGY | TALC005 |
| T43734080 | 12 | 01/01/1977 | 12/31/1978 | TALC-NEWSLETTER | | TALC005 |
| T43734080 | 13 | 01/01/1980 | | INTERNATIONAL 1965-1967 | | TALC005 |
| T43734080 | 14 | 01/01/1974 | 12/31/1975 | TALC-MICROBIAL STANDARDS | CHRONO ORDER | TALC005 |
| T43734080 | 15 | 01/01/1974 | | TALC-MICROBIAL STATUS | | TALC005 |
| T43734080 | 16 | 01/01/1973 | 06/30/1973 | TALC-MICROBIAL STATUS | | TALC005 |
| T43734080 | 17 | 01/01/1972 | | TALC-SANITIZATION THRU 1972 | | TALC005 |
| T43734080 | 18 | | | TALC-SPECIAL TALC STUDY-ADULT | POWDERING STUDY 7008 | TALC005 |
| T43734080 | 19 | 01/01/1978 | | SPECIAL TALC STUDY1976 0503 01 | | TALC005 |
| T43734080 | 20 | 01/01/1975 | | TALC-SPEC TALC STUDIES PROJ | 503 00 MONTHLY REPORTS | TALC005 |
| T43734081 | 1 | 01/01/1992 | | TALC NTP TECH REPORT INHALATN | RATS | TALC006 |
| T43734081 | 2 | 01/01/1972 | | ALLAMOORE TEXAS TALC | DISTRICT | TALC006 |
| T43734081 | 3 | 01/01/1957 | | BABY POWDER MONTHLY REPORTS | | TALC006 |
| T43734081 | 4 | 01/01/1959 | | SPECIAL REPORT ON CANADIAN | TALC DEPOSITS-BATTELLE | TALC006 |
| T43734081 | 5 | 01/01/1959 | | PROGRESS REPORT ON CONCEN | TALC ORES-BATTELLE | TALC006 |
| T43734081 | 6 | 01/01/1960 | | PHASE REPORT-CONCEN OF ITALIAN | 2 TALC BY FLOTATION-BATTELLE | TALC006 |
| T43734081 | 7 | 01/01/1959 | | PHASE REPORT-AN INVESTIGATION | FINE TALCS-BATTELLE | TALC006 |
| T43734081 | 8 | 01/01/1959 | | SUMMARY REP-ULTRASONIC | COMMINUTION OF TALC-BATTELLE | TALC006 |
| T43734081 | 9 | 01/01/1966 | | TOPICAL REP-CHAR OF FLOTATION | TAILINGS W WINDSOR-BATTELLE | TALC006 |
| T43734081 | 10 | 01/01/1962 | | BENEFICATED POWDER IN-USE | TEST | TALC006 |
| T43734081 | 11 | 01/01/1972 | | ANALYSIS OF PARTICLES | TISSUES | TALC006 |
| T43734081 | 12 | 01/01/1985 | 12/31/1967 | TALC-MISC | | TALC006 |
| T43734081 | 13 | 01/01/1980 | | TALC-BABY POWDER IN CHRONO | 1959-1967 | TALC006 |
| T43734081 | 14 | 01/01/1963 | | CORN STARCH STUDY | | TALC006 |

Protected Document--Subject to Protective Order

JNJ 000089349

| Doc ID | No. | Date 1 | Date 2 | Title | Subtitle | Code |
|---|---|---|---|---|---|---|
| T4373408 1 | 15 | | | TALC-BABY PRODUCTS | | TALC006 |
| T4373408 1 | 16 | | | SUMMARY REP AMERICAN GROUND | ITALIAN TALC-MATHIEU | TALC006 |
| T4373408 1 | 17 | 01/01/1971 | | TALC SUBSTITUES LITERATURE | SEARCH | TALC006 |
| T4373408 1 | 18 | 01/01/1975 | | PROCESS TALC SLURRY & WATER | DECONTAMINATION EXP PROGRAM | TALC006 |
| T4373408 1 | 19 | 01/01/1970 | | BATCH PROD OF GRANTHAM LOT 1 | BENEFICIATED TALC COPY 3 | TALC006 |
| T4373408 1 | 20 | 01/01/1980 | | TALC IN CHRONO ORDER 1964-67 | | TALC006 |
| T4373408 1 | 21 | 01/01/1980 | | TALC-MISC IN CHRONO ORDER | 1965-1972 | TALC006 |
| T4373408 1 | 22 | 01/01/1980 | | TALC-MISC IN CHRONO ORDER | 1965-67-68 | TALC006 |
| T4373408 1 | 23 | 01/01/1982 | | TALC-AIHA AMERICAN INDUSTRIAL | HYGIENE ASSOC | TALC006 |
| T4373408 1 | 24 | 01/01/1982 | | PROSPECTIVE EVAL PULMONARY | WINDSOR TALC WORKR-BAYLOR UNIV | TALC006 |
| T4373408 2 | 1 | 01/01/1980 | | TALC-MISC IN CHRONO 1955-70 | | TALC007 |
| T4373408 2 | 2 | 01/01/1980 | | BABY POWDER IN CHRONO 1960-66 | | TALC007 |
| T4373408 2 | 3 | 01/01/1958 | | BATTELLE-PROGRESS REPORT | PHYS CONCEN OF TALC ORES | TALC007 |
| T4373408 2 | 4 | 12/01/1967 | 03/31/1970 | ALTERNATE SOURCES OF DOMESTIC | TALC PROJ D1 | TALC007 |
| T4373408 2 | 5 | 01/01/1980 | | INTERNATIONAL IN CHRONO | 1960-65-66-67 | TALC007 |
| T4373408 2 | 6 | 01/01/1959 | | BATTELLE-PROG REPORT-AN EXAM | JAIPUR INDIA TALC | TALC007 |
| T4373408 2 | 7 | 01/01/1967 | | ANALYSIS OF TALC PROD | WINDSOR MINERALS | TALC007 |
| T4373408 2 | 8 | | | J&J TALC ANALYSIS-POOLEY | | TALC007 |
| T4373408 2 | 9 | 01/01/1973 | | TALC-AMERICAN STANDARD TESTING | METHODS ASTM | TALC007 |
| T4373408 2 | 10 | 01/01/1971 | | MINERAL ANALYSIS-CO SCHOOL | MINES | TALC007 |
| T4373408 2 | 11 | | | EXAM OF BRITISH TALC POWDERS | DEPT OF MINERAL EXPLOR-CARDIFF | TALC007 |
| T4373408 2 | 12 | 01/01/1974 | 12/31/1975 | TALC ANALYTICAL METHODS | | TALC007 |
| T4373408 2 | 13 | 01/01/1967 | 12/31/1973 | TALC ANALYTICAL METHODS | | TALC007 |
| T4373408 2 | 14 | 01/01/1978 | | TALC-CTFA | | TALC007 |
| T4373408 2 | 15 | 01/01/1969 | 12/31/1976 | TALC-ANALYTICAL TEST RESULTS | | TALC007 |
| T4373408 2 | 16 | 01/01/1973 | 12/31/1975 | TALC-ANALYTICAL TEST RESULTS | | TALC007 |
| T4373408 2 | 17 | 01/01/1977 | | TALC-ANALYTICAL TEST RESULTS | | TALC007 |
| T4373408 2 | 18 | 01/01/1976 | 12/31/1977 | TALC-ANALYTICAL METHODS | | TALC007 |
| T4373408 2 | 19 | 01/01/1958 | 12/31/1966 | TALC-STUDIES-BATTELLE MEMORIAL | INSTITUTE | TALC007 |
| T4373408 3 | 1 | 01/01/1976 | | TALC SANITIZATION | | TALC008 |
| T4373408 3 | 2 | | | TALC SANITIZATION WINDSOR | MINERALS | TALC008 |
| T4373408 3 | 3 | | | TALC SANITIZATION PROJ 2601 01 | | TALC008 |
| T4373408 3 | 4 | 01/01/1973 | | TALC NOTES | | TALC008 |
| T4373408 3 | 5 | 01/01/1974 | 06/30/1974 | TALC SANITIZATION | | TALC008 |
| T4373408 3 | 6 | 01/01/1975 | 04/30/1975 | TALC SANITIZATION | | TALC008 |
| T4373408 3 | 7 | | | TALC SANITIZATION PROJ 2008 04 | | TALC008 |
| T4373408 3 | 8 | 05/01/1975 | 12/31/1975 | TALC SANITIZATION | | TALC008 |
| T4373408 3 | 9 | 12/01/1971 | | TALC-KLIGMAN REPORT | | TALC008 |
| T4373408 3 | 10 | 01/01/1976 | | WINDSOR MINERALS | | TALC008 |
| T4373408 3 | 11 | 01/01/1973 | | TALC SANITIZATION | | TALC008 |
| T4373408 3 | 12 | 01/01/1978 | 12/31/1979 | TALC-SAFETY | | TALC008 |

Protected Document--Subject to Protective Order

JNJ 000089350

| Bates | No. | Date 1 | Date 2 | Description | Description 2 | TALC |
|---|---|---|---|---|---|---|
| T4734083 | 13 | 01/01/1977 | | TALC-SAFETY | | TALC008 |
| T4734083 | 14 | 01/01/1971 | | EXAM OF TALC & BABY POWDER | SAMPLES | TALC008 |
| T4734083 | 15 | 01/01/1984 | | TALC & PATENT INFO | | TALC008 |
| T4734083 | 16 | 01/01/1976 | | TALC GENERAL CORRESPONDENCE | | TALC008 |
| T4734083 | 17 | 01/01/1974 | | TALC STERILIZATION | | TALC008 |
| T4734083 | 18 | 01/01/1971 | 12/31/1973 | LOW DENSITY HIGH LUBRICITY | PROJ 0894 00 TALC | TALC008 |
| T4734083 | 19 | | | TALC RESOURCES | | TALC008 |
| T4734083 | 20 | 01/01/1973 | | TALC IN AFTRSHAVE LOTION | | TALC008 |
| T4734083 | 21 | 01/01/1973 | | TALC RESEARCH 503 01 | | TALC008 |
| T4734089 | 1 | 01/01/1983 | 12/30/1984 | KWANGSI TALC LONGSHENG CHINA | | TALC009 |
| T4734089 | 2 | 01/01/1977 | 12/30/1977 | WINDSOR MATERIALS GEOLOGY OF | TALC MINE EAST JOHNSON VRMONT | TALC009 |
| T4734089 | 3 | 01/01/1975 | 12/30/1978 | TALC SAFETY BROCHURE | | TALC009 |
| T4734089 | 4 | 01/01/1976 | 12/30/1977 | TALC PROFESSIONAL RELATIONS | PRJ WHITE PAPER JBP | TALC009 |
| T4734089 | 5 | 01/01/1973 | 12/30/1983 | TALC RESPIRABLES/FINES REMOVED | | TALC009 |
| T4734089 | 6 | 01/01/1982 | 12/30/1983 | TALC OVARIAN CANCER | | TALC009 |
| T4734089 | 7 | 01/01/1967 | 12/30/1983 | TALC ARTICLES 1979/1967/1976 | 1983 | TALC009 |
| T4734089 | 8 | 01/01/1977 | 12/30/1982 | TALC ARTICLE BOOK | | TALC009 |
| T4734089 | 9 | 01/01/1936 | 12/30/1963 | US RUBBER-WESTPHALL TALC SUIT | ARTICLES BUREAU OF MINES AND ARTICLES | TALC009 |
| T4734089 | 10 | | | WESTPHALL SUIT RELATED REPORTS | | TALC009 |
| T4734089 | 11 | 01/01/1976 | 12/30/1977 | TALC HEALTH STUDIES BY FINE | WEGMAN SELEVAN RUBINO GAMBIL | TALC009 |
| T4734089 | 12 | 01/01/1983 | 12/30/1983 | WESTFALL CHRONO 1 BOOK 1 | | TALC009 |
| T4734089 | 13 | 01/01/1983 | 12/30/1983 | WESTFALL CHRONO 2 BOOK 2 | | TALC009 |
| T4734089 | 14 | 01/01/1981 | 12/30/1981 | NIOSH TALC CRITTERIA DOCUMENT | | TALC009 |
| T4734089 | 15 | 01/01/1980 | 12/30/1980 | NIOSH TALC CRITERIA DOCUMENT | | TALC009 |
| T4734089 | 16 | 01/01/1979 | 12/30/1979 | NIOSH TALC CRITERIA DOCUMENT | | TALC009 |
| T4734089 | 17 | 01/01/1982 | 12/30/1982 | TALC NATIONAL TOXICOLOGY PROG | NOMINATION OF TALC FOR TESTING | TALC009 |
| T4734089 | 18 | 01/01/1972 | 12/30/1972 | TALC MANUSCRIPTS | | TALC009 |
| T4734089 | 19 | | | TALC LITERATURE | | TALC009 |
| T4734088 | 1 | | | WINDSOR EVIDENCE | | TALC010 |
| T4734088 | 2 | 01/01/1982 | 12/30/1982 | BACKGROUND INFO FOR WESTPHAL C | CASE | TALC010 |
| T4734088 | 3 | | | US RUBBER-WESTPHALL TALC SUIT | BIBLIO OF LANGER/POOLEY/SUZUKI | TALC010 |
| T4734088 | 4 | | | US RUBBER-WESTPHAL | INHALLATION STUDIES BIBLIO | TALC010 |
| T4734088 | 5 | | | GEOLOGY OF TALC MINE AT | EAST JOHNSON VERMONT | TALC010 |
| T4734088 | 6 | | | THE ORGIN OF TALC AT JOHNSON | VERMONT | TALC010 |
| T4734088 | 7 | 01/01/1966 | 12/30/1966 | MARKET ANALYSIS EMT CO | EXAM OF TALC SAMPES REPORT | TALC010 |
| T4734088 | 8 | | | SELECTED BIBLIOGRAPHY VOLS 1&2 | MESOTHELIOMA | TALC010 |
| T4734087 | 1 | | | JOLY TALC SUIT | | TALC012 |
| T4734087 | 2 | 01/01/1978 | 12/30/1979 | TALC FDA REGULATORY | | TALC012 |
| T4734087 | 3 | 01/01/1979 | 12/30/1982 | TALC CTFA SUB-COMMITTEE | | TALC012 |
| T4734087 | 4 | 01/01/1983 | 12/30/1983 | CTFA GENERAL | | TALC012 |
| T4734087 | 5 | 01/01/1980 | 12/30/1982 | CTFA GENERAL | | TALC012 |

Protected Document--Subject to Protective Order

JNJ 000089351

| Doc ID | Seq | Date | Description | Extra | Collection |
|---|---|---|---|---|---|
| T43734087 | 6 | 01/01/1976 | 12/30/1978 TALC CTFA COSMETIC TALC SPECS | | TALC012 |
| T43734087 | 7 | | BIMONTHLY REPORTS TALC/POWDER | | TALC012 |
| T43734087 | 8 | | CONSUMER PRODUCT SAFETY COMMIS | ENVIRO PROTECTION AGENCY | TALC012 |
| T43734087 | 9 | 01/01/1979 | 12/30/1980 TALC CORPORATE PRESS | | TALC012 |
| T43734087 | 10 | 01/01/1978 | 12/30/1978 TALC CORPORATE PRESS | PR STATEMENTS | TALC012 |
| T43734087 | 11 | 01/01/1976 | 12/30/1977 TALC CORPORATE PRESS | PR STATEMENTS | TALC012 |
| T43734087 | 12 | 01/01/1975 | 12/30/1976 TALC-ASHTON GOV'T LIAISON | | TALC012 |
| T43734087 | 13 | 01/01/1977 | 12/30/1977 TALC-ASHTON GOV'T LIAISON | | TALC012 |
| T43734087 | 14 | 01/01/1978 | 12/30/1978 TALC-ASHTON GOV'T LIAISON | | TALC012 |
| T43734087 | 15 | 01/01/1979 | 12/30/1979 TALC-ASHTON GOV'T LIAISON | | TALC012 |
| T43734087 | 16 | 01/01/1980 | 12/30/1983 TALC-ASHTON GOV'T LIAISON | | TALC012 |
| T43734087 | 17 | 01/01/1979 | 12/30/1979 TALC ANALYTICAL METHODS | | TALC012 |
| T43734087 | 18 | 01/01/1978 | 12/30/1983 TALC ANALYTICAL TEST RESULTS | 1978/1982/1983 | TALC012 |
| T43734087 | 19 | | AMBIENT RESPIRABLE DUST | | TALC012 |
| T43734087 | 20 | 01/01/1982 | 12/30/1983 ALTERNATE SOURCES OF TALC | | TALC012 |
| T43734087 | 21 | 01/01/1978 | 12/30/1981 ALTERNATE SOURCES OF TALC | | TALC012 |
| T43734087 | 22 | 01/01/1974 | 12/30/1977 ALTERNATE SOURCES OF TALC | OTHER | TALC012 |
| T43734087 | 23 | 01/01/1976 | 12/30/1976 ALTERNATE SOURCES OF TALC | ARGONAUT TALC WINDSOR MINERALS | TALC012 |
| T43734087 | 24 | 01/01/1984 | 12/30/1984 ASTM MEETING | | TALC012 |
| T43734090 | 1 | 01/01/1977 | 12/30/1977 TALC-INTL ENGLAND PRELIMINARY | STUDIES | TALC012 |
| T43734090 | 2 | 01/01/1976 | 12/30/1976 RHYOLITE | | TALC012 |
| T43734090 | 3 | 01/01/1975 | 12/30/1975 TALC ASBESTOS | | TALC012 |
| T43734090 | 4 | 12/28/1972 | CSMRI TALC PRELIMINARY STUDY | FEASIBILITY OF MOLECULAR SYNTH | TALC012 |
| T43734090 | 5 | 10/18/1979 | PROJ 0983 ACUTE DERMAL TOX | RABBIT STUDY | TALC012 |
| T43734090 | 6 | 07/01/1963 | REPORT ON GEOLOGIC INVESTIGATI | OF ORIENTAL & CHOONGWON TALC | TALC012 |
| T43734090 | 7 | 09/15/1977 | NBS ASBESTOS WORKSHOP | | TALC012 |
| T43734090 | 8 | 07/30/1975 | REVIEW-TALC SAFETY SUBSTANTIAL | ACTIVITIES-CONTINGENCY | TALC012 |
| T43734090 | 9 | 01/01/1978 | 12/30/1978 TALC WINDSOR MINERALS 2008 04 | | TALC012 |
| T43734090 | 10 | 06/01/1970 | 01/30/1971 GRANTHAM TALC COMPREHENSIVE | REPORT | TALC012 |
| T43734090 | 11 | 09/29/1971 | PRESSENTIN TALC PROSPECT PETIT | CREEK SKAGIT CTY WASHINGTON | TALC012 |
| T43734090 | 12 | 12/08/1971 | SIX TALCOSE PROSPECTS CSMRI | WASHINGTON STATE | TALC012 |
| T43734090 | 13 | 03/14/1972 | ALLAMORE TEXAS TALC DISTRICT | CSMRI | TALC012 |
| T43734090 | 14 | 07/30/1959 | BATELLE PROGRESS REPORT | FLOTATION OF ITALIAN 2 TALC | TALC012 |
| T43734090 | 15 | 01/18/1972 | PHOTOMICROGRAPHS 35MM SLIDES | OF TISSUE CONSULTOX LABS | TALC012 |
| T43734090 | 16 | 01/01/1972 | 12/30/1972 TISSUE SECTIONS TENOVUS LABS | | TALC012 |
| T43734090 | 17 | 08/19/1970 | MAPS/CROSS-SECTIONS-REPORT ON | GEOLOGY AND ORE RESERVES | TALC012 |
| T43734090 | 18 | 07/20/1970 | CSMRI-EVAL OF MONARCH MINE | SAN BERNARDINO CALIFORNIA | TALC012 |
| T43734090 | 19 | 06/25/1975 | COMPLETED REPORTS TALL | | TALC012 |
| T43734090 | 20 | 05/01/1985 | EVAL OF MARKET OUTLOOK FOR | E MAGNESIA TALC COMPANY | TALC012 |
| T43734090 | 21 | 12/30/1969 | MADOC TALC COMPREHENSIVE | REPORT | TALC012 |
| T43734090 | 22 | 11/30/1971 | BIBLI OF TALC & SOAPSTONE | OCCURRENCES IN WASH STATE CSMR | TALC012 |

Protected Document--Subject to Protective Order

JNJ 000089352

| | | | | | | |
|---|---|---|---|---|---|---|
| T43734090 | 23 | 04/21/1971 | | BATCH FLOTATION PROD OF PLATY | TALC FROM L GRANTHAM CORP ORES | TALC012 |
| T43734090 | 24 | 11/19/1969 | | CSMRI-PHASE 1 EVAL OF WESTERN | TALC SOURCES | TALC012 |
| T43734090 | 25 | 07/10/1970 | | CSMRI RECON STUDY TALC DEPOSIT | SOUTHERN DEATH VALLEY KINGSTON | TALC012 |
| T43734092 | 1 | 01/01/1988 | 12/30/1988 | TALC XRD | | TALC014 |
| T43734092 | 2 | 01/01/1987 | 12/30/1987 | TALC XRD/TEM | | TALC014 |
| T43734092 | 3 | 01/01/1971 | 12/30/1979 | CORNSTARCH BINDER | | TALC014 |
| T43734092 | 4 | 01/01/1983 | 12/30/1983 | RESPIRATORY PROTECTION | | TALC014 |
| T43734092 | 5 | 01/01/1981 | 12/30/1981 | NUISANCE DUST AIR SAMPLING | | TALC014 |
| T43734092 | 6 | 04/02/1982 | | MSHA STANDARDS | | TALC014 |
| T43734092 | 7 | 06/22/1973 | | EXAM OF J&J SHOWER TO SHOWER | | TALC014 |
| T43734092 | 8 | 01/01/1984 | 12/30/1984 | JBPOWDER HISTORICAL LABEL | FOR ABESTIFORM MINERALS MCCRON | TALC014 |
| T43734092 | 9 | 01/01/1979 | 12/30/1979 | TALC REGULATIONS | CHANGES 1950-78 GAMBINO SUIT | TALC014 |
| T43734092 | 10 | 01/01/1978 | 12/30/1978 | INDUSTRIAL TOXICITY | | TALC014 |
| T43734092 | 11 | 08/30/1981 | | 3M RESPIRATORS TO JIM JONES | | TALC014 |
| T43734092 | 12 | 01/01/1982 | 12/30/1982 | MATERIAL SAFETY DATA SHEET | CORRESPONDENCE | TALC014 |
| T43734092 | 13 | 01/01/1985 | 12/30/1985 | OSHA HAZARD COMMUNICATION | STANDARD | TALC014 |
| T43734093 | 1 | 06/24/1971 | | GRANTHAM ITALIAN AND VERMONT | TALC FINAL PRODUCTS | TALC015 |
| T43734093 | 2 | | | CARDIFF EXAM OF BRITISH TALC | DEPT OF MINERAL EXPLOITATION | TALC015 |
| T43734093 | 3 | 10/15/1957 | | STUDIES OF PHYS PROPERTIES OFF | TALC MEASAUREMENT COMPARISON | TALC015 |
| T43734093 | 4 | 10/01/1972 | | INTL AGENCY RESEARCH ON | CANCER MEETING ON ASBESTOS | TALC015 |
| T43734093 | 5 | 01/01/2024 | 12/30/1962 | INVOICES | MOLNAR | TALC015 |
| T43734093 | 6 | 01/01/1984 | 12/30/1989 | INTERNATIONAL TALC | MOLNAR | TALC015 |
| T43734093 | 7 | | | GAMBINO V J&J FILES | MOLNAR | TALC015 |
| T43734093 | 8 | | | INTERNATIONAL TALC FILES | MOLNAR | TALC015 |
| T43734093 | 9 | 01/01/1984 | 12/30/1984 | ASBESTOS AND TALC | MOLNAR | TALC015 |
| T43734093 | 10 | 10/01/1984 | | TALC BIWEEKLY COMPOSITES | MOLNAR | TALC015 |
| T43734093 | 11 | | | TALC PROJECT FILES | MOLNAR | TALC015 |
| T43734093 | 12 | 01/01/1978 | 12/30/1978 | TALC INHALATION | MOLNAR | TALC015 |
| T43734094 | 1 | 01/01/1983 | 12/30/1983 | OSHA HAZARD | | TALC016 |
| T43734094 | 2 | 01/01/1973 | 12/30/1977 | TALC CORRESPONDENCE | REG AFFAIRS | TALC016 |
| T43734094 | 3 | 02/01/1973 | | BIOLOGICAL EFFECTS ON ASBESTOS | REG AFFAIRS | TALC016 |
| T43734094 | 4 | 01/01/1963 | 12/30/1975 | TALC ALTERNATIVES | REG AFFAIRS | TALC016 |
| T43734094 | 5 | 05/25/1972 | | PHYS TESTING OF TALC FD-14 | REG AFFAIRS | TALC016 |
| T43734094 | 6 | 01/01/1967 | 12/30/1970 | TALC ASBESTOS LITERATURE COPYU | REG AFFAIRS | TALC016 |
| T43734094 | 7 | 03/28/1972 | | MJR PROJECT 503 RESPIRABLE | REG AFFAIRS | TALC016 |
| T43734094 | 8 | 04/21/1972 | | PHYS TESTING ALLEN CLARK RPT | DUPLICATE REG AFFAIRS | TALC016 |
| T43734094 | 9 | 08/12/1972 | | EXTRA COPIES TALC ON RICE REG | REG AFFAIRS | TALC016 |
| T43734094 | 10 | 06/02/1972 | | IDENT OF PART IN TISSUES USING | DECO TECHNIQUE COPY REG AFFAIR | TALC016 |
| T43734095 | 1 | 05/25/1972 | | CHAR OF TREMOLITE TALC FD-14 | REG AFFAIRS EXTRA COPY | TALC016 |
| T43734095 | 2 | 11/09/1973 | | TALC INFORMATION NASHED | REG AFFAIRS | TALC017 |
| T43734095 | 3 | 03/06/1972 | | ORGANIZATION TALL FILES | REG AFFAIRS | TALC017 |

Protected Document--Subject to Protective Order

JNJ 000089353

| ID | No | Date | Date2 | Description | Note | TALC |
|---|---|---|---|---|---|---|
| T43734095 | 4 | 07/20/1971 | | JBP FDA SUBMISSION WORKING CPY | REG AFFAIRS | TALC017 |
| T43734095 | 5 | 02/14/1973 | | TALC SAFETY LIT REVIEW SUMMARY | REG AFFAIRS | TALC017 |
| T43734095 | 6 | 10/29/1973 | | ASBESTOS IN TALC METHOD FED | REG PROPOSAL REG AFFAIRS | TALC017 |
| T43734095 | 7 | 10/29/1973 | | ASBESTOS TALC METH FED REG | REG AFFAIRS EXTRA COPY | TALC017 |
| T43734095 | 8 | 01/01/1971 | 12/30/1974 | MASTER FILE TALC PHYS TESTING | REG AFFAIRS | TALC017 |
| T43734095 | 9 | 11/29/1972 | | JBP FDA SUBM N WORKING COPY | REG AFFAIRS | TALC017 |
| T43734095 | 10 | | | TALC PHOTOS IN ENVELOPE | | TALC017 |
| T43734096 | 1 | 01/01/1977 | 12/30/1989 | TALC MISC 7321 | | TALC018 |
| T43734096 | 2 | 01/01/1984 | 12/30/1985 | 2581 31 THAILAND CHINESE TALC | | TALC018 |
| T43734096 | 3 | 08/30/1989 | | 2573 CHINESE TALC JAPAN JJKK | INDUSTRIAL | TALC018 |
| T43734096 | 4 | 05/01/1977 | | MCCRONE | OSMANTHUS | TALC018 |
| T43734096 | 5 | 01/01/1989 | 12/30/1990 | 7321 JBP TALC QC | | TALC018 |
| T43734096 | 6 | 01/01/1985 | 12/30/1988 | 2581 31 THIALAND CHINESE TALC | COSMETIC | TALC018 |
| T43734096 | 7 | 01/01/1972 | 12/30/1984 | V-66 TALC EXAM FOR ASBESTOS | | TALC018 |
| T43734097 | 1 | 07/08/1971 | 09/01/1971 | TALC TRANSMITTALS TO FDS VOL1 | WEEKLY X-RAY & DTA | TALC019 |
| T43734097 | 2 | 04/29/1985 | | TALC RESPIRABLES | | TALC019 |
| T43734097 | 3 | 01/01/1981 | 12/30/1981 | DR MOFENSONS ARTICLES IN | PEDIATRICS FILE COPY | TALC019 |
| T43734097 | 4 | 01/01/1982 | 12/30/1984 | TALC OVARIAN CANCER | | TALC019 |
| T43734097 | 5 | 12/29/1981 | | TALC OVARIAN CANCER | | TALC019 |
| T43734097 | 6 | 01/01/1985 | 12/30/1985 | TALC CORRESPONDENCE | | TALC019 |
| T43734097 | 7 | 10/30/1972 | | TALC BIBLIOGRAPHY HILDICK SMTH | | TALC019 |
| T43734097 | 8 | 01/01/1972 | 12/30/1972 | PARTICLE SIZE & INHALATION | LITERATURE | TALC019 |
| T43734097 | 9 | 01/01/1971 | 12/30/1973 | TALC LITERATURE | | TALC019 |
| T43734097 | 10 | 01/01/1971 | 12/30/1972 | TALC LIT SUMMARY | | TALC019 |
| T43734098 | 1 | | | VARIOUS TALC DOCUMENTS & LIT | LOOSE | TALC020 |
| T43734098 | 2 | 01/01/1974 | 12/30/1978 | TALC REPRINTS | | TALC020 |
| T43734098 | 3 | 01/01/1973 | 12/30/1978 | TALC PAPERS | | TALC020 |
| T43734098 | 4 | 01/01/1976 | | TALC SAFETY RELEASE | | TALC020 |
| T43734098 | 5 | 01/01/1972 | 12/30/1972 | TALC LITERATURE | THE MEDICAL PROFESSIONAL | TALC020 |
| T43734098 | 6 | 07/01/1974 | | JBP FORMULA 409 FACTBOOK | | TALC020 |
| T43734098 | 7 | | | VARIOUS LITERATURE LOOSE DOCS | SUPPLEMENT | TALC020 |
| T43734098 | 8 | 01/01/1975 | 12/30/1971 | ASBESTOS AND HEALTH INFO FILE | | TALC020 |
| T43734098 | 9 | 01/01/1973 | 12/30/1973 | TALC ASBESTOS REPORTS | | TALC020 |
| T43734098 | 10 | 01/01/1971 | 12/30/1971 | TALC ALTERNATIVES | | TALC020 |
| T43734098 | 11 | 01/01/1971 | 12/30/1971 | HEW STUDIES ASBESTOS MASTER | FILE | TALC020 |
| T43734098 | 12 | 01/01/1972 | 12/30/1973 | LIST MASTER FILE REPORTS | | TALC020 |
| T43734098 | 13 | 06/18/1974 | | SURVEY OF PAPERS ON TALC | | TALC020 |
| T43734099 | 1 | 01/01/1978 | 12/30/1978 | GENERAL INFORMATION | POUDRAGE | TALC021 |
| T43734099 | 2 | 01/01/1974 | | J&J PLANTS TALC DUST | | TALC021 |
| T43734099 | 3 | 01/01/1973 | 12/30/1973 | SAFETY WHITE PAPER | | TALC021 |
| T43734099 | 4 | 01/01/1972 | 12/30/1972 | TALC ASBESTOS LITERATURE | | TALC021 |

Protected Document--Subject to Protective Order

JNJ 000089354

| Doc ID | No. | Date 1 | Date 2 | Description | Note | TALC |
|---|---|---|---|---|---|---|
| T43734099 | 5 | 10/27/1980 | | ETHYLENE OXIDE | | TALC021 |
| T43734099 | 6 | 09/02/1983 | | NJ RIGHT TO KNOW FILE | | TALC021 |
| T43734099 | 7 | 01/01/1978 | 12/30/1978 | TOXIC SUBSTANCES | | TALC021 |
| T43734099 | 8 | 01/01/1978 | 12/30/1980 | OSHA FILES NIOSH 5 | | TALC021 |
| T43734099 | 9 | 01/01/1983 | 12/30/1984 | NJ RIGHT TO KNOW FILE | | TALC021 |
| T43734099 | 10 | 01/17/1978 | | ACRYLONITRILE FEDERAL REGISTER | | TALC021 |
| T43734099 | 11 | 01/01/1971 | 12/30/1974 | PRESS RELEASE | | TALC021 |
| T43734099 | 12 | 01/01/1973 | 12/30/1973 | LITERATURE TALC | | TALC021 |
| T43734099 | 13 | 01/01/1968 | 12/30/1971 | LITERATURE ASBESTOS MASTER | FILE NASMED | TALC021 |
| T43734099 | 14 | 01/01/1969 | 12/30/1969 | LIT ASBESTOS | | TALC021 |
| T43734099 | 15 | 01/01/1949 | 12/30/1970 | LIT TALC MASTER FILE | LIT REFERENCES TALC ASBESTOS | TALC021 |
| T43734100 | 1 | 01/01/1972 | 12/30/1974 | SEMINARS LYONS/DURHAM/MONTREAL | | TALC022 |
| T43734100 | 2 | 08/27/1973 | 09/20/1973 | CONSUMENT ENBOND HOLLAND | DUTCH CONSUMER GROUP | TALC022 |
| T43734100 | 3 | 08/01/1973 | 09/26/1975 | TALC STRATEGY AND STRATUS | BOOK 2 | TALC022 |
| T43734100 | 4 | 01/01/1973 | 12/30/1973 | KENNEDY HEARINGS | | TALC022 |
| T43734100 | 5 | 05/08/1973 | | FDA COMMUNICATIONS | | TALC022 |
| T43734100 | 6 | 01/01/1973 | 12/30/1973 | CONSUMER GROUPS | | TALC022 |
| T43734100 | 7 | 01/01/1974 | 12/30/1974 | ILLINOIS EPA & WINDSOR MINERAL | | TALC022 |
| T43734100 | 8 | 01/01/1971 | 12/30/1971 | ROMER NYC DEPT OF AIR RESOURCE | | TALC022 |
| T43734100 | 9 | 01/01/1975 | 12/30/1975 | POOLEY LETTER TO LEE | | TALC022 |
| T43734100 | 10 | 01/01/1971 | 12/30/1971 | TALC FILE CSMRI CORRESPONDENCE | | TALC022 |
| T43734100 | 11 | 01/01/1971 | 12/30/1971 | J&J ENGLAND CORRESP TALC | | TALC022 |
| T43734100 | 12 | 01/01/1973 | 12/30/1973 | MCCRONE ASSOCIATES CORRESP | | TALC022 |
| T43734100 | 13 | 01/01/1974 | 12/30/1974 | NIOSH REPORT ON TALCS | | TALC022 |
| T43734100 | 14 | 07/30/1972 | | KRETCHNER CORRESP | | TALC022 |
| T43734100 | 15 | 01/01/1971 | 12/30/1971 | SELIKOFF LANGER CORRESP | | TALC023 |
| T43731799 | 1 | 10/31/1988 | 06/28/1971 | PHYSICAL TESTING VARIOUS FILES | BOOK 1 | TALC023 |
| T43731799 | 2 | 01/01/1971 | 12/31/1972 | PHYSICAL CHARACTERISTICS | VARIOUS TALCS BOOK 2 | TALC023 |
| T43731799 | 3 | 01/01/1971 | 12/31/1974 | PHYSICAL TESTING VARIOUS | REPORTS BOOK 3 | TALC023 |
| T43731799 | 4 | | | TREMOLITE-TALC FD-14 | PHYSICAL TESTING EMPTY FOLDER | TALC023 |
| T43731799 | 5 | 01/01/1972 | | METHODOLOGY X-RAY DIFFRACTION | | TALC023 |
| T43731799 | 6 | 01/01/1973 | | METHODOLOGY ASBESTOS | | TALC023 |
| T43731799 | 7 | 01/01/1971 | | J&J ENGLAND STRATEGY-PHYS | | TALC023 |
| T43731799 | 8 | 01/01/1974 | | PHYS TESTING OVERSEAS CO | TESTING | TALC023 |
| T43731799 | 9 | 01/01/1972 | 12/31/1973 | RT VANDERBILT CO | SAMPLES INTL | TALC023 |
| T43731799 | 10 | 07/09/1975 | | COSMETIC TALC-CTFA PRESENTATION | TO DTC ANTIPERSPIRANT PANEL | TALC023 |
| T43731800 | 1 | 01/01/1971 | 12/31/1974 | CLINICAL DUSTING & INHALATION | REPORTS AND CORRESPONDENCE | TALC024 |
| T43731800 | 2 | 01/01/1971 | 12/31/1973 | TALC CORRESPONDENCE | CLINICAL INFO | TALC024 |
| T43731800 | 3 | 01/01/1974 | | TENOVUS INSTITUTE | | TALC024 |
| T43731800 | 4 | 01/01/1971 | 12/31/1972 | MRC-TIMBRELL TALC ASBESTOS | | TALC024 |
| T43731800 | 5 | | | ANIMAL VARIOUS-EMPTY FOLDER | | TALC024 |

Protected Document--Subject to Protective Order

JNJ 000089355

| Bates | No. | Date | Title | Folder | TALC |
|---|---|---|---|---|---|
| T43731800 | 6 | | ANIMAL-BATTELLE INSTITUTE | CORRESPONDENCE-EMPTY FOLDER | TALC024 |
| T43731800 | 7 | 01/01/1971 | WE SMITH FAIRLEIGH-DICKINSON | CORRESPONDENCE | TALC024 |
| T43731800 | 8 | 12/31/1972 | TALC CORRESPONDENCE ANIMAL | STUDIES | TALC024 |
| T43731800 | 9 | 01/01/1972 | FINDINGS ON J&J PRODUCTS-LEWIN | TALC/ASBESTOS | TALC024 |
| T43731800 | 10 | 01/01/1965 | ETHYLENE OXIDE SAFETY SUMMARY | | TALC024 |
| T43731800 | 11 | 01/01/1969 | JOHNS-MANVILLE | | TALC024 |
| T43731800 | 12 | 01/01/1973 | PFIZER INC | | TALC024 |
| T43731794 | 1 | 01/01/1972 | FDA PROPOSED METHOD & RELATED | CORRESPONDENCE REGULATIONS | TALC025 |
| T43731794 | 2 | 01/01/1972 | S LEWIN REPORTS | | TALC025 |
| T43731794 | 3 | | TALC-LISTING/FDA SUBMISSIONS | | TALC025 |
| T43731794 | 4 | 01/01/1972 | NIOSH STANDARDs ASBESTOS | EXPOSURE | TALC025 |
| T43731794 | 5 | 01/01/1971 | 12/31/1973 TALC STRATEGY AND STATUS BOOK1 | | TALC025 |
| T43731794 | 6 | 01/01/1973 | 12/31/1974 TALC INFORMATION VOL1 | | TALC025 |
| T43731794 | 7 | 06/01/1975 | FINAL REPORT-INVGN/EFFECTS | INHALED BABY POWDER-HAMSTERS | TALC025 |
| T43731720 | 1 | 04/10/1991 | 10/02/1992 ORTHO VS KORFF | | TALC026 |
| T43731720 | 2 | 09/24/1982 | 01/08/1986 KLIGMAN PATENTS | | TALC026 |
| T43731720 | 3 | 07/29/1986 | 03/27/1991 KLIGMAN PATENTS | | TALC026 |
| T43731720 | 4 | 08/16/1982 | 04/05/1991 KLIGMAN PATENTS | | TALC026 |
| T43731721 | 1 | | EPA TALC | | TALC027 |
| T43731721 | 2 | | ENGLEHARD AFFADAVIT | W ASHTON | TALC027 |
| T43731721 | 3 | | CYPRUS TALC AGREEMENT | | TALC027 |
| T43731721 | 4 | 01/01/1989 | 12/30/1990 CHINA TALC | | TALC027 |
| T43731721 | 5 | | TALC-CANADA | WINDSOR MINERALS | TALC027 |
| T43731721 | 6 | | CHINA TALC SPECIFICATIONS | | TALC027 |
| T43731721 | 7 | | CHINA TALC | | TALC027 |
| T43731721 | 8 | | CTFA-BATELLE | TALC MIGRATION STUDY | TALC027 |
| T43731721 | 9 | | US BUREAU OF MINES | | TALC027 |
| T43731721 | 10 | | TALC FINES RESPIRABLE | REDUCTION MENNEN | TALC027 |
| T43731721 | 11 | | TALC AIRBORNE RESPIRABLES | | TALC027 |
| T43731721 | 12 | | TENEVOUS-TALC | | TALC027 |
| T43731721 | 13 | | TALC-BABY POWDER CORNSTARCH | | TALC027 |
| T43731721 | 14 | | STARCH STUDIES PROJECT 7016 | | TALC027 |
| T43731721 | 15 | | TALC/CANCER ISSUE | | TALC027 |
| T43731721 | 16 | 01/01/1992 | 12/30/1992 NTP INHALATION STUDY | | TALC027 |
| T43731721 | 17 | 01/01/1980 | 12/30/1980 FUNDAMENTAL PROPERTIES OF | POWDER 7006 | TALC027 |

Protected Document--Subject to Protective Order

JNJ 000089356

Exhibit 182



**m<sup>c</sup>crone environmental services, inc.**
850 PASQUINELLI DRIVE
WESTMONT, ILLINOIS 60559 • 708-887-7100

3 January 1995

Mr. John O'Shaughnessy
J & J, The Law Dept.
One J & J Plaza
New Brunswick, NJ 08933-7002

Re: *Ritler v. Win ?*

Subject:     Windsor Minerals, Inc.
             McCrone File No. ME-4055

Re:       McCrone Project No. IL-2689

Dear Mr. O'Shaughnessy:

As you requested during our telephone conversation on 13 December 1994, I have completed my review of McCrone File No. ME-4055 for the additional information that you requested. The information that you requested included memos and/or correspondence from J & J that may assist in determining sample locations. A copy of the entire file has been enclosed for your review as you requested during our telephone conversation today.

If I can be of any further assistance, please do not hesitate to contact me at 708-887-7100.

Sincerely,

Laurie R. Bain
Vice President and General Manager

LRB:lrd
Enclosures

**RECEIVED**

JAN  5 1995

J.C. O'SHAUGHNESSY

a member of the m<sup>c</sup>crone group

EXHIBIT
J&J-1035.1
3695-14

JNJ 000687065

Exhibit 183

John C. O'Shaughnessy

```
1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                  STATE OF MISSOURI
2
                      - - - - -
3

     VICKIE FORREST, et al.,
4           Plaintiffs,
5           vs.                  Cause No.
                                 1522-CC0419-02
6

     JOHNSON & JOHNSON, et al.
7           Defendants.
8               - - - - -
9         UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
10
                      - - - - -
11

     IN RE:  JOHNSON & JOHNSON    MDL NO:
12   TALCUM POWDER PRODUCTS        16-2738 (FLW)(LGH)
     MARKETING, SALES PRACTICES,
13   AND PRODUCTS LIABILITY
     LITIGATION
14               - - - - -
15
               Wednesday, June 30, 2021
16
17               - - - - -
18          Continued Videotaped Oral Deposition of
19   JOHN C. O'SHAUGHNESSY, taken at the Crowne Plaza
20   Princeton, 900 Scudders Mill Road, Plainsboro, New
21   Jersey, commencing at 9:35 a.m., by and before Robin
22   L. Clark, Registered Professional Reporter and
23   Notary Public in and for the State of New Jersey.
24               - - - - -
```

Page 420

```
1  APPEARANCES:
2
3         LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
          BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
4         BY:  CHRISTOPHER V. TISI, ESQ.
          316 South Baylen Street, Suite 600
5         Pensacola, Florida 32502-5996
          850-435-7176
6         ctisi@levinlaw.com
              For the Plaintiff, Vickie
7         Forrest
8         COHEN, PLACITELLA & ROTH
          BY:  CHRISTOPHER M. PLACITELLA, ESQ.
9         127 Maple Avenue
          Red Bank, New Jersey 07701
10        732-749-9003
          cplacitella@cprlaw.com
11            For the MDL Plaintiffs
12
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13        BY:  ALLISON M. BROWN, ESQ.
          and RICHARD T. BERNARDO, ESQ.
14        One Manhattan West
          New York, New York 10001-8602
15        212-735-3000
          allison.brown@skadden.com
16        richard.bernardo@skadden.com
              For the Defendant,
17        Johnson & Johnson
18
          YETTER COLEMAN LLP
19        BY:  COLLIN J. COX, ESQ.
          811 Main Street, Suite 4100
20        Houston, Texas 77002
          713-632-8000
21        ccox@yettercoleman.com
              For the Witness
22
23  ALSO PRESENT:
24        JOEL SCHNEIDER, USMJ (Retired)
```

Page 421

```
1   ALSO PRESENT, continued:
2
3         WILLIAM GEIGERT, VIDEOGRAPHER
4         MICHAEL KUTYS, EXHIBIT TECH
5   REMOTE APPEARANCES:
6
7         BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
          MILES, P.C.
8         BY:  LEIGH O'DELL, ESQ.
          218 Commerce Street
9         Montgomery, Alabama 36104
          800-898-2034
10        leigh.odell@beasleyallen.com
              For the Plaintiff, Vickie
11        Forrest
12        ASHCRAFT & GEREL, LLP
          BY:  MICHELLE A. PARFITT, ESQ.
13        1825 K Street, N.W., Suite 700
          Washington, D.C. 20006
14        202-759-7648
          mparfitt@ashcraftlaw.com
15            For the Plaintiff, Vickie
          Forrest
16
17        COHEN, PLACITELLA & ROTH
          BY:  DENNIS M. GEIER, ESQ.
18        and HARRY M. ROTH, ESQ.
          127 Maple Avenue
19        Red Bank, New Jersey 07701
          732-749-9003
20        dgeier@cprlaw.com
          hroth@cprlaw.com
21            For the MDL Plaintiffs
22
23
24
```

Page 422

```
1   REMOTE APPEARANCES, continued:
2
3         BARNES LAW GROUP, LLP
          BY:  JOHN R. BEVIS, ESQ.
4         31 Atlanta Street
          Marietta, Georgia 30060
5         678-290-2240
          bevis@barneslawgroup.com
6             For the Plaintiffs
7         ROBINSON CALCAGNIE, INC.
          BY:  GENEVIEVE OUTLAW, ESQ.
8         19 Corporate Plaza Drive
          Newport Beach, California 92660
9         949-720-1288
          goutlaw@robinsonfirm.com
10            For the Plaintiffs in JCCP 4872
11
          BLASINGAME, BURCH, GARRARD & ASHLEY, PC
12        BY:  LEANNA BANKESTER PITTARD, ESQ.
          and SARA SCHRAMM, ESQ.
13        2100 Southbridge Parkway
          Suite 650
14        Birmingham, Alabama 35209
          866-354-3544
15        lpittard@bbga.com
          sschramm@bbga.com
16            For the MDL Plaintiffs
17
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
18        BY:  CATHERINE I. MULLALEY, ESQ.
          500 Boylston Street
19        Boston, Massachusetts 02116
          617-573-4851
20        kate.mullaley@skadden.com
              For the Defendant,
21        Johnson & Johnson
22
23
24
```

Page 423

```
1   REMOTE APPEARANCES, continued:
2
3         FAEGRE DRINKER BIDDLE & REATH LLP
          BY:  SUSAN M. SHARKO, ESQ.
4         600 Campus Drive
          Florham Park, New Jersey 07932
5         susan.sharko@faegredrinker.com
          973-549-7000
6             For the Defendant, Johnson &
          Johnson
7
8         SEYFARTH SHAW LLP
          BY:  THOMAS T. LOCKE, ESQ.
9         975 F Street, N.W.
          Washington, D.C. 20004
10        202-828-5376
          tlocke@seyfarth.com
11            Appearing on behalf of Personal
          Care Products Council
12
13        TUCKER ELLIS, LLP
          BY:  ELIZABETH J. CUMMINGS, ESQ.
14        100 South 4th Street
          St. Louis, Missouri 63102
15        314-571-4969
          elizabeth.cummings@tuckerellis.com
16            For the Defendants, PTI
          Royston, LLC and PTI Union, LLC
17
18  ALSO PRESENT:
19        LEA CALLAHAN, Paralegal
20        JEN SECRIST, Paralegal
21        STEPHANIE E. MARTIN
22            - - - - -
23
24
```

Page 424

I N D E X

WITNESS                                    PAGE
JOHN C. O'SHAUGHNESSY
    BY MR. PLACITELLA:          430, 879, 903
    BY MR. TISI:                776, 849
    BY MS. BROWN:               779, 903

E X H I B I T S
NUMBER      DESCRIPTION              MARKED
O'Shaughnessy
Exhibit JOS 1  McCrone Binder 1          482
Exhibit JOS 1A McCrone Binder 2          482
Exhibit JOS 2A Musco-2/Hopkins Binder 1  430
    of 2

Exhibit JOS 2B Musco-2/Hopkins Binder 2  430
    of 2
Exhibit JOS 3 Additional Testing Binder  430
Exhibit 4    Handwritten Document        644
Exhibit J&J 4 Cosmetics Document         894
Exhibit TR-15 Deposition of Dr. John     678
    Hopkins dated 3/6/07

Exhibit 82   Muscat Video Clip           864

Exhibit 172  Deposition of Glenn A.      536
    Hemstock dated 1/28/83
Exhibit 173  Deposition of Glenn A.      538
    Hemstock dated 3/16/83

Exhibit 188  Stipulation of Dismissal,   463
    Letter dated 7/23/87,
    Affidavit of Roger Miller,
    and Letter dated 1/28/87

Page 425

Exhibit 195  Affidavit of William H.     518
    Ashton

Exhibit 198  Letter dated 11/26/90 and   738
    Attachment Bates
    JNJMX__68__000012851 to
    12859
Exhibit 230  Affidavit of Dr. John       680
    Hopkins in Durham case

Exhibit 270  Deposition of Roger N.      896
    Miller taken 6/12/91
Exhibit 274  Letter dated 1/23/88 Bates  633
    JNJ 000024573 to 24576

Exhibit 277  Answers to Interrogatories  663
    In Krushinski Case Bates
    JNJ 000065001 to 650011

Exhibit 282  Roger Miller Affidavit in   499
    Andonian case Bates
    JNJ-WIL__0000094 to 95

Exhibit 319  Letter dated 10/27/97 and   652
    Attachments
Exhibit 322  IARC Monograph              636
Exhibit 355  Letter dated 1/28/1987      729
    Bates JNJTALC0000387714 to
    387716
Exhibit 414  Spreadsheet                 890
Exhibit 418  Email String dated 11/21/08 755
Exhibit 436  Deposition of Peter N. Gale 547
    dated 4/26/83

Exhibit 441  Stipulation and             554
    Confidentiality Order
Exhibit 443  Windsor Minerals' Responses 720
    to Interrogatories in
    Westfall case

Page 426

Exhibit 446  Agreement Between Cyprus &  511
    J&J dated 1/6/89

Exhibit 456  Report dated 11/23/83 Bates 744
    JNJ 000240739 to 40742
Exhibit 472  Photograph                  900
Exhibit 486  Privilege Log               715
Exhibit 488  Spreadsheet                 891
Exhibit 491  Memo dated 1/4/84           748
Exhibit 525  Event Report dated 1/9/17   451
    Bates JNJTALC000125625 to
    125632
Exhibit 1035 Letter dated 1/3/95         573
Exhibit 1039 Excerpt for J&J Privilege   526
    Log

Exhibit 1040 Letter dated 8/14/89        563

Exhibit 1042 Dismissal Order             515

Exhibit 1043 Deposition Of Roger N.      618
    Miller dated 4/6/95
Exhibit 1044 Deposition of Roger Miller  697
    taken 1/16/07

Exhibit 1047 Affidavit of Roger Miller   507
    in Miller case
Exhibit 1048 Letter dated 9/10/85 Bates  484
    JNJ 000064652

Exhibit 1049 Legal Hold Letter dated     718
    5/16/03
Exhibit 1051 Document Preservation       722
    Notice Bates
    JNJTAL000949679 to 949681

Page 427

Exhibit 1052 Mediation Memo dated 2/4/03 666
    Bates JNJTALC001243929 to
    1243949
Exhibit 1053 Letter dated 6/6/88         475
Exhibit 1054 Letter dated 8/27/86        468
Exhibit 1060 Transcript of John Hopkins  477
Exhibit 1061 Andonian Case Witness List  497
    Bates JNJ 000065334 to
    65339

Exhibit D-1  Affidavit of Robert K.      810
    Denton
Exhibit D-2  Letter dated 9/28/72        820
    and Report Bates
    JNJTALC000289268 to 359834
Exhibit D-3  Letter dated 3/18/02 Bates  828
    JNJTALC00109268 to 109278

Exhibit D-4  Case Control Studies that   845
    were Published from 1992
    to 1999

Page 428

1
2  REDACTED PORTION OF TRANSCRIPT
   Page 586, Line 9 to Page 589, Line 6
3
   SEALED PORTION OF TRANSCRIPT
4
   Page 601, Line 7 to Page 614, Line 10
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 429

1        DEPOSITION SUPPORT INDEX
2
3            - - - - -
4  Direction to Witness Not to Answer
5  Page  Line
6  432   20
7  522   21
8  560   20
9  751   14
10 766   17
11 778   23
12 Request for Production of Documents
13 Page  Line
14 NONE
15 Question Marked
16 Page  Line
17 NONE
18
19
20
21
22
23
24

Page 430

1        - - - - -
2      (Binders premarked
3  O'Shaughnessy Exhibits JOS 2A, JOS
4  2B, and JOS 3 for identification.)
5        - - - - -
6        THE VIDEOGRAPHER:  Good
7  morning.  We are now on the record.
8  My name is Bill Geigert.  I'm a
9  videographer for Golkow Litigation
10 Services.  Today's date is June 30,
11 2021, and the time is 9:35 a.m.
12 This is the continuation of the
13 deposition of John C.
14 O'Shaughnessy.  Sir, I want to
15 remind you, you are still under
16 oath.  Counsel, please proceed.
17        - - - - -
18     JOHN C. O'SHAUGHNESSY, having been
19 duly previously sworn, was examined
20 and testified as follows:
21        - - - - -
22 BY MR. PLACITELLA:
23     Q.  Good morning,
24 Mr. O'Shaughnessy.  How are you?

Page 431

1     A.  Good, Mr. Placitella.
2     Q.  We've met informally.
3     A.  Yes.
4     Q.  I'm here now formally on behalf
5  of the 30000-plus women who have cases
6  filed who believe that their ovarian cancer
7  is a result of their unwaning use of
8  Johnson's Baby Powder or Shower to Shower.
9  Do you understand that?
10     A.  I understand who you represent.
11     Q.  Okay.  Now, in preparation for
12 today's deposition or yesterday, did you
13 review your transcript from last week?
14     A.  No.
15     Q.  Okay.  I want to spend a little
16 time just talking to you about your active
17 involvement in the cases that you worked
18 on.  Okay?
19        When you were working on the
20 talc cases for Johnson & Johnson, you were
21 aware of the evidence available to respond
22 to requests made in litigation?
23     A.  I was --
24     Q.  Were you aware --

John P. O'Shaughnessy

Page 432

1    A.  Of what?
2    Q.  The evidence that was available
3 to respond to requests for evidence made in
4 litigation?
5    A.  Like --
6        MS. BROWN:  I object as
7 vague.  I don't understand the
8 question.
9        THE WITNESS:  Discovery
10 requests?
11 BY MR. PLACITELLA:
12    Q.  Yes.
13    A.  Yes.  I was, yeah.
14    Q.  And you took and defended
15 depositions.
16    A.  Rarely.
17    Q.  Okay.  Did you decide what
18 evidence would be turned over in the course
19 of litigation?
20        MS. BROWN:  I object and
21 instruct Mr. O'Shaughnessy not to
22 answer that.  You're asking him a
23 question about his role as counsel
24 for Johnson & Johnson in

Page 433

1 determining what would be provided
2 in litigation.
3        MR. PLACITELLA:  I'll
4 ask for a ruling.
5        JUDGE SCHNEIDER:  I
6 think that Plaintiffs are entitled
7 to know who provided information in
8 order to answer interrogatories.
9 That is not a work product
10 question.  So I would phrase it --
11 if it's phrased that way, I think
12 it's an appropriate question.
13 Let's -- can we hear the question
14 again?
15        - - - - -
16    (Whereupon, the reporter read
17 back as requested.)
18        - - - - -
19        JUDGE SCHNEIDER:  I
20 think that particular question does
21 ask for work product, but it's a
22 perfectly appropriate interrogatory
23 to ask a company who supplied
24 information in response to

Page 434

1 interrogatories.  So if that's the
2 question, that can be asked or what
3 persons participated or supplied
4 information to answer
5 interrogatories, that is an
6 appropriate question.  Questions of
7 that ilk are appropriate, but the
8 particular question as phrased does
9 ask for work product, because it
10 asks for the ultimate
11 decision-maker and that's a work
12 product issue.
13 BY MR. PLACITELLA:
14    Q.  Did you decide what evidence
15 must preserved in the context of
16 litigation?  Did you decide?  That's all
17 I'm asking?
18        MS. BROWN:  I object as
19 well, your Honor, for the same
20 reasons.  This is work product,
21 decisions made by Johnson &
22 Johnson's attorney in terms of how
23 to defend litigation.
24        JUDGE SCHNEIDER:  I

Page 435

1 think that particular question is
2 privileged, but I think if Mr.
3 Placitella asks who decided to
4 preserve evidence, that is an
5 appropriate discovery question.
6 BY MR. PLACITELLA:
7    Q.  Well, who made the decision
8 what evidence should be preserved for
9 litigation?
10        MS. BROWN:  Vague as to
11 litigation.
12        THE WITNESS:  A hold
13 notice would typically be used to
14 hold, to send to the company to
15 instruct them to hold documents
16 that may be relevant to the
17 litigation and, I believe, I signed
18 the hold notices for that.  But it
19 all depends on the point in time.
20 BY MR. PLACITELLA:
21    Q.  Okay.  During the time that you
22 worked on the talc litigation, who made the
23 decision as to what evidence had to be
24 preserved?

Page 436

1      A.   The hold notice would have been
2  issued by me.
3      Q.   Okay.  And the first hold
4  notice that you issued was, what, in 1997?
5      A.   I don't recall.
6      Q.   Okay.  And you were involved in
7  verifying the accuracy of discovery
8  responses you said the other day, true?
9      A.   Yes, I worked with, along with
10 outside counsel, yes.
11     Q.   And you ensured that the
12 discovery responses that were provided had
13 a proper factual basis?
14     A.   Along with outside counsel,
15 based on our work, and yes.
16     Q.   Okay.  Did you ever make
17 representation of facts to litigants or
18 courts concerning talc and its safety?
19     A.   Other than what's in the file
20 documents, I'm not sure what you mean.
21     Q.   Right, in file documents.
22     A.   Whatever was filed was filed.
23 I don't know.
24     Q.   Okay.  Nancy Musco testified

Page 437

1  that you were the one who decided what
2  information would be turned over in
3  litigation.  Was she wrong about that?
4           MS. BROWN:  I object.
5      Misstates the evidence and lacks
6      foundation.
7           MR. PLACITELLA:  All
8      right.  I'm going to play you
9      her -- from her transcript.  Hold
10     on.
11           - - - - -
12     (Whereupon, a video clip was played.)
13           - - - - -
14 BY MR. PLACITELLA:
15     Q.   Is that accurate?
16           MS. BROWN:  Same
17     objection to a selective playing of
18     Ms. Musco's testimony that
19     Mr. O'Shaughnessy has not reviewed.
20           THE WITNESS:  I believe
21     the discovery was phrased that it
22     was based on the advice and
23     assistance of counsel and that was
24     true.

Page 438

1  BY MR. PLACITELLA:
2      Q.   Okay.  Before sworn statements
3  from Johnson & Johnson employees went out
4  in litigation, were they reviewed and
5  approved by you?
6      A.   If it was my litigation,
7  generally, yes.
8      Q.   And did that include talc
9  litigation?
10     A.   Yes.
11     Q.   Okay.  And did you have
12 something known as a talc litigation guide
13 for outside counsel?
14           MS. BROWN:  I object and
15     instruct not to answer.  Work
16     product.
17           MR. PLACITELLA:  I'm
18     just asking if it existed.  I'm not
19     asking what was in it.
20           MS. BROWN:  I object.
21     The existence of any materials that
22     were provided by in-house counsel
23     for J&J to outside counsel for J&J
24     in furtherance of defending

Page 439

1  litigation is work product.
2           JUDGE SCHNEIDER:  Is
3      this something that some other
4      witness had identified in
5      deposition testimony?
6           MR. PLACITELLA:  Not to
7      my knowledge.
8           JUDGE SCHNEIDER:  Can
9      you repeat the question, please,
10     Court Reporter?
11           - - - - -
12     (Whereupon, the reporter read
13     back as requested.)
14           - - - - -
15           JUDGE SCHNEIDER:  I
16     think that's plainly work product.
17     Objection sustained.
18 BY MR. PLACITELLA:
19     Q.   Okay.  Did Johnson & Johnson
20 corporate, that meaning you, receive
21 records of pleadings and discovery requests
22 that were made in talc litigation?
23     A.   I received those requests
24 through local counsel on a case.

John O'Shaughnessy

---

Page 440

1    Q.  Okay.  And who was in charge of
2  gathering evidence to supply answers to
3  discovery in talc litigation?
4           MS. BROWN:  I object,
5       Your Honor, for the same reasons,
6       work product.
7           JUDGE SCHNEIDER:  Can I
8       ask the court reporter to repeat
9       the question?
10          - - - - -
11      (Whereupon, the reporter read
12  back as requested.)
13          - - - - -
14          JUDGE SCHNEIDER:  Okay.
15  Is the question who was in charge,
16  is that what it said?  I think the
17  question who was in charge is
18  objectionable as work product, but
19  I don't think the question of who
20  supplied information to answer
21  interrogatories is work product.
22  That's clearly discoverable and is
23  an appropriate interrogatory that's
24  typically asked.  So if the

---

Page 441

1       question is who supplied
2       information rather than the person
3       who was in charge, that can be
4       asked, but the question who was in
5       charge is work product.
6  BY MR. PLACITELLA:
7       Q.  Okay.  Can you answer Judge
8  Schneider's question?  He's been around,
9  you know, on the bench, so he's a little
10  better at that than me.
11      A.  When we answered discovery in
12  general, what would happen is outside
13  counsel in coordination with me would
14  interview appropriate people at the company
15  who had knowledge of the product or the
16  issues in the lawsuit.  They would be
17  tasked also with collecting relevant
18  documents and assembling them for use in
19  the litigation.
20      Q.  And that by name is who?
21      A.  Early on, it would have been
22  Mr. Williams and the MehaffyWeber firm.  It
23  also would have been to the extent if there
24  were any other firms that were handling

---

Page 442

1  talc litigation, they might have played a
2  role in that, I just don't recollect, but
3  as time went on and the litigation grew,
4  then, you know, then the legal team grew
5  and there was more responsibility
6  concerning ongoing discovery through the
7  legal team and collecting and interviewing,
8  you know, again, people at the company to
9  obtain the information.
10      Q.  When evidence was turned over
11  in talc litigation, where was it stored,
12  within what Johnson & Johnson?
13          MS. BROWN:  I object.
14      Work product, Your Honor.
15          JUDGE SCHNEIDER:
16      Objection overruled.  That's not
17      work product.
18          THE WITNESS:  Typically,
19      the documents would be collected
20      and maintained by outside counsel.
21  BY MR. PLACITELLA:
22      Q.  So they would be kept with
23  outside counsel and would you at Johnson &
24  Johnson keep copies?

---

Page 443

1       A.  No, there was too many of them.
2       Q.  Okay.  And when there was
3  information from prior litigation, like, a
4  case was closed, a talc case, for example,
5  was closed, what was done with those files?
6       A.  The Johnson & Johnson files
7  or --
8       Q.  Yes.
9       A.  -- the outside counsel files?
10      Q.  Both.
11      A.  Johnson & Johnson had a file
12  system where the summons and complaint were
13  filed to it, so there would be a file for a
14  case name and a general file where papers
15  would be filed to that.  And then they
16  would be maintained there, whatever papers
17  were filed, including the closing
18  documents.
19      Q.  So, for example, if a witness
20  in a Johnson & Johnson talc case provided a
21  sworn statement that you reviewed, where
22  would that be -- where would that be saved
23  at Johnson & Johnson when the case was
24  over?

---

Page 444

1    A.   It might not have been kept at
2  Johnson & Johnson.  It might have been kept
3  by outside counsel and it might not have
4  been kept at Johnson & Johnson.  Johnson &
5  Johnson did not keep, generally speaking,
6  as far as I am aware, like, a mirror file
7  of what outside counsel has.
8    Q.   Well, if someone made a request
9  in a case and they said give me all of the
10 prior statements on this issue that were
11 made by Johnson & Johnson employees, either
12 in terms of interrogatories or affidavits,
13 you would have to go to outside counsel and
14 get them?
15   A.   I maybe would have it in a file
16 and know where it was or, yeah, we would go
17 to outside counsel for it, yes.
18   Q.   And you kept track of what
19 outside counsel was in possession of, what
20 statements and what discovery responses?
21        MS. BROWN:  I object
22     Your Honor, work product in terms
23     of what outside counsel had versus
24     Mr. O'Shaughnessy.

Page 445

1        JUDGE SCHNEIDER:
2     Objection overruled.  I think this
3     is akin to document custodian
4     questions which are appropriate for
5     discovery to find out the location
6     and existence of discoverable
7     documents and whether they can
8     search for and produce in discovery
9     and I think that is an appropriate
10    area of discovery.
11        THE WITNESS:  I'm sorry,
12    can --
13        MR. PLACITELLA:  Can you
14    read the question back, please?
15        - - - - -
16    (Whereupon, the reporter read
17    back as requested.)
18        - - - - -
19        THE WITNESS:  Not
20    really.
21 BY MR. PLACITELLA:
22   Q.   So you were in charge for a
23 while at least before you retired of the
24 ovarian cancer talc litigation, right?

Page 446

1    A.   Up until about 2012, I was
2  responsible for the day to day.
3    Q.   But you were involved after
4  2012.  I saw you at a deposition.
5    A.   Yes, I had a limited role after
6  that.
7    Q.   Okay.  And when documents were
8  produced in the ovarian cancer talc
9  litigation, did you go to all of the
10 outside counsel and say give me all of the
11 prior sworn statements from Johnson &
12 Johnson?
13        MS. BROWN:  Objection,
14    Your Honor, work product.
15        JUDGE SCHNEIDER:  Same
16    ruling, overruled, because again,
17    this is akin to document custodian
18    questions, which is an appropriate
19    area of inquiry.
20        THE WITNESS:  I don't
21    recall that I did that and I don't
22    recall whether I had any
23    responsibility for discovery, I
24    don't know what stage discovery was

Page 447

1    at in the ovarian cancer litigation
2    by the time I had left supervising.
3  BY MR. PLACITELLA:
4    Q.   Well, who was in charge at that
5  point that made those calls?
6    A.   It would have been, it would
7  have been for Johnson & Johnson, it would
8  have been Denise Houghton in conjunction,
9  again, with Gene Williams and his firm,
10 which by then might have been Shook Hardy.
11   Q.   So as you sit here today, you
12 cannot testify under oath that in the
13 ovarian cancer litigation you have produced
14 all of the prior sworn statements given by
15 Johnson & Johnson employees in talc
16 litigation, correct?
17        MS. BROWN:  I object as
18    vague.  Are we talking about in
19    response to a particular discovery
20    request.
21        THE WITNESS:  All I --
22        MR. PLACITELLA:  You can
23    answer it.
24        THE WITNESS:  What I can

Page 448

1 say is that when I was responsible
2 for the ovarian cancer litigation,
3 I don't know that we had too many
4 cases at that time and whatever
5 discovery we provided was
6 consistent with our obligations in
7 that particular case.
8 BY MR. PLACITELLA:
9     Q.  Well, you were involved and
10 supervised literally thousands of Johnson &
11 Johnson talc cases, correct?
12     A.  No, not in ovarian cancer.
13     Q.  I didn't ask you about ovarian
14 cancer.  You supervised literally thousands
15 of Johnson & Johnson talc cases where
16 people were alleging injury from Johnson &
17 Johnson talc?
18     A.  I did supervise cases.  I don't
19 know that they were in the thousands.
20     Q.  Okay.  Lawsuits alleging injury
21 from cosmetic talc put the company on
22 notice that there are people alleging
23 injuries associated with talc.  Do you
24 agree with that?

Page 449

1         MS. BROWN:  I object,
2 Your Honor.  It's asking for a
3 legal conclusion in terms of when
4 the company was on notice.
5         JUDGE SCHNEIDER:  Is
6 there a privilege objection?
7         MS. BROWN:  Well, Your
8 Honor, he's not here speaking for
9 Johnson & Johnson and the question
10 is when was Johnson & Johnson on
11 notice.
12         MR. PLACITELLA:  I
13 didn't know that this --
14         MS. BROWN:  It lacks
15 foundation.
16         JUDGE SCHNEIDER:  How do
17 we know he can't answer?
18         MS. BROWN:  It lacks
19 foundation.
20         THE WITNESS:  The
21 beginning of that question was --
22 BY MR. PLACITELLA:
23     Q.  Lawsuits alleging injury from
24 cosmetic talc put Johnson & Johnson on

Page 450

1 notice that people were alleging injuries
2 associated with talc, true?
3         MS. BROWN:  Same
4 objection.
5         THE WITNESS:  Sure, to
6 the extent they sued Johnson &
7 Johnson, yes.
8 BY MR. PLACITELLA:
9     Q.  And in fact, lawsuits alleging
10 injury from cosmetic talc were reportable
11 by Johnson & Johnson to the FDA in terms of
12 adverse event reports, correct?
13     A.  I don't know the specific
14 requirements for the FDA.
15     Q.  Okay.  Can you go in your book
16 to Exhibit 525.  And it's 525.758.
17     A.  What volume is it in, do you
18 know?
19     Q.  It should be in book two.  525,
20 I'll pull it up, it's up on the screen,
21 it's in front of you.  This is an adverse
22 event report dated January 9, 2017.  Do you
23 see that?
24     A.  I do.

Page 451

1         - - - - -
2     (Event Report dated 1/9/17
3     Bates JNJTALC000125625 to 125632
4     marked O'Shaughnessy Exhibit 525
5     for identification.)
6         - - - - -
7 BY MR. PLACITELLA:
8     Q.  And it's for somebody who
9 brought a case for ovarian cancer related
10 to Johnson & Johnson's Baby Powder.  Do you
11 see that?
12     A.  Yes.
13     Q.  And it says the information was
14 supplied by the Johnson & Johnson law
15 department.  Do you see that?  I blew it
16 up, if you look right on the screen.
17     A.  I just want to make sure, is it
18 525?
19     Q.  Yeah.
20     A.  Got it.  Got it.  I'm sorry.  I
21 was on the wrong one.
22     Q.  Yeah, no problem.
23     A.  It says these documents were
24 received by the J&J law department on

Page 452

1 January 9, 2017.
2    Q.  That's you, right, the law
3 department?
4    A.  It's the J&J law department, I
5 was not handling the cases at that time.
6    Q.  But generally speaking, you
7 knew that was the procedure, right, that a
8 complaint came in and you sent it to an
9 independent analyst hired by Johnson &
10 Johnson to assess causality for purposes of
11 reporting to the FDA.
12    A.  I don't know that.
13        MS. BROWN:  Objection,
14    foundation.
15 BY MR. PLACITELLA:
16    Q.  You don't know that?
17    A.  No.
18    Q.  Okay.  Do you see, go to the
19 next page.  If you see on the bottom, it
20 says case medically confirmed.  And it says
21 reportable to FDA, yes.  Do you see that?
22    A.  Yeah.
23    Q.  Okay.  And your independent
24 consultant actually evaluated this case and

Page 453

1 determined that casualty was actually
2 possible, correct?
3        MS. BROWN:  Objection.
4    Misstates the document.
5        THE WITNESS:  I'm --
6    this is a document -- you know
7    what, I don't recognize what the
8    document is.  It looks like a
9    regulatory document and they had
10    their own procedures about what
11    they had to do when they received
12    complaints.  So you would have to
13    ask someone in the regulatory
14    function about this.
15 BY MR. PLACITELLA:
16    Q.  Okay.  So you have no knowledge
17 of Johnson & Johnson having the complaints
18 that were filed that you were in charge of
19 making an independent evaluation about
20 whether causation was possible?
21        MS. BROWN:  Objection.
22    Misstates the document and the
23    evidence and lacks foundation.
24        THE WITNESS:  At this

Page 454

1 time, I was not responsible for
2 processing complaints, but I know
3 that the Johnson & Johnson law
4 department had complaints and they
5 were appropriately reported by the
6 company to wherever it had to be
7 reported.  How the company handled
8 that and what consultants they
9 used, I don't have any knowledge of
10 that.
11 BY MR. PLACITELLA:
12    Q.  Well, in 2012 when you were
13 sued in an ovarian cancer case, you
14 understood that that complaint was going to
15 be used as a basis for independent
16 evaluation and submitted to the FDA,
17 correct?
18        MS. BROWN:  Object,
19    foundation.
20        THE WITNESS:  The
21    company had their procedures about
22    what to do with complaints and I
23    assume they followed them.  I
24    didn't have any insight into that.

Page 455

1 BY MR. PLACITELLA:
2    Q.  So they kept that from you?
3    A.  I didn't say that --
4    Q.    (MS. BROWN) Objection,
5 argumentative.
6 BY MR. PLACITELLA:
7    Q.  So you do know?
8        MS. BROWN:  Wait, wait,
9    wait.  Hold on.  Hold on.
10        THE WITNESS:  They
11    didn't keep anything from me.
12    That's not a proper way to put it.
13    I said I didn't know what they did,
14    they had their own procedures.
15 BY MR. PLACITELLA:
16    Q.  Okay.  They shared, they shared
17 these reports with you as they came in?
18        MS. BROWN:  Objection.
19    Misstates the testimony.
20        THE WITNESS:  I didn't
21    see all documents from the company,
22    no.
23 BY MR. PLACITELLA:
24    Q.  Okay.  Now, information

John O'Shaughnessy

---

Page 456

1 available to answer questions in one case
2 would be relevant to answer similar
3 questions in other cases, do you agree with
4 that?
5            MS. BROWN:  Objection,
6      Your Honor, work product.
7            JUDGE SCHNEIDER:  I
8      think that's a general question not
9      asking about specific case
10     preparation and litigation, so
11     objection overruled.
12           THE WITNESS:  I do
13     believe, yes, it is a general
14     question.  I can't answer it in
15     that form.  Each case is treated
16     individually.
17 BY MR. PLACITELLA:
18     Q.  So, for example, when you had
19 your deposition taken last week by
20 Mr. Block, you don't think that's relevant
21 to what you might have to talk about here
22 today?
23     A.  That's not for me to decide.
24 That's for the judge to decide.

---

Page 457

1     Q.  Okay.  But you understood as a
2 lawyer in charge of the litigation that if
3 somebody provided sworn testimony under
4 oath, that might be evidence in another
5 case with similar allegations, correct?
6            MS. BROWN:  Objection,
7      vague.  Doesn't make sense.
8            THE WITNESS:  I can't
9      speculate as to where it may be
10     used or where it may --
11 BY MR. PLACITELLA:
12     Q.  I'm not asking you to
13 speculate.  I'm asking --
14     A.  Well, then, I don't know.
15     Q.  You don't know.  Okay.  That's
16 fine.  Last week you testified that in
17 cases that you supervised, Johnson &
18 Johnson swore under oath that Johnson's
19 Baby Powder's never contained asbestos in
20 any form or tremolite.  Do you recall that?
21     A.  Yes, I do.
22     Q.  Okay.  And you indicated that
23 in making that statement that you relied
24 upon Dr. Hopkins, true?

---

Page 458

1     A.  I think I stated we relied on
2 all the people we spoke to at the company
3 and he would be one of them.
4     Q.  Well, Mr. Block asked you for
5 specific names and you gave him Dr.
6 Hopkins, Mr. Ashton, and Mr. Chudkowski,
7 correct?
8     A.  Those are the names I could
9 remember, but our lawyers when they went
10 and did their research to respond to this
11 or to prepare themselves for litigation
12 would have talked to way more than those
13 people.
14     Q.  That's fine.  I'm just asking
15 you.  You recall that Dr. Hopkins,
16 Mr. Ashton, and Chudkowski were at least
17 some of the people that you relied upon,
18 correct?
19     A.  Yes.
20     Q.  Okay.  What about Roger Miller?
21     A.  Him too.
22     Q.  What about Bruce Semple?
23     A.  I don't recall, I know Bruce,
24 Dr. Semple, and we certainly interviewed

---

Page 459

1 him.  I don't recall when he was there,
2 because I know he left the company, so I'm
3 not sure.
4     Q.  And wasn't he the medical
5 director at Johnson & Johnson?
6     A.  He was at one point, I think,
7 yeah.
8     Q.  Now, I wouldn't ordinarily ask
9 you this question, I don't want to insult
10 you, but at the end of the last deposition,
11 Ms. Brown asked you this question, so I
12 want to get it up front so I'm not accused
13 of being unfair, because you accused
14 Mr. Block of being unfair.  Do you remember
15 that?
16           MS. BROWN:  Object to
17     the argumentative nature of these
18     questions.
19 BY MR. PLACITELLA:
20     Q.  Do you remember accusing
21 Mr. Block of being unfair --
22     A.  I thought the inference was
23 unfair.
24     Q.  Okay.  You believe you had a

---

John O'Shaughnessy

| Page 460 |
| --- |

1 duty to provide truthful and accurate
2 information to all parties including
3 courts, correct?
4    A.  Yes, yes.
5    Q.  Okay.  And that would include
6 not withholding any evidence that might
7 lead to the discovery of relevant
8 admissible evidence, correct?
9    A.  Whatever was required by the
10 cases.
11       MR. PLACITELLA:  Okay.
12    Can you read my question back,
13    please?
14       - - - - -
15    (Whereupon, the reporter read
16    back as requested.)
17       - - - - -
18       THE WITNESS:  In
19    general, yeah.
20 BY MR. PLACITELLA:
21    Q.  Okay.  And the ability to
22 provide truthful and accurate information
23 is entirely dependent on whether the
24 scientists and executives at Johnson &

| Page 461 |
| --- |

1 Johnson were entirely truthful and
2 forthright with you, right?
3       MS. BROWN:  Objection,
4    speculation, foundation.
5       THE WITNESS:  We
6    depended on them to provide us with
7    the information.
8 BY MR. PLACITELLA:
9    Q.  Okay.  Let me ask the question
10 again.  Your ability in the context of
11 litigation to provide truthful and accurate
12 information is entirely and was entirely
13 dependent on whether the scientists and
14 executives at Johnson & Johnson were
15 entirely truthful and forthright with you?
16       MS. BROWN:  Same
17    objections and asked and answered.
18       THE WITNESS:  Yeah, you
19    know, in general, yes, but I'm
20    having trouble with entirely,
21    because there could have been other
22    sources of information that we
23    relied on to provide answers, I
24    just don't --

| Page 462 |
| --- |

1 BY MR. PLACITELLA:
2    Q.  I understand that part, but you
3 depended on them to --
4    A.  We did.
5    Q.  -- tell you the truth and the
6 whole truth when you were asking for
7 information to respond to discovery, true?
8    A.  Yes.
9    Q.  Okay.  Now, you go to your book
10 number one and take out Exhibit 188.  And
11 I'm going to put it up on the screen.  And
12 I'm putting up, the first page I'm going to
13 put up is 188.2.  And 188.2 is a July 23,
14 1987, letter from Ronald Levitt to a
15 Mr. Ronald Grayzel.
16    A.  I'm just having trouble.
17    Q.  Yeah, I know, it's a lot of
18 stuff.
19    A.  It's falling apart.
20       MS. BROWN:  You know
21    what, I'm going to switch binders
22    with you, John.
23       THE WITNESS:  Yeah,
24    thanks.

| Page 463 |
| --- |

1       MS. BROWN:  Yeah, of
2    course.
3       - - - - -
4    (Stipulation of Dismissal,
5    Letter dated 7/23/87, Affidavit of
6    Roger Miller, and Letter dated
7    1/28/87 marked O'Shaughnessy
8    Exhibit 188 for identification.)
9       - - - - -
10 BY MR. PLACITELLA:
11    Q.  See, Lea, I told you the
12 binders are too fat.  Okay.  This is a
13 letter from Ronald Levitt to Mr. Ron
14 Grayzel.  He was a lawyer with an office in
15 Edison, New Jersey.  Do you see that?
16    A.  I do.
17    Q.  And he -- and it's written, it
18 says enclosed please find -- here, let me
19 get -- blow that up.  "Enclosed please find
20 an affidavit on behalf of Windsor Minerals,
21 Inc. signed by Roger Miller, president of
22 Windsor Minerals since 1968."  Do you see
23 that?
24    A.  I do.

John Q. O'Shaughnessy

Page 464

1    Q.  He was one of the people you
2 relied on to tell you the truth and the
3 whole truth?
4    A.  Yes.
5    Q.  Okay.  It says "Also enclosed
6 you will find an assay from McCrone
7 Environmental Services.  I trust that these
8 documents will now unable to sign a
9 dismissal as was done in the Yuhas file."
10 Do you see that?
11    A.  Yes.
12    Q.  And now I want to go to the
13 actual affidavit of Mr. Miller.  That's the
14 next page.  He says that -- and Mr. Miller
15 was the president of Johnson & Johnson,
16 correct -- of Windsor Minerals, correct?
17    A.  Yes.
18    Q.  And that was a wholly-owned
19 subsidiary of Johnson & Johnson, correct?
20    A.  Yes.
21    Q.  And you worked as a lawyer, you
22 worked as a lawyer for both Windsor
23 Minerals and Johnson & Johnson at the same
24 time?

Page 465

1    A.  Yes.
2    Q.  Okay.  And Mr. Miller says "I
3 am the president of Windsor Minerals."  Do
4 you see that?
5    A.  Yes.
6    Q.  And then he goes on and he says
7 "The exclusive business of Windsor
8 Minerals, Inc. is and has been for the last
9 18 years the mining and milling of talc
10 from a single mining district in Windsor,
11 Vermont.  The mining district is the
12 exclusive source of talc for all Johnson's
13 Baby Powder sold in the United States."
14 That was your understanding, correct?
15    A.  Yes.
16    Q.  Okay.  He goes on to say, "In
17 addition to supplying the talc for
18 Johnson's Baby Powder, Windsor Minerals
19 also sells a portion of its product to
20 independent industrial users."  Do you see
21 that?
22    A.  I do.
23    Q.  Okay.  Go to the next page,
24 please.  He states "All of the talc mined

Page 466

1 by Windsor Minerals, Inc., whether it is
2 ultimately sold to industrial users or used
3 in Johnson's Baby Powder, is sampled and
4 tested for the presence of asbestos."  Do
5 you see that?
6    A.  I do.
7    Q.  "No evidence of the presence of
8 asbestos in Windsor Minerals' product has
9 ever be revealed by this testing."  Do you
10 see that?
11    A.  Yes.
12    Q.  And you understand there's a
13 difference between saying no evidence, but
14 there is evidence, but we don't agree with
15 it?  You understand there's a difference,
16 right?
17        MS. BROWN:  Objection,
18     vague.
19        THE WITNESS:  Yeah, I
20     guess so, yeah.
21 BY MR. PLACITELLA:
22    Q.  Okay.  And what he does is he
23 attaches a report.  Do you see that?
24 That's the next page.

Page 467

1    A.  I do, yes.
2    Q.  And you've seen reports like
3 this before in defending Johnson & Johnson,
4 correct?
5    A.  I've seen testing reports from
6 time to time, yes.
7    Q.  Okay.  And what the report
8 says, it gives a whole bunch of numbers and
9 it says "examination found no quantifiable
10 amounts of asbestiform minerals."  Do you
11 see that?
12    A.  I do.
13    Q.  Now, have you ever been
14 involved in drafting similar affidavits?
15 Were you involved in drafting this
16 affidavit?
17    A.  No, it was before my time
18 there.
19    Q.  Were you ever involved in
20 drafting similar affidavits?
21    A.  I believe so.
22    Q.  Okay.  And do you know what the
23 factual predicate is for this affidavit?
24 What's the factual basis for it?

Page 468

1    MS. BROWN:  I object,
2    that last foundation, he said he
3    wasn't involved in this affidavit.
4        MR. PLACITELLA:  You can
5    answer it.
6        THE WITNESS:  I don't
7    know the factual -- for this
8    particular affidavit, I don't know.
9    I mean, I didn't prepare it, so I
10   don't know that I had any
11   discussions around it, et cetera.
12 BY MR. PLACITELLA:
13   Q.  Okay.  Can you go to Johnson &
14 Johnson 1054, which is in book two?  While
15 you're looking, can you tell me who John N.
16 Beidler is?
17   A.  He was an attorney with Johnson
18 & Johnson.
19       - - - - -
20     (Letter dated 8/27/86 marked
21     O'Shaughnessy Exhibit 1054 for
22     identification.)
23       - - - - -
24

Page 469

1 BY MR. PLACITELLA:
2    Q.  He worked with you in defending
3 talc cases?
4    A.  No, he handled it before I came
5 to the company.
6    Q.  Okay.  And did he work for the
7 office of general counsel?
8    A.  He did.
9    Q.  All right.  1054 is a letter
10 from John Beidler to the same Ronald
11 Grayzel in the Edley case.  Do you see
12 that?
13   A.  Yes.
14   Q.  And it's on Johnson & Johnson
15 letterhead indicating it came from the
16 office of the general counsel, correct?
17   A.  Yes.
18   Q.  Okay.  And what Mr. Beidler --
19       MS. BROWN:  Object to
20     this document as lacking
21     foundation.
22 BY MR. PLACITELLA:
23   Q.  States is "Please be advised
24 that Windsor Minerals Inc., contrary to the

Page 470

1 allegation in the Complaint, does not now
2 engage or has never engaged in the
3 manufacture or supply of
4 asbestos-containing products."  Do you see
5 that?
6    A.  Yes.
7    Q.  And then he goes on to say
8 "Rather, the exclusive business of Windsor
9 Minerals is and has been the mining and
10 milling of talc from a single mining
11 district in Windsor, Vermont.  That mining
12 district is the exclusive source of the
13 talc for all of the Johnson's Baby Powder
14 sold in the United States as well as a
15 source of pure talc sold to independent
16 industrial users."  Did I read that
17 correctly?
18   A.  Yes.
19   Q.  "All of the talc mined by
20 Windsor Minerals, whether ultimately sold
21 to industrial users or used in Johnson's
22 Baby Powder, is sampled and tested for the
23 presence of asbestos and no evidence of the
24 presence of asbestos in any Windsor Mineral

Page 471

1 product has ever been revealed."  Do you
2 see that?
3    A.  I do.
4    Q.  That's the same exact language
5 that ended up in Mr. Miller's affidavit,
6 isn't it?
7    A.  If you say so, I didn't compare
8 them.  It's similar, certainly.
9    Q.  So now we know where Mr. Miller
10 got the information?
11       MS. BROWN:  I object,
12     speculation, foundation.
13       THE WITNESS:  No.  I
14     wasn't employed by the company at
15     this time, so you're asking me
16     questions that I don't know.
17 BY MR. PLACITELLA:
18   Q.  It goes on to say "Under the
19 circumstances, there obviously can be no
20 reasonable knowledge, information or belief
21 which provides good ground to support to
22 pleading under Rule 1:48."  Do you see
23 that?
24   A.  I do.

Page 472

1    Q.  You were a New Jersey lawyer,
2 correct?
3    A.  I was, yeah.
4    Q.  And you know that that is the
5 citation to the New Jersey frivolous
6 lawsuit statute, right?
7    A.  I don't recall it.
8    Q.  And you understand that the
9 frivolous lawsuit statute, when you write a
10 letter like this, you are threatening a
11 lawyer with sanctions if they don't dismiss
12 the complaint?
13        MS. BROWN:  I object.
14    That misstates the evidence and
15    lacks foundation.
16        THE WITNESS:  I didn't
17    write this letter.
18 BY MR. PLACITELLA:
19    Q.  Did you ever write similar
20 letters?
21    A.  I don't believe I did.
22    Q.  Okay.  Now, I want to go back
23 to 188.  When we talked about the
24 information that was in the letter where

Page 473

1 Miller attached the tests from McCrone.
2    A.  Yes.
3    Q.  Okay.  And he used a
4 nonquantifiable, no quantifiable amount
5 language?
6    A.  Yes.
7        MS. BROWN:  Objection,
8    vague.
9 BY MR. PLACITELLA:
10    Q.  And that's language that you're
11 familiar with, correct?
12        MS. BROWN:  Objection,
13    foundation.
14        THE WITNESS:  I know
15    it's language used in testing
16    reports.
17 BY MR. PLACITELLA:
18    Q.  Okay.  And but before we get
19 there, let's just go to the front of this.
20 The very first page of 188.
21    A.  Yes.
22    Q.  Do you see that after this
23 affidavit was produced, Mr. Grayzel agreed
24 to dismiss this case?

Page 474

1        MS. BROWN:  Objection,
2    foundation, speculation.
3        THE WITNESS:  I don't
4    know.  What I'm looking at is a
5    Stipulation of Dismissal.
6 BY MR. PLACITELLA:
7    Q.  Right.  And this Stipulation of
8 Dismissal was actually filed with the judge
9 in charge of all the asbestos cases in the
10 State of New Jersey, Judge Keefe.  Did you
11 know Judge Keefe?
12        MS. BROWN:  Objection,
13    speculation, foundation.
14        THE WITNESS:  I don't
15    know judge -- did Judge Keefe
16    retire and become a mediator?
17 BY MR. PLACITELLA:
18    Q.  Eventually, yes, after he went
19 to the appellate division with a very fine
20 career.
21    A.  That's how I know Judge Keefe.
22    Q.  Okay.  And if you look at 1053,
23 J&J 1053, which should be in your book two.
24 You will see that the Stipulation of

Page 475

1 Dismissal was filed with Judge Keefe.  Do
2 you see that?
3    A.  I do.
4       - - - - -
5        (Letter dated 6/6/88 marked
6    O'Shaughnessy Exhibit 1053 for
7    identification.)
8       - - - - -
9 BY MR. PLACITELLA:
10    Q.  Okay.  And one of the people
11 that you say you relied upon was John
12 Hopkins, correct?
13    A.  Yes.
14    Q.  Are you aware that in trial
15 before a jury, John Hopkins testified that
16 this document, this affidavit was false on
17 its face?
18        MS. BROWN:  I object.
19    Misstates the evidence.  Lacks
20    foundation.
21 BY MR. PLACITELLA:
22    Q.  Okay.  I'll show you the
23 evidence.  Can you go to your transcript
24 book, please, where it says Hopkins TR?

Page 476

1    A.  One or two?
2    Q.  Yeah, hold on.  It's 1060 in
3 the transcript book.  It says trial
4 testimony in the Barden case and I'll put
5 it up.  And I'll put it up on the screen
6 for you, if you need to look at it later --
7         MS. BROWN:  Well, can he
8    review, hear the entirety of the
9    testimony?
10        MR. PLACITELLA:  The
11   whole transcript, I think we don't
12   have time for that, but --
13        MS. BROWN:  I want to
14   know where this is talked about on
15   redirect.
16        MR. PLACITELLA:  You can
17   ask him all that on redirect.
18        MS. BROWN:  Are you
19   putting that up or can he --
20        MR. PLACITELLA:  I'm
21   putting the whole document into
22   evidence, so no problem.
23        THE WITNESS:  I'm just
24   trying to find the document.

Page 477

1         MR. PLACITELLA:  I put
2    it up on the transcript --
3         MS. BROWN:  Right, I
4    just wanted to go to the document
5    and see the cover sheet.  Oh, that
6    single sheet is the exhibit?
7         - - - - -
8    (Transcript of John Hopkins
9    marked O'Shaughnessy Exhibit 1060
10   for identification.)
11        - - - - -
12 BY MR. PLACITELLA:
13   Q.  Yes, sir.  I'll put the whole
14 transcript into evidence.
15   A.  Okay.
16        MS. BROWN:  I'll just
17   object to selective reading --
18        THE WITNESS:  I'm just
19   trying to go to your sheet.
20        MS. BROWN:  -- of this
21   questioning.  That's incomplete.
22        THE WITNESS:  1068?
23        MR. PLACITELLA:  1060.
24        THE WITNESS:  I have

Page 478

1    1060A.
2 BY MR. PLACITELLA:
3    Q.  You know what, we'll come back
4 to it, because I'm trying to get this done
5 today.  Did John Hopkins ever have a
6 conversation with you and tell you that
7 affidavits like this were untrue?
8    A.  I had many conversations with
9 John.  I never had a discussion with him
10 about an untrue affidavit.
11   Q.  Okay.  In 188, do you see where
12 Johnson & Johnson told Mr. Grayzel that
13 they wanted a dismissal in this case just
14 like he gave in the other cases?
15   A.  Can you put it up?  I'm having
16 trouble with -- I'm sorry.
17   Q.  That's okay, I put it right in
18 front of you.
19        MS. BROWN:  So, John, if
20   you want the hard copy, I think we
21   are now back in binder one and
22   we're looking at 188, which you
23   probably still have open or close
24   to open.

Page 479

1         MR. PLACITELLA:  You can
2    look at the hard copy, but I'm
3    not --
4         THE WITNESS:  You know,
5    part of the problem is, it says
6    '88, but there's a handwritten one
7    and that gets confusing.
8 BY MR. PLACITELLA:
9    Q.  I understand.
10   A.  I got it.  I got it.
11   Q.  Do you see where it says "I
12 trust these documents will now enable you
13 to sign a dismissal."  And when they say
14 these documents, they're talking about the
15 Miller affidavit, right?
16        MS. BROWN:  I object,
17   foundation.
18 BY MR. PLACITELLA:
19   Q.  "As was done in the Yuhas
20 file".  Do you see that?
21   A.  Yes, you read that to me
22 before.
23   Q.  So this was a second case that
24 was dismissed based upon the representation

Page 480

1 of no asbestos being in the Johnson &
2 Johnson talc, right?
3           MS. BROWN:  Lacks
4      foundation, I object.
5           THE WITNESS:  I don't
6      know.
7 BY MR. PLACITELLA:
8      Q.  Okay.  Whatever happened to the
9 Yuhas file, do you know?
10      A.  I have no idea.  That was
11 before my time.
12      Q.  Do you know what happened to
13 the Edley file?
14      A.  No.
15      Q.  Going back to the report in
16 188.5, that talks about no quantifiable
17 evidence?
18      A.  Okay.
19      Q.  Okay.  Are you aware that the
20 term "nonquantifiable" does not mean
21 asbestos free as Mr. Miller actually
22 states?
23           MS. BROWN:  I object.
24      That misstates the evidence and

Page 481

1      lacks foundation.
2           THE WITNESS:  I'm not
3      competent to interpret what that
4      term means.
5 BY MR. PLACITELLA:
6      Q.  Did you know that that was a
7 code word for not reporting the actual test
8 results?
9           MS. BROWN:  Objection.
10      Misstates the evidence, the facts,
11      lacks foundation.
12           THE WITNESS:  I never
13      heard anything about a code word.
14 BY MR. PLACITELLA:
15      Q.  Did you ever see any of the
16 Johnson & Johnson, McCrone, the test
17 results that McCrone did for Johnson &
18 Johnson before 1988?
19      A.  I've seen some testing
20 documents and I think I've seen some from
21 McCrone, the date of which I'm not sure.
22      Q.  Okay.  I'm going to provide you
23 what I have marked as JOS 1 and JOS 1A,
24 which I will represent to you are

Page 482

1 documents, McCrone test results that were
2 provided predating the Edley report, the
3 Edley affidavit with one exception.  And
4 there's a copy for you behind you.
5           MS. BROWN:  Okay.  Can
6      we hang on, so we can grab copies
7      of this?
8           MR. PLACITELLA:  Yeah,
9      there's McCrone 1 and 2 and there's
10      a copy behind you as well on the
11      radiator.
12           MR. BERNARDO:  All
13      right.  Chris, McCrone 1  and 2?
14           MR. PLACITELLA:
15      Correct.
16           MR. BERNARDO:  Thanks.
17      - - - - -
18      (McCrone Binders marked
19      O'Shaughnessy Exhibits JOS 1 and 2
20      for identification.)
21      - - - - -
22 BY MR. PLACITELLA:
23      Q.  And can you, in McCrone number
24 1, can you go to Exhibit 180.2?

Page 483

1      A.  Got it.
2           MR. COX:  I have 180.
3           MS. BROWN:  Oh, the
4      second page of 180.
5           MR. PLACITELLA:  It
6      says, I put numbers so people can
7      see it.
8           MS. BROWN:  We got it.
9 BY MR. PLACITELLA:
10      Q.  You can see that this report is
11 from August 1985, correct?
12      A.  That's what it says here.
13      Q.  Okay.  And that was -- and it's
14 a letter from McCrone, correct?
15      A.  That's right.
16      Q.  All right.  And that predates
17 the Miller affidavit, correct?
18           MS. BROWN:  Object as
19      lacking foundation.
20           THE WITNESS:  It's 1985.
21 BY MR. PLACITELLA:
22      Q.  Okay.  And can we go to the
23 second page?  Do you see where it says "The
24 presence of asbestos minerals was verified

Page 484

1 by selected area electron diffraction,
2 (SAED), energy dispersive X-ray analysis
3 and by morphology."  Did I read that
4 correct?
5       A.  Yes.
6       Q.  It says "Chrysotile asbestos
7 was detected only in the samples labeled
8 WMI 85-28 and WMI 85-30."  Do you see that?
9       A.  I do.
10       Q.  Okay.  Now, I'm going to leave
11 that.  And if you can now go to book two in
12 your J&J books.  Okay.  And go to
13 Exhibit 1048.  And I'm going to put it up
14 on the screen.  I'm going to show you the
15 whole thing.
16       A.  I got it.
17           - - - - -
18       (Letter dated 9/10/85 Bates JNJ
19       000064652 marked O'Shaughnessy
20       Exhibit 1048 for identification.)
21           - - - - -
22 BY MR. PLACITELLA:
23       Q.  And do you see this is a letter
24 a month later from Roger Miller, right?

Page 485

1       A.  Yes.
2       Q.  All right.  And the date is
3 September 10, 1985, right?
4       A.  Yes.
5       Q.  And Roger Miller is one of the
6 people that you depended upon to tell you
7 the whole truth, right?
8       A.  Yes.
9       Q.  And Roger Miller writes to
10 McCrone.  Do you see that?
11       A.  Yes.
12       Q.  And he writes and he says "I am
13 touching base with you on methodology and
14 reports by your representatives on analysis
15 of our products.  I also want to complain
16 on their failure to read our
17 correspondence."  Did I read that correct?
18       A.  You did.
19       Q.  It says, I'm sorry, "We
20 submitted, on July 11, to Mark Palenik,
21 seven samples."  Do you see that?
22       A.  Yeah.
23       Q.  And you got -- and he got a
24 report back on August 22.  Do you see that?

Page 486

1       A.  Uh-huh.
2       Q.  All right.  And that's the
3 August 22 report up on the screen to the
4 left.  Do you see that?
5           MS. BROWN:  That lacks
6       foundation.
7           THE WITNESS:  You know,
8       I don't know, this is before I was
9       with Johnson & Johnson, but, you
10       know, it's connected to it, I
11       guess.
12 BY MR. PLACITELLA:
13       Q.  Yeah, I'm just trying to figure
14 out if they told you the whole truth.
15           MS. BROWN:  Well, that's
16       argumentative.
17           MR. PLACITELLA:  So let
18       me ask you --
19           MS. BROWN:  Wait, hold
20       on, hold on.
21           THE WITNESS:  They did,
22       as far as I'm concerned.
23           MR. PLACITELLA:  Well,
24       let's find out.

Page 487

1           MS. BROWN:  Chris
2       Placitella, let him finish.  I
3       object as argumentative and I
4       object to both of these documents
5       as lacking foundation.
6 BY MR. PLACITELLA:
7       Q.  Okay.  It says on the next
8 paragraph, "The August 22 report is couched
9 in substantially different language than
10 earlier reports.  As I explained to you on
11 my visit to Chicago it is a very important
12 that specific language be used."  Do you
13 see that?
14       A.  I do.
15       Q.  Okay.  And now I'm going to
16 show you, can you go to J&J 181 in the
17 McCrone book of testing.
18       A.  Got it.
19       Q.  Okay.  Do you see this is a
20 subsequent report now written by McCrone to
21 Mr. Miller.  Do you see that?
22       A.  Yes.
23       Q.  Okay.  And it references the
24 same exact samples from the August 22,

John Q. Shaughnessy

1 1985, report where McCrone reported
2 asbestos in the testing, right?
3          MS. BROWN:  Lacks
4     foundation.
5          THE WITNESS:  I didn't
6     check, but I assume you're right.
7 BY MR. PLACITELLA:
8     Q.  It says, look, I don't want to
9 assume anything.  The samples were
10 identified as WMI85-25 through 31, right.
11 And that's the same one, I have it up on
12 the screen right in front of you, it's the
13 same samples?
14     A.  Yes.
15     Q.  But after being admonished by
16 Mr. Miller, the new letter says the
17 following, correct.  "Under your purchase
18 order, WS-17577, we received seven talc
19 samples for asbestos analysis.  The samples
20 were identified as WMI85-25 through
21 WMI85-31.  Examination by transmission
22 election microscopy did not find any
23 quantifiable amount of asbestiform minerals
24 in any of the samples."  Did I read that

1 correct?
2          MS. BROWN:  Object to
3     the question as argumentative and
4     lacking foundation.
5          THE WITNESS:  What is
6     the question, did you read it
7     correctly?
8 BY MR. PLACITELLA:
9     Q.  Yes, sir.
10     A.  You read it correct.
11     Q.  And the report was changed from
12 finding asbestos to finding no asbestos
13 after Roger Miller weighed in and
14 admonished McCrone for using asbestos
15 findings in the report.  Isn't that what
16 happened?
17          MS. BROWN:  Incorrect,
18     misstates the evidence.  Lacks
19     foundation.  Calls for speculation.
20          THE WITNESS:  You're
21     asking me for what happened two
22     years before I was at the company,
23     so I don't know that happened.  I
24     don't know if there was an

1 admonishment.  I saw a letter from
2     Mr. Miller to him, so you know,
3     you're asking me to interpret
4     something, you know, I have no
5     familiarity with.
6 BY MR. PLACITELLA:
7     Q.  Well, that's the issue I'm
8 having.  Was this ever shared with you by
9 Mr. Miller?
10          MS. BROWN:  Objection to
11     the speech.
12          THE WITNESS:  I don't
13     know if I saw these documents
14     before.  I saw a lot of documents.
15     I don't know.
16 BY MR. PLACITELLA:
17     Q.  Well, would you allow
18 Mr. Miller to sign an affidavit saying
19 there was absolutely no evidence if you had
20 seen these reports before he signed the
21 affidavit?
22          MS. BROWN:  Objection.
23     Misstates the evidence.
24          THE WITNESS:  It's a

1 hypothetical I can't answer.
2          MS. BROWN:  Lacks
3     foundation.
4          THE WITNESS:  Because I
5     would have to have him explain to
6     me, you know, these documents.
7 BY MR. PLACITELLA:
8     Q.  Did he ever explain to you
9 these documents?
10     A.  Like I said, I don't know if I
11 ever discussed it with him or not.
12     Q.  So you have no recollection of
13 him explaining these documents to you?
14     A.  No, it has been, you know, over
15 30 years since I worked on these cases.
16     Q.  You don't think you would
17 remember if somebody was filing an
18 affidavit that said there was no evidence
19 and they actually showed you evidence?
20          MS. BROWN:  That lacks
21     foundation.
22          THE WITNESS:  Well,
23     that's easy, because I never was
24     aware of any evidence that showed

Page 492

1    that anything that the company was
2    stating in its affidavits was not
3    truthful.
4  BY MR. PLACITELLA:
5    Q.  Okay.  You didn't see the
6  McCrone report reporting asbestos then?
7         MS. BROWN:  That
8    misstates testimony.
9         THE WITNESS:  No, I
10    don't know if I did or didn't.
11         MS. BROWN:  Can we take
12    a break and figure out why there's
13    no air conditioning in this room
14    right now?
15         MR. PLACITELLA:  Sure.
16         MS. BROWN:  Thank you.
17         THE VIDEOGRAPHER:  Off
18    the record, 10:28 a.m.
19         - - - - -
20    (A recess was taken at this time.)
21         - - - - -
22         THE VIDEOGRAPHER:  We
23    are back on the record at
24    10:43 a.m.

Page 493

1  BY MR. PLACITELLA:
2    Q.  Okay.  Would you agree that
3  when witnesses die, unless there's
4  something in writing, their personal
5  knowledge concerning the facts related to a
6  case die with them?
7         MS. BROWN:  Foundation.
8         THE WITNESS:  You know,
9    I don't know what, you know,
10    unfortunately, look, this is
11    obvious, when a person dies,
12    whatever they know or knowledge
13    with them as a source has ended.
14    So I don't know, I'm agreeing
15    with --
16  BY MR. PLACITELLA:
17    Q.  So, for example, with
18  Mr. Miller, he's dead, right?
19    A.  I believe he is.  I was never
20  told that, but I just, based on his age, it
21  does --
22    Q.  So the only thing we have left,
23  because we didn't have a chance to take
24  this deposition, was the letters he wrote

Page 494

1  and his testimony or sworn affidavits,
2  correct?
3         MS. BROWN:  Objection,
4    foundation, speculation.
5         THE WITNESS:  I don't
6    know if there's anything else.
7    That sounds right, but you know,
8    there may other things I just
9    sitting here can't think of.
10  BY MR. PLACITELLA:
11    Q.  Okay.  That's fair.  Before I
12  move to the next topic, going back to 1054,
13  this is the letter to Mr. Grayzel where
14  Johnson & Johnson's threatened Mr. Grayzel
15  with frivolous lawsuit sanctions?
16         MS. BROWN:  Well, that
17    misstates the document.  I object.
18         MR. PLACITELLA:  Oh, I
19    don't think it misstates anything.
20         MS. BROWN:  It's your
21    interpretation.
22  BY MR. PLACITELLA:
23    Q.  It says on the bottom
24  "Parenthetically, we received a Complaint

Page 495

1  several months ago filed by the Wysoker
2  firm here in New Brunswick," because the
3  Wysoker firm was right down the street from
4  Johnson & Johnson, wasn't it?
5    A.  I don't know.  I don't know.
6    Q.  And the courthouse where these
7  affidavits were filed and these letters
8  related to, that was, like, two or three
9  blocks from your headquarters, right?
10    A.  If they were filed in Middlesex
11  County Courthouse, yes.
12    Q.  And it says we received a
13  Complaint from the Wysoker firm a few
14  months ago from another employee who worked
15  at the same place, we told them the same
16  thing and the plaintiff lawyer dismissed
17  his case, right?
18         MS. BROWN:  Lacks
19    foundation.  Misstates the
20    document.
21         THE WITNESS:  I don't
22    know, I don't know the facts of the
23    case and you just kind of summed it
24    up, I don't --

John A. O'Shaughnessy

Page 496

¹ BY MR. PLACITELLA:
²    Q.  I don't want to misstate so --
³      MS. BROWN:  Let him
⁴ finish his answer.
⁵      THE WITNESS:  I'm not
⁶ saying you misstated anything, it's
⁷ just that I don't know.  I don't
⁸ know Bird & Son.  I don't know the
⁹ Wysoker firm and I don't know this
¹⁰ other complaint that is mentioned
¹¹ by complaint.  Again, this is
¹² before my time there.  I have no
¹³ knowledge of this.
¹⁴ BY MR. PLACITELLA:
¹⁵    Q.  Well, now I've counted three
¹⁶ cases that were apparently dismissed based
¹⁷ upon the representation that there's no
¹⁸ evidence of asbestos in Johnson & Johnson's
¹⁹ talc, right?
²⁰      MS. BROWN:  That
²¹ assumes, misstates the evidence and
²² lacks foundation.
²³      THE WITNESS:  That could
²⁴ be true.  I don't know.

Page 497

¹ BY MR. PLACITELLA:
²    Q.  Okay.  And what happened to the
³ file from the Wysoker firm's file when the
⁴ case was dismissed?  What happened to that
⁵ file?
⁶      MS. BROWN:  Foundation.
⁷      THE WITNESS:  I have no
⁸ idea.  I don't know.
⁹ BY MR. PLACITELLA:
¹⁰    Q.  Now, there was a case named
¹¹ Andonian, A-N-D-O-N-I-A-N.  You know that
¹² case, correct?
¹³    A.  I don't believe so.
¹⁴    Q.  Okay.  Can you go to 1061,
¹⁵ please?
¹⁶    A.  Okay.
¹⁷      - - - - -
¹⁸    (Andonian Case Witness List
¹⁹    Bates JNJ 000065334 to 65339 marked
²⁰    O'Shaughnessy Exhibit 1061 for
²¹    identification.)
²²      - - - - -
²³ BY MR. PLACITELLA:
²⁴    Q.  And 1061 is a document dated

Page 498

¹ March 28, 1995, with your stamp received on
² it.  Do you see that?
³    A.  I do.
⁴    Q.  And it's a witness list in the
⁵ Andonian case, correct?
⁶    A.  Yes.
⁷    Q.  Okay.  And can you go to 282 in
⁸ book one, please, and I'll put it up.  282,
⁹ while you're looking for it, and I'll
¹⁰ identify it is an affidavit filed by Roger
¹¹ Miller, July 8, 1988, in the Andonian case.
¹² Do you see that?
¹³    A.  My book seems to skip.
¹⁴    Q.  It should be 282.
¹⁵    A.  259 to 297.  Does that sound
¹⁶ right?
¹⁷    Q.  It doesn't sound right, but
¹⁸ maybe I can fix it at the break.  I'll show
¹⁹ you the whole thing here.
²⁰      MS. BROWN:  I'm going to
²¹ give you my copy, John, 282.
²²      THE WITNESS:  Just pile
²³ it on.
²⁴      MS. BROWN:  Are we done

Page 499

¹ with the McCrone books or do we
² keep them?
³      MR. PLACITELLA:  I think
⁴ you keep them handy.
⁵      THE WITNESS:  Okay.
⁶      - - - - -
⁷    (Roger Miller Affidavit in
⁸    Andonian case Bates
⁹    JNJ-WIL__0000094 to 95 marked
¹⁰    O'Shaughnessy Exhibit 282 for
¹¹    identification.)
¹²      - - - - -
¹³ BY MR. PLACITELLA:
¹⁴    Q.  This an affidavit filed by
¹⁵ Mr. Miller in a case that you worked on.
¹⁶    A.  That's right.
¹⁷    Q.  Okay.  And if you go to the
¹⁸ second page, Mr. Miller -- this is a year
¹⁹ after the Edley case, right?
²⁰    A.  Yes.
²¹    Q.  Mr. Miller states under oath
²² "All of the talc mined by Windsor Minerals
²³ has been regularly sampled and tested for
²⁴ the presence of asbestos.  No evidence of

John O'Shaughnessy

Page 500

1 the presence of asbestos in Windsor
2 Minerals, Inc.'s products has ever been
3 revealed by this testing."  Did I read that
4 correctly?
5       A.  Yes.
6       Q.  And this affidavit, however,
7 doesn't attach any documents, correct?
8             MS. BROWN:  Objection,
9       foundation.
10            THE WITNESS:  Not, I
11      don't see any others.
12 BY MR. PLACITELLA:
13      Q.  Okay.  So do you have the
14 McCrone reports?
15      A.  I have those two binders you
16 gave me.
17      Q.  Yes.
18      A.  Yes.
19      Q.  Could we just put them over
20 here to your right, if you wouldn't mind.
21 There should be two.
22            MS. BROWN:  There's one
23      behind you.
24            THE WITNESS:  Oh,I put

Page 501

1       it on the floor, I'm sorry.
2 BY MR. PLACITELLA:
3       Q.  So here's one and two.
4       A.  Okay.
5       Q.  And my question to you is did
6 you turn over any of those documents in the
7 Andonian case?
8             MS. BROWN:  Objection.
9             MR. PLACITELLA:  In
10      McCrone 1 and 2.
11            MS. BROWN:  Number one,
12      I object.  We don't know what's in
13      those binders, and number two, I
14      object as lacking foundation.
15            MR. PLACITELLA:  Well,
16      they're all the McCrone reports.
17      I'll represent that to you.  Did
18      you turn over any McCrone reports
19      in the Andonian case?
20            MS. BROWN:  Objection to
21      form.  Lacks foundation.
22            THE WITNESS:  I don't
23      recall what was or was not turned
24      over in the Andonian case or what

Page 502

1       the state of the discovery was, so
2       I really can't answer the question.
3 BY MR. PLACITELLA:
4       Q.  Well, in the context of
5 submitting to the plaintiffs -- and by the
6 way, there were hundreds of plaintiffs in
7 the Andonian case, right?
8       A.  I don't recall.
9       Q.  In the context of submitting an
10 affidavit saying that there was no testing
11 available in the Andonian case, right, no
12 testing has ever revealed anything, did you
13 turn over any of the testing documents?
14            MS. BROWN:  Hold on.  I
15      object as lacking foundation that
16      there was even a request to Johnson
17      & Johnson.
18            THE WITNESS:  I don't
19      recall what was turned over in
20      discovery or not.
21 BY MR. PLACITELLA:
22      Q.  Okay.  Now, if I might, I'm
23 going to show you a book I went over with
24 Ms. Musco in her deposition and with Dr.

Page 503

1 Hopkins in his deposition.  And I spent
2 three days, yeah, you can put it aside, I'm
3 just going to put it right here.  You can
4 take a look at it.  And tell me if perusing
5 through it, did you turn any of these
6 testing documents in the Andonian case?
7             MS. BROWN:  I object, we
8       have -- lacking foundation that J&J
9       was even a defendant in that case
10      or that there were even any
11      requests.
12            MR. PLACITELLA:  So you
13      are --
14            MS. BROWN:  This whole
15      line of questioning lacks --
16            MR. PLACITELLA:  You are
17      representing on the record you were
18      not a defendant in the case now?
19            MS. BROWN:  I am saying
20      your question lacks foundation --
21            MR. PLACITELLA:  Oh,
22      okay.
23            MS. BROWN:  -- as you
24      have not even shown this witness a

Page 504

1    request in that case.
2 BY MR. PLACITELLA:
3    Q.  Okay.  Why don't we just --
4 I'll represent to you, Mr. Hopkins -- I'm
5 sorry, Mr. O'Shaughnessy, these are all the
6 testing documents I went over with Dr.
7 Hopkins for three days.  Do you have any
8 recollection of turning any of those
9 documents over, any documents over in the
10 Andonian case when you submitted the
11 affidavit saying that there was no testing
12 available?
13         MS. BROWN:  The
14    affidavit does not say there's no
15    testing available.
16         MR. PLACITELLA:  You're
17    right.
18         MS. BROWN:  So you're
19    misstating the evidence.
20 BY MR. PLACITELLA:
21    Q.  When you submitted the
22 affidavit that said no evidence of the
23 presence of asbestos in Windsor Minerals
24 products has ever been revealed, did you

Page 505

1 turn over any of those documents?
2         MS. BROWN:  I object,
3    this whole line of questioning
4    assume facts and misstates the
5    evidence, and we have no idea
6    what's in those binders.
7         THE WITNESS:  I don't
8    recall what the state of discovery
9    was in the Andonian case.  And by
10    that I mean, I don't know what they
11    requested or what was turned over
12    or even if they requested anything.
13    That would have been a matter of
14    record at the time.  You asked me
15    if I turned over any of these
16    documents and you point to me three
17    binders and I take you at your
18    word.  I respect that they are
19    Johnson & Johnson testing.  And you
20    asked me if I turned over any of
21    these documents.  It's impossible
22    for me to answer that question,
23    because, A, I don't recall as I
24    previously stated, but B, there's

Page 506

1    about a foot and a half of
2    documents here.  I would have to go
3    through them to see if I recognize
4    them and I don't recall, you know,
5    things from 30 years ago.
6 BY MR. PLACITELLA:
7    Q.  Okay.
8    A.  But my answer is, I go back to
9 the beginning, my answer is I don't recall
10 what the state of discovery may have been.
11    Q.  In the context of supplying
12 this affidavit saying that no evidence of
13 the presence was ever revealed, do you have
14 a recollection of turning any of those
15 testing documents?
16         MS. BROWN:  I object,
17    again, as lacking foundation that
18    this affidavit was even supplied by
19    us.
20         THE WITNESS:  I give the
21    same answer.
22 BY MR. PLACITELLA:
23    Q.  Okay.  Can you go to 1047.
24    A.  Got it.

Page 507

1    Q.  Okay.  1047 is an affidavit
2 submitted by Roger Miller on the exhibit
3 same day as the Andonian case.  Do you see
4 that?
5    A.  I do.
6    Q.  Yes?
7    A.  I do.
8         - - - - -
9    (Affidavit of Roger Miller in
10    Miller case  marked O'Shaughnessy
11    Exhibit 1047 for identification.)
12         - - - - -
13 BY MR. PLACITELLA:
14    Q.  Okay.  And he represents in the
15 Faye Miller case the same exact thing and
16 he's talking -- and he's referencing here
17 directly Windsor Minerals, that's you,
18 right?
19    A.  That's the --
20         MS. BROWN:  Objection.
21    Lacking foundation as to who
22    submitted this affidavit.
23         THE WITNESS:  That's the
24    subsidiary of Johnson & Johnson.

Page 508

¹ BY MR. PLACITELLA:
²    Q.  Right.  And again, Roger Miller
³ on behalf of the subsidiary of Johnson &
⁴ Johnson represents in the sworn testimony
⁵ no evidence of the presence of asbestos in
⁶ Windsor Minerals' products has ever been
⁷ revealed, correct?
⁸    A.  That's right.
⁹    Q.  Do you have any recollection of
¹⁰ turning over any of the testing documents
¹¹ to your right in the Faye Miller case?
¹²         MS. BROWN:  Objection as
¹³      assuming facts that there were
¹⁴      requests and lacking foundation
¹⁵      that we were involved.
¹⁶         THE WITNESS:  My same
¹⁷      answer as to the other questions, I
¹⁸      don't want to repeat.  If it's okay
¹⁹      if I don't repeat it.
²⁰ BY MR. PLACITELLA:
²¹    Q.  Okay.
²²    A.  I can if you want me to.
²³    Q.  That's fine.  Can you go to --
²⁴ by the way, what happened to the Andonian

Page 509

¹ files when the case was terminated?
²         MS. BROWN:  Lacks
³      foundation.
⁴ BY MR. PLACITELLA:
⁵    Q.  Because they weren't turned
⁶ over in discovery.
⁷         MS. BROWN:  To who -- I
⁸      object.  That lacks foundation on
⁹      so many levels and it's vague as to
¹⁰      turning over in discovery.
¹¹ BY MR. PLACITELLA:
¹²    Q.  Well, let me just -- let me
¹³ withdraw the question.  What happened to
¹⁴ the Andonian files when the case was
¹⁵ terminated?
¹⁶    A.  I don't know.  I mean, they
¹⁷ could be there or they could have been
¹⁸ processed according to the document
¹⁹ retention policy.
²⁰    Q.  But you didn't have a document
²¹ retention policy back then?
²²    A.  I think what happened in -- at
²³ some point in time, cases that were in the
²⁴ file room would come up to the attorneys'

Page 510

¹ attention over whether do we need to keep
² this file for a reason or not and it would
³ be put in off-site storage.
⁴    Q.  Okay.  Can you produce for me a
⁵ hold notice or a document retention notice
⁶ from the 1980s when these cases were filed
⁷ and terminated?
⁸    A.  I wasn't with the company until
⁹ 1987.  I'm not sure if there were hold
¹⁰ notices, if that was a tool we were using.
¹¹ I don't know when we began to use that
¹² tool.  So you're asking me for the first
¹³ hold notice, I don't -- I can't -- by the
¹⁴ way, I don't have any of the documents --
¹⁵    Q.  Okay.
¹⁶    A.  -- myself.
¹⁷    Q.  What about the documents from
¹⁸ the Faye Miller case, what happened to
¹⁹ those?
²⁰    A.  When you say documents, you
²¹ mean the pleadings and that sort of thing?
²²    Q.  Yeah.
²³    A.  Again, it was the practice to
²⁴ keep it in a file room and then when the

Page 511

¹ case was filed, the case was closed and it
² eventually went to off-site storage.
³    Q.  Now, can you go to J&J 446,
⁴ which is in your book two.
⁵    A.  Got it.
⁶    Q.  J&J 446 is an agreement between
⁷ Cyprus Mines and Johnson & Johnson dated
⁸ January 6, 1989, correct?
⁹    A.  Yes.
¹⁰      - - - - -
¹¹      (Agreement Between Cyprus & J&J
¹²      dated 1/6/89 marked O'Shaughnessy
¹³      Exhibit 446 for identification.)
¹⁴      - - - - -
¹⁵ BY MR. PLACITELLA:
¹⁶    Q.  And you were working on the
¹⁷ cases at that point, correct?
¹⁸    A.  The talc cases, yes.
¹⁹    Q.  And you recall that the mine,
²⁰ the Windsor Mineral mines were sold to
²¹ Cyprus on or about that date?
²²    A.  They were sold probably on or
²³ about that date, yeah.
²⁴    Q.  And what I want to you to look

Page 512

1 at is 446.111, page 111 on the exhibit tab.
2    A.  Got it.
3    Q.  Okay.  And it states "Windsor,"
4 that's Johnson & Johnson, right?
5    A.  Yes.
6    Q.  "Has been named as a defendant
7 in various lawsuits which allege injuries
8 related to exposure to asbestos and/or talc
9 primarily by rubber/tire industry
10 employees.  The following cases are
11 currently pending."  Do you see that?
12   A.  Yes.
13   Q.  And you were in charge of all
14 these cases, correct?
15   A.  You know, I'm just thinking at
16 that time, '89, I might not have been
17 formally in charge of all the talc cases,
18 but I might have been.
19   Q.  Well, we know you worked on the
20 Andonian and the Miller case, right?
21   A.  I'm just I'm thinking about
22 that now.  It depends on when they were
23 filed.  Because Mr. Beidler might have
24 still been handling them for a while.  I

Page 513

1 just don't recall when the transition was.
2 It wasn't when I immediately went to the
3 company, which was in '87, it took a while
4 after that.
5    Q.  Is he dead now, Mr. Beidler?
6    A.  I don't know.
7    Q.  And what it states here is that
8 the cases that were currently pending were
9 Andonian, which looks like 277 people,
10 correct?
11   A.  Yes.
12   Q.  And another one from Miller,
13 that was only one person, right?
14   A.  Yes.
15   Q.  Adkins was 474 different
16 people, correct?
17   A.  Yes.
18   Q.  And Akers was 229 different
19 people, right?
20   A.  Yes.
21   Q.  And in all of those cases,
22 Windsor Minerals asserted the same thing,
23 there's no evidence whatsoever of asbestos
24 in the talc, right?

Page 514

1       MS. BROWN:  That lacks
2 foundation.
3       THE WITNESS:  We covered
4 some documents where they did do
5 that, I'm not sure about all the
6 cases.
7 BY MR. PLACITELLA:
8    Q.  Okay.  Remember I asked you
9 about hundreds of cases before.  This looks
10 like thousands of cases, no?
11   A.  Well, you can add them up, it
12 looks like it's maybe just a little under a
13 thousand.
14   Q.  Okay.  And what happened to the
15 files in the Adkins and the Akers case for
16 the 700 people?
17   A.  Well, it would have been one
18 file for us.
19   Q.  Okay.  Where is that file?
20   A.  Like I said, I don't know.
21   Q.  What did you do with it when
22 the case was over?
23       MS. BROWN:  Objection.
24       THE WITNESS:  I didn't

Page 515

1 do anything with it.
2 BY MR. PLACITELLA:
3    Q.  Well, what happened to it?
4       MS. BROWN:  Asked and
5 answered.
6       THE WITNESS:  I don't
7 know if I was even responsible for
8 it.  I don't know.
9 BY MR. PLACITELLA:
10   Q.  Okay.  And by the way, if I go
11 to 1042, I don't know if you have to pull
12 it from your book, do you see that this is
13 the actual dismissal of the Andonian and
14 Miller case?
15   A.  I can't see the whole thing,
16 but I take your word for it, sure.
17      MS. BROWN:  It's 1042 in
18 book two?
19      - - - - -
20      (Dismissal Order marked
21 O'Shaughnessy Exhibit 1042 for
22 identification.)
23      - - - - -
24

BY MR. PLACITELLA:

Q.  Right.  And that was after you submitted the affidavit saying there's no evidence of asbestos, right?

MS. BROWN:  Lacks foundation.  Assumes facts.

THE WITNESS:  I'm not seeing the name of the case.  It says Ohio asbestos litigation --

BY MR. PLACITELLA:

Q.  Yeah, do you see the docket numbers, if you match them up.  Here, I'll do it --

A.  I'll take your word for it.

MS. BROWN:  Lacks foundation.

BY MR. PLACITELLA:

Q.  Well, I can match them up and spend the time or I can --

MS. BROWN:  Lacks foundation.

MR. PLACITELLA:  -- play match up.  Okay.  I'll tell you that.

MS. BROWN:  With this witness, it lacks foundation.

BY MR. PLACITELLA:

Q.  Okay.  Now, in any of the cases, this under 1,000 cases that were pending in 1989, do you have any evidence, as you sit here today, that any of the testing documents to your right were turned over in those cases?

MS. BROWN:  I object.  It assumes facts that they were requested and lacks foundation with this witness.

THE WITNESS:  Like I said before, I don't know the state of discovery of these cases.  Some of them at least I'm pretty sure I was not handling at the time.  So I don't know whether or not anything was turned over or if in fact anything was requested to be turned over.

BY MR. PLACITELLA:

Q.  Okay.  Let's go to Exhibit --

let's go to Exhibit 195.  And do you know whether, before you look at that, do you know whether any of those testing documents were reviewed by the scientists that you relied upon before Miller submitted those affidavits?

MS. BROWN:  Objection, lacks foundation, vague.

THE WITNESS:  I don't have personal knowledge.  I just know the practice of the company was to send out testing and to review the results, if that was your question.

- - - - -

(Affidavit of William H. Ashton marked O'Shaughnessy Exhibit 195 for identification.)

- - - - -

BY MR. PLACITELLA:

Q.  Actually, my question was -- well, let me ask you a different question.  Do you know whether Mr. Miller reviewed any of those testing documents to your right

before he signed those affidavits and submitted them to courts and counsel?

MS. BROWN:  Foundation, speculation.

THE WITNESS:  I don't know exactly what he reviewed, but he would have reviewed -- I mean, you showed me some documents where he did look at the testing.

BY MR. PLACITELLA:

Q.  Okay.  Now, let's go to 195.  195 is an affidavit -- by the way, you testified, I think the last time, that William Ashton was somebody that you relied upon heavily when you made statements that there's no evidence of asbestos in Vermont talc, right?

A.  He was one of the people we relied on, among others, including, you know, the people I mentioned and I said including other people at the company that our attorneys would interview.

Q.  So the answer is yes?

MS. BROWN:  Asked and

John O'Shaughnessy

Page 520

1   answered.
2           THE WITNESS:  He was one
3   of the people relied on.  You said
4   heavily, you know, I can't weigh
5   them.
6   BY MR. PLACITELLA:
7       Q.  And he's dead now, right?
8       A.  I believe Mr. Ashton is dead.
9       Q.  Now, this affidavit from
10  Mr. Ashton dated -- I'm trying to find the
11  date of the affidavit.  Give me a second
12  here.  May 8, 1989, do you see that?  It's
13  on 195.8.
14      A.  Yes, yes.
15      Q.  You know about this affidavit,
16  right?
17      A.  I do recognize it, yes.
18      Q.  This is an affidavit you
19  personally worked on?
20      A.  Yes.
21      Q.  All right.  And Mr. Ashton in
22  his affidavit starts out with his
23  background in working for Johnson &
24  Johnson, correct?

Page 521

1       A.  Yes.
2       Q.  Okay.  And in his affidavit,
3   Mr. Ashton states unequivocally "From the
4   1940s through the 1980s, talc mined in
5   Vermont."  Do you see that?
6       A.  Yes.
7       Q.  "And specifically, the talc
8   mined by Engelhard Corporation and its
9   predecessors."  Do you see that?
10      A.  Yes.
11      Q.  The predecessor was Johnson &
12  Johnson, right?
13          MS. BROWN:  Objection.
14          THE WITNESS:  The
15      predecessor was the -- I forget the
16      corporate name, whether it was
17      Windsor Minerals or something else,
18      but we were one of the predecessor
19      companies that owned the Johnson
20      mine.
21  BY MR. PLACITELLA:
22      Q.  You owned the Johnson mine and
23  then you sold it to Engelhard?
24      A.  Yes.

Page 522

1       Q.  "From the talc mine located in
2   Johnson Vermont, the Johnson mine has been
3   considered to be talc free from
4   contamination by asbestos."
5       A.  Yes.
6       Q.  Did I read that correctly?
7       A.  Yes.
8       Q.  And what was the factual basis
9   for that?  Where did the facts come for
10  that statement?
11      A.  It follows in the affidavit.
12  The remainder of the affidavit states what
13  he relied on.
14      Q.  Okay.  And attached to the
15  affidavit are all kinds of exhibits,
16  correct?
17      A.  There were studies, et cetera,
18  attached, yeah.
19      Q.  Okay.  Who was involved in
20  preparing this affidavit?
21          MS. BROWN:  I object and
22      instruct Mr. O'Shaughnessy not to
23      answer that question.  This
24      affidavit was prepared in

Page 523

1   connection with litigation and that
2   information is privileged.
3           JUDGE SCHNEIDER:  I'm
4   thinking.  Can you please read back
5   the last two questions and answers?
6       - - - - -
7       (Whereupon, the reporter read
8   back as requested.)
9       - - - - -
10          JUDGE SCHNEIDER:  I
11  thought that question I was already
12  asked and answered, didn't he say
13  that he testified that, I don't
14  know the exact words, but the
15  record will reflect whether --
16          MR. PLACITELLA:  He said
17  he was involved.
18          JUDGE SCHNEIDER:  He
19  assisted --
20          MR. PLACITELLA:  Right.
21  Who else, who else was involved?
22          JUDGE SCHNEIDER:  The
23  door is open.  He can answer the
24  question.  Was anyone else involved

Page 524

1    except him?
2        MR. PLACITELLA:  You can
3    answer that.
4        THE WITNESS:  Yeah,
5    there were attorneys for the
6    Engelhard Corporation.
7  BY MR. PLACITELLA:
8    Q.  Right.  They were not lawyers
9  working for Johnson & Johnson, correct?
10   A.  No, they were not.
11   Q.  Right.  And what happened, the
12 back story is that they threatened to sue
13 Johnson & Johnson for selling them a pig in
14 a poke with the Johnson mine, right?
15       MS. BROWN:  I object to
16   the form of that question as
17   argumentative, misstating the
18   evidence, and assuming facts.
19       THE WITNESS:  They
20   threatened a lawsuit against
21   Johnson & Johnson for exposures to
22   talc mined from the Johnson &
23   Johnson mine at the time it was
24   owned by Johnson & Johnson and

Page 525

1    before.  So it probably --
2  BY MR. PLACITELLA:
3    Q.  Correct.
4    A.  Yeah.
5    Q.  And as a result of that threat,
6  you got together with the lawyers from
7  Engelhard and helped prepare this affidavit
8  in order to deal with the cases, right?
9        MS. BROWN:  I object.
10   Lacks foundation.
11       THE WITNESS:  What we
12   did was we participated in this
13   affidavit and Mr. Ashton wrote the
14   affidavit to protect Johnson &
15   Johnson's interests.
16 BY MR. PLACITELLA:
17   Q.  Okay.  Now, and so if we can go
18 back -- by the way, can you go to
19 Exhibit 1039, I'm assuming it's in book
20 two.  And I'm looking specifically at
21 1039.12.
22       MS. BROWN:  Counsel, can
23   you identify for the record what
24   this is?

Page 526

1        MR. PLACITELLA:  Yes,
2    it's an excerpt from the Johnson &
3    Johnson privilege log.
4        - - - - -
5        (Excerpt for J&J Privilege Log
6    marked O'Shaughnessy Exhibit 1039
7    for identification.)
8        - - - - -
9        MS. BROWN:  I object.
10   Lacks foundation.
11       MR. PLACITELLA:  I'm not
12   going to ask privileged questions,
13   I'm just going to ask about
14   people --
15       MS. BROWN:  Same
16   objection.
17       MR. PLACITELLA:  -- as
18   identified on the log.  You got it?
19       MS. BROWN:  Same
20   objection.
21       THE WITNESS:  Yeah.
22 BY MR. PLACITELLA:
23   Q.  Do you see 5/5/1989 and it
24 lists Ira Dembrow, William Ashton, John

Page 527

1  O'Shaughnessy, and Howard Sloane?
2    A.  Yes.
3    Q.  They were people who worked on
4  the affidavit, right?
5    A.  I remember working on it with
6  Mr. Dembrow.
7    Q.  Right.  And do you see where
8  your description says "memorandum with
9  attachment" and it refers directly to baby
10 powder litigation?
11       MS. BROWN:  I object.
12   Lacks foundation.  Misstates the
13   document and vague.
14       MR. PLACITELLA:  Well,
15   it says "Memorandum with attachment
16   prepared by counsel pursuant to
17   pending and anticipated litigation
18   regarding baby powder litigation."
19       THE WITNESS:  I see
20   that.  I do.
21 BY MR. PLACITELLA:
22   Q.  So Johnson & Johnson has listed
23 this affidavit as relevant to baby powder
24 litigation.  Do you see that?

Page 528

1    MS. BROWN:  No, that
2 assumes facts and misstates the
3 document and lacks foundation.
4    THE WITNESS:  No, this
5 is a description in the privilege
6 log.
7 BY MR. PLACITELLA:
8    Q.  Okay.
9    A.  That's all it is.
10    Q.  Oh, that's all.  Didn't
11 somebody take care in putting this log
12 together?
13    A.  You would hope so, but
14 oftentimes, maybe a description of a
15 document is not totally accurate.  I'm not
16 sure this isn't, I'm just saying --
17    Q.  Well, I'm skipping down to
18 another entry, 5/5/1989, that also lists
19 Johnson's Baby Powder as relevant to this
20 affidavit?
21    A.  Yeah and see --
22    MS. BROWN:  No, hang on
23 a second.  That misstates the
24 document and lacks foundation and

Page 529

1 assumes facts.
2    THE WITNESS:  I'm sorry.
3 I've never seen this, but I'm
4 looking at all sorts of different
5 descriptions.  It says talc
6 litigation, anticipated talc
7 litigation, baby powder litigation,
8 so it describes it in a number of
9 different ways.
10 BY MR. PLACITELLA:
11    Q.  Okay.  And on the date that the
12 affidavit was signed, 5/18/1989, there's an
13 entry from Ira Dembrow to you and Ashton
14 listing specifically that the affidavit
15 relates to Johnson's Baby Powder
16 litigation, correct?
17    MS. BROWN:  Foundation,
18 speculation, misstates the
19 documents and assumes facts.
20    THE WITNESS:  I'm not
21 sure which, it's like 25 boxes
22 here.  I'm trying to figure out --
23 BY MR. PLACITELLA:
24    Q.  I'm looking at the very last

Page 530

1 one.
2    A.  On the page?
3    Q.  Yes.  I have blown up --
4    MS. BROWN:  I can't even
5 see it.  There's an exhibit
6 sticker.
7 BY MR. PLACITELLA:
8    Q.  Here I'll blow it up.
9    A.  That's better, which one?
10    Q.  Do you see that?
11    MS. BROWN:  For the
12 record, I can't tell from this, can
13 you identify when this privilege
14 log was served and the date of it?
15    MR. PLACITELLA:  I have
16 to tell you, I can go back and do
17 it, but you've served so many
18 versions of these logs, it's hard
19 to keep track of.
20    MS. BROWN:  Well, I want
21 to make sure --
22    MR. PLACITELLA:  They
23 change every other week.
24    MS. BROWN:  I want to

Page 531

1 make sure we're looking at the --
2    MR. PLACITELLA:  I think
3 your entries are still the same if
4 you go back and look at the one you
5 sent, like, a couple of weeks ago.
6    MS. BROWN:  Okay.  If
7 you could just, it doesn't have to
8 be now, but if we can identify what
9 we're looking at for the record,
10 that would be great.  Thank you.
11 BY MR. PLACITELLA:
12    Q.  Okay.  So you see 5/18/89, the
13 date the affidavit was signed, you list
14 Johnson's Baby Powder litigation?
15    A.  I think you're mixing two
16 things.  And maybe you're not.  So if you
17 mind, so 5/18/89 is the date the affidavit
18 was signed.  And so I think that appears on
19 this, because that's the date of the
20 document, right, I believe.  And yeah, if
21 you go to the right on any of those, you
22 know, it makes different statements, but
23 the one you highlighted says Johnson's Baby
24 Powder litigation.

John Q. Shaughnessy

---

Page 532

1    Q.   Okay.  Fair enough.  And I just
2  want to look at this group.  If you keep
3  looking at the screen.
4    A.   Sure.
5    Q.   Listed as people who worked on
6  this included from Johnson & Johnson
7  yourself, Mr. Ashton, and Bruce Semple,
8  correct?
9            MS. BROWN:  Foundation,
10       speculation.  Misstates the
11       document.
12            THE WITNESS:  It lists
13       people.  I don't know where they
14       got Bruce Semple's name on it.  I
15       don't recall him having anything to
16       do with the affidavit.
17  BY MR. PLACITELLA:
18    Q.   Well, that's what's listed on
19  your --
20    A.   It's listed on this privilege
21  log once.
22    Q.   And he was the medical director
23  of Johnson & Johnson, right?
24    A.   He was.

---

Page 533

1    Q.   At any time, at any time, did
2  Mr. Ashton, Mr. Semple or anybody else who
3  you said you relied upon tell you that the
4  information in this affidavit is false?
5            MS. BROWN:  Assumes
6       facts, misstates the evidence,
7       lacks foundation.
8            THE WITNESS:  Never.
9  BY MR. PLACITELLA:
10    Q.   Okay.  So you understand that
11  this affidavit was used by Johnson &
12  Johnson to try to extricate itself from
13  talc litigation pending at the time the
14  affidavit was executed, correct?
15            MS. BROWN:  Assumes
16       facts, misstates the evidence,
17       lacks foundation.
18            THE WITNESS:  Yeah, that
19       was one of the purposes of the
20       affidavit, yes.
21  BY MR. PLACITELLA:
22    Q.   Okay.  Now, in the affidavit,
23  if you go to -- give me one second here.
24  If you go to 195.59, do you see that it's

---

Page 534

1  in the same affidavit?
2    A.   I'm on the way.  I'm there.
3    Q.   Okay.  One of the things that
4  you attach is testimony from your expert in
5  the Westfall case, correct, Alfred
6  Chidester?
7    A.   Yes, I think so.
8    Q.   And in fact, if you go to the
9  next page, you can see the direct
10  examination of Mr. Chidester by your
11  lawyer, right?
12    A.   Yes.
13    Q.   Okay.  Now --
14    A.   And just as a qualification,
15  this was before I was at Johnson & Johnson.
16  It's 1983.
17    Q.   I understand.
18    A.   But I do know that he was the
19  lawyer for Johnson & Johnson.
20    Q.   All right.  And you're familiar
21  with the Westfall case?
22    A.   I know of it, yes.  I'm not
23  intimately familiar with it.  I think it
24  was over by the time I started.

---

Page 535

1    Q.   It was, sir.  But I'm asking
2  the questions because in support for the
3  proposition for the affidavit that there's
4  no asbestos in Vermont talc, you attached
5  testimony from the Westfall case, we agree?
6    A.   Yes.
7            MS. BROWN:  That
8       misstates the evidence.
9  BY MR. PLACITELLA:
10    Q.   Okay.  So and were you aware
11  that Mr. Miller, who you relied upon, also
12  testified in the Westfall case?
13    A.   I don't recall if I knew that
14  or not.
15    Q.   Can you go to Exhibit 172 in
16  the transcript binder.
17            MS. BROWN:  I think it's
18       these, John.
19  BY MR. PLACITELLA:
20    Q.   And 172 --
21    A.   I see that.
22    Q.   -- is the deposition in the
23  Westfall case of Glenn Hemstock.  Do you
24  see that?

---

John J. O'Shaughnessy

1        MS. BROWN:  Object to
2    the document as lacking foundation.
3         - - - - -
4        (Deposition of Glenn A.
5        Hemstock dated 1/28/83 marked
6        O'Shaughnessy Exhibit 172 for
7        identification.)
8         - - - - -
9    BY MR. PLACITELLA:
10        Q.  I'm going to lay a foundation.
11   Do you see that?
12        A.  Yes.
13        Q.  Okay.  And do you see that on
14   the second page appearing at that
15   deposition is the general counsel for
16   Johnson & Johnson.  Do you see that?
17        A.  No.
18        Q.  Do you see 172.3?
19        A.  Yes.
20        Q.  Look at the bottom.
21        A.  Oh, I see.  That's a typo, Mr.
22   Beidler was not general counsel.
23        Q.  He worked for Johnson & Johnson
24   as in-house counsel, right?

1        MS. BROWN:  Hold on, his
2    mic is off.
3        MR. PLACITELLA:  He
4    worked --
5        THE WITNESS:  He was in
6    the Johnson & Johnson law
7    department.
8    BY MR. PLACITELLA:
9        Q.  And also present was the
10   Johnson & Johnson local lawyer.  Do you see
11   that?
12        A.  From Nutter McClennen & Fish.
13        Q.  And this is the same Mr.
14   Beidler who threatened Mr. Grayzel in 1987
15   with sanctions, correct?
16        MS. BROWN:  That
17    misstates the document and lacks
18    foundation.  I object.
19        THE WITNESS:  I don't
20    think he threatened anyone.
21   BY MR. PLACITELLA:
22        Q.  He's the one that wrote
23   Mr. Grayzel a letter saying there's no
24   evidence whatsoever and if you don't

1    dismiss your case, we're going to seek
2    sanctions under the frivolous lawsuit
3    statute.  That's what the letter said,
4    right?
5        MS. BROWN:  Again, it
6    misstates the document and lacks
7    foundation.
8        THE WITNESS:  I don't
9    think he said it.  He did mention
10    the rule that you spoke about.
11   BY MR. PLACITELLA:
12        Q.  Okay.  Now, can you go to 173,
13   please; in the transcript binder, the
14   second day of Mr. Hemstock's deposition?
15        A.  Okay.
16         - - - - -
17        (Deposition of Glenn A.
18        Hemstock dated 3/16/83 marked
19        O'Shaughnessy Exhibit 173 for
20        identification.)
21         - - - - -
22   BY MR. PLACITELLA:
23        Q.  And can you go to 173.23?
24        A.  Yes.

1        Q.  Okay.  It says now, and this is
2    Dr. Hemstock, he's the chief scientist at
3    Engelhard, did you know that?
4        MS. BROWN:  Lacks
5    foundation.
6        THE WITNESS:  I don't
7    know who he is.
8    BY MR. PLACITELLA:
9        Q.  Did you know his testimony was
10   actually quoted by the Third Circuit in a
11   reported decision while you were there?
12        MS. BROWN:  Oh my
13    goodness.  Hold on a second.  I
14    object.  This lacks foundation.
15    And, Judge, further to our
16    discussion yesterday, I do want to
17    raise that we are down a rabbit
18    hole with another litigation
19    regarding industrial talc that was
20    never used in Johnson's Baby
21    Powder.  We are showing --
22        MR. PLACITELLA:  Excuse
23    me, that's a speaking objection and
24    can we have the witness leave the

Page 540

1    room if we're going to do this?
2         MS. BROWN:  Sure.
3    Thanks, John.
4         JUDGE SCHNEIDER:  Maybe
5    close the door, Mr. O'Shaughnessy.
6         MS. BROWN:  Thank you.
7         Your Honor, further to
8    our discussion yesterday, I do want
9    to raise an objection.  We are now
10   nearly two hours into this
11   deposition and the majority of
12   questioning and certainly within
13   the last half hour has dealt with
14   the Engelhard litigation, which, of
15   course, Mr. Placitella is
16   intimately familiar with.  But what
17   we are doing is showing this
18   witness other people's testimony in
19   that case.  This involves the
20   Johnson mine, which was never used
21   in Johnson's Baby Powder.
22        MR. PLACITELLA:  Are you
23   sure about that?
24        MS. BROWN:  The most

Page 541

1    recent question to the witness is
2    asking if he's familiar with the
3    fact that this testimony was cited
4    in the Third Circuit decision about
5    BASS.  And so I do want to appeal
6    to Your Honor pursuant to our
7    discussion yesterday that this has
8    nothing to do with ovarian cancer
9    and nothing to do with Johnson's
10   Baby Powder.  And so, you know, I
11   respectfully submit we are wasting
12   time here.
13        MR. PLACITELLA:  It has
14   everything to do with Johnson's
15   Baby Powder.  It has everything to
16   do with his statements about who he
17   relied upon.  Their own log says it
18   relates directly to Johnson's Baby
19   Powder.  And if they ask those
20   questions on their direct, I will
21   prove that it relates to Johnson's
22   Baby Powder with their own
23   documents --
24        MS. BROWN:  Shouldn't we

Page 542

1    do that first?
2         MR. PLACITELLA:  -- but
3    I don't want to spend the time
4    doing that now.
5         JUDGE SCHNEIDER:
6    Counsel, for discovery purposes,
7    it's unquestionably the case that
8    this is a relevant area of inquiry.
9    Mr. Placitella is directing his
10   questioning to the accuracy of
11   affidavits and statements made by
12   Johnson & Johnson regarding the
13   presence of asbestos in talc.  He's
14   attempting to show that there was,
15   whether it's true or not, it's not
16   for me to decide, but it's plain to
17   me, he's directing his questions to
18   try and prove that there's factual
19   evidence that is inconsistent with
20   representations made by Johnson &
21   Johnson in affidavits that there
22   was no asbestos in its talc.
23        Ultimately, the trial
24   judge is going to decide whether

Page 543

1    this is admissible evidence at
2    trial, but for discovery purposes,
3    under Rule 26, it's plainly a
4    relevant area of inquiry.  And to
5    the extent there's a request to
6    limit or bar Mr. Placitella from
7    directing his questions to this
8    area of inquiry, it's denied.  Of
9    course, all of your objections to
10   the admissibility of this evidence
11   at trial are preserved.  That's not
12   my role.  But for discovery
13   purposes, it's unquestionably
14   relevant.
15        MS. BROWN:  Understood.
16        JUDGE SCHNEIDER:  If he
17   doesn't know the answer to the
18   question, Mr. O'Shaughnessy is
19   perfectly capable of saying he
20   doesn't know the answer.
21        MS. BROWN:  Understood.
22        MR. PLACITELLA:  Okay.
23        MS. BROWN:  Thank you.
24

John J. O'Shaughnessy

Page 544

BY MR. PLACITELLA:

Q.   Okay.  I'm going to withdraw the last question and ask another question. I want to read the testimony for you from Dr. Hemstock, the lead scientist.

"Now, you testified that your department has tested both processed talc and raw talc ore from the Emtal mine for the presence of chrysotile asbestos; is that correct?"

Answer: "Yes.

"Has your department in its research found chrysotile asbestos in both processed talc and raw ore from the Emtal mine?"

Do you see that?

Answer: "Yes."

Do you see that?

A.   Yes.

Q.   Did anybody in the Johnson & Johnson law department, including Mr. Beidler, tell you about this testimony before you submitted doctor -- Mr. Ashton's affidavit?

Page 545

MS. BROWN:  I object. It misstates the evidence and lacks foundation.  And is an incomplete reading from this deposition.

THE WITNESS:  No, and I wouldn't expect him to.

BY MR. PLACITELLA:

Q.   Okay.  What about Mr. Ashton who worked on the Westfall case, did he tell you about the testimony from the chief scientist that said they found asbestos in the talc that he said was asbestos free?

MS. BROWN:  It misstates the evidence.  Lacks foundation.

THE WITNESS:  I don't recall any conversations one way or the other on this.

BY MR. PLACITELLA:

Q.   Okay.

A.   I don't recall this at all.

Q.   Okay.  Well, Mr. Ashton, who is unfortunately gone, he was one of the people that you relied upon to tell you the truth, right?

Page 546

A.   Absolutely.

Q.   Okay.  And what about the medical director, Bruce Semple, did you know he worked on the Westfall case?

MS. BROWN:  Objection, assumes facts.

THE WITNESS:  That doesn't sound familiar to me, but you know, this is a long time ago and before I was there even, so I wouldn't know.

BY MR. PLACITELLA:

Q.   Okay.  Did Bruce Semple tell you anything about this testimony?

MS. BROWN:  Objection, assumes facts.

THE WITNESS:  I don't recall that.

BY MR. PLACITELLA:

Q.   Okay.  Now, go to J&J 436.

MS. BROWN:  Not in the testimony binder, right?

MR. PLACITELLA:  It's in the testimony binder.

Page 547

MS. BROWN:  Do I have a copy of these transcripts?

MR. PLACITELLA:  Yes, you do.

MS. BROWN:  Okay.  Thank you.

MR. PLACITELLA:  There's a copy behind you as well.

THE WITNESS:  I have it.

MS. BROWN:  And what number were we just on?

THE WITNESS:  We're on 436.  I don't know what we were on now.

MS. BROWN:  Chris, what was the previous transcript number in this binder?

MR. PLACITELLA:  It was 172 and 173.

MS. BROWN:  Thank you.

- - - - -

(Deposition of Peter N. Gale dated 4/26/83 marked O'Shaughnessy Exhibit 436 for identification.)

John T. O'Shaughnessy

Page 548

1      -----
2  BY MR. PLACITELLA:
3      Q.  By the way, you didn't attach
4  the Hemstock transcript to the Ashton
5  affidavit, did you?
6          MS. BROWN:  Assumes
7      facts.
8          THE WITNESS:  It wasn't
9      attached.  We attached what
10     Mr. Ashton wanted to rely on.
11 BY MR. PLACITELLA:
12     Q.  So my question -- the answer is
13 no, you never attached the Hemstock
14 transcript?
15     A.  It was not attached to that
16 transcript.
17     Q.  Okay.  Now, you have before you
18 436, which is the deposition of Peter Gale.
19 Do you see that?
20     A.  I do.
21     Q.  Taken in the Westfall case.  Do
22 you see that?
23     A.  Yup.
24     Q.  Okay.  And if you look at the

Page 549

1  436.2?
2      A.  Yes.
3      Q.  You will see that Windsor
4  Minerals was present at this deposition as
5  well, correct?  For the defendant, Windsor
6  Minerals, Brian T. Kenner.
7      A.  Yes, I see that.
8      Q.  Okay.  And also on the bottom
9  is Howard Sloane.  Do you see that?
10     A.  Yes.
11     Q.  He's one of the people who
12 helped you work on the affidavit, right?
13     A.  I don't recall dealing with him
14 on the affidavit.  I recall Mr. Dembrow.
15     Q.  And they work for the same law
16 firm?
17     A.  They did.
18     Q.  Okay.  And if you go to -- and
19 did you know that Mr. Gale was the
20 mineralogist that worked for Engelhard?
21     A.  I don't know that.
22     Q.  Okay.  If you go to 436.19.  Do
23 you see where Mr. Gale talks about taking
24 samples from the Johnson mine?

Page 550

1      A.  No.
2      Q.  Look at page 436.19.
3      A.  Okay.
4      Q.  Line 7.
5      A.  Samples from the Johnson mine.
6      Q.  Right.  And he says the
7  question is "What analysis did you run on
8  the second round of studies?"  Do you see
9  that?
10     A.  Yes, I do.
11     Q.  And there's some objection and
12 then it says, "The Witness:  Scanning
13 electron microscopy, transmission electron
14 microscopy, selected area electric
15 diffraction."  Do you see that?
16     A.  Yes.
17     Q.  And it says "Where did you
18 perform those tests?"
19         Answer:  "Georgia Tech."
20         Question:  "When those tests
21 were performed -- when were those tests
22 performed?
23         "Late fall of '78 and January
24 and February of '79 I believe.

Page 551

1          "Do you recall today what
2  those tests revealed?"  Do you see that?
3      A.  Yes.
4      Q.  "I recall that there were
5  fibers found in those," go to the next
6  page, "talcs, yes.
7          "Did you identify the nature,
8  mineralogic nature of the fibers that were
9  found?"
10         Answer:  "Yes.
11         "What was the nature of those
12 fibers?
13         "I determined those fibers
14 were chrysotile fibers."
15         Question:  "How did you
16 determine those were -- those fibers were
17 chrysotile fibers?"
18         Answer:  "Using selected area
19 electron diffraction in conjunction with
20 transmission electron microscopy."
21         Do you see that?
22         MS. BROWN:  All of this
23     lacks foundation.
24

Page 552

1  BY MR. PLACITELLA:
2    Q.  Do you see that?
3    A.  I see it.
4    Q.  Is this the first time you ever
5  saw this?
6    A.  Yes.
7    Q.  So Mr. Ashton never shared this
8  with you?
9    A.  I don't even know if he had it.
10      MS. BROWN:  Lacks
11    foundation.  Assumes facts.
12  BY MR. PLACITELLA:
13    Q.  Okay.  Nobody at Johnson &
14  Johnson shared this with you, correct?
15      MS. BROWN:  Lacks
16    foundation.
17      THE WITNESS:  I never
18    saw it before.
19  BY MR. PLACITELLA:
20    Q.  And it's not attached to the
21  affidavit that attaches other transcripts
22  from the Westfall case, is it?
23    A.  I think the only attachment of
24  a transcript was Dr. Chidester.

Page 553

1    Q.  Right.
2    A.  Chidester.
3    Q.  Right.
4    A.  That's the only one.
5    Q.  You didn't attach the Gale
6  transcript where he reports asbestos in the
7  mine to the Ashton affidavit, correct?
8      MS. BROWN:  Misstates,
9    facts.  Lacks foundation.
10      THE WITNESS:  It wasn't
11    and I know that it's 1978 also --
12  BY MR. PLACITELLA:
13    Q.  Okay.
14    A.  -- we're talking about here.
15    Q.  So after --
16    A.  After Johnson & Johnson owned
17  the mine.
18    Q.  After these people testified
19  that they found asbestos in the mine, what
20  happened in that case, do you know?
21      MS. BROWN:  Lacks
22    foundation.
23      THE WITNESS:  I don't
24    know.

Page 554

1      MS. BROWN:  Assumes
2    facts.
3      THE WITNESS:  I don't
4    know.
5  BY MR. PLACITELLA:
6    Q.  Okay.  Can you look at 441.
7      MR. COX:  Which binder,
8    I'm sorry?
9      MR. PLACITELLA:  I think
10    it's in binder two.
11      MR. COX:  Okay.  Not the
12    transcripts.
13      MR. PLACITELLA:  No.
14      THE WITNESS:  Can I put
15    the transcripts away?
16  BY MR. PLACITELLA:
17    Q.  Yes.
18    A.  Thank you.
19      MS. BROWN:  Do you want
20    mine?
21      THE WITNESS:  I'm
22    finally at it.
23      - - - - -
24      (Stipulation and

Page 555

1    Confidentiality Order marked
2    O'Shaughnessy Exhibit 441 for
3    identification.)
4      - - - - -
5  BY MR. PLACITELLA:
6    Q.  441 is a stipulation and
7  confidentiality order entered into in the
8  Westfall case.  Do you see that?
9    A.  I see it, yes.
10      MS. BROWN:  I object.
11    Lacks foundation.
12  BY MR. PLACITELLA:
13    Q.  Okay.  And if you go to the
14  last page, which was 441.7.
15    A.  Yes.
16    Q.  You see it was signed off on by
17  your lawyers.  Do you see that?
18    A.  It's signed by, yeah, another
19  McClennen & Fish lawyer.
20    Q.  And what the confidentiality
21  order provided, if you go to 441.5, is that
22  at the conclusion of the case, the
23  plaintiff's lawyer had to return all the
24  evidence, right?

John P. O'Shaughnessy

1        MS. BROWN:  Objection.
2    Lacks foundation.
3        THE WITNESS:  It says
4    "at the conclusion," that one?
5  BY MR. PLACITELLA:
6    Q.  Yes, sir.
7    A.  Well, this one says at the
8  conclusion, all documents subject shall be
9  returned to Cahill Gordon, to Cahill
10  Gordon.
11    Q.  Right.  And did you know that
12  the depositions and all the testing
13  documents were returned to Cahill Gordon
14  and never saw the light of day?
15        MS. BROWN:  That assumes
16    facts and lacks foundation.
17        THE WITNESS:  This is
18    1983.  I have no familiarity with
19    any of that.
20  BY MR. PLACITELLA:
21    Q.  No one ever told you that
22  Johnson & Johnson entered into a
23  confidentiality order in the Westfall case
24  to keep the evidence in that case secret?

1        MS. BROWN:  That
2    misstates the facts and lacks
3    foundation.
4        THE WITNESS:  I might
5    have been aware, you know, going
6    back in time that Westfall was a
7    case that was -- I don't know what
8    happened to it, if there was a
9    Stipulation of Dismissal, so it was
10    either settled or dismissed.  But I
11    wouldn't have any knowledge over,
12    you know, what happened to
13    particular documents, especially
14    concerning a client that wasn't
15    Johnson & Johnson.
16  BY MR. PLACITELLA:
17    Q.  Well, Windsor Minerals was you?
18    A.  Engelhard --
19    Q.  No, no.
20    A.  Cahill Gordon didn't represent
21  Johnson & Johnson.
22    Q.  But you signed the
23  confidentiality order that says all the
24  documents have to go back to Cahill Gordon?

1    A.  I wasn't even at the company at
2  the time.
3        MR. PLACITELLA:  I
4    object.
5        THE WITNESS:  I'm
6    talking about me too.
7        MS. BROWN:  That
8    misstates the document.
9        THE WITNESS:  I'm
10    talking about me too.  I didn't
11    sign this.  I wasn't even at the
12    company.
13  BY MR. PLACITELLA:
14    Q.  Yeah, one of your lawyers
15  signed it though, right?
16        MS. BROWN:  Misstates
17    the evidence.
18        THE WITNESS:  A lawyer
19    signed this agreement --
20  BY MR. PLACITELLA:
21    Q.  One of the Johnson & Johnson
22  lawyers signed the confidentiality order
23  that they knew that at the end of the case
24  the evidence was going to be returned never

1  to see the light of day, right?
2        MS. BROWN:  That's
3    argumentative and misstates the
4    document and lacks foundation.
5        THE WITNESS:  No, as I
6    read it and, again, I'm
7    interpreting a document I had
8    nothing to do with or the
9    Stipulation of Dismissal or
10    whatever agreements the parties
11    came to, but you're asking me about
12    the behavior of the party
13    represented by Cahill Gordon.
14  BY MR. PLACITELLA:
15    Q.  No, I'm asking about Johnson &
16  Johnson, sir.
17    A.  I'm sorry, I don't see anything
18  in here about Johnson & Johnson.
19    Q.  Well, when you and Mr. Ashton
20  put your affidavit together, and cited the
21  Westfall transcripts, you didn't also
22  produce at that time any of the testing or
23  any of the testimony showing that
24  unequivocally, there was asbestos in that

Page 560

1 mine, correct?
2          MS. BROWN:  That
3     misstates the evidence and that
4     lacks foundation.
5 BY MR. PLACITELLA:
6     Q.   You can answer it.
7     A.   Mr. Ashton submitted the
8 Ashton -- the Chidester testimony to
9 support his affidavit with respect to his
10 knowledge of that mine, the Johnson mine.
11     Q.   How sad.
12          MS. BROWN:  What?
13          MR. PLACITELLA:  No, how
14     sad.  Don't you agree?
15          MS. BROWN:  How sad, is
16     that what you just said?  Hold on,
17     hold on.  I object.
18          MR. PLACITELLA:  Don't
19     you agree, how sad?
20          MS. BROWN:  No, no, do
21     not answer that.  This is
22     argumentative.
23 BY MR. PLACITELLA:
24     Q.   Okay.  We'll go to the next

Page 561

1 question.  That affidavit that you put
2 together was sent to plaintiffs' lawyers
3 across the country to try to get them to
4 get -- dismiss their cases, correct?
5          MS. BROWN:  Objection,
6     argumentative, assumes facts, lacks
7     foundation.
8          THE WITNESS:  It was
9     used to obtain dismissals in cases
10     that Johnson & Johnson had some
11     liability for, potential liability
12     for.  It was used in that fashion,
13     yes.  I don't know how many or
14     where.
15 BY MR. PLACITELLA:
16     Q.   You even sent a copy or you
17 were aware that a copy of the affidavit was
18 sent to the chief judge of the federal
19 court in charge of all the cases nationwide
20 and cited for the proposition that there
21 was no evidence.  Did you know that?
22     A.   No, but that wouldn't --
23          MS. BROWN:  Objection,
24     lacks foundation.

Page 562

1          THE WITNESS:  No, I
2     don't know exactly who sent it,
3     but.
4 BY MR. PLACITELLA:
5     Q.   That there was no evidence of
6 asbestos in that mine.  Did you know that
7 the chief judge for all the cases in the
8 United States got a copy of that affidavit?
9          MS. BROWN:  Lacks
10     foundation.  Misstates the
11     evidence.
12          THE WITNESS:  I don't --
13     you asked me three questions there.
14 BY MR. PLACITELLA:
15     Q.   That's one question.
16     A.   I'm going to respond to the
17 last one, do I know if the federal judge
18 had a copy of the affidavit.  I don't know
19 that.  If he did, he did.
20     Q.   Can you go to Exhibit 1040.  It
21 should be in book two.
22          Exhibit 1040 is an August 14,
23 19 -- it looks like '89 or August 15, 1989,
24 letter to Judge Weiner.  Do you see that?

Page 563

1          MS. BROWN:  It looks
2     like '88 and I object.
3          MR. PLACITELLA:  It's
4     hard to tell.
5          MS. BROWN:  It's
6     impossible to read.  I object.  It
7     lacks foundation.
8          - - - - -
9     (Letter dated 8/14/89 marked
10     O'Shaughnessy Exhibit 1040 for
11     identification.)
12          - - - - -
13 BY MR. PLACITELLA:
14     Q.   Do you see that?
15     A.   I see it, but I can't read the
16 date.
17          MS. BROWN:  No one can
18     read this.
19 BY MR. PLACITELLA:
20     Q.   Is your recollection at the
21 time that you were defending cases that
22 Judge Weiner, who was in Philadelphia, was
23 in charge for the entire MDL for asbestos
24 cases?

Page 564

1    A.  I don't recall that.
2    Q.  And go to the second page,
3 please.  And I'm going to blow it up,
4 because it's hard to read.  Do you see
5 where it says "By letter dated May 17,
6 1989, we provided plaintiffs' counsel with
7 such report, the affidavit of William H.
8 Ashton who has been involved in
9 investigating and studying talc for over 35
10 years"?
11    A.  I see that, yeah.
12    Q.  Do you see that and it says
13 "Mr. Ashton concludes our client's talc did
14 not contain asbestos," right?
15        MS. BROWN:  This whole
16    document lacks foundation.
17        THE WITNESS:  That's
18    what it says.  The Ashton affidavit
19    though speaks for itself.
20 BY MR. PLACITELLA:
21    Q.  In all the cases that you
22 defended related to the Johnson mine, did
23 you ever turn over any of the documents
24 from the Westfall case?

Page 565

1        MS. BROWN:  Objection,
2    lacks foundation.  Misstates the
3    evidence.
4        THE WITNESS:  I don't
5    know what was turned over in the
6    individual case.
7 BY MR. PLACITELLA:
8    Q.  When Cyprus purchased the mines
9 from you and the liabilities from you, did
10 you tell them about the evidence from the
11 Westfall case?
12        MS. BROWN:  Objection,
13    vague, lacks foundation.
14        THE WITNESS:  The
15    Johnson mine, I believe, was not
16    part of the sale to Cyprus.
17 BY MR. PLACITELLA:
18    Q.  Okay.  So can we go back to
19 that Cyprus agreement for a second.  That's
20 Exhibit I, I put up on the --
21        MS. BROWN:  What's the
22    number, Chris?
23        MR. PLACITELLA:
24    446.111.  And it's page, it's at

Page 566

1    446.111.  I just blew up there --
2    it says --
3        MS. BROWN:  Hold on, let
4    him get there.
5        THE WITNESS:  Let me
6    just go there, please.  446.11?
7        MS. BROWN:  111.
8 BY MR. PLACITELLA:
9    Q.  111.
10    A.  I'm sorry.  Okay.  I have it.
11    Q.  Do you see where it says
12 "Engelhard asserts that Windsor is
13 responsible for any liability due to
14 exposure provided."  Do you see that?
15    A.  Yes.
16    Q.  Okay.  So it was part of the
17 agreement.  Do you see that?
18        MS. BROWN:  What about
19    the next sentence.
20        THE WITNESS:  What do
21    you mean?
22        MS. BROWN:  Can we read
23    what goes on to the --
24

Page 567

1 BY MR. PLACITELLA:
2    Q.  "To the rubber and tire
3 industry by Eastern Magnesia Talc prior to
4 July 24, 1967."  Do you see that?
5        MS. BROWN:  Right, but
6    the next question. I object to
7    this --
8        THE WITNESS:  I don't
9    know what the question is.
10        MR. PLACITELLA:  Did I
11    read that correct so far?
12        THE WITNESS:  I'm sorry
13    to do this, but can you do it
14    again.
15 BY MR. PLACITELLA:
16    Q.  Yeah, no problem.  It talks
17 here about Engelhard asserting that Windsor
18 is responsible for --
19    A.  Yes, I see it.  I'm sorry.
20    Q.  Do you see that?
21    A.  Yes.
22    Q.  So let's go to the next page.
23 And the actions pending that were part of
24 the subject of this agreement --

---

Page 568

1         MS. BROWN:  I mean, can
2     we just --
3  BY MR. PLACITELLA:
4     Q.  It says "The actions pending
5  against Engelhard and/or EMTC as of
6  December 14, 1988 are as follows."  Do you
7  see that?
8         THE WITNESS:  I do.
9         MS. BROWN:  I object.
10 BY MR. PLACITELLA:
11    Q.  And it lists 1800 separate
12 cases.  Do you see that?
13        MS. BROWN:  I object to
14    the sentence you left out.  This is
15    intentionally misleading.
16        MR. PLACITELLA:  I'm not
17    trying to mislead anybody.  You can
18    do whatever you need to do.
19        MS. BROWN:  Can you
20    read the complete -- you skipped
21    over --
22 BY MR. PLACITELLA:
23    Q.  "Responsibility for the
24 aforementioned liability is currently

Page 569

1  disputed by Windsor."  Oh, okay.  That's
2  because they didn't tell anybody anything.
3  Okay.  So then it says "The actions pending
4  against Engelhard and/or EMTC as of
5  December 14, 1988 are as follows."  Do you
6  see that?
7     A.  Yes.
8     Q.  And then you list 1800 separate
9  cases, right?
10        MS. BROWN:  Lacks
11    foundation.  All this lacks
12    foundation.
13        THE WITNESS:  That's the
14    total number of plaintiffs.
15 BY MR. PLACITELLA:
16    Q.  You submitted that Ashton
17 affidavit to dismiss the cases of 1800
18 different people, didn't you?
19        MS. BROWN:  No, that
20    misstates the evidence and lacks
21    foundation.
22        THE WITNESS:  I don't
23    recall how many, but I know it was
24    used to obtain dismissals in cases.

Page 570

1  BY MR. PLACITELLA:
2     Q.  Okay.  And what happened to
3  those files?  The 1800 people, what
4  happened to those files?
5     A.  You say 1800 people?
6     Q.  It says total 1827.
7     A.  Can I finish, can I just
8  finish?
9     Q.  Sure.
10    A.  And it says total number of
11 actions 467.  So what I think, these
12 complaints, and I'm trying to remember, but
13 in these asbestos complaints, there would
14 often be complaints, I think, as you
15 mentioned before, with hundreds of people
16 in the complaint against scores of
17 companies.
18    Q.  Right.
19    A.  And so the liability here that
20 we were getting caught up in was about
21 that.
22    Q.  I understand.
23    A.  Now you're asking me for files
24 on these.  I don't know if we had files on

Page 571

1  them, because our liability here was going
2  to be through Engelhard, so they might have
3  had actual files.  I don't believe we had
4  all files.  Certainly, if J&J was named as
5  a defendant, we would have some file around
6  that.
7     Q.  Well, you know they were
8  named -- I mean, I can show them to you,
9  but you know they were named directly as
10 defendants in the case, right?
11        MS. BROWN:  That
12    misstates the evidence.
13        THE WITNESS:  I know in
14    some cases, they were not, but it,
15    you know, has been so long since I
16    looked at this.
17 BY MR. PLACITELLA:
18    Q.  Who is "they"?
19    A.  Johnson & Johnson.
20    Q.  Okay.  So let me turn the page
21 here.  Well, let me ask a question.  I see
22 you guys talking.  Do you want, how do you
23 want to handle --
24        MS. BROWN:  Lunch.

Page 572

1          MR. PLACITELLA: -- the
2     logistics here?  Do you want to go
3     to 12:30 and then break,
4     12:00 o'clock?  What do you want to
5     do?
6          MS. BROWN:  I think we
7     should go to 12:00 and take a lunch
8     break, so you have 13 minutes.
9  BY MR. PLACITELLA:
10     Q.  Okay.  Well, put me on a clock.
11  You worked on a case called Ritter.  Do you
12  recall that?
13     A.  I recall that.
14     Q.  Okay.  And you worked on that
15  case with Mr. Ashton.  Do you recall that?
16     A.  I don't recall, but that's
17  entirely possible.
18     Q.  Okay.  And can you go -- I
19  think you were shown this last week, but
20  can you go to Exhibit 1035.  I'm sorry.
21  Let me, yeah, 1035.  1035, for the record,
22  is a January 3, 1995, letter from Laurie
23  Bain of McCrone Environmental Services to
24  you.  Do you see that?

Page 573

1     A.  Yes.
2          - - - - -
3          (Letter dated 1/3/95 marked
4     O'Shaughnessy Exhibit 1035 for
5     identification.)
6          - - - - -
7  BY MR. PLACITELLA:
8     Q.  Okay.  And the re: up in the
9  right-hand corner is Ritter.  Do you see
10  that?
11     A.  Yes.
12     Q.  Okay.  And in that letter, what
13  McCrone did was they said they gave you a
14  copy of their entire file?
15     A.  Yes.
16     Q.  Do you see that?
17     A.  Yes.
18     Q.  Did you read it when you got
19  it?
20     A.  I probably did, yeah.
21     Q.  Okay.  And what happened to
22  that file?
23     A.  I don't have any specific
24  recollection, but what would have happened

Page 574

1  is I would have turned it over to our
2  attorneys for Ritter and Mr. Williams as
3  well.
4          Q.  Okay.  And in the context of
5  the Ritter case, you learned that the
6  McCrone reports that you received reported
7  asbestos in the Johnson & Johnson mines,
8  correct?
9          A.  No.
10             MS. BROWN:  Objection.
11         Misstates the evidence.  What is
12         the -- and vague as to the Johnson
13         & Johnson mines.
14  BY MR. PLACITELLA:
15         Q.  The Johnson & Johnson talc.
16             MS. BROWN:  Same
17         objection.
18             THE WITNESS:  No is the
19         answer.
20  BY MR. PLACITELLA:
21         Q.  Okay.  And you also learned
22  during the course of the Ritter case that
23  when you were mining the talc from the
24  Johnson mine, there was no way in heaven

Page 575

1  you could avoid mining the tremolite in the
2  mine at the same time, correct?
3             MS. BROWN:  Assumes
4         facts, misstates the evidence,
5         lacks foundation.
6             THE WITNESS:  When you
7         say "you," I assume you mean the
8         Johnson & Johnson people?
9  BY MR. PLACITELLA:
10         Q.  Yes, sir.
11         A.  No, no, I don't recall.
12         Q.  Okay.  Who is Barry Doolan?
13         A.  Barry Doolan was a geologist, I
14  believe, with the University of Vermont.
15         Q.  Okay.  And he is someone that
16  you consulted during the course of the
17  Ritter case?
18         A.  He was a litigation consultant,
19  yes.
20         Q.  And can you go to 1055, please.
21             MS. BROWN:  Your Honor,
22         this is a privileged document.  Can
23         we have a moment?
24             JUDGE SCHNEIDER:  You

Page 576

1    want to go --
2         MS. BROWN:  Can I confer
3    with my co-counsel?  This appears
4    on its face to me to be a
5    privileged document that I just
6    want to find out if it has been
7    clawed back.
8         JUDGE SCHNEIDER:  Sure.
9         MS. BROWN:  Thanks.
10         MR. PLACITELLA:  Well,
11    no one sent any clause my way.
12         MS. BROWN:  Let's go off
13    for a second.
14         THE VIDEOGRAPHER:  Off
15    the record 11:51.
16         - - - - -
17    (Discussion was held off the record.)
18         - - - - -
19         MR. PLACITELLA:  So this
20    document does have J&J Bates
21    numbers on it.  It was in the
22    packet that Mr. Block submitted
23    with his deposition that you've had
24    now for a week and it contradicts

Page 577

1    what the witness just said.  It
2    clearly contradicts what the
3    witness just said.
4         JUDGE SCHNEIDER:  First,
5    let's find out.  Is there an
6    objection to the use of this
7    exhibit?
8         MS. BROWN:  Yes.
9         MR. BERNARDO:  Yes.  And
10    to explain, it was our
11    understanding that we were not to
12    advance and look at the documents
13    that were not being used and this
14    was not one of the documents being
15    used, so I did not go through the
16    binder to ascertain.  I will say
17    that as I was going through another
18    one, I do recall opening and
19    thinking, I think this is a
20    document to recall, but I
21    intentionally followed
22    instructions --
23         JUDGE SCHNEIDER:  In
24    fairness, that was the right thing

Page 578

1    to do.
2         MR. BERNARDO:  Right.
3         JUDGE SCHNEIDER:  You're
4    not going to be blamed for that.
5         MR. BERNARDO:  And I
6    will explain what I think is
7    appropriate to put on the record
8    and then, Your Honor, if you
9    require additional information as
10    we did during the privilege
11    hearing, there were other, say,
12    privilege facts I can explain to
13    Your Honor that would further
14    explain this, but let me state at a
15    very high level things that I'm
16    comfortable saying on the record.
17         This was not a document
18    produced by Johnson & Johnson in
19    its document production.  This is a
20    document that I, having looked at
21    it now, do recall several years ago
22    learning that there was some
23    inadvertent disclosure of it, but
24    based upon what we learned and

Page 579

1    understood, we were under the
2    impression that it never made its
3    way out to plaintiffs' counsel or
4    wouldn't otherwise be in
5    plaintiffs' counsel's hands.
6    Obviously, we were wrong in that
7    investigation and understanding.
8    So we didn't see a need to claw it
9    back, because it was our
10    impression, based upon facts I can
11    be happy to tell you, that it had
12    never been disclosed.  The
13    document, I've just confirmed with
14    Mr. Fine, continues to be on our
15    privilege log.  I actually asked
16    him, Your Honor, if it was among
17    the documents that are being
18    challenged and I haven't received
19    an answer of that yet.
20         JUDGE SCHNEIDER:  Not in
21    the federal MDL?
22         MR. BERNARDO:  It may be
23    among Mr. Block's, it may be as
24    part of the larger group, that's

John O'Shaughnessy

Page 580

why the binder --
        JUDGE SCHNEIDER:  The 156 documents?
        MR. BERNARDO:  Yeah, I confirmed, it's not among those. So, again, Your Honor, I would be happy to provide additional details that would sort of substantiate the top line information I provided.
        JUDGE SCHNEIDER:  Are you at liberty to say who did produce this document?
        MR. BERNARDO:  I would rather disclose that --
        MS. BROWN:  I wouldn't even say produced, Judge.  It was never produced.  There is a situation where the document was --
        MR. BERNARDO:  I would rather --
        MR. PLACITELLA:  I can leave the room.
        JUDGE SCHNEIDER:  Before you leave, I have a question.

Page 581

        MR. BERNARDO:  Sure.
        MR. PLACITELLA:  I would rather not leave, but I can leave.
        MR. TISI:  It does have a J&J Bates number.
        MR. PLACITELLA:  It does have a J&J Bates number.
        MS. BROWN:  No.
        MR. BERNARDO:  No, no, it doesn't.  It has an internal J ampersand J on it, right?
        MR. TISI:  We can look at it right here.  We can give you the number.
        MR. PLACITELLA:  I can put it up if you want.
        JUDGE SCHNEIDER:  I would like to see it.
        MR. BERNARDO:  Right. So I can state with certainty, because I personally investigated that J ampersand J reflects an endorsement that was put on a large swath of materials, some of which

Page 582

were not at all responsive, some of which are withheld on the basis of privilege.  That was an internal way of just tracking documents. Some of the documents that have that designation are in the production.  This goes back more than a decade, and again, Your Honor, this goes in part with something I explained the other day, but I'm very comfortable in saying that not every document that has that on it was produced, number one.  And number two, as Plaintiffs probably know, most documents that have that designation also have another number on it.
        JUDGE SCHNEIDER:  That appears to be a different format from at least one other J&J Bates number, which is J, the letter N, J.
        MR. TISI:  Yeah, but we've had -- if I can just weigh in

Page 583

on that.
        JUDGE SCHNEIDER:  Sure.
        MR. TISI:  As I think Mr. Bernardo explained last time and, again, I'm just saying this as a matter of fact.  When they were originally produced in the initial state litigation, Mr. Bernardo, I don't think was even involved in the production at that point. There was another firm involved in the production.  There was a production of documents that had different Bates numbers.  Over time, as that number grew, as the number of documents grew, we had a big fight in the MDL about, you know, the number of documents produced and it went from, you know, 36,000 to hundreds of thousands of documents.  I mean, it grew over time and I think when Mr. Bernardo became involved, and you'll correct me if I'm wrong, the

John T. O'Shaughnessy

Page 584

1  numbers changed. So some of these
2  documents have different, multiple
3  different Bates numbers over time,
4  because of the way in which they
5  were produced originally in an
6  individual state litigation,
7  actually, starting in South Dakota,
8  and then expanded over time and I
9  think that they used different
10 systems. It has been confusing to
11 us, candidly, because we never know
12 which Bates number to use when
13 we're referring to it. But the
14 fact that this is in a different
15 format, Judge, and this is all I'm
16 going to say, the fact that this is
17 isn't a different format doesn't
18 raise any red flags to me, because
19 some of these documents have four
20 or five different Bates numbers on
21 it because they were produced under
22 different circumstances in
23 different litigations. Does that
24 make sense?

Page 585

1        JUDGE SCHNEIDER: Fair
2  enough.
3        MR. BERNARDO: And I
4  completely agree with what Mr. Tisi
5  said. I'm making the point simply
6  that not every document that has
7  that designation was a document
8  that was intended to be produced.
9  Some of those are on the privilege
10 log. Some of those were deemed to
11 be completely not responsive to
12 anything. So --
13       MR. TISI: And some of
14 them have been produced.
15       MR. BERNARDO:
16 Absolutely, Chris, I'm agreeing
17 with you. I'm simply saying that
18 that does not indicate that it was
19 produced. That's my only --
20       MR. PLACITELLA: Here's
21 where we are.
22       MR. BERNARDO: Excuse
23 me?
24       MR. PLACITELLA: I

Page 586

1  accept whatever you say. I'm not
2  fighting with you over it. I got
3  it. It was in Jerry's packet. I
4  read it. I used it. But here's
5  the problem. The witness has said
6  that he never learned this
7  information during the course of
8  the case or from Doolan.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 587

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 588

Page 590

```
1   procedurally doing this by the
2   books, because I can expect, I'm
3   not saying that I'm anticipating
4   Judge Schneider is going to rule
5   against us, but if he does, I can
6   anticipate that this might be
7   something we would want to appeal.
8   This is a very important issue,
9   it's a threshold issue, and I just
10  want to make sure we're creating an
11  appropriate record --
12      MR. TISI:  I just want
13  to make sure when you say the word
14  "privilege," I think we have to
15  indicate, because one privilege is
16  much more absolute than another
17  privilege.  I want to make sure
18  when you say "privilege," what
19  we're actually talking about.
20      MR. PLACITELLA:  Yeah,
21  so if we're stepping through the
22  paces trying to do what you're
23  saying, okay, you want a ruling
24  whether it's privileged or not --
```

Page 589

```
6       .
7       MR. BERNARDO:  Chris, my
8   only point is, procedurally, I feel
9   like we need a ruling so we can
10  decide what that is and decide
11  whether we appeal it or not on
12  whether this is or isn't
13  privileged.  If it is and it's work
14  product and that's what the judge
15  decides, you can make that
16  argument.  Although, I don't think
17  you're supposed to be making
18  arguments based upon the actual
19  content of an otherwise privileged
20  document.  I really --
21      MR. TISI:  No, I hear
22  you --
23      MR. BERNARDO:  I just
24  want to make sure we're
```

Page 591

```
1       MR. BERNARDO:  Work
2   product --
3       MR. PLACITELLA:  Work
4   product privilege --
5       THE STENOGRAPHER:  One
6   at a time.  Okay.
7       MR. BERNARDO:  I first
8   want a ruling as to whether or not
9   this document should even be in
10  your hands, because it was -- look,
11  if the ruling is that we waived
12  whatever we asserted, then we go to
13  the next step.
14      JUDGE SCHNEIDER:  Can I
15  ask a question?
16      MR. BERNARDO:  Sure.
17      JUDGE SCHNEIDER:  I
18  think you're right.  I think we
19  have to decide if it's work product
20  or not.  And then we have the other
21  issue about whether there's a
22  substantial need for it and whether
23  you can rely on content of a work
24  product document to prove
```

John 2 - O'Shaughnessy

Page 592

1  substantial need.
2          MR. BERNARDO:  Which
3  under the federal rules, you
4  cannot.
5          JUDGE SCHNEIDER:  Yeah,
6  I don't have a case at my
7  fingertips, but it doesn't --
8          MR. BERNARDO:  I'll get
9  you one.
10          JUDGE SCHNEIDER:  I
11  don't know, but here's the question
12  I have --
13          MR. PLACITELLA:  Well,
14  there's one more piece of the
15  analysis.  I would rather not go
16  there.
17          JUDGE SCHNEIDER:  I
18  would just like to get your
19  representation.  Is it your
20  representation that it wasn't until
21  Jerry Block's binder that you
22  realized that this document was in
23  Johnson & Johnson's -- Plaintiffs'
24  exhibits?

Page 593

1          MS. BROWN:  Yes.
2          MR. BERNARDO:  Correct,
3  it was my understanding and
4  impression when we did our
5  investigation of circumstances when
6  this first came to my attention
7  several years ago that it never
8  made its way out there.  We took
9  appropriate steps to avoid it from
10  even getting there.
11          JUDGE SCHNEIDER:  Maybe
12  we need to have an ex parte
13  conversation too, without revealing
14  the answer, do you know how this
15  document came to be in your hands
16  other than --
17          MR. TISI:  It was in the
18  production.  It was in the
19  production of documents.
20          JUDGE SCHNEIDER:  What
21  production of documents?
22          MR. TISI:  The regular,
23  the normal in the course of
24  business production of documents.

Page 594

1          MR. PLACITELLA:  First
2  of all, I don't know that --
3          MR. TISI:  Well, that's
4  what I understand.
5          MR. PLACITELLA:  I don't
6  know that.
7          JUDGE SCHNEIDER:  Isn't
8  that a critical question --
9          MR. PLACITELLA:  I don't
10  know that.  So I just want to back
11  up for a second before we --
12          JUDGE SCHNEIDER:  When
13  you say it was in the normal
14  course, Chris, do you mean by J&J
15  or somebody else?
16          MR. TISI:  It would only
17  come from J&J.  But the other
18  question that I have, and let me
19  double check, because I don't
20  know where else we would have
21  gotten it --
22          MR. BERNARDO:  And to be
23  honest, I did not reconfirm that,
24  which I can do --

Page 595

1          MR. TISI:  Let me go
2  check.
3          MR. BERNARDO:  We spent
4  significant time --
5          MR. TISI:  Let me go and
6  check.
7          MR. BERNARDO:  I think
8  it might just help and we can
9  probably figure out where they got
10  it if we can have a very brief ex
11  parte and then we have one with
12  them --
13          MR. TISI:  But let me
14  ask one question.  When you --
15          MR. PLACITELLA:  You can
16  read between the lines where I got
17  it.  I'm not --
18          MR. BERNARDO:  I think I
19  can figure it out.
20          MR. TISI:  But let me
21  ask you one question.  When you
22  inadvertently realized that it was
23  in the binder or whatever you -- I
24  think you had indicated it was

John O'Shaughnessy

Page 596

1  inadvertent.  You didn't go back
2  and look any further --
3        MR. BERNARDO:  Chris, I
4  didn't write down the date.  I
5  didn't do anything.  It was one of
6  those under the rules, you see
7  something, you realize --
8        MR. TISI:  I totally get
9  it.  I totally get it --
10        THE STENOGRAPHER:  You
11  know what, I can't take this.  I
12  cannot take this back and forth,
13  because you're not going to get a
14  record.
15        MR. BERNARDO:  I
16  apologize.
17        MR. TISI:  And I totally
18  understand that.  My question is,
19  did you recognize that this
20  document, even if you don't go any
21  further, at some earlier point was
22  in our hands?
23        MS. BROWN:  No.
24        MR. TISI:  Okay.  That

Page 597

1  was my question.
2        MR. BERNARDO:  My
3  representation and maybe you can
4  prove me wrong --
5        MR. TISI:  I'm not
6  trying to prove you wrong.
7        MR. BERNARDO:  No, no, I
8  know you're not.  I'm just giving
9  you the benefit of the doubt.
10        JUDGE SCHNEIDER:  But at
11  the earliest, it was a week ago,
12  right?
13        MR. TISI:  Well, we know
14  at least a week ago, right, at
15  least, I think that's what I'm
16  asking is, you know, if you had a
17  week to claw it back and you knew
18  for either advertent or
19  inadvertent, why is it now we're a
20  week later?
21        MS. BROWN:  Well, I can
22  tell you this, because these
23  binders also went to an associate
24  who saw it and raised with us they

Page 598

1  have a privileged document and we
2  said, oh, my goodness, we're not
3  supposed to be looking ahead in the
4  binder.  So we knew that there was
5  a suggestion there might be a
6  privileged document in there.
7        MR. TISI:  But you
8  didn't know which one?
9        MS. BROWN:  No, because
10  I instructed her, she told me tab
11  24.  So I know -- I suspect it was
12  tab 24 and we both said to her, you
13  are not supposed to look ahead, so
14  that's where we left it.
15        MR. BERNARDO:  Maybe I'm
16  the last lawyer who does this, but
17  I, genuinely, when I get something
18  and realize I'm not supposed to
19  have it --
20        MR. TISI:  I'm with you.
21  I don't do it either.  You and I
22  have had this discussion.
23        MS. BROWN:  And that's
24  how we knew, and we took steps

Page 599

1  pursuant to what was asked of us --
2        JUDGE SCHNEIDER:  I
3  don't think that's a concern --
4        MR. TISI:  It's not a
5  concern on my part either.  You're
6  an honorable person.
7        JUDGE SCHNEIDER:  I
8  credit -- I credit that they closed
9  the book after a fleeting
10  reference, but Chris, I would like
11  to know if you can document that
12  J&J produced that, because that
13  might be the answer to this.
14        MR. BERNARDO:  And if it
15  is, it is.  I mean --
16        JUDGE SCHNEIDER:  If J&J
17  produced it --
18        MR. TISI:  Let me see if
19  I can check right now, but what I'm
20  concerned about, Judge, and this is
21  an important issue, right, and it's
22  in the flow of Chris' deposition,
23  from just a practical standpoint,
24  we're eating up time that we want

John T. O'Shaughnessy

Page 600

1   to -- you know, you were very
2   concerned about time and I don't
3   want to prejudice us in getting
4   through this examination.
5        JUDGE SCHNEIDER:  Let's
6   do this --
7        MR. PLACITELLA:  Well,
8   I'm going to take you at your word.
9   You don't need to prove anything to
10  me.  Okay.  Let them figure out,
11  you know.  So I don't know that you
12  want to -- you need ex parte, if
13  you think you do, you do.  If you
14  say it is, it is.  Okay.  That's
15  how I see the world, you know.
16  Because our lives are way too long
17  to go up and eat the sheets on
18  that.
19        JUDGE SCHNEIDER:  You
20  meant to say way too short.
21        MR. PLACITELLA:
22  Unfortunately, we're all --
23        MR. BERNARDO:  I agree
24  with everything you said up to

Page 601

1   there, Chris.
2        - - - - -
3   (Discussion was held off the record.)
4        - - - - -
5   (Sealed Portion of Transcript.)
6        - - - - -

Page 602

Page 603

John P. O'Shaughnessy

Page 604

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 606

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 605

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 607

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

John F. O'Shaughnessy

| Page 608 | Page 610 |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |

| Page 609 | Page 611 |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |

Page 612

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 614

1
2
3
4
5
6
7
8
9
10
11       - - - - -
12  (Whereupon, sealed portion of transcript concluded.)
13       - - - - -
14    (A recess was taken at this time.)
15       - - - - -
16       JUDGE SCHNEIDER:  This
17  is Special Master Schneider, Judge
18  Schneider, before our lunch break,
19  an issue came up about a particular
20  document.  It's claimed that the
21  document is work product, but
22  there's an issue whether the work
23  product has been waived and there
24  was an inadvertent production.

Page 613

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 615

1   After speaking ex parte with
2  defense counsel, and I could
3  represent we only talked about
4  privileged information, and talking
5  with Plaintiffs' counsel, it's my
6  determination that the record is
7  not complete enough to make an
8  informed decision as to whether
9  this document should be used, so
10  we're going to table the use of
11  this document for purposes of this
12  deposition.  At the conclusion of
13  the deposition, or shortly
14  thereafter, we'll discuss with
15  counsel a briefing schedule and get
16  a determinative ruling on the
17  issue, but for purposes of this
18  afternoon, this document will not
19  be used.  And this is for the
20  record Exhibit J&J 1055.1.
21       MR. PLACITELLA:  Could I
22  add something just so that there's
23  no missteps?  There was certain
24  argument under seal.  So, Robin,

John P. O'Shaughnessy

Page 616

1    before you send the transcript out
2    to anybody else, including me,
3    could you send it to Alli and Rich
4    only so they can make sure that
5    it's appropriately -- whatever
6    needs to be done.
7            MS. BROWN:  Thank you.
8            MR. PLACITELLA:  I don't
9    want it to be inadvertent.
10            MS. BROWN:  That's
11    great.
12            MR. PLACITELLA:  We have
13    enough inadvertence.
14            MS. BROWN:  Yeah,
15    thanks, Chris, I appreciate that.
16            MR. TISI:  We would
17    agree to that.
18            THE VIDEOGRAPHER:  We
19    are back on the record at 1:23 p.m.
20    BY MR. PLACITELLA:
21        Q.  All right.  I thought I was
22    doing great on time, but I'm going to try
23    to make up some of it so this could be your
24    last day.

Page 617

1        A.  Thanks a lot.
2        Q.  I'm trying.  Remember we just
3    went over the document where they sent you
4    the McCrone file?  McCrone sent you their
5    entire file.
6        A.  Leslie Bain or something, yes.
7        Q.  Yes.  What happened to that
8    file?
9        A.  I would have given the
10    documents to our lawyers, our outside
11    counsel.
12        Q.  Who would that be?
13        A.  If that was under the Ritter
14    case, it would have been to Ritter and to
15    Gene Williams as well.
16        Q.  Okay.  Now, I mentioned
17    Professor Doolan, is he dead or alive?
18        A.  I don't know.
19        Q.  In the Ritter case, you
20    defended Mr. Miller's deposition, correct?
21        A.  I don't recall, but if you say
22    so.
23        Q.  Okay.  If you look at 1043 in
24    your transcript binder.  I want to put it

Page 618

1    up on the screen.  This is the deposition
2    of Roger Miller, April 6, 1995.  Do you see
3    that?
4        A.  Yes, I see it.
5            - - - - -
6            (Deposition Of Roger N. Miller
7            dated 4/6/95 marked O'Shaughnessy
8            Exhibit 1043 for identification.)
9            - - - - -
10    BY MR. PLACITELLA:
11        Q.  And do you see on the second
12    page of the deposition you're listed as
13    counsel?
14        A.  I am.
15        Q.  Okay.  So you're actually
16    participating in this dep, correct?
17        A.  The transcript will show.  I
18    don't recall.
19        Q.  And in this deposition, if you
20    go to 26, it's 1043.26.
21        A.  Yes.
22        Q.  Mr. Miller is asked "And is
23    there any fiber material in the talc that
24    Windsor Minerals has sold over the years

Page 619

1    since you have been with the Windsor
2    Minerals -- with Windsor Minerals?"
3            Answer:  "We had no fiber
4    form materials in our product."  Do you see
5    that?
6        A.  Yes.
7        Q.  In the -- what happened to the
8    file from the Ritter case?
9        A.  The Johnson & Johnson file?
10        Q.  Yeah.
11        A.  It would have been, like I
12    said, in the central file room for a period
13    of time and then moved over to outside
14    storage.
15        Q.  Okay.  And where are all the
16    testing documents, I thought there were --
17        A.  I have some below here.
18        Q.  Okay.  Can you put them back up
19    for a second?
20        A.  Sure.
21        Q.  That's fine.  Just make it so
22    it doesn't fall on you.
23        A.  That's what I tried to do.
24    This is Musco 2.

Page 620

1    Q.  Yeah, that's right.
2    A.  Okay.
3    Q.  Do you have any evidence that
4 any of those testing documents in those
5 binders to your right were produced in the
6 Ritter case?
7            MS. BROWN:  Objection.
8    Assumes facts and lacks foundation.
9            THE WITNESS:  I have --
10   I don't have any specific recall of
11   what was produced in the Ritter
12   case, but we would have been -- our
13   practice would have been to have
14   been responsive to discovery
15   requests in light of whatever rules
16   were present in the court at the
17   time and agreements with counsel.
18 BY MR. PLACITELLA:
19   Q.  Well, did you ever claim that
20 any of those testing documents were subject
21 to -- that they were your trade secrets at
22 Johnson & Johnson?
23   A.  I don't recall positions taken.
24   Q.  It wouldn't have been a fair

Page 621

1 thing to do, to say that those documents
2 were trade secrets, do you agree?
3            MS. BROWN:  Objection.
4    Assumes facts.  Lacks foundation.
5            THE WITNESS:  Well,
6    you're pointing to three binders
7    and I don't know exactly what's in
8    all of them.  Oftentimes, and I
9    can't talk specifically, but
10   oftentimes in litigation, trade
11   secret is a -- is a type of
12   document that we would bring to the
13   attention of the court and the
14   counsel in discovery.  So we may
15   denominate something as trade
16   secret.  And I'm not sure what else
17   I can say.
18 BY MR. PLACITELLA:
19   Q.  I'll come back to that.
20   A.  Okay.
21   Q.  Just for context, at the same
22 time that the Ritter case, that what Roger
23 Miller testified under oath that there was
24 no minerals, fiber in any of the Windsor

Page 622

1 mines, that was the same year as the
2 citizens' petition that you went over with
3 Mr. Tisi yesterday, right?
4    A.  I assume, you know, I take your
5 word for it, but I don't recall.
6    Q.  And in the citizens' petition,
7 the CTFA took the position with Johnson &
8 Johnson's input that there was no evidence
9 of asbestos in any of the talc products at
10 issue, right?
11           MS. BROWN:  Objection.
12   Lacks foundation.  Misstates the
13   evidence.
14           THE WITNESS:  That would
15   have been our position with respect
16   to our own talc.
17 BY MR. PLACITELLA:
18   Q.  Okay.
19   A.  I'm sorry, Johnson & Johnson's
20 talc.
21   Q.  Now, when you made those
22 representations to the FDA -- by the way,
23 was that -- Mr. Tisi sent me a note.  Was
24 that the same year that Mr. -- that Dr.

Page 623

1 Muscat proposed his study?
2    A.  I don't know.
3            MS. BROWN:  Objection.
4    Lacks foundation.
5 BY MR. PLACITELLA:
6    Q.  Okay.  So did you know, because
7 you say you rely upon the people at J&J,
8 did you know that Johnson & Johnson's never
9 gave another -- a testing report to the FDA
10 after 1973?
11           MS. BROWN:  Objection.
12   Lacks foundation.
13           THE WITNESS:  I would
14   have no knowledge what the company
15   did with respect to its dealings
16   with the FDA.  You would have to
17   ask someone in their regulatory
18   group over there.
19 BY MR. PLACITELLA:
20   Q.  Okay.  I want to just show you
21 the testimony of -- why am I getting no
22 sound here?
23           THE VIDEOGRAPHER:  It's
24   super duper low, I hear it, but

Page 624

1   it's very low.
2           MR. PLACITELLA:  Why is
3   that?
4           THE VIDEOGRAPHER:  Is
5   the volume all the way up?
6   BY MR. PLACITELLA:
7   Q.  It's all the way up.  I'll try
8   it one more time, if not, I'm just going to
9   have to move on.  Do you know who Susan
10  Nicholson is?
11  A.  I do.
12  Q.  She testified in a deposition
13  that no test was provided -- no asbestos
14  testing documents were provided to the FDA
15  after 1973.  Do you have any reason to
16  dispute that?
17          MS. BROWN:  Objection.
18  Lacks foundation.
19          THE WITNESS:  No, I'm
20  not familiar with the deposition or
21  testimony.  I don't have any
22  different reason to -- I would have
23  no knowledge of that whole area,
24  so, you know, I don't know.

Page 625

1   BY MR. PLACITELLA:
2   Q.  Okay.  So if they're asking you
3   to go to tell the FDA there's no evidence
4   of asbestos, but they didn't tell you that
5   they never gave the FDA any tests after
6   1973?
7           MS. BROWN:  I object.
8   Lacks foundation.  Assumes facts.
9           THE WITNESS:  You're
10  asking me about going to the FDA, I
11  don't deal with the FDA in my
12  position.
13  BY MR. PLACITELLA:
14  Q.  Well, you did as it related to
15  the citizen petition, you were on the
16  committee.
17          MS. BROWN:  Objection.
18  Misstates the evidence.
19          THE WITNESS:  No, I was
20  familiar with the citizens'
21  petition and what they were doing,
22  I was copied on it, but I didn't
23  have any responsibility or input to
24  it or not.  That was a regulatory

Page 626

1   matter with the FDA.
2   BY MR. PLACITELLA:
3   Q.  But you were on the committee
4   that provided input by Johnson & Johnson
5   and took a position before the FDA, right?
6   A.  They denominated me on that
7   Worldwide Talc Committee that, you know,
8   you guys have shown me documents about.
9   Q.  Yes, sir.
10  A.  I don't know if that committee
11  dealt with the citizens' petition.  I think
12  that's probably putting form over
13  substance, because clearly the same people
14  would probably be involved.  What I'm
15  telling you is that the regulatory
16  attorneys would take the laboring more in
17  dealing with the citizens' petition and the
18  response and the substance of it.
19  Q.  Okay.  Is it fair to say today
20  is the first time you ever heard that
21  Johnson & Johnson never gave the FDA an
22  asbestos test after 1973?
23          MS. BROWN:  Objection.
24  Misstates the evidence and lacks

Page 627

1   foundation.
2           THE WITNESS:  I'm sorry.
3           MS. BROWN:  Go ahead.
4           THE WITNESS:  I don't
5   have any knowledge of that whole
6   area.
7   BY MR. PLACITELLA:
8   Q.  Okay.  The next thing I want to
9   talk to you about is, and I promise you I
10  will not spend the same amount of time as
11  everybody else did.  The next thing I want
12  to talk to you --
13  A.  Bless you.
14  Q.  -- about is the Coker case in
15  the context of the timeline.  Okay.
16  A.  I was responding to the court
17  reporter.
18  Q.  Yeah, I understand.
19  A.  I'm sorry.  Could you repeat
20  it?
21  Q.  The next thing I want to talk
22  to you about is the Coker case and the
23  context of the timeline of cases that you
24  worked on.  Okay?

John P. O'Shaughnessy

Page 628

1    A.  I worked on the Coker case.
2    Q.  Okay.  And if you can go to
3 1039, which is in your book two.  And while
4 you're looking for that, when you were
5 defending the Coker case, Johnson & Johnson
6 had all hands on deck to defend that case,
7 do you agree?
8         MS. BROWN:  Objection.
9     Lacks foundation.
10        THE WITNESS:  I don't
11    know what you mean by that.
12 BY MR. PLACITELLA:
13    Q.  Well, everybody who could help
14 did help?
15    A.  There's a lot of people who had
16 input into the case.  I can't answer that
17 question.
18    Q.  Okay.  Can you go to 1039.19?
19    A.  Got it.
20    Q.  Okay.
21    A.  I'm sorry 1039, it's an
22 exhibit.
23    Q.  Right.  Right.
24    A.  Number 19.

Page 629

1    Q.  Put it up, I put it up on the
2 screen to make it easy for you.  Okay.
3 According to your privilege log, the
4 following people worked on the Coker case.
5 Michael Chudkowski, John Hopkins, Randy
6 Corder, James Molnar, Al Wehner, Nancy
7 Musco, Jeff F. Slade, Sam Jiwarjka,
8 Marjorie McTernan, right?
9         MS. BROWN:  The question
10    misstates the document.
11        THE WITNESS:  No, that's
12    not correct.  You didn't misstate
13    any names, but that's not what the
14    document says.
15 BY MR. PLACITELLA:
16    Q.  It says "Emails from inside
17 counsel to company personnel providing
18 legal advice in connection with the Coker
19 case."  And then to the left for 1998,
20 which is when Coker was pending, you have
21 all those names that we just read?
22    A.  Right, but I believe, Mr.
23 Placitella, maybe I heard it wrong, that
24 your question was these people worked on

Page 630

1 the Coker case.
2    Q.  Well, they assisted you.
3    A.  I might have asked them for
4 information like I would on any other case.
5    Q.  Well, that's my point.  So --
6    A.  But I don't know, because I
7 don't see the document.
8    Q.  My point is they were all
9 involved somehow in the defense of the
10 Coker case?
11        MS. BROWN:  Objection.
12    Misstates the document.  Lacks
13    foundation.
14        THE WITNESS:  No, I
15    wouldn't characterize it that way.
16    The lawyers were involved in the
17    defense of it and the company helps
18    the lawyers and assists.
19 BY MR. PLACITELLA:
20    Q.  Okay.  So were you keeping all
21 these people apprised on what was going on
22 in the Coker case?
23    A.  I don't see the emails, so I
24 don't know.  It's a privileged email, so I

Page 631

1 was probably telling them --
2        MS. BROWN:  Well, hold a
3    second, John, don't.
4        THE WITNESS:  That's
5    right, I can't --
6        MS. BROWN:  I'll
7    instruct you not to answer that.
8 BY MR. PLACITELLA:
9    Q.  I don't want to know what you
10 asked them about.  I really don't.  Your
11 privilege log indicates that all these
12 people were somehow involved in the Coker
13 case, right?
14        MS. BROWN:  Well, that
15    misstates the document.
16        THE WITNESS:  No, it
17    doesn't.
18 BY MR. PLACITELLA:
19    Q.  Well, it says --
20    A.  It says --
21    Q.  You sent them emails.  They
22 sent you emails.  There were letters.  All
23 that, right?
24    A.  What it says is these people,

Page 632

¹ I'm trying to read, so it lists me as the
² author and the recipients that you had
³ mentioned and it describes the -- and it
⁴ gives a description of the subject and I
⁵ assume that's what it was about, legal
⁶ advice.
⁷      Q.  Okay.  Dr. Hopkins who you say
⁸ you rely upon and Wehner, they worked on
⁹ the Coker case with you, correct?
¹⁰      A.  Dr. Hopkins would have been one
¹¹ of the people I would have consulted with,
¹² you, in terms of company contact, not
¹³ Dr. Wehner, no.
¹⁴      Q.  Okay.  Can you go to
¹⁵ Exhibit 274.2, which would be book one.
¹⁶          MS. BROWN:  Do you have
¹⁷      it?  I'll give you my copy.
¹⁸          THE WITNESS:  I think I
¹⁹      got it.
²⁰          MS. BROWN:  Okay.  I
²¹      think you're in the transcript
²²      binder, John.
²³          THE WITNESS:  Oh, all
²⁴      right.

Page 633

¹          MS. BROWN:  Right.
²          MR. PLACITELLA:  A lot
³      of binders.
⁴          THE WITNESS:  I'm sorry,
⁵      it's just a normal document binder?
⁶      It's probably the bottom one.
⁷      Thanks.
⁸          MR. PLACITELLA:  274.2,
⁹      not the deposition binder.
¹⁰          MS. BROWN:  I think we
¹¹      got it now.
¹²          MR. PLACITELLA:  Okay.
¹³          THE WITNESS:  I have it.
¹⁴          - - - - -
¹⁵      (Letter dated 1/23/88 Bates JNJ
¹⁶      000024573 to 24576 marked
¹⁷      O'Shaughnessy Exhibit 274 for
¹⁸      identification.)
¹⁹          - - - - -
²⁰ BY MR. PLACITELLA:
²¹      Q.  Okay.  So see if this refreshes
²² your recollection.  I have in front of you
²³ a January 23, 1998, letter from Dr. Wehner
²⁴ to John Hopkins about the Coker case,

Page 634

¹ correct?
²      A.  I don't know.
³          MS. BROWN:  Object.
⁴      Lacks foundation.
⁵ BY MR. PLACITELLA:
⁶      Q.  Well, let me go to the second
⁷ paragraph.
⁸      A.  Yeah, I'm just reading the
⁹ first, it's related to the Coker case.  It
¹⁰ says, with letter from Dr. Abraham to
¹¹ Mr. Hobson, attorney at law.
¹²      Q.  Next line, "Knowing as little
¹³ as I do about this case at present,
¹⁴ specifically Mrs. Coker's history."  Do you
¹⁵ see that, Mrs. Coker's history?
¹⁶      A.  Right.
¹⁷      Q.  So not to belabor the point,
¹⁸ because it's in evidence, but during the
¹⁹ course of that case, you learned that Alice
²⁰ Blount found asbestos in her testing of the
²¹ Johnson's Baby Powder, correct?
²²          MS. BROWN:  Objection.
²³      Misstates the evidence.
²⁴          THE WITNESS:  I received

Page 635

¹      that letter from MehaffyWeber
²      regarding Dr. Blount.
³ BY MR. PLACITELLA:
⁴      Q.  So the answer is yes?
⁵      A.  If that's the letter you're
⁶      referring to, yes.
⁷      Q.  Okay.
⁸      A.  I forget the date.
⁹      Q.  And all those, Mr. Tisi put
¹⁰ them in the record.  I don't want to spend
¹¹ time on that.  But I just want to be clear
¹² on what was going on here with Dr. Blount.
¹³ Okay.  Dr. Blount did not test the
¹⁴ Johnson's Baby Powder as a consultant for
¹⁵ Johnson & Johnson in litigation involving
¹⁶ the Coker case, true?
¹⁷          MS. BROWN:  Objection.
¹⁸      Lacks foundation.
¹⁹          THE WITNESS:  I don't
²⁰      have the letter in front of me, but
²¹      I don't believe -- oh, for the
²²      Coker case?
²³ BY MR. PLACITELLA:
²⁴      Q.  Yes.

Page 636

1    A.  No.  No, I think her testing
2  was on her own accord.
3    Q.  Correct.
4    A.  And she published a study on
5  it, I think, in 1991.
6    Q.  Exactly.  So it was no secret
7  that Dr. Blount found asbestos in cosmetic
8  talc, it was in her published article,
9  correct?
10    MS. BROWN:  Objection.
11  Speculation.
12    THE WITNESS:  I don't
13  recall the article, but I think she
14  did report that.
15  BY MR. PLACITELLA:
16    Q.  All right.  And if you go to
17  322 in book one?
18    A.  I have it.
19    - - - - -
20    (IARC Monograph  marked
21  O'Shaughnessy Exhibit 322 for
22  identification.)
23    - - - - -
24

Page 637

1  BY MR. PLACITELLA:
2    Q.  Okay.  This is a monograph that
3  was published by IARC and you know that's
4  an international working group on cancer,
5  right?
6    A.  Yes.
7    Q.  And Dr. Blount, if you go to
8  322.246.  Dr. Blount's testing results were
9  so important in finding asbestos in the
10  cosmetic talc that it was actually
11  published by IARC in 2012, some, what,
12  20-plus years after?
13    MS. BROWN:  I object.
14  It misstates the evidence and lacks
15  foundation with this witness.
16    THE WITNESS:  It appears
17  in the monograph.
18  BY MR. PLACITELLA:
19    Q.  Right.
20    A.  I don't know if it makes it
21  more important or less important, but it
22  certainly appears there.
23    Q.  Okay.  So it was no secret that
24  Dr. Blount and the significance of her

Page 638

1  tests, finding asbestos in cosmetic talc,
2  you agree that was no secret?
3    MS. BROWN:  I object.
4  Lacks foundation.
5    THE WITNESS:  No, she
6  published on it.
7  BY MR. PLACITELLA:
8    Q.  What was secret was that the
9  positive results were for Johnson's Baby
10  Powder, right, that was a secret?
11    MS. BROWN:  That assumes
12  facts and misstates the evidence.
13    THE WITNESS:  No, I
14  can't agree with that.
15  BY MR. PLACITELLA:
16    Q.  Well, after you were told that
17  she found asbestos in your baby powder, the
18  very subject of her article, who did you
19  tell outside of Johnson & Johnson?
20    MS. BROWN:  I object to
21  that question.  And instruct you,
22  Mr. O'Shaughnessy, if you did
23  anything in connection with
24  litigation where Dr. Blount was a

Page 639

1  consulting expert not to answer
2  that question.
3  BY MR. PLACITELLA:
4    Q.  Okay.  Who did you tell outside
5  of Johnson & Johnson or the experts that
6  were working for Johnson & Johnson about
7  the secret that Johnson & Johnson -- that
8  Alice Blount found asbestos in Johnson's
9  Baby Powder?
10    MS. BROWN:  I object to
11  the form of the question.  It
12  assumes facts and misstates the
13  evidence.
14    THE WITNESS:  Yeah, I
15  didn't consider anything like that
16  a secret and I wouldn't have
17  normally discussed any company
18  business with people outside the
19  company.
20  BY MR. PLACITELLA:
21    Q.  Who did you tell inside Johnson
22  & Johnson that Dr. Blount found asbestos in
23  Johnson's Baby Powder?
24    MS. BROWN:  And I

Page 640

1  object.  Your Honor, Dr. Blount was
2  a consulting expert in a litigation
3  and so to the extent that
4  Mr. O'Shaughnessy did work in
5  connection with that litigation, I
6  would object on work product
7  grounds.
8      MR. PLACITELLA:  Well,
9  he just testified that she did no
10  testing for them in the context of
11  the case.  And this is just a fact
12  that was related to
13  Mr. O'Shaughnessy that he admits
14  happened.
15      JUDGE SCHNEIDER:  I
16  agree.  Objection overruled.
17      THE WITNESS:  You're
18  asking me as an attorney --
19  BY MR. PLACITELLA:
20  Q.  Yes.
21  A.  -- who I discussed the Blount
22  article with at the company?
23  Q.  No, not the Blount article.
24  Who did you tell at the company that Alice

Page 641

1  Blount told you by way of letter through
2  your counsel that the asbestos, that the
3  asbestos she found in the cosmetic talc was
4  in fact Johnson's Baby Powder?
5      MS. BROWN:  Your Honor,
6  a renewed objection here.  This
7  information came to
8  Mr. O'Shaughnessy from outside
9  counsel in connection with a
10  litigation that he was litigation
11  counsel for Johnson & Johnson.
12  What he did with that information
13  about a consulting expert in a
14  pending case is privileged.  It's
15  his work product.
16      JUDGE SCHNEIDER:  Query,
17  you say this information came to
18  Mr. O'Shaughnessy in connection
19  with a pending case?
20      MS. BROWN:  Right.
21      JUDGE SCHNEIDER:  But
22  isn't that reflected in a document
23  that's already been used during
24  this and/or Mr. Block's deposition?

Page 642

1      MR. PLACITELLA:
2  Absolutely.
3      JUDGE SCHNEIDER:  So the
4  work product protection that
5  applied to it, wasn't it waived?
6      MS. BROWN:  Well, your
7  Honor, as to the four corners of
8  the document.  This question goes
9  beyond the four corners of the
10  document, as we discussed with Your
11  Honor last week.  So certainly, if
12  counsel wants to put the document
13  in front of him and ask about --
14      MR. PLACITELLA:  You
15  want to do that all over again?
16      MS. BROWN:  -- what is
17  contained in that document.  But my
18  objection is that this question
19  goes beyond the document and asks
20  what he did after that.
21      JUDGE SCHNEIDER:  I
22  think if I recall correctly and we
23  can always ask the court reporter
24  to read it back, I think the

Page 643

1  question was, did Mr. O'Shaughnessy
2  tell anyone about what Mr.
3  Placitella had questioned about and
4  I suppose he can answer that
5  question.  And then if he recalls,
6  then we'll have to inquire further
7  whether it's in connection with
8  litigation preparation, et
9  cetera --
10      MS. BROWN:  Understood.
11      JUDGE SCHNEIDER:  -- or
12  whether there was a conversation at
13  the water cooler perhaps.  So I
14  would suggest, Mr. Placitella, you
15  ask the witness does he recall or
16  have any recollection regarding
17  conversations with anyone regarding
18  what you inquired about and then if
19  the answer is yes, he does recall,
20  then we have to proceed slowly.
21  BY MR. PLACITELLA:
22  Q.  Okay.  Are you able to flip --
23  give me the Elmo?  Can I have a piece of
24  paper?  It doesn't matter.

John P. O'Shaughnessy

Page 644

1   THE VIDEOGRAPHER:  Yeah,
2   Elmo is up.
3   BY MR. PLACITELLA:
4   Q.   Secret, Alice Blount found
5   asbestos in Johnson's Baby Powder.  Do you
6   see that?
7        MS. BROWN:  I object.
8   Misstating the evidence, lacks
9   foundation, and is argumentative.
10  BY MR. PLACITELLA:
11  Q.   Do you see that?
12  A.   I do.
13        - - - - -
14   (Handwritten Document marked
15   O'Shaughnessy Exhibit 4 for
16   identification.)
17        - - - - -
18  BY MR. PLACITELLA:
19  Q.   Who did you tell outside of the
20  lawyers working on the case that secret?
21  A.   You're asking me about events
22  that happened about 25 years ago, so I
23  don't have any specific recollection.  But
24  it would have been our practice at the time

Page 645

1   in handling litigation and within the
2   context of the litigation, to discuss
3   subject focus with the people at the
4   company.
5   Q.   Okay.  Did you disclose at any
6   point in time during your defense of the
7   Johnson & Johnson company the fact, the
8   fact that Alice Blount told you she found
9   asbestos in Johnson's Baby Powder?
10        MS. BROWN:  Objection.
11   Misstates the evidence.  Lacks
12   foundation.
13        THE WITNESS:  Like I
14   said, I don't have any specific
15   recollection of any discussions
16   about Blount or that letter.  But
17   as a matter of practice as a lawyer
18   defending the case, I or
19   Mr. Williams would have discussed
20   it with company people we were
21   working with in the defense of the
22   litigation.
23  BY MR. PLACITELLA:
24  Q.   Did you disclose that to any

Page 646

1   litigant or jurist in the context of
2   defending of the case that Alice Blount
3   disclosed to you that her tests
4   demonstrated asbestos in Johnson's Baby
5   Powder?
6        MS. BROWN:  That
7   misstates the evidence and lacks
8   foundation and assumes facts.
9        THE WITNESS:  I don't
10   recall doing that.
11  BY MR. PLACITELLA:
12  Q.   Okay.  Now, that secret was not
13  the only secret that you asserted in the
14  Coker case, correct?
15        MS. BROWN:  I object to
16   the form of the question as
17   argumentative as to secret,
18   misstating the facts and the
19   evidence.
20        THE WITNESS:  I don't
21   regard it as a secret, so your
22   premise to the question, I don't
23   accept.
24

Page 647

1   BY MR. PLACITELLA:
2   Q.   Before I go to the next
3   question, did you disclose to any doctors
4   or outside scientists the information you
5   learned from Dr. Blount that she found
6   asbestos in Johnson's Baby Powder?
7        MS. BROWN:  That assumes
8   facts.  Misstates the evidence.
9        THE WITNESS:  Like I
10   said, I don't recall any specific
11   discussions, but it would have been
12   our practice to discuss this with
13   company people.
14  BY MR. PLACITELLA:
15  Q.   Okay.  And did that include the
16  people who recommended the Muscat study?
17  A.   I don't recall who it was.
18  Q.   Okay.  Now, those testing
19  documents to your right, in the Coker case,
20  you made a decision, an affirmative
21  decision not to turn those documents over,
22  true?
23        MS. BROWN:  Objection.
24   Misstates facts, assumes facts, and

John O'Shaughnessy

1     lacks foundation.
2           THE WITNESS:  I don't
3     recall specific decisions in the
4     Coker case, but it would have been
5     the practice at the time to, in
6     responding to discovery, to list,
7     respond to discovery within the
8     context of the local jurisdiction,
9     our input from outside counsel with
10    respect to local obligations under
11    discovery and the answers would
12    speak for themselves along with
13    their objections.
14    BY MR. PLACITELLA:
15    Q.   Okay.
16    A.   So -- sorry, can I finish?
17    Q.   Sure.
18    A.   You asked me whether any of
19    these were produced, I don't know, but
20    discovery, as you know, is a very
21    sophisticated process and, you know,
22    requests are made, formal requests, like
23    interrogatories and requests for production
24    of documents and the attorneys look at it,

1     assess it, and they respond in light of the
2     local rules and what we know about the case
3     and the specific question.
4     Q.   Okay.  In the Coker case, the
5     plaintiff's lawyer found out about the
6     McCrone tests and the tests by the Colorado
7     School of Mines.  Do you recall that?
8           MS. BROWN:  I object,
9     lacks foundation.
10          THE WITNESS:  I don't
11    know what, I don't know what that
12    attorney knew or didn't know.
13    BY MR. PLACITELLA:
14    Q.   And when he asked you, and when
15    he went to find out what the results of
16    those tests were, you determined that you
17    weren't going to turn them over and
18    asserted they were trade secrets, right?
19          MS. BROWN:  I object.
20    Lacks foundation, misstates the
21    evidence, and assumes facts.
22          THE WITNESS:  I never
23    dealt with that attorney, so I
24    never had any direct conversation

1     with him.
2     BY MR. PLACITELLA:
3     Q.   Before you would assert that
4     relevant evidence is a trade secret, would
5     you actually review the evidence?
6           MS. BROWN:  Object.
7           THE WITNESS:  When you
8     say assert --
9     BY MR. PLACITELLA:
10    Q.   You, Johnson & Johnson.
11    A.   You mean John O'Shaughnessy
12    or --
13          MS. BROWN:  Hold on.
14    Hold on.  He is here as an
15    individual testifying to his own
16    knowledge, nonprivilege knowledge
17    as a fact witness.  He is not here
18    too as a corporate representative
19    for Johnson & Johnson.  So when
20    you're asking him you, you're
21    asking Mr. O'Shaughnessy, not
22    Johnson & Johnson.
23          MR. PLACITELLA:  Oh, I
24    thought he worked for Johnson &

1     Johnson, he didn't?  Who was he
2     working for?
3           MS. BROWN:  You
4     understand my objection.  He's
5     not --
6           MR. PLACITELLA:  Was he
7     working for my firm?  I didn't
8     think so.
9           MS. BROWN:  -- speaking
10    on behalf of Johnson & Johnson,
11    he's speaking as himself and you're
12    entitled to inquire into
13    nonprivileged information and
14    that's my objection.
15    BY MR. PLACITELLA:
16    Q.   Well, thanks for that.  When
17    you were working for Johnson & Johnson on
18    the Coker case, did you actually review the
19    material before asserting that it was a
20    trade secret?
21          MS. BROWN:  I object.
22    Your Honor, what he did in
23    connection with his work on the
24    Coker case and determinations he

John O'Shaughnessy

Page 652

1  made is work product.
2  BY MR. PLACITELLA:
3       Q.  Okay.  Let me go to -- go
4  ahead.
5            JUDGE SCHNEIDER:  Can
6       you repeat the question?
7            - - - - -
8       (Whereupon, the reporter read
9       back as requested.)
10           - - - - -
11           JUDGE SCHNEIDER:  Give
12      me one moment.  It's a close call,
13      but I think it does ask for work
14      product information, so the
15      objection is sustained.
16  BY MR. PLACITELLA:
17      Q.  Okay.  Can you go to 319,
18  please, in book number one.
19      A.  I have it.
20           - - - - -
21      (Letter dated 10/27/97 and
22      Attachments marked O'Shaughnessy
23      Exhibit 319 for identification.)
24           - - - - -

Page 653

1  BY MR. PLACITELLA:
2       Q.  Okay.  And can you go to 319,
3  28.  Actually, 319.26.
4       A.  Okay.
5       Q.  Do you see 319.26 is a
6  deposition on written questions in the
7  Coker case served on McCrone.  Do you see
8  that?
9       A.  Yes.
10      Q.  Okay.  And if you look at the
11  319.28, the questions are "Did you ever
12  visit and test talc from the Val Chisone
13  Mine and the Hammondsville Mine for Johnson
14  & Johnson?"  Do you see that?
15      A.  I'm going to it.  319.28.
16      Q.  Uh-huh.  I put it up on the
17  screen to make it easy for you.
18      A.  Yeah, all right.  I like to
19  look at here, because the screen --
20      Q.  Yeah, go ahead.
21      A.  Okay.  Oh, it's backwards, all
22  right.  Number two.
23      Q.  Yeah.
24      A.  Deposition directed to McCrone.

Page 654

1  Please state if you ever visited or
2  analyzed talc from Val Chisone Mine, yes.
3       Q.  Then the next page asks if you
4  did it, turn the documents over.  Do you
5  see that?
6            MS. BROWN:  Objection.
7       Misstates the evidence.
8            THE WITNESS:  Please
9       produce any and all documents
10      responses six through eight, yes.
11  BY MR. PLACITELLA:
12      Q.  Okay.  So now go to 106 in the
13  same document.  Let me know when you're
14  there?
15      A.  I will.
16      Q.  Actually go to 105.
17      A.  Okay.
18      Q.  And these are the objections
19  that Johnson & Johnson filed to the
20  questions that were asked of McCrone.  Do
21  you see that?
22      A.  Yes.
23      Q.  Okay.  And when it came to
24  producing the documents that were

Page 655

1  requested, your response was that you
2  weren't turning them over because it was a
3  trade secret, right?
4            MS. BROWN:  Objection.
5       Misstates the document.
6  BY MR. PLACITELLA:
7       Q.  It says "Finally, the
8  information requested from the witness is
9  subject to proprietary and trade secret
10  privileges of Defendant."  That's you?
11           MS. BROWN:  I object.
12      You're misstating the document.
13           THE WITNESS:  I'm in the
14      process of reading it.
15  BY MR. PLACITELLA:
16      Q.  Sure.
17      A.  So you want me to go to, on
18  .106, it's number four?  Is that what it
19  is?
20      Q.  Four and five.
21      A.  Okay.  If I can read it.
22           MS. BROWN:  Yeah, take
23      as long as you need,
24      Mr. O'Shaughnessy.

John O'Shaughnessy

Page 656

1    THE WITNESS: So it
2 looks like, I don't recall this
3 document, but it looks like to me
4 that questions were directed to
5 McCrone.
6 BY MR. PLACITELLA:
7    Q.   Correct.
8    A.   And so the Johnson & Johnson
9 lawyers objected to the questions to
10 McCrone.
11   Q.   Correct.
12   A.   And on the basis of the
13 objections, including -- I mean, there are
14 a lot of objections here and a lot of this
15 goes to, I guess, the procedure involved in
16 Texas for these sorts of questions to a
17 nonparty.
18   Q.   Okay.
19   A.   And part of that refers to
20 Texas law --
21   Q.   Yup.
22   A.   -- that the request was in
23 violation of the Texas law.
24   Q.   Yeah.  Go ahead.

Page 657

1    A.   And in terms of the form it was
2 used, so that was an objection.  And then
3 they add, among other objections, that "the
4 information requested is subject to
5 proprietary and trade secret privileges of
6 Defendant."  So yes, we did assert that.
7    Q.   So now we have two sets of
8 secrets in the Coker case, the Blount
9 article, and all the testing documents,
10 right?
11        MS. BROWN:  I object.
12   Argumentative, misstates the
13   evidence.
14 BY MR. PLACITELLA:
15   Q.   The fact -- I'm sorry, I
16 misspoke, we have two secrets.  One, Alice
17 Blount found asbestos in Johnson's Baby
18 Powder; and two, all the testing documents
19 on your right?
20        MS. BROWN:  Objection.
21   Misstates the evidence,
22   argumentative.
23        THE WITNESS:  No, like I
24 said before, the Blount issue was

Page 658

1 not a secret.  And number two, what
2 you call a second secret is a trade
3 secret.  Now, there's a whole law
4 around trade secret.  It's a term
5 of art that applies to a company's
6 documents that I believe are so
7 sensitive that disclosure of them
8 without certain protections would
9 harm the business of the company.
10 So it's not a secret.  It's a trade
11 secret and it's recognized and it's
12 often made in objections.
13 BY MR. PLACITELLA:
14   Q.   Okay.  Did you turn the
15 documents over then?
16        MS. BROWN:  Objection.
17   Assumes facts.
18        THE WITNESS:  I don't
19 know.  I mean, you're showing me
20 one snippet of this discovery
21 record and I'm not sure if it was
22 or wasn't, because if we raised the
23 trade secret objection, then a lot
24 of things could have happened and I

Page 659

1 don't recall what.  But the
2 plaintiff who wanted the documents
3 could say, well, no, we don't agree
4 with Johnson & Johnson and take it
5 into the court and the court would
6 have ruled on it.  I don't know if
7 any of that happened, but there's a
8 whole procedure involved here.
9 BY MR. PLACITELLA:
10   Q.   All my question is, sir, do you
11 have any proof, as you sit here today, that
12 you turned any of those documents over on
13 your right in the Coker case?
14        MS. BROWN:  Objection.
15   Assumes facts.
16        THE WITNESS:  I don't
17 recall what we did in the Coker
18 case.  I don't recall a discovery
19 record.  We may not have with the
20 court's permission or we may have
21 had to turn them over with the
22 court's ruling.
23 BY MR. PLACITELLA:
24   Q.   Okay.  Well, you said that --

Page 660

1 you said they were trade secrets was they
2 were so sensitive they could hurt the
3 company. How could they hurt the company?
4         MS. BROWN: Objection.
5     Misstates the testimony and the
6     evidence.
7         THE WITNESS: I don't
8     know what documents were requested,
9     so I can't comment on that now, but
10    it could be something about the
11    procedure or the methods that was
12    proprietary.
13 BY MR. PLACITELLA:
14    Q. Well, you had the McCrone file,
15 they handed it to you.
16    A. You handed me three
17 documents --
18    Q. No, no, sir, let me back up.
19 You had the McCrone file, they sent it to
20 you, correct? In the Ritter case, they
21 sent you their entire file.
22    A. No, what she sent me was
23 elaborated on in that letter, I don't know
24 if it's the entire file.

Page 661

1    Q. It says the entire file in the
2 document, sir.
3    A. Let's go see the document,
4 please.
5    Q. Okay. I want to make sure I
6 don't screw something up here. Here's the
7 letter, 1035.
8    A. Yeah.
9    Q. "A copy of our entire file has
10 been enclosed for your review." Do you see
11 that?
12    A. The McCrone file number
13 ME-4055, I have no idea if that's anything
14 to do with the trade secrets that's under
15 discussion in that legal document.
16    Q. But you didn't turn this file
17 over either in the Coker case, did you?
18    A. I don't know if we did.
19        MS. BROWN: Objection,
20    wait, hold on.
21        THE WITNESS: I'm sorry.
22        MS. BROWN: Lacks
23    foundation, misstates the evidence,
24    and assumes facts.

Page 662

1        THE WITNESS: Like I
2    say, I don't know if we did or we
3    didn't.
4 BY MR. PLACITELLA:
5    Q. Okay. Krushinski, you were
6 asked questions about that in your prior
7 deposition. Do you recall that?
8    A. Yes, I do.
9    Q. Okay.
10    A. Can I put this binder way,
11 please?
12    Q. As long as 277 is not in that
13 binder, because that's my next question.
14    A. Oh, okay. Got it.
15        MR. TISI: I did put a
16    chair next to you if you want to
17    move the binders.
18        MS. BROWN: John, do you
19    want me to move some of that stuff
20    over for you?
21        THE WITNESS: No, it is
22    in that same binder. Yeah, thanks,
23    Mr. Tisi. 277.
24        - - - - -

Page 663

1        (Answers to Interrogatories In
2    Krushinski Case Bates JNJ 000065001
3    to 650011 marked O'Shaughnessy
4    Exhibit 277 for identification.)
5        - - - - -
6 BY MR. PLACITELLA:
7    Q. Yes. And, again, 277, it was
8 marked before, it's the Answers to
9 Interrogatories that were shown to you in
10 the last deposition?
11    A. Okay, yes.
12    Q. In Krushinski, do you recall
13 that?
14    A. Yes.
15    Q. And do you recall you were
16 asked, I think it's 17, at 17?
17    A. Number 17?
18    Q. Yes which would be 277.7.
19    A. Yes.
20    Q. And you approved answers that
21 said that the defendant's talc source,
22 defendant is you, correct?
23    A. Yes.
24    Q. Did not contain asbestos or

John O'Shaughnessy

Page 664

1 tremolite.  You approved those answers,
2 right?
3       A.   This is 17, this is the one we
4 read the other day, yes.
5       Q.   Yes.  Okay.  Now, what was the
6 factual source for that statement?
7       A.   The source would have been, as
8 I said before, it would have been
9 discussions with people at the company in
10 general and in preparation of the defense
11 as well as the examination of documents
12 that the company had.
13      Q.   Okay.  What documents did you
14 look at?
15      A.   Well, this would include all of
16 the documents that were collected and the
17 synthesis of that with knowledge of
18 counsel, and the knowledge of our counsel.
19      Q.   Did it include all of those
20 documents that were to your right?
21      A.   I don't know specifically what
22 was collected at that time.
23      Q.   Okay.  And who was the exact
24 person who told you as a factual basis that

Page 665

1 the talc sources that you used did not
2 contain asbestos or tremolite?
3       A.   This would have been based on
4 discussions -- I don't recall any specific
5 discussions for this.  But it would have
6 been -- I'm not finished, but it would have
7 been based on the discussions and
8 investigations that we do in terms of
9 defending the litigation and interviewing
10 witnesses and looking at documents.  So the
11 attorneys synthesize that and then they use
12 that information to answer the questions.
13      Q.   And you told Judge Keefe the
14 exact same thing, right, there's no
15 asbestos in Johnson's Baby Powder?
16           MS. BROWN:  Objection,
17      vague.
18           THE WITNESS:  That is
19      the position of the company.
20 BY MR. PLACITELLA:
21      Q.   The answer is yes, you told
22 Judge Keefe that?
23      A.   I don't know what was told to
24 Judge Keefe.

Page 666

1       Q.   Do you remember you testified
2 about that the last time, it was the
3 mediation memo you sent to him?
4       A.   I don't -- if it was in there,
5 it was in there.
6       Q.   Okay.  And I'll mark my
7 Exhibit 1052, which is the
8 2/24/2003 mediation memo into the record
9 and I won't ask any more questions to keep
10 this thing going.
11           - - - - -
12           (Mediation Memo dated 2/4/03
13           Bates JNJTALC001243929 to 1243949
14           marked O'Shaughnessy Exhibit 1052
15           for identification.)
16           - - - - -
17 BY MR. PLACITELLA:
18      Q.   In the Krushinski case, do you
19 have any proof that you turned over any of
20 the testing records that are on your
21 right-hand side today?
22           MS. BROWN:  Objection.
23      Assumes facts, lacks foundation.
24           THE WITNESS:  No,

Page 667

1      again --
2 BY MR. PLACITELLA:
3       Q.   That show asbestos, I'm sorry.
4           MS. BROWN:  Same
5      objections.
6           THE WITNESS:  Can you
7      ask it?
8 BY MR. PLACITELLA:
9       Q.   Let me ask you, did you turn
10 over any of the McCrone, any McCrone
11 records in the Krushinski case?
12           MS. BROWN:  It assumes
13      facts and misstates the evidence.
14           THE WITNESS:  I have no
15      specific recollection of what was
16      turned over or not turned over in
17      these cases.
18 BY MR. PLACITELLA:
19      Q.   As you sit here today, do you
20 have any proof that you turned over any
21 testing records at all in the Krushinski
22 case?
23           MS. BROWN:  That assumes
24      facts.  Lacks foundation.

John O'Shaughnessy

Page 668

1    THE WITNESS:  You know,
2  you're asking me 20-plus years
3  later whether I have any proof that
4  I turned over certain documents and
5  sitting here today, I don't.  But I
6  know that our practice was to, as
7  we went over before, to comply with
8  discovery requests to the best of
9  our ability and I don't recall
10 exactly what was done in each
11 particular case or what documents
12 were produced or not produced.
13 That's specific to the case.  It's
14 specific to the request in the
15 case, the local law, input from
16 counsel and our objections.
17 BY MR. PLACITELLA:
18    Q.  Okay.  So what did you do with
19 the file from the Krushinski case?
20    A.  The Johnson & Johnson law
21 department file would have been in the file
22 room and at some point sent to off-site
23 storage.
24    Q.  So if it's in off-site storage,

Page 669

1  we could look at it and find out exactly
2  what you sent to the plaintiff's lawyer in
3  that case.
4    A.  If it's still there.
5    Q.  Oh, okay.
6    A.  Well, I'm sorry, you said to
7  find out what was sent to the plaintiff's
8  lawyer.
9    Q.  Yes, sir.
10   A.  That would be in the possession
11 of our local counsel.  Our files did not
12 contain documents that we produced in
13 litigation.
14   Q.  So when you were producing
15 documents in litigation and people are
16 asking you for information from prior
17 cases, did you go back to all your local
18 counsel and say send me all your files?
19   A.  You were asking me about the
20 McCrone production, whether or not McCrone
21 documents were produced in Krushinski and
22 what I'm saying, if they were produced in
23 Krushinski, that would have been handled by
24 the local attorneys, MehaffyWeber firm, in

Page 670

1  conjunction with the New Jersey firm.
2  Those documents would be in the collection
3  of our lawyers and they would have
4  collected that beforehand and they would
5  use that document collection, that body of
6  documents to respond to discovery requests.
7    Q.  By the way, your lawyer, one of
8  your lawyers was the MehaffyWeber firm in
9  the Krushinski case, right?
10   A.  Yes, they would have been
11 assisting and Drinker Biddle, are they on
12 there?  Drinker Biddle would have been our
13 counsel as well.
14   Q.  And MehaffyWeber was in on the
15 Blount secret of finding asbestos in
16 Johnson's Baby Powder, weren't they?
17    MS. BROWN:
18 Argumentative.  Misstates the facts
19 and the evidence, and assumes
20 facts.
21    THE WITNESS:  There was
22 no Blount secret.
23    MR. PLACITELLA:  I'm
24 sorry, could you read the answer

Page 671

1  back?
2    - - - - -
3    (Whereupon, the reporter read
4  back as requested.)
5    - - - - -
6  BY MR. PLACITELLA:
7    Q.  So you told the lawyers on the
8  other side in the Krushinski case about
9  what you knew from Dr. Blount?
10    MS. BROWN:  Objection,
11 argumentative.
12    THE WITNESS:  That's not
13 my testimony.  My testimony is
14 you're characterizing it as a
15 secret, something that was hidden
16 away by the company and I'm saying
17 that's not the case.  We respond to
18 discovery based on the particular
19 requests and the particular local
20 law.  So you asked me was this
21 provided to other people, I don't
22 know.  It might have been.  It
23 might not have been.
24

Page 672

BY MR. PLACITELLA:
1  Q.   Well, sir, you said under --
2  your company said under oath that there's
3  no evidence of asbestos or tremolite, but
4  you knew that was not true?
5        MS. BROWN:  Objection,
6  misstates testimony.
7        THE WITNESS:  No, that's
8  not correct at all.
9 BY MR. PLACITELLA:
10  Q.   Okay.  Let's keep going.  I
11  don't know, when do you guys want to take a
12  break?  Is now a good time?  Do you want me
13  to keep pushing forward?
14        MS. BROWN:  Sure, we'll
15  take a break.
16        MR. PLACITELLA:  I'm
17  fine --
18        MS. BROWN:  How are you
19  doing on time, Chris?
20        MR. PLACITELLA:  I'm
21  getting there.
22        MS. BROWN:  Okay.  Why
23  don't we take a short break then?

Page 673

1        MR. PLACITELLA:  Don't
2  make it too long.
3        MS. BROWN:  Okay.
4        THE VIDEOGRAPHER:  Off
5  the record, 2:12 p.m.
6        - - - - -
7  (A recess was taken at this time.)
8        - - - - -
9        THE VIDEOGRAPHER:  We
10  are back on the record at 2:36 p.m.
11 BY MR. PLACITELLA:
12  Q.   Okay.  So for context,
13  Krushinski is around 2000, 2001, right?
14  A.   I'll accept that.
15  Q.   Okay.  And then in 2002, the
16  issue with the National Toxicology Project
17  comes up, remember you talked about that
18  last time?
19  A.   Yes.
20  Q.   And internally at Johnson &
21  Johnson, you testified that your
22  recommendation was to tell the National
23  Toxicology Program there's no asbestos in
24  Johnson & Johnson's talc.  Do you recall

Page 674

1  that?
2        A.   No.
3        Q.   You don't recall giving that
4  testimony?
5        A.   Are you referring to the email
6  I discussed?
7        Q.   Yes.
8        A.   And can I see it, I please?
9        Q.   Okay.  I'll find it at a break.
10  I didn't think it was going to be an
11  argument.
12        A.   No, it's just the way you're
13  phrasing it, it doesn't sound exactly the
14  way I remember.
15        Q.   I'll pull it out in a break.
16  And then in 2004, do you remember the
17  discussion about the forensic analytical
18  report that you received from the TV
19  station.  Do you recall that?
20        A.   I received, yeah, I recall the
21  issue with the TV station, yeah.
22        Q.   And I actually don't have it in
23  your binder, I apologize.
24        A.   No, that's fine.

Page 675

1        Q.   But I will --
2        A.   Is this it here?
3        Q.   Yeah.  This is the report that
4  you went over with Mr. Block.
5        A.   It was the subject of some
6  emails, right?
7        Q.   Correct.  Correct.  And you
8  testified that you learned of the report
9  because it might come up in litigation.  Do
10  you recall that?
11        A.   I don't have the email in front
12  of me, the exact words that they used when
13  they sent it.  I was copied on it and
14  oftentimes, they would copy me on
15  information that could be -- come up in
16  litigation because they know that was my
17  role.
18        Q.   Right.
19        A.   Yeah.
20        Q.   And I think you testified last
21  time that one of the reasons you got the
22  report was because it might come up in
23  litigation.  That was your testimony.
24        A.   Yeah, without seeing the email,

John J. O'Shaughnessy

Page 676

¹ that would be one of the reasons I get
² something like this.
³     Q.  Okay.  But it never came up in
⁴ litigation, right?
⁵     A.  Well, we're talking about it
⁶ now.
⁷     Q.  No, before now.
⁸     A.  Oh, I don't know.
⁹     Q.  Well, one of the reasons it
¹⁰ never come up is because you never told
¹¹ anybody about it, right?
¹²         MS. BROWN:  Objection.
¹³     Misstates the evidence.
¹⁴         THE WITNESS:  No, I
¹⁵     can't say that.
¹⁶ BY MR. PLACITELLA:
¹⁷     Q.  So you did disclose --
¹⁸     A.  I don't know why it never came
¹⁹ up.
²⁰     Q.  So you did disclose it in
²¹ litigation that you had this report in your
²² possession showing there was asbestos in
²³ Johnson's Baby Powder --
²⁴         MS. BROWN:  Objection.

Page 677

¹         MR. PLACITELLA:  -- from
²     the, on Exhibit 989, you told
³     somebody about it?
⁴         MS. BROWN:  Objection,
⁵     misstates the testimony.  It
⁶     assumes facts and it misstates the
⁷     evidence.
⁸         THE WITNESS:  No, I
⁹     don't think I testified to that
¹⁰     last time.
¹¹ BY MR. PLACITELLA:
¹²     Q.  Well, I'm asking you now.
¹³     A.  Okay.  What is it?
¹⁴     Q.  So you did turn this report
¹⁵ over in the context of litigation?
¹⁶     A.  I don't know what happened to
¹⁷ the report.  It was in the company files.
¹⁸ So I don't know whether it was collected
¹⁹ and turned over or not.  I just don't know.
²⁰     Q.  Do you have any recollection of
²¹ turning it over in any cases that you were
²² involved in?
²³     A.  No, I don't recall any specific
²⁴ documents that were produced in the

Page 678

¹ litigation.
²     Q.  Okay.  And now I want to turn
³ your attention to the Durham case, 2006.
⁴ You worked on that case, right?
⁵         MS. BROWN:  Objection,
⁶     foundation.
⁷         THE WITNESS:  I don't
⁸     recognize the name, but do you have
⁹     something I can look at?
¹⁰         - - - - -
¹¹     (Deposition of Dr. John Hopkins
¹²     dated 3/6/07 marked O'Shaughnessy
¹³     Exhibit TR-15 for identification.)
¹⁴         - - - - -
¹⁵ BY MR. PLACITELLA:
¹⁶     Q.  Sure.  Can you look at the
¹⁷ transcript binder and it's labeled TR15 and
¹⁸ I'll put it up here.  Maybe you don't even
¹⁹ want to look at it.  This is a deposition
²⁰ given of Dr. Hopkins in the Durham case
²¹ dated March 6, 2007.  Do you see that?
²²         MS. BROWN:  What's the
²³     number again?
²⁴         MR. PLACITELLA:  TR15 in

Page 679

¹     the transcript file.
²         MS. BROWN:  Object as
³     lacking foundation.
⁴         THE WITNESS:  I see,
⁵     yeah, can you take away that big
⁶     thing.
⁷ BY MR. PLACITELLA:
⁸     Q.  Oh, yeah, sure.
⁹     A.  I don't recognize this.
¹⁰     Q.  Do you see on the next page
¹¹ that you're the lawyer listed for
¹² representing Dr. Hopkins?
¹³     A.  Oh, I see Gene Williams is, but
¹⁴ I'm listed as also present.  I see it.
¹⁵     Q.  So you and Gene Williams?
¹⁶     A.  Uh-huh.
¹⁷     Q.  Okay.  And he's at
¹⁸ MehaffyWeber, right?
¹⁹     A.  And then he went to the firm
²⁰ that's listed here, Shook, Hardy & Bacon.
²¹     Q.  Did he take the secret about
²² Dr. Blount with him to Shook, Hardy &
²³ Bacon?
²⁴         MS. BROWN:  Objection,

Page 680

1  misstates the evidence.
2  Argumentative.
3      THE WITNESS:  Again, I
4  don't want to, you know, belabor
5  it, but I don't think there was any
6  secret about that.  And, yes,
7  Mr. Williams did transfer all of
8  the files that he had on J&J, it
9  went with him.
10 BY MR. PLACITELLA:
11     Q.  Okay.  Can you go to two -- so
12 you worked on the Durham case, does that
13 refresh your memory?
14     A.  Apparently, I was there, yes.
15     Q.  Okay.  Can you go to
16 Exhibit 230 in your binders, I think that
17 would be binder number one.
18     A.  I have 230.
19         - - - - -
20     (Affidavit of Dr. John Hopkins
21     in Durham case marked O'Shaughnessy
22     Exhibit 230 for identification.)
23         - - - - -
24

Page 681

1  BY MR. PLACITELLA:
2      Q.  And 230 is an affidavit
3  submitted by Johnson & Johnson signed by
4  Dr. Hopkins in the Durham case, right?
5      A.  Yes.
6      Q.  Okay.  And Dr. Hopkins is one
7  of those scientists that you stated that
8  you relied upon for giving you the truth
9  and the whole truth, correct?
10     A.  Yes.
11     Q.  Okay.  And he was also on the
12 Worldwide Talc Safety Committee, right?
13     A.  He was listed on it, yes.
14     Q.  Ms. Brown is smiling at me.
15 She doesn't usually do that.  Okay.  And on
16 page 230.3, if you can go to that?
17     A.  I'm on 230 and it would be
18 page 3.
19     Q.  Yeah, it says 230.3.
20     A.  I don't have that, but I do
21 have -- I do have the page you have up on
22 the screen.
23     Q.  Okay.  I'm sorry.
24     A.  Mine is missing an exhibit tag.

Page 682

1      Q.  Oh, I goofed up.
2      A.  That's all right.
3      Q.  Lea, if you're listening, 30
4  lashes.  Okay.  Do you see here under
5  audits of talc mines?
6      A.  Yes.
7      Q.  Okay.  He says that he
8  consulted Dr. Pooley.  Do you know who
9  Dr. Pooley is?
10     A.  Yes.
11     Q.  Okay.  Who is Dr. Pooley?
12     A.  I believe he's a professor at
13 the University of Cardiff in Wales who
14 specializes in, I was going to say lung
15 issues and but I see here it says
16 mineralogy and geology, so I'm corrected by
17 that.
18     Q.  He's somebody who helped you
19 out in litigation?
20     A.  I believe we consulted with
21 Professor Pooley in the litigation, yes.
22     Q.  And Dr. Hopkins says to you, or
23 not to you, but writes in his affidavit
24 "the conclusion of the audits," he's

Page 683

1  talking about looking at the talc mines in
2  Italy and Vermont.  Do you see that?
3      A.  Yes, I do.
4      Q.  And he says "The conclusion of
5  the audits was that for both the Italian
6  and Vermont mines, there was zero evidence
7  of asbestos in the geology and mineralogy
8  of the mines."  Do you see that?
9      A.  I do.
10     Q.  But you had testing reports in
11 your possession that contradicted that
12 statement, didn't you?
13         MS. BROWN:  Objection.
14     Misstates the evidence.
15         THE WITNESS:  The
16     testing reports that we spoke about
17     before were -- McCrone testing was
18     of the baby powder.  This seems to
19     be about the geology.
20 BY MR. PLACITELLA:
21     Q.  Right.
22     A.  Right.  Right.
23     Q.  But you also had reports from
24 Dr. Pooley about his studies of your mines,

Page 684

1  correct?
2      A.  I believe Pooley did visit our
3  mines, yes.
4      Q.   And can you go to J&J 586 and
5  maybe I can, if you wouldn't mind, I'll
6  walk over and try to help you.
7      A.  Sure.  Sure.
8      Q.  You're not going to find it
9  over there.
10     A.  Uh-huh.
11     Q.  Okay.  It's in this book.  If
12 you go to 586 in this book.
13     A.  I have it.
14     Q.  Okay.  And for identification,
15 586 is a report entitled "Department of
16 Mineral Exploitation from the University of
17 Cardiff."  And we know that's where
18 Dr. Pooley worked, right?
19     A.  Yes.
20     Q.  And this dates all the way back
21 to 1972, right, if you look on the next
22 page.
23     A.  It does, yes.
24     Q.  And it says "This document

Page 685

1  represents the completion report of the
2  Italian mine samples and other powders
3  supplied by Johnson & Johnson."  Do you see
4  that?
5      A.  Yes.
6      Q.  Okay.  And if you go to
7  586.124.
8          MS. BROWN:  What binder
9      is this in, I don't have it.
10         MR. PLACITELLA:  It says
11     "additional testing documents."
12     You have it, it might be behind
13     you, I don't know.
14         MS. BROWN:  Okay.
15 BY MR. PLACITELLA:
16     Q.  Are you with me?
17     A.  Not yet.
18     Q.  It's towards the end.
19     A.  Yeah, I'm almost there.  I got
20 it.
21     Q.  There's a section at the end,
22 it says conclusions.  Do you see that?
23     A.  Right, yeah.
24     Q.  And in the conclusions, they

Page 686

1  talk about what they found.  Do you see
2  that?
3      A.  I do.
4      Q.  And it says "Minerals found and
5  associated with the talc specimens included
6  tremolite."  Do you see that?
7      A.  I'm probably looking at the
8  wrong paragraph.
9      Q.  Okay.  I have it.
10     A.  I see that, second paragraph.
11     Q.  Yup.
12     A.  The carbonate night specimens
13 examined, et cetera and were accompanied by
14 talc chloride, tremolite, others, all in
15 minor amounts.
16     Q.  And then in the next paragraph
17 it says "The powder X-ray examination
18 confirmed that a major minerals occurring
19 in the hand specimens and a classification
20 was possible into three groups already
21 mentioned, rock types, carbonate samples,
22 and talc specimens."  Do you see that?
23     A.  I do.
24     Q.  And it says "The only asbestos

Page 687

1  type mineral to be detected in the hand
2  samples was tremolite."  Do you see that?
3      A.  Yes.
4      Q.  Okay.  That's from Dr. Pooley,
5  that's not consistent with what Dr. Hopkins
6  put in his affidavit, is it?
7          MS. BROWN:  Objection.
8      Misstates the document and the
9      evidence.
10         THE WITNESS:  You know,
11     there was a time when I kind of
12     understood a little bit about some
13     of these terms, but I definitely
14     don't now.  But even back then when
15     I did have an understanding of it,
16     I would ask the company scientists
17     to explain it to me.  So I can't
18     really interpret this.
19 BY MR. PLACITELLA:
20     Q.  Did Dr. Hopkins in making this
21 statement, this sworn statement, ever
22 advise you that he had in his possession
23 test results from Pooley that actually
24 showed tremolite asbestos in the Italian

John C. O'Shaughnessy

Page 688

1 mines?
2          MS. BROWN:  Objection.
3     That misstates the evidence.
4          THE WITNESS:  My
5     recollection of any discussions I
6     had with Hopkins and others was
7     that the findings were always no
8     asbestos there.
9 BY MR. PLACITELLA:
10    Q.  Well, that's not what this says
11 though, sir --
12    A.  I know, but, see, now we're
13 getting into what tremolite is or isn't and
14 I'm not really qualified to say that and I
15 don't know what Mr. Hopkins would say about
16 that.
17    Q.  Let's read it together.
18    A.  Sure.
19    Q.  "The only asbestos type mineral
20 to be detected in the hand samples was
21 tremolite."  Did I read that correctly?
22    A.  You did.
23    Q.  Okay.  And remember that Dr.
24 Hopkins in his affidavit that was turned

Page 689

1 over in this case also said that Pooley
2 never found any tremolite-type asbestos in
3 the Vermont mines.  Do you remember that?
4    A.  Yeah, well, from what we just
5 read before, right?
6    Q.  Right.
7    A.  Okay.
8    Q.  Can you go in the same book to
9 620.  620 is a May 16, 1973, report from
10 T.H. Shelley.  Do you see that?
11    A.  620?
12    Q.  Yes.
13    A.  "Proposed specs for analyzing
14 talc for asbestos."
15    Q.  J&J --
16    A.  The next page has got it.  I
17 have it.
18    Q.  It's page 2, I'm sorry.
19          MS. BROWN:  I object as
20     lacking foundation.
21 BY MR. PLACITELLA:
22    Q.  Okay.  And in the third
23 paragraph it says that Pooley found
24 .05 percent of a tremolite-type asbestos in

Page 690

1 Vermont, right?
2          MS. BROWN:  It does not
3     say that.
4 BY MR. PLACITELLA:
5    Q.  Let me read the whole thing so
6 it's clear, "England is considering method
7 of preconcentrating the asbestos so as to
8 to be analyze by X-ray."  Do you see that?
9    A.  I do.
10    Q.  "They find no asbestos by doing
11 this with Italian talc.  They find (Pooley)
12 .05 percent of a tremolite-type in
13 Vermont."  Do you see that?
14    A.  I do.
15    Q.  Okay.  And if we go back to Dr.
16 Hopkins' affidavit, he says Pooley found no
17 asbestos, zero evidence in the Italian and
18 the Vermont mines, correct?
19    A.  Right.
20    Q.  Now, if you go to 230.4, which
21 is the next page.
22    A.  Okay.
23    Q.  That's the end of his
24 affidavit?

Page 691

1    A.  The affidavit?
2    Q.  Yes.  I'll put it up on the
3 screen.  He ends by saying "It may be
4 concluded there has never been asbestos
5 contamination of the talc used by Johnson &
6 Johnson in the United States from the
7 period in question, 1955-2002."  He says
8 that, correct?
9    A.  He does say that.
10    Q.  Okay.
11    A.  And, you know, you're asking
12 me, you know, you're showing me these
13 documents from 1973, et cetera, and I don't
14 think you're asking me to interpret them.
15 But maybe you are and to the extent you
16 are, I cannot interpret them and you would
17 have to speak to Mr. Hopkins about that.
18 Okay?
19    Q.  Respectfully sir, I move to
20 strike.  There was no question.
21    A.  It was the end of the answer to
22 your first question.
23    Q.  I will leave it as it is.
24          Now, Dr. Hopkins actually

John O'Shaughnessy

Page 692

¹ testified with you present in that case,
² correct?
³      A.   That transcript you showed me,
⁴ yes.
⁵      Q.   Okay.
⁶      A.   And by that case, you mean that
⁷ Durham case, right?
⁸      Q.   Correct.
⁹      A.   Yeah.
¹⁰      Q.   And can you go to page --
¹¹      A.   And what is that again, sorry,
¹² Mr. Placitella.
¹³      Q.   I'm sorry, it's TR15 in the
¹⁴ transcript binder.
¹⁵      A.   TR15.
¹⁶      Q.   And I'm going specifically to
¹⁷ TR15.34.  And focusing on page 133.
¹⁸      A.   Just want to make sure I have
¹⁹ the deposition here.
²⁰      Q.   Yes.
²¹      A.   Okay.  Okay.  133?
²²      Q.   Right.  It would be page 34 of
²³ your document.  You know what, in the
²⁴ interest of time, let's just go right to

Page 693

¹ TR15.37, okay, so that's three pages later.
²      A.   The same transcript?
³      Q.   Yeah, same transcript.
⁴      A.   15.37?
⁵      Q.   Yeah.
⁶      A.   Tell me what page on the
⁷ transcript, I could probably find it.
⁸      Q.   Sure, absolutely, it's page 143
⁹ of the transcript.
¹⁰      A.   Yeah, that's a lot easier.  I
¹¹ thought it was a lot easier, but I don't
¹² see.
¹³      Q.   Yeah, no problem.
¹⁴      A.   I don't have 143.  It goes from
¹⁵ 133 to 162.
¹⁶      Q.   Oh, that's bad --
¹⁷      A.   Then it goes down.
¹⁸      Q.   That's bad for me.  Well, let
¹⁹ me show it to you and then we'll fix it.
²⁰      A.   What was the page?  I think,
²¹ I'm closing in on it.
²²           MS. BROWN:  143.
²³ BY MR. PLACITELLA:
²⁴      Q.   143.

Page 694

¹      A.   I have it.
²      Q.   Okay.  And I highlighted in
³ green the part I want to talk to you about.
⁴      A.   Okay.  I see it.
⁵      Q.   So Question:  "So based on what
⁶ we've discussed, what you've come to is --
⁷ for the talc sources used in the United
⁸ States over the period 1955 to 2002,
⁹ there's never been an instance of asbestos
¹⁰ contamination?"
¹¹           Answer:  "That appears to be
¹² the case, yes.  Reviewing all of the data
¹³ from the mineralogy, from the mine, from
¹⁴ the actual physical testing of talc samples
¹⁵ from those mines, then asbestos
¹⁶ contamination, there is no evidence."  Do
¹⁷ you see that?
¹⁸      A.   Yeah, he's talking about the
¹⁹ totality of the evidence, I think.
²⁰      Q.   And in this case, the Durham
²¹ case, do you have any evidence that you
²² ever turned over any of the testing
²³ documents that we went over here -- that we
²⁴ pointed out here today?

Page 695

¹           MS. BROWN:  Objection.
² Misstates the evidence.  Lacks
³ foundation.
⁴           THE WITNESS:  My answer
⁵      would be the same answer I gave
⁶      before that I have no recollection
⁷      of what was done in a specific case
⁸      and I went through how we answered
⁹      the interrogatories in cases and
¹⁰      what we did to do that and so I
¹¹      can't answer your question other
¹²      than the way I answered it before,
¹³      which I could repeat, if you want,
¹⁴      but I'm getting tired --
¹⁵           MR. PLACITELLA:  Please
¹⁶      don't.
¹⁷           THE WITNESS:  -- and I
¹⁸      don't know if I can do it.
¹⁹ BY MR. PLACITELLA:
²⁰      Q.   Please don't.
²¹      A.   All right.
²²      Q.   As you sit here today, do you
²³ have any recollection of turning over the
²⁴ testing documents in the Durham case?

John T. O'Shaughnessy

Page 696

1    MS. BROWN:  Objection.
2  Lacks foundation.  Assumes facts.
3    THE WITNESS:  I don't
4  have any specific recollection of
5  what was produced in this case or
6  not produced, because of the
7  passage of time.
8  BY MR. PLACITELLA:
9    Q.  Okay.  Do you have any
10  recollection of turning over the Blount
11  report or the information that Blount found
12  asbestos in Johnson's Baby Powder in the
13  Durham case?
14    MS. BROWN:  That assumes
15  facts and lacks foundation.
16    THE WITNESS:  It would
17  be the same answer, Mr. Placitella.
18  BY MR. PLACITELLA:
19    Q.  Okay.  Last case I want to ask
20  you about.  You were involved in a case
21  called Lopez.  Do you recall that?  It
22  should be a little bit more familiar,
23  because it's a little bit more recent.
24    A.  I don't, but if you point it

Page 697

1  out to me, I'm sure you have a reason why
2  you're saying that.
3    Q.  Can you go to 1044 in your
4  book.  And 1044 is the deposition of Roger
5  Miller.
6    MR. COX:  The transcript
7  1044?
8    MR. PLACITELLA:  Yes.
9    THE WITNESS:  Okay, I'm
10  sorry, wrong one.  I see Lopez,
11  yes.
12  - - - - -
13  (Deposition of Roger Miller
14  taken 1/16/07 marked O'Shaughnessy
15  Exhibit 1044 for identification.)
16  - - - - -
17  BY MR. PLACITELLA:
18    Q.  Okay.  And if you go to the
19  second page, you'll see that you were the
20  person representing Miller in this case?
21    A.  I'm looking for my name.  I
22  don't doubt what you say, but there's so
23  many people here.
24    Q.  I blew it up on the bottom.  I

Page 698

1  blew it up for you.
2    A.  Yeah, I was present for that,
3  yes.
4    Q.  And if you go to --
5    A.  And also, for J&J was Mr.
6  Pulliam and Mr. Williams.
7    Q.  Wow, you've got a lot of people
8  there.
9    A.  Not compared to the others.
10    Q.  Okay.  And can you go to
11  1044.84.  And I'll tell you exactly what
12  page that is in a second.  I'm sorry.
13    A.  Yeah, I think you better give
14  me the page.
15    Q.  Hold on.  Go to, it's page 84.
16  I blew it up.
17    A.  I have it.
18    Q.  The testimony is but -- "All
19  right.  But there was never a positive
20  result for finding asbestos from any of the
21  mines from the ore?"
22    And the answer is "No,
23  never."  Do you see that?
24    A.  Yes.

Page 699

1    Q.  Okay.  And can you go to, can
2  you go to the 1044.26 which would start on,
3  look at page 102?
4    A.  1044?
5    Q.  Which would be page 102 of the
6  transcript.
7    A.  Oh, I'm sorry.
8    Q.  That's all right.  I'm sorry,
9  almost done.
10    A.  I see it.
11    Q.  Okay.  Now, this is the same
12  Roger Miller, by the way, who executed the
13  Edley affidavit way back 20 years earlier
14  in 1987, correct?
15    A.  Yes.
16    Q.  And he's asked a series of
17  questions.  First he's asked "So the
18  Argonaut mine, you think, went online -- in
19  other words the operations began, right, in
20  approximately 1975?"  And he says "Right."
21  Do you see that?
22    A.  I see it on the screen, I'm
23  just looking for the page again, so I can
24  follow it.

John T. O'Shaughnessy

Page 700

1    Q.  It's the next page.
2    A.  What page of the transcript?
3    Q.  It would be page 103.
4    A.  I got it.  I'm sorry.  It's
5  right in front of me.
6    Q.  It's no problem.  And he's
7  asked specifically "So did the ore from the
8  Argonaut mine also go to the Ludlow mill?
9        "Yes.
10       "And how long was the
11  Argonaut mine used?
12       "It's still in operation."
13  Do you see that?
14    A.  Yes.
15    Q.  And then he's asked on the very
16  next page, "Was there testing done at the
17  Argonaut mine?"  Right?
18        And he says, Answer:  "Yes.
19       "Okay.  Same fashion?
20       "Same protocol, exactly.
21       "And the results never
22  revealed any asbestos?"  Do you see that?
23    A.  Well, he answers "Never found
24  anything.

Page 701

1        "Were they looking for a
2  particular form, if you know?
3        "I believe the suspect
4  mineral was chrysotile but I cannot tell
5  you precisely what McCrone was looking
6  for."
7    Q.  Right.  And his answer was,
8  just to be clear, and the results never
9  revealed anything, "never found anything,"
10  correct?
11    A.  "Never found anything."
12    Q.  Right.
13    A.  And well, the results never
14  revealed asbestos.  Never found anything.
15  Then he goes on to discuss, I guess he
16  discusses chrysotile and tremolite and I
17  can't follow it.
18    Q.  Okay.  I'm not asking you to.
19  So now go to the McCrone book of tests, the
20  first book and look at J&J 65 and if you
21  need to help you, I'm happy to come over
22  and help you.
23    A.  I think I got it by now.  I
24  surrender.  I think the volume must be over

Page 702

1  here, Mr. Tisi.  These don't look like
2  this.
3        MR. TISI:  These are the
4    Musco.
5        MS. BROWN:  I have mine
6    McCrone, do you want my McCrone?
7        MR. PLACITELLA:  Yeah,
8    sure.  Just give it to him.
9        MS. BROWN:  What is it,
10    binder one?
11        MR. PLACITELLA:  One.
12        MS. BROWN:  Here you go.
13        THE WITNESS:  Thank you.
14  BY MR. PLACITELLA:
15    Q.  Do you remember he's the one
16  who said in the Edley affidavit that he was
17  relying upon McCrone testing?
18    A.  Are you talking about Roger
19  Miller --
20    Q.  Yes, sir.
21    A.  -- in the affidavit?
22    Q.  Yeah.  He cited the McCrone
23  testing?
24    A.  If he did, I accept that.

Page 703

1    Q.  So this document from 1974?
2    A.  And which one is it, please?
3    Q.  Sixty-five.
4    A.  Got it.
5    Q.  Is entitled from McCrone
6  "Examination of Talc Samples Argonaut Ore
7  Body."  Do you see that?
8    A.  Yes.
9    Q.  So let's just put them side by
10  side for a second.  Give me a second.
11  Okay.  So now we have them side by side.
12    A.  The transcript and this
13  exhibit?
14    Q.  Correct.  Where he says, okay.
15  When he's talking about the Argonaut mine,
16  never received any -- never revealed any
17  asbestos.  Do you see that?  And he says
18  never found anything, right, here, I'll
19  blow it up again, right?
20    A.  Okay.
21    Q.  Now, let's go look at what,
22  let's look at this report --
23    A.  Yes.
24    Q.  -- from McCrone.

John P. O'Shaughnessy

Page 704

1    A.  Okay.
2    Q.  That's right next to it.  And
3 do you see Table 2, Electron Microscopic
4 Analyses of Talc Ore Symbols?
5    A.  Yes, I do.
6    Q.  And you see they actually have
7 chrysotile and amphibole?
8    A.  I see those terms.
9    Q.  And you see that they list all
10 the chrysotile findings in the chart?
11        MS. BROWN:  Objection,
12    misstates the document.
13        THE WITNESS:  I see
14    what's there, but you're asking me
15    to interpret the chart and I really
16    can't do that.  I mean, you know
17    these -- one -- I've seen testing
18    documents, you know, from time to
19    time, and one thing I learned is
20    that, you know, the testing was
21    varied, it was different and there
22    was a lot of it.  And to fully
23    understand it, you need to really
24    have interpreted by someone who is

Page 705

1    familiar with the testing and we
2    would use people at the company in
3    R&D and the scientific disciplines
4    to do that.
5        So you're asking me
6    these questions now and they get
7    into a form of interpretation which
8    I'm not comfortable doing.  I don't
9    have the expertise to do that.  And
10    you're lining it up with his
11    testimony about that mine, but I
12    don't know if that's the testing he
13    was referring to or anything else,
14    because this -- I don't know what
15    he's referring to.
16 BY MR. PLACITELLA:
17    Q.  What was my question?
18    A.  Can you read it back, please?
19 I think we somehow switched roles here.
20    Q.  Well, I'm trying to understand,
21 so let me ask it again.  Okay.  He
22 testified under oath in front of you that
23 there was -- the results never revealed
24 asbestos ever, right?

Page 706

1    A.  In the context of that
2 deposition what it says there and there's a
3 lot of other questions I guess too --
4    Q.  Yes, sir.
5    A.  -- so you've got to read those
6 depositions in context --
7    Q.  Yes, sir?
8    A.  -- as I'm sure you're aware.
9    Q.  I'm absolutely aware.
10        MS. BROWN:  Let him
11    finish.
12        THE WITNESS:  But you're
13    plucking out things and I am saying
14    I see what you're reading.
15 BY MR. PLACITELLA:
16    Q.  Okay.  And Table 1 is entitled
17 "Electron Microscope Asbestos [sic] of the
18 Talc Core Samples."  Do you see that?
19    A.  It says --
20    Q.  Analysis of the Talc Core
21 Samples, right?
22    A.  Yes.
23    Q.  Okay.  And then there's a
24 listing of chrysotile and it shows finding

Page 707

1 chrysotile at almost every level of the
2 mine, right?
3        MS. BROWN:  I object.
4        THE WITNESS:  I can't
5    interpret that.
6        MS. BROWN:  That
7    misstates the document.
8        THE WITNESS:  I'm not
9    the right person to ask that
10    question.
11 BY MR. PLACITELLA:
12    Q.  Let me ask you this.  Did Roger
13 Miller ever share this document with you in
14 the context of his testimony that there was
15 never ever any evidence?
16    A.  Did it happen during the
17 deposition?  I don't -- if it was, it was
18 an exhibit at the deposition.
19    Q.  Should have been, right?
20    A.  No, I'm saying --
21        MS. BROWN:  Objection.
22        THE WITNESS:  -- I don't
23    know if it was or wasn't.  I don't
24    know.

Page 708

1  BY MR. PLACITELLA:
2      Q.  I don't know, you tell me, you
3  were there.
4      A.  Yes, I was there 20 years ago
5  or so.
6      Q.  Well, shouldn't it have been if
7  he's testifying there is no evidence,
8  shouldn't it have been there --
9      A.  It depends on what the
10 attorneys were showing him.
11     Q.  Okay.  So now I want to go to a
12 new topic, because I'm trying to keep to my
13 promise to His Honor.
14         By the way, before I end,
15 when was the first time that you know that
16 the testing documents that we flagged today
17 in your deposition were ever turned over in
18 the context of a talc lawsuit?
19         MS. BROWN:  Objection.
20 Lacks foundation, misstates the
21 evidence, assumes facts.
22         THE WITNESS:  I think I
23 touched on this before in your
24 specific questions to specific talc

Page 709

1  cases.  There were, you know, a few
2  talc cases, many talc cases maybe
3  over time and they all had their
4  separate discovery requests and
5  responses.  And they were handled
6  separately.  And we complied with
7  whatever our obligations were in
8  the specific case.  And at this
9  point in time, I don't recall any
10 specific documents or any specific
11 productions.  So you're asking me,
12 you know, I know you put your three
13 stacks of documents and I accept
14 you at your word that they're
15 McCrone testing and whether they
16 were produced or not, but I would
17 not have that information.
18 BY MR. PLACITELLA:
19     Q.  Respectfully move to strike.
20 My question is simply this.  You were in
21 charge of the litigation.  When is the
22 first time you turned over the testing
23 results by McCrone or anybody else for
24 asbestos in the Johnson & Johnson talc in a

Page 710

1  lawsuit?  When is the first time?
2          MS. BROWN:  Same
3  objections to the question you just
4  asked as well as now --
5          MR. PLACITELLA:  Please
6  don't, please.
7          MS. BROWN:  Asked and
8  answered.
9          MR. PLACITELLA:  That's
10 not a form -- that's not a form
11 objection.  Please don't do that.
12         MS. BROWN:  It is, asked
13 and answered --
14         MR. PLACITELLA:  It's
15 not.
16         MS. BROWN:  -- and you
17 know there are objections where I
18 need --
19         MR. PLACITELLA:  That's
20 definitely not a form objection.
21         MS. BROWN:  -- to
22 preserve.
23         THE WITNESS:  In
24 addition to what I said before, I

Page 711

1  don't have a recollection right now
2  of when we first produced documents
3  in any specific case or what those
4  documents were.
5  BY MR. PLACITELLA:
6      Q.  I'm not asking any specific
7  case.
8      A.  I thought that's what your --
9      Q.  Just give me a year, when was
10 the first time you turned them over,
11 because all of the research I've done
12 didn't show that you turned them over until
13 sometime after 2010.
14         MS. BROWN:  Well, you're
15 arguing and testifying, so I object
16 to that.  And he has answered your
17 question to the best of his
18 ability.  Mr. O'Shaughnessy, if you
19 would like to repeat your answer
20 for the third time, please do so.
21 BY MR. PLACITELLA:
22     Q.  Let me ask the question.
23     A.  I have the question in mind.
24 And I understand you're not asking me about

Page 712

¹ a specific case, because you're not naming
² one. But you are, in essence, because
³ you're asking me when it was first turned
⁴ over and that would be in some specific
⁵ case that I can't recall right now.
⁶      Q. Let me ask you a question this
⁷ way. Do you have a -- when you left
⁸ Johnson & Johnson, did you have a record of
⁹ when you produced what evidence?
¹⁰      A. Any record of what was produced
¹¹ would be with the local law firms and the
¹² outside law firms that did the actual
¹³ production.
¹⁴      Q. So --
¹⁵      A. If they existed.
¹⁶      Q. So to get actually all the
¹⁷ evidence from all these cases, we'd have to
¹⁸ send subpoenas to all the local law firms,
¹⁹ right?
²⁰           MS. BROWN: Objection.
²¹      Lacks foundation, assumes facts,
²²      misstates the evidence.
²³           THE WITNESS: I'm not
²⁴      going to tell you how to do your

Page 713

¹      job. I'm just answering questions
²      about where.
³           MR. PLACITELLA: I'm not
⁴      asking you to --
⁵           THE WITNESS: -- the
⁶      documents were and how they were
⁷      produced.
⁸ BY MR. PLACITELLA:
⁹      Q. Yes, sir. But if you didn't
¹⁰ take them at Johnson & Johnson, then the
¹¹ only way I can find out where all the
¹² evidence is is to actually send subpoenas
¹³ to the local law firms, right?
¹⁴           MS. BROWN: Objection.
¹⁵      Misstates the evidence, lacks
¹⁶      foundation --
¹⁷           THE WITNESS: I don't
¹⁸      know.
¹⁹           MS. BROWN: -- and is
²⁰      argumentative.
²¹           THE WITNESS: I don't
²²      know.
²³ BY MR. PLACITELLA:
²⁴      Q. Okay. Now, can you go to --

Page 714

¹ well, let me ask you this, if you know, off
² the top of your head. When was the first
³ lawsuit filed against Johnson & Johnson
⁴ involving Johnson's Baby Powder?
⁵      A. I don't know. That would have
⁶ been before my time with the company.
⁷      Q. Long before your time, right?
⁸      A. I don't know. You showed me
⁹ some cases today that were before I was
¹⁰ there.
¹¹      Q. Okay. So can you go to
¹² Exhibit 486 in your binder and I'm going to
¹³ tell you it's in book two.
¹⁴      A. I have 485.
¹⁵      Q. I need 486.
¹⁶      A. I know. And then my next one
¹⁷ says 542. And, Mr. Placitella, I'm in
¹⁸ additional testing binders?
¹⁹      Q. No, no, I'm sorry, your book
²⁰ two. Do you want me to come over and help
²¹ you?
²²      A. I don't think that's necessary.
²³ It's here somewhere.
²⁴           MR. TISI: I'll get it.

Page 715

¹      I'll help him.
²           MR. PLACITELLA: Chris,
³      go help him. This is a logistical
⁴      nightmare, I understand.
⁵           MR. TISI: The Musco 2?
⁶           MR. PLACITELLA: No.
⁷      It's the regular -- let me find it.
⁸           THE WITNESS: The
⁹      regular documents binder.
¹⁰ BY MR. PLACITELLA:
¹¹      Q. Yes, JOS on the front. Book
¹² two. Look at 446.
¹³      A. I got it.
¹⁴      - - - - -
¹⁵      (Privilege Log marked
¹⁶      O'Shaughnessy Exhibit 486 for
¹⁷      identification.)
¹⁸      - - - - -
¹⁹ BY MR. PLACITELLA:
²⁰      Q. Okay. And go to 486.1.
²¹           MS. BROWN: I object to
²²      this document on foundation.
²³           MR. PLACITELLA: Okay.
²⁴           THE WITNESS: Okay.

Page 716

```
1   BY MR. PLACITELLA:
2       Q.   And I'm going to represent to
3   you this is a privilege log that was served
4   upon us by Johnson & Johnson and I'm just
5   going to blow up a section of the log.
6   According to your privilege log, you had
7   pending and anticipated litigation
8   involving baby powder going back to 1974;
9   is that true?
10          MS. BROWN:  Objection.
11      Misstates the document and lacks
12      foundation.
13          THE WITNESS:  I don't
14      see where that is stated here.  Can
15      you point it out to me?
16  BY MR. PLACITELLA:
17      Q.   Sure.
18      A.   I think if you just scroll down
19  for me a little bit, that might be what you
20  want me to look at.
21      Q.   It might be easier to find on
22  the next page.  Give me a second.
23      A.   Okay.
24      Q.   So I'm sorry.  Getting late in
```

Page 717

```
1   the day.  Do you see where it talks about,
2   I blew it up.  Here, if you look at my
3   screen.  Do you see, let's just start with
4   '77, okay?
5       A.   In the left.
6       Q.   Right.  Do you see it says
7   11/7/77 Roger Miller pending anticipated --
8   pending and anticipated litigation, 1977?
9       A.   Yes.
10      Q.   Okay.
11          MS. BROWN:  Objection.
12      Lacks foundation.
13          THE WITNESS:  I see
14      where that's read, yes.
15  BY MR. PLACITELLA:
16      Q.   Okay.  And it goes, and if you
17  keep going down, it goes to 1978, same
18  thing?
19      A.   Uh-huh.
20      Q.   Okay.  And so here's my
21  question.  If you go to your -- you agree
22  that once there is pending or anticipated
23  litigation, you were aware that there was a
24  duty to put a litigation hold on the
```

Page 718

```
1   evidence, correct?
2           MS. BROWN:  Your Honor,
3       I object.  Counsel is asking
4       Mr. O'Shaughnessy a legal question
5       about his legal analysis and
6       judgment about when it is
7       appropriate for a legal hold to
8       issue.  And that is his mental
9       thoughts and impressions, his legal
10      analysis and it's protected.
11  BY MR. PLACITELLA:
12      Q.   Let's go to 1049 in your book.
13      A.   I have it.
14          - - - - -
15          (Legal Hold Letter dated
16      5/16/03 marked O'Shaughnessy
17      Exhibit 1049 for identification.)
18          - - - - -
19  BY MR. PLACITELLA:
20      Q.   Okay.  This is a legal hold
21  document that you put out in 2003.
22      A.   Okay.
23      Q.   Do you see that?
24      A.   Yeah.
```

Page 719

```
1       Q.   And do you recognize this?
2       A.   I don't recognize it, but I
3   recognize the form of it, yes.
4       Q.   And you say in connection with
5   this matter, "It is vital to preserve all
6   documents relating in any way to the below
7   subject."  Do you see that?
8       A.   Yes.
9       Q.   It says "Failure to preserve
10  these materials could result in Court
11  imposed penalties or sanctions on both the
12  company and/or individual employees."  Do
13  you see that?
14      A.   I do.
15      Q.   "Do not discard, destroy or
16  alter in any way any of the documents,"
17  right?
18      A.   Yes.
19      Q.   Okay.  And as of 1983, when you
20  were already in litigation, you had no
21  document retention policy, correct?
22      A.   I was not --
23      Q.   Johnson & Johnson, I'm talking
24  about.
```

Page 720

1    A.  I was not at the company in
2  '83.  I'm unaware of what they had in
3  place.
4    Q.  Okay.  Look at J&J 443, please.
5  J&J 443.
6        MS. BROWN:  Is that
7    testimony?
8        - - - - -
9       (Windsor Minerals' Responses to
10   Interrogatories in Westfall case
11   marked O'Shaughnessy Exhibit 443
12   for identification.)
13       - - - - -
14  BY MR. PLACITELLA:
15   Q.  For the record is responses of
16  Windsor Minerals to interrogatories and the
17  person who is supplying the information is
18  Roger Miller, do you see that?
19   A.  I do.
20   Q.  And if you go to 443.28.
21   A.  Yes.
22   Q.  Or actually 27.
23   A.  Okay.
24   Q.  Interrogatory 35.

Page 721

1    A.  Okay.
2    Q.  You're asked specifically
3  whether you have a document retention or
4  destruction policy.  Do you see that?
5    A.  I do.
6    Q.  Okay.  And on the next page,
7  the answer is no.  Right?
8    A.  That's the answer to the
9  question.
10       MS. BROWN:  I object.
11   This lacks foundation.
12  BY MR. PLACITELLA:
13   Q.  And the first notice that ever
14  went out for a litigation hold was put out
15  by you, correct?
16       MS. BROWN:  Objection.
17   Assumes facts.  Lacks foundation.
18       THE WITNESS:  I don't
19   know that.
20  BY MR. PLACITELLA:
21   Q.  Okay.  Go to 1051.  1051 is an
22  October 10, 1997, document preservation
23  notice that went to a whole bunch of people
24  including Hopkins, et cetera.  And the

Page 722

1  second page was a letter sent by you
2  attaching it in the Coker case, correct?
3    A.  Yes.
4        - - - - -
5       (Document Preservation Notice
6    Bates JNJTAL000949679 to 949681
7    marked O'Shaughnessy Exhibit 1051
8    for identification.)
9        - - - - -
10  BY MR. PLACITELLA:
11   Q.  Okay.  And as you sit here
12  today, are you aware of any document
13  retention hold put out by Johnson & Johnson
14  before this time?
15   A.  I don't recall.  There may have
16  been.  I might have put out a hold before
17  this.  I'm not sure.
18   Q.  Okay.  Because I haven't found
19  one in the production.  So I'm asking from
20  your recollection, do you recall any hold
21  before 1997?
22       MS. BROWN:  He answered
23   that.  I object.
24       THE WITNESS:  I don't

Page 723

1    recall any, but I'm sure there was
2    one, because we didn't suffer from
3    a lack of lawsuits.
4  BY MR. PLACITELLA:
5    Q.  Okay.  Right.  And if there
6  were lawsuits, then you should have put in
7  a hold on the evidence, correct?
8    A.  If there was a lawsuit, the
9  policy was to issue a hold notice with
10  respect to that particular case.
11   Q.  At least when you were in
12  control?
13   A.  No, I think it was there, and I
14  wasn't in control of hold notices, I was
15  managing my cases and that would be part of
16  my responsibility to issue the hold notice,
17  but I wasn't in control of them for other
18  cases or other lawyers.  What I'm -- that's
19  it.
20   Q.  So given your testimony, can
21  you tell me where are all the files from
22  all these lawsuits?
23       MS. BROWN:  Objection.
24   Lacks foundation.  Assumes facts.

Page 724

BY MR. PLACITELLA:
   Q.  Let's say before 2010.  Where are all the files?
         MS. BROWN:  Same objections.
         THE WITNESS:  I'm sorry, I was stuck -- I was looking at this, because I kind of had my refreshed -- I'm refreshing my memory a little bit about the hold notices.
BY MR. PLACITELLA:
   Q.  Please.
   A.  So I see that this was sent to Hernando Arbelaez and then he in turn sent it to other people at the company.  So you asked me if this was the first hold notice and I don't think it was, because I think, you know, as time went on, you know, we tried to always try to improve our procedures round hold notices and this -- sending the hold notice to one person at the other company to distribute it, I don't think that was the initial way we did it.

Page 725

I think we issued some hold notices directly to people at the company that we think were involved and then I think what happened later on is there would be people from the company who were assigned to distribute hold notices not only for, you know, personal injury litigation like this, but for any kind of litigation.  So that's why I'm thinking this wasn't the first hold notice.
   Q.  Okay.  Fair enough.
   A.  And I'm sorry, I interrupted you.
   Q.  No, that's fine.  That's fine.  We're trying to get to the bottom.  The hold notice was, you know, it was a serious issue, right?
   A.  Absolutely.
   Q.  Okay.  You wouldn't throw out hold notices, right, that's part of the historical files for litigation?
   A.  We would keep the hold notices, you know, according to, in a particular file as long as we kept that file, I guess,

Page 726

yeah.
   Q.  Okay.  So my question is what happened to all the hold notices before 1997?
         MS. BROWN:  Asked and answered.  Assumes facts.  Lacks foundation.
         THE WITNESS:  Sitting here now, I don't recall.
BY MR. PLACITELLA:
   Q.  Okay.  Now, the hold notice you put out is not just for the current case, but when you anticipate further cases, it's to preserve evidence for all cases going forward, right?
   A.  No, I think -- I think when we issued hold notices, they were for a specific case.
   Q.  So even if you anticipated a case, you didn't put a hold notice out?
   A.  No, I think maybe we would put another one out, because sometimes the case -- each case is different and each case is treated individually.  And so

Page 727

sometimes, the documents that you would hold for one case doesn't necessarily translate to the other.  So no, we would -- I don't think we had, like, generic hold notices.
   Q.  So when you anticipated --
   A.  Except I think maybe the mass, when we started getting mass torts, it might have been a little bit different, but I don't know.
   Q.  But when you say you anticipated future cases, didn't you put a hold notice at that point in time to preserve the evidence?
   A.  I don't recall whether we did or did not.
   Q.  Well, we know that you were involved in litigation going back to the early '70s and as of 19 -- J&J --
   A.  Oh, J&J, yes.
   Q.  Yes.  And as of 1983, there was no hold notice, right?
   A.  I don't know whether there was a hold notice or not.  But the hold notices

Page 728

¹ were issued in individual cases, so I'm not
² sure where --
³      Q.   So this is clear, because it's
⁴ important --
⁵      A.   Sure.
⁶      Q.   -- so you're saying even when
⁷ you anticipated litigation, you did not
⁸ send out hold notices, only when you were
⁹ actually sued?
¹⁰           MS. BROWN:  Objection.
¹¹      Misstates testimony.
¹²           THE WITNESS:  I don't
¹³      recall, I don't recall if that
¹⁴      would provoke a hold notice.  I'm
¹⁵      thinking no, because without the
¹⁶      allegations in the complaint, it
¹⁷      would be difficult to say what
¹⁸      should be held.
¹⁹ BY MR. PLACITELLA:
²⁰      Q.   Okay.  Well, you, for example,
²¹ indicated to Mr. Tisi that you anticipated
²² ovarian cancer cases related to talc from
²³ the early 1990s.  Do you recall that
²⁴ testimony?

Page 729

¹      A.   Yes.
²      Q.   So did you put a hold notice
³ out at that point for the ovarian evidence?
⁴      A.   I don't think we would have
⁵ until we had a case come in.
⁶      Q.   Oh, okay.  And what about when
⁷ testing was done, right, and samples were
⁸ taken in the testing, did your litigation
⁹ hold notices go to tell people who are
¹⁰ involved in the testing to retain samples?
¹¹      A.   I don't know whether it did or
¹² not.  I would have to look at the hold
¹³ notice.
¹⁴      Q.   Well, here's the reason I'm
¹⁵ asking the question.
¹⁶      A.   Sure.
¹⁷      Q.   Can you go to J&J 355, which is
¹⁸ in the JOS book.
¹⁹      A.   I got it.
²⁰           - - - - -
²¹           (Letter dated 1/28/1987 Bates
²²      JNJTALC0000387714 to 387716 marked
²³      O'Shaughnessy Exhibit 355 for
²⁴      identification.)

Page 730

¹           - - - - -
² BY MR. PLACITELLA:
³      Q.   Okay.  355 is the --
⁴      A.   I'm going to get to it.
⁵      Q.   I'm sorry.
⁶      A.   It's at the end of it.  I have
⁷ it.
⁸      Q.   I want to show you something
⁹ while we're at it.  Give me one second.  Do
¹⁰ you see -- remember the Edley case and
¹¹ Roger Miller attaching as proof the report
¹² from McCrone with the code language, no
¹³ quantifiable amounts?
¹⁴      A.   Yes, we discussed that, yeah.
¹⁵      Q.   Okay.  And so clearly this was
¹⁶ a test involved in litigation, correct?
¹⁷           MS. BROWN:  Objection.
¹⁸      Misstates the document.
¹⁹           THE WITNESS:  I'm not
²⁰      sure what you mean by that.
²¹ BY MR. PLACITELLA:
²²      Q.   Well, you're attaching test
²³ results to an affidavit filed in litigation
²⁴ saying what the results show.

Page 731

¹      A.   Refresh me, was this attached
² to an affidavit?
³      Q.   Yeah, if you flip forward, it
⁴ was attached to the Miller affidavit?
⁵      A.   Okay.
⁶      Q.   Right.
⁷      A.   Flip forward.
⁸      Q.   It's in 188.3, remember?
⁹      A.   What case was that?
¹⁰      Q.   Remember in the Edley case,
¹¹ look at the screen in front of you.
¹²      A.   I don't think I was around for
¹³ the Edley case at Johnson.
¹⁴      Q.   Yeah, I understand.  I'm asking
¹⁵ this way -- you said that.  But you
¹⁶ actually were around when the affidavit was
¹⁷ filed.
¹⁸      A.   What's the date of it?
¹⁹      Q.   It was in July of '87.
²⁰      A.   Yes, then I would have been,
²¹ but I don't think I was responsible for the
²² talc litigation at that time.
²³      Q.   All right.  But the same
²⁴ affidavit was filed a year later when you

Page 732

1 were in charge, remember that?
2    A.  In essence, yes.
3    Q.  Okay.  And the last page of the
4 Edley affidavit attaches a report from
5 McCrone, right?
6    A.  It does.
7    Q.  Okay.  Hold that there.  So if
8 I go to 355, right, that's the same exact
9 report.  Do you see that?  They're side by
10 side.
11    A.  I'm looking, they look to be
12 the same except for Exhibit A is written on
13 one in hand.  Do you see where I'm
14 referring to?
15    Q.  Yes, sir.
16    A.  That's the only difference I
17 see.
18    Q.  But it even has the same
19 received stamp on it.
20    A.  This quick look at it, yeah.
21    Q.  Same exact report?
22    A.  Right.
23    Q.  But what was not attached to
24 the Edley report was the next page of 355.

Page 733

1 Do you see that?
2    A.  I don't know if that's the next
3 page or not.
4    Q.  It's the very next page.  It's
5 entitled "please note."
6    A.  Yeah, I know.
7    Q.  Do you see that?
8    A.  I know what it says.  But I
9 don't know what that's part of and I didn't
10 have anything to do with the preparation of
11 the affidavit or why that particular
12 affidavit had an exhibit attached to it.
13 It might have been something relevant to
14 the case or what the lawyers were
15 discussing.  I just don't know.
16    Q.  That's not the point of my
17 question.
18    A.  I know, but you're asking --
19    Q.  The second page says that the
20 samples are being destroyed --
21       MS. BROWN:  Objection.
22 Misstates the document.
23       MR. PLACITELLA:  --
24 correct?  It says our present

Page 734

1    policy is to hold samples for 30
2    days after the analysis, right?
3       THE WITNESS:  I can't
4    interpret a document from this time
5    period from another company, it
6    looks like, right?
7 BY MR. PLACITELLA:
8    Q.  Well, sir, it went to your
9 company --
10    A.  I know, before I --
11    Q.  -- and it was a policy that was
12 being executed in the context of litigation
13 that your company was handling.
14       MS. BROWN:  Objection.
15 Misstates the testimony.
16       THE WITNESS:  If it's a
17    policy, it's the policy of McCrone.
18 BY MR. PLACITELLA:
19    Q.  Sir, they're working for you,
20 Johnson & Johnson?
21    A.  I understand.
22    Q.  Did you tell them don't destroy
23 the samples, because they're being used in
24 litigation?

Page 735

1    A.  I don't know they are
2 destroying samples.
3    Q.  It says "Our present policy is
4 to hold samples for 30 days after issuance
5 of the analysis and at no additional
6 charge.  At the end of 30 days, samples
7 will be disposed."  Do you see that?
8    A.  At the end of 30 days, "Samples
9 will be disposed of unless a written
10 request to return has been received in our
11 office."
12    Q.  Did you ever send such a
13 request?
14    A.  I wasn't handling the
15 litigation.
16    Q.  The entire time that you worked
17 for Johnson & Johnson when you were
18 handling the litigation, did you ever tell
19 McCrone don't destroy the samples, because
20 they're being used for litigation?
21    A.  I don't recall the specific
22 discussions and communications I had with
23 McCrone.
24    Q.  Okay.

John O'Shaughnessy

Page 736

1   A.  Obviously, I had some, because
2  you've shown them to me.  And so although I
3  don't recall specific discussions, if
4  something came up in a lawsuit, which
5  called for us to preserve documents that we
6  knew were with another company, generally,
7  we took those steps.
8   Q.  Sir, it's clear from this
9  evidence, is it not, that Johnson & Johnson
10 was being advised during the time
11 litigation was pending that McCrone was
12 destroying the samples, the very samples
13 that Johnson & Johnson was relying upon to
14 defend itself?
15   MS. BROWN:  Misstates
16   facts, misstates evidence, and
17   lacks foundation.
18   THE WITNESS:  No, I
19   don't agree with that.
20 BY MR. PLACITELLA:
21   Q.  Okay.  We'll let the jury
22 decide.  Did you know -- can you go to your
23 book one, your book one, Exhibit 198.
24   MR. TISI:  I'll help you

Page 737

1   here.  It's getting late.
2   THE WITNESS:  I think
3   it's this one, Chris.
4   MR. TISI:  Oh, okay, I
5   was going to try to put it over
6   here, so you could find it.
7   THE WITNESS:  Well, now
8   I dumped -- all right.  Well, that
9   was about to happen, wasn't it?
10   MR. TISI:  Yeah, you
11   know that's my life --
12   THE WITNESS:  I got it,
13   Chris, thanks.
14   MS. BROWN:  198?
15   MR. PLACITELLA:  198.
16   MR. TISI:  Why don't we
17   take a quick break so you can --
18   THE WITNESS:  No, I'm
19   all right.  Let's go.
20   MR. TISI:  Are you sure?
21   THE WITNESS:  Yeah, I'm
22   fine.  Thanks, Chris.  I have 198,
23   Mr. Placitella.
24   - - - - -

Page 738

1   (Letter dated 11/26/90 and
2   Attachment Bates
3   JNJMX__68__000012851 to 12859
4   marked O'Shaughnessy Exhibit 198
5   for identification.)
6   - - - - -
7  BY MR. PLACITELLA:
8   Q.  Sure.  198 is a report from
9  McCrone to Cyprus Minerals Corporation from
10 1990.  Do you see that?
11   A.  Yes, I do.
12   Q.  Okay.  And do you see they use
13 the magic language, "no quantifiable
14 amounts"?
15   MS. BROWN:  I object to
16   the form of the question,
17   argumentative, lacks foundation.
18 BY MR. PLACITELLA:
19   Q.  Do you see that?
20   A.  My mic fell off.
21   Q.  Yeah, sure.
22   A.  You know, you're saying magic,
23 you're characterizing it in your way.  I
24 see where it says "no quantifiable

Page 739

1  amounts."
2   Q.  Fair enough.  And could you go
3  to page 4?
4   A.  I have it.
5   Q.  And do you see that there are
6  actual backup testing data attached to this
7  report?
8   A.  You know, I don't -- I'm not
9  trying to be difficult, Mr. Placitella, I'm
10 really not.  But you're showing me
11 documents from a long time ago for testing
12 reports that if they are testing, I don't
13 recognize these documents nor can I
14 interpret them.  And I'm not trying to be
15 difficult, but --
16   Q.  I know you're not trying to be
17 difficult.
18   A.  There's other people at the
19 company who can address this way better
20 than I can.
21   Q.  Yeah, but that's not the point
22 of my question, so give me a chance.  Okay?
23   A.  Absolutely.
24   Q.  Okay.  So do you see that

John O'Shaughnessy

Page 740

¹ despite finding no quantifiable amounts,
² the backup data actually lists chrysotile
³ fiber?
⁴          MS. BROWN:  I object.
⁵     That misstates the document and
⁶     lacks foundation.
⁷          THE WITNESS:  I can't
⁸     comment on that.
⁹ BY MR. PLACITELLA:
¹⁰     Q.  Okay.
¹¹     A.  I really can't interpret it.
¹² Q.  Here's my question.  Do you see
¹³ at least that this report has all this
¹⁴ backup data?  I'm not asking you to
¹⁵ interpret.
¹⁶     A.  My eyes are glazing over at
¹⁷ this time.
¹⁸     Q.  Okay.  Has all this backup
¹⁹ data, do you see that?
²⁰     A.  It has graphs and charts.  I
²¹ don't know if it's backup data.
²²     Q.  Exactly.
²³     A.  It's attached to the report.
²⁴     Q.  How come none of the documents

Page 741

¹ you turned over had the same graphs and
² charts?
³          MS. BROWN:  That assumes
⁴     facts and lacks foundation.
⁵ BY MR. PLACITELLA:
⁶     Q.  Didn't you --
⁷     A.  Me personally?
⁸     Q.  You, Johnson & Johnson, when
⁹ you turned over, finally turned over the
¹⁰ testing documents, why didn't you have the
¹¹ facts and data attached to the McCrone
¹² reports?
¹³          MS. BROWN:  That assumes
¹⁴     facts and lacks foundation and he's
¹⁵     not testifying as Johnson &
¹⁶     Johnson.
¹⁷          THE WITNESS:  In the
¹⁸     cases I handle, when we turned over
¹⁹     documents, we turned over documents
²⁰     that we felt were responsive to the
²¹     discovery process in cases that we
²²     were litigating.  So McCrone
²³     documents were probably turned
²⁴     over, I don't know which, I don't

Page 742

¹     know how many, and I don't know if
²     these were among them.  But you're
³     asking me assuming that, it sounds
⁴     like you're assuming we consciously
⁵     made an effort not to turn
⁶     documents over and that was not
⁷     done.
⁸ BY MR. PLACITELLA:
⁹     Q.  No, sir, that's not what I'm
¹⁰ asking.  I'm asking --
¹¹          MS. BROWN:  Well, let
¹² him finish though, Chris.
¹³ BY MR. PLACITELLA:
¹⁴     Q.  No, what I'm asking you is why
¹⁵ didn't you retain the backup data for any
¹⁶ of the McCrone reports or any other
¹⁷ reports?
¹⁸          MS. BROWN:  Assumes
¹⁹     facts, misstates the evidence,
²⁰     lacks foundation.
²¹          THE WITNESS:  The
²²     company would have its own process
²³     with how it dealt with McCrone and
²⁴     what tests they received and what

Page 743

¹     data they received for the tests
²     and you would have to discuss this
³     with someone at the company.
⁴ BY MR. PLACITELLA:
⁵     Q.  Who shall I ask?
⁶     A.  You should ask some of the
⁷ people that you might have spoken to
⁸ already, like Hopkins --
⁹     Q.  He didn't know.
¹⁰     A.  -- and others in the R&D.
¹¹     Q.  Give me somebody else.
¹²          MS. BROWN:  Chris.
¹³ BY MR. PLACITELLA:
¹⁴     Q.  Who else should I ask?  Okay.
¹⁵ Let's go to --
¹⁶     A.  I'm thinking, but you know --
¹⁷     Q.  Go ahead.
¹⁸     A.  I'm thinking, but you're asking
¹⁹ me and, you know, technical people at the
²⁰ company may have this information.
²¹     Q.  The problem is they're all
²² gone, dead, or retired, right?
²³          MS. BROWN:  I object to
²⁴     the argumentative nature of your

Page 744

1    question.
2         THE WITNESS:  I don't
3    know if that's true.  You know,
4    through the passage of time that's
5    normally what happens.
6  BY MR. PLACITELLA:
7    Q.  Okay.  So let's go to 456 in
8  your book two.
9    A.  I have it.
10      - - - - -
11      (Report dated 11/23/83 Bates
12      JNJ 000240739 to 40742 marked
13      O'Shaughnessy Exhibit 456 for
14      identification.)
15      - - - - -
16  BY MR. PLACITELLA:
17    Q.  456 is a report from
18  November 23, 1993, from Denton.  Do you
19  know who Denton is?
20    A.  I don't know.
21    Q.  To William Ashton, you know
22  him, right?
23    A.  I do.
24    Q.  He's dead though, right?

Page 745

1    A.  Yes, he is.
2    Q.  So the truth died with him,
3  right?
4         MS. BROWN:  Objection.
5    Chris Placitella, I know it's
6    getting late, but the questions,
7    they're so inappropriate.
8  BY MR. PLACITELLA:
9    Q.  So let's go to 456.3.
10    A.  Yes.
11    Q.  Okay.  This is 1993.
12    A.  Okay.
13    Q.  The note in this Johnson &
14  Johnson document says "The specifics of the
15  mining operation at Hammondsville is
16  uncertain, as most of the pre-Luzenac
17  records were destroyed by the mine
18  management just prior to the J&J
19  divestiture and the Cyprus purchase."  Do
20  you see that?
21    A.  Yes, I do.
22         MS. BROWN:  This lacks
23    foundation.
24

Page 746

1  BY MR. PLACITELLA:
2    Q.  "However, several former are
3  Hammondsville minors are still employed at
4  the mine and they provided us with some
5  useful information."  Do you see that?
6    A.  "As to the nature of the
7  underground works."
8    Q.  Okay.  So did you know before
9  today that all the documents from the mine
10  were destroyed before you turned over the
11  mine to Cyprus?
12         MS. BROWN:  That
13    misstates the evidence and assumes
14    facts and lacks foundation.
15         THE WITNESS:  I don't
16    know what he was referring to and I
17    don't know exactly what was kept or
18    not kept and what documents he's
19    talking about.  So I can't comment
20    on someone else's memo.
21  BY MR. PLACITELLA:
22    Q.  Would that have satisfied your
23  litigation hold?
24    A.  I'm sorry?

Page 747

1         MS. BROWN:  I object.
2  BY MR. PLACITELLA:
3    Q.  Would that have satisfied your
4  litigation hold?
5    A.  You're mixing apples and
6  oranges.
7         MS. BROWN:  I object.
8  BY MR. PLACITELLA:
9    Q.  Okay.  So was there a
10  litigation hold in place in 1993 when
11  litigation was pending that would have
12  prevented the destruction of these records?
13         MS. BROWN:  Objection.
14    Misstates the evidence.  Assumes
15    facts.
16         THE WITNESS:  I don't
17    know, I don't know what records
18    he's referring to and I'm not sure
19    if there was a specific hold in
20    place.
21  BY MR. PLACITELLA:
22    Q.  Okay.  Did you know that
23  Johnson & Johnson maintained a specific
24  file for all of their contact, all their

Page 748

¹ phone calls with the FDA?  Did you know
² that?
³       A.  I don't know what files they
⁴ maintain with the FDA, but they were pretty
⁵ careful about how they recorded their
⁶ contacts with the agency.
⁷       Q.  Can you go to 491.  491 is a
⁸ January 4, 1984, memo from --
⁹       A.  I'm sorry.
¹⁰       MS. BROWN:  Hold on.
¹¹    Let him get there and I object as
¹²    lacking foundation.
¹³             THE WITNESS:  I got it
¹⁴    now.
¹⁵             - - - - -
¹⁶    (Memo dated 1/4/84 marked
¹⁷    O'Shaughnessy Exhibit 491 for
¹⁸    identification.)
¹⁹             - - - - -
²⁰ BY MR. PLACITELLA:
²¹       Q.  -- From Robert Kohler with a
²² copy to Bruce Semple.  He was the medical
²³ director, right?
²⁴       A.  I don't know what he was at the

Page 749

¹ time.  I wasn't with the company.
²       Q.  Okay.  And it's a memo to the
³ FDA call file.  Do you see that?
⁴       A.  Yes.
⁵       Q.  Did you ever put a litigation
⁶ hold out that said to maintain copies of
⁷ the FDA call file?
⁸       A.  I don't know what the FDA call
⁹ file was.  I wasn't with the company at the
¹⁰ time.  All I can tell you is when we put
¹¹ out a hold notice, we would put out the
¹² hold notice and include any documents
¹³ specific to the hold notice in the case
¹⁴ that we thought were relevant and should be
¹⁵ preserved.
¹⁶       Q.  Okay.  So I want to show you --
¹⁷ I still have no audio?  Let me start it
¹⁸ again.  Did you have a -- should the FDA
¹⁹ call file related to asbestos and talc have
²⁰ been retained pursuant to a document
²¹ retention?
²²             MS. BROWN:  That assumes
²³    facts, misstates this document, and
²⁴    lacks foundation.

Page 750

¹             THE WITNESS:  I don't
²    know what procedures were in place
³    in 1984.
⁴ BY MR. PLACITELLA:
⁵       Q.  Well, I'm talking about ever.
⁶       A.  Oh, ever?
⁷       Q.  Yes, sir.
⁸       A.  So whatever files they had that
⁹ was required to be held by the hold notice
¹⁰ should be held.
¹¹       Q.  Because I asked Susan Nicholson
¹² who was produced as the person with the
¹³ most knowledge about your interaction with
¹⁴ the FDA by you, Johnson & Johnson, this is
¹⁵ what she said about the call file.
¹⁶             MS. BROWN:  Object to
¹⁷    selective playing of testimony.
¹⁸    Lacks foundation.
¹⁹             - - - - -
²⁰    (Video Clip was played.)
²¹             - - - - -
²² BY MR. PLACITELLA:
²³       Q.  So I guess Susan Nicholson
²⁴ never got the hold notice for the FDA call

Page 751

¹ file?
²             MS. BROWN:  Okay.  That
³    misstates testimony.
⁴             THE WITNESS:  I don't
⁵    know what you're talking about.
⁶             MS. BROWN:  Assumes
⁷    facts, lacks foundation, and is
⁸    argumentative.
⁹ BY MR. PLACITELLA:
¹⁰       Q.  So do you have any information
¹¹ that you told the people handling the FDA
¹² call file that they should preserve the
¹³ documents?
¹⁴             MS. BROWN:  I object and
¹⁵    instruct not to answer.  That would
¹⁶    be legal advice or legal direction
¹⁷    and that's protected.
¹⁸             MR. PLACITELLA:  Can I
¹⁹    get a ruling on that?
²⁰             JUDGE SCHNEIDER:  Can I
²¹    have the court reporter to please
²²    repeat the question?
²³             - - - - -
²⁴    (Whereupon, the reporter read

Page 752

1  back as requested.)
2  - - - - -
3      JUDGE SCHNEIDER:
4  Objection overruled.  I think it's
5  discoverable to find out and an
6  appropriate area of inquiry is who
7  received the hold notice, which is,
8  obviously, relevant to whether
9  appropriate documents have been
10 preserved or exist.  So objection
11 overruled.
12     THE WITNESS:  I'm sorry,
13 could you read it back, please?
14 - - - - -
15   (Whereupon, the reporter read
16 back as requested.)
17 - - - - -
18     THE WITNESS:  I don't
19 recognize what -- this is a
20 document from 1984.  I don't
21 recognize what FDA call file may
22 be.  I don't know if it's a general
23 file that they would be keeping
24 there or it's this individual's

Page 753

1  file that he called the FDA call
2  file.  All I can tell you is if we
3  issued a hold notice that called
4  for the retention of FDA
5  communications, we would expect
6  those communications to be held.
7  BY MR. PLACITELLA:
8    Q.  So Susan Nicholson testified
9  that there is no FDA call file in paper.
10 What happened to it?
11     MS. BROWN:  No, no, that
12 misstates her testimony and lacks
13 foundation with this witness.
14 BY MR. PLACITELLA:
15   Q.  What happened to it?
16     MS. BROWN:  The same
17 objection.
18     THE WITNESS:  I
19 testified, I don't recognize what a
20 call file is.
21 BY MR. PLACITELLA:
22   Q.  Okay.  So let me ask you
23 another question.
24     MS. BROWN:  Chris, can

Page 754

1  we take a break soon, we have been
2  going over an hour?
3      MR. PLACITELLA:  Okay.
4  I was trying to finish by 4:00, but
5  we'll take a break.
6      MS. BROWN:  If you're
7  going to finish in 13 minutes --
8      MR. PLACITELLA:  I was
9  going to try, but we'll take a
10 break.
11     MS. BROWN:  Okay.
12     THE VIDEOGRAPHER:  Off
13 the record at 3:47 p.m.
14 - - - - -
15   (A recess was taken at this time.)
16 - - - - -
17     THE VIDEOGRAPHER:  We
18 are back on the record at 4:05.
19 BY MR. PLACITELLA:
20   Q.  Okay.  I'm going to refer back
21 to 219, I don't think you have to pull it
22 out of your binder, because I'm going to
23 ask you one question.  This is a document
24 that you've seen a number of times already

Page 755

1  where in the Coker case, Luzenac provided
2  you with all of their testing documents
3  back to 1982.  Do you see that?
4    A.  The talc test with -- I don't
5  know if it was all of it, but with
6  documents related to talc testing and Val
7  Chisone deposit dating back to 1982.
8    Q.  What happened to those
9  documents?
10     MS. BROWN:  Objection.
11 Foundation.
12     THE WITNESS:  I don't
13 recall specifically, but it would
14 have been in my practice to turn
15 them over so our lawyers would have
16 them.
17 BY MR. PLACITELLA:
18   Q.  The lawyers in the case?
19   A.  Yeah.
20   Q.  So last document I want to ask
21 you about is 418.
22   A.  Okay.  Yes, I have it.
23 - - - - -
24   (Email String dated 11/21/08

Page 756

1    marked O'Shaughnessy Exhibit 418
2    for identification.)
3          - - - - -
4  BY MR. PLACITELLA:
5    Q.  Okay.  418 is an email dated
6  November 21, 2008, subject, baby powder,
7  from Tim McCarthy.  Do you see that?
8    A.  Yes.
9    Q.  This would have been a time
10 when your litigation hold would have been
11 in effect, true?
12   A.  I'm assuming there might have
13 been one in place at this time, yes.
14        MS. BROWN:  I object to
15    this document as lacking
16    foundation.
17 BY MR. PLACITELLA:
18   Q.  Okay.  And if we just go to the
19 bottom, it talks about baby powder, "Hi
20 Tim, I don't think you would want to share
21 this document, but FYI, I thought you would
22 find it interesting."  Do you see that?
23   A.  I do.
24   Q.  And then below it, it says

Page 757

1  "More seriously, we have about four file
2  drawers of information on talc over here."
3  Do you see that?
4    A.  Yes.
5    Q.  What happened to that
6  information?
7        MS. BROWN:  Objection,
8    assumes facts.
9  BY MR. PLACITELLA:
10   Q.  Was that ever turned over to
11 you as part of the litigation hold?
12        MS. BROWN:  Assumes
13    facts.  Lacks foundation.
14        THE WITNESS:  I don't
15    know what this person is
16    specifically referring to.  Though
17    I am familiar though in general
18    when we do go to collect documents,
19    there's documents, they're not all
20    in one place.  So you go to
21    different places to collect them
22    and you speak to different people
23    to try and find out where they kept
24    the files and where their files are

Page 758

1    kept.  It looks like, you know,
2    that this might have been material
3    if it came to our attention that we
4    definitely would have collected.
5    And I don't know if we did or we
6    didn't.  And I don't know the
7    subject of these emails, whether
8    they involved, you know, the
9    document collection process or not
10   and maybe that's why they were
11   talking about it.
12 BY MR. PLACITELLA:
13   Q.  Okay.  How do we find that out?
14 Who would I ask?
15   A.  I don't know, I didn't read the
16 whole email, but -- I didn't read the whole
17 email.
18   Q.  Okay.  Can we go -- give me an
19 Elmo.  Okay.  You stated before that Blount
20 telling J&J Johnson's Baby Powder does
21 not -- does have asbestos, not a secret.
22 Did I get that right?
23   A.  I think what she said in her
24 report to the lawyers, the letter that was

Page 759

1  sent to me was that she found trace amounts
2  in cosmetic talc products, including
3  Johnson & Johnson.
4    Q.  And you said that's not a
5  secret, right?
6    A.  I forget the way you
7  characterized it and I would really want to
8  know how I responded, because you were
9  calling it a secret and as if, you know, it
10 was maintained like that by the company and
11 I don't think that's correct.  So that's
12 what I meant by not a secret.
13   Q.  Okay.  So let me ask you then.
14 Did you tell the FDA that?
15   A.  Tell the FDA what?
16   Q.  That Alice Blount told you
17 specifically that the baby powder she
18 tested had asbestos in it.
19        MS. BROWN:  That
20   misstates facts.
21        THE WITNESS:  I think I
22   told you before, I don't
23   communicate with the FDA, Mr.
24   Placitella, the company does.

Page 760

1  BY MR. PLACITELLA:
2      Q.  All right. So did you ever tell
3  the FDA?
4          MS. BROWN:  Same
5      objection.  Misstates facts.
6          THE WITNESS:  I don't
7      communicate with the FDA, so I
8      wouldn't tell them that or anything
9      else.
10  BY MR. PLACITELLA:
11     Q.  Do you have any information
12  that Johnson & Johnson told the FDA?
13     A.  I didn't finish my answer.  I
14  don't know if you caught it, I was just
15  about finished the prior answer, but if
16  not, I want that clear.
17     Q.  Let me ask the question again.
18     A.  Could you read it back to me
19  please?
20     Q.  Let me ask the question again?
21     A.  Oh, sure.
22     Q.  Do you have any information
23  that Johnson & Johnson told the FDA about
24  Alice Blount finding asbestos in Johnson's

Page 761

1  Baby Powder?
2          MS. BROWN:  Objection.
3      Misstates the evidence.
4          THE WITNESS:  I don't
5      know exactly what the company
6      communicated with FDA about.  There
7      was always communication between
8      the company, I think, and the FDA,
9      so I don't know what it might have
10     been.  I can't guess at that.
11  BY MR. PLACITELLA:
12     Q.  Should they have told them?
13         MS. BROWN:  Objection.
14         THE WITNESS:  I don't
15     know.
16  BY MR. PLACITELLA:
17     Q.  Oh, okay.  So I'll just put "I
18  don't know."  Okay?
19     A.  No, no, no.
20     Q.  That's what you just told me.
21     A.  You're putting I don't know as
22  if I -- somehow that means that they did
23  not tell the FDA.  Something that I don't
24  even know, you know, that they knew --

Page 762

1      Q.  Well, you don't even
2  know whether you should have told them --
3          MS. BROWN:  Wait.  Let
4      him finish.  Let him finish and
5      don't argue with him, please.
6          MR. PLACITELLA:  Go
7      ahead finish your answer.
8          THE WITNESS:  You know,
9      it has been a long four days --
10  BY MR. PLACITELLA:
11     Q.  It sure has.
12     A.  -- Mr. Placitella, but I don't
13  really appreciate you waiving your hand at
14  me and laughing at me when I'm giving you
15  my answers.  I don't think it's right.  I
16  have been trying my best to answer these
17  questions about 25 years ago and I'm doing
18  my best and I know I said I don't recall to
19  a lot of questions, but that's 25 years ago
20  and, you know, and if you asked me these
21  questions way back then, I probably would
22  have had the answers to an awful lot of
23  them.
24     Q.  What was my question, sir?

Page 763

1  Move to strike your response.  What was my
2  question?
3      A.  I'm not sure at this point.
4      Q.  Okay.  Move to strike your
5  response.
6      A.  It's in the record though.
7      Q.  Do you have any information
8  that the Blount findings of asbestos in
9  Johnson's Baby Powder were communicated to
10  the FDA, yes or no?
11         MS. BROWN:  Objection.
12     Misstates the evidence and lacks
13     foundation.
14         THE WITNESS:  I don't
15     have any information really about
16     the company's, all the company's
17     communications with the FDA.  You
18     would have to ask someone at the
19     company.
20  BY MR. PLACITELLA:
21     Q.  Okay.  So the answer is what,
22  yes or no?
23         MS. BROWN:  The answer
24     is what he gave.  Asked and

John O'Shaughnessy

Page 764

1  answered.
2           THE WITNESS:  No, that's
3  my answer, you would have to ask
4  someone at the company.
5  BY MR. PLACITELLA:
6      Q.   Okay.  So your answer is I
7  don't know?
8           MS. BROWN:  Objection.
9           THE WITNESS:  No, my
10  answer is what it was.
11  BY MR. PLACITELLA:
12      Q.   Okay.  Who should I ask at the
13  company?
14      A.   You can ask people in the
15  regulatory area.
16      Q.   Give me a name.
17      A.   I don't know who is there now.
18      Q.   Okay.  How about the National
19  Toxicology Project, when you were involved
20  with the National Toxicology Project, did
21  you disclose to the National Toxicology
22  Project that you knew that Dr. Blount found
23  asbestos in Johnson's Baby Powder?
24           MS. BROWN:  That assumes

Page 765

1  facts and misstates the evidence.
2           THE WITNESS:  Again,
3      like with the FDA, I don't
4      communicate with agencies or other
5      entities, the company does.  And
6      I'm not privy to all the back and
7      forth with those entities by the
8      company, so I don't know.
9  BY MR. PLACITELLA:
10      Q.   Okay.  You were on a committee
11  that dealt with the National Toxicology
12  Project, correct?
13      A.   I was on a committee that was
14  formulating a response and materials for
15  the consideration of that as their lawyer,
16  yes.
17      Q.   Okay.  And did you recommend
18  any time on that committee that the fact
19  that Alice Blount found asbestos in
20  Johnson's Baby Powder should be indicated
21  to the National Toxicology Project?
22      A.   I don't recall recommending nor
23  would that be my role of what they should
24  communicate to an agency or an entity.

Page 766

1      Q.   So what's the answer, did you
2  ever make a recommendation?
3      A.   No, I think that was part of my
4  answer.
5      Q.   So the answer is no, you never
6  made a recommendation?
7      A.   I don't recommend to them what
8  they should do to communicate with other
9  entities.  That's up to them.
10      Q.   All right.  So just to be
11  clear, you never made a recommendation that
12  Johnson & Johnson disclose to the National
13  Toxicology Program that they knew that
14  Alice Blount found asbestos in Johnson's
15  Baby Powder?
16      A.   I didn't --
17           MS. BROWN:  I object.
18      To the extent that this is calling
19      for privileged information.  First
20      of all, it has been asked and
21      answered.  And to the extent that
22      Mr. O'Shaughnessy did anything in
23      connection with the Coker case
24      regarding that information, I would

Page 767

1      instruct you, Mr. O'Shaughnessy,
2      not to answer that.
3           MR. PLACITELLA:  Okay.
4      Can I have a ruling, Your Honor?
5           JUDGE SCHNEIDER:
6      Objection overruled.  This does not
7      call for privileged information.
8      It's in the course of a
9      non-litigation context and it's the
10      work of a committee, which is not
11      to prepare for litigation.
12           THE WITNESS:  I didn't
13      recommend to the committee what
14      they should do or not do with
15      respect to scientific information
16      that was available to them.
17  BY MR. PLACITELLA:
18      Q.   My question, sir, is did you
19  ever recommend to the committee that they
20  disclose to the National Toxicology Program
21  that Alice Blount found asbestos in the
22  Johnson's Baby Powder?
23           MS. BROWN:  Asked and
24      answered.

1    THE WITNESS:  I would
2    not have recommended that, because
3    I didn't recommend anything with
4    respect to what they should do with
5    scientific information.
6  BY MR. PLACITELLA:
7    Q.  So the answer is no, you never
8  did?
9    A.  I just said I wouldn't have
10  recommended that since I don't recommend
11  what they should do with scientific
12  information.
13    Q.  Sir, can an honest and
14  forthright witness provide a simple answer
15  to a simple question?
16    MS. BROWN:  That's
17    argumentative.  He's asked and
18    answered your questions.
19  BY MR. PLACITELLA:
20    Q.  So let me ask the question
21  again.
22    A.  Wait, you're referring to me --
23    Q.  Excuse me, excuse me.
24    A.  No, no, no, you asked a

1  question, I want to answer it --
2    Q.  Go ahead.
3    A.  -- because you're impugning my
4  credibility and I am providing honest and
5  forthright answers.  So that's the answer
6  to your question.
7    Q.  So the answer is --
8    JUDGE SCHNEIDER:  If you
9    ask me, the witness has been asked
10    the question, he has given, I
11    think, a responsive answer.
12    MR. PLACITELLA:  Fine.
13    JUDGE SCHNEIDER:  And if
14    I was the judge, I would say time
15    to move on.
16  BY MR. PLACITELLA:
17    Q.  Okay.  Am I correct that you
18  never disclosed the fact that Johnson &
19  Johnson found -- I mean, Alice Blount found
20  asbestos in the Johnson & Johnson's Baby
21  Powder to any litigant in cases that you
22  were involved in?
23    A.  I think you asked this before
24  and I think my answer was I don't recall

1  what information that we specifically gave
2  in specific cases.
3    Q.  So let me ask you this final
4  couple of questions.  And I know that you
5  are getting a little impatient with me and
6  I apologize if in any way you think I was
7  impugning your integrity, I wasn't.
8    A.  Okay.  Thank you.  I appreciate
9  that.  I did interpret that question that
10  way and I have the greatest respect for
11  you.  I only met you here during this
12  depositions, but I certainly know you by
13  reputation and it's a very good reputation
14  among my colleagues at the bar.
15    Q.  Okay.  So if in any way I
16  offended you, I apologize on the record in
17  front of however many people are watching.
18    A.  If I misinterpreted it, then
19  likewise.
20    Q.  Okay.  Because I don't want you
21  to answer questions when Ms. Brown asks you
22  questions that I was unfair to you, because
23  I don't want to be unfair to you.  Okay?
24    A.  I hear you.

1    Q.  Okay.  And having now sat
2  through four days of depositions, including
3  my sometimes impatient questions, and by
4  the way, you said about my hands flying,
5  I'm Italian, that's what happens.  Okay.
6  So I apologize.  Hands go up and down when
7  I ask questions.
8    A.  It wasn't the hands so much.
9  I've had people throw their hands at me,
10  it's the way you were laughing.
11    Q.  Italians talk with their hands.
12  There's nothing we can do about that.
13  Okay.  So you've sat here patiently for
14  four days, which I greatly appreciate,
15  because I know you're retired and this is
16  the last thing you want to do.  Will you
17  agree with that?
18    A.  Look, I don't mind fulfilling
19  obligations or talking on behalf of what I
20  did.  I understand there's a lot of issues
21  with respect to taking the deposition of
22  attorneys and I may not agree with it, but
23  I understand that if I'm going to be asked
24  questions about what I did, I have no

1  problem answering those questions.
2      Q.   Okay.  So here's my final two
3  questions.  Having sat through four days
4  and going home and thinking about this at
5  night, probably more than you would like
6  to, do you feel that Johnson & Johnson made
7  any mistakes in communicating to courts and
8  litigants and the public the fact that
9  there's no evidence whatsoever that
10  Johnson's Baby Powder ever contained
11  asbestos or tremolite?
12      A.   No, and here's why.  During all
13  my time at J&J, in responding to these
14  document requests and discovery and
15  creating affidavits, we didn't do it -- I
16  didn't do it and our outside counsel didn't
17  do it willy-nilly.  We spent an awful lot
18  of time with these people and with the
19  documents, understanding the Johnson &
20  Johnson story with respect to talc and
21  understanding it well, speaking to other
22  experts, looking at the scientific
23  literature, and based on the totality of
24  that, I am completely comfortable with the

1  affidavits when I worked on them then and
2  even now.
3      Q.   Okay.  Even though there were
4  documents in your files that contradicted
5  the affidavits?
6          MS. BROWN:  Objection.
7      Misstates the evidence.
8          THE WITNESS:  You say
9      there are documents that contradict
10     it, I don't believe so.
11  BY MR. PLACITELLA:
12     Q.   Okay.  But you never read all
13  the documents?
14     A.   Of course, I never read every
15  document, but I did speak to the witnesses
16  along with outside counsel and I'm
17  fairly -- very comfortable with what I
18  learned.
19     Q.   So if no mistakes were made,
20  then you'll agree with me that everything
21  that was done was done on purpose?
22          MS. BROWN:  I object.
23          THE WITNESS:  Our
24      answers were done with a lot of

1  contemplation and with a lot of
2  thought and with a lot of work and
3  they were purposeful, yes.
4          MR. PLACITELLA:  I think
5  that's all the questions I have.
6  If you want to give me -- or you
7  know what, I'll turn the witness
8  over and if I have something I
9  forgot, I'll ask you on my chance
10  on redirect.  How is that?
11          THE WITNESS:  Thank you.
12          MR. PLACITELLA:  Is that
13  okay?
14          MS. BROWN:  Yeah.
15          THE WITNESS:  That's
16  okay.
17          MR. TISI:  There were
18  just a handful of questions I would
19  ask.  I got an email from a
20  colleague to ask a couple of
21  questions.  I think it would be
22  like five minutes, but if you
23  prefer, I pass them over to --
24          MS. BROWN:  On behalf of

1  who?
2          MR. TISI:  Just from one
3  of my colleagues.
4          MS. BROWN:  I know, but
5  on behalf of the Forrest
6  Plaintiffs?
7          MR. TISI:  Yeah, on
8  behalf of the Forrest Plaintiffs.
9          MS. BROWN:  You
10  concluded that questioning
11  yesterday.
12          MR. TISI:  I understand.
13  I am happy to talk to Chris and
14  I'll ask Chris to just reserve and
15  I will --
16          MR. PLACITELLA:  Do you
17  really want -- I'll do it, but --
18          MS. BROWN:  I mean,
19  look, if you have --
20          MR. PLACITELLA:  Do you
21  want me to ask the questions?
22          MS. BROWN:  If you have
23  five minutes of questioning, I
24  think that that is fine.

Page 776

1      MR. TISI:  They're going
2  to be quick, I don't even need,
3  candidly, I think I can anticipate
4  some of the answers and I will not
5  even put a microphone on.
6      MS. BROWN:  I mean, note
7  our eminent reasonableness in
8  allowing the callback questions.
9      THE VIDEOGRAPHER:  Off
10  the record, 4:21 p.m.
11           - - - - -
12  (Discussion was held off the record.)
13           - - - - -
14      THE VIDEOGRAPHER:  Back
15  on the record, 4:22.
16  BY MR. TISI:
17      Q.  I apologize and I appreciate
18  your patience on this.
19      A.  Sure.
20      Q.  This is just a couple of
21  questions and I have, like, a half page
22  here.  What is Johnson & Johnson's, if you
23  know, principal place of business?
24      A.  I believe the principal place

Page 777

1  of business is New Brunswick, New Jersey.
2  I forget where the place of incorporation
3  is and from a legal standpoint, I think the
4  two are different, but they may not be.
5  I'm not an expert on corporate law.
6      Q.  Okay.  And JJCI, where is their
7  principal place of business, if you know?
8      A.  I don't know where they're
9  incorporated, but they were located in
10  Skillman, New Jersey.
11      Q.  Okay.  Do you have any
12  information about, at the time you left,
13  any assets that they had, that J&J had and
14  JJCI?
15      MS. BROWN:  What?  Hold
16  on.
17      THE WITNESS:  I'm not
18  sure --
19      MS. BROWN:  Hold on.
20      THE WITNESS:  I don't
21  understand your question.
22      MS. BROWN:  I don't
23  either and it's overly broad.
24

Page 778

1  BY MR. TISA:
2      Q.  Okay.  Do you know, and
3  honestly I'm just reading it, do you have
4  any information about Johnson & Johnson's,
5  what total assets they had?
6      A.  No.
7      Q.  Any information about total
8  assets that JJCI had?
9      A.  I don't know any of that
10  information.
11      Q.  Same thing, same questions
12  about liabilities.  Do you know any
13  projected liabilities for Johnson &
14  Johnson or JJCI?
15      A.  No.  It sounds like you're
16  asking for accounting-type information.  I
17  don't have that.
18      Q.  Was there ever, to your
19  knowledge, any estimation to J&J or JJCI,
20  any analysis or asbestos-related
21  liabilities in connection with these
22  litigations?
23      MS. BROWN:  I object and
24  instruct not to answer.  It sounds

Page 779

1  like advice in the legal context.
2      MR. TISI:  Okay.  I
3  think that's all.  Thank you.
4      MR. PLACITELLA:  Do you
5  want to switch seats?
6      MS. BROWN:  I do.
7      THE VIDEOGRAPHER:  Off
8  the record, 4:24.
9           - - - - -
10  (A recess was taken at this time.)
11           - - - - -
12      THE VIDEOGRAPHER:  We
13  are back on the record at 4:34 p.m.
14  BY MS. BROWN:
15      Q.  Good afternoon,
16  Mr. O'Shaughnessy.
17      A.  Good afternoon.
18      Q.  Mr. O'Shaughnessy, I'm glad to
19  finally have the chance to talk to you.  We
20  are here on day four of your deposition; is
21  that right?
22      MR. TISI:  Objection.
23      THE WITNESS:  Right.
24      MR. PLACITELLA:  Okay.

Page 780

1  Well, not exactly right.
2  MR. TISI:  Not exactly,
3  but go ahead.
4  BY MS. BROWN:
5  Q.  And Mr. O'Shaughnessy, would
6  you take a minute to introduce yourself to
7  our jurors, please?
8  A.  Yes.  My name is John
9  O'Shaughnessy and I'm here, as you know,
10  testifying on behalf of what I did as an
11  attorney with Johnson & Johnson.  My
12  background is I'm from New York City.  I
13  grew up in the Bronx.  I was one of seven
14  children.  I attended schools in the Bronx
15  until I went to college.  I lived at home
16  when I went to college in a small college
17  called Iona College in New Rochelle, New
18  York, just over the border from the Bronx.
19  I graduated there in -- with a degree in
20  history in 1974.  And I then I drove a
21  truck for a year.  I actually drove a truck
22  while I was in school as well, but I drove
23  a truck for a year while I wasn't going to
24  school, before I entered law school at New

Page 781

1  York Law School, which is in Lower
2  Manhattan.  And I entered law school in
3  1975 and graduated in 1978.  And upon
4  graduation, I was employed by the Bronx
5  District Attorney's office.
6  Q.  And let me stop you right there
7  for one second, Mr. O'Shaughnessy.  So you
8  said that you attended New York Law School;
9  is that right?
10  A.  I did, yes.
11  Q.  And tell our jurors, did you
12  always want to be a lawyer?
13  A.  No, I had kind of visions of
14  actually being an oceanographer.  In fact,
15  I applied for the program and was accepted,
16  believe it or not, and the program was at
17  the City University of New York in Upper
18  Manhattan.  They were one of only at the
19  time four or five programs that offered
20  that.  I was in my sophomore year of
21  college with two years under my belt, but I
22  hadn't taken any science courses.  So in
23  order to go for that degree, it was
24  explained to me that I would have to

Page 782

1  probably be in school another two years.
2  And I decided, you know, that wasn't for
3  me, I wanted to graduate from college in
4  two years.  So I stayed with college and by
5  the time I got out of college, I became
6  interested in becoming a lawyer.
7  Q.  And so you attended law school
8  from '75 to '78 ; is that right?
9  A.  Yes.
10  Q.  And you were just about to tell
11  us about some time that you spent at the
12  DA's office; is that right?
13  A.  Yes.
14  Q.  And can you tell us a little
15  bit about what -- did you work there as a
16  lawyer?
17  A.  Yeah, I was employed there for
18  four years and I was an assistant district
19  attorney and so there's a progression in
20  the office where, you know, you begin with
21  lower seriousness-type crimes like
22  misdemeanors and then you graduate, you get
23  more responsibility up to, you know,
24  serious crimes.  And when I was there in

Page 783

1  the criminal court bureau, they called it
2  at one point, I was supervising five or six
3  other attorneys.  And then I moved on to
4  the homicide bureau and I ended there as a
5  member of the major offense bureau.
6  Q.  Did you ever have to give
7  testimony in connection with that job like
8  you're giving here today?
9  A.  Yes.  They had, from time to
10  time, I would be assigned to what we called
11  homicide duty, which meant that you were on
12  call 24 hours so if there were a homicide
13  committed and they had a body at the scene,
14  I would be called up along with the DA's
15  office video team to go and videotape the
16  crime scene.
17  Also, if there was an arrest
18  made in a homicide and the person decided
19  to make a statement, I would go with the
20  video team and we would videotape the
21  statement for use later in court.  And then
22  when it was introduced in court, I would
23  give testimony about the circumstances
24  surrounding the taking of the statement

Page 784

1 during the trial of the homicide.
2      Q.   And how long did you stay
3 there?
4      A.   I was there -- I was in the
5 office for four years and I left in 1982
6 and I went to a civil litigation firm.  The
7 DA's office is, of course, is criminal, now
8 I went to civil litigation and that was a
9 firm in New York City called Martin
10 Clearwater & Bell where their clients were
11 primarily hospitals and doctors sued in
12 medical malpractice personal injury cases.
13      Q.   And how long did you stay
14 there?
15      A.   I was there, I think,
16 approximately three years and then I went
17 to the first time to a corporation.  And
18 the name of the corporation was
19 International Playtex and they were located
20 in Stamford, Connecticut.  And I was hired
21 as a litigation attorney and I primarily
22 handled their lawsuits involving some of
23 their consumer products.
24      Q.   And did there come a point in

Page 785

1 time where you came to Johnson & Johnson?
2      A.   Yeah, while I was at Playtex, I
3 was working with attorneys who also worked
4 with Johnson & Johnson and they informed me
5 that they were looking for someone.  And I
6 threw my hat in the ring and eventually was
7 hired by Johnson & Johnson in June of --
8 and started in June of 1987.
9      Q.   And did you have to move to New
10 Jersey for that job?
11      A.   No, by the time I took the job
12 at Johnson & Johnson, I had moved from the
13 Bronx to Queens, New York, which is right
14 over a bridge, and I was commuting to
15 Connecticut where the Playtex Corporation
16 was.  But when I took the job at Johnson &
17 Johnson, I realized I had to move to New
18 Jersey.  It was too far to commute.  I
19 commuted for about six or seven months, but
20 it was about two and a half hours each way
21 by car through the heart of, you know, the
22 greater New York City metropolitan area
23 traffic.
24      Q.   So lots of traffic, yeah.

Page 786

1      A.   Yeah.
2      Q.   Did you have family during that
3 time, Mr. O'Shaughnessy?
4      A.   Yeah, my wife and I had our
5 first child while we were living in Queens
6 and a second child as well and the third
7 child was born in New Jersey.
8      Q.   And how old are your kids
9 today?
10      A.   All right.
11      Q.   Not to make you feel old.
12      A.   I can't say I don't recall to
13 these questions, I'll get in trouble.
14           MR. TISI:  Exactly.
15           MR. PLACITELLA:  Just
16      don't screw up the birthdays or the
17      anniversary.  Don't ask him the
18      anniversary question.
19           THE WITNESS:  My
20      daughter is approaching 36 or 37.
21      I have a son who is working back
22      from that, who is about four years
23      younger than her, so he's about 31
24      or so.  And I'm sorry, he's about,

Page 787

1      approaching 35.  And then I have a
2      son who I know is 31.
3 BY MS. BROWN:
4      Q.   And are you a grandfather?
5      A.   I am.  I have two
6 grandchildren -- three grandchildren and
7 one, my daughter-in-law is due to have a
8 baby this fall.  So that would be four.
9      Q.   And we'll talk in a second a
10 little bit about what you're doing now, but
11 fair to say you're retired now?
12      A.   Yeah, I retired in May 1st of
13 2018.
14      Q.   And can you tell us generally
15 how you've spent your retirement?
16      A.   Yeah, you know, it's something
17 that I don't -- people talk about getting
18 used to retirement, I don't think -- I
19 think it's kind of a continuum.  So I don't
20 know if I'm used to it already, but I spend
21 most of time doing family-type stuff and,
22 you know, my kids were moving, both of them
23 were moving when I first retired and I
24 moved, so that was three moves that I was

¹ involved with helping the kids out and
² myself. So that kept you pretty busy. And
³ after that, it's more, you know, keeping in
⁴ touch with friends and family and my
⁵ immediate family. And you know that, of
⁶ course, like a lot of other people, that
⁷ was interrupted by COVID, so right now,
⁸ we're just kind of beginning to begin that
⁹ process, again, of having our family, you
¹⁰ know, get together.
¹¹     Q.   And have you gotten to spend
¹² time with your grandkids in your
¹³ retirement?
¹⁴     A.   Yeah, but not as much. They're
¹⁵ very young. The oldest is four, so COVID
¹⁶ took, you know, a good chunk of that out
¹⁷ about a year, you know.
¹⁸     Q.   I want to talk a little bit,
¹⁹ Mr. O'Shaughnessy, about your time at
²⁰ Johnson & Johnson. Can you tell us a
²¹ little bit about what your position was
²² when you started and what your
²³ responsibilities were?
²⁴     A.   Yeah, I started with Johnson &

¹ Johnson, as I told Mr. -- one of the
² attorneys, as a senior attorney when I was
³ hired. And I was hired and I primarily
⁴ handled litigation at that time for the
⁵ Ortho Pharmaceutical Corporation. I should
⁶ explain, Johnson & Johnson, as we testified
⁷ about, is a large company. And it's broken
⁸ up into basically three different
⁹ businesses, pharmaceuticals, medical
¹⁰ devices, and consumer, which we observe
¹¹ talking about mostly during my deposition.
¹² But I did an awful lot of work with the
¹³ pharmaceutical side. Same type of work
¹⁴ that I did with talc, defending product
¹⁵ liability lawsuits in courts around the
¹⁶ country, working with outside counsel. The
¹⁷ same for medical device-type cases and by
¹⁸ medical devices, I mean implants,
¹⁹ orthopaedic implants. And we also had a --
²⁰ I don't know if Johnson & Johnson still
²¹ owns the company, but we had a company that
²² made neurosurgical instruments. So there
²³ were an awful lot of lawsuits between the
²⁴ pharmaceuticals, the medical devices as

¹ well.
²     Q.   And how long did you stay in
³ that position at Johnson & Johnson?
⁴     A.   Well, I stayed in that position
⁵ until I left. My title changed after five
⁶ years to assistant general counsel, but
⁷ that didn't impact my responsibilities.
⁸     Q.   Okay. And we have been here
⁹ over the last couple of days,
¹⁰ Mr. O'Shaughnessy, talking with you about
¹¹ your work on talc.
¹²     A.   Yes.
¹³     Q.   Can you help us understand in
¹⁴ terms of all of your responsibilities at
¹⁵ the company how much time you spent on
¹⁶ issues relating to baby powder and talcum
¹⁷ powder?
¹⁸     A.   Yeah, in the context of the
¹⁹ other litigation, I estimate the time I
²⁰ spent on talc was about 8 percent or less.
²¹     Q.   And during the time period that
²² you were at Johnson & Johnson, did you have
²³ the opportunity to work with a number of
²⁴ lawyers outside of the company?

¹     A.   Right. In the position of an
² in-house attorney, of course, you can't
³ handle cases on your own as a law firm --
⁴ as a law firm would do, you know, in
⁵ wherever the law firm is located. So
⁶ Johnson & Johnson is sued basically
⁷ everywhere throughout the United States.
⁸ And we have to hire counsel to handle those
⁹ cases. And some cases, as we know, from
¹⁰ talc, they are repeated and they're more
¹¹ than one. And they become a lot of cases,
¹² what you generally do is you try and work
¹³ with a few firms that develop a specialty,
¹⁴ that understand the product, understand the
¹⁵ people who, you know, produce the product
¹⁶ at the company and, you know, like I said
¹⁷ before, responsible for collecting
¹⁸ documents and that sort of thing so we can
¹⁹ respond to these discovery requests that I
²⁰ have been asked about and that sort of
²¹ thing. So it's very, you know, you have
²² to -- my role in-house was to kind of
²³ manage all of that. So it's a balance of
²⁴ being involved in the day-to-day operations

Page 792

1 so that you understand what's going on, but
2 you have to let go some of that to manage
3 around the country. So you really get to
4 rely on your outside counsel to do a lot of
5 that with you, your coordinating counsel.
6      Q.   What about expert witnesses,
7 Mr. O'Shaughnessy, over the course of your
8 work at Johnson & Johnson, did you have the
9 opportunity to meet and work with any
10 expert witnesses?
11      A.   Yes, like I said, most of my
12 work was on the pharmaceutical and device
13 side and in those cases, you know, we would
14 be working with outside experts retained to
15 provide their opinions on the case, to
16 review what the company has done, and I
17 worked with our outside counsel and I met
18 with those experts, not all of them and not
19 as much as our outside counsel, but I would
20 get to know who we were using. And that
21 kind of, that kind of involvement would
22 become more if the case were proceeding to
23 trial. Because then, you know, all the
24 evidence is being marshaled and there's

Page 793

1 going to be a trial, so you have to arrange
2 for witnesses and that sort of thing. So
3 the work intensified as the cases
4 approached trial.
5      Q.   And what about the scientists
6 and experts inside of Johnson & Johnson,
7 did you have an opportunity over the course
8 of your work as a lawyer to meet with and
9 work with some of those folks?
10      A.   Yeah, I would say that's one of
11 the main functions of, I thought of my job,
12 was to make sure that the information that
13 the company had would get, as far as
14 possible, seamlessly translated to our
15 legal teams so they would be able to defend
16 the cases in court. And so that would mean
17 going with our outside counsel, meeting
18 with the people who, you know, had
19 information about the product, who worked
20 on the product. And in a company like
21 Johnson & Johnson, it's not that easy,
22 because the company is large. These
23 companies in their own right are large.
24 And so there's many employees working on a

Page 794

1 product in different departments. I mean,
2 we spoke about regulatory, R&D, medical, so
3 there's not just one or two people in those
4 departments, there's many. So you try and
5 understand that product within that company
6 and how that company, you know, handled
7 that product.
8           And with respect to my role
9 as an attorney in litigation, litigation
10 touches on all of the areas that the
11 company would have with the product. So
12 the company has lots of contact, as we've
13 seen, with outside agencies and outside
14 entities and although I wouldn't be
15 responsible for the back and forth and what
16 was substantively done, but I had to know
17 what was going on, because those issues
18 would come up in court. So although we had
19 lawyers from Johnson & Johnson, for
20 instance, assigned to regulatory,
21 corporate, trademark, other areas of
22 litigation, I had to make sure that I was
23 aware of anything that could potentially
24 impact the litigation.

Page 795

1      Q.   Do you have any medical or
2 scientific background, Mr. O'Shaughnessy?
3      A.   I do not.
4      Q.   You were asked a lot of
5 questions over the course of these last few
6 days about epidemiology, for example. Do
7 you recall some of those questions?
8      A.   Yes.
9      Q.   In your role as a lawyer for
10 Johnson & Johnson, was it your job to
11 review and evaluate epidemiology regarding
12 the products you were responsible for?
13      A.   No, that would be the company
14 scientists, technical people.
15      Q.   Do you feel qualified as a
16 lawyer to evaluate those kind of scientific
17 issues?
18      A.   No --
19           MR. TISI:  Objection.
20 Mischaracterizes my question. Go
21 ahead.
22           THE WITNESS:  No,
23 clearly not.
24

Page 796

BY MS. BROWN:
Q.   What about do you have any training or expertise in testing talc for asbestos?
A.   No.
Q.   Are you a geologist?
A.   No, no.
Q.   Are you a microscopist?
A.   No.
Q.   Somebody who looks under a microscope at talc to see if there was asbestos?
A.   No, I have no expertise in those areas.
Q.   Are you qualified to look through -- counsel had stacks of what he represented were test results for Johnson's Baby Powder.  Do you recall those stacks and those questions?
A.   Yes, I do.
Q.   Are you qualified as a lawyer to review those stacks of testing results and analyze their meaning?
A.   No.  As a lawyer, we would be

Page 797

dealing with those insofar as the company had to explain them or if they came up in the litigation.  But we would always rely, I would always rely on the company's scientists to explain them.  Because I think I explained at one point, you know, I have been around these companies for a long time and I learned that the testing is sophisticated and it's different and there are different types of testing.  And there are people who are trained to do it who do it at our company who know it way better than I and interpret it, so I would rely on them.
Q.   Mr. O'Shaughnessy, you were asked a lot of questions to which you responded in some way, shape, or form that you couldn't really recall.
A.   Yes.
Q.   Do you know what I'm talking about?
A.   Sure.
Q.   And I imagine that probably happened to a fair amount of questions you

Page 798

have been asked over the past couple of days; is that right?
A.   Yes.
MR. TISI:  Objection, leading.
THE WITNESS:  Yes, I did give that answer on multiple occasions during the deposition, more than I would have liked.
BY MS. BROWN:
Q.   Why do you think it is that you had to answer in that way so many times?
A.   Well, because most of these events that I was questioned about occurred in the area of 30 to 20 years ago.  And I don't have any recollection of them.  In fact, you know, counsel would ask me a question, did you ever do this and I would say I don't recall doing it.  And then they would have a document showing that, well, I did have correspondence here or I did speak to that person.  But even after seeing that correspondence, it didn't click with any recollection I had.

Page 799

And, you know, at this time, I'm dealing with talc, but I'm also dealing with the same kind of issues, discovery, documents, company witnesses, outside counsel in other litigation for, you know, the pharmaceutical side and the medical device side.  So it's very hard to remember and especially when, you know, there were hundreds and thousands of cases.
Q.   Did you do your best, nevertheless, while you were here over the last couple of days to try and recall what you could?
A.   Yes, I did.
Q.   Did you try and do your best to answer everybody's questions truthfully and accurately?
A.   Yes, I tried to the best of my ability to do that.
Q.   Would it be fair for someone to argue that because you said I don't recall a lot, you were trying to hide information?
MR. TISI:  Objection.
MR. PLACITELLA:  I'll

Page 800

1  defer to Tisi's objection.
2          MR. TISI:  It's okay.
3  We can both object.
4          MR. PLACITELLA:
5  Objection.
6          THE WITNESS:  No, I
7  would never try to hide anything
8  and I know it has been -- it seems
9  to me it has been suggested or
10  inferred that I tried to hide
11  information or considered
12  information secret.  I know that
13  term was used.  And that I would
14  prevent information from going to
15  the court or not divulge to the
16  court or not given to outside
17  agencies or anything like that.  I
18  would never do anything to impede
19  information.  I would never do
20  anything to violate the oath I took
21  as a lawyer to tell the truth and
22  to be honest in dealing with
23  outside counsel, opposing counsel
24  and the court.

Page 801

1  BY MR. PLACITELLA:
2      Q.  And let's break that down a
3  little bit if we could, Mr. O'Shaughnessy.
4  You understand the questions that you have
5  been asked over the course of the last
6  couple of days are about really serious
7  issues, right?
8      A.  Absolutely.
9      Q.  And in fact, the work that you
10  did at Johnson & Johnson, did you take it
11  seriously?
12      A.  I did, because I understood the
13  issues were serious then and I understand
14  they're serious now.  And I understand
15  they're serious to the litigants and
16  they're serious to the company.
17      Q.  And in terms of your appearance
18  here at this deposition, how did you come
19  to learn that your presence here for
20  questioning by the Plaintiffs' lawyers was
21  requested?
22      A.  I had a gentleman came to my
23  house, a process server and rang the
24  doorbell and served a subpoena.  Then there

Page 802

1  was some correspondence, dealings with
2  lawyers and I volunteered to go to New
3  Jersey from Pennsylvania, because there's
4  jurisdictional issues about subpoenas and I
5  didn't want to impede it or cause a
6  problem.  So I said look, I'll voluntarily
7  go to New Jersey.  I'll meet your process
8  server and I'll accept service.
9      Q.  Why did you do that?
10      A.  Because I didn't want --
11          MR. TISI:  Objection.
12          MR. PLACITELLA:
13  Objection, scope.  It has nothing
14  to do with this case.
15          MR. TISI:  And in all
16  honesty, I think that may call for
17  some communications that you had
18  with him.  So if you, honestly, if
19  you ask that question, I'm going to
20  ask questions and follow up asking,
21  did you have communications with
22  your lawyers about that.  So you're
23  going to open the door about that.
24          MS. BROWN:  Well, that's

Page 803

1  just not fair.  I'm not opening the
2  door about that at all.  I'm asking
3  you not about anything that you
4  talked to lawyers about.  But why
5  did you make the decision to do
6  what you just described?
7          MR. TISI:  Objection,
8  except to the extent if you're
9  asking -- I'm going to ask him, if
10  any of his decision had any -- in
11  reaching that decision, did he
12  speak with the lawyers.
13          MS. BROWN:  Okay.  I'm
14  going to withdraw the question.
15          MR. TISI:  Thank you.
16          MS. BROWN:  This is not
17  worth it.
18  BY MS. BROWN:
19      Q.  And so, Mr. O'Shaughnessy, over
20  the course of the past couple of days, did
21  you come to kind of understand why the
22  lawyers wanted to talk to you?
23      A.  Yeah, I think in part, I did,
24  yeah, I know.

John O'Shaughnessy

---

Page 804

1  Q.  And what was your impression of
2  the questions being asked of you?
3          MR. TISI:  Objection.
4          THE WITNESS:  Like I
5      said before, these questions were
6      posed to me sometimes with
7      testimony from the employee or for
8      some deposition that I may not even
9      have known about or been employed
10     and then juxtapositioned with a
11     document.  And the inference I
12     think always was that the document
13     or the information in the document
14     or information about testing was
15     being hidden.  And that's what I
16     think they were trying to do with
17     the documents and that wasn't, in
18     your opinion, what was happening
19     with what I was doing with the
20     product.  And I --
21  BY MS. BROWN:
22     Q.  I'm sorry.  Mr. O'Shaughnessy,
23  as it relates to your actions and based on
24  your experience, is it fair and accurate to

---

Page 805

1  suggest that you were part of an effort to
2  keep information secret?
3          MR. TISI:  Objection.
4          THE WITNESS:  That's not
5      accurate and no, it's not fair.
6  BY MS. BROWN:
7     Q.  Okay.  Is it based on your
8  experience and your knowledge, is it fair
9  and accurate to suggest that you tried to
10 give information to courts and to
11 plaintiffs that wasn't truthful?
12         MR. TISI:  Objection.
13         MR. PLACITELLA:
14     Objection to form.
15         THE WITNESS:  No.
16         MR. PLACITELLA:
17     Mischaracterizes.
18 BY MS. BROWN:
19     Q.  You were asked a number of
20 questions, Mr. O'Shaughnessy, about whether
21 or not --
22     A.  You have your notes up on the
23 Elmo.
24     Q.  Sorry, thanks.  This is top

---

Page 806

1  secret.
2          MR. TISI:  But nobody
3      could deliver it as well as you
4      did.
5          MR. PLACITELLA:  It says
6      pick up milk on the way home.
7  BY MS. BROWN:
8     Q.  No, I don't do that.  Clearly
9  that wasn't my note.  We can get back to
10 business here.
11         Mr. O'Shaughnessy, you were
12 asked a number of questions about whether
13 or not you had, quote, "turned over certain
14 documents in certain cases."  Do you
15 remember those questions?
16     A.  I do, yeah.
17     Q.  First of all, were you ever
18 shown any documents about particular
19 requests in individual cases?
20         MR. TISI:  Objection.
21         THE WITNESS:  I was
22     shown the document requests in some
23     of the discovery.
24

---

Page 807

1  BY MS. BROWN:
2     Q.  Do you have a memory, sitting
3  here today, about what specific documents
4  were requested in what individual cases?
5          MR. TISI:  Objection.
6          THE WITNESS:  No, I
7      don't.  And I think I testified to
8      that and, you know, the discovery
9      requests -- no, I don't, and I
10     think I said that.
11 BY MS. BROWN:
12     Q.  And in terms of your role in
13 responding to requests like that, did you
14 take those requests seriously?
15     A.  Yes.  And, you know, we spent a
16 lot of time, we, when I say "we," I mean
17 myself and our outside counsel spent a lot
18 of time, you know, analyzing those
19 requests, developing the response, in a way
20 I testified here with all we did
21 with respect to the company witnesses and
22 documents.  And, you know, really, in light
23 of the current law, because these requests
24 are made in jurisdictions and certain laws

---

Page 808

1  apply to that and there's certain
2  objections that we can and do make and so
3  all of that put together, yeah, and we took
4  it very seriously and we spent a lot of
5  time on it making sure they were accurate.
6      Q.  Did you ever take steps to --
7  strike that.  You were asked questions
8  about a document that I want to show you,
9  if we could have the Elmo now that my notes
10  are gone.
11          MR. TISI:  Did you give
12      me that document, I'm sorry?
13          MS. BROWN:  It's a
14      document Chris used, 456.1.
15          MR. TISI:  I'm sorry,
16      could I just take a look at it?
17      Oh, Chris used it.
18  BY MS. BROWN:
19      Q.  It's the other Chris.  This
20  document was marked as Exhibit 456.1 and it
21  is a document from November 23, 1993, to W.
22  Ashton and D. Jones from R. Denton.  Do you
23  see that?
24      A.  Yes, I remember that.

Page 809

1      Q.  Okay.  And the subject is "Trip
2  Report Talc Validation Team Meeting."  Do
3  you see that?
4      A.  Yes.
5      Q.  And first of all, did this
6  document go to you?
7      A.  No.
8      Q.  Have you ever seen this
9  document before?
10      A.  No.
11      Q.  Okay.  Do you know anything
12  about the contents of this document?
13      A.  No, I never read it.
14      Q.  Okay.  You were shown page 3 of
15  this document and you were asked questions
16  about this highlighted section that has a
17  little asterisk and the word "note."  Do
18  you see that?
19      A.  I do.
20      Q.  Okay.  And you were asked
21  questions about this sentence "The
22  specifics of the mining operation at
23  Hammondsville are uncertain, as most of the
24  pre-Luzenac records were destroyed by the

Page 810

1  mine management staff just prior to the J&J
2  divestiture and the Cyprus purchase.
3  However, several former Hammondsville
4  miners are still employed at the Ham mine,
5  and they provided us with useful
6  information as to the nature of the
7  underground works."  Do you recall
8  questions regarding that paragraph?
9      A.  Yes, I do.
10      Q.  Okay.  And I want to show you a
11  document that counsel didn't show you.  And
12  let's mark this document as Defense 1.
13  Okay.
14          - - - - -
15      (Affidavit of Robert K. Denton
16      marked O'Shaughnessy Exhibit D-1
17      for identification.)
18          - - - - -
19  BY MS. BROWN:
20      Q.  Now, the document --
21          MR. PLACITELLA:  Could I
22      just ask a question?
23          MS. BROWN:  Yes.
24          MR. PLACITELLA:  This

Page 811

1  affidavit dated 11 -- well,
2  October 31, 2018.  Was it ever
3  turned over to me in the course of
4  litigation?  Because it doesn't
5  have any information that you ever
6  turned it over.
7          MR. BERNARDO:  I'll
8  represent, Chris, it's in multiple
9  briefs --
10          MR. PLACITELLA:  That's
11  not the question, whether it's in
12  briefs or not.
13          MR. BERNARDO:  That have
14  been served in the MDL and the
15  other places that you're privy to.
16          MR. PLACITELLA:  The
17  question is --
18          MS. BROWN:  He just
19  answered that.
20          MR. PLACITELLA:  Excuse
21  me.  Was this affidavit ever turned
22  over to me in discovery?
23          MS. BROWN:  He just
24  answered that.

John O'Shaughnessy

Page 812

1      MR. PLACITELLA:  No, he
2  didn't.
3      MS. BROWN:  Yes, it has
4  been filed with the court.  Okay.
5      MR. PLACITELLA:  Where,
6  can you tell me where it was filed?
7      MR. BERNARDO:  Why don't
8  we continue with this examination
9  instead of an examination --
10      MR. PLACITELLA:  Judge,
11  they're asking the witness about an
12  affidavit of a J&J --
13      MS. BROWN:  Hold on,
14  hold on.  It's been used at court.
15  It has been used at trial.
16      MR. PLACITELLA:  Not my
17  trial.  What trial?
18      MS. BROWN:  Let's take a
19  look, if we could,
20  Mr. O'Shaughnessy --
21      MR. PLACITELLA:  Well, I
22  would object to the use of the
23  affidavit or any questions about it
24  when you've had it in your

Page 813

1  possession, you knew you were going
2  to ask it, and you never turned
3  over.
4      MS. BROWN:  Okay.  That
5  is demonstrably false.  It has been
6  attached to a number of filings and
7  it has been used in court.
8      MR. TISI:  But there's
9  no Bates numbers on it.
10      MS. BROWN:  I
11  understand.  We're going to proceed
12  and you can ask whatever you want.
13      MR. PLACITELLA:  So
14  you're representing this affidavit
15  was served upon me as counsel for
16  J&J --
17      MS. BROWN:  I'm
18  representing that this document has
19  been used.
20      MR. BERNARDO:  In your
21  role in the multi-district
22  litigation.
23  BY MS. BROWN:
24      Q.  This is what we have marked as

Page 814

1  Defense Exhibit No. 1.  Do you see that,
2  Mr. O'Shaughnessy?
3      A.  I do.
4      Q.  And the document that counsel
5  showed you was written by a R. Denton.  Do
6  you see that?
7      A.  Yes.
8      Q.  Okay.  And this affidavit, can
9  you tell our jurors who signed and swore to
10  the information in this affidavit?
11      A.  Robert K. Denton.
12      Q.  Okay.  And --
13      MR. PLACITELLA:  Can we
14  ask him if he's ever seen it
15  before?
16  BY MS. BROWN:
17      Q.  Did counsel show you this
18  document during his questioning,
19  Mr. O'Shaughnessy?
20      MR. PLACITELLA:  No, my
21  question was --
22      THE WITNESS:  No, he
23  didn't.
24      MS. BROWN:  Wait,

Page 815

1  wait --
2      MR. PLACITELLA:  No, no,
3  no, please.
4      MS. BROWN:  -- you are
5  interrupting my questioning --
6      MR. PLACITELLA:  Please
7  ask him if he ever saw it before.
8      MS. BROWN:  You are
9  welcome to ask him whatever you
10  want, you are interrupting me and
11  you are suggesting questions out of
12  turn.
13      MR. PLACITELLA:  Okay.
14      MS. BROWN:  Please stop.
15  Now, Mr. O'Shaughnessy,
16  did counsel show you Defense
17  Exhibit 1, Mr. Denton's affidavit,
18  when he was questioning you?
19      THE WITNESS:  No.
20  BY MS. BROWN:
21      Q.  Let's look at paragraph number
22  14.  And would you read to our jurors the
23  information contained in Mr. Denton's
24  affidavit of 2018?

Page 816

1    A.  Paragraph 14 reads "I
2  understand that some attorneys for
3  plaintiffs in talcum powder litigation
4  involving Johnson & Johnson have suggested
5  that the records I described as having been
6  destroyed would have included records and
7  materials related to testing, testing
8  results, talcum powder samples tested,
9  and/or TEM grids of talc and/or talc ore
10  from the Hammondsville mine.  No such
11  records or materials would have been
12  included among the materials that were
13  destroyed."
14    Q.  And in terms of the document
15  that counsel showed you as Exhibit 456.1,
16  is that a document you had ever seen
17  before?
18    A.  I have not.
19    Q.  And in terms of this affidavit
20  with information from Mr. Denton himself,
21  is that something you had ever seen before?
22    A.  No.
23    Q.  Okay.  Do you think it's
24  important, Mr. O'Shaughnessy, when

Page 817

1  considering all documents like this one
2  from 1993 to look at all of the
3  information?
4        MR. TISI:  Objection to
5    form.
6        THE WITNESS:  Yes, I
7    believe so and I was being asked
8    questions about a document that I
9    hadn't seen and I wasn't aware of
10    information that the document had
11    been addressed already in the
12    litigation and the specific
13    questions that Mr. Placitella had
14    had been addressed.  And I couldn't
15    address them, because I had no
16    knowledge about the document.
17  BY MS. BROWN:
18    Q.  Did it happen a lot,
19  Mr. O'Shaughnessy, over the past couple of
20  days that you were shown selected test
21  reports or studies or documents?
22    A.  Yes.
23        MR. PLACITELLA:
24    Objection to the question.

Page 818

1        THE WITNESS:  Yes.
2        MR. TISI:  Yeah,
3    objection to form.
4  BY MS. BROWN:
5    Q.  And, Mr. O'Shaughnessy, in your
6  role as lawyer for Johnson & Johnson, did
7  you review and study and become an expert
8  on every single test result test that was
9  performed on Johnson's Baby Powder?
10    A.  No.
11    Q.  You were shown by counsel
12  Exhibit 230, an affidavit of John Hopkins,
13  do you remember being shown this affidavit?
14    A.  Yes, in that Durham case.
15    Q.  And first of all, tell our
16  jurors, who is John Hopkins?
17    A.  John Hopkins was a toxicologist
18  who was employed by Johnson & Johnson as a
19  scientist.  I believe John was originally
20  employed in the UK and then he came over to
21  New Jersey and was a scientist for the
22  company there.
23    Q.  And just generally, and I don't
24  want to ask you in any particular case, but

Page 819

1  can you tell us generally about your
2  interactions with Dr. Hopkins?
3    A.  Yeah.  As I think I explained
4  before in the testimony, in order to defend
5  the product in litigation, you speak to the
6  people at the company who are experts in it
7  and who know about it, are familiar with
8  all the issues.  And Mr. Hopkins was among
9  the many people at Johnson & Johnson who
10  was familiar with a lot of these issues.
11  And I spoke with him, as did our outside
12  counsel, quite often regarding this
13  litigation.
14    Q.  And you were asked questions
15  about paragraph 3, audits of talc mines
16  conducted by Professor Fred Pooley.  Do you
17  remember that?
18    A.  Right, I do.
19    Q.  And you were asked questions
20  about Dr. Hopkins' statement that the
21  conclusion of the audits was that for both
22  the Italian and Vermont mines, there was
23  zero evidence of asbestos in the geology
24  and mineralogy of the mines.  Do you recall

Page 820

¹ that?
² A. Right, I do.
³ Q. And then you were shown some
⁴ other documents that were put up next to
⁵ this affidavit.
⁶ MR. PLACITELLA:
⁷ Objection. You're using your
⁸ hands.
⁹ BY MS. BROWN:
¹⁰ Q. Do you recall those questions?
¹¹ A. I do.
¹² Q. And one document though you
¹³ were not shown was one of Dr. Pooley's
¹⁴ audits and so I would like to mark as
¹⁵ Defense 2 the document about which Dr.
¹⁶ Hopkins was referring here.
¹⁷ MR. PLACITELLA:
¹⁸ Objection, no basis.
¹⁹ - - - - -
²⁰ (Letter dated 9/28/72 and
²¹ Report Bates JNJTALC000289268 to
²² 359834 marked O'Shaughnessy Exhibit
²³ D-2 for identification.)
²⁴ - - - - -

Page 821

¹ BY MS. BROWN:
² Q. And counsel has an objection to
³ no basis. Do you have a memory of seeing
⁴ any of the test results that counsel for
⁵ the Plaintiffs put in front of you today?
⁶ A. No.
⁷ Q. Do you -- was it your role at
⁸ the company to be an expert on the meaning
⁹ or interpretation of those test results?
¹⁰ A. No, that was for the
¹¹ scientists.
¹² Q. All right. And was Dr. Hopkins
¹³ one of those scientists?
¹⁴ A. Yes.
¹⁵ Q. Okay. And in terms of this
¹⁶ letter, it's dated September 28, 1972, by
¹⁷ Dr. Pooley. And it's a letter to
¹⁸ Dr. Shelley. Do you have a memory of who
¹⁹ Dr. Shelley was?
²⁰ A. I do not, no.
²¹ Q. Okay. Can you read to our
²² jurors the information contained in the
²³ first paragraph of this letter that we've
²⁴ marked as Defense 2?

Page 822

¹ A. It states "The mineralogical
² X-ray and morphological examination of the
³ Italian mine samples has been in progress
⁴ for over a year. The samples were all
⁵ collected under my supervision at the
⁶ Fontana mine, which is the same mine from
⁷ which the Shower to Shower sample was
⁸ obtained."
⁹ Q. Okay. And what information
¹⁰ does Dr. Pooley provide about his own audit
¹¹ that was the subject of Dr. Hopkins'
¹² affidavit?
¹³ A. Reading from the document again
¹⁴ it says "The report of the examination
¹⁵ contains a brief outline of the results
¹⁶ obtained. No chrysotile was found at the
¹⁷ mine or in the samples taken. Some
¹⁸ tremolite was located, but was not
¹⁹ asbestiform in character and has not been
²⁰ detected in 00000 talc imported into Great
²¹ Britain for the past year, nor in shipments
²² dating back to 1949. I hope that it is of
²³ some interest to you. Yours sincerely,
²⁴ Fred Pooley."

Page 823

¹ Q. And one of the things that Dr.
² Pooley notes here is that some tremolite
³ was located, but was not asbestiform in
⁴ character. Do you see that?
⁵ A. I do.
⁶ Q. Are you, Mr. O'Shaughnessy,
⁷ qualified or capable of interpreting test
⁸ results to determine whether or not the
⁹ minerals identified are asbestiform or
¹⁰ nonasbestiform?
¹¹ A. I am not.
¹² Q. And when reviewing testing
¹³ results at Johnson & Johnson, were there
¹⁴ people who were qualified to do that?
¹⁵ A. Yes, of course.
¹⁶ Q. And was Dr. Hopkins one of
¹⁷ those people?
¹⁸ A. Yes.
¹⁹ Q. And what is, and I don't want
²⁰ to ask you about any particular case,
²¹ Mr. O'Shaughnessy, but what was your
²² understanding based on speaking to all of
²³ the experts at the company about the
²⁴ processes that were in place to test talc

John T. O'Shaughnessy

Page 824

¹ for asbestos?
²            MR. TISI:  Objection to
³     form.  Overbroad.
⁴            THE WITNESS:  My
⁵     understanding that the testing was
⁶     voluminous.  It occurred over many,
⁷     many years while the product was on
⁸     the market.  That it was conducted
⁹     both inside by Johnson & Johnson
¹⁰    and by outside entities and
¹¹    laboratories as we discussed today.
¹²    And that that testing was all in
¹³    totality showing that there was no
¹⁴    asbestos in the product.
¹⁵ BY MS. BROWN:
¹⁶    Q.  You were asked -- first of all,
¹⁷ you were shown this exhibit, which counsel
¹⁸ marked as JOS 4 and he wrote, "Secret
¹⁹ equals Alice Blount found asbestos in
²⁰ JBBP."  I think he meant JBP.  Do you see
²¹ that?
²²    A.  I do.
²³    Q.  First of all, do you have a
²⁴ memory of receiving any information about

Page 825

¹ Dr. Blount?
²    A.  No, I don't.  I think I
³ testified to that.  I don't recall it.
⁴    Q.  Do you have a memory of any
⁵ specific analysis of Dr. Blount's purported
⁶ findings?
⁷    A.  I do not.
⁸    Q.  Sitting here today, can you
⁹ remember the specifics of anything that Dr.
¹⁰ Blount may have claimed to have found?
¹¹    A.  I don't.
¹²    Q.  Okay.  What is your
¹³ understanding generally about how you dealt
¹⁴ with information like the letter regarding
¹⁵ Alice Blount?
¹⁶    A.  I believe I testified that, you
¹⁷ know, I have no recollection of it, but
¹⁸ issues such as this, it would have been our
¹⁹ practice to discuss it with the company
²⁰ people and I say "us," I would say, you
²¹ know, outside counsel who sent me the
²² information and myself.
²³    Q.  You were asked -- and would
²⁴ you, Mr. O'Shaughnessy, make a personal

Page 826

¹ determination about whether or not this
² statement is true, Alice Blount found
³ asbestos?
⁴    A.  No.
⁵    Q.  Who would be in charge of
⁶ something like that?
⁷    A.  That type of information would
⁸ be assessed like other scientific
⁹ information by the scientists.
¹⁰    Q.  Okay.  And even though you
¹¹ don't have a perfect recollection about
¹² what happened here with this Blount letter,
¹³ what was the practice in terms of that
¹⁴ evaluation?
¹⁵            MR. TISI:  Objection to
¹⁶    form.
¹⁷            THE WITNESS:  Well, the
¹⁸    company would always examine --
¹⁹    from time to time the company had
²⁰    reports of talc in -- its talcum
²¹    powder containing asbestos and it's
²²    my understanding that what they did
²³    was they would look into those and
²⁴    examine and determine for

Page 827

¹    themselves how they assessed
²    whether that was accurate, reliable
³    or not.
⁴ BY MS. BROWN:
⁵    Q.  And you were asked a number of
⁶ questions about whether you took the
⁷ information contained in a letter from your
⁸ lawyer and relayed it to entities like the
⁹ NTP.  Do you recall those questions?
¹⁰    A.  I do, yes.
¹¹    Q.  And I know you don't recall a
¹² ton of the specifics about Dr. Blount, but
¹³ do you recall generally, were her purported
¹⁴ findings published?
¹⁵            MR. PLACITELLA:
¹⁶    Objection to form.
¹⁷            THE WITNESS:  I think,
¹⁸    yes, I think there was a
¹⁹    publication in 1991 by Dr. Blount.
²⁰ BY MS. BROWN:
²¹    Q.  And I want to show you a
²² document that we'll mark as Defense
²³ Exhibit 3.  This is a document that we've
²⁴ marked as Defense Exhibit 3 and it is on

Page 828

1 CTFA letterhead, the Cosmetic, Toiletry,
2 and Fragrance Association.  Do you see
3 that?
4        A.  I do.
5             - - - - -
6        (Letter dated 3/18/02 Bates
7        JNJTALC00109268 to 109278 marked
8        O'Shaughnessy Exhibit D-3 for
9        identification.)
10            - - - - -
11 BY MS. BROWN:
12       Q.  And do you know generally what
13 the CTFA is?
14       A.  Like we discussed, it was an
15 industry group for companies in that
16 industry of cosmetics, toiletry, and
17 fragrances.
18       Q.  And it is a letter to whom,
19 Mr. O'Shaughnessy?
20       A.  This is a letter to Dr. Kenneth
21 Olden who is the director of the National
22 Toxicology Program of the National
23 Institute of Environmental Health Services.
24       Q.  Okay.  And would you tell our

Page 829

1 jurors what information is contained in the
2 second paragraph?
3        A.  I'll read it.  It says "In an
4 attempt to clarify issues that were raised
5 in the initial Draft Background Document in
6 discussion at the RoC subcommittee meeting
7 and in your letter of July 9, we have
8 completed an updated review and analysis of
9 the literature.  Our findings include some
10 90 studies, articles, and commentaries,
11 more than 50 of which (the ones preceded an
12 asterisk) that are not referenced in the
13 initial DBD," which is the Draft Background
14 Document.  "While not all of the additional
15 references may meet NTP criteria for use in
16 a DBD, we believe they provide useful
17 information relevant to the subject
18 matter."
19       Q.  And in terms of the 50 studies,
20 articles, or commentaries that had an
21 asterisk and were not referenced by the NTP
22 but were provided by the CTFA, would you
23 tell our jurors what number 55 was?
24       A.  Number 55 was an article

Page 830

1 authored by Blount and Vassiliou, 1983,
2 Identification of chlorite and serpentine
3 in cosmetic or pharmaceutical talc.
4 Published in the Environmental Health
5 Perspect.  I don't know the correct title
6 of that publication.
7        Q.  And would you have been the
8 person, Mr. O'Shaughnessy, to have
9 scientific discussions with the NTP about
10 references like the ones contained in this
11 letter?
12       A.  No.
13       Q.  You were asked a lot of
14 questions about whether the Blount letter
15 went to the FDA, went to the NTP, would you
16 have been the person to engage in those
17 kind of scientific discussions?
18       A.  No, that was not my role.
19       Q.  Did you attend the public NTP
20 hearings and participate in scientific
21 debate and discussions about references
22 including those cited on this list?
23       A.  I went to that one meeting and
24 I forget which meetings it was, NTP, but I

Page 831

1 went as an observer to keep my myself
2 abreast of what was going on.
3        Q.  Was it your role as a lawyer
4 for Johnson & Johnson to be the person
5 engaging in scientific discussions with
6 regulators?
7        A.  No.
8        Q.  And do you have firsthand
9 knowledge or would you about how the NTP,
10 what the NTP did with this information?
11       A.  No.
12       Q.  You were asked a number of
13 questions about an affidavit that was
14 prepared by Mr. Ashton regarding the
15 Johnson mine in Vermont.  Do you recall
16 that?
17       A.  Yes.
18       Q.  And first of all, can you tell
19 our jurors just generally who Mr. Ashton
20 was?
21       A.  Mr. Ashton was an employee of
22 the company for a number of years and as I
23 knew him, he was primarily devoted to the
24 research of geology and mineralogy related

John C. Shaughnessy

Page 832

1 to talc on behalf of the company.
2    Q.  And you were shown a multi-page
3 affidavit by Mr. Ashton stating that
4 there's no asbestos in the Johnson mine and
5 providing his support for that statement.
6 Do you recall that?
7    A.  Yes.
8    Q.  Okay.  And to the best of your
9 knowledge, did Johnson & Johnson ever use
10 talc from the Johnson mine in its baby
11 powder?
12    A.  No, that was used for
13 industrial talc.
14    Q.  And to the best of your
15 knowledge, were the sources cited in
16 Mr. Ashton's affidavit truthful and
17 accurate?
18    A.  Yes, they were published
19 sources, yes.
20    Q.  And to the best of your
21 knowledge, were the statements made in
22 Mr. Ashton's affidavit truthful and
23 accurate?
24    A.  Yes.

Page 833

1         MR. TISI:  Objection.
2 BY MS. BROWN:
3    Q.  You were shown a bunch of
4 snippets from other people's depositions
5 regarding the Johnson mine.  Do you
6 remember that?
7    A.  Yes, I do.
8    Q.  First of all, do you have any
9 idea who those folks are?
10    A.  No.
11    Q.  Do you know if they were being
12 paid by plaintiffs' lawyers in litigation?
13         MR. PLACITELLA:
14    Objection, there's no basis for
15    that and you know it.
16         MS. BROWN:  It's
17    actually in the transcript, we can
18    look at it.
19         MR. PLACITELLA:  Dr.
20    Hemstock was being paid by the
21    plaintiffs' lawyer?
22         MS. BROWN:  Dr. Gale.
23    Dr. Gale was a paid expert.
24         MR. PLACITELLA:  Who?

Page 834

1 BY MS. BROWN:
2    Q.  Dr. Gale.  We'll get to it.
3 Relax.  Do you have any information about
4 who those folks were?
5    A.  No.
6    Q.  What their role was in
7 litigation?
8    A.  No.
9    Q.  Have you ever reviewed the
10 totality of those transcripts?
11    A.  No.
12    Q.  You were shown a transcript,
13 which was at Exhibit 436, and it was a
14 deposition, I'm going to have to take this
15 out of here, just a second.  You were shown
16 a deposition of Peter Gale.  Do you recall
17 that generally?
18    A.  Yes.
19    Q.  I mean, do you have any idea
20 who Peter Gale is?
21    A.  I do not.
22    Q.  You were shown some selected
23 testimony about Mr. Gale's purported
24 finding of asbestos in talc.  Do you

Page 835

1 remember that?
2         MR. PLACITELLA:
3    Objection to the form.
4         THE WITNESS:  I remember
5    being shown excerpts, yes.
6 BY MS. BROWN:
7    Q.  And you never read the totality
8 of this deposition?
9    A.  No, never.
10    Q.  I mean, do you think it's
11 important if you're going to comment or
12 question about somebody's sworn testimony
13 to read and consider the whole thing?
14         MR. TISI:  Objection.
15         MR. PLACITELLA:
16    Objection.
17         THE WITNESS:  Well,
18    depositions are usually lengthy, as
19    we know from my experience here.
20    And there's a lot of testimony, so
21    in order to have the context of it,
22    that is certainly something you
23    need to do.
24

Page 836

¹ BY MS. BROWN:
²     Q.  And I want to show you a part
³ of -- as it relates to -- you were shown
⁴ some testimony about a purported finding of
⁵ asbestos.  Do you remember that?
⁶     A.  Yes.
⁷         MR. PLACITELLA:
⁸     Objection to form.
⁹ BY MS. BROWN:
¹⁰     Q.  And I want to show you some
¹¹ other testimony that in fairness, sir, you
¹² weren't shown.  And could you read starting
¹³ at line 8, the question that Mr. Gale was
¹⁴ asked at the end of his deposition when the
¹⁵ other lawyers had a chance to question.
¹⁶     A.  Question:  "Is it possible that
¹⁷ an element that you may have identified as
¹⁸ chrysotile by using the earlier two methods
¹⁹ that you talked about and not performing an
²⁰ elemental analysis, could after elemental
²¹ analysis be determined to be something
²² other than chrysotile?"
²³         There was an objection and
²⁴ then the witness answered "That is a

Page 837

¹ possibility."
²     Q.  And continuing on, what about
³ the next question?
⁴     A.  Question:  "Did you recommend
⁵ that Engelhard pursue further analysis of
⁶ these samples along the lines that you've
⁷ identified?"
⁸     Q.  And what was --
⁹     A.  There was an objection and the
¹⁰ answer was no.
¹¹     Q.  Okay.  And so in terms of the
¹² snippet of the testing results that you
¹³ were shown from Mr. Gale, are you in a
¹⁴ position to evaluate the accuracy or the
¹⁵ significance of those?
¹⁶     A.  No.
¹⁷     Q.  Do you defer to somebody else
¹⁸ for that kind of stuff?
¹⁹         MR. PLACITELLA:
²⁰     Objection to form.
²¹         THE WITNESS:  Anything
²²     with respect to scientific findings
²³     and testing, I would defer to the
²⁴     scientists.

Page 838

¹ BY MS. BROWN:
²     Q.  You were -- when you were being
³ asked some questions about test results,
⁴ there was something you wanted to explain
⁵ about what you were thinking when you were
⁶ looking at them and there was an objection
⁷ and a motion to strike your answer.  And so
⁸ I want to give you the opportunity to
⁹ explain to our jurors, when you were
¹⁰ looking at that backup data and you were
¹¹ looking at those test results, was there
¹² something you wanted to continue on in your
¹³ answer?
¹⁴         MR. TISI:  Objection.
¹⁵     Improper question.
¹⁶         THE WITNESS:  I believe
¹⁷     so.  And that is, you know, being
¹⁸     shown, and I think I specifically
¹⁹     said my eyes were glazing over,
²⁰     because I have no way of
²¹     interpreting those documents.  I
²²     rely on the scientists and, you
²³     know, they were shown to me along
²⁴     with maybe deposition transcript

Page 839

¹     quotes and things of that nature.
²     And to me, they were -- they were
³     totally different from each other.
⁴     One was testimony and one was some
⁵     scientific document.  And I had no
⁶     way based on my experience to and
⁷     lack of expertise to correlate the
⁸     two.  And so I was asked questions
⁹     about that and I couldn't answer
¹⁰     them.
¹¹ BY MS. BROWN:
¹²     Q.  Who do you think would be
¹³ better able to answer those kind of
¹⁴ questions?
¹⁵         MR. PLACITELLA:
¹⁶     Objection to form.
¹⁷         THE WITNESS:  The people
¹⁸     at the company who actually perform
¹⁹     the testing and dealt with it and
²⁰     are familiar with it.
²¹ BY MS. BROWN:
²²     Q.  Do you believe, sitting here
²³ today, Mr. O'Shaughnessy, that the
²⁴ statements that were made to courts and

Page 840

¹ plaintiffs during the time period that you
² worked at Johnson & Johnson were truthful
³ and accurate?
⁴     A.  They were truthful and
⁵ accurate, yes.
⁶     Q.  You were asked two days ago
⁷ about what was marked as Exhibit 74 to your
⁸ deposition, a memo dated January 24, 1995,
⁹ from Neal Matheson and the subject was
¹⁰ proposal for a new talc study.
¹¹     A.  I recall --
¹²          MR. TISI:  Objection,
¹³     misstates the document.  It's not
¹⁴     from Neal Matheson.  It's to Neal
¹⁵     Matheson.
¹⁶ BY MS. BROWN:
¹⁷     Q.  Oh, that's fair.  Hold on.
¹⁸ Let's get this right.  You were shown
¹⁹ Exhibit 74 dated January 24, 1995, and it
²⁰ is a letter from Donald Jones to Neal
²¹ Matheson and the subject is proposal for
²² new talc study.  Do you remember that?
²³     A.  I do.
²⁴     Q.  And you were asked really a lot

Page 841

¹ of questions about this proposed new talc
² study.  Do you remember those?
³     A.  Yes.
⁴     Q.  Was it your role at the company
⁵ as a lawyer for Johnson & Johnson to
⁶ evaluate the proprietary of a proposal for
⁷ a study?
⁸          MR. TISI:  Objection.
⁹          THE WITNESS:  No.
¹⁰ BY MS. BROWN:
¹¹     Q.  Were you involved in your role
¹² as a lawyer for Johnson & Johnson in
¹³ discussions about the potential merits or
¹⁴ lack thereof of any scientific study
¹⁵ proposal?
¹⁶     A.  No, I had no role in that
¹⁷ process.
¹⁸     Q.  And I think how we got to this
¹⁹ is that there's a list of people who are
²⁰ carbon copied here, right?
²¹     A.  Yes.
²²     Q.  And that's, like, not a thing
²³ anymore, but it means that a copy was sent
²⁴ to you, right?

Page 842

¹     A.  It does, yeah.
²     Q.  Okay.  And a lot of the
³ documents you were shown had you sort of
⁴ cc'd.  Do you remember that?
⁵     A.  Yes.
⁶     Q.  And lot of them dealt with
⁷ scientific or epidemiology issues.  Do you
⁸ remember those questions?
⁹     A.  Yes, I do.
¹⁰     Q.  Was your understanding -- what
¹¹ was your understanding as to why you were
¹² copied on those types of documents?
¹³          MR. TISI:  Objection.  I
¹⁴     think you should rephrase the
¹⁵     question, because I think it may
¹⁶     call for attorney work product and
¹⁷     attorney-client privilege and if
¹⁸     you open the door, I'm going to go
¹⁹     through it.
²⁰          MS. BROWN:  This has
²¹     nothing to do with talking to
²²     lawyers.
²³          MR. TISI:  Well, I think
²⁴     you have to preface it.

Page 843

¹ BY MS. BROWN:
²     Q.  What was your understanding of
³ your role as it relates to issues like this
⁴ proposal for a new talc study?
⁵     A.  I believe I testified my role
⁶ is, as you know, an attorney for the
⁷ company, and the company, these people knew
⁸ I was handling litigation and I would often
⁹ be copied on materials that they thought
¹⁰ might be relevant to that and that's why I
¹¹ would get it.
¹²          MR. TISI:  Objection to
¹³     move to strike as being
¹⁴     speculative.
¹⁵ BY MS. BROWN:
¹⁶     Q.  Did you understand there to be
¹⁷ a suggestion that Johnson & Johnson was
¹⁸ purposefully not funding a study because it
¹⁹ was trying to hide a dangerous product?
²⁰     A.  I think the theme here that I'm
²¹ picking up in the litigation on behalf of
²² the Plaintiffs is that Johnson & Johnson
²³ somehow hid information regarding science,
²⁴ regarding talc.

Page 844

1  Q.  And based on your experience
2  and your participation in things like the
3  talc steering committee, is that truthful
4  and accurate?
5  MR. TISI:  Objection.
6  THE WITNESS:  No, based
7  on my experience, no.
8  BY MS. BROWN:
9  Q.  And so you were asked a ton of
10  questions about this particular proposal
11  for a new study and if we look at some
12  additional information provided under cost
13  and timing, would you tell our jurors how
14  many people this proposed study sought to
15  evaluate?
16  A.  The document reads, "The study
17  is expected to require two-plus years and
18  report 171 cases and 171 controls."
19  Q.  And the date of this proposal
20  for a study of approximately three- or 400
21  people is what?
22  A.  The date on the memo is
23  January 24, 1995.
24  Q.  Okay.  And what I would like to

Page 845

1  mark as Exhibit 4 to your deposition is a
2  chart, I'll represent to you, of studies,
3  case control studies that were published
4  during the years 1992 to 1999.  Do you see
5  that?
6  A.  I do.
7  - - - - -
8  (Case Control Studies that were
9  Published from 1992 to 1999 marked
10  O'Shaughnessy Exhibit D-4 for
11  identification.)
12  - - - - -
13  BY MR. PLACITELLA:
14  Q.  And first of all, in terms of
15  your role as a lawyer, were you in charge
16  of evaluating the significance or findings
17  of these epidemiology studies?
18  A.  No.
19  Q.  When you were asked a ton of
20  questions about this proposal for a new
21  study in 1995, were you involved in any
22  discussions about how the 1995 study
23  proposal compared to the two studies that
24  were published in 1995?

Page 846

1  A.  No.
2  Q.  Were you involved in any
3  discussions about whether or not the case
4  control studies that were published in 1995
5  were bigger or better or more significant
6  than the proposal Johnson & Johnson
7  received?
8  A.  No.
9  Q.  Do you have any information
10  about whether or not the studies from 1992
11  to 1999 that were published studied more,
12  less, or the same amount of women that were
13  referenced in the study proposal?
14  A.  I don't -- I don't know.
15  Q.  Were those discussions you
16  would have been involved in as a lawyer at
17  Johnson & Johnson?
18  A.  No, no.
19  Q.  Do you have any information
20  about the scientific merits of the proposed
21  study versus studies that were done during
22  that time period or before?
23  A.  No, I do not.  That's well
24  beyond my expertise.

Page 847

1  Q.  Were you shown any of the
2  prospective cohort studies that were done,
3  for example, the Nurses' Health Study or
4  the Women's Health Initiative?
5  A.  During the deposition, no.
6  Q.  Are you aware generally that
7  there were a number of government-funded
8  prospective or forward-looking studies that
9  were done throughout the '90s and the
10  2000s?
11  A.  Yes.
12  Q.  Okay.  And were you involved in
13  any discussions at Johnson & Johnson about
14  how the strength of those studies and the
15  size of those studies compared to the
16  proposed study that you were shown at
17  Exhibit 74?
18  A.  No.
19  Q.  Okay.  And in terms of
20  evaluating and understanding the
21  significance of those prospective
22  government-funded studies, is that
23  something you would be involved in as a
24  lawyer for Johnson & Johnson?

John T. O'Shaughnessy

Page 848

1   A.  No, again, that would be the
2   scientists at the company.
3   Q.  If Plaintiffs' lawyers really
4   wanted to understand the scientific merits
5   or lack thereof of this 1995 proposed case
6   control study, are you the person they
7   should talk to?
8   A.  No.
9       MS. BROWN:
10  Mr. O'Shaughnessy, thank you so
11  much for your patience and for
12  taking the time to answer my
13  questions.  I appreciate it.
14      THE WITNESS:  Thank you.
15      MR. PLACITELLA:  So what
16  do you want to do here?
17      MS. BROWN:  Let's go.
18      MR. PLACITELLA:  Do you
19  want to take a break?
20      MS. BROWN:  Oh, yeah,
21  let's take five minutes.
22      THE VIDEOGRAPHER:  Off
23  the record, 5:33.
24      - - - - -

Page 849

1   (A recess was taken at this time.)
2       - - - - -
3       THE VIDEOGRAPHER:  We
4   are back on the record at 5:51 p.m.
5   BY MR. TISI:
6   Q.  All right.  Mr. O'Shaughnessy,
7   I'm going to try to be as quick as and
8   efficient as I can.  I promised you when I
9   was on a break.
10  A.  Thank you.
11  Q.  But I am going to jump around a
12  little bit, because I'm following the J&J
13  lawyer's questions.
14  A.  I understand.
15  Q.  So if for some reason I kind of
16  bear quickly to the right and you don't see
17  where, I'm going to ask you to let me know
18  that.  Okay?
19  A.  I will.
20  Q.  All right.  So let's just start
21  kind of refocusing.  I would like to really
22  reset a little bit what I really was asking
23  you in the direct examination.  Did I ask
24  you any questions about, you know, how many

Page 850

1   people would be enrolled in the study, in a
2   study or, you know, what statistical
3   analyses would be done and all of those
4   things?  Did I ask you any of those
5   questions?
6       A.  I don't believe you did.
7       Q.  Okay.  What I asked you about
8   was in the 1990s when you first started to
9   be involved in the Worldwide Talc Steering
10  Committee, I asked you these questions.
11  And I'm really going to come back to these
12  questions.  I asked you whether there were
13  proposals on the table that women would be
14  warned of the risk, the potential risk of
15  ovarian cancer.  Remember those questions?
16      A.  I do.
17      Q.  I asked you whether or not
18  women would be instructed not -- whether it
19  was reasonable for women to be told not to
20  use talc, you know, in their genital area.
21  Do you remember those questions?
22      A.  Questions along those lines.
23      Q.  I asked you whether or not
24  there were proposals out there in realtime,

Page 851

1   not made up by the lawyers, right,
2   proposals by scientists and researchers,
3   including the American Cancer Society, that
4   women -- that women not use talcum powders,
5   but switch to cornstarch products.  Do you
6   remember those?
7       A.  I recall you showing me some
8   documents that stated things like that.
9       Q.  Correct.  And then I also asked
10  you whether or not there was in realtime,
11  not by me, not by Mr. Placitella --
12      A.  I don't know what you mean by
13  realtime.
14      Q.  In realtime, in the 1990s.
15      A.  Okay.
16      Q.  Okay.  I asked you whether or
17  not in realtime, not by lawyers, because
18  there wasn't even ovarian cancer cases at
19  that time, right?
20      A.  I don't believe there were.
21      Q.  Okay.  I asked you whether or
22  not there were proposals about studying
23  ovarian cancer made directly to Johnson &
24  Johnson.  Do you remember that?

Page 852

1    A.  I don't, Mr. Tisi.  Maybe it's
2 just a fog up --
3    Q.  Well, I asked -- I'm sorry.  I
4 asked you whether or not, remember I showed
5 you a study not for the purposes of asking
6 you whether it was good study or a bad
7 study, I asked you whether or not the
8 conclusion of the study was do more
9 studies.  And that was the Gross paper,
10 remember that?
11    A.  You had me read from papers and
12 Gross was one of them.
13    Q.  Right.  And I asked you to look
14 at the Harlow paper and what I really
15 pointed out to you was the suggestion that
16 women be told not to use talc in light of
17 what was known at that time?
18    A.  I remember you -- we discussing
19 the Harlow paper.
20    Q.  Right, so all the questions
21 that the lawyer for Johnson & Johnson asked
22 you about study designs and all those kinds
23 of things, those weren't questions I asked
24 you, were they?

Page 853

1        MS. BROWN:  Objection to
2    the form.
3        THE WITNESS:  The
4    question that she asked me, was I
5    familiar with that or did I play a
6    role in it.
7 BY MR. TISI:
8    Q.  Okay.  So let's kind of refocus
9 on where I was really asking you, because I
10 understand that there are other people who
11 are scientists at Johnson & Johnson,
12 correct?
13    A.  Yes.
14    Q.  And I asked you, for example,
15 with respect to the study proposal by Dr.
16 Muscat, whether or not the scientists
17 recommended that the study be done.  Do you
18 remember those questions?
19    A.  I remember and there was some
20 documents.
21    Q.  Right.  And there was some
22 documents that said, you know, we've looked
23 at the study, it looks like a really great
24 study.  In fact, the words that were used

Page 854

1 were "definitive," "important," all of
2 those questions --
3    A.  I remember those.
4    Q.  And I made a long list of those
5 questions, right?
6    A.  You did.
7    Q.  I didn't ask you whether or not
8 you found it to be definitive, important,
9 substantive, all those adjectives, did I?
10    A.  You had me read from the
11 document.
12    Q.  Right.  The document written by
13 the scientists?
14        MS. BROWN:  Objection.
15    Misstates the document.
16        THE WITNESS:  I forget
17    who authored it.
18 BY MR. TISI:
19    Q.  Okay.  It was Mr. Jones, but
20 we'll look at that really quickly.
21    A.  Okay.
22    Q.  But in fairness to both you and
23 me, I was focusing my questions on what
24 nonscientific recommendations were made out

Page 855

1 there.  Okay.  So let me ask you this
2 question.  When I asked, counsel asked you,
3 the lawyer for J&J asked you about
4 forward-looking and backward-looking
5 studies.  Do you remember her questions
6 about forward looking and backward looking.
7 Do you remember those?
8    A.  She mentioned the studies, yes.
9    Q.  Right.  A cohort study by --
10 funded by the government, right?
11    A.  Yes.
12    Q.  Do you remember she asked you
13 those questions?
14    A.  Yes.
15    Q.  Okay.  Let's talk about those
16 for a moment.  Did counsel ask you
17 questions about the cohort studies?  For
18 example, whether or not the studies funded
19 by the government were even designed to
20 look initially to look at the risk of
21 ovarian cancer and the relationship to
22 talc?
23    A.  No, I don't think Ms. Brown
24 asked me that.

Page 856

1   Q.   All right.  Did she ask you how
2  many people within the cohort actually had
3  ovarian cancer?
4       A.   I don't recall -- I'm sorry,
5  she did not ask me that detail.
6       Q.   She didn't ask you, for
7  example, what the women in the cohort were
8  asked about their exposure to talc or when
9  they were asked, did she?
10      A.   No.
11      Q.   Okay.  And so the question
12 about whether the cohort studies are better
13 than case control studies are best left to
14 the epidemiologists, correct, and the
15 scientists?
16      A.   Yes, yes.
17      Q.   So the scientific question,
18 okay, is one that I wasn't asking you, in
19 all fairness to me, I was asking you
20 whether or not the company was told to
21 initiate studies and we looked at documents
22 that indicated that there were -- that
23 scientists were saying there's a concern
24 about ovarian cancer and talc, correct?

Page 857

1       MS. BROWN:  Object, that
2       misstates the testimony and the
3       evidence.
4       THE WITNESS:  Yeah, you
5       know, we discussed these issues, I
6       just don't know, I don't have a
7       clear memory of the exact
8       questions, but yeah, I follow you.
9  BY MR. TISI:
10      Q.   And then I asked you whether or
11 not it came to your personal attention that
12 after the meeting at the FDA in January
13 of two thousand -- excuse me, 1994, whether
14 or not scientists came to J&J and proposed
15 a study.  Do you remember that?
16      A.   I don't remember specifically,
17 but I'll accept, you know --
18      Q.   Well, it's the Muscat study.
19      A.   Okay.
20      Q.   So in 1995 --
21      A.   There was -- I'm sorry, I
22 didn't want to interrupt you.
23      Q.   I'm sorry, in 1995, you
24 received a memo that recommended that the

Page 858

1  Muscat study be done?
2       MS. BROWN:  Objection,
3       misstates the evidence and lacks
4       foundation.
5       THE WITNESS:  I take
6       your word for it.  I was copied on
7       some things and some things I was
8       shown that I wasn't -- I had no --
9       I wasn't part of it and I didn't --
10 BY MR. TISI:
11      Q.   Well, would you bring up
12 Exhibit No. 74, please.
13      A.   -- analyze.
14      Q.   Because, again, I want to be
15 fair to you.
16      A.   No, no, you know, you're asking
17 me questions about the testimony yesterday.
18      Q.   I have no problem --
19      A.   It's kind of a jumble, but that
20 will be fine.  And I understand what you're
21 doing, so that's fine.
22      Q.   Yeah.  No, I do want to be fair
23 to you, because I don't want there to be
24 any suggestion that I was unfair to you, as

Page 859

1  a lawyer to a lawyer, about scientific
2  questions.  So let's look at the document
3  that was sent to you as a lawyer.  Okay.
4  So let's look at Exhibit No. 74 again.
5       A.   Okay.
6       Q.   And I've put it up on the
7  screen.  And this document indicates that,
8  the first paragraph says "This recommends
9  that J&J sponsor a new highly structured
10 epidemiology study focused to examine the
11 possibility that talc can lead to increased
12 risk of ovarian cancer."  That's a document
13 you received, correct?
14      A.   I believe I was copied on it.
15 You showed that to me.
16      Q.   And that follows the Gates --
17 the Gross study which published that
18 additional studies need to be done,
19 correct?
20      A.   I remember you going through
21 that, yes.
22      Q.   And remember I showed you an
23 email from Dr. Gettings that he spoke to
24 the FDA and they said additional work

John O'Shaughnessy

Page 860

1  needed to be done, correct?
2      A.   Yes.  I don't recall exactly
3  what it was.
4      Q.   So in the context of what was
5  really happening in realtime, okay, there
6  was a general feeling that there was this
7  concern out there for women who have the
8  potential of getting ovarian cancer from
9  talc and a suggestion that additional
10 studies be done?
11     A.   In those documents, yes.
12     Q.   All right.  And the words that
13 I pulled out of this document were words
14 that are actually in the document.  Things
15 like potentially significant.  This would
16 be a definitive treatise.  All those words
17 that I wrote down for you, okay, were words
18 that I didn't use, they were words that
19 were in a document that you got, true?
20     A.   You did do that, yes.
21     Q.   Okay.  So I didn't make that
22 up, did I?
23     A.   No, you took the words from a
24 document and put them on that machine there

Page 861

1  and wrote them down.
2      Q.   Okay.  And kind of anticipating
3  that Ms. Brown would ask you about all the
4  other studies that came after that, would
5  it surprise you that I asked Dr. Muscat
6  that very question about whether or not at
7  some point later in time, you know, that
8  maybe a cohort study might have been a
9  better thing and did he ever at some later
10 time suggest that the company do that?
11 Would that surprise you that when you --
12     A.   I'm not following that
13 question.
14     Q.   All right.
15         MS. BROWN:  Objection.
16 BY MR. TISI:
17     Q.   One of the things that counsel
18 asked you was whether or not you should
19 look at the entire depositions of -- to
20 address multiple issues, right?  Do you
21 remember --
22     A.   Well, to understand the
23 testimony.
24     Q.   Correct.  And sometimes when

Page 862

1  you're asking a witness questions, just
2  like we've done for you over a couple days,
3  we would do one topic here, one topic
4  there, we cover a lot of ground, right?
5      A.   Certainly with me you did.
6      Q.   With you, we did.  And I'll
7  tell you, I covered the same ground with
8  Dr. Muscat and I asked him the questions of
9  whether or not these forward-looking
10 studies was something that even in
11 retrospect, you know, he wishes that he
12 would have suggested.  So I'm going to play
13 that for you.  Could you look at Exhibit
14 No. 80?  Can you please play the second
15 clip that I pulled from Dr. Muscat,
16 Exhibit 82.
17         MS. BROWN:  I object on
18 foundation grounds.
19         MR. PLACITELLA:  It
20 doesn't look like Susan Sharko.
21         MR. TISI:  Are we able
22 to show Exhibit 82, the video clip?
23         THE VIDEOGRAPHER:  Mike
24 is playing it.  I don't see it.

Page 863

1          MR. TISI:  Is Mike
2  there?
3          THE VIDEOGRAPHER:  Yeah,
4  he put up the document.
5          MR. TISI:  It's not a
6  document.
7          THE VIDEOGRAPHER:  He
8  put up the last thing.
9          MR. TISI:  I don't see
10 it.
11         THE VIDEOGRAPHER:  I
12 don't know.
13 BY MR. TISI:
14     Q.   Well, would it surprise that
15 you even in retrospect, Dr. Muscat said
16 look, I didn't propose a cohort study, the
17 best study I could think of was a case
18 control analysis?
19         MS. BROWN:  That
20 misstates his testimony and lacks
21 foundation.
22         THE WITNESS:  Surprise
23 isn't a word I would use.  I don't
24 have a reaction to it since I'm not

Page 864

1  familiar with the issues.
2  BY MR. TISI:
3      Q.  Okay.  Now --
4          MR. TISI:  Could you put
5  it up on the screen?
6          - - - - -
7      (Whereupon video clip was played.)
8          - - - - -
9          (Muscat Video Clip marked
10  O'Shaughnessy Exhibit 82 for
11  identification.)
12          - - - - -
13  BY MR. TISI:
14      Q.  Let's stop there.
15          MS. BROWN:  I'm
16  objecting to the playing of this --
17          MR. TISI:  Do you see
18  where I asked him -- I'm sorry, do
19  you want to object?
20          MS. BROWN:  I do want to
21  object to just playing portions of
22  somebody else's deposition into the
23  record.  He has never reviewed
24  that --

Page 865

1  BY MR. TISI:
2      Q.  That's fine.  In light of
3  Ms. Brown's questions to you about whether
4  or not maybe a cohort study might have been
5  a better design, you understand that doctor
6  and I know you're not a doctor, an
7  epidemiologist or a doctor, but the
8  epidemiologist that J&J had retained, you
9  saw his testimony, he never recommended a
10  cohort study, did he?
11      A.  I don't know what would be the
12  better design or a better study to do.  I
13  don't think Ms. Brown asked me that
14  question and I can't comment on what, you
15  know, Dr. Muscat said.  His testimony
16  speaks for itself.
17      Q.  Right?
18      A.  And I'm familiar with it or
19  aware of it and I would defer to the
20  scientists.
21      Q.  Right.  And in fairness to me,
22  I never raised the question of cohort
23  study.  That was a question that was asked
24  by your counsel, correct?

Page 866

1          MS. BROWN:  I object to
2  the question.
3          THE WITNESS:  She
4  certainly asked me that.  I don't
5  know if it came up during the
6  deposition.
7  BY MR. TISI:
8      Q.  All right.  So let's move on.
9  I asked you -- you were asked some
10  questions about the other case control --
11  the other case control studies that
12  happened in 1995 when this Muscat study was
13  being proposed, the better definitive study
14  that was described.  Remember she asked you
15  about the Purdie and the Cramer studies?
16      A.  She showed me a chart with
17  studies on it.
18      Q.  Right.  And she kind of
19  highlighted the ones from 1995?
20      A.  Yes.
21      Q.  Would it surprise you that the
22  Purdie study showed an increased risk
23  association for ovarian cancer in the range
24  of almost 30 percent?

Page 867

1      A.  I wouldn't --
2          MS. BROWN:  Object,
3  lacks foundation.
4          THE WITNESS:  I can't
5  say surprised.  Surprised isn't a
6  term I would use.  I'm not that
7  familiar with it, so I can't
8  comment on it.
9  BY MR. TISI:
10      Q.  Honestly, I didn't raise the
11  Purdie study, Ms. Brown did, so she asked
12  about those other studies.  So I'm asking
13  you, would it surprise you that the Cramer
14  study from 2005, which was also a Harvard
15  study, showed a 60 percent increased risk
16  of ovarian cancer associated with talc use?
17          MS. BROWN:  Misstates
18  the study and lacks foundation.
19          THE WITNESS:  Again, I
20  wouldn't characterize my reaction
21  to it as surprise.  I know there
22  were a lot of studies with a lot of
23  results.
24

John C. O'Shaughnessy

1  BY MR. TISI:
2      Q.  All right.  So I just want to
3  kind of be clear as to what was happening
4  in the mid 1990s in fact when you were
5  provided with information about whether or
6  not additional studies needed to be done
7  and so to be clear, just to wrap it up
8  here, number one, there was a
9  recommendation to do additional studies,
10 right?
11             MS. BROWN:  Objection.
12     Misstates the evidence.
13             THE WITNESS:  You showed
14     me documents to that effect.
15 BY MR. TISI:
16     Q.  Number two, Dr. Muscat from the
17 American Health Foundation came to you and
18 proposed a study that was described by your
19 scientists as definitive, significant, and
20 important?
21     A.  We talked about that document.
22             MS. BROWN:  Misstates
23        the evidence.
24

1      time.
2  BY MR. TISI:
3      Q.  But we also know from the memo
4  we looked at that the scientists at J&J
5  recommended that the study be done, right?
6             MS. BROWN:  Objection.
7     Misstates the evidence.
8             THE WITNESS:  I would
9        just say that that document speaks
10       for itself and there were certain
11       people who seemed to recommend that
12       they were in favor doing of doing
13       the study.
14 BY MR. TISI:
15     Q.  And we know that J&J, you've
16 never seen the results of that study
17 because it was never done, right?
18             MS. BROWN:  Lacks
19        foundation.
20             THE WITNESS:  I don't
21        know if it was done or not.  I
22        don't recall ever seeing any
23        results.
24

1  BY MR. TISI:
2      Q.  Number three, okay, that the
3  other studies that Ms. Brown, assuming that
4  I'm correct and it showed, they both,
5  Purdie and Cramer, showed an increased
6  risk, there were multiple studies that
7  seemed to go in that direction of an
8  increased risk, true?
9             MS. BROWN:  Misstates
10       the evidence and lacks foundation.
11             THE WITNESS:  You know,
12       I can't comment on what studies
13       were showing what direction and you
14       kind of, I think you're asking me
15       what was -- you're questioning me
16       about what else was going on in
17       1995.
18             MR. TISI:  Okay.
19             THE WITNESS:  In any
20       year, there's a lot going on and I
21       don't want -- you know, and I can't
22       recite all of it to you, because
23       I probably wasn't aware of all of
24       what was going in science at the

1  BY MR. TISI:
2      Q.  All right.  So let's move on to
3  the other things I actually asked you
4  about.  You recall that when I talked about
5  the Harlow paper, I talked about the fact
6  that this professor at Harvard suggested
7  that women not use talc in their genital
8  area out of an abundance of caution, right?
9      A.  I don't know the exact wording
10 of what he recommended, but I accept what
11 you say.  I mean, we discussed this when it
12 was all on the record --
13     Q.  Correct.
14     A.  -- and I had documents before
15 me.
16     Q.  And this wasn't just, like, you
17 know, some professor just thinking about
18 this in his laboratory somewhere.  There
19 were other -- I brought to your attention
20 that -- and you were aware of other people
21 who were making the same recommendations at
22 that time in the 1990s, right?
23     A.  You showed me --
24             MS. BROWN:  I'm just

Page 872

1   objecting.  This beyond the scope
2   now of the direct.
3          THE WITNESS:  You showed
4   me, I'm not trying to be difficult,
5   you showed me certain documents
6   that there were recommendations
7   made.  I remember words like
8   discouraged the use and that sort
9   of thing.
10  BY MR. TISI:
11     Q.  Right.  I mean, do you remember
12  the document where Dr. Wehner said to you,
13  you know, the prestigious University of
14  Berkeley Wellness Center was suggesting
15  that women not use it?  Do you remember
16  that document?
17     A.  I remember the memo where he
18  discussed that.
19     Q.  And you remember the American
20  Cancer Society press release where they
21  said that women should not -- should use
22  cornstarch instead, he said, correct?
23          MS. BROWN:  Objection.
24     Beyond the scope of the direct.

Page 873

1          THE WITNESS:  That was a
2   press release, I think, in a
3   document that was interviewing
4   someone about the press releases
5   and I'm not sure who said what.
6   BY MR. TISI:
7      Q.  All right.  So let's move onto
8   the next thing.  Now, Mr. Placitella will
9   be asking you some questions -- well, let
10  me rephrase the question.  When counsel was
11  asking you questions about the totality of
12  the studies and what the studies showed and
13  what, you know, I think she mentioned
14  government agencies and all that kind of
15  stuff recommended.  Do you remember those
16  questions?
17     A.  Not the way you're describing
18  them.
19     Q.  Okay.  Are you aware that in
20  2021, the Canadian FDA looking at all of
21  the evidence in this case, cohort studies,
22  case control studies, all the mechanistic
23  studies, determined that talc was a likely
24  cause of ovarian cancer?

Page 874

1          MS. BROWN:  Beyond the
2   scope.  Lacks foundation.
3          THE WITNESS:  I'm not
4   aware of anything like that.
5   BY MR. PLACITELLA:
6      Q.  So if you were to really --
7      A.  2021, right?
8      Q.  Yeah.
9      A.  Okay.
10     Q.  So if you were really to
11  evaluate, which I didn't ask you to do,
12  right, all the other studies that kind of
13  come out over time, right, you would want
14  to look at what the most recent evaluation
15  of those studies said, correct?
16          MS. BROWN:  Beyond the
17     scope.  Lacks foundation.
18          THE WITNESS:  I wasn't
19     asked to evaluate studies.  I don't
20     evaluate studies.
21  BY MR. TISI:
22     Q.  Right, but what you were asked
23  is whether or not there was recommendations
24  made for Johnson & Johnson to do a study

Page 875

1   and that's what I asked you, right?
2      A.  By you.
3      Q.  Correct.  All right.  So last
4   thing I was going to ask you before I turn
5   it over to Mr. Placitella, and I know he's
6   got some questions to ask you about, you
7   were asked some questions about asbestos in
8   the talc and over many, many years and
9   testing documents and all of that stuff.
10     A.  Uh-huh.
11     Q.  But I want to get real kind of
12  like -- so that the jury really understands
13  what this testing program was over decades.
14  Do you have any understanding of -- now,
15  you would agree with me just intuitively
16  because of your involvement that hundreds
17  of thousands, if not millions, of bottles
18  of talc were sold in the United States over
19  the past 50 years?
20          MS. BROWN:  Objection.
21     Foundation.
22          THE WITNESS:  A lot of
23     talc has been sold.  I don't know
24     how much.

BY MR. TISI:

Q.  In terms of the testing protocol for talc, do you understand how much talc was actually tested for asbestos by Johnson & Johnson in order to conclude that it had no asbestos in it?

MS. BROWN:  That's been asked and answered and --

THE WITNESS:  I don't know the specific amount.

BY MR. TISI:

Q.  And would it surprise you, regardless of how many papers there are, no matter how many slips of paper that were placed before you even by Mr. Placitella, that the actual amount of talc that was tested in 50 years would fit in this cup?

MS. BROWN:  That is demonstrably false.  You are misstating the evidence.  And I object as lacking foundation and absolutely incorrect.

BY MR. TISI:

Q.  Would it surprise you?

A.  I don't characterize my reaction as surprise.  You had said in your question regardless of all the testing, well, I can't disregard all the testing.

Q.  All the testing of the talc that would fit in this cup.

MS. BROWN:  Again, misstates the testing.

THE WITNESS:  I don't know how much they tested in terms of all the testing they've done over the years, but it was continuous and it was regular.

BY MR. TISI:

Q.  All right.  And when you made the representations in the pleadings that you made, did you ever suggest to any court, litigant, anybody that, you know, when we made the suggestion that talc was asbestos free that was sold over decades, did you ever say to them, but we only tested a small amount?

MS. BROWN:  Well, that's misstating the record and lacks

foundation and calls for speculation.

THE WITNESS:  No, and, you know, what we told the courts in the documents is, of course, the talc is asbestos free and that was based on the testing that the company had done over all the years and, you know, our information from the company's scientists.

BY MR. TISI:

Q.  Right.  So if I take this napkin and put this napkin on this table here and say the amount of paper underneath this napkin, okay, is zero, okay.  But I don't look at all the other information on this table, you would agree there's a lot of paper on this table, on this square table, right?

A.  Is that a trick question?

Q.  No, it's not.

MS. BROWN:  It sounds like it.

BY MR. TISI:

Q.  You would agree there's a lot of paper on this square table, right?

MS. BROWN:  This table is not a square.

THE WITNESS:  Yes, there is.

BY MR. TISI:

Q.  But if I say, you know, I'm going to test only this portion of this table, would there be any paper on this table, on this sample?

MS. BROWN:  I object to this hypothetical as vague and lacking foundation.

THE WITNESS:  I can't answer your question.

BY MR. TISI:

Q.  You can't answer that question?

A.  No, I can't.

MR. TISI:  Okay.  I don't have any questions.  I think Mr. Placitella may have some.

John O'Shaughnessy

Page 880

BY MR. PLACITELLA:

Q.  How are you doing?  Are you hanging in there?

A.  So far.

Q.  Okay.

MR. TISI:  I told you I would be quick.  Pretty good, right?

MR. PLACITELLA:  Alli, can I have your exhibits?

MS. BROWN:  Which ones?

MR. PLACITELLA:  The ones you just had marked and went over with him.

MS. BROWN:  The court reporter has what I have marked.

BY MR. PLACITELLA:

Q.  While he's doing that, let me just ask some basic questions.  I'm going to try to be as efficient as I can.  I want to see if maybe you just made some mistakes in some of the answers you gave to Ms. Brown.  By the way, to start off, I never served you with a subpoena at your

Page 881

house, did I?

A.  I don't know which firm did it, Mr. Placitella.  I don't think it was you though.

Q.  No.  Okay.  And that was in a totally different kind of case, wasn't it?

A.  It was related to these depositions and these cases.

Q.  Okay.  And you, in your testimony, talked about the proportionate time that you spent in talc cases.  Do you recall that?

A.  I do.

Q.  But the talc cases were so important to you with all the things you had to do, and I'm sure there were a lot, that you actually appeared at depositions that you thought were important to be at, correct?

MS. BROWN:  Objection, foundation.

THE WITNESS:  Yes, I did.  I generally tried to be at depositions where the company

Page 882

witnesses were being asked questions.

BY MR. PLACITELLA:

Q.  Okay.

A.  Regardless of whether it was talc, pharmaceutical, or medical devices.  Can't do all of it.

Q.  I understand.

A.  But some of them I did attend.

Q.  I understand.  And Ms. Brown asked you some questions about, you know, where you don't know what was turned over in a particular case, because you don't know what requests.  Do you remember those?

A.  I recall my testimony on the subject.

Q.  Okay.  All right.  But regardless of what was asked to you and what was turned over, when the affidavits saying that there was no evidence whatsoever were filed in courts and given to judges, you had all the evidence in your possession that's in these books here today, didn't you?

Page 883

A.  The company would have had these, I'm sure.

Q.  Okay.  And why file affidavits saying there's absolutely no evidence when the company knows that there's evidence sitting in their files?

MS. BROWN:  Okay.  Hold on.  I object to that as misstating the evidence and if you are asking him for his legal strategy behind filing affidavits in litigation, I'll object and instruct.

JUDGE SCHNEIDER:  Do you want a ruling?

MR. PLACITELLA:  Yes, Your Honor.

JUDGE SCHNEIDER:  Objection overruled.  It doesn't ask for work product.

BY MR. PLACITELLA:

Q.  So you had the evidence in your possession and I'm not saying that you knew it was there --

A.  What evidence?

John F. O'Shaughnessy

Page 884

1   Q.  All the testing evidence, the
2 McCrone evidence, the Colorado School of
3 Mine evidence, the Pooley studies --
4   A.  I'm sorry.
5   Q.  -- if you had all that --
6   A.  The documents were there in the
7 company?
8   Q.  Then why would the company ask
9 you to file affidavits saying there was no
10 evidence?
11   MS. BROWN:  I object.
12   That misstates the evidence.
13   THE WITNESS:  The
14   company didn't ask me to file
15   affidavits.  That's a legal
16   decision about what we should do
17   with the lawsuit.
18 BY MR. PLACITELLA:
19   Q.  Okay.  And remember I started
20 out the deposition and I tried to be
21 careful and very respectful to you and I
22 said that I know you recognize your duty as
23 a lawyer and I think you do recognize that.
24 And I said to you that the representations

Page 885

1 that you could make in litigation are only
2 as good as the information that's provided
3 to you.  Do you recall that?
4   A.  I recall that line of
5 questioning, yes.
6   Q.  So I want to go over quickly
7 some of Ms. Brown's exhibits.  Can you give
8 me the Elmo, please?  So here is this D-1,
9 which was this affidavit from Mr. Denton.
10 Do you see that?
11   A.  I do.
12   Q.  Okay.  Did you ever see that
13 before Ms. Brown showed it to you?
14   A.  No.
15   Q.  Okay.  So and she read to you
16 or she had you read the stuff about "I
17 understand some plaintiffs' lawyers."  Do
18 you see that?
19   A.  I do.
20   Q.  And it suggested that what was
21 destroyed were TEM grids.  Do you see that?
22   A.  Yes.
23   Q.  Did I suggest that to you, sir?
24   MS. BROWN:  Objection,

Page 886

1 misstates the evidence and the
2 questioning on --
3 BY MR. PLACITELLA:
4   Q.  In the context of the document
5 that said the mine documents were
6 destroyed --
7   MS. BROWN:  Objection.
8 BY MR. PLACITELLA:
9   Q.  Did I suggest that to you?
10   MS. BROWN:  Same
11   objection.
12   THE WITNESS:  I believe,
13   Mr. Placitella, you said that --
14   you used terms like all the talc
15   documents were destroyed, all that
16   testing, all the backup documents
17   were destroyed.
18   MR. PLACITELLA:  No,
19   sorry --
20   MS. BROWN:  Wait, let
21   him finish, Chris.
22   MR. PLACITELLA:  Well, I
23   think you're mistaken.
24   THE WITNESS:  I might

Page 887

1 be.
2   MS. BROWN:  Let him
3   finish.
4   THE WITNESS:  I might
5   be.
6 BY MR. PLACITELLA:
7   Q.  Okay.  The document that we
8 talked about was the document, and I can go
9 back to it if you want --
10   A.  I think I recall it.
11   Q.  Was the Trip report?
12   A.  With the paragraph at the
13 bottom.
14   Q.  Right, right.  And it said that
15 the documents were destroyed.  And in that
16 context, I never said -- suggested to you
17 exactly what documents were destroyed, did
18 I?
19   MS. BROWN:  Misstates
20   the testimony.
21   THE WITNESS:  I thought
22   you phrased it at one point as all
23   the documents.
24

John 2 -- O'Shaughnessy

Page 888

BY MR. PLACITELLA:
2    Q.   And let me -- this document
3 that Ms. Brown showed you from the CTFA --
4    A.   Yes, yes.
5    Q.   -- 2002, have you ever seen
6 that before?
7    A.   Can you just move it over, Mr.
8 Placitella, just a little bit?  I don't
9 recall seeing it.
10    Q.   Okay.  And do you remember that
11 she highlighted the Blount reference,
12 right?  Do you see that?
13    A.   There's two Blount references.
14    Q.   Yes.
15    A.   And one is the '83 article and
16 one in the '91 article and she highlighted
17 the '83 article.
18    Q.   Right.  Well, they're both
19 there, right?
20    A.   Yes.
21    Q.   And we discussed that that was
22 no secret, right, that she did testing,
23 right?
24    A.   That's right.

Page 889

1    Q.   Right.  But nothing in the CTFA
2 documents says that Alice Blount found
3 asbestos in Johnson's Baby Powder, does it?
4        MS. BROWN:  Assumes
5    facts.  Misstates the evidence.
6        THE WITNESS:  Nothing in
7    that document, the cover letter
8    says that.
9 BY MR. PLACITELLA:
10    Q.   Okay.  The cover letter --
11    A.   I'm referring to this document
12 you're showing me now.
13    Q.   Yeah.  It says that Alice
14 Blount found asbestos in Johnson's Baby
15 Powder?
16    A.   No, I said it doesn't say that.
17    Q.   Okay.  Now, can you go to
18 Exhibit 488?  Actually, go to 414 first.
19 Okay.
20    A.   I think I'm having a problem, I
21 go from --
22    Q.   Well, why don't I just show it
23 to you --
24    A.   Okay.  Sure?

Page 890

1    Q.   -- because I know it's getting
2 late?
3    A.   Right, that's fine.
4    Q.   414 --
5    A.   Probably looking at the wrong
6 thing.
7    Q.   -- is a spreadsheet that was
8 created at Dr. Hopkins' deposition in this
9 very case.  Do you see that?
10        MS. BROWN:  Lacks
11    foundation.
12        THE WITNESS:  I see what
13    you have up there, sure.
14        - - - - -
15    (Spreadsheet marked
16    O'Shaughnessy Exhibit 414 for
17    identification.)
18        - - - - -
19 BY MR. PLACITELLA:
20    Q.   Now, I'm just going to show you
21 for a second, 488.  It's the same
22 spreadsheet, but it's a little easier to
23 read the headings.  Okay?
24        MS. BROWN:  Also, lacks

Page 891

1    foundation.  Also lacks foundation.
2        - - - - -
3    (Spreadsheet marked
4    O'Shaughnessy Exhibit 488 for
5    identification.)
6        - - - - -
7 BY MR. PLACITELLA:
8    Q.   Okay.  Can you see where --
9 what I did was, with Dr. Hopkins' help,
10 along with the Johnson & Johnson lawyer, we
11 looked at every record, we looked at the
12 tests, the date, who authored it, the
13 method they used, what the test showed, and
14 Dr. Hopkins was actually able to put his
15 own comments in.  Do you see that?
16    A.   I do.  I'm not familiar with
17 this document.  Are you saying it was
18 created by a Johnson & Johnson lawyer?
19    Q.   It was created at the
20 deposition of Dr. Hopkins in this case.
21    A.   By you?
22        MS. BROWN:  Lacks
23    foundation.
24        THE WITNESS:  By you?

Page 892

1  BY MR. PLACITELLA:
2      Q.  Myself and Dr. Hopkins
3  together, yes.
4          MS. BROWN:  Lacks
5      foundation.
6  BY MR. PLACITELLA:
7      Q.  Okay.  So all I'm saying, and
8  you see the last part, the last column says
9  "satisfies Johnson & Johnson asbestos
10  deposition."  Do you see that?
11     A.  Yes.
12     Q.  Okay. So that was ultimately
13  marked and I'll make sure it's in the
14  record, Hopkins 28.  Do you see that?
15     A.  I do.
16     Q.  Okay.  When Ms. Brown showed
17  you documents from Dr. Pooley from 1972,
18  did she ever show you this spreadsheet that
19  was created in this very case where Dr.
20  Hopkins went through all the tests in the
21  first big test book?
22          MS. BROWN:  I object.
23      Lacks foundation.  Misstates the
24      evidence.

Page 893

1          THE WITNESS:  I don't --
2      I'm not familiar with this document
3      and what it contains.  And I
4      haven't seen it until now.
5  BY MR. PLACITELLA:
6      Q.  Okay.  That's fair.  Now, last
7  set of questions.  You testified, I want to
8  see if you were mistaken, you testified
9  that the Johnson mine only sold industrial
10  talc.  Do you recall that?
11     A.  Yes.
12          MS. BROWN:  Objection.
13      Misstates the testimony.
14  BY MR. PLACITELLA:
15     Q.  Okay.  Can you go to Exhibit 4,
16  J&J 4, in book one?
17          MS. BROWN:  Of
18      testimony?
19          MR. PLACITELLA:  No.
20      The JOS booklet.
21          THE WITNESS:  I'm sorry,
22      what was the number?
23          MR. PLACITELLA:  Four.
24          THE WITNESS:  I think I

Page 894

1  have it.  It says cosmetics on the
2  front of it.
3          - - - - -
4      (Cosmetics Document marked
5      O'Shaughnessy Exhibit J&J 4 for
6      identification.)
7          - - - - -
8  BY MR. PLACITELLA:
9      Q.  Yes, it says cosmetics on the
10  front of it.  And if you go to 4.2, do you
11  see where it says Eastern Magnesia Talc, a
12  Johnson & Johnson company?
13     A.  Yeah.
14     Q.  And do you see where it says
15  the cosmetic industry?
16     A.  Yes.
17     Q.  Do you see down below, the
18  Emtal talc that was used in the cosmetic
19  industry from the Vermont plants that came
20  out of the Johnson, Vermont, mine?
21          MS. BROWN:  Objection.
22      Misstates the document.
23          THE WITNESS:  Are you
24      referring to subsection D?

Page 895

1  BY MR. PLACITELLA:
2      Q.  Yes, sir.
3      A.  It says "The following grades,
4  FOB, the Vermont plants, are sold in the
5  cosmetic industry."  And it has plant
6  Johnson, Vermont.  West Windsor, Vermont.
7      Q.  Right.  And if you go to
8  page 4.4, do you see where it says that
9  "EMTCO," which is Eastern Magnesia Talc
10  Company, "working to replace Johnson EMTals
11  towels with West Windsor EMTals --"
12     A.  Can you --
13     Q.  Yes, number five, all the way
14  down at the bottom.
15     A.  I see the bottom, yes.
16     Q.  "When and if Johnson cosmetic
17  grades are eliminated due to arsenic
18  content."  Do you see that?
19     A.  I do.
20     Q.  Now, you were present at
21  Mr. Miller's deposition when he testified
22  in your presence that the Johnson mine
23  produced cosmetic talc.  Do you recall
24  that?

Page 896

1        MS. BROWN:  Objection.
2    Lacks foundation.  Misstates the
3    evidence.
4 BY MR. PLACITELLA:
5        Q.  Okay.  Can you go to 270 in the
6 transcript folder?
7        A.  Oh, transcript, all right.
8        Q.  Yeah.
9        A.  270.  Got it.
10       Q.  And if you look at the second,
11 270.3, it says for Roger Miller, John
12 O'Shaughnessy, correct?
13       A.  Yes.
14              - - - - -
15       (Deposition of Roger N. Miller
16       taken 6/12/91 marked O'Shaughnessy
17       Exhibit 270 for identification.)
18              - - - - -
19 BY MR. PLACITELLA:
20       Q.  Okay.  And if you go to 270.45
21 and I'll give you the right page, because I
22 know that's how you like to do, it's
23 actually page 42 of the deposition.
24       A.  Yup.

Page 897

1        Q.  It says "And the Johnson mine
2 and mill did not or did produce cosmetics?"
3        MS. BROWN:  What page
4        are you on?
5        MR. PLACITELLA:  Page
6        42.
7        THE WITNESS:  I see it.
8 BY MR. PLACITELLA:
9        Q.  And the answer was, in your
10 presence, "They produced a very minor
11 quantity of cosmetic materials."  Do you
12 see that?
13       A.  I do.
14       Q.  And he also testified that, if
15 you go to page 54 of the deposition, he was
16 asked a question "Was the purity similar
17 between the Johnson mine and the
18 Hammondsville mine and the Waterbury mine
19 of the talc?"  Do you see that?
20       A.  Was the purity similar
21 between -- yes, I see that.
22       Q.  And he says "I don't know
23 anything about Waterbury.  The ore bodies
24 were essentially the same except for

Page 898

1 crystal size between the Hammondsville and
2 Johnson mine."  Do you see that?
3        A.  Yes.
4        MS. BROWN:  Objection.
5        Lacks foundation.
6 BY MR. PLACITELLA:
7        Q.  So testing that was done at the
8 Johnson mine would clearly be evidential of
9 what would be the Hammondsville mine, true?
10       MS. BROWN:  I object.
11       It misstates the evidence and lacks
12       foundation.
13       THE WITNESS:  I'm not
14       qualified to say.  They're two
15       different mines, so --
16 BY MR. PLACITELLA:
17       Q.  But he said they're the same,
18 the ore bodies --
19       MS. BROWN:  No.
20       MR. PLACITELLA:  -- are
21       essentially the same?
22       THE WITNESS:  He said
23       the ore bodies are, that's his
24       testimony.

Page 899

1 BY THE WITNESS:
2        Q.  Right, so if they found
3 asbestos in the Johnson mine, it's a
4 reasonable indication that there was
5 asbestos in the Hammondsville mine?
6        MS. BROWN:  I object.
7        It misstates the evidence, calls
8        for speculation, lacks foundation.
9        THE WITNESS:  No, not at
10       all.
11 BY MR. PLACITELLA:
12       Q.  Okay.  And then lastly, go to
13 J&J 472.
14       A.  In the transcript?
15       Q.  No, I'm sorry, in the regular
16 book.  This is the last, this is the last
17 thing you'll have to fight with here?
18       A.  Excuse me.
19       Q.  This is the last document
20 you'll have to fight to find.
21       A.  Oh, okay.  I'm sorry, what
22 binder is it?
23       Q.  It's book two.
24       A.  Okay.  Got it, book two.

Page 900

1  Q.  Exhibit 472.
2  A.  Got it.
3      - - - - -
4    (Photograph marked
5    O'Shaughnessy Exhibit 472 for
6    identification.)
7      - - - - -
8  BY MR. PLACITELLA:
9    Q.  Okay.  And this is a photo
10 taken directly from the Johnson Mine Museum
11 in Johnson, Vermont.
12         MS. BROWN:  I object,
13    lacks foundation.
14 BY MR. PLACITELLA:
15    Q.  I'm going to blow it up.  Do
16 you see here where it shows all the
17 different products of Eastern Magnesia Talc
18 Company?
19    A.  I see that.
20    Q.  It has rubber products, paint
21 products, plastic products.  Do you see
22 that?
23    A.  Yes.
24    Q.  Okay.

Page 901

1    A.  I can't --
2    Q.  Okay.  Well, this is the one I
3  want to show you.  See the bottle of
4  Johnson's Baby Powder on the bottom?
5    A.  Yeah.
6    Q.  Okay.
7    A.  Yeah.  It says Johnson.
8    Q.  Do you want me to do it again?
9    A.  No, I can't see what -- it says
10 Johnson's Baby Powder, I don't know what it
11 is in terms of a container, but looks
12 like --
13         MS. BROWN:  I object as
14    lacking foundation.
15 BY MR. PLACITELLA:
16    Q.  Well, you recognize that has a
17 bottle of Johnson's Baby Powder, don't you?
18    A.  That's what it says.
19    Q.  Okay.
20    A.  It looks very old.
21    Q.  And at the end of the day,
22 Mr. Ashton never told you that there were
23 testing and testimony from the Westfall
24 case showing that there was asbestos in the

Page 902

1  Johnson mine, correct?
2         MS. BROWN:  That
3    misstates the testimony and lacks
4    foundation.
5         THE WITNESS:  I don't
6    know what you mean by at the end of
7    the day, do you mean today?  Are we
8    at the end of the day?
9  BY MR. PLACITELLA:
10   Q.  I'm hoping.
11   A.  I don't recall my discussions
12 with Mr. Ashton specifically, but I don't
13 recall those transcripts at all or that
14 testimony at all.  I never saw them, I
15 believe.
16   Q.  And to be totally fair to you,
17 it would have been good if they were shared
18 with you, don't you think?
19         MS. BROWN:
20    Argumentative.  Lacks foundation.
21         THE WITNESS:  No, I
22    wouldn't necessarily say that.
23         MR. PLACITELLA:  Okay.
24    Well, thank you for your patience

Page 903

1    with me and I appreciate your time.
2         THE WITNESS:  Thank you
3    both.
4  BY MS. BROWN:
5    Q.  Just one question.  Can I do it
6  from here?  Mr. O'Shaughnessy, based on
7  everything you know about where Johnson &
8  Johnson sourced its talc for use in baby
9  powder, did it get talc for baby powder
10 from the Johnson mine?
11   A.  Not to my knowledge, no.
12         MS. BROWN:  Thanks.  No
13    more questions.
14 BY MR. PLACITELLA:
15   Q.  You weren't alive in 1967 doing
16 this work when they were doing that, were
17 you?
18         MS. BROWN:  Lacks
19    foundation.
20 BY MR. PLACITELLA:
21   Q.  Well, let me rephrase the
22 question.  You weren't working for Johnson
23 & Johnson when they were pulling cosmetic
24 talc out of the Johnson mine in 1967, were

John O'Shaughnessy

Page 904

1  you?

2          MS. BROWN:  Misstates
3  the evidence and lacks foundation.
4          THE WITNESS:  I was not
5  working for the company in 1967.
6          MR. PLACITELLA:  Thank
7  you, sir.
8          MS. BROWN:  Going off.
9          THE VIDEOGRAPHER:  Okay.
10  That concludes today's deposition.
11  The time is 6:37 p.m.
12          JUDGE SCHNEIDER:  So the
13  question I want to raise is do you
14  want to close the deposition or
15  just keep it open just for that one
16  issue regarding the one document?
17          MR. TISI:  Well, there
18  is a question and I'm not prepared
19  to really address it, but I know
20  that there are many privileged
21  issues that are still pending
22  before Your Honor in terms of, you
23  know, the issues that you heard
24  argument on a couple of weeks ago.

Page 905

1  And so, you know, when we say on
2  the one document, I just want to
3  make -- I haven't really, I've only
4  been tangentially involved in that
5  issue.  I don't know where we stand
6  with all of that, but with respect
7  to any privileged document that is
8  still under review and in that
9  process, I think we would keep it
10  open for those purposes.
11          JUDGE SCHNEIDER:  The
12  reason I raised it, I'm not sure of
13  the legal niceties, if you formally
14  close the deposition or if you say
15  we're reserving depending upon the
16  rulings of the privileged document.
17  I just don't want anybody to be
18  prejudiced.
19          MR. PLACITELLA:  It
20  feels like to me, it feels like,
21  not having any research in front of
22  me, it feels like to me that we
23  should close the deposition subject
24  to that one issue with the

Page 906

1  agreement and perhaps other issues
2  and I don't know what counsel's
3  preference is.  I know when I'm
4  going to get in my car, I'm going
5  to get four phone calls to say why
6  did you do that.
7          JUDGE SCHNEIDER:  While
8  we're here, it seems to me we ought
9  to have briefing and hopefully
10  supporting affidavits on the one
11  document that came up today.  I
12  think probably Johnson & Johnson
13  should go first.  You tell me how
14  much time you want or need,
15  whatever is reasonable is perfectly
16  fine with me and we'll get a
17  response from --
18          MR. TISI:  It's fine
19  with us.  Whatever time you think
20  you need with that.
21          JUDGE SCHNEIDER:  Do you
22  just need the time to do the due
23  diligence?
24          MR. BERNARDO:  I would

Page 907

1  rather talk to the people who are
2  actually going to put the brief
3  together.
4          JUDGE SCHNEIDER:  You
5  probably -- I mean, I think the key
6  issue is can you track down whether
7  or not it was produced by J&J.
8          MS. BROWN:  Yeah, we
9  will.
10          JUDGE SCHNEIDER:  That's
11  the key issue.
12          MR. PLACITELLA:  Can you
13  guys go through whatever binders
14  you have and pull that document
15  out?
16          MS. BROWN:  I took my
17  version out of here and it's in our
18  breakout room.
19          MR. PLACITELLA:  But
20  there's two sets.
21          MS. BROWN:  Okay.
22          MR. BERNARDO:  Yeah, and
23  just a spoiler alert, I just edited
24  a clawback letter just to be formal

Page 908

1   about it that I'll send you all and
2   send to Jerry Block, just so we're
3   doing our due diligence.
4           MR. PLACITELLA:  You're
5   clawing at me?
6           MR. BERNARDO:  Yes.  And
7   I'll send one, because Judge
8   Schneider will yell at me if I
9   haven't taken appropriate steps to
10  formally claw it back.
11          JUDGE SCHNEIDER:  Would
12  you just agree with Plaintiffs on a
13  briefing schedule?  Whatever you
14  agree to is fine with me.  Whatever
15  you think is reasonable.
16          MR. PLACITELLA:  Thank
17  you.
18          - - - - -
19      (Whereupon, the deposition was
20  concluded at 6:41 p.m.)
21          - - - - -
22
23
24

Page 910

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4   and make any necessary corrections.
5   You should state the reason in the appropriate
6   space on the errata sheet for any corrections
7   that are made.
8       After doing so, please sign the errata
9   sheet and date it.
10      You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.
19
20
21
22
23
24

Page 909

1   C E R T I F I C A T I O N
2
3
4       I HEREBY CERTIFY that the proceedings and
5   evidence are contained fully and accurately in the
6   stenographic notes taken by me upon the foregoing
7   matter on June 30, 2021, and that this is a correct
8   transcript of same.
9
10
11
12
13
14  _____
15      Robin L. Clark
    Registered Professional Reporter
16
17
18
19
20
21      (The foregoing certification of this
22  transcript does not apply to any reproduction of the
23  same by any means unless under the direct control
24  and/or supervision of the certifying reporter.)

Page 911

1           - - - - -
2           E R R A T A
3           - - - - -
4   PAGE   LINE   CHANGE
5
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____

Page 912

ACKNOWLEDGMENT OF DEPONENT

1
2
    I, JOHN C. O'SHAUGHNESSY, do hereby
3
certify that I have read the foregoing pages
4
and that the same is a correct
5
transcription of the answers given by me to
6
the questions therein propounded, except for
7
the corrections or changes in form or
8
substance, if any, noted in the attached
9
Errata Sheet.
10
11 DATE          SIGNATURE
12
Subscribed and sworn to before me this
13
    day of        ,
14
2021.
15
16 My commission expires:
17
18
19
20 Notary Public
21
22
23
24

Exhibit 184

*George: F.Y.I.*

## Johnson&Johnson

DOMESTIC OPERATING COMPANY                                     NEW BRUNSWICK, N. J.

June 10, 1977

Dear Task Force Member:

We are sending to you, under separate cover, Set of coded talc samples for the CTFA round robin retest. It is hoped that through this partial retesting we can achieve our objectives as discussed at our recent meeting.

A.  To verify that CTFA Method J4-1 is accurate and reliable.

B.  To determine whether or not any 1976 production major commercial talc products contain asbestiform amphibole contaminants.

Each set of 4 samples has been selected at RANDOM from:

1 standard sample prepared by spiking talc with an amphibole mineral, and
3 products which were indicated by several labs. in our initial round robin to have failed the Method.

This means that your set might include any combination of the above four talc samples. Each vial should contain sufficient sample to prepare at least three (3) pellets, if necessary. The smudges on the sides and bottom of each vial are again caused by the masking perfume.

It is imperative that we adhere strictly to the CTFA Method as written if we are to obtain a valid inter-laboratory comparison of results. For this purpose, please:

1.  In reporting round robin results, consider only those samples showing x-ray diffraction peaks of intensity equal to or greater than that obtained for your own standard talc spiked with 0.5% of the CTFA tremolite.

JNJ 000250596

<u>CTFA Round Robin</u>          -2-          June 10, 1977

2.  Substitute Method J4-1, Part II - Tentative
    Revision (attached) for the Optical Microscopy
    and Dispersion-Staining Method.

3.  Consider an amphibole particle to be a fiber
    <u>only</u> if it meets the shape, size and aspect
    ratio criteria of the OSHA Field Memorandum,
    given in Method J4-1, p. 9.  Note:  Item 3
    of the OSHA fiber definition has been corrected
    to read:

        "3. The maximum length of a fiber to be
        counted is 200 microns."

    It may be necessary to accurately measure certain
    particles to determine if they conform to this
    fiber definition.

In addition to round robin results, please report to me
your results from Method J4-1 (Parts I and II) for those samples
showing <u>statistically significant</u> x-ray diffraction amphibole
peaks of intensity <u>less than</u> the 0.5% standard.

We have set August 1, 1977 as deadline for receipt of
your round robin results.  We would also appreciate your comments
and suggestions concerning the Part II Tentative Revision.  Please
contact me (201/524-5518) should you have problems or questions.
Thank you for your participation.

                              Sincerely,

                              John P. Schelz, Chairman
                              CTFA Task Force on
                              Round Robin Testing of
                              Consumer Talcum Products
                              Central Analytical Laboratories
                              Johnson & Johnson Research Center
                              New Brunswick, N.J.  08903

JPS/gm

cc:  Dr. N. F. Estrin
       Vice President-Science, CTFA
     Mr. G. Sandland
       Bristol-Myers Products

RECEIVED

JUN 14 1977

JNJ 000250598

Exhibit 185

Johnson&Johnson

C O N F I D E N T I A L

DOMESTIC OPERATING COMPANY                                      NEW BRUNSWICK, N. J.

March 1, 1978

Mr. Charles Haynes
The Cosmetic, Toiletry and Fragrance Association, Inc.
1133 15th Street, N.W.
Washington, D.C.   20005

Dear Mr. Haynes:

I am enclosing a table which breaks the code for
the recently completed CTFA Task Force on Round Robin
Testing of Consumer Talcum Products for Asbestiform
Amphibole Minerals.   The names, addresses, and phone
numbers are also included for those industrial parti-
cipants whose products were involved.

In accordance with your discussions with Norm Estrin
and George Sandland, Chairman CTFA Talc Subcommittee, we
would request your assistance in the dissemination of
these round robin results as follows:

1.  Please contact me (201/524/5518) upon
    receipt of this letter so that I may
    destroy the only other copy of this
    table, which is in my possession.

2.  Contact each of the industrial participants
    to inform them of the round robin results
    for their product only, as well as the
    actual lot tested.   Please emphasize that
    no talcum product failed CTFA Method J4-1,
    Parts I and II; i.e., no product was found
    to contain asbestiform amphibole at a level
    equal to or greater than 0.5% by weight.
    "Nonasbestiform Amphibole Detected" means
    that the product was found by CTFA Method
    J4-1 to contain only nonasbestiform amphibole
    at a level equal to approximately 0.5% or
    greater.

RECEIVED

MAR 0 1978

GEORGE LEE

JNJ 000265120

-2-                                  March 1, 1978

3.  Destroy your copy of the table.

Your participation in this final important phase of
the round robin is appreciated.  Thank you very much.

Sincerely,

John P. Schelz,  Chairman
CTFA Task Force on
Round Robin Testing of
Consumer Talcum Products

JS/gm
Enclosure

cc   (without table):  Dr. N. F. Estrin
                       Vice President-Science, CTFA
                       Mr. G. Sandland
                       Bristol-Myers Products

JNJ 000265121

Exhibit 186

```
 1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                 STATE OF MISSOURI
 2

                     - - - - -
 3

     VICKIE FORREST, et al.,
 4           Plaintiffs,
 5           vs.              Cause No.
                              1522-CC0419-02
 6

     JOHNSON & JOHNSON, et al.
 7           Defendants.
 8               - - - - -
 9        UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
10

                     - - - - -
11

     IN RE:  JOHNSON & JOHNSON    MDL NO:
12   TALCUM POWDER PRODUCTS       16-2738 (FLW)(LGH)
     MARKETING, SALES PRACTICES,
13   AND PRODUCTS LIABILITY
     LITIGATION
14               - - - - -
15
             Wednesday, June 30, 2021
16
17               - - - - -
18       Continued Videotaped Oral Deposition of
19   JOHN C. O'SHAUGHNESSY, taken at the Crowne Plaza
20   Princeton, 900 Scudders Mill Road, Plainsboro, New
21   Jersey, commencing at 9:35 a.m., by and before Robin
22   L. Clark, Registered Professional Reporter and
23   Notary Public in and for the State of New Jersey.
24               - - - - -
```

Page 420

```
 1   APPEARANCES:
 2
 3        LEVIN, PAPATONIO, RAFFERTY, PROCTOR,
          BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
 3        BY:  CHRISTOPHER V. TISI, ESQ.
 4        316 South Baylen Street, Suite 600
          Pensacola, Florida 32502-5996
 5        850-435-7176
          ctisi@levinlaw.com
 6             For the Plaintiff, Vickie
          Forrest
 7
 8        COHEN, PLACITELLA & ROTH
          BY:  CHRISTOPHER M. PLACITELLA, ESQ.
 9        127 Maple Avenue
          Red Bank, New Jersey 07701
10        732-749-9003
          cplacitella@cprlaw.com
11             For the MDL Plaintiffs
12
13        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          BY:  ALLISON M. BROWN, ESQ.
14        and RICHARD T. BERNARDO, ESQ.
          One Manhattan West
15        New York, New York 10001-8602
          212-735-3000
16        allison.brown@skadden.com
          richard.bernardo@skadden.com
17             For the Defendant,
          Johnson & Johnson
18
19        YETTER COLEMAN LLP
          BY:  COLLIN J. COX, ESQ.
20        811 Main Street, Suite 4100
          Houston, Texas 77002
21        713-632-8000
          ccox@yettercoleman.com
22             For the Witness
23   ALSO PRESENT:
24        JOEL SCHNEIDER, USMJ (Retired)
```

Page 421

```
 1   ALSO PRESENT, continued:
 2
 3        WILLIAM GEIGERT, VIDEOGRAPHER
 4        MICHAEL KUTYS, EXHIBIT TECH
 5   REMOTE APPEARANCES:
 6
 7        BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
          MILES, P.C.
 8        BY:  LEIGH O'DELL, ESQ.
          218 Commerce Street
 9        Montgomery, Alabama 36104
          800-898-2034
10        leigh.odell@beasleyallen.com
               For the Plaintiff, Vickie
11        Forrest
12        ASHCRAFT & GEREL, LLP
          BY:  MICHELLE A. PARFITT, ESQ.
13        1825 K Street, N.W., Suite 700
          Washington, D.C. 20006
14        202-759-7648
          mparfitt@ashcraftlaw.com
15             For the Plaintiff, Vickie
          Forrest
16
17        COHEN, PLACITELLA & ROTH
          BY:  DENNIS M. GEIER, ESQ.
18        and HARRY M. ROTH, ESQ.
          127 Maple Avenue
19        Red Bank, New Jersey 07701
          732-749-9003
20        dgeier@cprlaw.com
          hroth@cprlaw.com
21             For the MDL Plaintiffs
22
23
24
```

Page 422

```
 1   REMOTE APPEARANCES, continued:
 2
 3        BARNES LAW GROUP, LLP
          BY:  JOHN R. BEVIS, ESQ.
 3        31 Atlanta Street
 4        Marietta, Georgia 30060
          678-290-2240
 5        bevis@barneslawgroup.com
               For the Plaintiffs
 6
 7        ROBINSON CALCAGNIE, INC.
          BY:  GENEVIEVE OUTLAW, ESQ.
 8        19 Corporate Plaza Drive
          Newport Beach, California 92660
 9        949-720-1288
          goutlaw@robinsonfirm.com
10             For the Plaintiffs in JCCP 4872
11
12        BLASINGAME, BURCH, GARRARD & ASHLEY, PC
          BY:  LEANNA BANKESTER PITTARD, ESQ.
13        and SARA SCHRAMM, ESQ.
          2100 Southbridge Parkway
          Suite 650
14        Birmingham, Alabama 35209
          866-354-3544
15        lpittard@bbga.com
          sschramm@bbga.com
16             For the MDL Plaintiffs
17
18        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          BY:  CATHERINE I. MULLALEY, ESQ.
18        500 Boylston Street
19        Boston, Massachusetts 02116
          617-573-4851
20        kate.mullaley@skadden.com
               For the Defendant,
21        Johnson & Johnson
22
23
24
```

Page 423

```
 1   REMOTE APPEARANCES, continued:
 2
 3        FAEGRE DRINKER BIDDLE & REATH LLP
          BY:  SUSAN M. SHARKO, ESQ.
 4        600 Campus Drive
          Florham Park, New Jersey 07932
 5        susan.sharko@faegredrinker.com
          973-549-7000
 6             For the Defendant, Johnson &
          Johnson
 7
 8        SEYFARTH SHAW LLP
          BY:  THOMAS T. LOCKE, ESQ.
 9        975 F Street, N.W.
          Washington, D.C. 20004
10        202-828-5376
          tlocke@seyfarth.com
11             Appearing on behalf of Personal
          Care Products Council
12
13        TUCKER ELLIS, LLP
          BY:  ELIZABETH J. CUMMINGS, ESQ.
14        100 South 4th Street
          St. Louis, Missouri 63102
15        314-571-4969
          elizabeth.cummings@tuckerellis.com
16             For the Defendants, PTI
          Royston, LLC and PTI Union, LLC
17
18   ALSO PRESENT:
19        LEA CALLAHAN, Paralegal
20        JEN SECRIST, Paralegal
21        STEPHANIE E. MARTIN
22             - - - - -
23
24
```

```
 1          I N D E X
 2  WITNESS                        PAGE
 3  JOHN C. O'SHAUGHNESSY
      BY MR. PLACITELLA:       430, 879, 903
 4  BY MR. TISI:              776, 849
      BY MS. BROWN:           779, 903
 5
 6          E X H I B I T S
 7  NUMBER    DESCRIPTION        MARKED
 8  O'Shaughnessy
 9  Exhibit JOS 1  McCrone Binder 1      482
10  Exhibit JOS 1A McCrone Binder 2      482
11  Exhibit JOS 2A Musco-2/Hopkins Binder 1   430
      of 2
12
    Exhibit JOS 2B Musco-2/Hopkins Binder 2   430
13      of 2
14  Exhibit JOS 3 Additional Testing Binder   430
15  Exhibit 4     Handwritten Document      644
16  Exhibit J&J 4 Cosmetics Document        894
17  Exhibit TR-15 Deposition of Dr. John    678
      Hopkins dated 3/6/07
18
    Exhibit 82    Muscat Video Clip        864
19
    Exhibit 172   Deposition of Glenn A.    536
20      Hemstock dated 1/28/83
21  Exhibit 173   Deposition of Glenn A.    538
      Hemstock dated 3/16/83
22
    Exhibit 188   Stipulation of Dismissal,   463
23      Letter dated 7/23/87,
        Affidavit of Roger Miller,
24      and Letter dated 1/28/87
```

```
                              Page 426
 1  Exhibit 446   Agreement Between Cyprus &   511
      J&J dated 1/6/89
 2
 3  Exhibit 456   Report dated 11/23/83 Bates  744
      JNJ 000240739 to 40742
 4  Exhibit 472   Photograph           900
 5  Exhibit 486   Privilege Log         715
 6  Exhibit 488   Spreadsheet          891
 7  Exhibit 491   Memo dated 1/4/84      748
 8  Exhibit 525   Event Report dated 1/9/17   451
      Bates JNJTALC000125625 to
 9    125632
10  Exhibit 1035  Letter dated 1/3/95     573
11  Exhibit 1039  Excerpt for J&J Privilege  526
      Log
12
    Exhibit 1040  Letter dated 8/14/89     563
13
    Exhibit 1042  Dismissal Order        515
14
    Exhibit 1043  Deposition Of Roger N.   618
15      Miller dated 4/6/95
16  Exhibit 1044  Deposition of Roger Miller  697
      taken 1/16/07
17
    Exhibit 1047  Affidavit of Roger Miller  507
18      in Miller case
19  Exhibit 1048  Letter dated 9/10/85 Bates  484
      JNJ 000064652
20
    Exhibit 1049  Legal Hold Letter dated   718
21      5/16/03
22  Exhibit 1051  Document Preservation    722
      Notice Bates
23      JNJTAL000949679 to 949681
24
```

```
                              Page 425
 1  Exhibit 195   Affidavit of William H.    518
      Ashton
 2
    Exhibit 198   Letter dated 11/26/90 and   738
 3      Attachment Bates
        JNJMX__68__000012851 to
 4      12859
 5  Exhibit 230   Affidavit of Dr. John    680
      Hopkins in Durham case
 6
    Exhibit 270   Deposition of Roger N.    896
 7      Miller taken 6/12/91
 8  Exhibit 274   Letter dated 1/23/88 Bates  633
      JNJ 000024573 to 24576
 9
    Exhibit 277   Answers to Interrogatories  663
10      In Krushinski Case Bates
        JNJ 000065001 to 650011
11
    Exhibit 282   Roger Miller Affidavit in   499
12      Andonian case Bates
        JNJ-WIL__0000094 to 95
13
    Exhibit 319   Letter dated 10/27/97 and   652
14      Attachments
15  Exhibit 322   IARC Monograph        636
16  Exhibit 355   Letter dated 1/28/1987    729
      Bates JNJTALC0000387714 to
17      387716
18  Exhibit 414   Spreadsheet          890
19  Exhibit 418   Email String dated 11/21/08  755
20  Exhibit 436   Deposition of Peter N. Gale  547
      dated 4/26/83
21
    Exhibit 441   Stipulation and        554
22      Confidentiality Order
23  Exhibit 443   Windsor Minerals' Responses  720
      to Interrogatories in
24      Westfall case
```

```
                              Page 427
 1  Exhibit 1052  Mediation Memo dated 2/4/03  666
      Bates JNJTALC001243929 to
 2    1243949
 3  Exhibit 1053  Letter dated 6/6/88     475
 4  Exhibit 1054  Letter dated 8/27/86     468
 5  Exhibit 1060  Transcript of John Hopkins  477
 6  Exhibit 1061  Andonian Case Witness List  497
      Bates JNJ 000065334 to
 7    65339
 8
    Exhibit D-1   Affidavit of Robert K.    810
 9      Denton
10  Exhibit D-2   Letter dated 9/28/72     820
      and Report Bates
11      JNJTALC000289268 to 359834
12  Exhibit D-3   Letter dated 3/18/02 Bates  828
      JNJTALC00109268 to 109278
13
    Exhibit D-4   Case Control Studies that  845
14      were Published from 1992
        to 1999
15
16
17
18
19
20
21
22
23
24
```

John O'Shaughnessy

1    Q.   Okay.  And who was in charge of
2  gathering evidence to supply answers to
3  discovery in talc litigation?
4           MS. BROWN:  I object,
5       Your Honor, for the same reasons,
6       work product.
7           JUDGE SCHNEIDER:  Can I
8       ask the court reporter to repeat
9       the question?
10          - - - - -
11          (Whereupon, the reporter read
12      back as requested.)
13          - - - - -
14          JUDGE SCHNEIDER:  Okay.
15      Is the question who was in charge,
16      is that what it said?  I think the
17      question who was in charge is
18      objectionable as work product, but
19      I don't think the question of who
20      supplied information to answer
21      interrogatories is work product.
22      That's clearly discoverable and is
23      an appropriate interrogatory that's
24      typically asked.  So if the

1       question is who supplied
2       information rather than the person
3       who was in charge, that can be
4       asked, but the question who was in
5       charge is work product.
6  BY MR. PLACITELLA:
7       Q.   Okay.  Can you answer Judge
8  Schneider's question?  He's been around,
9  you know, on the bench, so he's a little
10 better at that than me.
11      A.   When we answered discovery in
12 general, what would happen is outside
13 counsel in coordination with me would
14 interview appropriate people at the company
15 who had knowledge of the product or the
16 issues in the lawsuit.  They would be
17 tasked also with collecting relevant
18 documents and assembling them for use in
19 the litigation.
20      Q.   And that by name is who?
21      A.   Early on, it would have been
22 Mr. Williams and the MehaffyWeber firm.  It
23 also would have been to the extent if there
24 were any other firms that were handling

1  talc litigation, they might have played a
2  role in that, I just don't recollect, but
3  as time went on and the litigation grew,
4  then, you know, then the legal team grew
5  and there was more responsibility
6  concerning ongoing discovery through the
7  legal team and collecting and interviewing,
8  you know, again, people at the company to
9  obtain the information.
10      Q.   When evidence was turned over
11 in talc litigation, where was it stored,
12 within what Johnson & Johnson?
13          MS. BROWN:  I object.
14      Work product, Your Honor.
15          JUDGE SCHNEIDER:
16      Objection overruled.  That's not
17      work product.
18          THE WITNESS:  Typically,
19      the documents would be collected
20      and maintained by outside counsel.
21 BY MR. PLACITELLA:
22      Q.   So they would be kept with
23 outside counsel and would you at Johnson &
24 Johnson keep copies?

1       A.   No, there was too many of them.
2       Q.   Okay.  And when there was
3  information from prior litigation, like, a
4  case was closed, a talc case, for example,
5  was closed, what was done with those files?
6       A.   The Johnson & Johnson files
7  or --
8       Q.   Yes.
9       A.   -- the outside counsel files?
10      Q.   Both.
11      A.   Johnson & Johnson had a file
12 system where the summons and complaint were
13 filed to it, so there would be a file for a
14 case name and a general file where papers
15 would be filed to that.  And then they
16 would be maintained there, whatever papers
17 were filed, including the closing
18 documents.
19      Q.   So, for example, if a witness
20 in a Johnson & Johnson talc case provided a
21 sworn statement that you reviewed, where
22 would that be -- where would that be saved
23 at Johnson & Johnson when the case was
24 over?

Page 464

1    Q.  He was one of the people you
2 relied on to tell you the truth and the
3 whole truth?
4    A.  Yes.
5    Q.  Okay.  It says "Also enclosed
6 you will find an assay from McCrone
7 Environmental Services.  I trust that these
8 documents will now unable to sign a
9 dismissal as was done in the Yuhas file."
10 Do you see that?
11    A.  Yes.
12    Q.  And now I want to go to the
13 actual affidavit of Mr. Miller.  That's the
14 next page.  He says that -- and Mr. Miller
15 was the president of Johnson & Johnson,
16 correct -- of Windsor Minerals, correct?
17    A.  Yes.
18    Q.  And that was a wholly-owned
19 subsidiary of Johnson & Johnson, correct?
20    A.  Yes.
21    Q.  And you worked as a lawyer, you
22 worked as a lawyer for both Windsor
23 Minerals and Johnson & Johnson at the same
24 time?

Page 466

1 by Windsor Minerals, Inc., whether it is
2 ultimately sold to industrial users or used
3 in Johnson's Baby Powder, is sampled and
4 tested for the presence of asbestos."  Do
5 you see that?
6    A.  I do.
7    Q.  "No evidence of the presence of
8 asbestos in Windsor Minerals' product has
9 ever be revealed by this testing."  Do you
10 see that?
11    A.  Yes.
12    Q.  And you understand there's a
13 difference between saying no evidence, but
14 there is evidence, but we don't agree with
15 it?  You understand there's a difference,
16 right?
17        MS. BROWN:  Objection,
18    vague.
19        THE WITNESS:  Yeah, I
20    guess so, yeah.
21 BY MR. PLACITELLA:
22    Q.  Okay.  And what he does is he
23 attaches a report.  Do you see that?
24 That's the next page.

Page 465

1    A.  Yes.
2    Q.  Okay.  And Mr. Miller says "I
3 am the president of Windsor Minerals."  Do
4 you see that?
5    A.  Yes.
6    Q.  And then he goes on and he says
7 "The exclusive business of Windsor
8 Minerals, Inc. is and has been for the last
9 18 years the mining and milling of talc
10 from a single mining district in Windsor,
11 Vermont.  The mining district is the
12 exclusive source of talc for all Johnson's
13 Baby Powder sold in the United States."
14 That was your understanding, correct?
15    A.  Yes.
16    Q.  Okay.  He goes on to say, "In
17 addition to supplying the talc for
18 Johnson's Baby Powder, Windsor Minerals
19 also sells a portion of its product to
20 independent industrial users."  Do you see
21 that?
22    A.  I do.
23    Q.  Okay.  Go to the next page,
24 please.  He states "All of the talc mined

Page 467

1    A.  I do, yes.
2    Q.  And you've seen reports like
3 this before in defending Johnson & Johnson,
4 correct?
5    A.  I've seen testing reports from
6 time to time, yes.
7    Q.  Okay.  And what the report
8 says, it gives a whole bunch of numbers and
9 it says "examination found no quantifiable
10 amounts of asbestiform minerals."  Do you
11 see that?
12    A.  I do.
13    Q.  Now, have you ever been
14 involved in drafting similar affidavits?
15 Were you involved in drafting this
16 affidavit?
17    A.  No, it was before my time
18 there.
19    Q.  Were you ever involved in
20 drafting similar affidavits?
21    A.  I believe so.
22    Q.  Okay.  And do you know what the
23 factual predicate is for this affidavit?
24 What's the factual basis for it?

Page 524

1  except him?
2      MR. PLACITELLA:  You can
3  answer that.
4      THE WITNESS:  Yeah,
5  there were attorneys for the
6  Engelhard Corporation.
7  BY MR. PLACITELLA:
8      Q.   Right.  They were not lawyers
9  working for Johnson & Johnson, correct?
10     A.   No, they were not.
11     Q.   Right.  And what happened, the
12 back story is that they threatened to sue
13 Johnson & Johnson for selling them a pig in
14 a poke with the Johnson mine, right?
15     MS. BROWN:  I object to
16 the form of that question as
17 argumentative, misstating the
18 evidence, and assuming facts.
19     THE WITNESS:  They
20 threatened a lawsuit against
21 Johnson & Johnson for exposures to
22 talc mined from the Johnson &
23 Johnson mine at the time it was
24 owned by Johnson & Johnson and

Page 525

1      before.  So it probably --
2  BY MR. PLACITELLA:
3      Q.   Correct.
4      A.   Yeah.
5      Q.   And as a result of that threat,
6  you got together with the lawyers from
7  Engelhard and helped prepare this affidavit
8  in order to deal with the cases, right?
9      MS. BROWN:  I object.
10 Lacks foundation.
11     THE WITNESS:  What we
12 did was we participated in this
13 affidavit and Mr. Ashton wrote the
14 affidavit to protect Johnson &
15 Johnson's interests.
16 BY MR. PLACITELLA:
17     Q.   Okay.  Now, and so if we can go
18 back -- by the way, can you go to
19 Exhibit 1039, I'm assuming it's in book
20 two.  And I'm looking specifically at
21 1039.12.
22     MS. BROWN:  Counsel, can
23 you identify for the record what
24 this is?

Page 526

1      MR. PLACITELLA:  Yes,
2  it's an excerpt from the Johnson &
3  Johnson privilege log.
4      - - - - -
5      (Excerpt for J&J Privilege Log
6  marked O'Shaughnessy Exhibit 1039
7  for identification.)
8      - - - - -
9      MS. BROWN:  I object.
10 Lacks foundation.
11     MR. PLACITELLA:  I'm not
12 going to ask privileged questions,
13 I'm just going to ask about
14 people --
15     MS. BROWN:  Same
16 objection.
17     MR. PLACITELLA:  -- as
18 identified on the log.  You got it?
19     MS. BROWN:  Same
20 objection.
21     THE WITNESS:  Yeah.
22 BY MR. PLACITELLA:
23     Q.   Do you see 5/5/1989 and it
24 lists Ira Dembrow, William Ashton, John

Page 527

1  O'Shaughnessy, and Howard Sloane?
2      A.   Yes.
3      Q.   They were people who worked on
4  the affidavit, right?
5      A.   I remember working on it with
6  Mr. Dembrow.
7      Q.   Right.  And do you see where
8  your description says "memorandum with
9  attachment" and it refers directly to baby
10 powder litigation?
11     MS. BROWN:  I object.
12 Lacks foundation.  Misstates the
13 document and vague.
14     MR. PLACITELLA:  Well,
15 it says "Memorandum with attachment
16 prepared by counsel pursuant to
17 pending and anticipated litigation
18 regarding baby powder litigation."
19     THE WITNESS:  I see
20 that.  I do.
21 BY MR. PLACITELLA:
22     Q.   So Johnson & Johnson has listed
23 this affidavit as relevant to baby powder
24 litigation.  Do you see that?

Page 636

1    A.  No.  No, I think her testing
2  was on her own accord.
3    Q.  Correct.
4    A.  And she published a study on
5  it, I think, in 1991.
6    Q.  Exactly.  So it was no secret
7  that Dr. Blount found asbestos in cosmetic
8  talc, it was in her published article,
9  correct?
10        MS. BROWN:  Objection.
11    Speculation.
12        THE WITNESS:  I don't
13    recall the article, but I think she
14    did report that.
15  BY MR. PLACITELLA:
16    Q.  All right.  And if you go to
17  322 in book one?
18    A.  I have it.
19        - - - - -
20    (IARC Monograph  marked
21    O'Shaughnessy Exhibit 322 for
22    identification.)
23        - - - - -
24

Page 637

1  BY MR. PLACITELLA:
2    Q.  Okay.  This is a monograph that
3  was published by IARC and you know that's
4  an international working group on cancer,
5  right?
6    A.  Yes.
7    Q.  And Dr. Blount, if you go to
8  322.246.  Dr. Blount's testing results were
9  so important in finding asbestos in the
10  cosmetic talc that it was actually
11  published by IARC in 2012, some, what,
12  20-plus years after?
13        MS. BROWN:  I object.
14    It misstates the evidence and lacks
15    foundation with this witness.
16        THE WITNESS:  It appears
17    in the monograph.
18  BY MR. PLACITELLA:
19    Q.  Right.
20    A.  I don't know if it makes it
21  more important or less important, but it
22  certainly appears there.
23    Q.  Okay.  So it was no secret that
24  Dr. Blount and the significance of her

Page 638

1  tests, finding asbestos in cosmetic talc,
2  you agree that was no secret?
3        MS. BROWN:  I object.
4    Lacks foundation.
5        THE WITNESS:  No, she
6    published on it.
7  BY MR. PLACITELLA:
8    Q.  What was secret was that the
9  positive results were for Johnson's Baby
10  Powder, right, that was a secret?
11        MS. BROWN:  That assumes
12    facts and misstates the evidence.
13        THE WITNESS:  No, I
14    can't agree with that.
15  BY MR. PLACITELLA:
16    Q.  Well, after you were told that
17  she found asbestos in your baby powder, the
18  very subject of her article, who did you
19  tell outside of Johnson & Johnson?
20        MS. BROWN:  I object to
21    that question.  And instruct you,
22    Mr. O'Shaughnessy, if you did
23    anything in connection with
24    litigation where Dr. Blount was a

Page 639

1    consulting expert not to answer
2    that question.
3  BY MR. PLACITELLA:
4    Q.  Okay.  Who did you tell outside
5  of Johnson & Johnson or the experts that
6  were working for Johnson & Johnson about
7  the secret that Johnson & Johnson -- that
8  Alice Blount found asbestos in Johnson's
9  Baby Powder?
10        MS. BROWN:  I object to
11    the form of the question.  It
12    assumes facts and misstates the
13    evidence.
14        THE WITNESS:  Yeah, I
15    didn't consider anything like that
16    a secret and I wouldn't have
17    normally discussed any company
18    business with people outside the
19    company.
20  BY MR. PLACITELLA:
21    Q.  Who did you tell inside Johnson
22  & Johnson that Dr. Blount found asbestos in
23  Johnson's Baby Powder?
24        MS. BROWN:  And I

John O'Shaughnessy

Page 656

1    THE WITNESS:  So it
2  looks like, I don't recall this
3  document, but it looks like to me
4  that questions were directed to
5  McCrone.
6  BY MR. PLACITELLA:
7    Q.  Correct.
8    A.  And so the Johnson & Johnson
9  lawyers objected to the questions to
10  McCrone.
11    Q.  Correct.
12    A.  And on the basis of the
13  objections, including -- I mean, there are
14  a lot of objections here and a lot of this
15  goes to, I guess, the procedure involved in
16  Texas for these sorts of questions to a
17  nonparty.
18    Q.  Okay.
19    A.  And part of that refers to
20  Texas law --
21    Q.  Yup.
22    A.  -- that the request was in
23  violation of the Texas law.
24    Q.  Yeah.  Go ahead.

Page 657

1    A.  And in terms of the form it was
2  used, so that was an objection.  And then
3  they add, among other objections, that "the
4  information requested is subject to
5  proprietary and trade secret privileges of
6  Defendant."  So yes, we did assert that.
7    Q.  So now we have two sets of
8  secrets in the Coker case, the Blount
9  article, and all the testing documents,
10  right?
11    MS. BROWN:  I object.
12  Argumentative, misstates the
13  evidence.
14  BY MR. PLACITELLA:
15    Q.  The fact -- I'm sorry, I
16  misspoke, we have two secrets.  One, Alice
17  Blount found asbestos in Johnson's Baby
18  Powder; and two, all the testing documents
19  on your right?
20    MS. BROWN:  Objection.
21  Misstates the evidence,
22  argumentative.
23    THE WITNESS:  No, like I
24  said before, the Blount issue was

Page 658

1  not a secret.  And number two, what
2  you call a second secret is a trade
3  secret.  Now, there's a whole law
4  around trade secret.  It's a term
5  of art that applies to a company's
6  documents that I believe are so
7  sensitive that disclosure of them
8  without certain protections would
9  harm the business of the company.
10  So it's not a secret.  It's a trade
11  secret and it's recognized and it's
12  often made in objections.
13  BY MR. PLACITELLA:
14    Q.  Okay.  Did you turn the
15  documents over then?
16    MS. BROWN:  Objection.
17  Assumes facts.
18    THE WITNESS:  I don't
19  know.  I mean, you're showing me
20  one snippet of this discovery
21  record and I'm not sure if it was
22  or wasn't, because if we raised the
23  trade secret objection, then a lot
24  of things could have happened and I

Page 659

1  don't recall what.  But the
2  plaintiff who wanted the documents
3  could say, well, no, we don't agree
4  with Johnson & Johnson and take it
5  into the court and the court would
6  have ruled on it.  I don't know if
7  any of that happened, but there's a
8  whole procedure involved here.
9  BY MR. PLACITELLA:
10    Q.  All my question is, sir, do you
11  have any proof, as you sit here today, that
12  you turned any of those documents over on
13  your right in the Coker case?
14    MS. BROWN:  Objection.
15  Assumes facts.
16    THE WITNESS:  I don't
17  recall what we did in the Coker
18  case.  I don't recall a discovery
19  record.  We may not have with the
20  court's permission or we may have
21  had to turn them over with the
22  court's ruling.
23  BY MR. PLACITELLA:
24    Q.  Okay.  Well, you said that --

Exhibit 187

Page 263

```
 1                    SUPERIOR COURT OF NEW JERSEY
                      LAW DIVISION - MIDDLESEX COUNTY
 2                    DOCKET NO. MID-L-1030-19 AS

 3
                                            VIDEOTAPED
 4                                           VIRTUAL
      ROY COKER, individually and as,    DEPOSITION UPON
 5    Executor of the Estate of          ORAL EXAMINATION
      DARLENE COKER, Deceased,                  OF
 6    and CRYSTAL DECKARD and         JOHN C. O'SHAUGHNESSY
      CATHRYN EVANS, Individually        (VOL. II)
 7    and as Individual Heirs of the
      Estate of DARLENE COKER,

 8
                    Plaintiffs,
 9         v.
10    JOHNSON & JOHNSON, et al.,
11              Defendants.
      ------------------------------
12    DAVID HAMMOCK, Individually and
      as Administrator of the Estate    MID-L-5103-18 AS
13    of SANDRA HAMMOCK,
14                  Plaintiffs,
15         v.
16    JOHNSON & JOHNSON, et al.,
17              Defendants.
      ------------------------------
18    CANDYSE STANFORD and JOHN
      STANFORD,                         MID-L-8486-19 AS
19
                    Plaintiffs,
20
           v.
21
      JOHNSON & JOHNSON, et al.,
22    ------------------------------
23
24
25    JOB NO.:  4580329
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 264

1          TRANSCRIPT of the stenographic notes of
2    ANDREA F. NOCKS, a Certified Court Reporter and
3    Certified Realtime Court Reporter of the State of
4    New Jersey, Certificate No. XI01573, taken virtually
5    on Wednesday, June 23, 2021, commencing at
6    9:35 a.m., Eastern Standard Time.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1    BEFORE:
2    SPECIAL MASTER JOEL SCHNEIDER
3    MONTGOMERY McCRACKEN WALKER & RHOADS LLP
     Liberty View
4    457 Haddonfield Road
     Suite 600
5    Cherry Hill, NJ 08002
6
7    A P P E A R A N C E S :
8    LEVY KONIGSBERG LLP
       BY:  JEROME H BLOCK, ESQ
9        MOSHE MAIMON, ESQ
         ROBERT ELLIS, ESQ
10   605 Third Avenue
     33rd Floor
11   New York, New York 10158
     Attorneys for Plaintiffs
12
13   YETTER COLEMAN LLP
       BY:  COLLIN J  COX, ESQ
14   811 Main Street
     Suite 4100
15   Houston, Texas 77002
     Attorneys for Witness,
16   John C  O'Shaughnessy
17
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
18   LLP
       BY:  ALLISON M  BROWN, ESQ
19       RICHARD BERNARDO, ESQ
         CATHERINE MULLALEY, ESQ
20       BRIAN McCARTHY, ESQ
     One Manhattan West
21   New York, New York  10001
     Attorneys for Defendants,
22   Johnson & Johnson, Johnson & Johnson
     Consumer Products, Inc
23
24
25

Page 266

1    A P P E A R A N C E S :
2    McCARTER & ENGLISH, LLP
       BY:  JOHN C  GARDE, ESQ
3    Four Gateway Center
     100 Mulberry Street
4    Newark, New Jersey 07102-4056
     Attorneys for Defendant,
5    Johnson & Johnson
6
     FAEGRE DRINKER BIDDLE & REATH, LLP
7    BY:  SUSAN M  SHARKO, ESQ
     600 Campus Drive
8    Florham Park, New Jersey  07932-1047
     Attorneys for Johnson & Johnson
9    defendants
10
11   ALSO PRESENT:  JIM ROBERTS,
                    VIDEOGRAPHER
12
13   RACHEL GOODMAN,
     MONTGOMERY McCRACKEN WALKER & RHOADS
14   LLP
15
     CHRIS PLACITELLA, ESQ
16   COHEN, PLACITELLA & ROTH
17
     CHRISTOPHER V  TISI, ESQ
18   LEVIN PAPANTONIO RAFFERTY
19
     MICHELLE PARFITT, ESQ
20   ASHCRAFT & GEREL, LLP
21
     LEVY KONIGSBERG LLP
22   BRADY McLAUGHLIN, Paralegal
     JOSH DISCHINGER, Paralegal
23
24   SKADDEN, ARPS, SLATE, MEAGHER & FLOM
     PAUL COTLER, Legal Assistant
25   STEPHANIE MARTIN, Legal Assistant

Page 267

1                    INDEX
2                    PAGE
3    WITNESS:
4        JOHN C. O'SHAUGHNESSY
5    EXAMINATION BY:
6        MR. BLOCK          272, 503, 532
7        MS. BROWN          459, 526
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 264 - 267)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 268

E X H I B I T S

| NUMBER | DESCRIPTION | IDENTIFICATION |
|---|---|---|
| 15A | Business Confidential Research Report | 275 |
| 15B | January 22, 1998 letter | 290 |
| 16 | February 13, 1998 e-mail | 321 |
| 19 | 10/16/97 memo | 325 |
| 25 | July 29, 1971 letter | 344 |
| 26 | October 27, 1972, Examination Of Johnson & Johnson's Baby Powder | 350 |
| 26A | May 14, 1971, Assay of Talc in Baby Powder | 533 |
| 26B | April 24, 1974, Examination Of Talc Samples, Argonaut Ore Body | 354 |
| 33 | July 1, 1999 e-mail | 372 |
| 35 | June 4, 2000 e-mail | 363 |
| 35A | February 4, 2000 e-mail | 369 |
| 36 | E-mail chain | 394 |

Page 269

E X H I B I T S   C O N T ' D

| NUMBER | DESCRIPTION | IDENTIFICATION |
|---|---|---|
| 37 | E-mail chain | 485 |
| 37A | 11/27/2000 e-mail | 400 |
| 39 | 3/29/2002 e-mail | 406 |
| 40 | October 23, 2002 memo | 411 |
| 40A | October 1, 2002 fax Asbestos Phobia to Eat At Economy | 420 |
| 40B | September 19, 2002 letter | 417 |
| 41 | August 19, 2003 fax | 426 |
| 41A | May 17, 2001 e-mail | 422 |
| 42 | February 24, 2004 fax | 436 |
| 43 | 3/3/2004 e-mail | 441 |
| 43A | E-mail chain | 445 |
| 45 | E-mail chain | 509 |
| 48 | E-mail chain | 430 |

(Exhibits e-mailed to Certified Court Reporter.)

Page 270

1        VIDEOGRAPHER:  Good morning.
2        We're going on the record at
3    approximately 9:35 a.m. on June 23rd, 2021.
4        Please silence cell phones, computer
5    tones and other electronic devices.
6        Audio and video recording will
7    continue to take place unless all parties agree to
8    go off the record.
9        This is Media Unit 1 of the remote
10    video recorded deposition of John C. O'Shaughnessy
11    taken by counsel for plaintiff in the matter of Roy
12    Coker, et al., versus Johnson & Johnson, et al.,
13    filed in the Superior Court of New Jersey, Law
14    Division, Middlesex County, under multiple docket
15    numbers.
16        My name is Jim Roberts, here in
17    association with Priority One, a Veritext company.
18    I'm the videographer.  The court reporter is Andrea
19    Nocks, also with Veritext.
20        All counsel consent to this remote
21    video arrangement, waive objections to this manner
22    of recording and to the remote swearing in of the
23    witness.
24        The court reporter has noted
25    counsels' appearances and will please swear in the

Page 271

1    witness.
2    J O H N   C.   O' S H A U G H N E S S Y,
3    C/o Skadden Arps, Slate, Meagher & Flom, LLP,
4    One Manhattan West, New York, New York, having been
5    first duly sworn, testifies as follows:
6        MS. BROWN:  Mr. Block, before you
7    begin, I just want to further put on the record our
8    objection to the use of Exhibit 15.
9        The document at issue is protected
10    work product, created in defense of the talc
11    litigation.  It's our position that sharing that
12    with Luzenac did not waive the work product
13    protection, given the company's common interest in
14    the talc litigation.  Luzenac, as you know, is a
15    supplier of Johnson & Johnson's talc.
16        Luzenac or Imerys who produced the
17    document cannot, on its own, waive the work product
18    protection over J&J's work product.  And our failure
19    to claw back somebody else's documents does not
20    change that outcome because, of course, we did not
21    produce it and were not aware of the production
22    until yesterday.
23        So we understand the court's ruling.
24    We're prepared to allow Mr. O'Shaughnessy to answer
25    questions about the four corners of this document.

3 (Pages 268 - 271)

O'SHAUGHNESSY - Direct

Page 272

1  But for the record, we do believe that this is work
2  product that can't be waived by another company.
3       MR. BLOCK:  Okay.  I disagree with
4  everything you said, but with that, I'm going to
5  proceed.
6  CONTINUED DIRECT EXAMINATION BY MR. BLOCK:
7       Q.    Mr. O'Shaughnessy, can you hear me?
8       A.    I can.
9       Q.    Okay.  Mr. O'Shaughnessy, when we
10  left off yesterday we were looking at Exhibit 15 to
11  your deposition.
12       Do you remember that?
13       A.    I'll go to it right now.
14       Q.    And you could see on the screen that
15  Exhibit 15 is a fax that you sent on April 16, 1998,
16  correct?
17       A.    Yes.
18       Q.    And you sent to Mr. Zazenski from
19  Luzenac, correct?
20       A.    That's right.
21       Q.    Luzenac was the talc supplier for
22  Johnson's Baby Powder at the time, correct?
23       A.    Yes.  I'm sorry.  What am I looking
24  at, Exhibit 15?
25       Q.    Exhibit 15, page 2, sir.

Page 273

1       A.    I'm sorry.  Okay.  Got it.  Yes.
2       Q.    And do you remember Mr. Zazenski from
3  Luzenac?
4       A.    I do.
5       Q.    And what do you remember about him?
6       A.    He was, I recall that he was the
7  point person for me for litigation matters between
8  the companies involving the supply of talc.
9       Q.    And in your fax to Mr. Zazenski,
10  let's see what you wrote.  What you attach to the
11  fax to Mr. Zazenski, I guess because he was your
12  point person, was a letter actually to someone else
13  at Luzenac, someone named Mr. Jean Pierre Grange,
14  correct?
15       A.    Yes.
16       Q.    And your letter to Mr. Grange is in
17  regard to Coker, which, you put in parentheses,
18  "(Texas mesothelioma lawsuit)."
19       That's what you wrote, correct?
20       A.    Yes.
21       Q.    And you wrote to Mr. Grange from
22  Luzenac, "Thank you so much for providing me with
23  the documents related to talc testing and the Val
24  Chisone deposit."
25       Do you see that?

Page 274

1       A.    I do.
2       Q.    Then you wrote, "Those documents
3  dated back to 1982."
4       Do you see that?
5       A.    Yes.
6       Q.    Then you wrote, "In our lawsuit, the
7  person suing Johnson & Johnson had exposure to
8  Italian talc used in our baby powder that was
9  produced from 1945 through 1963."
10       Is that what you wrote?
11       A.    Yes.
12       Q.    Then you wrote, "After 1963 or so,
13  Johnson & Johnson began using Vermont talc."
14       That's what you wrote, correct?
15       A.    Yes.
16       Q.    Then you wrote, "Therefore, it is
17  very important that we be able to provide evidence
18  to the court that the talc produced from Val Chisone
19  in the 1945 to 1963 timeframe was free from
20  asbestiform fibers."
21       Do you see that?
22       A.    I do.
23       Q.    And when you made this statement to
24  Mr. Grange from Luzenac, you know that Johnson &
25  Johnson, as you testified to yesterday, was telling

Page 275

1  the public that there was never asbestos in the talc
2  used in Johnson's Baby Powder, correct?
3       A.    That was Johnson & Johnson's position
4  throughout.
5       Q.    Okay.  And I want to hone in on this
6  statement here.  And you say that the documents
7  related to talc testing, you were thanking Luzenac
8  for providing them to you, but you were saying that
9  those documents regarding the testing of Italian
10  talc only dated back to 1982.
11       Is that what your letter states?
12       A.    It says those documents dated back to
13  1982, yes.
14       Q.    Right.  Referring to documents
15  related to talc testing, right?
16       A.    In the Val Chisone deposit, yes.
17       Q.    And the Val Chisone deposit was the
18  Italian talc that was used in Johnson's Baby Powder,
19  right?
20       A.    Yes.
21       Q.    Okay.  Let's go to the next exhibit,
22  which is Exhibit 15A, okay.  And Exhibit 15A is
23  entitled "Business Confidential" on the top right,
24  correct?
25       A.    Yes.

4 (Pages 272 - 275)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

O'SHAUGHNESSY - Direct

Page 276

1    Q.    And Exhibit 15A is entitled "Research
2  Report" and there's a name, "Battelle Memorial
3  Institute," on the bottom.
4         Do you see that?
5    A.    I do.
6    Q.    Okay.  And if we look at the cover
7  page of the report, which is the third page in, we
8  see that the title of the report is "Phase Report on
9  Pilot-Plant Beneficiation of Italian Run-Of-Mine
10  Talc," correct?
11   A.    Yes.
12        MS. BROWN:  Objection to this
13  document on foundation.
14  BY MR. BLOCK:
15   Q.    And this is to Johnson & Johnson,
16  correct?
17   A.    That's what it says.
18   Q.    And this is dated March 8, 1960,
19  right?
20   A.    That's the date on it.
21   Q.    And this document about Italian talc
22  which was sent to Johnson & Johnson from Battelle is
23  dated March 8, 1960, which is well before 1982,
24  correct?
25   A.    It's before 1982, obviously, yeah.

Page 277

1    Q.    Okay.  And this document from the
2  Battelle Memorial Institute, if you look at the
3  fourth page in, was sent to Mr. William Ashton from
4  Johnson & Johnson in New Brunswick, New Jersey,
5  correct?
6    A.    Yeah, that's what it says.  I'm just
7  trying -- do you know what Bates number that is,
8  because I'm following with the hard copy document?
9    Q.    The Bates number on the bottom right
10  corner is 580 at the end.
11   A.    Got it.  Thank you.
12   Q.    Okay.  And this report from the
13  Battelle Memorial Institute was sent to Mr. William
14  Ashton way back in 1960, right?
15   A.    Yes.
16   Q.    And just to be clear, sir, when you
17  were on the Talc Steering Committee, as we saw, one
18  of the purposes of the Talc Steering Committee was
19  to monitor the science of talc including studies on
20  talc, publications on talc, correct?
21   A.    Yeah, those were the people from the
22  company, those are on the, I think the documents you
23  showed me yesterday, which included the names of,
24  you know, the scientists, I think some regulatory
25  people, corporate communications people.

Page 278

1         And that committee, in advance of the
2  FDA meeting, was assembling the information from
3  around the company; not that it hadn't been done
4  before, I think, but they were doing it in advance
5  of the FDA meeting.
6         So those are the people responsible
7  in part, you know, not all of them, but for the
8  safety of the product.  And I was there, you know,
9  identified as the lawyer.  It was at that time there
10  was some publicity around the product and there were
11  some legal cases, so I was there in my role as a
12  lawyer for the litigation to provide information
13  about the cases should they need that, and also to
14  understand the issues, my own views in litigation
15  around the FDA meeting.
16   Q.    Move to strike the portion that was
17  not responsive.
18        You were on J&J's Worldwide Talc
19  Steering Committee:  Yes or no?
20   A.    Yes, they identified me as on there,
21  yeah.
22   Q.    Okay.  And one of the scientists from
23  Johnson & Johnson that provided information to J&J's
24  Talc Steering Committee was William Ashton, correct?
25   A.    Yes, Mr. Ashton was a, I don't know,

Page 279

1  I forget his background, but I believe he was
2  definitely a technical scientific person, yes.
3    Q.    Did you ever hear Mr. Ashton referred
4  to at Johnson & Johnson as Mr. Talc or the leading
5  expert on talc?
6    A.    No, I know he was very well versed in
7  the field because he had been working on it.  You
8  know, this memo you're showing me now shows that Mr.
9  Ashton went back with talc a long way.
10   Q.    And you regularly communicated with
11  William Ashton while you were on J&J's Talc Steering
12  Committee:  Yes or no?
13   A.    I communicated with Mr. Ashton from
14  time to time.  I wouldn't call it regular, but as I
15  needed information or had questions with respect to
16  litigation.  So it was --
17   Q.    You spoke to --
18        MS. BROWN:  Let him finish.
19   A.    It was probably during the time I
20  was, that they said I was on that committee, but it
21  would be other times as well.
22   Q.    You spoke to Mr. Ashton on many
23  occasions about talc, correct?
24   A.    Yes.
25   Q.    All right.  So looking at this report

5 (Pages 276 - 279)

O'SHAUGHNESSY - Direct

Page 280

1 that was sent to William Ashton in 1960, it says,
2 "Dear Mr. Ashton, We are pleased to transmit six
3 copies of our Phase Report, Pilot-Plant
4 Beneficiation of Italian Run-Of-Mine Talc."
5          Is that what it says?
6     A.    Yes.
7     Q.    And then on the page that ends with
8 582, just turn two pages more, there's a sentence at
9 the top, it says, "Laboratory work."
10         Do you see that?
11    A.    Yes, in the body, yes.
12    Q.    It says, "Laboratory work had shown
13 that a superior talc product could be produced by
14 wet grinding and flotation of Italian run-of-mine
15 talc."
16         Do you see that?
17    A.    Yes.
18    Q.    Okay.  And it abbreviates, there's a
19 note at the bottom that run-of-mine talc, there's an
20 abbreviation, ROM.
21         Do you see that?
22    A.    Yeah.
23    Q.    Okay.
24    A.    Yeah.
25    Q.    All right.  And please go to the

Page 281

1 page, let me rotate the view here so you could see
2 it.  All right.  Please turn to the page that ends
3 in Bates 594.  You'll see Table 8.
4     A.    I have it.
5     Q.    Okay.  And in the report sent to
6 William Ashton from Johnson & Johnson, Table 8 says,
7 "Characteristics of talc products."
8         Do you see that?
9     A.    Yes.
10    Q.    All right.  And it says, "ROM,"
11 run-of-mine, "talc untreated, tremolite, 1 percent,"
12 correct?
13    A.    It says one, yeah.
14    Q.    Right?  It says that it's in per cent
15 at the top.
16         Do you see that?
17    A.    I do.
18    Q.    And then it says, beneficiated run of
19 mill talc under tremolite says, "trace," T-R, trace,
20 correct?
21    A.    Right.
22    Q.    And for primary cyclone overflow, it
23 says plus or minus 1 percent tremolite, correct?
24    A.    Correct.
25    Q.    For the flotation tailing, it's 1 to

Page 282

1 2 percent tremolite, correct?
2     A.    1 to 2 is under there, yeah,
3 tremolite, 1-2.
4     Q.    1-2 under percent tremolite, correct?
5     A.    Yes.
6     Q.    And for combined by-products, 1 to 2
7 percent tremolite, correct?
8     A.    Yes.
9     Q.    Johnson & Johnson shelf product, it
10 says, "trace," tremolite, correct, TR?
11    A.    TR, yes.
12    Q.    Okay.  And there's a footnote D, and
13 it says that the Johnson & Johnson shelf product was
14 a sample of August 1958, correct?
15    A.    I see that, yes.
16    Q.    And under Italian Number 2,
17 beneficiated talc, under tremolite it says, "trace,"
18 correct?
19    A.    Correct.
20    Q.    And it doesn't say zero under
21 tremolite for any of these Italian talc products,
22 correct?
23    A.    Right.
24    Q.    And to your knowledge, did Mr. Ashton
25 ever share this report with the Talc Steering

Page 283

1 Committee at J&J?
2         MS. BROWN:  Objection; foundation;
3 speculation.
4     A.    I wouldn't know.  They did a lot of
5 activity outside my presence, so I have no idea.
6     Q.    Is this the first time that you have
7 ever seen a report from Battelle which tested J&J's
8 talc?
9         MS. BROWN:  I object,
10 Mr. O'Shaughnessy, and I instruct you not to answer
11 the question if doing so would reveal information
12 you may have reviewed in connection with defending
13 the company in talcum powder lawsuits.
14         MR. BLOCK:  Let me rephrase the
15 question.
16 BY MR. BLOCK:
17    Q.    Mr. O'Shaughnessy, is this the first
18 time that you could ever recall seeing a report from
19 Battelle which tested J&J's talc?
20         MS. BROWN:  It's the same objection.
21         MR. BLOCK:  I'd ask for a ruling.
22         SPECIAL MASTER:  The ruling is that
23 the objection is overruled.
24 BY MR. BLOCK:
25    Q.    Could you please answer, sir?

6 (Pages 280 - 283)

O'SHAUGHNESSY - Direct

Page 284

1        SPECIAL MASTER: Hold on. Hold on.
2 The questioner is only asking the witness if he's
3 seen this before. He's not asking when, how, where,
4 et cetera. The answer will give absolutely no
5 indication whether, if the witness saw it, he saw it
6 in connection with litigation or some other issue.
7        When and if plaintiffs' counsel goes
8 further with his questions which would seek to
9 identify whether the knowledge was gained in
10 connection with litigation, then we may have an
11 appropriate objection. But just the general
12 question whether he's seen it before reveals no work
13 product. That's my ruling.
14        MS. BROWN: Understood.
15        MR. BLOCK: Can we have the question
16 read back and an answer, please.
17        (The following Question is read back:
18        "QUESTION: Mr. O'Shaughnessy, is
19 this the first time that you could ever recall
20 seeing a report from Battelle which tested J&J's
21 talc?")
22        A.   That's different from what Judge
23 Schneider said. The question that Judge Schneider
24 thought was appropriate, if I heard it from the
25 judge correctly, was have I ever --

Page 285

1        MR. BLOCK: Your Honor, excuse me,
2 who's speaking right now?
3        MS. BROWN: You just interrupted him,
4 so if you're going to --
5        MR. BLOCK: No, your Honor, your
6 Honor, is Mr. O'Shaughnessy making a legal
7 objection?
8        MS. BROWN: No, Jerry --
9        SPECIAL MASTER: Hold on. Hold on.
10 Hold on. Please, counsel. Please. Let's keep this
11 on a professional level.
12        MR. BLOCK: I'm sorry, I didn't know
13 who was speaking.
14        SPECIAL MASTER: That was
15 Mr. O'Shaughnessy.
16        MR. BLOCK: Okay, your Honor, I
17 object -- I object --
18        SPECIAL MASTER: Hold on.
19        MR. BLOCK: -- to Mr. O'Shaughnessy
20 objecting.
21        SPECIAL MASTER: Hold on. Please,
22 Mr. O'Shaughnessy. I understand what's going on.
23        Mr. O'Shaughnessy just wants
24 clarification of the question to be answered. That
25 is an appropriate inquiry, so you may ask your

Page 286

1 question, Mr. O'Shaughnessy.
2        MS. BROWN: Thank you, your Honor.
3        A.   The way I understood Judge
4 Schneider's ruling was that the question was have I
5 ever seen this document before, and I think
6 Mr. Block's question as read back was different than
7 that.
8        MR. BLOCK: Your Honor, that is not
9 how I understood your ruling. You heard my
10 question, you overruled the objection, and I don't
11 think there's any misunderstanding at all.
12        If I could have the question read
13 back and the question answered, that's what I would
14 request at this point, your Honor.
15        SPECIAL MASTER: Please have the
16 court reporter repeat the question.
17        (The following Question is read back:
18        "QUESTION: Mr. O'Shaughnessy, is
19 this the first time that you could ever recall
20 seeing a report from Battelle which tested J&J's
21 talc?")
22        SPECIAL MASTER: That's an
23 appropriate question and can be answered,
24 Mr. O'Shaughnessy. I do not believe it requires you
25 to reveal any work product at all.

Page 287

1        Is this the first occasion you could
2 ever recall seeing the report?
3        A.   I don't recall seeing this report. I
4 don't recall seeing it, so I don't know if this is
5 the first time or not for this report, but I don't
6 recall seeing it.
7        Q.   Mr. O'Shaughnessy, before I showed
8 you this report from Battelle here today, do you
9 ever recall seeing any report from Battelle which
10 tested J&J's talc?
11        MS. BROWN: It's the same question.
12 I object as asked and answered.
13        SPECIAL MASTER: No, it's not the
14 same question because the first question was Exhibit
15 15A and the question is broader than just 15A. It
16 asks about any Battelle report, not just this 15A,
17 so it's not the same question.
18        MS. BROWN: I understood the first
19 question to be broader than 15A, but I understand,
20 judge.
21        MR. BLOCK: Could we have the
22 question read back so the witness can answer,
23 please.
24        (The following Question is read back:
25        "QUESTION: Mr. O'Shaughnessy, before

7 (Pages 284 - 287)

O'SHAUGHNESSY - Direct

Page 288

1 I showed you this report from Battelle here today,
2 do you ever recall seeing any report from Battelle
3 which tested J&J's talc?")
4      A.     In preparing these cases and working
5 on the litigation, I did see testing documents from
6 the outside labs.  I don't remember which ones as I
7 sit here now, but I did see some testing documents,
8 yes, from outside labs, and Battelle is a familiar
9 name to me as an outside lab for J&J.
10     Q.     So is your answer that you don't
11 recall ever seeing any report from Battelle before
12 today testing J&J's talc or that you're not sure?
13     A.     I'm trying to describe as best I can
14 'cause it's going back so long.  I saw testing
15 reports from outside labs from J&J as part of my
16 work on the litigation.  Battelle is familiar to me
17 as one of the outside labs, and I believe there were
18 others.  But, you know, I don't recall specifically,
19 you know, which reports I saw from which labs.  It
20 might have been all of them, some of them.  I just
21 don't recall that detail.  And that's kind of the
22 best way I can answer.
23     Q.     Okay, sir.  Now, looking at Exhibit
24 15A that we just went through where tremolite is
25 reported in the Italian talc, including Johnson &

Page 289

1 Johnson shelf product.
2         Do you see that?
3     A.     I see that, yes.
4     Q.     Okay.  All right.  And looking on the
5 screen, we looked at the document yesterday, we're
6 looking at part of the answers to the Krushinski
7 case.
8         You remember we looked at that
9 yesterday?
10     A.     I do.
11     Q.     And as we could see on the screen
12 looking at Exhibit 32, J&J's answer in the
13 Krushinski case was, in 2000, in the year 2000 was,
14 "to the best of defendant's knowledge, talc used in
15 the manufacture of Johnson & Johnson's Baby Powder
16 never contained asbestos in any form, or tremolite."
17         That's what it says, right?
18     A.     Did not contain asbestos or
19 tremolite, yes.
20     Q.     The words used are, "Johnson's Baby
21 Powder never contained asbestos in any form," comma,
22 "or tremolite."
23     A.     Okay.
24     Q.     Correct?
25     A.     I was reading from the bottom as

Page 290

1 well.
2     Q.     Okay.  And you gave the final
3 approval of those Answers to Interrogatories, as you
4 testified to yesterday, right?
5     A.     Yes.
6     Q.     And Nancy Musco signed those Answers
7 to Interrogatories with the assistance and advice of
8 counsel, and she said that she understood those
9 statements, she understood that if any of the
10 foregoing statements made were willfully false, it
11 may subject her and the company to punishment,
12 right?  That's what it says?
13         MS. BROWN:  Objection (inaudible).
14     A.     I may be subject to punishment.
15         (Court Reporter clarification.)
16         MS. BROWN:  I apologize, Andrea.  My
17 objection was this was asked and answered
18 extensively yesterday.
19 BY MR. BLOCK:
20     Q.     Sir, let's look at Exhibit 15B,
21 please.  Exhibit 15B, let's just go to the second
22 page.
23         Do you see that this is a letter from
24 Johnson & Johnson Consumer dated January 22nd, 1998?
25     A.     Yes.

Page 291

1     Q.     Do you see that this is a letter to
2 that same Richard Zazenski from Luzenac that you had
3 sent that fax to that we looked at earlier?
4     A.     Right.
5     Q.     All right.  And you see that this is
6 a letter from Michael Chudkowski from Johnson &
7 Johnson Consumer?
8     A.     Yes.
9     Q.     And the letter says, to Mr. Zazenski,
10 "Dear Rich, This will confirm our meeting on talc
11 for Friday, February 6, 1998 at Johnson & Johnson
12 Consumer."
13         Do you see that?
14     A.     I do.
15     Q.     And it says, "Please notify Jean
16 Pierre Grange and let me know your flight
17 schedules."
18         Do you see that?
19     A.     Yes.
20     Q.     And John Pierre Grange was the person
21 from Luzenac in France that you had written to about
22 the Coker case in the exhibit we looked at earlier,
23 correct?
24     A.     Yes.
25     Q.     And Mr. Chudkowski copies you on this

8 (Pages 288 - 291)

O'SHAUGHNESSY - Direct

Page 292

1 letter, correct?
2    A.    Yes.
3    Q.    He copies Dr. Hopkins, correct?
4    A.    Right.
5    Q.    And copies Mr. Ashton, right?
6    A.    Yes.
7    Q.    The same Mr. Ashton who received that
8 report in 1960 that we just looked at where
9 tremolite was reported in J&J's talc, correct?
10    A.    On that table as stated in the
11 document, yeah.
12    Q.    Right.  In the table that said
13 Johnson & Johnson shelf product, correct?
14         MS. BROWN:  I object; lacks
15 foundation.
16    A.    Yes.
17    Q.    Okay.  And who is this Mr. John
18 McKeegan?
19    A.    I know he was an employee of, I
20 believe of the consumer products company, but I
21 don't recall him.
22    Q.    John McKeegan was the manager of
23 communications for Johnson & Johnson at this time.
24         Do you remember that?
25    A.    No.

Page 293

1         MS. BROWN:  Foundation.
2 BY MR. BLOCK:
3    Q.    All right.  And then let's look at
4 the attachment here.
5         MS. BROWN:  Hold on, counsel.  I have
6 an objection to this because it's certainly not the
7 attachment because they have been produced from
8 different companies.  So it looks like you or
9 someone on your team has taken two J&J produced
10 documents and paired it with an Imerys produced
11 document.
12         I'm going to object to the Imerys
13 produced document on work product grounds pursuant
14 to the joint defense of the talc litigation, similar
15 to the same objection I made on Exhibit 15.
16         MR. BLOCK:  Okay.  Let me make clear
17 what I was referring to.
18 BY MR. BLOCK:
19    Q.    Now, this letter that Mr. Chudkowski
20 sent refers to a February 6, 1998, meeting to take
21 place at Johnson & Johnson, correct?
22    A.    Correct.
23    Q.    If we look at the next page of the
24 exhibit, 15B, at the top the date is the same,
25 correct, February 6, 1998, right?

Page 294

1    A.    I'm a little bit lost here.  Okay.  I
2 got it.
3    Q.    It says, "Skillman, 6, February" --
4 it says, "Skillman 6 Feb 98," right?
5    A.    Yes.
6    Q.    And the meeting was scheduled to take
7 place on February 6, 1998, in Skillman, right?
8    A.    Yes.
9    Q.    And it says, "Please notify John
10 Pierre Grange," and there's a document attached
11 which is J.P. Grange, to others, and it also copies
12 Mr. Zazenski, and others.
13         Do you see that?
14    A.    I do.
15    Q.    Okay.  And this document that we're
16 looking at has an Imerys stamp on the bottom right.
17         Do you see that?
18    A.    Yes.
19    Q.    Okay.  And the document from
20 Mr. Grange has a heading that says, "Johnson &
21 Johnson - Mesothelioma Case."
22         Do you see that?
23    A.    Yes.
24    Q.    And it reads, "John O'Shaughnessy,
25 lawyer in charge" --

Page 295

1         MS. BROWN:  I'm sorry to interrupt,
2 but, your Honor, we are going to assert work product
3 over these Imerys produced documents regarding joint
4 defense of these cases.
5         Could we discuss that at a sidebar,
6 please, and get a ruling on this document?
7         SPECIAL MASTER:  Let's go to sidebar.
8         MS. BROWN:  Thank you, your Honor.
9         (Sidebar.)
10         MR. BLOCK:  Your Honor, is everyone
11 in the room?
12         SPECIAL MASTER:  I think it would be
13 helpful, one, to understand whether J&J has seen
14 this particular document before.  Is this the first
15 time you're seeing it, and the circumstances
16 regarding the production of the document.
17         MR. BERNARDO:  Your Honor, I'm going
18 to be at Miss Brown's computer here because we're
19 all in the same room and we'll get feedback if I log
20 on separately, but... your Honor, there are millions
21 of pages of documents produced in this litigation.
22 There are millions or there are numerous different
23 proceedings with different companies producing
24 different documents.
25         It is a literal impossibility to be

9 (Pages 292 - 295)

O'SHAUGHNESSY - Direct

1 on top of what every other company has produced. I
2 personally have not seen this before, which I
3 understand is not dispositive. I may be wrong and
4 Mr. Block will correct me if I am. I have a
5 reasonable and good faith belief that we have not
6 seen this.
7        But, your Honor, a third party with
8 whom we would share a joint defense or common
9 interest privilege simply cannot waive that on
10 behalf of another party. And the idea that Johnson
11 & Johnson could somehow know what litigation Imerys
12 is in and actively claw that back is not realistic
13 in this type of a mass tort proceeding. That's why
14 we're raising this.
15        Again, I certainly could not
16 personally have knowledge of every document produced
17 everywhere, but I can say that I have not seen it.
18 I know Miss Brown has tried a number of these
19 cases --
20        MS. BROWN: I have not seen it.
21        SPECIAL MASTER: I accept your
22 representation that subjectively neither of you have
23 seen this document before, but what were the
24 circumstances regarding the production of this
25 document? Mr. Block got it somehow.

1        MR. BLOCK: Yeah, your Honor, since
2 I'm the proponent of the document, I feel that I'd
3 like to give you, you know, what happened here. And
4 Mr. Maimon, my partner, you know, he's been
5 litigating the J&J and Imerys cases since 2017, and
6 he received the original productions from J&J and
7 Imerys and all subsequent productions, and he taught
8 me everything I know.
9        So I will say this, your Honor, both
10 sides have very sophisticated databases. And just
11 ask Mr. Bernardo and he'll tell you, okay, the
12 productions are put into a database. We have a
13 database, they have a database, and all you do is
14 search the name O'Shaughnessy. That's all you do.
15        And so our Imerys, we have our Imerys
16 documents in the database, we have our Johnson &
17 Johnson documents in the database. They have all
18 their talc productions in their own database, which
19 is probably better than ours, and you search the
20 name O'Shaughnessy and you could find all the
21 documents. It's not hard. I did it all myself.
22        SPECIAL MASTER: The question,
23 please.
24        MR. BLOCK: So, your Honor, the
25 Imerys production was made to plaintiffs in the talc

1 litigation years ago and it was made to Johnson &
2 Johnson years ago.
3        SPECIAL MASTER: Do we know in what
4 case -- hold on, please. Do we know in what case it
5 was produced?
6        MR. BLOCK: The original -- Moshe
7 could talk about it. I think the Sabatelli case was
8 the original case in which the productions from both
9 companies were made.
10        But let's also keep in mind, your
11 Honor, a few things. Imerys, Luzenac, Cyprus, all
12 those related companies, they were not a defendant
13 in Coker. So that's just one issue.
14        But in terms of modern day, 2017 to
15 present, they have been codefendants. So the idea
16 that we could have an Imerys-stamped document and be
17 able to find it and Johnson & Johnson could not is
18 completely inconceivable. And the obligation would
19 be on Johnson & Johnson, upon receiving the Imerys
20 production, to simply put in the names of their
21 lawyers into the production, including the key
22 lawyer in the litigation, John O'Shaughnessy, and
23 find out if Imerys produced any of those documents,
24 and if they thought they could take some action to
25 claw back a document another party produced to do

1 so. And they have never made any effort to claw
2 back this document because the lawyers here are
3 claiming they never saw it. And if they never saw
4 it, it's because they never did the proper searches
5 of the name O'Shaughnessy in their Imerys
6 production. But I'll defer to Mr. Maimon on the
7 production.
8        MR. MAIMON: Yes, your Honor.
9        SPECIAL MASTER: Can I ask a
10 question, please?
11        Mr. Block, you referred to a database
12 of documents. Are -- do J&J and plaintiffs have
13 access to the same database or does each have their
14 own proprietary system.
15        MR. BLOCK: We have access to the
16 same documents to the extent they're produced in
17 litigation by parties, but we have our own
18 proprietary databases; however, they operate
19 similarly in that when the documents are produced by
20 parties, metadata, it comes with metadata, so that
21 when it goes in the database you have the date of
22 the document, it contains information such as who
23 the custodian of the document was, and, I mean, you
24 know, it's kind of like Google, you know, once it's
25 in the data --

10 (Pages 296 - 299)

O'SHAUGHNESSY - Direct

Page 300

1    SPECIAL MASTER:  My question --
2    MR. BLOCK:  -- you put the word in
3 and search it.
4    SPECIAL MASTER:  My question was, I
5 take it from what you're saying that you don't share
6 a database, right?
7    MR. BLOCK:  Right, we don't.  I mean,
8 you know, they could search their database right now
9 and I'm sure they'll find this document.
10    SPECIAL MASTER:  Okay.  Before we
11 turn to the other gentleman, one more area of
12 inquiry.  Can you, can you help me understand the
13 relationship in the litigation between Imerys and
14 J&J because, you know, there's a couple of legal
15 steps that J&J has to overcome, they're arguing the
16 community of interest privilege.  You know I've
17 written on that issue several times.  The interest
18 of the parties who hold the privilege has to be
19 coextensive.  I don't know if Imerys and J&J have
20 coextensive interests.  I don't know if they made
21 claims against each other in the case.
22    So can you help me understand their
23 relationship in the litigation?  I know Imerys is in
24 bankruptcy, but supposedly, presumably, there was a
25 time when they were in the litigation together and

Page 301

1 I'm just, I need to know whether their interests are
2 coextensive in the litigation.
3    MR. BLOCK:  Your Honor, in 1998 --
4    MR. BERNARDO:  I think that's a
5 question for Johnson & Johnson.
6    MR. BLOCK:  Well, I think in 1998,
7 your Honor, it's undisputed, it's undisputed that
8 Luzenac, the predecessor to Imerys, was not a
9 defendant in the Coker case, was never a defendant
10 in the Coker case.
11    So when Mr. O'Shaughnessy was writing
12 them letters, like Exhibit 15 that we looked at,
13 when he was having meetings with them in 1998 which
14 was memorialized in this Imerys memo, Luzenac was
15 not a codefendant.  And to my knowledge in 1998,
16 there was no joint defense agreement that had been
17 signed that would memorialize any joint defense.
18    And I think Mr. Bernardo would have
19 something to say about modern times, you know, maybe
20 from 2017 to present, but I think it's undisputed
21 what I just said regarding the time of the document
22 we're looking at, 1998.
23    SPECIAL MASTER:  Okay.  Why don't we
24 hear from your partner and then we'll hear from J&J.
25    MR. MAIMON:  Yeah, thank you, your

Page 302

1 Honor.
2    There are two cases in New Jersey
3 State Court in which we received productions from
4 Imerys as a defendant in those cases.  One was a
5 wrongful death case called "Sabatelli," that was the
6 first case that we filed, and both Imerys as well as
7 Johnson & Johnson produced documents to us.
8    They did it in the format that
9 Mr. Block had described in producing documents that
10 were not only in PDFs, but also in a format that
11 they could be loaded into a database and were
12 automatically word searchable so that if you put in
13 any name, any word, you would get all the documents
14 that had that name or word in it.
15    And not only is it clear that nobody
16 searched the database for Mr. O'Shaughnessy's name
17 when they got it or in the three plus years, almost
18 four years now since the documents have been
19 produced, but in preparation for the deposition also
20 they could have taken a look and see well, where's
21 Mr. O'Shaughnessy listed, and if they had any
22 objections they could have raised those also and
23 that's the opportunity.
24    In addition to the State Court
25 proceedings in which both Johnson & Johnson and

Page 303

1 Imerys produced these documents, also in the Federal
2 MDL, which, as your Honor knows, is overseen by
3 Judge Wolfson, they produced a document also
4 pursuant to a document production and management
5 order whereby the format in which the documents was
6 ordered by, I think it was then Magistrate Pisano
7 who was overseeing the discovery, and there was a
8 discovery order that was entered whereby it was
9 recognized that different parties and different law
10 firms and different groups of people would want to
11 have their own -- had their own database systems in
12 their offices and in their firms, but the documents
13 as produced had to be accommodatable to each one so
14 that even though we don't share a database, so to
15 speak, with Mr. Bernardo's firm or Miss Brown's
16 firm, the underlying data and the searchability is
17 the same for both.
18    And just, Mr. Block is correct, that
19 Imerys is a successor company to Luzenac, and I
20 think that transfer took place somewhere after 2003,
21 in which Luzenac sold all of its mining interests to
22 Imerys, and Imerys never sold Johnson & Johnson talc
23 out of the Vermont mine.  That was only Luzenac, the
24 predecessor company.
25    And before that, Luzenac had

11 (Pages 300 - 303)

O'SHAUGHNESSY - Direct

Page 304

1  purchased another company called "Rio Tinto" which
2  bought the Vermont mines from Johnson & Johnson in
3  1992, I believe it was.
4       So that's kind of the history of the
5  mining.  But in 1998 when this document is being
6  generated, Luzenac is the supplier of the Vermont
7  talc to Johnson & Johnson.  They are not a party in
8  litigation.  To the best of my knowledge, Luzenac
9  itself was never a party in talc litigation and the
10 only party in talc litigation was eventually Imerys,
11 and that wasn't until 2017, I think, was the
12 earliest case against them on a claim for Johnson &
13 Johnson talc.
14      SPECIAL MASTER:  We're going to hear
15 from Johnson & Johnson, so, Mr. Bernardo, please
16 just be patient, you'll get an opportunity to say
17 whatever you want.
18      MR. BERNARDO:  Thank you, your Honor.
19      SPECIAL MASTER:  Counsel, in your
20 question, in your mind and in Mr. Block's mind, is
21 there any reasonable question that J&J had
22 possession of this document for years before today,
23 even if counsel in this case were not subjectively
24 aware of this document?
25      MR. MAIMON:  That would be an

Page 305

1  impossibility because the productions are done
2  pursuant to court order and they're done to all
3  parties, and so it's an impossibility; unless
4  somebody in a nefarious and criminal act excised
5  this document from the production that went
6  specifically to Johnson & Johnson, and I don't know
7  how that would technically be done, but unless
8  somebody did that to excise this document from the
9  production, and I don't think that's technologically
10 feasible, it is an impossibility that we received a
11 document from Imerys that Johnson & Johnson did not.
12      And it's the same impossibility that
13 Johnson & Johnson had a joint defense with Luzenac
14 because Luzenac was not a defendant in any case.
15      SPECIAL MASTER:  In your best
16 judgment, how long ago was this document produced?
17      MR. MAIMON:  Probably on the order of
18 three plus years.
19      SPECIAL MASTER:  And to the best of
20 your knowledge and Mr. Block's knowledge, is this
21 the first time that this document has been attempted
22 to be used in connection with litigation either at
23 trial or at a deposition?
24      MR. BLOCK:  The answer -- your Honor,
25 I believe so.  I mean, I don't know, but I believe

Page 306

1  so, because I can't think of another witness who we
2  would use this document with.  I mean, it involves
3  John O'Shaughnessy and, you know, it's not a
4  document -- it involves a meeting he was present at,
5  and I don't think there would be another witness
6  that this would be used with, but, of course, I
7  don't know about every proceeding, you know,
8  deposition, trial, you know, around the country that
9  we tried mesothelioma cases, so...
10      SPECIAL MASTER:  Mr. Block, I'm going
11 to get to J&J, but I just want to get these
12 questions answered.  This particular document,
13 February 6, 1998, document, in your view, is it
14 substantially similar to the content that's
15 contained in the April 16, 1998, letter that's part
16 of Exhibit 15?
17      MR. BLOCK:  It's similar in that in
18 the earlier Exhibit 15, starting on page 2,
19 Mr. O'Shaughnessy is reaching out to Mr. Grange,
20 he's telling him what he wants to know, actually
21 page 1 is Mr. Grange's response, and that's in the
22 record here.  And, you know, in this exhibit, you
23 know, we have the meeting being set up by Johnson &
24 Johnson and then clearly the next page is from the
25 Imerys production and it's Imerys', you know,

Page 307

1  recitation of what occurred at the meeting and they
2  produced that document to us and they produced it to
3  J&J.
4       MR. MAIMON:  If you look, it's all
5  part of the same communication because if you look
6  at Exhibit 15, your Honor, the last page is Bates
7  Number 209397, and if you look at Exhibit 15B, the
8  February 6, 1998, memo is the next sequential Bates
9  page, it's 209 --
10      SPECIAL MASTER:  I'm sorry, could you
11 run that by me again?  I lost you there.
12      MR. MAIMON:  Sure.  If you look at
13 page, at Exhibit 15 --
14      SPECIAL MASTER:  15, I have it.
15      MR. MAIMON:  It's the April 16, 1998,
16 letter.
17      SPECIAL MASTER:  That's Bates stamp
18 23 -- 9397 and then --
19      MR. MAIMON:  Well, the next
20 sequential one.  And so within the production, these
21 are all, I mean, I don't have the metadata in front
22 of me, but if you're looking at one, the very next
23 page is Exhibit 15B.
24      SPECIAL MASTER:  Okay.  Why don't we
25 go to J&J.

12 (Pages 304 - 307)

O'SHAUGHNESSY - Direct

Page 308

1    MR. BERNARDO: Thank you, your Honor.
2    Let me first address the common
3  interest issue, and let me preface my comment by
4  saying I think the person who would be able to
5  contribute facts, some of which may be privileged,
6  that would best support this is sitting in the other
7  room, and I would invite your Honor to discuss that
8  with Mr. O'Shaughnessy. Because it's our
9  understanding that for years going back, Johnson &
10  Johnson and Imerys and Luzenac and successors and
11  predecessors were all reasonably anticipating
12  litigation or working in a common interest and were
13  communicating with each other with the expectation
14  of that common interest privilege.
15    The fact that Imerys or Luzenac was
16  not a defendant in the Coker matter is irrelevant.
17  That's simply a single lawsuit. And as I think your
18  Honor is aware, there were a number of lawsuits, not
19  just the type that we're here talking about today
20  alleging mesothelioma, but there were lawsuits with
21  respect to industrial talc, there were lawsuits
22  involving other claims besides mesothelioma.
23    So to say that Johnson & Johnson and
24  Luzenac shared a common interest and that
25  Mr. O'Shaughnessy would have expected that that

Page 309

1  common interest would have protected this is an
2  understatement. But again, I would invite your
3  Honor to speak with Mr. O'Shaughnessy about that.
4    I next want to address the issue of
5  databases. And I don't disagree with a lot of the
6  statements that Mr. Block and Mr. Maimon
7  made -- stated, your Honor. I'm interested to know
8  that they seem to know so much about how we maintain
9  our documents, and I'm also interested to know,
10  given the number of questions that I've received
11  from Mr. Block's firm about what was produced when
12  and what the current status of it is, that he would
13  suggest that we're that much more on top of the
14  documents.
15    Your Honor, to state again, an
16  understatement, this is the, a veritable paper
17  chase. There are documents produced by Imerys.
18  There are documents that were produced by other
19  manufacturers, because a lot of times in these cases
20  there are other manufacturers of other products.
21  There are documents that are produced by retailers.
22  There are documents that are produced in connection
23  with dozens of third-party Subpoenas.
24    Your Honor, again, I cannot overstate
25  the volume and number of document production in this

Page 310

1  lawsuit. It cannot be --
2    SPECIAL MASTER: Mr. Bernardo, but
3  with all due respect, and I say this with the utmost
4  respect, isn't that why Skadden, Arps was hired?
5  Because there appears, from the productions that
6  I've seen, that there were production of work
7  product documents in the past.
8    So Skadden, Arps was retained
9  apparently, I'm surmising this, to make sure that
10  all the productions are consistent and all the
11  document issues are straightened out.
12    So is there any reasonable -- I
13  accept your representation and co-counsel's
14  representation that you and her were not
15  subjectively aware of this particular document.
16  That's a given. We'll accept that.
17    But is there any legitimate question,
18  any reasonable question that this document was not
19  in J&J's database for years?
20    MR. BERNARDO: Your Honor, I can
21  honestly say I don't know the answer to that. And
22  to answer your first question most directly, you're
23  exactly right. Among the reasons, and I would like
24  to say there are many, not just that, that Skadden,
25  Arps was retained here, and I've stated that before

Page 311

1  in open court, was to make reasonable efforts to
2  manage the documents produced by Johnson & Johnson,
3  not to manage the documents produced by others.
4    And as Mr. Block states, whether you
5  can or cannot query a document to see if
6  Mr. O'Shaughnessy's name is on it, as your Honor
7  knows, there are dozens if not hundreds of documents
8  that Mr. O'Shaughnessy's name is on that the J&J
9  defendants do not claim as privileged.
10    So what your Honor would be
11  suggesting is the imposition of a burden, otherwise
12  a risk of labor, on a defendant to do a privileged
13  analysis of every other company's document
14  production, and that's simply not the obligation
15  that Johnson & Johnson has to reasonably manage its
16  documents.
17    And that's separate, your Honor, from
18  the issue --
19    SPECIAL MASTER: Well, I have to
20  respectfully disagree with you on that.
21    MR. BERNARDO: Understood, your
22  Honor.
23    SPECIAL MASTER: I have to
24  respectfully disagree that in a litigation with
25  billions of dollars at stake with cases all over the

13 (Pages 308 - 311)

O'SHAUGHNESSY - Direct

Page 312

1  country, the target defendant doesn't have a
2  responsibility or duty, however you want to describe
3  it, to be up to date on the status of the document
4  production of related parties or defendants in the
5  case, especially, especially someone with -- it's
6  claiming it has a community of interest with.
7           Let me ask you this question,
8  Mr. Bernardo.  We can continue this deposition.  Can
9  you get on the phone and ask your document
10 production to check right now if they did a search
11 for this document, is it in J&J's database?
12          MR. BERNARDO:  I am happy to make
13 that inquiry, your Honor.
14          MR. BLOCK:  And, your Honor, I just
15 want to add something we -- we just, we confirmed on
16 our end that just because by looking at the Bates
17 number you could tell what production it was from,
18 and our people here advised me that this Bates
19 number is in the Bates number range from the
20 Sabatelli production that was produced to our firm
21 and J&J in 2017, Moshe, right?
22          MR. MAIMON:  Yeah.
23          MR. BLOCK:  2017.
24          And by the way, your Honor, all of
25 the databases, and I'm sure Mr. Bernardo would agree

Page 313

1  with this, all you do is, if you just put in the
2  Bates number, you could find the document.  I mean,
3  you know --
4           SPECIAL MASTER:  In fairness, I would
5  assume that that's the case, in fairness, Mr. Block,
6  but you don't know and I don't know --
7           MR. BLOCK:  Okay.
8           SPECIAL MASTER:  -- how J&J works
9  its --
10          MR. BLOCK:  Okay.
11          SPECIAL MASTER:  -- database.
12          MR. BERNARDO:  And, your Honor --
13          SPECIAL MASTER:  Mr. Bernardo, can I,
14 let me just cut to the chase.
15          MR. BERNARDO:  I was going to say
16 I'll stipulate that we have this document and I
17 would suspect if somebody does a search we'll be
18 able to find it.
19          SPECIAL MASTER:  Right.  Okay.
20          MR. BERNARDO:  I'm not quibbling over
21 that, your Honor.  And I take your Honor's ruling.
22 We respectfully disagree, but I take your Honor's
23 ruling.  And I would simply make one last point just
24 to cut through this, which is, regardless of what
25 we've been discussing, it's the J&J defendant's

Page 314

1  position that it is the law that a third party or
2  another party cannot waive Johnson & Johnson's
3  privilege.
4           So with that, I will allow us to move
5  on, and I just wanted to make sure we stated that
6  for the record.
7           SPECIAL MASTER:  Let me just say this
8  for the record, too, because I want to be clear on,
9  one, I haven't formally ruled yet, so let me
10 formally rule.
11          My formal ruling is that the
12 objection to the use of this document is overruled
13 for this reason:  The document has been produced in
14 related talc litigation.  J&J had possession of the
15 document presumably for years.
16          I think it's a fair assumption that
17 if the database had been searched for O'Shaughnessy
18 documents, this document would have or should have
19 been revealed.  I don't doubt that perhaps there's a
20 significant number of documents to deal with in this
21 case.  There's no question about that.
22          But given the stakes in the case and
23 the significance of the issues we're talking about,
24 I don't think it's unreasonable to expect that J&J
25 would have knowledge of this document not only in

Page 315

1  preparation for this deposition today, but even
2  years before that.
3           And I know J&J disagrees and we can
4  respectfully disagree with that, but I do think that
5  it clearly reveals information that ordinarily would
6  not be, may not be discoverable.
7           But I think that given the knowledge
8  that J&J had, it had an obligation or duty to move
9  to claw back the document.  It didn't do that.  So
10 if there was any privilege or work product
11 protection that applied to the document, it's been
12 waived.
13          So I do believe that plaintiff can
14 question about this document, but I want to make the
15 same proviso I made yesterday and I will continue to
16 make, I am not, I am not ruling that there is a
17 subject matter waiver.
18          So I'm not opening the door for
19 Mr. Block to question Mr. O'Shaughnessy about all of
20 his strategies and mental impressions and things
21 like that.  I'm only saying that this particular
22 document, if there was a work product privilege or
23 attorney-client privilege that applied to it, is
24 waived.  So that should give you some comfort.  So
25 that's my ruling for the record.

14 (Pages 312 - 315)

O'SHAUGHNESSY - Direct

Page 316

1          MR. BERNARDO:  Thank you, your Honor.
2          And as your Honor said, we can
3   respectfully disagree and we do, and I would like an
4   opportunity briefly to discuss this with my
5   colleagues to determine whether we would choose to
6   appeal this ruling, your Honor, if we may.
7          SPECIAL MASTER:  I certainly think
8   that's appropriate, and hopefully the technical
9   people can do what they have to do to set that up.
10          MR. BERNARDO:  All right.  It
11   shouldn't take very long.
12          MR. BLOCK:  Yeah, they're together.
13   Should the rest of us just be put back in the main
14   room so we can proceed when the J&J lawyers are done
15   conferring?  How do we want to do this most
16   efficiently?
17          MR. BERNARDO:  Jerry, it's 10:40.  I
18   know we've been dealing with these issues, but I
19   know, if we can have a brief break, maybe that, we
20   can kill two birds with one stone and we can all
21   come back on in five minutes.
22          MR. BLOCK:  All right.  And just come
23   back into the main room?
24          MR. BERNARDO:  Yeah.
25          MS. BROWN:  Let's do ten so we can

Page 317

1   give John a break.
2          MR. BERNARDO:  Yeah.
3          MR. BLOCK:  Your Honor, your Honor,
4   I'm not saying -- I know everyone is doing their
5   best and acting in the utmost good faith and I --
6          SPECIAL MASTER:  I gotcha, I gotcha,
7   I gotcha, Mr. Block, I know what you're going to
8   say.  We'll deal with the issue.
9          MR. BLOCK:  Yeah, yeah, yeah.
10          SPECIAL MASTER:  We'll see where we
11   are later this afternoon.
12          MR. BLOCK:  Yeah.  You saw that I was
13   primed and ready at 9:30.  I even cut down a number
14   of my exhibits and what we just had here was we had
15   a company that, you know, objected, you know, to a
16   document they've had for three years -- actually we
17   discovered it was produced in the Lanzo trial, this
18   document, where Imerys and Johnson & Johnson were a
19   defendant.  And so, you know, this took a long time,
20   you know, to deal with a document that J&J has had
21   for three years, and, you know, we're just not
22   getting a lot of testimony.
23          SPECIAL MASTER:  Okay.  Let's take
24   the break that we talked about.
25          MR. BLOCK:  Right, thank you.

Page 318

1          SPECIAL MASTER:  And we'll be back
2   hopefully promptly.
3          MR. BLOCK:  Thank you so much.
4          MR. BERNARDO:  Thank you, your Honor.
5          (Sidebar ends.)
6          (Recess:  10:40 a.m. to 10:51 a.m.,
7   Eastern Standard Time.)
8          VIDEOGRAPHER:  Going back on the
9   record, 10:51 a.m.
10          This is the beginning of Media Unit
11   2.  Okay.
12          MR. BLOCK:  Could we have the last
13   two questions and the last two answers read back so
14   we could just remember where we were?
15          MS. BROWN:  Yeah, and just for the
16   record, this is Alli Brown for J&J.  We understand
17   the court's ruling as to Exhibit 15 and as to the
18   document we've been discussing, Exhibit 15B, and for
19   purposes of these two rulings we intend to proceed
20   pursuant to the court's order here, but reserve our
21   right to re-raise an objection if there is a
22   subsequent document for which plaintiffs claim
23   privilege has been waived by a third-party
24   production of Imerys or others.  Thanks.
25          MR. BLOCK:  Go ahead, Andrea, please.

Page 319

1   Do we have the judge?
2          SPECIAL MASTER:  Yes.
3          MR. BLOCK:  Go ahead, Andrea, please.
4   Thank you.
5          (The following Questions and Answers
6   are read back:
7          "QUESTION:  And this document that
8   we're looking at has an Imerys stamp on the bottom
9   right.
10          "Do you see that?
11          "ANSWER:  Yes.
12          "QUESTION:  Okay.  And the document
13   from Mr. Grange has a heading that says, 'Johnson &
14   Johnson - Mesothelioma Case.'
15          "Do you see that?
16          "ANSWER:  Yes.
17          "QUESTION:  And it reads, 'John
18   O'Shaughnessy, lawyer in charge'--
19          "MS. BROWN:  I'm sorry to interrupt,
20   but, your Honor, we are going to assert work
21   product...")
22   BY MR. BLOCK:
23          Q.     Mr. O'Shaughnessy, looking at
24   Exhibit 15B, the memo from Mr. Grange from Luzenac
25   regarding the February 6, 1998, meeting in Skillman,

15 (Pages 316 - 319)

O'SHAUGHNESSY - Direct

Page 320

1 New Jersey, states, "John O'Shaughnessy, lawyer in
2 charge of J&J's liability litigation, told me the
3 following."
4        Do you see that?
5    A.   I do.
6    Q.   It says, "J&J is sued by a lady from
7 Texas who suffers from a mesothelioma.  This is a
8 rare cancer of the pleura, specific to asbestos
9 exposure."
10       Do you see that?
11   A.   I do.
12   Q.   And it says, "She claims that the
13 body powder was containing asbestos on the base of
14 an asbestos analyze performed by a lab on a tin of
15 body powder."
16       Do you see that?
17   A.   Yes.
18   Q.   And it says, "John is requesting our
19 help to solve the case."
20       Is that what it says?
21   A.   Yes.
22   Q.   And at the bottom it says,
23 "Mr. Grange from Luzenac says, our contribution to
24 solving their case would support Luzenac's image of
25 reliable partner and supplier as opposed to China of

Page 321

1 Australia."
2        Do you see that?
3    A.   I do.
4    Q.   Now, looking at Exhibit 16, you see,
5 sir, that I'm showing an e-mail, Exhibit 16, from
6 John McKeegan from Johnson & Johnson Corporate?
7    A.   Yes.
8    Q.   And this e-mail is one week after the
9 meeting you had with Luzenac requesting their help
10 in that case, correct?
11   A.   It's one week after that memo, yes.
12   Q.   Right.  One week after the meeting in
13 Skillman with Luzenac where you asked for their help
14 in the Coker case, right?
15   A.   I don't recall the meeting, but
16 that's what that memo says.  I don't know if I was
17 there or participated by phone.  I don't recall it,
18 but your timing is right.
19   Q.   Right.  Okay.  Just to be clear, you
20 were cc'd on the letter to Luzenac setting up the
21 meeting on February 6, 1998, that referred to
22 Mr. John Pierre Grange, and then Mr. Grange has the
23 memo from February 6, 1998, saying what you said at
24 the meeting, right?
25   A.   In part, yeah.

Page 322

1    Q.   All right.  And then a week later on
2 February 13, 1998, John McKeegan from J&J Corporate
3 e-mails two people, one is Dr. John Hopkins, and the
4 other is you, John O'Shaughnessy, correct?
5    A.   Yes.
6    Q.   And the subject of his e-mail is
7 talc, correct?
8    A.   Correct.
9    Q.   And his e-mail starts out by saying,
10 "FYI Irene Malbin of the CTFA has gotten a call from
11 CBS Morning News."
12       Do you see that?
13   A.   I do.
14   Q.   And at the bottom it says, "We have
15 not gotten a call from CBS yet, but we should be
16 prepared in case we need to tweak our statement at
17 all."
18       Do you see that?
19   A.   Yes.
20   Q.   And it says, "If you could each call
21 me next week, we can talk more about what we know
22 and what we may need to do."
23       Is that what it says?
24   A.   Yes.
25   Q.   It says, "Thanks.  The most recent

Page 323

1 statement is attached."
2        Do you see that?
3    A.   Yes.
4    Q.   And if we go to the statement on
5 talcum powder that is attached, let me ask you about
6 the first sentence, please.  Turn the page.
7        Do you see that?
8    A.   I do.
9    Q.   And it says, "Statement on Talcum
10 Powder.  Johnson's Baby Powder has been used safely
11 for more than 100 years.  It contains pure, high
12 grade cosmetic talc that is free of impurities and
13 is not carcinogenic."
14       Is that what it says?
15   A.   Yes.
16   Q.   And Mr. McKeegan, in his e-mail, is
17 only writing two people at Johnson & Johnson to ask
18 if this statement is appropriate, correct?
19       MS. BROWN:  Objection; lacks
20 foundation; misstates the document.
21   A.   Well, three actually; Jeff Leebaw is
22 also on it.
23   Q.   Jeff Leebaw is copied, right?
24   A.   Yes.
25   Q.   And, but he's sending it to, in the

16 (Pages 320 - 323)

O'SHAUGHNESSY - Direct

Page 324

1 "To" column, only to you and Dr. Hopkins, and he is
2 asking each of you to call him next week to talk
3 about it, right?
4      A.     Yes.
5      Q.     And there is no reference in this
6 e-mail to any lawsuit, is there?
7      A.     There is not, but they know that the
8 corporate communications people know that these
9 communications that the company makes, public
10 statements that they make do show up in lawsuits, do
11 become the subject of the lawsuits, and that's why
12 I'm copied.
13     Q.     Move to strike everything after the
14 word "not."
15            Sir, do you know, do you know a
16 person named Dick Wiles?
17     A.     I do.
18     Q.     And who is Dick Wiles?
19     A.     Dick Wiles was an attorney in Texas
20 who was retained for Johnson & Johnson work.
21     Q.     Including on the Coker case, correct?
22     A.     Apparently, yeah.
23     Q.     Who is John Ship?
24     A.     I don't know.  I don't recognize the
25 name.

Page 325

1      Q.     Who is Lenore McKenna?
2      A.     I don't know.
3      Q.     Let's go to Exhibit 19 to your
4 deposition.  We're going to skip forward to Exhibit
5 19.
6            Do you see that Exhibit 19 is a memo
7 written from Lenore McKenna to Dick Wiles and John
8 Shipp?
9            Do you see that?
10     A.     Yes.
11     Q.     And you just acknowledged that Dick
12 Wiles was one of the lawyers in Texas for Johnson &
13 Johnson in the Coker case, correct?
14     A.     Yes, and I believe John ship and
15 Lenore McKenna were with his office.
16     Q.     Okay.  And what office is that?
17     A.     Dick Wiles' firm, I forget the name.
18     Q.     Was it Mehaffy & Weber or another law
19 firm in Texas?
20     A.     No, it was a different law firm in
21 Texas.
22     Q.     All right.  And the memo -- strike
23 that.
24            And these attorneys reported to you
25 in the Coker case, correct?

Page 326

1      A.     Yeah, I'm thinking that -- Dick Wiles
2 handled litigation for us in Texas, and I'm thinking
3 the Coker case was a Texas case so we might have
4 retained Dick, Mr. Wiles, early, and then brought in
5 Gene Williams, I'm not sure, but I think that's
6 maybe what happened here.
7      Q.     And Gene Williams was from Mehaffy &
8 Weber, correct?
9      A.     Yeah, yes, he was.
10     Q.     All right.  For the time that Dick
11 Wiles and John ship, for the time that their law
12 firm was working on the Coker case, they reported to
13 you as the attorney from Johnson & Johnson managing
14 the Coker case, correct?
15     A.     Correct.
16     Q.     And have you seen this memo before?
17     A.     I've seen it recently, yes.
18     Q.     How recently?
19     A.     With my attorneys.
20     Q.     Okay.  Looking at this memo dated
21 October 16, 1997, it's in regards to Coker versus
22 Johnson & Johnson, correct?
23     A.     Yes.
24     Q.     And the subject says,
25 "Mesothelioma/Talc Medical Research," correct?

Page 327

1      A.     Yes.
2      Q.     Not legal research, right?
3      A.     Done by a lawyer, though.
4      Q.     But the words are "medical research,"
5 right?
6      A.     Yes.
7      Q.     Okay.  And looking at this memo, one
8 of the things it says is that asbestos is divided
9 into two main classes:  The serpentines, chrysotile,
10 and amphiboles, crocidolite, amosite, anthophyllite,
11 tremolite, and actinolite.
12            Is that what it says?
13     A.     Yes, that's what it says.
14     Q.     And it says, "The association between
15 asbestos and both pleural and peritoneal
16 mesothelioma has clearly been established since the
17 1960s."
18            Is that what it says?
19     A.     It does, yes.
20     Q.     Another thing it says is that,
21 "Mesothelioma may occur after brief or indirect
22 exposure to asbestos."
23            You see that?
24     A.     I am skipping.  Yes.
25     Q.     And it refers to a latency period for

17 (Pages 324 - 327)

O'SHAUGHNESSY - Direct

Page 328

1  mesothelioma.
2       Do you see that word, "latency
3  period"?
4  A.    It's in the document, yeah.
5  Q.    Okay.  And you understand latency
6  period refers to the fact that if you're exposed to
7  asbestos, you may not develop mesothelioma until
8  decades later?
9       MS. BROWN:  Objection; foundation.
10  A.   I would defer to someone with more
11  technical expertise than me as to the meaning.
12  Q.   And this memo that was done in
13  October of 1997 for this law firm working on the
14  Coker case for Johnson & Johnson has a section that
15  says, "Talc," right?
16  A.   Yes.
17  Q.   And it states here, "In several
18  mesothelioma patients studied, both talc fibers and
19  tremolite were detected."
20      Do you see that?
21  A.   Yes.
22  Q.   And it says, "In fact, the majority
23  of asbestos bodies isolated from the lungs of women
24  in the general population have tremolite or
25  anthophyllite and because tremolite and

Page 329

1  anthophyllite are known contaminants of talc, this
2  data suggests that rare cases of mesothelioma among
3  women with no other identifiable exposure might be
4  related to exposure to cosmetic talc."
5       Is that what it says?
6  A.    Yes.
7  Q.    And there's a reference here, it
8  says, "2."
9       Do you see that?
10  A.   Yes.
11  Q.   And if you go down to reference 2,
12  there's a cite to a publication called "Malignant
13  Mesothelioma," edited by Douglas W. Henderson and
14  others from 1992.
15      Do you see that?
16  A.   No, I'm not finding it.  Let me
17  just --
18  Q.   On the last page of the document.
19  A.   Okay.  Last page.  Number 2, yes.
20  Q.   Right.  If we go up to the previous
21  page at the bottom it also says here, "The outlook
22  of malignant mesothelioma is poor with few patients
23  living two years; the time from diagnosis to death
24  is usually about six months."
25      It says that in this memo, correct?

Page 330

1  A.    Yes.
2  Q.    Because you were the lawyer that was
3  managing the Coker case, this memo would have been
4  sent to you by Dick Wiles and John Shipp's law firm,
5  correct?
6       MS. BROWN:  Objection; lacks
7  foundation; calls for speculation.
8  A.    Not necessarily, no.  To me it looks
9  like an internal backgrounder that the lawyers
10  created.
11  Q.   This document, sir, was produced by
12  Johnson & Johnson.  Do you see the Bates stamp at
13  the bottom that says J&J?
14  A.   I do.
15  Q.   Just to be clear, are you saying that
16  this memo, Exhibit 19, dated October 16, 1997, that
17  we're looking at here, was not sent to you in
18  October of 1997, or that you don't remember?
19  A.   I don't recall seeing it and so it
20  doesn't look like something that the law firms would
21  have sent me.  I generally don't get memorandum.  I
22  do a lot of my discussion with lawyers on the phone
23  and this might have been for their own use as a
24  backgrounder, so I can't say it was sent to me.
25  Q.   Move to strike the portion that was

Page 331

1  not responsive.
2       My question is:  Is it your testimony
3  that this memo was not sent to you in October of
4  19 -- sir, I have to finish my question.
5       MS. BROWN:  Can you just calm down a
6  little bit?  We're going to --
7       MR. BLOCK:  Sir, sir, sir, I must be
8  able to finish my question.
9  A.    I know and I apologize, I thought you
10  were finished.
11  Q.   Sir, is it your testimony that this
12  memo dated October 16, 1997, was not sent to you in
13  October of 1997, or that you just don't remember?
14      MS. BROWN:  Objection; asked and
15  answered.
16  A.   I don't recall seeing it.  I don't
17  recall this memo.
18  Q.   And, sir, can you explain how this
19  memo got into the files of Johnson & Johnson if it
20  was not sent to you at the time it was created in
21  October of 1997?
22      MS. BROWN:  Objection; foundation;
23  speculation.
24  A.   I don't know, but there's been some
25  inadvertent disclosures here from the law firms, so

18 (Pages 328 - 331)

O'SHAUGHNESSY - Direct

Page 332

1 I can't, you know, I don't know where it came from
2 in the production.
3      Q.   Sir, my question for you is:  Can you
4 explain how this document got into the files of
5 Johnson & Johnson and was produced by Johnson &
6 Johnson in litigation if it was not sent to you back
7 at the time it was created in October of 1997?
8           MS. BROWN:  He's answered that like
9 three times.  I object, asked and answered.  You're
10 harassing him.
11           MR. BLOCK:  Please don't make
12 speaking objections.  Let's have the question read
13 back and let's have an answer.
14           MS. BROWN:  Please stop asking the
15 same question multiple times.
16           MR. BLOCK:  That's another speaking
17 objection.  It's against the rules.
18           Please have the question read back
19 and let's have an answer.
20           (The following Question is read back:
21      "QUESTION:  Sir, my question for you
22 is:  Can you explain how this document got into the
23 files of Johnson & Johnson and was produced by
24 Johnson & Johnson in litigation if it was not sent
25 to you back at the time it was created in October of

Page 333

1 1997?")
2           MS. BROWN:  I have the same
3 objection.
4      A.   I can't explain.  If it was sent to
5 me, I don't know if it was sent to me or not and
6 there was an inadvertent production from the law
7 firm, and so it may have come from there perhaps.  I
8 don't know.
9      Q.   Move to strike the portion of that
10 answer that was not responsive.
11           Sir, did you ever hear any discussion
12 by J&J's Talc Steering Committee about mesothelioma?
13           MS. BROWN:  Objection; vague.
14      A.   I don't, I don't recall, you know,
15 specific subjects that came up.  Subjects were those
16 that, you know, were headed towards that FDA meeting
17 and the safety of talc, so it might have come up,
18 probably came up, I just don't know.  I don't recall
19 that.
20      Q.   Your answer is you don't recall any
21 discussions specifically of mesothelioma by J&J's
22 Talc Steering Committee; true?
23           MS. BROWN:  I object; asked and
24 answered.
25      A.   I don't recall any specific

Page 334

1 discussions at all of the committee or at the
2 meetings I attended or phone calls I may have
3 participated in.
4      Q.   Let's look at the next exhibit,
5 Exhibit 37.
6           MS. BROWN:  John, I think this is the
7 second binder now.
8           MR. BLOCK:  Yes, thank you.
9 BY MR. BLOCK:
10      Q.   If you could leave the first binder
11 with you as well, we're sort of going out of order,
12 but yes, this is the first one from the second
13 binder, if you could just turn to Exhibit 37 in
14 binder 2, sir.
15      A.   Okay.
16      Q.   And I want to direct your attention,
17 this is an e-mail chain.  I want to direct your
18 attention to the e-mail that you sent on August 13,
19 2001.
20      A.   I see it.
21      Q.   All right.  And just to get a little
22 context, you're responding to an e-mail from
23 August 10, 2001, from Helen Han Hsu, to you, John
24 O'Shaughnessy, and to others, and it says, "Talc
25 conference call minutes."

Page 335

1           Do you see that?
2      A.   Yes, yes.
3      Q.   And there's a reference to NTP as it
4 continues to do the review of talc.
5           Do you see that?  I have highlighted
6 that on the screen.  NTP --
7      A.   Yes, I'm sorry, I'm sorry, I'm
8 looking at the wrong e-mail.
9      Q.   All right.  And NTP stands for
10 National Toxicology Program, correct?
11      A.   That's right.
12      Q.   And the National Toxicology Program
13 at this time in 2001 was reviewing talc as a
14 potential carcinogen, correct?
15      A.   Yes, I believe so.  I kind of get the
16 FDA, NTP and ISR, whatever that meaning was, I kind
17 of conflate them, but that sounds right to me, yeah.
18      Q.   Okay.  And just looking at this
19 e-mail just to give some context, Helen Han Hsu
20 e-mails you and others, to all, "The CTFA
21 teleconference took place last week.  It was
22 unanimous among the task force members that CTFA
23 should work with NTP as it continues to do the
24 review of talc."
25           Do you see that?

19 (Pages 332 - 335)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

O'SHAUGHNESSY - Direct

Page 336

1    A.    I do.
2    Q.    Okay.  And you respond -- and Helen
3 Han Hsu, was she a scientist for one of the Johnson
4 & Johnson companies?
5    A.    I recognize her name and, but I don't
6 know her role at this point.
7    Q.    Okay.  And you respond, "Thanks,
8 Helen.  I read the minutes, and I think it's crucial
9 that we keep in mind that for talc composition, J&J
10 has a unique story to tell that is different from
11 the other task force members."
12    A.    Yes.
13    Q.    Is that what you wrote?
14    A.    Yes.
15    Q.    And then you wrote, "J&J, back in the
16 '70s, developed proof that its talc was free from
17 asbestos."
18          Is that what you wrote?
19    A.    I did.
20    Q.    And then you wrote, "I have assembled
21 those documents and have them."
22          Is that what you wrote?
23    A.    Yes.
24    Q.    And you said, "Let's consider making
25 our story known to NTP apart from the other

Page 337

1 members," right?
2    A.    Yes.
3    Q.    And you're suggesting there that
4 Johnson & Johnson tell the National Toxicology
5 Program that J&J's talc has no asbestos in it,
6 right?
7    A.    Yeah, I'm just -- yes.
8    Q.    And the National Toxicology Program
9 is part of, it's part of the United States
10 Government agency, the Department of Health and
11 Human Services, right?
12    A.    I accept that.  I'm not sure.
13    Q.    Okay.  You knew it was a part, a
14 research part of the United States Government,
15 correct?
16          MS. BROWN:  Foundation.
17    A.    I probably did at the time.  I don't
18 recall now.
19    Q.    All right.  And so you're telling the
20 people on this e-mail that Johnson & Johnson's talc
21 is free from asbestos and that you've assembled the
22 proof going back to the 1970s, right?
23    A.    I said that J&J developed proof that
24 its talc was free from asbestos.  And as part of
25 work on the litigation and meeting with the

Page 338

1 witnesses and working with our outside counsel and
2 assembling documents and having those documents with
3 our coordinating counsel as part of our document
4 collection, that if they needed them, all that
5 information was in one place and through our
6 counsel, I could provide those to them.
7    Q.    All right.  Move to strike the
8 portion that was not responsive.
9          Nothing in this e-mail refers to
10 litigation; nothing in your e-mail refers to
11 litigation; true or not true?
12    A.    No, I disagree.  I have assembled
13 those documents and I did that as part of the
14 litigation.
15    Q.    Your e-mail is referring to NTP,
16 correct?
17          MS. BROWN:  Objection; misstates
18 testimony.
19    A.    It's referring to the talc conference
20 call minutes and the NTP meeting, yeah.
21    Q.    Okay.  And let's look at the people
22 that you, as a lawyer, were telling the scientists
23 that Johnson & Johnson's talc was free of asbestos.
24          What scientists are on this e-mail
25 that you sent?

Page 339

1    A.    There was, I think Neal Matheson had
2 a science background.  I think Dr. -- well, Dr. Bob
3 Armstrong, I think he did.  William Powers.  Clay
4 Paterson is a lawyer, a regulatory lawyer working on
5 this issue.  Those are the ones I recognize and
6 remember offhand.
7    Q.    All right.  So you, John
8 O'Shaughnessy, a lawyer, is telling scientists,
9 including Matheson, Powers, Armstrong, of Johnson &
10 Johnson, that Johnson & Johnson's talc was free of
11 asbestos, right?
12    A.    I'm telling them that back in the
13 '70s Johnson & Johnson, their company, which they
14 know, developed proof that its talc was free from
15 asbestos, and the message was that considered
16 telling our story separately from the NTP and that I
17 have assembled, through the litigation work, those
18 documents, have them in one place; if they need
19 them, they're available.
20    Q.    And that's what you told these
21 scientists from Johnson & Johnson, correct?
22    A.    Scientists and the others on the
23 call, too, which are the corporate communications
24 people who we spoke about before.  Lorena Telofski I
25 know was at the company.  She was a long time

20 (Pages 336 - 339)

O'SHAUGHNESSY - Direct

Page 340

1  employee who worked, I think she worked in some kind
2  of support for the regulatory area, and there's
3  probably regulatory personnel on here who I'm not
4  recognizing.
5       Q.    Was the letter from Mehaffy & Weber
6  from March of 1998 that informed you that Dr. Blount
7  had tested Johnson's Baby Powder and determined that
8  it contained asbestos part of the documents that you
9  assembled regarding Johnson's Baby Powder and
10 asbestos?
11      A.    I am referencing documents that are
12 company documents here.  That's what I was referring
13 to.
14      Q.    Did you include the letter from
15 Mehaffy & Weber regarding Dr. Blount from March
16 of 1998 in the documents that you say you assembled
17 that show that Johnson's Baby Powder was free of
18 asbestos:  Yes or no?
19      A.    I have assembled those documents,
20 meaning they were collected for the litigation.  I
21 don't think the company followed up on my
22 consideration because they made a joint presentation
23 with the other manufacturers.  So I don't think
24 anything was ever provided.
25      Q.    Move to strike the portion --

Page 341

1            MS. BROWN:  He's not finished.
2       A.    Pursuant to my suggestion, I don't
3  think anything was provided.
4       Q.    Move to strike -- move to strike the
5  portion that was not responsive.
6            Your e-mail says that you have
7  assembled the documents, right?
8       A.    Yes.  As I explained before, outside
9  lawyers had those documents assembled, which they do
10 for litigation, for discovery purposes, for our own
11 purposes in litigation, and that I had to make them
12 available to them if they want to follow-up on my
13 suggestion.
14      Q.    Yes or no, Mr. O'Shaughnessy, did you
15 include the letter from Mehaffy & Weber from March
16 of 1998 about Dr. Blount in the documents that you
17 assembled:  Yes or no?
18           MS. BROWN:  Objection; asked and
19 answered.
20      A.    There were no documents assembled and
21 sent these people.  The documents assembled were,
22 that I referred to, were the company testing
23 documents.
24      Q.    So you did not include the letter
25 from Mehaffy & Weber from March of 1998 in those

Page 342

1  documents that you assembled that you're referring
2  to in your August of 2001 e-mail; true?
3            MS. BROWN:  Objection; asked and
4  answered.
5       A.    I didn't include anything because
6  nothing was sent.  The documents I referred to, like
7  I said before, those documents from the company that
8  we collected as part of the litigation process.
9       Q.    Okay.  Let's just read the sentence.
10      A.    Sure.
11      Q.    The sentence you wrote says, "I have
12 assembled those documents and have them."
13           Is that what it states?
14      A.    That's what it states, and I told you
15 --
16      Q.    Okay.  Sir, is that what it states?
17      A.    That's what it states.
18      Q.    Okay.  Was the letter from Mehaffy &
19 Weber from March of 1998 about Dr. Blount and her
20 testing of Johnson's Baby Powder and her
21 determination that it contained asbestos in those
22 documents that you assembled:  Yes or no?
23      A.    You're asking me then if that letter
24 was in company documents that were assembled for
25 collection for litigation.  I don't know --

Page 343

1            MS. BROWN:  I --
2  BY MR. BLOCK:
3       Q.    Okay.  The answer is --
4       A.    -- I didn't assemble anything.
5       Q.    Move to strike everything after, "I
6  don't know," in the answer as not responsive.
7            Now, there are some communications
8  and PR people from Johnson & Johnson who you also
9  e-mailed on this e-mail of August 13 of 2001,
10 correct?
11      A.    Yes.
12      Q.    And who are those communications and
13 PR people that you told, on August 13, 2001, that
14 Johnson & Johnson's talc was free from asbestos?
15      A.    I told them that J&J, back in the
16 '70s, developed proof that its talc was free from
17 asbestos.  And Sarah Colamarino, I believe, was a
18 corporate communications person.
19      Q.    Okay.  And who was Owen Rankin?
20      A.    I don't recall.
21      Q.    Who is Fritz Grutzner?
22      A.    I don't recall.
23      Q.    How about Kathleen Dittman?
24      A.    I don't recall.
25      Q.    Michael Connors?

21 (Pages 340 - 343)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

O'SHAUGHNESSY - Direct

Page 344

1    A.    I don't recall.
2    Q.    Elaine Knight?
3    A.    I don't recall.  I may not have even
4 known some of these people, but I don't recall them.
5    Q.    So tell me more about Sarah
6 Colamarino.  What do you remember about her?  You
7 said she was the head of PR for Johnson & Johnson at
8 the time you e-mailed her?
9        MS. BROWN:  Objection; vague and
10 compound.
11    A.    No, I said I think, I think she was a
12 corporate communications person.  She had a
13 communications role.  That's what I thought.  That's
14 what I recall.
15    Q.    All right.  So your statement, as
16 you've emphasized, says here that J&J, back in the
17 '70s, developed proof that its talc was free from
18 asbestos.
19        Is that the words you used in your
20 e-mail of August 13, 2001?
21    A.    It is.
22    Q.    Let's look at Exhibit 25 to your
23 deposition.  Back to the first binder, do you see
24 Exhibit 25?
25    A.    Yes.

Page 345

1    Q.    And it's dated from the 1970s, right?
2    A.    1971.
3    Q.    Okay.  And subject is
4 "Talc/Asbestos," right?
5    A.    Yes.
6    Q.    And it's to Mr. Foster.  Do you know
7 who that was?
8    A.    No, I don't recall.
9        MS. BROWN:  Object to this document
10 as lacking foundation.
11 BY MR. BLOCK:
12    Q.    It's from Mr. Nashed.  Do you know
13 who that was?
14    A.    No, these predate my employment with
15 the company.
16    Q.    And this document from the 1970s
17 starts out saying, "The talc used in Johnson's Baby
18 Powder is obtained from a selected mine in Vermont
19 where the ore consists mainly of platy talc with
20 only trace amounts of fibrous minerals
21 tremolite/actinolite."
22        Do you see that?
23    A.    Yes.
24    Q.    And was this document from the 1970s
25 one of the documents that you assembled and had in

Page 346

1 2001?
2    A.    Our lawyers conducted, you know, as
3 part of the litigation, collection of documents.
4 Any specific one, I don't know whether it was in
5 there or not.
6    Q.    Do you ever recall seeing this
7 document before dated July 29, 1971, which is
8 Exhibit 25 to your deposition?
9    A.    No, I don't recall it.
10    Q.    Going back to the answer, the sworn
11 Answers to Interrogatories that you approved in the
12 Krushinski case.  Answer 17 says, "Defendant's
13 sources of talc were selected for their lack of
14 contaminants and further, testing was performed over
15 a significant number of years by outside
16 laboratories which verified that defendant's talc
17 sources did not contain asbestos or tremolite."
18        That's what those sworn answers say
19 that you approved, correct?
20    A.    Yes.
21        MS. BROWN:  Objection; asked and
22 answered multiple times.
23 BY MR. BLOCK:
24    Q.    Yet this document from July 29, 1971,
25 which is Exhibit 25 to your deposition, says that

Page 347

1 Johnson's Baby Powder uses talc from a mine in
2 Vermont which contains trace amounts of
3 tremolite/actinolite, right?
4    A.    That's what it says.  Your question
5 is yet this contained.  I'm not sure what kind of a
6 connection you mean by yet.
7    Q.    This document that we're looking at
8 says that Johnson's Baby Powder is obtained from a
9 mine in Vermont that contained trace amounts of
10 fibrous minerals tremolite/actinolite, right?
11    A.    That's what it says, yes.
12    Q.    This document from 1971 does not say
13 that there's no tremolite in the Vermont mine used
14 in Johnson's Baby Powder, does it?
15    A.    It says exactly what it says.
16    Q.    Okay.  And are you aware that under
17 Johnson & Johnson's own definition of asbestos at
18 the time you worked for the company, fibrous
19 tremolite is asbestos?
20        MS. BROWN:  I object; that misstates
21 the document and the evidence and lacks foundation
22 with this witness.
23    A.    You would have to ask the company
24 scientist about what this means.  I'm not the person
25 to comment on that.

22 (Pages 344 - 347)

O'SHAUGHNESSY - Direct

Page 348

1    Q.    And when I --
2          MS. BROWN:  Can I please -- Jerry,
3  Jerry, I know you're in a rush, I know you want to
4  finish, but you are continuing to interrupt
5  Mr. O'Shaughnessy.  Please let him finish his
6  answers.
7          Mr. O'Shaughnessy, you can continue,
8  please.
9    A.    I defer to the scientists on these
10 type of issues, Mr. Block.
11   Q.    Right.  You're not a scientist,
12 right?
13   A.    I am not.
14   Q.    You're not qualified at all to say,
15 as a scientific matter, whether there is asbestos in
16 Johnson's Baby Powder, right?
17   A.    That's right.
18         MS. BROWN:  Objection.
19 BY MR. BLOCK:
20   Q.    Yet that's exactly what you did
21 August 13, 2001, is you made a scientific statement
22 that J&J, back in the '70s, developed proof that its
23 talc was free from asbestos.  That's a scientific
24 statement, isn't it, sir, a scientific statement by
25 a lawyer?

Page 349

1          MS. BROWN:  Compound, argumentative,
2  misstates the document.
3    A.    That's absolutely incorrect,
4  Mr. Block.  What I said here was Johnson & Johnson,
5  back in the '70s, Johnson & Johnson, the people who
6  work for the company, the scientists who work for
7  the company, they developed proof that the talc was
8  free from asbestos.  Yes, that's what I said.
9    Q.    Who developed the proof, which
10 scientist?
11   A.    All of the scientists at Johnson &
12 Johnson.
13   Q.    Which ones?  Name one.
14   A.    The researchers, anyone working on
15 the product.  I don't know all the --
16   Q.    Name one scientist at Johnson &
17 Johnson that you say developed the proof that
18 Johnson's Baby Powder was free from asbestos; name
19 one.
20   A.    Back in the '70s, I don't recall.  It
21 would have been in the documents.
22   Q.    Can you name one, sir?
23         MS. BROWN:  He just answered that.
24 Objection.
25   A.    No, not now I can't, no.

Page 350

1    Q.    Sir, let's go to Exhibit 26 to your
2  deposition.
3          Now, again, your e-mail from
4  August 13, 2001, refers to proof Johnson & Johnson
5  developed back in the 1970s, right?
6    A.    That's correct.
7    Q.    All right.  So looking at Exhibit 26,
8  this is a document from the 1970s.
9          Do you see on the cover page it's
10 dated October 27, 1972?
11   A.    That's right.
12   Q.    Do you see that this document is from
13 a laboratory called "McCrone"?
14   A.    Yes.
15   Q.    And do you see that the title of the
16 document is "Examination of Johnson & Johnson's Baby
17 Powder"?
18   A.    I do, yes.
19   Q.    And do you see that someone wrote on
20 this report, "Do not use this report.  Replaced by
21 another version"?
22   A.    I see that, yeah.
23         MS. BROWN:  Objection; lacks
24 foundation.
25 BY MR. BLOCK:

Page 351

1    Q.    And looking at the title, it says,
2  "Examination of Johnson & Johnson's Baby Powder,"
3  and there's a summary at the top, right?
4    A.    Yes.
5    Q.    And it says, "Two samples of Johnson
6  & Johnson's Baby Powder, batch number 108T and 109T,
7  which correspond to the samples examined by
8  Professor Seymour Z. Lewin of New York University on
9  behalf of FDA have been examined," and then it lists
10 the methods.
11         Do you see that there?
12   A.    Yes, I do.
13   Q.    And it says it was examined to
14 determine whether they contain any asbestiform
15 minerals.
16         Do you see that?
17   A.    Yes.
18   Q.    And it says that both samples
19 contained an insignificant amount of tremolite.
20         Do you see that?
21   A.    Yes.
22   Q.    And it says that the level -- it
23 says, "A detailed examination," at the bottom,
24 signed by Ian Stewart, "A detailed examination of
25 two samples of Johnson & Johnson's Baby Powder shown

23 (Pages 348 - 351)

O'SHAUGHNESSY - Direct

Page 352

1 this material to be substantially free of
2 asbestiform minerals. A few tremolite rods were
3 observed in both samples at a level less than 0.5
4 percent."
5         Do you see that?
6     A.    I do.
7     Q.    Okay. So the report does not say
8 there's no asbestiform minerals. It says that there
9 is tremolite at less than 0.5 percent, correct?
10         MS. BROWN: I object. That misstates
11 the document and it certainly lacks foundation with
12 this witness who has never seen this document
13 before.
14     A.    You skipped when you described what
15 the document says. I don't dispute what the
16 document says, Mr. Block, but it's right there in
17 the conclusion.
18     Q.    Okay. So your lawyer just testified
19 that this is the first time you've seen this
20 document. Did you hear what your lawyer said?
21     A.    I did hear what she said.
22     Q.    Okay. I want to hear your testimony,
23 sir. Have you ever seen this document before?
24     A.    I don't recall.
25     Q.    Was this one of the documents from

Page 353

1 the 1970s that you assembled that was the basis for
2 your statement that Johnson & Johnson's talc was
3 free from asbestos?
4     A.    The documents referred to as
5 assembled were part of the, of all of the documents
6 from the company collected by our lawyers, so if
7 this was in my files I assume it was in there. I
8 did not physically assemble those documents. They
9 were assembled in the course of the litigation by
10 our outside counsel.
11     Q.    So just to be clear -- well, sir, do
12 you recall ever seeing any document from the McCrone
13 laboratory that identified asbestiform minerals in
14 Johnson's Baby Powder before looking at this
15 document here today?
16     A.    I recall seeing documents, testing
17 documents from McCrone. Specifics of those, I don't
18 recall.
19     Q.    Before I showed this document here
20 today, do you recall seeing any McCrone reports
21 where any asbestiform minerals including tremolite
22 were identified in Johnson's Baby Powder?
23     A.    I recall --
24         MS. BROWN: Objection.
25     A.    I recall seeing McCrone testing

Page 354

1 documents, but I don't recall the specifics of them.
2     Q.    So we're looking at, we looked at
3 here McCrone testing of Johnson & Johnson's Baby
4 Powder, the product itself, right?
5     A.    That's what it says, yes.
6     Q.    Okay. Let's look at the next
7 exhibit, which is 26B. And this is another document
8 from the 1970s, right? April 24, 1974.
9         Do you see that?
10     A.    That's right. That's correct.
11     Q.    And just to be clear, in your e-mail,
12 August 13, 2001, when you referred to the documents,
13 where you said, "I have assembled," were you
14 referring to documents showing the testing of
15 Johnson's Baby Powder and the talc used in Johnson's
16 Baby Powder?
17     A.    I was referring to all those
18 documents that were collected as part of the
19 litigation, including testing documents.
20     Q.    All right. And Exhibit 26 that we
21 just looked at was a testing document for the
22 testing of Johnson's Baby Powder, right?
23     A.    Yes, that's what it appears to be.
24     Q.    And Exhibit 26B is another document
25 from McCrone and it refers to the testing of

Page 355

1 Argonaut ore body.
2         Do you see that?
3     A.    Yes.
4     Q.    And do you know that Argonaut was a
5 talc ore that was used for certain years in
6 Johnson's Baby Powder?
7         MS. BROWN: Objection --
8     A.    I know that Argonaut was a mine, but
9 I'm not sure what it produced and how it was used.
10     Q.    You know that Argonaut was one of the
11 Windsor Minerals mines in Vermont, correct?
12     A.    I believe that's true, yes.
13     Q.    Okay. And this summary says, "An
14 intensive examination has been made by X-ray
15 diffraction and electron microscopy of 38 core
16 samples taken from a new ore body which Windsor
17 Minerals, Inc. are contemplating exploiting."
18         Do you see that?
19     A.    I do.
20     Q.    And back in the '70s, Windsor
21 Minerals was part of Johnson & Johnson, right?
22     A.    Yes, Windsor Minerals was a
23 subsidiary company.
24     Q.    All right. And it says, "The
25 examination was undertaken to determine the

24 (Pages 352 - 355)

O'SHAUGHNESSY - Direct

Page 356

1 mineralogical content of the core samples and, in
2 particular, whether or not there was any significant
3 content of asbestiform minerals in the ore body."
4      That's what it says, right?
5      A.    That's what it says, yes.
6      Q.    And it says, "For comparison, three
7 core samples from the current ore body were also
8 examined.  Is that what it says?
9      A.    Yes.
10     Q.    And then it says, "The majority of
11 the samples showed no evidence of any asbestiform
12 minerals present, and of the 15 samples that did
13 show an asbestiform mineral, only one exceeded an
14 estimated level of approximately 0.0005 percent."
15     Is that what it says?
16     A.    Yes.
17     Q.    And toward the bottom it says, "It is
18 concluded that the ore body is of suitable quality
19 for the manufacture of high grade cosmetic and
20 toiletry products."
21     Is that what it says?
22     A.    Yes.
23     Q.    It also says, "As the feature of
24 particular interest was the asbestiform minerals
25 which might be present in the material, our

Page 357

1 attention was focused on these and thus, the
2 photographic documentation accompanying this report
3 consists almost exclusively of representation of
4 this small fibrous fraction."
5      Do you see that?
6      A.    I do.  Can you tell me what page
7 you're on, please?
8      Q.    Sure.  It is the page with the Bates
9 at the bottom 670.
10     A.    Okay.  Thank you.
11     Q.    Then it says, "As will be seen from
12 Table 2, only two samples showed a level of asbestos
13 above 0.0005 percent, the actual figures being 0.007
14 percent and 0.001 percent, respectively, for
15 chrysotile asbestos, plus approximately 0.0001
16 percent of fibrous tremolite."
17     Do you see that?
18     A.    I do.
19     Q.    And it says, "Excluding these
20 samples, the remaining samples which showed
21 asbestiform fibers are exhibiting levels which are
22 no higher than has been seen in a raw composite used
23 to manufacture a finished product."
24     Is that what it says?
25     A.    Yes.

Page 358

1      MS. BROWN:  I object to this whole
2 line of questioning on foundation grounds.
3 BY MR. BLOCK:
4      Q.    And then it says, "The level of
5 chrysotile observed in the two high samples is only
6 an order of magnitude above this and would
7 presumably be reduced considerably by your
8 beneficiation process."
9      Do you see that?
10     A.    I do.
11     Q.    And if we look at, there's a table
12 attached, and it says, "Table 2, electron
13 microscopic analyses of talc ore core samples."
14     Do you see that?
15     A.    I do.
16     Q.    And you see chrysotile here, there's
17 a column, right?
18     A.    Yes.
19     Q.    And you know chrysotile is asbestos,
20 right?
21     A.    I hesitate to say.  It's been such a
22 long time since I dealt with any of this.
23     Q.    Okay.  And I understand that.  The
24 report that we looked at uses the words "chrysotile
25 asbestos," right?

Page 359

1      A.    I see the --
2      MS. BROWN:  Lacks foundation.
3 BY MR. BLOCK:
4      Q.    Do you see on the screen "chrysotile
5 asbestos," sir?
6      A.    I do.
7      Q.    Okay.  And then if you look at the
8 samples, the transmission electron microscopy
9 analysis, it lists the samples in the left column
10 and then you see "chrysotile" here?
11     A.    I see the word "chrysotile," yes.
12     Q.    All right.  And you could see the
13 percentages of chrysotile are listed in the samples
14 in which chrysotile asbestos was detected, right?
15     A.    I'm a little bit uncomfortable,
16 you're asking me to interpret this and I don't think
17 I can.  I see where there are percentages and I see
18 where you're pointing out, but, you know, I, I feel
19 uncomfortable, I defer to the scientists to, you
20 know, testify about this.
21     Q.    Okay.  And was this document that we
22 just looked at, Exhibit 26B, from April of 1974,
23 this McCrone report that we're looking at where
24 chrysotile asbestos is reported, was this one of the
25 documents that you assembled in those documents that

25 (Pages 356 - 359)

O'SHAUGHNESSY - Direct

Page 360

1 you said you had back in the e-mail that you wrote
2 on August 13, 2001?
3     A.    I don't know if this document was in
4 the document collection that our attorneys had made
5 or not. It might have been.
6     Q.    One thing you did not write, looking
7 back at Exhibit 37, one thing you did not write in
8 your e-mail on August 13, 2001, is that you defer to
9 the scientists, the scientists on the issue of
10 asbestos in Johnson's Baby Powder. That's not what
11 you wrote in your e-mail on October 13, 2001, right?
12     A.    There's plenty of things I didn't
13 write in this e-mail.
14     Q.    Right.
15     A.    It's clear that I'm saying, though,
16 J&J developed proof, not John O'Shaughnessy
17 developed the proof, but Johnson & Johnson did.
18     Q.    Today you're saying you defer to the
19 scientists, right?
20     A.    I always do that.
21     Q.    Back in August 13, 2001, you told the
22 scientists, including Mr. Matheson, Dr. Armstrong,
23 William Powers, "J&J developed proof that its talc
24 was free of asbestos," and you said that "I have
25 assembled those documents and have them."

Page 361

1         That's what you wrote in your e-mail
2 in August of 2001; true?
3     A.    You asked me this question before and
4 I will answer it the same way. Yes, this is what I
5 wrote. Johnson & Johnson, meaning the Johnson &
6 Johnson company, all of its resources and scientists
7 back then developed that proof as part of the
8 litigation process we had assembled documents and
9 had them in our attorneys' possession that we used
10 in litigation, but it had kind of -- J&J's a big
11 company, and even CPWW was a big company. There's a
12 lot of different departments. And when you get into
13 litigation, you collect documents from all these
14 departments and you kind of, you have a collection
15 of everything in one place. And that's what I was
16 referring to and offering it to them if they wanted
17 to follow-up on my suggestion.
18     Q.    You said, in referring to Johnson &
19 Johnson, all of its resources and scientists, right?
20     A.    Um-hum.
21     Q.    Which scientists developed the proof
22 that Johnson's Baby Powder is free of asbestos?
23 Name one.
24         MS. BROWN:  You already asked this
25 line of questioning. I object for the same reasons,

Page 362

1 and asked and answered.
2 BY MR. BLOCK:
3     Q.    Name one, sir.
4     A.    Like I said before, I don't know the
5 names offhand. There were scientists at Johnson &
6 Johnson in the '70s who did work on talc and that
7 information is in the document collection.
8     Q.    You worked for Johnson & Johnson for
9 almost 31 years, right, sir?
10     A.    I did, yes.
11     Q.    You can't name a single scientist
12 that you claim developed proof that Johnson &
13 Johnson's talc was free from asbestos, correct?
14         MS. BROWN:  I object; asked and
15 answered ten times.
16     A.    I don't recall all the names and I
17 wasn't at the company back in the '70s. I can only
18 rely on what I was told by the company and what was
19 in their documents as part of my work on litigation.
20 That's what I was referring to.
21     Q.    Mr. O'Shaughnessy, did you approve
22 public statements by Johnson & Johnson that went to
23 newspapers around the country that said that
24 Johnson's Baby Powder never contained asbestos?
25     A.    I would have reviewed statements made

Page 363

1 by the corporations since they would come up in
2 litigation.
3     Q.    Let's go to Exhibit 35 to your
4 deposition. Do you see -- and we're in binder 2.
5         Do you see that Exhibit 35 to your
6 deposition is an e-mail from John McKeegan?
7     A.    Yes.
8     Q.    All right. And he, like you, worked
9 for Johnson & Johnson Corporate, correct?
10     A.    Yeah, that's what the indication is.
11     Q.    And his e-mail is dated June 4, 2000,
12 right?
13     A.    That's right.
14     Q.    And it's sent to some other people
15 from Johnson & Johnson Corporate, including Willard
16 Nielsen. Who is that?
17     A.    The name is familiar. I don't know
18 his role.
19     Q.    And Mr. --
20     A.    I was going to say I know I knew him,
21 but I don't remember.
22     Q.    Was he a scientist, a communications
23 person, a PR person, an attorney or you don't know?
24     A.    Not an attorney. I think he might
25 have been a corporate communications person.

26 (Pages 360 - 363)

O'SHAUGHNESSY - Direct

Page 364

1    Q.    Okay.  And so Mr. McKeegan sends this
2  e-mail to three people from Johnson & Johnson or
3  four people from Johnson & Johnson Corporate; Mr.
4  Nielsen who you just described, Mr. Leebaw who is in
5  the area of public relations or communications,
6  right?
7    A.    Yes.
8    Q.    And two attorneys, you, John
9  O'Shaughnessy, and Clayton Paterson, right?
10   A.    That's right.
11   Q.    Did Clayton Paterson work for you or
12 were you parallel?
13   A.    No, Clay Paterson was an attorney who
14 was a member of the Johnson & Johnson regulatory
15 group, the law department.  So Clayton Paterson's
16 responsibilities, you know, I don't know them
17 exactly, but he would be involved in regulatory
18 issues and ancillary issues involving the company,
19 involving talc, he worked on talc.
20   Q.    Clayton Paterson was not a -- hold on
21 a second.  I just got feedback.  Someone unmuted.
22 Let's just -- we're going to have to cure the
23 technical problem.  Someone did something.
24        VIDEOGRAPHER:  It looks like it might
25 be coming from the judge's microphone.  Can't be

Page 365

1  sure.
2         MR. BLOCK:  All right.  Let's see, I
3  think if it was just cured.
4         VIDEOGRAPHER:  Okay.
5         MR. BLOCK:  Okay.
6  BY MR. BLOCK:
7    Q.    All right.  Now, just to be clear,
8  Mr. Paterson was not a litigation attorney, correct?
9    A.    That's right.
10   Q.    Mr. Paterson of Johnson & Johnson was
11 an attorney, but he didn't litigate cases, right?
12        MS. BROWN:  Asked and answered.
13   A.    Yes, that's my understanding.
14   Q.    All right.  So looking at
15 Mr. McKeegan's e-mail of June 4, 2000, that was sent
16 to you, the subject is "Asbestos Stories," correct?
17   A.    Right.
18   Q.    And Mr. McKeegan writes, "We never
19 did receive a call back from the Seattle
20 Post-Intelligencer about asbestos and baby powder,
21 but we did receive a call from the Easton,
22 Pennsylvania Express-Times near the Crayola crayon
23 factory about the same subject.  The Associated
24 Press version of their story which was sent -- which
25 went to newspapers around the country is attached."

Page 366

1         Is that what it says?
2    A.    Yes.
3    Q.    And if you look at the attached
4  article, and just to be clear, the e-mail refers to
5  the Associated Press version of the story from this
6  newspaper in Easton, Pennsylvania.  And you
7  understand that the AP, the Associated Press, was a
8  major -- was and is a major news wire service?
9    A.    Yeah, I recognize AP.
10   Q.    Okay.  And in this Associated Press
11 story from this paper in Easton, Pennsylvania, it
12 says -- that was sent to you, it says, "'Johnson's
13 Baby Powder never contained asbestos,' Johnson &
14 Johnson spokesman John McKeegan said."
15        Do you see that?
16   A.    Yes.
17   Q.    Does that refresh your memory that
18 John McKeegan was in the communications area at
19 Johnson & Johnson?
20   A.    Yeah, that would make sense 'cause he
21 interfaces here with the media.
22   Q.    All right.  And what Mr. McKeegan
23 said on behalf of Johnson & Johnson in this news
24 article that was sent to you, it also states,
25 "Mr. McKeegan also states, 'Johnson's Baby Powder is

Page 367

1  mined at a talc mine in Vermont that we went through
2  very carefully before selecting,' McKeegan said."
3         You see that?
4    A.    I do.
5    Q.    And then Mr. McKeegan says, as a
6  spokesman for Johnson & Johnson, "The mine itself
7  goes through many tests to make sure that there are
8  no asbestos fibers or minerals that could become
9  asbestos fibers in the talc."
10        Do you see that?
11   A.    I do.
12   Q.    And so in this news article that was
13 sent to you by Mr. McKeegan in the year 2000,
14 Mr. McKeegan is telling the public that Johnson's
15 Baby Powder has never contained asbestos and that
16 the Vermont talc mine that Johnson & Johnson uses
17 has no asbestos in it, right?
18   A.    Yeah, that's what it says here in the
19 quote.
20   Q.    Okay.  That's what Johnson & Johnson
21 was telling the public the entire time you worked
22 for the company, right?
23        MS. BROWN:  Asked and answered many
24 times.
25   A.    Yeah, Johnson & Johnson was telling

27 (Pages 364 - 367)

O'SHAUGHNESSY - Direct

Page 368

1 the public in its statement that its product was
2 asbestos-free, yes.
3     Q.    Okay.  And Mr. McKeegan, on behalf of
4 Johnson & Johnson, could not have made those
5 statements to the public without your approval,
6 right, sir?
7         MS. BROWN:  Objection.
8     A.    No --
9         MS. BROWN:  Misstates the testimony.
10 BY MR. BLOCK:
11    Q.    Why was Mr. McKeegan sending this
12 news article to you?
13        MS. BROWN:  Foundation; speculation.
14    A.    I'm the attorney who handles
15 litigation, so issues like this do come up in the
16 litigation, so he was keeping me informed.
17    Q.    There is nothing about litigation in
18 this e-mail, right?
19    A.    No, but it could be -- come up in
20 litigation.  Just because the document doesn't
21 mention litigation doesn't mean that the lawyers
22 don't use it in the litigation, and I face it in a
23 lawsuit on behalf of Johnson & Johnson that I'm
24 defending.
25    Q.    You certainly did not object to the

Page 369

1 words that Mr. McKeegan used in telling the public
2 that Johnson's Baby Powder never contained asbestos,
3 right, sir?
4         MS. BROWN:  Objection.
5     A.    If you're asking me did I review what
6 he told them before, I -- no.  John's
7 responsibility, I believe, just from my knowledge in
8 corporate communications, is they get media
9 inquiries and they respond to them.  They don't come
10 to lawyers and say, well, I'm going to do this or
11 that.  They might, but oftentimes they have prepared
12 statements that they work off of.
13    Q.    Sir, Mr. McKeegan's, if we look at
14 Exhibit 35A, Mr. McKeegan would send his statements
15 and newspaper articles to a small group of people at
16 Johnson & Johnson and you were one of them, right?
17    A.    Yes.
18        MS. BROWN:  Objection; foundation.
19 BY MR. BLOCK:
20    Q.    I mean, if you look at Exhibit 35A,
21 Mr. McKeegan is only sending this e-mail to two
22 people or three people from Johnson & Johnson
23 corporate; you, Jeffrey Leebaw in the public
24 relations area and a third person, Gary Noble.
25 Who's Gary Noble?

Page 370

1     A.    I don't recall.  I do recognize the
2 name.  But I don't recall.  In fact, I think there
3 were a couple of people named Noble that I dealt
4 with at J&J.  So I recognize the name, but I don't
5 know who it is.
6     Q.    All right.  Let's look at
7 Mr. McKeegan's e-mail of February 4, 2000, and the
8 subject is "HealthScout.com article."
9         Do you see that?
10    A.    Yes, I do.
11    Q.    And if we go to the Bates page ending
12 in 754, please.
13    A.    Okay.
14    Q.    In this news article that was sent to
15 you, it says, "John McKeegan, a spokesman for
16 Johnson & Johnson, which makes talc-containing
17 products, says the company is taking a very close
18 look at the study."
19        Do you see that?
20    A.    Yes.
21    Q.    And then it says, "All of Johnson &
22 Johnson's talc-containing products are free of
23 asbestos contaminants and use 'just the purest,
24 highest grade talc and fragrance,' McKeegan says."
25        Is that what this news article says

Page 371

1 that Mr. McKeegan sent to you?
2     A.    Yes.
3     Q.    And so this statement by Mr. McKeegan
4 is that Johnson & Johnson's talc products are talc
5 and fragrance, right?
6     A.    He said, and just the purest -- well,
7 you know, I don't know what he said, but this is a
8 quote by apparently a reporter, so I'm trying to
9 interpret it.  "And use just the purest highest
10 grade talc and fragrance," yes, that's what it says.
11    Q.    And they're quoting --
12    A.    Yeah.  And the quote, you know, I'm
13 not trying to be picky, but, you know, the quote is
14 select.  It's just part of the paragraph.  So I
15 don't know all of what John said.  I don't know if
16 the reporter got it right.  But in essence, yes, J&J
17 is free from asbestos.  So I think --
18    Q.    It's the same thing that the
19 Johnson's Baby Powder containers said for all the
20 years you worked at the company that the ingredients
21 were just talc and fragrance, right?
22    A.    If that's what it said, that's what
23 the container said.  I'm talking about what John
24 said.
25    Q.    Okay, sir.  I mean, at the time these

28 (Pages 368 - 371)

O'SHAUGHNESSY - Direct

Page 372

1 news articles were being sent to you by Mr. McKeegan
2 in the area of communications at Johnson & Johnson
3 telling the public that Johnson's Baby Powder never
4 contained asbestos, you actually knew that
5 healthcare providers were cautioning against the use
6 of talc products, correct?
7           MS. BROWN:  Objection; that misstates
8 the document you're referring to.
9      A.    Well, I don't know what you're
10 referring to, but it's juxtaposing two things, and I
11 can't answer the question in that form.
12     Q.    Go to Exhibit 33 to your deposition.
13 And this is back to binder 1.
14           MS. BROWN:  And, Jerry, when you
15 finish this exhibit can we take a lunch break,
16 please?
17           MR. BLOCK:  Yes.
18           MS. BROWN:  Thank you.
19     A.    I'm on 33.  Is that the one I'm
20 supposed to be looking at?
21     Q.    Yes.  And do you see Exhibit 33 is an
22 e-mail from Nancy Musco.
23           Do you see that?
24     A.    Yes.
25     Q.    Okay.  And that's the Nancy Musco

Page 373

1 that certified those Interrogatories in the
2 Krushinski case as true, per your direction,
3 correct?
4      A.    Yes.
5      Q.    And Miss Musco sends this e-mail to
6 you, John O'Shaughnessy, correct?
7      A.    Yes.
8      Q.    And to John McKeegan, who made those
9 statements to the public we just looked at, right?
10     A.    Right, right.
11     Q.    Okay.  David Moret, do you know who
12 that was?
13     A.    David, no.
14     Q.    All right.  Also to Clayton Paterson,
15 another attorney that you told us about, right?
16     A.    Right.
17     Q.    And there's another e-mail below
18 where she says, Miss Musco, "Attached please find
19 the minutes from the talc review held June 29,
20 1999," right?
21     A.    Yes.
22     Q.    All right.  And if we look at the
23 minutes, it's on a letterhead for Johnson & Johnson
24 Consumer Medical Affairs, right?
25     A.    It does, yes.

Page 374

1      Q.    All right.  And it lists Nancy Musco
2 as being with, she lists herself as "Nancy Musco,
3 Product Safety."
4           Do you see that?
5      A.    Yes.
6      Q.    Right?  Do you see that?
7      A.    Yes.
8      Q.    All right.  And the memo is to you,
9 right?
10     A.    Yes.
11     Q.    To you --
12     A.    And others.
13     Q.    It's to Mr. Paterson?
14     A.    Yeah.
15     Q.    It's to the J&J spokesperson John
16 McKeegan and other people, right?
17     A.    That's right.
18     Q.    And it says, "A meeting was held on
19 June 29, 1999, to review the history of talc and
20 publicity circulated about talc and/or Johnson's
21 Baby Powder."
22           Is that what it says?
23     A.    Yes.
24     Q.    And in the memo it also says that
25 "marketing informed us that the adult woman is the

Page 375

1 biggest user of talc products and that J&J is the
2 largest manufacturer of talc products."
3           Do you see that?
4      A.    I do.
5      Q.    And having received this memo in
6 1999, you knew this in 1999, right?
7      A.    I knew what was in the memo.
8      Q.    Okay.  And then it says, "We
9 discussed the impact of the issues on professional
10 marketing."
11           Is that what it says?
12     A.    Yes.
13     Q.    And then it says, "Healthcare
14 providers caution against the use of talc products."
15           Do you see that?
16     A.    I do.
17     Q.    You knew that in the 1990s, right?
18     A.    I mean, I knew, I knew, I knew what's
19 in the statement here 'cause I had read it, and what
20 I recall is that there was some inhalation issues
21 and pediatricians were cautioning against, some
22 pediatricians were cautioning against the use of
23 talc products.  That's my recollection.
24     Q.    And it says, at the bottom, that
25 "Clayton Paterson and John O'Shaughnessy will

29 (Pages 372 - 375)

O'SHAUGHNESSY - Direct

Page 376

1 discuss the meeting issues with R. Fine."
2        Is that what it says?
3    A.    Yes.
4    Q.    So it's saying attorney Clayton
5 Paterson and attorney John O'Shaughnessy will
6 discuss the meeting issues with Roger Fine, who was
7 then at what position at Johnson & Johnson?
8    A.    I don't recall his position. It was
9 a legal position, though. What was the date of this
10 again?
11   Q.    1999.
12   A.    I don't know if Roger was still the
13 head of litigation. He at one point became general
14 counsel, though.
15   Q.    Okay. And Roger Fine, was he one of
16 your bosses at this time in 1999?
17   A.    I don't know. I reported to the head
18 of litigation and I don't know if Roger was the head
19 of litigation at the time.
20   Q.    And just to be clear, Roger Fine, who
21 it says you would discuss these meeting issues with,
22 was at one time general counsel at Johnson &
23 Johnson, which is the head lawyer for the entire
24 Johnson & Johnson, right?
25   A.    Yes.

Page 377

1    Q.    Okay.
2        MR. BLOCK: A lunch break was
3 requested and that's fine.
4        MS. BROWN: Okay. And before we do
5 that can we excuse the witness and can I raise
6 something with your Honor, please?
7        CONCIERGE: Okay.
8        VIDEOGRAPHER: Do you want to go off
9 the video record?
10       MS. BROWN: We can go off the video
11 and just remain on the stenographic, please.
12       VIDEOGRAPHER: Sure. Stand by.
13       Going off the record, 12:08 p m.
14 This is the end of Media Unit 2.
15       (Stenographic record.)
16       MS. BROWN: And, Jerry, can you just
17 stop sharing your screen so I can see everybody.
18       So, your Honor, I want to raise a
19 very increasing concern I have about the ability to
20 complete this deposition today based on the last
21 hour and 15 minute segment of questioning.
22       What I am, I'm afraid and
23 disappointed is going on here is that
24 Mr. O'Shaughnessy is doing his very best to give
25 truthful information about what he does or does not

Page 378

1 remember, and he is giving an answer that he doesn't
2 remember something and then counsel is continuing to
3 put documents in front of him to ask the very same
4 question time and time again, to go back to an
5 exhibit -- that Nancy Musco certification we must
6 have read five times yesterday and we've been back
7 to it three times today.
8        And so is he really just fishing for
9 these sound bites and it's becoming abusive to
10 Mr. O'Shaughnessy who is truthfully answering he
11 does not remember. He must have said ten times that
12 those documents were assembled by somebody else and
13 he doesn't remember what was in them, and then we go
14 page by page through a document he tells Mr. Block
15 time and time again he does not remember.
16       And so I know we are going to get a
17 request in a few hours for Mr. Block to continue
18 this into tomorrow, and I wanted to raise with your
19 Honor now that there is no reason that this
20 deposition cannot conclude today, and that I would
21 ask for some help from the court in getting us back
22 on track here and to have counsel stop plowing old
23 ground and truthfully harassing this retiree who is
24 doing his very best to answer these questions.
25       MR. BLOCK: Your Honor, I completely

Page 379

1 disagree with Miss Brown's characterization of
2 things. We spent a lot of time this morning on J&J
3 making an objection to the use of a document that
4 they've had for three years in their database.
5        Then Mr. O'Shaughnessy, on a number
6 of occasions, was giving long answers that were
7 partially nonresponsive that forced me to re-ask
8 certain questions or ask them in different ways to
9 gain responsive answers, which I'm entitled to.
10       He's a lawyer, so he knows more than
11 anyone, he's a litigation lawyer, so he knows more
12 than anyone what a responsive answer is. I mean, we
13 all learn that in law school.
14       And, you know, he can say all he
15 wants that, you know, he didn't assemble the
16 documents, you know, he wrote in an e-mail when it
17 was fresh in his mind, "I assembled the documents,"
18 so it's certainly fair examination to ask whether
19 some of these documents from the '70s were in the
20 documents he assembled.
21       I think this discussion is premature.
22 I think that if we don't have speaking objections,
23 if we don't have requests for sidebars challenging
24 documents that Johnson & Johnson has had for years
25 and have been produced for years and we're able just

30 (Pages 376 - 379)

O'SHAUGHNESSY - Direct

Page 380

1 to get questioning in like we were, I think, over
2 the last hour or so, you know, let's see what
3 happens.
4          I think we're still in the same
5 position we were when we had our first meeting,
6 which is, you know, I said it could very well take
7 more than two days.  Your Honor has told me you
8 would like to see it get done in two days.  J&J has
9 said that there's no reason it should take more than
10 two days.  I think we're still in that same
11 position, and I think that we should see where
12 things are this afternoon.
13          But, you know, if you time the
14 actual, my actual questions and Mr. O'Shaughnessy's
15 actual answers, and you remove Miss Brown speaking
16 during the testimony --
17          MS. BROWN:  There were --
18          MR. BLOCK:  -- and if you remove the
19 sidebars, I think we're probably somewhere around
20 four hours.  So by the end of today we might only be
21 at seven hours, which is, you know, a one-day
22 deposition.
23          So again, I don't -- I think this is
24 premature.  I think we should all take a breath and
25 have lunch, and I think we should come back, you

Page 381

1 know, at, you know, maybe not take so long for
2 lunch, maybe come back at ten to 1 so we could, you
3 know, make headway.
4          And by the way, I'll just add that,
5 you know, I was respectful, you know, I'm being
6 accused of being abusive, which is not true, and I
7 don't know why Miss Brown is trying to make a record
8 that uses words like "abusive."
9          But I'll just remind Miss Brown and
10 your Honor that Mr. O'Shaughnessy wanted to get done
11 at 5 o'clock yesterday.  You know, it's customary,
12 you know, to go longer, particularly when there's
13 been a lot of, you know, time spent on sidebars.  I
14 had no problem with that.  So, you know, all the
15 courtesies are being extended both ways here.
16          You know, I have issues with
17 Miss Brown's speaking objections.  I didn't use the
18 word "abusive," I would not use the word "abusive."
19          SPECIAL MASTER:  Let me give you my
20 impressions.  And I apologize because I'm having
21 some issues with the video, but if the video was on
22 you would see that I have seen everything that went
23 on and have been paying close attention to
24 everything that's gone on since the first moment
25 this deposition started.

Page 382

1          In my view, I have not seen anything
2 on either side to indicate that either side is
3 acting in other than complete good faith.  I
4 respectfully don't agree that J&J is making speaking
5 objections.  I don't agree that plaintiff is
6 harassing the witness.
7          My impression is that
8 Mr. O'Shaughnessy is acting in the utmost good
9 faith, not purposely or deliberately trying to avoid
10 counsel's questions.  He's doing the best he can.  I
11 don't get the impression that plaintiff is
12 intentionally trying to drag out the questioning to
13 go onto another day.
14          I agree with Mr. Block that at the
15 mid afternoon break we ought to talk about where we
16 are and hopefully we could wrap up today.  In the
17 unfortunate event that we do have to go onto a third
18 day, it will not be open-ended.  There will be a
19 finite limit on the time that I'm hopeful we could
20 wrap up today.
21          He's an exceedingly important witness
22 with a lot of documents and I just think Mr. Block
23 is doing a workmanlike job.  Defense counsel is
24 doing her job to defend this deposition all within
25 the bounds of the rules and the professional

Page 383

1 obligation.
2          So I think what we ought to do is at
3 the mid afternoon break, one should take a deep
4 breath, see where we are.  Hopefully we can finish
5 today, that certainly would be our preference, but
6 we really won't know and Mr. Block will not be able
7 to tell us until he sees, I think, what happens for
8 the rest of the afternoon.
9          J&J, to give you some comfort, you
10 have probably seen my e-mail this morning where I
11 sent notice to the MDL plaintiffs that unlike this
12 deposition, I think it's fully expected that they
13 won't need a third day for Mr. O'Shaughnessy's
14 deposition.
15          Mr. Block is starting with a clean
16 slate, unlike the plaintiffs in the MDL which have
17 the benefit of this transcript and deposition.  And
18 it may be that hopefully the MDL plaintiffs can
19 finish the deposition in one day rather than two,
20 but I would think it's completely out of the
21 question that it would be a third day contemplated
22 unless something totally and completely unexpected
23 happens.
24          And frankly, I would be surprised if
25 plaintiffs' counsel in the MDL disagree with me

31 (Pages 380 - 383)

O'SHAUGHNESSY - Direct

Page 384

1 because Mr. Block has certainly covered a lot of
2 ground and the plaintiffs in the MDL have plain
3 notice of where Mr. O'Shaughnessy stands.
4           So I think we should respect
5 Mr. O'Shaughnessy.  I think Mr. Block is acting
6 professionally and with courtesy as expected and we
7 should just continue.  Let's take a lunch break.
8           MR. TISI:  Your Honor.
9           SPECIAL MASTER:  Hold on.  At the mid
10 afternoon break we'll see where we are.  I'm hopeful
11 that Mr. Block can get his notes and thoughts
12 together to focus on the crux of this and maybe
13 we'll get fortunate and finish up today.
14           MR. BLOCK:  Your Honor, I'm sorry, I
15 know Mr. Tisi wants to speak.  I just wanted to know
16 what time we're returning because I'm not going
17 to -- if there's going to be discussion about
18 scheduling for ovarian cancer, I'd just as soon go
19 eat.
20           SPECIAL MASTER:  You tell me,
21 Mr. Block.
22           MR. BLOCK:  Alli, what time do you
23 want to resume?
24           MS. BROWN:  Let's do 12:50.  We'll
25 try to keep on track.

Page 385

1           MR. BLOCK:  12:50.
2           (Discussion held off the record.)
3           MR. TISI:  Your Honor, we can
4 certainly deal with this afterwards.  I know that
5 Miss O'Dell sent you an e-mail earlier today.  And
6 I'm glad to see that Mr. Bernardo is actually on the
7 call 'cause we have had -- we have not had a meeting
8 with you about the ovarian cancer part of this, but
9 Mr. Bernardo and I have spent quite a bit of time
10 discussing this issue.
11           First of all, I mean, I'm just
12 getting notice, we are almost a day and a half into
13 the deposition of Mr. O'Shaughnessy and the word
14 "ovarian cancer" has not, I don't think the word
15 "ovarian cancer" has even come up in the entire
16 transcript.  So that's an initial just observation
17 on my part.
18           But the agreement with Mr. Bernardo
19 in coordinating this was that we would use this
20 deposition, obviously, as a part of a good faith
21 effort to streamline our own examination in the
22 ovarian cancer cases, but it is very clear that we
23 are doing this without prejudice to our ability to
24 present this witness at the trial in an ovarian
25 cancer case, State and Federal.  That's number one.

Page 386

1           Number two is this case, this
2 deposition was originally ordered by a judge in
3 Missouri and this was cross-noticed in the MDL, so
4 the rules that apply here, at least in part, has to
5 be taken into consideration to a State Court order
6 that this deposition proceed.
7           The third really important thing, and
8 I'll just kind of say this, is that we will endeavor
9 to complete this deposition within the time period
10 that we've talked about with Mr. Bernardo, with the
11 understanding that we may have to go over to a third
12 day.
13           We have no desire to plow all the
14 ground.  We may have to, for context, refer to
15 exhibits.  In fact, I'm quite sure, and I can give
16 you examples, that we will -- that there are
17 documents that Mr. Block used that refer to
18 asbestos, for example, but also refer to ovarian
19 cancer that were not discussed at all with the
20 witness.
21           So we may have to go back to some
22 documents that he discussed and said that, where we
23 say, for example, you discussed X with Mr. Block on
24 asbestos, but there's also some paragraphs that deal
25 with ovarian cancer.

Page 387

1           And we discussed this very issue with
2 Mr. Bernardo, I doubt Mr. Bernardo is going to
3 disagree with me, and we used this as an, almost as
4 a discovery deposition, we even tried to streamline
5 it.
6           I have no desire for the lawyers in
7 the MDL and the State Court ovarian cancer cases,
8 for example, to spend a lot of time on some of the
9 documents relating specifically to asbestos, but
10 it's important for us to be able to present our case
11 in the way in which we really want to be able to do
12 it for the benefit of the over 30,000 ovarian cancer
13 cases.
14           And to paraphrase a phrase that I've
15 used with Mr. Bernardo repeatedly is I never wanted
16 the meso individual cases that Mr. Block had to wag
17 the ovarian cancer dog involving 30,000 women.
18           Just one more observation there.  I
19 would say that 50 percent of the documents that
20 Mr. Block used refer specifically to the Coker case.
21 Now, I'm not saying that the issues relating to the
22 Coker case do not also apply more generically, but
23 he is clearly focusing his examination on something
24 that will benefit meso cases that he has gotten,
25 that he's getting ready for his trial.

32 (Pages 384 - 387)

O'SHAUGHNESSY - Direct

Page 388

1    I will tell you that our examination
2  for the ovarian cases would have a different, a
3  different focus, a different priority, and we should
4  be entitled to do that.  So, you know, kind of
5  wrapping up, I know it's -- I've gone on, I didn't
6  expect to have to talk during this deposition at
7  all, so I apologize if I am not as concise as I
8  would otherwise like to be.
9    I would think, I just want to make
10 clear that we had set aside two days for this
11 deposition with a spillover for the third day.  This
12 was a subject to, for a lot of discussion with
13 Mr. Bernardo that I do not think that he is going to
14 say that I said anything that is incorrect.
15    We never wanted to be in a position
16 where, because Mr. Block insisted on going first,
17 that we would be prejudiced.  We were working things
18 out and being agreeable, but I don't feel like we
19 should be prejudiced by the fact that this has gone
20 on the way it has for the past two days.
21    Anyway, I apologize for being longer
22 than I thought, but it's very important that we put
23 this on the record.  I am hoping that this is just
24 preemptive discussion, that we will not have to
25 really have a problem next week, but I thought it's

Page 389

1  important to at least raise the issue.
2    SPECIAL MASTER:  Thank you, Mr. Tisi.
3  I thought it was also important that I put your team
4  on notice of what I believe is appropriate.  I'm
5  sure you know that I not only have the benefit of
6  having dealt with these issues for 14 years on the
7  bench, but I was practicing for 26 years before I
8  went on the bench and I've been in your shoes 10,000
9  times, and I am of the firm belief that given the
10 background of the cases and the benefit that you
11 have because you sat in on this deposition that
12 absent unforeseen circumstances, there should be no
13 reason why you need a third day for O'Shaughnessy's
14 deposition.
15    I'm not saying, I'm not ruling that
16 it's totally foreclosed, I'm just giving you the
17 benefit of what I believe at the moment is
18 appropriate to put you on notice.  I think it's fair
19 to assume, you know and I know that if I had the
20 black robe on and said you only have two days, under
21 no circumstances are you going longer than that,
22 you'd finish in two days.
23    MR. TISI:  I hear you.
24    SPECIAL MASTER:  I'm just giving you,
25 to be fair, I want to be fair to you.

Page 390

1    MR. TISI:  Sure.
2    SPECIAL MASTER:  Because if you know
3  you have at most two days, hopefully one day, to
4  depose O'Shaughnessy, you'll finish.
5    MR. TISI:  I hear you.
6    SPECIAL MASTER:  I want to be fair to
7  the witness and J&J as well.  He's been here for two
8  days.  I hope we don't go over to tomorrow, but I
9  wouldn't be shocked for a finite period of time.
10    You have seen his demeanor.  You know
11 how he's going to respond.  You know the flavor of
12 his questioning.  That's of immense benefit to you
13 when you depose him, so --
14    MR. TISI:  I --
15    SPECIAL MASTER:  Let's wait to see
16 what happens.  Why argue about something that may
17 not come up?  I am completely confident that
18 everybody's acting in good faith.
19    MR. TISI:  I agree.  And I agree,
20 your Honor.  I guess I was just taken back by the
21 suggestion that we complete in one day and I don't
22 think that --
23    SPECIAL MASTER:  I said hopefully, I
24 said hopefully one day.
25    MR. TISI:  I --

Page 391

1    SPECIAL MASTER:  I live in the real
2  world, Mr. Tisi.  I don't live in a fantasy world.
3  I hope you can finish in one day, but like I said, I
4  live in the real world.  I think it's unlikely
5  but...
6    MR. TISI:  May I ask a logistical
7  question, your Honor?  You have a two-hour, I know
8  that, you know, apart from the sidebars and all that
9  stuff, but you have a two-hour commitment involving
10 the CLE.  Is that something where you have to travel
11 back and forth to it and then it's really a three
12 hour break?
13    SPECIAL MASTER:  No, no, no, I built
14 in the half hour on each side.
15    MR. TISI:  Okay, okay.
16    SPECIAL MASTER:  I have a one hour
17 CLE and I put a half hour on each side, so my two
18 hours should be fine.  Why don't we start, if you
19 want, I'm perfectly agreeable if you want to start
20 at 8, 8:30, 9.
21    MR. TISI:  Yeah, let's -- yeah, let
22 Mr. Bernardo and I talk about it.  I know that, you
23 know, at least for my purposes, I'm on Mountain
24 Time, I'm more than happy to, you know, there will
25 be different questioners because it's a Missouri and

33 (Pages 388 - 391)

O'SHAUGHNESSY - Direct

Page 392

1 a Federal case, so I'll have to coordinate with my
2 side on that, but I think starting earlier may make
3 some sense to make sure that we get, you know, the
4 one thing we have seen a pattern of what's happened
5 here, I don't know how much time we've actually
6 spent on the record getting questions and answers,
7 but if we start earlier then we can get what would
8 typically be if we were doing a regular deposition
9 without, you know, the issues that are raised in
10 this case, that we would be getting a lot more time
11 than we actually have gotten.
12          SPECIAL MASTER:  Yes, we have to talk
13 and maybe we'll schedule another call because I am
14 still not certain if Special Master Norton is going
15 to participate in this deposition, and then we have
16 to talk about the logistics of how to coordinate his
17 rulings, efforts, with mine, so...
18          MR. TISI:  Yes, I think that's
19 important.
20          SPECIAL MASTER:  We'll have to deal
21 with that, and not to take up the people's time who
22 may want to take a bite before we reconvene, but
23 maybe by tomorrow we can caucus about the MDL
24 deposition.
25          MR. TISI:  I agree, your Honor.  And

Page 393

1 I apologize if I was more verbose than I would
2 typically be earlier.  I didn't expect to have to
3 address this issue now, so I do apologize for that.
4          SPECIAL MASTER:  You don't have to do
5 that Mr. Tisi.  Everybody's acting in good faith.
6 There's a lot at stake, so let's just move on and
7 we'll see what happens this afternoon at the mid
8 afternoon break.  Mr. Bernardo will talk about
9 whether we, hopefully not, but maybe go over for
10 today, but you already have my assurances it's not
11 going to be open-ended if we, unfortunately, have to
12 go over for today.
13          So we'll see you in a few minutes,
14 everybody.
15          (Luncheon recess:  12:32 p.m. to
16 12:57 p m., Eastern Standard Time.)
17
18
19
20
21
22
23
24
25

Page 394

1          A F T E R N O O N   S E S S I O N
2          VIDEOGRAPHER:  Going back on the
3 record, 12:57 p.m.
4          This is the beginning of Media Unit
5 3.  Okay.
6 BY MR. BLOCK:
7      Q.    Mr. O'Shaughnessy, earlier we looked
8 at a statement or some statements to the public by
9 John McKeegan where he sent you an e-mail of news
10 articles where J&J told the public that Johnson's
11 Baby Powder never contained asbestos.
12          Do you remember that?
13      A.    Yes, I recall.
14      Q.    Okay.  And isn't it true that at
15 times you edited statements about talc safety that
16 were intended for use with pediatricians?
17      A.    I -- I -- yes, it's possible I edited
18 statements.  I don't know who they would be used
19 for, I don't recollect.
20      Q.    You did edit statements about talc
21 safety when you were at Johnson & Johnson, correct?
22      A.    Yes, I may have.
23      Q.    Let's go to the next exhibit that
24 we're going to look at, which is Exhibit 36.  And
25 looking at Exhibit 36, I want to go to the page that

Page 395

1 ends with 001 at the end.  And it's an e-mail from
2 you dated -- yeah, it's the e-mail from you, it's an
3 e-mail chain.
4      A.    I got it.
5      Q.    Yes.  And we're looking at the e-mail
6 from you from August 24, 2001, at 6:19 p.m.
7      A.    Yes.
8      Q.    All right.  And you're sending this
9 e-mail to Jeffrey Leebaw, who we've discussed.
10 You're copying Nancy Musco.  You're also sending
11 this to Lorena Telofski.
12          Do you know what her role was at
13 Johnson & Johnson?
14      A.    Yeah, I know Lorena well.  I don't
15 know her exact role.  I think she was in regulatory,
16 but I know her well.
17      Q.    All right.  And John Crisan,
18 C-r-i-s-a-n, he's with Johnson & Johnson Corporate.
19          Do you know what he did?
20      A.    John's an attorney.
21      Q.    All right.  And you attach to your
22 e-mail a file called "Powder Q-A Detailing."
23      A.    Okay.
24      Q.    You see that?
25      A.    I do.

34 (Pages 392 - 395)

O'SHAUGHNESSY - Direct

Page 396

1    Q.    You see it listed there under your
2  name?
3    A.    Yes.  Oh, I'm sorry, yeah.
4    Q.    Then if we just work our way up the
5  e-mail chain, by the way, the subject of the e-mail
6  is Johnson's Baby Powder and Prickly Heat Powder.
7          Do you see that?
8    A.    I do.
9    Q.    And if you could just make sure I
10 finish my question and I'll make sure that you get
11 to finish your answer.  Okay?
12   A.    Sure.
13   Q.    So let's work our way up the e-mail
14 chain.  So there's a response to your e-mail on
15 August 24, 2001, at 6:28 p.m., nine minutes later,
16 Mr. Leebaw responds -- actually he forwards the
17 e-mail to Marc Monseau for Johnson & Johnson
18 Corporate.  And who is Mr. Monseau?
19   A.    I believe he was a corporate
20 communications person.
21   Q.    And Jeff Leebaw says to Mr. Monseau,
22 "Marc, This looks good to me.  John's changes are on
23 the money.  You might want to ask John McKeegan to
24 take a quick peak.  He was very close to this issue.
25 Thanks.  Jeff."

Page 397

1          Do you see that?
2    A.    Yes.
3    Q.    Okay.  So you sent an e-mail with an
4  attachment called "Powder Q-A Detailing," and then
5  your e-mail was forwarded by Mr. Leebaw, and
6  Mr. Leebaw comments that your changes are on the
7  money, right?
8    A.    Yes.
9    Q.    And then if we go to the next e-mail,
10 Mr. Monseau then forwards the e-mail to
11 Mr. McKeegan, August 27, 2001.
12         Do you see that?
13   A.    I do.
14   Q.    And Mr. Monseau says to Mr. McKeegan,
15 "John, not sure what your schedule is like today,
16 but can you have a quick look at the attached
17 document that includes edits from John
18 O'Shaughnessy?"
19         Do you see that?
20   A.    I do.
21   Q.    It says, "I have read through and
22 like Jeff, I agree with John's edits."
23         Do you see that?
24   A.    I do, yes.
25   Q.    And then if you follow the e-mail up

Page 398

1  further, Mr. McKeegan responds to Mr. Monseau and
2  says, "Marc," and he says, "here are my thoughts, I
3  would take out the references to pharmaceutical
4  grade talc, the eating kind, since it isn't used in
5  our product.  I agree with John's edits and I've
6  included some of my own."
7          Do you see that?
8    A.    Yeah, this is from John McKeegan,
9  right.
10   Q.    Right.
11   A.    Okay.  Got it.
12   Q.    All right.  So Mr. McKeegan says that
13 he made some edits, but that he also agrees with
14 your edits, right?
15   A.    Right.
16   Q.    All right.  Then if we look at the
17 document that's attached, Johnson's Baby Powder and
18 Johnson's Baby Prickly Heat Powder, do you see it
19 says, "Safe and effective products for the 21st
20 Century," on the top?
21   A.    Yes.
22   Q.    And it says, "Affiliate Information
23 For Detailing at International Congress of
24 Pediatrics in Beijing, China, September 2001."
25         Do you see that?

Page 399

1    A.    I do.
2    Q.    And did you know at this time in 2001
3  that that is a major conference for pediatricians
4  where pediatricians from all over the world attend?
5    A.    I don't know the nature of it.  I'm
6  not familiar with it.
7    Q.    All right.  Okay.  And so if we look
8  at the document there's a question, "What is talc?"
9          Do you see that?
10   A.    Yes.
11   Q.    And we could see that, like it says
12 in the e-mail, Mr. McKeegan, he said he deleted the
13 reference to pharmaceutical grade, and that's
14 reflected in the changes in the document, right, on
15 the right side?
16   A.    Yeah.
17   Q.    Okay.  And the document says, the
18 edited document that you edited and Mr. McKeegan
19 edited has the statement, "Cosmetic grade talc is
20 free from impurities such as asbestos."
21         Is that what it says?
22   A.    Yes.
23   Q.    And this document that you edited and
24 Mr. McKeegan edited for this conference of
25 pediatricians says, "Confidential, for internal use,

O'SHAUGHNESSY - Direct

Page 400

1 professional marketing training," correct?
2     A.    Where are you reading from?  Yes, I
3 see it.
4     Q.    And the statement, "Cosmetic grade
5 talc is free from impurities such as asbestos," is a
6 scientific statement, correct?
7     A.    Yes.
8     Q.    And Mr. McKeegan was from the
9 communications department from Johnson & Johnson,
10 correct?
11    A.    Yes.
12    Q.    You were a lawyer for Johnson &
13 Johnson, correct?
14    A.    Yes.
15    Q.    Let's go to Exhibit 37A to your
16 deposition.  Exhibit 37A is a e-mail from Nancy
17 Musco and it was sent to you, John O'Shaughnessy, an
18 attorney; also to Clayton Paterson, an attorney;
19 Mr. McKeegan from communications and a number of
20 other people from the Johnson & Johnson companies,
21 correct?
22    A.    Yes.
23    Q.    And the subject of Miss Musco's
24 e-mail is talc, right?
25    A.    Yes.

Page 401

1     Q.    Okay.  And her e-mail refers to,
2 attaches a document NTP meeting doc, and also she
3 refers in the first sentence to NTP meeting.
4          Do you see that?
5     A.    I do.
6     Q.    And she writes, "Dear All, Over the
7 last few days we have received several papers to
8 review for the upcoming NTP meeting."
9          Do you see that?
10    A.    Yes.
11    Q.    And Johnson & Johnson retained
12 certain scientists to write papers for, to submit to
13 the NTP as part of the NTP's review of talc as a
14 carcinogen, true?
15    A.    You're not referring to the document,
16 you're asking me a question; right, Mr. Block?
17    Q.    I'm asking you as someone who was
18 involved in the, in Johnson & Johnson's work
19 relating to the NTP review of talc as a carcinogen,
20 you know that Johnson & Johnson hired certain
21 scientists to write papers to submit to the NTP,
22 correct?
23    A.    I believe that's true 'cause my
24 involvement with this was, yes, I was monitoring
25 what was going on for the NTP meeting, yes.

Page 402

1          (Court Reporter clarification.)
2          MS. BROWN:  I objected on foundation
3 grounds.  Thank you.
4 BY MR. BLOCK:
5     Q.    And, in fact, Mr. O'Shaughnessy, you
6 were one of the key people at Johnson & Johnson that
7 would review the papers that were submitted by the
8 scientists that Johnson & Johnson paid to write
9 papers to submit to the NTP, correct?
10         MS. BROWN:  Speculation.
11    A.    No, I wouldn't agree with that.
12    Q.    All right.  Let's read this e-mail
13 from Miss Musco from November 27, 2000.
14         Do you see where it starts out, "Dear
15 All"?
16    A.    Yes.
17    Q.    All right.  And in this e-mail that
18 was sent to you and others, Miss Musco writes, "Over
19 the last few days we have received several papers to
20 review for the upcoming NTP meeting."
21         Is that what she said?
22    A.    Yes.
23    Q.    Then she writes, "As agreed, those
24 papers received to date have been sent to key people
25 for review of content accuracy and appropriateness

Page 403

1 of tone."
2          Is that what it says?
3     A.    Yes.
4     Q.    And then it says, "Those key people
5 will meet on Monday morning at 8 a.m. to discuss
6 their opinions."
7          Is that what it says?
8     A.    Yes.
9     Q.    And then Miss Musco writes,
10 "Unfortunately, with the holiday weekend, John
11 O'Shaughnessy, Clay Paterson and possibly John
12 Hopkins will not have received their copies of the
13 papers in time to have reviewed for the Monday AM
14 meeting."
15         Is that what it says?
16    A.    Yes, that's what it says.
17    Q.    So it says, the key people will be
18 meeting on Monday morning, but that with the holiday
19 weekend, John O'Shaughnessy, an attorney, Clay
20 Paterson, an attorney, and possibly John Hopkins
21 will not have received their copies in time to have
22 reviewed the papers for the meeting, right?
23    A.    Right.
24    Q.    And then it says, "John, Clay" -- it
25 says, "John, Clay and John H," so John H is John

36 (Pages 400 - 403)

O'SHAUGHNESSY - Direct

Page 404

1 Hopkins, right?
2    A.    Yes.  I assume, yes.
3    Q.    John, Clay is Clay Paterson, right?
4    A.    That's right.
5    Q.    And then the other John being
6 referred to here is you, right?
7    A.    Yes.
8    Q.    So it says, "John, Clay and John H,
9 Please address your comments and/or questions on
10 these documents to Mike Chudkowski."
11        Is that what it says?
12    A.    Yes.
13    Q.    So you, as a lawyer, were a part of
14 reviewing papers from scientists that were being
15 submitted to the NTP on behalf of Johnson & Johnson?
16        MS. BROWN:  I object; it misstates
17 the testimony and the document.
18    A.    Yes, since this, again, the NTP issue
19 was going to be an issue that would come up in
20 litigation and it's responsive to litigation, I
21 would be kept informed of what they were doing, what
22 they planned to do and the papers that they used,
23 and I would be given them to review, but the
24 scientific papers, they would be reviewed by
25 scientists.

Page 405

1    Q.    Well, it says that you are going to
2 receive these papers, right?
3    A.    Yes.
4    Q.    Okay.  And it says you were going to
5 be part of this meeting to talk about the papers
6 after reviewing the papers, right?
7    A.    Well, apparently I was not going to
8 be at the meeting, but was going to address my
9 comments to Mike Chudkowski, who is a scientist.
10    Q.    And Nancy Musco was asking for your
11 comments about scientific papers, right?
12        MS. BROWN:  That misstates the
13 document; I object.
14    A.    No, not necessarily.  She's asking
15 for comments from the key people and she has given
16 it to me if I saw something I wanted to comment
17 about, I'm free to do that as a lawyer for the
18 company.  So, you know, there's no rule against me
19 commenting.  I'm not reviewing them for scientific
20 accuracy.
21    Q.    Did you approve a written submission
22 that J&J and the CTFA sent to the NTP that stated
23 that cosmetic talc was free of asbestos?
24    A.    I would not have approval, but I
25 certainly would have seen the document.  From the

Page 406

1 legal perspective Clay Paterson, from a regulatory
2 perspective Clay Paterson would be more involved in
3 that kind of a document proceeding than me.  But I'm
4 certainly monitoring it and aware of what's going on
5 for my purposes in litigation.
6    Q.    Let's go to Exhibit 39 to your
7 deposition.
8        Exhibit 39 to your deposition is an
9 e-mail from Steven Mann dated March 29, 2002.
10        Who is Steven Mann?
11    A.    I'm embarrassed to say, I knew
12 Steven, I knew who he was, I just don't remember
13 now, it's been so long.
14    Q.    And his e-mail says that Steven Mann
15 was director of toxicology for Johnson & Johnson
16 Consumer at this time in the early 2000s, right?
17    A.    Okay, I accept that.
18    Q.    Okay.  And Steven Mann sends this
19 e-mail to you, John O'Shaughnessy, and he writes,
20 he's forwarding talc submission NTP?
21    A.    Yes.
22    Q.    See that's the subject?
23    A.    I do.
24    Q.    Okay.  And you said that in terms of
25 the submission to the NTP from Johnson & Johnson or

Page 407

1 its trade association, from a legal perspective,
2 that would be more in attorney Clayton Paterson's
3 area.
4        Is that what you said?
5    A.    Yes.
6    Q.    Okay.  Yet Dr. Mann, Steven Mann, is
7 only sending, is only including one attorney in this
8 e-mail, right?
9    A.    Yeah, I mean, but that doesn't mean
10 that Clay didn't receive it or have it.
11    Q.    The one --
12    A.    Yeah, I see my name on there and Clay
13 Paterson's name is not.
14    Q.    Right.  So Dr. Mann's e-mail says,
15 "FYI, just the final documents that were submitted
16 for your files.  This was reviewed internally and
17 OK'd several weeks back."
18        Do you see that?
19    A.    I do.
20    Q.    Okay.  And the only attorney who
21 Dr. Mann wrote that e-mail to from Johnson & Johnson
22 is who?
23    A.    I'm the only attorney listed on the
24 e-mail.
25    Q.    Okay.  And if we look at the

37 (Pages 404 - 407)

O'SHAUGHNESSY - Direct

Page 408

1 attachments in terms of the final documents that
2 were submitted to the NTP, do you see there's a
3 cover letter, and this is in the document Bates
4 labeled in the right corner 006.
5        A.    As part of 39?
6        Q.    Yes.  It's part of Exhibit 39.  It's
7 attached to Dr. Mann's e-mail.
8        A.    Yes.
9        Q.    Right.  So, I mean, just to be clear,
10 Dr. Mann is sending around the final documents that
11 were submitted to the NTP and he attaches them, and
12 now I'm directing your attention to the cover letter
13 from March 18, 2002, and it's to Dr. Kenneth Olden
14 of the National Toxicology Program.
15            Do you see that?
16       A.    Yes.
17       Q.    All right.  And in this attachment
18 that was sent to you, it says that Dr. Olden is
19 Director, National Toxicology Program and National
20 Institute of Environmental Health Sciences, U.S.
21 Department of Health and Human Services.
22            Do you see that?
23       A.    I do.
24       Q.    Okay.  And so you would have known
25 then that the National Toxicology Program was part

Page 409

1 of the United States Government, correct?
2        A.    Yes.
3        Q.    And if we go to what the submission
4 says that, that Johnson & Johnson and the CTFA sent
5 to the National Toxicology Program that was sent to
6 you in this e-mail, do you see the heading that
7 says, "Cosmetic talc versus asbestos"?
8        A.    Yes.
9        Q.    And here, the CTFA and J&J, in 2002,
10 tells the National Toxicology Program, "In 1976,
11 CTFA promulgated a specification for cosmetic talc
12 to ensure that it is free of asbestos."
13           Do you see that?
14       A.    I do.
15       Q.    And in terms of, and you understood
16 at this time that whether there was asbestos in talc
17 was a key issue in determining the cancer-causing
18 nature of talc?
19           MS. BROWN:  I object; that lacks
20 foundation.
21       A.    I -- if you're referring to what the
22 NTP was considering, I have to defer to the NTP.  I
23 have to defer to the NTP in how they were regarding
24 it.
25       Q.    Okay.  So in this attachment that was

Page 410

1 sent to you, it says, "There's no asbestos in
2 cosmetic talc," right?
3        A.    It's free of asbestos, yeah.
4        Q.    Okay.  And the submission also
5 acknowledges, the submission that was sent to the
6 NTP by the CTFA and J&J says, "Asbestos has long
7 been listed since the first ROC in 1980 as a known
8 human carcinogen, and has shown clearly carcinogenic
9 action in both humans and animals."
10           Do you see that?
11       A.    I do.
12       Q.    And you knew, when you were working
13 at J&J at this time in the 1990s and early 2000s,
14 that asbestos was a carcinogen; you knew that,
15 right?
16       A.    Yes.
17       Q.    And it says, "Asbestos is known to
18 induce pleural and respiratory system cancers."
19           Do you see that?
20       A.    I do.
21       Q.    And you knew that the entire time you
22 worked at J&J, right?
23           MS. BROWN:  Objection; foundation.
24       A.    You know, I think those are types of
25 lung cancer and that's, I would associate asbestos

Page 411

1 with lung cancer, mesothelioma, yes.
2        Q.    And you knew that the entire time you
3 worked at J&J, right?
4        A.    I was generally aware that asbestos
5 was associated as a carcinogen and with
6 mesothelioma.
7        Q.    Now, we talked about Dr. Wehner
8 earlier.
9            Do you remember that?
10       A.    I do.
11       Q.    And you were aware that J&J sent
12 another article by Dr. Wehner to the NTP in 2002
13 during this time period, right?
14       A.    I don't specifically recall what they
15 sent them, but I don't doubt that.
16       Q.    Let's look at Exhibit 40 to your
17 deposition.  Exhibit 40 is a memo from October 23rd,
18 2002, and the subject is "Talc Activities," and it
19 is to Lorena Telofski from Johnson & Johnson.
20           Do you see that?
21       A.    I do, yes.
22       Q.    And the writer of this memo is Bill
23 Ashton, William Ashton, who we have discussed
24 throughout your deposition.
25           Do you see that?

38 (Pages 408 - 411)

O'SHAUGHNESSY - Direct

Page 412

1      A.    I do.
2      Q.    And copied on this is Steven Mann,
3  you're copied on this memo, right?
4      A.    Yes.
5      Q.    Dr. Hopkins is copied on this memo,
6  right?
7      A.    He is, yes.
8      Q.    And Dr. Wehner himself is copied on
9  this memo, right?
10     A.    Yes.
11     Q.    And Dr. Wehner would be copied on
12  internal memos at Johnson & Johnson, right?
13           MS. BROWN:  Objection; lacks
14  foundation.
15     A.    I don't know what he was copied on.
16  He was certainly copied on this one.
17     Q.    Okay.  And let's look at what Mr.
18  Ashton says here, October 23rd, 2002.  He says,
19  "Attached is a copy of Dr. Wehner's article that was
20  issued last week."
21           Is that what it says?
22     A.    Yes.
23     Q.    And then it goes on to say, "It is a
24  masterful piece of work in support of the safety of
25  our type talc and is a major document that talc is

Page 413

1  not a carcinogen."
2           Is that what it says?
3      A.    Yes.
4      Q.    All right.  And then Mr. Ashton says,
5  "We have made arrangements to have a reprint of
6  Wehner's article sent to each member of the NTP
7  review panel in the next week or so."
8           Do you see that?
9      A.    I do.
10     Q.    And it says that, Mr. Ashton says
11  also, "We also will have the work come to the
12  attention of some of our Federal agencies such as
13  OSHA, U.S.G.S. and others here in the United
14  States."
15           Do you see that?
16     A.    I do.
17     Q.    And then it also says, Mr. Ashton
18  says, "We have arranged that Dr. Wehner's article
19  will be sent to the officials of IARC by the parent
20  company of our U.S. talc producer, Luzenac France."
21           Do you see that?
22     A.    Yes.
23     Q.    And then Mr. Ashton says, "This
24  should have a sobering effect on the IARC group
25  regarding any adverse decisions on talc."

Page 414

1           Is that what it says in this memo you
2  were copied on?
3      A.    Yes.
4      Q.    All right.  And then it attaches a
5  copy of Dr. Wehner's article, and so I'd like to
6  look at that article and if we look at the cover
7  page, Dr. Wehner's article is entitled:  "Cosmetic
8  Talc Should Not Be Listed As a Carcinogen:  Comments
9  on NTP's Deliberations to List Talc As a
10  Carcinogen."
11           Do you see that?
12     A.    I do.
13     Q.    Okay.  And Dr. Wehner is identified
14  as being from Biomedical and Environmental
15  Consultants, correct?
16     A.    Yes.
17     Q.    And there's two footnotes by his
18  name, and let's see what those footnotes say.  One,
19  Dr. Wehner gives his fax number and e-mail, right?
20           Do you see that?
21     A.    Yes.
22     Q.    And the other footnote by his name
23  says, "This review was conducted independently and
24  the opinions expressed in it are solely those of the
25  author."

Page 415

1           Do you see that?
2      A.    Yes.
3      Q.    All right.  And let's look at the
4  acknowledgment that Dr. Wehner had in this article.
5           If you go to the page ending in 803.
6      A.    Yes.
7      Q.    It says, "Acknowledgment."
8           Do you see that?
9      A.    Yes.
10     Q.    And Dr. Wehner says, "I am indebted
11  to Dr. John Hopkins, Innovant Research, United
12  Kingdom, for his review of this manuscript and his
13  constructive comments."
14           Do you see that?
15     A.    I do.
16     Q.    And it doesn't list Johnson & Johnson
17  in the acknowledgment, does it?
18     A.    It's not in there, no.
19     Q.    It lists Dr. John Hopkins, who was
20  employed by Johnson & Johnson companies for many
21  years prior to the date of this publication,
22  correct?
23     A.    I guess.  I don't know the dates, but
24  I am thinking John Hopkins was now not an employee
25  of the company.  He was, of course, as you said, but

O'SHAUGHNESSY - Direct

Page 416

1 now was under a company called, you know, "Innovant
2 Research."
3      Q.   Right.  So the acknowledgment doesn't
4 say I am indebted to Dr. John Hopkins, long time
5 employee of Johnson & Johnson, does it?
6      A.   No, it doesn't say that.
7      Q.   And it doesn't say the name "Johnson
8 & Johnson" at all, does it?
9      A.   No.
10      Q.   And in the meantime, Johnson &
11 Johnson is e-mailing -- strike that.
12           In the meantime, Johnson & Johnson is
13 writing a memo about this article copying Dr. Wehner
14 on the memo and copying Dr. Hopkins on the memo,
15 right?
16      A.   Yes.
17      Q.   And the article that Dr. Wehner wrote
18 that said that cosmetic talc should not be listed as
19 a carcinogen, let's look at this paragraph on the
20 first page of the article that starts with, "The
21 important point to remember."  And I put it on the
22 screen, second column, first page of the article.
23      A.   I got it.
24      Q.   And Dr. Wehner says in this article,
25 "The important point to remember in the context of

Page 417

1 this review is that non-fibrous, or pure, talc as
2 used by consumers in cosmetics or pharmaceuticals
3 undergoes strict quality control measures and does
4 not contain asbestos fibers."
5           Is that what it says?
6      A.   That's right.
7      Q.   And at this very time that Dr. Wehner
8 made this statement in this article and did not
9 acknowledge Johnson & Johnson in the article,
10 Dr. Wehner was someone who was, in fact, being paid
11 as a consultant by Johnson & Johnson, right?
12           MS. BROWN:  I object; it misstates
13 the evidence and the facts.
14      A.   I don't -- he certainly was a
15 consultant but at what times, I don't know.
16      Q.   Okay.  So this publication was in
17 2002, right?
18      A.   Yes.
19      Q.   And there's this memo from October of
20 2002 attaching a publication and Dr. Wehner is on
21 the memo, right, copied on the memo?
22      A.   Yes.
23      Q.   Let's look at Exhibit 40B.  Do you
24 see Exhibit 40B?
25      A.   I do.

Page 418

1      Q.   And Exhibit 40B is a letter from
2 Dr. Wehner to Dr. Steven Mann from Johnson & Johnson
3 Consumer during that same time period, September of
4 2002, right?
5      A.   A few weeks later.
6           MS. BROWN:  Foundation.
7 BY MR. BLOCK:
8      Q.   And do you see that Dr. Wehner, it's
9 on his letterhead, right?
10      A.   Yes.
11      Q.   All right.  And let's see what
12 Dr. Wehner says to Dr. Mann in September of 2002.
13 It says, "Dear Steve, I am enclosing BEC's invoice
14 for professional services."
15           Do you see that?
16      A.   I do.
17      Q.   And BEC stands for Biomedical and
18 Environmental Consultants, BEC, right?
19      A.   I'd assume so.
20      Q.   Okay.  Well, Dr. Wehner's writing
21 Johnson & Johnson and enclosing an invoice for his
22 professional services in September of 2002, right?
23      A.   I assume that's what this is.
24      Q.   And Dr. Wehner wants to know about
25 the status of the Krushinski litigation, right?

Page 419

1      A.   He asked about that, yeah.
2      Q.   And Dr. Wehner says that, "I will let
3 you know when it is published and I'll send 50
4 reprints to Bill Ashton," right?
5      A.   Yes.
6      Q.   Okay.  So Bill Ashton, who wrote the
7 memo about this publication of Dr. Wehner in 2002,
8 we see that Dr. Wehner is promising to send 50
9 reprints of the publication to Bill Ashton, right?
10      A.   Yes.
11           MS. BROWN:  Lacks foundation.
12 BY MR. BLOCK:
13      Q.   Dr. Wehner, sir, was not an
14 independent scientist in relation to Johnson &
15 Johnson, was he?
16           MS. BROWN:  Objection; vague; lacks
17 foundation.
18      A.   I -- I'm not able to comment on
19 whether he was independent or not vis-a-vis Johnson
20 & Johnson.  He was a consultant to the company.  I
21 knew that.  That's about all I can say.
22      Q.   Do you remember Dr. Wehner sending
23 you an article about asbestos phobia?
24      A.   No.
25      Q.   Do you remember Dr. Wehner sending

40 (Pages 416 - 419)

O'SHAUGHNESSY - Direct

1 you a note referring to nuts that are obsessed with
2 cosmetic talc?
3     A.    I don't.
4     Q.    Let's look at Exhibit 40A.  Exhibit
5 40A, you can see, is a fax from Dr. Wehner dated
6 October 1st, 2002?
7     A.    Yes.
8     Q.    So this is the same month and same
9 year as the memo we were looking at where Mr. Ashton
10 attached Dr. Wehner's article and copied you, right?
11    A.    Yes.
12    Q.    All right.  And Dr. Wehner sends this
13 fax to William Ashton, John O'Shaughnessy, and Rich
14 Zazenski, right?
15    A.    Yes.
16    Q.    And the title of this article that
17 Dr. Wehner sends to you is:  "Asbestos Phobia to Eat
18 At Economy."
19          Is that what it says?
20    A.    Yes.
21    Q.    And it starts out with a statement:
22 "Asbestos phobia, as those unfortunate enough to be
23 school board members decades ago know, was the most
24 scientifically irrational, hysterically hyped and
25 immensely profitable environmental scare of the late

1 20th Century."
2          Is that what it says in the article
3 he sent you?
4     A.    Yes.
5     Q.    And at the bottom there's a note from
6 Dr. Wehner, "For your information, similar to some
7 nuts who are obsessed with cosmetic talc!"
8          Do you see that?
9     A.    I do.
10    Q.    And he signs Al, right?
11    A.    Yes.
12    Q.    That was the scientist that Johnson &
13 Johnson was paying as a consultant while you worked
14 for the company, correct?
15          MS. BROWN:  Objection; foundation.
16    A.    He was a paid consultant for the
17 company, yeah.
18    Q.    Now, this Mr. Zazenski that we've
19 talked about, this Mr. Zazenski that's included on
20 the fax from Dr. Wehner, you said he's someone you
21 worked with in what capacity?
22    A.    He was at Luzenac and he was kind of
23 the person I would go to with respect to information
24 concerning litigation.
25    Q.    Isn't it true that you worked with

1 Mr. Zazenski on opposing the NTP listing talc as a
2 carcinogen?
3     A.    No, I worked with the company on any
4 position with respect to regulatory agencies.  I
5 don't work with people outside the company.
6     Q.    You certainly would give
7 phone -- strike that.
8          You certainly would make phone calls
9 to Mr. Zazenski and talk about the NTP review about
10 talc, correct?
11    A.    I don't know if I would make them or
12 receive them, but I wouldn't, I wouldn't doubt that
13 it would come up if I was talking to him at the time
14 the events occurred.
15    Q.    Did Mr. Zazenski ever tell you that
16 J&J would owe him a bounty if talc was not listed as
17 a carcinogen by the NTP?
18          MS. BROWN:  Objection; foundation.
19    A.    I don't --
20    Q.    Let's go to Exhibit 41A.
21          MS. BROWN:  I object on foundation to
22 this Imerys document.
23 BY MR. BLOCK:
24    Q.    Sir, are you familiar with Steve
25 Mauney from Luzenac?

1     A.    I am not.
2     Q.    How about Jack Buettner?
3     A.    No.
4     Q.    Robert Bernstein?
5     A.    No, I don't recall them.
6     Q.    But you do know Rich Zazenski from
7 Luzenac, right?
8     A.    I do, yes.
9     Q.    And let's look at his e-mail from
10 May 17, 2001, and the subject is "J&J."
11          Do you see that?
12    A.    Yes.
13    Q.    All right.  And the e-mail states,
14 "Just so you know, I received a call from Bill
15 Ashton yesterday."
16          Do you see that?
17    A.    Yes.
18    Q.    All right.  And then the second
19 sentence Mr. Zazenski says, "We then turned to the
20 NTP review.  I informed Bill that the issue will be
21 decided in mid-June."
22          Do you see that?
23    A.    Yes.
24    Q.    And then Mr. Zazenski says, with
25 regard to Mr. Ashton, "He was grateful for the

41 (Pages 420 - 423)

O'SHAUGHNESSY - Direct

Page 424

1 inside information."
2        Is that what it says?
3    A.    Yes.
4    Q.    And then Mr. Zazenski says, "As I
5 also told Bill that I was quite disappointed in both
6 CTFA and J&J with regard to their efforts to fight
7 this review.  Bill was in full agreement and said he
8 would try to get their main attorney, John
9 O'Shaughnessy, to call me."
10        Do you see that?
11    A.    Yes.
12    Q.    "And that I should tell him what I
13 just told Bill."
14        Do you see that?
15    A.    I do.
16    Q.    And then Mr. Zazenski says, "Sure
17 enough, O'Shaughnessy called and I repeated what I
18 told Bill, described Luzenac's aggressiveness and
19 involvement, as well as our disappointment by the
20 lack of activity of others."
21        Is that what Mr. Zazenski says here?
22    A.    Yes.
23    Q.    And then Mr. Zazenski writes, "Since
24 I worked with O'Shaughnessy before, I told him
25 flatly that if talc doesn't get listed, J&J and

Page 425

1 every other talc supplier/customer should pay us a
2 bounty for leading the fight."
3        Do you see that?
4    A.    I said it in a nice tone, he claims,
5 yes.
6    Q.    Right.  And then he said I said it in
7 a nice tone, right?
8    A.    Yep.
9    Q.    And then Mr. Zazenski writes, "John
10 understood the message."
11        See that?
12    A.    Yes.
13    Q.    You did speak to Mr. Zazenski at
14 Luzenac about the NTP's review of talc as a
15 carcinogen, right?
16    A.    Yeah, I don't recall the call, but if
17 he said so, I am assuming I called him back.  It
18 sounds like he was complaining to Mr. Ashton,
19 Mr. Ashton threw him over to me since he knew me,
20 and he vented to me and that was that.
21    Q.    He said Mr. Ashton agreed with him?
22    A.    That's what he said.
23    Q.    Okay.  And, I mean, the fact is, is
24 that you did work alongside Mr. Zazenski of Luzenac
25 in opposing the NTP listing talc as a carcinogen,

Page 426

1 right?
2        MS. BROWN:  Objection; foundation.
3    A.    No, not at all.
4        I'm sorry.  No, not at all.
5    Q.    Mr. Zazenski would send you his
6 correspondence that he sent to the NTP so you would
7 know what Mr. Zazenski was saying to the NTP, right?
8        MS. BROWN:  Lacks foundation.
9    A.    I don't recall what he sent me or
10 didn't send me, but I didn't work alongside
11 Mr. Zazenski in doing anything other than on the
12 litigation.
13    Q.    Let's go to Exhibit 41 to your
14 deposition.
15    A.    41?
16    Q.    Yep.  Exhibit 41.  And the e-mail we
17 were just looking at was from May of 2001, and now
18 we're in August 19th, 2003.
19        Do you see that, the date of
20 Mr. Zazenski's fax?
21    A.    Yes.
22    Q.    All right.  And that fax is Exhibit
23 41, and it is to Bill Ashton at J&J, right?
24    A.    Yes.
25    Q.    And that's the same Bill Ashton that

Page 427

1 was referred to in the e-mail we just looked at,
2 right?
3    A.    Yes.
4    Q.    And you're copied?
5    A.    I am.
6    Q.    On the document as well, right?
7    A.    I am.
8    Q.    And Mr. Zazenski is keeping Johnson &
9 Johnson informed by writing, "Here was my letter to
10 Olden earlier this year."
11        Do you see that?
12    A.    He's sending it to Mr. Ashton, yes.
13    Q.    But he's copying only two other
14 people at the entire Johnson & Johnson company, John
15 O'Shaughnessy and Lorena Telofski, right?
16    A.    Yes.
17    Q.    And the letter that he sent to you is
18 to Mr. Olden at the NTP, part of the United States
19 Government, right?
20    A.    Yes.
21    Q.    And that letter is dated February 7,
22 2003, right?
23    A.    Yes.
24    Q.    And the letter says, "It is clear to
25 Luzenac scientists that cosmetic talc exposures

42 (Pages 424 - 427)

O'SHAUGHNESSY - Direct

Page 428

1 prior to 1976 cannot be characterized with any
2 degree of certainty as to mineral composition and
3 the absence of asbestos."
4        Is that what it says?
5    A.    That's what it says.
6    Q.    And then it says, "In fact, a
7 thorough review of the scientific literature
8 published worldwide during the 1940s, 1950s, 1960s,
9 and 1970s strongly suggests that many commercial
10 talc products did indeed contain some quantities of
11 asbestos."
12        Do you see that?
13   A.    I do.
14   Q.    And then Mr. Zazenski, he's the one
15 who wrote this letter to the NTP, right?
16   A.    Yes.
17   Q.    Then he adds, and then he refers to
18 "present day talc as asbestos-free."
19        Do you see that?
20   A.    Yes.
21   Q.    Okay.  So Luzenac, Mr. Zazenski, sent
22 a letter to NTP and then faxed it to Bill Ashton at
23 Johnson & Johnson and copied you where Luzenac told
24 the NTP that some talc products prior to 1976 did
25 contain asbestos, but that present day talc as of

Page 429

1 2002 were asbestos-free, right?
2        MS. BROWN:  Foundation.
3    A.    That's what he said was Luzenac's
4 position.
5    Q.    So not only did Mr. Zazenski share
6 letters like this that were written to the NTP with
7 Johnson & Johnson, but you would also have to admit
8 that Mr. Zazenski shared intelligence with Johnson &
9 Johnson about the NTP's talc review process?
10   A.    Whatever he shared with Johnson &
11 Johnson would be evidenced in the documents, I
12 guess.  I don't -- I don't -- I don't know.  There
13 was a business relationship, of course, between
14 Johnson & Johnson Consumer and Luzenac that was the
15 supplier, so, you know, there was a lot of contact
16 between those two companies.  There had to be.  They
17 were in a business relationship together.
18        And apparently Zazenski was, you
19 know, part of that process.  He knew I was handling
20 litigation, so he would -- he knew I was an attorney
21 for J&J, so apparently he would send me things.
22   Q.    To your knowledge, did Mr. Zazenski
23 from Luzenac have inside information, also known as
24 intelligence, about the NTP's talc review process?
25   A.    I have no idea what he had.

Page 430

1    Q.    Let's look at Exhibit 48 to your
2 deposition.  We're skipping to Exhibit 48 for now.
3    A.    I have it.
4    Q.    Okay.  And Exhibit 48 is an e-mail
5 chain and the top date on the top document is an
6 e-mail from you August 8, 2004?
7    A.    Yes.
8    Q.    And the subject is regarding talc
9 NTP.
10        You see that?
11   A.    Yes.
12   Q.    And just to gain some context, let's
13 look at lower down in the e-mail chain, and there's
14 an e-mail from Dr. Steven Mann from a day earlier,
15 October 7, 2004.
16        Do you see that?
17   A.    I do.
18   Q.    And Dr. Mann sends an e-mail, talc
19 NTP, and he sends it to Sarah Colamarino.  She was
20 in public relations, right?
21   A.    Yes.
22   Q.    Marc Monseau, he was in
23 communications, right?
24   A.    Right.
25   Q.    To you, John O'Shaughnessy, right?

Page 431

1    A.    Yes.
2    Q.    And Dr. Mann says in his e-mail to
3 all of you, "I'd like to get everyone on a
4 conference call, specifically to hear what Rich
5 Zazenski, Luzenac, has to say about some
6 intelligence he has been hearing about the NTP
7 process on talc."
8        Do you see that?
9    A.    Yes.
10   Q.    So you were one of the people that
11 was being invited to get on a conference call to
12 hear what Mr. Zazenski from Luzenac had to say about
13 some intelligence that he knew about the NTP process
14 on talc, right?
15   A.    Yeah.
16        MS. BROWN:  Foundation.
17   A.    I'm sorry, go ahead.
18        MS. BROWN:  I'm sorry, John, just
19 objection; foundation.
20   A.    Yeah, I mean, it says that Zazenski
21 had some intelligence he had been hearing about and
22 it looks like the same people who were copied on,
23 you know, the other NTP issues from J&J are included
24 on this e-mail, as well as others.
25   Q.    And Dr. Wehner was invited to hear

43 (Pages 428 - 431)

O'SHAUGHNESSY - Direct

Page 432

1 about the intelligence that Mr. Zazenski knew about
2 the NTP talc process, right; Dr. Wehner?
3        A.     He's on the list, and I assume it's
4 because he was consulting on that issue to the
5 company.
6        Q.     And does an independent scientist
7 participate in conference calls to hear about
8 intelligence where the United States Government is
9 considering talc as a carcinogen?
10       MS. BROWN:  Objection; lacks
11 foundation; calls for speculation; argumentative.
12       A.     I can't answer that question because
13 now you're talking about intelligence.  I don't even
14 know what that means.  And in terms of who the
15 company invites on a call, I don't have any control
16 of that.  You know, they invite who they think they
17 need input from and this was an NTP issue and Wehner
18 was part of the consultancy for that, so that's why
19 they copied him.
20       Q.     I mean, you, John O'Shaughnessy, were
21 especially important to this call to hear about the
22 intelligence that Rich Zazenski had been hearing
23 about the NTP process on talc, right?
24       A.     Well, it says, "John O'Shaughnessy is
25 especially important to this call."  That's what it

Page 433

1 says.  And, you know, they included me on most
2 things because they knew I was handling litigation
3 with respect to the product and that they kept me
4 informed of basically all they were doing.
5        Q.     Well, Dr. Mann says here that John
6 O'Shaughnessy, you are especially important to this
7 call, right?
8        A.     That's what he says, yeah.
9        Q.     He doesn't say anything about
10 litigation, right?
11       A.     Say anything about it, no.
12       Q.     And I want you to assume that Dr.
13 Mann has testified under oath that he never worked
14 on any litigation while at Johnson & Johnson.  Would
15 you dispute Dr. Mann's sworn testimony if that's
16 what he said?
17       MS. BROWN:  I object as lacking
18 foundation.
19       A.     I -- I -- I'm not in a position to
20 dispute or not dispute.  And it doesn't matter if he
21 never touched or worked on litigation.  He knew I
22 was responsible for it.
23       Q.     Do you agree, sir, that the NTP's
24 review of talc as a carcinogen at this time in 2004
25 was not a litigation?

Page 434

1        A.     It was a scientific issue that would
2 be very important in litigation that would come up
3 and arise, yes.  It was not a litigation issue, it
4 was a regulatory issue, but like a lot of regulatory
5 and governmental issues, it played a huge role in
6 litigation and that's why they're keeping me
7 informed and that's why I wanted to be kept
8 informed.
9        Q.     And is that why you were especially
10 important to a strategy call about the talc NTP
11 review?
12       MS. BROWN:  Well, that lacks
13 foundation, calls for speculation.
14       A.     I don't know what Steve Mann meant by
15 that, but they did, thankfully, consider their
16 attorneys to be important members of, you know, the
17 advice they get.
18       Q.     Okay.  And you responded at the top
19 of this e-mail chain that you could not make this
20 call that Dr. Mann said you were especially
21 important to, but that you would follow-up with
22 Steve Mann, right?
23       A.     Yeah, I said I can't make the call,
24 I'm in an all-day meeting, can't break away, I will
25 follow up with Steve Mann.  And, you know, if they

Page 435

1 requested, if the company ever requested my input or
2 presence as their attorney, I would always
3 follow-up, I hope I would anyway, and respond, so
4 that's why I said that.
5        Q.     So, Mr. O'Shaughnessy, just to sort
6 of get the dates here, in this time period in 2004,
7 the NTP, as we've discussed, was considering listing
8 talc as a carcinogen, right?
9        A.     I think, yes, that's what the meeting
10 was about.
11       Q.     And Johnson & Johnson and Johnson &
12 Johnson's talc supplier, Luzenac, had told the NTP
13 that there was no asbestos in cosmetic talc, right?
14       A.     That was Johnson & Johnson's position
15 and separately I believe it was Luzenac's position
16 from what you showed me, but I don't know all of the
17 communications Luzenac had with NTP.  I'm not privy
18 to that.
19       Q.     Okay.  Certainly you know, based upon
20 your work at Johnson & Johnson and the documents
21 we've looked at, that in 2004 Johnson & Johnson was
22 telling the NTP, the National Toxicology Program,
23 that there was no asbestos in cosmetic talc, right?
24       A.     Yes, their assessment of the science
25 and the information and the testing was that, yes.

44 (Pages 432 - 435)

O'SHAUGHNESSY - Direct

Page 436

1    Q.    In 2004, sir, isn't it true that you
2  knew that a laboratory called "Forensic Analytical"
3  had analyzed Johnson's Baby Powder and reported
4  finding asbestos?
5         MS. BROWN:  Objection; misstates the
6  evidence; lacks foundation.
7    A.    I don't recall that, but from time to
8  time I think the company did receive reports from
9  outside people that, you know, they had tested the
10 talc and it contained asbestos, and, you know, the
11 company would follow-up with those and investigate
12 those.  I'm not specifically aware of this one.  I'm
13 not specifically recalling this one.
14    Q.    Okay.  Let's look at Exhibit 42 to
15 your deposition.  Exhibit 42 to your deposition is a
16 fax and it's dated February 24, 2004, correct?
17    A.    Yes.
18    Q.    And at the top it says the fax is
19 from J&J Corporate PR, correct?
20    A.    Yes.
21    Q.    Okay.  And the fax is to Steven Mann,
22 who we've talked about, correct?
23    A.    Right.
24    Q.    And the fax is from Marc Monseau from
25 Johnson & Johnson Corporate communications, correct?

Page 437

1    A.    Yes.
2    Q.    And the subject of the fax is
3  asbestos, right?
4    A.    Yes.
5    Q.    And the fax says, "Last week we were
6  contacted by a reporter at a Sacramento television
7  station who wanted to get our reaction to a test
8  they performed on Johnson's Baby Powder.  She has
9  since sent me the attached cover letter and lab
10 results, which Sarah Colamarino suggested I share
11 with you.  Can you please review?"
12        Do you see where it says that?
13    A.    I do.
14        MS. BROWN:  Lacks foundation.
15 BY MR. BLOCK:
16    Q.    And then it says, "Sarah will be
17 calling you shortly to discuss."
18        Do you see that?
19    A.    I do.
20    Q.    And then it says, "In the meantime,
21 if you have any questions, please give me a call.
22 Marc Monseau."
23        Do you see that?
24    A.    I do.
25    Q.    All right.  So this says that Sarah

Page 438

1  Colamarino from the Johnson & Johnson public
2  relations department would be calling Dr. Steve Mann
3  about this testing of Johnson's Baby Powder, right?
4    A.    Yes.
5    Q.    And --
6         MS. BROWN:  Objection.
7  BY MR. BLOCK:
8    Q.    And if we go into the document
9  there's a letter, February 23rd, 2004, to Mr. Marc
10 Monseau, Johnson & Johnson, from a person at KCRA
11 TV.
12        Do you see that?
13    A.    Yes.
14    Q.    And it says one of the items tested
15 was Johnson's Baby Powder which tested at above
16 normal levels of asbestos.
17        Do you see that?
18    A.    I do.
19    Q.    And then it says, "I am enclosing a
20 copy of the test and results for you to look over."
21        Is that what it says in this letter
22 to Mr. Monseau of Johnson & Johnson?
23    A.    Yes.
24    Q.    And then if you turn the page and
25 look at the lab report, do you see that it says

Page 439

1  Forensic Analytical at the top?
2    A.    Yes.
3    Q.    And do you see the words "asbestos in
4  bulk material"?
5    A.    I do.
6    Q.    And do you see it says -- see where
7  it says, "transmission electron microscopy"?
8         MS. BROWN:  Let me get my objection
9  on the record, please.  This document lacks
10 foundation.
11    A.    Yes, I am sorry.  I've been hearing,
12 I don't know, Miss Brown, if you're objecting 'cause
13 sometimes I hear garbled --
14        MS. BROWN:  Okay, I'll try to speak a
15 little louder.
16    A.    Yeah, no, I hear it fine now.
17        MS. BROWN:  Thank you, John.
18    A.    I'm sorry, Mr. Block, can you
19 continue?
20    Q.    Right.  Do you see that the document
21 says, "Forensic Analytical," on the top?
22    A.    Yes.
23    Q.    And you see it says the words,
24 "asbestos in bulk material," on the top?
25    A.    Yes.

45 (Pages 436 - 439)

O'SHAUGHNESSY - Direct

Page 440

1    Q.    And you see under that it says,
2  "transmission electron microscopy," correct?
3    A.    It does, yes.
4    Q.    And it says, "Date received, December
5  19, '03."
6         Do you see that?
7    A.    Yes.
8    Q.    And then it says, "Date analyzed and
9  date reported, January 5, 2004"?
10   A.    Yes.
11   Q.    And then it says, "Analytical
12 results," and there's a table.
13        Do you see that?
14   A.    Yeah.  I'm just going to get my
15 glasses.  I'm not seeing this too well, even on the
16 screen.
17   Q.    All right.  I can blow it up a little
18 more.
19   A.    That's helpful.
20   Q.    Okay.  Great.
21        Do you see there's a table there that
22 says, "Analytical results"?
23   A.    Yes.
24   Q.    And you see it says, "Client sample
25 number"?

Page 441

1    A.    Yes.
2    Q.    And it says, "TEM," and then it says,
3  "Johnson's Baby Powder."
4         Do you see those words?
5    A.    Yeah.
6    Q.    And then in the row with Johnson's
7  Baby Powder, it says, "Asbestos weight percent."
8         Do you see that?
9    A.    I do.
10   Q.    And then it says, "0.2 percent."
11        Do you see that?
12   A.    0.20, yes.
13   Q.    All right.  And then it says,
14 "Asbestos type, AN."
15        Do you see that?
16   A.    Yes, yeah.
17   Q.    And do you see at the bottom, it
18 says, "AN," and the words, "anthophyllite"?
19   A.    I, yes, okay.
20   Q.    All right.  Now, you knew about this,
21 didn't you, sir?
22        MS. BROWN:  Objection; foundation.
23   A.    I don't, I don't recall it.
24   Q.    Let's go to Exhibit 43.  So the fax
25 we just looked at from Mr. Monseau to Mann was

Page 442

1  February 24, 2004.  Exhibit 43, there was a meeting
2  with the subject "Powder" scheduled on March 3rd,
3  2004, which is a week later, right?
4    A.    I'm sorry.  I'm on 43A.  What should
5  I be looking at?
6    Q.    I'm sorry.  43, sir.
7    A.    Okay.  My mistake.  Yeah, I see that
8  document now.
9    Q.    So one week later, a meeting was
10 scheduled and the subject of the meeting was powder,
11 right?
12   A.    Yes.
13   Q.    And Miss Telofski scheduled the
14 meeting, right?
15   A.    Yes.
16   Q.    And Miss Colamarino was one of the
17 required attendees at the meeting, right?
18   A.    Yes.
19   Q.    And Miss Colamarino is mentioned as
20 one of the people who knew about the Forensic
21 Analytical test results, right?
22   A.    I think she was.  I don't know, I'm
23 losing track.  She was mentioned in that prior
24 document, right?
25   Q.    Right.  "That Sarah Colamarino

Page 443

1  suggested I share with you."  So she knew about it,
2  right?
3    A.    Yes, she had it.
4    Q.    All right.  And then the fax is from
5  Mr. Monseau to Dr. Mann, and both Dr. Mann -- Dr.
6  Mann is a required attendee at the meeting as well?
7    A.    Yeah, he's listed as required.
8    Q.    So one week after that fax about the
9  Forensic Analytical lab results reporting asbestos
10 in Johnson's Baby Powder, a meeting was scheduled
11 that included Sarah Colamarino, Dr. Steven Mann,
12 you, and others, correct?
13   A.    Yes.
14   Q.    And if you go to the next page, it
15 says, "Meeting will actually be tomorrow, March
16 4th."  So it was bumped back a day, right?  The
17 meeting was bumped from March 3rd, 2004, to March
18 4th?
19   A.    Yeah, I see that, meeting will be
20 tomorrow instead.
21   Q.    Instead.  All right.  So then we go
22 to the next page, we see that there's a meeting
23 scheduled for March 4, 2004, which is eight days
24 after that fax regarding the Forensic Analytical
25 testing, and it's scheduled for a one-hour meeting,

46 (Pages 440 - 443)

O'SHAUGHNESSY - Direct

Page 444

1 right?
2    A.    Yes.
3    Q.    And certainly at this one-hour
4 meeting that you had with Dr. Mann and
5 Miss Colamarino, you would have discussed the
6 Forensic Analytical testing that was in that fax
7 just eight days before?
8         MS. BROWN:  Hold on.  First of all, I
9 object as lacking foundation.
10        Second of all, Mr. O'Shaughnessy, I
11 will instruct you not to disclose any legal advice
12 you may have provided to anyone at Johnson &
13 Johnson.
14   A.    I don't know if I attended the
15 meeting or not.  I don't recall.  I am often
16 included on lists for meetings that I could not
17 attend because of my schedule, so I don't know if I
18 was at this meeting or not.
19   Q.    Do you -- do you admit that you
20 e-mailed Sarah Colamarino and Steven Mann about this
21 Forensic Analytical testing?
22        MS. BROWN:  Foundation.
23   A.    I might have.  I don't recall an
24 e-mail.  I might have had a communication with them
25 about it.  I assume I did if I'm listed in some

Page 445

1 fashion.  A lot of times I would have phone calls
2 instead of going to meetings with people to catch up
3 with them, 'cause a lot of times I would be out of
4 town or not available for other reasons so I would
5 have to play a little catch-up.  I did a lot of
6 communicating with the company by phone.
7    Q.    Go to Exhibit 43A to your deposition.
8 And this is an e-mail chain, and why don't we look
9 at it from the bottom up so we could see the
10 progression.
11        So if you look at the very first
12 e-mail in the chain of Exhibit 43A, it's dated
13 April 6, 2004.
14   A.    The bottom one, yes, I see it.
15   Q.    So this is a month after that meeting
16 was scheduled where you were in the meeting with
17 Sarah Colamarino and Dr. Steven Mann, right?
18   A.    It's a month after those
19 communications you just showed me.  Like I said, I
20 don't recall if I was in the meeting or not.
21   Q.    Okay.  And Steven Mann writes to you
22 and Sarah Colamarino, "Sarah/John, I have not
23 received the talc sample from the reporter or the
24 label information they told Sarah they would send.
25 It has been a long time so I am doubtful we are

Page 446

1 going to see it.  Should we pull the group together
2 to determine how to proceed?"
3         Is that what it says?
4    A.    Yes.
5    Q.    Okay.  So now is it clear to you that
6 you were a part of the group of people at J&J that
7 was dealing with this issue of this TV station
8 sending these lab results showing asbestos in
9 Johnson's Baby Powder?
10   A.    I was a person --
11        MS. BROWN:  Objection; lacks
12 foundation.
13   A.    I was a person who was informed of
14 what the company was doing.  They were keeping me
15 informed, again, because this is an issue that may
16 come up in litigation.
17   Q.    And it's your sworn testimony today
18 here that you didn't direct anyone to do anything
19 with respect to this Forensic Analytical testing,
20 correct?
21        MS. BROWN:  Misstates testimony.
22   A.    No, I don't direct people to do
23 anything.
24   Q.    Okay.  Well, let's look at what the
25 e-mails say.  The next sentence of the e-mail is,

Page 447

1 Dr. Mann says to you and Miss Colamarino, "I am
2 afraid they might surprise us down the road if all
3 of a sudden they decide to run a story."
4         Do you see that?
5    A.    Yes, yes.
6    Q.    In terms of "they, they decide to run
7 a story," that's the TV station that sent Johnson &
8 Johnson the lab results showing asbestos in
9 Johnson's Baby Powder, right?
10   A.    Yes.  And that's another reason why
11 they would keep me informed because it's a potential
12 publicity issue and that can impact the litigation
13 as well.
14   Q.    You just said under oath that you
15 would not have directed anyone to do anything about
16 this, right?
17   A.    I don't direct people at the company,
18 no.
19   Q.    But on April 7, 2004, you were
20 directing Sarah Colamarino in this e-mail, weren't
21 you?
22   A.    No.
23   Q.    All right.  So let's look at the
24 e-mail, April 7, 2004, 8:23 a.m., from John
25 O'Shaughnessy, right?  That's an e-mail from you?

47 (Pages 444 - 447)

O'SHAUGHNESSY - Direct

Page 448

1    A.    Yes.
2    Q.    And you write Steven Mann and Sarah
3  Colamarino, and you say, "Sarah, can we redouble our
4  efforts to get this?"
5    A.    Yes.
6    Q.    So you're asking Sarah Colamarino, a
7  public relations person from Johnson & Johnson, to
8  redouble her efforts to get the talc sample from the
9  TV reporter who sent Johnson & Johnson the lab
10  results, correct?
11    A.    I'm asking, they're apparently trying
12  to do that without much success, so I say, hey, can
13  we try again.  That's all I'm saying.
14    Q.    And --
15    A.    -- person with --
16    Q.    Okay.
17    A.    -- the TV station, so...
18    Q.    All right.  And we saw earlier that
19  the lab results were from a lab called "Forensic
20  Analytical;" true?
21    A.    Yes.
22    Q.    And you didn't direct anyone to
23  contact the lab Forensic Analytical to get
24  information from the scientists at the lab, right?
25    A.    No, that wasn't my role at the

Page 449

1  company.  The company does its own follow-up of
2  situations like this based on what they think they
3  need to do based on their expertise.
4    Q.    You're asking Sarah Colamarino to
5  redouble her efforts with the reporter, correct?
6    A.    Yeah, to get the sample.  I said can
7  we redouble it.  She was concerned that they had not
8  been responsive apparently, and so I was, in
9  essence, saying can we try again.  That's all.
10    Q.    Did you ever say to anyone at Johnson
11  & Johnson that, you know, we should have our
12  scientists reach out to the laboratory that found
13  asbestos in the Johnson's Baby Powder so we could
14  look into this as a scientific matter?
15    MS. BROWN:  Objection; foundation.
16    A.    No, J&J would decide to do what they
17  felt appropriate to investigate a particular issue.
18  I didn't give that to them.  That wouldn't be my
19  role.
20    Q.    After your e-mail, let's go further
21  up the e-mail chain, Sarah Colamarino responds to
22  you and Dr. Mann and says, "Hi, John and Steve:  I
23  have contacted the reporter three times for the
24  sample.  The last contact was about two and a half
25  weeks ago.  I did not get the impression that the

Page 450

1  story was moving forward quickly."
2    Do you see that?
3    A.    Yes.
4    Q.    And then Miss Colamarino, from the
5  public relations department of Johnson & Johnson,
6  says, "I've always been concerned about provoking
7  the story."
8    Do you see that?
9    A.    Yes.
10    Q.    Johnson & Johnson was concerned about
11  provoking the TV station in terms of the TV station
12  running a story about the lab results showing
13  asbestos in Johnson's Baby Powder, correct?
14    MS. BROWN:  I object, it misstates
15  the document.
16    A.    Sarah Colamarino wrote that, but to
17  say it was J&J's position, I don't think that's
18  right.
19    Q.    Then let's see what Mr. Monseau, he
20  then responds.  He says, "It doesn't seem they are
21  actively pushing the story."
22    Do you see that?
23    A.    Yes, I do.
24    Q.    And, you know, I'd just like to know
25  from you, do you have any evidence, as someone who

Page 451

1  was involved in this, that Johnson & Johnson ever
2  attempted to contact the laboratory that found
3  asbestos in Johnson's Baby Powder, the laboratory
4  called "Forensic Analytical"?
5    MS. BROWN:  Asked and answered; lacks
6  foundation.
7    A.    I have no specific recollection of
8  it, but it appears to me that regardless that the
9  story didn't seem to be a priority, Mr. Monseau
10  said, hey, let's try again to get the sample.  So
11  they tried to get the sample.  I don't know what the
12  scientists did on their end.
13    Q.    The sample, sir, you understand from
14  looking at the lab report in Exhibit 42 that the
15  sample was tested by the laboratory called "Forensic
16  Analytical," right?
17    A.    Yeah, but for some reason and, you
18  know, Sarah Colamarino is trying to get it, I'm just
19  reading it now, trying to get the sample and I'm
20  trying to see from the reporter, okay.  She's trying
21  to follow-up with the reporter.
22    Q.    And the lab results were signed, the
23  lab results finding asbestos in Johnson's Baby
24  Powder were signed by Mark Floyd, supervisor of the
25  laboratory.

48 (Pages 448 - 451)

O'SHAUGHNESSY - Direct

Page 452

1      Do you see that?
2    A.    That's what it says.
3    Q.    And as someone who was involved in
4  the process of looking into this, do you have any
5  evidence that anyone ever contacted Mark Floyd to
6  ask him about these findings of asbestos in
7  Johnson's Baby Powder?
8    A.    No, but that --
9        MS. BROWN:  Objection.
10    A.    No, but I wouldn't necessarily had
11  that or know that because that's an issue that the
12  company would independently follow-up on.
13    Q.    Did Johnson & Johnson send the
14  Forensic Analytical lab report that found asbestos
15  in Johnson's Baby Powder to the National Toxicology
16  Program that was considering whether talc was a
17  carcinogen?
18        MS. BROWN:  Speculation.
19    A.    I wouldn't know that, be able to know
20  that.
21    Q.    Did Johnson & Johnson ever send this
22  lab report that it received by fax with the Forensic
23  Analytical lab results to anyone outside of Johnson
24  & Johnson?
25        MS. BROWN:  He never saw the lab

Page 453

1  report.  I object on foundation grounds and calling
2  for speculation.
3    A.    I wouldn't know.  You would have to
4  ask people at the company.
5    Q.    So it's your testimony that even
6  though you were e-mailing about these lab results in
7  2004, that the first time you ever saw these lab
8  results from Forensic Analytical was when I showed
9  them to you today?
10    A.    That's not my testimony.  My
11  testimony is I received whatever was in the e-mail,
12  I don't know if I received the attachment or even
13  saw it.  I don't recognize it.  I have no
14  recollection of it.  So that's my testimony.
15    Q.    All right.  So your testimony is that
16  even though you were e-mailing about the lab results
17  from Forensic Analytical finding asbestos in
18  Johnson's Baby Powder in 2004, you're not sure if
19  you ever reviewed those lab results, correct?
20        MS. BROWN:  Misstates testimony, I
21  object, and it lacks foundation.
22    A.    No, that's not my testimony.
23    Q.    Did you review the Forensic
24  Analytical lab results in 2004:  Yes or no?
25    A.    I have no idea.  I don't recollect

Page 454

1  it.  I don't recognize it.
2    Q.    Do you think you would have been
3  e-mailing about the Forensic Analytical lab results
4  as you were in 2004 and never looked at those lab
5  results?
6    A.    Sure.  That's entirely possible.
7  They sent me an e-mail saying it was a positive
8  sample they were trying to get and I just said hey,
9  can we redouble our efforts to get it.
10    Q.    And even after you found out about
11  the Forensic Analytical lab results finding asbestos
12  in Johnson's Baby Powder, you continued to allow
13  Johnson & Johnson to certify in sworn
14  Interrogatories in litigation that there was never
15  asbestos in Johnson's Baby Powder, correct?
16        MS. BROWN:  I object; misstates the
17  evidence; lacks foundation.
18        And, Jerry, when you get to a good
19  point, we've been going well over an hour, can we
20  take a break before the next exhibit?
21        MR. BLOCK:  Let's have the question
22  read back.
23        (The following Question is read back:)
24        "QUESTION:  And even after you found
25  out about the Forensic Analytical lab results

Page 455

1  finding asbestos in Johnson's Baby Powder, you
2  continued to allow Johnson & Johnson to certify in
3  sworn Interrogatories in litigation that there was
4  never asbestos in Johnson's Baby Powder, correct?")
5    A.    I'm having trouble answering the
6  question because your introduction to the question
7  is even though I had this lab report, and then you
8  connect it up with those interrogatories.  To me
9  they're two different things and I can't answer that
10  question.
11    Q.    Even after you reviewed -- strike
12  that?
13        Even after you knew that Forensic
14  Analytical had found asbestos in Johnson's Baby
15  Powder in 2004, you know that Johnson & Johnson
16  continued to take the position that there was never
17  asbestos in Johnson's Baby Powder, correct?
18        MS. BROWN:  Same objection; and asked
19  and answered.
20    A.    Yeah, the only way I can answer that
21  is, look, Johnson & Johnson's position has been the
22  same, as you stated, that there was no asbestos in
23  its baby powder.  As far as connecting that up with
24  some report that I don't even know I saw or we don't
25  even know was accurate, it was not our company, I

49 (Pages 452 - 455)

O'SHAUGHNESSY - Direct

Page 456

1 can't connect the two up.
2    Q.    And --
3    A.    And the Interrogatories and those
4 answers, yes, they went out the way they were at
5 that time because they were accurate.
6    Q.    And you just said that the position
7 of Johnson & Johnson was that there was never
8 asbestos in Johnson's Baby Powder and as you've
9 testified to, that was always Johnson & Johnson's
10 position when you were with the company, right?
11    A.    That's right.
12    Q.    And that was always the position that
13 Johnson & Johnson took in all of its litigations
14 involving Johnson's Baby Powder, correct?
15    A.    As far as -- yes, I believe, as far
16 as I'm aware. I left the company in 2019 -- 2018,
17 but that's true, yes, up until the time I --
18    Q.    And during the time that you worked
19 at Johnson & Johnson, Johnson & Johnson told courts,
20 opposing attorneys, and anyone involved in these
21 lawsuits that Johnson's Baby Powder never contained
22 asbestos, right?
23    A.    Was asbestos-free, those
24 representations were made, yeah.
25    Q.    Okay.

Page 457

1    MR. BLOCK:  We can take a break,
2 thank you.
3    MS. BROWN:  Okay, great.  Let's take
4 ten minutes, please.  Thank you.
5    VIDEOGRAPHER:  Stand by.  Going off
6 the record, 2:18 p.m.
7    This is the end of Media Unit 3.
8    (Recess:  2:18 p.m to 2:28 p.m.,
9 Eastern Standard Time.)
10    VIDEOGRAPHER:  Going back on the
11 record, 2:28 p.m.
12    This is the beginning of Media Unit
13 4.  Okay.
14    MR. BLOCK:  Mr. O'Shaughnessy, I have
15 no further questions at this time.
16    VIDEOGRAPHER:  Looks like
17 Mr. O'Shaughnessy is muted.
18    MS. BROWN:  That's great, Jerry, but
19 I wish you had told me --
20    MR. BLOCK:  Excuse me, let's go back
21 on the record.  Let's start over and unmute the
22 witness, please.
23    A.    I am now unmuted, but I did hear you
24 on audio.
25    Q.    We're back on the record.

Page 458

1    Mr. O'Shaughnessy, I have no further
2 questions at this time.
3    MS. BROWN:  Okay.  So this is Alli
4 Brown, I just want to take five minutes to set up my
5 Elmo to show a few documents during my exam of
6 Mr. O'Shaughnessy and we'll be ready to proceed.
7    MR. BLOCK:  Okay.  Can we just go to,
8 could we just exclude Mr. O'Shaughnessy, I just have
9 some procedural questions I want to discuss?
10    MS. BROWN:  Okay.
11    (Witness out of Zoom meeting.)
12    MR. BLOCK:  So I need to receive the
13 documents --
14    MS. BROWN:  They're yours.  I'm only
15 using your documents.
16    MR. BLOCK:  Oh, thank you.  Okay.  So
17 when you use them, obviously just refer to the
18 numbers that I have used and so the record reflects
19 that and I know it as well.
20    MS. BROWN:  Actually, I misspoke,
21 there's one additional document which I will e-mail
22 you right now.
23    MR. BLOCK:  Yeah, so please e-mail me
24 that document, I appreciate that, and when do you
25 want to get started, five minutes?

Page 459

1    MS. BROWN:  Yeah, let's take ten just
2 so I can make sure the Elmo works.
3    MR. BLOCK:  All right.  In the
4 meantime I'll look for that e-mail.  Thank you.
5    MS. BROWN:  Thanks, Jerry.
6    VIDEOGRAPHER:  Off the record,
7 2:30 p.m.
8    (Recess:  2:30 p.m. to 2:42 p.m.,
9 Eastern Standard Time.)
10    VIDEOGRAPHER:  Back on the record,
11 2:42 p.m.  Back on the record.  Okay.
12 CROSS-EXAMINATION BY MS. BROWN:
13    Q.    Good afternoon, Mr. O'Shaughnessy.
14    A.    Hi.
15    Q.    I am really glad to have you here and
16 to be able to introduce you to our jurors.
17    Would you tell them who you are and
18 where you're from?
19    A.    Well, I'm John O'Shaughnessy and as
20 you know, I've been testifying on behalf of my role
21 as an attorney with Johnson & Johnson.
22    I grew up in New York City in the
23 bureau of the Bronx.  I went to school there and I
24 went to college, a small college in New Rochelle
25 which is just outside the Bronx, and from there I

50 (Pages 456 - 459)

O'SHAUGHNESSY - Cross

Page 460

1  was employed as a truck driver and then I went to
2  law school at New York Law School in lower
3  Manhattan, New York City.
4      Q.     Did you always want to be a lawyer,
5  Mr. O'Shaughnessy?
6      A.     No, I thought I would be an
7  oceanographer at one point, but then I wasn't
8  getting anywhere with that, so I became interested
9  in the law.  Actually it was from watching the
10  Watergate hearings.
11      Q.     Tell me what you mean by that.
12      A.     Back in the '70s, you know, there
13  were hearings on Nixon's administration and I just
14  thought that that method of inquiry and they were
15  all lawyers and I said, you know, that looks
16  interesting, I'd kind of like to try that, so I went
17  to law school, you know, not knowing how well I'd
18  do, I actually one to hit the books a lot, but
19  I kind of disciplined myself to do that in law
20  school, and graduated in 1978.
21           And I was hired by the Bronx district
22  attorney's office in New York, in the Bronx, as a
23  prosecutor in 1978.  And I served there until
24  approximately 1982 when I was a member of the
25  homicide bureau and the major offense bureau and

Page 461

1  tried cases, criminal prosecutions, in that county.
2      Q.     And, Mr. O'Shaughnessy, you mentioned
3  a little bit of your work earlier.  You testified
4  about some of your work in the homicide division of
5  the DA's office.  Can you give us an idea about what
6  your role and responsibility was there?
7      A.     Well, the prosecutions there begin in
8  the grand jury and as part of that we would present,
9  you know, the homicide defendants that were arrested
10  recently, the cases would come in, you would deal
11  with the police and the law enforcement, and present
12  the case to a grand jury.
13           Part of that, as I mentioned during
14  the deposition, was we rotated through 24-hour
15  on-call duty.  And I think the Bronx was the first
16  prosecutor's office in the country back at this
17  time, which is hard to believe, to use videotape,
18  when they videotaped a murder scene if we found a
19  body there or, and we would also videotape a
20  defendant upon the arrest, assuming, you know, he
21  waived his rights to a lawyer and we would take
22  statements on videotape.  And then we would later,
23  like I explained in my testimony, that would later
24  be played in court.
25      Q.     And when you were at the Bronx DA's

Page 462

1  office in 1982, what did you do next?
2      A.     I went to a firm in Manhattan called
3  "Martin Clearwater & Bell," which is a medical
4  malpractice defense firm, so I was a trial attorney,
5  and I tried cases defending doctors and hospitals
6  primarily in and around New York City, Bronx,
7  Brooklyn, Queens, in state and Federal Court.
8      Q.     And your testimony may be played
9  ultimately in a courtroom.  Did you spend time when
10  you were at that firm in courtrooms a lot?
11      A.     Yes, I tried cases.  Yeah, I was in
12  court a lot.  The same, of course, in the DA's
13  office.
14      Q.     And how long did you stay at that
15  firm, sir?
16      A.     I was with Martin Clearwater & Bell
17  for, I think, four years, three or four years.  And
18  then I went to work at a corporation, the
19  International Playtex Corporation, as a litigation
20  attorney.  At the time they had some products
21  involved in litigation, and so I was hired by them
22  and I dealt with litigation involving Playtex
23  products.
24      Q.     And how long did you stay there?
25      A.     I was with Playtex, I think, three

Page 463

1  years.  And that's when I moved to, was hired by
2  Johnson & Johnson, in 1987.
3      Q.     So in 1987, is that when you started
4  at J&J?
5      A.     That's right.
6      Q.     And what was your title when you
7  started at Johnson & Johnson in 1987?
8      A.     My title was, as I explained to
9  Mr. Block, was senior attorney, and when I come into
10  Johnson & Johnson I did primarily work on the
11  lawsuits from the, involved in a subsidiary called
12  "Ortho Pharmaceutical Corporation," and they were a
13  maker of various, various prescription products,
14  including contraception.  And that's what I started
15  out by doing in 1987.
16           But Johnson & Johnson is, I assume
17  they still are, they're divided into three separate
18  business categories; consumer, and the talc we've
19  been talking about is in the consumer side of the
20  business; there's the medical device side of the
21  business, and then there's the pharmaceutical side
22  of the business.
23           So during my career at Johnson &
24  Johnson and through the time I was testifying, at
25  any given time I would be responsible for product

51 (Pages 460 - 463)

O'SHAUGHNESSY - Cross

Page 464

1  liability litigation involving products from those
2  companies.  So when I started with Johnson & Johnson
3  there were approximately well over 200 cases on the
4  pharmaceutical side of Ortho, and then I had also
5  managed litigation for a medical device company
6  called "Codman & Shurtleff" which made neurosurgical
7  instruments and tools.  And then I had cases with a
8  company called Johnson & Johnson Orthopedics at the
9  time which made orthopedic implants.
10        And so I had cases in all of those
11  categories of the business.  And besides that,
12  beginning in about 1991 I also started to do
13  employment litigation because we had a dramatic
14  uptick in cases and some employees, like a lot of
15  other companies with the passage of the 1991 Civil
16  Rights Act.
17        So I had cases in all those
18  categories and I also, you know, as an in-house
19  counsel, I would hire outside lawyers to work with
20  in the jurisdictions around the country.  So I
21  worked with many, many firms around the country and,
22  you know, many, many lawyers during my career at
23  Johnson & Johnson.
24        Q.    Can you give our jurors an idea,
25  Mr. O'Shaughnessy, you know, just on a general level

Page 465

1  when you were at Johnson & Johnson, what was a
2  typical day like for you working in the law
3  department?
4        A.    Well, I was dealing with outside
5  cases and the outside counsel, I'm sorry, and it was
6  a lot of phone work with them, and, you know, my
7  responsibility to make sure that our outside
8  counsel were adequately prepared to defend the cases
9  and that meant a whole kind of gamut of what we do
10  in litigation.  It meant the ability to respond to
11  discovery, the making sure that we got the
12  appropriate and relevant information from each of
13  the companies on each of the products on each of the
14  cases we were dealing with, working with outside
15  counsel to make sure that we met our obligations in
16  court in terms of documents, discovery, timelines,
17  to make sure that the cases were prepared for trial,
18  and that would involve making sure we had the
19  appropriate witnesses from the company to explain to
20  the juries what the product was and why the company
21  would do what it did with respect to a product.  And
22  also to make sure that we had witnesses who were
23  outside the company to testify to lend their
24  scientific expertise to the issue.
25        Q.    Did --

Page 466

1        A.    That's kind of it in a nutshell.
2        Q.    Did you like working at Johnson &
3  Johnson, Mr. O'Shaughnessy?
4        A.    Yeah, you know, I was there 31 years,
5  so I did enjoy it.  You know, I didn't go into the
6  job thinking, well, I'm going to be here for 30
7  years.  You go in and you, you know, and the next
8  thing you know a lot of time goes by.
9        But it was a privilege to work for
10  that company.  They're a good company.  It was a
11  great experience in terms of being a lawyer working
12  with excellent lawyers around the country, both
13  lawyers that represent Johnson & Johnson and even
14  lawyers that were suing Johnson & Johnson, many fine
15  and good attorneys.  It was a privilege to work in
16  that sort of a practice.
17        Q.    And did there come a time when you
18  retired from Johnson & Johnson?
19        A.    Yeah, I retired in May first of 20 --
20  2018.
21        Q.    And do you have a family,
22  Mr. O'Shaughnessy?
23        A.    I do have a wife and three children
24  and three grandchildren and one on the way.  When I
25  was working at Johnson & Johnson I lived in New

Page 467

1  Jersey and my kids were raised there and two out of
2  three live there.  My daughter is a teacher in a
3  local school, my son-in-law is in financing, my
4  other son has his own little company trying to get
5  off the ground doing various production work.  He
6  lives in the Bronx.
7        Q.    And, sir, (inaudible) close by.
8        A.    My other son lives in the Bronx.
9        Q.    And have you been able to spend more
10  time with your family in your retirement?
11        A.    Yeah, we just started to now.  You
12  know, like a lot of other people with COVID that's
13  been interrupted, but fortunately, you know, no one
14  in my family was ill, so we're starting to have more
15  family time together, yes.
16        Q.    Have you, since the time that you
17  were retired, Mr. O'Shaughnessy, in 2018, have you
18  spent any time studying or thinking about issues
19  regarding cosmetic talc?
20        A.    No, no.  I worked on talc, like I
21  said to Mr. Block, you know, day-to-day, you know,
22  responsibility for the case up to 2012, and then I
23  came back into working on talc in about 2016 in a
24  more limited fashion with the uptick in all the
25  litigation that the company is dealing with now.

52 (Pages 464 - 467)

O'SHAUGHNESSY - Cross

Page 468

1    Q.    Since you left the company in 2018,
2  have you spent really any time thinking about some
3  of the issues that you handled while you were there?
4    A.    No, no, I, you know, look, I spent a
5  lot of time working on it.  You know, I have my
6  views of it, but, you know, I've moved on now and
7  I'm trying to enjoy time.  I spent a lot of time,
8  you know, working and a lot of time traveling, and
9  so one of the nice things about retirement is to
10 finally have some time which, you know, you have to
11 yourself, so it's mainly with family and friends and
12 interests, that sort of thing.
13   Q.    And have you done your best here
14 today, Mr. O'Shaughnessy, to try and remember what
15 you can and answer counsel's questions truthfully
16 and accurately?
17   A.    Yeah.  And, you know, it is difficult
18 and I wish it weren't, but many of the issues I was
19 asked questions about, of course, happened, you
20 know, 25, 30 years ago, so my memory of it is
21 limited.  And, you know, during the time I was
22 working on these cases with talc, like I said, I was
23 also working on a lot of other litigation, a lot of
24 other cases that involved kind of similar issues
25 with respect to science, you know, witnesses,

Page 469

1  communicating with company witnesses and outside
2  counsel.  So, you know, distinguishing certain
3  things and being aware, do I remember certain
4  things, it's tough to do that after the passage of
5  time and given the amount of time I was spending on
6  different litigation.
7    Q.    Mr. O'Shaughnessy, I want to go
8  through a couple of topics that counsel asked you
9  questions about and get a few more pieces of
10 information for our jurors.  So I'm going to show
11 you what, I'm going to share my screen and show you
12 on the Elmo what counsel marked as Exhibit 2 to your
13 deposition.
14         And let me, it'll be Exhibit 2 in
15 your binder, and then I'll also put it up here on
16 the screen if that is helpful for you.
17   A.    Sure.
18   Q.    This document, Mr. O'Shaughnessy,
19 marked as Exhibit 2 to your deposition is a memo
20 dated September 22, 1993, and the subject is "J&J
21 Worldwide Talc Steering Committee."
22         Do you see that?
23   A.    I do, yes.
24   Q.    And the memo is addressed to
25 Dr. Hopkins, Mr. Leebaw, yourself, and an individual

Page 470

1  named W. Slivka.
2          Do you see that?
3    A.    I do.
4    Q.    Okay.  And what was your
5  understanding, Mr. O'Shaughnessy, about why this
6  Worldwide Talc Steering Committee was formed?
7    A.    My recollection is, and I think it's
8  evidenced in the document, is the companies, when
9  they sometimes have issues that are arising that
10 are, maybe a limited duration like this FDA meeting,
11 they will assemble a group to make sure that they
12 get the people with the relevant knowledge about the
13 issue on the same page that they have input from all
14 different areas of the corporation that are maybe
15 relevant to the particular issues, and this issue is
16 the FDA talc safety.
17         So, you know, the companies are big.
18 There's, each department has lots of people.  And so
19 this is a way of coalescing it.  And at this time,
20 you know, there was some publicity, I think,
21 beginning around the issues of talc and talc safety.
22 There were certainly lawsuits, which explained my
23 involvement, which, I was responsible for
24 litigation.  And because the meeting was, you know,
25 it was an important meeting, scientific meeting,

Page 471

1  Government agency, that would be something that
2  would come up, as it has, in litigation.
3          So I, as the litigation lawyer for
4  J&J, would want to know what the company, what it
5  was about to keep myself abreast of what the company
6  was doing and the position it was taking because
7  later on, the attorneys for J&J that I worked with
8  would have to, you know, do the same thing.  They
9  would have to explain what the company did, who did
10 it on behalf of the company, and why.
11   Q.    When it comes to the Worldwide Talc
12 Steering Committee, what was your role on that
13 committee, Mr. O'Shaughnessy?
14   A.    As a lawyer, I was to give input
15 with respect to the legal cases, because, like I
16 said, there was some publicity around the legal
17 cases.  And also, we did have legal cases.  So
18 that's important for the company to know the status
19 of litigation.  Because the litigation also
20 generates publicity, the company gets questions, the
21 company wants to respond.  So they need to respond
22 in a knowing matter and that's why they get the
23 relevant people together.  So that was my role on
24 the committee.
25   Q.    And what was your understanding of

53 (Pages 468 - 471)

O'SHAUGHNESSY - Cross

Page 472

1 the role of some of the other folks on the
2 committee; for example, Dr. Hopkins?
3     A.    Dr. Hopkins was a scientific person
4 and he was a member of the company in England at the
5 time.  But there was also a science organization, of
6 course, in New Jersey and he was part of that.  So
7 he wouldn't be the only one that would be lending
8 effort to this FDA issue.  He would be the
9 scientific person.  And I guess from his end he
10 would coordinate and get the appropriate
11 information.
12        Same for Jeff Leebaw who was
13 responsible for corporate communications.  So if a
14 company gets an inquiry from the media, I think many
15 companies do this, but Johnson & Johnson certainly
16 does, they have a communication group to make sure
17 that you respond to requests from the media and
18 information from outside the company in a knowing
19 and accurate way.
20        So the corporate communication group
21 kind of coalesces around that to make sure that the
22 responses are appropriate and accurate, and they
23 come from people who are aware of the issues rather
24 than having people not aware of the issues, you
25 know, talking to people outside the company.

Page 473

1     Q.    If we look at Exhibit 2,
2 Mr. O'Shaughnessy, the document states that the
3 objectives/responsibilities of the committee are,
4 "Number 1, to monitor publications, studies,
5 regulatory actions, legal cases, et cetera,
6 regarding talc."
7        Do you see that in the document?
8     A.    I do.
9     Q.    And were you the person,
10 Mr. O'Shaughnessy, on this committee who was in
11 charge of things like monitoring publications and
12 studies regarding talc?
13     A.    No, that would be for the scientific
14 and technical people.
15     Q.    Were you aware -- go ahead.
16     A.    The scientific and medical people who
17 were on the committee and those that they work with.
18     Q.    And can you describe for our jurors
19 generally what you became aware of through your
20 participation on the Worldwide Talc Steering
21 Committee that the scientists at the company were
22 doing to ensure the safety of talc?
23     A.    Since the meeting was about talc
24 safety, it was to -- the scientists were coalescing
25 or gathering all of the information that the company

Page 474

1 had that they had on talc safety.  So that includes
2 what the company usually does in situations like
3 this; they monitor publications, medical literature
4 and the public studies, regulatory actions.  That's
5 very relevant because the FDA and other regulatory
6 agencies have certain rules and regulations that
7 impact the product as well.
8        So that's what would be going on by
9 those people.  So, you know, when you have exposure
10 to that like I did, and I knew these people, you
11 know, of course, before this committee was formed
12 and had knowledge of talc, but you get to see it
13 again, you know, you get to see what they're doing,
14 what studies they relied on and what their thinking
15 was with respect to talc safety.
16     Q.    And to your knowledge,
17 Mr. O'Shaughnessy, and through your work on the
18 Worldwide Talc Steering Committee, was anyone at the
19 company testing and monitoring talc for asbestos?
20        MR. BLOCK:  Objection; foundation;
21 form.
22     A.    I was aware that the company
23 regularly monitored and tested its talc product,
24 yes.
25     Q.    And through your work on the Talc

Page 475

1 Steering Committee, Mr. O'Shaughnessy, were you
2 aware of whether or not anybody at the company was
3 monitoring the scientific literature regarding talc
4 safety?
5     A.    Yes --
6        MR. BLOCK:  Objection; form;
7 foundation.
8     A.    Yes, the company, the scientists at
9 the company monitored the publications and the
10 scientific area related to products.  That's done at
11 all the companies.
12     Q.    And one of the things that this
13 Exhibit 2 that we're looking at notes is that the
14 plan is to have the committee meet at least once
15 before a major FDA talc safety symposium scheduled
16 for late January 1994.
17        Do you see that?
18     A.    I do.
19     Q.    And through your participation on the
20 Worldwide Talc Steering Committee, what was your
21 understanding about the purpose of this FDA talc
22 safety symposium?
23        MR. BLOCK:  Objection; form and
24 foundation.
25     A.    I think, like we discussed during my

54 (Pages 472 - 475)

O'SHAUGHNESSY - Cross

Page 476

1 prior testimony, to review, you know, the safety of
2 talc as of that point in time with respect to, you
3 know, issues with respect to talc in the lung and
4 issues with respect to talc and ovarian cancer.  I
5 think this was the two-day meeting, if I'm not
6 mistaken.
7        Q.    And I want to show you Exhibit 7 to
8 your deposition, which is an article you were shown
9 earlier today regarding that very meeting.
10       Do you recall some questions
11 regarding Exhibit 7 titled: "Talc:  Consumer Uses
12 and Health Perspectives"?
13       A.    Yes, I do.
14       Q.    Okay.  And one of the things that
15 counsel asked you questions, a couple questions
16 about had to do with the list of workshop
17 participants.
18       Do you remember those questions?
19       A.    Yes.
20       Q.    All right.  And first of all, would
21 you agree, Mr. O'Shaughnessy, that there are a
22 number of different scientists and individuals
23 listed as workshop participants on this document at
24 Exhibit 7?
25       A.    That's right.

Page 477

1        Q.    And counsel asked you some questions
2 about how your name appears on the list.
3        Do you remember that?
4        A.    Yes, yes.
5        Q.    And the fact of the matter is,
6 Mr. O'Shaughnessy, after your name it doesn't say
7 Johnson & Johnson, right?
8        A.    No, it doesn't.
9        Q.    Did you provide the information about
10 how your name was going to be listed here in this
11 document?
12       MR. BLOCK:  Objection; form and
13 foundation.
14       A.    The company would have submitted my
15 name because I would be going with Johnson &
16 Johnson, so the company would handle those
17 arrangements.
18       Q.    Did you take any steps to try and
19 hide the fact that you were employed by Johnson &
20 Johnson when you participated in this meeting?
21       MR. BLOCK:  Objection; form and
22 foundation.
23       A.    I've never done that for this meeting
24 or any other meeting.
25       Q.    And counsel asked you some questions

Page 478

1 about the fact that you didn't put something like
2 E-S-Q after your name to tell people that you're a
3 lawyer.
4        Do you remember those questions?
5        MR. BLOCK:  Objection.
6        A.    I do.
7        MR. BLOCK:  Form.
8 BY MS. BROWN:
9        Q.    Did you take any steps to try and
10 hide from the people at this meeting that you were a
11 lawyer?
12       MR. BLOCK:  Objection; form.
13       A.    No, I did not.
14       Q.    I want to ask you a couple of
15 questions not about how your name is listed, but
16 about the substance of what happened at this
17 conference.
18       Can you read to our jurors,
19 Mr. O'Shaughnessy, and I'm sorry if I have to make
20 you grab your glasses, the sentence in Exhibit 7
21 that begins, "The workshop."
22       A.    It says here, "The workshop was to
23 provide a forum on an updated discussion of the
24 origins, manufacture, characterization and
25 toxicology and epidemiology of talc.  Principal

Page 479

1 focus of the meeting was on the latest toxicologic
2 and epidemiologic studies as they reflect on the
3 safe uses of talc in consumer products."
4        Q.    And based on your participation, is
5 that a fair characterization of what happened at the
6 workshop?
7        MR. BLOCK:  Objection; form and
8 foundation.
9        A.    Yeah, I believe that's what it was
10 about, yes.
11       Q.    And would you read to our jurors the
12 paragraph that begins, "Dr. Gilbertson"?
13       MR. BLOCK:  Objection to form.
14       A.    It says, "Dr. Gilbertson, FDA,
15 reviewed the harmonization of international
16 standards and regulations for cosmetic talc and its
17 consumer applications.  In their joint evaluation,
18 talc has proven to be among the safest of all
19 consumer products."
20       Q.    And based on your participation in
21 this two-day FDA talc symposium, do you recall an
22 evaluation that had a conclusion that talc had
23 proven to be among the safest of all consumer
24 products?
25       MR. BLOCK:  Objection to form.

55 (Pages 476 - 479)

O'SHAUGHNESSY - Cross

Page 480

1    A.    Yeah, you know, I don't recall the
2  specifics of each day, but my take-away was that the
3  committee, FDA committee found that talc was safe,
4  consumer talc was safe.
5           MR. BLOCK:  Objection; move to strike
6  as not responsive.
7  BY MS. BROWN:
8    Q.    And I want to talk a little bit,
9  Mr. O'Shaughnessy, about a document you were shown
10 from some of your outside counsel at a law firm
11 called "Mehaffy & Weber."
12          Do you remember taking a look at a
13 document from some lawyers at Mehaffy & Weber?
14   A.    Yes.
15   Q.    And do you remember that the subject
16 of the document had to do with a potential
17 consulting expert named Dr. Alice Blount?
18   A.    I recall that testimony, yeah.
19   Q.    And one of the things that you
20 testified earlier in regards to those documents is
21 that you just don't really recall those letters.
22         Do you remember that?
23         MR. BLOCK:  Objection to form.
24   A.    I'm sorry, that's right.
25   Q.    And to help us understand a couple

Page 481

1  things, Mr. O'Shaughnessy, in 1998, can you tell our
2  jurors about how much of your time was spent on talc
3  and talc-related issues?
4    A.    Yeah, so like I said, at the time I
5  was responsible for litigation involving companies
6  in different sectors, many different lawsuits,
7  hundreds of lawsuits in, you know, literally tens of
8  attorneys around the country.  And the time I spent
9  on talc as opposed to those other areas in
10 employment law I would estimate to be less than
11 eight percent of my time.
12   Q.    And in terms of your overall work as
13 a lawyer at Johnson & Johnson, did you have the
14 opportunity to meet with experts or learn about
15 experts in your role as a lawyer?
16   A.    Well, yeah, you deal with the people
17 at the company who have expertise in the field and
18 then as part of the litigation as well, it's common
19 for both sides of litigation to hire outside experts
20 that have expertise to testify in court.  And I had
21 some exposure with our outside counsel to that, yes.
22   Q.    And when it comes to any one
23 particular expert or particular correspondence, do
24 you remember all of that perfectly?
25   A.    No, no, it's very difficult.

Page 482

1    Q.    Counsel started your deposition
2  showing you the Subpoena that you were served with
3  to testify here.
4           Do you remember that?
5    A.    I do.
6    Q.    Were you personally served with a
7  document requiring you to give testimony,
8  Mr. O'Shaughnessy?
9    A.    Yeah, couple times they came, came to
10 my house, my wife answered the door and got me and I
11 took the documents from them.  And then there was
12 one occasion where I drove to, from my house in
13 Pennsylvania, I drove to New Jersey to meet the
14 process server from, I believe it was Mr. Block's
15 office to accept service to facilitate the
16 deposition.
17   Q.    And did you come, Mr. O'Shaughnessy,
18 to understand why it is that the plaintiffs' lawyers
19 wanted to talk to you in this litigation?
20   A.    I think I have a good understanding
21 now after the deposition, yes.
22   Q.    And what is that understanding?
23         MR. BLOCK:  Objection to form.
24   A.    Well, you know, based on the
25 questions I received today, and yesterday, about,

Page 483

1  you know, especially about the letter that mentioned
2  Dr. Blount and then the Interrogatory answers, it
3  seems to me that there, that plaintiffs want, the
4  lawyers want somehow to show that I had done
5  something wrong with respect to the information that
6  was in that letter and that these Answers to
7  Interrogatories that kept on referring back to that
8  letter were somehow wrong or that I misrepresented
9  information about Johnson & Johnson to the court and
10 to other lawyers.  And that's what I believe.  I
11 mean, you know --
12   Q.    And --
13         MR. BLOCK:  Move to strike as
14 nonresponsive.
15 BY MS. BROWN:
16   Q.    Let me just ask you,
17 Mr. O'Shaughnessy, how does that make you feel?
18         MR. BLOCK:  Objection to form.
19   A.    Well, it's upsetting and it's also
20 disappointing.  You know, after 40 years of
21 practicing law, after being a prosecutor, after, you
22 know, working in this profession alongside attorneys
23 who sued Johnson & Johnson and attorneys who
24 represent Johnson & Johnson, you know, to be accused
25 of wrongdoing is upsetting.  And I don't think it's

56 (Pages 480 - 483)

O'SHAUGHNESSY - Cross

Page 484

1 appropriate or right based upon the letter from 25
2 years ago in a litigation I don't recall and to use
3 that as a basis to impugn my credibility with the
4 court, I don't think it's right or fair and I know
5 it's not true.
6         MR. BLOCK: Move to strike as not
7 responsive.
8 BY MS. BROWN:
9     Q.    Is it fair in your mind,
10 Mr. O'Shaughnessy, to suggest that because you don't
11 have a perfect memory of one letter from the spring
12 of 1998 that you did something wrong here?
13        MR. BLOCK: Objection to form.
14    A.    No, I don't think that's right.
15    Q.    Did you take your job at Johnson &
16 Johnson seriously, Mr. O'Shaughnessy?
17    A.    I did. I took it very seriously and
18 I also took, throughout my career, very seriously as
19 my duty to not misrepresent things to other lawyers
20 of the court. I don't think I ever did that.
21        MR. BLOCK: Move to strike as not
22 responsive.
23 BY MS. BROWN:
24    Q.    Mr. O'Shaughnessy, looking back on
25 your career, do you believe that you had a duty to

Page 485

1 provide truthful and accurate information to all
2 parties, including the court?
3        MR. BLOCK: Objection to form.
4    A.    Yes. Yes.
5    Q.    And did you do your very best to
6 fulfill that duty?
7    A.    I did.
8    Q.    Mr. O'Shaughnessy, I want to show you
9 what was marked as Exhibit 37 to your deposition.
10 And this Exhibit 37 to your deposition included an
11 e-mail from you dated Monday, August 13, 2001.
12        Do you see that, Mr. O'Shaughnessy?
13    A.    Yes, I do.
14    Q.    Okay. And you were asked some
15 questions about a couple of things that you said in
16 this e-mail and I want to give you a chance to
17 explain it.
18        What you read in this e-mail is that
19 J&J, back in the '70s, developed proof that its talc
20 was free from asbestos. I have assembled those
21 documents and have them.
22        Do you see that?
23    A.    Yes, I do.
24    Q.    Okay. And there were a bunch of
25 questions about whether there were folks on this

Page 486

1 e-mail who were scientists and toxicologists and
2 scientific people.
3        Do you remember those?
4    A.    I do.
5    Q.    And first of all, as an initial
6 matter, Mr. O'Shaughnessy, during the 30 plus years
7 that you worked at Johnson & Johnson, did you ever
8 tell scientists what to do on scientific issues?
9        MR. BLOCK: Objection to form.
10    A.    No, clearly not.
11    Q.    You, sir, have a very impressive
12 career and a lot of experience and education, but
13 are you experienced in scientific issues?
14        MR. BLOCK: Objection to form.
15    A.    No, I didn't take any science courses
16 beyond high school.
17    Q.    Okay. Do you consider yourself
18 qualified to review epidemiology studies or asbestos
19 test results?
20    A.    No.
21    Q.    And when it came to cosmetic talc,
22 were you ever directing scientific decisions at
23 Johnson & Johnson?
24    A.    No, I never did that.
25    Q.    What did you mean, Mr. O'Shaughnessy,

Page 487

1 when you said J&J, back in the 1970s, developed
2 proof that its talc was free from asbestos?
3        MR. BLOCK: Objection to form;
4 foundation.
5    A.    What I meant by that and what I hope
6 I conveyed earlier is that as the attorney for the
7 company --
8        (Technical difficulty.)
9        (Court Reporter clarification.)
10        (The following is read back:
11 "QUESTION: What did you mean,
12 Mr. O'Shaughnessy, when you said J&J, back in the
13 1970s, developed proof that its talc was free from
14 asbestos?
15        "MR. BLOCK: Objection to form;
16 foundation.
17        "ANSWER: What I meant by that and
18 what I hope I conveyed earlier is that as the
19 attorney for the company...")
20 BY MS. BROWN:
21    Q.    Mr. O'Shaughnessy, do you mind
22 picking up there? Thank you.
23    A.    What I meant by that was that as the
24 attorney for the company in litigation and working
25 with our outside lawyers, as part of that process we

57 (Pages 484 - 487)

O'SHAUGHNESSY - Cross

Page 488

1 would be interviewing all the people at the company
2 who had any involvement with the product, we would
3 be assembling the documents that are relevant to the
4 issues in a particular case, and the lawyers would
5 have those documents and information in one place.
6         And this firm, Mehaffy & Weber, Gene
7 Williams in particular, when you have multiple cases
8 oftentimes you gather a lot of the information with
9 one firm and then you use that firm to help out
10 around the country with the lawsuits in different
11 jurisdictions.  So you have one attorney, one firm
12 that is quite conversant with the product and the
13 documents.
14         So when I said that J&J, back in the
15 '70s, developed proof that its talc was free from
16 asbestos, I have assembled those documents, I was
17 referring to the documents that our attorneys had
18 assembled and collected as part of the litigation
19 process which would include, you know, the testing
20 and other scientific data related to the product,
21 including back to the '70s.
22         And I was saying to them here it was,
23 I have it in one place.  If you need it, let me know
24 and we'll consider that.
25     Q.    And to the best of your recollection,

Page 489

1 Mr. O'Shaughnessy, did anybody on this e-mail take
2 you up on that and come get your documents?
3         MR. BLOCK:  Objection to form.
4     A.    No, I think, you know, my suggestion
5 was to present Johnson & Johnson apart from the
6 other members, and no, they continued on with what
7 they were doing to begin with.
8     Q.    And in terms of your knowledge of how
9 these documents were collected and assembled, to the
10 best of your knowledge, where did all these test
11 results come from?
12         MR. BLOCK:  Objection to form;
13 foundation.
14     A.    They came from the company files.
15     Q.    And was it your job,
16 Mr. O'Shaughnessy, to review and analyze the details
17 of those test results?
18         MR. BLOCK:  Objection to form.
19     A.    No, they would be collected.  And
20 like I testified before, from time to time, if a
21 particular document for testing came up in a
22 litigation, I would have probably seen with the
23 attorneys.  But no, I did not sit down and look at
24 all those documents collected.  You're talking
25 about, you know, thousands of pages of documents.

Page 490

1     Q.    You were shown, for example,
2 Mr. O'Shaughnessy, Exhibit 26 to your deposition,
3 which is a report from Walter McCrone Associates
4 titled: "Examination of Talc Samples, Argonaut Ore
5 Body."
6         Do you recall this document?
7     A.    No.  I mean, I recall it from the
8 deposition earlier, yes, I'm sorry.
9     Q.    And counsel pointed to a couple of
10 different passages in this document, including this
11 chart, Table 2.  And do you remember questions from
12 counsel about chrysotile and whether there was
13 chrysotile findings in these samples?
14     A.    Yes.
15     Q.    And the part of the document, though,
16 that counsel didn't show you is here on page 4 --
17         MR. BLOCK:  Objection to form.
18 BY MS. BROWN:
19     Q.    Can you read to our jurors the very
20 last sentence in this McCrone testing report?
21     A.    "Chrysotile levels" of this order of
22 magnitude might well arise" -- I'm going to have to
23 read it again because I'm blocked.
24     Q.    I apologize.
25     A.    It's me.  It's my screen.  I'll begin

Page 491

1 again.
2         "Chrysotile levels of this order of
3 magnitude might well arise during the -- during the
4 taking and handling of the samples."
5     Q.    Were you the person tasked with
6 analyzing reports like this to determine whether or
7 not the samples had been contaminated during the
8 taking and handling?
9     A.    No.
10     Q.    In terms of reviewing and analyzing
11 this kind of scientific information, did you ever
12 have a responsibility for doing that kind of stuff,
13 Mr. O'Shaughnessy?
14     A.    No, absolutely not.
15     Q.    Based on your participation in the
16 Worldwide Talc Steering Committee, were there other
17 people at the company who were qualified to review
18 and analyze and interpret results like the one we're
19 looking at here in Exhibit 26B?
20         MR. BLOCK:  Objection; form;
21 foundation.
22     A.    Yes, that's correct.
23     Q.    And for the record, I think I
24 referred to this as Exhibit 26, but it's 26B.
25         Mr. O'Shaughnessy, you were asked

58 (Pages 488 - 491)

O'SHAUGHNESSY - Cross

Page 492

1 some questions about Exhibit 32, Interrogatory
2 responses in a case called "Krushinski."
3          Do you recall those questions?
4     A.    Yes, I do.
5     Q.    And you were specifically asked
6 questions about a response to Interrogatory Number
7 17 in which the response was that, "To the best of
8 defendant's knowledge, talc used in the manufacture
9 of Johnson & Johnson's Baby Powder never contained
10 asbestos in any form, or tremolite."
11          Do you remember questions about that?
12     A.    Yes.
13     Q.    And then you were shown some
14 documents from the 1960s reporting what appeared to
15 be trace amounts of tremolite.
16          Do you remember that line of
17 questions?
18     MR. BLOCK:  Objection to form.
19     A.    Yes.  I'm sorry, yes, that's right.
20     Q.    Okay.  First of all, did you review
21 and analyze that Battelle document to determine
22 whether or not the tremolite finding was tremolite
23 or tremolite asbestos?
24     MR. BLOCK:  Objection to form.
25     A.    No.  No, I didn't do anything like

Page 493

1 that.
2     Q.    Okay.  Are you aware --
3     MR. BLOCK:  Your Honor, your Honor, I
4 just want to interject that if Miss Brown is going
5 to ask the witness what he, what documents he
6 reviewed and relied upon before approving this
7 statement in this Interrogatory, then that will open
8 the door for me to ask about any documents and any
9 information he reviewed before finally approving
10 this.  So I --
11     MS. BROWN:  Jerry --
12     MR. BLOCK:  -- so I just want to say
13 that's going to be our position.  She's asking
14 him -- she's asking him as a lawyer -- she's asking
15 Mr. O'Shaughnessy as an attorney what he reviewed,
16 what internal documents he reviewed in order to make
17 a decision to give final approval to that statement.
18     MS. BROWN:  Jerry --
19     MR. BLOCK:  And that is exactly the,
20 that -- she's asking for his mental impressions and
21 what went into his thinking in approving that
22 statement, and what --
23     MS. BROWN:  That is not --
24     MR. BLOCK:  -- and what he -- she
25 just asked him.  So, your Honor, that is a --

Page 494

1     SPECIAL MASTER:  Miss Brown, please,
2 Miss Brown, let Mr. Block finish and you can be
3 heard.
4     MR. BLOCK:  So I think after
5 Miss Brown's done questioning, I'd like to be heard
6 about whether that was a waiver and then what the
7 scope of the waiver would be.  But I say it now so
8 that Miss Brown knows that any further questions
9 about what Mr. O'Shaughnessy reviewed or did not
10 review before giving his final approval to these
11 Interrogatories that included that statement, in my
12 view, is a waiver.  And I will just say that now
13 that she's gotten that one question and answer and
14 if that's it, then we could take it up at a break.
15 If it's not, then I think we should take it up now.
16     SPECIAL MASTER:  Can we hear from
17 Miss Brown?
18     MS. BROWN:  Judge, you're a little
19 hard to hear, I don't know if it's just on my end.
20     VIDEOGRAPHER:  Yeah, no, I'm having
21 trouble picking him up as well.
22     MR. BLOCK:  No, that is -- we're
23 having a hard time hearing you, judge.
24     (Court Reporter clarification.)
25     SPECIAL MASTER:  I just turned up the

Page 495

1 volume on the computer.
2          Andrea, for my benefit, can you
3 please repeat the last question and answer and then
4 we'll hear from Miss Brown.
5     MR. BLOCK:  And, your Honor, if she
6 could please read back, it might take a couple of
7 questions, 'cause there was sort of an intro about
8 the Battelle documents and then ultimately it was
9 did you review those Battelle documents before, you
10 know, these Interrogatories were certified or
11 something along those lines.  So that chunk of
12 questioning and answering.
13     SPECIAL MASTER:  Sure.
14     (The following Questions and Answers
15 are read back:
16     "QUESTION:  And you were specifically
17 asked questions about a response to Interrogatory
18 Number 17 in which the response was that, 'To the
19 best of defendant's knowledge, talc used in the
20 manufacture of Johnson & Johnson's Baby Powder never
21 contained asbestos in any form, or tremolite.'
22     "Do you remember questions about
23 that?
24     "ANSWER:  Yes.
25     "QUESTION:  And then you were shown

59 (Pages 492 - 495)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

O'SHAUGHNESSY - Cross

Page 496

1 some documents from the 1960s reporting what
2 appeared to be trace amounts of tremolite.
3         "Do you remember that line of
4 questions?
5         "MR. BLOCK: Objection to form.
6         "ANSWER: Yes. I'm sorry, yes,
7 that's right.
8         "QUESTION: Okay. First of all, did
9 you review and analyze that Battelle document to
10 determine whether or not the tremolite finding was
11 tremolite or tremolite asbestos?
12         "MR. BLOCK: Objection to form.
13         "ANSWER: No. No, I didn't do
14 anything like that.
15         "QUESTION: Are you aware --" )
16         SPECIAL MASTER: Okay, Miss Brown,
17 you want to be heard on that?
18         As I understood the question, it was
19 only directed to that one specific document. The
20 witness wasn't asked what he relied upon if, to
21 approve or bless, what have you, that answer to
22 Interrogatories.
23         So I just want -- that's my
24 understanding of the question. It was only directed
25 to that one specific document, so...

Page 497

1         MS. BROWN: Yeah, thank you. Thanks,
2 judge.
3         MR. BLOCK: Your Honor --
4         MS. BROWN: Real quick, your Honor
5 made the point better than I would have. That's
6 exactly right. Counsel suggested that I had, in
7 some way, asked what he had reviewed before this
8 Interrogatory.
9         It was two separate questions. We
10 started here and then I said you remember you were
11 shown this other one. Did you review that document,
12 like here in the deposition, to determine
13 asbestiform/nonasbestiform.
14         I am not intending to ask what he
15 reviewed to verify these Interrogatories as that is
16 most certainly privileged. And then my question was
17 not even close to the line on that. It was a
18 document Mr. Block showed him, and I asked about
19 whether he took the time to go through that to
20 figure out whether the tremolite listing there was
21 asbestiform or nonasbestiform.
22         So I only have two more questions
23 here, they will certainly not go into an area of
24 what privileged material he reviewed to inform this
25 response and that will be the end of this document.

Page 498

1         MR. BLOCK: Your Honor, it's our
2 position that if Miss Brown asked this witness for
3 mental impressions such as whether he analyzed
4 documents to determine whether the references were
5 to tremolite or tremolite asbestos, then we can also
6 ask the witness about his mental impressions about
7 testing documents. I mean, it has to go both ways,
8 your Honor.
9         MS. BROWN: I'm following up on --
10         SPECIAL MASTER: Hold on.
11         Miss Brown, we'll get to that when
12 the opportunity arises. After you finish your
13 questioning --
14         MR. BLOCK: Okay.
15         SPECIAL MASTER: -- Mr. Block will
16 question and if you have an objection, assert it and
17 we'll deal with it.
18         MR. BLOCK: All right. Also, could
19 we get, I mean, an estimate of time or else I think
20 I need a break. I mean, we've been going for a
21 while. Miss Brown's been going for a while.
22         MS. BROWN: I'm going to be done with
23 everything in less than ten minutes.
24         MR. BLOCK: Well, I'm going to need
25 like a minute break anyway before I go, so we either

Page 499

1 could take a five-minute break now or if you want to
2 finish your questioning then we can take five
3 minutes then.
4         MS. BROWN: Let's do this, I want to
5 finish making a very clear record about this
6 extensive objection. My question was whether the
7 document that Mr. Block put in front of this witness
8 was analyzed here in this deposition or whether or
9 not the tremolite that counsel put on the screen was
10 asbestiform or nonasbestiform.
11         Although counsel represented that I
12 linked that to these Interrogatory responses, I did
13 not, and they are two very different questions, and
14 I have no intention nor did I of asking what he
15 reviewed before verifying this response.
16         With that, I am happy to take a break
17 and I can tell everyone --
18         SPECIAL MASTER: I appreciate your
19 clarification. Can we just confirm that your
20 understanding of what you intended to ask was what
21 the witness intended when he answered the question;
22 that he intended to answer the question only as to
23 what he saw today and not with regard to these
24 Answers to Interrogatories. I think it would be
25 helpful if the record reflected --

60 (Pages 496 - 499)

O'SHAUGHNESSY - Cross

Page 500

1      MR. BLOCK:  Yeah, your Honor, I would
2  request that be clarified when we come back, you
3  know, in Miss Brown's questioning.
4      MS. BROWN:  Yeah, I'll gladly
5  rephrase that question, and your Honor is a hundred
6  percent right and I will make clear on the record.
7  My question was directed towards his contemporaneous
8  review in this deposition of that document and it
9  was entirely divorced from the document I have on
10  the screen, and I'd be glad to clarify that when we
11  come back.
12      MR. BLOCK:  Yeah.  And if it has
13  nothing to do with the document on the screen, then
14  Miss Brown should not have this document on the
15  screen when she's asking the question as she did
16  before.
17      MS. BROWN:  That's Miss Brown's
18  decision of how she wants to question, but, in any
19  event, I'm happy to clarify when we come back.
20      SPECIAL MASTER:  Time for a break.
21      MS. BROWN:  Okay, thank you.
22      VIDEOGRAPHER:  All right, stand by.
23  Going off the record, 3:37 p.m.
24      This is the end of Media Unit 4.
25      (Recess:  3:37 p.m. to 3:54 p.m.,

Page 501

1  Eastern Standard Time.)
2      VIDEOGRAPHER:  Going back on the
3  record, 3:54 p.m.
4      And this is the beginning of Media
5  Unit 5.  Okay.
6      MR. BLOCK:  Can we please have the
7  last question and answer read back.
8      (The following Questions and Answers
9  are read back:
10  "QUESTION:  Okay.  First of all, did
11  you review and analyze that Battelle document to
12  determine whether or not the tremolite finding was
13  tremolite or tremolite asbestos?
14  "MR. BLOCK:  Objection to form.
15  "ANSWER:  No.  No, I didn't do
16  anything like that.
17  "QUESTION:  Are you aware --")
18  BY MS. BROWN:
19      Q.  Mr. O'Shaughnessy, picking up where
20  we left off, when I asked you that question about
21  that Battelle document, what was your understanding
22  of what I was talking about?
23      A.   I was answering with respect to what
24  happened during the deposition today.
25      Q.  And I will share with you what was

Page 502

1  marked during the deposition as Exhibit 15A, and do
2  you recognize this document, this Battelle document,
3  as the Battelle exhibit that you were shown during
4  your deposition today?
5      A.  Yes.
6      Q.  And if we go to page 13, do you
7  recognize this Table 8 as a chart that you were
8  shown during your deposition today?
9      A.  Yes, I think so.
10      Q.  And to be more precise for my
11  question, Mr. O'Shaughnessy, when you were shown
12  this document during your deposition today, did you
13  analyze the document or the testing to determine
14  whether the tremolite reference here is
15  nonasbestiform tremolite or asbestiform tremolite?
16      MR. BLOCK:  Objection; form and
17  foundation.
18      A.  No, I wasn't doing that.
19      Q.  Mr. O'Shaughnessy, Mr. O'Shaughnessy,
20  you were asked a number of questions during the
21  course of your deposition about statements you
22  reviewed or court documents you reviewed that stated
23  that Johnson's Baby Powder is asbestos-free.
24      Do you recall those questions?
25      A.  Yes.

Page 503

1      Q.  Mr. O'Shaughnessy, sitting here
2  today, several years after you've retired from
3  Johnson & Johnson, do you still stand by the
4  statements that you made and approved that Johnson's
5  Baby Powder is asbestos-free?
6      MR. BLOCK:  Objection; form and
7  foundation.
8      A.  Yes, I do.
9      Q.  And why is that, Mr. O'Shaughnessy?
10      MR. BLOCK:  Objection; form and
11  foundation.
12      A.  'Cause I believe that they are
13  accurate.
14      Q.  Thanks very much, Mr. O'Shaughnessy,
15  for your time today.
16      MS. BROWN:  I have no further
17  questions.
18      MR. BLOCK:  I have some follow-up
19  questions.
20  REDIRECT EXAMINATION BY MR. BLOCK:
21      Q.  Mr. O'Shaughnessy, could you identify
22  any specific evidence, any specific document that
23  supports the statement that you just made to this
24  jury that you believe that Johnson's Baby Powder is
25  and has always been asbestos-free?

61 (Pages 500 - 503)

O'SHAUGHNESSY - Redirect

Page 504

1    A.    No, not as I sit here today, after --
2    Q.    Can you identify --
3          MS. BROWN:  Jerry, he was still
4 talking, I'm just going to ask that you let him
5 finish his answer before you ask your next question.
6    A.    No --
7    Q.    Your answer --
8    A.    No, so many years after the fact.
9    Q.    Can you identify any specific
10 scientist that ever worked at Johnson & Johnson that
11 you're relying upon for the statement that you just gave
12 to this jury that there has never been asbestos in
13 Johnson's Baby Powder, even as we sit here today in
14 2021?
15         MS. BROWN:  Objection; misstates the
16 question, lacks foundation.
17    A.    It would be the totality of the
18 people I discussed that issue with over the years at
19 Johnson & Johnson.
20    Q.    Can you name one, any scientist by
21 name who you're relying upon for the statement that
22 you just gave to this jury that as of today, in
23 2021, there has never been asbestos in Johnson's
24 Baby Powder?
25         MS. BROWN:  That absolutely misstates

Page 505

1 his testimony and the question, I object.
2          MR. BLOCK:  Excuse me, excuse me,
3 let's have the question read back so it could be
4 answered.
5          (The following Question is read back:
6          "QUESTION:  Can you name one, any
7 scientist by name who you're relying upon for the
8 statement that you just gave to this jury that as of
9 today, in 2021, there has never been asbestos in
10 Johnson's Baby Powder?")
11         MS. BROWN:  I have the same objection
12 that that misstates his testimony and the question.
13         MR. BLOCK:  Please answer the
14 question, sir.
15    A.    Again, it would be, it would be all
16 of the scientists and people I spoke with at Johnson
17 & Johnson and in my work as a whole on the
18 litigation.
19    Q.    Can you name any scientist who you're
20 relying upon, anyone by name?
21         MS. BROWN:  It's been asked and
22 answered many times.  I object.
23    A.    It would be all of them.
24    Q.    Can you name any scientist by name?
25 You're saying all of them.  Name one.

Page 506

1          MS. BROWN:  Same objection.  He just
2 answered that.
3    A.    The scientists I dealt with,
4 Chudkowski, Ashton, Hodgkins (sic), and others, I
5 don't recall their names.
6    Q.    Okay.  You said Michael Chudkowski?
7    A.    Yeah.
8    Q.    Did Michael Chudkowski tell you that
9 there was never asbestos in Johnson's Baby Powder?
10    A.    I don't recall specific discussions
11 with any of them, but that subject came up and the
12 statement that it does not contain asbestos or the
13 fact it does not contain asbestos, yes, was
14 discussed with all of them.
15    Q.    Okay.  And to the best of your
16 recollection, Mike Chudkowski, William Ashton and
17 Dr. John Hopkins all told you that there was never
18 asbestos in Johnson's Baby Powder, correct?
19    A.    Those conversations I don't recall
20 the specifics of, but yes, that was the gist of the
21 information I received from the company.
22    Q.    And did Michael Chudkowski, William
23 Ashton or Dr. John Hopkins show you the documents
24 that Johnson & Johnson had discussing asbestos in
25 talc?

Page 507

1          MS. BROWN:  Objection; vague.
2    A.    I don't recall all of the
3 circumstances of the many meetings, you know, that I
4 had along with outside counsel with the scientists
5 at Johnson & Johnson.  I don't recall specifically
6 what documents we may or may not have been talking
7 about or that I may have saw during any of those
8 meetings.
9    Q.    You said as you sit here today, you
10 still believe that there was never asbestos in
11 Johnson's Baby Powder, right?
12         That's what you just testified to in
13 response to Miss Brown's testimony, right?
14         MS. BROWN:  Objection.
15    A.    Yeah.
16    Q.    And can you identify any documents
17 you reviewed that supports the statement you just
18 made to the jury?
19         MS. BROWN:  Object; asked and
20 answered.
21    A.    I can't identify any specific
22 documents, but I have seen documents at the company
23 that do support that statement.
24    Q.    Can you identify any testing done at
25 any time that you reviewed that support the

62 (Pages 504 - 507)

O'SHAUGHNESSY - Redirect

Page 508

1 statement that you just made to the jury that you
2 believe that there's never been asbestos in
3 Johnson's Baby Powder, even as of today?
4        MS. BROWN:  Misstates his testimony
5 and I object as asked and answered multiple times.
6    A.    I'll try it again.  I think I, what I
7 was conveying is that, you know, based on my
8 experience at the company while I was there, that
9 was certainly the view of the company and in
10 preparing cases for litigation, you know, we would
11 review materials with the company.  I can't
12 specifically identify them right now, I can't, if
13 that answers your question, but there were some.
14    Q.    Mr. O'Shaughnessy, in response to
15 questioning from J&J's lawyer, you acknowledge that
16 you're not a scientist, right?
17    A.    That's right.
18    Q.    And you're a lawyer and you litigated
19 cases for Johnson & Johnson, right?
20    A.    That's correct.
21    Q.    Would you be someone at Johnson &
22 Johnson that would recommend what scientists Johnson
23 & Johnson should use when they were opposing the
24 NTP's listing of talc as a carcinogen; would you
25 recommend scientists?

Page 509

1    A.    No.
2    Q.    You would never do that?
3    A.    No, I don't recall ever doing that.
4    Q.    All right.  Let's take a look at
5 Exhibit 45 to your deposition.  And if you look at
6 binder number 2, Exhibit 45 is a e-mail chain.  And
7 if we start on page 2, if you just flip into the
8 second page, do you see that there's an e-mail from
9 Steven Mann?
10    A.    Yes.
11    Q.    And do you see that Steven Mann is
12 sending an e-mail to Sarah Colamarino and Marc
13 Monseau and also to you and other people.
14        Do you see that?
15    A.    Yes.
16    Q.    All right.  And this is June 2nd,
17 2004, right?
18    A.    June 2nd, 2004, yes.
19        VIDEOGRAPHER:  I'm sorry, I'm losing
20 the witness' image off of the screen.  Okay.
21 BY MR. BLOCK:
22    Q.    All right.  The e-mail from Steven
23 Mann is June 2nd, 2004, correct?
24    A.    Yes.
25    Q.    And June 2nd, 2004, is about, it's

Page 510

1 about two or three months after you were e-mailing
2 with Miss Colamarino and Dr. Mann and Mr. Monseau
3 about the Forensic Analytical testing that reported
4 finding asbestos in Johnson's Baby Powder, right?
5    A.    Yes.
6    Q.    All right.  And the subject of the
7 e-mail to you on June 2nd, 2004, is talc conference
8 call minutes, right?
9    A.    Yes.
10    Q.    And Dr. Mann mentions a Dr. Judith
11 Jones.
12        Do you see that?
13    A.    Yes.
14    Q.    And he characterized Dr. Judith Jones
15 as a strong supporter.
16        Do you see that?
17    A.    Yes.
18    Q.    All right.  And then you replied to
19 that e-mail, didn't you?
20    A.    Yes, I did.
21    Q.    And your e-mail from June 3rd, 2004,
22 says, "Steven:  Dr. Judith Jones was not on the NTP
23 committee.  Rather, she was a presenter.  We asked
24 her to become involved.  She is an epidemiologist
25 and I'm sure would work with us again.  She's right

Page 511

1 in DC.  John."
2        That was from you, right?
3    A.    Yes.
4    Q.    And then you could see, and you wrote
5 that to Dr. Steven Mann, a toxicologist at Johnson &
6 Johnson, right?
7    A.    I did.
8    Q.    And then Steven Mann writes above
9 your e-mail to Linda Loretz of the CTFA -- I'm
10 sorry, Steven Mann writes to Linda.
11        You see that?  It appears to be Linda
12 Loretz from the CTFA.
13    A.    Yes.
14    Q.    And Dr. Mann writes, "Linda, I
15 believe you were copied on John O'Shaughnessy's
16 comment about Judith Jones not being on the NTP
17 panel but a presenter for us."
18        Do you see that?
19    A.    Yes.
20    Q.    Okay.  And Dr. Mann, at the top
21 e-mail, says, "Linda, do you have contact
22 information for Judith Jones?  John O'Shaughnessy
23 thinks we should use her again."
24        Do you see that?
25    A.    I do.

63 (Pages 508 - 511)

O'SHAUGHNESSY - Redirect

Page 512

1    Q.    Okay.  So you did recommend a
2  scientist, Judith Jones, for Johnson & Johnson to
3  use in regard to the NTP review on talc.  You did do
4  that, didn't you, sir?
5    A.    Yeah, what I said was apparently,
6  apparently Judith Jones worked with the company
7  before and I was aware of that, so I corrected Mr.
8  Man's statement, and I was suggesting that they may
9  want to work with her again because she's right in
10 DC.
11   Q.    So when Dr. Mann said, "John
12 O'Shaughnessy thinks we should use her again," did
13 he misunderstand you?
14   A.    No, I don't think so.
15   Q.    Okay.
16   A.    Work with her again.
17   Q.    You were asked about Exhibit 7, which
18 was the summary of the proceedings at the workshop
19 that was jointly sponsored by the International
20 Society of Regulatory Toxicology and Pharmacology
21 and the FDA.
22         Do you remember that?
23   A.    I do.
24   Q.    And that's the one where you were
25 identified in the proceedings as John O'Shaughnessy

Page 513

1  from Princeton, no mention of Johnson & Johnson,
2  right?
3    A.    That's right.
4    Q.    Okay.  And Miss Brown asked you to
5  read certain portions of these proceedings.
6          Do you remember that?
7    A.    I do.
8    Q.    And it's true that at those
9  proceedings, Dr. Gettings, on behalf of the CTFA,
10 including Johnson & Johnson, told the FDA officials
11 that there was no asbestos fibers in cosmetic talc,
12 correct?
13         MS. BROWN:  Objection; misstates the
14 document.
15   A.    Can you just move it to the left a
16 little bit, please?
17   Q.    Sure.
18   A.    I'm sorry.  I'm going to --
19   Q.    Here it is.  Do you see it right big
20 on the screen, that in summarizing Dr. Gettings'
21 comments to the FDA officials and the other
22 participants, it says, "Today stringent safety and
23 quality control measures ensure the absence of
24 asbestos fibers"?
25   A.    Yes.

Page 514

1    Q.    Do you see that?
2    A.    Yes.
3    Q.    And Johnson & Johnson, when you
4  worked for the company, always told the FDA that
5  there was no asbestos in cosmetic talc, correct?
6          MS. BROWN:  Objection; foundation.
7    A.    I wouldn't be privy to everything
8  they told them, but I believe that's correct, that
9  was certainly their position.
10   Q.    Okay.  Now, you were asked about
11 Exhibit 37.  You were asked about Exhibit 37 and
12 about your statement that I have assembled those
13 documents and I have them.
14         Do you remember that?
15   A.    I do.
16   Q.    I put the statement up on the screen,
17 your statement on August 13, 2001, "I have assembled
18 those documents and have them."
19         Do you see that?
20   A.    I do.
21   Q.    Okay.  And then I want to just make
22 sure what you were explaining to the jury.
23         Were you saying to the jury that the
24 documents were actually assembled by lawyers,
25 including primarily the law firm of Mehaffy & Weber

Page 515

1  and Gene Williams who was an attorney there?
2          MS. BROWN:  I am going to object and
3  hold on a second here.
4          Mr. O'Shaughnessy, I'm going to
5  instruct you not to reveal any specific interaction
6  you had with particular outside counsel and the work
7  that particular outside counsel would have done in a
8  particular litigation.  You can talk generally, of
9  course, as it relates to this document, but I
10 caution you on the specifics.
11         MR. BLOCK:  Your Honor, your Honor,
12 I'd like to request a sidebar so we can get a read
13 back of Mr. O'Shaughnessy's testimony.
14         He already testified that the
15 documents were gathered by the lawyers and I believe
16 he already testified that the main law firm who
17 gathered and assembled the documents was Gene
18 Williams and Mehaffy & Weber, and that the outside
19 law firms would gather the documents and put them
20 together, and I was following up on that.
21         But then since we're going to have
22 these objections, we can go to sidebar and we can
23 get a read back of that testimony, then hopefully we
24 can have some guidance from you about the parameters
25 of my questioning in response to that.

64 (Pages 512 - 515)

O'SHAUGHNESSY - Redirect

Page 516

1    SPECIAL MASTER:  Let's go sidebar.
2    MR. BLOCK:  Thank you.
3    (Sidebar.)
4    SPECIAL MASTER:  I think a good place
5 to start, sorry to bother you, Andrea, if you can
6 just repeat the question that was last asked and
7 we'll go from there.
8    (The following Question is read back:
9    "QUESTION:  Okay.  And then I want to
10 just make sure what you were explaining to the jury.
11    Were you saying to the jury that the
12 documents were actually assembled by lawyers,
13 including primarily the law firm of Mehaffy & Weber
14 and Gene Williams who was an attorney there?")
15    SPECIAL MASTER:  J&J, the argument
16 plaintiffs made is that this door was already
17 opened; what say you?
18    MS. BROWN:  Thanks, judge.  Couple of
19 things.  Certainly I understand what
20 Mr. O'Shaughnessy's testimony was and my instruction
21 was simply not to go beyond that.
22    He did testify that the documents
23 were put together in litigation and primarily by
24 Gene Williams and Mehaffy & Weber.  I was just
25 cautioning him not to reveal specific work that

Page 517

1 would have been done in a specific case.
2    But if the extent of this inquiry is
3 Gene Williams and Mehaffy & Weber, I agree he has
4 already testified to that, and I agree that's, you
5 know, consistent with the produced document and I
6 don't have an objection to that.
7    SPECIAL MASTER:  Mr. Block, why don't
8 we have the witness answer this question.
9 Essentially, you're just asking him to confirm his
10 earlier testimony and if there's an objection to the
11 follow-up question or questions, we'll deal with it.
12    MR. BLOCK:  I agree.  We can go back,
13 have the question read back, have the witness answer
14 and then we'll just go forward and see where it
15 goes.
16    MS. BROWN:  Well, I mean, if you're
17 intending to go further in terms of specific cases,
18 why not just deal with that now that we're at
19 sidebar?
20    MR. BLOCK:  I am not -- I don't know
21 what I'm intending to ask next, okay.  I'm not going
22 to --
23    MS. BROWN:  I'm going to object to
24 that, so if you want to --
25    MR. BLOCK:  That's fine.  I can't

Page 518

1 think of anything that we should talk about now that
2 is hypothetical.  We may not have any issues, we may
3 have issues, I don't know, but just --
4    SPECIAL MASTER:  Let's go back on the
5 record.  I'd rather deal with a concrete question
6 and answer.
7    MR. BLOCK:  Right.  Thank you very
8 much.
9    MS. BROWN:  Thank you.
10    (Sidebar ends.)
11    VIDEOGRAPHER:  Back on the record,
12 4:18 p.m.  Okay.
13    We're on.  You may proceed.
14    MR. BLOCK:  Okay.  Could we have the
15 last question read back, please.
16    (The following Question is read back:
17    "QUESTION:  Okay.  And then I want to
18 just make sure what you were explaining to the jury.
19    Were you saying to the jury that the
20 documents were actually assembled by lawyers,
21 including primarily the law firm of Mehaffy & Weber
22 and Gene Williams who was an attorney there?")
23    MR. BLOCK:  Please answer the
24 question.
25    A.   Yes, as part of the litigation in the

Page 519

1 document collection process it would have been
2 collected and I believe Gene Williams' firm would
3 have been part of that.
4    Q.   And Gene Williams' firm was Mehaffy &
5 Weber, correct?
6    A.   Yes.
7    Q.   And that is the same Mehaffy & Weber
8 law firm that wrote you on March 16, 1998, to tell
9 you that Dr. Blount had tested Johnson's Baby Powder
10 and determined that it contained asbestos, correct?
11    MS. BROWN:  Objection; misstates the
12 document.
13    A.   That's -- the document we discussed
14 from Dr. Blount, yes.
15    Q.   It's the same Mehaffy & Weber that
16 sent you the document, the letter in March of 1998,
17 that reported on their conversations with
18 Dr. Blount, correct?
19    A.   That's right.
20    Q.   And reported to you that Dr. Blount's
21 opinion was that Johnson & Johnson Baby Powder
22 contained trace amounts of asbestos, correct?
23    A.   Yeah, I think that's her reported
24 findings, yes.
25    Q.   All right.  And Gene Williams from

65 (Pages 516 - 519)

O'SHAUGHNESSY - Redirect

Page 520

1  Mehaffy & Weber, that's the same Mehaffy & Weber law
2  firm that Dr. Blount herself wrote to on April 23rd,
3  1998, correct?
4      A.    That's the same firm.
5      Q.    And GMW on the top right of
6  Dr. Blount's letter to Mehaffy & Weber are the
7  initials of Gene Williams, the head lawyer at
8  Mehaffy & Weber and the person in charge of
9  assembling all of the documents for Johnson &
10 Johnson relating to talc, correct?
11         MS. BROWN:  Objection; misstates
12 testimony.
13     A.    I'm not -- I'm not looking at the
14 GW -- the initials right now, and I don't
15 know -- can you just tell me the document number
16 quickly?
17     Q.    Sure.  If you look at Exhibit 12,
18 we're looking at Dr. Blount's letter to the law firm
19 of Mehaffy & Weber.
20     A.    I see what you're referring to now.
21 It could be his initials, I'm not sure.
22     Q.    Okay.  Well, his first name is Gene,
23 G, and his last name is Williams, right?
24     A.    Right.
25     Q.    You just don't know if his middle

Page 521

1  initial is M?
2      A.    I don't.
3      Q.    Okay.  But again, Dr. Blount, on
4  April 23rd, 1998, sent this letter to Mehaffy &
5  Weber and she enclosed a report about asbestos in
6  talc and she enclosed two articles, one from 1990
7  and one from 1991 in this article to Mehaffy &
8  Weber, right?
9      A.    Yes, that's in the document, yes.
10     Q.    And in her own letter that she signed
11 to Mehaffy & Weber, she said, "As I told you, I
12 believe that Johnson & Johnson's Vermont talc
13 contains trace amounts of asbestos."
14         That's what her letter says, right?
15     A.    As I told you, I believe -- yes.
16     Q.    And she's saying this in the letter
17 to the Mehaffy & Weber law firm, which was the law
18 firm that collected all the documents regarding talc
19 for Johnson & Johnson, right?
20         MS. BROWN:  No, I object.  That
21 misstates his testimony and Exhibit 37.
22     A.    It was the same Mehaffy & Weber that
23 Gene Williams had and they were involved in document
24 collection.  They probably weren't the only firm
25 because, you know, these things, there were many

Page 522

1  cases, but yes.
2      Q.    And in Exhibit 37, in your e-mail
3  when you said, "I have assembled those documents,"
4  you were referring to the documents that were
5  assembled by law firms, and the law firm that you
6  identified as the primary law firm was Mehaffy &
7  Weber, right?
8      A.    Yes.
9      Q.    And when you said that you have them,
10 right, that was part of your e-mail, that I have
11 them, you're talking about yourself, John
12 O'Shaughnessy, right?
13     A.    I am talking about that I, as the
14 person in the law department responsible for
15 litigation, had those.  I didn't have them in my
16 office.  They were available, you know, through our
17 lawyers and I could make them available to those
18 people if they wanted them.
19     Q.    Okay.  So when you say, "assembled,"
20 that word means to bring, the documents have been
21 brought together and put somewhere, right?
22     A.    Yeah.
23     Q.    Where were they at this time in 2001?
24     A.    I don't recall.  Either at the law
25 firm or somewhere else where they store documents.

Page 523

1      Q.    And when you say, "at the law firm,"
2  do you mean Mehaffy & Weber?
3      A.    Primarily, yeah.
4      Q.    And because Mehaffy & Weber was the
5  law firm that was the lead law firm outside Johnson
6  & Johnson handling Johnson's Baby Powder litigation?
7      A.    Yes.
8      Q.    Mr. O'Shaughnessy, you were asked
9  whether you enjoyed working at Johnson & Johnson.
10         Do you remember that?
11     A.    I did, yeah.
12     Q.    And working at Johnson & Johnson also
13 had financial benefits to you, correct, sir?
14     A.    I was paid.
15     Q.    Okay.  Do you own shares of Johnson &
16 Johnson stock?
17     A.    Right now I do, yes.
18     Q.    Okay.  How many shares of Johnson &
19 Johnson stock do you currently own?
20     A.    I think about 3,000.
21     Q.    And is that the largest number of
22 Johnson & Johnson shares of stock that you have
23 owned or have you owned more and then sold some over
24 time?
25     A.    Yes, the latter.

66 (Pages 520 - 523)

O'SHAUGHNESSY - Redirect

Page 524

1    Q.    And what was the most amount of
2  Johnson & Johnson shares of stock that you owned
3  before you sold some of it?
4    A.    I don't recall.  I don't recall over
5  time.
6    Q.    Was it over 5,000 shares of Johnson &
7  Johnson stock?
8    A.    Could have been, yes.
9    Q.    Over 10,000 shares of Johnson &
10 Johnson stock?
11   A.    I'm not sure if I accumulated any of
12 those all at once, yeah.
13   Q.    Okay.  Sir, do you have a pension
14 that you get paid through Johnson & Johnson?
15   A.    I do.
16   Q.    Okay.  And are those monthly payments
17 or weekly payments?
18   A.    They come in monthly.
19   Q.    Okay.  And do you have a 401(k)
20 through Johnson & Johnson or is that separate or
21 distinct from the pension?
22   A.    It's separate and the 401(k) is, it's
23 over.  I still maintain what I have there at Johnson
24 & Johnson, but it's --
25   Q.    Okay.

Page 525

1    A.    My understanding is it's over.
2    Q.    Okay.  And do you have any other
3  financial benefits that you currently receive from
4  Johnson & Johnson?
5    A.    No.
6    Q.    Do you still have -- you were asked
7  about your family.
8    A.    Yes.
9    Q.    And you're a father.  And --
10   A.    I'm not a father --
11   Q.    I said, sir, you're a father,
12 correct?
13   A.    Oh, yes, yes.
14   Q.    Okay.  Do you have any children that
15 work at Johnson & Johnson?
16   A.    Yes, my son John does.
17   Q.    Okay.  So you have a son that works
18 at Johnson & Johnson.  Do you have any close friends
19 that still work at Johnson & Johnson?
20   A.    Yeah, I have friends who work at
21 Johnson & Johnson.  I consider them my friends.  You
22 know, I don't have that much contact with them.
23   Q.    Thank you, Mr. O'Shaughnessy.
24         MS. BROWN:  Just a couple of quick
25 follow-ups, Mr. O'Shaughnessy.

Page 526

1  RECROSS-EXAMINATION BY MS. BROWN:
2    Q.    I asked you if you stood by the
3  statements that you made and approved during the
4  time you worked at Johnson & Johnson that there was
5  no asbestos in baby powder.
6         Do you remember that?
7    A.    I do.
8    Q.    And it's true that you do, right,
9  sir?
10   A.    I do.
11   Q.    And counsel asked you to name all of
12 the people that you relied on over the 31 years that
13 you worked there to support those statements.
14        Do you remember that?
15        MR. BLOCK:  Objection to form.
16   A.    I do.
17   Q.    Can you remember, sitting here today,
18 every scientist, inside the company or outside the
19 company, that you worked with and spoke to on issues
20 relating to talc?
21   A.    No.
22   Q.    You mentioned a couple of folks, Mr.
23 Ashton being one of them.  Is that right?
24   A.    Yes.
25   Q.    And what do you remember about Mr.

Page 527

1  Ashton, Mr. O'Shaughnessy?
2    A.    I remember he was a senior person and
3  I recollect that he had a lot of knowledge with
4  respect to talc ore and talc deposits and that sort
5  of thing and had been working in, with respect to
6  talc, I think, most of his professional life.
7    Q.    And you mentioned Dr. Hopkins was
8  another scientist that you relied on and spoke with
9  and dealt with on issues of talc safety.  Is that
10 right?
11   A.    Right.
12   Q.    And what do you remember about
13 Dr. Hopkins?
14   A.    I remember Dr. Hopkins, you know, I
15 remember my first contact with him, I think it was
16 when he came over, it might have been in the UK, but
17 he came over here.  I remember that he was a
18 toxicologist and he had been working on talc for a
19 while with Johnson & Johnson as well.
20   Q.    And what about Michael Chudkowski,
21 what do you remember about him?
22   A.    Michael Chudkowski was a toxicologist
23 who worked at J&J as well.  He was, I think he was
24 kind of on the age or close to the age level of John
25 Ashton when he was there, when I met him, I'm sorry

67 (Pages 524 - 527)

O'SHAUGHNESSY - Recross

Page 528

1    Q.    And did you rely on scientists like
2  Mr. Chudkowski, Mr. Ashton, Dr. Hopkins, and others,
3  to provide you information about talc?
4    A.    Yes.
5    Q.    And sitting here today, all these
6  years later, are you able to give our jurors a
7  complete list of everybody's name who you relied on
8  for various pieces of information about talc?
9    A.    No.
10   Q.    You were asked some questions again
11  about Exhibit 37 that I just want to go back to
12  briefly, if we could.
13         This was a document where you said
14  that Johnson & Johnson, back in the 1970s, developed
15  proof that its talc was free of asbestos.
16         Do you remember that?
17   A.    Yes.
18   Q.    And you told us about some documents
19  that you had been -- you had assembled, that you
20  offered to the folks on this e-mail, right?
21   A.    Yes.
22   Q.    And is it true, Mr. O'Shaughnessy,
23  that the scientists on this e-mail didn't take you
24  up on your offer for those documents?
25         MR. BLOCK:  Objection to form.

Page 529

1    A.    I believe I testified before, yeah,
2  there was never a request then because they didn't
3  take me up on my suggestion.
4    Q.    And in terms of your work on the Talc
5  Advisory Committee and the Talc Steering Committee,
6  did you become aware of whether or not folks on that
7  committee had access to their own scientific
8  information about talc?
9         MR. BLOCK:  Objection to form;
10  foundation.
11   A.    Well, I knew that already because the
12  documents we had assembled were documents from the
13  company that we got from the company from those
14  people included.
15   Q.    So in terms of the documents that the
16  lawyers packaged together for your job, where did
17  they get them?
18         MR. BLOCK:  Objection to form;
19  foundation.
20   A.    From the company.
21   Q.    And, I mean, would it be fair to
22  suggest, Mr. O'Shaughnessy, that the scientists at
23  the company were relying on lawyers for scientific
24  information?
25         MR. BLOCK:  Objection to form.

Page 530

1    A.    No.
2         MR. BLOCK:  Foundation.
3    A.    No, that's --
4    Q.    Were you offering to the scientists
5  some documents you had packaged up because the
6  scientists didn't know about them?
7         MR. BLOCK:  Objection to form;
8  foundation.
9    A.    I was just telling them that we had
10  these documents from the company in one place if
11  they needed them.
12   Q.    From time to time, Mr. O'Shaughnessy,
13  dating back to the 1970s, did you learn that the
14  company became aware of reports of asbestos in talc?
15         MR. BLOCK:  Objection to form;
16  foundation.
17   A.    I recall reports like that from time
18  to time and I think some of them were from the early
19  part of the '70s or from the '70s.
20         MR. BLOCK:  Objection.  Move to
21  strike the portion that was not responsive.
22  BY MS. BROWN:
23   Q.    And based on your work, for example,
24  with the Worldwide Steering Committee, what was your
25  understanding about what the company did in

Page 531

1  response?
2         MR. BLOCK:  Objection to form;
3  foundation.
4    A.    I don't recall the specifics, but the
5  company would have examined that situation and tried
6  to understand, you know, why there was a finding and
7  that sort of thing.
8         MR. BLOCK:  Move to strike the
9  portion that was not responsive.
10  BY MS. BROWN:
11   Q.    When you wrote J&J, back in the '70s,
12  developed proof that its talc was free from
13  asbestos, did you believe that to be true?
14         MR. BLOCK:  Objection; form.
15   A.    Yes.
16   Q.    And did you rely on scientists like
17  Dr. Hopkins, Mr. Ashton, Mike Chudkowski and others
18  to provide information to support your statements
19  like this?
20         MR. BLOCK:  Objection to form;
21  foundation.
22   A.    It was part of the background for my
23  making the statement, yes.
24   Q.    And based on all of your 31 years
25  working at Johnson & Johnson, did the lawyers direct

68 (Pages 528 - 531)

O'SHAUGHNESSY - Redirect

Page 532

1 science at Johnson & Johnson?
2        MR. BLOCK:  Objection to form;
3 foundation.
4    A.    No.
5        MS. BROWN:  That's all I have.
6 Thanks, Mr. O'Shaughnessy.
7 FURTHER REDIRECT EXAMINATION BY MR. BLOCK:
8    Q.    Mr. O'Shaughnessy -- can you just
9 take down the share screen?
10        MS. BROWN:  Sure, sorry.
11 BY MR. BLOCK:
12    Q.    Mr. O'Shaughnessy, in response to
13 Johnson & Johnson's lawyer's questioning, you just
14 said that Bill Ashton was one of the scientists at
15 Johnson & Johnson that you relied upon for
16 information about talc.  Is that correct?
17    A.    That's correct.
18    Q.    And you said that you relied upon him
19 to give you information about talc, including
20 information about talc and asbestos, right?
21    A.    Yes, I believe that would be
22 included.
23    Q.    And you knew Bill Ashton personally,
24 right?
25    A.    I knew him professionally at the

Page 533

1 company, but I --
2    Q.    Right.
3    A.    -- I did meet him personally, yeah,
4 in person.
5    Q.    Let me show you what is Exhibit 26A
6 to your deposition.
7    A.    I see it.
8    Q.    And Exhibit 26A is a document dated
9 May 14, 1971, and it is entitled:  "Assay of Talc in
10 Baby Powder."
11        Do you see that?
12    A.    Yes.
13    Q.    An assay is a scientific work for
14 analysis or test, right?
15        MS. BROWN:  Foundation.
16    A.    I don't -- I'm not sure, but I accept
17 what you're saying.
18    Q.    Okay.  Well, let's see who it's
19 authored by.  This 1971 document, Exhibit 26A, is
20 that person Bill Ashton, William Ashton, right?
21    A.    Yes.
22    Q.    And let's see what Mr. Ashton -- do
23 you know that he's writing this memo to
24 Dr. Hildick-Smith.  Do you know who that was?
25    A.    I recognize the name, but I'm not

Page 534

1 sure who he was.
2    Q.    Okay.  And Mr. Ashton writes the
3 following, he says, "The attached letter shows the
4 particle size shape consists of a production batch
5 of our product produced in December, 1970."
6        Do you see that?
7    A.    Yes.
8    Q.    And it says, "It is an aliquot of
9 that which I gave to Dr. A. Langer at Mount Sinai
10 Hospital."
11        Do you see that?
12    A.    Yes.
13    Q.    Okay.  So he's talking about a
14 production batch of our product, and it lists baby
15 powder at the top, right?
16        MS. BROWN:  I object to this document
17 as lacking foundation.
18    A.    It's what it says, yes.
19    Q.    Okay.  And then Mr. Ashton writes,
20 "We consider the free non-talc needles but a trace,
21 both on a count and area basis."
22        Do you see that?
23    A.    I do.
24    Q.    And he says, "Those particles are
25 tremolite."

Page 535

1        Do you see that?
2    A.    I do.
3    Q.    And the attachment to the letter,
4 let's look at the attachment to the letter.
5        Do you see it's a letter from May 10,
6 1971, to Mr. Ashton on letterhead from the Colorado
7 School of Mines?
8        Do you see that?
9    A.    Yes, yes.
10    Q.    All right.  And it is a analysis of
11 baby powder.
12        Do you see that?
13    A.    Yes.
14    Q.    All right.  And it lists free
15 non-talc needles.
16        Do you see that?
17    A.    Right.
18    Q.    And it says, "0.6 percent."
19        Do you see that?
20    A.    Yes.
21    Q.    All right.  And so Mr. Ashton says
22 that the free non-talc needles are tremolite.
23        Do you see that?
24    A.    I see what --
25        MS. BROWN:  Objection; lacks

69 (Pages 532 - 535)

O'SHAUGHNESSY - Redirect

Page 536

1 foundation.
2 BY MR. BLOCK:
3    Q.    Do you see that Mr. Ashton says he
4 considers the free non-talc needles to be tremolite?
5        MS. BROWN:  Same objection.
6    A.    I can see what -- it says, "We
7 consider the free non-talc needles but a trace," I'm
8 not sure about what that means, "but a trace, both
9 on a count and area basis.  Those particles are
10 tremolite."
11    Q.    Did Mr. Ashton, who you relied upon,
12 ever tell you that the Colorado School of Mines had
13 found tremolite needles in Johnson's Baby Powder?
14        MS. BROWN:  Objection; foundation and
15 misstates the document.
16    A.    I don't recall any specific
17 conversation with Mr. Ashton.
18    Q.    Then Mr. Ashton says, "In addition to
19 the attached, I ran an X-ray diffractograph on that
20 batch."  And he said it shows these minerals are
21 present, and he lists tremolite-actinolite as one of
22 the minerals present on that batch of Johnson's Baby
23 Powder.
24        Do you see that?
25        MS. BROWN:  Foundation.

Page 537

1    A.    I do.
2    Q.    Okay.  And did Mr. Ashton, who you
3 say you relied upon, ever tell you that he had
4 personally tested Johnson's Baby Powder and found
5 tremolite?
6    A.    Like I said, I don't recall the
7 specific discussions I had with Mr. Ashton.
8    Q.    You don't remember any specific
9 discussions you had with Mr. Ashton about talc and
10 asbestos, do you?
11    A.    No.
12    Q.    And in response to questioning by
13 Johnson & Johnson's lawyer, you said that in
14 addition to Mr. Ashton, you relied upon two other
15 people, Dr. Hopkins and Mr. Chudkowski.  Is that
16 correct?
17        MS. BROWN:  Misstates testimony.  I
18 object.
19    A.    Those are the names I recalled among
20 the, you know, people, many people I spoke to.
21    Q.    Okay.  And are those the people that
22 you can recall at Johnson & Johnson who you relied
23 upon in approving the statement under oath in the
24 Krushinski case that Johnson's Baby Powder never
25 contained asbestos in any form, or tremolite?

Page 538

1        MS. BROWN:  I object,
2 Mr. O'Shaughnessy, and I instruct you not to answer
3 the information that you relied on as a lawyer in
4 responding to Interrogatories in a particular case.
5        MR. BLOCK:  Your Honor, this has been
6 waived.  The witness was just asked whether he
7 believes all the statements that he made, including
8 in the Interrogatories, were true.  He says he
9 believed they were true.  He still believes they
10 were true.  He said he relied upon these people.
11 And this is a fair question to ask in response to
12 that and he should be able to answer this question.
13        MS. BROWN:  And, your Honor, I was
14 very careful to ask those questions in terms of his
15 general knowledge.  I asked did you identify these
16 people that you spoke to about talc safety, we
17 talked about information he received through his
18 participation in the Worldwide Talc Steering
19 Committee.
20        He absolutely did not identify nor
21 was he ever asked to identify particular information
22 he had or relied on in a particular case.  That is
23 100 percent work product, your Honor, I didn't ask
24 any question that comes close to that.
25        He made a statement in an e-mail

Page 539

1 that's been produced about Johnson & Johnson
2 developing proof that talc was free of asbestos.  We
3 asked him questions about non-privileged statements
4 like that, about non-privileged information he
5 learned through the Worldwide Talc Steering
6 Committee of which Dr. Hopkins was a member.
7        But a question that is asking for
8 particular information on which he relied in
9 informing an Interrogatory response in a particular
10 case is work product, and I'm going to instruct him
11 not to answer that.
12        SPECIAL MASTER:  Can I ask to impose
13 on the court reporter to please repeat the question.
14        (The following Question is read back:
15        "QUESTION:  Okay.  And are those the
16 people that you can recall at Johnson & Johnson who
17 you relied upon in approving the statement under
18 oath in the Krushinski case that Johnson's Baby
19 Powder never contained asbestos in any form, or
20 tremolite?")
21        SPECIAL MASTER:  This was the same
22 issue we dealt with in camera and we specifically
23 discussed it.  The court's ruling at that time which
24 is the same now that if it asked the witness for the
25 basis of an answer to an Interrogatory, mental

70 (Pages 536 - 539)

O'SHAUGHNESSY - Redirect

Page 540

1 impression, et cetera, that was work product, but if
2 it was a more generalized question it was
3 appropriate. And then we came back on the record
4 and I recall Mr. Block asked a generalized question.
5        So as to this specific question since
6 it's directed to the specific Interrogatory in that
7 case, and importantly, the witness did not himself
8 verify those particular answers, the objection is
9 appropriate. I think we would have a different
10 result if it was the witness who verified those
11 answers, but that's not the case here. So the
12 objection is sustained.
13        MS. BROWN: Thank you, your Honor.
14 BY MR. BLOCK:
15    Q.    Mr. O'Shaughnessy, are you saying
16 that you still, as of today, in 2021, stand by the
17 statement that Johnson's Baby Powder never contained
18 asbestos in any form, or tremolite?
19    A.    I do.
20        MR. BLOCK: I have no further
21 questions. Thank you.
22        MS. BROWN: Nothing from me. Thanks
23 so much, Mr. O'Shaughnessy.
24        VIDEOGRAPHER: Stand by. We are
25 going off the record, 4:46 p.m.

Page 541

1        This concludes today's testimony
2 given by John O'Shaughnessy. There are five media
3 units. They will be retained by Veritext.
4        (Deposition adjourns: 4:47 p.m.,
5 Eastern Standard Time.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 542

1        CERTIFICATE OF OFFICER
2
3        I CERTIFY that the foregoing is a true
4 and accurate transcript of the testimony and
5 proceedings as reported stenographically by me at
6 the time, place and on the date as hereinbefore set
7 forth.
8        I DO FURTHER CERTIFY that I am neither
9 a relative nor employee nor attorney or counsel of
10 any of the parties to this action, and that I am
11 neither a relative nor employee of such attorney or
12 counsel, and that I am not financially interested in
13 the action.
14
15    _Andrea Nocks CCR CRR_
16    ANDREA NOCKS, CCR, CRR
      Certificate No. XI001573
17
18
19
20
21
22
23
24
25

71 (Pages 540 - 542)

| & |
| --- |

**&**   263:10,16,21
265:3,17,22,22
266:2,5,6,8,13,16
266:20,24 268:12
270:12 271:3,15
274:7,13,24 275:3
276:15,22 277:4
278:23 279:4
281:6 282:9,13
288:25 289:15
290:24 291:6,11
292:13,23 293:21
294:20 296:11
297:16 298:1,17
298:19 301:5
302:7,25 303:22
304:2,7,12,15
305:6,11,13
306:23 308:9,23
311:2,15 314:2
317:18 319:13
321:6 323:17
324:20 325:12,18
326:7,13,22
328:14 330:12
331:19 332:5,5,23
332:24 336:4
337:4,20 338:23
339:9,10,13,21
340:5,15 341:15
341:25 342:18
343:8,14 344:7
347:17 349:4,5,11
349:16 350:4,16
351:2,6,25 353:2
354:3 355:21
360:17 361:5,5,18
362:5,8,12,22
363:9,15 364:2,3
364:14 365:10

366:13,19,23
367:6,16,20,25
368:4,23 369:16
369:22 370:16,21
371:4 372:2
373:23 376:7,22
376:24 379:24
394:21 395:13,18
396:17 400:9,12
400:20 401:11,18
401:20 402:6,8
404:15 406:15,25
407:21 409:4
411:19 412:12
415:16,20 416:5,8
416:10,12 417:9
417:11 418:2,21
419:14,20 421:12
427:8,14 428:23
429:7,8,10,14
433:14 435:11,11
435:14,20,21
436:25 438:1,10
438:22 444:12
447:7 448:7,9
449:11 450:5,10
451:1 452:13,21
452:24 454:13
455:2,15,21 456:7
456:9,13,19,19
459:21 462:3,16
463:2,7,10,16,23
464:2,6,8,23 465:1
466:2,13,14,18,25
472:15 477:7,15
477:19 480:11,13
481:13 483:9,23
483:24 484:15
486:7,23 488:6
489:5 492:9
495:20 503:3

504:10,19 505:17
506:24 507:5
508:19,21,23
511:5 512:2 513:1
513:10 514:3,25
515:18 516:13,24
517:3 518:21
519:4,7,15,21
520:1,1,6,8,9,19
521:4,7,11,12,17
521:19,22 522:6
523:2,4,6,9,12,15
523:18,22 524:2,6
524:9,14,20,24
525:4,15,18,19,21
526:4 527:19
528:14 531:25
532:1,13,15
537:13,22 539:1
539:16

| 0 |
| --- |

**0.0001**   357:15
**0.0005**   356:14
357:13
**0.001**   357:14
**0.007**   357:13
**0.2**   441:10
**0.20**   441:12
**0.5**   352:3,9
**0.6**   535:18
**001**   395:1
**006**   408:4
**03**   440:5
**07102-4056**   266:4
**07932-1047**   266:8
**08002**   265:5

| 1 |
| --- |

**1**   268:20 269:8
270:9 281:11,23
281:25 282:2,6

306:21 372:13
381:2 473:4
**1-2**   282:3,4
**10**   334:23 535:5
**10,000**   389:8 524:9
**10/16/97**   268:8
**100**   266:3 323:11
538:23
**10001**   265:21
**10158**   265:11
**1030-19**   263:2
**10613**   542:14
**108t**   351:6
**109t**   351:6
**10:40**   316:17
318:6
**10:51**   318:6,9
**11/27/2000**   269:4
**12**   520:17
**12:08**   377:13
**12:32**   393:15
**12:50**   384:24
385:1
**12:57**   393:16
394:3
**13**   268:6 322:2
334:18 343:9,13
344:20 348:21
350:4 354:12
360:2,8,11,21
485:11 502:6
514:17
**14**   268:14 389:6
533:9
**15**   271:8 272:10,15
272:24,25 293:15
301:12 306:16,18
307:6,13,14
318:17 356:12
377:21

**15a**  268:3 275:22
  275:22 276:1
  287:15,15,16,19
  288:24 502:1
**15b**  268:5 290:20
  290:21 293:24
  307:7,23 318:18
  319:24
**16**  268:6 272:15
  306:15 307:15
  321:4,5 326:21
  330:16 331:12
  519:8
**17**  269:13 346:12
  423:10 492:7
  495:18
**18**  408:13
**19**  268:8 269:11,12
  325:3,5,6 330:16
  331:4 440:5
**1940s**  428:8
**1945**  274:9,19
**1950s**  428:8
**1958**  282:14
**1960**  276:18,23
  277:14 280:1
  292:8
**1960s**  327:17
  428:8 492:14
  496:1
**1963**  274:9,12,19
**1970**  534:5
**1970s**  337:22
  345:1,16,24 350:5
  350:8 353:1 354:8
  428:9 487:1,13
  528:14 530:13
**1971**  268:10,14
  345:2 346:7,24
  347:12 533:9,19
  535:6

**1972**  268:11
  350:10
**1974**  268:16 354:8
  359:22
**1976**  409:10 428:1
  428:24
**1978**  460:20,23
**1980**  410:7
**1982**  274:3 275:10
  275:13 276:23,25
  460:24 462:1
**1987**  463:2,3,7,15
**1990**  521:6
**1990s**  375:17
  410:13
**1991**  464:12,15
  521:7
**1992**  304:3 329:14
**1993**  469:20
**1994**  475:16
**1997**  326:21
  328:13 330:16,18
  331:12,13,21
  332:7 333:1
**1998**  268:5,6
  272:15 290:24
  291:11 293:20,25
  294:7 301:3,6,13
  301:15,22 304:5
  306:13,15 307:8
  307:15 319:25
  321:21,23 322:2
  340:6,16 341:16
  341:25 342:19
  481:1 484:12
  519:8,16 520:3
  521:4
**1999**  268:20
  373:20 374:19
  375:6,6 376:11,16

**19th**  426:18
**1st**  420:6

**2**

**2**  272:25 282:1,2,6
  282:16 306:18
  318:11 329:8,11
  329:19 334:14
  357:12 358:12
  363:4 377:14
  469:12,14,19
  473:1 475:13
  490:11 509:6,7
**20**  466:19
**200**  464:3
**2000**  268:22,23
  289:13,13 363:11
  365:15 367:13
  370:7 402:13
**2000s**  406:16
  410:13
**2001**  269:13
  334:19,23 335:13
  342:2 343:9,13
  344:20 346:1
  348:21 350:4
  354:12 360:2,8,11
  360:21 361:2
  395:6 396:15
  397:11 398:24
  399:2 423:10
  426:17 485:11
  514:17 522:23
**2002**  269:7,8,11
  406:9 408:13
  409:9 411:12,18
  412:18 417:17,20
  418:4,12,22 419:7
  420:6 429:1
**2003**  269:12
  303:20 426:18
  427:22

**2004**  269:14 430:6
  430:15 433:24
  435:6,21 436:1,16
  438:9 440:9 442:1
  442:3 443:17,23
  445:13 447:19,24
  453:7,18,24 454:4
  455:15 509:17,18
  509:23,25 510:7
  510:21
**2012**  467:22
**2016**  467:23
**2017**  297:5 298:14
  301:20 304:11
  312:21,23
**2018**  456:16
  466:20 467:17
  468:1
**2019**  456:16
**2021**  264:5 270:3
  504:14,23 505:9
  540:16
**209**  307:9
**209397**  307:7
**20th**  421:1
**21st**  398:19
**22**  268:5 469:20
**22nd**  290:24
**23**  264:5 269:7
  307:18
**23rd**  270:3 411:17
  412:18 438:9
  520:2 521:4
**24**  268:16 269:14
  354:8 395:6
  396:15 436:16
  442:1 461:14
**25**  268:10 344:22
  344:24 346:8,25
  468:20 484:1

[26 - 9:35]

**26** 268:11 350:1,7 354:20 389:7 490:2 491:24
**26a** 268:14 533:5,8 533:19
**26b** 268:16 354:7 354:24 359:22 491:19,24
**27** 268:11 350:10 397:11 402:13
**272** 267:6
**275** 268:4
**29** 268:10 346:7,24 373:19 374:19 406:9
**290** 268:5
**2:18** 457:6,8
**2:28** 457:8,11
**2:30** 459:7,8
**2:42** 459:8,11
**2nd** 509:16,18,23 509:25 510:7

**3**

**3** 394:5 457:7
**3,000** 523:20
**3/29/2002** 269:6
**3/3/2004** 269:15
**30** 466:6 468:20 486:6
**30,000** 387:12,17
**31** 362:9 466:4 526:12 531:24
**32** 289:12 492:1
**321** 268:6
**325** 268:8
**33** 268:20 372:12 372:19,21
**33rd** 265:10
**344** 268:10
**35** 268:22 363:3,5

**350** 268:13
**354** 268:18
**35a** 268:23 369:14 369:20
**36** 268:24 394:24 394:25
**363** 268:22
**369** 268:23
**37** 269:3 334:5,13 360:7 485:9,10 514:11,11 521:21 522:2 528:11
**372** 268:20
**37a** 269:4 400:15 400:16
**38** 355:15
**39** 269:6 406:6,8 408:5,6
**394** 268:24
**3:37** 500:23,25
**3:54** 500:25 501:3
**3rd** 442:2 443:17 510:21

**4**

**4** 268:22,23 363:11 365:15 370:7 443:23 457:13 490:16 500:24
**40** 269:7 411:16,17 483:20
**400** 269:4
**401** 524:19,22
**406** 269:6
**40a** 269:8 420:4,5
**40b** 269:11 417:23 417:24 418:1
**41** 269:12 426:13 426:15,16,23
**4100** 265:14
**411** 269:7

**417** 269:11
**41a** 269:13 422:20
**42** 269:14 436:14 436:15 451:14
**420** 269:10
**422** 269:13
**426** 269:12
**43** 269:15 441:24 442:1,6
**430** 269:20
**436** 269:14
**43a** 269:16 442:4 445:7,12
**441** 269:15
**445** 269:16
**45** 269:18 509:5,6
**457** 265:4
**4580329** 263:25
**459** 267:7
**48** 269:20 430:1,2 430:4
**485** 269:3
**4:18** 518:12
**4:46** 540:25
**4:47** 541:4
**4th** 443:16,18

**5**

**5** 381:11 440:9 501:5
**5,000** 524:6
**50** 387:19 419:3,8
**503** 267:6
**509** 269:18
**5103-18** 263:12
**526** 267:7
**532** 267:6
**533** 268:15
**580** 277:10
**582** 280:8
**594** 281:3

**6**

**6** 291:11 293:20,25 294:3,4,7 306:13 307:8 319:25 321:21,23 445:13
**600** 265:4 266:7
**605** 265:10
**670** 357:9
**6:19** 395:6
**6:28** 396:15

**7**

**7** 427:21 430:15 447:19,24 476:7 476:11,24 478:20 512:17
**70s** 336:16 339:13 343:16 344:17 348:22 349:5,20 355:20 362:6,17 379:19 460:12 485:19 488:15,21 530:19,19 531:11
**754** 370:12
**77002** 265:15

**8**

**8** 276:18,23 281:3 281:6 391:20 403:5 430:6 502:7
**803** 415:5
**811** 265:14
**8486-19** 263:18
**8:23** 447:24
**8:30** 391:20

**9**

**9** 391:20
**9397** 307:18
**98** 294:4
**9:30** 317:13
**9:35** 264:6 270:3

| a | | | |
|---|---|---|---|

**a.m.** 264:6 270:3 318:6,6,9 403:5 447:24

**abbreviates** 280:18

**abbreviation** 280:20

**ability** 377:19 385:23 465:10

**able** 274:17 298:17 308:4 313:18 331:8 379:25 383:6 387:10,11 419:18 452:19 459:16 467:9 528:6 538:12

**abreast** 471:5

**absence** 428:3 513:23

**absent** 389:12

**absolutely** 284:4 349:3 491:14 504:25 538:20

**abusive** 378:9 381:6,8,18,18

**accept** 296:21 310:13,16 337:12 406:17 482:15 533:16

**access** 299:13,15 529:7

**accommodatable** 303:13

**accompanying** 357:2

**accumulated** 524:11

**accuracy** 402:25 405:20

**accurate** 455:25 456:5 472:19,22 485:1 503:13 542:4

**accurately** 468:16

**accused** 381:6 483:24

**acknowledge** 417:9 508:15

**acknowledged** 325:11

**acknowledges** 410:5

**acknowledgment** 415:4,7,17 416:3

**act** 305:4 464:16

**acting** 317:5 382:3 382:8 384:5 390:18 393:5

**actinolite** 327:11 345:21 347:3,10 536:21

**action** 298:24 410:9 542:10,13

**actions** 473:5 474:4

**actively** 296:12 450:21

**activities** 411:18

**activity** 283:5 424:20

**actual** 357:13 380:14,14,15

**add** 312:15 381:4

**addition** 302:24 536:18 537:14

**additional** 458:21

**address** 308:2 309:4 393:3 404:9 405:8

**addressed** 469:24

**adds** 428:17

**adequately** 465:8

**adjourns** 541:4

**administration** 460:13

**administrator** 263:12

**admit** 429:7 444:19

**adult** 374:25

**advance** 278:1,4

**adverse** 413:25

**advice** 290:7 434:17 444:11

**advised** 312:18

**advisory** 529:5

**affairs** 373:24

**affiliate** 398:22

**afraid** 377:22 447:2

**afternoon** 317:11 380:12 382:15 383:3,8 384:10 393:7,8 459:13

**age** 527:24,24

**agencies** 413:12 422:4 474:6

**agency** 337:10 471:1

**aggressiveness** 424:18

**ago** 298:1,2 305:16 420:23 449:25 468:20 484:2

**agree** 270:7 312:25 382:4,5,14 390:19,19 392:25 397:22 398:5 402:11 433:23 476:21 517:3,4,12

**agreeable** 388:18 391:19

**agreed** 402:23 425:21

**agreement** 301:16 385:18 424:7

**agrees** 398:13

**ahead** 318:25 319:3 431:17 473:15

**al** 263:10,16,21 270:12,12 421:10

**alice** 480:17

**aliquot** 534:8

**alleging** 308:20

**alli** 318:16 384:22 458:3

**allison** 265:18

**allow** 271:24 314:4 454:12 455:2

**alongside** 425:24 426:10 483:22

**amosite** 327:10

**amount** 351:19 469:5 524:1

**amounts** 345:20 347:2,9 492:15 496:2 519:22 521:13

**amphiboles** 327:10

**analyses** 358:13

**analysis** 311:13 359:9 533:14 535:10

**analytical** 436:2 439:1,21 440:11 440:22 442:21 443:9,24 444:6,21 446:19 448:20,23

[analytical - article]

Page 5

451:4,16 452:14
452:23 453:8,17
453:24 454:3,11
454:25 455:14
510:3
**analyze** 320:14
489:16 491:18
492:21 496:9
501:11 502:13
**analyzed** 436:3
440:8 498:3 499:8
**analyzing** 491:6
491:10
**ancillary** 364:18
**andrea** 264:2
270:18 290:16
318:25 319:3
495:2 516:5
542:16
**animals** 410:9
**answer** 271:24
283:10,25 284:4
284:16 287:22
288:10,22 289:12
305:24 310:21,22
319:11,16 332:13
332:19 333:10,20
343:3,6 346:10,12
361:4 372:11
378:1,24 379:12
396:11 432:12
455:9,20 468:15
487:17 494:13
495:3,24 496:6,13
496:21 499:22
501:7,15 504:5,7
505:13 517:8,13
518:6,23 538:2,12
539:11,25
**answered** 285:24
286:13,23 287:12

290:17 306:12
331:15 332:8,9
333:24 341:19
342:4 346:22
349:23 362:1,15
365:12 367:23
451:5 455:19
482:10 499:21
505:4,22 506:2
507:20 508:5
**answering** 378:10
455:5 495:12
501:23
**answers** 289:6
290:3,6 318:13
319:5 346:11,18
348:6 379:6,9
380:15 392:6
456:4 483:2,6
495:14 499:24
501:8 508:13
540:8,11
**anthophyllite**
327:10 328:25
329:1 441:18
**anticipating**
308:11
**anybody** 475:2
489:1
**anyway** 388:21
435:3 498:25
**ap** 366:7,9
**apart** 336:25
391:8 489:5
**apologize** 290:16
331:9 381:20
388:7,21 393:1,3
490:24
**apparently** 310:9
324:22 371:8
405:7 429:18,21

448:11 449:8
512:5,6
**appeal** 316:6
**appearances**
270:25
**appeared** 492:14
496:2
**appears** 310:5
354:23 451:8
477:2 511:11
**applications**
479:17
**applied** 315:11,23
**apply** 386:4
387:22
**appreciate** 458:24
499:18
**appropriate**
284:11,24 285:25
286:23 316:8
323:18 389:4,18
449:17 465:12,19
472:10,22 484:1
540:3,9
**appropriateness**
402:25
**approval** 290:3
368:5 405:24
493:17 494:10
**approve** 362:21
405:21 496:21
**approved** 346:11
346:19 503:4
526:3
**approving** 493:6,9
493:21 537:23
539:17
**approximately**
270:3 356:14
357:15 460:24
464:3

**april** 268:16
272:15 306:15
307:15 354:8
359:22 445:13
447:19,24 520:2
521:4
**area** 300:11 340:2
364:5 366:18
369:24 372:2
407:3 475:10
497:23 534:21
536:9
**areas** 470:14
481:9
**argonaut** 268:18
355:1,4,8,10 490:4
**argue** 390:16
**arguing** 300:15
**argument** 516:15
**argumentative**
349:1 432:11
**arises** 498:12
**arising** 470:9
**armstrong** 339:3,9
360:22
**arps** 265:17
266:24 271:3
310:4,8,25
**arranged** 413:18
**arrangement**
270:21
**arrangements**
413:5 477:17
**arrest** 461:20
**arrested** 461:9
**article** 366:4,24
367:12 368:12
370:8,14,25
411:12 412:19
413:6,18 414:5,6,7
415:4 416:13,17

[article - assume]

416:20,22,24
417:8,9 419:23
420:10,16 421:2
476:8 521:7
**articles** 369:15
372:1 394:10
521:6
**asbestiform**
274:20 351:14
352:2,8 353:13,21
356:3,11,13,24
357:21 497:13,21
499:10 502:15
**asbestos** 269:9
275:1 289:16,18
289:21 320:8,13
320:14 327:8,15
327:22 328:7,23
336:17 337:5,21
337:24 338:23
339:11,15 340:8
340:10,18 342:21
343:14,17 344:18
345:4 346:17
347:17,19 348:15
348:23 349:8,18
353:3 357:12,15
358:19,25 359:5
359:14,24 360:10
360:24 361:22
362:13,24 365:16
365:20 366:13
367:8,9,15,17
368:2 369:2
370:23 371:17
372:4 386:18,24
387:9 394:11
399:20 400:5
405:23 409:7,12
409:16 410:1,3,6
410:14,17,25

411:4 417:4
419:23 420:17,22
428:3,11,18,25
429:1 435:13,23
436:4,10 437:3
438:16 439:3,24
441:7,14 443:9
446:8 447:8
449:13 450:13
451:3,23 452:6,14
453:17 454:11,15
455:1,4,14,17,22
456:8,22,23
474:19 485:20
486:18 487:2,14
488:16 492:10,23
495:21 496:11
498:5 501:13
502:23 503:5,25
504:12,23 505:9
506:9,12,13,18,24
507:10 508:2
510:4 513:11,24
514:5 519:10,22
521:5,13 526:5
528:15 530:14
531:13 532:20
537:10,25 539:2
539:19 540:18
**ashcraft** 266:20
**ashton** 277:3,14
278:24,25 279:3,9
279:11,13,22
280:1,2 281:6
282:24 292:5,7
411:23,23 412:18
413:4,10,17,23
419:4,6,9 420:9,13
423:15,25 425:18
425:19,21 426:23
426:25 427:12

428:22 506:4,16
506:23 526:23
527:1,25 528:2
531:17 532:14,23
533:20,20,22
534:2,19 535:6,21
536:3,11,17,18
537:2,7,9,14
**aside** 388:10
**asked** 287:12
290:17 321:13
331:14 332:9
333:23 341:18
342:3 346:21
361:3,24 362:1,14
365:12 367:23
419:1 451:5
455:18 468:19
469:8 476:15
477:1,25 485:14
491:25 492:5
493:25 495:17
496:20 497:7,18
498:2 501:20
502:20 505:21
507:19 508:5
510:23 512:17
513:4 514:10,11
516:6 523:8 525:6
526:2,11 528:10
538:6,15,21 539:3
539:24 540:4
**asking** 284:2,3
324:2 332:14
342:23 359:16
369:5 401:16,17
405:10,14 448:6
448:11 449:4
493:13,14,14,20
499:14 500:15
517:9 539:7

**asks** 287:16
**assay** 268:15
533:9,13
**assemble** 343:4
353:8 379:15
470:11
**assembled** 336:20
337:21 338:12
339:17 340:9,16
340:19 341:7,9,17
341:20,21 342:1
342:12,22,24
345:25 353:1,5,9
354:13 359:25
360:25 361:8
378:12 379:17,20
485:20 488:16,18
489:9 514:12,17
514:24 515:17
516:12 518:20
522:3,5,19 528:19
529:12
**assembling** 278:2
338:2 488:3 520:9
**assert** 295:2
319:20 498:16
**assessment** 435:24
**assistance** 290:7
**assistant** 266:24
266:25
**associate** 410:25
**associated** 365:23
366:5,7,10 411:5
**associates** 490:3
**association** 270:17
327:14 407:1
**assume** 313:5
353:7 389:19
404:2 418:19,23
432:3 433:12
444:25 463:16

**assuming** 425:17 461:20
**assumption** 314:16
**assurances** 393:10
**attach** 273:10 395:21
**attached** 294:10 323:1,5 358:12 365:25 366:3 373:18 397:16 398:17 408:7 412:19 420:10 437:9 534:3 536:19
**attaches** 401:2 408:11 414:4
**attaching** 417:20
**attachment** 293:4 293:7 397:4 408:17 409:25 453:12 535:3,4
**attachments** 408:1
**attempted** 305:21 451:2
**attend** 399:4 444:17
**attended** 334:2 444:14
**attendee** 443:6
**attendees** 442:17
**attention** 334:16 334:18 357:1 381:23 408:12 413:12
**attorney** 315:23 324:19 326:13 363:23,24 364:13 365:8,11 368:14 373:15 376:4,5 395:20 400:18,18

403:19,20 407:2,7 407:20,23 424:8 429:20 435:2 459:21 462:4,20 463:9 487:6,19,24 488:11 493:15 515:1 516:14 518:22 542:9,11
**attorney's** 460:22
**attorneys** 265:11 265:15,21 266:4,8 325:24 326:19 360:4 361:9 364:8 434:16 456:20 466:15 471:7 481:8 483:22,23 488:17 489:23
**audio** 270:6 457:24
**august** 269:12 282:14 334:18,23 342:2 343:9,13 344:20 348:21 350:4 354:12 360:2,8,21 361:2 395:6 396:15 397:11 426:18 430:6 485:11 514:17
**australia** 321:1
**author** 414:25
**authored** 533:19
**automatically** 302:12
**available** 339:19 341:12 445:4 522:16,17
**avenue** 265:10
**avoid** 382:9
**aware** 271:21 304:24 308:18

310:15 347:16 406:4 411:4,11 436:12 456:16 469:3 472:23,24 473:15,19 474:22 475:2 493:2 496:15 501:17 512:7 529:6 530:14

**b**

**b** 268:1 269:1
**baby** 268:12,15 272:22 274:8 275:2,18 289:15 289:20 323:10 340:7,9,17 342:20 345:17 347:1,8,14 348:16 349:18 350:16 351:2,6,25 353:14,22 354:3 354:15,16,22 355:6 360:10 361:22 362:24 365:20 366:13,25 367:15 369:2 371:19 372:3 374:21 394:11 396:6 398:17,18 436:3 437:8 438:3 438:15 441:3,7 443:10 446:9 447:9 449:13 450:13 451:3,23 452:7,15 453:18 454:12,15 455:1,4 455:14,17,23 456:8,14,21 492:9 495:20 502:23 503:5,24 504:13 504:24 505:10 506:9,18 507:11

508:3 510:4 519:9 519:21 523:6 526:5 533:10 534:14 535:11 536:13,22 537:4 537:24 539:18 540:17
**back** 271:19 274:3 275:10,12 277:14 279:9 284:16,17 286:6,13,17 287:22,24 288:14 296:12 298:25 299:2 308:9 315:9 316:13,21,23 318:1,8,13 319:6 332:6,13,18,20,25 336:15 337:22 339:12 343:15 344:16,23 346:10 348:22 349:5,20 350:5 355:20 360:1,7,21 361:7 362:17 365:19 372:13 378:4,6,21 380:25 381:2 386:21 390:20 391:11 394:2 407:17 425:17 443:16 454:22,23 457:10,20,25 459:10,11 460:12 461:16 467:23 483:7 484:24 485:19 487:1,10 487:12 488:14,21 495:6,15 500:2,11 500:19 501:2,7,9 505:3,5 515:13,23 516:8 517:12,13 518:4,11,15,16

**[back - block]**                                                      Page 8

528:11,14 530:13
531:11 539:14
540:3
**background**  279:1
339:2 389:10
531:22
**backgrounder**
330:9,24
**bankruptcy**
300:24
**base**  320:13
**based**  377:20
435:19 449:2,3
479:4,20 482:24
484:1 491:15
508:7 530:23
531:24
**basically**  433:4
**basis**  353:1 484:3
534:21 536:9
539:25
**batch**  351:6 534:4
534:14 536:20,22
**bates**  277:7,9
281:3 307:6,8,17
312:16,18,19
313:2 330:12
357:8 370:11
408:3
**battelle**  276:2,22
277:2,13 283:7,19
284:20 286:20
287:8,9,16 288:1,2
288:8,11,16
492:21 495:8,9
496:9 501:11,21
502:2,3
**bec**  418:17,18
**bec's**  418:13
**becoming**  378:9

**began**  274:13
**beginning**  318:10
394:4 457:12
464:12 470:21
501:4
**begins**  478:21
479:12
**behalf**  296:10
351:9 366:23
368:3,23 404:15
459:20 471:10
513:9
**beijing**  398:24
**belief**  296:5 389:9
**believe**  272:1
279:1 286:24
288:17 292:20
304:3 305:25,25
315:13 325:14
335:15 343:17
355:12 369:7
389:4,17 396:19
401:23 435:15
456:15 461:17
479:9 482:14
483:10 484:25
503:12,24 507:10
508:2 511:15
514:8 515:15
519:2 521:12,15
529:1 531:13
532:21
**believed**  538:9
**believes**  538:7,9
**bell**  462:3,16
**bench**  389:7,8
**beneficiated**
281:18 282:17
**beneficiation**
276:9 280:4 358:8

**benefit**  383:17
387:12,24 389:5
389:10,17 390:12
495:2
**benefits**  523:13
525:3
**bernardo**  265:19
295:17 297:11
301:4,18 304:15
304:18 308:1
310:2,20 311:21
312:8,12,25
313:12,13,15,20
316:1,10,17,24
317:2 318:4 385:6
385:9,18 386:10
387:2,2,15 388:13
391:22 393:8
**bernardo's**  303:15
**bernstein**  423:4
**best**  288:13,22
289:14 304:8
305:15,19 308:6
317:5 377:24
378:24 382:10
468:13 485:5
488:25 489:10
492:7 495:19
506:15
**better**  297:19
497:5
**beyond**  486:16
516:21
**biddle**  266:6
**big**  361:10,11
470:17 513:19
**biggest**  375:1
**bill**  411:22 419:4,6
419:9 423:14,20
424:5,7,13,18
426:23,25 428:22

**benefit**  532:14,23 533:20
**billions**  311:25
**binder**  334:7,10
334:13,14 344:23
363:4 372:13
469:15 509:6
**biomedical**  414:14
418:17
**birds**  316:20
**bit**  294:1 331:6
359:15 385:9
461:3 480:8
513:16
**bite**  392:22
**bites**  378:9
**black**  389:20
**bless**  496:21
**block**  265:8 267:6
271:6 272:3,6
276:14 283:14,16
283:21,24 284:15
285:1,5,12,16,19
286:8 287:21
290:19 293:2,16
293:18 295:10
296:4,25 297:1,24
298:6 299:11,15
300:2,7 301:3,6
302:9 303:18
305:24 306:10,17
309:6 311:4
312:14,23 313:5,7
313:10 315:19
316:12,22 317:3,7
317:9,12,25 318:3
318:12,25 319:3
319:22 331:7
332:11,16 334:8,9
343:2 345:11
346:23 348:10,19
349:4 350:25

**[block - brown]**

352:16 358:3
359:3 362:2 365:2
365:5,6 368:10
369:19 372:17
377:2 378:14,17
378:25 380:18
382:14,22 383:6
383:15 384:1,5,11
384:14,21,22
385:1 386:17,23
387:16,20 388:16
394:6 401:16
402:4 418:7
419:12 422:23
437:15 438:7
439:18 454:21
457:1,14,20 458:7
458:12,16,23
459:3 463:9
467:21 474:20
475:6,23 477:12
477:21 478:5,7,12
479:7,13,25 480:5
480:23 482:23
483:13,18 484:6
484:13,21 485:3
486:9,14 487:3,15
489:3,12,18
490:17 491:20
492:18,24 493:3
493:12,19,24
494:2,4,22 495:5
496:5,12 497:3,18
498:1,14,15,18,24
499:7 500:1,12
501:6,14 502:16
503:6,10,18,20
505:2,13 509:21
515:11 516:2
517:7,12,20,25
518:7,14,23

526:15 528:25
529:9,18,25 530:2
530:7,15,20 531:2
531:8,14,20 532:2
532:7,11 536:2
538:5 540:4,14,20
**block's** 286:6
304:20 305:20
309:11 482:14
**blocked** 490:23
**blount** 340:6,15
341:16 342:19
480:17 483:2
519:9,14,18 520:2
521:3
**blount's** 519:20
520:6,18
**blow** 440:17
**board** 420:23
**bob** 339:2
**bodies** 328:23
**body** 268:18
280:11 320:13,15
355:1,16 356:3,7
356:18 461:19
490:5
**books** 460:18
**bosses** 376:16
**bother** 516:5
**bottom** 276:3
277:9 280:19
289:25 294:16
319:8 320:22
322:14 329:21
330:13 351:23
356:17 357:9
375:24 421:5
441:17 445:9,14
**bought** 304:2
**bounds** 382:25

**bounty** 422:16
425:2
**brady** 266:22
**break** 316:19
317:1,24 372:15
377:2 382:15
383:3 384:7,10
391:12 393:8
434:24 454:20
457:1 494:14
498:20,25 499:1
499:16 500:20
**breath** 380:24
383:4
**brian** 265:20
**brief** 316:19
327:21
**briefly** 316:4
528:12
**bring** 522:20
**broader** 287:15,19
**bronx** 459:23,25
460:21,22 461:15
461:25 462:6
467:6,8
**brooklyn** 462:7
**brought** 326:4
522:21
**brown** 265:18
267:7 271:6
276:12 279:18
283:2,9,20 284:14
285:3,8 286:2
287:11,18 290:13
290:16 292:14
293:1,5 295:1,8
296:18,20 316:25
318:15,16 319:19
323:19 328:9
330:6 331:5,14,22
332:8,14 333:2,13

333:23 334:6
337:16 338:17
341:1,18 342:3
343:1 344:9 345:9
346:21 347:20
348:2,18 349:1,23
350:23 352:10
353:24 355:7
358:1 359:2
361:24 362:14
365:12 367:23
368:7,9,13 369:4
369:18 372:7,14
372:18 377:4,10
377:16 380:15,17
381:7,9 384:24
402:2,10 404:16
405:12 409:19
410:23 412:13
417:12 418:6
419:11,16 421:15
422:18,21 426:2,8
429:2 431:16,18
432:10 433:17
434:12 436:5
437:14 438:6
439:8,12,14,17
441:22 444:8,22
446:11,21 449:15
450:14 451:5
452:9,18,25
453:20 454:16
455:18 457:3,18
458:3,4,10,14,20
459:1,5,12 478:8
480:7 483:15
484:8,23 487:20
490:18 493:4,11
493:18,23 494:1,2
494:8,17,18 495:4
496:16 497:1,4

498:2,9,11,22
499:4 500:4,14,17
500:21 501:18
503:16 504:3,15
504:25 505:11,21
506:1 507:1,14,19
508:4 513:4,13
514:6 515:2
516:18 517:16,23
518:9 519:11
520:11 521:20
525:24 526:1
530:22 531:10
532:5,10 533:15
534:16 535:25
536:5,14,25
537:17 538:1,13
540:13,22
**brown's** 295:18
303:15 379:1
381:17 494:5
498:21 500:3,17
507:13
**brunswick** 277:4
**buettner** 423:2
**built** 391:13
**bulk** 439:4,24
**bumped** 443:16,17
**bunch** 485:24
**burden** 311:11
**bureau** 459:23
460:25,25
**business** 268:3
275:23 429:13,17
463:18,20,21,22
464:11

**c**

**c** 263:6 265:7,16
266:1,2 267:4
269:1 270:10
271:2,3 395:18

**call** 279:14 322:10
322:15,20 324:2
334:25 338:20
339:23 365:19,21
385:7 392:13
423:14 424:9
425:16 431:4,11
432:15,21,25
433:7 434:10,20
434:23 437:21
461:15 510:8
**called** 302:5 304:1
329:12 350:13
395:22 397:4
416:1 424:17
425:17 436:2
448:19 451:4,15
462:2 463:11
464:6,8 480:11
492:2
**calling** 437:17
438:2 453:1
**calls** 330:7 334:2
422:8 432:7,11
434:13 445:1
**calm** 331:5
**camera** 539:22
**campus** 266:7
**cancer** 320:8
384:18 385:8,14
385:15,22,25
386:19,25 387:7
387:12,17 409:17
410:25 411:1
476:4
**cancers** 410:18
**candyse** 263:18
**capacity** 421:21
**carcinogen** 335:14
401:14,19 410:8
410:14 411:5

413:1 414:8,10
416:19 422:2,17
425:15,25 432:9
433:24 435:8
452:17 508:24
**carcinogenic**
323:13 410:8
**career** 463:23
464:22 484:18,25
486:12
**careful** 538:14
**carefully** 367:2
**case** 289:7,13
291:22 294:21
298:4,4,7,8 300:21
301:9,10 302:5,6
304:12,23 305:14
312:5 313:5
314:21,22 319:14
320:19,24 321:10
321:14 322:16
324:21 325:13,25
326:3,3,12,14
328:14 330:3
346:12 373:2
385:25 386:1
387:10,20,22
392:1,10 461:12
467:22 488:4
492:2 517:1
537:24 538:4,22
539:10,18 540:7
540:11
**cases** 278:11,13
288:4 295:4
296:19 297:5
302:2,4 306:9
309:19 311:25
329:2 365:11
385:22 387:7,13
387:16,24 388:2

389:10 461:1,10
462:5,11 464:3,7
464:10,14,17
465:5,8,14,17
468:22,24 471:15
471:17,17 473:5
488:7 508:10,19
517:17 522:1
**catch** 445:2,5
**categories** 463:18
464:11,18
**catherine** 265:19
**cathryn** 263:6
**caucus** 392:23
**cause** 288:14
366:20 375:19
385:7 401:23
439:12 445:3
495:7 503:12
**causing** 409:17
**caution** 375:14
515:10
**cautioning** 372:5
375:21,22 516:25
**cbs** 322:11,15
**cc'd** 321:20
**ccr** 542:16
**cell** 270:4
**cent** 281:14
**center** 266:3
**century** 398:20
421:1
**certain** 355:5
379:8 392:14
401:12,20 469:2,3
474:6 513:5
**certainly** 293:6
296:15 316:7
352:11 368:25
379:18 383:5
384:1 385:4

405:25 406:4
412:16 417:14
422:6,8 435:19
444:3 470:22
472:15 497:16,23
508:9 514:9
516:19
**certainty** 428:2
**certificate** 264:4
542:1,16
**certification** 378:5
**certified** 264:2,3
269:22 373:1
495:10
**certify** 454:13
455:2 542:3,8
**cetera** 284:4 473:5
540:1
**chain** 268:24
269:3,16,18,20
334:17 395:3
396:5,14 430:5,13
434:19 445:8,12
449:21 509:6
**challenging**
379:23
**chance** 485:16
**change** 271:20
**changes** 396:22
397:6 399:14
**characteristics**
281:7
**characterization**
379:1 478:24
479:5
**characterized**
428:1 510:14
**charge** 294:25
319:18 320:2
473:11 520:8

**chart** 490:11
502:7
**chase** 309:17
313:14
**check** 312:10
**cherry** 265:5
**children** 466:23
525:14
**china** 320:25
398:24
**chisone** 273:24
274:18 275:16,17
**choose** 316:5
**chris** 266:15
**christopher**
266:17
**chrysotile** 327:9
357:15 358:5,16
358:19,24 359:4
359:10,11,13,14
359:24 490:12,13
490:21 491:2
**chudkowski** 291:6
291:25 293:19
404:10 405:9
506:4,6,8,16,22
527:20,22 528:2
531:17 537:15
**chunk** 495:11
**circulated** 374:20
**circumstances**
295:15 296:24
389:12,21 507:3
**cite** 329:12
**city** 459:22 460:3
462:6
**civil** 464:15
**claim** 304:12
311:9 318:22
362:12

**claiming** 299:3
312:6
**claims** 300:21
308:22 320:12
425:4
**clarification**
285:24 290:15
402:1 487:9
494:24 499:19
**clarified** 500:2
**clarify** 500:10,19
**classes** 327:9
**claw** 271:19
296:12 298:25
299:1 315:9
**clay** 339:3 364:13
403:11,19,24,25
404:3,3,8 406:1,2
407:10,12
**clayton** 364:9,11
364:15,20 373:14
375:25 376:4
400:18 407:2
**cle** 391:10,17
**clean** 383:15
**clear** 277:16
293:16 302:15
314:8 321:19
330:15 353:11
354:11 360:15
365:7 366:4
376:20 385:22
388:10 408:9
427:24 446:5
499:5 500:6
**clearly** 306:24
315:5 327:16
387:23 410:8
486:10
**clearwater** 462:3
462:16

**client** 315:23
440:24
**close** 370:17
381:23 396:24
467:7 497:17
525:18 527:24
538:24
**coalesces** 472:21
**coalescing** 470:19
473:24
**codefendant**
301:15
**codefendants**
298:15
**codman** 464:6
**coextensive**
300:19,20 301:2
**cohen** 266:16
**coker** 263:4,5,7
270:12 273:17
291:22 298:13
301:9,10 308:16
321:14 324:21
325:13,25 326:3
326:12,14,21
328:14 330:3
387:20,22
**colamarino**
343:17 344:6
430:19 437:10
438:1 442:16,19
442:25 443:11
444:5,20 445:17
445:22 447:1,20
448:3,6 449:4,21
450:4,16 451:18
509:12 510:2
**coleman** 265:13
**colleagues** 316:5
**collect** 361:13

collected  340:20
342:8 353:6
354:18 488:18
489:9,19,24 519:2
521:18
collection  338:4
342:25 346:3
360:4 361:14
362:7 519:1
521:24
college  459:24,24
collin  265:13
colorado  535:6
536:12
column  324:1
358:17 359:9
416:22
combined  282:6
come  316:21,22
333:7,17 363:1
368:15,19 369:9
380:25 381:2
385:15 390:17
404:19 413:11
422:13 434:2
446:16 461:10
463:9 466:17
471:2 472:23
482:17 489:2,11
500:2,11,19
524:18
comes  299:20
471:11 481:22
538:24
comfort  315:24
383:9
coming  364:25
comma  289:21
commencing
264:5

comment  308:3
347:25 405:16
419:18 511:16
commenting
405:19
comments  397:6
404:9 405:9,11,15
414:8 415:13
513:21
commercial  428:9
commitment
391:9
committee  277:17
277:18 278:1,19
278:24 279:12,20
283:1 333:12,22
334:1 469:21
470:6 471:12,13
471:24 472:2
473:3,10,17,21
474:11,18 475:1
475:14,20 480:3,3
491:16 510:23
529:5,5,7 530:24
538:19 539:6
common  271:13
296:8 308:2,12,14
308:24 309:1
481:18
communicated
279:10,13
communicating
308:13 445:6
469:1
communication
307:5 444:24
472:16,20
communications
277:25 292:23
324:8,9 339:23
343:7,12,18

344:12,13 363:22
363:25 364:5
366:18 369:8
372:2 396:20
400:9,19 430:23
435:17 436:25
445:19 472:13
community
300:16 312:6
companies  273:8
293:8 295:23
298:9,12 336:4
400:20 415:20
429:16 464:2,15
465:13 470:8,17
472:15 475:11
481:5
company  270:17
272:2 277:22
278:3 283:13
290:11 292:20
296:1 303:19,24
304:1 317:15
324:9 339:13,25
340:12,21 341:22
342:7,24 345:15
347:18,23 349:6,7
353:6 355:23
361:6,11,11
362:17,18 364:18
367:22 370:17
371:20 405:18
413:20 415:25
416:1 419:20
421:14,17 422:3,5
427:14 432:5,15
435:1 436:8,11
445:6 446:14
447:17 449:1,1
452:12 453:4
455:25 456:10,16

464:5,8 465:19,20
465:23 466:10,10
467:4,25 468:1
469:1 471:4,5,9,10
471:18,20,21
472:4,14,18,25
473:21,25 474:2
474:19,22 475:2,8
475:9 477:14,16
481:17 487:7,19
487:24 488:1
489:14 491:17
506:21 507:22
508:8,9,11 512:6
514:4 526:18,19
529:13,13,20,23
530:10,14,25
531:5 533:1
company's  271:13
311:13
comparison  356:6
complaining
425:18
complete  377:20
382:3 386:9
390:21 528:7
completely  298:18
378:25 383:20,22
390:17
composite  357:22
composition  336:9
428:2
compound  344:10
349:1
computer  270:4
295:18 495:1
concern  377:19
concerned  449:7
450:6,10
concerning  421:24

concierge 377:7
concise 388:7
conclude 378:20
concluded 356:18
concludes 541:1
conclusion 352:17
479:22
concrete 518:5
conducted 346:2
414:23
conference 334:25
338:19 399:3,24
431:4,11 432:7
478:17 510:7
conferring 316:15
confident 390:17
confidential 268:3
275:23 399:25
confirm 291:10
499:19 517:9
confirmed 312:15
conflate 335:17
congress 398:23
connect 455:8
456:1
connecting 455:23
connection 283:12
284:6,10 305:22
309:22 347:6
connors 343:25
consent 270:20
consider 336:24
434:15 486:17
488:24 525:21
534:20 536:7
considerably
358:7
consideration
340:22 386:5
considered 339:15

considering
409:22 432:9
435:7 452:16
considers 536:4
consistent 310:10
517:5
consists 345:19
357:3 534:4
constructive
415:13
consultancy
432:18
consultant 417:11
417:15 419:20
421:13,16
consultants
414:15 418:18
consulting 432:4
480:17
consumer 265:22
290:24 291:7,12
292:20 373:24
406:16 418:3
429:14 463:18,19
476:11 479:3,17
479:19,23 480:4
consumers 417:2
contact 429:15
448:23 449:24
451:2 511:21
525:22 527:15
contacted 437:6
449:23 452:5
contain 289:18
346:17 351:14
417:4 428:10,25
506:12,13
contained 289:16
289:21 306:15
340:8 342:21
347:5,9 351:19

362:24 366:13
367:15 369:2
372:4 394:11
436:10 456:21
492:9 495:21
519:10,22 537:25
539:19 540:17
container 371:23
containers 371:19
containing 320:13
370:16,22
contains 299:22
323:11 347:2
521:13
contaminants
329:1 346:14
370:23
contaminated
491:7
contemplated
383:21
contemplating
355:17
contemporaneous
500:7
content 306:14
356:1,3 402:25
context 334:22
335:19 386:14
416:25 430:12
continue 270:7
312:8 315:15
348:7 378:17
384:7 439:19
continued 272:6
454:12 455:2,16
489:6
continues 335:4
335:23
continuing 348:4
378:2

contraception
463:14
contribute 308:5
contribution
320:23
control 417:3
432:15 513:23
conversant 488:12
conversation
536:17
conversations
506:19 519:17
conveyed 487:6,18
conveying 508:7
coordinate 392:1
392:16 472:10
coordinating
338:3 385:19
copied 323:23
324:12 412:2,3,5,8
412:11,15,16
414:2 417:21
420:10 427:4
428:23 431:22
432:19 511:15
copies 280:3
291:25 292:3,5
294:11 403:12,21
copy 277:8 412:19
414:5 438:20
copying 395:10
416:13,14 427:13
core 355:15 356:1
356:7 358:13
corner 277:10
408:4
corners 271:25
corporate 277:25
321:6 322:2 324:8
339:23 343:18
344:12 363:9,15

[corporate - current]                                                                 Page 14

363:25 364:3
369:8,23 395:18
396:18,19 436:19
436:25 472:13,20
**corporation**
462:18,19 463:12
470:14
**corporations**
363:1
**correct** 272:16,19
272:22 273:14,19
274:14 275:2,24
276:10,16,24
277:5,20 278:24
279:23 281:12,20
281:23,24 282:1,4
282:7,10,14,18,19
282:22 289:24
291:23 292:1,3,9
292:13 293:21,22
293:25 296:4
303:18 321:10
322:4,7,8 323:18
324:21 325:13,25
326:8,14,15,22,25
329:25 330:5
335:10,14 337:15
338:16 339:21
343:10 346:19
350:6 352:9
354:10 355:11
362:13 363:9
365:8,16 372:6
373:3,6 394:21
400:1,6,10,13,21
401:22 402:9
409:1 414:15
415:22 421:14
422:10 436:16,19
436:22,25 440:2
443:12 446:20

448:10 449:5
450:13 453:19
454:15 455:4,17
456:14 491:22
506:18 508:20
509:23 513:12
514:5,8 519:5,10
519:18,22 520:3
520:10 523:13
525:12 532:16,17
537:16
**corrected** 512:7
**correctly** 284:25
**correspond** 351:7
**correspondence**
426:6 481:23
**cosmetic** 323:12
329:4 356:19
399:19 400:4
405:23 409:7,11
410:2 414:7
416:18 420:2
421:7 427:25
435:13,23 467:19
479:16 486:21
513:11 514:5
**cosmetics** 417:2
**cotler** 266:24
**counsel** 270:11,20
284:7 285:10
290:8 293:5
304:19,23 338:1,3
338:6 353:10
376:14,22 378:2
378:22 382:23
383:25 464:19
465:5,8,15 469:2,8
469:12 476:15
477:1,25 480:10
481:21 482:1
490:9,12,16 497:6

499:9,11 507:4
515:6,7 526:11
542:9,12
**counsel's** 310:13
382:10 468:15
**counsels** 270:25
**count** 534:21
536:9
**country** 306:8
312:1 362:23
365:25 461:16
464:20,21 466:12
481:8 488:10
**county** 263:1
270:14 461:1
**couple** 300:14
370:3 469:8
476:15 478:14
480:25 482:9
485:15 490:9
495:6 516:18
525:24 526:22
**course** 271:20
306:6 353:9
415:25 429:13
462:12 468:19
472:6 474:11
502:21 515:9
**courses** 486:15
**court** 263:1 264:2
264:3 269:22
270:13,18,24
274:18 286:16
290:15 302:3,24
305:2 311:1
378:21 386:5
387:7 402:1
461:24 462:7,12
465:16 481:20
483:9 484:4,20
485:2 487:9

494:24 502:22
539:13
**court's** 271:23
318:17,20 539:23
**courtesies** 381:15
**courtesy** 384:6
**courtroom** 462:9
**courtrooms**
462:10
**courts** 456:19
**cover** 276:6 350:9
408:3,12 414:6
437:9
**covered** 384:1
**covid** 467:12
**cox** 265:13
**cpww** 361:11
**crayola** 365:22
**crayon** 365:22
**created** 271:10
330:10 331:20
332:7,25
**credibility** 484:3
**criminal** 305:4
461:1
**crisan** 395:17
**crocidolite** 327:10
**cross** 386:3 459:12
**crr** 542:16
**crucial** 336:8
**crux** 384:12
**crystal** 263:6
**ctfa** 322:10 335:20
335:22 405:22
409:4,9,11 410:6
424:6 511:9,12
513:9
**cure** 364:22
**cured** 365:3
**current** 309:12
356:7

currently   523:19
   525:3
custodian   299:23
customary   381:11
customer   425:1
cut   313:14,24
   317:13
cyclone   281:22
cyprus   298:11

**d**

d   282:12
da's   461:5,25
   462:12
darlene   263:5,7
data   299:25
   303:16 329:2
   488:20
database   297:12
   297:13,13,16,17
   297:18 299:11,13
   299:21 300:6,8
   302:11,16 303:11
   303:14 310:19
   312:11 313:11
   314:17 379:4
databases   297:10
   299:18 309:5
   312:25
date   276:20
   293:24 299:21
   312:3 376:9
   402:24 415:21
   426:19 430:5
   440:4,8,9 542:6
dated   274:3
   275:10,12 276:18
   276:23 290:24
   326:20 330:16
   331:12 345:1
   346:7 350:10
   363:11 395:2

406:9 420:5
427:21 436:16
445:12 469:20
485:11 533:8
dates   415:23 435:6
dating   530:13
daughter   467:2
david   263:12
   373:11,13
day   298:14 380:21
   382:13,18 383:13
   383:19,21 385:12
   386:12 388:11
   389:13 390:3,21
   390:24 391:3
   428:18,25 430:14
   434:24 443:16
   465:2 467:21,21
   476:5 479:21
   480:2
days   380:7,8,10
   388:10,20 389:20
   389:22 390:3,8
   401:7 402:19
   443:23 444:7
dc   511:1 512:10
deal   314:20 317:8
   317:20 385:4
   386:24 392:20
   461:10 481:16
   498:17 517:11,18
   518:5
dealing   316:18
   446:7 465:4,14
   467:25
dealt   358:22 370:3
   389:6 462:22
   506:3 527:9
   539:22
dear   280:2 291:10
   401:6 402:14

418:13
death   302:5
   329:23
decades   328:8
   420:23
deceased   263:5
december   440:4
   534:5
decide   447:3,6
   449:16
decided   423:21
decision   493:17
   500:18
decisions   413:25
   486:22
deckard   263:6
deep   383:3
defend   382:24
   465:8
defendant   266:4
   298:12 301:9,9
   302:4 305:14
   308:16 311:12
   312:1 317:19
   461:20
defendant's
   289:14 313:25
   346:12,16 492:8
   495:19
defendants   263:11
   263:17 265:21
   266:9 311:9 312:4
   461:9
defending   283:12
   368:24 462:5
defense   271:10
   293:14 295:4
   296:8 301:16,17
   305:13 382:23
   462:4

defer   299:6 328:10
   348:9 359:19
   360:8,18 409:22
   409:23
definitely   279:2
definition   347:17
degree   428:2
deleted   399:12
deliberately   382:9
deliberations
   414:9
demeanor   390:10
department
   337:10 364:15
   400:9 408:21
   438:2 450:5 465:3
   470:18 522:14
departments
   361:12,14
depose   390:4,13
deposit   273:24
   275:16,17
deposition   263:4
   270:10 272:11
   302:19 305:23
   306:8 312:8 315:1
   325:4 344:23
   346:8,25 350:2
   363:4,6 372:12
   377:20 378:20
   380:22 381:25
   382:24 383:12,14
   383:17,19 385:13
   385:20 386:2,6,9
   387:4 388:6,11
   389:11,14 392:8
   392:15,24 400:16
   406:7,8 411:17,24
   426:14 430:2
   436:15,15 445:7
   461:14 469:13,19

476:8 482:1,16,21
485:9,10 490:2,8
497:12 499:8
500:8 501:24
502:1,4,8,12,21
509:5 533:6 541:4
**deposits** 527:4
**describe** 288:13
312:2 473:18
**described** 302:9
352:14 364:4
424:18
**description** 268:2
269:2
**desire** 386:13
387:6
**detail** 288:21
**detailed** 351:23,24
**detailing** 395:22
397:4 398:23
**details** 489:16
**detected** 328:19
359:14
**determination**
342:21
**determine** 316:5
351:14 355:25
446:2 491:6
492:21 496:10
497:12 498:4
501:12 502:13
**determined** 340:7
519:10
**determining**
409:17
**develop** 328:7
**developed** 336:16
337:23 339:14
343:16 344:17
348:22 349:7,9,17
350:5 360:16,17

360:23 361:7,21
362:12 485:19
487:1,13 488:15
528:14 531:12
**developing** 539:2
**device** 463:20
464:5
**devices** 270:5
**diagnosis** 329:23
**dick** 324:16,18,19
325:7,11,17 326:1
326:4,10 330:4
**different** 284:22
286:6 293:8
295:22,23,24
303:9,9,10 325:20
336:10 361:12
379:8 388:2,3,3
391:25 455:9
469:6 470:14
476:22 481:6,6
488:10 490:10
499:13 540:9
**difficult** 468:17
481:25
**difficulty** 487:8
**diffraction** 355:15
**diffractograph**
536:19
**direct** 272:6
334:16,17 446:18
446:22 447:17
448:22 531:25
**directed** 447:15
496:19,24 500:7
540:6
**directing** 408:12
447:20 486:22
**direction** 373:2
**directly** 310:22

**director** 406:15
408:19
**disagree** 272:3
309:5 311:20,24
313:22 315:4
316:3 338:12
379:1 383:25
387:3
**disagrees** 315:3
**disappointed**
377:23 424:5
**disappointing**
483:20
**disappointment**
424:19
**discharger** 266:22
**disciplined** 460:19
**disclose** 444:11
**disclosures** 331:25
**discoverable**
315:6
**discovered** 317:17
**discovery** 303:7,8
341:10 387:4
465:11,16
**discuss** 295:5
308:7 316:4 376:1
376:6,21 403:5
437:17 458:9
**discussed** 375:9
386:19,22,23
387:1 395:9
411:23 435:7
444:5 475:25
504:18 506:14
519:13 539:23
**discussing** 313:25
318:18 385:10
506:24
**discussion** 330:22
333:11 379:21

384:17 385:2
388:12,24 478:23
**discussions** 333:21
334:1 506:10
537:7,9
**dispositive** 296:3
**dispute** 352:15
433:15,20,20
**distinct** 524:21
**distinguishing**
469:2
**district** 460:21
**dittman** 343:23
**divided** 327:8
463:17
**division** 263:1
270:14 461:4
**divorced** 500:9
**doc** 401:2
**docket** 263:2
270:14
**doctors** 462:5
**document** 271:9
271:17,25 276:13
276:21 277:1,8
286:5 289:5
292:11 293:11,13
294:10,15,19
295:6,14,16
296:16,23,25
297:2 298:16,25
299:2,22,23 300:9
301:21 303:3,4
304:5,22,24 305:5
305:8,11,16,21
306:2,4,12,13
307:2 309:25
310:11,15,18
311:5,13 312:3,9
312:11 313:2,16
314:12,13,15,18

314:25 315:9,11
315:14,22 317:16
317:18,20 318:18
318:22 319:7,12
323:20 328:4
329:18 330:11
332:4,22 338:3
345:9,16,24 346:7
346:24 347:7,12
347:21 349:2
350:8,12,16
352:11,12,15,16
352:20,23 353:12
353:15,19 354:7
354:21,24 359:21
360:3,4 362:7
368:20 372:8
378:14 379:3
397:17 398:17
399:8,14,17,18,23
401:2,15 404:17
405:13,25 406:3
408:3 412:25
422:22 427:6
430:5 438:8 439:9
439:20 442:8,24
450:15 458:21,24
469:18 470:8
473:2,7 476:23
477:11 480:9,13
480:16 482:7
489:21 490:6,10
490:15 492:21
496:9,19,25
497:11,18,25
499:7 500:8,9,13
500:14 501:11,21
502:2,2,12,13
503:22 513:14
515:9 517:5 519:1
519:12,13,16

520:15 521:9,23
528:13 533:8,19
534:16 536:15
**documentation**
357:2
**documents** 271:19
273:23 274:2
275:6,9,12,14
277:22 288:5,7
293:10 295:3,21
295:24 297:16,17
297:21 298:23
299:12,16,19
302:7,9,13,18
303:1,5,12 309:9
309:14,17,18,21
309:22 310:7
311:2,3,7,16
314:18,20 336:21
338:2,2,13 339:18
340:8,11,12,16,19
341:7,9,16,20,21
341:23 342:1,6,7
342:12,22,24
345:25 346:3
349:21 352:25
353:4,5,8,16,17
354:1,12,14,18,19
359:25,25 360:25
361:8,13 362:19
378:3,12 379:16
379:17,19,20,24
382:22 386:17,22
387:9,19 404:10
407:15 408:1,10
429:11 435:20
458:5,13,15
465:16 480:20
482:11 485:21
488:3,5,13,16,17
489:2,9,24,25

492:14 493:5,8,16
495:8,9 496:1
498:4,7 502:22
506:23 507:6,16
507:22,22 514:13
514:18,24 515:15
515:17,19 516:12
516:22 518:20
520:9 521:18
522:3,4,20,25
528:18,24 529:12
529:12,15 530:5
530:10
**dog** 387:17
**doing** 278:4
283:11 317:4
377:24 378:24
382:10,23,24
385:23 392:8
404:21 426:11
433:4 446:14
463:15 467:5
471:6 473:22
474:13 489:7
491:12 502:18
509:3
**dollars** 311:25
**door** 315:18
482:10 493:8
516:16
**doubt** 314:19
387:2 411:15
422:12
**doubtful** 445:25
**douglas** 329:13
**dozens** 309:23
311:7
**dr** 292:3 322:3
324:1 339:2,2
340:6,15 341:16
342:19 360:22

407:6,14,21 408:7
408:10,13,18
411:7,12 412:5,8
412:11,19 413:18
414:5,7,13,19
415:4,10,11,19
416:4,13,14,17,24
417:7,10,20 418:2
418:2,8,12,12,20
418:24 419:2,7,8
419:13,22,25
420:5,10,12,17
421:6,20 430:14
430:18 431:2,25
432:2 433:5,12,15
434:20 438:2
443:5,5,5,11 444:4
445:17 447:1
449:22 469:25
472:2,3 479:12,14
480:17 483:2
506:17,23 510:2
510:10,10,14,22
511:5,14,20
512:11 513:9,20
519:9,14,18,20
520:2,6,18 521:3
527:7,13,14 528:2
531:17 533:24
534:9 537:15
539:6
**drag** 382:12
**dramatic** 464:13
**drinker** 266:6
**drive** 266:7
**driver** 460:1
**drove** 482:12,13
**due** 310:3
**duly** 271:5
**duration** 470:10

**duty** 312:2 315:8
461:15 484:19,25
485:6

**e**

**e** 265:7,7 266:1,1
268:1,6,20,22,23
268:24 269:1,3,4,6
269:13,15,16,18
269:20,22 271:2
321:5,8 322:3,6,9
323:16 324:6
334:17,18,22
335:8,19,20
337:20 338:9,10
338:15,24 341:6
342:2 343:9,9
344:8,20 350:3
354:11 360:1,8,11
360:13 361:1
363:6,11 364:2
365:15 366:4
368:18 369:21
370:7 372:22
373:5,17 379:16
383:10 385:5
394:1,1,9 395:1,2
395:3,5,9,22 396:5
396:5,13,14,17
397:3,5,9,10,25
399:12 400:16,24
401:1 402:12,17
406:9,14,19 407:8
407:14,21,24
408:7 409:6
414:19 416:11
423:9,13 426:16
427:1 430:4,6,13
431:24 434:19
444:20,24 445:8
445:12 446:25,25

447:20,24,25
449:20,21 453:6
453:11,16 454:3,7
458:21,23 459:4
478:2 485:11,16
485:18 486:1
489:1 509:6,8,12
509:22 510:1,7,19
510:21 511:9,21
522:2,10 528:20
528:23 538:25
**earlier** 291:3,22
306:18 385:5
392:2,7 393:2
394:7 411:8
427:10 430:14
448:18 461:3
476:9 480:20
487:6,18 490:8
517:10
**earliest** 304:12
**early** 326:4 406:16
410:13 530:18
**eastern** 264:6
318:7 393:16
457:9 459:9 501:1
541:5
**easton** 365:21
366:6,11
**eat** 269:10 384:19
420:17
**eating** 398:4
**economy** 269:10
420:18
**edit** 394:20
**edited** 329:13
394:15,17 399:18
399:18,19,23,24
**edits** 397:17,22
398:5,13,14

**education** 486:12
**effect** 413:24
**effective** 398:19
**efficiently** 316:16
**effort** 299:1
385:21 472:8
**efforts** 311:1
392:17 424:6
448:4,8 449:5
454:9
**eight** 443:23 444:7
481:11
**either** 305:22
382:2,2 498:25
522:24
**elaine** 344:2
**electron** 355:15
358:12 359:8
439:7 440:2
**electronic** 270:5
**ellis** 265:9
**elmo** 458:5 459:2
469:12
**else's** 271:19
**embarrassed**
406:11
**emphasized**
344:16
**employed** 415:20
460:1 477:19
**employee** 292:19
340:1 415:24
416:5 542:9,11
**employees** 464:14
**employment**
345:14 464:13
481:10
**enclosed** 521:5,6
**enclosing** 418:13
418:21 438:19

**endeavor** 386:8
**ended** 382:18
393:11
**ends** 280:7 281:2
318:5 395:1
518:10
**enforcement**
461:11
**england** 472:4
**english** 266:2
**enjoy** 466:5 468:7
**enjoyed** 523:9
**ensure** 409:12
473:22 513:23
**entered** 303:8
**entire** 367:21
376:23 385:15
410:21 411:2
427:14
**entirely** 454:6
500:9
**entitled** 275:23
276:1 379:9 388:4
414:7 533:9
**environmental**
408:20 414:14
418:18 420:25
**epidemiologic**
479:2
**epidemiologist**
510:24
**epidemiology**
478:25 486:18
**especially** 312:5,5
432:21,25 433:6
434:9,20 483:1
**esq** 265:8,9,9,13
265:18,19,19,20
266:2,7,15,17,19
**essence** 371:16
449:9

essentially 517:9
established 327:16
estate 263:5,7,12
estimate 481:10
  498:19
estimated 356:14
et 263:10,16,21
  270:12,12 284:4
  473:5 540:1
evaluation 479:17
  479:22
evans 263:6
event 382:17
  500:19
events 422:14
eventually 304:10
everybody 377:17
  393:14
everybody's
  390:18 393:5
  528:7
evidence 274:17
  347:21 356:11
  417:13 436:6
  450:25 452:5
  454:17 503:22
evidenced 429:11
  470:8
exact 395:15
exactly 310:23
  347:15 348:20
  364:17 493:19
  497:6
exam 458:5
examination 263:5
  267:5 268:11,16
  272:6 350:16
  351:2,23,24
  355:14,25 379:18
  385:21 387:23
  388:1 459:12

490:4 503:20
  526:1 532:7
examined 351:7,9
  351:13 356:8
  531:5
example 386:18
  386:23 387:8
  472:2 490:1
  530:23
examples 386:16
exceeded 356:13
exceedingly
  382:21
excellent 466:12
excise 305:8
excised 305:4
exclude 458:8
excluding 357:19
exclusively 357:3
excuse 285:1
  377:5 457:20
  505:2,2
executor 263:5
exhibit 271:8
  272:10,15,24,25
  275:21,22,22
  276:1 287:14
  288:23 289:12
  290:20,21 291:22
  293:15,24 301:12
  306:16,18,22
  307:6,7,13,23
  318:17,18 319:24
  321:4,5 325:3,4,6
  330:16 334:4,5,13
  344:22,24 346:8
  346:25 350:1,7
  354:7,20,24
  359:22 360:7
  363:3,5 369:14,20
  372:12,15,21

378:5 394:23,24
  394:25 400:15,16
  406:6,8 408:6
  411:16,17 417:23
  417:24 418:1
  420:4,4 422:20
  426:13,16,22
  430:1,2,4 436:14
  436:15 441:24
  442:1 445:7,12
  451:14 454:20
  469:12,14,19
  473:1 475:13
  476:7,11,24
  478:20 485:9,10
  490:2 491:19,24
  492:1 502:1,3
  509:5,6 512:17
  514:11,11 520:17
  521:21 522:2
  528:11 533:5,8,19
exhibiting 357:21
exhibits 269:22
  317:14 386:15
expect 314:24
  388:6 393:2
expectation
  308:13
expected 308:25
  383:12 384:6
experience 466:11
  486:12 508:8
experienced
  486:13
expert 279:5
  480:17 481:23
expertise 328:11
  449:3 465:24
  481:17,20
experts 481:14,15
  481:19

explain 331:18
  332:4,22 333:4
  465:19 471:9
  485:17
explained 341:8
  461:23 463:8
  470:22
explaining 514:22
  516:10 518:18
exploiting 355:17
exposed 328:6
exposure 274:7
  320:9 327:22
  329:3,4 474:9
  481:21
exposures 427:25
express 365:22
expressed 414:24
extended 381:15
extensive 499:6
extensively 290:18
extent 299:16
  517:2

---

f

---

f 264:2 394:1
face 368:22
facilitate 482:15
fact 308:15 328:6
  328:22 370:2
  386:15 388:19
  402:5 417:10
  425:23 428:6
  477:5,19 478:1
  504:8 506:13
factory 365:23
facts 308:5 417:13
faegre 266:6
failure 271:18
fair 314:16 379:18
  389:18,25,25
  390:6 479:5 484:4

484:9 529:21
538:11
**fairness** 313:4,5
**faith** 296:5 317:5
382:3,9 385:20
390:18 393:5
**false** 290:10
**familiar** 288:8,16
363:17 399:6
422:24
**family** 466:21
467:10,14,15
468:11 525:7
**fantasy** 391:2
**far** 455:23 456:15
456:15
**fashion** 445:1
467:24
**father** 525:9,10,11
**fax** 269:8,12,14
272:15 273:9,11
291:3 414:19
420:5,13 421:20
426:20,22 436:16
436:18,21,24
437:2,5 441:24
443:4,8,24 444:6
452:22
**faxed** 428:22
**fda** 278:2,5,15
333:16 335:16
351:9 470:10,16
472:8 474:5
475:15,21 479:14
479:21 480:3
512:21 513:10,21
514:4
**feasible** 305:10
**feature** 356:23
**feb** 294:4

**february** 268:6,23
269:14 291:11
293:20,25 294:3,7
306:13 307:8
319:25 321:21,23
322:2 370:7
427:21 436:16
438:9 442:1
**federal** 303:1
385:25 392:1
413:12 462:7
**feedback** 295:19
364:21
**feel** 297:2 359:18
388:18 483:17
**felt** 449:17
**fibers** 274:20
328:18 357:21
367:8,9 417:4
513:11,24
**fibrous** 345:20
347:10,18 357:4
357:16 417:1
**field** 279:7 481:17
**fight** 424:6 425:2
**figure** 497:20
**figures** 357:13
**file** 395:22
**filed** 270:13 302:6
**files** 331:19 332:4
332:23 353:7
407:16 489:14
**final** 290:2 407:15
408:1,10 493:17
494:10
**finally** 468:10
493:9
**financial** 523:13
525:3
**financially** 542:12

**financing** 467:3
**find** 297:20 298:17
298:23 300:9
313:2,18 373:18
**finding** 329:16
436:4 451:23
453:17 454:11
455:1 492:22
496:10 501:12
510:4 531:6
**findings** 452:6
490:13 519:24
**fine** 376:1,6,15,20
377:3 391:18
439:16 466:14
517:25
**finish** 279:18
331:4,8 348:4,5
372:15 383:4,19
384:13 389:22
390:4 391:3
396:10,11 494:2
498:12 499:2,5
504:5
**finished** 331:10
341:1 357:23
**finite** 382:19 390:9
**firm** 303:15,16
309:11 312:20
325:17,19,20
326:12 328:13
330:4 333:7 389:9
462:2,4,10,15
480:10 488:6,9,9
488:11 514:25
515:16 516:13
518:21 519:2,4,8
520:2,4,18 521:17
521:18,24 522:5,6
522:25 523:1,5,5

**firms** 303:10,12
330:20 331:25
464:21 515:19
522:5
**first** 271:5 283:6
283:17 284:19
286:19 287:1,5,14
287:18 295:14
302:6 305:21
308:2 310:22
323:6 334:10,12
344:23 352:19
380:5 381:24
385:11 388:16
401:3 410:7
416:20,22 444:8
445:11 453:7
461:15 466:19
476:20 486:5
492:20 496:8
501:10 520:22
527:15
**fishing** 378:8
**five** 316:21 378:6
458:4,25 499:1,2
541:2
**flatly** 424:25
**flavor** 390:11
**flight** 291:16
**flip** 509:7
**flom** 265:17
266:24 271:3
**floor** 265:10
**florham** 266:8
**flotation** 280:14
281:25
**floyd** 451:24 452:5
**focus** 384:12 388:3
479:1
**focused** 357:1

**focusing** 387:23

**folks** 472:1 485:25
526:22 528:20
529:6

**follow** 341:12
361:17 397:25
434:21,25 435:3
436:11 449:1
451:21 452:12
503:18 517:11
525:25

**followed** 340:21

**following** 277:8
284:17 286:17
287:24 319:5
320:3 332:20
454:23 487:10
495:14 498:9
501:8 505:5
515:20 516:8
518:16 534:3
539:14

**follows** 271:5

**footnote** 282:12
414:22

**footnotes** 414:17
414:18

**force** 335:22
336:11

**forced** 379:7

**foreclosed** 389:16

**foregoing** 290:10
542:3

**forensic** 436:2
439:1,21 442:20
443:9,24 444:6,21
446:19 448:19,23
451:4,15 452:14
452:22 453:8,17
453:23 454:3,11
454:25 455:13

510:3

**forget** 279:1
325:17

**form** 289:16,21
372:11 474:21
475:6,23 477:12
477:21 478:7,12
479:7,13,25
480:23 482:23
483:18 484:13
485:3 486:9,14
487:3,15 489:3,12
489:18 490:17
491:20 492:10,18
492:24 495:21
496:5,12 501:14
502:16 503:6,10
526:15 528:25
529:9,18,25 530:7
530:15 531:2,14
531:20 532:2
537:25 539:19
540:18

**formal** 314:11

**formally** 314:9,10

**format** 302:8,10
303:5

**formed** 470:6
474:11

**forth** 391:11 542:7

**fortunate** 384:13

**fortunately** 467:13

**forum** 478:23

**forward** 325:4
450:1 517:14

**forwarded** 397:5

**forwarding** 406:20

**forwards** 396:16
397:10

**foster** 345:6

**found** 449:12
451:2 452:14
454:10,24 455:14
461:18 480:3
536:13 537:4

**foundation** 276:13
283:2 292:15
293:1 323:20
328:9 330:7
331:22 337:16
345:10 347:21
350:24 352:11
358:2 359:2
368:13 369:18
402:2 409:20
410:23 412:14
418:6 419:11,17
421:15 422:18,21
426:2,8 429:2
431:16,19 432:11
433:18 434:13
436:6 437:14
439:10 441:22
444:9,22 446:12
449:15 451:6
453:1,21 454:17
474:20 475:7,24
477:13,22 479:8
487:4,16 489:13
491:21 502:17
503:7,11 504:16
514:6 529:10,19
530:2,8,16 531:3
531:21 532:3
533:15 534:17
536:1,14,25

**four** 266:3 271:25
302:18 364:3
380:20 462:17,17

**fourth** 277:3

**fraction** 357:4

**fragrance** 370:24
371:5,10,21

**france** 291:21
413:20

**frankly** 383:24

**free** 274:19 323:12
336:16 337:21,24
338:23 339:10,14
340:17 343:14,16
344:17 348:23
349:8,18 352:1
353:3 360:24
361:22 362:13
368:2 370:22
371:17 399:20
400:5 405:17,23
409:12 410:3
428:18 429:1
456:23 485:20
487:2,13 488:15
502:23 503:5,25
528:15 531:12
534:20 535:14,22
536:4,7 539:2

**fresh** 379:17

**friday** 291:11

**friends** 468:11
525:18,20,21

**fritz** 343:21

**front** 307:21 378:3
499:7

**fulfill** 485:6

**full** 424:7

**fully** 383:12

**further** 271:7
284:8 346:14
398:1 449:20
457:15 458:1
494:8 503:16

517:17 532:7
540:20 542:8
**fyi** 322:10 407:15

**g**

**g** 271:2 520:23
**gain** 379:9 430:12
**gained** 284:9
**gamut** 465:9
**garbled** 439:13
**garde** 266:2
**gary** 369:24,25
**gateway** 266:3
**gather** 488:8
515:19
**gathered** 515:15
515:17
**gathering** 473:25
**gene** 326:5,7 488:6
515:1,17 516:14
516:24 517:3
518:22 519:2,4,25
520:7,22 521:23
**general** 284:11
328:24 376:13,22
464:25 538:15
**generalized** 540:2
540:4
**generally** 330:21
411:4 473:19
515:8
**generated** 304:6
**generates** 471:20
**generically** 387:22
**gentleman** 300:11
**gerel** 266:20
**getting** 317:22
378:21 385:12
387:25 392:6,10
460:8
**gettings** 513:9,20

**gilbertson** 479:12
479:14
**gist** 506:20
**give** 284:4 297:3
315:24 317:1
335:19 377:24
381:19 383:9
386:15 422:6
437:21 449:18
461:5 464:24
471:14 482:7
485:16 493:17
528:6 532:19
**given** 271:13
309:10 310:16
314:22 315:7
389:9 404:23
405:15 463:25
469:5 541:2
**gives** 414:19
**giving** 378:1 379:6
389:16,24 494:10
**glad** 385:6 459:15
500:10
**gladly** 500:4
**glasses** 440:15
478:20
**gmw** 520:5
**go** 270:8 272:13
275:21 280:25
290:21 295:7
307:25 318:25
319:3 323:4 325:3
329:11,20 350:1
363:3 370:11
372:12 377:8,10
378:4,13 381:12
382:13,17 384:18
386:11,21 390:8
393:9,12 394:23
394:25 397:9

400:15 406:6
409:3 415:5
421:23 422:20
426:13 431:17
438:8 441:24
443:14,21 445:7
449:20 457:20
458:7 466:5,7
469:7 473:15
497:19,23 498:7
498:25 502:6
515:22 516:1,7,21
517:12,14,17
518:4 528:11
**goes** 284:7 299:21
367:7 412:23
466:8 517:15
**going** 270:2 272:4
285:4,22 288:14
293:12 295:2,17
304:14 306:10
308:9 313:15
317:7 318:8
319:20 325:4
331:6 334:11
337:22 346:10
363:20 364:22
369:10 377:13,23
378:16 384:16,17
387:2 388:13,16
389:21 390:11
392:14 393:11
394:2,24 401:25
404:19 405:1,4,7,8
406:4 440:14
445:2 446:1
454:19 457:5,10
466:6 469:10,11
474:8 477:10,15
490:22 493:4,13
498:20,21,22,24

500:23 501:2
504:4 513:18
515:2,4,21 517:21
517:23 539:10
540:25
**good** 270:1 296:5
317:5 382:3,8
385:20 390:18
393:5 396:22
454:18 459:13
466:10,15 482:20
516:4
**goodman** 266:13
**google** 299:24
**gotcha** 317:6,6,7
**gotten** 322:10,15
387:24 392:11
494:13
**government**
337:10,14 409:1
427:19 432:8
471:1
**governmental**
434:5
**grab** 478:20
**grade** 323:12
356:19 370:24
371:10 398:4
399:13,19 400:4
**graduated** 460:20
**grand** 461:8,12
**grandchildren**
466:24
**grange** 273:13,16
273:21 274:24
291:16,20 294:10
294:11,20 306:19
319:13,24 320:23
321:22,22
**grange's** 306:21

**grateful** 423:25
**great** 440:20 457:3
  457:18 466:11
**grew** 459:22
**grinding** 280:14
**ground** 378:23
  384:2 386:14
  467:5
**grounds** 293:13
  358:2 402:3 453:1
**group** 364:15
  369:15 413:24
  446:1,6 470:11
  472:16,20
**groups** 303:10
**grutzner** 343:21
**guess** 273:11
  390:20 415:23
  429:12 472:9
**guidance** 515:24
**gw** 520:14

**h**

**h** 265:8 268:1
  269:1 271:2,2,2
  403:25,25 404:8
**haddonfield** 265:4
**half** 385:12 391:14
  391:17 449:24
**hammock** 263:12
  263:13
**han** 334:23 335:19
  336:3
**handle** 477:16
**handled** 326:2
  468:3
**handles** 368:14
**handling** 429:19
  433:2 491:4,8
  523:6
**happened** 297:3
  326:6 392:4

468:19 478:16
  479:5 501:24
**happens** 380:3
  383:7,23 390:16
  393:7
**happy** 312:12
  391:24 499:16
  500:19
**harassing** 332:10
  378:23 382:6
**hard** 277:8 297:21
  461:17 494:19,23
**harmonization**
  479:15
**he'll** 297:11
**head** 344:7 376:13
  376:17,18,23
  520:7
**headed** 333:16
**heading** 294:20
  319:13 409:6
**headway** 381:3
**health** 337:10
  408:20,21 476:12
**healthcare** 372:5
  375:13
**healthscout.com**
  370:8
**hear** 272:7 279:3
  301:24,24 304:14
  333:11 352:20,21
  352:22 389:23
  390:5 431:4,12,25
  432:7,21 439:13
  439:16 457:23
  494:16,19 495:4
**heard** 284:24
  286:9 494:3,5
  496:17
**hearing** 431:6,21
  432:22 439:11

494:23
**hearings** 460:10
  460:13
**heat** 396:6 398:18
**heirs** 263:7
**held** 373:19
  374:18 385:2
**helen** 334:23
  335:19 336:2,8
**help** 300:12,22
  320:19 321:9,13
  378:21 480:25
  488:9
**helpful** 295:13
  440:19 469:16
  499:25
**henderson** 329:13
**hereinbefore**
  542:6
**hesitate** 358:21
**hey** 448:12 451:10
  454:8
**hi** 449:22 459:14
**hide** 477:19
  478:10
**high** 323:11
  356:19 358:5
  486:16
**higher** 357:22
**highest** 370:24
  371:9
**highlighted** 335:5
**hildick** 533:24
**hill** 265:5
**hire** 464:19 481:19
**hired** 310:4
  401:20 460:21
  462:21 463:1
**history** 304:4
  374:19

**hit** 460:18
**hodgkins** 506:4
**hold** 284:1,1 285:9
  285:9,10,18,21
  293:5 298:4
  300:18 364:20
  384:9 444:8
  498:10 515:3
**holiday** 403:10,18
**homicide** 460:25
  461:4,9
**hone** 275:5
**honestly** 310:21
**honor** 285:1,5,6
  285:16 286:2,8,14
  295:2,8,10,17,20
  296:7 297:1,9,24
  298:11 299:8
  301:3,7 302:1
  303:2 304:18
  305:24 307:6
  308:1,7,18 309:3,7
  309:15,24 310:20
  311:6,10,17,22
  312:13,14,24
  313:12,21 316:1,2
  316:6 317:3,3
  318:4 319:20
  377:6,18 378:19
  378:25 380:7
  381:10 384:8,14
  385:3 390:20
  391:7 392:25
  493:3,3,25 495:5
  497:3,4 498:1,8
  500:1,5 515:11,11
  538:5,13,23
  540:13
**honor's** 313:21,22
**hope** 390:8 391:3
  435:3 487:5,18

**hopeful** 382:19
384:10
**hopefully** 316:8
318:2 382:16
383:4,18 390:3,23
390:24 393:9
515:23
**hoping** 388:23
**hopkins** 292:3
322:3 324:1
403:12,20 404:1
412:5 415:11,19
415:24 416:4,14
469:25 472:2,3
506:17,23 527:7
527:13,14 528:2
531:17 537:15
539:6
**hospital** 534:10
**hospitals** 462:5
**hour** 377:21 380:2
391:7,9,12,14,16
391:17 443:25
444:3 454:19
461:14
**hours** 378:17
380:20,21 391:18
**house** 464:18
482:10,12
**houston** 265:15
**hsu** 334:23 335:19
336:3
**huge** 434:5
**hum** 361:20
**human** 337:11
408:21 410:8
**humans** 410:9
**hundred** 500:5
**hundreds** 311:7
481:7

**hyped** 420:24
**hypothetical**
518:2
**hysterically**
420:24

**i**

**ian** 351:24
**iarc** 413:19,24
**idea** 283:5 296:10
298:15 429:25
453:25 461:5
464:24
**identifiable** 329:3
**identification**
268:2 269:2
**identified** 278:9
278:20 353:13,22
414:13 512:25
522:6
**identify** 284:9
503:21 504:2,9
507:16,21,24
508:12 538:15,20
538:21
**ii** 263:6
**image** 320:24
509:20
**imerys** 271:16
293:10,12 294:16
295:3 296:11
297:5,7,15,15,25
298:11,16,19,23
299:5 300:13,19
300:23 301:8,14
302:4,6 303:1,19
303:22,22 304:10
305:11 306:25,25
308:10,15 309:17
317:18 318:24
319:8 422:22

**immense** 390:12
**immensely** 420:25
**impact** 375:9
447:12 474:7
**implants** 464:9
**important** 274:17
382:21 386:7
387:10 388:22
389:1,3 392:19
416:21,25 432:21
432:25 433:6
434:2,10,16,21
470:25 471:18
**importantly** 540:7
**impose** 539:12
**imposition** 311:11
**impossibility**
295:25 305:1,3,10
305:12
**impression** 382:7
382:11 449:25
540:1
**impressions**
315:20 381:20
493:20 498:3,6
**impressive** 486:11
**impugn** 484:3
**impurities** 323:12
399:20 400:5
**inadvertent**
331:25 333:6
**inaudible** 290:13
467:7
**include** 340:14
341:15,24 342:5
488:19
**included** 277:23
398:6 421:19
431:23 433:1
443:11 444:16
485:10 494:11

529:14 532:22
**includes** 397:17
474:1
**including** 277:19
288:25 298:21
324:21 339:9
353:21 354:19
360:22 363:15
407:7 463:14
485:2 488:21
490:10 513:10
514:25 516:13
518:21 532:19
538:7
**inconceivable**
298:18
**incorrect** 349:3
388:14
**increasing** 377:19
**indebted** 415:10
416:4
**independent**
419:14,19 432:6
**independently**
414:23 452:12
**index** 267:1
**indicate** 382:2
**indication** 284:5
363:10
**indirect** 327:21
**individual** 263:7
387:16 469:25
**individually** 263:4
263:6,12
**individuals** 476:22
**induce** 410:18
**industrial** 308:21
**inform** 497:24
**information** 278:2
278:12,23 279:15
283:11 299:22

315:5 338:5 362:7 377:25 398:22 421:6,23 424:1 429:23 435:25 445:24 448:24 465:12 469:10 472:11,18 473:25 477:9 483:5,9 485:1 488:5,8 491:11 493:9 506:21 511:22 528:3,8 529:8,24 531:18 532:16,19 532:20 538:3,17 538:21 539:4,8

**informed** 340:6 368:16 374:25 404:21 423:20 427:9 433:4 434:7 434:8 446:13,15 447:11

**informing** 539:9

**ingredients** 371:20

**inhalation** 375:20

**initial** 385:16 486:5 521:1

**initials** 520:7,14 520:21

**innovant** 415:11 416:1

**input** 432:17 435:1 470:13 471:14

**inquiries** 369:9

**inquiry** 285:25 300:12 312:13 460:14 472:14 517:2

**inside** 424:1 429:23 526:18

**insignificant** 351:19

**insisted** 388:16

**institute** 276:3 277:2,13 408:20

**instruct** 283:10 444:11 515:5 538:2 539:10

**instruction** 516:20

**instruments** 464:7

**intelligence** 429:8 429:24 431:6,13 431:21 432:1,8,13 432:22

**intelligencer** 365:20

**intend** 318:19

**intended** 394:16 499:20,21,22

**intending** 497:14 517:17,21

**intensive** 355:14

**intention** 499:14

**intentionally** 382:12

**interaction** 515:5

**interest** 271:13 296:9 300:16,17 308:3,12,14,24 309:1 312:6 356:24

**interested** 309:7,9 460:8 542:12

**interesting** 460:16

**interests** 300:20 301:1 303:21 468:12

**interfaces** 366:21

**interject** 493:4

**internal** 330:9 399:25 412:12

493:16

**internally** 407:16

**international** 398:23 462:19 479:15 512:19

**interpret** 359:16 371:9 491:18

**interrogatories** 290:3,7 346:11 373:1 454:14 455:3,8 456:3 483:7 494:11 495:10 496:22 497:15 499:24 538:4,8

**interrogatory** 483:2 492:1,6 493:7 495:17 497:8 499:12 539:9,25 540:6

**interrupt** 295:1 319:19 348:4

**interrupted** 285:3 467:13

**interviewing** 488:1

**intro** 495:7

**introduce** 459:16

**introduction** 455:6

**investigate** 436:11 449:17

**invite** 308:7 309:2 432:16

**invited** 431:11,25

**invites** 432:15

**invoice** 418:13,21

**involve** 465:18

**involved** 364:17 401:18 406:2 451:1 452:3

456:20 462:21 463:11 468:24 510:24 521:23

**involvement** 401:24 424:19 470:23 488:2

**involves** 306:2,4

**involving** 273:8 308:22 364:18,19 387:17 391:9 456:14 462:22 464:1 481:5

**irene** 322:10

**irrational** 420:24

**irrelevant** 308:16

**isolated** 328:23

**isr** 335:16

**issue** 271:9 284:6 298:13 300:17 308:3 309:4 311:18 317:8 339:5 360:9 385:10 387:1 389:1 393:3 396:24 404:18,19 409:17 423:20 432:4,17 434:1,3,4 446:7,15 447:12 449:17 452:11 465:24 470:13,15 472:8 504:18 539:22

**issued** 412:20

**issues** 278:14 310:11 314:23 316:18 348:10 364:18,18 368:15 375:9,20 376:1,6 376:21 381:16,21 387:21 389:6 392:9 431:23

434:5 467:18
468:3,18,24 470:9
470:15,21 472:23
472:24 476:3,4
481:3 486:8,13
488:4 518:2,3
526:19 527:9
**it'll**  469:14
**italian**  274:8 275:9
275:18 276:9,21
280:4,14 282:16
282:21 288:25
**items**  438:14

**j**

**j**  265:13 271:2
**j&j**  283:1 288:9,15
293:9 295:13
297:5,6 299:12
300:14,15,19
301:24 304:21
306:11 307:3,25
311:8 312:21
313:8,25 314:14
314:24 315:3,8
316:14 317:20
318:16 320:6
322:2 330:13
336:9,15 337:23
343:15 344:16
348:22 360:16,23
370:4 371:16
374:15 375:1
379:2 380:8 382:4
383:9 390:7
394:10 405:22
409:9 410:6,13,22
411:3,11 422:16
423:10 424:6,25
426:23 429:21
431:23 436:19
446:6 449:16

463:4 469:20
471:4,7 485:19
487:1,12 488:14
516:15 527:23
531:11
**j&j's**  271:18
278:18,23 279:11
283:7,19 284:20
286:20 287:10
288:3,12 289:12
292:9 310:19
312:11 320:2
333:12,21 337:5
361:10 450:17
508:15
**j.p.**  294:11
**jack**  423:2
**january**  268:5
290:24 440:9
475:16
**jean**  273:13
291:15
**jeff**  323:21,23
396:21,25 397:22
472:12
**jeffrey**  369:23
395:9
**jerome**  265:8
**jerry**  285:8 316:17
348:2,3 372:14
377:16 454:18
457:18 459:5
493:11,18 504:3
**jersey**  263:1 264:4
266:4,8 270:13
277:4 302:2 320:1
467:1 472:6
482:13
**jim**  266:11 270:16
**job**  263:25 382:23
382:24 466:6

484:15 489:15
529:16
**joel**  265:2
**john**  263:6,18
265:16 266:2
267:4 270:10
291:20 292:17,22
294:9,24 298:22
306:3 317:1
319:17 320:1,18
321:6,22 322:2,3,4
324:23 325:7,14
326:11 330:4
334:6,23 339:7
360:16 363:6
364:8 366:14,18
370:15 371:15,23
373:6,8 374:15
375:25 376:5
394:9 395:17
396:23 397:15,17
398:8 400:17
403:10,11,19,20
403:24,25,25,25
403:25 404:3,5,8,8
406:19 415:11,19
415:24 416:4
420:13 424:8
425:9 427:14
430:25 431:18
432:20,24 433:5
439:17 445:22
447:24 449:22
459:19 506:17,23
511:1,15,22
512:11,25 522:11
525:16 527:24
541:2
**john's**  369:6
395:20 396:22
397:22 398:5

**johnson**  263:10,10
263:16,16,21,21
265:22,22,22,22
266:5,5,8,8 268:12
270:12,12 271:15
274:7,7,13,13,24
274:25 275:3
276:15,15,22,22
277:4,4 278:23,23
279:4,4 281:6,6
282:9,9,13,13
288:25 289:1,15
290:24,24 291:6,7
291:11,11 292:13
292:13,23,23
293:21,21 294:20
294:21 296:10,11
297:16,17 298:1,2
298:17,17,19,19
301:5,5 302:7,7,25
302:25 303:22,22
304:2,2,7,7,12,13
304:15,15 305:6,6
305:11,11,13,13
306:23,24 308:9
308:10,23,23
311:2,2,15,15
314:2 317:18,18
319:13,14 321:6,6
323:17,17 324:20
324:20 325:12,13
326:13,13,22,22
328:14,14 330:12
330:12 331:19,19
332:5,5,5,6,23,23
332:24,24 336:3,4
337:4,4,20 338:23
339:9,10,10,13,13
339:21,21 343:8,8
343:14 344:7,7
347:17 349:4,4,5,5

349:11,12,16,17
350:4,4,16 351:2,5
351:25 353:2
354:3 355:21,21
360:17,17 361:5,5
361:5,6,18,19
362:5,6,8,8,12,22
362:22 363:9,9,15
363:15 364:2,2,3,3
364:14,14 365:10
365:10 366:13,14
366:19,19,23,23
367:6,6,16,16,20
367:20,25,25
368:4,4,23,23
369:16,16,22,22
370:16,16,21
371:4 372:2,2
373:23,23 376:7,7
376:22,23,24,24
379:24,24 394:21
394:21 395:13,13
395:18,18 396:17
396:17 400:9,9,12
400:13,20,20
401:11,11,18,20
401:20 402:6,6,8,8
404:15,15 406:15
406:15,25,25
407:21,21 409:4,4
411:19,19 412:12
412:12 415:16,16
415:20,20 416:5,5
416:7,8,10,11,12
416:12 417:9,9,11
417:11 418:2,2,21
418:21 419:14,15
419:19,20 421:12
421:13 427:8,9,14
427:14 428:23,23
429:7,7,8,9,10,11

429:14,14 433:14
433:14 435:11,11
435:11,14,20,20
435:21,21 436:25
436:25 438:1,1,10
438:10,22,22
444:12,13 447:7,8
448:7,7,9,9 449:10
449:11 450:5,5,10
450:10 451:1,1
452:13,13,21,21
452:23,24 454:13
454:13 455:2,2,15
455:15,21 456:7,7
456:9,13,13,19,19
456:19,19 459:21
459:21 463:2,2,7,7
463:10,10,16,16
463:23,24 464:2,2
464:8,8,23,23
465:1,1 466:2,3,13
466:13,14,14,18
466:18,25,25
472:15,15 477:7,7
477:15,16,19,20
481:13,13 483:9,9
483:23,23,24,24
484:15,16 486:7,7
486:23,23 489:5,5
492:9 495:20
503:3,3 504:10,10
504:19,19 505:16
505:17 506:24,24
507:5,5 508:19,19
508:21,22,22,23
511:5,6 512:2,2
513:1,1,10,10
514:3,3 519:21,21
520:9,10 521:12
521:19,19 523:5,6
523:9,9,12,12,15

523:16,18,19,22
523:22 524:2,2,6,7
524:9,10,14,14,20
524:20,23,24
525:4,4,15,15,18
525:18,19,19,21
525:21 526:4,4
527:19,19 528:14
528:14 531:25,25
532:1,1,13,15,15
537:13,22,22
539:1,1,16,16
**johnson's** 268:12
271:15 272:22
275:2,3,18 289:15
289:20 314:2
323:10 337:20
338:23 339:10
340:7,9,17 342:20
343:14 345:17
347:1,8,14,17
348:16 349:18
350:16 351:2,6,25
353:2,14,22 354:3
354:15,15,22
355:6 360:10
361:22 362:13,24
366:12,25 367:14
369:2 370:22
371:4,19 372:3
374:20 394:10
396:6 398:17,18
401:18 435:12,14
436:3 437:8 438:3
438:15 441:3,6
443:10 446:9
447:9 449:13
450:13 451:3,23
452:7,15 453:18
454:12,15 455:1,4
455:14,17,21

456:8,9,14,21
492:9 495:20
502:23 503:4,24
504:13,23 505:10
506:9,18 507:11
508:3 510:4 519:9
521:12 523:6
532:13 536:13,22
537:4,13,24
539:18 540:17
**joint** 293:14 295:3
296:8 301:16,17
305:13 340:22
479:17
**jointly** 512:19
**jones** 510:11,14,22
511:16,22 512:2,6
**josh** 266:22
**judge** 284:22,23
284:25 286:3
287:20 303:3
319:1 386:2
494:18,23 497:2
516:18
**judge's** 364:25
**judgment** 305:16
**judith** 510:10,14
510:22 511:16,22
512:2,6
**july** 268:10,20
346:7,24
**june** 264:5 268:22
270:3 363:11
365:15 373:19
374:19 423:21
509:16,18,23,25
510:7,21
**juries** 465:20
**jurisdictions**
464:20 488:11

**jurors** 459:16
464:24 469:10
473:18 478:18
479:11 481:2
490:19 528:6
**jury** 461:8,12
503:24 504:12,22
505:8 507:18
508:1 514:22,23
516:10,11 518:18
518:19
**juxtaposing**
372:10

**k**

**k** 524:19,22
**kathleen** 343:23
**kcra** 438:10
**keep** 285:10
298:10 336:9
384:25 447:11
471:5
**keeping** 368:16
427:8 434:6
446:14
**kenneth** 408:13
**kept** 404:21 433:3
434:7 483:7
**key** 298:21 402:6
402:24 403:4,17
405:15 409:17
**kids** 467:1
**kill** 316:20
**kind** 288:21
299:24 304:4
335:15,16 340:1
347:5 361:10,14
386:8 388:4 398:4
406:3 421:22
460:16,19 465:9
466:1 468:24
472:21 491:11,12

527:24
**kingdom** 415:12
**knew** 337:13
363:20 372:4
375:6,7,17,18,18
375:18 406:11,12
410:12,14,21
411:2 419:21
425:19 429:19,20
431:13 432:1
433:2,21 436:2
441:20 442:20
443:1 455:13
474:10 529:11
532:23,25
**knight** 344:2
**know** 271:14
274:24 277:7,24
278:7,8,25 279:6,8
283:4 285:12
287:4 288:18,19
291:16 292:19
296:11,18 297:3,4
297:8 298:3,4
299:24,24 300:8
300:14,16,19,20
300:23 301:1,19
305:6,25 306:3,7,7
306:8,20,22,23,25
309:7,8,9 310:21
313:3,6,6 315:3
316:18,19 317:4,7
317:15,15,19,20
317:21 321:16
322:21 324:7,8,15
324:15,24 325:2
331:9,24 332:1,1
333:5,8,14,16,18
336:6 339:14,25
342:25 343:6
345:6,12 346:2,4

348:3,3 349:15
355:4,8,10 358:19
359:18,20 360:3
362:4 363:17,20
363:23 364:16,16
370:5 371:7,7,12
371:13,15,15
372:9 373:11
376:12,17,18
378:16 379:14,15
379:16 380:2,6,13
380:21 381:1,1,3,5
381:5,7,11,12,13
381:14,16 383:6
384:15,15 385:4
388:4,5 389:5,19
389:19 390:2,10
390:11 391:7,8,22
391:23,24 392:3,5
392:9 394:18
395:12,14,15,16
395:19 399:2,5
401:20 405:18
410:24 412:15
415:23 416:1
417:15 418:24
419:3 420:23
422:11 423:6,14
426:7 429:12,15
429:19 431:23
432:14,16 433:1
434:14,16,25
435:16,19 436:9
436:10 439:12
442:22 444:14,17
449:11 450:24,24
451:11,18 452:11
452:19,19 453:3
453:12 455:15,24
455:25 458:19
459:20 460:12,15

460:17 461:9,20
464:18,22,25
465:6 466:4,5,7,8
467:12,13,21,21
468:4,5,6,8,10,17
468:20,21,25
469:2 470:17,20
470:24 471:4,8,18
472:25 474:9,11
474:13 476:1,3
480:1 481:7
482:24 483:1,11
483:20,22,24
484:4 488:19,23
489:4,25 494:19
495:10 500:3
507:3 508:7,10
517:5,20 518:3
520:15,25 521:25
522:16 525:22
527:14 530:6
531:6 533:23,24
537:20
**knowing** 460:17
471:22 472:18
**knowledge** 282:24
284:9 289:14
296:16 301:15
304:8 305:20,20
314:25 315:7
369:7 429:22
470:12 474:12,16
489:8,10 492:8
495:19 527:3
538:15
**known** 329:1
336:25 344:4
408:24 410:7,17
429:23
**knows** 303:2 311:7
379:10,11 494:8

**konigsberg** 265:8
266:21
**krushinski** 289:6
289:13 346:12
373:2 418:25
492:2 537:24
539:18

**l**

**l** 263:2,12,18
**lab** 288:9 320:14
437:9 438:25
443:9 446:8 447:8
448:9,19,19,23,24
450:12 451:14,22
451:23 452:14,22
452:23,25 453:6,7
453:16,19,24
454:3,4,11,25
455:7
**label** 445:24
**labeled** 408:4
**labor** 311:12
**laboratories**
346:16
**laboratory** 280:9
280:12 350:13
353:13 436:2
449:12 451:2,3,15
451:25
**labs** 288:6,8,15,17
288:19
**lack** 346:13
424:20
**lacking** 345:10
433:17 444:9
534:17
**lacks** 292:14
323:19 330:6
347:21 350:23
352:11 359:2
409:19 412:13

**419:11,16 426:8
432:10 434:12
436:6 437:14
439:9 446:11
451:5 453:21
454:17 504:16
535:25
lady** 320:6
**langer** 534:9
**lanzo** 317:17
**largest** 375:2
523:21
**late** 420:25 475:16
**latency** 327:25
328:2,5
**latest** 479:1
**law** 263:1 270:13
303:9 314:1
325:18,20 326:11
328:13 330:4,20
331:25 333:6
364:15 379:13
460:2,2,9,17,19
461:11 465:2
467:3 480:10
481:10 483:21
514:25 515:16,19
516:13 518:21
519:8 520:1,18
521:17,17 522:5,5
522:6,14,24 523:1
523:5,5
**lawsuit** 273:18
274:6 308:17
310:1 324:6
368:23
**lawsuits** 283:13
308:18,20,21
324:10,11 456:21
463:11 470:22
481:6,7 488:10

**lawyer** 278:9,12
294:25 298:22
319:18 320:1
327:3 330:2
338:22 339:4,4,8
348:25 352:18,20
376:23 379:10,11
400:12 404:13
405:17 460:4
461:21 466:11
471:3,14 478:3,11
481:13,15 493:14
508:15,18 520:7
537:13 538:3
lawyer's** 532:13
**lawyers** 298:21
299:2 316:14
325:12 330:9,22
341:9 346:2 353:6
368:21 369:10
387:6 460:15
464:19,22 466:12
466:13,14 480:13
482:18 483:4,10
484:19 487:25
488:4 514:24
515:15 516:12
518:20 522:17
529:16,23 531:25
**lead** 523:5
**leading** 279:4
425:2
**learn** 379:13
481:14 530:13
**learned** 539:5
**leave** 334:10
**leebaw** 323:21,23
364:4 369:23
395:9 396:16,21
397:5,6 469:25
472:12

**left** 272:10 359:9
456:16 468:1
501:20 513:15
**legal** 266:24,25
278:11 285:6
300:14 327:2
376:9 406:1 407:1
444:11 471:15,16
471:17 473:5
**legitimate** 310:17
**lend** 465:23
**lending** 472:7
**lenore** 325:1,7,15
**letter** 268:5,10
269:11 273:12,16
275:11 290:23
291:1,6,9 292:1
293:19 306:15
307:16 321:20
340:5,14 341:15
341:24 342:18,23
408:3,12 418:1
427:9,17,21,24
428:15,22 437:9
438:9,21 483:1,6,8
484:1,11 519:16
520:6,18 521:4,10
521:14,16 534:3
535:3,4,5
**letterhead** 373:23
418:9 535:6
**letters** 301:12
429:6 480:21
**level** 285:11
351:22 352:3
356:14 357:12
358:4 464:25
527:24
**levels** 357:21
438:16 490:21
491:2

| | | | |
|---|---|---|---|
| levin 266:18 | litigated 508:18 | 515:8 516:23 | 394:24 397:16 |
| levy 265:8 266:21 | litigating 297:5 | 518:25 522:15 | 398:16 399:7 |
| lewin 351:8 | litigation 271:11 | 523:6 | 407:25 411:16 |
| liability 320:2 | 271:14 273:7 | litigations 456:13 | 412:17 414:6,6 |
| 464:1 | 278:12,14 279:16 | little 294:1 331:6 | 415:3 416:19 |
| liberty 265:3 | 284:6,10 288:5,16 | 334:21 359:15 | 417:23 420:4 |
| life 527:6 | 293:14 295:21 | 439:15 440:17 | 423:9 430:1,13 |
| limit 382:19 | 296:11 298:1,22 | 445:5 461:3 467:4 | 436:14 438:20,25 |
| limited 467:24 | 299:17 300:13,23 | 480:8 494:18 | 445:8,11 446:24 |
| 468:21 470:10 | 300:25 301:2 | 513:16 | 447:23 449:14 |
| linda 511:9,10,11 | 304:8,9,10 305:22 | live 391:1,2,4 | 455:21 459:4 |
| 511:14,21 | 308:12 311:24 | 467:2 | 468:4 473:1 |
| line 358:2 361:25 | 314:14 320:2 | lived 466:25 | 480:12 489:23 |
| 492:16 496:3 | 326:2 332:6,24 | lives 467:6,8 | 509:4,5 520:17 |
| 497:17 | 337:25 338:10,11 | living 329:23 | 535:4 |
| lines 495:11 | 338:14 339:17 | llp 265:3,8,13,18 | looked 289:5,8 |
| linked 499:12 | 340:20 341:10,11 | 266:2,6,14,20,21 | 291:3,22 292:8 |
| list 414:9 415:16 | 342:8,25 346:3 | 271:3 | 301:12 354:2,21 |
| 432:3 476:16 | 353:9 354:19 | loaded 302:11 | 358:24 359:22 |
| 477:2 528:7 | 361:8,10,13 | local 467:3 | 373:9 394:7 427:1 |
| listed 302:21 | 362:19 363:2 | log 295:19 | 435:21 441:25 |
| 359:13 396:1 | 365:8 368:15,16 | logistical 391:6 | 454:4 |
| 407:23 410:7 | 368:17,20,21,22 | logistics 392:16 | looking 272:10,23 |
| 414:8 416:18 | 376:13,18,19 | long 279:9 288:14 | 279:25 288:23 |
| 422:16 424:25 | 379:11 404:20,20 | 305:16 316:11 | 289:4,6,12 294:16 |
| 443:7 444:25 | 406:5 418:25 | 317:19 339:25 | 301:22 307:22 |
| 476:23 477:10 | 421:24 426:12 | 358:22 379:6 | 312:16 319:8,23 |
| 478:15 | 429:20 433:2,10 | 381:1 406:13 | 321:4 326:20 |
| listing 422:1 | 433:14,21,25 | 410:6 416:4 | 327:7 330:17 |
| 425:25 435:7 | 434:2,3,6 446:16 | 445:25 462:14,24 | 335:8,18 347:7 |
| 497:20 508:24 | 447:12 454:14 | longer 381:12 | 350:7 351:1 |
| lists 351:9 359:9 | 455:3 462:19,21 | 388:21 389:21 | 353:14 354:2 |
| 374:1,2 415:19 | 462:22 464:1,5,13 | look 276:6 277:2 | 359:23 360:6 |
| 444:16 534:14 | 465:10 467:25 | 290:20 293:3,23 | 365:14 372:20 |
| 535:14 536:21 | 468:23 469:6 | 302:20 307:4,5,7 | 394:25 395:5 |
| literal 295:25 | 470:24 471:2,3,19 | 307:12 330:20 | 420:9 426:17 |
| literally 481:7 | 471:19 481:5,18 | 334:4 338:21 | 442:5 451:14 |
| literature 428:7 | 481:19 482:19 | 344:22 354:6 | 452:4 475:13 |
| 474:3 475:3 | 484:2 487:24 | 358:11 359:7 | 484:24 491:19 |
| litigate 365:11 | 488:18 489:22 | 366:3 369:13,20 | 520:13,18 |
| | 505:18 508:10 | 370:6,18 373:22 | |

**looks** 293:8 330:8
364:24 396:22
431:22 457:16
460:15
**lorena** 339:24
395:11,14 411:19
427:15
**loretz** 511:9,12
**losing** 442:23
509:19
**lost** 294:1 307:11
**lot** 283:4 309:5,19
317:22 330:22
361:12 379:2
381:13 382:22
384:1 387:8
388:12 392:10
393:6 429:15
434:4 445:1,3,5
460:18 462:10,12
464:14 465:6
466:8 467:12
468:5,7,8,23,23
486:12 488:8
527:3
**lots** 470:18
**louder** 439:15
**lower** 430:13
460:2
**lunch** 372:15
377:2 380:25
381:2 384:7
**luncheon** 393:15
**lung** 410:25 411:1
476:3
**lungs** 328:23
**luzenac** 271:12,14
271:16 272:19,21
273:3,13,22
274:24 275:7
291:2,21 298:11

301:8,14 303:19
303:21,23,25
304:6,8 305:13,14
308:10,15,24
319:24 320:23
321:9,13,20
413:20 421:22
422:25 423:7
425:14,24 427:25
428:21,23 429:14
429:23 431:5,12
435:12,17
**luzenac's** 320:24
424:18 429:3
435:15

### m

**m** 265:18 266:7
521:1
**magistrate** 303:6
**magnitude** 358:6
490:22 491:3
**mail** 268:6,20,22
268:23,24 269:3,4
269:6,13,15,16,18
269:20 321:5,8
322:6,9 323:16
324:6 334:17,18
334:22 335:8,19
337:20 338:9,10
338:15,24 341:6
342:2 343:9
344:20 350:3
354:11 360:1,8,11
360:13 361:1
363:6,11 364:2
365:15 366:4
368:18 369:21
370:7 372:22
373:5,17 379:16
383:10 385:5
394:9 395:1,2,3,5

395:9,22 396:5,5
396:13,14,17
397:3,5,9,10,25
399:12 400:16,24
401:1 402:12,17
406:9,14,19 407:8
407:14,21,24
408:7 409:6
414:19 423:9,13
426:16 427:1
430:4,6,13,14,18
431:2,24 434:19
444:24 445:8,12
446:25 447:20,24
447:25 449:20,21
453:11 454:7
458:21,23 459:4
485:11,16,18
486:1 489:1 509:6
509:8,12,22 510:7
510:19,21 511:9
511:21 522:2,10
528:20,23 538:25
**mailed** 269:22
343:9 344:8
444:20
**mailing** 416:11
453:6,16 454:3
510:1
**mails** 322:3
335:20 446:25
**maimon** 265:9
297:4 299:6,8
301:25 304:25
305:17 307:4,12
307:15,19 309:6
312:22
**main** 265:14
316:13,23 327:9
424:8 515:16

**maintain** 309:8
524:23
**major** 366:8,8
399:3 412:25
460:25 475:15
**majority** 328:22
356:10
**maker** 463:13
**making** 285:6
336:24 379:3
382:4 465:11,18
499:5 531:23
**malbin** 322:10
**malignant** 329:12
329:22
**malpractice** 462:4
**man's** 512:8
**manage** 311:2,3
311:15
**managed** 464:5
**management**
303:4
**manager** 292:22
**managing** 326:13
330:3
**manhattan** 265:20
271:4 460:3 462:2
**mann** 406:9,10,14
406:18 407:6,6,21
408:10 412:2
418:2,12 430:14
430:18 431:2
433:5,13 434:14
434:20,22,25
436:21 438:2
441:25 443:5,5,6
443:11 444:4,20
445:17,21 447:1
448:2 449:22
509:9,11,23 510:2
510:10 511:5,8,10

511:14,20 512:11

**mann's** 407:14
408:7 433:15

**manner** 270:21

**manufacture**
289:15 356:19
357:23 478:24
492:8 495:20

**manufacturer**
375:2

**manufacturers**
309:19,20 340:23

**manuscript**
415:12

**marc** 396:17,22
398:2 430:22
436:24 437:22
438:9 509:12

**march** 276:18,23
340:6,15 341:15
341:25 342:19
406:9 408:13
442:2 443:15,17
443:17,23 519:8
519:16

**mark** 451:24
452:5

**marked** 469:12,19
485:9 502:1

**marketing** 374:25
375:10 400:1

**martin** 266:25
462:3,16

**mass** 296:13

**master** 265:2
283:22 284:1
285:9,14,18,21
286:15,22 287:13
295:7,12 296:21
297:22 298:3
299:9 300:1,4,10

301:23 304:14,19
305:15,19 306:10
307:10,14,17,24
310:2 311:19,23
313:4,8,11,13,19
314:7 316:7 317:6
317:10,23 318:1
319:2 381:19
384:9,20 389:2,24
390:2,6,15,23
391:1,13,16
392:12,14,20
393:4 494:1,16,25
495:13 496:16
498:10,15 499:18
500:20 516:1,4,15
517:7 518:4
539:12,21

**masterful** 412:24

**material** 352:1
356:25 439:4,24
497:24

**materials** 508:11

**matheson** 339:1,9
360:22

**matter** 270:11
308:16 315:17
348:15 433:20
449:14 471:22
477:5 486:6

**matters** 273:7

**mauney** 422:25

**mccarter** 266:2

**mccarthy** 265:20

**mccracken** 265:3
266:13

**mccrone** 350:13
353:12,17,20,25
354:3,25 359:23
490:3,20

**mckeegan** 292:18
292:22 321:6
322:2 323:16
363:6 364:1
365:18 366:14,18
366:22,25 367:2,5
367:13,14 368:3
368:11 369:1,14
369:21 370:15,24
371:1,3 372:1
373:8 374:16
394:9 396:23
397:11,14 398:1,8
398:12 399:12,18
399:24 400:8,19

**mckeegan's**
365:15 369:13
370:7

**mckenna** 325:1,7
325:15

**mclaughlin** 266:22

**mdl** 303:2 383:11
383:16,18,25
384:2 386:3 387:7
392:23

**meagher** 265:17
266:24 271:3

**mean** 299:23
300:7 305:25
306:2 307:21
313:2 347:6
368:21 369:20
371:25 375:18
379:12 385:11
407:9,9 408:9
425:23 431:20
432:20 460:11
483:11 486:25
487:11 490:7
498:7,19,20
517:16 523:2

529:21

**meaning** 328:11
335:16 340:20
361:5

**means** 347:24
432:14 522:20
536:8

**meant** 434:14
465:9,10 487:5,17
487:23

**measures** 417:3
513:23

**media** 270:9
318:10 366:21
369:8 377:14
394:4 457:7,12
472:14,17 500:24
501:4 541:2

**medical** 326:25
327:4 373:24
462:3 463:20
464:5 473:16
474:3

**meet** 403:5 475:14
481:14 482:13
533:3

**meeting** 278:2,5
278:15 291:10
293:20 294:6
306:4,23 307:1
319:25 321:9,12
321:15,21,24
333:16 337:25
338:20 374:18
376:1,6,21 380:5
385:7 401:2,3,8,25
402:20 403:14,18
403:22 405:5,8
434:24 435:9
442:1,9,10,14,17
443:6,10,15,17,19

443:22,25 444:4
444:15,18 445:15
445:16,20 458:11
470:10,24,25,25
473:23 476:5,9
477:20,23,24
478:10 479:1
**meetings** 301:13
334:2 444:16
445:2 507:3,8
**mehaffy** 325:18
326:7 340:5,15
341:15,25 342:18
480:11,13 488:6
514:25 515:18
516:13,24 517:3
518:21 519:4,7,15
520:1,1,6,8,19
521:4,7,11,17,22
522:6 523:2,4
**member** 364:14
413:6 460:24
472:4 539:6
**members** 335:22
336:11 337:1
420:23 434:16
489:6
**memo** 268:8 269:7
279:8 301:14
307:8 319:24
321:11,16,23
325:6,22 326:16
326:20 327:7
328:12 329:25
330:3,16 331:3,12
331:17,19 374:8
374:24 375:5,7
411:17,22 412:3,5
412:9 414:1
416:13,14,14
417:19,21,21

419:7 420:9
469:19,24 533:23
**memorandum**
330:21
**memorial** 276:2
277:2,13
**memorialize**
301:17
**memorialized**
301:14
**memory** 366:17
468:20 484:11
**memos** 412:12
**mental** 315:20
493:20 498:3,6
539:25
**mention** 368:21
513:1
**mentioned** 442:19
442:23 461:2,13
483:1 526:22
527:7
**mentions** 510:10
**meso** 387:16,24
**mesothelioma**
273:18 294:21
306:9 308:20,22
319:14 320:7
326:25 327:16,21
328:1,7,18 329:2
329:13,22 333:12
333:21 411:1,6
**message** 339:15
425:10
**met** 465:15 527:25
**metadata** 299:12
299:20 307:21
**method** 460:14
**methods** 351:10
**michael** 291:6
343:25 506:6,8,22

527:20,22
**michelle** 266:19
**microphone**
364:25
**microscopic**
358:13
**microscopy**
355:15 359:8
439:7 440:2
**mid** 263:2,12,18
382:15 383:3
384:9 393:7
423:21
**middle** 520:25
**middlesex** 263:1
270:14
**mike** 404:10 405:9
506:16 531:17
**mill** 281:19
**millions** 295:20,22
**mind** 298:10
304:20,20 336:9
379:17 484:9
487:21
**mine** 276:9 280:4
280:14,19 281:11
303:23 345:18
347:1,9,13 355:8
367:1,6,16 392:17
**mined** 367:1
**mineral** 356:13
428:2
**mineralogical**
356:1
**minerals** 345:20
347:10 351:15
352:2,8 353:13,21
355:11,17,21,22
356:3,12,24 367:8
536:20,22

**mines** 304:2
355:11 535:7
536:12
**mining** 303:21
304:5
**minus** 281:23
**minute** 377:21
498:25 499:1
**minutes** 316:21
334:25 336:8
338:20 373:19,23
393:13 396:15
457:4 458:4,25
498:23 499:3
510:8
**misrepresent**
484:19
**misrepresented**
483:8
**missouri** 386:3
391:25
**misspoke** 458:20
**misstates** 323:20
338:17 347:20
349:2 352:10
368:9 372:7
404:16 405:12
417:12 436:5
446:21 450:14
453:20 454:16
504:15,25 505:12
508:4 513:13
519:11 520:11
521:21 536:15
537:17
**mistake** 442:7
**mistaken** 476:6
**misunderstand**
512:13
**misunderstanding**
286:11

**modern** 298:14 301:19
**moment** 381:24 389:17
**monday** 403:5,13 403:18 485:11
**money** 396:23 397:7
**monitor** 277:19 473:4 474:3
**monitored** 474:23 475:9
**monitoring** 401:24 406:4 473:11 474:19 475:3
**monseau** 396:17 396:18,21 397:10 397:14 398:1 430:22 436:24 437:22 438:10,22 441:25 443:5 450:19 451:9 509:13 510:2
**montgomery** 265:3 266:13
**month** 420:8 445:15,18
**monthly** 524:16 524:18
**months** 329:24 510:1
**moret** 373:11
**morning** 270:1 322:11 379:2 383:10 403:5,18
**moshe** 265:9 298:6 312:21
**mount** 534:9
**mountain** 391:23
**move** 278:16 314:4 315:8

324:13 330:25 333:9 338:7 340:25 341:4,4 343:5 393:6 480:5 483:13 484:6,21 513:15 530:20 531:8
**moved** 463:1 468:6
**moving** 450:1
**mulberry** 266:3
**mullaley** 265:19
**multiple** 270:14 332:15 346:22 488:7 508:5
**murder** 461:18
**musco** 290:6 372:22,25 373:5 373:18 374:1,2 378:5 395:10 400:17 402:13,18 403:9 405:10
**musco's** 400:23
**muted** 457:17

**n**

**n** 265:7 266:1 269:1 271:2,2 394:1,1,1 395:18
**name** 270:16 276:2 288:9 297:14,20 299:5 302:13,14,16 311:6,8 324:25 325:17 336:5 349:13,16,18,22 361:23 362:3,11 363:17 370:2,4 396:2 407:12,13 414:18,22 416:7 477:2,6,10,15 478:2,15 504:20

504:21 505:6,7,19 505:20,24,24,25 520:22,23 526:11 528:7 533:25
**named** 273:13 324:16 370:3 470:1 480:17
**names** 277:23 298:20 362:5,16 506:5 537:19
**nancy** 290:6 372:22,25 374:1,2 378:5 395:10 400:16 405:10
**nashed** 345:12
**national** 335:10,12 337:4,8 408:14,19 408:19,25 409:5 409:10 435:22 452:15
**nature** 399:5 409:18
**neal** 339:1
**near** 365:22
**necessarily** 330:8 405:14 452:10
**need** 278:13 301:1 322:16,22 339:18 383:13 389:13 432:17 449:3 458:12 471:21 488:23 498:20,24
**needed** 279:15 338:4 530:11
**needles** 534:20 535:15,22 536:4,7 536:13
**nefarious** 305:4
**neither** 296:22 542:8,11

**neurosurgical** 464:6
**never** 275:1 289:16,21 299:1,3 299:3,4 301:9 303:22 304:9 352:12 362:24 365:18 366:13 367:15 369:2 372:3 387:15 388:15 394:11 433:13,21 452:25 454:4,14 455:4,16 456:7,21 477:23 486:24 492:9 495:20 504:12,23 505:9 506:9,17 507:10 508:2 509:2 529:2 537:24 539:19 540:17
**new** 263:1 264:4 265:11,11,21,21 266:4,8 270:13 271:4,4 277:4,4 302:2 320:1 351:8 355:16 459:22,24 460:2,3,22 462:6 466:25 472:6 482:13
**newark** 266:4
**news** 322:11 366:8 366:23 367:12 368:12 370:14,25 372:1 394:9
**newspaper** 366:6 369:15
**newspapers** 362:23 365:25
**nice** 425:4,7 468:9

**nielsen**  363:16
  364:4
**nine**  396:15
**nixon's**  460:13
**nj**  265:5
**noble**  369:24,25
  370:3
**nocks**  264:2
  270:19 542:16
**non**  417:1 534:20
  535:15,22 536:4,7
  539:3,4
**nonasbestiform**
  497:13,21 499:10
  502:15
**nonresponsive**
  379:7 483:14
**normal**  438:16
**norton**  392:14
**note**  280:19 420:1
  421:5
**noted**  270:24
**notes**  264:1 384:11
  475:13
**notice**  383:11
  384:3 385:12
  389:4,18
**noticed**  386:3
**notify**  291:15
  294:9
**november**  402:13
**ntp**  335:3,6,9,16
  335:23 336:25
  338:15,20 339:16
  401:2,3,8,13,19,21
  401:25 402:9,20
  404:15,18 405:22
  406:20,25 408:2
  408:11 409:22,22
  409:23 410:6
  411:12 413:6

422:1,9,17 423:20
  425:25 426:6,7
  427:18 428:15,22
  428:24 429:6
  430:9,19 431:6,13
  431:23 432:2,17
  432:23 434:10
  435:7,12,17,22
  510:22 511:16
  512:3
**ntp's**  401:13 414:9
  425:14 429:9,24
  433:23 508:24
**number**  268:2
  269:2 277:7,9
  282:16 296:18
  307:7 308:18
  309:10,25 312:17
  312:19,19 313:2
  314:20 317:13
  329:19 346:15
  351:6 379:5
  385:25 386:1
  400:19 414:19
  440:25 473:4
  476:22 492:6
  495:18 502:20
  509:6 520:15
  523:21
**numbers**  270:15
  458:18
**numerous**  295:22
**nuts**  420:1 421:7
**nutshell**  466:1

**o**

**o**  269:1 271:2,3
  394:1,1,1
**o'clock**  381:11
**o'dell**  385:5
**o's**  271:2

**o'shaughnessy**
  263:6 265:16
  267:4 270:10
  271:24 272:7,9
  283:10,17 284:18
  285:6,15,19,22,23
  286:1,18,24 287:7
  287:25 294:24
  297:14,20 298:22
  299:5 301:11
  302:21 306:3,19
  308:8,25 309:3
  314:17 315:19
  319:18,23 320:1
  322:4 334:24
  339:8 341:14
  348:5,7 360:16
  362:21 364:9
  373:6 375:25
  376:5 377:24
  378:10 379:5
  381:10 382:8
  384:3,5 385:13
  390:4 394:7
  397:18 400:17
  402:5 403:11,19
  406:19 420:13
  424:9,17,24
  427:15 430:25
  432:20,24 433:6
  435:5 444:10
  447:25 457:14,17
  458:1,6,8 459:13
  459:19 460:5
  461:2 464:25
  466:3,22 467:17
  468:14 469:7,18
  470:5 471:13
  473:2,10 474:17
  475:1 476:21
  477:6 478:19

480:9 481:1 482:8
  482:17 483:17
  484:10,16,24
  485:8,12 486:6,25
  487:12,21 489:1
  489:16 490:2
  491:13,25 493:15
  494:9 501:19
  502:11,19,19
  503:1,9,14,21
  508:14 511:22
  512:12,25 515:4
  522:12 523:8
  525:23,25 527:1
  528:22 529:22
  530:12 532:6,8,12
  538:2 540:15,23
  541:2
**o'shaughnessy's**
  302:16 311:6,8
  380:14 383:13
  389:13 511:15
  515:13 516:20
**oath**  433:13
  447:14 537:23
  539:18
**object**  283:9
  285:17,17 287:12
  292:14 293:12
  332:9 333:23
  345:9 347:20
  352:10 358:1
  361:25 362:14
  368:25 404:16
  405:13 409:19
  417:12 422:21
  433:17 444:9
  450:14 453:1,21
  454:16 505:1,22
  507:19 508:5
  515:2 517:23

521:20 534:16
537:18 538:1
**objected** 317:15
402:2
**objecting** 285:20
439:12
**objection** 271:8
276:12 283:2,20
283:23 284:11
285:7 286:10
290:13,17 293:6
293:15 314:12
318:21 323:19
328:9 330:6
331:14,22 332:17
333:3,13 338:17
341:18 342:3
344:9 346:21
348:18 349:24
350:23 353:24
355:7 368:7 369:4
369:18 372:7
379:3 410:23
412:13 419:16
421:15 422:18
426:2 431:19
432:10 436:5
438:6 439:8
441:22 446:11
449:15 452:9
455:18 474:20
475:6,23 477:12
477:21 478:5,12
479:7,13,25 480:5
480:23 482:23
483:18 484:13
485:3 486:9,14
487:3,15 489:3,12
489:18 490:17
491:20 492:18,24
496:5,12 498:16

499:6 501:14
502:16 503:6,10
504:15 505:11
506:1 507:1,14
513:13 514:6
517:6,10 519:11
520:11 526:15
528:25 529:9,18
529:25 530:7,15
530:20 531:2,14
531:20 532:2
535:25 536:5,14
540:8,12
**objections** 270:21
302:22 332:12
379:22 381:17
382:5 515:22
**objectives** 473:3
**obligation** 298:18
311:14 315:8
383:1
**obligations** 465:15
**observation**
385:16 387:18
**observed** 352:3
358:5
**obsessed** 420:1
421:7
**obtained** 345:18
347:8
**obviously** 276:25
385:20 458:17
**occasion** 287:1
482:12
**occasions** 279:23
379:6
**occur** 327:21
**occurred** 307:1
422:14
**oceanographer**
460:7

**october** 268:11
269:7,8 326:21
328:13 330:16,18
331:3,12,13,21
332:7,25 350:10
360:11 411:17
412:18 417:19
420:6 430:15
**offense** 460:25
**offer** 528:24
**offered** 528:20
**offering** 361:16
530:4
**offhand** 339:6
362:5
**office** 325:15,16
460:22 461:5,16
462:1,13 482:15
522:16
**officer** 542:1
**offices** 303:12
**officials** 413:19
513:10,21
**oftentimes** 369:11
488:8
**oh** 396:3 458:16
525:13
**ok'd** 407:17
**okay** 272:3,9
273:1 275:5,21,22
276:6 277:1,12
278:22 280:18,23
281:5 282:12
285:16 288:23
289:4,23 290:2
292:17 293:16
294:1,15,19
297:11 300:10
301:23 307:24
313:7,10,19
317:23 318:11

319:12 321:19
325:16 326:20
327:7 328:5
329:19 334:15
335:18 336:2,7
337:13 338:21
342:9,16,18 343:3
343:19 345:3
347:16 352:7,18
352:22 354:6
355:13 357:10
358:23 359:7,21
364:1 365:4,5
366:10 367:20
368:3 370:13
371:25 372:25
373:11 375:8
376:15 377:1,4,7
391:15,15 394:5
394:14 395:23
396:11 397:3
398:11 399:7,17
401:1 405:4
406:17,18,24
407:6,20,25
408:24 409:25
410:4 412:17
414:13 417:16
418:20 419:6
425:23 428:21
430:4 434:18
435:19 436:14,21
439:14 440:20
441:19 442:7
445:21 446:5,24
448:16 451:20
456:25 457:3,13
458:3,7,10,16
459:11 470:4
476:14 485:14,24
486:17 492:20

493:2 496:8,16
498:14 500:21
501:5,10 506:6,15
509:20 511:20
512:1,15 513:4
514:10,21 516:9
517:21 518:12,14
518:17 520:22
521:3 522:19
523:15,18 524:13
524:16,19,25
525:2,14,17
533:18 534:2,13
534:19 537:2,21
539:15
**old** 378:22
**olden** 408:13,18
427:10,18
**once** 299:24
475:14 524:12
**ones** 288:6 339:5
349:13
**open** 311:1 382:18
393:11 493:7
**opened** 516:17
**opening** 315:18
**operate** 299:18
**opinion** 519:21
**opinions** 403:6
414:24
**opportunity**
302:23 304:16
316:4 481:14
498:12
**opposed** 320:25
481:9
**opposing** 422:1
425:25 456:20
508:23
**oral** 263:5

**order** 303:5,8
305:2,17 318:20
334:11 358:6
386:5 490:21
491:2 493:16
**ordered** 303:6
386:2
**ordinarily** 315:5
**ore** 268:18 345:19
355:1,5,16 356:3,7
356:18 358:13
490:4 527:4
**organization**
472:5
**original** 297:6
298:6,8
**originally** 386:2
**origins** 478:24
**ortho** 463:12
464:4
**orthopedic** 464:9
**orthopedics** 464:8
**osha** 413:13
**ought** 382:15
383:2
**outcome** 271:20
**outlook** 329:21
**outside** 283:5
288:6,8,9,15,17
338:1 341:8
346:15 353:10
422:5 436:9
452:23 459:25
464:19 465:4,5,7
465:14,23 469:1
472:18,25 480:10
481:19,21 487:25
507:4 515:6,7,18
523:5 526:18
**ovarian** 384:18
385:8,14,15,22,24

386:18,25 387:7
387:12,17 388:2
476:4
**overall** 481:12
**overcome** 300:15
**overflow** 281:22
**overruled** 283:23
286:10 314:12
**overseeing** 303:7
**overseen** 303:2
**overstate** 309:24
**owe** 422:16
**owen** 343:19
**owned** 523:23,23
524:2

**p**

**p** 265:7,7 266:1,1
**p.m.** 377:13
393:15,16 394:3
395:6 396:15
457:6,8,8,11 459:7
459:8,8,11 500:23
500:25,25 501:3
518:12 540:25
541:4
**packaged** 529:16
530:5
**page** 267:2 272:25
276:7,7 277:3
280:7 281:1,2
290:22 293:23
306:18,21,24
307:6,9,13,23
323:6 329:18,19
329:21 350:9
357:6,8 370:11
378:14,14 394:25
414:7 415:5
416:20,22 438:24
443:14,22 470:13
490:16 502:6

509:7,8
**pages** 280:8
295:21 489:25
**paid** 402:8 417:10
421:16 523:14
524:14
**paired** 293:10
**panel** 413:7
511:17
**papantonio**
266:18
**paper** 309:16
366:11
**papers** 401:7,12
401:21 402:7,9,19
402:24 403:13,22
404:14,22,24
405:2,5,6,11
**paragraph** 371:14
416:19 479:12
**paragraphs**
386:24
**paralegal** 266:22
266:22
**parallel** 364:12
**parameters**
515:24
**paraphrase**
387:14
**parent** 413:19
**parentheses**
273:17
**parfitt** 266:19
**park** 266:8
**part** 278:7 288:15
289:6 306:15
307:5 321:25
337:9,9,13,14,24
338:3,13 340:8
342:8 346:3 353:5
354:18 355:21

361:7 362:19
371:14 385:8,17
385:20 386:4
401:13 404:13
405:5 408:5,6,25
427:18 429:19
432:18 446:6
461:8,13 472:6
481:18 487:25
488:18 490:15
518:25 519:3
522:10 530:19
531:22
partially  379:7
participants
  476:17,23 513:22
participate  392:15
  432:7
participated
  321:17 334:3
  477:20
participation
  473:20 475:19
  479:4,20 491:15
  538:18
particle  534:4
particles  534:24
  536:9
particular  295:14
  306:12 310:15
  315:21 356:2,24
  449:17 470:15
  481:23,23 488:4,7
  489:21 515:6,7,8
  538:4,21,22 539:8
  539:9 540:8
particularly
  381:12
parties  270:7
  299:17,20 300:18
  303:9 305:3 312:4

485:2 542:10
partner  297:4
  301:24 320:25
party  296:7,10
  298:25 304:7,9,10
  309:23 314:1,2
  318:23
passage  464:15
  469:4
passages  490:10
paterson  339:4
  364:9,11,13,20
  365:8,10 373:14
  374:13 375:25
  376:5 400:18
  403:11,20 404:3
  406:1,2
paterson's  364:15
  407:2,13
patient  304:16
patients  328:18
  329:22
pattern  392:4
paul  266:24
pay  425:1
paying  381:23
  421:13
payments  524:16
  524:17
pdfs  302:10
peak  396:24
pediatricians
  375:21,22 394:16
  399:3,4,25
pediatrics  398:24
pennsylvania
  365:22 366:6,11
  482:13
pension  524:13,21
people  277:21,25
  277:25 278:6

303:10 312:18
316:9 322:3
323:17 324:8
337:20 338:21
339:24 341:21
343:8,13 344:4
349:5 363:14
364:2,3 369:15,22
369:22 370:3
374:16 400:20
402:6,24 403:4,17
405:15 422:5
427:14 431:10,22
436:9 442:20
445:2 446:6,22
447:17 453:4
467:12 470:12,18
471:23 472:23,24
472:25 473:14,16
474:9,10 478:2,10
481:16 486:2
488:1 491:17
504:18 505:16
509:13 522:18
526:12 529:14
537:15,20,20,21
538:10,16 539:16
people's  392:21
percent  281:11,23
  282:1,4,7 352:4,9
  356:14 357:13,14
  357:14,16 387:19
  441:7,10 481:11
  500:6 535:18
  538:23
percentages
  359:13,17
perfect  484:11
perfectly  391:19
  481:24

performed  320:14
  346:14 437:8
period  327:25
  328:3,6 386:9
  390:9 411:13
  418:3 435:6
peritoneal  327:15
person  273:7,12
  274:7 279:2
  291:20 308:4
  324:16 343:18
  344:12 347:24
  363:23,23,25
  369:24 396:20
  421:23 438:10
  446:10,13 448:7
  448:15 472:3,9
  473:9 491:5 520:8
  522:14 527:2
  533:4,20
personally  296:2
  296:16 482:6
  532:23 533:3
  537:4
personnel  340:3
perspective  406:1
  406:2 407:1
perspectives
  476:12
pharmaceutical
  398:3 399:13
  463:12,21 464:4
pharmaceuticals
  417:2
pharmacology
  512:20
phase  276:8 280:3
phobia  269:9
  419:23 420:17,22
phone  312:9
  321:17 330:22

334:2 422:7,8
445:1,6 465:6
**phones** 270:4
**photographic**
357:2
**phrase** 387:14
**physically** 353:8
**picking** 487:22
494:21 501:19
**picky** 371:13
**piece** 412:24
**pieces** 469:9 528:8
**pierre** 273:13
291:16,20 294:10
321:22
**pilot** 276:9 280:3
**pisano** 303:6
**place** 270:7 293:21
294:7 303:20
335:21 338:5
339:18 361:15
488:5,23 516:4
530:10 542:6
**placitella** 266:15
266:16
**plain** 384:2
**plaintiff** 270:11
315:13 382:5,11
**plaintiffs** 263:8,14
263:19 265:11
284:7 297:25
299:12 318:22
383:11,16,18,25
384:2 482:18
483:3 516:16
**plan** 475:14
**planned** 404:22
**plant** 276:9 280:3
**platy** 345:19
**play** 445:5

**played** 434:5
461:24 462:8
**playtex** 462:19,22
462:25
**please** 270:4,25
280:25 281:2
283:25 284:16
285:10,10,21
286:15 287:23
290:21 291:15
294:9 295:6
297:23 298:4
299:10 304:15
318:25 319:3
323:6 332:11,14
332:18 348:2,5,8
357:7 370:12
372:16 373:18
377:6,11 404:9
437:11,21 439:9
457:4,22 458:23
494:1 495:3,6
501:6 505:13
513:16 518:15,23
539:13
**pleased** 280:2
**plenty** 360:12
**pleura** 320:8
**pleural** 327:15
410:18
**plow** 386:13
**plowing** 378:22
**plus** 281:23
302:17 305:18
357:15 486:6
**point** 273:7,12
286:14 313:23
336:6 376:13
416:21,25 454:19
460:7 476:2 497:5

**pointed** 490:9
**pointing** 359:18
**police** 461:11
**poor** 329:22
**population** 328:24
**portion** 278:16
330:25 333:9
338:8 340:25
341:5 530:21
531:9
**portions** 513:5
**position** 271:11
275:3 314:1 376:7
376:8,9 380:5,11
388:15 422:4
429:4 433:19
435:14,15 450:17
455:16,21 456:6
456:10,12 471:6
493:13 498:2
514:9
**positive** 454:7
**possession** 304:22
314:14 361:9
**possible** 394:17
454:6
**possibly** 403:11,20
**post** 365:20
**potential** 335:14
447:11 480:16
**powder** 268:13,15
272:22 274:8
275:2,18 283:13
289:15,21 320:13
320:15 323:5,10
323:10 340:7,9,17
342:20 345:18
347:1,8,14 348:16
349:18 350:17
351:2,6,25 353:14
353:22 354:4,15

354:16,22 355:6
360:10 361:22
362:24 365:20
366:13,25 367:15
369:2 371:19
372:3 374:21
394:11 395:22
396:6,6 397:4
398:17,18 436:3
437:8 438:3,15
441:3,7 442:2,10
443:10 446:9
447:9 449:13
450:13 451:3,24
452:7,15 453:18
454:12,15 455:1,4
455:15,17,23
456:8,14,21 492:9
495:20 502:23
503:5,24 504:13
504:24 505:10
506:9,18 507:11
508:3 510:4 519:9
519:21 523:6
526:5 533:10
534:15 535:11
536:13,23 537:4
537:24 539:19
540:17
**powers** 339:3,9
360:23
**pr** 343:8,13 344:7
363:23 436:19
**practice** 466:16
**practicing** 389:7
483:21
**precise** 502:10
**predate** 345:14
**predecessor** 301:8
303:24

**predecessors**
308:11
**preemptive**
388:24
**preface**  308:3
**preference**  383:5
**prejudice**  385:23
**prejudiced**  388:17
388:19
**premature**  379:21
380:24
**preparation**
302:19 315:1
**prepared**  271:24
322:16 369:11
465:8,17
**preparing**  288:4
508:10
**prescription**
463:13
**presence**  283:5
435:2
**present**  266:11
298:15 301:20
306:4 356:12,25
385:24 387:10
428:18,25 461:8
461:11 489:5
536:21,22
**presentation**
340:22
**presenter**  510:23
511:17
**press**  365:24 366:5
366:7,10
**presumably**
300:24 314:15
358:7
**previous**  329:20
**prickly**  396:6
398:18

**primarily**  462:6
463:10 514:25
516:13,23 518:21
523:3
**primary**  281:22
522:6
**primed**  317:13
**princeton**  513:1
**principal**  478:25
**prior**  415:21 428:1
428:24 442:23
476:1
**priority**  270:17
388:3 451:9
**privilege**  296:9
300:16,18 308:14
314:3 315:10,22
315:23 318:23
466:9,15
**privileged**  308:5
311:9,12 497:16
497:24 539:3,4
**privy**  435:17
514:7
**probably**  279:19
297:19 305:17
333:18 337:17
340:3 380:19
383:10 489:22
521:24
**problem**  364:23
381:14 388:25
**procedural**  458:9
**proceed**  272:5
316:14 318:19
386:6 446:2 458:6
518:13
**proceeding**  296:13
306:7 406:3
**proceedings**
295:23 302:25

512:18,25 513:5,9
542:5
**process**  342:8
358:8 361:8 429:9
429:19,24 431:7
431:13 432:2,23
452:4 482:14
487:25 488:19
519:1
**produce**  271:21
**produced**  271:16
274:9,18 280:13
293:7,9,10,13
295:3,21 296:1,16
298:5,23,25
299:16,19 302:7
302:19 303:1,3,13
305:16 307:2,2
309:11,17,18,21
309:22 311:2,3
312:20 314:13
317:17 330:11
332:5,23 355:9
379:25 517:5
534:5 539:1
**producer**  413:20
**producing**  295:23
302:9
**product**  271:10,12
271:17,18 272:2
278:8,10 280:13
282:9,13 284:13
286:25 289:1
292:13 293:13
295:2 310:7
315:10,22 319:21
349:15 354:4
357:23 368:1
374:3 398:5 433:3
463:25 465:20,21
474:7,23 488:2,12

488:20 534:5,14
538:23 539:10
540:1
**production**  271:21
295:16 296:24
297:25 298:20,21
299:6,7 303:4
305:5,9 306:25
307:20 309:25
310:6 311:14
312:4,10,17,20
318:24 332:2
333:6 467:5 534:4
534:14
**productions**  297:6
297:7,12,18 298:8
302:3 305:1 310:5
310:10
**products**  265:22
281:7 282:6,21
292:20 309:20
356:20 370:17,22
371:4 372:6 375:1
375:2,14,23
398:19 428:10,24
462:20,23 463:13
464:1 465:13
475:10 479:3,19
479:24
**profession**  483:22
**professional**
285:11 375:9
382:25 400:1
418:14,22 527:6
**professionally**
384:6 532:25
**professor**  351:8
**profitable**  420:25
**program**  335:10
335:12 337:5,8
408:14,19,25

409:5,10 435:22
452:16
**progression**
445:10
**promising** 419:8
**promptly** 318:2
**promulgated**
409:11
**proof** 336:16
337:22,23 339:14
343:16 344:17
348:22 349:7,9,17
350:4 360:16,17
360:23 361:7,21
362:12 485:19
487:2,13 488:15
528:15 531:12
539:2
**proper** 299:4
**proponent** 297:2
**proprietary**
299:14,18
**prosecutions**
461:1,7
**prosecutor** 460:23
483:21
**prosecutor's**
461:16
**protected** 271:9
309:1
**protection** 271:13
271:18 315:11
**proven** 479:18,23
**provide** 274:17
278:12 338:6
477:9 478:23
485:1 528:3
531:18
**provided** 278:23
340:24 341:3
444:12

**providers** 372:5
375:14
**providing** 273:22
275:8
**proviso** 315:15
**provoking** 450:6
450:11
**public** 275:1 324:9
362:22 364:5
367:14,21 368:1,5
369:1,23 372:3
373:9 394:8,10
430:20 438:1
448:7 450:5 474:4
**publication**
329:12 415:21
417:16,20 419:7,9
**publications**
277:20 473:4,11
474:3 475:9
**publicity** 278:10
374:20 447:12
470:20 471:16,20
**published** 419:3
428:8
**pull** 446:1
**punishment**
290:11,14
**purchased** 304:1
**pure** 323:11 417:1
**purest** 370:23
371:6,9
**purpose** 475:21
**purposely** 382:9
**purposes** 277:18
318:19 341:10,11
391:23 406:5
**pursuant** 293:13
303:4 305:2
318:20 341:2

**pushing** 450:21
**put** 271:7 273:17
297:12 298:20
300:2 302:12
313:1 316:13
378:3 388:22
389:3,18 391:17
416:21 469:15
478:1 499:7,9
514:16 515:19
516:23 522:21

### q

**qualified** 348:14
486:18 491:17
**quality** 356:18
417:3 513:23
**quantities** 428:10
**queens** 462:7
**query** 311:5
**question** 283:11
283:15 284:12,15
284:17,18,23
285:24 286:1,4,6
286:10,12,13,16
286:17,18,23
287:11,14,14,15
287:17,19,22,24
287:25 297:22
299:10 300:1,4
301:5 304:20,21
310:17,18,22
312:7 314:21
315:14,19 319:7
319:12,17 331:2,4
331:8 332:3,12,15
332:18,20,21,21
347:4 361:3
372:11 378:4
383:21 391:7
396:10 399:8
401:16 432:12

454:21,23,24
455:6,6,10 487:11
494:13 495:3,16
495:25 496:8,15
496:18,24 497:16
498:16 499:6,21
499:22 500:5,7,15
500:18 501:7,10
501:17,20 502:11
504:5,16 505:1,3,5
505:6,12,14
508:13 516:6,8,9
517:8,11,13 518:5
518:15,16,17,24
538:11,12,24
539:7,13,14,15
540:2,4,5
**questioner** 284:2
**questioners**
391:25
**questioning** 358:2
361:25 377:21
380:1 382:12
390:12 494:5
495:12 498:13
499:2 500:3
508:15 515:25
532:13 537:12
**questions** 271:25
279:15 284:8
306:12 309:10
318:13 319:5
378:24 379:8
380:14 382:10
392:6 404:9
437:21 457:15
458:2,9 468:15,19
469:9 471:20
476:10,15,15,18
477:1,25 478:4,15
482:25 485:15,25

490:11 492:1,3,6
492:11,17 494:8
495:7,14,17,22
496:4 497:9,22
499:13 501:8
502:20,24 503:17
503:19 517:11
528:10 538:14
539:3 540:21
**quibbling** 313:20
**quick** 396:24
397:16 497:4
525:24
**quickly** 450:1
520:16
**quite** 385:9 386:15
424:5 488:12
**quote** 367:19
371:8,12,13
**quoting** 371:11

**r**

**r** 265:7 266:1
281:19 376:1
394:1 395:18
**rachel** 266:13
**rafferty** 266:18
**raise** 318:21 377:5
377:18 378:18
389:1
**raised** 302:22
392:9 467:1
**raising** 296:14
**ran** 536:19
**range** 312:19
**rankin** 343:19
**rare** 320:8 329:2
**raw** 357:22
**ray** 355:14 536:19
**reach** 449:12
**reaching** 306:19

**reaction** 437:7
**read** 284:16,17
286:6,12,17
287:22,24 318:13
319:6 332:12,18
332:20 336:8
342:9 375:19
378:6 397:21
402:12 454:22,23
478:18 479:11
485:18 487:10
490:19,23 495:6
495:15 501:7,9
505:3,5 513:5
515:12,23 516:8
517:13 518:15,16
539:14
**reading** 289:25
400:2 451:19
**reads** 294:24
319:17
**ready** 317:13
387:25 458:6
**real** 391:1,4 497:4
**realistic** 296:12
**really** 378:8 383:6
386:7 387:11
388:25 391:11
459:15 460:18
468:2 480:21
**realtime** 264:3
**reason** 314:13
378:19 380:9
389:13 447:10
451:17
**reasonable** 296:5
304:21 310:12,18
311:1
**reasonably** 308:11
311:15

**reasons** 310:23
361:25 445:4
**reath** 266:6
**recall** 273:6
283:18 284:19
286:19 287:2,3,4,6
287:9 288:2,11,18
288:21 292:21
321:15,17 330:19
331:16,17 333:14
333:18,20,25
337:18 343:20,22
343:24 344:1,3,4
344:14 345:8
346:6,9 349:20
352:24 353:12,16
353:18,20,23,25
354:1 362:16
370:1,2 375:20
376:8 394:13
411:14 423:5
425:16 426:9
436:7 441:23
444:15,23 445:20
476:10 479:21
480:1,18,21 484:2
490:6,7 492:3
502:24 506:5,10
506:19 507:2,5
509:3 522:24
524:4,4 530:17
531:4 536:16
537:6,22 539:16
540:4
**recalled** 537:19
**recalling** 436:13
**receive** 365:19,21
405:2 407:10
422:12 436:8
458:12 525:3

**received** 292:7
297:6 302:3
305:10 309:10
375:5 401:7
402:19,24 403:12
403:21 423:14
440:4 445:23
452:22 453:11,12
482:25 506:21
538:17
**receiving** 298:19
**recess** 318:6
393:15 457:8
459:8 500:25
**recitation** 307:1
**recognize** 324:24
336:5 339:5 366:9
370:1,4 453:13
454:1 502:2,7
533:25
**recognized** 303:9
**recognizing** 340:4
**recollect** 394:19
453:25 527:3
**recollection**
375:23 451:7
453:14 470:7
488:25 506:16
**recommend**
508:22,25 512:1
**reconvene** 392:22
**record** 270:2,8
271:7 272:1
306:22 314:6,8
315:25 318:9,16
377:9,13,15 381:7
385:2 388:23
392:6 394:3 439:9
457:6,11,21,25
458:18 459:6,10
459:11 491:23

[record - reported]

499:5,25 500:6,23
501:3 518:5,11
540:3,25
**recorded** 270:10
**recording** 270:6
270:22
**recross** 526:1
**redirect** 503:20
532:7
**redouble** 448:3,8
449:5,7 454:9
**reduced** 358:7
**refer** 386:14,17,18
387:20 458:17
**reference** 324:5
329:7,11 335:3
399:13 502:14
**references** 398:3
498:4
**referencing**
340:11
**referred** 279:3
299:11 321:21
341:22 342:6
353:4 354:12
404:6 427:1
491:24
**referring** 275:14
293:17 338:15,19
340:12 342:1
354:14,17 361:16
361:18 362:20
372:8,10 401:15
409:21 420:1
483:7 488:17
520:20 522:4
**refers** 293:20
327:25 328:6
338:9,10 350:4
354:25 366:4
401:1,3 428:17

**reflect** 479:2
**reflected** 399:14
499:25
**reflects** 458:18
**refresh** 366:17
**regard** 273:17
423:25 424:6
499:23 512:3
**regarding** 275:9
295:3,16 296:24
301:21 319:25
340:9,15 409:23
413:25 430:8
443:24 467:19
473:6,12 475:3
476:9,11 521:18
**regardless** 313:24
451:8
**regards** 326:21
480:20
**regular** 279:14
392:8
**regularly** 279:10
474:23
**regulations** 474:6
479:16
**regulatory** 277:24
339:4 340:2,3
364:14,17 395:15
406:1 422:4 434:4
434:4 473:5 474:4
474:5 512:20
**related** 273:23
275:7,15 298:12
312:4 314:14
329:4 475:10
481:3 488:20
**relates** 515:9
**relating** 387:9,21
401:19 520:10
526:20

**relation** 419:14
**relations** 364:5
369:24 430:20
438:2 448:7 450:5
**relationship**
300:13,23 429:13
429:17
**relative** 542:9,11
**relevant** 465:12
470:12,15 471:23
474:5 488:3
**reliable** 320:25
**relied** 474:14
493:6 496:20
526:12 527:8
528:7 532:15,18
536:11 537:3,14
537:22 538:3,10
538:22 539:8,17
**rely** 362:18 528:1
531:16
**relying** 504:11,21
505:7,20 529:23
**remain** 377:11
**remaining** 357:20
**remember** 272:12
273:2,5 288:6
289:8 292:24
318:14 330:18
331:13 339:6
344:6 363:21
378:1,2,11,13,15
394:12 406:12
411:9 416:21,25
419:22,25 468:14
469:3 476:18
477:3 478:4
480:12,15,22
481:24 482:4
486:3 490:11
492:11,16 495:22

496:3 497:10
512:22 513:6
514:14 523:10
526:6,14,17,25
527:2,12,14,15,17
527:21 528:16
537:8
**remind** 381:9
**remote** 270:9,20
270:22
**remove** 380:15,18
**repeat** 286:16
495:3 516:6
539:13
**repeated** 424:17
**repeatedly** 387:15
**rephrase** 283:14
500:5
**replaced** 350:20
**replied** 510:18
**report** 268:4 276:2
276:7,8,8 277:12
279:25 280:3
281:5 282:25
283:7,18 284:20
286:20 287:2,3,5,8
287:9,16 288:1,2
288:11 292:8
350:20,20 352:7
357:2 358:24
359:23 438:25
451:14 452:14,22
453:1 455:7,24
490:3,20 521:5
**reported** 288:25
292:9 325:24
326:12 359:24
376:17 436:3
440:9 510:3
519:17,20,23
542:5

**reporter** 264:2,3
269:22 270:18,24
286:16 290:15
371:8,16 402:1
437:6 445:23
448:9 449:5,23
451:20,21 487:9
494:24 539:13
**reporting** 443:9
492:14 496:1
**reports** 288:15,19
353:20 436:8
491:6 530:14,17
**represent** 466:13
483:24
**representation**
296:22 310:13,14
357:3
**representations**
456:24
**represented**
499:11
**reprint** 413:5
**reprints** 419:4,9
**request** 286:14
378:17 500:2
515:12 529:2
**requested** 377:3
435:1,1
**requesting** 320:18
321:9
**requests** 379:23
472:17
**required** 442:17
443:6,7
**requires** 286:24
**requiring** 482:7
**research** 268:4
276:1 326:25
327:2,4 337:14
415:11 416:2

**researchers**
349:14
**reserve** 318:20
**resources** 361:6
361:19
**respect** 279:15
308:21 310:3,4
384:4 421:23
422:4 433:3
446:19 465:21
468:25 471:15
474:15 476:2,3,4
483:5 501:23
527:4,5
**respectful** 381:5
**respectfully**
311:20,24 313:22
315:4 316:3 382:4
**respectively**
357:14
**respiratory**
410:18
**respond** 336:2,7
369:9 390:11
435:3 465:10
471:21,21 472:17
**responded** 434:18
**responding** 334:22
538:4
**responds** 396:16
398:1 449:21
450:20
**response** 306:21
396:14 492:6,7
495:17,18 497:25
499:15 507:13
508:14 515:25
531:1 532:12
537:12 538:11
539:9

**responses** 472:22
492:2 499:12
**responsibilities**
364:16 473:3
**responsibility**
312:2 369:7 461:6
465:7 467:22
491:12
**responsible** 278:6
433:22 463:25
470:23 472:13
481:5 522:14
**responsive** 278:17
331:1 333:10
338:8 341:5 343:6
379:9,12 404:20
449:8 480:6 484:7
484:22 530:21
531:9
**rest** 316:13 383:8
**result** 540:10
**results** 437:10
438:20 440:12,22
442:21 443:9
446:8 447:8
448:10,19 450:12
451:22,23 452:23
453:6,8,16,19,24
454:3,5,11,25
486:19 489:11,17
491:18
**resume** 384:23
**retailers** 309:21
**retained** 310:8,25
324:20 326:4
401:11 541:3
**retired** 466:18,19
467:17 503:2
**retiree** 378:23
**retirement** 467:10
468:9

**returning** 384:16
**reveal** 283:11
286:25 515:5
516:25
**revealed** 314:19
**reveals** 284:12
315:5
**review** 335:4,24
369:5 373:19
374:19 401:8,13
401:19 402:7,20
402:25 404:23
413:7 414:23
415:12 417:1
422:9 423:20
424:7 425:14
428:7 429:9,24
433:24 434:11
437:11 453:23
476:1 486:18
489:16 491:17
492:20 494:10
495:9 496:9
497:11 500:8
501:11 508:11
512:3
**reviewed** 283:12
362:25 403:13,22
404:24 407:16
453:19 455:11
479:15 493:6,9,15
493:16 494:9
497:7,15,24
499:15 502:22,22
507:17,25
**reviewing** 335:13
404:14 405:6,19
491:10
**rhoads** 265:3
266:13

**rich** 291:10 420:13
  423:6 431:4
  432:22
**richard** 265:19
  291:2
**right** 272:13,20
  275:14,15,19,23
  276:19 277:9,14
  279:25 280:25
  281:2,10,14,21
  282:23 285:2
  289:4,17 290:4,12
  291:4,5 292:4,5,12
  293:3,25 294:4,7
  294:16 300:6,7,8
  310:23 312:10,21
  313:19 316:10,22
  317:25 318:21
  319:9 321:12,14
  321:18,19,24
  322:1 323:23
  324:3 325:22
  326:10 327:2,5
  328:15 329:20
  334:21 335:9,11
  335:17 337:1,6,11
  337:19,22 338:7
  339:7,11 341:7
  344:15 345:1,4
  347:3,10 348:11
  348:12,16,17
  350:5,7,11 351:3
  352:16 354:4,8,10
  354:20,22 355:21
  355:24 356:4
  358:17,20,25
  359:12,14 360:11
  360:14,19 361:19
  362:9 363:8,12,13
  364:6,9,10 365:2,7
  365:9,11,14,17

366:22 367:17,22
368:6,18 369:3,16
370:6 371:5,16,21
373:9,10,10,14,15
373:16,20,22,24
374:1,6,8,9,16,17
375:6,17 376:24
395:8,17,21 397:7
398:9,10,12,14,15
398:16 399:7,14
399:15 400:24
401:16 402:12,17
403:22,23 404:1,3
404:4,6 405:2,6,11
406:16 407:8,14
408:4,9,17 410:2
410:15,22 411:3
411:13 412:3,6,9
412:12 413:4
414:4,19 415:3
416:3,15 417:6,11
417:17,21 418:4,9
418:11,18,22,25
419:4,9 420:10,12
420:14 421:10
423:7,13,18 425:6
425:7,15 426:1,7
426:22,23 427:2,6
427:15,19,22
428:15 429:1
430:20,23,24,25
431:14 432:2,23
433:7,10 434:22
435:8,13,23
436:23 437:3,25
438:3 439:20
440:17 441:13,20
442:3,11,14,17,21
442:24,25 443:2,4
443:16,21 444:1
445:17 447:9,16

447:23,25 448:18
448:24 450:18
451:16 453:15
456:10,11,22
458:22 459:3
463:5 476:20,25
477:7 480:24
484:1,4,14 492:19
496:7 497:6
498:18 500:6,22
507:11,13 508:12
508:16,17,19
509:4,16,17,22
510:4,6,8,18,25
511:2,6 512:9
513:2,3,19 518:7
519:19,25 520:5
520:14,23,24
521:8,14,19 522:7
522:10,12,21
523:17 526:8,23
527:10,11 528:20
532:20,24 533:2
533:14,20 534:15
535:10,14,17,21
**rights** 461:21
  464:16
**rio** 304:1
**risk** 311:12
**road** 265:4 447:2
**robe** 389:20
**robert** 265:9 423:4
**roberts** 266:11
  270:16
**roc** 410:7
**rochelle** 459:24
**rods** 352:2
**roger** 376:6,12,15
  376:18,20
**role** 278:11 336:6
  344:13 363:18

395:12,15 434:5
448:25 449:19
459:20 461:6
471:12,23 472:1
481:15
**rom** 280:20
  281:10
**room** 295:11,19
  308:7 316:14,23
**rotate** 281:1
**rotated** 461:14
**roth** 266:16
**row** 441:6
**roy** 263:4 270:11
**rule** 314:10 405:18
**ruled** 314:9
**rules** 332:17
  382:25 386:4
  474:6
**ruling** 271:23
  283:21,22 284:13
  286:4,9 295:6
  313:21,23 314:11
  315:16,25 316:6
  318:17 389:15
  539:23
**rulings** 318:19
  392:17
**run** 276:9 280:4
  280:14,19 281:11
  281:18 307:11
  447:3,6
**running** 450:12
**rush** 348:3

|  s  |
| --- |

**s** 265:7 266:1
  268:1 269:1 271:2
  271:2 394:1,1,1
  395:18 478:2
**sabatelli** 298:7
  302:5 312:20

sacramento 437:6
safe 398:19 479:3
　480:3,4
safely 323:10
safest 479:18,23
safety 278:8
　333:17 374:3
　394:15,21 412:24
　470:16,21 473:22
　473:24 474:1,15
　475:4,15,22 476:1
　513:22 527:9
　538:16
sample 282:14
　440:24 445:23
　448:8 449:6,24
　451:10,11,13,15
　451:19 454:8
samples 268:17
　351:5,7,18,25
　352:3 355:16
　356:1,7,11,12
　357:12,20,20
　358:5,13 359:8,9
　359:13 490:4,13
　491:4,7
sandra 263:13
sarah 343:17
　344:5 430:19
　437:10,16,25
　442:25 443:11
　444:20 445:17,22
　445:22,24 447:20
　448:2,3,6 449:4,21
　450:16 451:18
　509:12
sat 389:11
saw 277:17 284:5
　284:5 288:14,19
　299:3,3 317:12
　405:16 448:18

452:25 453:7,13
455:24 499:23
507:7
saying 275:8 300:5
308:4 315:21
317:4 321:23
322:9 330:15
345:17 360:15,18
376:4 387:21
389:15 426:7
448:13 449:9
454:7 488:22
505:25 514:23
516:11 518:19
521:16 533:17
540:15
says 275:12
276:17 277:6
280:1,5,9,12 281:6
281:10,13,14,18
281:19,23 282:10
282:13,17 289:17
290:12 291:9,15
294:3,4,9,20
319:13 320:6,12
320:18,20,22,23
321:16 322:14,20
322:23,25 323:9
323:14 326:24
327:8,12,13,14,18
327:20 328:15,22
329:5,8,21,25
330:13 334:24
341:6 342:11
344:16 346:12,25
347:4,8,11,15,15
351:1,5,13,18,22
351:23 352:8,15
352:16 354:5
355:13,24 356:4,5
356:6,8,10,15,17

356:21,23 357:11
357:19,24 358:4
358:12 366:1,12
366:12 367:5,18
370:15,17,21,24
370:25 371:10
373:18 374:18,22
374:24 375:8,11
375:13,24 376:2
376:21 396:21
397:14,21 398:2,2
398:12,19,22
399:11,17,21,25
403:2,4,7,15,16,17
403:24,25 404:8
404:11 405:1,4
406:14 407:14
408:18 409:4,7
410:1,6,17 412:18
412:18,21 413:2,4
413:10,10,17,18
413:23 414:1,23
415:7,10 416:24
417:5 418:12,13
419:2 420:19
421:2 423:19,24
424:2,4,16,21
427:24 428:4,5,6
431:2,20 432:24
433:1,5,8 436:18
437:5,12,16,20,25
438:14,19,21,25
439:6,7,21,23
440:1,4,8,11,22,24
441:2,2,7,10,13,18
443:15 446:3
447:1 449:22
450:6,20 452:2
478:22 479:14
510:22 511:21
513:22 521:14

534:3,8,18,24
535:18,21 536:3,6
536:18 538:8
scare 420:25
scene 461:18
schedule 392:13
397:15 444:17
scheduled 294:6
442:2,10,13
443:10,23,25
445:16 475:15
schedules 291:17
scheduling 384:18
schneider 265:2
284:23,23
schneider's 286:4
school 379:13
420:23 459:23
460:2,2,17,20
467:3 486:16
535:7 536:12
science 277:19
339:2 435:24
468:25 472:5
486:15 532:1
sciences 408:20
scientific 279:2
348:15,21,23,24
400:6 404:24
405:11,19 428:7
434:1 449:14
465:24 470:25
472:3,9 473:13,16
475:3,10 486:2,8
486:13,22 488:20
491:11 529:7,23
533:13
scientifically
420:24
scientist 336:3
347:24 348:11

349:10,16 362:11
363:22 405:9
419:14 421:12
432:6 504:10,20
505:7,19,24
508:16 512:2
526:18 527:8
**scientists** 277:24
278:22 338:22,24
339:8,21,22 348:9
349:6,11 359:19
360:9,9,19,22
361:6,19,21 362:5
401:1,2,11 402:8
404:14,25 427:25
448:24 449:12
451:12 473:21,24
475:8 476:22
486:1,8 505:16
506:3 507:4
508:22,25 528:1
528:23 529:22
530:4,6 531:16
532:14
**scope** 494:7
**screen** 272:14
289:5,11 335:6
359:4 377:17
416:22 440:16
469:11,16 490:25
499:9 500:10,13
500:15 509:20
513:20 514:16
532:9
**search** 297:14,19
300:3,8 312:10
313:17
**searchability**
303:16
**searchable** 302:12

**searched** 302:16
314:17
**searches** 299:4
**seattle** 365:19
**second** 290:21
334:7,12 364:21
416:22 423:18
444:10 509:8
515:3
**section** 328:14
**sectors** 481:6
**see** 272:14 273:10
273:25 274:4,21
276:4,8 280:10,16
280:21 281:1,3,8
281:16 282:15
288:5,7 289:2,3,11
290:23 291:1,5,13
291:18 294:13,17
294:22 302:20
311:5 317:10
319:10,15 320:4
320:10,16 321:2,4
322:12,18 323:2,7
325:6,9 327:23
328:2,20 329:9,15
330:12 334:20
335:1,5,25 344:23
345:22 350:9,12
350:15,19,22
351:11,16,20
352:5 354:9 355:2
355:18 357:5,17
358:9,14,16 359:1
359:4,10,11,12,17
359:17 363:4,5
365:2 366:15
367:3,10 370:9,19
372:21,23 374:4,6
375:3,15 377:17
380:2,8,11 381:22

383:4 384:10
385:6 390:15
393:7,13 395:24
396:1,7 397:1,12
397:19,23 398:7
398:18,25 399:9
399:11 400:3
401:4,9 402:14
406:22 407:12,18
408:2,15,22 409:6
409:13 410:10,19
411:20,25 413:8
413:15,21 414:11
414:18,20 415:1,8
415:14 417:24
418:8,11,15 419:8
420:5 421:8
423:11,16,22
424:10,14 425:3
425:11 426:19
427:11 428:12,19
430:10,16 431:8
437:12,18,23
438:12,17,25
439:3,6,6,20,23
440:1,6,13,21,24
441:4,8,11,15,17
442:7 443:19,22
445:9,14 446:1
447:4 450:2,8,19
450:22 451:20
452:1 469:22
470:2 473:7
474:12,13 475:17
485:12,22 509:8
509:11,14 510:12
510:16 511:4,11
511:18,24 513:19
514:1,19 517:14
520:20 533:7,11
533:18,22 534:6

534:11,22 535:1,5
535:8,12,16,19,23
535:24 536:3,6,24
**seeing** 283:18
284:20 286:20
287:2,3,4,6,9
288:2,11 295:15
330:19 331:16
346:6 353:12,16
353:20,25 440:15
**seek** 284:8
**seen** 283:7 284:3
284:12 286:5
295:13 296:2,6,17
296:20,23 310:6
326:16,17 352:12
352:19,23 357:11
357:22 381:22
382:1 383:10
390:10 392:4
405:25 489:22
507:22
**sees** 383:7
**segment** 377:21
**select** 371:14
**selected** 345:18
346:13
**selecting** 367:2
**send** 369:14 419:3
419:8 426:5,10
429:21 445:24
452:13,21
**sending** 323:25
368:11 369:21
395:8,10 407:7
408:10 419:22,25
427:12 446:8
509:12
**sends** 364:1 373:5
406:18 420:12,17
430:18,19

senior 463:9 527:2
sense 366:20 392:3
sent 272:15,18
  276:22 277:3,13
  280:1 281:5 291:3
  293:20 330:4,17
  330:21,24 331:3
  331:12,20 332:6
  332:24 333:4,5
  334:18 338:25
  341:21 342:6
  363:14 365:15,24
  366:12,24 367:13
  370:14 371:1
  372:1 383:11
  385:5 394:9 397:3
  400:17 402:18,24
  405:22 408:18
  409:4,5 410:1,5
  411:11,15 413:6
  413:19 421:3
  426:6,9 427:17
  428:21 437:9
  447:7 448:9 454:7
  519:16 521:4
sentence 280:8
  323:6 342:9,11
  401:3 423:19
  446:25 478:20
  490:20
separate 311:17
  463:17 497:9
  524:20,22
separately 295:20
  339:16 435:15
september 269:11
  398:24 418:3,12
  418:22 469:20
sequential 307:8
  307:20

seriously 484:16
  484:17,18
serpentines 327:9
served 460:23
  482:2,6
server 482:14
service 366:8
  482:15
services 337:11
  408:21 418:14,22
set 306:23 316:9
  388:10 458:4
  542:6
setting 321:20
seven 380:21
seymour 351:8
shape 534:4
share 282:25
  296:8 300:5
  303:14 429:5
  437:10 443:1
  469:11 501:25
  532:9
shared 308:24
  429:8,10
shares 523:15,18
  523:22 524:2,6,9
sharing 271:11
  377:17
sharko 266:7
shelf 282:9,13
  289:1 292:13
ship 324:23
  325:14 326:11
shipp 325:8
shipp's 330:4
shocked 390:9
shoes 389:8
shortly 437:17
show 324:10
  340:17 356:13

458:5 469:10,11
  476:7 483:4 485:8
  490:16 506:23
  533:5
showed 277:23
  287:7 288:1
  353:19 356:11
  357:12,20 435:16
  445:19 453:8
  497:18
showing 279:8
  321:5 354:14
  446:8 447:8
  450:12 482:2
shown 280:12
  351:25 410:8
  476:8 480:9 490:1
  492:13 495:25
  497:11 502:3,8,11
shows 279:8 534:3
  536:20
shurtleff 464:6
sic 506:4
side 382:2,2
  391:14,17 392:2
  399:15 463:19,20
  463:21 464:4
sidebar 295:5,7,9
  318:5 515:12,22
  516:1,3 517:19
  518:10
sidebars 379:23
  380:19 381:13
  391:8
sides 297:10
  481:19
signature 542:14
signed 290:6
  301:17 351:24
  451:22,24 521:10

significance
  314:23
significant 314:20
  346:15 356:2
signs 421:10
silence 270:4
similar 293:14
  306:14,17 421:6
  468:24
similarly 299:19
simply 296:9
  298:20 308:17
  311:14 313:23
  516:21
sinai 534:9
single 308:17
  362:11
sir 272:25 277:16
  283:25 288:23
  290:20 321:5
  324:15 330:11
  331:4,7,7,11,18
  332:3,21 333:11
  334:14 342:16
  348:24 349:22
  350:1 352:23
  353:11 359:5
  362:3,9 368:6
  369:3,13 371:25
  419:13 422:24
  433:23 436:1
  441:21 442:6
  451:13 462:15
  467:7 486:11
  505:14 512:4
  523:13 524:13
  525:11 526:9
sit 288:7 489:23
  504:1,13 507:9
sitting 308:6 503:1
  526:17 528:5

situation 531:5
situations 449:2
  474:2
six 280:2 329:24
size 534:4
skadden 265:17
  266:24 271:3
  310:4,8,24
skillman 294:3,4,7
  319:25 321:13
skip 325:4
skipped 352:14
skipping 327:24
  430:2
slate 265:17
  266:24 271:3
  383:16
slivka 470:1
small 357:4
  369:15 459:24
smith 533:24
sobering 413:24
society 512:20
sold 303:21,22
  523:23 524:3
solely 414:24
solve 320:19
solving 320:24
somebody 271:19
  305:4,8 313:17
  378:12
son 467:3,4,8
  525:16,17
soon 384:18
sophisticated
  297:10
sorry 272:23
  273:1 285:12
  295:1 307:10
  319:19 335:7,7
  384:14 396:3

426:4 431:17,18
439:11,18 442:4,6
465:5 478:19
480:24 490:8
492:19 496:6
509:19 511:10
513:18 516:5
527:25 532:10
sort 334:11 435:5
  466:16 468:12
  495:7 527:4 531:7
sound 378:9
sounds 335:17
  425:18
sources 346:13,17
speak 303:15
  309:3 384:15
  425:13 439:14
speaking 285:2,13
  332:12,16 379:22
  380:15 381:17
  382:4
special 265:2
  283:22 284:1
  285:9,14,18,21
  286:15,22 287:13
  295:7,12 296:21
  297:22 298:3
  299:9 300:1,4,10
  301:23 304:14,19
  305:15,19 306:10
  307:10,14,17,24
  310:2 311:19,23
  313:4,8,11,13,19
  314:7 316:7 317:6
  317:10,23 318:1
  319:2 381:19
  384:9,20 389:2,24
  390:2,6,15,23
  391:1,13,16
  392:12,14,20

393:4 494:1,16,25
495:13 496:16
498:10,15 499:18
500:20 516:1,4,15
517:7 518:4
539:12,21
specific 320:8
  333:15,25 346:4
  451:7 496:19,25
  503:22,22 504:9
  506:10 507:21
  515:5 516:25
  517:1,17 536:16
  537:7,8 540:5,6
specifically 288:18
  305:6 333:21
  387:9,20 411:14
  431:4 436:12,13
  492:5 495:16
  507:5 508:12
  539:22
specification
  409:11
specifics 353:17
  354:1 480:2
  506:20 515:10
  531:4
speculation 283:3
  330:7 331:23
  368:13 402:10
  432:11 434:13
  452:18 453:2
spend 387:8 462:9
  467:9
spending 469:5
spent 379:2
  381:13 385:9
  392:6 467:18
  468:2,4,7 481:2,8
spillover 388:11

spoke 279:17,22
  339:24 505:16
  526:19 527:8
  537:20 538:16
spokesman 366:14
  367:6 370:15
spokesperson
  374:15
sponsored 512:19
spring 484:11
stake 311:25 393:6
stakes 314:22
stamp 294:16
  307:17 319:8
  330:12
stamped 298:16
stand 377:12
  457:5 500:22
  503:3 540:16,24
standard 264:6
  318:7 393:16
  457:9 459:9 501:1
  541:5
standards 479:16
stands 335:9 384:3
  418:17
stanford 263:18
  263:18
start 391:18,19
  392:7 457:21
  509:7 516:5
started 381:25
  458:25 463:3,7,14
  464:2,12 467:11
  482:1 497:10
starting 306:18
  383:15 392:2
  467:14
starts 322:9
  345:17 402:14
  416:20 420:21

**state** 264:3 302:3 302:24 309:15 385:25 386:5 387:7 462:7
**stated** 292:10 309:7 310:25 314:5 405:22 455:22 502:22
**statement** 274:23 275:6 322:16 323:1,4,9,18 344:15 348:21,24 348:24 353:2 368:1 371:3 375:19 394:8 399:19 400:4,6 417:8 420:21 493:7,17,22 494:11 503:23 504:11,21 505:8 506:12 507:17,23 508:1 512:8 514:12,16,17 531:23 537:23 538:25 539:17 540:17
**statements** 290:9 290:10 309:6 324:10 362:22,25 368:5 369:12,14 373:9 394:8,15,18 394:20 461:22 502:21 503:4 526:3,13 531:18 538:7 539:3
**states** 275:11 311:4 320:1 328:17 337:9,14 342:13,14,16,17 366:24,25 409:1 413:14 423:13

**427**:18 432:8 473:2
**station** 437:7 446:7 447:7 448:17 450:11,11
**status** 309:12 312:3 418:25 471:18
**stay** 462:14,24
**steering** 277:17,18 278:19,24 279:11 282:25 333:12,22 469:21 470:6 471:12 473:20 474:18 475:1,20 491:16 529:5 530:24 538:18 539:5
**stenographic** 264:1 377:11,15
**stenographically** 542:5
**stephanie** 266:25
**steps** 300:15 477:18 478:9
**steve** 418:13 422:24 434:14,22 434:25 438:2 449:22
**steven** 406:9,10,12 406:14,18 407:6 412:2 418:2 430:14 436:21 443:11 444:20 445:17,21 448:2 509:9,11,22 510:22 511:5,8,10
**stewart** 351:24
**stipulate** 313:16
**stock** 523:16,19,22 524:2,7,10

**stone** 316:20
**stood** 526:2
**stop** 332:14 377:17 378:22
**store** 522:25
**stories** 365:16
**story** 336:10,25 339:16 365:24 366:5,11 447:3,7 450:1,7,12,21 451:9
**straightened** 310:11
**strategies** 315:20
**strategy** 434:10
**streamline** 385:21 387:4
**street** 265:14 266:3
**strict** 417:3
**strike** 278:16 324:13 325:22 330:25 333:9 338:7 340:25 341:4,4 343:5 416:11 422:7 455:11 480:5 483:13 484:6,21 530:21 531:8
**stringent** 513:22
**strong** 510:15
**strongly** 428:9
**studied** 328:18
**studies** 277:19 473:4,12 474:4,14 479:2 486:18
**study** 370:18
**studying** 467:18
**stuff** 391:9 491:12
**subject** 290:11,14 315:17 322:6

**324**:11 326:24 345:3 365:16,23 370:8 388:12 396:5 400:23 406:22 411:18 423:10 430:8 437:2 442:2,10 469:20 480:15 506:11 510:6
**subjectively** 296:22 304:23 310:15
**subjects** 333:15,15
**submission** 405:21 406:20,25 409:3 410:4,5
**submit** 401:12,21 402:9
**submitted** 402:7 404:15 407:15 408:2,11 477:14
**subpoena** 482:2
**subpoenas** 309:23
**subsequent** 297:7 318:22
**subsidiary** 355:23 463:11
**substance** 478:16
**substantially** 306:14 352:1
**success** 448:12
**successor** 303:19
**successors** 308:10
**sudden** 447:3
**sued** 320:6 483:23
**suffers** 320:7
**suggest** 309:13 484:10 529:22
**suggested** 437:10 443:1 497:6

suggesting  311:11
337:3 512:8
suggestion  341:2
341:13 361:17
390:21 489:4
529:3
suggests  329:2
428:9
suing  274:7
466:14
suitable  356:18
suite  265:4,14
summarizing
513:20
summary  351:3
355:13 512:18
superior  263:1
270:13 280:13
supervisor  451:24
supplier  271:15
272:21 304:6
320:25 425:1
429:15 435:12
supply  273:8
support  308:6
320:24 340:2
412:24 507:23,25
526:13 531:18
supporter  510:15
supports  503:23
507:17
supposed  372:20
supposedly  300:24
sure  288:12 300:9
307:12 310:9
312:25 314:5
326:5 337:12
342:10 347:5
355:9 357:8 365:1
367:7 377:12
386:15 389:5

390:1 392:3 396:9
396:10,12 397:15
424:16 453:18
454:6 459:2 465:7
465:11,15,17,18
465:22 469:17
470:11 472:16,21
495:13 510:25
513:17 514:22
516:10 518:18
520:17,21 524:11
532:10 533:16
534:1 536:8
surmising  310:9
surprise  447:2
surprised  383:24
susan  266:7
suspect  313:17
sustained  540:12
swear  270:25
swearing  270:22
sworn  271:5
346:10,18 433:15
446:17 454:13
455:3
symposium
475:15,22 479:21
system  299:14
410:18
systems  303:11

**t**

t  268:1 269:1
281:19 394:1
t'd  269:1
table  281:3,6
292:10,12 357:12
358:11,12 440:12
440:21 490:11
502:7
tailing  281:25

take  270:7 293:20
294:6 298:24
300:5 313:21,22
316:11 317:23
372:15 380:6,9,24
381:1 383:3 384:7
392:21,22 396:24
398:3 454:20
455:16 457:1,3
458:4 459:1
461:21 477:18
478:9 480:2
484:15 486:15
489:1 494:14,15
495:6 499:1,2,16
509:4 528:23
529:3 532:9
taken  264:4
270:11 293:9
302:20 355:16
386:5 390:20
talc  268:15,17
271:10,14,15
272:21 273:8,23
274:8,13,18 275:1
275:7,10,15,18
276:10,21 277:17
277:18,19,20,20
278:18,24 279:4,5
279:9,11,23 280:4
280:13,15,19
281:7,11,19
282:17,21,25
283:8,19 284:21
286:21 287:10
288:3,12,25
289:14 291:10
292:9 293:14
297:18,25 303:22
304:7,9,10,13
308:21 314:14

322:7 323:12
326:25 328:15,18
329:1,4 333:12,17
333:22 334:24
335:4,13,24 336:9
336:16 337:5,20
337:24 338:19,23
339:10,14 343:14
343:16 344:17
345:4,17,19
346:13,16 347:1
348:23 349:7
353:2 354:15
355:5 358:13
360:23 362:6,13
364:19,19 367:1,9
367:16 370:16,22
370:24 371:4,4,10
371:21 372:6
373:19 374:19,20
375:1,2,14,23
394:15,20 398:4
399:8,19 400:5,24
401:13,19 405:23
406:20 409:7,11
409:16,18 410:2
411:18 412:25,25
413:20,25 414:8,9
416:18 417:1
420:2 421:7 422:1
422:10,16 424:25
425:1,14,25
427:25 428:10,18
428:24,25 429:9
429:24 430:8,18
431:7,14 432:2,9
432:23 433:24
434:10 435:8,12
435:13,23 436:10
445:23 448:8
452:16 463:18

467:19,20,23
468:22 469:21
470:6,16,21,21
471:11 473:6,12
473:20,22,23
474:1,12,15,18,19
474:23,25 475:3
475:15,20,21
476:2,3,4,11
478:25 479:3,16
479:18,21,22
480:3,4 481:2,3,9
485:19 486:21
487:2,13 488:15
490:4 491:16
492:8 495:19
506:25 508:24
510:7 512:3
513:11 514:5
520:10 521:6,12
521:18 526:20
527:4,4,6,9,18
528:3,8,15 529:4,5
529:8 530:14
531:12 532:16,19
532:20 533:9
534:20 535:15,22
536:4,7 537:9
538:16,18 539:2,5
**talcum** 283:13
323:5,9
**talk** 298:7 322:21
324:2 382:15
388:6 391:22
392:12,16 393:8
405:5 422:9 480:8
482:19 515:8
518:1
**talked** 317:24
386:10 411:7
421:19 436:22

538:17
**talking** 308:19
314:23 371:23
422:13 432:13
463:19 472:25
489:24 501:22
504:4 507:6
522:11,13 534:13
**target** 312:1
**task** 335:22
336:11
**tasked** 491:5
**taught** 297:7
**teacher** 467:2
**team** 293:9 389:3
**technical** 279:2
316:8 328:11
364:23 473:14
487:8
**technically** 305:7
**technologically**
305:9
**teleconference**
335:21
**television** 437:6
**tell** 297:11 312:17
336:10 337:4
344:5 357:6 383:7
384:20 388:1
422:15 424:12
459:17 460:11
478:2 481:1 486:8
499:17 506:8
519:8 520:15
536:12 537:3
**telling** 274:25
306:20 337:19
338:22 339:8,12
339:16 367:14,21
367:25 369:1
372:3 435:22

530:9
**tells** 378:14 409:10
**telofski** 339:24
395:11 411:19
427:15 442:13
**tem** 441:2
**ten** 316:25 362:15
378:11 381:2
457:4 459:1
498:23
**tens** 481:7
**terms** 298:14
406:24 408:1
409:15 432:14
447:6 450:11
465:16 466:11
481:12 489:8
491:10 517:17
529:4,15 538:14
**test** 437:7 438:20
442:21 486:19
489:10,17 533:14
**tested** 283:7,19
284:20 286:20
287:10 288:3
340:7 436:9
438:14,15 451:15
474:23 519:9
537:4
**testified** 274:25
290:4 352:18
433:13 456:9
461:3 480:20
489:20 507:12
515:14,16 517:4
529:1
**testifies** 271:5
**testify** 359:20
465:23 481:20
482:3 516:22

**testifying** 459:20
463:24
**testimony** 317:22
331:2,11 338:18
352:22 368:9
380:16 404:17
433:15 446:17,21
453:5,10,11,14,15
453:20,22 461:23
462:8 476:1
480:18 482:7
505:1,12 507:13
508:4 515:13,23
516:20 517:10
520:12 521:21
537:17 541:1
542:4
**testing** 273:23
275:7,9,15 288:5,7
288:12,14 341:22
342:20 346:14
353:16,25 354:3
354:14,19,21,22
354:25 435:25
438:3 443:25
444:6,21 446:19
474:19 488:19
489:21 490:20
498:7 502:13
507:24 510:3
**tests** 367:7
**texas** 265:15
273:18 320:7
324:19 325:12,19
325:21 326:2,3
**thank** 273:22
277:11 286:2
295:8 301:25
304:18 308:1
316:1 317:25
318:3,4 319:4

334:8 357:10
372:18 389:2
402:3 439:17
457:2,4 458:16
459:4 487:22
497:1 500:21
516:2 518:7,9
525:23 540:13,21
**thankfully** 434:15
**thanking** 275:7
**thanks** 318:24
322:25 336:7
396:25 459:5
497:1 503:14
516:18 532:6
540:22
**thing** 327:20 360:6
360:7 371:18
386:7 392:4 466:8
468:12 471:8
527:5 531:7
**things** 298:11
315:20 327:8
360:12 372:10
379:2 380:12
388:17 429:21
433:2 455:9 468:9
469:3,4 473:11
475:12 476:14
480:19 481:1
484:19 485:15
516:19 521:25
**think** 277:22,24
278:4 286:5,11
295:12 298:7
301:4,6,18,20
303:6,20 304:11
305:9 306:1,5
308:4,17 314:16
314:24 315:4,7
316:7 326:5 334:6

336:8 339:1,2,3
340:1,21,23 341:3
344:11,11 359:16
363:24 365:3
370:2 371:17
379:21,22 380:1,4
380:10,11,19,23
380:24,25 382:22
383:2,7,12,20
384:4,5 385:14
388:9,13 389:18
390:22 391:4
392:2,18 395:15
410:24 432:16
435:9 436:8
442:22 449:2
450:17 454:2
461:15 462:17,25
470:7,20 472:14
475:25 476:5
482:20 483:25
484:4,14,20 489:4
491:23 494:4,15
498:19 499:24
502:9 508:6
512:14 515:21
516:4 518:1
519:23 523:20
527:6,15,23
530:18 540:9
**thinking** 326:1,2
415:24 466:6
467:18 468:2
474:14 493:21
**thinks** 511:23
512:12
**third** 265:10 276:7
296:7 309:23
314:1 318:23
369:24 382:17
383:13,21 386:7

386:11 388:11
389:13
**thorough** 428:7
**thought** 284:24
298:24 331:9
344:13 388:22,25
389:3 460:6,14
**thoughts** 384:11
398:2
**thousands** 489:25
**three** 302:17
305:18 317:16,21
323:21 332:9
356:6 364:2
369:22 378:7
379:4 391:11
449:23 462:17,25
463:17 466:23,24
467:2 510:1
**threw** 425:19
**time** 264:6 272:22
278:9 279:14,14
279:19 283:6,18
284:19 286:19
287:5 292:23
295:15 300:25
301:21 305:21
317:19 318:7
326:10,11 329:23
331:20 332:7,25
335:13 337:17
339:25 344:8
347:18 352:19
358:22 367:21
371:25 376:16,19
376:22 378:4,4,15
378:15 379:2
380:13 381:13
382:19 384:16,22
385:9 386:9 387:8
390:9 391:24

392:5,10,21
393:16 399:2
403:13,21 406:16
409:16 410:13,21
411:2,13 416:4
417:7 418:3
422:13 433:24
435:6 436:7,8
445:25 453:7
456:5,17,18 457:9
457:15 458:2
459:9 461:17
462:9,20 463:24
463:25 464:9
466:8,17 467:10
467:15,16,18
468:2,5,7,7,8,10
468:21 469:5,5
470:19 472:5
476:2 481:2,4,8,11
489:20,20 494:23
497:19 498:19
500:20 501:1
503:15 507:25
522:23 523:24
524:5 526:4
530:12,12,17,18
539:23 541:5
542:6
**timeframe** 274:19
**timelines** 465:16
**times** 279:21
300:17 301:19
309:19 332:9,15
346:22 362:15
365:22 367:24
378:6,7,11 389:9
394:15 417:15
445:1,3 449:23
482:9 505:22
508:5

timing  321:18
tin  320:14
tinto  304:1
tisi  266:17 384:8
   384:15 385:3
   389:2,23 390:1,5
   390:14,19,25
   391:2,6,15,21
   392:18,25 393:5
title  276:8 350:15
   351:1 420:16
   463:6,8
titled  476:11 490:4
today  287:8 288:1
   288:12 304:22
   308:19 315:1
   353:15,20 360:18
   377:20 378:7,20
   380:20 382:16,20
   383:5 384:13
   385:5 393:10,12
   397:15 446:17
   453:9 468:14
   476:9 482:25
   499:23 501:24
   502:4,8,12 503:2
   503:15 504:1,13
   504:22 505:9
   507:9 508:3
   513:22 526:17
   528:5 540:16
today's  541:1
toiletry  356:20
told  320:2 339:20
   342:14 343:13,15
   360:21 362:18
   369:6 373:15
   380:7 394:10
   424:5,13,18,24
   428:23 435:12
   445:24 456:19

457:19 506:17
   513:10 514:4,8
   521:11,15 528:18
tomorrow  378:18
   390:8 392:23
   443:15,20
tone  403:1 425:4,7
tones  270:5
tools  464:7
top  275:23 280:9
   281:15 293:24
   296:1 309:13
   351:3 398:20
   430:5,5 434:18
   436:18 439:1,21
   439:24 511:20
   520:5 534:15
topics  469:8
tort  296:13
totality  504:17
totally  383:22
   389:16
touched  433:21
tough  469:4
town  445:4
toxicologic  479:1
toxicologist  511:5
   527:18,22
toxicologists  486:1
toxicology  335:10
   335:12 337:4,8
   406:15 408:14,19
   408:25 409:5,10
   435:22 452:15
   478:25 512:20
tr  282:10,11
trace  281:19,19
   282:10,17 345:20
   347:2,9 492:15
   496:2 519:22
   521:13 534:20

536:7,8
track  378:22
   384:25 442:23
trade  407:1
training  400:1
transcript  264:1
   383:17 385:16
   542:4
transfer  303:20
transmission
   359:8 439:7 440:2
transmit  280:2
travel  391:10
traveling  468:8
tremolite  281:11
   281:19,23 282:1,3
   282:4,7,10,17,21
   288:24 289:16,19
   289:22 292:9
   327:11 328:19,24
   328:25 345:21
   346:17 347:3,10
   347:13,19 351:19
   352:2,9 353:21
   357:16 492:10,15
   492:22,22,23
   495:21 496:2,10
   496:11,11 497:20
   498:5,5 499:9
   501:12,13,13
   502:14,15,15
   534:25 535:22
   536:4,10,13,21
   537:5,25 539:20
   540:18
trial  305:23 306:8
   317:17 385:24
   387:25 462:4
   465:17
tried  296:18 306:9
   387:4 451:11

461:1 462:5,11
   531:5
trouble  455:5
   494:21
truck  460:1
true  333:22
   338:11,11 342:2
   355:12 361:2
   373:2 381:6
   394:14 401:14,23
   421:25 436:1
   448:20 456:17
   484:5 513:8 526:8
   528:22 531:13
   538:8,9,10 542:3
truthful  377:25
   485:1
truthfully  378:10
   378:23 468:15
try  384:25 424:8
   439:14 448:13
   449:9 451:10
   460:16 468:14
   477:18 478:9
   508:6
trying  277:7
   288:13 371:8,13
   381:7 382:9,12
   448:11 451:18,19
   451:20,20 454:8
   467:4 468:7
turn  280:8 281:2
   300:11 323:6
   334:13 438:24
turned  423:19
   494:25
tv  438:11 446:7
   447:7 448:9,17
   450:11,11
tweak  322:16

**two** 280:8 293:9
302:2 316:20
318:13,13,19
322:3 323:17
327:9 329:23
351:5,25 357:12
358:5 364:8
369:21 372:10
380:7,8,10 383:19
386:1 388:10,20
389:20,22 390:3,7
391:7,9,17 414:17
427:13 429:16
449:24 455:9
456:1 467:1 476:5
479:21 497:9,22
499:13 510:1
521:6 537:14
**type** 296:13
308:19 348:10
412:25 441:14
**types** 410:24
**typical** 465:2
**typically** 392:8
393:2

**u**

**u** 271:2
**u.s.** 408:20 413:20
**u.s.g.s.** 413:13
**uk** 527:16
**ultimately** 462:9
495:8
**um** 361:20
**unanimous** 335:22
**uncomfortable**
359:15,19
**undergoes** 417:3
**underlying** 303:16
**understand**
271:23 278:14
285:22 287:19

295:13 296:3
300:12,22 318:16
328:5 358:23
366:7 451:13
480:25 482:18
516:19 531:6
**understanding**
308:9 365:13
386:11 470:5
471:25 475:21
482:20,22 496:24
499:20 501:21
525:1 530:25
**understatement**
309:2,16
**understood**
284:14 286:3,9
287:18 290:8,9
311:21 409:15
425:10 496:18
**undertaken**
355:25
**undisputed** 301:7
301:7,20
**unexpected**
383:22
**unforeseen** 389:12
**unfortunate**
382:17 420:22
**unfortunately**
393:11 403:10
**unique** 336:10
**unit** 270:9 318:10
377:14 394:4
457:7,12 500:24
501:5
**united** 337:9,14
409:1 413:13
415:11 427:18
432:8

**units** 541:3
**university** 351:8
**unmute** 457:21
**unmuted** 364:21
457:23
**unreasonable**
314:24
**untreated** 281:11
**upcoming** 401:8
402:20
**updated** 478:23
**ups** 525:25
**upsetting** 483:19
483:25
**uptick** 464:14
467:24
**use** 271:8 306:2
314:12 330:23
350:20 368:22
370:23 371:9
372:5 375:14,22
379:3 381:17,18
385:19 394:16
399:25 458:17
461:17 484:2
488:9 508:23
511:23 512:3,12
**user** 375:1
**uses** 347:1 358:24
367:16 381:8
476:11 479:3
**usually** 329:24
474:2
**utmost** 310:3
317:5 382:8

**v**

**v** 263:9,15,20
266:17
**vague** 333:13
344:9 419:16
507:1

**val** 273:23 274:18
275:16,17
**various** 463:13,13
467:5 528:8
**vented** 425:20
**verbose** 393:1
**verified** 346:16
540:10
**verify** 497:15
540:8
**verifying** 499:15
**veritable** 309:16
**veritext** 270:17,19
541:3
**vermont** 274:13
303:23 304:2,6
345:18 347:2,9,13
355:11 367:1,16
521:12
**versed** 279:6
**version** 350:21
365:24 366:5
**versus** 270:12
326:21 409:7
**video** 270:6,10,21
377:9,10 381:21
381:21
**videographer**
266:11 270:1,18
318:8 364:24
365:4 377:8,12
394:2 457:5,10,16
459:6,10 494:20
500:22 501:2
509:19 518:11
540:24
**videotape** 461:17
461:19,22
**videotaped** 263:3
461:18

**view** 265:3 281:1
306:13 382:1
494:12 508:9
**views** 278:14
468:6
**virtual** 263:4
**virtually** 264:4
**vis** 419:19,19
**vol** 263:6
**volume** 309:25
495:1

**w**

**w** 329:13 470:1
**wag** 387:16
**wait** 390:15
**waive** 270:21
271:12,17 296:9
314:2
**waived** 272:2
315:12,24 318:23
461:21 538:6
**waiver** 315:17
494:6,7,12
**walker** 265:3
266:13
**walter** 490:3
**want** 271:7 275:5
303:10 304:17
306:11 309:4
312:2,15 314:8
315:14 316:15
334:16,17 341:12
348:3 352:22
377:8,18 384:23
387:11 388:9
389:25 390:6
391:19,19 392:22
394:25 396:23
433:12 458:4,9,25
460:4 469:7 471:4
476:7 478:14

480:8 483:3,4
485:8,16 493:4,12
496:17,23 499:1,4
512:9 514:21
516:9 517:24
518:17 528:11
**wanted** 314:5
361:16 378:18
381:10 384:15
387:15 388:15
405:16 434:7
437:7 482:19
522:18
**wants** 285:23
306:20 379:15
384:15 418:24
471:21 500:18
**watching** 460:9
**watergate** 460:10
**way** 277:14 279:9
286:3 288:22
312:24 361:4
381:4 387:11
388:20 396:4,5,13
455:20 456:4
466:24 470:19
472:19 497:7
**ways** 379:8 381:15
498:7
**we've** 313:25
316:18 318:18
378:6 386:10
392:5 395:9
421:18 435:7,21
436:22 454:19
463:18 498:20
**weber** 325:18
326:8 340:5,15
341:15,25 342:19
480:11,13 488:6
514:25 515:18

516:13,24 517:3
518:21 519:5,7,15
520:1,1,6,8,19
521:5,8,11,17,22
522:7 523:2,4
**wednesday** 264:5
**week** 321:8,11,12
322:1,21 324:2
335:21 388:25
412:20 413:7
437:5 442:3,9
443:8
**weekend** 403:10
403:19
**weekly** 524:17
**weeks** 407:17
418:5 449:25
**wehner** 411:7,12
412:8,11 414:13
414:19 415:4,10
416:13,17,24
417:7,10,20 418:2
418:8,12,24 419:2
419:7,8,13,22,25
420:5,12,17 421:6
421:20 431:25
432:2,17
**wehner's** 412:19
413:6,18 414:5,7
418:20 420:10
**weight** 441:7
**went** 279:9 288:24
305:5 362:22
365:25 367:1
381:22 389:8
456:4 459:23,24
460:1,16 462:2,18
493:21
**west** 265:20 271:4
**wet** 280:14

**wife** 466:23
482:10
**wiles** 324:16,18,19
325:7,12,17 326:1
326:4,11 330:4
**willard** 363:15
**willfully** 290:10
**william** 277:3,13
278:24 279:11
280:1 281:6 339:3
360:23 411:23
420:13 506:16,22
533:20
**williams** 326:5,7
488:7 515:1,18
516:14,24 517:3
518:22 519:2,4,25
520:7,23 521:23
**windsor** 355:11,16
355:20,22
**wire** 366:8
**wish** 457:19
468:18
**witness** 265:15
267:3 270:23
271:1 284:2,5
287:22 306:1,5
347:22 352:12
377:5 382:6,21
385:24 386:20
390:7 457:22
458:11 493:5
496:20 498:2,6
499:7,21 509:20
517:8,13 538:6
539:24 540:7,10
**witnesses** 338:1
465:19,22 468:25
469:1
**wolfson** 303:3

**woman** 374:25
**women** 328:23
329:3 387:17
**word** 300:2 302:12
302:13,14 324:14
328:2 359:11
381:18,18 385:13
385:14 522:20
**words** 289:20
327:4 344:19
358:24 369:1
381:8 439:3,23
441:4,18
**work** 271:10,12,17
271:18 272:1
280:9,12 284:12
286:25 288:16
293:13 295:2
310:6 315:10,22
319:20 324:20
335:23 337:25
339:17 349:6,6
362:6,19 364:11
369:12 396:4,13
401:18 412:24
413:11 422:5
425:24 426:10
435:20 461:3,4
462:18 463:10
464:19 465:6
466:9,15 467:5
473:17 474:17,25
481:12 505:17
510:25 512:9,16
515:6 516:25
525:15,19,20
529:4 530:23
533:13 538:23
539:10 540:1
**worked** 340:1,1
347:18 362:8

363:8 364:19
367:21 371:20
410:22 411:3
421:13,21,25
422:3 424:24
433:13,21 456:18
464:21 467:20
471:7 486:7
504:10 512:6
514:4 526:4,13,19
527:23
**working** 279:7
288:4 308:12
326:12 328:13
338:1 339:4
349:14 388:17
410:12 465:2,14
466:2,11,25
467:23 468:5,8,22
468:23 483:22
487:24 523:9,12
527:5,18 531:25
**workmanlike**
382:23
**works** 313:8 459:2
525:17
**workshop** 476:16
476:23 478:21,22
479:6 512:18
**world** 391:2,2,4
399:4
**worldwide** 278:18
428:8 469:21
470:6 471:11
473:20 474:18
475:20 491:16
530:24 538:18
539:5
**wrap** 382:16,20
**wrapping** 388:5

**write** 360:6,7,13
401:12,21 402:8
448:2
**writer** 411:22
**writes** 365:18
401:6 402:18,23
403:9 406:19
424:23 425:9
445:21 511:8,10
511:14 534:2,19
**writing** 301:11
323:17 416:13
418:20 427:9
533:23
**written** 291:21
300:17 325:7
405:21 429:6
**wrong** 296:3 335:8
483:5,8 484:12
**wrongdoing**
483:25
**wrongful** 302:5
**wrote** 273:10,19
273:21 274:2,6,10
274:12,14,16
336:13,15,18,20
336:22 342:11
350:19 360:1,11
361:1,5 379:16
407:21 416:17
419:6 428:15
450:16 511:4
519:8 520:2
531:11

| x |
| --- |
| **x** 268:1 269:1 |
| 355:14 386:23 |
| 536:19 |
| **xi001573** 542:16 |
| **xi01573** 264:4 |

| y |
| --- |
| **y** 271:2 |
| **yeah** 276:25 277:6 |
| 277:21 278:21 |
| 280:22,24 281:13 |
| 282:2 292:11 |
| 297:1 301:25 |
| 312:22 316:12,24 |
| 317:2,9,9,9,12 |
| 318:15 321:25 |
| 324:22 326:1,9 |
| 328:4 335:17 |
| 337:7 338:20 |
| 350:22 363:10 |
| 366:9,20 367:18 |
| 367:25 371:12 |
| 374:14 391:21,21 |
| 395:2,14 396:3 |
| 398:8 399:16 |
| 407:9,12 410:3 |
| 419:1 421:17 |
| 425:16 431:15,20 |
| 433:8 434:23 |
| 439:16 440:14 |
| 441:5,16 442:7 |
| 443:7,19 449:6 |
| 451:17 455:20 |
| 456:24 458:23 |
| 459:1 462:11 |
| 466:4,19 467:11 |
| 468:17 479:9 |
| 480:1,18 481:4,16 |
| 482:9 494:20 |
| 497:1 500:1,4,12 |
| 506:7 507:15 |
| 512:5 519:23 |
| 522:22 523:3,11 |
| 524:12 525:20 |
| 529:1 533:3 |
| **year** 289:13 |
| 367:13 420:9 |

[year - zoom]

427:10
**years** 298:1,2
302:17,18 304:22
305:18 308:9
310:19 314:15
315:2 317:16,21
323:11 329:23
346:15 355:5
362:9 371:20
379:4,24,25 389:6
389:7 415:21
462:17,17 463:1
466:4,7 468:20
483:20 484:2
486:6 503:2 504:8
504:18 526:12
528:6 531:24
**yep** 425:8 426:16
**yesterday** 271:22
272:10 274:25
277:23 289:5,9
290:4,18 315:15
378:6 381:11
423:15 482:25
**yetter** 265:13
**york** 265:11,11,21
265:21 271:4,4
351:8 459:22
460:2,3,22 462:6

**z**

**z** 351:8
**zazenski** 272:18
273:2,9,11 291:2,9
294:12 420:14
421:18,19 422:1,9
422:15 423:6,19
423:24 424:4,16
424:21,23 425:9
425:13,24 426:5,7
426:11 427:8
428:14,21 429:5,8

429:18,22 431:5
431:12,20 432:1
432:22
**zazenski's** 426:20
**zero** 282:20
**zoom** 458:11

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a
certified shorthand reporter, the witness shall not
sign the deposition. If the officer is not a
certified shorthand reporter, then unless reading
and signing of the deposition are waived by
stipulation of the parties, the officer shall
request the deponent to appear at a stated time for
the purpose of reading and signing it. At that time
or at such later time as the officer and witness
agree upon, the deposition shall be submitted to
the witness for examination and shall be read to or
by the witness, and any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness. If the witness fails to appear at the
time stated or if the deposition is not signed by
the witness, the officer shall sign it and state on
the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 188

## 6. Cosmetics



PLAINTIFF'S
EXHIBIT
JNJ-567



EXHIBIT

EXHIBIT
J&J-4

Protected Document--Subject to Protective Order

Eastern Magnesia **Talc Co.,** Inc.   a Johnson & Johnson company

## THE COSMETICS INDUSTRY

I. Today's Market

  A) EXTENT

    1). We estimate we have 32.10% of the talc market in cosmetics

    2). Total talc market in tons, est. 1964      30,000

    3). EMTCO shipments to 18 customers at 21 plants,'65   9,700

    4). Potential      21,300

  B). APPLICATION

    1). As a base for perfumed baby powder, dusting powder, foot powder, and pressed cake (packed face powder).

  C). COMPETITION

    1). Domestic            2). Foreign

       a) No. Carolina talc       a) Italian talc
       b) California talc         b) French talc
       c) Alabama talc          c) Korean talc

  D). EMTals for cosmetics

    1). The following grades, priced f.o.b. the Vermont plants, are sold in the cosmetic industry:

| EMTal | Plant | Price per ton Bags | Bulk |
|-------|-------|-----|------|
| 500 | Johnson, Vt. | $40 | - |
| 549 | Johnson, Vt. | 75 | - |
| 66 | West Windsor, Vt. | 80 | - |
| 600 | West Windsor, Vt. | 80 | - |
| 649 | West Windsor, Vt. | 80 | - |
| 659 | West Windsor, Vt. | - | - |

- 1 -

Protected Document--Subject to Protective Order

JNJH29W_000003709

UNTCO — COSMETICS

I. <u>Today's Market</u>

   D). EMTals for cosmetics

      2). No grades are presently shipped to the cosmetics industry from Gassetts.

      3). REASONS for EMTals acceptance are special and many

| | |
|---|---|
| a) Extremely soft | j) Excellent compressibility |
| b) Low on carbonates | k) Correct density & Particle size |
| c) Low acid soluble substances | l) Meets TGA & USP specs |
| d) Excellent slip | m) Meets customers specs |
| e) White color | n) Domestic source of supply |
| f) Free of grit & "shiners" | o) Bulk shipments available |
| g) High purity | p) Prices advantageous |
| h) Low calcium content | q) Unique flotation processing |
| i) Good adhering power | r) Immediate shipments |

II);. Today's Problems

   A). SHORTCOMINGS

      1). Not as white as some approved talcs

      2). EMTal 66 fails to hold fragrance as well as some competitive talcs

      3). F.O.B. price of West Windsor EMTals higher than any other known cosmetic talc

      4). Iron content high

      5). Johnson grades too high in arsenic content

   B). REQUIREMENTS

      1) Why ?

         a) To provide softness and smoothness
         b) To give good adherence
         c) To impart a white color
         d) To carry fragrance
         e) To meet USP & TGA specifications
         g) To furnish proper absorbency properties

      2) What industry is using (Price range: $35 - $80 per ton)

         a) EMTals 66, 500, & 549 ( less amounts of 600,649,&659)
         b) Italian (Blue Label & Red Label)
         c) Regal (No. Carolina)
         d) Sierra Supreme (California)
         e) W.C.&D. grades (P.3)

- 2 -

Protected Document--Subject to Protective Order

JNJH29W_000003710

EMTCO - COSMETICS



II). <u>Today's Problems</u>

   B). REQUIREMENTS

      2) What industry is using

         e) W.C. & D. grades

           1) Italian #1600,#1602,#1606
           2) French #8 & #12
           3) Canadian #2406 & #2427
           4) Indian #454
           5) No. Carolina #618 & #1625
           6) Alpine (Alabama) #112
           7) Montana Treasure #1736
           8) California Micro #1731

III). <u>Tomorrow's Market</u>

   A) PROJECTIONS )   1) Anticipated population growth expected
                      to require rapidly increasing amounts of
   B) GROWTH      )      powder-base cosmetic products for at least
                      the next decade.
   C) DEMAND      )

                      2) It is highly unlikely that substitutes
                      for talc-based powders will be an major
                      concern during this period.

   D) TRENDS

      1). All cosmetic talc producers active in promoting new
         or improved grades.

      2). Most large users constantly engaged in developing
         better powders.

         a) Working with many different talcs
         b) Aiming at reducing costs

      3). New markets showing active signs

         a) Powder for men
         b) Teen age cosmetics
         c) Untapped foreign outlets

      4).Few cosmetic chemists have knowledge or background on
         basic chemical and physical properties of talcs.

      5). EMTCO working to replace Johnson EMTals with West
         Windsor EMTals when and if Johnson cosmetic grades
         are eliminated due to arsenic content.

- 3 -

Protected Document--Subject to Protective Order

INTCO - COSMETICS

III. <u>Tomorrow's Market</u>

    E) CHALLENGE

        1) A lower price on West Windsor EMTals would assure larger sales volume.

        2) Added brightness at West Windsor would make EMTals more competitive.

        3) Elimination of arsenic in Johnson EMTals would assure retaining some 2000 tons valued at approx. $105,000.

        4) We need more technical knowledge of our cosmetic talcs; and , in turn, need to convey this to the cosmetic chemists.

        5) We need technical service personnel and lab facilities to effect direct liaison with present and potential cosmetic customers.

           a) To develop new markets

           b) To develop new grades, if necessary

           c) To improve present grades

-- 4 -

Protected Document--Subject to Protective Order

JNJH29W_000003712

Exhibit 189

MILLER

EXHIBIT NO. 4

CX-20-17

P. Frederickson, CSR, CCR

# CIRCUIT COURT OF THE STATE OF MICHIGAN

## IN AND FOR THE COUNTY OF WAYNE

| | |
|---|---|
| CUNNINGHAM, MAGGIE L., et al,) | NO. 88-826653 NP |
| WILLIAMS, LEO, et al, | NO. 88-826656 NP |
| PETERS, MAXINE, et al, | NO. 88-826658 NP |
| DUDLEY, WALTER, et al, | NO. 88-826700 NP |
| MILES, LOUIS, et al, | NO. 88-826810 NP |
| BARBER, THOMAS P., et al, | NO. 88-826811 NP |
| HENDERSON, SAMUEL, et al, | NO. 88-826813 NP |
| SCALES, LAURA, et al, | NO. 88-826918 NP |
| TISDALE, ALEXANDER, et al, | NO. 88-826807 NP |
| STEVENSON, PATRICIA, et al, | NO. 88-827261 NP |
| STOKES, JESSIE, et al, | NO. 88-827262 NP |
| PHILLIPS, LAURA MAE, et al, | NO. 88-827263 NP |
| BOMMARITO, PETER, et al, | NO. 88-827376 NP |
| MANNING, LEO, et al, | NO. 88-827378 NP |
| McDONALD, JOHN F., et al, | NO. 88-827379 NP |
| PORTER, FELIX, et al, | NO. 88-827381 NP |
| FLEMING, LOUIS, et al, | NO. 88-827383 NP |
| HALISON, DOROTHY, et al, | NO. 88-827453 NP |
| ALSTON, JAMES DAVID, et al, | NO. 88-827455 NP |
| FREEMAN, WOODROW, et al, | NO. 88-827459 NP |
| ANTHONY, JOSEPH, et al, | NO. 88-829107 NP |
| BAILEY, JOE MEDFORD, et al, | NO. 88-829109 NP |
| GANT, PAULINE, et al, | NO. 88-829113 NP |
| STEPHENS, GARLIN, et al, | NO. 88-829115 NP |
| CUNNINGHAM, JUDGE, et al, | NO. 88-829116 NP |
| COLEMAN, JOSEPH, et al, | NO. 88-829117 NP |
| OWENS, JAMES, et al, | NO. 88-829118 NP |

Plaintiffs,

vs.

DUPLICATE

OWENS-CORNING FIBERGLAS
CORPORATION, et al.,

Defendants.

---

*Deposition Upon Oral Examination Of*

## ROGER N. MILLER

---

DATE: June 12, 1991

REPORTED BY: Leslee J. Unti - CSR#UNTI*LJ502CA



APPEARANCES

For the Plaintiffs:
STEPHEN I. KAUFMAN, ESQ.
Lopatin, Miller, Freedman,
  Bluestone, Erlich, Rosen
  &amp; Bartnick
1301 Jefferson Avenue
Detroit, Michigan 48207-3197

For the Defendants:
ROBERT O. KRISTUFEK, ESQ.
Tilly &amp; Graves
Suite 1001, Ptarmigan Place
3773 Cherry Creek North Drive
Denver, Colorado 80209

MICHAEL MALLOY, ESQ.
Holahan, Malloy, Maybaught
  &amp; Monnich
911 West Big Beaver Road
Troy, Michigan 48084

Cahill, Gordon &amp;Reindel
1990 K Street Northwest
Washington, D.C. 20006

For Roger N. Miller:
JOHN C. O'SHAUGHNESSY, ESQ.
c/o BILL LEEDUM
Williams, Kastner &amp; Gibbs
Suite 4100 Two Union Square
P.O. Box 21926
Seattle, Washington 98111-0040

DATE: June 12, 1991

REPORTED BY: Leslee J. Unti

Ⅱ Exhibit Index                                    Roger N. Miller - June 12, 1991 ▶

Affadavit..................................................................................EXHIBIT 1
March 15, 1991                                                          Page

SEATTLE, WASHINGTON; WEDNESDAY, JUNE 12, 1991

9:00 A.M.

--oOo--

ROGER N. MILLER,                    *witness herein, having been*
                                    *first duly sworn on oath,*
                                    *was deposed and testified*
                                    *as follows:*

E X A M I N A T I O N

BY MR. KRISTUFEK:

Q    Sir, would you state your full name and spell your last name for
     the court reporter.

A    Roger N. Miller, M-i-l-l-e-r.

Q    I understand you are retired; is that correct?

A    That is correct.

Q    Give me your address, please.

A    10101 Manitow Beach Drive Northeast, Bainbridge Island,
     Washington 98110.

Q    How old are you, sir?

A    65.

Q    Mr. Miller, have you ever had your deposition taken before?

A    Once.

Q    Was that in any litigation that involved tire plants?

A    Yes.

By Mr. Kaufman                                          Roger N. Miller - June 12, 1991

1   Q   When was that?

2   A   It was in Rhode Island in -- I'm not sure of the date.  I wouldn't

3       want to guess.

4   Q   Do you remember what tire plant that involved?

5   A   A plant in Rhode Island.

6   Q   Was it a Goodyear plant, Goodrich plant, Uniroyal?

7   A   I believe it was Uniroyal.

8   Q   Did that involve questions of exposure to talc?

9   A   The focus, as I recall it, was on asbestos.

10  Q   Any particular type of asbestos?  Was it from pipe covering

11      gaskets or on --

12  A   I don't remember what the allegations were.

13  Q   Let me ask you one more question.  Why were you there?  What

14      was the reason they were asking you questions?

15          MR. O'SHAUGHNESSY:  Note my objection as to the

16      reason why he was there.  I assume it was because it was a

17      deposition noticed, but as to why the attorneys might have

18      wanted his deposition, he can't answer that.  Subject to that

19      objection, go ahead.

20  Q   That's what I am asking, sir.  In what capacity were you there?

21  A   I had been vice-president of operations of a talc operation,

22      Eastern Magnesia Talc Company, and subsequently was vice-

23      president of operations for Windsor Minerals.

24  Q   You probably heard, then, before in depositions two things that

25      most people talk about as kind of ground rules and the first one

3

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1    is if you do have an answer, I would ask that you give it verbally.

2    You have been doing fine up until now.

3  A   Rather than shake my head.  Is that what you mean?

4  Q   Exactly.  The second one is if you do answer a question that I

5    have or anyone has, we will assume that you understood the

6    question.

7  A   If I don't, I will tell you that.

8  Q   Great.  Thank you.  Let's mark this Exhibit 1.  Would you take a

9    look at that, please, sir.  Do you recognize that?

10  A   Yes.

11  Q   That is your signature?

12  A   Yes.

13  Q   In a nutshell, the reason we are here is because my client,

14    Owens, has questions of you about this particular affidavit.

15  A   Okay.

16  Q   The first thing I would like to ask you from this is it's obvious

17    that you worked for --

18  A   Eastern Magnesia Talc Company, Inc.

19  Q   When did you start with them?

20  A   1966.

21  Q   When did you finish with them?

22  A·  In 1967.

23  Q   Did you ever work for the Eastern Magnesia Talc Company?

24  A   No.

25  Q   Did you ever work for Pita Realty?

4 ▶

1  A   No.

2  Q   What did you do for Eastern Magnesia Talc Company, Inc., from

3      1966 until 1967?

4  A   I was vice-president of operations.

5  Q   What kind of duties did you have as vice-president of operations?

6  A   I coordinated the operation of the mines and mills, the

7      production facilities, the mine production and the mill

8      production.  I was responsible for modifications to the mill and

9      milling process.  I was responsible for exploration and

10     development in mines, guiding them, supplying the mill.

11 Q   One year?

12 A   Two years.  I came early in 1966 and was finished in September,

13     I believe, of 1967.  I'm not certain of the date.

14 Q   After September of 1967, what did you do?

15 A   Then I went to work as vice-president of operations for

16     Windsor Minerals, Incorporated.

17 Q   Prior to 1966, what were you doing, let's say, the year before?

18 A   I was vice-president of manufacturing for Buckman Laboratories

19     in Memphis, Tennessee, chemical manufacturing company.

20 Q   Let me ask you a little bit about your education.  Did you go to

21     college?

22 A   Yes.

23 Q   And your degree was in what?

24 A   Mining engineering.

25 Q   What college did you go to?

1    A    University of Washington, Seattle.

2    Q    When did you graduate?

3    A    1952, I believe.  I can't remember precisely.

4    Q    Prior to employment with Buckman, what did you do?

5    A    Prior to employment with Buckman, I worked for the

6         W.H. Loomis Talc Company.

7    Q    They were a competitor of R.T. Vanderbilt?

8    A    They were a competitor of R.T. Vanderbilt.

9    Q    Were they ultimately to your knowledge purchased by

10        Vanderbilt?

11   A    There was a succession of acquisitions.

12        W.H. Loomis Talc Company during the period I worked for them

13        was sold to the International Talc Company and that was

14        ultimately sold to R.T. Vanderbilt.

15   Q    What did you do with Loomis?

16   A    I was mine engineer.

17   Q    Prior to your employment with Loomis, what did you do?

18   A    I was manager for the Border Lord Mining Company operating a

19        tungsten mine on the Canadian border in the

20        State of Washington.

21   Q    And can you give me some dates or years?

22   A    It lasted about nine months.  It was 1952, 1953 and then I went

23        back to Loomis in the Gouverneur district in 1954, 1955 or

24        thereabouts and then to California to operate a mercury mine for

25        Buckman Laboratories in California and from California to

II By Mr. Kaufman                                Roger N. Miller - June 12, 1991 ▶

1      Memphis, Tennessee.

2   Q   Anything before the tungsten mine?

3   A   I was an underground miner in the Coeur d'Alene district in

4      Idaho.

5   Q   I don't know if I asked you this.  Please excuse me if I did.  After

6      you left Eastern Magnesia, you then did what?

7   A   I was vice-president of manufacturing for Windsor Minerals,

8      vice-president of operations.  Excuse me.

9   Q   That was until --

10  A   Until I retired in January 1989.

11  Q   Windsor Minerals is located where?

12  A   In West Windsor, Vermont.  The mailing address is

13      Windsor, Vermont.  The office is located in West Windsor.

14  Q   Was that a competitor or somehow connected with

15      Eastern Magnesia Talc Company, Incorporated?

16  A   No.  As a practical matter, it was not a competitor.

17      Windsor Minerals focused on highly refined toiletry grade talcs

18      and low grade modestly refined talcs for the roofing industry and

19      in neither of the markets was magnesia a significant factor.

20  Q   How far were the deposits that you were mining for the Windsor

21      company?  How far were they from the Eastern Magnesia

22      deposits?

23  A   Roughly 100 miles.

24  Q   We are talking about the Johnson deposit now?

25  A   Uh-huh, about 100 miles.

7 ▶

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1   Q   Let me ask you a little bit about the history if you know of

2       Eastern Magnesia Talc Company, I guess, Incorporated or when

3       it was the talc company.  Do you know where it was

4       incorporated?

5   A   Eastern Magnesia Talc Company, Inc.?

6   Q   Sure.

7   A   Incorporated in Vermont.

8   Q   Do you know where the Eastern Magnesia Talc Company was

9       incorporated?

10  A   No.

11  Q   Do you know when it was incorporated?  We are talking about

12      Inc. now.

13  A   It was incorporated in 1920 -- I don't know.  Early.

14  Q   Are you aware that there was a merger at some point between a

15      couple talc companies which resulted in the

16      Eastern Magnesia Talc Company?

17  A   By reading geological reports of state geologists, I'm aware of

18      that, yes.

19              MR. SARNER:  I think we need to be specific about

20      which companies we are talking about.  Half the time, I think I

21      know what you are talking about and half the time, I'm not clear

22      so maybe we can come up with a shorthand device or continue

23      to refer to Mr. Miller's previous employer as

24      Eastern Magnesia Talc Company, Inc., later company,

25      Eastern Magnesia Talc Company.  I think that's the correct way.

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 )

1   Q   The company comes after Inc.?

2   A   Uh-huh.

3           MR. O'SHAUGHNESSY:  You might want to refer to

4       EMTAL, Inc., and EMTAL Company which is the company after.

5           THE WITNESS:  Subsequent to my employment.

6           MR. O'SHAUGHNESSY:  EMTAL, Inc., versus

7       EMTAL Company.

8   Q   You worked for a year and something?

9   A   Yeah.

10  Q   I am confused about EMTAL Company and EMTAL, Inc.  At what

11      point did they split if you know?  Do you know what the year

12      was?

13          MR. O'SHAUGHNESSY:  They didn't split so maybe

14      you want to ask another question.

15  Q   Do you know when they unincorporated?

16  A   The sequence of events is that EMTAL, Inc., owned operations

17      in northern and southern Vermont.  Those were split in two.

18      The northern operation which was identified with the products

19      produced from the Johnson mine and mill retained the name

20      and the corporate form of Inc. or became company and a new

21      name was ascribed to the southern operations and that new

22      name is Windsor Minerals.

23          MR. SARNER:  To clarify for the record, Mr. Miller

24      doesn't have personal knowledge of what transpired after he

25      ceased working for East Magnesia Talc Company, Inc., which we

9 )

By Mr. Kaufman                                   Roger N. Miller - June 12, 1991

1    are calling EMTAL, Inc., and the statements about the corporate

2    history of EMTAL Company, my client, the predecessor to

3    Pita Realty Limited, are not correct.  The correct information is

4    provided in discovery responses which have previously been

5    provided in this litigation.

6              THE WITNESS:  I'm sorry for my error.

7              MR. SARNER:  You are not supposed to know.

8    Q    Let me ask you then about your knowledge as to each of these,

9         EMTAL Company and EMTAL, Inc.  At some point, we have to

10        call them Windsor Minerals as opposed to EMTAL Company.  I

11        don't know if that's going to help or not.

12             MR. O'SHAUGHNESSY:  That won't help.

13   Q    Let me ask you this.  Let's just talk about mines.  What mines was

14        EMTAL, Inc., operating when you were there?

15   A    One mine, the Johnson mine.

16   Q    A minute ago, you referenced a north and a south kind of

17        division.

18   A    Excuse me.  They operated the Johnson mine in the north in

19        conjunction with the Johnson mill and they operated the

20        Hammondsville mine in the south in conjunction with the

21        West Windsor mill and the Gassetts mill.

22             MR. KAUFMAN:  What was the second mine in the

23        south?

24             THE WITNESS:  Hammondsville.

25   Q    So then if I understand this correctly, EMTAL Company retained

10

ll By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 )

1   the rights to the Johnson mill and you --

2   A   And mine.

3   Q   And you in your capacity at Windsor Minerals assumed

4       responsibility for the Hammondsville mine?

5   A   Uh-huh.

6               MR. SARNER:  Just to clarify the record, it's spelled

7       out in discovery documents.  He doesn't have knowledge, but I

8       feel you are leading him about certain developments.  The

9       Eastern Magnesia Talc Company now known as the Pita Mill in

10      1967 that acquired the Johnson mine and mill didn't continue.

11              MR. KRISTUFEK:  If you are going to testify, is that

12      all they ever owned or what?

13              MR. SARNER:  I'm trying to correct the testimony

14      that you are trying to put on the record.  There was no

15      continuation.

16              MR. KRISTUFEK:  I can live with that.  That's fine.

17  Q   Sir, let's talk about the mill, the mill at Johnson first.  Are you

18      familiar with the milling process?

19  A   Yes.

20  Q   What kind of equipment was at the Johnson mill?

21              MR. O'SHAUGHNESSY:  At what period of time?

22              MR. KRISTUFEK:  I guess we have to assume the

23      period of time that he was there.

24              THE WITNESS:  There were two processing circuits

25      there, one of which is referred to as a dry mill and one which is

11 )

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1   referred to as a wet mill.  The dry mill was based on historical

2   practice, crushing, grinding and tumbling mills and produced

3   products largely composed of the total consist of the ore, not in

4   every case but in most cases.

5           The wet mill took the ground material, processed it by

6   flotation and made a second series of products that were highly

7   refined relative to the quality of the ore.  The ore as mined is not

8   all talc.  It contains carbonates, magnesite in this case.

9   Q   Let me digress.  The ore is mined.  We are talking about talc;

10      correct?

11  A   Uh-huh, talc ore.

12  Q   Have you ever heard the term soapstone?

13  A   Uh-huh.

14  Q   What is your definition of soapstone?

15  A   A hobbyist's word for a very durable form of mineral talc that can

16      be used for dishes, plates, door sills.  It's not a product of

17      commerce in the sense of talc.

18  Q   The material that was coming out of the Johnson mine, how

19      would you characterize that, as talc or soapstone?

20  A   Talc ore.

21  Q   What about Hammondsville?

22  A   Talc ore.

23  Q   Are you familiar with a mine called Waterbury?

24  A   Uh-huh.  I know where it is.  I'm not familiar with it.  It was

25      closed long before I got there.

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 )

1    Q    But where is it?

2    A    Waterbury, Vermont.

3    Q    Where is that in relation to the Johnson mine?

4    A    About 30 miles south of Johnson.

5    Q    What about the -- I don't know if it's Reading or Reading mine.

6    A    That's the Hammondsville mine.

7    Q    Let's talk about the Hammondsville mill for a moment.  What

8         kind of equipment did they have there?

9    A    There is no Hammondsville mill.  The mine was run in

10        conjunction with the West Windsor mill and the Gassetts mill.

11   Q    Where is the West Windsor mill in relation to the

12        Hammondsville mine?

13   A    Two miles south.

14   Q    What kind of equipment did they have at the West Windsor mill?

15   A    Wet mill there for the production of very, very high grade fine

16        toiletries, cosmetic qualities.

17   Q    When you say high grade, what do you mean by that?

18   A    Visualize the talc ore as a 50 percent mixture of magnesite and

19        talc.  The flotation process makes 99 percent talc product and

20        rejects the material.  The magnesite, using the process we used,

21        was a process of flotation where a chemical material is combined

22        with water that excelerates the flotation and removal of the talc.

23   Q    Are you familiar with the term black wall?

24   A    Yes.

25   Q    What is that?

13 )

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1   A   It's a miner's term for a schistose formation that in many

2       instances passes through the ore bodies.  It's waste.  It's never

3       mined.  It is black, very, very black.  Talc almost invariably is

4       sold on the basis of its brightness or whiteness so the black wall

5       is carefully avoided.

6   Q   Did you say that this can run through the talc ore itself?

7   A   It can run through the zone in which mining is conducted.

8   Q   Do you know what the mineral composition of black wall can be?

9   A   No, I don't.  It's indefinite.  It's a local name that miners applied

10      to anything that didn't look like talc.

11  Q   Were there black walls at the Johnson mine?

12  A   There were some, yes.

13  Q   Were there black walls at the Hammondsville or the Reading

14      mine?

15  A   Very, very few.

16  Q   Let's talk about Exhibit 1, sir, if we can.  It's in front of you there.

17      I would like to talk about this third paragraph where it says

18      "All of the talc sold to the tire and rubber industry by East

19      Magnesia Talc Company, Inc., including Grade 41 and other

20      grades -- I think that's in.

21  A   That's right.

22  Q   -- in the "40" series was mined from the Johnson talc mine in

23      Johnson, Vermont."  I assume you have been to the Johnson talc

24      mine?

25  A   Yes.

14

II By Mr. Kaufman                                   Roger N. Miller - June 12, 1991

1   Q   Have you ever been inside of it?

2   A   Yes.

3   Q   How many times?

4   A   Well, in the almost two years I was up there, I was underground

5       at the Johnson mine twice a week.

6   Q   Why?

7   A   Because part of my responsibilities were to direct the

8       operations, to oversee the operation.  The mine superintendent

9       worked for me.

10  Q   Who chose where ore was mined?  Was it the superintendent or

11      yourself?

12  A   On a day to day basis, the superintendent did.  On a generalized

13      basis, I did.

14  Q   How did the mining process occur at Johnson?  Was that an

15      above ground mine or below ground mine?

16  A   Underground mine.

17  Q   What kind of equipment did you have there?

18  A   It was mined by conventional drill and blast using dynamite and

19      using a device called a scraper to transport the ore horizontally

20      to a loading shoot.  The loading shoot delivered it into two-ton

21      cars.  Five of the cars were towed by a battery powered

22      locomotive on track and taken horizontally under the ore body to

23      the shaft.  They were dumped into what is called a skip pocket

24      and loaded into the skip which is the bucket that rides on rails

25      in the shaft, taken to the surface and transported by truck to the

15 )

1     mill.

2  Q   What about down in the Hammondsville or the Reading mine?

3     How was that ore mined?

4  A   Essentially the same way.

5  Q   Same type of equipment?

6  A   Same type of equipment.

7  Q   Grade 41 or the 40 series, what does that refer to?

8  A   Eastern Magnesia Talc Company, Inc., had a practice of

9     identifying the products by number identifiable with a particular

10    mill. At the Johnson mill, there were two product series. One

11    started with four and one started with five. At the West Windsor

12    mill, there was a product series that started with six and at the

13    Gassetts mill, there was a product that started with three. I

14    think it had to do with the historical order of building of the

15    mills.

16  Q   The last mill, where was that located?

17  A   Gassetts, Vermont.

18  Q   What was milled there?

19  A   Hammondsville ore.

20  Q   So Hammondsville ore or Reading were sent to two mills?

21  A   Yes.

22  Q   In your position, were you familiar with the output of the mines?

23  A   Yes.

24        MR. O'SHAUGHNESSY: Objection.

25        THE WITNESS: You mean tonnage of output?

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1    Q    Exactly.

2    A    Yes.

3    Q    Can you give me any idea of the rough tonnage output per day or

4         I don't know how you would measure it. Was it per month, per

5         year?

6              MR. O'SHAUGHNESSY: Which mine are we talking

7         about?

8              MR. KRISTUFEK: The Johnson mine first.

9              MR. O'SHAUGHNESSY: In the years he was there?

10             MR. KRISTUFEK: Apparently the year that he was

11        there, a little more than a year.

12             THE WITNESS: I am relying on my memory.

13             MR. O'SHAUGHNESSY: He may know prior to that.

14             MR. KRISTUFEK: Let's start with the time he was

15        there.

16             THE WITNESS: During the time I was there, I

17        believe the total annual output was about 80,000 tons a year, but

18        I'm not certain of that.

19   Q    I understand, sir. That's fine. What about Hammondsville?

20   A    It varied with market conditions and our customers' markets

21        from about 48,000 tons when I first got there to 110,000 tons

22        and back down to about 48,000 tons.

23   Q    There is some suggestion you may be aware of tonnage output for

24        years that you weren't out there. Might that be the case?

25   A    I would only be guessing. I really don't have those numbers.

17 ▶

**By Mr. Kaufman**                                    Roger N. Miller - June 12, 1991

1    Q   What about mill output?  How did that vary from the mine

2       output?

3    A   In the case of the Johnson mill as an example, let's assume that

4       half of the feed went to the dry mill where the whole ore is

5       ground, bagged and shipped so there is 40,000 tons.  The other

6       half of the ore, only a third of those other 40,000 tons would

7       ever be shipped because the concentration process only pulls

8       the very best talc out so there would be 12,000 more.  The

9       output from the mill in total in the example that I am using

10      would be 52,000 tons a year.  The balance of the material waste

11      by-product was stored in waste ponds, tailings ponds.

12   Q   What was the reason to store it in a waste pond?

13   A   In the wet process, you pump the tailings out.

14   Q   How about West Windsor?

15   A   The West Windsor mill, the formula is almost exactly the same.

16      If the annual production of the West Windsor mill was

17      25,000 tons, then 75,000 tons of ore would be processed by the

18      mill and 25,000 tons roughly of product would result.  The

19      balance of it would be returned as wet tailings to the tailings

20      pond.

21   Q   The Gassetts mill?

22   A   It's a dry mill and if 25,000 tons went in, 25,000 tons came out.

23   Q   How many people to your knowledge worked at the Johnson

24      mine while you were there?

25   A   Underground at the Johnson mine, I believe we varied between

18

1   12 and 15 plus supervision. There would be three supervisors

2   so from 15 to 18 is my recollection.

3   Q   The supervisors, what were their titles or responsibilities?

4   A   Mine superintendent, mine foreman and mechanical foreman.

5   Q   What did they do specifically?

6   A   The mechanical foreman was responsible for the direction of the

7   activity of the maintenance crew in the mine. The mine

8   foreman is the person who traveled continuously through the

9   mine working with the men to keep them at their tasks and the

10   mine superintendent did the general planning and direct

11   supervision. He told the mine foreman where to take the

12   miners to work.

13   Q   Do you recall the names of any of those three positions?

14   A   The only one I remember is a guy by the name of Beanie Bradley.

15   He was a mine foreman. I really don't remember the mine

16   superintendent's name I was there for such a short period of

17   time.

18   Q   What about the Hammondsville or Reading mine?

19   A   The mine superintendent was Win DeZaine and there were a

20   series of mine foremen, Ned Kandall, two or three people that

21   worked for him.

22   Q   What about the mill? How many folks worked on average at the

23   mill?

24   A   The mill generally --

25                    MR. O'SHAUGHNESSY: Johnson mill?

1          MR. KRISTUFEK:  Yes.

2              THE WITNESS:  The mill generally ran three shifts

3     and I believe there were -- My recollection is there were about

4     18 people there and four supervisors.  There would be a

5     shipping supervisor, a mill superintendent and two shift

6     foremen.  I'm not certain of that.

7     Q     Do you recall the names of any of those people?

8     A     I tend to forget them when they die.  I'm sorry.

9     Q     What about the other two mills?

10    A     At the West Windsor mill, the mill superintendent was

11    Steve Hastings.  There was a mechanical foreman there and two

12    additional shift foremen there and at the Gassetts mill,

13    Ken Dudley and then Burton White.  Ken Dudley was discharged

14    and Burt White -- There have been a lot of changes since that

15    time.  I have given you what the initial conditions were assuming

16    that's where your interest is.

17    Q     How do you know there were changes since that time?

18    A     Because I ran the West Windsor mill and the Gassetts mill for

19    25 years.

20    Q     You are just talking about the Gassetts mill?

21    A     Yes.

22    Q     Eastern Magnesia Talc Company, Inc., did it have a corporate

23    office?

24    A     Corporate office, yes.

25    Q     Where was that?

By Mr. Kaufman                                Roger N. Miller - June 12, 1991

1    A    In Burlington, Vermont when I first arrived.

2    Q    Do you know whether or not that corporate office is still there

3         today?

4    A    No.  I know for a fact that it's not.

5    Q    Did that office have a sales department?

6    A    Yes.

7    Q    Do you recall anyone who worked in the sales department?

8    A    Yes.

9    Q    Who might some of the people be?

10   A    The then president of Eastern Magnesia Talc Company was also

11        really the sales manager and his name was Emil Esckilsen.

12   Q    Is he alive?

13   A    No.

14   Q    How about anyone else, secretaries or assistants?

15   A    There was another salesman.  Eastern Magnesia Talc Company,

16        Inc., sold their products largely through agent distributors so

17        the sales effort on the part of the

18        Eastern Magnesia Talc Company was in substantial part dealing

19        with agents and distributors and Emil did a lot of that.  There

20        was another man who did that and I am trying to come up with

21        his name.  If I think of it, I will give it to you.

22   Q    I appreciate that.  Who were some of the distributors who were

23        the distributors of the agents if you recall?

24   A    I didn't have a lot to do with sales at that time.  One of them was

25        the Hall Company.

| | | |
|---|---|---|
| 1 | Q | W.C. Hall? |
| 2 | A | Yes. They were one and one was Charles B. Crystal. One was in |
| 3 | | Canada. I don't remember, something like Christianson. |
| 4 | Q | Let me ask you about the trade names for the product. Were |
| 5 | | there any trade names for the final product that came out of the |
| 6 | | Johnson mill? |
| 7 | A | Generally speaking, the name EMTAL was the identification. |
| 8 | Q | Did that hold true for the product that would leave the other two |
| 9 | | mills also? |
| 10 | A | Yes, until the change to Windsor. |
| 11 | Q | And at that point, how was the Windsor material marked? |
| 12 | A | We just simply used a grade number. We didn't have a |
| 13 | | trademark. We had Windsor Minerals, Inc., as the name of the |
| 14 | | company, but we didn't use EMTAL. The word EMTAL went |
| 15 | | with the change in ownership. |
| 16 | Q | Are you aware of how Eastern Magnesia Talc Company, Inc., |
| 17 | | labeled its products prior to 1966? |
| 18 | A | No. |
| 19 | Q | How about after 1967? |
| 20 | A | No. |
| 21 | Q | Mr. Miller, have you ever heard of the term micronizer? |
| 22 | A | Yes. |
| 23 | Q | What is that? |
| 24 | A | High energy device that's used to provide extremely high surface |
| 25 | | areas on mineral products by subdividing them into very, very |

1    small sizes. It has become a generalized word. Originally it

2    described a particular piece of machinery, but it's kind of like

3    Kleenex. It's become the generic word for ultra fine grinding.

4  Q  How fine can you grind something using a micronizer if you

5    know?

6  A  Typically products are described by the percentage which passes

7    a 325 mesh screen and with the micronizer, it was possible to

8    get to 99 percent finer than a 325 mesh screen. The rate at

9    which you did that is a function of the material which you are

10   grinding. With diamonds, it would take a long time. With talc, it

11   didn't take very long at all.

12 Q  Did Eastern Magnesia Talc Company, Inc., own any micronizers?

13 A  No.

14 Q  During the mining process, what steps were taken, if any, to

15   control, let's call it, the grade of the ore as it came out, what

16   they took from the ground?

17 A  Well, there was a long sequence involved in that. The unmined

18   areas were initially diamond drilled. Are you familiar with what a

19   diamond drill is?

20 Q  No.

21 A  It's a core drill device with a diamond bit which drills

22   downward, breaks off a piece of rock and comes out with a long

23   section of the rock so you can examine and test the material.

24   Ahead of the mining workings, this was done from above, from

25   older workings above or alongside. Based on the information

By Mr. Kaufman                                      Roger N. Miller - June 12, 1991

1   that was determined in the diamond drill holes, the direction of

2   the workings would be driven and where the working was driven

3   would be based on the requirements of the mill.

4            The ore bodies are not homogenous.  They grade laterally

5   across the ore bodies so where you put the mine opening and

6   where you went from the opening were dictated by the demands

7   of the mill, what products were required coming out of the mill.

8   It is secondary information because you only had information in

9   one plane.  The secondary information pilot holes would be

10  drilled ahead of the face to confirm that the opening was going

11  into the zones that were appropriate.

12  Q   So you would use these diamond core drills to pick your --

13  A   Examine the ore body.

14  Q   Were there logs made of the core that was taken out or

15  examined?

16  A   Well, if you were examining a new ore body that you hadn't

17  mined before, these cores would be very, very carefully

18  examined, tested, logged and retained until you began to mine.

19  The routine diamond drilling that was done as a grade control,

20  ordinarily not.  The core was examined by the mine

21  superintendent.  He could determine visually the quality of

22  materials that had been intersected and then he could make a

23  determination.  He and I looking at the core could make a

24  determination where the headings were going to go.

25  Q   Visual examination as opposed to chemical?

24

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1   A   Largely it was a visual determination.  There were routine

2       samples taken out.  Not every inch of it was sampled, but routine

3       samples were taken of it to confirm visually.  If you have done it

4       for awhile, you get into identifying what the quality of the

5       materials are.

6   Q   Sometimes they were, it sounds like, really tested and

7       sometimes they were visually examined?

8               MR. O'SHAUGHNESSY:  Note my objection to the

9       question.  Really tested, that's your term.

10              MR. KRISTUFEK:  I understand that.

11              MR. O'SHAUGHNESSY:  You are mischaracterizing

12      what he said.

13  Q   Mr. Miller, the times that the drill cores were analytically

14      examined and a report made, where did the report go?

15  A   The report generally came to me and the detailed analysis was

16      not always done in-house.  If we were curious about other

17      mineral species, if we were interested in more detailed

18      information -- Some of the heavy metals are very difficult to

19      analyze in a typical talc mills lab so we would do the

20      examinations in outside laboratories.  Those would come back to

21      me for my guidance.  The mineralogical assessment because I

22      also had a degree in geology or one course short of a degree in

23      geology, I did a lot of the mineralogical assessment and I was

24      very much aware of the qualities we were seeking and the

25      materials that we were avoiding.

25 ▶

1   Q   Who did the examination other than the mineralogical kind of

2       look see that you took a look at?

3              MR. O'SHAUGHNESSY:  Note my objection to the

4       form.  You are mischaracterizing his testimony with respect to

5       what he did.

6              THE WITNESS:  The examinations were done by

7       Batelle.  The Batelle Memorial Institute did some at one stage

8       when we were looking at flotation testing of new ore bodies and

9       I am trying to think of the outfit in Ohio.

10   Q   Where is the first place located?

11   A   Batelle was in Columbus, Ohio.  At that time, they had a minerals

12       section.  I don't believe they do now.  L.C. somebody.  If I think of

13       it, I will give it to you.

14   Q   They were in Ohio?

15   A   Yes.

16   Q   We have been going for an hour.  Would you like to take a break?

17   A   I'm fine.

18            *(A short recess was taken.)*

19   Q   Sir, I want to go back to these designations for the different

20       products.

21   A   The four series and five series were out of Johnson mine and

22       mill and had been since the beginning of the operation.

23   Q   Did the numbers have any significance other than identifying a

24       particular mill?

25   A   The four series and five series made the distinction in the

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1    Johnson mill between the dry products and floated products so

2    they had that significance.  They identified the subunit in the

3    whole processing affair where the product had come from.

4         Generally speaking, the higher the number, the finer the

5    degree of subdivision.  599 was finer particle size than 549 and

6    549 was finer particle size than 500.  In the 40 series, that's not

7    true.  41 was the finest of the products.  It wasn't a very fine

8    product, but it was the finest of the products made in the dry

9    mill.

10   Q    Do you know what the mesh size or the grade would have been

11        for the 41?

12   A    My recollection is that it was about 92 percent through

13        325 mesh screen.

14   Q    And the 42?

15   A    42 is about 88 to 90, I believe.

16   Q    That same 325 mesh?

17   A    Yes.

18   Q    Would you ever -- I anticipate you will say no, but I will ask you

19        anyway.  Would you ever find a final product coming from the

20        West Windsor mill with the designation of 40 anything on it?

21   A    No.

22   Q    With all of this, how do you know that all of the talc which was

23        sold to the tire and rubber industry came from the Johnson

24        mine and that's No. 3 in your affidavit?

25   A    What I tried to say here is that during my tenure, during the

27

1    period I was employed, all of it did and to the degree that I was

2    informed by others who had been there over a long period of

3    time, it was my understanding that that was true.  I had no

4    information that would suggest otherwise.

5              MR. O'SHAUGHNESSY:  For the periods prior to

6    1966 and 1967?

7              THE WITNESS:  Yeah, that it would reach back.  The

8    development of the markets takes a long, long time.

9    Q    You knew that from how?

10   A    Discussions with the shipping superintendent who had been

11   shipping material to various customers.

12   Q    Who was he again?

13             MR. O'SHAUGHNESSY:  Let him finish.

14             THE WITNESS:  And discussions with the guy that

15   ran the mill.  These customers didn't arrive when I arrived.

16   They had been doing this for an extended period of time was the

17   presumption I made from the conversations with them.

18   Q    And the shipping supervisor was who again?

19   A    I was trying to think of the name.  I will think of it.

20   Q    When you do, sir, please let me know.  Just so I understand this,

21   does this third sentence here in this affidavit mean that nothing

22   from the Windsor mill or the other mill ever went to the tire

23   and rubber industry?

24   A    To my knowledge, nothing ever did.

25   Q    When did Eastern Magnesia -- I don't know if we should call it

ll By Mr. Kaufman                               Roger N. Miller - June 12, 1991 )

1    talc company, Inc., or talc company -- ever begin mining in

2    Vermont?  You might have picked this up --

3              MR. O'SHAUGHNESSY:  Excuse me.  I will object to

4    the form.  I think it's become confused.

5  Q   Do you know when EMTAL aside from the Inc. and company

6    designation ever began mining in Vermont?

7              MR. O'SHAUGHNESSY:  Note my objection to the

8    form because EMTAL wasn't a company.  It was a trade name for

9    product.  Is that what you are asking about?  When was the trade

10   name first used according to your knowledge?

11             MR. KRISTUFEK:  That's fine.

12             THE WITNESS:  I don't know when it was first used.

13  Q   Do you know when the companies that sold the trade name

14   product EMTAL ever began mining in Vermont?

15  A   I know something of the history of talc mining in Vermont.

16   Based on what I know of that history, I believe that it coincided

17   with the final development of the railroads and so forth so about

18   1927.  I believe 1922 to 1927 were the earliest commercial

19   productions of talc.  It's a very erratic history because the

20   rainstorms washed out the railroads so they had to move from

21   one place to another.

22  Q   As deposits go, were any in Vermont larger than others?

23  A   Yes.

24  Q   Which was the largest to your knowledge?

25  A   The largest talc deposit was the Hammondsville mine.

1    Q    How did the Johnson mine compare to Hammondsville size

2         wise?

3    A    Probably three quarters of the size.

4    Q    Can you tell me how talc was formed in Vermont geologically.

5    A    There is a fair amount of debate about that particular subject.  It

6         is a metamorphic derivative of the hydrothermal and dynamic

7         metamorphism of serpentinite with the addition of carbon

8         dioxide and water from outside sources.

9    Q    When you say serpentinite, which of the serpentines are we

10        talking about?

11   A    Serpentinite is a metamorphosed form of serpentine.  It's a

12        two-stage operation to my understanding.

13   Q    Mineralogically, isn't there a name for serpentinite including

14        what, antigorite and chrysotile?

15   A    There is a series of minerals that form the rock serpentine.  I

16        don't happen to remember all of them.  Chrysotile is uncommon

17        in serpentine.  Many serpentines contain no chrysotile at all, but

18        serpentine is a rock.  It's like granite.  It's composed of

19        minerals.  Do you understand?

20   Q    Sure.  Is serpentine a generic name for a rock or specific

21        mineral name for a rock?

22   A    It's like granite.  Granite can have varying compositions and

23        serpentine can have varying compositions so it is a generic name

24        for hydrous magnesium silicate minerals, assemblage of

25        minerals.

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1    Q    The talc formed from this?

2    A    It formed from there with the addition of time, temperature,

3         pressure, carbon dioxide and water.  It occurred at the contact

4         between serpentine and other rock.

5    Q    Is there something between or at that contact point of the talc

6         and what's called serpentine country rock?

7              MR. O'SHAUGHNESSY:  Let me object to that.  I

8         don't think that's what I heard him say, the talc and serpentine.

9    Q    I would be more than happy to ask another question.

10   A    Okay.  Try it again.

11   Q    Where you find the talc, is there just this serpentine and talc or

12        is there something between the two?

13   A    The metamorphic process is gradational.  The talc deposits form

14        at the extremity.  Then there is a gradational zone that is not

15        serpentine and is not talc and then there is serpentine.

16        Serpentine is the dark core if there is a core.

17             In some deposits, there is no evidence of serpentine at all,

18        but none of the transitional zone is commercial.  It's a hard dark

19        color, has no commercial value.  The talc is mined outside of

20        that transitional zone in the fully metamorphosed portion of the

21        deposit.

22   Q    How do you know the difference between talc and the

23        transitional zone?

24   A    You tell it by the mineral assemblage, by the density, by the

25        compactness.  The talc is very obvious because it occurs in

1     micaceous plates, easy to see, very easy to see.

2  Q  There is then a distinct visual difference between the

3     gradational zone and the talc?

4  A  No.  There is a gradational zone, but it's very obvious if you are

5     mining, very obvious.

6  Q  Was there any analysis done of the gradational zone of the talc

7     deposits at Johnson?

8  A  I'm sure that there was.  Looking at the chemistry, the chemical

9     analysis, I can recognize when we have come out of the zone

10    because the talc invariably co-exists with magnesium carbonates

11    and no carbonates in the transitional zone so looking at the

12    chemical analysis, you can also see that you are at or near the

13    margin because the carbonate content goes down.

14  Q  Did you ever do any written reports about what was in that

15    gradational zone?

16  A  No.

17  Q  Do you know whether or not anyone else ever did?

18         MR. O'SHAUGHNESSY:  Anyone in the world?

19         MR. KRISTUFEK:  Anyone, anyone who worked at

20    the company while he was there.

21         THE WITNESS:  No, no one that worked at the

22    company did.

23  Q  Anyone who worked outside of the company who was hired by

24    the company to analyze the sample gradational zone?

25  A  I don't believe so.

**By Mr. Kaufman**                                    Roger N. Miller - June 12, 1991

| | | |
|---|---|---|
| 1 | Q | Was there a mineralogist on staff? |
| 2 | A | No. |
| 3 | Q | How about a geologist? |
| 4 | A | Summer times, we hired geologists to do field work. |
| 5 | Q | Can you recall the names of any of those people? |
| 6 | A | William Gregg is one. |
| 7 | Q | Anybody else? |
| 8 | A | He is really the only one I can remember. |
| 9 | Q | Is he still alive to your knowledge? |
| 10 | A | Yes. |
| 11 | Q | Where would he be located? |
| 12 | A | He is a professor at Michigan College of Mines and Technology. |
| 13 | | I think that's the right name, Michigan Tech. |
| 14 | Q | Mr. Miller, do you know whether or not any geological maps or |
| 15 | | sketches were done of the Johnson or Hammondsville mines? |
| 16 | A | A very extensive geological map was done by the |
| 17 | | United States Geological Survey at the time of the second world |
| 18 | | war.  The U.S.G.S. was charged with attempting to find steatite |
| 19 | | deposits because of its unique properties and as part of that |
| 20 | | program, a very thorough examination of the mines and the mills |
| 21 | | was done in Vermont. |
| 22 | Q | When you mention steatite, what do you mean by that? |
| 23 | A | Steatite is a compact, very dense form of talc that can be |
| 24 | | machined as if it were a metal and during the second world war, |
| 25 | | it was used as an insulator in large switch gear.  Since then, they |

**‖ By Mr. Kaufman**                                     Roger N. Miller - June 12, 1991 ▶

1     have learned to set the size by compressing as an ordinary talc.

2  Q  Was steatite found in Vermont?

3  A  No.

4  Q  Do you recall the authors of any of these reports?

5  A  Probably the most significant is Chidester.  His is the report that

6     I have seen most often.

7  Q  If I made the distinction between geological maps or sketches

8     and geological reports, would you direct me to Mr. Chidester for

9     both?

10  A  Yes, I would.  His work provided the basis of understanding that

11     I have of where those talc deposits came from and how.  The

12     distinctions he made and the significance of the mineral

13     assemblages, I relied on Chidester's work.  I had no reason after

14     25 years to dispute his conclusions from my own observation.

15  Q  What about the term cinder?  Have you ever heard that before?

16  A  Uh-huh.

17  Q  I am speaking now in terms of the talc mining context.  What

18     significance does that have to you?  What does it mean to you?

19  A  It is a miner's term, I believe, that is associated with basalt dikes

20     that pass through the talc deposits.  There was fairly active

21     volcanism after the talc deposit was formed and the residual

22     fractured pieces of these things I believe the miners referred to

23     as cinders.

24  Q  Where do they find the cinders?

25  A  Right in the talc deposit.

34 ▶

1    Q    Any particular size range?

2    A    All sizes, all shapes.

3    Q    It could be an inch?

4    A    It could be an inch.

5    Q    It could be five feet across?

6    A    It could be 30 feet.  They are an intrusion into the ore body is

7         my understanding of what the term meant.

8    Q    The intrusion of what?

9    A    The molten magma.

10   Q    Not necessarily the gradational zone?

11   A    No.

12   Q    What about the country rock?

13   A    The basalt dikes come out of the country rock through the talc

14        deposits and keep on going.  They are a field factor.

15   Q    Have you ever heard of the term chrysotile?

16   A    Yes.

17   Q    How about tremolite?

18   A    Yes.

19   Q    What about actinolite?

20   A    Yes.

21   Q    Pyrophyllite?

22   A    Yes.  I'm not very familiar with that.

23   Q    Of those four minerals, do you know if any were ever found in

24        Vermont?

25   A    In Vermont?

Roger N. Miller - June 12, 1991 ❱

1   Q   Yes.

2   A   Yes.  There is a chrysotile mine in northern Vermont and I have

3       seen actinolite.  I have rarely seen a tremolite crystal, not in the

4       ore body but prospect in the bag and pyrophyllite.

5   Q   You saw actinolite.  Where did you see that?

6   A   I saw actinolite in fault zones where there had been

7       hydrothermal activity.

8   Q   Where were the fault zones?

9   A   In the country rocks, in the wall rocks.

10  Q   Are we talking about the Johnson mine or the Hammondsville

11      mine?

12  A   I don't think I saw actinolite ever at Johnson.  I have seen it in

13      some deposits in Windham County.

14  Q   Can you recall the names of any of those deposits?

15  A   No.  These were unworked, small deposits.

16  Q   Were you ever in the Waterbury mine?

17  A   No.

18  Q   Are you aware or do you know whether or not any of those four

19      minerals I just talked about a minute ago were ever found in

20      association with the Eastern Magnesia Talc Company, Inc., or

21      company operated mine?

22  A   Ask me again.  That's a very wide ranging statement.

23  Q   Of the four minerals I am looking at, chrysotile, tremolite,

24      actinolite and pyrophyllite, do you know whether or not any of

25      those four were ever either found in or associated with a talc

1       deposit that was operated by the Eastern Magnesia

2       Talc Company or Company, Inc.?

3   A    I don't know anything about the Eastern Magnesia Talc Company.

4   Q    I don't know what you might have heard.

5   A    I didn't hear very much at all.  I was 100 miles away.  Of the

6       other minerals that you listed, I in a diamond drill core once saw

7       actinolite, bladed dark green crystals in a zone in which it

8       turned out there wasn't any ore.  I never saw chrysotile in a talc

9       mine, in an ore zone, in a waste zone.  I never saw any down

10      there.  I didn't ever recognize tremolite in the mines.  I never

11      did see any to recognize what it was.  Pyrophyllite is kind of a

12      mineral curiosity and I am sure I never saw anything that I

13      identified or recognized as pyrophyllite.

14  Q    When you say you never recognized tremolite, do you know what

15      it looks like?

16. A    Uh-huh.

17  Q    Do you know what --

18  A    I worked at Loomis Talc.

19  Q    That's right.  You certainly would have been aware of it there.

20      Mr. Miller, are you aware of the OSHA definition of asbestos?

21  A    About four years -- I'm not sure of the current definition.

22  Q    Could you give me your best recollection as to what the

23      definition was?

24  A    My understanding was that it was the asbestoform varieties of

25      about five minerals, tremolite, actinolite, chrysotile, amosite,

1     crocidolite.  This was my understanding and I am not sure

2     where the debate is now between asbestoform and non-

3     asbestoform varieties of some mineral grams.

4  Q  What's the difference between asbestoform and non-asbestoform

5     to your knowledge?

6  A  Under a microscope in my understanding of asbestoform, the

7     fibrils are visible.  In the non-asbestoform varieties, the crystals

8     are bladed and don't look like the ends of a broom.  I'm not a

9     mineralogist.

10  Q  Are you aware of any sales of Eastern Magnesia Talc Company or

11     Company, Inc., products to any particular tire companies?

12          MR. O'SHAUGHNESSY:  Let's limit it to what you

13     have noticed him for in this suit in Michigan.

14          MR. KRISTUFEK:  Sure.  Fine.  We can come back.

15     That's your choice.  I am just trying to simplify this.

16          THE WITNESS:  We have to make a distinction

17     between company and company, Inc.  I have no understanding,

18     no knowledge at all of --

19          MR. O'SHAUGHNESSY:  We are talking over each

20     other to a certain extent.

21          THE WITNESS:  I have no understanding of markets

22     for the talc company.  In the case of Inc., I am not personally

23     aware of shipments to any rubber company.  I knew there was a

24     market.  I didn't know where the markets were.

25          MR. O'SHAUGHNESSY:  That's true beyond

1  Michigan, too, I take it.

2  THE WITNESS:  Yes.

3  MR. KRISTUFEK:  Wait a minute.  Maybe I want to

4  come back and ask him again.  I appreciate that.  I appreciate

5  the clarification by Mr. O'Shaughnessy as to the extent of

6  Mr. Miller's answer.

7  Q  Let me ask you about the Johnson mine and about the

8  Hammondsville or Reading mine.  The ore in the two mines, was

9  it the same or was it different?

10 A  It was different.

11 Q  How was it different?

12 A  It was different in the microcrystalline size of the talc platelets.

13 Q  One being bigger and one smaller?

14 A  The Hammondsville mine in relative terms was a four by four

15  dimension.  The Johnson mine was a two by four dimension.

16 Q  Other than the size of the platelets, mineral composition or

17  accessory minerals, was there a difference?

18 A  Essentially the same.

19 Q  The talc ore itself at the Johnson mine and I would also like to

20  ask you about the Hammondsville mine, was that a continuous

21  band or was it little lenses and pods?

22 A  It varied from a long strike.  On the lateral dimension, it would

23  occur as pods and some of them were 700 feet thick and 600

24  feet high and some were 50 feet thick and 200 feet high.  They

25  were a wide range of metamorphism that had taken place.

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1   Q   What about Hammondsville?

2   A   Hammondsville, there were three discrete pods.  One of them is

3       2,200 feet in one dimension and up to 200 feet in the other

4       dimension.  The others were smaller than that.

5           MR. KRISTUFEK:  What I want to do is take about

6       seven minutes for myself and I may not have much more to do.

7           *(A short recess was taken.)*

8   Q   Sir, we talked about cinders at the Johnson mine.  Were there

9       also cinders in the Hammondsville or Reading mine?

10  A   Yes.

11  Q   How prevalent were they?

12  A   Uncommon.

13  Q   Now, the end product that came from the Johnson mill, that was

14      sized by going through a 325 mesh?

15  A   No.  They would be tested.  They would measure the percentage,

16      went through the 325 mesh screen and that defined the product

17      specifications in many cases.

18  Q   Other than that mesh screening test, was anything else done in

19      terms of the final product, mineralogical analyses or chemical

20      analyses?

21  A   The chemical analyses were done to determine what is called

22      the insoluble content.  Physical measurements were made of

23      color, reflected basically particle size, distribution of bulk

24      density.  The materials were tested for extraneous minerals.

25  Q   Who did this testing?

40 ▶

**By Mr. Kaufman**                                    Roger N. Miller - June 12, 1991

1   A    This was done, as I said, in-house but also outside and I am still

2        trying to think of the name of the guys in Ohio that did that.

3   Q    The in-house tester was who again?

4   A    The lab technician.

5   Q    Which?

6   A    I don't remember his name.

7   Q    What do you mean by insoluble content?

8   A    Talc is relatively insoluble and in order to determine the

9        proportion of talc and magnesite, you extract the magnesite with

10       acid and weigh the remaining material and that would tell you

11       generally speaking the talc content.  These all have to be

12       tempered with your own experience.

13  Q    Extraneous minerals, what did that mean?

14  A    That would be mica from the wall rocks.  As you approach the

15       contacts on them, there would be a zone that would have mica in

16       it and mica, generally speaking, is dark colored but not always

17       and it's fairly easy to see under a microscope, see the difference

18       in the physical characteristics so they would look for mica and

19       basalt.  A color test was a significant determinant because the

20       non-talc non-carbonate minerals are dark colored and color is a

21       critical specification of talc products so any change in color

22       would be obvious. .

23  Q    The color concern was as the ore came from the mill as opposed

24       to how it would look after firing or something like that?

25  A    Yeah.  The ore from these deposits is not typically used in fired

1    products.

2  Q   The brightness was used distinct from a question about firing?

3  A   Yes.

4  Q   The contact zone, was that as sharp?

5  A   Yes, the contact zone to the country rock.

6  Q   Exactly and the same thing about the Hammondsville or Reading

7      mine.  Were the same tests conducted on the product coming

8      from the mill?

9  A   Yes and more extensive mineralogical examinations because of

10     the application in toiletries and cosmetics.

11 Q   If I understand you then, the Reading or Hammondsville mine

12     and mill produced a cosmetic grade talc?

13 A   The Hammondsville mine produced ore which fed two mills, the

14     West Windsor mill and the Gassetts mill.  The West Windsor mill

15     produced only cosmetic materials.

16 Q   And the Johnson mine and mill did not or did produce

17     cosmetics?

18 A   They produced a very minor quantity of cosmetic

19     materials.

20          MR. KRISTUFEK:  That's all I have.  I told you I

21     would try to make it painless.  I appreciate your time.

22          MR. O'SHAUGHNESSY:  Could I have 15 seconds?

23     I don't want to take a break, but 15 seconds before

24     we start.

25          MR. KAUFMAN:  Sure.

42

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1

2                   E X A M I N A T I O N

3   BY MR. KAUFMAN:

4   Q   Hi.  I just have a few questions.

5   A   You are Steve Kaufman?

6   Q   Correct.  Did you review any materials before your deposition

7       today in --

8   A   No.  I reread my statement.

9   Q   That's this one-page affidavit; is that correct?

10  A   Yes.

11  Q   Are you familiar with the different uses of talc?

12  A   In the markets that were served by Windsor Minerals, yes.

13  Q   When you say Windsor Minerals, how about Eastern Magnesia

14      Talc Company, Inc.?

15  A   Just slightly.

16  Q   What was your position at Eastern Magnesia Talc?

17  A   I ran the mine and the mill.

18  Q   So you weren't involved with the uses of --

19  A   Marketing and selling, no.

20  Q   Are you familiar that the talc is used in the rubber industry?

21  A   Yes.

22  Q   What would the purpose of that be?

23  A   My understanding is it's used as a parting agent.

24  Q   But as far as any particular tire plants that the talc may have been

25      shipped to from your company at that time, 1966, 1967, you are

43 ▶

1      not aware of anything, of any particular companies or prior to

2      that; is that correct?

3   A  No.

4   Q  Are you familiar with whether or not there is a controversy as to

5      whether or not some talcs may contain asbestos?

6   A  I'm aware of that.

7   Q  Was that part of your concerns when you were employed at

8      Eastern Magnesia Talc Company, Inc.?  Did you get into that

9      area?

10  A  No, not in those years I didn't.  Subsequently I did.

11  Q  When did you first get into that area?

12  A  Mid 1970's I would say.

13  Q  In conjunction to what at that time?

14  A  There were allegations made by NIOSH concerning the Johnson

15     mine and I took it upon myself as part of my responsibilities to

16     study that matter very carefully and try to come forward with a

17     balanced program to be certain that we knew, we believed that

18     we knew and we went forward.

19  Q  You are talking about the Johnson mine?

20  A  No.

21  Q  What mine?

22  A  I was talking about Windsor Mills.  This is after I left.

23  Q  When the controversy arose in the 1970's, you were then

24     working at the Windsor company, Windsor Minerals?

25  A  Yes.

1   Q   So your focus was at that company at that point?

2   A   Yes.

3       MR. O'SHAUGHNESSY:  You seem to be jumping

4   ahead and answering before his question is finished.

5       MR. SARNER:  Can I ask one question for

6   clarification.  You said there were allegations by NIOSH

7   concerning the Johnson mine.  You were not talking about the

8   Johnson mine?

9       THE WITNESS:  No.  The allegation is the paper that

10  was produced by NIOSH identified various properties in the

11  State of Vermont and one of the properties that was referenced

12  was the Johnson mine.  I had no association with that mine at

13  that time, but because it was a very broad allegation by NIOSH, I

14  became involved in a very thorough look at our operations.

15  Q   Again, not the Johnson mine per se.

16  A   No.

17  Q   Are you familiar with who made that allegation as to the Johnson

18  mine being possibly involved?

19      MR. O'SHAUGHNESSY:  We seem to be talking in

20  ambiguities.  The way I hear it, it's not an allegation.  Apparently

21  it's a paper.

22      THE WITNESS:  Yes.

23  Q   Let's be specific.  In other words, the Johnson mine was one of

24  the mines that that paper --

25  A   Was drafted about.

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1   Q   At the time that you were working there -- This was not an issue.

2       This is not something you looked for or anybody was concerned

3       about at the Johnson mine at the time you were involved in that

4       mine through Eastern Magnesia Talc Company, Inc.?

5   A   That is not correct.  We were always interested in the

6       consistency and purity of the material that we were producing.

7       We were selling a mixture of the mineral talc and the mineral

8       magnesite.  We weren't selling cinders.  We weren't selling black

9       block.  We weren't selling any extraneous materials so we

10      focused carefully on the production of the optimum qualities in

11      that mineral sweep.

12  Q   Was there ever any testing done specifically of the talcs to

13      determine through analysis whether or not there was any

14      asbestos in those samples?

15  A   At the Johnson mine during my period of employment?

16  Q   Yes, specifically during your period of employment.

17  A   Routine testing?

18  Q   Any kind of testing.

19  A   I cannot be precise, but the geologists who worked for us in the

20      summertime did comprehensive evaluations following the work

21      of Chidester in order for us to be assured that the conditions

22      that Chidester had identified still prevailed in the mine.

23  Q   Who were those people?

24  A   These were various people sometimes associated with the

25      University of Vermont.  I'm sorry.  I can't remember the names.

1      Typically they would work for us for three or four months during

2      the summer.  One of them I remember worked both summers

3      that I was there.

4    Q  You referred to Chidester.  Who was Chidester?

5    A  He was a staff geologist for the United States Geological Survey

6      when I -- I only met him once, but he worked for a different

7      agency of government during the period of the second world war

8      that had to do with mineral resource evaluation.

9    Q  What specifically was he looking for or analyzing that you relied

10     on?  What was the issue?

11   A  He came looking for steatite, but he wrote a very thorough

12     definition of the geological conditions and the mineralogical

13     consist of those deposits.

14   Q  When was his work completed if you know?

15   A  I don't know.

16   Q  Approximately?

17   A  I would say sometime between the 1940's and the mid 1960's.

18     I'm not certain.

19   Q  Basically you were relying on that study that would have been

20     sometime in the 1940's to the 1960's?

21   A  I used that to instruct myself on the nature of these ore bodies.

22   Q  Are you aware of any subsequent studies that might have been

23     done with respect to the Johnson mine by any source?

24   A  I'm aware that there were two or three theses written on the

25     origin of the deposit by graduate students at the

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1       University of Vermont.  I never believed any of them figured it

2       out better than Chidester.

3   Q   These were three graduate studies?

4   A   I am aware of their existence.  I didn't review them.

5   Q   How did you become aware of those studies?

6   A   I did a biographical search.  I had in mind writing a book about

7       talc in Vermont and in the process of coming up with a

8       bibliography, I ran across reference to these in the state library.

9   Q   And there were three studies?

10  A   I believe there were three.  I could be mistaken.  One of them

11      may have been out of the state university of New York.  Two of

12      them, I'm sure, were graduate students.

13  Q   If I wanted to get ahold of those studies, how would I find them

14      today?

15  A   At the geology library at the University of Vermont.

16  Q   Are you familiar with what the studies found?

17  A   No.

18  Q   Was there any suggestion that they may have contradicted what

19      Chidester indicated?

20  A   I have never reviewed them, but the title suggested they were

21      revisiting the genesis of the deposits, how were they formed,

22      why were they formed and so forth.

23  Q   I'm a little bit confused.  You said you were going to write a book,

24      I believe, or get into that.  Is that something that just died so you

25      didn't go further with it?  Is that what happened?

48

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1   A   Uh-huh.  I would rather go fishing.

2   Q   Let me ask you this.  Did anyone that you know of in the industry

3       pick up on what you were doing in terms of studying those or

4       analyzing those studies in terms of further review?

5   A   Not that I am aware of.

6   Q   Was there some suggestion that there were some newer

7       analytical techniques that were available in later years that might

8       not have been available to Chidester?

9           MR. O'SHAUGHNESSY:  Suggestions where?

10  Q   Are you aware of any analytical texts?

11  A   Mineralogical analytical texts?

12  Q   Yes.

13  A   Not that I am aware of.

14  Q   Obviously you don't really know anything about the particular

15      graduate studies?

16  A   No.

17  Q   I would have to get those to review those?

18  A   Yes.

19  Q   Would it be a fair statement that the Eastern Magnesia

20      Talc Company is the successor company to Eastern Magnesia

21      Talc Company, Inc.?

22          MR. O'SHAUGHNESSY:  Note my objection.  It's a

23      legal question.

24          THE WITNESS:  I don't know.

25          MR. SARNER:  Join the objection as to form as well.

49

II By Mr. Kaufman                                    Roger N. Miller - June 12, 1991 ▶

1  Q  Specifically with respect to your affidavit, No. 3 where you are

2     referring to all of the talc sold to the tire and rubber industry by

3     Eastern Magnesia Talc Company, Inc., et cetera and referring to

4     that being mined from the Johnson talc mine, what years are you

5     referring to?

6  A  As I stated earlier, I am specifically referring to the two years in

7     which I was employed and I am referring to undoubtedly

8     hearsay.  I am referring to conversations that I held with the

9     manufacturing people and with the shipping people that these

10    clearly weren't new customers that had just arrived on the

11    scene.  This was a line of business that they had enjoyed for

12    many years.  I had that assumption from the conversations that I

13    had with those people.

14 Q  When did those conversations take place?  In other words, were

15    these conversations that arose after you were asked to prepare

16    this affidavit?

17 A  No.  These conversations arose during my employment there.

18    These folks worked for me.

19 Q  Do you remember the names of those individuals?

20 A  I was trying to remember Don's name and I can't remember.

21 Q  Some of this may be repetitive, but I apologize.  You really didn't

22    get into marketing; did you?

23 A  No.

24 Q  Would you really be the best one to prepare this affidavit in

25    terms --

50 ▶

1          MR. O'SHAUGHNESSY:  Objection.

2    Q    Let me rephrase that question.  Is there anybody alive today that

3          you know of who might be in a better position than you to

4          answer a question or item No. 3?

5          MR. O'SHAUGHNESSY:  Let me object to the form.

6          It is not a question.  No. 3 is his statement.

7          MR. KAUFMAN:  Right.

8          MR. O'SHAUGHNESSY:  This affidavit is based on his

9          knowledge.  Now you are asking him if there is someone else

10         that can write a better affidavit than him based on his

11         knowledge.  It doesn't make sense.

12         MR. KAUFMAN:  I think he understands.

13         THE WITNESS:  I don't believe so.

14   Q    Let me ask you this.  With respect to 1950, 1950 to 1963, would

15         it be a fair statement that you don't know what talcs would have

16         been shipped to the rubber industry during those years, personal

17         knowledge?

18         MR. O'SHAUGHNESSY:  I don't know what you mean

19         by what talcs.

20         MR. KAUFMAN:  From Eastern Magnesia

21         Talc Company, Inc.  Does he have any knowledge about that.

22         MR. O'SHAUGHNESSY:  He said he had the

23         knowledge when he was working there and discussing this with

24         the people he worked with during the time he was employed

25         there.  That's what he said before.

1   Q   Is that what you said before?

2   A   Yes and you should understand that in my conversations with

3       others, I am relying on those conversations reached back in

4       time.  Whether they reached to 1950 or not, I have no way of

5       knowing at all.  I was merely given to understand that these

6       were customers they always had.  I have no definition of what

7       always meant and the dates 1950 and 1963 have no meaning to

8       me.

9   Q   Would the Johnson mine have produced talc that would have

10      been used in the rubber industry?

11  A   Yes.

12  Q   Why is that?  In other words, what kind of talc would you use in

13      the rubber industry as opposed to some other industry?

14  A   Well, there are a number of factors that are engaged here.  One

15      is economy, cost of the material.  The other is the efficiency.  It

16      is my understanding that the talc was used as a parting agent.

17      Therefore, per pound of talc, you want to cover the maximum

18      surface area so you reach towards a platey talc because you get

19      the maximum surface area per pound of material.

20  Q   Would you be looking for a cheap type of talc; in other words,

21      less expensive talc to use in this fashion than you might use in

22      other industries?

23  A   No.  The price is determined by what the customer is willing to

24      pay, what it's worth to him and they are not going to buy an

25      exotic talc in order to do this job if, in fact -- It's a pragmatic

1    product.  It solves the problem of two pieces of rubber sticking

2    together.  What's the most efficient way to do it.

3  Q  Are you familiar with the competitors with Eastern Magnesia

4    Talc Company, Inc., in terms of the type of talc that might have

5    been produced at the time you were working for that company?

6  A  They were in competition with -- I'm not sure in the rubber

7    market.  No.  I'm not familiar.

8  Q  Would talcs used in the rubber market have been similar in type

9    and quality; in other words, would one company use a very fine

10   talc as opposed to talc that might be impure or would there be a

11   variance if you know?

12        MR. O'SHAUGHNESSY:  Note my objection to the

13   form.  I think it's confusing.

14        MR. KAUFMAN:  Well, if he understands it.

15        THE WITNESS:  I'm not sure I do understand.

16        MR. O'SHAUGHNESSY:  Then let him ask it again.

17 Q  Would it be more likely to use a talc in the rubber industry

18   because of the vast quantities you might need as a parting agent

19   to select a talc that might be somewhat impure because you are

20   looking for the cheapest kind of talc you can get?

21        MR. O'SHAUGHNESSY:  Note my objection to the

22   form which contains a lot of assumptions in there that aren't

23   based on anything that this witness has said in terms of the

24   amount of talc used or whether it's cheap or not.  It sounds like

25   you are trying to put words in his mouth.

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1    MR. KAUFMAN:  I'm not.

2    MR. MALLOY:  Lack of foundation as to particular use

3    by the rubber industry of the talc.

4   Q   You can answer the question as best you can.  If you can't, you

5    can tell me.

6    MR. O'SHAUGHNESSY:  Let's hear the question read

7    back.

8    (The reporter read back the last question.)

9    MR. O'SHAUGHNESSY:  Note my objection also.  You

10    are asking him what a rubber company would need or use a talc

11    for and I think he stated he doesn't know that.

12    MR. KAUFMAN:  Why don't we let the witness testify.

13    MR. O'SHAUGHNESSY:  You are doing a good job

14    yourself.

15    THE WITNESS:  I really don't know the basis of what

16    they made decisions on.

17   Q   Was the purity similar between the Johnson mine and the

18    Hammondsville mine and the Waterbury mine of the talc?

19   A   I don't know anything about Waterbury.  The ore bodies were

20    essentially the same except for crystal size between the

21    Hammondsville and Johnson mine.

22   Q   Was EMTAL always mined through the Johnson mine to the best

23    of your knowledge?

24   A   To the best of my knowledge.  I don't know what they call the

25    products that came from the Waterbury mine.

54

**By Mr. Kaufman**                                  Roger N. Miller - June 12, 1991

1   Q   Is it possible that prior to 1966, say in the early 1950's, that

2       EMTAL could have been mined at Hammondsville and/or

3       Waterbury to the best of your knowledge?

4           MR. O'SHAUGHNESSY:  Note my objection based on

5       the last answer.  He already answered that question.  EMTAL

6       came from Johnson except he doesn't know about Waterbury.

7       Now you just asked it another way.

8           MR. KAUFMAN:  I'm not sure his answer was clear.

9   Q   Do you understand what my question is?

10  A   I understand.  I think you misunderstood an answer I gave.

11  Q   That may be.

12  A   In 1967 prior to the sale, the word EMTAL encompassed the

13      Johnson mine and mill.  The Hammondsville mine, the

14      West Windsor mill and the Gassetts mill, that was all one

15      company who used the trade name EMTAL.  When the

16      companies were separated, the trade name, as I said earlier,

17      went with the Johnson mine and mill and the products coming

18      out of the West Windsor and Gassetts mill were renumbered

19      with simple grade numbers.

20  Q   Again, correct me if I am wrong because you know a lot better

21      than I do.  Prior to 1966, the EMTAL talcs could have come from

22      a variety of mines?

23          MR. SARNER:  Are we talking about the rubber

24      industry?

25  Q   EMTAL talc could have come from a variety of mines; is that

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1    correct?

2    A    It could have, but remember the identifying numbers that

3         characterized the location.  They weren't just called EMTAL.

4         They were call EMTAL 41 or EMTAL 42.

5    Q    How about EMTAL 41?  Could that have come from various

6         mines prior to 1966?

7    A    No.

8    Q    Why is that?

9    A    Because the economics of talc mining don't permit long distance

10        truck transport of ore from a mine to a mill.  It's changed a little

11        bit in the 1990's, but clearly in the 1960's, no.  It was unusual

12        for the Johnson mine to be seven miles from the Johnson mill, a

13        distinct economic disadvantage.

14   Q    Now, these three studies that were done by graduate students,

15        they were specifically as far as you know related to the Johnson

16        mine; is that correct?

17             MR. O'SHAUGHNESSY:  Objection.  I think he said

18        they were theses.

19             MR. KAUFMAN:  Whatever.  That's fine.

20             THE WITNESS:  I believe they were generic.  They

21        talked about talc formation of talc deposits in Vermont.  I believe

22        that was what I took from the titles.

23   Q    Is it possible that EMTAL 41 may have had some elements of

24        asbestoform material prior to 1966?

25   A    That requires conjecture and I really can't answer.

56

By Mr. Kaufman                                    Roger N. Miller - June 12, 1991

1    Q    You can't answer that question?

2    A    No.

3    Q    Do you know anyone that could answer that question, the name

4         of anyone that is presently alive that could answer that question?

5    A    No.

6    Q    Were there any health warnings put on talc 41 that you know of?

7    A    I'm not aware of what the labeling was.

8    Q    When you say you relied on the Chidester report, why would you

9         have relied on the Chidester report?  In other words, is there

10        some person that suggested that was a good report to rely on or

11        from some literature that you reviewed that cited the Chidester

12        report?

13   A    I had worked in the talc industry in New York state where the

14        origin and the genesis of the deposits was distinctly and totally

15        different.  When I came to work after being in the chemical

16        industry for 12 years, I needed to very quickly come to an

17        understanding of the nature of the deposit.  He was clearly the

18        best source.

19   Q    When you say he was clearly the best source, why do you take

20        that position?  In other words, what is your basis for that

21        statement?

22             MR. O'SHAUGHNESSY:  Note my objection to the

23        form of the question.  You can answer.

24             THE WITNESS:  He had spent a great deal of time in

25        those metals.  I am skilled in the art and practice of mining and

57

1    geology relatively so I looked at his reports and I could

2    determine that this was not a graduate student.  This was a

3    competent technical person who understood the variabilities

4    that were possible and hadn't decided the answer before he

5    wrote the paper so I recognized all that in reading this.  I used it

6    as a guide and it didn't fail me over the years that I was there.

7  Q  Are you suggesting then that you are somewhat suspect of the

8    work that might have been done by the graduate students?

9         MR. O'SHAUGHNESSY:  Note my objection.

10         THE WITNESS:  Not really.  I didn't mean to infer

11    that.  I wanted to make the distinction to understand that I

12    made the distinction.  I didn't go hire someone to do a report

13    for me.  I relied on the expert.

14  Q  Are you familiar with the content of any other talc that you may

15    have been in competition with at Eastern Magnesia

16    Talc Company?

17         MR. O'SHAUGHNESSY:  Other companies?

18  Q  Let me be specific.  Do you have any knowledge of the

19    R.T. Vanderbilt talcs?

20         MR. MALLOY:  In what specific form?

21         MR. KAUFMAN:  As to the mineral content of those

22    talcs.

23         MR. O'SHAUGHNESSY:  Did he ever analyze those

24    talcs?

25         MR. KAUFMAN:  We will get to that.  I don't know.

By Mr. Kaufman                                      Roger N. Miller - June 12, 1991

1       THE WITNESS:  Ask me again.  I want to be sure I

2  understand.

3  Q   Basically, my first question would be are you familiar at all and

4      then I will ask you how if you are familiar at all with the content

5      of the R.T. Vanderbilt talcs?

6       MR. MALLOY:  Again, objection.  There are a lot of

7  different talcs from a lot of different places.

8       MR. KAUFMAN:  Fine.  It's broad and we will narrow

9  it.

10      THE WITNESS:  As I previously testified, I worked at

11 one time for the R.W. Loomis Talc Company which has become a

12 portion of the R.T. Vanderbilt Company.  Whether Vanderbilt

13 ever mined the Loomis ore bodies, I have no knowledge at all.  I

14 have no way of knowing that.

15 Q   Was there any routine testing of competitors' talcs by your

16     company, Eastern Magnesia Talc Company, Inc., during the

17     period of time that you were there?

18 A   Not to my knowledge.  There could have been, but not to my

19     knowledge.  It wouldn't have been done in our process control

20     laboratory.

21 Q   Would it be a fair statement specifically that at no time prior to

22     '67 were you ever looking for asbestos in talc; in other words,

23     that was not an area that you got into?

24      MR. O'SHAUGHNESSY:  We went all through this

25 before and the whole series of questions and answers.  You are

59

1    opening up all those again. I believe the answer was that they

2    were always concerned with the purity of their talc.

3  Q  That's fine, but specifically with asbestos, that was never -- That

4    was never a concern at that period of time?

5         MR. O'SHAUGHNESSY: Note my objection because

6    it's a concern to the extent that they were interested in pure

7    talc. That means talc and nothing but talc including all universe

8    of mills.

9         MR. KAUFMAN: I will take that answer.

10        THE WITNESS: In our examination to control the

11   quality of the products, we looked for any extraneous mineral

12   and asbestos happens to be a readily easily identified mineral

13   species in hand specimen and fine powders. While there was no

14   specific directive to do that, I believe that our quality control

15   that we used to regulate the operations were such that we would

16   not have missed asbestos if it were present.

17 Q  Now you are talking by personal knowledge in 1966, 1967; is

18   that correct?

19 A  Right.

20 Q  Depending on how the mining might have occurred in prior

21   years, the quality of the talc could have varied; is that correct?

22 A  It may have varied. I have no knowledge whether it did or

23   didn't, but product specifications didn't vary very much.

24 Q  Is there any record that might exist today that would show any

25   attempts at analysis prior to the time you were there; in other

II By Mr. Kaufman                          Roger N. Miller - June 12, 1991 )

1    words, not 1966, 1967 but early in mid 1950's?  Is there

2    anywhere we could go to get that information?

3  A  The only resource I could point you to is Chidester's work.  He

4    did very thorough analysis.

5         MR. KAUFMAN:  I don't have any further questions.

6         MR. MALLOY:  I have some.

7

8                    E X A M I N A T I O N

9  BY MR. MALLOY:

10 Q  As I understand it, when you first went to work at the Johnson

11   mine, you became aware that their talc was being used by the

12   rubber industry; is that correct?

13 A  Uh-huh.

14 Q  Was the rubber industry a significant portion or significant

15   customer of that mine's output?

16 A  My recollection is that they were not if you mean over

17   25 percent.  I didn't have that sense.  I don't carry that sense

18   with me.

19 Q  Do you recall what the other applications of the use of the talc

20   were?

21        MR. O'SHAUGHNESSY:  From the Johnson mine?

22        MR. MALLOY:  Yes.

23        THE WITNESS:  They were used in paints, in the

24   paper industry, in plastics and in agricultural applications is my

25   recollection.

61 )

II By Mr. Malloy                                    Roger N. Miller - June 12, 1991 )

1    Q    Because of its particular use in the rubber industry, was there

2         any particular grade or mineralogical standard that you had to

3         keep in that talc?

4    A    My recollection and my understanding was that Grade 41 was

5         specifically targeted at the rubber industry.  It wasn't exclusively

6         targeted, but it was specifically targeted to the rubber industry

7         and the reason for that is that it is a partially beneficiated

8         product.  It isn't just ground up ore, whole ore.  Grade 41 was

9         made in a device called a double coned classifier and was, in

10        essence, an air elutriated talc.  It contained a significantly higher

11        portion of platey materials and a significantly lower proportion of

12        the extraneous associated minerals and magnesite that was

13        associated with it.

14   Q    And these platey materials apparently were well suited to act as

15        a parting agent in the rubber industry?

16   A    My assumption is they were, yes.

17   Q    I take it, then, that other talcs that were mined in that area and

18        I guess you were familiar with the Hammondsville mine weren't

19        as well suited as a parting agent for the rubber industry?

20   A    No.  The reason Hammondsville was not used in the rubber

21        industry is because it was ideally suited for cosmetic products

22        uniquely so because of the large plate size.

23   Q    Would that be true probably about other mines in the country,

24        that they may not have talc as well suited as the Johnson mine?

25             MR. KAUFMAN:  I will object to that question.  It's

62 )

By Mr. Malloy                                    Roger N. Miller - June 12, 1991

1    speculative.

2              THE WITNESS:  I don't know.

3    Q    You have worked over the years in a number of different mines;

4         is that correct?

5    A    Uh-huh.

6    Q    A lot of the mines produce talc?

7              MR. O'SHAUGHNESSY:  He testified as to how many

8    mines he has worked in and whether that's a large number or

9    not, that's your characterization.

10             MR. MALLOY:  He can say yes or no.

11             THE WITNESS:  I have worked in four ore and talc

12   deposits.

13   Q    The other talc deposits that you have worked in, were they as

14        well suited as far as the platey effect that you talked about as the

15        Johnson mine talc?

16             MR. O'SHAUGHNESSY:  Suited for what?

17             MR. MALLOY:  The platey effects we talked about

18   before as a parting agent.

19             MR. SARNER:  What platey effect?

20             MR. MALLOY:  It's a note I put down.  He mentioned

21   the size of the plates.

22             MR. O'SHAUGHNESSY:  Use your own language in

23   answering the question.

24   Q    If you don't understand the question, let me know.

25   A    The ore bodies that I am familiar with vary in that characteristic

63

By Mr. Malloy                                      Roger N. Miller - June 12, 1991

1    and the markets that they serve are a function of the degree to

2    which they exhibit that characteristic --

3                    MR. O'SHAUGHNESSY:  State the characteristics.

4                    THE WITNESS:  -- which is the micaceous platey

5    character.  A deck of cards exhibits a perfect talc characteristic

6    and large platelets are uniquely valuable because they can build

7    toiletry products, but they are not necessary for other

8    applications.  I don't know that.

9    Q    Are you familiar with the New York talcs?

10   A    I am familiar with the talcs I saw when I worked for Loomis.

11   Q    As far as you know, were they as well suited as the Johnson mine

12   talcs were for use as a parting agent in the rubber industry?

13                   MR. KAUFMAN:  What mines?

14                   MR. MALLOY:  The ones he is familiar with.

15                   MR. O'SHAUGHNESSY:  I also object because your

16   question calls -- You are asking him whether they were well

17   suited.  That would be up to persons in the rubber industry using

18   them and the witness I don't think is competent to testify about

19   what the rubber industry thought was suitable or not or

20   comparing one talc to another.

21                   THE WITNESS:  In my role at Loomis as mine

22   engineer, I spent all my time looking through a transit.

23   Q    You are not familiar with --

24   A    No.

25   Q    That's fine.  While you were with Loomis, were you aware of the

64

**By Mr. Malloy**                                    Roger N. Miller - June 12, 1991 ▶

1    use of their talcs at all in the rubber industry?

2    A    No.

3              MR. MALLOY:  I don't have any other questions.

4              MR. SARNER:  I have no questions at this time.

5              MR. KRISTUFEK:  I do based upon what Mr. Kaufman

6    raised.

7

8                    F U R T H E R   E X A M I N A T I O N

9    BY MR. KRISTUFEK:

10   Q    Mr. Miller, before when you were talking about your position at

11   Windsor, you referenced a NIOSH paper that talked about the

12   Johnson mine.

13   A    Talked about the talc mines in Vermont.

14   Q    About when did that come out?  Can you give me a time?

15   A    I have been sitting here trying to remember.  Mid 1970's, I

16   believe, but I'm not certain.  I cannot give you a day.

17   Q    Did it specifically mention the Johnson mine?

18   A    I don't believe that it did.  It identified companies A, B and C,

19   but a person familiar with the operation of Vermont can

20   recognize by the size which companies they were talking about.

21   I believe that's the way it was characterized.

22   Q    Were you able to recognize the Johnson mine between the

23   A, B and C?

24   A    I was able to recognize the Eastern Magnesia Talc Company

25   between A, B and C.

By Mr. Kristufek                                    Roger N. Miller - June 12, 1991

1   Q   What was the reference that NIOSH made?  What did they talk

2       about?

3           MR. O'SHAUGHNESSY:  I object.  You are asking him

4       about a scientific paper with a broad question, what did they talk

5       about.

6   Q   Mr. Miller, what do you remember that paper was about?

7   A   It was a retrospective epidemiological study of the causes of

8       mortality in talc miners in Vermont.

9   Q   Do you recall whether or not that included an analytical

10      description of the talc taken from deposits in Vermont?

11  A   I'm not certain, but I believe it did.

12  Q   Before when Mr. Kaufman and you were talking about prior to

13      1966, I got a little bit confused and maybe you can clear

14      something up for me.  I think the question was prior to 1966, do

15      you know whether or not a product which may have come from

16      Hammondsville or even Waterbury if it was operating at that time

17      could have been labeled EMTAL 42?

18  A   I don't know that with certainty, but I know the practice and it

19      is extremely unlikely.  I can't imagine that ever happening.  The

20      milling processes were different.  The ore bodies were different.

21      Each of the deposits is a little bit different.  I think it's

22      extremely unlikely that that would have occurred.

23  Q   Do you know when the numerical system for the different mills

24      came into play?

25  A   I don't.

II By Mr. Kristufek                              Roger N. Miller - June 12, 1991 ▶

1  Q   Before when you were talking to Mr. Kaufman, you made

2      reference to the fact that EMTAL was in the business of selling

3      the mineral talc with -- Was it magnesite?

4  A   Uh-huh.

5  Q   You did not sell cinder.  You did not sell black wall.  The cinder

6      that you saw at Johnson, how was that removed?

7  A   They would mine around it and the talc cinder mixture would be

8      taken off and hauled off as waste.  They had two bins in the head

9      frame.  They would take ore to one of the bins.  They would take

10     waste to the other so if you go to the Johnson mine today, you

11     see the great waste piles of material that were non-commercial

12     materials that were encountered in the mine.

13 Q   So this was a form of hand coning the ore on a very large scale?

14 A   Only they really didn't do that.  They would blast a round and if

15     that round had any contaminant in it at all, it was all wasted even

16     though it might be 95 percent talc.

17 Q   How would you determine whether or not there was a cinder or

18     an intrusion in the center of a chunk?

19 A   It didn't occur that way.  It occurred as discrete masses.

20 Q   I think we talked before they could range from an inch to feet in

21     size?

22 A   Uh-huh.  You would see them.  They are very dark colored, dark

23     green or black.

24 Q   Would you see an inch particle in the center of a chunk of talc

25     ore four or five feet?

67 ▶

1   A   If you blasted a round, looked at the muck pile and looked at the

2       margin that you just broke through and saw a black streak, you

3       wouldn't load that ore.

4   Q   Something else that you and Mr. Kaufman talked about, testing of

5       the ore for asbestos and we talked before about routine testing

6       for brightness.  How often were these kind of tests done while

7       you were there?

8           MR. O'SHAUGHNESSY:  Note my objection.  He

9       testified at length about the testing that was done and the

10      question, I think, misquotes the witness.

11  Q   I can separate them if you would like.  You talked to Mr. Kaufman

12      about testing of the ore for asbestos --

13          MR. O'SHAUGHNESSY:  Note my objection.  He

14      testified about testing of the ore.

15          MR. KRISTUFEK:  That's what I am talking about,

16      the ore.  We can take either one first.

17  Q   We can talk about the routine kind of testing that you talked

18      about for extraneous material.  How often was that done?

19  A   About every four hours.

20  Q   What about the testing for asbestos?

21          MR. O'SHAUGHNESSY:  It's my recollection that

22      the testimony regarding testing about and concerning asbestos

23      was that the testing was for the purity of the talc excluding

24      all kinds of contaminants, whatever minerals they were

25      which would necessarily include that kind of fiber if it were

**‖ By Mr. Kristufek**                                      Roger N. Miller - June 12, 1991 ▶

1        seen.

2    Q   Is that correct?

3    A   Yeah.  We were looking for extraneous minerals.

4    Q   There was no discrete fiber analysis done?

5    A   No.

6    Q   No x-ray infraction?

7    A   No.

8    Q   No T.E.M.?

9    A   Except the ongoing work that was done by Chidester through a

10       long period of time in those properties.

11   Q   Chidester is in your mind the most definitive source about what

12       was in that ore body?

13   A   I think so.  It is a valuable historical record.

14   Q   Let me switch if I can to your time at Loomis Talc.  You said that

15       was the Gouverneur district.  The talc that was there, was that

16       pseudomorphosed after any particular mineral?

17   A   I'm not certain.

18   Q   Do you know what the mineralogical composition of that ore

19       was?

20   A   I know that it was a metamorphic derivative of a silicated

21       dolomite.  The magnesium came out of the dolomite and it was

22       free silicate in association with the dolomite.  This was

23       metamorphosed talc by way of a different mechanism

24       than our talc.  The visual appearance of those talcs

25       were dramatically different than the visual appearance of these

69 ▶

By Mr. Kristufek                                    Roger N. Miller - June 12, 1991

1     talcs.

2  Q   The Loomis material, was that the mineral talc or was that the

3     mineral talc and other things?

4  A   I believe it was a mixture of the mineral talc and other things,

5     but I don't know what the other things were.  I was the engineer

6     looking through the transit.

7  Q   So you weren't involved at all with the analysis?

8  A   No.

9               MR. KRISTUFEK:  That's all I have, sir.

10              MR. KAUFMAN:  No further questions.

11

12              [The deposition concluded at 12:20 p.m.]

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| CUNNINGHAM, MAGGIE L., et al, ) | NO. 88-826653 NP |
| WILLIAMS, LEO, et al, ) | NO. 88-826656 NP |
| PETERS, MAXINE, et al, ) | NO. 88-826658 NP |
| DUDLEY, WALTER, et al, ) | NO. 88-826700 NP |
| MILES, LOUIS, et al, ) | NO. 88-826810 NP |
| BARBER, THOMAS P., et al, ) | NO. 88-826811 NP |
| HENDERSON, SAMUEL, et al, ) | NO. 88-826813 NP |
| SCALES, LAURA, et al, ) | NO. 88-826918 NP |
| TISDALE, ALEXANDER, et al, ) | NO. 88-826807 NP |
| STEVENSON, PATRICIA, et al, ) | NO. 88-827261 NP |
| STOKES, JESSIE, et al, ) | NO. 88-827262 NP |
| PHILLIPS, LAURA MAE, et al, ) | NO. 88-827263 NP |
| BOMMARITO, PETER, et al, ) | NO. 88-827376 NP |
| MANNING, LEO, et al, ) | NO. 88-827378 NP |
| McDONALD, JOHN F., et al, ) | NO. 88-827379 NP |
| PORTER, FELIX, et al, ) | NO. 88-827381 NP |
| FLEMING, LOUIS, et al, ) | NO. 88-827383 NP |
| HALISON, DOROTHY, et al, ) | NO. 88-827453 NP |
| ALSTON, JAMES DAVID, et al, ) | NO. 88-827455 NP |
| FREEMAN, WOODROW, et al, ) | NO. 88-827459 NP |
| ANTHONY, JOSEPH, et al, ) | NO. 88-829107 NP |
| BAILEY, JOE MEDFORD, et al, ) | NO. 88-829109 NP |
| GANT, PAULINE, et al, ) | NO. 88-829113 NP |
| STEPHENS, GARLIN, et al, ) | NO. 88-829115 NP |
| CUNNINGHAM, JUDGE, et al, ) | NO. 88-829116 NP |
| COLEMAN, JOSEPH, et al, ) | NO. 88-829117 NP |
| OWENS, JAMES, et al, ) | NO. 88-829118 NP |

Plaintiffs, )

vs.

OWENS-CORNING FIBERGLAS
CORPORATION, et al.,

Defendants.

*NOTICE OF READINESS
OF TRANSCRIPT FOR
READING AND SIGNING*

cc:   Stephen I. Kaufman, Esq.          Robert O. Kristufek, Esq. Esq.
      Eric S. Sarner, Esq.                    Michael Malloy, Esq.
      John C. O'Shaughnessy, Esq.
      316 Occidental Ave. S., Suite 216, Seattle WA. 98104 (206)447-0872   L E S L E E   U N T I   &   C O

ROGER N. MILLER
10101 Manitow Beach Drive Northeast
Bainbridge Island, Washington 98110

Notice is hereby given that the transcript of your deposition taken
June 12, 1991 in the above cause is ready for your reading and signing.
*Mr. Leedum has a copy of the transcript along with the original
signature/correction pages which can be sent to you to read and sign.*
If you prefer, the original transcript is available to read and sign at
316 Occidental Avenue, Suite 216, Seattle, Washington. *Please call
and make an appointment if you will be coming to our office.*

You have thirty (30) days from the date of this notice to read and sign
your deposition transcript, or state in writing your refusal to sign, or
state in writing that you waive your right to sign. Failing to do so,
signature shall be deemed waived and the transcript will be filed
without change with the party ordering the transcription.

Dated at Seattle, Washington, 25th day of June 1991.

LESLEE J. UNTI
Court Reporter - CSR#UNTI*LJ502CA

cc:   Stephen I. Kaufman, Esq.              Robert O. Kristufek, Esq. Esq.
      Eric S. Sarner, Esq.                  Michael Malloy, Esq.
      John C. O'Shaughnessy, Esq.
      316 Occidental Ave. S., Suite 216, Seattle WA. 98104 (206)447-0872   L E S L E E   U N T I   &   C O

# AFFIDAVIT

3   STATE OF WASHINGTON        )
                              ) ss.
4   COUNTY OF KING            )

I have read the foregoing transcript of my deposition taken June 12, 1991. The transcript is true and accurate except for all corrections and/or changes, if any, indicated by me on the inserted correction/change page(s).

_____
ROGER N. MILLER

SUBSCRIBED AND SWORN to me this _____ day of June 1991.

_____
NOTARY PUBLIC in and for the State of
Washington, residing at _____
My appointment expires _____

71

1                  C E R T I F I C A T E

2

3   STATE OF WASHINGTON   )
                           ) ss.

4   COUNTY OF KING         )

5

6      I, Leslee J. Unti, the undersigned Washington Certified

7   Shorthand Reporter, CSR#UNTI•LJ502CA, and officer of the Superior

8   Court under my commission as Notary Public in and for the State of

9   Washington, hereby certify that the foregoing deposition upon oral

10   examination of ROGER N. MILLER was taken before me on

11   June 12, 1991;

12      That each witness before examination was first duly sworn by me

13   to testify truthfully; that the transcript of the deposition is a full, true

14   and correct transcript of the testimony, including questions,

15   objections, motions and exceptions of counsel made and taken at the

16   time of the foregoing examination;

17      That I am neither attorney for, nor relative or employee of any of

18   the parties to the action; that I am not relative or employee of any

19   attorney or counsel employed by the parties hereto, nor financially

20   interested in its outcome.

21      IN WITNESS WHEREOF, I have hereunto set my hand and seal

22   this _____ day of June 1991.

23

24                              _____
                             NOTARY PUBLIC in and for the State of

25                              Washington, residing at Seattle.
                             My appointment expires 10-6-92.