Exhibit 192

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - x

DAVID HOWARD WESTFALL, IN HIS    :
CAPACITY AS ADMINISTRATOR OF
THE ESTATE OF THOMAS HOWARD    :
WESTFALL AND IN HIS CAPACITY
AS ADMINISTRATOR OF THE ESTATE    :    C.A. No. 79-0269
OF BETTY E. WESTFALL

                      :

         vs.              :    STIPULATION AND ORDER
                            OF CONFIDENTIALITY
WITTACKER, CLARK & DANIELS,
METROPOLITAN TALC COMPANY, INC.,    :
PFIZER, INC., WINDSOR MINERALS,
INC., itself and as successor    :
to EASTERN MAGNESIUM TALC
COMPANY INC., and OMYA, INC.,    :
itself and as successor to
VERMONT TALC COMPANY, INC.    :

- - - - - - - - - - - - - - - - - x

       IT IS HEREBY STIPULATED AND AGREED BY and between the
undersigned counsel as follows:

       1.    As used herein, the following words shall have
the following meaning:

       (a)   "document" shall be construed in the broadest

    possible sense, and shall include without limitation the

    following items, whether written, printed, typed, photo-

    stated, photographed, recorded or reproduced by any other

    mechanical or manual process or means upon any tangible

    thing in any form of communication or representation,

    including letters, words, numbers, pictures, sounds or

    symbols, or combinations thereof, or any copies bearing

notations or marks not found on the original, including but not limited to:  all transcripts, correspondence, memoranda, reports, financial reports, notes, records, letters, envelopes, telegrams, mailgrams, messages (including reports, diaries, logs, notes and memoranda of personal or telephone conversations and conferences), studies, analyses, projections, estimates, working papers, summaries, statistical statements, financial workpapers, accounts, analytical records, reports and/or summaries or investigations, opinions or reports of consultants, appraisals, studies, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, advertisements, notices, forecasts, drawings, diagrams, instructions, minutes of meetings or other communications of any type, including inter- and intra- office communications, charts, graphs, printouts, all other data compilations from which information can be obtained, and any preliminary versions, drafts or revisions of any of the foregoing, and any other writings of whatever description or kind.

(b)   "furnished" means the production of documents, whether voluntarily or involuntarily, whether pursuant to request or process and whether in accordance with the Federal Rules of Civil Procedure or otherwise.

-2-

BASF FC 0007774

(c)   "Engelhard" means Engelhard Corporation, any
of its affiliated entities, including but not limited to
Eastern Magnesia Talc Company, and any employees or agents
of Engelhard Corporation or of its affiliated entities,
including but not limited to Glen A. Hemstock.

2.   This Stipulation shall be applicable to, and
govern, all documents, including any transcripts of depositions
of Engelhard, heretofore or hereafter furnished by or on behalf
of Engelhard to the attorneys for any of the parties to the
above-captioned action.

3.   Engelhard has asserted that the information
requested through discovery in this proceeding constitutes
confidential, commercial and financial information within the
meaning of Fed.R.Civ.P. 26(c).

4.   In order to prevent the improper disclosure of
such confidential information, the following procedures shall be
followed with respect to documents or testimony containing such
information:

(a)   No documents furnished by Engelhard, including
any transcripts of depositions of Engelhard in this pro-
ceeding or the contents thereof shall be disclosed, di-
vulged, revealed, described, transmitted or otherwise
communicated by any of the attorneys for any of the

-3-

BASF FC 0007775

parties, or any other person, to any person other than a
member or employee of such attorneys' firm, or (a) outside
experts retained by such firm in connection with this
litigation, and who are assisting such firm in the cap-
tioned action; (b) the Court herein; (c) any jury herein;
(d) witnesses and their counsel at depositions or any
hearing or trial held herein; or (e) court reporters at

any depositions or hearings or trial held herein, or (F) counsel,
technical experts and corporate officers employed by the parties (or their parent
corporations) actively involved in the preparation of the defense of this
litigation.

    (b)  No person to whom documents are disclosed shall
make any copies, or otherwise use such documents or their
contents for any purpose whatsoever, except in connection
with pre-hearing or pre-trial proceedings, the preparation
for trial, trial or other judicial proceedings in connec-
tion with this action.

    (c)  Should any of such documents be utilized as
exhibits to any affidavits, interrogatories, answers to
interrogatories or any other document to be filed with the
Court or be utilized at any deposition, hearing or trial
in this action, or should the documents or any information
contained therein be disclosed in any such affidavits, in-
terrogatories, answers to interrogatories or any other docu-
ment to be filed with the Court or in the transcript of any
such depositions, hearings or trial in this action, Engel-
hard shall be given prior notice thereof and such exhibits,

-4-

BASF FC 0007776

affidavits, interrogatories, answers to interrogatories, other documents or transcripts shall be sealed upon their filing in Court.

(d)   With the exception of the Court and a jury, no person described in paragraph 4(a) hereof shall participate in the inspection of Engelhard's documents or be permitted access to them or their contents unless and until that person signs an agreement to be bound by this Order precisely in the form attached hereto as Exhibit A and a signed copy of the agreement has been delivered to counsel for Engelhard, Peter Lawson Kennedy, Esq., Adler Pollock & Sheehan Incorporated, 2300 Hospital Trust Tower, Providence, Rhode Island 02903 and David R. Hyde, Esq., Cahill Gordon & Reindel, 80 Pine Street, New York, New York 10005.

(e)   Any person who should utilize any such documents pursuant to paragraph 4(c) shall give notice of such use, together with a copy of such use to Peter Lawson Kennedy and David R. Hyde.

(f)   At the conclusion of all proceedings herein, all documents subject to the terms of this Stipulation shall be returned to Cahill Gordon & Reindel, and all copies thereof shall likewise be returned to Cahill Gordon & Reindel, by any person described in paragraph 4(a) in

-5-

BASF FC 0007777

possession thereof and all notes or other documents con-
taining extracts or other references to their contents
shall be destroyed.

(f)   This Stipulation shall remain in full force and
effect until modified, superseded, or terminated, by writ-
ten consent of the parties to this Stipulation or by Order
of the Court upon notice.

5.    Nothing herein contained shall be construed as
prohibiting or restricting Engelhard from disclosing or using
in any way documents, things, information or testimony, includ-
ing any confidential materials, produced by Engelhard or eli-
cited from them in discovery herein.


David R. Hyde, Esq.
Cahill Gordon & Reindel
(a partnership including
 professional corporations)
Attorneys for Non-Party,
Engelhard Corporation and
Glen A. Hemstock
80 Pine Street
New York, New York 10005


Benjamin V. White, III, Esq.
Vetter & White
Attorneys for Defendant,
Windsor Minerals Inc.
20 Washington Place
Providence, R.I. 02903


Peter Lawson Kennedy, Esq.
Adler Pollock & Sheehan
Incorporated
Attorneys for Non-Party,
Engelhard Corporation and
Glen A. Hemstock
2300 Hospital Trust Tower
Providence, R.I. 02903


Daniel Prentiss, Esq.
Decof & Grimm
Attorneys for Plaintiff,
David Howard Westfall
One Smith Hill
Providence, R.I. 02903

-6-

BASF FC 0007778

William A. Curran, Esq.
Hanson, Curran & Parks
Attorneys for Defendant,
Metropolitan Talc Co., Inc.
1210 Turks Head Building
Providence, R.I. 02903

Edward P. Leibensperger, Esq.
Nutter, McClennen & Fish
Attorneys for Defendant,
Windsor Minerals Inc.
Federal Reserve Plaza
600 Atlantic Avenue
Boston, Mass. 02210

PER ORDER:

Robert M. Lovegreen, Esq.
Hinckley & Allen
Attorneys for Defendant,
Whittacker, Clark & Daniels,
Inc.
2200 Fleet National Bank Bldg.
Providence, R.I. 02903

John F. Dolan, Esq.
Rice, Dolan, Kiernan & Kershaw
Attorneys for Defendant,
Omya, Inc.
Suite 3A, 101 Dyer Street
Providence, R.I. 02903

Berndt Anderson, Esq.
Roberts, Carroll, Feldstein &
Tucker
10 Dorrance Street
Providence, R.I.   02903

ENTER:

-7-

BASF FC 0007779

# Exhibit 193

Johnson & Johnson

OFFICE OF
GENERAL COUNSEL

ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, N.J. 08933 7002

August 27, 1986

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza
2 Lincoln Highway, P.O. Box 2905
Edison   NJ   08818-2905

Re: Edley v. Windsor Minerals Inc.

Dear Mr. Grayzel:

As you may know, Windsor Minerals Inc. is a wholly-owned
subsidiary of Johnson & Johnson and, accordingly, the Summons
and Complaint in the above-captioned matter has recently been
referred to my attention.

Please be advised that Windsor Minerals Inc., contrary to the
allegation in the Complaint, does not now engage and never has
engaged in the manufacture or supply of "asbestos-containing
products".  Rather, the exclusive business of Windsor Minerals
Inc. is and has been the mining and milling of talc from a
single mining district in Windsor, Vermont.  That mining
district is the exclusive source of talc for all of the
Johnson's Baby Powder sold in the United States as well as a
source of pure talc sold to independent industrial users.  All
of the talc mined by Windsor Minerals Inc., whether ultimately
sold to industrial users or used in Johnson's Baby Powder, is
sampled and tested for the presence of asbestos and no evidence
of the presence of asbestos in any Windsor Minerals product has
ever been revealed.  Under the circumstances, there obviously
can be no reasonable knowledge, information or belief which
provides good ground to support this pleading under Rl:4-8.

Parenthetically, we received a Complaint several months ago
filed by the Wysoker firm here in New Brunswick on behalf of
another former employee of Bird & Son and, upon being told the
forgoing facts, the plaintiff's attorneys immediately forwarded
to me a dismissal of the action as to Windsor Minerals Inc.

-2-

I am hopeful that you and your client will appreciate that there is no benefit to keeping Windsor Minerals in this case, from which in all fairness it should be dismissed and, I hope that this matter can be resolved as expeditiously as was the prior case.  In the event that you require an affidavit confirming the forgoing facts, please let me know.

May I hear from you promptly?

Very truly yours,

John N. Beidler

/rd

Exhibit 194

# NEWMAN, HERMAN, SALTMAN, LEVITT AND FEINSON

### A PROFESSIONAL ASSOCIATION

### ATTORNEYS AT LAW

EDWARD H. HERMAN
JAY J. NEWMAN
   (N.J. & D.C. Bar)
DAVID A. SALTMAN
   (N.J. & Fla. Bar)
RONALD S. LEVITT
   (N.J. & N.Y. Bar)
JULIUS J. FEINSON
JULIE VACCHER GOLDSTEIN
   (N.J. & Pa. Bar)

ISRAEL H. SALTMAN (1914-1982)

Of Counsel
ALLEN J. SIMONSON
DONALD J. PERRELLA
   (N.J. & N.Y. Bar)
ROBERT J. PINTO

Please Reply To:
   P.O. Box 769
   East Windsor, New Jersey 08520

New Brunswick Office:
   47 Paterson Street
   (201) 745-9005

East Windsor Office:
   339 Princeton-Hightstown Road
   (609) 443-4900

Somerville Area:
   By Appointment Only
   (201) 725-4257

OUR FILE NO.
11092-L

July 23, 1987

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza, 2 Lincoln Highway
PO Box 2905
Edison, New Jersey  08818-2905

RE: Edley -v- Madsen & Howell, Windsor Minerals, Inc., et als

Dear Mr. Grayzel:

Enclosed please find an Affidavit on behalf of Windsor Minerals, Inc., signed by Roger N. Miller, President of Windsor Minerals, Inc. since 1968.  Also enclosed you will find an assay from McCrone Environmental Services, Inc.  I trust that these documents will now enable you to sign the Dismissal as was done in the Yuhas file.  I have taken the liberty of drafting the Dismissal and enclosing the same for your signature along with a self-addressed stamped envelope.

If you are still unable or unwilling to sign the Dismissal, please forward immediately your client's answers to supplemental interrogatories which were served upon you almost one year ago.

Very truly yours,

Ronald S. Levitt

RSL/gbf
Encl.

cc:  Michael M. Tanenbaum, Esq., McCarter & English
    Thomas M. Kelly, Esq., Morley, Cramer, Tansey, Haggarty & Fanning
    Anthony Luongo, Esq., Donington, Leroe, Toland & Luongo

Certified Mail, Return Receipt Requested

```
--------------------------------
LOUIS EDLEY,                        :    SUPERIOR COURT
                                    :    OF NEW JERSEY
            Plaintiff,              :    LAW DIVISION
                                    :    MIDDLESEX COUNTY
        vs.                         :
                                    :    DOCKET NO. L-075913-86
WINDSOR MINERALS, INC.;             :
NICOLET, INC., as Successor-        :        CIVIL ACTION
in-Interest to Keasby &             :
Mattison; GAF CORP., RUBEROID,      :         AFFIDAVIT
GAF CORP., as Successor-in-         :
Interest to Ruberoid; MADSEN        :
& HOWELL, INC.; JOHN DOE #1         :
to #50 (Fifty Unidentified          :
Manufacturers and Distributors      :
of asbestos-containing              :
products),                          :
                                    :
            Defendants.             :
--------------------------------
```

STATE OF VERMONT  :
                   SS.
COUNTY OF WINDSOR :

     ROGER N. MILLER, of full age, being duly sworn, according to law, upon his oath, deposes and says:

     1. I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

     2. The exclusive business of Windsor Minerals, Inc. is, and has been for the last eighteen years, the mining and milling of talc from a single mining district in Windsor, Vermont. That mining district is the exclusive source of talc for all of the Johnson's Baby Powder sold in the United States. In addition to supplying the talc for Johnson's Baby Powder, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users.



EXHIBIT
43A

EXHIBIT
J&J-187

3.  All of the talc mined by Windsor Minerals, Inc., whether it is ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos.  No evidence of the presence of asbestos in Windsor Minerals' product has ever been revealed by this testing.  Attached hereto as Exhibit "A" is a true copy of a recent report of such testing.

ROGER N. MILLER

Sworn to and subscribed
before me this 13 day
of July, 1987.

Notary Public
My Commission Expires:
Feb, 10, 1991



**mccrone** environmental services, inc.
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

28 January 19876

Windsor Minerals, Inc.
P. O. Box 680
Windsor, Vermont  05089

RECEIVED

FEB 2  1987

W. M. I.

Attention:  Mr. Roger N. Miller, President

      Re:  McCrone Project No. ME-3241

Dear Mr. Miller:

     Under your Purchase Order QC-0548, we received nineteen talc samples for asbestos analysis by transmission electron microscopy. The samples were labelled as follows:

| | | | | |
|---|---|---|---|---|
| WMI 86-10 | WMI 86-14 | WMI 86-18 | WMI 86-22 | WMI 86-26 |
| WMI 86-11 | WMI 86-15 | WMI 86-19 | WMI 86-23 | WMI 86-27 |
| WMI 86-12 | WMI 86-16 | WMI 86-20 | WMI 86-24 | WMI 86-32 |
| WMI 86-13 | WMI 86-17 | WMI 86-21 | WMI 86-25 | |

    Examination found no quantifiable amounts of asbestiform minerals. The limit of detection for each sample is below 0.001 weight percent.

    Thank you for consulting McCrone Environmental Services, Inc.

        Sincerely,

        *Thomas Kremer*
        Thomas Kremer
        Electron Microscopist

        *James R. Millette*
        James R. Millette, Ph.D.
        Manager, Laboratory Services

TK/JRM/mtw

cc:  1)  Windsor Minerals, Inc.
       Windsor VT
    1)  Mr. Roger N. Miller, President  *EXHIBIT A*

a subsidiary of **walter c. mccrone** associates, inc.

2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

Exhibit 195



mccrone environmental services, inc.
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

22 August 1985

Windsor Minerals, Inc.
P.O. Box 680
Windsor, Vermont 05089

Attention:  Mr. Arthur J. LaPierre,
            Safety, Health and Training Director

    SUBJECT:  Analysis of Seven Talc Samples for
              Asbestos Mineral Content by
              Transmission Electron Microscopy

        Re:  McCrone Project No. ME-1862

Dear Mr. LaPierre:

    McCrone Environmental Services, Inc. of Norcross, Georgia,
has completed the analyses of the seven talc samples that we
received from your office on 25 July, 1985. The samples were
labelled as follows:

            WMI 85-25 (1) *
            WMI 85-26 (2)
            WMI 85-27 (3)
            WMI 85-28 (4)
            WMI 85-29 (5)
            WMI 85-30 (6)
            WMI 85-31 (7)
            * McCrone TEM Lab Number

    The samples were prepared following our usual technique for
TEM bulk sample analysis. Small (about 10 mg.) representative
portions of each sample were weighed and suspended in 10 ml. of
nanopure water and ultrasonicated for 5 minutes. Drops (6.5
microliters) of the suspended samples were placed on electron

a subsidiary of walter c. mccrone associates, inc.
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-1700

J&J-0034630

Protected Document--Subject to Protective Order

JNJMX68_000013019

microscope grids and allowed to dry. The prepared sample grids were analyzed at 20,000x magnification. Ten grid squares per sample were analyzed. The presence of asbestos minerals was verified by selected area electron diffraction (SAED), energy dispersive X-ray analysis (EDX) and by morphology.

Chrysotile asbestos was detected only in the samples labelled WMI 85-28 and WMI 85-30. Because only a few fibers were detected in the portion of each sample analyzed, no accurate value of the weight percent of chrysotile asbestos could be calculated with statistical certainty. The data obtained from each sample analysis suggest that the amount of chrysotile asbestos in the samples labelled WMI 85-28 and WMI 85-30 is less than 0.0001 percent by weight.

Thank you for consulting McCrone Environmental Services, Inc. If you have any questions concerning these results, please contact our office.

Sincerely,

Thomas J. Gore III
Laboratory Microscopist

James R. Millette, Ph.D.
Manager, Electron Optics Group

TJG/JRM/arwp

cc:  X)  Windsor Minerals, Inc.
        Windsor VT
     1)  Mr. Arthur J. LaPierre,
        Safety, Health and Training Director
        Windsor Minerals, Inc.
        Windsor VT

mccrone environmental services, inc.

J&J-0034631

Protected Document--Subject to Protective Order

JNJMX68_000013020

Exhibit 196

**WINDSOR MINERALS INC.**    P.O. Box 680   Windsor, Vermont 05089
Telephone (802) 484-7761

September 10, 1985

Mr. Ian Stewart
Walter McCrone Associates, Inc.
2820 South Michigan Avenue
Chicago, IL 60616

Dear Ian:

I am touching base with you on methodology and
reports by your representatives on analysis of our products.
I also want to complain on their failure to read our
correspondence.

We submitted, on July 11, to Mark Palenik, seven samples
for analysis with a specific note that the report be directed
to me. We received, on August 22, the enclosed report on
these samples mailed to another Company employee.

The August 22, report is couched in substantially
different language than earlier reports. As I explained to
you on my visit to Chicago it is very important that specific
language be used.

I am admittedly unfamiliar with your field to argue, but
I would appreciate your review and comments.

Yours very truly,

WINDSOR MINERALS, INC.

Roger N. Miller
President

RNM/rb
Enclosures


PLAINTIFF'S
TRIAL EXHIBIT
**3381**

J&J-0164227

Protected Document--Subject to Protective Order                    JNJ 000064652

Exhibit 197

 **mccrone environmental services, inc.**
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

08 October 1985

Windsor Minerals, Inc.                    RECEIVED
P. O. Box 680
Windsor, Vermont 05089                    OCT 16 1985

Attention: Mr. Roger N. Miller, President    W. M. I.

     Re: McCrone Project No. ME-1862

Dear Mr. Miller:

     Under you purchase order WS-17577 we received seven (7) talc
samples for asbestos analysis. The samples were identified as
WMI85-25 through WMI85-31. Examinations by transmission electron
microscopy did not find any quantifiable amount of asbestiform
minerals in any of the samples.

                         Sincerely,

                         Thomas J. Gore, III
                         Electron Microscopist

                         James R. Millette, Ph.D.
                         Manager, Electron Optics Group

TJG/JRM/jir

cc: 1) Windsor Minerals, Inc.
       Windsor VT
    1) Mr. Roger N. Miller, President

> **EXHIBIT**
> 92
> 2-9-18

a subsidiary of **walter c. mccrone associates, inc.**
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-1700

Protected Document--Subject to Protective Order

> **EXHIBIT**
> **J&J-181**
> 3337

Exhibit 198

$ 40

REC'D. & FILED
SUPERIOR COURT
OF NEW JERSEY

OCT  3 1986

M.V. 9
JOHN M. MAYSON
CLERK

LAW          UNIT

OCT  10 1986

SUPERIOR COURT OF N.J.
PAID

NEWMAN, HERMAN, SALTMAN, LEVITT & FEINSON, P.A.

☒ PRINCETON RD                    ☐ 261 E. MAIN ST.
BOX 769                              SOMERVILLE, N. J.
EAST WINDSOR, N. J.                  (201) 725-1338
(609) 443-4900
ATTORNEYS FOR   Defendant, Windsor Minerals, Inc.

# JURY

| | |
|---|---|
| *Plaintiff* | SUPERIOR COURT OF NEW JERSEY |
| ALEX YUHAS and JEAN YUHAS, his wife, | LAW DIVISION |
| | MIDDLESEX COUNTY |

*vs.*

*Docket No.* L-029706-84

*Defendant*

E&B MILL SUPPLY; MADSEN & HOWELL; GAF; RUBEROID;
GAF as Successor-in-Interest to Ruberoid;
CENTRAL JERSEY SUPPLY CO.; ELIZABETH INDUSTRIAL,
Division of Charles F. Guyon, Inc., as Successor-
in-Interest to Elizabeth Hardware; ZESTON; WINDSOR
MINERALS, INC.; NICOLET, INC., as Successor-in-
Interest to Keasbey & Mattison;  JOHN DOE #8 to #100;
(Forty three unidentified manufacturers and suppliers
of Asbestos and Asbestos Products to Plaintiff's
Places of Employment).

*CIVIL ACTION*

ASBESTOS LITIGATION
ANSWER, CROSSCLAIM AND
DEMAND FOR TRIAL BY JURY

Windsor Minerals, Inc., having offices in the Town of Windsor and State

of Vermont, by way of Answer to plaintiffs' Complaint says:

## FIRST COUNT

1.   This defendant does not have sufficient information to admit or

deny the allegations contained herein and, accordingly, plaintiffs are

left to their proofs.

2.   This defendant does not have sufficient information to admit or

deny the allegations contained herein and, accordingly, plaintiffs are

left to their proofs.

3.   This defendant does not have sufficient information to admit or deny the allegations contained herein and, accordingly, plaintiffs are left to their proofs.

4.   Denied, and plaintiffs are left to their proofs.

5.   Denied, and plaintiffs are left to their proofs.

6.   Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the First Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### SECOND COUNT

1.   This defendant repeats the Answer as set forth above and makes the same a part hereof as though set forth at length herein.

2.   Denied, and plaintiffs are left to their proofs.

3.   Denied, and plaintiffs are left to their proofs.

4.   Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the Second Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### THIRD COUNT

1.   This defendant repeats the Answer as set forth in the First and Second Counts above and makes the same a part hereof as though set forth at length herein.

2.   Denied, and plaintiffs are left to their proofs.

WHEREFORE, the defendant, Windsor Minerals, Inc., demands that the Third Count of plaintiffs' Complaint be dismissed with prejudice and without costs.

### SEPARATE DEFENSES

1.   Plaintiffs are barred from recovery by reason of the limits set forth in the statute of limitations.

IMAN, HERMAN,
LITMAN, LEVITT
FEINSON, P.A.

2.   Plaintiffs are barred from recovery by reason of the limits set forth in the statute of limitations.

3.   Any and all injuries and damages allegedly sustained by the plaintiffs were the result of the carelessness and negligence of third persons over whom this defendant had no control.

4.   This defendant never warranted, either expressly or impliedly, any products which were allegedly used by the plaintiffs' claim based on warranties, either expressed or implied, cannot be sustained as against this defendant.

5.   The plaintiffs were guilty of contributory negligence with respect to any injuries allegedly caused by this defendant, and should this defendant be found guilty of any negligence with respect to the plaintiffs' damages, which liability is denied, the comparative contributory negligence of the plaintiffs were greater than that of this defendant, barring any recovery of the plaintiffs as against this defendant, pursuant to N.J.S.A. 2A:15-5.1.

6.   The plaintiffs were cognizant of and had full knowledge of all the facts, circumstances and conditions existing with respect to the use of any products allegedly manufactured by this defendant as referred to in the Complaint and voluntarily assumed the risks therefrom or attendant thereto.

7.   This defendant denies any conduct on their part which would justify an award of punitive damages in favor of the plaintiffs.

8.   At the time and place mentioned in the Complaint, this defendant was not guilty of any negligence, whether by act of commission or omission, which was a proximate cause of the alleged accident, injuries and damages of which plaintiffs complain.

NEWMAN, HERMAN,
SALTMAN, LEVITT
& FEINSON, P.A.

9.   This defendant reserves the right to move at or before the time of trial to dismiss the Complaint on the grounds that the Court lacks personal jurisdiction over this defendant.

10.  This defendant reserves the right to move at or before the time of trial to dismiss the Complaint on the grounds that the Court lacks jurisdiction over the subject matter of the Complaint.

11.  This defendant reserves the right to move to dismiss the Complaint on the grounds that the plaintiffs failed to give notice to the defendant of the alleged breach of express or implied warranty contrary to the provisions of the applicable statutes of the State of New Jersey.

12.  This defendant reserves the right to move to dismiss the plaintiffs' Complaint on the grounds that the plaintiffs' Complaint and each Count thereof fails to state a claim upon which relief can be granted.

13.  This defendant denies that willfully, wantonly or intentionally withheld or prevented the dissemination of information concerning the alleged hazardous effects of asbestos products and further denies that they were guilty of fraudulent misrepresentation to the plaintiffs and members of the general public and further denies that they conspired to withhold the aforesaid information from the plaintiffs and other members of the general public.

14.  The incident, injuries and damages complained of were caused by unauthorized, unintended or improper use of the product complained of and was the result of the failure to exercise reasonable and ordinary care, caution or vigilance.

15.  This defendant denies the applicability of the concept of strict liability in tort to this litigation.

### CROSSCLAIM

Defendant, Windsor Minerals, Inc., by way of Crossclaim against co-defendants, E&B Mill Supply, Madsen & Howell, GAF, Ruberoid, GAF as Successor-in-Interest to Ruberoid, Central Jersey Supply Co., Elizabeth Industrial, Division of Charles F. Guyon, Inc., as Successor-in-Interest to Elizabeth Hardware, Zeston, Nicolet, Inc., as Successor-in-Interest to Keasbey & Mattison, John Doe #8 to #100, (Forty-three unidentified manufacturers and suppliers of Asbestos and Asbestos Products to Plaintiffs'

WMAN HERMAN
LTMAN LEVITT
FEINSON PA

Places of Employment, says:

### FIRST COUNT

Defendant, Windsor Minerals, Inc., denies that they were negligent and state that the accident was the direct and proximate result of the actions of Defendants, E&B Mill Supply, Madsen & Howell, GAF, Ruberoid, GAF as Successor-in-Interest to Ruberoid, Central Jersey Supply Co., Elizabeth Industrial, Division of Charles F. Guyon, Inc., as Successor-in-Interest to Elizabeth Hardware, Zeston, Nicolet, Inc., as Successor-in-Interest to Keasbey & Mattison, John Doe #8 to #100, (Forty three unidentified manufacturers and suppliers of Asbestos and Asbestos Products to Plaintiffs' Places of Employment), and that they were solely responsible for the injuries sustained by the plaintiffs but in the event this defendant is found guilty of contributory negligence, defendant, Windsor Minerals, Inc., demands contribution under and by reason of the Joint Tortfeasors Contribution Act, N.J.S. 2A:53a-1, et seq., and as provided by the provisions of the Comparative Negligence Act, N.J.S. 2A;15-5.3, for a proportionate share of all of which the plaintiffs may recover.

### SECOND COUNT

The defendant, Windsor Minerals, Inc., further demands and makes a claim for indemnity against the defendant, in the event it be deemed that the damages claimed in the Complaint were occasioned by the primary negligence of the said co-defendants, should the defendant, Windsor Minerals, Inc., be found secondarily liable to the plaintiffs herein.

### THIRD COUNT

Defendant, Windsor Minerals, Inc., hereby demands common law and contractual indemnification both expressed and implied from the co-defendants.

### FOURTH COUNT

The defendant, Windsor Minerals, Inc., further demands and makes a claim for indemnification against the co-defendants in the event it is deemed that they were manufacturers and distributors to this defendant of products alleged

HMAN, HERMAN
LTMAN, LEVITT
FEINSON P.A

by the plaintiffs to give rise to liability under theories of strict liability, warranty and products liability.

## ANSWER TO ALL CROSSCLAIMS

The defendant, Windsor Minerals, Inc., denies any and all Crossclaims for Contribution and Indemnification filed or to be filed against this defendant in the within action.

## DEMAND FOR ANSWERS TO INTERROGATORIES

This defendant hereby makes demand upon the plaintiffs for answers to interrogatories (Standard Form A) as directed by Order of the Honorable John E. Keefe, J.S.C., dated January 25, 1982.  These interrogatories may be obtained from the Court upon request.

## JURY DEMAND

Defendant, Windsor Minerals, Inc., hereby demands a trial by a six man jury on all issues in the above captioned matter.

## DEMAND FOR STATEMENT OF DAMAGES

PLEASE TAKE NOTICE that pursuant to Rule 4:5-2, the Defendant filing this Answer requires that within five days you furnish its attorney with a Statement of the amount of damages claimed.

## CERTIFICATION

I hereby certify that a copy of the within Answer was served within the time prescribed by Rule 4:6, and that a true copy of same has been served upon my adversary by first class mail on even date hereof.

NEWMAN, HERMAN, SALTMAN, LEVITT & FEINSON
Attorneys for Defendant, Windsor Minerals

BY: _____
EDWARD H. HERMAN, ESQ.

Date:  September 30, 1986

HERMAN
& LEVITT
ON P.A.

<u>CERTIFICATION</u>

PURSUANT TO RULE 4:5-1

Defendant hereby certifies the matter in controversy is not the subject of any other action pending in any Court, or of a pending arbitration proceeding and no other action or arbitration proceeding is contemplated. To the best of the defendant, Windsor Minerals, Inc., knowledge, there are no other parties who should be joined in this action.

EDWARD H. HERMAN, ESQ.

EWMAN, HERMAN,
ALTMAN, LEVITT
& FEINSON, P.A.

RECD. & FILE
SUPERIOR COURT
OF NEW JERSEY

JAN 13 1987
M.V. 24
JOHN M. MAYSON
CLERK

*Attorney(s):*   LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL

*Office Address & Tel. No.:*   2 Lincoln Hwy., Edison, NJ 08818

*Attorney(s) for*  Plaintiffs       (201) 494-2727

| | |
|---|---|
| ALEX YUHAS and JEAN YUHAS, his wife | *SUPERIOR COURT OF NEW JERSEY* |
| | MIDDLESEX          *COUNTY* |
| *Plaintiff(s)* | LAW          *DIVISION* |
| *vs.* | |
| E & B MILL SUPPLY, et als. | *DOCKET NO.* L-029706-84 |
| | *CIVIL ACTION* |
| *Defendant(s)* | Stipulation of Dismissal |

with prejudice
(as to defendant, Windsor Minerals, Inc.)

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party.*

*Dated:*    January 6      19 87 .

NEWMAN, HERMAN, SALTMAN, LEVITT
& FEINSON

*By* _____
    Edward H. Herman
*Attorney(s) for Defendant(s)* Windsor
    Minerals, Inc.

LEVINSON, CONOVER, AXELROD, WHEATON
& GRAYZEL

*By* _____
    Ronald B. Grayzel
*Attorney(s) for Plaintiff(s)*

D G R V   Y—1        Copyright© 1969 by ALL-STATE LEGAL SUPPLY CO.
One Commerce Drive, Cranford, N. J. 07016

Exhibit 199

```
                                              Page 1

 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION - MIDDLESEX COUNTY
 2              DOCKET NO. MID-1809-17AS
                APPELLATE DOCKET NO._____
 3
 4    DOUGLAS AND ROSALYN BARDEN,      )
                                       )  TRIAL
 5              Plaintiff,             )
                                       )
 6              v.                     )
                                       )  (VOLUME 1 OF 2)
 7    BRENNTAG NORTH AMERICA, et al., )
                Defendants.            )
 8    ----------------------------    )
      DAVID CHARLES ETHERIDGE AND      )
 9    DARLENE PASTORE ETHERIDGE,       )  MID-L-0932-17AS
                                       )
10              Plaintiffs,           )
                                       )
11              v.                     )
                                       )
12    BRENNTAG NORTH AMERICA, et al., )
                                       )
13              Defendants.            )
      ----------------------------    )
14    D'ANGELA McNEILL-GEORGE,         )
                                       )  MID-L-7049-16AS
15              Plaintiff,             )
                                       )
16              v.                     )
                                       )
17    BRENNTAG NORTH AMERICA, et al., )
                                       )
18              Defendants.            )
      ----------------------------    )
19    WILLIAM AND ELIZABETH RONNING,   )
                                       )  MID-L-6040-17AS
20              Plaintiffs,           )
                                       )
21              v.                     )
                                       )
22    BRENNTAG NORTH AMERICA, et al., )
                                       )
23              Defendants.            )
24
25    Job No. NJ3446618
```

Page 2

```
1
2        Place:  Middlesex County Courthouse
              56 Paterson Street
3             New Brunswick, New Jersey  08903
4
         Date:   Tuesday, July 23, 2019
5             9:00 a.m.
              (Volume 1 of 2)
6             (Pages 1 - 200)
7
8
9
10
11  Before:
12       Hon. Ana C. Viscomi, J.S.C.
13
14
15
16
17  TRANSCRIPT ORDERED BY:
18       MOSHE MAIMON ESQ.
              LEVY KONIGSBERG
19
20
21
              SILVIA P. WAGE, CCR CRR
22            PRIORITY ONE
              290 West Mount Pleasant Avenue
23            Livingston, New Jersey  07039
              (718) 983-1234
24            E-mail:  P1steno@veritext.com
25
```

Page 3

```
1  A P P E A R A N C E S :
2
     CHRISTOPHER PLACITELLA, ESQ
3    COHEN PLACITELLA & ROTH
     127 Maple Avenue
4    Red Bank, New Jersey  07701
     -and-
5    MOSHE MAIMON, ESQ
     LEVY KONIGSBERG
6    800 Third Avenue
     11th Floor
7    New York, New York  10022
     -and-
8    CHRIS J PANATIER, ESQ
     SIMON GREENSTONE PANATIER
9    1201 Elm Street
     Suite 3400
10   Dallas, Texas  75270
     Attorneys for Plaintiffs, Douglas and
11   Rosalyn Barden, Charles Etheridge and
     Darlene Pastore Etheridge, D'Angela
12   McNeill-George, William and Elizabeth
     Ronning
13
14   DIANE P SULLIVAN, ESQ
     JACK NOLAN, ESQ
15   WEIL GOTSCHAL & MANGES LLP
     17 Hulfish Street
16   Suite 201
     Princeton, New Jersey  08542
17   -and-
     JOHN C  GARDE, ESQ
18   McCARTER & ENGLISH
     Four Gateway Center
19   100 Mulberry Street
     Newark, New Jersey  07102
20   Attorneys for Defendants Johnson & Johnson,
     and Johnson & Johnson Consumer, Inc
21
22
23
24
25
```

Page 4

```
1                I N D E X
2  WITNESS:  JOHN HOPKINS              PAGE
3  CONTINUED DIRECT EXAMINATION BY MR  PANATIER    6
4              E X H I B I T S
5  NO         DESCRIPTION          PAGE
6  Plaintiff's Exhibit 1297           14
     Plaintiff's Exhibit 2049         115
7  Plaintiff's Exhibit 2321           129
     Plaintiff's Exhibit 2416         43
8  Plaintiff's Exhibit 2417           43
     Plaintiff's Exhibit 2423         28
9  Plaintiff's Exhibit 2434           21
     Plaintiff's Exhibit 2450         91
10 Plaintiff's Exhibit 2451           99
     Plaintiff's Exhibit 2452         93
11 Plaintiff's Exhibit 2454           102
     Plaintiff's Exhibit 2455         96
12 Plaintiff's Exhibit 2506           107
     Plaintiff's Exhibit 2525         137
13 Plaintiff's Exhibit 2536           140
     Plaintiff's Exhibit 2581         162
14 Plaintiff's Exhibit 2601           131
     Plaintiff's Exhibit 2669         165
15 Plaintiff's Exhibit 2723           176
     Plaintiff's Exhibit 2848         62
16 Plaintiff's Exhibit 2849           65
     Plaintiff's Exhibit 3051         161
17 Plaintiff's Exhibit 3083           151
     Plaintiff's Exhibit 3121         155
18 Plaintiff's Exhibit 3224           157
     Plaintiff's Exhibit 3441         82
19 Plaintiff's Exhibit 3446           188
     Plaintiff's Exhibit 3695-26      41
20 Plaintiff's Exhibit 3695-30        178
21
22
23
24
25
```

Page 5

```
1          (Jury enters.)
2          THE COURT:  Good morning, everyone.
3  Please be seated.  Make sure cell phones are turned
4  off.
5          Today is July 23, 2019.  This is a
6  continued trial in the matter of Douglas and Rosalyn
7  Barden versus Johnson & Johnson, David and Darlene
8  Etheridge versus Johnson & Johnson, D'Angela McNeill
9  versus Johnson & Johnson and William and Elizabeth
10 Ronning versus Johnson & Johnson.
11         May I have appearances please for the
12 Plaintiffs.
13         MR. MAIMON:  Thank you.  Good
14 morning, your Honor.  Moshe Maimon, Chris Panatier
15 and Christopher Placitella for the Bardens, the
16 Etheridges, the Ronnings and Ms. McNeill.
17         THE COURT:  Thank you.  On behalf of
18 the Defendants, Johnson & Johnson and Johnson &
19 Johnson Consumer Incorporated.
20         MS. SULLIVAN:  Good morning, your
21 Honor.  Hi, everyone, Diane Sullivan and Jack Nolan
22 for J&J.
23         MR. NOLAN:  Good morning.
24         THE COURT:  So Members of the Jury
25 yesterday, we began with the direct examination of
```

2 (Pages 2 - 5)

1 Dr. John Hopkins, who is the corporate
2 representative for the Johnson & Johnson Companies.
3 We're going to continue with that today.
4        Whenever you're ready, Mr. Panatier.
5        MR. PANATIER:  Thank you, your Honor.
6        Good morning, everyone.
7 CONTINUED DIRECT EXAMINATION BY MR. PANATIER:
8    Q.    Good morning, Dr. Hopkins.
9    A.    Good morning.
10        THE WITNESS:  Good morning, Jury.
11        THE COURT:  Oh, I'm sorry, yes,
12 please distribute the notebooks.  The Jurors just
13 hand the envelopes back to the officer when you're
14 done, thank you.
15        And now whenever you're ready.  Thank
16 envelopes and put them to the side.  Thank you.
17        And now whenever you're ready.  Thank
18 you.
19 BY MR. PANATIER:
20    Q.    Alright.  Sir, yesterday I asked you
21 a question about whether or not Johnson & Johnson
22 understood that people would put powder in their
23 sheets to smell good or feel fresh, right?
24    A.    You did.
25    Q.    And did you say at that point you had

1 -- you were unaware of that ever happening?
2    A.    On a personal basis, I was not aware
3 that people did that.  But, you know, if you have
4 different information...
5    Q.    This will be Exhibit 3695.
6        MS. SULLIVAN:  Your Honor, can we
7 have a sidebar on this?
8        THE COURT:  Sure.
9        MS. SULLIVAN:  Thank you.
10        (Sidebar.)
11        MR. PANATIER:  3695-25.
12        THE COURT:  That's right.  I have
13 yesterday's copy.  So I will give one back to you,
14 just in case.  We'll spread it around.
15        MR. PANATIER:  So we located a copy
16 with a Bates Stamp.
17        THE COURT:  Hold on, hold on.
18        Okay.  So, for the record, this was
19 the issue that we explained yesterday with regard to
20 quote, unquote, "native" documents, which is the
21 first time I've ever heard of anything like that.
22        MR. PANATIER:  So we got one -- so
23 there's -- they produced -- there's got to be 30
24 copies of this in the production.  So we finally got
25 one with a Bates Stamp.

1        MS. SULLIVAN:  And, your Honor, we've
2 done investigation.  It is actually a J&J document.
3 My objection relates to the time frame.  2014
4 post-dates anybody's use in this case and so it's
5 not relevant.
6        THE COURT:  Okay.  So that's --
7        MS. SULLIVAN:  This is the e-mail
8 that's attached.
9        THE COURT:  Got it.  Okay.
10        MR. PANATIER:  Our argument is that
11 it's a foreseeable use.
12        MS. SULLIVAN:  2014?  Stretch.
13        MR. PANATIER:  It's a realistic
14 foreseeable use.
15        THE COURT:  Look, there have --
16 certainly, in the course of this litigation, I've
17 read testimony from various individual, Plaintiffs
18 that have indicated that.  But in 2014 to say that
19 it's a foreseeable -- documents say that it's a
20 foreseeable use, I mean, unless you have something
21 else.
22        MR. PANATIER:  Well...
23        THE COURT:  This witness has never,
24 you know, heard of it.  It's 2014.  We're talking
25 about the various Plaintiffs' use going back

1 decades.  To say that this is foreseeable without
2 anything more --
3        MR. PANATIER:  Okay.
4        MS. SULLIVAN:  Thank you.
5        THE COURT:  Okay.
6        MS. SULLIVAN:  Thank you, your Honor.
7        (Sidebar ends.)
8 BY MR. PANATIER:
9    Q.    Alright.  Yesterday, I brought up
10 that we finished talking about Dr. Langer.  Now,
11 we're going to talk about the other Dr. L, Dr.
12 Lewin, okay?
13    A.    Yes.
14    Q.    And you're familiar with this -- with
15 the Dr. Lewin situation in the early '70s, right?
16    A.    Yes.
17    Q.    Now, Dr. Lewin was retained by the
18 FDA to test cosmetic talc samples, right?
19    A.    Yes.  They gave him that as a
20 project.
21    Q.    Right.  So, if you will turn to --
22 there is a tab marked August 3rd, 1972.  If you can
23 turn to that please.
24        (There is a discussion off the
25        record.)

Page 10

1        THE COURT:  I'm sorry, Counsel,
2  what's the year?  What's the date?
3        MR. PANATIER:  This is August 3rd,
4  1972, your Honor.
5        THE COURT:  Thank you.
6        MR. PANATIER:  And this is already in
7  evidence from last week.  It's Plaintiffs'
8  Exhibit 2852.  And then to help us, this is part of
9  our Exhibit 2852.
10  BY MR. PANATIER:
11     Q.    Here.
12        THE COURT:  Thank you.
13     A.    Thank you.
14     Q.    That's the back part of the exhibit.
15        So here we know that on August 3rd of
16  1972, Dr. Lewin issued his report and the FDA --
17  there you go.
18        Seymour Lewin communicated it to the
19  FDA, correct?
20     A.    Yes.
21     Q.    Okay.  And in this set, he had looked
22  at a 102 samples, right?
23     A.    Yes.
24     Q.    Now, he was a professor at NYU,
25  right?

Page 11

1     A.    He was, yes, at that time, yes.
2     Q.    He was a world-renowned mineralogist,
3  wasn't he?
4     A.    I don't know "world-renowned."  He
5  was well-respected.
6     Q.    Okay.  And you know that before he
7  was even retained by the FDA to do this work, he was
8  already working for the talc industry, correct?
9     A.    I didn't know that, no.  But, you
10  know --
11     Q.    We'll look at a document.
12     A.    If you can document it, I'll believe
13  you.
14     Q.    So he's got the product numbers on
15  the side.  And then if you turn to the back, he
16  lists out some of those different products.  There's
17  a product called Cashmere Bouquet.  We just heard
18  about that popular case.
19        And there's Sample 84, Shower to
20  Shower, right?
21     A.    Yes.
22     Q.    Okay.  By the time he was finished,
23  he had looked at close to a 195 different samples,
24  right?
25     A.    Yes.

Page 12

1     Q.    Okay.  Now, if you'll go to page...
2     A.    I've got 102 up to Page 6 but...
3     Q.    Right.  In this one he had looked at
4  102.
5     A.    Uh-huh.
6     Q.    And by the time he was done, by 1973,
7  he had looked at about 195 --
8     A.    Yeah.
9     Q.    -- correct?
10     A.    Yes, on the later, yes.
11     Q.    Right.  Now these are from the FDA,
12  so they don't number their pages.  But it is the
13  fifth page in.  It's this one here.
14        It says, "Products having small
15  amounts of chrysotile more than 1 percent but not
16  more than 5 percent by weight," right?
17     A.    Yes.
18     Q.    Do you see the sample 84, which is
19  Shower to Shower, is listed as having 5 percent
20  chrysotile, correct?
21     A.    You read what is written.
22     Q.    And sample 84 is Shower to Shower,
23  correct?
24     A.    I don't have the key.
25     Q.    We literally just looked at it.

Page 13

1     A.    I don't have the key here so...
2     Q.    Here it is.  Oh, that's 29, baby
3  powder.
4     A.    The key is on Page 10.
5     Q.    Right.  Shower to Shower, right, 84?
6     A.    Yes.  It's on Page 10.
7     Q.    And Shower to Shower is sample 84,
8  correct, Dr. Hopkins?
9     A.    That is what it states on Page 10.
10     Q.    So that's 72.
11        Now, that's August 3rd.
12        Let's skip all the way to July 31st
13  of '73.
14        MR. PANATIER:  This is Plaintiffs'
15  Exhibit 1297, your Honor.  I believe the Defense
16  offered their version, but we'll offer ours.
17  It's...
18        MS. SULLIVAN:  It's the same
19  document, right?
20        MR. PANATIER:  I believe it's the
21  same document, but just in case there's anything
22  missing.  We'll offer Plaintiff's Exhibit 1297.
23        THE WITNESS:  What was the date
24  again?
25        MR. PANATIER:  July 31st, 1973.

4 (Pages 10 - 13)

1        THE COURT: Counsel, is there any
2  objection?
3        MS. SULLIVAN: I'm not sure why we
4  need two of the same document, your Honor, but I
5  don't care. No objection.
6        THE COURT: So admitted as previously
7  admitted and readmitted again.
8        MR. PANATIER: Thank you.
9        (Plaintiff's Exhibit 1297 was moved
10        into evidence.)
11  BY MR. PANATIER:
12    Q.    Before we look at that one -- you
13  found it?
14    A.    Yes, I found it.
15    Q.    The one with the seal?
16    A.    Yes.
17    Q.    The second part of the previous
18  document?
19    A.    Yes.
20    Q.    Let's take a look at that.
21        That's an FDA document provided through
22  FOIA, right, you see that?
23    A.    Yes.
24    Q.    If you turn to the second to last
25  page, just so we can get a full picture of Lewin's

1  analysis. You can see that this is on New York
2  University letterhead. Do you see that?
3    A.    Yes.
4    Q.    And it's got some other products.
5        Now, it looks like it's Products 13
6  through 38 on the side. Do you see that, but it's
7  kind of cut off?
8    A.    On this version, it's 113 to 138.
9    Q.    Well, look on the next page. You can
10  see that it's 113 through 138, but on the results it
11  looks like it's cut off, correct?
12    A.    Yes.
13    Q.    Okay. So, just to get our bearings,
14  we know that 131 through 138 were also Johnson &
15  Johnson products, correct?
16    A.    Yes.
17    Q.    There's two medicated powders,
18  there's three Shower to Showers and it looks like
19  there's three baby powders, right?
20    A.    Yes.
21    Q.    Okay. He tested a total of 11
22  Johnson & Johnson products, correct?
23    A.    On this project, yes.
24    Q.    Yes. Okay. We know that he was
25  doing XRD, correct?

1    A.    Yes.
2    Q.    XRD is the non-microscope analytical
3  tool that has a detection limit of about half a
4  percent, right?
5    A.    Yeah, .3 to .5 depending on the speed
6  at which you run the machine.
7    Q.    Alright, sir.
8        So now looking at July 31st, 1973,
9  now this was Lewin's final report, correct?
10    A.    I believe so.
11    Q.    Okay. But let's look at what -- this
12  is from the FDA, correct, sir?
13    A.    Yes.
14    Q.    Okay. Now let's look at what Dr.
15  Weissler says here. He's at the FDA, true?
16    A.    Yes.
17    Q.    Okay. It says, "I asked Dr. Lewin in
18  December of '71 to undertake asbestos analyses in
19  100 samples of cosmetic powders. The scope was
20  expanded on two subsequent occasions to include a
21  total of 195. I chose Dr. Lewin for this work
22  because he is an internationally-recognized expert
23  on mineralogical chemistry," right?
24        So, according to the FDA, he was an
25  internationally-recognized expert on mineralogical

1  chemistry, correct?
2    A.    Yes, you read what was written.
3    Q.    Yeah. "And because he is a member of
4  the academic community and, therefore, likely to be
5  impartial in a confrontation between industry and
6  government. Furthermore, his competence had
7  previously been recognized by industry by virtue of
8  their own use of him as a consultant which appeared
9  to confer a desirable immunity against possible
10  industry attacks on the validity of the results."
11        Now, we know that Dr. Lewin was not
12  immune to attacks from industry, correct?
13    A.    Yes.
14    Q.    Okay. So let's look at how these
15  results evolved, okay.
16        So here's sample 84. If you go to
17  the page at the bottom, there's a Bates Stamp
18  HHS220, right? And 73 he goes from 5 percent to
19  questionable, right?
20    A.    Yes.
21    Q.    Alright. In 29 and 30 on Page 226 --
22  oh, sorry, 29 and 30 are J&J Baby Powder, correct?
23    A.    I believe they were, yes.
24    Q.    J&J Baby Powder and medicated powder.
25        And then here's the list again. We

1 can see 131 to 138 are the J&J products, correct?
2   A.   Yes.
3   Q.   They all went to ND, non-detect,
4 right, from 1972?
5   A.   On the final version that he's got
6 here, the later 1973 report it states non-detect.
7   Q.   Right.  In fact, for most of them --
8 here, we can look at them, right.
9       So let me go to 181 ND, 82, 83
10 question mark, 84, 85 ND, 186 question mark, right?
11   A.   Yes.
12   Q.   Okay.  Oh, let's look at 131 through
13 138.  Here we go.  Here we are.  Look, 131, 138
14 those are all ND now, correct?
15   A.   Yes.  On this final version, he's
16 written what he's written, ND.
17   Q.   Now, it says, X-ray diffraction,
18 right?
19   A.   Yes.
20   Q.   Now, you know that he only did the
21 X-ray diffraction the one time, correct?
22   A.   I don't know that, no.
23   Q.   Okay.
24   A.   I don't -- I mean, scientists --
25 yeah, I've done these sort of things and you often

1 do duplicate or replicates --
2   Q.   You've done X-ray diffraction?
3   A.   No, no, with analyses you can do --
4 scientists may well do more than one just to check
5 the results.
6   Q.   My question isn't about what you do.
7       My question is about what Dr. Lewin did.  So
8 my question is, did Dr. Lewin do X-ray diffraction
9 more than once on these?
10   A.   I don't know.  That's not stated.
11   Q.   And between 1972 and 1973, what did
12 he do that brought him from finding asbestos in some
13 of these to non-detect in virtually all of them but
14 for 84 where there is a question mark?  What did he
15 do?
16   A.   I don't know what he did.  I can
17 speculate.  He checked again with his results.  But
18 that's no more than speculation.
19   Q.   Well, you said you've seen all the
20 relevant documents in the case, right?
21   A.   Well, his project was sponsored by
22 the Food and Drug Administration.
23       MR. PANATIER:  I'm going to object to
24 nonresponsive.
25   Q.   The question was --

1       MR. PANATIER:  Well, I'll object to
2 nonresponsive, your Honor.
3       THE WITNESS:  Okay.
4       THE COURT:  The jury will not
5 consider that testimony.  It's stricken.
6       Please answer the question he asked.
7       THE WITNESS:  I beg your pardon.  Ask
8 the question again.
9 BY MR. PANATIER:
10   Q.   Yes.  You've reviewed all the
11 relevant documents in the case, right, you told us
12 that yesterday?
13   A.   I believe I have, yes.
14   Q.   Okay.  So, if you reviewed all the
15 relevant documents in the case, I expect that you
16 would have reviewed a document dated August 14th,
17 1972.  And there's two of them.  They should be
18 right next to each other in your binder, yeah, on
19 both of them.
20       That one and the next one, yes.
21       MR. PANATIER:  These will be
22 Exhibits 2423 and 2424.
23   Q.   Have you found those two dated
24 August 14, 1972?
25   A.   Yes.

1   Q.   Okay.  Let's go to the one -- since
2 they have the same date, let's go to the one that
3 says, "talc asbestos summary of FDA meeting
4 8/11/72," to Dr. R.A. Fuller."  Do you see that?
5   A.   Yes.
6   Q.   Okay, good.  Now, that is a Johnson &
7 Johnson document, do you see it's from W. Nashed to
8 R.A. Fuller?
9   A.   It is, yes.
10       MR. PANATIER:  Okay.  We offer this
11 into evidence, Exhibit 2424.
12       MS. SULLIVAN:  No objection.
13       THE COURT:  So admitted.
14       (Plaintiff's Exhibit 2434 was moved
15       into evidence.)
16 BY MR. PANATIER:
17   Q.   This is the document we're looking at
18 here, sir.  And we know that this is, approximately,
19 11 days after Lewin's initial report comes out.  So
20 they have a meeting with the FDA on 8/11/72, which
21 is eight days after the Lewin report is sent to FDA,
22 right?
23   A.   Yes, it's eight days, yes.
24   Q.   J&J has notice of it pretty quick,
25 don't they?

1    A.    Well, obviously, yes.

2    Q.    Okay.  So his summary says, "The
3 CTFA, FDA and Johnson & Johnson meeting can be
4 summarized as follows."  And they have a lot of
5 stuff.  They provided their own data on Shower to
6 Shower that they say it is free of chrysotile,
7 right?

8    A.    Yes.

9    Q.    They say that Dr. Lewin didn't agree
10 with McCrone's interpretation of the X-ray data;
11 however, he could not satisfactorily explain the
12 absence of chrysotile asbestos in the electro
13 microscopy grids.  He said it may be asbestos
14 growing inside the plates on top.

15    They summarize a lot of stuff here,
16 right?

17    A.    Yes.

18    Q.    What they say here is, "On the basis
19 of our data, CTFA was able to say that the Lewin
20 report is incomplete since it relied only on X-ray
21 assay, which must be confirmed by microscopy."

22    So what they're saying is, if you're
23 going to do X-ray you have to confirm it by optical
24 microscopy, correct?

25    A.    Yes.

1    Q.    Now, let's skip ahead.  In 1976
2 Johnson & Johnson and the CTFA adopt J4-1, correct,
3 which is the industry analytical standard for talc
4 and asbestos, right?

5    A.    It is, yes.

6    Q.    Okay.  That method is XRD and then
7 only if there's a positive do you go to optimal
8 microscopy, correct?

9    A.    Yes.

10    Q.    Okay.  Yet here in 1972, Johnson &
11 Johnson is saying that X-ray assay must be confirmed
12 by microscopy, correct?

13    A.    Yes.

14    Q.    Okay.  "Dr. Schaffner asked Dr. Lewin
15 to tell the group what work he proposes to confirm
16 his X-ray findings.  After some discussion Dr. Lewin
17 said that to be able to say that a sample contains
18 asbestos, the X-ray results have to be confirmed by
19 a light microscopy.  If no asbestos tremolite or
20 chrysotile is seen, the sample is declared free of
21 asbestos.  In subsequent discussion, Mr. Ian Stewart
22 pointed out that light microscopy may not detect
23 chrysotile fibers."

24    Now what was the chief type of fiber
25 that Dr. Lewin had said was in the Johnson & Johnson

1 products?

2    A.    He claimed he saw -- he observed
3 chrysotile.  He claimed that, yes.

4    Q.    Right.  And Ian Stewart from McCrone
5 said that light microscopy may not detect
6 chrysotile, correct?

7    A.    He stated what he stated.

8    Q.    Right.

9    A.    He didn't specify whether it's
10 optical light or polarized light.  He just uses the
11 word light microscopy.

12    Q.    I didn't ask you what type of light
13 microscopy.

14    He said light microscopy may not
15 detect chrysotile fibers, correct?

16    A.    Correct.

17    Q.    And look at what Dr. Weissler for the
18 FDA, what he says.  "Dr. Weissler said that they
19 recognized that some samples will be passed on that
20 basis but they are willing to live with that,"
21 right?

22    A.    Well, what is written is what Dr.
23 Weissler stated back in 1972.

24    Q.    Meaning, that they accept that some
25 chrysotile will not be seen, correct?

1    A.    What Dr. Weissler and FDA stated is
2 what he stated.

3    Q.    Okay.  And so he then says, "Dr.
4 Schaffner" -- who is at the FDA, is he not?

5    A.    Yes, he was.

6    Q.    (Continuing.) "Said that this
7 procedure will be adopted in the proposed policy
8 statement.  He asked if anyone present had any
9 toxicological objections to the allowance of
10 1 percent weight for weight asbestos and talc.  No
11 objections were raised"; is that correct?

12    A.    At that particular meeting, that is
13 what is written.

14    Q.    Johnson & Johnson was at this
15 meeting, right?

16    A.    Yes.  I believe they were.

17    Q.    Right.  This is Johnson & Johnson's
18 memo of the meeting, correct?

19    A.    There was a lot of people there.  But
20 I believe they were there, yes.

21    Q.    Okay.  Well, let's just -- just so we
22 are clear, right, CTFA, FDA and Johnson & Johnson
23 meeting, right?

24    A.    Yes.

25    Q.    They wouldn't call it a Johnson &

1 Johnson meeting if they weren't there?

2    A.    No, it was a CTFA and a Food and Drug
3 Administration meeting.

4    Q.    You told us yesterday that Johnson &
5 Johnson's stated policy is zero tolerance for
6 asbestos, correct?

7    A.    That is the policy, yes.

8    Q.    Here, Schaffner for the FDA says
9 that -- "he asked if anyone present had any
10 toxicological objections to the allowance of
11 1 percent asbestos in talc.  No objections were
12 raised," correct?

13    A.    Well, that's what Dr. Schaffer --
14 Schaffner wrote.

15    Q.    Are you saying that Johnson & Johnson
16 did object, but it wasn't recorded?

17    A.    I don't know.  I wasn't there in
18 1972.

19    Q.    If Johnson & Johnson has a zero
20 tolerance policy for asbestos, why would they not
21 object when the FDA said, we're going to allow
22 1 percent asbestos in talc?

23    A.    I can't answer that.  All I can say
24 is they had and still have a zero tolerance policy.

25    Q.    But the reality is outside of what

1 they say, they really didn't because we have the
2 evidence right here.  The FDA has said 1 percent
3 will be allowed and no objections were raised; isn't
4 that true?

5         MS. SULLIVAN:  Objection, lawyer
6 argument, your Honor.

7         THE COURT:  Overruled.

8         You can answer.

9         THE WITNESS:  The document states
10 what Dr. Schaffner FDA stated, period.

11 BY MR. PANATIER:

12    Q.    And what Johnson & Johnson didn't
13 state, an objection, right?

14    A.    Well, it said no objections were
15 raised.

16    Q.    Let's go down here.  "We obtained an
17 agreement with Dr. Schaffner and Lewin to allow Ian
18 Stewart to interact with Dr. Lewin to resolve the
19 differences on Shower to Shower findings."

20         Now, Ian Stewart was a consultant to
21 Johnson & Johnson, right?

22    A.    Yes.

23    Q.    Okay.  So that's the first memo from
24 that day by Dr. Nashed.  If you'll look at the next
25 one also dated the same date.  Have you found it?

1    A.    Yes.

2    Q.    Okay.  Alright.  This one is also by
3 Dr. Nashed, right?

4    A.    Yes.

5    Q.    August 14th, 1972, correct?

6    A.    Correct.

7         MR. PANATIER:  This is Exhibit 2423,
8 your Honor.  We offer it into evidence.

9         MS. SULLIVAN:  No objection.

10         THE COURT:  Admitted.

11         (Plaintiff's Exhibit 2423 was moved
12    into evidence.)

13 BY MR. PANATIER:

14    Q.    This is Dr. Nashed writing a memo to
15 file.  We've seen one of these before, right?

16    A.    We have, yes.

17    Q.    Okay.  This is more of a sort of
18 summary of what individual people said, correct?

19    A.    It appears to be, yes.  It's their
20 comments at a particular meeting, Food and Drug
21 Administration, yes.

22    Q.    Now, Mr. Merritt was head of the
23 CTFA, correct?

24    A.    I don't know.  I don't know at that
25 time.  He was certainly part of CTFA.

1    Q.    Okay.  Let's see what Merritt says.
2 "It is unfair to select samples at random and
3 release information by brand name.  This is not an
4 industry survey but an industry sampling.  If the
5 results are in error, the FDA will have to apologize
6 later.  Also the release of information will cause
7 economic hardships."

8         Now, it would only cause an economic
9 hardship if the information showed that there was
10 asbestos in the product, right; if it said it was
11 asbestos free, there would be no economic hardship,
12 right?

13    A.    Well, if the information was
14 factually correct, right.

15    Q.    Okay.  He suggested that if the FDA
16 releases anything it should be by code number.  So
17 not by brand name, right?

18    A.    Well, he's written what he's written.

19    Q.    Okay.  Schaffner says, "Our lawyers
20 say we have to release the actual names," right?

21    A.    Again, you're reading what he wrote.

22    Q.    Okay.  Merritt says, "This is not
23 legally the case.  We reserve the right to legal
24 action by the CTFA."

25         So they're threatening legal action

Page 30

1 against the FDA, correct?
2     A.     Well, they have an opinion and Dr.
3 Schaffner had an opinion.
4     Q.     Okay.  Alright.  So let's see what
5 they say about Dr. Lewin.  Dr. Lewin in responding
6 to Johnson & Johnson says, "Knowing Johnson &
7 Johnson, I repeated my work on Shower to Shower last
8 night using stefs scanning.  I find that my initial
9 result is confirmed," right?
10    A.     That's what he stated.
11    Q.     Now, on the Shower to Shower, he
12 reported finding asbestos, correct?
13    A.     He claimed to have found -- he
14 claimed to have found chrysotile.
15    Q.     And he said, "I know these guys, so I
16 repeated my work last night.  I verified it," right?
17    A.     Well, that's what he wrote.
18    Q.     Dr. Nashed from J&J says, "We didn't
19 find any asbestos in Shower to Shower," right?
20    A.     Yes.
21    Q.     Okay.  Interestingly, Dr. Schaffner
22 says at one point, "I understand that talc can be
23 purified to remove asbestos, looking at Nashed."
24 And then someone said -- from Whitaker Clark &
25 Daniel says, "This cannot be done.  The mine must be

Page 31

1 substantially free of asbestos."  And Johnson &
2 Johnson agrees with that, correct?
3     A.     Absolutely, yes.
4     Q.     Right.  If there is asbestos present,
5 there's not a process that can remove it all from
6 the talc, correct?
7     A.     Correct.
8     Q.     Okay.  And then Avon says, "We don't
9 know if our supply has less than 1 percent of
10 asbestos.  But this isn't an Avon case."
11          Schaffner, "No, I think all samples
12 must be confirmed.  Lewin finally suggested that the
13 samples be examined by light microscopy and if the
14 asbestos is not seen, the sample will be declared no
15 detectable asbestos."
16    Right, that's that "ND" we've seen, correct?
17    A.     Yes, looking at it by light, yes.
18    Q.     Not withstanding the X-ray finding.
19 Dr. Stewart -- now, in the previous memo, Dr. Nashed
20 says that Dr. Stewart says something about light
21 microscopy, correct?
22    A.     He used the word "light microscopy."
23    Q.     Right.  Dr. Stewart said or Ian
24 Stewart said, "Light microscopy may not detect
25 chrysotile fibers," correct?

Page 32

1     A.     That's what he states -- stated.
2     Q.     And here he -- that's verified, "The
3 light microscopy is not capable of detecting fine
4 chrysotile fibers," correct?
5     A.     That's what he stated.
6     Q.     Right.  Dr. Weissler, "I understand
7 that some samples will be passed even though they
8 contain such fibers but we are willing to live with
9 it," right?
10    A.     Again, you're reading what he stated.
11    Q.     Dr. Schaffner from the FDA, "The
12 policy will depend on X-ray, which is sensitive to
13 more than 1 percent asbestos."
14          So X-ray, right, that's XRD, correct?
15    A.     It is, yes.
16    Q.     Here they're saying it's sensitive
17 only to 1 percent, right?
18    A.     At the time it was.
19    Q.     Meaning, if there's asbestos present
20 less than 1 percent, it's not going to be seen,
21 right?
22    A.     At that time, that was the case by
23 X-ray diffraction.
24    Q.     Again, does anybody object from a
25 toxicological point of view, no objections, right?

Page 33

1     A.     Well, I wasn't at that meeting.
2     Q.     The people who were say nobody
3 objected to that?
4     A.     Well, that's what's stated in that
5 report.
6     Q.     Okay.  And so industry said, Lewin
7 you've got to verify your results, right?
8     A.     Are you reading from...
9     Q.     We just went over it on the previous
10 document right here.  "On the basis of our data,
11 CTFA" -- of which Johnson & Johnson was a member,
12 correct, sir?
13    A.     Yes.
14    Q.     (Continuing.) "Was able to say that
15 the Lewin report is incomplete since it relied on
16 X-ray only.  It has to be confirmed by microscopy,"
17 correct?
18    A.     Correct.
19    Q.     They insisted upon that, correct?
20    A.     That's what was written.
21    Q.     Right.  At the same time they know
22 that the light microscopy is not capable of
23 detecting the chrysotile, right?  Correct, sir?
24    A.     On the previous -- yeah, that's what
25 is stated.  But on the previous one it uses the word

9 (Pages 30 - 33)

Page 34

1 "microscopy." Certainly, by 1972 Johnson & Johnson
2 were using transmission electron microscopy.
3          MR. PANATIER: I'm going to object as
4 nonresponsive.
5          THE COURT: Doctor, could you please
6 just answer the question being asked.
7          THE WITNESS: Yes.
8          THE COURT: Thank you.
9 BY MR. PANATIER:
10     Q.    What they used here was not
11 transmission electron microscopy at all, correct?
12     A.    Let's go back again.
13     Q.    Sir, let me just ask you a question.
14     You said yesterday that you had reviewed all
15 of the relevant documents in the case, correct?
16     A.    Yes.
17     Q.    I've shown you these documents
18 before, haven't I?
19     A.    You have, yes.
20     Q.    In person, at your deposition?
21     A.    Yes.
22     Q.    You know that they're not talking
23 about transmission electron microscopy here,
24 correct?
25     A.    Ian Stewart was not talking about

Page 35

1 transmission electron microscopy, no.
2     Q.    What the industry said was, Lewin you
3 have to follow up with light microscopy, correct?
4     A.    Would you put that back on the screen
5 so --
6     Q.    I will put it up again, sure.
7     A.    I don't want to give a false
8 statement.
9     Q.    "Confirmed by microscopy," correct?
10     A.    Yeah, that was the point I was trying
11 to make. It said it must be confirmed by
12 microscopy.
13     Q.    Yes. And in the discussion they're
14 clearly talking about Lewin doing light microscopy.
15 "In subsequent discussion Ian Stewart pointed out
16 light microscopy may not detect chrysotile fibers.
17 Weissler said they recognize some samples will be
18 passed on that basis but willing to live with it,"
19 correct?
20     A.    Yes.
21     Q.    Okay. We know that Lewin concludes
22 by saying, "I'll do light microscopy. If I don't
23 see it, I'll say non-detect," correct?
24     A.    I believe that was what he stated,
25 yes.

Page 36

1     Q.    Okay.
2     A.    He didn't have...
3     Q.    Again, you have two documents here
4 where Johnson & Johnson is given an opportunity to
5 object to something that is only sensitive to 1
6 percent, right, XRD?
7     A.    Yes.
8     Q.    Right?
9     A.    Yes.
10     Q.    And they are given an opportunity to
11 object to using light microscopy but they all accept
12 it, don't they?
13     A.    On that part of the phraseology, I,
14 you know, I don't know whether you are going to go
15 on to Page 3 of the...
16     Q.    Which one? What do you want to look
17 at?
18     A.    Well, it's part of this whole
19 documentation of what was said and what they did, on
20 Page 3, which is top of Page 358. He does talk --
21 and that's what I was trying to say -- "I suggested
22 he look at a sample by EM."
23     Q.    Where are you?
24     A.    It's Bates No. ending 3555.
25     Q.    I have that. Where are you?

Page 37

1     A.    Okay. The penultimate paragraph on
2 the bottom said, "During lunch I discussed with Dr.
3 Lewin" -- and then he goes on to say -- "I suggested
4 he look at our sample by EM."
5     Q.    Right.
6     A.    And I believe -- that's what I was
7 just trying to say, that they weren't just talking
8 about optical in the discussion.
9     Q.    Dr. Nashed invited Dr. Lewin to look
10 at a sample, a sample by EM, not all of his testing.
11     You understand that this entire thing
12 was about all -- confirming, as they say, all of the
13 testing he had done, correct?
14     A.    Yes.
15     Q.    And it was set to be confirmed, as
16 they put it, by optical microscopy, you understand
17 that, right?
18     A.    At that part of the meeting, yes.
19     Q.    Dr. Lewin never confirmed his results
20 by EM, correct?
21     A.    No --
22     Q.    Okay.
23     A.    -- but I was just trying to explain
24 that they did talk about it at that meeting.
25     Q.    They talked about all sorts of things

10 (Pages 34 - 37)

1 at the meeting. But that's what Dr. Lewin was asked
2 to do, was it?
3        MS. SULLIVAN: Objection, your Honor,
4 lawyer argument.
5        THE COURT: Overruled.
6        You can answer it.
7 BY MR. PANATIER:
8    Q.    Correct, sir?
9    A.    Lewin was asked to look at it by
10 light microscopy.
11   Q.    Right. And so, when he comes back in
12 1973 and a bunch of his chrysotile results become
13 question marks or non-detects, right, we have a
14 reasonable explanation as to why, because Ian
15 Stewart from McCrone told us the light microscopy
16 will not resolve the fine chrysotile fibers,
17 correct?
18   A.    Again, I'm not -- I mean, you are
19 stating what was stated, correct.
20   Q.    Right.
21   A.    But I'm not a microscopist, so I
22 don't want to speculate.
23   Q.    Ian Stewart was, though?
24   A.    Ian Stewart was, yes.
25   Q.    Alright. You can set that aside.

1        And then Dr. Lewin was -- he wrote a
2 letter to the editor where he said -- he said --
3 you're familiar with this, right?
4    A.    Yes.
5    Q.    Right. It's marked 1973. I think
6 this is already in evidence from last week. It's a
7 Defense exhibit. I'll just put it up.
8        Right, we saw this last week where he
9 says, "In the article referred to, I was erroneously
10 quoted as having reported that Johnson & Johnson
11 talcum powder contained 2 to 3 percent asbestos. In
12 actual fact, I reported that 11 of the samples of
13 the products of this company I found no asbestos in
14 nine of the samples and the other two samples fell
15 into the inconclusive category described above.
16 These results are not seriously at variance with
17 those reported by investigators retained by the
18 company."
19        So we're talking about McCrone, Colorado
20 School of Mines, Brown, all those guys, right?
21   A.    Yeah, Berger.
22   Q.    Berger?
23   A.    Professor Pooley.
24   Q.    Yes, okay.
25   A.    Yeah.

1    Q.    Okay, yeah.
2        So, to summarize, Lewin does XRD, XRD
3 is only sensitive, according to this report, down to
4 1 percent, correct?
5    A.    According to that report.
6    Q.    He does get a good number of
7 positives for asbestos, correct?
8    A.    He gets positives for amphibole by
9 XRD.
10   Q.    Right, right. Then he reports in
11 '72?
12   A.    He reports in this -- yes,
13 amphiboles.
14   Q.    Eight days later they're meeting with
15 the FDA and they get the FDA to say, you've got to
16 confirm these but you have to do it by a different
17 method optical microscopy, correct?
18   A.    Yes.
19   Q.    And Johnson & Johnson's own
20 consultant at the meeting says, it's not going to
21 see fine chrysotile, correct?
22   A.    Well, that's what he stated at that
23 time.
24   Q.    And then the results go to non-detect
25 in the last report, correct?

1    A.    Well, that's what Dr. Lewin --
2 Professor Lewin reported.
3    Q.    Now, he also said in that meeting,
4 eight days after the initial report that he had
5 confirmed the Shower to Shower report the night
6 before, right?
7    A.    That's what he stated.
8    Q.    Shower to Shower was sample 84,
9 right?
10   A.    Yes.
11       MR. PANATIER: Okay. Okay. Let's
12 look at -- this will be 3695-26. This is a FDA FOIA
13 document, your Honor.
14       THE COURT: Thank you.
15
16   Q.    Dr. Hopkins, this here --
17       MR. PANATIER: Your Honor, we'll
18 offer this into evidence. It's a memo of a meeting
19 August 11, 1972. It's the FDA FOIA response.
20       MS. SULLIVAN: No objection.
21       THE COURT: Admitted.
22       (Plaintiff's Exhibit 3695-26 was
23       moved into evidence.)
24 BY MR. PANATIER:
25   Q.    This is the FDA's own memo of their

11 (Pages 38 - 41)

1 meeting, right?
2    A.    Yes.
3    Q.    Okay.  And you can see that Nashed,
4 Rolle, Hammer, Goudie and Stewart are all listed as
5 being there for Johnson & Johnson, right?
6    A.    Yes.
7    Q.    They have more people there than any
8 other company, right?
9    A.    There are representatives from many
10 other companies, yes.
11    Q.    But they have more people for their
12 company than any others did for theirs, right?
13    A.    Yes, they have a few more, yes.
14    Q.    I just wanted to see if you agreed
15 with this statement.  "There was no disagreement
16 between FDA industry scientists present at this
17 meeting about the potential safety hazard that the
18 presence of asbestos in talc containing cosmetic
19 product posses to the consumer."
20         Johnson & Johnson still agrees today
21 that that would pose a danger to the consumer,
22 correct, if there was asbestos in consumer talc?
23    A.    Yes.
24    Q.    Alright.  So let's go to October 27,
25 1972.  And you probably have four tabs with that

1 date.  And they're all related.
2         (There is a discussion off the
3    record.)
4         MR. PANATIER:  Alright.  So these
5 will be Exhibits 2415, 2416, which are both in --
6 I'm sorry -- yeah, 2416, 2415 is already in
7 evidence.  2419 is already in evidence and then
8 2417.  So 2416 and 2417 we'll offer into evidence.
9         MS. SULLIVAN:  No objection.
10         THE COURT:  So admitted.
11         (Plaintiff's Exhibit 2416 was moved
12    into evidence.)
13         (Plaintiff's Exhibit 2417 was moved
14    into evidence.)
15 BY MR. PANATIER:
16    Q.    Now, Dr. Hopkins, if you'll turn to
17 -- yeah.  Yeah, that's a good place to start.
18         That is dated October 27, 1972,
19 right?
20    A.    Yes.
21    Q.    And this is McCrone's analysis of
22 Lewin's Johnson's Baby Powder, correct?
23    A.    It is, yes.
24    Q.    Okay.
25         THE COURT:  For the record, you're

1 starting with 2416?
2         MR. PANATIER:  2415, your Honor.
3         THE COURT:  15, thank you.
4         MR. PANATIER:  Yes.
5 BY MR. PANATIER:
6    Q.    And inside he makes very clear what
7 they're looking at.  He says that, both samples, at
8 least, by their characterization contained an
9 insignificant amount of tremolite, less than
10 5 percent, right?
11    A.    Yes.
12    Q.    Okay.  And we know that these were
13 samples 108 and 109T, correct?
14    A.    Yes.
15    Q.    And McCrone -- now, we've heard a lot
16 about McCrone.  I think you have said they're
17 world-renowned.  They were head of the game.  They
18 knew what they were doing with microscopy, correct?
19    A.    Yes.
20    Q.    And they say here, the total
21 tremolite content of the two samples would be,
22 approximately, .5 percent for 108T and about .2 to
23 .3 percent for 109T, correct?
24    A.    Yes.
25    Q.    And they say in their conclusion, "A

1 detailed examination of two samples of Johnson &
2 Johnson's Baby Powder 108T and 109T has shown this
3 material to be substantially free of asbestiform
4 minerals."
5         Now, "substantially free" doesn't mean all
6 free, does it?
7    A.    No.  You're reading what is written.
8 I'm not going to speculate on what they meant by
9 "substantially free."
10    Q.    Well, if it was free, they would say
11 "free," wouldn't they?
12    A.    They may do.
13    Q.    Right.
14    A.    They may do.
15    Q.    And, in fact, the very next line they
16 say, a few tremolite rods were observed in both
17 samples at a level less than .5 percent, right?
18    A.    Tremolite rods.
19    Q.    Right?
20    A.    Yes.
21    Q.    They say, "substantially free of
22 asbestiform minerals" and then they describe what
23 they found in the very next sentence.
24    A.    As tremolite rods.
25    Q.    Are you saying that's different

1 than asbestiform minerals that they say in the
2 sentence right before that, sir?
3     A.    No, tremolite rods are not
4 asbestiform.
5     Q.    Where do you get -- are you a trained
6 geologist?
7     A.    I've read so much of those, thousands
8 of documents, that's where I've gained that
9 information.
10     Q.    Let's just see here.
11        So I want you to tell me --
12        MR. PANATIER:  You know what, your
13 Honor, permission for the witness to step down to
14 the chart.
15        THE COURT:  Sure.
16 BY MR. PANATIER:
17     Q.    And choosing any color you like, sir,
18 can you draw what you believe a rod looks like.
19 Show us a rod.
20     A.    It looks like my pen.
21     Q.    Okay.  So go ahead and draw it since
22 you're down here.
23     A.    (The witness complies.)
24     Q.    Okay.  Thank you.
25     A.    That's it.

1     Q.    That's very good.  That's very good.
2 Did you go to art school?
3        And we're going to put -- I'll put
4 "rod" here; is that okay?
5     A.    Yes.
6     Q.    Okay.  Okay.  I'm sorry I got you
7 down here to just draw one line.  But now we know
8 what we're talking about.
9     A.    That's okay.  Now we know what we are
10 talking about.  Like I said, it looks like my pen.
11     Q.    Now, we know it was tremolite, right?
12     A.    Yes.
13     Q.    And we know that Johnson & Johnson's
14 definition of a fiber is something that is 3-to-1 or
15 longer, correct?
16     A.    A fiber?
17     Q.    That's correct.
18     A.    Yes, yes.
19     Q.    What you drew is certainly 3-to-1 or
20 longer.  It's about probably a hundred-to-1, isn't
21 it?
22     A.    That particular drawing is a rod,
23 which is not microscopically described as fibrous or
24 fibrous.
25     Q.    I'm going to draw a fiber; there.

1 There's my drawing of a fiber.
2        Now what's the difference between my
3 fiber and your rod?
4     A.    This is where we get into the
5 expertise that are required from a microscopist to
6 explain the difference between a fibrous form of --
7 for asbestos or the non-fibrous form of tremolite or
8 those materials.
9     Q.    What we have here from McCrone is
10 McCrone says it's "substantially free," which means
11 it's not free of asbestiform minerals, correct?
12     A.    What is written is what is written.
13 It says, "substantially free of asbestiform
14 minerals."
15     Q.    If I draw a circle and I -- say it's
16 substantially colored in, it means it's not all the
17 way colored in, correct?
18     A.    You know, I'm not going to speculate
19 on what McCrone wrote long ago.
20     Q.    Hold on.  I'm just talking about my
21 circle right now.
22     A.    Okay.  You can talk about your
23 circle.
24     Q.    Okay.  So, if -- because we're just
25 trying to get your understanding straight, sir.

1        So, if I substantially color in the
2 circle, I haven't colored in the entire circle, have
3 I?
4     A.    No.  But you're talking about
5 circles.
6     Q.    Can we agree that it's substantially
7 colored in?
8     A.    Again, it's -- you're playing word
9 games.  It is substantially colored in, not entirely
10 colored in.
11     Q.    I don't think I'm the one playing
12 "word games," sir.
13     A.    It's not entirely colored in.
14        MS. SULLIVAN:  Lawyer argument.
15     Q.    Can you just answer my question?
16        THE COURT:  Excuse me.  Not more than
17 one person at one time please, for the record.
18        The question, please.
19 BY MR. PANATIER:
20     Q.    The question is, sir, with regard to
21 the circle, so we can try to get our bearings and be
22 on the same ground, would you agree that it's
23 substantially colored in?
24     A.    If you are describing the circle,
25 yes.

13 (Pages 46 - 49)

Page 50

1    Q.    Okay.  Which means that part of it,
2 this little part down here, is not colored in,
3 right?
4    A.    The circle is not fully colored in.
5    Q.    What "substantially" means, is that
6 most of, but not all.  Can we agree with that
7 working definition of "substantial"?
8    A.    In relation to the circle, yes.
9    Q.    Okay.  Now, let's take that same
10 definition and let's apply it to what McCrone said.
11 They said "substantially free," which means most but
12 not all.  Can we agree that that's what that means?
13    A.    Again, I'm not going to speculate
14 what Ian Stewart wrote in 1970, whatever it was, as
15 to what he meant.
16    Q.    I --
17    A.    He wrote what he's spoken, "not
18 substantially free."
19    Q.    I'm sorry, sir.
20        I'm asking you whether or not we can
21 just apply plain English to the word
22 "substantially."  Can we do that together?
23        MS. SULLIVAN:  Objection, your Honor.
24 It's lawyer argument.
25        THE COURT:  Overruled.

Page 51

1        You can answer.
2    A.    We can apply "substantially free" and
3 that is what McCrone wrote.
4    Q.    It doesn't say all free or asbestos
5 free, does it?
6    A.    What it says is what it says,
7 "substantially free."
8    Q.    And if we -- we know that according
9 to Johnson & Johnson's own definition of fiber, it
10 is a particle of one of the six regulated minerals,
11 right?
12    A.    Yes.
13    Q.    That is greater than or equal to
14 3-to-1, right?  And that's from JM -- I'm sorry, TM.
15 And that has a J.  TM7024, right?
16    A.    On that particular definition, right.
17    Q.    That's their TEM definition for
18 asbestiform fibers, right?
19    A.    On their particular four-line
20 definition, yes.
21    Q.    Now, we know that this report was
22 changed, correct?
23    A.    It was revised when it was
24 re-evaluated, yes.
25    Q.    Because it says, do not use this

Page 52

1 report, right?
2    A.    Yes.
3    Q.    And this is now in evidence.  You can
4 see this is 2416.
5        This says "McCrone study being
6 redone," right?
7    A.    Yes.
8    Q.    If you turn to the other side of it,
9 it says, October 27, 1972.  "Here is our report on
10 the baby samples.  I hope to have the Shower to
11 Shower report out to you soon.  But something always
12 seems to break lose when I sit down to write it."
13 Okay.
14        Someone there at J&J says, it's being
15 redone, right?
16    A.    Yes.
17    Q.    And then there's addition, I guess,
18 once it comes in.  It says, new one is in the Master
19 talc file, right?
20    A.    Yes.
21    Q.    Where was the old one put?
22    A.    Well, the old one we just looked at.
23    Q.    Yeah, right.  It's present in the
24 courtroom right now.  But did they not put it in the
25 Master talc file?

Page 53

1    A.    I don't see why they wouldn't.
2    Q.    This was not sent to the FDA,
3 correct?
4        THE COURT:  For the record, when you
5 say, "this was not sent to the FDA"?
6        MR. PANATIER:  Thank you, your Honor.
7 BY MR. PANATIER:
8    Q.    Exhibit 2415.  The one that says, "do
9 not use this report," correct?
10    A.    I don't know.
11    Q.    Exhibit 2419 was sent to the FDA,
12 correct?
13    A.    I believe so, yes.
14    Q.    Okay.  Now, let's look at -- this is
15 the revised report, correct?
16    A.    Yes.
17    Q.    Now --
18    A.    They repeat -- they did the study
19 again.
20    Q.    Here now it says, "both samples
21 contain an insignificant amount of tremolite,"
22 right?
23    A.    Yes.
24    Q.    In the first version it says,
25 "insignificant amount," and they give the

14 (Pages 50 - 53)

Page 54

1 percentage, correct?
2     A.     On the first version they claimed a
3 percentage, on the --
4     Q.     Now, they say --
5     A.     -- on the second version.  They
6 dropped the word "percentages" and simply stated --
7 well...
8     Q.     A few isolated crystals?
9     A.     Oh, in the conclusion, they say
10 almost exactly the same thing.  Are we...
11     Q.     That's fine.  I was looking at the
12 front, but we can go to the conclusion.  Here's the
13 conclusion from the first version, right?
14     A.     Yes.
15     Q.     Observed in both samples of less than
16 5 percent -- .5 percent, correct?
17     A.     Less than 0.5, yes.
18     Q.     And then they take that out in the
19 second one and say, "a few tremolite rods were
20 observed in both samples," correct?
21     A.     Yes.  They say almost the same thing,
22 substantially free of asbestiform minerals --
23         MR. PANATIER:  I'm going to object to
24 nonresponsive.
25         THE WITNESS:  Yes, correct.

Page 55

1         THE COURT:  Overruled.
2         THE WITNESS:  Correct.
3 BY MR. PANATIER:
4     Q.     Sir, look under "light microscopy."
5 Do you see there under "light microscopy"?  You can
6 either look on the board, if you want, it might be
7 easier.
8     A.     No, I can see it.
9     Q.     In the revised version they say --
10 let's see -- "presence of tremolite and a few
11 individual crystals were found, some rod shaped,"
12 right?
13     A.     Yes.
14     Q.     In the original, they actually give
15 the percentages in each product, correct?
16     A.     Yes.  On the second version they did
17 it again and weren't able to confirm the
18 percentages.  They still stated that they found
19 tremolite rods.
20     Q.     And they even sent in a letter to J&J
21 saying, "here's our revised thinking, we couldn't
22 confirm our percentages," right?
23     A.     Yes, they checked again and they
24 could still see tremolite rods but could not confirm
25 percentages.

Page 56

1     Q.     Okay.  So this is McCrone.  The best
2 lab in the world, we've heard?
3     A.     They did the study twice.
4     Q.     Well, that's what they say they did,
5 right?
6     A.     Yeah.
7     Q.     Okay.
8     A.     They did it again.
9     Q.     If you do a study again, you have a
10 new study, don't you?
11     A.     Yes.
12     Q.     But we don't have a new study here,
13 do we?
14     A.     Well, they're two separate studies
15 that came in on separate times.
16     Q.     Are they?
17     A.     Well, they're both separate.
18     Q.     Because it seems to me like there's
19 two versions and the second one is backdated to the
20 first, is it not?
21     A.     The second one they didn't change the
22 front page date.  But they're two separate reports.
23     Q.     They replaced the report.  If it was
24 two separate reports, right, you wouldn't say, don't
25 use this report, you would have two separate

Page 57

1 reports, correct, sir?
2     A.     Who is "they"?  Who wrote, "do not
3 use this report"?
4     Q.     Sir, Johnson & Johnson wrote "do not
5 use this report."  You know that.
6     A.     Well, I don't know that.  But someone
7 wrote it.
8         What I'm saying is that, you asked
9 the question, were there are two separate reports,
10 yes.
11     Q.     But this isn't two separate reports.
12 It's represented to be the same report.
13         Are they both titled "Examination of Johnson
14 & Johnson's Baby Powder"?
15     A.     They are.
16     Q.     Are they both dated 27 October '72?
17     A.     They are.
18     Q.     Okay.  And they both are reporting on
19 the exact same two samples, 108 and 109T, correct?
20     A.     Yes.
21     Q.     And then one they're told, do not
22 use, right?
23     A.     Yes.  They did a second version, a
24 second review, a second study, and issued a second
25 report.

15 (Pages 54 - 57)

Page 58

1    Q.    It's the same report, just backdated
2 to replace the first.  In fact, that's what these
3 words say, is it not?
4        MS. SULLIVAN:  Objection, your Honor,
5 lawyer argument.
6        THE COURT:  Objection overruled.
7        You can answer.
8    A.    Sorry.  I missed the question there.
9    Q.    It's the same report to be replaced
10 by the first.  In fact, it even says replaced by
11 another version.  It's not a -- this is not a second
12 report, is it?
13    A.    It depends on how you define "second
14 report."  There are two reports here, this one and
15 this one.
16    Q.    You know the do not the use --
17    A.    Yes.
18    Q.    -- stayed at Johnson & Johnson and
19 you know the second one to the FDA, right?
20    A.    The second one went to the FDA based
21 on a second study.
22    Q.    If you'll go to the next document
23 dated 10/27.  That's it.  That's it.  You've got it.
24    A.    Okay.
25    Q.    That's Exhibit 2417.  It's two-sided,

Page 59

1 okay.  On the one side it says, "revise report just
2 received," right?
3    A.    Yes, uh-huh.
4    Q.    And on the other side there's a note
5 from Nashed to Dr. Goudie, right?
6    A.    Yes.
7    Q.    And Nashed says, "I thought tremolite
8 was mistakenly identified in view of similarity to
9 sodium sesquihydrate," another chemical, correct?
10    A.    Yes.
11    Q.    And Al Goudie writes back, "There are
12 trace quantities present confirmed both by McCrone
13 and Bill Ashton."
14        Now, Bill Ashton was Johnson & Johnson,
15 right?
16    A.    Yeah.
17    Q.    "Levels are extremely low but
18 occasionally can be detected optically."  This is
19 not new, right?
20    A.    Yes.
21    Q.    And you and I know the issue of
22 tremolite in the baby powder was not new; it was
23 quite old by this point, correct?
24    A.    Yes.  This could be trace tremolite,
25 yes.

Page 60

1    Q.    And just because you said "trace,"
2 going back to Battelle, we know that it appeared
3 anywhere from trace up to 3 percent, right?
4    A.    On some of those early Battelle
5 studies.
6    Q.    Right.  We'll put that in the inbox.
7        Now, because we had that revised
8 report that was backdated -- and it was backdated,
9 was it not?
10    A.    I don't know.  They both carry the
11 same date.
12    Q.    Right.  Even though -- even though
13 the second version came later than October 27th,
14 correct?
15    A.    I don't know when the second
16 version -- they both carry the same dates, but there
17 was -- they were -- the second report was a repeat
18 of the experiments.
19    Q.    Johnson & Johnson actually took
20 liberty to revise reports of its consultants for
21 them, did it not?
22    A.    Revise, I'm not aware of revising.
23 You'd need to show me what you're talking about.
24    Q.    I will.  This is Exhibit 2848.  And,
25 sir, it is under the Tab 1976, June 2nd.  It's

Page 61

1 probably in the third binder is going to be my
2 guess.  Let me help you.  Yeah, it will be right
3 there.  There it is right there.  Got it?
4    A.    (No response.)
5    Q.    Okay.
6        THE COURT:  What was the date on
7 that?
8        MR. PANATIER:  June 2nd, 1976.
9 BY MR. PANATIER:
10    Q.    Okay.  Sir, if you could turn --
11 there's some handwriting on the cover of that
12 document, right --
13    A.    Yes.
14    Q.    -- on the first page?
15        And then there's a report on the second page
16 dated June 2nd, 1976.  Do you see that?
17    A.    Yes.
18    Q.    Okay.  And that is a letter from Gene
19 Greiger to Walter McCrone, correct -- or to, I'm
20 sorry, to Johnson & Johnson, correct?
21    A.    Yes.  Yeah.
22        MR. PANATIER:  We offer this into
23 evidence, your Honor.
24        MS. SULLIVAN:  No objection.
25        THE COURT:  So admitted.

16 (Pages 58 - 61)

1          (Plaintiff's Exhibit 2848 was moved
2       into evidence.)
3 BY MR. PANATIER:
4     Q.    So let's turn to the second page that
5 has --
6          THE COURT:  I'm sorry.  And what's
7 the marking on this?
8          MR. PANATIER:  Yes, your Honor, this
9 is 2848.
10          THE COURT:  Thank you.
11 BY MR. PANATIER:
12     Q.    So let's turn to the second page
13 which is the sample.  And this is just a sample that
14 was run by McCrone.  They sent their results to J&J,
15 right?
16     A.    Yes.
17     Q.    Okay.  And they're looking at a talc
18 sample.  I don't think they identify what the
19 samples are.
20     A.    No.
21     Q.    But you can see there's some detail
22 in the middle paragraph about those samples.  They
23 found some talc ribbons.  They said found one fiber
24 which was not asbestiform, probably talc and they
25 summarized their results, right?

1     A.    Yes.
2     Q.    Okay.  And then they -- on the next
3 pages they take photomicrographs, they take
4 pictures?
5     A.    They do.
6     Q.    Was McCrone an independent company?
7     A.    Yes.
8     Q.    Right.  Could they be influenced by
9 Johnson & Johnson?
10     A.    I don't believe so.
11     Q.    There's some of the -- there's some
12 of the pictures they sent along.
13          Now, let's go to the cover, right?
14 You see the front page, "note from Bill Ashton"?
15 Now he's Johnson & Johnson, right?
16     A.    Yes.
17     Q.    Okay.  I'll put our list of folks up
18 here.  "About 6-2-76 reports, delete second
19 paragraph, first and third only," right?  Right?
20 Signed "Gene," that's Gene Grieger, right?
21     A.    Yes.
22     Q.    And then there's a note that says,
23 "done," right?
24     A.    That's what it says, here, yes,
25 handwritten.

1     Q.    They generated a report for Johnson &
2 Johnson.  Somehow Bill Ashton finds out about it,
3 tells them to delete the second paragraph, correct?
4     A.    Well, I'm not going to speculate
5 what -- any chain of events.
6     Q.    Well, it says it right there, right?
7     A.    This document says nothing more than
8 what it says.
9     Q.    Don't you agree it's pretty clear,
10 note from Bill Ashton, "About 6-2-76 reports, delete
11 second paragraph, first and third okay"?  That seems
12 pretty clear to me.
13     A.    Yeah, whether that actually happened,
14 I don't know.
15     Q.    I do.  So let's go to the next
16 document.  It's dated -- go to August 18, 1976.  Let
17 me see.  Actually, it may have the same date.  It
18 may have the same date.  Yes, it's this one right
19 here.  Sorry.
20          This is dated August 18, 1976,
21 correct?
22     A.    Yes.
23     Q.    It's from Gene Grieger to Johnson &
24 Johnson to Bill Ashton?
25          MS. SULLIVAN:  May I have a copy,

1 Counsel?
2          MR. PANATIER:  Oh, I'm so sorry.
3 Here it is.  Yeah, here you go.  That's yours.
4 Sorry.
5 BY MR. PANATIER:
6     Q.    It's Exhibit 2849.  Have you had a
7 chance to look at that?
8     A.    Yes.
9     Q.    Okay.  And it has the Johnson &
10 Johnson Bates Stamp on it, correct?
11     A.    Yes.
12          MR. PANATIER:  We offer this into
13 evidence, your Honor.
14          MS. SULLIVAN:  No objection, your
15 Honor.
16          THE COURT:  Admitted.
17          (Plaintiff's Exhibit 2849 was moved
18       into evidence.)
19 BY MR. PANATIER:
20     Q.    So here's the report.  You see where
21 it says, "using TEM we examine 13 samples of talc
22 for asbestiform minerals submitted with your letter
23 dated 5, April '76"?
24     A.    Yes.
25     Q.    And this they were designated 1976 1

17 (Pages 62 - 65)

Page 66

1 through 13 --
2    A.    Yes.
3    Q.    -- right?
4        Now, let's go to the original report.  Do
5 you see the paragraph here?  It's the identical
6 first paragraph.
7    A.    Yes.
8    Q.    And then the middle paragraph is
9 gone, correct?
10   A.    Yes.
11   Q.    And the conclusions, the conclusions
12 are...
13   A.    The same.
14   Q.    The same?
15   A.    Didn't find any asbestiform minerals.
16   Q.    Right.  But per Johnson & Johnson's
17 instruction, they deleted the entire middle part of
18 their report, right?
19   A.    Well, both --
20   Q.    Sir, can you answer the question,
21 please?
22   A.    Yes.  I mean, the second version
23 which came two months later is a condensed version,
24 yes.
25   Q.    Sir, here's my question --

Page 67

1    A.    So the answer is, yes.
2    Q.    Yes.  Johnson & Johnson told them to
3 delete a paragraph and they did it and they reissued
4 their report, right?
5    A.    Well, there are two reports.
6    Q.    And this is Bill Ashton, right, to
7 Bill Ashton and it was Bill Ashton who called and
8 said, "delete the second paragraph," right?
9    A.    Yes.  He's, obviously, wanted a
10 condensed version, a shortened version.
11   Q.    Maybe he was into speeding things up.
12 But it resulted in a lot of information being taken
13 out, correct?
14   A.    But both versions are here.  There's
15 nothing -- no one is hiding it.
16   Q.    No one is hiding it?
17   A.    No, both versions are here.
18   Q.    Did Johnson & Johnson give me this
19 document, do you know?
20   A.    Where else?  Yes.
21   Q.    Do you know if I had to go to McCrone
22 to get it?
23   A.    I believe you got this from Johnson &
24 Johnson.
25   Q.    You think I got this one from Johnson

Page 68

1 & Johnson to delete the second paragraph?
2    A.    Yeah, I don't know.
3    Q.    Because this one has the Johnson &
4 Johnson Bates Stamp, right?
5    A.    Yes.
6    Q.    Either way, wherever I got it --
7        MS. SULLIVAN:  Your Honor, just for
8 completeness, if Counsel can show the second page of
9 the document with the Johnson & Johnson Bates Stamp
10 on it.
11       THE COURT:  Counsel.
12       MR. PANATIER:  Sure.
13       Second page of this one?
14       MS. SULLIVAN:  Right here.
15       MR. PANATIER:  That's not a Johnson &
16 Johnson's Bates Stamp.
17 BY MR. PANATIER:
18   Q.    That -- JOJOMA2546 is the McCrone
19 Bates Stamp.  But, anyway, you see the Bates Stamp
20 and there's the J&J Bates Stamp?
21       Bottom line is, wherever I got it --
22       THE COURT:  Excuse me.
23       MR. PANATIER:  I'm sorry.
24       MS. SULLIVAN:  Your Honor, I just --
25       THE COURT:  Counsel, let's have a

Page 69

1 discussion at sidebar.
2        (Sidebar.)
3        THE COURT:  I have no issue with
4 discussions at Counsel table, but they're little bit
5 too loud and they're getting picked up.  Okay.
6        MS. SULLIVAN:  I object to the
7 misrepresentation.  It says "JOJ" on it.
8        THE COURT:  Hold on, hold on.  And
9 what's your response?
10       MR. PANATIER:  My response is she's
11 wrong.  These are from McCrone.  I can prove it.
12 I've got affidavits.  For her to say these are
13 J&J's, well, she just doesn't know her documents.
14 It's patently clear.
15       THE COURT:  Okay.  Well, are you
16 going to do that?
17       MR. PANATIER:  I can -- if there is
18 an allegation or a reason to present to the Jury
19 that this is from McCrone instead of J&J, I'm happy
20 to do it.  I'll do it right now.
21       THE COURT:  I think you should.
22       MR. PANATIER:  Okay.  I will do it.
23       THE COURT:  Okay.
24       (Sidebar ends.)
25 BY MR. PANATIER:

18 (Pages 66 - 69)

1     Q.     Just so we can be clear on where
2  these documents come from.  You see that Bates Stamp
3  JOJOMA2546, right?
4     A.     Yes.  Yes.
5     Q.     I'm just going to show the Court an
6  affidavit from McCrone.  Do you see that, "My name
7  is David Wiley.  I am of sound mind" --
8           MR. SULLIVAN:  Your, Honor, I'm going
9  to object because I haven't been shown the
10 affidavit.  I don't know what he's putting on the
11 screen.
12          MR. PANATIER:  She just asked me to
13 do it.
14          MS. SULLIVAN:  The practice is
15 usually to show it to --
16          THE COURT:  Show it to Counsel.
17          MS. SULLIVAN:  No objection, your
18 Honor.
19          THE COURT:  Continue.
20 BY MR. PANATIER:
21    Q.     You see how this says, "I'm David
22 Wiley.  I am one of the custodians of records from
23 McCrone & Associates."  Do you see that?
24    A.     Yes.
25    Q.     It says that they were served with a

1  subpoena to produce documents.  Do you see that?
2     A.     Yes.
3     Q.     These are kept, it says, in response
4  to the subpoena and we produced records to
5  Plaintiffs identified in the attached Exhibit 1.
6  These are kept by McCrone in the regular course of
7  business and so on and so on.  Do you see that?
8     A.     Yes.
9     Q.     Signed April 23, 2018, right?
10    A.     Yes.
11    Q.     Okay.  And attached to this affidavit
12 are a list of documents, right, from McCrone?  You
13 see those Bates Stamps?
14    A.     Yes.
15    Q.     They have ones related to Cyprus,
16 Engelhard, Imerys, Johns Manville and Johnson &
17 Johnson, right?
18    A.     Yes.
19    Q.     And do you see here, the Johnson &
20 Johnson ones that McCrone produced are all with that
21 "JOJOMA" and then a number as you get down to the
22 possession of documents?
23    A.     Yes.
24    Q.     Okay.
25           (There is a discussion off the

1     record.)
2     Q.     In fact, 2546 on the document I
3  showed you, do you see that?
4     A.     Yes.
5     Q.     It's right here 2546?
6     A.     Yes.
7     Q.     And it say there's 1,561 pages in the
8  sequence, right?
9     A.     Yes.
10    Q.     And this is number 1,410, right?
11    A.     Yes.
12    Q.     This came from McCrone --
13    A.     Okay.
14    Q.     -- right, not Johnson & Johnson?
15    A.     Okay.
16    Q.     But going back to my point which
17 wasn't about where it came from.
18           My point is even if this stayed in
19 Johnson & Johnson's files, right, the report that
20 was ultimately generated was missing the middle
21 paragraph per Johnson & Johnson's instructions; is
22 that right?  Can we agree on that?
23    A.     The report was ultimately generated,
24 did not include the middle paragraph.
25    Q.     Alright.  Do you know how many other

1  reports generated by its consultants, these
2  apparently independent people that's been said, how
3  many more were altered by Johnson & Johnson?
4     A.     None that I know of.
5     Q.     Okay.  Let's talk about FDA testing
6  of the Lewin samples, okay.  This is already in
7  evidence.  It's Exhibit 2617.
8           Thank you.
9           We discussed some of this last week
10 with Dr. Weber, okay.  So the Jury has already seen
11 this.  It's in evidence.
12           Sir, you and I have been over -- if
13 you'll take a look at the board -- you and I have
14 been over this document before.
15           This is the FDA testing of the Lewin
16 samples, correct?
17    A.     Yes.
18    Q.     Okay.  And we're going to talk about
19 sample 84.  The FDA found tremolite asbestos in
20 sample 84, correct?
21    A.     Well, do we have the document in here
22 I can look at?
23    Q.     Yeah, of course.  So it will be dated
24 -- it should be dated 1973.  Because it covers a
25 range of dates, so we just put the year.  And if I

19 (Pages 70 - 73)

1 can -- do you mind if I help you find it, because I
2 know what it looks like.
3     A.    Yeah. It's in the binder.
4     Q.    Okay. It probably is, yeah. Here it
5 is. There you go.
6          So, sir, if you will turn please to
7 the page at the top marked 670 -- you know what, I
8 think of a lot them are marked 679. It's not the
9 page number. It's the -- again, we have this issue
10 of the FDA not numbering pages. It's about the
11 fifth page in, sir. Have you found that?
12    A.    Yes.
13    Q.    Okay. Okay. So we know sample 84,
14 because we just talked about it with Lewin, was
15 Shower to Shower, right?
16    A.    Yes.
17    Q.    And we know that the FDA confirmed
18 that there was tremolite actinolite in sample 84,
19 true?
20    A.    Tremolite actinolite, yes.
21    Q.    Right? It says it right there. It
22 says that, sample 84 contained a 107 fibers of
23 tremolite actinolite per gram, right, or per
24 milligram?
25    A.    Yes, tremolite actinolite, yes.

1     Q.    Okay. And you and I can do the
2 simple math on this, right? There are -- if it's
3 107 fibers -- by the way, 107 fibers would be
4 fibrous, can we agree?
5     A.    No, we can't agree unless you own a
6 microscope.
7     Q.    We can't agree that 107 fibers is not
8 fibrous, sir? Are we still having this argument?
9     A.    Yes.
10    Q.    Okay, alright.
11          107 fibers in a milligram, right?
12    A.    Yes.
13    Q.    A milligram -- how many milligrams
14 are there in a gram?
15    A.    A thousand.
16    Q.    There's a thousand.
17          So, if we wanted to know what it is per
18 gram, we have to multiply this times a thousand,
19 correct? Do we want to know what it is per gram?
20    A.    Yeah, 107,000.
21    Q.    And it's tremolite, right, tremolite
22 actinolite, right?
23    A.    Yes. It doesn't say asbestos. It's
24 just described as tremolite actinolite.
25    Q.    Okay. Well, according to Johnson &

1 Johnson's definitions, if it's fibrous, right,
2 fibrous versions of the amphiboles including
3 tremolite it's asbestos, right?
4     A.    If it's in the fibrous form, it could
5 be asbestos.
6     Q.    Okay. And he found --
7     A.    They tested in the fibrous form as
8 opposed to a fiber.
9     Q.    Okay. And by light microscopy he
10 found 107 of them, right?
11    A.    He found 107 fibers, yes.
12    Q.    Fibers, right?
13    A.    But he doesn't say they're asbestos
14 fibers. He doesn't describe them as fibrous, which
15 would make them asbestos, according to the J4-1
16 definition.
17    Q.    According to the industry definition
18 that came out three years after this, right?
19    A.    It's a microscopic -- microscopist
20 definition to -- if you're going to describe
21 asbestos --
22          MR. PANATIER: I'm going to object to
23 nonresponsive. Move to strike.
24          MS. SULLIVAN: Your Honor, I'm going
25 to object to interrupting his answer. That was

1 responsive.
2          THE COURT: I'm going to strike that
3 response and instruct the witness to please listen
4 to the question being asked and only answer that
5 question.
6          One more time.
7 BY MR. PANATIER:
8     Q.    J4-1, which came out three years
9 after this, right?
10    A.    Yeah, the final version, three
11 years -- I think it's three years. Yeah, three
12 years later.
13    Q.    Why would an analyst for the FDA be
14 using a version that wasn't even invented yet, sir?
15    A.    A version of J4-1?
16    Q.    A method that hadn't been invented
17 yet.
18    A.    I don't know. But it was -- it was
19 certainly in process development at that time.
20    Q.    He would -- and I'm not being
21 hyperbolic here. It might sound like it. But he
22 would literally need a time machine to go and use a
23 method that hadn't been invented yet, right?
24          MS. SULLIVAN: Objection, lawyer
25 argument.

Page 78

1    THE COURT: Counsel, let's --
2    MR. PANATIER: Okay.
3    THE COURT: -- get this back on
4 track.
5    MR. PANATIER: Yes, your Honor.
6 BY MR. PANATIER:
7    Q.    So we've got what he finds.
8    Now, last week -- this is Defense
9 Exhibit 7873. It's in evidence. We saw this.
10    Counsel for Johnson & Johnson showed this
11 document to Dr. Weber.
12    Have you seen this document before? It's
13 not in there. This is a Defense exhibit.
14    A.    I think I have, yes.
15    Q.    Okay. Do you see that up at the top,
16 there's a sample numbered 084-802H, right?
17    A.    Yes.
18    Q.    Do you know what sample 084-802H is?
19    A.    No.
20    Q.    Do you have any idea?
21    A.    No.
22    Q.    In fact, under "product" it says,
23 "Johnson's Baby Powder," right?
24    A.    That's what someone's written.
25    Q.    Right. And then here it's crossed

Page 79

1 out. It says "J&J baby PROD," maybe, product. Seal
2 date 6 -- or 8/8/74, right?
3    A.    Yes.
4    Q.    So the seal on it had a date,
5 August 8th, '74, right?
6    A.    I don't know whether the seal is on
7 the product or that was the bag it came in. I don't
8 know.
9    Q.    Yeah, right. We don't know what the
10 seal was on, right?
11    A.    What seal was, no.
12    Q.    Okay. But it says, "Johnson's Baby
13 Powder" and then the sample is "084-802H."
14    You told us you don't know what sample that
15 is or if it's just the designation for this sample,
16 correct?
17    A.    Correct.
18    Q.    You have no basis to say that this
19 was Shower to Shower, not Johnson's Baby Powder as
20 is written here, correct?
21    A.    Not without information, no.
22    Q.    Right. And let's look at the bottom.
23 This sample was reported September 18th, 1974. Do
24 you see that?
25    A.    I do, yes.

Page 80

1    Q.    Signed by John Stewart, right?
2    A.    Yes.
3    Q.    Now, last week Counsel for Johnson &
4 Johnson suggested that this was the actual analysis
5 for Shower to Shower.
6    Did you know that Counsel for Johnson &
7 Johnson did that?
8    A.    No.
9    Q.    Okay. This couldn't have been the
10 analysis for Shower to Shower sample 84, could it
11 have?
12    A.    Well, that's dated -- sorry, remind
13 me, September '74.
14    Q.    And this says as of, right here, as
15 of December 21st, 1973 samples, Lewin's
16 identification 84 were analyzed for mineral content,
17 correct?
18    A.    Yes.
19    Q.    So sample 84 Shower to Shower had
20 been analyzed ten months before whatever this is was
21 sampled, correct?
22    A.    Well, before that report was done.
23    Q.    Right.
24    A.    That may have been a second version
25 of the first one. I don't know. I'm not going to

Page 81

1 speculate. There's a ten-month difference.
2    Q.    Is there ten months between
3 December 1973 when they say they did the analysis on
4 sample 84 and this sample which is identified as
5 "baby powder" in September of '74?
6    A.    Well, there's ten months' -- ten
7 months' difference.
8    Q.    And I think I might have said
9 December '74 -- December '73, right?
10    A.    Yes, ten months' difference.
11    Q.    You have no basis to say that this
12 count sheet shown to the jury last week is Shower to
13 Shower, do you?
14    A.    I don't have that basis unless there
15 is other documentation to validate it.
16    MR. PANATIER: This will be
17 Exhibit 3441, your Honor.
18    THE COURT: Thank you.
19    MR. PANATIER: Yes, your Honor.
20 BY MR. PANATIER:
21    Q.    Here you go, Doctor. Do you see that
22 this is -- it says, "Italian medicated Grantham talc
23 from R. Rolle's files"?
24    A.    Yes.
25    Q.    That's a Robert Rolle?

21 (Pages 78 - 81)

1    A.    Yes.

2    Q.    At J&J, right?

3    A.    (No response.)

4    Q.    And do you see on the next page the
5  Bates Stamps?  These are J&J Bates Stamps, right?

6    A.    Yes.

7    Q.    These are handwritten notes, correct?

8    A.    Yes.

9    Q.    And just so we get our bearings,
10  they're entitled, "Lewin samples of Shower to Shower
11  August 10, 1972," right?

12    A.    Yes.

13        MR. PANATIER:  We offer these into
14  evidence.

15        MS. SULLIVAN:  No objection.

16        THE COURT:  Admitted.

17        (Plaintiff's Exhibit 3441 was moved
18        into evidence.)

19  BY MR. PANATIER:

20    Q.    Alright.  You see it's, "Italian
21  medicated Grantham talc," right, on the cover?

22    A.    Yes, there are three products there,
23  Italian talc, medicated talc and Grantham talc.

24    Q.    And then there are some handwritten
25  notes about Lewin's samples of Shower to Shower,

1  August 10, 1972.

2    This is an internal document, correct?

3    A.    Yes.

4    Q.    About one fiber or of -- I don't know
5  whether that says "or"...

6    But "about one fiber or rod/needle every 500
7  particles," correct?

8    A.    Yes, there's a rod every 500
9  particles, yes.

10    Q.    Well, one fiber or rod/needle, right?

11    A.    Yes.

12    Q.    And about one-third of these are
13  tremolite, two-thirds or roll talc or talc shards,
14  right?

15    A.    Yeah, you read what is written.

16    Q.    So Dr. Rolle -- so this is Shower to
17  Shower, sample 84 Lewin.  This here was the FDA.
18  And then Rolle, I think, we have him on our list
19  here.

20    Yeah, Robert Rolle, Assistant
21  Director Analytical Research, right?

22    A.    Yes.

23    Q.    Okay.  In the same sample, Lewin
24  Shower to Shower, he identifies "fiber rod/needle
25  one per 500 particles," right?

1    A.    Yeah, fiber or rod, yes.

2    Q.    Right.  And you can see that it
3  says --

4        MS. SULLIVAN:  Your Honor, just in
5  the interest -- for the sake of completeness, if I
6  can have the third line down on that document read
7  to the Jury.

8    Q.    "No crinkled fibers or small bundles
9  of chrysotile asbestos were observed."

10        MS. SULLIVAN:  Thank you.

11    Q.    He found tremolite, he didn't see
12  chrysotile?

13    A.    He found, yeah, tremolite described
14  as rods, fiber rod, yeah.

15    Q.    And he's using plain polarized light,
16  right?

17    A.    (No response.)

18    Q.    If you look down paragraph starting
19  "observations"?

20    A.    Yes.  Yes, he was using polarized
21  light microscopy, yes.

22    Q.    Okay.  And so that's the same method
23  that was discussed in the Lewin meeting that the FDA
24  had with Dr. Lewin that he would confirm with
25  polarized light, right, or optical microscopy,

1  correct?

2    A.    Well, this states polarized light
3  microscopy.

4    Q.    And that is optical microscopy?

5    A.    There are two kinds of optical
6  microscopy.

7    Q.    PLM?

8    A.    PLM and just the regular one that you
9  have at school, yeah.

10    Q.    Right.

11    A.    Yeah.

12    Q.    Is Rolle using optical microscopy?

13    A.    He's using optical microscopy,
14  polarized light --

15    Q.    Right.

16    A.    -- microscopy.

17    Q.    And just like Dr. Lewin, he doesn't
18  see any chrysotile with it, does he?

19    A.    No.

20    Q.    Okay.  But he does see tremolite as
21  he describes it, "fiber" or "rod/needle," right?

22    A.    Yes.

23    Q.    "One every 500 particles," true?

24    A.    On that particular sample is what he
25  sees, yes.

22 (Pages 82 - 85)

Page 86

1    Q.    Okay.  And I think this is -- this is
2  perhaps illustrative for us.  It says, "particle
3  density."
4      So he's looking at a very small area, right?
5    A.    Yes.
6    Q.    And that's an 18 square millimeter
7  area, right?
8    A.    Yes.
9    Q.    So what would you say, is that a
10 little bit more than four millimeters by four
11 millimeters, something like that, that would get us
12 to 16?
13   A.    No 18 millimeters square, means 18
14 millimeters by 18 millimeters.
15   Q.    I don't think it does.
16   A.    No.  18 square millimeters would be 6
17 by 3.
18   Q.    Right.  That's what he's looking at.
19   A.    No, it isn't.  He's looking 18
20 millimeters square, which is a grid square.
21   Q.    Okay.  So you're saying he's looking
22 at 18 by 18, right?
23   A.    Well, that's what I'm reading, yes.
24   Q.    Okay.  I'm not going to argue about
25 whether it was 18 square or 18 square millimeters.

Page 87

1        We know it was a small area, right?
2    A.    Yes.
3    Q.    And he said that there were 125,000
4  particles in that area, right?
5    A.    Yes.
6    Q.    And that one of every 500 was
7  tremolite, right?
8    A.    That's what he reported on that
9  particular sample.
10   Q.    One out of every 500 --
11   A.    Yes.
12   Q.    -- right?
13     So how many times does 500 go into 125,000?
14 Here, I have a calculator on my phone.  Okay.  So
15 I'll just divide, right, I would just divide 125,000
16 divided by 500, correct?  I get 250.
17   A.    Sounds right.
18   Q.    Okay.  So that would be in the area
19 he looked at.  That would equate to about 250
20 tremolite.  And we'll do fiber/rod/needle, right?
21   A.    Yes.
22   Q.    Did his analysis go to the FDA?
23   A.    I don't know.  This is a -- it looks
24 like a hundred page from an exercise book.
25   Q.    They also looked at -- if you go to

Page 88

1  the last page, they also looked at their own
2  retained samples of Shower to Shower.  Do you see
3  that?
4    A.    I do, yes.
5    Q.    Right.  So they have -- so they had
6  it looks like from February of '70 through August of
7  1971, right?
8    A.    Yes.  They report trace tremolite.
9    Q.    And, again, he says, "no chrysotile
10 observed," true?
11   A.    Yes.
12   Q.    But he has 1, 2, 3, 4 results where
13 he identifies tremolite, correct?
14   A.    Trace tremolite, yes.
15   Q.    Yeah.  Did this go to the FDA?
16   A.    I don't know.  This is someone's
17 handwritten notes.  It may well have gone into a
18 typed-up report.  But this is just handwritten
19 notes.
20     MR. PANATIER:  Your Honor, I'm moving
21 on to another topic, if you we like to do a break
22 now.
23     THE COURT:  This would be a good
24 time.  Thank you.
25     Members of the Jury, we're going to

Page 89

1  take a 15-minute break.  Please remember all the
2  instructions I've provided to you.  No discussions
3  with regard to this case including testimony you've
4  heard this morning.  Please be ready to be back up
5  here -- be ready to come back up at five of.  No
6  research of any kind whatsoever.  Thank you.
7     And then at five of just be
8  downstairs, bring them up and I will meet you in the
9  hallway.
10     THE COURT OFFICER:  Jury exiting.
11     (Jury exits.)
12     (There is a discussion off the
13   record.)
14     THE COURT:  So we're off the record.
15     (Recess taken 10:39 to 11:01 a.m.)
16     (Jury enters.)
17     THE COURT:  Please be seated.  Make
18 sure cell phones are turned off.
19     You may continue, Mr. Panatier.
20     MR. PANATIER:  Thank you, your Honor.
21 BY MR. PANATIER:
22   Q.    Mr. Hopkins, Johnson & Johnson was
23 aware that in the early 1970s a company called RT
24 Vanderbilt was selling talc that had tremolite in
25 it, correct?

Page 90

1    A.    There was a company called RT
2 Vanderbilt, but sold -- I think they owned a talc
3 mine in New York State, yes.
4    Q.    Okay.  So they were a company that
5 was selling talc, right?
6    A.    Yes.
7    Q.    Okay.  And you're aware that they
8 were claiming that the tremolite in their talc was
9 not asbestos or nonasbestiform, right?
10    A.    I'm not familiar with RT Vanderbilt.
11 I know that they had talc mine in New York State.
12 Johnson & Johnson never used it.  But I'm aware that
13 they did have a talc mine.
14    MR. PANATIER:  Okay.  This is
15 Exhibit 2450.
16    Q.    And if you would turn to April 13th,
17 1973 in your binder.  This is a document I've shown
18 you before.
19    THE COURT:  I'm sorry, Counsel,
20 what's the date?
21    MR. PANATIER:  April 13, 1973, your
22 Honor.
23    THE COURT:  Thank you.
24 BY MR. PANATIER:
25    Q.    You found that, sir?

Page 91

1    A.    Yes.
2    Q.    Okay.  This is a Johnson & Johnson
3 memo with the date I've just stated, correct?
4    A.    Yes.
5    Q.    From Bill Ashton, right?
6    A.    Yes.
7    MR. PANATIER:  I'm going to offer
8 this into evidence your Honor 2450.
9    MS. SULLIVAN:  No objection.
10    THE COURT:  So admitted.
11    (Plaintiff's Exhibit 2450 was moved
12    into evidence.)
13 BY MR. PANATIER:
14    Q.    "I attended a meeting with talc
15 manufacturers which R. Bacon of Vanderbilt called
16 had his New York offices yesterday."
17    So Johnson & Johnson met with RT Vanderbilt,
18 right?
19    A.    Yes.
20    Q.    Vanderbilt's idea was to try to
21 elicit and unify presentations, which talc firms
22 might present to the US Bureau of Mines at the Talc
23 Safety Symposium scheduled for May 8th in Washington
24 D.C.
25    And the part I'm interested in is

Page 92

1 this part down below.  "Only a couple broader
2 aspects were made reasonably clear.  One, Johns
3 Manville.  Now Johns Manville was a pretty
4 well-known asbestos miner manufacturer of products
5 right?
6    A.    I've heard of them, yes, yes.
7    Q.    "Johns Manville is going to take the
8 position that tremolite is an asbestos mineral and
9 they will not go along with the type of science
10 which Vanderbilt has been indicating aimed at
11 confusing the mineralogy of talc."  Right, isn't
12 that what Mr. Ashton wrote there?
13    A.    You've read what was written.
14    Q.    That Vanderbilt tried to confuse the
15 mineralogy of talc, true?
16    A.    Well, that was Vanderbilt's --
17 whatever Vanderbilt were doing, yeah.
18    Q.    Okay.
19    A.    I can't speak for Vanderbilt.
20    Q.    We're going to go from that document
21 to the next one.
22    The next one is dated April 24th, which is
23 11 days later.  And this is Exhibit 2452.  So
24 April 24th is what you're looking for, sir, 1973.
25 You found that?

Page 93

1    A.    Yes.
2    Q.    Okay.  And that is Plaintiff's
3 Exhibit 2452.  This is another J&J memo, right?
4    A.    Yes.
5    MR. PANATIER:  Okay.  We offer this
6 into evidence, your Honor.
7    MS. SULLIVAN:  No objection.
8    THE COURT:  So admitted.
9    (Plaintiff's Exhibit 2452 was moved
10    into evidence.)
11    Q.    11 days later this is a memo from
12 Mr. Nashed, right?
13    A.    Yes.
14    Q.    "Mr. Norwood said he followed my
15 advice to adopt the attitude that Pfizer is there to
16 see what they can do to help FDA in methodology.  He
17 also followed my advice and did not mention that he
18 had been talking to Johnson & Johnson."
19    And by the way, sorry, I didn't read this at
20 first.  "I talked with Mr. Norwood of Pfizer."  So
21 that's who that is, right?
22    A.    It appears to be, yes.
23    Q.    Yeah.  On the phone today to touch
24 base on their current activities in their views of
25 Vanderbilt and the Bureau of Mines Meeting."

24 (Pages 90 - 93)

1 Alright.  So sorry I didn't give us that framework,
2 but now we have it.
3      A.     Yes.
4      Q.     He said that, "subsequent to the
5 meeting they have been informed by Sherwin Williams
6 that they will discontinue use of New York talc
7 because of their feeling that tremolite may be a
8 problem, i.e., Vanderbilt's story was not accepted."
9 Do you see that?
10      A.     Yes.  Yes, you read what is written.
11      Q.     "Bureau of Mines Meeting.  Mr.
12 Norwood expressed the view that Vanderbilt is acting
13 very rationally in raising the question on talc
14 safety and he agreed that they are desperate if they
15 lose their tremolite is safe argument.  They will be
16 out of the talc business and, therefore, would not
17 be interested in defending safety of talc, per se.
18 He felt that questions on safety of talc fibers
19 other than tremolite could reflect on the whole talc
20 industry.  He thought Vanderbilt's defense of
21 tremolite is very weak and that the meeting at the
22 Bureau of Mines is bound to raise problems for the
23 talc industry.  Therefore, they've decided to avoid
24 all involvement with Vanderbilt."
25          You're aware that Vanderbilt was

1 trying to argue that the tremolite in their talc was
2 not an issue, correct?
3      A.     Well, I can't speak for Vanderbilt.
4 They're a separate company.  But you read what was
5 written.
6      Q.     They were trying to say that their
7 tremolite was not asbestos, correct?
8      A.     Well, you read what is written.  And
9 again, I'm not speaking for Vanderbilt.  They're a
10 separate company and this quotes what they were
11 saying.
12      Q.     Okay.  Dr. Nashed reports, "I called
13 Pfizer today to determine FDA's attitude toward
14 microscopy.  Mr. Stanley, Mr. Norwood's associate,
15 said that the FDA microscopist was of the opinion
16 that optical microscopy was not suitable as a
17 control method."
18          Now, sir, this is April 24, 1973.
19 This is right around the time that Lewin's second
20 report is coming out, a confirmation of his results
21 using optical microscopy, correct?
22      A.     It describes the word "optical
23 microscopy."  It doesn't break it down as to
24 polarized or regular.
25      Q.     Well, and neither does this, does it?

1      A.     No.  You have read what is written.
2      Q.     Let's go to the next one.  This
3 should be May 2nd, 1973.  So this is a couple weeks
4 later.  This is Exhibit 2455, May 2nd, 1973, sir.
5 Let me know when you've found that.
6      A.     Yeah, we've got it.  Yeah, we're
7 there.
8      Q.     Got it?  Okay.
9      A.     Yeah.
10      Q.     Another J&J memo, right?
11      A.     Yes.
12      Q.     This one is from Nashed again, right?
13      A.     Yes.
14          MR. PANATIER:  We offer Exhibit 2455
15 into evidence.
16          MS. SULLIVAN:  No objection.
17          THE COURT:  Admitted.
18          (Plaintiff's Exhibit 2455 was moved
19     into evidence.)
20 BY MR. PANATIER:
21      Q.     This is a meeting between Johns
22 Manville and J&J, right?
23      A.     Yes.
24      Q.     Okay.  "The Johns Manville group
25 agreed with us that the efforts by Vanderbilt were

1 somewhat unsophisticated and, in general, they
2 expect that the Bureau of Mines will adopt the
3 asbestos standards for tremblotic talc and fibrous
4 talc.  Fibrous talc, according to the ACGIH it's
5 talc containing asbestos."
6          Okay.  And you can see that there's
7 several presentations that are given, right?
8      A.     Yes.
9      Q.     Okay.  "We," that's Johnson &
10 Johnson, right?
11      A.     Yes.
12      Q.     "We told the Johns Manville group
13 that our efforts have been mainly directed to the
14 FDA on cosmetic uses of talc.  We outlined in the
15 status of the safety of cosmetic talc."
16          And they go through what they have done and
17 some of which you and I have discussed, correct?
18      A.     Yes.
19      Q.     Okay.  Let's go to the last page.
20 "They saw no chance of success for Vanderbilt
21 claiming tremolite was not be asbestos," right?
22      A.     You read what is written.
23      Q.     That's 1973, 46 years ago, right?
24      A.     Yes, that's what -- that's what Johns
25 Manville stated.

1     Q.     Right.  Vanderbilt was trying to
2  claim that tremolite was not asbestos and they saw
3  no chance of success for them doing that, right?
4     A.     Johns Mansville stated they saw no
5  chance of success for Vanderbilt claiming tremolite
6  not being asbestos.
7     Q.     For the past two days whenever I have
8  shown you a reference to fibers of tremolite,
9  needles of tremolite, rods of tremolite, you said
10  that's not asbestos, haven't you?
11     A.     Unless -- unless it's proven to be in
12  the asbestiform version, you cannot say that the
13  tremolite when it's described as rods is asbestos.
14     Q.     MR. PANATIER:  Your Honor, I object
15  to nonresponsive.
16     THE COURT:  Objection sustained.
17     MR. PANATIER:  Move to strike.
18     THE COURT:  Stricken.
19  BY MR. PANATIER:
20     Q.     Sir, for the past two days anytime
21  I've shown you a needle, fiber, fibers or rods of
22  tremolite you said it's not asbestos; is that
23  correct?
24     A.     Yes, that is correct.
25     Q.     Thank you, sir, okay.

1     Next document is going to be
2  April 27th -- I'm sorry, April 19th -- yeah,
3  April 19, 1973.  This is Exhibit 2451.
4     Have you found that one, sir?
5     A.     Yes.
6     Q.     Alright.  And do you see that that is
7  a memo from David H. Hammer to Rolle and then it's
8  marked out and they marked in someone else's
9  initials, right?
10     A.     Yes.
11     Q.     Okay.  That's a Johnson & Johnson
12  memo, true?
13     A.     Yes.
14     Q.     It's CC'd to about nine people?
15     A.     Yeah.
16     Q.     Right?
17     MR. PANATIER:  Your Honor, we offer
18  Exhibit 2451 into evidence.
19     MS. SULLIVAN:  No objection.
20     THE COURT:  Admitted.
21     (Plaintiff's Exhibit 2451 was moved
22     into evidence.)
23  BY MR. PANATIER:
24     Q.     Sir, do you see that this is
25  "dispersion staining examination of retained samples

1  of Johnson's Baby Powder"?
2     A.     Yes.
3     Q.     It says "25 samples of Johnson's Baby
4  Powder representing retained samples."
5     Those are samples, by the way, that are held
6  back by the company in case they want to look at
7  what was in a certain lot at a certain time,
8  correct?
9     A.     "A retained sample" is one you hold
10  back in case there is a question on it, if someone
11  said it irritated my skin or whatever.  You keep it
12  in the -- in a cupboard until you don't need it.
13     Q.     You can go back and look at it?
14     A.     Yeah.
15     Q.     "Retained samples from both ESDP" --
16  and what does "ESDP" stand for?
17     A.     It stands -- it's the place where
18  they manufactured -- Eastern Surgical Dressings
19  Plant, just down the road here.
20     Q.     "Both ESDP and Chicago facilities
21  were examined microscopically by the dispersion
22  staining technique for the presence of tremolite.
23  Four of these samples are suspected of containing
24  tremolite based on the finding of 1 or 2 fibers per
25  sample, which satisfy the color/morphology

1  criteria."
2     Now, they're just looking for
3  tremolite, right?
4     A.     Yeah, that would appear to be what
5  the memo is about.
6     Q.     It doesn't say they're looking for
7  tremolite asbestos, right?
8     A.     No, it's just -- the memo states what
9  it states.
10     Q.     But according to you, the presence of
11  tremolite is not a problem, it's tremolite asbestos
12  that's the problem?
13     A.     Tremolite asbestos would be a
14  problem.
15     Q.     Is tremolite a problem?
16     A.     It's asbestos, no.
17     Q.     But yet here in 1973 they're
18  investigating the retained samples for tremolite,
19  right?
20     A.     Right, appears to be, yes.
21     Q.     Not a problem, right?
22     A.     The microscopist is looking at those
23  samples.
24     Q.     Okay.  So those are the samples and
25  let's look at the results.  This will be April 27,

26 (Pages 98 - 101)

1 '73. It's likely the next document in your folder.
2 It's Exhibit 2454.
3      A.    Yes.
4      Q.    Do you see that?
5      A.    I have that, yeah.
6      Q.    Okay.  And are those the results of
7 those retained samples, sir?
8      A.    They appear to be.
9      Q.    Okay.  You can look at the bottom of
10 this document and you can see that the samples match
11 --
12         MR. PANATIER:  Your Honor, we offer
13 this into evidence, 2454.
14         MS. SULLIVAN:  No objection.
15         THE COURT:  Admitted.
16         (Plaintiff's Exhibit 2454 was moved
17      into evidence.)
18      Q.    And, sir, you can see the samples are
19 here and they match.  Do you see that?
20      A.    Yes.
21      Q.    Okay.  So if we look here at the
22 results, "petrographic optical microscopy revealed
23 trace amounts of amphibole in each of the above
24 samples.  Based on the numbers and particles
25 scanned, we estimate trace amounts to be .001 to .01

1 by weight," right?
2      A.    Yeah.
3      Q.    Okay.  And they tell us what the
4 shape of these particles were and they say
5 "prismatic columnar."  That's mean like a column,
6 right?
7      A.    Yeah, like my pen.
8      Q.    Like your pen.
9      A.    Yeah.
10      Q.    Okay.  "Parallel sided," right?
11      A.    Yes.
12      Q.    Rods?
13      A.    Yeah.
14         And see how it says, "size from 20 by
15 4 microns," that would be 5-to-1, would it not?
16      A.    Yes.
17      Q.    And 20 by 30.  What would that be
18 about 6 or 7-to-1?
19      A.    200 by 30, isn't it?  Yeah, 200 by
20 30.
21      Q.    I'm sorry, 200 by 30.  That's my --
22 my error.  That would be about 6 or 7-to-1?
23      A.    Yes, yes.
24      Q.    Right.  The optical properties of the
25 particles are closer to actinolite than tremolite.

1 So they are amphibole particles that they found,
2 right?
3      A.    They're amphiboles, yes.
4      Q.    They are from between 5-to-1 to 6 or
5 7-to-1 in shape, right?
6      A.    Yeah, they're amphibole rods, yeah.
7      Q.    And they are parallel sided, right?
8      A.    Yes.
9      Q.    Alright.  Let's talk about the
10 definition of fiber in Johnson & Johnson.  3-to-1
11 parallel sides, right?
12      A.    That's that -- that's that definition
13 you have on that chart.
14      Q.    That's the analytical definition that
15 Johnson & Johnson uses to define asbestiform
16 minerals to find asbestiform minerals in their talc,
17 right?
18      A.    It is not.  It is the definition
19 that's written on the specification.  It is not the
20 system for the --
21         MR. PANATIER:  Your Honor, I object
22 as nonresponsive, your Honor.
23         MS. SULLIVAN:  I think he's answering
24 the question.
25         THE COURT:  Objection sustained.

1 BY MR. PANATIER:
2      Q.     Here's the question I'm asking.
3         "3-to-1 parallel sides" is the
4 definition of "fiber" used by Johnson & Johnson in
5 testing method 7024 to define asbestiform minerals
6 in the talc, correct?
7      A.     I don't see where asbestiform.  I...
8      Q.     Sir, you and I have already been over
9 this.  This is in evidence testing method 7024.
10 Look at the board.  Elongated particle, right?
11      A.     Yes.  On that definition TM7024 that
12 is what is stated.
13      Q.     Okay.  And look, we have elongated
14 particles, do we not?
15      A.    We do.
16      Q.     We have longer than 3-to-1 aspect
17 ratios, correct?
18      A.    Yes.
19      Q.     We have parallel sides, correct?
20      A.    Yes.
21      Q.     By this definition, these are
22 asbestiform minerals by Johnson & Johnson's own
23 definition?
24      A.     By that definition but not by the
25 microscopist's.

27 (Pages 102 - 105)

Page 106

1    Q.    Just by Johnson & Johnson's
2 definition, right?
3    A.    By that -- what you've copied down
4 there, yes.
5    Q.    You know I didn't write that
6 document, right?
7    A.    No, you -- as you say, you just
8 copied it down.  That's okay.
9    Q.    So those were four samples where they
10 found actinolite tremolite, right?
11    A.    They found actinolite tremolite rods.
12    Q.    Do you know if that went to the FDA?
13    A.    I don't know.
14    Q.    Okay.  The next document will be
15 dated January 18, 1974.  So it should be a few
16 documents before what we just went through, I think.
17 This is Exhibit 2506.
18    A.    '74 or '73?
19    Q.    1974, January 18, '74.  Let me know
20 if you have any trouble finding it.
21         THE COURT:  It's in Binder 2.
22         MR. PANATIER:  Binder 2.
23    Q.    I think you put it on the ground.
24    A.    Oh, that's where it is.
25    Q.    These documents will not hide from

Page 107

1 you.
2    A.    You need to give me a bigger table.
3 Right, '74, give me the...
4    Q.    Yes, January 18, '74.
5    A.    Okay, we have that.
6    Q.    Have you found that?
7    A.    Yes.
8    Q.    Okay.  That's a Johnson & Johnson
9 memo, correct, sir?
10    A.    Yes.
11    Q.    It is from Hildick-Smith and Nashed,
12 right?
13    A.    Yes.
14    Q.    Okay.  Now, this is --
15         MR. PANATIER:  We offer 2506 into
16 evidence.
17         MS. SULLIVAN:  No objection.
18         THE COURT:  Admitted.
19         (Plaintiff's Exhibit 2506 was moved
20      into evidence.)
21 BY MR. PANATIER:
22    Q.    This is another meeting with the FDA.
23 The meeting was January 16th and the memo is
24 January 18th, right?
25    A.    Yes.

Page 108

1    Q.    The FDA asks Johnson & Johnson to do
2 a calculation about the amount of asbestos that they
3 believe to be safe in baby powder, correct?
4    A.    They asked Johnson & Johnson to do a
5 calculation, a mathematical calculation, yes.
6    Q.    And when they said, can you do a
7 mathematical calculation that tells us how much
8 asbestos is safe in baby powder, I assume Johnson &
9 Johnson said zero, right?
10    A.    Well, that wasn't the exact question
11 that was asked.  They were asked to give a question
12 -- sorry.  They were asked to give a mathematical
13 calculation as to what may be present if there was a
14 certain amount of asbestos there.
15    Q.    When they were asked by the FDA what
16 amount is safe in baby powder, did they say zero
17 because our policy is zero tolerance?
18    A.    I don't know whether they said that.
19 But if FDA -- if the FDA asks you to do something.
20    Q.    Sir, if you don't know, you don't
21 know, okay?
22    A.    I don't know.
23    Q.    Okay.
24    A.    I don't know.
25    Q.    That's fine.

Page 109

1         Okay.  Now, Eiermann, Eiermann, he is
2 at this meeting, correct?
3    A.    He was one of several FDA people,
4 yes.
5    Q.    Because I've been wanting to ask you
6 about him, but I keep forgetting.
7         Eiermann, he's at the FDA, right?
8    A.    Yes.
9    Q.    But there's an asterisk by his name,
10 right?
11    A.    Yes.
12    Q.    And if we go to the bottom, it says
13 he's a former Johnson & Johnson employee in Brazil,
14 right?
15    A.    That was one of his previous
16 employers, Johnson & Johnson Brazil, yes.
17    Q.    And now he's with the FDA, right?
18    A.    Yes, yes, no secret.
19    Q.    So let's get to that calculation.  So
20 see where Johnson & Johnson says here, "Our very
21 preliminary calculation indicates that substantial
22 asbestos can be allowed safely in a baby powder"?
23 Did they say that to the FDA?
24    A.    That was in response to a question.
25    Q.    I know.

28 (Pages 106 - 109)

Page 110

1    A.    To say if there are 1 percent, how
2 much would that --
3          MR. PANATIER: Your Honor, I object
4 as nonresponsive.
5    A.    Okay. That's what is written.
6          THE COURT: Objection is sustained.
7    A.    That is what is written.
8    Q.    Okay. Because that's all I asked
9 you.
10   A.    That is what is written, yes.
11   Q.    Is that what was said to the FDA?
12   A.    That is what is written, yes.
13   Q.    And Eiermann -- Wodicka, Mr. Wodicka
14 appeared skeptical of Dr. Eiermann's approach to the
15 problem because it was Eiermann, the former J&J
16 employee, who had asked them to do the calculation,
17 right?
18   A.    He had asked him to do a calculation
19 based on certain hypothesis, yes.
20   Q.    And what Wodicka says is, he implied
21 that what is safe for a miner may not be safe for a
22 baby, right?
23   A.    Yes, I wouldn't disagree.
24   Q.    Okay. Has Johnson & Johnson ever
25 told the public what they told the FDA in 1974 that

Page 111

1 they believed that substantial asbestos can be
2 safely allowed in a baby powder?
3    A.    What they actually told FDA --
4          MR. PANATIER: Your Honor -- your
5 Honor, I'm objecting, nonresponsive.
6    A.    In that case, no.
7          MR. PANATIER: I would ask the
8 witness to answer the question.
9    Q.    No, they have not, correct?
10   A.    They have not stated that sentence
11 that was written in this report.
12   Q.    Okay. What Johnson & Johnson has
13 always told the public is zero tolerance, right?
14   A.    And that's still the case.
15   Q.    Do you believe it was the case right
16 here when they told this to the FDA?
17   A.    Yes.
18   Q.    Okay. And then Dr. Fuller of Johnson
19 & Johnson stressed that Johnson & Johnson has a
20 policy of full cooperation with the FDA and that if
21 the results of any scientific studies show any
22 question of safety of talc, Johnson & Johnson will
23 not hesitate to take it off the market, right?
24   A.    Yes.
25   Q.    Sir, don't you agree that just based

Page 112

1 on what we've gone through so far, what's in our
2 inbox, was enough to present the question about the
3 safety of their talc?
4    A.    No.
5    Q.    Okay. But if there ever was a
6 question, they should take it off the market, right?
7    A.    If there was a genuine question
8 relating to safety, yes.
9    Q.    So, if there was "a genuine
10 question."
11         And what do you mean by "a genuine
12 question"?
13   A.    The question where the answer is that
14 there's a significant problem or a problem. In
15 other words, you can have a question, I can have a
16 question, but it has to be one where there is
17 evidence to say this question is valid.
18   Q.    So, sir, does Johnson & Johnson agree
19 that the consumers of its products should be able to
20 make their own health and safety decisions about
21 whether or not to use that product?
22   A.    Yes.
23   Q.    And does Johnson & Johnson agree that
24 they should provide full information to those
25 people, those consumers about the products that they

Page 113

1 are manufacturing and selling?
2    A.    Yes.
3    Q.    And that Johnson & Johnson shouldn't
4 make risk decisions for consumers, consumers should
5 be able to make their own risk decisions, right?
6    A.    Yes.
7    Q.    Okay. So far in everything that we
8 have gone through where we found fibers of
9 tremolite, needles of tremolite, rods of tremolite,
10 none of that was provided to the public, was it?
11   A.    No.
12   Q.    Okay.
13   A.    For good reason.
14   Q.    Do you know whether or not the
15 consumers who were purchasing it thought it was a
16 good reason?
17   A.    I cannot speak or hypothesize what
18 consumers think.
19   Q.    Let's go to the next document. This
20 one will be 1974, April 24, 1974. There were two
21 primary ore bodies in the '70s which Johnson &
22 Johnson was using.
23         The biggest, the one that produced the most
24 talc was Hammondsville Cosmetic, correct?
25   A.    The Hammondsville mine produced

1 cosmetic talc, yes.

2    Q.    Okay.  And the other one was

3 Argonaut, that was qualified in '74 or '75 and went

4 open in about '76; is that true?

5    A.    It was never used commercially until

6 around about 1995 for cosmetic talc.

7    Q.    It was qualified in the '70s?

8    A.    It was qualified in the '70s, yes,

9 but it wasn't used in cosmetic talc until the --

10 '95, '96.

11    Q.    Okay, alright.  And we'll address

12 that a little bit later.

13     They qualified it 15 to 20 years earlier,

14 right?

15    A.    Yes, but they had sufficient in the

16 Hammondsville mine not to need it.

17    Q.    And when they qualified the Argonaut

18 ore body, Johnson & Johnson knew it contained

19 chrysotile asbestos, correct?

20    A.    No.

21    Q.    No, alright.

22     Let's look at this document dated April 24,

23 1974, okay?  Can you find that one, sir, please?

24    A.    Yes.

25    Q.    Have you found that?

1    A.    Yes.

2    Q.    Okay.  You've got it.  This is a

3 McCrone report entitled, "Examination of Talc

4 Samples Argonaut Ore Body," right?

5    A.    Yes.  This is -- they looked at 38

6 core samples from a new ore body.

7    Q.    One second, step by step.

8    A.    Yes.

9    Q.    Hold on.  It is what I represented it

10 was, right?

11    A.    It's -- it's examination of samples.

12    Q.    Right.

13    A.    Yes.

14    Q.    I'm just getting the title, okay.

15 April 24, 1974, true?

16    A.    Yes.

17    Q.    Okay.

18     MR. PANATIER:  Your Honor, we offer

19 this into evidence.

20     MS. SULLIVAN:  No objection.

21     THE COURT:  Admitted.

22     (Plaintiff's Exhibit 2049 was moved

23     into evidence.)

24 BY MR. PANATIER:

25    Q.    Now, I asked you if Johnson & Johnson

1 knew there was chrysotile asbestos in the Argonaut

2 ore body, right?  Right?

3    A.    Which Argonaut ore body?  There are

4 two Argonaut mines.

5    Q.    What does this say?

6    A.    Well, this describes -- this is a

7 generic one talking about the Argonaut ore body.

8    Q.    Are you saying that there is another

9 Argonaut mine or are you saying that through time

10 they pulled from different areas in Argonaut?

11    A.    There are two Argonauts.  There's the

12 main ore body, south Argonaut and the east Argonaut

13    Q.    Okay.  Anyway --

14    A.    That's the ore body which covers many

15 acres.

16    Q.    The question I asked you not one

17 minute ago, was Johnson & Johnson knew there was

18 chrysotile asbestos in the Argonaut ore body and you

19 said no, correct?

20    A.    Not in the -- not in the main ore

21 body.

22    Q.    Can you answer the question.  Did you

23 say yes to my question or did you say no to my

24 question?

25    A.    I said no to your question.

1    Q.    Alright.  Let's look at this

2 document, which is an examination of talc samples

3 from the Argonaut ore body, shall we, okay?

4    A.    From the Argonaut ore body, yes.

5    Q.    Right.  This is the one they were

6 qualifying for baby powder, correct?

7    A.    They were looking at 15 years

8 previously for baby powder as a possibility, yes.

9    Q.    Okay.  "An intensive examination has

10 been made by XRD and electron microscopy of 38 core

11 samples," right?

12    A.    Yes.

13    Q.    "From a new ore body which Windsor

14 Minerals, Inc., are contemplating exploiting.  The

15 examination was undertaken to determine the

16 mineralogical content of core samples and, in

17 particular, whether or not there was any significant

18 content of asbestiform minerals in the ore body.

19 For comparison three core samples from the current

20 ore body were also examined."

21     Now, here's what it says, "The

22 majority of the samples showed no evidence of

23 asbestiform minerals and 15" -- now they did 38,

24 right?

25    A.    Yes.

1    Q.    "Of the 15 that did show an
2 asbestiform mineral, only one exceeded an estimated
3 level of 0005 percent," right?
4    A.    Yes.
5    Q.    Now, you and I discussed first thing
6 yesterday that with tens to hundreds of trillions of
7 particles per bottle, even if it was just 1 trillion
8 and you had .00001 percent, that's still 10 million
9 particles of asbestos, correct?
10    A.    Yes.
11    Q.    Okay.  So by the way, they found
12 asbestos in the Argonaut ore body, right?
13    A.    In one part of the ore body, yes.
14         MS. SULLIVAN:  And, your Honor, just
15 in the interest of completeness, I ask that Counsel
16 read the conclusion of this paragraph right below
17 that.
18         MR. PANATIER:  Right below that?  I
19 haven't gotten there, your Honor.
20         THE COURT:  Whenever you get there.
21         MR. PANATIER:  I will.
22         THE COURT:  Thank you.
23 BY MR. PANATIER:
24    Q.    Now look at what it says.  "It is
25 anticipated that the beneficiation" -- that's the

1 flotation, right?
2    A.    Yes, yes.
3    Q.    (Continuing.) "Of the ore would
4 significantly reduce these low levels and that,
5 therefore, the benefitiated ore would prove free of
6 any asbestiform minerals."
7         So they're saying, if you float it, we think
8 it will take it out, right?
9    A.    Well, that was his opinion in 1974.
10    Q.    That was not true, was it?
11    A.    No.
12    Q.    Okay.  "It is concluded that the ore
13 body is of suitable quality for manufacture of
14 high-grade cosmetic and toiletry products," and that
15 is where the baby powder falls, correct?
16    A.    It would be if it were ever accepted,
17 yes.
18    Q.    Let's look at -- we talked about XRD,
19 right?  "In no instance was any asbestos or
20 potentially asbestiform mineral identified by XRD,"
21 right?
22    A.    That's what is written.
23    Q.    We know XRD does not have very low
24 sensitivity, right?
25    A.    Yes, down about half percent

1 amphibole, yes.
2    Q.    And by the way, when we say "low
3 sensitivity," the lower the better, correct?  If you
4 say high --
5    A.    The stricter --
6    Q.    Right.
7    A.    The stricter the better, yes.
8    Q.    Right.  So, if you say, "high
9 sensitivity," that's actually poorer sensitivity
10 than something that is low sensitivity, right?
11    A.    Yes.
12    Q.    Okay.  But they also did electron
13 microscopy.
14    A.    They did, yes.
15    Q.    It starts there.
16    A.    Yeah.
17    Q.    And they say, "As will be seen from
18 Table 2, only two samples showed a level above 0005
19 the actual figures being 007 and 001 respectively.
20 For chrysotile asbestos plus, approximately,
21 .0001 percent of fibrous tremolite."
22    Q.    Now, right there he's describing the
23 asbestos they found as fibrous tremolite, right?
24    A.    Yes.
25    Q.    Okay.  "Excluding" -- excluding I

1 think is what that word is trying to say -- "these
2 samples, the remaining samples which showed
3 asbestiform in fibers are exhibiting levels which
4 are no higher than has been seen in a raw composite
5 used to manufacture a finished product."
6         Remember that he said, we looked at the
7 Argonaut and we also looked at the ore currently
8 being used, right?
9    A.    Yes.
10    Q.    And that's Hammondsville, correct?
11    A.    Yes.
12    Q.    Okay.  And they say that "The levels
13 of chrysotile observed in the two high samples is
14 only in order of magnitude above this."
15         So what he's saying is, we saw it in
16 the stuff we're using right now and the stuff we saw
17 in the Argonaut stuff that we're testing is too --
18 is an order of magnitude higher than what they're
19 currently using, correct?
20    A.    You're reading what he wrote.
21    Q.    And what I have summarized is
22 accurate, is it not?
23    A.    Well, you're reading or you've
24 summarized what he wrote.
25    Q.    Okay.  He's saying there's chrysotile

31 (Pages 118 - 121)

1 in the Hammondsville ore body, correct?
2    A.    Well, he doesn't actually say that.
3 He doesn't mention the Hammondsville ore body.
4    Q.    That's why you're here, sir, is you
5 and I have established that as the Hammondsville ore
6 body was the then used ore body, correct?
7    A.    The Hammondsville ore body was the
8 then -- was used at that time, yes.
9    Q.    Right.  And he was given a raw
10 composite used to make finished product then,
11 Hammondsville, correct?
12    A.    He was given a raw composite.  It
13 doesn't say it was Hammondsville, but it could have
14 been.
15    Q.    Sir, I don't want to go around in
16 circles with you.
17    A.    Yeah, like I say.
18    Q.    Go back to the beginning and I'll
19 show you if you want to see it.
20    For comparison three core samples
21 from the current ore body were also examined, right?
22    A.    Yes.
23    Q.    Okay.  We know that's Hammondsville,
24 right?
25    A.    It should have been, yes, yes.

1    Q.    Okay.  And what he says is that the
2 chrysotile that they found in the ore body that they
3 were looking to qualify had more chrysotile than the
4 current ore, correct?
5    A.    Well, that's what he's written.
6    Q.    Okay.  Right, that's all I'm asking
7 you, is did he write that?
8    A.    Yeah, he's written that as part of
9 this review to whether or not to use the --
10    Q.    Right.
11    A.    -- Argonaut mines.
12    MS. SULLIVAN:  Counsel, can you read
13 the conclusion.
14    MR. PANATIER:  Sure.
15    Q.    It's already been stated but he says,
16 The level of chrysotile -- "The levels of
17 chrysotile" --
18    MS. SULLIVAN:  The paragraph,
19 Counsel.
20    MR. PANATIER:  You want me to read
21 the bottom paragraph, okay.
22    Q.    "The examine of 41 core samples, 38
23 of them from a new talc ore body using the
24 techniques of X-ray diffraction, electron microscopy
25 and selected area electron refraction have shown

1 that even prior to beneficiation this material is of
2 extremely high grade substantially asbestos free."
3    By the way, we're back to
4 "substantially."
5    MS. SULLIVAN:  Can we read it first,
6 Counsel?
7    MR. PANATIER:  Your Honor, I can --
8    THE COURT:  Stop interrupting,
9 Counsel, he is reading it.
10    Continue.
11    MR. PANATIER:  I'm going to stop here
12 and I will read the rest but I'm going ask a
13 question.
14 BY MR. PANATIER:
15    Q.    "Substantially asbestos free,"
16 doesn't mean "asbestos free," does it?
17    A.    Again, we're going to that argument
18 as to what "substantially" means.  And, you know, I
19 can speculate.  But it reads what it reads
20 "substantially asbestos free."
21    Q.    I don't want to you speculate.
22    A.    Thank you.
23    Q.    I just want you to -- I just want you
24 to -- let's talk commonsense, okay?  Does
25 "substantially asbestos free" mean "asbestos free,"

1 sir?
2    A.    I don't know the context on how this
3 person thought.  What he stated is what he stated.
4    Q.    He already said he found asbestos.
5    A.    What he reads --
6    Q.    Did he say he found asbestos?
7    MS. SULLIVAN:  Your Honor, I'm just
8 going to object.  The Court instructed him to read
9 the conclusion for completeness and he's not doing
10 that.
11    THE COURT:  Overruled.  He is.
12    Q.    Does it say he found asbestos, Dr.
13 Hopkins?
14    A.    In the -- in the summary or the
15 conclusions?
16    Q.    In the summary.
17    A.    What he reads -- what he writes --
18    MR. PANATIER:  I'm going to object to
19 nonresponsive.
20    A.    He doesn't say he found asbestos.
21    Q.    He doesn't say he found asbestos?  It
22 literally says he found chrysotile asbestos in 15
23 samples, doesn't it?
24    A.    That's what -- I thought you were
25 going to read that in the next sentence.  In only

1 two samples --
2     Q.    Wait, wait.
3           MR. PANATIER:  Okay.  Your Honor, I
4 have to object to nonresponsive and move to strike.
5           MS. SULLIVAN:  Objection, your Honor.
6 He's arguing with -- Counsel is arguing with the
7 witness.
8           THE COURT:  Objection overruled.
9           Please listen to the question before
10 you begin to answer and answer only the question
11 being asked.
12          One more time.
13 BY MR. PANATIER:
14    Q.    Did they find asbestos in 15 samples?
15    A.    The claimed to.  He reported.  In
16 those core samples, drill samples, that's what he
17 reported.
18    Q.    And then down here when he describes
19 it as, "substantially asbestos free," that does not
20 mean "asbestos free," can we agree on that?
21    A.    Yes.
22    Q.    Okay.  And he says that, "And of a
23 quality which we associate with cosmetic-grade talc.
24 In only two samples was a level of chrysotile
25 observed which was higher than .0005.  Chrysotile

1 levels of this order of magnitude might well arise
2 during taking and handling of samples," right?
3     A.    That's exactly what is written, yes.
4     Q.    Now, if we actually look at the
5 results, there's XRD in Table 1.  And no positives.
6 There is one questionable for chrysotile, right?
7     A.    Yes.
8     Q.    But when we go to transmission
9 electron microscopy, we have both chrysotile and
10 amphibole in 15 samples, right?
11    A.    Yes, on the core drill samples, yes.
12    Q.    Okay.  Before this time Johnson &
13 Johnson had represented to the FDA that they had
14 never found chrysotile in any of their ores,
15 correct?
16    A.    Not in the -- not in the ores used to
17 make the powder, this ore body evaluation.
18          MR. PANATIER:  Objection
19 nonresponsive, your Honor.
20    A.    Okay.  Not in the ores used to make
21 the powder, period.
22    Q.    Okay.  And when they got this report,
23 when they started using the ore body, okay, in the
24 '90s, did this go to the FDA, that's the question?
25    A.    I don't know.

1     Q.    By the way, since he also said that
2 he found chrysotile in the then current ore body,
3 did that information go to the FDA?
4     A.    I don't know.
5     Q.    Okay.  Let's go to November 10th.
6 This is -- actually, it's dated November 6th, but
7 your tab says November 10, 1974, because that's when
8 the document is signed.  This is Exhibit 2321.  So
9 November 10, 1974.  Do you have that, sir?
10    A.    Yes.
11    Q.    Alright.  And this is one of our FDA
12 FOIA documents.  This is not a great copy, as we've
13 seen from some of the FDA documents.  But this a --
14 can you see it's a memorandum of a meeting
15 November 6th, 1974?
16    A.    Yeah.
17    Q.    Okay.
18    A.    Yes.
19    Q.    And it says, "Between FDA
20 representatives" -- and it has a list -- "and
21 representatives of J&J," right?
22    A.    Yes.
23    Q.    Subject is "General discussion of the
24 talc/asbestos problem," right?
25    A.    Yes.

1           MR PANATIER:  Okay.  Your Honor, we
2 offer Exhibit 2321 into evidence.
3           MS. SULLIVAN:  No objection.
4           THE COURT:  Admitted.
5           (Plaintiff's Exhibit 2321 was moved
6     into evidence.)
7 BY MR. PANATIER:
8     Q.    We're going to try to make this out
9 as best we can.  This is what I'm -- what I want to
10 discuss right here.  Following introductions, "Dr.
11 Nashed had stated that their statistical group had
12 made an estimation of a theoretical safe level of
13 asbestos fiber in a baby talc utilizing the official
14 TLV for asbestos and the data obtained from their
15 experiment on dusting of baby powder."  So I'll stop
16 there.
17          Again, Johnson & Johnson has said publically
18 and said here in this courtroom yesterday there is
19 no known safe level of asbestos exposure, correct?
20    A.    Yes.
21    Q.    Okay.  He further stated that
22 "Johnson & Johnson had examined many cosmetic talc
23 samples and had not detected chrysotile at any
24 level," right?
25    A.    You read what is written.

1    Q.    Okay.  That comes about seven months
2 after April where they analyzed the core samples,
3 right?
4    A.    In the mine that they were beginning
5 to look at, yes.
6    Q.    That's right.
7    A.    Yes.
8    Q.    Correct?  On the back -- we'll it's
9 here.  "He wondered, therefore" -- this is Dr.
10 Nashed -- "if a health hazard does exist involving
11 the presence of chrysotile in cosmetic talcs since
12 their calculation showed that a substantial safety
13 factor can be expected with talc containing
14 1 percent by weight asbestos particles," right?
15    A.    You read what is written.
16    Q.    Okay.  So, again, this is not zero
17 tolerance, correct?
18    A.    No, this is a response to a request
19 from FDA.
20    Q.    Okay.
21    A.    And you read what they wrote when
22 they responded to FDA.
23    Q.    Dr. Eiermann indicated that, "The
24 division of cosmetics technology had carried out a
25 simulated baby dusting experiment and the results

1 seem to differ from the results of Johnson & Johnson
2 by one order of magnitude."
3        Now, an order of magnitude is tenfold,
4 correct?
5    A.    Yes.
6    Q.    Okay.  That's it.  Let's look at
7 July 16, 1976.  Have you found that?
8    A.    Yes, yes.
9    Q.    Johnson & Johnson memo, July 16,
10 1976, Plaintiff's Exhibit 2601.  That's from Alan
11 Marks, right?
12    A.    Yes.
13        MR. PANATIER:  We'll offer this into
14 evidence, your Honor.
15        MS. SULLIVAN:  No objection, your
16 Honor.
17        THE COURT:  Admitted.
18        (Plaintiff's Exhibit 2601 was moved
19     into evidence.)
20 BY MR. PANATIER:
21    Q.    Now, this is a discussion of the
22 Argonaut mine evaluation, correct?
23    A.    Yes.
24    Q.    "Processed talc produced from the
25 Argonaut mineral of Windsor Minerals, Inc., has been

1 shown to be suitable for the production of Johnson's
2 Baby Powder."  So this is July.
3        That's two years and three months after the
4 74 core sample report, right?
5    A.    Yes.
6    Q.    And they are proving it, right?
7    A.    They are proving the areas that were
8 clean, yes.
9    Q.    Oh, I'm sorry, does it say that?
10    A.    Put it the other way around, you
11 would not approve areas.
12        MR. PANATIER:  I'm going to object as
13 nonresponsive, your Honor.
14    A.    No, it does not say that.  It does
15 not say that, no.
16    Q.    It doesn't say we're only approving
17 the clean areas, right?
18    A.    It doesn't that on here, no.
19    Q.    And by the way, when McCrone went out
20 and did the core samples, the core sample
21 representation represented areas of the entire ore
22 body, right?
23    A.    They went over several acres, yes.
24    Q.    If you go to the next page, they talk
25 about McCrone's report from '74, right?

1    A.    Yes.
2    Q.    And it says, "Walter C. McCrone &
3 Associates evaluated 38 ore samples from the
4 Argonaut ore body and found no difference in the
5 qualitative and quantitative presence of asbestiform
6 minerals compared to three samples from
7 Hammondsville ore body," right?
8    A.    That's what is written.
9    Q.    So remember how I asked you?  I said,
10 well, the then current ore being used was
11 Hammondsville, right?
12    A.    Yes.
13    Q.    Well, now we know for sure that's
14 correct, isn't it?
15    A.    That is correct, yes.
16    Q.    And they say that it didn't differ in
17 quantity or quality of the asbestiform minerals
18 present, right?
19    A.    You read what was written.
20    Q.    Right.  So we had the levels that
21 were found and we had the quantity, 15 of 38 that
22 were found, right?
23    A.    Yes.
24    Q.    Okay.  And they're saying it's
25 virtually the same as Hammondsville, right?

34 (Pages 130 - 133)

Page 134

1    A.    Well, obviously, they were taking it
2  from the areas that were asbestos free to meet that.
3    Q.    I'm so sorry, where does it say that?
4    A.    You know, it doesn't say that.
5    Q.    It doesn't, alright.
6    A.    I'm happy to give that information
7  and explanation later.
8    Q.    Okay.  Alright.  You can set that
9  aside, sir, or are you ready to turn to the next
10 page.
11       This will be 9 May 1974.  So it's
12 Exhibit 2525.  So May 9th, 1974.  If you would turn
13 to that, sir.
14       You found that?
15   A.    Yes.
16   Q.    Okay.  And by the way, what McCrone
17 said in their 1974 survey was that the talc they'd
18 sampled, all of it, was suitable for use in the
19 cosmetic products, correct?
20   A.    Did they state that, specifically,
21 or -- for every one of those core samples?
22   Q.    The sample was of the Argonaut ore
23 body, right?
24   A.    The ore body, yes.
25   Q.    It says, "It has concluded the ore

Page 135

1  body is of suitable quality for the manufacture of
2  high-grade cosmetic and toiletry products," correct?
3    A.    That's what they wrote.
4    Q.    They didn't say "the clean part,"
5  right?
6    A.    They didn't say that.
7    Q.    They didn't say the "south part" or
8  the "east part, did they?
9    A.    They didn't say that, no.
10       MS. SULLIVAN:  Your Honor, in the
11 interest of completeness, I ask that Counsel read
12 the back page that he hasn't shown the witness.
13       MR. PANATIER:  What page?
14       MS. SULLIVAN:  The back page.
15       MR. PANATIER:  Okay.
16 BY MR. PANATIER:
17   Q.    "It is our conclusion based on the
18 platyness of the material and its freedom from
19 asbestiform minerals that the ore body would be
20 suitable for use in high-quality cosmetic toiletry
21 products."  Isn't that what we just said?
22   A.    Yes, it's free from asbestiform
23 minerals.  You're reading what they wrote.
24   Q.    Wait, hold it, hold it.
25       That's what we just said, right?

Page 136

1    A.    Yes.  You're reading what they wrote.
2    Q.    Of course, it's not free of
3  asbestiform minerals, is it?
4    A.    Certain areas would be avoided.
5    Q.    Right.  But look, it's interesting
6  what they say in their conclusion.  This is McCrone
7  again, is it not?
8    A.    It's McCrone -- it's a McCrone
9  memorandum, yes.
10   Q.    Yes.  They say, "Based on it's
11 freedom from asbestiform minerals," and they're
12 talking about the whole ore body?
13   A.    They talk about the whole ore body,
14 yes.
15   Q.    But it's not free of asbestiform
16 minerals?
17   A.    No, there are areas that you would
18 not use.
19   Q.    Does it say that?
20   A.    That's just the way that the miners
21 and the geologists work.
22       MR. PANATIER:  Objection.
23 Nonresponsive, your Honor.
24   A.    It does not say that, no, it does
25 not.

Page 137

1       MR. PANATIER:  Move to strike.
2       THE COURT:  That part of the response
3  that was not in direct response to the question is
4  stricken.  The last sentence is responsive.
5  BY MR. PANATIER:
6    Q.    Okay.  So you have -- have you found
7  the May 9, 1974 document?
8    A.    Yes.
9    Q.    Okay.  This is another report of talc
10 ores and products from the Argonaut ore body from
11 McCrone, right?
12   A.    It is, yes.
13       MR. PANATIER:  Okay.  We offer this
14 into evidence, 2525.
15       MS. SULLIVAN:  No objection.
16       THE COURT:  Admitted.
17       (Plaintiff's Exhibit 2525 was moved
18       into evidence.)
19 BY MR. PANATIER:
20   Q.    They looked at six samples, right?
21   A.    Yes.
22   Q.    And they marked them "ore" and
23 "product," meaning one is ore coming into the
24 benefitiation process, one is the product coming out
25 of it; is that right?

35 (Pages 134 - 137)

Page 138

1     A.     Yes.
2     Q.     Let's just look at some of the
3 results.  In 6/6/14 are they say that they found
4 nine small chrysotile fibers, right?
5     A.     Yes.
6     Q.     They didn't find any asbestiform
7 amphiboles, just chrysotile, true?
8     A.     You read what is reported.
9     Q.     Now, well, here, let's look at the
10 next one, "product."  You see where it says,
11 "electron microscopical examination showed three
12 fibers which bore an exact resemblance to chrysotile
13 but no conclusive electron diffraction pattern could
14 be obtained.  In addition, three other small
15 chrysotile fibers were found which did give
16 diffraction patterns, no amphiboles," right?
17     A.     Yes.
18     Q.     They found chrysotile asbestos in the
19 product of the beneficiation process, right?
20     A.     From -- yes, yeah.
21     Q.     Alright.  So, after it's floated,
22 after it's benefitiated, they still found asbestos,
23 right?
24     A.     Yes.  And we've said that
25 benefitiation will not remove --

Page 139

1     Q.     Right.
2     A.     -- asbestiforms.
3     Q.     And J&J's always known that, right?
4     A.     Yes.
5     Q.     Okay.  Here it says, "The results of
6 extensive light and electron microscopical
7 examination of three Argonaut talc core samples and
8 three product samples produced from these ores so
9 that the Argonaut ore body, in general, produces a
10 good quality platy talc with low content of rolltop
11 fibers.  Only ARX66-14 ore and product showed any
12 evidence of asbestos contamination."
13     They're put unequivocal there, right, that's
14 asbestos, right?
15     A.     That's what is written.
16     Q.     "Which is estimated at less than 1 to
17 2 parts per million for the ore and less than one
18 half to one part per million for the resulting
19 product," right?
20     A.     Yes.
21     Q.     Okay.  Did this go to the FDA?
22     A.     I don't know.  I mean, this was never
23 used at that time as a cosmetic product.  It was an
24 industrial product.
25     MR. PANATIER:  Objection, your Honor,

Page 140

1 nonresponsive.  I move to strike.
2     A.     I said I don't know.
3     THE COURT:  Everything short of "I
4 don't know" has been stricken from the record.
5     Q.     The next document will be
6 September 6th, 1974.
7     THE COURT:  What was the date,
8 Counsel?
9     MR. PANATIER:  September 6th, 1974
10 and the Exhibit No. is 2536.
11 BY MR. PANATIER:
12     Q.     Let me know once you've located that,
13 Dr. Hopkins.
14     A.     Yeah, we have it.
15     Q.     You got it?
16     A.     Yes.
17     Q.     This is a letter to the FDA from
18 Johnson & Johnson, right?
19     A.     Yes.
20     MR. PANATIER:  We offer this into
21 evidence.
22     MS. SULLIVAN:  No objection.
23     THE COURT:  Admitted.
24     (Plaintiff's Exhibit 2536 was moved
25     into evidence.)

Page 141

1 BY MR. PANATIER:
2     Q.     September 6th, 1974.  They say to Dr.
3 Schaffner, they've done another calculation.  It
4 says, "The calculation shows that a substantial
5 safety factor can be expected with talc containing
6 1 percent by weight asbestos fibers," right?
7     A.     That was their response.
8     Q.     "WW" by the way, that just means
9 "weight for weight," right?
10     A.     Yes.
11     Q.     "Therefore, methods capable of
12 determining less than 1 percent in talc are not
13 necessary to assure the safety in cosmetic talc,"
14 right?
15     A.     That was their opinion in 1974.
16     Q.     So what they're saying is, if methods
17 are going to be developed, we don't need anything
18 that goes below 1 percent, right?
19     A.     Well, that was the opinion in 1974.
20     Q.     But Johnson & Johnson knew if certain
21 methods were used such as TEM, that asbestiforms,
22 chrysotile or amphiboles could be found but at less
23 than 1 percent, right?
24     A.     Yes.  And J&J were using TEM.
25     Q.     So Johnson & Johnson knew that if you

36 (Pages 138 - 141)

Page 142

1 looked down to a smaller percentage, you could see
2 it, right, by TEM?
3    A.    Yeah, they've been using TEM since
4 '72.
5        MR. PANATIER: Objection,
6 nonresponsive, your Honor.
7    A.    Yes.
8        THE COURT: The objection is
9 sustained.
10    A.    Your answer is, yes.
11        THE COURT: Dr. Hopkins, could I
12 please ask that you answer only the question being
13 asked. Counsel for Johnson & Johnson will have an
14 opportunity to ask questions later.
15        THE WITNESS: My apologies, your
16 Honor.
17        THE COURT: Thank you.
18 BY MR. PANATIER:
19    Q.    Yet the same year, 1974, they're
20 telling the FDA, we only need a method that goes --
21 I'm sorry.
22        (There is a discussion off the
23        record.)
24    Q.    They're telling the FDA, we only need
25 a method that goes down to 1 percent; is that true?

Page 143

1    A.    That was what was written in 1974.
2    Q.    So that's to the FDA. So that goes
3 in the outbox.
4        Let's look at July 1st, 1975. You
5 know that McCrone was finding asbestos in the
6 Hammondsville ore body in 1975, do you not?
7    A.    I don't know. I'd need to refresh my
8 mind on that one.
9    Q.    Okay. Well, look at July 1st, 1975,
10 please. That's already in evidence and it's
11 Exhibit 2053.
12        Have you found July 5th, 1975?
13    A.    Yes, yes, yes.
14    Q.    I've shown you that document, at
15 least, two or three times before, have I not?
16    A.    July 1st, 1975?
17    Q.    July 1st.
18    A.    Yes, I have that.
19    Q.    1975.
20    A.    Yeah.
21        MR. PANATIER: We offer this in
22 evidence.
23        MS. SULLIVAN: No objection.
24        MR. PANATIER: It's 2053. It might
25 already been.

Page 144

1        MS. SULLIVAN: It's already in
2 evidence.
3        THE COURT: It's already in.
4 BY MR. PANATIER:
5    Q.    Okay. So here's the -- here's the
6 document. We've already established that at this
7 time only Hammondsville is the only cosmetic ore
8 body, correct?
9    A.    The only cosmetic ore body.
10    Q.    Right.
11    A.    Yes.
12    Q.    Right.
13    A.    Yes.
14    Q.    And they're looking at 29 talc
15 samples, right?
16    A.    Yes.
17    Q.    And they found asbestos in them,
18 right?
19    A.    Yes.
20    Q.    Oh, by the way, we haven't seen this
21 fella's name yet, Vern Zeitz.
22        He was R&D director at Windsor Minerals,
23 right?
24    A.    Yes.
25    Q.    And I didn't put him on my list here

Page 145

1 because he didn't fit and he was "Z." So let's add
2 him. Let's add him by Miller because he was at
3 Windsor Minerals. So we're going to put "Zeitz,
4 head of R&D."
5        Okay. They found confirmed asbestos
6 in a number of these samples, right?
7    A.    In the samples that were reported,
8 yes.
9    Q.    Right. And let's just focus on HC.
10        Okay. So they found 1, 2, 3, 4, 5 results
11 for confirmed asbestos in the HC, correct?
12    A.    Yes.
13    Q.    And that's in the fines, right?
14    A.    Yes.
15    Q.    Because what they did here is they
16 actually did a separation technique, right, where
17 they put the powder into a test tube and they
18 sonicated it, right, which we talked about
19 yesterday, which separated out the fines from the
20 sediment, right?
21    A.    Yes.
22    Q.    That's a bit -- that's sort of like a
23 concentration technique, you can concentrate one
24 fraction away from another, right?
25    A.    Yeah, a bit like centrifuging, yes.

37 (Pages 142 - 145)

Page 146

1    Q.    Yeah.  If then you go to the next
2 page, they have the sediment.  And for HC one, two
3 -- two of those are the HC, right, in the sediment?
4    A.    Two of those are at HC.
5    Q.    So they were able to -- I think it
6 says right here on the front page, they say, "In
7 examining the samples, we kept a running tabulation
8 of the asbestos which we could positively identify
9 the total fiber content in the organic material
10 present in each sample.  These are listed
11 qualitatively as zero for none found, low for one to
12 three fibers found, medium for four to eight fibers,
13 high and very high.  In no case did the asbestos
14 content exceed medium."
15        My first question here is, did this
16 go to the FDA?
17    A.    I don't know.
18    Q.    Have you seen any evidence that it
19 actually did?
20    A.    I've not seen evidence that it did or
21 that it did not.  So my answer is the same.  I don't
22 know.
23    Q.    Now, there was a followup report on
24 this one in November.  So if you'll turn to November
25 5th, 1975.  This is also in evidence, November 5th,

Page 147

1 1975.
2        "This letter will supplement our
3 report of July 1st on a series of talc or samples
4 which we've analyzed for you.  Table 1 shows the
5 actual fiber counts and the approximate equivalent
6 concentration in parts per million of the amphibole
7 particles which we found in these samples."
8      So these were amphibole asbestos they found,
9 correct?
10    A.    They're described as amphiboles, yes.
11    Q.    Right.  It was amphibole asbestos
12 they found?
13    A.    Well, that was the heading that --
14 yeah, they've described it under the heading of
15 "fibers of asbestos."
16    Q.    Right.
17    A.    And described them as amphiboles.
18    Q.    By the way, it doesn't say "fibrous
19 asbestos," it says "fibers of asbestos," right?
20    A.    That is what is written.
21    Q.    They said some of them seemed rather
22 high, one at 10 and one had 9 amphiboles.  Most of
23 these come in bundles of 1, 2 or 3 fibers with
24 anywhere from 2 to 5 amphiboles in a bundle.
25        And here they're describing their suspension

Page 148

1 where they say that when they suspend the fines it's
2 more sensitive to the presence of amphibole than
3 looking in the sediment, right?
4    A.    Yeah, you're reading what is written.
5    Q.    So they had a way to sort of separate
6 out the different particles, fines versus sediment,
7 and they had a more sensitive way to look for the
8 asbestos, right?
9    A.    That is the impression we get, yes.
10    Q.    Do you know that they ever did this
11 again?
12    A.    McCrone?
13    Q.    Yeah, that they ever did this type of
14 technique to look for the asbestos after November of
15 1975?
16    A.    I don't know.
17    Q.    Okay.
18    A.    Don't know.
19    Q.    And on the back, fibers of asbestos
20 we've got HC.  Let's look at HC 1, 2, 3, 4, right?
21    A.    Yes.
22    Q.    And that's in the fines.  And then
23 five, looks like five, right, a total if you include
24 the sediment, right?
25    A.    Yes.

Page 149

1    Q.    And the highest result was this one
2 that had ten and that was marked HC?
3    A.    Yes.
4    Q.    Okay.  "HC" you know is Hammondsville
5 Cosmetic, correct?
6    A.    No.
7    Q.    It's not, okay.  So help me out then
8 so we can figure out what it means.  I'll put it in
9 green.  "HC," so I say it means "Hammondsville
10 Cosmetic" but you're the company, you tell me what
11 it is means.  What does that stand for?
12    A.    The designation HC --
13    Q.    Uh-huh, right, I'm ready.
14    A.    -- is applied to both industrial
15 talcs and to cosmetic talcs.
16    Q.    Well, I'm asking what it stands for.
17 What does "HC" stand for?
18    A.    I've never ever seen a key or a
19 breakdown as to what "HC" stands for.
20    Q.    Okay.  This is already in evidence as
21 Exhibit 2840 and I've shown you this before.
22 January 14, 1975.  Do you see that?
23    A.    Yes.
24    Q.    The samples represented both the
25 industrial materials produced at Gassetts, GI, the

1 West Windsor, WI, mill sites and the ores used in
2 the cosmetic production "HC," right?
3      A.    That's what I said a minute ago.  HC
4 can mean cosmetic ores, but it's, also, a
5 designation for industrial talcs.
6      Q.    Well, for this they're saying it's
7 the cosmetic talc, right, they're not saying it's
8 industrial, are they?
9      A.    On that particular memo.
10     Q.    Yes.
11     A.    That's what they said.  On that day
12 they shipped that product and that was the
13 designation they used on that day.
14     Q.    Oh, okay.  So they would have only
15 used it on that day.  Let's just be clear.  Look,
16 this was for six months of work.
17     A.    Okay.  Okay.
18     Q.    They said HC was the cosmetic
19 production, right?
20     A.    On that -- on that particular memo,
21 yes, on that -- written on that day.
22     Q.    Fine.  This next document is dated
23 May 24, 1976, if you'll turn to that.  It just says
24 '76.  So I'll help you find it.  Because it will be
25 near the front.  Here it is.

1      A.    Thank you.
2      Q.    No problem.  Sir, this is a letter
3 from Roger Miller, the president of Windsor
4 Minerals, to McCrone, right?
5      A.    Yes.
6      Q.    Dated May 24th, '76, true?
7      A.    Yes.
8      Q.    And you've seen this before?
9      A.    Yes.
10     MR. PANATIER:  Okay.  We offer this
11 into evidence, Plaintiff's Exhibit 3083.
12     MS. SULLIVAN:  No objection, your
13 Honor.
14     THE COURT:  Admitted.
15     (Plaintiff's Exhibit 3083 was moved
16     into evidence.)
17 BY MR. PANATIER:
18     Q.    This is a letter where he writes,
19 Roger Miller now, Windsor Minerals, so he knows what
20 the designation is for the products they use, right?
21     A.    Well, yeah, I would hope so.
22     Q.    You'd "hope so."  He's the president
23 of the mining company, right?
24     A.    Yes.
25     Q.    He says, "never ask a lawyer for a

1 quick answer."  We know that's true.  "I've just now
2 received the answer to your request of March 26,
3 1976.  You are hereby granted permission to disclose
4 data resulting from your tests on our samples.  The
5 samples which are relevant to the production and
6 sale of cosmetic talcs in the US and Canadian
7 markets are those bearing the letters HC as part of
8 their prefix," correct?
9      A.    Yes, you read what is written.
10     Q.    Right.  He's not saying one time for
11 one sample, is he?
12     A.    On that memo date on May 24, 1976 he
13 is instructing --
14     MR. PANATIER:  I'm going to object to
15 nonresponsive, your Honor.
16     THE COURT:  Let him finish the
17 answer.
18     Go ahead, Doctor.
19     THE WITNESS:  I'm sorry, I forgot the
20 question.
21 BY MR. PANATIER:
22     Q.    Yeah.  At that time he is saying that
23 the cosmetic production, the cosmetic talcs, are
24 designated HC, correct?
25     A.    Yes, and that's what I was saying.

1 On that time, that date, that's what he was saying.
2      Q.    Well, he doesn't restrict to it to
3 any date, sir, does he?
4      A.    Well, I was quoting from the memo
5 which is May 24th.  So he's saying on -- he wrote a
6 memo on May 24th saying those results you've got
7 designated HC, those are the ones that you're going
8 to look at.
9      Q.    Right.  You're testings, right?
10     A.    Yes.
11     Q.    Your tests?
12     A.    Yes.
13     Q.    He doesn't say one test at one time.
14 He said if you want the cosmetic tests, it's the
15 ones bearing the letters "HC," right?
16     A.    That's what he wrote on May 24th,
17 yes.
18     Q.    Do you agree -- can we agree on this
19 -- and I bet we can -- that Hammondsville Cosmetic,
20 if you just take the first letters of each one,
21 that's "HC," can we agree on that?
22     A.    Yeah, that's -- that's -- yeah, H and
23 C, yeah.
24     Q.    Right, okay.
25     A.    But --

Page 154

1    Q.    Well, hold on.
2    A.    I'll shut up.
3          Okay.  So now we have the memo from
4  1975 that says, "The cosmetic production is HC."
5          We have one the next year that is
6  unrestricted in time that says, "the cosmetics was
7  HC," correct?
8    A.    We do.
9    Q.    Okay.  This next one is just dated
10 1977.  And I can help you find that if you need it.
11 It should be at the front of the 77s.  Yeah, right,
12 here.  It's probably where it starts.  I'm just
13 going to let you look at it.
14         Okay.  So take a look a that.  Is
15 that dated November 4th, 1977?
16   A.    It is, yes.
17   Q.    And that's from Vernon Zeitz to Ian
18 Stewart at McCrone?
19   A.    Yes.
20   Q.    Okay.  Thank you.
21         MR. PANATIER:  We offer this into
22 evidence, your Honor, as Exhibit 3121.
23         MS. SULLIVAN:  No objection.
24         THE COURT:  I'm sorry, which one is
25 it?

Page 155

1          MR. PANATIER:  3121; 1977,
2  November 4, 1977.  It's this one.  It may have been
3  left out of the binders.
4          THE COURT:  Okay, thank you.
5          (Plaintiff's Exhibit 3121 was moved
6       into evidence.)
7  BY MR. PANATIER:
8    Q.    So we have '74 was our first one.
9  '76 was our second one.  Now we have '77.  "Enclosed
10 you will find our next series of samples for
11 asbestiform analysis via TEM in conjunction with
12 your discussions with Roger Miller."
13         And if you look at the back side of it,
14 you've got "Columbia Mill" composite, right?
15   A.    Yes.
16   Q.    Columbia Mill was industrial, right?
17   A.    It was one of several, yes.
18   Q.    Right.  So you have "CI," right?
19   A.    Yes.
20   Q.    Columbia Industrial, right?
21   A.    I don't know what it stands for but
22 Columbia was one of the industrial mines.
23   Q.    Gassetts was industrial, right?
24   A.    It was a milling operation for
25 industrial.

Page 156

1    Q.    Right.  So you have Gassetts
2  Industrial, right?
3    A.    Yes.
4    Q.    And then you have Hammondsville
5  Cosmetic grade ore "HC," right?
6    A.    Yes, on that particular memorandum,
7  yes.
8    Q.    Okay.  Alright.  This next one is --
9  it is missing the tag on that one.  This one is --
10 says 1978.  You should only have 1 or 2 tabs that
11 just say 1978.
12         It might be in Binder 3.  Let me help
13 you get it.  Yeah, here it is.  Here you go.
14         MR. PANATIER:  It's the first
15 document, your Honor, in Binder 3.
16         THE COURT:  Sure.
17 BY MR. PANATIER:
18   Q.    So that's a Windsor Minerals memo,
19 correct?
20   A.    Yes.  The answer is yes.
21   Q.    Sorry?
22   A.    The answer is yes.
23   Q.    Starting, "asbestiform mineral
24 analysis sampling procedure for Hammondsville
25 Cosmetic ore," right?

Page 157

1    A.    Yes.
2    Q.    Okay.  And you can see they're
3  summarizing the sampling?
4    A.    Yes.  Sorry, I said yes.
5          MR. PANATIER:  By the way, this is
6  Exhibit 3224.  We offer it, your Honor.  Sorry.
7          MS. SULLIVAN:  No objection.
8          THE COURT:  Admitted.
9          (Plaintiff's Exhibit 3224 was moved
10      into evidence.)
11 BY MR. PANATIER:
12   Q.    So they go through the sampling
13 procedure and they see under the Hammondsville
14 Cosmetic ore they reference 16 HC composite samples,
15 right?
16   A.    They do, yes.
17   Q.    Right?  And then they have a separate
18 section for industrial grade talcs, correct?
19   A.    They do in that memo, yes.
20   Q.    Okay.  So now we've seen '78, '77,
21 '76, '75 where Hammondsville Cosmetic is "HC,"
22 right, every single time, right?
23   A.    On those memos, yes.
24   Q.    Now, that is not to say that they
25 didn't also mine the Hammondsville -- I'm going to

40 (Pages 154 - 157)

1 draw a mine real fast, okay.
2     So here's the Hammondsville mine, okay,
3 Hammondsville. They mine the cosmetic talc out of
4 Hammondsville, correct?
5     A.    Yes.
6     Q.    That's not to say that they didn't
7 also pull some out and sell it as roofing talc,
8 correct?
9     A.    Yes.
10    Q.    They did that, right?
11    A.    Yes. And they occasionally, if I
12 may, mix it with material from the other mines, the
13 Columbia mine and the Clifton mine.
14    Q.    Well, we'll, get into that. The
15 Clifton mine wasn't in operation in 1975, was it?
16    A.    I believe it was. It was a short
17 period when it was shut down. But there were other
18 mines, the Chester mine and the Blackbear.
19    Q.    I was asking you about Clifton.
20    A.    Clifton. There was a short period it
21 was shut down.
22    Q.    Okay. So roofing talc, right?
23    A.    Yes.
24    Q.    You call that industrial?
25    A.    It is, yes.

1     Q.    Right?
2     But if it was roofing talc from
3 Hammondsville, it was coming from the same place the
4 cosmetic was coming from, from Hammondsville,
5 correct? True?
6     A.    From the same mine, yes.
7     Q.    Yes.
8     A.    Yes, yes, yes.
9         (There is a discussion off the
10        record.)
11        MR. PANATIER: We're going to put the
12 November 5, '75 confirmed asbestos and the July 1st,
13 '75 fibers of asbestos in the inbox.
14        MS. SULLIVAN: Objection, lacks
15 foundation.
16        MR. PANATIER: I was asked yesterday
17 to state where they were going. That's all I'm
18 doing.
19        THE COURT: Objection overruled.
20        MR. PANATIER: Okay.
21        (There is a discussion off the
22        record.)
23        MR. PANATIER: Alright, this will be
24 Exhibit 3051. Your Honor, I don't think I have
25 another copy of it.

1         THE COURT: That's okay. Don't worry
2 about it.
3 BY MR. PANATIER:
4     Q.    Okay. So I'll just show -- you see
5 that this is a FDA response to a FOIA request?
6 Right there?
7         MS. SULLIVAN: It looks like it's --
8 (INAUDIBLE.)
9         THE COURT: I'm sorry, is that an
10 objection?
11        MS. SULLIVAN: No, your Honor, it's
12 just it looks like it's not FDA but another
13 government.
14        MR. PANATIER: Oh, I'm sorry, that's
15 absolutely correct, it's --
16        THE WITNESS: US Department of Labor.
17 BY MR. PANATIER:
18    Q.    US Department of Labor, right?
19    A.    Yeah.
20    Q.    I'm sorry. We're so used to the FDA
21 here.
22        MR. PANATIER: Your Honor, I'm just
23 going to offer this into evidence.
24        MS. SULLIVAN: No objection.
25        THE COURT: Admitted.

1         (Plaintiff's Exhibit 3051 was moved
2         into evidence.)
3     Q.    So we've got the cover sheet where we
4 get the documents from the Department of Labor. And
5 there's only one part I'm interested in on this.
6     Do you see that it says it looks at some
7 mining companies and one of those is -- it says,
8 "Johnson & Johnson Division Windsor Minerals, Inc.,"
9 right?
10    A.    Yes.
11    Q.    And it says, "number of employees."
12 It says, "Argonaut, Frost Bite, Gassetts Mill,
13 Hammondsville Mine, West Windsor Mill," right?
14    A.    Yes.
15    Q.    And it doesn't list any employees for
16 Clifton, does it?
17    A.    On what date was that?
18    Q.    Right down here if you look. "We
19 already gave this info to Dr. Peters 6/11/74,"
20 correct?
21    A.    It doesn't list them, no, no.
22    Q.    So the mine is not running if it
23 doesn't have employees, right?
24    A.    I did say it was closed for a short
25 period.

1    Q.    Correct, okay.
2          (There is a discussion off the
3     record.)
4    Q.    This will be Exhibit 2581.  And this
5  is dated November 15th [sic], 1975, sir.  This is
6  probably going to be in your second binder.
7    A.    November the?
8    Q.    The 19th.
9    A.    The 19th.  That's it.  Got it.
10   Q.    Okay, great.
11         This is another memo from McCrone to
12 Windsor Minerals, right?
13   A.    It is, yes.
14         MR. PANATIER:  Okay.  We offer this
15 into evidence, 2581, your Honor.
16         MS. SULLIVAN:  No objection.
17         THE COURT:  Admitted.
18         (Plaintiff's Exhibit 2581 was moved
19     into evidence.)
20 BY MR. PANATIER:
21   Q.    This is just another testing result,
22 correct, where they looked at 24 talc ore samples,
23 right?
24   A.    Yes.
25   Q.    Dated 9/2/75, for asbestiform

1  minerals, right?
2    A.    Yes.
3    Q.    They say, "In the entire series, we
4  found only two asbestiform fibers, both amphiboles.
5  One in sample N1 HC of a size equivalent to a
6  concentration of, approximately, .1 parts per
7  million and one at sample 01 HC equivalent to,
8  approximately, .3 parts per million," correct?
9    A.    Yes.
10   Q.    Okay.  So, again, these are two more
11 results for asbestiform, as they call it, which is
12 asbestos, by the way, right?
13   A.    I wouldn't disagree with what we have
14 there.  It doesn't say "asbestos."
15   Q.    If it says -- sorry.
16   A.    We can only read what it says.
17   Q.    Just to be clear, Johnson & Johnson
18 agrees, if it says asbestiform, it's asbestos,
19 right?
20   A.    That would be the -- that would be
21 the approach today, yes.  I don't know what they
22 meant in 1975.  But that would be the approach
23 today.  I would agree today if I read that.
24   Q.    So are you saying you don't know what
25 that was in --

1    A.    I don't know what this individual
2  wrote in 1975.  He wrote what he wrote, you know.
3  I'm not going to argue over it, so...
4    Q.    Well, because you told me like when I
5  put up Johnson & Johnson's definitions, you say, oh,
6  no, it has to say it's asbestiform.  Well, they're
7  saying it here.  Is it asbestos?
8    A.    He says "asbestiform."
9    Q.    Is it asbestos?
10   A.    That would be my interpretation.
11   Q.    Did this go to the FDA?
12   A.    I don't know.  I don't know what
13 these talcs were.
14   Q.    Well it says "HC," right?
15   A.    It says "HC," yes.
16   Q.    And we know that there are some memos
17 you've shown me and that we've gone through, where
18 they reference "HC" as roofing talc, right, that we
19 know is taken out of Hammondsville Cosmetic,
20 correct?
21   A.    "HC" can mean industrial talcs.
22   Q.    Right, the roofing talcs were
23 industrial, correct?
24   A.    They were, yes.
25   Q.    Okay, alright.  Let's do -- let's go

1  to December and skip that one.  Go to December 15.
2  December 15, 1977, please sir.
3          (There is a discussion off the
4     record.)
5    Q.    Alright.  Sir, have you found
6  December 15, 1977?
7    A.    Yes.
8    Q.    Is that a document from the -- well,
9  does it look like this?  Yeah.
10   A.    Yeah.
11   Q.    That's it.
12         This is a document from Mountain
13 States Research and Development in Tucson, Arizona
14 dated December 15, 1977 with the Johnson & Johnson
15 Bates Stamp on it, correct?
16   A.    Yes.
17         MR. PANATIER:  Okay.  We offer this
18 into evidence, your Honor.
19         MS. SULLIVAN:  No objection.
20         THE COURT:  Admitted.
21         (Plaintiff's Exhibit 2669 was moved
22     into evidence.)
23   Q.    It says --
24         THE COURT:  What is the marking on
25 the document?

42 (Pages 162 - 165)

1        MR. PANATIER: Sorry. 2669, your
2 Honor, Exhibit 2669.
3        THE COURT: Thank you.
4 BY MR. PANATIER:
5    Q.    And you see it's prepared for Windsor
6 Minerals?
7    A.    Yes.
8    Q.    And, in fact, the title is,
9 "Mineralogical Investigation of Three Main
10 Contaminating Rock Types in a Talc Deposit of
11 Windsor, Vermont."
12       So we know this is Windsor's talc. This is
13 the talc that is being mined by Windsor which is
14 owned by Johnson & Johnson, correct?
15    A.    Well, I don't know which mine this
16 relates to. It only says "of the talc deposit of
17 Windsor, Vermont."
18    Q.    Johnson & Johnson owns Windsor
19 Minerals?
20    A.    Yes, they --
21    Q.    Right?
22    A.    Yes.
23    Q.    So, if it's any talc being mined by
24 Windsor, then it's something Johnson & Johnson owns?
25    A.    Oh, I see, okay. I was thinking

1 Windsor is actually a place, that's where the mines
2 are, in that location.
3    Q.    You see here where it says,
4 "Mineralogical investigation three main
5 contaminating rock types the talc deposit of
6 Windsor, Vermont," right?
7    A.    Yes, I'm thinking that's Windsor,
8 Vermont's place.
9    Q.    Okay. Is it your testimony that that
10 would not include Hammondsville, it would not
11 include Argonaut?
12    A.    It might do, yeah. It might do.
13    Q.    Okay. Okay. Well, let's see what it
14 says.
15    A.    Yeah.
16    Q.    Right. They said, "Purpose, to
17 determine the mineral composition of the samples in
18 particular respect to the transparent and opaque
19 contaminates intergrown with talc."
20       Under "mineralogy" it says, "Talc is the
21 second most abundant mineral in the samples." Oh,
22 I'm sorry, just before that.
23       "Both chlorites are intergrown with other
24 minerals such as talc, muscovite, hydromica,
25 biotite, tremolite, apatite, rutile and other

1 opaques," right?
2    A.    Yes, that's what's written.
3    Q.    "The talc is associated mostly with
4 chloride, muscovite, hydromica, biotite, calcite and
5 tremolite," right?
6    A.    That's what's written.
7    Q.    Alright. Let's just look at what
8 they say for those. "Actinolite, tremolite, zoisite
9 and apatite are only trace minerals in the samples.
10 Tremolite is the only mineral of the above-mentioned
11 ores which occur in minor amounts, four volume
12 percent Sample B. It also present in Sample A in
13 trace amount accompanied by actinolite. Tremolite
14 actinolite occurs in long prismatic needles."
15       I know we've seen references to needles a
16 number of times by now, correct?
17    A.    We have.
18    Q.    Okay. And then it talks about the
19 grain size of tremolite and actinolite.
20       Then on the very back page, it just
21 gives us the percentages, tremolite actinolite in
22 two of the samples, trace and 4 percent, right?
23    A.    On that particular examination of the
24 rocks, yes.
25    Q.    Okay. Now, in fairness -- in

1 fairness, there are other talc deposits around the
2 ones that Johnson & Johnson was mining in Vermont,
3 correct?
4    A.    Yes, as I recollect, there were
5 something like 50 mines in the State of Vermont.
6    Q.    Sure. It was talc heavy, right?
7    A.    Yes.
8    Q.    The reason I'm asking you about it is
9 Johnson & Johnson, of course, had this, correct, do
10 you see that Bates Stamped?
11    A.    Yes.
12    Q.    Okay. And there's an RVZ, Vern
13 Zeitz, right?
14    A.    Yes.
15    Q.    Okay. So this is something that
16 Johnson & Johnson certainly had, correct?
17    A.    Yes.
18    Q.    Okay. In fairness, it doesn't
19 specify the exact mines that were being sampled,
20 true?
21    A.    No, it doesn't, no.
22       MR. PANATIER: Your Honor, one more
23 document and then lunch break?
24       THE COURT: Sure.
25       (There is a discussion off the

Page 170

1      record.)
2  BY MR. PANATIER:
3      Q.     The next one should be dated March 2,
4  March 2, '87.  So that's probably going to be three
5  or four.  Let me help you.
6      A.     Uh-huh.
7      Q.     This is three.  Yeah, it will be at
8  the tail end of three.  And this is Exhibit 2723.
9      A.     March 4th, '87?
10      Q.     This is March 2, '87.
11      A.     March 2, '87, got it.
12      Q.     You see that it's entitled
13  "Mineralogical Report"?
14      A.     Yes.
15      Q.     Have you seen this document before?
16      A.     I don't think I have, no.
17      Q.     You and I can then decide if it's
18  relevant, okay?
19           So you can see it says, "subject,
20  microscopic examination of various flotation, high
21  intensity magnetic static and Archimedes spiral
22  separator products of Windsor talc," right?
23      A.     Yes.
24      Q.     Now, the "flotation," we know that's
25  the cosmetic talc, right, they didn't float the

Page 171

1  industrial, right?
2      A.     Correct.
3      Q.     And you can see that the purpose was
4  "to determine any contaminating minerals in talc,
5  concentrates and ore in particular respect to their
6  tremolite content."
7           Now, it doesn't say "tremolite asbestos,"
8  does it?
9      A.     No.  You read what is written.
10      Q.     But they did a specific test to find
11  out if there was tremolite to determine the content,
12  right?
13      A.     Someone did.  I don't know who this
14  -- I'm trying to find out who the author is, but
15  there's no author.
16      Q.     Not all the documents that we got
17  from Johnson & Johnson list the author.
18      A.     Okay.
19      Q.     On the second page under "Discussion"
20  they're describing the preparation.  They say, "In
21  this thin sections the talc plates show preferred
22  orientation according to one of the pseudohexagonal
23  edges of the plate.  This may cause some difficulty
24  in the immediate recognition of needle-type minerals
25  such as tremolite actinolite contaminating the talc

Page 172

1  product," right?
2      A.     That's what's written.
3      Q.     Another reference to needles, right?
4      A.     Yes.
5      Q.     Now, they're talking about the
6  Raymond Mill and that is the specific mill that was
7  being used by Johnson & Johnson for the cosmetic
8  talc, right?
9      A.     There was more than one Raymond Mill.
10  Raymond Mill it's a brand name, made by the Raymond
11  Company.  And that mill is -- the ore went into
12  powder.  But they also milled industrial as well as
13  cosmetic.
14      Q.     Okay.  Were they using -- but to be
15  clear, okay, so that's a machine?
16      A.     Yeah, it's a, you know, like a Ford
17  car.  It's a Raymond Mill.
18      Q.     Okay.  Do you know whether or not
19  they used the same mill for the cosmetic and the
20  industrial?
21      A.     I do know and they did not,
22  otherwise, that would be contamination.  You'd avoid
23  that.
24      Q.     Okay.  Let's go to the next page
25  tremolite.  So, to be clear, Johnson & Johnson would

Page 173

1  not want to mill the industrial with the cosmetic,
2  fair?
3      A.     No, you keep them separate.
4      Q.     Okay.  Tremolite as an iron-poor
5  needle-type amphibole was detected only as to two or
6  three small needles in the sand of the Raymond Mill
7  feed and one needle in the fourth cleaner
8  concentrate and tailings treated with sodium
9  silicate and citric acid.  Tremolite is present in
10  the fines minus 100 plus 200 mesh in 6 volume
11  percent as free needles in the loose grain mounds.
12  It was detected only as two or three small needles
13  in the other products such as the high intensely
14  magnetic static belt and Archimedes spiral
15  products."  They found a lot of tremolite needles,
16  fair?
17      A.     Well, they certainly -- they report
18  finding needles, yes --
19      Q.     Okay.
20      A.     -- tremolite.
21      Q.     Throughout the process, right?
22      A.     Yeah.  I don't know what product they
23  were milling, though.  It doesn't say, does it?
24      Q.     Well, this is flotation.  We know
25  it's cosmetic.

44 (Pages 170 - 173)

Page 174

1    A.    This looks like an experiment to me,
2 but they floated. Yes, they were doing a flotation.
3    Q.    They didn't float the industrial, did
4 they?
5    A.    Not in production, no, no.
6    Q.    "Tremolite and serpentine are present
7 only in subtrace amounts in the flotation and other
8 separation products, right?
9    A.    That's what's written.
10    Q.    So the product still had the
11 tremolite, right?
12    A.    Well, again, this looks to me like an
13 experimental study rather than production.
14    Q.    And they -- they, certainly, did a
15 lot of experiments. We'll see in 1974 where they do
16 an experiment to try to suppress the chrysotile
17 that's present in the ore, correct?
18    MS. SULLIVAN: Objection, foundation
19 it's argument. That's not what the document said.
20    THE WITNESS: They did many --
21    THE COURT: Objection, overruled.
22    You can answer.
23    THE WITNESS: I'll say, correct, they
24 did many experiments over the years, many
25 experiments.

Page 175

1 BY MR. PANATIER:
2    Q.    Okay, alright. And in fairness, when
3 we were talking about this volume of documents, some
4 are going to be experiments, right, and some will be
5 analysis of actual product, fair?
6    A.    Yes.
7    Q.    Okay. What this does and we'll look
8 into it a little bit more after the break. But what
9 this does is it's yet more proof that to the extent
10 there's tremolite or actinolite needles present, it
11 is not removed by flotation, correct?
12    A.    Yes, I would never disagree with
13 that.
14    Q.    Alright.
15    MR. PANATIER: Your Honor, I think
16 it's good time.
17    THE COURT: Members of the jury,
18 we're going to take a lunch break now. Leave your
19 notebooks here. Remember to wear juror badges where
20 are they visible. No discussions with regard to
21 this case, including testimony you've just heard, no
22 research of any kind whatsoever.
23    Enjoy your lunch. Be ready to come
24 back upstairs at 1:30. Thank you.
25    THE COURT OFFICER: Jury exiting.

Page 176

1    (Jury exits.)
2    THE COURT: Thank you.
3    We're off the record. I'll see
4 everyone at 1:30.
5    (There is a discussion off the
6    record.)
7    MR. PANATIER: Your Honor, can I just
8 offer 2723?
9    MS. SULLIVAN: No objection.
10    THE COURT: Ercilyn, back on the
11 record.
12    We're back on the record.
13    What are you offering into evidence?
14    2723.
15    THE COURT: And there is no
16 objection, so thank you.
17    (Plaintiff's Exhibit 2723 was moved
18    into evidence.)
19    (Lunch recess taken 12:27 to 1:37
20    p m.)
21    (Jury enters.)
22    THE COURT: Please be seated. Make
23 sure cell phones are turned off.
24    Whenever you're ready, Mr. Panatier,
25 you can continue.

Page 177

1    MR. PANATIER: Thank you, your Honor.
2 Good afternoon, everybody.
3 BY MR. PANATIER:
4    Q.    Okay. So, before we left for lunch,
5 sir, we were talking about that research that was
6 done by Mountain States Research in Arizona. Do you
7 recall that?
8    A.    I do.
9    Q.    And you had brought up that there
10 might be some other mines in or around Windsor,
11 Vermont, right?
12    A.    I think at one time I remember there
13 was up to 50 in the State of Vermont.
14    (There is a discussion off the
15    record.)
16    MR. PANATIER: Okay. So this will be
17 Exhibit 3695-30 and I'll just mark it right now.
18    There you are, your Honor.
19    THE COURT: Thank you.
20 BY MR. PANATIER:
21    Q.    There you go, sir.
22    So what I did over the break is I looked
23 through some of these documents to see if I could
24 find any other information, alright.
25    And do you see here you have a July 23, 1987

45 (Pages 174 - 177)

1  document from Roger Miller to William C. Egan
2  subject of which is process modifications?
3      A.    Yes.
4      Q.    Alright.  And there's another note at
5  the top.  It says, "BS_" and that's, in all
6  likelihood, probably Bruce Semple, would that be?
7      A.    He was there in '87.  I don't whether
8  that was him or not.
9      Q.    Okay.  It's not really important.
10 The handwritten note is not super important.
11         MR. PANATIER:  Your Honor, we offer
12 this in evidence.
13         MS. SULLIVAN:  No objection.
14         THE COURT:  Admitted.
15         (Plaintiff's Exhibit 3695-30 was
16     moved into evidence.)
17 BY MR. PANATIER:
18     Q.    Okay.  And just to give us a
19 framework of what we were talking about.  There were
20 two documents.  One was this document from
21 December 15th, 1977 where Mountain States Research
22 had done some work for Windsor Minerals, right?
23     A.    Yes, they had done some geological
24 reports, yes.
25         MS. SULLIVAN:  I'm sorry, Counsel.

1         THE COURT:  Sidebar.  Take your
2  document down, please.
3         MR. PANATIER:  Okay.
4         THE COURT:  Yeah, thank you.
5         (Sidebar.)
6         MR. PANATIER:  I'm so sorry, Judge.
7  I didn't -- I'll make sure it doesn't get shown.
8         MS. SULLIVAN:  Well, before you go,
9  what part of it if it do you wish to show?
10         MR. PANATIER:  So just the top part
11 and the part at the bottom and I don't think it says
12 anything.  Yeah.
13         MS. SULLIVAN:  The what?
14         MR. PANATIER:  Just the bottom, yeah,
15 paragraph second to last and last.
16         THE COURT:  And objection to that as
17 long as the rest --
18         MS. SULLIVAN:  No.
19         THE COURT:  Just make sure that you
20 cover that up.  Okay.
21         MR. PANATIER:  Yes, of course.
22         THE COURT:  Thank you.
23         (Sidebar ends.)
24 BY MR. PANATIER:
25     Q.    So we had looked at that one that one

1  from '77 and then the second one from March of '87
2  where we had looked at what you said could be an
3  experiment where they were experimenting with
4  flotation with particle respect to the tremolite
5  content, correct?
6      A.    That was '77?
7      Q.    That was '87 -- '82, I'm sorry.  So
8  we have '77 and then we have '80 -- sorry '87 -- '77
9  and '87 --
10     A.    Yes.
11     Q.    -- right?
12         Now, this document is July 23rd of '87 the
13 one that I've just given to you, right?
14     A.    Yes.
15     Q.    Okay.  And what they say there in the
16 first paragraph is, "Working with Mountain States
17 Research or Vail, Arizona, we have tested in their
18 laboratories and confirmed by plant trials here at
19 West Windsor the efficacy of sodium silicate as a
20 modifier, disbursing agent, to enhance the rejection
21 of deleterious mineral species in our process."  Do
22 you see that?
23     A.    Yes.
24     Q.    "Deleterious" means could be bad,
25 damaging, something you don't want, right?

1      A.    Something you don't want.
2      Q.    Okay.  And just to be clear that
3  we're talking about the right talc here, you can see
4  that at the bottom of Page 2 they say, "We will
5  shortly forward for approval via organoleptic
6  evaluation a sample of grade 66 talc processed by
7  the improved methods.  This material will
8  incorporate both the dispersion technique utilizing
9  the sodium silicate and the organic acid technique.
10 We do not believe that either of the special
11 techniques will leave a residual in the grade 66
12 talc."
13         That's what I'm trying to get to.  Grade 66
14 is the baby powder talc, right?
15     A.    Yes.
16     Q.    "We would like to move forward in
17 this matter, so I will appreciate early feedback of
18 the results of the testing at baby products
19 company."
20         So this testing, at least, what he's
21 referencing here, did have to do with the baby
22 powder that they were concerned about, right?
23     A.    In this 1987 report, yes.
24     Q.    Oh, alright.
25     A.    Yes.

Page 182

1    Q.    And are you aware of any other -- any
2  other testing that was done by this institution in
3  Arizona for Johnson & Johnson other than what I've
4  just shown you?
5    A.    I'm not aware of, no.
6          THE COURT:  For the record, where did
7  you put those documents?
8          MR. PANATIER:  In the inbox.
9          THE COURT:  Thank you.
10 BY MR. PANATIER:
11   Q.    Okay.  I'm going to take us back to
12 powder in the sheets.  I'm going to try again.
13         And perhaps we can -- well, here,
14 I'll hand you a copy of this.
15         MR. PANATIER:  And, for the record,
16 this document is 1996.  It will be 3695-29.
17   Q.    Here you go, sir.
18   A.    This one?
19   Q.    This one right here, yeah.
20         MR. PANATIER:  Here you go, your
21 Honor.
22         THE COURT:  Thank you.
23         MR. PANATIER:  Sure.
24   Q.    And, sir, you see that this has the
25 J&J Bates Stamp on it?

Page 183

1    A.    Yes.
2    Q.    It's dated 1996?
3    A.    Yes.
4    Q.    It says, "Shower to Shower
5  confidential."  It says, "Qualitative Research
6  conducted on behalf of Johnson & Johnson consumer
7  products, Inc.," correct?
8    A.    Yeah.
9          MR. PANATIER:  Okay.  And, your
10 Honor, we offer this into evidence as Exhibit
11 3695-29.
12         MS. SULLIVAN:  And, your Honor, I'm
13 going to object, hearsay.  It's an outside company's
14 document.
15         MR. PANATIER:  It goes to notice,
16 your Honor.
17         THE COURT:  I'll allow it as to
18 notice only.
19         MS. SULLIVAN:  Thank you.
20 BY MR. PANATIER:
21   Q.    So sometimes the company will do
22 market research, they'll have prospective customers
23 come in and they'll survey them, right?
24   A.    Well, usually, the company doesn't.
25 It's an agent that would do it in this case.

Page 184

1    Q.    Sure.  Whether it's the company or
2  somebody they hire to do the research, they're
3  interested in information about how their products
4  are used, correct?
5    A.    Yes.
6    Q.    Okay.  So, look, on this one I asked
7  you about sheets, people using it on their sheets.
8  So look at Page 8, please.
9          Do you see here it says, "It is not
10 surprising that during the warm and humid summer
11 months, powder usage is said to be remembered and
12 used with greater frequently.  During the warm
13 months a few woman said that they used powder in
14 between showers and also sprinkle powder between
15 sheets."
16         So Johnson & Johnson was, certainly,
17 aware that some customers did this as a use of their
18 product, correct?
19   A.    Well, that's of 1996, that's -- yeah.
20   Q.    Right?
21   A.    Yes.
22   Q.    And then if you'll turn to Page 10.
23 "Apart from the desire to want their own brand of
24 powder, many of the Shower to Shower users inherited
25 the product ritual from their mothers.  Even a

Page 185

1  relatively young user said that she had first tried
2  Shower to Shower because her mother was using it.
3  And quickly began to use it more regularly and then
4  went to purchase her own.  So was the case for a
5  majority of these woman who had first become aware
6  of Shower to Shower right at home and then continued
7  quite loyally, it appears, to maintain their usage
8  over a period of years."
9          And my question is, Johnson & Johnson
10 certainly doesn't disagree that a lot of users of
11 the products got it -- started using it because a
12 parent was using it on them or was using it in their
13 company, fair?
14   A.    That's not an unreasonable
15 conclusion.
16   Q.    Alright.  Sir, that's all I have.
17         So Johnson & Johnson, certainly, understood
18 that people would sprinkle it in their sheets, at
19 least, by '96, right?
20   A.    Yes.  By '96, yes.
21   Q.    And at no point did Johnson & Johnson
22 ever put out information whether it be on a package,
23 in a commercial or anything like that, that said,
24 here's a use we're aware of, don't sprinkle this in
25 your sheets, right?

47 (Pages 182 - 185)

Page 186

1     A.     I'm not aware of that.
2     Q.     Is there any reason that a person
3 shouldn't sprinkle it into their sheets?
4     A.     Again, I'm not aware that they
5 wouldn't. They're still getting it on their body.
6     Q.     Let's jump ahead.
7            This is dated July 23, 1987. So, if
8 you can find your binder with '87.
9     A.     Yeah.
10    Q.     Do you have it?
11    A.     I do.
12    Q.     Okay. Great. This is Exhibit 3446.
13 And do you see that this is -- if you turn the page
14 to -- it looks like this.
15    A.     Yes.
16    Q.     The third page in?
17    A.     Uh-huh.
18    Q.     It's an affidavit of Roger Miller,
19 right?
20    A.     It is.
21    Q.     Roger Miller was the President of
22 Windsor Minerals, which was the company owned by
23 Johnson & Johnson?
24    A.     It was.
25    Q.     And do you see that he filled out a

Page 187

1 sworn affidavit?
2     A.     Yeah, he appears to, yes.
3     Q.     Okay. He signed it on the 13th day
4 of July, 1987, true?
5     A.     Yes.
6     Q.     And back on the front where his
7 affidavit is, he signed this in Middlesex County,
8 right?
9     A.     Yes.
10    MR. PANATIER: Your Honor, we offer
11 this into evidence.
12    MS. SULLIVAN: It's hearsay, your
13 Honor and unrelated. It looks like unrelated
14 lawsuits.
15    THE COURT: How about we do this at
16 sidebar.
17    (Sidebar.)
18    THE COURT: What is the purpose for
19 which you are offering this into evidence?
20    MR. PANATIER: Yes, your Honor, this
21 is -- first of all, this would be an admission in
22 Plaintiff's interest. It's also an admission from
23 (INAUDIBLE) Stork by Johnson & Johnson. And the
24 purpose is to demonstrate that Mr. Miller, after all
25 of the records that we've gone through did not tell

Page 188

1 the truth about whether or not asbestos had been
2 detected in powders when he was defending the
3 company publically.
4     THE COURT: So this was -- this was
5 No. 3 -- (The Judge reads to herself out loud.)
6     MR. PANATIER: Yes, your Honor.
7     THE COURT: And your objection is?
8     MS. SULLIVAN: Yes.
9     THE COURT: I can't hear you.
10    MS. SULLIVAN: It's the record, I'm
11 objecting to hearsay (INAUDIBLE) to test.
12    MR. PANATIER: Yeah, he references
13 the text. That's fine.
14    THE COURT: Okay. So I'll allow the
15 statement as to the interest and whether you don't
16 use the test (INAUDIBLE) and I'm going to admit it
17 for purposes of completeness --
18    MS. SULLIVAN: (INAUDIBLE.)
19    MR. PANATIER: Fine. I'll show it.
20    (Sidebar ends.)
21    THE COURT: Okay. This document is
22 now admitted.
23    MS. SULLIVAN: Thank you, your Honor.
24    (Plaintiff's Exhibit 3446 was moved
25        into evidence.)

Page 189

1 BY MR. PANATIER:
2     Q.     Alright. Sir, so if you go to
3 Paragraph 1, Mr. Miller says, "I'm the president of
4 Windsor Minerals, Inc., and I've held that position
5 since 1968 when Windsor Minerals, Inc., was first
6 formed. The exclusive business of Windsor Minerals
7 is and has been over the last 18 years the mining
8 and milling of talc from a single milling district
9 in Windsor, Vermont."
10    Now, the last 18 years, so he's referencing
11 the full-time, isn't he?
12    A.     Yes.
13    Q.     Right? He's not referencing a
14 specific date, true?
15    A.     Yes.
16    Q.     Okay. "That mining district is the
17 exclusive source of talc for all of the Johnson's
18 Baby Powder sold in the United States. In addition
19 to supplying the talc for Johnson's Baby Powder,
20 Windsor Minerals, Inc., also sells a portion of its
21 products to independent industrial users."
22    So he's including in this paragraph
23 everything they sell, their baby powder talc and
24 their industrial talc, correct?
25    A.     Yeah, it says what it says. It sells

48 (Pages 186 - 189)

Page 190

1 a portion of it's product to industrial uses.
2     Q.     As well as the baby powder, correct?
3     A.     As well as the baby powder.
4     Q.     They didn't sell any other products.
5 He's listed everything they sold, right?
6     A.     They sold industrial and they sold
7 cosmetic talc, yes.
8     Q.     My question is, has he listed
9 everything that Windsor Minerals sold between the
10 cosmetic and the industrial?
11     A.     Yes.
12     Q.     Okay. Let's go to the next page.
13     And, again, you understand this was -- this
14 was in a case called Edly versus Windsor Minerals?
15 Do you see that on the front?
16     A.     Yes.
17     Q.     And you see here it says it's sworn?
18 This is a sworn statement?
19     A.     Yes.
20     Q.     Okay. Let's go to what he says last.
21 "All of the talc mind by Windsor Minerals, Inc.,
22 whether it is ultimately sold to industrial users or
23 used in Johnson's Baby Powder is sampled and tested
24 for the presence of asbestos. No evidence of the
25 presence of asbestos in Windsor Minerals' product

Page 191

1 has ever been revealed by this testing." Did he say
2 that?
3     A.     You read what he wrote.
4     Q.     And he attached a recent test, right?
5 Right?
6     A.     Yes.
7     Q.     He attached one test from -- that
8 looks like -- I don't know that this is a year yet.
9 We probably have a few thousand years to go, but I
10 think that's 1987, right?
11     A.     Yes.
12     Q.     He attaches one test, does he not?
13     A.     Exhibit A is one page.
14     Q.     Okay. Alright. This statement was
15 false, correct?
16     A.     Well, the statement -- I'm not going
17 to comment on whether it was false or true. It's
18 for Roger Miller to comment.
19     Q.     No. It's for you to comment. You're
20 here for Johnson & Johnson and Johnson & Johnson was
21 using this talc. So my question is, was Mr. Miller
22 being truthful or was he being untruthful?
23     A.     Well, okay, let's go through that
24 sentence, if I may. Industrial users or use in baby
25 powder. The baby powder testing that is available

Page 192

1 indicates asbestos free in the product that is sold.
2 We've seen some results on industrial talcs that
3 don't demonstrate that.
4     Q.     We've seen the HC samples that show
5 asbestos, correct?
6     A.     We've seen it.
7     Q.     Hold on. It's one question.
8     A.     Sorry. I thought you had finished.
9     Q.     We've seen the HC samples that show
10 asbestos, right, 1975, right?
11     A.     Yes.
12     Q.     We've seen GI and WI, those are
13 industrial, correct, at least, as of this year those
14 were industrial, right?
15     A.     I believe so, yes.
16     Q.     Right? We saw them again in
17 November. Over and over and over again. And those
18 were written, sir, to who?
19     A.     To whom?
20     Q.     Yeah. They were written to Windsor
21 Mineral, right?
22     A.     Yes.
23     Q.     This is the President of Windsor
24 Mineral in a lawsuit saying, no evidence of the
25 presence of asbestos in Windsor Minerals' product.

Page 193

1     And he included -- I asked you, he included
2 everything they'd ever sold, cosmetic and
3 industrial, has ever revealed or been revealed by
4 this testing.
5     Here's the question. Was that true or was
6 that false?
7     A.     On the face of it, it does not appear
8 to be true.
9     Q.     So that makes it what?
10     A.     Unless we've got other evidence. On
11 the face of it, it would not be true. Unless --
12     Q.     Which would make it?
13     A.     It would make it false, unless there
14 is other evidence that we don't have here.
15     Q.     But this -- well, presumably, sir,
16 Mr. Miller had all the evidence at his disposal, did
17 he not?
18     A.     In 1987?
19     Q.     Yeah.
20     A.     He must have been a very old man in
21 1987. I'm sure he long retired.
22     Q.     I didn't ask you his age.
23     A.     I don't know if he had the evidence
24 at his disposable -- at his disposal.
25     Q.     Sir, this is the President of Windsor

49 (Pages 190 - 193)

Page 194

1 Minerals in 1987.  No one -- you wouldn't expect
2 anybody at the company to have more access to the
3 information of that company than him, correct?
4    A.    You would expect him to be able to
5 access, if he requested it.
6    Q.    That was stated publically, correct,
7 in a lawsuit, right?
8    A.    It is.  The document states what it
9 states.
10    Q.    The documents we had going directly
11 to them in the '70s were internal, correct?
12    A.    Yes.
13    Q.    Do you know what happened to that
14 person's lawsuit as a result of Mr. Miller's
15 affidavit?
16    A.    No.
17    Q.    Is there any excuse to not be
18 truthful ever?
19        MS. SULLIVAN:  Objection.
20    A.    Everyone should also aim to speak the
21 truth.
22    Q.    Whether they're under oath or not?
23    A.    Yes.
24    Q.    And he was under oath, wasn't he?
25    A.    I believe so, yes.

Page 195

1    Q.    And that is -- you understand that is
2 perjury, do you not?
3    A.    I do.
4    Q.    Okay.  Alright.
5        (There is a discussion off the
6      record.)
7        MR. PANATIER:  This is 1991.  This is
8 already in evidence.  It's Exhibit 3390.  This is
9 the Blount paper, your Honor.
10    Q.    Sir, you know who Alice Blount is,
11 correct?
12    A.    Yes.
13    Q.    I'll just put it up here.  It's
14 already in evidence.
15    A.    Okay, yes.
16    Q.    She published this paper in 1991,
17 right?
18    A.    She did publish that paper in 1991,
19 yes.
20    Q.    We know that per her key and her
21 letters, we know that she tested Johnson's Baby
22 Powder, correct?
23    A.    In the report she states that she
24 tested baby powder, yes.
25    Q.    Now, when Johnson & Johnson found out

Page 196

1 about this, did they run it over to the FDA?
2    A.    I don't know.
3    Q.    Because the only thing that was
4 published when she published it was the article, not
5 the key, correct?
6    A.    The article was published.  The key
7 appears many years later, as I understand it.  But
8 the article stands by itself.
9    Q.    So, in the article where it says that
10 there were needles and fibers in Sample I, if you're
11 just looking at the article, you have no idea what
12 Sample I is, correct?
13    A.    Correct.
14    Q.    But looking at the key, you do know,
15 because it says what Sample I is, right?
16    A.    The key states samples A, B, C, D, E,
17 down to I.  It does state what Sample I is on that
18 key.
19    Q.    And you know that -- and, by the way,
20 is this Dr. Blount?
21    A.    Yes, she had a Ph.D. in mineralogy.
22    Q.    This is also in evidence.  This is
23 Exhibit 3191.  This is another copy of her letter.
24 And, of course, this was produced by J&J.  Can you
25 see that?

Page 197

1    A.    Yes.
2    Q.    By the way, the first one was
3 produced by Johnson & Johnson, too.  Do you see
4 that?
5    A.    Yes.
6    Q.    Meaning that Johnson & Johnson had
7 the key, correct?
8    A.    There is a key.
9    Q.    Right.  You see the Bates Stamp at
10 the bottom of the key?
11    A.    There is a key.
12    Q.    So the key -- key is in the inbox,
13 right, because that is something that Johnson &
14 Johnson had, true?
15    A.    Well, the key is in the Johnson &
16 Johnson files.  A key is in the Johnson & Johnson
17 files.
18    Q.    Okay.  And you know that in 1992, one
19 year after the paper came out -- so not many years
20 later, but one year after the paper came out, she
21 wrote to Luzenac, correct?
22    A.    I can't remember that, but refresh
23 me.
24    Q.    It's right up there.
25        MS. SULLIVAN:  Objection.  Can I get

50 (Pages 194 - 197)

Page 198

1 a copy, Counsel?
2          MR. PANATIER: Sure. This is
3 Exhibit 3191. That's correct. This is from 1992,
4 right.
5 BY MR. PANATIER:
6     Q.     And Luzenac -- yes?
7     A.     So is this in here?
8     Q.     Yes, sir. It is in there. It will
9 be under the tab that is 1992, if you want to look
10 at it. It's, also, up on the board if you would
11 like to reference it there.
12         Do you have it, sir?
13    A.     Yes, I do.
14    Q.     Okay, good.
15         So she writes -- and by the way, she
16 was at the Newark Museum at that time. Do you see
17 that?
18    A.     Yes.
19    Q.     Okay. And there's her signature down
20 there. She was a consultant to Johnson & Johnson,
21 correct?
22    A.     Johnson & Johnson had used her on
23 isolated occasions as a consultant, correct.
24    Q.     They had paid for a lot of her
25 research, correct?

Page 199

1     A.     I don't know how much they ever paid,
2 but they had used her on occasions as a consultant
3 for her mineralogical ability.
4     Q.     Sure. And I don't know how much they
5 paid her either.
6     A.     No.
7     Q.     But my question wasn't how much they
8 paid her.
9         My question was, she was paid by them
10 for her research, correct?
11    A.     Again, I don't know how often or on
12 what occasion. She was a consultant. I know no
13 more than that, whether it was one off, two off,
14 three off. But she did some consultancy.
15    Q.     I'm not asking how much she did or
16 how much she got paid.
17         By being a consultant, that meant she was
18 paid, right?
19    A.     Yes.
20    Q.     That's all I'm asking.
21    A.     Okay.
22         (Continuation of the day's
23 proceedings in Volume 2.)
24
25

Page 200

1          CERTIFICATION
2
3      I, SILVIA P. WAGE, C.S.R., License Number
4 30X100182700, a Certified Court Reporter in and for
5 the State of New Jersey, do hereby certify the
6 foregoing to be prepared in full compliance with the
7 current Transcript Format for Judicial Proceedings
8 _____ ___ non-compressed transcript
9 _____ __dge and ability.
10
11

12 SILVIA P. WAGE          JULY 22, 2019
13 CERTIFIED COURT REPORTER      DATE
14 MIDDLESEX COUNTY COURTHOUSE
15
16
17
18
19
20
21
22
23
24
25

51 (Pages 198 - 200)

**&**

**&**   3:3,15,18,20,20
5:7,8,9,10,18,18
6:2,21 15:14,22
21:6 22:3 23:2,10
23:25 25:14,17,22
25:25 26:4,15,19
27:12,21 30:6,6,24
31:1 33:11 34:1
36:4 39:10 40:19
42:5,20 45:1
47:13 51:9 57:4
57:14 58:18 59:14
60:19 61:20 63:9
63:15 64:1,23
65:9 66:16 67:2
67:18,23 68:1,3,9
68:15 70:23 71:16
71:19 72:14,19,21
73:3 75:25 78:10
80:3,6 89:22
90:12 91:2,17
93:18 97:9 99:11
104:10,15 105:4
105:22 106:1
107:8 108:1,4,8
109:13,16,20
110:24 111:12,19
111:19,22 112:18
112:23 113:3,21
114:18 115:25
116:17 127:12
129:17,22 131:1,9
133:2 140:18
141:20,25 142:13
161:8 163:17
164:5 165:14
166:14,18,24
169:2,9,16 171:17
172:7,25 182:3
183:6 184:16

185:9,17,21
186:23 187:23
191:20,20 195:25
197:3,6,13,15,16
198:20,22

**0**

**0.5**   54:17
**00001**   118:8
**0001**   120:21
**0005**   118:3 120:18
126:25
**001**   102:25 120:19
**007**   120:19
**01**   102:25 163:7
**07039**   2:23
**07102**   3:19
**07701**   3:4
**084-802h**   78:16,18
79:13
**08542**   3:16
**08903**   2:3
**0932-17as**   1:9

**1**

**1**   1:6 2:5,6 12:15
25:10 26:11,22
27:2 31:9 32:13
32:17,20 36:5
40:4 47:14,19,20
51:14 65:25 71:5
88:12 100:24
103:15,18,22
104:4,5,10 105:3
105:16 110:1
118:7 127:5
130:14 139:16
141:6,12,18,23
142:25 145:10
147:4,23 148:20
156:10 163:6
189:3

**1,410**   72:10
**1,561**   72:7
**10**   13:4,6,9 82:11
83:1 118:8 128:7
128:9 147:22
184:22
**10/27**   58:23
**100**   3:19 16:19
173:10
**10022**   3:7
**102**   4:11 10:22
12:2,4
**107**   4:12 74:22
75:3,3,7,11 76:10
76:11
**107,000**   75:20
**108**   44:13 57:19
**108t**   44:22 45:2
**109t**   44:13,23 45:2
57:19
**10:39**   89:15
**10th**   128:5
**11**   15:21 21:19
39:12 41:19 92:23
93:11
**113**   15:8,10
**115**   4:6
**11:01**   89:15
**11th**   3:6
**1201**   3:9
**125,000**   87:3,13,15
**127**   3:3
**129**   4:7
**1297**   4:6 13:15,22
14:9
**12:27**   176:19
**13**   15:5 65:21 66:1
90:21
**131**   4:14 15:14
18:1,12,13

**137**   4:12
**138**   15:8,10,14
18:1,13,13
**13th**   90:16 187:3
**14**   4:6 20:24
149:22
**140**   4:13
**14th**   20:16 28:5
**15**   44:3 89:1
114:13 117:7,23
118:1 125:22
126:14 127:10
133:21 165:1,2,6
165:14
**151**   4:17
**155**   4:17
**157**   4:18
**15th**   162:5 178:21
**16**   86:12 131:7,9
157:14
**161**   4:16
**162**   4:13
**165**   4:14
**16th**   107:23
**17**   3:15
**176**   4:15
**178**   4:20
**18**   64:16,20 86:6
86:13,13,14,16,19
86:22,22,25,25
106:15,19 107:4
189:7,10
**1809-17as**   1:2
**181**   18:9
**186**   18:10
**188**   4:19
**18th**   79:23 107:24
**19**   99:3
**195**   11:23 12:7
16:21

**[1968 - 3121]**

**1968** 189:5
**1970** 50:14
**1970s** 89:23
**1971** 88:7
**1972** 9:22 10:4,16
18:4 19:11 20:17
20:24 23:10 24:23
26:18 28:5 34:1
41:19 42:25 43:18
52:9 82:11 83:1
**1973** 12:6 13:25
16:8 18:6 19:11
38:12 39:5 73:24
80:15 81:3 90:17
90:21 92:24 95:18
96:3,4 97:23 99:3
101:17
**1974** 79:23 106:15
106:19 110:25
113:20,20 114:23
115:15 119:9
128:7,9,15 134:11
134:12,17 137:7
140:6,9 141:2,15
141:19 142:19
143:1 174:15
**1975** 143:4,6,9,12
143:16,19 146:25
147:1 148:15
149:22 154:4
158:15 162:5
163:22 164:2
192:10
**1976** 23:1 60:25
61:8,16 64:16,20
65:25 131:7,10
150:23 152:3,12
**1977** 154:10,15
155:1,2 165:2,6,14
178:21

**1978** 156:10,11
**1987** 177:25
181:23 186:7
187:4 191:10
193:18,21 194:1
**1991** 195:7,16,18
**1992** 197:18 198:3
198:9
**1995** 114:6
**1996** 182:16 183:2
184:19
**19th** 99:2 162:8,9
**1:30** 175:24 176:4
**1st** 143:4,9,16,17
147:3 159:12

**2**

**2** 1:6 2:5 39:11
44:22 88:12
100:24 106:21,22
120:18 139:17
145:10 147:23,24
148:20 156:10
170:3,4,10,11
181:4 199:23
**20** 103:14,17
114:13
**200** 2:6 103:19,19
103:21 173:10
**201** 3:16
**2014** 8:3,12,18,24
**2018** 71:9
**2019** 2:4 5:5
200:12
**2049** 4:6 115:22
**2053** 143:11,24
**21** 4:9
**21st** 80:15
**22** 200:12
**226** 17:21
**23** 2:4 5:5 71:9
177:25 186:7

**2321** 4:7 128:8
129:2,5
**23rd** 180:12
**24** 95:18 113:20
114:22 115:15
150:23 152:12
162:22
**2415** 43:5,6 44:2
53:8
**2416** 4:7 43:5,6,8
43:11 44:1 52:4
**2417** 4:8 43:8,8,13
58:25
**2419** 43:7 53:11
**2423** 4:8 20:22
28:7,11
**2424** 20:22 21:11
**2434** 4:9 21:14
**2450** 4:9 90:15
91:8,11
**2451** 4:10 99:3,18
99:21
**2452** 4:10 92:23
93:3,9
**2454** 4:11 102:2,13
102:16
**2455** 4:11 96:4,14
96:18
**24th** 92:22,24
151:6 153:5,6,16
**25** 100:3
**250** 87:16,19
**2506** 4:12 106:17
107:15,19
**2525** 4:12 134:12
137:14,17
**2536** 4:13 140:10
140:24
**2546** 72:2,5
**2581** 4:13 162:4,15
162:18

**26** 152:2
**2601** 4:14 131:10
131:18
**2617** 73:7
**2669** 4:14 165:21
166:1,2
**27** 42:24 43:18
52:9 57:16 101:25
**2723** 4:15 170:8
176:8,14,17
**27th** 60:13 99:2
**28** 4:8
**2840** 149:21
**2848** 4:15 60:24
62:1,9
**2849** 4:16 65:6,17
**2852** 10:8,9
**29** 13:2 17:21,22
144:14
**290** 2:22
**2nd** 60:25 61:8,16
96:3,4

**3**

**3** 16:5 36:15,20
39:11 44:23 47:14
47:19 51:14 60:3
86:17 88:12
104:10 105:3,16
145:10 147:23
148:20 156:12,15
163:8 188:5
**30** 7:23 17:21,22
103:17,19,20,21
**3051** 4:16 159:24
161:1
**3083** 4:17 151:11
151:15
**30x100182700**
200:4
**3121** 4:17 154:22
155:1,5

**[3191 - actual]**

**3191**   196:23 198:3
**31st**   13:12,25 16:8
**3224**   4:18 157:6,9
**3390**   195:8
**3400**   3:9
**3441**   4:18 81:17
  82:17
**3446**   4:19 186:12
  188:24
**3555**   36:24
**358**   36:20
**3695**   7:5
**3695-25**   7:11
**3695-26**   4:19
  41:12,22
**3695-29**   182:16
  183:11
**3695-30**   4:20
  177:17 178:15
**38**   15:6 115:5
  117:10,23 123:22
  133:3,21
**3rd**   9:22 10:3,15
  13:11

**4**

**4**   88:12 103:15
  145:10 148:20
  155:2 168:22
**41**   4:19 123:22
**43**   4:7,8
**46**   97:23
**4th**   154:15 170:9

**5**

**5**   12:16,19 16:5
  17:18 44:10,22
  45:17 54:16,16
  65:23 103:15
  104:4 145:10
  147:24 159:12

**50**   169:5 177:13
**500**   83:6,8,25
  85:23 87:6,10,13
  87:16
**56**   2:2
**5th**   143:12 146:25
  146:25

**6**

**6**   4:3 12:2 79:2
  86:16 103:18,22
  104:4 173:10
**6-2-76**   63:18 64:10
**6/11/74**   161:19
**6/6/14**   138:3
**6040-17as**   1:19
**62**   4:15
**65**   4:16
**66**   181:6,11,13
**670**   74:7
**679**   74:8
**6th**   128:6,15 140:6
  140:9 141:2

**7**

**7**   103:18,22 104:5
**70**   88:6
**7024**   105:5,9
**7049-16as**   1:14
**70s**   9:15 113:21
  114:7,8 194:11
**71**   16:18
**718**   2:23
**72**   13:10 40:11
  57:16 142:4
**73**   13:13 17:18
  81:9 102:1 106:18
**74**   79:5 80:13 81:5
  81:9 106:18,19
  107:3,4 114:3
  132:4,25 155:8

**75**   114:3 157:21
  159:12,13
**75270**   3:10
**76**   65:23 114:4
  150:24 151:6
  155:9 157:21
**77**   155:9 157:20
  180:1,6,8,8
**77s**   154:11
**78**   157:20
**7873**   78:9

**8**

**8**   184:8
**8/11/72**   21:4,20
**8/8/74**   79:2
**80**   180:8
**800**   3:6
**82**   4:18 18:9 180:7
**83**   18:9
**84**   11:19 12:18,22
  13:5,7 17:16
  18:10 19:14 41:8
  73:19,20 74:13,18
  74:22 80:10,16,19
  81:4 83:17
**85**   18:10
**87**   170:4,9,10,11
  178:7 180:1,7,8,9
  180:12 186:8
**8th**   79:5 91:23

**9**

**9**   134:11 137:7
  147:22
**9/2/75**   162:25
**90s**   127:24
**91**   4:9
**93**   4:10
**95**   114:10
**96**   4:11 114:10
  185:19,20

**983-1234**   2:23
**99**   4:10
**9932**   200:11
**9:00**   2:5
**9th**   134:12

**a**

**a.m.**   2:5 89:15
**ability**   199:3 200:9
**able**   22:19 23:17
  33:14 55:17
  112:19 113:5
  146:5 194:4
**absence**   22:12
**absolutely**   31:3
  160:15
**abundant**   167:21
**academic**   17:4
**accept**   24:24 36:11
**accepted**   94:8
  119:16
**access**   194:2,5
**accompanied**
  168:13
**accurate**   121:22
  200:8
**acgih**   97:4
**acid**   173:9 181:9
**acres**   116:15
  132:23
**acting**   94:12
**actinolite**   74:18,20
  74:23,25 75:22,24
  103:25 106:10,11
  168:8,13,14,19,21
  171:25 175:10
**action**   29:24,25
**activities**   93:24
**actual**   29:20 39:12
  80:4 120:19 147:5
  175:5

[add - area]                                                        Page 4

**add**  145:1,2
**addition**  52:17
  138:14 189:18
**address**  114:11
**administration**
  19:22 26:3 28:21
**admission**  187:21
  187:22
**admit**  188:16
**admitted**  14:6,7
  21:13 28:10 41:21
  43:10 61:25 65:16
  82:16 91:10 93:8
  96:17 99:20
  102:15 107:18
  115:21 129:4
  131:17 137:16
  140:23 151:14
  157:8 160:25
  162:17 165:20
  178:14 188:22
**adopt**  23:2 93:15
  97:2
**adopted**  25:7
**advice**  93:15,17
**affidavit**  70:6,10
  71:11 186:18
  187:1,7 194:15
**affidavits**  69:12
**afternoon**  177:2
**age**  193:22
**agent**  180:20
  183:25
**ago**  48:19 97:23
  116:17 150:3
**agree**  22:9 49:6,22
  50:6,12 64:9
  72:22 75:4,5,7
  111:25 112:18,23
  126:20 153:18,18
  153:21 163:23

**agreed**  42:14
  94:14 96:25
**agreement**  27:17
**agrees**  31:2 42:20
  163:18
**ahead**  23:1 46:21
  152:18 186:6
**aim**  194:20
**aimed**  92:10
**al**  1:7,12,17,22
  59:11
**alan**  131:10
**alice**  195:10
**allegation**  69:18
**allow**  26:21 27:17
  183:17 188:14
**allowance**  25:9
  26:10
**allowed**  27:3
  109:22 111:2
**alright**  6:20 9:9
  16:7 17:21 28:2
  30:4 38:25 42:24
  43:4 72:25 75:10
  82:20 94:1 99:6
  104:9 114:11,21
  117:1 128:11
  134:5,8 138:21
  156:8 159:23
  164:25 165:5
  168:7 175:2,14
  177:24 178:4
  181:24 185:16
  189:2 191:14
  195:4
**altered**  73:3
**america**  1:7,12,17
  1:22
**amount**  44:9
  53:21,25 108:2,14
  108:16 168:13

**amounts**  12:15
  102:23,25 168:11
  174:7
**amphibole**  40:8
  102:23 104:1,6
  120:1 127:10
  147:6,8,11 148:2
  173:5
**amphiboles**  40:13
  76:2 104:3 138:7
  138:16 141:22
  147:10,17,22,24
  163:4
**ana**  2:12
**analyses**  16:18
  19:3
**analysis**  15:1
  43:21 80:4,10
  81:3 87:22 155:11
  156:24 175:5
**analyst**  77:13
**analytical**  16:2
  23:3 83:21 104:14
**analyzed**  80:16,20
  130:2 147:4
**answer**  20:6 26:23
  27:8 34:6 38:6
  49:15 51:1 58:7
  66:20 67:1 76:25
  77:4 111:8 112:13
  116:22 126:10,10
  142:10,12 146:21
  152:1,2,17 156:20
  156:22 174:22
**answering**  104:23
**anticipated**  118:25
**anybody**  32:24
  194:2
**anybody's**  8:4
**anytime**  98:20

**anyway**  68:19
  116:13
**apart**  184:23
**apatite**  167:25
  168:9
**apologies**  142:15
**apologize**  29:5
**apparently**  73:2
**appear**  101:4
  102:8 193:7
**appearances**  5:11
**appeared**  17:8
  60:2 110:14
**appears**  28:19
  93:22 101:20
  185:7 187:2 196:7
**appellate**  1:2
**applied**  149:14
**apply**  50:10,21
  51:2
**appreciate**  181:17
**approach**  110:14
  163:21,22
**approval**  181:5
**approve**  132:11
**approving**  132:16
**approximate**
  147:5
**approximately**
  21:18 44:22
  120:20 163:6,8
**april**  65:23 71:9
  90:16,21 92:22,24
  95:18 99:2,2,3
  101:25 113:20
  114:22 115:15
  130:2
**archimedes**
  170:21 173:14
**area**  86:4,7 87:1,4
  87:18 123:25

[areas - back]

**areas** 116:10 132:7,11,17,21 134:2 136:4,17
**argonaut** 114:3,17 115:4 116:1,3,4,7 116:9,10,12,12,18 117:3,4 118:12 121:7,17 123:11 131:22,25 133:4 134:22 137:10 139:7,9 161:12 167:11
**argonauts** 116:11
**argue** 86:24 95:1 164:3
**arguing** 126:6,6
**argument** 8:10 27:6 38:4 49:14 50:24 58:5 75:8 77:25 94:15 124:17 174:19
**arizona** 165:13 177:6 180:17 182:3
**art** 47:2
**article** 39:9 196:4 196:6,8,9,11
**arx66-14** 139:11
**asbestiform** 45:3 45:22 46:1,4 48:11,13 51:18 54:22 62:24 65:22 66:15 98:12 104:15,16 105:5,7 105:22 117:18,23 118:2 119:6,20 121:3 133:5,17 135:19,22 136:3 136:11,15 138:6 155:11 156:23 162:25 163:4,11

163:18 164:6,8
**asbestiforms** 139:2 141:21
**asbestos** 16:18 19:12 21:3 22:12 22:13 23:4,18,19 23:21 25:10 26:6 26:11,20,22 29:10 29:11 30:12,19,23 31:1,4,10,14,15 32:13,19 39:11,13 40:7 42:18,22 48:7 51:4 73:19 75:23 76:3,5,13,15 76:21 84:9 90:9 92:4,8 95:7 97:3,5 97:21 98:2,6,10,13 98:22 101:7,11,13 101:16 108:2,8,14 109:22 111:1 114:19 116:1,18 118:9,12 119:19 120:20,23 124:2 124:15,16,20,25 124:25 125:4,6,12 125:20,21,22 126:14,19,20 128:24 129:13,14 129:19 130:14 134:2 138:18,22 139:12,14 141:6 143:5 144:17 145:5,11 146:8,13 147:8,11,15,19,19 148:8,14,19 159:12,13 163:12 163:14,18 164:7,9 171:7 188:1 190:24,25 192:1,5 192:10,25

**ashton** 59:13,14 63:14 64:2,10,24 67:6,7,7 91:5 92:12
**aside** 38:25 134:9
**asked** 6:20 16:17 20:6 23:14 25:8 26:9 34:6 38:1,9 57:8 70:12 77:4 108:4,11,11,12,15 110:8,16,18 115:25 116:16 126:11 133:9 142:13 159:16 184:6 193:1
**asking** 50:20 105:2 123:6 149:16 158:19 169:8 199:15,20
**asks** 108:1,19
**aspect** 105:16
**aspects** 92:2
**assay** 22:21 23:11
**assistant** 83:20
**associate** 95:14 126:23
**associated** 168:3
**associates** 70:23 133:3
**assume** 108:8
**assure** 141:13
**asterisk** 109:9
**attached** 8:8 71:5 71:11 191:4,7
**attaches** 191:12
**attacks** 17:10,12
**attended** 91:14
**attitude** 93:15 95:13
**attorneys** 3:10,20

**august** 9:22 10:3 10:15 13:11 20:16 20:24 28:5 41:19 64:16,20 79:5 82:11 83:1 88:6
**author** 171:14,15 171:17
**available** 191:25
**avenue** 2:22 3:3,6
**avoid** 94:23 172:22
**avoided** 136:4
**avon** 31:8,10
**aware** 7:2 60:22 89:23 90:7,12 94:25 182:1,5 184:17 185:5,24 186:1,4

**b**

**b** 4:4 168:12 196:16
**baby** 13:2 15:19 17:22,24 43:22 45:2 52:10 57:14 59:22 78:23 79:1 79:12,19 81:5 100:1,3 108:3,8,16 109:22 110:22 111:2 117:6,8 119:15 129:13,15 130:25 132:2 181:14,18,21 189:18,19,23 190:2,3,23 191:24 191:25 195:21,24
**back** 6:13 7:13 8:25 10:14 11:15 24:23 34:12 35:4 38:11 59:11 60:2 72:16 78:3 89:4,5 100:6,10,13

122:18 124:3
130:8 135:12,14
148:19 155:13
168:20 175:24
176:10,12 182:11
187:6
**backdated** 56:19
58:1 60:8,8
**bacon** 91:15
**bad** 180:24
**badges** 175:19
**bag** 79:7
**bank** 3:4
**barden** 1:4 3:11
5:7
**bardens** 5:15
**base** 93:24
**based** 58:20
100:24 102:24
110:19 111:25
135:17 136:10
**basis** 7:2 22:18
24:20 33:10 35:18
79:18 81:11,14
**bates** 7:16,25
17:17 36:24 65:10
68:4,9,16,19,19,20
70:2 71:13 82:5,5
165:15 169:10
182:25 197:9
**battelle** 60:2,4
**bearing** 152:7
153:15
**bearings** 15:13
49:21 82:9
**beg** 20:7
**began** 5:25 185:3
**beginning** 122:18
130:4
**behalf** 5:17 183:6

**believe** 11:12
13:15,20 16:10
17:23 20:13 25:16
25:20 35:24 37:6
46:18 53:13 63:10
67:23 108:3
111:15 158:16
181:10 192:15
194:25
**believed** 111:1
**belt** 173:14
**beneficiation**
118:25 124:1
138:19
**benefitiated** 119:5
138:22
**benefitiation**
137:24 138:25
**berger** 39:21,22
**best** 56:1 129:9
200:9
**bet** 153:19
**better** 120:3,7
**bigger** 107:2
**biggest** 113:23
**bill** 59:13,14 63:14
64:2,10,24 67:6,7
67:7 91:5
**binder** 20:18 61:1
74:3 90:17 106:21
106:22 156:12,15
162:6 186:8
**binders** 155:3
**biotite** 167:25
168:4
**bit** 69:4 86:10
114:12 145:22,25
175:8
**bite** 161:12
**blackbear** 158:18

**blount** 195:9,10
196:20
**board** 55:6 73:13
105:10 198:10
**bodies** 113:21
**body** 114:18 115:4
115:6 116:2,3,7,12
116:14,18,21
117:3,4,13,18,20
118:12,13 119:13
122:1,3,6,6,7,21
123:2,23 127:17
127:23 128:2
132:22 133:4,7
134:23,24 135:1
135:19 136:12,13
137:10 139:9
143:6 144:8,9
186:5
**book** 87:24
**bore** 138:12
**bottle** 118:7
**bottom** 17:17 37:2
68:21 79:22 102:9
109:12 123:21
179:11,14 181:4
197:10
**bound** 94:22
**bouquet** 11:17
**brand** 29:3,17
172:10 184:23
**brazil** 109:13,16
**break** 52:12 88:21
89:1 95:23 169:23
175:8,18 177:22
**breakdown**
149:19
**brenntag** 1:7,12
1:17,22
**bring** 89:8

**broader** 92:1
**brought** 9:9 19:12
177:9
**brown** 39:20
**bruce** 178:6
**brunswick** 2:3
**bs** 178:5
**bunch** 38:12
**bundle** 147:24
**bundles** 84:8
147:23
**bureau** 91:22
93:25 94:11,22
97:2
**business** 71:7
94:16 189:6

| c |
|---|

**c** 2:12 3:1,17 133:2
153:23 178:1
196:16
**c.s.r.** 200:3
**calcite** 168:4
**calculation** 108:2
108:5,5,7,13
109:19,21 110:16
110:18 130:12
141:3,4
**calculator** 87:14
**call** 25:25 158:24
163:11
**called** 11:17 67:7
89:23 90:1 91:15
95:12 190:14
**canadian** 152:6
**capable** 32:3
33:22 141:11
**car** 172:17
**care** 14:5
**carried** 130:24
**carry** 60:10,16

[case - concentrates]

| | | | |
|---|---|---|---|
| case 7:14 8:4 | check 19:4 | 126:15 | comments 28:20 |
| 11:18 13:21 19:20 | checked 19:17 | claiming 90:8 | commercial |
| 20:11,15 29:23 | 55:23 | 97:21 98:5 | 185:23 |
| 31:10 32:22 34:15 | chemical 59:9 | clark 30:24 | commercially |
| 89:3 100:6,10 | chemistry 16:23 | clean 132:8,17 | 114:5 |
| 111:6,14,15 | 17:1 | 135:4 | commonsense |
| 146:13 175:21 | chester 158:18 | cleaner 173:7 | 124:24 |
| 183:25 185:4 | chicago 100:20 | clear 25:22 44:6 | communicated |
| 190:14 | chief 23:24 | 64:9,12 69:14 | 10:18 |
| cashmere 11:17 | chloride 168:4 | 70:1 92:2 150:15 | community 17:4 |
| category 39:15 | chlorites 167:23 | 163:17 172:15,25 | companies 6:2 |
| cause 29:6,8 | choosing 46:17 | 181:2 | 42:10 161:7 |
| 171:23 | chose 16:21 | clearly 35:14 | company 39:13,18 |
| cc'd 99:14 | chris 3:8 5:14 | clifton 158:13,15 | 42:8,12 63:6 |
| ccr 2:21 | christopher 3:2 | 158:19,20 161:16 | 89:23 90:1,4 95:4 |
| cell 5:3 89:18 | 5:15 | close 11:23 | 95:10 100:6 |
| 176:23 | chrysotile 12:15 | closed 161:24 | 149:10 151:23 |
| center 3:18 | 12:20 22:6,12 | closer 103:25 | 172:11 181:19 |
| centrifuging | 23:20,23 24:3,6,15 | code 29:16 | 183:21,24 184:1 |
| 145:25 | 24:25 30:14 31:25 | cohen 3:3 | 185:13 186:22 |
| certain 100:7,7 | 32:4 33:23 35:16 | color 46:17 49:1 | 188:3 194:2,3 |
| 108:14 110:19 | 38:12,16 40:21 | 100:25 | company's 183:13 |
| 136:4 141:20 | 84:9,12 85:18 | colorado 39:19 | compared 133:6 |
| certainly 8:16 | 88:9 114:19 116:1 | colored 48:16,17 | comparison |
| 28:25 34:1 47:19 | 116:18 120:20 | 49:2,7,9,10,13,23 | 117:19 122:20 |
| 77:19 169:16 | 121:13,25 123:2,3 | 50:2,4 | competence 17:6 |
| 173:17 174:14 | 123:16,17 125:22 | columbia 155:14 | completeness 68:8 |
| 184:16 185:10,17 | 126:24,25 127:6,9 | 155:16,20,22 | 84:5 118:15 125:9 |
| certification 200:1 | 127:14 128:2 | 158:13 | 135:11 188:17 |
| certified 200:4,13 | 129:23 130:11 | column 103:5 | compliance 200:6 |
| certify 200:5 | 138:4,7,12,15,18 | columnar 103:5 | complies 46:23 |
| chain 64:5 | 141:22 174:16 | come 70:2 89:5 | composite 121:4 |
| chance 65:7 97:20 | ci 155:18 | 147:23 175:23 | 122:10,12 155:14 |
| 98:3,5 | circle 48:15,21,23 | 183:23 | 157:14 |
| change 56:21 | 49:2,2,21,24 50:4 | comes 21:19 38:11 | composition |
| changed 51:22 | 50:8 | 52:18 130:1 | 167:17 |
| characterization | circles 49:5 122:16 | coming 95:20 | compressed 200:8 |
| 44:8 | citric 173:9 | 137:23,24 159:3,4 | concentrate |
| charles 1:8 3:11 | claim 98:2 | comment 191:17 | 145:23 173:8 |
| chart 46:14 | claimed 24:2,3 | 191:18,19 | concentrates |
| 104:13 | 30:13,14 54:2 | | 171:5 |

**concentration**
145:23 147:6
163:6
**concerned** 181:22
**concluded** 119:12
134:25
**concludes** 35:21
**conclusion** 44:25
54:9,12,13 118:16
123:13 125:9
135:17 136:6
185:15
**conclusions** 66:11
66:11 125:15
**conclusive** 138:13
**condensed** 66:23
67:10
**conducted** 183:6
**confer** 17:9
**confidential** 183:5
**confirm** 22:23
23:15 40:16 55:17
55:22,24 84:24
**confirmation**
95:20
**confirmed** 22:21
23:11,18 30:9
31:12 33:16 35:9
35:11 37:15,19
41:5 59:12 74:17
145:5,11 159:12
180:18
**confirming** 37:12
**confrontation**
17:5
**confuse** 92:14
**confusing** 92:11
**conjunction**
155:11
**consider** 20:5

**consultancy**
199:14
**consultant** 17:8
27:20 40:20
198:20,23 199:2
199:12,17
**consultants** 60:20
73:1
**consumer** 3:20
5:19 42:19,21,22
183:6
**consumers** 112:19
112:25 113:4,4,15
113:18
**contain** 32:8 53:21
**contained** 39:11
44:8 74:22 114:18
**containing** 42:18
97:5 100:23
130:13 141:5
**contains** 23:17
**contaminates**
167:19
**contaminating**
166:10 167:5
171:4,25
**contamination**
139:12 172:22
**contemplating**
117:14
**content** 44:21
80:16 117:16,18
139:10 146:9,14
171:6,11 180:5
**context** 125:2
**continuation**
199:22
**continue** 6:3 70:19
89:19 124:10
176:25

**continued** 4:3 5:6
6:7 185:6
**continuing** 25:6
33:14 119:3
**control** 95:17
**cooperation**
111:20
**copied** 106:3,8
**copies** 7:24
**copy** 7:13,15
64:25 128:12
159:25 182:14
196:23 198:1
**core** 115:6 117:10
117:16,19 122:20
123:22 126:16
127:11 130:2
132:4,20,20
134:21 139:7
**corporate** 6:1
**correct** 10:19 11:8
12:9,20,23 13:8
15:11,15,22,25
16:9,12 17:1,12,22
18:1,14,21 22:24
23:2,8,12 24:6,15
24:16,25 25:11,18
26:6,12 28:5,6,18
28:23 29:14 30:1
30:12 31:2,6,7,16
31:21,25 32:4,14
33:12,17,18,19,23
34:11,15,24 35:3,9
35:19,23 37:13,20
38:8,17,19 40:4,7
40:17,21,25 42:22
43:22 44:13,18,23
47:15,17 48:11,17
51:22 53:3,9,12,15
54:1,16,20,25 55:2
55:15 57:1,19

59:9,23 60:14
61:19,20 64:3,21
65:10 66:9 67:13
73:16,20 75:19
79:16,17,20 80:17
80:21 82:7 83:2,7
85:1 87:16 88:13
89:25 91:3 95:2,7
95:21 97:17 98:23
98:24 100:8 105:6
105:17,19 107:9
108:3 109:2 111:9
113:24 114:19
116:19 117:6
118:9 119:15
120:3 121:10,19
122:1,6,11 123:4
127:15 129:19
130:8,17 131:4,22
133:14,15 134:19
135:2 144:8
145:11 147:9
149:5 152:8,24
154:7 156:19
157:18 158:4,8
159:5 160:15
161:20 162:1,22
163:8 164:20,23
165:15 166:14
168:16 169:3,9,16
171:2 174:17,23
175:11 180:5
183:7 184:4,18
189:24 190:2
191:15 192:5,13
194:3,6,11 195:11
195:22 196:5,12
196:13 197:7,21
198:3,21,23,25
199:10

[cosmetic - declared]

**cosmetic** 9:18
16:19 42:18 97:14
97:15 113:24
114:1,6,9 119:14
126:23 129:22
130:11 134:19
135:2,20 139:23
141:13 144:7,9
149:5,10,15 150:2
150:4,7,18 152:6
152:23,23 153:14
153:19 154:4
156:5,25 157:14
157:21 158:3
159:4 164:19
170:25 172:7,13
172:19 173:1,25
190:7,10 193:2
**cosmetics** 130:24
154:6
**counsel** 10:1 14:1
65:1 68:8,11,25
69:4 70:16 78:1
78:10 80:3,6
90:19 118:15
123:12,19 124:6,9
126:6 135:11
140:8 142:13
178:25 198:1
**count** 81:12
**counts** 147:5
**county** 1:1 2:2
187:7 200:14
**couple** 92:1 96:3
**course** 8:16 71:6
73:23 136:2 169:9
179:21 196:24
**court** 1:1 5:2,17
5:24 6:11 7:8,12
7:17 8:6,9,15,23
9:5 10:1,5,12 14:1

14:6 20:4 21:13
27:7 28:10 34:5,8
38:5 41:14,21
43:10,25 44:3
46:15 49:16 50:25
53:4 55:1 58:6
61:6,25 62:6,10
65:16 68:11,22,25
69:3,8,15,21,23
70:5,16,19 77:2
78:1,3 81:18
82:16 88:23 89:10
89:14,17 90:19,23
91:10 93:8 96:17
98:16,18 99:20
102:15 104:25
106:21 107:18
110:6 115:21
118:20,22 124:8
125:8,11 126:8
129:4 131:17
137:2,16 140:3,7
140:23 142:8,11
142:17 144:3
151:14 152:16
154:24 155:4
156:16 157:8
159:19 160:1,9,25
162:17 165:20,24
166:3 169:24
174:21 175:17,25
176:2,10,15,22
177:19 178:14
179:1,4,16,19,22
182:6,9,22 183:17
187:15,18 188:4,7
188:9,14,21 200:4
200:13
**courthouse** 2:2
200:14

**courtroom** 52:24
129:18
**cover** 61:11 63:13
82:21 161:3
179:20
**covers** 73:24
116:14
**crinkled** 84:8
**criteria** 101:1
**crossed** 78:25
**crr** 2:21
**crystals** 54:8
55:11
**ctfa** 22:3,19 23:2
25:22 26:2 28:23
28:25 29:24 33:11
**cupboard** 100:12
**current** 93:24
117:19 122:21
123:4 128:2
133:10 200:7
**currently** 121:7,19
**custodians** 70:22
**customers** 183:22
184:17
**cut** 15:7,11
**cyprus** 71:15

**d**

**d** 4:1 196:16
**d'angela** 1:14 3:11
5:8
**d.c.** 91:24
**dallas** 3:10
**damaging** 180:25
**danger** 42:21
**daniel** 30:25
**darlene** 1:9 3:11
5:7
**data** 22:5,10,19
33:10 129:14
152:4

**date** 2:4 10:2
13:23 21:2 27:25
43:1 56:22 60:11
61:6 64:17,18
79:2,4 90:20 91:3
140:7 152:12
153:1,3 161:17
189:14 200:13
**dated** 20:16,23
27:25 43:18 57:16
58:23 61:16 64:16
64:20 65:23 73:23
73:24 80:12 92:22
106:15 114:22
128:6 150:22
151:6 154:9,15
162:5,25 165:14
170:3 183:2 186:7
**dates** 8:4 60:16
73:25
**david** 1:8 5:7 70:7
70:21 99:7
**day** 27:24 150:11
150:13,15,21
187:3
**day's** 199:22
**days** 21:19,21,23
40:14 41:4 92:23
93:11 98:7,20
**decades** 9:1
**december** 16:18
80:15 81:3,9,9
165:1,1,2,6,14
178:21
**decide** 170:17
**decided** 94:23
**decisions** 112:20
113:4,5
**declared** 23:20
31:14

**defendants** 1:7,13
1:18,23 3:20 5:18
**defending** 94:17
188:2
**defense** 13:15 39:7
78:8,13 94:20
**define** 58:13
104:15 105:5
**definition** 47:14
50:7,10 51:9,16,17
51:20 76:16,17,20
104:10,12,14,18
105:4,11,21,23,24
106:2
**definitions** 76:1
164:5
**delete** 63:18 64:3
64:10 67:3,8 68:1
**deleted** 66:17
**deleterious** 180:21
180:24
**demonstrate**
187:24 192:3
**density** 86:3
**department**
160:16,18 161:4
**depend** 32:12
**depending** 16:5
**depends** 58:13
**deposit** 166:10,16
167:5
**deposition** 34:20
**deposits** 169:1
**describe** 45:22
76:14,20
**described** 39:15
47:23 75:24 84:13
98:13 147:10,14
147:17
**describes** 85:21
95:22 116:6

126:18
**describing** 49:24
120:22 147:25
171:20
**description** 4:5
**designated** 65:25
152:24 153:7
**designation** 79:15
149:12 150:5,13
151:20
**desirable** 17:9
**desire** 184:23
**desperate** 94:14
**detail** 62:21
**detailed** 45:1
**detect** 18:3,6
19:13 23:22 24:5
24:15 31:24 35:16
35:23 40:24
**detectable** 31:15
**detected** 59:18
129:23 173:5,12
188:2
**detecting** 32:3
33:23
**detection** 16:3
**detects** 38:13
**determine** 95:13
117:15 167:17
171:4,11
**determining**
141:12
**developed** 141:17
**development**
77:19 165:13
**diane** 3:14 5:21
**differ** 131:1
133:16
**difference** 48:2,6
81:1,7,10 133:4

**differences** 27:19
**different** 7:4 11:16
11:23 40:16 45:25
116:10 148:6
**difficulty** 171:23
**diffraction** 18:17
18:21 19:2,8
32:23 123:24
138:13,16
**direct** 4:3 5:25 6:7
137:3
**directed** 97:13
**directly** 194:10
**director** 83:21
144:22
**disagree** 110:23
163:13 175:12
185:10
**disagreement**
42:15
**disbursing** 180:20
**disclose** 152:3
**discontinue** 94:6
**discuss** 129:10
**discussed** 37:2
73:9 84:23 97:17
118:5
**discussion** 9:24
23:16,21 35:13,15
37:8 43:2 69:1
71:25 89:12
128:23 131:21
142:22 159:9,21
162:2 165:3
169:25 171:19
176:5 177:14
195:5
**discussions** 69:4
89:2 155:12
175:20

**dispersion** 99:25
100:21 181:8
**disposable** 193:24
**disposal** 193:16,24
**distribute** 6:12
**district** 189:8,16
**divide** 87:15,15
**divided** 87:16
**division** 1:1
130:24 161:8
**docket** 1:2,2
**doctor** 34:5 81:21
152:18
**document** 8:2
11:11,12 13:19,21
14:4,18,21 20:16
21:7,17 27:9
33:10 41:13 58:22
61:12 64:7,16
67:19 68:9 72:2
73:14,21 78:11,12
83:2 84:6 90:17
92:20 99:1 102:1
102:10 106:6,14
113:19 114:22
117:2 128:8 137:7
140:5 143:14
144:6 150:22
156:15 165:8,12
165:25 169:23
170:15 174:19
178:1,20 179:2
180:12 182:16
183:14 188:21
194:8
**documentation**
36:19 81:15
**documents** 7:20
8:19 19:20 20:11
20:15 34:15,17
36:3 46:8 69:13

70:2 71:1,12,22 106:16,25 128:12 128:13 161:4 171:16 175:3 177:23 178:20 182:7 194:10
**doing**  15:25 35:14 44:18 92:17 98:3 125:9 159:18 174:2
**douglas**  1:4 3:10 5:6
**downstairs**  89:8
**dr**  6:1,8 9:10,11,11 9:15,17 10:16 13:8 16:14,17,21 17:11 19:7,8 21:4 22:9 23:14,14,16 23:25 24:17,18,22 25:1,3 26:13 27:10,17,18,24 28:3,14 30:2,5,5 30:18,21 31:19,19 31:20,23 32:6,11 37:2,9,9,19 38:1 39:1 41:1,16 43:16 59:5 73:10 78:11 83:16 84:24 85:17 95:12 110:14 111:18 125:12 129:10 130:9,23 140:13 141:2 142:11 161:19 196:20
**draw**  46:18,21 47:7,25 48:15 158:1
**drawing**  47:22 48:1
**dressings**  100:18

**drew**  47:19
**drill**  126:16 127:11
**dropped**  54:6
**drug**  19:22 26:2 28:20
**duplicate**  19:1
**dusting**  129:15 130:25

**e**

**e**  2:24 3:1,1 4:1,4 8:7 196:16
**earlier**  114:13
**early**  9:15 60:4 89:23 181:17
**easier**  55:7
**east**  116:12 135:8
**eastern**  100:18
**economic**  29:7,8 29:11
**edges**  171:23
**editor**  39:2
**edly**  190:14
**efficacy**  180:19
**efforts**  96:25 97:13
**egan**  178:1
**eiermann**  109:1,1 109:7 110:13,15 130:23
**eiermann's**  110:14
**eight**  21:21,23 40:14 41:4 146:12
**either**  55:6 68:6 181:10 199:5
**electro**  22:12
**electron**  34:2,11 34:23 35:1 117:10 120:12 123:24,25 127:9 138:11,13 139:6

**elicit**  91:21
**elizabeth**  1:19 3:12 5:9
**elm**  3:9
**elongated**  105:10 105:13
**else's**  99:8
**em**  36:22 37:4,10 37:20
**employee**  109:13 110:16
**employees**  161:11 161:15,23
**employers**  109:16
**enclosed**  155:9
**ends**  9:7 69:24 179:23 188:20
**engelhard**  71:16
**english**  3:18 50:21
**enhance**  180:20
**enjoy**  175:23
**enters**  5:1 89:16 176:21
**entire**  37:11 49:2 66:17 132:21 163:3
**entirely**  49:9,13
**entitled**  82:10 115:3 170:12
**envelopes**  6:13,16
**equal**  51:13
**equate**  87:19
**equivalent**  147:5 163:5,7
**ercilyn**  176:10
**erroneously**  39:9
**error**  29:5 103:22
**esdp**  100:15,16,20
**esq**  2:18 3:2,5,8,14 3:14,17

**established**  122:5 144:6
**estimate**  102:25
**estimated**  118:2 139:16
**estimation**  129:12
**et**  1:7,12,17,22
**etheridge**  1:8,9 3:11,11 5:8
**etheridges**  5:16
**evaluated**  51:24 133:3
**evaluation**  127:17 131:22 181:6
**events**  64:5
**everybody**  177:2
**evidence**  10:7 14:10 21:11,15 27:2 28:8,12 39:6 41:18,23 43:7,7,8 43:12,14 52:3 61:23 62:2 65:13 65:18 73:7,11 78:9 82:14,18 91:8,12 93:6,10 96:15,19 99:18,22 102:13,17 105:9 107:16,20 112:17 115:19,23 117:22 129:2,6 131:14,19 137:14,18 139:12 140:21,25 143:10 143:22 144:2 146:18,20,25 149:20 151:11,16 154:22 155:6 157:10 160:23 161:2 162:15,19 165:18,22 176:13 176:18 178:12,16 183:10 187:11,19

188:25 190:24
192:24 193:10,14
193:16,23 195:8
195:14 196:22
**evolved** 17:15
**exact** 57:19 108:10
138:12 169:19
**exactly** 54:10
127:3
**examination** 4:3
5:25 6:7 45:1
57:13 99:25 115:3
115:11 117:2,9,15
138:11 139:7
168:23 170:20
**examine** 65:21
123:22
**examined** 31:13
100:21 117:20
122:21 129:22
**examining** 146:7
**exceed** 146:14
**exceeded** 118:2
**excluding** 120:25
120:25
**exclusive** 189:6,17
**excuse** 49:16
68:22 194:17
**exercise** 87:24
**exhibit** 4:6,6,7,7,8
4:8,9,9,10,10,11
4:11,12,12,13,13
4:14,14,15,15,16
4:16,17,17,18,18
4:19,19,20 7:5
10:8,9,14 13:15,22
14:9 21:11,14
28:7,11 39:7
41:22 43:11,13
53:8,11 58:25
60:24 62:1 65:6

65:17 71:5 73:7
78:9,13 81:17
82:17 90:15 91:11
92:23 93:3,9 96:4
96:14,18 99:3,18
99:21 102:2,16
106:17 107:19
115:22 128:8
129:2,5 131:10,18
134:12 137:17
140:10,24 143:11
149:21 151:11,15
154:22 155:5
157:6,9 159:24
161:1 162:4,18
165:21 166:2
170:8 176:17
177:17 178:15
183:10 186:12
188:24 191:13
195:8 196:23
198:3
**exhibiting** 121:3
**exhibits** 20:22
43:5
**exist** 130:10
**exiting** 89:10
175:25
**exits** 89:11 176:1
**expanded** 16:20
**expect** 20:15 97:2
194:1,4
**expected** 130:13
141:5
**experiment**
129:15 130:25
174:1,16 180:3
**experimental**
174:13
**experimenting**
180:3

**experiments** 60:18
174:15,24,25
175:4
**expert** 16:22,25
**expertise** 48:5
**explain** 22:11
37:23 48:6
**explained** 7:19
**explanation** 38:14
134:7
**exploiting** 117:14
**exposure** 129:19
**expressed** 94:12
**extensive** 139:6
**extent** 175:9
**extremely** 59:17
124:2

### f

**face** 193:7,11
**facilities** 100:20
**fact** 18:7 39:12
45:15 58:2,10
72:2 78:22 166:8
**factor** 130:13
141:5
**factually** 29:14
**fair** 173:2,16
175:5 185:13
**fairness** 168:25
169:1,18 175:2
**falls** 119:15
**false** 35:7 191:15
191:17 193:6,13
**familiar** 9:14 39:3
90:10
**far** 112:1 113:7
**fast** 158:1
**fda** 9:18 10:16,19
11:7 12:11 14:21
16:12,15,24 21:3
21:20,21 22:3

24:18 25:1,4,22
26:8,21 27:2,10
29:5,15 30:1
32:11 40:15,15
41:12,19 42:16
53:2,5,11 58:19,20
73:5,15,19 74:10
74:17 77:13 83:17
84:23 87:22 88:15
93:16 95:15 97:14
106:12 107:22
108:1,15,19,19
109:3,7,17,23
110:11,25 111:3
111:16,20 127:13
127:24 128:3,11
128:13,19 130:19
130:22 139:21
140:17 142:20,24
143:2 146:16
160:5,12,20
164:11 196:1
**fda's** 41:25 95:13
**february** 88:6
**feed** 173:7
**feedback** 181:17
**feel** 6:23
**feeling** 94:7
**fell** 39:14
**fella's** 144:21
**felt** 94:18
**fiber** 23:24 47:14
47:16,25 48:1,3
51:9 62:23 76:8
83:4,6,10,24 84:1
84:14 85:21 87:20
98:21 104:10
105:4 129:13
146:9 147:5
**fibers** 23:23 24:15
31:25 32:4,8

35:16 38:16 51:18
74:22 75:3,3,7,11
76:11,12,14 84:8
94:18 98:8,21
100:24 113:8
121:3 138:4,12,15
139:11 141:6
146:12,12 147:15
147:19,23 148:19
159:13 163:4
196:10
**fibrous** 47:23,24
48:6,7 75:4,8 76:1
76:2,4,7,14 97:3,4
120:21,23 147:18
**fifth** 12:13 74:11
**figure** 149:8
**figures** 120:19
**file** 28:15 52:19,25
**files** 72:19 81:23
197:16,17
**filled** 186:25
**final** 16:9 18:5,15
77:10
**finally** 7:24 31:12
**find** 30:8,19 66:15
74:1 104:16
114:23 126:14
138:6 150:24
154:10 155:10
171:10,14 177:24
186:8
**finding** 19:12
30:12 31:18
100:24 106:20
143:5 173:18
**findings** 23:16
27:19
**finds** 64:2 78:7
**fine** 32:3 38:16
40:21 54:11

108:25 150:22
188:13,19
**fines** 145:13,19
148:1,6,22 173:10
**finish** 152:16
**finished** 9:10
11:22 121:5
122:10 192:8
**firms** 91:21
**first** 7:21 27:23
53:24 54:2,13
56:20 58:2,10
61:14 63:19 64:11
66:6 80:25 93:20
118:5 124:5
146:15 153:20
155:8 156:14
180:16 185:1,5
187:21 189:5
197:2
**fit** 145:1
**five** 89:5,7 148:23
148:23
**float** 119:7 170:25
174:3
**floated** 138:21
174:2
**floor** 3:6
**flotation** 119:1
170:20,24 173:24
174:2,7 175:11
180:4
**focus** 145:9
**foia** 14:22 41:12
41:19 128:12
160:5
**folder** 102:1
**folks** 63:17
**follow** 35:3
**followed** 93:14,17

**following** 129:10
**follows** 22:4
**followup** 146:23
**food** 19:22 26:2
28:20
**ford** 172:16
**foregoing** 200:6
**foreseeable** 8:11
8:14,19,20 9:1
**forgetting** 109:6
**forgot** 152:19
**form** 48:6,7 76:4,7
**format** 200:7
**formed** 189:6
**former** 109:13
110:15
**forward** 181:5,16
**found** 14:13,14
20:23 27:25 30:13
30:14 39:13 45:23
55:11,18 62:23,23
73:19 74:11 76:6
76:10,11 84:11,13
90:25 92:25 96:5
99:4 104:1 106:10
106:11 107:6
113:8 114:25
118:11 120:23
123:2 125:4,6,12
125:20,21,22
127:14 128:2
131:7 133:4,21,22
134:14 137:6
138:3,15,18,22
141:22 143:12
144:17 145:5,10
146:11,12 147:7,8
147:12 163:4
165:5 173:15
195:25

**foundation** 159:15
174:18
**four** 3:18 42:25
51:19 86:10,10
100:23 106:9
146:12 168:11
170:5
**fourth** 173:7
**fraction** 145:24
**frame** 8:3
**framework** 94:1
178:19
**free** 22:6 23:20
29:11 31:1 45:3,5
45:6,9,10,11,21
48:10,11,13 50:11
50:18 51:2,4,5,7
54:22 119:5 124:2
124:15,16,20,25
124:25 126:19,20
134:2 135:22
136:2,15 173:11
192:1
**freedom** 135:18
136:11
**frequently** 184:12
**fresh** 6:23
**front** 54:12 56:22
63:14 146:6
150:25 154:11
187:6 190:15
**frost** 161:12
**full** 14:25 111:20
112:24 189:11
200:6
**fuller** 21:4,8
111:18
**fully** 50:4
**further** 129:21
**furthermore** 17:6

**g**

**gained** 46:8
**game** 44:17
**games** 49:9,12
**garde** 3:17
**gassetts** 149:25
  155:23 156:1
  161:12
**gateway** 3:18
**gene** 61:18 63:20
  63:20 64:23
**general** 97:1
  128:23 139:9
**generated** 64:1
  72:20,23 73:1
**generic** 116:7
**genuine** 112:7,9
  112:11
**geological** 178:23
**geologist** 46:6
**geologists** 136:21
**george** 1:14 3:12
**getting** 69:5
  115:14 186:5
**gi** 149:25 192:12
**give** 7:13 35:7
  53:25 55:14 67:18
  94:1 107:2,3
  108:11,12 134:6
  138:15 178:18
**given** 36:4,10 97:7
  122:9,12 180:13
**gives** 168:21
**go** 10:17 12:1
  17:16 18:9,13
  21:1,2 23:7 27:16
  34:12 36:14 40:24
  42:24 46:21 47:2
  54:12 58:22 63:13
  64:15,16 65:3
  66:4 67:21 74:5

77:22 81:21 87:13
  87:22,25 88:15
  92:9,20 96:2
  97:16,19 100:13
  109:12 113:19
  122:15,18 127:8
  127:24 128:3,5
  132:24 139:21
  146:1,16 152:18
  156:13 157:12
  164:11,25 165:1
  172:24 177:21
  179:8 182:17,20
  189:2 190:12,20
  191:9,23
**goes** 17:18 37:3
  141:18 142:20,25
  143:2 183:15
**going** 6:3 8:25
  9:11 19:23 22:23
  26:21 32:20 34:3
  36:14 40:20 45:8
  47:3,25 48:18
  50:13 54:23 60:2
  61:1 64:4 69:16
  70:5,8 72:16
  73:18 76:20,22,24
  77:2 80:25 86:24
  88:25 91:7 92:7
  92:20 99:1 124:11
  124:12,17 125:8
  125:18,25 129:8
  132:12 141:17
  145:3 152:14
  153:7 154:13
  157:25 159:11,17
  160:23 162:6
  164:3 170:4 175:4
  175:18 182:11,12
  183:13 188:16
  191:16 194:10

**good** 5:2,13,20,23
  6:6,8,9,10,23 21:6
  40:6 43:17 47:1,1
  88:23 113:13,16
  139:10 175:16
  177:2 198:14
**gotschal** 3:15
**gotten** 118:19
**goudie** 42:4 59:5
  59:11
**government** 17:6
  160:13
**grade** 119:14
  124:2 126:23
  135:2 156:5
  157:18 181:6,11
  181:13
**grain** 168:19
  173:11
**gram** 74:23 75:14
  75:18,19
**granted** 152:3
**grantham** 81:22
  82:21,23
**great** 128:12
  162:10 186:12
**greater** 51:13
  184:12
**green** 149:9
**greenstone** 3:8
**greiger** 61:19
**grid** 86:20
**grids** 22:13
**grieger** 63:20
  64:23
**ground** 49:22
  106:23
**group** 23:15 96:24
  97:12 129:11
**growing** 22:14

**guess** 52:17 61:2
**guys** 30:15 39:20

**h**

**h** 4:4 99:7 153:22
**half** 16:3 119:25
  139:18
**hallway** 89:9
**hammer** 42:4 99:7
**hammondsville**
  113:24,25 114:16
  121:10 122:1,3,5,7
  122:11,13,23
  133:7,11,25 143:6
  144:7 149:4,9
  153:19 156:4,24
  157:13,21,25
  158:2,3,4 159:3,4
  161:13 164:19
  167:10
**hand** 6:13 182:14
**handling** 127:2
**handwriting**
  61:11
**handwritten**
  63:25 82:7,24
  88:17,18 178:10
**happened** 64:13
  194:13
**happening** 7:1
**happy** 69:19 134:6
**hardship** 29:9,11
**hardships** 29:7
**hazard** 42:17
  130:10
**hc** 145:9,11 146:2
  146:3,4 148:20,20
  149:2,4,9,12,17,19
  150:2,3,18 152:7
  152:24 153:7,15
  153:21 154:4,7
  156:5 157:14,21

[hc - industry]                                                                        Page 15

163:5,7 164:14,15 164:18,21 192:4,9
**head** 28:22 44:17 145:4
**heading** 147:13,14
**health** 112:20 130:10
**hear** 188:9
**heard** 7:21 8:24 11:17 44:15 56:2 89:4 92:6 175:21
**hearsay** 183:13 187:12 188:11
**heavy** 169:6
**held** 100:5 189:4
**help** 10:8 61:2 74:1 93:16 149:7 150:24 154:10 156:12 170:5
**hesitate** 111:23
**hhs220** 17:18
**hi** 5:21
**hide** 106:25
**hiding** 67:15,16
**high** 119:14 120:4 120:8 121:13 124:2 135:2,20 146:13,13 147:22 170:20 173:13
**higher** 121:4,18 126:25
**highest** 149:1
**hildick** 107:11
**hire** 184:2
**hold** 7:17,17 48:20 69:8,8 100:9 115:9 135:24,24 154:1 192:7
**home** 185:6
**hon** 2:12

**honor** 5:14,21 6:5 7:6 8:1 9:6 10:4 13:15 14:4 20:2 27:6 28:8 38:3 41:13,17 44:2 46:13 50:23 53:6 58:4 61:23 62:8 65:13,15 68:7,24 70:8,18 76:24 78:5 81:17,19 84:4 88:20 89:20 90:22 91:8 93:6 98:14 99:17 102:12 104:21,22 110:3 111:4,5 115:18 118:14,19 124:7 125:7 126:3 126:5 127:19 129:1 131:14,16 132:13 135:10 136:23 139:25 142:6,16 151:13 152:15 154:22 156:15 157:6 159:24 160:11,22 162:15 165:18 166:2 169:22 175:15 176:7 177:1,18 178:11 182:21 183:10,12 183:16 187:10,13 187:20 188:6,23 195:9
**hope** 52:10 151:21 151:22
**hopkins** 4:2 6:1,8 13:8 41:16 43:16 89:22 125:13 140:13 142:11
**huh** 12:5 59:3 149:13 170:6

186:17
**hulfish** 3:15
**humid** 184:10
**hundred** 47:20 87:24
**hundreds** 118:6
**hydromica** 167:24 168:4
**hyperbolic** 77:21
**hypothesis** 110:19
**hypothesize** 113:17

**i**

**i.e.** 94:8
**ian** 23:21 24:4 27:17,20 31:23 34:25 35:15 38:14 38:23,24 50:14 154:17
**idea** 78:20 91:20 196:11
**identical** 66:5
**identification** 80:16
**identified** 59:8 71:5 81:4 119:20
**identifies** 83:24 88:13
**identify** 62:18 146:8
**illustrative** 86:2
**imerys** 71:16
**immediate** 171:24
**immune** 17:12
**immunity** 17:9
**impartial** 17:5
**implied** 110:20
**important** 178:9 178:10
**impression** 148:9

**improved** 181:7
**inaudible** 160:8 187:23 188:11,16 188:18
**inbox** 60:6 112:2 159:13 182:8 197:12
**include** 16:20 72:24 148:23 167:10,11
**included** 193:1,1
**including** 76:2 89:3 175:21 189:22
**incomplete** 22:20 33:15
**inconclusive** 39:15
**incorporate** 181:8
**incorporated** 5:19
**independent** 63:6 73:2 189:21
**indicated** 8:18 130:23
**indicates** 109:21 192:1
**indicating** 92:10
**individual** 8:17 28:18 55:11 164:1
**industrial** 139:24 149:14,25 150:5,8 155:16,20,22,23 155:25 156:2 157:18 158:24 164:21,23 171:1 172:12,20 173:1 174:3 189:21,24 190:1,6,10,22 191:24 192:2,13 192:14 193:3
**industry** 11:8 17:5 17:7,10,12 23:3

29:4,4 33:6 35:2
42:16 76:17 94:20
94:23
**influenced**  63:8
**info**  161:19
**information**  7:4
29:3,6,9,13 46:9
67:12 79:21
112:24 128:3
134:6 177:24
184:3 185:22
194:3
**informed**  94:5
**inherited**  184:24
**initial**  21:19 30:8
41:4
**initials**  99:9
**inside**  22:14 44:6
**insignificant**  44:9
53:21,25
**insisted**  33:19
**instance**  119:19
**institution**  182:2
**instruct**  77:3
**instructed**  125:8
**instructing**  152:13
**instruction**  66:17
**instructions**  72:21
89:2
**intensely**  173:13
**intensity**  170:21
**intensive**  117:9
**interact**  27:18
**interest**  84:5
118:15 135:11
187:22 188:15
**interested**  91:25
94:17 161:5 184:3
**interesting**  136:5
**interestingly**
30:21

**intergrown**
167:19,23
**internal**  83:2
194:11
**internationally**
16:22,25
**interpretation**
22:10 164:10
**interrupting**  76:25
124:8
**introductions**
129:10
**invented**  77:14,16
77:23
**investigating**
101:18
**investigation**  8:2
166:9 167:4
**investigators**
39:17
**invited**  37:9
**involvement**  94:24
**involving**  130:10
**iron**  173:4
**irritated**  100:11
**isolated**  54:8
198:23
**issue**  7:19 59:21
69:3 74:9 95:2
**issued**  10:16 57:24
**italian**  81:22 82:20
82:23

---

**j**

**j**  3:8 51:15
**j&j**  5:22 8:2 17:22
17:24 18:1 21:24
30:18 52:14 55:20
62:14 68:20 69:19
79:1 82:2,5 93:3
96:10,22 110:15
128:21 141:24

182:25 196:24
**j&j's**  69:13 139:3
**j.s.c.**  2:12
**j4-1**  23:2 76:15
77:8,15
**jack**  3:14 5:21
**january**  106:15,19
107:4,23,24
149:22
**jersey**  1:1 2:3,23
3:4,16,19 200:5
**jm**  51:14
**job**  1:25
**john**  3:17 4:2 6:1
80:1
**johns**  71:16 92:2,3
92:7 96:21,24
97:12,24 98:4
**johnson**  3:20,20
3:20,20 5:7,7,8,8,9
5:9,10,10,18,18,18
5:19 6:2,2,21,21
15:14,15,22,22
21:6,7 22:3,3 23:2
23:2,10,11,25,25
25:14,14,17,22,22
25:25 26:1,4,15,15
26:19,19 27:12,12
27:21,21 30:6,6,6
30:7 31:1,2 33:11
33:11 34:1,1 36:4
36:4 39:10,10
40:19 42:5,5,20,20
45:1 47:13 51:9
57:4,4,13 58:18,18
59:14,14 60:19,19
61:20,20 63:9,9,15
63:15 64:1,2,23,24
65:9,10 66:16
67:2,2,18,18,23,24
67:25 68:1,3,4,9,9

68:15 71:16,17,19
71:20 72:14,14,19
72:21 73:3,3
75:25 78:10,10
80:3,4,6,7 89:22
89:22 90:12,12
91:2,2,17,17 93:18
93:18 97:9,10
99:11,11 104:10
104:10,15,15
105:4,4,22 106:1
107:8,8 108:1,1,4
108:4,8,9 109:13
109:13,16,20
109:20 110:24,24
111:12,12,18,19
111:19,19,22,22
112:18,18,23,23
113:3,3,21,22
114:18,18 115:25
115:25 116:17,17
127:12,13 129:17
129:17,22,22
131:1,1,9,9 140:18
140:18 141:20,20
141:25,25 142:13
142:13 161:8,8
163:17,17 164:5
165:14,14 166:14
166:14,18,18,24
166:24 169:2,2,9,9
169:16,16 171:17
171:17 172:7,7,25
172:25 182:3,3
183:6,6 184:16,16
185:9,9,17,17,21
185:21 186:23,23
187:23,23 191:20
191:20,20,20
195:25,25 197:3,3
197:6,6,13,14,15

[johnson - light]                                                                 Page 17

197:16,16,16
198:20,20,22,22
**johnson's**  25:17
26:5 40:19 43:22
45:2 47:13 51:9
57:14 66:16 68:16
72:19,21 76:1
78:23 79:12,19
100:1,3 105:22
106:1 132:1 164:5
189:17,19 190:23
195:21
**joj**  69:7
**jojoma**  71:21
**jojoma2546**  68:18
70:3
**judge**  179:6 188:5
**judicial**  200:7
**july**  2:4 5:5 13:12
13:25 16:8 131:7
131:9 132:2 143:4
143:9,12,16,17
147:3 159:12
177:25 180:12
186:7 187:4
200:12
**jump**  186:6
**june**  60:25 61:8,16
**juror**  175:19
**jurors**  6:12
**jury**  5:1,24 6:10
20:4 69:18 73:10
81:12 84:7 88:25
89:10,11,16
175:17,25 176:1
176:21

**k**

**keep**  100:11 109:6
173:3
**kept**  71:3,6 146:7

**key**  12:24 13:1,4
149:18 195:20
196:5,6,14,16,18
197:7,8,10,11,12
197:12,15,16
**kind**  15:7 89:6
175:22
**kinds**  85:5
**knew**  44:18
114:18 116:1,17
141:20,25
**know**  7:3 8:24
10:15 11:4,6,9,10
15:14,24 17:11
18:20,22 19:10,16
21:18 26:17 28:24
28:24 30:15 31:9
33:21 34:22 35:21
36:14,14 44:12
46:12 47:7,9,11,13
48:18 51:8,21
53:10 57:5,6
58:16,19 59:21
60:2,10,15 64:14
67:19,21 68:2
69:13 70:10 72:25
73:4 74:2,7,13,17
75:17,19 77:18
78:18 79:6,8,9,14
80:6,25 83:4 87:1
87:23 88:16 90:11
96:5 106:5,12,13
106:19 108:18,20
108:21,22,24
109:25 113:14
119:23 122:21
124:18 125:2
127:25 128:4
133:13 134:4
139:22 140:2,4,12
143:5,7 146:17,22

148:10,16,18
149:4 152:1
155:21 163:21,24
164:1,2,12,12,16
164:19 166:12,15
168:15 170:24
171:13 172:16,18
172:21 173:22,24
191:8 193:23
194:13 195:10,20
195:21 196:2,14
196:19 197:18
199:1,4,11,12
**knowing**  30:6
**knowledge**  200:9
**known**  92:4
129:19 139:3
**knows**  151:19
**konigsberg**  2:18
3:5

**l**

**l**  1:9,14,19 9:11
**lab**  56:2
**labor**  160:16,18
161:4
**laboratories**
180:18
**lacks**  159:14
**langer**  9:10
**law**  1:1
**lawsuit**  192:24
194:7,14
**lawsuits**  187:14
**lawyer**  27:5 38:4
49:14 50:24 58:5
77:24 151:25
**lawyers**  29:19
**leave**  175:18
181:11
**left**  155:3 177:4

**legal**  29:23,25
**legally**  29:23
**letter**  39:2 55:20
61:18 65:22
140:17 147:2
151:2,18 196:23
**letterhead**  15:2
**letters**  152:7
153:15,20 195:21
**level**  45:17 118:3
120:18 123:16
126:24 129:12,19
129:24
**levels**  59:17 119:4
121:3,12 123:16
127:1 133:20
**levy**  2:18 3:5
**lewin**  9:12,15,17
10:16,18 16:17,21
17:11 19:7,8
21:21 22:9,19
23:14,16,25 27:17
27:18 30:5,5
31:12 33:6,15
35:2,14,21 37:3,9
37:19 38:1,9 39:1
40:2 41:1,2 73:6
73:15 74:14 82:10
83:17,23 84:23,24
85:17
**lewin's**  14:25 16:9
21:19 43:22 80:15
82:25 95:19
**liberty**  60:20
**license**  200:3
**light**  23:19,22 24:5
24:10,10,11,12,14
31:13,17,20,22,24
32:3 33:22 35:3
35:14,16,22 36:11
38:10,15 55:4,5

[light - mccrone]

76:9 84:15,21,25
85:2,14 139:6
**likelihood** 178:6
**limit** 16:3
**line** 45:15 47:7
51:19 68:21 84:6
**list** 17:25 63:17
71:12 83:18
128:20 144:25
161:15,21 171:17
**listed** 12:19 42:4
146:10 190:5,8
**listen** 77:3 126:9
**lists** 11:16
**literally** 12:25
77:22 125:22
**litigation** 8:16
**little** 50:2 69:4
86:10 114:12
175:8
**live** 24:20 32:8
35:18
**livingston** 2:23
**llp** 3:15
**located** 7:15
140:12
**location** 167:2
**long** 48:19 168:14
179:17 193:21
**longer** 47:15,20
105:16
**look** 8:15 11:11
14:12,20 15:9
16:11,14 17:14
18:8,12,13 24:17
27:24 36:16,22
37:4,9 38:9 41:12
53:14 55:4,6 65:7
73:13,22 79:22
84:18 100:6,13
101:25 102:9,21

105:10,13 114:22
117:1 118:24
119:18 127:4
130:5 131:6 136:5
138:2,9 143:4,9
148:7,14,20
150:15 153:8
154:13,14 155:13
161:18 165:9
168:7 175:7 184:6
184:8 198:9
**looked** 10:21
11:23 12:3,7,25
52:22 87:19,25
88:1 115:5 121:6
121:7 137:20
142:1 162:22
177:22 179:25
180:2
**looking** 16:8 21:17
30:23 31:17 44:7
54:11 62:17 86:4
86:18,19,21 92:24
101:2,6,22 117:7
123:3 144:14
148:3 196:11,14
**looks** 15:5,11,18
46:18,20 47:10
74:2 87:23 88:6
148:23 160:7,12
161:6 174:1,12
186:14 187:13
191:8
**loose** 173:11
**lose** 52:12 94:15
**lot** 22:4,15 25:19
44:15 67:12 74:8
100:7 173:15
174:15 185:10
198:24

**loud** 69:5 188:5
**low** 59:17 119:4
119:23 120:2,10
139:10 146:11
**lower** 120:3
**loyally** 185:7
**lunch** 37:2 169:23
175:18,23 176:19
177:4
**luzenac** 197:21
198:6

## m

**machine** 16:6
77:22 172:15
**magnetic** 170:21
173:14
**magnitude** 121:14
121:18 127:1
131:2,3
**mail** 2:24 8:7
**maimon** 2:18 3:5
5:13,14
**main** 116:12,20
166:9 167:4
**maintain** 185:7
**majority** 117:22
185:5
**man** 193:20
**manges** 3:15
**mansville** 98:4
**manufacture**
119:13 121:5
135:1
**manufactured**
100:18
**manufacturer**
92:4
**manufacturers**
91:15
**manufacturing**
113:1

**manville** 71:16
92:3,3,7 96:22,24
97:12,25
**maple** 3:3
**march** 152:2
170:3,4,9,10,11
180:1
**mark** 18:10,10
19:14 177:17
**marked** 9:22 39:5
74:7,8 99:8,8
137:22 149:2
**market** 111:23
112:6 183:22
**markets** 152:7
**marking** 62:7
165:24
**marks** 38:13
131:11
**master** 52:18,25
**match** 102:10,19
**material** 45:3
124:1 135:18
146:9 158:12
181:7
**materials** 48:8
149:25
**math** 75:2
**mathematical**
108:5,7,12
**matter** 5:6 181:17
**mccarter** 3:18
**mccrone** 24:4
38:15 39:19 44:15
44:16 48:9,10,19
50:10 51:3 52:5
56:1 59:12 61:19
62:14 63:6 67:21
68:18 69:11,19
70:6,23 71:6,12,20
72:12 115:3

132:19 133:2
134:16 136:6,8,8
137:11 143:5
148:12 151:4
154:18 162:11
**mccrone's**  22:10
43:21 132:25
**mcneill**  1:14 3:12
5:8,16
**mean**  8:20 18:24
38:18 45:5 66:22
103:5 112:11
124:16,25 126:20
139:22 150:4
164:21
**meaning**  24:24
32:19 137:23
197:6
**means**  48:10,16
50:1,5,11,12 86:13
124:18 141:8
149:8,9,11 180:24
**meant**  45:8 50:15
163:22 199:17
**medicated**  15:17
17:24 81:22 82:21
82:23
**medium**  146:12,14
**meet**  89:8 134:2
**meeting**  21:3,20
22:3 25:12,15,18
25:23 26:1,3
28:20 33:1 37:18
37:24 38:1 40:14
40:20 41:3,18
42:1,17 84:23
91:14 93:25 94:5
94:11,21 96:21
107:22,23 109:2
128:14

**member**  17:3
33:11
**members**  5:24
88:25 175:17
**memo**  25:18 27:23
28:14 31:19 41:18
41:25 91:3 93:3
93:11 96:10 99:7
99:12 101:5,8
107:9,23 131:9
150:9,20 152:12
153:4,6 154:3
156:18 157:19
162:11
**memorandum**
128:14 136:9
156:6
**memos**  157:23
164:16
**mention**  93:17
122:3
**mentioned**  168:10
**merritt**  28:22 29:1
29:22
**mesh**  173:10
**met**  91:17
**method**  23:6 40:17
77:16,23 84:22
95:17 105:5,9
142:20,25
**methodology**
93:16
**methods**  141:11
141:16,21 181:7
**microns**  103:15
**microscope**  16:2
75:6
**microscopic**  76:19
170:20
**microscopical**
138:11 139:6

**microscopically**
47:23 100:21
**microscopist**
38:21 48:5 76:19
95:15 101:22
**microscopist's**
105:25
**microscopy**  22:13
22:21,24 23:8,12
23:19,22 24:5,11
24:13,14 31:13,21
31:22,24 32:3
33:16,22 34:1,2,11
34:23 35:1,3,9,12
35:14,16,22 36:11
37:16 38:10,15
40:17 44:18 55:4
55:5 76:9 84:21
84:25 85:3,4,6,12
85:13,16 95:14,16
95:21,23 102:22
117:10 120:13
123:24 127:9
**mid**  1:2,9,14,19
**middle**  62:22 66:8
66:17 72:20,24
**middlesex**  1:1 2:2
187:7 200:14
**mill**  150:1 155:14
155:16 161:12,13
172:6,6,9,10,11,17
172:19 173:1,6
**milled**  172:12
**miller**  145:2 151:3
151:19 155:12
178:1 186:18,21
187:24 189:3
191:18,21 193:16
**miller's**  194:14
**milligram**  74:24
75:11,13

**milligrams**  75:13
**millimeter**  86:6
**millimeters**  86:10
86:11,13,14,14,16
86:20,25
**milling**  155:24
173:23 189:8,8
**million**  118:8
139:17,18 147:6
163:7,8
**mind**  70:7 74:1
143:8 190:21
**mine**  30:25 90:3
90:11,13 113:25
114:16 116:9
130:4 131:22
157:25 158:1,2,3
158:13,13,15,18
159:6 161:13,22
166:15
**mined**  166:13,23
**miner**  92:4 110:21
**mineral**  80:16
92:8 118:2 119:20
131:25 156:23
167:17,21 168:10
180:21 192:21,24
**mineralogical**
16:23,25 117:16
166:9 167:4
170:13 199:3
**mineralogist**  11:2
**mineralogy**  92:11
92:15 167:20
196:21
**minerals**  45:4,22
46:1 48:11,14
51:10 54:22 65:22
66:15 104:16,16
105:5,22 117:14
117:18,23 119:6

131:25 133:6,17
135:19,23 136:3
136:11,16 144:22
145:3 151:4,19
156:18 161:8
162:12 163:1
166:6,19 167:24
168:9 171:4,24
178:22 186:22
189:4,5,6,20 190:9
190:14,21,25
192:25 194:1
**miners**  136:20
**mines**  39:20 91:22
93:25 94:11,22
97:2 116:4 123:11
155:22 158:12,18
167:1 169:5,19
177:10
**mining**  151:23
161:7 169:2 189:7
189:16
**minor**  168:11
**minus**  173:10
**minute**  89:1
116:17 150:3
**misrepresentation**
69:7
**missed**  58:8
**missing**  13:22
72:20 156:9
**mistakenly**  59:8
**mix**  158:12
**modifications**
178:2
**modifier**  180:20
**month**  81:1
**months**  66:23
80:20 81:2,6,7,10
130:1 132:3
150:16 184:11,13

**morning**  5:2,14,20
5:23 6:6,8,9,10
89:4
**morphology**
100:25
**moshe**  2:18 3:5
5:14
**mother**  185:2
**mothers**  184:25
**mounds**  173:11
**mount**  2:22
**mountain**  165:12
177:6 178:21
180:16
**move**  76:23 98:17
126:4 137:1 140:1
181:16
**moved**  14:9 21:14
28:11 41:23 43:11
43:13 62:1 65:17
82:17 91:11 93:9
96:18 99:21
102:16 107:19
115:22 129:5
131:18 137:17
140:24 151:15
155:5 157:9 161:1
162:18 165:21
176:17 178:16
188:24
**moving**  88:20
**mulberry**  3:19
**multiply**  75:18
**muscovite**  167:24
168:4
**museum**  198:16

## n

**n**  3:1 4:1
**n1**  163:5
**name**  29:3,17 70:6
109:9 144:21

172:10
**names**  29:20
**nashed**  21:7 27:24
28:3,14 30:18,23
31:19 37:9 42:3
59:5,7 93:12
95:12 96:12
107:11 129:11
130:10
**native**  7:20
**nd**  18:3,9,10,14,16
31:16
**near**  150:25
**necessary**  141:13
**need**  14:4 60:23
77:22 100:12
107:2 114:16
141:17 142:20,24
143:7 154:10
**needle**  83:6,10,24
85:21 87:20 98:21
171:24 173:5,7
**needles**  98:9 113:9
168:14,15 172:3
173:6,11,12,15,18
175:10 196:10
**neither**  95:25
**never**  8:23 37:19
90:12 114:5
127:14 139:22
149:18 151:25
175:12
**new**  1:1 2:3,3,23
3:4,7,7,16,19 15:1
52:18 56:10,12
59:19,22 90:3,11
91:16 94:6 115:6
117:13 123:23
200:5
**newark**  3:19
198:16

**night**  30:8,16 41:5
**nine**  39:14 99:14
138:4
**nj3446618**  1:25
**nolan**  3:14 5:21,23
**non**  16:2 18:3,6
19:13 35:23 38:13
40:24 48:7 200:8
**nonasbestiform**
90:9
**nonresponsive**
19:24 20:2 34:4
54:24 76:23 98:15
104:22 110:4
111:5 125:19
126:4 127:19
132:13 136:23
140:1 142:6
152:15
**north**  1:7,12,17,22
**norwood**  93:14,20
94:12
**norwood's**  95:14
**note**  59:4 63:14,22
64:10 178:4,10
**notebooks**  6:12
175:19
**notes**  82:7,25
88:17,19
**notice**  21:24
183:15,18
**november**  128:5,6
128:7,9,15 146:24
146:24,25 148:14
154:15 155:2
159:12 162:5,7
192:17
**number**  12:12
29:16 40:6 71:21
72:10 74:9 145:6
161:11 168:16

200:3

**numbered** 78:16

**numbering** 74:10

**numbers** 11:14
102:24

**nyu** 10:24

**o**

**oath** 194:22,24

**object** 19:23 20:1
26:16,21 32:24
34:3 36:5,11
54:23 69:6 70:9
76:22,25 98:14
104:21 110:3
125:8,18 126:4
132:12 152:14
183:13

**objected** 33:3

**objecting** 111:5
188:11

**objection** 8:3 14:2
14:5 21:12 27:5
27:13 28:9 38:3
41:20 43:9 50:23
58:4,6 61:24
65:14 70:17 77:24
82:15 91:9 93:7
96:16 98:16 99:19
102:14 104:25
107:17 110:6
115:20 126:5,8
127:18 129:3
131:15 136:22
137:15 139:25
140:22 142:5,8
143:23 151:12
154:23 157:7
159:14,19 160:10
160:24 162:16
165:19 174:18,21
176:9,16 178:13

179:16 188:7
194:19 197:25

**objections** 25:9,11
26:10,11 27:3,14
32:25

**observations**
84:19

**observed** 24:2
45:16 54:15,20
84:9 88:10 121:13
126:25

**obtained** 27:16
129:14 138:14

**obviously** 22:1
67:9 134:1

**occasion** 199:12

**occasionally** 59:18
158:11

**occasions** 16:20
198:23 199:2

**occur** 168:11

**occurs** 168:14

**october** 42:24
43:18 52:9 57:16
60:13

**offer** 13:16,22
21:10 28:8 41:18
43:8 61:22 65:12
82:13 91:7 93:5
96:14 99:17
102:12 107:15
115:18 129:2
131:13 137:13
140:20 143:21
151:10 154:21
157:6 160:23
162:14 165:17
176:8 178:11
183:10 187:10

**offered** 13:16

**offering** 176:13
187:19

**officer** 6:13,15
89:10 175:25

**offices** 91:16

**official** 129:13

**oh** 6:11 13:2 17:22
18:12 54:9 65:2
106:24 132:9
144:20 150:14
160:14 164:5
166:25 167:21
181:24

**okay** 7:18 8:6,9
9:3,5,12 10:21
11:6,22 12:1
15:13,21,24 16:11
16:14,17 17:14,15
18:12,23 20:3,14
21:1,6,10 22:2
23:6,10,14 25:3,21
27:23 28:2,17
29:1,15,19,22 30:4
30:21 31:8 33:6
35:21 36:1 37:1
37:22 39:24 40:1
41:11,11 42:3
43:24 44:12 46:21
46:24 47:4,6,6,9
48:22,24 50:1,9
52:13 53:14 56:1
56:7 57:18 58:24
59:1 61:5,10,18
62:17 63:2,17
64:11 65:9 69:5
69:15,22,23 71:11
71:24 72:13,15
73:5,6,10,18 74:4
74:13,13 75:1,10
75:25 76:6,9 78:2
78:15 79:12 80:9

83:23 84:22 85:20
86:1,21,24 87:14
87:18 90:4,7,14
91:2 92:18 93:2,5
95:12 96:8,24
97:6,9,19 98:25
99:11 101:24
102:6,9,21 103:3
103:10 105:13
106:8,14 107:5,8
107:14 108:21,23
109:1 110:5,8,24
111:12,18 112:5
113:7,12 114:2,11
114:23 115:2,14
115:17 116:13
117:3,9 118:11
119:12 120:12,25
121:12,25 122:23
123:1,6,21 124:24
126:3,22 127:12
127:20,22,23
128:5,17 129:1,21
130:1,16,20 131:6
133:24 134:8,16
135:15 137:6,9,13
139:5,21 143:9
144:5 145:5,10
148:17 149:4,7,20
150:14,17,17
151:10 153:24
154:3,9,14,20
155:4 156:8 157:2
157:20 158:1,2,22
159:20 160:1,4
162:1,10,14
163:10 164:25
165:17 166:25
167:9,13,13
168:18,25 169:12
169:15,18 170:18

171:18 172:14,15
172:18,24 173:4
173:19 175:2,7
177:4,16 178:9,18
179:3,20 180:15
181:2 182:11
183:9 184:6
186:12 187:3
188:14,21 189:16
190:12,20 191:14
191:23 195:4,15
197:18 198:14,19
199:21
**old** 52:21,22 59:23
193:20
**once** 19:9 52:18
140:12
**ones** 71:15,20
153:7,15 169:2
**opaque** 167:18
**opaques** 168:1
**open** 114:4
**operation** 155:24
158:15
**opinion** 30:2,3
95:15 119:9
141:15,19
**opportunity** 36:4
36:10 142:14
**opposed** 76:8
**optical** 22:23
24:10 37:8,16
40:17 84:25 85:4
85:5,12,13 95:16
95:21,22 102:22
103:24
**optically** 59:18
**optimal** 23:7
**order** 121:14,18
127:1 131:2,3

**ordered** 2:17
**ore** 113:21 114:18
115:4,6 116:2,3,7
116:12,14,18,20
117:3,4,13,18,20
118:12,13 119:3,5
119:12 121:7
122:1,3,5,6,7,21
123:2,4,23 127:17
127:23 128:2
132:21 133:3,4,7
133:10 134:22,24
134:25 135:19
136:12,13 137:10
137:22,23 138:3
139:9,11,17 143:6
144:7,9 156:5,25
157:14 162:22
171:5 172:11
174:17
**ores** 127:14,16,20
137:10 139:8
150:1,4 168:11
**organic** 146:9
181:9
**organoleptic**
181:5
**orientation** 171:22
**original** 55:14
66:4
**outbox** 143:3
**outlined** 97:14
**outside** 26:25
183:13
**overruled** 27:7
38:5 50:25 55:1
58:6 125:11 126:8
159:19 174:21
**owned** 90:2
166:14 186:22

**owns** 166:18,24

**p**

**p** 2:21 3:1,1,14
200:3,12
**p.m.** 176:20
**p1steno** 2:24
**package** 185:22
**page** 4:2,5 12:1,2
12:13 13:4,6,9
14:25 15:9 17:17
17:21 36:15,20,20
56:22 61:14,15
62:4,12 63:14
68:8,13 74:7,9,11
82:4 87:24 88:1
97:19 132:24
134:10 135:12,13
135:14 146:2,6
168:20 171:19
172:24 181:4
184:8,22 186:13
186:16 190:12
191:13
**pages** 2:6 12:12
63:3 72:7 74:10
**paid** 198:24 199:1
199:5,8,9,16,18
**panatier** 3:8,8 4:3
5:14 6:4,5,7,19
7:11,15,22 8:10,13
8:22 9:3,8 10:3,6
10:10 13:14,20,25
14:8,11 19:23
20:1,9,21 21:10,16
27:11 28:7,13
34:3,9 38:7 41:11
41:17,24 43:4,15
44:2,4,5 46:12,16
49:19 53:6,7
54:23 55:3 61:8,9
61:22 62:3,8,11

65:2,5,12,19 68:12
68:15,17,23 69:10
69:17,22,25 70:12
70:20 76:22 77:7
78:2,5,6 81:16,19
81:20 82:13,19
88:20 89:19,20,21
90:14,21,24 91:7
91:13 93:5 96:14
96:20 98:14,17,19
99:17,23 102:12
104:21 105:1
106:22 107:15,21
110:3 111:4,7
115:18,24 118:18
118:21,23 123:14
123:20 124:7,11
124:14 125:18
126:3,13 127:18
129:1,7 131:13,20
132:12 135:13,15
135:16 136:22
137:1,5,13,19
139:25 140:9,11
140:20 141:1
142:5,18 143:21
143:24 144:4
151:10,17 152:14
152:21 154:21
155:1,7 156:14,17
157:5,11 159:11
159:16,20,23
160:3,14,17,22
162:14,20 165:17
166:1,4 169:22
170:2 175:1,15
176:7,24 177:1,3
177:16,20 178:11
178:17 179:3,6,10
179:14,21,24
182:8,10,15,20,23

183:9,15,20
187:10,20 188:6
188:12,19 189:1
195:7 198:2,5
**paper** 195:9,16,18
197:19,20
**paragraph** 37:1
62:22 63:19 64:3
64:11 66:5,6,8
67:3,8 68:1 72:21
72:24 84:18
118:16 123:18,21
179:15 180:16
189:3,22
**parallel** 103:10
104:7,11 105:3,19
**pardon** 20:7
**parent** 185:12
**part** 10:8,14 14:17
28:25 36:13,18
37:18 50:1,2
66:17 91:25 92:1
118:13 123:8
135:4,7,8 137:2
139:18 152:7
161:5 179:9,10,11
**particle** 51:10
86:2 105:10 180:4
**particles** 83:7,9,25
85:23 87:4 102:24
103:4,25 104:1
105:14 118:7,9
130:14 147:7
148:6
**particular** 25:12
28:20 47:22 51:16
51:19 85:24 87:9
117:17 150:9,20
156:6 167:18
168:23 171:5

**parts** 139:17 147:6
163:6,8
**passed** 24:19 32:7
35:18
**pastore** 1:9 3:11
**patently** 69:14
**paterson** 2:2
**pattern** 138:13
**patterns** 138:16
**pen** 46:20 47:10
103:7,8
**penultimate** 37:1
**people** 6:22 7:3
25:19 28:18 33:2
42:7,11 73:2
99:14 109:3
112:25 184:7
185:18
**percent** 12:15,16
12:19 16:4 17:18
25:10 26:11,22
27:2 31:9 32:13
32:17,20 36:6
39:11 40:4 44:10
44:22,23 45:17
54:16,16 60:3
110:1 118:3,8
119:25 120:21
130:14 141:6,12
141:18,23 142:25
168:12,22 173:11
**percentage** 54:1,3
142:1
**percentages** 54:6
55:15,18,22,25
168:21
**period** 27:10
127:21 158:17,20
161:25 185:8
**perjury** 195:2

**permission** 46:13
152:3
**person** 34:20
49:17 125:3 186:2
**person's** 194:14
**personal** 7:2
**peters** 161:19
**petrographic**
102:22
**pfizer** 93:15,20
95:13
**ph.d.** 196:21
**phone** 87:14 93:23
**phones** 5:3 89:18
176:23
**photomicrographs**
63:3
**phraseology** 36:13
**pick** 6:15
**picked** 69:5
**picture** 14:25
**pictures** 63:4,12
**place** 2:2 43:17
100:17 159:3
167:1,8
**placitella** 3:2,3
5:15
**plain** 50:21 84:15
**plaintiff** 1:5,15
**plaintiff's** 4:6,6,7
4:7,8,8,9,9,10,10
4:11,11,12,12,13
4:13,14,14,15,15
4:16,16,17,17,18
4:18,19,19,20
13:22 14:9 21:14
28:11 41:22 43:11
43:13 62:1 65:17
82:17 91:11 93:2
93:9 96:18 99:21
102:16 107:19

115:22 129:5
131:10,18 137:17
140:24 151:11,15
155:5 157:9 161:1
162:18 165:21
176:17 178:15
187:22 188:24
**plaintiffs** 1:10,20
3:10 5:12 8:17,25
10:7 13:14 71:5
**plant** 100:19
180:18
**plate** 171:23
**plates** 22:14
171:21
**platy** 139:10
**platyness** 135:18
**playing** 49:8,11
**pleasant** 2:22
**please** 5:3,11 6:12
9:23 20:6 34:5
49:17,18 66:21
74:6 77:3 89:1,4
89:17 114:23
126:9 142:12
143:10 165:2
176:22 179:2
184:8
**plm** 85:7,8
**plus** 120:20
173:10
**point** 6:25 30:22
32:25 35:10 59:23
72:16,18 185:21
**pointed** 23:22
35:15
**polarized** 24:10
84:15,20,25 85:2
85:14 95:24
**policy** 25:7 26:5,7
26:20,24 32:12

108:17 111:20
**pooley** 39:23
**poor** 173:4
**poorer** 120:9
**popular** 11:18
**portion** 189:20
190:1
**pose** 42:21
**position** 92:8
189:4
**positive** 23:7
**positively** 146:8
**positives** 40:7,8
127:5
**posses** 42:19
**possession** 71:22
**possibility** 117:8
**possible** 17:9
**post** 8:4
**potential** 42:17
**potentially** 119:20
**powder** 6:22 13:3
17:22,24,24 39:11
43:22 45:2 57:14
59:22 78:23 79:13
79:19 81:5 100:1
100:4 108:3,8,16
109:22 111:2
117:6,8 119:15
127:17,21 129:15
132:2 145:17
172:12 181:14,22
182:12 184:11,13
184:14,24 189:18
189:19,23 190:2,3
190:23 191:25,25
195:22,24
**powders** 15:17,19
16:19 188:2
**practice** 70:14

**preferred** 171:21
**prefix** 152:8
**preliminary**
109:21
**preparation**
171:20
**prepared** 166:5
200:6
**presence** 42:18
55:10 100:22
101:10 130:11
133:5 148:2
190:24,25 192:25
**present** 25:8 26:9
31:4 32:19 42:16
52:23 59:12 69:18
91:22 108:13
112:2 133:18
146:10 168:12
173:9 174:6,17
175:10
**presentations**
91:21 97:7
**president** 151:3,22
186:21 189:3
192:23 193:25
**presumably**
193:15
**pretty** 21:24 64:9
64:12 92:3
**previous** 14:17
31:19 33:9,24,25
109:15
**previously** 14:6
17:7 117:8
**primary** 113:21
**princeton** 3:16
**prior** 124:1
**priority** 2:22
**prismatic** 103:5
168:14

**probably** 42:25
47:20 61:1 62:24
74:4 154:12 162:6
170:4 178:6 191:9
**problem** 94:8
101:11,12,14,15
101:21 110:15
112:14,14 128:24
151:2
**problems** 94:22
**procedure** 25:7
156:24 157:13
**proceedings**
199:23 200:7
**process** 31:5 77:19
137:24 138:19
173:21 178:2
180:21
**processed** 131:24
181:6
**prod** 79:1
**produce** 71:1
**produced** 7:23
71:4,20 113:23,25
131:24 139:8
149:25 196:24
197:3
**produces** 139:9
**product** 11:14,17
29:10 42:19 55:15
78:22 79:1,7
112:21 121:5
122:10 137:23,24
138:10,19 139:8
139:11,19,23,24
150:12 172:1
173:22 174:10
175:5 184:18,25
190:1,25 192:1,25
**production** 7:24
132:1 150:2,19

152:5,23 154:4
174:5,13
**products** 11:16
12:14 15:4,5,15,22
18:1 24:1 39:13
82:22 92:4 112:19
112:25 119:14
134:19 135:2,21
137:10 151:20
170:22 173:13,15
174:8 181:18
183:7 184:3
185:11 189:21
190:4
**professor** 10:24
39:23 41:2
**project** 9:20 15:23
19:21
**proof** 175:9
**properties** 103:24
**proposed** 25:7
**proposes** 23:15
**prospective**
183:22
**prove** 69:11 119:5
**proven** 98:11
**provide** 112:24
**provided** 14:21
22:5 89:2 113:10
**proving** 132:6,7
**pseudohexagonal**
171:22
**public** 110:25
111:13 113:10
**publically** 129:17
188:3 194:6
**publish** 195:18
**published** 195:16
196:4,4,6
**pull** 158:7

**pulled**  116:10
**purchase**  185:4
**purchasing**  113:15
**purified**  30:23
**purpose**  167:16
171:3 187:18,24
**purposes**  188:17
**put**  6:16,22 35:4,6
37:16 39:7 47:3,3
52:21,24 60:6
63:17 73:25
106:23 132:10
139:13 144:25
145:3,17 149:8
159:11 164:5
182:7 185:22
195:13
**putting**  70:10

**q**

**qualified**  114:3,7,8
114:13,17
**qualify**  123:3
**qualifying**  117:6
**qualitative**  133:5
183:5
**qualitatively**
146:11
**quality**  119:13
126:23 133:17
135:1,20 139:10
**quantitative**  133:5
**quantities**  59:12
**quantity**  133:17
133:21
**question**  6:21
18:10,10 19:6,7,8
19:14,25 20:6,8
34:6,13 38:13
49:15,18,20 57:9
58:8 66:20,25
77:4,5 94:13

100:10 104:24
105:2 108:10,11
109:24 111:8,22
112:2,6,7,10,12,13
112:15,16,17
116:16,22,23,24
116:25 124:13
126:9,10 127:24
137:3 142:12
146:15 152:20
185:9 190:8
191:21 192:7
193:5 199:7,9
**questionable**
17:19 127:6
**questions**  94:18
142:14
**quick**  21:24 152:1
**quickly**  185:3
**quite**  59:23 185:7
**quote**  7:20
**quoted**  39:10
**quotes**  95:10
**quoting**  153:4

**r**

**r**  3:1 81:23 91:15
**r&d**  144:22 145:4
**r.a.**  21:4,8
**raise**  94:22
**raised**  25:11 26:12
27:3,15
**raising**  94:13
**random**  29:2
**range**  73:25
**rationally**  94:13
**ratios**  105:17
**raw**  121:4 122:9
122:12
**ray**  18:17,21 19:2
19:8 22:10,20,23
23:11,16,18 31:18

32:12,14,23 33:16
123:24
**raymond**  172:6,9
172:10,10,17
173:6
**read**  8:17 12:21
17:2 46:7 83:15
84:6 92:13 93:19
94:10 95:4,8 96:1
97:22 118:16
123:12,20 124:5
124:12 125:8,25
129:25 130:15,21
133:19 135:11
138:8 152:9
163:16,23 171:9
191:3
**reading**  29:21
32:10 33:8 45:7
86:23 121:20,23
124:9 135:23
136:1 148:4
**readmitted**  14:7
**reads**  124:19,19
125:5,17 188:5
**ready**  6:4,17 89:4
89:5 134:9 149:13
175:23 176:24
**real**  158:1
**realistic**  8:13
**reality**  26:25
**really**  27:1 178:9
**reason**  69:18
113:13,16 169:8
186:2
**reasonable**  38:14
**reasonably**  92:2
**recall**  177:7
**received**  59:2
152:2

**recess**  89:15
176:19
**recognition**
171:24
**recognize**  35:17
**recognized**  16:22
16:25 17:7 24:19
**recollect**  169:4
**record**  7:18 9:25
43:3,25 49:17
53:4 72:1 89:13
89:14 140:4
142:23 159:10,22
162:3 165:4 170:1
176:3,6,11,12
177:15 182:6,15
188:10 195:6
**recorded**  26:16
**records**  70:22 71:4
187:25
**red**  3:4
**redone**  52:6,15
**reduce**  119:4
**reference**  98:8
157:14 164:18
172:3 198:11
**references**  168:15
188:12
**referencing**
181:21 189:10,13
**referred**  39:9
**reflect**  94:19
**refraction**  123:25
**refresh**  143:7
197:22
**regard**  7:19 49:20
89:3 175:20
**regular**  71:6 85:8
95:24
**regularly**  185:3

regulated 51:10
reissued 67:3
rejection 180:20
related 43:1 71:15
relates 8:3 166:16
relating 112:8
relation 50:8
relatively 185:1
release 29:3,6,20
releases 29:16
relevant 8:5 19:20
  20:11,15 34:15
  152:5 170:18
relied 22:20 33:15
remaining 121:2
remember 89:1
  121:6 133:9
  175:19 177:12
  197:22
remembered
  184:11
remind 80:12
remove 30:23 31:5
  138:25
removed 175:11
renowned 11:2,4
  44:17
repeat 53:18 60:17
repeated 30:7,16
replace 58:2
replaced 56:23
  58:9,10
replicates 19:1
report 10:16 16:9
  18:6 21:19,21
  22:20 33:5,15
  40:3,5,25 41:4,5
  51:21 52:1,9,11
  53:9,15 56:23,25
  57:3,5,12,25 58:1
  58:9,12,14 59:1

60:8,17 61:15
64:1 65:20 66:4
66:18 67:4 72:19
72:23 80:22 88:8
88:18 95:20
111:11 115:3
127:22 132:4,25
137:9 146:23
147:3 170:13
173:17 181:23
195:23
reported 30:12
  39:10,12,17 41:2
  79:23 87:8 126:15
  126:17 138:8
  145:7
reporter 200:4,13
reporting 57:18
reports 40:10,12
  56:22,24 57:1,9,11
  58:14 60:20 63:18
  64:10 67:5 73:1
  95:12 178:24
representation
  132:21
representative 6:2
representatives
  42:9 128:20,21
represented 57:12
  115:9 127:13
  132:21 149:24
representing
  100:4
request 130:18
  152:2 160:5
requested 194:5
required 48:5
research 83:21
  89:6 165:13
  175:22 177:5,6
  178:21 180:17

183:5,22 184:2
198:25 199:10
resemblance
  138:12
reserve 29:23
residual 181:11
resolve 27:18
  38:16
respect 167:18
  171:5 180:4
respected 11:5
respectively
  120:19
responded 130:22
responding 30:5
response 41:19
  61:4 69:9,10 71:3
  77:3 82:3 84:17
  109:24 130:18
  137:2,3 141:7
  160:5
responsive 77:1
  137:4
rest 124:12 179:17
restrict 153:2
result 30:9 149:1
  162:21 194:14
resulted 67:12
resulting 139:18
  152:4
results 15:10
  17:10,15 19:5,17
  23:18 29:5 33:7
  37:19 38:12 39:16
  40:24 62:14,25
  88:12 95:20
  101:25 102:6,22
  111:21 127:5
  130:25 131:1
  138:3 139:5
  145:10 153:6

163:11 181:18
192:2
retained 9:17 11:7
  39:17 88:2 99:25
  100:4,9,15 101:18
  102:7
retired 193:21
revealed 102:22
  191:1 193:3,3
review 57:24
  123:9
reviewed 20:10,14
  20:16 34:14
revise 59:1 60:20
  60:22
revised 51:23
  53:15 55:9,21
  60:7
revising 60:22
ribbons 62:23
right 6:23 7:12
  9:15,18,21 10:22
  10:25 11:20,24
  12:3,11,16 13:5,5
  13:19 14:22 15:19
  16:4,23 17:18,19
  18:4,7,8,10,18
  19:20 20:11,18
  21:22 22:7,16
  23:4 24:4,8,21
  25:15,17,22,23
  27:2,13,21 28:3,15
  29:10,12,14,17,20
  29:23 30:9,16,19
  31:4,16,23 32:6,9
  32:14,17,21,25
  33:7,10,21,23 36:6
  36:8 37:5,17
  38:11,13,20 39:3,5
  39:8,20 40:10,10
  41:6,9 42:1,5,8,12

43:19 44:10 45:13
45:17,19 46:2
47:11 48:21 50:3
51:11,14,15,16,18
52:1,6,15,19,23,24
53:22 54:13 55:12
55:22 56:5,24
57:22 58:19 59:2
59:5,15,19 60:3,6
60:12 61:2,3,12
62:15,25 63:8,13
63:15,19,19,20,23
64:6,6,18 66:3,16
66:18 67:4,6,8
68:4,14 69:20
70:3 71:9,12,17
72:5,8,10,14,19,22
74:15,21,21,23
75:2,11,21,22 76:1
76:3,10,12,18 77:9
77:23 78:16,23,25
79:2,5,9,10,22
80:1,14,23 81:9
82:2,5,11,21 83:10
83:14,21,25 84:2
84:16,25 85:10,15
85:21 86:4,7,18,22
87:1,4,7,12,15,17
87:20 88:5,7 90:5
90:9 91:5,18 92:5
92:11 93:3,12,21
95:19 96:10,12,22
97:7,10,21,23 98:1
98:3 99:9,16
101:3,7,19,20,21
103:1,6,10,24
104:2,5,7,11,17
105:10 106:2,6,10
107:3,12,24 108:9
109:7,10,14,17
110:17,22 111:13

111:15,23 112:6
113:5 114:14
115:4,10,12 116:2
116:2 117:5,11,24
118:3,12,16,18
119:1,8,19,21,24
120:6,8,10,22,23
121:8,16 122:9,21
122:24 123:6,10
127:2,6,10 128:21
128:24 129:10,24
130:3,6,14 131:11
132:4,6,17,22,25
133:7,11,18,20,22
133:25 134:23
135:5,25 136:5
137:11,20,25
138:4,16,19,23
139:1,3,13,14,19
140:18 141:6,9,14
141:18,23 142:2
144:10,12,15,18
144:23 145:6,9,13
145:16,18,20,24
146:3,6 147:11,16
147:19 148:3,8,20
148:23,24 149:13
150:2,7,19 151:4
151:20,23 152:10
153:9,9,15,24
154:11 155:14,16
155:18,18,20,23
156:1,2,5,25
157:15,17,22,22
158:10,22 159:1
160:6,18 161:9,13
161:18,23 162:12
162:23 163:1,12
163:19 164:14,18
164:22 166:21
167:6,16 168:1,5

168:22 169:6,13
170:22,25 171:1
171:12 172:1,3,8
173:21 174:8,11
175:4 177:11,17
178:22 180:11,13
180:25 181:3,14
181:22 182:19
183:23 184:20
185:6,19,25
186:19 187:8
189:13 190:5
191:4,5,10 192:10
192:10,14,16,21
194:7 195:17
196:15 197:9,13
197:24 198:4
199:18
**risk**  113:4,5
**ritual**  184:25
**road**  100:19
**robert**  81:25 83:20
**rock**  166:10 167:5
**rocks**  168:24
**rod**  46:18,19 47:4
  47:22 48:3 55:11
  83:6,8,10,24 84:1
  84:14 85:21 87:20
**rods**  45:16,18,24
  46:3 54:19 55:19
  55:24 84:14 98:9
  98:13,21 103:12
  104:6 106:11
  113:9
**roger**  151:3,19
  155:12 178:1
  186:18,21 191:18
**roll**  83:13
**rolle**  42:4 81:25
  83:16,18,20 85:12
  99:7

**rolle's**  81:23
**rolltop**  139:10
**ronning**  1:19 3:12
  5:10
**ronnings**  5:16
**roofing**  158:7,22
  159:2 164:18,22
**rosalyn**  1:4 3:11
  5:6
**roth**  3:3
**rt**  89:23 90:1,10
  91:17
**run**  16:6 62:14
  196:1
**running**  146:7
  161:22
**rutile**  167:25
**rvz**  169:12

**s**

**s**  3:1 4:4
**safe**  94:15 108:3,8
  108:16 110:21,21
  129:12,19
**safely**  109:22
  111:2
**safety**  42:17 91:23
  94:14,17,18 97:15
  111:22 112:3,8,20
  130:12 141:5,13
**sake**  84:5
**sale**  152:6
**sample**  11:19
  12:18,22 13:7
  17:16 23:17,20
  31:14 36:22 37:4
  37:10,10 41:8
  62:13,13,18 73:19
  73:20 74:13,18,22
  78:16,18 79:13,14
  79:15,23 80:10,19
  81:4,4 83:17,23

85:24 87:9 100:9
100:25 132:4,20
134:22 146:10
152:11 163:5,7
168:12,12 181:6
196:10,12,15,17
**sampled** 80:21
134:18 169:19
190:23
**samples** 9:18
10:22 11:23 16:19
24:19 29:2 31:11
31:13 32:7 35:17
39:12,14,14 44:7
44:13,21 45:1,17
52:10 53:20 54:15
54:20 57:19 62:19
62:22 65:21 73:6
73:16 80:15 82:10
82:25 88:2 99:25
100:3,4,5,15,23
101:18,23,24
102:7,10,18,24
106:9 115:4,6,11
117:2,11,16,19,22
120:18 121:2,2,13
122:20 123:22
125:23 126:1,14
126:16,16,24
127:2,10,11
129:23 130:2
132:20 133:3,6
134:21 137:20
139:7,8 144:15
145:6,7 146:7
147:3,7 149:24
152:4,5 155:10
157:14 162:22
167:17,21 168:9
168:22 192:4,9
196:16

**sampling** 29:4
156:24 157:3,12
**sand** 173:6
**satisfactorily**
22:11
**satisfy** 100:25
**saw** 24:2 39:8 78:9
97:20 98:2,4
121:15,16 192:16
**saying** 22:22 23:11
26:15 32:16 35:22
45:25 55:21 57:8
86:21 95:11 116:8
116:9 119:7
121:15,25 133:24
141:16 150:6,7
152:10,22,25
153:1,5,6 163:24
164:7 192:24
**says** 12:14 16:15
16:17 18:17 21:3
22:2 24:18 25:3
26:8 29:1,19,22
30:6,18,22,25 31:8
31:20,20 39:9
40:20 44:7 48:10
48:13 51:6,6,25
52:5,9,14,18 53:8
53:20,24 58:10
59:1,7 63:22,24
64:6,7,8 65:21
69:7 70:21,25
71:3 74:21,22
78:22 79:1,12
80:14 81:22 83:5
84:3 86:2 88:9
100:3 103:14
109:12,20 110:20
117:21 118:24
123:1,15 125:22
126:22 128:7,19

133:2 134:25
138:10 139:5
141:4 146:6
147:19 150:23
151:25 154:4,6
156:10 161:6,7,11
161:12 163:15,16
163:18 164:8,14
164:15 165:23
166:16 167:3,14
167:20 170:19
178:5 179:11
183:4,5 184:9
189:3,25,25
190:17,20 196:9
196:15
**scanned** 102:25
**scanning** 30:8
**schaffer** 26:13
**schaffner** 23:14
25:4 26:8,14
27:10,17 29:19
30:3,21 31:11
32:11 141:3
**scheduled** 91:23
**school** 39:20 47:2
85:9
**science** 92:9
**scientific** 111:21
**scientists** 18:24
19:4 42:16
**scope** 16:19
**screen** 35:4 70:11
**se** 94:17
**seal** 14:15 79:1,4,6
79:10,11
**seated** 5:3 89:17
176:22
**second** 14:17,24
54:5,19 55:16
56:19,21 57:23,24

57:24,24 58:11,13
58:19,20,21 60:13
60:15,17 61:15
62:4,12 63:18
64:3,11 66:22
67:8 68:1,8,13
80:24 95:19 115:7
155:9 162:6
167:21 171:19
179:15 180:1
**secret** 109:18
**section** 157:18
**sections** 171:21
**sediment** 145:20
146:2,3 148:3,6,24
**see** 12:18 14:22
15:1,2,6,10 18:1
21:4,7 29:1 30:4
35:23 40:21 42:3
42:14 46:10 52:4
53:1 55:5,8,10,24
61:16 62:21 63:14
64:17 65:20 66:5
68:19 70:2,6,21,23
71:1,7,13,19 72:3
78:15 79:24 81:21
82:4,20 84:2,11
85:18,20 88:2
93:16 94:9 97:6
99:6,24 102:4,10
102:18,19 103:14
105:7 109:20
122:19 128:14
138:10 142:1
149:22 157:2,13
160:4 161:6 166:5
166:25 167:3,13
169:10 170:12,19
171:3 174:15
176:3 177:23,25
180:22 181:3

182:24 184:9
186:13,25 190:15
190:17 196:25
197:3,9 198:16
**seen** 19:19 23:20
24:25 28:15 31:14
31:16 32:20 73:10
78:12 120:17
121:4 128:13
144:20 146:18,20
149:18 151:8
157:20 168:15
170:15 192:2,4,6,9
192:12
**sees** 85:25
**select** 29:2
**selected** 123:25
**sell** 158:7 189:23
190:4
**selling** 89:24 90:5
113:1
**sells** 189:20,25
**semple** 178:6
**sensitive** 32:12,16
36:5 40:3 148:2,7
**sensitivity** 119:24
120:3,9,9,10
**sent** 21:21 53:2,5
53:11 55:20 62:14
63:12
**sentence** 45:23
46:2 111:10
125:25 137:4
191:24
**separate** 56:14,15
56:17,22,24,25
57:9,11 95:4,10
148:5 157:17
173:3
**separated** 145:19

**separation** 145:16
174:8
**separator** 170:22
**september** 79:23
80:13 81:5 140:6
140:9 141:2
**sequence** 72:8
**series** 147:3
155:10 163:3
**seriously** 39:16
**serpentine** 174:6
**served** 70:25
**sesquihydrate**
59:9
**set** 10:21 37:15
38:25 134:8
**seven** 130:1
**seymour** 10:18
**shape** 103:4 104:5
**shaped** 55:11
**shards** 83:13
**sheet** 81:12 161:3
**sheets** 6:23 182:12
184:7,7,15 185:18
185:25 186:3
**sherwin** 94:5
**shipped** 150:12
**short** 140:3 158:16
158:20 161:24
**shortened** 67:10
**shortly** 181:5
**show** 46:19 60:23
68:8 70:5,15,16
111:21 118:1
122:19 160:4
171:21 179:9
188:19 192:4,9
**showed** 29:9 72:3
78:10 117:22
120:18 121:2
130:12 138:11

139:11
**shower** 11:19,20
12:19,19,22,22
13:5,5,7,7 15:18
22:5,6 27:19,19
30:7,7,11,11,19,19
41:5,5,8,8 52:10
52:11 74:15,15
79:19,19 80:5,5,10
80:10,19,19 81:12
81:13 82:10,10,25
82:25 83:16,17,24
83:24 88:2,2
183:4,4 184:24,24
185:2,2,6,6
**showers** 15:18
184:14
**shown** 34:17 45:2
70:9 81:12 90:17
98:8,21 123:25
132:1 135:12
143:14 149:21
164:17 179:7
182:4
**shows** 141:4 147:4
**shut** 154:2 158:17
158:21
**sic** 162:5
**side** 6:16 11:15
15:6 52:8 59:1,4
155:13
**sidebar** 7:7,10 9:7
69:1,2,24 179:1,5
179:23 187:16,17
188:20
**sided** 58:25 103:10
104:7
**sides** 104:11 105:3
105:19
**signature** 198:19
200:11

**signed** 63:20 71:9
80:1 128:8 187:3
187:7
**significant** 112:14
117:17
**significantly** 119:4
**silicate** 13:9
180:19 181:9
**silvia** 2:21 200:3
200:12
**similarity** 59:8
**simon** 3:8
**simple** 75:2
**simply** 54:6
**simulated** 130:25
**single** 157:22
189:8
**sir** 6:20 16:7,12
21:18 33:12,23
34:13 38:8 46:2
46:17 48:25 49:12
49:20 50:19 55:4
57:1,4 60:25
61:10 66:20,25
73:12 74:6,11
75:8 77:14 90:25
92:24 95:18 96:4
98:20,25 99:4,24
102:7,18 105:8
107:9 108:20
111:25 112:18
114:23 122:4,15
125:1 128:9 134:9
134:13 151:2
153:3 162:5 165:2
165:5 177:5,21
182:17,24 185:16
189:2 192:18
193:15,25 195:10
198:8,12

sit 52:12
sites 150:1
situation 9:15
six 51:10 137:20
  150:16
size 103:14 163:5
  168:19
skeptical 110:14
skin 100:11
skip 13:12 23:1
  165:1
small 12:14 84:8
  86:4 87:1 138:4
  138:14 173:6,12
smaller 142:1
smell 6:23
smith 107:11
sodium 59:9 173:8
  180:19 181:9
sold 90:2 189:18
  190:5,6,6,9,22
  192:1 193:2
somebody 184:2
someone's 78:24
  88:16
somewhat 97:1
sonicated 145:18
soon 52:11
sorry 6:11 10:1
  17:22 43:6 47:6
  50:19 51:14 58:8
  61:20 62:6 64:19
  65:2,4 68:23
  80:12 90:19 93:19
  94:1 99:2 103:21
  108:12 132:9
  134:3 142:21
  152:19 154:24
  156:21 157:4,6
  160:9,14,20
  163:15 166:1

167:22 178:25
  179:6 180:7,8
  192:8
sort 18:25 28:17
  145:22 148:5
sorts 37:25
sound 70:7 77:21
sounds 87:17
source 189:17
south 116:12
  135:7
speak 92:19 95:3
  113:17 194:20
speaking 95:9
special 181:10
species 180:21
specific 171:10
  172:6 189:14
specifically 134:20
specification
  104:19
specify 24:9
  169:19
speculate 19:17
  38:22 45:8 48:18
  50:13 64:4 81:1
  124:19,21
speculation 19:18
speed 16:5
speeding 67:11
spiral 170:21
  173:14
spoken 50:17
sponsored 19:21
spread 7:14
sprinkle 184:14
  185:18,24 186:3
square 86:6,13,16
  86:20,20,25,25
staining 99:25
  100:22

stamp 7:16,25
  17:17 65:10 68:4
  68:9,16,19,19,20
  70:2 165:15
  182:25 197:9
stamped 169:10
stamps 71:13 82:5
  82:5
stand 100:16
  149:11,17
standard 23:3
standards 97:3
stands 100:17
  149:16,19 155:21
  196:8
stanley 95:14
start 43:17
started 127:23
  185:11
starting 44:1
  84:18 156:23
starts 120:15
  154:12
state 27:13 90:3,11
  134:20 159:17
  169:5 177:13
  196:17 200:5
stated 19:10 24:7
  24:7,23 25:1,2
  26:5 27:10 30:10
  32:1,5,10 33:4,25
  35:24 38:19 40:22
  41:7 54:6 55:18
  91:3 97:25 98:4
  105:12 111:10
  123:15 125:3,3
  129:11,21 194:6
statement 25:8
  35:8 42:15 188:15
  190:18 191:14,16

states 13:9 18:6
  27:9 32:1 85:2
  101:8,9 165:13
  177:6 178:21
  180:16 189:18
  194:8,9 195:23
  196:16
static 170:21
  173:14
stating 38:19
statistical 129:11
status 97:15
stayed 58:18 72:18
stefs 30:8
step 46:13 115:7,7
stewart 23:21 24:4
  27:18,20 31:19,20
  31:23,24 34:25
  35:15 38:15,23,24
  42:4 50:14 80:1
  154:18
stop 124:8,11
  129:15
stork 187:23
story 94:8
straight 48:25
street 2:2 3:9,15
  3:19
stressed 111:19
stretch 8:12
stricken 20:5
  98:18 137:4 140:4
stricter 120:5,7
strike 76:23 77:2
  98:17 126:4 137:1
  140:1
studies 56:14 60:5
  111:21
study 52:5 53:18
  56:3,9,10,12 57:24
  58:21 174:13

**stuff** 22:5,15
  121:16,16,17
**subject** 128:23
  170:19 178:2
**submitted** 65:22
**subpoena** 71:1,4
**subsequent** 16:20
  23:21 35:15 94:4
**substantial** 50:7
  109:21 111:1
  130:12 141:4
**substantially** 31:1
  45:3,5,9,21 48:10
  48:13,16 49:1,6,9
  49:23 50:5,11,18
  50:22 51:2,7
  54:22 124:2,4,15
  124:18,20,25
  126:19
**subtrace** 174:7
**success** 97:20 98:3
  98:5
**sufficient** 114:15
**suggested** 29:15
  31:12 36:21 37:3
  80:4
**suitable** 95:16
  119:13 132:1
  134:18 135:1,20
**suite** 3:9,16
**sullivan** 3:14 5:20
  5:21 7:6,9 8:1,7
  8:12 9:4,6 13:18
  14:3 21:12 27:5
  28:9 38:3 41:20
  43:9 49:14 50:23
  58:4 61:24 64:25
  65:14 68:7,14,24
  69:6 70:8,14,17
  76:24 77:24 82:15
  84:4,10 91:9 93:7

96:16 99:19
  102:14 104:23
  107:17 115:20
  118:14 123:12,18
  124:5 125:7 126:5
  129:3 131:15
  135:10,14 137:15
  140:22 143:23
  144:1 151:12
  154:23 157:7
  159:14 160:7,11
  160:24 162:16
  165:19 174:18
  176:9 178:13,25
  179:8,13,18
  183:12,19 187:12
  188:8,10,18,23
  194:19 197:25
**summarize** 22:15
  40:2
**summarized** 22:4
  62:25 121:21,24
**summarizing**
  157:3
**summary** 21:3
  22:2 28:18 125:14
  125:16
**summer** 184:10
**super** 178:10
**superior** 1:1
**supplement** 147:2
**supply** 31:9
**supplying** 189:19
**suppress** 174:16
**sure** 5:3 7:8 14:3
  35:6 46:15 68:12
  89:18 123:14
  133:13 156:16
  169:6,24 176:23
  179:7,19 182:23
  184:1 193:21

198:2 199:4
**surgical** 100:18
**surprising** 184:10
**survey** 29:4
  134:17 183:23
**suspected** 100:23
**suspend** 148:1
**suspension** 147:25
**sustained** 98:16
  104:25 110:6
  142:9
**sworn** 187:1
  190:17,18
**symposium** 91:23
**system** 104:20

**t**

**t** 4:4
**tab** 9:22 60:25
  128:7 198:9
**table** 69:4 107:2
  120:18 127:5
  147:4
**tabs** 42:25 156:10
**tabulation** 146:7
**tag** 156:9
**tail** 170:8
**tailings** 173:8
**take** 14:20 50:9
  54:18 63:3,3
  73:13 89:1 92:7
  111:23 112:6
  119:8 153:20
  154:14 175:18
  179:1 182:11
**taken** 67:12 89:15
  164:19 176:19
**talc** 9:18 11:8 21:3
  23:3 25:10 26:11
  26:22 30:22 31:6
  42:18,22 52:19,25
  62:17,23,24 65:21

81:22 82:21,23,23
  82:23 83:13,13
  89:24 90:2,5,8,11
  90:13 91:14,21,22
  92:11,15 94:6,13
  94:16,17,18,19,23
  95:1 97:3,4,4,5,14
  97:15 104:16
  105:6 111:22
  112:3 113:24
  114:1,6,9 115:3
  117:2 123:23
  126:23 128:24
  129:13,22 130:13
  131:24 134:17
  137:9 139:7,10
  141:5,12,13
  144:14 147:3
  150:7 158:3,7,22
  159:2 162:22
  164:18 166:10,12
  166:13,16,23
  167:5,19,20,24
  168:3 169:1,6
  170:22,25 171:4
  171:21,25 172:8
  181:3,6,12,14
  189:8,17,19,23,24
  190:7,21 191:21
**talcs** 130:11
  149:15,15 150:5
  152:6,23 157:18
  164:13,21,22
  192:2
**talcum** 39:11
**talk** 9:11 36:20
  37:24 48:22 73:5
  73:18 104:9
  124:24 132:24
  136:13

**[talked - transmission]**  Page 32

**talked**  37:25 74:14
  93:20 119:18
  145:18
**talking**  8:24 9:10
  34:22,25 35:14
  37:7 39:19 47:8
  47:10 48:20 49:4
  60:23 93:18 116:7
  136:12 172:5
  175:3 177:5
  178:19 181:3
**talks**  168:18
**technique**  100:22
  145:16,23 148:14
  181:8,9
**techniques**  123:24
  181:11
**technology**  130:24
**tell**  23:15 46:11
  103:3 149:10
  187:25
**telling**  142:20,24
**tells**  64:3 108:7
**tem**  51:17 65:21
  141:21,24 142:2,3
  155:11
**ten**  80:20 81:1,2,6
  81:6,10 149:2
**tenfold**  131:3
**tens**  118:6
**test**  9:18 145:17
  153:13 171:10
  188:11,16 191:4,7
  191:12
**tested**  15:21 76:7
  180:17 190:23
  195:21,24
**testimony**  8:17
  20:5 89:3 167:9
  175:21

**testing**  37:10,13
  73:5,15 105:5,9
  121:17 162:21
  181:18,20 182:2
  191:1,25 193:4
**testings**  153:9
**tests**  152:4 153:11
  153:14
**texas**  3:10
**text**  188:13
**thank**  5:13,17 6:5
  6:14,16,17 7:9 9:4
  9:6 10:5,12,13
  14:8 34:8 41:14
  44:3 46:24 53:6
  62:10 73:8 81:18
  84:10 88:24 89:6
  89:20 90:23 98:25
  118:22 124:22
  142:17 151:1
  154:20 155:4
  166:3 175:24
  176:2,16 177:1,19
  179:4,22 182:9,22
  183:19 188:23
**theirs**  42:12
**theoretical**  129:12
**thin**  171:21
**thing**  37:11 54:10
  54:21 118:5 196:3
**things**  18:25 37:25
  67:11
**think**  31:11 39:5
  44:16 49:11 62:18
  67:25 69:21 74:8
  77:11 78:14 81:8
  83:18 86:1,15
  90:2 104:23
  106:16,23 113:18
  119:7 121:1 146:5
  159:24 170:16

**third**  3:6 61:1
  63:19 64:11 83:12
  84:6 186:16
**thirds**  83:13
**thought**  59:7
  94:20 113:15
  125:3,24 192:8
**thousand**  75:15,16
  75:18 191:9
**thousands**  46:7
**threatening**  29:25
**three**  15:18,19
  76:18 77:8,10,11
  77:11 82:22
  117:19 122:20
  132:3 133:6
  138:11,14 139:7,8
  143:15 146:12
  166:9 167:4 170:4
  170:7,8 173:6,12
  199:14
**time**  7:21 8:3 11:1
  11:22 12:6 18:21
  28:25 32:18,22
  33:21 40:23 49:17
  77:6,19,22 88:24
  95:19 100:7 116:9
  122:8 126:12
  127:12 139:23
  144:7 152:10,22
  153:1,13 154:6
  157:22 175:16
  177:12 189:11
  198:16
**times**  56:15 75:18
  87:13 143:15
  168:16

**title**  115:14 166:8
**titled**  57:13
**tlv**  129:14
**tm**  51:14
**tm7024**  51:15
  105:11
**today**  5:5 6:3
  42:20 93:23 95:13
  163:21,23,23
**toiletry**  119:14
  135:2,20
**told**  20:11 26:4
  38:15 57:21 67:2
  79:14 97:12
  110:25,25 111:3
  111:13,16 164:4
**tolerance**  26:5,20
  26:24 108:17
  111:13 130:17
**tool**  16:3
**top**  22:14 36:20
  74:7 78:15 178:5
  179:10
**topic**  88:21
**total**  15:21 16:21
  44:20 146:9
  148:23
**touch**  93:23
**toxicological**  25:9
  26:10 32:25
**trace**  59:12,24
  60:1,3 88:8,14
  102:23,25 168:9
  168:13,22
**track**  78:4
**trained**  46:5
**transcript**  2:17
  200:7,8
**transmission**  34:2
  34:11,23 35:1
  127:8

**transparent** 167:18
**treated** 173:8
**tremboletic** 97:3
**tremolite** 23:19 44:9,21 45:16,18 45:24 46:3 47:11 48:7 53:21 54:19 55:10,19,24 59:7 59:22,24 73:19 74:18,20,23,25 75:21,21,24 76:3 83:13 84:11,13 85:20 87:7,20 88:8,13,14 89:24 90:8 92:8 94:7,15 94:19,21 95:1,7 97:21 98:2,5,8,9,9 98:13,22 100:22 100:24 101:3,7,11 101:11,13,15,18 103:25 106:10,11 113:9,9,9 120:21 120:23 167:25 168:5,8,10,13,19 168:21 171:6,7,11 171:25 172:25 173:4,9,15,20 174:6,11 175:10 180:4
**trial** 1:4 5:6
**trials** 180:18
**tried** 92:14 185:1
**trillion** 118:7
**trillions** 118:6
**trouble** 106:20
**true** 16:15 27:4 74:19 85:23 88:10 92:15 99:12 114:4 115:15 119:10 138:7 142:25

151:6 152:1 159:5 169:20 187:4 189:14 191:17 193:5,8,11 197:14 200:8
**truth** 188:1 194:21
**truthful** 191:22 194:18
**try** 49:21 91:20 129:8 174:16 182:12
**trying** 35:10 36:21 37:7,23 48:25 95:1,6 98:1 121:1 171:14 181:13
**tube** 145:17
**tucson** 165:13
**tuesday** 2:4
**turn** 9:21,23 11:15 14:24 43:16 52:8 61:10 62:4,12 74:6 90:16 134:9 134:12 146:24 150:23 184:22 186:13
**turned** 5:3 89:18 176:23
**twice** 56:3
**two** 14:4 15:17 16:20 20:17,23 36:3 39:14 44:21 45:1 56:14,19,22 56:24,25 57:9,11 57:19 58:14,25 66:23 67:5 83:13 85:5 98:7,20 113:20 116:4,11 120:18 121:13 126:1,24 132:3 143:15 146:2,3,4 163:4,10 168:22

173:5,12 178:20 199:13
**type** 23:24 24:12 92:9 148:13 171:24 173:5
**typed** 88:18
**types** 166:10 167:5

### u

**uh** 12:5 59:3 149:13 170:6 186:17
**ultimately** 72:20 72:23 190:22
**unaware** 7:1
**understand** 30:22 32:6 37:11,16 190:13 195:1 196:7
**understanding** 48:25
**understood** 6:22 185:17
**undertake** 16:18
**undertaken** 117:15
**unequivocal** 139:13
**unfair** 29:2
**unify** 91:21
**united** 189:18
**university** 15:2
**unquote** 7:20
**unreasonable** 185:14
**unrelated** 187:13 187:13
**unrestricted** 154:6
**unsophisticated** 97:1
**untruthful** 191:22

**upstairs** 175:24
**usage** 184:11 185:7
**use** 8:4,11,14,20 8:25 17:8 51:25 53:9 56:25 57:3,5 57:22 58:16 77:22 94:6 112:21 123:9 134:18 135:20 136:18 151:20 184:17 185:3,24 188:16 191:24
**user** 185:1
**users** 184:24 185:10 189:21 190:22 191:24
**uses** 24:10 33:25 97:14 104:15 190:1
**usually** 70:15 183:24
**utilizing** 129:13 181:8

### v

**v** 1:6,11,16,21
**vail** 180:17
**valid** 112:17
**validate** 81:15
**validity** 17:10
**vanderbilt** 89:24 90:2,10 91:15,17 92:10,14,17,19 93:25 94:12,24,25 95:3,9 96:25 97:20 98:1,5
**vanderbilt's** 91:20 92:16 94:8,20
**variance** 39:16
**various** 8:17,25 170:20

**verified** 30:16
32:2
**verify** 33:7
**veritext.com** 2:24
**vermont** 166:11
166:17 167:6
169:2,5 177:11,13
189:9
**vermont's** 167:8
**vern** 144:21
169:12
**vernon** 154:17
**version** 13:16 15:8
18:5,15 53:24
54:2,5,13 55:9,16
57:23 58:11 60:13
60:16 66:22,23
67:10,10 77:10,14
77:15 80:24 98:12
**versions** 56:19
67:14,17 76:2
**versus** 5:7,8,9,10
148:6 190:14
**view** 32:25 59:8
94:12
**views** 93:24
**virtually** 19:13
133:25
**virtue** 17:7
**viscomi** 2:12
**visible** 175:20
**volume** 1:6 2:5
168:11 173:10
175:3 199:23

**w**

**w** 21:7
**wage** 2:21 200:3
200:12
**wait** 126:2,2
135:24

**walter** 61:19 133:2
**want** 35:7 36:16
38:22 46:11 55:6
75:19 100:6
122:15,19 123:20
124:21,23,23
129:9 153:14
173:1 180:25
181:1 184:23
198:9
**wanted** 42:14 67:9
75:17
**wanting** 109:5
**warm** 184:10,12
**washington** 91:23
**way** 13:12 48:17
68:6 75:3 93:19
100:5 118:11
120:2 124:3 128:1
132:10,19 134:16
136:20 141:8
144:20 147:18
148:5,7 157:5
163:12 196:19
197:2 198:15
**we've** 8:1 28:15
31:16 44:15 56:2
78:7 96:6 112:1
128:12 138:24
144:6 147:4
148:20 157:20
161:3 164:17
168:15 187:25
192:2,4,6,9,12
193:10
**weak** 94:21
**wear** 175:19
**weber** 73:10 78:11
**week** 10:7 39:6,8
73:9 78:8 80:3
81:12

**weeks** 96:3
**weight** 12:16
25:10,10 103:1
130:14 141:6,9,9
**weil** 3:15
**weissler** 16:15
24:17,18,23 25:1
32:6 35:17
**went** 18:3 33:9
58:20 106:12,16
114:3 132:19,23
172:11 185:4
**west** 2:22 150:1
161:13 180:19
**whatsoever** 89:6
175:22
**whitaker** 30:24
**wi** 150:1 192:12
**wiley** 70:7,22
**william** 1:19 3:12
5:9 178:1
**williams** 94:5
**willing** 24:20 32:8
35:18
**windsor** 117:13
131:25 144:22
145:3 150:1 151:3
151:19 156:18
161:8,13 162:12
166:5,11,13,17,18
166:24 167:1,6,7
170:22 177:10
178:22 180:19
186:22 189:4,5,6,9
189:20 190:9,14
190:21,25 192:20
192:23,25 193:25
**windsor's** 166:12
**wish** 179:9
**withstanding**
31:18

**witness** 4:2 6:10
8:23 13:23 20:3,7
27:9 34:7 46:13
46:23 54:25 55:2
77:3 111:8 126:7
135:12 142:15
152:19 160:16
174:20,23
**wodicka** 110:13
110:13,20
**woman** 184:13
185:5
**wondered** 130:9
**word** 24:11 31:22
33:25 49:8,12
50:21 54:6 95:22
121:1
**words** 58:3 112:15
**work** 11:7 16:21
23:15 30:7,16
136:21 150:16
178:22
**working** 11:8 50:7
180:16
**world** 11:2,4
44:17 56:2
**worry** 160:1
**write** 52:12 106:5
123:7
**writes** 59:11
125:17 151:18
198:15
**writing** 28:14
**written** 12:21 17:2
18:16,16 24:22
25:13 29:18,18
33:20 45:7 48:12
48:12 78:24 79:20
83:15 92:13 94:10
95:5,8 96:1 97:22
104:19 110:5,7,10

**[written - zoisite]**

110:12 111:11
119:22 123:5,8
127:3 129:25
130:15 133:8,19
139:15 143:1
147:20 148:4
150:21 152:9
168:2,6 171:9
172:2 174:9
192:18,20
**wrong**  69:11
**wrote**  26:14 29:21
30:17 39:1 48:19
50:14,17 51:3
57:2,4,7 92:12
121:20,24 130:21
135:3,23 136:1
153:5,16 164:2,2,2
191:3 197:21
**ww**  141:8

**x**

**x**  4:1,4 18:17,21
19:2,8 22:10,20,23
23:11,16,18 31:18
32:12,14,23 33:16
123:24
**xrd**  15:25 16:2
23:6 32:14 36:6
40:2,2,9 117:10
119:18,20,23
127:5

**y**

**yeah**  12:8 16:5
17:3 18:25 20:18
33:24 35:10 39:21
39:25 40:1 43:6
43:17,17 52:23
56:6 59:16 61:2
61:21 64:13 65:3
68:2 73:23 74:3,4

75:20 77:10,11
79:9 83:15,20
84:1,13,14 85:9,11
88:15 92:17 93:23
96:6,6,9 99:2,15
100:14 101:4
102:5 103:2,7,9,13
103:19 104:6,6
120:16 122:17
123:8 128:16
138:20 140:14
142:3 143:20
145:25 146:1
147:14 148:4,13
151:21 152:22
153:22,22,23
154:11 156:13
160:19 165:9,10
167:12,15 170:7
172:16 173:22
179:4,12,14
182:19 183:8
184:19 186:9
187:2 188:12
189:25 192:20
193:19
**year**  10:2 73:25
142:19 154:5
191:8 192:13
197:19,20
**years**  76:18 77:8
77:11,11,12 97:23
114:13 117:7
132:3 174:24
185:8 189:7,10
191:9 196:7
197:19
**yesterday**  5:25
6:20 7:19 9:9
20:12 26:4 34:14
91:16 118:6

129:18 145:19
159:16
**yesterday's**  7:13
**york**  3:7,7 15:1
90:3,11 91:16
94:6
**young**  185:1

**z**

**z**  145:1
**zeitz**  144:21 145:3
154:17 169:13
**zero**  26:5,19,24
108:9,16,17
111:13 130:16
146:11
**zoisite**  168:8

Exhibit 200

| | |
|---|---|
| *Attorney(s):* | LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL |
| *Office Address & Tel. No.:* | 2 Lincoln Highway, Edison, New Jersey 08818-2905 (201)494-2727 |
| *Attorney(s) for* | Plaintiff |

LOUIS EDLEY

*Plaintiff(s)*

*vs.*

E & B MILL SUPPLY, et als

*Defendant(s)*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
MIDDLESEX COUNTY

DOCKET NO. L-075913-86

*CIVIL ACTION*

**Stipulation of Dismissal**
with prejudice
(as to defendant, Windsor Minerals, Inc.)

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party,* with prejudice as to defendant, Windsor Minerals, Inc.

EXHIBIT
43

*Dated:* July 23,          19 87 .

*By* _____
RONALD S. LEVITT
*Attorney(s) for Defendant(s)*
WINDSOR MINERALS, INC.

*By* _____
RONALD B. GRAYZEL
*Attorney(s) for Plaintiff(s)*
LOUIS EDLEY

EXHIBIT
J+J 188

## NEWMAN, HERMAN, SALTMAN, LEVITT AND FEINSON

A PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW

EDWARD H. HERMAN
JAY J. NEWMAN
   (N.J. & D.C. Bar)
DAVID A. SALTMAN
   (N.J. & Fla. Bar)
RONALD S. LEVITT
   (N.J. & N.Y. Bar)
JULIUS J. FEINSON
JULIE VACCHER GOLDSTEIN
   (N.J. & Pa. Bar)

ISRAEL H. SALTMAN (1914-1982)

Of Counsel
ALLEN J. SIMONSON
DONALD J. PERRELLA
   (N.J. & N.Y. Bar)
ROBERT J. PINTO

Please Reply To:
   P.O. Box 769
   East Windsor, New Jersey 08520

New Brunswick Office:
   47 Paterson Street
   (201) 745-9005

East Windsor Office:
   339 Princeton-Hightstown Road
   (609) 443-4900

Somerville Area:
   By Appointment Only
   (201) 725-4257

OUR FILE NO.
11092-L

July 23, 1987

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza, 2 Lincoln Highway
PO Box 2905
Edison, New Jersey  08818-2905

RE:  Edley -v- Madsen & Howell, Windsor Minerals, Inc., et als

Dear Mr. Grayzel:

Enclosed please find an Affidavit on behalf of Windsor Minerals, Inc., signed by Roger N. Miller, President of Windsor Minerals, Inc. since 1968.  Also enclosed you will find an assay from McCrone Environmental Services, Inc.  I trust that these documents will now enable you to sign a Dismissal as was done in the Yuhas file.  I have taken the liberty of drafting the Dismissal and enclosing the same for your signature along with a self-addressed stamped envelope.

If you are still unable or unwilling to sign the Dismissal, please forward immediately your client's answers to supplemental interrogatories which were served upon you almost one year ago.

Very truly yours,

Ronald S. Levitt

RSL/gbf
Encl.

cc:  Michael M. Tanenbaum, Esq., McCarter & English
     Thomas M. Kelly, Esq., Morley, Cramer, Tansey, Haggarty & Fanning
     Anthony Luongo, Esq., Donington, Leroe, Toland & Luongo

Certified Mail, Return Receipt Requested

```
------------------------------------
LOUIS EDLEY,                      :     SUPERIOR COURT
                                  :     OF NEW JERSEY
              Plaintiff,          :     LAW DIVISION
                                  :     MIDDLESEX COUNTY
       vs.                        :
                                  :     DOCKET NO. L-075913-86
WINDSOR MINERALS, INC.;           :
NICOLET, INC., as Successor-      :        CIVIL ACTION
in-Interest to Keasby &           :
Mattison; GAF CORP., RUBEROID,    :        AFFIDAVIT
GAF CORP., as Successor-in-       :
Interest to Ruberoid; MADSEN      :
& HOWELL, INC.; JOHN DOE #1       :
to #50 (Fifty Unidentified        :
Manufacturers and Distributors    :
of asbestos-containing            :
products),                        :
                                  :
              Defendants.         :
------------------------------------
```

STATE OF VERMONT  :
                        SS.
COUNTY OF WINDSOR :

      ROGER N. MILLER, of full age, being duly sworn, according

to law, upon his oath, deposes and says:

      1.  I am the President of Windsor Minerals, Inc. and have

held that position since 1968 when Windsor Minerals, Inc. was

first formed.

      2.  The exclusive business of Windsor Minerals, Inc. is,

and has been for the last eighteen years, the mining and

milling of talc from a single mining district in Windsor,

Vermont.  That mining district is the exclusive source of talc

for all of the Johnson's Baby Powder sold in the United

States.  In addition to supplying the talc for Johnson's Baby

Powder, Windsor Minerals, Inc. also sells a portion of its

product to independent industrial users.

3.   All of the talc mined by Windsor Minerals, Inc., whether it is ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos.  No evidence of the presence of asbestos in Windsor Minerals' product has ever been revealed by this testing.  Attached hereto as Exhibit "A" is a true copy of a recent report of such testing.

ROGER N. MILLER

Sworn to and subscribed
before me this *13*   day
of July, 1987.

Notary Public
My Commission Expires:
*Feb. 10, 1991*

Exhibit 201

REC'D. & FILE
SUPERIOR COURT
OF NEW JERSEY

JAN 13 1987
M.V. 24
JOHN M. MAYSON
CLERK

*Attorney(s):*   LEVINSON, CONOVER, AXELROD, WHEATON & GRAYZEL

*Office Address & Tel. No.:*   2 Lincoln Hwy., Edison, NJ 08818

*Attorney(s) for*   Plaintiffs      (201) 494-2727

| | |
|---|---|
| ALEX YUHAS and JEAN YUHAS, his wife | *SUPERIOR COURT OF NEW JERSEY* |
| | MIDDLESEX      *COUNTY* |
| *Plaintiff(s)* | LAW      *DIVISION* |
| *vs.* | |
| E & B MILL SUPPLY, et als. | *DOCKET NO.* L-029706-84 |
| | *CIVIL ACTION* |
| *Defendant(s)* | 𝔖tipulation of 𝔇ismissal |
| | with prejudice |
| | (as to defendant, Windsor Minerals, Inc.) |

*The matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and it is hereby dismissed without costs against either party.*

*Dated:*   January 6      *19* 87 .

NEWMAN, HERMAN, SALTMAN, LEVITT
& FEINSON

*By* _____
      Edward H. Herman
*Attorney(s) for Defendant(s)*  Windsor
      Minerals, Inc.

LEVINSON, CONOVER, AXELROD, WHEATON
& GRAYZEL

*By* _____
      Ronald B. Grayzel
*Attorney(s) for Plaintiff(s)*

Exhibit 202

John C. O'Shaughnessy

```
 1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                 STATE OF MISSOURI
 2

                     - - - - -
 3

     VICKIE FORREST, et al.,
 4           Plaintiffs,
 5           vs.                Cause No.
                               1522-CC0419-02
 6

     JOHNSON & JOHNSON, et al.
 7           Defendants.
 8               - - - - -
 9        UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
10

                     - - - - -
11

     IN RE:  JOHNSON & JOHNSON    MDL NO:
12   TALCUM POWDER PRODUCTS       16-2738 (FLW)(LGH)
     MARKETING, SALES PRACTICES,
13   AND PRODUCTS LIABILITY
     LITIGATION
14               - - - - -
15

             Wednesday, June 30, 2021
16

17               - - - - -
18       Continued Videotaped Oral Deposition of
19   JOHN C. O'SHAUGHNESSY, taken at the Crowne Plaza
20   Princeton, 900 Scudders Mill Road, Plainsboro, New
21   Jersey, commencing at 9:35 a.m., by and before Robin
22   L. Clark, Registered Professional Reporter and
23   Notary Public in and for the State of New Jersey.
24               - - - - -
```

Page 420

```
 1  APPEARANCES:
 2
 3      LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
        BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
 3      BY:  CHRISTOPHER V. TISI, ESQ.
 4      316 South Baylen Street, Suite 600
        Pensacola, Florida 32502-5996
 5      850-435-7176
        ctisi@levinlaw.com
 6          For the Plaintiff, Vickie
        Forrest
 7
 8      COHEN, PLACITELLA & ROTH
        BY:  CHRISTOPHER M. PLACITELLA, ESQ.
 9      127 Maple Avenue
        Red Bank, New Jersey 07701
10      732-749-9003
        cplacitella@cprlaw.com
11          For the MDL Plaintiffs
12
13      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  ALLISON M. BROWN, ESQ.
14      and RICHARD T. BERNARDO, ESQ.
        One Manhattan West
15      New York, New York 10001-8602
        212-735-3000
16      allison.brown@skadden.com
        richard.bernardo@skadden.com
17          For the Defendant,
        Johnson & Johnson
18
19      YETTER COLEMAN LLP
        BY:  COLLIN J. COX, ESQ.
20      811 Main Street, Suite 4100
        Houston, Texas 77002
21      713-632-8000
        ccox@yettercoleman.com
22          For the Witness
23  ALSO PRESENT:
24      JOEL SCHNEIDER, USMJ (Retired)
```

Page 421

```
 1  ALSO PRESENT, continued:
 2
 3      WILLIAM GEIGERT, VIDEOGRAPHER
 4      MICHAEL KUTYS, EXHIBIT TECH
 5  REMOTE APPEARANCES:
 6
 7      BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
        MILES, P.C.
 8      BY:  LEIGH O'DELL, ESQ.
        218 Commerce Street
 9      Montgomery, Alabama 36104
        800-898-2034
10      leigh.odell@beasleyallen.com
            For the Plaintiff, Vickie
11      Forrest
12      ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT, ESQ.
13      1825 K Street, N.W., Suite 700
        Washington, D.C. 20006
14      202-759-7648
        mparfitt@ashcraftlaw.com
15          For the Plaintiff, Vickie
        Forrest
16
17      COHEN, PLACITELLA & ROTH
        BY:  DENNIS M. GEIER, ESQ.
18      and HARRY M. ROTH, ESQ.
        127 Maple Avenue
19      Red Bank, New Jersey 07701
        732-749-9003
20      dgeier@cprlaw.com
        hroth@cprlaw.com
21          For the MDL Plaintiffs
22
23
24
```

Page 422

```
 1  REMOTE APPEARANCES, continued:
 2
 3      BARNES LAW GROUP, LLP
        BY:  JOHN R. BEVIS, ESQ.
 3      31 Atlanta Street
 4      Marietta, Georgia 30060
        678-290-2240
 5      bevis@barneslawgroup.com
            For the Plaintiffs
 6
 7      ROBINSON CALCAGNIE, INC.
        BY:  GENEVIEVE OUTLAW, ESQ.
 8      19 Corporate Plaza Drive
        Newport Beach, California 92660
 9      949-720-1288
        goutlaw@robinsonfirm.com
10          For the Plaintiffs in JCCP 4872
11
12      BLASINGAME, BURCH, GARRARD & ASHLEY, PC
        BY:  LEANNA BANKESTER PITTARD, ESQ.
13      and SARA SCHRAMM, ESQ.
        2100 Southbridge Parkway
14      Suite 650
        Birmingham, Alabama 35209
15      866-354-3544
        lpittard@bbga.com
16      sschramm@bbga.com
            For the MDL Plaintiffs
17
18      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  CATHERINE I. MULLALEY, ESQ.
19      500 Boylston Street
        Boston, Massachusetts 02116
20      617-573-4851
        kate.mullaley@skadden.com
21          For the Defendant,
        Johnson & Johnson
22
23
24
```

Page 423

```
 1  REMOTE APPEARANCES, continued:
 2
 3      FAEGRE DRINKER BIDDLE & REATH LLP
        BY:  SUSAN M. SHARKO, ESQ.
 4      600 Campus Drive
        Florham Park, New Jersey 07932
 5      973-549-7000
        susan.sharko@faegredrinker.com
 6          For the Defendant, Johnson &
 7      Johnson
 8      SEYFARTH SHAW LLP
        BY:  THOMAS T. LOCKE, ESQ.
 9      975 F Street, N.W.
        Washington, D.C. 20004
10      202-828-5376
        tlocke@seyfarth.com
11          Appearing on behalf of Personal
        Care Products Council
12
13      TUCKER ELLIS, LLP
        BY:  ELIZABETH J. CUMMINGS, ESQ.
14      100 South 4th Street
        St. Louis, Missouri 63102
15      314-571-4969
        elizabeth.cummings@tuckerellis.com
16          For the Defendants, PTI
        Royston, LLC and PTI Union, LLC
17
18  ALSO PRESENT:
19      LEA CALLAHAN, Paralegal
20      JEN SECRIST, Paralegal
21      STEPHANIE E. MARTIN
22          - - - - -
23
24
```

Page 424

I N D E X
WITNESS                          PAGE
JOHN C. O'SHAUGHNESSY
    BY MR. PLACITELLA:        430, 879, 903
    BY MR. TISI:              776, 849
    BY MS. BROWN:             779, 903

E X H I B I T S
NUMBER        DESCRIPTION        MARKED
O'Shaughnessy
Exhibit JOS 1  McCrone Binder 1        482
Exhibit JOS 1A McCrone Binder 2        482
Exhibit JOS 2A Musco-2/Hopkins Binder 1    430
    of 2

Exhibit JOS 2B Musco-2/Hopkins Binder 2    430
    of 2
Exhibit JOS 3 Additional Testing Binder    430
Exhibit 4    Handwritten Document        644
Exhibit J&J 4 Cosmetics Document        894
Exhibit TR-15 Deposition of Dr. John    678
    Hopkins dated 3/6/07

Exhibit 82    Muscat Video Clip        864

Exhibit 172   Deposition of Glenn A.    536
    Hemstock dated 1/28/83
Exhibit 173   Deposition of Glenn A.    538
    Hemstock dated 3/16/83

Exhibit 188   Stipulation of Dismissal,    463
    Letter dated 7/23/87,
    Affidavit of Roger Miller,
    and Letter dated 1/28/87

Page 425

Exhibit 195   Affidavit of William H.    518
    Ashton

Exhibit 198   Letter dated 11/26/90 and    738
    Attachment Bates
    JNJMX__68__000012851 to
    12859
Exhibit 230   Affidavit of Dr. John    680
    Hopkins in Durham case

Exhibit 270   Deposition of Roger N.    896
    Miller taken 6/12/91
Exhibit 274   Letter dated 1/23/88 Bates    633
    JNJ 000024573 to 24576

Exhibit 277   Answers to Interrogatories    663
    In Krushinski Case Bates
    JNJ 000065001 to 650011

Exhibit 282   Roger Miller Affidavit in    499
    Andonian case Bates
    JNJ-WIL__0000094 to 95

Exhibit 319   Letter dated 10/27/97 and    652
    Attachments
Exhibit 322   IARC Monograph        636
Exhibit 355   Letter dated 1/28/1987    729
    Bates JNJTALC0000387714 to
    387716
Exhibit 414   Spreadsheet        890
Exhibit 418   Email String dated 11/21/08    755
Exhibit 436   Deposition of Peter N. Gale    547
    dated 4/26/83

Exhibit 441   Stipulation and        554
    Confidentiality Order
Exhibit 443   Windsor Minerals' Responses    720
    to Interrogatories in
    Westfall case

Page 426

Exhibit 446   Agreement Between Cyprus &    511
    J&J dated 1/6/89

Exhibit 456   Report dated 11/23/83 Bates    744
    JNJ 000240739 to 40742
Exhibit 472   Photograph        900
Exhibit 486   Privilege Log        715
Exhibit 488   Spreadsheet        891
Exhibit 491   Memo dated 1/4/84        748
Exhibit 525   Event Report dated 1/9/17    451
    Bates JNJTALC000125625 to
    125632
Exhibit 1035  Letter dated 1/3/95        573
Exhibit 1039  Excerpt for J&J Privilege    526
    Log

Exhibit 1040  Letter dated 8/14/89        563

Exhibit 1042  Dismissal Order        515

Exhibit 1043  Deposition Of Roger N.    618
    Miller dated 4/6/95
Exhibit 1044  Deposition of Roger Miller    697
    taken 1/16/07

Exhibit 1047  Affidavit of Roger Miller    507
    in Miller case
Exhibit 1048  Letter dated 9/10/85 Bates    484
    JNJ 000064652

Exhibit 1049  Legal Hold Letter dated    718
    5/16/03
Exhibit 1051  Document Preservation    722
    Notice Bates
    JNJTAL000949679 to 949681

Page 427

Exhibit 1052  Mediation Memo dated 2/4/03    666
    Bates JNJTALC001243929 to
    1243949
Exhibit 1053  Letter dated 6/6/88        475
Exhibit 1054  Letter dated 8/27/86        468
Exhibit 1060  Transcript of John Hopkins    477
Exhibit 1061  Andonian Case Witness List    497
    Bates JNJ 000065334 to
    65339

Exhibit D-1   Affidavit of Robert K.    810
    Denton
Exhibit D-2   Letter dated 9/28/72    820
    and Report Bates
    JNJTALC000289268 to 359834
Exhibit D-3   Letter dated 3/18/02 Bates    828
    JNJTALC00109268 to 109278

Exhibit D-4   Case Control Studies that    845
    were Published from 1992
    to 1999

John C. O'Shaughnessy

| Page 476 |
| --- |

1    A.  One or two?

2    Q.  Yeah, hold on.  It's 1060 in

3 the transcript book.  It says trial

4 testimony in the Barden case and I'll put

5 it up.  And I'll put it up on the screen

6 for you, if you need to look at it later --

7         MS. BROWN:  Well, can he

8    review, hear the entirety of the

9    testimony?

10        MR. PLACITELLA:  The

11   whole transcript, I think we don't

12   have time for that, but --

13        MS. BROWN:  I want to

14   know where this is talked about on

15   redirect.

16        MR. PLACITELLA:  You can

17   ask him all that on redirect.

18        MS. BROWN:  Are you

19   putting that up or can he --

20        MR. PLACITELLA:  I'm

21   putting the whole document into

22   evidence, so no problem.

23        THE WITNESS:  I'm just

24   trying to find the document.

| Page 477 |
| --- |

1         MR. PLACITELLA:  I put

2    it up on the transcript --

3         MS. BROWN:  Right, I

4    just wanted to go to the document

5    and see the cover sheet.  Oh, that

6    single sheet is the exhibit?

7         - - - - -

8         (Transcript of John Hopkins

9    marked O'Shaughnessy Exhibit 1060

10   for identification.)

11        - - - - -

12 BY MR. PLACITELLA:

13   Q.  Yes, sir.  I'll put the whole

14 transcript into evidence.

15   A.  Okay.

16        MS. BROWN:  I'll just

17   object to selective reading --

18        THE WITNESS:  I'm just

19   trying to go to your sheet.

20        MS. BROWN:  -- of this

21   questioning.  That's incomplete.

22        THE WITNESS:  1068?

23        MR. PLACITELLA:  1060.

24        THE WITNESS:  I have

| Page 478 |
| --- |

1    1060A.

2 BY MR. PLACITELLA:

3    Q.  You know what, we'll come back

4 to it, because I'm trying to get this done

5 today.  Did John Hopkins ever have a

6 conversation with you and tell you that

7 affidavits like this were untrue?

8    A.  I had many conversations with

9 John.  I never had a discussion with him

10 about an untrue affidavit.

11   Q.  Okay.  In 188, do you see where

12 Johnson & Johnson told Mr. Grayzel that

13 they wanted a dismissal in this case just

14 like he gave in the other cases?

15   A.  Can you put it up?  I'm having

16 trouble with -- I'm sorry.

17   Q.  That's okay, I put it right in

18 front of you.

19        MS. BROWN:  So, John, if

20   you want the hard copy, I think we

21   are now back in binder one and

22   we're looking at 188, which you

23   probably still have open or close

24   to open.

| Page 479 |
| --- |

1         MR. PLACITELLA:  You can

2    look at the hard copy, but I'm

3    not --

4         THE WITNESS:  You know,

5    part of the problem is, it says

6    '88, but there's a handwritten one

7    and that gets confusing.

8 BY MR. PLACITELLA:

9    Q.  I understand.

10   A.  I got it.  I got it.

11   Q.  Do you see where it says "I

12 trust these documents will now enable you

13 to sign a dismissal."  And when they say

14 these documents, they're talking about the

15 Miller affidavit, right?

16        MS. BROWN:  I object,

17   foundation.

18 BY MR. PLACITELLA:

19   Q.  "As was done in the Yuhas

20 file".  Do you see that?

21   A.  Yes, you read that to me

22 before.

23   Q.  So this was a second case that

24 was dismissed based upon the representation

Page 480

¹ of no asbestos being in the Johnson &
² Johnson talc, right?
³          MS. BROWN:  Lacks
⁴     foundation, I object.
⁵          THE WITNESS:  I don't
⁶     know.
⁷ BY MR. PLACITELLA:
⁸     Q.  Okay.  Whatever happened to the
⁹ Yuhas file, do you know?
¹⁰     A.  I have no idea.  That was
¹¹ before my time.
¹²     Q.  Do you know what happened to
¹³ the Edley file?
¹⁴     A.  No.
¹⁵     Q.  Going back to the report in
¹⁶ 188.5, that talks about no quantifiable
¹⁷ evidence?
¹⁸     A.  Okay.
¹⁹     Q.  Okay.  Are you aware that the
²⁰ term "nonquantifiable" does not mean
²¹ asbestos free as Mr. Miller actually
²² states?
²³          MS. BROWN:  I object.
²⁴     That misstates the evidence and

Page 481

¹     lacks foundation.
²          THE WITNESS:  I'm not
³     competent to interpret what that
⁴     term means.
⁵ BY MR. PLACITELLA:
⁶     Q.  Did you know that that was a
⁷ code word for not reporting the actual test
⁸ results?
⁹          MS. BROWN:  Objection.
¹⁰     Misstates the evidence, the facts,
¹¹     lacks foundation.
¹²          THE WITNESS:  I never
¹³     heard anything about a code word.
¹⁴ BY MR. PLACITELLA:
¹⁵     Q.  Did you ever see any of the
¹⁶ Johnson & Johnson, McCrone, the test
¹⁷ results that McCrone did for Johnson &
¹⁸ Johnson before 1988?
¹⁹     A.  I've seen some testing
²⁰ documents and I think I've seen some from
²¹ McCrone, the date of which I'm not sure.
²²     Q.  Okay.  I'm going to provide you
²³ what I have marked as JOS 1 and JOS 1A,
²⁴ which I will represent to you are

Page 482

¹ documents, McCrone test results that were
² provided predating the Edley report, the
³ Edley affidavit with one exception.  And
⁴ there's a copy for you behind you.
⁵          MS. BROWN:  Okay.  Can
⁶     we hang on, so we can grab copies
⁷     of this?
⁸          MR. PLACITELLA:  Yeah,
⁹     there's McCrone 1 and 2 and there's
¹⁰     a copy behind you as well on the
¹¹     radiator.
¹²          MR. BERNARDO:  All
¹³     right.  Chris, McCrone 1  and 2?
¹⁴          MR. PLACITELLA:
¹⁵     Correct.
¹⁶          MR. BERNARDO:  Thanks.
¹⁷          - - - - -
¹⁸     (McCrone Binders marked
¹⁹     O'Shaughnessy Exhibits JOS 1 and 2
²⁰     for identification.)
²¹          - - - - -
²² BY MR. PLACITELLA:
²³     Q.  And can you, in McCrone number
²⁴ 1, can you go to Exhibit 180.2?

Page 483

¹     A.  Got it.
²          MR. COX:  I have 180.
³          MS. BROWN:  Oh, the
⁴     second page of 180.
⁵          MR. PLACITELLA:  It
⁶     says, I put numbers so people can
⁷     see it.
⁸          MS. BROWN:  We got it.
⁹ BY MR. PLACITELLA:
¹⁰     Q.  You can see that this report is
¹¹ from August 1985, correct?
¹²     A.  That's what it says here.
¹³     Q.  Okay.  And that was -- and it's
¹⁴ a letter from McCrone, correct?
¹⁵     A.  That's right.
¹⁶     Q.  All right.  And that predates
¹⁷ the Miller affidavit, correct?
¹⁸          MS. BROWN:  Object as
¹⁹     lacking foundation.
²⁰          THE WITNESS:  It's 1985.
²¹ BY MR. PLACITELLA:
²²     Q.  Okay.  And can we go to the
²³ second page?  Do you see where it says "The
²⁴ presence of asbestos minerals was verified

Exhibit 203

REDACTED DOCUMENT

**Phelps Dodge Corporation**

Ext Ref                    0000000

Sale of CIM - Stock Purchase Agreement among Cyprus Mines
Corporation, Cyprus Minerals Company and RTZ America Inc. - 5

01/58704

2001/58704

Row-12, Section 1, Shelf 5

REDACTED DOCUMENT

TABLE OF
CONTENTS

ITA-Herford-002675

REDACTED DOCUMENT

## TABLE OF CONTENTS

|  |  | Document Number |
|---|---|---|
| I. | **Closing Agenda** | 1 |
| II. | **Agreements and Schedules - U.S.A. Closing** | |
| | Stock Purchase Agreement among Cyprus Mines Corporation, Cyprus Minerals Company, and RTZ America Inc. dated as of June 5, 1992. (the "Agreement"). | 2 |
| | Amendment dated June 24, 1992 to the Agreement. | 3 |
| | Conformed copy of the Agreement. | 4 |
| | Annex A - Cyprus Industrial Minerals - Talc Only Balance Sheets dated December 31, 1991 and March 31, 1992 | 5 |
| | Annex B - Accounting Principles | 6 |
| | Annex C - Hamm Underground Mine Property | 7 |
| | Schedule 5.2 - Ability to Carry Out the Agreement | 8 |
| | Schedule 5.3 - Capitalization of the Companies | 9 |
| | Schedule 5.5 - Financial Statements | 10 |
| | Schedule 5.6 - Absence of Certain Changes or Events | 11 |
| | Schedule 5.7 - Liens | 12 |
| | Schedule 5.8 - Real Property - Permitted Exceptions | 13 |
| | Schedule 5.8-1a - Fee Property | 14 |
| | Schedule 5.8-1b - Fee Property  (Unpatented Millsite Claims) | 15 |
| | Schedule 5.8-1c - Fee Property  (Patented Millsite Claims) | 16 |
| | Schedule 5.8-2a - Mineral Property | 17 |
| | Schedule 5.8-2b - Mineral Property  (Unpatented Mining Claims) | 18 |
| | Schedule 5.8-3a - Leased Property | 19 |
| | Schedule 5.8-3b - Leased Property  (Unpatented Mining Claims) | 20 |
| | Schedule 5.8-4a - Water Rights | 21 |
| | Schedule 5.9 - Litigation | 22 |
| | Schedule 5.10 - Compliance with Law | 23 |

REDACTED DOCUMENT

| | |
|---|---|
| Schedule 5.11 - Contracts | 24 |
| Schedule 5.13 - Tax Matters | 25 |
| Schedule 5.14 - Employee Benefits | 26 |
| Schedule 5.15 - Patents and Trademarks | 27 |
| Schedule 5.16 - Environmental Matters | 28 |
| Schedule 5.23 - Inventory | 29 |
| Schedule 7.3 - Intercompany Accounts | 30 |
| Schedule 11.3 - Environmental Indemnification | 31 |
| Schedule 11.3a - Operating Sites | 32 |

III.   **Agreement and Schedules - European Closing**

| | |
|---|---|
| European Stock Purchase Agreement between Cyprus Mines Corporation and Talc De Luzenac S.A. dated as of June 5, 1992 (the "European Agreement"). | 33 |
| Amendment dated June 30, 1992 to the European Agreement. | 34 |
| Schedule 5.3 - Capitalization of the Companies | 35 |
| Schedule 5.5 - Financial Statements | 36 |
| Schedule 5.6 - Absence of Certain Changes of Events | 37 |
| Schedule 5.11 - Employment Agreements | 38 |
| Schedule 5.14 - Employee Benefits | 39 |

IV.   **Closing Documents**

| | |
|---|---|
| Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated June 5, 1992. | 40 |
| Amendment dated June 24, 1992 to the Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated as of June 5, 1992. | 41 |
| Second Amendment dated June 30, 1992 to the Agreement of Transfer and Assumption by and between Cyprus Talc Corporation and Cyprus Mines Corporation dated as of June 5, 1992. | 42 |
| Bill of Sale and Assignment dated June 30, 1992. | 43 |
| Assignment of Trademarks and Tradenames dated June 30, 1992. | 44 |
| Assignment of Patents dated June 30, 1992. | 45 |

ITA-Herford-002677

REDACTED DOCUMENT

Assumption Agreement dated June 30, 1992.                                                      46

Assumption and Retention Agreement dated June 30, 1992.                                        47

Certificate of the Secretary of the State of Delaware, dated                                   48
June 25, 1992, as to the good sanding of RTZ America Inc.
in the state of Delaware

Consent Action by the Board of Directors of Cyprus Mine                                        49
Corporation, dated June 30, 1992.

Officer's Certificate of RTZ America Inc., dated June 30, 1992.                                 50

Secretary's Certificate and Incumbency Certificate of RTZ                                       51
America Inc., dated June 30, 1992.

Officer's Certificate of Cyprus Mines Corporation, dated June 30, 1992.                        · 52

Officer's Certificate of Talc de Luzenac S.A., dated June 30, 1992.                            53

Secretary's Certificate and Incumbency Certificate of Cyprus                                    54
Mines Corporation, dated June 30, 1992.

Secretary's Certificate and Incumbency Certificate of Cyprus                                    55
Minerals Company, dated June 30, 1992.

Stock Transfer dated June 30, 1992, between Cyprus Mines                                        56
Corporation and Talc de Luzenac, S.A.

Resignations of Directors and Officers                                                         57

Officer's Certificate of Cyprus Mines Corporation, dated                                       58
June 30, 1992.

Officer's Certificate of Cyprus Minerals Company,                                              59
dated June 30, 1992.

Certificate of the Secretary of the State of Delaware, dated                                   60
June 23, 1992, as to the good standing of Cyprus Talc Corporation
in the state of Delaware.

Certificate of the Secretary of the State of Delaware, dated                                   61
June 23, 1992, as to the good standing of Cyprus Mines Corporation
in the state of Delaware.

Certificate of the Secretary of the State of Delaware, dated                                   62
June 23, 1992, as to the good standing of Cyprus Minerals Company
in the state of Delaware.

ITA-Herford-002678

# REDACTED DOCUMENT

Certificate of Assistant Secretary of Cyprus Minerals Company, dated June 30, 1992.                                              63

Certificate of Assistant Secretary of Cyprus Mines Corporation, dated June 30, 1992.                                              64

Cross Receipt                                                         65

Stock Assignment and Stock Certificates                              66

ITA-Herford-002679

REDACTED DOCUMENT

**40**

ITA-Herford-003354

REDACTED DOCUMENT

### AGREEMENT OF TRANSFER AND ASSUMPTION

AGREEMENT OF TRANSFER AND ASSUMPTION made this 5th day of June, 1992 by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS Cyprus wishes to sell and transfer to Newco, and Newco desires to acquire from Cyprus, all of the "Transferred Assets" (as defined below); and

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation, have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement").

NOW THEREFORE, in consideration of the mutual covenants herein set forth:

1.   <u>Definitions</u>.  All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement.

2.   <u>Purchase and Sale</u>.  Cyprus, in accordance with and subject to the terms and conditions of this Agreement of Transfer and Assumption, agrees to sell, assign, transfer, convey and deliver to Newco, and Newco agrees to purchase, accept, acquire and take delivery of the Transferred Assets, all for the consideration specified in Section 8.(b)(ii), as they exist at the Newco Closing (as defined below), in each case free and clear of any Encumbrances except Permitted Exceptions.   For purposes of this Agreement of Transfer and Assumption, the "Transferred Assets" shall mean all of Cyprus' right, title and interest in and to the assets, properties, rights and businesses of every type and description used primarily in or relating primarily to Cyprus' talc business (the "Talc Business"), whether real, personal or mixed, tangible or intangible, whether currently in use or idle, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and including, without limitation, all of the right, title and interest of Cyprus in the assets listed in paragraphs (a) through (l) below (but excluding the assets described in Section 3).

(a)   Cyprus' record  and beneficial ownership of all of the issued and outstanding  shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation; Cyprus Windsor Minerals Corporation, a Vermont corporation and its subsidiary Cyprus Western Source Corporation, a California

ITA-Herford-003355

REDACTED DOCUMENT

corporation; and Green Mountain Talc Corporation, a Delaware corporation; and Cyprus' record and beneficial ownership of ▆▆ of the issued and outstanding shares of capital stock of DIMTA SA, a company organized under the laws of Spain, and Cyprus' record and beneficial ownership of ▆▆ of the issued and outstanding shares of capital stock of Nihon Mistron Company, Ltd., a Tokyo, Japan corporation (collectively, the "Shares");

(b) the real property and mineral rights of the Talc Business and the records thereof;

(c) All current assets, including without limitation, all cash and, to the extent that the same may exist, all certificates of deposit, accounts receivable, claims, prepaid expenses, deferred charges, advances and deposits;

(d) All talc inventories of finished products, work-in-progress and raw materials of the Talc Business;

(e) All talc facilities and equipment of the Talc Business;

(f) All business machines, furniture and fixtures, supplies, office equipment, vehicles and other tangible personal property used primarily in or relating primarily to the Talc Business;

(g) All trademarks and other marks and, to the extent that the same may exist, all inventions, patents and any copyrights, and registrations thereof, all applications for any of the foregoing and all trade names;

(h) All right, title and interest in, to and under all contracts, agreements, leases, licenses, permits, orders, commitments of understandings to which Cyprus is a party or entitled to any right or interest;

(i) All trade secrets, processes, specifications, designs, drawings and technology which relate primarily to the Talc Business;

(j) All contracts, books, records and other data relating primarily to the Talc Business;

(k) All causes of action and claims of any kind of Cyprus against any other party related primarily to the Talc Business; and

-2-

ITA-Herford-003356

REDACTED DOCUMENT

(1) All other assets and rights of the Talc Business as a going concern.

3.  Excluded Assets.  Notwithstanding any provision of this Agreement of Transfer and Assumption to the contrary, the properties and assets (the "Excluded Assets") described in the attached Exhibit A, which by this reference is incorporated herein, shall be excepted herefrom and reserved to and retained by Cyprus.

4.  Assumed Liabilities.  Subject to the terms and conditions of this Agreement, in connection with its purchase of the Transferred Assets at the Newco Closing, Newco shall assume and shall perform, pay and discharge all of the liabilities or obligations, whether known, unknown, contingent or otherwise primarily relating to the Transferred Assets, including, without limitations, liabilities and obligations, whether known, unknown, contingent or otherwise arising out of transactions or events occurring on or prior to the Closing and relating primarily to the Transferred Assets (the "Assumed Liabilities").

5.  Excluded Liabilities.  Notwithstanding any provision of this Agreement of Transfer and Assumption to the contrary, Newco shall not be responsible for and shall not assume any of the following liabilities or obligations, whether known, unknown, contingent or otherwise (the "Excluded Liabilities") which are hereby expressly excluded from the definition of Assumed Liabilities: (i) any liabilities or obligations arising out of or relating to the Excluded Assets, (ii) any liabilities or obligations arising out of the Montana net proceeds tax liability, (iii) any liabilities arising out of or relating to properties disposed of by the Talc Business prior to the Newco Closing, and (iv) any liabilities or obligations (including costs and expenses associated therewith) arising from any litigation arising out of or relating to the operation of the businesses of the Companies prior to the Closing as to which Buyer has given written notice to Seller within one year of the Closing Date.

6.  Non-Assignable Contracts.  Nothing herein shall be deemed to constitute an assignment or an attempt to assign any contract, agreement, lease, license, permit, order, or commitment or understanding to which Cyprus is a party if the attempted assignment thereof without the consent of the other party thereto would constitute a breach thereof or affect in any way the rights of Cyprus thereunder and such consent has not been given; but Cyprus will cooperate with Newco in any reasonable arrangement designed

-3-

ITA-Herford-003357

REDACTED DOCUMENT

to provide for Newco the benefits under any such contract or agreement including, without limitation, the enforcement, for the benefit of Newco, of any and all rights of Cyprus against such other party or parties thereto arising out of any breach or cancellation thereof by such other party or parties or otherwise.

7.   Closing.  The closing of the transactions provided for herein (the "Newco Closing") will take place at the offices of Sullivan & Cromwell at 125 Broad Street, New York, New York, immediately prior to the Closing provided for in the Stock Purchase Agreement.

8.   Transactions at the Newco Closing. (a)  At the Newco Closing, Cyprus will deliver to Newco the following:

(i)  stock certificates evidencing the Shares, in each case endorsed in blank or with an executed blank stock power attached, and in form suitable for transfer of valid title thereto to Newco or its assigns, free and clear of any Encumbrances;

(ii) such deeds, bills of sale, endorsements, certificates, instruments of assignment and such other instruments of conveyance and transfer reasonably satisfactory in form and substance to vest in Newco good and marketable title to the Transferred Assets, in each case, free and clear of any Encumbrances other than Permitted Exceptions;

(iii) such instrument of retention reasonably satisfactory in form and substance as shall be necessary for Cyprus to retain the Excluded Liabilities.

(b)  At the Newco Closing, Newco will deliver to Cyprus the following:

(i)  such instruments of assumption reasonably satisfactory in form and substance to Cyprus as shall be necessary for Newco to assume all of the Assumed Liabilities;

(ii) Stock certificates evidencing all shares of Common Stock of Newco.

9.   Representations and Warranties of Cyprus. Cyprus hereby represents and warrants to Newco that it has good and marketable title or possessory rights to all of the Transferred Assets and that at the Newco Closing, good and

-4-

ITA-Herford-003358

REDACTED DOCUMENT

marketable title or possessory rights to all of the Transferred Assets, free and clear of any Encumbrances other than Permitted Exceptions, will be transferred to Newco.

10. <u>Attorney-in-Fact</u>. Cyprus hereby makes, constitutes and appoints Newco the true and lawful attorney-in-fact of Cyprus, with full power of substitution, in the name and stead of Cyprus, but on behalf and for the benefit of Newco, to demand and receive any and all of the Transferred Assets, and to give receipts and releases for and in respect of the same, and any part thereof, and from time to time institute, prosecute, appear in, defend and appeal in the name of Cyprus, or otherwise, at the expense and for the benefit of Newco, any and all actions, suits and proceedings at law, in equity or otherwise, which Newco may deem proper in order to collect or reduce to possession any of the Transferred Assets, or enforce any claim or right of any kind hereby conveyed or assigned and transferred, or to resist or defend against any claim, or assertion relating to an Assumed Liability and to do all acts and things in relation to the Transferred Assets or the Assumed Liabilities which Newco shall deem desirable.

11. <u>Mail</u>. Cyprus further authorizes Newco, its successors and assigns, to receive and open all mail, telegrams and other communications, and all express and other packages addressed to Cyprus under the name of "Cyprus Industrial Minerals Company" and to retain such of the same as relate to the Transferred Assets and Newco hereby agrees to forward to Cyprus with reasonable dispatch all other mail, telegrams, communications, express and other packages addressed to Cyprus. The foregoing shall constitute a full authorization to the postal authorities, all telegraph and express companies, and all other persons to make delivery of such items to Newco, its successors and assigns.

12. <u>Further Assurance</u>. Upon written request of Newco, Cyprus shall from time to time execute and deliver to Newco, without further consideration, such other and further instruments of conveyance, assignment and transfer as Newco may reasonably request for the more effective conveyance, assignment and transfer to Newco of any of the Transferred Assets.

13. <u>Indemnification</u>. (a) Cyprus shall indemnify and hold Newco harmless from and against all Damages caused by, resulting or arising from (i) any Breach of the representations or warranties of Cyprus set forth in Section 9 hereof, or (ii) the Excluded Liabilities.

-5-

ITA-Herford-003359

REDACTED DOCUMENT

       (b)  Newco shall indemnify and hold Cyprus harmless from and against all expenses, including reasonable legal expenses, incurred by Cyprus in any litigation against Newco in which Newco is found to have breached any of its obligations under this Agreement.

       14.  <u>Miscellaneous</u>.  This Agreement of Transfer and Assumption shall be governed by, and construed in accordance with, the law of the State of New York without reference to choice of law principles, including all matters of construction, validity and performance.  This Agreement of Transfer and Assumption contains the entire understanding of the parties hereto with respect to the subject matter contained herein, supersedes and cancels all prior agreements, negotiations, correspondences, undertakings and communications of the parties, oral or written, respecting such subject matter.  This Agreement may be amended only by a written instrument executed by the parties.  This Agreement may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

-6-

ITA-Herford-003360

REDACTED DOCUMENT

   IN WITNESS WHEREOF, the parties have duly executed this Agreement of Transfer and Assumption on the day and year first above written.

                                        CYPRUS TALC CORPORATION

                                        By: _____

                                        CYPRUS MINES CORPORATION

                                        By: _____

-7-

ITA-Herford-003361

REDACTED DOCUMENT

<u>EXHIBIT A</u>

<u>Excluded Assets</u>

1.    The Hamm Underground Mine Property

−8−

ITA-Herford-003362

REDACTED DOCUMENT

**41**

ITA-Herford-003363

REDACTED DOCUMENT

## AMENDMENT TO AGREEMENT OF TRANSFER AND ASSUMPTION

AMENDMENT DATED AS OF JUNE 24, 1992, TO AGREEMENT OF TRANSFER AND ASSUMPTION DATED JUNE 5, 1992, by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS, on June 5, 1992, the parties entered into an Agreement of Transfer and Assumption (the "Transfer Agreement");

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation ("RTZ"), have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement");

WHEREAS, with the recognition and acknowledgement of RTZ, the parties desire to make certain conforming changes to the Transfer Agreement to confirm the intent of the parties;

NOW THEREFORE, in consideration of the mutual covenants set forth herein and in the Transfer Agreement:

1.  The Transfer Agreement is hereby amended on page 3, Section 5, line 14, by deleting "litigation" after "any" and by inserting "third party claims (other than employee claims for which RTZ, referred to as "Buyer" in the Stock Purchase Agreement, is responsible under Section 7.4 of the Stock Purchase Agreement)" after "any".

2.  The Transfer Agreement is hereby amended on page 4, Section 7, line 5, by inserting "and shall be effective immediately prior to the close of business on the Closing Date" after "Agreement".

3.  The Transfer Agreement is hereby amended on page 4, Section 8(a)(ii), by deleting the last three lines of the section and inserting in lieu thereof "all right, title and interest of Cyprus in the Transferred Assets;" after "Newco".

4.  Section 9 of the Transfer Agreement is hereby amended by deleting the existing Section 9 and inserting in lieu thereof the following:

"   9.   Representations and Warranties of Cyprus.

(a)   Cyprus hereby represents and warrants to Newco that it has good and marketable title to the Shares and that at the Newco Closing, good and marketable title to the

ITA-Herford-003364

REDACTED DOCUMENT      - 2 -

Shares, free and clear of any Encumbrances will be transferred to Newco.

(b)    Cyprus hereby represents and warrants to Newco that, to the "Knowledge of Cyprus" (as such term is defined with respect to Seller in the Stock Purchase Agreement), it has good and marketable title or possessory rights to all of the Transferred Assets (other than the Shares covered in (a) above) and that at the Newco Closing, good and marketable title or possessory rights to all such Transferred Assets, free and clear of any Encumbrances other than those described in Section 5.8 or in Schedule 5.8 of the Stock Purchase Agreement, will be transferred to Newco.

(c)    The representations and warranties contained in Section 9(a) hereof shall survive the Newco Closing until the expiration of the limitation period under the applicable statutes of limitations (or any extension thereof) and thereafter shall expire except with respect to breaches or violations theretofore specified in writing to Cyprus by Newco, RTZ or their successors.  The representations and warranties contained in Section 9(b) hereof shall survive for a period of one year after the Newco Closing and shall thereafter expire except with respect to breaches and violations theretofore specified in writing to Cyprus by Newco, RTZ or their successors."

5.    The Transfer Agreement is hereby amended on page 5, Section 13(a), line 5, by inserting ", provided, however, that with respect to claims made pursuant to (i) of this Section 13(a), the limitations set forth in Section 11.4 of the Stock Purchase Agreement shall apply to all such claims and, in applying such limitations, such claims shall be added to all other claims made against Cyprus (referred to as "Seller" in the Stock Purchase Agreement) or Cyprus Minerals Company pursuant to Section 11.4 of the Stock Purchase Agreement" after "Liabilities".

6.    The Transfer Agreement is hereby amended on page 6 by renumbering Section 14 to become Section 15 and inserting a new Section 14 as follows:

"    14.    Taxes.  Cyprus shall be liable for all transfer, sales, use or other similar taxes arising under any state, local or foreign law from the sale and transfer of the Transferred Assets to Newco."

REDACTED DOCUMENT     - 3 -

    7.  This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

    IN WITNESS WHEREOF, the parties have duly executed this Amendment to the Agreement of Transfer and Assumption on the day and year first above written.

CYPRUS TALC CORPORATION

By: _____

    G. J. Phelps, Senior Vice President

CYPRUS MINES CORPORATION

By: _____

    R. C. Wahl, President

REDACTED DOCUMENT

**42**

ITA-Herford-003367

REDACTED DOCUMENT

## SECOND AMENDMENT TO AGREEMENT OF
## TRANSFER AND ASSUMPTION

SECOND AMENDMENT DATED AS OF JUNE 30, 1992, TO AGREEMENT OF TRANSFER AND ASSUMPTION DATED JUNE 5, 1992, by and between Cyprus Talc Corporation, a Delaware corporation ("Newco"), and Cyprus Mines Corporation, a Delaware corporation ("Cyprus").

WHEREAS, on June 5, 1992, the parties entered into an Agreement of Transfer and Assumption (the "Transfer Agreement") and thereafter entered into an Amendment to the Transfer Agreement;

WHEREAS, Cyprus, Cyprus Minerals Company, a Delaware corporation, and RTZ America Inc., a Delaware corporation ("RTZ"), have entered into a Stock Purchase Agreement dated as of June 5, 1992 ("the Stock Purchase Agreement") and thereafter entered into an Amendment to the Stock Purchase Agreement;

WHEREAS, with the recognition and acknowledgement of RTZ, the parties desire to make certain conforming changes to the Transfer Agreement to confirm the intent of the parties;

NOW THEREFORE, in consideration of the mutual covenants set forth herein and in the Transfer Agreement:

1.   The Transfer Agreement as amended is hereby amended on page 3, Section 5, line 14, by deleting "third party claims (other than employee claims for which RTZ, referred to as "Buyer" in the Stock Purchase Agreement, is responsible under Section 7.4 of the Stock Purchase Agreement)" after "any" and by inserting "third party claims (other than third party claims for which and to the extent that Cyprus and Cyprus Minerals Company are not liable to any Buyer Indemnitee under the Stock Purchase Agreement)" after "any".

2.   This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

REDACTED DOCUMENT

IN WITNESS WHEREOF, the parties have duly executed this Second Amendment to the Agreement of Transfer and Assumption on the day and year first above written.

Approved by:

RTZ AMERICA INC.

By: _____
Prisident

CYPRUS TALC CORPORATION

By: _____
Senior Vice President

CYPRUS MINES CORPORATION

By: _____
President

ITA-Herford-003369

REDACTED DOCUMENT

43

ITA-Herford-003370

REDACTED DOCUMENT

## BILL OF SALE AND ASSIGNMENT

THIS IS A BILL OF SALE AND ASSIGNMENT executed this 30th day of June, 1992, by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer"). Capitalized terms used herein and not otherwise defined herein have the same meaning ascribed to them in the Agreement.

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, its successors and assigns, all of Seller's right, title, and interest in and to all of the Transferred Assets.

To the extent that any provision of this Bill of Sale and Assignment is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the Seller has caused this Bill of Sale and Assignment to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name:   P. C. Wolf
Title:   President

ITA-Herford-003371

REDACTED DOCUMENT

**44**

ITA-Herford-003372

REDACTED DOCUMENT

## ASSIGNMENT OF TRADEMARKS AND TRADENAMES

THIS IS AN ASSIGNMENT OF TRADEMARKS AND TRADENAMES executed this 30th day of June, 1992 by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer").

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer all of its legal or beneficial right, title and interest in and to all trademarks, trademark applications, service marks and tradenames, including all goodwill associated therewith, that are specified on Exhibit A hereto, for Buyer's own use and enjoyment and for the use and enjoyment of its successors and assigns, as fully and entirely as the same would have been held and enjoyed by Seller if this sale, assignment and transfer had not been made.

To the extent any provision of this Assignment of Trademarks and Tradenames is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, Seller has caused this Assignment of Trademarks and Tradenames to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name: R. G. Wolf
Title: President

ITA-Herford-003373

REDACTED DOCUMENT

## TRADEMARKS

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | AC CLAY | U.S.A. - No. 787,316 | 03/31/64 |
| Cyprus Mines Corporation | ADSORBOL | U.S.A. - No. 437,025 | 05/09/47 |
| Cyprus Mines Corporation | ALTALC | U.S.A. - No. 1,271,407 | 03/27/84 |
| Cyprus Mines Corporation | ASPEN | U.S.A. - No. 1,276,609 | 05/08/84 |
| Cyprus Mines Corporation | ATOMITE | U.S.A. - No. 416,469 | 09/18/85 |
| Cyprus Mines Corporation | BARIMITE | U.S.A. - No. 1,244,825 | 07/12/83 |
| Cyprus Mines Corporation | CYPRUFIL | U.S.A. - No. 1,276,607 | 05/08/84 |
| Cyprus Mines Corporation | CYPRUCAST | U.S.A. - No. 1,205,102 | 08/17/83 |
| Cyprus Minerals Company | CIMFLX | U.S.A. - No. 74/144,440 | * |
| Cyprus Mines Corporation | DRIKALITE | U.S.A. - No. 1,244,041 | 07/05/83 |
| Cyprus Mines Corporation | DURAMITE | U.S.A. - No. 1,246,713 | 08/03/83 |
| Cyprus Mines Corporation | FURNACE CREEK | U.S.A. - No. 1,276,606 | 05/08/84 |
| Cyprus Mines Corporation | KOTAMITE | U.S.A. - No. 1,063,829 | 04/23/86 |
| Cyprus Mines Corporation | MISTROBRITE | U.S.A. - No. 886,957 | 03/03/70 |
| Cyprus Mines Corporation | MISTRON | United Kingdom - No. 888,418 | 08/24/64 |
| Cyprus Mines Corporation | MISTRON | Greece - No. 32,090 | 08/13/64 |
| Cyprus Mines Corporation | MISTRON | France - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Finland - No. 46,340 | 03/05/66 |
| Cyprus Mines Corporation | MISTRON | Canada - No. 139,280 | 02/19/65 |
| Cyprus Mines Corporation | MISTRON | Benelux - No. 71,923 | 10/28/71 |
| Cyprus Mines Corporation | MISTRON | Belgium - No. 102,577 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Denmark - No. 3673/64 | 11/18/64 |
| Cyprus Mines Corporation | MISTRON | Japan - No. 552,002 | 06/07/60 |
| Cyprus Mines Corporation | MISTRON | Mexico - No. 170,002 (abandoned) | 11/11/64 |
| Cyprus Mines Corporation | MISTRON | Netherlands - No. 153,884 | 08/03/64 |
| Cyprus Mines Corporation | MISTRON | U.S.A. - No. 534,073 | 11/28/50 |
| Cyprus Mines Corporation | MISTRON | Australia - No. A-189,166 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Australia - No. 53,206 | 07/27/64 |
| Cyprus Mines Corporation | MISTRON | West Germany - No. 819,565 | 05/16/66 |
| Cyprus Mines Corporation | MISTRON | South Korea - No. 20880 | 01/13/71 |
| Cyprus Mines Corporation | MISTRON | Spain - No. 452,784 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Sweden - No. 199,404 | * |
| Cyprus Mines Corporation | MISTRON | Switzerland - No. 205,871 | 11/03/64 |
| Cyprus Mines Corporation | MISTRON | Italy - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Norway - No. 68,025 | 05/15/65 |
| Cyprus Mines Corporation | MISTRON CASCADE | U.S.A. - No. 74,080,117 | * |
| Cyprus Mines Corporation | MISTRON CYPRUSBOND | U.S.A. - No. 1,271,408 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON CYPRUSPERSE | U.S.A. - No. 1,271,405 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON FROST | U.S.A. - No. 1,272,268 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,332 | * |
| Cyprus Mines Corporation | MISTRON SUPER FROST | U.S.A. - No. 1,271,403 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON SUPER VAPOR | U.S.A. - No. 1,331,487 | * |

P80527

*unknown

REDACTED DOCUMENT

Exhibit A
Page 2

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | MISTRON ULTRAMIX | U.S.A. - No. 1,272,287 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON VAPOR | Japan - No. 1,248,300 | |
| Cyprus Mines Corporation | MISTRON ZETA PLUS | Registration pending | * |
| Cyprus Mines Corporation | MONOBLEND | U.S.A. - No. 1,271,408 | 03/27/84 |
| Cyprus Mines Corporation | SIERRALITE | U.S.A. - No. 1,271,401 | 03/27/84 |
| Cyprus Mines Corporation | SIERRA WHITE | U.S.A. - No. 1,278,371 | 05/29/84 |
| Cyprus Mines Corporation | SILVERBOW | U.S.A. - No. 1,271,399 | 03/27/84 |
| Cyprus Mines Corporation | SNOWFLAKE WHITE | U.S.A. - No. 1,248,714 | 08/02/83 |
| Cyprus Mines Corporation | STEAWHITE | U.S.A. - No. 1,271,400 | 03/27/84 |
| Cyprus Mines Corporation | SUPERCOAT | U.S.A. - No. 1,244,040 | 07/05/83 |
| Cyprus Mines Corporation | SUPERMITE | U.S.A. - No. 1,063,678 | * |
| Cyprus Mines Corporation | SUPRA | U.S.A. - No. 1,270,450 | 03/20/84 |
| Cyprus Mines Corporation | SUPRAFINO | U.S.A. - No. 1,275,683 | 05/01/84 |
| Cyprus Mines Corporation | UNITED SIERRA | U.S.A. - No. 12,488 | 08/22/66 |
| Cyprus Mines Corporation | PYROPAQUE | U.S.A. - No. 807,428 | 04/26/66 |
| Cyprus Mines Corporation | SIERRA | U.S.A. - No. 197,912 | 03/29/83 |
| Cyprus Mines Corporation | SUPREME | * | |
| Cyprus Mines Corporation | YELLOWSTONE TALC | U.S.A. - No. 589,928 | 05/18/54 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,322 | 04/16/85 |
| Cyprus Mines Corporation | ULTRAMITE | | |
| Cyprus Mines Corporation | MISTROCARB | S/N 380,779 (expired) | 08/19/82 |
| Cyprus Mines Corporation | STELLAR | U.S.A. - No. 1,630,531 | 01/08/91 |

PE0827

*unknown

ITA-Herford-003375

REDACTED DOCUMENT

## SCHEDULE 5.15

### DIMTA, S.A.

Trademark 1.185.098/1 "TALCOLIVA", applied for on 13th March 1987 and granted on 20th September 1989 for Class 3rd: Talc Products.

U:DOCUMENT\615

# REDACTED DOCUMENT

SUPPLEMENT

**TRADEMARKS**

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | AC CLAY | U.S.A. - No. 767,316 | 03/31/64 |
| Cyprus Mines Corporation | ADSORBOL | U.S.A. - No. 437,025 | 05/09/47 |
| Cyprus Mines Corporation | ALTALC | U.S.A. - No. 1,271,407 | 03/27/84 |
| Cyprus Mines Corporation | ASPEN | U.S.A. - No. 1,276,609 | 05/08/84 |
| Cyprus Mines Corporation | ATOMITE | U.S.A. - No. 416,469 | 09/18/65 |
| Cyprus Mines Corporation | BARIMITE | U.S.A. - No. 1,244,925 | 07/12/83 |
| Cyprus Mines Corporation | CYPRUFIL | U.S.A. - No. 1,276,607 | 05/08/84 |
| Cyprus Mines Corporation | CYPRUCAST | U.S.A. - No. 1,205,102 | 08/17/83 |
| Cyprus Minerals Company | CIMFLX | U.S.A. - No. 74/144,440 | 03/04/91 |
| Cyprus Mines Corporation | DRIKALITE | U.S.A. - No. 1,244,041 | 07/05/83 |
| Cyprus Mines Corporation | DURAMITE | U.S.A. - No. 1,246,713 | 08/03/83 |
| Cyprus Mines Corporation | FURNACE CREEK | U.S.A. - No. 1,276,605 | 05/08/84 |
| Cyprus Mines Corporation | KOTAMITE | U.S.A. - No. 1,063,629 | 04/23/86 |
| Cyprus Mines Corporation | MISTROBRITE | U.S.A. - No. 886,957 | 03/03/70 |
| Cyprus Mines Corporation | MISTROCARB | S/N 380,779 (expired) | 08/19/82 |
| Cyprus Mines Corporation | MISTRON | United Kingdom - No. 868,418 | 08/24/64 |
| Cyprus Mines Corporation | MISTRON | Greece - No. 32,090 | 08/13/64 |
| Cyprus Mines Corporation | MISTRON | France - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Finland - No. 46,340 | 03/05/66 |
| Cyprus Mines Corporation | MISTRON | Canada - No. 139,280 | 02/19/65 |
| Cyprus Mines Corporation | MISTRON | Benelux - No. 71,923 | 10/28/71 |
| Cyprus Mines Corporation | MISTRON | Belgium - No. 102,577 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Denmark - No. 3673/64 | 11/18/64 |
| Cyprus Mines Corporation | MISTRON | Japan - No. 552,002 | 06/07/60 |
| Cyprus Mines Corporation | MISTRON | Mexico - No. 170,002 (abandoned) | 11/11/64 |
| Cyprus Mines Corporation | MISTRON | Netherlands - No. 153,884 | 08/03/64 |
| Cyprus Mines Corporation | MISTRON | U.S.A. - No. 534,073 | 11/28/50 |
| Cyprus Mines Corporation | MISTRON | Australia - No. A-189,166 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Australia - No. 53,206 | 07/27/64 |
| Cyprus Mines Corporation | MISTRON | West Germany - No. 819,565 | 05/16/66 |
| Cyprus Mines Corporation | MISTRON | South Korea - No. 20980 | 01/13/71 |
| Cyprus Mines Corporation | MISTRON | Spain - No. 452,784 | 07/29/64 |
| Cyprus Mines Corporation | MISTRON | Sweden - No. 199,404 | 01/17/86 |
| Cyprus Mines Corporation | MISTRON | Switzerland - No. 205,871 | 11/03/64 |
| Cyprus Mines Corporation | MISTRON | Italy - No. 83,257 | 08/12/64 |
| Cyprus Mines Corporation | MISTRON | Norway - No. 66,025 | 05/15/65 |
| Cyprus Mines Corporation | MISTRON CASCADE | U.S.A. - No. 74/080,117 | 07/20/90 |
| Cyprus Mines Corporation | MISTRON CYPRUSBOND | U.S.A. - No. 1,271,408 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON CYPRUSPERSE | U.S.A. - No. 1,271,405 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON FROST | U.S.A. - No. 1,272,268 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON SPRAY | U.S.A. - No. 1,330,322 | 04/16/85 |
| Cyprus Mines Corporation | MISTRON SUPER FROST | U.S.A. - No. 1,271,403 | 03/27/84 |
| Cyprus Mines Corporation | MISTRON SUPER VAPOR | U.S.A. - No. 1,331,497 | 04/23/85 |

PS0527

REDACTED DOCUMENT

| Cyprus Party | Trademark | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Mines Corporation | MISTRON ULTRAMIX | U.S.A. - No. 1,272,267 | 03/03/84 |
| Cyprus Mines Corporation | MISTRON VAPOR | Japan - No. 1,248,300 | 02/10/77 |
| Cyprus Mines Corporation | MISTRON ZETA PLUS | Registration pending | |
| Cyprus Mines Corporation | MONOBLEND | U.S.A. - No. 1,271,406 | 03/27/84 |
| Cyprus Mines Corporation | PYROPAQUE | U.S.A. - No. 807,429 | 04/26/66 |
| Cyprus Mines Corporation | SIERRALITE | U.S.A. - No. 1,271,401 | 03/27/84 |
| Cyprus Mines Corporation | SIERRA | U.S.A. - No. 197,912 | 03/29/83 |
| Cyprus Mines Corporation | SIERRA WHITE | U.S.A. - No. 1,279,371 | 05/29/84 |
| Cyprus Mines Corporation | SILVERBOW | U.S.A. - No. 1,271,399 | 03/27/84 |
| Cyprus Mines Corporation | SNOWFLAKE WHITE | U.S.A. - No. 1,246,714 | 08/02/83 |
| Cyprus Mines Corporation | STEAWHITE | U.S.A. - No. 1,271,400 | 03/27/84 |
| Cyprus Mines Corporation | STELLAR | U.S.A. - No. 1,630,531 | 01/08/91 |
| Cyprus Mines Corporation | SUPERCOAT | U.S.A. - No. 1,244,040 | 07/05/83 |
| Cyprus Mines Corporation | SUPERMITE | U.S.A. - No. 1,063,678 | 04/19/77 |
| Cyprus Mines Corporation | SUPRA | U.S.A. - No. 1,270,450 | 03/20/84 |
| Cyprus Mines Corporation | SUPRAFINO | U.S.A. - No. 1,275,663 | 05/01/84 |
| Cyprus Mines Corporation | SUPREME | U.S.A. - No. 1,273,240 | 04/10/84 |
| Cyprus Mines Corporation | ULTRAMITE | • | • |
| Cyprus Mines Corporation | UNITED SIERRA | U.S.A. - No. 12,498 | 08/22/66 |
| Cyprus Mines Corporation | YELLOWSTONE TALC | U.S.A. - No. 589,928 | 05/18/54 |
| IMTA, S.A. | TALCOLIVA | Spain - No. 1.185.098/1 | 09/20/89 |

ITA-Herford-003378

REDACTED DOCUMENT

**45**

ITA-Herford-003379

REDACTED DOCUMENT

## ASSIGNMENT OF PATENTS

THIS IS AN ASSIGNMENT OF PATENTS executed this 30th day of June, 1992 by Cyprus Mines Corporation, a Delaware corporation ("Seller"), pursuant to Section 8(a)(ii) of the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended (the "Agreement"), by and between Seller and Cyprus Talc Corporation, a Delaware corporation ("Buyer").

INTENDING TO BE LEGALLY BOUND and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer all of its legal or beneficial right, title and interest in and to all patents, exclusive or non-exclusive rights or interests in patents, and patent applications, including all goodwill associated therewith, that are specified on Exhibit A hereto, for Buyer's own use and enjoyment and for the use and enjoyment of its successors and assigns, to the full term of all the letters patent relating thereto, as fully and entirely as the same would have been held and enjoyed by Seller if this sale, assignment and transfer had not been made.

To the extent any provision of this Assignment of Patents is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, Seller has caused this Assignment of Patents to be executed by its duly authorized officer as of the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____

Name: R. C. Wolf
Title: President

ITA-Herford-003380

REDACTED DOCUMENT

## PATENTS

| Cyprus Party | Patent | Country/Number | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | An Amino Acid Coated Mineral Powder Composition and a Method for Making the same | U.S.A. - 07/824,580 | |
| Cyprus Industrial Minerals Company | Centrifugal Particle Classifier Having Uniform Influx Distributor | U.S.A. - * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Australia - No. 23168/88 | 05/23/91 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Brazil - No. PI 8807707 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Canada - No. 599,916 and 577,321 | 09/14/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | China - No. 89104404.3 and 88107159 | 05/16/89 |
| Cyprus Industrial Minerals | Method and Apparatus for Friction Sorting of Particular Materials | Egypt - No. 243/89 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Europe - No. 889076354 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Finland - * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | France - No. 8911027 | |

*Patent number unknown

ITA-Herford-003381

REDACTED DOCUMENT

Exhibit A
Page 2

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | India - Nos. 821/Cal/88 382/Cal/89 383/Cal/89 | 10/04/88 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Italy - No. * | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Japan - No. 50712/88 | 08/18/88 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Norway - No. 185/182 | 01/06/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | South Korea - No. 89-700872 | 05/17/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Spain - No. 2009039 | 08/27/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | Turkey - No. 46527/88 | 10/19/89 |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | U.S.A. - No. 5,089,346 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | WO - No. 8,902,328 | |
| Cyprus Industrial Minerals Company | Method and Apparatus for Friction Sorting of Particular Materials | EP - No. 335,922 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Brazil - No. PI 8904545 | |

*Patent number unknown

ITA-Herford-003382

REDACTED DOCUMENT

Exhibit A
Page 3

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Denmark - No. 4412/89 | 01/06/89 |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Greece - No. 890100005 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Argentine - No. 312935 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Australia - No. 23373/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Chile - No. 009/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Europe - No. 89101770.1-2304 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Finland - No. 894147 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Italy - No. 89/02814 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Japan - No. 501645/89 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Mexico - No. 14459 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | New Zealand - No. 277,526 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Norway - No. 893578 | |

ITA-Herford-003383

REDACTED DOCUMENT

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Portugal - No. 83397 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | South Africa - No. 880038 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | Spain - No. 2010072 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | U.S.A. - No. 4,964,955 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | WO - No. 8,906,294 | |
| Cyprus Industrial Minerals Company | Method of Reducing Pitch and Pulping in Papermaking | EP - No. 374,195 | |
| Cyprus Industrial Minerals Company | Rubber Composition Comprising Phyllosilicate Salines | U.S.A. - No. 4,431,755 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | U.S.A. - * | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | ES - No. 2,011740 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | BR - No. 8,804,173 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | FR - No. 2,635,475 | |
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | AU - No. 8,924,837 | |

ITA-Herford-003384

REDACTED DOCUMENT

Exhibit A
Page 5

| Cyprus Party | Patent | Country/Number | Date Granted |
|---|---|---|---|
| Cyprus Industrial Minerals Company | Separation Method for Different Materials Using Turntable | CN - No. 1,040,335 | |
| Cyprus Industrial Minerals Company | Small Particle Separator | U.S.A. - No. 07/588,202 | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Egypt - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Brazil - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Brazil - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Europe - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | India - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | South Korea - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Norway - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Finland - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | Australia - No. * | |
| Cyprus Industrial Minerals Company | Small Particle Separator | China - No. * | |
| Cyprus Mines Corporation | Beneficiation of New York State Talc | U.S.A. - No. 3,837,582 | |
| Cyprus Mines Corporation | Beneficiated Talc as Filler | U.S.A. - No. 4,814,019 | |
| Cyprus Mines Corporation | Removing Tremolite | U.S.A. - No. 3,965,241 | |
| Cyprus Mines Corporation | Rendering Montana Talc Suitable for use as fillers | U.S.A. - No. 4,931,493 | |

ITA-Herford-003385

REDACTED DOCUMENT

SUPPLEMENT

PATENTS

| CYPRUS PARTY | PATENT | COUNTRY/NUMBER | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Belgium - No. 883,648 | 06/30/80 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Canada - No. 1188513 | 06/30/80 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Europe - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | France - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Great Britain - No. 00417567 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Italy - No. 004176 | 01/18/85 |
| Cyprus Industrial Minerals | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Japan - No. 824049 | 10/24/81 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Korea - No. 18339 | 02/01/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Luxembourg - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Netherlands - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | New Zealand - No. 197297 | 05/15/84 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Sweden - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | Switzerland - No. 0041756 | 01/18/85 |

ITA-Herford-003386

REDACTED DOCUMENT

## PATENTS

| CYPRUS PARTY | PATENT | COUNTRY/NUMBER | DATE GRANTED |
|---|---|---|---|
| Cyprus Industrial Minerals Company | New Composition for the Color Developing Coating in Pressure Sensitive Carbonless Copying Systems | West Germany - No. 0041756 | 01/18/85 |
| Cyprus Industrial Minerals Company | Rubber Composition Comprising Phyllisilicate Minerals, Salines, and Quaternary Ammonium Salts | Canada - No. 490,980 | * |
| Cyprus Industrial Minerals Company | Rubber Composition and Method of Incorporating Carbon Black and a Quaternary Ammonium Coupling Agent Salt into Natural Rubber Containing Compositions | U.S.A. - No. 4,598,105 | 07/01/86 |
| Cyprus Industrial Minerals Company | Rubber Composition and Method of Incorporating Carbon Black and a Quaternary Ammonium Coupling Agent Salt into Natural Rubber Containing Compositions | U.S.A. - No. 4,602,052 | 07/22/86 |
| Cyprus Industrial Minerals Company | Pharmaceutical Tablet Matrix Containing Talc as a Major Component | U.S.A. - No. S/N264,377 | 10/31/88 |

ITA-Herford-003387

REDACTED DOCUMENT

46

ITA-Herford-003388

REDACTED DOCUMENT

## ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT dated June 30, 1992 by and between Cyprus Mines Corporation, a Delaware corporation ("Seller") and Cyprus Talc Corporation, a Delaware corporation ("Buyer"). All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended, by and among Seller and Buyer (the "Agreement").

WHEREAS, pursuant to Sections 4 and 8(b)(i) of the Agreement, Buyer has agreed to assume the Assumed Liabilities;

NOW, THEREFORE, in consideration of the foregoing, Buyer hereby agrees, subject to the terms and conditions set forth in the Agreement, to assume, perform, pay and discharge the Assumed Liabilities.

To the extent any provision of this Assumption Agreement is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Assumption Agreement to be duly executed on the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name: P. G. Wolf
Title: President

CYPRUS TALC CORPORATION,
a Delaware corporation

BY: _____
Name: G. J. Malys
Title: Senior Vice President

ITA-Herford-003389

REDACTED DOCUMENT

**47**

ITA-Herford-003390

REDACTED DOCUMENT

## ASSUMPTION AND RETENTION AGREEMENT

ASSUMPTION AND RETENTION AGREEMENT dated June 30, 1992 by and between Cyprus Mines Corporation, a Delaware corporation ("Seller") and Cyprus Talc Corporation, a Delaware corporation ("Buyer").  All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement of Transfer and Assumption dated as of June 5, 1992 as amended, by and among Seller and Buyer (the "Agreement").

WHEREAS, pursuant to Sections 5 and 8(a)(iii) of the Agreement, Seller has agreed to retain or assume the Excluded Liabilities;

NOW, THEREFORE, in consideration of the foregoing, Seller hereby agrees, subject to the terms and conditions set forth in the Agreement, to retain or assume the Excluded Liabilities.

To the extent any provision of this Assumption and Retention Agreement is inconsistent with the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Assumption and Retention Agreement to be duly executed on the date first above written.

CYPRUS MINES CORPORATION,
a Delaware corporation

BY: _____
Name:  P. G. Wolf
Title:   President

CYPRUS TALC CORPORATION,
a Delaware corporation

BY: _____
Name:  G. J. Malys
Title:   Senior Vice President

ITA-Herford-003391

REDACTED DOCUMENT

48

ITA-Herford-003392

REDACTED DOCUMENT

## State of Delaware



PAGE 1

# Office of Secretary of State

I, MICHAEL RATCHFORD, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY RTZ AMERICA INC. IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE DATE SHOWN BELOW.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

A A A A A A A A A A



722177006

Michael Ratchford, Secretary of State

AUTHENTICATION: 3498001

DATE: 06/25/1992

ITA-Herford-003393

REDACTED DOCUMENT

**49**

ITA-Herford-003394

REDACTED DOCUMENT

## CYPRUS MINES CORPORATION

Consent Action by the Board

June 30, 1992

We, the undersigned, being all of the Directors of Cyprus Mines Corporation (the "Corporation"), do hereby waive call, notice, meeting, and vote and do hereby consent to, confirm, and verify the following corporate actions pursuant to authority vested by the Delaware Corporation Law, Section 141(f):

**RESOLVED,** that this Corporation hereby transfer, effective immediately prior to the close of business on the Closing Date as defined in the Stock Purchase Agreement dated June 5, 1992 among Cyprus Mines Corporation ("Cyprus"), Cyprus Minerals Company, and RTZ America, Inc., as amended, (the "Agreement"), a copy of which is attached hereto as Exhibit A, to Cyprus Talc Corporation, a wholly owned subsidiary of this Corporation, as a contribution to the capital of Cyprus Talc Corporation, in accordance with the Agreement of Transfer and Assumption between Cyprus Talc Corporation and Cyprus Mines Corporation dated June 5, 1992, as amended (the "Transfer Agreement"), a copy of which is attached hereto as Exhibit B, all of Cyprus' right, title and interest in and to the assets, properties, rights and businesses of every type and description used primarily in or relating primarily to Cyprus' talc business (the "Talc Business"), whether real, personal and mixed, tangible or intangible, whether currently in use or idle, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and including, without limitation, all of the right, title and interest of Cyprus in the assets listed in paragraphs [a] through [l] below (but excluding the Excluded Assets as defined in the Transfer Agreement):

[a]     Cyprus' record and beneficial ownership of all of the issued and outstanding shares of the capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation, and its subsidiaries, Mistron Mineralien GmbH, a German corporation ████████████ and DIMTA, S.A., a Spanish corporation ████████████ Cyprus Windsor Minerals Corporation, a Vermont corporation and its subsidiary Cyprus Western Source Corporation, a California corporation; and Green Mountain Talc Corporation, a Delaware corporation; and Cyprus' record and beneficial ownership of ████ of the issued and outstanding shares of capital stock of Nihon Mistron Company, Ltd., a Tokyo, Japan corporation (collectively, the "Shares");

[b]     The real property and mineral rights of the Talc Business and the records thereof;

ITA-Herford-003395

REDACTED DOCUMENT

[c]     All current assets, including without limitation, all cash and, to the extent that the same may exist, all certificates of deposit, accounts receivable, claims, prepaid expenses, deferred charges, advances and deposits;

[d]     All talc inventories of finished products, work-in-progress and raw materials of the Talc Business;

[e]     All talc facilities and equipment of the Talc Business;

[f]     All business machines, furniture and fixtures, supplies, office equipment, vehicles and other tangible personal property used primarily in or relating primarily to the Talc Business;

[g]     All trademarks and other marks and, to the extent that the same may exist, all inventions, patents and any copyrights, and registrations thereof, all applications for any of the foregoing and all trade names;

[h]     All right, title and interest in, to and under all contracts, agreements, leases, licenses, permits, orders, commitments of understandings to which Cyprus is a party or entitled to any right or interest;

[i]     All trade secrets, processes, specifications, designs, drawings and technology which relate primarily to the Talc Business;

[j]     All contracts, books, records and other data relating primarily to the Talc Business;

[k]     All causes of action and claims of any kind of Cyprus against any other party related primarily to the Talc Business;

[l]     All other assets and rights of the Talc Business as a going concern;

together with any and all liabilities whether known, unknown, contingent or otherwise related to the above-referenced items, with the exception of Excluded Liabilities as described in the Agreement; provided, however, that no such right, title, or interest described above shall be deemed to be conveyed hereof if any consent necessary to such conveyance, which consent shall be effective as of the effective date of such conveyance, shall not have been, or shall not be, obtained, or if such conveyance would result in forfeiture of the interest conveyed or in other significant monetary (non-tax) penalty; and further

RESOLVED, that any prior transfer of the assets, properties, rights, and businesses to Cyprus Talc Corporation by this Corporation are hereby ratified, confirmed, and approved; and further

ITA-Herford-003396

REDACTED DOCUMENT

**RESOLVED,** that the Transfer Agreement, as amended, is hereby ratified, confirmed and approved; and further

**RESOLVED,** that the President, any Senior Vice President, Vice President, the Secretary or any Assistant Secretary of this Corporation are hereby authorized, empowered and directed to convey the Shares to Cyprus Talc Corporation, and to execute and deliver such stock certificates, stock powers and other documents and to take all other steps which may be necessary or desirable in connection with such conveyance.

_____
P. C. Wolf

_____
G. J. Malys

_____
Deborah J. Friedman

I hereby certify that the above signatories to this Consent Action by the Board of Cyprus Mines Corporation dated June 30, 1992, are all of the members of the Board of Directors of this Corporation on the date hereof.

_____
Assistant Secretary

REDACTED DOCUMENT

**50**

ITA-Herford-003398

REDACTED DOCUMENT

## RTZ AMERICA INC.

### Officer's Certificate

I, Arthur Glass, President of RTZ America Inc., a Delaware corporation ("RTZ"), pursuant to Section 8.3 of the Stock Purchase Agreement dated as of June 5, 1992, as amended (the "Purchase Agreement"), by and among RTZ, Cyprus Mines Corporation, a Delaware corporation, and Cyprus Minerals Company, a Delaware corporation, hereby certify that (i) each of the representations and warranties of RTZ contained in the Purchase Agreement are true in all material respects at and as of the date hereof with the same force and effect as though made at and as of the date hereof, except for changes permitted or contemplated by the Purchase Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and (ii) RTZ have performed and complied in all material respects with all its undertakings and agreements required by the Purchase Agreement to be performed or complied with by RTZ prior to or on the date hereof.

IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

_____
President

REDACTED DOCUMENT

**51**

ITA-Herford-003400

REDACTED DOCUMENT

RTZ AMERICA INC.

Secretary's Certificate

and

Incumbency Certificate

The undersigned hereby certifies that he is the Secretary of RTZ America Inc., a Delaware corporation ("RTZ"), and that, as such, he is authorized to execute this Certificate on behalf of RTZ, and further certifies, as of immediately prior to the consummation of the transactions contemplated by the Stock Purchase Agreement dated as of June 5, 1992, as amended, (the "Purchase Agreement"), by and among RTZ, Cyprus Mines Corporation, a Delaware corporation, and Cyprus Minerals Company, a Delaware corporation, as follows:

(i)  attached hereto as Exhibit A is a complete and correct copy of the resolutions of the Board of Directors of RTZ authorizing the execution and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereunder;

(ii) the following person is a duly elected, qualified and acting officer of RTZ and the signature appearing opposite the name of such officer is his true signature:

| Name | Office | Signature |
|------|--------|-----------|
| Arthur Glass | President | _Arthur Glass_ |

ITA-Herford-003401

REDACTED DOCUMENT

IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

RTZ AMERICA INC.

By: _Barry Grossman_
Barry Grossman
Secretary

-2-

ITA-Herford-003402

REDACTED DOCUMENT

Exhibit A

RESOLUTIONS
ADOPTED BY THE BOARD OF
RTZ AMERICA INC.
AT A SPECIAL MEETING
HELD ON JUNE 5, 1992

WHEREAS, Cyprus Mines Corporation, a Delaware Corporation ("Seller"), is the sole record and beneficial owner of all issued and outstanding shares of capital stock (the "Shares") of Cyprus Talc Corporation, a Delaware corporation ("Newco");

WHEREAS, Newco is the sole record and beneficial owner of all issued and outstanding shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation, Cyprus Windsor Minerals Corporation, a Vermont corporation, and its subsidiary Cyprus Western Source Corporation, a California corporation, and Green Mountain Talc Corporation, a Delaware Corporation, and is the record and beneficial owner of ███ of the issued and outstanding shares of DIMTA S.A., a company organized under the laws of Spain and is the record and beneficial owner of ███ of the issued and outstanding shares of Nihon Mistron Company, a Tokyo, Japan corporation (collectively the "Other Companies"); and

WHEREAS, Seller desires to sell or cause the sale of, and the Corporation desires to purchase, the Shares; NOW, THEREFORE, BE IT,

RESOLVED, that the Stock Purchase Agreement, together with the Schedules and Exhibits attached thereto (the "Agreement"), among Seller, Cyprus Minerals Company, a Delaware corporation ("Cyprus"), and the Corporation, in substantially the form distributed to directors at this meeting and to be included with the minutes of this meeting, providing for the purchase by the Corporation from Seller of the Shares, together with all transactions contemplated thereby, be and hereby are approved, with such changes as the President, the Secretary, the Treasurer or any Director (each an "Authorized Officer") of the Corporation may approve, such approval to be conclusively evidenced by the execution and delivery thereof; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized to take, or cause the Corporation or any of its subsidiaries to take, any actions they deem necessary or appropriate in order to obtain any and all necessary permits, authorizations, orders and approvals under applicable statutes or regulations, including federal,

REDACTED DOCUMENT

state, local and foreign statutes or regulations, as may be required to carry out the transactions contemplated by the Agreement; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized and directed to do and perform all such acts, deeds and things and to make, execute and deliver, or cause to be made, executed and delivered, all such applications, filings, agreements including the Agreement, documents, instruments or certificates in the name and on behalf of the Corporation as each such Authorized Officer may deem necessary or appropriate to effectuate or carry out fully the purpose and intent of these resolutions; and

FURTHER RESOLVED, that each of the Authorized Officers be, and each such Authorized Officer hereby is, authorized to execute and file any applications, certif- icates or other documents as may be necessary to carry out any one or more of the Agreements and the intent of the foregoing resolutions; and

FURTHER RESOLVED, that all actions heretofore taken by any officer or director of the Corporation in connection with, or with respect to, the matters referred to in the foregoing resolutions be and hereby are confirmed, ratified and approved in all respects.

ITA-Herford-003404

REDACTED DOCUMENT

**52**

ITA-Herford-003405

REDACTED DOCUMENT

OFFICER'S CERTIFICATE
CYPRUS MINES CORPORATION


I, P. C. Wolf, President of Cyprus Mines
Corporation, a Delaware corporation (herein called "Mines"),
do hereby certify, pursuant to Section 12(c) of the European
Stock Purchase Agreement (the "Agreement"), dated June 5,
1992 among Cyprus Mines Corporation and Talc da Luzenac
S.A., as amended, as follows:

1.     The representations and warranties of Mines referred to
       in Section 12(a) and 12(b) of the Agreement are true in
       all material respects except for changes permitted or
       contemplated by the Agreement and except to the extent
       that any representation or warranty is made as of a
       specified date, in which case such representation or
       warranty is true in all material respects as of such
       date, and except to the extent the untruthfulness of
       the representations and warranties in the aggregate
       would not constitute a material adverse change or
       unanticipated and undisclosed material liability
       previously unknown to RTZ America, Inc. which would
       have a material adverse effect on the talc business of
       the Companies (as defined in the Agreement) as a whole.

2.     Mines has performed and complied in all material
       respects with all of its undertakings and agreements
       required by the Agreement to have been complied with by
       it except to the extent non-compliance in the aggregate
       would not have a material adverse effect on the talc
       business of the Companies (as defined in the Agreement)
       as a whole.


       IN WITNESS WHEREOF, the undersigned has hereunto
subscribed his name and affixed the seal of Cyprus Mines
Corporation this 30th day of June, 1992.

ATTEST:


(CORPORATE SEAL)

_____          _____
                                          P. C. Wolf, President
                                          Cyprus Mines Corporation

ITA-Herford-003406

REDACTED DOCUMENT

**53**

ITA-Herford-003407

REDACTED DOCUMENT

TALC DE LUZENAC S.A.

Officer's Certificate

I, Dr. Graham B. Lawson, Director of Talc Luzenac S.A., a company organized under the laws of France ("Luzenac"), pursuant to Section 11(c) of the European Stock Purchase Agreement dated as of June 5, 1992 (the "Purchase Agreement"), by and between Luzenac and Cyprus Mines Corporation, a Delaware corporation, hereby certify that (i) each of the representations and warranties of Luzenac contained in the Purchase Agreement are true in all material respects at and as of the date hereof with the same force and effect as though made at and as of the date hereof, except for changes permitted or contemplated by the Purchase Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and (ii) Luzenac has performed and complied in all material respects with all its undertakings and agreements required by the Purchase Agreement to be performed or complied with by Luzenac prior to or on the date hereof.

IN WITNESS WHEREOF, I have hereunto signed my name as of June 30, 1992.

_____
Director

REDACTED DOCUMENT

**54**

ITA-Herford-003409

REDACTED DOCUMENT

**CYPRUS MINES CORPORATION**

**SECRETARY'S CERTIFICATE**

**AND**

**INCUMBENCY CERTIFICATE**

The undersigned hereby certifies that he is the Secretary of Cyprus Mines Corporation, a Delaware corporation ("Cyprus Mines"), and that, as such, he is authorized to execute this certificate on behalf of Cyprus Mines, and further certifies, as of immediately prior to the consummation of the transactions contemplated by the Stock Purchase Agreement dated as of June 5, 1992, as amended, (the "Purchase Agreement"), by and among Cyprus Mines Corporation, Cypurs Minerals Company, and RTZ America, Inc. as follows:

    (i)     attached hereto as Exhibit A is a complete and correct copy of the resolutions of the Board of Directors of Cyprus Mines authorizing the execution and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereunder;

    (ii)    the following persons are duly elected, qualified and acting officers of Cyprus Mines and the signature appearing opposite the name of such officer is his true signature:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Philip C. Wolf | President | |
| Gerald J. Malys | Senior Vice President | |
| Dale E. Huffman | Assistant Secretary | |

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of Cyprus Mines Corporation this 30th day of June, 1992.

CYPRUS MINES CORPORATION

BY: _____
Kevin Loughrey, Secretary

ITA-Herford-003410

REDACTED DOCUMENT

EXHIBIT A

**RESOLVED**, that the execution of that certain Stock Purchase Agreement dated June 5, 1992, as amended on June 24, 1992, among Cyprus Mines Corporation, Cyprus Minerals Company, and RTZ America Inc., a copy of which is attached hereto as Exhibit A, and the performance by this Corporation of its obligations thereunder hereby are authorized; and further

**RESOLVED**, that the President, any Senior Vice President, Vice President, the Controller, Treasurer, Secretary or Assistant Secretary of this Corporation, or any person designated by any of the foregoing hereby are authorized to take such action as is necessary or appropriate to give effect to the foregoing resolution, including but not limited to the authority to make amendments to the terms and conditions of the Agreement and to execute and deliver all such documents as may to such officer appear necessary or appropriate to carry out the intent of the resolutions.

REDACTED DOCUMENT
LONDON/2746.05

EXHBIT A

STOCK PURCHASE AGREEMENT

AMONG

CYPRUS MINES CORPORATION

CYPRUS MINERALS COMPANY

and

RTZ AMERICA INC.

Dated as of June 5, 1992

ITA-Herford-003412

REDACTED DOCUMENT

STOCK PURCHASE AGREEMENT dated as of June 5, 1992 (herein, together with the Schedules and Annexes attached hereto, referred to as the "Agreement") by and among Cyprus Mines Corporation, a Delaware Corporation ("Seller"), Cyprus Minerals Company, a Delaware corporation ("Cyprus") and RTZ America Inc., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, Seller is the sole record and beneficial owner of all issued and outstanding shares of capital stock (the "Shares") of Cyprus Talc Corporation, a Delaware corporation ("Newco");

WHEREAS, Newco is the sole record and beneficial owner of all issued and outstanding shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation; Cyprus Windsor Minerals Corporation, a Vermont corporation, and its subsidiary Cyprus Western Source Corporation, a California corporation; and Green Mountain Talc Corporation, a Delaware Corporation; and is the record and beneficial owner of ███ of the issued and outstanding shares of DIMTA S.A., a company organized under the laws of Spain and is the record and beneficial owner of ███ of the issued and outstanding shares of Nihon Mistron Company, a Tokyo, Japan corporation (collectively the "Other Companies"); and

WHEREAS, upon the terms and conditions hereinafter set forth, Seller desires to sell or cause the sale of, and Buyer desires to purchase, the Shares;

NOW, THEREFORE, in reliance upon the representations and warranties made herein and in consideration of the mutual agreements herein contained, Buyer and Seller hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1 **Definitions**. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Accounting Principles" means the accounting principles, policies and procedures of the Companies set forth on Annex B hereto.

"Acquisition Proposal" shall have the meaning set forth in Section 7.10.

-1-

REDACTED DOCUMENT

"Active Employee" shall have the meaning set forth in Section 7.4(a).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"Assets of the Companies" means all assets, properties and rights of the Companies recorded on the Reference Balance Sheet.

"Breach" shall have the meaning set forth in Section 11.1(a).

"Business Liabilities" shall have the meaning set forth in Section 7.6.

"Buyer Indemnitee" shall have the meaning set forth in Section 11.1.

"Claims" shall have the meaning set forth in Section 7.6.

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" shall mean collectively Newco and the Other Companies and each and every one of them shall be a "Company".

"Confidentiality Agreement" shall have the meaning set forth in Section 7.1.

"Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Current Assets" shall have the meaning set forth in Section 4.2.

"Current Liabilities" shall have the meaning set forth in Section 4.2.

-2-

ITA-Herford-003414

REDACTED DOCUMENT

"<u>Damages</u>" shall have the meaning set forth in Section 11.1(a).

"<u>Disputes Auditor</u>" means Ernst & Young or any other independent accounting firm mutually agreed upon by Seller and Buyer.

"<u>Encumbrances</u>" shall have the meaning set forth in Section 5.3.

"<u>Employee</u>" shall have the meaning set forth in Section 5.14(i).

"<u>Environmental Laws</u>" mean any federal, state, foreign and local law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, order, judgment, decree, injunction, requirement or agreement with any governmental entity and any judicial interpretation thereof, in effect on the Closing Date relating to (x) the protection, preservation or restoration of the environment, (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, Release or disposal of Hazardous Substances.  The term Environmental Law includes, without limitation, the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act (SARA), the Federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal and the federal Toxic Substances Control Act, the federal Insecticide, Fungicide and Rodenticide Act, each as in effect on the Closing Date.  However, notwithstanding anything in this Agreement to the contrary, "Environmental Laws" shall not include (i) laws relating to product liability; and (ii) laws and regulations regarding human health or safety including without limitation, federal and state Occupational Safety and Health and Mine Safety and Health Acts (collectively, "Non-Environmental Laws").

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>European Companies</u>" shall mean Cyprus Industrial Minerals de France SARL and Mistron Mineralien GmbH.

-3-

ITA-Herford-003415

REDACTED DOCUMENT

"Fee Property" shall have the meaning set forth in Section 5.8.

"Final Closing Statement" shall have the meaning set forth in Section 4.4.

"Financial Statements" shall have the meaning set forth in Section 5.5.

"Hamm Underground Mine Property" shall mean the property set forth on Annex C.

"Hazardous Substances" and "Hazardous Materials" mean any substance presently listed, defined, designated or classified as hazardous, toxic or radioactive under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component. Hazardous Substance includes, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial substance or any derivative or by-product thereof, radon, radioactive material, asbestos containing material, urea formaldehyde foam insulation, lead and polychlorinated biphenyl.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indemnifying Party" shall mean any party indemnifying an Indemnitee pursuant to the terms of this Agreement.

"Indemnitee" means any party indemnified pursuant to the terms of this Agreement.

"Intellectual Property Rights" shall have the meaning set forth in Section 5.15.

"Knowledge of Seller" means the actual or "Other Knowledge" of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright.

"Leased Property" shall have the meaning set forth in Section 5.8.

"Leases" shall have the meaning set forth in Section 5.8.

"Liabilities of the Companies" means all liabilities and obligations of the Companies recorded on the Reference Balance Sheet.

-4-

REDACTED DOCUMENT

"Losses" shall have the meaning set forth in Section 11.3.

"Mineral Property" shall have the meaning set forth in Section 5.8.

"Non-Represented Employee" means any Employee who is not a Represented Employee.

"Other Companies" shall have the meaning set forth in the Preamble.

"Other Knowledge" means information which should have been acquired by a reasonable person in the position of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright and having his respective knowledge of facts (which shall be deemed to include the representations and warranties to be given by Seller to Buyer in this Agreement) which should have caused such reasonable person to make due enquiries, which enquiries would have provided such information.

"Permitted Exceptions" shall have the meaning set forth in Section 5.8.

"Person" means an individual, corporation, partnership, trust or unincorporated organization or a government or any agency or political subdivision thereof.

"Plan" shall have the meaning set forth in Section 5.14.

"Possessory Property" shall have the meaning set forth in Section 5.8.

"Pre-Closing Period" means any Tax period ending on or prior to the Closing Date; and a "Post-Closing Period" means any Tax period that is not a Pre-Closing Period.

"Preliminary Closing Statement" shall have the meaning set forth in Section 4.2.

"Purchase Price" shall have the meaning set forth in Section 2.2.

"Real Property" shall have the meaning set forth in Section 5.8.

"Reference Balance Sheet" means the combined balance sheet of the Companies and the European Companies as of March 31, 1992 included in the Financial Statements.

-5-

ITA-Herford-003417

REDACTED DOCUMENT

"Release" has the same definition as in 42 U.S.C. § 9601(22).

"Represented Employee" means any Employee who is a member of a unit of Employees covered by a collective bargaining agreement.

"Returns" means all returns, reports, estimates, declarations, information returns and statements of any nature with respect to Taxes, including, without limitation, consolidated federal income tax returns of the Seller's Group, declarations of estimated tax and tax reports required to be filed with respect to the Companies or their respective income, properties or operations.

"Seller Indemnitee" shall have the meaning set forth in Section 11.2.

"Seller's Group" shall mean any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that includes the Seller or any predecessor of or successor to Seller (or another such predecessor or successor).

"Seller's Insurance Policies" shall have the meaning set forth in Section 7.6.

"Shares" shall have the meaning set forth in the Preamble.

"Subsidiaries" shall mean any Person (other than an individual) in which another person owns, beneficially or of record, securities or any other interest representing fifty percent (50%) or more of the aggregate voting power or equity interest in such Person.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, profits, severance, franchise, license, transfer, sales, use, payroll, employment, withholding, property (real or personal), excise and similar taxes (including interest, penalties or additions to such taxes and any interest in respect of such penalties or additions), but excluding all sales, use, value added, transfer and similar taxes imposed in connection with the consummation of the transactions contemplated by this Agreement.

"Working Capital of the Companies" shall have the meaning set forth in Section 4.2.

-6-

REDACTED DOCUMENT

## ARTICLE 2

### SALE AND PURCHASE OF SHARES

2.1. <u>Sale and Purchase</u>. Upon the terms and subject to the conditions contained herein, Seller will sell and transfer to Buyer, or cause the sale and transfer to Buyer of, and Buyer will purchase and accept, at the Closing, the Shares.

2.2. (a) <u>Purchase Price and Payment</u>. In consideration of the sale and transfer pursuant to Section 2.1, Buyer hereby agrees to pay to Seller a purchase price of (the "<u>Purchase Price</u>") ███████████, by wire transfer as provided in Section 3.2(b).

## ARTICLE 3

### CLOSING AND TERMINATION

3.1. <u>Closing</u>. The closing of the transactions provided for herein (the "<u>Closing</u>") will take place at the offices of Sullivan & Cromwell at 125 Broad Street, New York, New York at 10:00 a.m. (local time) on June 30, 1992 provided all conditions set forth in Articles 7 and 8 are satisfied or, if on such date such conditions are not satisfied, on the fifth business day following the satisfaction of all conditions set forth in Articles 7 and 8 (other than the conditions specified in Section 7.6 and 8.6, which shall be satisfied at the Closing), or at such other time and place as Buyer and Seller shall agree (the "<u>Closing Date</u>").

3.2. <u>Transactions on the Closing Date</u>. (a) At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(i) stock certificates evidencing the Shares, in each case endorsed in blank or with an executed blank stock power attached, and in form suitable for transfer of valid title thereto to Buyer or its assigns, free and clear of any Encumbrances.

(ii) resignations of each of the directors and officers of each Company (except as Buyer may specify to Seller prior to Closing);

(iii) resignations of such auditors for each Company as Buyer may specify to Seller prior to Closing; and

-7-

REDACTED DOCUMENT

   (iv)  each of the certificates and other documents required by Article 9 hereof.

  (b)  At the Closing, Buyer will deliver to Seller the following:

   (i)  the Purchase Price by wire transfer in immediately available funds in U.S. dollars to the following account:

    Pittsburgh National Bank (PNB)
    Pittsburgh, PA ████████

    Cyprus Minerals Company
    ████████

    Further Credit:  Cyprus Mines Corporation

the Closing shall not be deemed consummated until Seller shall have received confirmation from PNB of its receipt of the Purchase Price and;

   (ii)  each of the certificates and other documents required by Article 8 hereof.

  3.3.  <u>Termination</u>.  Anything contained in this Agreement other than in this Section 3.3 to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

  (a)  by mutual consent of Buyer and Seller;

  (b)  by either Buyer or Seller, if the transactions contemplated hereby are not consummated on or before August 31, 1992 (or such later date as may be agreed upon in writing by the parties hereto);

  (c)  by Buyer, if Seller shall breach in any material respect any of its representations, warranties or obligations hereunder and all breaches in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business taken as a whole and such breach shall not have been cured in all material respects or waived by Buyer and Seller shall not have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

  (d)  by Seller, if Buyer shall breach in any material respect any of its representations, warranties or obligations hereunder and such breach shall not have been cured in all material respects or waived and Buyer shall not

-8-

REDACTED DOCUMENT

have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

    3.4  <u>Effect of Termination</u>.  Termination of this Agreement pursuant to this Article 3 shall terminate all provisions of this Agreement, except that Section 3.4, the last sentence of Section 7.1(a) and Sections 12.2, 12.3 and 12.11 shall survive any such termination; <u>provided</u>, <u>however</u>, that termination pursuant to Sections 3.3(c) or (e) shall not relieve the defaulting or breaching party hereunder from any liability to the other party hereto resulting from the default or breach hereunder of such defaulting or breaching party occurring prior to the date of termination.


                    ARTICLE 4

              PRELIMINARY AND FINAL CLOSING
                STATEMENTS; ADJUSTMENTS

    4.1  <u>Working Capital</u>.  The parties intend that "Working Capital of the Companies", as defined in Section 4.2 below, shall be ██████████ as of the Closing.  Using the procedure set forth below, the parties shall determine the amount and manner by which Seller shall pay Buyer for any deficiency in Working Capital of the Companies below ██████████ or by which Buyer shall pay Seller for any excess in Working Capital of the Companies over ██████████ as of the Closing.

    4.2  <u>Preliminary Closing Statement</u>.  (a) As soon as reasonably possible after the Closing Date but in any event within sixty (60) days thereafter, Buyer shall prepare and deliver to Seller a statement of combined Working Capital of the Companies derived from a combined balance sheet for the Companies and the European Companies as of the Closing (the "<u>Preliminary Closing Statement</u>").  "<u>Working Capital of the Companies</u>" shall for all purposes of this Agreement mean, as the context requires, the difference between total Current Assets and total Current Liabilities of the Companies and the European Companies reflected on the Reference Balance Sheet, the Preliminary Closing Statement or the Final Closing Statement.  "Current Assets" shall for all purposes of this Agreement mean, as the context requires, cash, money on deposit with banks and other financial institutions, securities (excluding the stock of its subsidiaries), accounts receivable from customers or employees of the Companies, other receivables, all crude, work-in-process, finished goods and other product inventories, materials and supplies, and prepaid expenses.  "Current Liabilities" shall

                        -9-

ITA-Herford-003421

. REDACTED DOCUMENT

for all purposes of this Agreement mean, as the context requires, the amount of accounts payable, short-term debt, the current portion of long-term debt, and accrued liabilities due within one year other than liability for federal income taxes.  Any current assets retained by Seller at Closing shall be excluded from Working Capital of the Companies.  Any current liabilities assumed or retained by Seller at Closing shall be excluded from Working Capital of the Companies.  Current Assets and Current Liabilities shall be recorded consistent with the Accounting Principles. Seller shall assist Buyer, as reasonably requested by Buyer, in the preparation of such statement.

(b)   The Preliminary Closing Statement and the Final Closing Statement shall be prepared in accordance with the Accounting Principles applied on a basis consistent with that applied in preparing the Reference Balance Sheet.   In the determination of Working Capital of the Companies, finished product and crude talc inventories shall be valued in accordance with Seller's normal inventory valuation procedures and such valuation shall not be subject to adjustment.

(c)   Seller will make available to Buyer and its representatives, as reasonably requested by Buyer, all books, records and other documents pertaining to the businesses of the Companies deemed necessary or desirable by Buyer in preparing the Preliminary Closing Statement.

4.3. <u>Review of Statements</u>.   Seller and its independent certified public accountants may review the Preliminary Closing Statement and the books of account of Buyer relating to the Companies and the European Companies and may make inquiry of the representatives of Buyer's accountants and Buyer.   The Preliminary Closing Statement shall be binding and conclusive upon, and deemed accepted by, Seller unless Seller shall have notified Buyer in writing within thirty (30) days after receipt of the Preliminary Closing Statement of any objections thereto. A notice under this Section 4.3 shall specify in reasonable detail the items in the Preliminary Closing Statement which are being disputed, and a summary of the reasons for such dispute.

4.4. <u>Disputes; Final Closing Statement</u>. (a) At the request of either party, any dispute between the parties relating to the Preliminary Closing Statement which cannot be resolved by them within thirty (30) days after receipt of notice of any objections to such Preliminary Closing Statement pursuant to Section 4.3 shall be referred to the Disputes Auditor for decision, which decision shall be final and binding on both parties. The parties agree that they

-10-

ITA-Herford-003422

REDACTED DOCUMENT

will require the Disputes Auditor to render its decision within thirty (30) days after referral of the dispute to the Disputes Auditor for decision pursuant hereto.

(b)  Before referring a matter to the Disputes Auditor, the parties shall agree on procedures to be followed by the Disputes Auditor (including procedures for presentation of evidence). If the parties are unable to agree upon procedures before the end of thirty (30) days after receipt of notice of any objections pursuant to Section 4.3, the Disputes Auditor shall establish procedures giving due regard to the intention of the parties to resolve disputes as quickly, efficiently and inexpensively as possible; the Disputes Auditor's procedures may be, but need not be, those proposed by either party, provided, that such procedure shall require the Disputes Auditor to render its decision within thirty (30) days after referral of the dispute to the Disputes Auditor for decision pursuant hereto. The parties shall, as promptly as practicable, submit evidence in accordance with the procedures agreed upon or established by the Disputes Auditor, and the Disputes Auditor shall decide the dispute in accordance therewith as promptly as practicable. The fee of the Disputes Auditor for, and relating to, the making of any such decision shall be borne by the parties equally.

(c)  The Preliminary Closing Statement shall become final and binding on both parties upon the earliest of (i) if no such notice has been given, the expiration of the period within which Seller may notify Buyer of any objections thereto pursuant to Section 4.3, (ii) agreement in writing by Seller and Buyer that such Preliminary Closing Statement, together with any modifications thereto agreed by Seller and Buyer, shall be final and binding and (iii) the date on which the Disputes Auditor shall issue its decision with respect to any dispute relating to such Preliminary Closing Statement. The Preliminary Closing Statement, as adjusted pursuant to any agreement between the parties or pursuant to the decision of the Disputes Auditor, when final and binding on both parties, is herein referred to as the "Final Closing Statement".

4.5  Adjustment. Promptly after the Preliminary Closing Statement having become final and binding on Seller and Buyer pursuant to Section 4.4, but in no event later than the fifth business day thereafter, the following shall occur:

(a)  If the Working Capital of the Companies as reflected on the Final Closing Statement exceeds ▮▮▮▮▮▮▮▮▮▮, Buyer shall pay to Seller, by wire transfer in immediately available funds to the account designated by

-11-

REDACTED DOCUMENT

Seller not less than three business days prior to the date of such payment, an amount equal to such excess.

(b) If the Working Capital of the Companies as reflected on the Final Closing Statement is less than ████████, Seller shall pay to Buyer, by wire transfer in immediately available funds to the account designated by Buyer not less than three business days prior to the date of such payment, an amount equal to such deficit.

4.6  Effect of Payment.  Notwithstanding any other provision of this Agreement to the contrary, any payment made by Seller to Buyer or Buyer to Seller under this Article 4 shall have no effect upon either party's obligations to the other party under any other provision of this Agreement, including without limitation, Article 11.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLER AND CYPRUS

Seller and Cyprus represent and warrant, jointly and severally, to Buyer that:

5.1  Organization of Seller, Cyprus and the Companies; Authority.  Seller, Cyprus and each of the Companies is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with, in the case of Seller and Cyprus, the corporate power and authority to enter into this Agreement and to perform their respective obligations hereunder.  Each of the Companies is qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified except where failure to be so qualified would not have a material adverse effect on the assets, businesses, financial condition, results of operations or prospects of such Company.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller and of Cyprus.  This Agreement has been duly executed and delivered by Seller and Cyprus and constitutes the valid, binding and enforceable obligation of Seller and Cyprus.

5.2.  Ability to Carry Out the Agreement.  Except as provided in Schedule 5.2, none of Seller, Cyprus or any of the Companies is subject to or bound by any provision of

-12-

ITA-Herford-003424

REDACTED DOCUMENT

(i)   any law, statute, rule, regulation or judicial or administrative decision,

(ii)   any articles or certificates of incorporation or by-laws,

(iii)   any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship or other restriction, or

(iv)   any judgment, order, writ, injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement to which any of the Companies or any of its predecessors is a party, which consent has not been obtained, required for the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby.

5.3. Capitalization of the Companies; Ownership. (a) The authorized, issued and outstanding capital stock of each of the Companies are set forth in Schedule 5.3.  All of the issued and outstanding shares of capital stock of each of the Companies are duly authorized, validly issued, fully paid and nonassessable.  Except as set forth in Schedule 5.3, there are no outstanding options, warrants or other rights of any kind to acquire any additional shares of capital stock of any of the Companies or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to acquire, any such additional shares, nor is any of the Companies committed to issue any such option, warrant, right or security.

(b)   The Shares are owned of record and beneficially by Seller.  Seller has good and valid title to the Shares, free and clear of any and all liens, claims, restrictions, encumbrances, security interests or options ("Encumbrances") and good and valid title to the Shares, free and clear of any and all Encumbrances will pass to Buyer on the Closing Date.  Except as set forth on Schedule 5.3, Newco owns all shares of capital stock of the Other Companies, free and clear of any Encumbrances.

5.4. Equity Interests.  Except as set forth in Schedule 5.3, none of the Companies or the European Companies has, directly or indirectly, any equity interest

-13-

REDACTED DOCUMENT

in any other corporation, joint venture, partnership or other entity.

5.5. <u>Financial Statements</u>.  Seller has heretofore furnished Buyer with copies of the following financial statements:  (i) combined balance sheets for the Companies and the European Companies as of December 31, 1991 and as of March 31, 1992, and (ii) combined income statements and statements of cash flow (or, if applicable, changes in financial position) for the year ended December 31, 1991, and the period ended March 31, 1992 (such balance sheets and income statements and statements of cash flow (or, if applicable, changes in financial position), together with the comments thereto, being collectively referred to as the "<u>Financial Statements</u>").  The Financial Statements are attached hereto as Annex A.  To the Knowledge of Seller, the Financial Statements have been prepared in conformity with the Accounting Principles as applied by the Companies on a consistent basis throughout the period covered by such statements and the accounting principles used in the preparation of the Financial Statements are consistent with the accounting principles used by Seller and amended from time to time in the preparation of its financial statements for the years 1989, 1990 and 1991.  To the Knowledge of Seller, except as disclosed in the Reference Balance Sheet or in Schedule 5.5, as of March 31, 1992 there were no actual or contingent debts, liabilities or obligations of any of the Companies which were required to be disclosed on the Reference Balance Sheet or any note thereto by the Accounting Principles as applied by the Companies nor as of the Closing, any contingent debts, liabilities or obligations of any of the Companies which were required to be disclosed on the Final Closing Balance Sheet or any note thereto by the Accounting Principles as applied by the Companies.

5.6. <u>Absence of Certain Changes or Events</u>.  To the Knowledge of Seller, except as set forth on Schedule 5.6, or specifically required by the Agreement to consummate the transactions contemplated by the Agreement, since December 31, 1991, the Companies have conducted their businesses in the ordinary and usual course, and there has not been (i) any change or amendment to the charter, by-laws or other organizational agreements of any of the Companies, (ii) any issuance or sale of any shares of capital stock of any of the Companies, or options, warrants or other rights of any kind to acquire any such shares or securities convertible into or securities exchangeable for, or which otherwise confer on the holder thereof any rights to acquire, any such shares, or enter into any agreement obligating it to do any of the foregoing, (iii) any non-cash dividends declared, set aside, paid or made with respect to the capital stock of any

-14-

REDACTED DOCUMENT

of the Companies, except as provided in Section 7.3(b), (iv) any damage, destruction or other casualty loss of any asset or assets of the Companies (whether or not covered by insurance) which, singly or in the aggregate, has a Material Adverse Effect, (v) any increase in the compensation payable or to become payable by any of the Companies to any of its officers, directors or employees, or any increase in any bonus, insurance, pension or other employee benefit plan, payment or arrangement made by any of the Companies for or with any such officers, directors or employees, except in the ordinary course of business consistent with past practice (vi) any labor dispute, other than routine labor matters, (vii) any transaction between any of the Companies on the one hand and any of Seller, Cyprus or any of their Affiliates (other than the Companies) on the other hand, other than transactions in the ordinary and usual course of business, (viii) any acquisition or disposition of businesses or assets, other than in the ordinary course of business, (ix) any increased production or purchase of inventory in anticipation of the transactions contemplated by this Agreement, (x) any increase or decrease in the accounts receivable or accounts payable of the Companies in anticipation of the transactions contemplated by this Agreement or (xi) any other event or change of condition of any character which, singly or in the aggregate, has had or is reasonably likely to have a material adverse effect on the assets, businesses, financial condition, results of operations or, to the extent the event or change is caused by Seller, prospects, of the Companies taken as a whole.

5.7.  **Title to Personal Properties; Absence of Liens.**  To the Knowledge of Seller, except as set forth on Schedule 5.7, each of the Companies has good and valid title to, or valid and subsisting leasehold or other possessory interests in, all of its personal properties and assets reflected on the Reference Balance Sheet (except for property and assets disposed of since the date of the Reference Balance Sheet) or acquired since the date of the Reference Balance Sheet and required by the Accounting Principles to be recorded on the balance sheets of such Company, free and clear of any Encumbrances, except for Encumbrances which, individually or in the aggregate, do not exceed ███████.

5.8  **Real Property Matters:**

(a)  **Title to Real Properties; Absence of Liens.** To the Knowledge of Seller, the Companies (i) own good and valid fee simple title in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "Fee Property"), free and clear from any and all Encumbrances other than those identified as

-15-

REDACTED DOCUMENT

Permitted Exceptions on Schedule 5.8 (the "Permitted Exceptions"), (ii) own good and valid fee simple title to certain mineral rights pursuant to certain Deeds more particularly identified by parcel on Schedule 5.8 (the "Mineral Property") (iii) hold valid and subsisting leasehold estates in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "Leased Property"), pursuant, in each case, to a valid and subsisting lease (individually, "Lease" and collectively, the "Leases") identified, as to each Leased Property, on Schedule 5.8. and (iv) hold a possessory interest in certain unpatented mining claims subject to the paramount title of the United States Government as set forth on Schedule 5.8 (the "Possessory Property").  The Fee Property, the Mineral Property, the Leased Property and the Possessory Property are hereinafter referred to as the "Real Property".  To the Knowledge of Seller, Schedule 5.8 also includes a complete and accurate list of all patented and unpatented mining claims of the Companies.

(b)  Wetlands.  To the Knowledge of Seller, except as set forth on Schedule 5.8, there does not exist any written survey, study or report which claims specifically that any portion of the Real Property is a wetland as that term is used and defined in The Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, which would render previously disclosed talc reserves unrecoverable.

(c)  Real Property Records.  Seller has made available to Buyer, to the extent in Seller's possession or control, or in the possession or control of one of the Companies, copies of any documents directly relating to the Real Property, including, without limitation, copies of any and all title insurance policies, title commitments, title abstracts; deeds and options; leases and pipeline documents; plans and surveys; and environmental studies, surveys and reports.  In addition, in the event any additional items become available to Seller during the term of this Agreement, Seller shall promptly make such items or copies of such items available to Buyer.

(d)  Preservation of Mineral Rights.  To the Knowledge of Seller, except as set forth in Schedule 5.8, the Companies have good and valid title or possessory interest (where indicated) to the mineral rights located on the Real Property and each of them and its respective immediate predecessors have complied in all material respects with the requirements of any

-16-

ITA-Herford-003428

REDACTED DOCUMENT

and all federal, state or local laws or ordinances related to the preservation of such mineral rights.

(e) <u>Operations Within Boundary Lines</u>.  To the Knowledge of Seller, except as set forth in Schedule 5.8, the activities conducted by any of the Companies and the improvements located on the Real Property are in all material respects within the boundary lines of the Real Property as described in Schedule 5.8 and there are no material encroachments by others onto the Real Property.

(f) <u>Condemnation</u>.  To the Knowledge of Seller, there is not now pending any condemnation or similar proceeding which affects the Real Property or any portion thereof.  Seller has received no notice that any such proceeding or taking by condemnation is contemplated.

5.9  <u>Litigation</u>.  To the Knowledge of Seller, except as set forth on Schedule 5.9, there is no action, suit, proceeding or investigation pending or threatened against any Company or relating to any Company's properties, at law, in equity or otherwise, in, before, or by any court or governmental agency or authority.  To the Knowledge of Seller, there are no unsatisfied judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court, an administrative agency or by an arbitrator) against any of the Companies or against any Real Property or any other of their properties, assets or businesses.

5.10  <u>Compliance with Law</u>.  To the Knowledge of Seller, except as with respect to matters set forth in Section 5.16 which are covered therein, and except as set forth on Schedule 5.10, the business of each Company is being conducted, and has at all times during the last three years been conducted by a Company or its predecessor, in material compliance with all laws, ordinances and regulations of any governmental entity, common law and equitable doctrines applicable to such Company (including, without limitation, Non-Environmental Laws).  To the Knowledge of Seller, all material governmental approvals, permits and licenses required by any Company in connection with the conduct of its business have been obtained and are in full force and effect and are being complied with in all material respects.

5.11  <u>Contracts</u>.  (a)  To the Knowledge of Seller, Schedule 5.11 sets forth each written contract or agreement outstanding as of the date hereof to which any Company is a party or to which any of its properties are bound and which,

-17-

REDACTED DOCUMENT

(i)   involves future payment or receipt of in excess of ▓▓▓▓ or future performance or receipt of services or delivery or receipt of goods and materials, in each case with an aggregate value in excess of ▓▓▓▓, including, but not limited to, sale and purchase agreements, distributorship agreements and loan agreements, notes and other financing documents;

(ii)   is a guarantee in respect of indebtedness of any Person (other than a Company) which may involve future payment by a Company in excess of ▓▓▓▓, or is a mortgage, security agreement or other collateral arrangement securing indebtedness of any Person (other than a Company) and creating Encumbrances on properties and assets of a Company;

(iii)   is a lease providing for monthly rental payments by a Company in excess of ▓▓▓▓ (exclusive of charges for taxes, insurance, utilities, maintenance and repair);

(iv)   is an employment or consulting contract or is a collective bargaining agreement;

(v)   is a technology license agreement;

(vi)   contains a change of control provision or provisions of similar effect;

(vii) is between any Company and Seller or any of Seller's Affiliates (other than any Company);

(viii) is not an arm's-length agreement; or

(ix) contains any restriction on the Companies ability to compete with any other business.

(b)   To the Knowledge of Seller, there is no material default by any Company or any other party, under any contract or agreement set forth or described in Schedule 5.11.

5.12.   <u>Brokers and Intermediaries</u>.  Except for Dillon Read & Co., neither Seller nor any Company has employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's or similar fee or commission in connection therewith or upon the consummation thereof.  Seller shall be responsible for making any payments to which Dillon Read & Co. shall be entitled.

-18-

ITA-Herford-003430

REDACTED DOCUMENT

5.13. <u>Tax Matters</u>. (a) Except as set forth in Schedule 5.13, (i) all Returns with respect to Taxes that are required to have been filed by or with respect to the Seller's Group prior to the date of this Agreement, including any of the Companies, have been duly filed, (ii) all Taxes shown to be due on the Returns referred to in clause (i) or in assessments received have in either case been paid in full, (iii) the Returns referred to in clause (i) have been examined by the Internal Revenue Service or the appropriate state, local or foreign taxing authority or the period for assessment of the Taxes in respect of which such Returns were required to be filed has expired, (iv) all deficiencies asserted or assessments made as a result of such examinations have been paid in full, (v) no issues that have been raised by the relevant taxing authority in connection with the examination of any of the Returns referred to in clause (i) are currently pending, (vi) no waivers of statutes of limitation have been given or requested by or with respect to any Taxes of the Seller's Group or any of the Companies, (vii) there are no adjustments required by Section 481 of the Code or similar carryover items that would affect the income tax liability of any of the Companies for a tax year that ends after the Closing Date, and (viii) no adjustments have been made or proposed by the Internal Revenue Service or the appropriate state, local or foreign taxing authority with respect to any of the Returns referred to in clause (i) which would in any way affect the liability for Taxes of any of the Companies for any taxable year or periods ending after the Closing Date.

(b) No tax is required to be withheld pursuant to Section 1445 of the Code as a result of the transfer contemplated by this Agreement.

(c) As a result of Buyer's purchase of the Shares, neither Buyer nor any Company will be obligated to make a payment to an individual that would be a "parachute payment" to a "disqualified individual" as those terms are defined in Section 280G of the Code, without regard to whether such payment is reasonable compensation for personal services performed or to be performed in the future.

5.14. <u>Employee Benefits</u>.

(i) All benefit plans, contracts or arrangements having a benefit value exceeding, in present value terms (determined using a discount rate of 8-1/2% per annum), ▮▮▮▮▮▮ (regardless of whether they are funded or unfunded, foreign or domestic, contractual or not) covering current employees or former employees of the Companies (the "Employees"), including, but not limited to, "employee

-19-

REDACTED DOCUMENT

benefit plans" within the meaning of Section 3(3) of ERISA, and plans of deferred compensation (the "Benefit Plans"), are listed in Schedule 5.14.  True and complete copies of all Benefit Plans including, but not limited to, any trust instruments and insurance contracts forming a part of any Benefit Plans, summary plan descriptions and all amendments thereto have been made available to Buyer.

(ii)  To the Knowledge of Seller, all employee benefit plans, other than "multiemployer plans" within the meaning of Section 3(37) or 4001(a)(3) of ERISA, covering Employees (the "Plans"), to the extent subject to ERISA, are in substantial compliance with ERISA.  To the Knowledge of Seller, except as set forth on Schedule 5.14, each Plan which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("Pension Plan") and which is intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter, or is currently the subject of a request for a determination letter, from the Internal Revenue Service, and Seller is not aware of any circumstances likely to result in refusal or revocation of any such favorable determination letter.  To the Knowledge of Seller, there is no material pending or threatened litigation relating to the Plans.  To the Knowledge of Seller, the Companies have not engaged in a transaction with respect to any Plan that, assuming the taxable period of such transaction expired as of the date hereof, could subject the Companies to a tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA in an amount which, individually or in the aggregate, would be material.

(iii)  To the Knowledge of Seller, no liability under Subtitle C or D of Title IV of ERISA has been or is expected to be incurred by the Companies with respect to any ongoing, frozen or terminated "single-employer plan", within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with any Company under Section 4001 of ERISA or Section 414 of the Code (an "ERISA Affiliate").  To the Knowledge of Seller, the Companies have not incurred and do not expect to incur any withdrawal liability with respect to a multiemployer plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of an ERISA Affiliate).  To the Knowledge of Seller, no notice of a "reportable event", within the meaning of Section 4043 of ERISA for which the 30-day reporting requirement has not been waived, has been required to be filed for any Pension Plan or by any ERISA Affiliate within the 12-month period ending on the date hereof.

-20-

REDACTED DOCUMENT

       (iv)   To the Knowledge of Seller, all contributions required to be made under the terms of any Benefit Plan have been timely made.  Neither any Pension Plan nor any single-employer plan of an ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and no ERISA Affiliate has an outstanding funding waiver.  To the Knowledge of Seller, the Companies have not provided, or are required to provide, security to any Pension Plan or to any single-employer plan of an ERISA Affiliate pursuant to Section 401(a)(29) of the Code.

       (v)   To the Knowledge of Seller, except as previously disclosed in writing to the Buyer, under each Pension Plan which is a single-employer plan, as of the last day of the most recent plan year ended prior to the date hereof, the actuarially determined present value of all "benefit liabilities", within the meaning of Section 4001(a)(16) of ERISA (as determined on the basis of the actuarial assumptions contained in the Plan's most recent actuarial valuation), did not exceed the then current value of the assets of such Plan, and there has been no material change in the financial condition of such Plan since the last day of the most recent plan year.  To the Knowledge of Seller, the withdrawal liability of the Companies under each Benefit Plan which is a multiemployer plan to which the Companies or an ERISA Affiliate has contributed during the preceding 12 months, determined as if a "complete withdrawal", within the meaning of Section 4203 of ERISA, had occurred as of the date hereof, does not exceed ███████.

       (vi)   To the Knowledge of Seller, the Companies have no obligations for post retiree health and life benefits under any Benefit Plan, except as set forth on Schedule 5.14.  To the Knowledge of Seller, there are no restrictions on the rights of the Companies to amend or terminate any such Benefit Plan or any post retirement medical plan covering Active Employees without incurring any liability thereunder, except for any restrictions set forth in the Plan or arising under a collective bargaining agreement.

       5.15.  <u>Patents and Trademarks</u>.  To the Knowledge of Seller, the Companies own or have the rights to use, without payment of any  consideration, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and rights which are necessary for use in connection with the businesses of the Companies (collectively, the "<u>Intellectual Property Rights</u>").  The Intellectual Property Rights owned by the Companies are described on Schedule 5.15 hereto.  To the Knowledge of  Seller, the use and registration of the

ITA-Herford-003433

REDACTED DOCUMENT

Intellectual Property Rights do not conflict with the intellectual property rights of any other person, firm or corporation and no other person's, firm's or corporation's operations conflict with the use and registration of the Intellectual Property Rights.  To the Knowledge of Seller, there are no suits pending or threatened by any of the Companies claiming a conflict by such Company with any intellectual property rights of third parties or a conflict by any third party claiming a conflict by such third party with any of the Intellectual Property Rights.

5.16.  <u>Environmental Matters</u>.  For the purpose of this Section 5.16 <u>only</u>, and expressly not for the purpose of Section 11.3 hereof, "Predecessors" shall mean the companies that operated Seller's talc business immediately prior to the creation of Newco.  Except as set forth on Schedule 5.16:

(a)  Each of the Companies has obtained all material permits, licenses and other such authorizations required to be obtained by it for the operation of its business under all applicable Environmental Laws.

(b)  Each of the Companies is, and each of the Companies and its Predecessors has been, in material compliance with all applicable  Environmental Laws.

(c)  None of Seller, any Company or any of their respective Predecessors have received any written notice during the last six years of any material violation of any Environmental Law by the Companies or their respective Predecessors, and there are no civil, criminal or administrative actions, suits, hearings, proceedings, written notices of violations, claims or demands pending or, to the  Knowledge of Seller, threatened against any Company or with respect to any property owned or previously owned by any Company or its Predecessor under any Environmental Law.  None of the Companies has received any written notice of any actual or threatened Release of any Hazardous Substance in violation of any Environmental Law.

(d)  None of the Companies or any of its Predecessors have generated, transported, or disposed, and none of the Companies is generating, transporting or disposing, of any Hazardous Substances to, in, upon, about, or under any property wherever situated, which have resulted in a Release giving rise to any material claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines, or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

-22-

ITA-Herford-003434

REDACTED DOCUMENT

(e)  None of the Companies and no other party has been involved in any activity in, upon, about, or under the Real Property or any parcel or portion thereof, and none of the Companies or any of its Predecessors have been involved in any activity in, upon, about, or under any property previously owned by any Company or its Predecessors, in connection with the generation, use, handling, treatment, removal, storage, clean up, transport, or disposal of any Hazardous Substances which have resulted in a Release giving rise to any claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

(f)  To the Knowledge of Seller, there are not now any underground storage tanks (as such term is defined in 40 CFR § 280.12) in, upon, about or under any of the Real Property or any parcel or portion thereof.

(g)  Seller has made available in writing to Buyer which equipment of the Companies contain PCB and Seller has made available to Buyer all reports relating thereto.

(h)  There are not now, nor has there ever to the Knowledge of Seller been, any areas in, upon, about, or under the Real Property or any parcel or portion thereof which should have been permitted as treatment, storage, or disposal facilities under the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.

5.17  Improper Payments.  To the Knowledge of Seller, no improper payment has been made by or on behalf of any of the Companies which is in violation of any applicable federal, state, local or foreign law.

5.18  Insurance.  Full and complete copies of all property and casualty insurance policies which currently insure each of the Companies have been made available to Buyer.

5.19  Talc Reserves.  Seller has made available its talc reserve written data to Buyer.  To the Knowledge of Seller, Seller's reporting of talc reserves is consistent with the reserve reporting requirements of the U.S. Securities and Exchange Commission.

5.20  Entire Business.  The Companies and the European Companies conduct all of the talc business of Seller and its Affiliates and own (without any right, title or encumbrance in favor of Seller or any of its Affiliates other than the Companies) all of the assets, rights or interests relating to such business, other than Cyprus logos

-23-

ITA-Herford-003435

REDACTED DOCUMENT

and the Hamm Underground Mine Property, that are owned by
Seller or any of its Affiliates.  The assets of the
Companies as of the Closing Date will be sufficient to
enable the Companies to carry out the talc business of
Seller and its Affiliates as presently conducted by Seller
and its Affiliates.

5.21  <u>Mining and Technical Matters</u>.  (a)  For the
purposes of this representation and warranty, "<u>Mineral
Rights</u>" means all rights, leases, concessions, licenses and
other entitlements to explore for, mine and extract all and
any minerals.

(b)  To the Knowledge of Seller, except as set
forth on Schedule 5.8, each Company is duly authorized to
carry on production of minerals in each jurisdiction where
it presently carries on such activities, has good and valid
title to all Mineral Rights required in connection with its
current operations and possesses all rights of access,
easements, rights to water, power and other services
necessary for the said operations.

(c)  To the Knowledge of Seller, each Company is
duly authorized to carry on exploration for minerals (where
such exploration is currently in progress) in each
jurisdiction where it carries on such activities.

(d)  To the Knowledge of Seller, all Mineral
Rights held by a Company are in full force and effect and,
free from cancellation, forfeiture or any accrued right of
termination and there has been no material adverse change in
the condition of or rights under the same except depletion
of ore reserves due to operations in the ordinary course of
business; provided, however, that with respect to
cancellation of possessory interests, Seller only represents
and warrants that it has not received any written notice of
cancellation.

(e)  To the Knowledge of Seller, no Company has
received any notice of default or claim of default or of any
current or threatened expropriation, withdrawal or
cancellation of any Mineral Rights nor are there any suits
or proceedings in progress or pending or threatened against
or affecting any Mineral Rights or the minerals produced
therefrom which, if decided adversely, would materially
prejudice the Mineral Rights or the rights enjoyed
thereunder.

(f)  To the Knowledge of Seller, except as set
forth on Schedule 5.8, none of the Mineral Rights nor the
production of minerals thereunder is subject to any royalty,
production payment, lien, charge, security interest or other

-24-

REDACTED DOCUMENT

encumbrance, and no Company is obliged by virtue of any prepayment under any contract providing for the sale of any such minerals or under any similar arrangement to deliver any of such minerals at any future date without then or in due course thereafter receiving full payment therefor.

(g)   To the Knowledge of Seller, the records supplied to Buyer relating to:

(i)   geological, geophysical, geochemical, drilling and other engineering data;

(ii)   maps and drawings showing mining operations carried out;

(iii)   ore reserve estimates and production data; and

(iv)   metallurgical test work,

are true and accurate, within the standards of the industry, in all material respects.

5.22   **Disclosure.**   To the Knowledge of Seller, all written information which has been given by Seller or any representative of Seller to Buyer or any representative of Buyer, is true, complete and accurate in all material respects and there are no facts, matters or circumstances which render any such information inaccurate or misleading in any material respect.

5.23   **Inventory.**   All inventories of the Companies are of a quality and specification conforming to the usual standards used by the Companies, and except as set forth on Schedule 5.23, all inventories are reflected on the Reference Balance Sheet in accordance with the Accounting Principles to realizable value on a going-concern basis. There are no talc ores included in the inventories of the Companies that can not produce products in conformity with the Companies existing product specifications and existing production methods.

5.24   **Condition of the Assets of the Companies.** To the Knowledge of Seller, all of the physical assets of the Companies, including machinery and equipment, are in reasonable operating condition required for the current conduct of the business of the Companies, normal wear and tear excepted.

5.25   **Accounts Receivable.**   To the Knowledge of Seller, all accounts receivable of the Companies and the European Companies shown on the Reference Balance Sheet, and

-25-

ITA-Herford-003437

REDACTED DOCUMENT

all accounts receivable arising thereafter and prior to the Closing shown in the books of the Companies, arose and will arise in the ordinary course of business and are fully collectible, except to the extent a bad debt reserve has been established for such accounts receivable in accordance with the Accounting Principles.

5.26  <u>Formation of Newco.</u>  Newco was incorporated on April 1, 1992 in the State of Delaware.  Since its date of incorporation, Newco has not engaged in any activity other than activities contemplated and disclosed to Buyer in connection with the restructuring of the talc business of Seller and its Affiliates.

5.27  <u>Working Capital of the Companies</u>.  To the Knowledge of Seller, no individual working capital item set forth on the Reference Balance Sheet has changed by more than ████████ since the date of the Reference Balance Sheet, except for changes in the ordinary course of business of the Companies.

5.28  <u>Disclaimer.</u>  No representations or warranties have been made to Buyer by Seller other than those expressly set forth in this Agreement.


## ARTICLE 6

### <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller that:

6.1  <u>Organization and Authority of Buyer</u>.  Buyer is a Delaware corporation, with the corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer and, constitutes the valid, binding and enforceable obligation of Buyer.

6.2  <u>Ability to Carry Out the Agreement</u>.  Buyer is not subject to or bound by any provision of

(i)  any law, statute, rule, regulation or judicial or administrative decision,

(ii)  any articles or certificates of incorporation or by-laws,

-26-

ITA-Herford-003438

REDACTED DOCUMENT

(iii)  any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship, other restriction, or

(iv)  any judgment, order, writ injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement which has not been obtained required for, the execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby.

6.3.  **Brokers and Intermediaries**.  Buyer has not employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's, or similar fee or commission in connection therewith or upon the consummation thereof.

6.4.  **Investment**.  Buyer is acquiring the Shares for its own account for investment, without a view to, or for resale in connection with, the distribution thereof in violation of federal or state securities laws and with no present intention of distributing or reselling any part thereof.  Buyer will not so distribute or resell any Shares in violation of any such law.

## ARTICLE 7

### CERTAIN COVENANTS AND AGREEMENTS OF SELLER, CYPRUS AND BUYER

7.1.  **Access and Information; Testing of Reserves; Notice of Breaches**.  (a)  Seller shall permit Buyer and its representatives (including, without limitation, its public accountants, counsel and other advisors) after the date of this Agreement to have access during normal business hours, upon reasonable advance notice to Seller to the officers and directors of the Companies and/or the Seller (as appropriate), the auditors of the Companies and any and all of the premises, properties, contracts, books, records and data of or relating to each of the Companies.  Without limiting the foregoing, Buyer, its public accountants, counsel and other advisors shall have the right at any time and from time to time prior to Closing to enter the Real

~27~

ITA-Herford-003439

REDACTED DOCUMENT

Property, or any portion or parcel thereof, for the purpose of obtaining a survey, either boundary or as-built, of such Real Property, conducting Phase I environmental audits and property audits of Real Property, surveying and otherwise examining the physical, hydrological and topographical nature of the Real Property. "Phase I environmental audits" shall be understood to consist of walk-throughs of any of the Real Property or facilities thereon, review of documents relating to environmental issues, interviews of personnel with knowledge relating to environmental issues, and review of public records. Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company. All information provided to Buyer pursuant hereto shall be subject to that certain confidentiality agreement executed by an affiliate of Buyer and dated April 24, 1991 (the "Confidentiality Agreement").

(b)   From the date hereof through and including the Closing Date, Seller shall cause the Companies to give full access to Buyer and its representatives for the purpose of testing Seller's talc reserves, using standard industry testing techniques. Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company.

7.2   <u>Regulatory Filings</u>. Each party hereto will furnish to the other party hereto such necessary information and reasonable assistance as such other party may reasonably request in connection with its preparation of necessary filings or submissions to any government agency related to this transaction.

7.3   <u>Conduct of Business; Intercompany Accounts</u>.
(a) Prior to the Closing, and except as set forth in Schedule 7.3 or otherwise contemplated by this Agreement or consented to or approved by Buyer in writing, Seller covenants and agrees that:

(i)   it will cause the businesses conducted by the Companies to be operated only in the ordinary and usual course and use all reasonable efforts to preserve the properties and relationships with suppliers and customers of such businesses;

(ii)   it will cause each Company not to issue or sell any shares of capital stock of such Company, or issue or sell any options, warrants or other rights of any kind to acquire any such shares or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to

-28-

REDACTED DOCUMENT

acquire, any such shares, or enter into any agreement obligating it to do any of the foregoing;

(iii) except for the contemplated transfer of assets from Seller to Newco, it will not, other than in the ordinary course of business, cause the transfer of any material assets or contracts, or hire, fire or transfer any key employees to or from any subsidiary, division or other business unit within or among the Companies;

(iv)  it will cause each of the Companies not to change or amend its charter, by-laws or other organization agreements;

(v)   it will cause the Companies not to acquire or to dispose of any property, right or other asset employed in the business of the Companies, other than in the ordinary course of business (it being understood that the purchase or sale of talc reserves shall not be considered in the ordinary course of business for purposes of this paragraph (v));

(vi)  it will cause the Companies to or will itself keep in full force and effect insurance on assets and Real Property and other property of the Companies or for the benefit of employees of the Companies, liability and other casualty insurance related to the Companies, and bonds on personnel of the Companies in accordance with the past practices of the Companies, and it will ensure that all proceeds received under such insurances will remain assets of the Companies at the Closing or will be transferred to the Companies prior to the Closing;

(vii) it will cause the Companies not to enter into or to amend any employment, bonus, severance or retirement contract or arrangement or any employee benefit plan with regard to the Companies;

(viii) it will cause the Companies not to increase any salary or other form of compensation payable or to become payable to any of the executives or employees of the Companies, or to pay any bonuses to any of such executives or employees, except for payments made in the ordinary course and for such payments to be made pursuant to the bonus or profit sharing provisions of the employment agreements listed on Schedule 5.14 hereto;

(ix)  it will cause the Companies not to enter into, make, agree upon or to agree to enter into

-29-

ITA-Herford-003441

REDACTED DOCUMENT

(A) other than in the ordinary course, any contract, purchase or sale order, or other commitment, or (B) any real property lease requiring an expenditure or payment in excess of ████████ per annum or which cannot be terminated by the relevant Company within a period not exceeding 12 months;

(x)   it will cause the Companies not to incur any debt or obligation for borrowed funds and not to extend credit in the sale of products, collection of receivables or otherwise, other than in the ordinary and regular course of business;

(xi)   it will cause the Companies not to take any action and not to cause any action to be taken by any party, which action would materially and adversely affect the businesses of any of the Companies, including, without limitation, the state of title of any of the Companies in and to any material portion of the Real Property.  It will not permit any Company to fail to exercise any option to extend or exercise any option to terminate any Lease between the date hereof and the Closing without Buyer's prior written consent as to each such non-extension or termination of any Lease, or amend or modify any such Lease except in the ordinary course;

(xii)   it will not permit any of the Companies to wind up, liquidate or dissolve or to enter into any transaction of merger or consolidation; and

(xiii)   it will not, and it will not permit any of the Companies to, agree to take any of the foregoing actions.

(b)   Seller and Buyer agree that all intercompany accounts between Seller or any Affiliate of Seller (other than a Company) and any Company shall be settled with payment effective prior to the Closing and to the extent such settlement is not feasible at or prior to the Closing, shall be settled as soon as practicable after Closing, and such settlement shall be effective as of prior to Closing.

7.4.  Employee Matters.  (a) Ongoing Employment. Buyer shall ensure that all persons who were employed by any Company immediately preceding the Closing Date, including those on vacation, leave of absence or disability (whether short-term or long-term disability or workers's compensation) and those subject to or on lay-off (but only, in the case of employees subject to or on lay-off, to the extent a collective bargaining agreement providing for

-30-

ITA-Herford-003442

REDACTED DOCUMENT

recall rights is applicable to such employees) ("Active Employees", which term shall be defined as those individuals identified above), will be employed by Buyer or any Affiliate of Buyer (including but not limited to the Companies) on the Closing Date, on substantially the same terms (regarding salary, job responsibility and location but excluding retirement and welfare benefits) as those provided to such Active Employees immediately prior to the Closing Date.  The employment of any Active Employee by Buyer on the Closing Date does not create a right to ongoing employment with Buyer other than may exist under a collective bargaining agreement or an individual agreement.

      (b)  <u>Welfare Benefit Plans</u>.

         (i)  Seller shall retain the responsibility for providing for payment of all (A) claims of Employees under any medical, dental, hospital or health plans for previously documented physical or mental conditions in existence on the Closing Date, and provided that a claim for such condition is made within one year of the Closing Date, and (B) claims incurred under any life insurance plans for death occurring prior to the Closing Date.

         (ii)  Seller shall retain the responsibility for providing for payments of all long-term disability claims (including long-term disability claims that result from continuous short-term disability claims in existence on the Closing Date) arising from disabilities of Employees that occurred prior to the Closing Date and up until such time as the Employee returns to work with the relevant Company on a full-time, unrestricted basis for at least 30 days.  Buyer shall assume the responsibility for providing for payments of all short-term disability claims arising from such disabilities.

         (iii)  Seller shall retain the responsibility for providing for payments of all worker's compensation claims made on or before the Closing Date, <u>provided</u>, <u>however</u>, that Seller shall only be liable under this paragraph (iii) for payments in excess of the amount accrued with respect thereto on the Final Closing Statement.  Buyer shall assume the responsibility for providing for payments of all worker's compensation claims made after the Closing Date.

         (iv)  Seller shall retain the responsibility for providing Non-Represented Employees who retired (or if applicable who terminated with vested benefits) prior to the Closing Date with retiree health and life

-31-

ITA-Herford-003443

REDACTED DOCUMENT

benefit under the Benefit Plan(s) which covered such Employees prior to the Closing Date.  As of the Closing Date, Buyer assumes all liabilities for vested and non-vested post-retirement medical and life insurance benefits with respect to Non-Represented Employees who are Active Employees.

(v)  Seller shall retain the responsibility for providing Employees who terminated employment with the relevant Company prior to the Closing Date (and their "qualified beneficiaries" within the meaning of Section 4980B of the Code) with the continuation of group health coverage required by Section 4980B of the Code.

(vi)  Buyer shall assume Seller's obligations and responsibilities under all collective bargaining agreements covering Employees.

(c)  <u>Pension Plans</u>.

(i)  Effective as of the Closing Date, Buyer shall amend an appropriate pension plan to be designated by Buyer (the "Buyer Pension Plan") to provide that (A) upon the transfer of assets referred to below, the service of Active Employees who participated in the Retirement Plan for Salaried Employees of Cyprus Minerals Company or the Cyprus Industrial Minerals Company Division Pension Plan for Yellowstone Mine Hourly Employees (the "Seller Pension Plans") shall be recognized for all purposes thereunder (including benefit accrual) to the extent such service was recognized under the relevant Seller Pension Plan and (B) upon such transfer, the accrued benefits under the Buyer Pension Plan of Active Employees who participated in either of the Seller Pension Plans shall in no event be less than their accrued benefits under such Seller Pension Plan as of the Closing Date.

As soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, Seller shall cause to be transferred from the trusts under the Seller Pension Plans to the trust under the Buyer Pension Plan an amount in cash equal to the actuarial present value of the "benefit liabilities" (within the meaning of Section 4001(a)(16) of ERISA) as of the Closing Date of Active Employees who participated in either of the Seller Pension Plans, together with interest at the rate of 8½% per annum from the Closing Date to the date of transfer.  Determination of such actuarial present value shall be the Base Present

-32-

ITA-Herford-003444

REDACTED DOCUMENT

Value, provided, however, that if the Alternate Present Value exceeds the Base Present Value by more than ▇▇▇▇▇, the actuarial present value shall be the Base Present Value plus ▇▇ of the difference between the Alternate Present Value and the Base Present Value. As used herein, the "Base Present Value" shall mean the actuarial present value determined on the basis of the actuarial assumptions used in preparing the Cyprus Minerals Company Annual Report and ▇▇ as of December 31, 1991 plus ▇▇ of the actuarial present value so determined, and the "Alternate Present Value" shall mean the actuarial present value based on the actuarial assumptions used in preparing the Cyprus Minerals Company Annual Report and ▇▇ as of December 31, 1991, modified to (x) assume that a proportion of Employees will receive benefits upon termination or retirement under the lump sum option based upon the calculation practices currently used by Seller (including any non-qualified supplements that may be applicable) and upon deferred (or immediate, if applicable) Pension Benefit Guaranty Corporation interest rates, and (y) base the proportion of Employees assumed to take the lump sum option on the actual experience under the Seller Pension Plans over the last two years, taking into account the age and service of the Employees at termination or retirement. Such actuarial present values shall be calculated as at the Closing Date by an actuary appointed by Seller and agreed to by an actuary appointed by Buyer, and shall be reduced by the amount of any benefit payments made with respect to Active Employees after the Closing Date but prior to the date of transfer.

Pending completion of the transfers described in this paragraph (i), Seller and Buyer shall make arrangements for any required benefit payments to Employees from the relevant Seller Pension Plan. Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this Section.

(ii)  Effective as of the Closing Date, Seller shall amend the Retirement Plan for Employees of Windsor Minerals Corporation Represented by Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, A.F.L.-C.I.O., local lodge D449 (the "Windsor Plan") and Cyprus Industrial Minerals Company Division Pension Plan for Three Forks Plant Hourly Employees (the "Three Forks Plan") to make the Buyer the "plan sponsor" (as such term is defined in Section 3(16)(B) of ERISA thereunder. Seller shall cause to be transferred, as

-33-

ITA-Herford-003445

REDACTED DOCUMENT

soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, to a trust established by Buyer under the Windsor Plan and the Three Forks Plan, all assets attributable to such Plans held under the Cyprus Minerals Company Master Trust.

(iii)  Seller shall continue to make contributions to these plans when due as required until the Closing Date.  Buyer shall be responsible for making required contributions when due to these plans after the Closing Date.  With respect to the Three Forks Plan and the Windsor Plan, the required contributions for 1991 and 1992 for purposes of this Agreement shall be the minimum required contribution under Section 412 of the Code as determined by an actuary appointed by Seller.  Seller's share of the required contribution for 1991 will be the entire required contribution for 1991.  Seller's share of the required contribution for 1992 shall be determined by multiplying the total required contribution for 1992 by the fractional portion of 1992 preceding the Closing Date.  Buyer's share of the required contribution for 1992 shall be the total required contribution for 1992 minus Seller's share of the required contribution for 1992.  If actual contributions to these plans by Seller exceeds Seller's share of the required contributions then Buyer shall reimburse Seller for the amount of such excess.  If Seller's share of the required contributions exceeds Seller's actual contributions then Seller shall reimburse Buyer for the amount of such excess.

(iv)  Buyer shall assume Seller's liability under the Grand Island, Nebraska Multiemployer Pension Plan for Members of General Drivers and Helpers Local Union #544 Affiliated with the International Brotherhood of Teamsters Afl-CIO.

(d)  <u>European Pension Liabilities</u>.  Buyer shall assume all liabilities and assets for all Benefit Plans listed on Schedule 5.14 that cover foreign employees of the Companies or the European Companies.

(e)  Buyer shall assume responsibility for all liabilities, including but not limited to severance benefit liabilities and any withdrawal liabilities, arising because of Buyer's actions or omissions regarding Seller's then former Employees after the Closing Date.

-34-

ITA-Herford-003446

REDACTED DOCUMENT

(f) <u>Savings Plan</u>.

(i)  Effective as of the Closing Date, Buyer shall amend an appropriate savings plan to be designated by Buyer (the "Buyer Savings Plan") to provide that (A) the service of Active Employees who participated in the Cyprus Minerals Company Savings Plan and Trust (the "Seller Savings Plan") shall be recognized for all purposes thereunder to the extent such service was recognized under the Seller Savings Plan and (B) the account balances of such Employees which are transferred from the Seller Savings Plan to the Buyer Savings Plan in accordance with this paragraph shall be fully vested at all times.

As soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise·agree) within 180 days after the Closing Date, Sellers shall cause to be transferred from the Seller Savings Plan to the Buyer Savings Plan the liability for the account balances of Active Employees who participated in the Seller Savings Plan, together with assets the fair market value of which is equal to such liability.

(ii)  Pending the completion of the transfer described in paragraph (i), Seller and Buyer shall make arrangements for any required benefit payments to Employees from the Seller Savings Plan.  Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this Section.

(g)  <u>ESOP</u>.  Seller shall take all necessary actions to provide that all Active Employees are fully vested in the amounts credited to their accounts under the Cyprus Minerals Company Amended and Restated Employee Stock Ownership Plan as of the Closing Date.

(h)  <u>Indemnity</u>.  Seller agrees to defend, indemnify and hold harmless the Buyer Indemnitees against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Seller's responsibilities or obligations under this Section 6.4, and Buyer agrees to defend, indemnify and hold harmless the Seller Indemnities against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Buyer's responsibilities or obligations under this Section 6.4.  The obligations of this Section 6.4 shall survive the Closing Date without limitation as to time.  For purposes of this paragraph (h), the terms Buyer Indemnitees, Damages, Breach and Seller

-35-

REDACTED DOCUMENT

Indemnities have the respective meanings ascribed thereto in Section 11.1.

7.5.  <u>Tax Matters</u>.  (A)  <u>Section 338(h)(10)</u>. Neither Buyer nor Seller nor any of their respective Affiliates shall make any election pursuant to Section 338(h)(10) of the Code.  Seller understands that, Buyer may make and may cause each member of its affiliated group (as defined in Section 338(h)(5) of the Code) to join in a protective carryover basis election as provided for by regulations under Section 338(e) of the Code.  With regard to this election, Seller will fully cooperate and join in the election, if necessary.

(B)  <u>Liability for Taxes and Related Matters</u>.

(i)  <u>Liability for Taxes</u>.  Seller shall be liable for and indemnify Buyer for all Taxes (including, without limitation, any obligation to contribute to the payment of a tax determined on a consolidated, combined or unitary basis with respect to a group of corporations that includes or included any of the Companies and Taxes resulting from any of the Companies ceasing to be a member of the Seller's Group) (a) imposed on Seller's Group (other than any Taxes described in the following clause (b) of the Companies for any taxable year), (b) imposed on any of the Companies or for which any of the Companies may otherwise be liable (i) for any taxable year or period that ends on or before the Closing Date and, (ii) with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year ending on and including the Closing Date.  Except as set forth in (v), Seller shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(ii)  Buyer shall be liable for and indemnify Seller for the Taxes of any of the Companies for a taxable year or period that begins after the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year beginning after the Closing Date.  The Buyer shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(iii)  <u>Taxes for Short Taxable Year</u>.  For purposes of paragraphs (B)(i) and (B)(ii), whenever it is necessary to determine the liability for Taxes of any of the Companies for a portion of a taxable year or period that begins before and ends after the Closing

-36-

ITA-Herford-003446

REDACTED DOCUMENT

Date, the determination of the Taxes of any Company for the portion of the year or period ending on, and the portion of the year or period beginning after, the Closing Date shall be determined by assuming that such Company had a taxable year or period which ended at the close of the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a time basis.

(iv)  If, as a result of a challenge by any taxing authority to any transaction that had been treated or a tax-free transaction under Section 351 of the Code or any similar provision under state tax law, such taxing authority determines the adjusted tax basis in an asset of Newco, including the stock in any of the Other Companies, as of the Closing Date to be less than the Carryover Basis (as defined below), then Seller shall indemnify Buyer to the extent that the Carryover Basis of such asset would have produced greater tax benefits to Buyer.  Payment under this paragraph shall be made at the time the adjusted tax basis in an asset of Newco is determined to be other than the Carryover Basis and shall equal the highest marginal corporate tax rate in effect on the Closing Date multiplied by the difference between the Carryover Basis and the redetermined adjusted tax basis; provided, however, that for the purposes of computing such payment, a reduction in the basis of one or more assets shall not be taken into account to the extent that the determination that resulted in a reduction in the basis of such assets also resulted in the increase in the basis in inventory, receivables or other current assets, or any asset that is amortizable, depreciable or depletable under the applicable tax law in effect on the date that such determination is made.  As used herein, the term "Carryover Basis" means the adjusted tax basis in the asset as of December 31, 1991 reduced by any depreciation, depletion or other such allowance (or, in the case of stock in any of the Other Companies, by the adjustments provided for in section 1.1502-32 of the income tax regulations) properly attributable to the period between December 31, 1991 and the Closing Date.

(v)  Adjustment to Purchase Price.  Any payment by Buyer or Seller under this Section will be an adjustment to the Purchase Price.

(vi)  Refunds from Carrybacks.  If Seller becomes entitled to a refund or credit of Taxes for any period for which it is liable under paragraph (B)(i) to

-37-

ITA-Herford-003449

REDACTED DOCUMENT

indemnify Buyer and such refund or credit is attributable solely (or in part) to the carryback of losses, credits or similar items from either a taxable year or period that begins after the Closing Date or in the case of a taxable year or period that begins before and ends after the Closing Date, that portion of the taxable year or period that begins after the Closing Date (determined under the principles of paragraph (B)(iii)), and is attributable to any of the Companies, Seller shall promptly pay to the Buyer the amount of such refund or credit (or a pro-rata share of such refund or credit if due only in part to the carryback of such losses, credits or similar items) together with any interest thereon.  In the event that any refund or credit of Taxes for which a payment has been made is subsequently reduced or disallowed, the Buyer shall repay any amounts paid to it by the Seller pursuant to this paragraph and indemnify and hold harmless the Seller for any interest and penalties assessed against Seller by reason of the reduction or disallowance. Provided, however, that the preceding sentence shall not apply if the reduction or disallowance is caused by Seller's computational error.

(vii)  Returns.  Seller shall file or cause to be filed when due all Returns with respect to Taxes that are required to be filed by or with respect to any of the Companies for taxable years or periods ending on or before the Closing Date and shall pay any Taxes due in respect of such Returns, and Buyer shall file or cause to be filed when due all Returns with respect to Taxes that are required to be filed by or with respect to any of the Companies for taxable years or periods ending after the Closing Date and shall remit any Taxes due in respect of such Returns.  Each of the Companies shall retain an officer of Seller for the sole purpose of signing the Returns that Seller is required to file pursuant to this paragraph.  Seller shall pay Buyer the Taxes for which Seller is liable pursuant to paragraph (B)(i) but which are payable with Returns to be filed by Buyer pursuant to the previous sentence not less than two business days prior to the due date for the payment of such Taxes.  Buyer shall provide Seller with its then best estimate of these taxes 10 business days prior to the due date for payments of such Taxes. Notwithstanding the foregoing, with regard to taxes for periods that begin before but end after the Closing Date, Seller shall be entitled to reduce its payment under this paragraph to Buyer to the extent of the amount accrued by the Company making the payment on the Company's balance sheet as of the Closing Date.  With regard to taxes for periods that begin before but end

-38-

ITA-Herford-003450

REDACTED DOCUMENT

after the Closing Date, Buyer shall pay Seller, within five (5) business days of making a payment for the applicable taxes to a tax authority, any amounts accrued on the Final Closing Statement of the Company making the payment, for the particular liability for tax, in excess of the applicable tax.

(viii) <u>Contest Provisions</u>. Buyer shall promptly notify Seller in writing upon receipt by Buyer, any of its Affiliates or any of the Companies of notice of any pending or threatened audit or assessment by any federal, state, local or foreign taxing authorities which may affect the tax liabilities of any of the Companies for any periods for which Seller would be required to indemnify Buyer pursuant to paragraph (B)(i), provided that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder. Seller shall have the sole right to represent any Company's interests in any tax audit or administrative or court proceedings relating to taxable periods ending on or before the Closing Date, and to employ counsel of its choice at its expense. Notwithstanding the foregoing, Seller shall not be entitled to settle, either administratively or after the commencement of litigation, any claim for Taxes which would adversely affect the liability for Taxes of the Buyer or any of the Companies for any period ending after the Closing Date to any extent (including, but not limited to, the imposition of income tax deficiencies, the reduction of asset basis or cost adjustments, the lengthening of any amortization or depreciation periods, the denial of amortization or depreciation deductions, or the reduction of loss or credit carryforwards) without the prior written consent of Buyer. Such consent shall not be unreasonably withheld, and shall not be necessary to the extent that Seller has indemnified the Buyer against the effects of any such settlement. Buyer shall have the sole right to represent any Company's interest in any tax audit or administrative or court proceeding for any taxable year or period that begins before but ends after the Closing Date. Neither Buyer nor any of the Companies may agree to settle any tax claim for the portion of the year or period ending on the Closing Date which may be the subject of indemnification by Seller under paragraph (B)(i) without the prior written consent of Seller, which consent shall not be unreasonably withheld.

(ix) <u>Termination of Tax Allocation Agreements</u>. Any tax allocation or sharing agreement or arrangement, whether or not written, that may have been

-39-

REDACTED DOCUMENT

entered into by Seller or any member of Seller's Group and any of the Companies shall be terminated as to each of the Companies as of the Closing Date, and no payments which are owed by or to any of the Companies pursuant thereto shall be made thereunder.

(C) <u>Transfer Taxes</u>. Seller and Buyer shall each be liable for one half the transfer, sales, use or other similar taxes arising under any state, local or foreign law from the sale of the Shares, including any real property transfer taxes. Buyer and Seller shall cooperate fully in making any payment, withholding any amount or filing any return or information which is required with respect to a transfer, sales, use or other similar tax described in the preceding sentence. The party responsible under state, local or foreign law for making such payment, withholding such amount or filing such return or information with respect to such transfer, sales, use or other similar taxes shall undertake to fulfill that responsibility; provided, however, that Seller must inform Buyer of any payment that must be made by Buyer, amount that must be withheld by Buyer or return or information that must be filed by Buyer with respect to such transfer, sales, use or other similar taxes.

(D) <u>Information to be Provided by Buyer</u>. With respect to the periods in 1992 prior to the Closing Date, Buyer shall promptly cause each of the Companies to prepare and provide to Seller a package of tax information materials (the "Tax Package"), which shall be completed in accordance with past practice including past practice as to providing the information, schedules and work papers and as to the method of computation of separate taxable income or other relevant measure of income of each of the Companies. Buyer shall cause the Tax Package described in this paragraph to be delivered to Seller by December 31, 1992.

(E) <u>Assistance and Cooperation</u>. After Closing Date, each of Seller and Buyer shall:

(i) assist (and cause their respective Affiliates to assist) the other party in preparing any Returns or reports with such other party is responsible for preparing and filing in accordance with this Section;

(ii) cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding any Returns of any of the Companies;

(iii) make available to the other and to any taxing authority as reasonably requested all

-40-

ITA-Herford-003452

REDACTED DOCUMENT

information, records, and documents relating to Taxes of any of the Companies;

(iv)  provide timely notice to the other in writing of any pending or threatened tax audits or assessments of any of the Companies for taxable periods for which the other may have a liability under this Section; and

(v)  furnish the other with copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any such taxable period.

(F)  Record Retention.  Seller will continue to store and maintain the original copies of any federal, state, local or foreign tax return or report for any year still open for audit by any taxing authority for any period up to and including the taxable years or periods ending on or before the Closing Date and any work papers prepared exclusively for purposes of filing such returns.  Seller will provide Buyer with copies of all such returns and work papers that have been prepared within 10 days after the Closing Date and with copies of subsequent returns and work papers as soon as possible after such returns and work papers are prepared.  Seller will notify Buyer prior to the destruction of any records mentioned in this subsection (F) and provide Buyer with the option of continuing to store and maintain such records on its own behalf.

(G)  Survival of Obligations.  The obligations of the parties set forth in this Section shall be unconditional and absolute and shall remain in effect without limitation as to time.

7.6.  Insurance.  To the extent that (i) there are third-party insurance policies maintained by Seller and its Affiliates (other than the Companies) ("Seller's Insurance Policies") insuring against any loss, liability, damage or expense relating to the assets, businesses, operations, conduct, products and employees (including former employees) of the business of any Company (all such losses, liabilities, claims, damages or expenses, regardless of the availability of insurance coverage, are herein referred to collectively as the "Business Liabilities") and relating to or arising out of occurrences prior to the Closing, and (ii) Seller's Insurance Policies continue after the Closing to permit claims ("Claims") to be made with respect to such Business Liabilities relating to or arising out of occurrences prior to the Closing, Seller agrees to cooperate and cause such Affiliates to cooperate with Buyer and the Companies in submitting Claims on behalf of Buyer or such

-41-

ITA-Herford-003453

REDACTED DOCUMENT

Companies under Seller's Insurance Policies with respect to such Business Liabilities relating to occurrences prior to the Closing.

7.7. <u>Books and Records</u>. Except for tax records covered by Section 7.6(F), Buyer will, and will cause each Company to, for a period of six years after the Closing, retain all books, records and other documents pertaining to the businesses of the Companies in existence on the Closing Date and to make the same available after the Closing Date for inspection and copying by Seller or any Affiliate of Seller at Seller's expense during the normal business hours of Buyer or such Company, as applicable, upon reasonable request and upon reasonable notice. Without limiting the generality of the foregoing, Buyer will, and will cause each Company to, make available to Seller, the Affiliates of Seller and their respective representatives all information deemed necessary or desirable by Seller or such Affiliates in preparing their respective financial statements and Tax returns and conducting any audits in connection therewith.

7.8. <u>Announcements</u>. Prior to the Closing, neither Seller nor Buyer will issue any press release or otherwise make any public statement with respect to this Agreement and the transactions contemplated hereby without the prior written consent of the other (which consent shall not be unreasonably withheld), except as may be required by applicable law, stock exchange regulation or in connection with Buyer obtaining the approval of its shareholders.

7.9. <u>Interim Use of Names</u>. Except as provided in this Section 7.9, no interest in or right to use the name "Cyprus" or any derivation or logo thereof is being transferred hereunder. The parties agree that Buyer shall, as promptly as practicable but in any event within forty-five (45) days following the Closing Date, file an amendment with the appropriate authorities to eliminate the name Cyprus from the name of each Company, and within one year following the Closing Date, remove or obliterate all such trade names, trademarks and logos from all signs, purchase orders, invoices, sales orders, packaging stock, labels, letterheads, shipping documents and other materials used by it or any of its Affiliates (including but not limited to the Companies). For a period of sixty (60) days after the Closing Date, Buyer and its Affiliates (including the Companies) may continue to use any purchase orders, invoices, sales orders, letterheads or shipping documents which bear the name Cyprus, provided that after such sixty (60) days' period, Buyer and its Affiliates (including the Companies) shall cease to use (i) any purchase orders, invoices, sales orders, letterheads or shipping documents existing on the date hereof, which bear the name "Cyprus" or

-42-

ITA-Herford-003454

REDACTED DOCUMENT

any name confusingly similar thereto, without first
obliterating or covering such name, mark or logo, or (ii)
any such materials not in existence on the Closing Date
which bear such name, mark or logo. Except to the extent
contemplated above, Buyer will not, and will cause each of
its Affiliates (including but not limited to the Companies)
not to, misappropriate, misrepresent or otherwise infringe,
abuse or diminish the value of said names.

7.10. No Shopping. Between the date hereof and
the earlier of the Closing Date and the termination of this
Agreement, neither Seller nor any of its Affiliates shall,
directly or indirectly, through any officer, director or
agent or otherwise, in any manner solicit, initiate,
encourage, or participate in any negotiation in respect of
or cooperate with any person making an Acquisition Proposal
(as hereinafter defined). The term "Acquisition Proposal"
means any proposal for a merger with the Companies or for
the acquisition of all or substantially all the assets of
the Companies or the Shares.

7.11. Computer Technology and Other Interim
Services. For a period not to exceed six months following
the Closing, Seller will provide to the Companies such
computer services of the types and of substantially the same
standard of service that Seller has provided prior to the
date hereof, as and to the extent Buyer shall require, at
Seller's cost. Buyer shall only be billed for such services
to the extent Seller's cost for such services exceeds
████████  Buyer shall be responsible for obtaining all
required software licenses that are necessary for Seller to
provide such computer services to the Companies after
Closing. Buyer shall be responsible for all costs
associated with obtaining the software licenses required by
the Companies and for all costs associated with establishing
such computer services separate from Seller's processing
systems to provide for adequate security, efficient
processing, and transfer of historical data as may be
required by Buyer. Nothing herein shall prevent Buyer from
contracting directly with Seller's computer services vendor.
Buyer, Seller and the Companies, shall use reasonable
efforts to minimize data processing costs including costs
associated with the utilization of transitional operational
systems and software packages. Other transitional support
services provided to Buyer and the Companies by Seller after
the Closing will be performed at Buyer's expense but at an
amount equal to Seller's cost.

7.12. Barite Tolling Agreement. For as long as
the Companies operate the Houston Mill lease, or for a
maximum of one year from the Closing, if the operation
continues after such one year period, Buyer shall provide to

ITA-Herford-003455

REDACTED DOCUMENT

Seller reasonable barite toll grinding services at the Houston Mill on negotiated fair market value terms. Buyer shall provide Seller, and a purchaser and subsequent purchaser of Seller's· facilities to the extent of using ·it only with respect to such facility, with a non-assignable perpetual, royalty free license to utilize the Nichols classifier technology.

7.13. _Best Efforts_. Subject to the terms and conditions herein provided, each of Buyer and Seller agree to cooperate and to use their respective best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, obtaining consents under all contracts and agreements, requiring consent to be assigned to Buyer.

7.14. _Covenant Not to Compete_. (a) Subject to Seller's right to engage in the barite business, for a period of five years after the Closing, Seller will not, and will cause each of its Affiliates not to engage in any talc business that directly, or indirectly, competes with the businesses of the Companies, as conducted on the Closing Date; _provided_, _however_, that nothing contained in this Section 7.14(a) shall prohibit Seller or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a talc business.

(b) For a period of five years after the Closing, Buyer will not, and will cause each of its Affiliates not to engage in any barite business that directly, or indirectly, competes with the barite business of Seller, as conducted on the Closing Date; _provided_, _however_, that nothing contained in this Section 7.14(b) shall prohibit Buyer or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a barite business.

(c) After the Closing, Seller will not, and will cause each of its Affiliates not to, utilize the trade secrets to be transferred to Buyer pursuant to this Agreement to engage in any business that directly, or indirectly, competes with the businesses of the Companies, or disclose to any Affiliate or any other person any such trade secrets or, within five .years after the Closing, any other confidential information relating to the Companies or its properties, except that Seller may make disclosures, after consultation with Buyer, as required by law or applicable rules of a stock exchange. It is understood that confidential information does not include information which is or becomes publicly available without Seller's fault.

-44-

ITA-Herford-003456

REDACTED DOCUMENT

(d)   For a period of three years after the Closing Date, Seller will not and will cause each of its Affiliates not to, except with Buyer's prior written consent (which consent shall not be unreasonably withheld), hire or employ, or solicit the hiring or employment of, any employee of the Companies.

(e)   Seller and Buyer agree that, if any provision of this Section 7.14 should be adjudicated to be invalid or unenforceable, such provision shall, to the extent permitted by law, be deemed deleted herefrom with respect, and only with respect, to the operation of such provision in the particular jurisdiction in which such adjudication was made; provided, however, that to the extent any such provision may be made valid and enforceable in such jurisdiction by limitation of the scope of the activities, geographical area or time period covered, Seller and Buyer agree that such provision instead shall be deemed limited to the extent, and only to the extent, necessary to make such provision enforceable to the fullest extent permissible under the laws and public policy applied in such jurisdiction.

7.15   **Nihon Mistron.**   Pursuant to the Agreement of Transfer and Assumption dated June 5, 1992 between Seller and Newco, Seller has agreed to transfer to Newco, its record and beneficial ownership of ▆▆ of the issued and outstanding shares of Nihon Mistron Company.   If Seller is unable to transfer such shares to Newco because the other parties in the joint venture exercise their preemptive right to purchase such shares, the proceeds from such sale shall immediately be delivered to Buyer.

7.16   **Hamm Underground Mine Property.**   The parties have agreed that Seller shall retain title to the Hamm Underground Mine Property and shall be responsible for all costs associated with any required clean up of such property.   Any required clean up shall be performed as soon as reasonably practicable.   At such time as such property is in material compliance with all applicable Environmental Laws, Buyer shall have the option to purchase such property for one dollar in cash.

7.17   **Buyer's Insurance.**   For as long as Seller may be liable to indemnify Buyer pursuant to this Agreement, Buyer agrees to maintain business interruption insurance for the Companies in a manner and amount reasonable for a Company engaged in the same business as the Companies in the same area.

-45-

REDACTED DOCUMENT

ARTICLE 8

CONDITIONS PRECEDENT OF SELLER

The obligation of Seller to consummate the transactions described in Article 2 hereof is subject to the fulfillment of each of the following conditions prior to or at the Closing:

8.1.  Representations and Warranties.  The representations and warranties of Buyer made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date.

8.2.  Agreements.  Buyer shall have performed and complied in all material respects with all its undertakings and agreements required by this Agreement to be performed or complied with by Buyer prior to or at the Closing.

8.3.  Buyer Certificate.  Seller shall have been furnished with certificates of an authorized officer of Buyer, dated the Closing Date, certifying to the effect that the conditions contained in Sections 8.1 and 8.2 have been fulfilled.

8.4.  No Injunction.  No injunction, restraining order or decree of any nature of any court or governmental or regulatory authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

8.5.  Consents.  All material consents, approvals and authorizations of governmental and regulatory authorities, and all material filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable).

-46-

REDACTED DOCUMENT

8.6. **Miscellaneous Closing Deliveries.** Seller shall have received such evidence as Seller may reasonably request in order to establish (i) the power and authority of Buyer to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.

## ARTICLE 9

### CONDITIONS PRECEDENT OF BUYER

The obligation of Buyer to consummate the transactions described in Article 2 hereof is subject to or the fulfillment of each of the following conditions prior to or at the Closing:

9.1. **Representations and Warranties.** The representations and warranties of Seller and Cyprus made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date; provided that Buyer may not invoke this Section 9.1, unless the untruthfulness of the representations and warranties in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business of the Companies as a whole.

9.2. **Agreements.** Seller shall have performed and complied in all material respects with all of its undertakings and agreements required by this Agreement to be performed or complied with by it prior to or at the Closing; provided that Buyer may not invoke this Section 9.2, unless the non-compliance, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.3. **Seller Certificate.** Buyer shall have been furnished with a certificate of an authorized officer of Seller, dated the Closing Date, certifying to the effect that the conditions contained in Sections 9.1 and 9.2 have been fulfilled.

9.4. **No Injunction.** No injunction, restraining order or decree of any court or governmental or regulatory

-47-

ITA-Herford-003459

REDACTED DOCUMENT

authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

9.5.  <u>Consents</u>.  All material consents, approvals and authorizations of governmental and regulatory authorities, and all filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable); provided that Buyer may not invoke this Section 9.5 unless the failure to obtain or effect such consents, approvals and authorizations, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.6.  <u>Miscellaneous Closing Deliveries</u>.  Buyer shall have received such evidence as Buyer may reasonably request in order to establish (i) the power and authority of Seller and Cyprus to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.

9.7  <u>Newco Closing</u>.  The Closing of the transactions contemplated in the Agreement of Transfer and Assumption dates June 5, 1992 between Seller and Newco shall have occurred to Buyer's reasonable satisfaction.

9.8  <u>J&J Non-Termination</u>.  Johnson & Johnson Consumer Products, Inc. ("J&J") shall not have given notice of termination to Cyprus or its Affiliates or to Buyer pursuant to the Talc Supply Agreement by and between Windsor Minerals Inc. and J&J, dated January 6, 1989.

ARTICLE 10

SURVIVAL OF REPRESENTATIONS
AND WARRANTIES

10.1.  <u>Survival of Representations and Warranties</u>.
(a)  Except as specified in Section 10.1(b) hereof, all representations and warranties of Seller

-48-

ITA-Herford-003460

REDACTED DOCUMENT

included or provided for herein or in any schedule or in any certificate or other document delivered pursuant to this Agreement shall survive for a period of one year after the Closing Date and shall thereafter expire except with respect to breaches and violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

(b)  The representations and warranties contained in Sections 5.1, 5.3. 5.4 and 5.13 of this Agreement shall survive the Closing Date until the expiration of the limitation period under the applicable statutes of limitations (or any extensions thereof) and thereafter shall expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.  The representations and warranties contained in Section 5.16 of this Agreement shall survive for a period of thirty (30) months after the Closing and shall thereafter expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

### ARTICLE 11

#### INDEMNIFICATION

11.1.  **Indemnification of Buyer and its Affiliates.**  Subject to Section 11.4, Seller and Cyprus, jointly and severally, agree to defend, indemnify and hold harmless Buyer, its Affiliates and its successors and assigns (individually, a "**Buyer Indemnitee**", and collectively, the "**Buyer Indemnities**") against and in respect of:

(a)  any and all losses, claims, damages, liabilities, costs and expenses ("**Damages**") caused by, resulting or arising from or otherwise relating to (i) any failure by Cyprus or Seller to perform or otherwise fulfill or comply with any provision of this Agreement; (ii) any breach or violation ("**Breach**") of any representation or warranty of Cyprus or Seller hereunder, or (iii) any claim arising out of or relating to the operation of the businesses of any of the Companies or either of the European Companies prior to the Closing as to which Buyer has given written notice to Seller within one year of the Closing Date;

-49-

ITA-Herford-003461

REDACTED DOCUMENT

(b) any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.2. Indemnification of Seller and Its Affiliates. Subject to Section 11.4, Buyer agrees to defend, indemnify and hold harmless Seller and Seller's Affiliates, and their respective successors and assigns (individually, a "Seller Indemnitee", and collectively, the "Seller Indemnities") against and in respect of:

(a) any and all Damages caused by, resulting or arising from or otherwise relating to (i) any failure by Buyer to perform or otherwise fulfill or comply with any provision of this Agreement, or (ii) any Breach of any representation or warranty of Buyer hereunder;

(b) any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.3. (a) Environmental Indemnification. Subject to Section 11.3(c), and except to the extent disclosed in Schedule 11.3 or to the extent Dr. Graham B. Lawson, J. Stevenson, Richard Gaunt or John Paulson has actual knowledge on the date hereof of a matter that would give rise to a valid claim under (ii), (iii) or (iv) below, with respect to any written claim, specifying in reasonable detail to the extent known, made by Buyer within thirty (30) months of the Closing Date, Seller and Cyprus shall jointly and severally indemnify and hold Buyer Indemnitee harmless from and against any and all damages, losses, liabilities, actions, claims, costs and expenses (including, without limitation, removal costs, remediation costs, fines, penalties, expenses of investigation and ongoing monitoring, and reasonable attorney's fees) ("Losses") directly or indirectly based upon, arising out of, resulting from or relating to (i) any action taken by Seller with respect to the Hamm Underground Mine Property or any liability under Environmental Law relating to a present condition at the Hamm Underground Mine Property, (ii) any violation of any Environmental Law by the Companies or their predecessors or any of its employees, representatives, agents or any other person or entity acting on behalf of the Companies prior to the Closing (including, without limitation, any failure to obtain or comply with any permit, license or other approval or authorization under the provisions of any Environmental Law), (iii) any and all liabilities under any Environmental Law arising on or prior to the Closing out of or otherwise in respect of any act, omission, event, condition or

-50-

ITA-Herford-003462

REDACTED DOCUMENT

circumstance occurring or existing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing (including, without limitation, liabilities relating to investigation, removal, remediation, containment, cleanup or abatement of the presence, Release or threatened Release of any Hazardous Substance, whether on-site or off-site) and (iv) any and all expenditures required to be incurred by the Companies (x) to enable them to operate in compliance with all applicable Environmental Laws and (y) to repair and restore all damage to any building, land or property of the Companies arising out of or relating to the removal, remediation, cleanup or abatement of the presence of any Hazardous Substance in violation of any Environmental Law existing on or prior to the Closing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing; provided, however, that Seller shall not have any liability pursuant to this Section 11.3(a) for claims brought by private individuals where there is no violation or liability under any Environmental Law.  The indemnity provided in this Section 11.3 shall be without regard to any purported availability of insurance.

(b)  If any governmental authority (whether federal, foreign, state or local) or if any Environmental Law shall require Buyer or any Company to effect or take any removal, remedial, corrective or similar actions ("Remedial Action"), or if any third party makes any other claim which is to be the basis for a claim for indemnification under Section 11.3 ("Other Environmental Claim"), then Buyer shall prior to taking any Remedial Action or having discussions with or reporting to the governmental authority (except in situations requiring immediate action under the applicable Environmental Law or emergency situations to preserve life or property) give prompt written notice to Seller of the required Remedial Action or the Other Environmental Claim. Seller, at its option, by notice to Buyer given within thirty (30) days of Buyer's notice to Seller of the Remedial Action or Other Environmental Claim (or such shorter periods specified in Buyer's notice if the ordering governmental agency requires that action be taken more promptly than such thirty (30) day notice period would allow, or if Buyer reasonably determines that the existing condition which is the subject of the Remedial Action or Other Environmental Claim requires that action be taken more promptly than such thirty (30) day period would allow) shall (i) assume control of and effect such Remedial Action or defend such Other Environmental Claim at its cost and expense, or (ii) permit Buyer to control and effect such Remedial Action or defend such Other Environmental Claim at Seller's cost and expense. Any and all costs and expenses incurred or paid by Seller or

-51-

ITA-Herford-003483

REDACTED DOCUMENT

by Buyer on Seller's account hereunder shall be considered
within the term Losses and be subject to the limitations set
forth in Section 11.3(c).  Buyer and Seller shall cooperate
with each other and shall have a right to participate in
discussions with applicable government authorities in
effecting any Remedial Action with a view toward promptly
completing any Remedial Action, minimizing the disruptive
effect of any Remedial Action on the conduct of the
businesses of the Companies, avoiding the incurrence of
additional environmental liabilities with respect to the
existing condition as to which the Remedial Action is taken
and performing any Remedial Action at the lowest reasonable
cost.  All Remedial Action performed by Buyer shall be
performed at the lowest reasonable cost, taking into
consideration the matters set forth in the preceding
sentence, and subject to audit by Seller.  Costs in excess
of such lowest reasonable cost shall be for Buyer's account.
Seller may not settle or compromise any claim by any
governmental authorities relating to a Remedial Action or
Other Environmental Claim, without Buyer's prior written
consent (which consent may not be unreasonably withheld).
Buyer may not settle or compromise any claim by any
governmental authorities relating to a Remedial Action or
Other Environmental Claim, without Seller's prior written
consent (which consent may not be unreasonably withheld).
If Seller elects to assume control of a Remedial Action,
Buyer shall provide Seller reasonable access to the relevant
properties to allow Seller to complete such Remedial Action.
Buyer shall, at Seller's expense, provide reasonable access
to the properties of the Companies, to the extent reasonably
required by Seller in order for Seller to take Remedial
Action with respect to the Hamm Underground Mine Property,
provided that such access shall not have any disruptive
effect on the businesses of the Companies or expose the
Companies to any potential material liability.

          (c)  With respect to the operating sites of the
Companies set forth on Schedule 11.3A, Seller's liability
for Losses pursuant to Section 11.3(a) shall not include any
liability for closure costs or reclamation costs, and shall
not in the aggregate exceed an amount equal to the Purchase
Price; provided, however, that no claim for any single item
may be made under this Section 11.3, unless and until the
amount of such claim exceeds ███████ in which case Seller
and Cyprus shall be liable for the whole amount of such
claim.  With respect to the sites of the Companies not set
forth on Schedule 11.3A, Seller's liability for Losses
pursuant to Section 11.3(a) shall include all liabilities
for closure and reclamation costs, and shall not be limited
to any amount; provided, however, that no claim for any
single item may be made under this Section 11.3 unless and
until the amount of such claim exceeds ████████, in which

-52-

REDACTED DOCUMENT

case Seller and Cyprus shall be liable for the whole amount of such claim; _provided_, _further_, _however_, that if the cost of any Remedial Action on such property is clearly shown, by Seller to the reasonable satisfaction of Buyer, to be in excess of its fair market value, Seller shall instead of taking such Remedial Action have the option to reacquire such property from Buyer for one dollar and shall be solely liable for any costs associated with such property.

11.4. **Limitations on Indemnifications.** The provisions for indemnity under Sections 11.1(a)(i),(ii) and (b) and 11.2 shall be effective only when the aggregate amount of all claims for which Seller or Buyer is liable under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, exceeds ████████, in which case such party shall be liable for all such amounts; _provided_, _however_, that in no event shall either Buyer or Seller be liable for more than an amount in the aggregate equal to ████████ for all claims made against it under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively; _provided_, _further_, _however_, that no claim for any single item may be made, nor shall Seller or Buyer be liable, under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, if the amount of such claim is less than ████████ provided, further, however, that no claim may be made for indemnity to the extent the Indemnitee can reasonably, and does actually recover pursuant to an existing business interruption insurance.

11.5. **Claims.** Any claim for indemnity under Section 11.1 or 11.2 hereof shall be made by written notice from the Indemnitee to the Indemnifying Party specifying in reasonable detail the basis of the claim. Except as otherwise provided herein, when an Indemnitee seeking indemnification under Section 11.1 or 11.2 receives notice of any claims made by third parties ("Third Party Claims") which is to be the basis for a claim for indemnification hereunder, the Indemnitee shall give prompt written notice thereof to the Indemnifying Party reasonably indicating (to the extent known) the nature of such claims and the basis thereof. Upon notice from the Indemnitee, the Indemnifying Party may, but shall not be required to, assume the defense of any such Third Party Claims, including its compromise or settlement, and the Indemnifying Party shall pay all reasonable costs and expenses thereof and shall be fully responsible for the outcome thereof; _provided_, _however_, that in such case, the Indemnifying Party shall have no obligation to pay any further costs or expense of legal counsel of the Indemnitee in connection with such defense and, _provided_, _further_, that the Indemnifying Person may not settle or compromise any Third Party Claims without the Indemnitee's prior written consent (which consent shall not be unreasonably withheld).  The Indemnifying Party shall

-53-

REDACTED DOCUMENT

give notice to the Indemnitee as to its intention to assume the defense of any such Third Party Claims within twenty (20) business days after the date of receipt of the Indemnitee's notice in respect of such Third Party Claims. If an Indemnifying Party does not, within twenty (20) business days after the Indemnitee's notice is given, give notice to the Indemnitee of its assumption of the defense of the Third Party Claims, the Indemnifying Party shall be deemed to have waived its rights to control the defense thereof. If the Indemnitee assumes the defense of any Third Party Claims because of the failure of the Indemnifying Party to do so in accordance with this Section 11.4, the Indemnifying Party shall pay all reasonable costs and expenses of such defense and shall be fully responsible for the outcome thereof. The Indemnifying Party shall have no liability with respect to any compromise or settlement thereof effected without its prior written consent (which consent shall not be unreasonably withheld).

11.6. Survival. Notwithstanding anything in this Agreement to the contrary, this Article 11 shall survive termination of this Agreement without limitation.

### ARTICLE 12

#### MISCELLANEOUS

12.1. Further Assurances. From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Buyer as Buyer shall reasonably request in order to vest more effectively in Buyer good title to the Shares or otherwise consummate more effectively the transactions contemplated by this Agreement, and from time to time after the Closing, Buye. will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement.

12.2. Expenses. Each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby. Seller shall pay all expenses, including, without limitation, all taxes, duties and registration fees, incurred by it or the Companies in connection with the restructuring of the talc business of Seller and its

-54-

REDACTED DOCUMENT

Affiliates, including, without limitation, those relating to the creation of Newco.

12.3. <u>Applicable Law</u>. This Agreement shall be governed by, and construed in accordance with, the law of the State of New York without reference to choice of law principles, including all matters of construction, validity and performance.

12.4. <u>Notices</u>. All notices, requests, permissions, waivers, and other communications hereunder shall be in writing and shall be deemed to have been duly given if signed by the respective persons giving them (in the case of any corporation the signature shall be by an officer thereof) and delivered by hand, or by United States mail (registered, return receipt requested), properly addressed and postage prepaid:

If to Seller, to:

Cyprus Mines Corporation
9100 Mineral Circle
P.O. Box 3299
Englewood, Colorado 80155

Attention:  President

with a copy to:

Cyprus Mines Corporation
9100 Mineral Circle
P.O. Box 3299
Englewood, Colorado 80155

Attention:  General Counsel

If to Buyer, to:

RTZ America, Inc.,
150 East 58th Street
New York, New York  10155

Attention: President

with copies to:

Borax Consolidated Limited
Borax House
Carlisle Place
London
SW1P 1HT

-55-

REDACTED DOCUMENT

Attention: Mr. F. Alan S. Lesser

RTZ Corporation PLC
6 St. James's Square
London SW1Y 4LD

Attention: Charles H.H. Lawton Esq.

Sullivan & Cromwell
St Olave's House
9a Ironmonger Lane
London EC2V 8EY

Attention: David M. Kies, Esq.

Such names and addresses may be changed by such notice.

12.5. <u>Entire Agreement</u>. This Agreement
(including the Schedules attached thereto, all of which are
a part hereof) and the Confidentiality Agreement contains
the entire understanding of the parties hereto with respect
to the subject matter contained herein, supersedes and
cancels all prior agreements, negotiations, correspondence,
undertakings and communications of the parties, oral or
written, respecting such subject matter.

12.6. <u>Amendments</u>. This Agreement may be amended
only by a written instrument executed by the parties or
their respective successors or assigns.

12.7. <u>Headings; References</u>. The article, section
and paragraph headings and table of contents contained in
this Agreement are for reference purposes only and shall not
affect in any way the meaning or interpretation of this
Agreement. All references herein to "Articles", "Sections",
or "Schedules" shall be deemed to be references to Articles
or Sections hereof and Schedules hereto unless otherwise
indicated.

12.8. <u>Counterparts</u>. This Agreement may be
executed in one or more counterparts and each counterpart
shall be deemed to be an original.

12.9. <u>Parties in Interest; Assignment</u>. This
Agreement shall inure to the benefit of and be binding upon
Seller and Buyer and their respective successors. Nothing
in this Agreement, express or implied, is intended to confer
upon any Person not a party to this Agreement any rights or
remedies under or by reason of this Agreement. No party to
this Agreement may assign or delegate all or any portion of
its rights, obligations or liabilities under this Agreement
without the prior written consent of the other party to this

-56-

REDACTED DOCUMENT

Agreement; provided, however, that Seller shall have the right to assign or delegate any portion of its rights, obligations or liabilities hereunder to any Affiliate of Seller, so long as Seller and Cyprus shall remain fully liable for the fulfillment of all of its obligations and liabilities hereunder; and provided, further, that Buyer shall have the right to assign or delegate any or all of its rights, obligations or liabilities hereunder to any Affiliate of Buyer, so long as Buyer shall remain fully liable for the fulfillment of all of its obligations hereunder.

12.10.   Severability; Enforcement.   The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.   If it is ever held that any restriction hereunder it too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

12.11.   Jurisdiction.   Buyer, Seller and Cyprus hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, The City of New York, for any actions, suits, or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and Buyer, Seller and Cyprus agree not to commence any action, suit or proceeding relating thereto except in such courts), and further agree that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process of any action, suit or proceeding brought against it in any such court.   Buyer, Seller and Cyprus hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such state or federal courts as aforesaid and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

12.12.   Waiver.   Any of the conditions to Closing set forth in this Agreement may be waived at any time prior to or at the Closing hereunder by the party entitled to the benefit thereof.   The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be waiver of any such provision, nor in any way to affect the validity of this Agreement or any

-57-

ITA-Herford-003469

REDACTED DOCUMENT

part hereof or the right of such party thereafter to enforce each and every such provisions. No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach of non-compliance.

12.13. <u>Interest</u>. If any party to this Agreement defaults in the payment when due of any sum payable under this Agreement (whether determined by agreement or pursuant to an order of a court or otherwise), the liability of such party shall be increased to include interest on such sum from the date when such payment shall be due until the date of actual payment at a rate per annum (but not in excess of the maximum lawful rate) of three percent above the rate for three-month deposits in the London interbank market in the currency of payment, as announced by Citibank N.A. as of 11:00 A.M., London time, on the date when such payment shall be due.

-58-

ITA-Herford-003470

REDACTED DOCUMENT

IN WITNESS WHEREOF, the parties hereto have duly
executed this Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By _____
Name:
Title: SENIOR VICE PRESIDENT

CYPRUS MINERALS COMPANY

By _____
Name:
Title: SENIOR VICE PRESIDENT
AND CHIEF FINANCIAL OFFICER

RTZ AMERICA INC.

By _____
Name: Arthur L Glass
Title: President

-59-

REDACTED DOCUMENT

AMENDMENT TO

STOCK PURCHASE AGREEMENT

AMONG

CYPRUS MINES CORPORATION

CYPRUS MINERALS COMPANY

and

RTZ AMERICA INC.

Dated as of June 24, 1992

ITA-Herford-003472

REDACTED DOCUMENT

AMENDMENT DATED AS OF JUNE 24, 1992, TO STOCK PURCHASE AGREEMENT DATED JUNE 5, 1992, by and among Cyprus Mines Corporation, a Delaware corporation ("Seller"), Cyprus Minerals Company, a Delaware corporation ("Cyprus") and RTZ America Inc., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, on June 5, 1992 the parties entered into a Stock Purchase Agreement ("Agreement");

WHEREAS, the parties desire to make certain conforming changes to the Agreement to confirm the intent of the parties;

NOW, THEREFORE, in consideration of the mutual agreements contained herein and in the Agreement, Buyer, Seller and Cyprus hereby agree as follows:

1.    The Agreement is hereby amended to insert and delete specified words and phrases as follows:

a.   On page 7, Section 3.1, at the end of the section insert "The Closing shall be effective as of the close of business on the Closing Date.";

b.   On page 8, Section 3.3(c), line 1, insert "or Cyprus" after "Seller";

c.   On page 8, Section 3.3(c), line 9, insert "or Cyprus" after "Seller";

d.   On page 26, Section 5.28, line 2, insert "or Cyprus" after "Seller";

e.   On page 48, Section 10.1(a), line 2, insert "and Cyprus" after "Seller";

f.   On page 49, Section 11.1(a), line 8, insert "third party" after "any";

g.   On page 49, Section 11.1(a), line 12, insert "excluding, however, any such third party claim (x) for which a Buyer Indemnitee would be entitled to indemnification pursuant to Sections 11.1(a)(i), (ii) or (b), in each case disregarding the limitations set forth in Section 11.4, (y) regarding any environmental matter covered in Section 11.3, disregarding the limitations set forth in Section 11.3, or (z) for which Buyer is responsible under Section 7.4" after "Date";

- 1 -

ITA-Herford-003473

REDACTED DOCUMENT

h.   On page 51, Section 11.3(a), line 6 from end of paragraph,
     insert "neither Cyprus nor" prior to "Seller" and delete
     "not" prior to "have";

i.   On page 54, Section 11.6, line 3, insert "as to time" after
     "limitation";

j.   On page 55, Section 12.4, line 9, insert "or Cyprus" after
     "Seller"; and

k.   On page 56, Section 12.9, line 3, insert ", Cyprus" after
     "Seller".

     2.   Section 11.3(c) of the Agreement is hereby amended
to delete the existing Section 11.3(c) and insert in lieu thereof
the following:

     "   11.3.   (c)  With respect to the operating sites of
     the Companies set forth on Schedule 11.3A, Seller and
     Cyprus' liability for Losses pursuant to Section
     11.3(a) shall not include any liability for closure
     costs or reclamation costs, and collectively shall not
     in the aggregate exceed an amount equal to the Purchase
     Price; provided, however, that no claim for any single
     item may be made under this Section 11.3, unless and
     until the amount of such claim exceeds ███████ in
     which case Seller and Cyprus shall be liable for the
     whole amount of such claim subject to the aggregate
     limit stated above.  With respect to the sites of the
     Companies not set forth on Schedule 11.3A, Seller and
     Cyprus' liability for Losses pursuant to Section
     11.3(a) shall include all liabilities for closure and
     reclamation costs, and shall not be limited to any
     amount; provided, however, that no claim for any single
     item may be made under this Section 11.3 unless and
     until the amount of such claim exceeds ███████, in
     which case Seller and Cyprus shall be liable for the
     whole amount of such claim; provided, further, however,
     that if the cost of any Remedial Action on such
     property is clearly shown, by Seller or Cyprus to the
     reasonable satisfaction of Buyer, to be in excess of
     its fair market value, Seller or Cyprus shall instead
     of taking such Remedial Action have the option to
     reacquire such property from Buyer for one dollar and
     shall be solely liable for any costs associated with
     such property."

     3.   Section 11.4 of the Agreement is hereby amended to
delete the existing Section 11.4 and insert in lieu thereof the
following:

     "   11.4.   Limitations on Indemnifications.  The
     provisions for indemnity under Sections 11.1(a)(i),

- 2 -

REDACTED DOCUMENT

(ii) and (b) and 11.2 shall be effective only when the aggregate amount of all claims for which Seller and Cyprus, on the one hand, or Buyer, on the other hand, is liable under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, exceeds ████████, in which case such Indemnifying Party or Parties shall be liable for all such amounts; provided, however, that in no event shall either Buyer, on the one hand, or Seller and Cyprus collectively, on the other hand, be liable for more than an amount in the aggregate equal to ██████████ for all claims made against it or them under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively; provided, further, however, that no claim for any single item may be made, nor shall Seller and Cyprus, on the one hand, nor Buyer, on the other hand, be liable, under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, if the amount of such claim is less than ██████ provided, further, however, that no claim may be made for indemnity to the extent the Indemnitee can reasonably, and does actually recover pursuant to an existing business interruption insurance. Notwithstanding other provisions of this Section 11.4, the limitations set forth in this Section 11.4 do not apply to any claims by Buyer Indemnitees against Seller or Cyprus for any liabilities or obligations (including costs and expenses associated therewith) arising out of any litigation or claims listed on Schedule 5.9."

4.   Typographical errors in the Agreement are hereby corrected by amendment as follows:

a.   On page 7, Section 3.1, line 5, "7 and 8" is corrected to read "8 and 9";

b.   On page 7, Section 3.1, line 8, "7 and 8" is corrected to read "8 and 9";

c.   On page 7, Section 3.1, line 9, "Section 7.6 and 8.6" is corrected to read "Sections 8.6 and 9.6";

d.   On page 9, Section 3.4, line 6, "(e)" is corrected to read "(d)";

e.   On page 15, lines 4-5, "Material Adverse Effect" is corrected to read "material adverse effect";

f.   On page 34, Subsection (iv), line 5, "Afl-CIO" is corrected to read "AFL-CIO";

g.   On page 35, Subsection (f), line 16, "Sellers" is corrected to read "Seller";

- 3 -

REDACTED DOCUMENT

h.  On page 35, Subsection (h), line 6, "6.4" is corrected to read "7.4";

i.  On page 35, Subsection (h), line 7, "Indemnities" is corrected to read "Indemnitees";

j.  On page 35, Subsection (h), line 10, "6.4" is corrected to read "7.4";

k.  On page 35, Subsection (h), line 11, "6.4" is corrected to read "7.4";

l.  On page 36, line 1, "Indemnities" is corrected to read "Indemnitees";

m.  On page 37, Section 7.5(B)(iv), line 3, "treated or" is corrected to read "treated as";

n.  On page 48, Section 9.7; line 3, "dates" is corrected to read "dated";

o.  On page 49, Section 11.1, line 6, "Indemnities" is corrected to read "Indemnitees";

p.  On page 50, Section 11.2, line 6, "Indemnities" is corrected to read "Indemnitees";

q.  On page 54, line 12, "11.4" is corrected to read "11.5"; and

r.  On page 58, line 4, "breach of" is corrected to read "breach or".

5.  The parties hereby recognize, acknowledge and agree to the execution of a conforming amendment of even date to the Agreement of Transfer and Assumption dated June 5, 1992 between Seller and Newco.

- 4 -

REDACTED DOCUMENT

6.    This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment to the Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By: _____
     Name: P. C. Wolf
     Title: President

CYPRUS MINERALS CORPORATION

By: _____
     Name: G. J. Malys
     Title: Senior Vice President

RTZ AMERICA INC.

By: _____
     Name:
     Title:

- 5 -

ITA-Herford-003477

REDACTED DOCUMENT

6. This Amendment may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment to the Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By:_____
        Name:
        Title:

CYPRUS MINERALS CORPORATION

By:_____
        Name:
        Title:

RTZ AMERICA INC.

By: _Arthur L Glass_____
        Name: Arthur L Glass
        Title: President

- 5 -

Exhibit 204

IN THE COURT OF COMMON PLEAS

SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| PAUL ANDONIAN, et al., | : | CASE NO. ACV 88-6-1731 |
| Plaintiff, | : | JUDGE VICTOR |
| vs. | : | |
| A.C. & S., INC., et al. | : | **AFFIDAVIT** |
| Defendants. | : | |

ROGER N. MILLER, being duly sworn, according to law, upon his oath, deposes and says:

1. I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

2. The exclusive business of Windsor Minerals, Inc. is and has been the mining and milling of talc from a single mining district in Windsor, Vermont. In addition, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users for manufacturing purposes. Windsor Minerals, Inc. never sold any of its product to distributors or agents for resale.

**EXHIBIT**
**J&J-282**

JNJ-WIL_00000094

3.    Windsor Minerals, Inc. has never sold any of its product to the General Tire and Rubber Company in Akron, Ohio, or any other tire manufacturing facility or rubber company.

4.    All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos.   No evidence of the presence of asbestos in Windsor Mineral, Inc.'s product has ever been revealed by this testing.

Rogu N Miller
ROGER N. MILLER

Sworn to and subscribed
before me this $\underline{8 \text{th}}$
day of July, 1988.

Jurenaric Bucimeer
Notary Public

JNJ-WIL_00000095

Exhibit 205

# CAHILL GORDON & REINDEL

## EIGHTY PINE STREET

### NEW YORK, N.Y. 10005

FLOYD ABRAMS
ROBERT A. ALESSI
ROGER ANDRUS
MICHAEL A. BECKER
SUSAN BUCKLEY
KEVIN J. BURKE
P. KEVIN CASTEL
JAMES J. CLARK
WALTER C. CLIFF, P.C.
BENJAMIN J. COHEN
JOSEPH P. CONWAY
MARSHALL COX
THOMAS F. CURNIN
W. LESLIE DUFFY
PATRICIA FARREN
BART FRIEDMAN
CIRO A. GAMBONI
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
THOMAS R. JONES
ALLEN S. JOSLYN
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
'MANUEL KOHN
WARD P. KRUGMAN
ILLIAM T. LIFLAND
MICHAEL MACRIS
JONATHAN I. MARK

RAND McQUINN*
GERARD M. MEISTRELL
ROGER MELTZER
CLIFFORD L. MICHEL
JOHN P. MITCHELL
MATHIAS E. MONE
DONALD J. MULVIHILL
KENNETH W. ORCE
ROY L. REGOZIN
RICHARD L. REINHOLD
DEAN RINGEL
THORN ROSENTHAL
RICHARD J. SABELLA
H. RICHARD SCHUMACHER
JOHN SCHUSTER
LAURENCE A. SILVERMAN
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
GERALD S. TANENBAUM
JONATHAN D. THIER
MICHAEL P. TIERNEY
ROBERT USADI
JOHN R. VAUGHAN
GEORGE WAILAND
GLENN J. WALDRIP, JR.
GARY W. WOLF
JOHN R. YOUNG
DANIEL J. ZUBKOFF

DAVID R. HYDE
DENIS McINERNEY, P.C.
IRWIN SCHNEIDERMAN
RALPH O. WINGER
SENIOR COUNSEL

CORYDON B. DUNHAM
SAMUEL ESTREICHER
PHILIP A. HEIMOWITZ
MICHAEL S. SACKHEIM
JEFFREY E. SHAPIRO
JOHN J. STANTON, JR.
COUNSEL

FREDDY DRESSEN**
EUROPEAN COUNSEL

WASHINGTON, D.C. OFFICE
1990 K STREET, N.W.
WASHINGTON, D.C. 20006

EUROPEAN OFFICE
19 RUE FRANÇOIS I™
75008 PARIS, FRANCE

TELEX / CABLE
RCA 232184  WUT 127068
CAGO UR   COTTOFRANK NYK
FACSIMILE 212-269-5420

*ADMITTED D.C. ONLY
**ADMITTED FRANCE ONLY

TELEPHONE 212-701-3000

WRITER'S DIRECT NUMBER

(212) 701-3321

August 4, 1992

Re:   <u>Akron Tireworker Litigation</u>

Dear Russ and Brian:

        We recently learned that your firm voluntarily dis-
missed Windsor Minerals, Inc. from the Akron cases some time ago
after reviewing an affidavit supplied by Windsor.  Our client,
Eastern Magnesia Talc, bought precisely the same mining opera-
tions from Windsor in 1967 and operated them until 1983.  The
Windsor affidavit attests to the fact that "all of the talc
mined by Windsor Minerals, Inc. has been regularly sampled and
tested for the presence of asbestos.  No evidence of the pres-
ence of asbestos in Windsor Minerals, Inc.'s product has ever
been revealed by this testing".  (Copies of the affidavit and
dismissal stipulations are enclosed).

        In light of your dismissal of the predecessor owner
and operator of these mining operations, Windsor, we urge you to
voluntarily dismiss EMTal from the remaining Akron cases on the
same basis.  As I have indicated to you in the past, similar

BASF_WILLIAMS000105111

CAHILL GORDON & REINDEL

-2-

orders have been signed by plaintiffs' counsel in numerous
jurisdictions around the country after concluding that there was
no asbestos in the EMTal product.

Very truly yours,

Howard G. Sloane

A. Russell Smith, Esq.
Brian R. Nace, Esq.
Laybourne, Smith, Gore
    & Goldsmith
503 Society Building
159 South Main Street
Akron, Ohio 44308-1317

BASF_WILLIAMS000105112

IN THE COURT OF COMMON PLEAS

SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| FAYE MILLER, Individually and as Administratrix of the Estate of ROBERT R. MILLER, Deceased, 3026 Lake James Terrace, Akron, Ohio 44312 | : | CASE NO. ACV884-1087 |
| | : | JUDGE CARROLL |
| | : | |
| Plaintiff, | : | |
| vs. | : | AFFIDAVIT |
| A.C. & S., INC., et al. | : | |
| Defendants. | : | |

ROGER N. MILLER, being duly sworn, according to law, upon his oath, deposes and says:

1.   I am the President of Windsor Minerals, Inc. and have held that position since 1968 when Windsor Minerals, Inc. was first formed.

2.   The exclusive business of Windsor Minerals, Inc. is and has been the mining and milling of talc from a single mining district in Windsor, Vermont. In addition, Windsor Minerals, Inc. also sells a portion of its product to independent industrial users for manufacturing purposes. Windsor Minerals, Inc. never sold any of its product to distributors or agents for resale.

BASF_WILLIAMS000105113

3.  : Windsor Minerals, Inc. has never sold any of its product to the General Tire and Rubber Company in Akron, Ohio, or any other tire manufacturing facility or rubber company.

4.   All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. No evidence of the presence of asbestos in Windsor Mineral, Inc.'s product has ever been revealed by this testing.

ROGER N. MILLER

Sworn to and subscribed
before me this ____
day of July, 1988.

Notary Public

BASF_WILLIAMS000105114

# Exhibit 206

<u>AFFIDAVIT</u>

STATE OF NEW JERSEY)
: **ss.:**
COUNTY OF SOMERSET )

WILLIAM H. ASHTON, being duly sworn, deposes and says:

1. For thirty-five years, I was actively involved in investigating and studying the domestic and international talc industry and talc technology while employed by Johnson & Johnson. In the course of this work, I examined talc deposits in the United States and throughout the world. I graduated from the University of Pennsylvania in 1940 with a Bachelor of Science degree. My major field of study was chemistry; my minor fields of study were geology and mineralogy. I did graduate work at Louisiana State University and also received training in talc minerals at the Battelle Memorial Institute in Columbus, Ohio, which included consultations with the Geology Department of Ohio State University. I have been retired since 1984, but have remained an active member of various talc and mineral committees of the American Society for Testing and Materials and the International Standards Organization.

-2-

2.    From the 1940s through the 1980s, talc mined in Vermont and specifically, the talc mined by Engelhard Corporation (and its predecessors) from the talc mine located in Johnson, Vermont (the "Johnson mine") has been considered to be talc free from contamination by asbestos.  This conclusion is the result of numerous investigations, examinations and studies of the Johnson mine.  The following paragraphs discuss, in chronological order, these studies and investigations.

3.    In 1949, Warren L. Hogue, Jr. and Frederick S. Mallette published a scientific paper entitled "A Study of Workers Exposed to Talc and Other Dusting Compounds in the Rubber Industry" (a copy of which is annexed hereto as Exhibit A). The authors studied workers in two rubber plants who had been exposed to talc and other dusting compounds for periods as long as 36 years.  The authors noted that "[t]he dusting compound used in the tube operations and in rerolling liners is a pure talc from a deposit near Johnson, Vermont, and contains no free silica, tremolite, chrysolite, chrysotile, or actinolite." (Exhibit A at 360)  The authors identified the talc discussed in their study as being produced by Eastern Magnesia Talc Company (Exhibit A at 363-64), a predecessor of the Engelhard

-3-

subsidiary of the same name which produced talc from the Johnson mine.[1]

4.    In March 1951, the U.S. Geological Survey published a report written by Dr. Alfred H. Chidester (and two co-authors), entitled "Talc Investigation in Vermont, Preliminary Report" (relevant portions of which are annexed hereto as Exhibit B).  Dr. Chidester was employed for 39 years by the U.S. Geological Survey, a unit of the U.S. Department of the Interior.  For a period of about 18 years, from 1944 through 1962, he was primarily concerned with the talc deposits of Vermont and northern Massachusetts.  (From 1963 to 1971, while still employed by the Geological Survey, he was primarily involved with the United States lunar exploration program and training astronauts in field geology.)  Dr. Chidester has an extremely prestigious reputation for his studies of the geology of talc deposits in the United States.  In this 1951 report, Dr. Chidester stated:

---

[1]    The Hogue and Mallette study concluded that "[p]hysical examinations and chest roentgenograms of a group of 20 men exposed to talc dust (hydrous magnesium silicate) for periods ranging from 10 to 36 years in rubber inner tube production were normal for men of their age group and urban industrial environment" and "[t]he findings of the present study indicate that long exposure to talc does not appear to produce pathologic changes in the lungs." (Exhibit A at 364)

-4-

> "All the commercial talc deposits in Vermont are associated with the verde antique type of ultra-mafic body, whereas none is known to occur in ultramafic bodies that are only partly serpentin-ized.  On the other hand, cross-fiber asbestos appears to occur in appreciable quantities only in ultramafic bodies that contain unaltered dunite or peridolite, and is extremely rare or absent in the verde antique type." (Exhibit B at 4)

Stating this another way, Dr. Chidester wrote:  "no commercial talc deposits are known to be associated" with a certain type of rock formation in Vermont which "commonly contains more or less chrysotile asbestos. . . ." (Exhibit B at 1)

        5.    In a 1962 Geological Survey Professional Paper, entitled "Petrology and Geochemistry of Selected Talc-Bearing Ultramafic Rocks and Adjacent Country Rocks in North-Central Vermont" (relevant portions of which are annexed hereto as Exhibit C), Dr. Chidester analyzed talc samples from a number of different mines in Vermont.  He used the Johnson mine as a standard for the chemical analysis of pure talc.  He noted that a sample "from the Johnson talc mine, Johnson, Vt., is included because specimens for chemical analysis of the pure mineral were not obtainable from the Mad River and Barnes Hill locali-ties, and the specimen from the Johnson mine represents talc from the steatite zone of a purity not obtainable at the other deposits." (Exhibit C at 79)

-5-

6.    A scientific paper by Maryanne G. Boundy, Karen Gold, Kenneth P. Martin, Jr., William A. Burgess and John M. Dement, entitled "Occupational Exposures to Non-Asbestiform Talc in Vermont" (a copy of which is annexed hereto as Exhibit D) reported on an environmental study of three Vermont talc companies, including Eastern Magnesia Talc and its Johnson mine, during the summer of 1975 and the winter of 1976.  This study, under the auspices of the Department of Environmental Health Sciences, Harvard School of Public Health, Boston, Massachusetts, tested bulk samples of ore dust for their mineral constituents.  The purpose of this study, as stated in the introduction to the paper, was to verify "geological studies dating from the early 1900's [that] have shown that the Vermont talc deposits contain no asbestos and little quartz. . . ." (Exhibit D at 1)  In reporting the results of the study, the paper stated that "petrographic microscopy analysis, analytical transmission electron microscopy, and x-ray diffraction with step-scanning revealed no asbestos in the bulk samples" from the three Vermont talc companies.  (Exhibit D at 377)

7.    In September and October 1982, an independent testing laboratory, EMV Associates, then located in Rockville, Maryland, analyzed two talc samples taken from the Johnson mine by two different investigators in the 1961 time frame.  (One

-6-

sample had been taken by Dr. Chidester during the research incorporated in his 1962 Geological Survey Paper; I took the other sample during a May, 1961 visit to the Johnson mine.) These samples had not been modified or adulterated in any way prior to their 1982 analysis. (Dr. Chidester's talc sample had been maintained by the National Museum of Natural History, Smithsonian Institute in Washington, D.C.) The reports of the analysis of these two samples, dated September 24, 1982 and October 18, 1982 (copies of which are annexed hereto as Exhibits E and F), stated that no asbestos was detected and "prismatic and blocky forms of tremolite were not detected." The reports indicated that the talc samples were examined for freedom from asbestos by "scanning electron microscopy and energy dispersive spectroscopy (SEM/EDS)" and were examined at various magnifications from 1000x to 10,000x. Each of the reports includes a "Certificate of Microanalysis for Asbestos" which contains a Sample Description, Method of Analysis and "Results: No asbestos detected." The results of this analysis were confirmed by a subsequent analysis performed on these samples by Professor F.W. Pooley of the University of Cardiff in Wales, England. Prof. Pooley is one of the foremost authorities in the world in the identification of asbestos and other hazardous minerals in the respiratory tracts of individuals.

-7-

In a December 22, 1982 report, Prof. Pooley noted that the samples were examined by x-ray diffraction analysis and by an analytical transmission electron microscope.  The conclusion of these examinations was that no fibrous mineral particles were detected in the samples.

       8.   In sworn testimony in 1983 (relevant portions of which are annexed as Exhibit G), Dr. Chidester stated that he had never found veins of chrysotile asbestos in talc located in Vermont.  He noted that chrysotile was a serpentine mineral found in serpentinite rock, but that, in the formation of talc in Vermont, all of the serpentine minerals are changed to talc. "So any asbestos that may have been there in the first place is altered to talc." (Exhibit G at 24)  Thus, in Vermont, talc and serpentinite are mutually exclusive.  Dr. Chidester testified that he had personally been at the talc mine in Johnson, Vermont and, based on his personal observations and testing, all of the serpentinite at the Johnson mine had been changed to talc and magnesite.  He never observed any asbestos at the

-8-

Johnson mine and never saw any asbestos in any of the samples that he took from the Johnson mine and subjected to microscopic analysis.

William H. Ashton
_____
WILLIAM H. ASHTON

Sworn to before me this
8th day of May, 1989

_____
Notary Public

MARGARET M. NAGY
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES AUG. 18, 1991

**EXHIBIT A**

PLT-04771-0010

# A STUDY OF WORKERS EXPOSED TO TALC AND OTHER DUSTING COMPOUNDS IN THE RUBBER INDUSTRY*

WARREN L. HOGUE, JR. AND FREDERICK S. MALLETTE

*Firestone Tire and Rubber Company, Akron, Ohio*

TALC and similar minerals are widely used in industry. In the Mineral Yearbook Johnston and Barsigian (1) report that in 1946 over 450,000 short tons of domestically produced talc, pyrophyllite, and ground soapstone were consumed, of which 77 per cent was utilized in five industries—paint, rubber, roofing, ceramics, and insecticides. The paint industry alone used 23 per cent of the total.

## CHEMICAL COMPOSITION

One should note that the above-mentioned report groups talc with materials of like commercial applications rather than with those of mineralogical or chemical similarity. Actually talc is a hydrous magnesium silicate with the formula $Mg_3Si_4O_{10}(OH)_2$. Other minerals which have similar uses are: pyrophyllite, a hydrous calcium magnesium silicate, $Ca_2Mg_5Si_8(OH)_2$; serpentine, a hydrous magnesium silicate, $Mg_3Si_2O_7(OH)_2$; and dolomite, a calcium magnesium carbonate, $CaMg(CO_3)_2$. Tremolite, frequently found in nature with talc, has a fibrous variety which is used to some extent as asbestos (2). Soapstone is the granular to cryptocrystalline form of talc.

Apparently the physical characteristics of all these materials are so much alike that they may be used in almost identical applications and therefore are designated commercially as *talc*. Schulz and Williams (3) pointed out that "talc as used industrially generally refers to a substance which meets certain physical requirements rather than one which has a definite chemical composition." In an examination of 71 analyzed samples they found extreme variation in composition.

## PHYSIOLOGICAL EFFECTS

In general, most silicates of this kind were considered harmless until 1933 when Dreesen (4) studied conditions in tremolite mines and mills. He found dust exposures averaging as high as

* Presented at the Annual Meeting of the American Industrial Hygiene Association, Detroit, Michigan, April 5–8, 1949.

1,440 million particles per cubic foot in pneumatic drilling operations and as low as 4 million outside the mill proper. He reported that "in only three cases (5%) were the X-ray findings within the limits of normal; 38 (67%) showed evidence of an early or first-stage pneumoconiosis." Only one case—that of an individual who had been in the tremolite mills for over 40 years—had fibrosis advanced beyond the first stage. Dreesen concluded that the resulting pneumoconiosis was not disabling.

In 1935 Dreesen and Dalla Valle (5) reported dust concentrations varying from 32 to 1,672 million particles per cubic foot in two Georgia mills. Among 66 workers examined, they found 8 having advanced pneumoconiosis with disability and 14 having roentgenographically demonstrated slight pneumoconiosis without disability. The dust was found, by analysis, to consist chiefly of soapstone, but it also contained 10 per cent tremolite. The authors stated that the dust of the Georgia mills appeared to be more injurious than that reported by Dreesen (4). However, the study made in Georgia showed much higher concentrations of the dust. Furthermore, quite a few of the miners had worked in hard rock, although only 6 out of 13 showed pneumoconiosis stage I.

Eason, Trice, and Carpenter (6) reported pulmonary fibrosis among miners and millers of pyrophyllite, characterized roentgenographically by massive tumor-like shadows bilaterally situated in the subapical region or by granular densities distributed throughout the lungs. Of 101 workers, 35 per cent of those with two or more years of exposure showed evidence of pathologic changes in the lungs. The pyrophyllite dust contained from 25 to 35 per cent quartz.

Porro, Patton, and Hobbs (7) found 15 cases of pneumoconiosis in two tremolite mines and mills in New York State. According to them, the composition and concentrations of the dust were the same as those reported by Dreesen (4), who had previously surveyed one of the plants. Nondisabling pulmonary fibrosis was found in almost

PLT-04771-0011

360                    JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY                    [vol. 31, no. 6

all of the workers examined. Of the 15 patients, 7 were known to have worked in other types of mining operations. Dyspnea was an almost universal complaint, and several patients had cyanosis and club fingers. In all of those tested with a spirometer, vital capacity was very low (35–52 per cent). In the 5 postmortem examinations asbestosis bodies were a fairly frequent finding in lesions of the lungs. This may not be puzzling when it is recalled that tremolite is characteristically fibrous.

Further studies in tremolite mines and mills of northern New York by Siegal, Smith, and Greenburg (8) disclosed 32 cases of advanced fibrosis in a group of 221. Dust counts in the mines varied from 6 to 5,000 million particles per cubic foot in milling. The talc was of the asbestine variety and was mingled with tremolite and anthophyllite. The fibrosis tended to be disabling and was frequently accompanied by dyspnea, cough, and fatigue.

Prompted by these reports and by proposals for the inclusion of a limit for talc among dust hazards in certain state codes (9, 10, 11) we made a study in two rubber plants where workers had been exposed to talc and other dusting compounds for periods as long as 36 years. Talc dusting experiments were made on laboratory animals, the results of which will be reported in a separate communication.

### DUSTING RUBBER

As rubber is naturally tacky, it must be coated with a lubricant to keep it from sticking together. Many materials are used, both in the wet and the dry state, for this purpose. Among them are talc, pyrophyllite, mica, clay, walnut shell dust, corn starch, whiting, et cetera. Operations employing these materials in the dry state tend to be very dusty. In recent years control ventilation has reduced the concentrations of the dusts, but there are still operations, especially of an intermittent or temporary nature, which it is difficult or impractical to control. In these operations dust respirators must be relied upon for protection.

For the past six years periodic dust surveys have been made of several processes in the manufacture of inner tubes and in the reclaiming of rubber. The occupations in which talc was the only dust to which workers were exposed were those of tuber operators, tube bookers, tube cure men, and liner rerolling. Those jobs in which the major exposure was to whiting and the minor to

talc (in the past, to pyrophyllite) were those of refiner operators, strainer operators, mill men, truckers, slab checkers, and shipping laborers. The results of the surveys have been averaged for the period 1943 to 1948 and are presented together with the number of years of total exposure of the various occupations, in tables 1 and 2. It must be emphasized that before the installation of control ventilation the dust concentrations were probably much higher.

### TABLE 1

AVERAGE DUST CONCENTRATION AND PERIOD OF EXPOSURE FOR WORKERS IN TALC

| WORKERS EXPOSED | YEARS OF EXPOSURE | MILLIONS OF PARTICLES/CU. FT. |
|---|---|---|
| 6 tube machine operators....... | 20–34 | 20 |
| 3 tube bookers................. | 32–36 | 35 |
| 10 tube cure men............... | 10–34 | 15 |
| 1 liner reroller................ | 14 | 50 |

### TABLE 2

AVERAGE DUST CONCENTRATION AND PERIOD OF EXPOSURE FOR WORKERS IN WHITING, PYROPHYLLITE, AND TALC

| WORKERS EXPOSED | YEARS OF EXPOSURE | MILLIONS OF PARTICLES/CU. FT. |
|---|---|---|
| 13 refiner operators............. | 13–25 | 50 |
| 3 strainer operators............. | 15–25 | 75 |
| 1 mill man..................... | 24 | 50 |
| 1 trucker...................... | 20 | 30 |
| 1 slab checker.................. | 23 | 50 |
| 1 shipping laborer.............. | 24 | 150 |

### DUST COMPOSITION

The dusting compound used in the tube operations and in rerolling liners is a pure talc from a deposit near Johnson, Vermont, and contains no free silica, tremolite, chrysolite, chrysotile, or actinolite. It has the following composition:

*Talc Analysis*

| | |
|---|---|
| Silicon dioxide................. | 34.86% |
| Ferrous oxide.................. | 6.30 |
| Aluminum oxide............... | 1.22 |
| Manganese oxide.............. | 0.09 |
| Sodium oxide.................. | 0.53 |
| Potassium oxide............... | Trace |
| Combined water................ | 6.17 |
| Carbon dioxide................ | 13.10 |

PLT-04771-0012

Case 3:16-md-02738-MAS-RLS  Document 26642-5  Filed 08/14/23  Page 285 of 399 PageID: 162013

Whiting (calcium carbonate) is the principal compound for dusting reclaimed rubber. Until about six years ago pyrophyllite containing 65 per cent free silica was used for certain stocks, but since that time talc has been used for these special applications, but the use of both compounds amounted to only about 10 per cent of production.

## CLINICAL INVESTIGATION

The two groups of workers included in this study were specially selected for type and length of exposure. Only those with the longest and heaviest exposures were included. Complete physical

posed of 20 men who had been exposed to talc alone for periods ranging from 10 to 30 years. All of the men were working at the time of the study and were in apparent good health. None of them presented any symptoms referable to the lungs, such as dyspnea, cough, or shortness of breath. None had clubbing of the fingers or cyanosis. Only one member of this group had subnormal (71 per cent) vital capacity. This finding can perhaps be explained by the presence of an enlarged heart, as determined by the Hodges-Eyster formula.

In this group the roentgenographic findings were either completely normal or showed only

## TABLE 3

PHYSICAL EXAMINATION, VITAL CAPACITY DETERMINATIONS AND CHEST ROENTGENOGRAMS ON WORKERS EXPOSED TO TALC

| WORKER | AGE | YEARS OF EXPOSURE | MICRONS OF PARTICLE SIZE IN CU. FT. | BLOOD PRESSURE | VITAL CAPACITY | HEART | CHEST ROENT- GENOGRAMS | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 117R | 62 | 25 | 20 | 144/92 | 86% | | Negative | |
| 118R | 62 | 30 | 35 | 152/80 | 105% | | " | |
| 119R | 53 | 24 | 20 | 112/68 | 119% | +10 | " | Coal miner—10 years |
| 126R | 49 | 31 | 35 | 132/78 | 122% | . | " | |
| 90R | 53 | 25 | 20 | 142/82 | 71% | +17 | " | |
| 251R | 50 | 30 | 15 | 142/80 | 112% | | " | |
| 196R | 53 | 20 | 20 | 160/90 | 94% | Normal | " | |
| 167R | 62 | 36 | 35 | 120/80 | 95% | .. | " | Coal miner—11 years |
| 187R | 49 | 30 | 15 | 140/70 | 94% | | " | |
| 205R | 49 | 32 | 15 | 180/80 | 118% | | " | |
| 196R | 49 | 25 | 15 | 124/80 | 107% | | " | |
| 246R | 51 | 10 | 15 | 110/70 | 121% | | " | |
| 209R | 47 | 32 | 15 | 95/65 | 86% | | " | |
| 207R | 52 | 31 | 15 | 112/80 | 102% | Normal | " | |
| 17R | 58 | 27 | 15 | 140/95 | 118% | | " | |
| 287R | 50 | 24 | 20 | 138/78 | 116% | Normal | " | Coal miner—15 years |
| 206R | 57 | 34 | 20 | 194/94 | 89% | | " | |
| 200R | 43 | 14 | 50 | 103/71 | 105% | | " | |
| 202R | 51 | 19 | 15 | 110/65 | 93% | | " | |
| 286R | 39 | 18 | 15 | 120/55 | 114% | | " | |

examinations, including blood counts, urinalysis, blood pressure readings, and vital capacity determinations, were made. For the latter tests the Scott-McKesson apparatus was employed, and readings below 85 per cent were considered indicative of disease of the heart or the lungs. Roentgenograms of the lungs were made on 14" × 17" films and interpreted by a qualified radiologist with considerable experience in the diagnosis of pneumoconiosis.

### TIRE WORKERS

*Physical and Roentgenographic Examinations*
The first group, presented in table 3, was com-

the chronic changes found in industrial urban dwellers. (See figure 1.)

### RECLAIMING RUBBER WORKERS

*Physical and Roentgenographic Examinations*
The second group, presented in table 4, was composed of 20 men with a major exposure to whiting and minor exposures to pyrophyllite and talc. The exposure periods of this group ranged from 10 to 25 years. All of these men were also working at the time of the study, and none complained of or presented symptoms referable to the lungs, such as dyspnea, cough, or shortness of breath. No clubbing of the fingers nor cyanosis was noted.

PLT-04771-0013



Fig. 1. This man is 62 years old and has worked in the rubber industry for 36 years with an average dust exposure of 35 million particles per cubic foot. His vital capacity was 95 per cent. These lungs show only truncal accentuation of the lower lobes.

TABLE 4

PHYSICAL EXAMINATION, VITAL CAPACITY DETERMINATIONS AND CHEST ROENTGENOGRAMS ON WORKERS EXPOSED TO WHITING, PYROPHYLLITE, AND TALC

| WORKER | AGE | YEARS OF EXPOSURE | MILLIONS OF PARTICLES CU. FT. | BLOOD PRESSURE | VITAL CAPACITY | HEART | CHEST ROENTGENOGRAMS | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 229R | 55 | 23 | 50 | 160/100 | 71% | +17 | Negative | Previously coal miner |
| 244R | 62 | 15 | 0 | 158/86 | 68% * | +25 | " | |
| 228R | 47 | 24 | 50 | 104/56 | 85% | Normal | " | |
| 953R | 49 | 24 | 150 | 132/90 | 68% | " | Pneumoconi-osis III | Coal miner—5 years |
| 195R | 51 | 23 | 50 | 124/90 | 116% | — | Negative | |
| 226R | 50 | 24 | 50 | 140/70 | 90% | " | " | Coal miner—13 years |
| 248R | 54 | 10 | 75 | 130/90 | 98% | Normal | " | |
| 170R | 42 | 13 | 50 | 120/70 | 123% | " | " | |
| 165R | 49 | 20 | 50 | 130/80 | 73% | " | " | |
| 18L | 48 | 20 | 50 | 112/62 | 110% | — | " | |
| 185R | 64 | 18 | 50 | 180/98 | 101% | +10 | " | Foundry—7 years |
| 247R | 54 | 20 | 50 | 160/85 | 119% | Normal | " | Coal miner 4½ years |
| 234R | 54 | 23 | 75 | 120/70 | 110% | " | " | |
| 231R | 53 | 23 | 50 | 132/80 | 97% | " | " | |
| 232R | 55 | 25 | 50 | 130/70 | 74% | +21 | " | |
| 164R | 61 | 14 | 50 | 142/95 | 97% | Normal | " | |
| 184R | 53 | 25 | 75 | 110/65 | 106% | " | " | |
| 235R | 55 | 24 | 50 | 175/100 | 94% | " | " | |
| 217R | 37 | 20 | 30 | 165/95 | 94% | Normal | " | Coal miner—19 years |
| 972R | 55 | 23 | 50 | 182/120 | 56% † | " | " | |

* The subject was unsatisfactory—uncoöperative.

† The subject was 5 feet 2½ inches in height and weighed 203 pounds.

362

PLT-04771-0014

Six had vital capacities considered subnormal; of these, 3 had enlarged hearts, as determined by the formula mentioned above.

In this second group only one chest roentgenogram showed abnormality, which was considered third-stage pneumoconiosis. The man also had lowered vital capacity, but he appeared to be suffering no disability. He had previously worked in the mining industry for five years. (See figure 2.)

exposures restricted to that mineral. In the New York mines and mills the dust was composed of equal proportions of tremolite and talc. Porro *et al* (7) published illustrations contrasting the fibrous structure of tremolite with the granular nature of talc. In the Georgia studies the dust was principally soapstone, a form of talc, but also contained 10 per cent tremolite. The dust in the North Carolina studies was *not* talc but pyrophyllite and,



Fig. 2. This man is 49 years old and has been employed in the rubber industry for 24 years with an average exposure to pyrophyllite and whiting of 150 million particles per cubic foot. He worked in coal mines for a period of five years. His lungs show well-advanced pneumoconiosis diagnosed as grade III. His vital capacity was 60 per cent. In spite of the well-advanced pneumoconiosis and lowered vital capacity, he showed no disability. His work record shows that he has lost only three weeks from illness over the past 24 years.

Another group of 16 men engaged in the same rubber processes but with shorter exposure periods were examined in the same manner. All chest roentgenograms were normal.

The producer of the talc discussed in this study stated that periodic roentgenographic examinations among his employees have failed to reveal any changes due to talc (12).

## DISCUSSION

Previous publications reporting *talc* as a cause of disabling pneumoconiosis do not present

furthermore, contained from 25 to 35 per cent quartz!

In an excellent discussion of the entire matter Pendergrass and Robart (13) stated "... the occurrence of an asbestosis-like reaction following prolonged exposure to talc would seem unlikely. Further controlled investigation, designed to eliminate the possible complicating factors of quartz-contaminated dust and infection, is, however, imperative before concluding with finality that the roentgen changes are the reflection of a specific and progressive fibrosis, and that talc is the sole

364      JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY     [vol. 31, no. 6]

etiologic agent in their production. In this regard, it seems quite probable that the described coexistent nodulation may be silicotic in origin. In the reported autopsy cases there had been other opportunities for the inhalation of dusts presumably contaminated with silica, and in the mining of talc itself similar exposures have not been excluded."

## SUMMARY AND CONCLUSIONS

1. A review of the literature indicates that dust exposures producing pneumoconiosis allegedly due to talc were not restricted to that mineral alone, as tremolite, pyrophyllite, and even quartz were also involved.

2. Physical examinations and chest roentgenograms of a group of 20 men exposed to talc dust (hydrous magnesium silicate) for periods ranging from 10 to 36 years in rubber inner tube production were normal for men of their age group and urban industrial environment.

3. Similar examinations of another group of 20 men exposed for periods ranging from 10 to 25 years to whiting (calcium carbonate), with minor exposures to pyrophyllite (65 per cent quartz) and to talc, in rubber-reclaiming operations disclosed all to be normal except one whose condition was diagnosed as pneumoconiosis stage III. This man had the highest dust exposure in the two groups (150 million particles per cubic foot) and had a previous occupational history of five years in mining.

4. The findings of the present study indicate that long exposure to talc does not appear to produce pathologic changes in the lungs.

5. Proposals that limits for silicate minerals be added to lists of maximum allowable concentrations should include careful definition of chemical and mineralogical composition.

## REFERENCES

(1) JOHNSON, BERTRAND L. AND BARSIGIAN, F. M.: Talc and Pyrophyllite. Minerals Year Book 1946, Bureau of Mines, United States Department of the Interior.

(2) DANA, J. D.: Manual of Mineralogy, revised by C. S. Hurlbutt, 15th Edition, John Wiley and Sons, Inc., New York, 1941.

(3) SCHULZ, R. V. AND WILLIAMS, C. R.: Commercial talc: Animal and mineralogical studies. This J., 24: 75-79, 1942.

(4) DREESSEN, W. C.: Effects of certain silicate dusts on the lungs. This J., 15: 66-78, 1933.

(5) DREESSEN, W. C. AND DALLA VALLE, J. M.: Effects of exposure to talc in two Georgia talc mills. Public Health Reports, 50: 131-143, 1935.

(6) EASOM, H. F., TRICE, M. F. AND CARPENTER, C. C.: A Study of Effects of Mining and Milling of Pyrophyllite. North Carolina State Board of Health, Division of Industrial Hygiene, and North Carolina Industrial Commission, Raleigh, North Carolina, 1939.

(7) PORRO, F. W., PATTON, J. R. AND HOBBS, JR., A. A.: Pneumoconiosis in the talc industry. American Journal of Roentgenology and Radium Therapy, 17: 507-524, 1942.

(8) SIEGAL, WILLIAM, SMITH, A. R. AND GREENBURG, LEONARD: Study of Talc Miners and Millers in St. Lawrence County. New York State Industrial Bulletin, vol. 22, November, December, 1943.

(9) Preliminary draft, Proposed Ohio Industrial Public Health Hazards Code. Ohio Department of Health, 1946.

(10) Proposed California Safety Orders, as amended, Division of Industrial Safety, California Department of Industrial Relations, August 23, 1948.

(11) Tentative Hygiene and Sanitation Standards. Hygiene and Sanitation Section, Division of Engineering and Safety, Trenton, New Jersey. November 15, 1945.

(12) Personal communication, W. W. Magnus, Eastern Magnesia Talc Company, Burlington, Vermont.

(13) PENDERGRASS, E. P. AND ROBERT, A. G.: Some considerations of the roentgen diagnosis of silicosis and conditions that may simulate it. Radiology, 50: 136-745, 1948.

PLT-04771-0016

EXHIBIT B

PLT-04771-0017

GEOLOGICAL SURVEY CIRCULAR 95



March 1951

# TALC INVESTIGATIONS IN VERMONT
# PRELIMINARY REPORT

By

A. H. Chidester, M. P. Billings
and W. M. Cady

PLT-04771-0018



UNITED STATES DEPARTMENT OF THE INTERIOR
Oscar L. Chapman, Secretary

GEOLOGICAL SURVEY
W. E. Wrather, Director

Washington, D. C.

Free on application to the Geological Survey, Washington 25, D. C.

PLT-04771-0019

CONTENTS

Abstract.................................... 1
Introduction................................ 1
    Uses of talc........................... 1
    Preliminary maps available.............. 2
    Scope of the report.................... 2
    Acknowledgments........................ 2
    Definitions of technical terms.......... 3
    Geographic distribution of the
        talc deposits...................... 3
Geology.................................... 4
    The country rock ...................... 4
        Rock types......................... 4
        Structure.......................... 4
    The ultramafic rocks................... 4
        Composition and alteration......... 4
        Size and shape..................... 5
        Distribution of steatite and grit.. 5
        Structural details................. 6
            Banding........................ 6
            Schistosity.................... 7
            Shear polyhedrons.............. 7
        Faults............................. 7
        Origin............................. 7
Talc reserves.............................. 8
Talc deposits.............................. 8
    Geographic location of known deposits.. 8
        Enosburg Falls quadrangle.......... 8
        Jay Peak quadrangle................ 8
        Irasburg quadrangle................ 9
        Mount Mansfield quadrangle......... 9
        Hyde Park quadrangle............... 9
        Hardwick quadrangle................ 10
        Camels Hump quadrangle............. 10
        Montpelier quadrangle.............. 10
        Lincoln Mountain quadrangle........ 10
        Barre quadrangle................... 11
        Rochester quadrangle............... 11
        Randolph quadrangle................ 11
        Mt. Cube quadrangle................ 12
        Woodstock quadrangle............... 12
        Hanover quadrangle................. 12
        Ludlow quadrangle.................. 12
        Saxtons River quadrangle........... 13
        Wilmington quadrangle.............. 13
        Brattleboro quadrangle............. 14

Descriptions of deposits................... 14
    The Montgomery Center talc prospect,
        locality 5......................... 14
    The Belvidere Mountain asbestos
        quarry, locality 9................. 14
    Locality 16............................ 15
    Locality 17............................ 15
    The Waterville talc quarry,
        locality 22........................ 15
    The Rousseau talc prospect,
        locality 23........................ 15
    The Sterling Pond talc deposits,
        locality 25........................ 17
    The Johnson talc mine, locality 29..... 19
    Locality 30............................ 20
    The Barnes Hill talc prospect
        locality 40........................ 20
    The Waterbury talc mine, locality 41... 20
    The Mad River talc mine, locality 46... 20
    Locality 50............................ 24
    Locality 51............................ 24
    Locality 54............................ 24
    The Roxbury verde antique quarries,
        localities 66 and 67............... 24
    The East Granville talc mine,
        locality 72........................ 25
    The Rochester verde antique quarry,
        locality 73........................ 25
    Localities 74 and 75................... 26
    Locality 110........................... 27
    Localities 112 and 113................. 27
    Locality 114........................... 28
    The Hammondsville talc quarry,
        locality 117....................... 28
    Locality 124........................... 28
    The Vermont Talc Co., quarry,
        locality 126....................... 29
    Localities 127 and 128................. 30
    The Barton talc quarry, locality 129... 30
    The Davis (or Holden) talc quarry,
        locality 130....................... 30
    Locality 136........................... 31
Suggestions for exploration and further
    geologic study......................... 31
References................................. 32-32

ILLUSTRATIONS

Plate  1.--Map of Vermont showing locations of ultramafic rocks ......................... Inside back cover
Figure 1.-- Idealized sketch map of a typical steatite-grit-serpentinite body.................... 6

# TALC INVESTIGATIONS IN VERMONT
## PRELIMINARY REPORT

### ABSTRACT

Commercial talc deposits in Vermont are derived from ultramafic igneous rocks confined chiefly to a narrow belt that extends northward through the central part of the state from Massachusetts to Canada. This belt forms part of a more extensive belt that may be traced from Alabama to Newfoundland.

Bodies of ultramafic rock occur in phyllites, schists, gneisses, greenstones and amphibolites. Most of the ultramafic rocks are emplaced in or near greenstones or amphibolites. Knowledge of the regional structural and stratigraphic relations of the belt is incomplete, but in general the country rock forms a homoclinal sequence and exhibits little repetition of formations by folding.

The ultramafic bodies range in width from a few feet to about a mile, and in length from less than 100 feet to at least 3½ miles. They are of two types. Most of them, referred to here as the verde antique type, are completely serpentinized and more or less extensively steatitized. The second type, with which no commercial talc deposits are known to be associated, consists of partly serpentinized dunite or peridotite and minor pyroxenite, and commonly contains more or less chrysotile asbestos; this type occurs in one or two localities in southern Vermont and in several localities in northern Vermont. The mineral assemblage associated with the verde antique type of body reflects the effects of regional metamorphism alone, whereas the country rock bordering some bodies containing peridotite and dunite also reflects contact metamorphic effects attributable to the ultramafic intrusive.

The typical ultramafic body of the verde antique type contains steatite and grit, (a mixture of talc and carbonate at the margins), and a core of serpentinite. The steatite zone, at the outer border of the body, commonly ranges from a few inches to a few feet in thickness. The grit zone, between the steatite and serpentinite zones, is commonly several feet to a few tens of feet thick. There are, however, all gradations from ultramafic bodies formed almost entirely of serpentinite to bodies made up exclusively of grit and steatite. Inclusions, septa, and tongue-like projections of wall rock, which range widely in size, are common in the talc deposits; they are called "cinders" by the miners.

The structural features of the ultramafic rocks contrast rather markedly with those of the country rock. Serpentinite and grit show local schistosity that varies from poor to good, and steatite commonly exhibits a good schistosity. Some ultramafic masses appear to be folded. A layering or banding of undetermined origin is conspicuous at a few localities. Most serpentinite bodies are made up of rather distinct blocks of massive serpentinite as much as several feet across, termed shear polyhedrons, surrounded by thin, irregular layers of slickensided serpentinite. This feature contrasts markedly with the structural features

of the country rock; it may be interpreted in several ways, but suggests that the serpentinite was intruded in solid state. Minor faults are found in a few ultramafic bodies. Current general conceptions of the intrusion, serpentinization, and steatitization of the ultramafic bodies are stated briefly; a definite statement of the genesis of the ultramafic rocks is not attempted.

It is inferred from the wide distribution of localities in which ultramafic rocks are found and the general prevalence of steatitization at those localities, that the talc reserves in Vermont are large. The geographic positions of 145 localities are indicated. Suggestions for exploration and further geologic study are made.

## INTRODUCTION

Commercial talc deposits, with a few exceptions, fall into two classes: those derived from or very closely associated with ultramafic igneous rocks and those formed from carbonate rocks of sedimentary origin. In commercial usage of the term pyrophyllite, whose properties are similar to those of talc, is commonly included with talc. Nearly all of the talc deposits in Vermont, and all of those of economic value in the state are of ultramafic origin.

Talc deposits related to ultramafic bodies were formed by the metamorphism and alteration of the ultramafic rocks, accompanied by minor steatization of the country rock. Although such talc deposits are commonly in or closely associated with highly serpentinized ultramafic bodies, it is generally recognized that the processes of serpentinization and steatitization are unrelated and that serpentinization is an earlier process. Talc deposits derived from carbonate rocks are generally considered to have been produced by contact metamorphism of the carbonates where intruded by granitic rocks.

Talc derived from carbonate rocks is generally superior in "color" (whiteness) to talc associated with ultramafic rocks. But, many carbonate-derived deposits contain a large amount of tremolite which is undesirable in some talc products. Talc associated with ultramafic rocks commonly contains a relatively large amount of carbonate, and minor amounts of chlorite and serpentine, to which the generally inferior color of this type of talc is attributed.

### Uses of Talc

Massive talc, called soapstone or steatite, [2] has peculiar properties, particularly softness,

---

[1] A. E. J. Engel (written communication, March 19, 1950) states, "In California, for example, several economic talc deposits of considerable purity, and value are formed as replacements of marble and of feldspar types of igneous rocks. At Natural Bridge, N.Y. talc formed and 'talc' (actually talc and serpentine) has formed as a replacement of granite, syenite, and magnetite."

[2] For a definition of these terms, as used in this paper, see p. 2

PLT-04771-0021

denseness, impermeability, and high heat-resistivity, which have made it useful to man from very early times for making pipes, ornaments, and cooking utensils. Talc has a wide variety of uses in modern industry. 3/ Soapstone is sawed into crayons and pencils which are used in foundries to mark white-hot steel and in the garment industry to mark fabrics. Because of its resistance to acids, soapstone is used extensively for laboratory tables and sinks. Its refractory properties make it suitable for molds for such materials as iron and glass. Its dielectric properties make it suitable for insulators and base plates for switchboards. The pure, dense, cryptocrystalline variety of steatite known as "lava grade" is valuable because it can be machined into intricate forms and then heat-treated to great hardness with negligible shrinkage. 4/

The soft varieties of talc which are not suitable for sawing or machining are ground to various degrees of fineness for a great variety of industrial uses. Some of the products in which ground talc is used are: paper, toilet and pharmaceutical preparations, pottery and porcelain, rope and twine, wall plaster, paints, electrical insulation, textiles, linoleum and oil cloths, soaps, roofing papers, rubber, lubricants, foundry facings, glass, agricultural insecticides, pipe-coverings, leather, cement, asbestos shingles, candy, shoe polish, and crayons. Ground talc is used also to polish some articles of food, such as coffee and rice.

The talc deposits of Vermont furnish varieties suitable chiefly for grinding, but small quantities of material suitable for pencils to mark structural steel are produced as a by-product. The largest producer of talc in Vermont reports the following consumption data, in terms of percentages of total sales, for 1949. 5/

|                    | Percent |
|--------------------|---------|
| Paper              | 30      |
| Rubber             | 18      |
| Textiles           | 2       |
| Roofing            | 5       |
| Paint              | 5       |
| Ceramics           | 1       |
| Cosmetics          | 0.5     |
| Insecticides       | 23      |
| Asphalt filler     | .13     |
| Miscellaneous      | 2.5     |
| Total              | 100.0   |

### Preliminary maps available

. As a result of the studies made by the U. S. Geological Survey in the period August 1944-November 1945, the following maps have been prepared and placed in open file:

The Johnson talc mine:
   Geologic surface map, scale: 1 inch to 30 feet.
   Geologic map of the 200-foot level, scale: 1 inch to 30 feet.
   Structure sections, scale: 1 inch to 30 feet.

[1] For a more complete discussion of the uses of talc see Engel (1949, pp. 1035-1038) or Jullson (1937, pp. 982-988).

[2] For further discussion of the properties and uses of "lava grade" steatite see Engel (1949, pp. 1036-1037; also references cited in his bibliography, pp. 1039-1041).

[3] Quoted with permission of Eastern Magnesia Talc Co., Burlington, Vt.

The Waterbury talc mine, preliminary map 3-208:
   Geologic surface map, scale: 1 inch to 30 feet.
   Underground maps, including geologic maps and outline map of the underground workings.
   1 inch to 30 feet.
   Structure sections, scale: 1 inch to 30 feet.
   (3 sheets).

The Barnes Hill talc prospect, preliminary map 3-221.
   Geologic surface map, scale: 1 inch to 30 feet.

The Vermont Talc Co. quarry, Windham, preliminary map 3-221:
Geologic surface map and structure sections, scale: 1 inch to 30 feet.

The Hammondsville talc quarry, preliminary map 3-221:
   Geologic surface map and structure sections, scale: 1 inch to 30 feet.

The Rousseau talc prospect, preliminary map 3-221:
   Geologic surface map and structure sections, scale: 1 inch to 50 feet; geologic map of the underground workings, scale: 1 inch to 20 feet.

The Mad River talc mine, preliminary map 3-207:
   Geologic surface map, scale: 1 inch to 50 feet, geologic map of the underground workings and structure sections, scale: 1 inch to 20 feet.

The Carleton talc quarry, preliminary map 3-207:
   Geologic surface map and structure sections, scale: 1 inch to 20 feet.

Copies of these maps, released as Strategic Minerals Investigations, Preliminary Maps, may be obtained by persons directly interested in the talc deposits upon application to the U. S. Geological Survey, Washington 25, D. C.

### Scope of the report

The primary purpose of the report is to make available to interested persons the results of the work to date. The report is based almost entirely on field studies and is chiefly a description of the structural relationships of the talc deposits. Interpretations based on laboratory data are not included as laboratory work is still in progress.

### Acknowledgments

The authors appreciate the courtesy and cooperation of the officials of the following companies for their assistance in this investigation: Eastern Magnesia Talc Co., Burlington, Vt., Vermont Talc Co., Chester Vt.; Vermont Mineral Products Co., Chester, Vt.; Mad River Talc Corp., New York, N. Y.; and Vermont Marble Co., Rutland, Vt.

The Geological Survey is also indebted to a number of individual geologists, including F. H. T. P. E. Osberg, J. L. Rosenfeld, James Skehan, and J. B. Thompson, for their contributions to various aspects of the investigations. The authors are grateful to these persons for unpublished information concerning the regional geology, and for invitations to join in several interesting and informative field ex-

2

PLT-04771-0022

The authors benefitted from several days spent in the field with R. H. Jahns and T. P. Thayer of the Geological Survey. Jahns furnished unpublished information on the regional geology. M. R. Klepper and A. E. J. Engel of the Geological Survey read the manuscript critically and suggested numerous improvements.

## Definitions of technical terms

The following technical terms have been variously used in the past by different geologists, and many are in common use among talc miners. Because some of the miners' terms are apparently peculiar to the Vermont talc industry and may not be known in other areas, the terms in this report are defined.

Ultramafic. -- The term is used throughout the report in a broad sense with reference to the igneous rocks peridotite, dunite, and pyroxenite and their derivatives. Thus the term ultramafic body refers to the unaltered igneous rock, the serpentinite, the grit, and that part of the steatite which is an alteration of the original igneous body.

Serpentinite. -- The term is applied to rocks composed essentially of serpentine, after the usage of Lodochnikov (1933, p. 145), Phillips and Hess (1936, p. 333), and Selfridge (1936, p. 501). However, no genetic significance is attached to the term, as is apparently done by Phillips and Hess. The term serpentine is used here only in the mineral sense; it is used by miners in the sense of serpentinite as defined above. Verde antique is a trade term for serpentinite intricately veined with carbonate, and capable of taking a high polish so that it is suitable for use as an ornamental stone. Ultramafic bodies composed entirely of serpentinite, grit, and steatite are referred to as the verde antique type, and the serpentinite of such bodies is similarly distinguished. [6]

Serpentinization is the process by which ultramafic igneous rocks were partly or completely altered to serpentinite. The term has no genetic significance as used here. The serpentinite zone includes the part of the ultramafic body that consists principally of serpentinite; it commonly forms the core of the verde antique type of ultramafic body.

Talc. -- The word talc is used here only in the mineral sense. Grit is a miners' term for a rock composed essentially of talc and carbonate. The grit zone is that portion of an ultramafic body composed almost entirely of grit; it lies between the serpentinite zone and the steatite zone. The term steatite

is used in a broad sense to designate a rock composed almost entirely of talc. The magnesium distinction is that there is practically no carbonate. Chlorite may be more or less abundant. [?]

The steatite zone is the portion of the ultramafic body and immediately adjacent altered country rock between the grit zone and the blackwall zone (see next paragraph) at the outermost edge of the ultramafic body. The term soapstone is restricted to steatite that is suitable for making sawn and shaped slabs. Pencil stock is a variety of steatite with physical properties that make it suitable for "pencils" used in marking structural steel. Steatitization is the term applied to the process by which ultramafic rock is partly or completely altered to talc or talc and carbonate. No genetic significance is attached to the term.

Blackwall. -- The altered country rock at the outer border of the steatite zone is called blackwall by the miners. In the majority of deposits the blackwall is chlorite schist, but in a few it is biotite schist. The blackwall zone is the altered part of the country rock between the steatite zone and the unaltered country rock; it lies outside of the ultramafic body.

Cinder. -- The term "cinder" is applied by miners to masses of schist within a steatite-grit body. Cinders may range in size from small fragments less than an inch across to very large tabular masses. In practice, any body of schist which is not demonstrably a part of the accepted hanging wall or footwall of a deposit is referred to as cinder.

## Geographic distribution of the talc deposits

The talc deposits of Vermont are associated with ultramafic rocks that form part of a belt more than 2000 miles long, which extends from Alabama to Newfoundland. The belt lies in the terrane of crystalline rocks of the Appalachian Mountains.

In Vermont the ultramafic rocks are nearly all confined to a rather narrow belt that trends northward through the central part of the state from Massachusetts to Canada. The belt is almost 25 miles wide at its northern end, but it narrows rather markedly southward so that south of the Winooski River it is not more than 5 miles wide except at the latitude of Plymouth, where it broadens to a maximum width of 10 miles. Plate 1 shows the location of all known ultramafic bodies in Vermont; their distribution indicates the pattern of the ultramafic belt.

[6] This application of the term verde antique type of serpentinite is somewhat more restricted than that of Bain (1936, pp. 1967-1974) who distinguishes two practical types of serpentinite: the "verde antique (white weathering) type" and the "red-weathering type." The verde antique type of serpentinite as defined by Bain on the basis of weathering characteristics is found to some extent in ultramafic bodies that contain relatively large masses of unserpentinized dunite and peridotite, but is found structurally in bodies that contain only serpentinite of the verde antique type. The commercial verde antique occurs only in the white, and the term verde antique may be logically restricted to such inclusions in the purpose of sharpening a type of ultramafic body. We believe that this usage does not violate that of Bain in any essential way, inasmuch as the verde antique type of serpentinite as defined by Bain is overwhelmingly more abundant in the verde antique type of ultramafic body as defined herein. We believe that the classification of the ultramafic bodies on the basis proposed (see pp. 4-5) has greater genetic and practical merit.

[?] Various meanings have been attached to the word "steatite" in geologic literature. Probably the general accepted usage from the definition given here, but in some geologic literature and especially in writings on high-quality ceramic talcs a different usage has evolved. The term "steatite" is used in the ceramic industry to denote a massive, compact, and comparatively pure variety of talc which must meet certain chemical and electrical requirements for the manufacture of ceramic. U. S. Bureau of Mines, from study of commercial specimens, gives specifications of not more than 1.5 percent CaO, 1.5 percent $Fe_2O_3$ plus $Al_2O_3$, and 5 to 10 percent non-talc minerals. Industrial and non-uniform standards vary considerably, and some will accept as much as 4.5 percent CaO for certain uses (see Engel, 1949, p. 107). The adjective "talc best to define "steatite" in a broad sense and to describe such terms as "ceramic-grade steatite" or "electrical-grade steatite" when it is desired to indicate a specific grade or type of steatite.

3

PLT-04771-0023

GEOLOGY

Most of the ultramafic rocks of Vermont occur in schists, phyllites, and greenstones on the east flank of the Green Mountain anticlinorium; but in the northern part of the state, north of the approximate latitude of the village of Johnson, several occurrences are known in similar formations west of the anticlinorial axis; for example, in Cambridge, Waterville, and Berkshire townships. C. H. Hitchcock and A. D. Hager (Hitchcock et al., 1861, pp. 539, 543, 788-789) report occurrences of both serpentine and steatite in schists and gneisses in extreme eastern Vermont; these are apparently separated from those in the central part of the state by a broad synclinal belt of interbedded crystalline limestone and slate. Scattered occurrences of serpentine, steatite, and grit are found in comparable rocks throughout both New Hampshire and Maine (Hitchcock, C. H., 1878; Smith, Bastin, and Brown, 1907, pp. 8-9). Further knowledge of the regional relationships of the ultramafic rocks must await completion of areal mapping now in progress.

### The country rock

#### Rock types

The country rocks of the ultramafic belt include phyllites, schists, and gneisses, with intercalated schistose greenstones and amphibolites that represent altered volcanic rocks, both tuffs and flows, and intrusive rocks, chiefly sill-like dikes. Most of the ultramafic bodies are emplaced in greenstone or amphibolite or in schist and phyllite in the immediate vicinity of greenstones or amphibolites. Mafic dikes formed after regional folding and metamorphism intrude the ultramafic rock and country rock at several localities. There are no known granitic intrusive rocks, other than small felsic dikes at a few localities, associated with the ultramafic bodies.

The ages of the various formation into which the ultramafic rocks are intruded are uncertain, but it is probable that they range from Cambrian to Lower or Middle Ordovician.

#### Structure

Knowledge of the structural relations in the ultramafic belt is yet far from complete. Throughout most of the belt the rocks are vertical or dip steeply east or west on the east limb of the Green Mountain anticlinorium. The strike ranges from slightly west of north to northeast and averages about north. Schistosity and bedding are nearly parallel or parallel in most places where bedding is recognizable. There is remarkably little repetition of beds in folds, but very small folds with amplitudes of a few inches are present almost everywhere throughout the belt. At some localities there are folds with amplitudes of tens or hundreds of feet, and in a few areas, as much as a mile. These reflect the regional structural pattern, particularly that of the Green Mountain anticlinorium. However, such large folds appear to be the exception rather than the rule.

This rather simple homoclinal structure passes in the vicinity of Chester township into broad anticlinal arches and large overturned or recumbent folds. [8/] These structures, featured and noted for for the relatively greater width of the ultramafic in the latitude of Chester.

### The ultramafic rocks

#### Composition and alteration

The original minerals of the ultramafic rocks have been nearly or completely altered at most localities, and only rare relics and ghosts of olivine and pyroxene remain. It is difficult or impossible to determine accurately the composition of the rocks first emplaced. At several places a dunite type, however, and in at least one place in southern Vermont the ultramafic rocks are, at least in part, nearly unaltered (Bain, 1936, pp. 1989-1970). They apparently range from dunite, composed almost entirely of the mineral olivine, to pyroxene peridotite in which the mineral pyroxene as well as olivine is abundant. Most of the ultramafic rocks were probably of peridotitic composition originally.

The ultramafic bodies may be divided into two types on the basis of absence or presence within any body of unserpentinized peridotite or dunite. Those that do not contain peridotite or dunite are called the verde antique type (see footnote on p. 3 for a fuller discussion). Those that contain unaltered peridotite and dunite correspond in a broad way to the red-weathering type described by Bain (1936, pp. 1969-).

All the commercial talc deposits in Vermont are associated with the verde antique type of ultramafic body, whereas none is known to occur in ultramafic bodies that are only partly serpentinized, and the cross-fiber asbestos appears in quantities only in ultramafic bodies that contain unaltered dunite or peridotite, and is either rare or absent in the verde antique type. Small amounts of slip-fiber asbestos, commonly brittle and altered, have been found in association with a few talc deposits; and so have a few examples of what appear to be talc pseudomorphs after cross-fiber asbestos.

Several investigations of ultramafic rocks (Selfridge, 1936, pp. 497-498; T. P. Thayer, oral communication, August 1949) from widely separated regions, supplemented by incomplete petrographic studies made in connection with the current investigation in Vermont, indicate that the serpentine mineral in the verde antique type of ultramafic body is antigorite, whereas the serpentine mineral in serpentine associated with unaltered dunite and peridotite is a non-asbestiform variety of chrysotile. [8/]

---

[8] Thompson, J. B., Oral communication, September 1948.

[9] C. Selfridge (1936, pp. 458-489) defines the serpentine group of minerals as consisting of two mineral species, serpentine and antigorite. He considers chrysotile to be an asbestiform variety of the species serpentine.

Bain's conclusion that the "white-weathering" and the "red-weathering" serpentinite are two genetic types (1936, pp. 1975- 979) may be interpreted to support the foregoing definition. He identifies the serpentine mineral at both types as chrysotile, but presents no supporting data. It is commonly difficult to distinguish the serpentine minerals by optical characteristics (see Selfridge, 1936, pp. 484-498) and in thin section serpentine may easily be mistaken for antigorite.

4

EXHIBIT C

PLT-04771-0025

# Petrology and Geochemistry of Selected Talc-bearing Ultramafic Rocks and Adjacent Country Rocks in North-Central Vermont

*By* ALFRED H. CHIDESTER

GEOLOGICAL SURVEY PROFESSIONAL PAPER 345



UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON : 1962

PLT-04771-0026

UNITED STATES DEPARTMENT OF THE INTERIOR

STEWART L. UDALL, *Secretary*

GEOLOGICAL SURVEY

Thomas B. Nolan, *Director*

The U.S. Geological Survey Library has cataloged this publication as follows:

Chidester, Alfred Herman, 1914–
    Petrology and geochemistry of selected talc bearing ultra-
mafic rocks and adjacent country rocks in north-central
Vermont.  Washington, U.S. Govt. Print. Off., 1961.

    vii, 207 p. illus., maps (7 fold. col. in pocket) diagrs., tables.  29 cm.
(U.S. Geological Survey.  Professional paper 345)
    Bibliography: p. 205–207.
    1. Petrology—Vermont.  2. Talc—Vermont.  3. Mines and mineral
resources—Vermont.  4. Geochemistry—Vermont.  5. Rocks, Igne-
ous—Vermont.  I. Title.   (Series)

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington 25, D.C.

PLT-04771-0027

# CONTENTS

| | Page |
|---|---|
| Abstract | 1 |
| Introduction | 3 |
| Location and history | 3 |
| Barnes Hill locality | 3 |
| Waterbury mine locality | 4 |
| Mad River locality | 4 |
| Previous investigations | 5 |
| Fieldwork and acknowledgments | 5 |
| Geologic setting | 6 |
| Regional setting | 6 |
| Waterbury-Waitsfield area | 7 |
| Metamorphosed sedimentary and volcanic rocks | 8 |
| Intrusive igneous rocks | 9 |
| Ultramafic rocks | 9 |
| Mafic hypabyssal and granitic rocks | 10 |
| Metamorphism | 10 |
| Structure | 10 |
| Geology of the Barnes Hill, Waterbury mine, and Mad River localities | 10 |
| General geology | 10 |
| Barnes Hill locality | 11 |
| Waterbury mine locality | 12 |
| Mad River locality | 14 |
| Structure | 16 |
| Major features | 16 |
| Structural details | 16 |
| Bedding | 17 |
| Layering in ultramafic rocks | 17 |
| Folds | 17 |
| Schistosity | 22 |
| Slip cleavage | 23 |
| Fracture cleavage | 23 |
| Other cleavage | 24 |
| Lineation | 24 |
| Shear polyhedrons | 24 |
| Joints | 24 |
| Faults | 24 |
| Structural features of the Sterling Pond area | 24 |
| Origin and relations of structural features | 25 |
| Petrography | 27 |
| Methods and procedures | 27 |
| Determination of mineral compositions | 41 |
| Chlorite | 44 |
| Serpentine | 46 |
| Talc | 48 |
| General features | 48 |
| Schist | 49 |
| Mineralogy, textural features, and paragenesis | 49 |
| Quartz | 49 |
| Albite | 50 |
| Sericite | 50 |
| Chlorite | 51 |
| Biotite | 51 |
| Graphite | 52 |

| | Page |
|---|---|
| Geology of the Barnes Hill, Waterbury mine, and Mad River localities—Continued | |
| Petrography—Continued | |
| Schist—Continued | |
| Mineralogy, etc.—Continued | |
| Ilmenite, rutile, and sphene | 52 |
| Garnet | 52 |
| Apatite | 53 |
| Epidote and allanite | 53 |
| Other minerals | 53 |
| Petrogenesis | 53 |
| Quartzite | 55 |
| Mineralogy, textural features, and paragenesis | 55 |
| Petrogenesis | 55 |
| Greenstone | 55 |
| General features | 55 |
| Mineralogy, textural features, and paragenesis | 57 |
| Albite | 57 |
| Chlorite | 57 |
| Amphibole | 57 |
| Epidote and allanite | 58 |
| Biotite | 58 |
| Carbonate | 58 |
| Ilmenite, rutile, and sphene | 59 |
| Other minerals | 59 |
| Petrogenesis | 59 |
| Carbonate rock | 60 |
| General features | 60 |
| Barnes Hill | 60 |
| Waterbury mine | 61 |
| Mad River | 61 |
| Mineralogy, textural features, and paragenesis | 61 |
| Carbonate | 61 |
| Amphibole | 62 |
| Chlorite | 62 |
| Other minerals | 62 |
| Petrogenesis | 63 |
| Albite porphyroblast rock | 64 |
| Mineralogy, textural features, and paragenesis | 64 |
| Albite | 64 |
| Chlorite | 64 |
| Accessory minerals | 64 |
| Petrogenesis | 64 |
| Rocks of the blackwall zone | 65 |
| General features | 65 |
| Blackwall chlorite rock | 65 |
| Tremolite rock | 65 |
| Talcose carbonate rock | 66 |
| Mineralogy, textural features, and paragenesis | 66 |
| Chlorite | 66 |
| Ilmenite, rutile, and sphene | 69 |
| Magnetite | 69 |

III

CONTENTS

IV

Geology of the Barnes Hill, Waterbury mine, and Mad River localities—Continued
Petrography—Continued
  Rocks of the blackwall zone—Continued
    Mineralogy, textural features, and paragenesis—Continued

| | Page |
|---|---|
| Tremolite | 70 |
| Carbonate | 70 |
| Other minerals | 70 |
| Petrogenesis | 70 |
| Serpentinite | 71 |
| General features | 71 |
| Mineralogy, textural features, and paragenesis | 73 |
| Serpentine | 73 |
| Magnetite and chromite | 73 |
| Carbonate | 76 |
| Pyrite and pyrrhotite | 76 |
| Talc | 76 |
| Petrogenesis | 77 |
| Talc-carbonate rock, steatite, and talc-carbonate veins | 77 |
| General features | 77 |
| Talc-carbonate rock | 77 |
| Steatite | 78 |
| Talc-carbonate veins | 79 |
| Mineralogy, textural features, and paragenesis | 79 |
| Talc | 79 |
| Carbonate | 80 |
| Chlorite | 81 |
| Magnetite and chromite | 81 |
| Geradorffite(?) and unidentified opaque mineral | 81 |
| Petrogenesis | 81 |
| Mafic dikes | 82 |
| Mineralogy, textural features, and paragenesis | 83 |
| Augite | 83 |
| Plagioclase (An₅₀) | 83 |
| Hornblende | 83 |
| Biotite, sericite or talc, and chlorite | 83 |
| Glass and rutile | 83 |
| Magnetite | 83 |
| Carbonate and quartz | 83 |
| Petrogenesis | 84 |
| Petrology and geochemistry | 84 |
| Metamorphism | 84 |
| Origin of the peridotite and serpentinite | 87 |
| Source and derivation of the primary igneous rocks | 87 |
| Serpentinization | 88 |
| Steatitization | 88 |
| Previous work on steatitization | 90 |
| Age of steatitization | 91 |
| Relations of steatite and talc-carbonate rock | 91 |
| Relations between the steatite and the rocks of the blackwall zone | 91 |

Petrology and geochemistry—Continued
  Steatitization—Continued

| | Page |
|---|---|
| Relation of steatitization to structure and regional metamorphism | 92 |
| Volume relations in steatitization | 93 |
| Temperature relations during steatitization | 94 |
| Mechanism of steatitization | 94 |
| Talc-carbonate rock reaction | 121 |
| Boundary between talc-carbonate rock and serpentinite | 122 |
| Serpentinite-dunite boundary | 122 |
| Blackwall-steatite reaction | 122 |
| Steatite-serpentinite boundary | 123 |
| Boundary between steatite and talc-carbonate rock | 123 |
| Blackwall-schist boundary | 124 |
| Steatite-blackwall boundary | 124 |
| Geochemistry of the rocks affected by steatitization | 124 |
| Potassium | 124 |
| Sodium | 125 |
| Calcium | 125 |
| Magnesium | 125 |
| Iron and manganese | 126 |
| Nickel | 126 |
| Cobalt | 126 |
| Aluminum | 126 |
| Chromium | 127 |
| Titanium | 127 |
| Silicon | 127 |
| Phosphorus | 127 |
| Carbon | 127 |
| Hydrogen | 128 |
| Oxygen | 128 |
| Sulfur and arsenic | 128 |
| Nature of the steatitizing "solutions" | 128 |
| Origin of the talc-carbonate veins | 128 |
| Appendixes | 129 |
| Appendix A—Some basic procedures, definitions, and terminology | 129 |
| Appendix B—The modified standard cell, calculated modes, and mineral formulas | 132 |
| Definition of the modified standard cell | 132 |
| Calculation of the cell contents | 133 |
| Calculation of mineral modes | 137 |
| Calculation of mineral formulas | 137 |
| Appendix C—Carbonate in ultramafic rocks | 138 |
| Appendix D—Talc | 146 |
| Appendix E—Magnetite and chromite | 148 |
| Appendix F—Chrysotile asbestos | 150 |
| Appendix G—Serpentinite | 151 |
| Appendix H—Steatite and talc-carbonate rock | 161 |
| Appendix I—Blackwall chlorite rock | 172 |
| Appendix J—Sedimentary carbonate rock | 182 |
| Appendix K—Schist and albite porphyroblast rock | 194 |
| Appendix L—Calculated rock analyses | 192 |
| References cited | 205 |

## TALC-CARBONATE VEINS

Talc-carbonate veins are exposed and accessible to observation only at the Waterbury mine locality, but were also encountered in drill holes at Barnes Hill. Veins identical in mineralogic composition.-form. and structural relations have been noted in many other ultramafic bodies in Vermont. and those at the Barnes Hill locality are inferred to be similar.

The talc-carbonate veins are composed of dolomite and talc in roughly equal proportions. finely disseminated traces of magnetite. and small blebs of pyrite. The dolomite occurs in coarse. anhedral. white crystals from ¼ to 1¼ inches across: the talc forms fan-shaped aggregates of pale-green translucent folia as large as 1 inch across. Carbonate is predominantly near the centers of the veins and talc at the borders. but the relationship is irregular and many exceptions to the general pattern occur. Masses of carbonate from the veins are irregularly embayed and pitted. and in thin section wedge-shaped masses of talc are seen to extend into the carbonate.

The talc-carbonate veins commonly are joint controlled. though some are very irregular. Where joint control is apparent, the joints dip rather gently, though the direction of dip is variable. In a few places, where two or three sets of joints form a conjugate system, only the gently dipping set has a talc-carbonate vein along it, and the other joints are unmineralized. Not all gently dipping joints, however, have talc-carbonate veins along them.

## MINERALOGY, TEXTURAL FEATURES, AND PARAGENESIS

### TALC

Optical data on talc are summarized in table 26. The talc at a given locality is uniform in index except for that in talc-carbonate veins and in pseudomorphs after chrysotile asbestos, which has an index from 0.001 to 0.004 lower than the average. On the other hand, talc from Barnes Hill has a consistently lower index than that from the Waterbury mine and Mad River localities: talc from Barnes Hill averages about $\beta \approx \gamma = 1.585$, whereas that from both the Waterbury mine and Mad River localities averages about $\beta = \gamma = 1.591$. Only a few measurements of the $\alpha$ index were made; they indicate a birefringence of about 0.044 to 0.048, but the measurement of $\alpha$ is not as reliable as that of $\beta \approx \gamma$. The optic angle $(2V)$ is consistently small, but varies from 0° to 25°. However, determinations of $2V$ are not reliable because of the probable superposition of layers of talc with $c$ axes parallel but with the other axes randomly oriented with respect to each other. Extinction is parallel, the optic sign negative, and the sign of elongation is positive. The talc is colorless in thin section.

Two chemical analyses of nearly pure specimens of talc are given in table 3 (mineral analyses 7 and 8). One of these (J-103). from the Johnson talc mine. Johnson. Vt.. is included because specimens for chemical analysis of the pure mineral were not obtainable from the Mad River and Barnes Hill localities. and the specimen from the Johnson mine represents talc from the steatite zone of a purity not obtainable at the other deposits. It is of fine-grained pale-green talc that is distributed irregularly in the steatite in a branching veinlike pattern; no contaminating minerals are visible either megascopically or in thin section. but the analysis indicates the presence of small amounts of carbonate. Specimen W-83 is from a vein of coarse talc and carbonate. The only contaminating minerals are very small amounts of dolomite and traces of pyrite.

In addition to the chemical analyses of the mineral talc. there are two analyses of steatite (analyses 13 and 31) and three analyses of talc-carbonate rocks (analyses 21. 22. and 23). The steatite commonly contains only traces of dustlike particles of magnetite as visible contaminants. but locally small amounts of colorless chlorite occur also. The talc-carbonate rock specimens contain variable amounts of carbonate and small amounts of magnetite. By subtracting the appropriate amounts of oxides for the minerals other than talc in each rock, it is possible to approximate rather closely the chemical analysis of talc in each specimen.

The calculated formula compositions of the talc in each of the two analyses of the mineral and five analyses of steatite and talc-carbonate rock are given in table 3. Tables 33 to 34. and 43 to 47 show the calculated modes and the derivation of the formula compositions. The formula compositions calculated from analyses of steatite and talc-carbonate rock are not as accurate as those based on analyses of talc, but they probably represent closely the actual composition of the talc. In each case appropriate corrections were made for recognized contaminant minerals in the sample. No corrections were made for chlorite in W-23 because there was no basis for estimating how much. if any. is present. The slightly high content of (OH) and of $R^{+2}$ plus $R^{+3}$ suggests the presence of a small amount of chlorite; the amount, however, must be so small that it does not significantly affect the formula composition other than to make the $(Al.Fe^{+3})$ content appear very slightly higher than is actually the case. The very small amounts of $K_2O$ and $Na_2O$ in each analyses were ignored in making the calculations.

It is not known whether the Al and $Fe^{+3}$ indicated in the analyses substitutes directly for Mg by partial replacement of $3Mg$ for $2(Al.Fe^{+3})$. or by coupled substitution for Si and Mg. Samples that contain very little alumina approach the ideal formula almost

EXHIBIT D

PLT-04771-0031

# OCCUPATIONAL EXPOSURES
# TO NON-ASBESTIFORM TALC IN VERMONT

Maryanne G. Boundy, Karen Gold, Kenneth P. Martin, Jr.,
William A. Burgess, John M. Dement

Department of Environmental Health Sciences, Harvard School of
Public Health, Boston, Massachusetts 02115

## INTRODUCTION

An environmental study of the Vermont talc mines and mills was undertaken in support of a concurrent epidemiological study of talc workers. Since geological studies dating from the early 1900's have shown that the Vermont talc deposits contain no asbestos and little quartz this population represents a group of talc workers employed in mining and milling operations who have no association with these two fibrosis producing minerals (Jacobs, 1914, 1918; Weiss and Boettner, 1967). Therefore, the intent of this study was to verify these geological reports by quantitating the personal dust exposures of these talc workers, and by identifying the mineral content of this "clean" talc ore.

## MINERALOGY

Pure talc mineral is a hydrous magnesium silicate (Table 1) and consists of a brucite sheet containing magnesium ions sandwiched between two weakly held silica sheets (Hildick-Smith, 1976). This mineral is extremely soft and slippery, and has a hardness of 1 on the Mohs scale. However, as used industrially, the term "talc" refers to a mixture of minerals that meet certain physical requirements rather than one which has a fixed chemical composition (Brown, 1973). Industrial grades of talc (Table 2) usually contain chlorites which are sheet silicate minerals containing magnesium, iron, and aluminum, and carbonates which include magnesite, dolomite, and calcite. Quartz, iron oxides, serpentine (one of the minerals from which talc evolved) and tremolite may also be present. Since the constituents of industrial talc

TABLE 1. Some Chemical and Physical Properties of Talc

Talc: $3MgO \cdot 4SiO_2 \cdot H_2O$

Refractive indices: 1.54 - 1.6

Specific gravity: 2.6 - 2.8

Hardness (Mohs Scale): 1

Color: White or gray to apple green

Morphological varieties: Laminated and Fibrous

PLT-04771-0032

366                                                                      BOUNDY ET AL.

vary in their mineral and fiber content, the ensuing product has a considerable range
in hardness and particle shape which contributes to its versatility.

TABLE 2. Some Minerals Found in Industrial Talc

| Chlorite | $(MgFe)_5Al(AlSi_3)O_{10}(OH)_8$ |
|---|---|
| Magnesite | $MgCO_3$ |
| Dolomite | $CaMg(CO_3)_2$ |
| Calcite | $CaCO_3$ |
| Serpentine | $Mg_6(Si_4O_{10})(OH)_8$ |
| Quartz | $SiO_2$ |
| Tremolite | $Ca_2Mg_5Si_8O_{22}(OH)_2$ |

## FIELD STUDY

The three major Vermont talc companies were surveyed in the summer of 1975
and the winter of 1976. Bulk samples from representative milling and mining opera-
tions were collected and were analyzed qualitatively for their mineral constituents.
A total of 312 personal respirable mass samples (118 in mines and 194 in mills) were
taken using nylon, 10 mm cyclones at a flow rate of 1.7 lpm. Seventy percent of
these samples were analyzed for free silica content by infrared spectrophotometry
or x-ray diffraction (Cares et al., 1973). Fifty-seven parallel filter samples were taken
for fiber determinations on 0.8 $\mu m$ Millipore filters using phase contrast microscopy
at X437 magnification and on 0.4 $\mu m$ Nuclepore filters using scanning electron
microscopy at X5000 magnification.

## BULK SAMPLES

Bulk samples from the mines and mineral mixtures or products from the mills
were obtained from each company. Each sample was ground, dried, and scanned
qualitatively by x-ray diffraction (Table 3). For all the samples, talc and magnesite
are found in major amounts, chlorite and/or dolomite are minor constituents, and
dolomite, calcite, quartz, biotite, ankerite, chromite, oligoclase, or phlogopite may be
found in trace quantities.

Quartz was present in trace amounts in 15% of these samples. Further analysis
by NIOSH, which included petrographic microscope analysis, transmission electron
microscopy, and x-ray diffraction with step-scanning, revealed no asbestos in these
samples.

PLT-04771-0033

Case 3:16-md-02738-MAS-RLS  Document 26642-5  Filed 08/14/23  Page 306 of 399 PageID: 162034

TABLE 3. Qualitative Analysis of Bulk Samples by X-Ray Diffraction

| Source | Major (20-100%) | Minor (5-20%) | Trace (<5%) |
|---|---|---|---|
| Mine (37) | Talc Magnesite | Chlorite (Dolomite) | Dolomite Calcite Quartz Biotite Ankerite Chromite Phlogopite Oligoclase |
| Mill (20) | Talc Magnesite | Chlorite (Dolomite) | Calcite Quartz Phlogopite Biotite Dolomite |

## RESPIRABLE MASS SAMPLES

The personal respirable mass concentrations of the miners for the two sampling surveys are presented in Table 4. Companies A and B were working one mine, while Company C had three mines in operation in the summer and two mines during the

TABLE 4. Respirable Mass Concentrations of Vermont Miners

| Company | | Summer 1975 | | | Winter 1976 | | |
|---|---|---|---|---|---|---|---|
| | | (N) | GM | GSD | (N) | GM | GSD |
| | | | | (mg/m³) | | | (mg/m³) |
| A | Underground Mine | (18) | 0.6 | 2.1 | (16) | 0.5 | 2.1 |
| B | Underground Mine | (18) | 1.5 | 1.6 | (23) | 0.9 | 1.9 |
| C | Underground Mine | (12) | 0.6 | 1.9 | (19) | 0.7 | 1.8 |
| | Walk-in Mine | (7) | 1.2 | 2.2 | | | |
| | Walk-in Mine | | | | (6) | 1.7 | 3.3 |
| | Open Pit Mine | (2) | 0.7 | 1.4 | | | |

GM - Geometric mean
GSD - Geometric standard deviation
N - Number of samples

PLT-04771-0034

Case 3:16-md-02738-MAS-RLS   Document 28042-5   Filed 08/14/23   Page 307 of 399 PageID: 162035

winter survey. Table 4 shows that the highest dust concentrations in the underground mines occur at Company B. The ore in this mine is relatively hard, and the extensive drilling operations required to break apart the large boulders may account for the higher dust levels. There is no statistical difference between the dust exposures of the summer and winter surveys for the mines.

The respirable mass data of the millers for the summer and winter surveys are presented in Table 5. With the exception of Mill #1 at Company C, all the Vermont talc mills are large, barn-like, drafty structures heated by space-heaters. Despite the

TABLE 5. Respirable Mass Concentrations of Vermont Millers

| Company | Shift | Summer 1975 | | | Winter 1976 | | |
|---|---|---|---|---|---|---|---|
| | | (N) | GM | GSD (mg/m³) | (N) | GM | GSD |
| Company A | 1st | ( 4) | 1.7 | 1.6 | (13) | 1.7 | 1.9 |
| | 2nd | ( 6) | 0.5 | 2.0 | ( 3) | 1.5 | 2.2 |
| Company B | 1st | (22) | 1.6 | 1.8 | (42) | 1.8 | 1.6 |
| | 2nd | (12) | 2.9 | 1.7 | (16) | 1.9 | 1.6[1] |
| Company C | | | | | | | |
| Mill #1 | 1st | (12) | 0.9 | 2.4 | (20) | 1.1 | 2.8 |
| | 3rd | ( 3) | 0.8 | 2.0 | ( 4) | 1.4 | 1.9 |
| Mill #2 | 1st | (11) | 1.0 | 1.4 | ( 8) | 0.5 | 1.7[1] |
| | 2nd | (13) | 0.8 | 1.5 | ( 3) | 1.1 | 1.5 |

[1] p<0.5
[2] p<0.2
GM - Geometric mean
GSD - Geometric standard deviation
N - Number of samples.

winter closed-door policy, Table 5 shows that the dust concentrations were statistically different for only two shifts during the winter study. At Company B, the lower winter respirable dust exposures for the second shift may be caused by the severe weather conditions which forced the milling area employees to stay inside their acoustical booths whenever possible.

PLT-04771-0035

Case 3:16-md-02738-MAS-RLS Document 26642-5 Filed 08/14/23 Page 308 of 399 PageID: 162036

Of the three companies, the millers at Company C have the lowest respirable dust exposures. The bagging area at Mill #1 was not operational in the summer, since most of the product is shipped in bulk. However, this area was sampled during the winter survey and may partially account for the slight increase in the mean dust exposures. Since only the bagging area at Mill #2 was operational during the winter survey, the mean exposures are lower than the summer data.

## FIBER COUNTS

The carcinogenic potential and the hazards of asbestos exposures have been well documented. Also, several types of asbestos are known to be geological contaminants in talc ore. Since the accepted best index of exposure to asbestos requires counting the respirable fibers in the worker's breathing zone, a problem arises in the methodology of distinguishing asbestos fibers from talc. Characteristically, talc has a tendency to curl and stand on its edge which may result in many erroneous counts by optical microscopy.

The latest USPHS/NIOSH method for counting asbestos fibers requires phase contrast microscopy at X400-500 magnification, and arbitrarily defines a fiber as a particulate with a length to width ratio of 3:1 or greater, and a maximum width and minimum length of 5 micrometers (Leidel et al., in press). This method is a crude determination of total fiber exposure because of the resolution limitations of optical microscopy. Most airborne asbestos fibers are less than $5 \mu m$ in length, and those that are longer may have diameters too small to be resolved by phase contrast microscopy.

To compensate for the many controversies, our sampling protocol involved taking parallel fiber samples on Millipore (0.8 $\mu m$) and Nuclepore (0.4 $\mu m$) filters and quantitating the fibers by phase contrast microscopy and scanning electron microscopy. The fiber samplers were placed in the immediate vicinity of the worker, and a breathing zone sample was obtained without having the man wear the pumps. The Millipore filters were counted using the latest USPHS/NIOSH method at X437 magnification.

The evaluation of the corresponding Nuclepore filter by scanning electron microscopy at X5000 magnification allows one to morphologically distinguish rolled talc particles and talc shards from actual fibers. Fibers less than five micrometers in length may be counted by the higher magnification of this instrument, and the sample stage may be rotated to view a specific particle at various angles. Figures 1 through 7 represent scanning electron micrographs (SEM) of some Nuclepore filter samples showing rolled talc and elongated talc particles. Phase contrast magnifications cannot resolve the detailed morphology of these particles, and hence they would be erroneously counted as fibers.

Table 6 represents a partial list of fiber samples, and shows that by phase contrast microscopy the counts range from 0 to 60 fibers/cc. The parallel filters counted by SEM are greatly reduced and range from 0 to 0.8 fibers/cc. These concentrations are below the present time-weighted average (TWA) of asbestos which is 2 fibers/cc greater than five micrometers in length based on the phase contrast method. If the minimum length restriction is released, then the total fiber concentration for some of these samples changes slightly and ranges from 0 to 2.0 fibers/cc. Thus this SEM method provides a more realistic approach to fiber counting in the talc industry.

PLT-04771-0036

370
BOUNDY ET AL
EXPC:



FIGURE 1. Scanning electron micrograph of a Nuclepore filter showing a counting field at X400 which is the magnification recommended for fiber counting by phase contrast microscopy. Notice the number of elongated particles that fit the definition of a fiber.

FIGURE 2
located in

Case 3:16-md-02738-MAS-RLS   Document 200423   Filed XX/XX/XX   Page XXX of XXX PageID 162038



FIGURE 2. Scanning electron micrograph at X7000 magnification showing that the elongated particle located in the center of Figure 1 is morphologically not a fiber.

PLT-04771-0038

BOUNDY ET AL

EXPOSURES



FIGURE 3. Scanning electron micrograph of one rolled talc particle at X12,000 which has curled on both sides to form a tube. At a lower magnification this particle would be counted as a fiber.

FIGURE 4.   S
magnification  wr
laminated featur

PLT-04771-0039

Case 3:16-md-02738-MAS-RLS   Document 26642-5   Filed 08/14/22   Page 312 of 399 PageID: 162040



FIGURE 4.   Scanning electron micrograph of an elongated particle standing on edge at X3500 magnification which might be considered as a fiber. By rotating the sample stage 60° (Figure 5), the laminated features of this talc particle can be seen.

PLT-04771-0040

374                                                     BOUNDY ET AL.



FIGURE 5. (see Fig. 4 for legend).



FIGURE 8.    Scanning electron micrographs showing that even some "fibers" are not immune from closer scrutiny. When the sample stage of the "fiber" in Figure 6 is rotated 50, the "fiber" has the appearance as shown in Figure 7. These magnifications are X5000 and X15,000 respectively.

PLT-04771-0042



FIGURE 7. (see Fig 6 for legend).

Case 3:16-md-02738-MAS-RLS   Document 26642-5   Filed 08/14/23   Page 316 of 399 PageID: 16204

TABLE 6. Fiber Counts

| Company | | Location | Phase Contrast (fibers/cm³ > 5 μm length) | SEM | SEM fibers/cm³ |
|---------|--|----------|---------------------|-----|----------------|
| A | Mine | Bobcat area | 3.8 | 0 | 0.3 |
| | | Drilling area | 4.1 | 0 | |
| | Mill | Crushing area | 4.7 | 0 | — |
| | | Bagger | 63.5 | 0 | |
| | | Palletizer | 7.9 | 0.7 | |
| B | Mine | Driller | 0.8 | 0 | |
| | | Scraper | 16.1 | 0.7 | 2.0 |
| | Mill | Crusher | 1.6 | 0 | |
| | | Bagger | 8.0 | 0.8 | |
| | | Palletizer | 4.6 | 0.3 | |
| C | Underground mine | Driller | 0.8 | 0.3 | |
| | | Mucker | 0 | 0.3 | 0.6 |
| | Walk-in Mine | Automatic Miner | 7.5 | 0 | |
| | Mill #2 | Bagging Area | 0.6 | 0.1 | |
| | | Palletizing area | 1.7 | 0 | |

## CONCLUSIONS

The Vermont talc industry was selected by NIOSH for both epidemiological and environmental surveys to establish a TWA dust exposure because this talc was believed to contain minimum amounts of quartz and asbestos. This environmental study characterized bulk samples from the three companies, and quantitated the talc workers' dust exposures. X-ray diffraction studies showed that the bulk samples contained major amounts of talc, and only trace amounts of quartz were found in 15% of these samples. Petrographic microscopy analyses, analytical transmission electron microscopy, and x-ray diffraction with step-scanning revealed no asbestos in the bulk samples.

The study further showed that SEM should be considered as an adjunct to the USPHS/NIOSH method when counting fibers in a dust environment. Phase contrast microscopy may suffice in an asbestos environment, but the resolution limitations of optical microscopy and the inability to distinguish rolled talc particles and talc "shards" from actual asbestos fibers will allow only a crude determination of the total fiber exposure.

FIGURE 7. (see Fig 6 for legend).

PLT-04771-0044

Case 3:16-md-02738-MAS-RLS · Document 28642-5 · Filed 08/14/23 · Page 317 of 399 PageID: 162045

## REFERENCES

Brown, C.E.: Talc. In Brobst, D.A. and Pratt, W.P. (editors), U.S. Mineral Resources. Washington, D.C., 1973, pp. 619–625.

Carce, J.W., Goldin, A.S., Lynch, J.J., and Burgess, W.A.: The Determination of Quartz in Airborne Respirable Granite Dust by Infrared Spectrophotometry. Am. Ind. Hyg. Ass. J. 34: 298, 1973.

Hildick-Smith, G.Y.: The Biology of Talc. Brit. J. Ind. Med. 33: 217, 1976.

Jacobs, E.C.: Talc and the Talc Deposits of Vermont. Ninth Report Vermont State Geologist, 1914, pp. 382–429.

Jacobs, E.C.: The Talc and Verde Antique Deposits of Vermont. Report Vermont State Geologist, 1918, 232–281.

Leidel, N.A., Bayer, S.G., and Zumwalde, R.D.: USPHS/NIOSH Membrane Filter Method for Evaluating Airborne Asbestos Fibers. (in press).

Weiss, B. and Boettner, E.A.: Commercial Talc and Talcosis. Archives of Env. Health 14: 304, 1967.

PLT-04771-0045

**EXHIBIT E**

PLT-04771-0046

✛ EMV
ASSOCIATES

Consultant Report to
Johnson & Johnson

ANALYSIS OF TWO TALC
SAMPLES BY SEM/EDS

24 September 1982

Submitted by:

EMV ASSOCIATES, INC.

*Ethan J. Goldberg*
Ethan J. Goldberg
Laboratory Director

*John M. Wehrung* ЄУ
John M. Wehrung
Executive Vice President

PLT-04771-0047

+EMV
ASSOCIATES

## -ANALYSIS AND RESULTS

Two talc samples were examined for freedom from asbestos by scanning electron microscopy and energy dispersive spectroscopy (SEM/EDS).

The samples were designated as 100 mesh ore acid steeped (EMV #1) and ground ore at 100 mesh (EMV #2).

The samples were prepared by two methods. The first method involved placing a representative quantity of the powder onto double sided tape until a uniform dispersion of particles was obtained. The second method involved placing a representative quantity of powder into a beaker containing 20 ml of ethanol. This mixture was ultrasonically treated for 10 seconds to allow the powder to become suspended in the ethanol. The ultrasonic treatment was then stopped allowing for a density separation of the particles in the ethanol. The top layer of ethanol (which would contain the lighter asbestos particles, if present) was then filtered directly across a Nuclepore membrane (47 mm diameter, 0.2 um pore size). A 1 $cm^2$ region of the filter was trimmed and mounted on an SEM stub.

All samples were then coated with an evaporated layer of carbon for electrical conductivity.

The samples were examined at various magnifications (1000X to 10,000X) during the investigation with the SEM. Any fibrous particles encountered were identified by EDS analyses and an EDS spectrum was also obtained for typical talc particles. Total area viewed during the examination was approximately 0.5 $mm^2$.

PLT-04771-0048



Results of the analysis on these samples are that no asbestos was detected. In addition, prismatic and blocky forms of tremolite were not detected.

Representative SEM micrographs and EDS spectra for typical areas observed are shown in Figures 1 and 2.

PLT-04771-0049



2000X



Figure 1.  SEM micrograph of talc particles observed during the analysis or sample 100 mesh ore acid steeped (EMV #1).  EDS spectrum is representative of particles encountered throughout the sample.

PLT-04771-0050

EMV
ASSOCIATES



2000X



Figure 2.  SEM micrograph of talc particles observed during the analysis of sample ground ore at 100 mesh (EMV #2).  EDS spectrum is representative of particles encountered throughout the sample.

PLT-04771-0051

# CERTIFICATE OF MICROANALYSIS
# FOR ASBESTOS

**SAMPLE DESCRIPTION:** 100 mesh ore acid steeped (EMV #1) and ground ore at 100 mesh (EMV #2)

**METHOD OF ANALYSIS:** Qualitative physical and chemical characterization of fibrous material with the scanning electron microscope and energy dispersive x-ray analyzer.

**RESULTS:** No asbestos detected.

*John M. Wehrung*
**Analyst**

*9-23-82*
**Date**

*Ethan J. Goldberg*
**Ethan J. Goldberg**
**Laboratory Director**

**EMV ASSOCIATES INC**

MICROANALYSIS LABORATORY
15825 Shady Grove Road
Rockville, Maryland 20850

PLT-04771-0052

EXHIBIT F

PLT-04771-0053

EMV
ASSOCIATES

Consultant Report to
Johnson & Johnson

ANALYSIS OF ONE TALC
SAMPLE BY SEM/EDS

18 October 1982

Submitted by:

EMV ASSOCIATES, INC.

Leonard G. Burrelli
Research Analyst

Ethan J. Goldberg
Laboratory Director

PLT-04771-0054



## ANALYSIS AND RESULTS

One talc sample was examined for freedom from asbestos by scanning electron microscopy and energy dispersive spectroscopy (SEM/EDS).

The sample was designated as talc ore coded 529-162.

The sample was prepared by two methods. The first method involved placing a representative quantity of the powder onto double sided tape until a uniform dispersion of particles was obtained. The second method involved placing a representative quantity of powder into a beaker containing 20 ml of ethanol. This mixture was ultrasonically treated for 10 seconds to allow the powder to become suspended in the ethanol. The ultrasonic treatment was then stopped allowing for a density separation of the particles in the ethanol. The top layer of ethanol (which would contain the lighter asbestos particles, if present) was then filtered directly across a Nuclepore membrane (47 mm diameter, 0.2 um pore size). A 1 $cm^2$ region of the filter was trimmed and mounted on an SEM stub.

The sample was then coated with an evaporated layer of carbon for electrical conductivity.

The sample was examined at various magnifications (1000X to 10,000X) during the investigation with the SEM. Any fibrous particles encountered were identified by EDS analyses and an EDS spectrum was also obtained for typical talc particles. Total area viewed during the examination was approximately 0.5 $mm^2$.

EMV
ASSOCIATES

No asbestos was detected in this sample during the analysis.  In addition, prismatic and blocky forms of tremolite were not detected.

A representative SEM micrograph and EDS spectrum for a typical area observed is shown in Figure 1.

PLT-04771-0056





2000X



Figure 1.  SEM micrograph of talc particles observed during the analysis of Johnson & Johnson sample 529-162.  EDS spectrum is representative of particles encountered throughout the sample.

PLT-04771-0057

# CERTIFICATE OF MICROANALYSIS
# FOR ASBESTOS

**SAMPLE DESCRIPTION:**

Talc ore 529-162

**METHOD OF ANALYSIS:** Qualitative physical and chemical characterization of fibrous material with the scanning electron microscope and energy dispersive x-ray analyzer.

**RESULTS:** No asbestos detected.

Analyst

18 October 1982
Date

Ethan J. Goldberg
Laboratory Director

**EMV ASSOCIATES INC**

MICROANALYSIS LABORATORY
15825 Shady Grove Road
Rockville, Maryland 20850

PLT-04771-0058

**EXHIBIT G**

PLT-04771-0059

Volume _____
Pages _____
Exhibits _____

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
- - - - - - - - - - - - - - - - - - x
DAVID HOWARD WESTFALL IN HIS           :
CAPACITY AS ADMINISTRATOR OF THE       :
ESTATE OF THOMAS HOWARD WESTFALL       :
AND HIS CAPACITY AS ADMINISTRATOR      :
OF THE ESTATE OF BETTY E. WESTFALL,    :
                     Plaintiff,        :
                                       :
    v.                                 :
                                       :   Civil Action
WHITTAKER, CLARK & DANIELS,            :   No. 79-0269
METROPOLITAN TALC COMPANY, INC.,       :
PFIZER, INC., WINDSOR MINERALS, INC.,  :
ITSELF AND AS SUCCESSOR TO EASTERN     :
MAGNESIA TALC COMPANY, INC., AND       :
OMYA, INC., ITSELF AND AS SUCCESSOR    :
TO VERMONT TALC COMPANY, INC.,         :
                     Defendants.       :
- - - - - - - - - - - - - - - - - - x
```

VIDEOTAPE DEPOSITION of ALFRED H. CHIDESTER, a witness

called on behalf of the Defendants, taken pursuant to the

Federal Rules of Civil Procedure, before Doris M. Jones,

Registered Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the Offices of

Nutter, McClennen & Fish, 600 Atlantic Avenue, Boston,

Massachusetts, on Sunday, October 23, 1983, commencing at

10:15 a.m.

PRESENT:

    Decof & Grimm (by R. Daniel Prentiss, Esq.),
        One Smith Hill, Providence, Rhode Island 02903,
        for the Plaintiff.
                                        (continued)

Doris M.
JONES & Associates
Professional Shorthand Re...

101 Monmouth Street • Boston  Massachusetts 02146 • (617) 749-5888

PLT-04771-0060

1    am from Providence, Rhode Island and I represent

2    Omya, Inc.

3                   MR. PRENTISS:  I am Dan Prentiss.  I am

4    from the firm of Decof & Grimm in Providence and I

5    represent the plaintiff.

6                   MR. LEIBENSPERGER:  I would now like to

7    ask the court stenographer and court officer to

8    swear in the witness please.

9

10                   ALFRED H. CHIDESTER

11   a witness called for examination by counsel for

12   the Defendants, being first duly sworn, was

13   examined and testified as follows:

14

15                   DIRECT EXAMINATION

16      BY  MR. LEIBENSPERGER:

17      Q.    Sir, would you state your full name

18   please.

19      A.    Alfred H. Chidester.

20      Q.    And what's your home address?

21      A.    2427 Alsop, A L S O P, Court, Reston,

22   Virginia.

23      Q.    Where are you employed?

24      A.    U.S. Geological Survey.

PLT-04771-0061

Q. Are you married, sir?

A. Yes.

Q. Any children?

A. Three.

Q. Their ages?

A. Thirty-nine, 32 and 25.

Q. How long have you been employed by the United States Geological Survey?

A. Thirty-nine years. I think. Just about. Nearly 39 years.

Q. And what's your present position?

A. I am the associate chief of the Office of International Geology.

Q. Would you tell us what the United States Geological Survey is.

A. It's an organization that has the responsibility to prepare topographic maps of the United States, to assess the mineral resources of the United States and the water resources.

Q. Is it a governmental agency?

A. Yes.

Q. Under what --

A. Department of the Interior.

Q. A federal government agency then?

DORIS M. JONES & ASSOCIATES

PLT-04771-0062

1        A.     Yes.

2        Q.     Sir, where did you attend under-

3   graduate college?

4        A.     Augustana College in Rock Island,

5   Illinois.

6        Q.     And what year did you graduate?

7        A.     1942.

8        Q.     And what degree did you receive from

9   Augustana College?

10       A.     B.A. i think it was.  A.B., whichever

11   it is.

12       Q.     In what major please?

13       A.     In mathematics.

14       Q.     Now did you go on to any higher

15   education?

16       A.     Yes, I went to graduate school at the

17   University of Chicago.

18       Q.     And what degree did you receive from

19   the University of Chicago?

20       A.     Ph.D.

21       Q.     What year did you receive your Ph.D.

22   from Chicago?

23       A.     It was granted in 1959.

24       Q.     Did you spend some time in residence at

DORIS M. JONES & ASSOCIATES

PLT-04771-0063

1   the University of Chicago?

2        A.    Yes.   A little over three years.

3        Q.    And what were those years?

4        A.    1942 to 1944 and '45 to '48.

5        Q.    Doctor Chidester, what was your first

6   full time employment in the field of geology?   I'm

7   sorry, let me take a step back.   I didn't ask you

8   what your Ph.D. was in at the University of

9   Chicago.

10        A.    Geology.

11        Q.    What was your first full time

12   employment in the field of geology?

13        A.    My first full time employment was a

14   short -- about two months working on pegmatites in

15   New Hampshire.   Then I transferred immediately

16   after that over to Vermont, working on the talc

17   deposits of Vermont.

18        Q.    By whom were you employed?

19        A.    Geological Survey.

20        Q.    So your first full time employment was

21   the U.S. Geological and Survey and you have been

22   employed by them ever since; is that correct?

23        A.    Yes.

24        Q.    What year was it that you went to

1    Vermont and began working in the area of talc

2    deposits?

3         A.    1944.

4         Q.    Did you develop a specialty or a

5    special area of interest within the United States

6    Geological Survey with respect to any particular

7    type of rock?

8         A.    Yes, I specialized in the geology of

9    the ultramafic rocks with which talc is associated.

10        Q.    You used the word ultramafic rock.

11   Would you tell us what that is please.

12        A.    It's an igneous rock that consists of

13   minerals that are high in magnesium and iron.

14        Q.    You use the word igneous rock.  Would

15   you tell us what igneous is please.

16        A.    It's a rock that at one time in its

17   history was molten.

18        Q.    Such as -- well, molten meaning --

19        A.    Melted.

20        Q.    Melted.  All right.  Let's take a step

21   back then.

22             With respect to your starting

23   employment in the area of talc and that area of

24   interest, how many years did you spend with the

DORIS M. JONES & ASSOCIATES

1      J.S. Geological Survey concerning yourself with

2      talc?

3          A.      Actually in field mapping probably

4      about a total of 19 years.

5          Q.      And where did this take place?

6          A.      In Vermont and northern Massachusetts,

7      with considerable trips to other areas of

8      ultramafic rock though throughout the United

9      States.

10         Q.      The primary area of your concentration

11     geographically was --

12         A.      Vermont.

13         Q.      Vermont?

14         A.      And northern Mass.

15         Q.      Okay.  At some point in time in your

16     career at the United States Geological Survey did

17     you change into another area of interest other

18     than talc?

19         A.      Yeah, I went into the lunar exploration

20     program.

21         Q.      Lunar exploration?

22         A.      Yes.

23         Q.      And what year was that?

24         A.      1963.

DORIS M. JONES & ASSOCIATES

PLT-04771-0066

1    Q.    And would you tell us just very briefly

2    what you did with respect to that?

3         A.    Well, I became involved in the manned

4    lunar exploration part of the lunar program and it

5    was training the astronauts in field geology.

6         Q.    Where did you train the astronauts?

7         A.    Oh, everywhere from Hawaii to Alaska to

8    Iceland.

9         Q.    Would you give us the years inclusive

10   that you were involved with training the

11   astronauts?

12        A.    1963 to 1971.

13        Q.    What was your title with respect to

14   this job position?

15        A.    Well, it changed several times.  It

16   started out as chief of the field training for

17   astronauts.  Then I became the chief of the manned

18   lunar exploration branch of the Geological Survey

19   and then was chief of the Astrogeology Center in

20   Flagstaff, Arizona.

21        Q.    Since 1970, Doctor Chidester, would you

22   tell us in a brief sketch what your area of

23   interest has been with respect to the United

24   States Geological Survey?

PLT-04771-0067

1        A.      I have been primarily involved in the

2    international programs of the Geological Survey,

3    the coordination of those.

4        Q.      And your present title is what?

5        A.      Associate chief of the Office of

6    International Geology.

7        Q.      And what does that entail, being

8    involved with the international programs?

9        A.      Coordinating the activities of the

10   Geological Survey in cooperative research with

11   other countries throughout the world.

12       Q.      At the present time are you getting

13   ready to travel outside the United States?

14       A.      Yes.

15       Q.      Where are you going?

16       A.      South Africa.

17       Q.      On whose behalf are you going to South

18   Africa?

19       A.      The Geological Survey.

20       Q.      Will you tell us what this trip is just

21   very briefly?

22       A.      We have a cooperative program with

23   Australia, South Africa, Great Britain, West

24   Germany and -- the United States -- I knew there

DORIS M. JONES & ASSOCIATES

PLT-04771-0068

1   was another one -- involving an assessment --

2   developing an inventory of the principal mineral

3   deposits throughout the world, exchanging

4   information amongst these participants on these

5   mineral deposits.

6          Q.    With respect to this particular

7   conference, if I can use that word, in South

8   Africa, what is your title or role?

9          A.    I am the chief of the U.S. delegation.

10         Q.    And when do you leave?  What date do

11  you leave for that trip to South Africa?

12         A.    26th of October.

13         Q.    And what date do you come back from the

14  trip to South Africa?

15         A.    November 17.

16         Q.    Doctor Chidester, do you belong to any

17  professional societies?

18         A.    Yes.

19         Q.    Would you tell us what those are please?

20         A.    The Geological Society of America,

21  American Mineralogical Society, the American

22  Geophysical Union, Sigma Psi.  Let's see, there

23  must be a few others but those are the principal

24  ones.

DORIS M. JONES & ASSOCIATES

1        Q.      Now is the same true with the igneous

2   and sedimentary rocks?  Does that occur over

3   millions of years also?

4        A.      Ordinarily, yes.

5        Q.      Now how is the rock talc formed?

6        A.      Well, there are two principal kinds of

7   talc.  That is, in terms of what it was formed

8   from.  One is formed by the alteration of the

9   ultramafic rocks and talc is also formed by the

10  alteration of carbonate rocks like limestone.

11       Q.      So of the two ways that talc is formed --

12  and you used the word alteration.  Does that mean

13  change?

14       A.      Change, yes.

15       Q.      Over millions of years?

16       A.      Over a considerable period anyway, yes.

17       Q.      Hundreds of thousands of years?

18       A.      Hundreds of thousands.

19       Q.      All right.  Of the two ways that talc

20  is formed, which way is talc formed in Vermont?

21       A.      All the talc in Vermont that I am aware

22  of is formed by the alteration of ultramafic rocks.

23       Q.      So the only thing we are concerned

24  about here today is the formation of talc from

PLT-04771-0070

1    what you call ultramafic rocks?

2        A.    Yes.

3        Q.    Would you tell us then what an

4    ultramafic rock is?

5        A.    Ultramafic rock in the sense that we

6    are using it is -- those in Vermont anyway -- are

7    rocks that -- they were originally igneous rocks

8    and they consisted of two rock types in various

9    mixtures, dunite and peridotite.

10       Q.    And then did something happen to those

11   rocks to cause them to change?

12       A.    In Vermont they were -- most of the

13   ultramafic rock bodies are almost entirely or

14   entirely altered to serpentine.  The rock name is

15   serpentinite but it's a rock consisting of the

16   mineral serpentine and talc.  Talc rock, let's say.

17       Q.    If I understand you, the periodotite

18   and the dunite over hundreds of thousands of years

19   in Vermont was altered to sepentinite; is that

20   correct?

21       A.    Yes.

22       Q.    What is sepentinite then?

23       A.    It's a rock consisting primarily of one

24   or more of the serpentine minerals, commonly

PLT-04771-0071

1       antigorite, lizardite and chrysotile.

2            Q.     Now what happens --

3            A.       -- with minor accessory minerals.

4            Q.     What happens to serpentinite that

5       causes a change to talc?

6                   MR. PRENTISS:  Objection.

7            Q.     Let me rephrase the question.

8                   My original question was how was talc

9       formed and you have talked about the formation of

10      serpentinite.  What next happens in that process?

11           A.     Under appropriate conditions of

12      temperature and pressure the serpentinite can

13      alter to talc or -- actually I use the term talc

14      rock in a loose sense.  It's a rock consisting

15      either entirely of talc or a rock of talc and

16      magnesite.

17           Q.     Would you describe for us the changes

18      or the affects to serpentinite that causes that

19      alteration or change?

20                  MR. PRENTISS:  Objection.

21           A.     With the -- when carbon dioxide carried

22      in solution deep within the earth, deep within the

23      rock mass, rock pile, reaches the body of

24      serpentinite, it's altered under appropriate

PLT-04771-0072

2

1    conditions of temperature and pressure to talc and

2    magnesite.

3          Q.    How long does that take?

4          A.    Oh, I suppose that is a long continued

5    process.

6          Q.    Well, in numbers of years?

7          A.    Well, you know, it's really hard to say,

8    but hundreds of thousands to maybe a few million.

9          Q.    Years?

10         A.    Yes.

11         Q.    Does talc have a specific structure to

12    it that can be identified?

13         A.    Yes.

14         Q.    Is that also true of serpentinite or

15    serpentine?

16         A.    Yeah, there are three serpentine

17    minerals.

18         Q.    Can you tell the difference between

19    those two things by looking at the structure?

20         A.    Yeah.  Talc and serpentine minerals are

21    quite easily distinguished.

22         Q.    Doctor, we have talked up to now about

23    the rock talc and how talc was formed.  I am going

24    to change the subject now.  Would you tell us what

DORIS M. JONES & ASSOCIATES

PLT-04771-0073

31

1      asbestos is?

2                    MR. PRENTISS:  Objection.  You can

3      answer.

4            A.    Asbestos in Vermont, the kind that we

5      are concerned with in Vermont that I have worked

6      with, is a form of serpentine called chrysotile

7      and it's formed in a body of serpentine rock,

8      serpentinite, by when it is fractured and material

9      moves -- these fractures are filled with a

10     solution, a fluid, mostly water, and the asbestos,

11     chrysotile asbestos grows into these fractures.

12           Q.    Let me take a step back about the word

13     asbestos.  What does the word asbestos mean?  Is

14     that a rock, a mineral?

15           A.    It's a particular -- it's a mineral

16     that has a particular shape really.

17           Q.    Are there types of asbestos?

18           A.    Yes.

19           Q.    What types are there?

20           A.    Well, the two basic principal divisions

21     are amphibole asbestos and chrysotile asbestos.

22           Q.    Now of the two types of asbestos,

23     amphibole on the one hand and chrysotile on the

24     other hand, which of those kinds of asbestos is

DORIS M. JONES & ASSOCIATES

22

1    found in Vermont?

2         A.    Chrysotile.

3         Q.    Only chrysotile?

4         MR. PRENTISS:  Objection.

5         A.    It's the only kind mined and it's the

6    only kind that I have seen.

7         Q.    And I think you said in answer to a

8    previous question that the chrysotile asbestos

9    derives from serpentine or serpentinite; is that

10   correct?

11        A.    Yes.

12        Q.    Would you describe for us what that

13   process is.

14        A.    Under appropriate conditions of

15   temperature and pressure, when a fracture is

16   opened in the rock --

17        Q.    Opened in what rock?

18        A.    In the serpentinite or in the dunite.

19        Q.    All right.

20        A.    It can also form in a rock that is not

21   completely altered to serpentinite.  In fact it's

22   generally in these large bodies that there is some

23   residual igneous ultramafic rock left that you get

24   the chrysotile asbestos.  And under these

PLT-04771-0075

1    conditions material moves up from the wall rock

2    into -- because of the -- I want to avoid getting

3    too technical but it moves out into the wall rock

4    and forms fibers, hairlike filaments of chrysotile

5    that commonly are oriented normal or at a large

6    angle to the adjacent -- to the adjacent rock

7    bounding the fracture.

8         Q.    Is chrysotile asbestos found only --

9    well, let me withdraw that question.

10        You mentioned a crevice or a vein

11   before?

12             MR. PRENTISS:  Objection.

13        Q.    What did you mean by that?  A crevice

14   or vein in what?

15             MR. PRENTISS:  Objection.

16        A.    A fracture in the host rock.

17        Q.    What is the host rock?

18        A.    Sepentinite or dunite.

19        Q.    What do you mean by fracture?

20        A.    It's a -- well, it's a space in which a

21   rock opens up to form a void of appreciable length

22   and width and generally much smaller thickness.

23        Q.    What occurs in that fracture with

24   respect to this forming of asbestos you have

PLT-04771-0076

1       talked about?

2           A.    Because of chemical relations the

3       material from the rock bounding the fracture moves

4       out into the void and develops chrysotile asbestos.

5           Q.    I think you said before that you find

6       veins of chrysotile asbestos in a host rock of

7       serpentinite or dunite; is that correct?

8           A.    Yes.

9           Q.    Do you ever find veins of chrysotile

10      asbestos in talc?

11          A.    In a talc rock?  No, I have never.

12          Q.    Why not?

13          .     MR. PRENTISS:   Objection.

14          A.    Because the process by which the talc

15      was formed has changed the serpentine, all the

16      serpentine minerals to talc.  So any asbestos that

17      may have been there in the first place is altered

18      to talc.

19          Q.    How long does that take?

20          A.    Oh, you know, hundreds of thousands to

21      millions of years again.

22          Q.    Between serpentine or serpentinite and

23      chrysotile asbestos, which would alter first into

24      talc?

DORIS M. JONES & ASSOCIATES

PLT-04771-0077

1    personally been at the Johnson mine in Johnson,

2    Vermont?

3         A.    Yes.

4         Q.    Would you compare the Johnson mine with

5    this average ultramafic body with respect to the

6    existence of serpentinite?

7         A.    Yeah.    The Johnson mine has virtually --

8    well, not -- not no serpentinite, but very little

9    serpentinite.

10        Q.    Well, would you tell us with the

11   drawing you are looking at right now, with this

12   drawing, what happens to the serpentinite -- or

13   what happened to the serpentinite at the Johnson

14   mine?

15        A.    Well, it all changed to talc and

16   magnesite.

17        Q.    So that the area in the middle which is

18   serpentinite --

19        A.    Like so.

20        Q.    I understand.    All right.    Why don't

21   you have a seat again, Doctor Chidester, and let

22   me ask you a few more questions.

23             I think your earlier testimony was that

24   you spent from approximately 1943 or 4 to 1952

DORIS M. JONES & ASSOCIATES

PLT-04771-0078

1      studying talc; is that correct?

2          A.    Yes.

3          Q.    Would you tell us, for example, in

4      Vermont just a description of what -- how many

5      mines, for example, you visited?

6              MR. PRENTISS:  Objection.

7          Q.    In those years of '44 to '52, how many

8      mines did you go to in Vermont?

9              MR. PRENTISS:  Objection.

10         Q.    Talc mines, I mean.

11         A.    To virtually every talc mine.

12         Q.    Which is how many approximately?

13         A.    Well, at that time there were probably

14     four or five active and several that were shut

15     down.

16         Q.    All right.  And what did you do as part

17     of your job for the United States Geological

18     Survey with respect to looking at the talc mines?

19             MR. PRENTISS:  Objection.

20         A.    I would map the talc mine, collect

21     samples, analyze the samples and write a report.

22         Q.    Would you tell us what it means to map

23     the talc mine?

24         A.    Well, mapping a mine consists of two

PLT-04771-0079

1    phases.  One, mapping the surface outcrop of the

2    rocks in which you plot the distribution of the

3    different rock types on a map and draw in the

4    boundaries between the different rock types and

5    make observations on the attitudes of the

6    boundaries between these rock types, the contacts,

7    and then the underground workings you do the same

8    only on a plot of the mine workings themselves.

9        Q.    Now do you have to go into the mine

10   itself to do the mapping?

11       A.    Yes.

12       Q.    Would you tell us then what do you do

13   in terms of actually looking at things and getting

14   it down on paper?  What's the process?

15       A.    You take a plot of the mine workings,

16   which also includes in the mining activity they

17   actually drill -- make diamond drill holes ahead

18   of them to plan their mining so that they know the

19   distribution ahead of the talc rock.

20           So using this basic information you had

21   in the walls, the distribution of rock types in

22   the walls of the mine workings and make sketches

23   of the roof or anything else that is relevant  to

24   collect samples for analysis.

DORIS M. JONES & ASSOCIATES

PLT-04771-0080

1          Q.     Now what do you do with the samples

2     that you collect?

3          A.     Examine them with a hand lens and then

4     make a selection of samples that are

5     representative of different rock types and of the

6     different areas so that you adequately cover the

7     area of the mine and make thin sections for

8     microscopic study and select some for chemical

9     analysis.

10         Q.     Now with respect to the Johnson mine in

11    Johnson, Vermont, did you have a direct experience

12    or were you personally there at the Johnson mine

13    at sometime?

14         A.     Yes.

15         Q.     Did you map Johnson mine?

16         A.     Yes.

17         Q.     Tell us when that was.

18         A.     194 -- the intensive period of mapping

19    was 1944 to 1945.

20         Q.     When you say intensive period, would

21    you describe your day to day working.

22         A.     Virtually we made a map of the surface

23    and then map of the underground virtually every

24    day, spent much of that period actually in

DORIS M. JONES & ASSOCIATES

1    underground mapping and surface mapping.

2         Q.    Since that time, 1945, have you been

3    back to the Johnson mine?

4         A.    Yeah, I'd go back periodically after

5    1948 when I returned to Vermont to update the

6    mapping as they progressed in their mining.

7         Q.    Approximately how many times after 10 --

8    I guess commencing in 1943 did you go back to

9    update the mapping?

10        A.    Oh, probably two, three, four times a

11   year.

12        Q.    Through what year?  What was the last

13   time you updated the mapping at the Johnson mine?

14        A.    Probably in the mid-fifties.

15        Q.    Was that your best memory?  Can you

16   give us a year?

17        A.    No, not really.  I'd say probably

18   around '54, '55, something like that.

19        Q.    Since 1954, 1955, have you gone back to

20   the Johnson mine for any purpose?

21        A.    I would go back occasionally to take

22   foreign visitors who were interested in talc,

23   probably two or three, four times.

24        Q.    Can you give us the years that you took

5

1    visitors back to the Johnson mine after 1954 to '55?

2        A.    I'd say probably the last time would

3    have been in '51 or '52.

4        Q.    Now with respect to the Johnson mine

5    mapping, did you take any samples from the Johnson

6    mine?

7        A.    Yes.

8        Q.    Would you describe for us how you took

9    samples, where you took them, and what you did

10   with the samples?

11       A.    I took them out of the mine workings

12   themselves, the walls of the levels, out of the

13   stopes and particularly out of the stopes where

14   the principal -- where the ore is fully mined.

15       Q.    You are going to have to tell us what a

16   stope is.

17       A.    It's a large opening above a level

18   hallway, haulage way that is raised up along the

19   talc body, in the talc body, and they open this

20   out by various kinds of mining methods, and I'm no

21   mining engineer so I won't attempt to describe

22   them, so that it ends up as a very large opening,

23   maybe a hundred or more feet high, several hundred

24   feet long and 50, 60, 80, a hundred feet wide.

DORIS M. JONES & ASSOCIATES

PLT-04771-0083

1     Q.     Is this all underground?

2     A.     Yes.

3     Q.     So go ahead, tell us further where

4     you take samples in the underground --

5     A.     Throughout the mine really, wherever

6     there was a -- so that I had a good geographic

7     representation of the rocks as well as a good

8     selection of slight variations in rock type, both

9     of the country rock and of the talc body itself.

10     Q.     Would you tell us how many samples you

11     took from the Johnson mine?

12     A.     Oh, I would guess three, four, five

13     hundred.

14     Q.     And what did you do with those samples?

15     A.     After examining them by hand lens, I

16     selected probably a hundred or so for thin

17     sections.

18     Q.     When you say thin sections, would you

19     tell us what that means?

20     A.     You cut a thin slice of rock, just very

21     thin so that light -- so the light can be

22     transmitted through it, and it's mounted on a

23     glass slide covered with a glass plate. You put

24     it under a microscope, petrographic microscope,

PLT-04771-0084

1            MR. PRENTISS:   Well, objection.   I

2     think that calls for a yes or no answer.

3            A.     Yes.

4            Q.     Let me withdraw the question and I will

5     get back to it.

6                   Did you go into this mine that you have

7     now drawn for us?

8            A.     Yes.

9            Q.     Did you observe anywhere in the mine

10    any serpentinite?

11           A.     During the time that I was mapping

12    there, there was no serpentinite exposed in any of

13    the active mine workings.  There was an old mine

14    working that had been shut down for a number of

15    years, and I'm not sure how many, several years

16    though, before I started mapping, in which they

17    had encountered serpentinite.

18           MR. PRENTISS:   Objection.  Motion to

19    strike.

20           Q.     Let me go back for a moment.

21                  What year did you start your mapping at

22    Johnson mine?

23           A.     '44.

24           Q.     And would you show us, for example, on

DORIS M. JONES & ASSOCIATES

PLT-04771-0085

1       this drawing where the mine shaft would be that

2       the miners would go down in to get to the talc?

3              A.    Well, in the early days of mining they

4       went down on talc outcropping at the surface.

5       They went down for maybe a hundred feet.  Then --

6              Q.    By the early days of mining you mean

7       when?

8              A.    The early 1900s.

9              Q.    Before you were there?

10             A.    Before I was there.

11             Q.    And they went down about a hundred feet?

12             A.    Something like that.

13             Q.    Show us a hundred feet on this.

14             A.    There.

15             Q.    Just down to there?

16             A.    Yes.

17             Q.    When you got down there in 1944 was

18      that shaft going down a hundred feet still being

19      operated?

20             A.    No.

21             Q.    What shaft was being operated in 1944?

22             A.    They had put another shaft principally

23      in the country rock at 45 degrees.

24             Q.    So it angled down in the country rock?

DORIS M. JONES & ASSOCIATES

1      A.    Yes.

2      Q.    And then how would they get from that

3   shaft to where the talc was?

4      A.    They would drift over from the shaft at

5   appropriate intervals, something on the order of a

6   hundred feet, I recall, and then drift along the

7   length of the ore body.

8      Q.    The ore body meaning the talc?

9      A.    Yes.

10      Q.    Now I asked you before whether you had

11   ever in your time at Johnson mine observed any

12   serpentinite and would you answer that question

13   again please.

14      A.    Yes.

15      Q.    Where was that?

16      A.    At the north end of this old working.

17      Q.    All right.   Did you ever observe any

18   serpentinite in the active mine?

19      A.    No.

20      Q.    At any of your time at Johnson mine did

21   you ever observe any asbestos at the mine?

22      A.    No.

23      Q.    Were you looking for asbestos?

24      A.    Yes.

DORIS M. JONES & ASSOCIATES

PLT-04771-0087

1          Q.     Why?

2          A.     Well, I was interested in establishing

3     how these deposits -- and one of the critical

4     things to establish is the relation of the talc to

5     the serpentinite and the relation in terms of age

6     and the relation of the talc to the asbestos in

7     the serpentinite.

8          Q.     All right.  Have you been in other

9     ultramafic bodies other than the Johnson mine

10    where you did see serpentinite, for example?

11               MR. PRENTISS:  Objection.

12         A.     Yes.

13         Q.     So you had seen serpentinite before; is

14    that correct?

15         A.     Oh, yes.

16               MR. PRENTISS:  Objection.

17         Q.     And have you -- had you been in that

18    time, in the 1940s and 1950s, in an ore body where

19    there was asbestos?

20               MR. PRENTISS:  Objection.

21               MR. DOLAN:  Objection.

22         A.     Yes.

23         Q.     Had you seen asbestos before?

24         A.     Yes.

PLT-04771-0088

1        Q.      In a mine?

2        A.      Yes.

3        Q.      Now with respect to the samples that

4    you took from the Johnson mine, I think you said

5    several hundred; is that correct?

6        A.      Yes.

7        Q.      Did you ever see any asbestos in any of

8    those samples?

9        A.      No.

10       Q.      You also looked at under a microscope --

11   I forget the number now, was it over a hundred?

12       A.      Over a hundred.

13       Q.      -- samples from the Johnson mine.  Did

14   you see any asbestos in any of those microscopic

15   thin sections?

16       A.      No.

17       Q.      Have you seen in your experience or had

18   you seen at that time in your experience asbestos

19   under a microscope?

20       A.      Yes.

21       Q.      Would you tell us please what

22   microscope -- you may sit down, Doctor Chidester,

23   if you want.

24              Would you tell us please what type of

PLT-04771-0089

1    microscope you used in the 1940s and '50s to

2    examine the samples from the Johnson mine?

3        A.    It was a Leitz spectrographic

4    microscope, polarizing microscope.

5        Q.    The first word you said was?

6        A.    Leitz.

7        Q.    Can you spell it?

8        A.    L E I T Z.

9        Q.    And do you still today on occasion look

10   at rocks or rock samples under a microscope?

11       A.    Rarely but occasionally.

12       Q.    What sort of microscope would you use

13   today to look at a sample?

14       A.    Essentially the same kind, that

15   probably costs about ten times as much but

16   essentially the same kind.

17       Q.    Would you tell us please the procedure

18   you use when you look in the microscope to be able

19   to identify the material you are looking at on the

20   thin section?

21       A.    Well, there are various optical

22   properties that are characteristic of different

23   minerals and they relate to the rate at which

24   light goes through the mineral and light gets

PLT-04771-0090

1     through minerals -- each mineral it may go through

2     in different rates in different directions.

3              So depending upon the individual

4     mineral, you get these variations in three or four

5     optical properties that enable you to distinguish

6     one mineral from another.  That's the mineral

7     identification.

8              Then you are concerned with the

9     relations between minerals, the fabric of the rock

10    itself and that the polarizing microscope brings

11    these out too.

12             So essentially you are identifying

13    textural relations of minerals and mineral species,

14    identifying mineral species.

15        Q.    Would the microscopic technique you

16    used in the 1940s and  '50s reveal the existence

17    of asbestos in the samples?

18        A.    Yes.

19        Q.    And with respect to the Johnson mine

20    did you see any asbestos?

21        A.    No.

22        Q.    Did any of the samples that you took

23    from the Johnson mine, were they taken to the

24    Smithsonian Institute?

PLT-04771-0091

1              MR. PRENTISS:  Objection.

2       A.     There are some there now so I presume

3   they were taken there.

4       Q.     Do you know about that, as to how and

5   if any samples went to the Smithsonian?

6       A.     Actually what the -- the Smithsonian is

7   the official I think repository of samples from

8   the Geological Survey, but they are so buried in

9   samples that all they want are those that have

10  been chemically analyzed.  So some of those that

11  were chemically analyzed are now in the

12  Smithsonian.

13      Q.     Some of those from the Johnson mine?

14      A.     Yes.

15      Q.     Do you know that?

16      A.     I haven't seen them myself but -- well,

17  wait a minute now.  I have -- I guess it's

18  actually hearsay that it's there.

19              MR. PRENTISS:  Objection.  Motion to

20  strike.

21      Q.     Doctor Chidester, do you have an

22  opinion as to whether the talc mined from the

23  Johnson mine in the 1940s and 1950s and the early

24  1960s had any asbestos in it?

DORIS M. JONES & ASSOCIATES

PLT-04771-0092

1          MR. PRENTISS:  Objection.

2     A.    Yes.

3     Q.    What is your opinion?

4          MR. PRENTISS:  Objection.

5     A.    It did not contain asbestos.

6     Q.    Would you tell us the reasons for that

7    opinion.

8     A.    Because the areas that were actively

9    mined while I was there contained no serpentinite

10   and asbestos would persist only in zones -- only

11   in the serpentinite, in say a body of serpentinite

12   that had not been altered to talc, in my opinion.

13         MR. PRENTISS:  Motion to strike.

14    Q.    And is your opinion based on your own

15   observations and testing?

16    A.    Yes.

17         MR. PRENTISS:  Objection.

18         MR. LEIBENSPERGER:  We might want to

19   take a break here if everyone else agrees.

20         MR. PRENTISS:  Yes.

21         (Recess taken)

22    Q.    Doctor, I just have a few more

23   questions I wanted to ask you.

24         With respect to the samples that you

                    DORIS M. JONES & ASSOCIATES

PLT-04771-0093

53

1      yes.  It goes the other way.  The serpentinite is

2      altered to steatite or to talc.

3             Q.    Do you know of a categorization of talc

4      as being either steatitized or serpentinized?

5             A.    Talc being serpentinized?

6             Q.    Yes.  Just as a classification of talc

7      as being serpentinized as opposed to being

8      steatitized.

9             A.    If it's serpentinized it's no longer

10     talc.  I can conceive of situations in -- no, I do

11     not.  I guess the answer to that is no.  As far as

12     I -- I have never run into serpentinized talc.

13            Q.    You are not familiar with that

14     terminology as a classification of a type of talc;

15     is that your testimony?

16            A.    I guess so.

17            Q.    Okay.

18            A.    Serpentinized talc?  I mean, the

19     alteration -- I'm not quite sure what is meant by

20     that.

21            Q.    Okay.

22            A.    It's a contradiction in terms as far as

23     I am concerned.

24            Q.    Okay.  To go back to my earlier

DORIS M. JONES & ASSOCIATES

1          Q.    Now in the process that you have

2     described, and you used a chart, I will go to the

3     chart in a bit, you have described a method by

4     which certain kind of talc is created from

5     serpentinite rock; is that right?

6          A.    Yes.

7          Q.    Now serpentinite is a mixture of three

8     different serpentine minerals; is that true?

9          A.    Can be, yes.

10         Q.    Can be.  What does it consist of?

11         A.    Can be antigorite, a couple varieties

12    of chrysotile and lizardite.

13         Q.    Okay.  Is there such a thing as

14    serpentine itself?  Is that a distinct mineral?

15         A.    It's a group name for this.  The

16    serpentine minerals are chrysotile, lizardite and

17    antigorite.

18         Q.    And you have said that during the

19    geological process you have a mass of serpentinite

20    that would be converted over time to talc rock?

21         A.    Yes.

22         Q.    Is that the way you described the

23    process by which the talc that is mined at the

24    Johnson, Vermont mine is created?

DORIS M. JONES & ASSOCIATES

PLT-04771-0095

1        A.      Yes.

2        Q.      And you said that the method by which

3   that transformation takes place is that carbon

4   dioxide reacts with the serpentinite; is that

5   correct?

6        A.      Yes.

7        Q.      How does the carbon dioxide reach and

8   penetrate into this serpentinite?

9        A.      It's part of the fluid system that is

10  moving through the rocks during a process called

11  regional metamorphism.

12       Q.      Now the serpentinite, is that a uniform

13  substance or is that made up of a variety of other

14  substances?

15       A.      Serpentinite?

16       Q.      Yes.

17       A.      Well, it consists of serpentine

18  minerals and minor amounts of magnetite,

19  occasional relics, remnants of chromite, and

20  chloride.  Those are the predominant.

21       Q.      If you were to take a cross-section of

22  a piece of serpentinite that's typical in the

23  Johnson, Vermont area, would that look like one

24  clean uniform structure or would you be able to

DORIS M. JONES & ASSOCIATES

PLT-04771-0096

Exhibit 207

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000001 | 3/1/1990 | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTIC Litigation. |
| P-JNJ000002 | 5/8/1989 | Ira J. Dembrow | W.H. Ashton | John C. O'Shaughnessy; Bruce Sample | Work Product | Memo / work product re: EMTIC Litigation. |
| P-JNJ000003 | 5/30/1989 | Bruce Sample | W.H. Ashton | | Work Product | Memo / work product re: EMTIC Litigation. |
| JNJ_JXS_00000002 | 5/18/1989 | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTIC Litigation. |
| P-JNJ000004 | 11/23/1982 | George E. Lee | George E. Lee | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000005 | 10/22/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000006 | 10/18/1982 | | EMV Associates, Inc.; Leonard G. Burrell, Ethan J. Goldberg | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000007 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000008 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000009 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000010 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000011 | 7/2/1982 | Edward P. Leibensperger | John H. Beidler | | Attorney-Client; Work Product | Letter / attorney-client communication re: Westfall Product. |
| P-JNJ000012 | 5/14/1982 | Howard Johanson | Dennis J. McCarton | Donald Ferry; W.H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000013 | 5/13/1982 | File | Dennis J. McCarton | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000014 | 4/28/1982 | Howard Johanson | Dennis J. McCarton | W.H. Ashton; D. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000015 | 4/23/1982 | File | Dennis J. McCarton | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000016 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden;Donald E. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000017 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden; Donald E. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000018 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden; Donald E. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000019 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden; Donald E. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000020 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000021 | 7/15/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; B. Semple; W. Waggoner | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000022 | 3/13/1981 | W.H. Ashton | Frank A. Bolden | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000023 | 2/18/1981 | Frank A. Bolden | W.T. Cannon; Colorado School of Mines research institute | G. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000024 | 10/8/1982 | | W.H. Ashton | George Lee J. Beidler; F. Bolden; J. Blute, B. Davenport; E. Leibensperger; R. Miller; B. Semple, M.D.; J. Uzalski | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000025 | N/A | | George E. Lee | | Attorney-Client; Work Product | Meeting minutes / attorney client communication re: Westfall case. |
| P-JNJ000026 | 10/13/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000027 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000028 | 10/22/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000029 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000030 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000031 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000032 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000033 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000034 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| JNJ_JXS_00000114 | 12/23/1982 | George E. Lee | Edward P. Leibensperger; Harold H. Banks, Jr. | John H. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_JXS_00000115 | | | | | Work Product | Draft Affidavit / work product re: Westfall case. |
| JNJ_JXS_00000123 | 12/23/1982 | George E. Lee | Edward P. Leibensperger | John H. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_JXS_00000124 | | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| JNJ_JXS_00000125 | | | Harold H. Banks, Jr. | | Work Product | Draft Affidavit / work product re: Westfall case. |
| JNJ_JXS_000035 | 11/23/1982 | W.H. Ashton | George E. Lee | | Work Product | Memo / work product re: Westfall case. |



EXHIBIT

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0562-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000036 | 8/22/1990 | Bruce Semple | W.H. Ashton | John C. O'Shaughnessy | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000037 | 4/24/1989 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000038 | 4/19/1989 | John C. O'Shaughnessy | W.H. Ashton | Bruce Semple | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000039 | 4/17/1989 | Dr. Frederick D. Pooley | W.H. Ashton | Bruce Semple | Work Product | Letter to consulting expert re: EMTC Litigation. |
| P-JNJ000040 | 5/6/1989 | Ira J. Dembrow | W.H. Ashton | John C. O'Shaughnessy; Bruce Semple | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00000139 | 5/5/1989 | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy; Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00003163 | 5/8/1989 | Ira J. Dembrow | W.H. Ashton | John C. O'Shaughnessy; Bruce Semple | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00000164 | 5/5/1989 | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy; Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000041 | 8/22/1990 | Bruce Semple | W.H. Ashton | John C. O'Shaughnessy | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000042 | 8/22/1989 | W.H. Ashton | John C. O'Shaughnessy | C. Ehmann; B. Semple | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000043 | 8/7/1989 | W.H. Ashton | John C. O'Shaughnessy | C. Ehmann; B. Semple | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000044 | 5/6/1989 | Ira J. Dembrow | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00000233 | 5/5/1989 | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy; Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00000608 | 3/1/1990 | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000045 | 4/19/1989 | John C. O'Shaughnessy | W.H. Ashton | Bruce Semple | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000046 | 4/4/1989 | W.H. Ashton | Ira J. Dembrow | Howard G. Sloane; Eric S. Sarner | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000047 | 3/31/1989 | John C. O'Shaughnessy | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Draft Affidavit / work product re: EMTC Litigation. |
| P-JNJ000048 | | | Dr. Frederick D. Pooley | Bruce Semple | Work Product | Consulting Report / work product re: EMTC Litigation. |
| P-JNJ000049 | 4/17/1989 | Dr. Frederick D. Pooley | Dr. Frederick D. Pooley | | Work Product | Letter to consulting expert re: EMTC Litigation. |
| P-JNJ000050 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000051 | 11/5/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000052 | 11/5/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000053 | 11/5/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00000621 | 10/27/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00000622 | 9/28/1982 | John N. Beidler | Edward P. Leibensperger | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000054 | 10/25/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000055 | 10/21/1982 | George E. Lee | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00000662 | 10/15/1982 | John N. Beidler | Edward P. Leibensperger | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000056 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000057 | 10/11/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000058 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000059 | 10/22/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000060 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00000727 | 10/13/1982 | John N. Beidler | Edward P. Leibensperger | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000061 | 9/28/1982 | George E. Lee | W.H. Ashton | Frank A. Bolden; Roger N. Miller | Work Product | Notes / work product re: Westfall case. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| JNJ_ROS_0000732 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000062 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000063 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000064 | 2/18/1981 | Frank A. Borden | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000065 | 10/22/1982 | Edward P. Leibensperger | W.H. Ashton | C. Lee; D. Perry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000066 | 9/28/1982 | George E. Lee | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000067 | 10/22/1982 | Edward P. Leibensperger | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000068 | 9/28/1982 | George E. Lee | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000069 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| JNJ_ROS_0001145 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000070 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000071 | 10/27/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000072 | 3/25/1983 | John N. Beidler; George Lee; Edward Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000073 | 3/1/1983 | Roger N. Miller | Edward P. Leibensperger | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_0001190 | 2/28/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000073 | 2/11/1983 | John N. Beidler | George E. Lee | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000074 | 1/25/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000075 | 1/11/1983 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_0001199 | 1/30/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Joseph G. Blute | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000076 | 12/23/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000077 | 9/21/1982 | | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000078 | 1/18/1983 | George E. Lee | Edward P. Leibensperger | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000079 | 1/1/1983 | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| JNJ_ROS_00001202 | 1/12/1983 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee; Roger N. Miller | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000080 | 1/11/1983 | Edward P. Leibensperger | George E. Lee | J.N. Beidler; J.G. Blutes; R.N. Miller | Attorney-Client; Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000081 | 1/11/1983 | J.C. Wagner | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000082 | 1/6/1983 | Dr. J. C. Wagner | | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000083 | 1/11/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; George E. Lee | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000084 | 1/6/1983 | Dr. Frederick D. Pooley | | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000085 | 12/13/1982 | John N. Beidler; Roger N. Miller | George E. Lee | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000086 | | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000087 | 12/13/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000088 | 12/6/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000089 | 12/1/1982 | Edward P. Leibensperger | Roger N. Miller | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001205 | 11/30/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000089 | 11/29/1982 | John N. Beidler | George E. Lee | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000090 | 11/29/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000091 | 11/29/1982 | A. H. Cildester | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000092 | 11/29/1982 | John M. Wehrung | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000093 | 12/1/1982 | | George E. Lee | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000094 | 11/30/1982 | Edward P. Leibensperger | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000095 | 11/30/1982 | John N. Beidler | | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000036 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000097 | 11/16/1982 | Dr. Frederick D. Pooley | Dr. Frederick D. Pooley | John M. Beidler; Joseph G. Bluos; George E. Lee | Work Product | Consulting Report / work product re: Westfall case. |
| JNJ_ROS_00001208 | 11/10/1982 | George E. Lee | Edward P. Leibensperger | E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000098 | 11/10/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000099 | 11/22/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001217 | 11/24/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000100 | 11/23/1982 | W.H. Ashton | George E. Lee | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000101 | 11/17/1982 | George E. Lee | Roger M. Miller | Edward Leibensperger; John Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000102 | 11/2/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000103 | 1/1/1965 | | Nutter McClennen and Fish | | Work Product | Memo / work product re: Westfall case. |
| JNJ_ROS_00001223 | 11/1/1982 | John N. Beidler | George E. Lee | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000104 | 11/4/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000205 | 11/10/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000106 | 11/9/1982 | Edward P. Leibensperger | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000107 | 10/25/1982 | George E. Lee | Veryl E. Larsen | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000108 | | | Veryl E. Larsen | | Work Product | Memo / work product re: Westfall case. |
| JNJ_ROS_00001247 | 10/29/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000109 | 10/25/1982 | J.C. Wagner | George E. Lee | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000110 | 10/22/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller; Joseph G. Bluos; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001254 | 10/22/1982 | John N. Beidler | Edward P. Leibensperger | John N. Beidler; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001205 | 10/22/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | Miller | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000211 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000112 | 10/19/1982 | Dr. Frederick D. Pooley | George E. Lee | Bruce Semple | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000113 | 10/18/1982 | Edward P. Leibensperger | George E. Lee | J. Beidler; R. Miller; B. Semple | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000114 | 10/13/1982 | N/A | George E. Lee | J. Beidler; F. Bolden; J. Blute; B. Deavenport; E. Leibensperger; R. Miller; B. Semple, M.D.; J. Utaski | Attorney-Client; Work Product | Meeting minutes / attorney client communication re: Westfall case. |
| P-JNJ000115 | 10/8/1982 | W.T. Creery; Colorado School of Mines | George E. Lee | George Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000116 | 10/6/1982 | Research Institute | W.H. Ashton | | Attorney-Client; Work Product | Letter / attorney-client communication re: Westfall case. |
| P-JNJ000117 | 10/1/1982 | Bruce Semple | John N. Beidler | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney-client communication re: Westfall case. |
| P-JNJ000118 | 9/30/1982 | John N. Beidler | Edward P. Leibensperger | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000119 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000120 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000121 | 7/2/1982 | George E. Lee | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000122 | 6/2/1982 | Edward P. Leibensperger | William A. Curran | D. Ferry; H. Johanson | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000123 | 5/14/1982 | Frank A. Bolden | William A. Curran | Donald Ferry; William H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000124 | 5/13/1982 | Howard Johanson | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000125 | 4/28/1982 | File | Dennis J. McCarten | Donald Ferry; W. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000126 | 4/23/1982 | Howard Johanson | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000127 | 4/20/1982 | File | William A. Curran | Frank A. Bolden Esq.; Donald R. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000128 | 7/15/1981 | W.H. Ashton | W.H. Ashton | G. Lee; W. Waggoner; B. Semple | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000129 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product | Memo / work product, re: Westfall case. |
| P-JNJ000130 | 2/19/1981 | Frank A. Bolden | W.H. Ashton | S. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000131 | 6/2/1982 | Frank A. Bolden | William A. Curran | Donald Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000132 | 7/21/1982 | Edward P. Leibensperger | John N. Beidler | Joseph G. Blute; George E. Lee; Howard Johnson; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001229 | 9/8/1983 | John N. Beidler | Edward P. Leibensperger | Roger N. Miller; George E. Lee; Joseph G. Blute | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001328 | 6/22/1983 | John N. Beidler | Edward P. Leibensperger | | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001329 | 6/22/1983 | File | Edward P. Leibensperger | | Attorney-Clients; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000133 | 8/11/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001342 | 8/9/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001412 | | John N. Beidler; George E. Lee; Edward J. Leibensperger | Roger N. Miller | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000134 | 5/8/1989 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001412 | 5/8/1983 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000134 | 6/6/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001428 | 5/27/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001478 | 5/19/1983 | Edward P. Leibensperger | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000135 | 4/11/1983 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000136 | 5/18/1983 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001412 | | John N. Beidler | Edward P. Leibensperger | Roger N. Miller; George E. Lee; Joseph G. Blute | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000137 | 5/2/1983 | Edward P. Leibensperger | Roger N. Miller | G. Blute | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001524 | 4/29/1983 | Edward P. Leibensperger | B.T. Keener | | Attorney-Clients; Work Product | Memo / work product re: Westfall case. |
| JNJ_ROS_00001525 | 4/27/1983 | Edward P. Leibensperger | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000138 | 4/11/1983 | Edward P. Leibensperger | George E. Lee | B.M. Davenport; R.N. Miller; J.N. Beidler | Attorney-Clients; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001527 | 4/25/1983 | Edward P. Leibensperger | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000139 | 4/18/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000140 | 4/4/1983 | Edward P. Leibensperger | George E. Lee | | Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001530 | 4/4/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000141 | 3/31/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001544 | 3/25/1983 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001554 | 3/29/1983 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Work Product | Letter to consulting expert re: Westfall case. |
| JNJ_ROS_00005596 | 3/18/1983 | Edward A. Gisender, M.D | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000142 | 3/10/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00001557 | 3/10/1983 | John N. Beidler | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| JNJ_ROS_00005596 | 3/14/1983 | Edward P. Leibensperger | John N. Beidler | B. Semple; B. Davenpor | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000143 | 4/11/1983 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000144 | 11/23/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000145 | 9/36/1982 | George E. Lee | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000146 | 10/21/1982 | Allen S. Joslyn | Carol Rodgers; Ian M. Stewart | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00001648 | 7/9/1992 | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| JNJ_ROS_00001649 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| JNJ_ROS_00001650 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| JNJ_ROS_00001674 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| INJ_ROS_00001675 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| INJ_ROS_00001676 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000147 | 3/1/1990 | Ira J. Dembrow | John L. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00001712 | 5/8/1999 | Ira J. Dembrow | W.H. Ashton | John L. O'Shaughnessy; Howard G. Shane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00001721 | 5/5/1989 | W.H. Ashton | Ira J. Dembrow | John L. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00001722 | 5/30/1989 | Bruce Semple | W.H. Ashton | | Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000148 | 5/18/1989 | W.H. Ashton | Ira J. Dembrow | | Work Product; Common Interest Litigation Privilege | Memo / work product re: EMTC Litigation. |
| P-JNJ000149 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger M. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000150 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000151 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000152 | 7/9/1992 | Allen S. Joslyn | John L. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000153 | 9/21/1982 | File | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000154 | | File | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000155 | | File | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000156 | | File | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| INJ_ROS_00002058 | 12/27/1988 | File | John L. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000157 | 12/27/1988 | File | John L. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000158 | 12/1/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000159 | 11/30/1982 | File | Edward P. Leibensperger | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000160 | 11/24/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000161 | 10/12/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000162 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Memo / work product re: Westfall case. |
| P-JNJ000163 | 6/2/1982 | Frank A. Bolden | William A. Curran | Donald Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000164 | 5/14/1982 | Howard Johanson | Dennis J. McCarten | Donald Ferry; William H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000165 | 5/13/1982 | File | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo / work product re: Westfall case. |
| P-JNJ000166 | 4/28/1982 | Howard Johanson | Dennis J. McCarten | W.H. Ashton; D. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000167 | 4/23/1982 | File | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000168 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden, Esq.; Donald R. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000169 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000170 | 7/15/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner; B. Semple | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000171 | 2/18/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000172 | 7/21/1992 | Edward F. Leibensperger | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000173 | 3/16/1983 | Ira J. Dembrow | John L. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000174 | 6/5/1992 | John N. Beidler | David H. Garabrant, M.D. | | Work Product | Consulting Report / work product re: EMTC Litigation. |
| P-JNJ000175 | 10/11/1982 | Edward F. Leibensperger | Alfred H. Oldroyd | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000176 | 10/24/1983 | Edward P. Leibensperger | George E. Lee | | Work Product | Letter from consulting expert re: Westfall case. |
| P-JNJ000177 | 11/30/1982 | Edward P. Leibensperger | Joseph G. Blute | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000178 | 11/29/1982 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner; B. Semple | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000179 | 7/15/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000180 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000181 | 5/14/1982 | Howard Johnson | Dennis J. McCurten | Donald Ferry; William H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000182 | 5/15/1982 | File | Dennis J. McCurten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000183 | 6/2/1982 | Frank A. Bolden | William A. Curran | Donald Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000184 | 7/2/1982 | Edward P. Leibensperger | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney-client communication re: Westfall case. |
| | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000185 | 12/5/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000186 | 12/7/1982 | Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000187 | 12/5/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000188 | 10/11/1982 | John N. Beidler; George E. Lee; Edward | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000189 | 5/8/1989 | Ira J. Dembrow | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002333 | 5/5/1989 | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy; Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000190 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000191 | 9/24/1982 | Ira J. Dembrow | Ethan J. Goldberg; John M. Wehrum | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000192 | 12/23/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002242 | 10/13/1982 | John N. Beidler | Edward P. Leibensperger | Frank A. Bolden, Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000193 | 10/27/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002247 | 9/28/1982 | John N. Beidler | Edward P. Leibensperger | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000194 | | John N. Beidler | Edward P. Leibensperger | Roger N. Miller | Attorney-Client; Work Product | Draft Legal Documents / work product re: Westfall case. |
| P-JNJ000195 | 10/15/1982 | John N. Beidler | Edward P. Leibensperger | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002363 | 10/14/1982 | | | | Work Product | Legal Documents / work product re: Westfall case. |
| P-JNJ000196 | 11/29/1982 | Edward P. Leibensperger | Joseph G. Blute | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000197 | 11/29/1982 | Edward P. Leibensperger | Joseph G. Blute | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000198 | | Edward P. Leibensperger | Margot Joly | | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000199 | 6/6/1989 | | Johnson and Johnson | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000200 | 1/13/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000201 | 10/18/1982 | Maryanne Brundy Costa | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000202 | 1/12/1983 | | Edward P. Leibensperger | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000203 | 9/28/1982 | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000204 | 3/1/1983 | Roger N. Miller | Edward P. Leibensperger | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002780 | 2/28/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000205 | 2/11/1983 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000206 | 1/25/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000207 | 1/11/1983 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002788 | 1/20/1983 | Edward P. Leibensperger | George E. Lee | J. N. Beidler; J. G. Blute; R N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000208 | 12/23/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000209 | 9/21/1982 | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000210 | 1/18/1983 | George E. Lee | Edward P. Leibensperger | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000211 | 1/7/1983 | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |

*Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)*

8 of 26

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000212 | 1/12/1983 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee; Roger N. Miller | Work Product | Letter re consulting expert re: Westfall case. |
| P-JNJ000213 | | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000214 | 1/11/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Joseph G. Blute; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000215 | 1/11/1983 | J.C. Wagner | George E. Lee | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000216 | 1/6/1983 | Dr. C. J. Wagner | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000217 | 1/11/1983 | Dr. Frederick D. Pooley | George E. Lee | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000218 | 1/6/1986 | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000219 | 12/13/1982 | John N. Beidler | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000220 | | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000221 | 12/13/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000222 | 12/1/1982 | Edward P. Leibensperger | Roger N. Miller | John N. Beidler; George E. Lee | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000223 | 11/30/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000224 | 11/29/1982 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000225 | 11/29/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000226 | 11/29/1982 | A. H. Chidester | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000227 | 11/29/1982 | John M. Wehrung | Edward P. Leibensperger | John N. Beidler; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000228 | 12/1/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000229 | 11/30/1982 | Edward P. Leibensperger | George E. Lee | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000230 | 11/30/1982 | John N. Beidler | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000231 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| JNJ_ROS_00002797 | | | | John N. Beidler; Joseph G. Blute; George E. Lee | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000232 | 11/16/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000233 | 11/10/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000234 | 11/22/1982 | W.H. Ashton | George E. Lee | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000235 | 11/17/1982 | George E. Lee | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000236 | 11/2/1982 | George E. Lee | Nutter McClennen and Fish | | Work Product | Memo / work product re: Westfall case. |
| JNJ_ROS_00002806 | 1/1/1965 | | | | Attorney-Client; Work Product | Letter / attorney client communication on re: Westfall case. |
| P-JNJ000237 | 11/1/1982 | John N. Beidler | Edward P. Leibensperger | George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000238 | 11/16/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000239 | 11/12/1982 | George E. Lee | Edward P. Leibensperger | John N. Beidler | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000240 | 11/5/1982 | Edward P. Leibensperger | George E. Lee | J. Beidler; R. N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000241 | 1/2/1977 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000242 | 1/1/1982 | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000243 | 1/1/1967 | | | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000244 | 11/1/1982 | | | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000245 | 10/28/1982 | Dr. Frederick D. Pooley | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000246 | 1/1/1979 | Edward P. Leibensperger | George E. Lee | | Work Product | Legal/Case Research / work product re: Westfall case. |
| P-JNJ000247 | 10/15/1982 | J.C. Wagner | | | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000248 | 10/22/1982 | Edward P. Leibensperger | George E. Lee | John N. Beidler; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication on re: Westfall case. |
| JNJ_ROS_00002830 | 10/22/1982 | John N. Beidler | Edward P. Leibensperger | Joseph G. Blute; George E. Lee; Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00002861 | 10/22/1982 | Dr. Frederick D. Pooley | Edward P. Leibensperger | John N. Beidler; George E. Lee; Roger N. Miller | Work Product | Letter to consulting expert re: Westfall case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.,* Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000249 | 10/21/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000250 | 10/19/1982 | Dr. Frederick D. Pooley | George E. Lee | Bruce Semple | Work Product | Letter to consulting expert re: Westfall case. |
| P-JNJ000251 | 10/18/1982 | Edward P. Leibensperger | George E. Lee | J. Seidler; R. Miller; G. Semple; J. Beidler; F. Boldini; J. Bluhs; B. Davenport; E. Leibensperger; R. Miller; B. Semple; J. Utaski | Attorney-Client; Work Product | Attorney / client communication re: Westfall case. |
| P-JNJ000252 | 10/13/1982 | N/A | George E. Lee | | Attorney-Client; Work Product | Meeting minutes / attorney client communication re: Westfall case. |
| P-JNJ000253 | 10/6/1982 | Bruce Semple | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000254 | 10/1/1982 | John N. Beidler | Edward P. Leibensperger | Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000255 | 9/30/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000256 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000257 | 9/28/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000258 | 7/2/1982 | Edward P. Leibensperger | John N. Beidler | | Attorney-Client; Work Product | Letter / Attorney client communication re: Westfall case. |
| P-JNJ000259 | 5/14/1982 | Howard Johanson | Dennis J. McCarten | Donald Ferry; William H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000260 | 5/13/1982 | File | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000261 | 4/28/1982 | Howard Johanson | Dennis J. McCarten | W.H. Ashton, D. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000262 | 4/23/1982 | File | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000263 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden; Donald R. Ferry | Work Product | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000264 | 7/15/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner; B. Semple | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000265 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000266 | 2/18/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000267 | 6/2/1982 | Frank A. Bolden | William A. Curran | D. Ferry; H. Johanston | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000268 | 7/2/1982 | Edward P. Leibensperger | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| | | John N. Beidler; George E. Lee; Edward P. Leibensperger | Johnson and Johnson | | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000269 | 11/5/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000270 | 11/5/1982 | Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000271 | 10/25/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000272 | 10/21/1982 | George E. Lee | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000273 | 10/11/1982 | George E. Lee; John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNJ_ROS_00003882 | | George E. Lee | Roger N. Miller | | Work Product | Notes / work product re: Westfall case. |
| P-JNJ000274 | 7/15/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner; B. Semple | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000275 | 7/22/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; W. Waggoner | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000276 | 2/18/1981 | Frank A. Bolden | W.H. Ashton | G. Lee; D. Ferry | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000277 | 4/20/1982 | W.H. Ashton | William A. Curran | Frank A. Bolden; Donald R. Ferry | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000278 | 5/14/1982 | Howard Johanson | Dennis J. McCarten | Donald Ferry; William H. Ashton | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000279 | 5/13/1982 | File | Dennis J. McCarten | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: Westfall case. |
| P-JNJ000280 | 6/2/1982 | Frank A. Bolden | William A. Curran | D. Ferry; H. Johanston | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: Westfall case. |
| P-JNJ000281 | 7/2/1982 | Edward P. Leibensperger | John N. Beidler | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000282 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000283 | 11/30/1982 | Edward P. Leibensperger | George E. Lee | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000284 | 10/11/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / Attorney client communication re: Westfall case. |
| P-JNJ000285 | | | Roger N. Miller | | Work Product | Tax testing / work product re: Westfall case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| JNJ_RQS_00002993 | 6/6/1983 | Edward P. Leibensperger | Margot Joly | | Work Product | Memo Expert Binder re: Westfall case |
| JNJ_RQS_00002994 | 10/29/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00002995 | 1/11/1983 | | | | Work Product | Notes Expect Binder re: Westfall case. |
| JNJ_RQS_00002996 | 1/11/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00002997 | 5/4/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00002998 | 2/18/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00002999 | 12/20/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003000 | 2/3/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003001 | 3/7/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003002 | 3/4/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003003 | 10/29/1982 | | | | Work Product | Notes Expert Binder re: Westfall case |
| JNJ_RQS_00003004 | 11/16/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003005 | 3/4/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003006 | 2/3/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003007 | 2/1/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003008 | 1/1/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003009 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003010 | 11/1/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003011 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003012 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003013 | 1/1/1978 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003014 | 1/1/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003015 | 1/1/1975 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003016 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003017 | 3/12/1981 | | Joseph G. Blute | | Work Product | Notes Expert Binder re: Westfall case. |
| JNJ_RQS_00003145 | 11/29/1982 | Edward J. Leibensperger | | | Attorney Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000286 | | EPL | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000287 | 6/6/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000288 | 10/29/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000289 | 1/11/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000290 | 2/18/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000291 | 12/20/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000292 | 2/3/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000293 | 3/7/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000294 | 3/4/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000295 | 10/29/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000296 | 11/16/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000297 | 3/4/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000298 | 2/3/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000299 | 2/1/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000300 | 1/1/1983 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000301 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000302 | 11/1/1982 | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000303 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000304 | | | | | Work Product | Notes Expert Binder re: Westfall case. |
| P-JNJ000305 | 1/1/1978 | | | | Work Product | Notes Expert Binder re: Westfall case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000306 | 1/1/1975 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000307 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000308 | 3/12/1991 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000309 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000310 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000311 | 7/29/1957 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000312 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000313 | 3/1/1983 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000314 | 1/1/1960 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000315 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000316 | 10/6/1982 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000317 | 10/1/1979 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000318 | 5/14/1982 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000319 | 12/5/1982 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000320 | 2/28/1983 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000321 | 1/1/1964 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000322 | 10/6/1982 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000323 | 2/1/1963 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000324 | 10/1/1977 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000325 | 11/1/1982 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000326 | 2/15/1983 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000327 | 3/17/1983 | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000328 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000329 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000330 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000331 | | | | | Work Product | Notes: Expert Binder re: Westfall case. |
| P-JNJ000332 | 1/13/1983 | Edward P. Leibensperger | George E. Lee | John N. Beidler, Joseph G. Blair, Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000333 | | | W.H. Ashton | | Work Product | Draft Affidavit / work product re: Westfall case. |
| P-JNJ000334 | 10/28/1982 | Edward P. Leibensperger; George E. Lee; Edward | George E. Lee | John N. Beidler, Roger N. Miller | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000335 | 3/25/1983 | John N. Beidler; George E. Lee; Edward Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000336 | 3/1/1983 | | David H. Garabrant, M.D. | | Work Product | Legal/Case Research / work product re: Westfall case. |
| P-JNJ000337 | 8/5/1992 | Edward P. Leibensperger | George E. Lee | | Attorney-Client; Work Product | Consulting Report / work product re: EMTC Litigation. |
| P-JNJ000338 | 10/28/1982 | | David H. Garabrant, M.D. | | Work Product | Letter / attorney client communication re: Westfall case. |
| | 8/5/1992 | John N. Beidler; George E. Lee; Edward P. Leibensperger | George E. Lee | John N. Beidler, Roger N. Miller | Attorney-Client; Work Product | Consulting Report / work product re: EMTC Litigation. |
| P-JNJ000339 | 10/11/1982 | P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000340 | 10/11/1982 | John N. Beidler; George E. Lee; Edward P. Leibensperger | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| JNL_ROS_00003487 | 10/11/1982 | John N. Beidler; George E. Lee; Edward | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000341 | 9/24/1992 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000342 | 9/24/1982 | George E. Lee | W.H. Ashton | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000343 | 1/1/1955 | | | | Work Product | Legal/Case Research / work product re: Westfall case. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.,* Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000344 | 10/11/1982 | John N. Stedler, George E Lee, Edward | Roger N. Miller | | Attorney-Client; Work Product | Letter / attorney client communication re: Westfall case. |
| P-JNJ000345 | | P. Leidgassenger | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000346 | | | Johnson and Johnson | | Work Product | Memo / work product re: Westfall case. |
| P-JNJ000347 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000348 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000349 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000350 | | John C. O'Shaughnessy | Sullivan, Michael D | Allen S. Joslyn | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000351 | | Allen S. Joslyn | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000352 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000353 | | Roger N. Miller | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000354 | | File | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000355 | | John C. O'Shaughnessy | Ngai, Elaine | Sarner, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000356 | | Hoffman, Dale | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000357 | | John C. O'Shaughnessy | Ngai, Elaine | Sarner, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000358 | | John C. O'Shaughnessy | Zecsurek, CJ | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000359 | | Ashton, WH; Frazza, GS; Guynes, SJ; Molineux, FB; Semple, B | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000360 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000361 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000362 | | Frazza, GS; Guynes, SJ | John C. O'Shaughnessy | Fred B. Molineux | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000364 | | John C. O'Shaughnessy | Sarner, Eric S | L. Flaegel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000365 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000366 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000367 | | Flaegel, Lester | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000368 | | Flaegel, Lester | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000369 | | John C. O'Shaughnessy | Flaegel, Lester | Sarner, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000370 | | | Johnson and Johnson; Engelhard Corp. | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000371 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000372 | | | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Tolling Agreement re: EMTC Litigation. |
| P-JNJ000373 | | Sarner, Eric S | Johnson and Johnson; Engelhard Corp. | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000374 | | John C. O'Shaughnessy | Johnson and Johnson; Engelhard Corp. | Sarner, Eric S | Work Product; Common Interest Litigation Privilege | To: np Agreement re: EMTC Litigation. |
| P-JNJ000375 | | | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000376 | | John C. O'Shaughnessy | Edward J. Cook | | Work Product; Common Interest Litigation Privilege | Tolling Agreement re: EMTC Litigation. |
| P-JNJ000377 | | Sloane; Sarner | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000378 | | | Cahill Gordon and Reindel | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000379 | | | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000380 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000381 | | Bruce Semple | John C. O'Shaughnessy | | Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000382 | | | W.H. Ashton | John C. O'Shaughnessy | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000383 | | John C. O'Shaughnessy | Eric S. Sarner | I. Dembrow; L. Flaegel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000384 | | Howard G. Sloane | Ira J. Dembrow; Eric S. Sarner | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000385 | | Howard G. Sloane | Ira J. Dembrow; Eric S. Sarner | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13 of 26

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000386 | | John C. O'Shaughnessy | Ira J. Dembrow | Sloane, Howard G; Sarner, Eric | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000387 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000388 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000389 | | John C. O'Shaughnessy | Ira J. Dembrow | Sloane, Howard G; Sarner, Eric | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000390 | | Zezzarek, CJ | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000391 | | John C. O'Shaughnessy | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000392 | | John C. O'Shaughnessy | C. James Zazzarek | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000393 | | Fine, RS | | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000394 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000395 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| | | John C. O'Shaughnessy | Ira J. Dembrow | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000396 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000397 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000398 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000399 | | John C. O'Shaughnessy | Ira J. Dembrow | L. Fliegel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000400 | | John C. O'Shaughnessy | Ira J. Dembrow | Sloane, Howard G; Sarner, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000401 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000402 | | Ira J. Dembrow | John C. O'Shaughnessy | Robert E. Christiansen | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000403 | | John C. O'Shaughnessy | W.H. Ashton | Bruce Semple | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| | | | | Sloane, Howard G; Sarner, Eric S; | | |
| P-JNJ000404 | | John C. O'Shaughnessy | Robert E. Christiansen | Ashton, Bill | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000405 | | John C. O'Shaughnessy | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Draft Affidavit / work product re: EMTC Litigation. |
| P-JNJ000406 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000407 | | Christiansen, Robert | Johnson, Steven D | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| | | Fred B. Molineux; John C. O'Shaughnessy | Robert E. Christiansen | | Work Product; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000408 | | Christiansen, Robert E | Fred B. Molineux | John C. O'Shaughnessy | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000409 | | John C. O'Shaughnessy | Fred B. Molineux | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| | | Fred B. Molineux | Genevieve Murphy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000410 | | Robert E. Christiansen | Fred B. Molineux | John C. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000411 | | Sarner, Eric S | John C. O'Shaughnessy | Sloane, Howard G; Dembrow, Ira J | Attorney-Client; Work Product | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000412 | | John C. O'Shaughnessy | Fred B. Molineux | | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000413 | | John C. O'Shaughnessy | Ira J. Dembrow | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000414 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000415 | | | Johnson and Johnson; Engelhard Corp. | | | Tolling Agreement re: EMTC Litigation. |
| P-JNJ000416 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000417 | | | Johnson and Johnson; Engelhard Corp. | | | Tolling Agreement re: EMTC Litigation. |
| JNJ_RGS_00035370 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000418 | | John C. O'Shaughnessy | Ira J. Dembrow | | Work Product; Common Interest Litigation Privilege | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000419 | | John C. O'Shaughnessy | Johnson and Johnson; Engelhard Corp; | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000420 | | | Cahill Gordon and Reindel | | Work Product | Draft Tolling Agreement / work product re: EMTC Litigation. |
| | | | | Christiansen, RE; Egan, WJC; Frazza, GS; | | |
| P-JNJ000421 | | Fine, RS | John C. O'Shaughnessy | Utaski, JR; General Law Files | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000422 | | John C. O'Shaughnessy | Ira J. Dembrow | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.,* Docket No. MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000423 | | | Johnson and Johnson; Engelhard Corp; Cahill Gordon and Reindel | | Work Product | Draft Tolling Agreement / work product re: EMTC Litigation. |
| P-JNJ000424 | | W.H. Ashton | Ira J. Dembrow | John C. O'Shaughnessy; Howard G. Stone | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000425 | | | W.H. Ashton | Stone | Work Product; Common Interest Litigation Privilege | Draft Affidavit / work product re: EMTC Litigation. |
| P-JNJ000426 | | John C. O'Shaughnessy | Ira J. Dembrow | Sloane, Howard G., Samec, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000427 | | | W.H. Ashton | | Work Product; Common Interest Litigation Privilege | Draft Affidavit / work product re: EMTC Litigation. |
| P-JNJ000428 | | John C. O'Shaughnessy | Joseph G. Blute | Liebensperger, Edward P; General Law File | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000429 | | File | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000430 | | John C. O'Shaughnessy | Robert E. Christiansen | Fine, RS; Frazza, GS; General Law Files | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000431 | | John C. O'Shaughnessy | George Gore | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000432 | | George Gore | Ellen Anderson | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000433 | | Genevieve Murphy | Fred B. Molineux | L.C. O'Shaughnessy; R. A. Zimmer | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000434 | | John B. Ahrens, | Fred B. Molineux | L.C. O'Shaughnessy; R. A. Zimmer Beidler, JN, Zimmer, RA; General Law Files | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000434 | | Fine, RS | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000435 | | Beidler, JN; Zimmer, RA | John C. O'Shaughnessy | Fine, RS; General Law Files | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000436 | | John C. O'Shaughnessy | Newman, Craig A | John C. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000437 | | Eackblom, EE | Howard G. Sloane | O'Shaughnessy, John C; Clare, David R | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000438 | | Zimmer, RA | Fred B. Molineux | John C. O'Shaughnessy | Attorney-Client; Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000439 | | Zimmer, RA | Fred B. Molineux | John C. O'Shaughnessy | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000440 | | | | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000441 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000442 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000443 | | John C. O'Shaughnessy | Sullivan, Jacqueline A | Fite, CG | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000444 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000445 | | John C. O'Shaughnessy | Fred B. Molineux | Fite | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000446 | | Fred B. Molineux | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000447 | | Cahill Gordon and Reindel | Tracy Scott | John C. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000448 | | | | | Work Product; Common Interest Litigation Privilege | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000449 | | | | | Work Product; Common Interest Litigation Privilege | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000450 | | John C. O'Shaughnessy | Klokis, AW | File; CG | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000451 | | A.W. Klokis | Cook, Kenneth A | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000452 | | Georgiou, Cira | John C. O'Shaughnessy | | Work Product | Email / work product re: EMTC Litigation. |
| P-JNJ000453 | | John C. O'Shaughnessy | Flaigel, Lester | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000454 | | Flaigel, Lester | John C. O'Shaughnessy | Fred B. Molineux | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000455 | | Engelhard Corp. | Johnson and Johnson | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000456 | | Engelhard Corp. | Johnson and Johnson | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000457 | | Engelhard Corp. | Johnson and Johnson | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000458 | | Flaigel, Lester | John C. O'Shaughnessy | Dornbush, Arthur; Joslyn, AS; Sloane, HG | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000459 | | John C. O'Shaughnessy | Flaigel, Lester | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000460 | | John C. O'Shaughnessy | Alton S. Joslyn | | Work Product; Common Interest Litigation on Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000461 | | | Engelhard Corporation; Johnson and Johnson | | Work Product; Common Interest Litigation Privilege | Release / work product re: EMTC Litigation. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000462 | | | Englehard Corporation, Johnson and Johnson | Mulholland, Maryann; O'Shaughnessy, John; Pelzer, Joseph; DeCapua, Nick | Work Product; Common Interest Litigation Privilege | Release / work product re: EMTC Litigation |
| P-JNJ000463 | | Carl Patchke | Klohs, AW | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000464 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000465 | | Howard G. Sloane | John C. O'Shaughnessy | Lester Flagel | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000466 | | John C. O'Shaughnessy | Sullivan, Michael D | L. Flagel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000467 | | George S. Frazza | John C. O'Shaughnessy | Christiansen, RE; Doyo, RC | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| JNJ_RSG_00003599 | | Shaughnessy, John O | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000468 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000469 | | John C. O'Shaughnessy | Sullivan, Michael D | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000470 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000471 | | | Allen S. Joslyn | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000472 | | John C. O'Shaughnessy | Sullivan, Michael D | L. Flagel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000473 | | Howard G. Sloane | John C. O'Shaughnessy | Lester Flagel | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000474 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000475 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000476 | | Sloane, Howard G; Mandel, Bruce P; Masetti, Regina M; Dietz, DR; Powell, Donald A; Scully, William F; Kopp, Ronald S | Martillotta, Samuel R | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000477 | | Ronald S | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000478 | | Shaughnessy, John O | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000479 | | Smith, AR | Martillotta, Samuel R; Smith, AR | H. William; Mandel, Bruce P; Sloane, Howard G; Masetti, Regina M; Scully, William F; Carter, Michael D; Hestermann, Henry A; Powell, Donald A; Kopp, Ronald S; Fox, Timothy M; | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000480 | | Smith, AR; Nero, RD | Mandel, Bruce P | Barnhouse, James W | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000481 | | Mandel, Bruce P; Massetti, Regina M; Carter, Michael D; Powell, Donald A; Fox, Timothy M; Sloane, Howard G; Scully, William F; Hestermann, Henry A; Kopp, Ronald S; Barnhouse, James W | Martillotta, Samuel R; Smith, AR | Victor, William H | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000482 | | Flagel, Lester | Smith, AR | Fred B. Molineux | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000483 | | Bob | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000484 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000485 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000486 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000487 | | Johnson and Johnson | John C. O'Shaughnessy, John C; Christiansen. | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000488 | | Johnson and Johnson | O'Shaughnessy, John C; Christiansen. Robert E | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000489 | | Fred B. Molineux | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000490 | | Fred B. Molineux | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000491 | | John C. O'Shaughnessy | Flagel, Lester | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000492 | | | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Notes regarding litigation and strategy re: EMTC Litigation. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS – Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000493 | | John C. O'Shaughnessy | R Flegel, Lester | | Work Product; Common Interest Litigation Privilege | Letter regarding 'litigation and strategy re: EMTC Litigation. |
| P-JNJ000494 | | | Johnson and Johnson; Engelhard Corp. | | Work Product; Common Interest Litigation Privilege | Tolling Agreement re: EMTC Litigation. |
| P-JNJ000495 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000496 | | Sloane, Howard G; Mandel, Bruce P; Massetti, Regina M; Scully, William F; Kopp, Ronald S; Powell, Donald A; Tucker, Robert L; Evanchan, Nicholas L. | Mantiletta, Samuel R | Lester Flegel | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000497 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000498 | | Sloane, Howard G; Mandel, Bruce P; Massetti, Regina M; Scully, William F; Kopp, Ronald S; Powell, Donald A; Tucker, Robert L; Evanchan, Nicholas L. | Mantiletta, Samuel R | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000499 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000500 | | Allen S. Joslyn | Georgiou, Cra P | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000501 | | | Dr. Frederick O. Pedley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000502 | | Dornbusch, Arthur | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000503 | | John C. O'Shaughnessy | Allen S. Joslyn | Dornbusch, Arthur | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000504 | | | Johnson and Johnson; Engelhard Corp. | | Work Product; Common Interest Litigation Privilege | Tolling Agreement re: EMTC Litigation. |
| P-JNJ000505 | | John C. O'Shaughnessy | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000506 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000507 | | John C. O'Shaughnessy | Sullivan, Michael D | L. Flegel, H. Sloane | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000508 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000509 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000510 | | File | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| JNJ_ROS_00003614 | | John C. O'Shaughnessy | Howard G. Sloane | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| JNJ_ROS_00003615 | | Howard G. Sloane | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000512 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000513 | | Sloane, Regina M; Hestemann, Henry A; Goss, Thomas M; Ross, David | Mantiletta, Samuel R | Mellen, Francis J; Lonsdale, Judith A; Embleton, Jeffrey M; Gerlach, Julius R | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000514 | | Bruce Sample | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000515 | | Christiansen, RE; Deyo, RC; Frazza, GS | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000516 | | File | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000517 | | Howard G. Sloane | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000518 | | EMTAL File | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000519 | | John C. O'Shaughnessy | Allen S. Joslyn | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000520 | | | Allen S. Joslyn | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000521 | | Baker, Robert; AC&S Inc; Eastern Magnesia Talc Co | Victor, William H | Zaleski, Diana; Shroyer, David J; Joslyn, Allen S; Sloane; Sullivan; Carroll; Martin | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000522 | | John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000523 | | Howard G. Sloane | Musendorf, JR | L. Flegel; H. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.*, Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000524 | | Howard G. Sloane | George ou, Cora P | John C. O'Shaughnessy | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000525 | | Court of Common Pleas Summit County | Smith, AR; Naze, RB | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000526 | | Grinder, Harold, AP Green Industries Inc | Victor, William H; Gore, George; Naze, Gore, George; Naze, RB; Smith, AR; Lambros, Thomas D | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000527 | | | | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000528 | | Allen S. Joslyn | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000529 | | | Dr. S. Selevan | | Work Product; Common Interest Litigation Privilege | Consulting Report / work product re: EMTC Litigation. |
| P-JNJ000530 | | | | | Work Product; Common Interest Litigation Privilege | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000531 | | Howard G. Sloane | John C. O'Shaughnessy | File; EMTAC | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000532 | | Court of Common Pleas Summit County | Roger M. Miller | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000533 | | Howard G. Sloane | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000534 | | John C. O'Shaughnessy | George Gore | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000535 | | Court of Common Pleas Summit County | Roger M. Miller | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000536 | | Lester Fliegel; John C. O'Shaughnessy | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000537 | | | Michael D. Sullivan | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000538 | | | Michael D. Sullivan | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000539 | | | Michael D. Sullivan | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000540 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000541 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000542 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000543 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000544 | | Allen S. Joslyn | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000545 | | John C. O'Shaughnessy | Somer, Eric S | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000546 | | | Roger M. Miller | | Work Product; Common Interest Litigation Privilege | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000547 | | Christiansen, RE; Deyo, RC; Frazza, GS | John C. O'Shaughnessy | | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000548 | | File | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000549 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000550 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| JNJ_RGS_00003618 | | John C. O'Shaughnessy | Eric S. Somer | Sloane, H.G.; Dembrow, Ira J. | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_RGS_00003619 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000551 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000552 | | George S. Frazza | John C. O'Shaughnessy | Christiansen, RE; Deyo, RC | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000553 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000554 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000555 | | John C. O'Shaughnessy | Lester Fliegel | Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000556 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000557 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Legal/Case Research regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000558 | | | John C. O'Shaughnessy | | Work Product | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000559 | | | Cahill Gordon and Reindel | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000560 | | | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000561 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000562 | | | John C. O'Shaughnessy | | | Notes / work product re: EMTC Litigation. |
| P-JNJ000563 | | Voslyn, Allen | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000564 | | | Johnson and Johnson; Engelhard Corp; Cahill Gordon and Reindel | | | Draft Release / work product re: EMTC Litigation. |
| P-JNJ000565 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000566 | | John C. O'Shaughnessy | Sam Guynes | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000567 | | | John C. O'Shaughnessy | Christianson, RE; Fine, RS; Molineux, FB | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000568 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000569 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000570 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000571 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000572 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000573 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000574 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000575 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000576 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000577 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000578 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000579 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000580 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000581 | | | | | Work Product | Notes regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000582 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000583 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000584 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000585 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000586 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000587 | | George S. Frazza | John C. O'Shaughnessy | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000588 | | G. Frazza; S. Guynes | John C. O'Shaughnessy | Fred B. Molineux | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000589 | | John C. O'Shaughnessy | Cira P. Georgiou | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000590 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000591 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000592 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000593 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000594 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000595 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000596 | | | John C. O'Shaughnessy; Sloane, Peter; Silverman, Laurence A; Dembrow, Ira J; Finnegan, Kevin; Sanner, Eric S | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000597 | | Fred B. Molineux | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000598 | | | | | Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000599 | | E. E. Eckleton; David R. Clare | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000600 | | | Mannosi, Mark W | Warren, Lisbeth A; Rurka, MD | Work Product; Common Interest Litigation Privilege | Notes / work product re: EMTC Litigation. |
| P-JNJ000601 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000602 | | | | | Work Product | Legal Document / work product re: EMTC Litigation. |
| P-JNJ000603 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000604 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ00505 | | John C. O'Shaughnessy | Joseph G. Blute | Leibenberger, Edward P; General Law Files | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ00506 | | Leibenberger, Edward P; Blute, Joseph G | Chintz, Michael L | | | Memo / work product re: EMTC Litigation. |
| P-JNJ00507 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00608 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00609 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00610 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00611 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00612 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00613 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00514 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00615 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00616 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00617 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00618 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00619 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00620 | | | Skane, Peter; Silverman, Laurence A; Dembrow, Ira J; Finnegan, Kevin; Sarner, Eric S | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ00621 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00622 | | John C. O'Shaughnessy | W.H. Ashton | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ00623 | | | John C. O'Shaughnessy | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00624 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00625 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00627 | | John C. O'Shaughnessy | Eric S. Sarner | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ00628 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00629 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ00630 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00631 | | John C. O'Shaughnessy | Zescuiek, CJ | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00003949 | | John C. O'Shaughnessy | Ira J. Dembrow | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| | | | | | Work Product | Deposition Transcript with handwritten notes / work product re: EMTC Litigation. |
| JNJ_ROS_00004070 | | John C. O'Shaughnessy | Nypd, Eihine | Sarner, Eric S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ00632 | | John C. O'Shaughnessy | | | Work Product | Notes / work product re: EMTC Litigation. |
| JNJ_ROS_00004102 | | John N. Biedler | Roger N. Miller | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00633 | | | | | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ00634 | | File | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00635 | | John C. O'Shaughnessy | McCabe, Valerie T | Leibenberger, EP; Blute, JG | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ00636 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ00637 | | John C. O'Shaughnessy | Huffman, Dale E | John C. O'Shaughnessy | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ00638 | | | | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |

## Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000639 | | | | | Work Product; Common Interest Litigation Privilege | Case Status Updates regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000640 | | | | | Work Product; Common Interest Litigation Privilege | Case Status Updates regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000641 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000642 | | Huffman, Dale E | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000643 | | | Georgiou, Cira P | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000644 | | Harrington, Mike | John C. O'Shaughnessy | Cox, M.; Egan, WC; Zimmer, RA R.Christensen; J. O'Shaughnessy; L. Warren | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000645 | | Rose, Windsor Mills | Guynes, Sam J | Warren | Attorney-Client; Work Product | Letter / attorney client communication re: EMTC Litigation. |
| P-JNJ000646 | | | John C. O'Shaughnessy | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000647 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000648 | | Edward P. Luthensperger | Roger N. Miller | | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000649 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000650 | | John C. O'Shaughnessy | Michael D. Sullivan | Allen S. Joslyn | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000651 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000652 | | John C. O'Shaughnessy | John C. O'Shaughnessy | | Attorney-Client; Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000653 | | | W.H. Ashton | | Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000654 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000655 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000656 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000657 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000658 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000659 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000660 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000661 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000662 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000663 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000664 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000665 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000666 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000667 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000668 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000669 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000670 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000671 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000672 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000673 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000674 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000675 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000676 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000678 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000679 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000680 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000681 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000682 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000683 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000684 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000685 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000686 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000687 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000688 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000689 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000690 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000691 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000692 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000693 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000694 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000695 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000696 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000697 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000698 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000699 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000700 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000701 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000702 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000703 | | | | John C. O'Shaughnessy | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000704 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000705 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000706 | | Allen S. Joslyn | David H. Garabrant, M.D. | | Work Product; Common Interest Litigation Privilege | Letter from consulting expert re: EMTC Litigation. |
| P-JNJ000707 | | Allen S. Joslyn | David H. Garabrant, M.D. | | Work Product; Common Interest Litigation Privilege | Letter from consulting expert re: EMTC Litigation. |
| P-JNJ000708 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000709 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000710 | | John C. O'Shaughnessy | Allen S. Joslyn | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000711 | | Flegel, Lester | Allen S. Joslyn | L. Flegel; P. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000712 | | Weiner, Charles R | Rowland, Michael Y | Sloane, Peter | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000713 | | John C. O'Shaughnessy | Michael D. Sullivan | Setter, David M; Goss, Thomas M | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000714 | | Flegel, Dombusch | Sloane, Peter | Allen S. Joslyn | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000715 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| | | Dombusch, Flegel | Sloane, Peter | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| | | Baza, Daniels M; Wehile, Michael W; Brown, Carole D; Mellen, Francis J; Huffman, Dale E; Joslyn, Allen; Geraghty, Mark S; Guidry, Joel; Carter, Michael D; Ross, David; Baker, Robert; Massetti, Regina M; Sloane, Howard G; Zeszutek, CJ; Siegel, Nancy | Goss, Thomas M | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. Legal/Case Research regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000716 | | Dombusch, Flegel | Allen S. Joslyn; Peter Sloane | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |

Ross v. BASF Catalysts, LLC, et al., Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000717 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000718 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000719 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000720 | | Allen S Joslyn | Joyce, Robert H | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000721 | | | Allen S. Joslyn, Peter Sloane | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000722 | | Dornbusch, Fiegel | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000723 | | | Allen S. Joslyn, Peter Sloane | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000724 | | Fiegel, Dornbusch | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000725 | | | Cahill Gordon and Reindel | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000726 | | | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000727 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| JNJ_ROS_00005083 | | John C. O'Shaughnessy | Sullivan, Michael D | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| JNJ_ROS_00005084 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000728 | | File | | L. Fiegel, H. Sloane | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000729 | | File | Peter Moskowitz | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000730 | | File | | | Work Product | Deposition Preparation Materials / work product re: EMTC Litigation. |
| P-JNJ000731 | | | | | Work Product | Deposition Preparation Materials / work product re: EMTC Litigation. |
| P-JNJ000732 | | | | | Work Product | Deposition Preparation Materials / work product re: EMTC Litigation. |
| P-JNJ000733 | | | | | Work Product | Deposition Preparation Materials / work product re: EMTC Litigation. |
| P-JNJ000734 | | | | | Work Product | Deposition Preparation Materials / work product re: EMTC Litigation. |
| P-JNJ000735 | | | | | Work Product | |
| P-JNJ000736 | | | | | Work Product | Legal/Case Research from consulting expert re: EMTC Litigation. |
| P-JNJ000737 | | | | | Work Product | Legal/Case Research from consulting expert re: EMTC Litigation. |
| P-JNJ000738 | | Fiegel, Lester; Payum, Lindy | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000739 | | | Howard G. Sloane | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000740 | | Sloane, Peter | Kopp, Ronald S | Klusendorf, James R; Dineen, Thomas | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000741 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000742 | | | | | Work Product; Common Interest Litigation Privilege | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000743 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000744 | | Howard G. Sloane | Klusendorf, JR | Dineen, Thomas V; Joyce, Robert H; Kopp, Ronald S | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000745 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000746 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000747 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000748 | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000749 | | John C. O'Shaughnessy | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000750 | | | Dr. Frederick D. Pooley | | Work Product | Letter from consulting expert re: EMTC Litigation. |
| P-JNJ000751 | | Art Kimball | Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000752 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000753 | | | | | Work Product | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.,* Docket No. MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000754 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000755 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000756 | | Roger N. Miller | Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000757 | | Art Kimball | Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000758 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000759 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000760 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000761 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000762 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000763 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000764 | | Ian M. Stewart | Arthur R. Kimball | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000765 | | Ian M. Stewart | Roger N. Miller | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000766 | | Walter C McCrone Associates | Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000767 | | Roger N. Miller | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000768 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000769 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000770 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000771 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000772 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000773 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000774 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000775 | | | Carol Rodgers; Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000776 | | | Ian M. Stewart | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000777 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000778 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000779 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000780 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000781 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000782 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000783 | | Ian M. Stewart | Quantachrome | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000784 | | | Quantachrome | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000785 | | | | | Work Product | Talc testing / work product re: Westfall case. |
| P-JNJ000786 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000787 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000788 | | John C. O'Shaughnessy | Woodward, Taylor J | | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000789 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000790 | | Graybill, Ron | Georgiou, Cira P | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000791 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000792 | | | | | Work Product | Case Status Updates / work product re: EMTC Litigation. |
| P-JNJ000793 | | Roger N. Miller | McCabe, Valerie T | Bluta, JG; O'Shaughnessy, JC; File | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000794 | | Roger N. Miller | McCabe, Valerie T | John C. O'Shaughnessy | Attorney-Client; Work Product | Letter / Attorney client communication re: EMTC Litigation. |
| P-JNJ000795 | | George S. Frazza | Robert E. Christansen | John C. O'Shaughnessy | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000796 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000797 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000798 | | | | | Work Product | Legal/Case Research / work product re: Westfall case. |
| | | | | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000759 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000760 | | | | | Work Product | Legal/Case Research / work product re: Westfall case. |
| P-JNJ000761 | | | | | Work Product | Notes / work product re: EMTC Litigation |
| JNJ_ROS_00005338 | | Fine, RS | John C. O'Shaughnessy | Beidler, JN; Zimmer, RA | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000802 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000803 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| JNJ_ROS_00005478 | | Ira J. Dembrow | W.H. Ashton | John C. O'Shaughnessy; Howard G. Sloane | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000804 | | W.H. Ashton | Ira J. Dembrow | | Work Product | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000805 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000806 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000807 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000808 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000809 | | File | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000810 | | Ira J. Dembrow | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000811 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000812 | | File | John C. O'Shaughnessy | Robert E. Christiansen | Attorney-Client; Work Product | Memo / work product re: Westfall case. |
| P-JNJ000813 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000814 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000815 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000816 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000817 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000818 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000819 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000820 | | | John C. O'Shaughnessy | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000821 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000822 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000823 | | John C. O'Shaughnessy | Wehner, Alfred P | | Work Product | Letter from consulting expert re: EMTC Litigation. |
| P-JNJ000824 | | Doolan, Barry L | John C. O'Shaughnessy | Williams, Gene | Attorney-Client; Work Product | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000825 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000826 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000827 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000828 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000829 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000830 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000831 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000832 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000833 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000834 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000835 | | | John C. O'Shaughnessy | Christiansen, RE; Fine, RS; Molineux, FB | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000836 | | Allen S. Joslyn | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000837 | | | Divey, Kent; Wilson, RK; Cross, Carroll; Stevens, Paul | | Work Product; Common Interest Litigation Privilege | Memo regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000838 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000839 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ross v. BASF Catalysts, LLC, et al., Docket No.MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000840 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000841 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000842 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000843 | | | Dr. Frederick D. Pooley | | Work Product | Letter from consulting expert re: EMTC Litigation. |
| P-JNJ000844 | | John C. O'Shaughnessy | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000845 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000846 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000847 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000848 | | John C. O'Shaughnessy | Donato, Susan; Zezzulda, CJ | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000849 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000850 | | John C. O'Shaughnessy | Deyo, Russel | | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000851 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000852 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000853 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000854 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000855 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000856 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000857 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000858 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000859 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000860 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000861 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000862 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000863 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000864 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000865 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000866 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000867 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000868 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000869 | | Georges J. Frazza | Englehard Corporation; Johnson and Johnson | Christiansen, RE; Deyo, RC | Attorney-Client; Work Product | Memo / work product re: EMTC Litigation. |
| P-JNJ000870 | | | Englehard Corporation; Johnson and Johnson | | Work Product; Common Interest Litigation Privilege | Release / work product re: EMTC Litigation. |
| P-JNJ000871 | | | | | Work Product; Common Interest Litigation Privilege | Release / work product re: EMTC Litigation. |
| P-JNJ000872 | | | Scott Martin | | Work Product | Legal/Case Research / work product re: EMTC Litigation. |
| P-JNJ000873 | | John C. O'Shaughnessy | Scott Martin | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000874 | | John C. O'Shaughnessy | Martin, Scott | L. Flegel; H. Shone | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000875 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000876 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000877 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000878 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000879 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000880 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000881 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000882 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000883 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000884 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Ross v. BASF Catalysts, LLC, et al.,* Docket No.MID-L-0582-17AS - Privilege Log of Johnson and Johnson Consumer Products, Inc. (July 2017)

| DOCUMENT NUMBER | DOCUMENT DATE | AUTHOR | RECIPIENT | CC | PRIVILEGE ASSERTED | PRIVILEGE DESCRIPTION |
|---|---|---|---|---|---|---|
| P-JNJ000885 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000886 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000887 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000888 | | | | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000889 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000890 | | John C. O'Shaughnessy | Dr. Frederick D. Pooley | | Work Product | Letter from consulting expert re: EMTC Litigation |
| P-JNJ000891 | | Allen S. Jolyn | John C. O'Shaughnessy | | Work Product; Common Interest Litigation Privilege | Letter regarding litigation and strategy re: EMTC Litigation. |
| P-JNJ000892 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000893 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000894 | | | Dr. Frederick D. Pooley | | Work Product | Consulting Report / work product re: Westfall case. |
| P-JNJ000895 | | Dr. Frederick D. Pooley | John C. O'Shaughnessy | | Work Product | Letter to consulting expert re: EMTC Litigation. |
| P-JNJ000896 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |
| P-JNJ000897 | | | John C. O'Shaughnessy | | Work Product | Notes / work product re: EMTC Litigation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 208

## CAHILL GORDON & REINDEL

### EIGHTY PINE STREET

### NEW YORK, N.Y. 10005

FLOYD ABRAMS
ROGER ANDRUS
MICHAEL A. BECKER
HENRY G. BISGAIER
SUSAN BUCKLEY
KEVIN J  BURKE
H  KEVIN CASTEL
JAMES J  CLARK
WALTER C. CLIFF, P C.
BENJAMIN J. COHEN
JOSEPH P. CONWAY
MARSHALL COX
THOMAS F. CURNIN
W. LESLIE DUFFY
RAYMOND L  FALLS, JR.
PATRICIA FARREN
BART FRIEDMAN
CIRO A. GAMBONI
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
EDWARD A. HANSEN
WILLIAM M. HARTNETT
DAVID R. HYDE
THOMAS R. JONES
ALLEN S. JOSLYN
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
IMMANUEL KOHN
EDWARD P. KRUGMAN
WILLIAM T. LIFLAND
MICHAEL MACRIS

JONATHAN I  MARK
DENIS McINERNEY, P.C
RAND McQUINN *
GERARD M. MEISTRELL
ROGER MELTZER
CLIFFORD L  MICHEL
JOHN F  MITCHELL
MATHIAS E. MONE
HUGH P. MORRISON, JR. *
DONALD J. MULVIHILL
KENNETH W. ORCE
CHARLES PLATTO
ROY L. REGOZIN
RICHARD L. REINHOLD
DEAN RINGEL
THORN ROSENTHAL
RICHARD J. SABELLA
IRWIN SCHNEIDERMAN, P.C.
H  RICHARD SCHUMACHER
JOHN SCHUSTER
LAURENCE A. SILVERMAN
HOWARD G. SLOANE
LAURENCE T  SORKIN
LEONARD A  SPIVAK
GERALD S. TANENBAUM
MICHAEL P. TIERNEY
ROBERT USADI
JOHN R. VAUGHAN
GEORGE WAILAND
RALPH G. WINGER
GARY W  WOLF
JOHN R. YOUNG

SAMUEL ESTREICHER
RICHARD A. MAHFOOD, O.C. **
MICHAEL S. SACKHEIM
JOHN J. STANTON, JR.
COUNSEL

FREDDY DRESSEN ***
EUROPEAN COUNSEL

WASHINGTON, D.C. OFFICE
1990 K STREET, N W.
WASHINGTON, D.C. 20006

EUROPEAN OFFICE
10 RUE FRANÇOIS 1ER
75008 PARIS, FRANCE

TELEX/CABLE
RCA 232184   WUT 127089
CAGO UR   COTTOFRANK NTN
FACSIMILE 212-269-5420

* ADMITTED D C. ONLY
** ALSO ADMITTED ENGLAND AND JAMAICA
*** ADMITTED FRANCE ONLY

TELEPHONE 212-701-3000

WRITER'S DIRECT NUMBER

(212) 701-3648

May 17, 1989

### Re:   Tireworkers' Asbestos Litigation

Dear Mr. Schwartz:

      I write this letter as counsel for Engelhard Corporation and its former wholly-owned subsidiary, Eastern Magnesia Talc Co. ("EmTal") which currently are defendants in 28 lawsuits that your firm has brought in the Eastern District of Pennsylvania and in Montgomery County Court on behalf of former tireworkers at the B.F. Goodrich plant in Oaks, Pennsylvania.

      This letter is the continuation of a process that began last August at the Montgomery County Courthouse when Vicky Komarnicki, Engelhard's local counsel, and two colleagues of mine, Craig Newman and Eric Sarner, spoke to you about the possibility of your voluntarily dismissing Engelhard and EmTal from the tireworkers' actions on the ground that the talc manufactured by EmTal did not contain any asbestos.  You indicated that you would consider doing so if Engelhard would provide you with the location of its talc mines and if your expert then determined that they were not in a region in which asbestos-containing talc was found.

      By letter of September 22, 1988, Vicky Komarnicki provided you with an affidavit of Charles D. Carter, Engelhard's Director of Joint Ventures and Resources, stating that Engelhard's only talc mine was located in Johnson, Vermont and that Engelhard produced talc from that mine from 1967, when it acquired the mine, through 1983, when the mine was closed for economic reasons.  (A copy of the Carter affidavit is attached for your convenience.) There were then several telephone conversations between you and Ms. Komarnicki in regard to this matter, as reflected in her letters to you of October 18 and November 10, 1988, as well as a discussion in



EXHIBIT
70

EXHIBIT
J&J-196

BASF_SAMPS

CAHILL GORDON & REINDEL

-2-

Pottstown among you, Ms. Komarnicki and Eric Sarner on November 16, 1988, as reflected in a letter to you of November 21, 1988. Subsequently, you advised Messrs. Newman and Sarner that you no longer had available an expert in this field. You indicated, however, that you would be receptive to Engelhard pursuing this matter with its own expert. Engelhard has now done so.

Enclosed is an affidavit by William H. Ashton who has been involved in investigating and studying the talc industry and talc technology for over thirty-five years. In his affidavit, Mr. Ashton summarizes a number of reports, studies and analyses, from the 1940s through the 1980s, of the talc produced at the Johnson, Vermont talc mine that was owned and operated by EmTal from 1967 through 1983. The unequivocal conclusion, reached by all of these investigations, as set forth in Mr. Ashton's affidavit, is that talc from the Johnson, Vermont mine, which was Engelhard's only talc mine, did not contain asbestos. Included among the various studies and reports discussed by Mr. Ashton are two separate 1982 analyses of the talc from the Johnson mine, both of which concluded, based on, respectively, (i) scanning electron microscopy and energy dispersive spectroscopy, and (ii) x-ray diffraction analysis and analytical transmission electron microscopy, that no asbestos was present. (See para. 7 of the Ashton affidavit)

I would urge that after you review this affidavit, you will agree to voluntarily dismiss Engelhard and EmTal from the Goodrich tireworkers' lawsuits. If you should have any questions, please feel free to contact me.

I look forward to receiving your response by June 1, 1989.

Sincerely,

Ira J. Dembrow

Jeffrey C. Schwartz, Esq.
Law Offices of Allen L. Rothenberg
9th Floor
1201 Chestnut Street
Philadelphia, Pennsylvania 19107

[Enclosures]

FEDERAL EXPRESS

cc: Vicki Komarnicki, Esq. (w/encls.) [FEDERAL EXPRESS]
    Lynn Rosner, Esq. (w/encls.) [FEDERAL EXPRESS]

CAHILL GORDON & REINDEL

-3-

bcc:   Howard G. Sloane, Esq.
       Laurence A. Silverman, Esq.
       Kevin Finnegan, Esq.
       Eric S. Sarner, Esq.
       Michael Sullivan
          (all w/encls.)

BASF FC 0004282

BASF_SAMPSON000014992