# Exhibit 209

08. 14. 89   04:11 PM   *DILWORTH PHILA*          P02



LAW OFFICES

DILWORTH, PAXSON, KALISH & KAUFFMAN

2600 THE FIDELITY BUILDING

PHILADELPHIA, PENNSYLVANIA 19109-1094

(215) 875-7000

CABLE ADDRESS PETPAL    TELEX 83-129

FAX (215) 851-8040

SCRANTON, PENNSYLVANIA
HARRISBURG, PENNSYLVANIA
BOCA RATON, FLORIDA
WASHINGTON, D. C.
WEST ATLANTIC CITY, NEW JERSEY
CAMDEN, NEW JERSEY

DIRECT DIAL (215) 875- 7123

August 14, 1989

The Honorable Charles R. Weiner
United States District Court
Eastern District of Pennsylvania
U.S. Courthouse, Room 3613
601 Market Street
Philadelphia, PA 19106

Re: Tireworkers' Litigation
    August 15, 1989, 2:00 p.m. meeting

Dear Judge Weiner:

We are local counsel in the Tireworkers' Litigation representing Engelhard Corporation/Eastern Magnesia Talc Company.

We will be attending the August 15, 1989 2:00 p.m. general meeting before Your Honor, and respectfully request that we have a brief conference with Your Honor and plaintiffs' counsel immediately after the general meeting to discuss our long-standing request to plaintiffs' counsel for dismissal. An attorney from the firm of Cahill Gordon & Reindel, national counsel for the client, will also be attending the meeting.

I spoke to one of your clerks, Chris, on August 10, and he suggested that we speak to you immediately after the general meeting regarding the foregoing.

By way of background, the following is a summary of our efforts to have our client voluntarily dismissed from this litigation. In short, we have provided plaintiffs' counsel with every item of information they have requested to demonstrate both

Case 2:16-md-02738-MAS-BLS Document 26642-6 Filed 09/14/23 Page 3 of 544 PageID: 162180

Dilworth, Paxson, Kalish & Kauffman
To: The Honorable Charles R. Weiner
August 14, 1989

Page 2

that there was no asbestos in our talc, and that our talc was not present at the B.F. Goodrich Plant in Oaks, Pennsylvania (We are only named in the Goodrich cases).

1.  In August 1988 national counsel and I first spoke with plaintiffs' counsel, Jeffrey Schwartz, about the possibility of plaintiffs voluntarily dismissing our client from this litigation. Mr. Schwartz indicated that he would consider doing so if we provided him with the location of our talc mine and if his expert determined that it was not in a region in which asbestos-containing talc was found. By letter dated September 23, 1988 we provided plaintiffs' counsel with the Affidavit of Charles D. Carter, Engelhard Director of Joint Ventures and Resources, stating that our only talc mine was located in Johnson, Vermont, and that our client produced talc from that mine beginning in 1967, when it acquired the mine, through 1983, when the mine was closed.

2.  Thereafter, national counsel and I had several discussions with Mr. Schwartz, and he advised us that his expert had defected, but that he would be receptive to dismissing our client if we produced a report from our own expert that our talc did not contain asbestos. By letter dated May 17, 1989 we provided plaintiffs' counsel with such a report. The Affidavit of William H. Ashton, who has been involved in investigating and studying talc for over 35 years, contains extensive reviews of both samples from the Johnson mine and the literature. Mr. Ashton concludes that our client's talc did not contain asbestos.

3.  Thereafter, plaintiffs' counsel asked that we provide him with talc samples from our mine. We advised him that no samples were available, and that the Johnson, Vermont mine has been out of use since 1983 and is presently filled with water.

4.  By letter dated June 14, 1989, plaintiffs' counsel asked for a copy of the report of Professor Pooley, a noted expert, dated December 10, 1983, which was referred to in the Affidavit of Mr. Ashton. Mr. Schwartz also requested an affidavit stating that the only mine ever owned or operated by our client was the Johnson mine, and that talc samples were unavailable. By letter dated June 21, 1989 we sent Mr. Schwartz a copy of Dr. Pooley's report, which also concludes that talc from the Johnson mine does not contain asbestos. In addition, we provided plaintiffs' counsel with a further affidavit of Charles D. Carter indicating that the Johnson mine was the only mine and that the client does not have any talc samples.

5.  Thereafter, we spoke to Mr. Schwartz and received a letter from him dated July 19, 1989 again asking the location of our client's mine. We responded by letter dated July 25, 1989, stating once again that our one and only mine was in Johnson, Vermont.

Dilworth, Paxson, Kalish & Kauffman                              Page 3
To:  The Honorable Charles R. Weiner
August 14, 1989


    5.   In our letter of July 31, 1989 we also pointed out to
plaintiffs' counsel that there is no good faith basis for keeping
our client in these cases because of the lack of product
identification. From the time we were first sued, Mr. Schwartz
has continually advised us that the sole and only basis for our
client being named was the deposition testimony of John Bentley
taken in September 1987 in an unrelated case in which we were not
named, nor represented at the deposition. Since that time Mr.
Bentley, the purchasing manager for the Oaks plant, was deposed
in this litigation on July 28, 1989. At that deposition it became
clear that Mr. Bentley cannot testify that our talc was present
at the Oaks plant. Moreover, plaintiffs' counsel has failed to
provide us with any records indicating that our client's product
was present at the Oaks plant, and has indicated that there are
no such records.

    Disregarding the foregoing, plaintiffs' counsel have failed
and refused to dismiss our client from this litigation to the
great expense and detriment of our client, notwithstanding our
efforts to meet every one of their demands.

                                    Respectfully yours,

                                    Victoria M. Komarnicki
                                    Victoria M. Komarnicki

VMK/kas

VIA HAND DELIVERY:

cc:  Charles A. Klein, Esquire
     Jeffrey C. Schwartz, Esquire
     Jerry Lyons, Esquire

# Exhibit 210



*Luzenac America, Inc.* · P.O. Box 680 · Windsor, VT 05089 · (802) 484-7763 · Fax: (802) 484-3621

Ocotber 17, 1994

Johnson & Johnson
One Johnson & Jonson Plaza
New Brunswick, NJ  08933-7002

Attn:  Mr. John C. O'Shaughnessy

Dear Mr. O'Shaughnessy:

The following is in reply to your letter dated October 4, 1994, in reference to <u>RITTER V. CYPRUS, ET AL.</u>

To the best of my recollection and that of Bert White and Frank Hasty, the mines used to supply talc for the roofing industry prior to 1984 came from several ore bodies. We did not begin to produce roofing grade products from our local mines until 1970. These mines are Clifton, Frostbite, Argonaut, Rainbow, and the Hammondsville Mine. Prior to 1970, it is unclear where ore was shipped from. The following are the mines and dates in which talc was used for the roofing grades.

    1970........Clifton Mine
    1971........Clifton Mine
    1972........Clifton Mine, Frostbite Mine
    1973........Clifton Mine, Frostbite Mine,
               Argonaut Mine, Hammondsville Mine
    1974........Clifton Mine, Frostbite Mine,
               Argonaut Mine, Hammondsville Mine
    1975........Clifton Mine, Frostbite Mine,
               Argonaut Mine, Hammondsville Mine, Rainbow Mine
    1976........Clifton Mine, Frostbite Mine
               Argonaut Mine, Hammondsville Mine, Rainbow Mine
    1977........Clifton Mine, Frostbite Mine,
               Argonaut Mine, Hammondsville Mine, Rainbow Mine
    1978........Argonaut Mine, Rainbow Mine
               Hammondsville Mine
    1979........Clifton Mine, Argonaut Mine
               Rainbow Mine, Hammondsville Mine
    1980........Clifton Mine, Argonaut Mine
               Rainbow Mine, Hammondsville Mine
    1981........Clifton Mine, Argonaut Mine
               Rainbow Mine, Hammondsville Mine

**RECEIVED**

OCT 19 1994

J.C. O'SHAUGHNESSY

J&J-0109238

Protected Document--Subject to Protective Order                    JNJ 000063581

-2-

```
1982........Clifton Mine, Argonaut Mine
            Rainbow Mine, Hammondsville Mine
1983........Clifton Mine, Argonaut Mine
            Rainbow Mine, Hammondsville Mine
1984........Clifton Mine, Frostbite Mine,
            Argonaut Mine, Hammondsville Mine, Rainbow Mine
```

Testing was done on a monthly basis on the ore bodies we were mining. Composites for the talc used for industrial as well as cosmetics were sent to McCrone Associates, an independent lab for asbestiform analysis. Attached is a copy of the current procedure used which has been the procedure followed since 1970.

Samples are not available for this time frame since retention is only two years. All McCrone records for this time frame were turned over to Cyrus Minerals Company in 1989 with the sale of Windsor Minerals. It is my understanding that these records have since been turned over to Luzenac America Corporate Headquarters with the sale of Cyprus Windsor Minerals in 1992. Richard Zazenski, our Director Product Safety & Quality Assurance, may be able to help you in this area. He can be reached at (303)643-0404.

I hope the information I have provided will be of some assistance to you. If you have any other questions, please feel free to contact me.

Best regards,

LUZENAC AMERICA, INC.

James R. Gray
Manager of Purchasing

cc:  F. Hasty
     B. White
     R. Zazenski

J&J-0109239

Protected Document--Subject to Protective Order                    JNJ 000063582

Exhibit 211



**m<sup>c</sup>crone environmental services, inc.**
850 PASQUINELLI DRIVE
WESTMONT, ILLINOIS 60559 • 708-887-7100

3 January 1995

Mr. John O'Shaughnessy
J & J, The Law Dept.
One J & J Plaza
New Brunswick, NJ 08933-7002

*Re: Ritler v. Win ?*

Subject:     Windsor Minerals, Inc.
             McCrone File No. ME-4055

Re:          McCrone Project No. IL-2689

Dear Mr. O'Shaughnessy:

As you requested during our telephone conversation on 13 December 1994, I have completed my review of McCrone File No. ME-4055 for the additional information that you requested. The information that you requested included memos and/or correspondence from J & J that may assist in determining sample locations. A copy of the entire file has been enclosed for your review as you requested during our telephone conversation today.

If I can be of any further assistance, please do not hesitate to contact me at 708-887-7100.

Sincerely,

Laurie R. Bain
Vice President and General Manager

LRB:lrd
Enclosures

**RECEIVED**

JAN 5 1995

J.C. O'SHAUGHNESSY

a member of the m<sup>c</sup>crone group

J&J-0003946

JNJ 000687065

Exhibit 212

*Ritter –*
*Windsor*

## Johnson & Johnson

Office Of
GENERAL COUNSEL

NEW BRUNSWICK, N.J.

April 4, 1995

Attorney Notes

SUBJECT: SITE VISIT TO VERMONT MINES AND INTERVIEW WITH
PROFESSOR BARRY DOOLAN - MARCH 23, 1995

MEMO TO FILE:

With respect to the <u>Ritter</u> case I met with Lance Meade, Geologist with Luzenac, Rick Suydam, Geologist with Luzenac, and Professor Barry Doolan of the University of Vermont. Specifically, we discussed the quality of the talc mined at the five mines which feed the roofing industry as well as the methods of mining at those mines during the time period in question (1970 through 1984). We met at the Columbia Mine and Mill and also visited the Clifton Mine (now closed) and the Argonaut Mine which is actively mined. Both of these sites were open pit mines; however, both had an underground component to them in the past. Luzenac will consolidate its operations as the Ludlow Mines and identify them by geographic location which is consistent with the way they handle their mining operations around the world. The Argonaut, Frostbite, Clifton and Rainbow Mines are all within one or two miles of each other. The Hammondsville Mine is approximately 20 miles away. These are their mines that supplied talc for the roofing industry at the relevant time for <u>Ritter</u>.

1.      I began my discussions with Luzenac Geologist Rick Suydam who has been working in the area since the mid 70s when he started with Windsor Minerals. He explained that there are two grades of talc that had come out of the Clifton mine, TC100, which is a lower grade high in carbonate and used in the joint compound industry. Roofing talc is grade 36 and is the majority of the talc taken out of that mine. **N.B.** In the early 1980s they discovered one vein running through the pit which was narrow and localized and contained fibrous form materials. Dr. William Gregg worked closely with Roger on this issue. Rick mentioned that caution was used to mine around this material and to waste it to the extent it was taken from the ground. He added that this was a difficult process.

EXHIBIT
**24**

J&J-0163238

- 2 -

II.   I met our expert witness, Professor Barry Doolan at the stone house.  He initially discussed the McCrone reports which indicate that there is no contamination in the mining process during the time period we're interested in which is roughly 1975 through '84.  He pointed out that there are some letters which indicate findings of chrysotile asbestos in the material. Professor Doolan expressed surprise to see this type of material from these mines since chrysotile asbestos or any form of asbestos is not present in this geographic area.  He explained that there is a well defined and unique belt containing asbestos which is in northern Vermont and runs up to New Foundland.  He pointed out that this is the richest asbestos belt in the world and has been mined and known about for years.  In sum, all asbestos deposits are north of the Vermont location.  This is not to say that one cannot find lesser forms of asbestos in the south such as "slip fibers"; however, this would not be true asbestos.

Professor Doolan explained that the Windsor Mineral mines are in an area known as the Mooretown Deposit.  They are, in a sense, the boundary between the Mooretown and Cramhill (country) rock formations.  There is no question that one can find tremolite in these formations.

Professor Doolan explained that the ultramific rock where one finds talc had been altered to serpentinite and then to talc in the metamorphic process over 450 million years ago.  The talc in Vermont is a product of serpentine and the country or Cramhill rock.  The serpentine deposits appear like beads on a strong with the bead representing the serpentine.  Serpentine in the middle is a remnant core which no one quarries.  The talc zone, which is relatively thin, lays at the outer edges of the serpentine core.  He pointed out that a lot happens on the edges.  The serpentine body has contact with other rocks in this "reaction area".  This is where one can find tremolite as well.  The reaction areas contain chlorite, talc carbonate, quartz and also tremolite zones.  One can't avoid it in the mining process.  It has to be removed or extracted.  It is in the vicinity.

J&J-0163239

- 3 -

Rich Suydam pointed out that the company for the most part uses "continuous mining machines". It's easier to remove talc from other unwanted materials in this process since the operator is holding the drill in his hand and can point it directly at the talc deposit as he is mining. These talc deposits are easily distinguishable from other unwanted rock especially the serpentinite. Rick further indicated that the company's main selling point for the roofing grade talc was that it was platy which indicates that it was a purer form of talc.

Importantly, the company initially used the "drill and blast method of mining" at the Clifton Mine. This concerned Professor Doolan because it is a more indiscriminate mining method and is more likely to get material other than the desired talc. However, when we visited the open pit Clifton Mine later in the day, Professor Doolan noted that the reaction zone between the serpentinite and the talc deposit was very small to non-existent. In other words there was no layer or substantial layer which could contain tremolite. This site visit to the Clifton Mine corroborated Professor Doolan's reading of the 1975 map of the "Ludlow quadrangle" which showed the serpentinite deposit at the Clifton Mine to have a smaller, almost non-existent "reaction area".

Professor Doolan can testify that one does not find chrysotile in the geology of this area. He also states that the McCrone reports are consistent with not finding asbestos. He did point out that sometimes unusual minerals are found in lower Vermont and he questions whether the McCrone finding of chrysotile really refers to one of these unusual materials. However, the McCrone reports generally do not give the methodology of analysis so it's hard for him to tell. He called some of these unusual minerals asbestoform "slip fibers". He was concerned about it (up until the time to his actual visit to the Clifton Mine) but stated that these fibers have never been recorded in lower Vermont. His concern was regarding the type of reaction zone and whether it contained tremolite but after his visit to the Clifton Mine he felt much more comfortable since there was such a small reaction zone.

J&J-0163240

- 4 -

Professor Doolan pointed out that the U. S. Geological survey has just completed a new mapping of the Ludlow triangle which is now ready for use and he will see if he can obtain a copy. He will get an enlarged mining map of this area for use in court. In fact, he found such a map in the office and took a copy of it with him.

With respect to Professor Doolan's expert opinion, he is comfortable in indicating that this geology did not contain asbestos. With respect to tremolite, he cannot say the talc did not contain it since it is present in the area and basically up to the mining method to avoid it or extract it from ore. We can have Roger Miller and McCrone fill in this area.

With respect to the extent of the tremolite zone, Lance Meade pointed out that it was very thin and that they measure it in inches and in feet at the most. If it is gone into by mistake, it is wasted. In fact Lance said that he would go to the mines and when he spotted tremolite containing materials, he would spray paint it orange so it would not be used.

III.   Examining the August, 1975 map of the Ludlow Triangle

1.   Clifton Mine - This mine is the only mine where the company drilled and blasted for ore. It was strictly surface mining but Rick pointed out that we quickly switched to mechanical mining at the site. The Clifton Mine was used during the whole time of the plaintiff's work at Tamko, from 1970 through 1984.

2.   Frostbite Mine - This mine was utilized from 1972 or so through the end of 1977. It was all mined underground.

3.   Argonaut Mine - This mine was utilized from 1973 through 1984. From '73 through 1980 it was underground and became surface in about 1978 while underground was running at the same time. This mine used mechanical miners until 1985.

J&J-0163241

- 5 -

4.   Rainbow Mine - This mine has been in operation since 1975, although very little is coming out now. There is good detail on the '75 map for this mine showing good control in terms of where the ore was extracted. It has been an all surface mine from 1975 through the present.

5.   Hammondsville Mine - This mine has been closed since 1971. It is the mine that provided the talc to the cosmetic/toiletry industry. It started as a very small open mine and quickly went underground. It is under water now and the reason for this is that the water table has risen. Today, the cosmetic talc is extracted from the Hamm Mine which will soon be switched to Argonaut.

Rick pointed out that all the cosmetic grade talc goes to Johnson & Johnson which maintains strict quality control. Also, the floatation method is used. This is a very sensitive method since the talc and the contaminants weigh about the same and only the talc remains floating after treatment. The Hammondsville Mine became a significant source of talc during the later years with respect to plaintiff's tenure at Tamko because charts show the company was getting two times as much ore out of this mine compared to the others.

The Gassets Mill was used for grade 36. The talc was processed by a dry grinding method. Whatever was taken out was put into the mill and grind down. With respect to all the mines, Rick pointed out that the company did test drillings so it was known where the mines were going within the ore body. Rick pointed out that the floatation method was not used for roofing talc.

Barry pointed out that although the McCrone records show a small amount of contaminated rock, the report suggests good mining operation since the amounts are so small. Doolan cannot say that the rock cannot host chrysotile because the same host rock does have chrysotile in the northern or rich asbestos area. But the chrysotile, if it is present here, must

J&J-0163242

- 6 -

be an extremely low percentage.  He pointed out that there is added incentive to avoid tremolite areas because it is more expensive to mine.  Professor Doolan noted that there is no mention at all of tremolite in the McCrone reports.  (Attorney's note:  It may depend on how McCrone defines asbestoform fibers).

IV.     Doolan's Opinion

As indicated above, Doolan will state that there is no "asbestos" in the Ludlow quadrangle or the mines that provided talc to the roofing industry.  We must be careful, however, since asbestos is a much maligned term and involves many different fibers.  Professor Doolan is speaking only of the strict geology meaning of asbestos and not the legal definition.  With respect to tremolite, he indicates that it is present in this area and naturally occurring and the presence of it in talc depends chiefly on the mining methods and whether or not there is a careful avoidance of mining into such rock.  As indicated above, there are economic incentives not to mine this rock.  In addition, the areas to be avoided are somewhat obvious to the miners who are using the actual equipment on the rock so avoidance isn't a confusing or ambiguous endeavor.  Roger Miller's testimony on this issue will be important.

Basically, I can see using Professor Doolan for the following:

1.      To explain what geology is and the terms involved.

2.      To explain the geology of the Vermont region in general and for the Ludlow quadrangle in particular.

3.      To explain the geology of these particular mines to the extent he can do so.

J&J-0163243

- 7 -

4.    To give an opinion that based on all of his knowledge and material he has seen that these mines did not produce talc containing asbestos.

5.    That with respect to tremolite, there is no indication that the talc is contaminated with any tremolite; however, he can't state for certain since that can only be done by mining engineers who were responsible and present for the day-to-day mining procedures to explain how tremolite was avoided and wasted.

The basis for Dr. Doolan's knowledge is:

1.    His review of the geology literature over time.

2.    Examination of the mining maps for this area.

3.    Discussions with company geologists regarding mining methods and geology of the area.

4.    His personal visits to the Ludlow quadrangle including specifically the Argonaut and Clifton Mines.

5.    Professor Doolan pointed out that although he didn't investigate much of this area personally, under his direction his students have extensively mapped this area, including the serpentinite bodies.

6.    Professor Doolan's specific areas of research focus on the origin of all of these rocks from Quebec to the Massachusetts border. He considers himself an "Appalachian Geologist" and is intimately familiar with the evolution of the geology of this area. His research included bedrock mapping of the area, lab studies of rock (which

J&J-0163244

- 8 -

measure changes after chemical analysis and microscopic viewing) and understanding the structure of the formations which includes the fabric and shearing. Basically, his understanding how the rocks evolved over time.

He has done this for the last 25 years in Vermont and has an obvious enthusiasm for these rocks. He will be able to state quite clearly that talc is contained in these deposits not just as part of a random mix of minerals but rather as a distinct deposit which can be selectively mined to extract talc.

Demonstrative exhibits: Dr. Doolan will prepare a map of the Ludlow quadrangle using the August, 1975 map as a basis, and we will have actual samples of talc and serpentinite from this area.

John C. O'Shaughnessy

JCO:jcm

J&J-0163245

Exhibit 213

```
 1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                  STATE OF MISSOURI
 2

                      - - - - -
 3

      VICKIE FORREST, et al.,
 4            Plaintiffs,
 5            vs.                   Cause No.
                                    1522-CC0419-02
 6

      JOHNSON & JOHNSON, et al.
 7            Defendants.
 8                 - - - - -
 9         UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
10

                      - - - - -
11

      IN RE:  JOHNSON & JOHNSON    MDL NO:
12    TALCUM POWDER PRODUCTS        16-2738 (FLW)(LGH)
      MARKETING, SALES PRACTICES,
13    AND PRODUCTS LIABILITY
      LITIGATION
14                 - - - - -
15
                Wednesday, June 30, 2021
16
17                 - - - - -
18         Continued Videotaped Oral Deposition of
19    JOHN C. O'SHAUGHNESSY, taken at the Crowne Plaza
20    Princeton, 900 Scudders Mill Road, Plainsboro, New
21    Jersey, commencing at 9:35 a.m., by and before Robin
22    L. Clark, Registered Professional Reporter and
23    Notary Public in and for the State of New Jersey.
24                 - - - - -
```

John D. O'Shaughnessy

Page 420

1 APPEARANCES:
2
3     LEVIN, PAPATONIO, RAFFERTY, PROCTOR,
      BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
      BY:  CHRISTOPHER V. TISI, ESQ.
4     316 South Baylen Street, Suite 600
      Pensacola, Florida 32502-5996
5     850-435-7176
      ctisi@levinlaw.com
6         For the Plaintiff, Vickie
      Forrest
7
8     COHEN, PLACITELLA & ROTH
      BY:  CHRISTOPHER M. PLACITELLA, ESQ.
9     127 Maple Avenue
      Red Bank, New Jersey 07701
10    732-749-9003
      cplacitella@cprlaw.com
11        For the MDL Plaintiffs
12
13    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  ALLISON M. BROWN, ESQ.
      and RICHARD T. BERNARDO, ESQ.
14    One Manhattan West
      New York, New York 10001-8602
15    212-735-3000
      allison.brown@skadden.com
16    richard.bernardo@skadden.com
          For the Defendant,
17    Johnson & Johnson
18
      YETTER COLEMAN LLP
19    BY:  COLLIN J. COX, ESQ.
      811 Main Street, Suite 4100
20    Houston, Texas 77002
      713-632-8000
21    ccox@yettercoleman.com
          For the Witness
22
23 ALSO PRESENT:
24    JOEL SCHNEIDER, USMJ (Retired)

Page 421

1 ALSO PRESENT, continued:
2
3     WILLIAM GEIGERT, VIDEOGRAPHER

      MICHAEL KUTYS, EXHIBIT TECH
4
5 REMOTE APPEARANCES:
6
7     BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
      MILES, P.C.
      BY:  LEIGH O'DELL, ESQ.
8     218 Commerce Street
      Montgomery, Alabama 36104
9     800-898-2034
      leigh.odell@beasleyallen.com
10        For the Plaintiff, Vickie
      Forrest
11
12    ASHCRAFT & GEREL, LLP
      BY:  MICHELLE A. PARFITT, ESQ.
13    1825 K Street, N.W., Suite 700
      Washington, D.C. 20006
14    202-759-7648
      mparfitt@ashcraftlaw.com
15        For the Plaintiff, Vickie
      Forrest
16
17    COHEN, PLACITELLA & ROTH
      BY:  DENNIS M. GEIER, ESQ.
18    and HARRY M. ROTH, ESQ.
      127 Maple Avenue
19    Red Bank, New Jersey 07701
      732-749-9003
20    dgeier@cprlaw.com
      hroth@cprlaw.com
21        For the MDL Plaintiffs
22
23
24

Page 422

1 REMOTE APPEARANCES, continued:
2
3     BARNES LAW GROUP, LLP
      BY:  JOHN R. BEVIS, ESQ.
      31 Atlanta Street
4     Marietta, Georgia 30060
      678-290-2240
5     bevis@barneslawgroup.com
          For the Plaintiffs
6
7     ROBINSON CALCAGNIE, INC.
      BY:  GENEVIEVE OUTLAW, ESQ.
8     19 Corporate Plaza Drive
      Newport Beach, California 92660
9     949-720-1288
      goutlaw@robinsonfirm.com
10        For the Plaintiffs in JCCP 4872
11
12    BLASINGAME, BURCH, GARRARD & ASHLEY, PC
      BY:  LEANNA BANKESTER PITTARD, ESQ.
13    and SARA SCHRAMM, ESQ.
      2100 Southbridge Parkway
      Suite 650
14    Birmingham, Alabama 35209
      866-354-3544
15    lpittard@bbga.com
      sschramm@bbga.com
16        For the MDL Plaintiffs
17
      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
18    BY:  CATHERINE I. MULLALEY, ESQ.
      500 Boylston Street
19    Boston, Massachusetts 02116
      617-573-4851
20    kate.mullaley@skadden.com
          For the Defendant,
21    Johnson & Johnson
22
23
24

Page 423

1 REMOTE APPEARANCES, continued:
2
3     FAEGRE DRINKER BIDDLE & REATH LLP
      BY:  SUSAN M. SHARKO, ESQ.
4     600 Campus Drive
      Florham Park, New Jersey 07932
5     susan.sharko@faegredrinker.com
      973-549-7000
6         For the Defendant, Johnson &
      Johnson
7
8     SEYFARTH SHAW LLP
      BY:  THOMAS T. LOCKE, ESQ.
9     975 F Street, N.W.
      Washington, D.C. 20004
10    202-828-5376
      tlocke@seyfarth.com
11        Appearing on behalf of Personal
      Care Products Council
12
13    TUCKER ELLIS, LLP
      BY:  ELIZABETH J. CUMMINGS, ESQ.
14    100 South 4th Street
      St. Louis, Missouri 63102
15    314-571-4969
      elizabeth.cummings@tuckerellis.com
16        For the Defendants, PTI
      Royston, LLC and PTI Union, LLC
17
18 ALSO PRESENT:
19    LEA CALLAHAN, Paralegal
20    JEN SECRIST, Paralegal
21    STEPHANIE E. MARTIN
22        - - - - -
23
24

Page 424

```
 1        I N D E X
 2  WITNESS                        PAGE
 3  JOHN C. O'SHAUGHNESSY
      BY MR. PLACITELLA:        430, 879, 903
 4  BY MR. TISI:               776, 849
      BY MS. BROWN:            779, 903
 5
 6        E X H I B I T S
 7  NUMBER     DESCRIPTION          MARKED
 8  O'Shaughnessy
 9  Exhibit JOS 1  McCrone Binder 1      482
10  Exhibit JOS 1A McCrone Binder 2      482
11  Exhibit JOS 2A Musco-2/Hopkins Binder 1   430
      of 2
12
    Exhibit JOS 2B Musco-2/Hopkins Binder 2   430
13      of 2
14  Exhibit JOS 3 Additional Testing Binder   430
15  Exhibit 4    Handwritten Document        644
16  Exhibit J&J 4 Cosmetics Document         894
17  Exhibit TR-15 Deposition of Dr. John     678
      Hopkins dated 3/6/07
18
    Exhibit 82   Muscat Video Clip       864
19
    Exhibit 172  Deposition of Glenn A.      536
20      Hemstock dated 1/28/83
21  Exhibit 173  Deposition of Glenn A.      538
      Hemstock dated 3/16/83
22
    Exhibit 188  Stipulation of Dismissal,   463
23      Letter dated 7/23/87,
        Affidavit of Roger Miller,
24      and Letter dated 1/28/87
```

Page 425

```
 1  Exhibit 195  Affidavit of William H.     518
      Ashton
 2
    Exhibit 198  Letter dated 11/26/90 and   738
 3      Attachment Bates
        JNJMX__68__000012851 to
 4      12859
 5  Exhibit 230  Affidavit of Dr. John       680
      Hopkins in Durham case
 6
    Exhibit 270  Deposition of Roger N.      896
 7      Miller taken 6/12/91
 8  Exhibit 274  Letter dated 1/23/88 Bates  633
      JNJ 000024573 to 24576
 9
    Exhibit 277  Answers to Interrogatories  663
10      In Krushinski Case Bates
        JNJ 000065001 to 650011
11
    Exhibit 282  Roger Miller Affidavit in   499
12      Andonian case Bates
        JNJ-WIL__0000094 to 95
13
    Exhibit 319  Letter dated 10/27/97 and   652
14      Attachments
15  Exhibit 322  IARC Monograph              636
16  Exhibit 355  Letter dated 1/28/1987      729
      Bates JNJTALC0000387714 to
17      387716
18  Exhibit 414  Spreadsheet                 890
19  Exhibit 418  Email String dated 11/21/08 755
20  Exhibit 436  Deposition of Peter N. Gale 547
      dated 4/26/83
21
    Exhibit 441  Stipulation and             554
22      Confidentiality Order
23  Exhibit 443  Windsor Minerals' Responses 720
      to Interrogatories in
24      Westfall case
```

Page 426

```
 1  Exhibit 446  Agreement Between Cyprus &  511
      J&J dated 1/6/89
 2
    Exhibit 456  Report dated 11/23/83 Bates 744
 3      JNJ 000240739 to 40742
 4  Exhibit 472  Photograph                  900
 5  Exhibit 486  Privilege Log               715
 6  Exhibit 488  Spreadsheet                 891
 7  Exhibit 491  Memo dated 1/4/84           748
 8  Exhibit 525  Event Report dated 1/9/17   451
      Bates JNJTALC000125625 to
 9      125632
10  Exhibit 1035 Letter dated 1/3/95         573
11  Exhibit 1039 Excerpt for J&J Privilege   526
      Log
12
    Exhibit 1040 Letter dated 8/14/89        563
13
    Exhibit 1042 Dismissal Order             515
14
    Exhibit 1043 Deposition Of Roger N.      618
15      Miller dated 4/6/95
16  Exhibit 1044 Deposition of Roger Miller  697
      taken 1/16/07
17
    Exhibit 1047 Affidavit of Roger Miller   507
18      in Miller case
19  Exhibit 1048 Letter dated 9/10/85 Bates  484
      JNJ 000064652
20
    Exhibit 1049 Legal Hold Letter dated     718
21      5/16/03
22  Exhibit 1051 Document Preservation       722
      Notice Bates
23      JNJTAL000949679 to 949681
24
```

Page 427

```
 1  Exhibit 1052 Mediation Memo dated 2/4/03 666
      Bates JNJTALC001243929 to
 2      1243949
 3  Exhibit 1053 Letter dated 6/6/88         475
 4  Exhibit 1054 Letter dated 8/27/86        468
 5  Exhibit 1060 Transcript of John Hopkins  477
 6  Exhibit 1061 Andonian Case Witness List  497
      Bates JNJ 000065334 to
 7      65339
 8
    Exhibit D-1  Affidavit of Robert K.      810
 9      Denton
10  Exhibit D-2  Letter dated 9/28/72        820
      and Report Bates
11      JNJTALC000289268 to 359834
12  Exhibit D-3  Letter dated 3/18/02 Bates  828
      JNJTALC00109268 to 109278
13
    Exhibit D-4  Case Control Studies that   845
14      were Published from 1992
        to 1999
15
16
17
18
19
20
21
22
23
24
```

John O'Shaughnessy

Page 440

1    Q.  Okay.  And who was in charge of
2  gathering evidence to supply answers to
3  discovery in talc litigation?
4            MS. BROWN:  I object,
5       Your Honor, for the same reasons,
6       work product.
7            JUDGE SCHNEIDER:  Can I
8       ask the court reporter to repeat
9       the question?
10           - - - - -
11       (Whereupon, the reporter read
12  back as requested.)
13           - - - - -
14           JUDGE SCHNEIDER:  Okay.
15  Is the question who was in charge,
16  is that what it said?  I think the
17  question who was in charge is
18  objectionable as work product, but
19  I don't think the question of who
20  supplied information to answer
21  interrogatories is work product.
22  That's clearly discoverable and is
23  an appropriate interrogatory that's
24  typically asked.  So if the

Page 441

1       question is who supplied
2       information rather than the person
3       who was in charge, that can be
4       asked, but the question who was in
5       charge is work product.
6  BY MR. PLACITELLA:
7    Q.  Okay.  Can you answer Judge
8  Schneider's question?  He's been around,
9  you know, on the bench, so he's a little
10  better at that than me.
11   A.  When we answered discovery in
12  general, what would happen is outside
13  counsel in coordination with me would
14  interview appropriate people at the company
15  who had knowledge of the product or the
16  issues in the lawsuit.  They would be
17  tasked also with collecting relevant
18  documents and assembling them for use in
19  the litigation.
20    Q.  And that by name is who?
21    A.  Early on, it would have been
22  Mr. Williams and the MehaffyWeber firm.  It
23  also would have been to the extent if there
24  were any other firms that were handling

Page 442

1  talc litigation, they might have played a
2  role in that, I just don't recollect, but
3  as time went on and the litigation grew,
4  then, you know, then the legal team grew
5  and there was more responsibility
6  concerning ongoing discovery through the
7  legal team and collecting and interviewing,
8  you know, again, people at the company to
9  obtain the information.
10    Q.  When evidence was turned over
11  in talc litigation, where was it stored,
12  within what Johnson & Johnson?
13           MS. BROWN:  I object.
14       Work product, Your Honor.
15           JUDGE SCHNEIDER:
16       Objection overruled.  That's not
17       work product.
18           THE WITNESS:  Typically,
19       the documents would be collected
20       and maintained by outside counsel.
21  BY MR. PLACITELLA:
22    Q.  So they would be kept with
23  outside counsel and would you at Johnson &
24  Johnson keep copies?

Page 443

1    A.  No, there was too many of them.
2    Q.  Okay.  And when there was
3  information from prior litigation, like, a
4  case was closed, a talc case, for example,
5  was closed, what was done with those files?
6    A.  The Johnson & Johnson files
7  or --
8    Q.  Yes.
9    A.  -- the outside counsel files?
10    Q.  Both.
11    A.  Johnson & Johnson had a file
12  system where the summons and complaint were
13  filed to it, so there would be a file for a
14  case name and a general file where papers
15  would be filed to that.  And then they
16  would be maintained there, whatever papers
17  were filed, including the closing
18  documents.
19    Q.  So, for example, if a witness
20  in a Johnson & Johnson talc case provided a
21  sworn statement that you reviewed, where
22  would that be -- where would that be saved
23  at Johnson & Johnson when the case was
24  over?

Page 444

1      A.   It might not have been kept at
2 Johnson & Johnson.  It might have been kept
3 by outside counsel and it might not have
4 been kept at Johnson & Johnson.  Johnson &
5 Johnson did not keep, generally speaking,
6 as far as I am aware, like, a mirror file
7 of what outside counsel has.
8      Q.   Well, if someone made a request
9 in a case and they said give me all of the
10 prior statements on this issue that were
11 made by Johnson & Johnson employees, either
12 in terms of interrogatories or affidavits,
13 you would have to go to outside counsel and
14 get them?
15      A.   I maybe would have it in a file
16 and know where it was or, yeah, we would go
17 to outside counsel for it, yes.
18      Q.   And you kept track of what
19 outside counsel was in possession of, what
20 statements and what discovery responses?
21           MS. BROWN:  I object
22      Your Honor, work product in terms
23      of what outside counsel had versus
24      Mr. O'Shaughnessy.

Page 445

1           JUDGE SCHNEIDER:
2      Objection overruled.  I think this
3      is akin to document custodian
4      questions which are appropriate for
5      discovery to find out the location
6      and existence of discoverable
7      documents and whether they can
8      search for and produce in discovery
9      and I think that is an appropriate
10      area of discovery.
11           THE WITNESS:  I'm sorry,
12      can --
13           MR. PLACITELLA:  Can you
14      read the question back, please?
15           - - - - -
16      (Whereupon, the reporter read
17      back as requested.)
18           - - - - -
19           THE WITNESS:  Not
20      really.
21 BY MR. PLACITELLA:
22      Q.   So you were in charge for a
23 while at least before you retired of the
24 ovarian cancer talc litigation, right?

Page 446

1      A.   Up until about 2012, I was
2 responsible for the day to day.
3      Q.   But you were involved after
4 2012.  I saw you at a deposition.
5      A.   Yes, I had a limited role after
6 that.
7      Q.   Okay.  And when documents were
8 produced in the ovarian cancer talc
9 litigation, did you go to all of the
10 outside counsel and say give me all of the
11 prior sworn statements from Johnson &
12 Johnson?
13           MS. BROWN:  Objection,
14      Your Honor, work product.
15           JUDGE SCHNEIDER:  Same
16      ruling, overruled, because again,
17      this is akin to document custodian
18      questions, which is an appropriate
19      area of inquiry.
20           THE WITNESS:  I don't
21      recall that I did that and I don't
22      recall whether I had any
23      responsibility for discovery, I
24      don't know what stage discovery was

Page 447

1      at in the ovarian cancer litigation
2      by the time I had left supervising.
3 BY MR. PLACITELLA:
4      Q.   Well, who was in charge at that
5 point that made those calls?
6      A.   It would have been, it would
7 have been for Johnson & Johnson, it would
8 have been Denise Houghton in conjunction,
9 again, with Gene Williams and his firm,
10 which by then might have been Shook Hardy.
11      Q.   So as you sit here today, you
12 cannot testify under oath that in the
13 ovarian cancer litigation you have produced
14 all of the prior sworn statements given by
15 Johnson & Johnson employees in talc
16 litigation, correct?
17           MS. BROWN:  I object as
18      vague.  Are we talking about in
19      response to a particular discovery
20      request.
21           THE WITNESS:  All I --
22           MR. PLACITELLA:  You can
23      answer it.
24           THE WITNESS:  What I can

Exhibit 214



**m<sup>c</sup>crone environmental services, inc.**
850 PASQUINELLI DRIVE
WESTMONT, ILLINOIS 60559 • 708-887-7100

3 January 1995

Mr. John O'Shaughnessy
J & J, The Law Dept.
One J & J Plaza
New Brunswick, NJ 08933-7002

*Re: Ritler v. Win ?*

Subject:     Windsor Minerals, Inc.
             McCrone File No. ME-4055

Re:          McCrone Project No. IL-2689

Dear Mr. O'Shaughnessy:

As you requested during our telephone conversation on 13 December 1994, I have completed my review of McCrone File No. ME-4055 for the additional information that you requested. The information that you requested included memos and/or correspondence from J & J that may assist in determining sample locations. A copy of the entire file has been enclosed for your review as you requested during our telephone conversation today.

If I can be of any further assistance, please do not hesitate to contact me at 708-887-7100.

Sincerely,

Laurie R. Bain
Vice President and General Manager

LRB:lrd
Enclosures

**RECEIVED**
JAN  5 1995
J.C. O'SHAUGHNESSY

a member of the m<sup>c</sup>crone group

J&J-0003946

JNJ 000687065

Exhibit 215

1    CHARLES F. PREUSS  (State Bar No. 45783)
     THOMAS W. PULLIAM, JR.  (State Bar No. 46322)
2    PREUSS, WALKER & SHANAGHER
     595 Market Street, 16th Floor
3    San Francisco, California  94105-2802
     Telephone: (415) 978-2600
4

5    Attorneys for Defendant
     JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF SAN DIEGO

10

11    MARLENE SELBY and LOWELL      )    No. 670577
     WAYNE SELBY,                 )
12                             )
              ;   Plaintiff,       )    **DEFENDANT JOHNSON &**
13                             )    **JOHNSON CONSUMER**
      .v.                     )    **PRODUCTS, INC.'S**
14                             )    **SUPPLEMENTAL RESPONSES TO**
     JOHNSON & JOHNSON, a New Jersey    )    **PLAINTIFFS' SPECIAL**
15    corporation; AVON PRODUCTS, INC., a  )    **INTERROGATORIES**
     New York corporation; LONGS DRUG    )
16    STORES CALIFORNIA, INC., a        )
     California corporation;, and DOES 1     )
17    through 100, inclusive,           )
                            )
18              Defendants.       )
     _____ )
19

20    PROPOUNDING PARTY:      Plaintiffs, MARLENE SELBY, et al.

21    RESPONDING PARTY:       Defendant, JOHNSON & JOHNSON CONSUMER
                               PRODUCTS, INC., erroneously sued as JOHNSON
22                                & JOHNSON

23    SET NUMBER:           ONE

24                           **<u>DEFINITIONS</u>**

25       1.      The word "YOU", "YOUR", or "YOURSELF" refers to the party to

26    which these interrogatories are addressed and any and all of its agents,

27    representatives and/or employees.

28    ///

PREUSS, WALKER & SHANAGHER
595 Market Street, 16th Floor
San Francisco, California 94105
Telephone: (415) 878-2600


EXHIBIT
J&J 337

INTERIM-DISCO-000000062

2.    The term "THE PRODUCT" refers to the chemical composition, or compositions, marketed as Johnson's Baby Powder.

3.    The term" PRODUCT CONTAINER" refers to the complete vessel holding THE PRODUCT, as marketed and/or distributed to the general public, including all packaging, attachments or inserts.

4.    The term "DOCUMENT" means a writing, as defined in Evidence Code Section 250, and includes the original or a copy of handwriting, typewriting, printing, photostating, photographing, computer data and records, and every other means of recording upon any tangible thing and form of communicating or representing, including letters, words, pictures, sounds, or symbols or combinations of them, including any/all computer records.

5.    The term "IDENTIFY" as used herein means to describe with particularity the person, place, document and/or event referred to in the interrogatory, including, where requested, the name, address, telephone number, character of the document and/or event, and the relationship of the person, place and/or event to the defendant so as to allow the documents to be requested with particularity in Requests for Production and to allow persons to be properly noticed for deposition.

6.    The Term "JJCPI" refers to Johnson and Johnson Consumer Products, Inc.

7.    The Term "QUALITY CONTROL", as used herein shall mean any tests, samplings, and/or studies conducted at any time during the manufacture, production, marketing and/or distribution of THE PRODUCT, its ingredients and or THE PRODUCT CONTAINER, whether conducted at random or in accordance with a regularly maintained schedule.

///
///
///

PERDER, WALKER & SCHRAEKNE
585 Market Street, 18ᵗʰ Floor
San Francisco, California 94105
Telephone: (415) 970-2800

2

INTERIM-DISCO-000000063

## SPECIAL INTERROGATORIES

INTERROGATORY NO. 1:

State the trade name, product identification number and/or other means of identification of the product whose label reads "Johnson's Baby Powder". (See Exhibit "A" attached hereto).

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

The name of THE PRODUCT appearing on the container label is and has been "Johnson's Baby Powder". The trade name is "Johnson's".

INTERROGATORY NO. 3:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of the design and formulation of the chemical formula and/or composition of THE PRODUCT, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 4:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of manufacturing of THE PRODUCT, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 5:

IDENTIFY by name, title and last known address, the person(s) most knowledgeable of manufacturing of THE PRODUCT CONTAINER, from the time the product was first marketed and/or distributed to the present.

INTERROGATORY NO. 24:

For each complaint and/or report identified in YOUR response to Interrogatory No. 23, IDENTIFY the person most knowledgeable concerning how YOU investigated, responded to and/or resolved each complaint and/or report.

SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 3, 4, 5 and 24:

With the exception of Dr. Bruce Semple, the persons identified are JJCPI employees and we will cooperate with you in making them available for

PRINER, WALKER & BARBAENER
535 Market Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 878-2000

3.

INTERIM-DISCO-000000064

1  deposition, should that become necessary and appropriate.  Dr. Bruce Semple is

2  the former Medical Director of JJCPI and is now with Procter & Gamble in

3  Cincinnati, Ohio.  Dr. Semple should not be contacted except through the formal

4  deposition process, and, if you wish to depose him, JJCPI requests that its counsel

5  be contacted first, so that JJCPI may assist in scheduling a deposition mutually

6  convenient to all parties.

7  <u>INTERROGATORY NO. 15:</u>

8      IDENTIFY all warnings which appeared at any time on/with the PRODUCT

9  CONTAINER or which were included with THE PRODUCT and its packaging at

10  the time THE PRODUCT was first marketed in the United States.

11  <u>INTERROGATORY NO. 16:</u>

12      If at any time since you first began marketing THE PRODUCT the warnings

13  to consumers included on the PRODUCT CONTAINER were changed and/or

14  modified, describe each such modification and/or change, including the substance

15  of the modification and/or change, the date each modification and/or change was

16  instituted, the purpose of the modification and/or change and the identity of the

17  person upon whose authority each modification and/or change was implemented.

18  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 15 and 16:</u>

19      JJCPI believes its previous responses are adequate.

20  <u>INTERROGATORY NO. 27:</u>

21      State the name and full address of each location and/or plant where THE

22  PRODUCT is manufactured.

23  <u>INTERROGATORY NO. 28:</u>

24      State the name and full address of each location and/or plant where the

25  PRODUCT CONTAINER is manufactured.

26  ///

27  ///

28  ///

4

1  INTERROGATORY NO. 29:

2      State the name and full address of each location where JOHNSON'S BABY

3  POWDER is manufactured in final form before being distributed for sale to the

4  general public.

5  SUPPLEMENTAL RESPONSE TO INTERROGATORIES NOS. 27, 28 and 29:

6      Royston, Georgia is the only location of any manufacturing facility for THE

7  PRODUCT.  JJCPI will cooperate in arranging an inspection of that plant, should

8  that become necessary and appropriate.

9  INTERROGATORY NO. 36:

10     Do YOU have knowledge of any tests and/or studies conducted concerning

11  the health effects of asbestos on humans?

12  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 36:

13     There has been no asbestos in THE PRODUCT during the time plaintiff

14  claims to have used it.  Accordingly, the information sought by this interrogatory

15  is neither relevant to the subject matter of this action as to JJCPI nor is it

16  reasonably calculated to lead to the discovery of admissible evidence against

17  JJCPI.  If plaintiffs have evidence that THE PRODUCT has contained asbestos at

18  any relevant time, JJCPI will reconsider this response.

19

20  Dated:  April 20 , 1994          PREUSS, WALKER & SHANAGHER

21

22      *Thomas W. Pulliam II*

23      THOMAS W. PULLIAM, JR.

24      Attorneys for Defendant
        JOHNSON & JOHNSON CONSUMER

25      PRODUCTS, INC.

26

27

28

INTERIM-DISCO-000000066

## CERTIFICATE OF SERVICE BY MAIL

I, BEVERLY A. LEE, declare under penalty of perjury under the laws of the State of California that the following is true and correct:

I am a citizen of the United States, over the age of 18 years and not a party to or interested in the within entitled action. I am an employee of PREUSS, WALKER & SHANAGHER, and my business address is 595 Market Street, 16th Floor, San Francisco, California 94105.

I caused to be served by mail the following document(s):

**DEFENDANT JOHNSON & CONSUMER PRODUCTS, INC.'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES**

I enclosed a true copy of said document(s) in an envelope, addressed as follows:

**ATTORNEYS FOR PLAINTIFFS:**
Kevin F. Quinn, Esq.
John J. Rice, Esq.
THORSNES, BARTOLOTTA, McGUIRE & PADILLA
2550 Fifth Avenue, Suite 1100
San Diego, CA  92103
(619) 236-9363
(619) 236-9653 FAX

**ATTORNEYS FOR DEFENDANT AVON PRODUCTS, INC.**
Regina A. Petty, Esq.
MAZZARELLA, DUNWOODY, WILSON & PETTY
550 West C Street, Suite 1050
San Diego, CA  92101-3532
(619) 236-9600
(619) 236-9669 FAX

**ATTORNEYS FOR DEFENDANT AMERICAN DRUG STORES**
(erroneously sued as SAV-ON DRUG STORES)
Joseph T. Kutyla, Esq.
CALLAHAN, McCUNE & WILLIS
402 West Broadway, Suite 800
San Diego, CA  92101
(619) 232-5700
(619) 232-2206 FAX

PREUSS, WALKER & SHANAGHER
595 Market Street, 16th Floor
San Francisco, California 94105

INTERIM-DISCO-000000067

ATTORNEYS FOR DEFENDANT LONGS DRUG STORES CALIFORNIA, INC.
Scott R. Diamond, Esq.
Scott D. Buchholz, Esq.
DUMMIT, FABER & BRIEGLEB
750 B Street, Suite 1900
San Diego, CA 92101
(619) 231-7738
(619) 231-0886 FAX

   I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to-wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business.  I sealed said envelope and placed it for collection and mailing on April 20, 1994, following the ordinary business practice.

   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  I further declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

   Executed on April 20, 1994, at San Francisco, California.

                                        _Beverly A. Lee_
                                        Beverly A. Lee

H:\DOCS\25560\1373\PLEA\SELBY.POS

PREUSS, WALKER &
SHANNONER
595 Market Street, 18ᵗʰ Floor
San Francisco California
94105

2

INTERIM-DISCO-000000068

Exhibit 216



CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANTS' OBJECTIONS AND ANSWERS TO INTERROGATORIES AND OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., Defendant in the above-styled

and numbered cause, and files this its Objections and Answers to Interrogatories and Objections and

Responses to Request for Production propounded to Defendant Johnson & Johnson Consumers

Company, Inc.

MW/80804

**EXHIBIT**
**28**

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas 77704
Telephone: 409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the 6th day of May, 1998.

_____
SANDRA F. CLARK

MW/80804                                          -2-

## Preliminary Statement

Johnson & Johnson Consumer Companies, Inc. (hereinafter Johnson & Johnson) states that in the preparation of its responses to plaintiff's requests and interrogatories, it has made, and continues to make, a concerted good faith effort to collect all of the requested information or documents from Johnson & Johnson as well as any relevant predecessors and vendors. Defendant provides these preliminary responses with the understanding that information may change as discovery proceeds. Pursuant to agreement with plaintiff's counsel, defendant Johnson & Johnson provide these responses on behalf of Johnson & Johnson and reserves the right to make objections and to file responses for all other entities served by plaintiff's counsel in this lawsuit.

Johnson & Johnson will not produce any documents generated by its counsel directed to other counsel or to its officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees of Johnson & Johnson to its counsel regarding legal matters. Johnson & Johnson will not produce any documents which are work-product drafted by attorneys employed by Johnson & Johnson. As for its responses to interrogatories, Johnson & Johnson state that when the requested information is readily available from documents, the documents will be produced as noted in individual interrogatory responses. When information or documents concerning incomplete research are requested, Johnson & Johnson state that they will produce published interim reports of such research. In response to requests for documents and interrogatories, Johnson & Johnson will produce information relevant to talc or baby powder.

Johnson & Johnson reserves the right to change its responses if it appears from additional research that omissions or errors have been made herein or that further or more accurate information should be provided. Furthermore, Johnson & Johnson has not completed preparation for trial. Because the responses contained herein are based only upon such information and documents which are presently available to or specifically known to Johnson & Johnson at the time the responses were prepared, the responses herein may be supplemented or changed upon continuing investigation.

This Preliminary Statement shall apply to each and every response given herein, and shall be incorporated by reference as though fully set forth in each of the responses appearing in the following pages.

OBJECTIONS AND ANSWERS TO INTERROGATORIES AND
OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

Interrogatory No. 1

Please list the company name and location of each entity that packaged your baby powder from 1945 through 1975,

ANSWER: **Baby powder was packaged at a variety of locations by Johnson & Johnson entities from 1945 through 1975. To the best of the company's knowledge, baby powder was not packaged by any non-Johnson & Johnson entity.**

Request for Production No. 1

Please produce any and all documents responsive to Interrogatory No. 1.

RESPONSE: **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Interrogatory No. 1 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 2

Did Johnson & Johnson ever sell baby powder under any name other than Johnson & Johnson between 1945 through 1975, and if so, what name and when?

ANSWER: **No**

Request for production No. 2

Please produce any and all documents responsive to Interrogatory No. 2.

RESPONSE: **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Interrogatory No. 2 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Furthermore, defendant objects to the**

extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 3

Please list each location where your raw materials for Johnson & Johnson baby powder was mined from 1945 through 1975.

ANSWER:   Based on defendants' current investigation and document review to date, from 1945 through 1975, talc was mined from the Val Chisone Mine in Italy, and the Hammondsville Mine in Vermont, U.S.A.

Request for Production No. 3

Please produce any and all documents responsive to Interrogatory No. 3.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 3 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).   Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 4

Please list all suppliers to Johnson & Johnson of raw or processed material used in Johnson & Johnson baby powder between 1945 and 1975.

ANSWER:   Defendants object to this Interrogatory to the extent it calls for privileged or trade secret information.   Subject to the foregoing objection, talc was supplied by Windsor Minerals (Hammondsville Mine, Vermont) and the Val Chisone Mine, Italy.

Request for Production No. 4

Please produce any and all documents responsive to Interrogatory No. 4.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 4 does not request documents.   As such,

plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 5

Please list each claim made against you giving the style, court and date of filing, which involved an asbestos-related claim of injury and any talc product made or sold by you.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable.  Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges.  Subject to the foregoing objection, none.

Request for Production No. 5

Please produce any and all documents responsive to Interrogatory No. 5.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Interrogatory No. 5 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 6

Please list each epidemiological study any of your employees potentially occupationally exposed to talc made up all or part of the study cohort.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable.  Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges. Subject to the foregoing objections, defendants investigation is

MW/80804                                   -6-

ongoing . Defendant will supplement this interrogatory with non-objectionable information as it is discovered.

Request for Production No. 6

Please produce all documents responsive to Interrogatory No. 6.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 6. Interrogatory No. 6 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 7

Please list each location where your baby powder was packaged from 1945 through 1975.

ANSWER:   Object - Question is repetitious and duplicative of Interrogatory No. 1. Subject to the foregoing objection, see Answer to Interrogatory No. 1.

Request for Production No. 7

Please produce all documents responsive to Interrogatory No. 7.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 7. Interrogatory No. 7 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 8

MW/80804

-7-

What year did your baby powder change from talc to corn starch?

ANSWER:    Johnson's Baby Powder made with talc has been available from 1945 through 1975 and is currently sold; Johnson's Baby Powder with corn starch was first marketed in 1978.

Request for Production No. 8

Please produce any and all documents responsive to Interrogatory No. 8.

RESPONSE:    Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 8. Interrogatory No. 8 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 9

Please list all persons known by you who:

a)    ever recommended changing from talc to corn starch for baby powder product;
b)    ever made any analysis of your baby powder for fibrous material content;
c)    ever made any analysis of your baby powder for asbestiform material;
d)    ever surveyed your mine(s) for the geological structure prior to or during mining;
e)    ever made any analysis of raw and/or processed material used or considered for use in your baby powder for fibrous material content;
f)    ever made any analysis of raw and/or processed material used or considered for use in your baby powder for asbestiform mineral.

ANSWER:    Defendant objects to the overbroad nature of plaintiffs' requests. Identifying all persons without limitation to time, scope, and employment, is unduly burdensome. To identify all persons over the company's 100+ year history is not possible.

a) Defendants object to sub-part (a) as vague and that it is unlimited to time and scope. In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore,

MW/80804                                    -8-

defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.   Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant will supplement its response to this interrogatory as non-objectionable information is discovered.

b) Defendants object to sub-part (b) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

c) Defendants object to sub-part (c) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

d) Defendants object to sub-part (d) in that it is vague, overbroad, and unlimited in time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Subject to the foregoing objections, analysis may have been conducted by McCrone Associates, and Colorado School of Mines Research Institute.

e) Defendants object to sub-part (e) as  vague, overbroad,  and that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of  Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

f) Defendants object to sub-part (f) as vague, overbroad and that it is unlimited

MW/80804                                    -9-

to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

Request for Production No. 9

Please produce any and all documents responsive to Interrogatory No. 9.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 9.  Interrogatory No. 9 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 10

Please identify any person having knowledge of relevant facts.  A fact witness is a person who "has or may have knowledge of any discoverable matter."  As to each witness, please provide the following:

      a.     Name;
      b.     Address;
      c.     Telephone number;
      d.     Knowledge and opinions of the witness.

ANSWER:   Defendant objects to this Interrogatory as vague and overbroad.  The identity of fact witnesses over the 100+ history in which plaintiff requests is virtually impossible to determine all persons who may have facts relevant to this case. Subject to the above objections defendant's investigation is continuing and Defendant's will supplement.

Request for Production No. 10

    Please produce any and all documents responsive to Interrogatory No. 10.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 10. Interrogatory No. 10 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 11

    Please provide the following information as to each testifying expert:

a.      Name;
b.      Address;
c.      Telephone Number;
d.      Facts known by the testifying expert;
e.      Expected substance of testimony of each testifying expert, the mental impressions and opinions of each testifying expert, and any report or other documents prepared by each expert in anticipation of trial.

ANSWER:   **Defendant objects to this interrogatory as unduly burdensome, vague, and beyond the scope of permissible discovery. Specifically, it is not possible for defendant to list all facts, mental impressions, and opinions known to the testifying expert. Defendant will supplement this interrogatory in accordance with Rule 166(b).**

Request for Production No. 11

    Please produce any and all documents responsive to Interrogatory No. 11.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 11. Interrogatory No. 11 does not request documents. As such, plaintiffs' request is overbroad, vague,**

unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

(THERE IS NO INTERROGATORY NO. 12)

Request for Production No. 12

As to each testifying expert, please produce any documents, tangible things, physical models, or compilations of data or other material prepared by testifying expert.

RESPONSE:   Defendant objects to this request as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence. Defendant is willing to exchange trial exhibits with plaintiff by court order or by agreement of the counsel.

Interrogatory No. 13

Please describe any and all studies of asbestos or asbestiform talc disease in which you , the defendant, participated.

ANSWER:   Defendant objects to this interrogatory as vague, overbroad, and unduly burdensome, and not likely to lead to the discovery of relevant evidence. Plaintiff's interrogatory is unlimited in time and scope and is not confined to the issues in this case. Defendant further objects to the extent that plaintiff's interrogatory seeks to evade the attorney/client, work product, party communications/investigatory, and witness statement privileges. Subject to the foregoing objections, defendant's investigation is continuing and defendant will supplement with non-objectionable information as it is discovered.

Request for Production No. 13

Please produce any and all documents responsive to Interrogatory No. 13.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 13. Interrogatory No. 13 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).

Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will make non-objectionable documents available for inspection and copying at a mutually agreeable time and place as they are discovered.

Interrogatory No. 14

Please describe any and all studies of asbestos or asbestiform talc disease in which you,. the defendant, were aware of as of :

    a.    1940;
    b.    1950;
    c.    1970;
    d.    1972

ANSWER:    Defendant objects to this interrogatory as vague, and overbroad, and not calculated to lead to discovery of relevant evidence. It is impossible to determine what study any individual employee of Defendant was aware of by a certain date.

Request for Production No. 14

Please produce any documents responsive to Interrogatory No. 14.

RESPONSE:    Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 14. Interrogatory No. 14 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 15

Each workers' compensation claim for an alleged asbestos or asbestiform talc injuries, disease or death of an employee which could be used to evaluate the risk of developing an asbestos or asbestiform talc disease and/or providing knowledge to you of asbestos or asbestiform talc.

MW/80804

ANSWER:   Defendants object to this Interrogatory in that it is vague, ambiguous, overly broad and compound.  Furthermore, this interrogatory will call for a legal conclusion.  Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant is not aware of any workers compensation claim alleging either asbestos or an asbestiform talc disease by any employee of Johnson & Johnson.

Interrogatory No. 16

Please state if any air sampling was done to determine the exposure to your baby powder during its normal and intended use.

ANSWER:   Defendants object to this interrogatory as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence. Furthermore, this interrogatory is not limited to time or scope.

Request for Production No. 15

Please produce any and all documents responsive to Interrogatory No. 16.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 16.  Interrogatory No. 16 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 17

Please identify each mineralogist employed by you and/or consulted by you at any time before 1975.  Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:   Defendants object to plaintiffs' request in that it is duly burdensome and overbroad for defendants to list every mineralologist that may have been consulted with prior to 1975.  Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be mineralogist. Defendant's investigation is ongoing.   Defendant will supplement this interrogatory as persons are identified.

Request for Production No. 16

Please produce any and all documents responsive to Interrogatory No. 17.

RESPONSE:    **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 17. Interrogatory No. 17 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 18

Please identify each physician employed by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment.

ANSWER:    **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every physician employed prior to 1975. Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 19

Please identify each geologist employed by you an/or consulted by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:    **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendant to list every geologist that may have been consulted with prior to 1975. Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be geologist. Defendant's investigation is ongoing. Defendant will supplement this interrogatory as persons are identified.**

Interrogatory No. 20

Each document evidencing health warnings provided by you or to you before 1975 concerning the asbestos material or asbestos-containing products:

MW/80804                                         -15-

a.      used by you as an ingredient of a product;

b.      made by another and marketed by you.

ANSWER:      **a) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and ambiguous. Subject to the foregoing objections, no warning related to asbestos would be applicable or required.**

**b) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and that it does not identify warning related to what product. Subject to the foregoing objection, defendant has not marketed an asbestos containing product manufactured by another.**

Interrogatory No. 21

Please identify each industrial hygienist employed by you and/or consulted by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:      **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every industrial hygienist that may have been consulted with prior to 1975. Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 22

Documents which describe the asbestos content or absence of asbestos in your baby powder sold or manufactured by you or related companies of yours from 1945 through 1975.

ANSWER:      **Defendants object to this interrogatory as vague, ambiguous, and unintelligible. Specifically, the interrogatory does not ask a question but merely makes a statement, and therefore, as such can not be answered and should be rephrased. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will supplement its response to this interrogatory as information is discovered.**

Interrogatory No. 23

Please list each and every mine that was utilized by your company for talc. Please include complete address and dates of use.

ANSWER:      **Defendants object to this Interrogatory as over broad in that it is not limited to time or to cosmetic talc. Subject to the foregoing objections, Defendant answers, from 1945 until approximately 1964 from Val Chisone, Italy and from**

**1964 until approximately 1975 from Hammondsville Mine, Vermont, U.S.A.**

Request for Production No. 17

      Each workers' compensation claim or notice of injury filed before 1980 for any allegation of asbestos or asbestiform talc illnesses, including without limitation, asbestosis, pneumoconiosis, or mesothelioma.

**RESPONSE:** **Defendant objects to plaintiffs' request as vague, overbroad, unduly burdensome, and not likely lead to the discovery of relevant evidence. Plaintiff's request is not limited in time and scope or to any specific entity. Plaintiff's request does not identify from whom it is requesting documents. Subject to the foregoing objections, defendant has no documents responsive to this request.**

Request for Production No. 18

      Please produce each version of your "corporate biography" or published company history, whether an in-house effort, and "authorized" version or otherwise.

**RESPONSE:** **Defendants object to this request as overbroad, vague, unduly burdensome, and not likely to lead to the discovery of any relevant evidence. Further, plaintiff's request is not limited in time or scope.**

Request for Production No. 19

      Documents evidencing:
        a.    the identity of each of your insurer(s), including property loss, workers' compensation and general liability;
        b.    the extent of your yearly liability coverage relative to the claims raised to this suit.

**RESPONSE:** **Defendants object to this request as vague, overbroad and likely to lead to the discovery of relevant evidence. Furthermore, plaintiff's request is not limited in either time or scope. Subject to the foregoing objections, for the years of exposure Johnson & Johnson Consumer Companies, Inc., had coverage for claims provided through self insurance and The Aetna Property & Casualty Company in varying amounts ranging from 1.5 million through 50 million.**

Request for Production No. 20

      Research or studies which you, the defendant, possess conducted by NIOSH, Vermont Health Department, Mining Enforcement and Safety Administration (MESA), OSHA, and/or Walter C.

MW/80804

McCrone and Associates concerning asbestos or asbestiform talc illnesses.

RESPONSE:   **Defendant objects to this request as vague, overbroad, unduly burdensome, and not calculated to lead to the discovery of relevant evidence. Defendant's document review is ongoing. Defendants will make non-objectionable documents available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 21

Please provide a complete copy of "Talc: A Possible Occupational and Environmental Carcinogen", authored by H.P. Blejer and R. Arlon, 1973, showing who received each copy.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, documents responsive to this request will be made available at a mutually agreeable place and time.**

Request for Production No. 22

Please provide a copy of "The Biology of Talc", Brit. J. Ind. Med. 33: 217, 1976, authored by G.Y. Hildick-Smith, showing who received each copy.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, documents responsive to this request will be made available for inspection and copying at a mutually agreeable time and place.**

Request for Production No. 23

Research or studies conducted by or with any trade associations that in any way discuss asbestos or asbestiform minerals in consumer products prior to 1975.

RESPONSE:   **Defendant objects to this request as overbroad, vague, not likely to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited in time and scope or to projects in which Defendant participated. Furthermore, Defendant objects to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will make documents responsive to this**

request available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 24

Produce each air sampling results for dust, including asbestos or asbestiform minerals at your mining, milling and packaging plants.

RESPONSE: **Defendant objects to this request as overbroad, vague, and not likely to lead to the discovery of relevant evidence. Further, plaintiff's request is limited in time or scope. Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Defendants document review is ongoing. Non-objectionable documents responsive to this request will be made available for inspection at a mutually convenient time and place as they are discovered.**

Request for Production No. 25

Documents not dated greater than 1975 which mention compliance with or changes to, or proposed changes to, any regulations, statutes, rules or standards for the use or handling of materials which yield pneumoconiosis producing dust, including asbestosis or mesothelioma.

RESPONSE: **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 26

Documents not dated greater than 1975 which mention proposed or prescribed warnings, cautions or instructions regarding the potential health hazards or pneumonoconiosis-producing dust, including asbestos or asbestiform minerals for use upon or in your baby powder, your manuals or catalogs ("catalogs" means those documents regarding products made or sold by you, the defendant and your product literature).

RESPONSE: **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and**

witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 26

Please produce all documents provided to your sale and/or marketing organization which concern asbestos being found or not being found in baby powder.

RESPONSE:   Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.

# VERIFICATION

STATE OF NEW JERSEY     §

COUNTY OF MIDDLESEX     §

BEFORE ME,  the undersigned authority, on this day personally appeared Michael Ullmann, who being by me here and now duly sworn upon oath says that he is Secretary of Johnson & Johnson Consumer Companies, Inc., duly authorized to verify the statements contained in the foregoing instrument for and on behalf of Johnson & Johnson Consumer Companies, Inc., that certain of these matters stated herein are not within the personal knowledge of affiant, and that the facts stated herein have been assembled by authorized agents, employees and counsel of Johnson & Johnson Consumer Companies, Inc., and affiant is informed that the facts stated therein are true.

Michael Ullmann

SUBSCRIBED AND SWORN TO BEFORE ME by the said affiant on this the 7th day of May, 1998.

Cira Georgiou
Notary Public in and for
The State of New Jersey

My commission expires:  January 5, 1999

Exhibit 217

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

October 27, 1997

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find Affidavit of Return of
Service by Authorized Person, along with executed citations as to the following
defendants:

1)     McNeil PCC Inc.
2)     Fertittas Finer Foods Inc.
3)     Lovio and Sons Pharmacies Inc.
4)     Bill Thames Pharmacy Inc.
5)     Henke and Pillot Inc. Houston
6)     Giant Food Discount City Inc.
7)     Kroger Co.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosures

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084


EXHIBIT
tabbies
J&J 319

THE STATE OF TEXAS
136th JUDICIAL DISTRICT COURT
JEFFERSON COUNTY, TEXAS

| | | |
|---|---|---|
| Darlene Coker et vir | § | |
| VS. | § | No D-0157746 |
| Bill Thames Pharmacy Inc et al | § | |

<u>AFFIDAVIT OF RETURN OF SERVICE BY
AUTHORIZED PERSON</u>

STATE OF TEXAS

COUNTY OF JEFFERSON

   BEFORE ME, the undersigned authority, on this day personally appeared

KATHY VIATOR who, being sworn, did depose as follows:

   "My name is KATHY VIATOR. I am over 18 years of age, of sound mind and fully

qualified to make this affidavit, and have never been convicted of a crime. I have personal

knowledge of the facts stated below.

   "Attached is the following true and correct copy of the citation which I served via Certified

Mail, Return Receipt Requested, on the following Defendant:

McNeil PCC Inc..................................................................................Exhibit A
Fertittas Finer Foods Inc....................................................................Exhibit B
Lovoi and Sons Pharmacies Inc .........................................................Exhibit C
Bill Thames Pharmacy Inc..................................................................Exhibit D
Henke and Pillot Inc Houston ...........................................................Exhibit E
Giant Food Discount City Inc ............................................................Exhibit F
Kroger Co.   ...........................................................................Exhibit G

  "Further affiant sayeth not."

            _Katherine R. Viator_
            KATHERINE R. VIATOR

   SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this

_22nd_ day of _October_ , 19_97_, to certify which witness my hand and

seal of office.

                
            NOTARY PUBLIC

RENEE' ROBERTS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 02-10-98

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.
ATTORNEYS AT LAW

'98  APR 30  P 4 :36

April 30, 1998

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas, this letter serves as notice that by copy of this letter, I am
serving all counsel of record with Plaintiffs' 4/30/98 Responses to Defendant, Johnson &
Johnson Professional Inc., Requests for Production.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:    Mr. Gene Williams............................................................ Via Hand-Delivery
       Mr. Roger Worthington ...................................................... Via Facsimile



LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

December 5, 1997

**TO:**   ALL COUNSEL OF RECORD

**RE:**   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Counsel:

Enclosed please find Plaintiff's 12/5/97 Answers To Defendants' Master Set Of Interrogatories in connection with the above-referenced case.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:   Mr. John Appleman..................................................Via Hand-Delivery
Mr. Brock C. Akers ..................................................Via UPS
Mr. Daniel Foley ....................................................Via UPS
Mr. Eric D. Wewers .................................................Via UPS
Mr. Gary J. Siller ...................................................Via UPS
Mr. Gene Williams..................................................Via Hand-Delivery
Mr. James M. Harris, Jr.............................................Via Hand-Delivery
Mr. Kent M. Adams .................................................Via Hand-Delivery
Mr. Richard Corrigan ..............................................Via UPS

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



May 26, 1998

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:     CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
        THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
        OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following affidavits are being served on all counsel:

- Affidavit of Denise C. Bonavita, custodian of records for Dana-Farber Cancer Institute,
  (1 page of billing records)
- Affidavit of Scott Dare, custodian of records for Diagnostic Clinic, (4 pages of billing
  records)

Said records are available for copying at a cost of $.25 per page.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

'98  JUN 16  P 3 :09

June 15, 1998

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:     CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
        THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
        OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas, this letter serves as notice that by copy of this letter, I am
serving all counsel of record with Plaintiffs' 6/15/98 Cross Notice of Video Depositions.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/db

cc:     Mr. Roger Worthington
        Mr. Gene Williams
        Legal Images

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



'98 MAY 15 P 4 :53

May 15, 1998

<u>Via Hand-Delivery</u>

JOHN G. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:  CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find **Plaintiffs' 5/15/98 Cross-Notice of
Video Deposition of Melba Adams**.

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:  Roger Worthington
Gene Williams

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

'98 MAY 14 P4:42

May 14, 1998



Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:     CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
        THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
        OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following affidavits are being served on all counsel:

*   Affidavit of Laurie Hinds, custodian of records for Outpatient Diagnostic
    Center, (8 pages of billing records)
*   Affidavit of Nicole Lazard, custodian of records for Dr. A. Aldridge, (1 page of
    billing records)
*   Affidavit of Nick White, custodian of records for Brigham and Women's
    Hospital, (7 pages of billing records)

Said records are available for copying at a cost of $.25 per page.

Thank you for your assistance in this matter.

Very truly yours,

Darla Moore

Darla Moore
Secretary to Herschel Hobson

/dm

cc:     Mr. Roger Worthington
        Mr. Gene Williams

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

'98  MAY 14  P 4 :47

May 14, 1998

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following affidavits are being served on all counsel:

- Affidavit of Laurie Hinds, custodian of records for Outpatient Diagnostic
  Center, (8 pages of billing records)
- Affidavit of Nicole Lazard, custodian of records for Dr. A. Aldridge, (1 page of
  billing records)
- Affidavit of Nick White, custodian of records for Brigham and Women's
  Hospital, (7 pages of billing records)

Said records are available for copying at a cost of $.25 per page.

Thank you for your assistance in this matter.

Very truly yours,

Darla Moore
Secretary to Herschel Hobson

/dm

cc:    Mr. Roger Worthington
       Mr. Gene Williams

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

May 4, 1998

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following affidavits are being served on all counsel:

- Affidavit of Conne B. Neel, custodian of records for Texas Oncology-Southeast Texas
  Cancer Center f/k/a Mamie McFaddin Ward Cancer Treatment Center, (71 pages of
  **medical** records)

- Affidavit of Conne B. Neel, custodian of records for Texas Oncology-Southeast Texas
  Cancer Center f/k/a Mamie McFaddin Ward Cancer Treatment Center, (13 pages of
  **billing** records)

Said records are available for copying at a cost of $.25 per page.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

cc:   Mr. Gene Williams

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

April 30, 1998

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL THAMES PHARMACY INC., ET AL; IN THE 136ᵀᴴ JUDICIAL DISTRICT COURT OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the following affidavits are being served on all counsel:

- Affidavit of Sharon Caskey, custodian of records for M.D. Anderson Cancer Center, (3 pages of billing records)
- Affidavit of James E. Crites, custodian of records for M.D. Anderson Physician Referral, (5 pages of billing records)

Said records are being forwarded to opposing counsel via hand-delivery.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

cc:    Mr. Gene Williams............................................................. Via hand-delivery

## AFFIDAVIT

STATE OF _Texas_    *

COUNTY OF _Harris_    *

BEFORE ME, the undersigned authority, personally appeared

_Sharon Caskey_, who being by me duly sworn deposed as follows:

My name is _Sharon Caskey_. I am of sound mind and

capable of making this affidavit, and personally acquainted with the facts herein states:

I am the custodian of records for **M. D. Anderson Cancer Center**. Attached

hereto are **billing records** pertaining to **Darlene Coker**. These said records are kept

by **M. D. Anderson Cancer Center** in the regular course of business, and it was the

regular course of business of **M. D. Anderson Cancer Center** for an employee or

representative of **M. D. Anderson Cancer Center**, with knowledge of the act, event,

condition, opinion, or diagnosis, recorded to make the record or to transmit information

thereof to be included in such record; and the record was made at or near the time or

reasonably soon thereafter.

The service provided was necessary and the amount charged for the service was

reasonable at the time and place that the service was provided.

_____
AFFIANT

SWORN TO AND SUBSCRIBED Before Me on this _27_ day of

_April_, 1998.

_____
NOTARY PUBLIC, In and For the
State of _Texas_
My Commission expires: _7/25/99_

SHARON D. PRICE
Notary Public  State of Texas
My Commission Expires
JULY 25, 1999

000000

## A F F I D A V I T

STATE OF _Texas_ *

COUNTY OF _Harris_ *

BEFORE ME, the undersigned authority, personally appeared _James E. Crites_, who being by me duly sworn deposed as follows:

My name is _James E. Crites_. I am of sound mind and capable of making this affidavit, and personally acquainted with the facts herein states:

I am the custodian of records for **M. D. Anderson Physician Referral**. Attached hereto are **billing records** pertaining to **Darlene Coker**. These said records are kept by **M. D. Anderson Physician Referral** in the regular course of business, and it was the regular course of business of **M. D. Anderson Physician Referral** for an employee or representative of **M. D. Anderson Physician Referral**, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

The service provided was necessary and the amount charged for the service was reasonable at the time and place that the service was provided.

_James E. Crites_
AFFIANT

SWORN TO AND SUBSCRIBED Before Me on this _27_ day of _April_, 1998.

_Sharon D. Price_
NOTARY PUBLIC, In and For the
State of _Texas_
My Commission expires: _7/25/99_

SHARON D. PRICE
Notary Public, State of Texas
My Commission Expires
JULY 25 1999

000000

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



March 20, 1998

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT
COURT OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the
District Courts of Jefferson County, Texas, this letter serves as notice to all counsel of
record that the following documents are available for copying at a cost of $.25 per page:

1)   Affidavit of Juanita Rodriguez, Custodian of Record for **Dr. Richard C. Geis**,
along with **medical records**, totaling 9 pages;
2)   Affidavit of Linda S. Woods, Custodian of Records for **Columbia Beaumont
Medical Center**, along with **medical records** totaling 62 pages.
3)   Affidavit of Lorelei Johnson, Custodian of Records for **Dr. Ron Eager**, along with
**billing records** totaling 12 pages.
4)   Affidavit of Michael Sanders, Custodian of Records for **Diagnostic Hospital**, along
with **billing records** totaling 4 pages.
5)   Affidavit of Nicole Mathes, Custodian of Records for **M.D. Anderson Cancer
Center**, along with **medical records** totaling 39 pages.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

cc:   Mr. Gene Williams.........................................................Via facsimile

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'98 APR 21 P 4:30

April 21, 1998

Via Hand-Delivery

JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:     CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
        THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
        OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas, and Texas Civil Practices and Remedies Code, §18.001,
attached hereto is the affidavit of Kathi Manuel, custodian of records for Beaumont
Radiology Group. The billing records consist of one (1) page and are, therefore, being
provided to opposing counsel via facsimile.

Thank you for your assistance in this matter.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:     Mr. Gene Williams..............................................................Via facsimile

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'98 APR 21 P4:30

JOHN S. APPLEMAN
DISTRICT CLERK

April 21, 1998

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas, and the Texas Civil Practices and Remedies Code,
§18.001, attached hereto is the following affidavit:

• Affidavit of John J. Godleski, custodian of records for Dr. John Godleski

The medical records consist of three (3) pages and are, therefore, being provided to
opposing counsel via facsimile.

Thank you for your assistance in this matter.

Very truly yours,

Darla Moore
Secretary to Herschel Hobson

/dm

cc:    Mr. Roger Worthington .................................................... Via facsimile
       Mr. Gene Williams........................................................ Via facsimile

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'98 MAY 28 P 4:25

May 28, 1998

Via Hand-Delivery
JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find the following:

- Deposition on Written Questions to the Custodian of Records for Colorado School of Mines Research Institute;
- Deposition on Written Questions to the Custodian of Records for E.S. Laboratories;
- Deposition on Written Questions to the Custodian of Records for McCrone Associates

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

cc:   Mr. Roger Worthington
      Mr. Gene Williams

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse,<br>ROY COKER | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | '98 MAY 28 P4:25 |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

FILED
DISTRICT COURT OF
JEFFERSON CO.
JOHN S. APPLEMAN
DISTRICT CLERK

**DEPOSITION ON WRITTEN QUESTIONS**

TO:    Custodian of records for COLORADO SCHOOL OF MINES RESEARCH INSTITUTE, 1500 Illinois Street, Golden, Colorado 80401

You will please take notice that on June 15, 1998, a deposition by written questions will be taken of Colorado School of Mines Research Institute, 1500 Illinois Street, Golden, Colorado 80401, before a Notary Public or person authorized to administer oaths in the State of Colorado on behalf of Nell McCallum & Associates, and/or officers and/or agents, 2615 Calder, Suite 111, Beaumont, TX 77702, for the taking of this deposition.

The deposition with attached questions and any cross-questions timely served may be used as evidence in the trial of the above-styled and numbered cause pending in the above-named Court.

Notice is further given that request is hereby made as authorized under Rules 188 and 208 of the Texas Rules of Civil Procedure to issue a subpoena and have it served on the witness directing him to produce all documents in his possession pertaining to the attached written questions.

**DEFINITIONS**

1.    The term "**document**" means all writings of any kind, including written, recorded, including electronic and magnetic recordings, or graphic matter, however produced or reproduced. It includes all matter that relates or refers in whole or in part to the subjects of these Requests for Production of Documents. If the document has been prepared in several copies, or additional copies have been made, and the copies are not identical (or by reason of subsequent modification of a copy by the addition of notations, or other modifications, are no longer identical) each non identical copy is a separate "document." The term "document" includes, without limitation, correspondence, personal and interoffice memoranda, notes, diaries, statistics, letters, telexes, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations or memoranda or any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, recordings, worksheets, work papers, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing.

1

2.      When "**you**" or "**your**" is used in these Interrogatories, it explicitly means the whole, any subparts, or divisions, that have knowledge of the relevant information, and if you have knowledge of their information, then any subsidiaries, as well.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701                          By: _____
Ph. #: (409) 838-6410                                       Herschel L. Hobson
Fax #: (409) 838-6084                                        TBA# 09744600

ATTORNEY FOR PLAINTIFFS

Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 28th day of _____May_____, 1998.

_____
Herschel L. Hobson

d:\dmword\depos\dwq\coker-dwq (colorado school of mines).doc

2

**DEPOSITION ON WRITTEN QUESTIONS**
**TO COLORADO SCHOOL OF MINES RESEARCH INSTITUTE**

1.   Please state your name, address and job title.

   ANSWER:_____

   _____

2.   Please state if you ever visited and/or analyzed talc from the Val Chisone Mine in Italy and/or the Hammondsville Mine in Vermont, U.S.A. for Johnson & Johnson.

   ANSWER:_____

   _____

3.   If you answered "yes" to Question No. 2, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

   ANSWER:_____

   _____

4.   If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

   ANSWER:_____

   _____

5.   Please produce any and all documents responsive to Question Nos. 2-4.

   ANSWER:_____

   _____

6.   Please state if you ever analyzed Johnson & Johnson's Baby Powder or its components?

   ANSWER:_____

   _____

7.   If you answered "yes" to Question No. 6, what were your findings regarding the fiberous and asbestiform material content?

   ANSWER:_____

   _____

3

8.    If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

ANSWER:_____

_____

9.    Please produce any and all documents responsive to Question Nos. 6-8.

ANSWER:_____

_____

10.   Please state if you ever surveyed the Val Chisone, Italy and/or Hammondsville, Vermont mine for the geological structure prior to or during mining.

ANSWER:_____

_____

11.   If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

ANSWER:_____

_____

12.   Please produce any and all documents responsive to Question Nos. 10 & 11.

ANSWER:_____

_____

13.   Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

ANSWER:_____

_____

4



CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

## DEPOSITION ON WRITTEN QUESTIONS

TO:   Custodian of records for **E.S. LABORATORIES**, 1270 Roddy Road, Campobello, SC 29322.

You will please take notice that on June 15, 1998, a deposition by written questions will be taken of E.S. LABORATORIES, 1270 Roddy Road, Campobello, SC 29322, before a Notary Public or person authorized to administer oaths in the State of South Carolina on behalf of Nell McCallum & Associates, and/or officers and/or agents, 2615 Calder, Suite 111, Beaumont, TX 77702, for the taking of this deposition.

The deposition with attached questions and any cross-questions timely served may be used as evidence in the trial of the above-styled and numbered cause pending in the above-named Court.

Notice is further given that request is hereby made as authorized under Rules 188 and 208 of the Texas Rules of Civil Procedure to issue a subpoena and have it served on the witness directing him to produce all documents in his possession pertaining to the attached written questions.

## DEFINITIONS

1.   The term "**document**" means all writings of any kind, including written, recorded, including electronic and magnetic recordings, or graphic matter, however produced or reproduced. It includes all matter that relates or refers in whole or in part to the subjects of these Requests for Production of Documents. If the document has been prepared in several copies, or additional copies have been made, and the copies are not identical (or by reason of subsequent modification of a copy by the addition of notations, or other modifications, are no longer identical) each non identical copy is a separate "document." The term "document" includes, without limitation, correspondence, personal and interoffice memoranda, notes, diaries, statistics, letters, telexes, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations or memoranda or any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, recordings, worksheets, work papers, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing.

2.   When "**you**" or "**your**" is used in these Interrogatories, it explicitly means the whole, any subparts, or divisions, that have knowledge of the relevant information, and if you have knowledge of their information, then any subsidiaries, as well.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701        By: _____
Ph. #: (409) 838-6410                            Herschel L. Hobson
Fax #: (409) 838-6084                              TBA# 09744600

ATTORNEY FOR PLAINTIFFS

Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument
has been duly forwarded to all counsel of record on this ____ day of _____, 1998.

_____
Herschel L. Hobson

d:\dmword\depos\dwq\coker-dwq (e.s. laboratories).doc

## DEPOSITION ON WRITTEN QUESTIONS
## TO E.S. LABORATORIES

1.    Please state your name, address and job title.

       ANSWER:_____

       _____

2.    Please state if you ever visited and/ or analyzed talc from the Val Chisone Mine in
       Italy and/or the Hammondsville Mine in Vermont, U.S.A. for Johnson & Johnson.

       ANSWER:_____

       _____

3.    If you answered "yes" to Question No. 2, please provide the complete legal name,
       last known address and phone number of the person who performed the analysis.

       ANSWER:_____

       _____

4.    If you answered "yes" to Question No. 2, please state if you found the presence or
       absence of asbestiform minerals.

       ANSWER:_____

       _____

5.    Please produce any and all documents responsive to Question Nos. 2-4.

       ANSWER:_____

       _____

6.    Please state if you ever analyzed Johnson & Johnson's Baby Powder or its
       components?

       ANSWER:_____

       _____

7.    If you answered "yes" to Question No. 6, what were your findings regarding the
       fiberous and asbestiform material content?

       ANSWER:_____

       _____

8.     If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

     ANSWER:_____

_____

9.     Please produce any and all documents responsive to Question Nos. 6-8.

     ANSWER:_____

_____

10.    Please state if you ever surveyed the Val Chisone, Italy and/or Hammondsville, Vermont mine for the geological structure prior to or during mining.

     ANSWER:_____

_____

11.    If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

     ANSWER:_____

_____

12.    Please produce any and all documents responsive to Question Nos. 10 & 11.

     ANSWER:_____

_____

13.    Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

     ANSWER:_____

_____

CAUSE NO. D-157,746



| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

## DEPOSITION ON WRITTEN QUESTIONS

TO:     Custodian of records for McCRONE ASSOCIATES, 850 Pasquinelli Drive, West Mont, Illinois 60559.

You will please take notice that on June 15, 1998, a deposition by written questions will be taken of McCrone Associates custodian of record, 850 Pasquinelli Drive, West Mont, Illinois 60559, before a Notary Public or person authorized to administer oaths in the State of Illinois on behalf of Nell McCallum & Associates, and/or officers and/or agents, 2615 Calder, Suite 111, Beaumont, TX 77702, for the taking of this deposition.

The deposition with attached questions and any cross-questions timely served may be used as evidence in the trial of the above-styled and numbered cause pending in the above-named Court.

Notice is further given that request is hereby made as authorized under Rules 188 and 208 of the Texas Rules of Civil Procedure to issue a subpoena and have it served on the witness directing him to produce all documents in his possession pertaining to the attached written questions.

## DEFINITIONS

1.     The term **"document"** means all writings of any kind, including written, recorded, including electronic and magnetic recordings, or graphic matter, however produced or reproduced.  It includes all matter that relates or refers in whole or in part to the subjects of these Requests for Production of Documents.  If the document has been prepared in several copies, or additional copies have been made, and the copies are not identical (or by reason of subsequent modification of a copy by the addition of notations, or other modifications, are no longer identical) each non identical copy is a separate "document."   The term "document" includes, without limitation, correspondence, personal and interoffice memoranda, notes, diaries, statistics, letters, telexes, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations or memoranda or any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, recordings, worksheets, work papers, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing.

1

2.      When "**you**" or "**your**" is used in these Interrogatories, it explicitly means the whole, any subparts, or divisions, that have knowledge of the relevant information, and if you have knowledge of their information, then any subsidiaries, as well.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701        By: _____
Ph. #: (409) 838-6410
Fax #: (409) 838-6084                    Herschel L. Hobson
                                      TBA# 09744600

ATTORNEY FOR PLAINTIFFS

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 28th day of May, 1998.

_____
Herschel L. Hobson

d:\dmword\depos\dwq\coker-dwq (mccrone, etc.).doc

2

## DEPOSITION ON WRITTEN QUESTIONS
## TO MCCRONE ASSOCIATES

1.     Please state your name, address and job title.

    ANSWER:_____

_____

2.     Please state if you ever visited and/ or analyzed talc from the Val Chisone Mine in Italy and/ or the Hammondsville Mine in Vermont, U.S.A. for Johnson & Johnson.

    ANSWER:_____

_____

3.     If you answered "yes" to Question No. 2, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

    ANSWER:_____

_____

4.     If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

    ANSWER:_____

_____

5.     Please produce any and all documents responsive to Question Nos. 2-4.

    ANSWER:_____

_____

6.     Please state if you ever analyzed Johnson & Johnson's Baby Powder or its components?

    ANSWER:_____

_____

7.     If you answered "yes" to Question No. 6, what were your findings regarding the fiberous and asbestiform material content?

    ANSWER:_____

_____

8.      If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

        ANSWER:_____

        _____

9.      Please produce any and all documents responsive to Question Nos. 6-8.

        ANSWER:_____

        _____

10.     Please state if you ever surveyed the Val Chisone, Italy and/or Hammondsville, Vermont mine for the geological structure prior to or during mining.

        ANSWER:_____

        _____

11.     If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

        ANSWER:_____

        _____

12.     Please produce any and all documents responsive to Question Nos. 10 & 11.

        ANSWER:_____

        _____

13.     Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

        ANSWER:_____

        _____

4

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'98  JUN -2  P 4 :46

June 2, 1998

Via Hand-Delivery

JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following is being served on all counsel:

• Affidavit of Michael Sanders, custodian of records for Diagnostic Center Hospital,
  (along with 7 pages of billing records pertaining to Darlene Coker)

Thank you for your assistance in this matter.

Very truly yours,

Darla Budd

Darla Budd
Secretary to Herschel Hobson

/db

cc:   Mr. Roger Worthington ...................................................... Via facsimile
      Mr. Gene Williams ........................................................... Via facsimile

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



June 8, 1998

'98  JUN -9  P 2:32

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas and Texas Civil Practices and Remedies Code, §18.001, the
following is being served on all counsel:

- Affidavit of Aaron McBride, custodian of records for Market Basket #28 Pharmacy,
  (along with 3 pages of pharmacy records)

Thank you for your assistance in this matter.

Very truly yours,

Darla Budd
Secretary to Herschel Hobson

/db

Enclosure

cc:    Mr. Roger Worthington
       Mr. Gene Williams

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



June 11, 1998

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

In accordance with the Emergency Rule for Filing Discovery and Materials in the District
Courts of Jefferson County, Texas, this letter serves as notice that by copy of this letter, I am
serving all counsel of record with Plaintiffs' 6/11/98 Cross-Notice of Video Deposition of
Dr. Vern Mills.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/db

Enclosure

cc:   Mr. Roger Worthington
      Mr. Gene Williams
      Warriene Flatt/Legal Images

JOHN S. APPLEMAN
DISTRICT CLERK

'98 JUN 12 P4 27

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

### PLAINTIFFS' 6/11/98 CROSS-NOTICE OF VIDEO DEPOSITION OF DR. VERN MILLS

TO:   Defendant, JOHNSON & JOHNSON CONSUMER COMPANY, INC., by and through its attorney of record:  Mr. Gene Williams, Mehaffy & Weber, PO Box 16, Beaumont, TX  77704.

PLEASE TAKE NOTICE that the Plaintiffs in the above-referenced cause of action will take the video deposition of the person named below at the time and place designated in this notice pursuant to the Texas Rules of Civil Procedure.

WITNESS:      Dr. Vern Mills

DATE:          June 23, 1998, continuing from day to day until completed

TIME:          1:00 p.m.

PLACE:         Diagnostic Clinic of Houston
               6448 Fannin, 9th Floor (ask for Donna)
               Houston, TX

VIDEOGRAPHER:  Warriene Flatt
               Legal Images
               PO Box 315
               Gilchrist, TX  77617

You are invited to appear and cross-examine the witness.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

By: _Herschel Hobson /mrk_
                Herschel L. Hobson
                TBA# 09744600

ATTORNEY FOR PLAINTIFFS

Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record, via facsimile, on this _11th_ day of _June_, 1998.

Herschel L. Hobson

MATTHEW R. WILLIS

JOHN S. APPLEMAN
DISTRICT CLERK

'98 JUN 12 P4:27

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

d:\dmword\depos\coker-cross notice of video depo (dr. vern mills).doc

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

September 23, 1997

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

D157746

RE:     CAUSE NO. _____; DARLENE COKER, and spouse, ROY COKER
        v. BILL THAMES PHARMACY INC., ET AL; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find the following:

1)      Plaintiffs' Original Petition, original and 10 copies
2)      Jury Demand
3)      Motion for Appointment of Process Server, and proposed Order
4)      Check in the amount of $235.00, for filing fees and citations

Please contact me once the citations are completed so that we may pick them up.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosures

JOHN S. APPLEMAN
DISTRICT CLERK

'97 SEP 23 AM 11:38

JEFFERSON CO. TEXAS
DISTRICT COURT OF
FILED

D157746

CAUSE NO. _____

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | |
| | § | |
| BILL THAMES PHARMACY INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | |
| f/k/a S.W.S. Pharmacy Inc. | § | |
| FERTITTAS FINER FOODS, INC. | § | JEFFERSON COUNTY, TEXAS |
| GIANT FOOD DISCOUNT CITY, INC. | § | |
| HENKE & PILLOT, INC. HSTN. | § | |
| INC. f/k/a J&J Baby Products | § | |
| JOHNSON & JOHNSON PROFESSIONAL | § | |
| LOVOI AND SONS PHARMACIES, INC. | § | |
| MCNEIL PPC INC. | § | |
| Products | § | |
| THE KROGER COMPANY | § | _____ DISTRICT COURT |



## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW DARLENE COKER and spouse, ROY COKER, complaining of the following defendants, each of which did business in Texas at all relevant times and whose registered agents or statutory agent for service under the Long Arm Statute is indicated:

a.   Bill Thames Pharmacy Inc., f/k/a S.W.S. Pharmacy Inc., a Texas corporation, to be served Joseph Seale, 3655 Calder, Beaumont, Texas.

b.   Corrigan Enterprises, Incorporated, f/k/a The Summers Drug Store Company, a Maryland corporation, to be served via Walter N. Corrigan, 3130 E. Houston Street, San Antonio, TX.

c.   Fertittas Finer Foods, Inc., a Texas corporation, to be served via Jerome Fertitta, 1155 S. 11th Street, Beaumont, TX 77701.

d.   Giant Food Discount City, Inc., a Texas corporation, to be served via Henry C. Robson, Jr., 6002 Osburn Street, Houston, TX 77037.

e.   Henke & Pillot, Inc.-Houston, a Texas corporation, to be served via C.T. Corporation Systems, 811 Dallas Avenue, Houston, TX.

f.   Johnson & Johnson Professional Inc., f/k/a J&J Baby Products, a New Jersey corporation, to be served via registered agent: C.T. Corporation System, 1601 Elm Street, Dallas, TX 75201; and their home office: Johnson & Johnson, 1 Johnson & Johnson Plaza, New Brunswick, NJ 08933, via the Secretary of State.

g.   Lovoi and Sons Pharmacies, Inc., a Texas corporation, to be served via John J. Lovoi, 3480 Fannin Avenue, Beaumont, TX 77701.

h.   McNeil PCC Inc. f/k/a Johnson-Johnson Baby Products, a New Jersey corporation, to be served via C.T. Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

i.   The Kroger Co., an Ohio corporation, to be served via C.T. Corporation System, 811 Dallas Avenue, Houston, TX.

1

1. Jurisdiction is proper in this Court, the claim being in excess of the minimum jurisdictional limits of the Court.

2. Venue is proper because a significant and substantial amount of the bad acts complained of occurred in Jefferson County.

3. Plaintiffs sue for the personal injury of Darlene Coker inflicted by the negligent, gross negligent, fraud, deceit, misrepresentations and defective products of the defendants.

4. Defendants negligently and intentionally caused Darlene Coker to be fatally exposed to talc, proximately causing her to contract peritoneal mesothelioma.

5. Defendants made, sold, or specified, talc products which were defective and unreasonably dangerous as designed, manufactured and marketed.  These products, used as intended and foreseen, necessarily released poisonous talc, which was a producing cause of the mesothelioma.

6. Defendants had an actual, subjective awareness of the capacity of airborne talc components in susceptible individuals, and defendants knew they could not with confidence predict precisely who would become sickened, yet they intentionally failed to protect, warn, instruct or otherwise prevent the inevitable exposures and totally preventable disease, which conduct evidenced such an entire want of care as to be grossly negligent and battery.

7. Plaintiffs sue for their past and future injuries for which conduct of defendants has legal cause:

a.   pain, suffering, mental anguish and grief;
b.   physical impairment;
c.   loss of earnings and earning capacity and financial support;
d.   loss of inheritance;
e.   loss of society;
f.   hedonic damages for lifetime lost;
g.   exemplary damages;
h.   all other relief the law allows, plus prejudgment interest from the first date of injurious exposure, post judgment interest and costs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs DARLENE AND ROY COKER demand judgment against the defendants, and each of them, jointly and severally, for general damages, special damages, for punitive and exemplary damages, for their costs expended herein, for prejudgement interest from the date of the injury, and postjudgement on the judgment at the rate allowed by law, and for such other and further relief, both at law and in equity, to which Plaintiffs may show themselves justly entitled.

2

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701        By: _____
Ph. #: (409) 838-6410              Herschel L. Hobson
Fax #: (409) 838-6084               TBA# 09744600


Joseph C. Blanks, P.C.
PO Box 3172
Beaumont, Texas  77704
Ph. #: (409) 838-6410
Fax #: (409) 838-6084


ATTORNEYS FOR PLAINTIFFS



JURY DEMAND

Plaintiff respectfully requests a trial by jury.

By: _____
      Herschel L. Hobson

CAUSE NO. _____ D157746

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | |
| | § | |
| BILL THAMES PHARMACY INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
|     f/k/a Johnson-Johnson Baby | § | |
|     f/k/a S.W.S. Pharmacy Inc. | § | |
| FERTITTAS FINER FOODS, INC. | § | JEFFERSON COUNTY, TEXAS |
| GIANT FOOD DISCOUNT CITY, INC. | § | |
| HENKE & PILLOT, INC. HSTN. | § | |
|     INC. f/k/a J&J Baby Products | § | |
| JOHNSON & JOHNSON PROFESSIONAL | § | |
| LOVOI AND SONS PHARMACIES, INC. | § | |
| MCNEIL PPC INC. | § | |
|     Products | § | |
| THE KROGER COMPANY | § | _____ DISTRICT COURT |

## MOTION FOR APPOINTMENT FOR PROCESS SERVER

COMES NOW Plaintiff and move this Court pursuant to Rules 10S,105,106(a), 107 and 108 of the Texas Rules of Civil Procedure to appoint KATHY VIATOR as a designated agent by registered mail to serve process in this action, and that said individual is designated shall have full power and authority to execute such process and make due return as provided by Rule 107, T.RC.P.

For grounds, Plaintiff would ask this Honorable Court to execute service on the above styled cause because of the work overload of the Sheriff's Department, that the peculiarities of toxic litigation which involve numerous defendants many of whom are absent from or non-residents of the State and the necessity of an efficient and expeditious manner of process service.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray this Court enter its Order and designate KATHY VIATOR as agent to execute process by registered mail with return being made in accordance with Rule 107, T.R.C.P.

Respectfully submitted,

4

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

By: _____
      Herschel L. Hobson
      TBA# 09744600


By: _____
      Joseph C. Blanks
      TBA# 02456770

ATTORNEYS FOR PLAINTIFFS

5

D157746

CAUSE NO. _____

| | |
|---|---|
| DARLENE COKER, and spouse | § |
| ROY COKER | § |
| | § |
| vs. | § |
| | § |
| BILL THAMES PHARMACY INC., | § |
| CORRIGAN ENTERPRISES, INC. | § |
|     f/k/a Johnson-Johnson Baby | § |
|     f/k/a S.W.S. Pharmacy Inc. | § |
| FERTITTAS FINER FOODS, INC. | § |
| GIANT FOOD DISCOUNT CITY, INC. | § |
| HENKE & PILLOT, INC. HSTN. | § |
|     INC. f/k/a J&J Baby Products | § |
| JOHNSON & JOHNSON PROFESSIONAL | § |
| LOVOI AND SONS PHARMACIES, INC. | § |
| MCNEIL PPC INC. | § |
|     Products | § |
| THE KROGER COMPANY | § |

IN THE DISTRICT COURT OF

JEFFERSON COUNTY, TEXAS

_____ DISTRICT COURT

## O R D E R

CAME ON THIS DAY for consideration the Plaintiff's Motion for the authorization of KATHY VIATOR to be lawfully and duly authorized to execute all process in connection with the above captioned cause, and the Court having considered the Motion is of the opinion it is meritorious and should be granted.

IT IS, THEREFORE,

ORDERED, ADJUDGED and DECREED that KATHY VIATOR be authorized and empowered as an officer of this Court to execute process by registered mail and make due return thereof.

It is further ORDERED that a certified copy of this Order shall be attached to any and all such process.

SIGNED this the _____ day of _____,1997.

_____
JUDGE PRESIDING

6

# FOWLER, WILES & KEITH, L.L.P.

### ATTORNEYS AND COUNSELORS AT LAW

1900 CITYPLACE CENTER
2711 NORTH HASKELL AVENUE
DALLAS, TEXAS 75204-2944

TELEPHONE:  214-841-3000
FACSIMILE:   214-841-3099

C. EDWARD FOWLER, JR.
WILLIAM DIXON WILES
KEVIN J. KEITH*
BARBARA PILO
JOHN R. OWEN
HUNTER THOMAS HILLIN

* BOARD CERTIFIED - CIVIL APPELLATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

C. R. ALLEN, JR. M.D., J.D.
JULIE A. BEDINGHAUS
DAVID L. BENFORD
C. CHRISTIAN FREDERIKSEN, JR.
JEFFREY W. HIGHTOWER, JR.
ROBERT L. MANTEUFFEL
LENORE S. McKENNA, R.N., J.D.
JOHN B. SHIPP

OF COUNSEL
VICKY TROMPLER, M.D., J.D.

October 17, 1997

U.S. EXPRESS MAIL TB 162001697 US

Mr. John S. Appleman
District Clerk
Jefferson County Courthouse
P.O. Box 3707
Beaumont, TX 77704

      Re:  No. D-0157746; Coker v. Bill Thames
           Pharmacy, et al

Dear Mr. Appleman:

Please find enclosed Defendant's Original Answer and Defendant's Jury Demand, which I request that you file among the other papers in this cause.  Also enclosed is my firm check in payment of a jury fee.

By copy of this letter I am forwarding copies of the foregoing pleadings to plaintiffs' counsel.

Please return to me a file-stamped copy of this letter in the self-addressed envelope provided.  Thank you.

Yours very truly,

William Dixon Wiles

WDW/ak
Enc.

cc:  Mr. Herschel L. Hobson
     Attorney at Law
     2190 Harrison
     Beaumont, TX 77701

'97 OCT 20 A8:32

CAUSE NO. D-0157746

| | | |
|---|---|---|
| DARLENE COKER AND | § | IN THE DISTRICT COURT OF |
| SPOUSE, ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | DIST |
| | § | JEFF |
| BILL THAMES PHARMACY, INC.; | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | '97  OCT 20  A8:32 |
| f/k/a S.W.S. Pharmacy, Inc.; | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC.; | § | |
| GIANT FOOD DISCOUNT CITY, | § | |
| INC., HENKE & PILLOT, INC. | § | |
| HSTN., INC. f/k/a J&J Baby | § | JOHN S. APONEMAN |
| Products; JOHNSON & JOHNSON | § | |
| PROFESSIONAL; LOVOI AND | § | |
| SONS PHARMACIES, INC.; | § | |
| McNEIL PPC, INC. Products; | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANT'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now the entity sued under the name McNEIL PPC, INC. f/k/a Johnson-Johnson Baby Products, one of the defendants in the above entitled and numbered cause, and in response to Plaintiffs' Original Petition, makes and files this, its Original Answer, and as grounds therefor would respectfully show the Court the following:

1.

This defendant objects and specially excepts to paragraph 3 of Plaintiffs' Original Petition wherein plaintiffs allege the following:

> "Plaintiffs sue for the personal injury of Darlene Coker inflicted by the negligent, gross negligent, fraud, deceit, misrepresentations and defective products of the defendants."

DEFENDANT'S ORIGINAL ANSWER - Page 1
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS

This defendant would show that the allegations of negligence, gross negligence, fraud, deceit, misrepresentations and defective products are all vague, general and indefinite, and plaintiffs have failed to allege any act or omission complained of that would give rise to a claim for negligence, or gross negligence, or any act that would constitute fraud, deceit or any alleged misrepresentation or the particular type of defect being complained of, and therefore this defendant does not have fair notice of the allegations being asserted against him and cannot properly prepare its defenses.  Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

2.

This defendant objects and specially excepts to paragraph 4 of Plaintiffs' Original Petition wherein plaintiffs allege the following:

"Defendants negligently and intentionally caused Darlene Coker to be fatally exposed to talc, proximately causing her to contract peritoneal mesothelioma."

This defendant would show that the allegation that this defendant "negligently and intentionally caused Darlene Coker to be fatally exposed to talc," is vague, general and indefinite, and plaintiffs have failed to specify any act or omission complained of that would give rise to a claim of negligence, or to specify in any manner how this defendant is alleged to have "intentionally" caused plaintiff to be fatally exposed to talc, and therefore this defendant does

DEFENDANT'S ORIGINAL ANSWER - Page 2
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS

not have fair notice of the allegations being asserted against it and cannot properly prepare its defenses.  Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

<div align="center">3.</div>

This defendant objects and specially excepts to paragraph 5 of Plaintiffs' Original Petition wherein plaintiffs allege the following:

> "Defendants made, sold, or specified, talc products which
> were defective and unreasonably dangerous as designed,
> manufactured and marketed.   These products, used as
> intended and foreseen, necessarily released poisonous
> talc, which was a producing cause of the mesothelioma."

This defendant would show that plaintiffs have failed to specify which product it allegedly made, sold, or specified ... designed, manufactured [or] marketed" which was allegedly defective and unreasonably dangerous, and therefore this defendant does not have fair notice of the allegations being asserted against it and cannot properly prepare its defenses.  Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

<div align="center">4.</div>

This defendant objects and specially excepts to paragraph 6 of Plaintiffs' Original Petition wherein the plaintiffs allege the following:

> "Defendants had an actual, subjective awareness of the
> capacity of airborne talc components in susceptible
> individuals, and defendants knew they could not with
> confidence predict precisely who would become sickened,

DEFENDANT'S ORIGINAL ANSWER - Page 3
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS

yet they intentionally failed to protect, warn, instruct or otherwise prevent the inevitable exposures and totally preventable disease, which conduct evidenced such an entire want of care as to be grossly negligent and battery."

Defendant objects to paragraph 6 for the reason that plaintiffs have failed to specify which product this defendant allegedly "made, sold, or specified, ... designed, manufactured [or] marketed" which allegedly had the capacity to "sicken" susceptible individuals, and of which defendant was subjectively aware, or which product defendant allegedly manufactured from which defendant "intentionally failed to protect, warn, instruct or otherwise prevent the inevitable exposures and totally preventable disease," and therefore defendant does not have fair notice of the allegations being asserted against it and cannot properly prepare its defenses. Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

<center>5.</center>

This defendant objects and specially excepts to that portion of paragraph 6 wherein plaintiffs allege "battery," for the reason that the allegation is vague, general and indefinite and plaintiffs have failed to specify any acts which would constitute legal battery, and therefore defendant does not have fair notice of the allegations being asserted against it and cannot properly prepare its defenses. Defendant moves the Court to strike the allegation

from plaintiffs' pleading and of this exception, prays judgment of the Court.

6.

This defendant objects and specially excepts to that portion of paragraph 7-d wherein plaintiffs allege damages for "loss of inheritance," for the reason that inheritance damages are not recoverable absent a wrongful death claim, which has not been asserted in this cause of action.   Plaintiffs are therefore attempting to place a greater burden on this defendant than is allowed or permitted by law.  Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

7.

This defendant objects and specially excepts to paragraph 7-f of Plaintiffs' Original Petition wherein plaintiffs allege "hedonic damages for lifetime lost," for the reason that there is no such compensable item of damages permitted by common law or statute in the state of Texas, and plaintiffs are therefore attempting to place a greater burden on this defendant than is allowed or permitted by law.   Defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

8.

This defendant objects and specially excepts to that portion of paragraph 7-h wherein plaintiffs seek damages for "prejudgment

DEFENDANT'S ORIGINAL ANSWER - Page 5
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS

interest from the first date of injurious exposure," for the reason that there is no statutory or common law basis for recovery of prejudgment interest from "the date of injurious exposure," the same being specified, if at all, by statute.   Plaintiffs are attempting to place a greater burden on this defendant than is allowed or permitted by law and defendant moves the Court to strike the allegation from plaintiffs' pleading and of this exception, prays judgment of the Court.

9.

This defendant objects and specially excepts to that portion of paragraph 1 wherein plaintiffs claim damages "in excess of the minimum jurisdictional limits of the Court," for the reason that the allegation is vague, general and indefinite and open-ended, and plaintiffs have failed to specify the total amount of damages sought from this defendant and therefore defendant does not have fair notice of all of the allegations being asserted against it and cannot properly prepare its defenses.  Defendant moves the Court to require plaintiffs to amend and allege a total amount of damages being claimed in this lawsuit and of this exception, prays judgment of the Court.

10.

This defendant denies that he is liable to plaintiff for any amount of money whatsoever, and says that in any event, the damages which plaintiff could seek herein are limited by law pursuant to §11.01-11.04 of Art. 4590i, TEX. REV. CIV. STAT. ANN.

DEFENDANT'S ORIGINAL ANSWER - Page 6
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS

11.

This defendant would show that plaintiffs' cause of action is barred by the statute of limitations.

<u>TO THE COURT ONLY</u>

12.

Defendant denies that it is liable to plaintiffs for any amount of damages or money whatsoever, but states that inasmuch as plaintiffs have alleged exemplary and punitive damages, defendant hereby invokes **all** of the provisions of Chapter 41, TEX. CIV. PRAC. & REM. CODE, including but not limited to §§41.007 and 41.008.

13.

With respect to the allegations asserted by plaintiffs against this defendant and others, defendant hereby invokes **all** of the rights, remedies, elections and provisions of Chapters 32 and 33 of the TEX. CIV. PRAC. & REM. CODE, including but not limited to §§33.013 − 33.017.

WHEREFORE, PREMISES CONSIDERED, defendant prays that its special exceptions be sustained, and that upon final trial and hearing hereof plaintiffs take nothing from it, but that it go hence without day and recover its costs in this behalf expended, and for such other and further relief, both at law and in equity, to which defendant may show itself to be justly entitled.

DEFENDANT'S ORIGINAL ANSWER − Page 7
G:\WPDOC\WDA\054\02121\PLEADING\MCNEIL.ANS

Respectfully submitted,

FOWLER, WILES & KEITH, L.L.P.

By: *William Dixon Wiles*
       William Dixon Wiles
       State Bar No. 21467800

       1900 Cityplace Center
       2711 North Haskell
       Dallas, Texas 75204-2944
       (214) 841-3000 - Telephone
       (214) 841-3099 - Telecopier

       Attorney for Defendant
       McNeil PCC, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing answer was forwarded to plaintiffs' counsel this 17th day of October, 1997.

*William Dixon Wiles*
William Dixon Wiles

DEFENDANT'S ORIGINAL ANSWER - Page 8
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.ANS



CAUSE NO. D-0157746

| | | |
|---|---|---|
| DARLENE COKER AND | § | IN THE DISTRICT COURT OF |
| SPOUSE, ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY, INC.; | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | |
| f/k/a S.W.S. Pharmacy, Inc.; | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC.; | § | |
| GIANT FOOD DISCOUNT CITY, | § | |
| INC., HENKE & PILLOT, INC. | § | |
| HSTN., INC. f/k/a J&J Baby | § | |
| Products; JOHNSON & JOHNSON | § | |
| PROFESSIONAL; LOVOI AND | § | |
| SONS PHARMACIES, INC.; | § | |
| McNEIL PPC, INC. Products; | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANT'S JURY DEMAND

Pursuant to Rule 216 of the Texas Rules of Civil Procedure, the entity sued under the name McNeil PPC, Inc. respectfully requests a trial by jury regarding the above styled and numbered cause.

FOWLER, WILES & KEITH, L.L.P.

By: _William Dixon Wiles_
William Dixon Wiles
State Bar No. 21467800

1900 Cityplace Center
2711 North Haskell
Dallas, Texas 75204-2944
(214) 841-3000 - Telephone
(214) 841-3099 - Telecopier

Attorney for Defendant
McNeil PPC, Inc.

DEFENDANT'S JURY DEMAND - Page 1
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.JD

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the above Jury Demand was forwarded to plaintiffs' counsel this 17th  day of October, 1997.

_William Dixon Wiles_
William Dixon Wiles

DEFENDANT'S JURY DEMAND - Page 2
G:\WPDOC\WDW\054\02121\PLEADING\MCNEIL.JD



## CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

### DEFENDANTS' OBJECTIONS AND ANSWERS TO INTERROGATORIES AND OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., Defendant in the above-styled and numbered cause, and files this its Objections and Answers to Interrogatories and Objections and Responses to Request for Production propounded to Defendant Johnson & Johnson Consumers Company, Inc.

MW/80804

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____

Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas 77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the 6th day of May, 1998.

_____
        SANDRA F. CLARK

MW/80804

-2-

## Preliminary Statement

Johnson & Johnson Consumer Companies, Inc. (hereinafter Johnson & Johnson) states that in the preparation of its responses to plaintiff's requests and interrogatories, it has made, and continues to make, a concerted good faith effort to collect all of the requested information or documents from Johnson & Johnson as well as any relevant predecessors and vendors. Defendant provides these preliminary responses with the understanding that information may change as discovery proceeds. Pursuant to agreement with plaintiff's counsel, defendant Johnson & Johnson provide these responses on behalf of Johnson & Johnson and reserves the right to make objections and to file responses for all other entities served by plaintiff's counsel in this lawsuit.

Johnson & Johnson will not produce any documents generated by its counsel directed to other counsel or to its officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees regarding legal matters, and will not produce any documents generated by the officers, directors or employees of Johnson & Johnson to its counsel regarding legal matters. Johnson & Johnson will not produce any documents which are work-product drafted by attorneys employed by Johnson & Johnson. As for its responses to interrogatories, Johnson & Johnson state that when the requested information is readily available from documents, the documents will be produced as noted in individual interrogatory responses. When information or documents concerning incomplete research are requested, Johnson & Johnson state that they will produce published interim reports of such research. In response to requests for documents and interrogatories, Johnson & Johnson will produce information relevant to talc or baby powder.

Johnson & Johnson reserves the right to change its responses if it appears from additional research that omissions or errors have been made herein or that further or more accurate information should be provided. Furthermore, Johnson & Johnson has not completed preparation for trial. Because the responses contained herein are based only upon such information and documents which are presently available to or specifically known to Johnson & Johnson at the time the responses were prepared, the responses herein may be supplemented or changed upon continuing investigation.

This Preliminary Statement shall apply to each and every response given herein, and shall be incorporated by reference as though fully set forth in each of the responses appearing in the following pages.

MW/80804

OBJECTIONS AND ANSWERS TO INTERROGATORIES AND
OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

Interrogatory No. 1

Please list the company name and location of each entity that packaged your baby powder from 1945 through 1975,

ANSWER:    **Baby powder was packaged at a variety of locations by Johnson & Johnson entities from 1945 through 1975. To the best of the company's knowledge, baby powder was not packaged by any non-Johnson & Johnson entity.**

Request for Production No. 1

Please produce any and all documents responsive to Interrogatory No. 1.

RESPONSE:    **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 1 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 2

Did Johnson & Johnson ever sell baby powder under any name other than Johnson & Johnson between 1945 through 1975, and if so, what name and when?

ANSWER:    **No**

Request for production No. 2

Please produce any and all documents responsive to Interrogatory No. 2.

RESPONSE:    **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 2 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the**

extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 3

Please list each location where your raw materials for Johnson & Johnson baby powder was mined from 1945 through 1975.

ANSWER:   Based on defendants' current investigation and document review to date, from 1945 through 1975, talc was mined from the Val Chisone Mine in Italy, and the Hammondsville Mine in Vermont, U.S.A.

Request for Production No. 3

Please produce any and all documents responsive to Interrogatory No. 3.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 3 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).   Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 4

Please list all suppliers to Johnson & Johnson of raw or processed material used in Johnson & Johnson baby powder between 1945 and 1975.

ANSWER:   Defendants object to this Interrogatory to the extent it calls for privileged or trade secret information.   Subject to the foregoing objection, talc was supplied by Windsor Minerals (Hammondsville Mine, Vermont) and the Val Chisone Mine, Italy.

Request for Production No. 4

Please produce any and all documents responsive to Interrogatory No. 4.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.   Interrogatory No. 4 does not request documents.   As such,

plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 5

Please list each claim made against you giving the style, court and date of filing, which involved an asbestos-related claim of injury and any talc product made or sold by you.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable. Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges. Subject to the foregoing objection, none.

Request for Production No. 5

Please produce any and all documents responsive to Interrogatory No. 5.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Interrogatory No. 5 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 6

Please list each epidemiological study any of your employees potentially occupationally exposed to talc made up all or part of the study cohort.

ANSWER:   Defendant objects to this Interrogatory as beyond the scope of Rule 166(b)(2). The matters inquired of do not have a tendency to make any fact that is of consequence to this action more or less probable. Furthermore, Defendant objects to the extent Plaintiff's interrogatory seeks to evade the attorney/client, work product, party communication/investigatory and witness statement privileges. Subject to the foregoing objections, defendants investigation is

MW/80804                                    -6-

ongoing . Defendant will supplement this interrogatory with non-objectionable information as it is discovered.

<u>Request for Production No. 6</u>

Please produce all documents responsive to Interrogatory No. 6.

<u>RESPONSE:</u>  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 6. Interrogatory No. 6 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

<u>Interrogatory No. 7</u>

Please list each location where your baby powder was packaged from 1945 through 1975.

<u>ANSWER:</u>  **Object - Question is repetitious and duplicative of Interrogatory No. 1. Subject to the foregoing objection, see Answer to Interrogatory No. 1.**

<u>Request for Production No. 7</u>

Please produce all documents responsive to Interrogatory No. 7.

<u>RESPONSE:</u>  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 7. Interrogatory No. 7 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

<u>Interrogatory No. 8</u>

MW/80804

-7-

What year did your baby powder change from talc to corn starch?

ANSWER:   **Johnson's Baby Powder made with talc has been available from 1945 through 1975 and is currently sold; Johnson's Baby Powder with corn starch was first marketed in 1978.**

Request for Production No. 8

Please produce any and all documents responsive to Interrogatory No. 8.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 8.  Interrogatory No. 8 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 9

Please list all persons known by you who:

   a)   ever recommended changing from talc to corn starch for baby powder product;
   b)   ever made any analysis of your baby powder for fibrous material content;
   c)   ever made any analysis of your baby powder for asbestiform material;
   d)   ever surveyed your mine(s) for the geological structure prior to or during mining;
   e)   ever made any analysis of raw and/or processed material used or considered for use in your baby powder for fibrous material content;
   f)   ever made any analysis of raw and/or processed material used or considered for use in your baby powder for asbestiform mineral.

ANSWER:   **Defendant objects to the overbroad nature of plaintiffs' requests.  Identifying all persons without limitation to time, scope, and employment, is unduly burdensome.  To identify all persons over the company's 100+ year history is not possible.**

   **a) Defendants object to sub-part (a) as vague and that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence.  Furthermore,**

MW/80804                                              -8-

defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.   Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant will supplement its response to this interrogatory as non-objectionable information is discovered.

b) Defendants object to sub-part (b) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges. Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

c) Defendants object to sub-part (c) as vague and overbroad in that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges. Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

d) Defendants object to sub-part (d) in that it is vague, overbroad, and unlimited in time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Subject to the foregoing objections, analysis may have been conducted by McCrone Associates, and Colorado School of Mines Research Institute.

e) Defendants object to sub-part (e) as vague, overbroad,  and that it is unlimited to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of  Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

f) Defendants object to sub-part (f) as vague, overbroad and that it is unlimited

MW/80804

-9-

to time and scope.  In addition plaintiff's interrogatory is vague, unduly burdensome, and unlikely to lead to the discovery of relevant evidence. Furthermore, defendant objects to the extent that it is covered by the attorney/client, work product, party communication/investigatory privileges, and witness statement privileges.  Subject to the foregoing objections, analysis have been conducted by certain employees of Johnson & Johnson, McCrone Associates, E.S. Laboratories, Colorado School of Mines Research Institute, and Baine Environmental.

Request for Production No. 9

Please produce any and all documents responsive to Interrogatory No. 9.

RESPONSE:    Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 9.  Interrogatory No. 9 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 10

Please identify any person having knowledge of relevant facts.  A fact witness is a person who "has or may have knowledge of any discoverable matter."  As to each witness, please provide the following:

a.    Name;
b.    Address;
c.    Telephone number;
d.    Knowledge and opinions of the witness.

ANSWER:    Defendant objects to this Interrogatory as vague and overbroad.  The identity of fact witnesses over the 100+ history in which plaintiff requests is virtually impossible to determine all persons who may have facts relevant to this case. Subject to the above objections defendant's investigation is continuing and Defendant's will supplement.

MW/80804                            -10-

Request for Production No. 10

Please produce any and all documents responsive to Interrogatory No. 10.

RESPONSE:  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 10.  Interrogatory No. 10 does not request documents.  As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in _Loftin v. Martin_, 776 S.W.2d, 145 (Tex. 1989).  Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 11

Please provide the following information as to each testifying expert:

a.    Name;
b.    Address;
c.    Telephone Number;
d.    Facts known by the testifying expert;
e.    Expected substance of testimony of each testifying expert, the mental impressions and opinions of each testifying expert, and any report or other documents prepared by each expert in anticipation of trial.

ANSWER:  **Defendant objects to this interrogatory as unduly burdensome, vague, and beyond the scope of permissible discovery.  Specifically, it is not possible for defendant to list all facts, mental impressions, and opinions known to the testifying expert.  Defendant will supplement this interrogatory in accordance with Rule 166(b).**

Request for Production No. 11

Please produce any and all documents responsive to Interrogatory No. 11.

RESPONSE:  **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 11.  Interrogatory No. 11 does not request documents.  As such, plaintiffs' request is overbroad, vague,**

unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Furthermore, defendant objects to the extent that plaintiff's request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

(THERE IS NO INTERROGATORY NO. 12)

Request for Production No. 12

As to each testifying expert, please produce any documents, tangible things, physical models, or compilations of data or other material prepared by testifying expert.

RESPONSE:   Defendant objects to this request as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence. Defendant is willing to exchange trial exhibits with plaintiff by court order or by agreement of the counsel.

Interrogatory No. 13

Please describe any and all studies of asbestos or asbestiform talc disease in which you , the defendant, participated.

ANSWER:   Defendant objects to this interrogatory as vague, overbroad, and unduly burdensome, and not likely to lead to the discovery of relevant evidence. Plaintiff's interrogatory is unlimited in time and scope and is not confined to the issues in this case. Defendant further objects to the extent that plaintiff's interrogatory seeks to evade the attorney/client, work product, party communications/investigatory, and witness statement privileges. Subject to the foregoing objections, defendant's investigation is continuing and defendant will supplement with non-objectionable information as it is discovered.

Request for Production No. 13

Please produce any and all documents responsive to Interrogatory No. 13.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 13. Interrogatory No. 13 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989).

MW/80804

-12-

**Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will make non-objectionable documents available for inspection and copying at a mutually agreeable time and place as they are discovered.**

Interrogatory No. 14

Please describe any and all studies of asbestos or asbestiform talc disease in which you,. the defendant, were aware of as of :

   a.   1940;
   b.   1950;
   c.   1970;
   d.   1972

ANSWER:   **Defendant objects to this interrogatory as vague, and overbroad, and not calculated to lead to discovery of relevant evidence. It is impossible to determine what study any individual employee of Defendant was aware of by a certain date.**

Request for Production No. 14

Please produce any documents responsive to Interrogatory No. 14.

RESPONSE:   **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 14. Interrogatory No. 14 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 15

Each workers' compensation claim for an alleged asbestos or asbestiform talc injuries, disease or death of an employee which could be used to evaluate the risk of developing an asbestos or asbestiform talc disease and/or providing knowledge to you of asbestos or asbestiform talc.

ANSWER:   Defendants object to this Interrogatory in that it is vague, ambiguous, overly broad and compound.  Furthermore, this interrogatory will call for a legal conclusion.  Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant is not aware of any workers compensation claim alleging either asbestos or an asbestiform talc disease by any employee of Johnson & Johnson.

Interrogatory No. 16

Please state if any air sampling was done to determine the exposure to your baby powder during its normal and intended use.

ANSWER:   Defendants object to this interrogatory as vague, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence. Furthermore, this interrogatory is not limited to time or scope.

Request for Production No. 15

Please produce any and all documents responsive to Interrogatory No. 16.

RESPONSE:   Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested.  Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 16.  Interrogatory No. 16 does not request documents.   As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.

Interrogatory No. 17

Please identify each mineralogist employed by you and/or consulted by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:   Defendants object to plaintiffs' request in that it is duly burdensome and overbroad for defendants to list every mineralologist that may have been consulted with prior to 1975.  Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be mineralogist. Defendant's investigation is ongoing.   Defendant will supplement this interrogatory as persons are identified.

MW/80804                                         -14-

Request for Production No. 16

Please produce any and all documents responsive to Interrogatory No. 17.

RESPONSE: **Defendant objects to this request for the reason that it is vague and overbroad, and fails to give defendant fair notice of what information or documents are being requested. Specifically, plaintiff requests defendant to produce "all documents" responsive to Interrogatory No. 17. Interrogatory No. 17 does not request documents. As such, plaintiffs' request is overbroad, vague, unintelligible, and constitutes a "fishing expedition" such as that disallowed by the Texas Supreme Court in *Loftin v. Martin*, 776 S.W.2d, 145 (Tex. 1989). Defendant further objects to the extent that plaintiffs' request seeks to evade the attorney/client, work product, party communication/investigatory, and witness statement privileges.**

Interrogatory No. 18

Please identify each physician employed by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment.

ANSWER: **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every physician employed prior to 1975. Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 19

Please identify each geologist employed by you an/or consulted by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER: **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendant to list every geologist that may have been consulted with prior to 1975. Subject to the foregoing objections, certain employees listed in response to Interrogatory No. 9 may be geologist. Defendant's investigation is ongoing. Defendant will supplement this interrogatory as persons are identified.**

Interrogatory No. 20

Each document evidencing health warnings provided by you or to you before 1975 concerning the asbestos material or asbestos-containing products:

MW/80804

-15-

a.    used by you as an ingredient of a product;

b.    made by another and marketed by you.

ANSWER:    **a) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and ambiguous. Subject to the foregoing objections, no warning related to asbestos would be applicable or required.**

    **b) Defendants object to plaintiffs' Interrogatory No. 20 in that it is vague and that it does not identify warning related to what product. Subject to the foregoing objection, defendant has not marketed an asbestos containing product manufactured by another.**

Interrogatory No. 21

Please identify each industrial hygienist employed by you and/or consulted by you at any time before 1975. Please provide the last known address, telephone number, vital status and dates of employment and/or consultation.

ANSWER:    **Defendants object to plaintiffs' request in that it is unduly burdensome and overbroad for defendants to list every industrial hygienist that may have been consulted with prior to 1975. Subject to the foregoing objection, Defendant will supplement as persons are identified.**

Interrogatory No. 22

Documents which describe the asbestos content or absence of asbestos in your baby powder sold or manufactured by you or related companies of yours from 1945 through 1975.

ANSWER:    **Defendants object to this interrogatory as vague, ambiguous, and unintelligible. Specifically, the interrogatory does not ask a question but merely makes a statement, and therefore, as such can not be answered and should be rephrased. Subject to the foregoing objections, defendant's investigation is ongoing. Defendant will supplement its response to this interrogatory as information is discovered.**

Interrogatory No. 23

Please list each and every mine that was utilized by your company for talc. Please include complete address and dates of use.

ANSWER:    **Defendants object to this Interrogatory as over broad in that it is not limited to time or to cosmetic talc. Subject to the foregoing objections, Defendant answers, from 1945 until approximately 1964 from Val Chisone, Italy and from**

MW/80804

1964 until approximately 1975 from Hammondsville Mine, Vermont, U.S.A.

Request for Production No. 17

Each workers' compensation claim or notice of injury filed before 1980 for any allegation of asbestos or asbestiform talc illnesses, including without limitation, asbestosis, pneumoconiosis, or mesothelioma.

RESPONSE:  **Defendant objects to plaintiffs' request as vague, overbroad, unduly burdensome, and not likely lead to the discovery of relevant evidence. Plaintiff's request is not limited in time and scope or to any specific entity. Plaintiff's request does not identify from whom it is requesting documents. Subject to the foregoing objections, defendant has no documents responsive to this request.**

Request for Production No. 18

Please produce each version of your "corporate biography" or published company history, whether an in-house effort, and "authorized" version or otherwise.

RESPONSE:  **Defendants object to this request as overbroad, vague, unduly burdensome, and not likely to lead to the discovery of any relevant evidence. Further, plaintiff's request is not limited in time or scope.**

Request for Production No. 19

Documents evidencing:
    a.    the identity of each of your insurer(s), including property loss, workers' compensation and general liability;
    b.    the extent of your yearly liability coverage relative to the claims raised to this suit.

RESPONSE:  **Defendants object to this request as vague, overbroad and likely to lead to the discovery of relevant evidence. Furthermore, plaintiff's request is not limited in either time or scope. Subject to the foregoing objections, for the years of exposure Johnson & Johnson Consumer Companies, Inc., had coverage for claims provided through self insurance and The Aetna Property & Casualty Company in varying amounts ranging from 1.5 million through 50 million.**

Request for Production No. 20

Research or studies which you, the defendant, possess conducted by NIOSH, Vermont Health Department, Mining Enforcement and Safety Administration (MESA), OSHA, and/or Walter C.

MW/80804

-17-

McCrone and Associates concerning asbestos or asbestiform talc illnesses.

RESPONSE:   Defendant objects to this request as vague, overbroad, unduly burdensome, and not calculated to lead to the discovery of relevant evidence.  Defendant's document review is ongoing.   Defendants will make non-objectionable documents available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 21

Please provide a complete copy of "Talc: A Possible Occupational and Environmental Carcinogen", authored by H.P. Blejer and R. Arlon, 1973, showing who received each copy.

RESPONSE:   Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges.  Subject to the foregoing objections, documents responsive to this request will be made available at a mutually agreeable place and time.

Request for Production No. 22

Please provide a copy of "The Biology of Talc", Brit. J. Ind. Med. 33: 217, 1976, authored by G.Y. Hildick-Smith, showing who received each copy.

RESPONSE:   Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges.  Subject to the foregoing objections, documents responsive to this request will be made available for inspection and copying at a mutually agreeable time and place.

Request for Production No. 23

Research or studies conducted by or with any trade associations that in any way discuss asbestos or asbestiform minerals in consumer products prior to 1975.

RESPONSE:   Defendant objects to this request as overbroad, vague, not likely to lead to the discovery of relevant evidence.  Further, plaintiff's request is not limited in time and scope or to projects in which Defendant participated.  Furthermore, Defendant objects to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges.   Subject to the foregoing objections, defendant's investigation is ongoing.  Defendant will make documents responsive to this

MW/80804

-18-

request available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 24

Produce each air sampling results for dust, including asbestos or asbestiform minerals at your mining, milling and packaging plants.

RESPONSE:   **Defendant objects to this request as overbroad, vague, and not likely to lead to the discovery of relevant evidence. Further, plaintiff's request is limited in time or scope.  Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges.  Defendants document review is ongoing.  Non-objectionable documents responsive to this request will be made available for inspection at a mutually convenient time and place as they are discovered.**

Request for Production No. 25

Documents not dated greater than 1975 which mention compliance with or changes to, or proposed changes to, any regulations, statutes, rules or standards for the use or handling of materials which yield pneumoconiosis producing dust, including asbestosis or mesothelioma.

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence.  Further, plaintiff's request is not limited to time or scope.  Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.**

Request for Production No. 26

Documents not dated greater than 1975 which mention proposed or prescribed warnings, cautions or instructions regarding the potential health hazards or pneumonoconiosis-producing dust, including asbestos or asbestiform minerals for use upon or in your baby powder, your manuals or catalogs ("catalogs" means those documents regarding products made or sold by you, the defendant and your product literature).

RESPONSE:   **Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and**

witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.

Request for Production No. 26

Please produce all documents provided to your sale and/or marketing organization which concern asbestos being found or not being found in baby powder.

RESPONSE: Defendant objects to this request to the extent that it calls for documents subject to the attorney/client, party communications, work product, investigative and witness statement privileges. Further, plaintiff's request is vague, overbroad and not calculated to lead to the discovery of relevant evidence. Further, plaintiff's request is not limited to time or scope. Subject to the foregoing objections, defendants will make non-objectionable documents that are responsive to this request available for copying and inspection at a mutually agreeable time and place as they are discovered.

# V E R I F I C A T I O N

STATE OF _____        §
                                                         §
COUNTY OF _____        §

BEFORE ME, the undersigned authority, on this day personally appeared

_____, who being by me here and now duly sworn upon oath says that he is a

_____ of Johnson & Johnson Consumer Companies, Inc., duly authorized to verify

the statements contained in the foregoing instrument for and on behalf of J Johnson & Johnson

Consumer Companies, Inc., that certain of these matters stated herein are not within the personal

knowledge of affiant, and that the facts stated herein have been assembled by authorized agents,

employees and counsel of Johnson & Johnson Consumer Companies, Inc., and affiant is informed the

that the facts stated therein are true.

_____


SUBSCRIBED AND SWORN TO BEFORE ME by the said affiant on this the \_\_\_\_ day of _____,
1998.

_____
Notary Public in and for
the State of _____

My commission expires: _____

MW/80804                                    -21-

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |



**DEFENDANT'S NOTICE OF FILING VERIFICATION TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., Defendant in the above-styled and numbered cause, and files the attached verification to Plaintiff's First Set of Interrogatories.

MW/81951

Respectfully submitted,

MEHAFFY & WEBER
Attorneys    for    Johnson    &    Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas 77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded  to all counsel of record on this the ___ day of May, 1998.

_____
PAUL HEYBURN

MW/81951                                    -2-

# VERIFICATION

STATE OF NEW JERSEY    §

COUNTY OF MIDDLESEX    §

       BEFORE ME,  the undersigned authority, on this day personally appeared Michael Ullmann, who being by me here and now duly sworn upon oath says that he is Secretary of Johnson & Johnson Consumer Companies, Inc., duly authorized to verify the statements contained in the foregoing instrument for and on behalf of Johnson & Johnson Consumer Companies, Inc., that certain of these matters stated herein are not within the personal knowledge of affiant, and that the facts stated herein have been assembled by authorized agents, employees and counsel of Johnson & Johnson Consumer Companies, Inc., and affiant is informed that the facts stated therein are true.

_____
Michael Ullmann

       SUBSCRIBED AND SWORN TO BEFORE ME by the said affiant on this the 7th day of May, 1998.

_____
Cira Georgiou
Notary Public in and for
The State of New Jersey

My commission expires:  January 5, 1999

**MEHAFFY & WEBER**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2615 CALDER AVENUE
POST OFFICE BOX 16
BEAUMONT, TEXAS 77704

ONE ALLEN CENTER
500 DALLAS, SUITE 1200
HOUSTON, TEXAS 77002
TELEPHONE (713) 655-1200
FAX (713) 655-0222

1006 GREEN AVENUE
P.O. BOX 189
ORANGE, TEXAS 77630
TELEPHONE (409) 886-7766
FAX (409) 886-7790

TELEPHONE (409) 835-5011
FAX (409) 835-5177
(409) 835-5729

June 25, 1998

Re:   **NO. D-157746; Darlene Coker, and spouse Roy Coker vs. Bill Thames Pharmacy
Inc., et al; M&W File No. 3125-11**

Mr. John S. Appleman
District Clerk
Jefferson County Courthouse
P. O. Box 3707
Beaumont, Texas   77704

Dear Mr. Appleman:

Enclosed please find a **RULE 11 AGREEMENT** in connection with the above styled and numbered cause.

Please file stamp the enclosed copy of this letter reflecting the date of filing.

By copy hereof, I am forwarding a copy of said instrument to opposing counsel herein.

Thank you for your courtesy and attention to this matter.

Yours very truly,

Gene M. Williams
For the Firm

GMW/jah
Enc.

MW/100285

**MEHAFFY & WEBER**

Mr. John S. Appleman
June 25, 1998                                                    Page 2

---

cc:
Herschel L. Hobson
The Law Offices of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701

MW/100285



**MEHAFFY & WEBER**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2515 CALDER AVENUE
POST OFFICE BOX 16
BEAUMONT, TEXAS 77704

ONE ALLEN CENTER
500 DALLAS, SUITE 1200
HOUSTON, TEXAS 77002
TELEPHONE (713) 655-1200
FAX (713) 655-0222

1005 GREEN AVENUE
P.O. BOX 189
ORANGE, TEXAS 77630
TELEPHONE (409) 880-7700
FAX (409) 886-7790

TELEPHONE (409) 835-5011
FAX (409) 835-5177
(409) 835-5729

June 24, 1998

Re:   NO. D-157746; Darlene Coker, and spouse Roy Coker vs. Bill Thames Pharmacy
      Inc., et al; M&W File No. 3125-11

Herschel L. Hobson
Law Offices of Herschel L. Hobson
2190 Harrison
Beaumont, TX 77701

Dear Herschel:

          This letter will serve as a Rule 11 Agreement between the parties in this case.

          We recognize that the next thing that needs to happen in this case is for you to determine the
extent of your causation testimony.  We will immediately deliver to you the blocks that we have that
will allow Dr. Abraham to perform the digestion study he has discussed.

          Prior to Dr. Abraham beginning the digestion study, he will confirm that there will be
sufficient tissue remaining for us to perform our own study at a later time if that becomes necessary.
Also, you will agree and instruct Dr. Abraham that the results of any digestion study or destructive
use of this tissue will be maintained in a form where experts on behalf of the defendant can review
the work and "re-read" as it were, after he performs his study.

          Dr. Abraham will perform his work and have a final report regarding same by July 31,
1998.

          At this point in time the parties will enter into a "standstill" agreement.  The parties will
advise the Court that they will not be ready for trial at the current settings of September and, if
necessary, the parties will file a Joint Motion for Continuance of that setting.  This standstill
agreement will not effect dates that have already passed in the current scheduling order.  In other
words, by example, the plaintiff will not be allowed to identify any additional experts as those
deadlines have passed.  However, the defendants have not yet identified their experts and so the

MW/12G321

MEHAFFY & WEBER

Mr. Herschel Hobson
June 24, 1998

Page 2

standstill agreement would effectively abate the defendant's expert deadlines during the term of this agreement.

The parties anticipate approaching the Court, if testing proves this necessary, to ask for certain modification of the scheduling order to accommodate a new trial setting, but in no event will the defendant's designation of experts be due until a minimum of two weeks after a final report is delivered to defendant's counsel showing the results of Dr. Abraham's tests.

The "standstill" agreement envisions that the defendant will provide no more discovery to the plaintiff and that the plaintiff will contact the various court reporting services and third parties which have been served with depositions on written questions to inform them that production of documents will not be required until further notice by the parties. These would include McCrone Associates, E. S. Laboratories Colorado School of Mines Research Institute and Bains Laboratories.

Please sign a copy of this agreement for filing with the Court and return it to me at your earliest convenience.

Yours Very Truly,

[Original signed by Gene M. Williams]

Gene M. Williams
For the Firm

GMW/jah

Approved:

Herschel Hobson

MW/126321

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW



'98  MAY 22  P4 :47

May 22, 1998

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find Plaintiffs' 5/22/98 Fact Witness
Designations.

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:   Mr. Roger Worthington ................................................... Via facsimile
      Mr. Gene Williams............................................................ Via facsimile

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, ROY COKER | § § § | IN THE DISTRICT COURT OF [ON CO. TEXAS] |
| vs. | § § | JEFFERSON COUNTY, TEXAS |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

FILED
DISTRICT COURT OF
'98 MAY 22 P 4:47

JOHN S. APPLEMAN
DISTRICT CLERK

### PLAINTIFFS' 5/22/98 FACT WITNESS DESIGNATIONS

COME NOW the Plaintiffs in the above-styled and numbered cause and, in accordance with the 5/14/98 Amended Pre-Trial Docket Control Scheduling Order, designate the following fact witnesses. Plaintiffs are filing a preliminary fact witness list based on the best information available as of this date. They are as follows:

- COKER, DARLENE, 12 Dana Drive, Lumberton, TX 77657, (409) 755-1616
- COKER, ROY, 12 Dana Drive, Lumberton, TX 77657, (409) 755-1616
- DECKARD, CRYSTAL, 9920 South Gwendolyn Place, Highlands Ranch, CO 80126, (303) 683-5591
- STEPHENS, KATHRYN, 727 Oak Harbor, Houston, TX 77062, (281) 286-8477
- LARKIN, DIANE, Colorado Springs, CO, phone number unknown
- ADAMS, MELBA, Route 2, Box 404, Newton, TX 75966, (409) 383-1274
- JOHNSON & JOHNSON CONSUMER PRODUCTS INC., 199 Grandview Road, Skillman, NJ 08558, (908) 874-1000, and custodian of records and accounts for same
- JOHNSON & JOHNSON PROFESSIONAL INC., One Johnson & Johnson Plaza, New Brunswick, NJ 08933, (908) 524-0400, and custodian of records and accounts for same
- JOHNSON & JOHNSON INC., 2312 Beltline Blvd., Columbia, SC 29201, (803) 738-1228, and custodian of records and accounts for same
- JOHNSON & JOHNSON BABY PRODUCTS, 545 Old Elberton Road, Royston, GA 30662, (706) 245-7353, and custodian of records and accounts for same
- Any and all fact witnesses designated by defendant.

Plaintiffs reserve the right to supplement this designation because there are discovery issues that still need to be resolved with the defendant.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

By: _____
Herschel L. Hobson
TBA# 09744600

ATTORNEY FOR PLAINTIFFS

2

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 22nd day of May, 1998.

_____

Herschel L. Hobson



CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. f/k/a | § | |
| JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., | § | |
| FERTITTAS FINER FOODS, INC., | § | |
| GIANT FOOD DISCOUNT CITY, INC., | § | |
| HENKE & PILLOT, INC., HSTN. INC. | § | |
| f/k/a J&J BABY PRODUCTS, | § | |
| JOHNSON & JOHNSON | § | |
| PROFESSIONAL, LOVOI AND SONS | § | |
| PHARMACIES, INC., MCNEIL PPC | § | |
| INC. PRODUCTS, THE KROGER | § | |
| COMPANY | § | 136TH JUDICIAL DISTRICT |

**DEFENDANT'S PRELIMINARY DESIGNATION OF FACT WITNESSES**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., Defendant in the above-styled

and numbered cause, and pursuant to the Court's Scheduling Order dated May 14, 1998, files this

its preliminary designation of fact witnesses subject to the following reservations:

This defendant reserves the right to supplement the fact witness designation after additional

discovery has been completed.

I.      The following persons are either current or former employees Johnson & Johnson that may

have knowledge of facts related to the above lawsuit.

MW/J22782

Dr. C. Ackerman
Johnson & Johnson
New Brunswick, NJ

William Ashton
Johnson & Johnson
Skillman, NJ

Frank Bolden
Johnson & Johnson
New Brunswick, N.J.

Michael Chudkowski
Johnson & Johnson
Skillman, New Jersey

R.J. Ciatto
Johnson & Johnson
New Brunswick, NJ

J. Clark
Johnson & Johnson
New Brunswick, NJ

Randy Corder
Johnson & Johnson
Royston, Georgia

Ed Correia
Johnson & Johnson

J. Dattre,
Johnson & Johnson
New Brunswick, NJ

W.R. Dean
Johnson & Johnson
Deavenport, B.

J. Michael DeMarco
Johnson & Johnson
Skillman, NJ

MW/122782                    2

M. Edenbaum
Johnson & Johnson
New Brunswick, NJ

C. Gagliardi
Johnson & Johnson
New Brunswick, NJ

Regina Gallagher
Johnson & Johnson
Skillman, NJ

Dr. Garrison
Johnson & Johnson
New Brunswick, NJ

R. George
Johnson & Johnson
New Brunswick, NJ

H. Gessner
Johnson & Johnson
New Brunswick, NJ

D. F. Grabarz
Johnson & Johnson
New Brunswick, NJ

N. Greenberg
Johnson & Johnson
New Brunswick, NJ

Dr. M. Gross
Johnson & Johnson
New Brunswick, NJ

D.H. Hamer
Johnson & Johnson
New Brunswick, N.J.

G. Heinze
Johnson & Johnson
New Brunswick, NJ

MW/122782

3

Anthony A. Herrmann, M.D.
Johnson & Johnson
New Brunswick, NJ

Dr. Gavin Hildick-Smith
Johnson & Johnson
New Brunswick, NJ

Harold Hogan
Johnson & Johnson
New Brunswick, NJ

Aubrey Holcombe
Johnson & Johnson

Dr. John Hopkins
Johnson &Johnson
Skillman, NJ

R. Howland
Johnson & Johnson
New Brunswick, NJ

Dr. Hutchins
Johnson & Johnson
New Brunswick, NJ

J. Jackson
Johnson & Johnson
New Brunswick, NJ

T. Janicek
Johnson & Johnson
New Brunswick, NJ

Sam Jiwrajka
Johnson & Johnson
Royston, GA

James F. Jones
Johnson & Johnson
Royston, GA

MW/122782

4

Jerry Jordan
Johnson & Johnson
Royston, GA

William L. Komianos
Johnson & Johnson
Skillman, NJ

P. Kraft
Johnson & Johnson
New Brunswick, NJ

George Lee
Johnson & Johnson
Skilman, NJ

E. Lojacono
Johnson & Johnson
New Brunswick, NJ

Dr. Geoff Lord
Johnson & Johnson
New Brunswick, NJ

A. Marks
Johnson & Johnson
New Brunswick, NJ

Dr. Marvel
Johnson & Johnson
New Brunswick, NJ

B. McClain
Johnson & Johnson
New Brunswick, NJ

R. McNealy
Johnson & Johnson
New Brunswick, NJ

W. McQuade
Johnson & Johnson
New Brunswick, NJ

MW/122782

5

Marjorie McTernan, CPI
Johnson & Johnson
Skillman, New Jersey

R. D. Merz
Johnson & Johnson
Raritan, NJ

Dr. Arnold Miles
Johnson & Johnson
Raritan, NJ

C. Milner
Johnson & Johnson
New Brunswick, NJ

K. Miluszewski
Johnson & Johnson
New Brunswick, NJ

C. Mitchell
Johnson & Johnson
New Brunswick, NJ

James Molnar
Johnson & Johnson
Skillman, New Jersey

Aileen Mroz
Johnson & Johnson
Skillman, NJ

Jim Murray
Johnson & Johnson
New Brunswick, NJ

J. Norton
Johnson & Johnson
New Brunswick, NJ

Mathews A. Nunes, Ph.D.
Johnson & Johnson
Skillman, N.J.

MW/122782

6

L. Orlando
Johnson & Johnson
New Brunswick, NJ

D. Padgett
Johnson & Johnson
New Brunswick, NJ

Dibakar Panigrahi
Johnson & Johnson
New Brunswick, NJ

R. Piliero
Johnson & Johnson
New Brunswick, NJ

N. A. Poirier
Johnson & Johnson
New Brunswick, NJ

S. Rearstad
Johnson & Johnson
New Brunswick, NJ

Angela Recine
Johnson & Johnson

F.R. Rolle, Ph.D
Johnson & Johnson
New Brunswick, NJ

Lucy Romeo
Johnson & Johnson
New Brunswick, NJ

J. Runnells
Johnson & Johnson
New Brunswick, NJ

R. S. Russell
Johnson & Johnson
New Brunswick, NJ

MW/122782

7

Paul J. Russo
Johnson & Johnson
Skillman, NJ

P. Saunders
Johnson & Johnson
New Brunswick, NJ

Steven Sawchuk, M.D.
Johnson & Johnson

M. Scales
Johnson & Johnson
New Brunswick, NJ

Dr. Jack Schelz
Johnson & Johnson
New Brunswick, NJ 08901

Joseph Schmidt
Johnson & Johnson
Skillman, NJ 08558

E. Scott
Johnson & Johnson
New Brunswick, NJ

Bruce Semple, M.D.
Johnson & Johnson
Raritan, NJ

F. Servas
Johnson & Johnson
New Brunswick, NJ

Dr. Tom H. Shelley
Johnson & Johnson
New Brunswick, NJ

E. Shepherd
Johnson & Johnson
New Brunswick, NJ

MW/122782

8

Dr. William T. Sherman
Johnson & Johnson
Raritan, NJ

J. N. Sivertson
Johnson & Johnson
New Brunswick, NJ

P. Sternenberg
Johnson & Johnson
New Brunswick, NJ

Mary Szemis
Johnson & Johnson
New Brunswick, NJ

L. Toon
Johnson & Johnson
New Brunswick, NJ

D. Vassar
Johnson & Johnson
New Brunswick, NJ

A.S. Vitarius
Johnson & Johnson
New Brunswick, NJ

R. Vora
Johnson & Johnson
New Brunswick, NJ

K. Weber
Johnson & Johnson
New Brunswick, NJ

R. Weeks
Johnson & Johnson
New Brunswick, NJ

J. Williams
Johnson & Johnson
New Brunswick, NJ

MW/122782

II.     The following persons are either current or former employees Windsor Minerals, its predecessors, or successors that may have knowledge of facts related to the above lawsuit.

Karen L. Althouse
Windsor Minerals, Inc.
Windsor, VT

Rose Buzwell
Windsor Mineral, Inc.
Windsor, VT

John Carpenter
Windsor Mineral
Windsor, VT

W. A. Dezaine
Johnson Mine

Emil Esckelson
Eastern Magnesia Talc Company
South Burlington, VT.

Lee Esckilson
Windsor Mineral Company

Stephen P. Falk
Windsor Minerals
Windsor, VT

C. Gallion
Windsor Minerals, Inc.

Helen Grayson
Windsor Mineral Company
Windsor, VT 05089

James R. Guay
Windsor Minerals, Inc
Windsor, VT

Harold G. Hills
Windsor Minerals, Inc.

MW/122782

10

Windsor, Vermont

Joan R. Johnson
Windsor Minerals, Inc.
Windsor, VT

Arthur R. Kimball
Windsor Minerals Company
Windsor, VT

Bruce E. Kobel
Windsor Minerals, Inc.
Windsor, VT

Arthur La Pierre
Windsor Minerals, Inc.
Windsor, VT

H. LeMaster
Eastern Magnesia Talc Company and Windsor Minerals

W. W. Magnus
Eastern Magnesia Talc Co., Inc.
Burlington, VT

E. W. Magnus
Eastern Magnesia Talc

Howard Mailer
Windsor Mineral Company

P. Main
Windsor Minerals, Inc.
Windsor, VT

Edward F. McCarthy
Luzenac America
Englewood, Colorado

Roger N. Miller
Windsor Minerals, Inc.
Windsor, Vermont

MW/122782

11

Roger W. Perkins
Eastern Magnesia Talc Co., Inc.
Burlington, VT

James F. Reilly
Eastern Magnesia Talc Co.
Burlington, VT

Lorenzo Rodizza
Windsor Minerals, Inc.
Windsor, VT

C. P. Smith
Eastern Magnesia Talc Co., Inc.
Burlington, VT

Richard Zazenski
Luzenac America
Three Forks, Montana

Vernon Zeitz
Windsor Mineral Company
Windsor, VT


**III.**   The following persons are either current or former employees of the McCrone Laboratories that may have knowledge of facts related to the above lawsuit.  Some of the following individuals may be designated by Johnson & Johnson as expert witnesses in this case.

Laurie R. Bain
McCrone Environmental Services, Inc.
Westmont, Illinois 60559
Randy Boltin
McCrone Environmental Services
Norcross, GA

John P. Bradley, Ph.D.
McCrone Associates, Inc.
Westmont, Illinois

Don Brooks
McCrone

MW/122782

12

Anthony S. Claveria
McCrone Environmental Services, Inc.
Norcross, GA

Richard M. Ellis, Jr.
Walter C. McCrone Associates, Inc.
Chicago, Illinois 60616

Thomas J. Gore, III
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Gene Grieger
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Ralph J. Hinch, Jr.
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Thomas Kremer
McCrone Environmental Services, Inc.
Norcross, GA

Joseph A. Krewer
McCrone Environmental Services, Inc.
Norcross, GA

Thomas G. Laubenthal
McCrone Environmental Services, Inc.
Norcross, GA

James Martin
Walter C. McCrone Associates, Inc.
Chicago, Illinois

James R. Millette, Ph.D.
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Mark Palenik
Walter C. McCrone Associates, Inc
Chicago, Illinois

MW/122782

13

Deborah P. Polenda
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Carol Rodgers
Walter C. McCrone Associates, Inc.
Chicago, Illinois

Richard Shimps
Walter C. McCrone Associates, Inc.
Chicago, Illinois

E. Kent Sprague
McCrone Environmental Services, Inc.
Norcross, GA

Ian Stewart
Walter C. McCrone Associates, Inc.
Chicago, Illinois

 **IV.** The following persons may have knowledge of facts related to the above lawsuit. Some of the following individuals may be designated by Johnson & Johnson as expert witnesses in this case.

Maryanne G. Boundy
Department of Environmental Health Sciences
Harvard School of Public Health
Boston, MA

Gordon E. Brown
Princeton University
Princeton, NJ

R. L. Buschbom
Systems Department
Battelle, Pacific Northwest Laboratories
Richland, WA

W.T. Caneer
Colorado School of Mines Research Institute
P.O.Box 112
Golden, Colorado 80401

MW/122782        14

G. Gay
Ospedale Valdese, Pomaretto
Torino, Italy

Stephen D. Gettings
The Cosmetic, Toiletry and Fragrance Association
Washington, D.C.

Jerome B. Krause
Colorado School of Mines Research Institute
Golden, Colorado

Arthur M. Langer
Environmental Sciences Laboratory
Mount Sinai School of Medicine of the City University of New York
New York City

Eva Negri
Mario Negri Institute for Pharmacological Research
Milan, Italy

M. G. Pattengill
Mining Division
Colorado School of Mines Research Institute
P.O Box 112
Golden, Colorado 80401

Giorgio Piolatto, M.D.
Turin University
Torino, Italy

G. Pira, Institute of Medical Statistics
University of Milan
Milan, Italy

Dr. F. D. Pooley
University College
Newport Road
Cardiff, Wales

Giovanni Scansetti, M.D.

MW/122782

Turin University
Torino, Italy

Canzio A. Romano, M.D.
Turin University
Torino, Italy

Giovanni F. Rubino, M.D.
Turin University
Torino, Italy

C.R. Watson
Systems Department
Battelle, Pacific Northwest Laboratories
Richland, WA 99352

G.M. Zwicker
Biology Department, Battelle

Defendant reserves the right to amend, supplement and modify this Designation of Fact Witnesses.

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Consumer Companies, Inc.

By _____

Gene M. Williams, Of Counsel
State Bar No. 21535300

Post Office Box 16
Beaumont, Texas  77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

MW/122782

16

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the 22 day of May, 1998.

GENE M. WILLIAMS   *M. Raymond Hatcher*

MW/122782

17

## CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

### DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DEPOSITION ON WRITTEN QUESTIONS AND TO THE COMMISSION OF NELL MCCALLUM & ASSOCIATES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., a Defendant in the above lawsuit, and files this its Objections to Depositions on Written Questions to E. S. Laboratories and to the Commission of Nell McCallum & Associates.

Defendant objects to the appointment of Nell McCallum & Associates by commission to take the deposition on written questions to E.S. Laboratories because she is not authorized under the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 188. In addition, Defendant makes the following objections to the depositions on written questions:

MW/83051

3.      If you answered "yes" to Questions No. 2, please provide the complete legal name, last known address, and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

4.      If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

5.      Please produce any and all documents responsive to Questions 2-4.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

7.      If you answered "yes" to Question No. 6, what were your findings regarding the fibrous and asbestiform material content?

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

8.      If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

9.      Please produce any and all documents responsive to Question Nos. 6-8.

MW/83051

-2-

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

11.　　If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

12.　　Please produce any and all documents responsive to Questions Nos. 11 & 12.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

13.　　Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates the requisites of Tex. R. Civ. P. 208. Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

MW/83051

-3-

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas  77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the ____ day of _____ , 1998.

_____
Gene M. Williams  M. Raymond Hatcher

MW/83051

-4-

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DEPOSITION
## ON WRITTEN QUESTIONS AND TO THE COMMISSION
## OF NELL MCCALLUM & ASSOCIATES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., a Defendant in the above

lawsuit, and files this its Objections to Depositions on Written Questions to McCrone Associates and

to the Commission of Nell McCallum & Associates.

Defendant objects to the appointment of Nell McCallum & Associates by commission to take

the deposition on written questions to McCrone Associates because she is not authorized under the

Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 188. In addition, Defendant makes the following

objections to the depositions on written questions:

MW/82975

3.      If you answered "yes" to Questions No. 2, please provide the complete legal name, last known address, and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

4.      If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence.  Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

5.      Please produce any and all documents responsive to Questions 2-4.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208.  Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

7.      If you answered "yes" to Question No. 6, what were your findings regarding the fibrous and asbestiform material content?

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence.  Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

8.      If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

9.      Please produce any and all documents responsive to Question Nos. 6-8.

MW/82975                                    -2-

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

11.     If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

12.     Please produce any and all documents responsive to Questions Nos. 11 & 12.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

13.     Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates the requisites of Tex. R. Civ. P. 208. Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

MW/82975

Respectfully submitted,

MEHAFFY & WEBER
Attorneys    for    Johnson    &    Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____

Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas  77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has  been forwarded  to all counsel of record on this the _____day of _June_ , 1998.

_____
Gene M. Williams  M. Raymond Hatcher

MW/82975                          -4-

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

**DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DEPOSITION
ON WRITTEN QUESTIONS AND TO THE COMMISSION
OF NELL MCCALLUM & ASSOCIATES**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., a Defendant in the above

lawsuit, and files this its Objections to Depositions on Written Questions to Colorado School of

Mines Research Institute and to the Commission of Nell McCallum & Associates.

Defendant objects to the appointment of Nell McCallum & Associates by commission to take

the deposition on written questions to Colorado School of Mines Research Institute because she is

not authorized under the Texas Rules of Civil Procedure.  *See* Tex. R. Civ. P. 188.  In addition,

Defendant makes the following objections to the depositions on written questions:

MW/83053

3.      If you answered "yes" to Questions No. 2, please provide the complete legal name, last known address, and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

4.      If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

5.      Please produce any and all documents responsive to Questions 2-4.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

7.      If you answered "yes" to Question No. 6, what were your findings regarding the fiberous and asbestiform material content?

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

8.      If you answered "yes" to Question No. 6, please provide the complete legal name, last known address and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

9.      Please produce any and all documents responsive to Question Nos. 6-8.

MW/83053

-2-

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

11.     If you answered "yes" to Question No. 10, please provide the complete legal name, last known address and phone number of the person who surveyed the mines.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

12.     Please produce any and all documents responsive to Questions Nos. 11 & 12.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208. Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

13.     Please produce any and all documents in your possession pertaining to Johnson & Johnson baby powder or talc products.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. Furthermore, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates the requisites of Tex. R. Civ. P. 208. Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions. Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson
Professional, Inc. and McNeil PPC, Inc. f/k/a
Johnson-Johnson Baby Products

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas 77704
Telephone:  409/835-5011
Telecopier: 409/835-5729

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the _____ day of _____ , 1998.

_____
Gene M. Williams   M. Raymond Hatcher

MW/83053                                  -4-

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

**DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DEPOSITION
ON WRITTEN QUESTIONS AND TO THE COMMISSION
OF NELL MCCALLUM & ASSOCIATES**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc., a Defendant in the above

lawsuit, and files this its Objections to Depositions on Written Questions to Laurie R. Bain, McCrone

Environmental Services Inc., and to the Commission of Nell McCallum & Associates.

Defendant objects to the appointment of Nell McCallum & Associates by commission to take

the deposition on written questions to Laurie R. Bain, McCrone Environmental Services Inc., because

she is not authorized under the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 188.  In addition,

Defendant makes the following objections to the depositions on written questions:

MW/83055

3.      If you answered "yes" to Questions No. 2, please provide the complete legal name, last known address, and phone number of the person who performed the analysis.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, assumes facts not in evidence, and calls for speculation.**

4.      If you answered "yes" to Question No. 2, please state if you found the presence or absence of asbestiform minerals.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence.  Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

5.      Please produce any and all documents responsive to Questions 2-4.

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence. In addition, the question is over broad and unintelligible and fails to give witness fair notice of what information or documents are being requested and violates Tex. R. Civ. P. 208.  Furthermore, Plaintiff's request violates Tex. R. Civ. P. 201 in that no subpoena duces tecum was attached to the deposition on written questions.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

7.      If you answered "yes" to Question No. 6, what were your findings regarding the fiberous and asbestiform material content?

**OBJECTION: Defendant objects to the above question as vague, ambiguous, and assumes facts not in evidence.  Furthermore, the question requires witness to speculate and provide an expert opinion that witness is not qualified to express.  Finally, the information requested from the witness is subject to proprietary and trade secret privileges of Defendant.**

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Johnson & Johnson Professional, Inc. and McNeil PPC, Inc. f/k/a Johnson-Johnson Baby Products

By _____ /MRH

Gene M. Williams, Of Counsel
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520

Post Office Box 16
Beaumont, Texas 77704
Telephone: 409/835-5011
Telecopier: 409/835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the _1ONE_ day of _June_, 1998.

_____
Gene M. Williams  M. Raymond Hatcher

MW/83055                                        -3-

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

June 11, 1998

<u>Via Hand-Delivery</u>

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find Plaintiffs' Objections to
Defendant, Johnson & Johnson Consumer Company, Inc.'s, Notice of Oral Deposition with
Subpoena Duces Tecum.

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/db

Enclosure

cc:    Mr. Roger Worthington
Mr. Gene Williams

'98 JUN 12 P4:26

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084



CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

**PLAINTIFFS' OBJECTIONS TO DEFENDANT,
JOHNSON & JOHNSON CONSUMER COMPANY, INC.'s
NOTICE OF ORAL DEPOSITION WITH SUBPOEANA DUCES TECUM**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs and file these objections to Defendant, Johnson & Johnson Consumer Company, Inc.'s Notice of Oral Deposition with Subpoena Duces Tecum, and in support thereof would respectfully show unto the Court as follows:

Defendant has noticed the deposition of Plaintiffs' retained expert, Dr. Jerrold Abraham for Saturday, June 20, 1998. Attached to Defendant's Notice of Oral Deposition is a Subpoena Duces Tecum, a copy of which is attached to this motion as Exhibit A. Pursuant to the Texas Rules of Civil Procedure, several items on the subpoena are objectionable Accordingly, Plaintiffs lodge the following objections to aspects of the subpoena:

(6)     Objection. Overbroad and outside the scope of discovery pursuant to the Texas Rules of Civil Procedure. In addition, the request violates the consulting expert privilege. Moreover, the request is not relevant, nor reasonably calculated to lead to the discovery of relevant, admissible evidence.

(8)     Objection. This request goes beyond the scope of the Texas Rules of Civil Procedure in asking the witness to reduce opinions to tangible form without a Court order.

(10)    Objection. This request seeks to have the witness create a document which is not required by the Texas Rules of Civil Procedure. Furthermore, the rules only require that material reviewed by testifying expert become discoverable and not necessarily the name and address of any consulting expert who authored material reviewed by a testifying expert.

(11)    Objection. Outside the scope of the Texas Rules of Civil Procedure. In addition, this request seeks to violate the consulting expert privilege and the attorney work product privilege.

(14)    Objection. Over broad and outside the scope of the Texas Rules of Civil Procedure. Plaintiffs' experts are not required to conduct research for the defendant.

(15)   Objection.  This request is anticipatory and, therefore, not proper.  Subject to and without waiving this objection, Plaintiffs will produce any of the requested documents authored or formulated by the witness which are currently in existence.

(18)   Objection.  Over broad and outside the scope of the Texas Rules of Civil Procedure. In addition, this request is not relevant, nor reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is meant purely to harass and is improper.

(19)   Objection.  Over broad and outside the scope of the Texas Rules of Civil Procedure. Plaintiffs' witnesses are not required to create documents for the defendant.

(20)   Objection.  Over broad, unduly burdensome and outside the scope of the Texas Rules of Civil Procedure.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701
Ph. #: (409) 838-6410                    By: _____
Fax #: (409) 838-6084                              Matthew R. Willis
                                                              TBA# 21648600

ATTORNEY FOR PLAINTIFF

Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 11TH day of _June_____, 1998.

_____
Matthew R. Willis

JOHN S. APPLEMAN
DISTRICT CLERK

'98 JUN 12 P 4:27

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

d:\dmword\depos\coker-pls. obj. to j&rj nodwsdt.doc



NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS

136TH DISTRICT COURT |

## MOTION TO QUASH

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc. and files this its Motion to Quash a notice of deposition issued by the plaintiffs showing unto the Court as follows:

I.

On November 24, 1998, the plaintiffs issued a deposition notice for a Johnson & Johnson employee knowledgeable about whether or not it is possible to ascertain if a metal can has been sealed or opened. (See attached Exhibit A). This deposition was noticed for December 3, 1998.

II.

This notice of deposition is inappropriate and subject to a motion to quash. On October 1, 1998, the Court held a hearing on Defendant's Motion for Summary Judgment. At the conclusion of that hearing, the Court allowed the plaintiffs a continuance of the hearing granting the plaintiffs

MW/146826

until December 31, 1998 to respond to Defendant's Motion for Summary Judgment. Further, the Court specifically ordered in that hearing that "the plaintiff may not engage in additional discovery, either documentary or deposition as to the defendant during the pendency of this continuance." (See attached Exhibit B). Therefore, plaintiffs' November 23, 1998 Notice of Oral Deposition violates the Court's preexisting order.

III.

Further, defendant cannot comply with the scope of the notice. The plaintiffs seem to attempt to modify the burden of proof in requesting the defendant to propose a witness to give some apparent "chain of custody" testimony relative to cans of baby powder without reference to the specific age of the cans, the location of the cans or the chain of custody of those cans. Further, the plaintiffs seem to request someone to give an opinion as to whether or not such cans are sealed or in their original condition.

IV.

Chain of custody issues and other evidentiary issues are a burden of plaintiff in a products liability case such as this. It would be inappropriate to allow the plaintiffs to effectively modify the burden of proof such as is requested.

WHEREFORE, PREMISES CONSIDERED, defendant prays that the Court in all things quash the plaintiffs' November 23, 1998 Notice of Oral Deposition.

MW/146826

-2-

Respectfully submitted,

MEHAFFY & WEBER, P.C.
Attorneys for Johnson & Johnson Consumer
Companies, Inc.


By: _____
      Gene M. Williams, Of Counsel
      State Bar No. 21535300

Post Office Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5177

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the _1st_ day of _____, 1998.


_____
GENE M. WILLIAMS

MW/146826                                    -3-

11/24/98   16:17   ☎409 838 6084          HERSCHEL HOBSON  →→→  MEH WEB          ☑003/004

CAUSE NO. D-157,746

| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

PLAINTIFFS' 11/23/98 NOTICE OF ORAL DEPOSITION

TO:   Defendant, JOHNSON & JOHNSON PROFESSIONAL INC., by and through its attorney of record: Mr. Gene Williams, Mehaffy & Weber, PO Box 16, Beaumont, TX 77704.

PLEASE TAKE NOTICE that the Plaintiffs in the above-referenced cause of action will take the oral/video deposition of the person named below at the time and place designated in this notice pursuant to the Texas Rules of Civil Procedure.

WITNESS:      Person(s) knowledgeable of the age of Johnson & Johnson Baby Powder metal cans and/or whether or not Johnson & Johnson Baby Powder metal cans were or were not sealed and/or whether or not it is possible to ascertain if a metal can has been opened.

DATE:         December 3, 1998, continuing from day to day until completed –

TIME:         10:00 a.m.

PLACE:        Mehaffy & Weber
              2615 Calder
              Beaumont, TX 77704

COURT REPORTER:   Irene Meguess
                  Nell McCallum & Associates, Inc.
                  2615 Calder, Suite 111
                  Beaumont, TX 77702

You are invited to appear and cross-examine the witness.

The Law Offices Of Herschel L. Hobson                 Respectfully submitted,
2190 Harrison
Beaumont, Texas 77701
Ph. #: (409) 838-6410                   By: _____
Fax #: (409) 838-6084                              Herschel L. Hobson
                                                   TBA# 09744600

ATTORNEY FOR PLAINTIFFS

2



DEFENDANT'S EXHIBIT

11/24/98   16:17   ☎409 838 6084          HERSCHEL HOBSON   →→→ MEH WEB          ☑004/004

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 24th day of November, 1998.

Herschel L. Hobson

d:\dbword\depos\coker-nod, jfsj.doc

3

MON 12:29 FAX 713 655 0222
/05/98   MON 10:57 FAX 1 409 835 5177     MEHAFFY & WEBER     →→→ M & W BEAUMONT 1   ☑002
MEHAFFY & WEBER                                               ☑002
10/02/98   15:33   ☎409 838 6084     HERSCHEL HOBSON   →→→ MEH WEB   ☑002/003
10/01/98 13:18 To:Herschel Hobson     Fronttone H. Williams     4998324971     Page 2/4

A157746

NO. B-157,746

| | |
|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § IN THE DISTRICT COURT OF |
| VS. | § § § § |
| HILL, THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § JEFFERSON COUNTY, TEXAS |
| | § 136TH DISTRICT COURT |

## ORDER

CAME ON TO BE HEARD on October 1, 1998 the Motion for Summary Judgment by the defendant Johnson & Johnson Consumer Companies, Inc. and the Motion for Continuance of the plaintiff. After hearing argument of counsel and reviewing the papers, the Court finds that the Motion for Continuance shall be granted in that the plaintiff has until December 31, 1998 to file her final and full response to defendant's Motion for Summary Judgment. No other supplementations or responses shall be allowed after that date absent further orders of the Court. Further, the Court finds that the plaintiff may not engage in additional discovery, either documentary or deposition as to the defendant during the pendency of this continuance.

SIGNED this the 7th day of October 1998.

_____
JUDGE PRESIDING

APPROVED AS TO FORM AND CONTENT:

MSW139390

FILED

at 10:45 o'clock A M.

OCT 08 1998

JOHN C. APPLEMAN
CLERK, DIST. COURT, JEFFERSON CO., TEXAS

DEFENDANT'S EXHIBIT B

05/93  MON 12:25 FAX 713 655 0222       MEHAFFY & WEBER        →→→ M & W BEAUMONT 1    ☒003
J/08/96  MON 10:57 FAX 1 408 835 5177    MEHAFFY & WEBER                              ☒003
10/02/96    15:33    ☎409 835 8054       HERSCHEL HOBSON   →→ WEB WEB                 ☒003/003
18/01/96 19:19  To:Herschel Hobson       From:Gene M. Williams      4099324671       Page 4/6

MEHAFFY & WEBER, P.C.
Attorneys for Johnson & Johnson Consumer Companies, Inc.

By: _____
    Gene M. Williams

THE LAW OFFICES OF HERSCHEL L. HOBSON
Attorneys for Plaintiffs

By: _____  by permission
    Herschel L. Hobson

MW/13X0X0                              -2-

NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS 136TH DISTRICT COURT |

**ORDER**

ON THIS DAY there came on to be heard Defendant's Motion to Quash and the Court, having considered the motion, is of the opinion that it is well taken and should be GRANTED.  It is, therefore,

ORDERED, ADJUDGED and DECREED that Defendant's Motion to Quash is in all things GRANTED.

SIGNED this the 4th day of December, 1998.

_____
JUDGE PRESIDING

FILED
at 8:30 o'clock A M.

DEC 04 1998

JOHN S. APPLEMAN
CLERK DISTRICT COURT JEFFERSON CO., TEXAS
BY _____
DEPUTY

MW/146826

**PHILLIPS & AKERS**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TEXAS 77027
(713) 552-9595
FAX (713) 877-2531

BROCK C. AKERS

BOARD CERTIFIED PERSONAL INJURY
AND CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
BOARD CERTIFIED CIVIL TRIAL ADVOCATE
BY THE NATIONAL BOARD OF TRIAL ADVOCACY

DIRECT DIAL
(713) 552-0232
E-MAIL
Brock__Akers@panda-law.com

October 16, 1997

VIA FEDERAL EXPRESS

John S. Appleman, District Clerk
Jefferson County Courthouse
P.O. Box 3707
Beaumont, Texas  77704-3707

RE:     No. D157746; Darlene Coker and spouse, Roy Coker v. Bill Thames Pharmacy, Inc.,
         et al; In the 136th Judicial District Court of Jefferson County, Texas

Dear Mr. Appleman:

Enclosed for filing among the papers of the above-entitled and numbered cause is Defendants'
Original Answer and Defendants' Application and Demand for Trial by Jury, together with our firm's
check in the amount of $30.00 for jury fee.  Please date and file stamp the extra copy of this letter and
return in the envelope provided.

By copy of this letter, a copy of said documents have been forwarded to all counsel of record.

Thank you for your assistance.

Sincerely,

Brock C. Akers

BCA:pdg
7715.069

Enclosure(s)

cc:    Herschel L. Hobson
        The Law Offices of Herschel L. Hobson
        2190 Harrison
        Beaumont, Texas   77701
        (Attorney for Plaintiffs)
        CM-RRR #P 241 211 858

        Joseph C. Blanks
        P. O. Box 3172
        Beaumont, Texas   77704
        (Attorney for Plaintiffs)
        CM-RRR #P 241 211 860

NO. D157746

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| -VS- | § | |
| | § | |
| BILL THAMES PHARMACY INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY | § | |
| f/k/a S.W.S. PHARMACY INC. | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC. | § | |
| GIANT FOOD DISCOUNT CITY, INC. | § | |
| HENKE & PILLOT, INC. HSTN. INC. | § | |
| f/k/a J&J BABY PRODUCTS | § | |
| JOHNSON & JOHNSON PROFESSIONAL | § | |
| LOVOI AND SONS PHARMACIES, INC. | § | |
| MCNEIL PPC INC. | § | |
| Products | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANTS' ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendants, THE KROGER CO. and HENKE & PILLOT, INC. HOUSTON., in the above-styled and numbered cause and files this their Original Answer and would show unto the Court the following:

I.

Subject to such stipulations and admissions as may hereafter be made, these Defendants assert a general denial as is authorized by Rule 92 of the Texas Rules of Civil Procedure, and Defendants respectfully request that Plaintiffs be required to prove the charges and allegations against these Defendant by a preponderance of the evidence as is required by the constitution and laws of the State of Texas.

II.

Defendants formally make demand and application for a jury trial.

III.

That Defendants respectfully reserves the right at this time to amend this original answer to the Plaintiffs' allegations after said Defendants have had the opportunity to more closely investigate these claims, as is the right and privilege of said Defendants under the Rules of Civil Procedure and the laws of the State of Texas.

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiffs take nothing by reason of this suit, that Defendants go hence without day, for costs, and for general relief.

Respectfully submitted,

PHILLIPS & AKERS

By: _____
    Brock C. Akers
    State Bar No. 00953250
    3200 Phoenix Tower
    3200 Southwest Freeway
    Houston, Texas 77027
    (713) 552-9595
    FAX #(713) 552-0231
    ATTORNEY FOR DEFENDANTS,
    THE KROGER CO. and HENKE & PILLOT,
    INC. HOUSTON

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Defendants' Original Answer has been served in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 16th day of October, 1997.

_____
Brock C. Akers

NO. D157746

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| -VS- | § | |
| | § | |
| BILL THAMES PHARMACY INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY | § | |
| f/k/a S.W.S. PHARMACY INC. | § | |
| FERTITTAS FINER FOODS, INC. | § | JEFFERSON COUNTY, TEXAS |
| GIANT FOOD DISCOUNT CITY, INC. | § | |
| HENKE & PILLOT, INC. HSTN. INC. | § | |
| f/k/a J&J BABY PRODUCTS | § | |
| JOHNSON & JOHNSON PROFESSIONAL | § | |
| LOVOI AND SONS PHARMACIES, INC. | § | |
| MCNEIL PPC INC. | § | |
| Products | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## APPLICATION AND DEMAND FOR TRIAL BY JURY

Demand for trial by jury is hereby made by Defendants, THE KROGER CO. and HENKE &

PILLOT, INC. HOUSTON, and the necessary fee accompanies this request.

Respectfully submitted,

PHILLIPS & AKERS

BY: _____

Brock C. Akers
SBOT #: 00953250
3200 Phoenix Tower
3200 Southwest Freeway
Houston, Texas  77027
Telephone #(713) 552-9595
ATTORNEY FOR DEFENDANTS,
THE KROGER CO. and HENKE & PILLOT,
INC. HOUSTON

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Defendants' Application and Demand for Trial by Jury has been served in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 16th day of October, 1997.

Brock C. Akers

J. CARLISLE DEHAY, JR.
(1922 - 1991)

GARY D. ELLISTON
DAVID W. CROWE
MEL D. BAILEY
ERIC D. WEWERS
CHRISTOPHER P. MANNING
PAUL E. HAMILTON
KATHRYN HERMES
W. SCOTT BERRY

# DeHay & Elliston, L.L.P.

ATTORNEYS AND COUNSELORS
3500 NATIONSBANK PLAZA
901 MAIN STREET
DALLAS, TEXAS 75202-3736
(214) 210-2400
FACSIMILE (214) 210-2500

215 ORLEANS ST.
BEAUMONT, TEXAS 77701
(409) 833-0900
FACSIMILE (409) 833-0964

JILL G. ADAMS
KIRSTEN C. ALESSIO
JOHN W. ARNOLD
WILLIAM C. ARNOLD
STUART G. BROOKS
SUSAN CHAPMAN
RUSSELL J. DEPALMA
BRENT M. KARREN
LAURA E. KUGLER
ANTHONY S. MILLER
C. THOMAS MULLIGAN
LILY C. MYERS
AMY E. NETTLE
TODD D. OGDEN
REX RAMOS
TODD H. RAMSEY
H. TRACY RICHARDSON, III
DAVID L. RED
KYLE C. STEELE
TODD J. SUDDLESON
STEVEN RAY THOMAS
TANDY V. WELBORN

WRITER'S DIRECT DIAL
(214) 210-2404

October 31, 1997

**Via Certified Mail**

136th District Court
Jefferson County
1001 Pearl St.
Beaumont, Texas 77701

      Re:    Darlene Coker, and spouse Roy Coker vs. Bill Thames Pharmacy, Inc., et al; Cause No. D157746

Dear Clerk:

Enclosed for filing please find Defendant Giant Food Discount City, Inc.'s Motion to Transfer Venue and, Subject Thereto, Special Exceptions and Original Answer. Please return a file-marked copy for my records.

Thank you for your assistance in this matter. If you have any questions concerning this matter, please do not hesitate to contact me.

Sincerely,

Eric Wewers

EW/rc
Enclosure
cc: Mr. Herschell L. Hobson (via certified mail)

CAUSE NO. D157746

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT |
| ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
|   f/k/a Johnson-Johnson Baby | § | |
|   f/k/a S.W.S. Pharmacy Inc. | § | JEFFERSON COUNTY, TEXAS |
| FERITTITAS FINER FOODS, INC. | § | |
| GIANT FOOD DISCOUNT CITY, INC. | § | |
| HENKE & PILLOT, INC. HSTN. | § | |
|   Inc. f/k/a J&J Baby Products | § | |
| JOHNSON & JOHNSON PROFESSIONAL | § | |
| LOVOI AND SONS PHARMACIES, INC. | § | |
| MCNEIL PPC INC. | § | |
|   Products | § | |
| THE KROGER COMPANY | § | 136TH DISTRICT COURT |

**FILED**

at _____ o'clock _____ M.

**NOV 0 3 1997**

JOHN S. APPLEMAN
CLERK, DISTRICT COURT OF JEFFERSON CO., TEXAS
BY _____
         DEPUTY

## DEFENDANT GIANT FOOD DISCOUNT CITY, INC.'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, SPECIAL EXCEPTIONS AND ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW,** GIANT FOOD DISCOUNT CITY, INC., a Defendant in the above-styled and numbered cause (hereinafter referred to as "Defendant"), and makes and files this its Motion to Transfer Venue and, Subject Thereto, Special Exceptions and Original Answer to Plaintiffs' Original Petition and would respectfully show the Court and jury, which it hereby demands, the following:

### I. RULE 86 MOTION TO TRANSFER VENUE

Defendant, not a natural person, objects to venue in Jefferson County, Texas on the ground that, pursuant to Tex.R.Civ.P.86 and V.T.C.A. Civil Practice and Remedies Code §15.001 *et.*

*seq.*, Jefferson County is not the proper venue for this lawsuit. Defendant requests a transfer of this lawsuit to Harris County, Texas, the location of its principal office. *See* Tex. Civ. Pract. & Rem. Code §15.002(a)(3).

Paragraph 2 of Plalintiffs' Original Petition contains their only venue allegation: "[v]enue is proper because a significant and substantial amount of the bad acts complained of occurred in Jefferson County." To the extent this venue allegation comports with Tex. Civ. Pract. & Rem. Code § 15.002(a)(1), Defendant specifically denies same to require Plaintiffs to make a prima facie case that venue is proper in Jefferson County, Texas.

Furthermore, because this is a multi-defendant case, Plaintiffs must adhere to the requirements of V.T.C.A. Civil Practice and Remedies Code §15.005. Under this statute, in order to maintain venue against Defendant, plaintiffs must first properly establish venue against at least one other defendant ("venue defendant"), then prove that the injuries allegedly caused by Defendant arose from the "same transaction, occurrence, or series of transactions or occurrences" as those allegedly caused by the venue defendant. Plaintiffs' Original Petition is devoid of any allegations against Defendant tending to support §15.005 multi-defendant venue. To the extent such allegations may be included in Plaintiffs' Original Petition, they are specifically denied to require Plaintiff to make a prima facie case that multi-defendant venue against Defendant is proper in Jefferson County, Texas.

In view of the foregoing, Plaintiffs have failed to establish its case against Defendant may be maintained in Jefferson County, Texas. Accordingly, venue should be transferred to Harris County, Texas, the location of Defendant's principal office. *See* Tex. Civ. Pract. & Rem. Code §15.002(a)(3).

## II. SPECIAL EXCEPTIONS

1) Defendant specially excepts to Plaintiffs' venue allegation as set forth in paragraph 2 of their Original Petition as such allegations are vague and do not adequately inform Defendant of whether it may be subject to suit in Jefferson County, Texas under either Tex. Civ. Pract. & Rem. Code §15.002(a)(1) or §15.005.

2) Defendant specially excepts to Plaintiffs' use of the terms "talc", "talc products", "poisonous talc", and "airborne talc components" in paragraphs 4, 5, and 6 of Plaintiff's Original Petition. Such terms fail to provide adequate notice regarding which of Defendant's products, if any, allegedly caused Plaintiffs' damages.

## III. ORIGINAL ANSWER

1) Pursuant to Tex.R.Civ. P. 92, Defendant generally denies each and every, all and singular, the material allegations contained in Plaintiffs' Original Petition and demands strict proof thereof.

2) Plaintiffs' Petition fails to state a cause of action upon which relief can be granted.

3) Defendant objects to the Court's exercise of subject matter jurisdiction over the cause of action alleged by Plaintiffs. Furthermore, Plaintiffs' filing of this case violates the Texas Forum Non Conveniens statute, Texas Civil Practice and Remedies Code § 71.052.

4) Defendant denies that Plaintiffs and/or Plaintiffs' decedent sustained injuries as a result of contact with or use of any product for which this Defendant is responsible.

5) Plaintiffs are barred from recovery herein by the applicable statutes of limitations and/or statutes of repose.

6) Plaintiffs are barred from recovery herein by the doctrine of laches.

7) Plaintiffs are barred from recovery herein by the doctrine of assumption of risk (volenti non fit injuria).

8) Plaintiffs are barred from recovery herein by the doctrine of misuse or improper use which proximately caused or proximately contributed to cause the injuries about which Plaintiffs complain herein.

9) Plaintiffs are barred from recovery herein by the doctrines of comparative negligence, contributory negligence, comparative responsibility and/or comparative causation.

10) Defendant alleges that any exposure which Plaintiff might have had to any products for which this Defendant is responsible was "de minimus" and thus not the cause of the injuries about which Plaintiff complains of herein.

11) Defendant alleges that any injuries and damages alleged by Plaintiffs were solely caused by the acts and omissions of others over whom this Defendant had no supervision or control, and there was no damage from the conduct of this Defendant and no substantial damages by any other Defendant.

12) Defendant alleges that Plaintiffs and/or Plaintiffs' employers had knowledge of the products used and the risks incident thereto and therefore this Defendant breached no duty owing to them.

13) Defendant alleges that the situation about which Plaintiffs complain herein arose out of transitory conditions arising out of the very work of Plaintiffs and/or Plaintiffs' decedent and therefore this Defendant breached no duty and has no liability.

14) Defendant alleges that the condition about which Plaintiffs complain is due to causes other than exposure to products for which this Defendant is responsible.

15) Defendant alleges that Plaintiffs have no claim based upon allegations of strict liability arising from any alleged exposure to products for which this Defendant is responsible prior to June 6, 1967, because no cause of action existed in Texas based upon strict liability in tort for exposure to a product, since the Supreme Court of Texas in McKisson vs. Sales Affiliates, Inc., 416 S.W.2d 787, held that prior to 1967, it had refused to extend "strict liability" to any manufacturer other than the manufacturers and packagers of food products for human consumption, and the rule of 402A was adopted for the first time in June, 1967. The Supreme Court of Texas would not apply the rule of strict liability retroactively to cover exposures prior to June, 1967; therefore this Defendant pleads that no recovery can be had upon the theory of strict liability for exposures, if any, prior to June 6, 1967. Further, the application of strict liability on a retroactive basis would be violative of Article I, §16, of the Texas Constitution.

16) Defendant alleges that Plaintiffs have no claim based upon allegations of strict liability arising from any alleged exposure to any products for which this Defendant is responsible after June 6, 1967.

17) Defendant alleges that Plaintiffs' and/or Plaintiffs' decedent's injuries, if any, were pre-existing and/or not the result of any contact with any products for which this Defendant is responsible.

18) This Defendant alleges Plaintiffs' and/or Plaintiffs' decedent's injuries, if any, were caused in whole or in part by Plaintiffs' and/or Plaintiffs' decedent's history of smoking and failure to stop smoking and Plaintiffs and/or Plaintiffs' decedent were negligent and assumed any risks related to such smoking. Plaintiffs' claims, therefore, are barred by the doctrines of comparative fault, comparative responsibility, contributory negligence and/or comparative causation.

19) Defendant alleges that Plaintiffs' action against this Defendant for injuries sustained, if any, from exposure to any products for which this Defendant is responsible while employed by this Defendant is barred by the exclusive remedy provision of the Workers Compensation Act.

20) Defendant adopts by reference each defense not hereinabove alleged, if any, that may be alleged in any pleading by any other Defendant or Third-Party Defendant in this action, heretofore or hereafter filed.

21) Defendant alleges that it is entitled to indemnity and/or contribution from each of the other Defendants and/or a credit or pro rata reduction for any amounts paid by settling Defendants pursuant to Chapter 32 and Chapter 33 of the Texas Civil Practice and Remedies Code, and/or the doctrine of comparative fault.

22) Defendant alleges that Plaintiffs' damages, if any, were caused by negligent acts or omissions or breach of warranty of third parties or other Defendants and/or exposure to certain products manufactured or distributed by said third parties or Defendants, and, under the Supreme Court of Texas opinion in Duncan v. Cessna Aircraft Company II, this Defendant is entitled to a comparative apportionment of fault, if any, as to the other Defendants and Cross-Defendants and/or third parties and is entitled to a judgment against them herein for contribution and/or indemnity or a percentage reduction in accordance with the apportionment of fault.

23) Defendant is not liable to Plaintiffs because the products to which Plaintiffs and/or Plaintiffs' decedent were allegedly exposed were supplied in accordance with specifications and/or regulations of the United States Government and Defendant claims the benefit of the "Government Contractor Defense" announced in Yearly v. W. A. Ross Construction Co., 304 U.S. 18 (1940) and in Re Agent Orange Liability Litigation, 534 F. Supp. 1046 (E.D.N.Y., 1982).

24) Defendant alleges, in the alternative, that the Plaintiffs' claim of injury and damage, if any, was the result of an unavoidable accident or occurrence.

25) Defendant alleges that exemplary damages are improper and that an award of punitive damages would amount to excessive punishment in violation of due process of law and in violation of the Constitutions of the United States, the State of Texas, any other state which has the most significant relationship to this action, and of the common law.

26) Defendant alleges that any alleged defects in its product, if any, were beyond the scientific and medical knowledge available at the time of manufacturing, and the state-of-the-art prevented this Defendant from knowing any defect.

27) Defendant alleges that the products for which this Defendant is responsible were at all times reasonably fit and suitable for the purposes for which they were sold and this Defendant denies that such products were in anywise defective for the use for which they were sold.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that upon trial hereof, Plaintiffs recover nothing as against it, and for such other and further relief to which it may show itself justly entitled.

Respectfully submitted,

DeHAY & ELLISTON, L.L.P.
3500 NationsBank Plaza
901 Main Street
Dallas, Texas  75202-3736
Telephone: (214) 210-2400
Telefax:  (214) 210-2500


GARY D. ELLISTON
State Bar No. 06584700
ERIC D. WEWERS
State Bar No. 21236650

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been forwarded to counsel of record for Plaintiffs herein, Mr. Herschell L. Hobson, LAW OFFICES OF HERSCHELL L. HOBSON, 2190 Harrison, Beaumont, Texas 77701, via certified mail, return receipt requested, this ___31___ day of __October__, 1997.


ERIC D. WEWERS

F:\USERS\TEMP\GNTFOOD.EDW.1

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

'97   NOV 12   A8:49

November 11, 1997

<u>Via Hand-Delivery</u>

John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas  77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Appleman:

Enclosed for filing in the above-referenced case, please find Affidavit of Return of
Service by Authorized Person, along with executed citation as to defendant, Johnson
and Johnson Professional Inc.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

THE STATE OF TEXAS
136th JUDICIAL DISTRICT COURT
JEFFERSON COUNTY, TEXAS

| Darlene Coker et vir | § | |
|---|---|---|
| VS. | § | No D-0157746 |
| Bill Thames Pharmacy Inc et al | § | |

<u>AFFIDAVIT OF RETURN OF SERVICE BY
AUTHORIZED PERSON</u>

STATE OF TEXAS

COUNTY OF JEFFERSON

BEFORE ME, the undersigned authority, on this day personally appeared

KATHY VIATOR who, being sworn, did depose as follows:

"My name is KATHY VIATOR. I am over 18 years of age, of sound mind and fully

qualified to make this affidavit, and have never been convicted of a crime. I have personal

knowledge of the facts stated below.

"Attached is the following true and correct copy of the citation which I served via Certified

Mail, Return Receipt Requested, on the following Defendant:

Johnson and Johnson Professional Inc..........................................................Exhibit A

"Further affiant sayeth not."



KATHERINE R. VIATOR

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this

___7___ day of ___November___, 19 _97_, to certify which witness my hand and

seal of office.

NOTARY PUBLIC

RENEE' ROBERTS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 02-10-98

CAUSE NO. D-0157746

| | | |
|---|---|---|
| DARLENE COKER AND | § | IN THE DISTRICT COURT OF |
| SPOUSE, ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY, INC.; | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | |
| f/k/a S.W.S. Pharmacy, Inc.; | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC.; | § | |
| GIANT FOOD DISCOUNT CITY, | § | |
| INC., HENKE & PILLOT. | § | |
| HSTN., INC. f/k/a J&J Baby | § | |
| Products; JOHNSON & JOHNSON | § | |
| PROFESSIONAL; LOVOI AND | § | |
| SONS PHARMACIES, INC.; | § | |
| McNEIL PPC, INC. Products; | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

### DEFENDANT'S FIRST SET OF WRITTEN
### INTERROGATORIES TO PLAINTIFF DARLENE COKER

TO:  Plaintiff, Darlene Coker, by and through your Attorney of Record, Herschel L. Hobson, 2190 Harrison, Beaumont, Texas 77701

Pursuant to Rules 166b and 168, Texas Rules of Civil Procedure, defendant, the entity sued under the name McNEIL PPC, INC. f/k/a Johnson-Johnson Baby Products, submits the following interrogatories to you to be answered separately and fully in writing, under oath, within thirty-one (31) days after service of these interrogatories, all as provided in said rules.

---

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 1
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

Respectfully submitted,

FOWLER, WILES & KEITH, L.L.P.

By: _William Dixon Wiles_
     William Dixon Wiles
     State Bar No. 21467800

     1900 Cityplace Center
     2711 N. Haskell
     Dallas, Texas 75204-2944
     (214) 841-3000
     (214) 841-3099 - Telecopier

     Attorney for Defendant,
     McNeil, PPC, Inc.

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Defendant's First Set of Written Interrogatories to Plaintiff Darlene Coker was forwarded to plaintiffs' counsel by Certified Mail, Return Receipt Requested, this _22_ day of October, 1997.

_William Dixon Wiles_
William Dixon Wiles

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES TO PLAINTIFF DARLENE COKER - Page 2
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

## INTERROGATORIES

1.    Please state:

    (a)   Your full name and present address;

    (b)   Your date and place of birth;

    (c)   Your Social Security number;

    (d)   The name, address and telephone number of your spouse, if married, as well as the date of your marriage;

    (e)   The names, addresses, and dates of birth of all children born to or adopted by you.

2.    Please list in chronological order the resident addresses where you have resided during your lifetime and state the inclusive dates of your residence in each location.

3.    Please list in chronological order all employment, occupations and/or self-employment you have ever had, and state for each the following:  identify each employer and your immediate supervisor in each position held; the first and last date of each such employment or self-employment and your annual gross income for each year of employment; your job title, job description and duties in connection with such employment; whether you were exposed to talc-containing products, asbestos-containing products, silica-containing products or other dust, fumes or gases at each

---

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 3
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

employment site; the dates you were exposed to each of these products and the name, trade name and manufacturer of each product that you were exposed to and the purpose for which it was used.

4.    Please state whether you have been exposed to any talc-containing products, asbestos-containing products, silica-containing products, gases, fumes, or dust outside the workplace; the dates and frequency you were exposed to each product; the name, manufacturer and trade name of each product; and how you were exposed to each product.

5.    Please state the name, address and telephone number of all potential parties to this lawsuit, and all persons having knowledge of facts relevant to the lawsuit, including facts relevant to the incident made the basis of this suit, or any facts relevant to any allegation or claim for damages by plaintiffs in this lawsuit.

6.    Describe in detail how you have been damaged or injured by any product manufactured, marketed, distributed or sold by Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 4
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products.

7.   If you have been a party to any claim or lawsuit for bodily injuries or personal injuries to yourself, give the style and cause number of the lawsuit, the date on which the lawsuit was filed, the name and address of your attorney, and the disposition of the claim or lawsuit.

8.   Please list each and every physician, chiropractor, doctor of osteopathy or other practitioner of the healing arts, including psychologists and psychiatrists, who has examined or treated you from 1977 to the present, and state the illness or injury for which such health care provider treated or examined you, the dates of the treatment and the type of treatment received.

9.   Please state the name and address of every hospital or clinic where you have been examined, treated, subjected to any tests or X-rays, received outpatient care, or were hospitalized from 1977 to the present, and include the dates of each examination, testing, hospitalization or treatment, the illness or

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 5
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

injury, which was the subject of each hospitalization, examination, testing or treatment and the treatment received.

10. With regard to your present medical condition:

    (a) How and under what circumstances did you learn that talc could be harmful to your health;

    (b) When did you first believe that your medical problems related to talc exposure;

    (c) When were you first told, and by whom, that your medical problems were the result of exposure to talc-containing products;

    (d) When were you first told, and by whom, that your medical problems were the result of exposure to talc-containing products manufactured, marketed, distributed or sold by Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products.

11. Please state the factual basis for your claim that this defendant "made, sold, or specified, talc products which were defective and unreasonably dangerous as designed, manufactured and marketed."

12. Please state the factual basis for your allegation that this defendant had an "actual, subjective awareness of the capacity of airborne talc components in susceptible individuals ... [and]

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 6
G:\WPDOC\RDW\054\02121\DISCOVER\DARLENE.I

intentionally failed to protect, warn, instruct or otherwise prevent the inevitable exposures."

13. Please state the factual basis for plaintiffs' allegation that this defendant caused the injuries of Darlene Coker by the "negligent, gross negligent, fraud, deceit, written representations and defective products" of this defendant.

14. Please state the factual basis for plaintiffs' allegation that this defendant "negligently and intentionally caused Darlene Coker to be fatally exposed to talc."

15. Please state whether you or your representative have in your possession, custody or control any statement previously made by any agent, servant or employee of Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil, PPC, Inc. f/k/a Johnson & Johnson Baby Products regarding the Johnson & Johnson products made the basis of this lawsuit. If so:

        (a)  Please state the name and telephone number of the
             person from whom you have a statement;

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 7
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

   (b)   Please state the name, address and telephone number of the person having actual or constructive possession of the statement.


   16.   Pursuant to Texas Rules of Civil Procedure, Rule 166b(2)(e)(1), please state the name, address and telephone number of any expert witness who may be called as an expert witness, the subject matter on which the witness is expected to testify, the mental impressions and opinions held by the expert and the facts known to the expert (regardless of when the factual information was acquired) which relate to or form the basis of the mental impressions and opinions held by the expert.


   17.   Pursuant to Texas Rules of Civil Procedure, Rule 166b(2)(e)(2), please state whether or not any expert witness identified by you in the preceding interrogatory has prepared any documents, tangible things including tangible reports, physical models, compilations of data and other material in anticipation of the expert's trial and deposition testimony.  If so, please attach copies of the same to your answer to interrogatories.

---

18.   Please state the name, address, telephone number, mental impressions and opinions of any expert witness who has been informally consulted by you, or who has been retained or specially employed by you or your representative in anticipation of litigation or preparation for trial if any documents or tangible things containing the impressions and opinions of any consulting experts have been reviewed by any experts whom plaintiffs will call to testify pursuant to Texas Rules of Civil Procedure Rule 166b(2)(e)(1).   Please attach copies of these documents to your answers to interrogatories.

19.   Please state the name of every talc-containing product that you have used during your lifetime, including:

      (a)   The manufacturer's name and trade name of the product;

      (b)   The dates and frequency of use of this product;

      (c)   The purposes for which this product was used;

      (d)   A description of the product.

20.   If you have ever smoked, state when you started smoking, the type and brand of tobacco product you smoked, how much you have smoked of each type of tobacco product, the length of time you smoked each tobacco product, the name of any physician who has

---

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 9
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

advised you to stop smoking, and when and if you have stopped smoking, the reason you stopped smoking.

21.   Please specify all damages which you are claiming in this lawsuit, listing the nature, basis and amount claimed for each, as well as how you calculated the amount.

22.   Please identify all policies of insurance (other than of this defendant) that you believe provided coverage for all injuries arising out of the occurrence or occurrences made the basis of this lawsuit.  Please include in your answer the policy number, name of the insurance company, together with the name, address and telephone number of the claims representative or adjuster who handled your claim.

23.   If plaintiffs have entered into any settlement agreement, or received any monies from any named defendant or any third party, please state:

           (a)   The name of the party or person with whom plaintiffs have entered into an agreement;

           (b)   The date and essential terms of the agreement; and

(c)   The amount of money received by the plaintiffs from each person or party.


24.   If any lien or subrogation interest has been asserted on behalf of any individual or entity (including any hospital or governmental agency or governmental program such as Medicare or Medicaid) that might apply to a recovery in this case against defendants by plaintiffs, or if plaintiffs have been the recipient of any Medicare, Medicaid benefits or funding by any governmental agency, please state:

(a)   The name, address and phone number of the individual or entity asserting such lien or subrogation interest, or making any payments to, or on behalf of plaintiffs;

(b)   The date that plaintiffs were given notice of any lien or subrogation interest;

(c)   Whether the notice of lien or subrogation interest was oral or written;

(d)   The amount of the lien or subrogation interest;

(e)   The amount of any payments made by or on behalf of plaintiffs, or the total amount of benefits or funding received by, or on behalf of, plaintiffs.


25.   If you have ever served in any capacity in the military, please give the dates, rank, service number and branch of service; type of discharge from each tour of duty or enlistment; type of disability or pension you have received or are receiving, if any.

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF DARLENE COKER - Page 11
G:\WPDOC\WDW\054\02121\DISCOVER\DARLENE.I

CAUSE NO. D-0157746

| | | |
|---|---|---|
| DARLENE COKER AND | § | IN THE DISTRICT COURT OF |
| SPOUSE, ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY, INC.; | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | |
| f/k/a S.W.S. Pharmacy, Inc.; | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC.; | § | |
| GIANT FOOD DISCOUNT CITY, | § | |
| INC., HENKE & PILLOT, INC. | § | |
| HSTN., INC. f/k/a J&J Baby | § | |
| Products; JOHNSON & JOHNSON | § | |
| PROFESSIONAL; LOVOI AND | § | |
| SONS PHARMACIES, INC.; | § | |
| McNEIL PPC, INC. Products; | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

DEFENDANT'S FIRST SET OF WRITTEN
INTERROGATORIES TO PLAINTIFF ROY COKER

TO:  Plaintiff, Roy Coker, by and through your Attorney of Record, Herschel L. Hobson, 2190 Harrison, Beaumont, Texas 77701

Pursuant to Rules 166b and 168, Texas Rules of Civil Procedure, defendant, the entity sued under the name McNEIL PPC, INC. f/k/a Johnson-Johnson Baby Products, submits the following interrogatories to you to be answered separately and fully in writing, under oath, within thirty-one (31) days after service of these interrogatories, all as provided in said rules.

Respectfully submitted,

FOWLER, WILES & KEITH, L.L.P.

By: _William Dixon Wiles_
　　　William Dixon Wiles
　　　State Bar No. 21467800

　　　1900 Cityplace Center
　　　2711 N. Haskell
　　　Dallas, Texas 75204-2944
　　　(214) 841-3000
　　　(214) 841-3099 - Telecopier

　　　Attorney for Defendant,
　　　McNeil, PPC, Inc.


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Defendant's First Set of Written Interrogatories to Plaintiff Roy Coker was forwarded to plaintiffs' counsel by Certified Mail, Return Receipt Requested, this _22_ day of October, 1997.


_William Dixon Wiles_
William Dixon Wiles


DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 2
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

## INTERROGATORIES

1.   Please state:

    (a)   Your full name and present address;

    (b)   Your date and place of birth;

    (c)   Your Social Security number;

    (d)   The name, address and telephone number of your spouse, if married, as well as the date of your marriage;

    (e)   The names, addresses, and dates of birth of all children born to or adopted by you.

2.   Please list in chronological order all employment, occupations and/or self-employment you have ever had, and state for each the following:   identify each employer and your immediate supervisor in each position held; the first and last date of each such employment or self-employment and your annual gross income for each year of employment; your job title, job description and duties in connection with such employment; whether you were exposed to talc-containing products, asbestos-containing products, silica-containing products or other dust, fumes or gases at each employment site; the dates you were exposed to each of these products and the name, trade name and manufacturer of each product and the purpose for which it was used.

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 3
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

3.    If you have been a party to any claim or lawsuit for bodily injuries or personal injuries to yourself, give the style and cause number of the lawsuit, the date on which the lawsuit was filed, the name and address of your attorney, the disposition of the claim or lawsuit.

4.    Please specify all damages which you are claiming in this lawsuit, listing the nature, basis and amount claimed for each, as well as how you calculated the amount.

5.    If you have ever smoked, state when you started smoking, what type of tobacco product you smoked, how much you have smoked of each type of tobacco product, the length of time you smoked each tobacco product, the name of any physician who has advised you to stop smoking, and when and if you have stopped smoking, the reason you stopped smoking.

6.    Please state the name of every talc-containing product that you have used during your lifetime, including:

        (a)   The manufacture and trade name of the product;

        (b)   The dates and frequency of use of this product;

(c)  The purposes for which this product was used;

(d)  A description of the product.


7.   Please list each and every physician, chiropractor, doctor of osteopathy or other practitioner of the healing arts, including psychologists and psychiatrists, who has examined or treated you for injuries arising out of the occurrence or occurrences made the basis of this lawsuit and state the illness or injury for which such health care provider treated or examined you, the dates of the treatment and the type of treatment received.


8.   Please state the name and address of every hospital or clinic in which you have been examined for injuries arising out of the occurrence or occurrences made the basis of this lawsuit whether subject to any tests or X-rays, received outpatient care, or were hospitalized from and include the dates of each examination, testing, hospitalization or treatment, the illness or injury, which was the subject of each hospitalization, examination, testing or treatment and the treatment received.

9.    Please state the factual basis for your claim that this defendant "made, sold, or specified, talc products which were defective and unreasonably dangerous as designed, manufactured and marketed."

10.    Please state the factual basis for your allegation that this defendant had an "actual, subjective awareness of the capacity of airborne talc components in susceptible individuals ... [and] intentionally failed to protect, warn, instruct or otherwise prevent the inevitable exposures."

11.    Please state the factual basis for plaintiffs' allegation that this defendant caused the injuries of Darlene Coker by the "negligent, gross negligent, fraud, deceit, written representations and defective products" of this defendant.

12.    Please state the factual basis for plaintiffs' allegation that this defendant "negligently and intentionally caused Darlene Coker to be fatally exposed to talc."

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 6
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

13.   Please state whether you have been exposed to any talc-containing products, asbestos-containing products, silica-containing products, gases, fumes, or dust outside the workplace; the dates and frequency you were exposed to each product; the name, manufacturer and trade name of each product; and how you were exposed to each product.

14.   Please state whether you or your representative have in your possession, custody or control any statement previously made by any agent, servant or employee of Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products regarding the Johnson & Johnson products made the basis of this lawsuit.   If so:

      (a)   Please state the name and telephone number of the person from whom you have a statement;

      (b)   Please state the name, address and telephone number of the person having actual or constructive possession of the statement.

---

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 7
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

15.   Please state the name, address and telephone number of all potential parties to this lawsuit, and all persons having knowledge of facts relevant to the lawsuit, including facts relevant to the incident made the basis of this suit, or any facts relevant to any allegation or claim for damages by plaintiffs in this lawsuit.

16.   If any lien or subrogation interest has been asserted on behalf of any individual or entity (including any hospital or governmental agency or governmental program such as Medicare or Medicaid) that might apply to a recovery in this case against defendants by plaintiffs, or if plaintiffs have been the recipient of any Medicare, Medicaid benefits or funding by any governmental agency, please state:

      (a)    The name, address and phone number of the individual or entity asserting such lien or subrogation interest, or making any payments to, or on behalf of plaintiffs;

      (b)    The date that plaintiffs were given notice of any lien or subrogation interest;

      (c)    Whether the notice of lien or subrogation interest was oral or written;

      (d)    The amount of the lien or subrogation interest;

      (e)    The amount of any payments made by or on behalf of plaintiffs, or the total amount of benefits or funding received by, or on behalf of, plaintiffs.

17.   Pursuant  to  Texas  Rules  of  Civil  Procedure,  Rule 166b(2)(e)(1), please state the name, address and telephone number of any expert witness who may be called as an expert witness, the subject matter on which the witness is expected to testify, the mental impressions and opinions held by the expert and the facts known to the expert (regardless of when the factual information was acquired)  which  relate  to  or  form  the  basis  of  the  mental impressions and opinions held by the expert.

18.   Pursuant  to  Texas  Rules  of  Civil  Procedure,  Rule 166b(2)(e)(2), please state whether or not any expert witness identified by you in the preceding interrogatory has prepared any documents, tangible things including tangible reports, physical models, compilations of data and other material in anticipation of the expert's trial and deposition testimony.  If so, please attach copies of the same to your answer to interrogatories.

19.   Please state the name, address, telephone number, mental impressions and opinions of any expert witness who has been informally consulted by you, or who has been retained or specially employed  by  you  or  your  representative  in  anticipation  of litigation or preparation for trial if any documents or tangible

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 9
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

things containing the impressions and opinions of any consulting experts have been reviewed by any experts whom plaintiffs will call to testify pursuant to Texas Rules of Civil Procedure Rule 166b(2)(e)(1). Please attach a copy of these documents to your answers to interrogatories.

20. If plaintiffs have entered into any settlement agreement, or received any monies from any named defendant or any third party, please state:

    (a)   The name of the party or person with whom plaintiffs have entered into an agreement;

    (b)   The date and essential terms of the agreement; and

    (c)   The amount of money received by the plaintiffs from each person or party.

21. Please identify all policies of insurance (other than of this defendant) that you believe provided coverage for all injuries arising out of the occurrence or occurrences made the basis of this lawsuit. Please include in your answer the policy number, name of the insurance company, together with the name, address and telephone number of the claims representative or adjuster who handled your claim.

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 10
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

22.   If you have ever served in any capacity in the military, please give the dates, rank, service number and branch of service; type of discharge from each tour of duty or enlistment; type of disability or pension you have received or are receiving, if any.

DEFENDANTS' FIRST SET OF WRITTEN INTERROGATORIES
TO PLAINTIFF ROY COKER - Page 11
G:\WPDOC\WDW\054\02121\DISCOVER\ROY.I

CAUSE NO. D-0157746

| | | |
|---|---|---|
| DARLENE COKER AND | § | IN THE DISTRICT COURT OF |
| SPOUSE, ROY COKER | § | |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY, INC.; | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a Johnson-Johnson Baby | § | |
| f/k/a S.W.S. Pharmacy, Inc.; | § | JEFFERSON COUNTY, TEXAS |
| FERTITTAS FINER FOODS, INC.; | § | |
| GIANT FOOD DISCOUNT CITY, | § | |
| INC., HENKE & PILLOT, | § | |
| HSTN., INC. f/k/a J&J Baby | § | |
| Products; JOHNSON & JOHNSON | § | |
| PROFESSIONAL; LOVOI AND | § | |
| SONS PHARMACIES, INC.; | § | |
| McNEIL PPC, INC. Products; | § | |
| THE KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFFS

TO: Plaintiffs, DARLENE COKER and ROY COKER, by and through your Attorney of Record, Herschel L. Hobson, 2190 Harrison, Beaumont, Texas 77701

Pursuant to Rules 166b and 167, Texas Rules of Civil Procedure, defendant, the entity sued under the name McNEIL PPC, INC. f/k/a Johnson-Johnson Baby Products, requests voluntary production of the following documents and items in the possession or constructive possession of plaintiffs within thirty-one (31) days from the date of service of this request. Said items are to be produced for inspection and copying at the offices of William Dixon Wiles, 1900 Cityplace Center, 2711 N. Haskell, Dallas, Texas 75204.

---

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFFS - Page 1
G:\WPDOC\WDW\054\02121\DISCOVER\PLNTFS.RP

Respectfully submitted,

FOWLER, WILES & KEITH, L.L.P.

By: _William Dixon Wiles_

     William Dixon Wiles
     State Bar No. 21467800

     1900 Cityplace Center
     2711 N. Haskell
     Dallas, Texas 75204-2944
     (214) 841-3000
     (214) 841-3099 - Telecopier

     Attorney for Defendant,
     McNeil PPC, Inc.


## CERTIFICATE OF SERVICE

    This is to certify that a true and correct copy of Defendants' First Request for Production was forwarded to plaintiffs' counsel by Certified Mail, Return Receipt Requested, this _22_ day of October, 1997.

_William Dixon Wiles_
     William Dixon Wiles

<u>DEFINITION</u>

The term "documents" shall mean and include any letters, correspondence, telegrams, mailgrams, messages, message forms, memoranda, notes, records, videotapes, negatives, slides, purchase orders, change orders, financial records, log books, records, diaries, minutes, contracts, change proposals, charts, invoices, graphs, shipping receipts, time cards, work orders, memoranda of telephone or personal conversations, negotiations, conferences, inter-office communications, reports, analysis, studies, tape records, computer runs, and any codes necessary to comprehend such runs, books, pamphlets, indexes, photographs, specifications, drawings, statements and any writing of any nature, however produced or reproduced, including all drafts and non-identical copies of such documents.

<u>ITEMS TO BE PRODUCED</u>

1. Copies of all hospital, pharmaceutical and medical bills, for which damages are being asserted in this lawsuit.

2. Pursuant to Texas Rules of Civil Procedure Rule 166b(2)(e)(1) and (2), any and all communications, documents and tangible things, including tangible reports, physical models, compilations of data and other material prepared by an expert or for an expert in anticipation of the expert's trial and deposition testimony, including all materials prepared by an expert used for consultation if it was prepared in anticipation of litigation or for trial and the consulting expert's opinions or impressions have been reviewed by a testifying expert.

3. A signed medical authorization form and employment authorization form attached hereto. Copies of any medical records obtained using such authorization will be furnished to plaintiffs' counsel without charge.

4. Any statements, documents or brochures, pamphlets or other compilations or data that you have from any agent, servant or employee of Johnson & Johnson Professional f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products.

---

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFFS - Page 3
G:\WPDOC\WDW\054\02121\DISCOVER\PLNTFS.RP

5. Copies of sections, portions or pages of each and every book, treatise, periodical and/or pamphlet established or to be established as a reliable authority by the testimony of any expert witness that plaintiffs have identified or will identify or that plaintiffs will seek to have established as a reliable authority by requesting judicial notice of the same.

6. Any photographs, videotapes or movies or other representations of Darlene Coker which might be relevant to any allegation asserted by plaintiffs in this lawsuit.

7. Any and all correspondence, reports, notices or other documents in writing to plaintiffs or plaintiffs' representative evidencing that plaintiffs have been the recipient of any Medicare, Medicaid benefits or funding by any governmental agency, or purporting to assert a lien or subrogation interest on behalf of any individual or entity (including any hospital or governmental agency or governmental program such as Medicare or Medicaid) against any proceeds that might be recovered by plaintiffs in this lawsuit   [this request does not include any contract between plaintiffs and any attorney representing plaintiffs].

8. Copies of all hospital, medical, pharmaceutical records and X-rays of Darlene Coker which are in your possession, custody or control.

9. Copies of all newspaper, magazine or other news clippings in your possession, custody or control that in any way pertain to, deal with or mention the harmful effects of Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' talc-containing products made the basis of this lawsuit.

10. Any and all tissue samples, slides, blocks, X-rays or other pathological material in your possession, custody or control pertaining to Darlene Coker regarding injuries made the basis of this lawsuit.

11. Any and all documents supporting plaintiffs' allegations that Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' products contain or contained "poisonous talc" as alleged in plaintiffs' petition.

12. Any and all documents that support plaintiffs' claims that Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' products are the producing cause of Plaintiff Darlene Coker's mesothelioma.

13. Any and all documents that support plaintiffs' claims that Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' products made the basis of this lawsuit are harmful.

14. Any and all personnel files, check stubs, payroll records, Social Security records or other documents concerning the plaintiffs' employment history.

15. Any and all military or government records or other documents concerning the plaintiffs' military service or, in the alternative, an authorization to secure such records.

16. Any and all documents that directly or indirectly relate or refer to plaintiffs' purchase of any talc-containing products.

17. Any and all settlement agreements, releases, covenants not to sue, or similar agreements, whether written or oral, that plaintiffs or someone on plaintiffs' behalf have made with any person or entity concerning Plaintiff Darlene Coker's injuries or any other aspect of this lawsuit.

18. Any and all documents that directly or indirectly refer or relate to the dangers or hazards of talc-containing products.

19. Any and all documents that directly or indirectly support, relate or refer to plaintiffs' claims for:

    (a) Pain, suffering, mental anguish and grief;

    (b) Physical impairment;

    (c) Loss of earnings and earning capacity and financial support;

    (d) Loss of inheritance;

    (e) Loss of society;

    (f) Hedonic damages for lifetime lost;

    (g) Exemplary damages.

---

20. Any and all documents that directly or indirectly support, relate or refer to plaintiffs' claim for actual damages as set forth in Plaintiffs' Original Petition including but not limited to damage letters and other correspondence, all medical bills, invoices, or requests for payment by medical care providers, all canceled checks indicating payment for or with respect to any medical supplies or services provided to plaintiffs and all records, documents, or reports that show or support any claims, present or future, for loss of wages or earning capacity, for disability and impairment, for medical treatment and care, for pain, suffering, and mental anguish, for loss of enjoyment of life, and/or deterioration of the family unit.

21. Any and all documents pertaining to Johnson & Johnson Professional, Inc. f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' products to which plaintiffs claim to have been exposed.

22. Copies of all policies of insurance (other than of this defendant) that you believe provided coverage for all injuries arising out of the occurrence or occurrences made the basis of this lawsuit.

23. Certified, true and complete copies of any and all state and federal income tax returns, and all attachments and schedules thereto, filed by plaintiffs, or on plaintiffs' behalf, jointly or separately, since 1992.

24. Any and all talc products or containers of talc products in your possession, custody or control used by Darlene Coker in her lifetime, or that were used in her presence during her lifetime.

25. Any and all talc products or containers of talc products in your possession, custody or control which plaintiffs believe to be evidence that Johnson & Johnson Professional f/k/a Johnson & Johnson Baby Products and/or McNeil PPC, Inc. f/k/a Johnson & Johnson Baby Products' baby powder contained "a poisonous talc."

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

October 28, 1997

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

Via Hand-Delivery

'97  OCT 28  P 4 :36

JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find Notice of Oral/Video
Deposition of Darlene Coker.

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:  Mr. Brock C. Akers ............................................................... Via facsimile
     Mr. Gary J. Siller ................................................................. Via facsimile
     Mr. Kent M. Adams ............................................................... Via facsimile
     Mr. William Dixon Wiles ........................................................ Via facsimile
     Mr. Daniel Foley .................................................................. Via facsimile
     Corrigan Enterprises Incorporated ........................................ Via UPS
     Johnson and Johnson Professional Inc. ................................... Via UPS
     Bill Thames Pharmacy c/o Joseph Seale, 3655 Calder, Beaumont, TX ...... Via CMRRR P 189 682 304

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

NOTICE OF ORAL/VIDEO DEPOSITION

TO:  ALL DEFENDANTS, by and through their attorneys of record and/or registered agents for service.

PLEASE TAKE NOTICE that the Plaintiffs in the above-referenced cause of action will take the oral/video deposition of the person named below at the time and place designated in this notice pursuant to the Texas Rules of Civil Procedure.

WITNESS:          Darlene Coker

DATE:             Friday, November 21, 1997, continuing from day to day until completed

TIME:             9:00 a.m.

PLACE:            Nell McCallum & Associates, Inc.
                  2615 Calder, Suite 111
                  Beaumont, TX  77702

COURT REPORTER: Irene Meguess
                  Nell McCallum & Associates, Inc.
                  2615 Calder, Suite 111
                  Beaumont, TX  77702

VIDEOGRAPHER:     Legal Images
                  PO Box 315
                  Gilchrist, TX  77617

You are invited to appear and cross-examine the witness.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701              By: _Herschel Hobson /MRh_
Ph. #: (409) 838-6410                   Herschel L. Hobson
Fax #: (409) 838-6084                   TBA# 09744600

ATTORNEY FOR PLAINTIFFS

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 28TH day of OCTOBER , 1997.

Herschel L. Hobson
MATTHEW R. WILLIS

LAW OFFICES OF

# Herschel L. Hobson

ATTORNEY AT LAW

TELECOPIER TRANSMITTAL FORM

DATE: _____

TO:

| Attorney name | phone fax |
|---|---|
| Mr. Brock C. Akers | (713) 552-0231 |
| Mr. Daniel Foley | (603) 749-3963 |
| Mr. Gary J. Siller | (713) 651-1944 |
| Mr. Kent M. Adams | (409) 838-6950 |
| Mr. William Dixon Wiles | (214) 841-3099 |

COMMENTS:_____

_____

_____

_____

_____

RE: Coker _____    OUR FILE #: 2869-0 _____

TOTAL # OF PAGES INCLUDING THIS TRANSMITTAL FORM: _____

Warning

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately at (409) 838-6410 and return the original message to us at the above address via the united states postal service. We will reimburse any costs you may incur in notifying and returning the message to us.

If any of these pages are not clearly received, please call (409) 838-6410 as soon as possible and ask for _____.

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX(409) 838-6084

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Johnson & Johnson Consumer Companies, Inc. ("J&J"), defendant in the above-entitled and numbered cause, and files this Motion for Summary Judgment. In support thereof, defendant would respectfully show unto the Court as follows:

I.
PROCEDURAL LAW

Rule 166a(i) of the Texas Rules of Civil Procedure provides that a party may move for summary judgment on the grounds that there is no evidence on one or more essential elements of a claim or defense on which the opposing party bears the burden of proof. TEX. R. CIV. P. 166a(i) (Vernon Supp. 1998). Specifically, Rule 166a(i) provides:

MW/133598

> After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence.   The Court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

*Id.*

## II.
## PLAINTIFFS' CLAIMS AGAINST JOHNSON & JOHNSON

This is a personal injury case involving a product liability claim in which plaintiffs, Darlene and Roy Coker, allege that Darlene Coker's alleged exposure to Johnson & Johnson products caused her to contract mesothelioma.  Specifically, plaintiffs allege that J&J "made, sold, or specified, talc products which were defective and unreasonably dangerous as designed, manufactured and marketed." Plaintiffs' Original Petition at 2.  Plaintiffs further allege that "[t]hese products, used as as intended and forseen, necessarily released poisonous talc, which was a producing cause of [Darlene Coker's] mesothelioma." *Id.*

## III.
## NO EVIDENCE OF CAUSATION

Under Texas law, when a plaintiff's cause of action is one for personal injury, she "must prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).  In an action for injuries due to a defective product, whether the claim is grounded in negligence or strict liability, the plaintiff is must establish that a causal connection between the alleged defective product and her injury exists.  Product liability claims based on negligence require a showing of proximate

MW/133598

2



cause and product liability claims based on strict liability require a showing of producing cause. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995). Common to both proximate and producing cause is causation in fact which requires the plaintiff to demonstrate that the acts or omissions of the defendant were a substantial factor in bringing about the injury which would not otherwise have occurred. *Id.*; *Prudential Insurance Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995); *Nixon v. Mr. Property Management Co.*, 690 S.W. 2d 546, 549 (Tex. 1985). Plaintiffs have produced no evidence that any alleged acts or omissions by J&J in maufacturing and suppling any product are a cause in fact of Darlene Coker's mesothelioma.

## IV.
## ADEQUATE TIME FOR DISCOVERY

Plaintiffs' case was filed September 23, 1997. Plaintiffs requested an expedited trial and the Court set the case for June 22, 1998 but subsequently continued the case until September 21, 1998. Although at this time plaintiffs' medical causation expert has completed all necessary work, he has not tendered any opinion that J&J products in any way caused Darlene Cokers mesothelioma, nor have plaintiffs produced any other evidence to support that proposition.

## V.
## CONCLUSION

Defendant, Johnson & Johnson Consumer Companies, Inc., is entitled to summary judgment because there is no evidence of one or more essential elements of plaintiff's claim on which the plaintiff would have the burden of proof at trial. After adequate time for discovery, plaintiffs have failed to produce any evidence of causation. Specifically, plaintiffs have produced no evidence that Darlene Coker's alleged exposure to Johnson & Johnson products was, in any way, a cause in fact



of her mesothelioma.  Accordingly, defendant is entitled to summary judgment on all plaintiff's claims against all defendants.

WHEREFORE, PREMISES CONSIDERED, defendant, Johnson & Johnson Consumer Companies, Inc., prays that this motion be set for hearing, with notice to plaintiff and that on completion of the hearing, its Motion for Summary Judgment be in all things granted, and that the Court enter a judgment that plaintiffs take nothing, and that defendant recover its costs of court from plaintiff.  Defendant also prays for such other and further relief, both general and special, to which this defendant may be justly entitled.

Respectfully submitted,

MEHAFFY & WEBER
Attorneys for Defendant, Johnson & Johnson
Consumer Companies, Inc.

By _____
Gene M.  Williams
State Bar No. 21535300
Sandra F. Clark
State Bar No. 04294520
M.  Raymond Hatcher
State Bar No.  24002243

Post Office Box 16
Beaumont, TX 77704
Telephone: (409) 835-5011
Telecopier: (409) 835-5177

MW/133598                                4

## CERTIFICATE OF CONFERENCE

I certify that an associate in my office conferred with the plaintiff's attorney, Heschel Hobson, regarding this motion, and Mr. Hobson is opposed.

Gene M. Williams

## CERTIFICATE OF SERVICE

A copy of the foregoing instrument has been forwarded to all counsel of record on this the 8 day of _Septber_, 1998.

M. Raymond Hatcher

MW/133598

5

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| CORRIGAN ENTERPRISES, INC. | § | |
| f/k/a JOHNSON-JOHNSON BABY f/k/a | § | |
| S.W.S. PHARMACY INC., FERTITTAS | § | |
| FINER FOODS, INC., GIANT FOOD | § | |
| DISCOUNT CITY, INC., HENKE & | § | |
| PILLOT, INC., HSTN. INC. f/k/a | § | |
| J&J BABY PRODUCTS, JOHNSON & | § | |
| JOHNSON PROFESSIONAL, LOVOI | § | |
| AND SONS PHARMACIES, INC., | § | |
| MCNEIL PPC INC. PRODUCTS, THE | § | |
| KROGER COMPANY | § | 136TH JUDICIAL DISTRICT |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date came on to be heard Johnson & Johnson Consumer Companies, Inc.'s Motion for Summary Judgement on the issue that plaintiffs have no evidence on one or more essential elements of their claim. The Court having considered the evidence presented is of the opinion that the motion is meritorious and should, in all things be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that Johnson & Johnson Consumer Companies, Inc.'s Motion for Summary Judgment is GRANTED and that plaintiffs should take nothing against defendant by way of this lawsuit.

SIGNED THIS _____ DAY OF _____, 1998

_____
JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:


_____

GENE M. WILLIAMS
Attorney for Johnson & Johnson
Consumer Companies, Inc.

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

## NOTICE OF NONSUIT

COME NOW Plaintiffs, by and through their attorney of record, and advise the Court that they desire to take a non-suit, without prejudice, against only the Defendants, **Bill Thames Pharmacy Inc., Corrigan Enterprises, Inc., Fertittas Finer Foods, Inc., Giant Food Discount City, Inc., Henke & Pillot, Inc. Houston, Kroger Co. (The), Lovoi and Sons Pharmacies, Inc., McNeil PCC Inc., and Sommers Drug Store**. This Notice of Non-suit is only applicable to Defendants, **Bill Thames Pharmacy Inc., Corrigan Enterprises, Inc., Fertittas Finer Foods, Inc., Giant Food Discount City, Inc., Henke & Pillot, Inc. Houston, Kroger Co. (The), Lovoi and Sons Pharmacies, Inc., McNeil PCC Inc., and Sommers Drug Store**, and does not apply to any other Defendant in this cause of action.

Respectfully submitted,

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

By: _____
Herschel L. Hobson
TBA# 09744600

ATTORNEY FOR PLAINTIFFS

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 3rd day of March, 1998.

_____
Herschel L. Hobson

d:\dmword\motions\coker-nonsuit (all but j&j).doc

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

## PLAINTIFFS' NOTICE OF NON-SUIT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW the Plaintiffs, DARLENE COKER, and spouse, ROY COKER, and pursuant to the Texas Rules of Civil Procedure, hereby gives notice to this Court and to all parties to this suit that they are taking a nonsuit without prejudice as to the defendants, **McNeill PCC Inc.** (formerly known as Johnson-Johnson Baby Products); **Johnson & Johnson Professional Inc.** (formerly known as J&J Baby Products); **Johnson & Johnson Consumer Companies Inc.**, only, and effective immediately upon filing of this Notice.

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

Respectfully submitted,

By: _____

Herschel L. Hobson
TBA# 09744600

ATTORNEY FOR PLAINTIFFS

### Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this 5th day of February, 1999.

_____

Herschel L. Hobson

d:\dbword\motions\coker-nonsuit (mcneill, j&j entities).doc

2

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., | § | |
| ET AL | § | THE 136ᵃ JUDICIAL DISTRICT |

## DEFENDANT, FERTITTA'S FINER FOODS, INC.'S MOTION TO TRANSFER VENUE, AND IN THE ALTERNATIVE, MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS, AND SUBJECT THERETO, ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, FERTITTA'S FINER FOODS, INC., one of the Defendants in the above-entitled and numbered cause of action, and makes and files this its Motion to Transfer Venue, and in the Alternative, Motion to Dismiss on the Basis of Forum Non Conveniens, and Subject Thereto, Original Answer to Plaintiffs' Original Petition, and would show unto this Most Honorable Court the following:

### MOTION TO TRANSFER VENUE

I.

Pursuant to Rule 86 of the Texas Rules of Civil Procedure, Defendant, FERTITTA'S FINER FOODS, INC., files this Motion to Transfer Venue prior to or concurrently with any pleading or appearance in this cause of action. Defendant would show that, according to the Texas Rules of Civil Procedure, Jefferson County, Texas is an improper county for venue purposes. A proper county for venue purposes is Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas. Defendant specifically denies the venue facts pled in Plaintiff's live Petition.

II.

Defendant, FERTITTA'S FINER FOODS, INC., is a corporation duly organized and existing under the laws of the State of Texas and licensed to do business in this State. At the institution of this suit, at the time of service of process herein, and at the time of the filing of this Motion, this Defendant believes other Defendants' principal places of business/principal offices in the State of Texas are in Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas. This Defendant is a retailer only, in this alleged products liability case. The alleged product manufacturer defendant has no principal place of business in this county. On information and belief, the plaintiffs are residents of Hardin County, Texas, and it is unknown whether the torts, if any herein, occurred in Jefferson County, Texas.

III.

Defendant, FERTITTA'S FINER FOODS, INC., objects to venue in Jefferson County, Texas, the county in which this action is instituted, on the ground that Jefferson County, Texas, is an inconvenient venue and the action should be transferred to Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas in accordance with Texas Civil Practice and Remedies Code Section 15.002(b). More specifically, maintenance of this action in Jefferson County, Texas, would work an injustice on the defendants considering the defendants' economic and personal hardship; the balance of the interest of all the parties predominates in the favor of the action being brought in Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas; and the transfer of the action to Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas, would not work an injustice to any other party.

IV.

Defendant, FERTITTA'S FINER FOODS, INC., requests that this Court transfer this case to Dallas County, Texas, or in the alternative, Harris County, Texas, or in the alternative, Bexar County, Texas, each a county of proper venue.

### MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS

In the alternative, pursuant to Section 17.051(b) of the Texas Civil Practice and Remedies Code, this Defendant moves to dismiss based upon the doctrine of Forum Non Conveniens.  By the filing of this Motion concurrently with the Motion to Transfer Venue and prior to the filing of the answer, this Defendant reserves the right to supplement and amend this Motion to Dismiss on the Basis of Forum Non Conveniens as more information becomes available to it, and is in no way waiving its right to pursue a Motion to Dismiss on the Basis of Forum Non Conveniens.

### DEFENDANT'S ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE AND IN THE ALTERNATIVE, MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS

Subject to the foregoing Motion to Transfer Venue, and in the Alternative, Motion to Dismiss on the Basis of Forum Non Conveniens, Defendant, FERTITTA'S FINER FOODS, INC., denies generally each and every, all and singular, of the material allegations contained in Plaintiffs' Original Petition and says the same are untrue in whole or in part, and demands strict proof thereof.

WHEREFORE, PREMISES CONSIDERED, Defendant, FERTITTA'S FINER FOODS, INC., prays that this Court grant its Motion to Transfer Venue, and in the Alternative, Motion to Dismiss on the Basis of Forum Non Conveniens, and that upon final hearing hereof, Plaintiffs recover nothing, that Defendant recover its costs and that Defendant be granted such other and further relief as to which Defendant may show itself justly entitled.

Respectfully submitted,

ADAMS, COFFEY & DUESLER, L.L.P.

_____

KENT M. ADAMS
TEXAS BAR NO. 00869200
PAMELA J. WILLIAMS
TEXAS BAR NO. 00791936
PETROLEUM TOWER
550 FANNIN, SUITE 830
P. O. BOX 7505
BEAUMONT, TEXAS  77726-7505
(409) 838-6767
FAX:  (409) 838-6950

ATTORNEYS FOR DEFENDANT,
FERTITTAS FINER FOODS, INC.,

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant's Motion to Transfer Venue, and in the Alternative, Motion to Dismiss on the Basis of Forum Non Conveniens, and Subject Thereto, Original Answer to Plaintiffs' Original Petition has been forwarded to the following counsel of record via U. S. mail, certified mail, return receipt requested, on this the 20th day of October, 1997:

Mr. Herschel L. Hobson
THE LAW OFFICES OF HERSCHEL L. HOBSON
2190 Harrison
Beaumont, Texas  77701

CERTIFIED MAIL # P 523 860 124
RETURN RECEIPT REQUESTED

_____

KENT M. ADAMS

- 4 -

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

October 27, 1997

Via Hand-Delivery

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Please prepare citations to be served on the following defendants in the above-
referenced case:

Corrigan Enterprises Incorporated
856 Gembler Road
San Antonio, TX 78219

Johnson and Johnson Professional Inc.
350 N. St. Paul Street
Dallas, TX 75201

I have enclosed copies of the petition, along with our firm check in the amount of
$16.00.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

PHILLIPS & AKERS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TEXAS 77027
(713) 552-9595
FAX (713) 877-2531

BROCK C. AKERS

BOARD CERTIFIED PERSONAL INJURY
AND CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
BOARD CERTIFIED CIVIL TRIAL ADVOCATE
BY THE NATIONAL BOARD OF TRIAL ADVOCACY

DIRECT DIAL
(713) 552-0232
E-MAIL
Brock_Akers@panda-law.com

October 16, 1997

VIA FEDERAL EXPRESS

John S. Appleman, District Clerk
Jefferson County Courthouse
P.O. Box 3707
Beaumont, Texas 77704-3707

RE:   No. D157746; Darlene Coker and spouse, Roy Coker v. Bill Thames Pharmacy, Inc., et al; In the 136th Judicial District Court of Jefferson County, Texas

Dear Mr. Appleman:

I enclose five (5) self-addressed stamped envelopes from this firm along with this letter which is being sent pursuant to Rule 246 of the Texas Rules of Civil Procedure.

Pursuant to said Rule, I would ask that you inform this non-resident attorney and firm of all trial settings in this case using the enclosed self-addressed envelopes to do so.

Also enclosed is an additional copy of this letter which I would ask that you please date and file stamp and return in the extra envelope provided.

Sincerely,

Brock C. Akers/pdg

Brock C. Akers

BCA:pdg
7715.069

Enclosures

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

November 20, 1997



FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'97 NOV 20 P 4:24

<u>Via Hand-Delivery</u>

JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:    CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
       THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
       OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find the following:

- Affidavit of Judy L. Pollard, custodian of records for Columbia Beaumont Medical Center,
  along with 6 pages of billing records;
- Certification of Hospital/H.M.O. Bills of Nick White, along with 6 pages of billing records
  from Brigham and Women's Hospital;
- Affidavit of Carolyn B. Young, custodian of records for Dr. Vern Mills, along with 128
  pages of medical records;
- Affidavit of Scott Dare, custodian of records for Dr. Vern Mills, along with 3 pages of
  billing records;

By copy of this letter, all counsel of record are advised that these records are
available for copying at a cost of $.25 per page.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm
Enclosure

cc:    Mr. Brock C. Akers ................................. Via facsimile
       Mr. Daniel Foley ................................... Via facsimile
       Mr. Eric D. Wewers ................................ Via facsimile
       Mr. Gary J. Siller ................................. Via facsimile
       Mr. Gene Williams ................................. Via facsimile
       Mr. James M. Harris, Jr............................ Via facsimile
       Mr. Kent M. Adams ................................ Via facsimile
       Mr. Richard Corrigan ............................. Via facsimile

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

PHILLIPS & AKERS
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TX 77027

PHILLIPS & AKERS
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TX 77027

PHILLIPS & AKERS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TEXAS 77027

PHILLIPS & AKERS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TEXAS 77027

s & Akers
NAL CORPORATION
NEYS AT LAW
OENIX TOWER
HWEST FREEWAY
, TEXAS 77027



PHILLIPS & AKERS
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TX 77027

s & Akers
NAL CORPORATION
NEYS AT LAW
OENIX TOWER
HWEST FREEWAY
, TEXAS 77027



PHILLIPS & AKERS
3400 PHOENIX TOWER
3200 SOUTHWEST FREEWAY
HOUSTON, TX 77027



CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KRONER COMPANY | § | JEFFERSON COUNTY, TEXAS |
| | § | 136TH DISTRICT COURT |

### NOTICE OF SUBMISSION OF JOHNSON & JOHNSON PROFESSIONAL'S MOTION TO QUASH SERVICE OF PROCESS

Please take that the attached Motion to Quash Service of Process has been filed and will be submitted to the Court for consideration on November 24, 1997. The Court will consider and rule on the Motion without a hearing, unless you request one, in accordance with the Texas Rules of Civil Procedure and local rules of Court.

Respectfully submitted,

MEHAFFY & WEBER
Attorney for Defendant,
JOHNSON & JOHNSON PROFESSIONAL, INC.

By _____
Gene M. Williams, Of Counsel
State Bar No. 21535300

MW/99844

Post Office Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5729

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the 21 day of _____, 1997.

Gene M. Williams

**MEHAFFY & WEBER**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2615 CALDER AVENUE
POST OFFICE BOX 16
BEAUMONT, TEXAS 77704

ONE ALLEN CENTER
500 DALLAS, SUITE 1200
HOUSTON, TEXAS 77002
TELEPHONE (713) 655-1200
FAX (713) 655-0222

1006 GREEN AVENUE
P.O. BOX 189
ORANGE, TEXAS 77630
TELEPHONE (409) 886-7766
FAX (409) 886-7790

TELEPHONE (409) 835-5011
FAX (409) 835-5177
(409) 835-5729

November 12, 1997

Re:   **NO. D-157746; Darlene Coker, and spouse Roy Coker vs. Bill Thames Pharmacy Inc., et al; M&W File No. 3125-11**

Mr. John S. Appleman
District Clerk
Jefferson County Courthouse
P. O. Box 3707
Beaumont, Texas    77704

Dear Mr. Appleman:

Enclosed please find the **MOTION FOR SUBSTITUTION OF COUNSEL** in connection with the above styled and numbered cause.

Please file stamp the enclosed copy of same reflecting the date of filing.

Copies of these documents are being forwarded to opposing counsel by certified mail.

Thank you for your courtesy and attention to this matter.

Yours very truly,

Geneva Williams
For the Firm

GMW/jah
Enc.

MW/98571

MEHAFFY & WEBER

Mr. John S. Appleman
November 12, 1997

Page 2

cc:
Mr. Herschel L. Hobson                              **CM/RRR**
The Law Offices of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701

MW/98571

CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS

136TH DISTRICT COURT |

## MOTION FOR SUBSTITUTION OF COUNSEL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, William Dixon Wiles, Fowler, Wiles & Keith, counsel of record for Johnson & Johnson and moves the Court to substitute as counsel of record for Johnson & Johnson, Gene M. Williams and Sandra F. Clark of the law firm of Mehaffy & Weber, P. O. Box 16, Beaumont, Texas 77704. For all purposes, Gene M. Williams and Sandra F. Clark are designated as the responsible attorneys for Johnson & Johnson.

Respectfully submitted,

FOWLER, WILES & KEITH

By _____

MW/98328

JOHN S. APPLEMAN
DISTRICT CLERK

'97 NOV 14 P5:00

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

William Dixon Wiles, Of Counsel
Signed by permission

1900 Cityplace Center
2711 North Haskell
Dallas, Texas 75204-2944
Telephone:  (214) 841-3000
Telecopier:  (214) 841-3099

\*  _____

Gene M. Williams, Of Counsel
State Bar No. 21535300

Mehaffy & Weber
P. O. Box 16
Beaumont, Texas 77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded by certified mail to all counsel of record on this the _14_ day of _____ 1997.

_____
Gene M. Williams

MW/98328

CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS<br><br><br><br><br><br>136TH DISTRICT COURT |

## ORDER APPROVING SUBSTITUTION OF COUNSEL

ON THIS DAY came on to be heard the Motion for Substitution of Counsel of Johnson & Johnson, defendant herein, and the Court, having considered the motion, is of the opinion that the motion should be GRANTED.  It is, therefore,

ORDERED, ADJUDGED and DECREED that Gene M. Williams and Sandra F. Clark of Mehaffy & Weber is hereby substituted as counsel of record for defendant Johnson & Johnson in place of William Dixon Wiles.

SIGNED this 18th day of November, 1997.

JUDGE PRESIDING

MW/98328

CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KRONER COMPANY | § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS

136TH DISTRICT COURT |

## DEFENDANT'S MOTION TO QUASH SERVICE

Defendant, Johnson & Johnson Professional, Inc. (incorrectly sued as Johnson & Johnson Professional), asked the Court to quash the citation and service of Plaintiffs' petition.

### A. Introduction

1.  Plaintiff, Darlene Coker, and spouse Roy Coker, sued Defendant for personal injuries and related damages in this suit based on products liability.

### B. Argument and Authorities

2.  The Court should quash the citation and service of Plaintiff's petition because service of process of Plaintiff's petition was defective; specifically, the service was made on Johnson & Johnson Medical Inc., rather than Johnson & Johnson Professional, Inc.. Johnson & Johnson Medical Inc. is not an agent for service for Johnson & Johnson Professional, Inc. (See attached letter from Johnson & Johnson Medical, Inc. to counsel, attached hereto as Exhibit A).

MW/99829

C. Conclusion

5.     Because service of citation was defective due to service on an unrelated corporation

that is not authorized to accept service on behalf of Johnson & Johnson Professional, Inc., the Court

should quash the service of citation.

D. Prayer

6.     For these reasons Defendant asked the Court to sustain Defendant's Motion to Quash

and enter an Order quashing the citation and service of Plaintiff's petition, which will provide

additional time for Defendant to file an answer.

Respectfully submitted,

MEHAFFY & WEBER
Attorney for Defendant,
JOHNSON & JOHNSON PROFESSIONAL, INC.

By

Gene M. Williams, Of Counsel
State Bar No. 21535300

Post Office Box 16
Beaumont, Texas  77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5729

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing instrument has been
forwarded to all counsel of record on this the 21 day of _____, 1997.

Gene M. Williams

MW/99829

CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KRONER COMPANY | § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS

136TH DISTRICT COURT |

## ORDER ON DEFENDANT'S MOTION TO QUASH SERVICE OF PROCESS

On the _____ day of _____, 1997, the Court considered Defendant Johnson &

Johnson Professional, Inc.'s Motion to Quash Service of Process. After considering the pleadings,

the citation, and the service, the Court SUSTAINS the Motion to Quash Service of Process.

Therefore, the Court orders Defendant to answer on the Monday next at the expiration of twenty

days from the date of this Order.

SIGNED this ____ day of _____, 1997.

_____
PRESIDING JUDGE

APPROVED AND ENTRY REQUESTED:

_____
Gene M. Williams
Attorney for Defendant,
Johnson & Johnson Professional, Inc.

MW/99851

Gene M. Williams
Mehaffy & Weber
P. O. Box 16
Beaumont, Texas 77704
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on this the 21 day of _____, 1997.


Gene M. Williams

MW/99851

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

'97   NOV 25   P 4:30

October 28, 1997

<u>Via Hand-Delivery</u>

JOHN S. APPLEMAN
DISTRICT CLERK

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find Plaintiffs' Amended
Notice of Oral/Video Deposition of Darlene Coker.

All counsel of record are being furnished a copy of same.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

cc:   Mr. Brock C. Akers ................................................... Via facsimile
      Mr. Daniel Foley ..................................................... Via facsimile
      Mr. Eric D. Wewers ................................................. Via facsimile
      Mr. Gary J. Siller .................................................... Via facsimile
      Mr. Gene Williams................................................... Via facsimile
      Mr. James M. Harris, Jr.............................................. Via facsimile
      Mr. Kent M. Adams ................................................. Via facsimile
      Mr. Richard Corrigan ............................................... Via facsimile
      Nell McCallum & Associates.................................. Via facsimile
      Legal Images ........................................................ Via facsimile

2190 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

1

CAUSE NO. D-157,746

| | | |
|---|---|---|
| DARLENE COKER, and spouse, | § | IN THE DISTRICT COURT OF |
| ROY COKER | § | |
| | § | '97   NOV 25   P 4 :30 |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| BILL THAMES PHARMACY, INC., ET AL | § | 136TH JUDICIAL DISTRICT |

FILED
DISTRICT COURT OF
JEFFERSON CO. TEXAS

JOHN S. APPLEMAN
DISTRICT CLERK

## PLAINTIFFS' AMENDED NOTICE OF ORAL/VIDEO DEPOSITION

TO:    ALL DEFENDANTS, by and through their attorneys of record and/or registered agents for service.

PLEASE TAKE NOTICE that the Plaintiffs in the above-referenced cause of action will take the oral/video deposition of the person named below at the time and place designated in this notice pursuant to the Texas Rules of Civil Procedure.

WITNESS:    Darlene Coker

DATE:    Wednesday, December 10, 1997, continuing from day to day until completed

TIME:    10:00 a.m.

PLACE:    Nell McCallum & Associates, Inc.
2615 Calder, Suite 111
Beaumont, TX  77702

CT. REPORTER:    Irene Meguess
Nell McCallum & Associates, Inc.
2615 Calder, Suite 111
Beaumont, TX  77702

VIDEOGRAPHER:    Legal Images
PO Box 315
Gilchrist, TX  77617

You are invited to appear and cross-examine the witness.

The Law Offices Of Herschel L. Hobson
2190 Harrison
Beaumont, Texas  77701
Ph. #: (409) 838-6410
Fax #: (409) 838-6084

Respectfully submitted,

By: _____
Herschel L. Hobson
TBA# 09744600

ATTORNEY FOR PLAINTIFFS

2

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly forwarded to all counsel of record on this $\partial 4^{\underline{th}}$ day of November, 1997.

_____
Herschel L. Hobson

**MEHAFFY & WEBER**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2615 CALDER AVENUE
POST OFFICE BOX 16
BEAUMONT, TEXAS 77704

ONE ALLEN CENTER
500 DALLAS, SUITE 1200
HOUSTON, TEXAS 77002
TELEPHONE (713) 655-1200
FAX (713) 655-0222

1006 GREEN AVENUE
P.O. BOX 189
ORANGE, TEXAS 77630
TELEPHONE (409) 886-7766
FAX (409) 886-7790

TELEPHONE (409) 835-5011
FAX (409) 835-5177
(409) 835-5729

December 1, 1997

Re:   NO. D-157746; Darlene Coker, and spouse Roy Coker vs. Bill Thames Pharmacy
      Inc., et al; M&W File No. 3125-11

Herschel L. Hobson                              **FAX and CM/RRR**
The Law Offices of Herschel L. Hobson
2190 Harrison
Beaumont, Texas 77701

Dear Herschel:

      Enclosed please find **FIRST SET OF INTERROGATORIES TO PLAINTIFF
FROM MCNEIL PPC, INC. F/K/A JOHNSON-JOHNSON BABY PRODUCTS** in
connection with the above-styled and numbered cause.

                              Yours Very Truly,

                              Gene M. Williams
                              For the Firm

GMW/jah
cc:
Mr. John S. Appleman          w/o enc.
District Clerk
Jefferson County Courthouse
P. O. Box 3707
Beaumont, Texas    77704

Mr. James M. Harris, Jr.
Harris & Lively, PC
550 Fannin, Suite 845
P.O. Box 830
Beaumont, Texas 77704

MW/100683

**MEHAFFY & WEBER**

Herschel Hobson
December 1, 1997                                                    Page 2

---

Mr. Kent M. Adams
Adams, Duesler & Donaldson
550 Fannin, Suite 830
P.O. Box 7505
Beaumont, Texas 77726-7505

Mr. Brock C. Akers
Phillips & Akers
3200 Phoenix Tower
3200 Southwest Freeway
Houston, Texas 77027

William Dixon Wiles
Fowler, Wiles & Keith
1900 Cityplace Center
2711 North Haskell
Dallas, Texas 75204-2944

Mr. Richard P. Corrigan
1920 Nacogdoches Road
Suite 100
San Antonio, Texas 78209-2294

Mr. Eric D. Wewers
Dehay & Elliston, LLP
NationsBank Plaza
901 Main Street, Suite 3500
Dallas, Texas 75202

Mr. Gary J. Siller
Greggs & Harrison
1301 McKinney, Suite 3200
Houston, Texas 77010-3033

MW/100683

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.
ATTORNEYS AT LAW

'97 DEC -3 P1:27

December 2, 1997

Mr. John Appleman
Jefferson County District Clerk
PO Box 3707
Beaumont, Texas 77704

RE:     CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
        THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
        OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Appleman:

Enclosed for filing in the above-referenced case, please find a Rule 11 Agreement
signed by Gene Williams.

Thank you for your attention in this regard.

Very truly yours,

Luci Bailey,
Legal Assistant

/lb/dm

Enclosure

HERSCHEL HOBSON → MEH WEB                    ☎ 002/002

LAW OFFICES OF

# Herschel L. Hobson, Ph.D., J.D.

ATTORNEYS AT LAW

November 28, 1997

Mr. Gene Williams
Mehaffy & Weber
PO Box 16
Beaumont, TX 77704

RE:   CAUSE NO. D-157,746; DARLENE COKER, and spouse, ROY COKER v. BILL
      THAMES PHARMACY INC., ET AL; IN THE 136TH JUDICIAL DISTRICT COURT
      OF JEFFERSON COUNTY, TEXAS; OUR FILE NO. 2869-0

Dear Mr. Williams:

This letter is to serve as a Rule 11 Agreement wherein you have agreed to withdraw
Defendant McNeil PPC, Inc., f/k/a Johnson-Johnson Baby Products, First Set of
Interrogatories to Darlene Coker, Roy Coker and Requests for Production to Plaintiffs.
This letter is further to confirm that Plaintiffs are in agreement to answering the
Master Set of Discovery that I previously circulated, in addition to the two questions
you added.

If this letter accurately reflects our agreement, please sign on the line below and
return to me via facsimile for filing with the Court.

Thank you for your cooperation in this regard.

Very truly yours,

Herschel L. Hobson

HLH/dm

_____          12-1-97
Gene Williams                             Date

P.S,
Herschel,

    Our agreement also includes the proviso that you will timely
provide me with responses to the "master" set of discovery and any
medical in your possession.  This needs to be done relatively early
this week since you have now issued a notice for Ms. Coker's deposition
for December 10th.

2120 HARRISON AVE., BEAUMONT, TEXAS 77701 • (409) 838-6410 • FAX (409) 838-6084

CAUSE NO. D-157746

| | | |
|---|---|---|
| DARLENE COKER, AND SPOUSE ROY COKER | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | |
| BILL THAMES PHARMACY INC., CORRIGAN ENTERPRISES, INC. f/k/a JOHNSON-JOHNSON BABY f/k/a S.W.S. PHARMACY INC., FERTITTAS FINER FOODS, INC., GIANT FOOD DISCOUNT CITY, INC., HENKE & PILLOT, INC., HSTN. INC. f/k/a J&J BABY PRODUCTS, JOHNSON & JOHNSON PROFESSIONAL, LOVOI AND SONS PHARMACIES, INC., MCNEIL PPC INC. PRODUCTS, THE KROGER COMPANY | § § § § § § § § § § § § § § | JEFFERSON COUNTY, TEXAS

136TH DISTRICT COURT |

## AMENDED MOTION FOR SUBSTITUTION OF COUNSEL

COMES NOW William Dixon Wiles, Fowler, Wiles & Keith, counsel of record for McNeil PPC, Inc. f/k/a Johnson-Johnson Baby Products and moves the Court to substitute as counsel of record for Johnson & Johnson, Gene M. Williams and Sandra F. Clark of the law firm of Mehaffy & Weber, P. O. Box 16, Beaumont, Texas 77704.  For all purposes, Gene M. Williams and Sandra F. Clark are designated as the responsible attorneys for McNeil PPC, Inc. f/k/a Johnson-Johnson Baby Products.

Respectfully submitted,

FOWLER, WILES & KEITH

By _William Dixon Wiles_ /patt  *
William Dixon Wiles, Of Counsel
Signed by permission

MW/1000Tl

1900 Cityplace Center
2711 North Haskell
Dallas, Texas 75204-2944
Telephone: (214) 841-3000
Telecopier: (214) 841-3099

\* _Gene M. Williams / MRH_

Gene M. Williams, Of Counsel
State Bar No. 21535300

Mehaffy & Weber
P. O. Box 16
Beaumont, Texas 77704
Telephone: (409) 835-5011
Telecopier: (409) 835-5729

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded by certified mail to all counsel of record on this the 24 day of November 1997.

_Gene M. Williams / MRH_

Gene M. Williams

MW/100011

Exhibit 218



131 AVENUE CHARLES DE GAULLE - 92200 NEUILLY
TELEPHONE (33-1) 47 45 90 40 - TELEFAX (33-1) 47 47 58 05

**FACSIMILE**

| From | **Jean-Pierre GRANGE** | To | **JOHN O'SHAUGHNESSY** |
|------|------------------------|----|------------------------|
|      |                        | Company | **JOHNSON & JOHNSON** |
| Fax  | (33-1) 47.47.58.05     | Fax | 908 524 2788 |
| Date | 17 Apr 98              | Pages | 1 (Cover page included) |
| Copies | R.Zazenski           |    |  |

Re. **Coker v. J&J**

Dear John,

I am just coming back from Italy where I met two scientists who are preparing documents to help you solve your case.

Professor Sandrone, geologist from the university of Torino, will certify that the talc mined in Val Chisone before 1960 was not different from the one mined to day. He promised to send a letter. We have not yet received it and Val Chisone is recalling him.

The issue of asbestos in talc was raised in the early seventies and there was no reason before to carry out this type of analysis.

An important fact is that the workers examined by Rubino began to work between 1921 and 1950, therefore the period of exposure is the same as the one referred to by Coker. These workers did not show any mesothelioma despite very intense and prolonged exposure to talc dust.

Dr. Coggiola, from the Institute of Occupational Medicine of Torino, is updating the work of Rubino. Unfortunately his work will not be ready for publication before 1999. It is a long process but the quality of the epidemiological work depends directly on minimizing the number of lost subjects. Finding the vital status and the eventual cause of death of the last 5% takes more time than for the previous 95%!

Anyhow he will certify that no mesothelioma has been seen in the population of the talc workers. He promised me to send a letter directly to you.

I shall be in Italy the whole week and will give you a call on Monday the 27th to check if the documents have been sent.

Best regards

JP Grange

Protected Document – Subject to Protective Order

IMERYS 209394



## JOHNSON & JOHNSON
### CORPORATE HEADQUARTERS
### GENERAL LAW DEPARTMENT
### ONE JOHNSON & JOHNSON PLAZA
### NEW BRUNSWICK, NEW JERSEY 08933-7002

## FACSIMILE TRANSMISSIONS COVERSHEET

**DATE:**   April 16, 1998

TO:              **Rick Zazenski**

**COMPANY:**      Luzenac

**FACSIMILE NO.:**   (303) 643-0446

**FROM:**         John C. O'Shaughnessy, Esq.

**TELEPHONE NO.:**   (732) 524-2474         **FACSIMILE NO.:**   (732) 524-2788

NUMBER OF PAGES INCLUDING THIS COVER SHEET:

COMMENTS:

(IF THERE IS A PROBLEM WITH THIS TRANSMISSION, PLEASE CALL 732-524-2469)

## CONFIDENTIALITY NOTICE

THIS MESSAGE IS INTENDED ONLY FOR THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE SOLELY TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

Protected Document – Subject to Protective Order

IMERYS 209395

Johnson&Johnson

OFFICE OF
GENERAL COUNSEL

ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, N.J. 08933-7002

April 16, 1998

**VIA FACSIMILE**

Mr. Jean-Pierre Grange
Luzenac Group
131, Avenue Charles de Gaulle
92200 NEVILLY
FRANCE

        Re:  Coker v. Johnson & Johnson Consumer Companies, Inc.
           (Texas "Mesothelioma" Lawsuit)

Dear Jean-Pierre:

        Thank you so much for providing me with the documents related to talc testing and the Val Chisone deposit.  Those documents dated back to 1982.  In our lawsuit, the person suing Johnson & Johnson had exposure to Italian talc used in our baby powder that was produced from 1945 through 1963.  After 1963 or so, Johnson & Johnson began using Vermont talc.

        Therefore, it is very important that we be able to provide evidence to the Court that the talc produced from Val Chisone in the 1945-1963 time frame was free from asbestiform fibers.

        In order to do this, the Court will require that we produce a witness who has personal knowledge of those facts.  Therefore, I ask the following:

- Is there a geologist who has knowledge of the Val Chisone deposit and the mining operations during the time period 1942 to 1963?  Ideally, this witness would be able to testify that the talc taken from the mine and provided to Johnson & Johnson U.S. during 1945-1963 was free from asbestiform fibers.  This can be based on the particular geology of the Val Chisone deposit and whatever testing was done during that time period.

- There is an additional way to show that the talc provided to Johnson & Johnson from Val Chisone during 1945-1963 was free from asbestiform fibers.  The documents you provided to me show that from 1982 to the present the Val Chisone deposit does not contain asbestiform fibers.  If a geologist can testify that the ore body that produced

Protected Document – Subject to Protective Order

that talc is the same ore body that produced the talc shipped to Johnson & Johnson U.S. in 1945-1963 then it follows that this talc is also free from asbestiform fibers even though there may not be documents showing test results.

- Of course, if there is any documentary evidence of testing performed on the talc or the mine during the time period 1942 through 1963 that would be important for us to have.

- You informed me that the Rubino study has been updated. Are the results available? Have the results been published? Is there a scientist who participated in this study available to testify? Is there one witness who can cover both areas – that Val Chisone produced talc without abestiform fibers during 1945-1963 and the Rubino study update?

Since this case will go to trial on June 22, 1998 we are operating under tight timelines. We need to identify a witness or witnesses for the Val Chisone deposit and Rubino study as soon as we can and I appreciate your attention to my request.

I spoke with Rich Zazenski who informed me that you will be in Italy next week so perhaps this is an opportune time to identify the appropriate person or persons who will be able to come to the U.S. at the end of June to testify.

I will try to arrange a phone conference with you to discuss these issues when you return from Italy.

Once again, thank you for your assistance.

Best regards,

John C. O'Shaughnessy

cc:  Richard Zazenski

Protected Document – Subject to Protective Order

IMERYS 209397

Exhibit 219

DRINKER BIDDLE & SHANLEY LLP
A Pennsylvania Limited Liability Partnership
500 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 360-1100
Attorneys for Defendants
JOHNSON & JOHNSON CONSUMER COMPANIES, INC.
AND JOHNSON & JOHNSON

| | |
|---|---|
| THERESA KRUSHINSKI and FRANK KRUSHINSKI, <br><br> Plaintiffs, <br><br> v. <br><br> JOHNSON & JOHNSON BABY PRODUCTS COMPANY, A DIVISION OF JOHNSON & JOHNSON CONSUMER PRODUCTS COMPANY, INC., a subsidiary of JOHNSON & JOHNSON, INC.; JOHNSON & JOHNSON, INC.; ABC CORPORATIONS (fictitious corporations, subsidiaries and or divisions of JOHNSON & JOHNSON, INC.); THE ESTEE LAUDER COMPANIES, INC.; DEF CORPORATIONS (fictitious corporations); THE PUIG GROUP, trading as NINA RICCI; XYZ CORPORATIONS (fictitious corporations or business entities, trading as JEAN PATOU), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: MIDDLESEX COUNTY <br> DOCKET NUMBER MID-L-9389-99 <br><br> CIVIL ACTION <br><br> **DEFENDANTS JOHNSON & JOHNSON CONSUMER COMPANIES, INC. AND JOHNSON & JOHNSON'S ANSWERS TO PLAINTIFFS' SUPPLEMENTAL INTERROGATORIES** |

## OBJECTIONS AND ANSWERS TO SUPPLEMENTAL INTERROGATORIES

1.      If you contend that Johnson's Baby Powder was the subject of pre-market approval or licensure by the Federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. § 301 et seq. or the "Public Health Service Act, " 58 Stat. 682, 42 U.S.C. § 201 and was approved or licensed; or is generally recognized as safe and effective pursuant to conditions established by the Food and Drug Administration and applicable regulations,

J&J-0162339

Protected Document--Subject to Protective Order

including packaging and labeling regulations, set forth all facts and identify all documents upon which you intend to rely to support your contentions.

**RESPONSE**: It is defendants' position that the provision of the statute quoted in this interrogatory precludes any award of punitive damages against the Johnson & Johnson defendants.   Johnson & Johnson's Baby Powder is not subject to specific pre-market approval or licensure under the Federal Food Drug and Cosmetic Act. However, The FDA regulates cosmetics such as baby powders. The FDA has certain labeling and ingredient guidelines which are applicable to Johnson & Johnson's Baby Powder. Further defendant has at all required times submitted voluntary information regarding complaints or reactions pursuant to CFR 710 et seq.  Defendant objects to providing supporting documentation as overly broad and unduly burdensome and equally available to the plaintiff.

　　2.　　Define the term "cosmetic talc" in complete detail as used by Defendant in Defendant's response to Demands # 1, #2, #3, #4, #5, #6, #7, #8, #9, #10, #11, #12, #13, #14, #15, #16, #17, #18, #19, #20, #21, and #29, of Plaintiff's Demand for Admissions by Plaintiff by stating the range of size and the chemical formula of the talc particles contained in Johnson's Baby Powder.

**RESPONSE**: Cosmetic talc is one of three grades of commercial talc, the other two grades are industrial and pharmaceutical. Industrial grades of talc vary widely in talc mineral content from below 50% up to ranges approaching pure talc mineral assay, and also vary widely in particle size distribution. Cosmetic talcs normally have a talc mineral assay of 90% or more.   Pharmaceutical talc assay is generally from 95% to 100% pure talc mineral.

　　3.　　Define the term "industrial talc" in complete detail as used by Defendant in Defendant's response to Demands # 1, #2, #3, #4, #5, #6, #7, #8, #9, #10, #11, #12, #13, #14, #15, #16, #17, #18, #19, #20, #21, and #29, of Plaintiff's Demand for Admissions by Johnson & Johnson by stating the range of size and the chemical formula of the talc particles contained in industrial talc.

**RESPONSE**: Industrial talc is one of three grades of commercial talc, the other two grades are cosmetic and pharmaceutical. Industrial grades of talc vary widely in talc mineral content from below 50% up to ranges approaching pure talc mineral assay, and also vary widely in particle size distribution. Cosmetic talcs normally have a talc mineral assay of 90% or more.   Pharmaceutical talc assay is generally from 95% to 100% pure talc mineral.

- 2 -

J&J-0162340

Protected Document--Subject to Protective Order

JNJ 000065002

4.       Define the term "normal and expected use" of Johnson's Baby Powder as used by Defendant in Defendant's response to Demands #23, #24, #25, #26, #27, #28, and #29 of Plaintiffs Demand for Admissions by Johnson & Johnson, Inc. dated February 23, 2000.

**RESPONSE**: **Johnson's Baby Powder is expected to be used by shaking the powder into the hand of the consumer and applied to the skin.**

5.       Identify all written warnings contained on labels affixed to containers of Johnson's Baby Powder containing talc by setting forth all language contained on the label(s); the date each label was first placed upon containers of Johnson's Baby Powder containing talc, the dimensions of the label and the size of the type used for each portion of the label and the reason the language was incorporated.

**RESPONSE**: **See labeling documents found among the documents produced in response to plaintiffs' document demand.**

6.       Identify all studies performed by Johnson & Johnson, Johnson & Johnson Consumer Product or any of their subsidiaries, divisions, affiliates or any agent, or outside consultant designed to determine manner in which consumers apply and or use Johnson's Baby Powder.

**RESPONSE**: **Defendant objects to this interrogatory as over broad, vague and ambiguous. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, see documents provided in responses to request for production.**

7.       Identify all scientific testing performed by Johnson & Johnson, any of its subsidiaries, divisions, affiliates or any agent, or outside consultant designed to determine whether there are any health risks posed to users of Johnson's Baby Powder or any other cosmetic powders containing talc.

**RESPONSE**: **Defendant objects to this interrogatory as overly broad, vague, and ambiguous. Specifically, plaintiffs use of "health risks" include a myriad of conditions unrelated to any issue in this lawsuit. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, defendant refers plaintiff to the studies provided in response to plaintiffs requests for production.**

8.       Identify and describe all clinical testing performed by Johnson & Johnson, any of its subsidiaries, divisions, affiliates or any agent, or outside consultant upon Johnson's Baby Powder.

- 3 -

J&J-0162341

Protected Document--Subject to Protective Order

JNJ 000065003

RESPONSE: Defendant objects to this interrogatory as overly broad, vague, and ambiguous. Specifically, plaintiffs use of "all clinical testing" include a myriad of testing unrelated to any issue in this lawsuit. Furthermore, the documents requested by plaintiffs may be confidential, proprietary, and subject to trade secret privileges. Subject to the foregoing objections, defendant refers plaintiff to the studies provided in response to plaintiffs requests for production.

9.  Describe all refining processes undergone by the "highly refined cosmetic talc" contained in Johnson's Baby Powder prior to shipment for distribution for sale to consumers and identify the person or entity responsible for performing such process and the location where such processes are performed.

RESPONSE: Defendant objects to further response to this interrogatory on the grounds that it requests confidential and proprietary information subject to trade secret privileges. Further, this interrogatory is not relevant as plaintiffs have not made any manufacturing defect claim. Subject to the forgoing objections, the talc used in Johnson & Johnson's Baby Powder is selected from specific sources based on material specifications. Talc ore containing approximately 50% talc is taken from specific mining sites and is introduced into the refining process. Ore is crushed, dried and rolled to form a powder. Wetting is introduced to obtain a slurry which is introduced into a multiple horizontal float cell process which removes non talc particles. Talc is sampled at routine intervals and is prepared for shipping with methodology to retain aseptic qualities. Talc is maintained in dedicated silos and transported by air veying system for fragrance blending then filling and capping with routine sampling. The bottles are then packaged for shipping. These processes occur at the West Windsor Vermont purification plant and at the packaging facility in Royston GA. The individual with significant knowledge of these items is Randy Corder, an employee of defendant.

10.  Describe all refining processes which the talc contained in Johnson's Baby Powder has undergone prior to receipt by Johnson & Johnson in complete detail and identify all individuals or entities involved in or responsible for performing such processes, by name and address.

RESPONSE: Defendant objects to further response to this interrogatory on the grounds that it requests confidential and proprietary information subject to trade secret privileges. Further, this interrogatory is not relevant as plaintiffs have not made any manufacturing defect claim. Subject to the forgoing objections, the talc used in Johnson & Johnson's Baby Powder is selected from specific sources based on material specifications. Talc ore containing approximately 50% talc is taken from specific mining sites and is introduced into the refining process.

- 4 -

J&J-0162342

Protected Document--Subject to Protective Order

JNJ 000065004

Ore is crushed, dried and rolled to form a powder. Wetting is introduced to obtain a slurry which is introduced into a multiple horizontal float cell process which removes non talc particles. Talc is sampled at routine intervals and is prepared for shipping with methodology to retain aseptic qualities. Talc is maintained in dedicated silos and transported by air veying system for fragrance blending then filling and capping with routine sampling. The bottles are then packaged for shipping. These processes occur at the West Windsor Vermont purification plant and at the packaging facility in Royston GA. The individual with significant knowledge of these items is Randy Corder, an employee of defendant.

11.  Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether any adverse health effects have been associated with the long term use of cosmetic powders which contain talc? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: Defendant objects to this interrogatory in that it is overly broad, vague, ambiguous, and unduly burdensome. Specifically, "adverse health effects" is overly broad in that it calls for the identification of documents unrelated to any condition at issue in this lawsuit. In addition, such documents may be confidential or subject to a protective order. Subject to the foregoing objections, medical literature concerning talc and talcosis are available in the public domain. In addition, Defendant refers you to studies provided in response to plaintiffs' request for production.

12.  Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether any adverse health effects have been associated with the long term use of cosmetic powders which contain corn starch? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: Defendant objects to this interrogatory as overly broad and vague in that it does not define "adverse health effects," and that it seeks discovery related to a product not at issue in this case. "Adverse health effects" could include the identification of documents unrelated to any condition or product at issue in this lawsuit. Subject to the foregoing objection, medical literature related to cornstarch is available in the public domain.

- 5 -

J&J-0162343

13.    Is Defendant Johnson & Johnson aware of the existence of any studies which have been conducted to determine whether Johnson's Baby Powder containing talc is effective in reducing the likelihood of infants developing diaper rash or reducing its effects? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: **Defendant objects to this interrogatory as irrelevant. Specifically, this interrogatory calls for information that is not relevant to any condition at issue in this lawsuit.**

14.    Is Defendant Johnson & Johnson aware of the existence of any study conducted to determine whether Johnson's Baby Powder containing corn starch is effective in reducing or likelihood of developing diaper rash or its effects? If so please identify each such study by setting forth the identity of the individual(s) or entity responsible for conducting such study, whether such study has been published, where such study has been published and whether or not the results of the study have been subject to peer review.

RESPONSE: **Defendant objects to this interrogatory as irrelevant. Specifically, this interrogatory calls for information that is not relevant to any condition or product at issue in this lawsuit.**

15.    State the name, address and title of the individual(s) employed by Defendant who are most knowledgeable concerning the refining processes and procedures employed by Defendant or defendant's suppliers of the talc contained in Johnson's Baby Powder.

RESPONSE: **Defendant objects to this interrogatory as overly broad and vague. Defendant has had hundreds of employees involved in the production of Johnson & Johnson's Baby Powder of its 50+ year history. It is not possible to identify one person or even a small group of persons with complete knowledge of all aspects of production over the years. Furthermore, this interrogatory calls for information that is not likely to lead to the discovery of any evidence that is relevant to any issue in this lawsuit.**

**Subject to the above stated objections, individuals knowledgeable to this area would be Roger Miller, former President of Windsor Minerals, Inc. and Randy Corder, Quality Assurance, Johnson & Johnson.**

**These individuals may be contacted only through counsel for Johnson & Johnson.**

- 6 -

J&J-0162344

Protected Document--Subject to Protective Order

16.     State the name, address and title of the individual(s) employed by Defendant who are most knowledgeable concerning the incidence of talcosis and/or pulmonary fibrosis among employees of Johnson & Johnson engaged in the refining talc of used in the manufacture of Johnson's Baby Powder.

**RESPONSE:** Defendant objects to this interrogatory as overly broad and vague.  Defendant has had hundreds of employees involved in the production of Johnson & Johnson's Baby Powder of its 50 + year history.  It is not possible to identify one person or small group of persons with complete knowledge worker related injuries over the years.  Furthermore, this interrogatory calls for information that is not likely to lead to the discovery of any evidence that is relevant to any issue in this lawsuit.  Subject to this objection, see those individuals listed in response to # 15, above.

17.     Describe in detail all processes, procedures and testing performed upon the talc used in the manufacture of Johnson's Baby Powder to reduce or eliminate the existence of asbestos, tremolite or other contaminants in Johnson's Baby Powder.

**RESPONSE:** To the best of defendant's knowledge talc used in the manufacture of Johnson & Johnson's Baby Powder never contained asbestos in any form, or tremolite.  Defendant's sources of talc were selected for their lack of contaminants and further, testing was performed over a significant number of years by outside laboratories which verified that defendant's talc sources did not contain asbestos or tremolite.  Defendant objects to providing further information as overbroad and irrelevant.  Plaintiff has made no claim of an asbestos-related illness.

18.     Is Defendant Johnson & Johnson aware of the existence of any studies or tests conducted for the purpose of determining whether Johnson's Baby Powder containing talc contains any asbestos, tremolite or other contaminants?  If so please identify each such study or test by setting forth the identity of the individual(s) or entity responsible for conducting such study or performing such testing, whether the results of such study or tests have been published, where such study or the results of such test(s) has been published and whether or not the results of the study or testing have been subject to peer review.

**RESPONSE:** Over a number of years, defendant had an ongoing process of testing its source talc for Johnson & Johnson's Baby Powder for asbestos, tremolite or other contaminants.  This testing was performed by outside laboratories both McCrone and R.J. Lee.  For a significant period of time this testing was directed by Ian Stewart, a former employer of McCrone.  Mr. Stewart is a consultant for defendant and may be contacted only through its counsel.

-7-

J&J-0162345

Protected Document--Subject to Protective Order

JNJ 000065007

01/10/01 13:10 FAX 973 360 9831          DRINKER BIDDLE SHANLEY                    ☒024/027

Defendant objects to providing further information as it is overly broad and irrelevant. Plaintiff has made no claim for an asbestos-related illness.

19.    Has Johnson & Johnson ever received notice of any claim(s) made by any individual other than Plaintiff, Theresa Krushinski who claimed or alleged that they developed talcosis and/or pulmonary fibrosis through exposure to Johnson's Baby Powder? If so, for each such claim set forth the date upon which Defendant received notice of such claim, the name and address of the claimant, and whether or not such claim resulted in litigation. If the claimant was represented by counsel, set forth the name and address of the attorney who represented the claimant, the name of the court in which such claim was venued, the caption of the action, the docket number or case number identifying such action and the identity of the attorney or attorneys who represented Johnson & Johnson in that action. If any employee gave deposition or trial testimony in connection with such action, set forth the name and address of the employee who testified, the date and place where such testimony was given and the name and address of the court reporter who recorded such testimony. Please attach a copy of the transcript of such testimony to your responses to these Interrogatories.

RESPONSE:  Defendant objects to this interrogatory to the extent it calls for information irrelevant to any matter at issue in this lawsuit. Subject to the foregoing objections, defendant has been sued in the following cases.

No. L 064208-83; Selby v. Johnson & Johnson Consumer Products, Inc. California Superior Court, San Diego County - Filed 12-22-93

No. 670577; Gambino v. Johnson & Johnson Baby Products, Co. Superior Court, New Jersey, Middlesex County - Filed 10-12-83

20.    If Defendant has had any lung tissue sample alleged by any individual to evidence the existence of talcosis or pulmonary fibrosis caused by Plaintiff's exposure to Johnson's Baby Powder subject to scientific analysis, set forth the name and address of the individual whose tissue sample was tested, the name and address of the individual who performed such testing, the date such testing was performed and the result of such testing. Please attach a copy of the results of such testing or analysis to your responses to these Interrogatories.

RESPONSE:  Objection. Improper. The Judge in this case has ruled that the plaintiff is not entitled to this information unless or until an individual reviews tissues samples from the plaintiff and is identified as an expert.

21.    If you contend that the risk of developing talcosis and/or pulmonary fibrosis through the use of Johnson's Baby Powder was known to the average or ordinary consumer set forth, in complete detail, all facts upon which you intend to rely to establish that the characteristics of talc are known to the average or ordinary consumer.

- 8 -

J&J-0162346

Protected Document--Subject to Protective Order                                      JNJ 000065008

**RESPONSE**: Defendant objects to this interrogatory on the grounds that it is over broad, vague, and irrelevant. Plaintiff attempts to improperly shift the burden to defendant to prove that its product was safe. Subject to the foregoing objections, the normal and expected use of Johnson's Baby Powder poses no health risks.

22.   If you contend that exposure to "highly refined cosmetic talc" poses a reduced risk of developing pulmonary fibrosis or talcosis set forth all facts and identify all studies upon which you intend to rely to establish this fact at the time of trial.

**RESPONSE**: Defendant objects to this interrogatory on the grounds that it is over broad, vague, and irrelevant. Plaintiff attempts to improperly shift the burden to defendant to prove that its product was safe. Subject to the foregoing objections, the normal and expected use of Johnson's Baby Powder poses no health risks.

23.   If you contend that Plaintiff developed talcosis by exposure to talc other than through the use of Johnson's Baby Powder set forth in complete detail all facts upon which you rely to establish this contention.

**RESPONSE**: Defendant disputes the contention that plaintiff developed talcosis by exposure to talc produced by Johnson & Johnson. Further information will be provided in response to this interrogatory when discovery is completed.

24.   Identify all individuals employed by Defendant, by name, address and job title who provided information necessary to respond to these Interrogatories and identify the individual, by name address and job title with Defendant, who Certified these Answers to Interrogatories on behalf of Defendants.

**RESPONSE**: Defendant objects to this interrogatory as over broad, harassing, and requests information subject to the attorney client, work product, and investigative privileges. Subject to the foregoing objection, these answers to interrogatories were complied from numerous sources and the investigation by counsel.

25.   If any individual employed by Defendant consulted in connection with providing Defendant's answers to these Interrogatories or provided information necessary to respond to these Interrogatories is licensed to practice medicine in this or any other state, or is a scientist with experience or training in the field of inhalation toxicology, set forth the name and address of such

- 9 -

J&J-0162347

Protected Document--Subject to Protective Order                     JNJ 000065009

physician, whether such physician has been Board Certified in any area of medicine and attach a copy of the current curriculum vitae for such individuals.

**RESPONSE**:  Defendant objects to this interrogatory as over broad, harassing, and requests information subject to the attorney client, work product, and investigative privileges.  These answers to interrogatories were compiled from numerous sources and the investigation of counsel.

- 10 -

SFNJ1 667751v1

J&J-0162348

Protected Document--Subject to Protective Order                                          JNJ  000065010

01/10/01  13:11 FAX 973 360 9831        DRINKER BIDDLE SHANLEY                    ☒027/027

## CERTIFICATION

I am employed by Johnson & Johnson Consumer Companies, Inc. (JJCCI), a defendant in the above-entitled action. The foregoing answers to interrogatories were prepared with the assistance and advice of counsel for JJCCI, upon whose advice and information JJCCI and I relied. The foregoing answers are true and correct to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

*Nancy C. Musee*

Dated: 5/23/00

SFNJ1 665775v1

J&J-0162349

Protected Document--Subject to Protective Order

JNJ 000065011

Exhibit 220

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE: ASBESTOS LITIGATION | ) | |
| | ) | |
| HORACE A DURHAM, SR., and | ) | |
| DOLORES JANE DURHAM | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05C-07-136 ASB |
| | ) | |
| METROPOLITAN LIFE INSURANCE., | ) | NON-ARBITRATION |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT

My name is John Hopkins. I hold a BSc (Batchelor of Science) degree with Honors in Chemistry & Biochemistry from the University of St Andrews, Scotland, UK. I also hold a PhD degree in Toxicology from the University of Dundee, Scotland, UK.

I am a Chartered Biologist, holding the Diploma, C Biol.

My academic background is in the field of Toxicology.

I make this affidavit based on my personal knowledge gained during my employment with Johnson & Johnson Consumer Products, Inc. (hereinafter referred to as "Johnson & Johnson" as described below and from a personal review of documents in the files of Johnson & Johnson during certain of the times I worked for the Company as well as information conveyed to me in the ordinary course of business by other employees of Johnson & Johnson.

Prior to joining Johnson & Johnson in 1976 I undertook some teaching to medical students followed by employment as a Toxicologist in the Pharmaceutical industry. I was a founder Member of the British Toxicology Society in 1979.

During the period 1976 -2000 I was in the employment of Johnson & Johnson.

222733v1

EXHIBIT
J&J-230

I was employed in the United Kingdom (1976-94) for the United States for the four years 1995-1998 inclusive and in France (1999-2000).

Since 2000 I am the President my own Company, Innovant Research. This is an independent Consultancy in the field of Toxicology, Product Safety and Risk Assessment.

For the whole of the period from 1976 onwards I have been familiar with the literature and debate as to talc safety. I am a Member of the UK Trade Association, CTPA Scientific Advisory Committee and the CTPA Talc Committee.

I am also familiar with the history and background of the sourcing, standards and specification of talc as used by Johnson & Johnson on a worldwide basis. During my employment for Johnson & Johnson in the UK, I was in regular contact with medical and scientific colleagues in the United States on all matter relating to talc safety.

Through my Company, I am a Consultant to Johnson & Johnson both in Europe and in the United States on safety matters, including talc safety, and still retain authorized copies of talc literature and information on talc usage within Johnson & Johnson.

This documentation includes summary of documented historical data and talc specifications.

**Johnson & Johnson Talc History**

1. **Talc Sourcing:**

The purity of talc is based on its source. There are only a limited number on talc mines in the World that provide a grade of talc that meets the requirements of talc for pharmaceutical applications (Talc USP) and talc for cosmetic applications (compliance with the CTFA monograph).

Mines that include geological structures, other than pure talc are not suited as a source of Cosmetic and Pharmaceutical grades of talc.

From 1946 talc for Johnson & Johnson in the United States was sourced from the Italian mine at Val Chisone.

Italian talc was the sole source for Johnson & Johnson products until 1964.

From 1964 until 2002, talc was sourced by Johnson & Johnson in the United States from the Windsor mine in Vermont, USA.

222733v1

2

**2. Specification of Cosmetic Talc**

The records indicate that as far back as 1949, there is documented evidence that the specification for Johnson & Johnson Cosmetic talc should be free from asbestos and asbestiform minerals.

Although asbestos was not known as a hazard in 1949, the presence of asbestos was even at that time, considered highly undesirable as the "feel" of its presence on the skin is regarded as unpleasant and cosmetically unacceptable.

Confirmation of the absence of asbestos on a historical basis has been reported in a Johnson & Johnson internal Report from 1966 that summarized the results of 13 samples of talc from the Company Museum, and dating from the period 1910 – 1964.

### 3. Audits of Talc Mines.

As a part of a program to ensure that the talc used in Johnson & Johnson products was free from asbestos, an independent geological audit of the talc mines both in Italy and in Vermont was conducted in 1972 by Professor Fred Pooley from the Department of Mineral Exploitation, University of Wales, UK.

Professor Pooley is considered a world class expert in talc mineralogy and geology. The audits included a systematic geological sampling of all areas of the mines, including the non-talc bearing areas.

The conclusion of the Audits was that for both of the Italian and Vermont mines, there was zero evidence of asbestos in the geology and mineralogy of the mines.

Additionally Professor Pooley examined a sample of talc dating from 1949, as used by Johnson & Johnson in the UK. It was reported that the quality had not changed.

### 4. Sampling of Talc

Since 1975, Johnson & Johnson has conducted a regular monitoring program of samples of talc from all mines supplying to affiliate Johnson & Johnson companies throughout the world. Although Italian talc was not used in the United States after 1964, it was used in Europe until 1999. The monitoring program included assay for asbestos, silica and quartz. Assay has been conducted by an independent external laboratory in the United States.

In addition, it has been a requirement of the Raw Material specification since 1975, for each batch of talc to be supplied to Johnson & Johnson to be free from asbestos and in compliance to the CTFA Talc Monograph. This has required the supplier to confirm purity of every batch supplied using state of the art techniques.

222733v1

3

For the talc sources in use in the United States over the period 1955-2002, there has never been an instance of asbestos contamination.

## 5. Conclusions

It is my considered expert opinion that based on:

1.   An absence of asbestos contamination in historical talc samples,
2.   An in-house raw material specification requirement, dating from at least prior to 1949, for absence of asbestos in talc,
3.   No evidence of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States and
4.   No evidence of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 –to date,

It may be concluded that there has never been asbestos contamination of the talc used by Johnson & Johnson in the United States from the period in question, 1955-2002.

John Hopkins. BSc, PhD, C Biol.

Duly sworn before me
by John Hopkins on
19ᵗʰ September 2006

RICHARD W S. DRAKE

NOTARY PUBLIC

PENNINGTONS
Newbury House
20 Kings Road West
Newbury
Berkshire RG14 5XR UK
Telephone 01635 571000

222733v1

4

Exhibit 221

3

**EXHIBIT J&J-586**

tective Order





# DEPARTMENT OF
# MINERAL EXPLOITATION

## UNIVERSITY COLLEGE
## CARDIFF

Protected Document--Subject to Protective Order

JNJAZ55_000000088

# AN EXAMINATION OF ITALIAN MINE
## SAMPLES AND RELEVANT POWDERS

This document represents the completion report of the Italian mine samples and other powders supplied by Johnson and Johnson, Cosham, Portsmouth, to the Department of Mineral Exploitation.

The persons involved in the examination of the material reported here were:

Mr. J. Lightfoot

Mr. G.A. Kingston

Dr. F.D. Pooley

Received: 8th September
1972

Protected Document--Subject to Protective Order

JNJAZ55_000000089

# REPORT OF INVESTIGATION OF ITALIAN MINE

## SAMPLES AND RELATED POWDERS

## Introduction

Talc is hydrated magnesium silicate ($Mg_3Si_4O_{10}(OH)_2$) which can occur in a number of forms. In its compact form it is known as stealite or soapstone. The form normally employed for toilet purposes is soft and very friable in character. It is mined in many parts of the world including the U.S.A., Canada, France, Italy, Norway and India, as well as several other countries. It occurs in both a flaky and lath like form and the chief deposits occur in altered magnesia-rich calcareous rocks such as dolomite, marble, and magnesian limestone. The purest talc deposits occur in association with dolomite and marble. Talc also occurs in altered basic rocks such as serpentines and again as thin beds in mica schists. Commercial talcs contain a number of related mineral impurities. They may include antigorite (hydrated magnesium silicate) magnesite or members of the magnesite-chalybite series of carbonates, dolomite (calcium magnesium carbonate), tremolite and actinolite (calcium, iron magnesium silicates), chlorites (magnesium aluminium iron silicates) and other minor minerals such as the sulphides and spinels.

The hand specimens examined in this report were collected at the Italian mine and do not represent an average collection of specimens of material being produced at the mine. The specimens were collected with the intention of sampling those areas with obvious non talc mineral inclusions. Specimens were retained which showed differences in physical appearance, i.e. fibrous, flakey, massive and powdery in texture. Specimens of ore in which colour variation was observed were also collected. In general the colour of the talc ore varied from grey through white to a light green colour. Obvious inclusions in the talc ore itself were retained and a careful search at the various sample locations in the talc seam was performed for fibrous amphibole minerals.

Specimens of the hanging and footwall were also collected to assess their mineral content as these were likely sources of ore contamination, although the method of mining which consisted of hand filling methods precluded any gross contamination of the ore.

The hand specimens have been, where possible, prepared for examination by the optical microscope and both polished blocks and thin sections of material have been employed. Representative fractions of all hand specimens have been reduced to powder form and subjected to powder X-ray diffraction examination. The representative powdered samples also form the samples for morphological examination by the electron microscope.

Protected Document--Subject to Protective Order

The list of samples obtained from the Italian mine are given in Tables 1 and 2 and throughout this report the samples are referred to by the preceding code number for each specimen.

The objective of the examination has been mainly to establish the major minerals which occur in association with talc at the Italian mine. In particular to look at the association of these minerals with the talc and especially those minerals which are of the same family as the commercial asbestos minerals, i.e. the amphiboles and serpentines.

The objective of the optical examination has been to establish textural and mineral relationship and not to quantify the phases occurring in each hand specimen. X-ray work has been aimed at establishing the minerals observed by optical means and to produce reference patterns for future investigation together with computed data from pattern measurement.

Electron microscope work has been selective in nature and performed on the finer fraction of the powdered specimens. Its aim has been to describe the morphology of the particles produced by comminution of the hand specimens and to investigate any obvious structural information which might be of use in identification of individual mineral particles.

Representative data obtained from the various examinations are included in the following report.

Protected Document--Subject to Protective Order

## TABLE 1

### LIST OF ITALIAN MINE SAMPLES

| Code No. | Description |
|---|---|
| I.1. | Talc from footwall contact |
| I.2. | Sorting pieces (with obvious colour differences) |
| I.3. | Coloured talc (green) |
| I.4. | Face 10 sample with obvious amphibole inclusion. |
| I.5. | General ore |
| I.6. | Suspected Quartz sample |
| I.7. | Mica schist specimen |
| I.8. | Massive talc |
| I.9. | Grey talc 1st face |
| I.10. | Granular talc sample |
| I.11. | Carbonate and talc |
| I.12. | Footwall sample? Amphibolite |
| I.13. | Inclusion showing passage into talc bottom transit. |
| I.14. | Inclusion in talc seam face 4, middle of seam. |
| I.15. | Talc footwall contact |
| I.16. | Inclusion from face 1. |
| I.17. | Footwall rock sample |
| I.18. | Face 3 carbonate/talc sample |
| I.19. | Tremolite/quartz/talc sample |
| I.20. | Amphibole sample from Gianna level 1212 |
| I.21. | Inclusion from face 2. |
| I.22. | Carbonate/talc sample |
| I.23. | Black gneiss 2 ft below talc seam |
| I.24. | Talc next to carbonate face 2. |
| I.25. | Footwall limestone |
| I.26. | Talc inclusions |
| I.27. | Lithological inclusions face 1 |

JNJAZ55_000000092

**Table 1 Continued**

| Code No. | Description |
|----------|-------------|
| I.28. | Quartz/talc sample |
| I.29. | Sample 6 footwall |
| I.30. | Quartz/Carbonate/talc sample |
| I.31. | Black inclusion face 1 |
| I.32. | Face 2 inclusion from base of talc |
| I.33. | Talc from lower left end of working |
| I.34. | Marble/tunnel wall |
| I.35. | Massive carbonate from rear end of working |
| I.36. | Grey talc specimen |
| I.37. | Carbonate in talc inclusion |
| I.38. | Pyrite/talc specimen |
| I.39. | 5" - 0 pieces from crusher |
| I.40. | Platey talc |
| I.41. | Face 2, good specimen |
| I.42. | Face 1, coloured green (talc) |
| I.43. | Face 10, fibrous sample |
| I.44. | Face 1, pure talc? |
| I.45. | Face 1, good specimen |
| I.46. | Face 3, coloured specimen |

Protected Document--Subject to Protective Order

JNJAZ55_000000093

## TABLE 2

### OTHER SPECIMENS EXAMINED

| Code No. | Description |
|---|---|
| B1 | Pure talc 1st face |
| B2 | Greenish talc 1st face |
| B3 | Talc 6 inches above footwall |
| B4 | Talc from above inclusion |
| B5 | Inclusion in talc |
| B6 | Talc 2 ft above inclusion |
| B7 | Section 2 ft above inclusion |
| B8 | Pure talc 1st face |
| B9 | Grey talc 1st face |

### Also examined

1) Batch shipments of ØØØØØ talc

2) Old samples of British powders.

---

Protected Document--Subject to Protective Order

JNJAZ55_000000094

# OPTICAL EXAMINATION OF SPECIMENS I1 - I46

Thin and polished sections were prepared of the specimens of wallrock and, where possible, the talc ore.

The minerals which formed a major constituent in at least one of the sections were quartz, muscovite, talc, chlorite, (var sheridanite), calcite, garnet, and tremolite; the latter only occurred as a major constituent in section I19. Phases which were always minor or accessory were microcline, plagioclase, biotite, pennine, epidote, clinozoisite, hornblende, actinolite (section I7), rutile, and opaque constituents pyrite, pyrrhotite, and chalcopyrite.

The identification of the minerals in the sections of these specimens was based on the optical characteristics of the minerals in transmitted and reflected light, both under plane polarised light (PPL) and crossed nicols (XN), combined with the results of the X-ray diffraction study of the crushed hand specimens. In some cases material was extracted from the sections and examined in R.I. liquids as in determining that the most common chlorite mineral in these specimens is a variety called sheridanite having a R.I. $\omega$ equivalent of $1.590 \pm 0.005$ and a birefringence of 0.012 - 0.014. Similarly much of the muscovite was nearly uniaxial with a R.I. of 1.600 corresponding to the variety phengite, an abnormally siliceous muscovite. In the case of talc its confident determination optically is difficult since its optical properties are identical to muscovite. However, it was found that the common "feathery" form of the talc combined with the invariable occurrence of minute transparent inclusions (suspected to be silica) in the talc producing a 'dusty' appearance in thin section and a greenish colour in hand specimen, enabled talc to be distinguished from muscovite. Talc also exhibited slightly higher order interference colours in general. Where talc was only an accessory mineral to muscovite, as in some of the wallrock samples, then it could not be distinguished with certainty.

In the following pages (no. 7 to 48 ) the Italian specimens are systematically described as regards their mineral composition and mode of intergrowth. Numerous photomicrographs taken under PPL and XN are provided with the description to mainly illustrate the rock textures which, it is hoped, will provide information useful in the comminution of particularly the talc ore samples, and also displays the non occurrence of asbestiform amphiboles in the talc ore.

Protected Document--Subject to Protective Order

## Specimen I1

Specimen I1 consisted of several pieces of wallrock with one piece displaying the talc/footwall contact. One polished section was made of the talc/footwall contact and one thin section of the wallrock alone.

The wallrock is a schist which in thin section displayed a segregation of the main minerals into thin lenticular bands composed, as in Figure 1, of long tabular aggregates of intermixed muscovite (var. phengite) and chlorite (var sheridanite), and granular quartz exhibiting a polygonal grain boundary structure. Accessory rutile occurs as orientated inclusions in the chlorite and muscovite, and also opaque constituents which in polished section were identified as dominantly pyrite metacrysts with minor pyrrhotite. Some subhedral porphyroblasts of plagioclase also occur.



**Fig. 1.** Photomicrograph, X 40, of thin section of wallrock I1 under crossed nicols. A schist of quartz (granular white-black), muscovite (lamellar yellow-blue), and chlorite (lamellar white-blueish grey).

## Specimen I3: 'coloured talc'

The minerals composing this specimen are major talc and chlorite (var sheridanite) with the talc content much greater than chlorite, together with accessory garnet, rutile, and an unidentifiable finely dispersed phase occurring as minute transparant inclusions along the cleavage planes and grain boundaries of the talc and imparting a dusty brown appearance to the talc in thin section and a greenish colour in hand specimen. The talc occurs as medium grained feathery aggregates which are in places 'dusty' and grade into 'clean' transparant aggregates which are free of any inclusions. It appears that some retrograde metamorphic process has caused the inclusions to be removed or incorporated into the talc

Protected Document--Subject to Protective Order

8

minor chlorite is dispersed in the talc matrix as small
lenticular and globular fibrous aggregates.    Rare garnet,
possibly a member of the ugrandite series because of its
anisotropy, occurs as subhedral porphyroblasts.



**Fig. 2.**    Photomicrograph, X 24, of thin section of 'coloured
        talc' specimen I3 under crossed nicols.    Dominantly
talc (yellow-blue interference colours) showing murky brownish
black patches due to presence of fine unidentifiable inclusions.


Specimen I5:  general ore

    A coarse aggregate of curving foliaceous and feathery
crystals of talc displaying evidence of shearing and translation
twinning.    As in specimen I3, dusty inclusions of a transpa-
rant mineral with a general prismatic habit occurs dispersed
in the talc.    As before, but to a lesser extent, the talc is
cleansed of these inclusions along zones associated with defor-
mation and translation twinning, and it appears that the
inclusions have either been converted to talc (as in the con-
version of tremolite to talc by low temperature $CO_2$ metasomatism)
or incorporated into the talc structure as a result of retro-
grade deformation metamorphism.    Rare small subhedral garnet
porphyroblasts also occur.

Protected Document--Subject to Protective Order

**Fig. 3.** Photomicrograph, x 24, of thin section of 'general ore' specimen I5 under crossed nicols showing the texture of the talc, and the 'murky' inclusion-rich talc compared to the clear inclusion-free talc.


Specimen I6

Specimen I6 consists of a very coarse aggregate of interlocking anhedral magnesite grains which exhibit strongly irregular and angular penetrating grain boundaries. The magnesite is characterised in thin section, Fig. 3a, by its marked change in relief and perfect rhombohedral cleavage in plane polarised light, and very high order interference colours, Fig. 3b, under crossed nicols.

Intergranular pockets of fine grained foliaceous and radiating prismatic crystals of talc together with rare chlorite (var. sheridanite) occur. In places the prismatic clusters of talc appear to have formed at the expense of the magnesite, perhaps as a result of a retrograde thermal metamorphism with its formation being ascribed to a reaction between the magnesite and silica. One subhedral porphyroblast of plagioclase felspar occurs in the thin section.

Protected Document--Subject to Protective Order



**Fig. 3a.** Photomicrograph, x 24, of thin section of specimen $I_6$ under plane polarised light, consisting dominantly of magnesite with minor talc and rare chlorite.



**Fig. 3b.** Photomicrograph of thin section of specimen $I_6$, mag x 24, under crossed nicols showing the occurrence of small equigranular and prismatic crystals of talc penetrating and interstitial to coarse anhedral magnesite.

Protected Document—Subject to Protective Order

JNJAZ55_000000099

Specimen I7

This specimen of wallrock is a quartz-muscovite-garnet schist (Figs. 4a, 4b, and 4c) containing some accessory actinolite, brown hornblende, talc and rare biotite.

The muscovite (var. phengite) forms long lenticular bands showing a preferred orientation in a matrix of interlocked equigranular quartz grains displaying strongly irregular grain boundaries. Large euhedral porphyroblasts of garnet, forming one of the major phases, are dispersed throughout the rock.

Accessory subhedral tabular and rhombic sections of actinolite (colourless to bluish green pleochroism) occur orientated parallel to the schistosity. The actinolite also occurs as rims to euhedral grains of rhombic and tabular outline which may have originally been brown hornblende but now are pseudomorphed by what appears to be a mixture of talc, chlorite and residual hornblende. Some talc is present as small pockets within the muscovite layers but this identification is based on the form, the lower refractive index and the occurrence of dusty inclusions. The colour, birefringence etc. of the talc is otherwise the same as muscovite.

In polished section the main opaque accessory mineral is pyrrhotite occurring as subhedral laths lying parallel to the schistosity. Traces of chalcopyrite also occur, and some rutile rods mainly as inclusions in the garnet porphyroblasts.



**Fig. 4a** Photomicrograph of polished section of I7 showing pyrrhotite (white), garnet (light grey), and muscovite-quartz (darker grey). Very dark to black areas are pits in the surface.

Protected Document--Subject to Protective Order



**Fig. 4b.** Photomicrograph, mag. x 40, of thin section of I7 consisting of garnet, muscovite and quartz under plane polarised light.



**Fig. 4c.** Photomicrograph, mag. x 40, of thin section of I7 under crossed nicols showing subhedral garnet (black), anhedral interlocking quartz (white-grey-black), and lamellar muscovite (coloured).

Protected Document—Subject to Protective Order

## Specimen $I_8$

In hand specimen $I_8$ appears as a coarse aggregate of foliaceous talc varying in colour from white to greenish white. The general texture in thin section is of coarse foliated talc preferentially orientated and alternating with long lenses of a finer talc in which a preferred orientation appears to be absent as a result of shearing parallel to the schistosity. Minor chlorite (var. sheridanite) occurs as orientated laths intimately intergrown with the coarse talc and as fibrous aggregates in the finer talc lenses. Rare anhedral garnet, possibly pyrope, occurs.

In thin section the talc which appears greenish in hand specimen is seen to be crowded with minute inclusions of a pinkish mineral occurring as rounded to thin tabular grains and having a lower refractive index than the talc. A grey-brown amorphous material is also present. This material together with the granular inclusions is presumably responsible for the greenish colouration of the talc in hand specimen. As in $I_3$ and $I_5$ the greenish talc has been cleansed of inclusions along planes parallel to the schistosity by some later metasomatic process or retrograde metamorphic process. This 'absorbtion' of the inclusions by the talc or removal of the inclusions does not effect the form of aggregation of the talc crystals. Boundaries between the clean transparent and 'murky' talc often transgress the schistosity and there is no change in the coarseness or mode of aggregation of the talc across such boundaries. X-ray diffraction of the transparent white talc and the translucent greenish talc revealed no differences and the composition of these inclusions is at the moment unknown. Figure 5, under crossed nicols, shows such a transgressive boundary between the clear and 'murky' or dusty talc.



**Fig. 5.** Photomicrograph, mag x 24, of thin section $I_8$ showing the nature of the talc intergrowth under crossed nicols, and the transgressive boundaries between clear transparent talc and the inclusion-rich 'murky' talc which appears greenish white in hand specimen.

Protected Document--Subject to Protective Order

14

<u>Specimen I9</u>:  'Grey talc 1st face'.

In specimen I9 <u>talc</u> and <u>chlorite</u> (var. sheridanite) are the main constituents.  They occur intimately intergrown as long orientated foliaceous aggregates alternating with finer platy aggregates in which the talc and chlorite fibres are randomly orientated and which form lenses elongated parallel to the schistosity of the coarser foliaceous talc (Figs. 6a and 6b). As in previous sections the talc appears murky in parts due to the presence of minute unidentifiable inclusions.

The talc is also crowded with small irregular and rod-shaped grains of <u>rutile</u> .  Rare subhedral porphyroblasts of <u>garnet</u> (possibly pyrope) also occur.



<u>Fig. 6a</u>    Photomicrograph, x 40 mag, of thin section I9 under plane polarised light showing subhedral garnet grains in an orientated foliaceous aggregate of talc and chlorite.

Protected Document--Subject to Protective Order

15



**Fig. 6b.**   Photomicrograph, x 40 mag., of thin section I₉ under crossed nicols showing garnet (black) in a coarse matrix of foliaceous talc (bright interference colours) and chlorite (white to blue-grey interference colours).

Protected Document--Subject to Protective Order

16

Specimen $I_{10}$ and $I_{10A}$:  'granular talc'

Both $I_{10}$ and $I_{10A}$ consist of an intergrowth of medium grained and randomly orientated major talc with minor chlorite (var. sheridanite) (Fig. 7).   Some small porphyroblasts of garnet also occur scattered in the talc/chlorite ground mass. In this specimen the talc is not crowded with inclusions as is the case in most of the other samples.



Fig. 7.   Photomicrograph, x 40 mag., of thin section $I_{10}$, under crossed nicols, consisting of talc (blue and yellow interference colours), chlorite (white and greys), and garnet (black).

Specimen $I_{11}$ :  'carbonate and talc'

Specimen $I_{11}$ consists dominantly of a mosaic of coarse to fine grained anhedral interlocking magnesite grains with interstitial pockets of coarse to medium grained foliaceous aggregates of talc (Figs. 8a and 8b).   The talc is crowded with near sub-microscopic inclusions of a transparant phase together with a brown amorphous material which causes the talc to appear dusty or turbid in thin section.   Some fibrous chlorite (var. sheridanite) occurs as small pockets intergrown with the talc. Traces of rutile and pyrite occur.

Protected Document--Subject to Protective Order



**Fig. 8a.** Photomicrograph, x 24 mag., of thin section $I_{11}$ under plane polarised light showing a subhedral pyrite metacryst (black) in a matrix of compact granular magnesite with interstitial foliaceous talc (top centre).



**Fig. 8b.** Photomicrograph, x 24 mag., of thin section $I_{11}$ under crossed nicols showing a pyrite metacryst (black) in a granular magnesite matrix, with a foliaceous interstitial aggregate of talc (top centre).

Protected Document—Subject to Protective Order

18

### Specimen I₁₂

An aggregate of anhedral quartz as the main constituent with minor interstitial muscovite and green chlorite (var. pennine) Fig. 9. The long muscovite laths show a preferred orientation. Chlorite occurs in interstitial pockets as randomly orientated platy grains. Some epidote is present and a trace of magnesite.

The chlorite displays a pleochroism from light green to brownish-cream, and anomalous blue interference colours in some cases. However, most of the chlorite grains display lower second order to upper first order interference colours. Thus a range of chlorite composition is probably represented in the section.



**Fig. 9.** Photomicrograph, x 40 mag., of thin section I₁₂ under crossed nicols.

### Specimen I₁₃

This specimen consists of an aggregate of mainly medium grained platy to fibrous chlorite (var. sheridanite) and equigranular quartz.' These two enclose ragged replacement residuals of calcite and subhedral metacrysts of pyrite with rare chalcopyrite.

Protected Document--Subject to Protective Order

**Fig. 10a** Photomicrograph, x 40 mag., of thin section $I_{13}$ under PPL showing subhedral pyrite metacrysts (black) in a matrix of dominantly <u>chlorite</u> and quartz with minor calcite.

**Fig. 10b** Photomicrograph, x 40 mag., of thin section $I_{13}$ under XN showing chlorite (fibrous white and greenish-grey) and calcite (coloured) enclosing subhedral grains of pyrite (black). Equigranular grey grains are quartz.

Protected Document--Subject to Protective Order

JNJAZ55_000000108

Case 3:16-md-02738-MAS-RLS Document 26642-6 Filed 08/14/23 Page 315 of 544 PageID: 162442

Protected Document—Subject to Protective Order

JNJAZ55_000000109

**Specimen I₁₄**

This specimen is dominantly composed of very coarse grained magnesite enclosing minor amounts of talc and very minor chlorite (var. sheridanite). The talc and chlorite form pockets of radiating lamellar and foliaceous crystals as in Figs. 11a, 11b.



Fig. 11a Photomicrograph, x 24 mag., of thin section I₁₄ under PPL of coarse magnesite and intergranular pockets of 'dusty' and 'clear' talc.



Fig. 11b Photomicrograph, x 24 mag., of thin section I₁₄ under XN of magnesite (greenish) and pockets of radiating lamellar talc (blue, purple, yellow).

21

<u>Specimen I$_{15A}$</u>

This specimen of wallrock is a <u>garnet-muscovite-quartz</u> schist with minor green <u>chlorite</u>, <u>biotite</u>, and rare <u>talc</u> and <u>feldspar</u> (Figs. 12a and 12b).

The garnet occurs as large (1-3mm diam.) porphyroblasts altered along irregular fractures to a mixture of greenish chlorite, biotite, and some feldspar, and enclosed in a matrix composed of orientated tabular grains of muscovite, forming elongated lenses, and alternating with 'mosaic' granular quartz containing randomly dispersed biotite and chlorite flakes.



<u>Fig. 12a</u>   Photomicrograph, x 24 mag., of thin section I$_{15A}$ UNDER PPL showing a large altered porphyroblast of garnet in a matrix of dominantly muscovite with minor quartz.

Protected Document--Subject to Protective Order



**Fig. 12b.** Photomicrograph, x 24 mag., of thin section
$I_{15A}$ under crossed nicols. Garnet (black).
Muscovite (dominantly purple interference
colours). Quartz (white and greys).

Protected Document--Subject to Protective Order

JNJAZ55_000000111

23

Specimen $I_{15}$

This specimen is dominantly composed of chlorite (var. sheridanite) and quartz as orientated aggregates producing a schistosity.   Very minor amounts of magnesite and talc occur.   The talc occurs as thin laths intergrown with the chlorite (Fig. 13b).



Fig. 13a   Photomicrograph, x40 mag., of thin section $I_{15}$ under PPL showing the irregular but preferred elongation of granular quartz segregations in a matrix of fibrous chlorite (var. sheridanite).



Fig. 13b   Photomicrograph, x 40 mag., of thin section $I_{15}$ under XN, composed of chlorite (fibrous white, greenish grey, black), quartz (granular white-grey-black), and talc (blue, red, and yellow interference colours).

**Specimen I$_{16}$: 'first face inclusion'**

    **This** specimen is composed of a medium grained aggregate
of dominantly <u>chlorite</u> (var. sheridanite) and <u>quartz</u>, with
minor <u>magnesite</u>, <u>clinozoisite</u>, <u>talc</u>, and <u>muscovite</u>, and
displaying a poor schistosity.   Scattered euhedral to sub-
hedral <u>pyrite</u> metacrysts occur as well as medium grained
crystal aggregates of <u>rutile</u> associated with <u>clinozoisite</u>
forming 'stringers' parallel to the general schistosity of
the rock.

    In the photomicrograph of figure 14a the brownish
speckled areas are dominantly chlorite although in Figure 14b
talc and muscovite are more apparent because of their inter-
ference colours.



<u>Figure 14a</u>  Photomicrograph, x 40 mag., of thin section I$_{16}$
          under PPL.

Protected Document--Subject to Protective Order



Fig. 14b  Photomicrograph, x 40 mag., of thin section $I_{16}$
under crossed nicols.   A <u>chlorite</u> — <u>quartz</u> rock
with minor talc and muscovite, and accessory
magnesite, clinozoisite, rutile and pyrite.

Protected Document--Subject to Protective Order

Specimen $I_{17}$:   footwall

This specimen of footwall rock is a muscovite-quartz-garnet schist consisting of long lenticular anhedral quartz aggregates.   Both are enclosing fractured and altered euhedral porphyroblasts of garnet.   Accessory sphene also occurs as well as serpentine-quartz pseudomorphs after a mineral displaying rhombic and tabular sections.



Fig. 15a    Photomicrograph, x 24 mag., of thin section $I_{17}$ under PPL showing garnet euhedra in a matrix of segregated quartz and muscovite.



Fig. 15b    Photomicrograph, x 24 mag., of thin section $I_{17}$ under XN.   Garnet (black), quartz (white to grey), and muscovite (lamellar and coloured).

Protected Document--Subject to Protective Order

27

**Specimen I$_{18}$:**  'Face 3, carbonate/talc'

A coarse to medium grained aggregate of subhedral inter-
locking grains of magnesite with minor talc occurring as
scattered small interstitial clusters associated with rare
chlorite (var. sheridanite) and muscovite (Figs. 16a, 16b).



**Fig. 16a**  Photomicrograph, x 24 mag., of thin section I$_{18}$
under PPL of granular magnesite with scattered
tabular crystals and clusters of talc.



**Fig. 16b**  Photomicrograph, x 24 mag., of thin section I$_{18}$ under
XN of granular magnesite (high order interference
colours, and scattered tabular crystals and clusters
of talc (top right, coloured) and rare chlorite
(white to blue-grey colours).

Protected Document--Subject to Protective Order

**Specimen I₁₉:**

This specimen consists of an aggregate of coarse grained anhedral <u>magnesite</u> intergrown with solitary bladed crystals and crystal aggregates of tremolite associated with minor amounts of fine fibrous <u>talc</u> and rare anhedral grains of <u>quartz</u> (Figs. 17a, 17b).



**Fig. 17a**  Photomicrograph, x 24 mag., of thin section of I₁₉ under PPL, showing coarse bladed tremolite intergrown with very coarse grained <u>magnesite</u>.



**Fig. 17b**  Photomicrograph, x 24 mag., of thin section I₁₉ under crossed nicols showing coarse bladed tremolite and anhedral coarse-grained magnesite with minor small fibrous aggregates of talc (top left)..

Protected Document--Subject to Protective Order

**Specimen I21:** 'Inclusion, face 2'.

Specimen I21 is composed of a fine grained interlocking aggregate of anhedral <u>magnesite</u>, as the major constituent, associated with scattered laths and interstitial fine-grained fibrous aggregates of very minor <u>talc</u> (Figs. 18a and 18b).



<u>Fig. 18a</u>  Photomicrograph, x 24 mag., of thin section I21 under PPL.  Magnesite with rare talc.



<u>Fig. 18b</u>  Photomicrograph, x 24 mag., of thin section I21 under crossed nicols.  Magnesite with rare talc.

Protected Document--Subject to Protective Order

30

<u>Specimen I22</u>

This specimen is dominantly composed of coarse subhedral to euhedral interlocking grains of <u>magnesite</u> associated with intergranular fibrous clusters of <u>talc</u> which often enclose smaller euhedral magnesite grains (Fig. 19).



<u>Fig. 19</u>   Photomicrograph, x 24 magnification, of thin section I22 under plane polarised light.  Magnesite and interstitial aggregates of talc.

Protected Document--Subject to Protective Order

**Specimen I$_{23}$:** 'Black Gneiss 2' below talc vein'

Specimen I$_{23}$ consists dominantly of medium grained anhedral interlocking quartz as orientated bands enclosing large microcline anhedra and anhedral aggregates.   Scattered platy aggregates of muscovite occur orientated parallel to the general direction of the quartz banding.   Minor epidote and chlorite also occur. (Figs. 20a and 20b).



**Fig. 20a**  Photomicrograph, x 24 mag., of thin section I$_{23}$ under PPL. Quartz-muscovite-microcline gneiss.



**Fig. 20b**  Photomicrograph, x 24 mag., of thin section I$_{23}$ under XN.  Quartz-muscovite-microcline gneiss.

Protected Document--Subject to Protective Order

Specimen $I_{24}$:  'Face 2, Talc next to carbonate'

This specimen of talc ore consists dominantly of coarse fibrous talc with minor chlorite (var. sheridanite) occurring as small lenticular fibrous aggregates within the main mass of talc (Figs. 21a and 21b).  A few small subhedra of garnet are present.  As in previous specimens there are two forms of talc present: (1) a talc that in thin section appears brown (Fig.21a) under plane polarised light due to finely dispersed dusty inclusions of a transparant mineral and a brown amorphous material, (2) a clear transparant talc free of inclusions which appears to have been formed at the expense of the other by some metasomatic 'cleansing' process.  Talc crystals in optical continuity can be seen to change sharply from 'dusty' brown talc to the clear talc.



Fig.21a  Photomicrograph, x 24 mag., of thin section $I_{24}$ under PPL. 'Dusty' and clear talc enclosing small lenticular aggregates of chlorite.



Fig.21b  Photomicrograph, x24 mag., of thin section $I_{24}$ under XN.

Protected Document--Subject to Protective Order

Specimen I25

This specimen of footwall rock consists of an interlocking aggregate of medium grained anhedral quartz enclosing occasional large anhedra of microcline feldspar (Figs. 22a,22b). Minor magnesite occurs as pockets interstitial to the quartz, and also scattered laths of muscovite. Green chlorite (pennine) and epidote occur in trace amounts.



Fig. 22a  Photomicrograph, x 24 mag., of thin section I25 under PPL; dominantly a quartz-microcline rock with minor muscovite and rare pennine and epidote.



Fig. 22b  Photomicrograph, x 24 mag., of thin section I25 under XN.

Protected Document--Subject to Protective Order

### Specimen I26

This specimen contains chlorite, talc, magnesite and rutile. One part of the thin section consisted of a massive coarse fibrous and feathery aggregate of talc enclosing pockets of coarse magnesite.   This texture graded into one which was dominantly fine grained chlorite (var. sheridanite) intimately intergrown with minor quantities of fibrous and platy talc (Fig. 23) as well as scattered small equigranular and rod-shaped rutile crystals.



Fig. 23.   Photomicrograph, x 40 mag., of thin section I26 under crossed nicols showing minor talc (coloured) intimately intergrown with major chlorite.

Protected Document--Subject to Protective Order

Specimen I27

Specimen I27 is dominantly composed of quartz, chlorite (var. sheridanite) and talc (Figs. 24a and 24b). Thin lenticular bands of coarse feathery talc and chlorite alternate with anhedral granular interlocking aggregates of quartz. Scattered inclusions of rutile and epidote occur, as well as occasional large microcline anhedra.



Fig. 24a  Photomicrograph, x 40 mag., of thin section I27 under PPL, showing a fibrous and feathery aggregate of talc and chlorite enclosing anhedral segregations of quartz.



Fig. 24b  Photomicrograph, x 40 mag., of thin section I27 under XN.

Protected Document—Subject to Protective Order

## Specimen I$_{29}$

Specimen I$_{29}$ is a gneissic rock consisting of segregated bands of medium to fine interlocking nhedral <u>quartz</u> grains alternating with minor <u>muscovite</u> as orientated platy clusters and enclosing large microcline anhedra. Some rare <u>pennine</u> and very rare <u>epidote</u> occur intergrown with the muscovite.



**Fig. 25a**  Photomicrograph, x 24 mag., of thin section I$_{29}$ under PPL; quartz, muscovite, and microcline (top left)



**Fig. 25b**  Photomicrograph, x 24 mag., of thin section I$_{29}$ under XN.

Protected Document—Subject to Protective Order

## Specimen I₃₁

Specimen I₃₁ is a muscovite-quartz schist containing minor pennine, sphene and tremolite.

The rock is dominantly made up of coarse orientated lamellar segregations of muscovite intergrown with flakes of minor greenish brown chlorite (pennine) and enclosing euhedral to subhedral grains of sphene. Minor interlocking fine to medium grained quartz segregations occur alternating with the muscovite bands. Hexagonal sections of an amphibole, probably tremolite, occur dispersed in the muscovite matrix.



**Fig. 26a** Photomicrograph, x 40 mag., of thin section I₃₁ under PPL; muscovite-quartz schist.



**Fig. 26b** Photomicrograph, x 40 mag., of thin section I₃₁ under XN; muscovite-quartz schist.

Protected Document--Subject to Protective Order

JNJAZ55_000000126

Specimen I$_{32}$

This specimen consists of coarse feathery lenticular aggre-
gates of dominantly <u>chlorite</u> (var. sheridanite) intimately
intergrown with minor amounts of <u>talc</u> (Figs. 27a and 27b).

Small inclusions of <u>rutile</u> occur along the boundaries
(shear planes) between the chlorite aggregates and also along
chlorite cleavage planes. Finely dispersed submicroscopic
dusty inclusions of an unidentified phase similar to that found
in talc occur in the chlorite.



<u>Fig. 27a</u>  Photomicrograph, x 24 mag., of thin section I$_{32}$ under
XN. Feathery aggregates of sheared chlorite (white to
greenish grey to black) with minor talc (coloured).



<u>Fig. 27b</u>  Photomicrograph, x 24 mag., of thin section I$_{32}$ under
XN. Finer grained chlorite-talc mixture.

Protected Document--Subject to Protective Order

Specimen I$_{33}$

This specimen of talc ore consists of a medium to fine grained randomly orientated intergrowth of dominantly talc with minor chlorite (var. sheridanite). The chlorite is intimately mixed with the talc (Fig. 28). Some pockets of coarse interlocking anhedral magnesite grains occur enclosed by the talc-chlorite matrix.



Fig. 28   Photomicrograph, x 24 mag., of thin section I$_{33}$ under XN.

Protected Document--Subject to Protective Order

### Specimen I35

This specimen consists dominantly of <u>magnesite</u> as a very coarse to medium grained interlocking aggregate of euhedral to subhedral grains. Minor <u>tremolite</u> occurs as long prismatic crystals forming interstitial clusters, and as solitary crystals penetrating the magnesite and along the grain boundaries of the magnesite. Minor <u>chlorite</u> (var. sheridanite) and rare <u>talc</u> occur associated with the tremolite segregations. (Figs. 29a, 29b).



**Fig. 29a** Photomicrograph, x 24 mag., of thin section I35 under PPL. Magnesite-tremolite-chlorite-talc rock.



**Fig. 29b** Photomicrograph, x 24 mag., of thin section I35 under XN. Prismatic tremolite in magnesite in the extinction position

Protected Document--Subject to Protective Order

## Specimen I₃₇

This specimen consists dominantly of <u>magnesite</u> with minor <u>talc</u>. The magnesite occurs as an aggregate of very large <u>magnesite</u> anhedra enclosed by finer grained subhedral magnesite which is intergrown with feathery intergranular clusters of <u>talc</u> (Fig. 30).



**Fig. 30**   Photomicrograph of thin section I₃₇, x 24 mag., under XN showing the finer intergranular magnesite associated with small laths of talc (fibrous and coloured).

Protected Document--Subject to Protective Order

Specimen I$_{39}$

This specimen is dominantly composed of <u>talc</u> forming coarse feathery aggregates intimately intergrown with minor finer grained chlorite (var. sheridanite) and containing fine disseminated inclusions of <u>rutile</u>. Occasional fine grained <u>quartz</u> as well as larger oval-shaped augen of quartz and rare garnet occur scattered throughout the talc matrix. The talc is for the most part crowded with inclusions, as in previous sections, but elongate areas of 'clean' talc occur as in Fig. 31a.



**Fig. 31a** Photomicrograph, x 24 mag., of thin section I$_{39}$ under PPL.



**Fig. 31b** Photomicrograph, x 24 mag., of thin section I$_{39}$, under XN

Protected Document--Subject to Protective Order

Specimen I41

This specimen of talc ore consists of a coarse aggregate of feathery talc intimately intergrown with minor chlorite (var. sheridanite), and enclosing rare large porphyroblasts of subhedral garnet which occasionally contain long prismatic inclusions of tremolite (Fig.32a).



Fig. 32a  Photomicrograph, x 24 mag., of thin section I41 under XN.  Feathery aggregate of talc with garnet porphyroblast (bottom right, black).

Protected Document--Subject to Protective Order

Specimen I42:   'No.1 Face, green coloured'

Specimen I42 consists dominantly of an aggregate of fine grained fibrous chlorite (var. sheridanite) intimately inter-grown with minor very fine grained talc as in Fig. 33.



Fig. 33   Photomicrograph, x 24 mag., of thin section I42 under crossed nicols of chlorite (white, greenish grey, black), and fine grained talc (yellow).

Protected Document--Subject to Protective Order

45

<u>Specimen I43</u>:   'Face 10 fibrous sample'

Specimen I43 consists dominantly of <u>chlorite</u> (var. sheridanite), occurring in the form of a coarse sheared fibrous aggregate intimately intergrown with very minor talc as in Figure 34.



<u>Fig. 34</u>    Photomicrograph, x 40 mag., of thin section I43 unde crossed nicols showing deformed fibrous chlorite (white-greenish grey-black) intergrown with platy and prismatic crystals of talc (coloured).

<u>Specimen I43A</u>

As for I43 the specimen consisted dominantly of <u>chlorite</u> (var. sheridanite) with very minor <u>talc</u>.   The 'cross fibre' type texture found in I43 and produced by shearing at right angles to the schistosity was absent in specimen I43A.

Protected Document--Subject to Protective Order

46

Specimen I$_{44}$:   'First face pure talc"

A coarse aggregate of lamellar talc showing a preferred orientation and enclosing augen of what appears to be an intimate intergrowth of quartz and serpentine (Fig. 35).   Both talc crowded with fine unidentified inclusions and 'clear' talc are present.   See also description for I$_{45}$.



Fig. 35   Photomicrograph, x 24 mag., of section I$_{44}$ under crossed nicols showing coarse lamellar talc enclosing rare anhedral segregations of probable serpentine-quartz composition.

Protected Document--Subject to Protective Order

**Specimen I45:** 'No.1 good specimen'

This specimen of 'talc ore' consists nearly wholly of <u>talc</u> occurring in the form of a randomly orientated 'matted' aggregate of fibrous talc enclosing minor <u>quartz-serpentine</u> augen.   As in previous sections the talc is rendered murky or dusty by fine inclusions of a brown amorphous material and an unidentified transparant phase.   In places the talc has been cleansed of these inclusions along zones which appear to be independent of any intergrowth or crystallographic features of the talc (Fig. 36).



**Fig. 35**   Photomicrograph, x 24 mag., of thin specimen I45 under crossed nicols showing the form of aggregation of the talc and the difference between the 'murky' talc and the linear transgressive zone of 'clear' talc.

Protected Document--Subject to Protective Order

<u>Specimen I$_{46}$</u>:   'No. 3 face, coloured'

This specimen consists of very coarse lenticular aggregates of long fibrous and feathery <u>talc</u> crystals enclosing rare anhedral porphyroblasts of <u>garnet</u>.

Protected Document--Subject to Protective Order

49

## DIGESTIVE TESTS

To confirm the presence of acid soluble carbonate material and also to help identify the type of carbonate present in the rock specimens collected, each powder specimen was subjected to a digestive test.

Half gram quantities of each of the powders were treated with normal hydrochloric acid for several hours at approximately 70°C. The residues were reweighed and the filtrates were analysed for their calcium and magnesium content using the EEL, 240 Atomic Absorption Spectrophotometer. The aim of the digestion was not to estimate the total acid soluble fraction only to help establish the carbonate minerals present and to estimate roughly their quantity to help interpret the X-ray powder photographs obtained from the samples.

The results are present under three headings, namely 'Rock Types', 'Carbonate Specimens', and 'Talc Specimens'.

It can be seen that only small quantities of carbonate material are present in the talc specimen group, similarly in the rock specimens with the exception of the marble specimen which is practically 100% calcite. The carbonate group of specimens appear to be mixtures of calcium and magnesium carbonate with a number of specimens being possible dolomites.

Protected Document--Subject to Protective Order

## ROCK TYPES

| Specimen No. | % Weight Loss | % Calcium | % Magnesium |
|---|---|---|---|
| I1 | <0.2% | <0.2% | <0.2% |
| I7 | 3.0% | <0.2% | <0.2% |
| I12 | <0.2% | <0.2% | <0.2% |
| I13 | 4.2% | 1.0% | 0.4% |
| I15 | 6.0% | <0.2% | 0.4% |
| I16 | 4.8% | 2.0% | 0.4% |
| I17 | 6.0% | <0.2% | <0.2% |
| I20 | 11.2% | <0.2% | <0.2% |
| I23 | 1.4% | <0.2% | <0.2% |
| I25 | 22.4% | <0.2% | <0.2% |
| I27 | 9.0% | <0.2% | <0.2% |
| I29 | 3.6% | <0.2% | <0.2% |
| I31 | 9.6% | <0.2% | <0.2% |
| I34 | 92.2% | >20.0% | <0.2% |

## CARBONATE SPECIMENS

| Specimen No. | % Weight Loss | % Calcium | % Magnesium |
|---|---|---|---|
| I4 | 22.8% | 3.0% | 1.1% |
| I6 | 48.0% | 6.0% | 1.15% |
| I11 | 21.6% | 3.0% | 6.4% |
| I14 | 44.2% | 7.0% | 5.0% |
| I18 | 75.2% | 14.0% | 24.0% |
| I19 | 37.8% | 5.0% | 4.0% |
| I21 | 61.8% | 8.4% | 8.0% |
| I22 | 91.2% | 16.0% | 15.2% |
| I30 | 15.0% | 1.9% | 1.6% |
| I35 | 50.8% | 6.6% | 13.4% |
| I37 | 51.0% | 4.4% | 24.0% |

## TALC SPECIMENS

| Specimen No. | % Weight Loss | % Calcium | % Magnesium |
|---|---|---|---|
| I2 | 3.6% | <0.2% | 0.4% |
| I3 | 1.6% | <0.2% | <0.2% |
| I5 | 5.4% | <0.2% | <0.2% |
| I8 | 6.0% | <0.2% | <0.2% |
| I9 | <0.2% | <0.2% | <0.2% |
| I10 | 4.2% | <0.2% | <0.2% |
| I24 | 8.0% | <0.2% | <0.2% |
| I26 | <0.2% | <0.2% | <0.2% |
| I28 | 12.6% | <0.2% | <0.2% |
| I32 | 1.2% | <0.2% | 0.4% |
| I33 | 5.6% | 0.34% | <0.2% |
| I36 | 4.6% | <0.2% | <0.2% |

/Continued....

Protected Document--Subject to Protective Order

JNJAZ55_000000139

**TALC** SPECIMENS (Continued)

| Specimen No. | % Weight Loss | % Calcium | % Magnesium |
|---|---|---|---|
| I38 | 1.0% | <0.2% | <0.2% |
| I39 | <0.2% | <0.2% | <0.2% |
| I40 | 7.0% | <0.2% | <0.2% |
| I41 | <0.2% | <0.2% | <0.2% |
| I42 | 0.8% | <0.2% | <0.2% |
| I43 | 6.2% | <0.2% | <0.2% |
| I44 | <0.2% | <0.2% | <0.2% |
| I45 | 8.0% | <0.2% | <0.2% |

Protected Document--Subject to Protective Order

# Electron Microscope Examination of Italian
## Mine Samples and Imported Batch Shipments of
### Italian Powder

The main purpose of the electron microscope examination of mine samples and also representative fractions of the Italian powder has been to establish whether or not any particles corresponding to the commercial forms of asbestos were present. The electron microscope is an instrument which is most usefully employed in the examination of particles less than ten microns in size. It has been used in this investigation therefore to examine only the finer particulate portion of the Italian samples. It may be argued that only a small fraction of each of the powdered samples was examined and that this was not representative of the total sample. However, we can assume that the fraction examined was representative of the dust formed from each sample and that it is this finer fraction which is the most important from a biological stand-point. Also as the size of the biologically active commercial asbestos particles fall entirely within the particle size range examined we can consider the main aim of the examination to be entirely satisfied by only looking at the finer fractions from each of the Italian samples.

To acquaint ourselves with the type of particles formed by the commercial asbestos minerals, Figs. A-D have been included. They represent samples of Amosite, Crocidolite, Anthophyllite and Chrysotile asbestos. Also Figs. E-F have been inserted to demonstrate typical single particle electron diffraction patterns which can be obtained from the four asbestos types for comparison with patterns obtained from the Italian samples.

## Sample Preparation

Small portions of the powdered rock samples and imported powder specimens were placed in 15cc centrifuge tubes to which distilled water was added. The powders were then dispersed first by hand shaking and then with the aid of a small ultra-sonic bath. The concentration of suspended material in the tubes was adjusted by eye using dilutions of distilled water. The tubes containing suspended solids were then allowed to stand for 20 minutes to allow the larger particles of mineral to sediment to the bottom of the tubes.

Electron microscope grids coated with carbon films were prepared and small drops of the particulate material from each of the specimen tubes were mounted on specimen grids and allowed to dry. The specimens were inserted into an A.E.I. E.M.6. electron microscope and examined for particles resembling commercial asbestos fibres. Where suitable particles were observed, selected area electron diffraction patterns were taken and compared with those produced by the commercial asbestos minerals. In all cases photomicrographs representative of the type of particles found in each sample were taken while interesting diffraction patterns were also recorded.

JNJAZ55_000000141

## Particle Morphology

The carbonate rich materials were found to produce
compact particles which were very electron dense.  On the
whole they were finer particles than those obtained after
crushing talc rich specimens.   No fibrous material whatso-
ever was found when carbonate material only was comminuted.
The morphology of particles produced from the footwall rocks
i.e. limestone, marble, gneiss and the amphibolites were also
very compact, although in the gneiss specimen platey parti-
cles were present probably representing the muscovite content
of the specimen.  Again in the footwall rock specimens
fibrous particles were very scarce.  Those lath like parti-
cles detected resembled the amphibole minerals rather than
chrysotile.   Selected area diffraction patterns which were
obtained from the lath like particles in no way resembled
the typical amphibole fibre diffraction pattern.   They were
generally very distorted patterns containing streaks rather
than spots indicating a rather stressed and deformed material.

The specimens which were composed of talc together with
other mineral associations, presented a very different picture,
as far as particle shape was concerned.  In the main parti-
cles were flat and plate-like, some being very thin and
translucent in the electron beam.  Particle sizes varied from
very small to quite large plates some with very sharp discrete
edges, others with rather ragged outlines.   Comparing parti-
cles from those samples of talc which varied in bulk morphology
in hand specimens, no observable difference could be drawn
between them.  Similarly, a comparison of particles produced
from talc specimens of varying colour revealed no differences
in the overall particle shape.  Similarly those specimens
rich in chlorite did not form particles with any distinctive
features.

There were, however, observable differences in particle
morphology between individual powder specimens.   In the main
most produced good plate like particles, however, one or two
specimens were found to contain considerable numbers of lath
like particles, these being very thin in character.  These
particles resembled the amphibole asbestos type particle being
less regular and also very much larger in projected diameter.
Diffraction patterns from these particles matched those
obtained from the platy particles with which they were asso-
ciated and in no way resembled the typical amphibole diffrac-
tion pattern obtained from single amphibole asbestos fibres.

Other fibrous particles were observed in the mainly talc
specimens which to some extent resembled chrysotile asbestos
fibres rather than amphibole minerals.   They often had a
somewhat textile appearance but were, however, crystalline.
Diffraction patterns from these fibres were very distorted
and in no way matched typical chrysotile or amphibole patterns.

Protected Document--Subject to Protective Order

The only group of specimens in which amphibole fibres were confirmed were in those specimens with known amphibole composition. However, even the fibres found in these speci- mens barely resembled the fibres formed by the commercial amphibole asbestos minerals. To assess the particles produced from the pure amphibole mineral (Tremolite), found in three of the specimens, small crystals of the mineral were taken from the hand specimens and crushed separately. An examination of the finer particles produced revealed stubby electron dense fibres associated with irregular lumps of the same mineral. Diffraction patterns from these fibres were similar to those obtained from the commercial amphibole minerals, although they were more difficult to obtain because of the greater thickness of these particles. Other specimens in the group, which did not contain talc but were composed of sheet silicate minerals mainly muscovite, were also practically free of fibrous parti- cles. There appeared to be no general tendency for these other minerals to form fine fibrous particles. A number of very fine short fibres were observed on grids prepared from several of the talc specimens, these were, however, chance small pieces torn from the edges of talc plates. They appeared in those samples which had a tendency to form copius numbers of very fine particles when subjected to comminution.

The specimens examined can be grouped into four categories on the basis of particle morphology and they are as follows:

(a) Talc specimens with impurities of carbonate and chlorite.

(b) Rock type specimens, i.e. footwall limestone etc.

(c) Those specimens composed mainly of carbonates.

(d) Amphibole specimens with carbonate and talc.

The talc specimens were characterised by the large number of plate like particles often translucent in the electron beam. Rock specimens varied from specimens which were composed mainly of compact electron dense particles to those with some sheet silicate content in which plate like particles become apparent. Those specimens composed mainly of carbonate material produced compact rounded particles, often very small and grouped to- gether in aggregates. Finally the specimens containing amphi- bole were characterised by the compact nature of the particles with evenly distributed fibres and very few translucent plates. The groups of particles described are illustrated by the foll- owing micrographs which illustrate the various forms.

Selected area electron diffraction patterns obtained from single particles of the amphibole mineral are also presented showing the similarity of these patterns to those obtained from commercial asbestos fibres. Also included are single crystals patterns and polycrystalline patterns, from talc, chlorite and muscovite rich specimens. It can be seen that they are very different in character to those obtained from the amphibole mineral. However, patterns from the sheet silicate minerals mentioned above are all very similar and it is impossible to identify each of these minerals from their

JNJAZ55_000000143

electron diffraction patterns or to tell them apart without applying a more sophisticated approach to the diffraction procedure. With specimen tilt facilities enabling the particle to be rotated through more than 45° discrimination is possible between certain of these minerals.

As mentioned earlier, patterns obtained from lath like particles found in the talc specimens were identical to those observed from general plate like forms. Those fibres with a textile like appearance often only gave very streaked patterns but in one or two cases these also resembled very closely the normal talc pattern.

Protected Document--Subject to Protective Order

56.

Examples of Commercial Amphibole and Chrysotile asbestos particles together with typical selected area electron diffraction patterns.



Chrysotile asbestos particles x 3000



Anthophyllite asbestos particles x 3000

Protected Document—Subject to Protective Order



Amosite asbestos particles x 3000



Crocidolite asbestos particles x 3000

Protected Document--Subject to Protective Order

JNJAZ55_000000146



**Amphibole asbestos selected area electron diffraction pattern.**



**Chrysotile asbestos selected area electron diffraction pattern.**

Protected Document--Subject to Protective Order

Electron micrographs of particles produced from specimens which have been classified as rock types.

Protected Document--Subject to Protective Order

JNJAZ55_000000148



**Fig. 1.** Specimen I13 seam inclusion showing passage into talc x 3000. The particles are mainly compact and electron dense. A few flakes, no fibres present.



**Fig. 2.** Specimen I15. Talc footwall contact. x 3000. Compact particles with a few small flakes. No fibres present.

Protected Document--Subject to Protective Order



**Fig. 3.**   Specimen I$_{16}$.   Lithological inclusion from Face 1. x 3000.   Compact electron dense particles.   No fibres present.



**Fig. 4.**   Specimen I$_{17}$.   Footwall rock sample, x 3000. Mainly compact particles produced with a few plate like forms.

Protected Document--Subject to Protective Order

62



<u>**Fig. 5.**</u>  Specimen I23.  Black gneiss, 2ft below talc
seam.  x 3000.   Compact electron dense
particles produced.



<u>**Fig. 6.**</u>  Specimen I25.  Footwall limestone.  x 3000.
Compact electron dense particles.

Protected Document--Subject to Protective Order



**Fig. 7.** Specimen I27.   Lithological inclusion face 1.
x 3000.   Platey electron dense particles.
No fibres.



**Fig. 8.** Specimen I29.   Sample 6 Footwall.   x 3000
Compact electron dense particles with a few

Protected Document--Subject to Protective Order



**Fig. 9.**  Specimen I₃₁.  Black inclusion face 1.  x 3000
A mixture of plate-like and compact forms
mainly electron dense in character.



**Fig.10.**  Specimen I₃₄.  Marble from tunnel wall.  x 3000
Mainly compact electron dense particles with a
few plate-like forms.

Protected Document--Subject to Protective Order

Electron micrographs of particles produced from those specimens mainly composed of carbonate minerals.

Protected Document--Subject to Protective Order



**Fig. 1.** Specimen $I_{11}$. Carbonate inclusion with some talc. x 3000. Particles consist of a mixture of compact and plate-like forms.



**Fig. 2.** Specimen $I_{14}$. Inclusion in talc seam Face 4, middle of seam. x 3000. Granular particles with plate-like types and lath-like forms.

Protected Document--Subject to Protective Order



**Fig. 3.**   Specimen $I_{18}$.   Carbonate/talc sample, x 3000.
Particles compact and electron dense.   A
few plate-like forms.



**Fig. 4.**   Specimen $I_{21}$.   Inclusion from Face 2.  x 3000.
This specimen produced plate-like and compact
**particles with some lath-like forms.**

Protected Document--Subject to Protective Order



**Fig. 5.** Specimen I35. Massive carbonate from rear end of working, x 3000. Compact electron dense particles with some plate-like talc particles.



**Fig. 6.** Specimen I37. Carbonate in talc inclusion x 3000. Compact particles together with some plate-like forms and rolled talc sheets.

Protected Document--Subject to Protective Order

69

Electron Micrographs of specimens of talc with carbonate and other mineral inclusions.

Protected Document—Subject to Protective Order

JNJAZ55_000000158



**Fig. 1.** Specimen I₃. Coloured talc (Green) x 3000. Particles plate-like. Few fibres, rolled sheets and shords.



**Fig. 2.** Specimen I₅. General ore, x 3000. Plate-like particles together with short lath-like particles, also a typical example of textile type fibre.

Protected Document--Subject to Protective Order



**Fig. 3.** Specimen I₈. Massive talc, x 3000. Plate-like particles with a few lath- forms also typical textile type long fibre.



**Fig. 4.** Specimen I₉. Grey talc First Face, x 3000. Practic ally all plate-like with a few lath forms.

Protected Document--Subject to Protective Order



**Fig. 5.** Specimen $I_{10}$. Granular talc, x 3000. All plate-like particles.



**Fig. 6.** Specimen $I_{24}$. Talc next to carbonate inclusion, x 3000. This specimen was found to contain a large number of lath-like particles, as can be seen from the micrograph above. No diffraction pattern corresponding with an amphibole fibre was obtained from a selection of the elongated particles.

Protected Document--Subject to Protective Order



**Fig. 7.**   Specimen I26.   Coloured talc inclusions, x 3000.
The particles produced from the various coloured
inclusions in the talc were found to be mainly
plate-like with a few lath forms.



**Fig. 8.**   Specimen I28.   Talc/Quartz specimen, x 3000.
Particles from this specimen were mainly plate-
like but accompanied by more compact opaque
particles.   A few textile type fibres were
observed.

Protected Document--Subject to Protective Order

JNJAZ55_000000162



**Fig. 9.** Specimen I32.  Face 2 inclusion from base of talc seam, x 3000.  The specimen produced a mixture of irregular particles varying from compact to plate-like in form with a few lath like particles.



**Fig.10.** Specimen I33.  Talc from lower left end of working x 3000.  Particles mainly plate-like with some lath forms.

Protected Document--Subject to Protective Order



**Fig. 11.** Specimen I38.   Pyrite/Talc specimen, x 3000. Plate-like particles with some rolled tubes of talc.



**Fig. 12.** Specimen I39.   5" - O coloured pieces from the crusher, x 3000.  These various coloured talc pieces produced only plate-like particles.

Protected Document–Subject to Protective Order

JNJAZ55_000000164



**Fig. 13** Specimen I41. Face 2, good talc specimen x 3000. Plate-like particles together with rolled talc sheets lath forms and textile type fibres.



**Fig. 14.** Specimen I42. Face 1, green coloured talc, x 3000. This coloured specimen produced plate-like particles which were rather more electron dense.

Protected Document--Subject to Protective Order



**Fig. 15.** Specimen I₄₃. Face 10. Fibrous looking hand specimen, x 3000. This sample was found to be practically all plate-like in form.



**Fig. 16.** Specimen I₄₄. Face 1. Pure talc sample, x3000. Plate-like particles with some lath-like forms.

Protected Document--Subject to Protective Order



**Fig. 17.** Specimen I45. Face 1. Good talc specimen,
x 3000. A mixture of plate-like particles and
fibrous forms, including rolled tubes and
==textile== type fibres.



**Fig. 18.** Specimen I46. Face 3. Coloured specimen
x 3000. Plate-like particles with shards and
lath like forms, together with a typical
textile form. which can be seen to have a

Protected Document–Subject to Protective Order

JNJAZ55_000000167

Electron Micrographs of particles produced from
those specimens containing amphibole mineral and
also from the amphibole mineral itself.

Protected Document—Subject to Protective Order

JNJAZ55_000000168



**Fig. 1.**   Specimen I19.   Tremolite/carbonate talc
sample x 3000.   Compact particles, a few
lath forms present.



**Fig. 2.**   Specimen I20.   Amphibole sample from Guiana
level 1212.  x 3000.   Compact particles with
numerous lath forms.

Protected Document--Subject to Protective Order

JNJAZ55_000000169





Figs. 3 and 4

Particles produced from single crystals of tremolite extracted from specimens $I_{19}$ and $I_{20}$. x 3000. Very few fibrous particles were produced when this specimen was crushed. Those that were fibrous in nature were thick and stubby in character, less than 50% of the particles were elongated in shape.

Protected Document--Subject to Protective Order

JNJAZ55_000000170





Figs. 5 and 6

Selected area electron diffraction patterns obtained from amphibole particles found in specimens I19 and I20.

Protected Document--Subject to Protective Order

JNJAZ55_000000171



**Fig. 7.**  Typical selected area diffraction pattern obtained from talc plates.



**Fig. 8.**  Selected area diffraction pattern obtained from a typical textile type fibre showing features of a rotated or coiled structure.

Protected Document--Subject to Protective Order

## X-RAY ANALYSIS OF ITALIAN MINE SAMPLES

### Introduction

This report concerns the X-ray powder analysis of the Italian mine samples.  The samples were classified into three categories according to their chemical and physical properties:

(i)   'Rock' Type
(ii)  'Talc' Type
(iii) 'Carbonate' Type

All the samples were prepared by similar means and the procedure for obtaining the X-ray powder patterns was standardised.

From these powder photographs, several were chosen which clearly showed distinct mineral phases.  These were used as standards for this group of samples.  These standard patterns were compared against the ASTM index and this comparison illustrates the need to prepare standards for a particular locality from specimens at that locality.

The samples were compared with these standards by computer methods and visually and the results and discrepancies between the methods of comparison noted.

### LIST OF SAMPLES

See Table 1

### SAMPLE PREPARATION

The samples were received mainly as large rocks and were labelled according to their appearance and location in the mine.

With the larger samples a section was cut from the middle to be a representative sample, for the smaller samples as many pieces as possible were crushed to form the representative sample.

These samples were then roughly broken up and placed in a 'Tema' disc mill and ground for 5 mins. until all the sample was below approx. 100 mesh.  These powders were stored in clean plastic bags.  The samples, when required for X-ray analysis, were further ground (to less than 300 mesh) in a small agate ball mill and then sieved through a 350 mesh screen and stored in plastic bags.

The grinding mills and other apparatus used were thoroughly cleaned between samples and during the grinding care was taken to obtain a good representative sample.

Protected Document—Subject to Protective Order

## X-RAY ANALYSIS

All the samples were analysed using a Debye-Scherrer camera mounted on a Raymax RX 3-D X-ray generator. A copper X-ray tube was used with nickel filters (0.02 mm thick) and the power rating of the tube set at 36 kV and 22mA.

The apparatus was carefully aligned and checked before mounting a sample. All the samples had the same exposure time of 8 hrs.

The samples were loaded into 0.5 mm diameter Lindemann glass tubes to be mounted in the Debye-Scherrer cameras. In the cameras Ilford Industrial 'G' X-ray film was used. The film was processed using Kodak DX-80 developer and Ilford Hypain fixer. The films were developed for 5 minutes using a 1:4 dilution for the developer and fixed for 2 minutes. The films were then washed in running water for 30 minutes and allowed to dry naturally. The X-ray films were then measured.

Using an illuminated screen and the line-spacings calculated, taking into account film shrinkage, from these line spacings the bragg angle and 'd' spacings can be calculated.

## STANDARD PATTERNS

When all the samples X-ray photographs had been measured and the 'd' spacings calculated, they were visually inspected to find the film showing samples with pure mineral phases. These patterns were then taken as standards.

The samples were then broken up and the different mineral phases were sorted by hand to attempt to find a purer standard. These samples were then crushed in a similar way to the samples crushed beforehand. For X-ray analysis they were placed in 0.2 mm diameter tubes and given a 12 hr exposure. This method was used to give finer lines on the X-ray photograph and the larger exposure was to try and detect as many impurities as possible.

The 'd' spacings of the standards were compared with the A.S.T.M. index and also with themselves. They were compared with themselves to check that all the Talc and Chlorite standards matched each other and were similar in intensity.

Several standards were prepared containing the same mineral. This was because the 'd' spacings of the mineral varied slightly from sample to sample and especially with chlorite, depending on its composition the major reflections varied between 13.5% and 15.0%. This was mainly due to varying iron content and this can easily be seen on the X-ray films as it causes fluorescence with copper radiation and blackens the X-ray film generally.

Protected Document--Subject to Protective Order

## RESULTS

For the analysis of the results the samples have been divided into five sections:

(i)   standard patterns
(ii)  sample patterns (rock type)
(iii) sample patterns (carbonate type)
(iv)  sample patterns (talc type)
(v)   batch sample patterns (includes old powders and shipments).

Two methods were used to find the mineral present in the sample.  One method uses a computer program to detect the mineral.

In this method the bragg angles of samples were compared with the bragg angles of the standard and the number of lines fitted printed out.  A print out was also obtained of all the standards which fitted a particular line to find all the possible minerals present and to see which lines were common to several standards.

As this procedure is quite long, the lines in the sample were first sorted into order of decreasing intensity and then the three most intense lines of the sample compared with the standards.  If all three lines failed to match it was considered that that standard was not present and so the program deleted that standard from the comparison.  At the end of the program the list of the standards was printed with the percentage of lines fitted to the sample noted.

The obvious disadvantage of this comparison was that the program could take no account of the relative intensities of the lines and so a visual method was used to find which was the major mineral phase.  The computer program usually found the mineral phases present in the samples but could not place them in the correct order.

Protected Document--Subject to Protective Order

87

Patterns used as standards from the Italian mine samples and their comparison with A.S.T.M. data and against themselves.

Protected Document--Subject to Protective Order

JNJAZ55_000000176

SAMPLE SIP 1    TALC



Comparison against A.S.T.M. index: 1 line unmatched, 1.1145 $\overset{o}{A}$

Patterns not included:  6-263  Muscovite -2M1,  7-25 Muscovite (1M), 7-32  Muscovite (2M1),  7-76 Ripidolite (Chlorite), 7-78 Thuringite (Chlorite), 7-166 Bavalite (Chlorite), 1O-183 Peninnite Chlorite , 11-78 Dolomite, B and T Quartz.

Most probable minerals present:  Talc  Muscovite  Calcite

Comparison against Italian Standards
Patterns not included:  Chlorite (I42), Chlorite (I4), Muscovite (I35), Magnesite (I6), Tremolite (Il9/I2O), Dolomite.

Most probable minerals present:  Talc

| Visual comparison | Minerals detected |
| --- | --- |
| Talc, Calcite | Talc, Calcite |

SAMPLE SIP 2    TALC



Comparison against A.S.T.M. index:  2 lines unmatched, 1.1159$\overset{o}{A}$ 1.1353$\overset{o}{A}$

Patterns not included:  7-76 Ripodolite (Chlorite), 7-78 Thuringite (Chlorite), 7-166 Bavalite (Chlorite).

Most probable minerals present:  Talc, Muscovite, Calcite

Comparison against Italian Standards
Patterns not included:  Chlorite (I42), Chlorite (I4), Tremolite (Il9/I2O).

Most probable minerals present:  Talc, Muscovite, Magnesite.

| Visual Comparison | Minerals Detected |
| --- | --- |
| Talc, Chlorite, Magnesite | Talc, Chlorite, Magnestie |

Protected Document--Subject to Protective Order

JNJAZ55_000000177

**SAMPLE SIP 3    CHLORITE**



**Comparison against A.S.T.M. index:**  2 lines unmatched, 1.1739Å, 1.29Å

**Patterns not included:**  6-263 Muscovite -2Ml, 7-25 Muscovite (IM) 7-32 Muscovite (2Ml), 7-79 Forsterite (Olivine), 8-479 Magnesite

**Most probable minerals present:**  Chlorite, Talc

**Comparison against Italian Standards**
**Patterns not included:**  Muscovite (I35), Tremolite (I19 and I20)

**Most probable minerals present:**  Chlorite, Talc.

**Visual Comparison**                    **Minerals Present**
Chlorite, Talc                           Chlorite, Talc


**SAMPLE SIP 4    CHLORITE**



**Comparison against A.S.T.M. index:**  3 lines unmatched 1.1741Å, 1.1318Å, 1.0984Å.

**Patterns not included:**  6-263 Muscovite -2Ml, 7-32 Muscovite (2Ml), 8-479 Magnesite, 11-78 Dolomite, 13-437 Boric Acid.

**Most probable minerals present:**  Chlorite, Talc

**Comparison against Italian Standards**
**Patterns not included:**  Calcite (I34), Magnesite (I37), Muscovite (I35), Tremolite (I19/I20), Dolomite.

**Most probable mineral present:**  Chlorite, Talc

**Visual Comparison**                    **Minerals Present**
Chlorite, Talc                           Chlorite, Talc

Protected Document--Subject to Protective Order

JNJAZ55_000000178



SAMPLE SIP 5    TALC



Comparison against A.S.T.M. index:

Patterns not included:  5-586 Calcite, 7-25 Muscovite (IM),
7-77 Sheridanite (Chlorite), 7-79 Forsterite (Olivine),
7-166 Bavalite (Chlorite).

Most probable minerals present:  Talc, Muscovite, Chlorite

Comparison against Italian Standards

Patterns not included:  Chlorite (I42), Chlorite (I4),
                        Magnesite (I6), Tremolite (I19/I20).

Most probable minerals present:  Talc

| Visual comparison | Minerals Present |
|---|---|
| Talc, Chlorite | Talc, Chlorite |

SAMPLE SIP 6    MUSCOVITE



Comparison against A.S.T.M. index: 3 lines unmatched, 1.7999$\overset{o}{A}$,
1.3721$\overset{o}{A}$, 1.2741$\overset{o}{A}$.

Patterns not included:  3-881 Talc, 7-79 Forsterite (Olivine),
7-166 Bavalite (Chlorite), 7-183 Penninite (CHlorite),
8-479 Magnesite, 11-78 Dolomite, 19-770 Talc.

Most probable minerals present:  Muscovite, Chlorite

Comparison against Italian Standards

Patterns not included:  Magnesite (I37), Tremolite (I19 and I20),
                        Dolomite

Most probable minerals present:  Muscovite, Talc

| Visual Comparison | Mineral Present |
|---|---|
| Muscovite, Calcite | Muscovite, Calcite |

Protected Document--Subject to Protective Order

## SAMPLE SIP 7  MAGNESITE



Comparison against A.S.T.M. Index:  1 line unmatched  1.1092Å

Patterns not included: 5-586 Calcite, 6-263 Muscovite -2M1, 7-25 Muscovite (IM), 7-32 Muscovite (2M1), 7-160 Chlorite (Kotshubeite), 7-76 Ripidolite (Chlorite), 7-78 Thuringite (Chlorite), 7-166 Bavalite (Chlorite), 10-183 Penninite Chlorite, 13-437 Tremolite.

Most probable minerals present: Magnesite, Dolomite, Talc

Comparison against Italian Standards

Patterns not included:  Calcite (I34), Chlorite (I4)
                        Muscovite (I35), Tremolite (I19/I20).

Most probable minerals present:  Magnesite, Dolomite, Talc

Visual Comparison                    Minerals Present
Magnesite, Talc                      Talc, Magnesite.

## SAMPLE SIP 8  TREMOLITE



Comparison against A.S.T.M. Index:  1 line unmatched  1.1118Å

Patterns not included:  6-263 Muscovite -2M1, 7-25 Muscovite (IM), 7-32 Muscovite (2M1), 7-42 Muscovite (3T), 7-79 Forster-ite (Olivine).

Most probable minerals present: Tremolite, Talc, Calcite

Comparison against Italian Standards

Patterns not included:  Magnesite (I37), Chlorite (I4), Muscovite (I35).

Most probable minerals present: Tremolite, Talc, Calcite

Visual Comparison                    Minerals Present
Tremolite, Talc                      Tremolite, Talc

Protected Document--Subject to Protective Order

SAMPLE SIP 9   DOLOMITE



Comparison against A.S.T.M. Index: 1 line unmatched  1.1094$\overset{\circ}{A}$

Patterns not included: 3-881 Talc, 6-263 Muscovite -2Ml, 7-25 Muscovite (IM), 7-32 Muscovite (2Ml), 19-814 Muscovite 2Ml (Vanadian), 7-160 Chlorite (Kotschubeite), 7-79 Forsterite (Olivine), 13-437 Tremolite, 19-770 Talc.

Most probable minerals present:  Dolomite, Muscovite

Comparison against Italian Standards

Patterns not included: Magnesite (I37), Chlorite (I4) Tremolite (I19/I20).

Most probable minerals present:  Dolomite, Talc

Visual Comparison

Dolomite, Muscovite, Calcite

Minerals Present

Dolomite, Muscovite, Calcite

SAMPLE SIP 10   CALCITE



Comparison against A.S.T.M. Index:  3 unmatched lines
1.2095$\overset{\circ}{A}$, 1.1098$\overset{\circ}{A}$, 1.0926$\overset{\circ}{A}$

Patterns not included:  7-160 Chlorite (Kotschubeite), 7-79 Forsterite (Olivine), 13-437 Tremolite.

Most probable minerls present:  Calcite, Muscovite

Comparison against Italian Standards

Patterns not included:  Magnesite (I6), Tremolite (I19-I20).

Most probable minerals present:  Calcite, Muscovite

Visual Comparison

Calcite

Minerals Present

Calcite, Muscovite

Protected Document--Subject to Protective Order

SAMPLE SIP 11   MAGNESITE



Comparison against A.S.T.M. Index:  1 unmatched line  1.1085Å

Patterns not included:  5-586 Calcite, 7-25 Muscovite (IM), 7-160 Chlorite (Kotschubeite), 7-76 Ripidolite (Chlorite), 7-78 Thuringite (Chlorite), 7-166 Bavalite (Chlorite), 10-183 Penninite Chlorite,  B & T  Quartz.

Most probable minerals present:  Magnesite, Dolomite, Talc

Comparison against the Italian Standards

Patterns not included:  Calcite (I34), Chlorite (I4), Muscovite (I35).

Most probable minerals present:  Magnesite, Dolomite, Talc

Visual Comparison                    Minerals Present

Magnesite, Dolomite, Talc            Magnesite, Talc, Dolomite

Protected Document--Subject to Protective Order

Examples of Patterns Obtained from
Rock Type Specimens and Their
Major Mineral Content from X-Ray
Comparison.

Protected Document--Subject to Protective Order

## SAMPLE I1  TALC FROM FOOTWALL CONTACT

Comparison

Patterns not included:  Magnesite (I37), Tremolite (I19/I20).

Most probable minerals present: <u>Chlorite</u>, Muscovite, Talc, Dolomite.

Visual Comparison: <u>Talc</u>  Chlorite, Calcite

Minerals Present: <u>Talc</u>  Chlorite, Calcite.


## SAMPLE I7  MICA SCHIST

Comparison

Patterns not included:  Magnesite (I37), Talc (I46), Tremolite (I19/I20).

Most probable minerals present:  Muscovite, Talc, Quartz

Visual Comparison:  <u>Muscovite</u>, Talc, Quartz

Minerals Present:


## SAMPLE I12  FOOTWALL SAMPLE?  AMPHIBOLITE

Comparison:  3 lines unmatched.  $6.4653\overset{o}{A}$  $1.2819\overset{o}{A}$  $1.225\overset{o}{A}$

Patterns not included:  Calcite (I34), Magnesite (I37), Talc (I46), Talc (I5), Tremolite (I19/I20).

Most probable minerals present:  Muscovite, Dolomite, Quartz.

Visual Comparison:  Muscovite, Chlorite, Quartz

Minerals Present:

Protected Document--Subject to Protective Order

SAMPLE I13   INCLUSION SHOWING PASSAGE INTO TALC BOTTOM TRANSIT



Comparison:  1 unmatched line    $1.1541\overset{\circ}{A}$

Patterns not included:  Magnesite (I37), Muscovite (I35),
                         Tremolite (I19/I20), Dolomite

Most probable minerals present:  Chlorite, Talc, Quartz

Visual Comparison:  Chlorite, Muscovite, Quartz

Minerals Present:   Chlorite, Muscovite, quartz

SAMPLE I15   TALC-FOOTWALL CONTACT



Comparison:

Patterns not included:  Magnesite (I37), Tremolite (I19/I20).

Most probable minerals present:  Chlorite, Talc, Muscovite,
                                  Quartz.

Visual Comparison:  Chlorite,  Talc,  Quartz

Minerals Present:   Chlorite,  Talc, Quartz

Protected Document—Subject to Protective Order

SAMPLE I16   FACE 1   INCLUSION BELOW SEAM

Comparison

Patterns not included:  Talc (I45), Tremolite (I19/I20)
                        Dolomite

Most probable minerals present:  Muscovite, Chlorite,
                                 Calcite, Quartz

Visual Comparison:  Chlorite, Muscovite, Calcite, Quartz

Minerals Present:  Chlorite, Muscovite, Calcite, Quartz


SAMPLE I17   FOOTWALL ROCK SAMPLE



Comparison:  2 unmatched lines   6.6957Å,  1.6305Å

Patterns not included:  Talc (I46), Chlorite (I42),
Muscovite (I35), Magnesite (I6), Tremolite (I19/I20), Dolomite.

Most probable minerals present:  Calcite, Talc, Quartz

Visual Comparison:  Calcite, Talc, Quartz

Minerals Present:  Calcite, Talc, Quartz

SAMPLE I20   AMPHIBOLE SAMPLE FROM GUIANA LEVEL 1212



Comparison:   1 unmatched line   $1.6309\overset{o}{A}$

Patterns not included: Chlorite (I42), Chlorite (I4), Muscovite (I35), Magnesite (I6), Dolomite.

Most probable minerals present:   Talc, Tremolite, Calcite, Magnesite.

Visual Comparison:   Talc, Tremolite, Chlorite

Minerals Present:   Talc, Chlorite, Tremolite

SAMPLE I23   BLACK GNEISS



Comparison:   5 unmatched lines   $6.3586\overset{o}{A}$, $1.449\overset{o}{A}$, $1.2278\overset{o}{A}$, $1.2121\overset{o}{A}$, $1.1520\overset{o}{A}$.

Patterns not included: Calcite (I34), Tremolite (I19/I20)

Most probable minerals present:   Muscovite, Talc, Magnesite, Quartz

Visual Comparison:   Muscovite, Magnesite, Quartz

Minerals Present:   Muscovite, Magnesite, Quartz

Protected Document--Subject to Protective Order

JNJAZ55_000000187

## SAMPLE I25  LIMESTONE FOOTWALL

### Comparison

Patterns not included:  Calcite (I34), Tremolite (I19/I20).

Most probable minerals present:  Talc, Chlorite, Quartz

Visual Comparison:  Talc, Magnesite, Quartz

Minerals Present:  Talc, Magnesite, Quartz


## SAMPLE I27  LITHOLOGICAL INCLUSION

### Comparison

Patterns not included:  Chlorite (I42), Chlorite (I4),
                        Tremolite (I19/I20), Magnesite (I6),
                        Dolomite

Most probable minerals present:  Talc, Calcite, Quartz

Visual Comparison:  Talc, Calcite, Quartz

Minerals Present:  Talc, Calcite, Quartz


## SAMPLE I29  SAMPLE 6 FOOTWALL

Comparison:  2 unmatched lines    1.1526Å,  6.3031Å

Patterns not included:  Calcite (I34), Magnesite (I37),
                        Chlorite (I4), Talc (I5).

Most probable minerals present:  Muscovite, Quartz, Dolomite,
                                 Talc

Visual Comparison:  Muscovite,  Quartz

Minerals Present:  Muscovite,  Quartz

Protected Document--Subject to Protective Order

JNJAZ55_000000188

SAMPLE I31   BLACK INCLUSION



Comparison:    1 unmatched line      1.2145$\overset{o}{A}$

Patterns not included:  Magnesite (I37), Talc (I5),Dolomite

Most probable minerals present:  Muscovite, Calcite, Talc

Visual Comparison:  Muscovite, Calcite

Minerals Present:    Muscovite, Calcite


SAMPLE I34   TUNNEL WALL – MARBLE



Comparison

Patterns not included:  Tremolite (I19/I20), Magnesite (I6)

Most probable minerals present:  Calcite, Muscovite, Talc

Visual Comparison,  Calcite

Minerals Present    Calcite

Protected Document–Subject to Protective Order

Examples of Patterns Obtained
from the Carbonate Specimens
and their Major Mineral Compo-
sition Obtained from Comparison
with Standards.

Protected Document--Subject to Protective Order

102

SAMPLE I4   FACE 10   AMPHIBOLE



Comparison:   3 unmatched lines   1.2586Å, 1.0823Å, 1.074Å

Patterns not included:   Chlorite (I42), Chlorite (I4)
                         Dolomite

Most probable minerals present:   Tremolite, Talc, Magnesite

Visual Comparison:   Talc, Tremolite, Magnesite

Minerals Present:   Talc, Tremolite, Magnesite


SAMPLE I6   QUARTZ

Comparison

Patterns not included:   Calcite (I34), Chlorite (I4)
                         Tremolite (I19/I20)

Most probable minerals present:   Magnesite, Dolomite,
                                  Talc

Visual Comparison:   MAGNESITE, Talc

Minerals Present:   Magnesite, Talc

Protected Document--Subject to Protective Order

SAMPLE Ill  CARBONATE – TALC INCLUSION



Comparison:   l unmatched line   1.2143Å

Patterns not included:  Chlorite (I42), Chlorite (I4)

Most probable minerals present:  Magnesite, Dolomite, Talc

Visual Comparison:  Talc, Magnesite, Calcite

Minerals Present:   Talc, Magnesite, Calcite


SAMPLE I14  SEAM 4  INCLUSION IN TALC

Comparison

Patterns not included:  Magnesite (I37), Chlorite (I4),
                        Muscovite (I35), Tremolite(I19/I20)

Most probable minerals present:  Dolomite, Talc

Visual Comparison:  Talc, Dolomite

Minerals Present:   Talc, Dolomite


SAMPLE I18  FACE 3  MAGNESITE AND TALC

Comparison:

Patterns not included:  Talc (I5), Tremolite (I19/I20)

Most probable minerals present:  Dolomite, Magnesite,
                                 Chlorite

Visual Comparison:  Dolomite, Talc Chlorite

Minerals Present:   Dolomite, Talc, Chlorite.

Protected Document—Subject to Protective Order

**SAMPLE I 19   IMPURITY IN TALC AND QUARTZ**



Comparison:

Patterns not included:  Magnesite (I37)

Most probable minerals present:  Tremolite, Dolomite, Muscovite, Talc

Visual Comparison:   Talc, Tremolite, Magnesite.

Minerals Present:   Talc, Tremolite, Magnesite


**SAMPLE I21   FACE 2 OCCLUSION  (MAGNESITE)**



Comparison:

Patterns not included:  Calcite (I34), Chlorite (I4), Muscovite (I35), Tremlite (I19/I20)

Most probable minerals present:  Dolomite, Magnesite, Talc

Visual Comparison:   Talc, Magnesite, Dolomite

Minerals Present:   Talc, Magnesite, Dolomite

Protected Document–Subject to Protective Order

JNJAZ55_000000193

## SAMPLE I22  MAGNESITE, DOLOMITE, TALC



Comparison:

Patterns not included:  Calcite (I34), Talc (I45), Talc (I46) Muscovite (I35), Tremolite (I19/I20).

Most probable minerals present:  Dolomite, Magnesite, Chlorite, Talc.

Visual Comparison:  Talc, Dolomite.

Minerals Present:  Talc, Dolomite

## SAMPLE I30  TALC AND OTHERS



Comparison:

Patterns not included:  Magnesite (I37), Talc (I5), Tremolite (I19/I20).

Most probable minerals present:  Dolomite, Chlorite, Muscovite, Talc.

Visual Comparison:  Talc, Chlorite

Minerals Present:  Talc, Chlorite

Protected Document—Subject to Protective Order

SAMPLE I35   MASSIVE CARBONATE.   END OF WORKING



Comparison:

Patterns not included:   Tremolite (I19/I20)

Most probable minerals present:   Muscovite, Magnesite,
                                  Chlorite

Visual Comparison:   Magnesite, Talc, Chlorite

Minerals Present:    Magnesite, Talc, Chlorite


SAMPLE I37   CARBONATE AND TALC



Comparison

Patterns not included:   Calcite (I34), Chlorite (I4),
                         Muscovite (I35).

Most probable minerals present:   Magnesite, Dolomite, Talc

Visual Comparison:   Magnesite, Talc

Minerals Present:    Magnesite, Talc

Protected Document—Subject to Protective Order

107

Examples of Patterns and
Major Mineral Content of
Those Specimens Classified
as Talc Types Obtained by
Comparison.

Protected Document--Subject to Protective Order

JNJAZ55_000000196

SAMPLE I2   SORTING PIECES



Comparison

Patterns not included:  Tremolite (I19/I2O)

Most probable minerals present:  Chlorite, Magnesite, Talc

Visual Comparison:  Chlorite, Talc

Minerals Present:  Chlorite, Talc

SAMPLE I3   COLOURED TALC



Comparison:

Patterns not included:  Chlorite (I42), Chlorite (I4), Muscovite (I35), Magnesite (I6), Tremolite (I19/I2O), Dolomite.

Most probable minerals present:  Talc

Visual Comparison:  Talc

Minerals present:  Talc

Protected Document--Subject to Protective Order

## SAMPLE I5   GENERAL ORE



Comparison:  2 unmatched lines      18.1157Å    7.0073Å

Patterns not included:  Chlorite (I42), Chlorite (I4), Muscovite (I35), Dolomite.

Most probable minerals present:  Talc, Magnesite

Visual Comparison:   Talc

Minerals present:   Talc

## SAMPLE I8   MASSIVE TALC



Comparison

Patterns not included:  Magnesite (I6), Tremolite (I19/I2O).

Most probable minerals present:  Talc, Chlorite

Visual Comparison:   Talc, Chlorite

Minerals Present:   Talc, Chlorite

Protected Document--Subject to Protective Order

JNJAZ55_000000198

SAMPLE I9   FACE 1   GREY TALC



Comparison

Patterns not included:  Calcite (I34),  Magnesite (I37), Muscovite (I35), Magnesite (I6), Tremolite (I19/I20).

Most probable minerals present:  Talc, Chlorite

Visible Comparison:  Talc, Chlorite

Minerals Present:  Talc, Chlorite

SAMPLE I10   GRANULAR TALC

Comparison

Patterns not included:  Calcite (I34), Magnesite (I37),
Chlorite (I42) Chlorite (I4),
Muscovite (I35), Magnesite (I6)
Tremolite (I19/I20)

Most probable minerals present:  Talc, Dolomite

Visible Comparison:  Talc,  Dolomite

Minerals Present:  Talc,  Dolomite

Protected Document--Subject to Protective Order

SAMPLE I24   TALC FACE 2



Comparison:

Patterns not included:  Muscovite (I35),  Tremolite (I19/I20)
Magnesite (I6).

Most probable minerals present:  Talc, Chlorite, Dolomite,
Magnesite

Visual Comparison:        Dolomite, Magnesite, Talc

Minerals Present:         Dolomite, Magnesite, Talc


SAMPLE I26   TALC INCLUSIONS



Comparison

Patterns not included:  Calcite (I34), Tremolite (I19/I20)

Most probable minerals present:  Talc, Chlorite, Dolomite

Visual Comparison:        Talc, Chlorite

Minerals Present:         Talc, Chlorite

Protected Document--Subject to Protective Order

SAMPLE I28   QUARTZ TALC



Comparison

Patterns not included:   Muscovite (I35), Tremolite (I19/I20)
                         Magnesite (I6),  Dolomite

Most probable minerals present:  Chlorite, Talc, Quartz

Visual Comparison:  Chlorite, Talc, Quartz

Minerals Present:   Chlorite, Talc, Quartz

SAMPLE I32   OCCLUSION FACE 2



Comparison

Patterns not included:  Muscovite (I35),  Tremolite (I19/I20)
                        Dolomite

Most probable minerals present:  Chlorite, Talc, Magnesite

Visual Comparison:   Chlorite, Talc

Minerals Present:    Chlorite, Talc

Protected Document--Subject to Protective Order

## SAMPLE I33   TALC END OF WORKING



Comparison:

Patterns not included:  Muscovite (I35), Tremolite (I19/I20)

Most probable minerals present:  Talc, Chlorite, Magnesite
                                 Dolomite

Visual Comparison:       Talc, Chlorite, Magnesite

Minerals Present:        Talc, Chlorite, Magnesite


## SAMPLE I36   GREY TALC

Comparison:  2 unmatched lines     $1.2204\overset{o}{A}$;  $1.1517\overset{o}{A}$

Patterns not included:  Calcite (I34), Talc (I46)
                        Tremolite (I19/I20).

Most probable minerals present:  Chlorite, Muscovite, Talc

Visual Comparison:  Chlorite, Talc

Minerals Present:   Chlorite, Talc


## SAMPLE I38   TALC AND PYRITE

Comparison:   1 unmatched line      $1.041\overset{o}{A}$

Patterns not included:  Chlorite (I42), Chlorite (I4),
                        Muscovite (I35), Tremolite (I19/I20)

Most probable minerals present:  Talc, Calcite

Visual Comparison:       Talc, Calcite

Minerals Present:        Talc, Calcite

Protected Document--Subject to Protective Order

SAMPLE I39  S-'Q' FROM CRUSHER



Comparison

Patterns not included: Muscovite, (I35), Tremolite (I19/I20)
                       Magnesite  (I6).

Most probable minerals present: Talc  Chlorite

Visual Comparison:      Talc, Chlorite, Calcite

Minerals Present:      Talc, Chlorite, Calcite


SAMPLE I40  PLATEY TALC

Comparison:

Patterns not included:  Tremolite (I19/I20)

Most probable minerals present:  Talc, Magnesite, Chlorite

Visual Comparison:      Talc, Chlorite, Magnesite

Minerals Present:      Talc, Chlorite, Magnesite


SAMPLE I41  GOOD SPECIMEN No.2.

Comparison:

Patterns not included:  Calcite (I34), Muscovite (I35),
                        Tremolite (I19/I20), Magnesite (I6),
                        Dolomite

Most probable minerals present:  Talc, Chlorite

Visual Comparison:  Talc, Chlorite

Minerals Present:  Talc, Chlorite

Protected Document--Subject to Protective Order

115

SAMPLE I42   COLOURED TALC No.1.



Comparison

Patterns not included:  Magnesite (I37), Talc (I46), Muscovite
                        (I35), Dolomite.

Most probable minerals present:  Chlorite, Talc

Visual Comparison:      Chlorite, Talc

Minerals Present:       Chlorite, Talc


SAMPLE I43  FIBROUS TALC    FACE 10



Comparison:      2 unmatched lines    4.8928A, 4.4431A

Patterns not included:  Calcite (I34), Magnesite (I37),
                        Muscovite (I35), Tremolite (I19/I20)

Most probable minerals Present:  Chlorite, Talc

Visual Comparison:      Chlorite, Talc

Minerals Present:       Chlorite, Talc

Protected Document—Subject to Protective Order

## SAMPLE I44 PURE TALC FACE 1

<u>Comparison:</u>    1 unmatched line    1.0798

<u>Patterns not included:</u>    Magnesite (I37), Talc (I42), Muscovite (I35), Tremlite (I19/I20)

<u>Most probable minerals present:</u> <u>Chlorite</u>, Talc, Dolomite

<u>Visual Comparison:</u> Talc, Magnesite, Chlorite

<u>Minerals Present:</u>    Talc, Magnesite, Chlorite

## SAMPLE I45 GOOD SPECIMEN FACE 1



<u>Comparison:</u>   2 unmatched lines   1.0882A, 1.0505A

<u>Patterns not included:</u>   Calcite (I34), Chlorite (I42), Chlorite (I4) Muscovite (I35), Magnesite (I6), Tremolite (I19/I20), Dolomite.

<u>Most probable minerals present:</u> <u>Talc</u>, Magnesite

<u>Visual Comparison:</u>    Talc
<u>Minerals Present:</u>    Talc

## SAMPLE I46 COLOURED TALC FACE 3



<u>Comparison:</u>

<u>Patterns not included:</u> Chlorite (I42), Chlorite (I4), Muscovite (I35), Tremolite (I19/I20).

<u>Most probable minerals present:</u> <u>Talc</u>,  Magnesite

<u>Visual Comparison:</u>    Talc, Magnesite

<u>Minerals Present:</u>    Talc, Magnesite

Protected Document--Subject to Protective Order

JNJAZ55_000000205

**Specimen Patterns and Comparison Data for Samples of Old Powders and ØØØØØ Shipments**

Protected Document--Subject to Protective Order

JNJAZ55_000000206

118

SAMPLE   BATCH 6    POWDER Fl   PW.J. O35

Comparison:    1 unmatched line    $8.1972\overset{o}{A}$

Patterns not included:  Muscovite (I35),  Tremolite (I19/I20)

Most probable minerals present:  Talc, Magnesite, Chlorite

Visual Comparison:   Talc, Chlorite, Magnesite

Minerals Present:   Talc, Chlorite, Magnesite


SAMPLE BATCH 8  POWDER (S and G)  PW.J. O35



Comparison

Patterns not included:   Magnesite (I6), Tremolite (I19/I20)

Most probable minerals present:  Talc, Magnesite, Boric Acid

Visual Comparison:  Talc, Chlorite, Boric Acid

Minerals Present:   Talc, Chlorite, Boric Acid


SAMPLE BATCH 9   POWDER T4   P.W.J. O35

Comparison:  1 unmatched line    $1. 2587\overset{o}{A}$

Patterns not included:  Tremolite (I19/I20)

Most probable minerals present:  Talc, Chlorite, muscovite,
                                 Magnesite, Boric Acid

Visual Comparison:   Talc, Chlorite, Boric Acid

Minerals Present:   Talc, Chlorite, Boric Acid

Protected Document--Subject to Protective Order

JNJAZ55_000000207

119

**SAMPLE BATCH 10   POWDER SK1BP     PW.J. 035**

<u>Comparison</u>

<u>Patterns not included</u>:  Calcite (I34), Muscovite (I35), Tremolite (I19/I20), Dolomite

<u>Most probable minerals present</u>:  <u>Talc</u>, Chlorite, Magnesite, Boric Acid.

<u>Visual Comparison</u>:  Talc, Chlorite, Boric Acid

<u>Minerals Present</u>:  Talc, Chlorite, Boric Acid

**SAMPLE BATCH 11   POWDER LD18P   PW.J. 035**



<u>Comparison</u>:  1 unmatched line   8.1363Å

<u>Patterns not included</u>:  Magnesite (I6), Tremolite (I19/I20) Dolomite

<u>Most probable minerals present</u>:  <u>Talc</u>, Chlorite, Boric Acid

<u>Visual Comparison</u>:  Talc, Chlorite, Boric Acid, Magnesite

<u>Minerals Present</u>:  Talc, Chlorite, Boric Acid, Magnesite

**SAMPLE BATCH 12   TALC 1960   PW.J. 025**

<u>Comparison</u>:    1 unmatched line    8.12  Å

<u>Patterns not included</u>:  Tremolite (I19/I20)

<u>Most probable minerals present</u>:  <u>Talc</u>, muscovite, chlorite, Boric Acid.

<u>Visual Comparison</u>:  Talc, Chlorite, Boric Acid, Magnesite

<u>Minerals Present</u>:  Talc, Chlorite, Boric Acid, Magnesite

Protected Document--Subject to Protective Order

SAMPLE BATCH 13   TALC 1961   PW.J. O26

**Comparison**

**Patterns not included:**  Calcite (I34), Muscovite (I35)
Tremolite (I19/I20)

**Most probable minerals present:**  Talc, Chlorite, Magnesite
Boric Acid

**Visual Comparison:**  Talc, Chlorite, Magnesite, Boric Acid

**Minerals Present:**    Talc, Chlorite, Magnesite, Boric Acid


SAMPLE BATCH 19   S.S.  CATHERINA W.  O2/05/72



**Comparison**

**Patterns not included:**    Tremolite (I19/I20)

**Most probable minerals present:**  Talc, Chlorite, Magnesite

**Visual Comparison:**  Talc, Chlorite, Magnesite

**Minerals Present:**   Talc, Chlorite, Magnesite


SAMPLE BATCH 2   TALC S.S. EDNA 'B'  14/O2/72

**Comparison**

**Patterns not included:**  Talc (I45), Tremolite (I19/I20)

**Most probable minerals present:**  Talc, Chlorite

**Visual Comparison:**   Talc, Chlorite

**Minerals Present:**   Talc, Chlorite

Protected Document—Subject to Protective Order

## CONCLUSIONS

The optical examination has shown that there are a large number of minerals associated with the rock types found both in the talc seam and in the associated rocks. The footwall rocks in contact with the talc are mainly composed of the minerals quartz, muscovite, chlorite, garnet, and some carbonate material both calcite and magnesite. Minor minerals in the footwall contact rocks include epidote, microcline, tremolite and actinolite, sphene, rutile, hornblende, rare talc, biotite, pyrite, pyrrhotite and chalcopyrite. Rock type inclusions into the talc have similar compositions to the footwall rocks but with higher muscovite and chlorite contents. The muscovite was generally an iron rich variety (phengite), while two forms of chlorite were observed namely sherid-anite and penninite. Other talc inclusions consist mainly of carbonate minerals, calcite and magnesite in varying quantities. It is with these nodules that some tremolite is found. The rocks further away from the talc seams, namely the gneiss, become richer in quartz and microcline and below these marble occurs.

The carbonate specimens examined by optical means showed that the carbonate minerals, calcite and magnes-ite, were accompanied by talc, chlorite, tremolite, muscovite, rutile and pyrite, all in minor amounts. In general the carbonate inclusions were large and very discrete in the talc seam itself.

The specimens examined, which can be classified as talc samples, were found to be in the main composed of talc with chlorite as the major contaminant. Some specimens, however, were predominantly composed of chlor-ite with minor talc inclusions. Other minerals found in association with the talc specimens included garnet, rutile and magnesite with rare tremolite and a quartz or serpentine inclusion. Some differences were observed in the talc itself, some of the talc appearing to be a little murky in texture. X-ray pictures of the clear and murky material showed no differences however.

The powder X-ray examination confirmed the major minerals occurring in the hand specimens and a classifi-cation was possible into the three groups already men-tioned, i.e. rock types, carbonate samples and talc spec-imens. The only asbestos type mineral to be detected in the hand samples was tremolite, which was found in three of the specimens. The tremolite was associated with carbonate minerals, namely magnesite and calcite, no tremolite was detected in the talc type specimens. Chlorite was, however, very common in the talc types, some of the specimens being very nearly pure chlorite in composition. There appeared to be some association of the chlorite with coloured talc specimens, especially those with a greyish colour. Other colour variations due to rutile were not detected by X-ray examination.

JNJAZ55_000000210

The examination of consecutive samples at face 1 in the mine showed that the chlorite content can vary very drastically over a 6ft thick section of the talc seam. Patterns obtained from several shipments of ØØØØØ talc showed that chlorite, together with carbonate material, were the major contaminant minerals.  This was also true of powder samples ranging back to 1949 in which the only observable difference was the presence of boric acid.

The electron microscope examination of the powdered samples showed that a difference could be drawn between particles produced from the various samples.  The carbonates and rock types on the whole produced compact fibre free particles.  The talc specimens were, however, plate-like in appearance with varying quantities of lath like particles coupled with fibres which were textile in appearance.  Both lath and textile types of particles were not composed of minerals associated with the commercial asbestos industry.  Particles formed from the amphibole mineral found at the mine were hardly fibrous in character, the majority of the tremolite breaking to give compact particles.  Those fibres formed were short and had a very large diameter when compared with the commercial varieties of asbestos.  No amphibole or chrysotile mineral was detected in any of the numerous powders examined.

The Italian talc ØØØØØ contains observable quantities of chlorite and carbonate minerals and could contain any one of the following minerals in very minor amounts: muscovite, quartz, tremolite, garnet and rutile.  If small pieces of footwall rock were to contaminate the ore during production, several of the other listed minerals found in the rock type specimens could appear in the shipped product.  It is unlikely that they would be present in detectable amounts.

F.D. POOLEY
Project Supervisor

Protected Document--Subject to Protective Order

JNJAZ55_000000211

# Exhibit 222

E-SERVICE
59262175
Jul 11 2016
04:07PM
File & ServeXpress

1   ALEXANDER G. CALFO (State Bar No. 152891)
    acalfo@kslaw.com
2   JULIA E. ROMANO (State Bar No. 260857)
    jromano@kslaw.com
3   BRIAN PRIESTLEY (State Bar No. 301586)
    bpriestley@kslaw.com
4   **KING & SPALDING LLP**
    633 West 5th Street, Suite 1700
5   Los Angeles, CA 90071
6   Telephone:   +1 213 443 4355
    Facsimile:   +1 213 443 4310
7
8   Attorneys for Defendant
    JOHNSON & JOHNSON CONSUMER INC.
9   (formerly known as JOHNSON & JOHNSON
    CONSUMER COMPANIES, INC.)
10
              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11
                   **FOR THE COUNTY OF LOS ANGELES**
12

13  JESUS PAYAN and FRANCISCA PAYAN,          JCCP 4674
14                                            Case No. BC608412
               Plaintiff,
15                                            **DECLARATION OF JOHN HOPKINS IN**
          v.                                  **SUPPORT OF DEFENDANT JOHNSON**
16                                            **& JOHNSON CONSUMER INC.'S**
    CBS CORPORATION, et al.,                  **MOTION FOR SUMMARY JUDGMENT,**
17                                            **OR IN THE ALTERNATIVE, SUMMARY**
               Defendants.                    **ADJUDICATION OF ISSUES**
18
19                                            *[Filed Concurrently with JJCI's Notice of*
20                                            *Motion and Motion; Separate Statement Of*
                                              *Undisputed Material Facts; Declaration Of*
21                                            *Julia E. Romano; Compendium of Evidence;*
                                              *[Proposed] Order]*
22
23                                            Date:   August 12, 2016
                                              Time:   9:00 a.m.
24                                            Dept.:  1
                                              Judge:  Hon. Joseph R. Kalin
25
26                                            Action Filed:      January 27, 2016
                                              Trial Date:        August 22, 2016
27  ///
28
                                       1

**EXHIBIT**

tabbies

15

I, John Hopkins, declare:

1.   My name is John Hopkins. I hold a BSc (Bachelor of Science) degree with Honors in Chemistry & Biochemistry from the University of St Andrews, Scotland, UK. I also hold a PhD degree in Toxicology from the University of Dundee, Scotland, UK.

2.   I am a Chartered Biologist, holding the Diploma, C Biol.

3.   My academic background is in the field of Toxicology.

4.   I make this declaration based on my personal knowledge gained during my employment with the Johnson & Johnson Consumer Companies (hereinafter referred to as "Johnson & Johnson") as described below, from my personal review of documents in the files of Johnson & Johnson during certain of the times I worked for the Company, as well as information conveyed to me in the ordinary course of business by other employees of Johnson & Johnson.

5.   Prior to joining Johnson & Johnson in 1976, I undertook some teaching to medical students followed by employment as a toxicologist in the pharmaceutical industry. I was a founding member of the British Toxicology Society in 1979.

6.   During the period 1976-2000, I was in the employment of Johnson & Johnson. I was employed in the United Kingdom (1976-94), in the United States for the four years 1995-1998 inclusive and in France (1999-2000).

7.   Since 2000 I am the President my own Company, Innovant Research. This is an independent Consultancy in the field of Toxicology, Product Safety and Risk Assessment.

8.   For the whole of the period from 1976 onwards I have been familiar with the literature and debate as to talc safety. Through my Company I am a Member of the UK Trade Association, CTPA Scientific Advisory Committee and the CTPA Talc Committee.

9.   I am also familiar with the history and background of the sourcing, standards and specification of talc as used by Johnson & Johnson on a worldwide basis. During my employment for Johnson & Johnson in the UK, I was in regular contact with medical and scientific colleagues in the United States on all matter relating to talc safety.

///

2

10.     Through my Company, I have consulted to Johnson & Johnson both in Europe and in the United States on safety matters, including talc safety, and still retain authorized copies of talc literature and information on talc usage within Johnson & Johnson.  This documentation includes summary of documented historical data and talc specifications.

11.     It is my understanding that Plaintiffs JESUS PAYAN and FRANCISCA PAYAN ("Plaintiffs") allege Mr. Payan was exposed to asbestos-contaminated Johnson & Johnson baby powder while serving in the U.S. Navy from 1960 to 1966.

**Johnson & Johnson Talc History:**

A.  **Talc Sourcing:**

12.     The purity of talc is based on its source. There are only a limited number on talc mines in the World that provide a grade of talc that meets the requirements of talc for pharmaceutical applications (Talc USP) and talc for cosmetic applications (compliance with the PCPC (formerly known as CTFA) monograph and the Monograph for USP).

13.     Mines that include geological structures, other than pure talc are not suited as a source of Cosmetic and Pharmaceutical grades of talc.

14.     From 1946 talc for Johnson & Johnson products in the United States was sourced from the Italian mine at Val Chisone.

15.     Italian talc was the sole source for Johnson & Johnson products until 1967.

16.     From 1967 until 2003, talc was sourced by Johnson & Johnson in the United States from the Windsor mine in Vermont, USA.

B.  **Specification of Cosmetic Talc**

17.     The records indicate that as far back as 1949, there is documented evidence that the specification for Johnson & Johnson cosmetic talc should be free from asbestos and asbestiform minerals.

18.     Although asbestos was not known as a hazard in 1949, the presence of asbestos was even at that time, considered highly undesirable as the "feel" of its presence on the skin is regarded as unpleasant and cosmetically unacceptable.

3

DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S
MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

19.     Confirmation of the absence of asbestos on a historical basis has been reported in a Johnson & Johnson internal report from 1966 that summarized the results of 13 samples of talc from the Company Museum, and dating from the period 1910-1964.

**C.  Audits of Talc Mines**

20.     As a part of a program to ensure that the talc used in Johnson & Johnson products was free from asbestos, an independent geological audit of the talc mine in Italy was conducted in 1972 by Professor Fred Pooley from the Department of Mineral Exploitation, University of Wales, UK.

21.     Professor Pooley is considered a world class expert in talc mineralogy and geology.

22.     The audits included a systematic geological sampling of all areas of the mines, including the non-talc bearing areas.

23.     The conclusion of the Audit was that there was zero evidence of asbestos in the geology and mineralogy of the Italian mine.

24.     Additionally Professor Pooley examined a sample of talc dating from 1949, as used by Johnson & Johnson in the UK. It was reported that the quality had not changed.

**D.  Sampling of Talc**

25.     Since 1975, Johnson & Johnson has conducted a regular monitoring program of samples of talc from all mines supplying to affiliate Johnson & Johnson companies throughout the world. Although Italian talc was not used in the United States after 1967, it was used in Europe until 1999. The monitoring program included assay for asbestos, silica and quartz. Assay has been conducted by an independent external laboratory in the United States.

26.     In addition, it has been a requirement of the Raw Material specification since 1975, for each batch of talc to be supplied to Johnson & Johnson to be free from asbestos and in compliance to the PCPC (CTFA) Talc Monograph. This has required the supplier to confirm purity of every batch supplied using state of the art techniques.

///

4

27.   Based on the absence of asbestos contamination in historical talc samples; an in-house raw material specification requirement dating from at least 1949, for absence of asbestos in talc; no evidence of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States; and no evidence of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 to present, it is my expert opinion that the Johnson & Johnson baby powder Mr. Payan was allegedly exposed to while serving in the U.S. Navy from 1960 to 1966 was not contaminated with asbestos.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed July 7th, 2016, at Newbury, United Kingdom.


_____

John Hopkins, Declarant

DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S
MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

## PROOF OF SERVICE

*Jesus and Francisca Payan v. CBS Corporation, et al.*
LASC Case No. JCCP 4674; BC608412

I, the undersigned, declare: I am a citizen of the United States, over 18 years of age and not a party to the within action. I am employed in the County of Los Angeles, State of California; my business address is 633 West 5th Street, Suite 1700, Los Angeles, CA 90071.

On the date specified below, I served a copy of the foregoing document described as:

**DECLARATION OF JOHN HOPKINS IN SUPPORT OF DEFENDANT JOHNSON & JOHNSON CONSUMER INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**

on the interested parties in this action

[X]     by placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Laurel L. Simes, Esq.<br>Heather B. Osuna, Esq.<br>LEVIN SIMES LLP<br>44 Montgomery Street, 32nd Floor<br>San Francisco, CA 94104 | Attorneys for Plaintiffs<br>JESUS PAYAN and FRANCISCA PAYAN<br><br>T:    (415) 426-3000<br>F:    (415) 426-3001 |

[ ]     BY MAIL: I am readily familiar with the business practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business; on this date, the above-referenced correspondence was placed for deposit at Los Angeles, California, and placed for collection and mailing following ordinary business practices.

[X]     BY ELECTRONIC SERVICE VIA FILE & SERVEXPRESS: File & ServeXpress for service on all counsel of record by electronic service pursuant to the Order Authorizing Electronic Service and pursuant to California Code of Civil Procedure § 1010.6 and California Rules of Court 2060(c). The transmission was reported as complete without error.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 11, 2016, at Los Angeles, California.

Brigette S. Price

1

Exhibit 223

ROGER MILLER - PLT'S - January 16, 2007

## Page 1

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA
2  COUNTY OF SAN FRANCISCO
3  ---oOo---
4  CONSUELO LOPEZ, et al., individually
5  and as Sucessor-in-Interest to
6  AUGUSTINE LOPEZ, Deceased; et al.,
7  Plaintiffs,
8  v.                          No. 434980
9  ACandS, INC., et al.,
10  Defendants.
11  _____/
12
13
14
15  PLAINTIFF'S VIDEOTAPED DEPOSITION OF
16  ROGER MILLER
17  TUESDAY, JANUARY 16, 2007
18
19
20
21  REPORTED BY: JOANNE BALBONI, CSR 10206
22
23  TOOKER & ANTZ
    COURT REPORTING & VIDEO SERVICES
24  350 Sansome Street, Suite 700
    San Francisco, CA 94104
25  (415) 392-0650 Fax:  (415) 392-3897

## Page 2

1        I N D E X
2  DEPOSITION OF ROGER MILLER
3  EXAMINATION BY:                PAGE
4  MR. HAMES                      9
5        ---oOo---
6      E X H I B I T S
7  A    Document entitled "Verification of
8       Luzenac Western Source Corporation,
9       Inc.'s Supplemental Response to
10      Plaintiff's Special Interrogatories
11      (Set One - Supplemental)"      169
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1        BE IT REMEMBERED that, pursuant to Notice
2  of Taking Deposition, and on Tuesday, January 16,
3  2007, commencing at 10:08 o'clock a.m. thereof, at
4  the offices of Drinker, Biddle & Reath, 50 Fremont
5  Street, 20th Floor, San Francisco, California, before
6  me, JOANNE BALBONI, duly authorized to administer
7  oaths pursuant to Section 2093(b) of the California
8  Code of Civil Procedure, personally appeared
9        ROGER MILLER,
10  called as a witness on behalf of the Plaintiffs, and
11  the said witness, having first been placed under
12  oath, was thereupon examined and testified as
13  hereinafter set forth.
14      A P P E A R A N C E S
15      The Law Offices of Keller, Fishback &
16  Jackson, 1200 Gough Street, Suite 400, San Francisco,
17  California 94109, represented by SCOTT HAMES,
18  Attorney at Law, appeared as counsel on behalf of the
19  Plaintiffs.
20      The Law Offices of Shook, Hardy & Bacon,
21  600 Travis Street, Suite 1600, Houston, Texas
22  77002-2911, represented by GENE WILLIAMS, Attorney at
23  Law, appeared as counsel on behalf of Roger Miller.
24
25

## Page 4

1      A P P E A R A N C E S
2  (Continued)
3      The Law Offices of McKenna, Long &
4  Aldridge, 101 California Street, 41st Floor, San
5  Francisco, California 94111, represented by REBECCA
6  WOODSON, Attorney at Law, appeared as counsel on
7  behalf of Luzenac Western Source Corporation.
8      The Law Offices of Armstrong & Associates,
9  One Kaiser Plaza, Suite 625, Oakland, California
10  94612, represented by JENNIFER FITZPATRICK, Attorney
11  at law, appeared as counsel on behalf of Elementis
12  Chemicals, Inc.
13      The Law Offices of Drinker, Biddle & Reath,
14  0 Fremont Street, 20th Floor, San Francisco,
15  California 94105-2235, represented by THOMAS PULLIAM,
16  JR., Attorney at Law, appeared as counsel on behalf
17  of Roger Miller and Consuelo Lopez.
18      The Law Offices of Gordon & Rees, 275
19  Battery Street, 20th Floor, San Francisco, California
20  94111, represented by Anne Brauer, Attorney at law,
21  appeared as counsel on behalf of The Goodyear Tire &
22  Ruber Company.
23
24
25

1 (Pages 1 to 4)

ROGER MILLER - PLTFS - January 16, 2007

| | |
|---|---|

**Page 5**

```
 1        A P P E A R A N C E S
 2   (Continued):
 3        The Law Offices of Brydon, Hugo & Parker,
 4   135 Main Street, San Francisco, California,
 5   represented by ROBERO OCA, Attorney at Law, appeared
 6   as counsel on behalf of Foster Wheeler, LTD.
 7        The Law Offices of Berry & Berry, 1 Temple
 8   Street, San Francisco, California 94114, represented
 9   by GINA TRAVAGLIO, Attorney at Law, appeared on
10   behalf of Thorpe Insulation.
11        The Law Offices of Jackson & Wallace, 55
12   Francisco Street, 6th Floor, San Francisco,
13   California 94133, represented by ANA PORTILLO,
14   Attorney at Law, appeared on behalf of H.M. Royal.
15        The Law Offices of Sedgwick, Detert, Moran
16   & Arnold, One Market Plaza, Steuart Tower, 8th Floor,
17   San Francisco, California 94105, represented by SEAN
18   PATTERSON, appeared on behalf of Soco-West, Inc.,
19   Whittaker, Clark & Daniels.
20        The Law Offices of Jedeikin, Spaulding,
21   Meadows & Schneider, 333 Pine Street, San Francisco,
22   California 94104, represented by LEOPOLDO CHANCO,
23   Attorney at Law, appeared on behalf of Omya
24   California, Inc., Mcneil (Ohio) Corporation.
25
```

**Page 6**

```
 1        A P P E A R A N C E S
 2   (Continued):
 3        The Law Offices of Imai, Tadlock, Keeney &
 4   Cordery, 100 Bush Street, Suite 1300, San Francisco,
 5   California 94104, represented by DANA LEAHY, Attorney
 6   at Law, appeared on behalf of Milwhite Inc., & CP
 7   Hall Company.
 8        The Law Offices of Thelen, Reid, Brown,
 9   Raysman & Steiner, 101 Second Street, Suite 1800, San
10   Francisco, California 94105, represented by MIMI LEE,
11   Attorney at Law, appeared on behalf of R.T.
12   Vanderbilt & Company, Inc.
13        The Law Offices of Thelen, Reid, Brown,
14   Raysman & Steiner, 101 Second Street, 18th Floor, San
15   Francisco, California 9494104-1211, represented by
16   ROBERTA RENDAHL, Attorney at Law, appeared on behalf
17   of Daimler Chrysler Corporation, appeared
18        The Law Offices of Buty & Curliano, 383
19   Fourth Street, Oakland, California 94607, represented
20   by ADAM KOSS, Attorney at Law, appeared on behalf of
21   Engelhard Corporation.
22        Johnson & Johnson, 1 Johnson & Johnson
23   Plaza, New Brunswick, New Jersey 08933, represented
24   by JOHN O'SHAUGHNESSY, Attorney at Law, appeared on
25   behalf of Johnson & Johnson.
```

**Page 7**

```
 1                PROCEEDINGS
 2        MR. HAMES:  I'm going to ask that the court
 3   reporter re-swear you in, and we'll just consider
 4   this another deposition, although Mr. Miller was just
 5   deposed 15 minutes ago.  So are we on the record?
 6        THE VIDEOGRAPHER:  Yeah, we are on the
 7   record.
 8        MR. HAMES:  Okay.
 9        THE VIDEOGRAPHER:  And we are back on the
10   record.  The time is 10:07 a.m.
11        You may proceed.
12        MR. HAMES:  Okay.  We are here to take the
13   deposition of Roger Miller in the Consuelo Lopez case
14   regarding the wrongful death of Mark Lopez, and this
15   is San Francisco Superior Court case number 434980.
16   My name is Scott Hames.  I'm from the law
17   firm of Keller, Fishback & Jackson, and I represent
18   the plaintiffs in this case.  And I'm going to ask
19   that everyone just restate their appearances, please,
20   even though Mr. Miller just gave a deposition on
21   direct examination by his own attorney, and then I'm
22   going to ask the court reporter to re-swear him.  Go
23   ahead.
24        MR. CHANCO:  My name is Leo Chanco, and I'm
25   with the law firm of Jedeikin, Spaulding, Meadows &
```

**Page 8**

```
 1   Schneider.  I represent McNeil Ohio Corporation and
 2   Omya California, Incorporated.
 3        MS. LEE:  Mimi Lee for R.T. Vanderbilt
 4   Company from Thelen.
 5        MS. LEAHY:  Dana Leahy.  I am from the law
 6   firm of Imai, Tadlock, Keeney & Cordery for C.P. Hall
 7   Company and Milwhite, Inc.
 8        MR. OCA:  Robero Oca from Brydon, Hugo &
 9   Parker on behalf of Foster Wheeler.
10        MS. WILLIAMS:  Tina Williams from Bassi,
11   Martini, Edlin & Blum, representing JT Thorpe & Son
12   and Parker Hannifin.
13        MS. TRAVAGLIO:  Gina Travaglio for Thorpe
14   Insulation.
15        MS. BRAUER:  Anne Brauer for Goodyear Tire
16   and Rubber Company.
17        MS. PORTILLO:  Ana Portillo for HM Royal.
18        MS. FITZPATRICK:  Jennifer Fitzpatrick from
19   Armstrong & Associates on behalf of Elementis
20   Chemicals, Inc.
21        MR. MENO:  Rudy Meno for Daimler Chrysler
22   Corporation.
23        MR. KOSS:  Adam Koss from Buty & Curliano,
24   and I represent Engelhard Corp.
25        MR. PATTERSON:  Sean Patterson from
```

2 (Pages 5 to 8)

ROGER MILLER - Pltf's - January 16, 2007

1    Sedgwick, Detert, Moran & Arnold on behalf of
2    Soco-West Company and Whittaker, Clark & Daniels.
3         MS. WOODSON:  And Rebecca Woodson here for
4    Luzenac.
5         MR. WILLIAMS:  And I'm Gene Williams,
6    Mr. Miller's personal counsel.
7         MR. HAMES:  Can you guys state your
8    appearances?
9         MR. PULLIAM:  Tom Pulliam, Drinker, Biddle &
10   Reath.
11        MR. O'SHAUGHNESSY:  John O'Shaughnessy,
12   attorney for Johnson & Johnson.
13        MR. HAMES:  All right.  Can you swear him
14   in, please?
15        (Whereupon the witness was sworn.)
16            EXAMINATION BY MR. HAMES
17        MR. HAMES:  Q.  Good morning, Mr. Miller.
18   Again, my name is Scott Hames, and I represent the
19   plaintiffs in this case.
20        You understand that the oath that you took
21   has the same force and effect as though you were in
22   court, right?
23   A.  Yes.
24   Q.  It comes with the penalty of perjury.
25   A.  Yes.

Page 9

1    Q.  And you just gave a deposition a few minutes
2    ago.  I'm going to ask you a lot of questions.  A lot
3    of them are going to be probably very redundant as to
4    what you already testified about, but I am entitled
5    to ask you those questions.  Okay?  So I apologize if
6    it seems somewhat redundant.
7         First of all, sir, how old are you?
8    A.  I'm 81.
9    Q.  What's your date of birth?
10   A.  8-30-25.
11   Q.  All right.  And I understand that you
12   attended the University of Washington in Seattle,
13   right?
14   A.  Yes.
15   Q.  Okay.  And you graduated from that school,
16   right?
17   A.  Yes.
18   Q.  Okay.  When did you graduate from the
19   University  of Washington?
20   A.  1952.
21   Q.  And what was your degree in?
22   A.  Bachelor of science in mining engineering.
23   Q.  Okay.  Did your studies at the University of
24   Washington have anything to do with the mining of
25   asbestos in any way?

Page 10

1    A.  No.
2    Q.  Okay.  Were you studying the mining of talc
3    in any way at that time?
4    A.  No.
5    Q.  Can you describe generally what you were
6    studying then at the University of Washington
7    pertaining to mining?
8    A.  I was studying the methodology and the
9    technology of acquiring minerals from ores.
10   Q.  Okay.  What minerals?
11   A.  In general, in the university level, it was
12   considering all minerals.  We were exposed to a broad
13   range of techniques.
14   Q.  Okay.  And that's the only formal education
15   that you had --
16   A.  Yes.
17   Q.  -- that's the last degree that you achieved,
18   right?
19   A.  Right.
20   Q.  Okay.  Then what was your first job after
21   college?
22   A.  The first job was as general manager of the
23   Border Lord Mining Company, reopening an abandoned
24   tungsten mine on the Canadian border.  In the State
25   of Washington but on the Canadian border.

Page 11

1         The mine had been originated by the Germans.
2    They had discovered the hardening effect of tungsten
3    in steel, and they were up there in 1913, 1914,
4    mining tungsten and shipping it back to Germany.  We
5    were attempting to reopen this mine.
6    Q.  What was the name of that company?
7    A.  Border Lord Mining Company.  They actually
8    mined doctors and dentists is what they did.
9    Q.  I'm sorry.  What did you say?  They actually
10   what?
11   A.  I shouldn't have said that.
12        They were mining doctors and lawyers.
13   That's where their funding was coming from.
14   Q.  All right.  How long did you work for that
15   company?
16   A.  Seven and a half months, eight months.
17   Q.  And what was your job title?
18   A.  Probably general manager would --
19   Q.  What were your job duties?
20   A.  I was responsible for the resurrection of an
21   abandoned mining camp and the initiation of the
22   mining operations.
23   Q.  Okay.  And at that time did you have any
24   involvement or become aware of any asbestos
25   contamination in that particular mine?

Page 12

3 (Pages 9 to 12)

ROGER MILLER - PLFFS - January 16, 2007

Page 13

1   **A. No.**
2   Q. Okay. And then what was your next job?
3   **A. The next job was with the WH Loomis Scott**
4   **Company in Gouvernor, New York.**
5     MS. BRAUER: Can I hear that back,
6   Ms. Reporter?
7     (Record read.)
8     BY MR. HAMES: Q. When did you start
9   working for them?
10  **A. I believe in about 1953.**
11  Q. For how long?
12  **A. I worked for Loomis, and they were later**
13  **acquired by International Talc Company. I was there**
14  **for two and a half years. '54, maybe '55. I'm not**
15  **sure of those dates.**
16  Q. Okay. And were you working out of New York?
17  **A. No, no. I was in Gouvernor, New York,**
18  **upstate New York.**
19  Q. What was your position with them?
20  **A. I was mining engineer.**
21  Q. All right. What were your job duties?
22  **A. My job was to position and design the**
23  **operations that were used to extract the ore.**
24  Q. And this is for a talc company?
25  **A. Yes.**

Page 14

1   Q. Where was the mine?
2   **A. In Fowler, New York.**
3   Q. Fowler?
4   **A. Fowler, F-o-w-l-e-r.**
5   **They actually had three ore bodies that they**
6   **were mining.**
7   Q. They had three ore bodies at that one
8   particular mine?
9   **A. M-hm. One company had three ore mines.**
10  Q. Were they all in Fowler?
11  **A. Yes. Or more proximate to Fowler.**
12  Q. Okay. Where were the other locations?
13  **A. I don't really remember the name of the**
14  **villages. They were within seven miles of one**
15  **another.**
16  Q. Okay. What were your day-to-day duties?
17  **A. I was responsible for the measurement of**
18  **progress in the mine openings underground. I was**
19  **responsible for sampling the ore faces so that the**
20  **laboratory could determine the quality of the**
21  **material. I was responsible for preparing all the**
22  **maps and drawings of the geology and of the physical**
23  **assets of the company.**
24  Q. Did you ever learn that any of those ore
25  bodies were contaminated with any form of asbestos

Page 15

1   when you were working there?
2   **A. No.**
3   Q. Okay. Were you aware if there was any
4   concern about the mine or rather the ore bodies being
5   contaminated with asbestos.
6     MS. LEE: Objection; overbroad, vague, and
7   ambiguous.
8     BY MR. HAMES: Q. You can answer.
9   **A. I was unaware of it.**
10  Q. Okay. So that puts us in approximately 1956
11  when you left that company?
12  **A. '55, I think.**
13  Q. Okay. And then where did you go after that?
14  **A. I went to Buckman mines in Cloverdale,**
15  **California, to operate a mercury mine and mill.**
16  Q. I'm sorry. Where did you say that was?
17  Cloverdale?
18  **A. Near Cloverdale, California. Actually, it's**
19  **7 miles up a very crooked road in Cloverdale,**
20  **California.**
21  Q. Near Clear Lake?
22  **A. No. It was on this side of the mountain.**
23  Q. And it was a mercury mine you said?
24  **A. Yes.**
25  Q. What were your job duties?

Page 16

1   **A. I was manager.**
2   Q. Okay. How long did you work for Buckman
3   Mines?
4   **A. I worked for Buckman Mines and Buckman**
5   **Laboratories for nine and a half years. I was in**
6   **California for about two years, and then I was in**
7   **Tennessee for seven, seven and a half. I believe,**
8   **I'm not absolutely sure of this.**
9   Q. Okay. What were your day-to-day duties
10  during the first two years when you were in
11  California for Buckman Mines?
12  **A. I was responsible for the recovery of and**
13  **the search for the ore-bearing zones and for the**
14  **operation of the reduction plant.**
15  Q. Okay. Where was the Buckman Mine located?
16  **A. Do you know where the big geysers are?**
17  Q. No. I'm sorry. I don't.
18  **A. Well, it's halfway between Healdsburg and**
19  **Cloverdale but back up in the Mayacamas mountain.**
20  Q. Okay. And was --
21  **A. There was a place up there where they**
22  **generate electricity now, and we were very close to**
23  **that.**
24  Q. And was this just one mine that you were --
25  **A. Yeah. Well, they had two properties that we**

4 (Pages 13 to 16)

ROGER MILLER - Plrfs - January 16, 2007

1  were running at the time.
2  Q.  Did you ever hear of either of those mines
3  being contaminated with any form of asbestos?
4  **A.  No.**
5  Q.  So that puts us in about -- well, what was
6  your next job?
7  **A.  Well, as I said, I went from the mining**
8  **operation to the chemical operation in Memphis.**
9  Q.  Okay.  And --
10 **A.  And from there, I went to the Eastern Mag**
11 **job in Vermont.**
12 Q.  Okay.  What were you doing in Tennessee for
13 Buckman Mines or Buckman Laboratories?
14 **A.  Buckman Laboratories produced organic**
15 **industrial products for the control of molds and**
16 **slimes, dominantly in the paper industry, to keep the**
17 **paper machines clean.  So these were organic bromine,**
18 **organic sulfur products, barium products, and I built**
19 **plants for them and was responsible for the operation**
20 **of the plants.**
21 Q.  Okay.  That is so far over my head, I'm
22 going to ask the court reporter to read that answer
23 back.  Okay?
24     (Record read.)
25     BY MR. HAMES:  Q.  Is there any way --

Page 17

1     MS. BRAUER:  I'm sorry.  Ms. Reporter,
2  people are not hearing you down the room.  I hate to
3  ask you, but could you please repeat that again
4  louder?
5     (Record read.)
6     BY MR. HAMES:  Q.  Did she get that right?
7  **A.  Yes.**
8  Q.  Is there any way for you to simplify that
9  for a layman to understand what you were doing?
10 That's a very --
11 **A.  Industrial microorganisms control chemicals.**
12 **To summarize all this, all of the properties and what**
13 **the intentions of the properties were.**
14 Q.  And it was for the paper industry?
15 **A.  Dominantly for the paper industry but in**
16 **paint and other products.**
17 Q.  So the ultimate purpose is to prevent mold?
18 **A.  It's to kill molds and slimes.**
19 Q.  And what organic materials were being used?
20 **A.  Organic sulfur compounds, organic mercury**
21 **compounds, organic bromine compounds, and barium**
22 **compounds.**
23 Q.  I don't want to spend too much time on this,
24 but was it actually in the paper or the paint itself,
25 or was it on the machines that was generated?

Page 18

1  **A.  It's in the fluid systems in which these**
2  **paper products are produced.**
3  Q.  Okay.
4  **A.  There is a tendency for the slime and mold**
5  **to plug the very fine mesh wires on which paper is**
6  **made, and so these products eliminated that problem.**
7  Q.  And your role with respect to what they were
8  doing was what exactly?
9  **A.  Building the plants and running the plants.**
10 Q.  Building the plants that actually --
11 **A.  Produced the material.**
12 Q.  Okay.  And at any time did you come across
13 the use of asbestos or any issues related to asbestos
14 at all?
15 **A.  None.**
16 Q.  Okay.  And you were in Tennessee for about
17 seven years or so?
18 **A.  I think that's right.**
19 Q.  Okay.  So what was your next job?
20 **A.  The next job was with Eastern Magnesia in**
21 **Vermont.**
22 Q.  Okay.  What year was that?
23 **A.  That was 1966.**
24 Q.  What was your job title?
25 **A.  Vice president of operations.**

Page 19

1  Q.  And how long did you hold that position?
2  **A.  About two years.  I'm not really very sure**
3  **but about two years.**
4  Q.  Okay.  Let's just talk about the first two
5  years.
6     What were your day-to-day duties when you
7  were working for Eastern Mag as VP of operations?
8  **A.  I was responsible for the operation of the**
9  **mines and mills, every aspect, including the**
10 **prospecting for new ore bodies, including the**
11 **construction and changes of the mills themselves.  I**
12 **had broad responsibilities in the operations.**
13 Q.  Okay.  How many mines did Eastern -- I'll
14 just call them Eastern, if that's all right -- have
15 when you first started working there in 1966?
16 **A.  Two.**
17 Q.  Where were they?
18 **A.  One at Johnson Vermont, and one at**
19 **Hammondsville.**
20 Q.  And that's Hammondsville, Vermont?
21 **A.  Yes.**
22 Q.  And how many mills did they have?
23 **A.  They had three.  They had one in Johnson**
24 **Vermont, and one in West Windsor, Vermont, and one at**
25 **Gassetts, Vermont.**

Page 20

5 (Pages 17 to 20)

ROGER MILLER - Plffs - January 16, 2007

1    Q.  How do you spell that?
2    A.  G-a-s-s-e-t-t-s.
3    Q.  Okay.  And --
4       THE WITNESS:  Can you folks hear me all
5    right?
6       MR. WILLIAMS:  Believe me, they are not shy.
7    They'll speak up if they can't.
8       BY MR. HAMES:  Q.  Did you know how long
9    Eastern Magnesia had been in business before you
10   started working for them?
11   A.  Before I started working for them, no.
12   Q.  Do you know if they were a subsidiary of any
13   other companies?
14   A.  When I came to work for Eastern Magnesia,
15   they were a wholly owned subsidiary of Johnson &
16   Johnson.
17   Q.  Okay.  Do you know if Johnson & Johnson at
18   that time had any mines that they were operating?
19   A.  They did not.
20   Q.  Okay.  How do you know that?
21   A.  Well, because my presence was very
22   distinctive within the J & J organization.
23   Q.  Okay.  What do you mean by "very
24   distinctive"?
25   A.  There wasn't anybody else doing what I was

                                      Page 21

1    doing.
2    Q.  Okay.  So you were the only person that
3    really had any information related to the mine
4    operations?
5    A.  Well, I was their source of information for
6    the mining operation.
7    Q.  Okay.  So when did the Johnson Vermont mine
8    first come online?
9    A.  Oh, boy.  The Johnson Vermont mine was
10   probably  80 years old by the time I got there.  So
11   it would have been 80 years before 1966.
12   Q.  Okay.  What about the Hammondsville mine?
13   How long had it been around or been in use?
14   A.  Since about 1941.
15   Q.  All right.
16   A.  And there were very different scale and
17   scopes of these operations over time.
18   Q.  Okay.  Let's take them individually.
19      The Johnson Vermont mine, do you know what
20   they were mining there before --
21   A.  They were mining --
22   Q.  Wait.  Hold on.  Let me just finish just so
23   the record is clear.
24      They were mining there before you started
25   working for Eastern?

                                      Page 22

1    A.  M-hm.
2    Q.  What were they mining?
3    A.  Talc ore.
4    Q.  Okay.  Had they ever mined anything other
5    than talc ore from that mine that you are aware of?
6    A.  No.
7    Q.  All right.  The same question with respect
8    to Hammondsville.  What were they mining there?
9    A.  Talc ore.
10   Q.  Did they ever mine anything else?
11   A.  No.
12   Q.  What was your next position with Eastern
13   after the first two years when you were VP of
14   operations?
15   A.  I became president of Windsor Minerals.  By
16   that time, the name Eastern Mag had been eliminated.
17   The northern properties had been sold, and I was
18   president of the new company Windsor Minerals.
19   Q.  And so that was 1968, right?
20   A.  I believe that's --
21   Q.  Or thereabouts?
22   A.  Or thereabouts is a better way to say it.
23   Q.  Okay.  It's okay for you to give me an
24   estimate as long as you are not guessing about
25   something.  Okay?  If you are guessing or you are

                                      Page 23

1    purely speculating --
2    A.  What if I'm fumbling?
3    Q.  Fumbling is okay.  That's allowed.  You can
4    give me an estimate, though.  Okay?
5    A.  All right.
6    Q.  All right.  So in approximately 1968, you
7    were president, and the company name had changed to
8    Windsor Minerals?
9    A.  Yes.
10   Q.  Do you know when that name change took
11   place?
12   A.  It took place coincident with the sale of
13   the Johnson mine and mill, Engelhard Minerals and
14   Chemicals, which took place in 1968.
15   Q.  Okay.  And it was sold to whom?
16   A.  Engelhard Minerals & Chemicals.
17   Q.  How do you spell that?  The Engelhard part?
18   A.  Somebody here, I think, has a closer
19   association, and I don't --
20      MR. WILLIAMS:  If you know, tell him.  If
21   you don't --
22      THE WITNESS:  I don't know.
23      MR. HAMES:  Okay.
24      MR. WILLIAMS:  It's not a spelling test.
25      MR. HAMES:  No, it's not.

                                      Page 24

                                6  (Pages 21 to 24)

ROGER MILLER - Plf's - January 16, 2007

1  Q.  Nonetheless, the Johnson Vermont mine in
2  approximately 1968 was sold to this other company
3  Engelhard?
4  **A.  Yes.**
5  Q.  And --
6  **A.  And the name Eastern Magnesia was sold with**
7  **it.**
8  Q.  With it.  All right.
9      And then your position changes as well, and
10 you became the president?
11 **A.  Yes.**
12 Q.  But you became the president of Windsor
13 Minerals?
14 **A.  Yes.**
15 Q.  Okay.  Was there any relationship with
16 Windsor Minerals with Eastern Magnesia?
17 **A.  Eastern Magnesia was the company that J & J**
18 **acquired.  Okay?**
19 Q.  Uh-huh.
20 **A.  The acquired company was sold.  The northern**
21 **half of the acquired company was sold, and the name**
22 **Eastern Magnesia was sold with it, and a new**
23 **corporation was formed, a wholly owned subsidiary of**
24 **Johnson & Johnson, named Windsor Minerals.**
25 Q.  Okay.  So as far as you were aware, Windsor

Page 25

1  Minerals never existed before 1968?
2  **A.  It did not.**
3  Q.  Okay.  And they were a wholly owned
4  subsidiary of Johnson & Johnson?
5  **A.  Yes.**
6  Q.  And they were newly formed in 1968 after
7  Eastern Mag was sold to Engelhard along with the
8  name?
9  **A.  Yes.**
10 Q.  Okay.  I got it.
11     And then did Windsor Minerals have any
12 connection or any duties at all with the Johnson
13 Vermont mine after 1968?
14 **A.  No.**
15 Q.  Okay.  So you only had dealings with the
16 Johnson Vermont mine from 1966 to 1968?
17 **A.  Yes.**
18 Q.  Okay.  Did Windsor Minerals continue to
19 operate the Hammondsville mine?
20 **A.  Yes.**
21 Q.  And how long did they continue to do that?
22 **A.  As long as I worked there.**
23 Q.  Okay.  And how long was that?
24 **A.  Until 1989.**
25 Q.  Okay.  And so you were the president of

Page 26

1  Windsor Minerals from 1968 until 1989; is that
2  correct?
3  **A.  Yes.**
4  Q.  Okay.  And as president, after 1968, what
5  was your involvement with the Hammondsville mine, if
6  any?
7  **A.  I was directly responsible for the conduct**
8  **of mining operations at the Hammondsville mine.  I**
9  **had a mine superintendent who reported to me, but it**
10 **was my responsibility to oversee and supervise the**
11 **development of that property.**
12 Q.  Before we leave the Johnson Vermont mine,
13 for those two years when you were still working for
14 Eastern Mag and had dealings with that mine, they
15 were only mining talc from that mine, correct?  Is
16 that what --
17 **A.  Yes.**
18 Q.  -- you said?
19     Do you know what that talc was used for?
20 **A.  It was used in the paper industry.  It was**
21 **used in the paint industry.  It was used in the auto**
22 **body putty industry, and a whole range of minor uses.**
23 Q.  What other minor uses that you recall?
24 **A.  They had a very small scale production of a**
25 **cosmetic -- not a high-grade cosmetic but a low grade**

Page 27

1  **cosmetic product which was sold to cosmetic uses and**
2  **also to the paint and varnish industry.  They also**
3  **sold to the rubber industry.**
4  Q.  Do you know who they sold to in the rubber
5  industry?
6  **A.  No.**
7  Q.  Let me just make sure the record is clear on
8  that.
9      You don't know who Eastern Mag's essentially
10 their clients or customers were who were purchasing
11 the talc from the Johnson mine and the rubber
12 industry, correct?
13 **A.  I knew generally they were selling to the**
14 **rubber industry.  I didn't know specifically who they**
15 **were selling to.**
16 Q.  Okay.  And do you know how much they sold to
17 the rubber industry at that time?  How much talc?
18 **A.  I do not know.**
19 Q.  Do you know if at the Johnson Vermont mine
20 anything was ever done to determine if that mine was
21 contaminated with asbestos of any form?
22 **A.  I don't.**
23     MS. WOODSON:  Objection; vague and ambiguous
24 as to "anything done."
25     MR. WILLIAMS:  You can go ahead and answer.

Page 28

7 (Pages 25 to 28)

ROGER MILLER - Plffs - January 16, 2007

Page 29

1    THE WITNESS: I don't know.
2    BY MR. HAMES: Q. Was there any testing of
3  any kind that you are aware of?
4    **A. There was testing done in order to ascertain**
5  **whether or not the products met the quality**
6  **standards, the customer's quality standards, for the**
7  **individual products, because the products would be**
8  **used in many different applications, and so our test,**
9  **our physical tests in the mill, met the quality**
10  **standards of the customer.**
11    Q. Okay. And let me ask you this: All the
12  talc that came from that mine, was it essentially the
13  same, or were there different batches, different
14  quantities, different mixtures, that sort of thing?
15    MR. WILLIAMS: And you are asking just about
16  the Johnson mine?
17    MR. HAMES: Yeah. Just about the Johnson
18  mine and from 1966 to '68.
19    THE WITNESS: There was some variation in
20  quality within the ore body, and one of the aspects
21  of mining was to come up with a uniform blend because
22  the mill wasn't adjustable to any significant degree.
23  And so they took the composite of the ore body and
24  then attempted to operate enough headings in the
25  mines so that they have a relatively uniform -- not

Page 30

1  an absolute uniform but a relatively uniform feed to
2  the mill.
3    BY MR. HAMES: Q. What other minerals, if
4  any, were in the talc from the Johnson's mine from
5  '66 to '68 that you are aware of?
6    **A. The most common mineral in association with**
7  **the talc was magnesite, magnesium carbonate. It was**
8  **actually a calcium magnesium carbonate.**
9    Q. A calcium magnesium carbonate --
10    **A. Right.**
11    Q. -- and talc?
12    **A. And talc.**
13    Q. Was there anything else that you are aware
14  of, any other minerals?
15    **A. There were minor dark-colored minerals,**
16  **which they tried forever and ever to avoid because**
17  **most of the talc products required a color standard,**
18  **a whiteness standard. And there were the streaks of**
19  **a dark color mica that would come through, and it**
20  **would change the color of the massive talc.**
21    Q. I'm sorry. What was that mineral?
22    **A. Mica.**
23    Q. Okay. Were you aware of any other
24  minerals --
25    **A. No.**

Page 31

1    Q. -- that you haven't already mentioned?
2    **A. No.**
3    Q. Okay. So there was testing that was done
4  for the end product of the talc, right?
5    **A. That's right.**
6    Q. What about at the mine itself to see if
7  there was any asbestos present at the mine.
8    **A. The testing of the mine -- the head of the**
9  **mine consisted of the same diamond drill pattern. In**
10  **order to determine the location of the ore bodies,**
11  **the quantities of the ore, we used diamond drills.**
12  **And the core from those diamond drills were always**
13  **evaluated in the laboratory to be sure they met the**
14  **criteria that we needed to feed the mills. I have no**
15  **knowledge or recollection of any specific testing for**
16  **asbestos in the period of time that I was there.**
17    Q. Okay. And we are just talking about the
18  Johnson mine --
19    **A. Yes.**
20    Q. -- from '66 to '68.
21    **A. I'm talking about the Johnson mine.**
22    Q. And you talked about the diamond drilling a
23  little bit earlier --
24    **A. M-hm.**
25    Q. -- but I want you to describe in detail

Page 32

1  exactly what that is.
2    **A. A diamond bit is a circular surface**
3  **impregnated with diamond particles on a hollow pipe,**
4  **a hollow stem. It is forced against rock, cooled by**
5  **water. And as a result of this, you end up with a**
6  **three- or four-foot-long piece of rock that's an inch**
7  **and a quarter in diameter. It's a very**
8  **representative sample of the material that it has**
9  **just passed through, and we used those to assess the**
10  **quality of the ore.**
11    Q. For the Johnson mine, how frequently was
12  this diamond drilling done where the core samples
13  were taken during that two-year period?
14    **A. I really can't say. I know that we had**
15  **them, that we used them. The frequency, I do not**
16  **recall.**
17    Q. Okay. How big was that mine?
18    **A. How big was the mine? About 140,000 tons a**
19  **year.**
20    Q. That's what it produced --
21    **A. M-hm.**
22    Q. -- for talc?
23    **A. Of the ore.**
24    Q. Of the ore?
25    **A. Yes.**

8 (Pages 29 to 32)

ROGER MILLER - Plf's - January 16, 2007

Q. Okay. And then the ore is sent off to the
processing plants?
A. Yes.
Q. Okay. Is there any way for you to tell me
how frequently the diamond drilling was done? You
said that you don't really know, but was it done
annually or every month?
A. It was done by the operating staff, drilling
holes ahead of the opening. You are driving an
opening through the ore. You want to know the
quality of the ore ahead of you. They would bring in
a diamond drill and drill a pilot hole ahead for 60
or 80 feet to assess the quality. That was a uniform
practice that went on all the time. If they were in
search for an extension of the ore body or a
different dimension of the ore body, then they would
set up and drill a whole pattern of holes.
Q. Okay. And once they found from the core
sample the talc that they were looking for, how was
the talc then mined?
A. Drill and blast.
Q. Okay. All right. And I think you mentioned
this, but I want to make sure the record is clear.
You are not aware of any testing being done
of those core samples for asbestos in the Johnson

Page 33

mine --
A. No.
Q. -- from 1966 to '68?
A. No, I'm not aware.
Q. Okay. Since you have so much experience in
this area, what do you think they would have done had
they come across asbestos?
MS. WOODSON: Objection; calls for
speculation and irrelevant.
THE WITNESS: I have no idea what the
response would be.
BY MR. HAMES: Q. If they found asbestos in
a core sample, would that be of such a nature that it
would contaminate the ore body that you wouldn't
drill there, or you wouldn't mine there?
MS. WOODSON: Objection; calls for
speculation --
MS. BRAUER: Objection; irrelevant.
MS. WOODSON: -- and irrelevant.
THE WITNESS: I have no idea what the
reaction would have been.
MR. HAMES: Okay.
THE WITNESS: They had been in those ore
bodies for a long, long time.
BY MR. HAMES: Q. Right. For 80 years

Page 34

before you were there?
A. Yes.
Q. Okay. Do you know the names of any of the
companies that were customers that purchased the
actual talc in any of those different industries from
that --
MR. WILLIAMS: Again, the Johnson mine?
BY MR. HAMES: Q. -- from that Johnson mine
from '66 to '68?
A. I would be guessing.
Q. Okay. And why is that? Because you just --
A. Because I didn't have a relationship with
the sales. My responsibilities were the operation of
the mines and mills.
Q. Okay. Are you aware of any documents or any
records that might reflect that?
A. No.
Q. Okay. Are you aware of any documents at all
relating to that mine and the samples that were taken
of the diamond drilling?
A. I'm not. There have been two acquisitions
since I had anything to do with it. I only had to do
it for two years, and it's 25 years ago.
Q. Right.
A. I have no information. No recollection at

Page 35

all.
Q. Okay. Were you aware of any allegations of
anyone ever being exposed to asbestos while they were
working at that mine?
A. No.
Q. And just to be clear about that, you are not
aware of any workers ever filing any workers'
compensation claims for asbestos exposure from that
mine?
A. No.
Q. Is that right?
A. Yes, that's right.
Q. Okay. Are you aware of any individuals that
might know who the customers were that were
purchasing the talc from that mine? Former
employees, managers, the people in the distribution
department, something like that? Anyone?
A. I don't believe so. I think I'm the
survivor of that whole --
Q. Well, whether or not you are aware if they
are alive or not --
A. I don't know.
Q. Okay. You are not aware of the names of
anyone that worked there that might have known who
the customers were who purchased the talc from that

Page 36

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - PLTFS - January 16, 2007

1  Johnson mine?
2      MS. WOODSON:  Asked and answered.
3      THE WITNESS:  I don't know.
4      BY MR. HAMES:  Q.  Can you give me the names
5  of any of your former co-workers?  Can you name one
6  that was working for the same company as you were
7  during that time period, from '66 to '68?
8  A.  A live one you mean?
9  Q.  No.  Any of them at all because they may
10  have given a deposition or something similar to what
11  you are doing that we might be able to look at.
12  A.  I really don't know.  I was young when I
13  went there, and everybody else was old.  So --
14  Q.  Okay.  I'm talking about anyone that was
15  employed by that company, meaning people that were
16  down in the mines themselves or management or --
17  A.  No, I don't recall.
18  Q.  -- anyone.  Okay.
19      Whether or not they are gone or not, you
20  don't recall anyone's name?
21  A.  No.  That's a long time ago.
22  Q.  Okay.  I just want to make sure we are
23  through with that.
24  A.  Yes.
25  Q.  I'm not trying to beat you up about it.  I

Page 37

1  realize it was a long time ago.  All right.  Do you
2  know how -- well, let's talk about this.
3      Once the talc was mined from the Johnson
4  mine, it went to different processing plants,
5  correct?
6  A.  No.
7  Q.  It went to one?
8  A.  It went to the Johnson mill.
9  Q.  Okay.  And that was also located in Johnson
10  Vermont?
11  A.  Yes.
12  Q.  How was it transported over there?
13  A.  A truck, an eleven-hundred-ton truck.
14  Q.  How much talc was being produced from that
15  mine?
16  A.  About 160, 180 -- I'm not too sure of that
17  number, but I think it's around 160,000 tons a year.
18  Q.  160,000 tons a year.  Okay.
19      So it's trucked over to the processing mill?
20  A.  Yes.
21  Q.  And can you just generally describe what the
22  processing mill did with the talc?
23  A.  The ore coming from the mine, generally
24  speaking, was less than 24 inch by 24 inch chunks.
25  These chunks were passed through a crusher, a primary

Page 38

1  crusher, and through a secondary crusher and produced
2  material about three-quarters of an inch in diameter.
3      This material, depending on where it was
4  going and what it was going to be used for, it was
5  ground in a device called a Raymond mill.  And it
6  could be ground to 95 percent, minus 325 measure, or
7  it could be ground to 40 percent, minus 325 measure.
8  But it was around 40 microns where most of the
9  utility of the product was available to the
10  customers.  And so that was a process.
11      In the Johnson mill, there was what we
12  called the dry mill, which it just simply took the
13  whole ore, grounded it up, and shipped it to
14  customers.  But there also was the wet mill in which
15  the flotation process was applied and the refined
16  product resulted, and that refined product drew a
17  premium of income to the company from the paint
18  industry and from the cosmetic industry.  So there
19  were some special uses.
20  Q.  For the cosmetic industry?
21  A.  Well, the cosmetic industry, but also for
22  some industrial applications.
23  Q.  Okay.  So essentially what you have, I think
24  it's -- just to summarize what you said.
25      You have a 24 by 24 inch --

Page 39

1  A.  Block.
2  Q.  -- block of --
3  A.  Of stone.
4  Q.  -- of stone that has the talc inside it, and
5  it's pulverized or crushed, right?
6  A.  Right.
7  Q.  And it's crushed to different varying
8  degrees?
9  A.  Yes.
10  Q.  Okay.  And the stone -- the other minerals
11  are removed from the talc?
12  A.  In the wet mill.
13  Q.  In the wet mill?
14  A.  But not in the dry mill.  The dry mill is
15  whole ore.
16  Q.  Okay.  So what does the dry product consist
17  of then?
18  A.  It consists of the minerals in the ore
19  itself.  The carbonate mineral and the talc mineral.
20  Q.  Anything else?
21  A.  Traces of biotite mica occasionally.
22  Q.  I'm sorry.  Traces of what?
23  A.  Of mica --
24  Q.  Okay.
25  A.  -- occasionally.

Page 40

10 (Pages 37 to 40)

ROGER MILLER - PLTFS - January 16, 2007

**Page 41**

1    Q.  Anything else that you are aware of?
2    A.  No.  And I do not have a recollection of the
3    minor minerals that might have been present.  I don't
4    have a good recollection of that at all.
5    Q.  And you are saying minor, m-i-n-o-r, right?
6    A.  Yes.
7    Q.  So what would you consider to be a minor
8    mineral?
9    A.  Biotite mica.
10   Q.  Okay.
11   A.  Just a little bit of silica.  Those are
12   really the only two that come to my mind.
13   Q.  Could asbestos have been one of those minor
14   minerals?
15   A.  It might have been.  I have no way of
16   knowing.
17   Q.  Okay.  The reason why you don't know is
18   because it wasn't tested; is that right?
19   A.  Yes.
20   Q.  As far as you are aware?
21   A.  Right.
22   Q.  Okay.  All right.  And that's the dry
23   milling process, right?
24   A.  Right.
25   Q.  Okay.  And then you also described a wet

**Page 42**

1    process?
2    A.  Right.
3    Q.  Can you describe that in a little more
4    detail for me, please?
5    A.  The ground talc ore is mixed with water and
6    with some surfactants.  Air is blown through it, and
7    the talc floats.  The talc is hydrophobic.  It hates
8    water.
9        Take baby powder and sprinkle it in the
10   bathtub, and it floats.  So that characteristic of
11   talc is used to separate talc from nontalc in a
12   flotation process.  All the nontalc particles sink.
13   The talc particles float so that the wet mill product
14   was enriched in talc.  It wasn't pure talc, but it
15   was enriched in talc.
16   Q.  Okay.  Now, with the dry process, do you
17   know how pure the talc was?
18   A.  Do I know how pure it was?  I know that the
19   ore typically was about 58 percent talc.
20   Q.  Okay.  So it's 58 percent talc --
21   A.  Don't quote me.
22   Q.  -- and the rest is other minerals?
23   A.  Other minerals.  Basically, the carbonate,
24   the magnesium carbonate.
25   Q.  Okay.  That's the vast majority --

**Page 43**

1    A.  Yes.
2    Q.  -- as far as you are aware?
3    A.  Yes.
4    Q.  Okay.  And then there is the other minor
5    minerals which may or may not have included asbestos
6    as far as you are aware?
7    A.  Yeah.  As far as I'm aware, right.
8    Q.  What percentage of the remaining minerals
9    would you consider that to be, the minor minerals?
10   A.  A quarter of one percent.
11   Q.  Okay.  A quarter of one percent --
12   A.  Yes.
13   Q.  -- or a quarter to one percent?
14   A.  No.  I think a quarter of one percent.  It's
15   a very minor thing.
16   Q.  Okay.
17   A.  I explained to you that they avoided the
18   dark micas because of the color effect.
19   Q.  All right.  And then with the wet process,
20   do you know what percentage of talc was remaining?
21   A.  I believe those products were about 92
22   percent talc.
23   Q.  And what's the remaining minerals, if you
24   know?
25   A.  Residual carbonate.

**Page 44**

1    Q.  Okay.  Could asbestos have been one of those
2    minerals?
3    A.  It could have been.  I was never aware ever
4    that there was any.
5    Q.  All right.  And were there any other
6    processing plants other than the Johnson one during
7    this time period?
8        MR. WILLIAMS:  For the Johnson mine?
9        MR. HAMES:  Yes, for the Johnson mine.
10       THE WITNESS:  No.
11       BY MR. HAMES:  Q.  And you mentioned the
12   different industries where the talc was sold from the
13   Johnson Vermont mine --
14   A.  M-hm.
15   Q.  -- and just to be clear, you don't know who
16   any of the customers were, right?
17   A.  No, I do not.
18       MS. WOODSON:  Objection; asked and answered.
19       BY MR. HAMES:  Q.  Can you describe
20   generally -- you went through a couple of them --
21   which industries wanted the fine talc versus the dry
22   talc?
23   A.  Well, the paint industry used the refined
24   product to some degree, and the toiletry industry
25   used it to some degree, the paper industry used it as

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - Plf's - January 16, 2007

1  a paper coating material to some degree. I'm not
2  well versed in that.
3  Q. Okay. And then who were the customers for
4  the dry? What different industries?
5  A. Probably the auto body putty, tape compound,
6  joint cement. At one time some of the roofing.
7  Basically, that was it.
8  Q. Is that it? Are you aware of any others?
9  A. Well, as I told you, the rubber industry
10 took some, but I don't know who they were, or how
11 much they took.
12 Q. Right. Okay. And so these different
13 industries were essentially getting the same
14 material, the same percentage of talc, the same
15 quality?
16 A. The same quality but a different particle
17 size distribution --
18 Q. Okay.
19 A. -- because people had different criteria of
20 coarseness or fineness that they required.
21 Q. Okay. And that's what you were describing
22 with the mesh?
23 A. Yes.
24 Q. And the diameter I think you said, or was
25 that the thickness of the end product? Why don't you

Page 45

1  put it in your words. If you can, describe what the
2  different qualities were.
3  MS. WOODSON: Objection; vague and
4  ambiguous.
5  THE WITNESS: If you were to prepare a
6  product for the paint industry, because paint is
7  composed of very, very fine particulate material,
8  they want you, the supplier, to grind it as far as
9  you can so that they don't have to grind it up when
10 they get it. So paint requires the finest particle
11 size that is possible.
12 The joint smith, the body putty guys, and
13 the automobile industry, they don't want it fine.
14 They want it with few fines, if they can, because
15 their properties are balanced with plastic in them
16 and the talc are balanced to do a particular function
17 when you apply it. So there is a great range of
18 particle size distributions that are used to control
19 the product.
20 BY MR. HAMES: Q. Do you know what particle
21 sizes were distributed to the rubber industry?
22 A. I have no idea.
23 Q. Okay. Do you know what size -- they didn't
24 want the fine, right? They weren't using the wet,
25 well refined --

Page 46

1  A. I have no idea.
2  Q. Okay. Do you know what the talc was used
3  for by the rubber industry at that time?
4  A. I believe -- and this is hearsay. It's not
5  from my personal knowledge, but I have been told that
6  it was used as a parting agent. If you had two
7  slabs of rubber and you didn't want it to slip, stick
8  together, you dust this surface with talc and then
9  put this one on top of it.
10 Q. Okay.
11 A. That's the entire limit of my knowledge of
12 the rubber industry.
13 Q. Just one last question on the Johnson
14 mine: Do you know if the Goodyear Tire and Rubber
15 Company ever used any of the talc from that mine?
16 A. I don't know.
17 MS. BRAUER: Objection. It calls for
18 speculation, vague, and overbroad.
19 BY MR. HAMES: Q. The reason I ask you
20 that -- and I don't know how much information you
21 have -- my client worked at this Goodyear Tire and
22 Rubber Company and factory. And that reminds me of
23 something.
24 Other than your attorney, have you spoken to
25 anyone about your deposition today?

Page 47

1  A. My wife.
2  Q. Okay.
3  A. She told me not to swear.
4  Q. Well, unfortunately, we did swear you in.
5  Okay.
6  But you didn't talk to anyone else?
7  A. No.
8  Q. Did you review any documents other than what
9  your attorney produced?
10 A. I've looked carefully through this.
11 Q. Is that it? Did you look at anything else?
12 A. I've looked at other documents, but they
13 were not in my possession.
14 Q. Okay. What other documents did you look at?
15 A. Kind of a residual history of the time lines
16 so that I could come here and be able to say this
17 happened there and this happened then.
18 Q. When did you review that document?
19 A. Three months ago.
20 Q. All right. And do you still have it?
21 A. No. I never did have it.
22 Q. Who had it?
23 A. I went to his office.
24 Q. Your attorney?
25 A. The attorney, yes.

Page 48

12 (Pages 45 to 48)

ROGER MILLER - PLTFS - January 16, 2007

1   Q.  Okay.
2   A.  He had some information that was useful to
3   me.
4   Q.  Okay.  And it was the time line of what
5   exactly?
6   A.  The sequence of events.  When did this
7   happen, when did that happen, when did Eastern Mag
8   become Windsor Minerals.  You know, when did I arrive
9   on the scene.
10  Q.  All right.  And was this something that your
11  attorney had prepared or that you prepared?
12  A.  No.  These were documents that were in his
13  possession.  I have no idea who prepared them.
14  Q.  Okay.  All right.  I don't want to get into
15  anything that might be attorney-client privilege
16  about your discussions with your attorney, but was it
17  something that you wrote yourself, or was it
18  something that your attorney wrote?
19  A.  Some of the documents were documents that I
20  had prepared.
21  Q.  Okay.  Which documents are the ones that you
22  had prepared?
23  A.  Oh, maybe a letter to McCrone or a response
24  to McCrone.  A series of documents that had to do
25  with the controversy that we had with NIOSH at one

Page 49

1   point in time.  I really cannot think of other
2   specifics.  It was a general review of the history --
3   Q.  Okay.
4   A.  -- is what it was.
5   Q.  The letters that you are referring to with
6   McCrone -- we are going to get to that later -- those
7   aren't the letters that were produced here today,
8   right?
9   A.  Well, one of them was.
10  Q.  One of them was, but there is another one
11  that's not here?
12  A.  Well, there may be others.  I don't know.
13  Q.  Okay.
14  A.  I may have seen others.
15  Q.  Okay.  And then you mentioned something
16  about a dispute with NIOSH?
17  A.  Yes.
18  Q.  Can you describe that?
19  A.  It was a controversy that came in the
20  '70s based on a study done by graduate students out
21  of Ohio that alleged health problems from working in
22  the talc mines.  It was a failed paper as far as I
23  was concerned.
24  Q.  Graduate students from where?
25  A.  I don't know.  They were out of Columbus,

Page 50

1   Ohio.
2   Q.  Okay.  And what were the documents that your
3   attorney had relating to the NIOSH dispute?
4   A.  I think it was, again, the time line of when
5   it occurred and how it occurred.
6   Q.  Okay.  Was it the results of the study
7   itself?
8   A.  None of this had anything -- excuse me.
9       Was it as a result of the study itself?
10  Q.  Yes.
11  A.  Yes.
12  Q.  And which mine was that concerning?
13  A.  It was basically the Johnson mine.
14  Q.  Was there any other mine other than Johnson
15  mine?
16  A.  They had looked at three different mining
17  companies in Vermont.
18  Q.  Okay.  Which companies?
19  A.  They had looked at Johnson.  At Eastern Mag,
20  they looked at Vermont Talc Company, and there was a
21  third company whose name I'm not going to be able to
22  recall, a very small company.
23  Q.  Okay.  And so you had the time line of the
24  events that happened regarding that dispute?
25  A.  Regarding our reaction and response to the

Page 51

1   allegations of the paper.
2   Q.  Okay.  What were the allegations of the
3   paper pertaining to the Johnson Vermont mine?
4   A.  The allegations were that they believed that
5   they had found a cause of death relative to the
6   employment in the mines.  They were never able to
7   demonstrate what the cause of death was, and we
8   challenged it.  We challenged it very forcibly.  We
9   hired people to look at it and had long discussions
10  with NIOSH about the quality of the work that had
11  been presented.
12  Q.  Okay.  Just generally, what sort of deaths
13  are we talking about?  Was it from disease?  Was it
14  mining accidents?  What was it?
15  A.  They were never able to determine.  They
16  were looking for a medical effect from talc
17  exposures.  I think the concluding remark was that
18  maybe it was caused by radiation in the water in the
19  mines.
20  Q.  So was it looking at whether or not cancer
21  was what was being caused?
22  A.  They were simply looking at cause of death.
23  I don't know what they were looking for.
24      MR. HAMES:  The videotape is going to run
25  out.  We've been going a little while.  So why don't

Page 52

13 (Pages 49 to 52)

ROGER MILLER - PLF's - January 16, 2007

1  we take about a ten-minute break.  Okay?  Let's go
2  off the record then.
3      THE VIDEOGRAPHER:  This is the end of tape
4  one, Volume I, for the deposition of Roger Miller.
5  Going off the record.  The time is 11:01 a.m.
6      (Recess.)
7      THE VIDEOGRAPHER:  This is the start of tape
8  two, Volume I, for the deposition of Roger Miller.
9  We are back on the record.  The time is 11:16 a.m.
10  You may proceed.
11     BY MR. HAMES:  Q.  All right.  Mr. Miller,
12  we were talking about this NIOSH dispute before we
13  broke, and I just want to ask you a little bit about
14  that.
15     Do you know if there were any allegations
16  whatsoever of anyone being exposed to asbestos in
17  that graduate student study?
18  **A.  I really told you just about all I know**
19  **about that particular thing.  The details of it, I do**
20  **not have in mind.**
21  Q.  So you don't know one way or the other if
22  asbestos was an issue?
23  **A.  No.**
24  Q.  Okay.  You mentioned that there might have
25  been some exposure to radiation in the water?

Page 53

1  **A.  That was one of the things that were**
2  **reported, yeah.**
3  Q.  Okay.  Well, what was the position of your
4  company in relation to that study?
5  **A.  Because we were operating the properties in**
6  **Southern Vermont and some of the people from Southern**
7  **Vermont were included in the study, so we were a**
8  **participant in that.  Our crew was part of that.**
9  Q.  And when you are talking about Southern
10  Vermont, are you talking about the Johnson mine?
11  **A.  No.**
12  Q.  What are you talking about then?
13  **A.  Hammondsville.**
14  Q.  Hammondsville.
15     So that was another mine that the graduate
16  students had looked at?
17  **A.  No.  They looked at people.**
18  Q.  Oh, the people.
19  **A.  Yeah.  I really have told you just about all**
20  **I know about that.**
21  Q.  So they were looking at the people --
22  **A.  I don't want to mislead you.**
23  Q.  Yeah.  That's okay.
24     They were looking at the people that worked
25  at these mines?

Page 54

1  **A.  M-hm.**
2  Q.  Is that right?
3  **A.  Yes.**
4  Q.  And that included the Johnson mine and the
5  Hammondsville mine?
6  **A.  As I remember.**
7  Q.  Were they former employees or former miners
8  that had worked there?
9  **A.  I think that's right.  You are saying it.**
10  **I'm not saying it.**
11  Q.  Okay.  Well, I'm just asking for what you
12  recall.  It's okay.
13  **A.  Yeah.**
14  Q.  If you are wrong, you are wrong.  It's not a
15  big deal.
16  **A.  All right.**
17     MR. WILLIAMS:  But don't guess.
18     BY MR. HAMES:  Q.  I just don't want you
19  to -- you know, if you are purely guessing about
20  something is one thing, but if you have some
21  recollection or some basis for your understanding,
22  then please let me know.
23     So what we are talking about is graduate
24  students looking at some of the former or current
25  employees that had been working in these mines as to

Page 55

1  what they were exposed to, right?
2  **A.  I believe that's right.**
3  Q.  Were there any citations, warnings, fines
4  issued by NIOSH?
5  **A.  No.**
6  Q.  Okay.  Were there any recommendations from
7  NIOSH?
8  **A.  No.**
9  Q.  Okay.  And this is while you were president
10  of Windsor, right?
11  **A.  Of Windsor, yes.**
12  Q.  Okay.  So you had direct involvement with
13  this issue?
14  **A.  I was aware of the issue, yeah.**
15  Q.  Okay.  So what were the documents that your
16  attorney had you were looking at?
17     MS. WOODSON:  Asked and answered.
18     BY MR. HAMES:  Q.  It was a study from the
19  graduate students, right?
20  **A.  M-hm.**
21  Q.  And their allegations; is that right?
22  **A.  Right.**
23  Q.  Okay.  And then was there anything else
24  related to the NIOSH dispute?
25  **A.  I don't recall anything else.**

Page 56

14 (Pages 53 to 56)

ROGER MILLER - Plf's - January 16, 2007

Q. Was there anything from NIOSH itself?
A. I don't recall if there was.
Q. Okay. Was there anything from Windsor in response?
A. Was there anything from Windsor in response?
Q. Yes, sir. Any documents.
A. In the documents that I reviewed, no.
Q. Well, do you know if there ever was a response from Windsor?
A. I think there must have been, but I have no recollection of it.
Q. Okay. Was this in relation to any sort of lawsuit?
A. No.
Q. Either a workers' comp case or anything like that?
A. No.
Q. Do you know when the study was done by the graduate students?
A. I really don't know.
Q. I think you said it was around the 1970s?
A. If I did, I was probably guessing because I really don't know when it was done.
   MR. HAMES: Okay. Well, I will just request that we get a copy of the documents that he's looked

Page 57

at in preparation for the deposition, including this history of time line and this NIOSH dispute since he's clearly identified them.
Q. Was there anything else that you looked at?
   MS. WOODSON: Objection; asked and answered.
   BY MR. HAMES: Q. Any other documents when you were getting ready to --
A. None that I specifically recall.
Q. Okay. I didn't ask you this, but with relation to the Johnson Vermont mine, during those years, 1966 to '68, once the talc had been processed, how was it distributed to its customers?
A. In 50-pound paper bags, in one-ton bulk containers, and covered hopper cars.
   MS. BRAUER: Madam Court Reporter, could you read that back, please?
   (Record read.)
   MS. BRAUER: Covered what?
   MR. WILLIAMS: Hopper cars.
   BY MR. HAMES: Q. The 50-pound bags, do you recall what the bags themselves looked like?
A. They were the color of a grocery sack.
Q. Brown?
A. Brown, somewhat larger. It had an identifying number stenciled on them as they were

Page 58

being filled. The customers had a symbol or a number that they used to identify our particular product, and so it would be imprinted on the bag.
Q. I'm sorry. Can you describe that last thing you just said?
A. The customers in their coding in their warehouses had numbers or a symbol. And whatever that number or symbol was, we were required to print it on the bags. So it would be marked.
Q. Okay. So your company actually printed the bags, but the logo or the number came from the customer?
A. The customers.
Q. Okay. And do you recall what any of those numbers or any of those symbols were from the customers?
A. No.
Q. Okay. All right. But they were all about 50-pound brown paper bags?
A. Most of them, yes.
Q. And they had some internal numbers on them from their company?
A. No.
Q. The bags themselves were not numbered?
A. No.

Page 59

Q. Okay. Was there any other identifying markings on those bags from your company before you put the other company's markings on it?
A. There was a symbol in the shape of a shield with a cougar going over the top of it. I remember that, and that's about all I remember about the appearance of the bags.
Q. Okay. And where was that shield with the cougar going over it printed on the bags?
A. It was on the front surface.
Q. About how big was it?
A. Six inches, maybe.
Q. The whole thing?
A. M-hm.
Q. The whole logo?
A. M-hm.
Q. Is that a yes?
A. Yes.
Q. I just have to ask you --
A. Excuse me, excuse me.
Q. Okay. And other than being brown, about 50 pounds, with the shield, with the cougar being on it, was there any other identifying marks on those bags?
A. I'm not aware of any other.
Q. Okay. What color was the shield and the

Page 60

15 (Pages 57 to 60)

ROGER MILLER - Plfs - January 16, 2007

cougar?

A. I think the shield was blue, and the cougar
was maybe gray. I really don't have a clear memory.

Q. Were the cougar and the shield different
colors?

A. I believe they were.

Q. Okay. You just don't remember what the
colors were?

A. I'm not very sure of it.

Q. That's okay.

Was your company's name printed anywhere on
the bags?

A. I believe they were stenciled, but I'm not
sure enough to say they were.

Q. Okay. You have some recollection of that,
though, in the back of your mind, that the company's
name was stenciled on the bags?

A. I have that recollection.

Q. And the bags were all printed by your
company, right?

A. The bags were printed by the bag supplier.
The shield and the cougar were printed there by the
bag supplier.

Q. Okay. Were there any other forms of
packaging for the talc from the Johnson plant?

Page 61

A. I mentioned bags. I mentioned the bulk
bags, and I mentioned the covered hopper cars. Those
are what I was aware of.

Q. Were there any particular brand names
associated with the talc coming from the Johnson
facility?

A. In correspondence, they used the word EMTAL,
E-M-T-A-L, and then a number. If they were
corresponding to describe a product, they would
identify it by EMTAL 41.

Q. Okay. And that's in correspondence with the
customers or correspondence with --

A. I had seen correspondence in which there was
a reference to the product.

Q. And who was the correspondence to?

A. I don't know.

Q. But it was the customers?

A. To a customer, I would say, yeah.

Q. Okay. So a customer would order EMTAL,
whatever number?

A. M-hm.

Q. Is that right?

A. Yes.

Q. Okay. And do you recall what those numbers
were?

Page 62

A. I recall some of the numbers. 41, 42, 43,
5500, 549, 599.

Q. And you knew what those numbers related to?

A. I don't recall.

Q. Were they different blends of the talc?

A. Or different particle size.

Q. So they are either different fineness or
different particle size, as far as you know?

A. Fineness and particle size, you are talking
about the same thing.

Q. Okay. But that's what the numbers related
to?

A. The numbers related to the entire
specification for that grade of product.

Q. So some joint cement company might order
EMTAL with a number after it, and that would mean how
fine it is?

A. M-hm.

Q. Is that right?

A. Yes.

Q. Okay. Do you recall what numbers after the
EMTAL were for which different industries?

A. In general, the numbers 500 and above were
the products that had been through the flotation
process, and they went over to the fine paints and

Page 63

varnishes. The other numbers, I have no recollection
of.

Q. And other than the EMTAL and then the
number, were there any other sort of brands or names
that were associated with --

A. Not that I'm aware of.

Q. Okay. Do you recall if the name EMTAL with
a number was ever printed on any of the bags or any
of the packaging?

A. I don't recall.

Q. Okay. So then you become the president of
Windsor in 1968, right?

A. Yes.

Q. We haven't talked about that yet. So let's
go into that.

At that time, you have the Hammondsville
mine, right?

A. Yes.

Q. Were there any other mines?

A. At that time, no.

Q. Later on, did some other mines come on?

A. Yes.

Q. Okay. So they had the Hammondsville mine
when you started in 1966 and then when the corporate
name change happened and your position became

Page 64

16 (Pages 61 to 64)

ROGER MILLER - Plf's - January 16, 2007

1  president, you continued to have that mine under your
2  control?
3  **A.  Yes.**
4  Q.  Okay.  And what were your duties related to
5  that mine?
6  **A.  I was president of the corporation.  My**
7  **responsibilities were for everything --**
8  Q.  Okay.
9  **A.  -- including sales.**
10  Q.  How long did Windsor continue to operate
11  that mine?
12  **A.  I retired in '89, '90, and they were still**
13  **operating the mine.**
14  Q.  Okay.  And during this entire time, it was
15  all just for mining talc, right?
16  **A.  Yes.**
17  Q.  And then where did the ore go from the
18  Hammondsville mine?
19  **A.  It followed two paths.  One, it went to the**
20  **beneficiation plant, West Windsor, the flotation**
21  **plant.  The other stream at that time went to the**
22  **Gassetts mill.**
23  Q.  So the West Windsor plant is the flotation
24  plant?
25  **A.  Yes.**

Page 65

1  Q.  And that's for making the --
2  **A.  The cosmetic grade.**
3  Q.  The cosmetic grade.  The very refined talc?
4  **A.  Yes.**
5  Q.  So that's all wet process?
6  **A.  Yes.**
7  Q.  And then the Gassetts mill, what was that
8  one?
9  **A.  The dry mill, dry grinding.**
10  Q.  All right.  Now, with respect to the
11  Hammondsville mine, do you know if anything was ever
12  done to determine whether or not that mine was
13  contaminated with any form of asbestos?
14  **A.  Yes.**
15  Q.  What was done?
16  **A.  This is all part of the broader question of**
17  **our efforts to measure and to control and to**
18  **determine the quality of the ore.**
19  Q.  Okay.
20  **A.  And as part of that, we sampled continuously**
21  **during operations the stream of material produced**
22  **from the Hammondsville ore and evaluated it**
23  **independently through McCrone labs for the presence**
24  **of deleterious material.**
25  Q.  Okay.  And asbestos was one of those

Page 66

1  materials?
2  **A.  We were specifically looking to demonstrate**
3  **freedom from asbestos.**
4  Q.  When did they first start looking to
5  demonstrate that it was free from asbestos?
6  **A.  1966.**
7  Q.  Do you know why they didn't do that with the
8  other mine?
9  **A.  Do I know why they didn't do it with the**
10  **other --**
11  Q.  Yes, sir.
12  **A.  -- mine?**
13  **I don't have any idea.**
14  Q.  Did you have any say over that as vice
15  president?
16  MS. WOODSON:  Objection; vague as to "that."
17  What are you asking him?
18  THE WITNESS:  I may have -- my
19  responsibilities in that two-year period were to aid
20  in the sale of the northern operations to someone
21  else, and so my focus was on that.
22  BY MR. HAMES:  Q.  Okay.  But in 1966, a
23  decision had been made to test the Hammondsville mine
24  to see if there was any asbestos contamination?
25  **A.  And the products from it.**

Page 67

1  Q.  And the products?
2  **A.  Yes.**
3  Q.  You mean the ore?
4  **A.  The ore, but we also prepared samples of the**
5  **finished products and sent them in for evaluation.**
6  Q.  Oh, okay.  Whose decision was it to test it
7  for asbestos?
8  **A.  Mine.**
9  Q.  Why did you make that decision?
10  **A.  Because I became aware of a groundswell of**
11  **concern in industrial circles for the presence of**
12  **asbestos and the medical effects of asbestos, and I**
13  **responded as soon as I became aware of that concern.**
14  Q.  How did you become aware of it, of issues
15  and concerns on asbestos --
16  **A.  I used to subscribe to Chemical Engineering**
17  **News, and Chemical Engineering News had an orange**
18  **page in the middle of the magazine.  And on that**
19  **page, there were alerts of where new concerns for the**
20  **industry could be identified.  I saw a commentary in**
21  **there, and I anticipated that three years downstream,**
22  **we are going to come to a set of regulations.**
23  MS. BRAUER:  I'm sorry.  Can I have that
24  answer read back?
25  (Record read.)

Page 68

ROGER MILLER - PLT'S - January 16, 2007

1    MR. WILLIAMS:  Are you fine?
2    THE WITNESS:  Hm?
3    MR. WILLIAMS:  Are you tired?
4    THE WITNESS:  I'm fine.
5    MR. HAMES:  You let me know if you want to
6  take a break, if you are hungry, or whatever.  Okay?
7  I have a million questions to ask you.  So I
8  apologize.  This is going to take a while.  You have
9  a lot of information, and you are very knowledgeable.
10  Okay.
11    Q.  So it was Chemical Engineering News.  There
12  was an alert that was in that.  A publication?
13    **A.  It was a commentary.**
14    Q.  Okay.  And so you took the steps to initiate
15  the testing to see if asbestos was present?
16    **A.  Yes.**
17    Q.  And the purpose for that wasn't just for the
18  quality of the ore and the product but for also the
19  health effects?
20    **A.  Well, to ascertain whether we were exposing
21  our employees to something that was being identified
22  as a health risk, but also to be certain that we were
23  not exposing our customers, employees to any of
24  these.**
25    Q.  Okay.  And prior to this time of 1966 --

Page 69

1  well, do you remember when in 1966 that was?
2    **A.  No.**
3    Q.  Do you remember what issue of Chemical
4  Engineering News it was?
5    **A.  No.**
6    Q.  I've just got to ask you these questions
7  because we might be able to find it.
8    **A.  Yeah.**
9    Q.  Do you know who the author was?
10    **A.  No.**
11    Q.  Do you know what that alert was pertaining
12  to, if it was one particular study for a mine or
13  something like that?
14    **A.  No.  I have no recollection.**
15    Q.  Okay.  Nonetheless, prior to that time, had
16  you ever heard about asbestos being a health hazard?
17    **A.  I'm not sure that I was ever acutely aware
18  of it.  You know, I read all kind of commentaries and
19  all kind of things, but I wasn't acutely aware of it.**
20    Q.  Okay.  So it would have never been a concern
21  of yours prior to that time?
22    **A.  No.**
23    MR. WILLIAMS:  I object.  That misstates his
24  testimony.
25    THE WITNESS:  No.

Page 70

1    BY MR. HAMES:  Q.  Well, I don't want to
2  misstate.  I want to make sure we get this straight.
3    Prior to 1966, when you'd seen that alert,
4  you had never considered asbestos to be a health
5  hazard for the industry that you were working in,
6  correct?
7    **A.  That's right.**
8    Q.  Okay.  And then after seeing that, you
9  initiated the testing.
10    What was done?  What sort of testing was
11  done?
12    **A.  We embarked on a program to examine our
13  products ourselves.  J & J has a very competent
14  technical group.  We looked with the best technology
15  that we had available and attempted to discern
16  absence or presence of asbestos fibers.**
17    Q.  Okay.  And just for the record, when you say
18  "J & J," you mean Johnson & Johnson?
19    **A.  Yes.**
20    Q.  Okay.  Continue.
21    **A.  It became very obvious very quickly that in
22  order to fully assess the characteristics of our
23  products, that we needed to have continuing
24  assessment, and we needed a lot of samples.**
25    **The laboratories at J & J, A, didn't have**

Page 71

1  **time to do it.  B, I wanted it done at arm's length.
2  We went to the Colorado School of Mines Research
3  Institute.  We went to Batel and quickly determined
4  that they were not the cutting edge people in this
5  evaluation of mineral things.**
6    **We discovered -- I don't remember who
7  recommended them -- McCrone Institute.  I went to
8  Chicago, sat down with Ian Stewart, and very quickly
9  was able to determine that this was the organization,
10  A, that were the most competent in the country and,
11  B, were able to take on the workload.**
12    Q.  Okay.  Let's talk about that stuff a little
13  bit.
14    For Johnson & Johnson, did they ever do any
15  of their own testing prior to hiring McCrone?
16    **A.  I just explained to you that we initially
17  did the examination using Johnson & Johnson
18  facilities.**
19    Q.  Okay.  And do you know which individuals
20  within Johnson & Johnson were involved in that
21  testing besides yourself?
22    **A.  No.**
23    Q.  Do you know what the results of the testing
24  was?
25    **A.  They found none.**

Page 72

18  (Pages 69 to 72)

ROGER MILLER - PLTFS - January 16, 2007

1   Q.  They found none, meaning they found zero
2   asbestos?
3   **A.  Yes.**
4   Q.  This is for the Hammondsville mine only,
5   right?
6   **A.  The ore stream at Hammondsville mine and the**
7   **products produced from the ore stream in**
8   **Hammondsville.**
9   Q.  All right.  Let's talk about the testing
10  just by Johnson & Johnson.
11      What was done exactly?
12  **A.  I have very limited knowledge.  I simply**
13  **know that we went there initially and then decided to**
14  **move on.**
15  Q.  Okay.  Just so the record is clear about
16  that, you don't know the methodology for the testing
17  itself that Johnson & Johnson did on the
18  Hammondsville mine?
19  **A.  No.**
20  Q.  Okay.  That's correct then?
21  **A.  That's correct.**
22  Q.  Okay.  But you know the result -- someone
23  communicated that to you -- was that there was zero
24  asbestos found?
25  **A.  That's right.**

Page 73

1   Q.  All right.  And was there some sort of
2   report that was issued?  Some study?  Was this all
3   written down?
4   **A.  No.**
5   Q.  Did you ever see any documents at all --
6   **A.  From J & J?**
7   Q.  Yes.
8   **A.  No.**
9   Q.  Okay.  Do you remember how it was that you
10  learned that there was no asbestos found?
11  **A.  In conversation with one of the people in**
12  **the research laboratory.**
13  Q.  Okay.  And you don't remember who that was?
14  **A.  No.**
15  Q.  Okay.  And do you know how many tests were
16  done by Johnson & Johnson?
17  **A.  No.**
18  Q.  Do you know if any samples were taken?
19  **A.  No.**
20  Q.  Then you went on to hire McCrone.
21      Why was it that after Johnson & Johnson came
22  up with the zero asbestos result did you go to
23  McCrone?
24  **A.  Because we need to be continuously assured**
25  **of the safety and the purity of the product.**

Page 74

1   Q.  So was there an issue with whether you
2   thought Johnson & Johnson was capable of doing the
3   testing?
4   **A.  They didn't have the facility to do the**
5   **testing.  You have to understand that in this period**
6   **of history, the whole examination of fine particles**
7   **was evolving through a whole series of**
8   **technologies --**
9   Q.  Okay.
10  **A.  -- and McCrone was at the leading edge of**
11  **that.**
12  Q.  Do you know -- all right.  Well, we'll walk
13  through this.
14      McCrone, when did you first hire them?
15  **A.  In '71, I believe.**
16  Q.  Okay.  So when was the first testing done at
17  Hammondsville by Johnson & Johnson?  1966?
18  **A.  Probably '66, '68, in there.  I'm not sure.**
19  Q.  Somewhere between 1966 and 1968 --
20  **A.  Right.**
21  Q.  -- right?
22  **A.  Right.**
23  Q.  That's okay.
24      And then did that continue -- did that
25  testing by Johnson & Johnson's own people continue up

Page 75

1   until McCrone was hired in 1971?
2   **A.  Well, I think I misstated.  I think actually**
3   **McCrone came on board in '69, but I'm not certain of**
4   **that.**
5   Q.  Okay.  That's fine.
6       But what I'm getting at is:  Did Johnson &
7   Johnson continue to do testing up until hiring
8   McCrone, or was it a one-time thing where they did
9   some testing?
10  **A.  I don't recall.**
11  Q.  Okay.  When you had heard that the results
12  were zero asbestos was found, was that the results
13  from one test or --
14  **A.  No.  There were a series of samples that had**
15  **done that.  The methodology had to be developed, and**
16  **they wanted to develop the methodology with the**
17  **agreement that they had.  So there were a series of**
18  **samples over a period perhaps of a year in which they**
19  **were evaluating methods.**
20  Q.  Do you remember when it was that you learned
21  that there was no asbestos found?
22  **A.  Probably in '68, but I cannot be certain.**
23  Q.  Okay.  Do you know if Johnson & Johnson did
24  any testing in '69?
25  **A.  I don't know.**

Page 76

19 (Pages 73 to 76)

ROGER MILLER - Plf's - January 16, 2007

Q. All right. Then how soon after you hired
McCrone did they come out and do some testing?
A. They didn't come out.
Q. They didn't come out.
   How soon did they do some testing.
A. Very shortly.
Q. All right. And what was it about McCrone --
you mentioned a couple of things as to why you hired
them, but what was it about the methodology they were
using for testing versus the other entities that you
were looking at?
A. As I understood the technology at the time,
it was clearly evident, listening to them and
watching them, that they were using the best
available technology because I had become aware in
the course of getting to McCrone of the different
methodologies that were available. And McCrone was
right at the top of the line on that thing, and
that's where I wanted to be.
Q. Do you remember what those methodologies
were at the time?
A. No. I get confused between TEM, SEMs, and
all the rest of them. I cannot state.
Q. Okay. At the time, though, you think that
you were up to speed on that --

Page 77

   We installed a direct sampling port for the
purpose of catching a sample, and we set up a timing
schedule for the operator at each of these locations
to insert the sampling, bring it out, and dump it
directly into a paper bag.
   These paper bags were accumulated. The
sample was made into a pile. Cone and quartering
it's called. It's been used for hundreds of years in
the mining industry. And we would cone and quarter
down to a sample that was representative of the
stream that had been sampled, and also it was of the
size that was practical to send to McCrone. And
these samples were sent off on a regular basis to
McCrone, and the results were reported back to us.
   When we examined a new ore body, we would
diamond drill the ore body, cross-section it, in
multiple zones. Those diamond drill cores would be
pressed and ground and split, and samples of those
would go -- before we evaluated and even began to
mine a new ore body, we already knew what the quality
and the materials were. So we applied it uniformly
to the Gassetts mill, to the new mill at Ludlow, and
the West Windsor mill.
Q. Okay. How often was the testing done with
the sample from the ore stream?

Page 79

A. Yes.
Q. -- and knew what was being used?
A. Yes.
Q. And that McCrone was at the top of the line,
and that's why you hired them?
A. That's right.
Q. Okay. And then that's the only testing
company that your employer ever used, right?
A. On a steady basis, yes.
Q. Now, were you aware of any other entity
testing any of the ore or the end product from the
Hammondsville mine?
A. No.
Q. What about any governmental agency?
A. Not that I'm aware of.
Q. And explain how the samples were gathered
and given to McCrone, please.
A. Okay. The Hammondsville mine was the source
of the ore stream to two plants: The Gassetts plant
and the West Windsor plant. Both of those plants
were operating 24 hours a day, seven days a week. In
the process, there were segments where there was a
continuous moving stream of the product flowing from
device A to device B. And it was true at Gassetts,
and it was true at West Windsor.

Page 78

A. Probably four times in an eight-hour shift.
Q. Four times in an eight-hour shift?
A. M-hm.
Q. And then how frequently? In other words --
A. Four times a year.
Q. -- for the test itself, how frequently was
the test conducted?
A. I have tried to recall whether we made our
weekly composite. I think initially we did daily
compounds. But as results accumulate zero, zero,
zero, zero, zero, zero, I think we went over to a
week, but I cannot swear to that.
Q. Was it ever longer than a week?
A. I doubt it. I doubt it.
Q. So at least once a week and probably more
frequently in the beginning than in the later years,
the ore sample was being tested?
A. M-hm.
Q. Right?
A. Yes.
Q. Okay. And so it's gathered up and shipped
off to McCrone.
   And how long did it take them to get the
results back to you?
A. They would accumulate a series of samples,

Page 80

20 (Pages 77 to 80)

ROGER MILLER - PLT'S - January 16, 2007

Page 81

1  and I believe that we -- as it came to be, after the
2  initial stages, I think that we got a report every
3  two weeks, but I couldn't swear to that.
4  Q.  Okay.  And do you know if the methodology
5  that McCrone was using evolved over time?
6  A.  I'm sure that it did, but I do not remember
7  specifically.
8  Q.  Okay.  Other than just being sure that it
9  did, do you know if it actually did?
10  A.  No, I don't.  I don't know.
11  Q.  How many people worked for McCrone, if you
12  know?
13  A.  I think in Chicago there were about -- they
14  did many, many things besides look for asbestos, but
15  I think there were probably 50 or 60 people in the
16  laboratories in Chicago.  Subsequently, the
17  laboratories were moved down to Norcross, Georgia,
18  and I think there were probably 20 or 30 people in
19  that laboratory, which was more narrowly operated
20  than the one in Chicago.
21  Q.  Okay.  And you mentioned one individual's
22  name, but I didn't catch it.  That was --
23  A.  Ian Stewart.
24  Q.  Is he still alive?
25  A.  I don't know.

Page 82

1  Q.  When was the last time you talked to him?
2  A.  Probably 15 years ago.
3  Q.  When you retired?
4  A.  (Witness nods affirmatively.)
5  Q.  Do you recall the names of any other
6  individuals that worked for McCrone other than
7  Mr. Stewart?
8  A.  No.  There was another person in Georgia
9  that had a dominant role, but I don't specifically
10  remember his name.
11  Q.  Okay.  How much was McCrone's fee for doing
12  this work?
13  A.  It was expensive, but I don't remember the
14  number.
15  Q.  Okay.  Do you remember if they charged by
16  the sample or --
17  A.  By the sample.
18  Q.  -- how they did it?
19  A.  They did it by the sample.  We issued a
20  blanket purchase order to them, and then they worked
21  off that purchase order.
22  Q.  Okay.  And do you know if Windsor kept any
23  of the results from the testing?
24  A.  I think that it must have been in the files,
25  but there have been two company transitions since

Page 83

1  then, and I have no idea where those files might be,
2  or even if they exist.
3  Q.  Well, your attorney produced at least one of
4  them, right --
5  A.  Right.
6  Q.  -- in the form of a letter?
7  A.  M-hm.
8  Q.  And as he asked you, that's the form that it
9  typically took.  It was just a letter from McCrone?
10  A.  Right.
11  Q.  Okay.  And they would tell you what the
12  results were?
13  A.  Yes.
14  Q.  And as you recall, there was never ever any
15  asbestos found from the Hammondsville mine or any
16  other mine; is that right?
17  A.  There was never any asbestos found in the
18  ore.
19  Q.  Okay.
20  A.  There were two occasions over a period of 20
21  years in which a fiber was seen in a product, and we
22  were able to demonstrate that the fiber in one
23  instance was off of the clutch of one of the machines
24  in the processing plant, and in the other case it was
25  a particle from the siding on the mill building that

Page 84

1  was Transite.
2  Q.  Okay.
3  A.  Those are the only two instances that I was
4  ever aware of.
5  Q.  And when you say "we were able to
6  determine," was that you, meaning as an employee of
7  Windsor, or was it McCrone that determined that it
8  was off the clutch?
9  A.  In cooperation with them.
10  Q.  Okay.  The same with the siding?
11  A.  Yes.
12  Q.  All right.  But there was never a positive
13  result for finding asbestos from any of the mines
14  from the ore?
15  A.  No, never.
16  Q.  Okay.  Are you aware of any employees of
17  Windsor or Johnson & Johnson ever filing a lawsuit
18  related to being exposed to asbestos in the mines?
19  A.  Never, in my knowledge.
20  Q.  Okay.  You are not aware of any workers'
21  compensation claims?
22  A.  Never.
23  Q.  Okay.  Let me make sure that's clear.
24  You are not aware of any workers'
25  compensation claims related to workers being exposed

21 (Pages 81 to 84)

ROGER MILLER - Plf's - January 16, 2007

Page 85

1  to asbestos?
2  **A. I'm not aware of any.**
3  Q. Okay. And do you know -- okay.
4  There are the two processing plants, West
5  Windsor and Gassetts, right?
6  **A. Initially.**
7  Q. Were there more that came on later?
8  **A. Subsequently, the Ludlow mill was**
9  **constructed.**
10  Q. How do you spell that?
11  **A. L-u-d-l-o-w.**
12  MR. WILLIAMS: That's the name of a town?
13  THE WITNESS: It's the name of a town in
14  Vermont.
15  BY MR. HAMES: Q. Okay. It's in Vermont.
16  And that's just another processing plant?
17  **A. The dry processing plant.**
18  Q. The dry one.
19  Were there any other mines during your time
20  with Windsor other than the Hammondsville mine?
21  **A. Yes. We discovered and opened the Rainbow**
22  **mine.**
23  Q. Rainbow?
24  **A. Rainbow.**
25  Q. Uh-huh.

Page 86

1  **A. The Black Bear mine, the Argonaut mine.**
2  **There was one more, and I'm having trouble coming up**
3  **with the name. There was one more, a small one. It**
4  **operated for two or three years. Clifton.**
5  Q. Okay. Any other mines that Windsor had --
6  **A. No.**
7  Q. -- while you were working there?
8  **A. No.**
9  MR. WILLIAMS: You are talking about Vermont
10  or nationally because we have kind of focused on
11  Vermont.
12  MR. HAMES: Well, you guys have focused on
13  Vermont.
14  MR. WILLIAMS: We talked about the
15  California ones. That's why --
16  BY MR. HAMES: Q. I'm talking about any of
17  them, any of them that you are aware of.
18  There is another one, I think you said, in
19  Calaveras County?
20  **A. Yes.**
21  Q. Okay. We'll call it the Calaveras one.
22  **A. Red Hill mine.**
23  Q. Red Hill mine?
24  **A. M-hm.**
25  Q. Are there any other mines that you are aware

Page 87

1  of at all regardless of where they were?
2  **A. No.**
3  Q. So we've got Rainbow, Black Bear, Argonaut,
4  Clifton, and Red Hill, correct?
5  **A. M-hm. And the Red Hill is in California.**
6  Q. Okay. You are not aware of any other mines?
7  **A. No.**
8  Q. Okay. So when did the company start using
9  the Rainbow mine?
10  **A. Oh, boy. 1978, '79. I cannot be specific.**
11  Q. That's okay. Your best estimate is fine.
12  **A. Yeah.**
13  Q. In 1978 or '79, where was that mine located?
14  **A. Near Ludlow, Vermont.**
15  Q. All right. What were they mining from that
16  mine?
17  **A. Talc ore.**
18  Q. Anything else?
19  **A. No.**
20  Q. I'm going to ask you some of the same
21  questions for each one of these mines, okay? And
22  it's going to be a little bit tedious, but we've got
23  to go through it.
24  So what I want to ask you is: With the
25  Hammondsville mine, how was the talc packaged that

Page 88

1  ultimately came from that mine? Was it the same
2  as --
3  **A. After processing?**
4  Q. After processing.
5  **A. After processing. The ore stream that went**
6  **to West Windsor Mill was beneficiated by a flotation,**
7  **and the product was shipped in bulk and in bags to**
8  **customers.**
9  Q. Okay.
10  **A. And the bulk were bulk trucks and then**
11  **subsequently bulk rail cars.**
12  Q. All right. So it's just open in bulk, in
13  trucks, or rail cars, right?
14  **A. And at Gassetts --**
15  Q. Wait. Hold on a second.
16  **A. Excuse me.**
17  Q. So each processing plant has different
18  packaging?
19  **A. Oh, yeah.**
20  Q. So let's break it's down. All right? We
21  got way too far ahead of ourselves.
22  So West Windsor is the fine, refined talc?
23  **A. Yes.**
24  Q. And it comes in bulk and in bags?
25  **A. Yes.**

22 (Pages 85 to 88)

ROGER MILLER - PLT's - January 16, 2007

Q.   How big were the bags?
A.   **50 pounds.**
Q.   Okay.  If they are the same as the other ones that you described, you can just tell me that.
A.   **Essentially the same.  They are different construction, but essentially the same.**
Q.   What was different about them?
A.   **Because of the value of the product, it had a tighter valve to minimize leakage.  So the paper bag company was able to install in these bags a more secure closure.  They were filled with a spout in the top and then a valve closed.**
Q.   Okay.  So when the end-user wanted to open up the bag, there was like a valve on the top of the bag?
A.   **No.  Generally, they sliced the bag open and dumped it in the hopper.**
Q.   Was a valve present, though, on the bag?
A.   **It's made of paper.  It's part and parcel of the bag.**
Q.   Okay.  The markings on the bags that came from West Windsor, were there any?
A.   **There were.**
Q.   What was there?
A.   **Windsor Minerals, Grade 66, 50 pounds.**

Page 89

Q.   And the grade was relating to how refined it was, the talc was?
A.   **With the particular process stream, yes.**
Q.   Were there ever any other markings on those bags that you are aware of?
A.   **No.**
Q.   Okay.  Again, they are brown bags?
A.   **Yes.**
Q.   In what color was the Windsor Minerals Grade 6 written on the back?
A.   **Orange.**
Q.   Orange.  Okay.
      And was there any of the customer's logos or numbers or any markings of the customer on those bags?
A.   **No.**
Q.   Okay.  Were you aware of any competitors having any bags looking similar to the ones that came from West Windsor?
A.   **Ground mineral products are uniformly shipped in 50-pound paper bags.  To the degree that that's true, then there were competitors with similar bags, but not with similar logo or grade.**
Q.   Okay.  All right.  How long was the West Windsor facility in operation?

Page 90

A.   **From 1964 through about 1994 --**
Q.   Okay.
A.   **-- '95, maybe.**
Q.   All right.  And then we move on to the Gassetts mill, which is the dry facility, right?
A.   **Right.**
Q.   In what forms was the end product packaged in?
A.   **In 50-pound multi-wall (phonetic) bags and then in bulk hopper cars.**
Q.   What color were the bags for the Gassetts mill?
A.   **I believe the printing -- as I remember, the printing was black.**
Q.   Are they brown bags?
A.   **Brown bags.**
Q.   With black printing?
A.   **Yes.**
Q.   What did it say on them?
A.   **It said, "Windsor Minerals Grade 36, 50 pounds."**
Q.   Grade -- sorry?
A.   **Grade 36.**
Q.   36.  Then it said 50 pounds on it?
A.   **Yes.**

Page 91

Q.   Did the West Windsor bags say 50 pounds on it as well?
A.   **Yes.  I believe I said that.**
     MR. WILLIAMS:  Yeah, you did.
     MR. HAMES:  I think you did.  I apologize.
I didn't hear you.  All right.
Q.   These bags that we are talking about from the Gassetts mill, was there any other writing on them that you are aware of?
A.   **Not that I'm aware.**
Q.   And that's either by your company or by the customers?
A.   **I don't know whether the customers put anything on them after they received them, but we didn't put anything else on them.**
Q.   Okay.  What about the shield and the cougar?  Did you ever see that --
A.   **That went with the sale of Eastern Mag.**
Q.   They bought the logo, as far as you know?
A.   **Yes.**
Q.   Okay.  Then we have the Ludlow.  Wait.  I didn't ask you one more question.
     With respect to the Gassetts mill, when was that mill in operation?
A.   **When was in it operation?**

Page 92

23  (Pages 89 to 92)

ROGER MILLER - Plffs - January 16, 2007

Q.  Yes, sir.
**A.  It was in operation when I got there in 1966, and it ran until about 1978 or '79.**
Q.  Do you know how long it had been in operation before you got there?
**A.  It had had a prior history as a processor of different material, garnet, and I don't know when that originated.**
Q.  Okay.  But Windsor purchased it in '66?
**A.  No.  Eastern Mag had acquired it sometime in the '50s.**
Q.  All right.  And then the Ludlow -- there is both -- is there a Ludlow mine?
**A.  There are three mines -- four mines at Ludlow.  That list of mines that I gave you, the Rainbow and the --**
Q.  Okay.  We'll go through each one.  We'll go through the mines and the processing plants again.
     So Hammondsville ore went to the Ludlow facility, right?
**A.  Yeah.  Initially, yes.**
Q.  Okay.  And how long was the Ludlow facility in operation?
**A.  I believe we opened it in '78 or '79, and it was running when I left.  It still is running, I**

Page 93

believe.
Q.  When did the Hammondsville ore go to the Ludlow, Vermont, processing plant?
**A.  During the initial operations.**
Q.  Can you give me the years?
**A.  Oh, probably it was in 1979, but I can't be sure.**
Q.  Okay.  So it started in 1979?
**A.  I believe, yeah.**
Q.  And then how long did that continue for?
**A.  I think about a year, and then we got the ore bodies in shape up above and fed it from the mines above the mill.**
Q.  Okay.  So for that year, what was the -- how was the end product packaged --
**A.  In 50-pound bags.**
Q.  -- from Ludlow?
**A.  In 50-pound bags.**
Q.  The same way --
**A.  The same way.**
Q.  -- you've already described?
**A.  Right.**
Q.  Was there any writing on them?
**A.  The same writing.**
Q.  Was it exactly the same?

Page 94

**A.  I would think.  I'm not aware that we ever changed it.**
Q.  And that's the dry plant.  So did it say Windsor Minerals, Grade 36, 50 pounds?
**A.  Yeah.**
Q.  So there wasn't any distinction on the bags which plant it came from?
**A.  No.**
Q.  All right.  Did any of the ore from the Hammondsville mine ever go to any other facility that you are aware that we haven't talked about?
**A.  No.**
Q.  Okay.  Then we go to the rainbow mine in 1978, and that's in Ludlow, Vermont, right?
**A.  Yes.**
Q.  Where does the ore go from that one?
**A.  It goes right down the hill to the Ludlow mill.**
Q.  The Ludlow mill which is also -- the same one that we just talked about?
**A.  M-hm.**
Q.  Right?
**A.  M-hm, yes.**
Q.  Okay.  They started operating that mine, the Rainbow mine -- why was it called the Rainbow mine,

Page 95

by the way?
**A.  Because on the day we discovered it, there was a beautiful rainbow right on top of the ore body.**
Q.  Was it an old abandoned mine or something like that?
**A.  No, no.**
Q.  What do you mean you discovered it?
**A.  We prospected for ore, and we found it.  We found four of them up there.**
Q.  So this was just an area where you found the ore --
**A.  Yes.**
Q.  -- where they did some sample drilling?
**A.  And after we had located the ore, we had measured the dimensions of it, saw that it was potentially worthwhile, and we came in and diamond drilled it.**
Q.  Okay.  And how long was that mine in operation?
**A.  It was in operation through 1990.**
Q.  Okay.
**A.  But I'm not sure how long the Cyprus ran it after that.**
Q.  Okay.  And did the ore from that mine go anywhere else --

Page 96

24 (Pages 93 to 96)

ROGER MILLER - Plt's - January 16, 2007

**Page 97**

1    **A.  No.**
2    Q.  -- other than the Ludlow processing plant?
3    **A.  Right.**
4    Q.  Okay.  And do you know if any testing for
5    asbestos was ever done at the Rainbow mine?
6    **A.  Always.**
7    Q.  Okay.
8    **A.  The same testing procedure, the same**
9    **protocol were applied to all of these ore bodies, all**
10   **of these sources of ore, and the products that we**
11   **produced from them.**
12   Q.  Okay.  So just to summarize that and to be
13   perfectly clear about it, the Rainbow mine was tested
14   in exactly the same fashion that you already
15   described for the ore stream and the end product?
16   **A.  Yes.**
17   Q.  And it was all done by -- sorry.  I'm
18   getting tired.  What's the name of the company?
19        MR. WILLIAMS:  McCrone.
20        BY MR. HAMES:  Q.  McCrone, right?
21   **A.  Yes.**
22   Q.  Okay.  And you never hired anyone else?
23   **A.  No.**
24   Q.  Okay.  And when was that testing for the
25   Rainbow mine initiated?

Page 97

**Page 98**

1    **A.  As soon as we did the diamond drilling, the**
2    **diamond drill core was split and ground and samples**
3    **were sent off to McCrone before we committed**
4    **ourselves to buy the property on which we had found**
5    **the ore.  So it was '78 or '79.  Somewhere in there.**
6    **I shouldn't be giving you these years, but it was in**
7    **the '70s.**
8    Q.  Okay.  In the late '70s?
9    **A.  In the late '70s, I believe.**
10   Q.  So the testing for asbestos actually
11   occurred before you even purchased the property?
12   **A.  Yes.**
13   Q.  Okay.  And what were the results?
14   **A.  They were absolutely clear.**
15   Q.  Okay.  And that continued throughout the
16   operation of the mine --
17   **A.  Yes.**
18   Q.  -- in that facility?
19   **A.  Yes.**
20   Q.  The processing facility as well?
21   **A.  Yes.**
22   Q.  Okay.
23   **A.  The same sampling technique was applied.**
24   Q.  Okay.  Who instructed you on the sampling
25   technique?

Page 98

**Page 99**

1    **A.  I've been in the mining business for 25**
2    **years.  I knew how to sample things.**
3    Q.  Were there ever any industrial hygienists or
4    scientists or anyone that came along and said, "This
5    is how we should test to see if we get a fair
6    sample"?
7    **A.  We consulted with McCrone on what we were**
8    **doing, and McCrone, of course, was dealing with**
9    **samples from hundreds of companies.  Ian came down**
10   **and we walked through what we were doing and how we**
11   **were doing it before we installed the sampling**
12   **system, and he approved of it.**
13   Q.  All right.  And then there is another mine.
14   The Black Bear mine, right?
15   **A.  The Black Bear mine, yes.**
16   Q.  Was there a black bear around when you
17   discovered that one?
18   **A.  Yeah.  I almost stepped on him.**
19   Q.  Is that in Vermont as well?
20   **A.  Yes.**
21   Q.  And when was that mine discovered?
22   **A.  It was the last of the mines.  So it was**
23   **probably in '83, '84.**
24   Q.  Okay.  And how long was it used for?
25   **A.  We operated out of it intermittently over a**

Page 99

**Page 100**

1    period of three or four years.
2    Q.  So it was finally shut down at some point?
3    **A.  M-hm.**
4    Q.  When was that?
5    **A.  I don't know.**
6    Q.  Was it before 1990?
7    **A.  Just before.**
8    Q.  Okay.  So, like, the late '80s?
9    **A.  Yes.**
10   Q.  All right.  And where did the ore go from
11   that particular mine?
12   **A.  To the Ludlow mill.**
13   Q.  Okay.  And if you could -- was there any --
14        Can you describe any testing that was done
15   to see if asbestos was present --
16   **A.  We drilled it --**
17   Q.  -- at the Black Bear mine?
18   **A.  We drilled it, as I've described on the**
19   **other properties.  We did the sampling on the drill**
20   **core.  And then as it became part of the feed stream**
21   **to the mills, it was sampled along with the other**
22   **materials in the mill.**
23   Q.  Okay.  And when was that initiated?
24   **A.  It was initiated when we diamond drilled.**
25   **And then as it came in of the usable ore stream, it**

Page 100

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - PLT'S - January 16, 2007

1    A.  M-hm.
2    Q.  And then how soon -- was that a yes?
3    A.  Yes.
4    Q.  And then how long after that does it take
5    the mines on an average to start operating?
6    A.  About three years to get up to speed, yeah.
7    Q.  Okay.  So then once it was operating, then
8    the testing continued, as you've already described?
9    A.  Yes.
10   Q.  Okay.  What's done in the three years for
11   the preparation of the mine?
12   A.  Well, first, you cut down all the trees.
13   Then you come in with earth moving equipment and
14   strip the soil.  There is very little soil in Vermont
15   because the glacier is stripped in Vermont clean.  So
16   you remove the soil, and then you go through -- and
17   in those years, we were using automatic continuous
18   mining machines, which look like a Sherman tank that
19   have a cutting head on the end of a long groove.
20       We would go in and clean the top of the
21   outcrop to get rid of the discolored materials
22   because we couldn't use the discolored material.
23
24
25

Page 101

1    A.  Right.
2    Q.  -- in approximately 1975?
3    A.  Right.  And it initially was an underground
4    mine, developed two full levels over a strike length
5    of maybe 2,000 feet on two levels, and then we
6    converted it to an open pit mine.
7    Q.  Okay.  And where was that one located?
8    A.  Near the Ludlow mill.  Just uphill above the
9    Ludlow mill.
10   Q.  So did the ore from the Argonaut mine also
11   go to the Ludlow mill?
12   A.  Yes.
13   Q.  And how long was the Argonaut mine used?
14   A.  It's still in operation.
15   Q.  And this is an underground mine, meaning
16   there's --
17   A.  It was an underground mine.  It's been
18   converted to an open pit.
19   Q.  Okay.  What's the difference between those
20   two, if you can just describe that?
21   A.  Well, the underground mine is just exactly
22   what it says it is.  You go underground, excavate the
23   opening, mine the material above the opening, go down
24   to the next level and mine the material between the
25   two levels.

Page 103

1    Once we had done that, then we would establish --
2    these were open pit mines, and we would establish
3    benches and use the mining machines to mine it.
4    Q.  Okay.  All right.  And the next mine that
5    you gave me was the Argonaut mine?
6    A.  The Argonaut mine was before Rainbow.
7    Q.  So prior to 1978?
8    A.  Yes.  So it would probably be '75, '76.
9    Q.  Okay.
10   A.  Initially, it operated as an underground
11   mine.
12   Q.  So, Mr. Miller, when you are giving me these
13   dates, like you gave me the Rainbow one for 1978 --
14   A.  Right.
15   Q.  -- that first date, is that the date of
16   operation or the date of discovery of the mine?
17   A.  Probably the date of operation, I would
18   think.  And I don't want you to place a whole lot of
19   reliance on those dates because I'm very unsure of
20   the statements.
21   Q.  That's okay.  I think you've made that clear
22   for the record.  I was just wondering which date you
23   were giving me.
24       So the Argonaut mine, you think, went
25   online -- in other words, the operations began --

Page 102

1    An open pit is typically operated by drill
2    and blast methods.  In fact, that's the way Luzenac
3    and Cyprus operated them, but we operated them with
4    continuous mining machines.  We would establish
5    benches and mine from one wall to the next.
6    Q.  Okay.  Was there testing done at the
7    Argonaut mine?
8    A.  Yes.
9    Q.  Okay.  Same fashion?
10   A.  Same protocol, exactly.
11   Q.  Okay.  And the results never revealed any
12   asbestos?
13   A.  Never found anything.
14   Q.  Okay.  Were they looking for a particular
15   form of asbestos, if you know?
16   A.  I believe the suspect mineral was
17   chrysotile, but I could not tell you precisely what
18   McCrone was looking for.
19   Q.  Okay.  Do you know if they were looking for
20   tremolite?
21   A.  No.
22   Q.  You don't know?
23   A.  No.  But I know the one they did tremolite
24   deposits.
25   Q.  All right.  Let's move on to the Clifton

Page 104

26 (Pages 101 to 104)

ROGER MILLER - Plf's - January 16, 2007

| | |
|---|---|
| 1 mine? | 1    Q.  Asbestos was never found at that mine |
| 2 **A.  The Clifton mine was the earliest mine and** | 2 either, right? |
| 3 **was used to supply the Gassetts mill.** | 3    **A.  No.** |
| 4    Q.  Okay.  So when did the Clifton mine first | 4    Q.  Okay.  And then let's talk about the Red |
| 5 begin operating? | 5 Hill mine. |
| 6    **A.  Oh, boy.  I would say '69 or '70.  It** | 6    **A.  It's in California.** |
| 7 **operated for three seasons, three years.** | 7       MR. WILLIAMS:  Do you want to take a break, |
| 8    Q.  All right.  So it ceased to operate in | 8 or do you want to keep going? |
| 9 approximately 1973? | 9       THE WITNESS:  Pardon? |
| 10    **A.  Yes.** | 10       MR. WILLIAMS:  Do you want to keep going, or |
| 11    Q.  And the ore from that particular mine went | 11 do you want to take a quick break? |
| 12 to the Gassetts mill? | 12       THE WITNESS:  No, I'm fine. |
| 13    **A.  It went to the Gassetts mill.** | 13       MR. HAMES:  Why don't we finish talking |
| 14    Q.  Okay.  And, again, was the testing done | 14 about this last mine, and then we'll break for lunch. |
| 15 before you purchased the property there? | 15 Okay? |
| 16    **A.  No.  We already owned that property.** | 16    Q.  So there is the Red Hill mine, which is in |
| 17 **Eastern Mag had owned that property.  I don't know** | 17 Calaveras County, right? |
| 18 **why they had, but they had.** | 18    **A.  Yes.** |
| 19    Q.  Okay.  So Eastern Mag owned it? | 19    Q.  And when did that mine begin its operation? |
| 20    **A.  Yes.** | 20    **A.  I cannot with clarity say, but it was in the** |
| 21    Q.  And had they been operating the mine? | 21 **'80s.  Probably '84 or '85.  I almost got divorced.** |
| 22    **A.  No.  They owned the property I said.** | 22 **Somewhere along in there.** |
| 23    Q.  Okay.  And then Windsor did the testing | 23    Q.  Because you were in California for so long? |
| 24 there -- | 24    **A.  Because I was gone so long, yeah.** |
| 25    **A.  Yes.** | 25    Q.  Okay.  All right.  But it was sometime in |
| Page 105 | Page 107 |

| | |
|---|---|
| 1    Q.  -- and found some ore and decided to do the | 1 the '80s? |
| 2 mining? | 2    **A.  Yes.** |
| 3    **A.  Yes.** | 3    Q.  Do you know if it was early, mid, or late |
| 4    Q.  Okay.  Did they have to purchase the | 4 '80s? |
| 5 property from Eastern Mag? | 5    **A.  No.** |
| 6    **A.  No.  It was part of the transaction.  The** | 6    Q.  Okay.  Had that mine already been in |
| 7 **sale to Engelhard Minerals and Chemicals included all** | 7 operation for another company, or -- |
| 8 **of the holdings of Eastern Magnesia Talc Company** | 8    **A.  No.  I found it.** |
| 9 **north of the Winooski River.  The rest of it all came** | 9    Q.  You found it? |
| 10 **to Windsor mill.  Everything south of the river.** | 10    **A.  M-hm.** |
| 11    Q.  So they just happened to have some ore that | 11    Q.  How did you go about finding it? |
| 12 they -- and they already owned the property? | 12    **A.  Well, it's a fairly long story.  I found it** |
| 13    **A.  M-hm.** | 13 **in a TWA airplane flying to California.** |
| 14    Q.  Okay.  And they began operation in | 14    Q.  You just looked out the window and saw -- |
| 15 approximately 1969 or '70 and ran for about three | 15    **A.  No.  I read a publication by the California** |
| 16 years? | 16 **Division of Mines and Geology.** |
| 17    **A.  Yeah, we did.  Windsor Minerals did.** | 17    Q.  Okay.  So was this just a bare piece of |
| 18    Q.  Right.  Okay.  And all the ore went to the | 18 property that you purchased? |
| 19 Gassetts mill, which we've already talked about, | 19    **A.  Yes.  It had been subdivided to 20-acre** |
| 20 right? | 20 **lots, and they were offering it to people who wanted** |
| 21    **A.  Yes.** | 21 **to live out in the country.** |
| 22    Q.  Okay.  And so the way it was packaged and | 22    Q.  Okay.  And you went out there and did some |
| 23 the way that it was distributed, we've already talked | 23 sampling? |
| 24 about, right? | 24    **A.  We found it and did some sampling, enough** |
| 25    **A.  Yes.** | 25 **sampling.  We were very sure of what we were doing.** |
| Page 106 | Page 108 |

27 (Pages 105 to 108)

1  We couldn't diamond drill it because we were doing a
2  lot of this kind of on the side.  And we diamond
3  drilled it before we ever developed it.  We initially
4  surface sampled it extensively.
5  Q.  So you surface sampled it, and you believed
6  that there would be some usable ore there?
7  A.  Oh, we knew there was usable ore there.  We
8  were surface sampling extensively to affirm that
9  there were no fibers there.
10  Q.  Asbestos?
11  A.  Yes.
12  Q.  Okay.  And what were the results of the
13  surface samples?
14  A.  The surface samples were very positive.  It
15  had all the characteristics we were looking for for
16  the products that we intended to produce.
17  Q.  Did surface samples reveal the presence of
18  any asbestos that you recall?
19  A.  No.
20  Q.  Can you describe what the surface sampling
21  is?
22  A.  That part of California has a very thin soil
23  cover, a very, very thin soil cover, and so the
24  outcrop was present at the surface.  You didn't have
25  to dig to find it.  You could walk over the whole

Page 109

1  thing.  About 1,000 feet long.  We could take
2  samples, clean samples, all over it, which is exactly
3  what we did.
4  Q.  Okay.  And how did you go about doing the
5  sampling?
6  A.  Pick and a canvas sack.
7  Q.  Okay.  And so you physically picked some of
8  the rock off --
9  A.  Right.
10  Q.  -- put it in a canvas bag and then shipped
11  that to McCrone?
12  A.  Brought it back to Vermont and ground it and
13  then shipped the ground fraction to McCrone.
14  Q.  Okay.  Did McCrone ever test or sample any
15  of the actual remnants from the chipping itself for
16  asbestos?
17  A.  Well, that's what we made the samples out
18  of.
19  Q.  Right.
20  Before it was ground, did they test any of
21  that?
22  A.  No, not before it was ground.
23  Q.  Okay.  What were the results?
24  A.  We found no evidence of asbestos.  And after
25  we acquired the property, we diamond drilled it and

Page 110

1  followed the same protocol.  Because we stole the
2  property, really, as a mineral property, and so we
3  could well afford to go ahead and buy the property.
4  If it turned out it wasn't any good, we could just
5  put it on the market.  So we went ahead and bought
6  the property and then drilled it after we had owned
7  it.
8  Q.  What do you mean by you stole the property?
9  A.  We bought it very reasonably.
10  Q.  Just for the record, I mean, you are joking
11  about that?
12  A.  Yes.
13  Q.  So you got it at a very cheap price?
14  A.  Reasonable price.
15  Q.  All right.  And how long did the Red Hill
16  mine operate?
17  A.  13 years.
18  Q.  Do you know exactly when it ceased its
19  operations?
20  A.  No, I don't know exactly when it ceased
21  operation.
22  Q.  Can you give me an estimate?
23  A.  I would say about six years ago.
24  Q.  Okay.  Where did the ore go from that mine?
25  A.  The ore went to the new mill that we built

Page 111

1  at San Andreas.
2  Q.  And where exactly was that mill?
3  A.  In San Andreas, California.
4  Q.  Okay.  All right.  We haven't talked about
5  that one yet.
6  So what sort of mill was that?
7  A.  Dry processing.
8  Q.  And how was the finished material packaged
9  from that mill?
10  A.  In bulk trucks, shipped in bulk trucks in
11  50-pound bags and in one-ton sacks.
12  Q.  Okay.  And the 50-pound bags, were they any
13  different than what you've already described?
14  A.  No.  They were the same.
15  Q.  And there weren't any specific markings,
16  lettering, writing of any kind indicating that it was
17  from the San Andreas facility?
18  A.  No.
19  Q.  Okay.
20  A.  But it was a Western Source product.  It
21  wasn't a Windsor Minerals product.
22  Q.  Did it say Western Source on it?
23  A.  Yes.
24  Q.  Okay.  Tell me exactly what the bag said.
25  A.  My recollection the bag said, "Western

Page 112

28 (Pages 109 to 112)

ROGER MILLER - PLTFS - January 16, 2007

1  Source, Incorporated, Grade" and there were three or
2  four grades produced there.  Grade X, 50 pounds.
3  Q.  Okay.  And that's it?
4  A.  Yes.
5  Q.  And they were brown, and what color was the
6  writing?
7  A.  I think they were a dark brown.  I'm not
8  sure.  Dark brown, I think,
9  Q.  The bags were?
10  A.  No.  The printing.
11  Q.  Okay.  And the bags themselves were brown?
12  A.  They were the same, craft paper.
13  Q.  Okay.  Do you know who any of the customers
14  were for the end product from the San Andreas mill?
15  A.  I know that the roofing companies all up and
16  down the West Coast of the United States were
17  customers.  I know that some of the tape compound and
18  joint cement companies were customers.  I know the
19  auto body companies were either customers or
20  potential customers.
21  Q.  What about the rubber industry?
22  A.  I never sold a pound.
23  Q.  How do you know that?
24  A.  Because I was responsible for mining,
25  manufacture, and sales.

Page 113

1  BY MR. HAMES:  Q.  Okay.  All right.  Now,
2  with reference to all these different mines and all
3  the different manufacturing plants, you are not aware
4  of the presence of any records at all that were
5  maintained by your employer pertaining to who the
6  customers were that were purchasing the end product?
7  A.  See, I don't have any of those materials.
8  There have been two sales between me and today.  I
9  don't have any idea.
10  Q.  Are you aware of any individuals at all that
11  I can ask, from Western Source, Windsor, or any other
12  company, that might know that information pertaining
13  to who the customers were that were buying the end
14  product?
15  A.  No.
16  Q.  Okay.  Do you recall the names of anyone
17  that you used to work with that either is alive or
18  dead or is a current or a former employee of your
19  employer?
20  A.  A guy named Leroy, who was Portuguese.  And
21  I don't remember his last name, but he passed away
22  last year.
23  Q.  Okay.  Do you remember anyone else that you
24  ever worked with, the names of any of the people that
25  you worked with?

Page 115

1  Q.  Are you aware of the presence of any
2  documents or purchase orders, that sort of thing,
3  that might reflect who the customers were for that
4  particular mill?
5  A.  I have no idea who they are.
6  Q.  Do you know who any of the customers were
7  for Western Source?
8  A.  Yes.
9  Q.  Who were they?
10  A.  I just related them.
11  Q.  No, no.  The actual company names.
12  A.  US Gypsum is one.  Berg & Son Roofing is
13  one.  Certainty Products Corporation is one.  I'm
14  trying to think.  The auto body guys down in Los
15  Angeles.  I don't really have the whole list in my
16  mind.
17  MS. BRAUER:  Can I have that answer read
18  back, please?
19  MS. LEE:  Yeah.
20  (Record read.)
21  BY MR. HAMES:  Q.  What about Goodyear Tire
22  and Rubber?  Do you know if they ever sold any --
23  THE COURT REPORTER:  I'm sorry.  Who?
24  Goodyear Tire and Rubber.
25  THE WITNESS:  Never.

Page 114

1  A.  No.
2  Q.  Okay.
3  A.  Not really.
4  Q.  You worked for this company for a really
5  long time.
6  A.  For Western Source?  No.
7  Q.  No, no, no.
8  For Windsor?
9  A.  Yes.
10  Q.  Okay.  You were president of the company?
11  A.  Yes.
12  Q.  There were a lot of people working under
13  you, right?
14  A.  That's right.
15  Q.  How many employees did you guys have.
16  A.  At the peak, we had 113.
17  Q.  Okay.  And what about the least?
18  A.  During the strike, we only had 12.
19  Q.  Okay.  When was that, the 12?
20  A.  That was in 1974.
21  Q.  And how long were you down to that few
22  number of employees?
23  A.  16 weeks.
24  Q.  Okay.  And did you return up to 150 or so,
25  or --

Page 116

29 (Pages 113 to 116)

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - Plaintiffs - January 16, 2007

Page 117

1  A. No. We returned back to about 80.
2  Q. Okay. So my question to you, Mr. Miller,
3  is: Other than this guy Leroy that's dead, do you
4  know the names of any of your former co-workers,
5  ever?
6  A. The names of them?
7  Q. Yes, sir.
8  A. I know names of the guys that have died.
9  Q. Okay. That's fine. I want the names of
10  anyone, whether or not they are living or dead, that
11  you worked with because I might want to call them up,
12  or we might try to find them, or maybe through the
13  attorneys involved in the case, to see what they know
14  about it. Okay? So if you can give me their names,
15  that would be great.
16  A. The only one that comes to mind is Steve
17  Hastings, Steven V. Hastings, but he's been dead for
18  2 years.
19  Q. Okay.
20  A. I really can't bring to mind the specific
21  names of individuals. I really can't.
22  Q. Was there someone working directly under
23  you, like a vice president?
24  A. No.
25  Q. Okay. Well, you know what we are going to

Page 118

1  do is, I'm going to ask you about some of the
2  corporate history and the structure and stuff. We
3  can do that after lunch.
4  But as you sit here right now, you can't
5  think of anyone, other than Steve Hastings and
6  someone named Leroy, that you worked with during
7  those years? I don't care if it's a miner, you know,
8  or someone in your shipping department or in the
9  manufacturing plant -- the processing plants or
10  management or whatever.
11  A. Are you at all familiar with the mining
12  industry?
13  MR. WILLIAMS: You don't get to ask him
14  questions.
15  THE WITNESS: Oh.
16  MR. HAMES: Unfortunately, it's kind of a
17  one-way conduit where I get to ask you questions --
18  MR. WILLIAMS: Why don't we take a break. I
19  think you are getting tired. Let's just take a break
20  for lunch.
21  MR. HAMES: Okay. We'll break for lunch,
22  and why don't we take an hour. Okay? So we'll be
23  back at 1:30.
24  THE VIDEOGRAPHER: This is the end of tape
25  two, Volume I, for the deposition of Roger Miller.

Page 119

1  Going off the record. The time is 12:29 p.m.
2  (Lunch recess.)
3  THE VIDEOGRAPHER: This is the beginning of
4  tape three, Volume I, for the deposition of Roger
5  Miller. We are back on the record. The time is 1:31
6  p.m.
7  You may proceed.
8  BY MR. HAMES: Q. Mr. Miller, when we left
9  off, I was asking you about former employees that you
10  worked with.
11  Were you able to come up with any names of
12  anyone?
13  A. I came up with four names.
14  Q. Okay. Good.
15  A. Lynette Rapetti.
16  Q. Okay.
17  A. She was the office manager at Western
18  Source.
19  Q. Who else?
20  A. John Fike, F-i-k-e.
21  Q. Who was --
22  A. And he is from Reading, Vermont, and was a
23  sales representative for me for 10 or 15 years.
24  Q. Okay.
25  A. Robert Goff, G-o-f-f, who was manager of

Page 120

1  operations at Windsor Minerals for a period of time.
2  Q. Okay.
3  A. I thought of another now. Now I have to
4  rethink.
5  Q. That's all right. Take your time.
6  A. Oh, Lorenzo Rodizza, R-o-d-i-z-z-a. He was
7  the financial officer for Windsor Minerals for 25
8  years. He is very, very ill.
9  Q. Okay. Do you know where Lynette is today?
10  A. I believe she lives in San Andreas,
11  California.
12  Q. What about John Fike?
13  A. I thought I told you, Reading, Vermont.
14  Q. Is he still alive?
15  A. Yes, to my knowledge.
16  Q. Robert Goff?
17  A. He lives in North Carolina. I don't know
18  where.
19  Q. Okay. Do you think he is still alive,
20  though?
21  A. I believe so.
22  Q. And Lorenzo, where does he live?
23  A. He lives in New Hampshire.
24  Q. Do you know where?
25  A. No. It's Western New Hampshire.

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - PLTFS - January 16, 2007

1   Q.   Okay.  All right.  Have we now talked about
2   all of the mines and all the processing plants that
3   you are aware of Windsor owning and operating during
4   your time with them?
5   **A.   Yes.**
6   Q.   Okay.  You are familiar with the name
7   Luzenac, right?
8   **A.   Yes.**
9   Q.   Okay.  And what is your understanding of
10  Luzenac?
11      MS. WOODSON:  Objection; vague and
12  ambiguous.
13      THE WITNESS:  It was a talc operating
14  company based in France.
15      BY MR. HAMES:  Q.  Okay.  And did you ever
16  work for them?
17  **A.   No.**
18  Q.   Did they ever come to acquire Windsor, if
19  you know?
20  **A.   They didn't acquire Windsor.  They acquired**
21  **Cyprus.**
22  Q.   You worked for Cyprus, right?
23  **A.   Briefly.**
24  Q.   It was 19, I believe, '89?
25  **A.   '89 or '90.**

Page 121

1   Q.   Okay.
2   **A.   Yes.**
3   Q.   So what happened to Windsor, if you know?
4   **A.   What happened to Windsor?**
5   Q.   Yes, the company, was it purchased by
6   Cyprus?
7   **A.   It was purchased by Cyprus, yes.**
8   Q.   And that you believe took place in 1989?
9   **A.   '89, I believe.**
10  Q.   Okay.  And as president, were you involved
11  in that transaction at all?
12  **A.   I was involved in the negotiations for the**
13  **transaction, yes.**
14  Q.   Okay.  So ultimately -- well, tell me a
15  little bit about Cyprus?  What do you know about
16  them?  What did they do?
17  **A.   I do.  They were in the talc mining business**
18  **basically in Montana and in California.**
19  Q.   Uh-huh.
20  **A.   And that was about all that I knew about**
21  **them.**
22  Q.   And so when Cyprus purchased Windsor
23  Minerals, did they abandon the Windsor Minerals name?
24  **A.   I'm not sure.**
25  Q.   Did Cyprus completely -- did they purchase

Page 122

1   all the assets of the company --
2   **A.   Yes.**
3   Q.   -- of Windsor?  Okay.
4      And then what was your job title with
5   Cyprus?
6   **A.   I'm not at all sure what the correct title**
7   **was.  I was part of the transition team to put them**
8   **in a position to operate the company, and then in the**
9   **second year I represented them for sales on the West**
10  **Coast.**
11  Q.   So that was 1990 --
12  **A.   '90.**
13  Q.   -- that you began sales on the West Coast?
14  **A.   Right.  Specifically to the roofing**
15  **industry.**
16  Q.   Okay.  Did you learn about the history of
17  the Cyprus organization?
18  **A.   Very little.**
19  Q.   Okay.  What did you learn about them?
20  **A.   They had other mining operations in the coal**
21  **industry and in the copper industry.**
22  Q.   Okay.  Did you learn where their talc mines
23  were?
24  **A.   I learned a little more about the Montana**
25  **and California mines, yes.**

Page 123

1   Q.   Do you know where in Montana the mine was?
2   **A.   The one that I became familiar with was**
3   **Three Forks, Montana.**
4   Q.   Did they have a processing plant?
5   **A.   At Three Forks.**
6   Q.   At Three Forks.  Okay.
7      Now, when you started working for Cyprus,
8   you said that you were a member of the transition
9   team.
10      What exactly were your job duties?
11  **A.   To familiarize the new management with the**
12  **processes and procedures that we had in place.**
13  Q.   Okay.  Do you know the names of any of the
14  employees of Cyprus that worked there either before
15  you, or while you were working with them?
16  **A.   I don't know really.**
17  Q.   Okay.  So you don't know any of the other
18  names of any of the people that you were training for
19  the transition?
20  **A.   No.**
21  Q.   Okay.  Were you showing them and explaining
22  to them the operations of Windsor?
23  **A.   Yes.**
24  Q.   Okay.  And so they essentially purchased the
25  mines that Windsor had owned and the manufacturing

Page 124

31 (Pages 121 to 124)

ROGER MILLER - PLT'S - January 16, 2007

1  facilities?
2  **A.  Yes.**
3  Q.  Okay.  Had you known Cyprus from your
4  previous business dealings?  Were they a competitor
5  of Windsor?
6  **A.  They were not a direct competitor.  They**
7  **were in the talc business --**
8  Q.  Okay.
9  **A.  -- and I knew that.**
10  Q.  All right.  And you subsequently learned
11  that they had a mine in Three Forks Montana, along
12  with the manufacturing plant?
13  **A.  M-hm.**
14  Q.  And they had another one you said in
15  California?
16  **A.  I believe there was a plant in Southern**
17  **California.  I was never absolutely sure of that.**
18  Q.  Okay.  Do you know where in Southern
19  California?
20  **A.  No.**
21  Q.  Do you know if they had a manufacturing
22  plant in California?
23  **A.  I believe that they did, but I'm not sure.**
24  Q.  What made you believe that they had a mine
25  and possibly a manufacturing plant in California?

Page 125

1  **A.  Because years before, they had acquired**
2  **Southern California Minerals which had begun its**
3  **business in Southern California --**
4  Q.  Okay.
5  **A.  -- is the basis for my conjecture.**
6  Q.  And that's another company, Southern
7  California Minerals?
8  **A.  It was an old, old company.**
9  Q.  Okay.  Did you ever work for them?
10  **A.  No.**
11  Q.  Do you know if Cyprus, in fact, purchased
12  Southern California Minerals?
13  **A.  No.**
14  Q.  No, you don't know, or --
15  **A.  I don't know.**
16  Q.  Okay.  And you had heard that Southern
17  California Minerals had a mine in Southern California
18  somewhere?
19  **A.  I was aware that they did.**
20  Q.  Okay.  And this is the mine that you are
21  referring to?
22  **A.  Yes.**
23  Q.  Okay.  How big of a company was Cyprus when
24  they purchased Windsor?
25  **A.  I have no idea.**

Page 126

1  Q.  You don't know how many employees there
2  were?
3  **A.  No.**
4  Q.  Do you know how many people you were
5  training, or they were part of the distribution team?
6  **A.  They brought about 10 or 12 people to our**
7  **operations.**
8  Q.  Okay.  And your operations were in Vermont?
9  **A.  Yes, and in California.**
10  Q.  And in California.  Okay.
11      There is another entity, Western Source,
12  right?  That's another company?
13  **A.  Yes.**
14  Q.  Okay.  And what was the relationship of
15  Western Source with Windsor?
16  **A.  It was a wholly owned subsidiary of Windsor**
17  **Minerals.**
18  Q.  Okay.  Do you know how long Western Source
19  had been a wholly owned subsidiary of Windsor?
20  **A.  Since 1978 or '79.**
21  Q.  What were your dealings, if any, with
22  Western Source?
23  **A.  I was the president of Western Source.**
24  Q.  Okay.  So when you were president of
25  Windsor, you were also president of Western Source --

Page 127

1  **A.  Yes.**
2  Q.  -- right?
3      What sort of activities did Western Source
4  do?
5  **A.  They mined and processed mineral talc.**
6  Q.  Okay.  And where was Western Source's mines?
7  **A.  In Red Hill mine.**
8  Q.  That's the one we already talked about?
9  **A.  Yes.**
10  Q.  Okay.  Did they have any other mines that
11  you are aware of?
12  **A.  No.**
13  Q.  Okay.  And so when Cyprus purchased Windsor,
14  they also purchased Western Source?
15  **A.  Yes.**
16  Q.  Okay.  Did they purchase any other entities
17  that you are aware of simultaneously?
18  **A.  Not that I'm aware of, no.**
19  Q.  Okay.  And were you the president of any
20  other entities?
21  **A.  No.**
22  Q.  Just those two?  What was the reason for
23  having two different names?  Do you know?  Western
24  Source and Windsor Minerals?
25  **A.  I don't remember why that was.  But we had**

Page 128

32 (Pages 125 to 128)

ROGER MILLER - PLF's - January 16, 2007

```
1  to be incorporated in California, and it had
2  something to do with it.
3  Q.  Okay.  Did you learn about Cyprus's
4  operations when you were working for them for the
5  last couple of years?
6  A.  Very little.
7  Q.  Okay.  What did you learn about them?
8  A.  I learned the nature of their operations in
9  Montana, the markets and the products that they were
10 producing then.  I learned very little about that
11 from them.  I wasn't really interested at all.
12 Q.  They were probably more interested in
13 learning your operations, right?
14 A.  Yes.  That is true.
15 Q.  Well, tell me, what were they doing -- they
16 were mining talc in Montana at Three Forks?
17 A.  Yes.
18 Q.  Do you know what the final product -- what
19 it was used for?
20 A.  I know of one product which was a very, very
21 finely divided talc.  It was sold in the paper
22 industry.
23 Q.  And that was refined at the Three Forks
24 plant?
25 A.  Yes.
```

Page 129

```
1  Q.  Were you aware of any other end products
2  that Cyprus had?
3  A.  No.
4  Q.  Okay.  Do you know how the end product from
5  the Montana plant was packaged?
6  A.  No.
7  Q.  All right.  Do you know if any testing had
8  ever been done at the Three Forks mine for the
9  purpose of asbestos?
10 A.  I don't know.
11 Q.  Do you know if Cyprus sold any of its talc
12 to the rubber industry?
13 A.  I don't know.
14     MS. BRAUER:  Can you read back that last
15 question and answer?
16     (Record read.)
17     BY MR. HAMES:  Q.  Okay.  And then you
18 stopped working for Cyprus in approximately 1990,
19 right?
20 A.  Yes.
21 Q.  Okay.  And what did you do after that?  Did
22 you just retire?
23 A.  Yes.
24 Q.  And you never had another job after that?
25 A.  No.
```

Page 130

```
1  Q.  Okay.  And then do you have some
2  understanding that Luzenac purchased Cyprus?
3  A.  That's my understanding.
4  Q.  Do you know when that happened?
5  A.  No.
6  Q.  You believe it was after the time that you
7  were employed by them --
8  A.  Yes.
9  Q.  -- after 1990?
10 A.  Yes.
11 Q.  Okay.  Just so I have some understanding
12 here, you really don't know much about the operations
13 of the Montana mine --
14 A.  I know nothing --
15 Q.  -- that Cyprus had?
16 A.  I know nothing about it.
17 Q.  Okay.  And you don't know what mines Luzenac
18 had because you weren't even in the industry then,
19 right?
20 A.  That's right.
21 Q.  Okay.  So did you ever learn about Luzenac
22 and where their facilities were, where their mines
23 were?
24 A.  I learned that there were operations in
25 France, and I visited them once --
```

Page 131

```
1  Q.  Okay.
2  A.  -- when I was on vacation.
3  Q.  Okay.  Was that after you retired?
4  A.  Yes, I believe it was.
5  Q.  Okay.
6  A.  I'm not absolutely sure.
7  Q.  Were you aware as to whether or not Luzenac
8  had any operations in the United States?  Any mines
9  or manufacturing plants?
10 A.  No, I didn't know.
11 Q.  Okay.  Let me ask you this:  With respect to
12 Windsor, are you aware of the EPA, Environmental
13 Protection Agency, ever doing any testing or any
14 sampling of any of the mines owned by Windsor?
15 A.  I'm not aware of it.
16 Q.  What about any of the mines owned by Western
17 Source?
18 A.  I'm not aware of it.
19 Q.  What about for Cyprus?
20 A.  I don't know.
21 Q.  Okay.  And the same question with respect to
22 Luzenac?
23 A.  Yes, I don't know.
24 Q.  You don't know.  Okay.
25     And with respect to any one of those
```

Page 132

33 (Pages 129 to 132)

ROGER MILLER - Plaintiffs - January 16, 2007

| | |
|---|---|
| 1  entities, do you know if any epidemiological studies | 1  Q.  Okay. |
| 2  have ever been done? | 2  **A.  Okay.** |
| 3  **A.  I don't know.** | 3  Q.  For Johnson & Johnson? |
| 4  Q.  Okay.  Are you aware of any employees of any | 4  **A.  The roofing products were shipped to or** |
| 5  of those entities ever filing any asbestos-related | 5  **offered to every roofing plant in the United States** |
| 6  lawsuits against those companies? | 6  **at one time or another.  They were sold to plants** |
| 7  **A.  I don't know.** | 7  **from Texas and Illinois east.  It was very difficult** |
| 8  Q.  Are you aware of any workers' compensation | 8  **to sell our products after the long freight charges** |
| 9  cases? | 9  **to the West Coast.** |
| 10  **A.  I don't know of any.** | 10  Q.  Okay.  Wait a minute.  You confused me |
| 11  Q.  Okay.  And I'm asking you with respect to | 11  there. |
| 12  all of these different companies -- | 12    It was sold from plants -- |
| 13  **A.  I understand.** | 13  **A.  From Vermont to all the roofing plants** |
| 14  Q.  -- just to try to speed things up. | 14  **basically east of Illinois and Texas.** |
| 15    And what about any just third-party | 15  Q.  Okay.  So essentially, it was sold to the |
| 16  lawsuits, nonemployees, but just other individuals | 16  roofing industry and the roofing plants throughout |
| 17  that have sued either Windsor or Western Source, | 17  the United States? |
| 18  Cyprus? | 18  **A.  Right.** |
| 19  **A.  None that I'm aware of.** | 19  Q.  Were there any states that it did not sell |
| 20  Q.  Okay.  Can you tell me with respect to | 20  it's end products to? |
| 21  Windsor what the areas of distribution were | 21  **A.  There were a number of states without a** |
| 22  geographically for their end product? | 22  **roofing plant.** |
| 23    MR. WILLIAMS:  Do you want to break it down | 23  Q.  Okay.  Do you know which ones? |
| 24  Vermont versus California? | 24  **A.  Not offhand, I don't.** |
| 25    MR. HAMES:  I don't care.  If that's | 25  Q.  Okay.  All right.  So we have the cosmetic. |
| Page 133 | Page 135 |

| | |
|---|---|
| 1  easier -- | 1  We have the roofing. |
| 2    MR. WILLIAMS:  And I don't know if it will | 2    What else?  What other distributions? |
| 3  be different.  I'm just trying to -- | 3  **A.  Cement compound and joint cement was sold in** |
| 4    THE WITNESS:  From the California | 4  **roughly the same distribution pattern as the roofing.** |
| 5  operations, the market was purely the West Coast | 5  Q.  Can you think of any states that were |
| 6  states. | 6  specifically excluded? |
| 7    BY MR. HAMES:  Q.  Okay.  Which states were | 7  **A.  No.** |
| 8  included then? | 8  Q.  In other words, where there were no joint |
| 9  **A.  Washington, Oregon, and California.** | 9  compound -- |
| 10  Q.  And that's for Western Source? | 10  **A.  Well, there were states without joint** |
| 11  **A.  That's for Western Source, yes.** | 11  **compound plants, but I don't remember which of those** |
| 12  Q.  The subsidiary? | 12  **states they were.** |
| 13  **A.  Yes.** | 13  Q.  Okay.  All right.  Any other areas of |
| 14  Q.  Okay.  Did they have any other areas of | 14  distribution? |
| 15  distribution other than those three states? | 15  **A.  No.** |
| 16  **A.  No.** | 16  Q.  What about for the rubber industry? |
| 17  Q.  Okay.  And then what about for Windsor? | 17  **A.  We never sold anything to the rubber** |
| 18  What was their area of distribution for their | 18  **industry.** |
| 19  material? | 19  Q.  Windsor never did? |
| 20  **A.  Windsor produced toiletries talc, which was** | 20  **A.  No.** |
| 21  **a proprietary product produced solely for Johnson &** | 21  Q.  I could have sworn that you had said that |
| 22  **Johnson, and it was shipped to Illinois or to New** | 22  they did. |
| 23  **Jersey or to Georgia.** | 23    MR. WILLIAMS:  He is talking about Windsor, |
| 24  Q.  That's just one particular -- | 24  not Western Source. |
| 25  **A.  That's the cosmetic product.** | 25    BY MR. HAMES:  Q.  Western Source sold to |
| Page 134 | Page 136 |

34 (Pages 133 to 136)

ROGER MILLER - PLTFS - January 16, 2007

1    the rubber industry?
2    A.  No.  Windsor never sold to the rubber
3    industry.
4    Q.  Western Source did sell to the rubber
5    industry?
6    A.  No.
7    Q.  No.  Western Source did?
8    A.  No, never.
9    Q.  And neither did Windsor?
10   A.  Neither did Windsor.
11   Q.  So as far as you are aware, Mr. Miller, did
12   any of the companies that you worked for -- Windsor,
13   Western Source, or Cyprus -- ever sell any talc to
14   the rubber industry?
15   A.  I have no knowledge of Cyprus sales.  I know
16   that Windsor Minerals never sold --
17   Q.  Okay.
18   A.  -- nor did Western Source.
19   Q.  Okay.  What about the distribution for the
20   end product that wound up going to the paint
21   industry?
22   A.  From?
23       MS. WOODSON:  Objection --
24       BY MR. HAMES:  Q.  Well, we can do it either
25   way.

                                        Page 137

1        Western Source, what was their area of
2    distribution?
3    A.  We didn't sell to the paint industry.
4    Q.  Okay.  What about Windsor?
5    A.  We didn't sell, other than a very, very
6    small quantity in 1965 to the paint industry.  Our
7    products were too coarse to be used in paint.
8    Q.  Okay.  What about Eastern Magnesium?  When
9    you started working for them in 1966 through '68 --
10   A.  M-hm.
11   Q.  -- they sold to the rubber industry, right?
12   A.  It's my understanding they did.  I don't
13   have any certain knowledge that --
14   Q.  Do you know what their area of distribution
15   was?
16   A.  The rubber plants would be the controlling
17   element.
18   Q.  Okay.  Are you aware of Eastern ever being
19   sued by anyone alleging exposure to asbestos from
20   their mine or from their products?
21   A.  Not to my knowledge.
22   Q.  Okay.  And are you aware of any workers'
23   compensation cases filed against them for asbestos
24   exposure?
25   A.  Not to my knowledge.

                                        Page 138

1    Q.  Okay.  Do you know if any of the Eastern
2    mines ever tested positive for the presence of
3    tremolite?
4    A.  Not to my knowledge, but I'm only speaking
5    about Eastern Magnesia in the two years that I worked
6    there.
7    Q.  Did you ever subsequently learn that any of
8    their mines --
9    A.  I never did, no.
10   Q.  Okay.  And let me ask that question with
11   respect to the other companies that you worked for.
12       Did you ever learn that any of your former
13   employers -- that includes Eastern Magnesium, Western
14   Source, Windsor, and Cyprus -- that any of their
15   mines ever tested positive for the presence of
16   asbestos?
17   A.  I know nothing about Cyprus.  I know that --
18   Q.  So you wouldn't know?
19   A.  I wouldn't know.
20   Q.  Okay.
21   A.  But in the case of the other properties, the
22   properties that we controlled, I never heard of
23   tremolite or asbestos.
24   Q.  Okay.  Are you familiar with what's a
25   medical disease called mesothelioma?

                                        Page 139

1    A.  I'm aware of it.
2    Q.  Okay.
3    A.  I'm not familiar with it.
4    Q.  Have you ever heard of anyone claiming that
5    they contracted and developed mesothelioma from
6    working in one of these talc mines?
7    A.  No.
8    Q.  Okay.  Have you ever given a deposition
9    before prior to today?
10   A.  Yes.
11   Q.  How many times?
12   A.  Either two or three, but it's been 17 or 18
13   years since I did it.
14   Q.  Okay.  And you think it was two or three
15   depositions?
16   A.  Yes.
17   Q.  Was it two or three different cases?
18   A.  Yes.
19   Q.  Do you remember the case names?
20   A.  No.
21   Q.  Do you remember any of the parties involved?
22   A.  No.
23   Q.  Do you know -- well, first of all, were you
24   currently an employee -- you must have been.
25       You were a current employee of Windsor when

                                        Page 140

35 (Pages 137 to 140)

ROGER MILLER - Plf's - January 16, 2007

1  you were testifying, right?
2  **A.  Yes.**
3  Q.  Were you testifying in your capacity as the
4  president of Windsor?
5  **A.  I was testifying in my capacity as the**
6  **person who had worked at Eastern Magnesium Talc**
7  **Company.**
8      MS. BRAUER:  Excuse me.  Would you read that
9  answer back?
10     (Record read.)
11     BY MR. HAMES:  Q.  In all two or three
12  instances?
13 **A.  Yes, I believe they were similar.**
14  Q.  Okay.  Was the issue of whether or not
15  anyone had been exposed to asbestos ever brought up
16  in those cases or in those depositions?
17 **A.  I don't remember.**
18  Q.  What was the nature of the lawsuit?
19 **A.  I don't remember the specifics of it at all.**
20  Q.  Do you remember just generally what you were
21  being questioned about?
22 **A.  I was being questioned about the use and**
23 **application of talc in the rubber industry.**
24  Q.  Okay.
25 **A.  I believe that's true in all three cases,**

Page 141

1  but I'm not absolutely certain of this.  It's been a
2  **long time.**
3  Q.  Was it an issue with someone getting hurt in
4  any way, or --
5  **A.  I really don't remember what the allegations**
6  **were.**
7  Q.  Okay.  So you don't know if it was a
8  personal injury lawsuit?
9  **A.  I don't know.**
10  Q.  Okay.  I've just got to ask.
11     Do you think it might have been something
12  that related to, like, a breach of contract issue?
13 **A.  I honestly don't know.**
14  Q.  Okay.  And it was about your prior
15  operations with Eastern Magnesium?
16 **A.  My experience during the period of time that**
17 **I was employed at Eastern Magnesia Talc Company.**
18  Q.  Okay.  And I realize it was 17 or 18 years
19  ago.
20     Was it essentially the same issue for either
21  both or all three of those cases?
22 **A.  My recollection is that it might be the**
23 **same, but I'd have to answer no.**
24     MR. WILLIAMS:  Don't speculate.  Tell him
25  what you remember.  Don't speculate.  If you don't

Page 142

1  know, you don't know.
2      BY MR. HAMES:  Q.  You are not sure?
3  **A.  No, I'm not sure.**
4  Q.  Okay.  Did you keep a copy of your
5  deposition?
6  **A.  No.**
7  Q.  Okay.  Do you know which lawyers represented
8  you?  Which law firm or the attorney's name?
9  **A.  No.**
10     MR. WILLIAMS:  I think I'll object to that.
11  That assumes he was represented, and his company was
12  a party, and I don't --
13     BY MR. HAMES:  Q.  Well, did Windsor have
14  its own attorneys?
15 **A.  No.**
16  Q.  Okay.  Did you have an attorney represent
17  you at your deposition --
18 **A.  Yes.**
19  Q.  -- like you do today?
20 **A.  Yes.**
21  Q.  It wasn't Mr. Williams that was representing
22  you, was it?
23 **A.  No.**
24     MR. WILLIAMS:  I was still a baby back then.
25     MR. HAMES:  It was only 17 years ago.

Page 143

1      MR. WILLIAMS:  I was a child.
2      BY MR. HAMES:  Q.  All right.  Do you know
3  the name of the law firm that represented you in any
4  of those?
5  **A.  I honestly have no recollection.**
6  Q.  Do you know where your deposition was taken?
7  **A.  One was in Boston, and one was in Rhode**
8  **Island.  I don't recall where the third one might**
9  **have been.**
10  Q.  Okay.  Was this a situation where you were
11  living in Boston and gave a deposition there --
12 **A.  No.**
13  Q.  -- or did you have to travel there?
14 **A.  I had to travel.**
15  Q.  Okay.  The same with Rhode Island?
16 **A.  Yes.**
17  Q.  And do you recall if you were testifying as
18  a party in the lawsuit?  In other words, you were
19  suing someone, or your company was suing someone, or
20  you were being sued, and you were the defendant?
21 **A.  I don't recall the details.**
22  Q.  Okay.  Do you remember what the results of
23  the lawsuits were?
24 **A.  I never knew.**
25  Q.  Okay.  So was your entire involvement in

Page 144

36 (Pages 141 to 144)

ROGER MILLER - PLT's - January 16, 2007

1   these cases just to go and give a deposition, just
2   kind of like you are doing today?
3   **A. Yes.**
4   Q. And was it just a one-day thing?
5   **A. Yes.**
6   Q. And then did you ever go testify in trial?
7   **A. No.**
8   Q. Have you ever testified in trial in your
9   lifetime?
10  **A. No.**
11  Q. Do you know where those cases themselves
12  were actually filed?  Which county or which state?
13  **A. I don't know.**
14  Q. Okay. Did any of your former employers do
15  any testing on any of its own employees for, you
16  know, any medical testing or examinations of any
17  kind?
18      MR. WILLIAMS: Can you be a little more
19  specific?  I assume you don't mean routine, like,
20  physicals, or maybe you do.
21      MR. HAMES: Well, yeah.  Anything like that.
22  I mean, we can get more specific as we go along,
23  but --
24      THE WITNESS: We had pre-employment physical
25  examinations.

                                    Page 145

1      BY MR. HAMES: Q. Okay.
2   **A. And we had annual physical examinations.**
3   **This is Windsor Minerals, Western Source.**
4   Q. Okay.
5   **A. And in the State of Vermont, there was**
6   **routine about every third year to examine workers in**
7   **the dusty trades.**
8   Q. Okay.  And let's talk a little bit about
9   that.
10      Was that only in the State of Vermont where
11  they did that every three years or so.
12  **A. To my knowledge.**
13  Q. Okay.  The pre-employment physicals, do you
14  know if those involved anything to do with breathing
15  or lung function or pulmonary exam, something like
16  that, chest X-rays?
17  **A. I don't remember the details of the**
18  **examination.**
19  Q. Did you have to go through one of them
20  yourself?
21  **A. Yes.**
22  Q. Okay.  Do you remember if you had an X-ray
23  of your chest?
24  **A. We had a chest X-ray, but I believe it was**
25  **part of the Vermont state examination program.**

                                    Page 146

1   Q. Okay.  So then was it only -- it's only in
2   Vermont where they had these examinations, like,
3   approximately every three years?
4   **A. The only ones I'm familiar with, yes.**
5   Q. Okay.  And what was required in that
6   examination, if you remember?
7   **A. They did -- I believe they did --**
8       MR. WILLIAMS: Don't guess.  If you know,
9   tell him your best recollection.
10      THE WITNESS: I don't know the details.  I
11  know there was an X-ray.  I believe there was a
12  pulmonary function evaluation.
13      BY MR. HAMES: Q. Okay.  So the X-ray was
14  of the chest?
15  **A. Yes.**
16  Q. And they were looking at the people that
17  were working, you said, in the dusty trades?
18  **A. Yes.**
19  Q. And for Windsor, which employees would those
20  be?
21  **A. All of the mine, mill, and office personnel.**
22  Q. Okay.  Who would be excluded from that?
23  **A. No one.**
24  Q. Okay.  So basically all the employees of
25  Windsor were tested?

                                    Page 147

1   **A. Yes.**
2   Q. All right.  And did you ever learn what the
3   results of the tests were for any of the employees?
4   **A. No.  In conversation perhaps, but they were**
5   **confidential to the employee.**
6   Q. Okay.  Did you guys have a human resources
7   department at Windsor?
8   **A. Personnel department, yes.**
9   Q. Personnel department?
10  **A. Yes.**
11  Q. Do you remember the names of any of the
12  people that were working in the personnel department?
13  **A. No, not really.**
14  Q. Okay.  The personnel department, were they
15  informed of the results, if you know?
16  **A. No.**
17  Q. Okay.
18  **A. These were confidential examinations.**
19  Q. Just with the doctor and just with the
20  worker?
21  **A. Yes.**
22  Q. And let me ask you, over time, were some
23  precautions taken by Windsor to protect its workers
24  from dust?
25  **A. Yes.**

                                    Page 148

37 (Pages 145 to 148)

1  Q.  What was the reason for that?
2  A.  We wanted to be able to be certain that our
3  employees are not exposed in excess of the standards
4  that apply.
5  Q.  Exposed to what?
6  A.  The particulate material.
7  Q.  Okay.  Was it just the talc that you were
8  concerned about, or was there anything else?
9  A.  All of the particulate material.
10  Q.  Okay.  Was there any concern ever about
11  workers being exposed to asbestos that you are aware
12  of --
13  A.  Not that I'm aware of.
14  Q.  -- other than the testing that we talked
15  about, of course.
16     What steps were taken?
17  A.  We initially sampled the different areas of
18  work in the mine and in the mill with fixed, in-place
19  samplers.  And we studied the results of that, we
20  became aware that the human exposures were very
21  different than any exposures on the fixed sites.  So
22  we bought a whole series of little samplers that were
23  clamped on to the employees' clothing which breathed
24  the same air that he breathed, and we did this as a
25  routine matter for many, many years.

Page 149

1  Q.  Okay.  And were any recommendations
2  implemented, or was there anything that came out as a
3  result of those tests?
4  A.  From the results of these evaluations, we
5  would adjust the working environment to protect the
6  employee.
7  Q.  Okay.  And who actually conducted the
8  testing?
9  A.  We did.
10  Q.  You mean Windsor?
11  A.  Windsor.
12  Q.  Did they hire someone, like an industrial
13  hygienist, or --
14  A.  We had an industrial hygienist that did the
15  evaluations and made the recommendations.
16  Q.  Was it just one industrial hygienist?
17  A.  Yes.
18  Q.  Okay.  Do you know who that was?
19  A.  I don't remember the name.  It was a girl
20  from New Zealand, and she went home.
21  Q.  Okay.  How long was this girl from New
22  Zealand employed by Windsor?
23  A.  I believe eight years.
24  Q.  And when did she start?
25  A.  1972, perhaps.

Page 150

1  Q.  Okay.  Had they ever employed an industrial
2  hygienist before that?
3  A.  Not to my knowledge.
4  Q.  Okay.  And did they have employ an
5  industrial hygienist after she left and went home
6  back to New Zealand?
7  A.  I believe the duties were assigned to
8  someone else, but I don't know who.
9  Q.  Okay.  What's your basis for believing that
10  they were assigned to someone else?
11  A.  Because we continued to get reports on the
12  environment in which the employees worked.
13  Q.  So because you got the report, you
14  assumed someone was doing the work?
15  A.  Yes.
16  Q.  Do you know if it was in-house, or someone
17  else was doing it outside Windsor?
18  A.  It was done in-house.
19  Q.  Okay.  Was her position -- this woman from
20  New Zealand, was she a full-time employee?
21  A.  Yes.
22  Q.  Okay.  Do you know if any sampling was done
23  by her for the presence of asbestos?
24  A.  No, I don't know.
25  Q.  Okay.  Do you know if any of the employees

Page 151

1  had ever come back with any asbestos-related
2  illness --
3  A.  No.
4  Q.  -- from the examinations that they had?
5  A.  No.
6  Q.  No, you don't know, or --
7  A.  I don't know, but I have no recollection of
8  it.
9  Q.  Okay.  If a government or agency came in and
10  tested or wanted to test one of the mines owned by
11  Windsor, would that be something that you would know
12  about?
13  A.  Yes.
14  Q.  That would be your position as president?
15  A.  Yes.
16  Q.  And you don't recall that ever happening?
17  A.  No.  Well, wait a minute.  The Mine Safety
18  and Health Administration conducted testing in the
19  mines and in the mills for us to meet the established
20  standards that they had established for a mining
21  environment and a mill environment.
22  Q.  Okay.  Did that include the presence of any
23  carcinogens?
24  A.  I don't know.
25  Q.  So outside inspectors from this governmental

Page 152

38 (Pages 149 to 152)

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - Plffs - January 16, 2007

1  agency came and inspected the mines?
2  **A. M-hm, sampled them.**
3  Q.  They sampled them?  They took air samples?
4  **A. I believe so.**
5  Q.  Were you ever informed of the results of
6  those samples?
7  **A. I believe I was, yes.**
8  Q.  Okay.  And did you maintain those within the
9  company?
10 **A. I would certainly think so, but I don't know**
11 **for a fact.**
12 Q.  Do you recall if there was ever any mention
13 of asbestos being present in any of the mines?
14 **A. I don't remember that there ever was.**
15 Q.  Windsor or Western Source, were they ever
16 cited by this governmental agency for any violations
17 at all of any kind?
18 **A. The examination by the mining authorities**
19 **included ground support.  It included lighting.  It**
20 **included the condition of the walkways, and so we**
21 **would receive citations on those kinds of matters.**
22 Q.  Okay.  Just basic safety things?
23 **A. Basic safety things.**
24 Q.  But with respect to asbestos --
25 **A. No.**

Page 153

1  plants?
2    MR. WILLIAMS:  It's different mills is what
3  he is talking about.
4    MR. WILLIAMS:  Yeah, different mills --
5    MR. WILLIAMS:  Did they come out of all of
6  them or just one or two?
7    THE WITNESS:  They came out of the later
8  mills, out of the Ludlow mill and the West Windsor
9  mill.
10   MR. HAMES:  Okay.
11   THE WITNESS:  Gassetts was never equipped to
12 handle those bags.
13   BY MR. HAMES:  Q.  And do you know who the
14 customers were who were purchasing the one-ton sacks?
15 **A. I don't.**
16 Q.  Who was purchasing the bulk material?
17 **A. The more substantial customers in the**
18 **roofing industry were acquiring the bulk material,**
19 **and the cosmetic material was shipped in both to the**
20 **receiving locations.**
21 Q.  Okay.  And was that something Windsor did?
22 Did they do the shipping, or did the customers pick
23 it up?
24 **A. We delivered it to the railroad.  The**
25 **customer paid the freight.**

Page 155

1  Q.  -- you are not aware of them ever citing you
2  or warning Windsor of any violations?
3  **A. That's correct.**
4  Q.  Okay.  You are not even aware if they were
5  testing for the presence of asbestos, right?
6  **A. I honestly cannot be sure.**
7  Q.  Okay.  You also mentioned that some of these
8  plants, the manufacturing plants, had one-ton sacks?
9  **A. Yes.**
10 Q.  Was that actually a bag of some kind, some
11 kind of container?
12 **A. It was a polypropylene fabric sack about**
13 **four feet by four feet by four feet that contained a**
14 **ton of talc and had a discharge port on the bottom**
15 **and a filler port on top.**
16 Q.  Okay.  And was anything written on those?
17 **A. I don't recall.**
18 Q.  What color were the sacks?
19 **A. White.**
20 Q.  All right.  And you don't recall if there
21 was any -- were there any logos, writings, anything
22 saying the grade or the --
23 **A. I don't recall.**
24 Q.  Okay.  And those were produced by a few
25 different plants, right?  Two different manufacturing

Page 154

1  Q.  Okay.  Which railroad companies did Windsor
2  use?
3  **A. The Green Mountain Railroad, the Delaware**
4  **and Hudson Railroad, the Boston and Maine railroad**
5  **and connecting lines.**
6  Q.  Okay.  And it was delivered in bulk to the
7  railroad, right?
8  **A. M-hm, yes, loaded in cars.**
9  Q.  How was it loaded?
10 **A. Top loaded through orifices in the roof of**
11 **the car.**
12 Q.  Okay.  So they had some kind of silo of some
13 kind where the talc was kept?
14 **A. We had.**
15 Q.  You did?
16 **A. We did --**
17 Q.  Windsor did?
18 **A. -- and we transferred from the silo to the**
19 **rail car, and the customer transferred from the rail**
20 **car to their silo.**
21 Q.  Right.  Okay.  Were you aware of Cyprus
22 owning a talc mine in Warm Springs Canyon in
23 California?
24 **A. No.**
25 Q.  Were you aware of them having any talc mines

Page 156

39 (Pages 153 to 156)

ROGER MILLER - Plf's - January 16, 2007

| | |
|---|---|
| 1    in Death Valley? | 1    Q.   Okay.   What about for Luzenac?   Do you know |
| 2    **A.   No.** | 2    how they packaged any of their talc? |
| 3    Q.   Were you aware of Cyprus -- hold on a | 3    **A.   I saw their packaging operation in France,** |
| 4    second. | 4    **and it was virtually identical with what we had used** |
| 5         Were you aware that any of Cyprus's mines | 5    **in the United States.** |
| 6    were reported to be contaminated with tremolite? | 6    Q.   Okay.   Do you know if there were any |
| 7    **A.   I was unaware of that.** | 7    identifying logos or markings or writing on any of |
| 8    Q.   Okay.   All right.   So the only mine that you | 8    the Luzenac talc? |
| 9    are aware of Cyprus having was the one in Three | 9    **A.   I have no idea.** |
| 10   Forks, right? | 10   Q.   Okay.   What about the end product? |
| 11   **A.   Near Three Forks, yes.** | 11   **A.   I have no idea.** |
| 12   Q.   Okay.   Do you know -- I don't think I asked | 12   Q.   And the same with respect to Cyprus?   You |
| 13   you this. | 13   don't know? |
| 14        Do you know if Cyprus was doing any sampling | 14   **A.   I don't know.** |
| 15   of the ore, like Windsor was doing, for the Three | 15   Q.   Okay.   Do you know if Cyprus ever sold any |
| 16   Forks mine? | 16   of its talc to the rubber industry? |
| 17   **A.   I have no knowledge of that at all.** | 17   **A.   I have no knowledge of that.** |
| 18   Q.   Okay.   You never heard anything about that? | 18   Q.   Specifically -- so do you know if they sold |
| 19   **A.   No.** | 19   any of their talc to the Goodyear Tire and Rubber |
| 20   Q.   Okay.   What about the end product? | 20   Company? |
| 21   **A.   I have no knowledge of what their sampling** | 21   **A.   I have no knowledge at all.** |
| 22   **was.** | 22   Q.   The same with respect to Luzenac? |
| 23   Q.   Okay.   So just generally, with respect to | 23   **A.   That's true.** |
| 24   that mine, do you know if they ever did any | 24   Q.   You don't know if they sold any of their |
| 25   testing -- if Cyprus ever did any testing for that | 25   talc to Goodyear Tire and Rubber Company? |
| Page 157 | Page 159 |

| | |
|---|---|
| 1    mine to see if there was any asbestos present? | 1    **A.   I don't know.** |
| 2    **A.   I have no knowledge of that.** | 2         MR. HAMES:   I'm almost done. |
| 3    Q.   Okay.   So if we had evidence or information | 3    Q.   Have you ever heard of an individual named |
| 4    that the mines that Cyprus owned in Death Valley were | 4    Arthur Langer? |
| 5    contaminated with tremolite, do you have any | 5    **A.   I believe I heard of him early, early on, a** |
| 6    information at all to contradict that? | 6    **long time ago.   I'm not sure of that.   I may have.** |
| 7         MS. WOODSON:   Objection; calls for | 7    Q.   Have you ever heard that Arthur Langer did |
| 8    speculation.   It's been asked and answered. | 8    some consulting work for Cyprus? |
| 9         THE WITNESS:   I have no information | 9    **A.   No.** |
| 10   whatsoever. | 10   Q.   All right.   Do you know of anyone that did |
| 11        BY MR. HAMES:   Q.   Okay.   And the same with | 11   any consulting work for Cyprus pertaining to whether |
| 12   respect to the mine that's in Three Forks, Montana? | 12   or not any of their talc had asbestos contamination |
| 13   **A.   That's right.** | 13   in it? |
| 14   Q.   Okay.   Are you aware of -- you never worked | 14   **A.   I have no knowledge of that.** |
| 15   for Luzenac, right? | 15   Q.   Okay.   The same with Luzenac? |
| 16   **A.   No.** | 16   **A.   The same with Luzenac.** |
| 17   Q.   So are you aware of Luzenac ever being sued | 17   Q.   All right.   And the same with respect to |
| 18   for claims of asbestos exposure either by workers' | 18   Eastern Magnesium?   Are you aware of anyone doing any |
| 19   comp cases or personal injury cases? | 19   consulting work for them to determine whether or not |
| 20   **A.   I have no knowledge at all.** | 20   there was any asbestos in their talc other than the |
| 21   Q.   Okay.   Do you know how Cyprus's talc was | 21   company that we talked about? |
| 22   packaged? | 22   **A.   I'm unaware of any.** |
| 23   **A.   Cyprus where?   In Montana?** | 23        MR. HAMES:   Okay.   I think that we are |
| 24   Q.   Anywhere. | 24   almost done.   Why don't we take a break.   We've been |
| 25   **A.   I have no knowledge of that.** | 25   going almost an hour, like 50 minutes.   So why don't |
| Page 158 | Page 160 |

40 (Pages 157 to 160)

ROGER MILLER - Plf's - January 16, 2007

1 we take a few minutes and let me look at my notes and
2 see if I missed anything.
3     MR. WILLIAMS: Just one quick thing, in the
4 last couple of questions you've been saying Eastern
5 Magnesium. It's actually Eastern Magnesia.
6     MR. HAMES: Okay. Sorry.
7     MR. WILLIAMS: I don't think it's a big
8 deal, but just so we are clear.
9     BY MR. HAMES: Q. Okay. That's your
10 understanding, right, when I was asking you those
11 questions?
12 **A. I understood what you were talking about.**
13     MR. HAMES: Okay. Good. Thank you for
14 clearing that up. Okay. Why don't you take a break.
15     THE VIDEOGRAPHER: Going off the record.
16 The time is 2:21 p.m.
17     (Recess.)
18     THE VIDEOGRAPHER: And we are back on the
19 record. The time is 2:36 p.m.
20     You may proceed.
21     BY MR. HAMES: Q. Okay. Mr. Miller, I just
22 have a couple more questions for you, and then we'll
23 be done. Okay?
24     Is it your understanding that the Eastern
25 Magnesia Talc Company was essentially purchased by

Page 161

1 **A. The Johnson mine and mill and an abandoned**
2 **mining property of Waterbury, Vermont.**
3 Q. Okay. And that's what Engelhard purchased
4 in about 1968 --
5 **A. Right.**
6 Q. -- from Eastern Magnesia Talc Company,
7 right?
8 **A. Right, including the name.**
9 Q. Okay. And they purchased the name Eastern
10 Magnesia Talc Company?
11 **A. Yes.**
12 Q. Okay. And then so what happened with the
13 remaining assets that were not purchased by
14 Engelhard?
15 **A. The new company Windsor Minerals was formed**
16 **and took all of those southern assets.**
17 Q. Okay. And then Windsor Minerals created
18 West -- a subsidiary was created, Western Source,
19 right?
20 **A. Some years later.**
21 Q. Do you know when that was?
22     MR. WILLIAMS: I think he said that earlier.
23     BY MR. HAMES: Q. Around 1979 or so?
24 **A. I believe, but I'm not sure.**
25 Q. Okay. Then just to finish the cycle with

Page 163

1 the Engelhard Corporation?
2 **A. The northern operations of the Eastern**
3 **Magnesia Talc Company, its name, all of its rights,**
4 **north of the Winooski River was purchased by the**
5 **Engelhard Minerals.**
6     THE COURT REPORTER: What river?
7     THE WITNESS: Winooski River.
8     MR. KOSS: What is the name?
9     THE WITNESS: Winooski.
10     BY MR. HAMES: Q. Where is that?
11 **A. It cuts Vermont in half --**
12 Q. Okay.
13 **A. -- between north and south.**
14 Q. Okay. So what was left that was not sold to
15 Engelhard?
16 **A. The Hammondsville mine, the West Windsor**
17 **mill, the Gassetts mill, and certain properties that**
18 **Eastern had purchased years ago in Southern Vermont.**
19 Q. Okay. And what was included in that
20 purchase then?
21 **A. The Hammondsville mine --**
22 Q. No, no.
23     MR. WILLIAMS: The Johnson mine.
24     THE WITNESS: Oh, what was included?
25     BY MR. HAMES: Q. What was included?

Page 162

1 this, then Cyprus purchased it, Windsor and Western
2 Source, in about 1990?
3 **A. Yes.**
4 Q. And then Luzenac purchased it when?
5 **A. I don't know.**
6 Q. Okay. And then with the Eastern Magnesia
7 Talc Company, in about 1968, they purchased the
8 assets that you described, right?
9 **A. Yes.**
10     MR. HAMES: What? Did I misquote him?
11     MR. WILLIAMS: Yeah. I mean --
12     THE WITNESS: Say it again.
13     BY MR. HAMES: Q. In about 1968, Engelhard
14 purchases --
15     MR. WILLIAMS: Oh, Engelhard is right. You
16 said Eastern Magnesia.
17     MR. HAMES: I'm sorry.
18     MR. WILLIAMS: Yes.
19     BY MR. HAMES: Q. In about 1968, Engelhard
20 purchased part of the assets of Eastern Magnesia Talc
21 Company but including the name?
22 **A. Yes.**
23 Q. Okay. And did they continue to do business
24 under that name?
25 **A. I believe that they did.**

Page 164

41 (Pages 161 to 164)

ROGER MILLER - Pltf's - January 16, 2007

1    Q.  Okay.  Did they also do business under
2    Engelhard?
3    **A.  I don't believe so.**
4    Q.  Okay.  Do you know whatever happened to the
5    Eastern Magnesia Talc Company?
6    **A.  It continued to operate for a number of**
7    **years and was subsequently sold, I believe, to**
8    **Vermont Talc Company, but I can't be sure.**
9    Q.  Okay.  Do you know whatever happened to the
10   Engelhard Company?
11   **A.  No.**
12   Q.  Do you know if Johnson & Johnson ever
13   purchased any assets of the Eastern Magnesia Talc
14   Company?
15   **A.  No.**
16   Q.  Okay.  Do you know if Johnson & Johnson
17   ever -- you mean no, they didn't, or no, you don't
18   know?
19   **A.  No, they did not, to my knowledge.**
20   Q.  Do you know if Johnson & Johnson ever
21   purchased any of the assets of the Engelhard Company?
22   **A.  I don't know.**
23   Q.  Okay.  So do you have any information about
24   what Johnson & Johnson's role is with respect to
25   talc?  In other words, are they just a customer of

Page 165

1    these talc companies, and they just buy the talc for
2    their product?  Is that your understanding?
3    **A.  Right.  That's my understanding.**
4    Q.  They never actually purchased a talc company
5    and mining company or manufacturing company, as far
6    as you know?
7    **A.  Well, they purchased Eastern Magnesia Talc**
8    **Company.**
9    Q.  Okay.  That's what I thought.
10        So Johnson & Johnson purchased Eastern
11   Magnesia Talc Company?
12   **A.  Right.**
13   Q.  When did that happen?
14   **A.  1964 -- '64 or '65.**
15   Q.  Okay.  And so how was it then Engelhard was
16   able to purchase the Eastern Magnesia Company in
17   1968?
18        MS. WOODSON:  I'm going to object.  It goes
19   beyond the scope of the witness's knowledge.
20        BY MR. HAMES:  Q.  If you know.
21   **A.  Say that again.**
22   Q.  We have the Eastern Magnesia Talc Company
23   being purchased by Johnson & Johnson in approximately
24   1964, correct?
25   **A.  Right.**

Page 166

1    Q.  Okay.  So what was there for Engelhard to
2    purchase in 1968?
3    **A.  The northern operations --**
4    Q.  So the --
5    **A.  -- north of the Winooski River.**
6    Q.  So the southern operations, were those sold
7    to Johnson & Johnson?
8    **A.  They were owned by Johnson.**
9    Q.  They were already owned by Johnson?
10   **A.  They were owned by Johnson & Johnson by**
11   **virtue of having acquired Eastern Magnesia Talc**
12   **Company, and so we sold off the northern operations**
13   **to Engelhard.**
14   Q.  Okay.  And so really there was -- when you
15   started working for the Eastern Magnesia Talc
16   Company, you were working for the northern division,
17   or were you --
18   **A.  I worked for the whole organization.**
19   Q.  Were you an employee of Johnson & Johnson?
20   **A.  I was an employee of Eastern Magnesia Talc**
21   **Company.**
22   Q.  Okay.  A subsidiary of Johnson & Johnson?
23   **A.  Yes.**
24   Q.  Okay.  Were you aware of Johnson & Johnson
25   owning any other talc mine operations?

Page 167

1    **A.  I was aware that they did not.**
2    Q.  Okay.  And that was the whole reason why
3    they purchased that southern portion of the Eastern
4    Magnesia Talc Company?
5    **A.  Right.**
6        MS. WOODSON:  Objection; calls for
7    speculation, beyond the scope of the witness's
8    knowledge.
9        MR. HAMES:  All right.  I just wanted to
10   make sure I got all that straight.  Now I have just
11   one document here that's been produced in this case.
12   I just want to hand it to you -- I'll read what it
13   is.  It's a verification of Luzenac Western Source
14   Corporation's Inc.'s supplemental response to
15   plaintiff's special interrogatories, and it's in this
16   case.
17   Q.  If you can take look at that, please.  We
18   will go ahead and mark that.
19        What were you using?  Numbers?
20        MR. WILLIAMS:  Yeah.  That will be 4.
21        MR. HAMES:  Okay.  Why don't we call it --
22        MR. WILLIAMS:  Why don't we just call it 1,
23   2, 3, 4.
24        MR. HAMES:  We'll do Plaintiff's A.  Okay.
25   Just so we can to separate it out.

Page 168

42 (Pages 165 to 168)

1    THE WITNESS:  All right.
2    (Plaintiff's Exhibit A marked.)
3    BY MR. HAMES: Q.  Okay.  Is that your
4  signature at the bottom of that page?
5  **A.  Yes.**
6  Q.  Okay.  And on that verification page, is
7  there anything in there that you believe is
8  incorrect?
9  **A.  From reading it, no.**
10    MR. HAMES:  Okay.  All right.  That's all I
11  wanted to ask you.  I think that those are all my
12  questions at this time.  The only thing that we'd
13  want is we would request, you know, the documents
14  that we talked about that you guys might have that
15  he's looked at, that he looked at in preparation for
16  his deposition.  And if we need to meet and confer on
17  that, we can do that.  And if we need to further
18  depose him, we'll do that, and I reserve my rights to
19  do that.
20    MR. WILLIAMS:  Okay.
21    MR. HAMES:  I don't know if we will need to
22  or not.
23    MR. WILLIAMS:  I mean, I'm not agreeing to
24  it.  He is not a party.  We are not a party.
25    MR. HAMES:  Right.

Page 169

1    MR. WILLIAMS:  So whatever -- I mean, I
2  don't know the California practice.  You guys can
3  work that out.
4    MR. HAMES:  Yeah.
5    MR. WILLIAMS:  I understand your position.
6    MR. HAMES:  Okay.  Do you guys have anything
7  for the record?  Do you have any questions or
8  anything at all?  All right.
9    Thanks, Mr. Miller.
10    THE WITNESS:  Thank you.
11    MR. HAMES:  Let's go off the record.
12    THE VIDEOGRAPHER:  This is the end of the
13  deposition of Roger Miller.  The total number of
14  tapes are three.  All original videotapes are
15  retained at Tooker & Antz, 350 Sansome Street, Suite
16  700, San Francisco, California 94104.  (415)
17  392-0650.  We are now going off the record.  The time
18  is 2:45 p.m.
19    (Time noted:  2:45 p.m.)

Page 170

CERTIFICATE OF DEPOSITION OFFICER
I, JOANNE BALBONI, CSR No. 10206, duly
authorized to administer oaths pursuant to Section
2093(b) of the California Code of Civil Procedure,
hereby certify that at the commencement of the
foregoing deposition, the witness stated he or she
would testify the truth, the whole truth, and nothing
but the truth in the within-entitled cause; that said
deposition was taken at the time and place therein
stated; that the testimony of said witness was
reported by me and was thereafter transcribed under
my direction into typewriting by computer; that the
foregoing is a full, complete and true record of such
testimony; and that the witness was given an
opportunity to read and correct said deposition, and
to subscribe the same.
    I FURTHER CERTIFY that I am not of counsel
or attorney for either or any of the parties in the
foregoing deposition and caption named, nor in any
way interested in the outcome of the cause named in
said caption.
                    _Joanne Balboni_
                    DEPOSITION OFFICER
I hereby certify this copy is
a true and exact copy of the original
_____
DEPOSITION OFFICER

Page 171

Mr. Roger Miller
C/O Roberta Woodson, Esq.
McKenna Long & Aldridge
101 California Street, 41st Floor
San Francisco, California 94111
Re:  Consuelo Lopez vs. ACandS, Inc., et al.
 Superior Court of the State of California,
 County of San Francisco
Dear Mr. Miller:
Your deposition taken in the above-entitled matter
has been transcribed.  This deposition will be
available at our offices for reading and signing by
you for a period of thirty (30) days from the date of
this letter, after which time the original of your
deposition will be sealed and sent to the office
which noticed the deposition, in accordance with
Section 2025(q)(1) of the California Code of Civil
Procedure.
Sincerely,
Tooker & Antz
cc:  All Counsel

Page 1

43 (Pages 169 to 1)

ROGER MILLER - PLF'S - January 16, 2007

Page 1

---

**A**

**a.m (4)** 3:3 7:10 53:5,9
**abandon (1)** 122:23
**abandoned (1)** 11:23 12:21 96:4 163:1
**able (14)** 37:11 48:16 51:21 52:6,15 70:7 72:9,11 83:22 84:5 89:10 119:11 149:2 166:16
**above-entitled (1)** 1:10
**absence (1)** 71:16
**absolute (1)** 30:1
**absolutely (5)** 16:8 98:14 125:17 132:6 142:1
**ACandS (2)** 1:9,6
**accidents (1)** 52:14
**accumulate (2)** 80:10,25
**accumulated (1)** 79:6
**achieved (1)** 11:17
**acquire (2)** 121:18,20
**acquired (9)** 13:13 25:18,20 25:21 93:10 110:25 121:20 126:1 167:11
**acquiring (2)** 11:9 155:18
**acquisitions (1)** 35:21
**activities (1)** 128:3
**actual (3)** 35:5 110:15 114:11
**acutely (2)** 70:17,19
**Adam (2)** 6:20 8:23
**adjust (1)** 150:5
**adjustable (1)** 29:22
**administer (2)** 3:6 171:2
**Administration (1)** 152:18
**affirm (1)** 109:8
**affirmatively (1)** 82:4
**afford (1)** 111:3
**agency (5)** 78:14 132:13 152:9 153:1,16
**agent (1)** 47:6
**ago (12)** 7:5 10:2 35:23 37:21 38:1 48:19 82:2 111:23 142:19 143:25 160:6 162:18
**agreeing (1)** 169:23
**agreement (1)** 76:17
**ahead (9)** 7:23 28:25 33:9,11 33:12 88:21 111:3,5 168:18
**aid (1)** 67:19
**air (3)** 42:6 149:24 153:3
**airplane (1)** 108:13
**al (4)** 1:4,6,9,6
**Aldridge (2)** 4:4 1:3
**alert (3)** 69:12 70:11 71:3
**alerts (1)** 68:19
**alive (5)** 36:21 81:24 115:17 120:14,19
**allegations (7)** 36:2 52:1,2,4 53:15 56:21 142:5
**alleged (1)** 50:21
**alleging (1)** 138:19
**allowed (1)** 24:3
**ambiguous (4)** 15:7 28:23 46:4 121:12
**Ana (2)** 5:13 8:17
**Andreas (5)** 112:1,3,17 113:14 120:10
**Angeles (1)** 114:15

**Anne (2)** 4:20 8:15
**annual (1)** 146:2
**annually (1)** 33:7
**answer (8)** 15:8 17:22 28:25 68:24 114:17 130:15 141:9 142:23
**answered (5)** 37:2 44:18 56:17 58:5 158:8
**anticipated (1)** 68:21
**Antz (3)** 1:23 170:15 1:20
**anybody (1)** 21:25
**anyone's (1)** 37:20
**apologize (3)** 10:5 69:8 92:5
**appearance (1)** 60:7
**appearances (2)** 7:19 9:8
**appeared (18)** 3:8,18,23 4:6 4:11,16,21 5:5,9,14,18,23 6:6,11,16,17,20,24
**application (1)** 141:23
**applications (2)** 29:8 39:22
**applied (4)** 39:15 79:21 97:9 98:23
**apply (2)** 46:17 149:4
**approved (1)** 99:12
**approximately (9)** 15:10 24:6 25:2 103:2 105:9 106:15 130:18 147:3 166:23
**area (5)** 34:6 96:10 134:18 138:1,14
**areas (4)** 133:21 134:14 136:13 149:17
**Argonaut (8)** 86:1 87:3 102:5 102:6,24 103:10,13 104:7
**arm's (1)** 72:1
**Armstrong (2)** 4:8 8:19
**Arnold (2)** 5:16 9:1
**arrive (1)** 49:8
**Arthur (2)** 160:4,7
**asbestos (70)** 10:25 12:24 14:25 15:5 17:3 19:13,13 28:21 31:7,16 33:25 34:7 34:12 36:3,8 41:13 43:5 44:1 53:16,22 66:13,25 67:3,5,24 68:7,12,12,15 69:15 70:16 71:4,16 73:2 73:24 74:10,22 76:12,21 81:14 83:15,17 84:13,18 85:1 97:5 98:10 100:15 104:12,15 107:1 109:10,18 110:16,24 130:9 138:19,23 139:16,23 141:15 149:11 151:23 153:13,24 154:5 158:1,18 160:12,20
**asbestos-related (2)** 133:5 152:1
**ascertain (2)** 29:4 69:20
**asked (7)** 37:2 44:18 56:17 58:5 83:8 157:12 158:8
**asking (6)** 29:15 55:11 67:17 119:9 133:11 161:10
**aspect (1)** 20:9
**aspects (1)** 29:20
**assess (3)** 32:9 33:13 71:22
**assessment (1)** 71:24
**assets (8)** 14:23 123:1 163:13 163:16 164:8,20 165:13,21
**assigned (2)** 151:7,10
**associated (2)** 62:5 64:5
**Associates (2)** 4:8 8:19

**association (2)** 24:19 30:6
**assume (1)** 145:19
**assumed (1)** 151:14
**assumes (1)** 143:11
**assured (1)** 74:24
**attempted (2)** 29:24 71:15
**attempting (1)** 12:5
**attended (1)** 10:12
**attorney (29)** 3:18,22 4:6,10 4:16,20 5:5,9,14,23 6:5,11 6:16,20,24 7:21 9:12 47:24 48:9,24,25 49:11,16,18 51:3 56:16 83:3 143:16 171:16
**attorney's (1)** 143:8
**attorney-client (1)** 49:15
**attorneys (2)** 117:13 143:14
**AUGUSTINE (1)** 1:6
**author (1)** 70:9
**authorities (1)** 153:18
**authorized (2)** 3:6 171:2
**auto (4)** 27:21 45:5 113:19 114:14
**automatic (1)** 101:17
**automobile (1)** 46:13
**available (5)** 39:9 71:15 77:15,17 1:12
**average (1)** 101:5
**avoid (1)** 30:16
**avoided (1)** 43:17
**aware (85)** 12:24 15:3 23:5 25:25 29:3 30:5,13,23 33:24 34:4 35:15,18 36:2,7 36:13,20,23 41:1,20 43:2,6 43:7 44:3 45:8 56:14 60:24 62:3 64:6 68:10,13,14 70:17,19 77:15 78:10,15 84:4,16,20,24 85:2 86:17 86:25 87:6 90:5,17 92:9,10 95:1,11 114:1 115:3,10 121:3 126:19 128:11,17,18 130:1 132:7,12,15,18 133:4,8,19 137:11 138:18 138:22 140:1 149:11,13,20 154:1,4 156:21,25 157:3,5 157:9 158:14,17 160:18 167:24 168:1

---

**B**

**B (4)** 2:6 72:1,11 78:24
**baby (2)** 42:9 143:24
**Bachelor (1)** 10:22
**back (23)** 7:9 12:4 13:5 16:19 17:23 53:9 58:16 61:16 68:24 79:14 80:24 90:10 110:12 114:18 117:1 118:23 119:5 130:14 141:9 143:24 151:6 152:1 161:18
**Bacon (1)** 3:20
**bag (14)** 59:3 61:21,23 79:5 89:10,14,15,16,18,20 110:10 112:24,25 154:10
**bags (44)** 58:13,20,21 59:9,11 59:19,24 60:2,7,9,23 61:12 61:17,19,21 62:1,2 64:8 79:6 88:7,24 89:1,10,21 90:5,7,15,18,21,23 91:9,11 91:15,16 92:1,7 94:16,18
**95:6 112:11,12 113:9,11 155:12
**balanced (2)** 46:15,16
**BALBONI (3)** 1:21 3:6 171:1
**bare (1)** 108:17
**barium (2)** 17:18 18:21
**based (2)** 50:20 121:14
**basic (2)** 153:22,23
**basically (6)** 42:23 45:7 51:13 122:18 135:14 147:24
**basis (5)** 55:21 78:9 79:13 126:5 151:9
**Bassi (1)** 8:10
**batches (1)** 29:13
**Batel (1)** 72:3
**bathtub (1)** 42:10
**Battery (1)** 4:19
**bear (6)** 86:1 87:3 99:14,15 99:16 100:17
**beat (1)** 37:25
**beautiful (1)** 96:3
**began (4)** 79:19 102:25 106:14 123:13
**beginning (2)** 80:16 119:3
**begun (1)** 126:2
**behalf (20)** 3:10,18,23 4:7,11 4:16,21 5:6,10,14,18,23 6:6,11,16,20,25 8:9,19 9:1
**believe (44)** 13:10 16:7 21:6 23:20 36:18 43:21 47:4 56:2 61:6,13 75:15 81:1 91:13 92:3 93:24 94:1,9 98:9 104:16 120:10,21 121:24 122:8,9 125:16,23 125:24 131:6 132:4 141:13 141:25 146:24 147:7,11 150:23 151:7 153:4,7 160:5 163:24 164:25 165:3 165:7 169:7
**believed (2)** 52:4 109:5
**believing (1)** 151:9
**benches (2)** 102:3 104:5
**beneficiated (1)** 88:6
**beneficiation (1)** 65:20
**Berg (1)** 114:12
**Berry (2)** 5:7,7
**best (4)** 71:14 77:14 87:11 147:9
**better (1)** 23:22
**beyond (2)** 166:19 168:7
**Biddle (3)** 3:4 4:13 9:9
**big (8)** 16:16 32:17,18 55:15 60:11 89:11 126:23 161:7
**biotite (2)** 40:21 41:9
**birth (1)** 10:9
**bit (8)** 31:23 32:2 41:11 53:13 72:13 87:22 122:15 146:8
**black (8)** 86:1 87:3 91:14,17 99:14,15,16 100:17
**blanket (1)** 82:20
**blast (2)** 33:21 104:2
**blend (1)** 29:21
**blends (1)** 63:5
**block (2)** 40:1,2
**blown (1)** 42:6
**blue (1)** 61:2
**Blum (1)** 8:11

**board (1)** 76:3
**bodies (9)** 14:5,7,25 15:4 20:10 31:10 34:24 94:12 97:9
**body (14)** 27:22 29:20,23 33:15,16 34:14 45:5 46:12 79:15,16,20 96:3 113:19 114:14
**border (4)** 11:23,24,25 12:7
**Boston (3)** 144:7,11 156:4
**bought (4)** 154:14 169:4
**bought (4)** 92:19 111:5,9 149:22
**boy (3)** 22:9 87:10 105:6
**brand (1)** 62:4
**brands (1)** 64:4
**Brauer (13)** 4:20 8:15,15 13:5 18:1 34:18 47:17 58:15,18 68:23 114:17 130:14 141:8
**breach (1)** 142:12
**break (12)** 53:1 69:6 88:20 107:7,11,14 118:18,19,21 133:23 160:24 161:14
**breathed (2)** 149:23,24
**breathing (1)** 146:14
**Briefly (1)** 121:23
**bring (3)** 33:11 79:4 117:20
**broad (2)** 11:12 20:12
**broader (1)** 66:16
**broke (1)** 53:13
**bromine (2)** 17:17 18:21
**brought (3)** 110:12 127:6 141:15
**brown (13)** 6:8,13 58:23,24 59:19 60:21 90:7 91:15,16 113:5,7,8,11
**Brunswick (1)** 6:23
**Brydon (2)** 5:3 8:8
**Buckman (9)** 15:14 16:2,4,4 16:11,15 17:13,13,14
**building (3)** 19:9,10 83:25
**built (2)** 17:18 111:25
**bulk (14)** 58:13 62:1 88:7,10 88:10,11,12,24 91:10 112:10,10 155:16,18 156:6
**Bush (1)** 6:4
**business (8)** 21:9 99:1 122:17 125:4,7 126:3 164:23 165:1
**Buty (2)** 6:18 8:23
**buy (3)** 98:4 111:3 166:1
**buying (1)** 115:13

---

**C**

**C (4)** 3:14 4:1 5:1 6:1
**C.P (1)** 8:6
**C/O (1)** 1:2
**CA (1)** 1:24
**Calaveras (3)** 86:19,21 107:17
**calcium (2)** 30:8,9
**California (61)** 1:1 3:5,7,17 4:4,5,9,15,19 5:4,8,13,17 5:22,24 6:5,10,15,19 8:2 15:15,18,20 16:6,11 86:15 87:5 107:6,23 108:13,15 109:22 112:3 120:11

122:18 123:25 125:15,17
125:19,22,25 126:2,3,7,12
126:17,17 127:9,10 129:1
133:24 134:4,9 156:23
170:2,16 171:2 1:4,5,7,17
**call (5)** 20:14 86:21 117:11
168:21,22
**called (6)** 3:10 39:5,12 79:8
95:25 139:25
**calls (5)** 34:8,16 47:17 158:7
168:6
**camp (1)** 12:21
**Canadian (2)** 11:24,25
**cancer (1)** 52:20
**canvas (2)** 110:6,10
**Canyon (1)** 156:22
**capable (1)** 75:2
**capacity (2)** 141:3,5
**caption (2)** 171:17,19
**car (3)** 156:11,19,20
**carbonate (7)** 30:7,8,9 40:19
42:23,24 43:25
**carcinogens (1)** 152:23
**care (2)** 118:7 133:25
**carefully (1)** 48:10
**Carolina (1)** 120:17
**cars (7)** 58:14,19 62:2 88:11
88:13 91:10 156:8
**case (11)** 7:13,15,18 9:19
57:15 83:24 117:13 139:21
140:19 168:11,16
**cases (10)** 133:9 138:23
140:17 141:16,25 142:21
145:1,11 158:19,19
**catch (1)** 81:22
**catching (1)** 79:2
**cause (5)** 52:5,7,22 171:6,18
**caused (2)** 52:18,21
**cc (1)** 1:21
**ceased (3)** 105:8 111:18,20
**cement (5)** 45:6 63:15 113:18
136:3,3
**certain (7)** 69:22 76:3,22
138:13 142:1 149:2 162:17
**certainly (1)** 153:10
**Certainty (1)** 114:13
**CERTIFICATE (1)** 171:1
**certify (3)** 171:3,15,22
**challenged (2)** 52:8,8
**Chanco (1)** 5:22 7:24,24
**change (3)** 24:10 30:20 64:25
**changed (2)** 24:7 95:2
**changes (2)** 20:11 25:9
**characteristic (1)** 42:10
**characteristics (2)** 71:22
109:15
**charged (1)** 82:15
**charges (1)** 135:8
**cheap (1)** 111:13
**chemical (5)** 17:8 68:16,17
69:11 70:3
**chemicals (6)** 4:12 8:20 18:11
24:14,16 106:7
**chest (4)** 146:16,23,24 147:14
**Chicago (4)** 72:8 81:13,16,20
**child (1)** 144:1
**chipping (1)** 110:15
**Chrysler (2)** 6:17 8:21
**chrysotile (1)** 104:17

**chunks (2)** 38:24,25
**circles (1)** 68:11
**circular (1)** 32:2
**citations (2)** 56:3 153:21
**cited (1)** 153:16
**citing (1)** 154:1
**Civil (3)** 3:8 171:2 1:17
**claiming (1)** 140:4
**claims (4)** 36:8 84:21,25
118:5
**clamped (1)** 149:23
**clarity (1)** 107:20
**Clark (2)** 5:19 9:2
**clean (4)** 17:17 101:15,20
110:2
**clear (13)** 15:21 22:23 28:7
33:23 36:6 44:15 61:3
73:15 84:23 97:13 98:14
102:21 161:8
**clearing (1)** 161:14
**clearly (2)** 58:3 77:13
**client (1)** 47:21
**clients (1)** 28:10
**Clifton (5)** 86:4 87:4 104:25
105:2,4
**close (1)** 16:22
**closed (1)** 89:12
**closer (1)** 24:18
**closure (1)** 89:11
**clothing (1)** 149:23
**Cloverdale (5)** 15:14,17,18
15:19 16:19
**clutch (2)** 83:23 84:8
**co-workers (2)** 37:5 117:4
**coal (1)** 123:20
**coarse (1)** 138:7
**coarseness (1)** 45:20
**Coast (5)** 113:16 123:10,13
134:5 135:9
**coating (1)** 45:1
**Code (3)** 3:8 171:2 1:17
**coding (1)** 59:6
**coincident (1)** 24:12
**college (1)** 11:21
**color (10)** 30:17,19,20 43:18
58:22 60:25 90:9 91:11
113:5 154:18
**Colorado (1)** 72:2
**colors (2)** 61:5,8
**Columbus (1)** 50:25
**come (17)** 19:12 22:8 29:21
30:19 34:7 41:12 48:16
64:21 68:22 77:2,3,4
101:13 119:11 121:18
152:1 155:5
**comes (3)** 9:24 88:24 117:16
**coming (4)** 12:13 38:23 62:5
86:2
**commencement (1)** 171:3
**commencing (1)** 3:3
**commentaries (1)** 70:18
**commentary (2)** 68:20 69:13
**committed (1)** 98:3
**common (1)** 30:6
**communicated (1)** 73:23
**comp (2)** 57:15 158:19
**companies (14)** 21:13 35:4
51:17,18 99:9 113:15,18
113:19 133:6,12 137:12

**139:11 156:1 166:1**
**company (88)** 4:22 6:7,12 8:4
8:7,16 9:2 11:23 12:6,7,15
13:4,13,24 14:9,23 15:11
23:18 24:7 25:2,17,20,21
37:6,15 39:17 47:15,22
51:20,21,22 54:4 59:10,22
60:2 61:20 63:15 78:8
82:25 87:8 89:10 92:11
97:18 106:8 108:7 114:11
115:12 116:4,10 121:14
122:5 123:1,8 126:6,8,23
127:12 141:7 142:17
143:11 144:19 153:9
159:20,25 160:21 161:25
162:3 163:6,10,15 164:7
164:21 165:5,8,10,14,21
166:4,5,5,8,11,16,22
167:12,16,21 168:4
**company's (3)** 60:3 61:11,16
**compensation (5)** 36:8 84:21
84:25 133:8 138:23
**competent (2)** 71:13 72:10
**competitor (2)** 125:4,6
**competitors (2)** 90:17,22
**complete (1)** 171:11
**completely (1)** 122:25
**composed (1)** 46:7
**composite (2)** 29:23 80:9
**compound (5)** 45:5 113:17
136:3,9,11
**compounds (5)** 18:20,21,21
18:22 80:10
**computer (1)** 171:10
**concern (5)** 15:4 68:11,13
70:20 149:10
**concerned (2)** 50:23 149:8
**concerning (1)** 51:12
**concerns (2)** 68:15,19
**concluding (1)** 52:17
**condition (1)** 153:20
**conduct (1)** 27:7
**conducted (3)** 80:7 150:7
152:18
**conduit (1)** 118:17
**cone (2)** 79:7,9
**confer (1)** 169:16
**confidential (2)** 148:5,18
**confused (2)** 77:22 135:10
**conjecture (1)** 126:5
**connecting (1)** 156:5
**connection (1)** 26:12
**consider (3)** 7:3 41:7 43:9
**considered (1)** 71:4
**considering (1)** 11:12
**consist (1)** 40:16
**consisted (1)** 31:9
**consists (1)** 40:18
**constructed (1)** 85:9
**construction (2)** 20:11 89:6
**Consuelo (4)** 1:4 4:17 7:13
1:6
**consulted (1)** 99:7
**consulting (3)** 160:8,11,19
**contained (1)** 154:13
**container (1)** 154:11
**containers (1)** 58:14
**contaminate (1)** 34:14
**contaminated (7)** 14:25 15:5

17:3 28:21 66:13 157:6
158:5
**contamination (3)** 12:25
67:24 160:12
**continue (9)** 26:18,21 65:10
71:20 75:24,25 76:7 94:10
164:23
**continued (8)** 4:2 5:2 6:2
65:1 98:15 101:8 151:11
165:6
**continuing (1)** 71:23
**continuous (3)** 78:23 101:17
104:4
**continuously (2)** 66:20 74:24
**contract (1)** 142:12
**contracted (1)** 140:5
**contradict (1)** 158:6
**control (5)** 17:15 18:11 46:18
65:2 66:17
**controlled (1)** 139:22
**controlling (1)** 138:16
**controversy (2)** 49:25 50:19
**conversation (2)** 74:11 148:4
**converted (2)** 103:6,18
**cooled (1)** 32:4
**cooperation (1)** 84:9
**copper (1)** 123:21
**copy (4)** 57:25 143:4 171:22
171:23
**Cordery (2)** 6:4 8:6
**core (7)** 31:12 32:12 33:18,25
34:13 98:2 100:20
**cores (1)** 79:17
**Corp (1)** 8:24
**corporate (2)** 64:24 118:2
**corporation (11)** 2:8 4:7 5:24
6:17,21 8:1,22 25:23 65:6
114:13 162:1
**Corporation's (1)** 168:14
**correct (12)** 27:2,15 28:12
38:5 71:6 73:20,21 87:4
123:6 154:3 166:24 171:13
**correspondence (5)** 62:7,11
62:12,13,15
**corresponding (1)** 62:9
**cosmetic (12)** 27:25,25 28:1,1
39:18,20,21 66:2,3 134:25
135:25 155:19
**cougar (8)** 60:5,9,22 61:1,2,4
61:22 92:16
**counsel (10)** 3:18,23 4:6,11
4:16,21 5:6 9:6 171:15
1:21
**country (2)** 72:10 108:21
**county (5)** 1:2 86:19 107:17
145:12 1:8
**couple (5)** 44:20 77:8 129:5
161:4,22
**course (3)** 77:16 99:8 149:15
**court (11)** 1:1,23 7:2,15,22
9:22 17:22 58:15 114:23
162:6 1:7
**cover (2)** 109:23,23
**covered (3)** 58:14,18 62:2
**CP (1)** 6:6
**craft (1)** 113:12
**created (2)** 163:17,18
**crew (1)** 54:8
**criteria (2)** 31:14 45:19

**crooked (1)** 15:19
**cross-section (1)** 79:16
**crushed (2)** 40:5,7
**crusher (3)** 38:25 39:1,1
**CSR (2)** 1:21 171:1
**Curliano (2)** 6:18 8:23
**current (5)** 55:24 115:18
140:25
**currently (1)** 140:24
**customer (8)** 29:10 59:12
62:18,19 90:14 155:25
156:19 165:25
**customer's (2)** 29:6 90:13
**customers (31)** 28:10 35:4
36:14,25 39:10,14,14 44:16
45:3 58:12 59:1,6,13,16
62:12,17 69:23 88:8 92:12
92:13 113:13,17,18,19,20
114:3,6 115:6,13 155:14
155:17,22
**cut (1)** 101:12
**cuts (1)** 162:11
**cutting (2)** 72:4 101:19
**cycle (1)** 163:25
**Cyprus (40)** 96:22 104:3
121:21,22 122:6,7,15,22,25
123:5,17 124:7,14 125:3
126:11,23 128:13 130:2,11
130:18 131:2,15 132:19
133:18 137:13,15 139:14
139:17 156:21 157:3,9,14
157:25 158:4,23 159:12,15
160:8,11 164:1
**Cyprus's (3)** 129:3 157:5
158:21

**D**

**D (1)** 2:1
**daily (1)** 80:9
**Daimler (2)** 6:17 8:21
**Dana (2)** 6:5 8:5
**Daniels (2)** 5:19 9:2
**dark (4)** 30:19 43:18 113:7,8
**dark-colored (1)** 30:15
**date (7)** 10:9 102:15,15,16,17
102:22 1:13
**dates (3)** 13:10 102:13,19
**day (2)** 78:21 96:2
**day-to-day (3)** 14:16 16:9
20:6
**days (2)** 78:21 1:13
**dead (4)** 115:18 117:3,10,17
**deal (2)** 55:15 161:8
**dealing (1)** 99:8
**dealings (6)** 26:15 27:14
125:4 127:21
**Dear (1)** 1:9
**death (6)** 7:14 52:5,7,22
157:1 158:4
**deaths (1)** 52:12
**Deceased (1)** 1:6
**decided (2)** 73:13 106:1
**decision (3)** 67:23 68:6,9
**defendant (1)** 144:20
**Defendants (1)** 1:10
**degree (7)** 10:21 11:17 29:22
44:24,25 45:1 90:21
**degrees (1)** 40:8

ROGER MILLER - PLF'S - January 16, 2007

Delaware (1) 156:3
deleterious (1) 66:24
delivered (2) 155:24 156:6
demonstrate (4) 52:7 67:2,5 83:22
dentists (1) 12:8
department (7) 36:17 118:8 148:7,8,9,12,14
depending (1) 39:3
depose (1) 169:18
deposed (1) 7:5
deposition (33) 1:15 2:2 3:2 7:4,13,20 10:1 37:10 47:25 53:4,8 58:1 118:25 119:4 140:8 143:5,17 144:6,11 145:1 169:16 170:13 171:1 171:4,7,13,17,21,25 1:10 1:11,15,16
depositions (2) 140:15 141:16
deposits (1) 104:24
describe (12) 11:5 31:25 38:21 42:3 44:19 46:1 50:18 59:4 62:9 100:14 103:20 109:20
described (8) 41:25 89:4 94:21 97:15 100:18 101:8 112:13 164:8
describing (1) 45:21
design (1) 13:22
detail (2) 31:25 42:4
details (4) 53:19 144:21 146:17 147:10
determine (9) 14:20 28:20 31:10 52:15 66:12,18 72:9 84:6 160:19
determined (2) 72:3 84:7
Detert (2) 5:15 9:1
develop (1) 76:16
developed (4) 76:15 103:4 109:3 140:5
development (1) 27:11
device (3) 39:5 78:24,24
diameter (3) 32:7 39:2 45:24
diamond (19) 31:9,11,12,22 32:2,3,12 33:5,12 35:20 79:16,17 96:16 98:1,2 100:24 109:1,2 110:25
died (1) 117:8
difference (1) 103:19
different (40) 22:16 29:8,13 29:13,14 33:16 35:5 38:4 40:7 44:12 45:4,12,16,19 46:2 51:16 61:4 63:5,6,7,8 63:22 77:16 88:17 89:5,7 93:7 112:13 115:2,3 128:23 133:12 134:3 140:17 149:17,21 154:25 154:25 155:2,4
difficult (1) 135:7
dig (1) 109:25
dimension (1) 33:16
dimensions (1) 96:15
direct (4) 7:21 56:12 79:1 125:6
direction (1) 171:10
directly (3) 27:7 79:5 117:22
discern (1) 71:15
discharge (1) 154:14

discolored (2) 101:21,22
discovered (7) 12:2 72:6 85:21 96:2,7 99:17,21
discovery (1) 102:16
discussions (2) 49:16 52:9
disease (2) 52:13 139:25
dispute (6) 50:16 51:3,24 53:12 56:24 58:2
distinction (1) 95:6
distinctive (2) 21:22,24
distributed (3) 46:21 58:12 106:23
distribution (11) 36:16 45:17 127:5 133:21 134:15,18 136:4,14 137:19 138:2,14
distributions (2) 46:18 136:2
divided (1) 129:21
division (2) 108:16 167:16
divorced (1) 107:21
doctor (1) 148:19
doctors (2) 12:8,12
document (3) 2:7 48:18 168:11
documents (19) 35:15,18 48:8,12,14 49:12,19,19,21 49:24 51:2 56:15 57:6,7,25 58:6 74:5 114:2 169:17
doing (22) 17:12 18:9 19:8 21:25 22:1 37:11 75:2 82:11 99:8,10,11 108:25 109:1 110:4 129:15 132:13 145:2 151:14,17 157:14,15 160:18
dominant (1) 82:9
dominantly (2) 17:16 18:15
doubt (2) 80:14,14
downstream (1) 68:21
drawings (1) 14:22
drew (1) 39:16
drill (12) 31:9 33:12,12,17,21 34:15 79:16,17 98:2 100:19 104:1 109:1
drilled (7) 96:17 100:16,18 100:24 109:3 110:25 111:6
drilling (7) 31:22 32:12 33:5 33:8 35:20 96:13 98:1
drills (2) 31:11,12
Drinker (3) 3:4 4:13 9:9
driving (1) 33:9
dry (15) 39:12 40:14,14,16 41:22 42:16 44:21 45:4 66:9,9 85:17,18 91:5 95:3 112:7
duly (2) 3:6 171:1
dump (1) 79:4
dumped (1) 89:17
dust (2) 47:8 148:24
dusty (1) 146:7 147:17
duties (10) 12:19 13:21 14:16 15:25 16:9 20:6 26:12 65:4 24:10 151:7

_____

**E**

E (10) 2:1,6 3:14,14 4:1,1 5:1 5:1 6:1,1
E-M-T-A-L (1) 62:8
earlier (2) 31:23 163:22
earliest (1) 105:2

early (3) 108:3 160:5,5
earth (1) 101:13
easier (1) 134:1
east (2) 135:7,14
Eastern (54) 17:10 19:20 20:7,13,14 21:9,14 22:25 23:12,16 25:6,16,17,22 26:7 27:14 28:9 49:7 51:19 92:18 93:10 105:17,19 106:5,8 138:8,18 139:1,5 139:13 141:6 142:15,17 160:18 161:4,5,24 162:2 162:18 163:6,9 164:6,16 164:20 165:5,13 166:7,10 166:16,22 167:11,15,20 168:3
edge (2) 72:4 75:10
Edlin (1) 8:11
education (1) 11:14
effect (4) 9:21 12:2 43:18 52:16
effects (2) 68:12 69:19
efforts (1) 66:17
eight (2) 12:16 150:23
eight-hour (2) 80:1,2
either (14) 17:2 57:15 63:7 92:11 107:2 113:19 115:17 124:14 133:17 137:24 140:12 142:20 158:18 171:16
electricity (1) 16:22
element (1) 138:17
Elementis (2) 4:11 8:19
eleven-hundred-ton (1) 38:13
eliminated (2) 19:6 23:16
embarked (1) 71:12
employ (1) 151:4
employed (5) 37:15 131:7 142:17 150:22 151:1
employee (9) 84:6 115:18 140:24,25 148:5 150:6 151:20 167:19,20
employees (19) 36:16 55:7,25 69:21,23 84:16 116:15,22 119:9 124:14 127:1 133:4 145:15 147:19,24 148:3 149:3 151:12,25
employees' (1) 149:23
employer (3) 78:8 115:5,19
employers (2) 139:13 145:14
employment (1) 52:6
EMTAL (7) 62:7,10,19 63:16 63:22 64:3,7
end-user (1) 89:13
Engelhard (22) 6:21 8:24 24:13,16,17 25:3 26:7 106:7 162:1,5,15 163:3,14 164:13,15,19 165:2,10,21 166:15 167:1,13
engineer (1) 13:20
engineering (5) 10:22 68:16 68:17 69:11 70:4
enriched (2) 42:14,15
entire (4) 47:11 63:13 65:14 144:25
entities (5) 77:10 128:16,20 133:1,5
entitled (2) 2:7 10:4

entity (2) 78:10 127:11
environment (4) 150:5 151:12 152:21,21
Environmental (1) 132:12
EPA (1) 132:12
epidemiological (1) 133:1
equipment (1) 101:13
equipped (1) 155:11
Esq (1) 1:2
essentially (10) 28:9 29:12 39:23 45:13 89:5,6 124:24 135:15 142:20 161:25
establish (3) 102:1,2 104:4
established (2) 152:19,20
estimate (4) 23:24 24:4 87:11 111:22
et (4) 1:4,6,9,6
evaluated (3) 31:13 66:22 79:19
evaluating (1) 76:19
evaluation (3) 68:5 72:5 147:12
evaluations (2) 150:4,15
events (2) 49:6 51:24
everybody (1) 37:13
evidence (2) 110:24 158:3
evident (1) 77:13
evolved (1) 81:5
evolving (1) 75:7
exact (1) 171:23
exactly (14) 9:18 32:1 49:5 73:11 94:25 97:14 103:21 104:10 110:2 111:18,20 112:2,24 124:10
exam (1) 146:15
examination (9) 2:3 7:21 9:16 72:17 75:6 146:18,25 147:6 153:18
examinations (6) 145:16,25 146:2 147:2 148:18 152:4
examine (2) 71:12 146:6
examined (2) 3:12 79:15
excavate (1) 103:22
excess (1) 149:3
excluded (2) 136:6 147:22
excuse (5) 51:8 60:20,20 88:16 141:8
Exhibit (1) 169:2
exist (1) 83:2
existed (1) 26:1
expensive (1) 82:13
experience (2) 34:5 142:16
explain (1) 78:16
explained (2) 43:17 72:16
explaining (1) 124:21
exposed (10) 11:12 36:3 53:16 56:1 84:18,25 141:15 149:3,5,11
exposing (2) 69:20,23
exposure (5) 36:8 53:25 138:19,24 158:18
exposures (2) 52:17 149:20 149:21
extension (3) 33:15
extensively (2) 109:4,8
extract (1) 13:23

_____

**F**

F-i-k-e (1) 119:20
F-o-w-l-e-r (1) 14:4
fabric (1) 154:12
faces (1) 14:19
facilities (3) 72:18 125:1 131:22
facility (10) 62:6 75:4 90:25 91:5 93:20,22 95:10 98:18 98:20 112:17
fact (3) 104:2 126:11 153:11
factory (1) 47:22
failed (1) 50:22
fair (1) 99:5
fairly (1) 108:12
familiar (6) 118:11 121:6 124:2 139:24 140:3 147:4
familiarize (1) 124:11
far (13) 17:21 25:25 41:20 43:2,6,7 46:8 50:22 63:8 88:21 92:19 137:11 166:5
fashion (2) 97:14 104:9
Fax (1) 1:25
fed (1) 94:12
fee (1) 82:11
feed (3) 30:1 31:14 100:20
feet (6) 33:13 103:5 110:1 154:13,13,13
fiber (2) 83:21,22
fibers (2) 71:16 109:9
Fike (2) 119:20 120:12
filed (2) 138:23 145:12
files (2) 82:24 83:1
filing (3) 36:7 84:17 133:5
filled (2) 59:1 89:11
filler (1) 154:15
final (1) 129:18
finally (1) 100:2
financial (1) 120:7
find (3) 70:7 109:25 117:12
finding (2) 84:13 108:11
fine (15) 19:5 44:21 46:7,13 46:24 63:17,25 69:1,4 75:6 76:5 87:11 88:22 107:12 117:9
finely (1) 129:21
fineness (3) 45:20 63:7,9
fines (2) 46:14 56:3
finest (1) 46:10
finish (3) 22:22 107:13 163:25
finished (2) 68:5 112:8
firm (5) 7:17,25 8:6 143:8 144:3
first (16) 3:11 10:7 11:20,22 16:10 20:4,15 22:8 23:13 67:4 75:14,16 101:12 102:15 105:4 140:23
Fishback (2) 3:15 7:17
Fitzpatrick (3) 4:10 8:18,18
fixed (2) 149:18,21
float (1) 42:13
floats (2) 42:7,10
Floor (8) 3:5 4:4,14,19 5:12 5:16 6:14 1:4
flotation (6) 39:15 42:12 63:24 65:20,23 88:6
flowing (1) 78:23
fluid (1) 19:1
flying (1) 108:13

ROGER MILLER - PLF'S - January 16, 2007

**focus (1)** 67:21
**focused (2)** 86:10,12
**folks (1)** 21:4
**followed (2)** 65:19 111:1
**force (1)** 9:21
**forced (1)** 32:4
**forcibly (1)** 52:8
**foregoing (3)** 171:4,11,17
**forever (1)** 30:16
**Forks (1)** 124:3,5,6 125:11 129:16,23 130:8 157:10,11 157:16 158:12
**form (7)** 14:25 17:3 28:21 66:13 83:6,8 104:15
**formal (1)** 11:14
**formed (3)** 25:23 26:6 163:15
**former (10)** 36:15 37:5 55:7 55:7,24 115:18 117:4 119:9 139:12 145:14
**forms (2)** 61:24 91:7
**forth (1)** 3:13
**Foster (2)** 5:6 8:9
**found (24)** 33:18 34:12 52:5 72:25 73:1,1,24 74:10 76:12,21 83:15,17 96:8,9 96:10 98:4 104:13 106:1 107:1 108:8,9,12,24 110:24
**four (11)** 80:1,2,5 93:14 96:9 100:1 113:2 119:13 154:13 154:13,13
**four-foot-long (1)** 32:6
**Fourth (1)** 6:19
**Fowler (5)** 14:2,3,4,10,11
**fraction (1)** 110:13
**France (3)** 121:14 131:25 159:3
**Francisco (20)** 1:2,24 3:5,16 4:5,14,19 5:4,8,12,12,17,21 6:4,10,15 7:15 170:16 1:5 1:8
**free (1)** 67:5
**freedom (1)** 67:3
**freight (2)** 135:8 155:25
**Fremont (2)** 3:4 4:14
**frequency (1)** 32:15
**frequently (5)** 32:11 33:5 80:4,6,16
**front (1)** 60:10
**full (2)** 103:4 171:11
**full-time (1)** 151:20
**fully (1)** 71:22
**fumbling (2)** 24:2,3
**function (3)** 46:16 146:15 147:12
**funding (1)** 12:13
**further (2)** 169:17 171:15

---

**G**

**G-a-s-s-e-t-t-s (1)** 21:2
**G-o-f-f (1)** 119:25
**garnet (1)** 93:7
**Gassetts (18)** 20:25 65:22 66:7 78:19,24 79:22 85:5 88:14 91:5,11 92:8,23 105:3,12,13 106:19 155:11 162:17
**gathered (1)** 78:16 80:21

---

**Gene (2)** 3:22 9:5
**general (5)** 11:11,22 12:18 50:2 63:23
**generally (9)** 11:5 28:13 38:21,23 44:20 52:12 89:16 141:20 157:23
**generate (1)** 16:22
**generated (1)** 18:25
**geographically (1)** 133:22
**geology (2)** 14:22 108:16
**Georgia (3)** 81:17 82:8 134:23
**Germans (1)** 12:1
**Germany (1)** 12:4
**getting (7)** 45:13 58:7 76:6 77:16 97:18 118:19 142:3
**geysers (1)** 16:16
**Gina (1)** 5:9 8:13
**girl (2)** 150:19,21
**give (7)** 23:23 24:4 37:4 94:5 111:22 117:14 145:1
**given (4)** 37:10 78:17 140:8 171:12
**giving (3)** 98:6 102:12,23
**glacier (1)** 101:15
**go (32)** 7:22 15:13 28:25 53:1 64:15 65:17 74:22 79:19 87:23 93:17,17 94:2 95:10 95:13,16 96:24 100:10 101:16,20 103:11,22,23 108:11 110:4 113:4,24 145:1,6,22 146:19 168:18 170:11
**goes (2)** 95:17 166:18
**Goff (2)** 119:25 120:16
**going (29)** 7:2,18,22 10:2,3 17:22 39:4,4 50:6 51:21 52:24,25 53:5 60:5,9 68:22 69:8 87:20,22 107:8,10 117:25 118:1 119:1 137:20 160:25 161:15 166:18 170:17
**good (5)** 9:17 41:4 111:4 119:14 161:13
**Goodyear (8)** 4:21 8:15 47:14,21 114:21,24 159:19 159:25
**Gordon (1)** 4:18
**Gough (1)** 3:16
**Gouvernor (2)** 13:4,17
**government (1)** 152:9
**governmental (3)** 78:14 152:25 153:16
**grade (15)** 27:25 63:14 66:2 66:3 89:25 90:1,9,23 91:20 91:22,23 95:4 113:1,2 154:22
**grades (1)** 113:2
**graduate (8)** 10:18 50:20,24 53:17 54:15 55:23 56:19 57:19
**graduated (1)** 10:15
**gray (1)** 61:3
**great (2)** 46:17 117:15
**Green (1)** 156:3
**grind (2)** 46:8,9
**grinding (1)** 66:9
**grocery (1)** 58:22
**groove (1)** 101:19

---

**ground (12)** 39:5,6,7 42:5 79:18 90:20 98:2 110:12 110:13,20,22 153:19
**grounded (1)** 39:13
**groundswell (1)** 68:10
**group (1)** 71:14
**guess (2)** 55:17 147:8
**guessing (5)** 23:24,25 35:10 55:19 57:22
**guy (2)** 115:20 117:3
**guys (10)** 9:7 46:12 86:12 114:14 116:15 117:8 148:6 169:14 170:2,6
**Gypsum (1)** 114:12

---

**H**

**H (1)** 2:6
**H.M (1)** 5:14
**half (6)** 12:16 13:14 16:5,7 25:21 162:11
**halfway (1)** 16:18
**Hall (2)** 6:7 8:6
**Hames (94)** 2:4 3:17 7:2,8,12 7:16 9:7,13,16,17,18 13:8 15:8 17:25 18:6 21:8 24:23 24:25 29:2,17 30:3 34:12 34:22,25 35:8 37:4 44:9,11 44:19 46:20 47:19 52:24 53:11 55:18 56:18 57:24 58:6,20 67:22 69:5 71:1 85:15 86:12,16 92:5 97:20 107:13 114:21 115:1 118:16,21 119:8 121:15 130:17 133:25 134:7 136:25 137:24 141:11 143:2,13,25 144:2 145:21 146:1 147:13 155:4,10,13 158:11 160:2,23 161:6,9 161:13,21 162:10,25 163:23 164:10,13,17,19 169:6 21,24 170:4,6,11
**Hammondsville (31)** 20:19 20:20 22:12 23:8 26:19 27:5,8 54:13,14 55:5 64:16 64:23 65:18 66:11,22 67:23 73:4,6,8,18 75:17 78:12,18 83:15 85:20 87:25 93:19 94:2 95:10 162:16,21
**Hampshire (2)** 120:23,25
**hand (1)** 168:12
**handle (1)** 155:12
**Hannifin (1)** 8:12
**happen (3)** 49:7,7 166:13
**happened (11)** 48:17,17 51:24 64:25 106:11 122:3 122:4 131:4 163:12 165:4 165:9
**happening (1)** 152:16
**hardening (1)** 12:2
**Hardy (1)** 3:20
**Hastings (3)** 117:17,17 118:5
**hate (1)** 18:2
**hates (1)** 42:7
**hazard (2)** 70:16 71:5
**head (3)** 17:21 31:8 101:19
**headings (1)** 29:24

---

**Healdsburg (1)** 16:18
**health (6)** 52:6 69:19,22 70:16 71:4 152:18
**hear (4)** 13:17,22 21:4 92:6
**heard (9)** 70:16 76:11 126:16 139:22 140:4 157:18 160:3 160:5,7
**hearing (1)** 18:2
**hearsay (1)** 47:4
**hereinafter (1)** 3:13
**high-grade (1)** 27:25
**hill (9)** 86:22,23 87:4,5 95:17 107:5,16 111:15 128:7
**hire (3)** 74:20 75:14 150:12
**hired (6)** 52:9 76:1 77:1,8 78:5 97:22
**hiring (2)** 72:15 76:7
**history (7)** 48:15 50:2 58:2 75:6 93:6 118:2 123:16
**Hm (2)** 8:17 69:2
**hold (4)** 20:1 22:22 88:15 157:3
**holdings (1)** 106:8
**hole (1)** 33:12
**holes (2)** 33:9,17
**hollow (2)** 32:3,4
**home (2)** 150:20 151:5
**honestly (3)** 142:13 144:5 154:6
**hopper (5)** 58:14,19 62:2 89:17 91:10
**hour (2)** 118:22 160:25
**hours (1)** 78:21
**Houston (1)** 3:21
**Hudson (1)** 156:4
**Hugo (1)** 5:3 8:8
**human (2)** 148:6 149:20
**hundreds (2)** 79:8 99:9
**hungry (1)** 69:6
**hurt (1)** 142:3
**hydrophobic (1)** 42:7
**hygienist (5)** 150:13,14,16 151:2,5
**hygienists (1)** 99:3

---

**I**

**Ian (3)** 72:8 81:23 99:9
**idea (12)** 34:10,20 46:22 47:1 49:13 67:13 83:1 114:5 115:9 126:25 159:9,11
**identical (1)** 159:4
**identified (3)** 58:3 68:20 69:21
**identify (2)** 59:2 62:10
**identifying (4)** 58:25 60:1,23 159:7
**ill (1)** 120:8
**Illinois (3)** 134:22 135:7,14
**illness (1)** 52:2
**Imai (2)** 6:3 8:6
**implemented (1)** 150:2
**impregnated (1)** 32:3
**imprinted (1)** 59:3
**in-house (2)** 151:16,18
**in-place (1)** 149:18
**Inc.'s (2)** 2:9 168:14
**inch (5)** 32:6 38:24,24 39:2 39:25

---

**inches (1)** 60:12
**include (1)** 152:22
**included (11)** 43:5 54:7 55:4 106:7 134:8 153:19,19,20 162:19,24,25
**includes (1)** 139:13
**including (6)** 20:9,10 58:1 65:9 163:8 164:21
**income (1)** 39:17
**incorporated (3)** 8:2 113:1 129:1
**incorrect (1)** 169:8
**independently (1)** 66:23
**indicating (1)** 112:16
**individual (2)** 29:7 160:3
**individual's (1)** 81:21
**individually (2)** 1:4 22:18
**individuals (6)** 36:13 72:19 82:6 115:10 117:21 133:16
**industrial (10)** 17:15 18:11 39:22 68:11 99:3 150:12 150:14,16 151:1,5
**industries (6)** 35:5 44:12,21 45:4,13 63:22
**industry (50)** 17:16 18:14,15 27:20,21,22 28:2,3,5,12,14 28:17 39:18,18,20,21 44:23,24,25 45:9 46:6,13 46:21 47:3,12 68:20 71:5 79:9 113:21 118:12 123:15 123:21,21 129:22 130:12 131:18 135:16 136:16,18 137:1,3,5,14,21 138:3,6,11 141:23 155:18 159:16
**information (11)** 22:3,5 35:25 47:20 49:2 69:9 115:12 158:3,6,9 165:23
**informed (2)** 148:15 153:5
**initial (2)** 81:2 94:4
**initially (9)** 72:16 73:13 80:9 85:6 93:21 102:10 103:3 109:3 149:17
**initiate (1)** 69:14
**initiated (4)** 71:9 97:25 100:23,24
**injury (2)** 142:8 158:19
**insert (1)** 79:4
**inside (1)** 40:4
**inspected (1)** 153:1
**inspectors (1)** 152:25
**install (1)** 89:10
**installed (2)** 79:1 99:11
**instance (1)** 83:23
**instances (2)** 84:3 141:12
**Institute (2)** 72:3,7
**instructed (1)** 98:24
**Insulation (2)** 5:10 8:14
**intended (1)** 109:16
**intentions (1)** 18:13
**interested (3)** 129:11,12 171:18
**intermittently (1)** 99:25
**internal (1)** 59:21
**International (1)** 13:13
**interrogatories (2)** 2:10 168:15
**involved (6)** 72:20 117:13 122:10,12 140:21 146:14

---

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

ROGER MILLER - PLF'S - January 16, 2007

Page 5

involvement (4) 12:24 27:5 56:12 144:25
irrelevant (3) 34:9,18,19
Island (2) 144:8,15
issue (9) 53:22 56:13,14 70:3 75:1 141:14 142:3,12,20
issued (3) 56:4 74:2 82:19
issues (2) 19:13 68:14

**J**

J (12) 21:22,22 25:17,17 71:13,13,18,18,25,25 74:6 74:6
Jackson (3) 3:16 5:11 7:17
January (2) 1:17 3:2
Jedeikin (2) 5:20 7:25
Jennifer (2) 4:10 8:18
Jersey (2) 6:23 134:23
JOANNE (3) 1:21 3:6 171:1
job (17) 11:20,22 12:17,19 13:2,3,21,22 15:25 17:6,11 19:19,20,24 123:4 124:10 130:24
John (4) 6:24 9:11 119:20 120:12
Johnson (111) 6:22,22,22,22 6:25,25 9:12,12 20:18,23 21:15,16,17,17 22:7,9,19 24:13 25:1,24,24 26:4,4,12 26:16 27:12 28:11,19 29:16,17 31:18,22 32:11 33:25 35:7,8 37:1 38:3,8,9 39:11 44:6,8,9,13 47:13 51:13,14,19 52:3 54:10 55:4 58:10 61:25 62:5 71:18,18 72:14,14,17,17,20 72:20 73:10,10,17,17 74:16,16,21,21 75:2,2,17 75:17,25 76:6,7,23,23 84:17,17 134:21,22 135:3 135:3 162:23 163:1 165:12 165:12,16,16,20,20,24 166:10,10,23,23 167:7,7,8 167:9,10,10,19,19,22,22,24 167:24
Johnson's (3) 30:4 75:25 165:24
joint (7) 45:6 46:12 63:15 113:18 136:3,8,10
joking (1) 111:10
JR (1) 4:16
JT (1) 8:11

**K**

Kaiser (1) 4:9
Keeney (2) 6:3 8:6
keep (4) 17:16 107:8,10 143:4
Keller (2) 3:15 7:17
kept (2) 82:22 156:13
kill (1) 18:18
kind (15) 29:3 48:15 70:18 70:19 86:10 109:2 112:16 118:16 145:2,17 153:17 154:10,11 156:12,13
kinds (1) 153:21
knew (9) 28:13 63:3 78:2 79:20 99:2 109:7 122:20

125:9 144:24
know (211) 16:16 21:8,12,17 21:20 22:19 24:10,20,22 27:19 28:4,9,14,16,18,19 29:1 32:14 33:6,10 35:3 36:14,22 37:3,12 38:2 41:17 42:17,18,18 43:20 43:24 44:15 45:10 46:20 46:23 47:2,14,16,20 49:8 50:12,25 52:23 53:15,18 53:21 54:20 55:19,22 57:8 57:18,20,23 62:16 63:8 66:11 67:7,9 69:5 70:9,11 70:18 72:19,23 73:13,16 73:22 74:15,18 75:12 76:23,25 81:4,9,10,12,25 82:22 85:3 92:13,19 93:4,7 97:4 100:5 104:15,19,22 104:23 105:17 108:3 111:18,20 113:13,15,17,18 113:23 114:6,22 115:12 117:4,8,13,25 118:7 120:9 120:17,24 121:19 122:3,15 124:1,13,16,17 125:18,21 126:11,14,15 127:1,4,18 128:23 129:18,20 130:4,7 130:10,11,13 131:4,12,14 131:16,17 132:10,20,23,24 133:1,3,7,10 134:2 135:23 137:15 138:14 139:1,17,17 139:18,19 140:23 142:7,9 142:13 143:1,1,7 144:2,6 145:11,13,16 146:14 147:8 147:10,11 148:15 150:18 151:8,16,22,24,25 152:6,7 152:11,24 153:10 155:13 157:12,14,24 158:21 159:1 159:6,13,14,15,18,24 160:1 160:10 163:21 164:5 165:4 165:9,12,16,18,20,22 166:6 166:20 169:13,21 170:2
knowing (1) 41:16
knowledge (24) 31:15 47:5 47:11 73:12 84:19 120:15 137:15 138:13,21,25 139:4 146:12 151:3 157:17,21 158:2,20,25 159:17,21 160:14 165:19 166:19 168:8
knowledgeable (1) 69:9
known (2) 36:24 125:3
Koss (4) 6:20 8:23,23 162:8

**L**

L-u-d-l-o-w (1) 85:11
laboratories (6) 16:5 17:13 17:14 71:25 81:16,17 152:20
laboratory (4) 14:20 31:13 74:12 81:19
labs (1) 66:23
Lake (1) 15:21
Langer (2) 160:4,7
larger (1) 58:24
late (4) 98:8,9 100:8 108:3
law (35) 3:15,18,20,23 4:3,6 4:8,11,13,16,18,20 5:3,5,7 5:9,11,14,15,20,23 6:3,6,8 6:11,13,16,18,20,24 7:16

7:25 8:5 143:8 144:3
lawsuit (5) 57:13 84:17 141:18 142:8 144:18
lawsuits (3) 133:6,16 144:23
lawyers (2) 12:12 143:7
layman (1) 18:9
leading (1) 75:10
Leahy (3) 6:5 8:5,5
leakage (1) 89:9
learn (10) 14:24 123:16,19 123:22 129:3,7 131:21 139:7,12 148:2
learned (7) 74:10 76:20 123:24 125:10 129:8,10 131:24
learning (1) 129:13
leave (1) 27:12
Lee (5) 6:10 8:3,3 15:6 14:19
left (5) 15:11 93:25 119:8 151:5 162:14
length (2) 72:1 103:4
Leo (1) 7:24
LEOPOLDO (1) 5:22
Leroy (3) 115:20 117:3 118:6
let's (13) 20:4 22:18 38:2 53:1 64:14 72:12 73:9 88:20 104:25 107:4 118:19 146:8 170:11
letter (4) 49:23 83:6,9 1:14
lettering (1) 112:16
letters (2) 50:5,7
level (2) 11:11 103:24
levels (3) 103:4,5,25
lifetime (1) 145:9
lighting (1) 153:19
limit (1) 47:11
limited (1) 73:12
line (6) 49:4 51:4,23 58:2 77:18 78:4
lines (2) 48:15 156:5
list (2) 93:15 114:15
listening (1) 77:13
little (16) 31:23 41:11 42:3 52:25 53:13 72:12 87:22 101:14 122:15 123:18,24 129:6,10 145:18 146:8 149:22
live (3) 37:8 108:21 120:22
lives (3) 120:10,17,23
living (2) 117:10 144:11
loaded (3) 156:8,9,10
located (5) 16:15 38:9 87:13 96:14 103:7
location (1) 31:10
locations (3) 14:12 79:3 155:20
logo (4) 59:11 60:15 90:23 92:19
logos (3) 90:13 154:21 159:7
long (41) 4:3 12:14 13:11 16:2 20:1 21:8 22:13 23:24 26:21,22,23 34:24,24 37:21 38:1 52:9 65:10 80:23 90:24 93:4,22 94:10 96:18,22 99:24 101:4,19 103:13 107:23,24 108:18 110:1 111:15 116:5,21 127:18 135:8 142:2 150:21

160:6 1:3
longer (1) 80:13
look (8) 37:11 48:11,14 52:9 81:14 101:18 161:1 168:17
looked (14) 48:10,12 51:16 51:19,20 54:16,17 57:25 58:4,21 71:14 108:14 169:15,15
looking (18) 33:19 52:16,20 52:22,23 54:21,24 55:24 56:16 67:2,4 77:11 90:18 104:14,18,19 109:15 147:16
Loomis (2) 13:3,12
Lopez (6) 1:4,6 4:17 7:13,14 1:6
Lord (2) 11:23 12:7
Lorenzo (2) 120:6,22
Los (1) 114:14
lot (7) 10:2,2 69:9 71:24 102:18 109:2 116:12
lots (1) 108:20
louder (1) 18:4
low (1) 27:25
Ludlow (20) 79:22 85:8 87:14 92:21 93:12,13,15 93:19,22 94:3,17 95:14,17 95:19 97:2 100:12 103:8,9 103:11 155:8
lunch (5) 107:14 118:3,20,21 119:2
lung (1) 146:15
Luzenac (20) 2:8 4:7 9:4 104:2 121:7,10 131:2,17 131:21 132:7,22 158:15,17 159:1,8,22 160:15,16 164:4 168:13
Lynette (2) 119:15 120:9

**M**

M-hm (26) 14:9 23:1 31:24 32:21 44:14 55:1 56:20 60:14,16 62:21 63:18 80:3 80:18 83:7 86:24 87:5 95:21,23 100:3 101:1 106:13 108:10 125:13 138:10 153:2 156:8
m-i-n-o-r-l (1) 41:5
machines (5) 17:17 18:25 83:23 101:18 102:3 104:4
Madam (1) 58:15
Mag (12) 17:10 20:7 23:16 26:7 27:14 49:7 51:19 92:18 93:10 105:17,19 106:5
Mag's (1) 28:9
magazine (1) 68:18
Magnesia (28) 19:20 21:9,14 25:6,16,17,22 106:8 139:5 142:17 161:5,25 162:3 163:6,10 164:6,16,20 165:5,13 166:7,11,16,22 167:11,15,20 168:4
magnesite (1) 30:7
magnesium (10) 30:7,8,9 42:24 138:8 139:13 141:6 142:15 160:18 161:5
Main (1) 5:4

Maine (1) 156:4
maintain (1) 153:8
maintained (1) 115:5
majority (1) 42:25
making (1) 66:1
management (3) 37:16 118:10 124:11
manager (5) 11:22 12:18 16:1 119:17,25
managers (1) 36:16
manufacture (1) 113:25
manufacturing (10) 115:3 118:9 124:25 125:12,21,25 132:9 154:8,25 166:5
maps (1) 14:22
mark (2) 7:14 168:18
marked (2) 59:9 169:2
market (3) 5:16 111:5 134:5
markets (1) 129:9
markings (7) 60:2,3 89:21 90:4,14 112:15 159:7
marks (1) 60:23
Martini (1) 8:11
massive (1) 30:20
material (21) 14:21 19:11 32:8 39:2,3 45:1,14 46:7 66:21,24 93:7 101:22 103:23,24 112:8 134:19 149:6,9 155:16,18,19
materials (6) 18:19 67:1 79:21 100:22 101:21 115:7
matter (2) 149:25 1:10
matters (1) 153:21
Mayacamas (1) 16:19
McCrone (36) 49:23,24 50:6 56:23 72:7,15 74:20,23 75:10,14 76:1,3,8 77:2,7 77:16,17 78:4,17 79:12,14 80:22 81:5,11 82:6 83:9 84:7 97:19,20 98:3 99:7,8 104:18 110:11,13,14
McCrone's (1) 82:11
McKenna (2) 4:3 1:3
Mcneil (2) 5:24 8:1
Meadows (2) 5:21 7:25
mean (15) 21:23 37:8 63:16 68:3 71:18 96:7 113:18 145:19,22 150:10 164:11 165:17 169:23 170:1
meaning (4) 37:15 73:1 84:6 103:15
measure (3) 39:6,7 66:17
measured (1) 96:15
measurement (1) 14:17
medical (4) 52:16 68:12 139:25 145:16
meet (2) 152:19 169:16
member (1) 124:8
memory (1) 61:3
Memphis (1) 17:8
Meno (2) 8:21,21
mention (1) 153:12
mentioned (11) 31:1 33:22 44:11 50:15 53:24 62:1,1,2 77:8 81:21 154:7
mercury (3) 15:15,23 18:20
mesh (2) 19:5 45:22
mesothelioma (2) 139:25 140:5

met (3) 29:5,9 31:13
methodologies (2) 77:17,20
methodology (6) 11:8 73:16
76:15,16 77:9 81:4
methods (2) 76:19 104:2
mica (5) 30:19,22 40:21,23
41:9
micas (1) 43:18
microns (1) 39:8
microorganisms (1) 18:11
mid (1) 108:3
middle (1) 68:18
miles (2) 14:14 15:19
mill (58) 15:15 24:13 29:9,22
30:2 38:8,19,22 39:5,11,12
39:14 40:12,13,14,14
42:13 65:22 66:7,9 79:22
79:22,23 83:25 85:8 88:6
91:5,12 92:8,23,24 94:13
95:18,19 100:12,22 103:8
103:9,11 105:3,12,13
106:10,19 111:25 112:2,6
112:9 113:14 114:4 147:21
149:18 152:21 155:8,9
162:17,17 163:1
Miller (23) 1:16 2:2 3:9,23
4:17 7:4,13,20 9:17 53:4,8
53:11 102:12 117:2 118:25
119:5,8 137:11 161:21
170:9,13 1:1,9
Miller's (1) 9:6
milling (1) 41:23
million (1) 69:7
mills (10) 20:9,11,22 31:14
35:14 100:21 152:19 155:2
155:4,8
Milwhite (2) 6:6 8:7
Mimi (2) 6:10 8:3
mind (6) 41:12 53:20 61:16
114:16 117:16,20
mine (181) 11:24 12:1,5,25
14:1,8,18 15:4,15,23 16:15
16:24 22:3,7,9,12,19 23:5
23:10 24:13 25:1 26:13,16
26:19 27:5,8,9,12,14,15
28:11,19,20 29:12,16,18
30:4 31:6,7,8,9,18,21
32:11,17,18 34:1,15 35:7,8
35:19 36:4,9,15 37:1 38:4
38:15,23 44:8,9,13 47:14
47:15 51:12,13,14,15 52:3
54:10,15 55:4,5 58:10
64:17,23 65:1,5,11,13,18
66:11,12 67:8,12,23 68:8
70:12 73:4,6,18 78:12,18
79:20 83:15,16 85:20,22
86:1,1,22,23 87:9,13,16,25
88:1 93:13 95:10,13,24,25
95:25 96:4,18,24 97:5,13
97:25 98:16 99:13,14,15
99:21 100:11,17 101:11
102:3,4,5,6,11,16,24 103:4
103:6,10,13,15,17,21,23,24
104:5,7 105:1,2,2,4,11,21
107:1,5,14,16,19 108:6
111:16,24 124:1 125:11,24
126:17,20 128:7 130:8
131:13 138:20 147:21
149:18 152:17 156:22

157:8,16,24 158:1,12
162:16,21,23 163:1 167:25
mined (5) 12:8 23:4 33:20
38:3 128:5
miner (1) 118:7
mineral (10) 30:6,21 40:19
40:19 41:8 72:5 90:20
104:16 111:2 128:5
minerals (53) 11:9,10,12
23:15,18 24:8,13,16 25:13
25:16,24 26:1,11,18 27:1
30:3,14,15,24 40:10,18
41:3,14 42:22,23 43:5,8,9
91:20 95:4 106:7,17
112:21 120:1,7 122:23,23
126:2,7,12,17 127:17
128:24 137:16 146:3 162:5
163:15,17
miners (1) 55:7
mines (60) 14:9 15:14 16:3,4
16:11 17:2,13 20:9,13
21:18 29:25 35:14 37:16
50:22 52:6,19 54:25 55:25
64:19,21 72:2 84:13,18
85:19 86:5,25 87:6,21
93:14,14,15,18 94:13
99:22 101:5 102:2 108:16
115:2 121:2 123:22,25
124:25 128:6,10 131:17,22
132:8,14,16 139:2,8,15
140:6 152:10,19 153:1,13
156:25 157:5 158:4
minimize (1) 89:9
mining (41) 10:22,24 11:2,7
11:23 12:4,7,12,21,22
13:20 14:6 17:7 22:6,20,21
22:24 23:2,8 27:8,15 29:21
51:16 52:14 65:15 79:9
87:15 99:1 101:18 102:3
104:4 106:2 113:24 118:11
122:17 123:20 129:16
152:20 153:18 162:3 166:5
minor (10) 27:22,23 30:15
41:3,5,7,13 43:4,9,15
minus (2) 39:6,7
minute (2) 135:10 152:17
minutes (4) 7:5 10:1 160:25
161:1
mislead (1) 54:22
misquote (1) 164:10
missed (1) 161:2
misstate (1) 71:2
misstated (1) 76:2
misstates (1) 70:23
mixed (1) 42:5
mixtures (1) 29:14
mold (2) 18:17 19:4
molds (2) 17:15 18:18
Montana (11) 122:18 123:24
124:1,3 125:11 129:9,16
130:5 131:13 158:12,23
month (1) 33:7
months (3) 12:16,16 48:19
Moran (2) 5:15 9:1
morning (1) 9:17
mountain (3) 15:22 16:19
156:3
move (3) 73:14 91:4 104:25

moved (1) 81:17
moving (2) 78:23 101:13
multi-wall (1) 91:9
multiple (1) 79:17

N

N (5) 2:1 3:14 4:1 5:1 6:1
name (36) 7:16,24 9:18 12:6
14:13 23:16 24:7,10 25:6
25:21 26:8 37:5,20 51:21
61:11,17 64:7,25 81:22
82:10 85:12,13 86:3 97:18
115:21 121:6 122:23 143:8
144:3 150:19 162:3,8
163:8,9 164:21,24
named (6) 25:24 115:20
118:6 160:3 171:17,18
names (22) 35:3 36:23 37:4
62:4 64:4 82:5 114:11
115:16,24 117:4,6,8,9,14
117:21 119:11,13 124:13
124:18 128:23 140:19
148:11
narrowly (1) 81:19
nationally (1) 86:10
nature (3) 34:13 129:8
141:18
Near (5) 15:18,21 87:14
103:8 157:11
need (4) 74:24 169:16,17,21
needed (3) 31:14 71:23,24
negotiations (1) 122:12
neither (2) 137:9,10
never (33) 26:1 44:3 48:21
52:6,15 70:20 71:4 83:14
83:17 84:12,15,19,22
97:22 104:11,13 107:1
113:22 114:25 125:17
130:24 136:17,19 137:2,8
137:16 139:9,22 144:24
155:11 157:18 158:14
166:4
new (24) 6:23,23 13:4,16,17
13:18 14:2 20:10 23:18
25:22 68:19 79:15,20,22
111:25 120:23,25 124:11
134:22 150:20,21 151:6,20
163:15
newly (1) 26:6
News (4) 68:17,17 69:11 70:4
nine (1) 16:5
NIOSH (10) 49:25 50:16
51:3 52:10 53:12 56:4,7,24
57:1 58:2
nods (1) 82:4
nonemployees (1) 133:16
nontalc (2) 42:11,12
Norcross (1) 81:17
north (5) 106:9 120:17 162:4
162:13 167:5
northern (7) 23:17 25:20
67:20 162:2 167:3,12,16
noted (1) 170:19
notes (1) 161:1
Notice (1) 3:1
noticed (1) 1:16
number (16) 7:15 38:17
58:25 59:1,8,11 62:8,20

63:16 64:4,8 82:14 116:22
135:21 165:6 170:13
numbered (1) 59:24
numbers (13) 59:7,15,21
62:24 63:1,3,11,13,21,23
64:1 90:14 168:19

O

o'clock (1) 3:3
O'Shaughnessy (3) 6:24 9:11
9:11
Oakland (2) 4:9 6:19
oath (2) 3:12 9:20
oaths (2) 3:7 171:2
object (3) 70:23 143:10
166:18
Objection (14) 15:6 28:23
34:8,16,18 44:18 46:3
47:17 58:5 67:16 121:11
137:23 158:7 168:6
obvious (1) 71:21
Oca (3) 5:5 8:8,8
occasionally (2) 40:21,25
occasions (1) 83:20
occurred (3) 51:5,5 98:11
offered (1) 135:5
offering (1) 108:20
offhand (1) 135:24
office (4) 48:23 119:17
147:21 1:15
officer (4) 120:7 171:1,21,25
offices (17) 3:4,15,20 4:3,8,13
4:18 5:3,7,11,15,20 6:3,8
6:13,18 1:12
Oh (13) 22:9 49:23 54:18
68:6 87:10 88:19 94:6
105:6 109:7 118:15 120:6
162:24 164:15
Ohio (4) 5:24 8:1 50:21 51:1
okay (488) 7:8,12 10:5,15,18
10:23 11:2,10,14,20 12:23
13:2,16 14:12,16 15:3,10
15:13 16:2,9,15,20 17:9,12
17:21,23 19:3,12,16,19,22
20:4,13 21:3,17,20,23 22:2
22:7,12,18 23:4,23,23,25
24:3,4,15,23 25:15,18,25
26:3,10,15,18,23,25 27:4
28:16 29:11 30:23 31:3,17
32:17 33:1,4,18,22 34:5,22
35:3,11,15,18 36:2,13,23
37:14,18,22 38:9,18 39:23
40:10,16,24 41:10,17,22,25
42:16,20,25 43:4,11,16
44:1 45:3,12,18,21 46:23
47:2,10,13 48:2,5,14 49:1
49:4,14,21 50:3,13,15 51:2
51:6,18,23 52:2,12 53:1,24
54:3,23 55:11,12 56:6,9,12
56:15,23 57:3,12,24 58:9
59:10,14,18 60:1,8,21,25
61:7,10,15,24 62:11,19,24
63:11,21 64:7,11,23 65:4,8
65:14 66:19,25 67:22 68:6
69:6,10,14,25 70:15,20
71:8,17,20 72:12,19 73:15
73:20,22 74:9,13,15 75:9
75:16,23 76:5,11,23 77:24

78:7,18 79:24 80:21 81:4,8
81:21 82:11,15,22 83:11
83:19 84:2,10,16,20,23
85:3,3,15 86:5,21 87:6,8
87:11,21 88:9 89:3,13,21
90:7,12,17,24 91:2 92:16
92:21 93:9,17,22 94:8,14
95:13,24 96:18,21,24 97:4
97:7,12,22,24 98:8,13,15
98:22,24 99:24 100:8,13
100:23 101:7,10 102:4,9
102:21 103:7,19 104:6,9
104:11,14,19 105:4,14,19
105:23 106:4,14,18,22
107:4,15,25 108:6,17,22
109:12 110:4,7,14,23
111:24 112:4,12,19,24
113:3,11,13 115:11,16,23
116:2,10,17,19,24 117:2,7
117:14,19,25 118:21,22
119:14,16,24 120:2,9,19
121:1,6,9,15 122:1,10,14
123:3,16,19,22 124:6,13,17
124:21,24 125:3,8,18
126:4,9,16,20,25 127:6,10
127:14,18,24 128:6,10,13
128:16,19 129:3,7 130:4
130:17,21 131:1,11,17,21
132:1,3,5,11,21,24 133:4
133:11,20 134:7,14,17
135:1,2,10,15,23,25 136:13
137:17,19 138:4,8,18,22
139:1,10,20,24 140:2,8,14
141:14,24 142:7,10,14,18
143:4,7,16 144:10,15,22,25
145:14 146:1,4,8,13,22
147:1,5,13,22,24 148:6,14
148:17 149:7,10 150:1,7
150:18,21 151:1,4,9,13,19
151:22,25 152:9,22 153:8
153:22 154:4,7,16,24
155:10,21 156:1,6,12,21
157:8,12,18,20,23 158:3,11
158:14,21 159:1,6,10,15
160:15,23 161:6,9,13,14,21
161:23 162:12,14,19 163:3
163:9,12,17,25 164:6,23
165:1,4,9,16,20,23 166:9
166:15 167:1,14,22,24
168:2,21,24 169:3,6,10,20
170:6
old (6) 10:7 22:10 37:13 96:4
126:8,8
Omya (2) 5:23 8:2
once (7) 33:18 38:3 58:11
80:15 101:7 102:1 131:25
one-day (1) 145:4
one-time (1) 76:8
one-ton (4) 58:13 112:11
154:8 155:14
one-way (1) 118:17
ones (6) 49:21 86:15 89:4
90:18 135:23 147:4
online (2) 22:8 102:25
oOo--- (2) 1:3 2:5
open (7) 88:12 89:13,16
102:2 103:6,18 104:1
opened (2) 85:21 93:24
opening (4) 33:9,10 103:23

**P**

openings (1) 14:18
operate (8) 15:15 26:19 29:24 65:10 105:8 111:16 123:8 165:6
operated (8) 81:19 86:4 99:25 102:10 104:1,3,3 105:7
operating (12) 21:18 33:8 54:5 65:13 78:21 95:24 101:5,7 105:5,21 121:3,13
operation (24) 16:14 17:8,8 17:19 20:8 22:6 35:13 90:25 92:24,25 93:2,5,23 96:19,20 98:16 102:16,17 103:14 106:14 107:19 108:7 111:21 159:3
operations (32) 12:22 13:23 19:25 20:7,12 22:4,17 23:14 27:8 66:21 67:20 94:4 102:25 111:19 120:1 123:20 124:22 127:7,8 129:4,8,13 131:12,24 132:8 134:5 142:15 162:2 167:3,6,12,25
operator (1) 79:3
opportunity (1) 171:13
orange (3) 68:17 90:11,12
order (7) 29:4 31:10 62:19 63:15 71:22 82:20,21
orders (1) 114:2
ore (76) 13:23 14:5,7,9,19,24 15:4 20:10 23:3,5,9 29:20 29:23 31:10,11 32:10,23 32:24 33:1,10,11,15,16 34:14,23 38:23 39:13 40:15,18 42:5,19 65:17 66:18,22 68:3,4 69:18 73:6 73:7 78:11,19 79:15,16,20 79:25 80:17 83:18 84:14 87:17 88:5 93:19 94:2,12 95:9,16 96:3,8,11,14,24 97:9,10,15 98:5 100:10,25 103:10 105:11 106:1,11,18 109:6,7 111:24,25 157:15
ore-bearing (1) 16:13
Oregon (1) 134:9
ores (1) 11:9
organic (7) 17:14,17,18 18:19,20,20,21
organization (4) 21:22 72:9 123:17 167:18
orifices (1) 156:10
original (3) 170:14 171:23 1:14
originated (2) 12:1 93:8
outcome (1) 171:18
outcrop (1) 101:21 109:24
outside (2) 151:17 152:25
overbroad (2) 15:6 47:18
oversee (1) 27:10
owned (19) 21:15 25:23 26:3 105:16,17,19,22 106:12 111:6 124:25 127:16,19 132:14,16 152:10 158:4 167:8,9,10
owning (3) 121:3 156:22 167:25

P (8) 3:14,14 4:1,1 5:1,1 6:1,1
p.m (6) 119:1,6 161:16,19 170:18,19
packaged (8) 87:25 91:7 94:15 106:22 112:8 130:5 158:22 159:2
packaging (4) 61:25 64:9 88:18 159:3
page (5) 2:3 68:18,19 169:4,6
paid (1) 155:25
paint (13) 18:16,24 27:21 28:2 39:17 44:23 46:6,6,10 137:20 138:3,6,7
paints (1) 63:25
paper (22) 17:16,17 18:14,15 18:24 19:2,5 27:20 44:25 45:1 50:22 52:1,3 58:13 59:19 79:5,6 89:9,19 90:21 113:12 129:21
parcel (1) 89:19
Pardon (1) 107:9
Parker (3) 5:3 8:9,12
part (12) 24:17 54:8 66:16,20 89:19 100:20 106:6 109:22 123:7 127:5 146:25 164:20
participant (1) 54:8
particle (8) 45:16 46:10,18 46:20 63:6,8,9 83:25
particles (4) 32:3 42:12,13 75:6
particular (13) 12:25 14:8 46:16 53:19 59:2 62:4 70:12 90:3 100:11 104:14 105:11 114:4 134:24
particulate (3) 46:7 149:6,9
parties (2) 140:21 171:16
parting (1) 47:6
party (4) 143:12 144:18 169:24,24
passed (3) 32:9 38:25 115:21
paths (1) 65:19
pattern (3) 31:9 33:17 136:4
Patterson (5) 5:18 8:25,25
peak (1) 116:16
penalty (1) 9:24
people (24) 18:2 36:16 37:15 45:19 52:9 54:6,17,18,21 54:24 72:4 74:11 75:25 81:11,15,18 108:20 115:24 116:12 124:18 127:4,6 147:16 148:12
percent (9) 39:6,7 42:19,20 43:10,11,13,14,22
percentage (3) 43:8,20 45:14
perfectly (1) 97:13
period (12) 31:16 32:13 37:7 44:7 67:19 75:5 76:18 83:20 100:1 120:1 142:16 1:13
perjury (1) 9:24
person (3) 22:2 82:8 141:6
personal (4) 9:6 47:5 142:8 158:19
personally (1) 3:8
personnel (3) 147:21 148:8,9 148:12,14
pertaining (6) 11:7 52:3

70:11 115:5,12 160:11
phonetic (1) 91:9
physical (4) 14:22 29:9 145:24 146:2
physically (1) 110:7
physicals (2) 145:20 146:13
pick (2) 110:6 155:22
picked (1) 110:7
piece (2) 32:6 108:17
pile (1) 79:7
pilot (1) 33:12
Pine (1) 5:21
pipe (1) 32:3
pit (4) 102:2 103:6,18 104:1
place (8) 16:21 24:11,12,14 102:18 122:8 124:12 171:7
placed (1) 3:11
plaintiff's (5) 1:15 2:10 168:15,24 169:2
plaintiffs (5) 1:7 3:10,19 7:18 9:19
plant (26) 16:14 61:25 65:20 65:21,23,24 78:19,20 83:24 85:16,17 88:17 94:3 95:3,7 97:2 118:9 124:4 125:12,16,22,25 129:24 130:5 135:5,22
plants (26) 17:19,20 19:9,9 19:10 33:2 38:4 44:6 78:19 78:20 85:4 93:18 115:3 118:9 121:2 132:9 135:6 135:12,13,16 136:11 138:16 154:8,8,25 155:1
plastic (1) 46:15
Plaza (3) 4:9 5:16 6:23
please (9) 7:19 9:14 18:3 42:4 55:22 58:16 78:17 114:18 168:17
plug (1) 19:5
point (2) 50:1 100:2
polypropylene (1) 154:12
port (3) 79:1 154:14,15
Portillo (3) 5:13 8:17,17
portion (1) 168:3
Portuguese (1) 115:20
position (11) 13:19,22 20:1 23:12 25:9 54:3 64:25 123:8 151:19 152:14 170:5
positive (4) 84:12 109:14 139:2,15
possession (2) 48:13 49:13
possible (1) 46:11
possibly (1) 125:25
potential (1) 113:20
potentially (1) 96:16
pound (1) 113:22
pounds (8) 60:22 89:2,25 91:21,24 92:1 95:4 113:2
powder (1) 42:9
practical (1) 79:12
practice (2) 33:14 170:2
pre-employment (2) 145:24 146:13
precautions (1) 148:23
precisely (1) 104:17
premium (1) 39:17
preparation (3) 58:1 101:11 169:15
prepare (1) 46:5

prepared (6) 49:11,11,13,20 49:22 68:4
preparing (1) 14:21
presence (22) 21:21 66:23 68:11 71:16 109:17 114:1 115:4 139:2,15 151:23 152:22 154:5
present (8) 31:7 41:3 69:15 89:18 100:15 109:24 153:13 158:1
presented (1) 52:11
president (22) 19:25 23:15 23:18 24:7 25:10,12 26:25 27:4 56:9 64:11 65:1,6 67:15 116:10 117:23 122:10 127:23,24,25 128:19 141:4 152:14
pressed (1) 79:18
prevent (1) 18:17
previous (1) 125:4
price (2) 111:13,14
primary (1) 38:25
print (1) 59:8
printed (5) 59:10 60:9 61:11 61:19,21,22 64:8
printing (4) 91:13,14,17 113:10
prior (9) 69:25 70:15,21 71:3 72:15 93:6 102:7 140:9 142:14
privilege (1) 49:15
probably (18) 10:3 12:18 22:10 45:5 57:22 75:18 76:22 80:1,1 81:15,18 82:2 94:6 99:23 102:8,17 107:21 129:12
problem (1) 19:6
problems (1) 50:21
procedure (4) 3:8 97:8 171:2 1:18
procedures (1) 124:12
proceed (4) 7:11 53:10 119:7 161:20
PROCEEDINGS (1) 7:1
process (11) 39:10,15 41:23 42:1,12,16 43:19 63:25 66:5 78:22 90:3
processed (2) 58:11 128:5
processes (1) 124:12
processing (21) 33:2 38:4,19 38:22 44:6 83:24 85:4,16 85:17 88:3,4,5,17 93:18 94:3 97:2 98:20 112:7 118:9 121:2 124:4
processor (1) 93:6
produce (1) 109:16
produced (17) 17:14 19:2,11 32:20 38:14 39:1 48:9 50:7 66:21 73:7 83:3 97:11 113:2 134:20,21 154:24 168:11
producing (1) 129:10
product (40) 28:1 31:4 39:9 39:16,16 40:16 42:13 44:24 45:25 46:6,19 59:2 62:9,14 63:14 69:18 74:25 78:11,23 83:21 88:7 89:8 91:7 94:15 97:15 112:20 112:21 113:14 115:6,14

129:18,20 130:4 133:22 134:21,25 137:20 157:20 159:10 166:2
production (1) 27:24
products (29) 17:15,18,18 18:16 19:2,6 29:5,7,7 30:17 43:21 63:24 67:25 68:1,5 71:13,23 73:7 90:20 97:10 109:16 114:13 129:9 130:1 135:4,8,20 138:7,20
program (2) 71:12 146:25
progress (1) 14:18
properties (10) 16:25 18:12 18:13 23:17 46:15 54:5 100:19 139:21,22 162:17
property (17) 27:11 98:4,11 105:15,16,17,22 106:5,12 108:18 110:25 111:2,2,3,6 111:8 163:2
proprietary (1) 134:21
prospected (1) 96:8
prospecting (1) 20:10
protect (2) 148:23 150:5
Protection (1) 132:13
protocol (3) 97:9 104:10 111:1
proximate (1) 14:11
publication (2) 69:12 108:15
Pulliam (3) 4:15 9:9,9
pulmonary (2) 146:15 147:12
pulverized (1) 40:5
purchase (9) 82:20,21 106:4 114:2 122:25 128:16 162:20 166:16 167:2
purchased (32) 35:4 36:25 93:9 98:11 105:15 108:18 122:5,7,22 124:24 126:11 126:24 128:13,14 131:2 161:25 162:4,18 163:3,9 163:13 164:1,4,7,20 165:13,21 166:4,7,10,23 168:3
purchases (1) 164:14
purchasing (5) 28:10 36:15 115:6 155:14,16
pure (3) 42:14,17,18
purely (3) 24:1 55:19 134:5
purity (1) 74:25
purpose (4) 18:17 69:17 79:2 130:9
pursuant (3) 3:1,7 171:2
put (8) 46:1 47:9 60:3 92:13 92:15 110:10 111:5 123:7
puts (2) 15:10 17:5
putty (3) 27:22 45:5 46:12

**Q**

qualities (1) 46:2
quality (14) 14:20 29:5,6,9 29:20 32:10 33:11,13 45:15,16 52:10 66:18 69:18 79:20
quantities (2) 29:14 31:11
quantity (1) 138:6
quarter (6) 32:7 43:10,11,13 43:14 79:9
quartering (1) 79:7
question (8) 23:7 47:13 66:16

92:22 117:2 130:15 132:21 139:10
**questioned (2)** 141:21,22
**questions (12)** 10:2,5 69:7 70:6 87:21 118:14,17 161:4,11,22 169:12 170:7
**quick (2)** 107:11 161:3
**quickly (3)** 71:21 72:3,8
**quote (1)** 42:21

---

**R**

**R (4)** 3:14 4:1 5:1 6:1
**R-o-d-i-z-z-a (1)** 120:6
**R.T (2)** 6:11 8:3
**radiation (2)** 52:18 53:25
**rail (4)** 88:11,13 156:19,19
**railroad (6)** 155:24 156:1,3,4 156:4,7
**rainbow (15)** 85:21,23,24 87:3,9 93:16 95:13,25,25 96:3 97:5,13,25 102:6,13
**ran (3)** 93:3 96:22 106:15
**range (3)** 11:13 27:22 46:17
**Rapetti (1)** 119:15
**Raymond (1)** 39:8
**Raysman (2)** 6:9,14
**re-swear (2)** 7:3,22
**reaction (2)** 34:21 51:25
**read (18)** 13:7 17:22,24 18:5 58:16,17 68:24,25 70:18 108:15 114:17,20 130:14 130:16 141:8,10 168:12 171:13
**reading (4)** 119:22 120:13 169:9 1:12
**ready (1)** 58:7
**realize (2)** 38:1 142:18
**really (25)** 14:13 20:2 22:3 32:14 33:6 37:12 41:12 50:1 53:18 54:19 57:20,23 61:3 111:2 114:15 116:3,4 117:20,21 124:16 129:11 131:12 142:5 148:13 167:14
**reason (5)** 41:17 47:19 128:22 149:1 168:2
**Reasonable (1)** 111:14
**reasonably (1)** 111:9
**Reath (3)** 3:4 4:13 9:10
**Rebecca (2)** 4:5 9:3
**recall (31)** 27:23 32:16 37:17 37:20 51:22 55:12 56:25 57:2 58:8,21 59:14 62:24 63:1,4,21 64:7,10 76:10 80:8 82:5 83:14 109:18 115:16 144:8,17,21 152:16 153:12 154:17,20,23
**receive (1)** 153:21
**received (1)** 92:14
**receiving (1)** 155:20
**recess (3)** 53:6 119:2 161:17
**recollection (15)** 31:15 35:25 41:2,4 55:21 57:11 61:15 61:18 64:1 70:14 112:25 142:22 144:5 147:9 152:7
**recommendations (3)** 56:6 150:1,15
**recommended (1)** 72:7

---

**record (29)** 7:5,7,10 13:7 17:24 18:5 22:23 28:7 33:23 53:2,5,9 58:17 68:25 71:17 73:15 102:22 111:10 114:20 119:1,5 130:16 141:10 161:15,19 170:7,11 170:17 171:11
**records (2)** 35:16 115:4
**recovery (1)** 16:12
**Red (8)** 86:22,23 87:4,5 107:4,16 111:15 128:7
**reduction (1)** 16:14
**redundant (2)** 10:3,6
**Rees (1)** 4:18
**reference (2)** 62:14 115:2
**referring (2)** 50:5 126:21
**refined (8)** 39:15,16 44:23 46:25 66:3 88:22 90:1 129:23
**reflect (2)** 35:16 114:3
**regarding (3)** 7:14 51:24,25
**regardless (1)** 87:1
**regular (1)** 79:13
**regulations (1)** 68:22
**Reid (2)** 6:8,13
**related (11)** 19:13 22:3 56:24 63:3,11,13 65:4 84:18,25 114:10 142:12
**relating (3)** 35:19 51:3 90:1
**relation (3)** 54:4 57:12 58:10
**relationship (3)** 25:15 35:12 127:14
**relative (1)** 52:5
**relatively (2)** 29:25 30:1
**reliance (1)** 102:19
**remaining (4)** 43:8,20,23 163:13
**remark (1)** 52:17
**remember (35)** 14:13 55:6 60:5,6 61:7 70:1,3 72:6 74:9,13 76:20 77:20 81:6 82:10,13,15 91:13 115:21 115:23 128:25 136:11 140:19,21 141:17,19,20 142:5,25 144:22 146:17,22 147:6 148:11 150:19 153:14
**REMEMBERED (1)** 3:1
**reminds (1)** 47:22
**remnants (1)** 110:15
**remove (1)** 101:16
**removed (1)** 40:11
**RENDAHL (1)** 6:16
**reopen (1)** 12:5
**reopening (1)** 11:23
**repeat (1)** 18:3
**report (3)** 74:2 81:2 151:13
**reported (6)** 1:21 27:9 54:2 79:14 157:6 171:9
**reporter (9)** 7:3,22 13:6 17:22 18:1 58:15 114:23 162:6
**REPORTING (1)** 1:23
**reports (1)** 151:11
**represent (5)** 7:17 8:1,24 9:18 143:16
**representative (3)** 32:8 79:10 119:23
**represented (20)** 3:17,22 4:5

---

4:10,15,20 5:5,8,13,17,22 6:5,10,15,19,23 123:9 143:7,11 144:3
**representing (2)** 8:11 143:21
**request (2)** 57:24 169:13
**required (4)** 30:17 45:20 59:8 147:5
**requires (1)** 46:10
**research (2)** 72:2 74:12
**reserve (1)** 169:18
**residual (2)** 43:25 48:15
**resources (1)** 148:6
**respect (17)** 19:7 23:7 66:10 92:23 132:11,21,25 133:11 133:20 139:11 153:24 157:23 158:12 159:12,22 160:17 165:24
**responded (1)** 68:13
**response (8)** 2:9 34:11 49:23 51:25 57:4,5,9 168:14
**responsibilities (4)** 20:12 35:13 65:7 67:19
**responsibility (1)** 27:10
**responsible (9)** 12:20 14:17 14:19,21 16:12 17:19 20:8 27:7 113:24
**rest (3)** 42:22 77:23 106:9
**restate (1)** 7:19
**result (6)** 32:5 51:9 73:22 74:22 84:13 150:3
**resulted (1)** 39:16
**results (19)** 51:6 72:23 76:11 76:12 79:14 80:10,24 82:23 83:12 98:13 104:11 109:12 110:23 144:22 148:3,15 149:19 150:4 153:5
**resurrection (1)** 12:20
**retained (1)** 170:15
**rethink (1)** 120:4
**retire (1)** 130:22
**retired (3)** 65:12 82:3 132:3
**return (1)** 116:24
**returned (1)** 117:1
**reveal (1)** 109:17
**revealed (1)** 104:11
**review (3)** 48:8,18 50:2
**reviewed (1)** 57:7
**Rhode (2)** 144:7,15
**rid (1)** 101:21
**right (175)** 9:13,22 10:11,13 10:16 11:18,19 12:14 13:21 18:6 19:18 20:14 21:5 22:15 23:7,19 24:5,6 25:8 30:10 31:4,5 33:22 34:25 35:24 36:11,12 38:1 40:5,6 41:5,18,21,22,23,24 42:23 43:7,19 44:5,16 45:12 46:24 48:20 49:10,14 50:8 53:11 55:2,9,16 56:1,2,10 56:19,21,22 59:18 61:20 62:22 63:19 64:12,17 65:15 66:10 71:7 73:5,9,25 74:1 75:12,20,21,22 77:1,7 77:18 78:6,8 80:19 83:4,5 83:10,16 84:12 85:5 87:15 88:12,13,20 90:24 91:4,5,6 92:6 93:12,20 94:22 95:9 95:14,17,22 96:3 97:3,20

---

99:13,14 100:10 102:4,14 103:1,3 104:25 105:8 106:18,20,24 107:2,17,25 110:9,19 111:15 112:4 115:1 116:13,14 118:4 120:5 121:1,7,22 123:14 125:10 127:12 128:2 129:13 130:7,19 131:19,20 135:18,25 136:13 138:11 141:1 144:2 148:2 154:5 154:20,25 156:7,21 157:8 157:10 158:13,15 160:10 160:17 161:10 163:5,7,8 163:19 164:8,15 166:3,12 166:25 168:5,9 169:1,10 169:25 170:8
**rights (2)** 162:3 169:18
**risk (1)** 69:22
**river (6)** 106:9,10 162:4,6,7 167:5
**road (1)** 15:19
**Robero (2)** 5:5 8:8
**Robert (2)** 119:25 120:16
**Roberta (2)** 6:16 1:2
**rock (3)** 32:4,6 110:8
**Rodizza (1)** 120:6
**Roger (12)** 1:16 2:2 3:9,23 4:17 7:13 53:4,8 118:25 119:4 170:13 1:1
**role (3)** 19:7 82:9 165:24
**roof (1)** 156:10
**roofing (13)** 45:6 113:15 114:12 123:14 135:4,5,13 135:16,16,22 136:1,4 155:18
**room (1)** 18:2
**roughly (1)** 136:4
**routine (3)** 145:19 146:6 149:25
**Royal (2)** 5:14 8:17
**rubber (29)** 8:16 28:3,4,11 28:14,17 45:9 46:21 47:3,7 47:12,14,22 113:21 114:22 114:24 130:12 136:16,17 137:1,2,4,14 138:11,16 141:23 159:16,19,25
**Ruber (1)** 4:22
**Rudy (1)** 8:21
**run (1)** 52:24
**running (4)** 17:1 19:9 93:25 93:25

---

**S**

**S (5)** 2:6 3:14 4:1 5:1 6:1
**sack (3)** 58:22 110:6 154:12
**sacks (4)** 112:11 154:8,18 155:14
**safety (4)** 74:25 152:17 153:22,23
**sale (4)** 24:12 67:20 92:18 106:7
**sales (8)** 35:13 65:9 113:25 115:8 119:23 123:9,13 137:15
**sample (15)** 32:8 33:19 34:13 79:2,7,10,25 80:17 82:16 82:17,19 96:13 99:2,6 110:14

---

**sampled (8)** 66:20 79:11 100:21 109:4,5 149:17 153:2,3
**samplers (2)** 149:19,22
**samples (22)** 32:12 33:25 35:19 68:4 71:24 74:18 76:14,18 78:16 79:13,18 80:25 98:2 99:9 109:13,14 109:17 110:2,2,17 153:3,6
**sampling (17)** 14:19 79:1,4 98:23,24 99:11 100:19 108:23,24,25 109:8,20 110:5 132:14 151:22 157:14,21
**San (24)** 1:2,24 3:5,16 4:4,14 4:19 5:4,8,12,17,21 6:4,9 6:14 7:15 112:1,3,17 113:14 120:10 170:16 1:5 1:8
**Sansome (2)** 1:24 170:11
**sat (1)** 72:8
**saw (4)** 68:20 96:15 108:14 159:3
**saying (5)** 41:5 55:9,10 154:22 161:4
**says (1)** 103:22
**scale (2)** 22:16 27:24
**scene (1)** 49:9
**schedule (1)** 79:3
**Schneider (2)** 5:21 8:1
**school (2)** 10:15 72:2
**science (1)** 10:22
**scientists (1)** 99:4
**scope (2)** 166:19 168:7
**scopes (1)** 22:17
**Scott (4)** 3:17 7:16 9:18 13:3
**sealed (1)** 1:15
**Sean (2)** 5:17 8:25
**search (2)** 16:13 33:15
**seasons (1)** 105:7
**Seattle (1)** 10:12
**second (5)** 6:9,14 88:15 123:9 157:4
**secondary (1)** 39:1
**Section (3)** 3:7 171:2 1:17
**secure (1)** 89:11
**Sedgwick (2)** 5:15 9:1
**see (11)** 31:6 67:24 69:15 74:5 92:17 99:5 100:15 115:7 117:13 158:1 161:2
**seeing (1)** 71:3
**seen (4)** 50:14 62:13 71:3 83:21
**segments (1)** 78:22
**sell (6)** 135:8,19 137:4,13 138:3,5
**selling (2)** 28:13,15
**SEMs (1)** 77:22
**send (1)** 79:12
**sent (5)** 33:1 68:5 79:13 98:3 1:15
**separate (2)** 42:11 168:25
**sequence (1)** 49:6
**series (6)** 49:24 75:7 76:14,17 80:25 149:22
**SERVICES (1)** 1:23
**set (5)** 2:11 3:13 33:17 68:22 79:2
**seven (6)** 12:16 14:14 16:7,7

---

19:17 78:21
**shape (2)** 60:4 94:12
**Sherman (1)** 101:18
**shield (8)** 60:4,8,22,25 61:2,4 61:22 92:16
**shift (2)** 80:1,2
**shipped (10)** 39:13 80:21 88:7 90:21 110:10,13 112:10 134:22 135:4 155:19
**shipping (3)** 12:4 118:8 155:22
**Shook (1)** 3:20
**shortly (1)** 77:6
**showing (1)** 124:21
**shut (1)** 100:2
**shy (1)** 21:6
**side (2)** 15:22 109:2
**siding (2)** 83:25 84:10
**signature (1)** 169:4
**significant (1)** 29:22
**signing (1)** 1:12
**silica (1)** 41:11
**silo (3)** 156:12,18,20
**similar (5)** 37:10 90:18,22,23 141:13
**simplify (1)** 18:8
**simply (3)** 39:12 52:22 73:12
**simultaneously (1)** 128:17
**Sincerely (1)** 1:19
**sink (1)** 42:12
**sir (5)** 10:7 57:6 67:11 93:11 117:7
**sit (1)** 118:4
**sites (1)** 149:21
**situation (1)** 144:10
**six (2)** 60:12 111:23
**size (8)** 45:17 46:11,18,23 63:6,8,9 79:12
**sizes (1)** 46:21
**slabs (1)** 47:7
**sliced (1)** 89:16
**slime (1)** 19:14
**slimes (2)** 17:16 18:18
**slip (1)** 47:7
**small (4)** 27:24 51:22 86:3 138:6
**Soco-West (2)** 5:18 9:2
**soil (5)** 101:14,14,16 109:22 109:23
**sold (33)** 23:17 24:15 25:2,6 25:20,21,22 26:7 28:1,3,4 28:16 44:12 113:22 114:22 129:21 130:11 135:6,12,15 136:3,17,25 137:2,16 138:11 159:15,18,24 162:14 165:7 167:6,12
**solely (1)** 134:21
**Somebody (1)** 24:18
**somewhat (2)** 10:6 58:24
**Son (2)** 8:11 114:12
**soon (5)** 68:13 77:1,5 98:1 101:2
**sorry (13)** 12:9 15:16 16:17 18:1 30:21 40:22 59:4 68:23 91:22 97:17 114:23 161:6 164:17
**sort (9)** 29:14 52:12 57:12

64:4 71:10 74:1 112:6 114:2 128:3
**source (37)** 2:8 4:7 22:5 78:18 112:20,22 113:1 114:7 115:11 116:6 119:18 127:11,15,18,22,23,25 128:3,14,24 132:17 133:17 134:10,11 136:24,25 137:4 137:7,13,18 138:1 139:14 146:3 153:15 163:18 164:2 168:13
**Source's (1)** 128:6
**sources (1)** 97:10
**south (2)** 106:10 162:13
**southern (15)** 54:6,6,9 125:16,18 126:2,3,6,12,16 126:17 162:18 163:16 167:6 168:3
**Spaulding (2)** 5:20 7:25
**speak (1)** 21:7
**speaking (2)** 38:24 139:4
**special (3)** 2:10 39:19 168:15
**specific (6)** 31:15 87:10 112:15 117:20 145:19,22
**specifically (8)** 28:14 58:8 67:2 81:7 82:9 123:14 136:6 159:18
**specification (1)** 63:14
**specifics (2)** 50:2 141:19
**speculate (2)** 142:24,25
**speculating (1)** 24:1
**speculation (5)** 34:9,17 47:18 158:8 168:7
**speed (3)** 77:25 101:6 133:14
**spell (3)** 21:1 24:17 85:10
**spelling (1)** 24:24
**spend (1)** 18:23
**split (2)** 79:18 98:2
**spoken (1)** 47:24
**spout (1)** 89:11
**Springs (1)** 156:22
**sprinkle (1)** 42:9
**staff (1)** 33:8
**stages (1)** 81:2
**standard (2)** 30:17,18
**standards (5)** 29:6,6,10 149:3 152:20
**start (6)** 13:8 53:7 67:4 87:8 101:5 150:24
**started (10)** 20:15 21:10,11 22:24 64:24 94:8 95:24 124:7 138:9 167:15
**state (9)** 1:1 9:7 11:24 77:23 145:12 146:5,10,25 1:7
**stated (2)** 171:4,8
**statements (1)** 102:20
**states (13)** 113:16 132:8 134:6,7,15 135:5,17,19,21 136:5,10,12 159:5
**steady (1)** 78:9
**steel (1)** 12:3
**Steiner (2)** 6:9,14
**stem (1)** 32:4
**stenciled (3)** 58:25 61:13,17
**stepped (1)** 99:18
**steps (2)** 69:14 149:16
**Steuart (1)** 5:16
**Steve (2)** 117:16 118:5
**Steven (1)** 117:17

**Stewart (3)** 72:8 81:23 82:7
**stick (1)** 47:7
**stole (2)** 111:1,8
**stone (3)** 40:3,4,10
**stopped (1)** 130:18
**story (1)** 108:12
**straight (2)** 71:2 168:10
**streaks (1)** 30:18
**stream (13)** 65:21 66:21 73:6 73:7 78:19,23 79:11,25 88:5 90:3 97:15 100:20,25
**Street (17)** 1:24 3:5,16,21 4:4 4:14,19 5:4,8,12,21 6:4,9 6:14,19 170:15 1:4
**strike (2)** 103:4 116:18
**strip (1)** 101:14
**stripped (1)** 101:15
**structure (1)** 118:2
**student (1)** 53:17
**students (6)** 50:20,24 54:16 55:24 56:19 57:19
**studied (1)** 149:19
**studies (2)** 10:23 133:1
**study (10)** 50:20 51:6,9 53:17 54:4,7 56:18 57:18 70:12 74:2
**studying (3)** 11:2,6,8
**stuff (2)** 72:12 118:2
**subdivided (1)** 108:19
**subscribe (2)** 68:16 171:14
**subsequently (6)** 81:16 85:8 88:11 125:10 139:7 165:7
**subsidiary (9)** 21:12,15 25:23 26:4 127:16,19 134:12 163:18 167:22
**substantial (1)** 155:17
**Sucessor-in-Interest (1)** 1:5
**sued (4)** 133:17 138:19 144:20 158:17
**suing (2)** 144:19,19
**Suite (7)** 1:24 3:16,21 4:9 6:4 6:9 170:15
**sulfur (2)** 17:18 18:20
**summarize (3)** 18:12 39:24 97:12
**superintendent (1)** 27:9
**Superior (3)** 1:1 7:15 1:7
**supervise (1)** 27:10
**supplemental (3)** 2:9,11 168:14
**supplier (3)** 46:8 61:21,23
**supply (1)** 105:3
**support (1)** 153:19
**sure (32)** 13:15 16:8 20:2 28:7 31:13 33:23 37:22 38:16 61:9,14 70:17 71:2 75:18 81:6,8 84:23 94:7 96:22 108:25 113:8 122:24 123:6 125:17,23 132:6 143:2,3 154:6 160:6 163:24 165:8 168:10
**surface (11)** 32:2 47:8 60:10 109:4,5,8,13,14,17,20,24
**surfactants (1)** 42:6
**survivor (1)** 36:19
**suspect (1)** 104:16
**swear (5)** 9:13 48:3,4 80:12 81:3
**sworn (2)** 9:15 136:21

**symbol (4)** 59:1,7,8 60:4
**symbols (1)** 59:15
**system (1)** 99:12
**systems (1)** 19:1

---

**T**

**T (1)** 2:6
**Tadlock (2)** 6:3 8:6
**take (20)** 7:12 22:18 42:9 53:1 69:6,8 72:11 80:23 101:4 107:7,11 110:1 118:18,19,22 120:5 160:24 161:1,14 168:17
**taken (8)** 32:13 35:19 74:18 144:6 148:23 149:16 171:7 1:10
**talc (114)** 11:2 13:13,24 23:3 23:5,9 27:15,19 28:11,17 29:12 30:4,7,11,12,17,20 31:4 32:22 33:19,20 35:5 36:15,25 38:3,14,22 40:4 40:11,19 42:5,7,7,11,11,13 42:14,14,15,17,19,20 43:20 43:22 44:12,21,22 45:14 46:16 47:2,8,15 50:22 51:20 52:16 58:11 61:25 62:5 63:5 65:15 66:3 87:17 87:25 88:22 90:2 106:8 121:13 122:17 123:22 125:7 128:5 129:16,21 130:11 134:20 137:13 140:6 141:6,23 142:17 149:7 154:14 156:13,22,25 158:21 159:2,8,16,19,25 160:12,20 161:25 162:3 163:6,10 164:7,20 165:5,8 165:13,25 166:1,1,4,7,11 166:22 167:11,15,20,25 168:4
**talk (7)** 20:4 38:2 48:6 72:12 73:9 107:4 146:8
**talked (14)** 31:22 64:14 82:1 86:14 95:11,20 106:19,23 112:4 121:1 128:8 149:14 160:21 169:14
**talking (17)** 31:17,21 37:14 52:13 53:12 54:9,10,12 55:23 63:9 86:9,16 92:7 107:13 136:23 155:3 161:12
**tank (1)** 101:18
**tape (6)** 45:5 53:3,7 113:17 118:24 119:4
**tapes (1)** 170:14
**team (3)** 123:7 124:9 127:5
**technical (1)** 71:14
**technique (2)** 98:23,25
**techniques (1)** 11:13
**technologies (1)** 75:8
**technology (4)** 11:9 71:14 77:12,15
**tedious (1)** 87:22
**tell (11)** 24:20 33:4 83:11 89:4 104:17 112:24 122:14 129:15 133:20 142:24 147:9
**TEM (1)** 77:22
**Temple (1)** 5:7

**ten-minute (1)** 53:1
**tendency (1)** 19:4
**Tennessee (3)** 16:7 17:12 19:16
**test (11)** 24:24 29:8 67:23 68:6 76:13 80:6,7 99:5 110:14,20 152:10
**tested (7)** 41:18 80:17 97:13 139:2,15 147:25 152:10
**testified (3)** 3:12 10:4 145:8
**testify (2)** 145:6 171:5
**testifying (4)** 141:1,3,5 144:17
**testimony (3)** 70:24 171:8,12
**Texas (47)** 29:2,4 31:3,8,15 33:24 69:15 71:9,10 72:15 72:21,23 73:9,16 75:3,5,16 75:25 76:7,9,24 77:2,5,10 78:7,11 79:24 82:23 97:4,8 97:24 98:10 100:14 101:8 104:6 105:14,23 130:7 132:13 145:15,16 149:14 150:8 152:18 154:5 157:25 157:25
**tests (4)** 29:9 74:15 148:3 150:3
**Thank (2)** 161:13 170:10
**Thanks (1)** 170:9
**Thelen (3)** 6:8,13 8:4
**thereabouts (2)** 23:21,22
**thereof (1)** 3:3
**thickness (1)** 45:25
**thin (2)** 109:22,23
**thing (34)** 29:14 43:15 53:19 55:20 59:4 60:13 63:10 76:8 77:18 110:1 114:2 145:4 161:3 169:12
**things (9)** 54:1 70:19 72:5 77:8 81:14 99:2 133:14 153:22,23
**think (50)** 15:12 19:18 24:18 33:22 34:6 36:18 38:17 39:23 43:14 45:24 50:1 51:4 52:17 55:9 57:10,21 61:2 76:2,2 77:24 80:9,11 81:2,13,15,18 82:24 86:18 92:5 94:11 95:1 102:18,21 102:24 113:7,8 114:14 118:5,19 120:19 136:5 140:14 142:11 143:10 153:10 157:12 160:23 161:7 163:22 169:11
**third (3)** 51:21 144:8 146:6
**third-party (1)** 133:15
**thirty (1)** 1:13
**THOMAS (1)** 4:15
**Thorpe (3)** 5:10 8:11,13
**thought (4)** 75:2 120:3,13 166:9
**three (38)** 14:5,7,9 20:23 48:19 51:16 68:21 86:4 93:14 100:1 101:6,10 105:7,7 106:15 113:1 119:4 124:3,5,6 125:11 129:16,23 130:8 134:15 140:12,14,17 141:11,25 142:21 146:11 147:3 157:9 157:11,15 158:12 170:14

---

ROGER MILLER - PLF'S - January 16, 2007

three- (1) 32:6
three-quarters (1) 39:2
tighter (1) 89:9
time (61) 7:10 11:3 12:23
  17:1 18:23 19:12 21:18
  22:10,17 23:16 28:17
  31:16 33:14 34:24 37:7,21
  38:1 44:7 45:6 47:3 48:15
  49:4 50:1 51:4,23 53:5,9
  58:2 64:16,20 65:14,21
  69:25 70:15,21 72:1 77:12
  77:21,24 81:5 82:1 85:19
  116:5 119:1,5 120:1,5
  121:4 131:6 135:6 142:2
  142:16 148:22 160:6
  161:16,19 169:12 170:17
  170:19 171:7 1:14
times (4) 80:1,2,5 140:11
timing (1) 79:2
Tina (1) 8:10
Tire (8) 4:21 8:15 47:14,21
  114:21,24 159:19,25
tired (3) 69:3 97:18 118:19
title (4) 12:17 19:24 123:4,6
today (7) 47:25 50:7 115:8
  120:9 140:9 143:19 145:2
toiletries (1) 134:20
toiletry (1) 44:24
told (6) 45:9 47:5 48:3 53:18
  54:19 120:13
Tom (1) 9:9
ton (1) 154:14
tons (3) 32:18 38:17,18
Tooker (1) 1:23 170:15 1:20
top (10) 47:9 60:5 77:18 78:4
  89:12,14 96:3 101:20
  154:15 156:10
total (1) 170:13
Tower (1) 5:16
town (2) 85:12,13
Traces (2) 40:21,22
trades (2) 146:7 147:17
training (2) 124:18 127:5
transaction (3) 106:6 122:11
  122:13
transcribed (2) 171:9 1:11
transferred (2) 156:18,19
Transite (1) 84:1
transition (3) 123:7 124:8,19
transitions (1) 82:25
transported (1) 38:12
Travaglio (3) 5:9 8:13,13
travel (2) 144:13,14
Travis (1) 3:21
trees (1) 101:12
tremolite (6) 104:20,23 139:3
  139:23 157:6 158:5
trial (2) 145:6,8
tried (2) 30:16 80:8
trouble (1) 86:2
truck (2) 38:13,13
trucked (1) 38:19
trucks (4) 88:10,13 112:10,10
true (8) 78:24,25 90:22
  129:14 141:25 159:23
  171:11,23
truth (3) 171:5,5,6
try (2) 117:12 133:14
trying (3) 37:25 114:14 134:3

Tuesday (2) 1:17 3:2
tungsten (3) 11:24 12:2,4
turned (1) 111:4
TWA (1) 108:13
two (38) 13:14 16:6,10,25
  20:2,3,4,16 23:13 27:13
  35:21,23 41:12 47:6 53:8
  65:19 78:19 81:3 82:25
  83:20 84:3 85:4 86:4 103:4
  103:5,20,25 115:8 118:25
  128:22,23 139:5 140:12,14
  140:17 141:11 154:25
  155:6
two-year (2) 32:13 67:19
typewriting (1) 171:10
typically (3) 42:19 83:9 104:1

### U

Uh-huh (3) 25:19 85:25
  122:19
ultimate (1) 18:17
ultimately (2) 88:1 122:14
unaware (3) 15:9 157:7
  160:22
underground (7) 14:18
  102:10 103:3,15,17,21,22
understand (6) 9:20 10:11
  18:9 75:5 133:13 170:5
understanding (10) 55:21
  121:9 131:2,3,11 138:12
  161:10,24 166:2,3
understood (2) 77:12 161:12
unfortunately (2) 48:4
  118:16
uniform (5) 29:21,25 30:1,1
  33:13
uniformly (2) 79:21 90:20
United (5) 113:16 132:8
  135:5,17 159:5
university (5) 10:12,19,23
  11:6,11
unsure (1) 102:19
uphill (1) 103:8
upstate (1) 13:18
usable (3) 100:25 109:6,7
use (6) 19:13 22:13 101:22
  102:3 141:22 156:2
useful (1) 49:2
uses (4) 2:23 28:1 39:19
utility (1) 39:9

### V

v (2) 1:8 117:17
vacation (1) 132:2
vague (6) 15:6 28:23 46:3
  47:18 67:16 121:11
Valley (2) 157:1 158:4
value (1) 89:8
valve (4) 89:9,12,14,18
Vanderbilt (2) 6:12 8:3
variation (1) 29:19
varnish (1) 28:2
varnishes (1) 64:1
varying (1) 40:7
vast (1) 42:25
verification (3) 2:7 168:13
  169:6
Vermont (49) 17:11 19:21

20:18,20,24,24,25 22:7,9
  22:19 25:1 26:13,16 27:12
  28:19 38:10 44:13 51:17
  51:20 52:3 54:6,7,10 58:10
  85:14,15 86:9,11,13 87:14
  94:3 95:14 99:19 101:14
  101:15 110:12 119:22
  120:13 127:8 133:24
  135:13 146:5,10,25 147:2
  162:11,18 163:2 165:8
versed (1) 45:2
versus (3) 44:21 77:10
  133:24
vice (3) 19:25 67:14 117:23
VIDEO (1) 1:23
VIDEOGRAPHER (9) 7:6,9
  53:3,7 118:24 119:3
  161:15,18 170:12
videotape (1) 52:24
VIDEOTAPED (1) 1:15
videotapes (1) 170:14
villages (1) 14:14
violations (2) 153:16 154:2
virtually (1) 159:4
virtue (1) 167:11
visited (1) 131:25
Volume (5) 53:4,8 118:25
  119:4
VP (2) 20:7 23:13
vs (1) 1:6

### W

wait (5) 22:22 88:15 92:21
  135:10 152:17
walk (2) 75:12 109:25
walked (1) 99:10
walkways (1) 153:20
wall (1) 104:5
Wallace (1) 5:11
want (28) 18:23 31:25 33:10
  33:23 37:22 46:8,13,14,24
  47:7 49:14 53:13 54:22
  55:18 69:5 71:1,2 87:24
  102:18 107:7,8,10,11
  117:9,11 133:23 168:12
  169:13
wanted (10) 44:21 72:1 76:16
  77:19 89:13 108:20 149:2
  152:10 168:9 169:11
warehouses (1) 59:7
Warm (1) 156:22
warning (1) 154:2
warnings (1) 56:3
Washington (6) 10:12,19,24
  11:6,25 134:9
wasn't (11) 21:25 29:22
  41:18 42:14 69:17 70:19
  95:6 111:4 112:21 129:11
  143:21
watching (1) 77:14
water (5) 32:5 42:5,8 52:18
  53:25
Waterbury (1) 163:8
way (18) 10:25 11:3 17:25
  18:8 23:22 33:4 41:15
  53:21 88:21 94:19,20 96:1
  104:2 106:22,23 137:25
  142:4 171:18

we'll (11) 7:3 75:12 86:21
  93:17,17 107:14 118:21,22
  161:22 168:24 169:18
we've (6) 52:25 87:3,22
  106:19,23 160:24
week (4) 78:21 80:12,13,15
weekly (1) 80:9
weeks (2) 81:3 116:23
went (31) 15:14 17:7,10
  33:14 37:13 38:4,7,8 44:20
  48:23 63:25 65:19,21 72:2
  72:3,7 73:13 74:20 80:11
  88:5 92:18 93:19 102:24
  105:11,13 106:18 108:22
  111:5,25 150:20 151:5
weren't (3) 46:24 112:15
  131:18
West (21) 20:24 65:20,23
  78:20,25 79:23 85:4 88:6
  88:22 89:22 90:19,24 92:1
  113:16 123:9,13 134:5
  135:9 155:8 162:16 163:18
Western (37) 2:8 4:7 112:20
  112:22,25 114:7 115:11
  116:6 119:17 120:25
  127:11,15,18,22,23,25
  128:3,6,14,23 132:16
  133:17 134:10,11 136:24
  136:25 137:4,7,13,18
  138:1 139:13 146:3 153:15
  163:18 164:1 168:13
wet (8) 39:14 40:12,13 41:25
  42:13 43:19 46:24 66:5
WH (1) 13:3
whatsoever (2) 53:16 158:10
Wheeler (2) 5:6 8:9
White (1) 154:19
whiteness (1) 30:18
Whittaker (2) 5:19 9:2
wholly (5) 21:15 25:23 26:3
  127:16,19
wife (1) 48:1
Williams (51) 3:22 8:10,10
  9:5,5 21:6 24:20,24 28:25
  29:15 35:7 44:8 55:17
  58:19 69:1,3 70:23 85:12
  86:9,14 92:4 97:19 107:7
  107:10 118:13,18 133:23
  134:2 136:23 142:24
  143:10,21,24 144:1 145:18
  147:8 155:2,5 161:3,7
  162:23 163:22 164:11,15
  164:18 168:20,22 169:20
  169:23 170:1,5
window (1) 108:14
Windsor (106) 20:24 23:15
  23:18 24:8 25:12,16,24,25
  26:11,18 27:1 49:8 56:10
  56:11 57:3,5,9 64:12 65:10
  65:20,23 78:20,25 79:23
  82:22 84:7,17 85:5,20 86:5
  88:6,22 89:22,25 90:9,19
  90:25 91:20 92:1 93:9 95:4
  105:23 106:10,17 112:21
  115:11 116:8 120:1,7
  121:3,18,20 122:3,4,22,23
  123:3 124:22,25 125:5
  126:24 127:15,16,19,25
  128:13,24 132:12,14

133:17,21 134:17,20
  136:19,23 137:2,9,10,12,16
  138:4 139:14 140:25 141:4
  143:13 146:3 147:19,25
  148:7,23 150:10,11,22
  151:17 152:11 153:15
  154:2 155:8,21 156:1,17
  157:15 162:16 163:15,17
  164:1
Winooski (5) 106:9 162:4,7,9
  167:5
wires (1) 19:5
within-entitled (1) 171:6
witness (39) 3:10,11 9:15
  21:4 24:22 29:1,19 34:10
  34:20,23 37:3 44:10 46:5
  67:18 69:2,4 70:25 82:4
  85:13 107:9,12 114:25
  118:15 121:13 134:4
  145:24 147:10 155:7,11
  158:9 162:7,9,24 164:12
  169:1 170:10 171:4,8,12
witness's (2) 166:19 168:7
woman (1) 151:19
wondering (1) 102:22
Woodson (19) 4:6 9:3,3
  28:23 34:8,16,19 37:2
  44:18 46:3 56:17 58:5
  67:16 121:11 137:23 158:7
  166:18 168:6 1:2
word (1) 62:7
words (6) 46:1 80:4 102:25
  136:8 144:18 165:25
work (14) 12:14 16:2 21:14
  52:10 82:12 115:17 121:16
  126:9 149:18 151:14 160:8
  160:11,19 170:3
worked (25) 13:12 16:4
  26:22 36:24 47:21 54:24
  55:8 81:11 82:6,20 115:24
  115:25 116:4 117:11 118:6
  119:10 121:22 124:14
  137:12 139:5,11 141:6
  151:12 158:14 167:18
worker (1) 148:20
workers (5) 36:7 84:25 146:6
  148:23 149:11
workers' (7) 36:7 57:15
  84:20,24 133:8 138:22
  158:18
working (28) 13:9,16 15:11
  20:7,15 21:10,11 22:25
  27:13 36:4 37:6 50:21
  55:25 71:5 86:7 116:12
  117:22 124:7,15 129:4
  130:18 138:9 140:6 147:17
  148:12 150:5 167:15,16
workload (1) 72:11
worthwhile (1) 96:16
wouldn't (4) 34:14,15 139:18
  139:19
wound (1) 137:20
writing (6) 92:8 94:23,24
  112:16 113:6 159:7
writings (1) 154:21
written (3) 74:3 90:10 154:16
wrong (2) 55:14,14
wrongful (1) 7:14
wrote (2) 49:17,18

ROGER MILLER - PLF'S - January 16, 2007

---

**X**

**X (3)** 2:1,6 113:2
**X-ray (4)** 146:22,24 147:11 147:13
**X-rays (1)** 146:16

---

**Y**

**yeah (27)** 7:6 16:25 29:17 43:7 54:2,19,23 55:13 56:14 62:18 70:8 87:12 88:19 92:4 93:21 94:9 95:5 99:18 101:6 106:17 107:24 114:19 145:21 155:4 164:11 168:20 170:4
**year (11)** 19:22 32:19 38:17 38:18 76:18 80:5 94:11,14 115:22 123:9 146:6
**years (50)** 13:14 16:5,6,10 19:17 20:2,3,5 22:10,11 23:13 27:13 34:25 35:23 35:23 58:11 68:21 79:8 80:16 82:2 83:21 86:4 94:5 98:6 99:2 100:1 101:6,10 101:17 105:7 106:16 111:17,23 117:18 118:7 119:23 120:8 126:1 129:5 139:5 140:13 142:18 143:25 146:11 147:3 149:25 150:23 162:18 163:20 165:7
**York (5)** 13:4,16,17,18 14:2
**young (1)** 37:12

---

**Z**

**Zealand (4)** 150:20,22 151:6 151:20
**zero (10)** 73:1,23 74:22 76:12 80:10,10,11,11,11,11
**zones (2)** 16:13 79:17

---

**0**

**0 (1)** 4:14
**08933 (1)** 6:23

---

**1**

**1 (3)** 5:7 6:22 168:22
**1,000 (1)** 110:1
**1:30 (1)** 118:23
**1:31 (1)** 119:5
**10 (2)** 119:23 127:6
**10:07 (1)** 7:10
**10:08 (1)** 3:3
**100 (1)** 6:4
**101 (4)** 4:4 6:9,14 1:4
**10206 (2)** 1:21 171:1
**11:01 (1)** 53:5
**11:16 (1)** 53:9
**113 (1)** 116:16
**12 (3)** 116:18,19 127:6
**12:29 (1)** 119:1
**1200 (1)** 3:16
**13 (1)** 111:17
**1300 (1)** 6:4
**135 (1)** 5:4
**140,000 (1)** 32:18
**15 (3)** 7:5 82:2 119:23
**150 (1)** 116:24

---

**16 (3)** 1:17 3:2 116:23
**160 (1)** 38:16
**160,000 (2)** 38:17,18
**1600 (1)** 3:21
**169 (1)** 2:11
**17 (3)** 140:12 142:18 143:25
**18 (2)** 140:12 142:18
**180 (1)** 38:16
**1800 (1)** 6:9
**18th (1)** 6:14
**19 (1)** 121:24
**1913 (1)** 12:3
**1914 (1)** 12:3
**1941 (1)** 22:14
**1952 (1)** 10:20
**1953 (1)** 13:10
**1956 (1)** 15:10
**1964 (3)** 91:1 166:14,24
**1965 (1)** 138:6
**1966 (17)** 19:23 20:15 22:11 26:16 29:18 34:3 58:11 64:24 67:6,22 69:25 70:1 71:3 75:17,19 93:3 138:9
**1968 (18)** 23:19 24:6,14 25:2 26:1,6,13,16 27:1,4 64:12 75:19 163:4 164:7,13,19 166:17 167:2
**1969 (1)** 106:15
**1970s (1)** 57:21
**1971 (1)** 76:1
**1972 (1)** 150:25
**1973 (1)** 105:9
**1974 (1)** 116:20
**1975 (1)** 103:2
**1978 (7)** 87:10,13 93:3 95:14 102:7,13 127:20
**1979 (3)** 94:6,8 163:23
**1989 (3)** 26:24 27:1 122:8
**1990 (6)** 96:20 100:6 123:11 130:18 131:9 164:2
**1994 (1)** 91:1

---

**2**

**2 (2)** 117:18 168:23
**2,000 (1)** 103:5
**2:21 (1)** 161:16
**2:36 (1)** 161:19
**2:45 (2)** 170:18,19
**20 (2)** 81:18 83:20
**20-acre (1)** 108:19
**2007 (2)** 1:17 3:3
**2025(q)(1) (1)** 1:17
**2093(b) (2)** 3:7 171:2
**20th (3)** 3:5 4:14,19
**24 (5)** 38:24,24 39:25,25 78:21
**25 (3)** 35:23 99:1 120:7
**275 (1)** 4:18

---

**3**

**3 (1)** 168:23
**30 (2)** 81:18 1:13
**325 (2)** 39:6,7
**333 (1)** 5:21
**350 (2)** 1:24 170:15
**36 (4)** 91:20,23,24 95:4
**383 (1)** 6:18
**392-0650 (2)** 1:25 170:17

---

**392-3897 (1)** 1:25

---

**4**

**4 (2)** 168:20,23
**40 (2)** 39:7,8
**400 (1)** 3:16
**41 (2)** 62:10 63:1
**415 (3)** 1:25,25 170:16
**41st (2)** 4:4 1:4
**42 (1)** 63:1
**43 (1)** 63:1
**434980 (2)** 1:8 7:15

---

**5**

**50 (11)** 3:4 60:21 81:15 89:2 89:25 91:20,24 92:1 95:4 113:2 160:25
**50-pound (9)** 58:13,20 59:19 90:21 91:9 94:16,18 112:11,12
**500 (1)** 63:23
**50s (1)** 93:11
**54 (1)** 13:14
**549 (1)** 63:2
**55 (3)** 5:11 13:14 15:12
**5500 (1)** 63:2
**58 (2)** 42:19,20
**599 (1)** 63:2

---

**6**

**6 (1)** 90:10
**60 (2)** 33:12 81:15
**600 (1)** 3:21
**625 (1)** 4:9
**64 (1)** 166:14
**65 (1)** 166:14
**66 (7)** 30:5 31:20 35:9 37:7 75:18 89:25 93:9
**68 (10)** 29:18 30:5 31:20 34:3 35:9 37:7 58:11 75:18 76:22 138:9
**69 (3)** 76:3,24 105:6
**6th (1)** 5:12

---

**7**

**7 (1)** 15:19
**70 (2)** 105:6 106:15
**700 (2)** 1:24 170:16
**70s (4)** 50:20 98:7,8,9
**71 (1)** 75:15
**75 (1)** 102:8
**76 (1)** 102:8
**77002-2911 (1)** 3:22
**78 (2)** 93:24 98:5
**79 (6)** 87:10,13 93:3,24 98:5 127:20

---

**8**

**8-30-25 (1)** 10:10
**80 (5)** 22:10,11 33:13 34:25 117:1
**80s (4)** 100:8 107:21 108:1,4
**81 (1)** 10:8
**83 (1)** 99:23
**84 (2)** 99:23 107:21
**85 (1)** 107:21
**89 (4)** 65:12 121:24,25 122:9

---

**8th (1)** 5:16

---

**9**

**9 (1)** 2:4
**90 (3)** 65:12 121:25 123:12
**92 (1)** 43:21
**94104 (4)** 1:24 5:22 6:5 170:16
**94105 (2)** 5:17 6:10
**94105-2235 (1)** 4:15
**94109 (1)** 3:17
**94111 (3)** 4:5,20 1:5
**94114 (1)** 5:8
**94133 (1)** 5:13
**94607 (1)** 6:19
**94612 (1)** 4:10
**9494104-1211 (1)** 6:15
**95 (2)** 39:6 91:3

---

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

# Exhibit 224

CFR - Code of Federal Regulations Title 21

FDA Home[3] Medical Devices[4] Databases[5]

# CFR - Code of Federal Regulations Title 21

### The information on this page is current as of April 1 2015.

For the most up-to-date version of CFR Title 21, go to the Electronic Code of Federal Regulations (eCFR).[6]

New Search                                    Help[7] | More About 21CFR [8]

```
[Code of Federal Regulations]
[Title 21, Volume 7]
[Revised as of April 1, 2015]
[CITE: 21CFR740.1]
```

```
TITLE 21--FOOD AND DRUGS
CHAPTER I--FOOD AND DRUG ADMINISTRATION
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER G--COSMETICS
```

PART 740 -- COSMETIC PRODUCT WARNING STATEMENTS

Subpart A--General

Sec. 740.1 Establishment of warning statements.

(a) The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product.

(b) The Commissioner of Food and Drugs, either on his own initiative or on behalf of any interested person who has submitted a petition, may publish a proposal to establish or amend, under subpart B of this part, a regulation prescribing a warning for a cosmetic. Any such petition shall include an adequate factual basis to support the petition, shall be in the form set forth in part 10 of this chapter, and will be published for comment if it contains reasonable grounds for the proposed regulation.

[40 FR 8917, Mar. 3, 1975, as amended at 42 FR 15676, Mar. 22, 1977]

Plaintiff's Exhibit No.

**P-324**

exhibitsticker.com

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. http://www.ecfr.gov/cgi-bin/text-idx?SID=3ee286332416f26a91d9e6d786a604ab&mc=true&tpl=/ecfrbrowse/Title21/21tab_02.tpl

7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true

8. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/ucm135680.htm

Page Last Updated: 08/21/2015

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

     

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

 U.S. Department of **Health & Human Services**

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. http://www.ecfr.gov/cgi-bin/text-idx?SID=3ee286332416f26a91d9e6d786a604ab&mc=true&tpl=/ecfrbrowse/Title21/21tab_02.tpl

7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true

8. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/ucm135680.htm

Exhibit 225



1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF ALAMEDA
2                       ---O0O---

3    TERESA ELIZABETH LEAVITT
    and DEAN J. MCELROY,
4          Plaintiffs,
    vs.
5    JOHNSON & JOHNSON, et        No. RG17882401
    al.,
6          Defendants.
    _____/
7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF LOS ANGELES
9                       ---O0O---
    PUI FONG and THAI WONG,
10         Plaintiff,
                        JCCP CASE NO. 4674
11   vs.                 No. BC675449
    JOHNSON & JOHNSON, et al.,
12
           Defendants.
13   _____/

14              TRIAL PRESERVATION
     VIDEOTAPED DEPOSITION OF JAMES PETER MITTENTHAL
15      (PMQ/COR Johnson & Johnson; Johnson & Johnson
                 Consumer, Inc.)
16
            VOLUME III, Pages 444 - 602
17

18
     Taken before EARLY K. LANGLEY, B.A., RMR, RSA, CLR
19             CSR No. 3537

20             October 19, 2018

21

22
            Aiken Welch Court Reporters
23           One Kaiser Plaza, Suite 250
            Oakland, California 94612
24          (510) 451-1580/(877) 451-1580
            Fax:  (510) 451-3797
25             www.aikenwelch.com

Page 445

```
1           I N D E X
2
                   PAGE
3
JAMES PETER MITTENTHAL          449
4
DIRECT EXAMINATION BY MR. SWANSON (Cont'd)   449
5
CROSS-EXAMINATION BY MR. COX          586
6
REDIRECT EXAMINATION BY MR. SWANSON    592
7
RECROSS-EXAMINATION BY MR. COX         599
8
9
10
11          E X H I B I T S
12 EXHIBIT NO.                  PAGE
13 Exhibit 38   4/15/69 memo re Alternate   457
             Domestic Talc Sources
14
   Exhibit 39   Defendant Johnson & Johnson   469
15             Consumer Inc.'s September 2018
               Amended Responses to Plaintiffs'
16             LAOSD Standard Interrogatories -
               Fong case
17
   Exhibit 40   USDC District of Rhode Island,   471
18             deposition of Roger N. Miller,
               10/29/82, in the Westfall v
19             Whittaker, Clark & Daniels case
20 Exhibit 41   Superior Court New Jersey,   477
               Middlesex County, Gambino v
21             Johnson & Johnson Baby Products
               Company, Complaint and Demand for
22             Trial by Jury
23 Exhibit 42   8/6/18 letter, K. Frazier, Shook,   483
               Hardy & Bacon, to J. Satterley,
24             with attached privilege log
25
```

Page 446

```
1  Exhibit 43   11/23/93 memo, R. Denton to W.   494
              Ashton, Trip Report, Talc
2             Validation Team Meeting, 11/16/93
              Windsor, Vermont
3
   Exhibit 44   10/17/94 letter, Luzenac America   501
4             letterhead, to J. O'Shaughnessy
5  Exhibit 45   Superior Court, San Diego, Selby   504
              v Johnson & Johnson, Defendant
6             Johnson & Johnson Consumer
              Products, Inc.'s Response to
7             Plaintiffs' Requests for
              Admission
8
   Exhibit 46   Superior Court, Alameda County,   531
9             Leavitt v Johnson & Johnson,
              Defendant Johnson & Johnson's
10            June 11, 2018 Amended Responses
              to Plaintiffs' Requests for
11            Production of Documents Set 3
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 447

```
1       DEPOSITION OF JAMES PETER MITTENTHAL
2
3       BE IT REMEMBERED, that pursuant to Notice, and
4  on October 19, 2018, commencing at the hour of 9:01
5  a.m., in the offices of Kazan, McClain, Satterley &
6  Greenwood, 55 Harrison Street, Suite 400, Oakland,
7  California 94607, before me, EARLY LANGLEY, a Certified
8  Shorthand Reporter, State of California, personally
9  appeared JAMES PETER MITTENTHAL, produced as a witness
10 in said action, and being previously duly sworn, was
11 thereupon examined as a witness in said cause.
12              ---oOo---
13 APPEARANCES:
14
15 For the Plaintiffs:
16     MARK SWANSON
       Kazan, McClain, Satterley & Greenwood
17     55 Harrison Street, Suite 400
       Oakland, California 94607
18     (510) 302-1000
       Mswanson@kazanlaw.com
19
20 For the Defendants Imerys Talc America, Inc.; Cyprus
   Mines Corporation; Imerys Talc Vermont, Inc.;
21 Specially appearing for Defendant Imerys USA, Inc.:
22     KARLEEN MURPHY
       (Via phone)
23     Dentons US LLP
       601 S. Figueroa Street, Suite 2500
24     Los Angeles, CA 90017-5704
       213 623 9300
25     karleen.murphy@dentons.com
```

Page 448

```
1  For the Defendants Johnson & Johnson; Johnson & Johnson
   Consumer, Inc.:
2
       CHRISTOPHER COX
3      RICHARD T. BERNARDO (Via phone)
       Skadden Arps, Slate, Meagher & Flom, LLP
4      4 Times Square
       New York, New York 10036
5      (212) 735-3453
       christopher.cox@skadden.com
6      richard.bernardo@skadden.com
7
   Also present:
8
       Jonathan Jaffe
9      ESI Consultant
       Jim Partridge
10     Tele-Video Production Services
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 449

1          --oOo--
2          P R O C E E D I N G S
3          --oOo--
4          THE VIDEOGRAPHER:  We are on the record at
5    11 -- excuse me.  We are on the record at
6    9:01 a.m.
7          This marks -- today's date is October 19,
8    2018.
9          This is the continuation of the deposition
10   of James Mittenthal.  This is Volume III, Disk
11   Number 1.
12         Counsel, you may proceed.
13         MR. SWANSON:  Thank you.
14         JAMES PETER MITTENTHAL
15         previously sworn as a witness,
16         testified as follows:
17   DIRECT EXAMINATION BY MR. SWANSON (Cont'd):
18   Q.  Good morning, Mr. Mittenthal.
19   A.  Good morning.
20   Q.  Your deposition is continuing now, and are
21   you ready to go forward today?
22   A.  Yes.
23   Q.  Any reason you can't give your best
24   testimony?
25   A.  No.

Page 450

1    Q.  Okay.  So I want to ask you a couple
2    follow-ups on one of the legal holds.  So if you'd
3    go to Exhibit 1A, and that's Tab 1A in your
4    binder.
5          Do you have that in front of you?
6    A.  Yes, I do.
7    Q.  Now, this is the 2' -- I think it's the
8    current or most recent Johnson & Johnson legal
9    hold notice in asbestos-related talc litigation;
10   correct?
11   A.  Yes.
12   Q.  And I wanted -- I want to go through a
13   little bit on this notice.  It looks like there is
14   some kind of software that notes -- a notice is
15   sent via an email, I guess; is that right?  This
16   notice that -- is that how it gets sent to
17   recipients?
18   A.  Yes.
19   Q.  Okay.  And there is some kind of software
20   that's related to this in terms of them
21   acknowledging receipt in various things; is that
22   right?
23   A.  Yes.
24   Q.  And does that software track certain kinds
25   of information in terms of when they receive it

Page 451

1    and acknowledge receipt and that sort of thing?
2    A.  Yes.
3    Q.  And does the software -- and what's the
4    name of the software?
5    A.  Exterro.
6    Q.  And it says, "Visit the legal hold manager
7    compliance portal, legal hold manager."
8          And does the software track who the
9    intended recipient -- recipients are?
10   A.  Of what?
11   Q.  Of the hold.  In other words, to whom it's
12   sent?
13   A.  Yes.
14   Q.  And I notice there's a section in here
15   that tells recipients that they can suggest other
16   recipients of the hold.
17         Did you see that?
18   A.  Can you reference me to that section?
19   Yes.  I see it.
20   Q.  Yes.  "Suggest other custodians."
21         Do you see that?
22   A.  Yes.
23   Q.  And does the software track who gets
24   suggested?
25   A.  It's my understanding that the company can

Page 452

1    add those people to the list and that they would
2    be tracked.
3    Q.  Does the software track when each
4    recipient acknowledges receipt of the hold?
5    A.  I believe it does.
6    Q.  Okay.  And does the software track who was
7    trained on legal holds, or what the -- anything --
8    information about the recipients of the hold's
9    training?
10   A.  From my fact finding, I have other
11   vehicles, eUniversity, other modules unrelated to
12   Exterro that track training.  And I can pull out
13   my notes for those.
14   Q.  We may do that later.
15         But so that the -- you're not aware that
16   this software actually would have that
17   information; correct?
18   A.  Correct.
19   Q.  Okay.  I noticed that it -- it states here
20   in the first page that "the instruction is within
21   seven days, please visit the legal hold manager
22   compliance portal," and "review and acknowledge
23   this notice."
24         Now, what is triggered with -- what
25   triggers the seven days?  At the point they open

Page 453

1   that email, the recipient of the soft -- of the
2   email regarding this legal hold?  In other words,
3   I work for Johnson & Johnson, I get an email with
4   this legal hold notice.  If I didn't open my email
5   for several days, does that seven days start
6   running when I open my email?
7       A.  I would -- I would be guessing.  My -- I
8   would -- I have a sense of how it works, but I --
9   I'm not -- I would need to do further research to
10  determine that.
11      Q.  I'm interested in what your -- I don't
12  want you to guess, but, based on your experience,
13  what is your expectation?
14      A.  My expectation would be from the -- from
15  the date sent.
16      Q.  From the date the email gets sent?
17      A.  Yes.
18      Q.  Okay.  Do you know why they give seven
19  days for that?  Couldn't somebody -- for example,
20  if I'm an employee and I open the email
21  immediately and I see that there's this legal hold
22  notice, why so long before I have to acknowledge
23  that I've gotten the legal hold notice?
24          MR. COX:  Object to the form of the
25  question.

Page 454

1           THE WITNESS:  I mean, it calls for
2   speculation on my part, but perhaps someone is out
3   of the office on a plane traveling over a long
4   weekend.  It would give them an opportunity to get
5   in front of a place where they can operate the
6   Chrome browser and access the portal.
7   BY MR. SWANSON:
8       Q.  Okay.  That's -- you're assuming that,
9   correct, based on your experience?
10      A.  Those would be -- as I mentioned, I don't
11  know the precise reasons seven days was chosen.  I
12  can only speak to why there may be some days given
13  in terms of the time period.
14      Q.  Okay.  Now, isn't it true that obviously
15  the longer that you wait to require
16  acknowledgment, the chances that some
17  document could get destroyed that should have been
18  preserved under the notice; correct?
19          MR. COX:  Object to the form.
20  BY MR. SWANSON:
21      Q.  Well, let's say if you gave 30 days,
22  right, so any period that you wait beyond what's
23  minimally necessary to acknowledge receipt of that
24  increases the likelihood that documents that are
25  subject to the hold get destroyed; true?

Page 455

1           MR. COX:  Object to the form.
2           THE WITNESS:  Well, I'm not sure if it's a
3   philosophical or legal distinction.  But if I see
4   the email, I can -- I'm able to comply even before
5   I acknowledge compliance.  So the email tells me
6   that there's something going on and that I have
7   something I should or should not be doing.
8           The acknowledgment obviously is a formal
9   indication that I read and understood.  It doesn't
10  mean I can't be doing those things before I even
11  can formally comply with the -- with the notice.
12  BY MR. SWANSON:
13      Q.  Right.  But the idea of having the receipt
14  acknowledgment is so that the company can track
15  who knew when; right?
16      A.  Well, I don't know if I can speculate to
17  all the motives.  It certainly gives the company a
18  sense of -- from an overall perspective who has --
19  who has acknowledged and, therefore, a way to
20  understand who needs to be followed up on, who
21  needs to have their manager contacted, who needs
22  additional action taken.
23      Q.  Right.  Now, if somebody gets it and they
24  don't acknowledge it and they wait the maximum
25  period -- let's say this person doesn't have good

Page 456

1   intentions, and you said, you know, you're
2   assuming somebody is going to -- they see the
3   email, they can comply anyway.  But until they
4   acknowledge it, the company has no way of knowing
5   if somebody actually read it and looked at it,
6   and, furthermore, if somebody had an intention to
7   get rid of something within that window of seven
8   days, that would give them the opportunity to do
9   it before they even acknowledge receipt; correct?
10      A.  Well --
11          MR. COX:  Object to the form.
12          Go ahead.
13          THE WITNESS:  I'm sorry.
14          The company does not know that the person
15  has formally acknowledged until they do so.  But
16  this -- the system operates against the backdrop
17  of all the training and records management
18  awareness and legal hold awareness so that the
19  automated portion of it that I get a legal hold
20  and I'm responding to it formally is just a part
21  of the overall duties and expectations and
22  training for every custodian.  And so it's
23  understood that if I get a notice, it's not the
24  first time I've ever heard of a -- what a legal
25  hold is and what my responsibilities are.

Page 457

1    MR. SWANSON:  I'm going to move to strike
2  that last answer as being nonresponsive.
3        (Whereupon, Plaintiff's Exhibit 38 was
4        marked for identification.)
5  BY MR. SWANSON:
6    Q.  Mr. Mittenthal, I'm handing you Exhibit 38
7  to your deposition.
8        Do you have Exhibit 38 in front of you?
9    A.  I do.
10    Q.  And this is a Johnson & Johnson document
11  dated April 15, 1969, and the subject matter is
12  "alternative domestic source" -- "talc sources."
13        Do you see that?
14    A.  "Alternate domestic talc sources."
15    Q.  "Alternate" -- thank you -- "domestic talc
16  sources."
17        You have been asked about this document
18  before; correct?
19        Do you remember this document?
20    A.  I frankly don't recall.
21    Q.  Okay.  You see here in paragraph --
22  paragraph 3 here that -- well, the author of this
23  is a T.M. Thompson, M.D., and he's writing to
24  William Ashton, W.H. Ashton, at Johnson & Johnson;
25  correct?

Page 458

1    A.  Well, I see that's what's written on the
2  document, yes.
3    Q.  That's what the document says.
4        And Mr. Thompson tells Mr. Ashton, "We
5  have been concerned to a much greater extent with
6  regard to possible dangers relative to inhalation
7  of the talc with a spicule or needle-like
8  crystalline structure as compared to the flat
9  platelet-type of crystalline structure."
10        Do you see that?
11    A.  Yes.
12    Q.  Then he goes on to talk about how there
13  are reports in the literature of talcosis.
14        Do you see that?  Right after that
15  sentence.
16    A.  I'm looking for...
17    Q.  There are reports in the literature?
18    A.  Oh, yes.  Yes.  Yes.
19    Q.  Okay.
20        If you go towards the bottom, the
21  second-to-last sentence.  It says, "In the past we
22  have applied" -- oh, wait.  "Furthermore."  Do you
23  see that halfway through that paragraph?
24  "Furthermore we have occasionally received
25  inquiries from various individuals including

Page 459

1  General Johnson and several pediatricians
2  expressing concern over the possibility of adverse
3  effects on the lungs of babies or mothers who
4  might inhale any substantial amounts of our talc
5  formulations.  In the past we have replied to the
6  effect that, since our talc is essentially all of
7  the platelet-type of crystalline structure and is
8  of a size which would not be likely to enter the
9  pulmonary alveoli, we would not regard the usage
10  of our powders as presenting any hazard."
11        Do you see that?
12    A.  Yes, I do.
13    Q.  And then next sentence says, "Obviously,
14  if we do not" -- "if we do include tremolite in
15  more than unavoidable trace amounts, this sort of
16  negation of such inquiries could no longer
17  pertain."
18        Do you see that?
19    A.  Yes.
20    Q.  And then if you look at the next page, the
21  second paragraph, you see where it says -- author
22  says, "Since pulmonary diseases including
23  inflammatory fibroplastic and neoplastic types
24  appear to be on the increase, it would seem to be
25  prudent to limit any possible content of tremolite

Page 460

1  in our powder formulations to an absolute minimum.
2  To the best of my knowledge, we have never been
3  faced with any unavoidable litigation involving either skin or
4  lung penetration in our formulas."
5        Then it talks about they were "faced with
6  more or less serious problem resulting from what
7  we have considered to have been unjust accusation
8  of danger due to the presence of small amount of
9  boric acid in our talc."
10        Do you see that?
11    MR. COX:  Object to the form of the
12  question.
13    THE WITNESS:  Yes.
14  BY MR. SWANSON:
15    Q.  It says, you see the sentence here, "It is
16  conceivable that a similar situation might
17  eventually arise if it became known that our talc
18  formulations contained any significant amount of
19  tremolite.  Since the usage of these products is
20  so widespread and the existence of pulmonary
21  disease is increasing, it is not inconceivable
22  that we could become involved in litigation in
23  which pulmonary fibrosis or other changes might be
24  rightfully or wrongfully attributed to inhalation
25  of our powder formulations.  It might be that

Page 461

1  someone in the law department should be consulted
2  with regard to the defensibility of our position
3  in the event that such a situation should ever
4  arise."
5       Do you see that?
6    A. "Could ever arise," yes.
7    Q. "Could ever arise." Thank you.
8       So in -- as of April 15, 1969, people in
9  the research and development department,
10  Mr. Ashton in -- at Johnson & Johnson was aware --
11  anticipating at least the possibility of
12  litigation from tremolite-contaminated talc and
13  allegations of lung disease resulting from that;
14  true?
15       MR. COX: Object to the form of the
16  question. Mischaracterizes the document.
17       THE WITNESS: I'm not in a position to
18  say. I'm not familiar with this document. I'm
19  not -- it's beyond my scope to make any assessment
20  of its content.
21  BY MR. SWANSON:
22    Q. Well, you're the person who's here to talk
23  about legal holds and you're also here to talk
24  about the documents that have been produced in
25  this case and whether or not these are authentic

Page 462

1  documents.
2       This is an authentic Johnson & Johnson
3  document; correct?
4    A. I can't say one way or the other.
5    Q. Well, what is it about -- this was -- you
6  can see that this is Johnson & Johnson's Bates
7  numbers; correct?
8    A. I frankly -- oh, yes. I do see a Bates
9  number on it.
10    Q. So you know that that was produced by
11  Johnson & Johnson in this case; true?
12    A. I would want to study it further and
13  verify that, but I do see a Bates number on it.
14    Q. All right. Well, you understand you were
15  noticed, you were -- have been produced as the
16  corporate representative to talk about the
17  authenticity -- authenticity of these documents
18  and whether or not they're business records.
19       You understand that; right?
20    A. I understand that was part of my notice,
21  yes.
22    Q. Okay. So what is it about this document
23  that makes you unable to say whether or not that
24  is an authentic Johnson & Johnson business record?
25       MR. COX: Object to the form of the

Page 463

1  question.
2       THE WITNESS: I -- I'm not familiar with
3  the content. I'm not able to speak to what the
4  content means in any sense of the scientific,
5  factual, or business or medical sense. To the
6  extent that this is an actual Bates number, and I
7  can certainly confirm that, I have no reason to
8  believe that -- nor does the company believe that
9  there are documents that have been produced that
10  are not authentic documents.
11       But in terms of the content, I can't speak
12  to it.
13    Q. I'm not asking -- I'm asking you first
14  whether or not this is an authentic business
15  record of Johnson & Johnson. And you'll agree
16  that it is; true?
17       MR. COX: Object to the form of the
18  question.
19       THE WITNESS: No. The -- the -- the
20  term "business record" is one that I -- I believe
21  entails a legal judgment. And I think the first
22  time you asked me you didn't say the -- I don't
23  believe you said "business."
24  BY MR. SWANSON:
25    Q. Let me ask it differently. It's an

Page 464

1  authentic record of Johnson & Johnson; correct?
2    A. It -- it appears to be a document from the
3  production, and if it is -- if that is the case,
4  then the company has no reason to believe that it
5  is not an authentic document.
6    Q. An authentic document that was created in
7  Johnson & Johnson's regular course of business;
8  true?
9    A. I don't know.
10       MR. SWANSON: Counsel, I want to meet and
11  confer on this because he is designated to speak
12  on these issues and we're talking about, you know,
13  business record in the simplest sense: Is this
14  authentic and is it something created in the
15  regular course of their business. He needs to be
16  able to talk about that. That's one of the
17  noticed topics.
18       MR. COX: I think he is talking about
19  that. I don't think --
20       MR. SWANSON: Well, he needs to be able
21  to -- he isn't because he's saying, I don't know,
22  I can't say.
23       MR. COX: Well, you're asking compound
24  questions and I think he's trying to answer them
25  the best he can.

Page 465

1  BY MR. SWANSON:
2     Q.  Was this document, Exhibit 38, created in
3  the regular course of Johnson & Johnson's
4  business?
5     A.  I simply don't have the information to
6  answer that.  It -- the -- based on the fact that
7  it appears to be a document produced in this
8  litigation, the company does not doubt -- have any
9  special reason to question its authenticity, but I
10 cannot speak to whether it's -- how it was
11 created, whether it was in the ordinary course of
12 business, whether it was in any sense of how the
13 company chose to create its documents.  It is --
14 the document population certainly contains many
15 records created in the course of business.  I'm
16 not able to make a judgment as to this particular
17 document as to the circumstances by which it was
18 created.
19    Q.  Do you have any reason to believe that any
20 documents that are created that were produced in
21 this case, in Leavitt or Fong, that are on
22 Johnson & Johnson letterhead are not records that
23 were created in the regular course of Johnson &
24 Johnson's business?
25    MR. COX:  Object to the form.

Page 466

1     THE WITNESS:  I -- if -- to the extent
2  that the regular course of business assumes a
3  legal judgment, I'm not able to say one way or the
4  other.  I can say that amongst the information
5  produced where there are records created in the
6  course of the company's business operations, I
7  cannot speak to the providence, the context, or
8  the classification of this particular document.
9  BY MR. SWANSON:
10    Q.  But it was created in Johnson & Johnson's
11 business; correct?  You just said that.
12    A.  It was created in such a manner that the
13 company has no reason to doubt its authenticity,
14 to the extent that it was produced in this -- in
15 this litigation.
16    Q.  As a Johnson & Johnson record; correct?
17    A.  I don't know what -- what does that mean,
18 Johnson & Johnson?
19    Q.  It means this is a Johnson & Johnson
20 letter, correct, sent in their -- in the course of
21 their business.  This isn't somebody else's
22 business; right?  This is Johnson & Johnson's
23 business we're talking about; right?
24    A.  I -- I can agree with you that the words
25 at the top say "Johnson & Johnson," but I'm not

Page 467

1  here, nor would I be able to make a judgment as to
2  whether it's a business record created in the
3  course of business and any other categorization of
4  it.
5     Q.  Okay.
6     MR. SWANSON:  We're going to have to meet
7  and confer on that.  He's not an adequate witness
8  on this issue.  These are really simple questions
9  and he is tasked with doing that and he's not able
10 to do it.
11    MR. COX:  I disagree.  I mean, I think he
12 answered your question about authenticity and he
13 answered your question about whether it was
14 created in -- in connection with Johnson &
15 Johnson's business.  I think he's appropriately
16 making a distinction in terms of the legal import
17 of the term "business record," but I think he
18 answered the question -- the other two questions
19 you asked.
20    MR. SWANSON:  Well, I left out the
21 term "business record" and I started asking if it
22 was created in the regular course of their
23 business.  That's not a highly legal term.
24    MR. COX:  No.  And I think he answered
25 that question and said it was.

Page 468

1     MR. SWANSON:  You're agreeing that it was,
2  correct, as counsel for Johnson & Johnson, on this
3  document?
4     MR. COX:  That that was -- that that's a
5  Johnson & Johnson -- created in Johnson &
6  Johnson's business, yes.  Yes.
7     MR. SWANSON:  Okay.
8  BY MR. SWANSON:
9     Q.  All right.  So, with regard to this
10 document, is there -- was -- let me ask you this:
11 Legal holds can be issued either because a lawsuit
12 has been filed, correct, or because a company
13 anticipates litigation; correct?
14    MR. COX:  Object to the form of the
15 question to the extent it calls for a legal
16 conclusion.
17 BY MR. SWANSON:
18    Q.  Those are two situations in which a legal
19 hold could be...
20    A.  And -- and I would concur, but there's
21 many situations where a legal hold could be
22 issued, and the law department makes that
23 determination as to what to issue and when.
24    Q.  But the legal holds themselves talk about
25 anticipated, and, Johnson & Johnson's

Page 469

1  documentation that I've seen, and I can't point
2  you to the exact document, mention both litigation
3  and anticipated litigation in terms of when holds
4  are appropriate; correct?
5      A.  Well, I've seen language like Johnson &
6  Johnson -- or so and so is party to litigation.
7  That I recall seeing in the notice.
8      Q.  But you agree that anticipated litigation
9  is sometimes a trigger for issuing a hold,
10  correct, for a company?
11      A.  In the hypothetical, yes.  Absolutely.
12      Q.  Do you have any information that Johnson &
13  Johnson issued a legal hold in 1969 in instructing
14  Johnson & Johnson employees not to destroy
15  documents relating to the testing of Johnson's
16  Baby Powder or talc that was used in Johnson's
17  Baby Powder for the presence of asbestos?
18      A.  I have no information as to that.
19      Q.  Is there anything that you're aware of
20  that prevented anybody at Johnson & Johnson from
21  issuing a hold on testing documents at this time
22  in 1969?
23      A.  I have -- I have no information one way or
24  the other.  That was not part of my research.
25          (Whereupon, Plaintiff's Exhibit 39 was

Page 470

1          marked for identification.)
2  BY MR. SWANSON:
3      Q.  Mr. Mittenthal, I'm handing you Exhibit
4  Number 39.
5          Let your counsel see that for a moment.
6          Do you have Exhibit Number 39 in front of
7  you?
8      A.  Yes, I do.
9      Q.  And these are Defendant Johnson & Johnson
10  Consumer, Inc.'s September 2018 Amended Responses
11  to Plaintiff's LAOSD Standard Interrogatories in
12  the Fong case; correct?
13      A.  I see that, yes.
14      Q.  Okay.  And if you go to page 21 of this
15  document, Interrogatory Number 36, do you see the
16  question is, "When did you first receive notice
17  that any person including any agent" -- "employee
18  or agent claimed injury as a result of exposure to
19  asbestos or asbestos-containing product supplied
20  by you?"
21          Do you see that?
22      A.  Yes, I do.
23      Q.  And then starting at the second sentence
24  of the answer, "After reasonable investigation,
25  defendant states that it has reasonable and good

Page 471

1  faith belief that it first became aware of a claim
2  of alleged exposure to asbestos with respect to
3  defendant's talc in connection with Westfall v.
4  Whittaker, Clark & Daniels, et al., Case Number
5  79-0269, in the United States District Court for
6  the District of Rhode Island in which plaintiffs
7  alleged injury was mesothelioma, and plaintiff was
8  represented by Decoff & Grimm of Providence,
9  Rhode Island.  Defendant states that the J&J
10  entity Windsor Minerals was voluntarily dismissed
11  from the case."
12          Have you seen this before?
13      A.  I've seen the interrogatory responses,
14  yes.
15      Q.  So you were aware that Johnson & Johnson,
16  or its operating entity company, Windsor Minerals,
17  was sued in the Westfall case; correct?
18      A.  I'm aware of the question and the answer.
19      Q.  Okay.  Were you aware that -- were you
20  aware that Johnson & Johnson's Windsor Minerals
21  had been sued in the Westfall case?
22      A.  I have a general understanding of that.
23      Q.  And to your knowledge, when was that?
24      A.  I'm not familiar with the precise date.
25          (Whereupon, Plaintiff's Exhibit 40 was

Page 472

1          marked for identification.)
2  BY MR. SWANSON:
3      Q.  Let me hand you Exhibit Number 40 to your
4  deposition.
5          MR. COX:  Do you have an extra copy of
6  that, Mark?
7          Thank you.
8  BY MR. SWANSON:
9      Q.  Do you have Exhibit 40 in front of you?
10      A.  Yes.
11      Q.  Okay.  And I've just given you the -- here
12  the first few pages of a transcript of a Roger
13  Miller in the Westfall case.
14          Do you see that?
15      A.  Yes.
16      Q.  And you see that's the same case number,
17  790269?
18      A.  Yes, I do.
19      Q.  And what was the date of that deposition?
20      A.  October 29, 1982.
21      Q.  And if you go to the second page of this
22  on appearances, do you see that Windsor Minerals
23  was represented at the deposition?
24      A.  I do.
25      Q.  And you know that Windsor Minerals, Inc.

Page 473

1 was a subsidiary of Johnson & Johnson that
2 supplied talc to Johnson & Johnson for Johnson's
3 Baby Powder and cosmetic talc products; correct?
4     A. That's my general understanding.
5     Q. And from this information it's clear that
6 Johnson & Johnson was aware of the lawsuit; true?
7         MR. COX:  Object to the form of the
8 question.
9 BY MR. SWANSON:
10     Q. From the interrogatory response that I
11 provided you?
12     A. Well, it – by inference it would appear
13 that the company was aware by virtue of counsel.
14     Q. Okay.  Right.
15         And – okay.  Did Johnson & Johnson
16 instruct anyone at Windsor Minerals at that time
17 to preserve or not destroy documents, information,
18 or physical evidence relating to talc from Windsor
19 Minerals, Inc. Vermont mines –
20         MR. COX:  Object to form.
21 BY MR. SWANSON:
22     Q. – or related to products manufactured
23 from talc that came from Windsor Minerals mines?
24         MR. COX:  Object to the form of the
25 question.

Page 474

1         THE WITNESS:  That was outside the scope
2 of my investigation.
3 BY MR. SWANSON:
4     Q. Well, the scope of your investigation was
5 to investigate talc hold issues; correct?
6         MR. COX:  Object to the form of the
7 question misstates the scope of the notice for
8 which this witness has been tendered.
9 BY MR. SWANSON:
10     Q. You know from looking at the notice that
11 we asked what efforts were made by Johnson &
12 Johnson to preserve documents, correct –
13         MR. COX:  Object to the form.
14 BY MR. SWANSON:
15     Q. – as well as samples?
16         MR. COX:  Object to the form of the
17 question.  Misstates what the notice says.
18         THE WITNESS:  My understanding was that
19 the – my investigation was concerning consumer
20 talc products.
21 BY MR. SWANSON:
22     Q. And what distinction are you making here
23 about Westfall?
24     A. I have a general and limited understanding
25 that Westfall did not involve a consumer talc

Page 475

1 product.
2     Q. And you got this from the lawyers, right,
3 this understanding?
4     A. Yes.
5     Q. Did you also get an understanding that
6 this came from the same mines where cosmetic talc
7 was being mined?
8         MR. COX:  Object to the form.
9         THE WITNESS:  That was outside the scope
10 of my investigation.
11 BY MR. SWANSON:
12     Q. I see.  So you didn't ask that question or
13 find the answer to that?
14     A. I asked – I asked – which question?
15     Q. Whether or not the mines that were
16 involved in – in the Westfall case issues were
17 the same mines that were producing cosmetic talc
18 for cosmetic talc products for Johnson & Johnson.
19     A. I – I would not have viewed that as
20 within the scope of my investigation.
21     Q. Speaking on behalf of Johnson & Johnson on
22 the issue of legal holds and preservation of
23 documents, are you aware of any legal hold being
24 issued with respect to the Westfall case?
25     A. I'm – I'm not aware of holds.  I

Page 476

1 requested holds that related to consumer talc.  I
2 received those holds.  I'm not aware of other
3 holds.
4     Q. Okay.  You are aware of the Westfall case?
5 You were made aware of that and you were
6 specifically made aware of the fact that the case
7 allegations itself weren't about a cosmetic talc
8 product; true?
9     A. I have general knowledge of that, yes.
10     Q. But you didn't bother to find out whether
11 or not the talc issues were related to these
12 cases; true?
13         MR. COX:  Object to the form.
14         THE WITNESS:  I – looking at the
15 deposition notice and my responsibilities, I did
16 not see that my investigation included
17 understanding where talc came from.  I was focused
18 on responding to the deposition topics.
19 BY MR. SWANSON:
20     Q. You would agree with me, though, that if
21 the area where the talc was being mined that's at
22 issue in the Johnson case was an area where
23 cosmetic talc was being mined and in addition it's
24 a mesothelioma case, that there would be many,
25 many overlapping issues with the cosmetic talc

Page 477

1  case; correct?
2      MR. COX:  Object to the form.
3      THE WITNESS:  I know that -- that's a
4  legal conclusion.  I -- I think I'm being asked to
5  provide, and I -- I just can't speak to that.
6  BY MR. SWANSON:
7      Q.  You understand that mesothelioma results
8  from inhalation typically; correct?
9      MR. COX:  Object to the form.  Beyond the
10  scope of the notice.
11      THE WITNESS:  I'm not an expert on the
12  causes of mesothelioma.
13  BY MR. SWANSON:
14      Q.  In any case, you're not aware of any legal
15  hold notice, you've never heard of any legal hold
16  notice being issued with respect to any type of
17  talc prior to 1999; true?
18      A.  I am not aware of any notices prior to
19  1999.
20      (Whereupon, Plaintiff's Exhibit 41 was
21      marked for identification.)
22  BY MR. SWANSON:
23      Q.  Handing you Exhibit 41 to your deposition.
24      Do you have that in front of you?
25      A.  I do.

Page 478

1      Q.  Have you seen -- now, Exhibit 41, you can
2  see that this is a Johnson & Johnson Bates number
3  at the bottom; correct?
4      A.  Yes.  I see what appear to be two
5  different Bates numbers.
6      Q.  And you recognize those are Bates numbers
7  that Johnson & Johnson uses; you've seen those on
8  other documents that they've produced from their
9  records; correct?
10      A.  Correct.
11      Q.  And this is -- appears to be a complaint
12  in a case called Anthony Gambino and Rose Marie
13  Gambino, his wife v. Johnson & Johnson Baby
14  Products Company; correct?
15      A.  I see that.
16      Q.  Were you aware of the Gambino case?
17      A.  I don't recall it specifically.
18      Q.  And if you go to the last -- if you go
19  to -- well, on the first page, first claim of
20  relief, and you can see that the product at issue
21  is Johnson's Baby Powder Purest Protection.
22      Do you see that?
23      A.  Yes.
24      Q.  And, then, if you go to the second page,
25  there is a mention in paragraph 2 that the

Page 479

1  plaintiff alleges that they purchased the product.
2      Do you see that?
3      A.  Yes.
4      Q.  And do you see that Number 4, the
5  plaintiff alleges talcosis from long-term use of
6  Johnson's Baby Powder?
7      A.  I see it.
8      Q.  And in Number 5, they are alleging severe
9  and permanent injuries from that exposure.
10      Do you see that?
11      A.  Yes.
12      Q.  Okay.  If you go to the last page, you see
13  the date of the complaint?
14      A.  Yes.
15      Q.  And what was the date of the complaint?
16      A.  October 11, 1983.
17      Q.  And Johnson & Johnson obviously was aware
18  of this lawsuit; correct?
19      MR. COX:  Object to the form.
20      THE WITNESS:  Well, I have not seen this
21  document before and can't speak to it.  By -- by
22  common sense, it would appear that Johnson &
23  Johnson was aware of this.
24  BY MR. SWANSON:
25      Q.  Right.  Because this document -- I didn't

Page 480

1  make this up or even get it off the Court's Web
2  site or anything; I got it from Johnson & Johnson
3  because that's their Bates number; right?
4      A.  I see the Bates number, yes.
5      Q.  And speaking on behalf of Johnson &
6  Johnson on the issue of legal holds and
7  preservation of documents and evidence, you are
8  not aware of any legal hold being issued at the
9  time of this Gambino case with respect to talc
10  litigation issues and Johnson's Baby Powder; true?
11      MR. COX:  Object to the form.
12      THE WITNESS:  I have no information as to
13  whether a hold was issued or not issued or what
14  the circumstances were.
15  BY MR. SWANSON:
16      Q.  Now, the reality is you're not aware of
17  any legal hold being issued in any kind of talc
18  litigation case prior to 1999.  So, as the
19  spokesperson for Johnson & Johnson, Johnson &
20  Johnson did not issue a legal hold in response to
21  this complaint; correct?
22      MR. COX:  Object to the form of the
23  question.
24      THE WITNESS:  I'm sorry, are you asking me
25  to -- to verify that statement or are you asking

Page 481

1  me if I know it?
2  BY MR. SWANSON:
3      Q.  I'm asking you to verify that.
4      A.  I don't --
5          MR. COX:  Object to the form.
6          THE WITNESS:  I'm sorry.
7          I am not aware of holds prior to 1999, but
8  I'm not speaking as to whether there were or were
9  not holds issued.
10 BY MR. SWANSON:
11     Q.  Well, sure you are.  You are the
12 representative.  You are Johnson & Johnson sitting
13 here speaking as Johnson & Johnson today, and I'm
14 asking you about legal holds, and it's a noticed
15 topic.
16         So did Johnson & Johnson issue a legal
17 hold as a result of the Gambino case --
18         MR. COX:  Object to the form of the
19 question.
20 BY MR. SWANSON:
21     Q.  -- in 1983?
22         MR. COX:  Same objection.
23         THE WITNESS:  That was -- that was not
24 part of my investigation.  I don't have that
25 information.

Page 482

1  BY MR. SWANSON:
2      Q.  So the answer is you don't know, it was
3  your assignment, so there's two options:  Either
4  you don't know -- you did your investigation and
5  there wasn't one, or it hasn't been produced or
6  it's been destroyed or they never issued one.
7          Are there any other options I'm not
8  thinking of?
9          MR. COX:  Object to the form.
10         THE WITNESS:  My objective was to identify
11 the holds that were available.  As far as the
12 holds that weren't available, if there were any,
13 I -- I can't speak to the absence of something as
14 to why it was or wasn't there.  I don't know one
15 way or the other if there was a hold issued or
16 not.  I simply asked for the holds that were
17 available.
18 BY MR. SWANSON:
19     Q.  As Johnson & Johnson speaking today here,
20 do you have any evidence of a hold as a result of
21 the Gambino case in 1983?
22     A.  I do -- I have not received a hold
23 associated with that case.
24     Q.  Okay.  That's all I have about that.  Put
25 that in the stack.

Page 483

1          MR. SWANSON:  Whoever's on the phone, one
2  of you, please mute your phone.
3          MR. BERNARDO:  This is Rich.  Mine has
4  been on mute.
5          MR. SWANSON:  Okay.
6          This is a Fong privilege log.
7          (Whereupon, Plaintiff's Exhibit 42 was
8          marked for identification.)
9  BY MR. SWANSON:
10     Q.  Do you have Exhibit 42 in front of you?
11     A.  Yes, I do.
12     Q.  And you can see that this is a privilege
13 log that was produced by Johnson & Johnson in the
14 Fong case; correct?
15     A.  Appears to be, yes.
16     Q.  Have you seen this privilege log before?
17     A.  I have not.
18     Q.  So you didn't have anything to do with
19 making it a privilege log; correct?
20     A.  That's correct.
21     Q.  Now I want to go through some -- you
22 understand what the general purpose of a privilege
23 log is; correct?
24     A.  Yes.
25     Q.  Okay.  If you go to page 2 of this -- and

Page 484

1  I know the writing is small, but I -- you're
2  pretty young and I assume you can read it.
3      A.  Okay.
4      Q.  Page 2.  Tell me when you're there.
5      A.  I'm on page 2.
6      Q.  You see on page 2 it lists the document.
7  There's various columns for this, and you can see
8  there's -- including privilege log number, the
9  Bates number, the date of the document, the
10 author, the recipient, people who were copied,
11 very -- sometimes a little bit of information
12 about subject matter but not so much, and a
13 privilege description and a privilege claim;
14 correct?
15         MR. COX:  Object to the form.
16         THE WITNESS:  Yeah.  I see those are the
17 column headings on page 1.
18 BY MR. SWANSON:
19     Q.  Okay.  And if you go to page 2, you see
20 the third one down, there's a document that --
21 about which Johnson & Johnson's claiming privilege
22 dated 7/22/1981 from William Ashton to Frank
23 Bolden.
24         Do you see that entry?
25     A.  Yes, I do.

Page 485

1    Q. If you just go to the right there, you see
2  it says, "Memorandum prepared at the request of
3  counsel pursuant to pending and anticipated talc
4  litigation."
5       Do you see that?
6    A. Yes, I do.
7    Q. I don't know what pending talc litigation
8  they're referring to.
9       Do you know if any legal holds were issued
10  with respect to the pending talc litigation that's
11  being referred to in that item from 1981?
12      MR. COX:  Object to the form.
13      THE WITNESS:  I don't know and I simply
14  didn't investigate those types of notations from
15  the privilege log.
16  BY MR. SWANSON:
17    Q. Okay.  You're not aware of any being
18  privilege log from 1981 related to talc
19  litigation, are you?
20    A. I'm sorry.  One more time, please.
21    Q. You're not aware of any talc litigation
22  related legal hold being issued in 1981; correct?
23    A. I'm not aware of one.  I did not receive
24  one when I requested.
25    Q. Okay.  The next item down, do you see

Page 486

1  there's an entry for May 5, 1989?
2    A. Yes.
3    Q. And there's some kind of communication
4  between Ira Dembro and William Ashton.
5       Do you see that?
6    A. I do.
7    Q. And, again, this indicates there's a
8  memorandum prepared by counsel pursuant to pending
9  and anticipated litigation prepared by counsel
10  pursuant to pending and anticipated talc
11  litigation; correct?
12    A. I see that, yes.
13    Q. Are you aware of any legal holds with
14  respect to pending talc litigations being issued
15  by Johnson & Johnson or one of its -- Johnson &
16  Johnson broadly speaking, in 1989 as a result of
17  whatever pending litigation is being referred to
18  there?
19      MR. COX:  Object to the form.
20      THE WITNESS:  I'm not aware.
21  BY MR. SWANSON:
22    Q. Okay.  Going to Page Number 4.  Tell me
23  when you're there.
24    A. Yes.
25    Q. Do you see at the top there are multiple

Page 487

1  references to communications dated November 30,
2  1982, between a George Lee and an Edward
3  Leibensperger?
4    A. I see that, yes.
5    Q. And date of communication is 11/30/1982;
6  correct?
7    A. Well, the first four --
8    Q. That's what I am --
9    A. Yeah.
10    Q. Okay.  And it refers to -- the first one
11  says, "Letter from client to counsel providing
12  materials in anticipation of litigation for
13  counsel to provide legal advice regarding talc
14  sample evidence."
15       Do you see that?
16    A. Yes.
17    Q. And then the next one says, "Attachment
18  between counsel and client sent at counsel's
19  request seeking legal advice regarding ongoing
20  talc litigation."
21       Do you see that?
22    A. I do.
23    Q. So, as of November 30, 1982, whatever case
24  they're referring to these issues in, or
25  anticipated cases, was any legal hold issued by

Page 488

1  Johnson & Johnson?
2      MR. COX:  Object to the form.
3  BY MR. SWANSON:
4    Q. For talc litigation-related information
5  and documents?
6      MR. COX:  Same objection.
7      THE WITNESS:  I -- I simply don't have
8  that information.  I didn't view it as my scope to
9  investigate these -- these privilege log
10  notations.
11  BY MR. SWANSON:
12    Q. Well, you understood that we were asking
13  you about Johnson & Johnson's attempt to preserve
14  evidence related to talc issues; correct?
15      MR. COX:  Object to the form.
16      THE WITNESS:  Yes.  With respect to the
17  Fong and Leavitt cases.
18  BY MR. SWANSON:
19    Q. Okay.  But you just didn't look at this
20  thing.
21       But you asked for holds; right?
22    A. Yes, I did.
23    Q. Okay.  And from what you saw, you're not
24  aware of any holds before 1999; true?
25    A. That's true.

Page 489

1    Q.  And if you go down further at the bottom
2   of the page, you see the reference to June 22,
3   1983?
4    A.  Yes.
5    Q.  You see again there's another
6   communication and this one between
7   Mr. Leibensperger and a John Beidler?
8    A.  Yes.
9    Q.  And copied is Roger Miller.  You see that?
10   A.  Yes.
11   Q.  And this also refers to pending and
12  anticipated talc litigation; correct?
13   A.  Yes.  Correct.
14   Q.  Okay.  So as of 1983 you're not aware of
15  any talc litigation legal holds being issued by
16  Johnson & Johnson; true?
17       MR. COX:  Object to the form.
18       THE WITNESS:  That's correct.
19  BY MR. SWANSON:
20   Q.  Was there anything that prevented
21  Johnson & Johnson issuing holds as to any of
22  these cases that we've talked about so far?  The
23  Gambino case, the Westfall case, or any of these
24  cases that are referred to in this privilege log?
25       MR. COX:  Object to the form.

Page 490

1        THE WITNESS:  So I would disagree that the
2   absence of a hold means that a hold wasn't issued.
3   I requested the holds that were available in
4   consumer talc.  As to whether holds were issued in
5   these cases or the other circumstances surrounding
6   the discovery process, I can't say one way or the
7   other.  I can't say that there wasn't a hold
8   issued.  I simply don't know.
9   BY MR. SWANSON:
10   Q.  So as Johnson & Johnson, you don't know if
11  there were holds on these issues; correct?
12   A.  That's correct.
13   Q.  Okay.  And are you -- and that does
14  suggest an issue I need to follow up on.
15       Are you saying that legal holds don't get
16  retained by Johnson & Johnson?
17       MR. COX:  Object to the form.
18       THE WITNESS:  I -- I'm not saying that one
19  way or the other.
20  BY MR. SWANSON:
21   Q.  Are you aware of the destruction of legal
22  holds by Johnson & Johnson?
23   A.  I am not.
24   Q.  Okay.  If you could go to page 25 of this
25  privilege log, please.

Page 491

1        Are you there?
2    A.  Yes.
3    Q.  So if you see the second reference down,
4   you see there was a communication from Roger N.
5   Miller to a Frank Bolden and other individuals?
6    A.  I do.
7    Q.  And the date of this communication was
8   November 7, 1977.
9        Do you see that?
10   A.  Yes.
11   Q.  And the privilege description says,
12  "Attachment prepared at the request of counsel
13  pursuant to pending and anticipated litigation
14  regarding talc litigation."
15       Did I read that right?
16   A.  Sounds right.
17   Q.  Okay.  And was any legal hold issued with
18  respect to that case that you're aware of?
19   A.  I'm not aware.
20   Q.  Was there anything that prevented
21  Johnson & Johnson from issuing a legal hold as to
22  that talc litigation that you can think of?
23       MR. COX:  Object to the form.
24       THE WITNESS:  I don't know the
25  circumstances of the case.  I don't know

Page 492

1   whether -- what holds were issued.  I don't know
2   the circumstances of the case.
3   BY MR. SWANSON:
4    Q.  Now, you said that you were -- only
5   prepared hold issues related to the Fong and
6   Leavitt case or something along those lines;
7   correct?
8    A.  Well, I understood that my general charge
9   was in reference to these two cases.
10   Q.  Right.  But you understand we're looking
11  here at a privilege log from the Fong case;
12  correct?
13   A.  I understand that.
14   Q.  So Johnson & Johnson already made the
15  determination that it was required to give us a
16  privilege log on documents that were related to
17  these cases; correct?
18   A.  When you say "these cases," you mean --
19   Q.  Fong and Leavitt.  This was issued in
20  Fong.  You see that; right?
21   A.  Yes.  I just didn't know what "these" was
22  referring to.
23   Q.  Okay.  But that's a true statement; right?
24   A.  Yes.
25   Q.  Okay.  The third item down you see there

Page 493

1  was a communication from a Frank Bolden to Roger
2  Miller December 6, 1978?
3      A.  Yes.
4      Q.  And, again, it says, "Attachment between
5  counsel and client providing legal advice prepared
6  by counsel pursuant to pending and anticipated
7  litigation regarding talc litigation."
8          Did I read that right?
9      A.  Yes.
10     Q.  Okay.  And with respect to that talc
11 litigation that's referring to, do you have any
12 information that a legal hold was issued?
13     A.  I – I don't know one way or the other.
14     Q.  And, again, because you're saying "one way
15 or the other," you understand that you were to
16 talk about legal holds on behalf of Johnson &
17 Johnson; correct?
18     A.  Yes.
19     Q.  And you made an inquiry about that to
20 Johnson & Johnson; correct?
21     A.  Yes.
22     Q.  And they provided legal holds to you that
23 go back to 1999; true?
24     A.  Yes.
25     Q.  And those are the same legal holds they

Page 494

1  provided to us in this case; correct?
2      A.  Yes.
3      Q.  Okay.  And those go back to 1999?
4      A.  I believe I've answered that, yes.
5      Q.  That's right.  Okay.
6          I'm done with that one.  Thank you.
7          (Whereupon, Plaintiff's Exhibit 43 was
8          marked for identification.)
9  BY MR. SWANSON:
10     Q.  Mr. Mittenthal, I'm handing you Exhibit 47
11 to your deposition.
12         Do you have that in front of you?
13     A.  Yes, I do.
14     Q.  Okay.  And at the top, you see this is on
15 Johnson & Johnson letterhead?
16     THE REPORTER:  You got the wrong number.
17     MR. SWANSON:  Oh, I did?
18     THE REPORTER:  You're out of order.
19     MR. SWANSON:  Okay.  Let's start over on
20 that, then.
21         Thank you, Early.
22         Let me redo that.  I'm getting ahead of
23 myself.
24 BY MR. SWANSON:
25     Q.  I'm handing you Exhibit 43.  That's a

Page 495

1  correction.  This was not Exhibit 47.  Exhibit 43
2  to your deposition.
3      A.  Thank you.
4      Q.  You have Exhibit 43 in front of you?
5      A.  I do.
6      Q.  And that is correspondence on Johnson &
7  Johnson letterhead; correct?
8      A.  Appears to be, yes.
9      Q.  And from an R. Denton to a W. Ashton and
10 to a D. Jones; correct?
11     A.  I haven't seen this document before, but I
12 agree with you those are the words in the "to" and
13 "from."
14     Q.  And the date it's dated is November 23,
15 1993; correct?
16     A.  Yes.
17     Q.  And it says, "Subject:  Trip report, talc
18 validation team meeting November 16, 1993,
19 Windsor, Vermont."  Correct?
20     A.  Yes.  I see that.
21     Q.  Okay.  And I'm not going to read through
22 this whole document.  But I want to skip -- first
23 of all, again, you're aware that Windsor Minerals
24 was a subsidiary of Johnson & Johnson that mined
25 talc that was used in Johnson & Johnson's baby

Page 496

1  powder; correct?
2      MR. COX:  Object to the form.
3      THE WITNESS:  I have a general awareness
4  of that.
5  BY MR. SWANSON:
6      Q.  And if you go to Page Number 3 of this
7  letter, you see that there's -- above that they're
8  talking about mine tour highlights.
9          Is the heading there?
10     A.  You mean down on the page.
11     Q.  Yeah.  That's right.  Two-thirds of the
12 way down the page.
13     A.  Yes.
14     Q.  And then in the last paragraph, there's a
15 note.
16         Do you see that?
17     A.  Yes.
18     Q.  And the note says -- well, you go ahead
19 and read that note, please.
20         What does the note say?
21     A.  "Note:  The specifics of the mining
22 operation at Hammondsville are uncertain as most
23 of the pre-Luzenac records were destroyed by the
24 mine management staff just prior to the J&J
25 divestiture and the Cyprus purchase.  However,

Page 497

1   several former Hammondsville miners are still
2   employed at the Ham mine, and they provided us
3   with useful information as to the nature of the
4   underground works."
5       Q.  Now, you're aware from your research that
6   Windsor Minerals did testing of talc; true?
7       A.  I recall that I have some notes to that
8   effect.
9       Q.  And you're also aware that Hammondsville
10  was one of the main mines where the talc for
11  Johnson & Johnson's baby powder was mined;
12  correct?
13      MR. COX:  Object to the form of the
14  question.
15      THE WITNESS:  I don't know the specific
16  names of the mines.
17  BY MR. SWANSON:
18      Q.  Okay.  And do you know -- did you do any
19  research -- had you been aware of this destruction
20  of records from your research?
21      MR. COX:  Object to the form.
22      THE WITNESS:  I'm generally aware that
23  records are destroyed from time to time in
24  accordance with retention practices.
25  BY MR. SWANSON:

Page 498

1       Q.  Okay.  That wasn't the question.  I
2   specifically -- I understand that you say you
3   hadn't seen this document before, but were you
4   aware from your research that at the time of the
5   J&J divestiture in the Cyprus purchase or prior to
6   that, which was 1989, for the record, there
7   were -- that the most of the records were
8   destroyed by the mine management staff?
9       MR. COX:  Object to the form.
10      THE WITNESS:  Well, I can read this
11  document on first impression that it refers to
12  pre-Luzenac records being destroyed by mine
13  management.  I did not investigate that issue.  I
14  don't know the circumstances of the destruction
15  and under what business circumstances it was -- it
16  was conducted.
17  BY MR. SWANSON:
18      Q.  Okay.  Do you know of all the testing
19  records that have been there up until that point
20  had been destroyed as of 1989 that were in the
21  possession of the mine?
22      MR. COX:  Object to the form.
23      THE WITNESS:  Yeah.  I have general notes
24  as we've gone through on testing records.  I
25  cannot speak to any specific instances that would

Page 499

1   be in this document which I'm just seeing.
2   BY MR. SWANSON:
3       Q.  And from your research on legal holds,
4   you're not aware of any legal holds being in place
5   at that time in 1989; correct?
6       MR. COX:  Object to the form.
7       THE WITNESS:  I'm not aware any.
8   BY MR. SWANSON:
9       Q.  And the reason why there was no legal hold
10  in place at that time is because Johnson & Johnson
11  chose not to issue legal holds with respect to its
12  talc litigation up to that point; true?
13      MR. COX:  Object to the form.
14  Mischaracterizes the earlier testimony.
15      THE WITNESS:  I would disagree on two
16  points.  Number one, I'm not -- I believe I made
17  it clear, I don't know if holds were issued or
18  not, and I'm also aware that historic cases may be
19  dispositions settled, litigated, come to their
20  conclusion.  I -- I'm not aware of relevant holds
21  that would be in effect prior to 1999.
22  BY MR. SWANSON:
23      Q.  And if there had been a hold in place for
24  testing records and mining records prior to 1989
25  when these records were destroyed, they would have

Page 500

1   been preserved and retained at that point;
2   correct?
3       MR. COX:  Object to the form.
4       THE WITNESS:  I mean, that -- that -- that
5   calls for some degree of speculation.  I -- the
6   records you're speaking about I can't speak to
7   there what happened to them.  I know that what it
8   says on the page here as you've had me read it,
9   but I have not investigated the circumstances of
10  this particular matter.
11  BY MR. SWANSON:
12      Q.  You're not aware -- I mean, you keep
13  raising the specter that you just aren't aware of
14  any holds as if there could have been some holds
15  from before.  But you've told us that you're
16  not -- you're not aware of any holds being
17  destroyed by Johnson & Johnson; correct?
18      A.  I'm not aware of any, no.
19      Q.  That's right.  And you're not aware of any
20  hold releases being issued on talc litigation
21  holds; correct?
22      A.  Correct.
23      MR. SWANSON:  That's all I have about
24  that.  Thank you.
25      MR. COX:  Want to take a five-minute break

Page 501

1  now, Mark?
2        MR. SWANSON:  Sure.  Yeah.
3        MR. COX:  Okay.
4        THE VIDEOGRAPHER:  This marks the end of
5  Media Number 1 in Volume III of the deposition of
6  James Mittenthal.
7        Off the record at 10:07 a.m.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  On the record at
10  10:20 a.m.  This marks the start of Media Number
11  2, Volume III in the deposition of James
12  Mittenthal.
13        You may proceed, Counsel.
14        (Whereupon, Plaintiff's Exhibit 44 was
15        marked for identification.)
16  BY MR. SWANSON:
17        Q.  Mr. Mittenthal, I'm going to hand you --
18  I'm handing your counsel first.  Oh, actually, I
19  have a separate copy there -- Exhibit 44 to your
20  deposition.
21        Do you have that in front of you?
22        A.  I do.
23        Q.  And you've seen this letter before,
24  correct, been shown it in a deposition?
25        A.  I may have.  I don't recall.

Page 502

1        Q.  You see that this appears to be
2  correspondence from Luzenac America to Johnson &
3  Johnson dated October 17, 1994?
4        A.  Yes.
5        Q.  And do you recognize the name of the
6  recipient, Mr. O'Shaughnessy; is that correct?
7        A.  I don't know how it's pronounced.  I see
8  that that's the recipient.
9        Q.  Right.  But you've seen his name on legal
10  holds, correct, John O'Shaughnessy for Johnson &
11  Johnson?
12        A.  I've seen his name before.
13        Q.  And it says, "Dear Mr. O'Shaughnessy, the
14  following is in reply to your letter dated
15  October 4, 1994, in reference to Ritter v. Cyprus,
16  et al."
17        Do you see that?
18        A.  Yes.
19        Q.  And the Ritter case was a case in which
20  Johnson & Johnson, or Cyprus, or Windsor Minerals
21  was a defendant; correct?  Have you heard of that
22  case?
23        MR. COX:  Object to the form.
24        THE WITNESS:  I don't recall.
25  BY MR. SWANSON:

Page 503

1        Q.  Okay.  You see that in the second sentence
2  here.  Second paragraph, second sentence says, "We
3  did not begin to produce roofing-grade products
4  from our local mines until 1970s.  These mines are
5  Clifton, Frostbite, Argonaut, Rainbow, and the
6  Hammondsville mine."
7        Do you see that?
8        A.  I do.
9        Q.  And then you go to the second page.  You
10  see the first actual paragraph there starting
11  with, "Testing was done on a monthly basis on the
12  ore bodies we were mining"?
13        A.  Yes.
14        Q.  "Composites for the talc used for
15  industrial as well as cosmetics were sent to
16  McCrone Associates, an independent lab, for
17  asbestiform analysis."
18        Do you see that?
19        A.  I do.
20        Q.  Now, I don't have the complaint in front
21  of me, but are you aware of any legal holds being
22  issued by Johnson & Johnson with respect to the
23  Ritter case?
24        A.  I'm not aware one way or the other.
25        MR. SWANSON:  That's all I have about that

Page 504

1  one.
2        Thank you.
3        (Whereupon, Plaintiff's Exhibit 45 was
4        marked for identification.)
5        MR. COX:  Thanks.  I'm handing you.
6  BY MR. SWANSON:
7        Q.  I'm handing you Exhibit Number 45 to your
8  deposition.
9        Do you have that in front of you?
10        A.  Yes, I do.
11        Q.  And do you see that this appears to be a
12  discovery response of Johnson & Johnson Consumer
13  Products, Inc. to a plaintiff's request for
14  admission in a Marlene Selby and Lowell Selby --
15  Lowell Wayne Selby v. Johnson & Johnson case?
16        A.  Yes.
17        Q.  Okay.
18        And if you go to the last page, you see
19  that these responses were verified on July 19,
20  1994, in San Francisco, California, according to
21  the signature?
22        A.  July 19, 1994.
23        Q.  And if you go to the second page of these
24  responses, do you see where the plaintiffs are
25  requesting Johnson & Johnson to admit various

Page 505

1  things, including that you engage in the
2  production, manufacture, and/or packaging of
3  Johnson's Baby Powder?
4      Do you see that Request Number 1?
5    A. Yes.
6    Q. Okay. And if you look at Request Number
7  2, it says, "You are aware that the plaintiffs
8  requesting that Johnson & Johnson admit that
9  they're aware that the aspiration of Johnson's
10  Baby Powder may lead to bronchoconstriction."
11      Do you see that?
12    A. Yes.
13    Q. And then if you go to the fourth page, you
14  see where the plaintiff is asking Johnson &
15  Johnson to admit that you were aware that the
16  aspiration of Johnson's Baby Powder may lead to
17  fibrosis.
18      Do you see that?
19    A. Yes.
20    Q. Did Johnson & Johnson issue a legal hold
21  notice in the Selby case in 1994, or at any time
22  for the Selby case?
23    A. I'm not aware of whether or not a hold was
24  issued for the Selby case.
25    Q. You have no information that a hold was

Page 506

1  issued; correct?
2    A. One way or the other.
3    Q. When you say "one way or the other,"
4  again, you're not aware of any holds being
5  destroyed, correct, by Johnson & Johnson?
6    A. Correct.
7    Q. And you're not ahold -- aware of a hold
8  release ever being issued by Johnson & Johnson
9  related in any way to talc litigation; correct?
10    A. I'm not aware that the -- of releases to
11  the holds that I requested. In other words, the
12  1999 through 2017 holds that I requested I am not
13  aware of releases applicable to those holds.
14    Q. Are you aware of releases applicable to
15  other holds related to talc litigation for
16  Johnson & Johnson?
17    A. I requested all holds applicable to
18  cosmetic talc. I -- I don't recall if I requested
19  every release ever issued.
20    Q. Okay. Well, this is clearly cosmetic talc
21  issue, right, the Selby case; true? Johnson's
22  Baby Powder is what they're talking about.
23    A. Yes.
24    Q. And so was the Gambino case. Remember
25  that was a talcosis case --

Page 507

1    A. Yes.
2    Q. -- back in 1983?
3    A. Yes.
4    Q. So those are consumer talc holds if there
5  was a hold related to those talc -- let me start
6  over.
7      If there was a hold related to those
8  cases, it would be a cosmetic talc litigation
9  hold; true?
10    A. True.
11    Q. Okay. And you asked for all those; right?
12    A. Yes, I did.
13    Q. And the oldest one you got is 1999?
14    A. Correct.
15    Q. And you're not aware of any hold releases
16  ever being issued by Johnson & Johnson related to
17  cosmetic talc litigation; correct?
18    A. Correct.
19    Q. Or any other talc litigation; true?
20    A. I have not seen any releases.
21    Q. Okay. That's all I have about that.
22  Thank you.
23      I want to ask you a few questions about
24  Johnson & Johnson International, and I probably
25  should have asked some of these in the context of

Page 508

1  what we were doing yesterday, but I've looked at
2  the holds again in preparation for today, and we
3  went over them in some detail yesterday, and I'd
4  asked you questions about recipients of those
5  legal holds for talc -- in talc litigation going
6  back to 1999.
7      And do you have any information that
8  Johnson & Johnson International ever received any
9  of those holds?
10    A. As an entity?
11    Q. Yes.
12    A. I -- I don't have information with respect
13  to that. I do understand that the 2017 hold was
14  directed at people in international entities.
15    Q. And that was at the first hold that you're
16  aware of that was directed to individuals at
17  Johnson & Johnson International?
18      MR. COX: Object to the form.
19      THE WITNESS: Well, I'm not -- in terms of
20  the precise name of the entity, I would have to
21  double-check those entities. But I -- it's
22  certainly in international locations for over --
23  overseas or OUS locations. That is the first ones
24  I am aware of.
25  BY MR. SWANSON:

Page 509

1    Q. I see.  And I should have been clear in my
2  question.  My understanding is, Mr. Mittenthal,
3  that there is -- there is an operating company of
4  Johnson & Johnson called "Johnson & Johnson
5  International."
6       Are you aware of that?
7    A. Well, I'm aware that the -- that the names
8  of the entities change over time, and so I just
9  want to make sure I'm using the right terminology
10  that befits the time and place.
11    Q. Let me -- let me ask it a little more
12  precisely.  Try to.  Are you aware of an entity
13  called "Johnson & Johnson International" that was
14  the recipient as an entity of legal holds?
15    A. I'm not aware.
16    Q. Are you aware of individuals who worked
17  for an entity called -- an entity or division
18  called "Johnson & Johnson International" who
19  received any of the talc litigation legal holds?
20    A. I am aware that in 2017 people in -- that
21  worked for international elements of the
22  organization received litigation holds.
23    Q. When you say "worked for international
24  elements of the organization," are you talking
25  about people who worked domestically or, for

Page 510

1  example, people in the Philippines like we talked
2  about yesterday?
3    A. The latter.  People who were physically
4  located in the Philippines or Hong Kong.
5    Q. Do you have any awareness that the most --
6  and you're talking about the most recent hold --
7  the current hold in asbestos cases; correct?
8    A. Yes.
9    Q. Okay.  Are you aware of any individuals at
10  a domestic unit of Johnson & Johnson that's called
11  "Johnson & Johnson International" receiving legal
12  holds?
13    A. A domestic unit that's called
14  "International"?
15    Q. Yes.
16    A. I -- I wouldn't know that one way or the
17  other.
18    Q. The way Chris is smiling it might be that
19  I needed to do more research before I asked that
20  question, but.
21       So are you -- did you -- and I don't want
22  to redo what we've done with respect to your notes
23  already, but with -- so keeping in mind that I'm
24  just asking about an operating unit or division
25  called "Johnson & Johnson International," and I'm

Page 511

1  not asking generally about operating units outside
2  the United States like, you know, J&J Hong Kong,
3  J&J Philippines, okay, so just keep -- let's keep
4  that separate.
5       From the research that you've done, can
6  you provide any information about what search --
7  inquiry search was done for documents that were
8  documents that were kept, produced, retained by
9  Johnson & Johnson International?
10       MR. COX:  Object to the form.
11       THE WITNESS:  I -- I can't speak to the --
12  to the entities per se.  I know that my notes
13  reflect the fact that there were documents from
14  international operations that were housed in the
15  United States and were searched as part of this
16  effort.
17  BY MR. SWANSON:
18    Q. Okay.  And would that be, for example,
19  when we were talking about in the first volume of
20  your deposition about the search that was done
21  through the Philippines documents you had -- there
22  was something in your notes about a hundred boxes
23  being selected and then a Skadden associate going
24  through those boxes and not really finding
25  anything.

Page 512

1       Do you remember that generally?
2    A. I do.
3    Q. And is that what you're referring to as a
4  search about an "outside of the U.S." entity but
5  the search is actually physically being done in
6  the United States in an archive in the
7  United States?
8    A. Well, that hundred-box search -- that
9  hundred-box search was actually performed
10  overseas.  So I am actually talking about other
11  documents that were related to international
12  operations but the documents themselves were
13  stored in U.S. locations and searched there.
14    Q. I don't know if this will help, but the
15  Johnson & Johnson International entity or
16  operating unit is located in Brunswick, New
17  Jersey.
18       Does that help you at all in terms of
19  whether or not what information that you have
20  about that from your research?
21    A. You know, in my research, I understand
22  that -- and I have a list of company sources that
23  were searched that was -- that was -- you know,
24  we've talked about the archive, the various
25  noncustodial and custodial sources that were

Page 513

1  listed with my materials. To the extent that they
2  were available to be searched, regardless of
3  whether they were part of an international entity
4  or a U.S. entity, I -- they were all searched, to
5  my understanding.
6       Q.  Well --
7          MR. SWANSON:  I'm going to move to strike
8  that.
9          I just -- it's a very particular question.
10  I'm trying to get at.
11  BY MR. SWANSON:
12      Q.  Which is what information specifically do
13  you have about the operating unit, Johnson &
14  Johnson International, which is in New Brunswick,
15  New Jersey, searches being done of their
16  documents, documents that they retained or
17  archived or had on their computers?  And if you
18  have a list of sources that you're referring to
19  that we can refer to -- if it helps you at all,
20  you know, let's look at it.
21      A.  Well, I'm certainly going to look at the
22  list of noncustodial sources and see if there's
23  anything specifically mentioned about company
24  entities.
25      Q.  For the record, that's a -- Exhibit Number

Page 514

1  4 to your deposition; is that right?
2      A.  That's right.  I just have a general
3  understanding that all documents that would have
4  been available in the U.S. and potentially
5  relevant were subject to search.
6          MR. SWANSON:  Again, I'm going to move to
7  strike as nonresponsive.
8          THE WITNESS:  You know, I'm looking, for
9  instance, on page 2 of Exhibit 4, contracts from
10  the international contracts database.  I'm just
11  seeing an international reference there.  I --
12  I...
13  BY MR. SWANSON:
14      Q.  Can you provide any additional information
15  about any search done -- other than your general
16  impression that searches were done of all U.S.
17  sources, do you have any information specifically
18  as it relates to searches done with respect to
19  Johnson & Johnson International, that you
20  associate with Johnson & Johnson International?
21      A.  Well, I have in my notes, for instance,
22  that various people who I interviewed in
23  international locations who I presume to be part
24  of an international organization utilized
25  enterprise global systems that would have stored

Page 515

1  information in the U.S. relating to international
2  facts or data.
3          So, for instance, the TrackWise system,
4  the SCEPTRE system, other business systems were
5  global in nature so that if I put something into
6  that system in the Philippines or Hong Kong or
7  China, it would have been stored essentially in
8  the -- in the U.S. system.
9      Q.  Do you know as of what year that was being
10  stored in those databases, the first year?
11      A.  You know, I have a chart that I've
12  assembled that we marked yesterday.  From what I
13  know about those various business systems, the
14  objective was not to necessarily understand when a
15  system went global, but there are systems listed
16  there that have international usage.
17      Q.  Let me -- let me just try to cut it short
18  because I don't want to...
19          Do any of those systems go back to the
20  1970s?  In other words, were any of those systems
21  utilized in the 1970s?
22      A.  I have information in my notes that
23  information may have been scanned and brought
24  forward.  There were not a lot of electronic
25  systems in the '70s -- there were some -- but that

Page 516

1  certain information was carried forward, brought
2  into systems that have been migrated forward in
3  our -- so I would not be surprised if there were
4  systems today that had some information from those
5  earlier times.
6          For instance, I know that there has been
7  some scanning of -- occasional scanning of lab
8  notebooks.  So those were in paper form.  Those
9  went back many years.  Those have now been brought
10  forward, some of them, at least, into electronic
11  systems.
12      Q.  I appreciate what you're saying, which is
13  some of the information got transferred forward
14  from a long time ago paper -- paper-type documents
15  from like the 1970s; correct?
16          But would those database systems that
17  you're talking about being in use for Johnson &
18  Johnson -- for domestic Johnson & Johnson's
19  companies keeping track of and having
20  documentation from Johnson & Johnson operating
21  units outside the United States, those are recent
22  platforms, correct, and the -- in terms of
23  preserving those locations; correct?
24          MR. COX:  Object to the form.
25  BY MR. SWANSON:

Page 517

1    Q. They don't go back to the 1970s.
2    A. Well, certainly many of the systems I
3  investigated were in paper form in the '70s, and
4  I -- it would be a one-by-one investigation to
5  look at complaints, adverse events, the call
6  center, the document control systems, the
7  archiving system. I mean, each of those has a
8  different story as to when it was -- what system
9  went live when and what was migrated from a
10  previous system where paper filings would. So it
11  would be -- it's not a monolithic answer. Each
12  system would have an answer as to...
13    Q. I understand. But what was -- you
14  referred to some current systems. Since I don't
15  have a handle on these names when you first
16  answered the question, what were those systems you
17  referred to?
18    A. The first ones I mentioned TrackWise.
19    Q. TrackWise. Were any of those in use --
20  was TrackWise in use by Johnson & Johnson in the
21  1970s or 1980s, 1990s, or even the early 2000s?
22    A. I believe TrackWise -- TrackWise went live
23  relatively recently in about 2009. Well, ten
24  years, nine years ago.
25    Q. Okay.

Page 518

1    A. Approximately when -- around the time that
2  certain operations were consolidated and a global
3  talc specification was created. So there was a
4  lot of that activity in that 2009 time frame,
5  including, as I recall, the conversion to the
6  TrackWise system.
7    Q. And what was the system before TrackWise?
8    A. I've got to check my notes.
9    Q. Okay. I'm going to have you hold that
10  thought.
11    Let me ask. I think I do want to look at
12  your notes for a moment here and ask you about --
13  a little bit more about the Philippines.
14    Do you have your paginated notes? It's
15  Exhibit 26 and I think for the most part, those
16  are -- actually, it would be over there, I
17  believe, wouldn't it?
18    If you go to page 64 in the paginated
19  notes, your paginated notes, which is Exhibit 26.
20  You see here where it's -- there's a summary of
21  your discussions with, was it Pamela Downs? Let's
22  see, yes.
23    A. Yes.
24    Q. Pam Downs regarding searches in overseas
25  location including the Philippines, Hong Kong.

Page 519

1    Did you investigate what systems were in
2  use at either of those locations, the Philippines
3  or Hong Kong in the 1960s or '70s or '80s in terms
4  of database systems or the systems for organizing
5  and preserving documents?
6    A. I did not catalogue the systems in use at
7  that time. I understood that what was available
8  from the time frame that had been preserved from
9  that time was in paper form or in a storage form
10  that it could be put in a box and had been stored
11  in a facility, and that that's the material that
12  was -- that was -- that was searched and that
13  there were indexes to that material.
14    I don't know that there were any
15  electronic systems in use then. I did not
16  catalogue that.
17    Q. We talked about this a little bit so I
18  don't want to spend a lot of time on this, but
19  this hundred boxes that got pulled, that was
20  pulled based on key words, right, according to
21  your notes, for the Philippines?
22    A. Yes. And what that indicated was that
23  when they did the search and came up with
24  nothing -- nothing based on the key word search of
25  the index, they retrieved -- it may have been

Page 520

1  101 boxes -- it was approximately a hundred
2  boxes -- to go through to confirm from a sampling
3  standpoint.
4    Q. I'm going to cut you off. I just asked
5  you a real simple question and you gave me the
6  full explanation again. And we talked about it
7  last time, so I've just got a couple little pieces
8  here to cover.
9    A. Okay.
10    Q. I don't mean to be rude or anything, but I
11  want to move things along and I'm sure you do,
12  too.
13    Okay. So the key words that were
14  searched, were those only in English?
15    A. I don't know if the key words were only in
16  English. I have an understanding that the -- that
17  there was a general use of English for business
18  documents and that there were English speakers
19  there in the records staff who would have known if
20  there were other foreign language issues. I don't
21  know if there were other key words added in any
22  other languages.
23    Q. Well, were the key words the same word --
24  these are different key words from the ERMS key
25  words or the E-R-M-S key words that we spoke about

Page 521

1 last time that are in Exhibit 6 to your
2 deposition?
3    A. You know, I think the terms may have been
4 the same, but because it was a different system --
5 it was an index, it may have been an Excel index
6 or some other different format than ERMS -- and
7 therefore, the precise way it was searched may
8 have varied. I understand that the intent was to
9 search the same type of information.
10    Q. Okay. But you don't know if there were --
11 whether or not there were any non-English words
12 that were used; correct?
13    A. That's correct.
14    Q. Did you -- has this been produced to us,
15 this index of key words?
16       MR. COX: Object to the form.
17       THE WITNESS: I'm not aware one way or the
18 other.
19 BY MR. SWANSON:
20    Q. You didn't produce it for your deposition;
21 true?
22    A. Correct.
23    Q. Now, these boxes that were selected, a
24 hundred boxes, out of how many boxes were those
25 selected?

Page 522

1    A. I -- I don't know the total box count in
2 all these facilities.
3    Q. That was not a random sampling; correct?
4    A. It was -- it was chosen by the attorneys.
5 The methodology I'm not -- I'm not aware of.
6    Q. And is it true that any documents based on
7 the search -- well, whatever documents there were
8 there still -- strike that.
9       With respect to the Hong Kong search,
10 again, it says there was "inbox site index."
11       Has that been produced?
12    A. I'm not aware of one way or the other.
13    Q. Okay. "Put together committee as per
14 above."
15       What does that mean?
16    A. So, there were a list of people associated
17 with the search, and those are actually listed in
18 the later document, because these searches were
19 prior -- prior to the specific Fong and Leavitt
20 searches.
21       So my recent exhibit list additional
22 efforts and list out those people.
23    Q. Okay. And we can pull that up if we need
24 to, but let me -- let me ask you: It says that no
25 responsive documents were found; correct?

Page 523

1    A. Can you reference me to where we are?
2    Q. "Found none. No" -- "no boxes needed" --
3 it says, "No boxes needed to be opened." What was
4 that -- that was based on what?
5    A. The searching of the index.
6    Q. Okay. And what -- and I apologize if I
7 asked this. Was -- were the searches in the Hong
8 Kong documents only done in English, as far as you
9 know?
10    A. I -- I don't know. I do know that there
11 was a committee of people involved with the
12 search, and that committee would list people who
13 would be aware of what documents would be in
14 English and in other languages, and the search
15 would have been calibrated accordingly.
16       MR. SWANSON: Move to strike as
17 nonresponsive.
18 BY MR. SWANSON:
19    Q. Would you agree that if the search terms
20 were English only, then English documents --
21 documents in English would be more likely to come
22 up; right?
23    A. I -- I'm not sure I would say that because
24 you have the index and you have the body of the
25 documents, and the index terms could be in

Page 524

1 English, the document could be in another
2 language. I don't have the particulars on how the
3 index was -- was developed. I have an
4 understanding that the business language in use
5 would have been English, but I don't know the
6 nature of how the boxes were described and which
7 languages were used.
8    Q. And when you say you have an understanding
9 the business language being used, you mean
10 English?
11    A. Yes.
12    Q. For business?
13    A. Yes.
14    Q. Is that what you're saying?
15    A. English was commonly used in the business,
16 yes.
17    Q. So Johnson & Johnson -- and I think you
18 referred to that in the Philippines, too; correct?
19    A. Yes.
20    Q. So Johnson & Johnson's operating
21 companies -- in Philippines, in Hong Kong,
22 Johnson & Johnson was using English in those for
23 the most part; is that what you're saying?
24    A. I would say that English was widely used.
25 I don't -- I can't speak to the ratios or the

Page 525

1  official adoption.
2     Q.  Okay.  Right.  So but would you agree that
3  manufacturers and suppliers to Johnson & Johnson
4  in those foreign countries might not be using
5  English?
6     A.  I wouldn't want to speculate on how they
7  communicated.
8     Q.  Now, with respect to your subsequent
9  discussion with Pam Downs and Laura -- I --
10  Giacino, or whatever her name was, did you learn
11  anything more in terms of whether or not any
12  documents were actually located at the Hong Kong
13  location?
14     A.  Well, I can make a blanket statement that
15  what I did learn was in my notes and I --
16     Q.  Well, let's go to your notes, then, and
17  let's pull that -- I don't remember what exhibit
18  that is offhand, but I believe --
19     A.  It's right on top here, actually.
20     Q.  Oh, it is.
21     A.  20.
22     Q.  Okay.  Great.  And let's -- since we've
23  got this in front of us, it looks like that's on
24  the bottom of page 2 there's a reference to Hong
25  Kong; correct?

Page 526

1     A.  Yeah.  That is the first Fong reference.
2     Q.  Okay.  And is it correct that no documents
3  were located with respect to Hong Kong?
4     A.  Yes.  So this -- this is in Category 4,
5  and if I reference what that means, it says that
6  this type of search was a company source that had
7  not been searched before.  So there were
8  certain -- certain searches conducted in new
9  areas, new searches, entirely new searches, and
10  that was -- that further yielded nothing in that
11  time frame.
12     Q.  Do you know what the terms -- have you
13  seen the offsite storage index and any electronic
14  listings with respect to Hong Kong?
15     A.  Have I -- have I seen it?
16     Q.  Yeah.
17     A.  No.
18     Q.  Do you know what -- how detailed it is?
19     A.  I have not -- I have not seen it.
20     Q.  Do you know what search -- what search
21  terms -- what specific -- do you know the specific
22  individuals who did -- who looked at the storage
23  indexes, who they were?
24     A.  No.  I know Ms. Downs and attorneys were
25  part of the process.  I don't know who -- who

Page 527

1  actually --
2     Q.  Do you know what their instructions or
3  training was in terms of what they were looking
4  for, the people who actually looked at the offsite
5  storage indexes or any electronic listings?
6     A.  Well, I don't know about their training.
7  I know that they -- they were looking for the
8  items detailed in the search criteria.
9     Q.  And what was the year limit put on the
10  search?
11     A.  I don't know that they had a year limit.
12  I know that they were aware of the time frame, as
13  I recall, from 1970 to '84 -- or '71 -- '70 to
14  '84.
15     Q.  That's all I've got about that one.
16  Although you probably hold on to that one because
17  you may look at it again in a moment.
18        Do you know, with respect to the Korean
19  talc that was being supplied to Johnson & Johnson
20  Hong Kong and Johnson & Johnson Philippines,
21  whether or not any searches for documents related
22  to that talc supply in either Leavitt or Fong
23  cases, or any other cases, for that matter, were
24  done in English, and what languages they were done
25  in?  Let me ask you that way.

Page 528

1     MR. COX:  Object to the form.
2     THE WITNESS:  I don't know the range of
3  languages that were used in the search.
4  BY MR. SWANSON:
5     Q.  Do you know whether or not the talc
6  supplier from Korea's talc supply documents are in
7  Korean or some other language?
8     A.  I don't have that information.  I did not
9  research that.
10     Q.  And you're aware from your review of the
11  discovery and the responses to discovery in the
12  Fong and Leavitt cases that the plaintiffs broadly
13  asked for results of testing and testing documents
14  related to talc that went into Johnson's Baby
15  Powder, including from that manufactured overseas;
16  correct?
17     MR. COX:  Object to the form.
18     THE WITNESS:  I'm generally aware that
19  test results were requested.
20  BY MR. SWANSON:
21     Q.  Okay.  And we have been provided, and I
22  don't know if you're aware of it, some Johnson &
23  Johnson worldwide talc surveys from the late 1970s
24  and early 1980s.
25        Have you seen those documents?  And I

Page 529

1  believe those may have been initially obtained or
2  provided in the De La Cruz case?
3      A.  I'm aware of those documents.
4      Q.  Other than those documents, are you aware
5  of the existence of any other talc testing-related
6  documents for the testing of Korean talc for
7  asbestos?
8      A.  I'm not specifically aware one way or the
9  other.
10      Q.  And I believe I asked this yesterday, but
11  you're not aware of a legal hold ever being issued
12  with respect to Korean underlying testing
13  documents, testing of Korean talc; true?
14      MR. COX:  Object to the form.
15      THE WITNESS:  I'm not aware of a -- of
16  a...
17      Actually, I should rephrase.  What I
18  believe I said yesterday was that I'm not aware if
19  there were holds sent to any international
20  locations prior to 2017.
21  BY MR. SWANSON:
22      Q.  Fair enough.
23      Are there any MSDS sheets that Johnson &
24  Johnson has for Korean talc?  I haven't seen any,
25  but do you know from your research are there MSDS

Page 530

1  sheets for Korean talc?
2      A.  I mean, I'm just going to quickly tab
3  through the noncustodial sources and see if I see
4  any references to it.  I don't recall any
5  references to it.
6      Q.  Just for the record, you're looking at
7  Exhibit 4?
8      A.  That's right.
9      Yeah.  I can't tell from here.  I'm not
10  aware of any.
11      Q.  Okay.  You saw from your review of the
12  discovery that the plaintiffs again asked for --
13  and we can go through the discovery, but I think
14  you've looked at it, so if we need to, we will --
15  but that the plaintiffs have asked Johnson &
16  Johnson, in the Leavitt case specifically, for all
17  talc testing results going back to 1965 to the
18  present.
19      Did you see that?
20      A.  I'm aware of historical requests for
21  testing.
22      Q.  Do you -- are you aware in the Leavitt
23  case those went out pretty far; correct?
24      Let me see if I can pull this out real
25  quickly and show it to you.

Page 531

1      MR. SWANSON:  Might as well go ahead and
2  mark it, Exhibit 46 to your deposition.
3      (Whereupon, Plaintiff's Exhibit 46 was
4      marked for identification.)
5  BY MR. SWANSON:
6      Q.  Do you have that in front of you?
7      A.  Yes, I do.
8      Q.  And you see this is defendant Johnson &
9  Johnson's June 26, 2018, Amended Responses to
10  Plaintiff's Request for Production of Documents,
11  Set 3; correct?
12      A.  Yes.
13      Q.  And if you go to the Request Number 29 --
14  Request Number 29 and 30, you see that 29 asks for
15  all the results of testing of talc or talc ore
16  that was used for Johnson & Johnson cosmetic talc
17  products from '65 -- 1965 to the present.
18      Do you see that?
19      A.  Yes.
20      Q.  And Number 30 asked essentially the same
21  question for Johnson & Johnson's talc products,
22  right, testing or testing results of Johnson &
23  Johnson cosmetic talc products 1965 to the
24  present; correct?
25      A.  Yes.

Page 532

1      Q.  And you see that Johnson & Johnson has
2  said that it has produced all documents; correct?
3      MR. COX:  Object to the form.
4      THE WITNESS:  I see that.
5  BY MR. SWANSON:
6      Q.  Okay.  It says it's identified and
7  produced all documents in its possession, custody,
8  or control.
9      So -- and these are verified; right?  If
10  you go to the last page or the second-to-last
11  page, you see the verification; correct?
12      A.  Yes.
13      Q.  Who verified those?
14      A.  Tina French.
15      Q.  And you know who Tina French is; correct?
16      A.  Yes.
17      Q.  And she's empowered by Johnson & Johnson
18  to verify those; correct?
19      A.  Yes.
20      Q.  And so if -- do you have information with
21  respect to the level of completeness of -- let me
22  see if I can ask this differently:  Do you know of
23  all the testing that would -- that was done from
24  1965 to the present that meets that description,
25  how much of those testing results were produced in

Page 533

1  the Leavitt case?
2      MR. COX:  Object to the form.
3  BY MR. SWANSON:
4      Q.  And I'm not talking about the documents
5  that just exist now but of all the testing that
6  was done from '65 to the present, those testing
7  results, how many of those have actually been
8  produced?
9      MR. COX:  Objection.
10  BY MR. SWANSON:
11      Q.  What percentage, anything like that.
12      MR. COX:  Object to the form.  Beyond the
13  scope of the notice.
14      THE WITNESS:  I'm not sure how I would
15  have -- able to understand what percentage were
16  produced.  Certainly the ones were produced that
17  were -- the company could find.
18  BY MR. SWANSON:
19      Q.  Right.  So you -- right.  And that's fine.
20  And you can say you don't know.  I mean, that's a
21  perfectly fine answer in a deposition, as you
22  know.
23      Okay.  But they produced everything they
24  had, according to their diligent search, according
25  to that answer; right?

Page 534

1      A.  Yes.
2      Q.  Okay.  So if any document -- if any
3  testing documents are missing that there is reason
4  to believe existed, those documents would have
5  been destroyed; correct?
6      MR. COX:  Object to the form.
7      THE WITNESS:  I -- I didn't understand the
8  last question, I'm sorry.
9  BY MR. SWANSON:
10      Q.  Well, hypothetically -- you said they
11  produced all the documents in their possession,
12  custody, or control.  And they said that under
13  oath; Johnson & Johnson said that and you've
14  verified that.
15      My question is, if -- first of all, can
16  you say what percentage of the documents
17  reflecting all testing results from those periods
18  were produced, whether it was more or less than 5
19  percent?
20      MR. COX:  Object to the form.
21      THE WITNESS:  I'm in no position to --
22  based on research or even research that I could
23  do, I don't know how I could say what a percentage
24  would be.  I think the company's methodology, as
25  in much discovery, is to look for the information

Page 535

1  that it can find to identify it, or review it and
2  produce it.  I don't know how one would go about
3  knowing what percentage of a hypothetical,
4  historical population would have -- would have
5  been calculated.
6  BY MR. SWANSON:
7      Q.  Okay.  So, to the extent that testing
8  results have not been produced by Johnson &
9  Johnson, that -- where the testing was done and at
10  some point there was a testing result, that would
11  be the result of destruction of the testing
12  results; correct?
13      MR. COX:  Object to the form.
14      THE WITNESS:  I don't think that
15  inevitably follows a "to be."  That could be a --
16  that's a potential reason for why something wasn't
17  produced if it was a disposition in the course of
18  business.
19  BY MR. SWANSON:
20      Q.  Right.  Which means it would be -- and if
21  those documents -- and we -- I'm not going to go
22  back into all the holds and the retention
23  schedules, but we talked about this yesterday.  If
24  something is not under a hold and it's no longer
25  under retention by the retention schedule, it's

Page 536

1  actually supposed to be disposed of; correct?
2      MR. COX:  Object to the form.
3      THE WITNESS:  It becomes a candidate for
4  destruction.
5  BY MR. SWANSON:
6      Q.  Right.  And if, for example, a company
7  like Johnson & Johnson has a cleanout policy
8  annually that's a mandatory possible -- procedure,
9  then, in fact, it would get destroyed; true?
10      MR. COX:  Object to the form.
11      THE WITNESS:  To the extent that it was
12  agreed upon and signed off on, yes.
13  BY MR. SWANSON:
14      Q.  I'd like to ask you some questions about
15  the Legacy collections of documents.  And we
16  touched on this a little bit in the first volume
17  of your deposition.  And let me ask you about --
18  first of all, are those listed in noncustodial
19  sources, I believe?  Is that right?
20      A.  Yes, they are, which is Exhibit 4.
21      Q.  Okay.  And you've got some information in
22  your notes about this.
23      Did you prepare this document,
24  "Noncustodial sources"?
25      A.  I did not.

Page 537

1    Q. It was prepared by counsel?
2    A. Yes.
3    Q. So looking at page 2 of Exhibit 4, it
4  lists Legacy 1 and some information about that;
5  correct?
6    A. Yes.
7    Q. And Legacy 1 was a document collection of
8  talc-related documents that was put together in --
9  as a result or in connection with a 2009 South
10  Dakota action, Berg v. Johnson & Johnson; correct?
11    A. That's my read of the description, yes.
12    Q. And that was a lawsuit alleging ovarian
13  cancer as a result of the use of Johnson's Baby
14  Powder; correct?
15    A. By its description.
16    Q. Do you -- do you know -- was a legal hold
17  issued in that case? I think actually we may have
18  seen -- is this Berg? Yeah, okay. I think we did
19  see Berg from 2009. Yeah. Okay.
20    So I think I know the answer to that.
21    So that was a 2009 hold that we looked; is
22  that right?
23    A. Yeah. You know, I'm going to actually
24  just reach over and grab my list of holds so I've
25  got that in front of me.

Page 538

1    Q. Oh, yeah. So what exhibit is that for the
2  record?
3    A. That is 21.
4    Q. Thank you.
5    And the Berg case was under a legal hold;
6  is that right?
7    A. I have a legal hold from December 15th,
8  '09.
9    Q. And a collection of documents was put
10  together at that time?
11    A. At some point it was put together.
12    Q. Do you know -- do you remember the last
13  time we talked about in some detail how the
14  various inquiry and search steps related to
15  documents that had become part of the sort of -- I
16  forget what we're calling it, but the large sort
17  of omnibus talc collection of documents, and we
18  talked about those procedures with respect to the
19  1600 boxes being pulled and the ERMS and the
20  filtering terms.
21    You remember that?
22    A. Yes.
23    Q. And what I'd like to ask you is about
24  what -- how the searches were done, the inquiry
25  and searches related to Legacy -- the Legacy 1

Page 539

1  collection were done back in 2009 or '10 or
2  whenever that was actually effectuated.
3    Do you have information about that?
4    A. I -- I don't. I have it represented that
5  that was a monolithic collection that was
6  preserved and carried forward. I don't have the
7  search criteria for -- for that particular matter.
8    Q. Do you know how sources of documents were
9  identified?
10    A. In Legacy 1?
11    Q. Yes.
12    A. No. As I mentioned, that was presented to
13  me as a -- as a monolithic set. I mentioned in
14  the first day that I had gone through and reviewed
15  certain -- sampled and reviewed certain documents
16  in a litigation review tool. I -- I pulled up a
17  few Legacy 1 documents just to -- just to see them
18  and get familiar with them. I certainly couldn't
19  speak to where all -- they all came from.
20    Q. And it looks like -- interesting. I'm
21  looking at these other Legacy collections and I
22  think I'll just jump over to some of these others.
23    You see -- do you know why Legacy 4, for
24  example, was -- how the numbering for the Legacy
25  collections came about? For example, there were

Page 540

1  some documents, it appears from the description
2  here that are part of Legacy 4, that were gathered
3  in the Ritter case.
4    Do you see that?
5    A. Yes.
6    Q. Do you know when those were gathered?
7    A. No, I do not.
8    Q. It says "primarily collected in connection
9  with the Ritter case."
10    And then you were aware of the Coker case
11  and the collection that came out of that; is that
12  right? That's Legacy Number 2?
13    A. That's right.
14    Q. Does the -- and I know you don't have any
15  holds prior to 1999, but does the existence of
16  these Legacy collections to you suggest that there
17  were legal holds in place?
18    MR. COX: Object to the form.
19    THE WITNESS: It does not necessarily
20  follow that. And I -- as a hypothetical and maybe
21  they collected for the purposes of accomplishing a
22  hold. I know from -- in some cases that happens.
23  I don't know if that's an indication or not of
24  whether holds were issued.
25  BY MR. SWANSON:

Page 541

1    Q.  Looking at the Coker, the one that was
2    collect -- the Legacy 2, it says it was a
3    historical collection of materials primarily
4    located in connection with the 1998 Texas action,
5    Coker v. Bill Thames Pharmacy, Inc. et al.
6        Do you see that?
7    A.  Yes.
8    Q.  And that was a case where a woman had
9    alleged that she developed malignant mesothelioma
10   from airborne exposure to talcum powder, and that
11   would be referring to either Johnson & Johnson
12   Baby Powder or Shower to Shower; right?
13   A.  I'd have to double-check, but apparently,
14   yes.
15   Q.  Okay.  Speaking as to that collection that
16   was gathered as a result of this Coker case that
17   was filed in 1998, do you know what sources of --
18   do you know -- generally, can you talk about how
19   the collection was created?
20   A.  You know, I received a brief overview from
21   counsel and then I was also referred to the letter
22   that is marked as Exhibit 10 to familiarize myself
23   with those materials.
24   Q.  Okay.  Without me reading this letter in
25   detail right now, based on your understanding

Page 542

1    after having read it, do you know what sources
2    were consulted to locate relevant documents that
3    were collected and became Legacy 2?
4    A.  Well, I did not personally verify this,
5    but based on my read of the document, on page 2
6    there's a question about the document collection
7    that occurred, and the text in the case that "the
8    collection efforts involved identifying,
9    collecting, and copying the reasonably available
10   documents related to talc from employees
11   identified in the memo," that collection which was
12   referred to as "the '98 collection" contains a
13   list of identified individuals below that.
14   Q.  Okay.  And you're looking at this list:
15   John Hopkins, Bill Ashton, Regina Gallagher,
16   Connie Seamen, James Molnar, Bob Russell, George
17   Lee, and Bruce Semple?
18   A.  Yes.
19   Q.  Are you aware of anybody else who was
20   consulted or -- for documents from whom documents
21   were sought with respect to this -- the Coker case
22   and the documents that became Legacy 2 collection?
23   A.  Well, as I mentioned, I know basically my
24   understanding comes from a read of the documents,
25   and it does note that some documents came from

Page 543

1    other people.  But beyond that, I don't have
2    specific information, nor did I do a discrete
3    investigation of this historical collection that
4    was brought forward.
5    Q.  And do you know specifically -- or what
6    information do you have about the -- what was
7    being sought and what indexes -- indices,
8    electronic or paper, were consulted for that?
9    A.  I don't have specific information beyond
10   what -- what's in the letter.
11   Q.  And do you know who actually did the
12   search?
13   A.  My understanding is that it was done under
14   attorney supervision.  Beyond that, I can't speak
15   to who physically performed the search.
16   Q.  Do you know if the search was done only
17   through paper files or were there electronic
18   searches done?
19   A.  I'm reviewing the letter to see if there's
20   any indications.
21       Yeah.  It -- it's not clear from the
22   letter what sources were consulted.  There are --
23   there are certainly references to paper documents.
24   I -- I can't ascertain the scope of the search
25   from the letter.

Page 544

1    Q.  And is your information about that
2    collection limited to that letter?
3    A.  There was a brief summary of it from --
4    from counsel, and then there's the materials that
5    are in the Exhibit 4 table.
6    Q.  Where it mentions the collection?
7    A.  The noncustodial list, yes.
8    Q.  When you say a summary from counsel, and
9    I'm not specifically -- are you talking about some
10   written summary as in, for example, what's written
11   here in Exhibit 4, or something additional?
12   A.  No.  I was generally told that there was a
13   case and I was being provided a letter about the
14   case to educate me.
15   Q.  Do you know whoever did the search, and I
16   know -- whether, how narrowly or broadly their
17   instruction was as to -- well, do you know how
18   broadly or narrowly they interpreted what was
19   relevant to the inquiry?  For example, if there
20   was a document with attachments and the
21   attachments, for example, maybe one of the
22   attachments doesn't match up some particular
23   search terms or group of search terms, whether or
24   not all of the attachments would be included?
25   A.  I -- I don't have that information.  I

Page 545

1  mean, I understand from the memo certain searches
2  were conducted with certain custodians and other
3  sources where the documents were reasonably
4  calculated to be, that they were put in boxes at
5  some point. They were rearranged and reorganized.
6  But that that collection has been preserved
7  historically in a monolithic way and only -- only
8  what's in this letter is what I know about how the
9  collection was performed.
10      Q. And in looking at your noncustodial
11  sources here, Legacy, the Legacy 4 collection.
12      MR. SWANSON: Oh, let me stop for a
13  second.
14      Is it about time for a little break?
15      MR. COX: That sounds good.
16      MR. SWANSON: I think that's about the
17  right time. Okay. And we'll have lunch coming,
18  so. But we'll do some more testimony first. I
19  think it's -- isn't it 11:30?
20      MR. COX: It is.
21      MR. SWANSON: Yeah. That's fine. Okay.
22  Good.
23      THE VIDEOGRAPHER: This marks the end of
24  Media Number 2, Volume III in the deposition of
25  James Mittenthal.

Page 546

1      Off the record at 11:29.
2      (Recess taken.)
3      THE VIDEOGRAPHER: We are on the record at
4  11:52 a.m.
5      This marks the start of Media Number 3,
6  Volume III in the deposition of James Mittenthal.
7      Counsel, you may continue.
8  BY MR. SWANSON:
9      Q. Okay. Let's see. Gather myself up here.
10      You have that letter in front of you.
11  That was Exhibit 10 we were talking about, the
12  Legacy 2 collection in the Coker case.
13      You remember that?
14      A. Yes.
15      Q. And that indicates on the first page that
16  the case was actually filed in 1997; correct?
17      A. Yes.
18      Q. Okay. And was a legal hold issued in that
19  case?
20      A. I don't have information about that.
21      Q. Now, you knew about this document and you
22  asked for legal holds in this case.
23      Did you ask if there was a legal hold for
24  this case?
25      A. I recall asking for all relevant legal

Page 547

1  holds from the context of consumer talc. I didn't
2  specify this case individually.
3      Q. We had spoken about the Gambino case and
4  the Westfall case. Were any Legacy document
5  collections created in connection with those
6  cases?
7      A. Well, I'm not aware of a precise
8  definition of a Legacy document collection. I
9  know that in the noncustodial sources there are
10  four designated groups of documents called Legacy
11  1 through 4 that have been denoted that for
12  various reasons.
13      I don't -- I also understand that -- that
14  the global put out -- the global talc production
15  and, in addition to that, the specific productions
16  for Leavitt and Fong were based on documents that
17  were available, both through the ongoing
18  collection process as well as the incorporation of
19  Legacy 1 through 4.
20      I'm not aware of any distinct sets that
21  have been created that are called "Legacy,"
22  anything else. But I know that the company used
23  its best efforts to collect the information from
24  whatever relevant sources were available and
25  incorporated those Legacy cases as well.

Page 548

1      MR. SWANSON: Move to strike as
2  nonresponsive.
3  BY MR. SWANSON:
4      Q. Was there -- do you have any information
5  that documents were gathered in connection with
6  the Westfall litigation that are part of the
7  global talc production of documents?
8      A. You know, I have no specific tie-back from
9  a document to a case. I have an understanding
10  that the documents that have been produced in this
11  case go back and in some cases many, many years to
12  the '60s before that. I -- I can't tie a
13  particular document to a particular prior case.
14      Q. Well, I mean, that's not really the case,
15  is it, because you've got these descriptions of
16  the Legacy collections and they tell you what
17  cases those were in connection with; correct?
18      A. Well, I was -- I believe I was speaking of
19  Legacy 1 through 4 as a carve-out to the general
20  approach that the company took to comply with its
21  production obligations.
22      Q. But you can tell from those Legacy
23  collections in connection with what case they were
24  done; correct?
25      A. I believe -- well, I --

1    Q. It says right there, it says, "Coker" --
2  for Legacy 2, "Coker v. Bill Thames Pharmacy." It
3  was primarily collected in connection with that.
4    A. Yes. I see that now. I just read through
5  them, yes.
6    Q. And the Legacy collections, these were
7  stored at attorneys' offices; correct? And we saw
8  that -- you saw that with Legacy 2; correct?
9    A. I'm not able to respond in every case
10  where they were stored. I know they were in
11  attorney custody.
12    Q. Okay. But -- and if you would just answer
13  the question, because you're talking about this
14  huge gathering of documents over many, many years.
15      The question is simply now, are -- do you
16  have any information that documents were gathered
17  in connection with the Gambino case by Johnson &
18  Johnson and became -- and are now part of the
19  global talc collection of documents?
20    A. Other than Legacy 1 through 4, I cannot
21  tie specific documents to historical -- historical
22  cases, but I can speak to the fact that the
23  document production goes back many, many years.
24    Q. Okay. I didn't ask about how far it goes
25  back. I'm -- I've looked at the document

1  collection, I understand that. That's not
2  responsive to my question.
3      So please answer the questions -- and
4  you're putting a bunch of nonresponsive stuff in
5  here and I want to get through this. So.
6      And, again, as to the Westfall case, same
7  answer, you're not aware of any documents that are
8  now part of the global talc production that were
9  gathered initially during the period of the
10  Westfall case; true?
11    A. I just want to make sure I understand the
12  answer. I'm not aware of any documents that I can
13  associate specifically with that -- with that
14  case.
15    Q. And you don't know whether or not any of
16  the documents that are part of the global talc
17  production were gathered during that -- during
18  that pending litigation, are you?
19    A. I have not done that particular
20  investigation.
21    Q. So you're not aware of it; correct?
22    A. One way or the other.
23    Q. Well, do you have any reason to believe
24  that there are documents related that were
25  gathered during the period of the Westfall

1  litigation that are part of the global talc
2  production?
3    A. My reasoning is just based on the
4  understanding that the documents go back many,
5  many years. That's the basis I have to understand
6  that there may be documents from other cases that
7  are a part of the global talc production.
8    Q. And when you say "maybe," that means
9  you're speculating, true, as to those particular
10  cases?
11    A. Well, I think by definition it is
12  speculation.
13    Q. Okay. Thank you.
14      I want to go back to the testing results a
15  little bit.
16      You're aware that testing for asbestos was
17  done on a quarterly and annual basis; correct?
18      MR. COX: Object to the form.
19      THE WITNESS: I am aware that there are
20  many types of testing and that included, for
21  instance, quarterly testing.
22  BY MR. SWANSON:
23    Q. Did you make any attempt to -- did you
24  make any attempt to determine the number of tests
25  that were generated during the course of the

1  period from 1965 when we first asked for testing
2  results to the present, testing for asbestos, that
3  is, in the talc?
4    A. I did not investigate the number of tests
5  performed and the -- and the particular date
6  range.
7    Q. And can you say that even 1 percent of the
8  testing results were produced in the Leavitt case?
9      MR. COX: Object to the form of the
10  question.
11      THE WITNESS: I'm not in a position, nor
12  did I conduct an investigation to ascertain
13  percentages of -- of test results produced.
14  BY MR. SWANSON:
15    Q. And you didn't -- so you didn't do an
16  audit; correct?
17    A. Well, as I mentioned, there's many types
18  of test results. Even if I had attempted to do an
19  audit, I might not have viewed testing categories
20  in the -- as anyone else would have viewed them.
21  It's -- there's -- a number of different types of
22  testing analysis, certificates. I -- I don't have
23  a specific parameter to even make that assessment.
24    Q. Well, for example, you know how many
25  quarters there are in a year; right?

Page 553

1    A. I -- I think so.
2    Q. Right. And you can multiply, so that if
3  you -- if you could -- you could find out by
4  asking Johnson & Johnson when it first started
5  doing quarterly testing for certain types of
6  quarterly tests; correct?
7    A. Well --
8    Q. For example, from the talc that came out
9  of the mine, you could find that out; right?
10    A. That presupposes that I would be able to
11  ascertain how many tests were done each quarter,
12  which -- and even that information I don't -- I
13  would have to understand how -- what I do know is
14  that there are tests that were performed
15  quarterly.
16    But how many tests, where the tests were
17  performed, I have some information about that in
18  my notes, but I can't specifically say where every
19  quarterly test was done so that I could multiply
20  it.
21    Q. Right. But you didn't try to figure that
22  out. You didn't see whether or not in theory that
23  could be done because you didn't do an audit;
24  correct?
25    A. I didn't do an audit of the number of

Page 554

1  tests done.
2    Q. Right. But hypothetically, you could go
3  about trying to do that, correct, if you wanted
4  to? You are telling us that that would be
5  difficult and you're not sure if it could be done,
6  but you can certainly think about how you would go
7  about doing that and attempt to do that; correct?
8    MR. COX: Object to the form.
9    THE WITNESS: I mean, if we're talking
10  hypothetically, I could -- I could -- you know,
11  one -- not I, but one could attempt to conduct
12  such an activity. I don't know if that
13  information could be easily -- readily or even
14  possibly ascertained, but one could go -- could go
15  about an exercise to do that.
16  BY MR. SWANSON:
17    Q. I'm looking at Exhibit 6, and if you could
18  pull that out, that's Tab 6 for you there. The
19  next one in a row.
20    And looking through this -- and Exhibit 6,
21  for the record, what is that again?
22    A. Those are to date -- or as of September 7,
23  2018, a list of search terms by which the ERMS
24  system was -- was searched.
25    Q. Does that list include -- other than

Page 555

1  perhaps as proper names, does it include any terms
2  that are not in English?
3    MR. COX: Object to the form.
4    THE WITNESS: You know, I -- I can't
5  interpret all of the terms. I can say that
6  these -- that the terms are as you and I see them
7  here are -- I don't -- many of them look like
8  English words or names, but I can't necessarily
9  interpret all the terms or verify if there's any
10  that aren't in English.
11  BY MR. SWANSON:
12    Q. I want to go to your notes, the paginated
13  notes that's Exhibit 26.
14    A. I got to pull that out again.
15    THE REPORTER: Here. That's it; right?
16    THE WITNESS: Looks good.
17  BY MR. SWANSON:
18    Q. We had touched on this yesterday. But if
19  you go to page 42, these are your contemporaneous
20  notes from interviewing an Uday Sharan; is that
21  right?
22    A. Yes.
23    Q. And you were discussing with him documents
24  related to Johnson & Johnson India and Johnson &
25  Johnson Thailand; is that right?

Page 556

1    A. Yes.
2    Q. And he told you that the Thailand has
3  batch manufacturing records, raw materials,
4  packaging materials, and that the standard
5  document retention was -- it says five years.
6  There's a question mark next to it.
7    Does that mean it was five years or around
8  five years, do you remember?
9    A. He -- he estimated it was five years.
10    Q. Okay. Now, the Johnson & Johnson Thailand
11  was making baby powder for distribution in Europe,
12  correct, according to your notes?
13    A. According to my notes.
14    Q. And would you agree that the legal
15  standards with respect to lawsuits and document
16  retention and those sort of things are tougher in
17  Europe, for example, or the United States, than
18  they are in -- overseas in many countries like the
19  Philippines?
20    MR. COX: Object to the form of the
21  question. And beyond the scope of the notice.
22    THE WITNESS: I mean, it would call for
23  some speculation. I mean, I know in Europe and
24  other parts of the world there's -- there's
25  certain privacy standards that are beyond those in

Page 557

1  the U.S.  I don't think it's an easily answerable
2  question even as a hypothetical.
3  BY MR. SWANSON:
4      Q.  Do you know if the standard, for example,
5  the retention on these types of documents at J --
6  Johnson & Johnson Philippines, which as I
7  understand makes Johnson's Baby Powder for the
8  Philippines, Philippines consumption, are -- the
9  retention period is as long?
10     MR. COX:  Object to the form.
11     THE WITNESS:  Yeah, I don't have specific
12 information on that.
13 BY MR. SWANSON:
14     Q.  Were -- just so that the record is clear,
15 in Fong and Leavitt on these overseas searches, in
16 Leavitt, are there contemporaneous records --
17 well, I should say, are there -- were there any
18 records produced -- located with respect to
19 Johnson & Johnson Philippines and the baby powder
20 manufactured there contemporaneous with her
21 exposure -- or alleged exposure in the 1966 to
22 1968 period in the Philippines with respect to the
23 mining, milling, or manufacturing of the talc and
24 the baby powder?
25     MR. COX:  Object to the form.

Page 558

1      THE WITNESS:  I need to understand just a
2  couple parts of your question better.
3      Were those -- were there contemporaneous
4  documents located that were stored in those
5  countries or that were relating to those countries
6  but stored, let's say, in the United States?
7  BY MR. SWANSON:
8      Q.  Yeah.  Let me break it down a little bit
9  more, and it would be -- it would be either.  Are
10 there any documents regarding the mining of the
11 talc for use in Johnson's Baby Powder that was
12 manufactured in the Philippines contemporaneous
13 with her exposure, in other words, for that period
14 1966-1968?
15     A.  You know, I'm going to look at the
16 specific searches in that area.  In terms of
17 information stored in the U.S., there -- I can't
18 speak to that.  I have not looked at the global
19 talc production or the specific Leavitt
20 production.
21     There may -- I'm going to also consult the
22 production summaries to see if there's anything
23 written down about that.  So I'm just going to
24 look at those sources.
25     Q.  And since I asked the question specific to

Page 559

1  mines, let's throw in there milling and
2  manufacturing since you're doing the search and
3  then we can touch on anything you do find.
4      A.  And I'm just applying my general
5  understanding of your questions to these
6  categories, that is not dispositive, but, for
7  instance by your question, I would assume you
8  don't care about, for the sake of this question,
9  trade organization payments.
10     Q.  Correct.
11     A.  Or Workers' Comp.
12     Q.  I'm asking about the mining, milling --
13 the mining of the talc, the milling of the talc,
14 and the manufacturing of the baby powder with
15 respect to the Johnson's Baby Powder that was
16 manufactured in the Philippines from 1966 to 1968.
17     A.  I'm sorry, I was reading Pam Downs'
18 section as you were restating the question.
19     I just want to hear it one more time
20 specific to the country.
21     MR. SWANSON:  Can you read that, my
22 clarification, back to him?
23     (Record read by the court reporter.)
24     THE WITNESS:  You know -- and I'm not an
25 expert on all the places where talc was mined and

Page 560

1  manufactured and I'm not here to respond to that
2  specifically.  I'm just noting that in my Pamela
3  Downs notes, it indicates for the Philippines that
4  talc was not mined there but was manufactured
5  there for a while.
6  BY MR. SWANSON:
7      Q.  Right.  And we had touched on this before,
8  and I had informed you based on the discovery
9  responses of Johnson & Johnson that the talc came
10 from Korea.
11     A.  Yes.
12     Q.  So if you have the information about the
13 mining and milling of Korean talc contemporaneous
14 with Teresa Leavitt's exposure in the Philippines
15 from 1966 to '68 that would be also responsive.
16     MR. COX:  So why don't you take a look at
17 what you need to look at and then answer his
18 question.
19     THE WITNESS:  I'm sorry.  Take a look at
20 what?
21     MR. COX:  Why don't you take a look at
22 whatever you need to look at and then answer
23 Mr. Swanson's question.
24     MR. SWANSON:  That's fine.  Let me -- and
25 I can re-ask the question later.

1  BY MR. SWANSON:
2      Q.  Let's just -- let me be clear about the
3  totality of what I am asking and I'm going to ask
4  as to the Philippines and Teresa Leavitt's
5  exposure and I'm going to ask as to Hong Kong.
6      So for the Philippines, it's going to be
7  the bottling of the talc related to Johnson &
8  Johnson Philippines, the manufacturing, and it
9  will be the mining and the milling of the talc
10 that was used for that.  And these are
11 contemporaneous with her exposure.  So '66 to '68
12 period, okay?  So that talc would have come from
13 Korea based on what Johnson & Johnson has told us.
14 And then in the Fong case, it would be the
15 Johnson & Johnson baby powder distributed in Hong
16 Kong from 1971 to '83, contemporaneous with that
17 period, and it would be the mining of the talc
18 during that period, mining and milling of the talc
19 during that same period.  And that talc, from what
20 we have been told, also came from Korea.
21     So it's whether or not there are any
22 contemporaneous documents that have been located
23 and produced for that.
24     A.  So I want to -- I want to find the
25 production requests.

1      Q.  Now, the production requests --
2      Do you have the -- well, yeah.  Go ahead
3  and look at that.
4      A.  Actually...
5      MR. SWANSON:  Yeah.  Why don't we do this,
6  let's take our break and grab our lunch.
7      Obviously, since I've committed to a stop
8  time, I don't want to, you know, run out my clock
9  by taking the time to do this.
10     If you can sort of gather your thoughts
11 during the break, that would be great.
12     Okay.  Let's go ahead and go off the
13 record.
14     THE VIDEOGRAPHER:  Off the record at
15 12:17.
16     (Lunch break taken.)
17     THE VIDEOGRAPHER:  On the record at 1:02.
18     You may continue, Counsel.
19 BY MR. SWANSON:
20     Q.  Okay.  Mr. Mittenthal, we've had our lunch
21 break.  Are you okay to continue?
22     A.  Yes.
23     Q.  Good.  Before the break, I was asking you
24 very specific questions -- or I was attempting
25 to -- about the Fong and Leavitt cases and whether

1  or not documents related to the mining and milling
2  of talc or the manufacturing of the baby powder
3  contemporaneous with their exposure in Hong Kong
4  and the Philippines, and I'll separate them --
5  were located and produced.
6      Do you remember that?
7      A.  Yes.
8      Q.  Okay.  And have you had an opportunity to
9  look at anything else?
10     A.  So I -- I did this for both Hong Kong and
11 the Philippines:  consulted my notes, specifically
12 noncustodial sources, interview notes, including
13 the interview notes with Pam Downs.
14     I looked at the chart that I had assembled
15 that represented the follow-up collection efforts
16 for Leavitt and Fong.
17     I then turned to the document production
18 summaries and --
19     Are we on Fong or Leavitt at this point?
20     Q.  Let's talk about Leavitt first and Johnson
21 & Johnson Philippines, the manufacturing of that
22 baby powder from '66 to '68 and the mining and
23 milling from Korea that was used in that baby
24 powder.
25     A.  Well, I can't answer the questions with

1  respect to the specific entities of Johnson &
2  Johnson.  What I attempted to do was to understand
3  the extent to which those questions have been
4  asked for document production and that document
5  responses have been provided.
6      To do so, with respect to Leavitt, I
7  looked at this production summary which has been
8  marked as Exhibit 14 and I looked first of all at
9  the Set 3 which is -- has tabs that, in the
10 document production responses that relate to just
11 general questions about entities that supplied
12 talc and mines that were sources of talc and the
13 J&J Company's role in mining and processing of
14 talc and the specified date range to see if there
15 was anything specific to the contemporaneous time
16 frames for Fong or Leavitt -- well, in this case,
17 Leavitt -- or any indications of those overseas
18 locations.
19     I looked -- as I mentioned, I looked in
20 the RFP Set 3 for those and I looked specifically
21 at responses on, I believe, starting on page 8
22 which is Request -- I'm sorry -- page 7, Request
23 22.  And I did not see anything specific to the
24 particulars of your question in terms of
25 locations.

Page 565

1    I went to then RFP Set 7 which was
2  specific to the Philippines and the aforementioned
3  date ranges and I consulted to the responses to
4  RFP Set 7 which begin in the binder that I have as
5  tab N as in Nancy, and in the -- starting with
6  page 1, Request 99, I reviewed those productions
7  and production summaries, and, as noted, there
8  were certain documents identified in response to
9  that -- to those searches, including some that
10  were designated confidential.  In reviewing those,
11  started with 99, continuing through page 2, I note
12  that in response to RFP 103, "All documents
13  regarding or reflecting the locations where
14  Johnson's Baby Powder was manufactured which was
15  supplied to the Philippines from 1965 through
16  April 1968," there is an indication that there
17  were documents produced and that the Exhibit 1,
18  which is, I believe, a spreadsheet of --
19  containing the relevant Bates ranges under Tab 2,
20  denotes the documents that were responsive to
21  that.
22    I also continued going through Request 104
23  and noted the request for locations where
24  Johnson's Baby Powder was manufactured which was
25  available for purchase in the Philippines from

Page 566

1  1966 through April 1968, and also noted documents
2  that were provided in response in Exhibit 1,
3  Tab 2.  And then continued on through 104, 105,
4  106, 107.  And then 107, which was documents
5  regarding or reflecting what entities supplied
6  talc that was used in Johnson's Baby Powder
7  supplied to the Philippines from 1965 through
8  April 1968.  I noted that in Exhibit 1, Tab 3
9  there were other documents produced in response to
10  that request, as well as Request For
11  Production 108, which was similar, although
12  instead of supplied to the Philippines, it was
13  available for purchase in the Philippines from
14  1966 through 19' -- April 1968.
15    The documents were produced in that same
16  exhibit, Exhibit 1, Tab 3.  So that was -- those
17  were the request for production categories that I
18  consulted that yielded documents that had been
19  produced that I believe are in the context of your
20  question.
21    Q. All right.  So you provided a lot of
22  information there.  We're going to have to break
23  that down substantially.
24    You threw me off there.  You were actually
25  talking about -- you said Johnson & Johnson, and

Page 567

1  maybe I just heard that, but you were actually
2  looking at the Set 2 of request for production to
3  Johnson & Johnson Consumer, Inc.; correct?  That's
4  the numbers you were referencing.  They're fairly
5  equivalent, but the numbering is different, so I
6  just wanted to be clear.  That's what you were
7  just referencing when you were going through Set
8  Number 7?
9    MR. COX:  Look at the footer.
10    THE WITNESS:  Oh.  Yeah.  I'm sorry,
11  Johnson & Johnson Consumer, yes.
12  BY MR. SWANSON:
13    Q. And I didn't have that in front of me.  So
14  let me -- and you haven't reviewed the specific
15  documents that were stated as being responsive to
16  those requests; correct?
17    A. Correct.  I noted on the first day that I
18  had run various documents from the production to
19  get an understanding of several hundred documents.
20  I didn't review any of these production sets
21  specifically for that goal.
22    Q. So, yeah, you kind of -- because I didn't
23  have this in front of me, I wasn't looking at the
24  same thing you were talking about.
25    So we're going to have to go through it

Page 568

1  again even though you gave me that long answer.
2    Let's start with Request 103 on Set Number
3  7.  That's reflecting the locations, okay?  There
4  were a list there of documents.  Let's see.
5    And, I'm sorry, what was the other set
6  that you were referring to, Set Number 5?
7    A. I believe it was Set 3, and that was just
8  from the standpoint of making sure that in the --
9  sort of the general request for production that
10  didn't specify a country, I wanted to confirm that
11  there were no mentions of those countries in any
12  of the responses.  So I consulted RFP Set 3, the
13  tabs that included 6, 7, 8.
14    Q. Okay.
15    A. Just to make sure there were no mentions.
16    Q. Okay.  So let me -- and I'm not going to
17  make too firm of a representation about exactly
18  what has been produced.  But let me start with
19  just asking you, or confirming.  You didn't review
20  the specific documents that were -- that were
21  identified as being produced to those requests we
22  talked about.  So, going back to my original
23  question, if you can answer this because -- well,
24  let me -- let me back up another step.
25    When I looked at your notes on the

Page 569

1  Philippines in the Hong Kong -- and Hong Kong and
2  looking at what I had looked at from the
3  production in your notes, it looked to me like
4  what had been -- what -- that, for example, Hong
5  Kong they weren't related -- they weren't able to
6  locate any responsive documents.
7      And, as to the Philippines -- and this is
8  looking at page, I think, 64 of your notes --
9  saying that nothing had been found in the date
10 range.
11     So that's where I started with this, is
12 that you had nothing being found in that date
13 range, so -- and you haven't reviewed specifically
14 the documents that were produced in response to
15 the request that you pointed out.
16     So are you aware of any manufacturing
17 documents with respect to the Philippines
18 Johnson's Baby Powder that were produced for that
19 period from 1966 to 1968?
20     A. Well, I don't -- I'm interpreting these
21 broadly. So I don't know what "supply" means.
22 For instance...
23     Q. And "supply" does include manufacturing.
24     A. Okay. So, for instance, in 101, the
25 documents regarding or reflecting location where

Page 570

1  Johnson's Baby Powder was manufactured which was
2  supplied to the U.S. Navy in the Philippines in
3  the date range.
4      So I conclude that that is a part of your
5  question insofar as it relates to manufacturing.
6      Q. Yes. "Supply" includes manufacturing.
7      A. Okay. So, for instance, in page 2 of
8  Tab -- I guess this is Set -- Set -- Set 7 --
9      Q. Uh-huh.
10     A. -- of -- in the -- in the notebook under
11 Tab N, Number 103 on page 2, "documents regarding
12 or reflecting location where Johnson's Baby Powder
13 was manufactured which was supplied to the
14 Philippines."
15     So that is "manufactured." There were
16 documents provided that are reflected in
17 Exhibit 1, Tab 2.
18     Q. Right. And that's regarding the location.
19 Okay. I guess -- and partly I may need to get to
20 the bottom of this by specifically looking through
21 each and every document that was produced. What I
22 am telling you is that I am not aware of documents
23 specific to the manufacturing being produced for
24 the Philippines for that '66 to '68 time frame.
25 And I don't think the answer resolves that issue

Page 571

1  because the question is not phrased precisely that
2  way and it's phrased broadly enough that it can
3  include other documents. So.
4      But you haven't reviewed the specific
5  documents that were produced; right?
6      A. I've sampled them. I have not reviewed
7  them.
8      Q. Sampled them. Right.
9      A. Yes.
10     Q. And your initial -- your initial notes
11 speaking to Pam Downs it indicated that there
12 weren't any documents related to the
13 manufacturing, correct?
14     MR. COX: Object to the form.
15 BY MR. SWANSON:
16     Q. During the -- during the relevant time
17 period.
18     A. My notes from Ms. Downs covered the onsite
19 searches of archive materials in the Philippines,
20 so that -- that only covered that category of
21 document searches.
22     Q. As to -- and what about as to the mining
23 and milling by the Korean talc supplier. Do you
24 have any -- has Johnson & Johnson produced
25 documents regarding the mining and milling of the

Page 572

1  talc contemporaneous with Ms. Leavitt's exposure
2  from '66 to '68?
3      A. Well, you know, I'm not the best person to
4  interpret what's covered in some of these
5  requests. It is possible that 103 would cover
6  that.
7      Q. Okay. Let's -- I get that, and -- but
8  that's a specific question. And, you know,
9  whether or not there was a request that covered
10 it, because simply you looking at what tabs were
11 referenced in an Excel spreadsheet and the Bates
12 numbers isn't going to tell you if something was
13 produced specifically responsive to my question.
14     So -- and if you don't know the answer,
15 that's fine, but I don't want a record that is
16 unclear, so -- and if you don't know and we just
17 need to look at it again, that's okay. But I
18 don't have -- yeah. I think if you can just focus
19 on the question -- and if you don't have the
20 answer based on the information that you have,
21 that's fine.
22     A. I've gathered a lot of information in
23 anticipation of these topics, including all the
24 productions, my notes. In response to the
25 question at hand, I have tracked down what I think

Page 573

1  is the best place to look to definitively answer
2  the question. I have certainly not reviewed the
3  documents to determine which ones are specifically
4  responsive, but this is -- this is my best answer
5  to where one would determine those documents that
6  are in the context of your requests.
7      Q.  And as to -- we're not going to get --
8  obviously get to the bottom of this right now in
9  terms of the -- whether or not those documents
10  are, but if those documents listed aren't
11  regarding the manufacture during that time period
12  of from '66 to '68 of Johnson's Baby Powder at the
13  Philippines facility, then they weren't produced;
14  correct?
15      MR. COX:  Object to the form.
16      THE WITNESS:  Well, once again, what you
17  are asking for sounded a lot like this category.
18  Now, as you said, the category may not be
19  precisely those documents. There may be overlap.
20  But it's the closest approximation of what you're
21  looking for.
22  BY MR. SWANSON:
23      Q.  I understand that. And that's the best
24  you can do based on that. This is just the
25  question, though, if those documents -- and I've

Page 574

1  reviewed them and I haven't seen what I'm looking
2  for here and that's why I'm asking. And, you
3  know, there are a lot of documents, so it's
4  possible I missed it.
5      But if those -- if those documents
6  regarding the manufacture of the baby powder from
7  '66 to '68 aren't listed among those documents in
8  those tabs that are cited, then they were not
9  produced; correct?
10      A.  That would -- that would make sense.
11      Q.  Okay. And if they hadn't been produced,
12  assuming they hadn't been produced -- and I
13  understand this is a hypothetical -- then they
14  were destroyed at some point; correct?
15      MR. COX:  Object to the form.
16      THE WITNESS:  I mean, that -- that is one
17  explanation. That is also a hypothetical as to
18  what happened, why they weren't produced. They --
19  they -- there's other explanations.
20  BY MR. SWANSON:
21      Q.  The other explanation would be what, that
22  a -- not an adequate search was done?
23      MR. COX:  Object to the form.
24      THE WITNESS:  They could have been
25  mislabeled. I'm, you know, in hypothetical land

Page 575

1  here, but there are reasons why they -- they could
2  have been misfiled in a different part of the
3  warehouse. I mean, I'm just saying there are --
4  you know, there are errors in the process that
5  occur from time to time in filing information.
6  BY MR. SWANSON:
7      Q.  Same question as to Hong Kong. Did you
8  look at Hong Kong to see if you had -- if Johnson
9  & Johnson produced manufacturing documents
10  contemporaneous with Ms. Fong's exposure?
11      A.  So as I mentioned, I consulted my notes,
12  including my typewritten notes, my follow-on with
13  Pamela Downs, the noncustodial document listing.
14  Then I further went to the production summaries
15  for Fong, RFP Set 1. It speaks to mining
16  entities, mines that produced talc for JPP in Hong
17  Kong '70 through '84. Other -- the next four or
18  five entries -- and I went to the corresponding
19  sections, which I believe are in the Fong binder
20  under discovery responses, Tab 3, Subtab C, and
21  looked through -- well, I looked through -- just
22  starting from the beginning, looked through 1, 2,
23  3, 4. I'm up through -- you know, it was -- it's
24  more difficult to connect your question to the
25  specific categories in Fong. I -- for instance, I

Page 576

1  looked at Response 11, "testing of talc marketed
2  in Hong Kong from '70 through '84." There were
3  documents produced for that. I understand that to
4  be part of the manufacturing process.
5      I looked at response -- Request For
6  Production 12.
7      I haven't found other document categories
8  that were produced that are directly reflective of
9  your question in Fong, looking at -- looking
10  through the production set.
11      Q.  The same thing in Fong, you haven't looked
12  at the actual documents that were produced under
13  those categories related to Hong Kong
14  manufacturing; correct? I mean, you see where
15  some Bates numbers have been identified; correct?
16      A.  Yes. And I sampled some documents. But I
17  haven't looked at them for the eye to verifying
18  what was there.
19      Q.  Were -- just in terms of audio that was
20  produced in the Leavitt and Fong matters, were the
21  only audio records that were produced related to
22  advertising?
23      A.  You know, I was just checking the
24  noncustodial sources to see if there's any
25  additional information about that. I -- I don't

Page 577

1  know for sure.  An audio file could just be a
2  computer file type that's present in a custodial
3  production in a share directory.  I can't speak to
4  the extent to which there may be files that have
5  audio in them.
6      Q.  If you go to Exhibit Number 6 which are
7  the archive search terms.  You have -- it's Tab 6
8  in your binder.
9      A.  Okay.  Thank you.
10     Q.  And these are the archive search terms
11  that are used in the ERMS system to locate
12  documents that may have relevant documents to the
13  talc litigation, correct, that are Iron Mountain's
14  archive documents and I believe some onsite
15  collections, too; is that correct?
16     A.  There are -- onsite there is a movable
17  file system in the records-keeping facilities, and
18  the ERMS would have covered that area as well as
19  offsite storage.
20     Q.  And this was the most recent list of
21  archive search terms; true?
22     A.  Yes.
23     Q.  If you go to -- I don't these are
24  numbered, but if you go to the third page of this,
25  they're alphabetical, though, right, the search

Page 578

1  terms, the way they're set out here?
2      A.  Well, I don't know if the search
3  descriptions or the terms are alphabetical.  I
4  believe it's the search titles, not the terms.
5      Q.  Do you see the search term "fiber"
6  anywhere in these archive search terms?
7      A.  I don't see the term "fiber," but it may
8  be there.  As a quick go-through, I don't see it.
9      Q.  That is a term which I don't see it in
10  there and I've looked at it.  That's a term that
11  should be in there, shouldn't it, for talc
12  litigation?
13     MR. COX:  Object.  Object to the form of
14  the question.  Beyond the scope of the notice.
15  BY MR. SWANSON:
16     Q.  I mean, you told us that people would
17  enter information about the boxes and the amount
18  of information and descriptive information they
19  would vary.
20         Isn't "fiber" a term that you'd want to
21  look for if you were looking for documents
22  relevant to asbestos talc litigation where there's
23  an allegation that the tremolite that's being
24  found in Johnson's Baby Powder is fibrous
25  tremolite?

Page 579

1      MR. COX:  Object to the form.  Beyond the
2  scope of the notice.
3      THE WITNESS:  You know, I didn't see that
4  as my area to investigate under the scope of the
5  notice.  I will say that the composition of the
6  searches is -- some of the attorneys have made
7  their work product, and I have a general
8  understanding that it's designed -- the totality
9  of the search terms are designed to cast a very
10  wide possible net.  The search terms have been
11  refined over time.  They have been provided to the
12  plaintiffs, as I understand.  I -- I can't opine
13  on whether a particular term would have been
14  appropriate in the context of all the terms
15  presented.
16     MR. SWANSON:  Move to strike nonresponsive
17  portions.
18  BY MR. SWANSON:
19     Q.  If you -- if you see under Exhibit 6,
20  there's a search term "mesothelioma"?
21     A.  Yes.
22     Q.  Okay.  Do you know if this system is set
23  up to do stem searches?
24     A.  You know, I did not conduct a -- and I
25  think we got into this on a previous day as well.

Page 580

1  I don't -- I didn't understand -- seek to
2  understand the search engine behind ERMS and how
3  it does stem searches or fuzzy searches or if it's
4  Google-like in the way it returns information.
5  BY MR. SWANSON:
6      Q.  And it makes sense that "mesothelioma"
7  could be misspelled by people; right?
8      MR. COX:  Object to the form.
9  BY MR. SWANSON:
10     Q.  It's a complicated enough word that one
11  would expect that that could be misspelled; true?
12     MR. COX:  Object to the form.
13     THE WITNESS:  Yes.  In general I would
14  agree as a -- as a lay opinion.
15  BY MR. SWANSON:
16     Q.  And you would want, then, search terms
17  that would pick up possible misspellings, and one
18  way to do that is to have what's sometimes called
19  a "stem search"; correct?
20     A.  For the sake of certain search engines, I
21  would agree with you.
22     Q.  And if you continue on here, if you look
23  at -- if you look in the Ts, do you see the term
24  "talc" in there?
25     A.  Yes.

Page 581

1    Q. There is no term "talcosis" in there, is
2  there?
3    A. I wouldn't guarantee it, but I don't see
4  it.
5    Q. I mean, most of these things from your
6  view of this are alphabetical, right, even the
7  search terms and the search description that
8  generally are falling in the same alphabetical
9  range; correct?
10    A. They appear to be alphabetized.
11    Q. Okay. If you go to the Cs, you've heard
12  the term "cleavage fragment" when it comes to talc
13  and testing talc for the presence of asbestos?
14    A. I -- I'm not sure if I know that
15  expression or not.
16    Q. You haven't heard it?
17    A. I may have. I don't recall.
18    Q. It's something that -- it's an element
19  found in testing results -- or claimed in testing
20  results that, for example, the tremolite that's
21  being found or the anthophyllite is a cleavage
22  fragment and not an asbestos fiber.
23        Have you heard about that controversy at
24  all?
25    A. I'm not current on the technical details

Page 582

1  of that.
2    Q. Assuming that I didn't misrepresent that
3  to you, wouldn't it make sense that you would want
4  the term "cleavage" in these archive search terms?
5    A. You know, once again, my understanding is
6  that these search terms were designed to retrieve
7  boxes that had been denoted a certain way to be
8  sent to storage.
9        I don't -- I -- I'm not opining on whether
10  a term like that would be appropriate to locate a
11  box in this particular context.
12    Q. If you go to the Is -- turn to the Is
13  here.
14        Are you there?
15    A. Yeah.
16    Q. "I-N"?
17    A. Yes.
18    Q. You see the term "inhalation" anywhere?
19    A. I -- I don't see the term "inhalation" on
20  this page.
21    Q. Certainly you can agree with me that
22  "inhalation" is a relevant term when -- a relevant
23  term to the talc litigation; correct?
24        MR. COX: Object to the form.
25        THE WITNESS: As I mentioned before, it

Page 583

1  may be relevant, but it may not be a criteria to
2  retrieve a box.
3  BY MR. SWANSON:
4    Q. And -- now, you say it may not be a
5  criteria to return a box.
6        The -- the information that you gave me
7  about what were required terms on those boxes, if
8  I remember right, was a date range, the retention
9  cutoff period, and the department; correct? Those
10  were required terms.
11    A. Well, the retention series.
12    Q. Okay. Retention series.
13    A. Which would then be driven off the date
14  range, but yes.
15    Q. Okay. That's -- and then they were
16  supposed to put in a textual or a narrative
17  description of the contents of the box; correct?
18    A. Yes.
19    Q. And there were no hard-and-fast rules that
20  you knew about that were consistent throughout the
21  company in terms of exactly what information was
22  in there; right?
23    A. As I recall, the department, each
24  individual department, was responsible for how
25  that information was entered based on the

Page 584

1  requirements laid out by the SOP of the records
2  department.
3    Q. So how did Johnson -- based on that and
4  based on the issues that are -- would be relevant
5  here, how did Johnson & Johnson go about
6  determining the terms such as "fiber" and
7  "inhalation" and "talcosis" and "cleavage" are not
8  relevant? Because you don't know specifically
9  what that individual is going to put in their
10  textual description, do you?
11        MR. COX: Object to the form.
12  BY MR. SWANSON:
13    Q. And it's variable.
14    A. As I mentioned before, the search terms
15  were designed to return a large overly inclusive
16  set of boxes. The search terms have been refined
17  over time and they've been -- the decision as to
18  what goes into a search term is -- is a legal --
19  ultimately a legal decision.
20    Q. And they've been refined over time to make
21  changes; correct?
22    A. Well, that -- I think that's the
23  definition of "refined."
24    Q. And giving Johnson & Johnson's lawyers the
25  benefit of the doubt in terms of creating that,

Page 585

1  you would hope that the changes that were made
2  over time were to improve this and make it catch
3  more relevant documents; true?
4       MR. COX:  Object to the form.
5       THE WITNESS:  Well, "improve" is a -- is
6  one rationale that there may have been other
7  specific searches related to Leavitt and Fong that
8  would have been added so it was -- the -- the
9  search terms themselves reflect all of the cases
10  and matters and needs that have been, up until
11  that present time, encapsulated in the -- in the
12  list.
13  BY MR. SWANSON:
14       Q.  You're not saying this is a perfect list,
15  are you?
16       A.  I don't believe I said that.
17       Q.  Okay.  And you're not testifying either
18  that -- you don't know one way or the other
19  whether or not using the terms "talcosis,"
20  "fiber," "cleavage," "inhalation" would produce --
21  would catch more boxes of documents that had
22  relevant information and documents in them; true?
23       A.  That's a hypothetical.  I'm not able to
24  speak to that hypothetical, no -- or yes.  I
25  mean --

Page 586

1       Q.  Right.  Because you -- you haven't audited
2  that, have you?
3       A.  "Audited" by meaning that I haven't --
4       Q.  By adding -- nobody did an experiment, as
5  far as you know.  Johnson & Johnson hasn't audited
6  this to add a search term like "fiber" and see if
7  it would pick up anything else, has it?
8       A.  I -- I don't know.  That was beyond the
9  scope of my inquiry for this matter.
10       MR. SWANSON:  Okay.  I'll keep to my
11  promise.
12       MR. COX:  Can we go off the record for a
13  moment?
14       MR. SWANSON:  Yes.
15       THE VIDEOGRAPHER:  Off the record at 1:45.
16       (Off the record.)
17       THE VIDEOGRAPHER:  On the record at 1:48.
18       You may proceed, Counsel.
19  CROSS-EXAMINATION BY MR. COX:
20       Q.  Mr. Mittenthal, I'm just going to ask you
21  a few questions on behalf of the J&J defendants,
22  okay?
23       A.  Yes.
24       Q.  Do you have an understanding of why you
25  were asked to provide testimony in response to the

Page 587

1  topics that were identified in plaintiff's
2  deposition notice?
3       A.  There were a number of different topics in
4  the notice.  They covered a number of different
5  functional areas and departments, and my prior
6  experience with the company and as a consultant,
7  my knowledge of the information enabled me to go
8  and speak to people in the various aspects of the
9  company to gather the documentation to cohesively
10  bring all the information together to be able to
11  provide the best answers to those questions.
12       Q.  Did you investigate all of the areas in
13  which you were asked to provide testimony over the
14  three days?
15       A.  Yes, I did.
16       Q.  Can you please describe how you did that
17  investigation?
18       A.  Well, I conducted at least -- I conducted
19  four site visits.  During that period, I spoke to
20  various records managers and people with
21  responsibility for document issues.  Over time, I
22  expanded the list of people that I interviewed to
23  encompass nearly 40 people and nearly 70
24  single-spaced typewritten pages of notes.
25       I requested a number of documents,

Page 588

1  including retention schedules, policies and
2  procedures, other supporting materials.  I asked
3  for production summaries and built with that
4  information timelines, applications listings,
5  people listings of -- lists of legal holds which I
6  requested, and better in order to understand the
7  document population itself.
8       I loaded a litigation review tool on my
9  computer and went through various aspects of the
10  production, looked at the exhibit spreadsheets and
11  the various tabs, and put Bates ranges in to look
12  at the documents specifically.
13       I sampled several hundred documents.
14       I conducted follow-up interviews.
15       I -- probably in total I put together
16  about ten different reference aids in order to be
17  able to respond to the questions.
18       Q.  You mentioned interviewing a number of
19  people, nearly 40 people.
20       What disciplines or functional areas did
21  those individuals cover?
22       A.  They included people in the records
23  function, in the quality function.  And that's
24  both supplier quality as well as internal quality
25  control; records officers; IT people; procurement

Page 589

1  people; people involved with the supply chain;
2  people in the corporate organization, including
3  records officers; third parties, including several
4  vendors who were responsible for assisting in
5  retrieving and staging documents. That brought
6  the total to about close to 40.
7      Q. And you mentioned that the list of
8  interviewees expanded over time.
9          Who determined which individuals you
10 interviewed in connection with your fact-finding?
11     A. I did.
12     Q. How did you go about doing that?
13     A. Well, I asked to identify the records
14 officer first. And then that led me to a records
15 person who had more experience actually running
16 the searches in the system, and then that brought
17 me to the corporate records people.
18         I had previously experience with the
19 corporate reports people, so I knew some of the
20 people to ask and also some of the corporate IT
21 people to ask.
22         And then, through the records officers at
23 the consumer level, I was able to get names of
24 other people involved with R&D and supply chain
25 and supplier quality and, you know, sort of built

Page 591

1  at the corporate level as well as at the consumer
2  level or the operating company level. And I knew
3  which procedures were operational at the corporate
4  level, the worldwide policies and supporting
5  schedules. Through the results of my interviews
6  at the consumer level, I learned of the existence
7  of the consumer level schedules and their
8  histories and requested those.
9          I was also -- also went to the legal team
10 and requested the document productions, their
11 request for interrogatories, the holds, the
12 pleadings of other -- other materials in the case
13 file to best educate myself, both about the nature
14 of the Fong and Leavitt cases as well as the
15 efforts to produce information to date.
16     Q. In terms of all of the efforts you've
17 described involved in your preparation, over how
18 long a period of time did that occur?
19     A. I started in the -- in the spring of 2018
20 approximately March -- in the March time frame.
21 Some of the people I knew had come from earlier
22 efforts in other matters. But my fact-finding in
23 this case -- and I went to all those people,
24 starting in March and interviewed them all going
25 forward.

Page 590

1  upon those lists additional names.
2          And then, with respect to the actual
3  collection activities, I knew -- I knew from
4  counsel who the vendors were and sought to
5  interview the vendors.
6          And then, in terms of some of the
7  follow-up, I found it necessary to speak to people
8  in the corporate secretary's office to learn
9  information about the additional searches
10 conducted for the cases.
11     Q. Did you identify any individuals at any
12 time during your investigation that you believed
13 were important to your fact-finding but who you
14 did not speak with?
15     A. I did not.
16     Q. Were there any questions during your
17 interviews that you wanted to ask people that you
18 were not permitted to ask?
19     A. There were not.
20     Q. How did you go about identifying the
21 documents that you said you reviewed?
22     A. Well, with respect to the records
23 officers, I knew that there were procedures -- and
24 this goes back to my past experience with the
25 company that there were procedures and schedules

Page 592

1      Q. And in total, how many hours were involved
2  in your preparation to give testimony regarding
3  the topics for which you were designated in the
4  Leavitt and Fong cases?
5      A. At least 200.
6      MR. COX: I don't have any further
7  questions.
8          Thank you, Mr. Mittenthal.
9          THE VIDEOGRAPHER: This concludes the
10 deposition --
11     MR. SWANSON: Uh, uh, uh, uh --
12     THE VIDEOGRAPHER: Oh, I'm sorry. I
13 was -- I was waiting -- I'm so sorry. I was
14 waiting for a response. I saw nothing. I strike
15 that.
16     MR. SWANSON: I need to take my seat
17 again.
18     THE VIDEOGRAPHER: Yeah. So sorry.
19     MR. SWANSON: We're still on the record,
20 aren't we?
21         Oh, funny.
22 REDIRECT EXAMINATION BY MR. SWANSON:
23     Q. I bet you're happy this is about done,
24 huh?
25     A. Well --

Page 593

1    Q.  I think we all are.
2    A.  I will be happy when it is done.
3    Q.  I just want to clarify some things from
4   the testimony you just gave, and I will be brief.
5        When you -- you testified in June in the
6   Hayes case; correct?
7    A.  Yes.
8    Q.  And in June, you said you were aware of
9   the Leavitt case but you hadn't been asked to do
10  any specific work with respect to that case.
11       Do you remember that testimony?
12   A.  Yes.
13   Q.  And you also said you didn't even know
14  about the Fong case.
15       You remember that testimony in the Hayes
16  case?
17   A.  I didn't recall it, yes.
18   Q.  So you hadn't done any work in these cases
19  up until June; correct?
20   A.  I would disagree that --
21   Q.  Specific to these cases.
22   A.  My work encompassed talc cases and they --
23  much of my preparation was in connection with
24  Hayes which I supplemented with specific Fong and
25  Leavitt investigation.

Page 594

1    Q.  Okay.  If anyone were to get the
2   impression that all of that work that you were
3   doing was specific to the Leavitt and Fong cases,
4   that would be the wrong impression from the
5   testimony that you just gave in response to
6   Mr. Cox's questions; correct?
7    A.  Well, I -- that -- if that were the
8   impression, that would be wrong.
9    Q.  Right.  And you talked about talking to
10  40 people, but, actually, once you were working on
11  the Leavitt and Fong cases, you spent a few
12  minutes speaking to Pam Downs -- and that was
13  between Hayes and your Leavitt deposition -- and
14  then this last time you spent an hour and a half
15  speaking to Pam Downs, and I think, an hour or so
16  speaking to Ms. -- Ms. French and Giacino;
17  correct?
18   A.  Yes.  I spent -- well, I mean, in total
19  the number of hours speaking to Ms. Downs and
20  Ms. Giacino.
21   Q.  Right.  So that's about three hours total,
22  and that's just two individuals, or three
23  individuals you were speaking to, and those were
24  the follow-up interviews that you just spoke
25  about; right?

Page 595

1    A.  Those were interviews that were
2   follow-ups.
3        Well, I hadn't spoken to Ms. Giacino
4   before that.
5    Q.  And none of those original interviews were
6   done specifically -- of those 40 people were done
7   specifically with the Leavitt and Fong cases in
8   mind; true?
9    A.  They were done with -- with the talc
10  litigation in mind.
11   Q.  Okay.  That wasn't my question.  They were
12  not done specifically with Leavitt and Fong in
13  mind, were they?
14   A.  Correct.
15   Q.  Everything that you've learned from these
16  individuals you've spoken to, other than the
17  attorneys for Johnson & Johnson, you've reflected
18  in your contemporaneous notes; correct?
19       MR. COX:  Object to the form.
20  BY MR. SWANSON:
21   Q.  Except for the follow-up interviews where
22  you didn't produce contemporaneous notes; is that
23  correct?
24       MR. COX:  Object to the form.
25       THE WITNESS:  Well, what I've learned

Page 596

1   encompasses not just my notes but the materials
2   I've assembled.  The policies and procedures, the
3   supporting documents, that is part of what I
4   learned.
5   BY MR. SWANSON:
6    Q.  And I may have asked the question poorly.
7        But everything that you learned from
8   speaking to people at Johnson & Johnson other than
9   the lawyers who have information about document
10  retention, document searches, document
11  productions, the various platforms in which
12  documents are kept, those are reflected in your
13  contemporaneous notes that have been attached to
14  this transcript; correct?
15   A.  Yes.
16   Q.  Except for the follow-up interviews, the
17  very brief follow-up interview with Pam Downs
18  before the Leavitt, the first volume of the
19  Leavitt -- Leavitt and Fong deposition, and then
20  you've got some notes that I wouldn't call
21  "contemporaneous notes" that are summarized in a
22  chart that you produced that you brought with you
23  to this -- to the second volume of your deposition
24  yesterday; true?
25   A.  I'm sorry.  I heard the words, but I

Page 597

1  wasn't sure what the question was on the table at
2  that point.
3     Q.  Okay.  The bottom line is, your -- if you
4  spoke to somebody about these talc-related issues
5  in the work that you just described to Mr. Cox,
6  that's reflected in your contemporaneous notes
7  except for a little bit of your follow-up
8  conversations; correct?
9     A.  I would generally agree.
10        MR. COX:  Object to the form.
11 BY MR. SWANSON:
12    Q.  Okay.  And how much have you billed
13 Johnson & Johnson for your work in this case?
14    A.  It will be -- you mean the bills that have
15 actually gone out the door?  I don't know.  It
16 will be about close to probably a hundred
17 thousand.
18    Q.  Okay.  That's $500 an hour for 200 hours?
19    A.  Yes.
20    Q.  I'm terrible at math.
21        And that's a hundred -- that's a hundred
22 thousand dollars just in these two cases; correct?
23        MR. COX:  Object to the form.
24 BY MR. SWANSON:
25    Q.  Or does that include the prior work that

Page 598

1  you were talking about?
2     A.  That includes the prior work.
3     Q.  Okay.  Now, you mentioned that you -- and
4  we talked about this last time a little bit --
5  that you actually looked through several hundred
6  pages of documents that were responsive documents
7  produced by Johnson & Johnson in Fong and Leavitt;
8  correct?
9     A.  Yes.
10    Q.  And you're aware, though, that something
11 like at least 250,000 different documents were
12 produced; correct?
13    A.  Yes.
14    Q.  And, even though you've seen the responses
15 to the requests for production and you've seen
16 what was described abstractly in terms of the
17 Excel spreadsheets and the various tabs and the
18 Bates numbers, you didn't systematically go
19 through the production and sort of audit the
20 production and see if this was exactly what was
21 produced in response to different requests, have
22 you?
23    A.  That's right.  That was not something I
24 viewed as my responsibility.
25    Q.  And you have not audited -- even though

Page 599

1  you asked for the holds, you haven't audited holds
2  for Johnson & Johnson to find out whether or not
3  there's been good compliance with those holds,
4  have you?
5         MR. COX:  Object to the form.
6         THE WITNESS:  I've spoken to people in the
7  records functions to understand how hold programs
8  are delivered, how compliance is measured.  I
9  haven't audited individual holds.
10        MR. SWANSON:  Move to strike nonresponsive
11 portions.
12        That's all I have.  Thank you.
13        MR. COX:  One question.
14        MR. SWANSON:  Okay.  Do you want to come
15 over here for it?
16        MR. COX:  No, that's fine.
17        MR. SWANSON:  You can bounce it off me.
18 And he can look at me when he's answering.
19 RECROSS-EXAMINATION BY MR. COX:
20    Q.  Mr. Mittenthal, did all the work you did
21 for the Hayes case inform the testimony you've
22 given in response to the topics in the deposition
23 notices in the Leavitt and Fong cases?
24    A.  Yes, it did.
25        MR. COX:  That's all I have.

Page 600

1         MR. SWANSON:  Okay.
2         THE VIDEOGRAPHER:  I'm afraid to say
3  anything.
4         MR. SWANSON:  You should be.
5         Let's go off the record.
6         THE VIDEOGRAPHER:  This concludes the
7  deposition of James Mittenthal.
8         Volumes II and III contain eight media
9  disks.  These originals are to be retained by
10 Tele-Video Production Services.  Telephone is
11 (510) 893-0555.
12        Copies are available to interested parties
13 unless otherwise stipulated.
14        Off the record at 2:05.
15
16        (Whereupon, the deposition was
17         concluded at 2:05 p.m.)
18
19
20
21
22
23
24
25

Page 601

1        SIGNATURE OF DEPONENT

2

3     I, the undersigned, JAMES PETER MITTENTHAL, do

4  hereby certify that I have read the foregoing

5  deposition and find it to be a true and accurate

6  transcription of my testimony, with the following

7  corrections, if any:

8

9  PAGE   LINE         CHANGE

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23

24        _____

        JAMES PETER MITTENTHAL, Date

25

---

Page 602

1  STATE OF CALIFORNIA   )

2               )  ss.

3  COUNTY OF ALAMEDA   )

4

5     I, EARLY LANGLEY, a Certified Shorthand

6  Reporter, State of California, do hereby certify:

7     That JAMES PETER MITTENTHAL, in the foregoing

8  deposition named, was present and by me sworn as a

9  witness in the above-entitled action at the time and

10  place therein specified;

11     That said deposition was taken before me at

12  said time and place, and was taken down in shorthand by

13  me, a Certified Shorthand Reporter of the State of

14  California, and was thereafter transcribed into

15  typewriting, and that the foregoing transcript

16  constitutes a full, true and correct report of said

17  deposition and of the proceedings that took place;

18  IN WITNESS WHEREOF, I have hereunder subscribed my hand

19  on October 22, 2018.

20

21       _____

       EARLY LANGLEY, CSR NO. 3537

22       State of California

23

24

25

**Exhibits**

**Ex 38 Mittenthal, J**
445:13 457:3,6,8 465:2

**Ex 39 Mittenthal, J**
445:14 469:25 470:3,4,6

**Ex 40 Mittenthal, J**
445:17 471:25 472:3,9

**Ex 41 Mittenthal, J**
445:20 477:20,23 478:1

**Ex 42 Mittenthal, J**
445:23 483:7,10

**Ex 43 Mittenthal, J**  446:1
494:7,25 495:1,4

**Ex 44 Mittenthal, J**  446:3
501:14,19

**Ex 45 Mittenthal, J**  446:5
504:3,7

**Ex 46 Mittenthal, J**  446:8
531:2,3

---

**$**

**$500**  597:18

---

**-**

**---ooo---**  447:12

**--ooo---**  449:1,3

---

**0**

**09**  538:8

---

**1**

**1**  449:11 484:17 501:5
505:4 537:4,7 538:25
539:10,17 547:11,19
548:19 549:20 552:7
565:6,17 566:2,8,16
570:17 575:15,22

**10**  539:1 541:22 546:11

**10036**  448:4

**101**  520:1 569:24

**103**  565:12 568:2 570:11
572:5

**104**  565:22 566:3

**105**  566:3

**106**  566:4

**107**  566:4

**108**  566:11

**10:07**  501:7

**10:20**  501:10

**11**  449:5 479:16 576:1

**11/30/1982**  487:5

**11:29**  546:1

**11:30**  545:19

**11:52**  546:4

**12**  576:6

**12:17**  562:15

**14**  564:8

**15**  457:11 461:8

**15th**  538:7

**16**  495:18

**1600**  538:19

**17**  502:3

**19**  447:4 449:7 504:19,22

**19'**  566:14

**1960s**  519:3

**1965**  530:17 531:17,23
532:24 552:1 565:15 566:7

**1966**  557:21 559:16 560:15
566:1,14 569:19

**1966-1968**  558:14

**1968**  557:22 559:16 565:16
566:1,8,14 569:19

**1969**  457:11 461:8 469:13,
22

**1970**  527:13

**1970s**  503:4 515:20,21
516:15 517:1,21 528:23

**1971**  561:16

**1977**  491:8

**1978**  493:2

**1980s**  517:21 528:24

**1981**  485:11,18,22

**1982**  472:20 487:2,23

**1983**  479:16 481:21 482:21
489:3,14 507:2

**1989**  486:1,16 498:6,20
499:5,24

**1990s**  517:21

**1993**  495:15,18

**1994**  502:3,15 504:20,22
505:21

**1997**  546:16

**1998**  541:4,17

**1999**  477:17,19 480:18
481:7 488:24 493:23 494:3
499:21 506:12 507:13
508:6 540:15

**1:02**  562:17

**1:45**  586:15

**1:48**  586:17

**1A**  450:3

---

**2**

**2**  478:25 483:25 484:4,5,6,
19 501:11 505:7 514:9
525:24 537:3 540:12 541:2
542:3,5,22 545:24 546:12
549:2,8 565:11,19 566:3
567:2 570:7,11,17 575:22

**2'**  450:7

**20**  525:21

**200**  592:5 597:18

**2000s**  517:21

**2009**  517:23 518:4 537:9,
19,21 539:1

**2017**  506:12 508:13 509:20
529:20

**2018**  447:4 449:8 470:10
531:9 554:23 591:19

**21**  470:14 538:3

**212 735-3453**  448:5

**22**  489:2 564:23

**23**  495:14

**25**  490:24

**250,000**  598:11

**2500**  447:23

**26**  518:15,19 531:9 555:13

**29**  472:20 531:13,14

**2:05**  600:14,17

---

**3**

**3**  457:22 496:6 531:11
546:5 564:9,20 566:8,16
568:7,12 575:20,23

**30**  454:21 487:1,23 531:14,
20

**36**  470:15

**38**  457:3,6,8 465:2

**39**  469:25 470:4,6

---

**4**

**4**  448:4 479:4 486:22
502:15 514:1,9 526:4
530:7 536:20 537:3 539:23
540:2 544:5,11 545:11
547:11,19 548:19 549:20
575:23

**40**  471:25 472:3,9 587:23
588:19 589:6 594:10 595:6

**400**  447:6,17

**41**  477:20,23 478:1

**42**  483:7,10 555:19

**43**  494:7,25 495:1,4

**44**  501:14,19

**45**  504:3,7

**46**  531:2,3

**47**  494:10 495:1

---

**5**

**5**  479:8 486:1 534:18 568:6

**510 302-1000** 447:18

**510 893-0555** 600:11

**55** 447:6,17

---

**6**

**6** 493:2 521:1 554:17,18,20 568:13 577:6,7 579:19

**60s** 548:12

**623** 447:24

**64** 518:18 569:8

**65** 531:17 533:6

**66** 561:11 563:22 570:24 572:2 573:12 574:7

**68** 560:15 561:11 563:22 570:24 572:2 573:12 574:7

---

**7**

**7** 491:8 554:22 564:22 565:1,4 567:8 568:3,13 570:8

**7/22/1981** 484:22

**70** 527:13 575:17 576:2 587:23

**70s** 515:25 517:3 519:3

**71** 527:13

**79-0269** 471:5

**790269** 472:17

---

**8**

**8** 564:21 568:13

**80s** 519:3

**83** 561:16

**84** 527:13,14 575:17 576:2

---

**9**

**90017-5704** 447:24

**9300** 447:24

**94607** 447:7,17

---

**98** 542:12

**99** 565:6,11

**9:01** 447:4 449:6

---

**A**

**a.m.** 447:5 449:6 501:7,10 546:4

**absence** 482:13 490:2

**absolute** 460:1

**Absolutely** 469:11

**abstractly** 598:16

**access** 454:6

**accomplishing** 540:21

**accordance** 497:24

**accusation** 460:7

**acid** 460:9

**acknowledge** 451:1 452:22 453:22 454:23 455:5,24 456:4,9

**acknowledged** 455:19 456:15

**acknowledges** 452:4

**acknowledging** 450:21

**acknowledgment** 454:16 455:8,14

**action** 447:10 455:22 537:10 541:4

**activities** 590:3

**activity** 518:4 554:12

**actual** 463:6 503:10 576:12 590:2

**add** 452:1 586:6

**added** 520:21 585:8

**adding** 586:4

**addition** 476:23 547:15

**additional** 455:22 514:14 522:21 544:11 576:25 590:1,9

**adequate** 467:7 574:22

**admission** 504:14

---

**admit** 504:25 505:8,15

**adoption** 525:1

**adverse** 459:2 517:5

**advertising** 576:22

**advice** 487:13,19 493:5

**aforementioned** 565:2

**afraid** 600:2

**agent** 470:17,18

**agree** 463:15 466:24 469:8 476:20 495:12 523:19 525:2 556:14 580:14,21 582:21 597:9

**agreed** 536:12

**agreeing** 468:1

**ahead** 456:12 494:22 496:18 531:1 562:2,12

**ahold** 506:7

**aids** 588:16

**airborne** 541:10

**allegation** 578:23

**allegations** 461:13 476:7

**alleged** 471:2,7 541:9 557:21

**alleges** 479:1,5

**alleging** 479:8 537:12

**alphabetical** 577:25 578:3 581:6,8

**alphabetized** 581:10

**Alternate** 457:14,15

**alternative** 457:12

**alveoli** 459:9

**Amended** 470:10 531:9

**America** 447:20 502:2

**amount** 460:8,18 578:17

**amounts** 459:4,15

**analysis** 503:17 552:22

**and/or** 505:2

**Angeles** 447:24

**annual** 551:17

---

**annually** 536:8

**answerable** 557:1

**answering** 599:18

**answers** 587:11

**Anthony** 478:12

**anthophyllite** 581:21

**anticipated** 468:25 469:3, 8 485:3 486:9,10 487:25 489:12 491:13 493:6

**anticipates** 468:13

**anticipating** 461:11

**anticipation** 487:12 572:23

**apologize** 523:6

**apparently** 541:13

**appearances** 447:13 472:22

**appeared** 447:9

**appearing** 447:21

**appears** 464:2 465:7 478:11 483:15 495:8 502:1 504:11 540:1

**applicable** 506:13,14,17

**applications** 588:4

**applied** 458:22

**applying** 559:4

**approach** 548:20

**appropriately** 467:15

**approximately** 518:1 520:1 591:20

**approximation** 573:20

**April** 457:11 461:8 565:16 566:1,8,14

**archive** 512:6,24 571:19 577:7,10,14,21 578:6 582:4

**archived** 513:17

**archiving** 517:7

**area** 476:21,22 558:16 577:18 579:4

**areas** 526:9 587:5,12 588:20

**Argonaut** 503:5

**arise** 460:17 461:4,6,7

**Arps** 448:3

**asbestiform** 503:17

**asbestos** 469:17 470:19 471:2 510:7 529:7 551:16 552:2 578:22 581:13,22

**asbestos-containing** 470:19

**asbestos-related** 450:9

**ascertain** 543:24 552:12 553:11

**ascertained** 554:14

**Ashton** 457:24 458:4 461:10 484:22 486:4 495:9 542:15

**asks** 531:14

**aspects** 587:8 588:9

**aspiration** 505:9,16

**assembled** 515:12 563:14 596:2

**assessment** 461:19 552:23

**assignment** 482:3

**assisting** 589:4

**associate** 511:23 514:20 550:13

**Associates** 503:16

**assume** 484:2 559:7

**assumes** 466:2

**assuming** 454:8 456:2 574:12 582:2

**attached** 596:13

**Attachment** 487:17 491:12 493:4

**attachments** 544:20,21, 22,24

**attempt** 488:13 551:23,24 554:7,11

**attempted** 552:18 564:2

**attempting** 562:24

**attorney** 543:14 549:11

**attorneys** 522:4 526:24 579:6 595:17

**attorneys'** 549:7

**attributed** 460:24

**audio** 576:19,21 577:1,5

**audit** 552:16,19 553:23,25 598:19

**audited** 586:1,3,5 598:25 599:1,9

**authentic** 461:25 462:2,24 463:10,14 464:1,5,6,14

**authenticity** 462:17 465:9 466:13 467:12

**author** 457:22 459:21 484:10

**automated** 456:19

**aware** 452:15 461:10 469:19 471:1,15,18,19,20 473:6,13 475:23,25 476:2, 4,5,6 477:14,18 478:16 479:17,23 480:8,16 481:7 485:17,21,23 486:13,20 488:24 489:14 490:21 491:18,19 495:23 497:5,9, 19,22 498:4 499:4,7,18,20 500:12,13,16,18,19 503:21,24 505:7,9,15,23 506:4,7,10,13,14 507:15 508:16,24 509:6,7,12,15, 16,20 510:9 521:17 522:5, 12 523:13 527:12 528:10, 18,22 529:3,4,8,11,15,18 530:10,20,22 540:10 542:19 547:7,20 550:7,12, 21 551:16,19 569:16 570:22 593:8 598:10

**awareness** 456:18 496:3 510:5

---

**B**

**babies** 459:3

**baby** 469:16,17 473:3 478:13,21 479:6 480:10

495:25 497:11 505:3,10,16 506:22 528:14 537:13 541:12 556:11 557:7,19,24 558:11 559:14,15 561:15 563:2,22,23 565:14,24 566:6 569:18 570:1,12 573:12 574:6 578:24

**back** 493:23 494:3 507:2 508:6 515:19 516:9 517:1 530:17 535:22 539:1 548:11 549:23,25 551:4,14 559:22 568:22,24 590:24

**backdrop** 456:16

**based** 453:12 454:9 465:6 519:20,24 522:6 523:4 534:22 541:25 542:5 547:16 551:3 560:8 561:13 572:20 573:24 583:25 584:3,4

**basically** 542:23

**basis** 503:11 551:5,17

**batch** 556:3

**Bates** 462:6,8,13 463:6 478:2,5,6 480:3,4 484:9 565:19 572:11 576:15 588:11 598:18

**befits** 509:10

**begin** 503:3 565:4

**beginning** 575:22

**behalf** 475:21 480:5 493:16 586:21

**Beidler** 489:7

**belief** 471:1

**believed** 590:12

**benefit** 584:25

**Berg** 537:10,18,19 538:5

**BERNARDO** 448:3 483:3

**bet** 592:23

**Bill** 541:5 542:15 549:2

**billed** 597:12

**bills** 597:14

**binder** 450:4 565:4 575:19 577:8

**bit** 450:13 484:11 518:13 519:17 536:16 551:15 558:8 597:7 598:4

**blanket** 525:14

**Bob** 542:16

**bodies** 503:12

**body** 523:24

**Bolden** 484:23 491:5 493:1

**boric** 460:9

**bother** 476:10

**bottling** 561:7

**bottom** 458:20 478:3 489:1 525:24 570:20 573:8 597:3

**bounce** 599:17

**box** 519:10 522:1 582:11 583:2,5,17

**boxes** 511:22,24 519:19 520:1,2 521:23,24 523:2,3 524:6 538:19 545:4 578:17 582:7 583:7 584:16 585:21

**break** 500:25 545:14 558:8 562:6,11,16,21,23 566:22

**bring** 587:10

**broadly** 486:16 528:12 544:16,18 569:21 571:2

**bronchoconstriction** 505:10

**brought** 515:23 516:1,9 543:4 589:5,16 596:22

**browser** 454:6

**Bruce** 542:17

**Brunswick** 512:16 513:14

**built** 588:3 589:25

**bunch** 550:4

**business** 462:18,24 463:5,14,20,23 464:7,13, 15 465:4,12,15,24 466:2,6, 11,21,22,23 467:2,3,15,17, 21,23 468:6 498:15 515:4, 13 520:17 524:4,9,12,15 535:18

## C

**CA** 447:24

**calculated** 535:5 545:4

**calibrated** 523:15

**California** 447:7,8,17 504:20

**call** 517:5 556:22 596:20

**called** 478:12 509:4,13,17, 18 510:10,13,25 547:10,21 580:18

**calling** 538:16

**calls** 454:1 468:15 500:5

**cancer** 537:13

**candidate** 536:3

**care** 559:8

**carried** 516:1 539:6

**carve-out** 548:19

**case** 461:25 462:11 464:3 465:21 470:12 471:4,11, 17,21 472:13,16 475:16,24 476:4,6,22,24 477:1,14 478:12,16 480:9,18 481:17 482:21,23 483:14 487:23 489:23 491:18,25 492:2,6, 11 494:1 502:19,22 503:23 504:15 505:21,22,24 506:21,24,25 529:2 530:16,23 533:1 537:17 538:5 540:3,9,10 541:8,16 542:7,21 544:13,14 546:12,16,19,22,24 547:2, 3,4 548:9,11,13,14,23 549:9,17 550:6,10,14 552:8 561:14 564:16 591:12,23 593:6,9,10,14, 16 597:13 599:21

**cases** 476:12 487:25 488:17 489:22,24 490:5 492:9,17,18 499:18 507:8 510:7 527:23 528:12 540:22 547:6,25 548:11,17 549:22 551:6,10 562:25 585:9 590:10 591:14 592:4 593:18,21,22 594:3,11 595:7 597:22 599:23

**cast** 579:9

**catalogue** 519:6,16

**catch** 585:2,21

**categories** 552:19 559:6 566:17 575:25 576:7,13

**categorization** 467:3

**category** 526:4 571:20 573:17,18

**center** 517:6

**certificates** 552:22

**Certified** 447:7

**chain** 589:1,24

**chances** 454:16

**change** 509:8

**charge** 492:8

**chart** 515:11 563:14 596:22

**check** 518:8

**checking** 576:23

**China** 515:7

**chose** 465:13 499:11

**chosen** 454:11 522:4

**Chris** 510:18

**CHRISTOPHER** 448:2

**christopher.cox@ skadden.com** 448:5

**Chrome** 454:6

**circumstances** 465:17 480:14 490:5 491:25 492:2 498:14,15 500:9

**cited** 574:8

**claim** 471:1 478:19 484:13

**claimed** 470:18 581:19

**claiming** 484:21

**clarification** 559:22

**clarify** 593:3

**Clark** 471:4

**classification** 466:8

**cleanout** 536:7

**clear** 473:5 499:17 509:1 543:21 557:14 561:2 567:6

**cleavage** 581:12,21 582:4 584:7 585:20

**client** 487:11,18 493:5

**Clifton** 503:5

**clock** 562:8

**close** 589:6 597:16

**closest** 573:20

**cohesively** 587:9

**Coker** 540:10 541:1,5,16 542:21 546:12 549:1,2

**collect** 541:2 547:23

**collected** 540:8,21 542:3 549:3

**collecting** 542:9

**collection** 537:7 538:9,17 539:1,5 540:11 541:3,15, 19 542:6,8,11,12,22 543:3 544:2,6 545:6,9,11 546:12 547:8,18 549:19 550:1 563:15 590:3

**collections** 536:15 539:21,25 540:16 547:5 548:16,23 549:6 577:15

**column** 484:17

**columns** 484:7

**commencing** 447:4

**committed** 562:7

**committee** 522:13 523:11, 12

**common** 479:22

**commonly** 524:15

**communicated** 525:7

**communication** 486:3 487:5 489:6 491:4,7 493:1

**communications** 487:1

**Comp** 559:11

**companies** 516:19 524:21

**company** 451:25 455:14, 17 456:4,14 463:8 464:4 465:8,13 466:13 468:12

**469:10 471:16 473:13 478:14 509:3 512:22 513:23 526:6 533:17 536:6 547:22 548:20 583:21 587:6,9 590:25 591:2

**company's** 466:6 534:24 564:13

**compared** 458:8

**complaint** 478:11 479:13, 15 480:21 503:20

**complaints** 517:5

**completeness** 532:21

**compliance** 451:7 452:22 455:5 599:3,8

**complicated** 580:10

**comply** 455:4,11 456:3 548:20

**Composites** 503:14

**composition** 579:5

**compound** 464:23

**computer** 577:2 588:9

**computers** 513:17

**conceivable** 460:16

**concern** 459:2

**concerned** 458:5

**conclude** 570:4

**concluded** 600:17

**concludes** 592:9 600:6

**conclusion** 468:16 477:4 499:20

**concur** 468:20

**conduct** 552:12 554:11 579:24

**conducted** 498:16 526:8 545:2 587:18 588:14 590:10

**confer** 464:11 467:7

**confidential** 565:10

**confirm** 463:7 520:2 568:10

**confirming** 568:19

connect 575:24

connection 467:14 471:3 537:9 540:8 541:4 547:5 548:5,17,23 549:3,17 589:10 593:23

Connie 542:16

considered 460:7

consistent 583:20

consolidated 518:2

consult 558:21

consultant 448:9 587:6

consulted 461:1 542:2,20 543:8,22 563:11 565:3 566:18 568:12 575:11

consumer 448:1 470:10 474:19,25 476:1 490:4 504:12 507:4 547:1 567:3, 11 589:23 591:1,6,7

consumption 557:8

Cont'd 449:17

contacted 455:21

contained 460:18

contemporaneous 555:19 557:16,20 558:3,12 560:13 561:11,16,22 563:3 564:15 572:1 575:10 595:18,22 596:13,21 597:6

content 459:25 461:20 463:3,4,11

contents 583:17

context 466:7 507:25 547:1 566:19 573:6 579:14 582:11

continuation 449:9

continue 546:7 562:18,21 580:22

continued 565:22 566:3

continuing 449:20 565:11

contracts 514:9,10

control 517:6 532:8 534:12 588:25

controversy 581:23

conversations 597:8

conversion 518:5

copied 484:10 489:9

Copies 600:12

copy 472:5 501:19

copying 542:9

corporate 462:16 589:2, 17,19,20 590:8 591:1,3

Corporation 447:20

correct 450:10 452:17,18 454:9,18 456:9 457:18,25 462:3,7 464:1 466:11,16, 20 468:2,12,13 469:4,10 470:12 471:17 473:3 474:5,12 477:1,8 478:3,9, 10,14 479:18 480:21 483:14,19,20,23 484:14 485:22 486:11 487:6 488:14 489:12,13,18 490:11,12 492:7,12,17 493:17,20 494:1 495:7,10, 15,19 496:1 497:12 499:5 500:2,17,21,22 501:24 502:6,10,21 506:1,5,6,9 507:14,17,18 510:7 516:15,22,23 521:12,13,22 522:3,25 524:18 525:25 526:2 528:16 530:23 531:11,24 532:2,11,15,18 534:5 535:12 536:1 537:5, 10,14 546:16 548:17,24 549:7,8 550:21 551:17 552:16 553:6,24 554:3,7 556:12 559:10 567:3,16,17 571:13 573:14 574:9,14 576:14,15 577:13,15 580:19 581:9 582:23 583:9,17 584:21 593:6,19 594:6,17 595:14,18,23 596:14 597:8,22 598:8,12

correction 495:1

correspondence 495:6 502:2

cosmetic 473:3 475:6,17, 18 476:7,23,25 506:18,20 507:8,17 531:16,23

cosmetics 503:15

counsel 449:12 464:10 468:2 470:5 473:13 485:3

486:8,9 487:11,13,18 491:12 493:5,6 501:13,18 537:1 541:21 544:4,8 546:7 562:18 586:18 590:4

counsel's 487:18

count 522:1

countries 525:4 556:18 558:5 568:11

country 559:20 568:10

couple 450:1 520:7 558:2

court 471:5 559:23

Court's 480:1

cover 520:8 572:5 588:21

covered 571:18,20 572:4, 9 577:18 587:4

Cox 448:2 453:24 454:19 455:1 456:11 460:11 461:15 462:25 463:17 464:18,23 465:25 467:11, 24 468:4,14 472:5 473:7, 20,24 474:6,13,16 475:8 476:13 477:2,9 479:19 480:11,22 481:5,18,22 482:9 484:15 485:12 486:19 488:2,6,15 489:17, 25 490:17 491:23 496:2 497:13,21 498:9,22 499:6, 13 500:3,25 501:3 502:23 504:5 508:18 511:10 516:24 521:16 528:1,17 529:14 532:3 533:2,9,12 534:6,20 535:13 536:2,10 540:18 545:15,20 551:18 552:9 554:8 555:3 556:20 557:10,25 560:16,21 567:9 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 586:12,19 592:6 595:19,24 597:5,10,23 599:5,13,16, 19,25

Cox's 594:6

create 465:13

created 464:6,14 465:2,11, 15,18,20,23 466:5,10,12 467:2,14,22 468:5 518:3 541:19 547:5,21

creating 584:25

criteria 527:8 539:7 583:1, 5

CROSS-EXAMINATION 586:19

Cruz 529:2

crystalline 458:8,9 459:7

Cs 581:11

current 450:8 510:7 517:14 581:25

custodial 512:25 577:2

custodian 456:22

custodians 451:20 545:2

custody 532:7 534:12 549:11

cut 515:17 520:4

cutoff 583:9

Cyprus 447:20 496:25 498:5 502:15,20

D

Dakota 537:10

danger 460:8

dangers 458:6

Daniels 471:4

data 515:2

database 514:10 516:16 519:4

databases 515:10

date 449:7 453:15,16 471:24 472:19 479:13,15 484:9 487:5 491:7 495:14 552:5 554:22 564:14 565:3 569:9,12 570:3 583:8,13 591:15

dated 457:11 484:22 487:1 495:14 502:3,14

day 539:14 567:17 579:25

days 452:21,25 453:5,19 454:11,12,21 456:8 587:14

De 529:2

Dear 502:13

**December** 493:2 538:7

**decision** 584:17,19

**Decoff** 471:8

**defendant** 447:21 470:9, 25 471:9 502:21 531:8

**defendant's** 471:3

**defendants** 447:20 448:1 586:21

**defensibility** 461:2

**definition** 547:8 551:11 584:23

**definitively** 573:1

**degree** 500:5

**delivered** 599:8

**Dembro** 486:4

**denoted** 547:11 582:7

**denotes** 565:20

**Denton** 495:9

**Dentons** 447:23

**department** 461:1,9 468:22 583:9,23,24 584:2

**departments** 587:5

**deposition** 447:1 449:9,20 457:7 472:4,19,23 476:15, 18 477:23 494:11 495:2 501:5,11,20,24 504:8 511:20 514:1 521:2,20 531:2 533:21 536:17 545:24 546:6 587:2 592:10 594:13 596:19,23 599:22 600:7,16

**describe** 587:16

**description** 484:13 491:11 532:24 537:11,15 540:1 581:7 583:17 584:10

**descriptions** 548:15 578:3

**descriptive** 578:18

**designated** 464:11 547:10 565:10 592:3

**designed** 579:8,9 582:6 584:15

**destroy** 469:14 473:17

**destroyed** 454:17,25 482:6 496:23 497:23 498:8,12,20 499:25 500:17 506:5 534:5 536:9 574:14

**destruction** 490:21 497:19 498:14 535:11 536:4

**detail** 508:3 538:13 541:25

**detailed** 526:18 527:8

**details** 581:25

**determination** 468:23 492:15

**determine** 453:10 551:24 573:3,5

**determined** 589:9

**determining** 584:6

**developed** 524:3 541:9

**development** 461:9

**differently** 463:25 532:22

**difficult** 554:5 575:24

**diligent** 533:24

**DIRECT** 449:17

**directed** 508:14,16

**directly** 576:8

**directory** 577:3

**disagree** 467:11 490:1 499:15 593:20

**disciplines** 588:20

**discovery** 490:6 504:12 528:11 530:12,13 534:25 560:8 575:20

**discrete** 543:2

**discussing** 555:23

**discussion** 525:9

**discussions** 518:21

**disease** 460:21 461:13

**diseases** 459:22

**Disk** 449:10

**disks** 600:9

**dismissed** 471:10

**disposed** 536:1

**disposition** 535:17

**dispositions** 499:19

**dispositive** 559:6

**distinct** 547:20

**distinction** 455:3 467:16 474:22

**distributed** 561:15

**distribution** 556:11

**District** 471:5,6

**divestiture** 496:25 498:5

**division** 509:17 510:24

**document** 454:17 457:10, 17,19 458:2,3 461:16,18 462:3,22 464:2,5,6 465:2, 7,14,17 466:8 468:3,10 469:2 470:15 479:21,25 484:6,9,20 495:11,22 498:3,11 499:1 517:6 522:18 524:1 534:2 536:23 537:7 542:5,6 544:20 546:21 547:4,8 548:9,13 549:23,25 556:5,15 563:17 564:4,10 570:21 571:21 575:13 576:7 587:21 588:7 591:10 596:9,10

**documentation** 469:1 516:20 587:9

**documents** 454:24 461:24 462:1,17 463:9,10 465:13,20 469:15,21 473:17 474:12 475:23 478:8 480:7 488:5 492:16 511:7,8,13,21 512:11,12 513:16 514:3 516:14,23 519:5 520:18 522:6,7,25 523:8,13,20,21,25 525:12 526:2 527:21 528:6,13,25 529:3,4,6,13 531:10 532:2, 7 533:4 534:3,4,11,16 535:21 536:15 537:8 538:9,15,17 539:8,15,17 540:1 542:2,10,20,22,24, 25 543:23 545:3 547:10,16 548:5,7,10 549:14,16,19, 21 550:7,12,16,24 551:4,6 555:23 557:5 558:4,10 561:22 563:1 565:8,12,17,

20 566:1,4,9,15,18 567:15, 18,19 568:4,20 569:6,14, 17,25 570:11,16,22 571:3, 5,12,25 573:3,5,9,10,19,25 574:3,5,7 575:9 576:3,12, 16 577:12,14 578:21 585:3,21,22 587:25 588:12,13 589:5 590:21 596:3,12 598:6,11

**dollars** 597:22

**domestic** 457:12,14,15 510:10,13 516:18

**domestically** 509:25

**door** 597:15

**double-check** 508:21 541:13

**doubt** 465:8 466:13 584:25

**Downs** 518:21,24 525:9 526:24 560:3 563:13 571:11,18 575:13 594:12, 15,19 596:17

**Downs'** 559:17

**driven** 583:13

**due** 460:8

**duly** 447:10

**duties** 456:21

**E**

**E-R-M-S** 520:25

**earlier** 499:14 516:5 591:21

**early** 447:7 494:21 517:21 528:24

**easily** 554:13 557:1

**educate** 544:14 591:13

**Edward** 487:2

**effect** 459:6 497:8 499:21

**effects** 459:3

**effectuated** 539:2

**effort** 511:16

**efforts** 474:11 522:22 542:8 547:23 563:15 591:15,16,22

**electronic** 515:24 516:10 519:15 526:13 527:5 543:8,17

**element** 581:18

**elements** 509:21,24

**else's** 466:21

**email** 450:15 453:1,2,3,4,6, 16,20 455:4,5 456:3

**employed** 497:2

**employee** 453:20 470:17

**employees** 469:14 542:10

**empowered** 532:17

**enabled** 587:7

**encapsulated** 585:11

**encompass** 587:23

**encompassed** 593:22

**encompasses** 596:1

**end** 501:4 545:23

**engage** 505:1

**engine** 580:2

**engines** 580:20

**English** 520:14,16,17,18 523:8,14,20,21 524:1,5,10, 15,22,24 525:5 527:24 555:2,8,10

**entails** 463:21

**enter** 459:8 578:17

**entered** 583:25

**enterprise** 514:25

**entities** 508:14,21 509:8 511:12 513:24 564:1,11 566:5 575:16

**entity** 471:10,16 508:10,20 509:12,14,17 512:4,15 513:3,4

**entries** 575:18

**entry** 484:24 486:1

**equivalent** 567:5

**ERMS** 520:24 521:6 538:19 554:23 577:11,18 580:2

**errors** 575:4

**ESI** 448:9

**essentially** 459:6 515:7 531:20

**estimated** 556:9

**et al** 471:4 502:16 541:5

**euniversity** 452:11

**Europe** 556:11,17,23

**event** 461:3

**events** 517:5

**eventually** 460:17

**evidence** 473:18 480:7 482:20 487:14 488:14

**exact** 469:2

**EXAMINATION** 449:17 592:22

**examined** 447:11

**Excel** 521:5 572:11 598:17

**excuse** 449:5

**exercise** 554:15

**exhibit** 450:3 457:3,6,8 465:2 469:25 470:3,6 471:25 472:3,9 477:20,23 478:1 483:7,10 494:7,10, 25 495:1,4 501:14,19 504:3,7 513:25 514:9 518:15,19 521:1 522:21 525:17 530:7 531:2,3 536:20 537:3 538:1 541:22 544:5,11 546:11 554:17,20 555:13 564:8 565:17 566:2,8,16 570:17 577:6 579:19 588:10

**exist** 533:5

**existed** 534:4

**existence** 460:20 529:5 540:15 591:6

**expanded** 587:22 589:8

**expect** 580:11

**expectation** 453:13,14

**expectations** 456:21

**experience** 453:12 454:9 587:6 589:15,18 590:24

**experiment** 586:4

**expert** 477:11 559:25

**explanation** 520:6 574:17, 21

**explanations** 574:19

**exposure** 470:18 471:2 479:9 541:10 557:21 558:13 560:14 561:5,11 563:3 572:1 575:10

**expressing** 459:2

**expression** 581:15

**extent** 458:5 463:6 466:1, 14 468:15 513:1 535:7 536:11 564:3 577:4

**Exterro** 451:5 452:12

**extra** 472:5

**eye** 576:17

**F**

**faced** 460:3,5

**facilities** 522:2 577:17

**facility** 519:11 573:13

**fact** 452:10 465:6 476:6 511:13 536:9 549:22

**fact-finding** 589:10 590:13 591:22

**facts** 515:2

**factual** 463:5

**Fair** 529:22

**fairly** 567:4

**faith** 471:1

**falling** 581:8

**familiar** 461:18 463:2 471:24 539:18

**familiarize** 541:22

**fiber** 578:5,7,20 581:22 584:6 585:20 586:6

**fibroplastic** 459:23

**fibrosis** 460:23 505:17

**fibrous** 578:24

**Figueroa** 447:23

**figure** 553:21

**file** 577:1,2,17 591:13

**filed** 468:12 541:17 546:16

**files** 543:17 577:4

**filing** 575:5

**filings** 517:10

**filtering** 538:20

**find** 475:13 476:10 533:17 535:1 553:3,9 559:3 561:24 599:2

**finding** 452:10 511:24

**fine** 533:19,21 545:21 560:24 572:15,21 599:16

**firm** 568:17

**five-minute** 500:25

**flat** 458:8

**Flom** 448:3

**focus** 572:18

**focused** 476:17

**follow** 490:14 540:20

**follow-on** 575:12

**follow-up** 563:15 588:14 590:7 594:24 595:21 596:16,17 597:7

**follow-ups** 450:2 595:2

**Fong** 465:21 470:12 483:6, 14 488:17 492:5,11,19,20 522:19 526:1 527:22 528:12 547:16 557:15 561:14 562:25 563:16,19 564:16 575:15,19,25 576:9,11,20 585:7 591:14 592:4 593:14,24 594:3,11 595:7,12 596:19 598:7 599:23

**Fong's** 575:10

**footer** 567:9

**foreign** 520:20 525:4

**forget** 538:16

**form** 453:24 454:19 455:1 456:11 460:11 461:15

462:25 463:17 465:25 468:14 473:7,20,24 474:6, 13,16 475:8 476:13 477:2, 9 479:19 480:11,22 481:5, 18 482:9 484:15 485:12 486:19 488:2,15 489:17,25 490:17 491:23 496:2 497:13,21 498:9,22 499:6, 13 500:3 502:23 508:18 511:10 516:8,24 517:3 519:9 521:16 528:1,17 529:14 532:3 533:2,12 534:6,20 535:13 536:2,10 540:18 551:18 552:9 554:8 555:3 556:20 557:10,25 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 595:19,24 597:10,23 599:5

**formal** 455:8

**formally** 455:11 456:15,20

**format** 521:6

**formulas** 460:4

**formulations** 459:5 460:1, 18,25

**forward** 449:21 515:24 516:1,2,10,13 539:6 543:4 591:25

**found** 522:25 523:2 569:9, 12 576:7 578:24 581:19,21 590:7

**fourth** 505:13

**fragment** 581:12,22

**frame** 518:4 519:8 526:11 527:12 570:24 591:20

**frames** 564:16

**Francisco** 504:20

**Frank** 484:22 491:5 493:1

**frankly** 457:20 462:8

**French** 532:14,15 594:16

**front** 450:5 454:5 457:8 470:6 472:9 477:24 483:10 494:12 495:4 501:21 503:20 504:9 525:23 531:6 537:25 546:10 567:13,23

**Frostbite** 503:5

**full** 520:6

**function** 588:23

**functional** 587:5 588:20

**functions** 599:7

**funny** 592:21

**fuzzy** 580:3

### G

**Gallagher** 542:15

**Gambino** 478:12,13,16 480:9 481:17 482:21 489:23 506:24 547:3 549:17

**gather** 546:9 562:10 587:9

**gathered** 540:2,6 541:16 548:5 549:16 550:9,17,25 572:22

**gathering** 549:14

**gave** 454:21 520:5 568:1 583:6 593:4 594:5

**general** 459:1 471:22 473:4 474:24 476:9 483:22 492:8 496:3 498:23 514:2, 15 520:17 548:19 559:4 564:11 568:9 579:7 580:13

**generally** 497:22 511:1 512:1 528:18 541:18 544:12 581:8 597:9

**generated** 551:25

**George** 487:2 542:16

**Giacino** 525:10 594:16,20 595:3

**give** 449:23 453:18 454:4 456:8 492:15 592:2

**giving** 584:24

**global** 514:25 515:5,15 518:2 547:14 548:7 549:19 550:8,16 551:1,7 558:18

**go-through** 578:8

**goal** 567:21

**good** 449:18,19 455:25 470:25 545:15,22 555:16 562:23 599:3

**Google-like** 580:4

**grab** 537:24 562:6

**great** 525:22 562:11

**greater** 454:16 458:5

**Greenwood** 447:6,16

**Grimm** 471:8

**group** 544:23

**groups** 547:10

**guarantee** 581:3

**guess** 450:15 453:12 570:8,19

**guessing** 453:7

### H

**half** 594:14

**halfway** 458:23

**Ham** 497:2

**Hammondsville** 496:22 497:1,9 503:6

**hand** 472:3 501:17 572:25

**handing** 457:6 470:3 477:23 494:10,25 501:18 504:5,7

**handle** 517:15

**happened** 500:7 574:18

**happy** 592:23 593:2

**hard-and-fast** 583:19

**Harrison** 447:6,17

**Hayes** 593:6,15,24 594:13 599:21

**hazard** 459:10

**heading** 496:9

**headings** 484:17

**hear** 559:19

**heard** 456:24 477:15 502:21 567:1 581:11,16,23 596:25

**helps** 513:19

**highlights** 496:8

**highly** 467:23

**historic** 499:18

**historical** 530:20 535:4 541:3 543:3 549:21

**historically** 545:7

**histories** 591:8

**hold** 450:9 451:6,7,11,16 452:4,21 453:2,4,21,23 454:25 456:18,19,25 468:19,21 469:9,13,21 474:5 475:23 477:15 480:8,13,17,20 481:17 482:15,20,22 485:22 487:25 490:2,7 491:17,21 492:5 493:12 499:9,23 500:20 505:20,23,25 506:7 507:5,7,9,15 508:13,15 510:6,7 518:9 527:16 529:11 535:24 537:16,21 538:5,7 540:22 546:18,23 599:7

**hold's** 452:8

**holds** 450:2 452:7 461:23 468:11,24 469:3 475:22,25 476:1,2,3 480:6 481:7,9,14 482:11,12,16 485:9 486:13 488:21,24 489:15,21 490:3,4,11,15,22 492:1 493:16,22,25 499:3,4,11, 17,20 500:14,16,21 502:10 503:21 506:4,11,12,13,15, 17 507:4 508:2,5,9 509:14, 19,22 510:12 529:19 535:22 537:24 540:15,17, 24 546:22 547:1 588:5 591:11 599:1,3,9

**Hong** 510:4 511:2 515:6 518:25 519:3 522:9 523:7 524:21 525:12,24 526:3,14 527:20 561:5,15 563:3,10 569:1,4 575:7,8,16 576:2, 13

**hope** 585:1

**Hopkins** 542:15

**hour** 447:4 594:14,15 597:18

**hours** 592:1 594:19,21 597:18

**housed** 511:14

**huge** 549:14

**hundred** 511:22 519:19 520:1 521:24 567:19 588:13 597:16,21 598:5

**hundred-box** 512:8,9

**hypothetical** 535:3 540:20 557:2 574:13,17,25 585:23,24

**hypothetically** 534:10 554:2,10

**hypotheticals** 469:11

---

**I**

**I-N** 582:16

**idea** 455:13

**identification** 457:4 470:1 472:1 477:21 483:8 494:8 501:15 504:4 531:4

**identified** 532:6 539:9 542:11,13 565:8 568:21 576:15 587:1

**identify** 482:10 535:1 589:13 590:11

**identifying** 542:8 590:20

**II** 600:8

**III** 449:10 501:5,11 545:24 546:6 600:8

**Imerys** 447:20,21

**immediately** 453:21

**import** 467:16

**important** 590:13

**impression** 498:11 514:16 594:2,4,8

**improve** 585:2,5

**inbox** 522:10

**Inc.'s** 470:10

**include** 459:14 554:25 555:1 569:23 571:3 597:25

**included** 476:16 544:24 551:20 568:13 588:22

**includes** 570:6 598:2

**including** 458:25 459:22 470:17 484:8 505:1 518:5, 25 528:15 563:12 565:9 572:23 575:12 588:1 589:2,3

**inclusive** 584:15

**inconceivable** 460:21

**incorporated** 547:25

**incorporation** 547:18

**increase** 459:24

**increases** 454:24

**increasing** 460:21

**independent** 503:16

**index** 519:25 521:5,15 522:10 523:5,24,25 524:3 526:13

**indexes** 519:13 526:23 527:5 543:7

**India** 555:24

**indication** 455:9 540:23 565:16

**indications** 543:20 564:17

**indices** 543:7

**individual** 583:24 584:9 599:9

**individually** 547:2

**individuals** 458:25 491:5 508:16 509:16 510:9 526:22 542:13 588:21 589:9 590:11 594:22,23 595:16

**industrial** 503:15

**inevitably** 535:15

**inference** 473:12

**inflammatory** 459:23

**inform** 599:21

**information** 450:25 452:8, 17 465:5 466:4 469:12,18, 23 473:5,17 480:12 481:25 484:11 488:4,8 493:12 497:3 505:25 508:7,12 511:6 512:19 513:12 514:14,17 515:1,22,23 516:1,4,13 521:9 528:8

532:20 534:25 536:21 537:4 539:3 543:2,6,9 544:1,25 546:20 547:23 548:4 549:16 553:12,17 554:13 557:12 558:17 560:12 566:22 572:20,22 575:5 576:25 578:17,18 580:4 583:6,21,25 585:22 587:7,10 588:4 590:9 591:15 596:9

**informed** 560:8

**inhalation** 458:6 460:24 477:8 582:18,19,22 584:7 585:20

**inhale** 459:4

**initial** 571:10

**initially** 529:1 550:9

**injuries** 479:9

**injury** 470:18 471:7

**inquiries** 458:25 459:16

**inquiry** 493:19 511:7 538:14,24 544:19 586:9

**instance** 514:9,21 515:3 516:6 551:21 559:7 569:22,24 570:7 575:25

**instances** 498:25

**instruct** 473:16

**instructing** 469:13

**instruction** 452:20 544:17

**instructions** 527:2

**intended** 451:9

**intent** 521:8

**intention** 456:6

**intentions** 456:1

**interested** 453:11 600:12

**interesting** 539:20

**internal** 588:24

**international** 507:24 508:8,14,17,22 509:5,13, 18,21,23 510:11,14,25 511:9,14 512:11,15 513:3, 14 514:10,11,19,20,23,24 515:1,16 529:19

**interpret** 572:4

**interpret all** 555:5,9

**interpreted** 544:18

**interpreting** 569:20

**interrogatories** 470:11 591:11

**interrogatory** 470:15 471:13 473:10

**interview** 563:12,13 590:5 596:17

**interviewed** 514:22 587:22 589:10 591:24

**interviewees** 589:8

**interviewing** 555:20 588:18

**interviews** 588:14 590:17 591:5 594:24 595:1,5,21 596:16

**investigate** 474:5 485:14 488:9 498:13 519:1 552:4 579:4 587:12

**investigated** 500:9 517:3

**investigation** 470:24 474:2,4,19 475:10,20 476:16 481:24 482:4 517:4 543:3 550:20 552:12 587:17 590:12 593:25

**involve** 474:25

**involved** 460:22 475:16 523:11 542:8 589:1,24 591:17 592:1

**involving** 460:3

**Ira** 486:4

**Iron** 577:13

**Island** 471:6,9

**issue** 467:8 468:23 475:22 476:22 478:20 480:6,20 481:16 490:14 498:13 499:11 505:20 506:21 570:25

**issued** 468:11,22 469:13 475:24 477:16 480:8,13,17 481:9 482:6,15 485:9,22 486:14 487:25 489:15 490:2,4,8 491:17 492:1,19

493:12 499:17 500:20
503:22 505:24 506:1,8,19
507:16 529:11 537:17
540:24 546:18

**issues** 464:12 474:5
475:16 476:11,25 480:10
487:24 488:14 490:11
492:5 520:20 584:4 587:21
597:4

**issuing** 469:9,21 489:21
491:21

**item** 485:11,25 492:25

**items** 527:8

J

**J&j** 471:9 496:24 498:5
511:2,3 564:13 586:21

**Jaffe** 448:8

**James** 447:1,9 449:10,14
501:6,11 542:16 545:25
546:6 600:7

**Jersey** 512:17 513:15

**Jim** 448:10

**John** 489:7 502:10 542:15

**Johnson** 448:1 450:8
453:3 457:10,24 459:1
461:10 462:2,6,11,24
463:15 464:1,7 465:3,22,
23 466:10,16,18,19,22,25
467:14 468:2,5,25 469:5,6,
12,13,14,20 470:9 471:15,
20 473:1,2,6,15 474:11,12
475:18,21 476:22 478:2,7,
13 479:17,22,23 480:2,5,6,
19,20 481:12,13,16 482:19
483:13 484:21 486:15,16
488:1,13 489:16,21
490:10,16,22 491:21
492:14 493:16,17,20
494:15 495:6,7,24,25
497:11 499:10 500:17
502:2,3,10,11,20 503:22
504:12,15,25 505:8,14,15,
20 506:5,8,16 507:16,24
508:8,17 509:4,13,18
510:10,11,25 511:9 512:15
513:13,14 514:19,20
516:17,18,20 517:20
524:17,20,22 525:3

527:19,20 528:22,23
529:23,24 530:15,16
531:8,16,21,22,23 532:1,
17 534:13 535:8,9 536:7
537:10 541:11 549:17,18
553:4 555:24,25 556:10
557:6,19 560:9 561:7,8,13,
15 563:20,21 564:1,2
566:25 567:3,11 571:24
575:8,9 584:3,5,24 586:5
595:17 596:8 597:13 598:7
599:2

**Johnson's** 462:6 464:7
465:3,24 466:10,22 467:15
468:6,25 469:15,16 471:20
473:2 478:21 479:6 480:10
484:21 488:13 495:25
497:11 505:3,9,16 506:21
516:18 524:20 528:14
531:9,21 537:13 557:7
558:11 559:15 565:14,24
566:6 569:18 570:1,12
573:12 578:24 584:24

**Jonathan** 448:8

**Jones** 495:10

**JPP** 575:16

**judgment** 463:21 465:16
466:3 467:1

**July** 504:19,22

**jump** 539:22

**June** 489:2 531:9 593:5,8,
19

K

**KARLEEN** 447:22

**karleen.murphy@**
**dentons.com** 447:25

**Kazan** 447:5,16

**keeping** 510:23 516:19

**key** 519:20,24 520:13,15,
21,23,24,25 521:15

**kind** 450:14,19 480:17
486:3 567:22

**kinds** 450:24

**knew** 455:15 546:21
583:20 589:19 590:3,23

591:2,21

**knowing** 456:4 535:3

**knowledge** 460:2 471:23
476:9 587:7

**Kong** 510:4 511:2 515:6
518:25 519:3 522:9 523:8
524:21 525:12,25 526:3,14
527:20 561:5,16 563:3,10
569:1,5 575:7,8,17 576:2,
13

**Korea** 560:10 561:13,20
563:23

**Korea's** 528:6

**Korean** 527:18 528:7
529:6,12,13,24 530:1
560:13 571:23

L

**La** 529:2

**lab** 503:16 516:7

**laid** 584:1

**land** 574:25

**LANGLEY** 447:7

**language** 469:5 520:20
524:2,4,9 528:7

**languages** 520:22 523:14
524:7 527:24 528:3

**LAOSD** 470:11

**large** 538:16 584:15

**late** 528:23

**Laura** 525:9

**law** 461:1 468:22

**lawsuit** 468:11 473:6
479:18 537:12

**lawsuits** 556:15

**lawyers** 475:2 584:24
596:9

**lay** 580:14

**lead** 505:10,16

**learn** 525:10,15 590:8

**learned** 591:6 595:15,25
596:4,7

**Leavitt** 465:21 488:17
492:6,19 522:19 527:22
528:12 530:16,22 533:1
547:16 552:8 557:15,16
558:19 562:25 563:16,19,
20 564:6,16,17 576:20
585:7 591:14 592:4 593:9,
25 594:3,11,13 595:7,12
596:18,19 598:7 599:23

**Leavitt's** 560:14 561:4
572:1

**led** 589:14

**Lee** 487:2 542:17

**left** 467:20

**Legacy** 536:15 537:4,7
538:25 539:10,17,21,23,24
540:2,12,16 541:2 542:3,
22 545:11 546:12 547:4,8,
10,19,21,25 548:16,19,22
549:2,6,8,20

**legal** 450:2,8 451:6,7
452:7,21 453:2,4,21,23
455:3 456:18,19,24 461:23
463:21 466:3 467:16,23
468:11,15,18,21,24 469:13
475:22,23 477:4,14,15
480:6,8,17,20 481:14,16
485:9,22 486:13 487:13,
19,25 489:15 490:15,21
491:17,21 493:5,12,16,22,
25 499:3,4,9,11 502:9
503:21 505:20 508:5
509:14,19 510:11 529:11
537:16 538:5,7 540:17
546:18,22,23,25 556:14
584:18,19 588:5 591:9

**Leibensperger** 487:3
489:7

**letter** 466:20 487:11 496:7
501:23 502:14 541:21,24
543:10,19,22,25 544:2,13
545:8 546:10

**letterhead** 465:22 494:15
495:7

**level** 532:21 589:23 591:1,
2,4,6,7

**likelihood** 454:24

**limit** 459:25 527:9,11

**limited** 474:24 544:2

lines 492:6

list 452:1 512:22 513:18,22 522:16,21,22 523:12 537:24 542:13,14 544:7 554:23,25 568:4 577:20 585:12,14 587:22 589:7

listed 513:1 515:15 522:17 536:18 573:10 574:7

listing 575:13

listings 526:14 527:5 588:4,5

lists 484:6 537:4 588:5 590:1

literature 458:13,17

litigated 499:19

litigation 450:9 460:3,22 461:12 465:8 466:15 468:13 469:2,3,6,8 480:10, 18 485:4,7,10,19,21 486:9, 11,17 487:12,20 489:12,15 491:13,14,22 493:7,11 499:12 500:20 506:9,15 507:8,17,19 508:5 509:19, 22 519:16 548:6 550:18 551:1 577:13 578:12,22 582:23 588:8 595:10

litigation-related 488:4

litigations 486:14

live 517:9,22

LLP 447:23 448:3

loaded 588:8

local 503:4

locate 542:2 569:6 577:11 582:10

located 510:4 512:16 525:12 526:3 541:4 557:18 558:4 561:22 563:5

location 518:25 525:13 569:25 570:12,18

locations 508:22,23 512:13 514:23 519:2 529:20 564:18,25 565:13, 23 568:3

log 483:6,13,16,19,23 484:8 485:15,18 488:9 489:24 490:25 492:11,16

long 453:22 454:3 516:14 557:9 568:1 591:18

long-term 479:5

longer 454:15 459:16 535:24

looked 456:5 508:1 526:22 527:4 530:14 537:21 549:25 558:18 563:14 564:7,8,19,20 568:25 569:2,3 575:21,22 576:1,5, 11,17 578:10 588:10 598:5

Los 447:24

lot 515:24 518:4 519:18 566:21 572:22 573:17 574:3

Lowell 504:14,15

lunch 545:17 562:6,16,20

lung 460:4 461:13

lungs 459:3

Luzenac 502:2

---

**M**

---

M.D. 457:23

made 474:11 476:5,6 492:14 493:19 499:16 579:6 585:1

main 497:10

make 461:19 465:16 467:1 480:1 509:9 525:14 550:11 551:23,24 552:23 568:15, 17 574:10 582:3 584:20 585:2

makes 462:23 468:22 557:7 580:6

making 467:16 474:22 483:19 556:11 568:8

malignant 541:9

management 456:17 496:24 498:8,13

manager 451:6,7 452:21 455:21

managers 587:20

mandatory 536:8

manner 466:12

manufacture 505:2 573:11 574:6

manufactured 473:22 528:15 557:20 558:12 559:16 560:1,4 565:14,24 570:1,13,15

manufacturers 525:3

manufacturing 556:3 557:23 559:2,14 561:8 563:2,21 569:16,23 570:5, 6,23 571:13 575:9 576:4, 14

March 591:20,24

Marie 478:12

mark 447:16 472:6 501:1 531:2 556:6

marked 457:4 470:1 472:1 477:21 483:8 494:8 501:15 504:4 515:12 531:4 541:22 564:8

marketed 576:1

marks 449:7 501:4,10 545:23 546:5

Marlene 504:14

match 544:22

material 519:11,13

materials 487:12 513:1 541:3,23 544:4 556:3,4 571:19 588:2 591:12 596:1

math 597:20

matter 457:11 484:12 500:10 527:23 539:7 586:9

matters 576:20 585:10 591:22

maximum 455:24

Mcclain 447:5,16

Mccrone 503:16

Meagher 448:3

meaning 586:3

means 463:4 466:19 490:2 526:5 535:20 551:8 569:21

measured 599:8

media 501:5,10 545:24 546:5 600:8

medical 463:5

meet 464:10 467:6

meeting 495:18

meets 532:24

memo 542:11 545:1

memorandum 485:2 486:8

mention 469:2 478:25

mentioned 454:10 513:23 517:18 539:12,13 542:23 552:17 564:19 575:11 582:25 584:14 588:18 589:7 598:3

mentions 544:6 568:11,15

mesothelioma 471:7 476:24 477:7,12 541:9 579:20 580:6

methodology 522:5 534:24

migrated 516:2 517:9

Miller 472:13 489:9 491:5 493:2

milling 557:23 559:1,12,13 560:13 561:9,18 563:1,23 571:23,25

mind 510:23 595:8,10,13

mine 483:3 496:8,24 497:2 498:8,12,21 503:6 553:9

mined 475:7 476:21,23 495:24 497:11 559:25 560:4

Minerals 471:10,16,20 472:22,25 473:16,19,23 495:23 497:6 502:20

miners 497:1

mines 447:20 473:19,23 475:6,15,17 497:10,16 503:4 559:1 564:12 575:16

minimally 454:23

minimum 460:1

mining 496:21 499:24 503:12 557:23 558:10

559:12,13 560:13 561:9, 17,18 563:1,22 564:13 571:22,25 575:15

**minutes** 594:12

**Mischaracterizes** 461:16 499:14

**misfiled** 575:2

**mislabeled** 574:25

**misrepresent** 582:2

**missed** 574:4

**missing** 534:3

**misspelled** 580:7,11

**misspellings** 580:17

**misstates** 474:7,17

**Mittenthal** 447:1,9 449:10, 14,18 457:6 470:3 494:10 501:6,12,17 509:2 545:25 546:6 562:20 586:20 592:8 599:20 600:7

**modules** 452:11

**Molnar** 542:16

**moment** 470:5 518:12 527:17 586:13

**monolithic** 517:11 539:5, 13 545:7

**monthly** 503:11

**morning** 449:18,19

**mothers** 459:3

**motives** 455:17

**Mountain's** 577:13

**movable** 577:16

**move** 457:1 513:7 514:6 520:11 523:16 548:1 579:16 599:10

**MSDS** 529:23,25

**Mswanson@kazanlaw. com** 447:18

**multiple** 486:25

**multiply** 553:2,19

**MURPHY** 447:22

**mute** 483:2,4

**N**

**names** 497:16 509:7 517:15 555:1,8 589:23 590:1

**Nancy** 565:5

**narrative** 583:16

**narrowly** 544:16,18

**nature** 497:3 515:5 524:6 591:13

**Navy** 570:2

**necessarily** 515:14 540:19 555:8

**needed** 510:19 523:2,3

**needle-like** 458:7

**negation** 459:16

**neoplastic** 459:23

**net** 579:10

**non-english** 521:11

**noncustodial** 512:25 513:22 530:3 536:18,24 544:7 545:10 547:9 563:12 575:13 576:24

**nonresponsive** 457:2 514:7 523:17 548:2 550:4 579:16 599:10

**notations** 485:14 488:10

**note** 496:15,18,19,20,21 542:25 565:11

**notebook** 570:10

**notebooks** 516:8

**noted** 565:7,23 566:1,8 567:17

**notes** 450:14 452:13 497:7 498:23 510:22 511:12,22 514:21 515:22 518:8,12, 14,19 519:21 525:15,16 536:22 553:18 555:12,13, 20 556:12,13 560:3 563:11,12,13 568:25 569:3,8 571:10,18 572:24 575:11,12 587:24 595:18, 22 596:1,13,20,21 597:6

**notice** 447:3 450:9,13,14, 16 451:14 452:23 453:4, 22,23 454:18 455:11 456:23 462:20 469:7 470:16 474:7,10,17 476:15 477:10,15,16 505:21 533:13 556:21 578:14 579:2,5 587:2,4

**noticed** 452:19 462:15 464:17 481:14

**notices** 477:18 599:23

**noting** 560:2

**November** 487:1,23 491:8 495:14,18

**number** 449:11 462:9,13 463:6 470:4,6,15 471:4 472:3,16 478:2 479:4,8 480:3,4 484:8,9 486:22 494:16 496:6 499:16 501:5,10 504:7 505:4,6 513:25 531:13,14,20 540:12 545:24 546:5 551:24 552:4,21 553:25 567:8 568:2,6 570:11 577:6 587:3,4,25 588:18 594:19

**numbered** 577:24

**numbering** 539:24 567:5

**numbers** 462:7 478:5,6 567:4 572:12 576:15 598:18

**O**

**O'SHAUGHNESSY** 502:6,10,13

**Oakland** 447:6,17

**oath** 534:13

**Object** 453:24 454:19 455:1 456:11 460:11 461:15 462:25 463:17 465:25 468:14 473:7,20,24 474:6,13,16 475:8 476:13 477:2,9 479:19 480:11,22 481:5,18 482:9 484:15 485:12 486:19 488:2,15 489:17,25 490:17 491:23 496:2 497:13,21 498:9,22 499:6,13 500:3 502:23

508:18 511:10 516:24 521:16 528:1,17 529:14 532:3 533:2,12 534:6,20 535:13 536:2,10 540:18 551:18 552:9 554:8 555:3 556:20 557:10,25 571:14 573:15 574:15,23 578:13 579:1 580:8,12 582:24 584:11 585:4 595:19,24 597:10,23 599:5

**objection** 481:22 488:6 533:9

**objective** 482:10 515:14

**obligations** 548:21

**obtained** 529:1

**occasional** 516:7

**occasionally** 458:24

**occur** 575:5 591:18

**occurred** 542:7

**October** 447:4 449:7 472:20 479:16 502:3,15

**offhand** 525:18

**office** 454:3 590:8

**officer** 589:14

**officers** 588:25 589:3,22 590:23

**offices** 447:5 549:7

**official** 525:1

**offsite** 526:13 527:4 577:19

**oldest** 507:13

**omnibus** 538:17

**one-by-one** 517:4

**ongoing** 487:19 547:17

**onsite** 571:18 577:14,16

**open** 452:25 453:4,6,20

**opened** 523:3

**operate** 454:5

**operates** 456:16

**operating** 471:16 509:3 510:24 511:1 512:16 513:13 516:20 524:20

591:2

**operation** 496:22

**operational** 591:3

**operations** 466:6 511:14 512:12 518:2

**opine** 579:12

**opining** 582:9

**opinion** 580:14

**opportunity** 454:4 456:8 563:8

**options** 482:3,7

**order** 494:18 588:6,16

**ordinary** 465:11

**ore** 503:12 531:15

**organization** 509:22,24 514:24 559:9 589:2

**organizing** 519:4

**original** 568:22 595:5

**originals** 600:9

**OUS** 508:23

**ovarian** 537:12

**overlap** 573:19

**overlapping** 476:25

**overly** 584:15

**overseas** 508:23 512:10 518:24 528:15 556:18 557:15 564:17

**overview** 541:20

**P**

**p.m.** 600:17

**packaging** 505:2 556:4

**pages** 472:12 587:24 598:6

**paginated** 518:14,18,19 555:12

**Pam** 518:24 525:9 559:17 563:13 571:11 594:12,15 596:17

**Pamela** 518:21 560:2

575:13

**paper** 516:8,14 517:3,10 519:9 543:8,17,23

**paper-type** 516:14

**paragraph** 457:21,22 458:23 459:21 478:25 496:14 503:2,10

**parameter** 552:23

**part** 454:2 456:20 462:20 469:24 481:24 511:15 513:3 514:23 518:15 524:23 526:25 538:15 540:2 548:6 549:18 550:8, 16 551:1,7 570:4 575:2 576:4 596:3

**particulars** 524:2 564:24

**parties** 589:3 600:12

**partly** 570:19

**Partridge** 448:10

**parts** 556:24 558:2

**party** 469:6

**past** 458:21 459:5 590:24

**payments** 559:9

**pediatricians** 459:1

**pending** 485:3,7,10 486:8, 10,14,17 489:11 491:13 493:6 550:18

**penetration** 460:4

**people** 452:1 461:8 484:10 508:14 509:20,25 510:1,3 514:22 522:16,22 523:11, 12 527:4 543:1 578:16 580:7 587:8,20,22,23 588:5,19,22,25 589:1,2,17, 19,20,21,24 590:7,17 591:21,23 594:10 595:6 596:8 599:6

**percent** 534:19 552:7

**percentage** 533:11,15 534:16,23 535:3

**percentages** 552:13

**perfect** 585:14

**perfectly** 533:21

**performed** 512:9 543:15 545:9 552:5 553:14,17

**period** 454:13,22 455:25 550:9,25 552:1 557:9,22 558:13 561:12,17,18,19 569:19 571:17 573:11 583:9 587:19 591:18

**periods** 534:17

**permanent** 479:9

**permitted** 590:18

**person** 455:25 456:14 461:22 470:17 572:3 589:15

**personally** 447:8 542:4

**perspective** 455:18

**pertain** 459:17

**PETER** 447:1,9 449:14

**Pharmacy** 541:5 549:2

**Philippines** 510:1,4 511:3,21 515:6 518:13,25 519:2,21 524:18,21 527:20 556:19 557:6,8,19,22 558:12 559:16 560:3,14 561:4,6,8 563:4,11,21 565:2,15,25 566:7,12,13 569:1,7,17 570:2,14,24 571:19 573:13

**philosophical** 455:3

**phone** 447:22 448:3 483:1, 2

**phrased** 571:1,2

**physical** 473:18

**physically** 510:3 512:5 543:15

**pick** 580:17 586:7

**pieces** 520:7

**place** 454:5 499:4,10,23 509:10 540:17 573:1

**places** 559:25

**plaintiff** 471:7 479:1,5 505:14

**plaintiff's** 457:3 469:25 470:11 471:25 477:20 483:7 494:7 501:14 504:3,

13 531:3,10 587:1

**plaintiffs** 447:15 471:6 504:24 505:7 528:12 530:12,15 579:12

**plane** 454:3

**platelet-type** 458:9 459:7

**platforms** 516:22 596:11

**pleadings** 591:12

**point** 452:25 469:1 498:19 499:12 500:1 535:10 538:11 545:5 563:19 574:14 597:2

**pointed** 569:15

**points** 499:16

**policies** 588:1 591:4 596:2

**policy** 536:7

**poorly** 596:6

**population** 465:14 535:4 588:7

**portal** 451:7 452:22 454:6

**portion** 456:19

**portions** 579:17 599:11

**position** 461:2,17 534:21 552:11

**possession** 498:21 532:7 534:11

**possibility** 459:2 461:11

**possibly** 554:14

**potential** 535:16

**potentially** 514:4

**powder** 460:1,25 469:16, 17 473:3 478:21 479:6 480:10 496:1 497:11 505:3,10,16 506:22 528:15 537:14 541:10,12 556:11 557:7,19,24 558:11 559:14,15 561:15 563:2, 22,24 565:14,24 566:6 569:18 570:1,12 573:12 574:6 578:24

**powders** 459:10

**practices** 497:24

**pre-luzenac** 496:23 498:12

**precise** 454:11 471:24 508:20 521:7 547:7

**precisely** 509:12 571:1 573:19

**preparation** 508:2 591:17 592:2 593:23

**prepare** 536:23

**prepared** 485:2 486:8,9 491:12 492:5 493:5 537:1

**presence** 460:8 469:17 581:13

**present** 448:7 530:18 531:17,24 532:24 533:6 552:2 577:2 585:11

**presented** 539:12 579:15

**presenting** 459:10

**preservation** 475:22 480:7

**preserve** 473:17 474:12 488:13

**preserved** 454:18 500:1 519:8 539:6 545:6

**preserving** 516:23 519:5

**presume** 514:23

**presupposes** 553:10

**pretty** 484:2 530:23

**prevented** 469:20 489:20 491:20

**previous** 517:10 579:25

**previously** 447:10 449:15 589:18

**primarily** 540:8 541:3 549:3

**prior** 477:17,18 480:18 481:7 496:24 498:5 499:21,24 522:19 529:20 540:15 548:13 587:5 597:25 598:2

**privacy** 556:25

**privilege** 483:6,12,16,19, 22 484:8,13,21 485:15,18 488:9 489:24 490:25

491:11 492:11,16

**problem** 460:6

**procedure** 536:8

**procedures** 538:18 588:2 590:23,25 591:3 596:2

**proceed** 449:12 501:13 586:18

**process** 490:6 526:25 547:18 575:4 576:4

**processing** 564:13

**procurement** 588:25

**produce** 503:3 521:20 535:2 585:20 591:15 595:22

**produced** 447:9 461:24 462:10,15 463:9 465:7,20 466:5,14 478:8 482:5 483:13 511:8 521:14 522:11 532:2,7,25 533:8, 16,23 534:11,18 535:8,17 548:10 552:8,13 557:18 561:23 563:5 565:17 566:9,15,19 568:18,21 569:14,18 570:21,23 571:5,24 572:13 573:13 574:9,11,12,18 575:9,16 576:3,8,12,20,21 596:22 598:7,12,21

**producing** 475:17

**product** 470:19 475:1 476:8 478:20 479:1 579:7

**production** 448:10 464:3 505:2 531:10 547:14 548:7,21 549:23 550:8,17 551:2,7 558:19,20,22 561:25 562:1 563:17 564:4,7,10 565:7 566:11, 17 567:2,18,20 568:9 569:3 575:14 576:6,10 577:3 588:3,10 598:15,19, 20 600:10

**productions** 547:15 565:6 572:24 591:10 596:11

**products** 460:19 473:3,22 474:20 475:18 478:14 503:3 504:13 531:17,21,23

**programs** 599:7

**promise** 586:11

**pronounced** 502:7

**proper** 555:1

**Protection** 478:21

**provide** 477:5 487:13 511:6 514:14 586:25 587:11,13

**provided** 473:11 493:22 494:1 497:2 528:21 529:2 544:13 564:5 566:2,21 570:16 579:11

**providence** 466:7 471:8

**providing** 487:11 493:5

**prudent** 459:25

**pull** 452:12 522:23 525:17 530:24 554:18 555:14

**pulled** 519:19,20 538:19 539:16

**pulmonary** 459:9,22 460:20,23

**purchase** 496:25 498:5 565:25 566:13

**purchased** 479:1

**Purest** 478:21

**purpose** 483:22

**purposes** 540:21

**pursuant** 447:3 485:3 486:8,10 491:13 493:6

**put** 482:24 515:5 519:10 522:13 527:9 537:8 538:9, 11 545:4 547:14 583:16 584:9 588:11,15

**putting** 550:4

**Q**

**quality** 588:23,24 589:25

**quarter** 553:11

**quarterly** 551:17,21 553:5, 6,15,19

**quarters** 552:25

**question** 453:25 460:12 461:16 463:1,18 465:9

467:12,13,18,25 468:15 470:16 471:18 473:8,25 474:7,17 475:12,14 480:23 481:19 497:14 498:1 509:2 510:20 513:9 517:16 520:5 531:21 534:8,15 542:6 549:13,15 550:2 552:10 556:6,21 557:2 558:2,25 559:7,8,18 560:18,23,25 564:24 566:20 568:23 570:5 571:1 572:8,13,19, 25 573:2,25 575:7,24 576:9 578:14 595:11 596:6 597:1 599:13

**questions** 464:24 467:8, 18 507:23 508:4 536:14 550:3 559:5 562:24 563:25 564:3,11 586:21 587:11 588:17 590:16 592:7 594:6

**quick** 578:8

**quickly** 530:2,25

**R**

**R&d** 589:24

**Rainbow** 503:5

**raising** 500:13

**random** 522:3

**range** 528:2 552:6 564:14 569:10,13 570:3 581:9 583:8,14

**ranges** 565:3,19 588:11

**rationale** 585:6

**ratios** 524:25

**raw** 556:3

**re-ask** 560:25

**reach** 537:24

**read** 455:9 456:5 484:2 491:15 493:8 495:21 496:19 498:10 500:8 537:11 542:1,5,24 549:4 559:21,23

**readily** 554:13

**reading** 541:24 559:17

**ready** 449:21

**real** 520:5 530:24

**reality** 480:16

**rearranged** 545:5

**reason** 449:23 463:7 464:4 465:9,19 466:13 499:9 534:3 535:16 550:23

**reasonable** 470:24,25

**reasoning** 551:3

**reasons** 454:11 547:12 575:1

**recall** 457:20 469:7 478:17 497:7 501:25 502:24 506:18 518:5 527:13 530:4 546:25 581:17 583:23 593:17

**receipt** 450:21 451:1 452:4 454:23 455:13 456:9

**receive** 450:25 470:16 485:23

**received** 458:24 476:2 482:22 508:8 509:19,22 541:20

**receiving** 510:11

**recent** 450:8 510:6 516:21 522:21 577:20

**recently** 517:23

**recess** 501:8 546:2

**recipient** 451:9 452:4 453:1 484:10 502:6,8 509:14

**recipients** 450:17 451:9, 15,16 452:8 508:4

**recognize** 478:6 502:5

**record** 449:4,5 462:24 463:15,20 464:1,13 466:16 467:2,17,21 498:6 501:7,9 513:25 530:6 538:2 546:1, 3 554:21 557:14 559:23 562:13,14,17 572:15 586:12,15,16,17 592:19 600:5,14

**records** 456:17 462:18 465:15,22 466:5 478:9 496:23 497:20,23 498:7, 12,19,24 499:24,25 500:6 520:19 556:3 557:16,18

576:21 584:1 587:20 588:22,25 589:3,13,14,17, 22 590:22 599:7

**records-keeping** 577:17

**RECROSS-EXAMINATION** 599:19

**REDIRECT** 592:22

**redo** 494:22 510:22

**refer** 513:19

**reference** 451:18 489:2 491:3 492:9 502:15 514:11 523:1 525:24 526:1,5 588:16

**referenced** 572:11

**references** 487:1 530:4,5 543:23

**referencing** 567:4,7

**referred** 485:11 486:17 489:24 517:14,17 524:18 541:21 542:12

**referring** 485:8 487:24 492:22 493:11 512:3 513:18 541:11 568:6

**refers** 487:10 489:11 498:11

**refined** 579:11 584:16,20, 23

**reflect** 511:13 585:9

**reflected** 570:16 595:17 596:12 597:6

**reflecting** 534:17 565:13 566:5 568:3 569:25 570:12

**reflective** 576:8

**regard** 458:6 459:9 461:2 468:9

**Regina** 542:15

**regular** 464:7,15 465:3,23 466:2 467:22

**relate** 564:10

**related** 450:20 473:18,22 476:1,11 485:18,22 488:14 492:5,16 506:9,15 507:5,7, 16 512:11 527:21 528:14 538:14,25 542:10 550:24

555:24 561:7 563:1 569:5 571:12 576:13,21 585:7

**relates** 514:18 570:5

**relating** 469:15 515:1 558:5

**relative** 458:6

**release** 506:8,19

**releases** 500:20 506:10, 13,14 507:15,20

**relevant** 499:20 514:5 542:2 544:19 546:25 547:24 565:19 571:16 577:12 578:22 582:22 583:1 584:4,8 585:3,22

**relief** 478:20

**remember** 457:19 506:24 512:1 525:17 538:12,21 546:13 556:8 563:6 583:8 593:11,15

**REMEMBERED** 447:3

**reorganized** 545:5

**rephrase** 529:17

**replied** 459:5

**reply** 502:14

**report** 495:17

**reporter** 447:8 494:16,18 555:15 559:23

**reports** 458:13,17 589:19

**representation** 568:17

**representative** 462:16 481:12

**represented** 471:8 472:23 539:4 563:15

**request** 485:2 487:19 491:12 504:13 505:4,6 531:10,13,14 564:22 565:6,22,23 566:10,17 567:2 568:2,9 569:15 572:9 576:5 591:11

**requested** 476:1 485:24 490:3 506:11,12,17,18 528:19 587:25 588:6 591:8,10

**requesting** 504:25 505:8

**requests** 530:20 561:25 562:1 567:16 568:21 572:5 573:6 598:15,21

**require** 454:15

**required** 492:15 583:7,10

**requirements** 584:1

**research** 453:9 461:9 469:24 497:5,19,20 498:4 499:3 510:19 511:5 512:20,21 528:9 529:25 534:22

**resolves** 570:25

**respect** 471:2 475:24 477:16 480:9 485:10 486:14 488:16 491:18 493:10 499:11 503:22 508:12 510:22 514:18 522:9 525:8 526:3,14 527:18 529:12 532:21 538:18 542:21 556:15 557:18,22 559:15 564:1,6 569:17 590:2,22 593:10

**respond** 549:9 560:1 588:17

**responding** 456:20 476:18

**response** 473:10 480:20 504:12 565:8,12 566:2,9 569:14 572:24 576:1,5 586:25 592:14 594:5 598:21 599:22

**responses** 470:10 471:13 504:19,24 528:11 531:9 560:9 564:5,10,21 565:3 568:12 575:20 598:14

**responsibilities** 456:25 476:15

**responsibility** 587:21 598:24

**responsible** 583:24 589:4

**responsive** 522:25 550:2 560:15 565:20 567:15 569:6 572:13 573:4 598:6

**restating** 559:18

**result** 470:18 481:17 482:20 486:16 535:10,11 537:9,13 541:16

**resulting** 460:6 461:13

**results** 477:7 528:13,19 530:17 531:15,22 532:25 533:7 534:17 535:8,12 551:14 552:2,8,13,18 581:19,20 591:5

**retained** 490:16 500:1 511:8 513:16 600:9

**retention** 497:24 535:22, 25 556:5,16 557:5,9 583:8, 11,12 588:1 596:10

**retrieve** 582:6 583:2

**retrieved** 519:25

**retrieving** 589:5

**return** 583:5 584:15

**returns** 580:4

**review** 452:22 528:10 530:11 535:1 539:16 567:20 568:19 588:8

**reviewed** 539:14,15 565:6 567:14 569:13 571:4,6 573:2 574:1 590:21

**reviewing** 543:19 565:10

**RFP** 564:20 565:1,4,12 568:12 575:15

**Rhode** 471:6,9

**Rich** 483:3

**RICHARD** 448:3

**richard.bernardo@ skadden.com** 448:6

**rid** 456:7

**rightfully** 460:24

**Ritter** 502:15,19 503:23 540:3,9

**Roger** 472:12 489:9 491:4 493:1

**role** 564:13

**roofing-grade** 503:3

**Rose** 478:12

**row** 554:19

**rude** 520:10

**rules** 583:19

**run** 562:8 567:18

**running** 453:6 589:15

**Russell** 542:16

---

**S**

**sake** 559:8 580:20

**sample** 487:14

**sampled** 539:15 571:6,8 576:16 588:13

**samples** 474:15

**sampling** 520:2 522:3

**San** 504:20

**Satterley** 447:5,16

**scanned** 515:23

**scanning** 516:7

**SCEPTRE** 515:4

**schedule** 535:25

**schedules** 535:23 588:1 590:25 591:5,7

**scientific** 463:4

**scope** 461:19 474:1,4,7 475:9,20 477:10 488:8 533:13 543:24 556:21 578:14 579:2,4 586:9

**Seamen** 542:16

**search** 511:6,7,20 512:4,5, 8,9 514:5,15 519:23,24 521:9 522:7,9,17 523:12, 14,19 526:6,20 527:8,10 528:3 533:24 538:14 539:7 543:12,15,16,24 544:15,23 554:23 559:2 574:22 577:7,10,21,25 578:2,4,5,6 579:9,10,20 580:2,16,19, 20 581:7 582:4,6 584:14, 16,18 585:9 586:6

**searched** 511:15 512:13, 23 513:2,4 519:12 520:14 521:7 526:7 554:24

**searches** 513:15 514:16, 18 518:24 522:18,20 523:7 526:8,9 527:21 538:24,25 543:18 545:1 557:15 558:16 565:9 571:19,21

579:6,23 580:3 585:7 589:16 590:9 596:10

**searching** 523:5

**seat** 592:16

**second-to-last** 458:21 532:10

**secretary's** 590:8

**section** 451:14,18 559:18

**sections** 575:19

**seek** 580:1

**seeking** 487:19

**Selby** 504:14,15 505:21, 22,24 506:21

**selected** 511:23 521:23,25

**Semple** 542:17

**sense** 453:8 455:18 463:4, 5 464:13 465:12 479:22 574:10 580:6 582:3

**sentence** 458:15,21 459:13 460:15 470:23 503:1,2

**separate** 501:19 511:4 563:4

**September** 470:10 554:22

**series** 583:11,12

**Services** 448:10 600:10

**set** 531:11 539:13 564:9,20 565:1,4 567:2,7 568:2,5,6, 7,12 570:8 575:15 576:10 578:1 579:22 584:16

**sets** 547:20 567:20

**settled** 499:19

**severe** 479:8

**Sharan** 555:20

**share** 577:3

**sheets** 529:23 530:1

**short** 515:17

**Shorthand** 447:8

**show** 530:25

**Shower** 541:12

**shown** 501:24

**signature** 504:21

**signed** 536:12

**significant** 460:18

**similar** 460:16 566:11

**simple** 467:8 520:5

**simplest** 464:13

**simply** 465:5 482:16 485:13 488:7 490:8 549:15 572:10

**single-spaced** 587:24

**site** 480:2 522:10 587:19

**sitting** 481:12

**situation** 460:16 461:3

**situations** 468:18,21

**size** 459:8

**Skadden** 448:3 511:23

**skin** 460:3

**skip** 495:22

**Slate** 448:3

**small** 460:8 484:1

**smiling** 510:18

**soft** 453:1

**software** 450:14,19,24 451:3,4,8,23 452:3,6,16

**SOP** 584:1

**sort** 451:1 459:15 538:15, 16 556:16 562:10 568:9 589:25 598:19

**sought** 542:21 543:7 590:4

**sounded** 573:17

**sounds** 491:16 545:15

**source** 457:12 526:6

**sources** 457:12,14,16 512:22,25 513:18,22 514:17 530:3 536:19,24 539:8 541:17 542:1 543:22 545:3,11 547:9,24 558:24 563:12 564:12 576:24

**South** 537:9

**speak** 454:12 463:3,11 464:11 465:10 466:7 477:5 479:21 482:13 498:25 500:6 511:11 524:25 539:19 543:14 549:22 558:18 577:3 585:24 587:8 590:7,14

**speakers** 520:18

**speaking** 475:21 480:5 481:8,13 482:19 486:16 500:6 541:15 548:18 571:11 594:12,15,16,19,23 596:8

**speaks** 575:15

**special** 465:9

**Specially** 447:21

**specific** 497:15 498:25 522:19 526:21 543:2,9 547:15 548:8 549:21 552:23 557:11 558:16,19, 25 559:20 562:24 564:1, 15,23 565:2 567:14 568:20 570:23 571:4 572:8 575:25 585:7 593:10,21,24 594:3

**specifically** 476:6 478:17 498:2 513:12,23 514:17 529:8 530:16 543:5 544:9 550:13 553:18 560:2 563:11 564:20 567:21 569:13 570:20 572:13 573:3 584:8 588:12 595:6, 7,12

**specification** 518:3

**specifics** 496:21

**specter** 500:13

**speculate** 455:16 525:6

**speculating** 551:9

**speculation** 454:2 500:5 551:12 556:23

**spend** 519:18

**spent** 594:11,14,18

**spicule** 458:7

**spoke** 520:25 587:19 594:24 597:4

**spoken** 547:3 595:3,16

599:6

**spokesperson** 480:19

**spreadsheet** 565:18 572:11

**spreadsheets** 588:10 598:17

**spring** 591:19

**Square** 448:4

**stack** 482:25

**staff** 496:24 498:8 520:19

**staging** 589:5

**standard** 470:11 556:4 557:4

**standards** 556:15,25

**standpoint** 520:3 568:8

**start** 453:5 494:19 501:10 507:5 546:5 568:2,18

**started** 467:21 553:4 565:11 569:11 591:19

**starting** 470:23 503:10 564:21 565:5 575:22 591:24

**State** 447:8

**stated** 567:15

**statement** 480:25 492:23 525:14

**states** 452:19 470:25 471:5,9 511:2,15 512:6,7 516:21 556:17 558:6

**stem** 579:23 580:3,19

**step** 568:24

**steps** 538:14

**stipulated** 600:13

**stop** 545:12 562:7

**storage** 519:9 526:13,22 527:5 577:19 582:8

**stored** 512:13 514:25 515:7,10 519:10 549:7,10 558:4,6,17

**story** 517:8

**Street** 447:6,17,23

**strike** 457:1 513:7 514:7 522:8 523:16 548:1 579:16 592:14 599:10

**structure** 458:8,9 459:7

**study** 462:12

**stuff** 550:4

**subject** 454:25 457:11 484:12 495:17 514:5

**subsequent** 525:8

**subsidiary** 473:1 495:24

**substantial** 459:4

**substantially** 566:23

**Subtab** 575:20

**sued** 471:17,21

**suggest** 451:15,20 490:14 540:16

**suggested** 451:24

**Suite** 447:6,17,23

**summaries** 558:22 563:18 565:7 575:14 588:3

**summarized** 596:21

**summary** 518:20 544:3,8, 10 564:7

**supervision** 543:14

**supplemented** 593:24

**supplied** 470:19 473:2 527:19 564:11 565:15 566:5,7,12 570:2,13

**supplier** 528:6 571:23 588:24 589:25

**suppliers** 525:3

**supply** 527:22 528:6 569:21,23 570:6 589:1,24

**supporting** 588:2 591:4 596:3

**supposed** 536:1 583:16

**surprised** 516:3

**surrounding** 490:5

**surveys** 528:23

**SWANSON** 447:16 449:13,17 454:7,20 455:12

457:1,5 460:14 461:21 463:24 464:10,20 465:1 466:9 467:6,20 468:1,7,8, 17 470:2 472:2,8 473:9,21 474:3,9,14,21 475:11 476:19 477:6,13,22 479:24 480:15 481:2,10,20 482:1, 18 483:1,5,9 484:18 485:16 486:21 488:3,11,18 489:19 490:9,20 492:3 494:9,17,19,24 496:5 497:17,25 498:17 499:2,8, 22 500:11,23 501:2,16 502:25 503:25 504:6 508:25 511:17 513:7,11 514:6,13 516:25 521:19 523:16,18 528:4,20 529:21 531:1,5 532:5 533:3,10,18 534:9 535:6,19 536:5,13 540:25 545:12,16,21 546:8 548:1,3 551:22 552:14 554:16 555:11,17 557:3,13 558:7 559:21 560:6,24 561:1 562:5,19 567:12 571:15 573:22 574:20 575:6 578:15 579:16,18 580:5,9,15 583:3 584:12 585:13 586:10,14 592:11, 16,19,22 595:20 596:5 597:11,24 599:10,14,17 600:1,4

**Swanson's** 560:23

**sworn** 447:10 449:15

**system** 456:16 515:3,4,6, 8,15 517:7,8,10,12 518:6,7 521:4 554:24 577:11,17 579:22 589:16

**systematically** 598:18

**systems** 514:25 515:4,13, 15,19,20,25 516:2,4,11,16 517:2,6,14,16 519:1,4,6,15

---

**T**

---

**T.M.** 457:23

**tab** 450:3 530:2 554:18 565:5,19 566:3,8,16 570:8, 11,17 575:20 577:7

**table** 544:5 597:1

**tabs** 564:9 568:13 572:10 574:8 588:11 598:17

**taking** 562:9

**talc** 447:20 450:9 457:12, 14,15 458:7 459:4,6 460:9, 17 461:12 469:16 471:3 473:2,3,18,23 474:5,20,25 475:6,17,18 476:1,7,11,17, 21,23,25 477:17 480:9,17 485:3,7,10,18,21 486:10, 14 487:13,20 488:4,14 489:12,15 490:4 491:14,22 493:7,10 495:17,25 497:6, 10 499:12 500:20 503:14 506:9,15,18,20 507:4,5,8, 17,19 508:5 509:19 518:3 527:19,22 528:5,6,14,23 529:5,6,13,24 530:1,17 531:15,16,21,23 538:17 542:10 547:1,14 548:7 549:19 550:8,16 551:1,7 552:3 553:8 557:23 558:11,19 559:13,25 560:4,9,13 561:7,9,12,17, 18,19 563:2 564:12,14 566:6 571:23 572:1 575:16 576:1 577:13 578:11,22 580:24 581:12,13 582:23 593:22 595:9

**talc-related** 537:8 597:4

**talcosis** 458:13 479:5 506:25 581:1 584:7 585:19

**talcum** 541:10

**talk** 458:12 461:22,23 462:16 464:16 468:24 493:16 541:18 563:20

**talked** 489:22 510:1 512:24 519:17 520:6 535:23 538:13,18 568:22 594:9 598:4

**talking** 464:12,18 466:23 496:8 506:22 509:24 510:6 511:19 512:10 516:17 533:4 544:9 546:11 549:13 554:9 566:25 567:24 594:9 598:1

**talks** 460:5

**tasked** 467:9

**team** 495:18 591:9

**technical** 581:25

**Tele-video** 448:10 600:10

**Telephone** 600:10

**telling** 554:4 570:22

**tells** 451:15 455:5 458:4

**ten** 517:23 588:16

**tendered** 474:8

**Teresa** 560:14 561:4

**term** 463:20 467:17,21,23 578:5,7,9,10,20 579:13,20 580:23 581:1,12 582:4,10, 18,19,22,23 584:18 586:6

**terminology** 509:9

**terms** 450:20,25 454:13 463:11 467:16 469:3 508:19 512:18 516:22 519:3 521:3 523:19,25 525:11 526:12,21 527:3 538:20 544:23 554:23 555:1,5,6,9 558:16 564:24 573:9 576:19 577:7,10,21 578:1,3,4,6 579:9,10,14 580:16 581:7 582:4,6 583:7,10,21 584:6,14,16, 25 585:9,19 590:6 591:16 598:16

**terrible** 597:20

**test** 528:19 552:13,18 553:19

**testified** 449:16 593:5

**testifying** 585:17

**testimony** 449:24 499:14 545:18 586:25 587:13 592:2 593:4,11,15 594:5 599:21

**testing** 469:15,21 497:6 498:18,24 499:24 503:11 528:13 529:6,12,13 530:17,21 531:15,22 532:23,25 533:5,6 534:3, 17 535:7,9,10,11 551:14, 16,20,21 552:1,2,8,19,22 553:5 576:1 581:13,19

**testing-related** 529:5

**tests** 551:24 552:4 553:6, 11,14,16 554:1

**Texas** 541:4

**text** 542:7

**textual** 583:16 584:10

**Thailand** 555:25 556:2,10

**Thames** 541:5 549:2

**theory** 553:22

**thing** 451:1 488:20 567:24 576:11

**things** 450:21 455:10 505:1 520:11 556:16 581:5 593:3

**thinking** 482:8

**Thompson** 457:23 458:4

**thought** 518:10

**thoughts** 562:10

**thousand** 597:17,22

**threw** 566:24

**throw** 559:1

**tie** 548:12 549:21

**tie-back** 548:8

**time** 454:13 456:24 463:22 469:21 473:16 480:9 485:20 497:23 498:4 499:5,10 505:21 509:8,10 516:14 518:1,4 519:7,8,9, 18 520:7 521:1 526:11 527:12 538:10,13 545:14, 17 559:19 562:8,9 564:15 570:24 571:16 573:11 575:5 579:11 584:17,20 585:2,11 587:21 589:8 590:12 591:18,20 594:14 598:4

**timelines** 588:4

**times** 448:4 516:5

**Tina** 532:14,15

**titles** 578:4

**today** 449:21 481:13 482:19 508:2 516:4

**today's** 449:7

**told** 500:15 544:12 556:2 561:13,20 578:16

**tool** 539:16 588:8

**top** 466:25 486:25 494:14 525:19

**topic** 481:15

**topics** 464:17 476:18 572:23 587:1,3 592:3 599:22

**total** 522:1 588:15 589:6 592:1 594:18,21

**totality** 561:3 579:8

**touch** 559:3

**touched** 536:16 555:18 560:7

**tougher** 556:16

**tour** 496:8

**trace** 459:15

**track** 450:24 451:8,23 452:3,6,12 455:14 516:19

**tracked** 452:2 572:25

**Trackwise** 515:3 517:18, 19,20,22 518:6,7

**trade** 559:9

**trained** 452:7

**training** 452:9,12 456:17, 22 527:3,6

**transcript** 472:12 596:14

**transferred** 516:13

**traveling** 454:3

**tremolite** 459:14,25 460:19 578:23,25 581:20

**tremolite-contaminated** 461:12

**trigger** 469:9

**triggered** 452:24

**triggers** 452:25

**Trip** 495:17

**true** 454:14,25 461:14 462:11 463:16 464:8 473:6 476:8,12 477:17 480:10 488:24,25 489:16 492:23 493:23 497:6 499:12 506:21 507:9,10,19 521:21 522:6 529:13 536:9 550:10 551:9 577:21 580:11 585:3,22 595:8 596:24

**Ts** 580:23

**turn** 582:12

**turned** 563:17

**Two-thirds** 496:11

**type** 477:16 521:9 526:6 577:2

**types** 459:23 485:14 551:20 552:17,21 553:5 557:5

**typewritten** 575:12 587:24

**typically** 477:8

**U**

**U.S.** 512:4,13 513:4 514:4, 16 515:1,8 557:1 558:17 570:2

**Uday** 555:20

**Uh-huh** 570:9

**ultimately** 584:19

**unable** 462:23

**unavoidable** 459:15

**uncertain** 496:22

**unclear** 572:16

**underground** 497:4

**underlying** 529:12

**understand** 455:20 462:14,19,20 477:7 483:22 492:10,13 493:15 498:2 508:13 512:21 515:14 517:13 521:8 533:15 534:7 545:1 547:13 550:1,11 551:5 553:13 557:7 558:1 564:2 573:23 574:13 576:3 579:12 580:1,2 588:6 599:7

**understanding** 451:25 471:22 473:4 474:18,24 475:3,5 476:17 509:2 513:5 514:3 520:16 524:4, 8 541:25 542:24 543:13 548:9 551:4 559:5 567:19 579:8 582:5 586:24

**understood** 455:9 456:23

488:12 492:8 519:7

**unit** 510:10,13,24 512:16 513:13

**United** 471:5 511:2,15 512:6,7 516:21 556:17 558:6

**units** 511:1 516:21

**unjust** 460:7

**unrelated** 452:11

**USA** 447:21

**usage** 459:9 460:19 515:16

**utilized** 514:24 515:21

**V**

**validation** 495:18

**variable** 584:13

**varied** 521:8

**vary** 578:19

**vehicles** 452:11

**vendors** 589:4 590:4,5

**verification** 532:11

**verified** 504:19 532:9,13 534:14

**verify** 462:13 480:25 481:3 532:18 542:4 555:9

**verifying** 576:17

**Vermont** 447:20 473:19 495:19

**view** 488:8 581:6

**viewed** 475:19 552:19,20 598:24

**virtue** 473:13

**visit** 451:6 452:21

**visits** 587:19

**volume** 449:10 501:5,11 511:19 536:16 545:24 546:6 596:18,23

**Volumes** 600:8

**voluntarily** 471:10

**W**

**W.H.** 457:24

**wait** 454:15,22 455:24 458:22

**waiting** 592:13,14

**wanted** 450:12 554:3 567:6 568:10 590:17

**warehouse** 575:3

**Wayne** 504:15

**Web** 480:1

**weekend** 454:4

**Westfall** 471:3,17,21 472:13 474:23,25 475:16, 24 476:4 489:23 547:4 548:6 550:6,10,25

**Whittaker** 471:4

**Whoever's** 483:1

**wide** 579:10

**widely** 524:24

**widespread** 460:20

**wife** 478:13

**William** 457:24 484:22 486:4

**window** 456:7

**Windsor** 471:10,16,20 472:22,25 473:16,18,23 495:19,23 497:6 502:20

**woman** 541:8

**word** 519:24 520:23 580:10

**words** 451:11 453:2 466:24 495:12 506:11 515:20 519:20 520:13,15, 21,23,24,25 521:11,15 555:8 558:13 596:25

**work** 453:3 579:7 593:10, 18,22 594:2 597:5,13,25 598:2 599:20

**worked** 509:16,21,23,25

**Workers'** 559:11

**working** 594:10

**works** 453:8 497:4

**world** 556:24

**worldwide** 528:23 591:4

**writing** 457:23 484:1

**written** 458:1 544:10 558:23

**wrong** 494:16 594:4,8

**wrongfully** 460:24

**Y**

**year** 515:9,10 527:9,11 552:25

**years** 516:9 517:24 548:11 549:14,23 551:5 556:5,7,8, 9

**yesterday** 508:1,3 510:2 515:12 529:10,18 535:23 555:18 596:24

**yielded** 526:10 566:18

**York** 448:4

**young** 484:2