

**Susan M. Sharko**
Partner
susan.sharko@faegredrinker.com
+1 973 549 7350 direct

faegredrinker.com

**Faegre Drinker Biddle & Reath** LLP
600 Campus Drive
Florham Park, New Jersey  07932
+1 973 549 7000 main
+1 973 360 9831 fax

August 16, 2023

Honorable Michael A. Shipp, U.S.D.J.
United States District Court
Clarkson S. Fisher Building & US Courthouse
402 East State Street
Trenton, NJ 08608

Re:     *Johnson & Johnson Talcum Powder Products, Marketing, Sales Practices and Products
         Liability Litigation*
         **Case No.: 3:16-md-02738-MAS-RLS**

Dear Judge Shipp:

On behalf of Defendants, I write in response to the PSC's letter of August 11, 2023 to clarify the
status of these cases and to address the points raised in the PSC's letter ahead of the September 6,
2023 status conference.

### 1.  Judge Kaplan's Dismissal of the Bankruptcy

Contrary to the statements in the PSC letter, no court found that LTL (or J&J) had a bad faith <u>intent</u>
in filing the bankruptcies. To the contrary, Judge Kaplan repeatedly found—and the Third Circuit
did not dispute—that LTL/J&J pursued bankruptcy in a good faith attempt to obtain an equitable
and efficient resolution in the best interests of all claimants.  As Judge Kaplan also found in his
first decision, and again the Third Circuit did not dispute, that subjective good faith alone would
have allowed the case to proceed under the standards applied in other Circuits, including the Fourth
Circuit where the matter was commenced.  *In re LTL Mgmt., LLC*, 637 B.R. 396, 406 (Bankr.
D.N.J. 2022), rev'd and remanded, 58 F.4th 738 (3d Cir. 2023), and rev'd and remanded, 64 F.4th
84 (3d Cir. 2023).  Notwithstanding that subjective good faith and beneficial outcome for all
claimants, Judge Kaplan was constrained to dismiss the bankruptcy due to the "immediate
financial distress" standard of the Third Circuit.  Judge Kaplan noted that the Third Circuit had not
specified what was immediate financial distress, but he concluded that the Third Circuit required
immediate harm but for the bankruptcy tantamount to a house in flames.

Put simply, the PSC's description of Judge Kaplan's August 11, 2023, Order dismissing the second
*IN re LTL Management, LLC* bankruptcy and of the memorandum opinion he issued on July 28,
2023 ("Mem. Op.") leaves out key details and thereby gives a wrong impression.  Judge Kaplan
expressly noted that his decision was *not* based on whether the bankruptcy "could, in fact, produce
a just and right result."  Mem. Op. at 2-3.  Rather, his decision to dismiss the bankruptcy was

Honorable Michael A. Shipp,                              - 2 -                              August 16, 2023
U.S.D.J.

driven solely by his technical conclusion "that LTL is not sufficiently financially distressed to avail itself of bankruptcy at this time." *Id.* at 3, 25. He noted that "neither this Court, nor the Third Circuit has taken issue with the propriety of the corporate restructuring." *Id.* at 26 n.15. And he expressly recognized that bankruptcy offers key benefits over and against the tort system in resolving the instant litigation, including "the incontrovertible fact that many plaintiffs are denied any recovery in the tort system altogether" and the fact that he "remain[ed] unconvinced that the procedural mechanisms and notice programs offered in the tort system can protect future claimants' rights in the same manner as the available tools in the bankruptcy system." *Id.* at 26-29. He closed his discussion by observing that the *Imerys* bankruptcy proceedings might be "a platform to negotiate settlement." *Id.* at 38 (quoting *In re LTL Mgmt., LLC*, 64 F.4th 84, 108 (3d Cir. 2023). And he expressly rejected the talc claimants' request to prohibit LTL from filing for bankruptcy a third time in the coming six months. August 11, 2023 Order at 5 (striking out language in proposed order that would enjoin further Chapter 11 bankruptcy petitions for a period of 180 days). In short, Judge Kaplan firmly believed that the bankruptcy system, and not the tort system, holds the proper tools by which to resolve these claims. He refused to close the door on a resolution through bankruptcy, whether through the *Imerys* proceedings or in a future bankruptcy proceeding filed LTL. He simply did not find, on the present record, that LTL is "sufficiently financially distressed" as defined by the Third Circuit to support bankruptcy at this time.

## 2. Multi-Plaintiff Trials, Bellwether Trials, and Remand

Defendants welcome organized, fair trials. Which by definition means single plaintiff trials, as Chief Judge Wolfson ruled for the four bellwether cases to be tried in the MDL.

Notably, there have been 13 trials to date that yielded a jury verdict in cases involving claims of ovarian cancer from the talcum powder at issue in this litigation. Only one of those trials resulted in a plaintiff's verdict that was left largely intact following post-verdict motions and appeals – and as discussed below, that was a multi-plaintiff trial. Seven trials resulted in a defense verdict. Five resulted in a plaintiff's verdict that was reversed on appeal. One more resulted in a plaintiff's verdict, but the trial court reversed the verdict.

The lone plaintiff's verdict that survives came in *Ingham*, a 22-plaintiff consolidated trial in state court in St. Louis that made a mockery of Defendants' Due Process rights. The plaintiffs in that case had different subtypes of ovarian cancer, different risk factors for ovarian cancer, different medical histories, different exposure to the products at issue (both in terms of amount and timing of use), and over a dozen different states of residence (requiring the Court, and the jury, to apply the laws of over a dozen different jurisdictions). As Professor Steven Penrod, Ph.D., Distinguished Professor of Psychology at the John Jay College of Criminal Justice of the City University of New York, noted in an affidavit submitted in support of severing the plaintiffs' claims in *Ingham* (submitted herewith):

> In my opinion, if the claims of multiple plaintiffs are presented to the same jury, the result will be unfairly prejudicial to defendants because there is a substantially greater likelihood that the jury will find defendants liable and will award greater

> damages to the plaintiffs.  It is also my opinion that jury instructions will not
> mitigate this unfair prejudice.

Penrod Aff. at ¶ 4.  He based that opinion "on scientific studies of jury decision making in which jurors are confronted with multiple charges or claims, as well as studies in which jurors are confronted with evidence that is intended for use in either a limited manner or that jurors are instructed not to consider at all." *Id.* at ¶ 6; *see also id.* at ¶¶ 7-51 (discussing these studies at length).

This Court <u>should not allow</u> multi-plaintiff trials.  With tens of thousands of cases awaiting trial, it is unreasonable to believe that trying cases with two, three, or even ten plaintiffs at a time would clear the backlog significantly faster than trying single-plaintiff cases.  What it would do – and what the PSC is likely counting on it to do – is unfairly prejudice Defendants in the hope of replicating *Ingham*'s outlier outcome.  The *Ingham* court's unfortunate decision to trample Defendants' rights by combining 22 trials into one has not moved these actions along more speedily; it has horrifically slowed settlement by misleading tens of thousands of plaintiffs into believing that they, too, might win the lottery.  And regardless of the PSC's intent, it is remarkable that the PSC was willing to request multi-plaintiff trials at all without informing the Court that Judge Wolfson was very clear that the coming bellwethers "are going to be single-plaintiff cases. So let's put aside that idea [of multi-plaintiff trials]."  Jan. 26, 2021 Status Conference Tr. at 13:18-21.

Remand is a far less fraught way of clearing the backlog, but it is premature to discuss remand at this point.  As the PSC notes, the parties were in the process of preparing for bellwether trials when the cases were stayed by the bankruptcy filing in 2021.  Defendants were preparing to disclose their expert witnesses, and Rule 702 briefing and dispositive motions were on the horizon.  The Court's rulings on those issues, even when not binding on future remand courts, would likely be informative to judges that do not share this Court's experience in the issues.

That is particularly true where, as here, almost two years of additional science has further bolstered Defendants' position relative to previous rounds of briefing.  Science has not been stayed by the bankruptcy, and additional work has been done to investigate a possible link between talcum powder and ovarian cancer.  Yet the American College of Obstetricians and Gynecologists, in their FAQ on ovarian cancer as last updated in May 2022 (available at https://www.acog.org/womens-health/faqs/ovarian-cancer), continues not to list talcum powder use among the risk factors for the disease.  Likewise, the National Cancer Institute's PDQ on ovarian cancer (last updated in June 2023, available at https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq) continues to state that "the data are inadequate to support an association between perineal talc exposure and an increased risk of ovarian cancer."  Plaintiffs' experts now have an even more difficult task in explaining away the absence of supposedly compelling evidence of causation.

Moreover, any cases that proceed past the dispositive motion stage would yield trial packages, including rulings on motions in limine, that would further assist the parties and remand courts in

Honorable Michael A. Shipp,                          - 4 -                          August 16, 2023
U.S.D.J.

streamlining future trials. The parties should proceed through the current round of bellwether trials before discussing remand.

Defendants agree that the backlog of cases is concerning. They have attempted to address that issue in multiple ways, including through the bankruptcy system (which, as Judge Kaplan observed, carries unique tools that are uniquely well-suited to the present situation). Progress is being made. But within the context of this MDL, the best and most expeditious way to move these cases forward is to proceed in an orderly, fair manner that gives the parties certainty as to how the cases will be tried and how they are likely to be valued.

### 3. Additional Discovery

Plaintiffs in talc litigation overall have taken 92 depositions of company witnesses (including 16 different corporate representatives), spanning 151 days and 34,152 pages of testimony. Defendants have produced 517,699 documents totaling 2,404,538 pages in the talcum powder product liability litigation. The parties have commenced 48 trials to date across the ovarian cancer and mesothelioma litigations, of which 33 have proceeded to a jury verdict. Indeed, Beasley Allen – co-lead counsel for Plaintiffs in this MDL – were trial counsel for seven of those cases (including six that yielded a jury verdict). Given the immense amount of company discovery already taken and the demonstrated adequacy of that discovery to support trial packages, the Court should view the PSC's requests for further discovery with skepticism.

In particular, Defendants are puzzled to see that the PSC intends to take depositions in this action relating to Defendants' corporate restructuring of talc liabilities. The corporate restructuring has been heavily investigated and carefully scrutinized in not one, but two bankruptcy cases. Neither Judge Kaplan nor the Third Circuit has taken issue with the restructuring. But even if that were not the case, it is difficult to imagine how the corporate restructuring would be so important to plaintiffs' liability or damages arguments (or even their claim for punitive damages) as to support further discovery given the history of this litigation. The point of such discovery would not be to support plaintiffs' cases, but to harass Defendants. The Court should not permit it.

### 4. Additional Defendants

Similarly, the PSC advises that it will seek leave to name additional defendants to the Master Complaint – including "Johnson & Johnson Consumer, Inc. (new); Johnson & Johnson Holdco (NA) Inc.; Kenvue Inc.; and Janssen Pharmaceuticals, Inc." – "as a result of Defendants' corporate restructuring." This is at best misguided and at worst mere gamesmanship. Plaintiffs in the state court MCL in New Jersey have theorized that all four of these entities are liable in talc litigation because New JJCI (which changed its name to Johnson & Johnson Holdco (NA) Inc.) transferred assets to Janssen, which then transferred assets to Kenvue. But New JJCI/Holdco was created through a divisional merger in which, as the Third Circuit has explained, it inherited "none of [old JJCI's] talc-related liabilities." 64 F.4th at 97. It therefore had no talc-related liabilities to transfer to Janssen, and Janssen had no talc-related liabilities to transfer to Kenvue. In the event these

Honorable Michael A. Shipp,                    - 5 -                         August 16, 2023
U.S.D.J.

entities are added to the Master Complaint despite that any allegations against them would be frivolous, Defendants will move to dismiss them and will seek sanctions as appropriate.

**5. Dispositive Motions**

Statute of limitations and other dispositive motions remain pending before the Court. Adjudication of these motions will help clear the docket in particular in light of the many cases filed since the bankruptcy involving very old diagnoses.

Thank you for your consideration of these matters.

Respectfully,

Susan M. Sharko

SMS/emf

cc:    Hon. Joel Schneider, U.S.M.J. (ret.) (via email)
       The Plaintiffs' Steering Committee (via email)
       All Counsel (via ECF)

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

GAIL LUCILLE INGHAM, et al.,

      Plaintiffs,

v.

JOHNSON & JOHNSON, et al.,

      Defendants.

Case No: 1522-CC10417-01

Division 10

## AFFIDAVIT OF STEVEN D. PENROD

BEFORE ME, the undersigned authority, personally appeared the affiant named below, who being by me duly sworn, deposed as follows:

1. My name is Steven D. Penrod. I am over 18 years of age. I submit this Affidavit in support of Defendants' Memorandum of Law in Support of Motion to Sever Plaintiffs' Claims for Improper Joinder in the above-referenced matter. I am of sound mind, and if called as a witness, I could and would competently testify to the statements herein.

2. I am a Distinguished Professor of Psychology at the John Jay College of Criminal Justice of the City University of New York. I hold a J.D. degree from the Harvard Law School, and a Ph.D. degree in social psychology, also from Harvard University. I have testified as an expert on a variety of social science and law issues in over 150 cases in federal and state venues, including Wisconsin, Minnesota, Illinois, Ohio, Indiana, California, Texas, Oklahoma, New York, New Jersey, Maine, Connecticut, Massachusetts, New Hampshire, Maryland, the District of Columbia, Virginia, Delaware, and Pennsylvania. I am an author or co-author of approximately 150 publications. I have specialized in the study of the legal and psychological aspects of

1

decision-making by juries for more than 35 years, am conversant with the literature on consolidation of claims and parties and have published research on the specific topics discussed in this affidavit. My professional qualifications, including publications, grants, awards, and memberships are set forth more fully in my *curriculum vitae*, attached to this affidavit as Exhibit A.

3.  I have been asked to render an opinion on: (1) the likely effect that consolidation of the claims of multiple plaintiffs against Johnson & Johnson, Johnson & Johnson Consumer Inc. and Imerys Talc America for trial will have on the jury; and (2) the efficacy of limiting instructions designed to overcome the prejudice stemming from such consolidation.

4.  In my opinion, if the claims of multiple plaintiffs are presented to the same jury, the result will be unfairly prejudicial to defendants because there is a substantially greater likelihood that the jury will find defendants liable and will award greater damages to the plaintiffs. It is also my opinion that jury instructions will not mitigate this unfair prejudice.

5.  In forming these opinions, I have reviewed the relevant psychological research literature summarized below and listed in Exhibit B hereto.

6.  I base my opinions on scientific studies of jury decisionmaking in which jurors are confronted with multiple charges or claims, as well as studies in which jurors are confronted with evidence that is intended for use in either a limited manner or that jurors are instructed not to consider at all. In my opinion these studies clearly show that unfair prejudice results when jurors are exposed to information about other claims or charges against a defendant.

## STUDIES ADDRESSING THE EFFECTS OF CONSOLIDATION

7.  A number of researchers have studied the effect that consolidation of charges/claims against a defendant has on jury decision making. The studies in this area clearly and fairly uniformly

demonstrate that when evidence of consolidated claims is presented to a jury, the jury is substantially more likely to find against a defendant on a given claim than if it had not heard evidence of the other claims. Although some of this research has been conducted within the context of criminal cases, it is directly relevant to the issues raised in the present civil cases because the research underscores the difficulties jurors have in keeping trial evidence neatly compartmentalized. The research further demonstrates the ways in which inappropriate use of evidence can produce prejudicial effects. The research also underscores my opinions that jurors are likely to misuse evidence presented about multiple plaintiffs/claims, that the result will be prejudice against defendants, and that efforts to constrain the jury's use of the evidence in order to avoid consolidation prejudice are extremely unlikely to succeed.

8. Among the studies supporting the conclusions above are:  Bordens & Horowitz (1983); Goodman-Delahunty, Cossins & Martschuk (2016); Greene & Loftus (1985); Horowitz & Bordens (1988); Horowitz & Bordens (1990); Horowitz & Bordens (2000); Horowitz, Bordens, & Feldman (1981); Leipold & Abbasi (2006); Tanford & Penrod (1982); Tanford & Penrod (1984); Tanford & Penrod (1986); Tanford, Penrod, & Collins (1985); Thomas (2010); White, (2006) and Wilford, Van Horn, Penrod & Greathouse (in press). Nearly all of these and other consolidation studies cited below have been published in peer-reviewed scientific journals. Most of my research and many other studies have been supported by grants from such as the National Science Foundation and the National Institute of Justice and these studies were subjected to peer review even before they were funded and conducted. Complete references to the studies cited in this affidavit are provided in Exhibit B hereto.

