## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 2738 |
| *This Document Relates To All Cases* | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

BACKGROUND ................................................................................................4

I.    RELEVANT CORPORATE HISTORY ............................................................4

ARGUMENT ...................................................................................................7

I.    THE COURT SHOULD DENY LEAVE TO ADD HOLDCO,
JANSSEN AND KENVUE AS FUTILE. ................................................................8

    A.    Choice Of Law ...........................................................................................9

    B.    Holdco Did Not Inherit Any Talc Liability From Old JJCI........................11

    C.    If Holdco Had Inherited Any Liability, It Would Not Have Passed
That Liability To Janssen Or Kenvue. ................................................................15

        1.    Neither Janssen Nor Kenvue Can Be Found Liable Under The
Product-Line Exception. ...................................................................................15

        2.    Neither Janssen Nor Kenvue Can Be Held Liable Under The
Mere-Continuity Exception. ..............................................................................22

II.    THE COURT SHOULD DENY LEAVE TO ADD SPOLIATION
CLAIMS AS UNTIMELY AND FUTILE.............................................................29

III.    THE COURT SHOULD DENY LEAVE TO ADD CLAIMS FOR
ASSUMPTION OF DUTY, AIDING AND ABETTING AND ACTING IN
CONCERT AS UNTIMELY AND FUTILE. .........................................................30

    A.    All Three Proposed Claims Are Untimely. .................................................31

    B.    Amendment To Add Claims For Assumption Of Duty And Acting In
Concert Would Be Futile. ...................................................................................33

        1.    Assumption Of Duty .................................................................................33

        2.    Acting In Concert Claims..........................................................................35

CONCLUSION ................................................................................................37

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### FEDERAL CASES

*Action Nissan, Inc. v. Hyundai Motor America*,
    No. 6:18-cv-380-Orl-78EJK, 2020 WL 7419669
    (M.D. Fla. Nov. 5, 2020) ...................................................................................9

*Anderson v. General Motors Corp.*,
    No. 03-275 JJF, 2004 U.S. Dist. LEXIS 5430 (D. Del. Mar. 29, 2004) .........7

*Argueta-Orellana v. Attorney General*,
    35 F.4th 144 (3d Cir. 2022) .............................................................................12

*In re Asbestos School Litigation*,
    46 F.3d 1284 (3d Cir. 1994) ............................................................................36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................3

*Atwell v. DJO, Inc.*,
    803 F. Supp. 2d 369 (E.D.N.C. 2011) ..........................................................25

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................3, 26

*City of Huntington Park v. Landscape Structures*,
    No. EDCV 14-00419-VAP (DTBx), 2015 WL 3948411
    (C.D. Cal. June 27, 2015) .......................................................................17, 20

*CMR D.N. Corp. v. City of Philadelphia*,
    703 F.3d 612 (3d Cir. 2013) ............................................................................31

*Dickens v. A-1 Auto Parts & Repair Inc.*,
    No. 1:18CV162-LG-JCG, 2020 WL 6265078
    (S.D. Miss. Oct. 23, 2020) ..............................................................................19

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)..................................................................................35

*Elmer v. Tenneco Resins, Inc.*,
    698 F. Supp. 535 (D. Del. 1988) ......................................................9, 23, 29

*FDIC v. Parzygnat*,
    No. 10 C 7038, 2011 WL 3704731 (N.D. Ill. Aug. 23, 2011) .....................33

*Forrest v. Beloit Corp.*,
    278 F. Supp. 2d 471 (E.D. Pa. 2003).........................................................9, 15

*Fraser v. Nationwide Mutual Insurance Co.*,
    352 F.3d 107 (3d Cir. 2003) ..........................................................................7

*In re General Motors LLC Ignition Switch Litigation*,
    No. 14-MD-2543 (JMF), 2017 WL 3382071
    (S.D.N.Y. Aug. 3, 2017)..........................................................................23, 24

*In re G-I Holdings, Inc.*,
    No. 02-3626 (SRC), 2008 WL 11513187 (D.N.J. May 30, 2008)...............19

*IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*,
    No. 07-1076 (GEB), 2009 WL 5205968 (D.N.J. Dec. 28, 2009) ...........22, 23

*Katzir's Floor & Home Design, Inc. v. M-MLS.com*,
    394 F.3d 1143 (9th Cir. 2004) ...............................................................14, 25

*Leo v. Kerr-McGee Chemical Corp.*,
    37 F.3d 96 (3d Cir. 1994) ...............................................................16, 17, 20

*In re LTL Management, LLC*,
    64 F.4th 84 (3d Cir. 2023) ...................................................................passim

*In re LTL Management, LLC*,
    652 B.R. 433 (Bankr. D.N.J. 2023) ..............................................6, 7, 12, 13

*Massaro v. Ftaiha*,
    No. 95-7006, 1997 U.S. Dist. LEXIS 3275 (E.D. Pa. Mar. 13, 1997)...........7

*Mullins v. Ethicon, Inc.*,
No. 2:12-cv-02952, 2016 WL 6836941 (S.D. W. Va. Nov. 18, 2016) .........30

*Peoples Gas Light & Coke Co. v. Beazer East, Inc.*,
802 F.3d 876 (7th Cir. 2015) .......................................................................13

*Randle v. AC Asset Services LLC*,
No. 19-CV-01074-LJV, 2022 WL 2680079 (W.D.N.Y. July 12, 2022) ......10

*Ronald A. Katz Technology Licensing, L.P. v. Verizon Communications, Inc.*,
No. 01-5627, 2002 WL 31834833 (E.D. Pa. Dec. 18, 2002) ........................35

*Ryan v. Smith*,
No. 06-5866-NLH-AMD, 2010 WL 743946 (D.N.J. Mar. 4, 2010).......16, 19

*Schneider v. Arc of Montgomery County*,
497 F. Supp. 2d 651 (E.D. Pa. 2007)...............................................................8

*Taylor v. Scheef & Stone, LLP*,
No. 3:19-CV-2602-D, 2020 WL 4432848 (N.D. Tex. July 31, 2020)..........33

*Taylor v. Union County Correctional Facility*,
No. 02-0812 (CCC), 2015 WL 5647989 (D.N.J. Sept. 23, 2015)..................8

*United Mine Workers of America v. Pennington*,
381 U.S. 657 (1965)......................................................................................35

*United States v. Americus Mortgage Corp.*,
No. 4:12-cv-02676, 2013 WL 4829284 (S.D. Tex. Sept. 10, 2013) ............13

*Van Dusen v. Barrack*,
376 U.S. 612 (1964).........................................................................................9

*Van Maanen v. Univ. of Nations, Inc.*,
542 F. App'x 581 (9th Cir. 2013)..................................................................34

*Van Maanen v. Youth with a Mission-Bishop*,
852 F. Supp. 2d 1232 (E.D. Cal. 2012) ........................................................34

iv

*Vos v. Lee*,
    No. 07-CV-804 (RLM), 2009 WL 10650615
    (E.D.N.Y. Dec. 22, 2009) ...............................................................................25

*In re Welding Fume Products Liability Litigation*,
    No. 1:03-CV-17000, 2010 WL 2403355 (N.D. Ohio June 11, 2010)...........37

## STATE CASES

*Alta Mesa Holdings, L.P. v. Ives*,
    488 S.W.3d 438 (Tex. App. 2016) ..............................................................11

*Arevalo v. Saginaw Machine Systems, Inc.*,
    344 N.J. Super. 490 (App. Div. 2001)...........................................................22

*Bussell v. DeWalt Products Corp.*,
    259 N.J. Super. 499 (App. Div. 1992)...........................................................21

*C.M. Asfahl Agency v. Tensor, Inc.*,
    135 S.W.3d 768 (Tex. App. 2004) ..............................................................13

