# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY
LITIGATION

Case No. 3:16-md-2738-MAS-RLS

MDL Case No. 2738

Motion Day: January 2, 2024

---

**DEFENDANTS JOHNSON & JOHNSON AND LTL MANAGEMENT
LLC'S MOTION FOR ORDER TO SHOW CAUSE WHY ANDY
BIRCHFIELD AND BEASLEY ALLEN SHOULD NOT BE DISQUALIFIED
FROM THIS LITIGATION OR REMOVED FROM THE PLAINTIFFS'
STEERING COMMITTEE**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    A.    Conlan Spends 1,600 Hours on J&J Legal Strategy ............................3

    B.    Conlan Launches A Business Venture And Becomes Adverse To J&J ...................................................................................................................6

    C.    Conlan Explicitly Allies Himself With A J&J Adversary ...................8

    D.    Conlan And Beasley Allen Take Aim At J&J In A Coordinated Media Campaign............................................................................................10

ARGUMENT .......................................................................................................13

    A.    The Court Should Exercise Its Inherent Power to Disqualify Birchfield and Beasley Allen From This Litigation............................14

    B.    At Minimum, the Court Should Exercise Its Power To Remove Beasley Allen From the PSC..............................................................18

CONCLUSION ....................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Carreno v. City of Newark*,
834 F. Supp. 2d 217 (D.N.J. 2011)........................................................19

*Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*,
808 F. Supp. 1200 (E.D. Pa. 1992).......................................................14

*Cordy v. Sherwin-Williams Co.*,
156 F.R.D. 575 (D.N.J. 1994) ................................................ 15, 16, 17

*Essex Cnty. Jail Annex Inmates v. Treffinger*,
18 F. Supp. 2d 418 (D.N.J. 1998)..........................................................15

*Greig v. Macy's Ne., Inc.*,
1 F. Supp. 2d 397 (D.N.J. 1998)............................................................16

*In re Corn Derivatives Antitrust Litig.*,
748 F.2d 157 (3d Cir. 1984) .................................................... 14, 15

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 1441804 (S.D.N.Y. Apr. 12, 2016).......................................18

*In re Merscorp Inc., Real Est. Settlement Procs. Act Litig.*,
2007 WL 4166128 (S.D. Tex. Nov. 20, 2007).......................................18

*In re Potash Antitrust Litig.*,
1993 WL 543013 (D. Minn. Dec. 8, 1993), *opinion amended in part on reconsideration* 1994 WL 2255 (D. Minn. Jan. 4, 1994)....................................16

*In re Snyder*,
472 U.S. 634 (1985) ..............................................................................14

*In re Terrorist Attacks on Sept. 11, 2001*,
2023 WL 4561766 (S.D.N.Y. July 17, 2023) .......................................18

*Maldonado v. New Jersey ex rel. Admin. Off. of Cts.-Prob. Div.*,
225 F.R.D. 120 (D.N.J. 2004) ...................................................... 15, 19

*Martin v. AtlantiCare*,
2011 WL 5080255 (D.N.J. Oct. 25, 2011)................................... 16, 17, 19

*MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*,
764 F. Supp. 712 (D. Conn. 1991) .......................................................15

*Montgomery Acad. v. Kohn*,
50 F. Supp. 2d 344 (D.N.J. 1999)..........................................................19

# TABLE OF AUTHORITIES

## (Continued)

**Page**

*Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*,
419 F.3d 794 (8th Cir. 2005) ................................................................. 18

*Shaikh v. Germadnig*,
Civ. No. 22-2053, 2022 WL 16716116 (D.N.J. Nov. 4, 2022) ........................... 15

*United States v. Miller*,
624 F.2d 1198 (3d Cir. 1980) ................................................................. 15

*United States v. Voigt*,
89 F.3d 1050 (3d Cir. 1996) ................................................................. 15

**Rules**

Fed. R. App. P. 46(c) ........................................................................... 14

Fed. R. Evid. 706(a) ........................................................................... 14

**Other Authorities**

5 Fed. Prac. & Proc. Civ. (Wright & Miller) § 1195 (4th ed.) ........................... 14

ABA Model Rule 1.9(a) ........................................................................... 6

ABA Model Rule 1.9(c)(1) ........................................................................ 6

ABA Model Rule 1.9(c)(2) ........................................................................ 6

# INTRODUCTION

Our adversarial system does not work if one side's lawyers obtain privileged and confidential information from the other's former counsel.  Where plaintiffs' counsel forms an alliance with one of defendants' former attorneys to pursue strategies directly adverse to the defendants in the very same matter, there is only one remedy that will restore fairness and the integrity of the judicial process: disqualification of plaintiffs' counsel, in this case Andy Birchfield and the Beasley Allen law firm.

