## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
)
IN RE: JOHNSON & JOHNSON   )
TALCUM POWDER PRODUCTS  )
MARKETING, SALES PRACTICES AND ) MDL No. 2738 (MAS) (RLS)
PRODUCTS LIABILITY LITIGATION )
_____)
)
*This Document Relates To All Cases* ) Argument Date: January 16, 2024
_____)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' IMPROPER SUPPLEMENTAL REPORTS

**FAEGRE DRINKER BIDDLE
& REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
Tel.: (973) 549-7000

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel.: (212) 735-3000

*Attorneys for Defendant
Johnson & Johnson*

## **TABLE OF CONTENTS**

**Page**

BACKGROUND ..................................................................................2

ARGUMENT.....................................................................................12

I.     PLAINTIFFS' NEW DISCLOSURES VIOLATE THE COURT'S CASE
       MANAGEMENT ORDERS AND RULE 26. .............................................12

   A.   Plaintiffs' New Experts And Certain New Opinions From Their Previously
        Disclosed Experts Are Untimely Under The Court's Case Management
        Orders And Rule 26...................................................................13

   B.   Plaintiffs Do Not Have Substantial Justification For The Untimely
        Submissions Of New Experts And Opinions, And Their Admission Would
        Be Highly Prejudicial. ..............................................................16

   C.   In The Alternative, Defendants Will Require Additional Time To Depose
        Plaintiffs' Experts....................................................................22

CONCLUSION .................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 3M Combat Arms Earplug Products Liability Litigation*,
    No. 3:19-md-2885, 2021 WL 763778 (N.D. Fla. Jan. 15, 2021) .................20

*Allen v. Parkland School District*,
    230 F. App'x 189 (3d Cir. 2007).................................................................13

*In re Asbestos Products Liability Litigation*,
    289 F.R.D. 424 (E.D. Pa. 2013) ................................................................20

*Dandy v. Ethicon Women's Health & Urology*,
    579 F. Supp. 3d 625 (D.N.J. Jan. 12, 2022)...........................................12, 16

*Eagle View Technnologies, Inc. v. Xactware Solutions, Inc.*,
    No. 15-7025 (RBK/JS), 2017 WL 5886004 (D.N.J. Nov. 29, 2017) ..........12

*In re Ethicon, Inc., Pelvic Repair System Products Liability Litigation*,
    MDL No. 2327, 2017 WL 4769657 (S.D. W. Va. July 21, 2017)...............21

*Fillichio v. Toms River Police Department*,
    No. 19-575 (ZNQ)(DEA), 2022 WL 959278 (D.N.J. Mar. 25, 2022)..........12

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales
    Practices & Products Liability Litigation*,
    220 F. Supp. 3d 1356 (J.P.M.L. 2016) .........................................................2

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales
    Practices & Products Litigation*,
    509 F. Supp. 3d 116 (D.N.J. 2020).........................................................3, 10

*Kieser v. C.R. Bard, Inc.*,
    No. 5:20-cv-06045-NKL, 2021 U.S. Dist. LEXIS 258776
    (W.D. Mo. Apr. 9, 2021)............................................................................19

*Perez v. Great Wolf Lodge of the Poconos LLC*,
 No. 3:12-CV-01322, 2017 U.S. Dist. LEXIS 19251
 (M.D. Pa. Feb. 10, 2017)...................................................... 11, 13, 16

*Raritan Baykeeper, Inc. v. NL Industries, Inc.*,
 No. 09-4117 (MAS) (DEA), 2022 U.S. Dist. LEXIS 47945
 (D.N.J. Mar. 17, 2022) ............................................................20

*Roberts v. United States*,
 No. 09-6212 (WJM), 2012 U.S. Dist. LEXIS 86762
 (D.N.J. June 22, 2012) .............................................................16

*Schneck v. International Business Machines Corp.*,
 No. 92-4370 (GEB), 1996 U.S. Dist. LEXIS 17486
 (D.N.J. June 25, 1996) .............................................................17

*In re Viagra Products Liability Litigation*,
 658 F. Supp. 2d 936 (D. Minn. 2009)........................................21

*In re Zantac (Ranitidine) Products Liability Litigation*,
 644 F. Supp. 3d 1075 (S.D. Fla. 2022) ........................................5

## RULES

Fed. R. Civ. P. 26(a)(2)(D) ..................................................11

Fed. R. Civ. P. 37(c)(1)................................................. 11, 16

## OTHER AUTHORITIES

*Johnson & Johnson Takes Steps to Equitably Resolve All Current and Future Talc Claims*, Cision PR Newswire (Oct. 14, 2021), https://www.prnewswire.com/news-releases/johnson--johnson-takes-steps-to-equitably-resolve-all-current-and-future-talc-claims-301400916.html ............................................................................................4

