Jeffrey M. Pollock, Esq.
Michael W. Sabo, Esq**.**
**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Telephone: 609-896-7660
Facsimile: 609-896-1469
*Attorneys for Andy Birchfield and Beasley Allen*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738 (MAS)/(RLS)<br><br>MLD Case No. 2738<br><br>[FILED ELECTRONICALLY]<br><br>Return Date: January 2, 2024 |

**DECLARATION OF JEFFREY M. POLLOCK, ESQ.**

I, JEFFREY M. POLLOCK, ESQ., declare:

1.      I am a partner at the law firm Fox Rothschild LLP, counsel for Andy D. Birchfield, Jr., Esq. and Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen). I make this declaration based on personal knowledge and in opposition to Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show Cause Seeking to Disqualify Andy D. Birchfield, Jr., Esq. and Beasley Allen from this litigation and remove Beasley Allen from the Plaintiffs' Steering Committee.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the October 31, 2018 article titled "Weil Gotshal's Lawyers Tough Tactics Sealed J&J Talc Win," by Bill Weichart that

1

appeared in Law 360.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the November 2, 2018 article titled "A Look At Biglaw's Tough Trial Tactics," by Kathryn Rubino that appeared in Above the Law.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the February 9, 2022 article titled "J&J Uses 'Project Plato' to Potentially Avoid Talcum Power Payouts," by Clay Hodges that appeared in the North Carolina Product Liability Lawyer Blog.

5.      Attached hereto as **Exhibit D** is a true and correct copy of a July 7, 2023 article titled "'Enemies List': Plaintiffs' Expert Witnesses Are Targets as J&J Unit Revives Lawsuit," by Amanda Bronstad that appeared in ALM Law.com.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the July 14, 2023 article titled "In Talc Defense, Johnson & Johnson Sues 4 Doctors Over Their 'Junk Litigation Opinions,'" by Kevin Dunleavy that appeared in Pharma.

7.      Attached hereto as **Exhibit F** is a true and correct copy of July 18, 2023 article titled "J&J Subsidiary Sues More Talc Researchers," by Rebecca Trager that appeared in Chemistry World.

8.      Attached hereto as **Exhibit G** is a true and correct copy of a Dupuy Orthopaedics (a J&J subsidiary) motion to disqualify Dr. Dana Medlin, a plaintiffs expert, in the North Carolina case, *Richard H. Weatherly v. Depuy Orthopaedics*, Case No. 1:23-cv-00134-(LCB)/(JEP) (filed July 20, 2023).

9.      Attached hereto as **Exhibit H** is a true and correct copy of the December 8, 2023 Order to Show Cause application J&J filed in the Superior Court of New Jersey, Atlantic County, which is nearly identical to J&J's motion to disqualify before this Court.

10.     Attached hereto as **<u>Exhibit I</u>** is a true and correct copy of an excerpt of a transcript dated July 11, 2019 of the trial in the *Barden v. Brennatag* trial, MID-L-1809-17 designated as "5T".

11.     Attached hereto as **<u>Exhibit J</u>** is a true and correct copy of an excerpt of a transcript dated July 15, 2019 of the trial in the *Barden v. Brennatag* trial, MID-L-1809-17 designated as "7T".

12.     Attached hereto as **<u>Exhibit K</u>** is a true and correct copy of an excerpt of a transcript dated September 4, 2019 of the trial in the *Barden v. Brennatag* trial, MID-L-1809-17 designated as "33T".

Under 28 U.S.C. 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on December 19, 2023

*/s/ Jeffrey M. Pollock*
JEFFREY M. POLLOCK, ESQ.

# EXHIBIT A

- Insurance
- Intellectual Property
- Product Liability
- Securities

- Beta Tools
- Track docs
- Track attorneys
- Track judges

- Site Menu
- Join the Law360 team
- Search legal jobs
- Learn more about Law360
- Read testimonials
- Contact Law360
- Sign up for our newsletters
- Law360 Company
- Resource Library
- Site Map
- Help

myLaw360 || Product Liability  Life Sciences  Class Action  Legal Industry  Access To Justice  Law360 UK  Pulse || See all sections ||  NEWSLETTERS

How They Won It

# Weil Gotshal Lawyers' Tough Tactics Sealed J&J Talc Win

*By Bill Wichert*

Law360 (October 31, 2018, 7:55 PM EDT) -- Weil Gotshal & Manges LLP this month knocked out claims that a woman's alleged exposure to asbestos in Johnson & Johnson's baby powder contributed to her mesothelioma, with firm attorneys taking a more aggressive stance than other counsel in prior cases by blasting the matter as a "sham" created by her lawyers.

After studying how similar cases unfolded — including one where J&J and a co-defendant were hit with verdicts totaling $117 million — Weil Gotshal "hammered hard" on the argument that the suit was a fraud perpetrated by the plaintiffs' lawyers for money, according to firm partner Diane Sullivan, who tried the matter in the New Jersey state trial with firm partner Allison Brown.

Looking at what lawyers for the pharmaceutical giant had done in other cases, Sullivan said she and Brown "took what we thought had worked … and kind of shook up the arguments a little bit … when we thought some things didn't work," and "went hard on what we think is the truth, that this is just … a litigation concocted by plaintiffs' lawyers."

With the Weil Gotshal attorneys framing the instant action as "a sham created by plaintiffs' lawyers" in a more overt way than had been done in prior cases, "the jury, it looks like, accepted that wholeheartedly and we were … obviously heartened by the verdict," Sullivan added.

Less than two hours after leaving the courtroom for deliberations, seven jurors on Oct. 11 unanimously sided with J&J by rejecting allegations from plaintiff Rosalind Henry and her husband that the company sold asbestos-containing baby powder and that Henry's exposure to the toxic mineral in the product played a substantial role in her contracting mesothelioma.

Throughout the nearly four-week trial, the Weil Gotshal attorneys argued that the company's baby powder does not contain asbestos.

Sullivan told jurors the company extensively tested its baby powder to ensure that the product was safe. The U.S. Food and Drug Administration and other third parties — including scientists at the Massachusetts Institute of Technology and Princeton University — have also confirmed that the baby powder did not contain asbestos, Sullivan said.

Such scientific evidence resonated with the jury in its rejection of the plaintiffs' claims, according to the Weil Gotshal attorneys.

Brown noted "there is no epidemiological study that shows an increase in [mesothelioma] in the miners and millers of cosmetic talc, and there's no government authority that says cosmetic talc increases the risk, and I think those two facts really resonated with some smart, perceptive jurors who paid a lot of attention."

One of J&J's themes during the trial was that "you should use your common sense, and that when you sort of hold the claims up to the light of your common sense, it's not gonna add up," Brown said.

"And I think there were a number of different ways where the jurors used the science to come to the conclusion pretty quickly that these claims didn't add up," Brown added.

The company's trial victory came about six months after jurors in the same New Brunswick courtroom awarded verdicts totaling $117 million in damages

against J&J and its talc supplier over claims that a man's exposure to the company's alleged asbestos-containing talcum powder contributed to his mesothelioma.

Superior Court Judge Ana C. Viscomi, who also presided over the Henry trial, later upheld those verdicts, which J&J is now appealing.

The outcome of the Henry trial, however, serves as a reminder that such cases could end in the defense's favor and puts pressure on plaintiffs to consider settlements, experts say.

That plaintiffs have won some talc verdicts puts pressure on J&J "to think about settling at some point, but the fact that juries can deliver defense verdicts puts pressure on plaintiffs, because it means that … if the next plaintiff chooses to go to trial, the plaintiff is risking getting zero," according to Howard M. Erichson, a professor at Fordham University School of Law.

"Everyone knows in theory that there's risk on both sides, but sometimes it takes a defense verdict to … hammer home the message … that there's risk for plaintiffs in these cases and not only for defendants," Erichson said.

Duane Morris LLP partner Robert Kum, who represents defendants in similar talc cases, said the Henry verdict gives the defense "further hope that they can defend these cases."

While the verdict won't deter some plaintiffs' firms from taking such cases to trial, the defense win will likely encourage others to take a harder look at resolving cases before going before a jury, according to Kum.

"It depends on the law firm. It depends on the resources that they have," Kum said.

The cases against J&J have centered in large part on internal company documents that plaintiffs have claimed shows the business knew its talcum powder contained asbestos.

As part of their argument, the Weil Gotshal attorneys confronted such documents at the Henry trial by claiming the plaintiffs' lawyers were "cherry-picking" and misleading jurors about what the documents say, according to Sullivan.

Among those purported misrepresentations, the Henry lawyers cited talc mines where asbestos was allegedly found — but those mines were not actually used by J&J, and other mines pointed to were used by the company but not for its baby powder, Sullivan said.

The Weil attorneys also pointed to Brown's cross-examination of a plaintiffs' expert who had opined the baby powder caused Henry's mesothelioma.

The lawyers said Brown showed the expert issued the finding before receiving the results of testing done on the product by another plaintiffs' expert.

"The fact that he issued the opinion without the testing … was consistent with what we had been arguing from the beginning that this was a concocted litigation," Sullivan said.

That cross-examination was among Brown's "brilliant" strategy calls in the case, according to Sullivan, who added that Brown is "one of the best young trial lawyers in the country."

Brown, who said she considered Sullivan a mentor and a friend, noted that "everything I know about how to be a trial lawyer, I know from Diane."

Two of Henry's attorneys, Nathan Finch and Christopher Swett of Motley Rice LLC, told Law360 in a statement, "Our case was strongly corroborated by Johnson & Johnson's internal documents showing the presence of asbestos in its baby powder and the mine from which the talc was mined. Any particular jury can be swayed by numerous case-specific facts, and the jury alone knows the basis for its decision."

They added that "so far, nationwide, there have been eight mesothelioma cases tried against Johnson & Johnson, with two plaintiff verdicts, two defense verdicts and four mistrial/hung juries. ... We continue to believe that the evidence showing asbestos in talc will win at the end of the day so that Johnson & Johnson will eventually have to pay for the deaths it has caused and add a warning label to its baby powder."

The Henrys are represented by Christopher Swett and Nathan Finch of Motley Rice LLC and Dennis Geier and Jared Placitella of Cohen Placitella & Roth PC.

J&J is represented by Diane Sullivan and Allison Brown of Weil Gotshal & Manges LLP.

The case is Rosalind Henry et al. v. Johnson & Johnson et al., case number L-1748-17, in the Superior Court of New Jersey, County of Middlesex.

--Editing by Philip Shea and Alanna Weissman.

*For a reprint of this article, please contact reprints@law360.com.*

## 0 Comments

Andy Birchfield
Your name will appear next to your comment. If you do not disclose your full name, your comment will be deleted. Your email address will not be visible to the public.

Terms of Service

# EXHIBIT B

Newsletters · Send Tips · Advertise · About    Menu

Subscribe | Send Tips

Biglaw   Small Law   Law Schools   In-House   Legal Tech   Bonuses   AI   Government   Career Center   Non-Event

**FEATURED:**   ILTA on ATL »

BIGLAW

# A Look At Biglaw's Tough Trial Tactics

Are aggressive Biglaw attorneys the difference maker?

By KATHRYN RUBINO   on November 2, 2018 at 1:43 PM

**52**     
SHARES



The Biglaw firm of Weil Gotshal & Manges lived up to their nickname of We'll Getcha & Mangle-ya in a recent trial. The firm, led by partners Diane Sullivan and Allison Brown, was defending Johnson & Johnson against allegations their baby powder contained asbestos and contributed to plaintiff's mesothelioma. J&J's already lost a similar lawsuit — to the tune of a $117 million verdict (though that case is being appealed), so Sullivan and Brown decided a case of hardball was in order.

According to a report on the case from Law360, Sullivan reveals the key to the case was successfully portraying the theory of the case as a "sham" perpetrated by lawyers for the plaintiff.

SPONSORED



**LawPay Pro Offers Upgraded Time And Billing Essentials**

AffiniPay's latest product for the legal community, introduced earlier this year, presents a simple web-based solution for attorneys seeking seamless firm cash flow.

From ABOVE THE LAW

**Recommended**

Looking at what lawyers for the pharmaceutical giant had done in other cases, Sullivan said she and Brown "took what we thought had worked … and kind of shook up the arguments a little bit … when we thought some things didn't work," and "went hard on what we think is the truth, that this is just … a litigation concocted by plaintiffs' lawyers."

With the Weil Gotshal attorneys framing the instant action as "a sham created by plaintiffs' lawyers" in a more overt way than had been done in prior cases, "the jury, it looks like, accepted that wholeheartedly and we were … obviously heartened by the verdict," Sullivan added.



SPONSORED

**InterAction+ Brings Power Of CRM Software To Law Firms Of All Sizes**

The only legal CRM with exclusive content from LexisNexis®.

From LEXISNEXIS® INTERACTION+™

And it certainly didn't hurt to have testimony that the USDA and other third parties have extensively tested the baby powder and found no evidence of asbestos.

> Brown noted "there is no epidemiological study that shows an increase in [mesothelioma] in the miners and millers of cosmetic talc, and there's no government authority that says cosmetic talc increases the risk, and I think those two facts really resonated with some smart, perceptive jurors who paid a lot of attention."

After a four-week trial, the jury came back with a verdict for the defense in less than two hours.

But still, cases alleging baby powder contributed to mesothelioma have been a mixed bag for J&J with them winning and losing at trial. It just might be that aggressive Biglaw attorneys are the difference maker.



**The Billions Boost … Into Reverse?**



**The $435K Raise Race: Which Firms Have Upped The Ante On Associate Salaries?**



SPONSORED

**How Generative AI Is Disrupting Law Firm Billing Practices**

Amid legal landscape shifts, billing practices remain vital. With generative AI enabling faster, more efficient work, some law firms may adjust billing models accordingly.

From LEXISNEXIS

SPONSORED



**How to Achieve Quicker, More Valuable Case Settlements with Minimal Effort: A Guide for Personal Injury Lawyers**

We're pleased to share the "Top 5 Things Carriers Are Looking for in Demands" — a guide authored by a lawyer with deep experience on...

From EVENUP AND ABOVE THE LAW



*Kathryn Rubino is a Senior Editor at Above the Law, and host of The Jabot podcast. AtL tipsters are the best, so please connect with her. Feel free to email her with any tips, questions, or comments and follow her on Twitter (@Kathryn1).*

TOPICS

Allison Brown, Biglaw, Diane Sullivan, Weil Gotshal & Manges

**Recommended**

**Don't Get Scammed This Holiday! -- See Also**

Back In My Day, Gift Cards Were Simple: I recommend giving out cash this year.

Looking For A Non Gift Card Gift?: Check out our gift guide!

Does Your Bonus Look Like A Salary?: Check out the firms paying out to the tune of $435k.

ASS Law Soon To Be Assed Out: Goodbye accreditation?

Giuliani Gives Live Evidence At His Defamation Trial: This guy can't keep out of trouble!

More Bonuses!: Congrats to Hueston Hennigan, Selendy, and Ross Aronstam & Moritz.

By CHRIS WILLIAMS

**More From Above the Law**

   



SPONSORED

**The Smartfirm Playbook - Thriving In Today's Legal Landscape**

Strategically using software and automation to boost efficiency and streamline operations, allowing for a laser-focus on practicing law.

I'd Watch That Fruit Salad If I Were You

Stop Using Phrases like 'Good Fit' In Clerkship Hirings

Will Former Stroock Partners Ever See Their Capital Again?

Think Twice Before Getting Those Gift Card Stocking Stuffers

From LAWMATICS

---

**From the Above the Law Network**

**8 Essential Soft Skills For Legal Professionals In 2023: A Comprehensive Guide**

LATERAL LINK

**Four Tips For Solo Attorneys To Build Their Marketing And Media Relations Skills**

LAWLINE CLE

**How Overture Law Is Revolutionizing Referral Fees**

ABOVE THE LAW

**How to Successfully Navigate Your Career as a Lateral Partner in the Legal Industry**

LATERAL LINK

**This Is Why You Don't Take Law Advice From Twitter — See Also**

ASSOCIATE CENTER

**Webinar: How Private Equity Is Gaining A Competitive Edge With AI**

ONTRA

**2023 Litigation Economics: How Today's Law Departments Are Finding New Value**

BURFORD CAPITAL AND ABOVE THE LAW

**Lex Machina's Karl Harris On Success With AI**

ETHAN BEBERNESS

OUR SITES









© 2023 Breaking Media, Inc. All rights reserved. Registration or use of this site constitutes acceptance of our Terms of Service and Privacy Policy.



# EXHIBIT C

Contact Us Now: **919-546-8788**

---

## NORTH CAROLINA PRODUCT LIABILITY LAWYER BLOG

---

## Johnson & Johnson Uses "Project Plato" to Potentially Avoid Talcum Powder Payouts

February 9, 2022  |  By **Clay Hodges**

Claims of ovarian and other cancers due to talcum powder or baby powder use have been in the news a lot lately. There has also been plenty of litigation stemming from this possible link.



Although talcum powder studies are ongoing, it has been established that some products that use talcum powder may contain small amounts of asbestos. And there's a well-known **link between asbestos and cancer** (especially mesothelioma).

So where does Johnson & Johnson come in? Well, they've been one of the more prominent defendants in these talcum powder/asbestos cancer lawsuits. Let's take a quick look at the baby powder litigation and then examine how Johnson & Johnson is planning to use something called "Project Plato" to deal with their recent legal and financial losses.

*A Brief History of Johnson & Johnson's Baby Powder Litigation*



In 2018, **Reuters published a story** claiming that Johnson & Johnson (J&J) knew its baby powder products used talc that contained asbestos. In 2019, J&J **voluntarily recalled** some of its baby powder being sold in the United States.

A lot of people sued J&J and/or related entities claiming the products they used containing talc (such as baby powder) caused their cancer. Many of these cases are currently in the **Johnson & Johnson Talcum Powder Litigation** MDL, or **multidistrict litigation**, which is currently in New Jersey federal court.

A few of the cases against J&J have resolved, resulting in massive verdicts in favor of the plaintiffs. One of the most notable was a case from St. Louis where 22 women successfully sued J&J in 2018 and were awarded **more than $4 billion in damages**. On appeal, this amount was reduced to about **$2 billion**. Still, a remarkable amount.

As of 2021, J&J faced approximately $3.5 billion in legal settlements and judgments relating to its baby powder. This was bad enough, but it was just the beginning for J&J, with tens of thousands of cases still remaining. Seeing the writing on the wall, J&J allegedly thought of a new strategy to handle these lawsuits and gave it the code name

**Project Plato**.

### How Project Plato Works

Project Plato is a very clever strategy that takes advantage of federal bankruptcy and state corporate laws. The goal is to pay off baby powder cancer litigants for pennies on the dollar and prevent J&J from having to worry about future plaintiffs. The plan is still ongoing and it's unclear if it'll work as J&J plans, but here's a rough overview of the process.

For step one, J&J shifted its headquarters to Texas. The reason would be to take advantage of one of Texas' corporate laws that allows a corporation to divide itself into two or more companies through a process called a "divisive merger."

In step two, J&J created a subsidiary called LTL Management. This would take on J&J's legal liabilities relating to the baby powder asbestos litigation. However, it would have a relatively small number of assets to pay any legal awards or settlements. The rest of J&J would continue operating as the second company, yet it would no longer have to worry about any lawsuits from the talcum powder litigation.

The third step required LTL Management to file Chapter 11 bankruptcy, which it did almost immediately after being created.

Project Plato is currently in step four, which involves getting the **automatic stay** to temporarily halt the talcum powder litigation against J&J. It's also during step four that J&J hopes the bankruptcy judge will approve LTL Management's Chapter 11 bankruptcy reorganization plan which has a few special terms.

Namely, all baby powder cancer plaintiffs against J&J would have to make their case in bankruptcy court (instead of regular court) and fight for their share of $2 billion that J&J would give LTL Management to compensate the almost **40,000 current plaintiffs**.

J&J would also get a non-debtor release, which would immunize it from getting sued by any future plaintiffs claiming they got cancer from using J&J's baby powder or talcum-based products. So the $2 billion wouldn't just be split among the almost 40,000 in current plaintiffs, but it would also be all that's available for future plaintiffs, too.

J&J reasons that this plan makes it more likely that plaintiffs who go to court for financial compensation for their injuries will get at least something. J&J contends that getting an almost guaranteed small amount of money is better for plaintiffs because they can avoid the risk of losing at trial. It would also give J&J finality to its baby powder legal woes. If successful, Project Plato would allow J&J to move on without constantly worrying about another talcum powder lawsuit decades from now.

Project Plato is a slight variation of something called the **Texas Two Step**, which has been successfully used by several companies (like Georgia-Pacific) looking to reduce and offload their mass tort legal claims.

### Will J&J's Plan Work?

No one knows for sure. Right now, the case isn't going as well as J&J would have hoped. When LTL Management filed Chapter 11 bankruptcy, it chose to do so in North Carolina. Why? Because of that state's history of favorable judicial rulings involving the Texas Two Step strategy. However, the North Carolina judge **transferred the case to New Jersey**.

As you can imagine, the plaintiffs aren't happy about Project Plato and are doing everything they can to stop it. The New Jersey bankruptcy judge has scheduled a hearing for February 14, 2022 to listen to arguments from the plaintiffs (who are technically creditors in this bankruptcy proceeding) as to why the court should dismiss LTL Management's request for bankruptcy.

Their primary argument would be that LTL Management filed Chapter 11 bankruptcy in bad faith. Specifically, that it was done as a way for J&J to avoid paying out the massive legal settlements and court judgments that have already been handed down, and with many more anticipated in the future.

Case 3:16-md-02738-MAS-RLS   Document 28826-1   Filed 12/19/23   Page 16 of 187 PageID: 169294

A possible good omen for plaintiffs in the J&J litigation is what's been happening with Purdue Pharma's litigation involving its alleged role in the opioid epidemic. Late last year, a judge rejected Purdue Pharma's proposed settlement and bankruptcy reorganization plan. The settlement and reorganization plan involved non-debtor releases that would have protected key individual defendants from personal liability. While Purdue Pharma's strategy wasn't the same as Project Plato, it was similar in that it tried to use the Bankruptcy Code to limit its legal liability in its civil lawsuits.

### What Happens Next?



Over the next few months, we'll see if Project Plato works for J&J. If it does, it would create a blueprint for any other company that faces mass tort lawsuits. This would make it much harder for plaintiffs to obtain compensation for their injuries. There's even a **proposed law in Congress** to ban what J&J is trying to do.

In the meantime, if you have any questions as to whether you can receive compensation for injuries potentially related to using baby powder or other talc-based products, don't hesitate to get in touch with me. And I'll let you know if there are any major developments in J&J's Project Plato.

Posted in: **Corporate Greed**, **Multidistrict Litigation** and **Talcum Powder**
Tagged: **baby powder**, **Cancer**, **J&J**, **Johnson & Johnson**, **Project Plato**, **talcum powder** and **talcum powder lawsuits**
Comments are closed.

## TOPICS

**Artificial Hip (100)**  |  **Multidistrict Litigation (87)**  |  **Jury Verdicts (54)**  |  **Health & Wellness (41)**  |  **Counseling (40)**  |  **Your Settlement Funds (38)**  |  **Deputy ASR (33)**  |  **Deputy Pinnacle (29)**  |  **510(k) Process (25)**  |  **Podcast (20)**  |  **Smith & Nephew (19)**  |  **Pelvic Mesh (16)**

Harris Sarratt & Hodges, LLP
1620 Hillsborough St #200
Raleigh, NC 27605

**Phone:** 919-546-8788

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Please do not include any confidential or sensitive information in a contact form, text message, or voicemail. The contact form sends information by non-encrypted email, which is not secure. Submitting a contact form, sending a text message, making a phone call, or leaving a voicemail does not create an attorney-client relationship.

Copyright © 2023, Clay Hodges

**JUSTIA** Law Firm Blog Design

# EXHIBIT D



Page Printed From:
https://www.law.com/njlawjournal/2023/07/07/enemies-list-plaintiffs-expert-witnesses-are-targets-as-jj-unit-revives-lawsuit/

  

NOT FOR REPRINT

NEWS

## 'Enemies List': Plaintiffs' Expert Witnesses Are Targets as J&J Unit Revives Lawsuit

Johnson & Johnson subsidiary LTL Management filed a second fraud lawsuit on Friday against three plaintiffs' experts who authored a 2020 report linking its talcum powder products to mesothelioma.

July 07, 2023 at 06:29 PM


Expert Witnesses



**Amanda Bronstad**
staff reporter

## What You Need to Know

- The lawsuit, filed on Friday in the District of New Jersey, names Drs. Theresa Emory, Richard Kradin and John Maddox, who all have testified in dozens of talc trials over the years.
- On Jan. 18, LTL Management filed a nearly verbatim complaint against the same three experts, but it was rendered moot following dismissal of its Chapter 11 case.
- Moshe Maimon, who represents one of the purported plaintiffs identified in the 2020 report, called LTL's lawsuit 'straight out of their playbook' designed 'to bully experts.'

A Johnson & Johnson subsidiary filed a second fraud lawsuit against three plaintiffs' experts who authored a 2020 report linking its talcum powder products to mesothelioma.

The lawsuit, filed on Friday in the District of New Jersey, names Drs. Theresa Emory, Richard Kradin and John Maddox, who all have testified in dozens of talc trials over the years. Emory and Maddox are pathologists affiliated with Peninsula Pathology Associates in Newport News, Virginia, while Kradin is a pulmonologist and pathologist who lives in New Hampshire.

The lawsuit, brought by LTL Management LLC, which is in Chapter 11 bankruptcy, alleges that the doctors' research is false because cosmetic talc wasn't the sole asbestos exposure for at least six of the report's 75 individuals purportedly identified through court records.

"The complaint details the 'junk science' published and promoted by three doctors—who were paid millions by the plaintiffs' bar—to deliberately defame our products," wrote Erik Haas, worldwide vice president of litigation for Johnson & Johnson. "These disparaging publications cause great harm to us and to our customers and the patients who are misled as to the actual cause of their health issues."

## 'Straight Out of Their Playbook'

Peter Harvey, of Patterson Belknap Webb & Tyler, along with two other firms, Skadden, Arps, Slate, Meagher & Flom and King & Spalding, filed the complaint.

It isn't the first time LTL has sued the three experts.

On Jan. 18, LTL filed a nearly verbatim complaint against the same three experts, identifying five of the same individuals in their report.

But the case was rendered moot after the U.S. Court of Appeals for the Third Circuit on Jan. 30 reversed the decision of a bankruptcy judge not to dismiss LTL's Chapter 11 case.

A lawyer for the three experts in the previous case, Arthur Abramowitz, of Sherman, Silverstein, Kohl, Rose & Podolsky in Moorestown, New Jersey, declined to comment.

The 2020 report bolstered the findings of previous research conducted by Dr. Jacqueline Moline, another plaintiffs' expert who is an occupational medicine specialist and professor at the Donald and Barbara Zucker School of Medicine at Hofstra/Northwell in Hempstead, New York.

LTL sued Moline, first on Dec. 16, and then, after filing its second bankruptcy, on May 31.

Moline's 2019 article, which linked the mesothelioma of 33 individuals to cosmetic talc, has been cited in hundreds of trials, including those against Johnson & Johnson.

The names of the individuals in both expert reports are not disclosed.

LTL attempted to identify the individuals by matching their claims to the facts in talc trials against Johnson & Johnson. Among the alleged individuals is Stephen Lanzo, a plaintiff in a New Jersey case who was identified in both lawsuits. Friday's lawsuit says Lanzo had 60 feet of asbestos pipe removed from his basement and was exposed in childhood at school.

Lanzo's attorney, Moshe Maimon, of Levy Konigsberg in New York, called the latest LTL lawsuit full of "fanciful claims by its lawyers that are totally unsupported by any medical expert."

"Indeed, it is often the case that J&J's lawyers make a big fuss about there being some alternative asbestos exposure, only for the actual evidence not being there," he said. "As for J&J, this is straight out of their playbook—to make an enemies list, seek to compromise scientific publications they don't like, and to bully experts. I am confident that the latest attempt will be seen by the court for what it is and be dismissed as well."

Friday's complaint also claims to identify a sixth plaintiff: Rosalind Henry, diagnosed in 2016, and her husband, Fred. A New Jersey jury issued a defense verdict in that case in 2018.

Johnson & Johnson isn't the only defendant pushing to disclose the individuals in the expert reports. In one talc lawsuit, American International Industries fought to have Moline disclose the names of the 33 individuals in her report. But on May 19, a federal magistrate judge in New York denied that request, concluding that there was no "relevant hook" to the plaintiff in the talc case.

NOT FOR REPRINT

Copyright © 2023 ALM Global, LLC. All Rights Reserved.

# EXHIBIT E

PHARMA

# In talc defense, Johnson & Johnson sues 4 doctors over their 'junk litigation opinions'

By **Kevin Dunleavy**

Jul 14, 2023 10:30am

( Johnson & Johnson )   ( talc litigation )   ( mesothelioma )   ( ovarian cancer )



Johnson & Johnson has sued four physicians who have authored articles that found the company's talc products can cause cancer, calling their work "junk litigation opinions." (Photo Illustration by Justin Sullivan/Getty Images)

As Johnson & Johnson awaits a decision on its second attempt to resolve talc lawsuits through a bankruptcy ploy, the company is attempting another legal tactic to free itself from those liabilities—suing doctors who say that its iconic baby powder can cause cancer.

In federal district court in New Jersey, J&J's talc subsidiary LTL Management has filed two suits against four doctors who authored studies that described a link between J&J's talc-based products and cancer.

Last week, J&J filed suit against New Hampshire physician Richard Lawrence Kradin and Virginia doctors Theresa Swain Emory and John Coulter Maddox. In a separate suit in May, J&J sued New York physician Jacqueline Miriam Moline.

In the most recent suit, J&J claims that the three doctors cited 75 people with malignant mesothelioma who had been exposed to cancer-causing asbestos only by using Johnson's Baby Powder or another J&J talc product, Shower to Shower.

But the company says that at least six of the 75 had potentially been exposed to asbestos in other ways. In the May lawsuit, J&J made similar claims against Moline.

All the doctors named in the lawsuits have been called to testify in talc cases against J&J and their studies have been used to bolster personal injury cases against the company.

"The Emory article demonstrates plaintiffs' experts' tactics to pollute the scientific literature," J&J wrote in its complaint. "They publish their junk litigation opinions in scientific journals. They use their credentials to instill their publications with false credibility. They then build from that fraudulent foundation by citing to each other's work."

In a statement, J&J explained that its second lawsuit was filed against three doctors "who were paid millions by the plaintiffs' bar to deliberately defame our products," said J&J's legal chief Erik Haas.

In the complaint, J&J said that the trio have made "careers and small fortunes" testifying almost exclusively for plaintiffs in asbestos trials.

While maintaining that its talc products are safe, J&J has taken its baby powder off shelves in the U.S. and Canada and is doing the same worldwide this year. The company now sells a cornstarch version of the baby powder.

"The safety of our talcum powder products is supported by decades of evidence by independent experts, governments and regulatory bodies," Haas said.

J&J has had mixed success in court, with a high-profile trial in Missouri resulting (https://www.fiercepharma.com/pharma/j-j-faces-2-11b-talc-verdict-after-missouri-supreme-court-denies-reviewing-its-appeal) in a $4.7 billion verdict against the drugmaker in 2018, which was later reduced to $2.1 billion after appeals.

J&J has lost (https://www.factsabouttalc.com/ltl) nine talc trials that are either on appeal or have been resolved. Out of 41 trials, 32 have ended in a win by J&J, a mistrial or plaintiff verdicts that were reversed on appeal.

Last month, New Jersey bankruptcy judge Michael Kaplan heard arguments in J&J's second bankruptcy attempt—which comes along with an $8.9 billion settlement offer to resolve tens of thousands of talc lawsuits.

J&J's first Chapter 11 attempt was dismissed in April when a U.S. appeals court decided that the company was not in the financial distress needed to secure bankruptcy protection.

( Johnson & Johnson )   ( talc litigation )   ( mesothelioma )   ( ovarian cancer )   ( bankruptcy )



©2023 Questex LLC All rights reserved

# EXHIBIT F

Case 3:16-md-02738-MAS-RLS    Document 29826-1    Filed 12/19/23    Page 25 of 187 PageID: 169303

NEWS



# J&J subsidiary sues more talc researchers

 BY **REBECCA TRAGER** 18 JULY 2023

    

3 COMMENTS

Lawsuit claims another study linking talc use to cancer is fraudulent

US healthcare giant Johnson & Johnson (J&J) has launched a second lawsuit against researchers whose studies have connected talc-based powders and cancer, attacking the underlying science.

Earlier this month, J&J's subsidiary LTL Management, which was formed in 2021 to assume the company's liabilities in talc litigation, sued two pathologists affiliated with Peninsula Pathology Associates in Virginia, US – Theresa Emory and John Maddox – and Richard Kradin, a pathologist and pulmonologist who is now retired from the Harvard University-affiliated Massachusetts General Hospital Cancer Center.

The article that the three jointly published in 2020 concluded that mesothelioma can develop following exposures to cosmetic talcum powders, but LTL argues that the paper included false statements, including that cosmetic talc was the only known exposure of the 75 study subjects to asbestos. The company asserts that some individuals in that study had admitted to, and even made claims seeking compensation for, contact with other sources of asbestos. 'The authors knew that, or recklessly disregarded substantial evidence to the contrary,' LTL's complaint states.

The company is seeking monetary damages, including punitive damages, for fraud and other legal infractions, as well as retraction or public correction of the article.

Related stories


**Chemistry needs the human element - here's why**


**Cubanes help drugs take the strain**


**Danaher completes $5.7 billion Abcam acquisition**

This case sits alongside an ongoing lawsuit by LTL making similar claims about a separate 2019 study led by Jacqueline Moline. All four of these researchers had provided expert testimony against J&J in court, and their studies were cited in lawsuits against J&J.

Mark Lanier, an attorney who represented 22 women in a successful 2018 talc lawsuit against J&J, is not surprised by LTL's latest action. 'This is an old tactic of J&J trying to squash scientific opinion through intimidation using its behemoth status,' he tells *Chemistry World*. 'This was done in the 1970s when scientists tried to warn about J&J's talc containing asbestos,' Lanier continues. 'I think this shows a level of audacity, if not desperation.'

Jean Eggen, a professor emerita of law at Widener University in Delaware, US, agrees. 'There is no doubt that these are aggressive tactics by LTL,' she says. 'If such cases were to succeed, it would leave virtually every expert open to claims of fraud whenever the opposing experts disagree or find fault with their opinions,' Eggen warns. 'This would have a chilling effect on expert testimony in toxic tort litigation.'

Companies like J&J have much greater resources than university scientists, emphasises Marion Nestle, a professor emerita of nutrition, food studies and public health at New York University. 'J&J has much deeper pockets than any academic researcher – their incomes aren't even in the same stratosphere – so if it can break them financially, it will,' she warns. 'Doing so will also send a message to other academics that criticising drug companies will have unpleasant consequences.'

Meanwhile, J&J and LTL still face thousands of unresolved US lawsuits relating to talc and cancer. On 18 July, a California jury ruled the company must pay almost $19 billion (£15 billion) to a man who claims his mesothelioma was caused by lifelong exposure to J&J's talc. The jury awarded compensation to cover medical expenses, but no punitive damages against J&J. Most litigation against LTL and J&J has been frozen while LTL's proposed bankruptcy settlement is considered in the courts, but this case prceeded owing to the plaintiff's poor health.

