UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | CIVIL ACTION NO. 3:16-md-2738-MAS-RLS<br><br>MDL NO. 2738 |

**PLAINTIFFS' STEERING COMMITTEE'S OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE PLAINTIFFS' EXPERT REPORTS**

On October 14, 2021, just days before their deadline to designate all general and case-specific experts for the first bellwether trial, Defendants made the strategic (albeit misguided) decision to attempt to force the resolution of all pending and future talcum powder claims by filing a Chapter 11 bankruptcy petition through its subsidiary, LTL Management LLC (LTL). Defendants' strategy failed twice. The first bankruptcy was dismissed by the Third Circuit, holding that the bankruptcy petition had "no valid bankruptcy purpose" but, instead, was implemented only to "beat back talc litigation in trial courts."[1] Within three hours of the first petition being dismissed, Defendants doubled down and filed a second flawed bankruptcy petition. Like the first petition, the second bankruptcy was dismissed because the debtor lacked financial distress.[2]

The PSC recounts this for one simple reason: Defendants' two failed bankruptcies caused nearly a two-year delay in this MDL. Now, despite acknowledging both the passage of time, new

---

[1] *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt. LLC)*, 58 F.4th 738 (3d Cir. 2023) (dismissing first bankruptcy petition because it was filed in bad faith and debtor was not in financial distress).
[2] *See In re LTL Mgmt., LLC*, 652 B.R. 433 (Bankr. D.N.J. 2023) (dismissing second bad faith bankruptcy because debtor was not in financial distress).

1

scientific publications, and developments in the litigation,[3] Defendants want to freeze the record as it existed in 2021 and demand that Plaintiffs rely upon experts identified and expert reports that were originally served in 2018 – over five years ago. Even more so, Defendants suggest that neither the PSC nor their experts should have continued to review the evidence to further develop the record of how Johnson & Johnson chose to ignore decades of evidence linking its flagship product to ovarian cancer.

The PSC represents the interests of more than 51,000 plaintiffs in this MDL, and leadership has an ongoing, fiduciary obligation to each of these plaintiffs. Discovery in this matter is ongoing and Defendants continue to produce documents that should have been produced years ago. The PSC continues to work to integrate science and facts into this ongoing litigation, including ongoing work with retained experts and finding new experts to support all relevant and necessary legal theories. As recently as August 14, 2023, Plaintiffs filed Plaintiffs' Renewed Motion For Leave To File A Second Amended Master Long Form Complaint (Dkt. No. 26636), to add additional facts, Defendants, and causes of action that arose during expert discovery and the pendency of the *LTL* bankruptcies.

With respect to the current motion, Defendants argue that Plaintiffs' expert disclosures are out of time, ignoring the plain language of the prior and most recent Case Management Orders and misrepresenting the events underlying their present motion. The extraordinary relief sought by Defendants seeks to capitalize on the significant delays that were caused by Defendants' own prior, misguided, strategic decisions. Defendants' motion should be denied in its entirety.

---

[3] *See* September 6, 2023, Transcript of Case Management Conference ("CMC Transcript") at 16:10-24, relevant excerpts of which are attached hereto as Exhibit A (Defendants arguing they would be handcuffed if required to rely upon hearings, reports and science that dates back to 2019).

2

## BACKGROUND

It has been more than seven years since the Judicial Panel on Multidistrict Litigation (JPML) first entered a Transfer Order pursuant to 28 U.S.C. §1407 to centralize these pretrial proceedings in the District of New Jersey. (Dkt. No. 1). At the outset of this litigation, former Chief Judge Freda Wolfson bifurcated the case requiring Plaintiffs to focus first on science and general causation issues. *Daubert* hearings on the issue of general causation were held in July 2019, and the Court issued its *Daubert* ruling on April 27, 2020. In the Opinion, Judge Wolfson stated: "Defendants' argument reveals their disagreement with the conclusions of the experts – not the methodologies employed in consideration of the studies…Where the Court has determined that the experts on both sides have applied a reliable methodology in reaching their conclusions, 'it is up to the jury to decide whether the expert used the best and most reliable methodology.'" *See In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prod. Litig.*, 509 F. Supp. 3d 116, at 168, 192 (D.N.J. 2020) (citations omitted).

