# EXHIBIT B

```
                                                              1


                       UNCERTIFIED ROUGH DRAFT

     1              ROUGH DRAFT DISCLAIMER
                           - - - - -
     2                 IMPORTANT NOTICE
                     AGREEMENT OF PARTIES
     3


     4   We, the party working with rough draft transcripts,
         understand that if we choose to use the rough draft
     5   screen or the printout, that we are doing so with
         the understanding that the rough draft is an
     6   uncertified copy.

     7   We further agree not to share, give, copy, scan,
         fax or in any way distribute this rough draft in
     8   any form (written or electronic) to any party.
         However, our own experts, co-counsel, and staff may
     9   have LIMITED INTERNAL USE of same with the
         understanding that we agree to destroy our rough
    10   draft and/or any electronic form, if any, and
         replace it with the final transcript upon its
    11   completion.

    12   By accepting a rough draft transcript, I am hereby
         agreeing to the above-mentioned terms, and I
    13   further agree to pay for these reporting services
         that have been provided.  I also understand that
    14   receipt of this rough draft will constitute an
         order for the final transcript.
    15

    16   CASE:       IN RE: JOHNSON & JOHNSON TALCUM POWDER
         PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS
    17   LIABILITY LITIGATION

    18   WITNESS:    DANIEL CLARKE-PEARSON, M.D.

    19   DATE:       January 17, 2024

    20
         REPORTER'S NOTE:
    21   Since this deposition has been in rough draft form,
         please be aware that there may be a discrepancy
    22   regarding page and line number when comparing the
         rough draft with the final transcript.
    23
```

24

25

UNCERTIFIED ROUGH DRAFT

1  Also, please be aware that the uncertified rough draft transcript may contain untranslated steno,
2  reporter's notes in asterisks, misspelled proper names, incorrect or missing Q/A symbols or
3  punctuation, and/or nonsensical English word combinations.  All such entries will be corrected
4  on the final, certified transcript.

5          COURT REPORTER:  Christine Taylor, RPR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   in this litigation. But as has been discussed in a

23   prior deposition, I became retained after I became

24   better educated about talcum powder but reviewing

25   literature at the time.

28

UNCERTIFIED ROUGH DRAFT

1        Q.   You were -- sorry?

2        A.   The literature that I was not aware of

3   to begin with.

4        Q.   You were retained in this litigation in

5   2018; correct?

6        A.   I believe so yes.

7        Q.   Is it your testimony that you discussed

8   talcum powder as a risk factor for ovarian cancer

9   with medical students before 2018?

