# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16–2738 (MAS) (RLS) <br><br> Return Date: February 5, 2024 |

## DEFENDANT JOHNSON & JOHNSON'S OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR PROTECTIVE ORDER REGARDING SUBPOENA DIRECTED AT NORTHWELL HEALTH, INC.

**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
Tel.: (973) 549-7000

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel.: (212) 735-3000

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036
Tel.:(212) 556-2100

*Attorneys for Defendant Johnson & Johnson*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 4

    Dr. Moline: Plaintiffs' Expert Witness ..................................... 4

    Dr. Moline Publishes Her Article. ............................................ 5

    The Premise Of Dr. Moline's Article Is False. ......................... 6

    Dr. Moline Publishes A New Article In 2023 ........................... 8

    Plaintiffs' Experts Rely On The Articles, And J&J Subpoenas Northwell. ....... 9

ARGUMENT ................................................................................ 10

    I.    The PSC's Motion Is Not Based On Its Own Interests. ........... 10

    II.    The Information Sought Is Relevant. ................................. 14

    III.    No Privacy Interests Are At Stake. ................................ 16

    IV.    The Subpoena Is Not Unduly Burdensome. ......................... 19

CONCLUSION ............................................................................. 20

## TABLE OF AUTHORITIES

**Case**                                                                      **Page(s)**

*Aetrex Worldwide, Inc. v. Burten Distribution, Inc.*,
    2014 WL 7073466 (D.N.J. Dec. 15, 2014)..........................................................11

*Adegbuji v. Middlesex Cnty.*,
    2004 WL 7334268 (D.N.J. Aug. 5, 2004) ..........................................................16

*Bell v. Am. Int'l Indus.*,
    627 F. Supp. 3d 520 (M.D.N.C. 2022) ...................................................6, 7, 17, 18

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018)........................................................................................17

*Corbi v. Marina Assocs.*,
    2009 WL 10727983 (D.N.J. July 14, 2009) .......................................................11

*Costantino v. City of Atl. City*,
    2015 WL 12806490 (D.N.J. Nov. 4, 2015) .........................................................11

*EEOC v. Friedman Realty Grp., Inc.*,
    2018 WL 10038314 (D.N.J. Oct. 11, 2018); ................................................13, 14

*Experience Hendrix, L.L.C. v. Pitsicalis*,
    2022 WL 4596558 (C.D. Cal. Sept. 2, 2022) .....................................................12

*Fed. Trade Comm'n v. Noland*,
    2021 WL 2187021 (D. Ariz. May 28, 2021) ......................................................11

*Hancock v. Credit Pros Int'l Corp.*,
    2021 WL 2948154 (D.N.J. July 13, 2021) .........................................................11

*Love v. NJ Dept of Corr.*,
    2017 WL 3477864 (D.N.J. Aug. 11, 2017) ........................................................14

*Mullen v. Taos Ski Valley, Inc.*,
    2011 WL 13289858 (D.N.M. Mar. 16, 2011) ....................................................12

*Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*,
    2017 WL 4839375 (D. Idaho Oct. 26, 2017).....................................................12

*N.J. Bldg. Laborers Statewide Ben. Funds v. Perfect Concrete Cutting*,
    2010 WL 2292102 (D.N.J. June 2, 2010)..........................................................17

*Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*,
  314 F.R.D. 304 (S.D. Ind. 2016) ........................................................................11

*Rudelli v. Eli Lilly & Co.*,
  2020 WL 13694732 (D.N.J. Nov. 13, 2020) .................................................12, 13

*S.R.L. v. Full Speed Ahead, Inc.*,
  2010 WL 11527270 (W.D. Wash. Jan. 4, 2010) .................................................12

*EEOC v. United Galaxy*,
  2011 WL 4072039 (D.N.J. Sept. 13, 2011) .................................................11, 13

*Williams v. BASF Catalysts, LLC*,
  2017 WL 3317295 (D.N.J. Aug. 3, 2017). ........................................................14

**Other**

45 C.F.R. § 160.103 ................................................................................................18

Baicker-McKee, Janssen, Corr's
  *Federal Civil Rules Handbook* (2011 ed.) ..........................................................12

Fed. R. Evid. 401 ...................................................................................................13

Wright & Miller,
  *Federal Practice & Procedure* § 2035 ...........................................................3, 10

Defendant Johnson & Johnson ("J&J") submits this brief in opposition to the Plaintiffs' Steering Committee's ("PSC") Motion For Protective Order Regarding Subpoena Directed At Northwell Health, Inc. ("Northwell").

