# Exhibit 26

```
                                                              Page 1

 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION: MIDDLESEX COUNTY
 2              DOCKET NO. MID-2912-17AS
                APPELLATE DOCKET NO._____
 3
 4   RICARDO RIMONDI AND PILAR RIMONDI,    )
                                           )
 5                                         )
                   Plaintiffs,             )
 6                                         ) TRANSCRIPT
        v.                                 ) OF TRIAL
 7                                         )
     BASF CATALYSTS LLC, et al.,           )
 8                                         )
                   Defendants.             )
 9   _____ )
                                           )
10
11              Place:  Middlesex County Courthouse
                        56 Paterson Street
12                      New Brunswick, New Jersey  08903
13              Date:  Wednesday, March 20, 2019
                        (Volume 1 of 2)
14                      (Pages 1 - 200)
15   BEFORE:
16      HON. ANA C. VISCOMI, J.S.C. and JURY
17
18   TRANSCRIPT ORDERED BY:
19      ALLISON BROWN, ESQ.
        WEIL, GOTSHAL & MANGES LLP
20
21
22              ANDREA F. NOCKS, CCR, CRR
                PRIORITY ONE
23              290 West Mount Pleasant Avenue
                Livingston, New Jersey  07039
24              (718) 983-1234
                E-mail:  p1steno@veritext.com
25
```

```
                                                              Page 2
 1   APPEARANCES:
 2      MARK A. LINDER, ESQ.
        JOSEPH N. COTILLETTA, ESQ.
 3      LEYDYLUZ SYMPHORIEN-RESTREPO, ESQ.
        MONICA COOPER, ESQ.
 4      THE LANIER FIRM
        Attorneys for Plaintiffs
 5
 6      ALLISON BROWN, ESQ.
        LUNA BARRINGTON, ESQ.
 7      SARA LONKS, ESQ.
        WEIL, GOTSHAL & MANGES LLP
 8      -and-
        MORTON DONALD DUBIN, II, ESQ.
 9      KEVIN HYNES, ESQ.
        ORRICK, HERRINGTON & SUTCLIFFE LLP
10      Attorneys for Defendants,
        Johnson & Johnson, and
11      Johnson & Johnson Consumer, Inc.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                              Page 3

 1                            INDEX

 2   WITNESSES              DIRECT  CROSS   REDIRECT   RECROSS

 3   FOR THE PLAINTIFF:

 4   JACQUELINE MOLINE        7      20     218,251      251

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                              Page 4

 1   EXHIBITS                                     IDENT.   EVID.
 2   D-11007-M        Northwell policies            137
     D-11007-G        Dr. Moline's note             144
 3   D-9253           Dr. Magnani's: Increased      154
                      Risk of Malignant
 4                    Mesothelioma of the Pleura
     D-9254           Dr. Magnani:                  164
 5                    A Multicentric Study on
                      Malignant Pleural
 6                    Mesothelioma and
                      Nonoccupational Exposure to
 7                    Asbestos
     D-12058          Pleural Malignant             167
 8                    Mesothelioma and
                      Nonoccupational Exposure to
 9                    Asbestos in Casale
                      Monferrato, Italy
10   D-12059          Pleural Malignant             168
                      Mesothelioma and
11                    Environmental Asbestos
                      Exposure in Casale
12                    Monferrato, Piedmont,
                      Preliminary Analysis of a
13                    Case Control Study
     D-12043          Mesothelioma in Italy, the    171
14                    Casale Monferrato Model to
                      a National Epidemiologic
15                    Surveillance System
     D-9251           Dr. Madkour article           182
16   D-12106-H        Google map                    186
     D-12106-I        Map                           190
17   D-12106-L        Map                           191
     D-12106-M        Map                           191
18   D-12078          Eternit website - Spanish     194
     D-12078-C        Eternit website - English     194
19   D-12078-B        Eternit printout              195
     D-11007-E        Occupational and 9/11         212
20                    Exposures Risk For Disease
     D-11055          Expert report                 216
21   P-2067           Andrion: Malignant            230
                      Peritoneal Mesothelioma in
22                    a 7-Year-Old Boy With
                      Evidence of a Previous
23                    Exposure to Chrysotile and
                      Tremolite Asbestos
24   P-6342           November 1971 letter                   238
     C-10             Jury question                          252
25   C-11             Jury question                          252
```

```
                                                              Page 5
 1                COURT OFFICER:  Jury's entering.
 2                (Jury enters.)
 3                THE COURT:  Good morning, everyone.  Please
 4     be seated.
 5                Today is March 20, 2019.  This is the trial
 6     in the matter of Ricardo Rimondi versus Johnson &
 7     Johnson, Docket Number 2912-17.
 8                Could I have appearances, please, on behalf
 9     of plaintiffs.
10                MS. COOPER:  Good morning.  Good morning,
11     members of the jury.  Monica Cooper on behalf of the
12     plaintiffs.
13                MR. LINDER:  Good morning.  Mark Linder on
14     behalf of the plaintiffs.
15                MR. COTILLETTA:  Good morning.  Joe
16     Cotilletta on behalf of the plaintiffs.
17                MS. SYMPHORIEN-RESTREPO:  Good morning.
18     Leydyluz Symphorien-Restrepo on behalf of the
19     plaintiffs.
20                THE COURT:  Thank you.
21                On behalf of the defendants, Johnson &
22     Johnson and Johnson & Johnson Consumer Incorporated.
23                MS. BROWN:  Good morning, judge.  Good
24     morning, jurors.  Alli Brown for Johnson & Johnson.
25                MR. DUBIN:  Good morning, everyone.  Morton
```