9. These studies reveal the difficulties jurors confront when trying to sort out evidence that is relevant to particular issues or parties and not relevant to other issues or parties. The research

3

shows that consolidated trials result in: (1) **inferences** by the jurors that a defendant has a bad character; (2) **cumulation** or spilling over of evidence against the defendant; (3) **confusion** of evidence; and (4) **changes in weight of evidence** (i.e. the tendency of jurors in such cases to give greater weight to plaintiff/prosecution evidence, relative to defense evidence). All of these factors have been shown to result in prejudice against defendants. A consolidated trial of these cases will therefore likely lead jurors to draw negative inferences against defendants and increase the likelihood of a pro-plaintiff verdict. It is also likely that jurors will cumulate "evidence" across claims, confuse the evidence presented by various plaintiffs and give greater weight to individual items of plaintiff evidence than would be the case if the claims were tried separately.

### ARCHIVAL VS EXPERIMENTAL STUDIES: COMPLEMENTARY STRENGTHS

9. Research on consolidation effects has emerged from two types of studies (both of which have demonstrated prejudicial effects). First, researchers have conducted *archival studies* of actual cases, in which they compare outcomes from trials in which multiple cases, charges or defendants have been consolidated to cases that have not been consolidated. In addition, there are *experimental studies*, in which researchers compare outcomes in exemplar cases decided by mock jurors that are consolidated versus those that are tried separately. Australian researchers Goodman-Delahunty, Cossins, & Martschuk (2016), published the most recent study of consolidation effects and have explained the advantages and disadvantages of archival studies:

> The advantage of such studies is that the observed relationships can be generalised across all jury trials with greater confidence than, for example, relationships between variables observed in a single trial or simulation. No two real trials will be exactly the same, so a finding that is robust across many trials is more likely to be broadly applicable to all relevant jury trials. One strength of archival studies is that they evaluate the verdicts of real-life juries, which have greater gravity due to their binding consequences. This is a feature that experimental trial simulations are less able to emulate. ... But these studies do not reveal the extent to which the observed increases in conviction rates in joint trials can be attributed to any of the three hypothesised sources

4

of unfair prejudice.   The core of the problem is that a comparison of verdicts in joint trials versus separate trials …cannot reveal a causal relationship between joinder (and verdicts). Real-life trials involve unique and highly complex variables. No archival study can exclude the possibility that differences in verdicts were influenced by numerous other confounding variables… Many potentially confounding variables cannot be controlled, manipulated or eliminated in archival studies.   (pp. 52-52.) Footnotes omitted.

10.  Goodman-Delahunty, Cossins & Martschuk, (2016) note that experimental studies offer

different benefits. For example:

Crucially, causal conclusions can be more readily drawn from trial simulations because researchers control and construct the elements of a trial that they are interested in studying…. Inferences about the causal relationships between variables of interest – for example, the influence of joinder (on outcomes) …can be determined with greater confidence than in archival studies because researchers are able to reduce the extraneous 'noise' present in real trials. Because the only differences across experimental conditions are manipulated by the researcher/s prior to observing the behaviour in interest, researchers can isolate whether these differences caused any observed differences in jury reasoning and case outcomes.  Another advantage is that the identical research problem can be replicated multiple times in an experimental simulation, whereas archival studies will always be beset by the possibility that the trials differed based on some confounding variable…. Trial simulations also have the methodological advantage of facilitating direct observations of the process of jury decision making, as well as the outcome of the trial. (pp. 54-55.) Footnotes omitted.

## ARCHIVAL STUDIES DEMONSTRATE THAT CONSOLIDATION OF CLAIMS RESULTS IN PREJUDICE TO DEFENDANTS

11.  White (2006) examined outcomes in more than 4,600 asbestos cases, including bouquet trials

(i.e. "a small group of … claims… selected to be tried together from a larger group of …

consolidated claims" (p. 375)), and reported "that plaintiffs' probability of winning at trial

increases by 15 percentage points when they have small consolidated trials rather than individual

trials, and … plaintiffs' probability of being awarded punitive damages increases by 6 percentage

points.  According to White, "the bouquet trial . . .  is associated with a huge increase—85

percentage points—in plaintiffs' probability of winning punitive damages and with an increase of

$1.5 million in punitive damage awards." (pp. 385 & 390.).  In short, consolidation of cases was

associated with a substantial increase in liability judgments against defendants, accompanied by substantial increases in damages.

12. White (2006) also tested whether trying cases together made it more likely that jurors would reach the same or similar liability and damage judgments with respect to those cases than if the cases were tried separately. According to White:

> For the actual two-plaintiff consolidations, the correlation coefficients for whether plaintiffs win and for expected total damages are .74 and .92, respectively. The correlation coefficients for larger consolidated trials are similarly high. However, the correlation coefficients for the random pairs and larger random groups are all close to zero... These results support the hypothesis that consolidating cases for trial increases the degree of correlation of the outcomes and therefore makes going to trial more risky. In fact, they suggest that the increase in risk due to consolidation is extremely large. (pp. 382-384.)

13. Leipold & Abbasi's (2006) study of 19,057 criminal trials in the United States produced similar findings. They reported that defendants in consolidated trials with two charges were 14% more likely to be convicted of the most serious count against them than were defendants tried on a single charge. As shown in the following Figure, the conviction rate rose if a second charge was added and rose again if a third count was tried, but peaked at that point. An increased rate of convictions was also observed for the consolidation of defendants (second figure).




14. Based on the study, Leipold & Abbasi reached the following conclusions:

Now we can say not only that joinder "prejudices" the defendant, but that joinder unfairly causes prejudice. Unlike many other harms about which defendants complain, the effects of spillover evidence, inference of a criminal disposition, and jury confusion do not themselves further any policy goals, do not avoid risks of defendant manipulation, and do not even plausibly make trials more accurate or more fair – quite the contrary. So to say a defendant is not entitled to a separate trial just because his chances of acquittal are better is to say that a defendant should not be granted a severance merely to avoid a significant (~10%) risk that his conviction will be influenced by improper factors. (p. 390)

15. Leipold & Abbasi's finding was replicated in Thomas (2010), which included an analysis of nearly 23,000 United Kingdom (UK) criminal trials. Thomas found that the probability of conviction rose significantly as the number of charges increased. As the following figure shows, jury conviction rates were 40% when a defendant was charged with one offense but rose steadily to 80% where there were five or more charges.



Figure 3.15:   Jury conviction rate by number of charges (n=22,907)

## EXPERIMENTAL STUDIES ALSO DEMONSTRATE THAT CONSOLIDATION CAUSES PREJUDICE TO DEFENDANTS

16. There is a somewhat larger body of experimental research. These studies typically compare verdicts and judgments reached in an exemplar case when tried by itself versus when the case is consolidated with one or more additional cases. In contrast to archival studies, this method permits direct comparisons based on the same fact patterns and trial evidence. Experimental

7

studies also permit collection of juror opinions about the evidence and the parties at issue in the case (which allows researchers to gain insight into possible causes of consolidation bias). These studies also permit comparisons of large numbers of juror/jury decisions in both separate and consolidated trials.

17. The prejudicial effects of consolidation have been observed in a number of experimental studies involving civil cases. These studies demonstrate that consolidation increases the likelihood a jury will find a defendant liable and generally increases the amount of the damage award. For example, Horowitz & Bordens (1990) found that only 25% of juries asked to decide the causation issue in a toxic tort case involving a single plaintiff found for the plaintiffs, but 87.5% of juries asked to evaluate causation in cases involving 2, 3, or 4 plaintiffs found for the plaintiffs. Juries confronted with liability evidence in a single-plaintiff trial voted for the plaintiffs 62.5% of the time versus 87.5% of the juries who were asked to decide liability in consolidated trials.

18. In another civil trial study, Horowitz, ForsterLee & Brolly (1996) had jury-eligible adults watch videotapes of a complex toxic tort trial. The videos varied with respect to the amount of information communicated ("information load') and complexity of the language used by the witnesses. Information load and complexity influenced both liability and compensatory decisions. As shown in the following table, jurors made compensatory awards commensurate with plaintiffs' injuries only under conditions of low-load and less complex language.

*Compensatory Awards as a Function of Plaintiffs and Simple or Complex Language*

| Plaintiff | Complex | | Simple | |
|---|---|---|---|---|
| | $M$ | $SD$ | $M$ | $SD$ |
| Lawson | $4.63_b$ | 2.70 | $5.43_a$ | 2.79 |
| Beaumont | $4.92_{a,b}$ | 2.67 | $4.89_{a,b}$ | 2.95 |
| Gallagher | $4.93_{a,b}$ | 2.68 | $4.30_b$ | 2.91 |
| Stephens | $4.31_b$ | 3.12 | $3.33_c$ | 2.99 |

19. Horowitz, ForsterLee & Brolly (1996) also found that information load significantly affected the type of information that jurors recalled about the cases they decided. Jurors in the high information load condition actually reported fewer case-related facts

20. Horowitz & Bordens (2000) reported a study in which 135 jury-eligible adults were randomly assigned to one of five different aggregations of civil plaintiffs with 1, 2, 4, 6, or 10 claimants. Their jurors were shown a 5- to 6-hour trial involving claims by railroad workers of varied repetitive stress injuries. As with the other civil case studies, both liability and damage judgments were affected by consolidation. As shown in the Table below, the defendant railroad was more likely to be found liable as the number of plaintiffs involved in the case increased. In addition, the degree of fault assigned to the plaintiff(s) by the jury went down as the number of plaintiffs involved in the case increased, while defendant liability scores rose steadily. Damage awards rose through four plaintiffs.

*Means and Standard Deviations for the Damage Award, Liability, and Plaintiff Liability Measures*

| No. of plaintiffs | Damage award | | Liability | | Plaintiff liability | |
|---|---|---|---|---|---|---|
| | *M* | *SD* | *M* | *SD* | *M* | *SD* |
| 1 | $0.96_a$ | 0.96 | $1.39_{ab}$ | 0.57 | $0.60_a$ | 0.27 |
| 2 | $1.21_a$ | 1.20 | $1.41_a$ | 0.50 | $0.51_a$ | 0.25 |
| 4 | $3.54_b$ | 2.14 | $1.19_{bc}$ | 0.40 | $0.36_b$ | 0.17 |
| 6 | $3.00_{bc}$ | 1.64 | $1.09_c$ | 0.27 | $0.34_b$ | 0.11 |
| 10 | $2.32_c$ | 1.12 | $1.00_c$ | 0.00 | $0.27_b$ | 0.12 |

*Note.* For liability scores, higher numbers denote lower defendant liability. For damage awards, higher numbers indicate higher awards. Plaintiff liability scores denote proportion of liability assigned to the plaintiff. Means with different subscripts in the same column differ significantly by a Tukey test. Damage awards of 1 resulted in compensation of $10,000, awards of 2 resulted in compensation of $10,001–50,000, and awards of 3 resulted in compensation of $100,000–200,000.

21. Studies have also demonstrated that jurors' knowledge of the size of the plaintiff population – without any presentation of the specific facts relevant to other plaintiffs' claims – can affect their assessment of a case. A study by Horowitz & Bordens (1988) addressed how mentioning the size of the "plaintiff population" affected trial outcomes. Juries were randomly assigned to evaluate a toxic tort trial in which one of three conditions were present: (1) no information was given about the size of the plaintiff population; (2) jurors were told there were 26 plaintiffs in the plaintiff population; and (3) jurors were told that there were hundreds of plaintiffs in the plaintiff population. No other evidence was presented about the plaintiff population. The study found that jurors' knowledge regarding the size of the plaintiff population affected their decisions about the fault attributable to the named plaintiff. Specifically, when jurors were told "there were 26 or hundreds of plaintiffs in the [plaintiff] population, less fault was assigned to [the named plaintiff] (M = .499 and .412, respectively) than if no information was provided about [plaintiff] population size (M --- .612)." (p. 219.) In addition, when the plaintiff population included hundreds of plaintiffs, punitive damages were, as shown below, dramatically higher with respect to all the named plaintiffs.



Fig. 1. Punitive damage awards in the no outlier condition.

22. One of the more exhaustive experimental consolidation studies is one that I conducted with my student Sarah Tanford in 1984 as part of a series of studies supported by the National Science Foundation in the 1980s (Tanford & Penrod (1984).)  Tanford & Penrod (1984) studied the decision-making of 732 jury-qualified residents who participated in a realistic mock jury study. The jurors included 714 adults who had been summoned for jury service in Dane County, Wisconsin, 69% of whom had served on one or more juries.  The eighteen remaining participants were jury-qualified students at the University of Wisconsin.  Participating jurors viewed one of several different versions of a re-enacted trial lasting between 50 and 120 minutes.  The trial was based upon actual trial transcripts and involved a criminal defendant charged with either one or three offenses.  Jurors heard evidence from an average of three witnesses.  The offenses included burglaries, assaults, and robberies.  In addition to manipulating the number of charges against the defendant, this study also manipulated the similarity of the charges and evidence considered by jurors.  Thus some jurors viewed a trial in which the defendant was charged with a single burglary, some jurors viewed a trial with three different burglaries, and other jurors viewed a trial

11

with a burglary, an assault, and a robbery charge. In some trials, the evidence against the defendant was similar for all charges (e.g., all based upon circumstantial evidence) and in others the evidence was different for different charges (e.g., circumstantial, eyewitness, and fingerprint). After watching their trial, jurors privately indicated their personal verdicts and then began deliberating in groups of six. Deliberations were videotaped with a video camera placed in the corner of the deliberation room so that deliberations could be analyzed later. The evidence presented to the jurors in the Tanford & Penrod (1984) study was not complex and the trials were very brief, regardless of how many charges were at issue

23. The individual juror verdicts in the Tanford & Penrod (1984) study were strongly affected by consolidation. When jurors decided a burglary case consolidated with evidence on two other charges, they were 62% more likely to convict than when they considered the same burglary evidence by itself. The study confirms that, when evidence of multiple claims/charges against a defendant is considered by a single jury in a single trial, the probability of a finding adverse to the defendant is significantly higher than when a single charge is at issue. In the Tanford & Penrod (1984) study, there were also more convictions when evidence presented on the various charges was dissimilar (43%) than when evidence on the charges was similar (35%).

24. The results of the Tanford & Penrod (1984) study are typical of the findings from other experimental studies, and parallel those of the archival studies, outlined above.

25. The relevant experimental studies, like archival studies, clearly show that the magnitude of the effect that consolidation has on verdicts increases as more claims/charges are consolidated. For example, Tanford & Penrod (1982) found that conviction rates on a rape charge increased from 5% when tried alone (or with one other charge) to 27% when consolidated with two other charges (a 540% increase), and to 39% when consolidated with three other charges (a 780%

12

increase).  A similar pattern was observed for a trespass charge.  In all these studies, the evidence on a given charge was always identical whether jurors evaluated the charge separately or consolidated with other charges.

26. The latest study of the effects of joining criminal allegations against a defendant is an Australian study by Goodman-Delahunty, Cossins & Martschuk (2016), who compared separate and joint trials with various forms of evidence in the context of a child sexual abuse scenario.  The study involved 90 mock juries and more than 1,000 jury-eligible citizens.  The researchers found that consolidated trials (as opposed to separate trials for the same offense) produced higher rates of errors in recall of trial evidence, stronger inferences about the defendant's sexual interest in boys, greater perceived intent, greater perceived poise and credibility for the complainant, greater defendant culpability, and, not surprisingly, greater defendant guilt (from about 80% not guilty to over 95% guilty).

## CONSOLIDATION OF CLAIMS LEADS JURORS TO DRAW NEGATIVE CHARACTER INFERENCES ABOUT DEFENDANTS

27. Tanford & Penrod (1984) studied with particular care the reasons why the consolidation of multiple allegations against a defendant increases the probability of an adverse finding against the defendant.  The strongest reason for the prejudicial effect of consolidation is that jurors in trials involving evidence of multiple allegations are substantially more likely to draw the inference that the defendant is "like a criminal" or has "criminal propensities."  More broadly, Tanford & Penrod (1984) demonstrated that, when presented with evidence of multiple offenses, jurors find the defendant less sincere, less believable, less honest, more immoral, more likely to commit a future crime, less likeable, and more like a "typical criminal."  This is the same pattern

demonstrated in the new study by Goodman-Delahunty, Cossins & Martschuk, (2016), discussed above, and similarly applies in civil cases.