*Cresser v. American Tobacco Co.*,
    662 N.Y.S.2d 374 (Sup. Ct. 1997) ..............................................................36

*Darst v. Illinois Farmers Insurance Co.*,
    716 N.E.2d 579 (Ind. Ct. App. 1999) ..........................................................33

*DeVries Dairy, L.L.C. v. White Eagle Cooperative Ass'n*,
    974 N.E.2d 1194 (Ohio 2012) .....................................................................33

*Hall v. Armstrong Cork, Inc.*,
    692 P.2d 787 (Wash. 1984) .........................................................................17

*Johnson & Johnson Talcum Powder Cases*,
    249 Cal. Rptr. 3d 642 (Ct. App. 2019) ........................................................33

*Marsdale v. Port Liberte Partners*,
    No. A-3890-03T1, 2007 WL 92666
    (N.J. Super. Ct. App. Div. Jan. 9 2007).......................................23, 24, 26, 27

*Neill v. Cinema de Lux*,
    155 N.Y.S.3d 580 (App. Div. 2021)................................................................34

*Nieves v. Bruno Sherman Corp.*,
    86 N.J. 361 (1981) ......................................................................................19

*Phillips v. Cooper Laboratories, Inc.*,
    264 Cal. Rptr. 311 (Ct. App. 1989) ............................................................16

*Potwora ex rel. Gray v. Grip.*,
    319 N.J. Super. 386 (App. Div. 1999)...............................................16, 17, 20

*Printing Mart-Morristown v. Sharp Electronics Corp.*,
    116 N.J. 739 (1989) ......................................................................................2

*Ramirez v. Amsted Industries, Inc.*,
    86 N.J. 332 (1981) ...............................................................................9, 14, 16

*Simple Global, Inc. v. Brathwait Watches, Inc.*,
    No. N21C-01-086 FWW, 2022 WL 100363
    (Del. Super. Ct. Jan. 10, 2022) ....................................................................24

*Team Health Holdings, Inc. v. Caceres*,
    357 So. 3d 746 (Fla. Dist. Ct. App. 2023)....................................................34

*Woodrick v. Jack J. Burke Real Estate*,
    306 N.J. Super. 61 (App. Div. 1997)..............................................................26

## FEDERAL STATUTE

42 U.S.C. § 9607(e) ................................................................................13

## STATE STATUTES

Tex. Bus. Orgs. Code Ann. § 10.008(a)(3)..............................................11

Tex. Bus. Orgs. Code Ann. § 10.008(a)(4)...........................................11, 12

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws § 302 (1971) ..................................10, 11

Restatement (Third) of Torts: Prod. Liab. § 12 (1998)...............................20, 22, 25

The Plaintiffs' Steering Committee ("PSC") has sought leave to file a Second Amended Master Long Form Complaint in order to add:  (1) new factual allegations; (2) four new defendants—LTL Management, LLC ("LTL"); Johnson & Johnson Holdco (NA), Inc. ("Holdco"); Kenvue, Inc. ("Kenvue"); and Janssen Pharmaceuticals, Inc. ("Janssen"); and (3) three new causes of action, assumption of duty, aiding and abetting, and acting in concert.  The PSC also renews its motion, which was briefed prior to the bankruptcy stay, to add a cause of action for spoliation of evidence.

Defendants[1] do not oppose the addition of LTL, which holds all talc-related liability and is a proper defendant in this litigation.  Defendants do, however, oppose the motion in several respects.

***First***, there is no basis to add Holdco, Kenvue or Janssen to this litigation. Holdco is a holding company that does not manufacture any cosmetic products. Kenvue is an independent, publicly-traded consumer products company that has never sold talc-based Johnson's Baby Powder in the United States.  And Janssen is a pharmaceutical company and wholly-owned subsidiary of J&J that has never manufactured any cosmetic products.

---

[1]     Holdco, Janssen and Kenvue are not defendants in this litigation.  This brief, which is filed on behalf of current defendants and proposed additional defendants, nevertheless uses the term defendants, collectively, for convenience.

The PSC appears to contend that these companies should be held liable as successors to Old Johnson & Johnson Consumer, Inc. ("Old JJCI"), which manufactured and sold talcum powder.  But when Old JJCI split into two companies—LTL and New Johnson & Johnson Consumer, Inc. (since renamed Holdco)—it divided its assets and liabilities between them, assigning all talc-related liability to LTL.  That merger was valid under Texas law, as the Third Circuit has already held, and it left LTL fully capitalized, as plaintiffs' lawyers have successfully argued to two federal courts.  In addition, California state courts have acknowledged that LTL holds all talc liability, and less than a week ago, a Washington state court did too, dismissing claims against Holdco and Kenvue in a well-reasoned order.  *See* Order ¶ 17, *LaSalle v. Am. Int'l Indus.*, No. 23-2-08165-0 SEA (Wash. Super. Ct. Sept. 12, 2023) (Ex. 1 to Cert. of Susan M. Sharko ("Sharko Cert.")).  This Court should do the same.[2]

---

[2]     Although a New Jersey Superior Court judge denied a motion to dismiss Kenvue, Janssen, and Holdco in related litigation, that court's ruling, which represents a minority position, and should not be followed.  The New Jersey Superior Court discounted the impact of the Texas divisional merger on the grounds that "what is at issue herein is the re-structuring that occurred after the 3d Circuit decision."  Order at 3, *Pressler v. Kenvue, Inc.*, No. MID-L-001944-23 (N.J. Super. Ct. Law Div. June 1, 2023) (Sharko Cert. Ex. 2).  But that reasoning doesn't follow.  If, as the Third Circuit implicitly held, Holdco retained no talc liability following the divisional merger, it could not possibly have passed any liability to Kenvue and Janssen in subsequent transactions.  Moreover, the New Jersey court indicated that its ruling was "guided" by the standard articulated in *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739 (1989), which holds that a motion to dismiss "should be granted only in the rarest of

2

Still, even if Holdco had retained any hypothetical liability, there would be no basis to impose that liability on Kenvue or Janssen because corporate successors generally do not inherit the liability of their predecessors.  While the PSC apparently seeks to invoke the product-line exception to this rule, most states, including Delaware, where Kenvue is incorporated, do not recognize the exception. Moreover, neither Kenvue nor Janssen has ever produced the product line at issue in this litigation.[3]  The PSC may also seek to argue that Kenvue or Janssen constitute mere continuations of Holdco, but that argument is equally unavailing. Holdco survived the spin-off, and both Kenvue and Janssen are managed independently from it; Kenvue is an independent, publicly-traded company, and while Janssen is a corporate parent of Holdco, it operates in an entirely different field.

*Second*, the PSC reasserts its spoliation theory, based on allegations that the J&J defendants failed to preserve every scrap of paper related to talc safety testing dating back to the early 1970s, long before the first hint of litigation.  This proposed amendment is both untimely and futile for reasons discussed in prior briefing related to a similar proposed amendment.  The PSC has added a handful of

---

circumstances" and not if "a cause of action is 'suggested' by the facts," a standard that is incompatible with the federal court pleading standard, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[3]      Of course, as already noted, neither has Holdco.

additional factual allegations supposedly relevant to spoliation, but none of them plausibly pleads that any defendant (or any predecessor) had a duty to preserve evidence at the relevant times, that the defendants engaged in bad faith, or that any plaintiff has suffered prejudice.

*Finally*, plaintiffs' new causes of action for aiding and abetting, concert of action and assumption of duty are also untimely. And even if they were not, the assumption of duty claim improperly seeks to make a parent company a guarantor of its subsidiaries' products, and the aiding and abetting claim seeks to punish protected First Amendment activity.