Because of the seriousness of the allegations, Defendants Johnson & Johnson and LTL Management LLC ("LTL") (collectively, "J&J") do not bring this motion lightly.[1]  But the facts require it.  Attorney James Conlan spent almost 1,600 hours as counsel for J&J, working hand-in-hand with J&J's in-house and outside counsel to discuss, debate, and ultimately develop a strategy to bring full and final resolution to the talc litigation—including consideration of a resolution through the tort system, through the Imerys bankruptcy, and through the LTL bankruptcy.  After the bankruptcy was dismissed and without notice to or consent from J&J, Conlan formed an alliance with plaintiffs' attorney Andy Birchfield of the Beasley Allen firm on a strategy for resolving the very same talc litigation—one that is adverse to the path

---

[1] J&J will submit a parallel motion in the talc MCL in New Jersey state court seeking similar relief on the same basis.

J&J is pursuing.  In furtherance of that alliance, Birchfield and Conlan have sought to thwart J&J's on-going efforts to achieve a comprehensive consensual resolution of the talc claims, seeking instead to impose billions of dollars of additional costs on J&J.

This new alliance and its effort to influence other members of the plaintiffs' bar, the investment community, and the media directly implicates the confidential, privileged, and protected information Conlan acquired as one of J&J's lawyers. Conlan was privy to wide-ranging, litigation-driven strategy discussions of the strengths, weaknesses, and optimal trial tactics for J&J's defense of the underlying tort cases that gave rise to J&J's resolution strategies.  Any advice or position Conlan conveys to, confers about, or considers with Birchfield regarding the resolution of those tort cases is necessarily informed by and imbued with J&J's attorney-client and work product communications from the same matter.

Birchfield entered into his current alliance with Conlan knowing full well that Conlan represented J&J in the same matter.  In fact, Birchfield was negotiating potential resolution of the same cases when Conlan was on the other side of the table advising J&J.  Accordingly, J&J respectfully requests that this Court issue an order

requiring Birchfield to show cause why he and his firm should not be disqualified from any continued representation of plaintiffs in this litigation.[2]

## BACKGROUND

### A.    Conlan Spends 1,600 Hours on J&J Legal Strategy

On June 1, 2020, James Conlan joined the law firm Faegre Drinker—which was and is J&J's lead counsel in this matter—as a partner in its finance and restructuring practice.[3]  Within a month, Conlan had begun representing J&J as part of a team evaluating legal strategies for resolution of pending and future claims by plaintiffs asserting liability for illnesses allegedly caused by talc products. Declaration of E. Haas ("Haas Decl.") ¶ 4.  Over the next 20 months, Conlan threw himself into the talc cases, spending almost 1,600 hours on the matter and billing J&J $2.24 million for his time.  This included 1,154 hours in 2021 alone—*an average of four and a half hours every single workday*.  *Id.* ¶ 5.

Conlan's work as counsel for J&J touched every strategic option the Company considered for resolution of talc claims, including resolution in the tort system, a resolution through the Imerys bankruptcy, or proceeding via an internal bankruptcy.

---

[2] At minimum, the members of Birchfield's firm should be removed from the Plaintiffs' Steering Committee ("PSC") and their role as Plaintiffs' Co-Lead Counsel in this MDL, and discovery should be permitted to uncover the extent of Conlan's discussions with other MDL counsel adverse to J&J.

[3] *See* Faegre Drinker Welcomes Prominent Restructuring Lawyers James Conlan and Patrick Corr (June 1, 2020), available at https://www.faegredrinker.com/en/about/news/2020/6/faegre-drinker-welcomes-prominent-restructuring-lawyers-james-conlan-and-patrick-corr (last accessed Dec. 3, 2023).

His involvement was substantial and widespread, even going so far as to meet personally as J&J's counsel with the Debtor's counsel and counsel for the Future Claims Representative in the Imerys bankruptcy over rounds of golf, dinner, and drinks in May 2021 during negotiations for resolution through the Imerys proceeding. *Id.* at ¶ 7. Throughout, Conlan reviewed and, with co-counsel for J&J, evaluated numerous communications from Birchfield.