O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323(1) JAMA 49, 56 (2020) .............................................5

Report of the Advisory Committee on Evidence Rules (May 15, 2022) .................5

After years of general causation discovery, thousands of pages of Rule 702 briefing, an eight-day hearing, and months of case-specific discovery, plaintiffs seek to start over with new experts and new expert opinions under the guise of "supplemental" reports.  Plaintiffs' recent disclosures (which attempt to address some of defendants' previous criticisms of their theories) include: (1) reports from four completely new experts (Drs. Cote, Rothman, Harlow and Newman); (2) a report from an expert who was originally designated as a general causation expert but was not disclosed as a bellwether case-specific expert in July 2021 (Dr. Levy); and (3) six reports from previously designated experts who improperly seek to amend their opinions rather than supplement them with new science or developments (Drs. Singh, Siemiatycki, Smith-Bindman, McTiernan, Longo and Kessler).[1]

Plaintiffs' disclosures with respect to these 11 experts violate the Court's recent case management order and are contrary to their own representations to the Court at the September 6 status conference.  They would also require the parties to redo years of prior work.  Accordingly, they should be stricken, and plaintiffs should be required to: (1) withdraw Drs. Cote, Rothman, Harlow and Newman; (2)

---

[1]     Defendants are not moving to strike five of plaintiffs' supplemental expert reports, because the new material in those reports is primarily focused on post-July 2021 developments.

withdraw Dr. Levy's untimely case-specific opinions; and (2) resubmit proper supplemental reports for the other five experts who are subject to this motion.  In the alternative, and given the breadth and timing of plaintiffs' recent disclosures, the Court should extend by four weeks the current deadlines for deposing plaintiffs' experts, as well as the deadlines that follow therefrom.[2]

## BACKGROUND

The Judicial Panel on Multidistrict Litigation created this proceeding to "eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel, and the judiciary" in all federal cases involving the core allegation that perineal use of talc-based Johnson's Baby Powder and Shower to Shower causes ovarian cancer.  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 220 F. Supp. 3d 1356, 1357-58 (J.P.M.L. 2016).  To further that objective, the parties spent nearly four years addressing the cross-cutting question of general causation—i.e., whether cosmetic talc is even capable of causing ovarian cancer.  In 2018, the PSC designated 21 experts to opine on this question and other related issues.  These experts were the subject of extensive discovery and Rule 702 motion practice involving more than 1,000 pages of pre-hearing briefing.  Following a hearing, Judge Wolfson requested that the parties

---

[2]    Defense counsel met and conferred with counsel for plaintiffs, who oppose both the main relief sought in this motion and the proposed alternative relief.

submit additional briefing; defendants filed an additional 80-page brief (ECF No. 10713); and plaintiffs submitted an additional 77-page brief (ECF No. 10712).  On April 27, 2020, the Court issued a 141-page opinion granting in part and denying in part defendants' motions.  *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020).[3]

The parties then proceeded to work up multiple cases for bellwether trials pursuant to a series of case management orders providing that "Plaintiffs shall designate ***all general and case specific experts*** pursuant to Rule 26(a)(2)(A) and serve on defense counsel the Rule 26(a)(2)(B) reports of all general case specific expert witnesses they may use at trial in any of the Stage Three cases by July 2, 2021."  (ECF No. 17833, at 3 (emphasis added).)  Those orders limited the scope of general causation evidence to "supplemental" testimony.  (*See* ECF No. 24511, at 2.)  In July 2021, pursuant to Judge Wolfson's case management order, plaintiffs designated the following ten experts for the first pool of bellwether cases:  Daniel Clarke-Pearson, John Godleski, William Longo, Anne McTiernan, Laura Plunkett, Jack Siemiatycki, Rebecca Smith-Bindman, Mark Rigler, William Sage and Judith Wolf.  Defendants deposed these witnesses during August-October 2021, focusing

---

[3]    The Court did not rule on regulatory and conduct experts; rather, those issues were deferred, subject to the agreement of the parties.

on their case-specific opinions and taking care not to duplicate work that had been done during the general-causation stage of this proceeding.[4]

On October 14, 2021—during the pendency of this case-specific work—J&J announced that LTL, a subsidiary established to hold and manage its claims in talcum powder litigation, would be filing for Chapter 11 bankruptcy protection, resulting in a stay of these proceedings.[5]  Although that stay was briefly lifted in January 2023 following the Third Circuit's decision dismissing the bankruptcy action, LTL re-filed for bankruptcy protection in April 2023, which had the effect of putting this litigation back on ice until that second action was dismissed in July of this year.