*Ed. This story was updated on 20 July to include details of the latest resolved lawsuit*

# EXHIBIT G

WEATHERLY, JR. v. DEPUY ORTHOPAEDICS INC et al, Docket No. 1:23-cv-00134 (M.D.N.C. Feb 10, 2023), Court Docket

## Multiple Documents

| Part | Description |
|------|-------------|
| 1 | 74 |
| 2 | Exhibit 01.Declaration of David Allen |
| 3 | Text of Proposed Order |

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NUMBER 1:23-cv-00134-LCB-JEP

| | |
|---|---|
| RICHARD H. WEATHERLY, JR.,<br><br>     Plaintiff,<br><br>v.<br><br>DEPUY ORTHOPAEDICS, INC., et al.,<br><br>     Defendants. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISQUALIFY PLAINTIFF'S EXPERT DANA MEDLIN** |

## STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

Plaintiff's proposed expert witness, Dr. Dana Medlin, has extensive experience serving as a consulting and testifying expert *for DePuy* in Pinnacle litigation.  While serving as a DePuy defense expert, he was intrinsically involved in shaping defense themes in the Pinnacle litigation.  He was also privy to privileged information and attorney work product, including DePuy's attorneys' mental impressions and strategic insights on responding to plaintiffs' experts and theories of liability and evaluating the parties' respective litigation positions.  Nonetheless, Dr. Medlin has now "switched sides" in the exact same litigation and seeks to testify on behalf of plaintiff.  Such behavior presents a clear conflict of interest, requiring that he be disqualified.[1]

---

[1] Defendants previously filed a motion to exclude Dr. Medlin while this case was pending in the Pinnacle MDL proceeding.  (*See Weatherly* N.D. Tex. ECF No. 46; M.D.N.C. ECF No. 56.)  Pursuant to this Court's order entered on May 18, 2023, defendants file this

*(cont'd)*

## STATEMENT OF FACTS

Dr. Dana Medlin was engaged by DePuy in June 2011 to serve as a consulting expert in litigation involving DePuy's metal-on-metal ASR system hip implants (Decl. of David C. Allen ("Allen Decl.") ¶ 4, Dec. 16, 2022 (attached as Ex. 1)) and in 2014, to serve as a testifying expert in Pinnacle litigation (*id.* ¶ 5). Dr. Medlin was specifically retained by DePuy as a testifying expert in five Pinnacle cases (*Paoli*,[2] *Lay*,[3] *Jones*,[4] *Mello*[5] and *Rowe*[6]), prepared expert reports on behalf of DePuy in four of those cases (*Rowe*, *Paoli*, *Lay* and *Jones*) and gave deposition testimony in three of those cases (*Paoli*, *Lay* and *Rowe*). (*Id.*) In total, Dr. Medlin was compensated at least $96,710 (exclusive of expenses) for 379 hours of expert services performed on behalf of DePuy in the Pinnacle litigation. (*Id.* ¶ 9.)

As part of his work as an expert for DePuy in Pinnacle litigation, Dr. Medlin "assisted [DePuy] by critiquing [p]laintiffs' experts' volumetric wear analyses of metal-on-metal devices and pinpointing flaws in their testing methodology" and "assess[ed] . . . various [p]laintiff expert reports and deposition transcripts." (*Id.* ¶¶ 6, 7.) Dr. Medlin

---

motion and brief to add Fourth Circuit authority and have not included any additional arguments.

[2] *Herlihy-Paoli v. DePuy Orthopaedics, Inc.*, No. 3:12-cv-04975-K (N.D. Tex.).

[3] *Lay v. DePuy Orthopaedics, Inc.*, No. 3:11-cv-03590-K (N.D. Tex.).

[4] *Jones v. DePuy Orthopaedics, Inc.*, No. 3:11-cv-03594-K (N.D. Tex.).

[5] *Mello v. DePuy Orthopaedics, Inc.*, No. 3:12-cv-00641-K (N.D. Tex.).

[6] *Rowe v. Johnson & Johnson, Inc.*, No. 3:12-cv-04354-K (N.D. Tex.).

also had numerous "confidential and privileged" conversations with DePuy Pinnacle litigation attorneys about "defense strategies and themes regarding corrosion and failure analysis and [p]laintiffs' theories of DePuy's liability." (*Id.* ¶ 8.) DePuy Pinnacle litigation attorneys also "relied on Dr. Medlin's input and expertise to assist DePuy in formulating defense strategies and rebuttal points to [p]laintiffs' anticipated liability theories." (*Id.*)

Now, Dr. Medlin seeks to serve as an expert for plaintiff Richard Weatherly in the same exact litigation.

## <u>ARGUMENT</u>

"A federal court has the inherent power to disqualify experts." *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 664 (S.D. W. Va. 2008); *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 579 (D.N.J. 1994) ("Any analysis properly begins with a recognition of the [c]ourt's inherent power to disqualify experts."). "This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process." *Wang Lab'ys, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991).

Pursuant to their inherent powers, courts in this circuit recognize a "bright-line rule": "when it is undisputed that an expert, who was previously retained by the adverse party in the same litigation and received confidential information as part of that earlier retention, is now blatantly side-switching, ***disqualification is clear***." *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2187, 2014 WL 6960396, at *7 (S.D.

W. Va. Dec. 8, 2014); *see also Wang Lab'ys*, 762 F. Supp. at 1248 ("[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention.").  Because Dr. Medlin switched sides after being retained by DePuy in the Pinnacle litigation and receiving confidential information as part of that retention, he has violated that bright-line rule, and disqualification is warranted.

*First*, Dr. Medlin switched sides.  The attached Allen declaration makes clear that Dr. Medlin previously worked for DePuy as an expert in the Pinnacle litigation – ***the exact same litigation here***, involving the same product, the same parties, the same product liability claims, the same discovery and the same alleged harms.  (*See* Allen Decl. ¶ 5 (explaining that Dr. Medlin served as a testifying expert in Pinnacle litigation beginning in 2014).)  Dr. Medlin's side-switching in the Pinnacle litigation is an obvious, undisputed fact, requiring his disqualification as plaintiff's expert witness.  *See In re C.R. Bard*, 2014 WL 6960396, at *9 (disqualifying a plaintiffs' expert where the expert worked on both sides of a litigation in cases "involv[ing] the same defendant, the same product lines, the same polypropylene mesh, the same alleged tortious behavior and product liability claims, the same underlying medical conditions, the same basic documents, the same scientific and medical issues, and the same alleged harm"); *see also Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) (where

an expert "switched sides" in the same litigation, "[t]his is a clear case for disqualification") (citation omitted); *Park v. Se. Serv. Corp.*, No. 3:10-cv-2949-JFA, 2011 WL 3794266, at *1 (D.S.C. Aug. 24, 2011) (court's duty to disqualify experts stems from "the necessity to protect privileges" and "the necessity to preserve public confidence in the fairness and integrity of judicial proceedings") (quoting *W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61, 64 (D. Md. 1993)).

   ***Second***, Dr. Medlin received confidential and privileged information as part of his earlier retention serving as a consulting expert for DePuy.  As detailed in Mr. Allen's declaration, Dr. Medlin was retained by DePuy as a testifying expert in ***five separate Pinnacle cases***.  (Allen Decl. ¶ 5.)  In that role, Dr. Medlin participated in "detail[ed]" discussions with DePuy's litigation attorneys regarding "defense strategies and themes regarding corrosion and failure analysis and [p]laintiffs' theories of DePuy's liability and responses to those theories."  (*Id.* ¶ 8.)  As part of those discussions, DePuy's litigation attorneys "shared with Dr. Medlin [their] confidential and privileged attorney mental impressions, and . . . relied on Dr. Medlin's input and expertise to assist DePuy in formulating defense strategies and rebuttal points to [p]laintiffs' anticipated liability theories."  (*Id.*)  And Dr. Medlin's work was significant – in total, he was compensated at least $96,710 for 379 hours of expert services performed on behalf of DePuy in Pinnacle litigation.  (*Id.* ¶ 9.)  It is undeniable, then, that Dr. Medlin received confidential information as part of that earlier retention, and he should be disqualified.

Notably, this is not the first time Dr. Medlin has impermissibly violated the "bright-line rule," requiring his disqualification.  In *Rouviere v. Howmedica Osteonics Corp.*, 496 F. Supp. 3d 811 (S.D.N.Y. 2020), Dr. Medlin sought to provide case-specific opinions on behalf of the plaintiffs, even though he had previously been retained by the defendant, Howmedica, "to conduct confidential review, testing and analysis of other hip implant products in the defense of the Howmedica Litigations."  *Id.* at 813.  The court disqualified Dr. Medlin, explaining that "there is no dispute that Howmedica's confidential information was disclosed" and Dr. Medlin "met with Howmedica's defense attorneys on numerous occasions in connection with the Howmedica Litigations and was privy to Howmedica's litigation and trial defense strategies."  *Id*. at 814.  The court concluded that "[i]t simply would be unfair and would subvert the integrity of the judicial process to permit [Dr. Medlin] to switch sides as he is seeking to do here."  *Id.*

The same result is required here.  Dr. Medlin received confidential information from DePuy during the period in which he was compensated for serving as an expert witness for Pinnacle litigation.  "[A]llowing [him] to change course in mid-stream would offend the notion of fundamental fairness and set a dangerous precedent in mass tort litigation."  *In re C.R. Bard*, 2014 WL 6960396, at *12.  Thus, Dr. Medlin should be disqualified from serving as plaintiff's expert witness.[7]

---

[7]     During the meet-and-confer process, plaintiff's counsel argued that the conflict was waived because DePuy was untimely in bringing the issue to counsel's attention. But there has been no such delay.  This case was dormant and stayed until the September 16, 2022 scheduling order.  Thus, there was no reason for DePuy to assess plaintiff's

*(cont'd)*

## CONCLUSION

For all of the reasons discussed above, and for the reasons outlined in the Allen declaration, Dr. Medlin should be disqualified from providing expert testimony for plaintiff in the instant case.

This the 20th day of July, 2023.

/s/ Dixie T. Wells
Dixie T. Wells
N.C. State Bar No. 26816
ELLIS & WINTERS LLP
300 N. Greene Street, Suite 800
Greensboro, NC 27401
Telephone: (336) 217-4197
Facsimile: (336) 217-4198
E-mail: dixie.wells@elliswinters.com

Robyn S. Maguire
Barnes & Thornburg LLP
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 316-5316
Facsimile: (617) 316-5311
E-mail: rmaguire@btlaw.com

Attorneys for DePuy Orthopaedics, Inc.
and Johnson & Johnson Services, Inc.

---

expert designations before that point. Moreover, plaintiff knew – or should have known – that this conflict existed from the moment he retained Dr. Medlin to serve as an expert witness. He cannot now claim that he has been prejudiced by DePuy's timing in lodging its objections about a conflict he knew existed. *See, e.g.*, *In re C.R. Bard*, 2014 WL 6960396, at *12 (disqualifying expert and noting "plaintiffs' counsel was fully aware" that a conflict existed, and thus, "[p]laintiffs' counsel could easily have avoided their current predicament").

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.3(d), this certifies that the foregoing brief contains fewer than 6,250 words (excluding the caption, signature block, and this certificate), as reported by counsel's word processing software.

This the 20th day of July, 2023.

/s/ Dixie T. Wells_____
Dixie T. Wells

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| **IN RE DEPUY ORTHOPAEDICS, INC.,** | : | **MDL Master Docket No.** |
| **PINNACLE HIP IMPLANT PRODUCTS** | : | **3:11-MD-2244-K** |
| **LIABILITY LITIGATION** | : | |
| | : | **JUDGE ED KINKEADE** |
| | : | |
| | : | |

**THIS DOCUMENT RELATES TO:**

**Bailey v. DePuy Orthopaedics, Inc.**
**Case No. 3:11-cv-02390-K**

**Weatherly v. DePuy Orthopaedics, Inc.**
**Case No. 3:13-cv-02664-K**

## DECLARATION OF DAVID C. ALLEN IN SUPPORT OF MOTION TO DISQUALIFY DANA J. MEDLIN, PHD AS AN EXPERT FOR PLAINTIFFS

Pursuant to 28 U.S.C. § 1746, I, David C. Allen, hereby declare and state as follows:

1.     My name is David C. Allen. I am an attorney licensed to practice law in the State of California. I am a partner with the law firm of Barnes & Thornburg LLP, attorneys for the Defendants in this litigation. I provide this Declaration in support of Defendants' Motion to Disqualify Dana J. Medlin, Ph.D., P.E., FASM ("Dr. Medlin"). I am over the age of 18, of sound mind, and I have personal knowledge of the matters and facts stated herein unless otherwise indicated.

2.     I began representing DePuy Orthopaedics, Inc., now known as Medical Device Business Services, Inc. ("DePuy") in 2013 in connection with litigation throughout the country, including in *In Re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*, 3:11-md-02244-K (the "Pinnacle MDL").

**Appendix 13**

3.      I have reviewed certain email correspondence, invoices from Dr. Medlin and
Engineering Systems, Inc., internal memoranda, Dr. Medlin's expert witness reports served in the
Pinnacle MDL, Dr. Medlin's notes provided to Defendants regarding Plaintiffs' expert witness
reports and depositions, and certain deposition transcripts in connection with preparing this
declaration regarding Dr. Medlin's expert engagement and work with Defendants relating to hip
implants and the Pinnacle MDL.

4.      Dr. Medlin's background is in metallurgy, materials science, and biomedical
engineering.

5.      When I began work on the Pinnacle hip litigation, I learned that Dr. Medlin had
worked as an expert witness for DePuy in the ASR hip litigation.  When issues similar to those Dr.
Medlin handled in the ASR litigation arose in the Pinnacle hip litigation, in 2014 Dr. Medlin was
retained to serve as a testifying expert witness for DePuy in the Pinnacle MDL. My colleague,
Stephen Myers, and I were the attorneys primarily responsible for dealings with Dr. Medlin in that
litigation.  Defendants disclosed Dr. Medlin as a specifically retained expert in five cases: *Paoli*,[1]
*Lay*,[2] *Jones*,[3] *Mello*,[4] and *Rowe*.[5] Dr. Medlin prepared expert reports[6] on behalf of DePuy in four
of those cases (*Paoli*, *Lay*, *Jones*, and *Rowe*), and he gave deposition testimony in three (*Paoli*,
*Lay*, and *Rowe*).[7] Mr. Myers and I consulted with Dr. Medlin regarding his expert opinions and
reports as well as prepared him for his deposition in the *Paoli*, *Lay*, and *Rowe* cases.

6.      In connection with his expert engagement in the Pinnacle MDL, Dr. Medlin also

---

[1] *Herlihy-Paoli v. DePuy Orthopaedics, Inc., et al.*, 3:12-cv-04975-K (N.D. Tex. Oct. 23, 2014).
[2] *Lay et al. v. DePuy Orthopaedics, Inc. et al.*, 3:11-cv-03590-K (N.D. Tex.).
[3] *Jones et al. v. DePuy Orthopaedics, Inc. et al.*, 3:11-cv-3594-K (N.D. Tex.).
[4] *Mello et al. v. DePuy Orthopaedics, Inc. et al.*, 3:12-cv-0641-K (N.D. Tex.).
[5] *Rowe et al. v. Johnson & Johnson, Inc. et al.*, 3:12-cv-4354-K (N.D. Tex.)
[6] Defendants are willing to provide Dr. Medlin's expert reports should the Court deem them helpful to its analysis.
[7] *Paoli* was the first Bellwether trial in the Pinnacle MDL and resulted in a defense verdict. The four other cases
have been resolved and dismissed.

**Appendix 14**

assisted Defendants by critiquing Plaintiffs' experts' volumetric wear analyses of metal-on-metal devices and pinpointing flaws in their testing methodology.

7.      Dr. Medlin performed detailed reviews of Plaintiffs' expert reports and deposition transcripts and assisted me in developing key points of cross-examination for the depositions and trial examination of Plaintiffs' experts. I am in possession of copies of Dr. Medlin's notes comprising his assessment of various Plaintiff expert reports and deposition transcripts, which include specific, page-by-page observations that he later discussed with me, Mr. Myers, and other counsel for Defendants.[8]

8.      Although Dr. Medlin's expert engagement with Defendants in the Pinnacle MDL initially focused on volumetric wear measurements and analysis, as the litigation progressed Dr. Medlin's expert work expanded more broadly to advising Defendants on other metallurgical issues involving metal-on-metal hip implants. For example, we discussed in detail defense strategies and themes regarding corrosion and failure analysis and Plaintiffs' theories of DePuy's liability and responses to those theories. During those discussions, I shared with Dr. Medlin my confidential and privileged attorney mental impressions, and I relied on Dr. Medlin's input and expertise to assist DePuy in formulating defense strategies and rebuttal points to Plaintiffs' anticipated liability theories. Dr. Medlin also assisted me in evaluating Plaintiffs' disclosed expert witnesses.

9.      Based on my review of invoices in my possession, the total compensation paid to Dr. Medlin by Defendants from February 2014 – May 2014 was $96,710 (exclusive of expenses), representing 379 hours of expert consulting services performed on behalf of Defendants in the Pinnacle MDL. There are also likely invoices for Dr. Medlin's services in the Pinnacle MDL that were billed to Helmsing, Leach, Herlon, Newman, and Rouse, P.C., another firm that represented

---

[8] Defendants are willing to produce these notes for *in camera* review should the Court find consideration of these materials helpful to its analysis.

**Appendix 15**

the Defendants. Those invoices are not in my possession.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on December 16, 2022.


                                   /s/ David C. Allen
                                   David C. Allen

**Appendix 16**

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO. 1:23-cv-00134-LCB-JEP

| | |
|---|---|
| RICHARD H. WEATHERLY, JR.,<br><br>     Plaintiff,<br><br>v.<br><br>DEPUY ORTHOPAEDICS, INC. et al.,<br><br>     Defendants. | **ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S EXPERT DANA MEDLIN** |

This matter comes before the court on Defendants DePuy Orthopaedics, Inc. and Johnson & Johnson Services, Inc.'s Motion to Disqualify Plaintiff's Expert Dana Medlin. Having considered the motion and the related briefing, the Court finds, in its discretion, that Defendants' motion should be GRANTED.

This the _____ day of _____, 2023.

_____
LORETTA C. BIGGS
United States District Judge

# EXHIBIT H

## SUPERIOR COURT OF NEW JERSEY
## LAW DIVISION, ATLANTIC COUNTY

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION**<br><br>*Applicable to All Cases* | Master Docket No. ATL-L-2648-15<br><br>MCL CASE NO. 300<br><br>CIVIL ACTION – **ORAL ARGUMENT REQUESTED**<br><br>Motion Day: January 17, 2024 |

### NOTICE OF MOTION FOR ENTRY OF ORDER TO SHOW CAUSE

PLEASE TAKE NOTICE that on January 17, 2024, the date of the next case management conference, the undersigned counsel will bring Defendants Johnson & Johnson and LTL Management LLC's Motion for Order to Show Cause Why Beasley Allen Should Not Be Disqualified From This Litigation. Defendants will ask for entry of an Order to Show Cause directing the Beasley Allen law firm to show cause why the firm should not be disqualified from representing plaintiffs in this litigation. Defendants request that oral argument be held in connection with this motion.

DATED: December 8, 2023               Respectfully submitted,

                                      **O'MELVENY & MYERS LLP**

                                      _____
                                      Stephen D. Brody (*Pro Hac Vice*
                                      Pending)
                                      1625 Eye Street NW
                                      Washington, DC 20006
                                      Tel.: (202) 383-5300
                                      sbrody@omm.com

                                      **FAEGRE DRINKER BIDDLE &
                                      REATH LLP**

                                      _____
                                      Susan M. Sharko
                                      600 Campus Drive
                                      Florham Park, NJ 07932
                                      Tel.: 973-549-7000
                                      susan.sharko@faegredrinker.com

                                      *Attorneys for Defendants Johnson
                                      & Johnson and LTL Management
                                      LLC*

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION, ATLANTIC COUNTY**

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION** | Master Docket No. ATL-L-2648-15 |
| | MCL CASE NO. 300 |
| ***Applicable to All Cases*** | CIVIL ACTION |

### ORDER

Upon consideration of the arguments made by the parties in support of and in opposition to Defendants Johnson & Johnson and LTL Management LLC's Motion for Order to Show Cause Why Beasley Allen Should Not Be Disqualified From This Litigation, it is hereby ORDERED on this _____ day of _____, 202_ _____, that the Motion is GRANTED; and it is further

ORDERED that Beasley Allen shall show cause the firm should not be disqualified from representing plaintiffs in this case. Beasley Allen shall show such cause within ____ days of the entry of this order.

_____
**Honorable John C. Porto, J.S.C.**

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION, ATLANTIC COUNTY**

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION**<br><br>*Applicable to All Cases* | Master Docket No.<br>ATL-L-2648-15<br><br>MCL CASE NO. 300<br><br>CIVIL ACTION |

---

**DECLARATION OF ERIK HAAS**

---

I, Erik Haas, hereby declare and state as follows:

1. I am over the age of eighteen, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to these facts if called to do so.

2. I am Worldwide Vice President, Litigation for Johnson & Johnson ("J&J"), a position I have held since November 2020.

3. In this position, I became familiar with work performed for J&J by attorney James Conlan of the law firm of Faegre Drinker between July 2020 and early 2022. I have also reviewed time entries submitted by Mr. Conlan for his work representing J&J.

4. From July 2020 through early 2022, Mr. Conlan represented J&J as part of a team of attorneys evaluating legal strategies for resolution of pending and future claims by plaintiffs asserting liability for illnesses allegedly caused by J&J's talc products.

1

5.      Billing submitted by Mr. Conlan reflects that, during this period, Mr. Conlan billed almost 1,600 hours on the talc matter, including 1,154 hours in 2021 alone.  The records reflect that Mr. Conlan billed J&J $2.24 million for this work.

6.      Those same billing records show that during this time period, Mr. Conlan attended dozens of meetings and phone conferences with members of the J&J Law Department, including myself, J&J's former head of litigation, Joseph Braunreuther, former product liability lead John Kim, and current product liability head, Andrew White.

7.      Mr. Conlan's time entries in the billing records also show that he communicated regularly with other members of J&J's outside counsel team on the talc matter throughout the same time period, and in May 2021, met personally as J&J's counsel with the Debtor's counsel and counsel for the Future Claims Representative in the Imerys bankruptcy over rounds of golf, dinner, and drinks.

8.      At no point did J&J, or any of its officers or agents, waive attorney-client privilege as to Mr. Conlan's representation of the Company.

9.      Attached as Exhibit 1 is a true and correct copy of an email that Mr. Conlan sent to me on August 23, 2022.

10.     Attached as Exhibit 2 is a true and correct copy of the transcript of J&J's Q3 earnings call, held October 17, 2023.

11.     Attached as Exhibit 3 is a true and correct copy of an email from Mr. Conlan to Johnson & Johnson Treasurer Duane Van Arsdale, dated October 18, 2023.

12.     Attached as Exhibit 4 is a true and correct copy of excerpts from the transcript of the April 17, 2023 deposition of Andy Birchfield, taken in *In re: LTL Management LLC*, No. 23-12825 (Bankr. D.N.J.).

13.     Attached as Exhibit 5 is a true and correct copy of a letter from James Murdica to Mr. Conlan, dated November 5, 2023.

14.     Attached as Exhibit 6 is a true and correct copy of a letter and attachment from Mr. Conlan to the Johnson & Johnson Board of Directors, dated November 9, 2023.

15.     Attached as Exhibit 7 is a true and correct copy of an email I sent to John Gasparovic, copying Mr. Conlan and others, dated November 9, 2023.

16.     On November 15, 2023, J&J learned that Mr. Conlan and Mr. Birchfield were set to appear at a November 29, 2023 symposium hosted by Gordon Haskett Research Advisors on "JNJ: Talc Litigation & 3rd Bankruptcy" to discuss the "viability" of "J&J's potential 3rd bankruptcy," "potential settlement issues," and "how J&J could resolve the litigation outside of bankruptcy."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of December, 2023.

_____

Erik Haas
Worldwide Vice President, Litigation
Johnson & Johnson

# EXHIBIT 1

**From:** James Conlan <james.conlan@legacyliability.com>
**Sent:** Tuesday, August 23, 2022 11:16 AM
**To:** Haas, Erik [JJCUS] <EHaas8@its.jnj.com>
**Subject:** [EXTERNAL]

> **WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, send it as an attachment to SuspiciousEmail@ITS.JNJ.COM

Confidential

Eric, I hope you're well and enjoying the summer. I'm in NY today through tomorrow afternoon and would be delighted to buy you a coffee or a drink.

I am among those who think the likelihood of plan confirmation/injunction (for solvent non debtor affiliates) in a Texas two step bankruptcy case (particularly outside of the asbestos context) has gone from low to essentially non existent.

I would like to talk to you about a dismissal -- with Legacy taking the ownership of LTL and causing an indemnity to be issued that would provide J&J and its other affiliates with the best available protection -- sufficient to cause your auditors to remove your ASC 450 disclosure relating to talc/baby powder. J&J would have to fund LTL with cash in excess of the PV of the tort system value of all current and future talc related claims against LTL.

The capital markets, not the bankruptcy courts, are the answer to achieving closure (current and future claims) for solvent mass tort defendants.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Bermuda | Dallas | Chicago | Paris
Email | james.conlan@legacyliability.com
Mobile | +312.927.7572
www.legacyliability.com

# EXHIBIT 2

Ex. 2

Printed from MarketBeat.com

# Johnson & Johnson Q3 2023 Earnings Call Transcript

Provided by AlphaStreet

October 17, 2023

⤨ SHARE ›

→ **The Only Practical Solution to the World's Looming Energy Crisis** (Ad)

## Participants

### Corporate Executives

**Jessica Moore**
*Vice President - Investor Relations*

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer*

**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D*

**Joaquin Duato**
*Chairman and Chief Executive Officer*

**Erik Haas**
*Worldwide Vice President of Litigation*

**Ahmet Tezel**
*Group Chairman and Global Head of MedTech Innovation and R&D*

### Analysts

**David Risinger**, *Leerink Partners*

**Matt Miksic**, *Barclays PLC*

**Chris Shibutani**, *The Goldman Sachs Group, Inc.*

**Geoff Meacham**, *Bank of America Merrill Lynch*

**Josh Jennings**, *TD Cowen*

**Chris Schott**, *J.P. Morgan*

**Larry Biegelsen**, *Wells Fargo & Company*

**Terence Flynn**, *Morgan Stanley*

**Joanne Wuensch**, *Citibank*

**Vamil Divan**, *Guggenheim Securities*

**Danielle Antalffy**, *UBS Group AG*

**Louise Chen**, *Cantor Fitzgerald*



## Presentation

 **Operator**

Good morning, and welcome to Johnson & Johnson's Third Quarter 2023 Earnings Conference Call. [Operator Instructions]

I would now like to turn the call over to Johnson & Johnson. You may begin.

**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Good morning. This is Jessica Moore, Vice President of Investor Relations for Johnson & Johnson. Welcome to our Company's review of the 2023 third quarter business results and full-year financial outlook.

A few logistics before we get into the details. As a reminder, you can find additional materials, including today's presentation and associated schedules on the Investor Relations section of the Johnson & Johnson website at investor.jnj.com.

Please note that this presentation contains forward-looking statements regarding, among other things, the Company's future operating and financial performance, market position and business strategy. You are cautioned not to rely on these forward-looking statements, which are based on current expectations of future events using the information available as of the date of this recording and are subject to certain risks and uncertainties that may cause the Company's actual results to differ materially from those projected. A description of these risks, uncertainties and other factors can be found in our SEC filings, including our 2022 Form 10-K, which is available at investor.jnj.com and on the SEC's website.

Additionally, several of the products and compounds discussed today are being developed in collaboration with strategic partners or licensed from other companies. This slide acknowledges those relationships.

Moving to today's agenda. I will start by reviewing the third quarter sales and P&L results for the corporation and highlights related to our two businesses. Joe Wolk, our CFO, will then provide additional business and financial commentary before sharing an overview of our cash position, capital allocation priorities and updated guidance for 2023. The remaining time will be available for your questions. Joaquin Duato, our Chairman and CEO; John Reed and Ahmet Tezel, our Innovative Medicine and MedTech R&D leaders; as well as Erik Haas, our VP of Litigation, will be joining us for Q&A. To ensure we provide enough time to address your questions, we anticipate the webcast will last approximately 60 minutes.

As a reminder, on August 23rd, 2023, Johnson & Johnson announced the final results of the exchange offer and completion of the separation of Kenvue Inc. Unless otherwise stated, the financial results and guidance highlighted today reflect the continuing operations of Johnson & Johnson. We will report the Consumer Health financial results as discontinued operations. Additionally, going forward, the Pharmaceutical segment will be referred to as Innovative Medicine.

Starting with Q3 2023 sales results. Worldwide sales were $21.4 billion for the third quarter of 2023, an increase of 6.8% versus the third quarter of 2022. Operational sales growth, which excludes the effect of translational currency, increased 6.4% as currency had a positive impact of 0.4 points. In the US, sales increased 11.1%. In regions outside the US, our reported growth was 1.6%. Operational sales growth outside the US was 0.7%, with currency positively impacting our reported OUS results by 0.9 points. It is important to note that operational sales in Europe were negatively impacted by the COVID-19 vaccine and loss of exclusivity of ZYTIGA. Excluding the net impact of acquisitions and divestitures, adjusted operational sales growth was 4.9% worldwide, 8.9% in the US, and 0.3% outside the US.

Turning now to earnings. For the quarter, net earnings were $4.3 billion and diluted earnings per share was $1.69 versus diluted earnings per share of $1.62 a year ago. Excluding after-tax intangible asset amortization expense and special items for both periods, adjusted net earnings for the quarter were $6.8 billion, and adjusted diluted earnings per share was $2.66, representing increases of 14.1% and 19.3%, respectively, compared to the third quarter of 2022. On an operational basis, adjusted diluted earnings per share increased 13.9%.

I will now comment on business sales performance. Unless otherwise stated, percentages quoted represent the operational sales change in comparison to the third quarter of 2022, and therefore, exclude the impact of currency translation.

Beginning with Innovative Medicine. Worldwide Innovative Medicine sales of $13.9 billion increased 5.1% with growth of 10.9% in the US and a decline of 2.3% outside the US. Operational sales growth increased 4.3% as currency had a positive impact of 0.8 points. Excluding COVID-19 vaccine sales, worldwide operational sales growth was 8.2% with growth of 10.9% in the US and growth of 4.3% outside the US. Sales outside the US, excluding the COVID-19 vaccine, were negatively impacted by approximately 500 basis points due to the loss of exclusivity of ZYTIGA in Europe.

Innovative Medicine growth was driven by our key brands and continued uptake from recently launched products with 11 assets delivering double-digit growth. We continue to drive strong sales growth for both DARZALEX and ERLEADA with increases of 20.7% and 27%, respectively, due to continued share gains and market growth. Within immunology, we saw growth in STELARA and TREMFYA with increases of 15.8% and 21.5%, respectively. This growth was predominantly driven by favorable patient mix and market growth.

Turning to newly launched products. We continue to make progress on our launches of CARVYKTI and SPRAVATO. We are also encouraged by the early success of our launches of TECVAYLI and TALVEY, sales of which are driving the growth in other oncology. We expect to begin disclosing TECVAYLI sales in Q1 2024. Total Innovative Medicine sales growth was partially offset by the loss of exclusivity of ZYTIGA and REMICADE, along with a decrease in IMBRUVICA sales due to competitive pressures.

I'll now turn your attention to MedTech. Worldwide MedTech sales of $7.5 billion increased 10% with growth of 11.6% in the US and 8.3% outside of the US. Operational sales growth increased 10.4% as currency had a negative impact of 0.4 points. Abiomed contributed 4.6% to operational growth. Excluding the impact of acquisition and divestitures, worldwide adjusted operational sales growth was 6%. On a pro forma basis utilizing sales in the prior year from Abiomed as a standalone company, MedTech's growth for the quarter would be 6.4%.

MedTech was negatively impacted across all platforms by international sanctions in Russia worth approximately 60 basis points and volume-based procurement in China, primarily in five MedTech platforms: Spine, Trauma, Endocutters, Energy and Electrophysiology. As communicated last quarter, we saw the return to more normalized seasonality with moderate deceleration in the third quarter.

The Interventional Solutions franchise delivered operational growth of 48.1%, which includes $311 million related to Abiomed. This reflects growth in Abiomed patient procedures in the high-teens and continued strong adoption of Impella 5.5 technology in Surgery. Electrophysiology is a major contributor to this growth with a double-digit increase of 20.3%. This reflects strong growth in all regions, including Europe, driven by our global market-leading portfolio, including the most recently launched QDOT RF ablation and OPTRELL Mapping Catheters. Operational growth of 3.2% in Surgery was driven primarily by procedure recovery and strength of our biosurgery and wound closure portfolios. Growth was partially offset by the impacts of volume-based procurement in China and supply challenges.

Global growth of 5.4% in Vision was driven by price actions in Contact Lenses and Other, as well as strength of new products, including ACUVUE OASYS 1-Day family of products in Contact Lenses and TECNIS Eyhance, our monofocal intraocular lens in surgical vision. Growth of Contact Lenses was partially offset by strategic portfolio choices and supply challenges although these continue to improve. Global Vision growth was negatively impacted by 100 basis points due to the Blink divestiture.

Orthopaedics' operational growth of 2.6% reflects procedure growth, success of recently launched products, such as the global expansion of our VELYS Digital Solutions and expansion in ambulatory surgical centers, partially offset by the impacts of volume-based procurement in China in Spine and Trauma.

Now, turning to our consolidated statement of earnings for the third quarter of 2023. I'd like to highlight a few noteworthy items that have changed compared to the same quarter of last year. Cost of products sold margin was flat due to favorable patient mix and lower COVID-19 vaccine supply network related exit costs in the Innovative Medicine business, partially offset by commodity inflation, unfavorable product mix, and restructuring related to excess inventory costs in the MedTech business.

Selling, marketing and administrative margins deleveraged 40 basis points, driven by increased expenses across the enterprise. We continue to invest strategically in research and development at competitive levels, investing $3.4 billion or 16.2% of sales this quarter. R&D was leveraged by 120 basis points, primarily driven by portfolio prioritization, partially offset by higher milestone payments in the Innovative Medicine business. Additionally, IPR&D impairments were $206 million in the third quarter of 2023.

Interest income was $182 million in the third quarter of 2023 as compared to $99 million of income in the third quarter of 2022. The increase in income was driven by higher interest rates earned on cash balances, partially offset by higher interest rates on debt balances.

The other income and expense line was an expense of $499 million in the third quarter of 2023 compared to an expense of $226 million in the third quarter of 2022. This was primarily driven by higher unrealized mark-to-market losses on public securities, partially offset by the lower COVID-19 vaccine-related exit costs and lower litigation expense.

Restructuring in the third quarter was $158 million, primarily related to the Innovative Medicine restructuring program announced in the first quarter.

Regarding taxes in the quarter, our effective tax rate was 17.4% versus 16.7% in the same period last year. This increase was primarily driven by a non-deductible, non-recurring pretax charge that occurred in the current quarter. Excluding special items, the effective tax rate is 15.6% versus 15.9% in the same period last year.

As a result of the completion of the exchange offer, Johnson & Johnson is presenting the Consumer Health business financial results as discontinuing operations, including a gain of approximately $21 billion. I encourage you to review our upcoming third quarter 10-Q filing for additional details on specific tax and separation-related matters.

Lastly, I'll direct your attention to the box section of the slide, where we have also provided our income before tax, net earnings, and earnings per share, adjusted to exclude the impact of intangible amortization expense and special items.

Now, let's look at adjusted income before tax by segment. In the third quarter of 2023, our adjusted income before tax for the enterprise as a percentage of sales increased from 35.3% to 37.6%, primarily driven by favorable patient mix in Innovative Medicine, partially offset by unfavorable product mix and commodity inflation in MedTech. Innovative Medicine margins improved from 41.4% to 45.4%, primarily driven by favorable patient mix and R&D portfolio prioritization. MedTech margins declined from 25% to 24.7%, primarily driven by commodity inflation and unfavorable product mix, partially offset by a divestiture gain.

This concludes the sales and earnings portion of the Johnson & Johnson third quarter results. I'm now pleased to turn the call over to Joe Wolk. Joe?