On June 11, 2020, the parties filed a joint submission relating to the expert witnesses who did not appear at the *Daubert* hearing but whose methodology was, in effect, examined by the Court. The joint submission stated: "The parties agree that the Court's rulings on the parties' experts' epidemiology and Bradford-Hill analyses will be binding on all experts who offer opinions in those areas." (Dkt. No. 13602).

Following the *Daubert* rulings, the parties continued with additional discovery, including liability discovery, and several state court trials also occurred. By the fall of 2021, this MDL was proceeding toward an MDL trial to occur in late spring or early summer of 2022. On July 2, 2021, nearly three years after Plaintiffs' original expert disclosures, Plaintiffs served case-specific expert reports for the six cases in the bellwether pool and amended reports for certain general causation

experts.[4]  Thereafter, Defendants deposed each of Plaintiffs' experts for which a new or amended report was served.  On October 14, 2021, one week prior to the deadline for Defendants to disclose their case-specific and general causation experts, Defendants embarked on their bankruptcy strategy that shielded Defendants from having to disclose and produce reports for their experts.

Now, again, Defendants look to use their ill-fated bankruptcy as a sword, arguing that Plaintiffs should be precluded from disclosing new, supplemental, or amended expert reports. Nothing could be more unfair or unfounded.  Although this litigation was stayed, time marched on during the *LTL* bankruptcy proceedings and Plaintiffs should have every opportunity to marshal our current understanding of the facts, science, and the law.  Accordingly, pursuant to the Scheduling Order, on November 15, 2023, Plaintiffs served expert reports on Defendants.

**New experts.**  Plaintiffs identified several experts who had not previously been identified in this MDL – Drs. Harlow, Rothman, Newman, and Cote.  Each of their opinions address issues that have been the subject of this litigation for more than seven years and are very familiar to Defendants. Dr. Newman is a marketing expert with expertise in the areas of branding and consumer behavior.  Defendants understand marketing has been a part of this litigation since the outset.  The Master Long Form Complaint is replete with allegations that Defendants, through their marketing initiatives, misled and deceived consumers for decades that talcum powder products were safe, pure, and asbestos free.  Moreover, the deposition of Defendants' designated marketing witness was completed after the July 2021 expert deadline and less than a month before the first bankruptcy filing.  The 30(b)(6) marketing deposition is a foundational element of Plaintiffs'

---

[4] Any position by Defendants that experts not designated on July 2, 2021 are not eligible for bellwether trials is misguided.  Plaintiffs have never withdrawn any experts and all experts are eligible to testify during a bellwether trial or any trial in a remanded case.  In fact, pursuant to the current Case Management Order, dated October 10, 2023, Plaintiff do not have to "serve their final list of trial experts for the first bellwether trial [until] **60 days before the date of the first trial**." Dkt. No. 28516 at ¶ 12 (hereinafter referred to as the "Scheduling Order") (emphasis in original).

marketing case. For that reason, it is not surprising that a report from a marketing expert was prepared after the deposition but, due to the nearly two-year bankruptcy stay, not produced until recently.

The PSC proffered a joint expert report by Bernard L Harlow, PhD and Kenneth Rothman, DrPH. Dr. Harlow is the past president of the Society of Epidemiological Research. He is currently a Professor of Epidemiology at Boston University's School of Public Health, was previously a Chair of the Division of Epidemiology at the University of Minnesota School of Public Health and was an Associate Professor of Epidemiology at the Harvard University School of Public Health. Dr. Rothman is also a Professor of Epidemiology at Boston University as well as an internationally recognized expert in epidemiology. In addition to founding the journal *Epidemiology*, Dr Rothman co-authored two of the premiere textbooks on Epidemiology – *Modern Epidemiology* (in its 4th edition) and *Epidemiology – An Introduction* (in its 2nd Edition). Dr. Rothman's expertise is not only acknowledged by his peers in the scientific community, who have cited him in the peer-reviewed scientific literature over 100,00 times, but by the federal judiciary in the *Federal Judicial Center's Reference on Scientific Evidence* (3rd edition). Unlike J&J's experts, Drs. Harlow and Rothman have published on the relationship between talcum powder and ovarian cancer in the medical literature and did so before being retained as experts. Most recently, in 2020, these epidemiologists published a response to the alleged "new science" that Defendants have touted as a sea-change in this litigation.[5]

Dr. Cote is a nationally and internationally recognized cancer epidemiologist and scientist. She has published extensively in the realm of gynecologic cancers, including ovarian cancer, from etiology to survivorship. As a member of the research team for the African American Cancer

---

[5] *See* Harlow BL, Murray EJ and Rothman, KJ, Genital Powder Use and Ovarian Cancer; JAMA 2020; 323 (20).