10            MS. O'DELL:  Jessica I object to this

11       questioning the purpose of this deposition

12       is to ask questions about what's occurred

13       since his last deposition, August 2021.  He

14       was asked questions about what he was

15       telling students and others in 2018 --

16       before 2018 in his first deposition.  And so

17       we just ask you to focus on activity after

18       August 2021.

19   BY MS. DAVIDSON:

```
20          Q.   Dr. Clarke-Pearson you can answer the
21   question?
22          A.   I don't.
23               MS. O'DELL:  Would you repeat or have
24          Jessica please I'm not sure remember it
25          Dr. Clarke-Pearson may not either.
                                                         29
                     UNCERTIFIED ROUGH DRAFT
 1               MS. DAVIDSON:  Court reporter can you
 2           repeat my question.
 3        (The reporter read the last question.)
 4               THE WITNESS:  I don't recall when I
 5           started talk to medical students about
 6           talcum powder per se.
 7               MS. O'DELL:  You guy can we go off the
 8           record just for a moment we need to check
 9           the power cord for Dr. Clarke-Pearson, so
10           let's go off the record.
11        (Recess taken from 9:37 a.m. until 9:38 a.m.)
12          Q.   Dr. Clarke-Pearson have you made any
13   public statements about asbestos and ovarian cancer
14   since August 2021?
15          A.   Not that I'm aware of.
16          Q.   Have you spoken in any public forum
17   about ovarian cancer since August 2021?
```

```
 7          either.
 8   BY MS. DAVIDSON:
 9          Q.   Are you familiar with the term post hoc
10   analysis?
11          A.   Somewhat, yes.
12          Q.   What does that mean?
13          A.   It means after the study has been done,
14   somebody not necessarily the primary researcher but
15   somebody could have access to the database and
16   reanalyze the database for asking another question
17   that might be contained in the data that's there.
18          Q.   Do you do post hoc analyses raise any
19   issue with respect to scientific in egg tee?
20               MS. O'DELL:  Object to the form.
21               THE WITNESS:  No I think scientific
22          integrity obviously ties back to publication
23          otherwise if it's just sitting on somebody's
24          desk it's not -- doesn't mean anything.  So
25          that integrity goes through the peer
                                                      123

                    UNCERTIFIED ROUGH DRAFT
 1          reviewed process before it gets published
 2          and identifying, you know, in the manuscript
 3          that it's a post hoc analysis is important
 4          for full disclosure.
```

```
 5   BY MS. DAVIDSON:
 6        Q.   Is the a reliability of a meta-analysis
 7   contingent on proper selection of studies and data
 8   sets?
 9             MS. O'DELL:  Objection.
10             THE WITNESS:  I would say yes.
11   BY MS. DAVIDSON:
12        Q.   Did Woolen 2022 include the prospective
13   data from a O'Brien 2020 fold analysis?
14             MS. O'DELL:  Objection form.
15             THE WITNESS:  It obtained it -- I had
16        included information supplied by O'Brien
17        from the Minerva study one that as I
18        understand it had not been published
19        previously.
20   BY MS. DAVIDSON:
21        Q.   Do you know why Woolen 2022 did not
22   include prospective data from O'Brien 2020
23   published?
24             MS. O'DELL:  Objection to form the data
25        in 2020 is different than the data that was
```

                                                    124

                    UNCERTIFIED ROUGH DRAFT

```
 1        supplied by O'Brien for this Woolen paper.
 2   BY MS. DAVIDSON:
```

PageID: 169952

```
 3          Q.   Do you know what the reason for that

 4   is?

 5          A.   Because O'Brien hadn't published

 6   previously on daily exposure in the previously

 7   published national health study -- national health

 8   study participants.

 9          Q.   Did O'Brien 20220 use the term frequent

10   exposure?

11          A.   I have to go back to O'Brien 2020.

12          Q.   Why don't we mark O'Brien 2020 I think

13   we did actually?

14               MR. TRANGLE:  We did.

15          Q.   O'Brien 2020 was Exhibit 6 let's put

16   that up Asher we want to move things along we'll

17   come back to this.

18   BY MS. DAVIDSON:

19          Q.   If you could turn -- Dr. Clarke-Pearson

20   if you could look up on the screen just to move

21   things along.  Do you see where it says exposure.

22   Exposures in the abstract?

23          A.   Looking at the abstract.

24          Q.   Do you see on the screen the word

25   exposures?
```

UNCERTIFIED ROUGH DRAFT

```
17          Q.   Would it surprise you to know that
18   nobody has written alert to editor with respect to
19   O'Brien and Wentzensen who is not a plaintiffs'
20   expert in this litigation?
21          MS. O'DELL:  Objection asked and
22       answered.
23          THE WITNESS:  I would just have to see
24       all the letters.
25   BY MS. O'DELL:
```

                                                              168

                        UNCERTIFIED ROUGH DRAFT

```
 1          Q.   I see.  Are you aware sitting here
 2   today of anybody who's not a plaintiffs experts in
 3   the litigation who has written alert with respect
 4   to O'Brien or Wentzensen's?
 5          MS. O'DELL:  Object to form.  He stated
 6       he doesn't know who's written the letter or
 7       whether they're in litigation or not.
 8   BY MS. O'DELL:
 9          Q.   Leigh, you have just coached the
10   witness.  I appreciate it.  Please stop doing it.
11          Dr. Clarke-Pearson sitting here today
12   are you aware of anyone who is not an expert for
13   plaintiffs in Talc litigation who has written any
14   letters involving any publication also about Talc
```

these papers to know whether they were somehow screening those papers to see whether they use the word cause. Clearly come up with a finding that is statistically associated with the development of ovarian cancer which to me means cause.

Q. So is it your testimony that any time there's an association that means cause?

MS. O'DELL: Object to the form.

THE WITNESS: No.

BY MS. O'DELL:

Q. I think that's what you just said you said statistically association which to me means cause; correct?

A. I think a lot of people would interpret it as cause.

Q. Again sitting here today you can't identify a single independent scientist not retained by plaintiffs in this litigation who has stated that Talc use causes ovarian cancer; correct?