## INTRODUCTION

J&J's subpoena seeks two short documents containing highly relevant, non-confidential information which would be no burden to produce. The only reason the PSC wants to block the subpoena is because the information damages their case—in which case, the relevance of the documents is indisputable.

Multiple Plaintiffs' experts in this litigation rely on an article written by Dr. Jacqueline Moline called *Mesothelioma Associated with the Use of Cosmetic Talc* ("Moline 2020"). Dr. Moline—while not an expert here—is a repeat plaintiff-side expert in cosmetic talc litigation.

Moline 2020 is a "case series" not of Dr. Moline's *patients*, but of 33 *plaintiffs* who developed mesothelioma and brought lawsuits alleging that talcum powder was the cause. Dr. Moline served as an expert witness in all of their cases. The article rests on the central premise that "[t]alcum powder usage was the only source of asbestos for all 33 cases." Ex. 1, Article at 11. In other words, it will be used in an attempt to demonstrate that asbestos is present in cosmetic talc, since that is supposedly the only way to explain how the individuals in Moline 2020 developed mesothelioma.

But that article's central premise is simply false. Although Dr. Moline anonymized the subjects of her article, J&J believes it has been able to match some individuals in the article with talc litigation plaintiffs who were exposed to asbestos from non-talc sources. For example, Case #17 in Moline 2020 appears to be plaintiff Helen Kohr. But Dr. Moline's *own expert report* from Ms. Kohr's case stated that Ms. Kohr was exposed to asbestos from smoking asbestos-containing cigarettes for years:

> asbestos. Ms. Kohr was exposed to asbestos from Kent Micronite cigarettes, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters. Studies have shown that each filter contained 10 milligrams of crocidolite asbestos and that millions of fibers of asbestos were released into the lungs during smoking. Dr. Steven Compton has

Ex. 2, Moline *Kohr* Rpt. at 17.

The concept that asbestos "must" be present in the talc because that is the only explanation for these individuals' mesotheliomas is just not true. But it is nearly impossible to prove that Ms. Kohr is, in fact, Case #17 because Dr. Moline and Northwell (her employer) have concealed the identities of the article's plaintiff-subjects. Dr. Moline also wrote a second, similar article with the same problems in 2023. Ex. 3 ("Moline 2023," and together with Moline 2020, the "Articles."). The PSC's experts rely on the 2023 Article as well.

J&J therefore subpoenaed Northwell for *two documents*: simply, the two lists of names identifying the individuals in Dr. Moline's Articles. This information is

necessary for J&J to defend itself against the arguments Plaintiffs will present through these bogus "studies."

The PSC's motion for a protective order seeking to block J&J from even discovering this critical information should be denied.

***The PSC Does Not Assert Its Own Interests***. The PSC improperly based its motion for a protective order on the interests of *others*. It claims that *someone else* will face a burden, and that *someone else* is being harassed, and that *someone else*'s privacy is at issue. Even when raising arguments based on lack of relevance, a party must show that its "*own interest* is jeopardized by discovery sought from a third person." *Wright and Miller* § 2035 (emphasis added). The PSC has not identified any of its own interests that would be jeopardized, nor could it. This Court should deny the PSC's motion for that reason alone. Yet even if the Court were to reach the merits of the PSC's motion, it should nevertheless be denied.

***The Information Sought Is Relevant***. The PSC is wrong to argue that the Articles are irrelevant because they concern mesothelioma rather than ovarian cancer. Their own experts rely on them. The Articles will be used to support the PSC's arguments that cosmetic talc products, including Johnson's Baby Powder, contain asbestos—a central and hotly disputed issue in this case. The only way for J&J to demonstrate that the Articles are false is with the identities of the plaintiffs

3

who make up those Articles. The subpoena therefore seeks highly relevant information.