Page 161

1  A    Yes.
2       Q    And with that we have a number of
3  statisticians on our jury who probably understand this,
4  but what that means is that you can have confidence
5  that the finding was not due to chance, correct?
6  A    It means there's a 95 percent probability that the
7  finding is not related to chance.
8       Q    And what this study found was that living,
9  for example, less than 500 meters from the Eternit
10 asbestos cement factory produced an odds ratio of 27.7,
11 correct?
12 A    Correct.
13      Q    And what that means, if we convert it to a
14 percent, what that means is that living within 500
15 meters of this asbestos cement factory increased the
16 odds of getting mesothelioma by 2,600 percent,
17 correct -- 2,670 percent, correct?
18 A    Try that one more time.
19      Q    What this study says as it relates to living
20 less than 500 meters --
21 A    Your number's just wrong.  If you're going to give
22 a number, it's 2,770.
23      Q    Well, the reason it's 2,670 is because if you
24 have an OR of one that's zero; if you have an OR of two
25 that's 100 percent increase in risk.  So the formula

Page 162

1    actually requires you to minus one before you multiply;
2    right, Dr. Moline?
3    A    I don't usually refer to it in those numbers, but
4    fine.
5         Q    That's the formula for odds ratio?
6    A    If the reference is one, then you would take one
7    away.
8         Q    Right.  So what this finding --
9    A    No.  I'm sorry.  Odds ratio is above.  One is the
10   floor.  So it's the difference above.  But it's --
11   doesn't matter.
12        Q    So if you have one, that's a risk of zero;
13   and if your odds ratio is two, that's 100 percent
14   increase in the risk.  And that's why, when you're
15   trying to convert these numbers to percents, you have
16   to minus one before you multiply.
17             So what that means, as it relates to the
18   finding of less than 500 meters, is that the increased
19   odds of getting mesothelioma if you live less than 500
20   meters from the Eternit asbestos facility was 2,670
21   percent, correct?
22   A    Yes.
23        Q    And, in fact, what these authors found is
24   that there was a statistically significant increased
25   risk all the way up to greater than 2,500 meters from