28. Negative impressions of defendants directly influence verdicts.   This is because negative inferences about a defendant's character appear to lower the standard of proof to which jurors hold the prosecution/plaintiff evidence. (See the discussion of Bordens & Horowitz (1986), below.)   Jurors are also more willing to find against defendants who they view negatively because the consequences of an erroneous decision seem less severe when the defendant is disliked.   (Bordens & Horowitz (1986).)

29.  In my opinion, consolidation of multiple plaintiffs' claims for trial in the present case is likely to result in the jury drawing similar negative inferences against the defendants and thereby make it more likely that the jury will find defendants liable and increase the amount of damages awarded.

## CONSOLIDATION OF CLAIMS AFFECTS JURORS' CONSIDERATION OF THE EVIDENCE

30. Negative impressions of a defendant against whom claims are consolidated also strongly influence jurors' assessments of trial evidence, and these assessments in turn influence verdicts. Tanford & Penrod (1984) found that consolidated charges produced stronger negative inferences about the defendant's criminal character than severed charges, and that those inferences influenced verdicts directly through distorted perceptions of the trial evidence.   When a defendant seems more like a criminal (an impression strongly fostered by evidence of multiple offenses arising from separate incidents), this makes it appear to jurors that evidence offered by the prosecution with respect to a particular charge is more compelling and the defendant's evidence less compelling, even though there is no logical basis for concluding that the evidence is stronger.   In short, an inference of criminality produced in consolidated trials makes identical

items of prosecution evidence look stronger (more probative of guilt) than the identical items of prosecution evidence in severed trials.

31. The same pattern of "criminal inferences" and changes in the weight of evidence has also been observed by Tanford, Penrod, & Collins (1985), and similar patterns of negative inferences about defendants were reported by Greene & Loftus (1985). The pattern of changes in rationales for verdicts reported by Goodman-Delahunty, Cossins & Martschuk (2016), described above are consistent with this cumulation effect. This research shows that jurors effectively cumulate evidence of multiple offenses. This makes jurors more likely to convict on any given charge in a consolidated trial than if they considered only the evidence of that particular charge. Furthermore, the more charges that are consolidated, the greater the likelihood and strength of a criminal inference, the greater the apparent changes in the weight of evidence, and the greater the likelihood of conviction, even though the evidence on any particular charge remains unchanged.

32. Bordens & Horowitz (1986) tested, in some detail, the effect of consolidation on jurors' assessments of the defendants' character and levels of "anti-defendant" sentiment. Their model (below) shows that simple knowledge of the number of charges against a defendant increased anti-defendant feelings and negative perceptions of the defendant's character.



33. In my opinion, it is extremely probable that consolidation of the plaintiffs' cases in this litigation will similarly affect juror perceptions of the defendants' character and evaluation of the evidence. Because each plaintiff will offer allegations and evidence that defendants engaged in similar alleged wrongdoing, the jury will be more likely to draw negative inferences about the defendants' character and have distorted perceptions of the probative value of the plaintiffs' evidence.

## CONSOLIDATION OF CLAIMS RESULTS IN JUROR CONFUSION

34. Consolidation of claims also results in confusion about the evidence. Tanford & Penrod (1984), Bordens & Horowitz (1983) and Tanford, Penrod & Collins (1985) all documented consolidation-induced confusion of evidence, and this confusion is compounded where the consolidated charges are similar, as are the claims in the various cases consolidated for trial in the instant litigation. Studies have shown that confusion is related to prejudicial

judgments about the defendant (e.g., Bordens & Horowitz (1983)) and that jurors confused by multiple claims are more likely to find against the defendant.

35. In Horowitz & Bordens (2000), researchers noted that "when judging four plaintiffs (as compared with a single plaintiff drawn from the four), jurors not only tend to lump or blend . . . plaintiffs but also appear to use fewer probative trial facts, as compared with when either fewer plaintiffs or fewer witnesses presented testimony." (Horowitz et al., 1996.)  As Horowitz & Bordens (2000) explained, "[e]xperimental research on decision making in nonlegal contexts suggests that when the number of options reaches four, the ability of individuals to consider each alternative on its merits is compromised" because there "appears to be a limitation on the number of hypotheses or alternatives that people can maintain and operate on at one time." (*Id.*)  In their study Horowitz & Bordens (2000) reported that jurors found it easier to understand evidence and easier to understand the expert testimony in 1- and 2-plaintiff trials, as compared with the 4-, 6-, and 10-plaintiff trials.  According to the study, "[w]ith respect to the impact of consolidation, the fate of the three 'focus' plaintiffs differed substantially when they were part of different configurations of plaintiffs.  Clearly, jurors were not judging the evidence pertaining to these plaintiffs on merits alone." (p. 917.)

36. Based on my review of the materials I have been given regarding the instant litigation, it is my understanding that the Court has consolidated the product-liability claims of six plaintiffs (with varying pre-existing conditions and general health status) and several of their spouses, which arise from different surgeries performed by different doctors over different time periods.  Such a consolidated trial of the plaintiffs' claims is likely to be fairly long, with many witnesses and a fairly large number of documents presented to the jury.  The published literature supports a

conclusion that such a consolidated trial will result in significant juror confusion regarding the evidence, which makes it more likely that the jury will find against defendants.

## LIMITING INSTRUCTIONS DO NOT MITIGATE THE PREJUDICE THAT RESULTS FROM THE CONSOLIDATION OF CLAIMS

37. Efforts to mitigate the prejudicial effects of consolidation by giving the jurors limiting instructions are exceedingly unlikely to offset the prejudice of joining many claims together in a single trial, and there is a serious risk that such instructions will aggravate the prejudice to defendants. There are several reasons for this. First, a substantial body of research shows poor juror comprehension of legal instructions. This research includes studies by Penrod & Tanford and Greene & Loftus, as well as that of Charrow & Charrow (1979), Cutler, Penrod & Schmolesky (1988) and Elwork, Sales, & Alfini (1982). Researchers have evaluated juror comprehension of standard instructions from Arizona (Sigwirth & Henze (1973)); California (Charrow & Charrow (1979); Haney & Lynch (1994)); Florida (Buchanan, Pryor, Taylor & Strawn (1978); Elwork, Sales & Alfini (1982)); Illinois (Smith (1993)); Michigan (Elwork, Sales & Alfini (1977)); Nevada (Elwork, Sales, & Alfini (1982)); Wisconsin (Heuer & Penrod (1988); Heuer & Penrod (1989); Heuer & Penrod (1994a); Heuer & Penrod (1994b)); and Washington (Severance & Loftus (1982)).

38. Severance and Loftus (1982) reported that jurors find limiting instructions one of the most difficult instructions to comprehend. One portion of the research on limiting instructions has focused on instructions intended to limit the impact of information about a defendants' bad acts. This research has been conducted in both criminal and civil settings. Although providing jurors with limiting instructions appears to slightly improve actual jurors' understanding of the appropriate use of evidence of prior convictions (Kramer & Koening (1990)), their overall

comprehension is still low. Approximately half of the participants in that study did not adequately comprehend limiting instructions. Because limiting instructions are intended to protect litigants against biasing information, lack of comprehension severely threatens the fairness of the trial.

39. Civil jury studies illustrate the problem with limiting instructions. Broeder (1959) found that mock juries awarded higher damages to a plaintiff after being instructed to disregard a statement that the defendant had insurance as opposed to when they were given no instructions. When jurors were told the defendant had no insurance, the average damage award was $33,000. When jurors were informed that the defendant had insurance, damages rose to $37,000. And, when jurors were instructed to disregard the insurance information, the award rose to $46,000. *See also* Cox & Tanford (1989) (Experiment 2) (jury eligible adults shown a videotape reenactment of a civil negligence trial recommended larger awards when given judicial admonitions to ignore certain evidence). Cox & Tanford (1989) (Experiment 2) characterized this as a "backfire effect." (*Id.*) Pickel (1995) similarly found that detailed legal explanations of limiting instructions did not help mock jurors ignore inadmissible prior conviction evidence and resulted in a backfire effect.

40. In a variant on limiting instructions research, Casper et al. (1989) showed participants (253 adults called for jury duty and 283 undergraduate students) a videotape of a hypothetical illegal search and seizure civil suit brought against two police officers. The videotape had three possible outcomes: police found evidence of illegal conduct (guilty outcome) or police found nothing and later arrested a different person (innocent outcome) or no outcome was provided (neutral outcome). Jurors were then presented with instructions that included an admonition to disregard outcome information when assessing damages. Participants who watched the

19

videotape indicating that the search resulted in the discovery of illegal conduct were significantly less likely to award damages to the subject of the search. In other words, jurors did not follow the judge's instructions not to consider outcome evidence.

41. Doob & Kirshenbaum (1973) found that participants were significantly more likely to find a defendant in a hypothetical burglary case guilty when presented with information indicating that the defendant had a prior criminal record than when no prior record information was given. Judicial instructions to use the information to determine credibility, rather than as an indicator of guilt, did not significantly reduce ratings of guilt.

42. Similarly, Hans & Doob (1976), whose participants were given a written summary of a hypothetical burglary case, found that groups who received evidence of prior conviction, accompanied by limiting instructions, were more likely to convict (40%) than groups who did not receive prior conviction evidence (0%). Furthermore, the content of jury deliberations was affected by the presence of inadmissible evidence. Groups exposed to prior conviction evidence made significantly more negative statements about the defendant and significantly more positive statements about the prosecution evidence. The authors concluded that jurors do not use evidence regarding convictions to determine the credibility of statements made by the defendant. Instead, they are used as an indicator of guilt, despite judicial instructions not to use the information in this manner.

43. Wissler & Saks (1985) reported similar results in a study using adults recruited from the Boston area. Some of these participants were told that the defendant had previously been convicted of either a similar crime, a dissimilar crime, or were given no information about a prior conviction. Participants who received information about a defendant's prior record were instructed to use it only to determine the credibility of the defendant's statements and as an indication that the

defendant has a criminal disposition. The type of prior conviction did not influence the defendant's credibility. Jurors who read about a defendant convicted of perjury did not view the defendant as less credible than jurors who read about any other defendant, including a defendant with no prior convictions. However, participants returned significantly more guilty verdicts for defendants with similar convictions (75%) than for defendants with dissimilar convictions (52.5%), perjury convictions (60%), or no convictions (42.5%).

44. Steblay, et al. (2006) provide the most exhaustive overview of the effects of limiting instructions. Their study is a meta-analysis of the effect of judicial instructions to disregard inadmissible evidence (IE) on juror verdicts. Their data include 175 hypothesis tests from 48 studies with a combined sample of 8,474 participants. The results revealed that inadmissible evidence has a reliable effect on verdicts consistent with the content of that evidence (inadmissible evidence could and did operate against both sides, depending on the study). Judicial instructions to ignore the inadmissible evidence did not effectively eliminate the negative impact of the evidence. Steblay noted two civil studies in which this pattern was observed: "Schaffer (1984) provided defense-slanted IE (of pretrial negotiation) in a product liability case and found support, $r=-.24$, for the hypothesis that judicial instruction does not eliminate the impact of IE on jurors' decisions. Also using a product liability case, Landsman & Rakos (1994) found a similar impact with pro-plaintiff IE (damaging information regarding a recall of the product) despite judicial instruction to disregard that evidence, $r=.33$." (p. 476.)

45. The results of both the civil and criminal studies all support the conclusion that jurors have difficulty comprehending and applying legal instructions not to consider certain evidence.

## CONSOLIDATION INSTRUCTIONS, IN PARTICULAR, DO NOT MITIGATE THE PREJUDICE THAT RESULTS FROM CONSOLIDATION

46. Studies have shown that judicial instructions are not effective in mitigating the prejudicial effect of consolidating multiple claims/charges. In Tanford & Penrod (1984) and Tanford, Penrod, & Collins (1985), half of study participants asked to evaluate a judicial case involving multiple charges were given a set of very strong instructions not to infer that the existence of multiple charges was evidence of guilt and that the evidence pertaining to each charge should be considered separately. The instructions were patterned after those actually employed in the federal courts, but were stronger and more extensive.

47. Tanford & Penrod (1984) found these instructions to be totally ineffective in eliminating or even reducing the effects of consolidation. The conviction rate for jurors in consolidated trials who did not receive these instructions was 39% as compared with 38% for jurors who did. According to this study, instructions were also ineffective in influencing other measures of juror judgments. Other studies that have produced similarly discouraging results about the impact of consolidation instructions include Greene & Loftus (1985) and Horowitz & Bordens (1985). The results from the large-scale Australian study by Goodman-Delahunty, Cossins & Martschuk (2016) confirm these conclusions and are "in line with a large body of empirical studies demonstrating the ineffectiveness" of jury instructions to mitigate the prejudicial effects of consolidation.

48. On the basis of this research, it is my opinion that it is extremely unlikely that a judicial instruction could effectively eliminate prejudicial inferences against defendants that will result from joining the claims of multiple plaintiffs for trial.

## DELIBERATION DOES NOT MITIGATE THE PREJUDICE THAT STEMS FROM CONSOLIDATION

49. The prejudice that would be caused by consolidation will not be cured by the process of jury deliberations. Tanford & Penrod (1986) showed that jury deliberations do not offset biases created by consolidation. In that study, jurors in consolidated trials, questioned before deliberation, recommended conviction at a higher rate than jurors in single trials. After deliberation, the difference was even greater. In short, deliberation aggravated consolidation-related biases.

50. Goodman-Delahunty, Cossins & Martschuk (2016) looked at the distribution of factual recall errors during deliberation and asked whether they were associated with varying numbers of trial witnesses. They found that simpler, non-consolidated, cases were associated with fewer errors as shown in the following figure.



*Figure 9.* Number of factual recall errors in deliberation, by total number of prosecution witnesses

51. Based upon the foregoing, I conclude that it would be highly prejudicial to defendants if multiple claims against them were consolidated for trial.  I anticipate that consolidation would cause jurors to draw negative inferences about the defendants, enhance the apparent probative value of evidence against the defendants, prompt confusion and accumulation of evidence against the defendants and prejudicially increase the risk of liability findings, damages and punitive damages awards against the defendants.  I further conclude that limiting instructions and deliberation by jurors are extremely unlikely to overcome these multiple sources of prejudice.  By far the most effective method of avoiding the problems detailed above is to try each claim separately before separate juries.

Further Affiant sayeth not.

Steven D. Penrod

SUBSCRIBED AND SWORN TO before me on this _18th_ day of April, 2018.

Notary Public In and For
The State of _New York_

My Commission Expires: _9/07/18_

EDWARD CANORA
Notary Public - State of New York
No. 01CA6227028
Qualified in Westchester County
My Commission Expires September 7, 2018

24

EXHIBIT B: BIBLIOGRAPHY OF SOURCES

Bordens, K.S. & Horowitz, I.A. (1983). Information processing in joined and severed trials. *Journal of Applied Social Psychology, 13,* 351-370.

Broeder, D. W. (1959). The University of Chicago jury project. *Nebraska Law Review, 38,* 744-755.

Buchanan, R. W., Pryor, B., Taylor, K. P., & Strawn, D. V. (1978). Legal communication: An investigation of juror comprehension of pattern jury instructions. *Communication Quarterly, 26,* 31-35.

Carroll, J. S., Kerr, N. L., Alfini, J. J., Weaver, F. M., MacCoun, R. J., & Feldman, V. (1986). Free press and fair trial: The role of behavioral research. *Law and Human Behavior, 10,* 187-201.

Casper, J. D., Benedict, K. & Perry, J. D. (1989). Juror decision making, attitudes, and the hindsight bias. *Law and Human Behavior, 13,* 291-310.

Charrow, R.P., & Charrow, V.R. (1979). Making legal language understandable: A psycholinguistic study of jury instructions. *Columbia Law Review, 79,* 1306-1374.

Costantini, E. and King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society Review, 15,* 9-40.

Cutler, B. L, Penrod, S. D., & Dexter, H. R. Expert testimony on eyewitness identification: The hired gun, the friend of the court, the battling experts, and the judge. *Law and Human Behavior.*

Cutler, B. L., Penrod, S. D., & Schmolesky, J. M. (1988). Presumption instructions and juror decision making. *Forensic Reports, 1,* 165-192.

Cutler, B. L, Penrod, S. D., & Stuve, T. E. (1988). Juror decisionmaking in eyewitness identification cases. *Law and Human Behavior, 12,* 41-55.

Daftary-Kapur, T., Penrod, S., O'Connor, M., & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior, 38,* 462-477.