## BACKGROUND

## I. RELEVANT CORPORATE HISTORY

Several corporate transactions underlie the PSC's effort to name additional defendants in this matter.[4] The first is a divisional merger executed under Texas law in October 2021. Under the divisional merger, Old JJCI was merged into a Texas corporation and then split into two companies, both initially Texas LLCs. (*See* Decl. of John Kim ("Kim Decl.") ¶ 24 (Sharko Cert. Ex. 3).) The first company was LTL, which was subsequently re-domesticated in North Carolina;

---

[4]    The structure of these transactions is explained in greater detail in (1) the Declaration of John Kim, which is quoted extensively in the proposed complaint and was filed in the bankruptcy court, and (2) the Third Circuit's decision in *In re LTL Management, LLC*, 64 F.4th 84, 93 (3d Cir. 2023) ("*LTL I*").

the second company merged into a New Jersey corporation to become New JJCI, now known as Holdco.[5]  (*See id.*; Prop. SAC ¶ 13.)  Holdco is LTL's sole member. Under the divisional merger, LTL was assigned certain assets along with all talc-related liabilities, while Holdco received other assets and all other liabilities.  (*See* Kim Decl. ¶ 24.)  Shortly thereafter, LTL filed for bankruptcy in order to resolve talc claims in a fair and orderly manner.[6]  At that point, litigation in this Court was stayed.

Certain plaintiffs' lawyers moved to dismiss LTL's bankruptcy.  (*See id.* ¶ 63.)  After a lengthy evidentiary hearing, the Bankruptcy Court for the District of New Jersey denied the motion.  Despite highlighting defendants' "[g]ood intentions," the U.S. Court of Appeals for the Third Circuit reversed, *LTL I*, 64 F.4th at 93, holding that although LTL inherited all talc liability, it "was not" "in financial distress."  *Id.*  According to the court, "[t]he value and quality of [LTL's] assets"—including funding agreements from J&J and Holdco—"exceeded any reasonable projections" of talc liability.  *Id.* at 106, 109; *see id.* at 108 ("highly solvent with access to cash to meet comfortably its liabilities").

---

[5]     For convenience, this brief refers to the company as "Holdco," including at times when it was known as New JJCI.

[6]     Prior to the corporate restructuring, defendants had won the majority of cases that had gone to trial, but a small number of plaintiffs obtained astronomical verdicts.  (*See* Kim Decl. ¶¶ 36-37.)

Thereafter, LTL was approached by counsel representing talc claimants nationwide, including some of the objectors to the first bankruptcy, with a proposal for resolution.  In order to allow claimants to vote on that proposal, LTL filed a second bankruptcy with a different funding agreement.  (*See* Kim Decl. ¶¶ 71-75, 79-84; *In re LTL Mgmt., LLC*, 652 B.R. 433, 439 (Bankr. D.N.J. 2023) ("*LTL II*").) Despite the support of counsel representing the vast majority of talc claimants, some plaintiffs' lawyers again moved to dismiss the complaint.  After another week-long evidentiary hearing, the bankruptcy court granted the motion, feeling constrained to do so by the Third Circuit's holding.  Despite strongly hinting that bankruptcy would produce the "just and right result" for both LTL and talc claimants, *LTL II*, 652 B.R. at 436, the bankruptcy court found that LTL was too financially strong, and too capable of satisfying any talc judgments, to allow the second bankruptcy to proceed, particularly in light of a "funding backstop" that gave it access to Holdco's assets "having a value approaching $30 billion," *id.* at 448; *see id.* at 444-48.[7]

While LTL made its way through bankruptcy proceedings, the consumer segment of J&J underwent its own restructuring, ultimately spinning off Kenvue as

---

[7]     The bankruptcy court nevertheless noted that LTL had made "remarkable progress" toward a "fair, efficient, and expeditious settlement," and "strongly encouraged" it to continue to pursue a global resolution—through bankruptcy. *LTL II*, 652 B.R. at 455.

its own publicly-traded company, which currently sells, among other things, cornstarch-based Baby Powder.  (*See* Prop. SAC ¶¶ 61-62.)  As part of the spin-off, the assets currently held by Kenvue passed through Holdco's parent company, Janssen.  (*See id.* ¶ 51.)  In August, J&J undertook an exchange offer that will leave it owning fewer than 10% of Kenvue's shares.  (*See* Johnson & Johnson Announces Preliminary Results of Kenvue Inc. Exchange Offer (Aug. 21, 2023), https://www.jnj.com/johnson-johnson-announces-preliminary-results-of-kenvue-inc-exchange-offer.)  Holdco continued to exist after the spin-off.  (*See* Kim Decl. ¶ 27 (explaining current assets).)  There is "no relationship" between the Kenvue spin-off and LTL's bankruptcy filings.  *LTL II*, 652 B.R. at 438 (citation omitted).

## ARGUMENT

Under Rule 15, "permission to amend is not to be given automatically but is allowed only 'when justice requires.'"  *Massaro v. Ftaiha*, No. 95-7006, 1997 U.S. Dist. LEXIS 3275, at *6-7 (E.D. Pa. Mar. 13, 1997) (citation omitted).  A district court properly denies a motion to amend when the proposed amendment would be futile.  *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003).  "An amendment to a pleading is deemed futile if it could not withstand a motion to dismiss."  *Anderson v. Gen. Motors Corp.*, No. 03-275 JJF, 2004 U.S. Dist. LEXIS 5430, at *8-9 (D. Del. Mar. 29, 2004).  Courts routinely find an amendment futile where it seeks to add new theories or uninvolved defendants and would not survive

a motion to dismiss.  *See, e.g.*, *Schneider v. Arc of Montgomery Cnty.*, 497 F. Supp. 2d 651, 659-60 (E.D. Pa. 2007) (amendment is futile if "the amended complaint cannot withstand a motion to dismiss") (citation omitted); *Taylor v. Union Cnty. Corr. Facility*, No. 02-0812 (CCC), 2015 WL 5647989, at *4 (D.N.J. Sept. 23, 2015) (allowing amendment to cure deficiency, but not "to enlarge the scope of any claims already asserted" or "to add any parties other than those directly responsible").

Plaintiffs' motion should be partially denied under this standard.

## I.   THE COURT SHOULD DENY LEAVE TO ADD HOLDCO, JANSSEN AND KENVUE AS FUTILE.

The PSC seeks to add three peripheral defendants—two owned by J&J and one publicly traded.  None of them has ever manufactured or sold talc-based Baby Powder in the United States.

For the PSC's claims to be viable, the Court would have to ignore two separate sets of corporate transactions.  As explained above, the first—a divisional merger under Texas law—separated Old JJCI into LTL and Holdco.  Consistent with Texas law, that divisional merger assigned LTL all talc liability, along with assets more than sufficient to cover it.  Therefore, Holdco did not inherit any talc liability, and ***the analysis need proceed no further***.  The second spun many (but not all) of Holdco's assets into Kenvue, a new publicly-traded company, and passed assets through Janssen as part of the process.  Even if Holdco had retained

8

any talc liability following the initial divisive merger—and it did not—the general principle of successor non-liability would mean those liabilities did not pass to Kenvue or Janssen.

### A.   <u>Choice Of Law</u>

A successor company "generally does not become liable for the debts and liabilities of its predecessor." *Forrest v. Beloit Corp.*, 278 F. Supp. 2d 471, 475 (E.D. Pa. 2003); *see, e.g.*, *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 339-41 (1981); *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988). Although there are different nuances in different states, the same result would obtain under any state's law.  To the extent a choice-of-law analysis is necessary, however, claims against Holdco are governed by Texas law, those against Janssen by New Jersey law, and those against Kenvue by Delaware law.