Conlan's engagement also included advising J&J regarding the potential resolution of talc claims through a bankruptcy filing by LTL, effectuated on October 14, 2021. As the Court is aware, J&J established LTL as a new subsidiary that would be responsible for holding and managing North American legal claims related to the Company's cosmetic talc. By voluntarily filing for Chapter 11 bankruptcy, LTL initiated a process designed to resolve these claims in a way that would be reasonable for all parties, including current and future claimants. The LTL bankruptcy plan gained the support of lawyers representing the vast majority of the plaintiffs with pending talc claims, who recognized that it offered not only a fair resolution but also a faster outcome than decades of litigation with uncertain results. Lawyers representing a minority of plaintiffs, however, opposed LTL's bankruptcy, led by Andy Birchfield. Birchfield's opposition to LTL's proposed resolution was particularly ironic, insofar as his firm had lost every case it tried against LTL and its predecessors. Haas Decl., ¶ 12, Ex. 4. (Tr., Dep. Of A. Birchfield (Excerpt), Apr.

17, 2023 ("Birchfield Dep."), at 130:14-22, 143:5-23.  Nonetheless, Birchfield took his opposition all the way to the Third Circuit and managed to defeat the bankruptcy plan, denying recovery to the tens of thousands of talc plaintiffs who wanted to see the plan proceed.

In 2021, in the run-up to LTL's bankruptcy filing, Conlan attended dozens of meetings and participated in innumerable phone conferences with J&J's Worldwide Vice President for Litigation, Erik Haas, former head of litigation, Joseph Braunreuther, and other counsel working for J&J on the talc litigation.  *Id.* ¶ 6.  Those meetings and phone conferences included former J&J product liability lead John Kim, who became LTL's Chief Legal Officer upon its formation, and J&J's current product liability head, Andrew White.  *Id.*  Conlan also communicated regularly with those team members via email and participated in and was privy to myriad communications with J&J's other outside counsel.  *Id.* ¶ 7.  Indeed, during this period, Conlan traveled across the country to attend meetings with J&J's outside attorneys, from New York to Miami to Los Angeles.  All told, as a fully integrated member of the legal team evaluating J&J's options for resolution of talc liabilities, Conlan participated in analysis and discussion of the Company's objectives with in-house and outside counsel for more than a year and a half, worked on the talc matter almost daily, and engaged in countless confidential, attorney-client communications.

### B.    Conlan Launches A Business Venture And Becomes Adverse To J&J

Conlan left Faegre Drinker in 2022 to launch a business venture called Legacy Liability Solutions LLC ("Legacy"), where he serves as Chief Executive Officer. Legacy describes itself as a company that "is able to advise, acquire restructured liability-tainted companies, and manage the liabilities for decades to come."[4] Notwithstanding his move from the private practice of law to head of a liability acquisition and management firm, Conlan owes the duties that all attorneys owe to former clients.   Absent informed consent from the client, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."   ABA Model Rule 1.9(a). Nor can a lawyer who has formerly represented a client in a matter "use information relating to the representation to the disadvantage of the former client" or "reveal information relating to the representation."   *Id.* 1.9(c)(1) and (2).

Flouting these ethical boundaries, Conlan sought to inject his new firm and business model into J&J's ongoing effort to resolve its talc liabilities.  Conlan first reached out to pitch his new business directly to J&J in August 2022, Haas Decl. ¶ 9, Ex. 1 (August 23, 2022 email), and thereafter repeatedly sought to convince J&J

---

[4] https://www.legacyliability.com/ (last accessed Dec. 3, 2023).

that Legacy should acquire and manage LTL or affiliated entities holding liability for present and future talc claims—but only after J&J funded the entities with what Legacy felt would be sufficient capital to cover the potential liabilities. *Id.* at ¶ 14, Ex. 6 (Conlan letter to J&J Board).  Legacy, Conlan proposed, would then invest and administer that money to settle talc claims within the tort system, to Legacy's substantial financial benefit. *Id.*

Conlan's proposal was of no interest to J&J, which continued to believe—and still believes—that the bankruptcy process offers the fairest, most efficient resolution.  After LTL's initial bankruptcy plan was dismissed, LTL refiled for voluntary Chapter 11 protection earlier this year.  Once again, Birchfield and Beasley Allen, representing a small minority of talc claimants, raised objections. Their opposition, orchestrated from Beasley Allen's perch on the Plaintiffs' Steering Committee in this MDL, again led to dismissal in July 2023, denying recovery to the more than 60,000 current claimants whose counsel supported the plan, which would have made $8.9 billion available to resolve talc liabilities.