On September 6, 2023, this Court held a hearing to address how best to resume work on this litigation, including further proceedings related to expert witnesses.  The PSC's lead counsel, Michelle Parfitt, stated at that hearing that the Court should "not go back and do that which we spent years developing." (9/6/2023 Hr'g Tr. 9:24-10:8 (Ex. 1).)  Instead, she said, "what we will be doing is simply supplementing any additional literature that they may have read, which one

---

[4]     The only witness defendants did not depose was Dr. Godleski.

[5]     *See Johnson & Johnson Takes Steps to Equitably Resolve All Current and Future Talc Claims*, Cision PR Newswire (Oct. 14, 2021), https://www.prnewswire.com/news-releases/johnson--johnson-takes-steps-to-equitably-resolve-all-current-and-future-talc-claims-301400916.html.

4

would expect." (*Id.* 13:17-22.)[6]  Following that hearing, the Court entered the

October 10, 2023 Case Management Order providing that "Plaintiffs shall serve, if

necessary, supplemental and amended disclosures of all general and case-specific

experts pursuant to Rule 26(a)(2)(A) and serve on Defendants' counsel the Rule

26(a)(2)(B) reports of all general and case-specific expert witnesses . . . on or

before November 15, 2023." (Order ¶ 2, Oct. 10, 2023, ECF No. 28516.)  Because

it contemplated only limited supplements to plaintiffs' expert reports, the CMO

provided just two months for completing plaintiffs' expert depositions—a period

---

[6]     As defendants pointed out during that hearing, both the science and the law
had changed since the Rule 702 hearings before Judge Wolfson in 2019.  Most
notably, a pooled study (the largest ever performed on the issue), led by a scientist
at the National Institutes of Health, found "no statistically significant association
between . . . use of [talcum] powder in the genital area and the risk of ovarian
cancer."  O'Brien et al., *Association of Powder Use in the Genital Area with Risk
of Ovarian Cancer*, 323(1) JAMA 49, 56 (2020).  In addition, one of the PSC's key
epidemiologists, Dr. McTiernan, was excluded by another federal court for her use
of "result-driven reasoning," *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F.
Supp. 3d 1075 (S.D. Fla. 2022), which she recently admitted was the same
methodology she employed in this litigation.  And just this month, Rule 702 was
amended to clarify that plaintiffs have the burden of proving, by a preponderance
of the evidence, that their experts' opinions are the product of reliable
methodologies and that the kind of challenges raised in defendants' prior Rule 702
motions implicate admissibility, not weight or credibility, as the prior MDL judge
held.  *See* Report of the Advisory Committee on Evidence Rules, at 6 (May 15,
2022) ("The Committee concluded that in a fair number of cases, the courts . . .
essentially treat[] these questions as ones of weight rather than admissibility, which
is contrary to the Supreme Court's holdings that under Rule 104(a), admissibility
requirements are to be determined by [the] court under the preponderance
standard.").

that encompasses the Thanksgiving, Christmas and New Years holidays.  On November 15, plaintiffs served their disclosures, which included entirely new experts in this litigation, experts who submitted original reports in 2018 but were not disclosed as witnesses in the bellwether cases, and new opinions from previously disclosed experts that were not tied to post-July 2021 developments.

*New experts.*  Plaintiffs have designated three new epidemiologists who were never previously disclosed in this MDL proceeding:  Dr. Michele Cote, Dr. Bernard Harlow and Dr. Kenneth Rothman.  (*See* Expert Rep. of Michele L. Cote ("Cote Rep."), Nov. 15, 2023; Expert Rep. of Bernard L. Harlow and Kenneth J. Rothman ("Harlow & Rothman Rep."), Nov. 15, 2023.)  These new epidemiologists—two of whom submitted a joint report—address the same fundamental question as plaintiffs' existing experts: "Can the use of perineal talcum powder cause epithelial ovarian cancer?"  (Cote Rep. at 3; *see also* Harlow & Rothman Rep. at 1 ("We have been retained to review the current state of the science regarding whether genital application of talcum powder products . . . causes epithelial ovarian cancer . . . .").)  The PSC also disclosed a new marketing expert, Dr. George Newman, with supposed expertise in "branding and consumer behavior."  (Expert Rep. of George E. Newman ("Newman Rep.") at 3, Nov. 15, 2023.)  The gist of Dr. Newman's report is that J&J "engaged in misleading and

deceptive conduct" in promoting talc products and failing to disclose purported safety risks.  (*Id.* at 4.)