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Thank you, Jessica; and thanks, everyone, for joining us today. This quarter's call marks a new era for Johnson & Johnson with a sharpened focus on Innovative Medicine and MedTech. What has remained consistent is our credo and our commitment to patients. We are privileged to build upon our 137-year legacy of tackling the world's most complex healthcare challenges and helping patients with serious unmet health needs around the world. As we look forward, we are well-positioned to grow our business and innovate across the spectrum of healthcare. We are excited about what's ahead and what we can achieve in the future.

Before we dive into our performance, I want to briefly touch upon other items important to our business. The first is a brief recap of the Kenvue separation, which was formerly completed during the quarter. The transaction was executed within our targeted timeframe and under budget, while generating significant cash and value for our shareholders. Through the separation, we raised $13.2 billion in cash proceeds to the Kenvue debt offering and IPO.

We've reduced Johnson & Johnson's outstanding share count by 191 million shares or approximately 7% without the use of cash and in a tax-free manner. We maintained our current quarterly dividend per share, and we've retained approximately 180 million shares of Kenvue's stock that provides cash proceeds for future flexibility. We will see the full impact to EPS of the share reduction in 2024.

Another item warranting comment is the Inflation Reduction Act. We continue to believe the IRA's price setting provisions are damaging to innovation and will prevent the delivery of transformative therapies and cures to patients. As we await adjudication of legal proceedings initiated by us and others, we did submit all requested information in compliance with CMS's drug price setting scheme to continue supporting patients' access to our medicines that help them stay healthy and live longer.

Moving to segment highlights in the quarter. As Jessica previously shared, our teams delivered strong results in the third quarter, while continuing to advance our pipeline to enhance future growth. Within the Innovative Medicine business, two important regulatory milestones were announced during the quarter. Specifically, we received European Commission approval for a reduced biweekly dosing frequency for TECVAYLI for eligible patients with relapsed and refractory multiple myeloma. And US FDA and European Commission approval of TALVEY, a first-in-class bispecific therapy for the treatment of patients with heavily pretreated multiple myeloma.

regarding clinical data, we are excited to have an unprecedented seven late-breaking abstracts, including three featured in the Presidential Symposium being presented at the European Society of Medical Oncology Meeting this weekend. Highlights will include the results from all three Phase 3 studies of RYBREVANT in lung cancer, including MARIPOSA, MARIPOSA-2, and PANTHEON. Additionally, updated data from the SunRISe-1 study of TAR-200 in non-muscle invasive bladder cancer will be shared, as well as the first-ever data of TAR-210 in patients with FGFR mutations. We also look forward to presenting Phase 2 data for Nipocalimab in rheumatoid arthritis at the American College of Rheumatology Annual Meeting in November, and have already launched a Phase 2 combination study in RA.

Lastly, we plan to initiate multiple clinical development programs for our Targeted Oral Peptide JNJ-2113. This includes the initiation of the ANTHEM Phase 2b study in ulcerative colitis, which will begin this month, and the Phase 3 clinical program titled ICONIC for adults with moderate-to-severe plaque psoriasis, expected to begin in November.

Moving to MedTech. Notable highlights in the quarter include significant advancements in electrophysiology across our Cardiac Ablation platform. We received FDA clearance from multiple Atrial Fibrillation Ablation products in our portfolio to be used in a workflow without fluoroscopy. This FDA indication is unique to Johnson & Johnson, and is a significant advancement, where caregivers and patients are not exposed to harmful fluoroscopy-related radiation during their cardiac ablation procedures. It also allows for the removal of heavy-lead protective equipment that may lead to orthopedic complications for care teams.

In Pulsed Field Ablation, we have completed our clinical trial in Europe and submitted for CE Mark for our VARIPULSE Catheter. We expect the completion for our US VARIPULSE study to occur in the fourth quarter. We are also simultaneously advancing clinical studies for two additional Pulsed Field Ablation catheters, the STSF Dual Energy Catheter, capable of delivering both PF and RF energy through the same device; and OMNYPULSE, a large-tip focal catheter.

Beyond Electrophysiology, we have completed enrollment in the Abiomed Impella ECP clinical study, a landmark pivotal trial designed to demonstrate the safety and efficacy of the Impella ECP during high-risk PCI procedures. Impella ECP is the world's smallest heart pump and the only heart pump compatible with small pore access and closure techniques. While not a clinical advancement, we have also taken steps in the quarter to improve MedTech's future margin profile, implementing a restructuring program designed to simplify and focus the operations of our Orthopedic business. As part of this two-year program, we expect to exit certain markets and product lines across that business.

We anticipate some short-term modest revenue disruption in Orthopedics of approximately $250 million in total over the next two years given the market and product line exits. But believe these actions will improve our ability to meet demand resulting in accelerated growth and enhanced profitability. The program is expected to be completed by the end of 2025 with total program costs estimated to be between $700 million and $800 million.

Let's now turn to cash and capital allocation. We ended the third quarter with approximately $24 billion of cash and marketable securities and approximately $30 billion of debt for a net debt position of $6 billion. Free cash flow year-to-date through the third quarter was approximately $12 billion, up from the $5 billion we reported year-to-date in the second quarter of 2023.

Our capital allocation priorities remain unchanged. We will continue to execute a strategic and disciplined approach, utilizing our strong credit profile and robust free cash flow generation to prioritize continued investment in our business, increasing dividends on an annual basis, executing strategic business development initiatives for inorganic growth, and executing share repurchases when appropriate.

Moving on to our 2023 guidance update. Based on the strong results delivered in the quarter and the first nine months of this year, balanced with planned investments in the fourth quarter, we are raising the ranges for full-year sales and EPS guidance. We now expect operational sales growth for the full year 2023 to be in the range of 8.5% to 9.0%, or up $600 million at the midpoint in the range of $84.4 billion to $84.8 billion on a constant currency basis and adjusted operational sales growth in the range of 7.2% to 7.7%.

Just a reminder, our sales guidance continues to exclude any COVID-19 vaccine revenue. While we do not speculate on future currency movements, utilizing the euro spot rate as of last week at $1.06, we now anticipate an incremental negative currency impact of $400 million, resulting in a full-year impact of negative 1% or $800 million.

Looking across the P&L. Adjusted pre-tax operating margin is still expected to improve by approximately 50 basis points versus prior year, driven by stronger margin profile and business mix. Net other income is also being maintained ranging from $1.7 billion to $1.9 billion. Due to higher interest rates earned on our cash, we now expect net interest income in the range of

$300 million to $400 million.

And finally, based on current tax law, our estimate for the effective tax rate for 2023 will be between 15.0% and 15.5%. These revised estimates translate to an increase in our adjusted operational earnings per share guidance by $0.10 at the midpoint. Our new range is $10.02 to $10.08, or 12.5% growth at the midpoint and adjusted reported earnings per share in the range of $10.07 to $10.13, or 13% growth at the midpoint.

Since January, we've been able to increase our guidance throughout the year for a cumulative impact of $3 billion on operational sales and $0.25 on adjusted operational earnings per share, which includes absorbing $0.10 for our licensing deal with Cellular Biomedicine Group announced in the second quarter of 2023.

Now, I appreciate that many of you are turning your attention to 2024, and our teams are actively finalizing our plans for next year. With that context, allow me to provide some preliminary perspectives for you to consider.

For Innovative Medicine, we remain confident in our ability to deliver growth from key brands and anticipate continued progress from our newly launched products, all advancing our robust pipeline with many exciting data readouts, filings and approvals ahead of us. This includes data presentations and regulatory submissions for TREMFYA in IBD, presenting data from our Phase 3 study of Nipocalimab in Myasthenia Gravis, and readouts from two Phase 3 ERLEADA trials in early-stage prostate cancer. We do not expect the entry of STELARA biosimilars in the United States during 2024. However, as a reminder, STELARA does have a composition of matter patent expiry in mid-2024 in Europe.

For MedTech, we expect our commercial capabilities and continued adoption of recently launched products across all MedTech businesses will continue to drive our growth and improve competitiveness, while continuing to advance our pipeline programs, including innovation in Pulsed Field Ablation, Abiomed and Surgical Robotics. We expect procedures in 2024 to remain consistent with elevated 2023 levels.

With respect to tax, as you may be aware, the European Union member states are in the process of enacting the EU's Pillar 2 Directive, which generally provides for a 15% minimum tax rate as established by the OECD Pillar 2 Framework. The first EU effective date for certain aspects of the law is January 1st, 2024. As a result, we currently estimate it up to a 1% tax rate increase in 2024. In addition, the US Treasury's current perspective on Pillar 2 will be harmful as it relates to the treatment of US incentives for innovation and will result in US-based multinational companies paying more tax revenue to foreign governments.

Regarding share count given the Kenvue separation, the full benefit of the approximately $191 million net share reduction in Johnson & Johnson shares outstanding from the exchange offer will be reflected in our 2024 financials.

And, finally, while we don't speculate on future currency impact, utilizing the current euro spot rate would yield an approximate $0.15 negative currency impact on 2024 full-year adjusted earnings per share.

We are pleased with our strong performance during the first nine months of this year and have positive momentum as we move into 2024. We look forward to sharing more about the strength of our business, promise of our Innovative Medicine and MedTech pipelines, and the long-term strategy of Johnson & Johnson at our upcoming enterprise business review on December 5th at the New York Stock Exchange. More information, including an overview of the day's schedule, will be shared shortly. We hope you will be able to join us either in person or on the available webcast.

I want to conclude my remarks by thanking our teams around the world for their continued hard work and unwavering commitment to excellence on behalf of our patients. We are confident that our strategy will position us to deliver long-term growth and create significant value for our shareholders.

With that, it's my pleasure to turn to Kevin and begin the Q&A portion of the call.

---

## Is Gold Really Boring? (Ad)

Many investors perceive gold as a "boring" investment. But according to MoneyWeek, that's a good thing. Gold helps investors sleep soundly as it preserves wealth and creates a hedge against inflation. Today, there's a unique way to invest in gold, with real advantages over coins and mining stocks.

See why this could be a huge untapped gold

---

Questions and Answers



**Operator**

Thank you. [Operator Instructions] Our first question is coming from David Risinger from Leerink Partners. Your line is now live.



**David Risinger**
*Analyst at Leerink Partners*

Thanks very much for taking my question, and congrats on the strong financial performance. So, my question is on benchmarking MARIPOSA results, please. Could you share your thoughts on key considerations, including AstraZeneca's recent FLAURA2 results, which included a nine-month PFS benefit? Thanks very much.



**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Hi. John Reed here. It's great to join the call. This is my first time as a newcomer to J&J. And before I answer your question, David, I would just like to say I have to tell you I'm really enjoying being a new member of the J&J team. I've really been impressed with the culture inspired by our credo with the caliber of our talent, our people here at J&J, and with a really strong performance of the pipeline.

We've already launched two NMEs this year, AKEEGA for prostate cancer and TALVEY for myeloma continuing our tradition in bringing new therapies and those agents and we're positioned to deliver an average of more than two NMEs per year between now and the close of the decade 2030. So, the pipeline is very robust, and it's exciting to be here and to be a part of it.

So, on to your question, the data will be presented at ESMO in a Presidential session. So, we are embargoed until then. Abstracts will be available on Wednesday. I can only say that the RYBREVANT-Lazertinib combo did perform well head-to-head against Osimertinib. Our regimen is a chemo-free option for patients, which we think is important, and we'll present those data at ESMO.



**Operator**

Thank you. Next question today coming from Matt Miksic from Barclays. Your line is now live.



**Matt Miksic**
*Analyst at Barclays*

Hi. Thanks so much for taking the question. So, I think most folks may look at the Orthopedic results in medical devices maybe being a little bit softer-than-expected. And I know that's not everything by a long shot for J&J. But given the expectations were for kind of continued strength heading into Q3, if you could talk maybe a little bit about your comment on more traditional seasonality and thoughts on the sustainability of that strength, as well as the sort of divestiture and sort of realignment plan, Joe, that you described? Thanks.



**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

So, thank you for the question. And, yeah, I mean, our results in Orthopedics were 2.6% growth overall. And part of it, as you mentioned, is driven by seasonality. As we have commented, we are in a journey of improvement in Orthopedics. We want to be number one and number two in every segment we compete. And that is a place where we are not there yet, but we are very confident that we are going to continue to make improvements by investing and by growing in the highest growth segments.

We have made improvements in our portfolio. For example, on the Knees side. We have a more complete portfolio now on the Revision side, on the Cementless side. We are launching now our VELYS Orthopedics, total robot -- total knee surgery replacement in Europe. And we already have about 30,000 procedures that have been performed with our VELYS robotic system.

Overall, we are increasing our penetration also in the ASCs which is a fast-growing segment, and we see our performance continue to improve in the US and globally. In this particular quarter, we also had some impact due to the impact of value-based procurement in China and also because of the impact of the Russia sanctions that was mentioned already in the prepared remarks.

So, overall, in Orthopedics, we are determined to continue our journey of improvement. We are focusing in having the right portfolio. We have a very strong team in the field. And, as Joe has announced, and Joe can comment on that, we have a plan to be able to continue to improve our margins in Orthopedics.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Yeah. Just very quickly, Matt. Thanks for the question. With respect to the restructuring program that we announced specifically in Orthopedics, we're looking to exit those less profitable markets and product lines. So, we'll have some, clearly, inventory write-downs as a result of that. Over the next two years, there will be some modest revenue disruption, but we actually do think these actions not only accelerate growth going forward, but will improve profitability.

**Operator**

Thank you. Next question is coming from Chris Shibutani from Goldman Sachs. Your line is now live.

**Chris Shibutani**
*Analyst at The Goldman Sachs Group*



Great. Thank you very much. Can you provide us with some insight into updates on the talc litigation process? And then, secondly, if you could just comment, Joe, you used the word voracious last time with your appetite for business development opportunities. How does that word stand still in terms of your appetite on the fore? Thank you.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Hey. So, Erik, why don't I turn it over to you to discuss the talc litigation matter, and then I'll come back and answer Chris's second question?



**Erik Haas**
*Worldwide Vice President of Litigation at Johnson & Johnson*

Great. Thanks, Joe. The short answer is that we continue to pursue the four-pronged strategy that we communicated back in July. So, let me quickly summarize those four-prongs and highlight the selling and development and perhaps anticipate some follow-up questions about talc.

So, the first prong, we are pursuing the appeal through to the Supreme Court to the United States of the July ruling by the New Jersey Bankruptcy Court that dismissed LTL's bankruptcy case. Notably, our appeal recently was joined by council representing the vast majority of the talc claimants. Also, thereafter, the Bankruptcy Court certified the case for a direct appeal to the Third Circuit bypassing the District Court, because the Bankruptcy Court found that the appeal raises matters of significant public interest, the resolution of which would materially advance the progress of the case, and we fully agree with that assessment.

On the merit, the appeal challenges both the validity, as well as the application of the novel standard that was imposed by the Third Circuit that requires a showing of, quote, immediate financial distress, to proceed with the bankruptcy case. That immediate financial distress requirement, which the Third Circuit did not specifically define is nowhere in the bankruptcy code, and is contrary to the standards that are implied by other Circuits. Moreover, under any reasonable interpretation of that standard, we believe the record has fully established that LTL faced immediate financial distress due to the large volume of talc claims that were asserted against it.

In terms of timing, the Third Circuit could rule at any moment, whether it will take the direct appeal or not. If it does, we expect briefing to take place over the next couple of months with a decision in the early-2024 timeframe. And because we do anticipate the Third Circuit primarily affirm the application of its standards, we will immediately, thereafter, request the Supreme Court to resolve the Circuit split and decide if the Third Circuit's novel approach is an appropriate standard for deciding a motion to dismiss, we do not think it is. We hope to squeeze the serve petition to the Supreme Court into the first term in 2024. But if not, we will raise it in the second term.

The second prong of our strategy involves working with the council, representing the vast majority of the talc claimants, more than we had previously, that were along with us, along with the -- and in addition to the future claims' representatives. And together with the council and the future claims representatives, we're pursuing a consensual resolution of the talc claims through another bankruptcy. And that is exactly what the Bankruptcy Court, the New Jersey Bankruptcy Court urged and strongly recommended that we do, and its decision that actually dismissed the case. And the New Jersey Court made those recommendations having found that LTL had made remarkable progress towards an equitable and efficient resolution to-date. So, we are continuing on in that process.

In terms of timing on the second prong, the consensual resolution is on the same trajectory as the initial bankruptcy plan with a vote expected in the next six months to determine whether the requisite supermajority of claimants support the plan.

Third, while those negotiations are proceeding, we will continue to vigorously defend the meritless talc claims in the tort system. As you may have seen just this last week, we had a significant favorable ruling in that regard with the New Jersey's Appellate Court in the Barden case, reversing a $223 million verdict against the company. The Appellate Court reversed because it determined the opinions of the leading plaintiff's experts were unsound, were unscientific, and were unsubstantiated. And it is that baseless nature of those expert opinions why we have prevailed in the vast majority of the cases that have been tried to-date.

In terms of timing of the litigation, there are two additional mesothelioma cases that we expect will be tried this year with more to come in 2024. As with the Barden case, it's important to keep in mind that the ultimate resolution of those matters often is determined at the Appellate level, not at the trial level, which is the place and which occurs in the forms that the plaintiff lawyers choose.

Finally, we will aggressively challenge the abuses of the judicial system by the mass tort claims, Barden and its experts with their own affirmative litigation. We mentioned last time that we brought two actions against the plaintiff as far as lead experts for defaming our talc products with publications premised, unknowingly false propositions, and those are moving forward. They've been fully briefed with respect to the initial case motions. And in terms of timing, we expect a ruling shortly from the Federal District Court in New Jersey whether those matters may proceed to the discovery phase.

So, that's a quick summary. I'd be happy to answer any follow-up questions you may have regarding the strategy.

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Great. Thank you, Erik. Chris, regarding your second question, if J&J had a nickel for every time voracious was quoted back to me since the second quarter earnings, we probably could have taken up guidance even a little bit more. And while that's often associated with wanting or devouring great quantities, I think it's really the second definition in Webster's, where having a very eager approach to an activity is the construct in which I meant that term in the second quarter.

So, I could have said that five years ago, 10 years ago, my predecessors could have said that. We routinely, almost weekly meet on new opportunities that may complement our existing portfolio or our future pipeline in both MedTech and Innovative Medicines, and the current moment is no different. In fact, we're in a very good position given the low levels of net debt, the cash we were able to raise to fulfill one of our capital allocation priorities, which you're probably very, very familiar with at this point in time.

But we're not going to compromise our principles in making sure that it's a strategic fit. So, it fits into the scientific expertise, the commercial capabilities with a global reach that will add value to that asset in our hands versus someone else. And we're going to make sure that we're disciplined in that approach financially by ensuring that we have a return that's commensurate with the risk that we're bearing on behalf of shareholders.



So, we'd much rather have an okay deal pass us by than make a bad deal. And that's kind of the principles that we live by too. There's no deal that's too big given our credit rating, as well as our financial strength and annual cash flow generation. But, as you know, we've had great success doing smaller earlier stage deals as well. We're agnostic with respect to whether it'd be -- the next one being MedTech or Innovative Medicines, we are simply looking for the best-qualified deal that meets both strategic and financial parameters.

So, hopefully, that answers your question. Next question, Kevin?

 **Operator**

Our next question is coming from Geoff Meacham from Bank of America. Your line is now live.

**Geoff Meacham**
*Analyst at Bank of America Merrill Lynch*

Hey, guys. Good morning. Thanks so much for the questions. I'll stick with one. So, on CARVYKTI, can you talk about the commercial backdrop just with respect to new centers or prescribers? And related on manufacturing, you guys have any update on the vector constraints and maybe when that could be relieved? Thank you so much.

 **Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Geoff. And as you have seen in the progression quarter-over-quarter of CARVYKTI, we continue to have, on one hand, strong demand, and on the other hand, a progress in our manufacturing. We're also very encouraged by the data that came out with CARTITUDE-4 that eventually, we make CARVYKTI also a medicine in earlier lines of therapy.

So, when it comes to our manufacturing progress, I'm going to let John explain what are we doing in order to be able to supply the strong demand that we are seeing in CARVYKTI to-date. Overall, what you can expect, Geoff, is that you will continue to see quarter-over-quarter improvement in 2023 into also 2024.

 **John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Yeah. To follow up on Joaquin's comments, we've been progressively adding more and more capacity that's included at our original launch site in New Jersey, but we are close to having an additional manufacturing site up and rolling in Europe, in Belgium. And also, have recently increased our capacity by using some excess capacity that Novartis had to further bolster the number of slots that we can accommodate.

One of the traditionally rate-limiting components of the therapy has been the lentivirus component. And there, we've made really outstanding progress in-house, mastering that technology, increasing the scale at our factory in Switzerland. And we're in the process -- we're building -- and I think it will be available next year, another factory in the Netherlands to support the lentivirus component, which has sometimes been one of the rate-limiting aspects. So, altogether, the capacity continues to ramp up, and we continue to perfect the technology, I would say. Same thing with the number of centers that are qualified to administer the therapy and we're also making progress on the number of countries where CARVYKTI will be available.

So, very excited, obviously, about the momentum with that, really best-in-class CAR therapy. The CARTITUDE-4 data, as you know, showed unprecedented progression-free survival benefit, a hazard ratio of 0.26, overall response rate of 99%, 86% complete response, very durable for a one-and-done therapy that was well tolerated. The Grade 3 or above cytokine release syndrome was only 1.1%. So, this is really, I think, now emerging as the preferred second-line therapy. And we hope to do more, such as bringing the front line as a possible alternative to stem cell transplant.

 **Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

And, Geoff, to your point, in multiple myeloma and new product launches, we are also very encouraged by the launch of TECVAYLI and also the recent approval of TALVEY. The progression of these medicines is exceeding our internal expectations. And we already have about 2,000 healthcare professionals in the US that are REMS certified to be able to administer

TECVAYLI and TALVEY. So, very encouraging progress in these two medicines in multiple myeloma, and we expect to be able to break out TECVAYLI sales beginning in 2024.



**Operator**

Thank you. Next question is coming from Josh Jennings from TD Cowen. Your line is now live.

**Josh Jennings**
*Analyst at TD Cowen*

Hi. Good morning. Thanks for taking the questions. I was hoping to ask on STELARA and the biosimilar competition in the US now expected in 2025. That's not new news. But wanted to check on how beneficial is the extra year for the Innovative Medicine business's defense strategy. I guess, focusing on just the potential for TREMFYA to take share from slorent [Phonetic] psoriasis and psoriatic arthritis and inflammatory bowel disease indications. And this timing should provide more confidence in the potential to hit the constant currency revenue target set for 2025 for the pharma unit? Thanks.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you for the question. Certainly, we have always been very confident in being able to hit our $57 billion target in 2025 for pharma.

As I have explained before, there are a number of factors there. The first one and most important is the growth that we're having in our key assets: TREMFYA, ERLEADA, UPTRAVI, our long-acting injectables and, especially, DARZALEX. We continue to have a tremendous trajectory gaining share in first-line. We are encouraged, as I just commented, by the launches of CARVYKTI, the progression of SPRAVATO, and also the recent launches too also in multiple myeloma of TECVAYLI and TALVEY.

And looking into 2024, the remainder of the year, and also into 2025, we have some very exciting news in our pipeline. Some of them have been already commented. For example, the first chemo-free regimen as first-line in EGFR mutated non-small lung cancer. We will be presenting the data of MARIPOSA at ESMO, and that potentially will be a filing and an approval in 2025. This would be a new standard of therapy in this line of therapy in this very important need for patients.

We also continue to be encouraged by the progress in our TARIS drug delivery platform. You are also going to see data being presented at ESMO. Very important for us. In two existing products, we will be presenting data on TREMFYA in IBD, both in Crohn's and in ulcerative colitis for a potential approval later in 2024. That's going to be a very significant growth driver for TREMFYA.

Take into consideration that in the STELARA case, IBD represents 75% of the sales. So, we still have a lot of growth in front of us with TREMFYA as we do also in ERLEADA in which we will present data in localized high-risk prostate cancer. We're also going to be able to present some data of Nipocalimab in Myasthenia Gravis end of this year. So, all in all, very good news for our pipeline in 2024 and 2025. Certainly, the entrance of the biosimilars in 2025 in the US is another factor that builds our confidence that we are going to be able to meet the $57 billion.

For me, the most important thing now is to look forward and to think about the growth profile of our Innovative Medicine group into the second half of the decade. We have a number of growth drivers that are already there, that I've described, but also the strength of our pipeline, both in immunology, in oncology, and in neuroscience profiles us as a strong company, as a strong growth profile into the second half of the decade. And that's part of what we will be looking forward to discussing with you in our upcoming enterprise business review, focusing on what is going to be the growth profile in the second half of the decade.



**Operator**

Thank you. Next question is coming from Chris Schott from J.P. Morgan. Your line is now live.

**Chris Schott**
*Analyst at J.P. Morgan*

Great. Thanks so much for the question. And, maybe, Joe, just a little bit more color on 2024. I appreciate the details you provided. Seems like a year of another healthy topline growth. But can you just give us some directional color on margins next year? I know there are some dissynergies with Kenvue this year. I'm just trying to get a sense of how you think about margin progression here as you kind of balance some of these kind of the pipeline opportunities and some of these topline growth initiatives versus kind of dropping that to the bottom line. So, just any directional color would be appreciated. Thanks.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Yeah. Sure, Chris. Thanks for the question. So, first off, we're very pleased with the margin progress that we've been able to make in 2023. I think, we started the year to roughly flat to now improving by 50 basis points. A lot of that has really gone -- is directly attributable to the efforts of many people in the organization, who really took the opportunity to look at our infrastructure as a two-segment company versus a three-segment company.

So, the dissynergies that we warned about and talked about early on in the Kenvue separation process really haven't come to manifest. In fact, as we look out to 2024, we see minimal to almost no impact from dissynergies from the separation. We are in the process of finalizing our business plans for 2024. I'd like to get a little bit better assessment of how the clinical development pipeline is shaping up, what the investments are required there. But we're a larger company, we take the opportunity to look each and every year at efficiencies. So, we're not in a position to give you margin guidance right now. But I would expect that something similar to, you know, where we started this year would not be a bad starting point for next year.

Again, it's going to depend on the investments that the R&D teams from both MedTech and Innovative Medicines can bring forth. And we'll, obviously, look to accelerate bringing some of these great products to patients sooner if we have that opportunity.

**Operator**

Thank you. The next question is coming from Larry Biegelsen from Wells Fargo. Your line is now live.

**Larry Biegelsen**
*Analyst at Wells Fargo & Company*

Good morning. Thanks for taking the question. Joe, just -- could you just clarify what you meant by flat procedures in 2024 in MedTech? Are you assuming -- does that mean flat in MedTech growth? And just for my question, can you talk about what you're seeing with bariatrics for GLP-1 this is and how you're thinking about the potential impact of GLP-1s across your device business, long term, especially in cardio and ortho? Thank you.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

So, I'll give the second half of that question to Joaquin, but thanks for the clarifying question with respect to market growth. We are not suggesting flat market in MedTech next year. What we do is -- are foreseeing right now based on what we know today is the elevated levels, the market overall being 5% to 7% versus what traditionally has been maybe 4% to 6%. We see that same 5% to 7% next year.

Joaquin?

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you. And thank you, Larry. And taking a step back, we see the evolution of our MedTech business in a very positive way. One of our key goals for us is to be a top-tier grower in MedTech. When I look at the results of MedTech this year, we are delivering on that. Our growth in the quarter, pro forma was 6.4% when you compare with Abiomed as a stand-alone company. And when you look at our pro forma growth year-to-date in MedTech is 7.9%. So, very pleased with the performance

of our MedTech business. And we have expectations to continue our progression into 2024 in part fueled by the procedural growth that we see and also by our continued improvement in our execution and the launch of new products. Some of them we can discuss later. For example, we will be launching our first PFA catheter in Europe into 2024.

And when it comes to GLP-1s, it's good for patients to have new options for treatment, especially in obesity, which at times has been a stigmatized disease in which patients were not looking for treatment due to the stigmatization of that. Certainly, as you commented, we're seeing some impact in our bariatric business in the short term as some patients are reconsidering surgery, expecting to get treatment. But, overall, when we talk to surgeons, bariatric surgeons, what they see is a complementary role of surgery and GLP-1s. And many of them comment on the fact that they could see a tailwind for bariatric surgery down the road, given this complementary nature, the increased awareness about obesity, more patients seeking treatment. And many of the patients, about 30% of them, are not going to be tolerating these medications. So, there would be another funnel for our bariatric business.

In the rest of our MedTech business, at this point, we continue to see robust procedure increase, and we don't anticipate that change -- that thing -- that then changing in the foreseeable future.



**Operator**

Thank you. Next question is coming from Terence Flynn from Morgan Stanley. Your line is now live.

**Terence Flynn**
*Analyst at Morgan Stanley*

Great. Thanks so much for taking the question. I was just wondering if you could elaborate a little bit more, John, on Nipocalimab in RA. I know, we're going to see the full data here at ACR. But is this a drug that you see potentially working in a broad population, or is there a biomarker subset group that's more likely to respond? And then, how are you thinking about Phase 3 plans here in this indication? Thank you.



**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Yeah. Thanks for the question, and we look forward to sharing those data at the ACR in November in San Diego. We're looking at Nipo as either a monotherapy combined with the precision medicine strategy or as a combination for a broad population, where we aim to combine with an anti-TNF agent. And we see those two mechanisms as being very complementary, reducing the levels of autoantibodies with Nipo and then inhibiting inflammatory mechanisms with the TNF. That so-called DAISY study, the Phase 2 is underway now, and we'll test that combination. So that, in general, has been the way we're looking at RA, not only for Nipo, but other agents in our pipeline, where we see the future being monotherapies that are targeted in a precision medicine way or broad therapies that are combos that can bring together synergistic mechanisms in a safe way. We're excited to be launching the DAISY program to look at that combo. And we're hoping that that will bring deeper, more durable remissions for patients as we bring those new mechanisms together.



**Operator**

Thank you. Next question is coming from Joanne Wuensch from Citibank. Your line is now live.

**Joanne Wuensch**
*Analyst at Citibank*

Good morning, and thank you for taking the questions. Is it possible to give us a little bit more detail on a couple of things? You mentioned headwinds from VBP. And I'm just curious if there's: A, a way to quantify it; and B, a way to say if it's at least better or worse or the same as it has been in the last couple of quarters? And then, similarly, in other aspects of China, we've been hearing a lot about anticorruption policies, etc. If you could comment on that, that would be great. Thank you.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Joanne. And, first, let me say that China for us is a key market and a market in which we are, you know, delivering growth now, and we are going to continue to deliver a strong growth into 2024. So, it's a key growth driver for us.

So, on one hand, certainly, VBP represents a headwind in price. And, on the other hand, it also represents an opportunity as you can expand quality products, medical technologies into more patients. So, there are a number of MedTech platforms now currently undergoing VBP headwinds; Electrophysiology, Spine, Trauma and Endocutters and Energy. And these effects will last during 2023 and part of 2024. We have already anniversary our large joints, VBP. So, at this point, we have about 80% of our platforms that have been already affected by VBP. Again, as we look into 2024, we expect to continue to deliver a strong growth in China, and China remaining a key part of our growth.

When it comes to the question that you were asking on anticorruption side, we have a strong culture of compliance in our business. And, at this point, we may see some limitations related to physician and surgeon access, but we are not seeing any material impact in any part of our business due to that, and we'll continue to monitor the situation. Overall, as I said, we'll continue to see China as a key driver of our growth, and also as a key source of innovation moving into the future.



**Operator**

Thank you. Next question is coming from Vamil Divan from Guggenheim Securities. Your line is now live.

**Vamil Divan**
*Analyst at Guggenheim Securities*

Great. Thanks for taking my questions. I just want to maybe dive a little deeper on the immunology side. I appreciate the comments you made there. Already for the quarter the performance was very strong for several of your products there. So, I'm just curious if there were any sort of one-time items there that we should be aware of. It sounded like there's a lot about patient mix and market growth that you are sort of commenting on. I'm curious if you can just highlight getting into store stocking or sort of one-time pricing adjustments that we should take into account as we look at future quarters? Thank you.



**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you. We are very pleased with the performance of our immunology business, especially we're pleased with the performance of TREMFYA with 25.1% growth in the quarter, which shows our ability to drive growth there. As I said before, TREMFYA currently is now indicated in psoriatic arthritis and psoriasis as an analog in the case of STELARA, that represents about 25% of the sales. So, with the upcoming readouts, filing, and potential approvals of ulcerative colitis and Chron's disease, we expect to have significant growth in TREMFYA. We talk about TREMFYA as a $5 billion product earlier in our Analyst Day in 2021. Now, you can see clearly that we're going not only to meet that, but to clearly exceed that benchmark for TREMFYA.

So, when it comes to STELARA, we had also a very robust growth of close to 16%. In that case, there is a prior period adjustment in the quarter a year ago that represents about 600 basis points. So, you should take that into consideration when you think about the STELARA growth.

We are very pleased overall, as I said, with our immunology portfolio. Overall, our immunology portfolio in the quarter grew 12.4%, which is very strong considering that we also have headwinds there of REMICADE biosimilars. And we remain very excited about the immunology portfolio as a key driver for J&J. Our Innovative Medicines are going to be bringing significant improvements there in IBD with TREMFYA, as I'd recall. But, also, staying there, we have our targeted oral peptide, which is going to be – presenting some data soon that we already presented data in psoriasis. And, also, we have the combination of Guselkumab and Golimumab in IBD, which has presented also groundbreaking results. So, very encouraged about our immunology portfolio and the ability to drive growth in the second half of the decade more to be seen in our EBR later in the year.



**Operator**

Thank you. Next question is coming from Danielle Antalffy from UBS. Your line is now live.

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 16 of 18   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28826-1   Filed 12/19/23   Page 68 of 187 PageID: 169346

Ex. 2

**Danielle Antalffy**
*Analyst at UBS Group*

Hey. Good morning, everyone. Thanks so much for taking the question. Ahmet, I wanted to actually bring you into the conversation here and ask about some of the innovation in MedTech and, you know, specifically, you guys have an Ottava Day coming up. And just curious what you can say about: A, what we can expect to see, obviously, appreciating you're not going to totally open the kimono and front run the day; but B, and probably most importantly, sort of where you see Ottava ultimately fitting into the robotics landscape and helping contribute to a continued move higher robotics penetration? Thanks so much.

**Ahmet Tezel**
*Group Chairman and Global Head of MedTech Innovation and R&D at Johnson & Johnson*

So first of all, thank you for the question. Similar to John, this is my first call as well. So really excited to be here, equally excited to be leading a team of talented scientists, engineers, and physicians as we do a lot smarter, less invasive and more personalized solutions for our patients.

So with respect to Ottava, we have made great progress on the platform. The team is really focused on combining a really differentiated architecture based on its software and hardware together with our best-in-class instruments, and we believe that combination of a differentiated architecture with instruments is going to enable us to have high value from day one.

Now, we will have more updates on Ottava next month, as you mentioned. And at that time, we will provide a lot more detail. But the one point I'll make is that even today, robotic-assisted surgery penetration is in single digits. So there's still a lot of growth left in that segment. And we're really excited because Ottava brings a lot of differentiation. So we're very excited that we can make a big kind of path -- we can open our path and growth there in that segment as well.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Danielle, if I may interject here on Ottava, I've been in touch with multiple surgeons around the world. And one common -- comment that I find is that they all want. They are all rooting for Johnson & Johnson to come into the robotic surgical space. They want to have the service and the support that they have accustomed doing decades with our Ethicon business and they also want to be able to utilize the advanced instruments with whom they have grown. So what I see in the surgical space is that the surgeons want to have alternatives and they are all looking forward to having Johnson & Johnson play an important role in robotic surgery.

**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Thank you, Danielle. We have time for one last question.

**Operator**

Thank you. Our final question today is coming from Louise Chen from Cantor Fitzgerald. Your line is now live.

**Louise Chen**
*Analyst at Cantor Fitzgerald*

Hi. Thanks for taking my question. I wanted to ask you on the FLAURA2 result, if they impacted at all your thinking on your market opportunity for MARIPOSA? And why or why not? Thank you.