Epidemiology Study (AACES), in 2016 she along with other researchers published a study examining genital talc use and ovarian cancer.[6] This research continues as a survival cohort, the only one of its kind to focus on African American women. In addition to her research and extensive peer-review publications, her teaching has predominantly focused on the application of epidemiologic methods to human health challenges. Dr. Cote currently acts as the Director of the Susan G. Komen Tissue Bank, Simon Cancer Center, at Indiana University. In her role as a cancer researcher and epidemiologist, she will provide general causation testimony that genital exposure to talcum powder can cause ovarian cancer. Defendants were offered deposition dates in early January 2024, to explore and challenge Dr. Cote's opinions, but declined the offer.

**Updated expert reports.** Since July 2021, there have been additional state-court trials in both ovarian cancer and mesothelioma cases, new depositions, new documents produced, and new literature published. In addition, Plaintiffs have continued to develop and advance their understanding of the evidence both prior to and during the pending bankruptcies. Experts in the upcoming bellwether trials in this MDL must have the ability to rely upon new scientific information that developed and occurred during the stay that was in place due to the bankruptcies that precluded any earlier filing of expert reports containing updates of information and opinions. More importantly, Plaintiffs' experts must be able to synthesize the new information with that which has already been part of this ongoing litigation. It should be expected and reasonable to assume that Plaintiffs' experts would add to and refine their opinions, just like was done in July 2021 pursuant to the similar scheduling order that was in place. The current scheduling Order contemplated as much, and the opinions of Plaintiffs' experts were timely disclosed.

---

[6] *See* Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology (ACCES). Cancer Epidemiol Biomark. Prev. 2016; 25(10): 1411-1417.

Dr. Shawn Levy is an expert in genetics. The Court previously denied Defendants' motion to exclude his opinions regarding the involvement of genetics in the development of ovarian cancer and, specifically, the biologically plausible mechanisms by which talcum powder can cause mutations resulting in ovarian cancer. Building upon his expertise and opinions, Dr. Levy will also opine on the genetic testing results of the six bellwether pool cases. The Court has not yet considered the case-specific opinions of any expert; therefore, Defendants will have opportunity to depose Dr. Levy and challenge any of his case-specific opinions.

Dr. David Kessler is a former Commissioner of the United States Food and Drug Administration and an expert in regulatory affairs. Dr. Kessler was identified as an expert in 2018 but was not deposed in relation to his November 2018 report. By agreement of the parties, the decision on Defendants' *Daubert* motion regarding Dr. Kessler's opinion was deferred until after the Court's *Daubert* decision on general causation and biologic plausibility. Dr. Kessler's report was not supplemented in 2021 since, at that time, he was serving as Chief Science Officer of the United States COVID-19 Response. Further, Defendants have not taken Dr. Kessler's deposition in this matter and, when Dr. Kessler is deposed, Defendants will be able to challenge all of the opinions contained in his report.

Dr. William Longo[7] has provided additional reports outlining results of testing of other samples of Defendants' talcum powder products for not only amphibole asbestos and fibrous talc, but also for *chrysotile asbestos*. These opinions relating to the presence of chrysotile asbestos in Johnson's Baby Powder were not previously disclosed in the MDL and were not addressed by the *Daubert* Order. However, many of the opinions expressed by Dr. Longo in these additional reports

---

[7] The Court's *Daubert* order provided that Dr. William Longo and Dr. Mark Rigler may testify to their TEM (transmission electron microscopy) results identifying amphibole asbestos and fibrous talc.