MS. O'DELL: Object to the form.

THE WITNESS: Not that I can recall to answer your question.

```
 1   BY MS. O'DELL:
 2        Q.   Are you aware of any published paper in
 3   the scientific literature by an independent
 4   scientist who not a paid expert in this litigation
 5   that includes that Talc use causes ovarian cancer?
 6             MS. O'DELL:  Object to form asked and
 7        answered also re treads ground that was
 8        previously covered in prior depositions.
 9        And so if you have a question about a
10        specific paper that has been included in
11        Dr. Clarke-Pearson's report since July of
12        2021, you know, then I would ask you to
13        direct your questions to those publications,
14        not a re review of everything he has looked
15        at over the course of this six year
16        litigation.
17   BY MS. O'DELL:
18        Q.   Leigh this is ongoing effort by you to
19   strike this deposition?
20             MS. O'DELL:  It is not it is to state
21        my objection ton the record.
22   BY MS. O'DELL:
23        Q.   I will keep any flee Dr. Clarke-Pearson
24   sitting here today are you aware of any published
25   literature any published paper in this scientific
```

24        and answered.

25        THE WITNESS: I will go to IARC for one

177

UNCERTIFIED ROUGH DRAFT

1        that says the that the source of Talc

2        outside of mining and industrial exposure is

3        most likely secondary to cosmetic exposure.

4  BY MS. O'DELL:

5        Q. Again I'm going to ask the question are

6  you aware of a single scientific body in the United

7  States that has stated that cosmetic Talc use

8  causes ovarian cancer?

9        MS. O'DELL: Objection form. Asked and

10       answered.

11       THE WITNESS: Cosmetic Talc Johnson's

12       baby powder has asbestos in it. Asbestos

13       causes ovarian cancer. Many organizations

14       at the highest level of our government and

15       scientific community have identified

16       asbestos as causing ovarian cancer.

17  BY MS. O'DELL:

18       Q. Can you identify a single scientific

19  body in the United States that has stated cosmetic

20  Talc causes ovarian cancer?

21       MS. O'DELL: Objection to form. The

22          question was just asked Dr. Clarke-Pearson

23          give his answer.  Dr. Clarke-Pearson, you're

24          welcome to respond again but if you if it's

25          the same answer previously again you can so

                                                    178

UNCERTIFIED ROUGH DRAFT

 1          say that.

 2   BY MS. O'DELL:

 3       Q.   Leigh you're pattern of obstructing

 4   this deposition and coaching the witness.

 5   Dr. Clarke-Pearson with all due respect you are not

 6   answering the question I asked.

 7            My question is whether there is any

 8   United States scientific body, any scientific body

 9   in the United States that has stated that cosmetic

10   Talc use causes ovarian cancer?

11          MS. O'DELL:  Objection to form.  Asked

12          and answered.  Please do not badger

13          Dr. Clarke-Pearson or be disrespectful.

14          THE WITNESS:  If you're focusing only

15          on the term Talc then I'm not aware of that.

16          But Talc has asbestos in it.

17   BY MS. O'DELL:

18       Q.   Dr. Clarke-Pearson do you have an

19   opinion as to what percentage of Johnson's baby

```
16           women that have ovaries.
17   BY MS. O'DELL:
18        Q.   Dr. Clarke-Pearson, can you point to me
19   to any epidemiological studies showing that the
20   level of asbestos to which a woman is allegedly
21   exposed from talcum powder can cause ovarian
22   cancer?
23             MS. O'DELL:  Objection to form.
24        Incomplete hypothetical.
25             THE WITNESS:  I'm unaware of any
```