***No Privacy Interests Are At Play.*** The subpoena does not implicate any privacy interests. All the individuals in the Articles filed lawsuits publicly announcing that they had developed mesothelioma and that they believed exposure to cosmetic talc contributed to the development of that mesothelioma. So the only information J&J seeks is which public litigation cases the Articles considered in conducting their analyses. The PSC has identified no legal basis for any confidentiality in the identity of these plaintiffs.

***Northwell Faces No Burden.*** Even if the PSC were able to raise Northwell's "burden," it is not remotely plausible that Northwell would bear any burden at all. And the PSC submitted no evidence to support their argument. Northwell would merely need to produce two short documents. A lower burden to comply with a subpoena could not exist.

This Court should deny the PSC's motion for a protective order.

## BACKGROUND

### *Dr. Moline: Plaintiffs' Expert Witness*

Dr. Moline is an expert witness who testifies on behalf of the mass tort asbestos plaintiffs' bar. She has been testifying as a paid expert in asbestos litigation for over 20 years, always on behalf of plaintiffs. Ex. 4, Moline *Blinkinsop* Tr.

4

178:25-27, 179:8-11. For playing that role, she is paid between approximately $250,000 and $300,000 per year (about 40% of her total income) and, in aggregate, has received over $3 million. Ex. 5, Moline *Teuscher/Etheridge* Dep. 30:12-17; Ex. 6, Moline *Young* Dep. 35:7-14; Ex. 7, Moline *Allen* Dep. 211:1-11.

### Dr. Moline Publishes Her Article.

Dr. Moline is the lead author of *Mesothelioma Associated with the Use of Cosmetic Talc* ("Moline 2020"). Ex. 1. It is a "case series" of 33 individuals who brought lawsuits alleging that talcum powder caused their mesothelioma. In other words, the 33 individuals are all plaintiffs in litigation where Dr. Moline served as their expert witness. Ex. 8, Moline *Zimmerman* Dep. 43:23-44:2.[1] Notably, however, Dr. Moline did not disclose the names of the 33 individuals featured in Moline 2020 and has gone to extreme lengths to conceal those individuals' identities.

In the article, Dr. Moline expressly represents multiple times that "[t]alcum powder usage was the only source of asbestos for all 33 cases." Ex. 1, Moline 2020 at 11; *see also id.* at 11 ("Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder."); *id.* at 14 ("[W]e present 33 cases, predominantly of women, who had no

---

[1] Dr. Moline likely originally published the Article to circumvent numerous court rulings precluding her from discussing plaintiffs in other cases. *See* Composite Ex. 9, Collection of Orders; *see also* Ex. 10, Moline *Herford* Tr. 1542:12-27 (attempting to discuss her other cases for the first time).

known exposure to asbestos other than prolonged use of talcum powder."); *id.* ("The table identifies talcum powder as the only asbestos exposure."); *id.* ("No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures."); *id.* ("[N]o known asbestos exposure had occurred.").

She even went so far as to represent that "potential exposures were considered" but that there was "no identified source apart from the talcum powder." *Id.* Many of the individuals in the Moline 2020 used Johnson's Baby Powder and Shower to Shower. Ex. 11, Product Key. The article states that "all forms of asbestos are recognized as the primary risk factor for malignant mesothelioma." Ex. 1, Moline 2020 at 11. Because Dr. Moline claims the individuals in her article had no other exposures to asbestos other than from cosmetic talc, the article purports to support the PSC's theory that asbestos is present in J&J and others' cosmetic talc products.