Page 163

1 this factory, correct?
2 A    Correct.
3      Q    So, for example, between 1500 and 2499
4 meters, the increased odds would have been 2,000,
5 correct?
6 A    Yes.
7      Q    That would mean that living that distance
8 from the factory would have increased the odds or the
9 chance that a person developed mesothelioma by 2,000
10 percent; true?
11 A    Yes.  For those folks living upland they described
12 in the paper.
13     Q    For those folks even living more than 2500
14 meters from the Eternit facility, this study reported
15 an increased odds of getting mesothelioma at 1,000
16 percent, correct?
17 A    Yes.
18     Q    And what the authors then concluded, if we
19 look at the third column, the bottom paragraph, that
20 begins with, "Our present work," Magnani authors
21 concluded that "Our present work confirms the
22 association of environmental asbestos exposure and
23 pleural malignant mesothelioma after careful control
24 for other sources of asbestos exposure; and it suggests
25 that in Casale, environmental exposure caused a greater

Page 164

1  risk than domestic exposure."  Correct?
2  A    Yes.
3       Q    And that is one of the articles that informs
4  this body of literature about environmental asbestos
5  exposure around the Eternit facility in Italy, correct?
6  A    Yes.
7       Q    But you know, because you've testified that
8  you've reviewed them before, that there are, in fact,
9  other publications by Dr. Magnani regarding
10 environmental asbestos exposure, right?
11 A    Dr. Magnani has published other papers.  I don't
12 know what specific document you're referring to.  I'd
13 be happy to look.
14      Q    Let's take a look then, if we could, at
15 another publication by Magnani and his colleagues at
16 D-9254, tab 133.
17           May I approach, your Honor?
18           THE COURT:  Yes.
19 BY MS. BROWN:
20      Q    Dr. Moline, I'm showing you what is another
21 publication by Dr. Magnani.  This one is entitled A
22 Multicentric Study on Malignant Pleural Mesothelioma
23 and Nonoccupational Exposure to Asbestos.
24           Do you see that?
25 A    Yes.

Page 174

1  interview notes of Mr. Rimondi, that you ever asked him
2  that question?
3  A    I don't put every negative question, negative
4  answer in my notes, but I did not make a note of that.
5  It's a typical question that I would ask.
6      Q    Right.  So if we go back to your notes, which
7  are tab 118, and we take a look at your assessment,
8  which is on page 3 of 3, we see the summary of the
9  exposure that you got from Mr. Rimondi during this
10 visit, and what you state under your assessment is
11 that, "This was a 57-year-old Peruvian man who has no
12 occupational exposure to asbestos."  Right?
13 A    Correct.
14     Q    No home renovations, right?
15 A    Correct.
16     Q    But used talcum powder for around 50 years
17 now with malignant mesothelioma of the left pleura,
18 correct?
19 A    Correct.
20     Q    So you did state here that you had inquired
21 and obtained knowledge that he had no occupational
22 exposure, correct?
23 A    Correct.
24     Q    And you did state that you had inquired and
25 believed he had done no home renovations, right?

Page 175

1  A    Or if he had done that were not to expose him to
2  asbestos.
3       Q    And what you didn't state was that he had no
4  environmental exposure from an asbestos factory, right?
5  A    He did not discuss that he had exposure to an
6  asbestos factory.
7       Q    But there's no evidence in these three pages
8  of notes that you ever asked him that question; right,
9  Dr. Moline?
10 A    There is nothing in my notes related to that.
11 That's correct.
12      Q    And at the time that you interviewed
13 Mr. Rimondi in November of 2017, you were familiar with
14 Eternit, correct?
15           MR. LINDER:  Objection.  Vague.
16           THE COURT:  Overruled.
17 A    I was familiar with the fact that that company
18 exists, yes.  And it was -- I was familiar with the
19 Italian papers, yes.
20      Q    And you knew that there were Eternit asbestos
21 factories all over the world, right?
22 A    I know that they had a global reach.  I don't know
23 all the locations of their company -- of their
24 factories.
25      Q    And you did not ask Mr. Rimondi if he lived