Davis, J.H. (1984). Order in the courtroom. In D.J. Muller, D.E. Blackman, and A.J. Chapman (Eds.) *Psychology and the law,* Chichester, G.B.: Wiley.

DeLuca, A.J. (1979). Tipping the scales of justice: The effects of pretrial publicity. Unpublished master's thesis, Iowa State University, Ames. IA.

Dexter, H., Cutler, B. L.& Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity," *Journal of Applied Social Psychology, 22,* 819-832.

Dillehay, R.C., & Neitzel, M.T. (1985). Juror experience and jury verdicts. *Law and Human Behavior, 9,* 179-192.

Doob, A. N., & Kirshenbaum, H. M. (1973). Some empirical evidence on the effect of s.12 of the Canada evidence act upon an accused. *The Criminal Law Quarterly, 15,* 88-95.

Elwork, A., Sales, B.D., & Alfini, J.J. (1977). Juridic decisions: In ignorance of the law or in light of it? *Law and Human Behavior, 1,* 163-189.

Elwork, A., Sales, B.D., & Alfini, J.J. (1982). *Making jury instructions understandable.* Charlottesville, VA: The Michie Co.

Federal Rules of Civil-Appellate-Criminal Procedure-West Law School Edition (1983). St. Paul, MN: West Publishing Company.

Fiske, S.T. & Taylor, S.E. (1984). *Social cognition.* Reading, Mass.: Addison-Wesley.

Forrest-Pressley, D-L., MacKinnon, G.E., & Waller, T.G. (1985). *Metacognition, cognition, and human performance* (Vols. 1 and 2). Orlando: Academic Press.

ForsterLee, L., & Horowitz, I. A. (1997). Enhancing juror competence in a complex trial. *Applied Cognitive Psychology, 11,* 305-319.

Goodman-Delahunty, J., Cossins, A, & Martschuk, N. (2016). *Jury reasoning in joint and separate trials of institutional child sexual abuse: An empirical study.* Royal Commission into Institutional Responses to Child Sexual Abuse, Sydney.

Greene, E. & Loftus, E.F. (1985). When crimes are joined at trial. *Law and Human Behavior, 9,* 193-207.

Haney, C. (1984). On the selection of capital juries: The biasing effects of the death-qualification process. *Law*

*and Human Behavior, 8,* 121 -132.

Haney, C. & Lynch, C. (1994). Comprehending life and death matters: A preliminary study of California s capital penalty instructions. *Law and Human Behavior, 18,* 411-436.

Hans, V. P., & Doob, A. N. (1976). S.12 of the Canada evidence act and the deliberation of simulated juries. *Criminal Law Quarterly, 18,* 235-253.

Harris, J E. & Morris, P.E. (1984). *Everyday memory, actions, and absent-Mindedness.* Orlando: Academic Press.

Hastie, R., Penrod, S., & Pennington, N. (1983). *Inside the jury.* Cambridge, Mass.: Harvard University Press.

Helgeson, J. G., & Ursic, M. L. (1993). Information load, cost/benefit assessment and decision strategy variability. *Journal of the Academy of Marketing Science, 21,* 13-20.

Heuer, L B., & Penrod, S. D. (1988). Increasing jurors' participation in trials: A field experiment with jury notetaking and question asking. *Law and Human Behavior, 12,* 231-262.

Heuer, L.B., & Penrod, S.D. (1989). Instructing jurors: A field experiment with written and preliminary instructions. *Law and Human Behavior, 13,* 409-430.

Heuer, L.B. & Penrod, S. (1994a). Juror notetaking and question asking during trials: A national field experiment. *Law and Human Behavior, 18,* 121 -150.

Heuer, L., & Penrod, S. D. (1990). Some suggestions for the critical appraisal of a more active jury. *Northwestern Law Review, 85,* 301 -314.

Heuer, L.B. & Penrod, S. (1994b). Trial complexity: A field investigation of its meaning and its effects. *Law and Human Behavior, 18,* 29-52.

Horowitz, I. A. & Bordens, K. S. (1988). The effects of outlier presence, plaintiff population size, and aggregation of plaintiffs on simulated civil jury decisions. *Law and Human Behavior, 12,* 209-229.

Horowitz, I. A., & Bordens, K. S. (1990). An experimental investigation of procedural issues in complex tort trials. Law and Human Behavior, 14, 269-285.

Horowitz, I. A. & Bordens, K. S. (2000). The consolidation of plaintiffs: The effects of number of plaintiffs on jurors' liability decisions, damage awards, and cognitive processing of evidence. *Journal of Applied Psychology, 85,* 909-918

Horowitz, I.A., Bordens, K S., & Feldman, M.S. (1981). A comparison of verdicts obtained in separate and joined criminal trials. *Journal of Applied Social Psychology, 10,* 444-456.

Horowitz, I. A., ForsterLee, L., & Brolly, I. (1996). Effects of trial complexity on decision making. *Journal of Applied Psychology, 81,* 757-768.

Kerr, N.L., Harmon, D.L., and Graves, J.K (1982). Independence of multiple verdicts by jurors and juries. *Journal of Applied Social Psychology, 12,* 12-29.

Kerr, N. L., & Sawyers, G. W. (1979). Independence of multiple verdicts within a trial by mock jurors. *Representative Research in Social Psychology, 10,* 16-27.

Leipold, A. D. & Abbasi, H. A. (2006). The impact of joinder and severance on federal criminal cases: An empirical study. *Vanderbilt Law Review, 59,* 349-402.

Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock juries. *Journalism Quarterly, 43,* 113-116.

Kramer, G. P., Kerr, N. L., & Carroll, J. S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior, 14,* 409-438.

Landsman, S., & Rakos, R. F. (1994). A preliminary inquiry into the effect of potentially biasing information on judges and jurors in civil litigation. *Behavioral Sciences and the Law, 12,* 113–126.

Linz, D., Penrod, S., & McDonald, E. (1986). Attorney communications in the courtroom: Views from off the bench. *Law and Human Behavior, 10,* 281-302.

McGuire, W.J. (1985). Attitudes and attitude change. In G. Lindzey and E. Aronson (Eds.), *The handbook of social psychology,* Vol. II, 3rd. Ed. New York: Random House.

Mandler, G. (1985). *Cognitive psychology.* Hillsdale, N.J.: Erlbaum.

Mynatt, C. R., Doherty, M. E., & Dragan, W. (1993). Information relevance, working memory, and the consideration of alternatives. *Quarterly Journal of Experimental Psychology, 46A,* 759-778.

26

Neitzel, M. T. McCarthy, D. M. & Kern, M. J. (1999). Juries: The Current State of the Empirical Literature. In *Psychology and Law: The State of the Discipline*, edited by Ronald Roesch, Stephen D. Hart, and James R. P. Ogloff. Kluwer: New York.

Otto, A. L., Penrod, S. & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18, 453-470.*

Otto, A., Penrod, S., & Hirt, E. (1990). The influence of pretrial publicity on juror judgments in a civil case. Unpublished manuscript

Padawer-Singer, A., & Barton, A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.), *The Jury System in America: A Critical Overview* (pp. 123139). Beverly Hills: Sage.

Padawer-Singer, A., Singer, A., & Singer, R. (1974). Voir dire by two lawyers: An essential safeguard. *Judiacature, 57,* 386-391.

Penrod, S., & Borgida, E. (1983). Legal rules and lay inference. In L. Wheeler (Ed.), *Review of personality and social psychology* (Vol. 4). Beverly Hills, CA: Sage.

Penrod, S., Coates, D., Linz, D., Herzberg, S. Atkinson, M., & Heuer, L. (1984). The implications of social science research for trial practice attorneys. In D. J. Muller, D. G. Blackman, & A. J. Chapman (Eds.), *Perspectives in psychology and law.* London: Wiley.

Penrod, S., & Crain, B.A. (1984). The effects of timing, form, and order of judges' instructions on juror comprehension, unpublished manuscript, University of Wisconsin.

Penrod, S. D., & Cutler, B. L. (1987). Assessing the competency of juries. In 1. Weiner & A. Hess (Eds.), *The Handbook of Forensic Psychology.* New York: Wiley.

Penrod, S., & Hastie, R. (1979). Models of jury decision-making: A critical review. *Psychological Bulletin, 86,* 462-492.

Penrod, S., & Linz, D. (1985). Voir dire: Its uses and abuses. In M. Kaplan, (Ed.), *The impact of social psychology on procedural justice.* Springfield, IL: C. C. Thomas.

Pickel, K. L. (1995). Inducing jurors to disregard inadmissible evidence: A legal explanation does not help. *Law and Human Behavior, 19,* 407-424.

Reed, K., & Bornstein, B.H. (August 2015). Juries, joinder and justice. *The Jury Expert, 27,* 1-5.

Sales, B.D., Elwork, A., & Alfini, J.J. (1977). Improving comprehension for jury instructions. In B.D. Sales (Ed.), *Perspectives in law and psychology: Volume 1. The criminal justice system.* (pp. 23-90). New York: Plenum.

Schaffer, S. J. (1984). Can jurors disregard inadmissible evidence? Unpublished doctoral dissertation, American University, Washington, DC.

Schmolesky, J. M. (1981). County Court of Ulster County v. Allen and Sandstrom v. Montana: The Supreme Court lends an ear but turns its face. *Rutgers Law Review, 33,* 261-316.

Severance, L. J., & Loftus, E. F. (1981/1982). Improving the ability of jurors to comprehend and apply criminal jury instructions. *Law and Society Review, 17,* 153-197.

Sigwirth, H. & Henze, F. (1973). *Jurors' comprehension of jury instructions in southern Arizona.* Unpublished report prepared for the Committee on Uniform Instructions of the State of Arizona.

Smith, V.L. (1993). When prior knowledge and law collide: Helping jurors use the law. *Law and Human Behavior, 17,* 507-536.

Steblay, N. M., Hosch, H. M., Culhane, S. E., & McWethy, A. (2006). The impact on juror verdicts of judicial instruction to disregard inadmissible evidence: A meta-analysis. Law *and Human Behavior, 30(4), 469-492.*

Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pre-trial publicity on judicial decisions. *Journal of Criminal Justice, 2.* 163-171.

Sue, S., Smith, R.E., & Pedroza, G. (1975). Authoritarianism, pretrial publicity and awareness of bias in simulated jurors. *Psychological Reports, 37,* 1299-1302.

Tanford, Sarah; Cox, Michele (1988). The effects of impeachment evidence and limiting instructions on individual and group decision making. *Law and Human Behavior, 12,* 477-497

Tanford, S., & Penrod, S. (1982). Biases in trials involving defendants charged with multiple offenses. *Journal*

*of Applied Social Psychology, 12,* 453-470.

Tanford, S. & Penrod, S. (1986). Jury deliberations: Discussion content and influence processes in jury decision making. *Journal of Applied Social Psychology, 16,* 322-347.

Tanford, S. & Penrod, S. (1984). Social inference processes in juror judgments of multiple-offense trials. *Journal of Personality and Social Psychology, 47,* 749-765.

Tanford, S., Penrod, S., & Collins, R. (1985). Decisionmaking in joined criminal trials: The influence of charge similarity, evidence similarity, and limiting instructions. *Law and Human Behavior, 9,* 319-337.

Tans, M. D., & Chaffee, S. H. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.

Thomas, C. (2010). *Are Juries Fair,* (Research Report No 1/10, Ministry of Justice). www.justice.gov.uk/publications/research.htm

Thompson, W. C. (1986, March). Mathematical evidence in criminal trials: Improving the probability of justice. Paper presented at the midyear meeting of the American Psychology-Law Society, Tucson, AZ.

*United States v. Foutz* (1976). 540 F.2d 733 (4th Cir.).

Vidmar, N. & Coleman, J. E. (2014). The American adversary system: Sources of error in the criminal adjudication process. In A. D. Redlich, J. R. Acker, R. J. Norris, & C. L. Bonventre (Eds.), Examining wrongful convictions: Stepping back, moving forward (pp. 141-156). Durham, NC: Carolina Academic Press.

Wissler, R. L.; Saks, M. J. (1985). On the inefficacy of limiting instructions: When jurors use prior conviction evidence to decide on guilt. *Law and Human Behavior, 9,* 37-48.

White, M. J. (2006). Asbestos Litigation: Procedural Innovations and Forum Shopping. *Journal of Legal Studies, 35,* 365-398.

Wilcox, W., & McCombs, M. (1967). Crime story elements and fair trial-free press. Unpublished paper, University of California.

Wilford, M. M., Van Horn, M. C., Penrod, S. D. & Greathouse, S. M. (In press). Not Separate but Equal? The Impact of Multiple-Defendant Trials on Juror Decision-Making. *Psychology, Crime & Law*, 1-24

Wolf, S., & Montgomery,D. A. (1977). Effects of inadmissible evidence and level of judicial admonishment to disregard on the judgments of mock jurors. *Journal of Applied Social Psychology, 7,* 205-219.

# EXHIBIT A

## CURRICULUM VITAE
### STEVEN PENROD

April 18, 2018

524 West 59th Street 10.65.3
John Jay College of Criminal Justice
New York, NY 10019-1199

Useful links: google "Steven Penrod"
email:spenrod@jjay.cuny.edu
646-783-8373

## EDUCATION

PhD Harvard University, 1979, Social Psychology. Dissertation: Evaluation of social scientific and traditional attorney methods of jury selection. Committee: Reid Hastie, Thomas Pettigrew, Charles Judd, and Charles Nesson

J.D. Harvard Law School, 1974. Third Year Paper: Intention and causation: A psychological critique. Advisor: Charles Fried

B.A. Yale College, 1969, Poli. Sci. Thesis Advisor: Robert Dahl

## HONORS AND AWARDS

2015—European Assoc for Psychology and Law Award for Distinguished Career Contributions

2005--APA Fowler Award for Outstanding Contribution to the Professional Development of Graduate Students

2001--Distinguished Professorship, John Jay College, CUNY

1999--Award for Distinguished Contributions to Psychology and the Law—American Psychology-Law Society

1999-2000--Gallup Professorship—University of Nebraska

1994-1995--Davis Professorship in Law, Univ of Minnesota

1986--American Psychological Association Distinguished Scientific Award for an Early Career Contribution to Applied Psychology (Citation: *American Psychologist, 42*, 300-303).

1981--Second Prize American Psychological Association Division 13 Meltzer Research Award

1980--Cattell Dissertation Award, NY Academy of Sciences.

1980--Soc. for Experimental Social Psych Dissertation Award.

1980--Co-winner of Society for the Psychological Study of Social Issues Dissertation Award

Harvard University: National Science Foundation Dissertation Research Grant:  Law and Social Sciences

Harvard Law School: Taft Scholarship.

Yale College: Political Science Honor Society; NSF Summer Research Grant; Griffin Scholarship, Alcoa Scholarship.