In transferred cases, like the great bulk here, the court applies the choice-of-law rules of the transferor state.[8]  *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).  Courts throughout the country have held that questions of successor liability are generally governed by the law of the successor's state of incorporation. *See, e.g.*, *Action Nissan, Inc. v. Hyundai Motor Am.*, No. 6:18-cv-380-Orl-78EJK,

---

[8]     Cases that were direct-filed in the MDL are treated for choice-of-law purposes as if they had been filed in the plaintiffs' home districts not New Jersey. (*See* Case Mgmt. Order 2, ECF 102, ¶ H (Feb. 7, 2017).

2020 WL 7419669, at *6 (M.D. Fla. Nov. 5, 2020) (Florida choice-of-law; "the question of successor liability involves their internal affairs" and is "subject to the laws of the state of incorporation") (citation omitted); *Randle v. AC Asset Servs. LLC*, No. 19-CV-01074-LJV, 2022 WL 2680079, at *2 n.2 (W.D.N.Y. July 12, 2022) ("Under New York choice-of-law rules, it is the law of the successor's state of incorporation that typically determines successor liability.") (citation omitted); Restatement (Second) of Conflict of Laws § 302 (1971) ("Conflicts Restatement") ("state which, with respect to the particular issue, has the most significant relationship" but that will be "the state of incorporation . . . except in . . . unusual" circumstances); *id.* cmt. g ("local law of the state of incorporation has been applied almost invariably").  This approach is favored because it provides for "certainty, predictability and uniformity of result, protection of the justified expectations of the parties and ease in the application of the law to be applied."  *Id.* cmt. e.

   ***Holdco.***  Texas law governs the question whether Holdco inherited any talc-related liabilities from Old JJCI, as the Third Circuit has implicitly recognized. *See LTL I*, 64 F.4th at 95-96.  This is so because Holdco was created by a divisional merger under the laws of Texas and was a Texas corporation at its creation.  Moreover, Texas clearly has the most significant relationship to a corporate transaction structured under Texas law that produced two Texas entities.

*See* Conflicts Restatement § 302 (most significant relationship evaluated "**with respect to the particular issue**") (emphasis added).

*Janssen.*  New Jersey law governs the question whether Janssen inherited any talc-related liabilities from Holdco.  Janssen is, and has been at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. (*See* Prop. SAC ¶ 7.)  Plaintiffs' effort to drag Janssen into this litigation apparently stems from its brief role facilitating the spin-off of Kenvue from Holdco, which was, at the time of the spin-off, yet another New Jersey corporation.

*Kenvue.*  Delaware law governs the question whether Kenvue inherited any talc-related liabilities from Holdco.  Kenvue is, and has been since its creation, a Delaware corporation.  (*See id.* ¶ 10.)

## B.  Holdco Did Not Inherit Any Talc Liability From Old JJCI.

"[L]iabilities and obligations" of a party undergoing a divisional merger can be "allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger," and "except as otherwise provided by the plan or merger or by law or contract, . . . no other new . . . entity . . . created under the plan of merger is liable for the debt."  Tex. Bus. Orgs. Code Ann. § 10.008(a)(3)-(4); *see, e.g.*, *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 449-50 & n.13 (Tex. App. 2016) (applying this rule).  Here, Old JJCI did what Texas law permits.  And the Third Circuit was extremely clear about the effect of that transaction—both

11

within and without the bankruptcy system:  "the merger allocated LTL responsibility for essentially all liabilities of Old" JJCI.  *LTL I*, 64 F.4th at 96; *see id.* at 97 (new JJCI, now Holdco, held "none of [the] talc-related liabilities").  Although the circuit court questioned the subsequent bankruptcy, "neither" that court nor the bankruptcy court for this district "has taken issue with the propriety of the [initial] corporate restructuring."  *LTL II*, 652 B.R. at 448 n.15 (citing *LTL I*, 64 F.4th at 106-07).)  This Court should not either.

The PSC may seize on language in the merger statute protecting companies like Holdco from liability "except as otherwise provided . . . by law" to suggest that some exception may apply here, Tex. Bus. Orgs. Code Ann. § 10.008(a)(4), but that would be tantamount to arguing that the Third Circuit got it wrong and render the Texas statute a nullity.  If a surviving company like Holdco could be held liable under successor-liability principles, the entire procedure for allocating liability under the plan of divisional merger would become meaningless.  Such a reading would violate the principle that statutory provisions "should be interpreted in a way that renders them compatible, not contradictory" and that a court must "fit, if possible, all parts into a harmonious whole."  *Argueta-Orellana v. Att'y Gen.*, 35 F.4th 144, 148 (3d Cir. 2022) (citation omitted).  A "harmonious" reading

here would limit the exception to specific statutory prohibitions on transferring liability, none of which apply.[9]

In any event, there is no conceivable principle of Texas law that would impose liability on Holdco, even in the absence of the protection provided by the merger statute.  Texas courts allow successor liability only when "the successor expressly assume[s]" it or in the case of a fraudulent transfer.  *See, e.g.*, *United States v. Americus Mortg. Corp.*, No. 4:12-cv-02676, 2013 WL 4829284, at *4 (S.D. Tex. Sept. 10, 2013).  The possibility of imposing liability on successors that form "mere continuation[s]" of their predecessors is not recognized.  *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 791-92 (Tex. App. 2004).  Clearly, Holdco never expressly assumed talc liability; the entire point of the transaction was to disclaim it.  And to the extent the PSC contends that the divisional merger constituted a fraudulent transfer, that argument is foreclosed by the findings of both the bankruptcy court and the Third Circuit that LTL is amply funded, and unlikely to even need "to exhaust its funding rights to pay talc liabilities," much less to fall short of those liabilities.  *LTL II*, 652 B.R. at 448 (quoting *LTL I*, 64 F.4th at 108); *see also LaSalle*, ¶ 17 (granting motion to dismiss Holdco and

---

[9]     For instance, the Comprehensive Environmental Response, Compensation, & Liability Act prohibits a party from transferring liability arising under that Act. *See Peoples Gas Light & Coke Co. v. Beazer E., Inc.*, 802 F.3d 876, 880 (7th Cir. 2015) (discussing 42 U.S.C. § 9607(e)).

13

Kenvue in part because "the purpose of the divisional merger . . . was expressly to anticipate creditor claims, not to evade them").

Even if Texas law did not apply, the laws of other states would also generally not impose liability on Holdco.  For starters, successor liability, in all its forms, is meant for circumstances in which "the successor deprives the predecessor's creditors of their remedy."  *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1151 (9th Cir. 2004) (California law); *Ramirez*, 86 N.J. at 358 (Schreiber, J., concurring) ("The central thesis of [successor liability] is premised on the elimination by the successor of an effective remedy.").  Here, by contrast, LTL was dismissed from bankruptcy not once, but twice, because the very same lawyers who have brought this motion argued that LTL was financially stable and therefore not worthy of bankruptcy protection and the courts agreed.  In other words, the tort claimants have an ample remedy against LTL.

Moreover, as discussed in greater detail below, those states that recognize the mere-continuity exception require, among other things, that the successor receive all assets and carry on the exact same business in place of the predecessor. *See LaSalle*, ¶ 14 ("Holdco and Kenvue did not continue the Old JJCI['s] operation of productive business assets in any material way").  And the very few states that recognize the product-line exception impose strict requirements that cannot be

14

satisfied where neither Holdco nor any successor ever manufactured or sold a talc product in this country.  *See id.* ¶¶ 18-19 (rejecting effort to invoke that exception).