During the Company's third-quarter earnings call on October 17, 2023, Haas reiterated J&J's intention to pursue resolution through the bankruptcy process, by both appealing the dismissal of LTL's second bankruptcy case and, separately, "working with the counsel[] representing the vast majority of the talc claimants … [to] pursu[e] a consensual resolution of the talc claims through another bankruptcy."

*Id.* ¶ 10, Ex. 2 (Oct. 17, 2023 earnings call transcript). Whether it stemmed from this reiteration of J&J's intended path forward or some other motive, Conlan doubled down on his determination to undermine the Company's effort. He would now partner with the primary opponent of the LTL bankruptcy plan: Birchfield and the Beasley Allen firm.

### C.    Conlan Explicitly Allies Himself With A J&J Adversary

The day after the earnings call, Conlan emailed J&J Treasurer Duane Van Arsdale and revealed that "***Legacy has the support of lead counsel*** for the [ovarian cancer] claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy." *Id.* ¶ 11 Ex. 3 (Oct. 18, 2023 Conlan email to Van Arsdale) (emphasis added). Conlan told Van Arsdale that "[t]he establishment of a settlement matrix should greatly reduce the uncertainty surrounding the estimation of future claims and the associated challenges of determining the quantum of funding necessary for your auditors to remove the non-cash charge for J&J's current and future talc related liabilities." *Id.* In other words, Conlan—unbeknownst to J&J—had been actively discussing a resolution of J&J's talc liabilities with Birchfield that sought to have J&J fund potential liabilities based on a matrix Conlan and Birchfield had jointly developed. That settlement matrix was the basis for what Conlan ultimately revealed as the amount he would require for his Legacy proposal: a ***minimum of $19 billion***,

8

or more than $10 billion above what the majority of current talc plaintiffs had agreed was a fair resolution just this year.

There is no disguising Birchfield's economic interest in joining Conlan and supporting the Legacy proposal. Birchfield and Beasley Allen, as opposed to the MDL plaintiffs they represent, stand to make more money if claims are resolved by Legacy through the tort system than through the LTL bankruptcy plan. During a deposition taken in the second LTL bankruptcy proceeding, Birchfield acknowledged that if the LTL bankruptcy resolution went forward, the Plaintiffs' Steering Committee would lose the ability to control a share of the $8.9 billion through the MDL common benefit fund established by Order of September 17, 2020. Birchfield Dep. at 18:8-25; *see also* Case Management Order No. 7(A) (ECF No. 14741). Under CMO 7(A), 8-12% of gross talc settlement amounts for clients of participating counsel must be deposited in the common benefit fund, and that money is then to be allocated to the firms that performed common benefit work. Birchfield Dep. at 20:24-22:19.

Notably, the MDL Plaintiffs' Steering Committee "is tasked with the responsibility of identifying who should do that common benefit work," *id.* at 22:20-23:4, which in turn determines how much Beasley Allen will take from the common benefit fund. In the case of the $8.9 billion LTL bankruptcy plan, Beasley Allen would lose its share of between $712 million and $1.068 billion that would go into

the common benefit fund if the money were part of a settlement outside the bankruptcy process. *Id.* at 21:7-13. For the $19 billion demanded by Conlan and Birchfield for the Legacy proposal, Beasley Allen would stand to gain a substantial share of **$1.52 billion to $2.28 billion** diverted from settling plaintiffs into the common benefit fund. And save for a participation percentage Beasley Allen contributes as participating counsel under CMO 7(A), the common benefit fund payments would be on top of the 40% contingency fee the firm charges to its clients directly. Birchfield Dep. at 28:9-11. In Conlan, Birchfield sees a windfall for Beasley Allen—an opportunity to join forces with a lawyer who spent 1,600 hours representing J&J in the exact matter for which Birchfield seeks to undermine J&J's preferred resolution.