   ***Previously Disclosed Expert With All-New Case-Specific Opinions.***  Dr. Shawn Levy submitted a report during the general-causation phase of this proceeding addressing the "role of genetics in the pathogenesis of cancer in general and specifically ovarian cancer." (Expert Rep. of Shawn Levy at 2, Nov. 16, 2018.)  Although plaintiffs did not designate Dr. Levy as an expert in the bellwether pool of cases in 2021, they recently served a report adding new case-specific opinions from Dr. Levy addressing the genetic testing results of the six plaintiffs in the bellwether pool of cases.  (*See* Am. Expert Rep. of Shawn Levy ("Am. Levy Rep.") at 18-24, Nov. 15, 2023.)[7]  The information relied upon by Dr. Levy was available when the PSC made its prior disclosures in 2021, as substantiated by plaintiffs' medical records.  (*See id.* at 21-25.)[8]

   ***Experts who were previously disclosed in these bellwether cases.***  Although Dr. Sonal Singh served a general causation report in November 2018 for purposes of the Rule 702 proceedings, plaintiffs did not designate him as an expert in these

---

[7]    Dr. Levy also includes a short general discussion of genetic testing that was not included in his original report and should be stricken.  (*See* Am. Levy Rep. at 18-20.)

[8]    Defendants have not attached those records because this motion is being filed on the public docket.

bellwether cases.  Nonetheless, they recently served a "supplement" to his original 2018 report that largely rewrites that prior document.  (*See* Suppl. Expert Rep. of Sonal Singh ("Singh Suppl. Rep."), Nov. 15, 2023.)  Dr. Singh's "supplemental" report addresses various studies since ***2017*** that "reaffirmed [his] conclusion that the association between genital talcum powder use and the development of ovarian cancer is causal," including studies such as Taher 2020 that were published well before complete disclosures were due under the 2021 case management order. (*See, e.g.*, *id.* at 2, 3, 4, 5, 6, 16.)  Dr. Singh's new report also significantly expands on his opinions regarding biological plausibility, espousing theories regarding "retrograde migration of talc particles" and "promotion of inflammation" that he attempts to substantiate by a report from a Canadian agency (Health Canada), as well as claims regarding the purported role of asbestos based on FDA and other materials that were available prior to July 2021.  (*See, e.g.*, *id.* at 13-19.)  Dr. Singh's new report also substantially revises his Bradford Hill analysis, stating, for example, that the "modest" association in question "may represent low level of exposure" and relying heavily on a 2015 paper for his expanded views on consistency and biological gradient.  (*See, e.g.*, *id.* at 17, 20-21.)

Drs. McTiernan, Siemiatycki and Smith-Bindman issued original reports in 2018, which they updated in 2021.  They have now submitted third iterations of their reports that purport to analyze "recent" epidemiologic and other evidence

regarding causation (*see, e.g.*, 2d Am. Expert Rep. of Jack Siemiatycki ("2d Am. Siemiatycki Rep.") at 50-52, Nov. 15, 2023; *see also id.* at 74-78), but swaths of their reports also include material that is not tied to any recent developments.  For example, Dr. Smith-Bindman purports to examine "[r]ecent in vitro research" regarding "cellular inflammatory changes, alteration of macrophages, and changes to the DNA and epigenetic expression," which includes papers published between 2019 and 2021.  (*See* 2d Am. Expert Rep. of Rebecca Smith-Bindman ("2d Am. Smith-Bindman Rep.") at 13-14, Nov. 15, 2023.)  Dr. McTiernan addresses in detail "[t]he most recent meta-analysis of the association" between perineal talc use and ovarian cancer (Taher et al. 2020), which "was published by Canadian researchers in 2019 (with data published in 2020)."  (2d Am. Expert Rep. of Anne McTiernan ("2d Am. McTiernan Rep.") at 55-56, Nov. 15, 2023.)  And Dr. Siemiatycki discusses multiple articles that predated his prior report in this litigation, including a paper addressing three case-control studies (Gabriel 2019), a "comprehensive review of evidence including epidemiologic studies, animal experimentation and some mechanistic evidence" (Goodman 2020) and the report from Health Canada.  (2d Am. Siemiatycki Rep. at 52, 74-75, 77.)

These experts also introduce new opinions or expand on their previously disclosed theories.  For example, Dr. Rebecca Smith-Bindman now claims that talcum powder products "have never been free of asbestos," relying on a 2019

study from Dr. William Longo, J&J corporate representative testimony from 2019 and FDA testing, also from 2019.  (*See* 2d Am. Smith-Bindman Rep. at 11, 12.) Dr. Siemiatycki now claims that talcum powder products "contained some heavy metals that are themselves carcinogenic." (2d Am. Siemiatycki Rep. at 71.)  Dr. Smith-Bindman includes an entirely new discussion of the "female genital tract" and her belief that talc particles can migrate to the ovaries based on studies from 1971, 1996, 2004 and 2020.  (2d Am. Smith-Bindman Rep. at 13.)  Dr. Anne McTiernan's "amended" report elaborates on her views regarding "statistical significance" (i.e., that it is essentially an outdated concept) and her belief that many studies "underestimate[ed] . . . talcum powder product exposure." (2d Am. McTiernan Rep. at 15, 27.)  Dr. Smith-Bindman tries to explain why the "absence" of a reported dose-response relationship "in any given study would not dissuade [her] from [her] belief that talcum powder products cause[] ovarian cancer in some women" (2d Am. Smith-Bindman Rep. at 35), and Dr. McTiernan offers the entirely new theory that "there are no standardized definitions" of "weak," "moderate," or "strong" associations (2d Am. McTiernan Rep. at 32).  Dr. McTiernan also expounds on her theory that talc causes ovarian cancer via inhalation (*see* 2d Am. McTiernan Rep. at 78, 92), even though Judge Wolfson excluded that opinion as unreliable.  *See In re Johnson & Johnson*, 509 F. Supp. 3d at 176.