**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

No, I don't think it influences, because it's really important to pay attention not only to progression-free survival, but also overall survival, as well as the PFS to the survival on the second line of therapy. Unfortunately, with today's therapies, almost all lung cancer patients will eventually relapse. They will need a second-line therapy. And we think chemo was best reserved

for that circumstance, where the patient now has failed the frontline targeted therapies.

So I would really say, pay attention to overall survival, pay attention to that progression-free survival to endpoint because these are going to be, I think, really things that matter in terms of what the long-term outcome is for patients with EGF receptor mutant lung cancer. The -- we -- we believe based on the data we'll present in the Presidential session at ESMO that the combination of RYBREVANT, our bispecific antibody, the first bispecific ever approved for a solid tumor indication incidentally, fully human, as well as the third-generation small molecule oral EGF receptor Lazertinib, which is brain penetrant, I remind. We believe that, that will become the new frontline standard of care for EGF receptor mutant lung cancer and offer patients durable remissions that are achieved in a chemo-free regimen.



**Operator**

Thank you.



**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Thank you and thanks to everyone for your questions and your continued interest in our Company. We apologize to those that we couldn't get to because of time, but don't hesitate to reach out to the Investor Relations team with any remaining questions you may have.

I will now turn the call back to Joaquin for some brief closing remarks.



**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Jess, and thank you to all of you for joining us today. I'm proud to present today the company's performance. This is the first quarter that we report as a new J&J, focused in health care innovation, in MedTech, and in Pharmaceuticals. And I believe this -- this new J&J has a better foundation to continue to drive growth for the next decade.

We are achieving strong results in 2023 with our 7.5% adjusted operational growth in the quarter. It's the second quarter in a row that we have a -- beat and raise of our guidance. And we continue to believe that we're going to have a very strong finish into 2023. And that reads well for a strong 2024 too. We have a dedicated team both in Innovative Medicines and in MedTech. And we think we are very well positioned, as I said, to carry the momentum that you are seeing in 2023 into 2024.

Finally, we are looking forward to engaging all of you at enterprise business review on December 5th. Thank you very much and enjoy the rest of your day.

**Operator**

[Operator Closing Remarks]



# More Earnings Resources from MarketBeat

## As Featured By:



**Empowering Individual Investors**

345 N Reid Place, Suite 620, Sioux Falls, SD 57103
contact@marketbeat.com
(844) 978-6257

| ABOUT MARKETBEAT | POPULAR TOOLS | FINANCIAL CALENDARS | TERMS & INFO |
| --- | --- | --- | --- |
| About | Stock Lists | Analyst Ratings | Advertising |
| Editorial Guidelines | Compare Stocks | Dividends | Accessibility Statement |
| Press Room | Dividend Calculator | Earnings | Do Not Sell My Information |
| Help and How-To | My MarketBeat | Insider Trades | Privacy Policy |
| Careers | Stock Screener | Stock Market Holidays | RSS Feeds |
| Contact | | | Terms of Service |

© American Consumer News, LLC dba MarketBeat® 2010-2023. All rights reserved.

© 2023 Market data provided is at least 10-minutes delayed and hosted by Barchart Solutions. Information is provided 'as-is' and solely for informational purposes, not for trading purposes or advice, and is delayed. To see all exchange delays and terms of use please see **Barchart's disclaimer**.

# EXHIBIT 3

| From: | James Conlan |
| --- | --- |
| To: | Van Arsdale, Duane [JJCUS] |
| Cc: | Douglas Dachille; Doug Dachille; Haas, Erik [JJCUS]; White, Andrew [JJCUS] |
| Subject: | [EXTERNAL] Re: Legacy Liability Solution |
| Date: | Wednesday, October 18, 2023 4:21:12 AM |

---

> **WARNING:** This email originated from outside the company. Do not click on links unless you recognize the
> sender and have confidence the content is safe. If you have concerns about this email, report it by clicking on
> the "Report Suspicious Email" button in the Outlook toolbar above.

Duane,

Thank you for your efforts to evaluate our proposal.  To further enhance our solution and to
address potential auditor concerns, Legacy has the support of lead counsel for the OC
Claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy that
will require (and is expected to garner) a 95% opt-in of current OC Claimants.  The
establishment of a settlement matrix should greatly reduce the uncertainty surrounding the
estimation of future claims and the associated challenges of determining the quantum of
funding necessary for your auditors to remove the non-cash charge for J&J's current and
future talc related liabilities.

Andy Birchfield, Doug Dachille, and I are prepared to meet with you, and your team, in
person to share and discuss the terms of such matrix as part of the Legacy acquisition.

Thank you again for your time and consideration.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Bermuda | Dallas | Chicago | Paris
Email | james.conlan@legacyliability.com
Mobile | +312.927.7572
www.legacyliability.com

On Oct 6, 2023, at 12:43 PM, Van Arsdale, Duane [JJCUS]
<DVanArs@its.jnj.com> wrote:

Hi Doug and Jim,

Thank you for the follow-up note to our discussion a few weeks ago.

To close the loop, we have discussed both internally and with our auditors, and at this time, we do not have an interest in pursuing this strategy.  While unlikely, we will let you know if this perspective changes in the future.

Thanks again for your time and thoughts.

Duane

---

**From:** Douglas Dachille <ddachille@non-canonical.com>
**Sent:** Thursday, September 28, 2023 10:16 PM
**To:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>
**Cc:** James Conlan <james.conlan@legacyliability.com>; Doug Dachille <doug.dachille@legacyliability.com>
**Subject:** [EXTERNAL] Re: RE:

> **WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, report it by clicking on the "Report Suspicious Email" button in the Outlook toolbar above.

## Hi Duane,

I wanted to thank you for arranging our meeting and for the time you and your colleagues afforded Jim and myself to outline the components of a transaction which we believe could provide J&J with legal finality to its talc liabilities, comparable to what it hoped to achieve through bankruptcy.

As Jim explained, our solution will relieve J&J of both its current and future talc liabilities in the tort system, as well as talc-related claims made against it by Imerys, Cyprus and other third parties (e.g. retailers). It should be noted that bankruptcy would not have resolved direct talc claims against affiliates of LTL, but the Legacy Liability solution will.

To achieve that outcome, Legacy will acquire LTL plus all other legal entities in the J&J corporate family that have any current or future talc liability in the tort system or contractually. This will require a further structural optimization (e.g. divisional merger) of J&J and likely other J&J affiliates. Once this additional structural optimization work is completed, and Legacy becomes the owner of all J&J entities with talc liabilities, J&J will no longer have any liability in the tort system or contractually for talc.

The transfer of ownership of the talc liable entities to Legacy, and the

disaffiliation of those entities from J&J, requires that such entities have assets at the time of transfer that equal or exceed the best estimate of the projected current and future talc claims. By doing so, there can be no fraudulent transfer or unlawful dividend. As a closing condition for the acquisition transaction by Legacy, J&J auditors must reach the foregoing conclusion in order for the ASC 450 non-cash charge to be removed from the financial statements of J&J.

Importantly, any talc claimant who disagrees with the above will lack standing to assert any "avoidance" theories, as all talc claims will continue to be paid in the ordinary course.

In addition to the legal construct of our proposed transaction, we briefly outlined a number of the other considerations  - tax, investment management, creditor issues, claims management, fees and expenses and the use of reinsurance in the form of an adverse development cover as a way for J&J to participate in the favorable development of claims prospectively relative to the original projections which determined the funding amount at inception. We would be happy to provide additional documentation which specifically addresses each of these issues in more detail.

Certainly the most important issues to address with respect to our proposal are the legal ones, but the relevant legal conclusions are quite clear.  Please contact either Jim or myself if there is any additional information we can provide to assist with the internal vetting process that our proposal provides J&J finality with respect to all of its talc-related liabilities.

Regards,
Doug

**From:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>
**Sent:** Monday, August 21, 2023 6:12 PM
**To:** Douglas Dachille <ddachille@non-canonical.com>
**Cc:** James Conlan <james.conlan@legacyliability.com>; Haas, Erik [JJCUS]
<EHaas8@its.jnj.com>; White, Andrew [JJCUS] <AWhite23@ITS.JNJ.com>; Rockaway,
Darlene [JJCUS] <DRockawa@its.jnj.com>
**Subject:** RE:

Hi Doug,

Thanks for the note and nice to meet you as well.  I have copied Erik Haas and Andrew
White who will also join the discussion.

I will ask Darlene (copied here) to coordinate and propose a few dates for us to get
together in the near future.  We'll be back in touch shortly.

Thank you,
Duane

---

**From:** Douglas Dachille <ddachille@non-canonical.com>
**Sent:** Monday, August 21, 2023 4:41 PM
**To:** Huffines, Robert <robert.huffines@jpmorgan.com>
**Cc:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>; James Conlan
<james.conlan@legacyliability.com>
**Subject:** [EXTERNAL] Re:

> **WARNING:** This email originated from outside the company. Do not click on links unless you
> recognize the sender and have confidence the content is safe. If you have concerns about this
> email, report it by clicking on the "Report Suspicious Email" button in the Outlook toolbar above.

Thank you Robert for the introduction.

Duane,

Nice to meet you. Jim and I would we happy to meet with you in person at your earliest
convenience.

Best regards,
Doug

Sent from my iPad

> On Aug 21, 2023, at 4:18 PM, Huffines, Robert
> <robert.huffines@jpmorgan.com> wrote:

Ex. 3

Duane - As I mentioned to you and Joe I'd like to introduce you to Doug & James.

Over to you all to connect.

Thanks. Let me know if I can be of help.

Robbie

Sent with BlackBerry Work (www.blackberry.com)

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# EXHIBIT 4 - Excerpt

Page 1

1

2      UNITED STATES BANKRUPTCY COURT OF NEW JERSEY
                    Case No. 23-12825

3    - - - - - - - - - - - - - - - - - -  x

     In re:                                :

4                                          :

     LTL MANAGEMENT LLC,                    :

5                                          :

                              Debtor,  :

6    - - - - - - - - - - - - - - - - - - -x

     LTL MANAGEMENT LLC,                    :

7                                          :

                         Plaintiff,   :

8                                          :

                 v.                    :

9                                          :

     THOSE PARTIES LISTED ON APPENDIX A :

10   TO COMPLAINT and JOHN AND JANE DOES:

     1-1000,                               :

11                                         :

                         Defendants. :

12   - - - - - - - - - - - - - - - - - -x

13                           April 17, 2023
                             1:12 p.m.

14                           7 Times Square
                             New York, NY

15

16

17

18

19

20           VIDEOTAPED AND REMOTE DEPOSITION UPON

21   ORAL EXAMINATION OF ANDY BIRCHFIELD, ESQ., held

22   at the above-mentioned time and place, before

23   Randi Friedman, a Registered Professional

24   Reporter, within and for the State of New York.

25

```
                                        Page 2

 1                  A. Birchfield, Esq.
 2     APPEARANCES:
 3                OTTERBOURG, P.C.
                  Attorneys for Proposed counsel for the
 4                official committee of talc claimants
 5                230 Park Avenue
                  New York, New York 10169
 6
                  BY:  RICHARD G. HADDAD, ESQ.
 7
 8
                  GOLOMB SPIRT GRUNFELD
 9                Attorneys for TCC
10                1835 Market Street, Suite 2900
                  Philadelphia, Pennsylvania 19103
11
                  BY:  RICHARD M. GOLOMB, ESQ.
12
13
                  LEVIN PAPANTONIO RAFFERTY
14                Attorneys for William Henry
15                316 South Baylen Street
                  Pensicola, Florida 32502
16
                  BY:  CHRISTOPHER V. TISI, ESQ.
17
18
                  BEASLEY ALLEN
19                Attorneys for Alishia Landrum
20                218 Commerce Street
                  Montgomery Alabama 36104
21
                  BY:  LEIGH O'DELL, ESQ.
22
23
24
25     (Appearances continued.)
```

```
                                                Page 3

 1                      A. Birchfield, Esq.
 2      (Appearances continued.)
 3                COHEN, PLACITELLA & ROTH
                  Attorneys for Estate of Kimberly
 4                Naranjo
 5                127 Maple Avenue
                  Red Bank, New Jersey 07701
 6
                  BY:  CHRISTOPHER PLACITELLA, ESQ.
 7
 8
                  JOHNSON & JOHNSON
 9                Attorneys for Johnson & Johnson
10                1 Johnson & Johnson Plaza
                  New Brunswick, New Jersey 08933
11
                  BY:  ERIC HAAS, ESQ.
12
13
                  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
14                Attorneys for LTL Management
15                One Manhattan West
                  New York, New York 10001
16
                  BY:  ALLISON BROWN, ESQ.
17
18
                  WHITE & CASE, LLP
19                Attorneys for Johnson & Johnson
20                555 South Flower Street, Sute 2700
                  Los Angeles, California 90071
21
                  BY:  GREGORY STARNER, ESQ.
22                     KATHRYN KUETHMAN, ESQ.
23
24
25      (Appearances continued.)
```

Page 4

1                    A. Birchfield, Esq.

2      (Appearances continued.)

3

                 KLEHR HARRISON HARVEY BRANZBURG, LLP
4                Attorneys for Andy Birchfield, Esq.
5                10000 Lincoln Drive East, Suite 201
                 Marlton, New Jersey 08053
6

                 BY:  CAROL ANN SLOCUM, ESQ.
7
                          *  *  *
8

9

10

11

12

13

14

15

16

17

18

19

20     ALSO PRESENT:
21                Paul Baker - Videographer
                 Jerry Curran - Concierge
22                Ted Meadows, Esq.
                 Jim Murdica, Esq.
23

24

25

Page 5

1                    A. Birchfield, Esq.

2                       STIPULATIONS

3            IT IS HEREBY STIPULATED AND AGREED, by

4     and among counsel for the respective parties

5     hereto, that the filing, sealing and

6     certification of the within deposition shall be

7     and the same are hereby waived;

8             IT IS FURTHER STIPULATED AND AGREED

9     that all objections, except as to form of the

10    question, shall be reserved to the time of the

11    trial;

12            IT IS FURTHER STIPULATED AND AGREED

13    that the within deposition may be signed before

14    any Notary Public with the same force and effect

15    as if signed and sworn to before the Court.

16                         *  *  *

17

18

19

20

21

22

23

24

25

Page 6

1          A. Birchfield, Esq.

2          MR. VIDEOGRAPHER:  Good afternoon.   13:12:46

3     We are going on the record at 1:12 p.m.     13:12:47

4     Eastern Daylight Time on Monday, April 17th,  13:12:51

5     2023.                                        13:12:54

6          Please note that the microphones        13:12:56

7     are sensitive and may pick up whispering and  13:12:58

8     private conversation.  Please mute all        13:13:02

9     cellphones at this time.                     13:13:04

10          This is Media Unit 1 of the            13:13:05

11     video-recorded deposition of Andy Birchfield 13:13:06

12     in the matter of LTL Management LLC, filed    13:13:08

13     in the United States Bankruptcy Court,        13:13:13

14     District of New Jersey, Case No. 23-12825.   13:13:14

15     This deposition is being held at Brown        13:13:21

16     Rudnick LLP, located at 7 Times Square, New  13:13:23

17     York, New York.                              13:13:26

18          My name is Paul Baker and I am the      13:13:28

19     videographer.  The court reporter is Randi   13:13:29

20     Friedman, and we are both from Veritext.     13:13:31

21     Appearances have been noted on the           13:13:34

22     stenographic record.                         13:13:36

23          Will the court reporter please          13:13:38

24     swear in the witness.                        13:13:47

25                                                  13:13:47

```
                                                      Page 7

  1                  A. Birchfield, Esq.

  2                       * * *                      13:13:47

  3                  ANDY BIRCHFIELD, the witness    13:13:47

  4        herein, having been duly sworn, was examined  13:13:47

  5        and testified as follows:                13:13:47

  6                       * * *                      13:13:47

  7                    EXAMINATION                   13:13:47

  8    BY MR. HAAS:                                  13:13:47

  9        Q     Mr. Birchfield, good afternoon.     13:13:48

 10        A     Good afternoon.                     13:13:50

 11        Q     My name is Eric Haas, on behalf of  13:13:50

 12    Johnson & Johnson.  We've met before; correct?  13:13:53

 13        A     Yes.                                13:13:56

 14        Q     Mr. Birchfield, you're a lawyer;    13:13:56

 15    right?                                        13:13:58

 16        A     Yes.                                13:13:58

 17        Q     Are you affiliated with any law firm?  13:13:59

 18        A     Beasley Allen Law Firm in Montgomery,  13:14:01

 19    Alabama.                                      13:14:03

 20        Q     Any other law firms?                13:14:05

 21        A     No.                                 13:14:06

 22        Q     Mr. Birchfield, which of the Beasley  13:14:08

 23    Allen partners have been involved in talc     13:14:10

 24    litigation or recovery of talc-related claims  13:14:14

 25    against Johnson & Johnson or its affiliation?  13:14:18
```

ATL-L -002648-15  12/08/2023 9:16:57 PM  Pg 9 of 33  Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS  Document 28826-1  Filed 12/19/23  Page 85 of 187 PageID:
169363
Ex. 4 - EXCERPT

Page 8

1              A. Birchfield, Esq.

2      A     You're going to test my memory here.    13:14:22

3   Certainly Leigh O'Dell and Ted Meadows.  We have   13:14:24

4   had over the course of the last nine years, had a   13:14:27

5   number of law partners that have been involved as   13:14:34

6   well.  David Dearing, Ryan Beatty.  We've had a    13:14:36

7   former law partner, Daniel Mason Ward, was         13:14:42

8   involved.  Maybe other law partners that have      13:14:46

9   been involved as well, but those are the ones      13:14:52

10   that I can think of off the top of my head.        13:14:55

11      Q     Okay.  Thank you.                        13:14:57

12            When I refer to talc-related             13:14:58

13   litigation or talc claims or talc litigation,     13:15:00

14   I'll be referring to the talc litigation against  13:15:03

15   Johnson & Johnson and its affiliates; okay?       13:15:07

16      A     Yes.                                     13:15:10

17      Q     How many individuals with talc claims    13:15:10

18   do you and/or Beasley Allen currently represent?  13:15:13

19      A     It would be approximately 11,300.        13:15:19

20      Q     Now, Mr. Birchfield, of any of those    13:15:32

21   11,300 individuals, are any of them claimants who  13:15:35

22   have not yet filed their claims in any court?     13:15:42

23      A     Yes.  There would be roughly -- my       13:15:46

24   best understanding is approximately 100 that      13:15:52

25   would have been -- would have been retained       13:15:55

```
                                              Page 9
  1                   A. Birchfield, Esq.
  2     and -- during the time of the pendency of     13:16:00
  3     bankruptcy, and not filed.                    13:16:03
  4        Q    Why were they not filed?              13:16:06
  5        A    Because of the pendency of the        13:16:07
  6     bankruptcy.                                    13:16:08
  7        Q    In other words, because there was an  13:16:09
  8     automatic stay --                             13:16:10
  9        A    Automatic stay.                       13:16:11
 10        Q    -- that precluded you from filing     13:16:11
 11     those claims?                                 13:16:14
 12        A    Yes.                                  13:16:14
 13        Q    Okay.  Of the 11,300 claims that      13:16:15
 14     Beasley Allen represents, how many of those have 13:16:23
 15     been filed in the multi-district litigation    13:16:26
 16     pending in New Jersey?                         13:16:29
 17        A    I couldn't give you a precise number. 13:16:33
 18     Approximately 5,000.                          13:16:35
 19        Q    So of the 11,200 claims that are      13:16:47
 20     filed --                                      13:16:51
 21        A    Let me back up.                       13:16:52
 22        Q    Would you like to correct that?       13:16:54
 23        A    I think it would probably be closer to 13:16:55
 24     6,000.  My best estimate.                     13:16:57
 25        Q    Okay.  So of the 11,200 claims that   13:17:03
```

```
                                                      Page 10
 1                   A. Birchfield, Esq.
 2    you said are filed, how many of those --      13:17:06
 3        A    No.  I'm sorry.                       13:17:10
 4        Q    Okay.                                 13:17:11
 5        A    So you asked how many claimants we    13:17:12
 6    represent.                                     13:17:14
 7        Q    Right.  And you said --               13:17:14
 8        A    11,300.                               13:17:15
 9        Q    Okay.                                 13:17:17
10        A    And you asked how many cases we have  13:17:18
11    that would be ready to be filed or would be filed 13:17:22
12    if -- but for the stay, and that's approximately 13:17:24
13    100.  You know, there are -- you know, there are 13:17:28
14    additional claims that are unfiled claims, but  13:17:31
15    would not be -- would not necessarily be cases to 13:17:34
16    be filed, you know, in the immediate term.      13:17:37
17        Q    What is the distinction you're making 13:17:42
18    between claims that are not files and claims that 13:17:45
19    are not ready to be filed in the immediate near 13:17:48
20    term?                                          13:17:51
21              MS. SLOCUM:  I'm going to object     13:17:51
22         and instruct the witness to the extent it 13:17:53
23         calls for work product, don't answer the  13:17:54
24         question.                                 13:17:57
25              THE WITNESS:  I will follow the      13:18:03
```

```
                                                 Page 11

   1              A. Birchfield, Esq.

   2       advice of my counsel.                    13:18:04

   3   BY MR. HAAS:                                  13:18:04

   4       Q    Okay.  So let me just be clear then.  13:18:05

   5   Of the 11,300 claims that you testified that  13:18:08

   6   Beasley Allen represents, how many of those have  13:18:14

   7   not yet been filed with any court?            13:18:17

   8       A    So there would be approximately, you  13:18:21

   9   know, 5,000 claims that are -- that are unfiled  13:18:23

  10   claims.                                       13:18:28

  11       Q    So of the 5,000 that are unfiled, 100  13:18:31

  12   have not been filed due to the automatic stay?  13:18:36

  13       A    Right.                               13:18:39

  14       Q    And the remaining 4,900 are not filed  13:18:39

  15   for some other reason?                        13:18:45

  16       A    Correct.                             13:18:46

  17       Q    Do those 4,900 other claims constitute  13:19:01

  18   viable claims?                                13:19:06

  19            MS. SLOCUM:  Objection.  Instruct    13:19:08

  20       the witness to the extent it requires work  13:19:09

  21       product to be divulged, do not answer the  13:19:12

  22       question.                                 13:19:16

  23            MR. HAAS:  There has been            13:19:17

  24       extensive inquiry about claims in this    13:19:18

  25       litigation by the group that Mr. Birchfield  13:19:21
```

```
                                                          Page 12

  1                    A. Birchfield, Esq.

  2          is a part, so I am inquiring as to which        13:19:24

  3          claims are viable claims and fall within the    13:19:27

  4          bucket of claims that he believes are           13:19:30

  5          associated with his views of the case.          13:19:37

  6                    MS. SLOCUM:  And that requires him     13:19:39

  7          to disclose work product, his analysis of       13:19:40

  8          the claims and -- or his firm's analysis and    13:19:43

  9          determination of what is viable.                13:19:47

 10   BY MR. HAAS:                                           13:19:49

 11       Q    Mr. Birchfield, let me ask it this           13:19:49

 12   way:                                                   13:19:51

 13               Do the 4,900 claims that are not filed     13:19:52

 14   for some other reason other than the automatic        13:19:56

 15   stay represent claims that are not supportive LTL     13:19:57

 16   bankruptcy claims?                                     13:20:08

 17       A    Okay.  Let me -- a couple of things I        13:20:09

 18   need to correct there.                                 13:20:11

 19               First of all, in regards to the -- you     13:20:13

 20   know, the 4,900, I was giving you approximate         13:20:15

 21   numbers.                                               13:20:19

 22               In regards to, you know, an LTL plan,      13:20:20

 23   I haven't seen an LTL plan.  I have seen, you         13:20:24

 24   know, the term sheet that has been proposed, and,    13:20:29

 25   you know, I'm not aware of any of the -- any of       13:20:35
```

```
                                                   Page 13
 1                   A. Birchfield, Esq.
 2     those claims that, you know, would be outside of   13:20:40
 3     what is -- what's referenced in that -- in the     13:20:44
 4     term sheet.  But, you know, I would not -- I       13:20:48
 5     would not recommend filing some of the types of    13:20:54
 6     claims that are referenced in the term sheet.      13:20:57
 7          Q    Okay.  So let me try walking through     13:21:05
 8     this one more time, see if we understand what      13:21:08
 9     we're talking about here.                          13:21:10
10               So you have 11,300 claims that you       13:21:11
11     contend that Beasley Allen represents; correct?    13:21:14
12          A    Yes.                                     13:21:18
13          Q    Of those, 6,000 claims are actually      13:21:20
14     filed in the MDL?                                  13:21:22
15          A    Approximately.                           13:21:24
16          Q    5,000 are unfiled claims?               13:21:25
17          A    Correct, approximately.                  13:21:28
18          Q    Of the 5,000, 100 are claims that you    13:21:30
19     say would be filed but for the automatic stay?     13:21:33
20          A    Right.                                   13:21:36
21          Q    And the other 4,900 balance represents   13:21:37
22     claims that you are not sure whether or not they   13:21:41
23     would be filed?                                    13:21:45
24          A    That's correct.  I mean, first of all,   13:21:48
25     I am not personally reviewing these cases and      13:21:53
```

```
                                                    Page 14
 1                    A. Birchfield, Esq.
 2     making these decisions, so there are lawyers at    13:21:57
 3     Beasley Allen that review these cases.  There's    13:22:01
 4     staff that collect the medical records.  So I'm    13:22:04
 5     not -- I'm not personally reviewing these 5,000    13:22:07
 6     cases and making decisions.                        13:22:11
 7        Q    So focusing on the 4900 claims, has        13:22:13
 8     anyone at Beasley Allen reviewed those claims and  13:22:17
 9     determined whether they will be filed?             13:22:20
10               MS. SLOCUM:  Objection.  I'm going       13:22:21
11          to again instruct not to answer based on      13:22:22
12          work product.                                 13:22:25
13               MR. HAAS:  It's a question of            13:22:25
14          whether.  I'm not getting into any            13:22:26
15          attorney-client privilege or work product     13:22:28
16          information.  Has anyone done it, so let's     13:22:29
17          start --                                      13:22:32
18               MS. SLOCUM:  No.  You asked              13:22:33
19          whether anybody has determined them to be     13:22:34
20          viable.  That was your question.              13:22:36
21               MR. HAAS:  I didn't ask that.            13:22:39
22     BY MR. HAAS:                                       13:22:39
23        Q    Has anyone done an analysis to             13:22:40
24     determine whether they can be filed?               13:22:42
25        A    So for all of the cases that Beasley       13:22:46
```

Page 15

```
 1                  A. Birchfield, Esq.
 2    Allen has, you know, has taken in, we would -- we   13:22:50
 3    would obtain medical records, we would do an        13:22:55
 4    evaluation, you know, of those claims.  And that    13:22:59
 5    would have been done for the vast majority of       13:23:05
 6    those claims.  I cannot say that it has been done   13:23:08
 7    for every claim.  If we got a case in last week,    13:23:11
 8    you know, it may not have happened.  But for the    13:23:15
 9    vast majority of the claims, we have -- we          13:23:17
10    obtained the medical records and we're in the       13:23:23
11    process of evaluating those claims.                 13:23:25
12        Q    Okay.  So to circle back, you have as      13:23:27
13    of this time 6,100 claims that you have             13:23:32
14    determined that will or have been filed in court?   13:23:38
15        A    Approximately.  I'm giving you             13:23:46
16    approximate numbers.                                13:23:47
17        Q    Approximately.  Okay.  6,100.  Okay.       13:23:48
18             Now starting with the very first claim     13:23:53
19    that Beasley Allen was engaged with respect to,     13:23:58
20    when was that?                                      13:24:02
21        A    If you want a precise date, I can't        13:24:06
22    give you that.                                       13:24:08
23        Q    Round terms.                                13:24:09
24        A    I believe that to have been in the        13:24:11
25    2013 time frame.                                    13:24:13
```

```
                                                        Page 16

 1                    A. Birchfield, Esq.

 2        Q     Okay.  You indicated that there are    13:24:16

 3   approximately 6,000 claims in the MDL.  By what   13:24:20

 4   time frame had Beasley Allen been retained with   13:24:25

 5   respect to those 6,000 claims?                    13:24:28

 6        A     Well, it would have been -- it would   13:24:32

 7   have been before October of '21.  I can't say.  I 13:24:35

 8   can't say when the last case was retained and was 13:24:39

 9   filed in the MDL, but I know it would have been   13:24:43

10   before October of '21.                            13:24:45

11        Q     And just for a general sense,          13:24:47

12   Mr. Birchfield, what was the time frame in which  13:24:49

13   you acquired those 6,000 claims between 2013 and  13:24:52

14   2021, in general terms?                           13:24:56

15        A     I really can't answer that question.   13:25:03

16        Q     When were the majority of the claims   13:25:04

17   obtained by?                                      13:25:08

18        A     I can't answer that question.  We have 13:25:09

19   been taking, you know, cases, you know, from      13:25:13

20   lawyers throughout the -- you know, throughout    13:25:18

21   this period, but I can't tell you, you know -- I  13:25:20

22   can't tell you, you know, how many were in 2014   13:25:24

23   versus '15 versus '16.  I don't know that.        13:25:27

24        Q     Did you have the majority of the       13:25:31

25   claims by 2018?                                   13:25:33
```

```
                                                      Page 17

 1                     A. Birchfield, Esq.

 2        A      I can't say.  Probably, but I can't    13:25:39

 3     give you a definitive answer.                    13:25:41

 4        Q      Did you have the majority of claims by  13:25:42

 5     2019?                                            13:25:43

 6        A      Probably so, but I can't say           13:25:47

 7     definitively.                                    13:25:49

 8        Q      Did you obtain any claims in '20 and   13:25:50

 9     '21 of the 6,000 that were filed in the MDL?    13:25:51

10        A      I can't say definitively, but I would  13:25:57

11     certainly think so.                             13:25:59

12        Q      So is it fair to say that you obtained 13:26:03

13     the majority of the claims that have been filed 13:26:05

14     in the MDL by no later than 2019?               13:26:07

15                 MS. SLOCUM:  Objection.             13:26:10

16                 THE WITNESS:  When you say          13:26:11

17          "majority," I mean, you're talking about   13:26:12

18          more than 50 percent, I would just have to 13:26:14

19          guess, but I would think most of those cases 13:26:18

20          had been retained by then, but I don't know 13:26:22

21          definitively.                              13:26:24

22     BY MR. HAAS:                                    13:26:25

23        Q      So with respect to the 6,000 claims   13:26:28

24     that have been filed in the MDL, those cases are 13:26:31

25     currently stayed; correct?                      13:26:36
```

```
                                                        Page 18

    1                     A. Birchfield, Esq.

    2          A     Yes.                               13:26:38

    3          Q     They have been since October 2021; 13:26:38

    4    correct?                                       13:26:40

    5          A     Except for a very brief --         13:26:41

    6          Q     Two hours?                         13:26:43

    7          A     Yes.                               13:26:43

    8          Q     And you're aware from your         13:26:45

    9    participation in the MDL that in September of 13:26:47

   10    2020, Judge Wolfson ordered the formation of --13:26:51

   11    an administration of a common benefit fund for 13:26:54

   12    the payment of fees and expenses incurred in   13:26:58

   13    connection with the MDL correct?               13:27:01

   14          A     I'm aware that a common benefit fee 13:27:03

   15    order was entered.  I couldn't give you the date. 13:27:06

   16          Q     Sometime around the September 2020 13:27:11

   17    time frame?                                    13:27:13

   18          A     I don't dispute that.  I don't know. 13:27:16

   19          Q     It was sometime before the LTL     13:27:18

   20    bankruptcy was commenced in October of 2021;   13:27:21

   21    correct?                                       13:27:24

   22          A     Yes.                               13:27:24

   23          Q     And you're generally familiar with the 13:27:25

   24    terms of that agreement?                       13:27:27

   25          A     Yes.                               13:27:28
```

```
                                                    Page 19

 1                    A. Birchfield, Esq.

 2         Q      Okay.  So pursuant to the common      13:27:29

 3    benefit order that Judge Wolfson entered, up to   13:27:36

 4    12 percent of any amount recovered on talc claims 13:27:39

 5    in the MDL is assigned to a common benefit;       13:27:42

 6    right?                                            13:27:47

 7         A      Could be, yes.  My understanding is   13:27:48

 8    it's -- 10 percent fee is 2 percent cost.         13:27:51

 9         Q      Right.  So let's say, for example, in 13:27:55

10    the MDL, if the settlement was obtained for       13:27:58

11    $8.9 billion, the common benefit fund would be up 13:28:02

12    to $1.068 billion, which is 12 percent; right?    13:28:07

13                MS. SLOCUM:  Objection.  You're       13:28:12

14         asking him to speculate as to a settlement   13:28:12

15         in the MDL which did not occur.              13:28:15

16                MR. HAAS:  I'm asking him to          13:28:18

17         answer the question of whether or not he     13:28:19

18         would agree that if there's a settlement in  13:28:20

19         the MDL, which is a gross recovery amount in  13:28:21

20         the MDL, up to 12 percent of that would go   13:28:25

21         into the common benefit fund, and that       13:28:30

22         number is, I'll represent for the record, is 13:28:32

23         1.068 billion.                               13:28:33

24                MS. SLOCUM:  Objection.  The          13:28:38

25         court's order states what it is, okay.       13:28:39
```

```
                                                    Page 20
  1                A. Birchfield, Esq.
  2                MR. HAAS:  No.  If you want to    13:28:42
  3        object, object.  If you want to instruct him 13:28:43
  4        not to answer, do so.                     13:28:45
  5    BY MR. HAAS:                                   13:28:46
  6        Q     Answer the question.                13:28:47
  7        A     When you say up to that amount, I   13:28:48
  8    would agree with that.  It would not be that  13:28:50
  9    amount because there are -- there were different 13:28:53
 10    provisions where firms could agree early on and 13:29:00
 11    there would be a lesser percentage.  So it's not 13:29:04
 12    12 percent across the board.                  13:29:07
 13        Q     You're referring to, let's say,     13:29:08
 14    Paragraph 24 of the order, which states that if 13:29:09
 15    you participate early on, the contribution     13:29:11
 16    percentage would be 8 percent, not 12 percent; 13:29:15
 17    right?  Is that what you're referring to?      13:29:19
 18        A     I'm not sure of the paragraph.  I    13:29:20
 19    didn't review it, you know -- I didn't review it 13:29:22
 20    for this deposition.  I'm not disputing that.  13:29:26
 21    I'm talking to you in terms of -- I'm testifying 13:29:28
 22    in terms of in my general understanding of the 13:29:31
 23    common benefit.                                13:29:34
 24        Q     So your general understanding is that 13:29:36
 25    the range of fees that could be contributed to 13:29:38
```

```
                                                    Page 21

 1                  A. Birchfield, Esq.

 2    the common benefit fund is anywhere from        13:29:41

 3    8 percent to 12 percent of the gross recovery   13:29:44

 4    amount, depending upon whether or not the       13:29:48

 5    individual firms were early participation or not? 13:29:51

 6        A     Yes.                                   13:29:56

 7        Q     So that would be anywhere between      13:29:56

 8    $712 million or $1.068 billion for 8.9 gross     13:29:58

 9    recovery amount; right?                          13:30:05

10        A     I'm trusting your math.  I can't do    13:30:08

11    that in my head.                                 13:30:11

12        Q     Okay.                                  13:30:11

13        A     Not quickly, anyway.                   13:30:12

14        Q     And that gross recovery amount that is 13:30:14

15    put into the common benefit fund is then provided 13:30:19

16    to those firms that provide common benefit work  13:30:25

17    product for the MDL; correct?                    13:30:30

18        A     As a general rule, you know, that is   13:30:34

19    true.  I mean, typically what would happen when a 13:30:36

20    court enters a common benefit assessment award   13:30:39

21    like this, then there would be, you know, a      13:30:42

22    determination, you know, at the back end about,  13:30:45

23    you know, the amount -- the amount of the overall 13:30:50

24    pot, the overall common benefit fund amount.  And 13:30:54

25    then that amount would be overseen by, you know,  13:31:00
```