have been provided to Defendants in other mesothelioma litigations and Dr. Longo has been deposed on those opinions, overcome various motions, and testified to those opinions in trials. Secondly, Defendants object to Dr. Longo's exposure analysis. The *Daubert* Order stated that "[b]y failing to conduct an exposure analysis, Dr. Longo's opinion on the likelihood that talc users were exposed to a 'significant' amount of asbestos… is too attenuated from his findings." *See In re: Johnson & Johnson Talcum Powder Prods. MDL,* 509 F. Supp. 3d at 157. At the time of the *Daubert* decision, potential bellwether plaintiffs had not been identified and Dr. Longo was unable to conduct any exposure analyses. That is no longer the case. Dr. Longo has reviewed detailed usage information for each of the six bellwether pool plaintiffs and conducted case-specific exposure analyses. Defendants will have an opportunity to depose Dr. Longo regarding these case-specific opinions and challenge these opinions if they wish to do so.

Drs. Anne McTiernan, Sonal Singh, Jack Siemiatycki, and Rebecca Smith-Bindman are previously disclosed expert epidemiologists and cancer specialists. The Court's *Daubert* decision approving the qualifications and general causation methodology of Plaintiffs' experts applied to each of these experts. (Dkt. 13602, p.1). Each of these experts incorporated recently published scientific literature relevant to their opinions in amended or supplemental expert reports. This updated scientific literature demonstrates the strength and consistency of the association between genital talcum powder exposure and ovarian cancer. The methodology employed in the recent reports prepared by these experts is the *same* methodology presented to the Court during the *Daubert* hearings conducted in July 2019 and addressed in the Court's *Daubert* opinion. The experts have not added to or changed their opinions, but rather their reports demonstrate that the updated scientific literature further affirms and strengthens their opinions that genital exposure to talcum powder can cause ovarian cancer.

## ARGUMENT

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony. The Rule provides that "a party must" disclose their experts and the contents of their reports "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). "The purpose of the requirement to disclose expert reports in advance of trial is to provide the opposing party with a 'reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony of other witnesses.'" *Trinity Indus. Inc. v. Greenlease Holding Co.*, 173 F. Supp. 3d 108, 222 (W.D. Pa. 2016) (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's notes to 1993 amendment).

The Federal Rules of Civil Procedure provide the Court with broad authority to manage the schedule of litigation. *See Rowe v. E.I. duPont de Nemours & Co.*, No. 06-1810 (RMB/AMD), 2010 WL 703210, at *3 (D.N.J. Feb. 24, 2010). Where a party fails to meet disclosure obligations, including proper disclosure of experts and their reports, Rule 37 authorizes the Court to issue sanctions. *See* Fed. R. Civ. P. 37(b)(2), (c)(1). However, the Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination in every action and proceeding." Fed. R. Civ. P. 1. The Third Circuit has expressed its preference for cases to be decided on the merits, particularly in the context of motions to strike or bar discovery, rather than on procedural technicalities. *See Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) ("[W]e have repeatedly stated our preference that cases be disposed of on the merits wherever practicable."). This is because "[t]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir. 1977) (quoting *Dudley v. South Jersey Metal, Inc.*,

9

555 F.2d 96, 99 (3d Cir. 1977)). Exclusion of evidence "should not be imposed where an untimely or improper expert disclosure amounts to only a 'slight deviation from pre-trial notice requirements' or occasions only 'slight prejudice' to the movant." *Withrow v. Spears*, 967 F. Supp. 2d 982, 1000 (D. Del. 2013) (citations omitted). "The Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony. *ABB Air Preheater, Inc. v. Regenerative Envtl. Equip. Co., Inc.*, 167 F.R.D. 668, 671 (D.N.J. 1996).

In the present motion, Defendants challenge Plaintiffs' expert reports, arguing for the extreme sanction that the reports be stricken because they are not timely. As outlined below, the expert reports at issue were timely served by Plaintiffs on or before the November 15, 2023 deadline set forth in the Scheduling Order.[8]  It is only through a tortured interpretation of the proceedings that Defendants argue that the reports were untimely.  Even so, to the extent the expert reports are determined to be untimely, a point Plaintiffs do neither agree with nor concede, Plaintiffs' "untimely" disclosure was substantially justified and harmless, and striking Plaintiffs' expert reports is unwarranted.