                                                              181

                        UNCERTIFIED ROUGH DRAFT

```
 1           threshold if you will or minimum amount of
 2           asbestos that would or would not cause
 3           ovarian cancer.
 4   BY MS. O'DELL:
 5        Q.   Is sit your opinion that talcum powder
 6   that does not contain asbestos causes ovarian
 7   cancer?
 8        A.   I'm not aware of any talcum powder
 9   based on the data that I've seen that doesn't
10   contain asbestos.
11        Q.   If a woman to use cosmetic Talc that
12   doesn't contain asbestos would she be at increased
13   of ovarian cancer?
```

```
14        A.   I would think that evidence shows that
15   if you make the hypothetical there's no asbestos in
16   it then the talcum powder and the all a if you
17   had's have been done and hypothetically that those
18   patients were exposed those women were exposed to
19   talcum powder that didn't have asbestos they still
20   had a higher risk of ovarian cancer caused by
21   talcum powder.
22        Q.   Do you believe that the mechanism by
23   which talcum powder can cause ovarian cancer is the
24   same for talcum powder that contains asbestos and
25   talcum powder that doesn't contain asbestos?
```

182

UNCERTIFIED ROUGH DRAFT

```
1             MS. O'DELL:  Objection to question this
2        is re treading ground that was covered in I
3        believe it was January or February 2019
4        almost concluded and Dr. Clarke-Pearson
5        already answered the questions.
6   BY MS. O'DELL:
7        Q.   Can doctor because Dr. Moss he dial it
8   takes twice as long to ask every question court
9   reporter?
10            MS. O'DELL:  That's incorrect you know
11       I'm just what you stated is an error on the
```

```
12            record.  Please ask your question.
13       (The reporter read back the last question.)
14            A.   Yes.
15            Q.   Okay.  Let's go off the record.
16       (Recess taken from 1:23 p.m. until 1:25 p.m.)
17   BY MS. DAVIDSON:
18            Q.   So number 1 court's order is very clear
19   that case specific experts align deposed for I'm
20   going to read the order exactly.
21                MS. O'DELL:  Dr. Clarke-Pearson has
22            already been deposed for 14 hours --
23                MS. DAVIDSON:  You're literally --
24            you're literally interrupting me.
25                MS. O'DELL:  On his case specific
```

183

UNCERTIFIED ROUGH DRAFT

```
 1            opinions and that occurred in August of --
 2                MS. DAVIDSON:  You're interrupting me,
 3            Leigh.  You literally interrupted me
 4            mid-sentence.
 5                MS. O'DELL:  Well --
 6                MS. DAVIDSON:  According to order as I
 7            was saying before I was interrupted
 8            depositions of experts who address case
 9            specific issues to individual plaintiffs in
```

```
 9    opinions; is that correct?
10         A.
11              MS. O'DELL:  Object to the form.
12              THE WITNESS:  Yes, that's correct.
13    BY MS. DAVIDSON:
14         Q.   Is that still the case?
15         A.   Yes.
16              MS. O'DELL:  Object to form.
17    BY MS. DAVIDSON:
18         Q.   Did you add any company documents to
19    your second amended reliance list?
20         A.   I don't recall.
21         Q.   If you could look at Item 121 it's put
22    that up on the screen Asher.  We're marking your
23    second supplemental reliance list as Exhibit 17 and
24    let's go to Item 121?
25              MR. TRANGLE:  121 okay.
```

                                                              197

                         UNCERTIFIED ROUGH DRAFT

```
 1    BY MS. DAVIDSON:
 2         Q.   And at 121 says JNJTalc C001465273.  Do
 3    you recall adding that to your supplemental
 4    reliance list?
 5         A.   I -- I don't, no.
 6              MS. O'DELL:  If you're identifying --
```

```
 7          excuse me, if you're identifying something
 8          by Bates Number which obviously there are
 9          hundreds of combinations of Bates numbers
10          which would be difficult for anyone to
11          remember much less in relation to all of the
12          things that Dr. Clarke Dr. Clarke-Pearson
13          reviewed if there's a specific document you
14          could pull it up and he could identify it by
15          something other than the Bates Number.
16              MS. DAVIDSON:  Well, Leigh, I have
17          asked --
18              MS. O'DELL:  Seems to be unfair way to
19          try to identify document for him.
20              MS. DAVIDSON:  Leigh, I've asked you
21          multiple times today to please keep your
22          objections to objections to form.  Your
23          testimony is not called for here.  You're
24          not the witness.  And it is inappropriate
25          under federal law that you continue to try
```

                                                          198

                        UNCERTIFIED ROUGH DRAFT

```
 1          to testify and tell the witness what to say.
 2     BY MS. DAVIDSON:
 3          Q.   Dr. Clarke-Pearson, correct that you
 4     stated that you don't recall what this document is;
```