***The Premise Of Dr. Moline's Article Is False.***

The falsity of Dr. Moline's Article was first laid bare in September 2022 by a federal judge in the District Court for the Middle District of North Carolina. *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520 (M.D.N.C. 2022). It was revealed that the plaintiff there, Betty Bell, was one of the individuals in Moline 2020. Yet Ms. Bell "reported to a state agency that she did have another known asbestos exposure" under criminal penalty for making false statements. *Id.* at 525 n.2, 530. The court

stated: "Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility." *Id.* at 530. The court also "expressed concern about this seeming contradiction" and stated that its "concern [wa]s magnified considering the influence the article has had on cosmetic talc litigation nationwide." *Id.*

Since then—based on the limited biographical data provided in Moline 2020—J&J believes it has matched up even more individuals in the article to litigation plaintiffs with non-talc asbestos exposures, contrary to the article's central claim:

- ***Case # 17*** appears to be plaintiff Helene Kohr. *See* Ex. 2, Moline *Kohr* Rpt. 3-5, 16-17. Dr. Moline's own expert report in Ms. Kohr's case stated that "Ms. Kohr was *exposed to asbestos from Kent Micronite cigarettes*, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters." *Id.* at 17 (emphasis added).[2]

- ***Case #6*** appears to be plaintiff Stephen Lanzo. *See* Ex. 13, Moline *Lanzo* Rpt. at 5, 10, 14-15; Ex. 14, Gordon *Lanzo* Rpt. Both the plaintiff and defense experts found a type of asbestos in Mr. Lanzo's tissue known as crocidolite that indisputably is not present in cosmetic talc— definitively demonstrating a non-talc asbestos exposure. *See* Ex. 15, Poye *Lanzo* Rep. at 4; Ex. 16, Sanchez *Lanzo* Rep. at 3. And there is

---

[2] Dr. Moline has since written in a response to a letter to the editor that she "identified one individual with an alternative exposure" who was "exposed to asbestos … from asbestos-contaminated cigarette filters" and "should not have been included in the article." *See* Ex. 12, Moline Response to Letter to the Editor.

ample additional evidence of Mr. Lanzo's non-talc exposures to asbestos.[3]

- *Case #3* appears to be plaintiff Doris Jackson. *See* Ex. 20, Moline *Jackson* Rpt. at 3-5. A medical record from her case included a handwritten statement that she had been exposed to "[c]eiling pipes with degrading insulation" during her more than 30-year career as a public school teacher. *Id*. at 5.

- *Case #4* appears to be plaintiff Valerie Jo Dalis. *See* Ex. 21, Moline *Dalis* Rpt. at 4, 10. Ms. Dalis submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from the Manville Personal Injury Settlement Trust. Ex. 22, *Dalis* Trust claim at 2; Ex. 23, Valerie *Dalis* Dep 220:1-223:2; Ex. 24, Nicholas *Dalis* Dep 142:17-146:7.

In short, many individuals in Moline 2020 appear to have non-talc exposures to asbestos—in direct contradiction to the article's claim. But *proving* these plaintiff-article matches is difficult, if not impossible, without Northwell identifying definitively who the individuals in Moline 2020 are. And based on the information uncovered to date, J&J believes there are likely many more examples demonstrating the falsity of the Article's premise.

### Dr. Moline Publishes A New Article In 2023.

In response to the *Bell* decision, Dr. Moline published a new similar paper in 2023 ("Moline 2023"). *See* Ex. 3. The subjects of Moline 2023 are also all litigation

---

[3] *See, e.g.,* Ex. 17, Moline *Lanzo* Tr. 4358:1-11 (Dr. Moline testifying that 60 linear feet of exposed asbestos pipe was removed from his basement); Ex. 18, Lanzo Abatement Records (67 bags of friable asbestos waste removed from Lanzo's middle school after he was a student); Ex. 19, Lanzo Medical Record at 3 (medical record showing that Lanzo had history of asbestos exposure when visiting a grandfather as a child).

plaintiffs. *Id.* at 2, 11. And Moline 2023 suffers from the same flaws as Dr. Moline's first article. For example, it appears that Case #25 in article is plaintiff Ricardo Rimondi. *See* Ex. 25, Moline *Rimondi* Rpt. at 3, 6. Despite Dr. Moline claiming that Case #25's potential for alterative exposures to asbestos was "none," Ex. 3, Moline 2023 at 5, Mr. Rimondi lived near a plant that purchased asbestos-containing products, and studies have shown that living next to a plant of that type massively increases one's risk of mesothelioma due to asbestos exposure. Ex. 26, Moline *Rimondi* Tr. 162:23-163:17, 175:25-176:8, 186:1-188:8. The *Rimondi* trial resulted in a full defense verdict. Ex. 27, *Rimondi* Tr. 87:6-14.