1  near the Eternit asbestos cement factory in Lima, Peru,
2  correct?
3          MR. LINDER:  Objection.
4          THE COURT:  Overruled.  You can answer.
5  A   I did not specifically ask.  I was unaware that
6  there was a factory in Peru, and I do not recall him
7  discussing the fact that he lived near any factories in
8  Peru.
9  Q   One of the things you know, Dr. Moline, as an
10 occupational medicine physician is that sometimes
11 people don't always know if they've been exposed to
12 asbestos, right?
13 A   That's correct.
14 Q   And one of the things that you found over the
15 course of your career is that if you just ask somebody
16 were you exposed to asbestos, sometimes they won't
17 know, right?
18 A   They won't know that they're using a product that
19 contains asbestos.  That's correct.
20 Q   Or they won't know that they live a mile away
21 from an asbestos cement factory, right?
22         MR. LINDER:  Objection.
23         THE COURT:  Sustained.
24 BY MS. BROWN:
25 Q   Sometimes people don't know about their

Page 177

1   environmental exposures to asbestos, correct?
2   A    If they had any, that is correct.
3        Q    And so one of the things you found as an
4   environmental medicine and occupational medicine
5   physician is that sometimes you have to do some
6   research on your own to figure out how people were
7   exposed to asbestos, right?
8             MR. LINDER:  Objection.
9             THE COURT:  Sustained.
10  BY MS. BROWN:
11       Q    One of the things you've testified about in
12  the past is that part of your job is sometimes to
13  investigate potential asbestos exposure, correct?
14            MR. LINDER:  Objection.
15            THE COURT:  Overruled.  You can answer.
16  A    In some circumstances where there is no apparent
17  source, that is correct.
18       Q    Right.  So one of the things you've done over
19  the course of your career when trying to figure out the
20  potential exposures that a patient has is to do some
21  research on your own, correct?
22  A    When they do not come in with a defined exposure,
23  yes.
24       Q    And at the time that you issued your report
25  in this case concluding that had Mr. Rimondi not used

1  Mr. Rimondi, there's no evidence in your notes that you
2  asked him if he lived near a factory, correct?
3  A    There's no -- I did not write that he -- that --
4  that is correct.  I didn't write that question down.
5       Q    Is it your testimony that you asked him that
6  question?
7  A    I generally ask a general question.  It's part of
8  my habit to ask people about it.  I don't always write
9  as I'm typing, as I'm interviewing somebody, all the
10 negatives, if they're unaware that they lived near a
11 plant.
12      Q    Do you have an independent recollection of
13 asking Mr. Rimondi if he lived near an asbestos
14 factory?
15 A    It's my general practice to ask individuals that.
16 I don't have a specific recollection of asking
17 Mr. Rimondi and I do recall asking if he lived in a
18 residential area and -- or what he described as a
19 residential area, and he, from the best of my
20 recollection, stated that he did live in a residential
21 area.
22           MS. BROWN:  And, your Honor, may I approach
23 the map, please?
24           THE COURT:  Sure.
25 BY MS. BROWN:

Page 186

1    Q    For the record, we have marked for
2    demonstrative purposes a Google Map.  We have marked it
3    as D-12106-H.
4         And, Dr. Moline, at the time you issued your
5    report in this case that had Mr. Rimondi not used baby
6    powder he would not have gotten mesothelioma, you had
7    his sworn testimony about the addresses in which he
8    lived in Lima, Peru, correct?
9    A    Yes.
10   Q    And so you knew, for example, the address of
11   Mr. Rimondi's grandfather's house where he lived from
12   the time he was born in 1960 to 1969, correct?
13   A    He mentioned the addresses in his testimony.
14   Q    Right.  In his sworn testimony under oath,
15   both in his deposition and in his Interrogatory answers
16   which you had, he identified the address of his
17   grandfather's house where he lived from 1960 to 1969,
18   correct?
19   A    Yes.
20   Q    And you know he also identified in his
21   testimony the elementary school he went to, Luz
22   Casanova, near his grandfather's house, correct?
23   A    I'm sure he did recognize it.  I don't know Lima,
24   Peru.  So he mentioned it.  I don't recall the name.
25   Q    And you also had, at the time you issued your