## PROFESSIONAL EXPERIENCE

2001- Distinguished Professor of Psychology, John Jay--CUNY

1999-2000 Gallup Professorship—University of Nebraska

1995-2001 Dir of Law and Psychology Program-Univ of NE

1995-2001 Prof of Psychology & Prof of Law-Univ of Nebraska

1994-1995 Adjunct Prof: Humphrey Institute of Public Affairs-MN

1993-1995 Dir of Grad Studies in Conflict Management-U of MN

1992-1993 Grievance Officer, University of Minnesota

1991-1995 Director, Conflict and Change Center, Univ of Minn

1990-1995 Adjunct Professor of Psychology, Univ of Minnesota

1989-1996 Professor of Law, University of Minnesota

1988-1989 Visiting Prof, Law & Psychology, Univ of Minnesota

1988-Professor of Psychology, University of Wisconsin

1986 Research Consultant, Judicial Council of California

1985-1988 Associate Prof of Psychology, Univ of Wisconsin

1985 Visiting Professor of Law, Indiana University

1983 Visiting Professor of Law, University of Wisconsin

1979-1985 Asst Professor of Psychology, Univ of Wisconsin

1975-1979 Research/Teaching Asst--Psychology, Harvard Univ

1975 (summer) Staff-Hartford Inst for Criminal & Social Justice

1974 (summer) Asst Ombudsman for Connecticut Corrections

1971-1973 Naval Judge Advocate General Corps

1970 (summer) Research Assistant, Sociology Dept, Harvard Univ

## PUBLICATIONS

Google Scholar: goo.gl/W480EC

Jones, A.M., & Penrod, S. (2018). Improving the Effectiveness of the Henderson Instruction Safeguard against Unreliable Eyewitness Identification. *Psychology, Crime and Law, 24,* 177-193.  https://doi.org/10.1080/1068316X.2017.1390113

Wilford, M. M., Van Horn, M. C., Penrod, S. D. & Greathouse, S. M. (2018). Not Separate but Equal? The Impact of Multiple-Defendant Trials on Juror Decision-Making.  *Psychology, Crime & Law,* 14-37. http://dx.doi.org/10.1080/1068316X.2017.1351969

Jones, A. M. & Penrod, S. (2017).  Research-Based Instructions Induce Sensitivity to Confession Evidence. *Psychiatry, Psychology and Law. 1-16.* http://dx.doi.org/10.1080/13218719.2017.1364677

Dillon, M. K., Jones, A. M, Bergold, A. N., Hui, C., & Penrod, S. D. (2017).  Henderson instructions: Do they enhance evidence evaluation? *Journal of Forensic Psychology Practice, 17,* 1-24. http://dx.doi.org/10.1080/15228932.2017.1235964

Smith, A.M., Wells, G.W., Lindsay, R.C.L. & Penrod, S.D. (2017). Fair Lineups Are Better Than Biased Lineups and Showups, but Not Because They Increase Underlying Discriminability.  *Law and Human Behavior,  41,* 127–145. http://dx.doi.org/10.1037/lhb0000219

Jones, A. M., Bergold, A. N., Dillon, M. K. & Penrod, S. D. (2017). Comparing the effectiveness of Henderson instructions and expert testimony: Which safeguard improves jurors' evaluations of eyewitness evidence? *Journal of Experimental Criminology*, 1-24. http://link.springer.com/article/10.1007/s11292-016-9279-6

Jones, A. M., Bergold, A. N., Dillon, M. K. & Penrod, S. D. (2016). Can Expert Testimony Sensitize Jurors to Coercive Interrogation Tactics?  *Journal of Forensic Psychology Practice,16,* 93-409. http://dx.doi.org/10.1080/15228932.2016.1232029

Zimmerman, D. M., Rodriguez, D., Bergold, A., & Penrod, S. D. (2016). The Influence of Pretrial Exposure to Community Outrage and Victim Hardship on Guilt Judgments. *Psychology, Crime and Law, 22,* 435-454.        http://goo.gl/uUULc4 http://dx.doi.org/10.1080/1068316X.2015.1120870

Tallon, J. A., Daftary-Kapur, T. & Penrod, S. (2015). Defendant Remorse and Publicity in Capital Trials: Is Seeing Truly Believing? *Criminal Justice and Behavior, 42,* 1282-1302          . http://goo.gl/xk2QvD  DOI: 10.1177/0093854815602500

Jones, A. M., Jones, S. & Penrod, S. (2015). Examining Legal Authoritarianism in the Impact of Punishment Severity on Juror Decisions. *Psychology, Crime and Law, 21,* 939-951. http://dx.doi.org/10.1080/1068316X.2015.1077244

Daftary-Kapur, T., Penrod, S., O'Connor, M., & Wallace, B. (2014).  Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior, 38,* 462-477. http://dx.doi.org/10.1037/lhb0000081

Nicholson, A. S., Yarbrough, A. M. & Penrod, S. D. (2014).  In G. J. N. Bruinsma, D.L. Weisburd (eds.), Jury Decision Making and Eyewitness Testimony. *Encyclopedia of Criminology and Criminal Justice*, Springer: New York. http://dx.doi.org/10.1007/978-1-4614-5690-2_670

Robbennolt, J., Groscup, J. & Penrod, S. (2013). Evaluating and assisting jury competence in civil and criminal cases. In I. Weiner & R. Otto (ed.), *Handbook of Forensic Psychology (4th Ed.)*. New York: Wiley.  ISBN-13: 978-1118348413  ISBN-10: 1118348419

Vredeveldt, A. & Penrod, S. D. (2013).  Eye-Closure Improves Memory for a Witnessed Event under Naturalistic Conditions. *Psychology, Crime and Law. 19*, 893-905.  http://dx.doi.org/10.1080/1068316x.2012.700313

Patry, M. W. & Penrod, S. D. (2013). Death penalty decisions: Instruction comprehension, attitudes, and decision mediators. *Journal of Forensic Psychology Practice, 13*, 204-244 .  http://dx.doi.org/10.1080/15228932.2013.795816

Bornstein, B. H.; Deffenbacher, K. A.; McGorty, K. & Penrod, S. D. (2012). Effects of exposure time and cognitive operations on facial identification accuracy:  A meta-analysis of two variables associated with initial memory strength.  *Psychology, Crime and Law, 18, 473-490. http://dx.doi.org/10.1080/1068316x.2010.508458*

Spano, L. M., Groscup, J. L. & Penrod, S .D. (2011).  Pretrial publicity and the jury:  Research and methods. In Wiener, R. L. & *Bornstein, B. H. (Eds.). Handbook of Trial Consulting.  NY: Springer.* http://dx.doi.org/10.1007/978-1-4419-7569-0_11

Rosenfeld, B. & Penrod, S. D. (Eds.). (2011). *Research Methods in Forensic Psychology*. New York: John Wiley & Sons.  http://goo.gl/VUWub8

Rosenfeld, B. & Penrod, S. D. (2011*)*. Introduction. In Rosenfeld, B. & Penrod, S. D. (Eds.). *Research Methods in Forensic Psychology*. New York: John Wiley & Sons.  ISBN-13: 978-0470249826  ISBN-10: 047024982X http://goo.gl/VUWub8

Penrod, S. D., Kovera, M. & Groscup, J. (2011*)*. Jury research methods. In Rosenfeld, B. & Penrod, S. D. (Eds.). *Research Methods in Forensic Psychology*. New York: John Wiley & Sons. ISBN-13: 978-0470249826  ISBN-10: 047024982X http://goo.gl/VUWub8

Spano, L, Daftary-Kapur, T. & Penrod, S. D. (2011*)*. Trial consulting in high publicity cases. In Rosenfeld, B. & Penrod, S. D. (Eds.). *Research Methods in Forensic Psychology*. New York: John Wiley & Sons. ISBN-13: 978-0470249826  ISBN-10: 047024982X http://goo.gl/VUWub8

Wells, G. & Penrod, S. D. (2011*)*. Eyewitness Research: Strengths and Weaknesses of Alternative Methods. In Rosenfeld, B. & Penrod, S. D (Eds.). *Research Methods in Forensic Psychology*. New York: John Wiley & Sons.  ISBN-13: 978-0470249826  ISBN-10: 047024982X  http://goo.gl/VUWub8

Kim, M. C. & Penrod, S. D. (2010).  Legal decision making among Korean and American legal professionals and lay people.  *International Journal of Law, Crime and Justice, 38*. 175-197.  http://dx.doi.org/10.1016/j.ijlcj.2011.01.004

Daftary-Kapur, T., Dumas, R. & Penrod, S.D. (2010).   Jury decision-making biases and methods to counter them.  *Legal and Criminological Psychology, 15,* 133-154.  http://dx.doi.org/10.1348/135532509x465624

Groscup, J. & Penrod, S. D. (2009). Appellate Review and Eyewitness Experts.  In Brian Cutler (Ed.). *Expert Testimony on the Psychology of Eyewitness Identification*.  NY: Oxford.  http://dx.doi.org/10.1093/acprof:oso/9780195331974.003.005

Penrod, S. & Kovera, M. B. (2009). Recent developments in North American identification science and practice. In: Bull, R., Valentine, T. & Williamson, T., (Eds.). *Handbook of Psychology of Investigative Interviewing*. Current Developments and Future Directions. Chichester, UK: John Wiley & Sons.  http://dx.doi.org/10.1002/9780470747599.ch15

Penrod, S. & Kurosawa, K. (2008).  Eyewitness errors: Assessing

their extent, causes, and solutions. *Japanese Journal of Psychology, 7*, 36-62.    http://dx.doi.org/10.1111/j.1468-5884.1996.tb00005.x

Bornstein, B. H. & Penrod, S.D. (2008). Hugo Who? G.F. Arnold's Alternative Early Approach to Psychology and Law.  *Applied Cognitive Psychology, 22,* 759-768.  http://dx.doi.org.central.ezproxy.cuny.edu:2048/10.1002/acp.1480

Deffenbacher, K. A.; Bornstein, B. H.; McGorty, K. & Penrod, S. D. (2008). Forgetting the once-seen face:  Estimating the strength of an eyewitness's memory representation.  *Journal of Experimental Psychology: Applied, 14,* 139-150.  http://dx.doi.org/10.1037/1076-898x.14.2.139

Heuer, L., Penrod, S., & Kattan, A.  (2007). The role of societal benefits and fairness concerns among decision makers and decision recipients.  *Law and Human Behavior, 31,* 573-610*.*  http://dx.doi.org/10.1007/s10979-006-9084-2

Penrod, S. D. & Bornstein, B. H. (2007). Generalizing Eyewitness Reliability Research. In R.C.L. Lindsay, D. Ross, D Read & M. Toglia, (Eds.), *Handbook of eyewitness psychology* (Vol. II): *Memory for people*. Mahwah, NJ: Erlbaum.  ISBN  1317777832 https://goo.gl/B7K4QP

Van Wallendael, L.R., Devenport, J., Cutler, B.L. & Penrod, S. (2007).  Mistaken  Identification=Erroneous  Convictions? Assessing and Improving Legal Safeguards.  In R.C.L. Lindsay, D. Ross, D Read & M. Toglia, (Eds.), *Handbook of eyewitness psychology* (Vol. II): *Memory for people*. Mahwah, NJ: Erlbaum. ISBN  1317777832 https://goo.gl/B7K4QP

Wells, G. L., Memon, A. & Penrod, S. D. (2006). Eyewitness Evidence: Improving its Probative Value.  *Psychological Science in the Public Interest, 7,* 45-75.   https://goo.gl/oaGPLf

Deffenbacher, K. A.; Bornstein, B. H.; & Penrod, S. D. (2006). Mugshot exposure effects: retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law  and  Human  Behavior,  30,*  287-307.  http://dx.doi.org/10.1007/s10979-006-9008-1

Robbennolt, J., Groscup, J. & Penrod, S. (2006). Evaluating and assisting jury competence in civil and criminal cases. In I. Weiner & A. Hess (ed.), *Handbook of Forensic Psychology (3rd Ed.)*. New York: Wiley.

Doyle, J. M., Penrod, S., Kovera, M. B. & Dysart, J. (2006).  The street, the lab, the courtroom, the meeting room.  *Public Interest Law Reporter, 11*, 13-16, 31, 46.

Studebaker, C. A. & Penrod, S. D. (2005).  Pretrial publicity and its influence on juror decision making.  In N. Brewer & K. D. Williams, *Psychology and Law: An Empirical Perspective*.  New York: Guilford.

Penrod, S. (2005). Eyewitnesses. In L. E. Sullivan & M. S. Rosen (Eds.).  *Encyclopedia of Law Enforcement, Vol. 1*.  Thousand Oaks: Sage.

Penrod, S. (2005). Lineups. In L. E. Sullivan & M. S. Rosen (Eds.).  *Encyclopedia of Law Enforcement, Vol. 1*.  Thousand Oaks: Sage.

Deffenbacher, K. A.; Bornstein, B. H.; Penrod, S. D. & McGorty, K. (2004).   A meta-analytic review of the effects of high stress on eyewitness memory.  *Law and Human Behavior, 28,* 687-706.  http://dx.doi.org/10.1007/s10979-004-0565-x

O'Neil, K.M., Patry, M. W., & Penrod, S. D. (2004). Exploring the effects of attitudes toward the death penalty on capital sentencing verdicts.  *Psychology, Public Policy and Law,* 10, 443-470.  http://dx.doi.org/10.1037/1076-8971.10.4.443

Hollin, C., van Koppen, P., Penrod, S. (2004). Editorial. *Psychology, Crime & Law, 10,* 1-3.

The nature and scope of the problem of sexual abuse of minors by catholic priests and deacons in the United States: The John Jay Study (2004).   http://goo.gl/Fc7jPN

Groscup, J.L. & Penrod, S. D. (2003). Battle of the standards for experts in criminal cases: police vs. psychologists. *Seton Hall Law Review, 33,* 1141-1165. http://scholarship.shu.edu/shlr/vol33/iss4/10

O'Neil, K.M., Penrod, S. D., & Bornstein, B. H. (2003).  Web-based research: methodological variables' effects on dropout and sample characteristics. *Behavior Research Methods, Instruments, and Computers, 35.* 217-236. http://goo.gl/qPOZ5z

McAuliff, B. D., Nemeth, R. J., Bornstein, B. H., Penrod, S.D. (2003). Juror decision-making in the 21st century: confronting science and technology in court. In D. Carson & R. Bull (Eds.), *Handbook of psychology in legal contexts* (2nd ed.). New York: Wiley ISBN-13: 978-1441975683

Penrod, S. (2003). Eyewitness identification evidence: how well are witnesses and police performing? *Criminal Justice Magazine, Spring,* 36-47, 54.

Heuer, L., Penrod, S. Hafer, C. & Cohn, I. (2002). The role of resource and relational concerns for procedural justice. *Personality and Social Psychology Bulletin, 28,* 1468-1482.

van Koppen, P.J., & Penrod, S.D. (Eds.). (2003). *Adversarial versus inquisitorial justice: Psychological perspectives on criminal justice systems.* New York: Plenum. ISBN: 978-1-4613-4832-0 (Print) 978-1-4419-9196-6 (Online)

van Koppen, P.J., & Penrod, S.D. (2003). Adversarial or Inquisitorial: Comparing Systems. In van Koppen, P.J., & Penrod, S.D. (Eds.). *Adversarial versus inquisitorial justice: Psychological perspectives on criminal justice systems.* New York: Plenum.

van Koppen, P.J., & Penrod, S.D. (2003). The John Wayne and Judge Dee Versions of Justice. In van Koppen, P.J., & Penrod, S.D. (Eds.). *Adversarial versus inquisitorial justice: Psychological perspectives on criminal justice systems.* New York: Plenum.

Groscup, J. L.; Penrod, S. D.; Studebaker, C. A.; Huss, M. T.; O'Neil, K. M. (2002). The effects of Daubert on the admissibility of expert testimony in state and federal criminal cases. *Psychology, Public Policy, & Law, 8, 339-372.*

Stolle, D. P, Robbennolt, J. K, Patry, M. & Penrod, S.D. Fractional Factorial Designs for Legal Psychology. (2002). *Behavioral Sciences and Law. 20,* 5-17.   http://dx.doi.org/10.1002/bsl.475

Greene, A., Chopra, S., Kovera, M. B., Penrod, S., Rose, V. G., Schuller, R., & Studebaker, C. (2002). Jurors and juries:  A review of the field. In J. R. P. Ogloff, Ed. *Taking Psychology and Law into the Twenty First Century.* New York: Kluwer.

Studebaker, C. A., Robbennolt, J. K., Penrod, S. D., Pathak-Sharma, M. K., Groscup, J. L. and Devenport, J. L. (2002). Studying pretrial publicity effects: New methods for improving ecological validity and testing external validity. *Law and Human Behavior, 26,* 19-41. http://dx.doi.org/10.1023/A:1013877108082

O'Neil, K.M.; Penrod, S. D. (2001). Methodological variables in Web-based research that may affect results: Sample type, monetary incentives, and personal information. *Behavior Research Methods, Instruments & Computers. 33,* 226-233. http://link.springer.com/article/10.3758%2FBF03195369

Studebaker, C. A., Robbennolt, J. K., Pathak-Sharma, M. K., & Penrod S. D. (2000). Assessing Pretrial Publicity Effects: Integrating Content Analytic Results. *Law and Human Behavior,* 24, 317-336.  Reprinted in Hans, V. (2006). *The Jury System: Contemporary Research,* Ashgate.
   http://dx.doi.org/10.1023/A:1005536204923

Vidmar, N., Lempert, R. O., Diamond, S. S., Hans, V. P., Landsman, S., MacCoun, R., Sanders, J., Hosch, H. M., Kassin, S., Galanter, M., Eisenberg, T., Daniels, S., Greene, E., Martin, J., Penrod, S., Richardson, J., Heuer, L., Horowitz, I. (2000). Amicus brief: *Kumho Tire v. Carmichael. Law & Human Behavior. 24,* 387-400

Studebaker, C., Devenport, J. & Penrod, S. (1999). Perspectives on Jury Decisionmaking: Cases with Pretrial Publicity and Cases Based on Eyewitness Identifications. In F. T. Durso & R. S. Nickerson (eds.), *Handbook of Applied Cognition.* New York: Wiley.