C.   **If Holdco Had Inherited Any Liability, It Would Not Have Passed That Liability To Janssen Or Kenvue.**

Because only LTL inherited any talc liability following the divisional merger, there is no need to consider any further transactions.  But even if Holdco had retained liability following the divisional merger, it would not have passed it on to Kenvue, a publicly-traded company, or to Janssen, a J&J subsidiary that helped facilitate the spin-off of Kenvue.  The corporate transactions that created Kenvue independently cut off liability, consistent with the general rule that successors do not inherit tort liability from their predecessors.  *See, e.g.*, *Forrest*, 278 F. Supp. 2d at 475.  The PSC may argue that Janssen and Kenvue are liable either under a product-line exception or as "mere continuations" of Holdco, but neither argument has any merit.

1.   Neither Janssen Nor Kenvue Can Be Found Liable Under The Product-Line Exception.

Even though Kenvue has never manufactured or sold talc-based Baby Powder in the United States, and Janssen has never sold any kind of Baby Powder anywhere, the PSC appears to invoke a rarely recognized exception to the principle of successor non-liability known as the product-line exception.  This effort fails as to both companies.  Most states do not even recognize a product-line exception,

15

and the few that do only do so when the remedy against the predecessor has been

destroyed and the successor continues to market essentially identical products—

neither of which is the case here.

Although New Jersey, where Janssen is incorporated and based, is among

the few states to adopt the product-line exception, it can only be invoked if the

successor "corporation acquires all or substantially all the manufacturing assets of

another corporation . . . and undertakes essentially the same manufacturing

operation as the selling corporation." *Potwora ex rel. Gray v. Grip.*, 319 N.J.

Super. 386, 403 (App. Div. 1999) (quoting *Ramirez*, 86 N.J. at 358).  "In order to

be 'manufacturing essentially the same line of products' . . . it is not enough to

simply produce the same general type of product as the processor." *Ryan v. Smith*,

No. 06-5866-NLH-AMD, 2010 WL 743946, at *4 (D.N.J. Mar. 4, 2010) (citation

omitted).  Moreover, "if the selling corporation remains a viable entity able to

respond in damages to the injured party, a successor acquiring a product line will

not be liable." *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 99 (3d Cir. 1994)

(New Jersey law).

The law in the few other states to adopt the exception is similar, but with an

even greater focus on the requirement that remedies against the predecessor

corporation must have been entirely destroyed by the successor.  *See, e.g.*, *Phillips

v. Cooper Lab'ys, Inc.*, 264 Cal. Rptr. 311, 314-16 (Ct. App. 1989) (must satisfy all

16

three prongs:  "(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business") (citation omitted); *LaSalle*, ¶ 18 (must "curtail[] or destroy[] the claimant's remedies" by "leaving no more than a corporate shell," which then must "produc[e] the same product line under a similar name" and "hold itself out to the public as a continuation of the transferor") (citation omitted).

The PSC has not pled facts to satisfy either of these steps.

*Janssen.*  As an initial matter, Janssen did not acquire "all or substantially all" of Holdco's assets.  *See Potwora*, 319 N.J. Super. at 403 (citation omitted). Moreover, plaintiffs have not lost their remedy against LTL, and there is therefore no basis to subject Janssen to liability under the product-line exception.  *See, e.g.*, *Leo*, 37 F.3d at 99; *City of Huntington Park v. Landscape Structures*, No. EDCV 14-00419-VAP (DTBx), 2015 WL 3948411, at *6 (C.D. Cal. June 27, 2015) (California "[c]ourts have held that a buyer is not liable under the product[-]line exception when the selling corporation continued to exist after the acquisition"); *Hall v. Armstrong Cork, Inc.*, 692 P.2d 787, 791-92 (Wash. 1984) (in part because

17

"the product[-]line rule is one of necessity," it requires the "destruction of the predecessor by acquisition").

In any event, the PSC does not and cannot allege that Janssen has manufactured "essentially the same line of products as its predecessor." The complaint does not allege in more than conclusory fashion that Janssen ever manufactured or sold any product line formerly belonging to Holdco (or, before that, to Old JJCI) at all, much less that it sold either talc- or cornstarch-based Baby Powder.[10] And in fact, Janssen—which is a pharmaceutical company, not a consumer product company—never did.

Instead, the PSC alleges that Janssen briefly received certain Holdco assets, including those "used to manufacture, market, and sell" *cornstarch* Baby Powder. (Prop. SAC ¶ 52.) But Janssen was simply an intermediary; certain "assets and businesses" belonging to Holdco were "transfer[red] through" Janssen on their way to Kenvue. (*Id.* ¶ 50.) The proposed amended complaint is devoid of any

---

[10]    The proposed amended complaint contains boilerplate allegations against Janssen, such as that it was "engaged in the business of manufacturing" talc-based Baby Powder. (Prop. SAC ¶ 8.) Because all parties know such a generic statement is entirely counterfactual, those allegations can only be interpreted as a restatement of the allegation that Janssen is the successor to Old JJCI, which manufactured the product. The proposed amended complaint itself alleges that prior to the "multifaceted restructuring of [J&J's] consumer product subsidiaries, *Old JJCI and its predecessors* milled, manufactured, labeled, sold, supplied, distributed, and/or marketed" the product. (*Id.* ¶ 41 (emphasis added).)

18

allegation about how long Janssen held these assets, or if it exploited them in any way before passing them on.  The fact that a successor company like Janssen acquired certain assets (and held them for a brief period) is irrelevant if it never manufactured or sold anything using those assets.  *See Ryan*, 2010 WL 743946, at *4-5 (companies that acquired trademarks but never manufactured products under those trademarks not liable).  That principle applies with special force here, where Janssen only acquired those assets to pass them to a different entity, facilitating a transaction primarily involving other companies.[11]

*Kenvue.*  Delaware, where Kenvue is incorporated, is among the majority of states that do not recognize a product-line exception to the rule of successor non-liability.  *Dickens v. A-1 Auto Parts & Repair Inc.*, No. 1:18CV162-LG-JCG, 2020 WL 6265078, at *3 (S.D. Miss. Oct. 23, 2020) ("There is no indication that Delaware has adopted the product[-]line exception to the general rule against successor liability. . . . Indeed, recent Delaware decisions list no more than the traditional exceptions to the general rule against successor liability.") (footnote omitted); *In re G-I Holdings, Inc.*, No. 02-3626 (SRC), 2008 WL 11513187, at *14 n.12 (D.N.J. May 30, 2008) ("Delaware and most other states do not"

---

[11]    *Nieves v. Bruno Sherman Corp.*, which held that "[i]n certain situations" an "intermediate **manufacturer**" could be held liable, is not to the contrary.  86 N.J. 361, 365 (1981) (emphasis added).  That case involved a defendant that manufactured and sold the product at issue for eight years.  *See id.* at 364-67.

"recognize[] . . . the product[-]line exception . . . ."); *see also* Restatement (Third) of Torts: Prod. Liab. § 12 rptr.'s note to cmt. c (1998) ("Prod. Liab. Restatement") ("Only a few states appear to have adopted liability based on the successor corporation's continuation of the predecessor's line of products[.]").  For this reason alone, the theory fails as to Kenvue.

Even if some subset of claims against Kenvue were governed by the law of a state that has adopted the product-line exception, the exception would still not apply here, for essentially the same reasons already discussed with respect to Janssen.  As an initial matter, because Holdco survived the transaction creating Kenvue (as did LTL), any remedies against predecessor companies remained intact.[12]  *See, e.g., Leo*, 37 F.3d at 99; *City of Huntington Park*, 2015 WL 3948411, at *6.  And in any event, Kenvue does not manufacture "essentially the same" product as the one that allegedly injured the plaintiffs in this litigation.  *Potwora*, 319 N.J. Super. at 403 (citation omitted).  As noted above, Kenvue does not manufacture or sell talc-based Johnson's Baby Powder in the United States and never has; it only sells cornstarch-based Johnson's Baby Powder.  (*See* Prop. SAC ¶¶ 62-63.)  The cornstarch product has superficial similarities to the products at issue in this litigation, but has an entirely different primary ingredient.  Indeed,

---

[12]     (That said, for all the reasons set out in Part I.B., no claim exists as to Holdco.)