### D.   Conlan And Beasley Allen Take Aim At J&J In A Coordinated Media Campaign

The joint effort to accomplish Beasley Allen's objectives continued when Conlan recently authored an opinion piece in Bloomberg, "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy." The November 2, 2023 article argued that J&J's effort to use the bankruptcy process to provide a fair and efficient resolution of talc claims was a "spectacular failure" that had "polluted the dialogue about the legitimate interest of a public company in obtaining 'finality' with respect to both current and future claims, and plaintiffs' legitimate interest to have their

claims determined or settled in the tort system and paid in full."[5]  Conlan insisted that "[s]tructural optimization and disaffiliation of the liable entities"—exactly what he was pitching to J&J—was "the right answer for everyone." *Id.*  The article identified Conlan only as Legacy's CEO and a "former Sidley Austin restructuring chair," omitting any mention of Conlan's time as a partner at Faegre Drinker, where he spent 1,600 hours representing J&J in the talc matter after leaving Sidley Austin. He did, however, use the Bloomberg platform to explain "what the companies believed" they would gain by pursuing a resolution through the bankruptcy process, showing no reticence about offering insights into the thinking of his former client.

Birchfield immediately endorsed Conlan's commentary in a news release ***issued the same day and also published by Bloomberg***, stating his opinion that "[p]laintiffs' lawyers in talc-related ovarian cancer cases share Mr. Conlan's concerns that the Texas Two-Step has 'polluted' the narrative."[6]  He went on to state that Conlan's scheme "should be appealing," because plaintiffs' lawyers "share [Mr. Conlan's] vision of a win-win solution where claimants can pursue their claims in the tort system." *Id.*

---

[5] https://news.bloomberglaw.com/us-law-week/time-to-ditch-the-texas-two-step-for-a-new-mass-tort-strategy-1 (last accessed Dec. 3, 2023).
[6] https://www.bloomberg.com/press-releases/2023-11-02/key-lawyer-in-johnson-johnson-talc-litigation-supports-call-to-rethink-legal-strategies-in-light-of-failure-of-texas-two-step (last accessed Dec. 3, 2023).

Conlan's and Birchfield's orchestrated effort to push their agenda did not escape J&J's attention.   On November 5, 2023, J&J's outside counsel James Murdica wrote to Conlan to "express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J."  Haas Decl., ¶ 13, Ex. 5 (Nov. 5, 2023 letter from J. Murdica to J. Conlan at 1).   Murdica reminded Conlan that, as a Faegre Drinker partner, Conlan had represented both J&J and LTL "regarding strategies for resolution of [their] talc liabilities, including various bankruptcy options and proposed structural optimization."  *Id.*   As Murdica emphasized, Conlan "attended—with me—many high level meetings with J&J in-house counsel regarding the talc bankruptcy and settlement strategies in addition to weekly strategy calls with J&J in-house and outside counsel.  There can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure."  *Id.*

None of these facts deterred Conlan or Birchfield.  Just four days after he received Murdica's letter, Conlan wrote to J&J to attach the $19 billion price tag to the "settlement matrix" he had developed with Beasley Allen's support.  Haas Decl., ¶ 14 Ex. 6 (Nov. 9, 2023 Conlan letter and exhibit).  In the letter, Conlan told J&J that "Leading Counsel in the MDL have agreed to support an opt-in settlement with Legacy, post-acquisition, on the terms described in the accompanying matrix."  *Id.*

at 2.  Conlan continued, "Leading Counsel in the MDL believe the matrix settlement will enjoy 95% opt-in," *id.*, a fact that could only be known from Conlan's communications with his former adversary Birchfield.

J&J responded by email to Legacy's Executive Chairman John Gasparovic, copying Conlan, advising that J&J's outside counsel had provided notice to Conlan "regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations."  Haas Decl., ¶ 15 Ex. 7 (Nov. 9, 2023 Haas email).  J&J further emphasized that the Company expected Conlan to respect his duties to J&J, his former client, going forward.  *Id.*

But Conlan and Birchfield remain undeterred.  Just six days later, J&J learned that Gordon Haskett Research Advisors would host a symposium in New York on "JNJ: Talc Litigation & 3rd Bankruptcy" on November 29, 2023.  *Id.* ¶ 16.  The symposium was to feature "two experts"—none other than James Conlan and Andy Birchfield—to discuss the "viability" of "J&J's potential 3rd bankruptcy," "potential settlement issues," and "how J&J could resolve the litigation outside of bankruptcy," *id.*, the outcome they have jointly pursued.