Finally, plaintiffs also served reports from their regulatory and asbestos testing experts that significantly revamp their prior opinions.  Plaintiffs' regulatory expert, Dr. David Kessler, has tripled the length of his report, adding opinions addressing purported asbestos contamination and expanding on his prior and very limited discussion of epidemiological studies.  (*See* Am. Expert Rep. of David Kessler ("Am. Kessler Rep.") ¶¶ 67-140, 149(d)-(f), 150.5-150.7, Nov. 15, 2023.)[9] Dr. William Longo's new report purports to perform asbestos exposure analyses for the bellwether plaintiffs and offers a Polarized Light Microscopy ("PLM") analysis of J&J talc samples using a method developed by the Colorado School of Mines "in the early 1970s" that had not been previously disclosed to defendants. (*See* Expert Rep. of William Longo Regarding Six Bellwether Plaintiffs ("Longo Nov. 2023 Bellwether Cases Rep.") at 20, Nov. 17, 2023; 3d Suppl. Expert Rep. of William Longo ("3d Suppl. Longo Rep.") at 3, Nov. 17, 2023.)

Defendants previewed these arguments in a November 21, 2023 letter to the Court.  (ECF No. 28727, and incorporated herein.)  This motion follows.

---

[9]     Defendants have attached as Exhibit 2 for illustrative purposes a redlined comparison between the report David Kessler submitted on November 16, 2018 and the report he submitted on November 15, 2023.  Defendants have generated redlined comparisons of all the reports that have been "supplemented" by plaintiffs' experts and can submit those to the Court if it would be helpful.

## ARGUMENT

### I.   PLAINTIFFS' NEW DISCLOSURES VIOLATE THE COURT'S CASE MANAGEMENT ORDERS AND RULE 26.

Federal Rule of Civil Procedure 26(a)(2)(D) requires parties to make expert disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  In addition, Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "[T]he party who failed to timely disclose . . . ha[s] the burden to prove 'substantial justification for its conduct or that the failure to produce was harmless.'"  *Perez v. Great Wolf Lodge of the Poconos LLC*, No. 3:12-CV-01322, 2017 U.S. Dist. LEXIS 19251, at *10 (M.D. Pa. Feb. 10, 2017) (citation omitted).

These principles apply where, as here, a party uses a "supplemental" report in an effort to amend an expert's opinions with previously available literature.  *See Dandy v. Ethicon Women's Health & Urology*, 579 F. Supp. 3d 625, 631 (D.N.J. 2022) (granting motion to strike late report challenging the safety of transvaginal mesh; "Despite calling the June 9, 2021 report a 'supplement' and implying that it is based on new information, it appears to be neither."); *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 15-7025 (RBK/JS), 2017 WL 5886004, at *3 (D.N.J.

12

Nov. 29, 2017) (citation omitted) (holding that "supplementary disclosures 'do not permit a party to introduce new opinions after the disclosure deadline under the guise of a supplement'" and striking plaintiffs' experts' new opinions as such) (citation omitted); *Fillichio v. Toms River Police Dep't*, No. 19-575 (ZNQ)(DEA), 2022 WL 959278, at *4 (D.N.J. Mar. 25, 2022) (striking plaintiffs' supplemental report that offered new opinions).

The Court should strike plaintiffs' newly disclosed experts' reports in their entirety and several of plaintiffs' experts' reports in part pursuant to this standard because:  (1) they are untimely; and (2) their belated disclosure is neither substantially justified nor harmless.

### A.    Plaintiffs' New Experts And Certain New Opinions From Their Previously Disclosed Experts Are Untimely Under The Court's Case Management Orders And Rule 26.