Page 22

1                    A. Birchfield, Esq.

2       an Article III judge to determine, you know, what    13:31:04

3       is an appropriate, you know, allocation of those     13:31:07

4       funds.  And that's -- you know, that is the          13:31:09

5       typical way, you know, that from my experience       13:31:13

6       the common benefit fees are -- you know, are         13:31:16

7       handled.                                             13:31:19

8                    So the first determination is, okay,    13:31:19

9       the order is entered, and the order is entered       13:31:22

10      to -- you know, as an approximation of what would    13:31:25

11      be necessary, the court at the end would             13:31:29

12      determine if that is appropriate, and if so, then    13:31:34

13      begin the allocation process among the lawyers       13:31:37

14      who did the work on behalf of the other              13:31:39

15      claimants.                                           13:31:42

16         Q     And the allocation of that amount           13:31:45

17      among the lawyers that did the work depends upon     13:31:47

18      what common benefit work they did; correct?          13:31:51

19         A     Yes.                                        13:31:54

20         Q     Okay.  And the plaintiff steering           13:31:54

21      committee that's in the MDL is tasked with the       13:31:58

22      responsibility of identifying who should do that     13:32:02

23      common benefit work; right?                          13:32:04

24         A     As a general -- as a general               13:32:06

25      principle, yes.                                       13:32:08

Page 23

1                  A. Birchfield, Esq.

2        Q     And Beasley Allen sits on that        13:32:09

3    plaintiff steering committee; correct?          13:32:11

4        A     Correct.                              13:32:13

5        Q     And Beasley Allen to date, you would  13:32:14

6    agree with me, has performed the vast majority of  13:32:19

7    the common benefit work product incurred,       13:32:22

8    according to Beasley Allen, the largest         13:32:24

9    percentage of the common benefit expenses; right?  13:32:28

10               MS. SLOCUM:  Objection.  That's     13:32:30

11         requiring work product.                   13:32:32

12               MR. HAAS:  No, it's not.  It's a    13:32:35

13         fact.                                      13:32:36

14   BY MR. HAAS:                                     13:32:36

15       Q     Go ahead, you can answer.             13:32:37

16               MS. SLOCUM:  Objection still        13:32:38

17         stands.                                    13:32:38

18   BY MR. HAAS:                                     13:32:39

19       Q     You can answer.                       13:32:39

20       A     I'm not trying to avoid or be evasive  13:32:42

21   here in any way.  I mean, has Beasley Allen done,  13:32:46

22   you know, a substantial amount of the, you know,  13:32:50

23   the work in the MDL?  Yes.  Sitting here, me     13:32:53

24   personally, I cannot give you an answer about how  13:32:59

25   much, you know, Beasley Allen has done, you know,  13:33:01

```
                                                    Page 24

 1                     A. Birchfield, Esq.

 2     versus, you know, Ashcraft & Gerel or Levin       13:33:05

 3     Papantonio and Mr. Tisi versus Mr. Golomb.  So to 13:33:08

 4     say vast majority, I think, is more than --       13:33:14

 5     that's farther than I can go at this point.       13:33:16

 6          Q    Beasley Allen tracks those amounts;     13:33:18

 7     right?                                            13:33:20

 8          A    Beasley Allen -- Beasley Allen tracks,  13:33:23

 9     you know, the work that we do for the, you know,  13:33:26

10     for the MDL.                                      13:33:30

11          Q    Do you provide any reports?            13:33:31

12          A    I don't.                               13:33:33

13          Q    Do you know whether Beasley Allen      13:33:34

14     does?                                             13:33:35

15          A    I'm not sure.  I mean, Ms. O'Dell is   13:33:36

16     co-lead and --                                    13:33:41

17          Q    Do you have --                         13:33:43

18          A    She's co-lead of the MDL.             13:33:43

19          Q    You're the head of the mass torts     13:33:45

20     litigation practice at Beasley Allen, are you    13:33:47

21     not?                                             13:33:47

22          A    I am.                                  13:33:49

23          Q    Do you have any sense of whether or    13:33:49

24     not Beasley Allen has a claim to be the largest  13:33:50

25     percentage of the common benefit fund based on   13:33:54
```

```
                                          Page 25
 1                 A. Birchfield, Esq.
 2    fees and work done to date?            13:33:57
 3        A     That would be the determination of --  13:34:00
 4    of an Article III judge if it is administered    13:34:03
 5    through the MDL court.                 13:34:07
 6        Q     Based upon the work done to date, is   13:34:09
 7    it Beasley Allen's position that it has  13:34:11
 8    undertaken the largest percentage of the common  13:34:16
 9    benefit work and incurred the largest percentages  13:34:20
10    of the expenses to date?               13:34:23
11               MS. SLOCUM:  Objection.  Asked and  13:34:24
12        answered.                         13:34:24
13               MR. HAAS:  No, it's not.    13:34:25
14    BY MR. HAAS:                           13:34:25
15        Q     You can answer.             13:34:26
16               MS. SLOCUM:  He did.  He    13:34:26
17        already --                        13:34:27
18               MR. HAAS:  That was not asked.  He  13:34:28
19        can answer.                       13:34:29
20               MS. SLOCUM:  He answered.  13:34:30
21    BY MR. HAAS:                           13:34:31
22        Q     You can answer.  Go ahead.   13:34:32
23        A     If you're asking my opinion as we sit  13:34:33
24    here today, my opinion is probably so.  13:34:35
25        Q     Yeah.                       13:34:38
```

```
                                          Page 26

  1              A. Birchfield, Esq.

  2       A    But I can't say that definitively.     13:34:39

  3       Q    You're the lead plaintiff counsel in   13:34:40

  4    the MDL, aren't you?                            13:34:40

  5       A    We're co-lead.                          13:34:43

  6       Q    You're not going to go to the court    13:34:45

  7    and say, "No, no, no, we're not entitled to the 13:34:46

  8    biggest percentage"?                            13:34:48

  9       A    But the difference in what you're      13:34:51

 10    asking and what I am saying is you're not --    13:34:52

 11    you're saying are you entitled to that.         13:34:56

 12       Q    No, I understand the process, that you  13:34:59

 13    have to basically make your submission.  The    13:35:01

 14    ultimate determination is made by the           13:35:04

 15    administrator.  I get that.  My question is     13:35:06

 16    whether with respect to the work done to date   13:35:09

 17    that would qualify you in the threshold inquiry 13:35:10

 18    is whether or not Beasley Allen has done most of 13:35:15

 19    the work and incurred most of the expenses from 13:35:17

 20    your perspective.                               13:35:19

 21       A    So first of all, it would not be -- in 13:35:24

 22    my view, it would not be an administrator.  It  13:35:26

 23    would be an Article III judge that would make the 13:35:29

 24    determination.  And I do think Beasley Allen --  13:35:31

 25    you could take the position that we've done the  13:35:35
```

Page 27

```
 1                    A. Birchfield, Esq.

 2      majority of the work.  Probably so.            13:35:39

 3           Q     If the Article III judge, in your view  13:35:43

 4      as the proper determiner, in the end allocates a   13:35:44

 5      portion of that 700 million to over a billion      13:35:50

 6      dollars worth of common benefit fees and expenses  13:35:55

 7      to Beasley Allen, that would be on top of the      13:36:01

 8      attorney fees that you otherwise would be          13:36:03

 9      entitled to get; correct?                          13:36:05

10           A     Partially.                              13:36:10

11           Q     Because there's a participation         13:36:13

12      percentage that you pay?                           13:36:15

13           A     Yeah, because part of the fees would    13:36:17

14      be paid, you know, out of the -- you know, of the  13:36:18

15      attorneys' fees portion.  And so a substantial     13:36:22

16      amount of the, you know, the common benefit, you   13:36:27

17      know, fund would be, you know, based on our        13:36:29

18      attorneys' fees.  So you cannot -- it would be     13:36:33

19      inappropriate to say that that is on top of the    13:36:35

20      attorneys' fees.                                   13:36:39

21           Q     Because under the order you are deemed  13:36:40

22      a participating attorney or participating counsel  13:36:42

23      in the common benefit fund agreement; correct?     13:36:47

24           A     Yes.                                    13:36:49

25                    MS. SLOCUM:  Objection.              13:36:49
```

```
                                                    Page 28

 1                   A. Birchfield, Esq.

 2     BY MR. HAAS:                                 13:36:50

 3          Q     So to summarize, Beasley Allen would  13:36:51

 4     be entitled to a share of the common benefit fund  13:36:56

 5     and a portion of its attorney fees that it    13:36:59

 6     otherwise charged; right?                    13:37:04

 7          A     If the court made that determination,  13:37:07

 8     yes.                                         13:37:09

 9          Q     Okay.  And the fees you otherwise   13:37:10

10     charge is a 40 percent contingency fee; correct?  13:37:11

11          A     As a general rule, that's true.   13:37:15

12          Q     Yes.  So it's fair to say that in   13:37:17

13     terms of the relative economic incentives,   13:37:23

14     because Beasley Allen is entitled to those   13:37:29

15     amounts from the common benefit fund outside of  13:37:32

16     bankruptcy, but not entitled to those amounts  13:37:34

17     inside a bankruptcy, that Beasley Allen has an  13:37:38

18     economic incentive to resolve the cases outside  13:37:41

19     of bankruptcy; correct?                      13:37:46

20                   MS. SLOCUM:  Objection.        13:37:47

21                   THE WITNESS:  No.  Our interest --  13:37:48

22          our interest is getting fair values for our  13:37:54

23          clients, period.  And that is our goal.  And  13:37:56

24          I have been steadfast.  I have been     13:38:02

25          steadfast on the position that we are not --  13:38:06
```

Page 29

1                    A. Birchfield, Esq.

2        that I have urged, you know, everyone on our    13:38:09

3        side and we have -- we have maintained the      13:38:12

4        position we are not going to have the common    13:38:15

5        benefit, you know, fee issue become a           13:38:18

6        barrier to getting reasonable resolution,       13:38:21

7        fair values for our clients.                    13:38:26

8    BY MR. HAAS:                                        13:38:27

9        Q    We'll come back to that in a moment,       13:38:27

10   but you understand that as a general matter in      13:38:29

11   bankruptcy you would not be entitled to any         13:38:34

12   portion of a common benefit fund that you would     13:38:36

13   be entitled outside of bankruptcy; correct?         13:38:39

14       A    No, I do not.                              13:38:42

15                 MS. SLOCUM:   Object.  The witness    13:38:44

16       is not here to testify to bankruptcy law.       13:38:45

17                 MR. HAAS:   He can answer the         13:38:47

18       question.  If you want to instruct him not      13:38:47

19       to answer --                                    13:38:49

20                 MS. SLOCUM:   Don't answer the        13:38:50

21       question.                                       13:38:50

22   BY MR. HAAS:                                        13:38:51

23       Q    Is it your view, Mr. Birchfield, that      13:38:51

24   as a general proposition you are entitled to the    13:38:53

25   common benefit fee in bankruptcy?                   13:38:56

Page 30

1              A. Birchfield, Esq.

2              MS. SLOCUM:  Objection.  Again,     13:38:59

3         I'll instruct the witness not to answer.   13:39:00

4         He's not here to testify as to --          13:39:02

5              MS. O'DELL:  Please don't             13:39:06

6         interrupt.                                  13:39:07

7              MR. HAAS:  I understand he has his    13:39:07

8         motivation for participating or not         13:39:08

9         participating in the proposed               13:39:10

10        reorganization, and that's what I'm         13:39:12

11        inquiring as to.                            13:39:16

12   BY MR. HAAS:                                     13:39:16

13        Q    You can answer the question.          13:39:16

14              MS. SLOCUM:  No.  I'm instructing    13:39:17

15        the witness not to answer.  He's not here to  13:39:17

16        testify as to bankruptcy law on a plan that  13:39:20

17        hasn't been filed.                          13:39:22

18              MR. HAAS:  A plan has been filed.    13:39:23

19   BY MR. HAAS:                                     13:39:28

20        Q    Again, Mr. -- I'll ask it one more    13:39:28

21   time.  If your counsel is going to instruct you   13:39:33

22   not to answer, we can address it later.  I       13:39:34

23   usually ask at least three times.  If I don't get  13:39:37

24   it on the third time, I move on.                 13:39:39

25        A    I can't answer.  You said you wanted  13:39:41

Page 130

```
 1                      A. Birchfield, Esq.

 2      notwithstanding the fact that Beasley Allen has    15:58:32

 3      litigated on behalf of talc claimants for          15:58:35

 4      decades, you have never record a dime for talc     15:58:37

 5      claimants in litigation; correct?                  15:58:40

 6                  MS. SLOCUM:  Objection, form.          15:58:42

 7                  THE WITNESS:  We haven't litigated     15:58:43

 8          for decades; okay.  The litigation is          15:58:44

 9          approximately ten years.  That's a decade.     15:58:51

10          So that is true, but it's not decades.         15:58:52

11          And -- but we have not -- you know, J&J has     15:58:57

12          not -- has not settled with Beasley Allen       15:59:00

13          any of our claims.                             15:59:06

14      BY MR. HAAS:                                       15:59:09

15          Q     And you have lost every single one of    15:59:10

16      the cases you tried, either at trial or on         15:59:11

17      appeal; correct?                                   15:59:13

18          A     No.  That's a mischaracterization.  I    15:59:15

19      mean, when you -- when you say that, you know,     15:59:17

20      that a verdict is vacated on personal              15:59:23

21      jurisdictional grounds, that is not losing on the  15:59:26

22      merits.  Those are still valid claims.             15:59:28

23          Q     Mr. Birchfield, in the entire           15:59:30

24      decade plus time --                                15:59:34

25                  MR. PLACITELLA:  Referee.  One         15:59:36
```

Page 143

```
 1                    A. Birchfield, Esq.

 2          we get reasonable compensation.  Reasonable   16:26:46

 3          values for our clients.                        16:26:49

 4     BY MS. BROWN:                                       16:26:51

 5          Q     Sure, and I understand your position.   16:26:51

 6     I'm just talking about kind of what has happened   16:26:52

 7     to date, and you would believe that to date,       16:26:55

 8     every client whose case Beasley Allen has taken    16:26:57

 9     to a trial has gone home with $0 --                16:27:02

10                    MS. SLOCUM:  Objection.             16:27:05

11     BY MS. BROWN:                                       16:27:06

12          Q     -- right?                                16:27:07

13                    MS. SLOCUM:  Asked and answered,    16:27:08

14          like, about 15 times now.                     16:27:08

15                    THE WITNESS:  So Beasley Allen --   16:27:10

16          for the cases that have gone to trial, none   16:27:12

17          of those -- you know, none of the verdicts,   16:27:14

18          the favorable verdicts, none of those have    16:27:16

19          been paid.  None of the defense verdicts      16:27:19

20          have been paid.  So it is true there have     16:27:21

21          been no payments on the 11 or 12 plaintiffs   16:27:24

22          that Beasley Allen represents that have gone  16:27:29

23          to trial to date.                             16:27:31

24     BY MS. BROWN:                                       16:27:32

25          Q     I want to ask you some questions, sir,  16:27:33
```

# EXHIBIT 5


**BARNES & THORNBURG LLP**

One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313
www.btlaw.com

James F. Murdica
Partner
(312) 214-4869
JMurdica@btlaw.com

November 5, 2023

Mr. James Conlan
Legacy Liability Solutions LLC
161 N. Clark Street, Suite 1700
Chicago, IL 60601

       **RE:   Bloomberg Law**

Dear Jim:

      I write on behalf of Johnson & Johnson ("J&J") to express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J.  As you know, while a partner at Faegre Drinker Biddle Reath ("FDBR") in 2020 and 2021, you represented J&J and LTL Management, Inc. ("LTL") regarding strategies for resolution of its talc liabilities, including various bankruptcy options and proposed structural optimizations.  Indeed, you attended—with me—many high level meetings with J&J in-house counsel regarding talc bankruptcy and settlement strategies in addition to weekly strategy calls with J&J in-house and outside counsel.  There can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure.

      It has come to J&J's attention that on November 2, 2023 Bloomberg published an article you wrote entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."  In that article, you discuss the LTL bankruptcy and what "the companies believed" certain strategies would accomplish.  With respect to LTL, you learned this information through the attorney-client relationship with J&J.  Moreover, you also wrote that a resolution strategy you recommended as J&J legal counsel and in which you assisted executing as J&J counsel is "a disaster," and that a service marketed by your new business enterprise "is the right answer."

      While we appreciate that you would like to promote your post-legal career business ventures—and, indeed, J&J met with you regarding those ventures two months ago—J&J requests you leave J&J and LTL out of any future publications.  You learned highly privileged information about J&J and LTL strategies from the attorney-client relationship.  And while publicly disparaging your own legal strategies that you recommended to J&J might be permissible if J&J or LTL were not included in the article, J&J believes that criticizing your former client for implementing a strategy you recommended as their counsel is not appropriate either.

Ex. 5

Mr. James Conlan
Legacy Liability Solutions, LLC
November 5, 2023
Page 2


      Please cease and desist from further similar publications, and be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship.

Sincerely,

Jim Murdica

**BARNES & THORNBURG** LLP

# EXHIBIT 6

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 2 of 7   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28826-1   Filed 12/19/23   Page 114 of 187 PageID: 169392

Ex. 6



November 9, 2023


The Board of Directors
Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933


Dear Members of the Board,


Legacy Liability Solutions LLC ("Legacy") proposes to acquire LTL and all the talc liable J&J affiliates in a transaction that will: (1) result in the disaffiliation of such entities from J&J, and (2) remove the non-cash charge for all the talc liabilities from J&J's balance sheet. For Legacy to enter into this transaction, the acquired talc liable entities of J&J would be required to hold assets with a present value of **$19.0 Billion,** or such greater amount as determined by J&J's independent auditor to remove from J&J's financial statements the non-cash charge for talc related liabilities.


Put simply, Legacy's proposal would resolve all of J&J's **current and future** talc related liabilities. Importantly, Legacy's proposal has been reviewed and is supported by leadership counsel on both the federal MDL and in state court cases across the country.


## Background to the Proposal


As you appreciate, J&J's Board must carefully evaluate Legacy's proposal and compare it to all other alternatives.


**Finality**


The word that describes your objective is "Finality". Finality means protection not only from the current talc claims (50,000+) but so-called future claims. Achievement of a confirmed Chapter *11* bankruptcy plan (with a channeling injunction) has many hurdles and is neither the most likely nor the fastest means to provide J&J finality. Indeed, even

if such a plan were confirmed, it simply cannot free J&J of its direct liability. Comparatively, Legacy's proposal is far more certain, is much faster, and **will free J&J of all liabilities including for direct claims against J&J.**

### Restoration of Shareholder Varue

The J&J business is truly impressive and is a tribute to management and this Board. On October 17, J&J announced positive third quarter results, beating analyst estimates top to bottom, and even surprised investors by raising guidance for the full year. However, the uncertainty regarding the ultimate resolution of the contingent talc related liabilities has resulted in the capital markets imposing a significant discount to the intrinsic value of J&J shareholder equity. We expect the economic impact of the Legacy proposal to J&J will be significantly less than what is currently reflected in your market capitalization caused by those same talc liabilities. Your investment bankers and capital markets experts will of course advise you on that.

### Details of Proposal

A critical factor of this transaction to achieving the desired finality, is a determination by your independent auditors (PricewaterhouseCoopers LLP) of the amount required to remove the non-cash charge on J&J's financial statements for the talc related liability. Legacy requires that the J&J entities with talc liability hold current assets of $19.0 Billion in present value, or such greater amount as determined by PwC.

To provide enhanced certainty to PwC in its determination, it is important to note that Leading Counsel in the MDL have agreed to support an opt-in settlement with Legacy, post-acquisition, on the terms described in the accompanying matrix (marked "Exhibit"). Leading Counsel in the MDL believe that the matrix settlement will enjoy 95% plus opt in and the matrix settlement is conditioned on achievement of the 95% opt in. Such a settlement should greatly reduce the tail of the distribution of future claims and projections considered by PwC in determining the amount of assets required to remove all talc related charges from J&J's financial statements.

As a result-of structural optimization in the form of a Texas divisive merger, much of J&J's talc liability is contained within LTL. J&J's counsel will structurally optimize all other affiliates (including J&J) with talc related liability, and those additional structurally optimized entities will become subsidiaries of LTL. Legacy will acquire 100% of the equity in LTL which will have assets of a value equal to $19 Billion in present value, or such great-er amount as determined by PwC.

We believe we can achieve closing in 90 days or less. We will go as fast as J&J and its professionals are able.

## Resources and Capabilities

The individuals running Legacy have led the world in (and quite literally invented) structural optimization and disaffiliation of solvent companies with mass tort liabilities. See, for example, the optimization of BorgWarner and ITT and the disaffiliation of their asbestos liabilities (BorgWarner/Morse-tee), and (ITT/Intelco). See also the optimization of Mine Safety Appliances and disaffiliation of the entities with coal dust related liabilities. John Gasparovic, one of Legacy's principals, was the Chief Legal Officer of BorgWarner and spear-headed the optimization. Notably, PwC was the independent auditor for BorgWarner and presided over removal of BorgWarner's contingent liability for asbestos.

## Asset Management

Our Chief Investment Officer, Doug Dachille is the former CIO of AIG and the investment management firm he founded, First Principles, was a fixed income manager for six of the largest 524(9) asbestos trusts at the direction of Cambrfdge Associates. Prudent investment guidelines, a minimum liquidity requirement equal to six months of projected claims and a capital adequacy standard will be established to ensure the entity has sufficient financial resources to satisfy its projected future claims obligations and a minimal risk of shortfall. These protections are critical to safeguard the claims paying capacity of LTI's assets. As one of the most experienced asset-liability investors in the world, Doug will ensure that claimants can be paid in full well into the future by taking a prudent and conservative investment approach.

The Legacy team has access to some of the most sophisticated asset management firms serving the insurance, pension, and institutional client segments. It is Legacy's intention to enter into an asset management agreement with New England Asset Management under which it will manage over 50% of LTI's assets.

- **New England Asset Management: will** serve as the investment manager of the liquid high credit quality assets for the investment portfolios of the acquired entities. In addition, **NEAM will** provide financial and ALM/risk management reporting, including capital stress testing to enable Legacy to dynamically manage the investment portfolio to preserve its claim payment capacity through investment cycles over the long-teTITI horizon.

- **Legacy Liability Solutions: will** establish investment management agreements with a select group of best-in-class asset managers with expertise and origination capabilities in specific asset classes including fixed income and alternative investments.

**Strategic Logistics Partner**

Given the importance of managing litigation for decades into the future, Legacy has partnered with KCIC to provide responsive and technologically sophisticated management for the long term.

KCIC is a nationally recognized industry leader in providing logistics, claims and litigation management services through efficient use of technology to mass tort defendants. Built to last for the foreseeable future, KCIC is staffed at the senior level with industry veterans. KCIC is headquartered in Washington DC with offices in Chicago and Phoenix.

Bringing decades of industry experience, KCIC has established an outsized reputation not only in a range of expert consulting services, but in deploying leading-edge technology to create innovative solutions for clients.

KCIC currently provides full-service litigation and claims management services to over 50 individual asbestos defendants, including some of the very largest, equipping KCIC to take on the challenge of LTL.

Since its founding in 2002, and much earlier in the experience of its senior leadership team, KCIC has been deeply immersed in all aspects of business dispute resolution and mass tort litigation. KCIC's services include:

- Management consulting
- Design and implementation of custom technology solutions
- Claims administration and insurer billing
- Insurance coverage litigation and settlement
- Economic modeling and forensic accounting
- Data normalization, migration, and analytics
- Forecasting of products liabilities
- Expert testimony

**Next Steps**

We propose an in person meeting with the J&J Board (or a subcommittee), and its professionals, in the coming days to provide even greater detail in an effort to aid you in your comparison of our proposal to all other alternatives availabfe to J&J. Together, after our in-person meeting, we will sign an appropriate confidentiality agreement. Thereafter, we will agree on a very specific, staged, action plan to reach closing.

Balancing risks, r.ewards, and probability -0f outcome, we believe the Board will conclude that the Legacy proposal is the clear winner in appropriately enhancing shareholder value.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Dallas I Chicago I Washington
Email I james.conlan@legacyliability.com

Office  I +312.291.4619
rv1obile I +312.927.7572
www.legacyliability.com

Cc: Douglas A. Dachille
    JohnJ. G-asparpvic.

| Age Group | Death, Stage IV, Stage III w/Recurrence | Stage III without Recurrence | Stage II and I with Recurrence | Stage II without Recurrence | Stage I without Recurrence | Stage IV and III Borderline | Stage II and I Borderline |
|---|---|---|---|---|---|---|---|
| Under 45 | $1,000,000 | $628,721 | $435,268 | $265,997 | $169,271 | $96,726 | $64,484 |
| 45-49 | $822,173 | $534,413 | $369,978 | $226,098 | $143,880 | $82,217 | $54,812 |
| 50-54 | $628,721 | $408,669 | $282,924 | $172,898 | $110,026 | $62,872 | $41,915 |
| 55-59 | $531,995 | $345,796 | $239,398 | $146,299 | $93,099 | $53,199 | $35,466 |
| 60-64 | $386,905 | $251,488 | $174,107 | $106,399 | $67,708 | $38,691 | $25,794 |
| 65-69 | $290,179 | $188,616 | $130,580 | $79,799 | $50,781 | $29,018 | $19,345 |
| 70-74 | $241,816 | $157,180 | $108,817 | $66,499 | $42,318 | $24,182 | $16,121 |
| 75-79 | $174,107 | $113,170 | $78,348 | $47,880 | $30,469 | $17,411 | $11,607 |
| 80+ | $116,072 | $75,446 | $52,232 | $31,920 | $20,313 | $11,607 | $7,738 |
| Average Claim Value per Stage | $520,462 | $365,674 | $281,032 | $171,231 | $111,108 | $86,147 | $52,675 |

Ex. 6

# EXHIBIT 7

| From: | Haas, Erik [JJCUS] |
|---|---|
| To: | John Gasparovic |
| Cc: | Van Arsdale, Duane [JJCUS]; White, Andrew [JJCUS]; James F. Conlan; doug.dachille@legacyliability.com; John J. Gasparovic; Forminard, Elizabeth [JJCUS] |
| Subject: | RE: [EXTERNAL] Re: Legacy Proposal |
| Attachments: | image001.png |

John,

Please cease any further communications with our executives, and direct any further correspondence concerning your proposals to my attention.

Also, our outside counsel has provided notice to Mr. Conlon regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations.  We expect that he will respect his duties going forward.

Best regards, Erik

**From:** John Gasparovic <jjgasparovic@gmail.com>
**Sent:** Thursday, November 9, 2023 10:48 AM
**To:** joaquinduato <joaquinduato@its.jnj.com>; jduato@its.jnj.com; Jduato2@its.jnj
**Cc:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>; Haas, Erik [JJCUS] <EHaas8@its.jnj.com>; White, Andrew [JJCUS] <AWhite23@ITS.JNJ.COM>; James F. Conlan <james.conlan@legacyliability.com>; doug.dachille@legacyliability.com; John J. Gasparovic <john.gasparovic@legacyliability.com>
**Subject:** [EXTERNAL] Re: Legacy Proposal

Mr. Duato,

Please see the attached proposal.



**John J. Gasparovic**
Executive Chairman
Legacy Liability Solutions
Dallas | Chicago | Washington
Email | john.gasparovic@legacyliability.com
Mobile | +1.330.573.7781
www.legacyliability.com

**SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ATLANTIC COUNTY**

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION** | Master Docket No. ATL-L-2648-15<br><br>MCL CASE NO. 300<br><br>CIVIL ACTION<br><br>Motion Day: January 17, 2024 |

---

**DEFENDANTS JOHNSON & JOHNSON AND LTL MANAGEMENT LLC'S MOTION FOR ORDER TO SHOW CAUSE WHY BEASLEY ALLEN SHOULD NOT BE DISQUALIFIED FROM THIS LITIGATION**

---

**O'MELVENY & MYERS LLP**
Steve Brody (*Pro Hac Vice* Pending)
1625 Eye Street NW
Washington, DC 20006
Tel.: (202) 383-5300
sbrody@omm.com

**FAEGRE DRINKER BIDDLE & REATH LLP**
Susan M. Sharko
600 Campus Drive
Florham Park, NJ 07932
Tel.: 973-549-7000
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson & Johnson and LTL Management LLC*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

    A.    Conlan Spends 1,600 Hours On J&J Legal Strategy .........................3

    B.    Conlan Launches A Business Venture And Becomes Adverse To J&J ................................................................................5

    C.    Conlan Explicitly Allies Himself With A J&J Adversary .................8

    D.    Conlan And Beasley Allen Take Aim At J&J In A Coordinated Media Campaign ................................................................11

ARGUMENT ................................................................................14

CONCLUSION ................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*City of Atlantic City v. Trupos*,
201 N.J. 448 (2010)...............................................................17

*Clark v. Super. Ct.*,
196 Cal. App. 4th 37 (2011) ...............................................18

*Cordy v. Sherwin-Williams Co.*,
156 F.R.D. 575 (D.N.J. 1994)...............................................19

*Dental Health Assocs. S. Jersey, P.A. v. RRI Gibbsboro, LLC*,
471 N.J. Super. 184 (App. Div. 2022) ................................14

*Dewey v. R.J. Reynolds Tobacco Co.*,
109 N.J. 201 (1988)........................................................ 14, 15, 18, 20

*Estate of Kennedy v. Rosenblatt*,
447 N.J. Super. 444 (App. Div. 2016) ........................... 15, 18

*Greebel v. Lensak*,
467 N.J. Super. 251 (App. Div. 2021) ................................18

*Grewal v. Atl. Coast House Lifting Ltd. Liab. Co.*,
2019 WL 3229747 (N.J. Super. Ct. App. Div. July 18, 2019) ..........................14

*Mgmt. Registry, Inc. v. A.W. Cos.*,
2021 WL 2434119 (D. Minn. June 15, 2021)....................................19

*N.J. Div. of Child Protection & Permanency v. G.S.*,
447 N.J. Super. 539 (App. Div. 2016) ................................16

*O'Gara Coach Co., LLC v. Ra*,
30 Cal. App. 5th 1115 (2019) ............................................19

*Sanchez v. Macquest Getinge Grp.*,
2018 WL 2324679 (N.J. Super. Ct. App. Div. May 23, 2008)..........................16

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

**Rules**

**N.J. RPC 1.10(b)** ................................................................**17**

**N.J. RPC 1.9(a)** ................................................................**6**

**N.J. RPC 1.9(c)(1)-(2)** ................................................................**6**

# INTRODUCTION

Our adversarial system does not work if one side's lawyers obtain privileged and confidential information from the other's former counsel. Where plaintiffs' counsel forms an alliance with one of defendants' former attorneys to pursue strategies directly adverse to the defendants in the very same matter, there is only one remedy that will restore fairness and the integrity of the judicial process: disqualification of plaintiffs' counsel, in this case the Beasley Allen law firm.

Because of the seriousness of the allegations, Defendants Johnson & Johnson and LTL Management LLC ("LTL") (collectively, "J&J") do not bring this motion lightly.[1] But the facts require it. Attorney James Conlan spent almost 1,600 hours as counsel for J&J, working hand-in-hand with J&J's in-house and outside counsel to discuss, debate, and ultimately develop a strategy to bring full and final resolution to the talc litigation—including consideration of a resolution through the tort system, through the Imerys bankruptcy, and through the LTL bankruptcy. After the bankruptcy was dismissed and without notice to or consent from J&J, Conlan formed an alliance with plaintiffs' attorney Andy Birchfield of the Beasley Allen firm on a strategy for resolving the very same talc litigation—one that is adverse to the path J&J is pursuing. In furtherance of that alliance, Birchfield and Conlan have sought

---

[1] J&J has submitted a parallel motion in the talc MDL in U.S. District Court for the District of New Jersey seeking similar relief on the same basis.

to thwart J&J's on-going efforts to achieve a comprehensive consensual resolution of the talc claims, seeking instead to impose billions of dollars of additional costs on J&J.

This new alliance and its effort to influence other members of the plaintiffs' bar, the investment community, and the media directly implicates the confidential, privileged, and protected information Conlan acquired as one of J&J's lawyers. Conlan was privy to wide-ranging, litigation-driven strategy discussions of the strengths, weaknesses, and optimal trial tactics for J&J's defense of the underlying tort cases that gave rise to J&J's resolution strategies. Any advice or position Conlan conveys to, confers about, or considers with Birchfield regarding the resolution of those tort cases is necessarily informed by and imbued with J&J's attorney-client and work product communications from the same matter.

Birchfield entered into his current alliance with Conlan knowing full well that Conlan represented J&J in the same matter. In fact, Birchfield was negotiating potential resolution of the same cases when Conlan was on the other side of the table advising J&J. Accordingly, J&J respectfully requests that this Court issue an order requiring Beasley Allen to show cause why the firm should not be disqualified from any continued representation of plaintiffs in this litigation.

## BACKGROUND

### A.      Conlan Spends 1,600 Hours On J&J Legal Strategy

On June 1, 2020, James Conlan joined the law firm Faegre Drinker—which was and is J&J's lead counsel in this matter—as a partner in its finance and restructuring practice.[2]  Within a month, Conlan had begun representing J&J as part of a team evaluating legal strategies for resolution of pending and future claims by plaintiffs asserting liability for illnesses allegedly caused by talc products. Declaration of E. Haas ("Haas Decl.") ¶ 4.  Over the next 20 months, Conlan threw himself into the talc cases, spending almost 1,600 hours on the matter and billing J&J $2.24 million for his time.  This included 1,154 hours in 2021 alone—***an average of four and a half hours every single workday***.  *Id.* ¶ 5.

Conlan's work as counsel for J&J touched every strategic option the Company considered for resolution of talc claims, including resolution in the tort system, a resolution through the Imerys bankruptcy, or proceeding via an internal bankruptcy. His involvement was substantial and widespread, even going so far as to meet personally as J&J's counsel with the Debtor's counsel and counsel for the Future Claims Representative in the Imerys bankruptcy over rounds of golf, dinner, and drinks in May 2021 during negotiations for resolution through the Imerys

---

[2] *See Faegre Drinker Welcomes Prominent Restructuring Lawyers James Conlan and Patrick Corr*, PR Newswire (June 1, 2020), https://www.prnewswire.com/news-releases/faegre-drinker-welcomes-prominent-restructuring-lawyers-james-conlan-and-patrick-corr-301068471.html (last accessed Dec. 8, 2023).

proceeding.  *Id.* ¶ 7.  Throughout, Conlan reviewed and, with co-counsel for J&J, evaluated numerous communications from Birchfield.

Conlan's engagement also included advising J&J regarding the potential resolution of talc claims through a bankruptcy filing by LTL, effectuated on October 14, 2021.  As the Court is aware, J&J established LTL as a new subsidiary that would be responsible for holding and managing North American legal claims related to the Company's cosmetic talc.  By voluntarily filing for Chapter 11 bankruptcy, LTL initiated a process designed to resolve these claims in a way that would be reasonable for all parties, including current and future claimants.  The LTL bankruptcy plan gained the support of lawyers representing the vast majority of the plaintiffs with pending talc claims, who recognized that it offered not only a fair resolution but also a faster outcome than decades of litigation with uncertain results.  Lawyers representing a minority of plaintiffs, however, opposed LTL's bankruptcy, led by Andy Birchfield and Beasley Allen.  Birchfield's opposition to LTL's proposed resolution was particularly ironic, insofar as his firm had lost every case it tried against LTL and its predecessors.  Haas Decl., ¶ 12, Ex. 4. (Tr., Dep. Of A. Birchfield (Excerpt), Apr. 17, 2023 ("Birchfield Dep."), at 130:14-22, 143:5-23).  Nonetheless, Birchfield took his opposition all the way to the Third Circuit and managed to defeat the bankruptcy plan, denying recovery to the tens of thousands of talc plaintiffs who wanted to see the plan proceed.