### I.   Plaintiffs' Expert Disclosures Were Timely

On September 6, 2023, after this matter was stayed for nearly two years due to Defendants' misguided efforts to stop trials and force resolution through failed bankruptcies, the Court held a Case Management Conference.  In advance of the Conference, the parties submitted competing versions of a proposed scheduling order.  "The proposed scheduling orders [were] identical with the exception of paragraph 8, which addresse[d] dispositive and *Daubert* motions."  *See* CMC

---

[8] By agreement of the parties, the reports of Dr. William Longo were served on November 17, 2023, since Dr. Longo was at trial in a mesothelioma case against Defendants in state court in California on November 15, 2023.

10

Transcript at 7:9-12.  In response to the proposed scheduling orders, on October 10, 2023, the Court entered an Order amending the discovery deadlines for Stage Three (bellwether) cases.  The Scheduling Order, the form of which had been agreed upon by all parties, stated that:

> Plaintiffs shall serve, if necessary, supplemental and amended disclosures of all general and case-specific experts pursuant to Rule 26(a)(2)(A) **and serve on Defendants' counsel the Rule 26(a)(2)(B) reports of all general and case-specific expert witnesses they may use at trial in any of the Stage Three cases** on or before November 15, 2023.

*See* Scheduling Order ¶ 2 (emphasis added).  Tellingly, in moving to strike Plaintiffs' experts, Defendants conspicuously omit that part of the Order (highlighted above) which contemplates Plaintiffs serving on November 15, 2023, **all** general and case-specific expert reports they **may** use at trial. Deft. Memo. at 5.[9]  If the agreed upon Scheduling Order was meant to prohibit Plaintiffs from serving reports for experts who had not previously been disclosed, there would be no reason for the Scheduling Order to direct Plaintiffs to serve experts reports for all general and case-specific expert witnesses that may be used at trial – Defendants would already be in possession of those reports.

Defendants also misrepresent the form and content of prior bellwether scheduling Orders.  For example, Defendants argue that the August 2, 2021 Order "limited the scope of general causation evidence to 'supplemental' testimony. (*See* ECF No. 24511, at 2.)." Deft. Memo. at 3.  However, the Order referred to by Defendants makes NO reference to limiting experts to "supplemental" reports.  Instead, the August 2021 Order provides for service of reports for all general and case specific expert witnesses (Order at ¶2) and differentiates between deposition time allotted for experts who only served supplemental reports (Order at ¶4) and those who provided new or supplemental reports on general causation (Order at ¶5).

---

[9] Defendants' Memorandum of Law in Support of Motion to Strike Plaintiffs' Improper Supplemental Reports, Dkt. No. 28798-1, is referred to herein as "Deft. Memo. at __."

11

In a similar fashion, Defendants attempt to limit the meaning and scope of "supplemental and amended disclosures" by arguing that Plaintiffs' experts "improperly seek to amend their opinions rather than supplement them with new science or developments." Deft. Memo. at 1. If the intent of the agreed upon Scheduling Order was to only allow Plaintiffs' experts to supplement their opinions with new science and developments, there would be no reason for the Scheduling Order to reference both supplemental and amended disclosures. Nor would there be a reason, as noted above, for the Scheduling Order to address service of all general and case-specific expert reports that may be used at trial.

Although the parties may differ as to whether and to what extent the Court needs to revisit *Daubert* for certain experts and certain opinions, especially since Judge Wolfson has already determined the methodologies to be sound, the parties were in agreement that new reports would be needed given the passage of time and new science. Ms. Sharko, for example, when addressing the Court on the issue of the proposed order, stated: "The problem with plaintiffs' proposed language is that it would handcuff the Court and handcuff counsel to a hearing that took place in 2019, **to reports that were written in 2019**, to an opinion based on the law as it existed in 2020." CMC Transcript at 16:10-14 (emphasis added). Despite acknowledging that reports from 2019 may be stale and in need of updating, Defendants' argument would tether Plaintiffs to 2018 and 2021 reports while providing the opportunity for Defendants to serve whatever they deem necessary and appropriate. In this regard, it should not be forgotten that Defendants were scheduled to serve their expert reports only days before filing the first *LTL* bankruptcy and the passage of time created by their own doing would give them a significant strategic advantage moving forward if this Motion were granted.

In short, all reports served by Plaintiffs pursuant to the Court's Order on November 15,

12

2023, whether a new report, amended report, or supplemental report, were timely served. Defendants' motion to strike should be denied in its entirety.