***Plaintiffs' Experts Rely On The Articles, And J&J Subpoenas Northwell.***

In the MDL, multiple Plaintiffs' experts rely on Dr. Moline's two Articles. *See* Ex. 28, 2023 Rigler Reliance List at 6 (entry 92); Ex. 29, 2023 2d Am. Plunkett Rpt. at 232; Ex. 30, 2023 Singh Rpt. at 36 (entry 52); *see also* Ex. 34, 2021 1st Am. Plunkett Rpt. at 229.

J&J therefore subpoenaed Northwell, Dr. Moline's employer. PSC Ex. A. The subpoena sought only two documents: the keys identifying the individuals in each of the Articles. *Id.* at 4 (Schedule A). There is no dispute that a 5-page key for the Moline 2020 exists and is in Northwell's possession because Northwell produced it with redactions in the *Bell* case. *See* Ex. 31, Redacted Key. In short, all J&J has sought is two short lists of names.

The PSC filed a motion for a protective order to prevent Northwell from identifying these individuals, and J&J now opposes that motion.

## ARGUMENT

The PSC must assert its *own* interests in order to seek a protective order. But it has not done so. It has only raised the interests of *others*. This Court can deny the PSC's motion for that reason alone. *Infra § I.*

Yet even if the Court were to reach the merits, it should permit J&J's subpoena. The information sought is highly relevant because Plaintiffs' experts rely on the Articles, and they go to a central issue in the case: whether or not asbestos is present in J&J's cosmetic talc products. *Infra § II.* Contrary to the PSC's contentions, no privacy interests are at stake. All the plaintiffs that make up the Articles publicly announced the fact of their mesothelioma—and their claims that cosmetic talc was the cause—when filing their complaints. *Infra § III.* Finally, the subpoena seeks a grand total of two documents, and so is not burdensome at all. *Infra § IV.* The PSC's motion should be denied.

## I.     The PSC's Motion Is Not Based On Its Own Interests.

The PSC's motion improperly attempts to assert the interests of others in an attempt to justify its requested protective order. However, a "party may not ask for an order to protect the rights of another party or a witness if that party or witness does not claim protection for himself, but a party may seek an order if it believes its

*own interest* is jeopardized by discovery sought from a third person." Wright & Miller, *Federal Practice & Procedure* § 2035 (emphasis added).

Even if a party may have Rule 26(c) *standing* to move for a protective order based on lack of relevance (unlike a motion to quash under Rule 45), Rule 26(c) requires a party to meet the additional hurdle of demonstrating its *own* interests are at stake.

As courts in this district repeatedly explain: "[A] party can move for a protective order in regard to a subpoena issued to a nonparty if it believes its own interests are jeopardized by discovery sought from a third party **and** has standing under Rule 26(c) to seek a protective order regarding subpoenas issued to non-parties which seek irrelevant information." *Aetrex Worldwide, Inc. v. Burten Distribution, Inc.*, 2014 WL 7073466, at *4 (D.N.J. Dec. 15, 2014) (emphasis added); *see also Hancock v. Credit Pros Int'l Corp.*, 2021 WL 2948154, at *7 (D.N.J. July 13, 2021) (same); *Costantino v. City of Atl. City*, 2015 WL 12806490, at *3 (D.N.J. Nov. 4, 2015) (same); *EEOC v. United Galaxy*, 2011 WL 4072039, at *2 (D.N.J. Sept. 13, 2011) (same); *Corbi v. Marina Assocs.*, 2009 WL 10727983, at *1 (D.N.J. July 14, 2009) (same).[4]

---

[4] As one court explained, the term "'standing' does not supply a proper doctrinal foundation" for the rule that a party must assert its own interests to object to a subpoena. *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016).