Page 187

1 report in this case concluding baby powder was the
2 cause of Mr. Rimondi's mesothelioma, you also had the
3 address of his mom's house where he lived from 1969 to
4 1992, with certain short periods of time when he left
5 for things like working in the police department.
6          Do you know that?
7 A    Correct.
8     Q    And one of the things you could have done to
9 do some of the research we talked about earlier and to
10 investigate all of the potential asbestos exposures
11 that Mr. Rimondi had is you could have looked at a map
12 of Lima to see what surrounded the areas where
13 Mr. Rimondi lived, worked and went to school for 32
14 years, correct?
15 A    Could I have done that?
16    Q    Yes.
17 A    It's not part of my typical practice, but I could
18 have done a lot of things.  Yes.
19    Q    Sure.  And if you want to really get to the
20 truth, if you want to really understand all of
21 Mr. Rimondi's potential asbestos exposures, one thing
22 you could have done was look at a map of where he lived
23 and worked for 32 years, right?
24 A    Looking at a map of where he lived and worked for
25 32 years might have not given me any additional

Page 188

1    information except from knowing at one point he lived
2    near a river or he lived in another community.
3         Q    And if you had put that information into
4    Google, what you might have also seen right here in
5    between both of the locations is Eternit, right?
6              MR. LINDER:  Objection.
7              THE COURT:  Overruled.  You can answer.
8    A    If I had known that it was there, yes.
9         Q    And if you would have looked at a Google map
10   and investigated the areas around where Mr. Rimondi
11   lived, Eternit would have caught your eye, right?
12             MR. LINDER:  Objection.
13             THE COURT:  Overruled.
14   A    If I had known it was there, then it might have
15   caught my eye.
16        Q    And the reason --
17   A    But, can I finish?
18        Q    Absolutely.
19   A    I know it is a company in the past, one of the
20   things they have done is used asbestos, but they've
21   done other things, and I don't know anything about what
22   was done in that particular country.
23        Q    Fair enough.  You could have investigated
24   that, right?
25   A    If the factory were still in use, theoretically I

Page 189

1    could.
2        Q   And one of the reasons the Eternit factory on
3    a map in Lima, Peru would have caught your eye in part
4    is based upon some of the studies we reviewed earlier,
5    correct?
6    A    No, not really.  That wouldn't have been the main
7    reason.  I am aware of that company for another
8    purpose, but it's not relevant to today.
9        Q   And one of the things you could have done,
10   Dr. Moline, is you could have used the map to figure
11   out the exact distances between where Mr. Rimondi lived
12   and went to school for 32 years and the Eternit
13   facility, correct?
14   A    I could have -- if I had a skill in cartography,
15   yes.  I'm not a cartographer.  I do not study maps.
16   That was not one of the things that was part of my
17   academic training.
18       Q   And one of the features of Google Maps,
19   though, is that it can give you the distances between
20   two locations.
21           Did you know that?
22           MR. LINDER:  Objection.
23           THE COURT:  Overruled.  You can answer.
24   A    I use Google Maps when I'm looking for driving
25   directions or to, but I'm not particularly facile with

Page 200

CERTIFICATION

I, ANDREA F. NOCKS, C.S.R., License Number 30XI00157300, an Certified Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript to the Best of my knowledge and ability.

*Andrea Nocks CCR CRR*

ANDREA F. NOCKS                            March 20, 2019
CERTIFIED COURT REPORTER                   DATE
MIDDLESEX COUNTY COURTHOUSE