Penrod, S. & Cutler, B.L. (1999). The case against traditional safeguards: Preventing mistaken convictions in eyewitness identification trials. In R. Roesch & S. Hart, *Psychology and Law: State of the Discipline.* Plenum: New York.

Robbennolt, J., Penrod, S. & Heuer, L. (1999). Assessing and Aiding Jury Competence. In I. Weiner & A. Hess (ed.), *Handbook of Forensic Psychology (2nd Ed.).* New York: Wiley.

Penrod, S. & Heuer, L.B. (1998). Improving group performance: The case of the jury. In R. S. Tindale, L. Heath, J. Edwards, E. J. Posavac, F. B. Bryant, Y. Suarez-Balacazar, E. Henderson-King & J. Meyers, *Theory and Research on Small Groups.* Plenum: New York.

Wells, G.L., Small. M., Penrod, S., Malpass, R. S., Fulero, S. M. & Brimacombe,  C.  A.  E.  (1998).  Eyewitness  identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603-647.
http://dx.doi.org/10.1023/a:1025750605807

Dexter, H.R., Penrod, S. D., Linz, D. & Saunders, D. (1997). Attributing responsibility to female victims after exposure to sexually violent films. *Journal of Applied Social Psychology, 27,* 2149-2171.

Penrod, S. & Heuer, L.B. (1997). Tweaking commonsense: Assessing Aids to Jury Decision Making. *Psychology, Public Policy & Law, 3,* 259-284.

Devenport, J. L., Penrod, S. D., & Cutler, B. L. (1997). Eyewitness identification evidence: Evaluating commonsense evaluations. *Psychology, Public Policy & Law, 3,* 338-361.

Studebaker, C. A & Penrod, S. D. (1997). Pretrial publicity: The media, the law and common sense. *Psychology, Public Policy & Law, 3,* 428-460.

Krafka, C., Linz, D., Donnerstein, E.,& Penrod, S. (1997). Women's reactions to sexually aggressive mass media depictions. *Violence Against Women, 3,* 149-181.

Kovera, M., Penrod, S.D., Pappas, C. & Thill, D. (1997). Identification of computer-generated facial composites  *Journal of Applied Psychology, 82,* 235-246.

Heuer, L.B. & Penrod, S. (1996). Increasing juror participation in trials through notetaking and question asking. *Judicature, 79. 256-262.*

Smith, B., Penrod, S.D., Park, R., & Otto, A. (1996). Jurors' use of probabilistic evidence. *Law and Human Behavior, 20. 49-82.*

Narby, D.J., Cutler, B.L., & Penrod, S. (1996). The effects of witness, target, and situational factors on eyewitness identifications. In Sporer, S.L., Malpass, R. & Koehnken, G. (Eds.). *Psychological Issues in Eyewitness Identification.* Mahwah, NJ: Lawrence Erlbaum.

Penrod, S.D., Fulero, S. & Cutler, B. (1995). Expert psychological testimony on eyewitness reliability before and after *Daubert*. *Behavioral Sciences and the Law 13,* 229-260.

Penrod, S. & Cutler, B. (1995). Witness confidence and witness accuracy: Assessing their forensic relation. *Psychology, Public Policy & Law, 1,* 817-845. http://dx.doi.org/10.1037/1076-8971.1.4.817

Sporer, S., Penrod, S.D., Read, D. & Cutler, B.L. (1995). Gaining confidence in confidence: A new meta-analysis on the confidence-accuracy relationship in eyewitness identification studies. *Psychological Bulletin, 118,* 315-327. http://dx.doi.org/10.1037//0033-2909.118.3.315

Cutler, B.L. & Penrod, S.D. (1995). *Mistaken Identifications: the Eyewitness, Psychology, and Law.* New York: Cambridge University Press.  ISBN-13: 978-0521445726  ISBN-10: 0521445728

Heuer, L.B. & Penrod, S. (1995). Jury decisionmaking in complex trials. In R. Bull & D. Carson (Eds.), *Handbook of Psychology in Legal Contexts.* Chichester: John Wiley & Sons.

Cutler, B.L. & Penrod, S. (1995). Assessing the accuracy of eyewitness identifications. In R. Bull & D. Carson (Eds.), *Handbook of Psychology in Legal Contexts.* Chichester: John Wiley & Sons.

Penrod, S.D., Fulero, S. & Cutler, B. (1995). Expert psychological testimony in the United States: A new playing field?   *European Journal of Psychological Assessment, 11,* 65-72.

Penrod, S. (1994). The psychology of criminal justice. *Contemporary Psychology, 39,* 897-898.

Heuer, L.B. & Penrod, S.D. (1994). Predicting the outcomes of disputes: Consequences for disputant reactions to procedures and outcomes. *Journal of Applied Social Psychology, 24,* 260-283.

Otto, A. L., Penrod, S. & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments.   *Law and Human Behavior, 18, 453-470.*

Heuer, L.B. & Penrod, S. (1994). Juror notetaking and question asking during trials: A national field experiment. *Law and Human Behavior, 18,* 121-150.

Kovera, M.B, Levy, R.J., Borgida, E. & Penrod, S.D. (1994). Expert testimony in child sexual abuse cases: Effects of expert evidence type and cross-examination. *Law and Human Behavior, 18,* 653- 674.

Heuer, L.B. & Penrod, S. (1994). Trial complexity: A field investigation of its meaning and its effects.   *Law and Human Behavior, 18,* 29-52.

Cutler, B.L., Berman, G.L., Penrod, S.D., & Fisher, R.P. (1994). Conceptual, practical and empirical issues associated with eyewitness identification test media. In Ross, D., Read, J.D. & Toglia, M., (Eds.). *Adult Eyewitness Testimony: Current Trends and Developments.* New York: Cambridge University Press.

Penrod, S. (1993). The child witness, the courts, and psychological research. *Minnesota* Nelson, C. (Ed.) *Memory and Affect in Development: Symposia on Child Psychology, Vol. 26.* Hilldale, N.J.: Erlbaum.

Penrod, S. & Cutler, B.L. (1992). Eyewitnesses, experts, and jurors: Improving the quality of jury decision-making in eyewitness cases. In J. Misumi, B. Wilpert, & H. Motoaki (Eds.), *Organizational and Work Psychology.* Hilldale, N.J.; Erlbaum.

Kovera, M.B., Park, R.C., & Penrod, S. (1992). Jurors' perceptions of eyewitness and hearsay evidence. *University of Minnesota Law Review, 76,* 703-722.

Linz, D. & Penrod, S.D. (1992). Exploring the First and Sixth Amendments:  Pretrial publicity and jury decisionmaking. In Kagehiro, D. K. & Laufer, W. S. (Eds.). *Handbook of Psychology and Law.* New York: Springer-Verlag.

Olczak, P. V., Kaplan, M. F., & Penrod, S.D. (1991). Attorney's lay psychology and its effectiveness in selecting jurors:  Three empirical studies. *Journal of Social Behavior and Personality, 6,* 431-452.

Cutler, B.L., Penrod, S.D., & Dexter, H.R. (1990). Nonadversarial methods for sensitizing jurors to eyewitness evidence. *Journal of Applied Social Psychology, 20,* 1197-1207.

Penrod, S.D. (1990). Predictors of jury decisionmaking in criminal and civil cases: A field experiment. *Forensic Reports, 3,* 261-277.

Fulero, S.M. & Penrod, S.D. (1990). The myths and realities of attorney jury selection folklore and scientific jury selection:  What works?  *Ohio Northern University Law Review, XVII,* 229-253.

Cutler, B. & Penrod, S.D. (1990). Estimator Variables and Eyewitness Identification. In G. Kohnken and S.L. Sporer (Eds.), *Eyewitness Identification:  Psychological Knowledge, Problems, and Perspectives.* Verlag fur Angewandte Psychologie: Stuttgart. (In German).

Heuer, L., & Penrod, S. D. (1990). Some suggestions for the critical appraisal of a more active jury.  *Northwestern Law Review, 85,* 301- 314.

Fulero, S.M., & Penrod, S.D. (1990). Attorney jury selection folklore:  What do they think and how can psychologists help? *Forensic Reports, 3,* 233-259.

Cutler, B.L., Dexter, H.R., & Penrod, S.D. (1990). Juror sensitivity to eyewitness identification evidence. *Law and Human Behavior, 14,* 185-191.

Tanford, S. & Penrod, S. (1990). Las deliberaciones del jurado:  Contenido de la discusion y procesos de influencia en la toma de decisiones de un jurado. /Jury deliberations: Discussion contents and processes influencing a jury's decision making. *Estudios de Psicologia, 42,* 75-98

Penrod, S.D. & Cutler, B.L. (1989). Eyewitness expert testimony and jury decisionmaking. *Law and Contemporary Problems, 52,* 1001-1041.  http://www.jstor.org/stable/1191907

Heuer, L.B., & Penrod, S.D. (1989). Instructing jurors:  A field experiment with written and preliminary instructions. *Law and Human Behavior, 13,* 409-430.

Penrod, S., Bull, M., and Lengnick, S. (1989). Children as observers and witnesses: The empirical data. *Family Law Quarterly, XXIII,* 411-431.

O'Rourke, T., Penrod, S.D., Cutler, B.L., & Stuve, T.E. (1989). The external validity of eyewitness identification research: Generalizing across age groups. *Law and Human Behavior, 13,* 385-396.

Cutler, B. L. & Penrod, S. D. (1989). Forensically relevant moderators of the relation between eyewitness identification accuracy and confidence. *Journal of Applied Psychology, 74,* 650-653.

Heuer, L.B. & Penrod, S.D. (1989). Trial lawyers in the box? Jurors question witnesses. *The Docket.*

Cutler, B.L., Penrod, S.D., & Dexter, H.R. (1989). The eyewitness, the expert psychologist, and the jury. *Law and Human Behavior, 13,* 311-332.

Penrod, S. (1989). Shedding empirical light on legal

controversies. *Contemporary Psychology, 34.* 738-739.

Cutler, B.L., Dexter, H.R., & Penrod, S.D. (1989). Expert testimony and jury decision making:  An empirical analysis. *Behavioral Sciences and the Law*, 7, 215-225.

Cutler, B.L., & Penrod, S.D. (1989). Moderators of the confidence-accuracy correlation in eyewitness identifications:  The role of information processing and base-rates. *Applied Cognitive Psychology*, 3, 95-107.

Linz, D., Penrod, S., & Donnerstein, E. (1988). Effects of long-term exposure to violent and sexually degrading depictions of women. *Journal of Personality and Social Psychology, 55*, 758-768.

Penrod, S. D. (1988). Psychology in court:  The child witness. *Contemporary Psychology*, 33, 655-657.

Sharp, G.L., Cutler, B.L., & Penrod, S.D. (1988). Performance feedback improves the resolution of confidence judgments. *Organizational Behavior and Human Decision Processes, 42,* 271- 283.

Cutler, B. L., Stocklein, C. J., & Penrod, S. D. (1988). An empirical examination of a computerized facial composite production system. *Forensic Reports, 1,* 207-218.

Cutler, B. L., Penrod, S. D., & Schmolesky, J. M. (1988). Presumption instructions and juror decision making. *Forensic Reports, 1,* 165-192.

Heuer, L. B., & Penrod, S. D. (1988). Increasing jurors' participation in trials:  A field experiment with jury notetaking and question asking. *Law and Human Behavior, 12*, 231-262.

Cutler, B. & Penrod, S. (1988). Context reinstatement and eyewitness identification. In G. Davies & D. Thomson (Eds.), *Memory in Context: Context in Memory*. Chichester: Wiley. pp. 231- 244.

Cutler, B. L., & Penrod, S. D. (1988). Improving the reliability of eyewitness identification: Lineup construction and presentation. *Journal of Applied Psychology, 73*, 281-290.

Cutler, B. L., Penrod, S. D., & Stuve, T. E. (1988). Juror decisionmaking in eyewitness identification cases. *Law and Human Behavior, 12*, 41-55.

Spear, P. Penrod, S, & Baker, T. (1988). *Psychology*. New York: Wiley.

Cutler, B.L., Penrod, S.D., & Martens, T.K. (1987). Improving the reliability of eyewitness identifications:  Putting context into context. *Journal of Applied Psychology*, 72, 629-637.

Penrod, S. D. (1987). Covert facilitation:  A necessary adjunct to overt facilitation?  *Journal of Social Issues, 43*, 71-78.  DOI: 10.1111/j.1540-4560.1987.tb02348.x

Linz, D., Donnerstein, E., Penrod, S. D. (1987). The findings and recommendations of the Attorney General's Commission on pornography:  Do the psychological "facts" fit the political fury? *American Psychologist, 42*, 946-953.

Cutler, B. L., Penrod, S. D., & Martens, T. K. (1987). The reliability of eyewitness identifications: The Role of System and Estimator Variables. *Law and Human Behavior, 11*, 233-258.

Linz, D., Donnerstein, E., & Penrod, S. (1987). The Attorney General's Commission on Pornography:  The gaps between "findings" and facts. *American Bar Foundation Research Journal, 1987*, 713-736.

Donnerstein, E., Linz, D., & Penrod, S. (1987). *The Question of Pornography:  Scientific Findings and Policy Implications*. New York: Free Press.

Penrod, S. D., & Cutler, B. L. (1987). Assessing the competency of juries. In I. Weiner & A. Hess (Eds.), *The Handbook of Forensic Psychology*. New York: Wiley.

Linz, D., Donnerstein, E., & Penrod, S. (1987). Sexual violence in the mass media: Social psychological implications. P. Shaver & C. Hendrick (Eds.), *Research in Personality and Social Psychology (Vol. 7)*. Beverly Hills, CA.: Sage.

Linz, D., Penrod, S., & Donnerstein, E. (1986). Issues bearing on the legal regulation of violent and sexually violent media. *Journal of Social Issues, 42*, 171-193.

Cutler, B. L., Penrod, S. D., O'Rourke, T. E., & Martens, T. K. (1986). Unconfounding the effects of contextual cues on eyewitness identification accuracy. *Social Behavior*, 1, 113-134.

Heuer, L. & Penrod, S. (1986). Procedural preference as a function of conflict intensity. *Journal of Personality and Social Psychology*, 51, 700-710.

Shapiro, P. & Penrod, S. (1986). A meta-analysis of facial identification studies. *Psychological Bulletin*, 100, 139-156. http://dx.doi.org/10.1037//0033-2909.100.2.139

Tanford, S. & Penrod, S. (1986). Jury deliberations: Discussion content and influence processes in jury decision making. *Journal of Applied Social Psychology*, 16, 322-347.

Linz, D., Penrod, S., & McDonald, E. (1986). Attorney communications in the courtroom: Views from and off the bench. *Law and Human Behavior*, 10, 281-302.

Penrod, S. (1986). *Social psychology*. 2nd Ed. New York: Prentice- Hall.

Pavitt, C. & Penrod, S. (1986). A test of two implicit assumptions of algebraic modeling: Salience and familiarity effects in affective evaluations of national leaders. *Journal of Social Psychology*, 126, 291-304.

Penrod, S. (1985). The growth of social science in the law. *Contemporary Psychology*, 30, 959-960.

Donnerstein, E., Linz, D., & Penrod, S. (1985). Massive exposure to media violence and desensitization. *Aggressive Behavior*, 11, 161 (abstract).

Tanford, S., Penrod, S., & Collins, R. (1985). Decisionmaking in joined criminal trials: The influence of charge similarity, evidence similarity, and limiting instructions. *Law and Human Behavior*, 9, 319-337.

Krafka, C., & Penrod, S. (1985). Reinstatement of context in a field experiment on eyewitness identification. *Journal of Personality and Social Psychology*, 49, 58-69.

Penrod, S., & Linz, D. (1985). Voir dire: Its uses and abuses. In M. Kaplan, (Ed.), *The impact of social psychology on procedural justice*. Springfield, IL: C. C. Thomas.

Tanford, S., & Penrod S. (1984). Social Influence Model: A formal integration of research on majority and minority influence processes. *Psychological Bulletin*, 95, 189-225.

Tanford, S., & Penrod, S. (1984). Social inference processes in juror judgments of multiple-offense trials. *Journal of Personality and Social Psychology*, 47, 749-765.