20

plaintiffs have repeatedly alleged that Johnson's Baby Powder should have been cornstarch-based and not talc-based; that is the essence of the litigation.  (*See id.* ¶¶ 84-85.)  This stands in stark contrast to cases in which product-line liability has been imposed.  *See, e.g.*, *Bussell v. DeWalt Prods. Corp.*, 259 N.J. Super. 499, 519 (App. Div. 1992) ("[A] distinguishing feature . . . ***that injured plaintiff*** is still included in the [product] produced . . . .") (emphasis added).

The PSC highlights in its proposed amended complaint that Kenvue still sells talc-based Johnson's Baby Powder outside of North America, and will continue to do so for another couple of months.  (*See id.* ¶ 63.)  To the best of defendants' knowledge, however, no case has ever imposed product-line liability based on continued sales in a foreign country.  Nor would doing so make any sense.  Only a tiny number of cases in this MDL proceeding involve foreign exposure, and the handful of American states that have adopted the product-line exception have no conceivable interest in regulating Kenvue's business practices in foreign countries.  Nor, for that matter, does this Court.  The PSC alleges that it is possible to purchase talc-based Baby Powder from a foreign market through a third-party website and have it delivered to the United States (*id.* ¶ 64), but that is entirely speculative.  The PSC does not allege that even a single U.S. consumer has ever done so.  And the argument also proves too much; virtually any product can

theoretically be shipped to this country, but that does not give any state an interest in imposing its product safety standards on the rest of the world.

For all of these reasons, neither Kenvue nor Janssen can be held liable under the product-line exception.

2.    Neither Janssen Nor Kenvue Can Be Held Liable Under The Mere-Continuity Exception.

The PSC also appears to contend that Janssen and Kenvue constitute mere continuations of Holdco and, thus, indirectly of Old JJCI.[13]

Most states allow a successor company to be held liable if the transaction that formed it "constitutes a consolidation or merger with the predecessor" and/or "results in the successor becoming a continuation of the predecessor."[14]  Prod. Liab. Restatement § 12; *see IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, No. 07-1076 (GEB), 2009 WL 5205968, at *11 (D.N.J. Dec. 28, 2009) ("mere continuation" of its predecessor or the transaction at issue "constituted a de facto

---

[13]    In state court, plaintiffs separately advanced the theory that certain existing companies have "direct" liability because they *are* Old JJCI.  Defendants are not aware of any authority to support this as a theory of liability separate from the mere-continuation exception.  The only case cited in the state court litigation to support this argument, *Arevalo v. Saginaw Machine Systems, Inc.*, held that a corporation was still liable for *its own* products because it remained the same legal entity even after divesting a division, emerging from bankruptcy, and changing its name.  344 N.J. Super. 490, 498-500 (App. Div. 2001).

[14]    These two exceptions are sometimes treated separately, but usually treated together, and defendants do so here.

merger or consolidation"); *see also In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 3382071, at *17-18 & n.8 (S.D.N.Y. Aug. 3, 2017) ("*GM Ignition Switch*") (under Delaware law, "merely a continuation" exception exists, but is narrower and requires the successor to be the "same legal person . . . under a new name") (citations omitted); *Elmer*, 698 F. Supp. at 542 (court must consider whether the "corporate entity" itself continues, not whether the "business operation" does). Some do not accept this theory. *See supra* at 13 (Texas). In states that allow it, this form of liability applies if the successor is "nothing but the predecessor in disguise," *IDT Telecom*, 2009 WL 5205968, at *11, and is "so dominated and controlled by the old company that separate existence must be disregarded," *GM Ignition Switch*, 2017 WL 3382071, at *18 (citation omitted).

Under New Jersey law for example, a plaintiff must plead, and ultimately "prove four elements: (1) continuity of shareholders or ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of business . . . ; and (4) continuation of the enterprise of the selling entity so that there is continuity of management, personnel, physical location, assets, and general business operation." *IDT Telecom*, 2009 WL 5205968, at *11. "[T]he intent of the contracting parties is especially important." *Marsdale v. Port*

23

*Liberte Partners*, No. A-3890-03T1, 2007 WL 92666, at *5 (N.J. Super. Ct. App. Div. Jan. 9 2007) (per curiam).  And, as with the product-line exception, the mere continuity exception is intended for plaintiffs without ordinary recourse, so that a successor will not be held liable where its predecessor "continued as [a] separate and distinct entit[y]."  *Id.* at *6.

The law of Delaware likewise considers continuity of both ownership and management, including of officers and directors, in evaluating whether one company is a mere continuation of another.  *See Simple Glob., Inc. v. Brathwait Watches, Inc.*, No. N21C-01-086 FWW, 2022 WL 100363, at *2 (Del. Super. Ct. Jan. 10, 2022) (whether "the officers, directors, or stockholders" remain the same); *GM Ignition Switch*, 2017 WL 3382071, at *18 ("continuity of ownership or control" cuts in favor of liability while "an arm's-length, cash transaction" cuts against it).  In that state, too, because the purpose of the exception is to allow for recovery where it would otherwise be impossible, a court must consider "whether the transferor corporation [continued to] exist[] after the sale."  *GM Ignition Switch*, 2017 WL 3382071, at *18; *Simple Global*, 2022 WL 100363, at *2 (similar); *see also GM Ignition Switch*, 2017 WL 3382071, at *17 n.8 (related de facto merger exception requires, among other things, transfer of "all [predecessor's] assets").

24

Other states focus on similar factors. *See, e.g.*, Prod. Liab. Restatement § 1, cmts. f & g; *Atwell v. DJO, Inc.*, 803 F. Supp. 2d 369, 372 (E.D.N.C. 2011) (North Carolina will apply mere-continuation exception "if only one corporation remains after the transfer of assets and there is identity of stockholders and directors") (citation omitted); *Vos v. Lee*, No. 07-CV-804 (RLM), 2009 WL 10650615, at *15-16 (E.D.N.Y. Dec. 22, 2009) ("identity of stock, stockholders, and directors" and "only the successor corporation . . . survive[s] the transaction"). Consistent with the rule that mere successor liability will not be imposed when the predecessor corporation continues, the exception requires that "all . . . tangible and intangible assets [be] transferred." *Id.* at *14 (rejecting successor liability because predecessor retained outstanding receivables).[15]

These considerations overwhelmingly weigh against imposing liability on either Janssen or Kenvue under the continuity exception.

***Janssen.*** Invocation of the mere continuity exception against Janssen fails at almost every step.[16] First, and most importantly, the PSC does not allege that

---

[15]   Some states impose additional requirements. For instance, Kenvue could not be held liable under the mere continuity exception under California law, because the exception only applies to direct sales, and Old JJCI is separated from Kenvue by at least three steps. *See Katzir's Floor & Home*, 394 F.3d at 1151.

[16]   Holdco and Janssen do have the same owners since Holdco is a Janssen subsidiary. If that were sufficient by itself to impose liability, the entire premise of corporate limited liability would collapse.

25

Holdco dissolved following the merger (or for that matter the commercial spin-off transaction), much less that it did so as soon as possible.  To the contrary, as discussed above, Holdco remained a going concern.  In fact, it is a proposed defendant in this litigation.

Second, while Janssen very briefly held certain "liabilities" originally held by Holdco, those did not include talc; the predecessor company retained others; and the PSC acknowledged that Janssen does not currently hold any Holdco liabilities, because it only acquired them as a pass-through to Kenvue.  Certainly, the PSC has not alleged facts to demonstrate[17] "that the intent" of the transaction "was for the successor to assume **all** the benefits and burdens of the predecessor's business."  *Marsdale*, 2007 WL 92666, at *5 (emphasis added) (quoting *Woodrick v. Jack J. Burke Real Est.*, 306 N.J. Super. 61, 74 (App. Div. 1997)).