## ARGUMENT

This Court should issue an order requiring Birchfield and Beasley Allen to show cause why they should not be disqualified from this litigation or removed from the PSC.  Show cause orders are an accepted part of federal practice where the

circumstances warrant. *See* 5 Fed. Prac. & Proc. Civ. (Wright & Miller) § 1195 (4th ed.); *see also, e.g.*, Fed. R. Evid. 706(a) (on a party's motion or on its own, court may order parties to show cause why expert witness should not be appointed); Fed. R. App. P. 46(c) (noting courts of appeal may discipline an attorney after "an opportunity to show cause to the contrary"); *In re Snyder*, 472 U.S. 634, 643 n.4 (1985). Here, the circumstances warrant an inquiry as to the requisite relief required to address Birchfield's alliance with J&J's former counsel, Conlan, in violation of their respective duties.

### A.   The Court Should Exercise Its Inherent Power to Disqualify Birchfield and Beasley Allen From This Litigation

Birchfield's relationship with Conlan severely and adversely implicates the integrity of the judicial process, such that the Court should exercise its "inherent powers" to disqualify Birchfield and Beasley Allen. *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984). Those inherent powers flow from and give life to courts' "vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar, eliminating conflicts of interest, and protecting confidential communications between attorneys and their clients." *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1203 (E.D. Pa. 1992).

Disqualification is often based on a finding that an attorney violated an express proscription of the Rules of Professional Conduct (RPC). *See, e.g.*, *United*

*States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).  But attorney disqualification "need not be … predicated on a finding of a specific RPC violation," because a district court has an "independent interest[] in ... preserving the integrity of its proceedings, and protecting the truth-seeking function of the proceedings." *United States v. Voigt*, 89 F.3d 1050, 1076 n.12 (3d Cir. 1996); *see Shaikh v. Germadnig*, Civ. No. 22-2053, 2022 WL 16716116, at *3 (D.N.J. Nov. 4, 2022) ("[A] specific violation is not a prerequisite for disqualification," which may be warranted where "sufficient doubt exists as to the propriety of further representation." (quotations omitted)).  Thus, courts in this Circuit have repeatedly emphasized that "[a]s a general matter, a district judge should disqualify the offending counsel when the integrity of the adversarial process is at stake." *Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 418, 440 (D.N.J. 1998) (quotations omitted); *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 583–85 (D.N.J. 1994).  To these ends, "doubt is to be resolved in favor of disqualification." *Maldonado v. New Jersey ex rel. Admin. Off. of Cts.-Prob. Div.*, 225 F.R.D. 120, 136–37 (D.N.J. 2004); *see also, e.g., Cordy*, 156 F.R.D. at 584 ("In disqualification situations, any doubt is to be resolved in favor of disqualification.").

One circumstance that self-evidently threatens the integrity of the adversarial process is where opposing counsel is in receipt of their adversary's confidential information.  *See In re Corn Derivatives*, 748 F.2d at 162; *see also MMR/Wallace*

*Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 723–28 (D. Conn. 1991) (disqualifying counsel where presumed possession of adversary's confidential information created appearance of unfair advantage); *Cordy*, 156 F.R.D. at 584 (A party's "interest in a trial free from the risk that confidential information will be used against him and the public's interest in the integrity of the judicial process itself demand[ed]" disqualification.); *Martin v. AtlantiCare*, 2011 WL 5080255, at *5 (D.N.J. Oct. 25, 2011) (disqualifying law firm after employing attorney who "played an integral," "substantial and substantive role" in formerly representing adversary in the same litigation at another law firm).[7]   Indeed, disqualification may be warranted based on the *possibility* that the attorney possessed an adversary's confidential information.  *See, e.g.*, *Greig v. Macy's Ne., Inc.*, 1 F. Supp. 2d 397, 403–04 (D.N.J. 1998) (disqualifying counsel based on the fact that lawyers "may have been privy" to privileged information); *cf. In re Potash Antitrust Litig.*, 1993 WL 543013, at *16 (D. Minn. Dec. 8, 1993), *opinion amended in part on reconsideration* 1994 WL 2255 (D. Minn. Jan. 4, 1994) (noting that "[e]stablishing contact with [the opposing

---

[7] "Side-switching" attorneys undermine the integrity of the proceedings, raising "the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with the expectation that they would be disclosed to no one else." *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 975, 976 (D.N.J. 1996) (rejecting effort by disqualified law firm to cleanse itself of imputed conflict by dismissing side-switching lawyer because "[s]uch a rule would not provide any disincentive to a law firm that contemplates hiring an attorney who has formerly represented an adverse party"); *see also Martin*, 2011 WL 5080255, at *1, *12 (imputing side-switching attorney's conflict to entire law firm and disqualifying law firm).

party's former counsel] alone created a risk that confidential information would be disclosed").