The most egregious violation of Rule 26 and this Court's prior orders was the designation of four experts who have never been involved in this litigation.  As explained above, plaintiffs have designated three epidemiologists and a marketing expert who are entirely new to this litigation: Bernard Harlow, Kenneth Rothman, Michele Cote and George Newman.  None of these individuals was designated as an expert at any point in this litigation, much less at the time "complete" disclosures were due under the applicable case management order.  The designation of these new experts is a "flagrant disregard" of the case management

13

orders in this MDL proceeding and Rule 26.  *See, e.g.*, *Allen v. Parkland Sch. Dist.*, 230 F. App'x 189, 194 (3d Cir. 2007) (affirming district court's exclusion of belatedly disclosed experts given plaintiff's "flagrant disregard of the [d]istrict [c]ourt's order requiring experts to be designated" nine months earlier); *Perez*, 2017 U.S. Dist. LEXIS 19251, at *10 (submission of five new expert reports from new witnesses was "untimely" under the court's scheduling order and thus violated Rules 26(a) and (e) (citation omitted).

Plaintiffs have also violated the case management orders and Rule 26 by belatedly designating Shawn Levy as a case-specific expert in these bellwether cases.  Although Dr. Levy submitted an original general report in November 2018 in connection with the Rule 702 proceedings, he has never before disclosed any case-specific opinions in this litigation.  To be clear, Dr. Levy's "amended" report is an entirely new report.  In contrast to his original report that only addressed general issues relating to genetics and ovarian cancer, his new report now purports to opine that genetics did not play a role in the development of the six bellwether plaintiffs' cancers, based on genetic testing that was available to him in July 2021. (*See* Am. Levy Rep. at 18-24.)  Accordingly, plaintiffs' designation of Dr. Levy is also untimely.

Finally, even as to the general-causation experts subject to this motion who were properly designated in November 2018 and/or July 2021, plaintiffs'

disclosures are improper because the new reports attempt to bolster or strengthen their prior opinions.  As explained in detail above, plaintiffs' disclosures from their existing epidemiologists rely heavily on purportedly "recent" studies that were published well before they submitted their 2021 reports, include new opinions on core epidemiologic principles, and, in the case of Dr. McTiernan, adds material designed to circumvent Judge Wolfson's rejection of her theory that talc particles can reach the ovaries through inhalation.  (*See* 2d Am. McTiernan Rep. at 77-78, 92.)  Dr. Kessler has tripled the length of his original report, adding hundreds of paragraphs of completely new content addressing purported asbestos contamination, defendants' historical conduct and epidemiological studies that were not previously disclosed in his original report.  (*See* Am. Kessler Rep. ¶¶ 67-140, 149(d)-150.1, 150.5-150.7, 155-255.11.)  And Dr. Longo not only introduces new asbestos-exposure analyses for each of the six proposed bellwether plaintiffs, but also addresses for the first time a testing methodology developed by the Colorado School of Mines in the 1970s.

For all of these reasons, these reports violate the Court's case management order and Rule 26.

**B.**   **Plaintiffs Do Not Have Substantial Justification For The Untimely Submissions Of New Experts And Opinions, And Their Admission Would Be Highly Prejudicial.**

As set forth above, Rule 37 requires the exclusion of expert opinions that are not submitted in a timely manner pursuant to Rule 26, unless plaintiffs can establish that the failure to comply with Rule 26 was "substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Perez*, 2017 U.S. Dist. LEXIS 19251, at *10 ("the party who failed to timely disclose" "ha[s] the burden to prove" substantial justification or harmlessness) (citation omitted).  Plaintiffs cannot demonstrate either.

*First*, plaintiffs have no justification for designating new experts and disclosing new opinions that were not necessitated by recent scientific developments.  *See, e.g.*, *Dandy*, 579 F. Supp. 3d at 631 (late report was not proper supplementation and was not substantially justified where it "cit[ed] materials that were all available prior to the March 2021 deadline in this case"); *Roberts v. United States*, No. 09-6212 (WJM), 2012 U.S. Dist. LEXIS 86762, at *12 (D.N.J. June 22, 2012) (because "[i]t seems clear that [p]laintiff had been seeking and receiving treatment for throat issues before the close of discovery," her "untimely identification of proposed [experts] well after the close of discovery is not 'substantially justified'").  That is the case with respect to all three categories of expert reports that are subject to this motion.

16

***New experts.***  Plaintiffs have no justification for their belated attempt to add George Newman—a purported "branding and consumer behavior" expert—who relies primarily on materials that were available well before 2021, including historical documents dating as far back as 1894.  (*See* Newman Rep. at 7.) Plaintiffs also cannot justify their dilatory attempt to introduce three new epidemiologists (Drs. Cote, Harlow and Rothman) into this litigation, all of whom rely substantially on studies that had been published prior to 2021.  This is particularly true since all three new epidemiology experts largely rehash the same opinions held by the four epidemiologists who were disclosed in 2021, rendering their proposed testimony cumulative.  *See Schneck v. Int'l Bus. Machs. Corp.*, No. 92-4370 (GEB), 1996 U.S. Dist. LEXIS 17486, at *77-79 (D.N.J. June 25, 1996) ("This [c]ourt finds that Dr. Glucksberg's opinions add nothing to plaintiffs' case beyond that which has already been proffered in the report of Dr. Punnett.  Such repetition serves no useful purpose and is merely cumulative.").