4

In 2021, in the run-up to LTL's bankruptcy filing, Conlan attended dozens of meetings and participated in innumerable phone conferences with J&J's Worldwide Vice President for Litigation, Erik Haas, former head of litigation, Joseph Braunreuther, and other counsel working for J&J on the talc litigation. *Id.* ¶ 6. Those meetings and phone conferences included former J&J product liability lead John Kim, who became LTL's Chief Legal Officer upon its formation, and J&J's current product liability head, Andrew White. *Id.* Conlan also communicated regularly with those team members via email and participated in and was privy to myriad communications with J&J's other outside counsel. *Id.* ¶ 7. Indeed, during this period, Conlan traveled across the country to attend meetings with J&J's outside attorneys, from New York to Miami to Los Angeles. All told, as a fully integrated member of the legal team evaluating J&J's options for resolution of talc liabilities, Conlan participated in analysis and discussion of the Company's objectives with in-house and outside counsel for more than a year and a half, worked on the talc matter almost daily, and engaged in countless confidential, attorney-client communications.

## B.    Conlan Launches A Business Venture And Becomes Adverse To J&J

Conlan left Faegre Drinker in 2022 to launch a business venture called Legacy Liability Solutions LLC ("Legacy"), where he serves as Chief Executive Officer. Legacy describes itself as a company that "is able to advise, acquire restructured

liability-tainted companies, and manage the liabilities for decades to come."[3] Notwithstanding his move from the private practice of law to head of a liability acquisition and management firm, Conlan owes the duties that all attorneys owe to former clients.  Absent informed consent from the client, "[a] lawyer who has [formerly] represented a client in a matter shall not thereafter represent another [person] in the same or a substantially related matter in which that [person]'s interests are materially adverse to the interests of the former client."  N.J. RPC 1.9(a). Nor can a lawyer who has formerly represented a client in a matter "use information relating to the representation to the disadvantage of the former client" or "reveal information relating to the representation."  *Id.* 1.9(c)(1)-(2).

Flouting these ethical boundaries, Conlan sought to inject his new firm and business model into J&J's ongoing effort to resolve its talc liabilities.  Conlan first reached out to pitch his new business directly to J&J in August 2022, Haas Decl. ¶ 9, Ex. 1 (Aug. 23, 2022 email), and thereafter repeatedly sought to convince J&J that Legacy should acquire and manage LTL or affiliated entities holding liability for present and future talc claims—but only after J&J funded the entities with what Legacy felt would be sufficient capital to cover the potential liabilities.  *Id.* ¶ 14, Ex. 6 (Conlan letter to J&J Board).  Legacy, Conlan proposed, would then invest and

---

[3] *How We Help*, Legacy Liability Solutions, LLC, https://www.legacyliability.com/ (last accessed Dec. 3, 2023).

administer that money to settle talc claims within the tort system, to Legacy's substantial financial benefit. *Id.*

Conlan's proposal was of no interest to J&J, which continued to believe—and still believes—that the bankruptcy process offers the fairest, most efficient resolution.  After LTL's initial bankruptcy plan was dismissed, LTL refiled for voluntary Chapter 11 protection earlier this year.  Once again, Birchfield and Beasley Allen, representing a small minority of talc claimants, raised objections. Their opposition again led to dismissal in July 2023, denying recovery to the more than 60,000 current claimants whose counsel supported the plan, which would have made $8.9 billion available to resolve talc liabilities.

During the Company's third-quarter earnings call on October 17, 2023, Haas reiterated J&J's intention to pursue resolution through the bankruptcy process, by both appealing the dismissal of LTL's second bankruptcy case and, separately, "working with the counsel[] representing the vast majority of the talc claimants … [to] pursu[e] a consensual resolution of the talc claims through another bankruptcy." *Id.* ¶ 10, Ex. 2 (Oct. 17, 2023 earnings call transcript).  Whether it stemmed from this reiteration of J&J's intended path forward or some other motive, Conlan doubled down on his determination to undermine the Company's effort.  He would now partner with the primary opponent of the LTL bankruptcy plan: Birchfield and the Beasley Allen firm.

7

### C.    Conlan Explicitly Allies Himself With A J&J Adversary

The day after the earnings call, Conlan emailed J&J Treasurer Duane Van Arsdale and revealed that "***Legacy has the support of lead counsel*** for the [ovarian cancer] claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy." *Id.* ¶ 11, Ex. 3 at 1 (Oct. 18, 2023 Conlan email to Van Arsdale) (emphasis added). Conlan told Van Arsdale that "[t]he establishment of a settlement matrix should greatly reduce the uncertainty surrounding the estimation of future claims and the associated challenges of determining the quantum of funding necessary for your auditors to remove the non-cash charge for J&J's current and future talc related liabilities." *Id.* In other words, Conlan—unbeknownst to J&J—had been actively discussing a resolution of J&J's talc liabilities with Birchfield that sought to have J&J fund potential liabilities based on a matrix Conlan and Birchfield had jointly developed. That settlement matrix was the basis for what Conlan ultimately revealed as the amount he would require for his Legacy proposal: a ***minimum of $19 billion***, or more than $10 billion above what the majority of current talc plaintiffs had agreed was a fair resolution just this year.

There is no disguising Birchfield's economic interest in joining Conlan and supporting the Legacy proposal. Birchfield and Beasley Allen, as opposed to the MDL and MCL plaintiffs they represent, stand to make more money if claims are resolved by Legacy through the tort system than through the LTL bankruptcy plan.

During a deposition taken in the second LTL bankruptcy proceeding, Birchfield acknowledged that if the LTL bankruptcy resolution went forward, the Plaintiffs' Steering Committee would lose the ability to control a share of the $8.9 billion through the MDL common benefit fund. Birchfield Dep. at 18:8-25; *see also* Case Mgmt. Order No. 7(A) ("CMO 7(A)"), *In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 3:16-md-2738-MAS-RLS, ECF No. 14741.

Under CMO 7(A), 8-12% of gross talc settlement amounts for clients of participating counsel must be deposited in the common benefit fund, and that money is then to be allocated to the firms that performed common benefit work. Birchfield Dep. at 20:24-22:19. CMO 7(A) provides that it is intended to "avoid unnecessary conflicts and expense, conserve judicial resources, and expedite the disposition of all cases by enabling the coordination of this multidistrict litigation (MDL) *with cases separately pending in state courts* that are also litigation claims involving" J&J cosmetic talc products. CMO 7(A) at 1 (emphasis added). The Order applies to all "claims of any of the ovarian cancer clients of any counsel who," like Beasley Allen, have signed a participation agreement, "whether [the] case was filed, unfiled or tolled, *including cases filed in state court*." *Id.* at 4 (emphasis added); *see also* Birchfield Dep. at 27:21-24.

9

Notably, the federal MDL Plaintiffs' Steering Committee "is tasked with the responsibility of identifying who should do that common benefit work," *id.* at 22:20-23:4, which in turn determines how much Beasley Allen will take from the common benefit fund.  In the case of the $8.9 billion LTL bankruptcy plan, Beasley Allen would lose its share of between $712 million and $1.068 billion that would go into the common benefit fund if the money were part of a settlement outside the bankruptcy process.  *Id.* at 21:7-13.  For the $19 billion demanded by Conlan and Birchfield for the Legacy proposal, Beasley Allen would stand to gain a substantial share of ***$1.52 billion to $2.28 billion*** diverted from settling plaintiffs into the common benefit fund.  And save for a participation percentage Beasley Allen contributes as participating counsel, the common benefit fund payments would be on top of the 40% contingency fee the firm charges to its clients directly.  Birchfield Dep. at 28:9-11.  In Conlan, Birchfield sees a windfall for Beasley Allen—an opportunity to join forces with a lawyer who spent 1,600 hours representing J&J in the exact matter for which Birchfield seeks to undermine J&J's preferred resolution. And under CMO 7(a), the windfall sought by Beasley Allen is inextricably tied to the firm's representation of plaintiffs in this MCL due to its interest in obtaining tort system settlement money paid to the common benefit fund by participating counsel in this MCL.

**D.    Conlan And Beasley Allen Take Aim At J&J In A Coordinated Media Campaign**

The joint effort to accomplish Beasley Allen's objectives continued when Conlan recently authored an opinion piece in Bloomberg, "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."  The November 2, 2023 article argued that J&J's effort to use the bankruptcy process to provide a fair and efficient resolution of talc claims was a "spectacular" "failure" that had "polluted the dialogue about the legitimate interest of a public company in obtaining 'finality' with respect to both current and future claims, and plaintiffs' legitimate interest to have their claims determined or settled in the tort system and paid in full."[4]  Conlan insisted that "[s]tructural optimization and disaffiliation of the liable entities"—exactly what he was pitching to J&J—was "the right answer for everyone."  *Id.*  The article identified Conlan only as Legacy's CEO and a "former Sidley Austin restructuring chair," omitting any mention of Conlan's time as a partner at Faegre Drinker, where he spent 1,600 hours representing J&J in the talc matter after leaving Sidley Austin. He did, however, use the Bloomberg platform to explain "what the companies believed" they would gain by pursuing a resolution through the bankruptcy process, showing no reticence about offering insights into the thinking of his former client.

---

[4] Conlan, James, *Time to Ditch the Texas Two-Step for a New Mass Tort Strategy*, Bloomberg Law (Nov. 2, 2023), https://news.bloomberglaw.com/us-law-week/time-to-ditch-the-texas-two-step-for-a-new-mass-tort-strategy-1 (last accessed Dec. 3, 2023).

Birchfield immediately endorsed Conlan's commentary in a news release *issued the same day and also published by Bloomberg*, stating his opinion that "[p]laintiffs' lawyers in talc-related ovarian cancer cases share Mr. Conlan's concerns that the Texas Two-Step has 'polluted' the narrative."[5] He went on to state that Conlan's scheme "should be appealing," because plaintiffs' lawyers "share [Mr. Conlan's] vision of a win-win solution where claimants can pursue their claims in the tort system." *Id.*

Conlan's and Birchfield's orchestrated effort to push their agenda did not escape J&J's attention. On November 5, 2023, J&J's outside counsel James Murdica wrote to Conlan to "express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J." Haas Decl., ¶ 13, Ex. 5 at 1 (Nov. 5, 2023 letter from J. Murdica to J. Conlan). Murdica reminded Conlan that, as a Faegre Drinker partner, Conlan had represented both J&J and LTL "regarding strategies for resolution of [their] talc liabilities, including various bankruptcy options and proposed structural optimization." *Id.* As Murdica emphasized, Conlan "attended—with me—many high level meetings with J&J in-house counsel regarding the talc bankruptcy and settlement strategies in addition to weekly strategy calls with J&J in-house and

---

[5]    https://www.bloomberg.com/press-releases/2023-11-02/key-lawyer-in-johnson-johnson-talc-litigation-supports-call-to-rethink-legal-strategies-in-light-of-failure-of-texas-two-step            (last accessed Dec. 3, 2023).

outside counsel.  There can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure." *Id.*

None of these facts deterred Conlan or Birchfield.  Just four days after he received Murdica's letter, Conlan wrote to J&J to attach the $19 billion price tag to the "settlement matrix" he had developed with Beasley Allen's support.  Haas Decl., ¶ 14, Ex. 6 (Nov. 9, 2023 Conlan letter and exhibit).  In the letter, Conlan told J&J that "Leading Counsel in the MDL have agreed to support an opt-in settlement with Legacy, post-acquisition, on the terms described in the accompanying matrix."  *Id.* at 2.  Conlan continued, "Leading Counsel in the MDL believe the matrix settlement will enjoy 95% plus opt in," *id.*, a fact that could only be known from Conlan's communications with his former adversary Birchfield.

J&J responded by email to Legacy's Executive Chairman John Gasparovic, copying Conlan, advising that J&J's outside counsel had provided notice to Conlan "regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations."  Haas Decl., ¶ 15, Ex. 7 (Nov. 9, 2023 Haas email).  J&J further emphasized that the Company expected Conlan to respect his duties to J&J, his former client, going forward.  *Id.*

But Conlan and Birchfield remain undeterred.  Just six days later, J&J learned that Gordon Haskett Research Advisors would host a symposium in New York on

"JNJ: Talc Litigation & 3rd Bankruptcy" on November 29, 2023. *Id.* ¶ 16. The symposium was to feature "two experts"—none other than James Conlan and Andy Birchfield—to discuss the "viability" of "J&J's potential 3rd bankruptcy," "potential settlement issues," and "how J&J could resolve the litigation outside of bankruptcy," *id.*, the outcome they have jointly pursued.

## ARGUMENT

This Court should issue an order requiring Beasley Allen to show cause why the firm should not be disqualified from this litigation. Show cause orders are an accepted part of New Jersey practice where the circumstances warrant. *See Grewal v. Atl. Coast House Lifting Ltd. Liab. Co.*, 2019 WL 3229747, at *5 (N.J. Super. Ct. App. Div. July 18, 2019) (explaining that a show cause order is appropriate where a party is seeking "any 'form of emergent, temporary, interlocutory, or other form of interim relief'"). Here, the circumstances warrant an inquiry as to the requisite relief required to address Beasley Allen's alliance with J&J's former counsel, Conlan.

A court considering disqualification must "balance the need to maintain the highest standards of the legal profession against a client's right freely to choose counsel." *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 205 (1988); *see also, e.g.*, *Dental Health Assocs. S. Jersey, P.A. v. RRI Gibbsboro, LLC*, 471 N.J. Super. 184, 192 (App. Div. 2022). Although important, "a person's right to retain counsel of his or her choice is limited," *Dewey*, 109 N.J. at 218, and must give way when

ethical considerations demand.  "Therefore, if there be any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification."  *Estate of Kennedy v. Rosenblatt*, 447 N.J. Super. 444, 451 (App. Div. 2016) (quotations and alteration omitted).

One ethical consideration demanding disqualification is where opposing counsel is in receipt of their adversary's confidential information.  *See id.* at 452 (noting that some of "[t]he highest standards of the profession" are "the maintenance of client confidentiality and the need to ensure that protected client information is not used to the detriment of a former client").  Although no Rule of Professional Conduct explicitly speaks to the precise situation here—an alliance between a client's former attorney and its now adversary—several Rules illustrate the overarching principle that disqualification should be required in these circumstances.

***Litigation Adversaries.***  Start with Rule 4.4(b).  That Rule provides that a lawyer who inadvertently receives a document or communication that contains privileged lawyer-client communications involving an adverse party shall not read the document, must notify the lawyer, and then needs to return or delete the document.  The manifest purpose of this rule is to "safeguard confidential" and privileged information and to prevent it from falling into the client's adversary's hands without the client's consent.  *Sanchez v. Macquest Getinge Grp.*, 2018 WL 2324679, at *4 (N.J. Super. Ct. App. Div. May 23, 2008) (affirming disqualification

for violation of RPC 4.4).  That purpose applies *a fortiori* here.  Whether Conlan communicated J&J's confidences to Birchfield orally or in writing, it would be unconscionable to allow his firm to continue to represent plaintiffs in this litigation if (as seems highly likely based on the facts known to J&J) the firm is in possession of—and can use in this litigation—J&J's utmost confidences without J&J's consent.

The most basic conflict of interest rules, *see* RPC 1.7, are designed with this same concern in mind:  one significant risk in allowing unconsented conflicts of interest is "that the lawyer will use confidences of one client to benefit the other." *N.J. Div. of Child Prot. & Permanency v. G.S.*, 447 N.J. Super. 539, 564 (App. Div. 2016).

*Former Clients*.  The same considerations likewise animate ethical duties to former clients.  Rule 1.9(a) provides that a lawyer who has represented a client cannot represent another client in the same or a substantially related matter in which the former and current client's interests are materially adverse, without the former client's informed consent.  As with the rules above, the obvious purpose of this Rule is to prevent the attorney from using the former client's confidences against it. Indeed, that purpose is expressly reflected in the test for determining whether the two matters are substantially related:  a matter is substantially related if "the lawyer from whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation."

*City of Atlantic City v. Trupos*, 201 N.J. 448, 452 (2010).  There is no principled reason why it should matter that the "side-switching" attorney is not formally aligned against his former client on the docket if the same protected information is being non-consensually passed to an attorney who is.

Rules 1.9(b) and (c) reflect the same concern.  Rule 1.9(b) provides that a lawyer shall not represent a client in a substantially related matter if his former firm represented a client with adverse interests and the lawyer acquired the former client's confidential information.  *See also* RPC 1.10(b) (imputing conflicts to firm on similar grounds).  Likewise, Rule 1.9(c) prohibits a lawyer who formerly represented a client from using his former client's confidences to the client's disadvantage or revealing that information.  In all of these cases, the animating concern is that a client should not be disadvantaged by its disclosure of confidential information without consent.  Any contrary conclusion would chill clients from disclosing confidential information with their attorneys, thus harming the profession.

***Prospective Clients.***  The principle that "information obtained from a client" should not be used "to the detriment of that client," *Kennedy*, 447 N.J. Super. at 453, even extends to prospective clients.  Rule 1.18(b) "precludes any representation of a client with interests materially adverse to those of a former prospective client in the same or a substantially related matter if the information acquired from the former prospective client could be significantly harmful to that person in the matter."

*Greebel v. Lensak*, 467 N.J. Super. 251, 257 (App. Div. 2021) (quotations omitted). The express concern reflected in this rule is the possibility that "the disclosed information could be used against," *id.* at 259, the one-time prospective client to its detriment.

*     *     *

All of these provisions "underscore the principle that an attorney may not use information obtained from a client to the detriment of that client," *Kennedy*, 447 N.J. Super. At 453, whether that client is a current client, former client, or former prospective client.  By its logic, that principle should also apply where, although the attorneys in question never had a relationship with the client, they form an alliance with and gain information from an attorney who has.  Indeed, is impossible to "conceive of any situation" in which it would be permissible for an attorney "to continue representation if" the attorney "had acquired confidential information concerning" his adversary's "affairs."  *Dewey*, 109 N.J. at 220; *see also O'Gara Coach Co., LLC v. Ra*, 30 Cal. App. 5th 1115, 1126-27 (2019) ("A lawyer and his or her law firm may also be disqualified for intentionally making use of an opposing party's confidential information acquired through improper means.") (citing *Clark v. Super. Ct.*, 196 Cal. App. 4th 37, 55 (2011) (noting "disqualification is proper as a prophylactic measure to prevent future prejudice to the opposing party from information the attorney should not have possessed")); *Cordy v. Sherwin-Williams*

18

*Co.*, 156 F.R.D. 575, 584 (D.N.J. 1994) (A party's "interest in a trial free from the risk that confidential information will be used against him and the public's interest in the integrity of the judicial process itself demand[ed]" disqualification.); *Mgmt. Registry, Inc. v. A.W. Cos.*, 2021 WL 2434119, at *3 (D. Minn. June 15, 2021) ("[C]ourts must guard against the risk that a party's own confidential information could be used against it unfairly.").

Here, there is no question that Conlan possesses J&J's client confidences. After all, he billed J&J for 1,600 hours working on strategies to resolve its talc liabilities.  It is likewise without question that Birchfield and Beasley Allen knew Conlan possessed those confidences, having been on the opposing side and directly adverse to Conlan in the talc litigation and negotiations seeking to resolve the very liabilities that Conlan addressed in his 1,600 hours of work for J&J.  In formulating and collaborating in a business venture designed to resolve those liabilities—and in pitching it to lawyers representing parties directly adverse to J&J—it is impossible that client confidences would not have passed from Conlan to Birchfield and his firm.  Indeed, the fact that J&J's current adversary is working closely with its former attorney on the very subject of its former attorney's representation cuts to the heart of the adversarial nature and integrity of these proceedings.  Those considerations require that Beasley Allen be disqualified from the talc litigation.

That said, J&J recognizes that disqualification of Beasley Allen is not a decision that this Court can take lightly. *See Dental Health Assocs.*, 471 N.J. Super. at 192.   But that is yet another reason a show cause order should issue. Disqualification and discipline issues are, by nature, "fact-sensitive," so it is essential for courts faced with these issues to amass as complete a factual picture as possible. *Dewey*, 109 N.J. at 220.  A show cause order will allow the Court to do just that.  The facts currently known to J&J clearly demand an explanation.

## CONCLUSION

Accordingly, J&J respectfully requests that this Court issue an order requiring Beasley Allen to show cause why the firm should not be disqualified from this litigation.

DATED: December 8, 2023          Respectfully submitted,

_____
Stephen D. Brody
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Tel.: 202-383-5300
sbrody@omm.com

Susan M. Sharko
FAEGRE DRINKER BIDDLE & REATH
LLP
600 Campus Drive
Florham Park, NJ 07932
Tel.: 973-549-7000
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson & Johnson and LTL Management LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the Notice of Motion for

Entry of Order to Show Cause, Defendants Johnson & Johnson and LTL

Management LLC's Motion for Order to Show Cause Why Beasley Allen Should

Not Be Disqualified From This Litigation with supporting Declaration and

accompanying exhibits, and Proposed Order were served electronically via eCourts

on December 8, 2023.

By:   /s/ *Susan M. Sharko*
        Susan M. Sharko

# EXHIBIT I

FILED, Clerk of the Appellate Division, April 19, 2021, **A-000047-20**, AMENDED                                    AMENDED

```
                                    SUPERIOR COURT OF NEW JERSEY
                                    LAW DIVISION, CIVIL PART
                                    MIDDLESEX COUNTY
                                    DOCKET NOS. MID-L-1809-17
                                                MID-L-0932-17
                                                MID-L-7049-16
                                                MID-L-6040-17
                                    APP. DIV. NO. _____
```

```
DOUGLAS BARDEN and ROSLYN BARDEN,   :
et al.,                             :
                                    :
              Plaintiffs,           :
                                    :
       v.                           :
                                    :
BRENNTAG NORTH AMERICA, INC.,       :
INDIVIDUALLY AND AS SUCCESSOR-IN-   :
INTEREST TO MINERAL PIGMENT         :
SOLUTIONS, INC. AS SUCCESSOR-IN-    :
INTEREST TO WHITTAKER CLARK &       :
DANIELS, INC.; BRENNTAG SPECIALTIES,:
INC., F/K/A MINERAL PIGMENT         :
SOLUTIONS, INC., AS A SUCCESSOR-IN- :
INTEREST TO WHITTAKER, CLARK        :
& DANIELS, INC.; BRENNTAG           :      TRANSCRIPT
SPECIALTIES, INC., f/k/a MINERAL    :
PIGMENT SOLUTIONS, INC., AS A       :          OF
SUCCESSOR-IN-INTEREST TO WHITTAKER  :
CLARK & DANIELS, INC.; CYPRUS AMAX  :        TRIAL
MINERALS COMPANY, INDIVIDUALLY AND  :
AS SUCCESSOR-IN-INTEREST TO AMERICAN:
TALC COMPANY, METROPOLITAN TALC     :
COMPANY, INC., CHARLES MATHIEU,     :
INC., RESOURCE PROCESSORS, INC.;    :
IMERYS TALC AMERICA, INC., f/k/a    :
LUZENAC AMERICA, INC., INDIVIDUALLY :
AND AS SUCCESSOR-IN-INTEREST TO     :
WINDSOR MINERALS, INC.; JOHNSON &   :
JOHNSON; JOHNSON & JOHNSON CONSUMER,:
INC. f/k/a JOHNSON & JOHNSON        :
CONSUMER COMPANIES, INC.; WHITTAKER :
CLARK & DANIELS, INC., INDIVIDUALLY :
AND AS SUCCESSOR-IN-INTEREST TO     :
AMERICAN TALC COMPANY, METROPOLITAN :
TALC COMPANY, INC., CHARLES MATHIEU,:
INC., AND RESOURCES PROCESSORS,     :
INC.; JOHN DOE CORPORATIONS 1-50;   :
JOHN DOE CORPORATIONS 51-100,       :
                                    :
              Defendants.           :
```

```
           Place:   Middlesex County Courthouse
                    56 Paterson Street
                    New Brunswick, NJ 08903

           Date:    July 11, 2019
```

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED

40

```
 1    anything from -- from when it was Colgate to when it
 2    was Johnson & Johnson, when the ex -- when the
 3    complaints were filed before experts were hired?  I
 4    mean, that was fair advocacy in that case, Your Honor.
 5              And many of the things that Mr. Placitella
 6    are pointing out that -- that I showed them that they
 7    -- that they showed the jury this document and I show
 8    how that was misleading, because they didn't show this
 9    part?  I mean, that's fair advocacy.  They do it, I do
10    it.
11              To -- so, to try to limit J&J from doing
12    what's basic and fair advocacy before the trial even
13    starts is just unfair, it's more personal attacks,
14    it's -- it's more, you know, nonsense, I would submit,
15    Your Honor.  I have -- I have acted professionally,
16    hopefully, before this Court, I intend to do so in
17    this trial as well, and -- and -- and so, Your Honor,
18    I think this motion should be denied.
19              THE COURT:  Thank you.
20              Anything further you haven't already
21    articulated?
22              MR. PLACITELLA:  Yes, Your Honor.
23              THE COURT:  You did cite to case law and
24    such that was not in the brief, by the way.
25              MR. PLACITELLA:  I apologize for that, Your
```

41

```
 1    Honor.  I was up late.  I'm happy to --
 2              But the transcript was attached to the
 3    brief.
 4              THE COURT:  Right.
 5              MR. PLACITELLA:  The decision to object or
 6    not object is by lead counsel.  That has nothing to do
 7    with us here.  What we're worried about here is how
 8    this case will be tried.
 9              Saying things like they ran out of people to
10    sue?  That has -- that -- that is just way out of
11    bounds.  Going into what the lawyer's mindset was and
12    strategy and conversations with their clients?  Way
13    out of bounds.
14              And they say that they would have negotiated
15    it?  They sat here just 30 seconds ago and told you
16    everything they said was proper.  It can't be proper
17    and that's why we're here.
18              MS. SULLIVAN:  And, Your Honor, even the ran
19    out of people to sue was evidence in that case.  Dr.
20    Longo and Mr. Finch went through all of the companies
21    they had sued in the past who had asbestos products in
22    it --
23              MR. PLACITELLA:  That's --
24              MS. SULLIVAN:  -- and that they had sued,
25    and they have been involved in those lawsuits, and
```

44

```
 1    cosmetic talcum powder products.  She saw Cashmere
 2    Bouquet, I remember, and she stopped, she didn't
 3    continue looking any further.  So there was no I.D. of
 4    Johnson & Johnson baby powder then.  She then, the day
 5    after the deposition -- what was it -- of an expert,
 6    goes to a doctor and says she was only exposed to
 7    Cashmere Bouquet.
 8              So there was so much to comment on in that
 9    case and you know what?  Even if there wasn't enough
10    to comment on, to resort to what I say is lawyer
11    bashing, is just inappropriate under the rules, the
12    case law, under who we are as a profession.  We have
13    to be better than that.  And I know that you can be.
14              And so I am going to enter this order,
15    because this is not about strategy of plaintiffs in
16    presenting this case.  This is about the evidence.
17              And not about what happened in Henry.  I
18    mean, I am horrified hearing and seeing those comments
19    in this transcript and I don't know -- I'm not
20    commenting upon anything in Law 360.  I don't know if
21    that comment was attributed to anyone and whether it's
22    accurate or not.  But it has no place here in trials
23    before this Court or should be in any court, frankly,
24    about attacking lawyers, attacking their strategy,
25    invading upon attorney-client privilege.
```

45

```
 1              Comment upon the evidence.  That's what
 2    you're supposed to be doing.  And that's what's going
 3    to happen here.
 4              But I will caution everyone caution everyone
 5    that I'm already concerned based upon what I see
 6    happened -- what happened during the jury selection
 7    process.  We really have to work together.  You may
 8    not like each other.  You don't have to like each
 9    other.  These are four cases that are going to be
10    tried and let's just try it and remain civil with each
11    other.
12              I am granting the order that comments by
13    defense counsel aimed at prejudicing the jury against
14    plaintiffs' counsel are excluded.
15              So, it goes beyond scam and sham.  Those
16    comments that we read in the transcript are not
17    comments that are going to be used and not a strategy
18    that's going to be used during this trial.
19              Let's move on.  What's the next motion?
20              MR. PLACITELLA:  There was a --
21              THE COURT:  I need a separate order that has
22    all of the dockets on it.  This one only supplied two.
23              MR. PLACITELLA:  Well, we'll get that, Your
24    Honor.
25              THE COURT:  Thank you.
```

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED                                                    AMENDED

108

1    advance that it was genetic mutations without
2    supporting evidence doesn't satisfy the Appellate
3    Division or the law in Johnesee.  That's number one.
4           Number two is that, in order to advance an
5    opinion, an expert has to articulate that opinion in
6    their expert report.  It simply can't be a throwaway
7    line that this is associated.  And then the defendant,
8    to show you what they want to do, misquote the expert
9    in their brief.  Because they don't want to simply
10   challenge Dr. Moline, they want their attorneys to be
11   able to advocate in front of this jury that, number
12   one, BRCA2 mutations are what caused Mr. Barden's
13   mesothelioma; number two, that diverticulitis is what
14   caused Mr. Ronning's mesothelioma; that, number three,
15   that age is what caused Ms. McNeill's mesothelioma;
16   that, four, some unknown genetic mutations are at work
17   in Mr. Etheridge that caused his mesothelioma.  You
18   cannot poison a jury by shooting out theories of
19   causation that have absolutely no basis.
20          And so while -- if there is an evidentiary
21   basis, a reasonable evidentiary basis, John -- we --
22   we advocate Johnesee.  Johnesee does say that the
23   opposing expert can be challenged with it.  But it has
24   to be scientifically valid and it has to have a
25   factual basis in the record and none of these do.

109

1    Thank you.
2           THE COURT:  Thanks.
3           MS. BROWN:  And, Your Honor, just briefly on
4    that point.  Okay?
5           Counsel have not raised either in briefing
6    or in argument here today any potential alternative
7    cause that has not been fully disclosed and supported
8    by either an expert report -- and the -- and what I'm
9    saying is, what they're seeking to exclude is all
10   either supported by a medical record, by an expert
11   report, by scientific literature that well satisfies
12   the test in Johnesee.  There is not a type of
13   potential alternative exposure that we are seeking to
14   cross Dr. Moline with that is purely speculative.
15   That is what the appellate court sought to exclude,
16   based on Johnesee.
17          Here, age.  Supported by an expert that this
18   Court has qualified before.  Dr. Moolgavkar.  Who has
19   published a peer-reviewed publication about that.
20          BRCA2.  The subject of a medical record.
21   Not the one that counsel read from the report, but
22   from a medical record, November of 2017, that says
23   BRCA can increase the risk of all cancers.  And
24   supported by an expert who has that --
25          THE COURT:  Where is the medical --

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED          AMENDED

176

```
 1              MS. SULLIVAN:  Got it.  Thank you.
 2              THE COURT:  -- on the other side.
 3              MS. SULLIVAN:  And our tech people could
 4     just coordinate with your --
 5              THE COURT:  Right.  Just call them.  I told
 6     -- I'll have Grayson tell the folks from CVN they
 7     cannot set up until Monday.
 8              MS. SULLIVAN:  Okay.
 9              THE COURT:  All right?  So we'll have your
10     people set up tomorrow.  I'll send an email over to IT
11     or give them a quick call to let them know that you
12     will all be setting up tomorrow.  Okay?
13              MS. SULLIVAN:  Thank you, Your Honor.
14              MR. MAIMON:  Thank you, Your Honor.
15              MR. PANATIER:  And we'll have Ryan here.
16              THE COURT:  All right.  So, 9 o'clock in my
17     other courtroom.  Thanks.
18              MR. MAIMON:  Thank you, Your Honor.
19              MR. NOLAN:  Thank you, Your Honor.
20              THE COURT:  Thank you.
21              (Trial adjourned at 4:39 p.m.)
22
23
24
25
```

177

```
 1                      CERTIFICATION
 2
 3          I, TERRY L. DeMARCO, the assigned transcriber, do
 4     hereby certify the foregoing transcript of proceedings
 5     recorded on CourtSmart, Index Nos. from 11:51:18 to
 6     12:05:53 and 1:27:49 to 4:39:11, is prepared to the
 7     best of my ability and in full compliance with the
 8     current Transcript Format for Judicial Proceedings and
 9     is a true and accurate compressed transcript of the
10     proceedings, as recorded.
11
12
13
14     /s/ Terry L. DeMarco                    AD/T 566
15        Terry L. DeMarco                    AOC Number
16
17
18     KLJ Transcription Service              04/15/21
19        Agency Name                           Date
20
21
22
23
24
25
```

# EXHIBIT J

**FILED,** Clerk of the Appellate Division, April 19, 2021, **A-000047-20,** AMENDED                                                  AMENDED

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MIDDLESEX COUNTY
DOCKET NOS. MID-L-1809-17
            MID-L-0932-17
            MID-L-7049-16
            MID-L-6040-17
APP. DIV. NO. _____

DOUGLAS BARDEN and ROSLYN BARDEN, et :
al.,                                 :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :
                                     :
BRENNTAG NORTH AMERICA, INC.,        :
INDIVIDUALLY AND AS SUCCESSOR-IN-    :   TRANSCRIPT
INTEREST TO MINERAL PIGMENT          :
SOLUTIONS, INC., AS SUCCESSOR-IN-    :      OF
INTEREST TO WHITTAKER CLARK &        :
DANIELS, INC.; BRENNTAG SPECIALTIES, :    TRIAL
INC., f/k/a MINERAL PIGMENT          :
SOLUTIONS, INC., AS A SUCCESSOR-IN-  :
INTEREST TO WHITTAKER CLARK &        :
DANIELS, INC.; CYPRUS AMAX MINERALS  :
COMPANY, INDIVIDUALLY AND AS         :
SUCCESSOR-IN-INTEREST TO AMERICAN    :
TALC COMPANY, METROPOLITAN TALC      :
COMPANY, INC., CHARLES MATHIEU,      :
INC., RESOURCE PROCESSORS, INC.;     :
IMERYS TALC AMERICA, INC., f/k/a     :
LUZENAC AMERICA, INC., INDIVIDUALLY  :
AND AS SUCCESSOR-IN-INTEREST TO      :
WINDSOR MINERALS, INC.;, JOHNSON &   :
JOHNSON; JOHNSON & JOHNSON CONSUMER,  :
INC. f/k/a JOHNSON & JOHNSON         :
CONSUMER COMPANIES, INC.; WHITTAKER  :
CLARK & DANIELS, INC., INDIVIDUALLY  :
AND AS SUCCESSOR-IN-INTEREST TO      :
AMERICAN TALC COMPANY, METROPOLITAN  :
TALC COMPANY, INC., CHARLES MATHIEU, :
INC., AND RESOURCES PROCESSORS,      :
INC.; JOHN DOE CORPORATIONS 1-50;    :
JOHN DOE CORPORATIONS 51-100,        :
                                     :
          Defendants.                :

Place:  Middlesex County Courthouse
        56 Paterson Street
        New Brunswick, NJ 08903

Date:   July 15, 2019

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED

102

```
 1              MS. SULLIVAN:  We're here for the folks at
 2   J&J.  And I'm going to have a little help in this -- a
 3   lot of help in this case from these two folks.  Derek
 4   Hen (phonetic) is going to work some of the technology
 5   in the courtroom, so you'll see him back there.
 6   Derek's been in courtrooms with me for about a couple
 7   of decades now.  At least he still looks young.  And
 8   Lamia Sampson is a lawyer and a paralegal who's sort of
 9   our manager, and she'll keep us running efficiently to
10   make sure we don't waste your time.  And so you'll see
11   those folks with us in the courtroom.
12              MS. SAMPSON:  Good afternoon.
13              MS. SULLIVAN:  So -- well, you heard the
14   plaintiffs' lawyer.  He made a lot of allegations and
15   accusations and said a lot of bad things about J&J and
16   the men and women who work there, and that's -- and
17   that's too bad.  But you know, in this country, it's
18   easy to file lawsuits and make all kinds of accusations
19   and all kinds of allegations and throw a lot of mud in
20   the interest of winning lawsuits for money.  But it's
21   going to be for you to decide whether those
22   allegations, those accusations, are really fair or not,
23   whether they're really true, whether they're really
24   supported by the evidence.
25              And plaintiffs here get a lot of rights.
```

103

```
 1   When you file a lawsuit in this country, you get a lot
 2   of rights, and you should.  And we have a great -- we
 3   have the best justice system in the world and we're the
 4   only country in the world that has jurors, citizens
 5   like you, decide these cases; not politicians, not
 6   judges, but our citizens.  And we thank you and your
 7   community members thank you and J&J and the people
 8   there thank you for your important service here.
 9              But when plaintiffs file a lawsuit, they have
10   a lot of rights.  They have a lot -- they're -- they're
11   entitled to a fair trial, and they're entitled to a
12   fair judge, and we have that with Judge Viscomi here,
13   and they're entitled to a fair jury.  And you got jury
14   summonses and you all came in and they're entitled to
15   empanel a jury, and all of you were asked a whole bunch
16   of questions by both sides, some of it invasive, and
17   you were patient and kind enough to fill out all the
18   jury sheets and ask -- answer the questions of counsel
19   and the judge and you're here because everybody, the
20   plaintiffs and the defendants and the Court, decided
21   that of all the jurors who came in, you can be the most
22   fair and decide the case based on the evidence and the
23   facts and keep bias and prejudice aside and actually
24   even decide the case without sympathy for -- which in a
25   case like this is going to be terribly, terribly hard.
```

106

1    experts have found again and again that there is no
2    asbestos in baby powder.  And I'm going to show you
3    that evidence.  And I submit to you the -- the
4    plaintiffs' case, you'll see, is based on confusion,
5    having hired experts who they've paid tens of millions
6    of dollars in lawsuits and Mr. -- Mr. Maimon has
7    acknowledged, they've used them in the past, they've
8    paid them millions and millions of dollars, get up here
9    and call things asbestos which are not.  And the
10   government doesn't agree with them, and we'll show you
11   -- we'll show you that ev -- evidence.
12          And you're going to see that the FDA actually
13   took a hard look at this issue and -- and did studies
14   and analysis and consulted with independent experts and
15   found that Johnson's Baby Powder was safe.  And we'll
16   talk some more about that.  And you're going to hear
17   that some of the best institutions in the world --
18   Johnson & Johnson -- this product has been on the
19   market for lit -- forever, almost.  And they sent their
20   baby powder out to some of the best laboratories in the
21   world.  Shine a light.  Test it.  Let us know if
22   there's any problems.  And Princeton, Harvard, MIT,
23   some of the best labs in the world have concluded that
24   this baby powder does not have asbestos.  And that's
25   why it's still on the market today.