**II.      Plaintiffs' November 15, 2023 Disclosure Of Experts Was Justified and Harmless**

Pursuant to Rule 37(c)(1), if "a party fails to provide information as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Plaintiffs do not concede that the service of expert reports on November 15, 2023 was untimely, however, to the extent the Court rules as such, service of the expert reports was substantially justified and harmless.

With respect to the "substantial justification" standard, the Third Circuit has expressed agreement with a Middle District of Pennsylvania Court decision which found that "'substantial justification' for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The test of substantial justification is satisfied if there exists a genuine dispute concerning compliance." *Landau v Lamas*, No. 3:15-cv-1327, 2021 WL 2930078, at *2 (M.D. Pa. July 12, 2021) (quoting *Girder v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 140 n. 19 (3d Cir. 2009)). In the present matter, at a minimum, there exists a genuine dispute concerning compliance with the Scheduling Order. The proposed order was negotiated and agreed upon by the parties (except for paragraph 8) before being submitted to the Court. Plaintiffs' position reasonably interprets the Order to permit Plaintiffs to serve upon Defendants "reports of **all general and case-specific expert witnesses they may use at trial in any of the Stage Three cases on or before November 15, 2023**." Scheduling Order at ¶2 (emphasis in original). Plaintiffs' interpretation is especially justified in light of the two-year delay unjustly caused by

13

Defendants' bad-faith bankruptcy strategy which was implemented only days before Defendants were scheduled to serve their expert reports upon Plaintiffs. To interpret the Order in any other way would substantially prejudice Plaintiffs by allowing Defendants to serve their expert disclosures more than two years after Plaintiffs' disclosures.

In determining whether a party's misconduct is "harmless," a Court must determine whether the misconduct "involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *Tolerico v Home Depot*, 205 F.R.D. 169 176 (M.D. Pa. 2022) (quoting *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 369, (M.D. Ala. 2001)). Examples of "harmless" violations of Rule 26(a) include "the inadvertent failure to disclose the name of a potential witness known to all parties or the failure to list as a trial witness a person listed by another party." *Id.* In determining whether a party's conduct is harmless, there are several factors the Third Circuit has identified that must be considered, including:

> (1) The prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of the other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Meyers v Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (applying the "*Pennypack* Factors" in holding district court abused discretion by excluding expert testimony). As outlined below, the *Pennypack* Factors favor Plaintiffs and Defendants' motion to strike should be denied in its entirety.

### A. Plaintiffs' expert disclosures were not a surprise and did not prejudice Defendants

Defendants are unable to credibly argue that Plaintiffs' expert disclosures came as a surprise. Defendants have been on notice of what would be part of this case for years. For

14

example, as it relates to the opinions of Plaintiffs' marketing expert, Dr. Newman, the Master Long Form Complaint is replete with allegations that Defendants misled and deceived consumers for decades about the safety of their talcum powder products. *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978) (reversing district court order excluding expert testimony and finding plaintiff's pleadings and pre-trial order gave defendant notice of what would be part of the case). Plaintiffs' genetics expert, Dr. Levy, previously provided general causation opinions related to genetics and has bolstered those opinions now that the specific bellwether plaintiffs have been identified. Along the same lines, Defendants argue that Plaintiffs' newly disclosed epidemiologists, Drs. Cote, Harlow, and Rothman, "address the same fundamental question as plaintiffs' existing reports." Deft. Memo. at 6.[10] Across the board, Defendants have been on notice for years of what would be part of this case and none of Plaintiffs' disclosures can be said to have taken Defendants by surprise.

Defendants cannot credibly argue that they have not been aware of the general substance of the testimony to be offered by Plaintiffs' experts, especially since there have been numerous state court trials wherein these experts have previously been identified. *See In re Paoli*, 35 F.3d at 792 (finding minimal prejudice where plaintiffs properly identified expert by applicable deadline and defendants were aware of the general substance of the testimony that would be offered); *E. Allen Reeves, Inc. v. Michael Graves & Assoc., Inc.*, No. 10-1393 (MAS)(TJB), 2015 WL 105825, at *7 (D.N.J. Jan. 7, 2015) (denying motion to exclude where moving party had been aware of portions of report adverse to its position and would suffer little prejudice if reports were

---

[10] To the extent Plaintiffs have identified multiple experts in certain disciplines, Defendants' current motion to strike is not the appropriate platform to address duplicative testimony. Pursuant to the Scheduling Order, Plaintiffs are not required to "serve their ***final*** list of trial experts for the first bellwether trial" until 60 day before the trial date. *See* Scheduling Order at ¶ 12 (emphasis added).

admitted).