Courts around the country follow the same rule requiring a party to show its own interests are at stake in order to move for a protective order. As some examples:

- "Although a party can move for a protective order in regard to a subpoena issued to a non-party, it may do so only if it believes its own interests are jeopardized." *Fed. Trade Comm'n v. Noland*, 2021 WL 2187021, at *4 (D. Ariz. May 28, 2021) (internal quotation marks and brackets omitted).

- "Pitsicalis has not shown how his own interests are jeopardized by Judgment Creditors' requests for documents regarding Purple Haze." *Experience Hendrix, L.L.C. v. Pitsicalis*, 2022 WL 4596558, at *3 (C.D. Cal. Sept. 2, 2022) (denying motion for protective order).

- "[A] party cannot ask for an order solely to protect the interests of another." *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, 2017 WL 4839375, at *3 (D. Idaho Oct. 26, 2017).

- "[A] party may not move for a protective order to protect the interests of another, but may move to protect the party's own interests when discovery is sought from another." *Mullen v. Taos Ski Valley, Inc.*, 2011 WL 13289858, at *1 (D.N.M. Mar. 16, 2011) (quoting Baicker-McKee, Janssen, Corr's *Federal Civil Rules Handbook* (2011 ed.)).

- "[A] party may move for a protective order to restrict the scope of discovery under Rule 26 if it believes its own interests are jeopardized by the nonparty subpoenas." *S.R.L. v. Full Speed Ahead, Inc.*, 2010 WL 11527270, at *1 (W.D. Wash. Jan. 4, 2010).

In other words, parties can use a protective order to "protect *themselves* against annoyance and embarrassment stemming from purportedly overbroad subpoenas served on" others. *S.R.L. v. Full Speed Ahead, Inc.*, 2010 WL 11527270, at *2 (W.D. Wash. Jan. 4, 2010) (emphasis added). But they cannot use a protective order to assert that *others* will be annoyed or embarrassed.

The PSC cited a single outlier case stating the rule in the disjunctive: that "[a] party may move for a protective order for a subpoena issued to a non-party if the party's interests 'are jeopardized by discovery from a third party' *or* if the discovery sought from a third party is irrelevant." Mot. 2 (emphasis added) (citing *Rudelli v. Eli Lilly & Co.*, 2020 WL 13694732, at *2 (D.N.J. Nov. 13, 2020)). That appears to simply have been loose phrasing on a nondispositive issue. The question did not affect the court's decision in that case because the court found that "the subpoenaed information [wa]s relevant, *and* Defendant's interests [we]re not jeopardized." *Rudelli*, 2020 WL 13694732, at *2 (emphasis added). In fact, even the other case the PSC cites—*United Galaxy*—states the rule as an "and," not an "or." Mot. 2 (citing *United Galaxy*, 2011 WL 4072039, at *2).

Here, the PSC does not assert its own interests. It contends that the subpoena will harass *others*, invade on the privacy interests of *others*, and will be unduly burdensome on *others*. That the information J&J seeks would hurt the PSC's case certainly would not represent a valid interest, and that would only mean that the information at issue is highly relevant and that the PSC's motion should therefore be denied outright.

The PSC has not asserted its own interest preventing the disclosure of the information, and its motion can be denied for that reason alone.

13

## II.     The Information Sought Is Relevant.

Even if this Court were to reach the merits of the PSC's motion, the two documents at issue are plainly relevant. The Federal Rules of Evidence define relevance as having "any tendency to make a fact more or less probable than it would be without the evidence" if "the fact is of consequence in determining the action." Fed. R. Evid. 401. And "[r]elevancy is more liberally and broadly construed at the discovery stage than at trial." *EEOC v. Friedman Realty Grp., Inc.*, 2018 WL 10038314, at *4 (D.N.J. Oct. 11, 2018); *see also, e.g.*, *Love v. NJ Dept of Corr.*, 2017 WL 3477864, at *7 (D.N.J. Aug. 11, 2017) (similar); *Williams v. BASF Catalysts, LLC*, 2017 WL 3317295, at *3 (D.N.J. Aug. 3, 2017).