Linz, D., & Penrod, S. (1984). Increasing attorney persuasiveness in the courtroom. *Law and Psychology Review*, 8, 1-47.

Linz, D., Donnerstein, E., & Penrod, S. (1984). The effects of long-term exposure to filmed violence against women. *Journal of*

*Communication*, 34, 130-147. Reprinted in *Media in Society: Readings in Mass Communication*, Deming & Becker (Eds.), 1988.

Penrod, S., & Linz, D. (1984). Using psychological research on violent pornography to inform legal change. In N. Malamuth & E. Donnerstein (Eds.), *Pornography and sexual aggression*. New York: Academic Press.

Penrod, S., Coates, D., Linz, D., Herzberg, S. Atkinson, M., & Heuer, L. (1984). The implications of social science research for trial practice attorneys. In D. J. Muller, D. G. Blackman, & A. J. Chapman (Eds.), *Perspectives in psychology and law*. London: Wiley.

Linz, D., Turner, C., Hesse, B., & Penrod, S. (1984). Using psychological research on violent pornography in civil litigation. In N. Malamuth & Donnerstein (Eds.), *Pornography and sexual aggression*. New York: Academic Press.

Penrod, S., & Borgida, E. (1983). Legal rules and lay inference. In L. Wheeler (Ed.), *Review of personality and social psychology (Vol. 4)*. Beverly Hills, CA: Sage.

Tanford, S., & Penrod, S. (1983). Computer modeling of influence in the jury: The role of the consistent juror. *Social Psychology Quarterly*, 46, 200-212.

Hastie, R., Penrod, S., & Pennington, N. (1983). *Inside the jury*. Cambridge MA: Harvard University Press.

Penrod, S. (1983). Jury decision making models. In H. H. Blumberg, P. Hare, V. Kent, & M. Davies (Eds.), *Small groups and social interaction (Vol. 2)*. Chichester, England: Wiley.

Hastie, R., Penrod, S., & Pennington, N. (1983). What goes on in a jury deliberation. *American Bar Association Journal*, 69, 1848-1853.

Penrod, S. (1983). *Social psychology*. New York: Prentice-Hall.

Tanford, S., & Penrod, S. (1982). Biases in trials involving defendants charged with multiple offenses. *Journal of Applied Social Psychology*, 12, 453-470.

Penrod, S.D., Donnerstein, E., & Linz, D. (1982). Scientific research on pornography and violence: implications for American law. *Bulletin of the British Psychological Society*, 35, 100 (abstract).

Penrod, S., Loftus, E. F., & Winkler, J. (1982). The reliability of eyewitness testimony: A psychological perspective. In N. Kerr & R. Bray (Eds.), *The psychology of the courtroom*. New York: Academic Press.

Coates, D., & Penrod, S. (1981-82). The social psychology of dispute resolution. *Law and Society Review*, 15, 701-726.

Penrod, S., & Hastie, R. (1980). A computer simulation of jury decision making. *Psychological Review*, 87, 133-159.

Penrod, S., & Hastie, R. (1979). Models of jury decision-making: A critical review. *Psychological Bulletin*, 86, 462-492.

## RESEARCH AND PROGRAM GRANTS

National Science Foundation. Disclosure in Plea Bargaining ($227,000, under review 08/17).

National Science Foundation. The Accuracy of High-Confidence Witness Judgments: The Impact of Lineup Bias, Memory Quality and Willingness to Choose ($114,000, under review 08/17).

National Science Foundation. Building Tools for Assessing the State of Eyewitness Science ($237,000, under review 08/17).

National Science Foundation. Trial Shadows: The Effects of Jury Instructions on Plea Bargaining ($125,000, under review 08/17).

National Science Foundation. A test of deservingness versus group values for a theory of procedural justice ($38,000, under review 08/17). With Larry Heuer.

National Science Foundation. The responsibility of judges to assure due process: Tension among neutrality, rights protection, and role ($193,796, 07/15-06/17). With Larry Heuer.

National Science Foundation. Issue-Specific Jury Instructions. ($194,262, 09/12-08/15).

National Science Foundation. Factors influencing plea bargaining decisions by prosecutors and defense attorneys. ($93,200, 09/09-08/11).

National Science Foundation. Understanding the Impact on Juries Of Defense Responses To Victim Impact Statements. ($245,813—8/08-6/11).

National Science Foundation, Field and Lab Studies of the Effects of Pretrial Publicity on Jurors' Trial Judgments. ($275,000, 8/1/06-7/31/09).

National Science Foundation, Eyewitness Guessing and Accuracy: Subjective Experience and Objective Determinants ($212,836, 9/1/2004-8/31/07) With Lisette Garcia.

National Science Foundation, Reducing Eyewitness Identification Errors: Procedural Strategies, ($298,398, 7/15/03-1/15/06).

National Science Foundation, Risk Management and Juries: How Jurors React to Cost-Benefit Analyses. ($260,000, 2/02-2/05). With Kevin O'Neil.

National Science Foundation, Meta-Analysis of Facial Identification Research: A Reappraisal ($140,669, 5/01-4/03). With Brian Bornstein.

National Science Foundation, A Continuing Empirical Analysis of the Admissibility of Expert Testimony: Investigating the Effects of *Kumho Tire v. Carmichael*. ($102,307, 01/15/00 - 09/15/02).

CUNY Research Foundation, Sequential vs. Serial Lineup Identification Procedures. ($4800, 03/01/2002-06/30/2003)

National Science Foundation, How Expert Are Factfinders? Evaluating the Reliability of Interviews in Child Sexual Abuse Cases ($77,309, 09/01/99 - 05/31/01). With Nancy Walker.

National Institute of Mental Health, Training Grant in Mental Health Policy and Research ($620,000, 7/1/99-6/30/01).

National Science Foundation, The Death Equation: Decisionmaking in Death Penalty Cases ($172,021, Aug 1998-Feb 2001).

National Science Foundation, A Scientific Examination of the Admissibility of Scientific Expert Testimony Under *Daubert v. Merrell Dow Pharmaceuticals*. ($78,000, Sept 1997-March 1999).

Hewlett Foundation, *Center for Conflict and Change*, ($125,000, July 1994-June 1996).

National Science Foundation, *Meta-Analysis of Jury Decisionmaking Studies*, ($65,456, August 1993-March 1996).

Hewlett Foundation, *Center for Conflict and Change*, ($200,000, November 1991-October 1993).

National Science Foundation (with Eugene Borgida), *Cameras in the Courtroom: A Field Experiment* ($150,000, July 1990-June 1992).

State Justice Institute (with American Judicature Society and Larry Heuer), *Assessing the Impact of Juror Notetaking and Question- asking on Juror Performance: A National Experiment* ($111,201, November 1988-May 1990).

National Science Foundation (with Daniel Linz), *Pretrial Mass Media Exposure and Jury Decisionmaking* ($135,000, July 1988-March 1991).

National Institute of Mental Health (with Daniel Linz and Edward Donnerstein), *Sexual Violence in the Media: Mental Health Implications* ($350,824, July 1986-July 1989).

National Science Foundation, *Assessing and Calibrating Juror Sensitivity to Eyewitness Evidence* ($131,290, Sept 1984-Feb 1988)

National Institute of Justice, *Improving Eyewitness Performance* ($119,767, March 1984-September 1986).

National Science Foundation (with Edward Donnerstein). *Effects of Long-term Exposure to Sexually Violent Images*. ($202,503, June 1983-May 1986).

National Institute of Justice, *Guidelines for Joinder in Criminal Cases* ($117,000, September 1981-January 1984).

National Institute of Health, *Social Cognition and Patient-Physician Communication* ($98,003, January 1981-July 1983).

National Science Foundation (Joint Funding from Law & Social Sciences & Social and Developmental) *Empirically Based Models of Juror and Jury Decision Making*. ($76,549, January 1981-December 1983).

National Institute of Justice, 1981-1982, (with Dan Coates). *The Implications of Social Science Research for Criminal Trial Advocacy* ($203,045, January 1981-July 1983).

National Institute of Justice, *Validation of a Measure of Assaultive Risk*. Principal Investigator/Advisor on Dissertation Research by Marlowe Embree. ($10,500, 1981-1982).

National Science Foundation, *Evidence in Civil Commitment Cases*. Faculty Advisor on Student Originated Study with Terri Finesmith. ($5,828, Summer 1981).

University of Nebraska Visiting Scholar Grant (John Michon). 1996. $795.

University of Minnesota Graduate School, 1991-1992, *External Validity of Jury Research*, ($9,056).

University of Minnesota Graduate School, 1990-1991, *Juror Decisions in Joined Trials*, ($10,000).

University of Minnesota Graduate School, 1989-1990, *Legal Decisionmaking*, ($10,000).

University of Wisconsin Alumni Research Fund, 1986-1987, *Legal Decisionmaking* ($2,730).

University of Wisconsin Alumni Research Fund, 1984-1985, *Modeling Social Influence Processes*. ($7,959).

University of Wisconsin Bio-Medical Research Fund, 1984-1985, *Physiological Desensitization from Exposure to Media Violence*. ($5,000).

University of Wisconsin Alumni Research Fund, 1983-1984, *Effects of Exposure to Sexually Violent Images*. ($2,600).

University of Wisconsin Bio-Medical Research Fund, 1983-1984, *An Inoculation Procedure for Exposure to Violent Media Portrayals*. ($2,600).

University of Wisconsin Alumni Research Fund, 1982-1983, *Eyewitness Reliability: Closing the Generalization Gap*. ($5,922).

University of Wisconsin Alumni Research Fund, 1981-1982, *Script- Based Inferencing and Decision Making*. ($10,229).

University of Wisconsin Alumni Research Fund, 1980-1981, *Models of Jury Decision Making*. ($5,964).

University of Wisconsin Bio-Medical Research Fund, 1980-1981, *Social Cognition and Patient-Physician Communication*. ($7,300).

University of Wisconsin Bio-Medical Research Fund, 1979-1980, *Cognitive Models of Symptoms and Diseases*. ($5,000).

Wisconsin Graduate Research Committee, General Research Support, 1979-1980.

National Science Foundation (Law & Social Sciences) Dissertation Research Award 1979, *Evaluation of Traditional and 'Scientific' Jury Selection Methods*. ($5,790).

## CONFERENCE PRESENTATIONS (2005-present )

Modjadidi, K., Khogali, M., & Penrod, S. D. (March 2017) Evaluating the Effect of Eyewitness Aids on Laypersons Through a Plea-Bargain Paradigm. American Psychology-Law Society, Seattle.

Rodriguez, D. Hanson, M., Berry, M., Rhead, L. Lawson, V.Z. & Penrod, S.D. (March 2017). Undisclosed and Disclosed Backloading in Sequential, Simultaneous, and Modified Simultaneous Lineups. . American Psychology-Law Society, Seattle.

Lee, J., Khogali, M., Band, S. & Penrod, S. D. (March 2017). The Effect of Own-Race and Interracial Crimes on People's Judgments in Criminal Cases. American Psychology-Law Society, Seattle.

Jones, A., Heuer, L. B. & Penrod, S.D. (March 2017). Does Good (Bad) Behavior Deserve Good (Bad) Treatment? A Test of the Justice Matching Hypothesis. American Psychology-Law Society, Seattle.

Modjadidi, K., Khogali, M., & Penrod, S. D. (July 2016). Jury aids in plea-bargaining: Are attorneys sensitive to eyewitness evidence with aid when making plea-bargaining decisions? European Assn of Psychology and Law, Toulouse.

Jones, A., Heuer, L. & Penrod, S. D. (July 2016). The responsibility of judges to assure due process: Assessing antecedents of procedural and distributive justice in New York City Housing Court. European Assn of Psychology and Law, Toulouse.

Penrod, S. (July 2016). Wagenaar Symposium - Face recognition in forensic settings—chair. European Assn of Psychology and Law, Toulouse.

Bergold, A. & Penrod, S. D. (March 2016). Can Closing Arguments Help Jurors' Evaluate Eyewitness Evidence? American Psychology-Law Society, Atlanta.

Penrod, S. & Smith, A. (August 2015). Memory Quality, Guessing and Bias in Lineups: Their Intersecting Influences on Eyewitness Performance. European Assn of Psychology and Law, Nuremberg.

Jones, A.M., & Penrod, S. (May 2015). Jurors' compliance and Henderson style judicial instructions influence evaluations of confession evidence. Association for Psychological Science, New York, New York.

Jones, A. Y., Bergold, A., Berman, M. & Penrod, S. (March 2015)

Sensitizing Jurors to Factors Influencing the Accuracy of Eyewitness Identification: Assessing the Effectiveness of the Henderson Instructions. American Psychology-Law Society, San Diego.

Berman, M. & Penrod, S. (March 2015) The Roles of Evidence Evaluation and Case-Specific Judicial Instructions in Eyewitness Identification Cases. American Psychology-Law Society, San Diego.

Sivasubramaniam, D., Heuer, L., Penrod, S. & Davies, L. (March 2015) "Acting Fairly": Do Instructions to Engage in Procedural Justice Prompt Distributive Justice?  American Psychology-Law Society, San Diego.

Yarbrough, A., & Penrod, S. (2014, March). Can expert testimony sensitize jurors to the coerciveness of interrogation tactics? American Psychology-Law Society, New Orleans.

Nicholson, A.S., Yarbrough, A., Berman, M., Hui, C., & Penrod, S. (2014, March). Helping jurors understand eyewitness identifications: Deliberations and judicial instructions. American Psychology-Law Society, New Orleans.

Berman, M., Yarbrough, A., Nicholson, A.S., Hui, C., & Penrod, S. (2014, March). Do issue-specific judicial instructions sensitize jurors to eyewitness identification accuracy? American Psychology-Law Society, New Orleans.

Hui, C., Yarbrough, A., Berman, M., Nicholson, A.S., & Penrod, S. (2014, March). Intuitive or informed decision makers? The impact of probative value of evidence on coherence-based reasoning in juror decision making. American Psychology-Law Society, New Orleans.

Penrod, S. (Dec 2013).  National Academy of Sciences Committee on Scientific Approaches to Understanding and Maximizing the Validity and Reliability of Eyewitness Identification in Law Enforcement and the Court.

Daftary-Kapur, T. & Penrod, S. (September 2013). Assessing the impact of research on the formation of a scientific consensus concerning eyewitness research findings: A longitudinal analysis. EAPL, Coventry.

Berman, M., Nicholson, A., Yarbrough, A., Hui, C., & Penrod, S. (June 2013). Issue-specific judicial instructions and expert testimony in eyewitness cases. Society for Applied Research in Memory and Cognition, Rotterdam, the Netherlands.

Hans, V., Ivkovich, S., Fukurai, H., Jaihyun, J., & Penrod, S. (Mar 2013).  Global Perspectives on Lay Participation in Legal Decisions. APLS, Portland, OR.

Daftary-Kapur, T., Tallon, J. A. & Penrod, S. (Mar 2013). Influence of pre-trial publicity on verdicts in a trial simulation: Issues of generalizability and type.  APLS, Portland, OR.

Berman, M. K. & Penrod, S. (Mar 2013). Mistaken eyewitness identification: A meta-analytic review of the efficacy of the judicial instruction safeguard.  APLS, Portland, OR.

Tallon, J. A., Daftary-Kapur, T. & Penrod, S. (Mar 2013). Remorse and PTP in capital trials: Is seeing truly believing?  APLS, Portland, OR.

Penrod, S. & Heuer, L. B. (December 2012). American Courts on Eyewitness Research. International Investigative Psychology. London.

Daftary-Kapur, T. & Penrod, S. (November 2012). An examination of the effects of post-venire publicity on juror decision-making. ASC, Chicago.

Yarbrough, A., Nicholson, A., & Penrod, S. (2012, June).

Significant eyewitness cases and the shifting focus of the courts. Paper presentation at the Tenth Biennial International Conference, New York, NY.

Beaudry, J, Crocker, C. O. & Penrod, S. D. (March 2012). Prosecutor and Defense Attorneys' Perceptions of Video-Recorded Eyewitness Identifications.   APLS, San Juan.

Penrod, S.  (March 2012).  Bringing Eyewitness Science to the Courts.  APLS, San Juan.

Penrod, S. (March 2012).  Panel Chair: Lineup Administration: Challenges and Reforms.  APLS, San Juan.

Tallon, J. A., Daftary-Kapur, T., Groscup, J., & Penrod, S. (March 2012). Examining Individual Differences in Jurors' Use of Affectively Laden Evidence. APLS, San Juan.