Third, the PSC has not alleged continuity of management, such as officers or directors, or of other personnel, in anything but conclusory fashion.  To the contrary, the PSC alleges that Janssen took control of Holdco assets for the purpose of spinning them off, not managing them.  Moreover, the proposed amended complaint does not mention a single employee who has worked for both

---

[17]     At times, the proposed amended complaint recites buzzwords relevant to successor liability, but "formulaic recitation of the elements of a cause of action" are insufficient.  *Twombly*, 550 U.S. at 555.

Holdco and Janssen.  Nor does it allege a single physical plant shared by the two companies.  *See Marsdale*, 2007 WL 92666, at *5 (discussing "physical location").  Beyond the claim that both are headquartered in New Jersey, the only reference to location is that Janssen has a general counsel in Titusville, New Jersey, while Holdco has a "registered agent" in New Brunswick, more than 30 miles away.

At bottom, "[t]he more a corporation physically resembles its predecessor, the more reasonable it is to hold [that corporation] fully responsible."  *Marsdale*, 2007 WL 92666, at *5 (citations omitted).  Janssen is a pharmaceutical company that does not currently hold any of the assets previously belonging to Holdco.  It does not "resemble" its predecessor in any way.  As such, there is no basis to impose liability.

***Kenvue.***  For similar reasons, Kenvue—an independent publicly traded company—does not constitute a mere continuation of Holdco.  Once again, the first, and perhaps most important, factor is that Holdco survived the Kenvue spin-off as a productive company, and relatedly, it transferred only a portion of its assets to Kenvue.  This alone forecloses any effort to treat Kenvue as its mere continuation.

Second, the proposed amended complaint does not allege any continuity in management between Kenvue and Holdco, much less between Holdco and Old JJCI.  For instance, the proposed amended complaint does not identify any officer

27

or director of Kenvue who previously served at either predecessor company (as opposed to another entity within the broad family of J&J companies).  Nor have plaintiffs alleged any substantial continuity in ownership.  Indeed, the proposed amended complaint is devoid of any allegations about the ownership of Kenvue at all.  Kenvue filed a Registration Statement with the SEC because it is a publicly traded company owned by the members of the general public who purchase its free-floating shares.  That is in contrast to Holdco, which is:  (1) a wholly-owned subsidiary of Janssen; and (2) an indirect wholly-owned subsidiary of J&J.

The proposed amended complaint makes much of the fact that Kenvue's Registration Statement, which must address material risks, mentioned the possibility that the parties might "seek to bring" and "be successful in bringing claims" related to talc liability.  (Prop. SAC ¶¶ 57-58.)  But the fact that the Registration Statement foresaw the possibility that some plaintiffs' lawyers might overreach and seek to impose liability on Kenvue does not concede the legitimacy of those arguments.  In fact, the Statement takes the position that LTL "assumed sole responsibility for all liabilities of Old JJCI related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product sold in the United

States or Canada" and that J&J and LTL "will retain the Talc-Related Liabilities." (Kenvue S-1 at 40 (Sharko Cert. Ex. 4).)[18]

For all of these reasons, the PSC's request to amend the complaint to add Holdco, Janssen, and Kenvue should be denied as futile.

## II.   THE COURT SHOULD DENY LEAVE TO ADD SPOLIATION CLAIMS AS UNTIMELY AND FUTILE.

Plaintiffs' proposal to amend the complaint to assert standalone claims for spoliation was untimely when first advanced in 2020 and is all the more so now.  It is also futile because the proposed amended complaint does not adequately allege a duty to preserve evidence, the destruction of evidence with a culpable intent or any prejudice.  These issues were fully briefed prior to the bankruptcy, and defendants incorporate by reference arguments set forth by J&J and Old JJCI in the previous Spoliation Opposition (ECF 16334).

Plaintiffs add a smattering of new allegations, but none of them moves the needle.  For example, plaintiff allege that by the late 1980s, "1,827 additional cases alleging injury from talc exposure from the Johnson mine were pending against J&J." (Prop. SAC ¶ 347.)  But even if that were accurate, cases alleging talcosis as

---

[18]    The fact that Kenvue was able to continue selling product lines previously sold by Holdco (and originally by Old JJCI) is inherent in any successful spin-off, but at most it shows a continuation of the "business operation," which is insufficient.  *Elmer*, 698 F. Supp. at 542.

a result of industrial exposure in a mine have nothing to do with this MDL proceeding, which involves ovarian cancer supposedly resulting from cosmetic exposure to a finished consumer product.  (*See* Spoliation Opp'n at 15; *see also LTL I*, 64 F.4th at 94 (noting "a small number of isolated claims alleging the products caused harms such as talcosis").)  The proposed amended complaint also includes a longer discussion of two supposedly misleading affidavits that were attached to the previous proposed complaint.  (*See* Prop. SAC ¶¶ 331-335, 350-355.)  But simply attempting to besmirch J&J does not plausibly plead that "***evidence was destroyed*** with the specific intent to defeat a pending or potential lawsuit."  *Mullins v. Ethicon, Inc.*, No. 2:12-cv-02952, 2016 WL 6836941, at *4 (S.D. W. Va. Nov. 18, 2016) (emphasis added) (citation omitted).  In short, just as before, plaintiffs have alleged no facts to support their spoliation claim, making amendment futile for this reason as well.

## III.   THE COURT SHOULD DENY LEAVE TO ADD CLAIMS FOR ASSUMPTION OF DUTY, AIDING AND ABETTING AND ACTING IN CONCERT AS UNTIMELY AND FUTILE.

Finally, the Court should deny plaintiffs' request for leave to add even more causes of action to the Master Complaint.  All three of their proposed causes of

action are untimely, and adding claims for assumption of duty and acting in concert would be futile.[19]

### A.     All Three Proposed Claims Are Untimely.

As with their spoliation claims, the PSC could have added their claims for assumption of duty, aiding and abetting, and acting in concert years before the bankruptcy stay.  Indeed, the underlying factual allegations are to a large degree already present in the operative master complaint.  This alone is reason enough to deny leave to amend.  *See, e.g.*, *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 629 (3d Cir. 2013) ("[A] significant, unjustified, or 'undue' delay in seeking the amendment may itself constitute prejudice sufficient to justify denial of a motion for leave to amend.").

The PSC's assumption of duty claims are asserted against J&J based on its role "as the parent company" of, among others, Old JJCI, while their proposed aiding and abetting claims arise out of supposed "substantial assistance to Old JJCI."  (Prop. SAC ¶¶ 1053, 1058.)  The operative master complaint already alleged that J&J and Old JJCI "engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, [and] distribution" of the products and

---

[19]     Defendants have chosen not to dispute the merits of the aiding and abetting theory at this stage.  If that theory reaches the summary judgment stage, defendants will address it then because such an argument would benefit from factual support.

that Old JJCI was a "wholly-owned subsidiary" "under the . . . control" of J&J. (*See* First Am. Compl. ("FAC") ¶¶ 7-8, ECF 132.)  If the PSC thought that J&J's role assumed a duty or constituted aiding and abetting, it could have raised these theories years ago.  Likewise, the acting in concert claim asserted against all defendants is based in large part on the allegation that the defendants, together with the Personal Care Products Council ("PCPC"), "sought to suppress" information related to the supposed health risks of talcum powder.  (Prop. SAC ¶ 1062.)  Once again, these factual allegations were included in the previous master complaint. (*See, e.g.*, FAC ¶¶ 35, 164(c) (J&J companies and PCPC "knowingly released false information . . . to the consuming public" "to create confusion"), *id.* ¶ 164(b) ("suppressed data").)  There is no reason for new legal theories based on these allegations to be added now.