Here, there is no question that Conlan possesses J&J's client confidences. After all, he billed J&J for 1,600 hours working on strategies to resolve its talc liabilities. It is likewise without question that Birchfield knew Conlan possessed those confidences, having been on the opposing side and directly adverse to Conlan in the talc litigation and negotiations seeking to resolve the very liabilities that Conlan addressed in his 1,600 hours of work for J&J. In formulating and collaborating in a business venture designed to resolve those liabilities—and in pitching it to lawyers representing parties directly adverse to J&J—it is impossible that client confidences would not have passed from Conlan to Birchfield. *See Cordy*, 156 F.R.D. at 584 (explaining that there is a "presumption … that confidences passed to the attorney"). Indeed, the fact that J&J's current adversary is working closely with its former attorney on the very subject of its former attorney's representation cuts to the heart of the adversarial nature and integrity of these proceedings. *Cf. Martin*, 2011 WL 5080255, at *12 (disqualifying law firm who hired attorney who formerly represented adversary "because [attorney's] conflict is imputed to the entire firm"). Those considerations require that Birchfield and Beasley Allen be disqualified from the talc litigation.

**B.      At Minimum, the Court Should Exercise Its Power To Remove Beasley Allen From the PSC**

Similar considerations govern this Court's exercise of its "inherent power" to oversee and determine the membership of the PSC.  *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 797 (8th Cir. 2005); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 4561766, at *13–14 (S.D.N.Y. July 17, 2023).  There is no singular standard under which a court must evaluate the propriety of a request to remove an attorney from a PSC.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 1441804, at *6 (S.D.N.Y. Apr. 12, 2016).  But it stands to reason that because removal from a steering committee is a lesser sanction than disqualification, the standard for removal should be lower.  And that is borne out in the case law, as courts have removed attorneys from steering committees for reasons not approaching ethical misconduct, such as poor performance.  *See, e.g.*, *In re Merscorp Inc., Real Est. Settlement Procs. Act Litig.*, 2007 WL 4166128, at *1 (S.D. Tex. Nov. 20, 2007) (noting attorney was removed as liaison counsel after "repeated failures to communicate and cooperate with" co-counsel, opposing counsel, and the court).  Actual impropriety or the objective appearance of impropriety surely justify removal from a prominent leadership position where an attorney acts as the public face of the litigation.

As discussed above, such is the case here.  Birchfield's relationship with J&J's former attorney in litigation against J&J jeopardizes the continued integrity of these

proceedings.  To protect that integrity, the Court should exercise its inherent power to require Birchfield to explain why the actual or apparent impropriety of that relationship does not at a minimum warrant his and Beasley Allen's removal from the PSC.

* * * *

J&J recognizes that disqualification or removal of Beasley Allen from the PSC is not a decision that this Court can take lightly.  *See Martin*, 2011 WL 5080255, at *2.  But that is yet another reason a show cause order should issue. Disqualification and discipline issues are, by nature, "intensely fact-specific," so it is "essential" for courts "to approach such issues with a sense of practicality as well as a precise understanding of the underlying facts."  *Id*.; *Carreno v. City of Newark*, 834 F. Supp. 2d 217, 224 (D.N.J. 2011); *Montgomery Acad. v. Kohn*, 50 F. Supp. 2d 344, 349 (D.N.J. 1999); *see also, e.g.*, *Maldonado*, 225 F.R.D. at 137 n.12 (noting the Court ordered a hearing to better ascertain the facts before ruling on disqualification).  A show cause order will allow the Court to do just that.  The facts currently known to J&J clearly demand an explanation.

## CONCLUSION

Accordingly, J&J respectfully requests that this Court issue an order requiring Birchfield to show cause why he should not be disqualified from this litigation or his firm removed from its role on the PSC.

DATED: December 5, 2023

Respectfully submitted,

/s/ *Stephen D. Brody*

Stephen D. Brody
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Tel.: 202-383-5300
sbrody@omm.com

Susan M. Sharko
FAEGRE DRINKER BIDDLE & REATH
LLP
600 Campus Drive
Florham Park, NJ 07932
Tel.: 973-549-7000
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson &*
*Johnson and LTL Management LLC*