***Dr. Levy.***  Plaintiffs also have no justification for disclosing case-specific opinions from Dr. Levy that he could have provided in 2021 under the applicable case management order.  After all, the genetic testing results for the six plaintiffs detailed in Dr. Levy's new report were available when plaintiffs disclosed their other experts' case-specific opinions in these bellwether cases.  (*See* Am. Levy Rep. at 21-25.)

17

***Previously disclosed experts who have significantly revamped their reports.*** Plaintiffs' "supplemental" reports for experts who were properly designated in 2018 and/or 2021 likewise have no substantial justification to the extent they address matters that could have been addressed at that time. Although lead counsel for the PSC promised that these experts would "simply [be] supplementing any additional literature that they may have read" (9/6/2023 Hr'g Tr. 13:17-22), Drs. McTiernan, Siemiatycki and Smith-Bindman all examine studies (e.g., Taher 2020) that were published well before they submitted their reports in 2021. (*See, e.g.*, 2d Am. McTiernan Rep. at 55-56; 2d Am. Siemiatycki Rep. at 52, 74-75, 77; 2d Am. Smith-Bindman Rep. at 13-14.)

Moreover, far from "simply . . . supplementing" their prior reports with more recent studies, plaintiffs' experts have used these new reports as vehicles for attempting to rehabilitate their opinions, which defendants have repeatedly criticized throughout this litigation. For example, Dr. Smith-Bindman now asserts that the talc products in question were always contaminated with asbestos and adds extensive discussion of her theory of talc migration (2d Am. Smith-Bindman Rep. at 11, 12, 13), and she, Dr. McTiernan and Dr. Singh attempt to fix their flawed approaches to the Bradford Hill criteria previously highlighted by defendants and their experts. (*Compare* 2d Am. Smith-Bindman Rep. at 35 (new explanations on dose response), *with* 2d Am. McTiernan Rep. at 32 (adding new justification for

her position on strength of association); *see also* Singh Suppl. Rep. at 17, 20-21 (elaborating on strength-of-association, consistency and biological gradient criteria).)  Finally, the addition of Dr. McTiernan's new statements regarding her unscientific theory that talc causes ovarian cancer via inhalation is especially egregious in light of Judge Wolfson's unequivocal ruling excluding that theory as unreliable.  *See Kieser v. C.R. Bard, Inc.*, No. 5:20-cv-06045-NKL, 2021 U.S. Dist. LEXIS 258776, at *8 (W.D. Mo. Apr. 9, 2021) (granting motion to strike opinions that had been excluded by the MDL court "[i]n lieu of any significant change in circumstance post-remand justifying the reexamination of the MDL [c]ourt's *Daubert* [o]rder").

Two of plaintiffs' other previously disclosed experts—Drs. David Kessler and William Longo—similarly did far more than update their reports with new data; rather, they have provided fundamentally new opinions based on information that was previously available.  For example, Dr. Kessler has more than tripled the length of his original report, addressing such issues as purported "asbestos, non-asbestiform amphiboles[] and fibrous talc" in Johnson's Baby Powder based on materials dating as far back as 1964 and expanding upon his prior limited discussion of old epidemiologic studies.  (*See* Am. Kessler Rep. ¶ 77; *see also id.* ¶¶ 67-140, 149(d)-150.1, 150.5-150.7, 155-255.11.)  These new opinions have nothing to do with any new studies or data and should have been disclosed years

19

earlier.  The same is true with respect to Dr. Longo's attempts to reassert his asbestos-exposure and PLM opinions—all of which were previously excluded by Judge Wolfson.  Indeed, because the data underlying Dr. Longo's opinions were available long before November 2023 (his "supplemental" report expressly acknowledges that his new PLM analysis of cosmetic talc samples is based on a "method" developed by the Colorado School of Mines in the 1970s), their disclosure is nothing but a thinly veiled (and procedurally improper) attempt to circumvent the prior ruling excluding them.