107

1          And you heard the plaintiffs' lawyer talk
2    some about the treating physicians in this case, and
3    the plaintiffs have seen, unfortunately, a lot of
4    doctors.  They've seen some of the best doctors in the
5    world.  And not one of their doctors have said in their
6    medical records or have told the plaintiffs or -- or
7    are even going to come in here and support their case.
8    None of their doctors believe that baby powder or
9    Shower to Shower caused their cancer, because it
10   didn't.  And we'll -- we'll talk more about that
11   evidence in a minute.
12          And I think the plaintiffs' lawyer said well,
13   that's because people don't know.  Well, you're going
14   to see, this is -- first of all, you guys -- most of
15   you have seen the commercials.  They're running
16   plaintiff lawyers commercials a lot.  Call, we'll sue
17   J&J.  Right?  It's gotten a lot of press.  It's got a
18   lot of -- in terms of the commercials, and --
19          MR. MAIMON:   Judge?
20          MS. SULLIVAN:   -- we talked to you about jury
21   --
22          THE COURT:  Sidebar.
23             (Sidebar discussion.)
24          MR. MAIMON:   This is essentially what we
25   moved on.  It's a direct violation of your order.  The

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED

AMENDED

108

```
1    Court -- I don't even know what to say.  She started,
2    getting close to the line.  This is way over the line.
3    And it's in direct violation of your order.  She should
4    be admonished in front of the jury and their answer
5    should be stricken.
6              MR. PLACITELLA:  Your Honor, please.  They're
7    letting ads, 1-800, call, sue J&J.  This was exactly
8    what was read to the Court and what the Court
9    admonished counsel about.  I have objections already,
10   but -- but we -- we stayed silent.  But to allow this,
11   in direct contravention to the Court's order, is
12   unforgivable.
13             MS. SULLIVAN:  Your Honor --
14             THE COURT:  Get closer to the microphone.
15             MS. SULLIVAN:  I'm sorry.  Your Honor, they
16   specifically said nobody knows about this.  And we --
17   and -- advertisements, at their request, was on a jury
18   questionnaire.  Your Honor extensively -- they all know
19   about.  Your Honor's extensively asked them about it.
20   They said nobody knows about it.  I talked to them
21   about what they've already been asked about in jury
22   selection as part of this case, for better or for
23   worse.
24             THE COURT:  I ruled that attacking lawyers
25   and advertisements that -- whether the -- the
```

109

```
1    questionnaire didn't say plaintiffs lawyers
2    advertising, it said lawyers advertising.  So -- but in
3    relation to the motion that was filed with respect to
4    what happened in the Rimondi (phonetic) trial, I made a
5    specific ruling, and you're not to violate that order.
6    So --
7              MS. SULLIVAN:  It was attacking
8    (indiscernible).
9              THE COURT:  It was -- it was --
10             MS. SULLIVAN:  I understand now.  I'll move
11   on.
12             MR. PLACITELLA:  No, no, no, no.  I don't
13   want her to move on.  I want her admonished in front of
14   the jury.  Not moving on.
15             MS. SULLIVAN:  (Indiscernible.)
16             THE COURT:  I will take that under
17   advisement.  You will refrain from that --
18             MS. SULLIVAN:  I --
19             THE COURT:  -- during openings and the
20   entirety of the case.
21             MR. PLACITELLA:  Your Honor, I'll just re --
22   preserve it.  But if she does it again, I'm going to
23   ask that their answer be stricken.
24             THE COURT:  Understood.
25             MS. SULLIVAN:  Thank you, Judge.
```

114

1  another one from the Washington Cancer Center.  The
2  implication of asbestos exposure in the causation of
3  peritoneal meso is far less obvious than the kind in
4  your lungs.
5          And you have something in this case that's
6  going to serve you well, and that's your good, old-
7  fashioned common sense.  And you're going to hear a lot
8  of technology and testing and medicine and it may sound
9  confusing to you, at least it was really confusing to
10  me the first time I heard it all, but sheer common
11  sense is going to let you cut through a lot of this
12  stuff and get to the truth.  And the truth is, the
13  scientific journals have said again and again that the
14  kind of mesothelioma they have is often not associated
15  with asbestos.
16          And here are some other journals.  This is --
17  the SEER data is a government data where they collect
18  the number of mesotheliomas around the country, and
19  this article says the observations suggest that
20  asbestos exposure was responsible for only a minor
21  fraction of peri -- peritoneal meso, the kind they
22  have, over the period '73 to 2005.  And again, about 30
23  percent of peritoneal meso in men is associated with
24  above background asbestos exposure, 70 percent not, and
25  that factors other than asbestos appear to be the main

115

1  cause of this kind of cancer in women.  Can you guys
2  see that, or is my board blocking you?
3          And more studies.  Accordingly, peritoneal
4  meso is often reported in men and women with no known
5  asbestos exposure.  And it's the kind of cancer that
6  unfortunately, happens, like so many cancers.  We could
7  -- I will tell you right now, the hardest part of this
8  case, it's going to break your heart.  These
9  plaintiffs, there's no question they have cancer, that
10  they're suffering, that some of them are dying, and
11  you're going to hear them.  You're going to hear their
12  families.  And it is going to break your heart.  But
13  the truth is, most people who get cancer, nobody knows
14  the cause.  Naturally-occurring, who knows.  Something
15  going on in their bodies.  And peritoneal meso --
16  mesothelioma, all of these studies say, happens, for
17  reasons nobody knows.  Sometimes asbestos, when you get
18  massive exposures like in insulation.  But often,
19  nobody knows.  It just happens.
20          And we can fill -- unfortunately, we could
21  fill the city of New Brunswick with people suffering
22  and dying from cancer and many of us, I know some of
23  you from your jury questionnaires have had people in
24  our families who we watched suffer and die from cancer,
25  and it's horrible.  It's terrible.  And it's going to

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED

AMENDED

118

```
 1     the plaintiffs claim here, you typically -- not always,
 2     but you typically have markers; you have fingerprints;
 3     you have evidence of that exposure.  And you're going
 4     to see in this case -- and then the kind of evidence
 5     you usually have if you have asbestos exposure and
 6     mesothelioma caused by asbestos is your lungs are thick
 7     or scarring because it's hard to breathe.  You know,
 8     it's hard to -- to -- to exhale these fibers and so you
 9     have thickening of your lungs, you have chronic lung
10     disease and scarring.  None of the plaintiffs here have
11     any evidence of that.  None.  There's no evidence of
12     any asbestos exposure in their bodies.  There's no --
13     none of these markers that doctors look for to say a-
14     ha, this is evidence of asbestos exposure.
15            They also didn't find any fibers of asbestos
16     in any of their pathology, which they often do in cases
17     where plaintiffs have cancer from meso -- from -- from
18     asbestos.
19            And so they have the kind of cancer that's
20     often not associated with asbestos, and they are going
21     to be able to bring you no evidence that they have any
22     markers in their bodies of asbestos exposure.  Their
23     lungs are clear; not scarring, not thickening, not pla
24     -- not the kind of thing you would see if you had
25     massive exposure to asbestos, as they're alleging.
```

119

```
 1     Nothing.
 2            And so I want to talk a little bit more about
 3     the plaintiffs.  You heard some about Mr. Barden.  He
 4     is sick.  He's got cancer.  It's -- it's terminal.  We
 5     don't dispute that.  It's terrible.  Mr. Barden, again,
 6     has no evidence of any asbestos exposure in his body.
 7     And our experts will come in here and talk to you about
 8     the fact that they don't believe Mr. Barden's cancer
 9     was caused by asbestos because he doesn't have any of
10     these markers, because he has the kind of cancer that's
11     not typically associated, or often not associated with
12     asbestos, but if they want to say it's from asbestos
13     exposure, his dad worked at one of the most well-known
14     asbestos places in the world: a Navy shipyard.  He was
15     an inspector.  And there were so many claims of workers
16     that worked there for mesothelioma because in the Navy
17     shipyard, they had tons of insulation.  It was very
18     common, because asbestos was a well-known fire
19     retardant.  So they would use it in ships to cover the
20     boiler room, they would use it on ships for other
21     reasons.  And so the Brooklyn Navy shipyard was filled
22     with asbestos and there's been tons of claims for
23     workers there.
24            And their experts will acknowledge, and Mr.
25     Barden was -- his dad was working there before he was
```

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED                                           AMENDED

158

```
 1    them on that.  She -- this is her published paper, and
 2    she says in her published paper, "Because many non-
 3    fibrous cleavage fragments of amphibole minerals have a
 4    three to one aspect or greater and because there is no
 5    good evidence for adverse effects of these particles, a
 6    stay has been in effect on this part of the
 7    regulation."
 8            And that's what we talked about.  So she does
 9    not agree that just because something's three times
10    longer as it is wide or five times longer than it is
11    wide that that's asbestos.  And of course not, because
12    there's all -- all kinds of things that can be three
13    times longer than they are wide.  That doesn't make it
14    asbestos.
15            So what's going on here with their experts,
16    and I will submit -- and they'll admit, they're going
17    to admit that they call things asbestos if it meets
18    this counting rule.  They're going to say the good
19    rocks, fragments, are asbestos even if they're not.
20            Okay.  So I submit to you that, and I'll show
21    you some documents now, that the plaintiffs' case is
22    based on confusion.  And I'm going to show you some
23    examples of what you saw in opening statement, and you
24    can decide whether what went on was -- was fair or not,
25    based on what the documents actually said.
```

159

```
 1            And when you -- and I noticed when
 2    plaintiffs' lawyer was up there showing you his slides,
 3    he didn't show you much evidence.  It was all his --
 4    you know, his words and graphs instead of the actual
 5    documents.  But I'm going to show you some of the
 6    documents, some of them are their exhibits, that are
 7    going to come into evidence and let you see examples of
 8    what's going on here, if you'll -- if you'll be patient
 9    enough for me to do that.  Do you guys need a break
10    first?  Everybody good?  Okay.
11            All right.  I could grab the ELMO here?
12            (Brief pause.)
13            MS. SULLIVAN:  So this is a slide of -- let
14    me see if I can get it better, that plaintiffs' lawyer
15    put up, I tried to take a snapshot of it.  And he
16    showed you this picture and suggested to you that that
17    was asbestos, but if you look at the document --
18    asbestos in baby powder, that that was asbestos in baby
19    powder.  But if you look at the document, where it
20    comes from, and this is plaintiffs' exhibit 3060, and
21    I'll show you -- this is plaintiffs' exhibit 3060.
22    This is from J&J's supplied, Luzenac.  I'm sorry.  I'm
23    making everybody dizzy here, but --
24            Sorry, you guys.  Bear with me.  Okay.  And
25    this is what he -- what was in his picture, and he says
```

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED                                                    AMENDED

190

```
 1      what he thinks the documents say.  And I submit to you,
 2      you folks are in a better position than anybody to look
 3      at a document and figure out what it says.  And I'm not
 4      sure you need anybody to tell you what something says,
 5      but that's what he's going to do.  And he's going to
 6      say that's asbestos, they should have done testing, and
 7      you'll hear that.  But -- but he's going to acknowledge
 8      that J&J went far beyond industry standards in terms of
 9      their testing and protocol and quality assurance and
10      far beyond what any other company making talcum powder
11      did during the relevant time frame.
12              Then you're going to hear from Dr. Longo.
13      He's their testing expert.  He's the only witness
14      they're going to bring in here who actually -- his lab,
15      he actually didn't do any of the testing.  He's just
16      the testifier.  He's -- he's -- they're going to bring
17      him in here and his lab did testing of samples of J&J
18      baby powder, and he's going to come in here and say
19      exactly what I had suggested to you, that that's
20      asbestos, that's asbestos, that's asbestos.  But what
21      you're going to see is Dr. Longo, he's counting.  When
22      he counts, he counts the cleavage fragments, the good
23      rocks, and calls it asbestos.  And he'll acknowledge
24      that.  He's like oh, that's the counting rules.  That's
25      what I'm doing.
```

191

```
 1              And he actually advertised for work in
 2      lawsuits.  I'll stand up in court and defend and -- and
 3      testify for you.  And he, as Mr. Maimon said, has made
 4      over $30 million, at least that's what he'll admit to
 5      now, over $30 million testifying for plaintiffs in
 6      asbestos lawsuits for over 30 years when plaintiffs'
 7      lawyers, including these plaintiffs' lawyers here, sue
 8      companies who actually make asbestos products like
 9      brake pad and pipe insulation.  He's their guy.  They
10      bring him in to testify.  He's been testifying in
11      lawsuits for many, many years.  He's testified in
12      thousands of lawsuits.  He's been in more courtrooms
13      than any lawyer in the country, and he's good.  He's
14      the best expert money can buy.
15              And -- and again, when he's testifying,
16      you're going to see.  He's charming.  He's slick.  He
17      could sell ice to Eskimos.  And he's going to try to
18      convince you that there is --
19              MR. MAIMON:  Your Honor, I object to this.
20      This is improper.
21              THE COURT:  Sidebar.
22              (Sidebar discussion.)
23              MR. MAIMON:  Before I state the basis of my
24      opinion, Your Honor, I object to counsel gesturing with
25      her arms wide open when we come to sidebar as if what
```

FILED, Clerk of the Appellate Division, April 19, 2021, A-000047-20, AMENDED
AMENDED

228

1  carts in the back, they can't stay like that.  I mean,
2  we have to offer public access, plu -- plus that's a
3  tripping hazard back there.  So you're going to have to
4  find another place for them.  You -- they just can't be
5  there like that throughout the course of this trial.
6  The last few trials, if you can fit anything that can
7  go behind that bench, you can.  If you want to store
8  anything in my regular courtroom, you can do that.  But
9  they can't stay there like that during this trial.
10            MR. PANATIER:  Understood, Your Honor.
11            THE COURT:  Thank you.
12            MR. PANATIER:  Thank you.
13            THE COURT:  Okay.  And you'll take care of
14  that today?
15            MR. PANATIER:  Yes, Your Honor.
16            THE COURT:  Before the jurors walk in
17  tomorrow.
18            MR. PANATIER:  Yes, Your Honor.
19            THE COURT:  Okay.  We're off the record.  See
20  everyone tomorrow morning.  Thank you.
21            (Proceeding concluded at 4:26 p.m.)
22
23
24
25

229

1                    CERTIFICATION
2
3       I, SARAH L. FETZ, the assigned transcriber, do
4  hereby certify that the foregoing transcript of
5  proceedings on CourtSmart, Index No. from 9:45:49 a.m.
6  to 4:26:08 p.m., is prepared to the best of my ability
7  and in full compliance with the current Transcript
8  Format for Judicial Proceedings and is a true and
9  accurate compressed transcript of the proceedings, as
10  recorded.
11
12
13
14     /s/ Sarah L. Fetz              AD/T 626
15       Sarah L. Fetz                AOC Number
16
17
18   KLJ Transcription Service        04/15/2021
19       Agency Name                    Date
20
21
22
23
24
25

# EXHIBIT K

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CIVIL PART
                              MIDDLESEX COUNTY
                              DOCKET NOS. MID-L-1809-17
                                          MID-L-0932-17
                                          MID-L-7049-16
                                          MID-L-6040-17
                              APP. DIV. NO. A-000047-20-T4
```

```
DOUGLAS BARDEN and ROSLYN BARDEN, et  :
al.,                                  :
                                      :
              Plaintiffs,             :
                                      :
     v.                               :
                                      :
BRENNTAG NORTH AMERICA, INC.,         :
INDIVIDUALLY AND AS SUCCESSOR-IN-     :     TRANSCRIPT
INTEREST TO MINERAL PIGMENT           :
SOLUTIONS, INC., AS SUCCESSOR-IN-     :        OF
INTEREST TO WHITTAKER CLARK &         :
DANIELS, INC.; BRENNTAG SPECIALTIES,  :      TRIAL
INC., f/k/a MINERAL PIGMENT           :
SOLUTIONS, INC., AS A SUCCESSOR-IN-   :
INTEREST TO WHITTAKER CLARK &         :
DANIELS, INC.; CYPRUS AMAX MINERALS   :
COMPANY, INDIVIDUALLY AND AS          :
SUCCESSOR-IN-INTEREST TO AMERICAN     :
TALC COMPANY, METROPOLITAN TALC       :
COMPANY, INC., CHARLES MATHIEU,       :
INC., RESOURCE PROCESSORS, INC.;      :
IMERYS TALC AMERICA, INC., f/k/a      :
LUZENAC AMERICA, INC., INDIVIDUALLY   :
AND AS SUCCESSOR-IN-INTEREST TO       :
WINDSOR MINERALS, INC.;, JOHNSON &    :
JOHNSON; JOHNSON & JOHNSON CONSUMER,  :
INC. f/k/a JOHNSON & JOHNSON          :
CONSUMER COMPANIES, INC.; WHITTAKER   :
CLARK & DANIELS, INC., INDIVIDUALLY   :
AND AS SUCCESSOR-IN-INTEREST TO       :
AMERICAN TALC COMPANY, METROPOLITAN   :
TALC COMPANY, INC., CHARLES MATHIEU,  :
INC., AND RESOURCES PROCESSORS,       :
INC.; JOHN DOE CORPORATIONS 1-50;     :
JOHN DOE CORPORATIONS 51-100,         :
                                      :
              Defendants.
```

```
                    Place:  Middlesex County Courthouse
                            56 Paterson Street
                            New Brunswick, NJ 08903

                    Date:   September 4, 2019
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

20

```
 1    they complain about here.
 2              And then, you saw Dr. Hopkins, who is head of
 3    product safety for talc, come in here and testify.  You
 4    saw Dr. Nicholson, the Doctor they had on video who
 5    talked about some of the issues in the case.  Dr.
 6    Musco, the burn nurse, who they also deposed.  The
 7    people who they complain about, who they alleged did
 8    the worst kind of things.  I mean, they've alleged that
 9    this -- these people hurt babies, hurt people on
10    purpose.  That they knew there was asbestos in their
11    product, and they continued to sell it.
12              They've accused them of being monsters and
13    killers.  Liars and cheaters, the Plaintiffs' lawyer
14    said in opening statement.  People that have babies
15    themselves.  Some of them, grand babies.  You don't
16    just drop your kids off for school one day -- some of
17    them, like all of us, maybe help out at PTA, coach
18    sports teams, volunteer work.  We don't do that and
19    then just go to work and decide to be monsters and
20    killers.  That doesn't make any sense.  And you don't
21    stay in business as long as J&J has by doing the kinds
22    of things that they've alleged.
23              And maybe some of you saw what was going on
24    from the beginning, because I submit to you, if you
25    view the evidence through the lens of your common
```

21

```
 1    sense, you can see the difference between science and
 2    truth and facts in the real world, and lawsuit fiction.
 3    Stories crafted by well-traveled, well-paid,
 4    multimillion dollar experts, and the lawyers who hire
 5    them again and again to try to win lawsuits for money.
 6    And I submit to you that the crafted lawsuit story
 7    doesn't stand up to the evidence, to the truth, to the
 8    facts.
 9              When you saw in the beginning of the case
10    when Dr. Longo was on the stand, Mr. Panatier talked
11    about banned asbestos products.  Do you remember that?
12    That there was asbestos in gaskets and in brake pads
13    and in wall mud and in insulation and other products.
14    And then, you heard that Dr. Moline, their medical
15    expert, Dr. Longo, their testing expert, Dr. Brody,
16    their animal studies expert, Dr. Maddox, their
17    pathologist, that all of those experts have testified
18    again and again and again for plaintiff's lawyers in
19    asbestos cases like this.  Now, these products are
20    banned.
21              And they have made millions.  You heard, and
22    the Judge is going to give you an instruction that you
23    can consider the amount of money experts have been paid
24    in deciding whether to believe them or not, in deciding
25    their credibility.  And all of these experts have made
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

22

```
 1    millions and millions of dollars, testifying again and
 2    again for plaintiff's lawyers in asbestos products for
 3    money.  And those products are now banned, and they
 4    came up with a new target, right?  Keep the money train
 5    going, these experts.  Dr. Longo, over 30 million
 6    dollars.  Dr. Moline, over 3 million.  Dr. Maddox, over
 7    5 million.  Dr. Brody, millions.
 8              Why, all of a sudden, after 125 years baby
 9    powder has been on the market.  Why all of a sudden?
10    J&J -- and they talked about the lawsuits, right?  You
11    heard about the lawsuits.  Since 2017, they have been
12    filing lawsuit after lawsuit against J&J.  Because they
13    can get juries to believe that there is asbestos in
14    baby powder, the money train goes on for a long time,
15    right?  A lot of people use baby powder.
16              And what do they do to try to create a
17    lawsuit story?  They resurrect -- they resurrect it,
18    and a repackaging, and I submit to you, trying to
19    resell and issue that was all over the news in the
20    1970s.  That was investigated to death by the best
21    third party experts in the world.  That the FDA
22    investigated, and concluded that there was nothing
23    there.  That there was no truth to this.  Fifty years
24    ago, this was investigated and put to bed.  Why, all of
25    a sudden, now?  Let's resurrect it.  Maybe we can get
```

23

```
 1    juries to believe it.  And if we yell asbestos,
 2    asbestos, asbestos enough in a courtroom, maybe we can
 3    scare juries into believing it's true, even without the
 4    evidence.  Even without the science.
 5              Because asbestos is scary.  A lot of you,
 6    when we interviewed you in jury selection, knew about
 7    asbestos, and knew about how bad it could be, because
 8    -- and they know that.  Maybe we can scare jurors into
 9    believing that there is truth to this.  And maybe they
10    can convince some juries.  Folks here are not that
11    naive, and not that gullible.  This jury is asking very
12    sophisticated, very hard questions.  And maybe some of
13    you saw what was going on and can tell the difference
14    between the lawsuit fiction and the science and the
15    evidence in the real world.
16              And who did they bring as the ringleader for
17    the lawsuit story?  The 31 million dollar man.
18    Remember, he said, oh, I didn't make 31 million
19    dollars.  My lab did.  Then, you heard he owns 75
20    percent of the lab, right?  And he has testified 2,000
21    to 3,000 times in lawsuits, 90 to 95 percent of his
22    work is for plaintiff's lawyers and asbestos lawsuits.
23    He testifies every week, going from courtroom to
24    courtroom, helping plaintiff's lawyers, mostly
25    plaintiff's lawyers, try to win lawsuits for money.
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

24

```
 1              He is listed by every plaintiff's lawyer in
 2    the country.  Why do you think that is?  Even if they
 3    don't ask him, they put him down.  They think he's a
 4    sure thing.  You heard he didn't even test the product.
 5    And when you think about the evidence in this case, ask
 6    yourself.  Why didn't the Plaintiffs' lawyer bring you
 7    one expert who actually testified the final product?
 8              They paid Dr. Longo a lot of money, they
 9    played (sic)  -- remember Dr. Compton, the younger guy,
10    the testing expert?  They paid him a lot of money.  Dr.
11    Webber, the guy that used to work for the New York
12    Department of Public Health, they paid him a lot of
13    money.  All three testing experts, capable of testing.
14    Not one of them did they have test the Baby Powder or
15    the Shower to Shower.  They have the burden of proof.
16    Why didn't they bring you a testing expert that
17    actually tested the product?  He was just the
18    testifier.  They didn't bring any of the people from
19    his lab who actually tested the product, and I'm going
20    to show you why.
21              And then, you heard when Dr. Longo got hired
22    in this litigation, in 2017 or so, when they first
23    start suing J&J, he went from jury to jury, and
24    courthouse to courthouse, in depositions as well, and
25    he raised his hand under oath, and he said oh, no, no,
```

25

```
 1    no, no, I have never tested talcum powder before this
 2    litigation.  First time.  Never did.  And then, you
 3    heard that was not the truth at all.  He had tested it
 4    several times before.  In fact, he had to admit when
 5    they were suing brake pads and gaskets and other
 6    things, and he wanted to say it wasn't the talcum
 7    powder, it was the brake pads, he said oh, asbestos in
 8    cosmetic talc, that's an urban legend, a myth, a story,
 9    a fairytale.  Like Jimmy Hoffa under the Meadowlands.
10    Like ghosts, like vampires, Loch Ness monster and
11    Bigfoot.  The notion of asbestos in talcum powder, he
12    said, was a myth, a story.
13              And then, you saw his prior testimony.  He
14    was asked, in 2002, under oath.  Talcum powder that was
15    used on babies.  Did some of that contain asbestos?
16    We've looked.  We've not found it.  Must be the brake
17    pads.  You had sworn in 2002 that you had tested talcum
18    powder used on babies and didn't find asbestos.
19    Answer?  That's what it states.
20              In 2003, have you ever found any asbestos at
21    all in talc used for cosmetic purposes?  No, I have
22    not.  And he tested it with the most sophisticated
23    testing, TEM, the super-duper microscope and the
24    polarized light microscope.  When he was trying to
25    blame other asbestos products like brake pads and
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

30

1   critical to the diagnosis and to determining what
2   caused the mesothelioma.
3           And then, you saw she didn't do it here.
4   Right?  She didn't -- she didn't interview a single
5   plaintiff, a single one of the four, before she
6   concluded that J&J is the cause.  I'm -- J&J is the
7   cause.  In fact, you saw that the Plaintiffs' lawyers
8   filed these four lawsuits saying J&J Baby Powder and
9   for Ms. McNeill Shower to Shower and Baby Powder was
10  the cause of their mesothelioma before they even talked
11  to her.  She said -- she was asked, but the truth is,
12  in all these cases, Plaintiffs had filed their
13  complaints months before alleging J&J caused their
14  cancer, months before you were even sent the
15  information about the case.  And she said, yeah, that
16  appears to be the case here.  They already sued saying
17  it was J&J before they even talked to her.  And then,
18  Dr. Moline said, yup, J&J is the cause, rubber-stamping
19  the complaint without even talking to a single
20  Plaintiff.
21          She -- even look at this.  She said they had
22  none of them, not one of the Plaintiffs, have any
23  evidence of biological exposure.  No biomarkers.
24  That's their own expert.  Their only expert on medical
25  causation has admitted and will look at it that not one

31

1   of the Plaintiffs have any trace of asbestos exposure
2   in their lungs, in their tissue, on their x-rays.  And
3   then, she didn't even interview them before she
4   concluded in her report yes, J&J's the cause.  She
5   examined and interviewed Mr. Barden after she already
6   concluded it was J&J, and then, right before this trial
7   started, she talked to Mr. Etheridge for about 30
8   minutes, after she had issued her report two years ago
9   saying J&J is the cause.  And she's still never talked
10  to or interviewed Ms. McNeill or Mr. Ronning even
11  though she said that's the most important thing.
12  What's going on here?  The difference between science
13  and medicine in the real world, and lawsuit fiction,
14  the lawsuit stories.
15          And then, you heard that Dr. Moline, in her
16  real world medical practice, where she sees patients,
17  not in lawsuits.  She never once has determined that
18  talcum powder was the cause of their mesothelioma.
19  Never.  She only started doing that in lawsuits after
20  being hired by the plaintiff's lawyers against J&J.
21          And you remember this testimony, Mr. Maimon,
22  the Plaintiffs' lawyer here, actually put Dr. Moline on
23  the witness stand a couple of years ago, four or five
24  years ago, in this courthouse.  And that's when they
25  were trying to blame a paint company who had dust in

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

32

1     the paint that they alleged had asbestos in it, and she
2     was asked by Mr. Maimon, isn't it important to look at
3     the miller and miner epidemiology in determining
4     causation?  And Dr. Moline, you remember, testified,
5     it's the most important thing.  The miller and miner
6     epidemiology is the best evidence.  Look at the people
7     with the highest exposure.  That was her testimony a
8     few years ago when they were suing against the paint
9     company.  And now, she's like oh, no, no, no.  Sue
10    against somebody else, miller and miner epidemiology,
11    not good.
12              She testified in that case, where Mr. Maimon
13    put her on the stand, that the very studies that J&J
14    relies on here, the Italian and Vermont epidemiology
15    studies, the very studies that J&J relies on here were
16    the best evidence, and they showed no increased risk of
17    mesothelioma.  Those studies haven't changed.  Same
18    studies.  She had no criticisms of them then.  In fact,
19    she said they were the best evidence.  She's changed
20    180 degrees.  The truth shouldn't change based on who
21    you're suing.  The studies haven't changed.
22              And then, Dr. Webber.  Remember Dr. Webber?
23    He was the New York Public Health official?  He used to
24    be a Public Health official in New York.  Now, he's
25    not.  And now, he's acknowledged 100 percent of his

33

1     earned income comes from plaintiff's lawyers suing in
2     asbestos lawsuits.  One hundred percent.
3               And Dr. Webber said yes to Mr. Maimon's
4     questions over 200 times.  Anything he asked him.  Yes.
5     Yes.  Yes, and yes.  And another testing expert who
6     didn't test any product.  And you remember -- and
7     actually, he was the most qualified of all the -- he
8     went around certifying labs.  He was a well-qualified
9     testing expert.  And Mr. Maimon said, oh, you retired,
10    that's why we didn't send anything to you.  And he
11    said, oh, no, I could test, I have access to labs.  I
12    could have tested it if you sent me it.  He could have.
13    They didn't want to risk it.  They had Dr. Longo, the
14    sure thing.  They weren't going to chance Dr. Webber
15    not saying oh, yes, there's asbestos.  Why didn't they
16    have him test?
17              And when Dr. Webber was a public health
18    official, he said the exact opposite thing than what he
19    told you jurors here.  He actually agreed with J&J when
20    he was an official trying to protect the public health.
21    Here's what he said.  "While a particle may well be
22    defined as a fiber when it has the 3:1 ratio, it may
23    not be an asbestos fiber."  Just because it's 3:1, he
24    said, that doesn't mean it's asbestos, necessarily.
25    That's the exact thing that J&J has been saying here.

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

36

```
 1    2014, including he had a test for talc.  There's
 2    nothing about heavy liquid concentration separation.
 3    Another story he's come up with after he left the
 4    public health.  Now, he's saying, oh, you should
 5    concentrate.  But he published a testing standard that
 6    didn't say that at all.  Again, ask yourselves.  What's
 7    going on here?  Why is things so different?
 8                    (Barking noise intensifies)
 9             MR. PANATIER:  Your Honor?  I just have to
10    object.  Something is barking at me over here?
11                    (Barking noise stops)
12             THE COURT:  Yeah, I hear it.
13             MR. PANATIER:  And I can't pay attention.
14             MS. SULLIVAN:  We'll turn that down.
15             THE COURT:  Thank you.
16             MS. SULLIVAN:  Dr. Compton, another
17    Plaintiffs' expert, testified for the plaintiff's
18    lawyers over 200 times.  Never testified for defense.
19    Another expert whose been well-traveled and testified
20    against the brake pads and the insulation.  And another
21    testing expert who didn't test the final product.  He
22    tested ore, but you heard J&J did exploratory sampling
23    to see what ore to use.  So, you have to test the final
24    product to see if there's asbestos.  Why didn't he?  He
25    could have.
```

37

```
 1             Again, why did they have three testing
 2    experts, and not one of them tested the final product.
 3    And Dr. Compton was asked how much money he made.  He
 4    couldn't tell you.  Maybe it was too much to count.
 5    Who knows?  He wouldn't tell you.
 6             And then, so what else did they do to come up
 7    with a lawsuit story?  Well, J&J produced millions and
 8    millions of documents in this litigation, some of them
 9    going back to the '40s and '50s, and they selected out
10    a few, and I submit to you they showed you one line,
11    cherry-picked out a line, without showing you the rest.
12    Showed you one document without showing you the
13    document that makes clear what the story really is.
14             I mean, it's easy to manufacture.  Imagine
15    someone picking out anything you said over, you know,
16    20 or 30 years, and just showing one piece of it and
17    not the rest.  Not the whole story.  And I'm going to
18    show you some examples of what they did here.  And they
19    kept talking about company documents, you didn't see
20    the company documents.  The company documents don't
21    support their case.  The company documents, as you've
22    heard, have been on J&J's website for the public to see
23    for a year or so.  The company documents -- their most
24    challenging part of this case is the company documents
25    say again and again that by TEM testing, polarized
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

54

```
 1    fair amount of Dr. Pooley.  Their own expert. Dr.
 2    Brody, said that Dr. Pooley was one of the most well-
 3    respected testing experts in the world.  And again, J&J
 4    didn't go to any Tom, Dick, and Harry.  They went to
 5    the best experts in the world, and the reason Dr.
 6    Pooley was so good at it is because, as you heard from
 7    Dr. Attanoos, there was a lot of problems with asbestos
 8    in the UK and in Wales at the time, and he had a lot of
 9    expertise in testing asbestos.
10             And he actually went to J&J's mines in Italy
11    and in Vermont, and he said, you've got some tremolite,
12    and we told the FDA about that, and we'll talk more
13    about that.  But it's not asbestos.  And he went back
14    to 1949, testing these -- the 5/0 talc is the Italian
15    talc that J&J used in Great Britain and the United
16    States, there's no dispute about that.  And he said
17    that there was no asbestos in shipments from 1949, and
18    he said the same thing about the Vermont talc, not
19    asbestiform in character.
20             And then, to the government's credit, again,
21    they didn't take everybody's word for it.  They
22    actually went in the Vermont mines themselves, right?
23    NIOSH, again, people that don't have an interest in
24    this case.  The government and scientists from the
25    National Institute of Occupation and Safety Health,
```