### B. If prejudiced, any prejudice can be easily cured

Although Plaintiffs contend that Defendants have not been prejudiced by the November 15, 2023 expert disclosures, if the Court determines that Defendants were prejudiced, any such prejudice can be easily cured. To start, in their moving papers, Defendants acknowledge that any prejudice can be cured by granting a four-week extension of the current deadlines. *See* Deft. Memo. at 2 ("given the breadth and timing of plaintiffs' recent disclosures, the Court should extend by four weeks the current deadlines for deposing plaintiffs' experts, as well as the deadlines that follow therefrom.").[11] Further, as outlined in Section II(C), *infra.*, there is ample time to cure any alleged prejudice given the current Scheduling Order and the fact that there is no trial date set for this action. *See ABB Air Preheater, Inc.*, 167 F.R.D. at 673 (untimely submission resulted in no prejudice where there was ample time to cure any alleged prejudice give the lack of trial date for the action, or any objection to supplementation by the other party of its own expert reports).

Further, to the extent Defendants argue that Plaintiffs' disclosures offer new opinions, the current Scheduling Order grants Defendants the right to depose and challenge those opinions. To date, Defendants have refused to do so, and their refusal to proceed with depositions is enough for the Court to find no prejudice. *See Pennypack*, 559 F.2d at 905 (holding no prejudice where defendant made no effort to depose or serve discovery on newly identified witnesses); *Estate of Goldberg by Goldberg v. Ninoityn*, 734 Fed.Appx. 141, 144 (3d Cir. 2018) (denial of motion to strike was appropriate where party had opportunity to cure prejudice).

---

[11] Plaintiffs made a good faith attempt to resolve this dispute by offering to agree to an extension of time for depositions until February 19, 2024, provided J&J agreed to withdraw the motion in its entirety and to schedule certain depositions in January. Defendants rejected the offer without further discussion or counter.

16

### C. Permitting Plaintiffs' expert disclosures will not disrupt trial proceedings

Permitting Plaintiffs' expert disclosures will not disrupt trial proceedings. As outlined in the Scheduling Order, discovery in this matter is still open, the deadlines for deposing experts has not yet passed, Defendants have not yet designated experts or served reports that may be used at trial, dispositive motions have not yet been filed, a case has not yet been designated for the first trial, the final list of trial experts has not yet been served, no pretrial order has been entered, and no trial date has been set. *See* Scheduling Order at ¶¶ 3 through 13.

The posture of this matter is far different than the posture of any cases cited by Defendants in support of their Motion. *See*, *e.g.*, *Dandy v. Ethicon Women's Health and Urology*, 579 F.Supp.3d 625, 632 (D.N.J. 2022) (granting motion to strike supplemental report where discovery had closed, expired deadlines would have to be reopened, and summary judgment motions had been briefed and were pending before the court); *Fillichio v Toms River Police Dept.*, No. 19-575 (ZNQ)(DEA), 2022 WL 959278, at **3-4 (D.N.J. Mar. 25, 2022) (granting motion to strike supplemental report served after discovery was "long-closed" and dispositive motions had been filed); *Allen v. Parkland School Dist.*, 230 Fed. Appx. 189, 194-195 (2007) (excluding testimony and noting "flagrant disregard of the District Court's order" where party first disclosed intention to call expert witness nine months after deadline to serve expert reports and waited another six months to produce an expert report); *Perez v. Great Wolf Lodge of the Poconos LLC*, 3:12-cv-01322, 2017 WL 559704, at *2 (M.D. Pa. Feb. 10, 2017) (denying motion to extend case management deadlines 2 months before trial, more than a year after discovery had closed, and with deadlines for motions *in limine*, pretrial memoranda, and other deadlines just days away); *Roberts v. United States*, No. 09-6212 (WJM), 2012 U.S. Dist. LEXIS 86762 (D.N.J. June 22, 2012) ("At the final pretrial conference, held nearly a year after discovery closed, Plaintiff first sought to