There can be no question that the information is relevant. *Three* of Plaintiffs' experts in this litigation rely on the Articles. *See* Ex. 28, 2023 Rigler Reliance List at 6 (entry 92); Ex. 29, 2023 2d Am. Plunkett Rpt. at 232, Ex. 30, 2023 Singh Rpt. at 36 (entry 52); *see also* Ex. 34, 2021 1st Am. Plunkett Rpt. at 229. That alone is sufficient to demonstrate the relevance of the information.

The PSC's professed ignorance regarding how the Articles that their own experts relied on could be relevant should not be credited. *See* Mot. 4. It does not matter that the Articles concerned individuals with mesothelioma. The Articles purport to show that *asbestos is present* in J&J's talc—and the PSC contends that asbestos contributed to the development of the plaintiffs' ovarian cancers. That is

why even Dr. Rigler—one of the PSC's *testing* experts, not a causation expert—relied on the Articles. Ex. 28, Rigler Reliance List at 6.

Moline 2020 states that "all forms of asbestos are recognized as the primary risk factor for malignant mesothelioma." Ex. 1 at 11. Dr. Moline then repeatedly states that the individuals in her Article all developed "malignant mesothelioma" but had "no known asbestos exposure other than cosmetic talcum powder." *Id.* The point is simple: supposedly the only thing that can explain why these individuals in the Articles developed mesothelioma is that asbestos is present in talc. And Dr. Moline even identifies Johnson's Baby Powder as among the products the individuals used. Ex. 11, Product Key. In other words, the Articles will be used to attempt to show asbestos is present in J&J's talc products.

The PSC's allegations that asbestos is present in cosmetic talc is a central and hotly disputed issue in this litigation. And as a result, demonstrating that these individuals had *other, non-talc* exposures to asbestos is critical to explaining how the Articles do not, in fact, demonstrate the presence of asbestos. This is no mere fishing expedition. J&J has good reason to believe these non-talc exposures exist but were ignored given what J&J has been able to uncover to date, as discussed above (*supra* at 6-8).

It is small comfort that the PSC argues that its experts *might* not present Dr. Moline's Articles to jury because "experts often review and consider a wide range

of materials." Mot. 4. Nor does anything prevent the PSC from using the Articles during cross examination.

In the mesothelioma litigation, because the subjects' anonymity permits plaintiffs to discuss the Articles with impunity, plaintiffs have used the Articles to dramatic effect. For example, an attorney in a cosmetic talc case against J&J asked the jury during closing argument after discussing the Articles: "How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'?" Ex. 32, *Johnson* Tr. at 10866:2-4. While a mesothelioma case, it takes no great leap of imagination to envision the of ways the Articles could be used in a similar vein in the MDL's ovarian cases. J&J's defense will be hamstrung if it is not permitted to respond armed with the truth about these Articles.

The identities of the plaintiffs in Dr. Moline's Articles are therefore extremely relevant to the case to rebut the PSC's claims that asbestos is present in J&J's talc products.

## III.   No Privacy Interests Are At Stake.

No privacy interests are implicated by Northwell identifying the individuals in the Articles. All the subjects of the Articles are plaintiffs in litigation. Ex. 8, Moline *Zimmerman* Dep. 43:23-44:2. They all voluntarily filed public complaints announcing that they had developed mesothelioma and claiming that their condition was caused by cosmetic talc.

16

The PSC does not assert any privilege is at issue, but even if any privilege may once have existed, the plaintiffs in the Articles all filed lawsuits putting their medical conditions at issue in litigation and therefore waived any confidentiality claims relating to those conditions. *See, e.g.*, *Adegbuji v. Middlesex Cnty.*, 2004 WL 7334268, at *3 (D.N.J. Aug. 5, 2004) ("[B]y alleging that he has been denied adequate medical treatment, plaintiff squarely has placed his medical condition at issue in this litigation and thus he has waived any and all claims of privilege or confidentiality as to his medical records").[5]

Moreover, Dr. Moline "did not solicit consent" from any individual to be in her Article. Ex. 33, Moline *Wiman* Dep. 50:19-24. So no individuals can have any expectation of privacy. In fact, the reason Dr. Moline had any of these individuals' medical information in the first place is because they put their medical condition at issue in litigation and therefore waived any confidentiality claims. As the *Bell* Court explained, these individuals "chose to publicly expose the fact of [their] mesothelioma by filing a complaint." *Bell*, 627 F. Supp. 3d at 537.