Vredeveldt, A. & Penrod, S. (March 2012). Eye-closure improves free recall of a live event: Context versus distraction. APLS, San Juan.

Tallon, J., Daftary-Kapur, T., Monier, A., Rhead, L., Loughlin, M., Yip, J., Groscup, J, & Penrod, S. (March 2011). Understanding potential defendant responses to victim impact statements. AP-LS, Miami.

Rhead, L. M., Daftary-Kapur, T. & Penrod, S. (March 2011). The effects of pretrial publicity on jurors' story construction in a civil case. AP-LS, Miami, FL.

Crocker, C. & Penrod , S. (March 2011). The influence of eyewitness identification factors and legal factors on attorneys' plea bargaining decisions. AP-LS, Miami, FL.

Dumas, R., Dysart, J. Py J. & Penrod, S. (March 2011). Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression. AP-LS, Miami, FL.

Wallace, B. & Penrod, S. (June 2010). Guessing, bias, and reliability in lineups. EAPL, Goteborg, Sweden.

Tallon, J.; Daftary-Kapur, T., Lindsey Rhead, L.; Jon Carbone, J.; Groscup, J.,; & Penrod, S. (March 2010). Underlying Affective Processes in Mock Jurors' Use of Victim Impact Statements. AP-LS, Vancouver.

Rhead, L.; D'Antuono, D., Daftary-Kapur, T., Tallon, J. A.,Penrod, S. (March 2010). The Death Penalty Attitudes Scale as a Moderator of Pre-trial Publicity. AP-LS, Vancouver.

Penrod, S. D. & Wallace, D. B (Nov 2009). Calculated guessing by eyewitnesses: Are those really correct IDs? Claremont Conference on Empirical Legal Studies, CA.

Daftary-Kapur, T., Tallon, J. A.,Penrod, S. (Sept 2009). Assessing the Impact of New Research on the  Formation of a Scientific Consensus Concerning Eyewitness Research Findings. EAPL, Sorrento, Italy.

Kim, M & Penrod, S. (May 2009).  A Comparison of an Adversarial and an Inquisitorial Trial in South Korea: Judges vs. Juries.  Law and Society, Denver.

Kim, M & Penrod, S. (May 2009).  A Comparison of Legal Decisions between American and Korean Mock Jurors in an Adversarial and an Inquisitorial Trial.  Law and Society, Denver.

Penrod, S. (March, 2009). Discussant: Plenary: Psychological Perspectives on Wrongful Conviction.  AP-LS, San Antonio.

Kapur, T. D., Wallace, B., & Penrod, S. (March, 2009). The Influence of Pretrial Publicity: Field vs. Laboratory Effects. AP-LS, San Antonio.

Rhead, L. M., Andiloro, N. R., Carbone, J.m Kapur, T. D., &

Penrod, S. (March, 2009). What Are They Saying?: The Effects of Pretrial Publicity on Jurors' Story and Jury Deliberations. AP-LS, San Antonio.

Alberts, W., Penrod, S., Wallace, B. & Duncan, J. (July 2008). Steering Witnesses in an Identification Procedure. EAPL, Maastrict.

Daftary-Kapur, T., Smith, K., Rhead, L., &S. Penrod, S. (July 2008). The influence of pre-trial publicity on juror decision making in a product liability case. EAPL, Maastrict.

Penrod, S. (March 2008). Issues and Advice for Expert Witnesses and Eyewitness Identification Researchers. AP-LS, Jacksonville, FL.

Smith, K. & Penrod, S. (March 2008). Field Survey of Juror Misconduct. AP-LS, Jacksonville, FL.

Hoy, C., Donovan, M., Daftary, T. & Penrod, S. (March 2008). The Influence of Pre-Trial Publicity and Legal Authoritarianism on Juror Decision Making. AP-LS, Jacksonville, FL.

Daftary, T, Smith, K. & Penrod, S. (March 2008). Influence of Predecisional Distortion and Bias on Juror Decision Making. AP-LS, Jacksonville, FL.

Penrod, S. (July 2007). Discussant on Symposium: Issues with Sequential and Simultaneous Lineups. SARMAC, Lewistown, ME.

Smith, K., Rhead, L., & Penrod, S. (May 2007). Effect of Extrinsic Evidence on Jurors' Judgments. APS, Washington D.C.

Pekhman, Y., Smith, K., Rhead, L., Cassandra, H., & Penrod, S. (May 2007). Are jurors' story construction influenced by pretrial publicity? APS, Washington D.C.

Penrod, S., Wells, G. & Memon, A. (May 2007). Eyewitness Evidence: Improving Its Probative Value. APS, Washington D.C.

Daftary, T., Smith, K., Rhead, L., & Penrod, S. (March 2007). The influence of pre-trial publicity and participant gender on defendant guilt judgments in a rape case mediated by rape empathy. Eastern Psychological Association, Philadelphia, PA.

Penrod, S. & Sporer. S. (March 2007). What Do Recent Meta-analyses Tell Us about Eyewitness Accuracy and Deception. . Off the Witness Stand, New York, New York.

Wallace, D. B., Garcia, L. & Penrod, S. (March 2007). The Effect of a Biased Lineup Re-examination and Lineup Size Using Alternate Instructions. Off the Witness Stand, New York, New York.

Penrod, S. (March 2007).Symposium Chair: Symposium: One Hundred Years of Eyewitness Testimony Research. Off the Witness Stand, New York, New York.

Smith, K., Daftary, T., Penrod, S. (March 2007). The influence of pretrial publicity and story construction on jurors' perception of defendants guilt pre- and post-trial mediated by attitudes. Paper presentation, Off the Witness Stand, New York, New York.

Penrod, S. (July 2006). Modeling eyewitness guessing. IAAP, Athens.

Penrod, S. (July 2006). Eyewitness reliability: The state of the science and its status in the law. IAAP, Athens.

Kim, M, Park, K. & Penrod, S. (July, 2006) Lay Participation in South Korea: The Content Analysis of Jury Deliberations. Law and Society, Baltimore, MD.

Penrod, S. (June 2006). Eyewitness and Calculated Guessing. European Association of Psychology and Law. Liverpool, UK.

DiGiovanni, L., Garcia, L. & Penrod, S. (May 2006). The Remember-Know-Guess Paradigm: Understanding the Effects of Race on Eyewitness. APS, NY, NY.

Penrod, S. (March 2006). Eyewitness Choosing and Guessing. AP-LS, St. Petersburg, FL.

Shlosberg, A., Garcia, L. & Penrod, S. (March 2006). Misinformation Effect Revisited Using RKG Judgments. AP-LS, St. Petersburg, FL.

Bostaph, R., Garcia, L. & Penrod, S. (March 2006). The Effects of Exposure Time, Type of Exposure, and Change in Appearance on the Remember, Know, Guess Paradigm. AP-LS, St. Petersburg, FL.

Garcia, L., Robertson, R., & Penrod, S. (March 2006). The Effects Of Lineup Size and Serial position under Alternative Lineup Instructions.

Penrod, S. (March 2006). Chair: Paper Session: Eyewitnesses. AP-LS, St. Petersburg, FL. AP-LS, St. Petersburg, FL.

Kim, M. Penrod, S..Park, K.-B. (March 2006). Chair Deliberation Content Analysis of Juries and Lay Participants in the South Korean Legal Context. AP-LS, St. Petersburg, FL.

Smith, K., Garcia, L. & Penrod, S. (March 2006). Rate of Lineup Identification Guessing and RKG Sensitivity to Bias., AP-LS, St. Petersburg, FL.

Chrzanowski, L., McAuliff, B. D., Steblay, N. & Penrod, S. (March 2006). Mediational effects of pretrial publicity on jurors' judgments of defendant. AP-LS, St. Petersburg, FL.

Chrzanowski, L., Solomonson, J., McAuliff, B. D., & Penrod, S. (March 2006). Pretrial Judgments of Defendant Guilt: Integrating Content Analysis with Case Survey Methodologies. AP-LS, St. Petersburg, FL.

Hyman, A., Garcia, L.. & Penrod, S. (March 2006). Eyewitness Misidentification and Unconscious Transference: Fact or Fiction? AP-LS, St. Petersburg, FL.

Penrod, S., Garcia, L. & Robertson, R. (July 2005). Assessing the Impact of Eyewitness Guessing and Lineup Bias on Eyewitness Performance. 29th International Congress on Law and Mental Health, Paris

Penrod, S., Garcia, L. & Robertson, R. (June 2005). Assessing the Impact of Verbal Instructions and Simultaneous versus Sequential Lineups on Cross-Ethnic Eyewitness Identifications. XVth European Conference on Psychology and Law. Vilnius.

Penrod, S., Bornstein, B., Deffenbacher, K., McGorty, K. & Adya, M. (June 2005). Meta-Analyses of the Effects of Estimator and System Variables in 469 Eyewitness and Facial Recognition Studies. XVth European Conference on Psychology and Law. Vilnius.

McGorty, E. K., Bornstein, B. & Penrod, S. (Mar 2005). The Effect of Cognitive Processing on Facial Identification Accuracy: A Meta-analysis. American Psychology-Law Society, La Jolla, CA.

Penrod, S. D,. Bornstein, B. ,McGorty, E. K., & Adya M. (Mar 2005). Determinants of Identification Accuracy in 469 Eyewitness and Facial Recognition Studies. American Psychology-Law Society, La Jolla, CA.

Chrzanowski, L., Groscup, J., Penrod, S., Giresi, S. Schwartz, S., & Solomonson, J. (Mar 2005). Ultimate Issue Testimony and Its Relationship to Juror Inferences and Information Processing in Forensic Cases. American Psychology-Law Society, La Jolla, CA.

9

**MAJOR DEPARTMENTAL AND UNIVERSITY COMMITTEES**

John Jay-CUNY:
Organizing CUNY Internal Grants for Psychology 2010-2013
CUNY Doctoral Faculty Policy Committee 2007-
CUNY Faculty Senate Legal Affairs Committee 2007-2010
Director of Forensic Psychology PhD program 2007-2008
CUNY Faculty Advisory Committee for Research Foundation—
    2003-  (Chair 2003-2005)
RFCUNY Board of Directors 2002-2006 2015-
Department Personnel and Budget 2005-2006
Faculty/Staff Resource Comm for New John Jay Building 2003
MacNamara Award Committee 2002-2003
Presidential Research Award Committee 2002-2003
Justice Scholarship Committee 2002-2004
Law- Psychology Admissions Committee 2004-
Criminal Justice Graduate Admissions/Financial Aid/Graduate
    Council 2002-2015.


**TEACHING**

2001-17 (CUNY): Rotation of Jury Decisionmaking; Eyewitness
Reliability; Experimental Psychology and Law; Graduate
Research Methods; Media, Psychology and Law

1995-01 (Nebraska): Law and Behavioral Sciences, Jury
Decisionmaking, Amicus Brief Writing; Juries, Alternative Dispute
Resolution, Law and Psychology, Grantwriting, Meta-analysis

1988-95 (Minnesota): Social Science and Law, Alternative Dispute
Resolution, Negotiation Skills, Conflict Management, Social
Psychology Graduate Pro-Seminar, Social Psychology Graduate
Pro-Seminar, Methods of Meta- Analysis, Moot Court Supervision,
Graduate Research Methods (Political Science Department),
Social Science and Law, Psychology and Law (Psychology
Department).

1979-1988 (Wisconsin): Research Methods in Social Psychology,
Psychology and Law, Graduate Research Methods in Social
Psychology, Social Psychology, Social Science and Law, Expert
Witness Seminar, Evidence (University of Wisconsin Law School),
Social Cognition, Introductory Psychology.

**Ph.D. STUDENTS**

Marlee Berman (2015)
Angela Yarbrough Jones (2015)
Min Kim (2009)
Tarika Daftary-Kapur (2009—with Maureen O'Connor) APA
    Division 41 Dissertation Prize and Cattell Dissertation award
Jennifer Tallon (2009--with Jennifer Groscup)
Kelloir Smith (2008)
Lisa Chrzanowski (2005—with Jennifer Groscup) APA Division 41
    Dissertation Prize (2nd)
Jennifer Groscup (2002)-- APA Division 41 Dissertation Prize
Aletha Claussen-Schulz (2002)
Sena Garven (2002)
Kerri Dunn (2002)
Kevin O'Neil (2002)
Robert Ray (2001)
Marc Patry (2001)
Peter Le (1999)
Dennis Stolle (1998)—APA Division 41 Dissertation Prize (3rd)
Amy Otto (1994)
Brian Cutler (1987)--APA Division 41 Dissertation Prize
Larry Heuer (1986)--APA Division 9 (SPSSI) Dissertation Prize
Carol Krafka (1985)--APA Division 41 Dissertation Prize (2nd)
Daniel Linz (1984)--APA Division 41 Dissertation Prize and APA
    Division 9 (SPSSI) Dissertation Prize;
Sarah Tanford (1983)--APA Division 41 Dissertation Prize

Marlowe Embree (1982)

**POST-DOCTORAL ADVISEES**
Yuhwa Han (2013-2014)
Rafaele Dumas (2007-2009)
Diane Sivasubramaniam (2005-2007)
Maria Hartwig (2005-2006)
Lissette Garcia (2003-2005)
Brad McAuliff, PhD (2000-02)—Cal St Northridge
Brian Bornstein, PhD (2000-02) –U of Nebraska
Greg Page, PhD (2000-02) (with Mario Scalora)—U of Pittsburgh-
    Bradford
Debra Lynn Kaplan, PhD (1999-01)—Arizona State
Theresa Doyon, PhD (1998- 2000) – Hewlett-Packard
Nancy Walker, PhD (1998-99) –Michigan State
Jennifer Devenport, PhD (1996-98) –Western Washington
Tom Hafemeister, JD , PhD ( 1996-98) –U of Virginia
Kwang Park, PhD (1995-96) (with Alan Tomkins)—Chungbuk
    National U–Korea
Maithilee Pathak, PhD (1995-97) (with Alan Tomkins)--Consulting
Christina Studebaker, PhD (1995-98) – Chicago School of
Professional Psychology


**MEMBERSHIPS**

Association for Psychological Science--Fellow
American Psychology-Law Society (Newsletter Ed. 1984-87--
    Secy/Treas. 1987-1990, President 2000-2001)
American Sociological Association
European Association of Psychology and Law
International Association for Applied Psychology
Law & Society Association
Psychonomic Society
International Association of Conflict Management
Society of Experimental Social Psychology
Society for Applied Research in Memory and Cognition
Society for the Psychological Study of Social Issues (Fellow)
    Kidder Award Committee (2000-2002)


**EDITORIAL BOARD/EXTERNAL POSITIONS**

APA Committee on Legal Issues 1999-2000
Applied Cognitive Psychology 1997-2004
Basic and Applied Social Psychology 1998-2002
Forensic Reports 1988-1992
Journal of Criminal Law and Criminology 1991-1994
Journal of Forensic Psychology Practice 2001-
Journal of Personality and Social Psychology 1990-1996
Law and Human Behavior (APA Div. 41 Publication) 1985-2006
Law, Probability and Risk 2000-
Legal and Criminological Psychology 1994-
Psychology, Crime, and Law [receiving editor] 1992-2006
Psychology, Public Policy and Law [editor-2007-2008]
Social Behaviour: Int'l J. of Applied Social Psych 1987- 1991
Social Justice Research 2004-
SSRN Law and Psychology Journal 2006-


**REVIEWING**

American Bar Foundation Research Journal
American Journal of Psychology
American Judicature Society
American Psychologist
APA Annual Meetings
APA Newman Awards
AP-LS Meetings

Applied Cognitive Psychology
Basic and Applied Social Psychology
European Journal of Social Psychology
Forensic Reports
Health Psychology
Journal of Applied Psychology
Journal of Applied Social Psychology
Journal of Criminal Law and Criminology
Journal of Experimental Psychology: Applied
Journal of Personality
Journal of Personality & Social Psychology
Journal of Research in Personality
Journal of Social Issues
Law and Human Behavior
Law and Policy

Law & Society Review
Legal and Criminological Psychology
MPA Meetings
National Institute of Justice--Study Section and external reviewer
National Institute of Mental Health—internal/external reviewer
National Science Foundation
Personality & Social Psychology Bulletin
Psychological Bulletin
Psychology, Crime, and Law
Psychology, Public Policy and Law
Social Behaviour
Social Psychology Quarterly
SSRN Law and Psychology Journal
NSF Panel External Reviews: Measurement Methods, Political Science, Law and Social Sciences, Social Developmental