The PSC's brief seeks to avoid an untimeliness argument on the ground that "[t]he facts giving rise to the new causes of action arose from Johnson & Johnson's corporate restructuring."  (Mot. at 12.)  But none of the facts are new.  Plaintiffs simply allege that defendants failed to ensure the safety of talcum powder products (all of which had been removed from the American market by the time of the restructuring).  (*See* Prop. SAC ¶¶ 1053, 1062; *see also id.* ¶ 1057 ("fraudulent marketing and sales").)  These allegations could have been raised long ago.

32

**B.**      **Amendment To Add Claims For Assumption Of Duty And Acting In Concert Would Be Futile.**

In most states, assumption of duty and acting in concert are not recognized as independent causes of action. *See, e.g., Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579, 584 (Ind. Ct. App. 1999) ("there is no such actionable claim" as assumption of duty); *Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-2602-D, 2020 WL 4432848, at *7 (N.D. Tex. July 31, 2020) (aiding and abetting not recognized); *FDIC v. Parzygnat*, No. 10 C 7038, 2011 WL 3704731, at *6 (N.D. Ill. Aug. 23, 2011) (striking concert of action claim because it is "not [an] independent cause[] of action but rather [a] theor[y] under which the [plaintiff] could establish the underlying tort"); *DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n*, 974 N.E.2d 1194 (Ohio 2012) (acting in concert). Even where they are recognized, the PSC's assumption of risk and acting in concert theories would fail on the merits.

1.      Assumption Of Duty

The PSC seeks to assert a claim for "assumption of duty" against J&J based on the theory that "as the parent company of Windsor Minerals, Inc., New JJCI, Old JJCI, and other . . . subsidiaries," it assumed a duty "regarding the . . . safety profile of . . . talcum powder" and failed to meet it. (Prop. SAC ¶ 1053.) This claim could not survive a motion to dismiss.

A parent does not assume responsibility for the torts of a subsidiary unless it has gone well beyond normal supervision. *See, e.g., Johnson & Johnson Talcum*

*Powder Cases*, 249 Cal. Rptr. 3d 642, 666 (Ct. App. 2019) (J&J did not owe a duty in negligence to talc plaintiff because it did not "treat[] JJCI as merely a conduit or instrumentality of itself"); *Van Maanen v. Youth with a Mission-Bishop*, 852 F. Supp. 2d 1232, 1249 (E.D. Cal. 2012) (collecting cases that require the parent to "take[] over performance of the subsidiary's day-to-day operations") (citation omitted), *aff'd sub nom. Van Maanen v. Univ. of Nations, Inc.*, 542 F. App'x 581 (9th Cir. 2013); *Team Health Holdings, Inc. v. Caceres*, 357 So. 3d 746, 752 (Fla. Dist. Ct. App. 2023) ("operational control of the subsidiary by the parent" and control of the subsidiary's "daily basic operation") (citation omitted), *reh'g denied* (Apr. 5, 2023); *Neill v. Cinema de Lux*, 155 N.Y.S.3d 580, 581 (App. Div. 2021) (no duty absent "complete domination and control over the subsidiary").

The PSC's allegations do not meet these standards. At bottom, the proposed amended complaint alleges that a group within J&J "set medical safety standards" and "review[ed]" subsidiaries "'to make sure they are in accord with the overall safety standards of'" J&J. (Prop. SAC ¶¶ 118-119.) But a parent does not assume a duty through "the establishment of general policy." *Van Maanen*, 852 F. Supp. 2d at 1249 (citation omitted). The PSC also alleges that a J&J committee could "overrule" decisions made by subsidiaries. (*Id.* ¶ 119; *see id.* ¶ 120 (J&J employee's "authority 'includes changes to . . . labeling updates, warnings, and, when necessary, product withdrawals'").) This proves too much. Presumably,

every parent corporation retains the authority to "overrule" a subsidiary as part of its "basic directional control"; as such, if that were sufficient to assume a duty of care, the principle of corporate separateness would be wholly eviscerated. *See, e.g.*, *Ronald A. Katz Tech. Licensing, L.P. v. Verizon Commc'ns, Inc.*, No. 01-5627, 2002 WL 31834833, at *2 (E.D. Pa. Dec. 18, 2002).

### 2.   Acting In Concert Claims.

The PSC also seeks to assert a claim against all defendants for "acting in concert." Its primary theory is that defendants and PCPC "sought to suppress" information related to the alleged risks of talc. To the extent that differs from a garden-variety theory of failure to warn, it would necessarily impose liability for a public relations strategy intended to influence government action in violation of the First Amendment and the *Noerr-Pennington* doctrine. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-41 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-71 (1965).[20]

The *Noerr-Pennington* doctrine is most commonly invoked with respect to the concept of direct political advocacy, but also applies to public relations. *See Noerr*, 365 U.S. at 137-41. Trade organizations that "participate in public

---

[20]    In granting summary judgment to PCPC, Judge Wolfson raised the possibility that its alleged conduct was protected by the *Noerr-Pennington* doctrine, but decided the motion on other grounds. (*See* ECF 22798, at 16-17 & n.6.)

debate . . . enjoy substantial First Amendment protection." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994). For this reason, the Third Circuit has held that premising concert-of-action liability on participation in a trade association that was allegedly intended in part to "continue the . . . concealment" of the dangers of asbestos, *id.* at 1292, would "powerfully inhibit" the defendant from engaging "in a 'public dialogue'" on the issue of product safety and would "irreparabl[y] harm" the defendant's right to engage in constitutionally protected activity, *id.* at 1294-95.

Recognizing this concern, the proposed amended complaint repeatedly asserts that PCPC's conduct "had no legitimate purpose" and thus fell "outside the purv[iew] of *Noerr-Pennington*." (Prop. SAC ¶¶ 753, 872, 993, 1005.) But these are unadorned legal conclusions that do not suffice to plead a plausible claim.

Plaintiffs secondarily assert as part of their acting in concert claim that defendants "aided . . . each other in the negligence, gross negligence, and reckless misconduct."[21] (Prop. SAC ¶ 1063.) In many states, however, concert of action requires an intentional tort: "just as defendants cannot conspire to commit negligence they cannot act in concert to commit negligence." *Cresser v. Am. Tobacco Co.*, 662 N.Y.S.2d 374, 379 (Sup. Ct. 1997). Moreover, most of the

---

[21] The proposed amended complaint uses the language "aided and abetted" to support the claim for concert of action.

36

defendants are corporate affiliates, and "[i]t is questionable whether a parent corporation can conspire, act in concert with, or aid and abet its own wholly-owned subsidiary." *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 2403355, at *7 n.59 (N.D. Ohio June 11, 2010). For this reason, too, adding such a claim would be futile, and the motion to amend should be denied.

## CONCLUSION

For the foregoing reasons, the PSC's motion for leave to file an amended complaint should be denied to the extent it seeks to add Holdco, Janssen and LTL as defendants and to the extent it seeks to add new claims for spoliation, aiding and abetting, acting in concert and assumption of duty.

Dated: September 20, 2023            Respectfully Submitted,

                                     *s/Susan M. Sharko*
                                     Susan M. Sharko
                                     FAEGRE DRINKER BIDDLE & REATH
                                     LLP
                                     600 Campus Drive
                                     Florham Park, New Jersey 07932
                                     Telephone: 973-549-7000
                                     Facsimile: 973-360-9831
                                     E-mail: susan.sharko@faegredrinker.com

                                     *Attorneys for Defendant Johnson & Johnson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,

*s/Susan M. Sharko*
Susan M. Sharko

38