> **Second**, allowing plaintiffs to add these new experts and opinions to these proceedings at this late stage would be far from harmless.  As this Court has recognized, "a rule that allows limitless ongoing supplementation would not only erode the court's ability to control discovery but also 'invite rolling discovery in a way that would unfairly burden one party in a suit and indefinitely postpone trial.'" *Raritan Baykeeper, Inc. v. NL Industries, Inc.*, No. 09-4117 (MAS) (DEA), 2022 U.S. Dist. LEXIS 47945, at *8 (D.N.J. Mar. 17, 2022) (citation omitted); *see also id.* at *11 ("[I]f every arguably relevant regulatory change and study required supplementing expert reports, the parties could drag out expert discovery indefinitely."); *In re Asbestos Prods. Liab. Litig.*, 289 F.R.D. 424, 426-27 (E.D. Pa. 2013) (striking untimely expert reports because "[t]he only way to 'cure' any

prejudice would be to re-open expert discovery[,] allow defendants to re-depose plaintiffs' experts, [and] generate new expert reports").[10]

If the current reports are not stricken, defendants would have to conduct full day-long depositions of each expert, prepare all-new rebuttal reports and challenge the new experts and opinions with plenary motions under Rule 702, dragging out this litigation (including the first bellwether trial) indefinitely.  For example, defendants would be entitled to probe and challenge: Dr. Singh's fundamentally new opinions regarding biological plausibility; his, Dr. Smith-Bindman's and Dr. Kessler's new claims about the purported role of asbestos in talc products; Dr. Kessler's new views about the alleged geological relationship between asbestos and talc; Dr. Kessler's new analysis of epidemiologic studies and his expansive new allegations that J&J acted improperly in defending the safety of its talc

---

[10]     *Accord In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2021 WL 763778, at *3 (N.D. Fla. Jan. 15, 2021) (striking expert report where "prejudice to [opposing party]—and the resolution of this case—is overwhelming," explaining that the "case is too far along for such repercussions, which would all but implode the [c]ourt's scheduling order in this vast multidistrict litigation"); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327, 2017 WL 4769657, at *2 (S.D. W. Va. July 21, 2017) (striking expert's untimely report, as court was "particularly cognizant of the realities of multidistrict litigation and the unique problems an MDL judge faces" in ensuring that "pretrial litigation flows as smoothly and efficiently as possible"); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 948, 950 (D. Minn. 2009) (untimely supplemental report "would further delay the resolution of this [c]ourt's role in the pretrial stage of this multidistrict litigation," where it had already been "three years since this multidistrict litigation began").

products; Dr. Singh's new claims about the consistency and biological gradient elements of Bradford Hill; Dr. McTiernan's theory that statistical significance is essentially outdated; Dr. Smith-Bindman's elaborations on why the dearth of a reported dose-response relationship in epidemiologic studies is not meaningful; and Dr. McTiernan's new claim that associations cannot be characterized as "weak," "moderate," or "strong."  As a result, injecting these new experts and opinions into the litigation would guarantee costly and protracted discovery and much more expansive Rule 702 motion practice.

In short, permitting plaintiffs to introduce new experts and new opinions into this litigation at this stage of the proceedings would be the quintessence of prejudice and result in the sort of inefficiency, delay and duplication that this MDL proceeding was created to prevent.

### C.     In The Alternative, Defendants Will Require Additional Time To Depose Plaintiffs' Experts.

If the Court denies defendants' requested relief, it should, at a minimum, extend the current deadlines for completing expert-related discovery.  As discussed throughout this brief, the scope of plaintiffs' "supplemental" disclosures is substantial, requiring examinations of entirely new witnesses and far greater probing of previously disclosed experts than defendants and the Court had anticipated.  As a result, and to ensure that defendants have a full and fair opportunity to test plaintiffs' experts' opinions, the Court should extend by four

22

weeks each of the pending expert-related deadlines, including the time for deposing plaintiffs' experts, designating defendants' rebuttal experts and service of their reports and deposing those witnesses.[11]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should:  (1) strike the expert reports of Drs. Cote, Harlow, Rothman and Newman in full; (2) strike the case-specific portion of Dr. Levy's new report; and (3) require Drs. Singh, Siemiatycki, Smith-Bindman, McTiernan, Longo and Kessler to submit supplemental reports that only address scientific and other developments after July 2021.

In the alternative, the Court should extend each of the upcoming expert-related deadlines by four weeks, with depositions of plaintiffs' experts to be completed by February 19, 2024; disclosure of rebuttal experts and reports due April 1, 2024; and depositions of defendants' experts to be completed by May 13, 2024.

Dated: December 14, 2023                    Respectfully submitted,

                                            <u>/s/ Susan M. Sharko</u>
                                            Susan M. Sharko
                                            **FAEGRE DRINKER BIDDLE &**
                                            **REATH LLP**
                                            600 Campus Drive
                                            Florham Park, NJ 07932
                                            Tel.: (973) 549-7000

---

[11]     This requested relief may also require modest extensions of dispositive and Rule 702 briefing deadlines as well.

susan.sharko@faegredrinker.com

Allison M. Brown
Jessica Davidson
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel.: (212) 735-3000
allison.brown@skadden.com
jessica.davidson@skadden.com

*Attorneys for Defendant*
*Johnson & Johnson*

24