55

```
 1    scientists from the Occupational Safety and health
 2    Agency, two government agencies, and scientists from
 3    Harvard.
 4             They actually went into the Vermont mine and
 5    they took air samplings all over the Vermont mine, and
 6    they took bulk samples of the product from the Vermont
 7    mine, and they tested with the best methods available,
 8    the petrographic microscope, the x-ray, and the step-
 9    scanning, and the transmission, the super-duper
10    microscope.  No asbestos.  They couldn't find it
11    anywhere, and none in the air sampling.  Nowhere in the
12    mine.  None of the bulk samples.
13             These were three mines including J&J.  The
14    government says, you know what?  Baby powder is so
15    popular, and this is so important, I'm going to go in
16    the mine myself with myself with my scientists and with
17    Harvard and look.  The facts and the science and peer
18    reviewed published literature doesn't add up.  Doesn't
19    support the lawsuit story, the lawsuit fiction.
20             And the FDA continued to test.  In 2009,
21    2010, they went -- again, they used a TEM microscope
22    and the PLM, the polarized mic, the two super -- the
23    super-duper and the other one that's pretty sensitive,
24    and they looked down to four parts per million.  Look
25    at the detection, it's down to almost nothing.  And
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

62

```
 1    chrysotile with it.  So, they're -- the same thing.
 2    They rejected it as a testing method.  The FDA said
 3    that they couldn't find chrysotile concentrating --
 4    using the concentration method.  So, why would you
 5    adopt a method that doesn't find the most common form
 6    of asbestos?
 7            So, the FDA did not agree with Dr. Longo that
 8    the concentration method was a good way to test for
 9    talcum powder.  They looked at it, they examined it,
10    and they said why use a method that doesn't find the
11    most common form of asbestos?
12            And then, sometimes lawyers like to use
13    props, maybe when you don't have evidence.  And you saw
14    the bathroom scale shown here where they put ping pong
15    balls on the bathroom scale, and then they put ping
16    pong balls on the jeweler's scale, and they said, oh,
17    the concentration lets you find something when it's --
18    because it's more sensitive, even though Dr. Blount,
19    who invented it for talc, who published on it, said
20    it's equally accurate, not more sensitive.  And then,
21    you saw all of us could see with our eyes the ping pong
22    balls.  And J&J, using multiple SWAT -- like a SWAT
23    team, multiple testing methods, if you don't see one
24    thing with x-ray, you can see it with PLM.  Some
25    things, you can see it with TEM that you can't pick up,
```

63

```
 1    the morphology, the color, and the shape of the fibers
 2    that you can pick up with PLM.
 3            So, when you use all the methods, just like
 4    we can see with a different method, our eyes, on those
 5    scales, you can find asbestos.  Well, lawyer shows and
 6    props are not evidence, right?  Where's your evidence?
 7    The FDA said the concentration method wasn't any good
 8    for testing talc.
 9            And when you don't have evidence, sometimes
10    you have to create it.  And so, you saw that they said
11    -- they gave Dr. Hopkins, when he was testifying, the
12    corporate representative who was from the UK, worked in
13    the US for a while as well, but he sat up here, and
14    then they showed him two binders of reports.  And they
15    said, well, you're saying that J&J denies that talcum
16    powder causes mesothelioma, yet the company said it was
17    possible in these reports, remember that?
18            Then, it turns out each and every one of the
19    reports in those two binders, each and every one of the
20    reports in those two binders, were because the
21    Plaintiffs had filed -- the Plaintiffs' lawyers had
22    filed a lawsuit.  And the company, as part of their
23    internal policy, the way a good company should, they
24    have a protocol that says you have to put it in as
25    possible when you get any report.  In accordance with
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

64

1  company policy, all spontaneous cases are considered
2  possible at the time of entry.  So, they create the
3  evidence.  They file a lawsuit, we got to log it as
4  possible, because you don't just dismiss it.  You look
5  at it.  You investigate.
6         And they asked Dr. Hopkins these questions
7  even though Mr. Panatier had taken Dr. Hopkins'
8  deposition many times over several days.  And he knew
9  that J&J had done a clinical review of a bunch of these
10 adverse event reports, and found that there was no
11 evidence.  Did not identify any data to provide
12 evidence to indicate a causal association between the
13 product use and the mesothelioma.
14        So, they create their own evidence.  They
15 say, we'll file these lawsuits.  You say, it's
16 possible, because we have to.  That's what a good
17 company does.  And then, they do an analysis with the
18 doctors, and they say, no, the evidence doesn't support
19 it.  They knew that when they were asking Dr. Hopkins
20 that.
21        You also heard the Judge gave you an
22 instruction that both sides agreed to.  These adverse
23 event reports that J&J's been getting since these
24 lawsuits started in 2017, they've been sending all the
25 ones in those binders Dr. Hopkins got, all of them,

65

1  went to the FDA.  They went to the FDA.  The FDA knows
2  about this.  The FDA has never changed their mind that
3  there's no hazard with talcum powder.  The FDA has
4  never required a warning.  They've never changed that
5  stance.  They know about these lawsuits.  Everybody
6  knows.  You saw.  They showed you the New York Times
7  article from last year.  There's no secret.  A lot of
8  you said in jury selection you know.  The Plaintiffs'
9  lawyers talked about the Plaintiffs themselves, some of
10 them talked about the lawyer commercials.  There's no
11 secret.  The FDA knows these allegations are there.
12 They don't believe it's true.  They don't believe it's
13 supported by the evidence.
14        All of those adverse events driven by
15 lawsuits.  Most times, you get adverse events from
16 doctors, right?  Your doctor reports them.  Every one
17 of them, I think he found one out of hundreds from
18 somebody that wasn't a lawyer.  It might have been a
19 duplicate of a lawyer, but one.  But not from any
20 doctors.  This has been all over the press.  Doctors
21 know about it.  They know about this issue.  There's no
22 science to support it.  Where's that evidence?
23        All of these reported -- and there's a --
24 they may claim, oh, all the stuff in the complaint, you
25 don't put in.  This is -- the FDA has a very specific

66

```
 1    format that requires you to -- they require you to fill
 2    out because they have a -- and I'm not as good with
 3    computers as some of the folks on the other side.  But
 4    they have computer systems where you can pull up and
 5    log in to the exact kind of information you want.  So,
 6    the FDA has a very specific format in terms of the
 7    information they want, and they may say oh, you didn't
 8    put all the information that's in the complaint in the
 9    form.  We put what the FDA wants you to put, what they
10    dictate you put in this MedWatch form.
11            And J&J sent each and every one of these
12    serious adverse reports, these allegations from these
13    lawsuits, to the FDA.  And the FDA confirmed receipt.
14    There's an FDA number on their website of each and
15    every one of them.
16            And what's the testing evidence here?  The
17    testing evidence comes from the guy who didn't test,
18    but he talks about how -- what his lab did, and all of
19    the bottles -- many of the bottles he got from
20    Plaintiffs' lawyers came from eBay, remember?  He
21    bought it from eBay.  Some came from the Plaintiffs'
22    lawyers' relatives, and they have the burden of proof.
23    No testing expert, no biological markers of asbestos
24    exposure in any of the Plaintiffs, and no bottles of
25    talcum powder that any of them used that could be
```

67

```
 1    tested.
 2            They didn't test any bottles that the
 3    Plaintiffs used.  Some of you might have caught this,
 4    when he said what's your common sense tell you about
 5    this?  Every single bottle of J&J talcum powder that
 6    Dr. Longo just pulled off the shelf and tested, even he
 7    had to admit.  He couldn't even see anything that they
 8    could even call asbestos.  Nothing.
 9            All of the off the shelf bottles, even they
10    had to admit, no asbestos.  And even he said in almost
11    40 percent of the bottles that they tested, they
12    couldn't find any fragment that they could even call
13    asbestos.  Nothing.  In everything off the shelf, no
14    asbestos.
15            And they talked about exposure analysis, and
16    that's what you do to figure out if there is asbestos,
17    if you're getting more than background, how much, you
18    know, they simulate the exposure, like, they do -- they
19    model in this lab how you use the powder and then they
20    collect the dust to simulate how much, if there is
21    asbestos exposure, you get.  He didn't do an exposure
22    analysis for a single plaintiff in this case.  He's
23    done it in other cases, but he didn't do it for any of
24    the Plaintiffs here.  When you got four really sick and
25    sympathetic plaintiffs against a big company, I guess
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

68

1  they think they don't need any evidence.
2          They didn't even bring you one.  They talked
3  about Shower to Shower and Ms. McNeill's bed sheets.
4  They didn't an exposure analysis to see whether that
5  actually causes more than background inhalation.  They
6  didn't do that study if there is asbestos.
7          They didn't do a study about how -- whether
8  -- where she alleges she puts it in her boots.  No
9  exposure analysis.  No exposure analysis for how Mr.
10  Ronning used it, how Mr. Barden used.  They just used
11  one for some other plaintiffs who used it in no way
12  like Ms. McNeill.  Said, oh, you know, the jury won't
13  care about the evidence.
14          They have the burden of proof.  They didn't
15  bring you it.  They got to bring it.  Even if you got a
16  case against a big company, you got to bring it.  And
17  they used 70 and 80 year old unsealed bottles for his
18  exposure, two exposure analyses he did that don't
19  relate to these Plaintiffs.  They used the oldest
20  bottles he could find.  One from the Plaintiffs'
21  lawyer's relative, remember that?  Holes are as big as
22  -- much bigger than they are now.  Even he had to admit
23  asbestos fibers could fit in there.  What's going on
24  here?
25          I submit to you, the Plaintiffs' case, when

69

1  it comes to the company documents, when you don't have
2  evidence, you cause confusion.  You try to cherry-pick.
3  You try to mislead.  And I want to show you that.
4          You Honor, this may be a good time, if it
5  makes sense for a break?
6          THE COURT:  Members of the jury, we're going
7  to take the break now.  Fifteen minutes.  Be ready to
8  come back upstairs at five-of.  You have not yet
9  received this case and no discussions with regard to
10  it, and no research of any kind whatsoever.  See you at
11  five-of.
12                  (Jury exits)
13          THE COURT:  I'll see Counsel at sidebar.
14          (Sidebar commenced at 10:37:50 a.m.)
15          THE COURT:  We're on sidebar?
16          COURT CLERK:  Yes.
17          THE COURT:  Ms. Sullivan, there is a motion
18  in limine at the beginning of the -- before the
19  beginning of the trial, and I made a ruling and you
20  have violated that ruling during the course of the
21  trial, and now again, during summations.  Using
22  terminology such as, "Lawyer shows and props."  "When
23  you don't have evidence, sometimes you have to create
24  it."  I don't know how many times I need to review this
25  with you.  And I'm just going to add this conduct to

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

70

```
 1        the pending motion.
 2               MS. SULLIVAN:  Your Honor, just --
 3               THE COURT:  "Lawyer shows and props."  "When
 4        you don't have evidence, sometimes you have to create
 5        it."
 6               MS. SULLIVAN:  Your Honor --
 7               THE COURT:  How do you think that that
 8        comports with the Rules of Professional Conduct?
 9               MS. SULLIVAN:  And Your Honor, in response,
10        the adverse event reports were created by lawsuits.
11        So, that's consistent with the evidence.
12               THE COURT:  Lawyer --
13               MS. SULLIVAN:  And so --
14               THE COURT:  "Lawyer shows and props."
15               MS. SULLIVAN:  They were props.
16               THE COURT:  No, Counsel.
17               MS. SULLIVAN:  And second --
18               THE COURT:  Not props.
19               MS. SULLIVAN:  And second, Your Honor, I
20        think it's fair to point out the difference between the
21        story and the allegations.  That's typical on the
22        evidence.
23               THE COURT:  "Lawyer shows and props," and
24        accusing the attorneys of creating evidence is not a
25        fair comment on the evidence.  You are attacking the
```

71

```
 1        profession, you've been warned about this.  There's an
 2        order that was entered with regard to this, and you
 3        have the responsibility of knowing the RPCs just like
 4        everyone else.  So, I think you should be careful in
 5        the remainder of your summation.  Is there anything
 6        further for the record now?
 7               MR. PLACITELLA:  Your Honor, I have a long
 8        list, which I was just going to wait until the end of
 9        summation about things like that that have been said.
10        And I haven't jumped up and down because -- out of
11        courtesy.  I'm sure Mr. Panatier wrote down things
12        different than me.
13               MR. PANATIER:  If -- I have plenty.  If, Your
14        Honor, if they're preserved, we can do it at the end?
15               THE COURT:  They're preserved.
16               MR. PANATIER:  Okay.
17               MR. PLACITELLA:  Thank you.
18               THE COURT:  But I caution you to proceed
19        accordingly and to be mindful of your responsibility to
20        your client to comply with the Rules of Professional
21        Conduct.
22               MS. SULLIVAN:  Right.  Of course, Your Honor.
23               THE COURT:  Thank you.
24               (Sidebar concluded at 10:40:30 a.m.)
25                         (Pause)
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

94

1   unsuitable technique to adopt.  That was the expert's
2   conclusion.  That's why the FDA and J&J and others
3   aren't using it for testing of talc.
4          And then, they showed you this document,
5   Plaintiffs' 1458, which says, oh, look, they didn't
6   want to use it because it was too sensitive.  Well,
7   it's like if you have a Geiger counter on the beach,
8   and you keep finding seashells instead of metal or
9   jewelry, you keep finding the regular rock instead of
10  asbestos?  Yeah.  You don't want that.  You want a
11  method that finds the asbestos, not a method that finds
12  stuff that's not asbestos.  And both the FDA and the
13  independent experts rejected the concentration method
14  as a good way to find asbestos in talc, particularly
15  because as their experts agreed, the concentration
16  method can't find the most common form of asbestos.
17         Then, they talked to Dr. Hopkins about this
18  document, I think Mr. Panatier talked to him at length
19  about it, Plaintiffs' Exhibit 2549, October 5th, 1974.
20  It's a review meeting at J&J, and remember this.  He
21  kept trying to -- the Plaintiffs' lawyer kept trying to
22  get Dr. Hopkins to agree that J&J had concerns about
23  using TEM.  That J&J had grave concern, remember that?
24  But Dr. Hopkins said this is an outside -- the CFTA is
25  an outside industry group, and we were reporting on

95

1   what other people were saying at the meeting, and why
2   would J&J have grave concerns in 1974 when they've
3   already been using TEM.  They've already had a -- you
4   saw, it was part of their regular quality assurance
5   protocol since 1973, using it in some form since '71,
6   but on a regular basis, since '73.  So, why?  That's
7   not J&J.  They're already using it.  Again, choosing to
8   mislead you.  Spinning the company documents in a way
9   inconsistent with the facts.  Inconsistent with the
10  truth.  They'll probably show you that one again, too.
11         Then the round robin testing, the companies
12  and the FDA doing what you hoped they would do.  Trying
13  out a way to make sure they can find asbestos in talc.
14  Trying out all kinds of testing methodology, and then,
15  testing it to see if it works.  And so, this is, on
16  March, 1977, Defense Exhibit 8012.  And they're testing
17  tremolite, and they say this is the regular tremolite,
18  the good kind, not -- should not be detected as
19  asbestos.
20         And then, you remember the Plaintiffs' lawyer
21  saying oh, well, why wouldn't you use asbestos, you
22  know, something about if you're looking for grapes, why
23  would you put oranges?  If you're looking for oranges,
24  why wouldn't you put grapes?  But then you heard the
25  truth was they did use.  This UISCC is asbestos,

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

102

```
 1              THE COURT:  I don't know that the Jury
 2     understood that distinction.  You said these lawsuits.
 3     We've been talking about the entirety of the lawsuits.
 4     There's been mention of Plaintiffs' other mentioning of
 5     the lawsuits.  So, how these jurors are going to
 6     distinguish what you meant was just these four, I do
 7     not know.  Anything else?
 8              MS. SULLIVAN:  Yes, Your Honor.  They have
 9     made the worst kinds of allegations against Johnson &
10     Johnson --
11              THE COURT:  Do you understand that you are
12     not supposed to be denigrating lawyers?  Do you
13     understand that calling them sinister is denigrating
14     lawyers?
15              MS. SULLIVAN:  No, Your Honor.  I
16     respectfully disagree --
17              THE COURT:  You have referred to Plaintiffs'
18     lawyers repeatedly as doing sinister things.  That is
19     to stop.
20              MS. SULLIVAN:  That's actually not true, Your
21     Honor.  I'm saying they're making the most sinister
22     allegations against us, which is the truth.
23              THE COURT:  You are calling the attorneys
24     sinister.  You should listen to what you're saying.
25     Don't -- oh, don't speak while I am speaking.
```

103

```
 1              MS. SULLIVAN:  I'm sorry.  I apologize, Your
 2     Honor.
 3              THE COURT:  Don't try to undermine me.  When
 4     I am giving you a ruling and instruction as to how you
 5     are to complete your statement, closing statement to
 6     this jury.  Stop denigrating the lawyers or you find
 7     yourself at the risk of having this entire summation
 8     struck from the record.  Continue.
 9              MR. PANATIER:  Thank you, Your Honor.
10              (Sidebar concluded at 11:43:09 a.m.)
11              MS. SULLIVAN:  This is Plaintiffs' Exhibit
12     2415, and you remember the Plaintiffs' lawyer showing
13     you this do not use this report, suggesting there was
14     something nefarious going on here.  And then, you saw
15     the truth, right?  That this related to Dr. Lewin's
16     testing of baby powder, the one where he in his second
17     test said there was no asbestos in Johnson's Baby
18     Powder, and they showed you McCrone, a few tremolite
19     rods were observed in both samples at a level less than
20     a fraction of a percent.  And they said no asbestos, no
21     chrysotile, as Dr. Lewin had claimed he found was
22     there.
23              And then, McCrone, knowing this was going to
24     the FDA, as you saw, the great lab that they were, they
25     said -- they did a follow-up, and they said before,
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

118

```
 1    distinguish.
 2              Any maybe some of you remember when Mr.
 3    Panatier handed out these pictures to you, claiming
 4    this is asbestos, this is asbestos.  Maybe some of you
 5    noticed this, and I want to just put it up.  This is,
 6    and I'm going to identify it as M69042-002BL-001.  And
 7    he showed you this, suggesting it was asbestos.  But
 8    look what the analysts at Dr. Longo's lab wrote.  They
 9    didn't write anthophyllite asbestos, did they?  They
10    didn't write asbestos at all.  They just said
11    anthophyllite.  And you know you can have the good
12    anthophyllite, and you can have the anthophyllite
13    asbestos, but they didn't write anthophyllite asbestos.
14    Maybe some of you noticed that.  Why do you think they
15    didn't they bring those testers here, the ones who
16    actually did the tests?  They weren't finding asbestos.
17              Maybe some of you noticed on the second
18    picture, the same thing.  It doesn't say asbestos.  It
19    just says anthophyllite.  And it doesn't look anything
20    like what the government report says anthophyllite
21    asbestos looked like.  It's not the hairy rock.  Oh,
22    I'm sorry, do you mind if I go back?
23              All right.  So, I submit to you, the
24    Plaintiffs' case is based on confusion, and based on
25    cherry-picking lines out of the document without
```

119

```
 1    showing you the truth.  And we disclosed, here's
 2    submissions to the FDA.  Remember, Mr. Panatier had the
 3    -- and he still has it over there, the inbox, outbox,
 4    right?  This is what went to the FDA.  What went to the
 5    world.  We told them.  We told the FDA we had some
 6    tremolite.  Not asbestiform, but we have it.  We told
 7    the FDA, submission, another submission to the FDA,
 8    that we have tremolite and actinolite.  We told them
 9    about the tremolite rods.  It wasn't a secret.  It was
10    disclosed to the FDA.
11              In fact, we told the FDA we didn't think it
12    was asbestos, but if you want to -- if you want to
13    consider it, we said, this talc contains essentially no
14    anthophyllite, and only minor amounts below one percent
15    of tremolite and actinolite, or in other words,
16    contains less than one percent, if any, asbestos
17    particles.  We didn't think it was, but if you want to
18    say it's asbestos particles, we have it.  We told the
19    FDA.  That was part of the disclosures.  To suggest
20    that J&J was hiding that?  Not the truth.  We told the
21    FDA, fully disclosed.
22              We told the FDA, when they were considering
23    regulation, I guess some companies had suggested you
24    could wash out asbestos?  We said that is not true.  We
25    told the FDA the assumptions we believe to be incorrect
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

120

1  are as follows, that talc can be processed to remove
2  asbestos.  We told them you can't wash it out.  That's
3  why we did all this testing for it.  Fully disclosed to
4  the FDA what was in our product, and that you couldn't
5  -- oh, did I mess this up, Jack?  I'm frozen?  I'm
6  frozen.  Apologies.  Oh, there we go.  It's fixed.
7  Okay.
8          Then, you saw that there were different
9  definitions that the government -- actually, the
10  government had consistent definitions.  And you saw in
11  one of the things, again, I submit the Plaintiffs' case
12  is based on confusion, and it's confusing, they're
13  trying to confuse you between what is regular, old,
14  good rocks that you see in the mines and every day, and
15  harmful stuff.
16          But then, you saw that just because it says
17  amphibole, most rocks are not asbestos.  Overwhelmingly
18  majority, 99-point-something percent of rocks are not
19  asbestos.  And that's true for -- their experts
20  acknowledged that tremolite does not necessarily mean
21  asbestos.  Anthophyllite does not mean asbestos,
22  necessarily.  And actinolite does not mean asbestos,
23  because there's two kinds of those things.  And the
24  EPA, OSHA, the Mineral -- the Mining Safety and Health
25  Agencies all make a distinction.  All of them agree

121

1  with J&J's position in this case, and with Dr.
2  Attanoos' position, that there's a difference between
3  asbestos tremolite, asbestos anthophyllite, and
4  asbestos actinolite.  And to be asbestos, to be the
5  harmful kind, it has to be the asbestiform kind.
6          And why defy -- ask yourself.  If they say it
7  doesn't matter, right?  Dr. Webber said it doesn't
8  matter, this 3:1.  Then why do all of these government
9  agencies and testing, why do they define it?  Why do
10  they say it has to be the asbestiform if it doesn't
11  matter?
12          Because it does matter.  And OSHA, the
13  government did a fairly extensive analysis that you
14  looked at, looking at all of the science on asbestos
15  and on non-asbestos, anthophyllite, actinolite, and
16  tremolite, these good rocks.  And they concluded,
17  looking at the human studies, looking at the animal
18  studies, looking at cell studies, they concluded --
19  this is the government.  Again, people that have no
20  interest in this case, right?  OSHA has made a
21  determination that substantial evidence is lacking to
22  conclude that non-asbestiform tremolite, anthophyllite,
23  and actinolite present the same type or magnitude of
24  health effects as asbestos.
25          So, the government disagrees with Plaintiffs'

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

122

```
 1    case.  They say you have to look.  You have to know
 2    whether it's asbestos or not, because the non-asbestos
 3    kind of rock is not harmful.  And it's not just OSHA.
 4    Multiple government agencies have looked at this issue.
 5    Here's the Department of Interior testing some talc and
 6    saying the tremolite fragment noted in the report is
 7    not asbestos, but rather normal, rock-forming
 8    amphibole, which is ubiquitous in the earth's crust.
 9    Regular old tremolite, they're saying, is not asbestos.
10    Normal, FDA agrees.  They have searched the literature
11    without success to find any report on the toxicity of
12    tremolite.
13            The FDA knew -- knows we have tremolite.
14    Occasionally, we had it as an invisible fragment, like
15    all of us breathe every day, and they say no evidence
16    it's toxic.  Same thing for the Consumer Product Safety
17    Commission.  No evidence of a hazard from non-asbestos
18    cleavage fragments.  In fact, studies dealing with non-
19    asbestiform tremolite or other cleavage fragments have
20    not, thus far, shown any indication of a carcinogenic
21    health hazard.  They don't agree with the Plaintiffs'
22    case, the government, that cleavage fragments, 3:1, are
23    harmful.
24            And why -- did -- maybe some of you thought
25    about this.  Why, if they're claiming there's asbestos
```

123

```
 1    in baby powder, are they talking about cleavage
 2    fragments?  It's like plan B.  They can't sell you that
 3    there's asbestos.  Oh, let's argue that the good rock's
 4    bad.  They're arguing about cleavage fragments because
 5    there's no asbestos in baby powder, and they know it.
 6    That's why -- why would they bring up this whole
 7    cleavage fragment thing?
 8            Dr. Blount, we looked at, she disagrees with
 9    them.  No good evidence for adverse effects of these
10    regular old cleavage fragment rocks.  And here's an
11    example we've -- you've looked at with a cleavage
12    fragment.  If you mash it up, it could have the same
13    ratio, if you mash it up, as an asbestos fiber, 3:1.
14    It doesn't make it asbestos.  Their experts agree.
15    Just because you -- we take non-asbestos tremolite and
16    crush it up, that doesn't magically make it asbestos.
17    That is correct.  And that would be the same for
18    anthophyllite, actinolite, and non-asbestos rocks like
19    tremolite.  Just because you mash it up, it doesn't
20    magically become asbestos.
21            And -- but that's the trick here.  That's the
22    Plaintiffs' experts' trick, I submit to you.  What
23    they're doing is calling the regular old good rock
24    asbestos because they have to, because there's no
25    asbestos in Baby Powder or Shower to Shower.  And they
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

124

```
1    actually admitted to you in cross-examination that
2    that's what they're doing.  That the structure -- so,
3    it was the same picture we just looked at, that the
4    structure comes from breaking apart non-asbestos
5    tremolite.  You would agree with me that it does not
6    magically, in fact, become asbestos.  Yes, sir, I've
7    already agreed.  But you would count it and report it
8    in your report as asbestos?  If your hypothetical was
9    true, yes.  They would report it as asbestos even if
10   it's not.  And Dr. Compton agreed to the same thing.
11   You asked me to assume it's not.  I would count it even
12   though you're telling me it's not.
13           That's the trick.  That is the trick, and
14   maybe some of you got it early on.  They are calling
15   non-asbestos, regular, old, cleavage fragment rocks,
16   that we encounter every day in our yards, outside in
17   the world.  They're calling it asbestos, even if it's
18   not.  That is the lawsuit trick that their experts are
19   selling you.
20           Why would they have to -- why would they have
21   to talk about cleavage fragments if they're really
22   finding asbestos?  And then, Dr. Longo, he came in
23   here, their 31 million dollar guy, he said oh, the
24   government makes me count.  They make me count, even if
25   it's not asbestos, if it's 3:5:1, they make me count.
```

125

```
1            Well, that's not the truth.  The government
2    doesn't make him count.  The government says they're
3    easily distinguishable.  Cleavage fragments are easily
4    distinguishable from true asbestos.  Using these
5    microscopic techniques, PLM, you can tell the
6    difference.  You can tell the hairy rock from the
7    straight up cleavage fragment.  And the regulation --
8    for purposes of regulation, a mineral must be one of
9    the six.  It must be asbestos in the growth habit.  And
10   they made fun.  Oh, we don't ask the rock how they
11   grow.  You don't have to ask the rock.  You can see.
12   Is the hairy rock or not?  That's the point.  That's
13   why the government defines it differently.
14           And you heard Dr. Attanoos talk about how
15   dimensions matter.  How there's fiber strength with
16   asbestos that you don't find with cleavage fragments,
17   and they break apartment more easily, so you can exhale
18   them like we exhale all kinds of dust we encounter
19   every day.  That's why there is a difference.
20           And Dr. Longo's own testing method, he
21   testified he used ISO, this stand -- this industry --
22   not industry.  This testing standard organizations
23   method.  But then, we looked at the definitions with
24   him.  His own standard makes him discriminate.  You got
25   to -- the government doesn't make you count.  His own
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

128

1    And here is another government document where
2    they show you a picture, the hairy rock.  Anthophyllite
3    asbestos.  Dr. Longo is saying this is an anthophyllite
4    bundle.  It looks nothing like it.  It looks nothing
5    like it at all.  In fact, his investigators just say
6    it's regular old anthophyllite.  Why did they bring him
7    here to talk to you?
8         The government says here's a picture of a
9    cleavage fragment.  Looks just like what Dr. Longo is
10   saying is asbestos, right?  What the government says is
11   a cleavage fragment looks just like what Dr. Longo says
12   is asbestos.  Another example.  The government says
13   cleavage fragment.  Dr. Longo says it's asbestos.  It
14   looks nothing like asbestos.
15        What's going on here?  Difference between
16   science and the real world, and lawsuit fiction, the
17   lawsuit story, without evidence.  Maybe they can
18   believe -- maybe Dr. Longo can get some juries to
19   believe what he's selling, but maybe not this jury.
20   The folks here are not that naive.
21             MR. PANATIER:  Your Honor, I object to that.
22             THE COURT:  That comment is stricken from the
23   record.
24             MS. SULLIVAN:  Use your common sense and ask
25   yourself, how could it be that the most common of


129

1    products, hundreds of millions of people have used
2    Johnson's talcum powder.  How could it be that one of
3    the most common, one of the most widely used products
4    in history, over 125 years, causes the rarest, rarest,
5    Dr. Diette, our epidem (sic) -- super rare, less than
6    one in a million.  How can it be that the most common
7    of products causes the most uncommon?  Almost nobody.
8    Less than a million a year, three hundred people a
9    year.  Super rare.
10        And ask yourself, when you look at the
11   government Seer data, Dr. Diette says their claim here
12   doesn't add up.  If they're right that diapering a baby
13   from 0 to 3 years with baby powder causes mesothelioma,
14   which is their claim, then how can you have a graph
15   like this?  The average latency is 20 to 40 years.  Dr.
16   Diette says you would expect this spike to be right up
17   here, right?  After 20, 30, 40 years.  Not here.  It
18   should be -- it doesn't make any sense.  It would be
19   right up here.  Where are the mesotheliomas on this
20   graph?  If what they're saying is true, that exposure
21   from 0 to 3 with a latency of 20 to 40 years, you'd see
22   that spike way, way sooner.  But Dr. Diette said it
23   doesn't add up.  It doesn't make sense.  Not consistent
24   with the science.
25        They claim that mesothelioma is a signal

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

136

```
1   that they were exposed to millions and millions and
2   billions of fibers of asbestos.  Why nothing in their
3   lungs?  Why all their lungs are clear according to
4   their own expert?  Why no biomarkers at all?
5           And when you don't see any biomarkers, when
6   you don't see any evidence of exposure, the experts,
7   Dr. Diette and Dr. Attanoos concluded this is the kind
8   of cancer that happens unfortunately to so many people
9   for no reason at all.  And all of us know family
10  members, have suffered through with family members, the
11  horrors of cancer, and it is horrible.  And that's why
12  sympathy is so hard in a case like this.  It's hard to
13  decide a case like this when people are really
14  suffering, right?  We've all seen family members,
15  friends, suffer.
16          But the truth is, most people can get cancer
17  because it just happens.  It's not a satisfying excuse,
18  and it's natural to try to find a villain, or reason to
19  cause.  And we don't blame the Plaintiffs for coming to
20  believe, now, that this is the reason, but it's not.
21  It's the kind of cancer that happens to so many people.
22  We could line the City of New Brunswick, I told you in
23  opening, with people suffering from cancer, and those
24  people have nobody to sue.  And most of those people
25  have no idea why they got it.  Because cancer, as Dr.
```

137

```
1   Attanoos explained to you, and Dr. -- it just happens.
2   It's a DNA mistake.  And most of the time, our bodies
3   can overcome it, but sometimes, not.  It just happens,
4   and it happens to good people.  And it doesn't mean
5   that J&J's Baby Powder caused it, even though I know
6   most of us would like to find a reason to cause,
7   sometimes it just happens.  And there's no evidence
8   here that it happened from baby powder.  There's no
9   evidence.  There's no biological markers.  There's no
10  testing evidence in their containers.  There's no
11  testing expert that they brought you and tested the
12  final product.
13          Mr. Etheridge diagnosed, you heard Dr. Maddox
14  agree, he's got an extraordinarily rare kind of
15  peritoneal mesothelioma.  Ask yourself how the most
16  common of products causes the most uncommon of disease.
17  No evidence of asbestos exposure in his lungs or
18  tissue.  He's -- and in his answer to interrogatories
19  in this case, he talked about three years of diapering
20  being his exposure, and no doctor's ever told him that
21  Johnson's Baby Powder caused his mesothelioma.  I think
22  Dr. Moline said there's something about, oh, well, he
23  used it in the last ten years.  But then, she
24  acknowledged in his deposition, that wasn't -- that
25  wasn't sufficient exposure, because you need ten years
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

172

```
 1              First, on the biomarker issue, it is proper.
 2   They are the Plaintiffs.  They have the burden of
 3   proof.  It is proper to say they have no evidence, and
 4   that's fair.  I mean, it happens all the time.  They
 5   have no evidence of exposure in lungs or tissue.  They
 6   could have brought an expert, and they chose not to.
 7   That's fair.
 8              On the issue of Dr. Attanoos, Your Honor
 9   permitted the jury question about generally, can you
10   test peritoneal tumors for fibers?  And I was
11   referencing that testimony.  That was in evidence.  The
12   Court permitted that.
13              THE COURT:  Here's what the Court had a
14   problem with.  What could have been a good closing
15   statement, commenting upon the evidence, was
16   unfortunately, replete with conduct that this Court has
17   already warned you about, that this Court issued a
18   ruling before opening statements, had to then issue an
19   instruction to the jury after opening statements
20   because you violated the Court's ruling, and throughout
21   the course of this trial, for which there is a pending
22   motion to hold you in contempt.
23              And at sidebar, after the first break, when
24   you started off already commenting upon lawyer driven
25   litigation, lawyer created litigation, lawyer showing
```

173

```
 1   shows and props, and when you don't have evidence,
 2   sometimes you have to create it, referring to the
 3   lawyers, that was replete throughout your entire
 4   closing statement, with other examples, as added by Mr.
 5   Placitella, and there are more.
 6              And so, that is the basis for the Court
 7   considering striking the entirety of your closing
 8   statement, because those kinds of comments were so
 9   replete that to leave in only the appropriate comments
10   on the evidence would be impossible.
11              So, I'll see you all at 2:00.  Thank you.
12   And we're off the record.
13       (Off the record from 1:16:52 p.m. to 2:09:11 p.m.)
14              (Jury enters)
15              THE COURT:  Can you take this down for a
16   moment?  It's in my way.  And move it, the board, the
17   --
18              MR. PANATIER:  Yeah, I'll grab that.
19              THE COURT:  Please be seated and make sure
20   cell phones are turned off.  Members of the jury,
21   before we proceed to the Plaintiffs' closing statement,
22   I have a comment to make.
23              During Counsel's closing statement, she
24   indicated words to the effect that she annoyed the
25   Judge and probably the Plaintiffs' attorneys, too.
```

FILED, Clerk of the Appellate Division, February 25, 2021, A-000047-20

276

```
 1
 2
 3                          CERTIFICATION
 4
 5          I, MARISSA McGILL, the assigned transcriber, do
 6     hereby certify the foregoing transcript of proceedings
 7     on CourtSmart, Index No. from 9:13:23 a.m. to 9:23:04
 8     a.m., 9:25:54 a.m. to 10:40:51 a.m., 10:59:29 a.m. to
 9     1:16:52 p.m., 2:09:11 p.m. to 3:36:35 p.m., and 3:50:25
10     p.m. to 4:36:09 p.m. is prepared to the best of my
11     ability and in full compliance with the current
12     Transcript Format for Judicial Proceedings and is a
13     true and accurate compressed transcript of the
14     proceedings, as recorded.
15
16
17
18        /s/ Marissa McGill                  AOC 732
19          Marissa McGill                   AOC Number
20
21
22       KLJ Transcription Service           02/16/21
23          Agency Name                        Date
24
25
```