17

identify two new potential 'expert' witnesses."); *Kieser v. C.R. Bard, Inc.*, No. 5:20-cv-06045, 2021 WL 8741516, at *1 (W.D. Mo. Apr. 9, 202) (granting motion to strike where case had been remanded from MDL with direction: "Because all general fact and expert discovery has been completed in this MDL, the courts receiving these cases need not be concerned with facilitating general expert, corporate, and third-party discovery."); *Raritan Baykeeper, Inc. v. NL Industries, Inc.*, No. 09-4117 (MAS)(DEA), 2022 WL 815846, at *1 (D.N.J. Mar. 17, 2022) (fact discovery had ended, expert discovery was closed, summary judgment and *Daubert* motions had come and gone, and by all counts, the case was ready for trial); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 289 F.R.D. 424, 425 (E.D. Pa. 2013) (expert and dispositive motion deadlines had passed).[12]

### D. There is no evidence of bad faith or willfulness on the part of Plaintiffs

Defendants motion should also be denied because Defendants make no arguments that Plaintiffs' November 15th service of expert reports pursuant to the Scheduling Order was in bad faith or intended to mislead Defendants. *See Pennypack*, 559 F.2d at 905 (refusing to strike testimony where no finding of bad faith or that failure to comply with order was willful or intended to mislead or confuse defendant); *Hurd v. Yaeger*, No. 3:06-cv-1927, 2009 WL 2516934, at *5 (M.D. Pa. Aug. 13, 2009) (finding no willful deception or flagrant disregard where reports were served within court-imposed deadlines); *Estate of Goldberg*, 734 Fed.Appx. at 144 (denial of

---

[12] Even the MDL cases cited by Defendants are inapposite. *See In re 3m Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2021 WL 763778, at *1 (excluding supplemental reports where "Defendants produced to Plaintiffs a 20-page supplemental expert report nearly two-months after their expert disclosure deadline and only 24 hours (and 6 minutes) before the parties' deadline to file their *Daubert* and dispositive motions."); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327, 2017 WL 4769657 (S.D. W. Va. July 21, 2017) (Second Supplemental report was served after the disclosure deadline, motion deadline, and close of discovery); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 948 (D. Minn. 2009) (excluding supplemental report filed after the court had already heard oral arguments on defendants second *Daubert* challenge, in addition to hearing oral arguments on case-specific summary judgment motions and motions to exclude Plaintiffs' regulatory and specific causation experts.

motion to strike where dearth of factual allegations as to how party acted in bad faith).

## CONCLUSION

For years, Defendants have made concerted efforts to delay this MDL litigation. Now, following a two-year stay of proceedings brought about by Defendants' bad-faith bankruptcy strategy, Defendants move to strike Plaintiffs' expert reports by arguing that permitting the reports would result in undue delay and prejudice. Defendants make their argument in the presence of a Scheduling Order that contemplates ongoing expert discovery and depositions and do so while themselves refusing to abide by the Scheduling Order and refusing to take the depositions of certain experts. Defendants' motion is disingenuous, at best, and yet another attempt to further delay and unfairly prejudice these proceedings with extended motion practice. The Court should not countenance Defendants' ongoing tactics and Defendants' motion should be denied in its entirety.

Dated: January 2, 2024

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
4900 Seminary Rd., Suite 650
Alexandria, VA 22311
Tel: 703-931-5500
Fax: 703-820-1656
mparfitt@ashcraftlaw.com

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN
PORTIS & MILES, P.C.
218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
leigh.odell@beasleyallen.com
**Plaintiffs' Co-Lead Counsel**

>*/s/ Christopher M. Placitella*
>Christopher M. Placitella
>COHEN, PLACITELLA & ROTH, P.C.
>127 Maple Ave.
>Red Bank, NJ 07701
>Tel: 732-747-9003
>Fax: 732-747-9004
>clpacitella@cprlaw.com
>**Plaintiffs' Liaison Counsel**

# CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

>Respectfully submitted,
>
>*/s/ P. Leigh O'Dell*
>P. Leigh O'Dell