---

[5] The same fundamental and obvious concept that confidentiality is waived when information is disclosed holds true even in very different contexts. In Fourth Amendment cases, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties" with only limited exceptions. *Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2018). "That remains true even if the information is revealed on the assumption that it will be used only for a limited purpose." *Id.* (internal quotation marks omitted).

The PSC cites no law whatsoever prohibiting Northwell from identifying the individuals of the Articles. To the extent the use of the phrase "protected health information" may have been a veiled reference to HIPAA (the Health Insurance Portability and Accountability Act of 1996), Mot. 5, the PSC does not develop the argument at all, which is therefore waived. *See, e.g.*, *New Jersey Bldg. Laborers Statewide Ben. Funds v. Perfect Concrete Cutting*, 2010 WL 2292102, at *1 (D.N.J. June 2, 2010) ("An undeveloped argument in a brief is waived.").

The PSC likely did not address the issue because HIPAA does not apply. HIPAA only regulates the release of "protected health information" by specific "covered entities," which include health plans, health care clearinghouses, and certain health care providers. 45 C.F.R. § 160.103. "Covered entities" do not include plaintiffs' experts in personal injury actions or their medical-legal consulting groups. These individuals are not Dr. Moline's *patients*—they are litigation plaintiffs. Indeed, in *Bell* the "Plaintiff concede[d] that the Northwell Document [identifying the subjects of Dr. Moline's Article] is not HIPAA protected." *Bell*, 627 F. Supp. 3d at 535. J&J's subpoena therefore does not implicate any privacy interests.[6]

---

[6] While the PSC's header to Section B also mentions an aim to "annoy" and "harass" non-parties, it never actually develops this argument. Mot. 5. Nor is it conceivable how J&J's subpoena, which seeks only to obtain two documents relevant to its defense, would impermissibly "annoy" or "harass" anyone, especially not Northwell, who was ordered to produce one of the documents in *Bell*.

**IV.    The Subpoena Is Not Unduly Burdensome.**

The PSC only half-heartedly contends that the subpoena would impose an undue burden. The PSC instead largely re-hashes its argument that the information sought is not relevant, which is incorrect for the reasons discussed above.

The PSC does not claim that *it* will be burdened. And even assuming the PSC could assert *Northwell's* interests in avoiding a burden, the subpoena is not burdensome at all. The subpoena sought a whole of *two documents*: the two keys identifying the individuals in each of Dr. Moline's Articles. PSC Ex. A. at 3 (Schedule A). They are merely two lists of names. The key for the first Article is known to exist in Northwell's possession and takes up only five pages. *See* Ex. 31, Redacted Key. The PSC submits no evidence whatsoever regarding how Northwell might face a burden. That's because the truth is this subpoena seeking production of two documents imposes as low a burden as possible.

Finally, the PSC uses creative euphemisms to cast aspersions on the timing of the subpoena. It argues the subpoena was "served shortly before Christmas and with a return date of January 2, at 10:00am." Mot. 6. The subpoena is dated December 13, 2023,[7] with a return date 20 days later. PSC Ex. A at 1. And shortly after the subpoena was served, J&J extended the time for Northwell to respond an additional 10 days to January 12, 2024. No harassment is at issue.

---

[7] The year was incorrectly listed on the subpoena as 2024.

Northwell faces no burden at all, much less an undue one, by producing two documents.

## CONCLUSION

This Court should deny Plaintiffs' Motion for a Protective Order.

Dated: January 22, 2024                    Respectfully submitted,

*Susan Sharko*

Susan M. Sharko
**FAEGRE DRINKER BIDDLE & REATH LLP**

Allison M. Brown
Jessica Davidson
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

Kristen R. Fournier
**KING & SPALDING**

**Attorneys for Defendants**